```
 1              IN THE DISTRICT COURT OF CLEVELAND COUNTY
                       STATE OF OKLAHOMA
 2    - - - - - - - - - - - - - - - - - - - - - - -x
      STATE OF OKLAHOMA, ex rel.,
 3    MIKE HUNTER, ATTORNEY GENERAL
      OF OKLAHOMA,
 4
                          Plaintiff,
 5                                        No. CJ-2017-816
          vs.
 6
      (1) PURDUE PHARMA, L.P.,
 7    (2) PURDUE PHARMA, INC.,
      (3) THE PURDUE FREDERICK COMPANY;
 8    (4) TEVA PHARMACEUTICALS USA, INC.;
      (5) CEPHALON, INC.;
 9    (6) JOHNSON & JOHNSON;
      (7) JANSSEN PHARMACEUTICALS , INC.;
10    (8) ORTHO-McNEIL-JANSSEN
      PHARMACEUTICALS, INC. n/k/a
11    JANSSEN PHARMACEUTICALS, INC.;
      (9) JANSSEN PHARMACEUTICA, INC.,
12    n/k/a JANSSEN PHARMACEUTICALS, INC.;
      (10) ALLERGAN, PLC, f/k/a ACTAVIS, PLC,
13    f/k/a ACTAVIS, INC., f/k/a WATSON
      PHARMACEUTICALS, INC.;
14    (11) WATSON LABORATORIES, INC.;
      (12) ACTAVIS LLC; and
15    (13) ACTAVIS PHARMA, INC.;
      f/k/a WATSON PHARMA, INC.;
16
                          Defendants.
17    - - - - - - - - - - - - - - - - - - - - - - -x

18

19            Videotaped deposition of GARY VORSANGER, M.D.,

20    Ph.D., taken pursuant to Notice, was held at the Law

21    Offices of DRINKER BIDDLE & REATH, LLP, 105 College Road

22    East, Princeton, New Jersey, commencing January 17,

23    2019, 9:08 a.m., on the above date, before Amanda

24    McCredo, a Court Reporter and Notary Public in the State

25    of New Jersey.
```

```
 1   A P P E A R A N C E S:

 2   NIX, PATTERSON & ROACH, LLP
                   3600 North Capital of Texas Highway
 3                 Suite 350B
                   Austin, Texas 78746
 4   BY: TREY DUCK, ESQ.
     tduck@nixlaw.com
 5   (512)328-5333
     Attorneys for Plaintiff

 6

 7   LYNN PINKER COX & HURST, LLP
                   2100 Ross Avenue, Suite 2700
 8                 Dallas, Texas 75201
     BY: JERVONNE NEWSOME, ESQ.
 9   jnewsome@lynnllp.com,
     (214)292-3607
10   Attorneys for Purdue Defendants

11

     MORGAN, LEWIS & BOCKIUS, LLP
12                 1701 Market Street
                   Philadelphia, Pennsylvania 19103
13   BY: MARK A. FIORE, ESQ.
     mark.fiore@morganlewis.com
14   (215)963-5000
     Attorneys for Teva, Watson, Cephalon, and Actavis
15   defendants

16

     O'MELVENY & MYERS, LLP
17                 400 South Hope Street
                   18th Floor
18                 Los Angeles, California 90071-2899
     BY: CHARLES LIFLAND, ESQ.
19       VINCENT S. WEISBAND, ESQ.
     clifland@omm.com
20   vweisband@omm.com
     (213)430-6000
21   Attorneys for Johnson & Johnson and Janssen defendants
     and the Witness

22

23   ALSO PRESENT:

24   James Soto - videographer

25   Maria Gomez - Nix, Patterson & Roach, LLP
```

```
 1                       I N D E X

 2    WITNESS

 3    Gary Vorsanger, M.D., Ph.D.

 4                         EXAMINATION BY           PAGE

 5                         Mr. Duck              6, 303

 6                         Mr. Lifland              224

 7

 8                         RULING

 9    PAGE      LINE      QUESTIONING ATTORNEY

10    152       15        Mr. Duck

11

12                         EXHIBITS

13    EXHIBIT                                    PAGE

14    Vorsanger 1   JAN-MS-0214093 through 094      46

15    Vorsanger 2   JAN-MS-02149085 through 086     54

16    Vorsanger 3   JAN-MS-00641019 through 022  65, 301

17    Vorsanger 4   JAN-MS-02102600 through 602     73

18    Vorsanger 5   JAN-MS-02102624 through 626     73

19    Vorsanger 6   JAN-MS-00491920                115

20    Vorsanger 7   JAN-MS-00605509 through 510    122

21    Vorsanger 8   JAN-MS-00337085 through 086    138

22    Vorsanger 9   JAN-MS-02337833 through 835    140

23    Vorsanger 10  JAN-MS-02102667 through 671 155, 299

24    Vorsanger 11  JAN-MS-00314736 through 745    158

25    Vorsanger 12  JAN-MS-02258276                164
```

```
1    Vorsanger 13   JAN-MS-00066073 through 095      167

2    Vorsanger 14   JAN-MS-02132383 through 387      189

3    Vorsanger 15   Highlights of Prescribing        240
                    Information
4
     Vorsanger 16   JAN-MS-02321524                  248
5
     Vorsanger 17   JAN-MS-02305132                  253
6
     Vorsanger 18   JAN-MS-00151777                  270
7
     Vorsanger 19   JAN-MS-02754767                  273
8
     Vorsanger 20   Review Article                   276
9
     Vorsanger 21   Long-term opioid management for  278
10                  chronic noncancer pain (Review)

11   Vorsanger 22   Evaluation of the                286
                    tamper-resistant properties of
12                  tapentadol extended-release
                    tablets: Results of in vitro
13                  laboratory analyses

14   Vorsanger 23   JAN-MS-01489228 through 275      290

15   Vorsanger 24   JAN-MS-00228548                  295

16

17

18

19

20

21

22

23

24

25
```

```
 1          THE VIDEOGRAPHER:  Good morning.  We're on
 2     the record.  The time is 9:08 a.m.  Today is
 3     the 17th day of January, 2019.
 4          We're here at 105 College Road East,
 5     Princeton, New Jersey, for the purpose of
 6     taking the videotape deposition of Dr. Gary
 7     Vorsanger in the matter of the State of
 8     Oklahoma versus Purdue Pharma, LP, et al.
 9          The videographer is James Soto, the court
10     reporter is Amanda McCredo, both with U.S.
11     Legal Support.
12          Counsel please identify yourselves for the
13     record.
14          MR. DUCK:  Trey Duck, from Nix, Patterson,
15     and Maria Gomez, from Nix, Patterson, on behalf
16     of the State of Oklahoma.
17          MR. LIFLAND:  Charles Lifland, O'Melveny &
18     Myers, for Johnson & Johnson and Janssen
19     Pharmaceuticals.
20          MR. WEISBAND:  Vincent Weisband, O'Melveny
21     & Myers, for Johnson & Johnson and Janssen
22     Pharmaceuticals.
23          MR. FIORE:  Mark Fiore, Morgan, Lewis &
24     Bockius, on behalf of the Teva defendants.
25          MS. NEWSOME:  Jervonne Newsome, with Lynn
```

```
 1        Pinker Cox & Hurst, on behalf of the Purdue

 2        defendants.

 3              THE VIDEOGRAPHER:  Thank you.

 4              Please administer the oath.

 5  GARY VORSANGER, the witness herein, after having been

 6              first duly sworn by a Notary Public of the

 7              State of New Jersey, was examined and

 8              testified as follows:

 9                            * * *

10              MR. LIFLAND:  So, we -- before we went on

11        the record, we discussed a stipulation

12        regarding objections.  And the stipulation is

13        that, my objections will also apply for the

14        other parties here, Purdue and Teva, but not

15        vice versa.  If they object and I want to

16        object, I will make that objection on the

17        record separately.

18              MR. DUCK:  Great.  Thank you.

19  EXAMINATION BY

20  MR. DUCK:

21        Q    Good morning, Dr. Vorsanger.

22        A    Good morning.

23        Q    How are you doing?

24        A    I'm doing okay, thanks.

25        Q    Can you please introduce yourself to the
```

```
 1   jury?

 2        A    Sure.  My name is Gary Vorsanger.

 3             You want my background, Counsel?

 4        Q    That would be great.  Please.

 5        A    Okay.  By way of my training, I'm an M.D.,

 6   Ph.D.  I received my Ph.D. before I went to medical

 7   school.  I received my Ph.D. from the City

 8   University of New York and went to medical school at

 9   the Mount Sinai School of Medicine, also in New

10   York.

11             After completing my medical training, I

12   went on to do an internship and a residency at

13   Montefiore Hospital & Medical Center in New York.

14   That culminated in me getting a board certification

15   in internal medicine.

16             After my training in internal medicine, I

17   went up to Massachusetts, up in Boston, and I did a

18   residency at the Massachusetts General Hospital in

19   anesthesiology.  I completed that residency, and

20   then I was invited to come on as a staff

21   anesthesiologist at the Massachusetts General

22   Hospital.  I was there for several years, and then I

23   transitioned to a private practice in the anesthesia

24   setting.  I did that for several years, and then I

25   went to the pharmaceutical industry.
```

 1              My positions --

 2              Would you -- do you want me to continue?

 3      Q     Please.  Let's -- let me ask you a question

 4    to maybe slow things down a little bit.

 5      A     Sorry.

 6      Q     No, that's okay.  You're, you're giving us

 7    a good background, which is great.  You may speak a

 8    little quickly, and I'm just looking out for Amanda

 9    here.

10      A     Right.  I'm from New York, sorry.

11      Q     No problem.

12              So, you mentioned that you went into the

13    pharmaceutical industry.

14              I would like to hear about where you first

15    started in the pharmaceutical industry.

16      A     Sure.  So, my first position in the

17    pharmaceutical industry was at Astra USA -- that was

18    before AstraZeneca -- and I was a medical advisor

19    there.

20      Q     And what were your responsibilities as a

21    medical advisor at Astra?

22      A     So, I provided expertise to the people at

23    Astra.  They were developing a local anesthetic, a

24    medication, like Novocaine.  And because of my

25    background as an anesthesiologist, I was able to

 1  provide -- and based on my real clinical

 2  experience -- on the types of questions that

 3  clinicians might have on how to use a medication

 4  safe and effectively.  So, that was a good part of

 5  my role.

 6         I also worked with their safety group for

 7  questions that may have come in from the field, as

 8  well.

 9     Q     Where was the first pharmaceutical industry

10  job you had where you worked with opioid analgesics?

11     A     So, I might have done a little bit of

12  opioid analgesia work at Astra, because Astra at

13  that time did market morphine.  But most of the work

14  that I did around opioid analgesia was the -- was

15  when I was at Janssen.

16     Q     When did you start working at Janssen?

17     A     So, I started working at Janssen in October

18  of 2000.

19     Q     All right.  And you currently work at

20  Janssen, right?

21     A     No.  I actually retired from the company in

22  June of 2017.

23     Q     Congratulations.

24     A     Thank you.

25     Q     So, you worked at Janssen from 2000 until

1    2017?

2         A    That's correct.

3         Q    And did you hold various positions at

4    Janssen during that time or the same position the

5    whole time?

6         A    So, there were different names of the

7    companies, as -- from internal reorganizations.  The

8    work that I did was really in the work with the

9    opioid analgesics.  I started as a medical director.

10   I was there for a period of -- I mean, I worked at

11   that job for several years.  And, again, the dates

12   are approximate.  And then I went on to become a

13   senior medical director.  And I held the position of

14   senior medical director for quite a while, until I

15   had retired.

16        At the -- yeah, just to answer your

17   question.  I had -- when I -- when the Nucynta --

18   the U.S. rights for Nucynta were sold, I had other

19   opportunities of things that I worked at at the

20   company.  I didn't do opioid analgesia afterwards,

21   at that point, for the most part.

22        Q    And that's because Janssen no longer had

23   any opioid analgesics --

24        A    That they were actively marketing.

25        Q    At what point in time did you move from a

1    medical director to a senior medical director?

2       A    It was after several years.  I don't know

3    exactly how long that would be.  It was a couple of

4    years.

5       Q    Okay.  And the role of senior medical

6    director is the role you were in when you retired?

7       A    No.  Actually, I was senior medical

8    director in actually therapeutic area later for

9    analgesia, when I worked on Nucynta.

10           Then I transitioned to the infectious

11   disease group, where I was a senior medical

12   director, but I was in the infectious disease group,

13   for about a year and a half.

14           In my last six months in the company, I

15   worked on special projects.  And at that point, I

16   was a medical director.

17      Q    How many medical directors were there in

18   the opioid analgesia group when you started in 2000?

19      A    Just one.

20      Q    Just you?

21      A    Yes.

22      Q    How many senior medical directors were

23   there when you started for the opioid analgesia

24   group?

25      A    There were none.

```
 1        Q    You were the first?

 2        A    I was the first medical director.  And my

 3   supervisor -- and I don't remember what his title

 4   was.  He may have been a group area lead or

 5   something like that, but...

 6        Q    Prior to hiring you to be the medical

 7   director for the opioid analgesia products at

 8   Janssen in 2000, was there someone else in that

 9   role?

10        A    So, the medical affairs group really began

11   in 2000.  And at that point, the analgesia group was

12   begun.  My supervisor, at that time, Dr. Bruce

13   Moskovitz, hired me based on my background and

14   expertise.

15             And so, as I already testified, I was the

16   first and only medical director at that point.

17        Q    As a medical director at Janssen working

18   with opioid analgesics, you worked with Duragesic

19   and Nucynta?

20        A    Yes.

21        Q    What other opioids did you work with?

22        A    Tramadol.

23        Q    Tramadol.

24             All right.  And when did Duragesic launch?

25        A    So, Duragesic first came to the U.S.
```

 1   market, I believe, in 1990.  So, the product had

 2   been on the market for approximately 10 years before

 3   I joined the company --

 4       Q    And during those --

 5       A    -- in the U.S.  Yeah.

 6       Q    And during those 10 years, there was no

 7   medical affairs group at Janssen?

 8       A    So, a lot of those activities were run by

 9   our R&D group.  And the company had made a decision

10   that they were going to develop a med affairs group

11   to engage in the type of activities that ultimately

12   became the responsibility of medical affairs.

13           So, the work was done, but it was done

14   really by individuals in the R&D group.

15       Q    By "R&D," you mean "research and

16   development"?

17       A    Yes, that's correct.

18       Q    By "med affairs," you mean "medical

19   affairs"?

20       A    Correct.

21       Q    Who was responsible in the R&D group for

22   Duragesic during this 10-year period of time?

23       A    I don't know.  Because as I mentioned, that

24   had predated my arrival at Janssen; so, I don't

25   know.

1      Q    Do you know whose decision it was to create

2   a medical affairs group at Janssen?

3      A    I don't.

4      Q    You mentioned that Bruce Moskovitz hired

5   you?

6      A    Yes, that's correct.

7      Q    What was his position when he hired you?

8      A    So, I don't recall the title at that point.

9   It would have been something like -- and again, this

10  is -- this is from memory, and I don't have an exact

11  thing that I can give you.

12          So, recollection would be something like a

13  group director or something like that.  But he led

14  the group.

15     Q    The medical affairs group?

16     A    The medical affairs group for analgesia.

17          There were other medical affairs groups, as

18  well, for different therapeutic areas.

19     Q    Okay.  You mentioned tramadol.

20          Did you work with Ultram?

21     A    Yes.  So, the active ingredient in Ultram

22  is tramadol.

23     Q    Did you work with any other tramadol

24  products?

25     A    I did.  I worked with Ulracet, which was

 1    tramadol and acetaminophen; and the extended-release

 2    tramadol called Ultram ER.

 3        Q    And can you please tell the jury what the

 4    active pharmaceutical ingredient in Nucynta is?

 5        A    So, Nucynta -- the active pharmaceutical

 6    ingredient in Nucynta is tapentadol.

 7        Q    Tapentadol.

 8             And if I use the word -- or the

 9    abbreviation "API," you understand that means

10    "active pharmaceutical ingredient"?

11        A    Yes.

12        Q    Okay.  So, can you please tell the jury

13    what the API for Duragesic is?

14        A    So, the active opioid in Duragesic is a

15    drug called fentanyl.

16        Q    So, when you were working in the medical

17    affairs group for analgesia, you were working with

18    opioids containing the following APIs:  Fentanyl,

19    tramadol, and tapentadol?

20        A    Correct.

21        Q    Were there any others?

22        A    Not to the best of my recollection.

23        Q    Are any of these APIs synthetic APIs?

24        A    Yes, they are.

25        Q    Which ones?

 1      A     Tapentadol is a synthetic opioid, and

 2   tramadol is a synthetic opioid.

 3      Q     And fentanyl is a semisynthetic opioid?

 4      A     That's correct.

 5      Q     Has Janssen ever had, to your knowledge, an

 6   opioid that was neither synthetic nor semisynthetic?

 7      A     I don't know.  I don't know.

 8            And your question about fentanyl, I believe

 9   it's semisynthetic, but I would need to check on

10   that.

11      Q     It might be synthetic?

12      A     It might be synthetic.  Actually, my

13   recollection is that it very well might be

14   synthetic.

15      Q     So, fentanyl, tramadol, and tapentadol are

16   all synthetic opioids?

17      A     Some degree of synthetic, yes.

18      Q     What do you mean by that?

19      A     Well, they either have to be synthetic or

20   semisynthetic.

21      Q     Okay.  Is there a reason why Janssen, to

22   your knowledge, only manufactured and marketed

23   synthetic opioids?

24      A     I don't know.

25      Q     All opioids, both nonsynthetic, synthetic,

```
 1   and semisynthetic --

 2        A    I didn't hear the last thing, Counsel.

 3        Q    Pardon me?

 4        A    I didn't hear what you said, the last

 5   thing.

 6        Q    Pardon me.  Let me start over.

 7        A    Sure.

 8        Q    All opioids, whether nonsynthetic,

 9   synthetic, semisynthetic, they're all treated the

10   same as controlled substances, right?

11        A    So, the medications that I worked on, which

12   were Duragesic and tapentadol, were controlled

13   substances of the C2 category.  Tramadol initially

14   was not scheduled, and later on it was scheduled.

15        Q    And what schedule was it placed on?

16        A    I would have to check.  I want to think --

17   I would say it was C4 for tramadol.  The other two

18   were C2, from the...

19        Q    Is it your position that synthetic opioids

20   are in any way safer than other types of opioids?

21        A    So, the synthetic opioids carry the same

22   risks as the natural occurring opioids, such as

23   morphine.

24        Q    Is it fair to say that -- new question.

25   Thank you.
```

```
 1            While you were working in the med affairs

 2   group, did you work on any non-opioid-containing

 3   products?

 4       A    Just so I can clarify the question.  You

 5   mean when I was in the analgesia group?

 6       Q    Yes.

 7       A    Is that your question?

 8            Because I did testify that I worked in the

 9   infectious disease group.

10       Q    Fair enough.  Let me restate.

11            While you were working in the medical

12   affairs group for analgesia --

13       A    Yes.

14       Q    -- did you work on any pharmaceuticals that

15   did not contain an opioid?

16       A    Not directly.  I provided consultation to

17   the research and development group for another

18   medication that was not an opioid.  It was a

19   biologic, but that was a compound that was

20   eventually abandoned by the company.

21       Q    What was its intended use?  What was it --

22       A    It was going to be used -- I believe the

23   indication was for chronic pain, but I worked on it

24   very peripherally and just provided some guidance to

25   them based on my background and expertise.
```

```
 1              But those activities were run predominantly

 2    by the research and development group, the R&D

 3    group.

 4        Q    Does Janssen manufacture any

 5    pharmaceuticals meant to treat chronic pain that are

 6    not opioids?

 7        A    Not that I'm aware of.

 8        Q    But Janssen has researched and attempted to

 9    develop non-opioid, chronic pain medications?

10        A    There was one medication that they looked

11    at.

12        Q    What was it called?

13        A    I don't remember the name now.

14        Q    Do you know why it was abandoned?

15        A    I don't.

16        Q    Who would know that?

17        A    I guess the people in the R&D group who

18    would have worked on it.

19        Q    And that's the R&D group that existed while

20    you were an employee in the medical affairs group?

21        A    That's correct.

22        Q    And the R&D group no longer performed the

23    medical affairs function it had performed before you

24    arrived at Janssen?

25        A    Right.  So, just to clarify.  The
```

1    activities from medical affairs that I talked about

2    in the analgesic group were handed over to the

3    medical affairs group in 2000.

4         Q    But you still worked with the R&D group?

5         A    Yes, I did.  I provided consultation to

6    them, as requested.

7         Q    You also provided consultation to other

8    departments or groups at Janssen, correct?

9         A    Yes.

10        Q    What were those groups?

11        A    So, I provided support -- or, actually,

12   consultation to our safety group, also called our

13   pharmacovigilance group.  I worked with our outcomes

14   research group.  I worked with our regulatory

15   affairs group.  These are, again, on issues related

16   to analgesia, which was my primary function.

17             Those were a lot of the groups that I

18   worked with.

19        Q    You also worked with marketing, correct?

20        A    Yes, that's correct, I did.

21        Q    And with sales?

22        A    Not with sales as much, but with marketing

23   in the capacity -- in my capacity working on the

24   promotional review committee and other and --

25   interactions, as well.

 1      Q    Can you please explain to the jury what the

 2   outcomes research group at Janssen does?

 3      A    Yes.  So, the outcomes research group are a

 4   group of individuals trained to analyze data from a

 5   variety of different sources.  And some of the data

 6   sources that they may work on may be databases,

 7   looking at information which would be of interest

 8   clinically.

 9           So, for example, they may look at the

10   demographics of patients on certain types of

11   medications, how those medications would be used.

12   They would also look at data quality of life-type

13   data that would come out of our clinical trials, et

14   cetera.

15           So, that would be some -- not all of it,

16   but some of the information that they would work on.

17      Q    And the outcomes research group at Janssen

18   also supports the marketing department?

19      A    The outcomes research group generated data

20   that we felt was clinically valuable and needed.

21   Where we got feedback on our compounds is the type

22   of information they would have.

23           I'm really -- need to get more

24   clarification, Counselor, from what you mean by

25   "supports."

```
 1        Q    Sure.  Well, I was using your word.  That

 2   was a word, actually --

 3        A    Sure.

 4        Q    -- that I picked up from you.

 5        A    Okay.

 6        Q    But my question is:  The data generated by

 7   the outcomes research group could be used by

 8   Janssen, and was used by Janssen, in promotional

 9   material?

10        A    So, actually, not very much, if at all.

11             So, the nature of the material that was --

12   is included for promotional materials was dictated

13   by quality of evidence or a level of evidence from

14   FDA.

15             So, the data from our controlled clinical

16   trials, a -- placebo-controlled trials, are data

17   that we would have predominantly used in most, in

18   our promotional materials.  And that would have been

19   the materials that a sales representative would have

20   been able -- again, these would have to be

21   company-approved materials.  So, there would have

22   been information that would have been reviewed by a

23   committee, the promotional review committee.  And

24   the people on the committee were a physician.

25             It would have been -- we had legal
```

```
 1    representation.  We had somebody from regulatory

 2    affairs.  We had somebody from our medical

 3    information group.  And they would review the

 4    information to ensure it was fair balanced.

 5            So, that's the type of information that

 6    would be used.  It wasn't directly necessarily going

 7    out from outcomes research to marketing.  It would

 8    have to go through a rigorous review process at the

 9    company.

10        Q    And through that process, ultimately, the

11    research from outcomes research could make its way

12    into promotional material?

13        A    My recollection was that very little, if

14    any, of it actually did.  There were many pieces

15    that were reviewed.  So, I would have to qualify my

16    answers, as I've just done.

17            To the best of my recollection, that type

18    of data did not find its way, for the most part,

19    into promotional materials.  It would have been

20    really more from our clinical trials.

21        Q    Why not?

22        A    Because FDA defines the level of evidence

23    that they say is appropriate to be used.  And

24    those -- their level of evidence that they define

25    would be placebo-controlled trials.
```

 1      Q    And the FDA regulates the marketed --

 2   excuse me, new question.

 3          The FDA regulates the branded promotional

 4   material that Janssen generates, right?

 5      A    That companies use, yes.

 6      Q    Including Janssen?

 7      A    Yes.

 8      Q    And the FDA does not regulate what's known

 9   as nonbranded marketing, right?

10      A    I would need to check on that, to be

11   honest.

12      Q    Okay.  You're not familiar with that?

13      A    I don't know what the current state of the

14   art is.  I had retired, as I mentioned, in 2017; so,

15   I don't know what current standards are from the FDA

16   around those materials.

17      Q    During your time at Janssen, the FDA did

18   not regulate nonbranded promotional material,

19   correct?

20      A    That was my understanding.

21      Q    Is the work of the safety or

22   pharmacovigilance group at Janssen used in

23   promotional material?

24      A    I'm not sure exactly what you mean by that

25   question.  Could you clarify a little bit for me?

1      Q     Sure.  Let's break it down.

2            What did the safety or pharmacovigilance

3  group at Janssen do?

4      A     Right.  So, they would have analyzed data

5  that would have come in from -- either from

6  consumers or from healthcare professionals and look

7  and analyze that type of data.

8            They ultimately -- we had a -- we have a

9  safety database called SCEPTRE, and they look at

10  adverse events coming in from there, as well as

11  adverse events coming in from FDA.  There is an FDA

12  database.

13           I don't know whether the pharmacovigilance

14  group would have had an opportunity to look at the

15  safety data from our clinical trials.  I suspect

16  that they do.

17           And those data actually would then be

18  reviewed with FDA, and those -- that type of

19  information, if FDA approved from our controlled

20  clinical trials, would find its way in the

21  promotional materials.

22           Hence is why I asked for the clarification

23  of the question.

24      Q     Well, let's talk about the

25  pharmacovigilance group.

```
 1              You mentioned SCEPTRE, right?

 2       A     That's correct.

 3       Q     Did the pharmacovigilance group have access

 4   to RADARS?

 5       A     Yes, they did.

 6       Q     Did they have access to DAWN?

 7       A     I believe that they did.

 8       Q     Okay.  And they reviewed the data within

 9   those various databases or the data generated from

10   them?

11       A     Yes.

12       Q     Did any of their work product from such

13   reviews ever make its way into promotional material?

14       A     So, the DAWN data did find its way into one

15   piece of promotional materials, and we heard about

16   that from the FDA.  We promptly took that out and

17   contacted healthcare providers that we were told

18   that we needed to take that out.

19              What was the -- I'm sorry, what was the

20   other part of your question?

21       Q     Let's follow up on that right there.

22              Janssen received a warning letter from the

23   FDA?

24       A     That is correct.

25       Q     About DAWN data?
```

```
 1       A    That's correct.

 2       Q    And the FDA found that, in its view,

 3   Janssen had used DAWN data to suggest that Duragesic

 4   was safer than other opioids, right?

 5       A    I don't believe that that was the claim.

 6       Q    Okay.  What is your understanding?

 7       A    My understanding was that there was a

 8   mention of data from DAWN in the promotional piece.

 9       Q    And that's it?

10       A    Yes.  They were talking about the mention.

11   I don't believe that comparative statements relative

12   to other opioids were done.  That's my recollection.

13       Q    Your understanding is that you -- Janssen

14   received a warning letter from the FDA simply

15   because it mentioned DAWN data in promotional

16   pieces?

17       A    No.  I think my understanding is that FDA

18   commented on the fact that they believe that the

19   DAWN data was not of a sufficient level of evidence

20   to be placed in a promotional materials.  We did not

21   agree.

22       Q    But you would agree that the DAWN data used

23   in the promotional pieces were used to portray

24   Duragesic in a positive light?

25       A    We believed -- and my recollection was that
```

 1   there was interest at the time of understanding

 2   information that could be used to look at mentions

 3   of abuse, especially for a population coming into an

 4   emergency room setting, which is where DAWN was

 5   done.

 6       Q    Did Janssen, during your time there, ever

 7   use any safety data from DAWN, RADARS, or SCEPTRE

 8   that portrayed Duragesic in a negative light?

 9       A    We didn't have data, that I was aware of.

10            And I developed the active surveillance

11   methodology that showed low mentions -- that showed

12   significant issues with abuse.

13            In fact, to my analysis -- and my team set

14   up the active surveillance programs, to answer your

15   question.  And consistently, both for tapentadol and

16   for Duragesic, really looking at it from, from the

17   time that I was monitoring it, from the time I got

18   to the company, but even looking back beyond that,

19   there were low mentions of abuse for those

20   compounds.

21            So, we didn't see the type of safety signal

22   that I think you're trying to ask me about, if I'm

23   understanding your question correctly.

24       Q    And the FDA found that one of the problems

25   with DAWN data is that it may not accurately capture

1    the safety hazards with particular drugs, right?

2         A    As I had testified already, the FDA had

3    indicated that the level of evidence that would be

4    required to be in promotional material was not

5    information that was in DAWN.

6              We thought it was important to put it in,

7    because we had heard from experts around abuse that

8    this was important data, and we thought it was

9    important to share that with clinicians.

10             Parenthetically, in our risk management

11   program, subsequently, FDA asked us to put DAWN data

12   in.  So, they must have thought the data was good

13   enough to be a part -- and collected as part of the

14   risk management program.

15        Q    How many studies did Janssen conduct

16   involving its opioids that were never published or

17   released to the public?

18        A    None.

19        Q    Every single one of the studies that

20   Janssen performed related to its opioids was either

21   published or otherwise disclosed to the public?

22        A    So, to the best of my understanding, all of

23   the opioid analgesic studies, there was an attempt

24   to publish, to answer your question, to try and get

25   it into the public domain.

```
 1            It may have been in a journal article, or

 2       it may have been presented in a professional meeting

 3       as an abstract or a post or...

 4          Q    But there were none that were never either

 5       published or presented?

 6          A    For the studies that I was aware of, my

 7       recollection was -- and the studies that I was also

 8       responsible for -- those studies were -- saw the

 9       light of day in the public domain, in some fashion,

10       as I mentioned.

11          Q    And you were involved in -- new question.

12            You just said you were responsible for some

13       studies?

14          A    Correct.

15          Q    And you helped to create or craft what

16       those studies were intended to study?

17          A    Not completely.

18          Q    Okay.  Explain that, please.

19          A    Yeah.  So, there were studies that were

20       ongoing before I had gotten to the company.

21          Q    Understood.

22          A    Yeah.

23          Q    Once you were at the company, any new study

24       that you were involved in and responsible for, you

25       could decide what that study was intended to
```

 1   research, right?

 2       A    I didn't hear the last part, I'm sorry.

 3       Q    You were involved in determining what each

 4   study was intended to research?

 5       A    I was part of a team that made that

 6   decision.  It was not a decision made unilaterally

 7   by me.

 8       Q    And by "part of a team," you mean a team of

 9   other Janssen employees?

10       A    Yes.

11            And there would have been feedback from

12   some of the external experts that -- who have -- who

13   would provide some information to us and the types

14   of information that people thought would be

15   important to do.

16       Q    And Janssen sells its pharmaceutical -- new

17   question.

18            Janssen sells its opioids with the intent

19   of making a profit, right?

20       A    Janssen markets its opioids for the idea

21   that we want to make sure that the right patients

22   get the right medications to treat their pain and

23   that prescribers use the medications as prescribed

24   to ensure that they're used safe and effectively.

25       Q    A couple of things in there.

```
 1              First, I used the word "sell," you used the

 2      word "market."

 3              Are you using those words synonymously?

 4      A     Let me clarify my statement.

 5              Janssen's intent is to ensure that its

 6      products are used as directed per package insert and

 7      that individuals are using the product

 8      appropriately.

 9      Q     All right.  Janssen is a for-profit

10      company, correct?

11      A     Yes.

12      Q     Is Janssen a publicly traded company?

13      A     Yes.

14      Q     Janssen has a duty to its shareholders,

15      correct?

16      A     Yes, it does.

17      Q     And Janssen develops, manufactures, and

18      sells pharmaceuticals in order to make a profit?

19      A     Janssen has a duty to its shareholders.

20              And to follow up on your comment,

21      Counselor, if I may, Janssen also operates under the

22      J&J credo.  And the credo sets the business ethics

23      forward on how the company operates.  The duty to

24      their shareholders is certainly part of the credo,

25      and it's actually the last portion of the credo.
```

```
 1      Q    It's number four, right?

 2      A    That's correct.

 3           The first one is the responsibility -- I'm

 4  paraphrasing -- is responsibility to physicians and

 5  nurses, to mothers and fathers, and to other -- and

 6  to patients.

 7           So, we recognize that we have a duty to

 8  shareholders, but we conduct our business in an

 9  ethical manner and ensure that our products are used

10  safely and effectively.

11      Q    If Janssen were not profitable, it couldn't

12  exist for very long, could it?

13      A    Correct.  What we were always taught was,

14  if you take care of the first three portions of the

15  credo, the fourth one takes care of itself.

16           So, if you work to take care of patients

17  properly, you take care of the environment, you

18  take -- make sure the employees are well treated,

19  and all of those things are good business practices

20  and translate into a profit.

21           And then protecting our patients is our

22  first responsibility.

23      Q    Your testimony is that Janssen has done all

24  of those things?

25      A    Yes, it has.
```

 1        Q    Okay.  You are also aware that people have

 2   died from taking Janssen's opioids?

 3        A    I am aware of the fact that there are

 4   overdoses that take place.

 5             I'm aware that we have worked with

 6   regulatory authorities, through my time at Janssen,

 7   to ensure that we had appropriate product labeling

 8   and that the drugs were used as intended in the

 9   patient populations for whom they were intended.

10             But there are instances where patients

11   died.

12             Now, some of the deaths that you're

13   referring to may have been individuals who also had

14   co-morbid conditions.  So, for example, the deaths

15   associated with people who were end-stage cancer

16   patients, those patients may have been on the

17   Duragesic patch and died, as well.

18             So, it's -- while it's true that there were

19   deaths, one would need to look and see what was

20   overdose; and one may have been due to coexisting

21   medical conditions, as well.

22        Q    So, you are aware that there is currently

23   an opioid crisis in this country, right?

24        A    Yes.

25        Q    All right.  Are you aware that there is an

```
 1   opioid crisis in the state of Oklahoma?

 2       A    I -- I'm not specific around the crisis in

 3   Oklahoma, but I'm aware of the opioid crisis in the

 4   United States.

 5       Q    And the opioid crisis is a crisis of

 6   addiction, right?

 7       A    So, my understanding is the crisis of

 8   substance abuse.  And I don't know if it's a crisis

 9   of addiction.  I'd have to read more and think more

10   about that.

11            But certainly of substance abuse, I'm aware

12   of that.

13       Q    Okay.  So, the opioid crisis is a crisis of

14   substance abuse, right?

15       A    Yes.

16       Q    It's a crisis of overdose, right?

17       A    Yes.

18       Q    It is a crisis that has upended the lives

19   of many Americans, right?

20       A    Yes.

21       Q    It's a crisis that has been very expensive

22   for various stakeholders, right?

23       A    I assume so.

24       Q    Okay.

25            MR. DUCK:  Okay.  Let's take a quick break.
```

 1          THE VIDEOGRAPHER:  We're off, 9:41.

 2                    (Recess taken.)

 3          THE VIDEOGRAPHER:  Back on, 9:50.

 4      Q    When you were working at Janssen,

 5  Dr. Vorsanger, what work did you do to help address

 6  the opioid crisis?

 7      A    So --

 8          MR. LIFLAND:  Object to the form of the

 9       question.

10      A    Could you clarify a little bit what you

11  mean by that for me?

12      Q    Janssen didn't want this crisis to occur,

13  right?

14      A    We want to make sure that our patients were

15  receiving our medications in a safe and effective

16  manner.

17      Q    And this crisis shouldn't have occurred,

18  should it?

19      A    I can't comment on what happened with the

20  crisis because I don't know what the causes of the

21  crisis are.

22      Q    Well, surely Janssen undertook efforts to

23  try to reverse the opioid crisis?

24      A    Janssen ensured that its products were

25  being used in a safe and effective manner.

```
 1            And to answer your question about what
 2   Janssen did to monitor, we had surveillance
 3   methodologies that went on for our pharmacovigilance
 4   group, our safety group, and those have been going
 5   on since the product came to market in the U.S.
 6            In addition to that, I started what we
 7   called active surveillance programs to monitor, as
 8   well.  And I can go into detail, if you'd like to me
 9   [sic], about those, as well.
10       Q    Yeah.  So, that brings up a good point.
11            Monitoring is a passive task, right?
12       A    Well, sir, there are, there are two -- we
13   believe -- and we have defined two types of
14   monitoring.
15       Q    One is active, and one is passive?
16       A    That's correct, yes.
17       Q    Okay.  So, how long did Janssen engage in
18   passive monitoring of abuse of its opioid products?
19       A    So, what we would call passive
20   monitoring -- and to ensure -- so, everybody
21   understands what I mean by that, we mean by the work
22   that would have been done by a pharmacovigilance
23   group.
24            I know that's the term that's used, but
25   it's important for people who maybe don't work in
```

```
 1   the area, in my mind, to understand that it's really

 2   not passive, necessarily.  It's passive in the

 3   nature of how the information comes in.

 4           It comes in from consumers; it comes in

 5   from healthcare professionals and other sources, as

 6   well.  And that information is analyzed through our

 7   pharmacovigilance group.  They also look at journal

 8   articles that are published, as well.

 9           The other type is active surveillance, and

10   those are methodologies that I had helped to

11   institute in the company fairly early on from when I

12   started.

13           You recall, I testified that I started in

14   2000.

15       Q    Can you give us a year?

16       A    The dates are approximate.

17           I started looking at how we could begin to

18   monitor our opioids based on the current

19   methodology.

20           So, in the early 2000 -- and again, dates

21   are approximate, as I just mentioned -- we worked

22   with learned individuals who know about abuse,

23   people like -- groups like Bensinger Dupont, PDRC,

24   and other companies, as well, to get an

25   understanding of what they had -- you know, what
```

 1   they knew about.  In those days, it was just

 2   Duragesic, our transdermal fentanyl patch.  And

 3   again, that continued in addition to what we

 4   described as the passive surveillance.

 5            Later on, when RADARS became available --

 6   and I would think that was in the timeframe of about

 7   2005, 2006 -- and again, the dates are

 8   approximate -- Janssen was a -- started and took and

 9   was a subscriber to the RADARS program, as well.

10            When the RADARS program took place, not

11   only did we put fentanyl into that program -- and my

12   recollection, Counselor, was that that was

13   introduced even before we were required to do so by

14   the FDA.

15            But in addition to --

16       Q    Required to do what by the FDA?

17       A    To do surveillance activities of that

18   nature by the FDA.

19       Q    When did the FDA start requiring Janssen to

20   start doing surveillance?

21       A    Later on -- it might have been around '05

22   or '06, but we had that in plan -- we had that in --

23   plans to do that anyway.

24            We also included the tramadol, which we

25   were not required to monitor.  We rolled that from

 1   the independent steering committee from tramadol.

 2           And later on, what I did, as part of my

 3   responsibilities, as I built out the program, was, I

 4   had asked that RADARS give me a background snapshot

 5   of abuse before the tapentadol immediate release --

 6   that's Nucynta -- actually even came into the U.S.

 7   marketplace.

 8           Because we were bringing in -- other opioid

 9   analgesic in, we wanted to make sure that we

10   understand what the situation was.

11           So, those were done, again, a bit -- if I

12   could describe it as a bit above and beyond what we

13   were asked to do.

14      Q    What does "RADAR" stand for?

15      A    People ask me, and I'm embarrassed to tell

16   you that I don't know.  We can look it up.  It's,

17   it's an acronym for something, and I don't remember

18   what it is.

19      Q    RADARS is not public information, right?

20      A    So, I haven't been associated with RADARS

21   for quite a while.  RADARS does have an annual

22   meeting, where some of the information may be

23   available to the people invited from the public to

24   do it.

25           But the information around the individual

 1   branded compounds was not public information.  That

 2   was information provided to the pharmaceutical -- to

 3   the subscribers.

 4       Q    And Janssen, while you were there,

 5   considered the RADARS data related to its opioid

 6   products to be confidential?

 7       A    In fact, I had the -- in fact, I had the

 8   idea that we think -- we thought it was important to

 9   share our data with people.  We thought that this

10   was important information, and because it wasn't

11   widely available.

12          So, one of my publications -- and again,

13   I'm paraphrasing on the title -- was 31 months of --

14   that was for the first 31 months of information

15   around abuse of tapentadol.  Again, it's Nucynta.

16   That was published.

17          So, we made an effort to try and share

18   RADARS data so that it would be publicly available

19   to people.

20       Q    Janssen pays a lot of money for -- while

21   you were there, Janssen paid a lot of money for

22   RADARS data, right?

23       A    Janssen felt it was important to monitor

24   our opioids, as we discussed.  So, there was a

25   subscriber fee that the company paid.

 1     Q    Over a million dollars a year?

 2     A    I don't know the precise amount, but it

 3  was -- it's somewhere around there.

 4     Q    Over $100,000 a month, right?

 5     A    Again, my recollection was about a million,

 6  Counselor, but it certainly could have been more.

 7     Q    So, "RADARS" stands for "Researched Abuse,

 8  Diversion and Addiction-Related Surveillance"

 9  System, correct?

10     A    That sounds correct.

11     Q    How long did Janssen subscribe to RADARS?

12     A    I can only comment on what I know.  We had

13  started subscription when it became available for

14  the opioids, as I've described.

15          When the U.S. rights for tapentadol were

16  sold to another company -- and we didn't continue

17  that with tapentadol.  And I was not responsible for

18  Duragesic after about 2005 or 2006, when the product

19  went off-patent.  So, I -- there were other

20  individuals at the company doing that.  So, they may

21  have continued the monitoring.

22          So, I'm unable to answer the question of

23  how long each of the compounds had been monitored by

24  RADARS.

25     Q    The medical affairs group no longer worked

January 17, 2019                                       43

1   on Duragesic after it went off-patent?

2       A    There was a different group, a different

3   medical affairs group at Janssen that worked on

4   Duragesic.

5       Q    Is there a generic medical affairs group

6   and a branded medical affairs group?

7       A    So -- just so I'm clear -- and I don't know

8   that I was correct on what I just said.

9           So, I had worked on Duragesic until about

10  2005 and '6.  Those responsibilities were passed to

11  another physician in medical affairs.  And later on,

12  the responsibilities for tapentadol were transferred

13  to a different medical affairs group within Janssen,

14  to the CNS group.

15          I continued to monitor for tapentadol with

16  RADARS.  And it's my belief that the other medical

17  affairs group monitored for Duragesic.

18          So, that's, that's my understanding of the

19  situation.

20      Q    "CNS" stands for "central nervous system"?

21      A    Yes, that's correct.

22      Q    Why didn't Janssen publish the RADARS data

23  related to Nucynta on its website every month after

24  it got it?

25      A    I was unaware about the fact that Janssen

 1  published RADARS data on its website every month.

 2      Q    No.  My question is:  Why didn't Janssen?

 3      A    Oh, why didn't?

 4           I don't know the answer to that.  I

 5  think -- we think it was important to provide the

 6  information.  And we were one of the first to

 7  actually provide what we did know about tapentadol

 8  when it came out.

 9           The information on RADARS that came for

10  both Duragesic and tapentadol were shared with the

11  FDA in our safety reporting.  They got that type of

12  information.  So, we were certainly providing that

13  information to regular authorities -- regulatory

14  authorities.

15      Q    Why did Janssen not make RADARS data

16  related to Nucynta available to the public

17  untouched?

18      A    I can't -- I don't know specifically why.

19  I think we just wanted to make sure that the data

20  would be put in a format that would be

21  understandable for people, and we thought the best

22  way to do that was through the publication process.

23           The publications were done with RADARS as

24  authors, where the scientists who generated the data

25  would be able to explain it.

 1              So, to put raw data, without an explanation

 2     on how to do that, sometimes can be problematic,

 3     because people may not necessarily understand it.

 4     And we thought the venue of putting it through, as

 5     I've already mentioned, publications in a way that

 6     people can understand it was a -- was the right way

 7     to do it.

 8        Q    There are a lot of good researchers that

 9     don't work for Janssen, right?

10        A    That's, that's correct.

11        Q    There are a lot of good researchers that

12     don't work for RADARS, correct?

13        A    There are people who -- yes.

14        Q    And why didn't Janssen provide the RADARS

15     data untouched to the public so that those

16     researchers could also look at that data and draw

17     their own conclusions?

18        A    Well, if individuals were interested in

19     getting RADARS data, then they certainly had an

20     opportunity to reach out to the company and make a

21     request for that type of information.

22        Q    And isn't it true that Janssen would only

23     share that type of information if a confidentiality

24     agreement was entered into?

25        A    I, I, I don't know that to be the case.

```
 1      Q    I'm going to hand you what we'll mark

 2   Exhibit 1 to your deposition.

 3                     (JAN-MS-0214093 through 094 was

 4                     marked as Vorsanger 1 for

 5                     identification, as of this

 6                     date.)

 7           MR. DUCK:  If you'll pass --

 8           MR. WEISBAND:  Actually, I need to look at

 9      it, first.

10           MR. DUCK:  My intent is that it was for

11      y'all.

12           MR. FIORE:  That's fine.

13      Q    All right.  Do you see your name at the top

14   of this email?

15      A    I do.

16      Q    All right.  This is an email chain between

17   you and several other Janssen employees, right?

18      A    That's correct.

19      Q    Have you seen this email between the time

20   that you wrote it and now?

21      A    No, sir, I have not.

22      Q    All right.  This email was written in 2008,

23   right?

24      A    Yes.  So, it appears to be.

25      Q    And it relates to RADARS, correct?
```

```
 1      A    Correct.

 2      Q    At the bottom of the page, we see an email

 3   from Margaret Quinn.

 4           Who is Margaret Quinn?

 5      A    She is a member -- or was a member, at that

 6   time, of the state government affairs group.

 7      Q    For Johnson & Johnson?

 8      A    Yes, that's right.

 9      Q    She didn't work directly for Janssen,

10   correct?

11      A    I believe so, yes.

12      Q    She did or she did not work directly --

13      A    Yeah, she did.

14      Q    Okay.  And her signature block says

15   "Johnson & Johnson."

16           Did she work for Johnson & Johnson or

17   Janssen or both?

18      A    She worked for Johnson & Johnson.

19      Q    In her email, you'll see there's a bracket

20   where she states your name?

21      A    Yes.

22      Q    Do you see that?

23           She says, "Gary, I assume RADARS is the

24   monitoring surveillance program you have in place.

25   Can you offer any clarity?"
```

```
 1              Right?

 2     A     Correct.

 3     Q     Did I read that right?

 4     A     Yes.

 5     Q     And then you responded to Margaret in the

 6  email above, correct?

 7     A     Right.

 8     Q     You say, "Hi Margaret," and then explain

 9  RADARS.

10     A     Right.

11     Q     Can you please read your explanation?

12     A     Sure.  "We purchased data from RADARS

13  for" --

14     Q     Sorry, can you start above, above that.

15  The word "yes" is the first --

16     A     Oh, yes, of course.  Yes.

17            "RADARS is a network that provides

18  information on abuse and diversion of prescription

19  pain medications on a subscription basis to

20  participating pharmaceutical companies about their

21  products."

22     Q     Thank you.

23     A     Shall I continue?

24     Q     Please.

25     A     "We purchase data from RADARS for Duragesic
```

1    and our tramadol-containing products.  We would not,

2    for example, be able to provide data on branded

3    prescription pain medication such as OxyContin."

4         Q    Okay.  Let's stop there.  Why not?

5         A    The arrangement that we had per contract

6    with RADARS is that pharmaceutical companies would

7    be able to purchase branded -- information for their

8    own branded products but not information for the

9    branded products from other companies.

10            So, as I've stated here, we would not be in

11   a position to get data on OxyContin, Purdue's

12   products, but we would have information on generic

13   oxycodone.

14            We -- conversely, Purdue, would not be

15   getting information directly on Duragesic, but they

16   would be getting information in general on generic

17   fentanyl, which would include information on

18   Duragesic.

19            And as -- to clarify, also, the generic

20   information on oxycodone would have lumped in there

21   the OxyContin, but we wouldn't have

22   OxyContin-specific information.

23            Do you want me to continue?

24        Q    Well, let me -- a couple of follow-up

25   questions.

 1       A    Sure.

 2       Q    For Janssen's subscription to RADARS, did

 3   it request all of the generic opioids RADARS data?

 4       A    We would be provided that as part of the

 5   data that RADARS provided for us.

 6       Q    So, you would receive, at Janssen, the

 7   RADARS data related to Janssen's branded opioids and

 8   the RADARS data for all opioid APIs?

 9       A    That RADARS was monitoring.

10       Q    Was RADARS not monitoring certain opioid

11   APIs?

12       A    So, I don't know what, what they were

13   monitoring and what they weren't monitoring.

14            But the subscription included, as I've

15   already described, the drugs that they were actually

16   monitoring.

17       Q    Okay.  Can you start with the next

18   sentence.

19       A    Sure.

20            "RADARS is completely independent of PhRMA.

21   Dr. Richard Dart heads up the RADARS program and has

22   accompanied us on occasion to discuss RADARS

23   findings as they relate to tramadol."

24       Q    What did you mean by, "RADARS is completely

25   independent of PhRMA"?

January 17, 2019                                                        51

```
 1      A    We -- PhRMA doesn't have influence.  RADARS

 2   collects the data, analyzes the data, and provides

 3   the data back based on their scientists looking at

 4   it and their interpretation, and that's the

 5   information that's provided to PhRMA.

 6      Q    Janssen pays RADARS over a million dollars

 7   a year for that data, right?

 8      A    To do the -- to accumulate the information,

 9   analyze the information, and provide their

10   scientific understanding of the information in a

11   report to Janssen.

12      Q    Do you know Richard Dart?

13      A    Yes, I do.

14      Q    And you've worked with Richard Dart, right?

15      A    I have.

16      Q    Okay.  If you'll read the paragraph that

17   starts "One of the success" --

18      A    Sure.

19      Q    Okay.

20      A    "One of the successes of our recent

21   interaction in Oklahoma was that we were able to

22   reach out to the state representative by

23   teleconference and provide him with information

24   needed.  If there is a requirement for data and we

25   can provide it by phone, then it would be easier
```

1  than having to pull a team together and make a trip

2  to Nebraska."

3      Q    Okay.  Do you recall what's being discussed

4  here about the State of Oklahoma?

5      A    My recollection was that there was a

6  request from the State of Oklahoma -- and I don't

7  recall by whom -- to provide information that the

8  company had on tramadol.

9          And my understanding is that that request

10  would have come through the state, the state affairs

11  representative to Oklahoma.  And again, I don't know

12  who that was at this point.

13      Q    Do you know who Richard Ponder is?

14      A    Yes, I do know Richard Ponder, but I didn't

15  remember his name.

16          So, he might have reached out and said, "Do

17  you have any information around what we know about

18  abuse of tramadol for the State of Oklahoma?"

19          And the way I had set it up was, we wanted

20  to make sure that the scientists who generated the

21  data, wherever possible, could come out with us to

22  explain their findings.

23          So, Dr. Dart headed up the RADARS program.

24  And so, either he or another member of the

25  scientific advisory board at RADARS would accompany

```
 1    us -- again, as requested by the State -- to provide

 2    information about it.

 3            And here, we have some state-specific

 4    information, as well.

 5        Q    And in particular, this Oklahoma discussion

 6    revolved around the scheduling of tramadol, right?

 7        A    Yes.  There was a request for information

 8    on what was known about the abuse of tramadol.

 9        Q    And the higher an opioid is on DEA's

10    schedule, the more restricted it is, right?  So, for

11    instance, a Schedule II drug would be more

12    restricted than a Schedule III drug?

13        A    That's correct.

14        Q    And for purposes of making its

15    pharmaceutical drugs accessible to the public,

16    Janssen would prefer, if the data supports it, that

17    its pharmaceuticals be on lower schedules as opposed

18    to higher schedules?

19        A    My recollection for -- having worked there

20    and where we were, was we wanted to ensure that

21    decisions were made in an evidence-based manner.

22            Tramadol had initially been approved by the

23    FDA with an unscheduled status.  I believe there was

24    a period of monitoring that went on, that the

25    company was required to do as part of the
```

 1   requirements.

 2         The company continued to monitor for abuse

 3   of tramadol after it was required to do so.  And we

 4   felt that what needed to happen was, if there was a

 5   change for any reason in the abuse of the compound,

 6   then it would be reflected appropriately in how the

 7   drug would be handled, but that we wanted to make

 8   sure that decisions that were made were

 9   evidence-based, that we had -- they looked at the

10   information available and to decide.

11   Q     You would agree that Janssen viewed the

12   scheduling of its opioids as a threat?

13   A     I don't.

14   Q     You would agree that Janssen viewed the

15   up-scheduling of any of its opioids as a threat?

16   A     No, actually, I don't.

17   Q     Okay.  I'm going to hand you Exhibit 2.

18                     (JAN-MS-02149085 through 086 was

19                     marked as Vorsanger 2 for

20                     identification, as of this

21                     date.)

22         MR. DUCK:  You're just going to stick on

23      that path?

24         MR. WEISBAND:  What's that?

25         MR. DUCK:  You're just going to stick on

```
 1        that path?  I'm mean, that's their courtesy

 2         copy.  You're welcome to, but...

 3             MR. WEISBAND:  I'd like to review the

 4          document before I pass it to them.

 5             MR. DUCK:  Doing my best for you, Mark.

 6     Q     You're ready?

 7     A     Yes, sir, I am.

 8     Q     Okay.  Thank you.

 9     A     Well, I also wanted to comment, if I may,

10     on a follow-up of your question, because I think

11     it's important.  And you were asking about

12     scheduling.

13             There were instances where --

14     Q     So, I've got some questions about this

15     document.

16     A     Which I would follow your lead, Counselor.

17     Whatever you'd like.

18     Q     Yeah.  Thank you very much.

19     A     Okay.

20     Q     Your counsel will have an opportunity, if

21     he wants, to ask you some questions later.

22     A     Very good.  Okay.

23     Q     So, this is another email chain involving

24     you and Bruce Moskovitz, right?

25     A     Yes.
```

```
 1        Q    On the next page, there are a few other

 2   people that we see on the email.

 3             And this is from Christopher Lepore, right?

 4        A    Let me find the email.

 5        Q    Who is that?

 6        A    Christopher Lepore is someone who worked in

 7   state government affairs.

 8        Q    For Johnson & Johnson?

 9        A    Yes.

10        Q    Thank you.

11             He states, "I just received the Nevada

12   Board of Pharmacy's agenda for their meeting

13   March 5th and 6th.  They plan to discuss the

14   scheduling of tramadol and may take action.  This is

15   the first time the issue has been brought up in

16   Nevada.  Larry Pinson, the executive director of the

17   BOP, is on vacation until next Tuesday.  In the

18   meantime, I left a message for the board's general

19   counsel.  We'll need to meet with Larry next week.

20   Any help you can provide, Gary, would be

21   appreciated."

22             Did I read that correctly?

23        A    Yes.

24        Q    He's referring to you there, right?

25        A    Yes, I believe so.
```

 1      Q    And you responded to the email, but only to

 2   Bruce Moskovitz, correct?

 3      A    Let me read the front.

 4      Q    The bottom email on the front page.

 5      A    (Perusing document.)

 6           Okay.

 7      Q    All right.  You say, "Bruce, we now have a

 8   request from Nevada and Nebraska."  Right?

 9      A    Yes.

10      Q    What kind of request?

11      A    Presumably a request for information on

12   what we know about -- from our data in RADARS at

13   that time about --

14      Q    Sorry, excuse me.  Go ahead.

15      A    -- to provide that type of information to,

16   in this case, individuals in both Nevada and

17   Oklahoma.

18      Q    So, the reason that a state may want to

19   know about RADARS data for a particular drug is to

20   determine which schedule that drug should be on?

21      A    So, my understanding is the states, when

22   they reached out to us, wanted to know what

23   available scientific data we might have been able to

24   share with them, as part of their decision-making

25   processes.

 1      Q    And the abusability of a drug or the

 2   occurrence of abuse for a particular drug is an

 3   important piece of information?

 4      A    So -- yes.  So, the abusability of a drug

 5   is defined by its schedule status.  But information

 6   on how the drug might be abused and mentions of

 7   abuse would be important information.

 8      Q    So, a drug -- an opioid that's on

 9   Schedule II is considered to be more abusable than a

10   drug on Schedule III?

11      A    The abusability of a drug is defined in

12   law.  And so, a Schedule II would be more abused,

13   potentially abusable than a Schedule III or a

14   Schedule IV.

15      Q    And RADARS data is some evidence of the

16   abusability of a particular drug, right?

17      A    Yeah.  The RADARS data has information on

18   how a product would be used -- to be abused.

19      Q    Thank you.

20           Can you read the second paragraph here of

21   your response, that starts "Richard Ponder"?

22      A    "Richard Ponder indicated that while we

23   have done well in Oklahoma with the representative

24   there, the Oklahoma Board of Pharmacy is threatening

25   to schedule tramadol again.  Ted Cicero and I were

```
 1    out there several years ago and were able to address

 2    their concerns by providing data from the ISC" --

 3    which is the independent steering committee for

 4    tramadol.

 5         Q    Who is on the independent steering

 6    committee, do you recall?

 7         A    I don't know that I have all of the

 8    members.  Dr. Ted Cicero was, Dr. James Inciardi

 9    was.

10         Q    And they work for RADARS; is that right?

11         A    So, they worked, initially, on the

12    independent steering committee for tramadol.  When

13    RADARS was formed, it's my understanding that they

14    went out to work, and many, if not all, of those

15    people comprised the scientific advisory board at

16    RADARS.

17              So, the answer to your question is, yes,

18    but I don't know if everybody did.

19         Q    When you and Ted Cicero went out to

20    Oklahoma to address the Board of Pharmacy's

21    concerns, where did Ted Cicero work?

22         A    He worked at Washington University.  He

23    amassed --

24         Q    In St. Louis?

25         A    Yes.  He amassed that information as one of
```

 1   the data sources for RADARS.  He was also on the

 2   scientific advisory board for RADARS.

 3          And as I had testified earlier, when we had

 4   requests for information from RADARS, we went out

 5   with individuals who were knowledgeable in

 6   generating data and could really explain the data

 7   best.

 8      Q    Did he work at all for RADARS at that time?

 9      A    In 2008, I -- he might have.  I don't know.

10   Because RADARS was up for awhile, and, as I

11   mentioned earlier, Purdue had formed it, and he may

12   have been working at the original RADARS at that

13   point.

14          But I think somebody from Purdue could

15   better answer that than me, than I could.

16      Q    Do you know if Oklahoma's Board of Pharmacy

17   ever scheduled tramadol?

18      A    I believe that, later on, the State of

19   Oklahoma did schedule it, but I don't know that for

20   a fact.

21      Q    The abusability of a drug is a constant.  A

22   drug is abusable unless it's reformulated; the

23   abusability is constant, right?

24          MR. LIFLAND:  Object to the form of the

25      question.

```
 1       A     The abusability of a drug may change with

 2   time, and it's important to monitor the drug to see

 3   how the product may have been changed.

 4             The abusability of the drug is also

 5   determined by the delivery system of the drug.

 6             So, for example, fentanyl is a drug that's

 7   potentially quite abused.  But in a system, for

 8   example, such as the Duragesic patch, where there is

 9   a controlled delivery of pharmaceutical-grade

10   fentanyl, the rate of rise into the -- first the

11   medication going into the body and the rate of rise

12   until it gets into the central nervous system is

13   slow.  So, therefore, the drug tends to be less

14   desirable to the people who intend to abuse a

15   medication.

16             So, abusability needs to be understood, as

17   I've just said, in terms of the delivery system.

18   And that's why we need to monitor, to see if there

19   are changes in it.

20       Q     If the delivery system stays the same for a

21   particular opioid, the abusability of that opioid

22   product is constant?

23       A     Well, sir, if --

24             MR. LIFLAND:  Object to the form of the

25        question.
```

1      A    Addicts are individuals who will find ways

2   in which they can.  So, there -- it may be, for

3   example, that a product was abused in a certain way

4   for a period of time, but addicts may sometimes find

5   new and different ways that they do it.

6           So, I think it would be important, as I've

7   already mentioned -- and in all of the publications

8   that I have, you'll see at the end it will say

9   something like "continued monitoring is warranted,"

10  just for that reason, to ensure that we understand

11  how products are abused.

12          And if the patterns of abuse change, that

13  we, at Janssen, were in a position to understand

14  that and educate individuals on how these drugs are

15  abused.

16          MR. DUCK:  Object as nonresponsive.

17     Q    Sir, I'm asking you a yes-or-no question.

18     A    Yes.

19     Q    You're welcome to explain that later, when

20  your counsel takes you on redirect.

21          I'm asking you a yes-or-no question.  Do

22  you understand that?

23     A    So --

24          MR. LIFLAND:  Objection.

25     Q    Let me ask you again.

1          If the delivery system stays the same for a

2     particular opioid product, the abusability of that

3     product is constant?

4          A    No, sir, it's not.

5          Q    Okay.  You were part of a team, along with

6     Ted Cicero, that visited Oklahoma, right?

7          A    Yes.

8          Q    You addressed their concerns, right?

9          A    Yes.

10         Q    And tramadol was not scheduled, correct?

11         A    Not at that time, sir.

12         Q    And your understanding is that today it is

13    scheduled, right?

14         A    That's what I believe.

15         Q    Thank you.

16              You'll see that Bruce Moskovitz responds to

17    your email just above the one we were looking at.

18              Do you see that?

19         A    Yes, I do.

20         Q    Can you read his response, please.

21         A    Sure.

22              "Is there a SWAT team that we can put

23    together with Ted Cicero and whatever source at

24    RADARS, perhaps under a retainer system, that would

25    allow them to mobilize as soon as a threat is

```
 1    detected with minimal oversight on our part?  It

 2    seems to me that this is how we routinely respond

 3    anyway, except that we always start from ground

 4    zero."

 5         Q    All right.  And was Bruce Moskovitz your

 6    supervisor?

 7         A    Yes, he was.

 8         Q    He sent this email to you, correct?

 9         A    I believe so, yes.

10         Q    Did Janssen ever put together such a SWAT

11    team?

12         A    No, sir, they didn't.

13         Q    Who is Edgar Adams?

14         A    Edgar Adams was another member of the

15    independent steering committee.  As I testified

16    earlier, I couldn't remember everyone, and he was

17    another individual who worked at RADARS, and he was

18    also, as I've just said, on the independent steering

19    committee.

20         Q    Are members of the independent steering

21    committee paid for their services?

22         A    I don't remember what the arrangement was

23    at the time.

24         Q    How much money did Janssen pay Ted Cicero

25    over the time that you were there?
```

```
 1      A     I don't know.

 2      Q     But Janssen did pay him?

 3      A     He was paid for his time.

 4      Q     Thanks.

 5            And you mentioned earlier that you had

 6   worked with Richard Dart before, right?

 7      A     Yes.

 8      Q     And he was the head of RADARS, correct?

 9      A     Yes.

10      Q     You also worked with Richard Dart and Ted

11   Cicero on research, correct?

12      A     They were involved in some of the

13   publications that we had, yes.

14      Q     I'll hand you what we'll mark as Exhibit 3.

15                      (JAN-MS-00641019 through 022 was

16                      marked as Vorsanger 3 for

17                      identification, as of this

18                      date.)

19                      (Whereupon, a discussion was

20                      held off the record.)

21      Q     Okay.  This is an email chain that starts

22   out between you and Richard Dart, right?

23      A     Yes.

24      Q     So-- and I'm looking at the second --

25   excuse me, the third page.  There's an email from
```

```
 1    you at the bottom of that page.

 2            Now, this email chain deals with research

 3    that was done by Dr. Ted Cicero and Dr. Jim

 4    Inciardi, right?

 5        A    I'll need to review the email for a moment,

 6    Counselor.

 7            (Perusing document.)

 8            Okay.

 9        Q    In the email that you sent, you'll see

10    there are some italicized words in there?

11        A    Yes.

12        Q    You see those?

13            He says -- you say to Richard Dart, who is

14    the head of RADARS -- in your email, you say, "It

15    appears that Drs. Cicero and Inciardi have the

16    ability to publish manuscripts with our data at any

17    time and for any purpose, and that we have no

18    control over how and where our data will be used."

19            Did I read those words right?

20        A    Yes.

21        Q    And those were words that you italicized in

22    your email, correct?

23        A    Correct.

24        Q    This was a concern of yours, wasn't it,

25    sir?
```

```
 1      A    Um --

 2      Q    It's a yes-or-no question, sir.

 3      A    Yes, it was.

 4      Q    At the end of this paragraph, you say that,

 5  "We believe that publication of this manuscript

 6  represents a violation of the confidentiality of our

 7  data."

 8           Correct?

 9      A    Yes.

10      Q    Now, above that, Richard Dart explains that

11  RADARS started as a Purdue project, correct?

12      A    I have to read the email.

13      Q    Specifically the third paragraph.

14      A    Yeah, let me read it.

15           (Perusing document.)

16           Okay.

17      Q    So, just a couple of questions on this one.

18           Richard Dart is explaining that there may

19  be some access to Janssen's data because a license

20  was given when Purdue was still running RADARS,

21  right?

22      A    So it seems.

23      Q    So, why, if you know, did Purdue sell

24  RADARS or -- you know, I don't actually know how it

25  was transferred.
```

 1          But Purdue no longer runs RADARS, right?

 2     A    Correct.

 3     Q    Now it's run by a different organization,

 4  correct?

 5     A    Yes.

 6     Q    Are you familiar with the name of that

 7  organization?

 8     A    I believe it was Denver Health.

 9     Q    The Rocky Mountain Poison & Drug Center?

10     A    Yes, as a part of Denver Health.

11     Q    Okay.  Do you know how RADARS passed from

12  Purdue to Denver Health?

13     A    No, I do not.

14     Q    But at this point in time, Denver Health

15  ran RADARS?

16     A    Correct.

17     Q    The second-to-last sentence is, "As for

18  your other comments, please be careful.  Email is

19  discoverable."

20          Right?

21     A    That's what it says.

22     Q    Was the -- do you have any understanding of

23  why it is he wrote that sentence?

24     A    I do not.

25     Q    On the next page, flipping forward in time,

```
 1   page 2, you respond to Richard Dart, and you say,

 2   "By way of violation of our confidentiality, we are

 3   referring to the fact that two of the authors on the

 4   paper never obtained confidentiality agreements from

 5   us to review the PriCara data captured within

 6   RADARS."

 7          Right?

 8   A     Yes.

 9   Q     What is PriCara?

10   A     PriCara was one of the operating companies

11   that ultimately became Janssen, that ultimately

12   became Janssen.

13   Q     What was PriCara responsible for?

14   A     PriCara was responsible for -- I'd have to

15   look and see.  Certainly Duragesic was one of its

16   responsibilities.

17   Q     When it was PriCara, was it owned by

18   Johnson & Johnson?

19   A     Yes, it was.

20   Q     But PriCara was rolled into Janssen?

21   A     Yes, as I mentioned, it was one of the

22   operating companies of J&J that rolled into Janssen.

23   Q     Richard Dart responds, "Your email is very

24   concerning to me.  I don't usually get emails like

25   this from you, although I do from others.  I have
```

```
 1   spoken with Jim, and I do not think he thinks that

 2   he wrote this in a favorable manner" --

 3           Excuse me, let me say that again.

 4           Richard Dart says, "I have spoken with Jim,

 5   and I do think he thinks that he wrote this in a

 6   favorable manner."

 7       A   Right.

 8       Q   "He is amenable to further discussion and

 9   revision."

10           Did I read that right?

11       A   Yes.

12       Q   On the next page, Richard Dart sends

13   another email to you, correct?

14       A   Yes.

15       Q   And again, this is all in 2007, right?

16       A   Correct.

17       Q   Richard Dart says, "Gary, I've just

18   reviewed -- finished reviewing the paper in detail.

19   I've made numerous suggestions for Jim, and he

20   sounded willing to make them, the last time I spoke

21   with him.  However, experience has taught me no one

22   reads the paper more carefully than the company

23   involved.  If you have comments, I would like to get

24   them.  In fact, I think the best approach would be

25   for a conference call of all three of us -- Jim,
```

 1    you, and me -- so, that Jim can get a feel for what

 2    gets the attention of the subscriber."

 3            That's you, the subscriber, Janssen, right?

 4        A    That's what I'm assuming he's referring to.

 5        Q    Yep.

 6            He continues, "We have to understand, like

 7    most investigators, Jim writes in a vacuum, never

 8    hearing the concerns of the company whose products

 9    he studies."

10            Did I read that right?

11        A    Yes.

12        Q    And you never provided any comments to Jim

13    or Richard, right?

14        A    The email I have above would have been a

15    comment that I would have given to Dr. Dart.

16        Q    Which was that you wanted to take a

17    hands-off approach?

18        A    Yes.

19        Q    And you can tell from the emails that

20    Richard Dart sent that he was concerned about not

21    upsetting Janssen, right?

22            MR. LIFLAND:  Object to the form of the

23        question.

24        A    I think -- in a partnership with Janssen, I

25    think that Dr. Dart wanted to ensure that the

 1   relationship went according to what we had

 2   contractually, and that it was done in a manner that

 3   reflected that.

 4      Q    And he said that Jim didn't think that he

 5   wrote an article that made Janssen look bad,

 6   correct?

 7          MR. LIFLAND:  Object to the form of the

 8       question.

 9      A    That's what it looked like he had

10   mentioned.

11      Q    Yup.  Because in the top email, Richard

12   Dart sends another email to you.

13          Can you please read the first two sentences

14   of that email.

15      A    Yes.  I think -- this is from Dr. Dart to

16   me in '07.

17          "Okay.  I think that will work fine.  I

18   don't think the manuscript will make Duragesic look

19   bad.  I'm asking that Jim emphasize the fact that

20   generic is diverted even if the magnitude isn't as

21   big as he expected yet.  He gets to the point that

22   all opioids are abused and we need to address the

23   whole issue rather than pick on certain drugs."

24      Q    Thank you.

25          And we mentioned earlier that you actually

1    paid for this data from RADARS.

2            I would just like for you to review

3    Exhibits 4 and 5 for me and confirm that.

4                        (JAN-MS-02102600 through 602 was

5                        marked as Vorsanger 4 for

6                        identification, as of this

7                        date.)

8    Q    Here is Exhibit 4.

9            You'll see that both of the exhibits I'm

10   handing you are, indeed, signed by you.

11                       (JAN-MS-02102624 through 626 was

12                       marked as Vorsanger 5 for

13                       identification, as of this

14                       date.)

15   Q    And they are for the years 2013 and 2014.

16   A    (Perusing document.)

17   Q    All right.  In the 2013 document,

18   Exhibit 4, this is -- reflects an amendment to the

19   contract between Janssen and Rocky Mountain Poison &

20   Drug Center for the RADARS data, correct?

21   A    Yes.

22   Q    And it's fully executed, as you see the

23   signatures on the last page, correct?

24   A    Correct.

25   Q    And on the second page, there is a section

 1   2B, which references the "Compensation" section,

 2   right?

 3        A    Yes.

 4        Q    And can you please tell me how much Janssen

 5   agreed to pay for RADARS data in 2013?

 6        A    Yes.  "Subscriber" --

 7             Do you want me to read the whole thing or

 8   just the number?

 9        Q    You can just tell me the number.

10        A    Sure.  1,392,114.

11        Q    And how much was that per month?

12        A    $116,000 per month.

13        Q    And that's what Janssen agreed to, and you

14   got that information from Exhibit 4 that you're

15   looking at?

16        A    Yes.

17        Q    On the 2014 contract, we see a similar

18   format, again, executed by you on the last page.

19             And in section 2B, you'll see the

20   "Compensation" section, right?

21        A    Correct.

22        Q    And how much did Janssen pay for RADARS

23   data in 2014?

24        A    $1,392,114.

25        Q    How much was that per month?

  1      A    $116,009.50 per month.

  2      Q    And you answered my question by looking at

  3 Exhibit 5, right?

  4      A    Yes, that's correct.

  5      Q    Who is Nat Katz?

  6      A    Nat Katz is Nathaniel Katz.

  7      Q    And how do you know him?

  8      A    From working in the area of analgesia.

  9 Dr. Katz is a pain specialist, neurologist, I

 10 believe, by training.

 11      Q    He is not an employee of Janssen?

 12      A    He was not certainly when I worked with

 13 him.

 14      Q    However, he did do some work for Janssen,

 15 right?

 16      A    Yes.

 17      Q    And he was a paid researcher for Janssen?

 18      A    He was a paid consultant for us.

 19      Q    And he published papers about Janssen's

 20 products, correct?

 21      A    He was one of the authors on papers about

 22 our products.

 23      Q    He's been a lead author on papers for

 24 Janssen's products?

 25      A    I would need to check that, but I can

1   certainly answer that he was an author on those

2   papers.

3       Q    You'd agree with me that Schedule II

4   opioids are addictive?

5       A    I do.

6       Q    And you would agree with me that, as a

7   manufacturer of opioids, Janssen should always

8   stress the risk of addiction?

9       A    Yes, I do.

10      Q    And you would agree with me that Janssen

11  should never omit that information about the risk of

12  addiction?

13      A    The information on addiction should be made

14  available through communications with prescribers as

15  it is in our product package inserts and other

16  sources, as well.

17      Q    And you would agree with me that opioid --

18  Schedule II opioids are dangerous?

19      A    If they're -- so, if the medications are

20  used as prescribed in appropriately selected

21  patients under the care of a healthcare professional

22  who is knowledgeable on how to administer those

23  medications, they can be very safe and effective.

24           If they're used not according to the

25  product label or used in other ways or if

 1    individuals seek to abuse or divert the product or

 2    tamper with it, then it can be -- lead to dangerous

 3    consequences.

 4        Q    Is it your testimony that, when a patient

 5    uses an opioid under a doctor's care and as

 6    prescribed, that it is a safe product?

 7        A    If it's used as prescribed, it is -- again,

 8    with follow-up and care from a physician, yes, it

 9    can be -- it is a safe product.

10        Q    Is it your testimony that a patient who

11    takes opioids under the care of a physician as

12    prescribed will not get addicted?

13        A    No, it's not.  There is a known rate of

14    what we call iatrogenic addiction.  And I can define

15    that, if you wish, Counselor.

16        Q    Iatrogenic addiction is when a patient gets

17    addicted taking a medicine as prescribed under a

18    doctor's care?

19        A    Or taking medication, yes.

20        Q    So, you're aware that iatrogenic addiction

21    can occur with Janssen's opioid products?

22        A    Iatrogenic addiction can occur.  The rates

23    are known.  Yes.

24        Q    What are the rates?

25        A    The rates from the published literature

1   that we have seen are, when you -- and as per our

2   conversation, if it's used as directed in

3   appropriately selected patient population, the rates

4   can be approximately 1 to 4 percent.

5          Those rates do go up for individuals who

6   may have added complicated past medical histories or

7   medical histories.  And by that I mean, if they are

8   substance abusers or have a history of mental

9   health, then the rates of iatrogenic addiction can

10  be higher.

11         And, in fact, they're labeled that way.

12  That type of information does exist in the product

13  label, I believe, of Duragesic.

14     Q    How does Janssen identify those different

15  patient populations?

16     A    Janssen doesn't.  That's the responsibility

17  of the healthcare professional who engages in a

18  discussion with their patients as part of a --

19  taking a careful medical history and identifying and

20  discussing those risks with the patient, pointing

21  out why those risks are important in terms of the

22  medication, to stay in touch with them and help them

23  where they can.

24     Q    You would agree with me that the risk of

25  addiction is different for each patient that walks

```
 1    into a doctor's office, fair?

 2        A    I do.

 3        Q    You went to medical school, right?

 4        A    Yes, sir, I did.

 5        Q    What years?

 6        A    1980 to 1984.

 7        Q    Did you receive any training in addiction?

 8        A    I don't recall.

 9        Q    Well, you'd agree with me that,

10    historically, medical schools have not taught

11    addiction science?

12        A    So, I don't know whether addiction

13    science -- what it would have been, depending on

14    that period of time.

15            But I think they would have discussed the

16    fact that these were Schedule II opioids and that

17    they were, therefore, addictive by nature of their

18    scheduling.

19        Q    Well, when you went to medical school, you

20    learned that opioids should be prescribed rarely,

21    didn't you, sir?

22        A    I don't remember what I was told about how

23    they would be prescribed.

24        Q    There was no opioid crisis in the '80s,

25    correct?
```

 1      A      "There was no"?

 2      Q      Opioid crisis in the '80s?

 3      A      Not to the best of my knowledge.

 4      Q      The opioid crisis started when opioids

 5  began to be prescribed for the treatment of chronic,

 6  nonmalignant pain; isn't that right?

 7          MR. LIFLAND:  Object to the form of the

 8       question.

 9      A      I'm not certain when the opioid crisis

10  actually began.

11          We know, for example, that there was

12  illegal fentanyl that was coming into the country at

13  different periods of time, and I don't know when

14  those dates started.

15          So, the question of when did it begin is

16  one, Counselor, that I don't know the answer to.  I

17  don't know if it blossomed or grew or when it

18  actually started, and I don't know -- so, I can't --

19  I'm unable to comment on that.

20      Q      Why don't you know that?

21      A      Because I don't think the epidemiology of

22  it has been traced far enough back to really

23  understand it, or at least I haven't read about it

24  or heard about it.

25      Q      Why haven't you looked into it?

 1              MR. LIFLAND:  Object to the form of the

 2        question.

 3        A     Because the issues that we have is to

 4   ensure that our products are prescribed safely,

 5   effectively, and as directed per our product package

 6   inserts.

 7              And what we did -- and I did was I worked

 8   at the company, was -- as I've already mentioned and

 9   testified, was to monitor our products for abuse.

10        Q     Well, Janssen's products are part of the

11   opioid crisis, right?

12        A     No, sir, I don't agree with that.

13        Q     You don't believe that Janssen's products

14   are abused?

15        A     I believe that Janssen's products can be

16   abused.

17        Q     You've seen it in the RADARS data.

18        A     We saw -- and -- we -- for all of the

19   reviews that we had, not only for the RADARS data

20   but subsequently from the Inflexxion data, we saw

21   low mentions -- consistently saw low mentions of

22   abuse for Duragesic as well as for tapentadol.

23        Q     Who defines "low"?

24        A     Low number of mentions is low.

25        Q     You?

January 17, 2019                                              82

```
 1        A      Relative to some of the other, other

 2    opioids that we're seeing.

 3        Q      All right.

 4        A      I think that's generally acknowledged by

 5    experts in the field.

 6        Q      Just so we're clear, when you say there are

 7    low mentions of Janssen's drugs Duragesic and

 8    tapentadol, those are your words?

 9        A      Those are the words --

10               MR. LIFLAND:  Object to the form of the

11         question.

12        A      Those are the words of individuals who are

13    knowledgeable outside of Janssen and outside of me,

14    experts.

15        Q      What does "low" mean?

16        A      "Low" means -- I don't have a number to

17    give you.  But if I look at, for example, some of

18    the other medications, bracive [sic] abu -- mentions

19    of abuse are higher.

20        Q      The fact that other medications are abused

21    more does not mean that Janssen's medications have a

22    low rate of abuse --

23        A      Well, sir, I can --

24               MR. LIFLAND:  Object to the form of the

25         question.
```

```
 1        Q    -- right?

 2        A    I can show you the data, but I don't -- if

 3   that's something that's discussed.

 4        Q    Let me ask my question again.

 5             The fact that other opioids are abused more

 6   doesn't mean that Janssen's opioids have a low rate

 7   of abuse?

 8        A    No, sir.  My statement about low rates --

 9   and I don't use the word "rate," I use "mentions."

10             The mentions of abuse are low, and I can

11   show you that in the RADARS data, and I can show you

12   that in the commentary from Inflexxion data.

13        Q    Well, see, you use the word "mentions"

14   because it's important that you use precise language

15   in the pharmaceutical industry, right?

16        A    Correct.

17             MR. LIFLAND:  Object to the form of the

18        question.

19        A    Yes.

20        Q    And you don't want to say something that

21   isn't true in the pharmaceutical industry, correct?

22        A    No, sir.

23        Q    But Janssen did say to prescribers and in

24   other material that Janssen's products have a low

25   rate -- a low -- excuse me.
```

 1          Janssen did say to prescribers and in other

 2   materials that Janssen's products had low mentions

 3   in the reported abuse data, correct?

 4          MR. LIFLAND:  Object to the form of the

 5      question.

 6      A    I would like to see that documentation.

 7      Q    You're aware of that, right?

 8      A    Sorry?

 9      Q    You're aware of that, that Janssen made

10   those statements?

11      A    I'd like to see those statements.

12      Q    I'm not asking -- you're aware that --

13      A    Not --

14      Q    -- Janssen has gotten in trouble for doing

15   that?

16      A    Not in promotional materials that were

17   shared with prescribers, that I'm aware of.

18      Q    Are you familiar with a Joranson study that

19   involved the DAWN network?

20      A    Yes, I am.

21      Q    Do you know whether or not that information

22   was shared with prescribers?

23      A    So, the DAWN data, as I believe I had

24   testified earlier this morning, was in a promotional

25   piece that was, that was reviewed.  It was discussed

 1    with the FDA.

 2              The FDA indicated that the level of

 3    evidence was not high enough to be used in a

 4    promotional venue.  The piece was removed.

 5              And Janssen subsequently reached out to

 6    individuals who may have received the piece and

 7    corrected it.

 8      Q    All right.  Tell us about the Joranson

 9    study you said you were familiar with.

10      A    Well, there were two studies.  There was an

11    initial study that came out by Joranson -- the

12    Joranson, I believe, was in the timeframe of 1990 to

13    1995, or thereabouts.

14      Q    All right.  Let's talk about that one

15    first.

16      A    Okay.

17      Q    What was your understanding of what that

18    study showed?

19      A    It showed low mentions of abuse -- low

20    mentions of ER admissions for fentanyl-containing

21    products and for oxycodone, as well.

22      Q    All right.  And you mentioned that it

23    looked at DAWN mentions from 1990 to 1995?

24      A    I believe -- that's to the best of my

25    recollection.

 1      Q    I'll submit to you that I think it was

 2  1996.

 3      A    Okay.

 4      Q    Do you know when OxyContin hit the market?

 5      A    Those data, to the best of my knowledge,

 6  did not capture OxyContin, because I don't think the

 7  product was on the market at that point, for that

 8  first DAWN data -- the Joranson article.

 9      Q    Right.  OxyContin hit the market in 1996,

10  correct?

11      A    I don't recall the year, but I know it was

12  not on the market for -- with those data.

13      Q    And you'd agree with me that OxyContin is

14  one of the culprits of the opioid crisis today,

15  correct?

16           MS. NEWSOME:  Objection to form.

17           MR. LIFLAND:  Object to the form of the

18      question.

19      A    No, sir, I don't.

20      Q    You don't think that OxyContin has anything

21  to do with the opioid crisis today?

22      A    I would need to understand a little bit

23  more about what -- about the oxy -- about the opioid

24  crisis that we discussed and what the components

25  are.

```
 1              So, I'm not in a position at this point to

 2    comment upon it.

 3         Q    All right.  Sir --

 4         A    I don't feel I have enough data at this

 5    point.

 6         Q    -- you are the senior medical director of

 7    medical affairs -- excuse me, the senior medical

 8    director in the medical affairs group for analgesia

 9    at Janssen, right?

10         A    Yes, sir.

11         Q    And you don't feel like you're in a

12    position to understand the components of the opioid

13    crisis?

14         A    I believe that the components of the opioid

15    crisis are complex.

16         Q    You haven't tried to understand them?

17         A    I have started to understand them.  I think

18    people are still trying to figure out what it is and

19    what the components are.

20              I think there are elements of the opioid

21    crisis -- for example, illegal fentanyl and other

22    substances.  So, I think there's complexity, as I

23    testified earlier, in the crisis.

24         Q    And you can't answer my questions because

25    you don't fully understand the opioid crisis, right?
```

```
 1      A    I believe that the opioid crisis is

 2  something that would require more information before

 3  we can begin to address it.

 4          So, right now, there's no evidence, that

 5  I'm aware of, that I have read, identifying

 6  specifically which -- about pharmaceutical

 7  companies.

 8          What I do know, as you asked me, is that

 9  the medications that I monitored, the Janssen

10  products, had low mentions of abuse.

11      Q    You can't answer my questions about the

12  opioid crisis because you don't understand the

13  opioid crisis, yes or no?

14      A    I --

15          MR. LIFLAND:  Object to the form of the

16      question.

17      A    I don't understand the complexity of the

18  opioid crisis.

19      Q    Is Purdue responsible for the opioid

20  crisis?

21          MS. NEWSOME:  Objection to form.

22          MR. LIFLAND:  Object to the form of the

23      question.

24      A    I think I had indicated to you already that

25  the complexity of the opioid crisis was such that
```

January 17, 2019                                    89

```
 1    it's not clear what the cause of it -- the root

 2    cause of the opioid crisis is.

 3        Q    As -- in your opinion as a former senior

 4    medical director at Janssen overseeing opioid

 5    analgesia medical research, do you believe that

 6    Purdue bears even 1 percent of responsibility for

 7    the opioid crisis?

 8        A    I'm not familiar --

 9             MR. LIFLAND:  Object to the form of the

10        question.

11        A    I'm not familiar with Purdue's processes

12    and what they did and how they acted.

13             And as I indicated to you -- so, I'm not

14    able to understand -- I'm not able to respond to the

15    question to really say what they did or did not do.

16        Q    Were you ever familiar with what Purdue did

17    and did not do?

18        A    Well, I -- having -- not having worked at

19    the company, not having interacted with people very

20    much at the company, and now knowing their processes

21    and how they did what they did, I didn't feel like

22    I -- and I still today don't feel like I'm in a

23    position to comment on that.

24        Q    Did you ever work on any recall studies?

25        A    Yes, sir, I did.
```

 1      Q    Okay.  Explain to the jury what a recall

 2   study is.

 3      A    So, if there was a problem with a product,

 4   then --

 5      Q    I think we might be talking about two

 6   different things, and that's my fault.

 7           Have you ever worked on any studies that

 8   looked into physician recall of promotional

 9   messages?

10      A    Could you explain that more for me?

11      Q    Sure.

12           It's a survey of physicians to see what

13   they specifically recall about sales

14   representatives' visits.

15      A    Oh, you're talking about memory recall.

16      Q    Memory recall.

17      A    Okay.  As opposed to recalling a product

18   because of a problem.

19      Q    Exactly.

20      A    Okay.  Thank you for clarifying.

21      Q    Did you work on any memory-recall studies

22   while you were at Janssen?

23      A    Not to the best of my recollection.

24      Q    You're aware that Janssen conducted

25   memory-recall studies?

1      A    I'm not aware of it.  They might have.

2  That may be something that sales groups do, to try

3  and see how good their messages are.  But I don't

4  have specifics about it at Janssen.

5      Q    So, you're not aware that Janssen performed

6  a memory-recall study that asked physicians what

7  they remembered about Purdue's salesforce messages?

8      A    Not that I recall.

9      Q    Would you have seen that, had it been done?

10     A    Possibly.

11     Q    You would agree with me that Purdue has

12  been accused of aggressively overpromoting

13  OxyContin?

14          MS. NEWSOME:  Objection to form.

15          MR. LIFLAND:  Object to the form of the

16      question.

17     A    I believe that there was something in the

18  lay press about that, but I don't follow that, and I

19  don't know the specifics about that.

20     Q    Okay.  Are you aware of a 2003 GAO report

21  about Purdue's marketing tactics?

22     A    Not that I recall.

23     Q    Are you aware that Purdue pled guilty to

24  federal criminal felonies for misbranding OxyContin

25  in 2007?

 1              MS. NEWSOME:  Objection to the form.

 2         A    I'm not aware of the specifics around that.

 3    As I -- but as I have just testified, I heard

 4    something from the lay press about this.

 5         Q    So, you do recall that?

 6         A    I recall an article -- an article in the

 7    lay press, but I don't have the specifics about what

 8    happened.

 9         Q    Did Janssen not attempt to learn any

10    lessons from what Purdue did?

11              MS. NEWSOME:  Objection to form.

12         A    I'm not, I'm not understanding the

13    question.  I'm sorry, Counselor.

14         Q    When one of your competitors that

15    manufactures and markets opioids is -- either pleads

16    guilty to or is found guilty of a crime, Janssen

17    doesn't look into what that company did?

18              MR. LIFLAND:  Object to the form of the

19       question.

20         A    So, I don't know what the company did.

21         Q    Why don't you know, is my question?

22         A    Because I would not have --

23              MR. LIFLAND:  Object to the form of the

24       question.

25         A    -- I would not have been the individual at

```
 1   the company who would have been responsible to look

 2   into those types of activities.

 3       Q    There are lessons to be learned there.

 4            You would agree with that, right?

 5            MR. LIFLAND:  Object to the form of the

 6        question.

 7       A    I would not be the person to be in a

 8   position to do that, as a medical director.  That

 9   would be something that might be handled by other

10   people with the company.

11       Q    I'm just asking Gary Vorsanger, sitting

12   here today --

13       A    Yes, sir.

14       Q    -- another competitor pleading guilty to

15   federal crimes could provide some valuable insight

16   to a pharmaceutical company about what not to do,

17   correct?

18            MR. LIFLAND:  Object to the form of the

19        question.

20       A    I think the individuals at the company who

21   would be looking and doing those types of analysis

22   would -- are not me.

23            My responsibilities at the company were,

24   again, to the development of clinical trials and to

25   monitor, as I've already testified, around abuse.
```

 1    And that's, that's where -- that was the focus of

 2    where I conducted my time.

 3        Q    So, you can't say whether or not Janssen

 4    did exactly the same things that Purdue did?

 5        A    Well, I know --

 6             MR. LIFLAND:  Object to the form of the

 7         question.

 8        A    -- from my time at Janssen, working there

 9    for 16 years, and sitting here today as a witness of

10    facts, that I did not witness any kind of behavior

11    that I thought was not exemplary.

12             I think they act with ethics and a

13    behavior -- in the area of the opioid analgesic that

14    I did, I didn't see any type of negative behavior.

15        Q    Not once?

16        A    No, sir, not around the opioids, that I

17    recall.

18        Q    You never had to discipline any of the

19    employees in the medical affairs group?

20        A    For the individuals working on the opioid

21    analgesics?  Is that your question?

22        Q    Yes, sir.

23        A    No, sir, I did not.

24        Q    You don't think that the FDA sending

25    Janssen warning letters about its promotion of

 1   opioids is bad behavior or reflects bad behavior?

 2           MR. LIFLAND:  Objection to the form of the

 3      question.

 4      A    The FDA entered in a discussion with the

 5   company.  We, as I already testified, felt that the

 6   data would be valuable to individuals who work in

 7   opioids.

 8           And when we were told by FDA that it was

 9   inappropriate, we pulled the piece and, as I've

10   already testified, contacted individuals to tell

11   them what had happened.

12      Q    You disagreed with the FDA?

13      A    We thought the data was important, but we

14   respected the FDA's understanding and decision of

15   what they wanted in terms of the level of evidence.

16   And when that became clear, that the information

17   from the DAWN data did not reflect the level of

18   evidence that they were interested, as I've just

19   said, we pulled the piece.

20      Q    Do you recall a study performed by Janssen

21   entitled "Fen USA 71"?

22      A    Yes, I do.

23      Q    What was that study?

24      A    That was a study looking at patient

25   preference in individuals, in patients who were

 1   either treated with Duragesic or with OxyContin.

 2       Q    Is pain a disease, sir?

 3       A    So, I need you to clarify that question a

 4   little more for me.

 5            Do you mean acute pain or chronic pain?

 6       Q    Is chronic pain a disease?

 7       A    I believe that it is.

 8       Q    And do you believe that there is no

 9   underlying disease state that causes chronic pain?

10       A    No, I think that there certainly can be

11   underlying diseases that cause chronic pain, as

12   well.

13       Q    Chronic pain is a symptom of another

14   disease, correct, sir?

15       A    There are people who believe that it's a

16   symptom.  There are other people who think that it

17   may be a disease itself, with other manifestations.

18       Q    Does Janssen employ anybody in the medical

19   affairs group who believes that chronic pain is a

20   symptom?

21       A    I don't know.  I would have to canvass all

22   the people who worked on it.  I don't know that.

23       Q    Janssen should not only hire medical

24   affairs experts who share all of Janssen's views,

25   right?

January 17, 2019                                                    97

```
 1            MR. LIFLAND:  Object to the form of the

 2       question.

 3       A     I think Janssen needs to hire people who

 4   are qualified and have the medical background and

 5   expertise to be able to work effectively with their

 6   medications.

 7       Q     You're a man of science, right?

 8       A     Yes.

 9       Q     You don't just go along with the company

10   line, do you?

11            MR. LIFLAND:  Object to the form of the

12       question.

13       A     I understand the company line, and I

14   actually agree with the company line, because their

15   basic premise is to ensure that patients get the

16   medications that they need and deserve, and the

17   medications need to be prescribed and used

18   responsibly.

19       Q     So long as doing that is profitable, right?

20            MR. LIFLAND:  Object to the form of the

21       question.

22       A     No, sir.

23            As I had already -- as I had already

24   testified earlier today, we operate under the

25   Johnson & Johnson credo, and we have a
```

 1    responsibility to our patients as -- and to make

 2    sure that they get the very best that they can from

 3    our products, that the products are used safely and

 4    effectively.

 5        Q    Who are Janssen's patients?

 6        A    Well, it depends on the product that we're

 7    talking about.

 8             Are you referring, sir, to chronic pain?

 9        Q    Yes.

10        A    So, those would be individuals who would

11    suffer from a variety of chronic painful conditions.

12        Q    And you agree that Janssen has a

13    responsibility to those patients?

14        A    Yes.

15        Q    Have you ever heard the abbreviation "CDS,"

16    C-D-S?

17        A    I'm not sure what that stands for.

18        Q    You've never heard that before?

19        A    Well, I don't know.  In what context, sir?

20        Q    Well, what do you think it stands for in

21    this context, in this deposition?

22             MR. LIFLAND:  Object to the form of the

23         question.

24        A    I don't know.

25        Q    You've never heard the phrase "controlled

 1   and dangerous substance"?

 2       A    I have not.

 3       Q    You didn't know that opioids were referred

 4   to as CDSs?

 5       A    I did not.

 6       Q    Why didn't you know that?

 7       A    I, I --

 8            MR. LIFLAND:  Object to the form of the

 9        question.

10       A    I don't know.  I just -- I did -- I have

11   not heard that used for opioids.

12       Q    Well, you don't think opioids are

13   dangerous, do you?

14       A    No, sir.  I think if they're used

15   inappropriately, they certainly can be dangerous,

16   and I testified to that extent.

17       Q    And you don't think addiction is dangerous,

18   do you, sir?

19       A    I think addiction can be dangerous, yes,

20   absolutely.

21       Q    You don't think it's dangerous in every

22   circumstance?

23       A    I think addiction -- well, if addiction is

24   treated and under control, that's different from

25   untreated addiction.

```
 1          But addiction is a condition that can be

 2     quite dangerous, yes.

 3          Q    Can -- should Janssen's patients who are

 4     addicted to Janssen's products continue taking those

 5     products?

 6          A    That would be --

 7               MR. LIFLAND:  Object to the form of the

 8           question.

 9          A    The decision to continue a medication or

10     not to continue a medication is one that needs to be

11     made with a patient in conjunction with the

12     healthcare provider.

13          Q    You are a healthcare provider -- or were,

14     right?

15               MR. LIFLAND:  Object to the form of the

16           question.

17          A    Yes, sir, I am -- I was.

18          Q    You have an MD?

19          A    Not --

20               I beg your pardon?

21               So, I do have a medical degree.  I was a

22     healthcare provider at one point.  And I know, as a

23     healthcare provider, that the decision on what

24     medications patients need to take is a decision that

25     a -- is a personal decision that's made between a
```

January 17, 2019                                              101

 1   patient and a healthcare provider.

 2       Q    All right.  Can you please explain to me

 3   the circumstances under which you, as a healthcare

 4   provider, would determine your patient was addicted

 5   to a particular opioid and continue that patient on

 6   that same opioid at the same dose?

 7       A    Well, I would need to understand --

 8            MR. LIFLAND:  Object to the form of the

 9        question.

10       A    I would need to understand the specifics.

11   So, by that, I mean --

12       Q    You mean there are situations where that's

13   appropriate?

14       A    Well, if a person, for example, needed

15   opioid analgesia for a certain reason where other

16   types of medications, lesser medicines were not

17   appropriate, then we would maybe try and try other

18   types of opioid analgesics, if that was appropriate,

19   switch from one type to another --

20       Q    Not my question, sir.

21            My question was:  Can you please explain to

22   me a situation where it's appropriate, as a

23   physician --

24       A    Sir --

25       Q    -- to understand that your patient is

```
 1    addicted to a specific opioid product and continue

 2    that patient on that specific opioid product?

 3        A    Well, I wasn't --

 4             MR. LIFLAND:  Please let him finish his

 5          answers.

 6        A    I was explaining it.  So, if I might have a

 7    moment, please.

 8             So, while certainly immediately, when you

 9    see that someone is addicted to a medication, the

10    first inclination would be get them off that

11    medication, for sure.

12             Your question to me was:  Can you come up

13    with a situation where you may continue them on it?

14    That's your question.

15             So, if lesser pain medications were not a

16    viable option, then we may be in a position where we

17    need to think about opioids.

18             Now, if someone had severe allergic

19    reactions or other types of situations where they

20    didn't tolerate other types of opioids, then one

21    might be stuck in a situation where the patient

22    needs to continue on it.

23             Now, having said that, though, that

24    individual would be someone who I would put into

25    extensive psychological counseling.  There are other
```

1   support groups that I would have.  I would -- if the

2   person had a family, I would work with them.  And I

3   would find ways to continue to have them safely use

4   the medication and to help them control their

5   addiction at the same time.

6       Q    All right.  So, in your opinion, sir, there

7   are situations where you think it's appropriate for

8   addicted patients to continue using opioids?

9       A    They would be --

10           MR. LIFLAND:  Object to the form of the

11       question.

12      A    They would -- given the scenario that I

13  just reviewed for the jury, then that could happen.

14           But in medical practice, in general, we

15  would certainly try and get the patient off that

16  opioid; and if lesser means were possible, we would

17  potentially try and get them off the opioid

18  analgesics altogether, if that was possible.

19      Q    What's worse, addiction or chronic pain?

20           MR. LIFLAND:  Object to the form of the

21       question.

22      A    This would be a case-by-case thing, and I

23  think we would really need to understand many, many

24  factors.  I don't think there is a blanket, specific

25  thing that I can send an email out to everyone:

```
 1    "This is better or worse than this."

 2          I think we really need to take it on an

 3    individual basis with the individual patient.

 4     Q    Is addiction a disease?

 5     A    I believe that it is.

 6     Q    And you would agree with me that today,

 7    based on what you know, there are people who are

 8    addicted to Janssen's opioid products?  They may be

 9    generic now, they may not be owned by Janssen, but

10    there are people who are addicted to them?

11          MR. LIFLAND:  Object to the form of the

12       question.

13     A    There may be -- I don't know who those

14    people are, but they may be addicted.

15     Q    Is that okay with you?

16          MR. LIFLAND:  Object to the form of the

17       question.

18     A    I'm not understanding what you're asking

19    me.

20     Q    Let's back up.

21          When you worked at Janssen, you were aware

22    that there were people addicted to the very opioid

23    products that you worked on, correct?

24     A    There likely were some people who had

25    addiction to some of these products, yes.
```

```
 1      Q    And surely you were not proud of that fact,

 2   sir?

 3           MR. LIFLAND:  Object to the form of the

 4        question.

 5      A    Addiction is a known complication.  It's

 6   described for opioid analgesics, and patients who

 7   become addicted on these medications need to be

 8   treated for those medications.  They need to be

 9   cared for by people who are knowledgeable in how

10   opioids should be used, and they need to be

11   knowledgeable how to treat patients when they become

12   addicted.

13      Q    When Janssen learned that patients were

14   addicted to some of their medications, did Janssen

15   do anything to determine what prescriptions were

16   prescribed to addicts?

17           MR. LIFLAND:  Object to the form of the

18        question.

19      A    I, I -- I don't know the answer to that

20   question.

21           I think if people reached out to the

22   company to get help on how to care for patients,

23   then, where possible, we tried to provide care, not

24   only to the patients but to the prescribers, by

25   providing medical education, reviewing package
```

1    inserts, and going through that type of information.

2        Q    Did Janssen ever donate the money that it

3    received from improper opioid prescriptions?

4            MR. LIFLAND:  Object to the form of the

5         question.

6        A    I don't know the answer to that question.

7        Q    Janssen makes money off of prescriptions,

8    whether they're appropriate or inappropriate, right?

9            MR. LIFLAND:  Object to the form of the

10        question.

11       A    I don't know the answer to that, as well.

12       Q    Why not?

13       A    Because I don't know if there is any

14   reviewing that goes on for the prescriptions that

15   are -- I don't -- I'm not -- as I mentioned to you,

16   I'm retired.  I don't know what the state of the art

17   is right now, and I don't --

18       Q    When you were there, did Janssen review any

19   prescriptions to determine whether they were

20   appropriate or inappropriate?

21       A    I don't know.  That was not work that was

22   done by me and my department.  So, I don't know the

23   answer.

24       Q    While you were at Janssen, Janssen made

25   money on all the prescriptions, not just those that

 1    were appropriate, correct?

 2            MR. LIFLAND:  Object to the form of the

 3        question.

 4      A    I don't know.  I don't, I don't know.  It

 5    was not an area that I saw.  I didn't see that type

 6    of data; so, I don't, I don't know.

 7      Q    What presents a better long-term business

 8    opportunity for Janssen, use of opioids for acute

 9    post-operative pain or chronic opioid therapy?

10            MR. LIFLAND:  Object to the form of the

11        question.

12      A    I think one would have to look at usage

13    patterns.

14            So, acute pain is something that -- there

15    is a lot of acute pain.  People may use medications

16    appropriate -- certainly for the treatment of that

17    pain.  There is also a lot of chronic pain, and I

18    think medications are used as appropriately.

19            I haven't seen a side-by-side comparison of

20    the dollar amounts that would be generated from an

21    acute pain market and a chronic pain market.  If I

22    saw that, it was many years ago, and it was

23    certainly not in something that I regularly

24    addressed or was not part of my responsibilities at

25    Janssen.

Gary Vandrangi, M.D.
January 17, 2019                                          108

```
 1            So, I don't know the answer to your
 2   question.
 3       Q    Are you aware of the fact that cigarettes
 4   are a profitable product because they are addictive?
 5            MR. LIFLAND:  Object to the form of the
 6        question.
 7       A    I'm aware of the fact that cigarettes are
 8   profitable products.  I don't know if that's
 9   necessarily only because they're addictive.  I don't
10   know.
11       Q    Well, companies like repeat business,
12   correct?
13       A    Companies like recreate -- repeat business,
14   but good business is to make sure that people are
15   well cared for and that they're doing well.
16       Q    Have you studied the prior opioid crises in
17   this country?
18            MR. LIFLAND:  Object to the form of the
19        question.
20       A    I've not -- could you explain that a little
21   more for me?
22       Q    Yeah.
23            Were you aware that this is not the first
24   opioid crisis in this country?
25       A    I'm aware that there may have been, many
```

 1   years ago, a crisis with, I believe, opium and some

 2   of the other ones.

 3         I don't know if that's the one you're

 4   referring to or not.

 5     Q     Are you aware there have been other

 6   medicinal opioid crises in this country?

 7     A     Not that I'm specifically aware of, no.

 8         I was aware of maybe -- I had heard of

 9   illegal opioid, opioid medicines, but not of a

10   medicinal opioid crisis, another one.

11     Q     You've never studied humanity's past

12   experience with medicinal opioids?

13     A     Not in a structured way.  No.  I mean, I

14   may have walked through a museum where some

15   information was available, but I haven't sat down

16   personally and gone through this.

17     Q     Opium-based products have been around for

18   millennia, correct?

19     A     Yes, that's correct.

20     Q     And you've never looked into how opium has

21   been used in the past?

22     A     Right.  So, what I had testified was, I

23   heard about the opium dens that we had talked about,

24   but I don't know specifically as how it may have

25   been abused as a medicinal product, to your

January 17, 2019                        110

```
 1   question.  No, I'm not familiar with that.

 2       Q    That's not something you looked into in

 3   your role at Janssen?

 4       A    I did not.

 5            MR. LIFLAND:  Are you okay?  Do you need a

 6        break?

 7            THE WITNESS:  A break would be good.

 8            MR. DUCK:  Okay, let's take a break.

 9            THE WITNESS:  Thank you.

10            THE VIDEOGRAPHER:  Off, 11:13.

11                    (Recess taken.)

12            THE VIDEOGRAPHER:  Back on, 11:31.

13       Q    Do opioids produce euphoria for some

14   patients?

15       A    Yes, they do.

16       Q    Do opioids make some patients feel good?

17       A    They can.

18       Q    Is that the same thing?

19       A    I think people use "euphoria" and "feel

20   good" in the same way.

21       Q    And does Janssen use them the same way?

22       A    "Feel good" is, is one of the terms that

23   they use to describe euphoria.  So, yes.

24       Q    Is that a good thing or a bad thing, for an

25   opioid to produce euphoria?
```

1           MR. LIFLAND:  Object to the form of the

2       question.

3       A    I think the primary goal, as we know, is to

4    reduce pain and to get people comfortable.  So,

5    euphoria is not a necessary -- a desirable effect;

6    so, it's not the primary focus on it.

7       Q    Is feeling good a desirable effect?

8       A    Feeling good is something that -- it's --

9    if people are feeling good, that's a good thing, but

10   that's not the primary intent of using the

11   medication.

12      Q    How does Janssen find out if patients are

13   experiencing euphoria?

14      A    So, we find we learn about euphoria in the

15   same way we would learn about any adverse event.

16   Either healthcare providers or patients would either

17   call in to our information center or fill out a med

18   watch form, which is a governmental form talking

19   about that.  And so, that would be ways that we

20   would hear about it.

21           Sometimes, if there were scientific

22   meetings, when -- we'd check in with people who were

23   caring for patients who were receiving our

24   medications, we might find out from them and

25   which -- and they may -- and we would encourage them

1    to fill out a med watch form, as well; so, we could

2    capture it formally.

3        Q    Did Janssen receive any input directly from

4    patients about euphoria or feeling good?

5        A    So, my experience, what I had heard, was

6    indirectly, but it relates to patients.  I don't

7    know if you'd want to hear that or not, Counselor.

8        Q    Sure.

9        A    All right.  So, early on, when tapentadol

10   was first introduced into the U.S. marketplace, we

11   became aware that there were some reports of

12   patients noting that -- it's actually almost the

13   reverse of what you're asking me.  So, patients were

14   taking the medication, and they were describing as

15   not getting the buzz, not getting the euphoria.  And

16   so, they had interpreted that as indicating that

17   the, that the drug was not working.

18            I had reached out to the individuals in the

19   field and said, "Do you know whether the healthcare

20   providers had actually done an assessment of pain

21   control or reduction in pain?"

22            And they went back, and, as it turned out,

23   they did.

24            So, for example, if a patient had a pain

25   level of level eight, and they did an -- they did

 1    a -- asked the patient what the level of pain was

 2    after they started the medication, and had it

 3    dropped from eight to six, then, assuming no other

 4    side effects, that that would be a successful

 5    treatment for that patient.

 6            So, we came to understand, at least early

 7    on in the U.S. marketplace, that, in fact,

 8    tapentadol wasn't giving the type of euphoria that

 9    patients may have been -- experienced with drugs

10    like hydrocodone or oxycodone.

11            So, we were -- in answer to your question,

12    we are aware of euphoria, we did get that feedback.

13    But in this case, it was not euphoria, it was

14    absence of euphoria that we've heard about.

15            But it gets anecdotal.  So, I want to make

16    sure that's clear.

17    Q    You also received -- Janssen also received

18    reports about patients experiencing euphoria with

19    its drugs?

20    A    Yes.

21    Q    And patients saying they felt good on the

22    drug; it made them feel good, right?

23    A    Presumably "feel good" would have been a

24    term -- one of the terms that people might use.

25            "Feel good" and other descriptions would

```
 1    fold into terms called -- of euphoria.  So, that

 2    could be.

 3         Q    Did Janssen ever try to separate them out?

 4         A    I'm not sure I'm following your question.

 5         Q    Well, if the term "feel good" got lumped in

 6    with euphoria --

 7         A    Oh, yes.

 8         Q    -- did Janssen ever try to tease those two

 9    apart?

10         A    So, they would see who came -- what the

11    reports were for feel good and euphoria, but when

12    those -- that type of information is submitted to a

13    regulatory authority, for example, those terms may

14    fold into the term of "euphoria."

15         Q    Did Janssen ever try to do anything that

16    would prevent the term "feel good" from folding into

17    "euphoria"?

18         A    I don't know how the data were reported

19    out.  I don't know if they were -- sometimes reports

20    may be the verbatim term and the preferred term.

21            So, the verbatim term, to your point, would

22    be "feel good," and the preferred term would be

23    "euphoria."  And they may have, in fact, provided

24    that information for both terms.  So, they may have.

25         Q    You're not sure one way or another, though?
```

1      A    Not -- it's not certain.  I think we did

2    try and include the verbatim terms, but I can't

3    testify to that.  I'm not sure.

4      Q    Exhibit 6.

5                      (JAN-MS-00491920 was marked as

6                       Vorsanger 6 for identification,

7                       as of this date.)

8      Q    Okay.  This Exhibit 6 is a medical

9    development project statement, right?

10     A    Yes.

11     Q    Showing the status as of June 26, 2001,

12   correct?

13     A    Yes.

14     Q    And this document, the format it's in, it's

15   a format that was commonly used by Janssen?

16     A    It was a doc -- it was a format that was

17   used at that time.  I don't know that that format

18   was preserved and used going after that time.

19     Q    Sure.  But you recognize the format of this

20   document?

21     A    At this time, yes.

22     Q    Okay.  What does this document reflect?

23     A    This is a document that was designed to

24   identify the nature of the data that would be of

25   interest to people and then to -- and to kind of set

 1    out a dissemination strategy for the data.

 2            So, it's -- do you want me to go through

 3    the document with you?

 4        Q    Yes.

 5        A    Oh, sure.  All right.

 6        Q    Please.

 7        A    So, the outcome statement, submission of

 8    one or more abstracts to one or more major

 9    meetings -- and this is identified as the American

10    Pain Society in '04.

11            So, the thinking would be that the study

12    would have been completed by, you know, let's say

13    six months earlier, or a period of time that they

14    could submit it.

15        Q    So, let me stop you there.

16            At this point in time, the study had not

17    been completed?

18        A    I don't even know if the study was

19    initiated at this point.

20        Q    Okay.

21        A    This may have been a draft document with

22    the intent of how the data might be used for this

23    study.

24        Q    This is a plan for a study that will be

25    conducted in the future?

 1       A    I think it was a draft plan.

 2       Q    Okay.  Thank you.

 3            Please continue.

 4       A    Okay.  I'm sorry, Counselor, do you have

 5  any other questions now?

 6       Q    No.  Please continue.

 7       A    Okay.  So, we talked about when the data

 8  would be available.

 9            One quarter after the 12.5-micrograms,

10  which we call the 12 patch, of which would be -- the

11  projected launch date was the fourth quarter of

12  2003.  And it talks about the study calls for the

13  clinical trial of approximately $6 million.

14            I'm not sure what "CT costs" means, at this

15  point.

16       Q    Okay.  A couple of questions about that.

17       A    Sure.

18       Q    So, this plan shows that the launch of the

19  study would start in the fourth quarter of 2003 --

20       A    Let me see.

21       Q    -- or a certain patch?

22       A    No, I think this was -- the data will be

23  available by one quarter after the 12-microgram

24  patch launches.  So, there was another formulation.

25            And I think the thinking at that time was

 1    that that launch would -- this is my interpretation

 2    of the document -- that the launch date for the

 3    patch would be the fourth quarter of 2003.

 4         Q    Okay.  And this study in -- regarding

 5    Duragesic --

 6              Which is the patch, right?

 7         A    Yes.

 8         Q    -- is meant to accompany or follow behind

 9    the launch of a new patch, right?

10         A    That's what it looks like.

11         Q    Okay.  And then below -- and by the way,

12    the medical director listed on this document is you?

13         A    That's correct.

14         Q    Then you'll see there's strategic linkage.

15              Do you see that?

16         A    Yes.

17         Q    And it says, "This trial is linked to two

18    strategies."

19              Can you please read those two strategies?

20         A    Yes.

21              "Expand Duragesic use in the nonmalignant

22    pain market while differentiating from the

23    competition."

24              And two, "Maximize cost and reimbursement

25    opportunities."

1        Q     Thank you.

2              This goes on to talk about what the study

3    may conclude or result in; is that right?

4        A     I think the trial should demonstrate -- and

5    again, this is what -- this is aspirational.  We

6    would hope -- we don't know what the data are going

7    to show.  We have to do the study.

8              "But the trial should demonstrate the

9    improvement in pain scores, as well an improvement

10   in activities of daily living" -- which we define as

11   "ADL" -- "over prior treatment."

12             And I don't have a draft protocol.  I don't

13   know what the study population is, other than to say

14   it's individuals with low back pain.  So, we -- I

15   don't have that data in front of me now to comment.

16             "ADLs will be measured -- events of daily

17   living will be measured using a validated

18   instrument, such as the Oswestry Disability Index.

19   This trial will provide data to advise clinicians on

20   how to use 12.5 mcg patch and will advise our

21   strategic customers (HMO, PPMs) the quality of life

22   benefits of the patch usage for pain while

23   improvement in patients with chronic low back pain."

24       Q     Thank you.

25             And then below this, we see a chart that

```
 1    shows "Key Milestones."

 2        A    Yes.

 3        Q    It shows "Risks and Competitive Threats,"

 4    right?

 5        A    Yes.

 6        Q    It shows "Financials," yes?

 7        A    Yes.

 8        Q    And "Issues," right?

 9        A    Yes.

10        Q    And let's look at the "Risk and Competitive

11    Threats."

12             Do you see the first bullet point there?

13        A    Yes.

14        Q    Can you please read that?

15        A    Yes.

16             "Small risk of NS," which I'm interpreting

17    mean "nonsignificant" -- "improvement in quality of

18    life and functionality measures."

19             What that means is, when this was put

20    together, we believed strongly that the patch would

21    be effective; and we believe that, as patients felt

22    better and their pain was better controlled, then

23    the events of daily living might be reflected in

24    that.

25             And we believed that, again, the risk could
```

```
 1   be small, but this is what we had said.

 2       Q    The risk would be small that the study

 3   would not show what Janssen expected it to show?

 4       A    The -- yes.

 5       Q    Thank you.

 6            Do you know whether or not this study was

 7   ever conducted?

 8       A    I don't think this study ever came to

 9   fruition, but I don't know.  I don't recall.

10       Q    Can you please read the second bullet point

11   under "Risk and Competitive Threats"?

12       A    Yes.

13            "Pain control is not significantly

14   different than prior treatment.

15       Q    Okay.  And that means that the study may

16   show that the pain relief that the patient received

17   with the Duragesic patch was not significantly

18   better than what other prior treatment they

19   received, right?

20       A    That's what that means.

21            But, but it's important to understand that

22   if these patients are going on a patch, that they

23   may have been on other opioid analgesics and their

24   pain control may be good, and so that that pain

25   control may continue on the patch.  But if you look
```

 1    at differences between the before and after, they

 2    may not be dramatically different.

 3        Q    The --

 4        A    The study design usually is set up to see

 5    that we're able to provide analgesia to patients

 6    going into the study.  They usually have to have a

 7    fairly significant amount of pain even to come into

 8    the study.

 9              So, typically, patients would be people, if

10    you look at the study design, who have inadequate

11    pain control.

12              But this was identified as a potential

13    issue.

14        Q    Are you familiar with a program called

15    MeDRA, M-E-D-R-A?

16        A    I remember the term, but I don't remember

17    the context.

18        Q    All right.  I'm going to hand you what's

19    marked as Exhibit 7.

20                        (JAN-MS-00605509 through 510 was

21                        marked as Vorsanger 7 for

22                        identification, as of this

23                        date.)

24        Q    All right.  If you'll turn to the second

25    page, this is an email from you to several people at

 1   Johnson & Johnson companies, right?

 2       A    I'm sorry, Counselor, the second page is

 3   one that I wrote to Jim Xiang.

 4            Is that the one you're referring to?

 5       Q    That's the one I'm referring to.

 6            And there are additional J&J employees

 7   copied, right?

 8       A    Oh, I see.  I'm sorry, I was on the

 9   previous page.

10       Q    No problem.

11       A    Yes, yes, that's right.

12       Q    And then the subject line of your email is,

13   "Euphoria versus feeling good."

14       A    Yes.

15       Q    Right?

16       A    Yes.

17       Q    And you state, in the second sentence here,

18   "Jim, we are interested in understanding whether

19   there may have been a difference in perceived mood

20   changes for subjects in the Nucynta ER clinical

21   trials that were treated with either Nucynta ER or

22   oxycodone CR."

23            Right?

24       A    Yes.

25       Q    Can you please read the next paragraph for

 1   me.

 2       A    "So, for example, some subjects may feel --

 3   have reported euphoria (an adverse event with a

 4   negative connotation) and others may report 'feeling

 5   good' (a positive effect)."

 6       Q    Thank you.

 7            Then in the last paragraph, you'll see

 8   reference to MeDRA.

 9            Do you see that?

10       A    Yes.

11       Q    And you write, "One obvious challenge is

12   that MeDRA may promote the verbatim term of 'feeling

13   good' to the preferred term of 'euphoria,' which

14   would be a problem, because then one cannot separate

15   the terms."

16            Did I read that right?

17       A    Yes.

18       Q    What is MeDRA?

19       A    So, MeDRA is, I believe, a medical

20   dictionary that talks about various adverse events.

21            And this reflects what I had said earlier

22   in my testimony, that the terms may come in as

23   "feeling good," and, as we had indicated, as

24   something that could be a good thing.

25            And you may be elevated -- or I use the

1    word "promoted to," which is sometimes the way it's

2    used -- to euphoria -- to the word "euphoria."

3              So, we were -- and what I had commented on,

4    as you can see, is I had reached out to a

5    psychiatrist, because I wanted to understand what

6    the differences were between those.

7              So, I reached out to one of my psychiatry

8    colleagues, and he helped explained that it's an

9    important thing from psychiatrists, because

10   apparently feeling good can be distinguished from

11   euphoria.

12             So, part of the analysis was to really

13   understand -- even though medically we may lump

14   these together or, as I say, promote one to the

15   other, there may be reasons where we really want to

16   understand, to your point, how do we drill down and

17   look at euphoria, et cetera.

18             So, that was why we actually did look at

19   this.

20        Q    You didn't want feeling good -- the term

21   "feeling good" to get lumped in with "euphoria"?

22        A    No, I wouldn't say that.  I would -- I --

23   we wanted to make sure that we understood the

24   differences between the two.

25        Q    You say "because then one cannot separate

```
 1    the terms."

 2            You wanted them to be separate, right?

 3        A    Right, because of the reasons I just

 4    testified to, was that the psychiatrists had

 5    indicated that those might be important differences.

 6        Q    Well -- and, as you state at the very

 7    beginning, euphoria is an adverse event with

 8    negative connotations, right?  That's what you say.

 9        A    Yes, I do.

10        Q    And you say, also, that feeling good is a

11    positive effect?

12        A    Actually what I say is, and others may

13    report feeling good as a positive effect.

14            But they would still all be reported as

15    adverse events.  And that's important.

16        Q    Let's be, let's be clear.

17            The positive effect is in quotations as

18    your comment, right?

19        A    Correct.  But it's still an adverse event,

20    because it's all folded into the adverse event of

21    euphoria.  That's the point of this discussion.

22        Q    And it was all reported to the FDA?

23        A    Yes.

24        Q    And the FDA would see a report of feeling

25    good as a negative effect?
```

```
 1      A    Yes, because all of these are reported as

 2   adverse events.

 3           So, there are positive effects from adverse

 4   events that are still adverse events.

 5           For the drug minoxidil, for example, for

 6   hair loss, was a -- is that some people perceived as

 7   a positive effect.  But when the drug was first

 8   introduced into the market, a hair gain I'm -- I'm

 9   growing it for hair gain was an adverse event.  It

10   was an adverse event that people went out and

11   promoted to -- for hair, for hair regrowth.

12           So, there are some adverse events that may

13   have a positive spin, but they're still adverse

14   events.

15           So, feeling good would have been reported

16   as euphoria as an adverse event.

17      Q    It would have been appropriate for feeling

18   good to be reported as an adverse event --

19      A    Yes --

20      Q    -- not --

21      A    -- even though -- well, people may think

22   it's a positive effect, but it's an adverse event.

23      Q    And you wanted people to be able to

24   separate those, right?

25      A    Well, we would never have promoted on it,
```

Gary Vandeweghe, M.D.
January 17, 2019                                   128

 1  anyway, and talked about it.  The analysis that we

 2  talked about -- and I provided the reasons for why

 3  we did that -- are here.

 4      Q    It would have been inappropriate to promote

 5  on this issue, correct?

 6      A    We would not have promoted on it.

 7      Q    Because it would have been inappropriate?

 8      A    We would not promote on it because it was

 9  not -- it was, it was not part -- it was only a

10  single adverse event.  So, we did not promote on

11  that.

12      Q    It would have been inappropriate to promote

13  on the difference between euphoria and feeling good,

14  correct?

15      A    Yes, that's correct.

16      Q    Who is Dr. Russell Portenoy?

17      A    Dr. Russell Portenoy is a pain specialist.

18      Q    When is the last time you spoke to him?

19      A    Quite a while ago.

20      Q    He was a friend of yours, correct?

21      A    He was a colleague of mine.  I wouldn't say

22  that he was a friend of mine.

23      Q    But you knew him personally?

24      A    I knew him personally.

25      Q    And you worked with him?

```
 1        A    I, I -- he provided consultation to the

 2   company.  And in that way, that's how I met him.

 3   But I did not know him socially, and I did not go

 4   out with him socially.

 5             That's how I would define a friendship.

 6        Q    Janssen used Dr. Russell Portenoy as a KOL,

 7   right?

 8        A    Yes.

 9             MR. LIFLAND:  Object to the form of the

10        question.

11        Q    And what is a KOL?

12        A    A key opinion leader.

13        Q    Janssen used many different key opinion

14   leaders for its opioid analgesics, right?

15             MR. LIFLAND:  Object to the form of the

16        question.

17        A    I don't know whether I would use the word

18   "many."

19        Q    How many?

20        A    I don't know.

21        Q    More than 10?

22        A    I don't know what the number would be, but

23   we -- Janssen used a number of individuals who are

24   key opinion leaders in the work, in their work.

25        Q    More than 100?
```

```
 1      A     No, sir, I don't believe it was that many.

 2      Q     How big was the speakers' bureau?

 3      A     The speakers' bureau, I don't know how big

 4   it was in its day.  That would be a question that

 5   the marketing group would be able to answer, not at

 6   the medical group, whether all the speakers were

 7   considered key opinion leaders or whether they were

 8   just knowledgeable clinicians, and one could, could

 9   make a distinction between those two.

10      Q     How are key opinion leaders identified?

11      A     I'm not sure if there's a formal process

12   that's used.  But one of the -- some of the things

13   we think about is the number of publications they

14   have and that type of thing.

15           So, if I were a knowledgeable clinician,

16   for example, where I was knowledgeable about the use

17   of our products, that individual, she or he, may go

18   out and speak at a speakers' bureau.

19           If I were a key opinion leader, I would be,

20   typically, someone who has published a lot, maybe

21   sat on FDA advisory boards and has distinguished

22   himself academically and through publications and

23   research.

24      Q     Someone who is credible, right?

25      A     Well, I think -- I mean, I think the
```

 1   clinicians are very credible, because they have

 2   experience caring for the patients, as well.

 3          So, I think the criteria that I provided,

 4   Counselor, in my testimony is a way that I think

 5   about distinguishing KOLs from other knowledgeable

 6   individuals.

 7   Q     And one of the reasons you want to have a

 8   distinguished KOL is because they are more

 9   influential that way, right?

10          MR. LIFLAND:  Object to the form of the

11      question.

12   A     We -- the individuals that one would want

13   to work with would be some of the more most

14   knowledgeable people that we have, not only about

15   our other -- own compound, but other compounds or

16   type of thinking that's going on in the field:  What

17   are people thinking about for the next set of drugs

18   in development?  What are the important issues that

19   are going on in analgesia?

20   Q     Is it your testimony that Janssen did not

21   consider whether a KOL would be influential to his

22   or her audience?

23   A     I think we understood the fact that people

24   who were -- people who published a lot and people

25   who were respected in the field would be important,

 1   and people who actually had used our medications and

 2   understood how to use those medications would be the

 3   people that we felt would be important, and I would

 4   want to listen to; that they, frankly, knew what

 5   they were talking about.

 6       Q    Because -- the reason Janssen would want to

 7   use those types of individuals you just described is

 8   they are influential?

 9            MR. LIFLAND:  Object to the form of the

10        question.

11       A    They may be influential, but I think that

12   people listening to that will form their own

13   opinions in terms of their own clinical experience.

14       Q    Well, that's not my question.

15            My question is this:

16            A reason that Janssen selects certain KOLs

17   is that they are influential?

18            MR. LIFLAND:  Object to the form of the

19        question.

20       A    I don't know what the criteria Janssen used

21   to select who the KOLs are.

22            When I look to see people who I might want

23   to work with, the criteria that I had already

24   testified was important for me to identify those

25   individuals.

Gary Foster - January 17, 2019                           133

```
 1            I don't know that the company identified
 2      formal criteria.
 3        Q    You don't know that?
 4        A    No, sir, I don't.
 5        Q    You've never seen anything about that?
 6        A    I don't recall a list specifically.
 7      Whether there were criteria at the company, I don't
 8      know.
 9        Q    Would it have been inappropriate for
10      Janssen to rank KOLs based on their ability to
11      influence their audience?
12            MR. LIFLAND:  Object to the form of the
13         question.
14        A    I would need to understand the
15      circumstances better to be able to do that.
16        Q    What don't you understand about my
17      question?  I would like to clarify it for you.
18        A    Sure.  I think, if one were going to do a
19      ranking of KOLs, it may depend on where those
20      individuals could be -- in what settings those could
21      be used.
22            So, for example, somebody who had
23      national -- someone who was nationally recognized in
24      something might be appropriate for situations in
25      where a national, a national audience would be more
```

 1   desirable.

 2          Somebody may be a regional KOL, would have

 3   more people in the area where they worked at.  It

 4   could be in the south, it could be in the far west,

 5   et cetera.  In those types of interest, that would

 6   be a more appropriate setting.

 7          So, it may be that, as the company

 8   identified a list of key opinion leaders, it may

 9   have been to stratify to see where it would be most

10   appropriate to have those people work with the

11   company or represent the company.

12      Q    The marketing department helped to identify

13   KOLs that Janssen would use, right?

14      A    So, there are a number of KOLs -- recall

15   that I had started at Janssen in 2000 -- I'm going

16   to answer your question.

17      Q    Yeah, if you will answer the question yes

18   or no, and then you're welcome to --

19      A    Okay.  So, I think the marketing department

20   did have an involvement on it.

21          But I want to qualify that, that the

22   activities that would have gone on in identifying

23   some of the KOLs that were already at the company

24   when I got there would have had a period of

25   approximately 10 years.

1          So, when those people -- when I joined

2    Janssen in 2000, there were people who were already

3    KOLs.  And I don't know what criteria or who

4    selected those criteria for those people.

5          Q    You don't know one way or another?

6          A    Correct.

7          Q    All right.  For those that were selected

8    while you were there, the marketing department was

9    involved in their selection, correct?

10         A    The marketing department may have been

11   involved in certain selection, but those -- yes.

12         So, to qualify, those may be related to

13   marketing-related activities that were appropriate

14   and, again, as deemed appropriate in terms of how

15   they would work with the company.

16         Q    Key opinion leaders that Janssen hired were

17   used to promote Janssen products, right?

18         MR. LIFLAND:  Object to the form of the

19     question.

20         A    Key opinion leaders were used in

21   company-sponsored settings using approved materials

22   to discuss Janssen products.

23         Q    And promote them?

24         A    To identify them as products that certainly

25   could be used for patients, for appropriate

1    patients.

2        Q    So, that prescribers would understand how

3    to use Janssen's products, right?

4        A    They could understand how to effectively

5    use those products.

6        Q    When to use them, right?

7        A    That would be a -- that would be a decision

8    by the prescriber, but we would be providing

9    additional information to them.

10       Q    And Janssen's hope is that that would lead

11   to additional prescriptions of Janssen's products?

12       A    As deemed appropriate.  I think we wanted

13   to inform, to make sure that people -- that

14   prescribers and patients were aware of their

15   therapeutic options.

16            And then, in instances, certain drugs may

17   be better or worse than other ones.  And that would

18   be a decision that the clinician would need to make

19   in counsel, in conjunction with the patient.

20       Q    Well, the purpose of Janssen's educational

21   activities -- the purpose is -- one purpose is to

22   increase the prescription of Janssen products?

23       A    I don't agree with that.

24       Q    Okay.  And do you agree with the fact that

25   one reason why Janssen engaged in promotional

```
 1    activity is to increase the prescribing of Janssen's

 2    products?

 3        A     Promotional activities -- no -- well, in

 4    part.  I would have to say in part.

 5             I think it was critically important for the

 6    company to understand that the products were using

 7    safe and effectively [sic], as I've testified

 8    earlier today.

 9             And part of the promotional activities were

10    to make sure that people understand safe use of the

11    product.

12        Q     Janssen employed sales reps to promote its

13    opioid products, correct?

14        A     That is correct.

15        Q     Janssen employed sales reps to market its

16    opioid products, correct?

17        A     Yes.

18        Q     And sales reps -- new question.

19             And what sales reps do is sell?

20        A     Yes.

21        Q     Thank you.

22             So, I'm going to hand you Exhibit 8.

23                         (JAN-MS-00337085 through 086 was

24                         marked as Vorsanger 8 for

25                         identification, as of this
```

Gary Vorsanger, M.D.
January 17, 2019                                        138

```
 1                         date.)
 2        Q    By the way, I'm just going to ask you about
 3   the first two emails on this page, so...
 4        A    Okay.
 5        Q    Who is Johnette Johnson?
 6        A    I think she is a marketing person, but I'm
 7   not certain.
 8        Q    And she's asking about Dr. Russell Portenoy
 9   in this email, correct?
10        A    Yes.
11        Q    She sent an email to Frank Demiro.
12             Who is Frank Demiro?
13        A    Frank Demiro is a marketing person.
14        Q    And this was in 2013, right?
15        A    Yes.
16        Q    Johnette Johnson says, "Frank, the KOL for
17   whom I was trying to seek your counsel and maybe
18   background information was Russell Portenoy.  Any
19   insights you can provide would be very helpful.
20   Thanks so much."
21             Did I read that right?
22        A    Yes.
23        Q    Demiro then responds to Johnette and says,
24   "Please talk with Gary Vorsanger.  He is personal
25   friends with Russ and can provide you with all the
```

 1   details that you need.  He is not a speaker, but is

 2   very influential."

 3          Did I read that right?

 4   A     Yes.

 5   Q     Do you disagree with anything there?

 6   A     Well, as I already testified, Dr. Portenoy

 7   and I were colleagues, and not friends.  We

 8   certainly knew each other.  So, if there was an

 9   interest in identifying from the med -- at Janssen

10   in medical who knew Dr. Portenoy, I knew him as I've

11   testified.

12   Q     Frank Demiro is a marketing guy, right?

13   A     Yes, he is.

14   Q     All right.  Do you see the last sentence he

15   wrote here?

16   A     "He's not a speaker, but is influential."

17   Q     "Very influential"?

18   A     "Very influential," that's right.

19   Q     Who is he talking about?

20   A     Dr. Portenoy.

21   Q     Thank you.

22          I hand you what we'll mark as Exhibit 9 to

23   your deposition.

24                        (JAN-MS-02337833 through 835 was

25                         marked as Vorsanger 9 for

```
 1                          identification, as of this

 2                          date.)

 3        Q    It's an email chain from 2002, in which

 4    you're copied.

 5        A    Thank you.

 6             (Perusing document.)

 7        Q    Are you ready?

 8        A    Yes, sir.

 9        Q    Do you remember this email?

10        A    In looking it over, I wouldn't say I

11    remember it.  But now that I read it, I'm

12    familiarizing myself with it.

13        Q    Who is Heather Thomson?

14        A    Heather Thomson was a medical scientist

15    liaison at Janssen.

16        Q    Do you know whether she's still there?

17        A    No, she's not -- I don't believe she is

18    there.  She left a while ago.

19        Q    Why did she leave?

20        A    To take another job.

21        Q    Do you know what year that was?

22        A    I don't know.  I don't.

23        Q    What is a medical science liaison at

24    Janssen?

25        A    So, a medical scientist liaison is
```

 1   typically an individual who may have an advanced

 2   degree, a PharmD or a Ph.D., who would interact in

 3   peer-to-peer communications or discussions with

 4   healthcare providers or key opinion leaders.

 5       Q    Thank you very much.

 6            Let's start on the last page.

 7            She sent an email to Bruce Moskovitz,

 8   right?  Last page.

 9       A    The last page is -- yes, from Heather to

10   Bruce.  Yes, I see it.

11       Q    Thank you.

12            She says, "Bruce, Clare Harte says, because

13   of HCC, we can't create information on KOLs that we

14   wouldn't share with them, which, according to her,

15   kills the opponent/neutral/advocate categorization."

16            Did I read that sentence right?

17       A    Yes.

18       Q    Who is Clare Harte?

19       A    Clare Harte was a project manager who

20   worked with -- in my group.

21       Q    For opioids?

22       A    Yes.

23       Q    In the medical affairs department?

24       A    Correct.

25       Q    What is HCC?

1      A     Health care compliance.

2      Q     That's a department at Janssen?

3      A     Yes, it is.

4      Q     Do you recall this rule that you could not

5   create information on KOLs that wouldn't be shared

6   with them?

7      A     I recall that there were conversations in

8   health care compliance.  And there's a reference to

9   one of our attorneys, as well, indicated that this

10  type of categorization, if the company was going to

11  do it, would need to share it with them, which is

12  what it says here.

13     Q     Okay.  And Heather Thomson references "the

14  opponent/neutral/advocate categorization of KOLs,"

15  correct?

16     A     That's what it says.

17     Q     And that means that, at one point in time,

18  Janssen placed different KOLs in one of those three

19  categories?

20           MR. LIFLAND:  Object to the form of the

21      question.

22     A     I think, at one time, Janssen was trying to

23  understand whether there may be a way or not to

24  begin to look at KOLs.  I described the

25  stratification earlier in my testimony.  There may

1   be another way of thinking about it -- this way, as

2   well, as it says in the email.  I don't think any of

3   this actually came to pass.

4       Q    It goes on to say, "She thinks we have to

5   stick to only capturing stuff like research projects

6   funded, speaking engagements, and other snooze

7   data."

8            What is "snooze data"?

9       A    I don't know what she means by that.

10      Q    She means boring data, right?

11      A    I would -- I think that's a good

12  assumption.

13      Q    "I am backing off further development of

14  this idea until we get the ground rules straight."

15           Right?

16      A    Yes.

17      Q    What -- did Janssen ever get the ground

18  rules straight?

19      A    Yes.  We did not do this type -- I don't

20  believe we ever -- we moved forward with

21  categorizing the KOLs in this manner.

22      Q    In what manner did Janssen categorize the

23  KOLs?

24      A    I think these were individuals who were

25  brought to work at the company based on some of the

1    criteria I've already testified, in terms of their

2    publications, et cetera, rather than this type of

3    categorization, as Heather has identified in her

4    email.

5         Q    Is it your testimony that Janssen never

6    placed KOLs into named categories?

7         A    My testimony is that I don't recall that

8    type of information.

9         Q    Fair enough.

10             So, Bruce Moskovitz responds to this,

11   right?

12        A    You're looking at the email on the page

13   before, Counselor?

14        Q    Pardon me.  I may not be.

15             Yes.

16        A    Okay.  I'd like to -- should I read it?

17   Okay.

18             (Perusing document.)

19             Okay.

20        Q    So, Bruce Moskovitz responds to Heather

21   Thomson's email, right?  Bottom of the page.

22        A    Yes.  So, Heather wrote an email to Michele

23   Cole and Bruce on the bottom of the first page --

24        Q    I'm looking at the bottom of the second

25   page.

 1      A    Right.  So, your -- I think your comment to

 2   me -- and if I misunderstood, I apologize -- was

 3   Bruce's email to Heather, yes.

 4      Q    Thank you.

 5           So, Bruce Moskovitz is responding to the

 6   email from Heather that we just read about

 7   information on KOLs, right?

 8      A    I'm confused in the sequence, and I

 9   apologize for that.  Heather's email looks like it

10   came after Bruce's email, if I got this right.

11           So, Heather wrote an email to Bruce saying,

12   "We're not able to move ahead."

13           The email before that was Bruce reaching

14   out to the other -- Heather and the other KOLs,

15   saying, "Listen, we need to really understand this

16   better."

17           So, maybe I don't have the sequence right.

18   And if I don't, I apologize.  It looks like this

19   email (indicating) -- okay.  It was a few minutes

20   apart.  I see.

21           So, yes.  So, Heather's email was on the

22   22nd to Bruce, and this is Bruce's email.  Yes, sir.

23   Okay, I got it straight now.

24      Q    All right.  So, we're on the same page.

25      A    Sorry.  Yup.

January 17, 2019                              146

```
 1        Q    Heather Thomson sent an email to Bruce

 2   Moskovitz --

 3        A    Two days later, right.

 4        Q    Two days later, Bruce Moskovitz responds to

 5   Heather Thomson?

 6        A    Yes, two days later.

 7        Q    Okay.  And I'm looking at that email from

 8   Bruce Moskovitz.

 9        A    Right.

10        Q    Bruce says, in response to Heather's email,

11   "Obviously not something we can proceed with

12   lightly.  This will take discussion directly among

13   us and perhaps at the RMAC."

14             Did I read that correctly?

15        A    Yes.

16        Q    What is the RMAC?

17        A    I don't remember.

18        Q    Bruce goes on to say, "But I think there is

19   a way to do it.  We just need to find out how."

20             Correct?

21        A    That's what it says.

22        Q    And the "it" he's referring to is

23   categorizing KOLs, correct?

24        A    Yes.

25        Q    He goes on to say, "Brand team collects
```

```
 1    lots of information on our docs.  In this case, it

 2    isn't even information we're collecting, just a

 3    reasoned assessment based on those data."

 4          Right?

 5    A     Yes.

 6    Q     Okay.  Above that email, Michele Cole

 7    responds.

 8    A     Yes.

 9    Q     A day later, correct?

10    A     Yes.

11    Q     Who is Michele Cole?

12    A     She is another medical scientist liaison.

13    Q     She is someone who, like Heather Thomson,

14    would communicate with prescribers and KOLs?

15    A     Yes, mostly KOLs, but with some --

16    certainly would be able to discuss things with

17    prescribers.

18    Q     And that would involve discussions about

19    Janssen's products, in some instances?

20    A     Yes.

21    Q     Thank you.

22          You'll see that Michele Cole weighs in on

23    this issue and uses Dr. Russell Portenoy as an

24    example, correct?

25    A     Yes.
```

 1      Q    She describes Dr. Russell Portenoy as "a

 2   frequent author of publications," correct?

 3      A    Yes.

 4      Q    "Editor or reviewer of The Pain Journal,"

 5   right?

 6      A    Right.

 7      Q    "A current or past officer of APS and

 8   AAPM," right?

 9      A    Yes.

10      Q    What is APS?

11      A    American Pain Society.

12      Q    What is AAPM?

13      A    It's either the American Academy of Pain

14   Management or American Academy of Pain Medicine.

15   They both had the same initials.

16      Q    He was also on a guideline development or

17   task force, right?

18      A    Yes.

19      Q    And "influential, as perceived by peers,"

20   correct?

21      A    Correct.

22      Q    Did you ever share this information with

23   Dr. Russell Portenoy?

24      A    I did not, personally.

25      Q    Why not?

```
 1      A    Because these are activities that went on

 2  with the medical scientist liaison group, which was

 3  separate from the work that I had done with them.

 4      Q    So, do you respect Dr. Russell Portenoy?

 5      A    I do.

 6      Q    As a scientist?

 7      A    Yes, I do.

 8      Q    As a physician?

 9      A    Yes.

10      Q    And as an expert on issues around the

11  treatment of pain with opioids?

12      A    Certainly when I worked with him, yes.

13      Q    So, Heather Thomson responds to Michele

14  Cole.  You'll see the third sentence.  She's talking

15  about Michele's email.  She says, "This is a great

16  way to determine whether a person is influential.

17  And we might, in fact, be able to assist that

18  practitioner in becoming more influential."

19           Did I read that sentence right?

20      A    Yeah, I'm sorry, Counselor, I -- I've got

21  the one that says, "It strikes me we've got two

22  different types of categorization going on."

23           Is that --

24      Q    Yeah.

25      A    Okay.  That's the one you're looking at.
```

January 17, 2019                                    150

1        Q    The third sentence there says, "This is a

2   great way to determine whether a person is

3   influential, and we might, in fact, be able to

4   assist that practitioner in becoming more

5   influential."

6             Did I read that sentence correctly?

7        A    Yes, you did.

8        Q    The email chain continues, and Michele

9   Cole -- well, let me -- before we move on, Heather

10  Thomson's email goes on to say, "However, if the

11  person is clueless about opioids and has no

12  knowledge of Duragesic, then I really don't want

13  them to become more influential."

14            Correct?

15       A    Yes.

16       Q    All right.  Michele Cole responds to this

17  email, and she says, "Well said.  I guess I missed

18  the most relevant point, that the KOL needs to be

19  well-versed regarding the use of opioids.  I guess I

20  assumed this, but did not state it.  We will only

21  call on KOLs that are opioid users.  We don't want

22  to serve meat to a vegetarian."

23            Did I read that paragraph right?

24       A    You did.

25       Q    Heather Thomson responds to this email.

```
 1           And I would like for you to read this

 2    email, but sometimes you read a little quickly, and

 3    I'd ask you, if you wouldn't mind, to slow down --

 4        A    Sure.

 5        Q    -- a little bit.  Thank you.

 6        A    Okay.

 7             MR. LIFLAND:  Maybe you can read it

 8         yourself.

 9             MR. DUCK:  That's okay.  I've --

10             MR. LIFLAND:  It's not his email.  You're

11         asking him to read something he didn't write

12          into the record.

13        Q    Sir, would you mind reading this email out

14    loud into the record?

15        A    Okay.  And the qualifications have already

16    been made that I did not write the email.

17             But the email says, "No, I want to seduce

18    the vegetarians with a thick, juicy steak.  If I

19    have to jump on -- jump -- if I have to start them

20    on limp tuna salad and work them up through some

21    stupid pasta dish with pieces of chicken, that's

22    okay.  I think we want both/and:  Help them become

23    more effective in their capacity as thought leaders

24    and help them increase their expertise in the area

25    of systemic opioid therapy."
```

```
 1     Q    Thank you, sir, for reading that.

 2          And what was your response to Heather's

 3  email?

 4     A    The policy is about how --

 5     Q    Sir, I'm asking you, on this page --

 6     A    Yes.

 7     Q    -- what was your response to this page?

 8     A    I didn't comment on any emails.

 9     Q    Do you see the very first email on this

10  page?

11     A    Yes.  My general -- oh, sorry, I did not

12  see my one at the top.

13          "A gentle word of caution:  Please see Mike

14  Chester's admonitions on email."

15     Q    Okay.  Heather Thomson shouldn't have

16  written what she wrote in this email, should she?

17     A    I think an email like this would require a

18  lot of explanation, rather than put it in one such

19  as it is.

20     Q    Who is Mike Chester?

21     A    He is somebody from the J&J legal

22  department.

23     Q    What was his admonition?

24     A    That --

25          MR. LIFLAND:  Objection.  Instructed not to
```

 1        answer.  This is attorney-client privilege.

 2              MR. DUCK:  It's been disclosed in this

 3        email that you gave us --

 4              MR. LIFLAND:  The fact that advice was

 5         given was disclosed.  The content of the advice

 6         was not disclosed.  It's privileged.  I've

 7          instructed the witness not to answer.

 8        Q    Do you recall the admonition?

 9        A    I do not.

10        Q    You just know it related to email?

11        A    Yes, from what I've written here.

12        Q    Was Dr. Portenoy a vegetarian or a

13    carnivore?

14        A    I don't know.

15        Q    Did you tell him which one he was?

16              MR. LIFLAND:  Object to the form of the

17         question.

18        A    I'm sorry, Counselor, I didn't hear your

19    question.

20        Q    Did you tell him whether he was a

21    vegetarian or a carnivore?

22        A    No, sir, I did not.

23        Q    Did you share this information from Heather

24    Thomson with the KOLs, in accordance with the policy

25    of sharing information about them?

 1      A    I did not.

 2           MR. LIFLAND:  Object to the form of the

 3       question.

 4      A    The policy was that with -- if the company

 5  decided to go ahead and do a stratification, that

 6  the content of that information would be shared with

 7  the KOLs.

 8           I don't -- I think -- I believe that I

 9  testified that I didn't know how they moved forward,

10  but I did comment that they -- at some point, they

11  were thinking about stratifications.

12           So, I don't know what material would have

13  been shared with the key opinion leaders.

14           Moreover, if that happened, that might have

15  been activities I would have done with the medical

16  scientists liaisons, but I -- there was not a group

17  that I was responsible for.  So, I don't know what

18  happened.

19      Q    The medical science liaison group is in the

20  marketing department?

21      A    No, sir, they're not.  They're in medical

22  affairs.

23      Q    They're in medical affairs department?

24      A    Yes, sir.

25      Q    Okay, thank you.

```
 1              I'm handing you Exhibit 10.

 2                      (JAN-MS-02102667 through 671 was

 3                      marked as Vorsanger 10 for

 4                      identification, as of this

 5                      date.)

 6      Q    This is a printout from the SCEPTRE --

 7  well, first of all, you told us what SCEPTRE was

 8  earlier.

 9              Can you remind me what SCEPTRE is, please?

10      A    So, SCEPTRE is the J&J adverse event

11  reporting system.

12      Q    How do adverse events get reported?  Is it

13  directly to J&J?

14      A    It can come in through J&J.  They can come

15  in through clinical trials that happen.  They can

16  come in from consumers.  They can come in from

17  healthcare providers.

18      Q    This is not RADARS?

19      A    So, I don't know what the origin of this

20  is, but RADARS data would have -- if there were

21  adverse events identified, would have come in and

22  been introduced into SCEPTRE.

23      Q    Okay.  What about DAWN data?

24      A    I don't know about DAWN.

25      Q    So, SCEPTRE was a program at Janssen that
```

```
 1   would have included adverse events reported directly

 2   to Janssen and adverse events that were in the

 3   RADARS data?

 4        A    I believe the RADARS data -- I believe that

 5   the RADARS adverse events were reported to SCEPTRE.

 6   That's what I believe.

 7        Q    Okay.  And this is an adverse event report

 8   for Nucynta, correct?

 9        A    Yes.

10        Q    Do you know what years this is for?

11        A    No, I don't.  Not clear.

12        Q    You'll see the print date at the bottom

13   right is 2015.

14             Do you have the start date, or can you

15   point me to it?

16        A    I don't see that on the top.  I see the AER

17   number, VER -- which I don't know what "VER"

18   means -- the queue, the suspected product, the

19   reaction, the reaction date, seriousness, and if

20   there was a reporter, that would be listed.

21             But I don't know where these data come

22   from.

23        Q    Are these the low mentions for Nucynta that

24   you were talking about?

25        A    So, one would have to have a conversation a
```

 1    little bit about -- so, I testified that I don't

 2    know where these data come from.

 3            One would also need to understand how AEs

 4    are reported.  So, if someone has an AE and it

 5    continues or gets worse, that may be -- that --

 6    those would be reported as multiple AEs.

 7            So, if -- what I think, if you're

 8    implying -- and I don't know if I'm -- maybe I'm not

 9    getting it correctly -- are these all from different

10    patients, or could some of these be from the same

11    patient?

12            But the answer is, I don't know from the

13    printout here.

14       Q    I'm not implying anything of the sort.

15            I'm asking if this is the kind of data that

16    you would look at to determine that there were low

17    mentions of Nucynta?

18       A    These might be some of the data we would

19    consider, yes.

20       Q    Thank you.

21            Janssen evaluated speakers in its speaker

22    program, right?

23       A    I don't -- I would assume so, but I don't

24    know.

25       Q    You've received an evaluation as a speaker

```
 1   for Janssen, right?

 2       A    I don't know.  And I don't know how well I

 3   did.

 4       Q    Would you like to see it?

 5       A    Yeah, sure, why not?

 6       Q    Here is Exhibit 11.

 7                    (JAN-MS-00314736 through 745 was

 8                    marked as Vorsanger 11 for

 9                    identification, as of this

10                    date.)

11       A    So, I'd like to point out that the third

12   bullet says that I speak too slowly.

13       Q    I was thinking of that when we first

14   started this deposition.

15       A    Okay.

16       Q    You got a good/excellent grade.

17       A    Thank you.

18       Q    So, you have nothing to --

19       A    Right, exactly.

20       Q    -- be ashamed of with respect to this

21   particular evaluation, at least.

22            So, the title of this document is

23   "Janssen's Speaker Training Meeting," right?

24       A    Yes.

25       Q    Janssen held meetings at which it trained
```

January 17, 2019                              159

```
 1    its speakers?

 2         A    Yes.

 3         Q    And those speakers might be KOLs, right?

 4         A    They might be.

 5         Q    And they might just be practitioners in the

 6    speaker -- speakers' bureau?

 7         A    Yes.

 8         Q    In this particular meeting, there were 162

 9    attendees, right?

10         A    That's what it looks like.

11         Q    And it was held at the Hyatt Regency

12    Scottsdale at Gainey Ranch in Scottsdale, Arizona,

13    right?

14         A    Yes.

15         Q    In February 2003?

16         A    Yes.

17         Q    Do you remember this?

18         A    I don't specifically remember the meeting,

19    but I certainly see what's listed on the document.

20              The company subsequently got away from

21    having meetings at these types of places.

22         Q    Why?

23         A    The company made a decision that having

24    meetings at ranches and other types of things was

25    something that they did not want to do.  So, the
```

1   speaker training was held at more -- hotels, like

2   Marriotts, and places like that.

3       Q    It could be viewed as something that may

4   influence the speakers who were being trained?

5       A    I think it was also important that the

6   environment that they be trained in enabled them to

7   focus on it and not be able to be distracted by

8   other types of things.

9       Q    But you agreed, I think, because you

10  shook -- nodded your head, that Janssen was

11  concerned that by having speaker training programs

12  held at locations like ranches or somewhere else

13  might influence the attendees?

14          MR. LIFLAND:  Objection to the form of the

15      question.

16      A    I don't know whether -- I don't know what

17  the reason was, per se.  But I think they felt that

18  the other places would be more appropriate.

19      Q    Why?

20      A    I think that that was the environment that

21  they could focus on that.

22      Q    And Janssen did not want to be seen as

23  conferring gifts on those in its speakers' program?

24          MR. LIFLAND:  Object to the form of the

25      question.

```
 1      A    I don't know that -- how that worked.  I

 2   don't know -- I don't recall whether they had gifts

 3   or didn't get gifts or any of those things.

 4      Q    Well, paying for someone in the speakers'

 5   bureau to travel to and stay at a luxurious or

 6   exotic location could be viewed itself as a gift

 7   that may influence the speaker, right?

 8           MR. LIFLAND:  Object to the form of the

 9        question.

10      A    I don't know.

11      Q    You don't know?

12      A    Maybe.  I don't know.

13      Q    Who is Steve Passik?

14      A    Steve Passik is a key opinion leader.

15      Q    Is he a physician?

16      A    I believe he's a Ph.D.

17      Q    What's he a key opinion leader about?

18      A    I'm sorry, I don't understand the question.

19      Q    What subject is he an expert on?

20      A    So, he is an expert in analgesia.

21      Q    That's the relief of pain?

22      A    Correct.

23      Q    But he's not a physician?

24      A    He's not a physician.

25      Q    Do you know what he has a Ph.D. in?
```

```
 1      A    I don't know.

 2      Q    What did Janssen do with the evaluations of

 3  the speakers?

 4      A    I don't know.  I don't know what they did

 5  with it.

 6      Q    Okay.

 7      A    This was more -- this was speaker training

 8  that would have been run through marketing, and I

 9  don't know what marketing had done with the

10  information.

11      Q    Janssen wanted to have tapentadol

12  down-scheduled from Schedule II to a lower schedule,

13  right?

14      A    That's not completely accurate.  Janssen

15  was investigating whether it would be appropriate to

16  consider tapentadol to be down-scheduled.

17      Q    Why would Janssen investigate that if it

18  didn't want that to happen?

19      A    Well, I don't know if it was a want as much

20  as saying, was it -- did the data support

21  down-scheduling?  And if so, then that was something

22  that they could investigate.

23      Q    And that was viewed as something that would

24  be good for tapentadol?

25      A    It was something that would allow that the
```

```
 1    product scheduling was consistent with the data that

 2    we had at the time, that would -- where the

 3    scheduled data would -- so, the compound was

 4    approved with a C2 status.  The C2 status was such

 5    that it is an abuse potential.

 6           And if the other -- if the additional data,

 7    once the product was on the market, would support a

 8    different schedule, then the company wanted to

 9    understand what that would look like and whether

10    that was appropriate or not.

11    Q    Yeah.  And if Nucynta --

12           Which is tapentadol, right?

13    A    Yes.

14    Q    -- had been down-scheduled from C2 to C3,

15    for instance --

16    A    Yes.

17    Q    Okay?

18           -- that would signal that Nucynta is less

19    abusable than other opioids in C2?

20    A    That would signal that the potential for

21    abuse may be less.

22    Q    All right.

23    A    Not the actual abuse, the potential.

24    Q    And that would be a good thing for

25    Janssen's sales of Nucynta, right?
```

 1      A    Well, I think the company's position was

 2   not related to sales at all, but to make sure that

 3   we now had a product -- because, remember, Vicodin

 4   in those days was also -- there was quite a lot of

 5   issues with Vicodin.  And to have a product that

 6   has -- potentially having a lower abuse potential

 7   meant that an opioid analgesic might -- could

 8   potentially be used in the U.S. by prescribers for

 9   patients that had a potential for a lower abuse

10   potential.

11      Q    Janssen also wanted to make a promotional

12   claim that Nucynta had a reduced risk of misuse and

13   abuse?

14           MR. LIFLAND:  Object to the form of the

15        question.

16      A    I don't recall that.

17      Q    Exhibit 12.

18                     (JAN-MS-02258276 was marked as

19                      Vorsanger 12 for identification,

20                      as of this date.)

21      Q    All right.  This is an email that you wrote

22   and sent in 2010, correct?

23      A    Yes.

24      Q    Do you see the sentence that starts, "Our

25   objective"?

1    A    Yes, I do.

2    Q    Can you please read that sentence?

3    A    Yes.

4         "Our objective is to gain insight from our

5   advisors on the studies needed to generate

6   scientifically compelling data on abuse, misuse, and

7   diversion of tapentadol and Nucynta ER that may

8   support down-scheduling tapentadol (currently C2),

9   revising labeling for Nucynta ER, tamper-resistant

10  formulation" -- okay.  So, this would be a change to

11  labeling based on scientific information -- "to

12  allow promotional claims of reduced risk of misuse

13  and abuse and publish a compelling body of evidence

14  on the abuse, misuse, and diversion of tapentadol."

15   Q    Okay.  Thank you.

16        This sentence both references -- this

17  sentence both references Janssen needing to generate

18  scientifically compelling data --

19   A    Yes.

20   Q    Right?

21        -- for three reasons?  Right?

22        Do you see those three reasons?

23   A    Yes, that is correct.

24   Q    Okay.  The first is down-scheduling

25  tapentadol, correct?

1      A     If the data supported down-scheduling, yes.

2      Q     The second one is "Revising the label for

3   Nucynta ER to allow promotional claim of reduced

4   risk of misuse and abuse," correct?

5           MR. LIFLAND:  Object to the form of the

6       question.

7      A     If the -- if this information could be put

8   in the product label, then it could be discussed

9   with prescribers based on promotion.

10     Q     Because Janssen has to promote based on

11  what's in the label, right?

12     A     Janssen needs to promote using

13  company-approved materials.

14     Q     Consistent with the label?

15     A     Consistent with the label.

16     Q     And the third reason was "publishing a

17  compelling body of evidence on the abuse, misuse,

18  and diversion of tapentadol"?

19     A     Which would be part of the information from

20  the clinical studies.  That the studies would be

21  done, and the data would be published.

22     Q     That Janssen could generate scientifically

23  compelling data to support those three things,

24  right?

25     A     Depending on what the studies showed, but

```
 1    yes.

 2         Q    Okay.  Thank you.

 3              Nucynta carries a risk of addiction, right?

 4         A    Yes, it does.

 5         Q    Do you remember when you said earlier that

 6    Janssen should not omit information about the risks

 7    of addiction?

 8              MR. LIFLAND:  Object to the form of the

 9       question.

10         A    I, I, I believe I testified that addiction

11    is an important adverse event and that information

12    needs to be information that prescribers need to be

13    aware of, and patients.

14         Q    It should be communicated, correct?

15         A    Correct.

16         Q    I'm going to hand you Exhibit 13.

17                        (JAN-MS-00066073 through 095 was

18                        marked as Vorsanger 13 for

19                        identification, as of this

20                        date.)

21         Q    Okay.  Janssen employs a salesforce,

22    correct?

23         A    Yes.

24         Q    Composed of sales representatives, right?

25         A    Correct.
```

 1      Q    And this is a training document entitled

 2   "Nucynta ER Frequently Asked Questions for Sales

 3   Representatives," right?

 4           MR. LIFLAND:  Object to the form of the

 5       question.

 6      A    So, I don't know if this a draft or whether

 7   this is a final version.  And I'm not -- I don't see

 8   specifically where it says that this was used with a

 9   salesforce.  This just says "Nucynta ER Frequently

10   Asked Questions."

11      Q    Okay.  Turn to page 8, please.

12      A    Page 8?

13      Q    Yes.

14           Do you see the box on page 8?

15      A    Yes, I do.

16      Q    What's the title of that box?

17      A    "Note to sales representatives."

18      Q    Does that help you answer my earlier

19   question?

20      A    If -- it may have been used -- yes.

21           MR. LIFLAND:  Objection.

22      A    It may have been used for internal

23   training, but it may have been used for the

24   salesforce.

25           But, again, as I commented, I don't know if

```
 1   this was a final draft or not.

 2       Q    And it would be important to train sales

 3   representatives about the risks of addiction

 4   associated with Nucynta, right?

 5       A    Yes.  And some of that would be information

 6   that would be in the product package insert, as

 7   well.

 8       Q    Are sales representatives required at

 9   Janssen to have a medical science degree?

10       A    I don't know the answer to that question.

11   I don't, I don't know what the requirements are

12   today, and I don't know if they've changed or not.

13       Q    Do you think that pharmaceutical package

14   inserts are easy to understand for people without a

15   science background?

16       A    I think that, from my experience on using

17   it, is that annotated package inserts were used to

18   train sales reps, and those went through and took

19   the language and put it in common language, where

20   people could understand it.

21           So, this -- the statement that this was the

22   document to train sales representatives is one that

23   I don't agree with, because they would have all --

24   this is a document --

25       Q    A document.
```

January 17, 2019                        170

 1     A    This a document.  So --

 2     Q    I never said otherwise.

 3     A    Right.  So, someone would have gone through

 4  and walked them through information from the package

 5  insert, as well.

 6     Q    These are -- according to this document,

 7  which there is nothing to suggest that I've seen

 8  this is a draft -- please correct me if you see

 9  something different.

10     A    Well, it doesn't -- Counselor, it doesn't

11  say "final."  So, I -- my assumption is it could be

12  a final or it may not be a final.

13     Q    It doesn't say "draft," either, does it?

14     A    All right.  So, I don't know what its

15  status is.

16     Q    If you'll turn to page 2, there is a table

17  of contents.

18          Do you see that?

19     A    Yes.

20     Q    There is no section entitled "Addiction."

21     A    Not in this document.

22     Q    Why not?

23     A    I don't know.  There may be -- as I've

24  already testified, there may have been additional

25  training from the package insert, which may have had

January 17, 2019                              171

```
 1    that.
 2           This is some -- this is some information
 3    communicated to the salesforce.
 4      Q    On the first page, it states, "You may
 5    encounter the following questions when discussing
 6    Nucynta ER with customers."
 7           Do you see that?
 8      A    Yes.
 9      Q    Customers are prescribers, correct?
10      A    Yes.
11      Q    Or maybe pharmacists, right?
12      A    Those would also be customers, yes.
13      Q    Okay.  When Nucynta came out in -- what
14    year?
15      A    The immediate release was -- I think came
16    to the U.S. marketplace in 2009.
17      Q    Okay.  By that time, according to this
18    document, assuming this is a final document, Janssen
19    did not believe that questions about addiction were
20    being frequently asked.
21           MR. LIFLAND:  Object to the form of the
22        question.
23      A    So, I, I haven't -- we haven't completely
24    agreed this is a final document.  We agreed it may
25    or may not be.
```

```
 1       Q    Assume with me it is, according to this

 2  document.

 3       A    All right.  And we also had agreed that --

 4            MR. LIFLAND:  Object to the form of the

 5        question.

 6       A    -- if I understood, there may have been --

 7  I had communicated that there were other documents

 8  that we used to train the salesforce.

 9       Q    Was there another Frequently Asked

10  Questions Nucynta document?

11       A    I don't know.  I don't know.

12       Q    This one doesn't have a section entitled

13  "Addiction," does it?

14       A    This particular document doesn't have a

15  section on addiction.

16       Q    Addiction is a big deal, isn't it?

17       A    And it may --

18            MR. LIFLAND:  Object to the form of the

19        question.

20       A    They may very well have been trained on

21  addiction.  That information is not in this

22  document.

23       Q    And Janssen should never omit information

24  about addiction, should it?

25            MR. LIFLAND:  Object to the form of the
```

```
 1            question.

 2       A    Information should be transmitted, but may

 3   have been transmitted through education through the

 4   package insert or other modalities, as well.

 5       Q    Janssen should never omit information about

 6   addiction, should it?

 7       A    I think --

 8            MR. LIFLAND:  Object to the form of the

 9        question.

10       Q    Can you answer my question?  And if you

11   want to say something afterwards, you can.

12            But Janssen should never omit information

13   about the risks of addiction, should it?

14       A    The answer is --

15            MR. LIFLAND:  Object to the form of the

16        question.

17       A    -- Janssen needs to communicate all of the

18   risks of opioid analgesics.

19       Q    Including the risks of addiction?

20       A    If --

21            MR. LIFLAND:  Object to the form of the

22        question.

23       A    Depending on how, depending on how the

24   conversation goes and what their -- how their sales

25   reps are instructed to do it.
```

```
 1      Q     Are there any circumstances under which a

 2   sales representative should call on a physician and

 3   not discuss the risks of addiction --

 4      A     If a sales --

 5      Q     -- for Nucynta?

 6      A     If a prescriber was interested in

 7   addiction --

 8            MR. LIFLAND:  Object to the form of the

 9       question.

10      A     -- they would then reach out specifically

11   and have a medical information request sent, and

12   that information could be sent.

13            So, that would be an opportunity or a

14   situation in which a sales rep was not discussing

15   it, because the prescriber may want more

16   information, in which case a medical information

17   request, if such a request existed, would be sent.

18      Q     Well, what if the prescriber didn't reach

19   out?

20            In your situation, we just have a sales

21   call where addiction wasn't discussed, right?

22      A     Or addiction may be something that's

23   important enough that they may say, "We have a --

24   specifically have a letter on addiction, or we have

25   other company information on addiction.  We would
```

1   like to send that to you."

2           So, I don't know the selling situation

3   which took place.  I'm unable to comment on your

4   answer [sic].

5       Q    Is there any situation you can think of

6   where it would be appropriate for a Janssen sales

7   representative to call on a physician and not say a

8   word about the risk of addiction associated with

9   Nucynta?

10          MR. LIFLAND:  Object to the form of the

11       question.

12      A    If, if a physician was knowledgeable about

13  opioids and had already received information on a

14  previous visit, then a subsequent visit, they may

15  not necessarily talk about addiction.

16      Q    If the physician was knowledgeable about

17  opioids already, didn't need to hear about addiction

18  anymore, why was Janssen calling on them at all?

19          MR. LIFLAND:  Object to the form of the

20       question.

21      A    Because as people use opioid analgesics,

22  there are other questions that come up, and there

23  may be other ways that -- new information that need

24  to be shared.

25      Q    When new information is shared, don't you

```
 1    think doctors should be reminded about the addictive

 2    nature of opioids?

 3         MR. LIFLAND:  Object to the form of the

 4       question.

 5    A    I can't comment on the nature of the new

 6    information that it was going to be putting out.  It

 7    depends on how much of the other information, et

 8    cetera.

 9    Q    Doctor, you would agree with me that, when

10    it comes to addiction, Janssen can't be too careful

11    with its promotional activities?

12    A    I think --

13         MR. LIFLAND:  Object to the form of the

14       question.

15    A    I think that the compounds that are being

16    prescribed are known to have high -- be highly

17    addictive.  They're C2.  That's defined in law.  The

18    individuals who are using these compounds require

19    special licensing to be able to even prescribe those

20    medications.  Those people would be knowledgeable.

21         They may have been provided information in

22    previous visits and subsequent visits, maybe new

23    clinical trial data and other information, as well.

24         The nature of the call is such that that

25    may be what needs to happen, and the physician --
```

```
 1    and the prescriber -- it may not be a physician -- a

 2    prescriber themselves may request certain types of

 3    information that they want to hear about, as well.

 4            So, the answer is, I have to qualify it,

 5    depending on the situation, and each one could be

 6    different.

 7    Q    It is impossible for Janssen to be too

 8    careful about the risks of addiction associated with

 9    its products?

10            MR. LIFLAND:  Object to the form of the

11         question.

12    A    I'm not understanding what you mean in that

13    context, sir.

14    Q    I'm going to ask you again.

15            Janssen cannot be too careful when it comes

16    to the risks of addiction associated with its opioid

17    products?

18    A    And that's --

19            MR. LIFLAND:  Object to the form of the

20         question.

21    A    And that's why the information is

22    communicated in the package insert and made

23    available to prescribers to be able to have that.

24    Q    And your testimony is:  Providing the

25    package insert is being careful enough about the
```

 1   risk of addiction?

 2           MR. LIFLAND:  Object to the form of the

 3        question.

 4      A    There may have been also conversations that

 5   took place, and there is CME that the company has

 6   done.  There are other routes and other ways that

 7   the company would communicate information on

 8   addiction.

 9      Q    Janssen should do as much as it possibly

10   can to communicate the risks of addiction about its

11   opioid products?

12      A    Janssen did --

13           MR. LIFLAND:  Object to the form of the

14        question.

15      A    Janssen needs to do what it considers to be

16   appropriate, in terms of how the -- of the

17   information that's been given to its prescribers.

18      Q    Janssen shouldn't do the bare minimum?

19           MR. LIFLAND:  Object to the form of the

20        question.

21      A    I'm sorry, I don't understand what you

22   said.

23      Q    Janssen should not do the bare minimum?

24           MR. LIFLAND:  Object to the form of the

25        question.

```
 1      A    I never suggested that Janssen is doing the

 2  bare minimum.

 3      Q    And not -- and Janssen shouldn't ever do

 4  the bare minimum --

 5           MR. LIFLAND:  Object to the form of the

 6       question.

 7      Q    -- when it comes to the risks of addiction?

 8      A    I don't think there is a suggestion that

 9  Janssen ever did or is currently doing the minimum.

10      Q    You said you don't know what caused the

11  opioid crisis, right?

12      A    I said that the opioid crisis was

13  complicated and the root cause was not something

14  that I know.

15      Q    And so, you can't testify here today

16  whether or not Janssen was a cause of the opioid

17  crisis, can you?

18      A    What I did testify earlier, Counselor, was,

19  based on my analysis and the work that we did

20  looking at mentions of abuse that took place from

21  both products, for tapentadol and from Duragesic,

22  from the time those products were introduced to the

23  U.S. marketplace until 2005, when I did work with

24  the compound, for Duragesic and for tapentadol, when

25  the compound was sold to another company, I
```

```
 1    observed, my team observed, using the methodologies

 2    that I've discussed, low mentions of abuse.

 3          And those low mentions of abuse suggest to

 4    me that the Janssen compounds did not contribute to

 5    the opioid crisis.

 6    Q    So, you assumed something in my question I

 7    didn't say, which was that it was limited only to

 8    J&J compounds.  I didn't say that.  So, let me, let

 9    me restate my question.  In fact, we'll break it

10    down.

11          Johnson & Johnson and Janssen do more than

12    just sell -- promote their own opioid products,

13    right?

14          MR. LIFLAND:  Object to the form of the

15           question.

16    Q    They engage in non-branded marketing?

17    A    They engage in -- I'm sorry?

18    Q    Non-branded marketing?

19          MR. LIFLAND:  Object to the form of the

20           question.

21    A    They have engaged in non-branded marketing.

22    Q    About opioids as a class of drug?

23    A    They have engaged in non-branded marketing.

24    Q    Okay.  So, J&J's actions -- I'm not

25    limiting my question to just opioid compounds that
```

```
 1   J&J manufactured.

 2           Do you understand that?

 3      A    Um --

 4      Q    And I'm going to ask the question again,

 5   but you understand I'm not limiting it to J&J

 6   opioids?

 7      A    You're talking about non-branded materials.

 8   The non-branded materials -- Counselor, so I'm

 9   clear, non-branded materials around opioids, is that

10   what you're referring, or non-branded materials for

11   any of their products?

12      Q    Around opioids.  This case is about

13   opioids.

14      A    Okay.  So, you're referring to not the

15   Janssen opioids, but non-branded material about

16   opioids.

17      Q    Let's back up.

18           Do you know what this case is about?

19      A    Yes, sir, I do.

20      Q    What is it?

21      A    It's about opioid abuse and some of the

22   problems.

23           But I'm just trying to understand your

24   questions, Counselor.

25      Q    Do you understand why your client is -- why
```

1    your former employer is being sued?

2              MR. LIFLAND:  Object to the form of the

3        question.

4        A    I don't, I don't have the specifics of the

5    case, no.

6        Q    Have you looked at the petition in this

7    case?

8        A    I have not.  No, I did not.

9        Q    Are you able to sit here today and say that

10   Janssen never did a single thing that contributed to

11   the opioid crisis in this country?

12             MR. LIFLAND:  Object to the form of the

13        question.

14       A    I believe that the -- as I've already

15   testified, now on several occasions, that the

16   medications did not contribute to the opioid crisis.

17             And I personally am not aware of any

18   behaviors or activities that I could see trace

19   specifically to the opioid crisis.

20       Q    So, you don't know the particulars of what

21   caused the opioid crisis, right?

22       A    I don't know -- I -- my testimony is that

23   the root cause of the opioid crisis is not something

24   that I'm aware has been identified.

25       Q    You just know that you don't think Janssen

1    had anything to do with it?

2        A    Based on --

3            MR. LIFLAND:  Object to the form of the

4        question.

5        A    Based on my experience of working at the

6    company for 16 years and testifying as a witness of

7    fact today, I haven't seen behaviors and I haven't

8    seen data scientifically generated to suggest that

9    that would have -- that would have contributed to

10   the problem we have of substance abuse in the United

11   States today.

12       Q    You think we need data to determine that

13   this opioid crisis was caused by the over-promotion

14   by pharmaceutical companies like Janssen?

15       A    I think --

16           MR. LIFLAND:  Object to the form of the

17       question.

18       A    I think in order to identify what the cause

19   of something is, I think we need to understand what

20   are the activities and what are the data around it,

21   rather than making an assumption.

22       Q    Well, you don't -- is it your opinion that

23   any decision made that's not based on hard data is

24   an assumption?

25       A    Not necessarily an assumption, but it's not

January 17, 2019                              184

 1    a decision that -- it would be a decision that I

 2    would have trouble following, if I didn't see the

 3    data to support it.

 4        Q    Because you're a man of science?

 5        A    Sorry?

 6        Q    Because you're a man of science?

 7             MR. LIFLAND:  Object to the form of the

 8         question.

 9        A    That's sort of our training, yes.

10        Q    Sales representatives don't need a science

11    degree, do they?

12             MR. LIFLAND:  Object to the form of the

13         question.

14        A    Well, I think I testified that, for

15    Janssen, I don't know whether they do or they don't.

16        Q    You don't know.

17             Did you ever attend any Pain Care Forum

18    meetings?

19        A    I don't remember.

20        Q    Do you know what the Pain Care Forum is?

21        A    Not exactly.  The name sounds familiar to

22    me, Counselor.  So, that's why I would say not

23    exactly, because I'm not sure if I did or didn't.

24        Q    Who is Burt Rosen?

25        A    I don't know who Burt Rosen is.

```
 1        Q     Never heard of him?

 2        A     I don't know who he is.

 3        Q     All right.  Do you remember the percentages

 4   of the rate of addiction you gave me earlier?

 5        A     (No verbal response.)

 6        Q     You said 1 and 4 -- or excuse me, you said

 7   1 to 4 percent.

 8        A     For iatrogenic addiction in patients who

 9   don't have an existing background -- I believe it

10   was who are not complicated.  And by that, I mean

11   may not be substance abusers and may not have mental

12   health disorders, yes.

13        Q     Have you seen the request for production

14   that Johnson & Johnson put out recently about

15   studying the medical education needed around opioid

16   prescribing?

17        A     I have.

18        Q     Okay.  So, now you're retired, right?

19        A     Yes.

20        Q     Do you tell people that you -- when they

21   ask, that you worked in and around the area of

22   opioids?

23        A     I do.

24        Q     And when they ask, "Man, how did we get

25   into this problem?" what do you tell them?
```

```
 1        A     I told them what I told you today, that

 2    I --

 3        Q     That you don't know?

 4        A     That I -- it's a complex issue.  The root

 5    cause has not been identified.  And I know that

 6    that's still being worked on and discussed.

 7        Q     Are you ashamed to tell people that you

 8    worked on opioids for so long?

 9        A     No, not at all.  I'm actually very proud of

10    the fact, as an anesthesiologist, that I got to work

11    on opioids.

12        Q     Really?

13        A     Yes.

14        Q     So, are you proud of the fact that

15    companies like yours were able to sell so many

16    opioids that we have an addiction, overdose, and

17    abuse problem in this country?

18              MR. LIFLAND:  Object to the form of the

19         question.

20        A     Well, I've already testified that the

21    cause, the root cause of the opioid crisis has not

22    been identified, and I am very proud of the fact

23    that I work at a company that's ethical and put out

24    excellent products that helped many, many patients.

25              And as a matter of fact, one of the reasons
```

```
 1    why I went into industry from private practice was

 2    to be able to do that, to advise companies in the

 3    safe and effective use of their medications.

 4              So, I'm quite proud of the work that I've

 5    done.

 6        Q    Were you aware that approximately

 7    80 percent of new heroin users started with

 8    prescription opioids?

 9              MR. LIFLAND:  Object to the form of the

10        question.

11        A    I would like to see the data to support

12    that.

13        Q    I'm just asking if you're aware of it.

14        A    I'm aware that heroin users may have

15    reported using prescription opioids, but I'm also

16    aware of the fact that many of those individuals

17    were substance abusers prior to using any of the

18    type of opioids that they describe.

19        Q    Yeah, but they -- substance abusers existed

20    whenever any of the prescription opioids launched,

21    right?

22              MR. LIFLAND:  Object to the form of the

23        question.

24        A    Substance abusers did exist before the

25    opioids launched.
```

 1      Q    That's the market into which Janssen

 2   marketed its opioids, one that contained substance

 3   abusers.

 4      A    But Janssen made sure that we --

 5           MR. LIFLAND:  Object to the form of the

 6      question.

 7           Just wait for me to --

 8           THE WITNESS:  Sure.

 9           MR. LIFLAND:  -- object before you start

10      your answers.

11           THE WITNESS:  Okay.

12           MR. LIFLAND:  Thank you.

13      A    Janssen respond -- marketed their products

14   for patients with pain and marketed those to ensure

15   that the drugs were used safe and effectively.

16           Yes, the abused market -- the substance

17   abusers were around before these medications were

18   available.

19      Q    Do you believe that people who are addicted

20   to opioids are bad people?

21      A    No, I do not.

22      Q    Do you think that they're just doing bad

23   things to get a high?

24           MR. LIFLAND:  Object to the form of the

25      question.

 1      A    I don't know what all their behaviors are.

 2   I think some people became addicted for a number of

 3   different reasons, and I don't always know -- and I

 4   don't know what many of those are.

 5      Q    Do you pass any judgment on people who are

 6   addicted to opioids?

 7      A    No, not at all.  Absolutely not.

 8      Q    Are you doing anything, now that you're

 9   retired, to assist with the opioid crisis?

10      A    Not specifically.

11      Q    Do you have any intention to?

12      A    Not at the, not at the moment.  I would

13   have to see what opportunities potentially come

14   along.  But not at the moment.

15           MR. DUCK:  All right.  Let's take a break.

16           THE VIDEOGRAPHER:  Off, 12:58.

17                   (Recess taken.)

18           THE VIDEOGRAPHER:  We're back on, 1:59.

19      Q    Okay.  I'm handing you what's been marked

20   as Exhibit 14.

21                       (JAN-MS-02132383 through 387 was

22                       marked as Vorsanger 14 for

23                       identification, as of this

24                       date.)

25      Q    All right.  What is this document that is

```
 1    Exhibit 14?

 2         A     What is it?

 3         Q     Yes.

 4         A     It looks like a discussion about a meeting

 5    that occurred with individuals from FDA, DEA, and

 6    individuals in various surveillance methodologies

 7    who attended a meeting.  I don't know the date.  I

 8    don't see the date on here.  It says, "Date:  Auto

 9    date," so, I don't know what it would be.

10              And there were members of representation

11    from the various pharmaceutical industry, different

12    companies.

13              And it looks like -- was it -- there's a --

14    I don't know if this is a summary document that

15    somebody prepared.  May have been from the people

16    who attended; John Thipphawong, Paul Kershaw, Kim

17    Gaumer, and David Hewitt.  It talked about the

18    various people presented -- Bob Rappaport, who is

19    formerly head of the division of anesthetics and

20    critical care -- I'm not sure what they're called

21    today -- Deborah Leiderman, who was in controlled

22    substance; Judy Ball from DAWN, and several other

23    people, as well, and it goes on and on -- David

24    Joranson, etc.

25              And then people from RADARS -- Edgar Adams
```

 1   we spoke about, I think; Ted Cicero; someone above

 2   him from Inflexxion; and some other -- James

 3   Inciardi was also from RADARS; and other people, as

 4   well.

 5       Q    Okay.  You see the Alza logo in the top

 6   left?

 7       A    Yes, I do.

 8       Q    What is Alza?

 9       A    So, Alza is a company that formerly worked

10   with J&J.  I believe the Duragesic patch was created

11   at Alza, made at Alza, and eventually Alza was

12   bought by J&J.

13       Q    Okay.  So -- and that's what we've heard in

14   prior testimony.  I've just got a couple of

15   questions.

16            Is Alza a -- was it a pharmaceutical

17   manufacturer that J&J acquired?

18       A    I believe so.

19       Q    Okay.  And they developed and manufactured

20   Duragesic before J&J acquired Alza?

21       A    Yes.  That's my understanding.

22       Q    And this memorandum is addressed to several

23   people, including you.

24       A    Yes, that's right.

25       Q    And it's from John --

January 17, 2019                                    192

1      A     Thipphawong.

2      Q     Thipphawong?

3      A     Yes.

4      Q     Who is that?

5      A     John Thipphawong was a medical director at

6  Janssen.

7      Q     Okay.

8      A     John may have been at Alza at that point,

9  and he went over to work at J&J.  I'm not sure what

10  his status was at the time, because I'm not sure

11  what the date of the document was.

12          Paul Kershaw was at J&J.  Kim Gaumer, I

13  don't remember if she was at Alza or J&J.  And David

14  Hewitt was another medical director at Janssen.

15      Q     Are all the people in the "To" line also

16  J&J employees?

17      A     Or they may have been at Alza.

18      Q     Okay.

19      A     Right.

20      Q     Does any of the information you see on this

21  first page give you any indication as to the

22  approximate date of this document?

23      A     No.  I was trying to recollect when this

24  would have occurred, as it would have passed along

25  to me for informational purposes, but I don't.  I

 1    don't know.

 2         Q    Does Alza still exist?

 3         A    No.  Alza was acquired by J&J, and I think

 4    whatever activities were going on were taken in by

 5    J&J.  So, I don't know -- I don't think they're

 6    freestanding anymore, I'm not sure, but I don't

 7    think so.

 8         Q    What year did J&J acquire Alza?

 9         A    I don't know.  We'd have to look that up.

10         Q    In the '90s?

11         A    I don't recall.  I mean, I don't recall.

12         Q    Okay.  By the time you joined Janssen,

13    Duragesic was already part of the Janssen portfolio?

14         A    Well, Duragesic was part of the Janssen --

15    it was marketed by Janssen, but it may have been

16    manufactured by Alza.

17         Q    Okay.  Did Alza ever market Duragesic?

18         A    I don't believe so.  I think Janssen, or

19    J&J, would have marketed it.  Alza was more of a

20    discovery company and created those types of --

21         Q    Are you familiar with any other drugs

22    created by Alza?

23         A    Not that come to mind very quickly.

24         Q    What about kind of slowly?

25         A    Even kind of slowly.

```
 1        Q    You can't think of any other ones, in other

 2   words?

 3        A    Not offhand.

 4        Q    Okay.  Do you know if Alza created any

 5   other opioid products?

 6        A    I don't recall, Counselor.

 7        Q    And I'm not asking for a name.

 8             Just generally, do you know that?

 9        A    I don't remember what -- their portfolio of

10   medications and what other things that they worked

11   on.  They may have worked on one of the successor

12   compounds for -- potential successor compounds, but

13   I'm not certain about that.

14        Q    Okay.  Thanks.

15             If you'll turn to page -- it's page 2.

16        A    Uh-huh.

17        Q    You'll see that Bob Rappaport is listed

18   there?

19        A    Yes.

20        Q    And he's from the FDA?

21        A    That's correct.

22        Q    Did you know Bob Rappaport?

23        A    I knew of him, but I did not know him well

24   at all.

25        Q    Do you recall this meeting at all?
```

```
 1      A     Excuse me.  I don't.

 2      Q     Do you recall the name of the group that

 3   attended this meeting?

 4      A     You mean was there a group that was formed

 5   and that those individuals went to it?  I don't.

 6            It looks like there are people from a

 7   variety of different backgrounds; so, I don't know

 8   if they were part of a specific group or not.

 9      Q     There's a symposium mentioned on the page,

10   on the first page.

11            Is that what this is reflecting?

12      A     It looks like it.  It looks like they

13   called it -- the opioid risk management meeting a

14   symposium.  That's what it looks like.

15            But I'm not sure if there was another

16   meeting that was convened, as well.  I don't know.

17      Q     Okay.  Thank you.

18            Do you know if Bob Rappaport still works at

19   the FDA?

20      A     No.  Bob Rappaport, I believe, retired from

21   the FDA.  And I think the person who took over his

22   position is Sharon Hertz, but I don't know whether

23   Sharon is still there or not.  But she was his

24   immediate successor, as far as I recall.

25      Q     When he left the FDA, he retired and didn't
```

 1   work anywhere else?

 2        A    I believe he did consulting work, but I

 3   would have to confirm that.

 4        Q    Did he do consulting work for Janssen?

 5        A    Not that I recall.  I mean, he might have

 6   worked for another division but not with me, not in

 7   the work that I did.

 8        Q    Did you interact directly with employees of

 9   the FDA?

10        A    Not specifically while they were at the

11   FDA.  We may have attended meetings where there was

12   representation from FDA and other governmental

13   agencies, at a meeting like ACTTION or some of the

14   other meetings.  That would have been where we

15   potentially might have had interactions with them.

16        Q    Were you involved in the launch of Nucynta?

17        A    I was involved in the launch of Nucynta,

18   yes.

19        Q    Did the medical affairs group for opioid

20   analgesia assist with the launch?

21        A    We would have provided scientific

22   information as requested.  And if there was any

23   training that would have needed to be done, we would

24   have done that, as well.  And we, of course, had

25   individuals working on the promotional review

1    committee to review materials that would have been

2    used for the launch.

3        Q    Did you and your group assist with

4    obtaining FDA approval for Nucynta?

5        A    Not specifically.  The FDA approval for

6    Nucynta would have been done by our research and

7    development group, predominantly.

8            If they wanted additional information or

9    scientific input, then we would have done that.

10           But the approval of the product would have

11   been the predominant role of the research and

12   development group.

13       Q    At what point does the research and

14   development group hand over the scientific research

15   projects to medical affairs?

16       A    So, once a product -- in the United States.

17   So, once the product is approved, then

18   responsibilities for that -- for marketed products

19   would be going to U.S. medical affairs.

20           If there were post-approval studies that

21   were needed by the FDA -- so, if FDA said, "This is

22   great, it's approved, but there are more studies we

23   would like you to do" -- those studies would be done

24   by the research and development group.

25       Q    Understood.  Thank you.

```
 1              You see Bob Rappaport says in -- there are

 2    some bullet points that are summarizing what he

 3    said.

 4              Do you see that?

 5       A    I do.

 6       Q    Number 6 says, "Major issues with

 7    evaluating effectiveness of RMP."

 8              What, what does "RMP" mean?

 9       A    A "risk management program."

10       Q    Okay.  And are any -- well, are any of --

11    new question.

12              Was Duragesic required to have an RMP?

13       A    Yes.

14       Q    Was Duragesic later required to have a

15    REMS?

16       A    Yes, that's right.

17       Q    Number 7, Bob Rappaport indicates that it's

18    unclear what rate of addiction you would expect in

19    legitimate pain patients.

20              Do you see that?

21       A    I do.

22       Q    Do you agree with that?

23       A    I don't know the timing on when this was

24    done, of when the meeting took place.  So, I don't

25    know whether -- what -- the published literature
```

```
 1    that came out after the meeting, where more

 2    information -- more studies might have been done, et

 3    cetera.  So, I don't --

 4        Q    Was Duragesic more addictive in 1990, when

 5    it was approved, than it is today?

 6             MR. LIFLAND:  Object to the form of the

 7          question.

 8        A    So, I'm not sure what the current rates of

 9    addiction would be and what it would be.  The

10    current formulation is not the reservoir patch that

11    was the case in 1990.

12             From studies that were done looking at

13    reservoir patch, the original Duragesic patch, and

14    the matrix technology which was used for transdermal

15    fentanyl, the Janssen follow-on product, rates of

16    abuse were low for both formulations.

17        Q    Was fentanyl less addictive in 1990 than it

18    is today?

19        A    So, fentanyl --

20             MR. LIFLAND:  Object to the form of the

21          question.

22             Go ahead.

23        A    So, fentanyl, as a compound, is still a C2.

24    So, the potential of abuse for the compound stays

25    the same.
```

 1          But as I testified earlier today, there are

 2    other considerations of abuse.  And we talked about

 3    the formulation, the delivery systems, et cetera.

 4        Q    So, fentanyl, as a Schedule II controlled

 5    substance, was just as addictive in 1990 as it is

 6    today?

 7        A    Yes.

 8        Q    What are the chances that a pain patient

 9    will get addicted?  Do you understand that to be

10    different than the current rate of addiction?

11          MR. LIFLAND:  Object to the form of the

12        question.

13        Q    Do you understand my question?

14        A    So, the chance -- the chance -- so, for an

15    individual patient, that needs to be individualized.

16          So, as we talked about this morning, it

17    depends, on part, on their past medical history.

18    So, if they have a history of substance abuse, if

19    they have a history of mental illness, then the

20    rates, projected rates of addiction from an opioid

21    medication prescribed to them would be higher than

22    someone who does not have a history of mental

23    disorder or substance abuse.

24        Q    How much higher?

25        A    I'd have to look at the publications that

 1   looked at that and stratify that based on it.  I

 2   don't have the numbers at my fingertips.

 3         But we know -- and, in fact, our product is

 4   labeled for the fact that those are risk factors

 5   that do increase the risk of iatrogenic addiction.

 6     Q    So, if I walked into your office and you're

 7   a practicing physician, and I told you the truth

 8   about my entire medical history, you could take that

 9   information, run some tests, and tell me, "Okay,

10   Trey, you have X percent chance to get addicted to

11   opioids"?

12     A    I don't know that we would be able to give

13   you a percentage.  We would say that you're at

14   increased risk for addiction because of the issues

15   that we had just spoken about.

16         And then I would make sure that I would

17   do -- my interaction with you and how I would follow

18   you medically might be different.

19         For example, I might see you more

20   frequently, I might check in and see how you're

21   using medications.  Somebody like that, we may do

22   more frequent urine toxicology screens, to see not

23   only if you're using the medicines that I prescribed

24   to you, but if you're using illegal medications.  I

25   might set you up with someone who is a counselor,

1    who can work with you to help you with some of the

2    psychological issues you have that may

3    predistribute -- that -- because you're predisposed

4    to it.

5            So, I wouldn't be able to give you a

6    number, but I would work with you to show the types

7    of things we could do to help you to make sure that

8    the medication is used safely and effectively.

9            Now, having said that, I would also see

10   whether an opioid analgesic was the best medication

11   for you.  It may be that other medications are

12   better and opioids would not be the best medicine.

13           But we would follow you carefully.  And if

14   we saw signs of addiction that were going on, then

15   we might either change the medication, use other

16   medications.

17           So, it's an ongoing process between the

18   medical doctor and the patient as we went along to

19   do that.

20      Q    Okay.  So, everything you just said would

21   be required.

22           That is what Janssen expects physicians to

23   do with every patient that walks in with pain?

24      A    So, my comment to you was, what would be

25   good clinical practice to care for a patient who is

 1   at an increased risk.  It's not -- I'm not speaking

 2   on what the company's expectations are.

 3          You asked me as a clinician, someone coming

 4   into my office, what would I do or what would be

 5   looked at.  And those would be the types of steps

 6   that I would do.

 7   Q    And that's what you think every physician

 8   should do with every patient that comes in with

 9   pain?

10   A    I think that that would be the type of care

11   that I would give patients coming into my -- if I

12   was in practice today doing something like that.

13   Q    A lot of work involved with prescribing an

14   opioid?

15   A    There is, and especially for individuals

16   with increased risk.

17   Q    You would agree that opioids are not a

18   risk-free panacea for chronic pain?

19   A    For?

20   Q    Chronic pain.

21   A    Every medication has its challenges that

22   you give the patients.  There are adverse events

23   associated with them, and you need to make sure that

24   whatever therapy you embark on with the patient to

25   treat their chronic pain, that you explain the risks

 1    to patients, that they understand the risks, and

 2    that you monitor patients carefully and continually

 3    on an ongoing basis to be able to do that.

 4        Q    So, my question is:  You would agree that

 5    opioids are not a risk-free panacea for chronic

 6    pain?

 7        A    Opioids are not risk-free; they have known,

 8    defined risks, yes.

 9        Q    They are not a cure-all for chronic pain?

10        A    They are not a cure-all for chronic pain.

11    They may be used in conjunction with other medical

12    therapeutic treatment for chronic pain, as well.

13        Q    Opioids do not heal the underlying disease

14    state causing the pain?

15        A    Depending on the nature of the disease,

16    yes, that may be true.

17        Q    Is there any disease that you're aware of

18    that opioids heal?

19        A    Not for the chronic pain, no.

20        Q    Is there any disease at all that you're

21    aware of that opioids heal?

22        A    Not specifically the disease; the symptoms

23    of a disease:  Pain.

24        Q    Who is Cynthia McCormick?

25        A    Cynthia McCormick was head of anesthetics

```
 1    and life support -- again, that's the division.  I

 2    don't -- I'm paraphrasing the title of the division

 3    at FDA.  She was the predecessor of Bob Rappaport;

 4    she was his boss.

 5         Q    Okay.  If you'll turn to page 4, do you see

 6    the bold language attributed to Cynthia McCormick?

 7         A    Yes, I do.

 8         Q    Can you please read that?

 9         A    "Cynthia McCormack [sic] raised concern

10    that risk -- RMP and other interventions do not seem

11    to have reduced OxyContin abuse based on available

12    surveillance data"-- and in parentheses --

13    "(potential implications for new opioids licensed

14    with restricted distribution, e.g., Palladone, due

15    to the need to assess success of RMP)."

16         Q    Thank you.

17              What is Inflexxion?

18         A    Inflexxion is a company based in

19    Massachusetts that does surveillance for abuse of

20    opioids, amongst other activities that they do.

21         Q    Does Inflexxion support RMPs?

22         A    The data that may be used from Inflexxion

23    could be used to inform the RMPs.

24         Q    If you'll turn the page to page 5, you see

25    James Inciardi.
```

 1          We've seen his name before today, right?

 2     A    That's correct, yes.

 3     Q    In association with RADARS data, right?

 4     A    Yes.

 5     Q    You'll see that there is a bullet point

 6  under James Inciardi's name that says "Diversion is

 7  a 25 billion-dollar industry," right?

 8     A    I see the bullet point.

 9     Q    Have you seen that figure before?

10     A    I have not.  I might have seen it when I

11  looked at this document, whenever it came out,

12  because my name was on it, but it's not a number

13  that I'm that familiar with.

14     Q    At the very bottom, you'll see that there

15  are additional comments?

16     A    Yes.

17     Q    It states, in the third bullet point,

18  "Prescription drug abuse rising disproportionately

19  in the past decade."

20          Correct?

21     A    Yes.

22     Q    And then there are three subpoints.

23  "Particularly in young" is the first one?

24     A    Uh-huh.

25     Q    And then the second one says, "Opioids

 1    becoming drug of choice for abuse."

 2         Do you see that?

 3    A    Yes.

 4    Q    Do you disagree with anything that we just

 5    read there?

 6    A    I would need to see the data sources that

 7    supported that.  So, I don't know where those

 8    conclusions came from.

 9    Q    Have you seen any data that, while you were

10    working at J&J or Janssen, showed that prescription

11    drug abuse was rising disproportionately?

12    A    I don't know if it's rising

13    disproportionately.  I think I have seen data

14    talking about use in young people and that there may

15    be more in, let's say, the younger category, but I

16    don't know that I saw data showing rising

17    disproportionately.

18    Q    Do you remember seeing data that opioids

19    were becoming the drug of choice for abuse?

20    A    I don't remember scientific data, although

21    there certainly could have been.  I think there was

22    mention in some of the lay press about that, but

23    that would be the best of my recollection.

24    Q    Are you distinguishing between the word

25    "data" I used and "scientific data," which is what

```
 1    you used?

 2        A    Yes.

 3        Q    Were you aware of any data, while you were

 4    working at Janssen, that showed opioids were

 5    becoming the drug of choice for abuse?

 6        A    As compared --

 7             MR. LIFLAND:  Object to the form of the

 8         question.

 9        A    I didn't have comparative data for drugs

10    such as heroin, I think, or illegal.  So, I don't, I

11    don't, I don't recall.

12        Q    If you'll turn to the first page, there's

13    reference to David Joranson, University of

14    Wisconsin.

15             Is that the same Joranson who did the DAWN

16    study that we talked about earlier?

17        A    I believe so.

18        Q    Where did Janssen get the APIs to

19    manufacture its opioids?

20        A    I believe that it came -- that the

21    medication, the API came from Noramco.

22        Q    Noramco is -- was a subsidiary of Johnson &

23    Johnson, correct?

24        A    It was a J&J company, yes.

25        Q    Do you have an understanding of whether or
```

January 17, 2019                                    209

1    not Noramco supplied other manufacturers of opioids

2    with APIs?

3       A    That's what I heard.  I hadn't seen it.  I

4    didn't work with Noramco.  They were not part of my

5    responsibility.  So, what I know is that it was a

6    J&J company, as I've just testified, and they

7    provide API to other pharma companies, but I don't

8    know which companies those were.

9           And that's pretty much what I know about

10   it.

11      Q    You didn't know that Noramco supplied

12   Purdue with oxycodone?

13      A    I didn't know that they --

14          MS. NEWSOME:  Objection to form.

15      A    -- specifically supplied Purdue.  As I just

16   testified, I know they supplied other pharmaceutical

17   companies, but I wasn't sure which ones.

18      Q    You're aware that Johnson & Johnson created

19   a poppy that allowed for the prolific --

20   proliferation of oxycodone?

21          MR. LIFLAND:  Object to the form of the

22       question.

23      A    I'm not aware of that.

24      Q    You're not aware of the high-thebaine

25   poppy?

```
 1      A    I am not.

 2           MR. LIFLAND:  Object to the form of the

 3       question.

 4      Q    Sorry, can you say --

 5      A    No, sir, I'm not.

 6      Q    Okay.  Are you aware of a company called

 7  Tasmanian Alkaloids?

 8      A    I've heard of the name of the company.

 9      Q    What is it?  What do you know about it?

10      A    That they obtain alkaloids, I believe, from

11  Tasmania.  That's pretty much the extent of what I

12  know about what they do.

13      Q    Well, you knew it was a Johnson & Johnson

14  company?

15      A    I did not know that that was a J&J company,

16  no.

17      Q    You didn't?

18      A    I did not.

19      Q    Have you ever heard of the Norman poppy?

20      A    No, I have not.

21      Q    Have you ever received any training, while

22  you were at Janssen, about how poppies are grown and

23  how the opium is extracted from the poppies?

24      A    Not to the best of my recollection.

25      Q    You haven't received any training on the
```

 1    development of certain poppies to increase the

 2    supply of opioid APIs?

 3            MR. LIFLAND:  Object to the form of the

 4        question.

 5        A    Not that I recall, no.

 6        Q    Sir, do you agree that there is an

 7    oversupply of opioids in the United States today?

 8            MR. LIFLAND:  Object to the form of the

 9        question.

10        A    No, I don't.

11        Q    You think there's just the right amount of

12    opioids in the market today?

13        A    My understand --

14            MR. LIFLAND:  Object to the form of the

15        question.

16        A    My understanding is that the supply of

17    opioids is regulated by the DEA.  The DEA monitor

18    it, are in a best position to understand what the

19    supply requirements are and what the demand

20    requirements are.

21            So, I don't have an opinion, other than the

22    fact that it's heavily regulated through DEA.

23        Q    DEA has no supply requirements.

24        A    No, they look and see -- they will look and

25    see what the supply needs of the country are, and

```
 1   then will understand when more drug may be needed.

 2       Q    And they get input from pharmaceutical

 3   companies to understand that need, right, sir?

 4       A    That's my understanding.

 5            MR. LIFLAND:  Object to the form of the

 6        question.

 7       A    That's my understanding.

 8       Q    But the DEA does not require any company to

 9   manufacture an opioid product?

10            MR. LIFLAND:  Object to the form of the

11        question.

12       A    I don't know what the processes are for the

13   DEA.

14       Q    DEA doesn't require Janssen to supply a

15   certain volume of opioids each year?

16            MR. LIFLAND:  Object to the form of the

17        question.

18       A    As I mentioned, I don't know the processes

19   around how DEA works.  I just testified on what I

20   have -- what I know.

21       Q    You have no idea?

22       A    I do not.

23       Q    But it's your testimony that there's not an

24   oversupply?

25       A    I believe that the supply would be correct,
```

 1   because I think DEA has been do -- is in a position

 2   to understand what the supply needs are and what the

 3   requirements are.

 4       Q    You mean the DEA, that's lobbied by

 5   pharmaceutical companies who manufacture opioids,

 6   should know exactly what the needs are?

 7       A    I think --

 8            MR. LIFLAND:  Object to the form of the

 9        question.

10       A    I think the DEA is heavily regulated.  I

11   think these processes are heavily regulated.  It's

12   not my area of expertise; so, I don't know the

13   specifics around it.

14       Q    Is it even possible for there to be an

15   opioid abuse, addiction, and overdose crisis if

16   there's not an oversupply of opioids?

17            MR. LIFLAND:  Object to the form of the

18        question.

19       A    Well, the opioid crisis is not only -- may

20   not only be related to what opioids are produced by

21   pharmaceutical companies.

22       Q    It's primarily related to that, sir.  You

23   would agree with that.

24            MR. LIFLAND:  Object to the form of the

25        question.

1      Q    There is a prescription opioid crisis in

2   this country.

3           MR. LIFLAND:  Object to the form of the

4       question.

5      A    My understanding is that the opioid crisis,

6   today, is fueled largely from illegal -- drugs like

7   illegal fentanyl.

8      Q    Who told you that?

9      A    That's what -- my understanding from

10  reading in the lay press.

11     Q    Okay.  So, I think we've had a

12  miscommunication today.

13          Are you aware that there is a prescription

14  opioid crisis in this country?

15          MR. LIFLAND:  Object to the form of the

16      question.

17     A    I'm aware of the fact that there is -- that

18  there is a crisis of substance abuse.  Some of that

19  involves prescription medications.

20          But to my reason, my understanding, a lot

21  of the opioid crisis today is being fueled by

22  illegal medications.

23     Q    And your testimony is that if you take the

24  illegal opioids out of the equation so that there

25  are only prescription opioids in this country, we

```
 1    wouldn't have a crisis?

 2        A    No, I didn't say that, nor did I imply

 3    that.

 4        Q    Okay.  Because that wouldn't be right,

 5    would it?

 6        A    Well, I --

 7             MR. LIFLAND:  Object to the form of the

 8         question.

 9        A    Yeah.  You had asked me a question, that I

10    think I understand, was:  The crisis is fueled by

11    prescription drugs.

12             And I think my -- my understanding is that

13    there are other forms of opioids that are also

14    fueling the crisis, as I've just testified.

15        Q    And you listed heroin and fentanyl?

16        A    Yes.

17        Q    Are you aware of the outbreak of heroin

18    epidemics in this country?

19        A    I know that heroin is widely abused in the

20    country.

21        Q    There was no heroin epidemic in the 1990s,

22    when OxyContin hit the market, was there?

23        A    I --

24             MR. LIFLAND:  Object to the form of the

25         question.
```

1      A      I don't know.

2      Q      Do you know what an epidemic is?

3      A      I do.

4      Q      There was no heroin crisis when OxyContin

5   hit the market in the 1990s, was there?

6      A      I don't know that.  I don't know.

7      Q      There was no heroin crisis when Duragesic

8   launched?

9              MR. LIFLAND:  Object to the form of the

10       question.

11     A      I would need to go back and look at the

12   available data to be able to comment on that.

13     Q      You don't know, one way or another?

14     A      I don't know at this time.

15     Q      You don't know how much heroin is being

16   used today?

17     A      No, I don't.

18     Q      You don't know how much fentanyl is being

19   used today?

20     A      Not offhand, not directly.

21     Q      You don't know what percentage of the

22   opioid crisis is attributable to prescription

23   opioids, do you?

24             MR. LIFLAND:  Object to the form of the

25       question.

January 17, 2019                            217

 1      A    No, I don't.  I just testified on what I

 2   had read recently, that a lot of it is being fueled

 3   by illegal opioids.

 4      Q    What did you read?  What source?

 5      A    Just that.  Some scientific data.  Maybe

 6   some of the lay press.

 7      Q    You're aware that, when it comes to

 8   addictive substances, that oversupplying a market

 9   can create a voracious appetite for that addictive

10   substance?

11           MR. LIFLAND:  Object --

12      Q    You're aware of that as a concept?

13           MR. LIFLAND:  Object to the form of the

14       question.

15      A    Could you repeat the question?

16      Q    Yeah.

17           If you oversupply addictive substances,

18   that can create a voracious demand for that

19   substance in the market, can it?

20           MR. LIFLAND:  Object to the form of the

21       question.

22      A    Do you have a reference for that, that I

23   can read -- can see?

24      Q    Opioids oversupplied --

25      A    Yes.

```
 1     Q    -- create an increased demand for opioids.

 2          MR. LIFLAND:  Object to the form of the

 3      question.

 4     A    Yes.  So, I would like to see a reference

 5   that supports that statement.

 6     Q    I'm asking you as a --

 7     A    No, I haven't seen it.

 8     Q    -- logical question, doesn't that make

 9   sense?

10     A    I would need to see the support for the

11   statement in order to -- you asked me do I agree,

12   and my answer is:  I would need to see the

13   scientific support to be able to agree with it or

14   disagree with it.

15     Q    You can neither agree nor disagree?

16     A    At this time, I can neither agree nor

17   disagree, in the absence of the data.

18     Q    Do you have any understanding of supply and

19   demand in markets for opioids?

20          MR. LIFLAND:  Object to the form of the

21      question.

22     A    I'm not sure I understand what that -- what

23   you're asking me.

24     Q    Do you understand how the economics of

25   supply and demand work with respect to opioid
```

1    products?

2              MR. LIFLAND:  Object to the form of the

3        question.

4        A    I don't know that they're different from

5    supply and demand in any other markets.  But there

6    may be differences that I'm not aware of.

7        Q    So, you don't know how the fact that

8    opioids are addictive may affect principles of

9    supply and demand?

10             MR. LIFLAND:  Object to the form of the

11       question.

12       A    I don't know specifically what -- how

13   addiction would impact on those.

14       Q    Janssen has stopped marketing opioids,

15   right?

16       A    I don't know if they're continuing to

17   market generic forms of fentanyl or not.  I simply

18   don't know.  I'm not connected to that, and I don't

19   know if they're continuing to market tramadol or

20   not.

21       Q    Janssen, at one point, has marketed generic

22   fentanyl?

23       A    Sorry?  There was a generic form, I think,

24   of fentanyl that was out at one point, but I don't

25   know if it's still being marketed or not.

```
 1       Q    What was it called?

 2       A    I don't know.

 3       Q    Like a fentanyl patch?

 4       A    I think they were marketing under the

 5  branded name of Duragesic, but I think they had

 6  authorized generics, as well -- an authorized

 7  generic, as well.

 8       Q    But it was a Duragesic-style generic?

 9       A    Yes, it was.

10       Q    Okay.  Janssen divested of Nucynta while

11  you were still there, correct?

12       A    That's correct.

13       Q    Why did Janssen divest of Nucynta?

14       A    I don't know.

15       Q    You have no idea?

16       A    I don't know why.

17       Q    What year was that?

18       A    And the dates are approximate.  I want to

19  say about 2015 or thereabouts.

20       Q    Okay.  There was an opioid crisis in 2015?

21            MR. LIFLAND:  Object to the form of the

22       question.

23       A    There were reports of substance abuse.  And

24  there was -- certainly, in the lay press, the opioid

25  crisis was reported.
```

```
 1        Q    All right.  And did Janssen divest of

 2   Nucynta to help address the opioid crisis?

 3            MR. LIFLAND:  Object to the form of the

 4        question.

 5        A    So, I just testified I don't know the

 6   reason for why they sold the product.

 7        Q    So, no, you don't know?

 8        A    I just said I don't know why they sold the

 9   product.  I don't know what the reason was for why

10   they sold the product.

11        Q    Who would know that?

12        A    I don't know.

13        Q    Do you have any idea?

14        A    No, I don't.  Somebody from the

15   commercial -- like somebody in the commercial group

16   maybe, but I don't know.

17        Q    So, if you were still working at Janssen

18   and you wanted to find that out, who would you ask?

19        A    I don't know at this point.

20        Q    No --

21        A    Even if I were working there -- I

22   understand -- I don't know specifically who I would

23   go to for that.

24            Somebody in senior management, but I don't

25   know even who that would be.
```

 1      Q     At the time of the divestiture, who would

 2   that have been?

 3      A     The president of the company at that point

 4   would maybe have known.

 5      Q     Who was that then?

 6      A     I don't know.  We'd have to look that up

 7   for you.  I don't remember.

 8      Q     Okay, thank you.

 9            Today, Janssen and Johnson & Johnson have

10   no public ties to opioids?

11            MR. LIFLAND:  Object to the form of the

12       question.

13      A     Yeah, I don't know.  I don't follow that

14   very much; so, I don't know.  I'm not at the company

15   anymore, and I don't -- so, I don't know.

16      Q     All right.  Janssen no longer markets

17   Duragesic, the branded form Duragesic, right?

18      A     I don't --

19            MR. LIFLAND:  Object to the form of the

20       question.

21      A     Yeah, as I commented, I'm not keeping up on

22   what currently is being done in the opioid space at

23   the company.  So, I'm not able to answer your

24   question if they are or are not marketing Duragesic.

25   I don't know.

```
 1      Q    Okay.  Let's go to the day before you left
 2  Janssen, okay?
 3           At that point in time, J&J was no longer
 4  marketing branded Duragesic, correct?
 5      A    I don't know.  As I mentioned and
 6  testified, I was working in infectious disease
 7  group; I did not have ties to the analgesia group.
 8  So, I don't know specifically what activities were
 9  going on about Duragesic.
10      Q    Did Janssen ever stop marketing Duragesic
11  while you were there?
12      A    I don't know at the very end, in 200 --
13      Q    No.  Any time you were there, did Janssen
14  ever stop marketing Duragesic?
15      A    No.  When I was there, to the best of my
16  recollection, the product was being sold.
17      Q    Okay.  Did Janssen ever stop promoting
18  Duragesic?
19      A    When the product went generic in 20 --
20  sorry, in 2005, I believe that there was a tampering
21  off of promotional activities, but I don't know when
22  they stopped completely.
23      Q    But you know that ultimately they stopped
24  promoting Duragesic?
25      A    That was my understanding.
```

```
 1      Q    Okay.  Thank you, sir.

 2           So, Janssen stopped promoting Duragesic,

 3  right?

 4      A    Yes.

 5      Q    Janssen divested of Nucynta, correct?

 6      A    Yes.

 7      Q    And you understand, sir, that Janssen sold

 8  Noramco?

 9      A    That's correct.

10      Q    Thank you.

11           MR. DUCK:  I'll pass the witness.

12           MR. LIFLAND:  Okay.

13           MR. WEISBAND:  Let's take a five-minute

14      break.

15           MR. LIFLAND:  Just five minutes to get

16      ready.

17           THE VIDEOGRAPHER:  We're off, 2:39.

18                    (Recess taken.)

19           THE VIDEOGRAPHER:  Back on, 2:43.

20  EXAMINATION BY

21  MR. LIFLAND:

22      Q    Good afternoon, Dr. Vorsanger.

23      A    Good afternoon.

24      Q    You've already given a description of your

25  general background earlier this morning.  So, I'd
```

```
 1    like to try to move this -- through this quickly

 2    with just a few questions.

 3        A    Sure.

 4        Q    You're a medical doctor?

 5        A    Yes.

 6        Q    And your medical education is what?

 7        A    My -- well, I went to medical school, and I

 8    was trained in both internal medicine and

 9    anesthesiology, and I'm board certified in both.

10        Q    And that was approximately when?

11        A    So, my -- I was at medical school, as I

12    testified, from 1980 to 1984.  From 1984 to 1987, I

13    did my internal medicine training; I did an

14    internship and residency.  From 1987 to 1990, I did

15    a residency in anesthesiology at the Massachusetts

16    General Hospital.

17        Q    Can you explain briefly what's involved in

18    an anesthesiology residency?

19        A    Yes.  So, an anesthesia -- anesthesiology

20    residence, physicians learn how to administer the

21    various anesthetic agents in -- either to treat

22    chronic pain or in the operating room.  It's to keep

23    patients comfortable, monitor vital signs, and give

24    them medicines to treat pain and keep them pain-free

25    during surgeries.
```

1     Q     And after your residency, I think you said

2   you were a practicing anesthesiologist?

3     A     That's correct.

4           MR. DUCK:  Objection to form.

5     A     I was invited to come on staff as a staff

6   anesthesiologist at Massachusetts General Hospital.

7   I was there for several years, from about 1990 to

8   1993.  And then from 19 -- and the dates are

9   approximate.  From 1993 to 1995, I worked in

10   anesthesia private practice.

11     Q     And where did you go after that?

12     A     After that, I transitioned to work at Astra

13   USA, as I have testified.

14     Q     And just briefly, what did you work on

15   there?

16     A     So, at Astra USA, I was a medical advisor,

17   as I mentioned, and I worked on helping them develop

18   their local anesthetic, Novocaine-like medication.

19     Q     And how about after Astra?

20     A     So, after Astra, I worked at a company

21   called Parexel.  It's P-A-R-E-X-E-L.  It's a

22   contract research organization.

23     Q     And why did you go to Parexel?

24     A     Parexel, as a company -- it's Parexel

25   International -- is a place where I learned a lot

1   about clinical trial methodology, how to write

2   protocols, how to conduct clinical trials, and

3   provide -- and learn about safety monitoring for

4   patients in clinical trials, to take data from those

5   studies and learn, in part, how to analyze and use

6   that information.

7        Q    Did you do any work with Janssen at

8   Parexel?

9        A    I did.

10       Q    Can you describe that briefly?

11       A    Yes.

12            I worked with Janssen, as an employee of

13  Parexel, on one of their pain products.  It's a

14  patch -- pain patch used to treat acute

15  postoperative pain, and I believe I provided some

16  consultation for a drug called Risperdal.

17       Q    And ultimately, you said you went to work

18  for Janssen --

19            MR. DUCK:  Objection to form.

20       Q    -- is that correct?

21       A    That's correct.

22       Q    When was that?

23       A    I, I started at Janssen in October of 2000.

24       Q    And why did you go to Janssen?

25       A    I was very interested -- I had an

 1 | opportunity to really see how a number of

 2 | pharmaceutical companies engage in their clinical

 3 | trials and how they are run.  And I was very

 4 | impressed with the way Janssen worked, the type

 5 | of -- how they did what they did, and I was

 6 | interested in their products.

 7 |    Q   Did you continue to work on pain products

 8 | while at Janssen?

 9 |    A   I did.  While at Janssen, during my time --

10 | and this -- for my 16 years, I worked on three pain

11 | products, as I testified; Duragesic, tramadol, and

12 | tapentadol.

13 |    Q   Were any of those Schedule II opioid

14 | products?

15 |    A   Yes.  Two of those were Schedule II:

16 | Duragesic, the transdermal fentanyl patch; and

17 | tapentadol.

18 |    Q   And was there a brand name for tapentadol?

19 |    A   Yes.  So, tapentadol has two formulations.

20 | It's an immediate-release and an extended-release.

21 | The immediate release of tapentadol is called

22 | Nucynta.  But for purposes of conversation, we may

23 | call it Nucynta IR, but it's actually just called

24 | Nucynta.  And an extended release of tapentadol,

25 | called Nucynta ER, for extended release.

```
 1        Q     Were any of those products already on the

 2   market as approved drugs when you started at

 3   Janssen?

 4              MR. DUCK:  Objection to form.

 5        A     Duragesic was on the market, but tapentadol

 6   was not on the market.

 7        Q     What position did you hold at Janssen?

 8        A     So, when I first started at Janssen, I was

 9   a medical director.  And as I testified earlier,

10   after several years, I was promoted to a senior

11   medical director.

12        Q     And who did you work with there?

13        A     I worked with Dr. Bruce Moskovitz.

14        Q     What was his position?

15        A     He was the leader of the analgesia group.

16   Analgesia was, at one point, called analgesia

17   mycology.  There was a substance used to treat my --

18   mycol -- mycology infectious, but it was mostly

19   analgesia.

20              And he was the group leader.  He had

21   different titles over the years, but that's what his

22   role was.

23        Q     And what is analgesia?

24              MR. DUCK:  Charlie, every single question

25       you've asked has already been covered.  I'm
```

1        trying to give you some leeway.  I mean, I want

2        you to be able to cover what I covered.  We're

3        paying for this deposition; we're paying for

4        the pages.  And literally every question has

5        already been covered.

6             MR. LIFLAND:  This is background.

7             MR. DUCK:  Let me ask you this:  Are you

8        intending to offer him as an expert in this

9        case?  Because this is not the expert

10       deposition, if you are.

11            MR. LIFLAND:  We haven't reached that point

12       yet.  But right now, I'm asking him about facts

13       that he knows from his work at Janssen.

14            MR. DUCK:  My question is why, so I can

15       know whether or not to object, to file a

16       motion, or whatever else.

17            MR. LIFLAND:  This is not an expert

18       deposition.  This is a fact deposition.

19            MR. DUCK:  Okay.  Well, can you move on to

20       something that has something to do with the

21       testimony that hasn't already been covered that

22       you want to cover?

23            MR. LIFLAND:  This is a direct examination.

24       I can ask whatever I want.

25            MR. DUCK:  But why?  It's useless.

 1              MR. LIFLAND:  I don't, I don't -- it will

 2        take less time if we don't debate this and let

 3        me just get through my examination.

 4        Q    What were your responsibilities as a

 5   medical director?

 6        A    So, my responsibilities as a medical

 7   director in the U.S. medical affairs group was, I

 8   was responsible for clinical trial work.  I was

 9   responsible for working on analyzing data that came

10   in from clinical trials, developing protocols for

11   clinical trials, and working with other individuals

12   in the company, working with the outcomes research

13   group, working, again, with the safety group,

14   working, as well, to -- and I also indicated that I

15   had worked to set up the acute surveillance program

16   for our opioid analgesics.

17        Q    All right.  Can you describe your

18   involvement in safety monitoring?

19              MR. DUCK:  Objection to form.

20        A    So, I was -- because of my expertise and

21   background as an anesthesiologist, I was asked

22   periodically to review data that came in, safety

23   data from the safety group.

24              And in addition to that, as I've already

25   indicated, I developed acute surveillance

 1   methodologies, using both RADARS and Inflexxion

 2   data, to monitor our opioid analgesics.

 3       Q    And which opioid analgesics are you talking

 4   about?

 5            MR. DUCK:  Objection to form.

 6       A    So, we initially had been -- started

 7   monitoring Duragesic, the transdermal fentanyl

 8   patch.

 9            Tramadol was eventually brought over as

10   part of the monitoring.

11            And then, when tapentadol came to the

12   market, tapentadol was included in the monitoring,

13   as well.

14       Q    Let's start with Duragesic.

15            What is Duragesic?

16            MR. DUCK:  Objection to form.

17       A    Duragesic is a transdermal fentanyl

18   product.  It contains pharmaceutical-grade fentanyl

19   in a patch.  The patch is applied to the skin.  The

20   fentanyl medication, the pain medication, goes

21   across the skin and into the body to provide pain

22   control.

23       Q    How long has Duragesic been on the market?

24            MR. DUCK:  Objection to form.

25       A    I believe Duragesic first came to the U.S.

```
 1   market in 1990.
 2           MR. DUCK:  Charlie, can I have a running
 3       objection to your entire direct examination?
 4           MR. LIFLAND:  No, you can object.
 5           MR. DUCK:  Okay.  I'll object every time.
 6   BY MR. LIFLAND:
 7       Q    Have you heard of illegally manufactured
 8   street fentanyl?
 9           MR. DUCK:  Objection to form.
10       A    Yes, I have.
11       Q    Can you explain what that is?
12           MR. DUCK:  Objection to form.
13       A    Yes.  So, in contrast to
14   pharmaceutical-grade fentanyl, which is produced
15   under highly regulated requirements and is very
16   pure, the illegal heroin is not produced in a, in a
17   way that's regulated at all; so that, with a patch,
18   such as Duragesic, a known amount of this
19   pharmaceutical-grade fentanyl diffuses across the
20   skin to treat a patient's pain.
21           Illegal fentanyl is made differently and
22   may have other substances, as well, and it's not
23   controlled, and has impurity.
24           MR. LIFLAND:  If you really are going to
25       object to every question, I think I will
```

```
 1        rethink that and give you a running objection.
 2            MR. DUCK:  Thank you.  So, just so we're
 3        clear, I have got a running objection to your
 4        direct examination --
 5            MR. LIFLAND:  No.  To the form of my
 6        questions.  That's the only objection I'm
 7        giving you.
 8            MR. DUCK:  That's what I will be objecting
 9        to anyway.  So, form objections are preserved
10        during your direct examination --
11            MR. LIFLAND:  Yes.
12            MR. DUCK:  -- is that right?
13            MR. LIFLAND:  Yes.
14            MR. DUCK:  Okay, thanks.
15        Q    Does the illegal fentanyl have anything to
16    do with Duragesic?
17        A    It did not.
18        Q    Which patients is Duragesic intended for?
19        A    So, Duragesic is a medication used to treat
20    chronic pain.  So, it's used -- and I'm paraphrasing
21    from the product label.  It's used -- it's, it's
22    approved for the use in patients with chronic pain,
23    where an opioid analgesic is required around the
24    clock for an extended period of time for the
25    treatment of pain severe enough to require an
```

```
 1    opioid, where lesser forms of pain medications are

 2    not -- you know, are not appropriate for treating

 3    the patients -- were not able to treat the patients.

 4         Q    Can patients be started on Duragesic as a

 5    first-line treatment?

 6         A    No, they cannot.  Patients who are not

 7    opioid-tolerant -- patients who are not

 8    opioid-tolerant -- that is to say, for opioid-naive

 9    patients, Duragesic is contraindicated.  They need

10    to be on a certain amount of opioid analgesics

11    before starting Duragesic.

12         Q    Is use of Duragesic limited to any

13    particular kind of chronic pain?

14         A    No, it's not.  Duragesic may be used to

15    treat any kind of chronic pain, regardless of

16    ideology, as long as it fits the criteria in terms

17    of the severity and the requirement for opioid

18    analgesia, as I've already discussed.

19         Q    What kinds of chronic pain?

20         A    So, it can be used to treat chronic pain

21    associated with cancer, it can be associated with --

22    chronic pain associated with low back pain, and

23    other types of chronic pain, as well.

24         Q    Has Duragesic always been approved for

25    chronic pain?
```

 1        A     Yes, it has been.

 2        Q     Is Duragesic approved for pain that is not

 3   chronic?

 4        A     No, it is not.  It's only approved for

 5   chronic pain.  In fact, I think it's contraindicated

 6   for acute pain.

 7        Q     What are the benefits of Duragesic for the

 8   patient?

 9        A     As a patch technology, there are certain --

10   there are several benefits.  One, patients don't

11   need to take a pill.  It's a patch that's applied to

12   the skin.  And Duragesic delivers

13   pharmaceutical-grade fentanyl in a known -- in a

14   known dosing, and in a known quantity.  And it's --

15   after a steady state is achieved, the medication

16   is -- for most patients, is -- lasts for 72 hours.

17   We know that, for some patients, the medication only

18   lasts for 48 hours.  And our product label states

19   that accordingly.

20        Q     Does the design of the patch make abuse

21   more difficult?

22        A     Yes.  In my opinion, and the opinion of

23   others, as well, the design of the patch is such,

24   that we talked about, the pharmaceutical-grade

25   fentanyl diffuses across the skin, goes into the

1    body.

2           But the rate of rise -- that is the time it

3    takes for the fentanyl to get to the central nervous

4    system -- is slower than what would be desirable by

5    people who would want to abuse or who are addicted

6    to opioid analgesics, where they want a very quick

7    high.  So, for addicts or people who abuse the

8    medication -- intravenous medication or snorting it

9    would be two examples to do that.  Because Duragesic

10   is delivered in a slower fashion over a period of

11   time, when we talked about the rate of rise in the

12   central nervous system, it would tend not to be as

13   desirable.  That's one reason.

14          The second reason is that fentanyl, in the

15   gel, is mixed with other, with other ingredients,

16   other excipients; so that, if addicts would try and

17   inject this, for example, not only would they get

18   the fentanyl, but they would get these other med --

19   these incipient products, as well.  And those can --

20   injecting Duragesic can be very, very dangerous, the

21   gel from the patch.

22      Q    And how does that affect abuse?

23      A    Well, if addict -- we -- early on, when the

24   product was on the market, we became aware of the

25   fact that addicts were trying to extract the gel and

January 17, 2019                                    238

 1    inject it intravenously.

 2           And what we learned, unfortunately, that

 3    those patients, when they did that, if they used it

 4    inappropriately, tampered with it -- and these were

 5    addicts, not patients -- chronic pain patients --

 6    that those patients, unfortunately, got quite sick

 7    and some of them died.

 8           We know from our Internet monitoring

 9    activities that took place, when we started

10    monitoring the Internet, there were warnings by

11    addicts that the patch system was dangerous and they

12    should stay away, because of the reports that they

13    had of what I just described to you, people who

14    tried to get at the gel and inject it, to shoot it,

15    mainline it, and the patients were -- sorry, the

16    addicts were quite sick, and many of these people

17    died.  These people didn't just die.  There weren't

18    many, but there were some deaths.

19      Q    Is there still a potential for abuse of

20    Duragesic?

21      A    Yes.  Any opioid can be abused.  And

22    Duragesic can be abused, as well.

23      Q    Is Duragesic scheduled?

24      A    Yes, it is.  Duragesic is a controlled

25    substance.  It's a Schedule II.

January 17, 2019                    239

1      Q    And is the abuse potential described in the

2   labeling?

3      A    Yes, it is.  The product labeling does

4   mention that it is a C2.  And the schedule C2 is

5   defined in law for bio abuse potential, as the

6   highest level of scheduling.

7           MR. LIFLAND:  What exhibit number are we up

8        to?

9           MR. DUCK:  Fifteen, I think.

10     Q    So, I've handed you a document that I've

11  marked as Exhibit 15.

12          I need a sticker to actually do that.

13          MR. DUCK:  Is there some way to denote

14       whether it was your exhibit or my exhibit?  I

15       mean, if you want to write something else on

16       these to denote that, I would appreciate it.

17          MR. LIFLAND:  We haven't been doing that in

18       any of the other depositions.  We've just been

19       numbering them.

20          MR. DUCK:  It's my deposition, though.  So,

21       if you'll put "Defendant's Exhibit" or write a

22       "D" on it, I'd appreciate it.

23          MR. LIFLAND:  Well, let's -- we can do that

24       afterward.  Let's just -- we're going to call

25       it Vorsanger 15 for this purpose.

January 17, 2019                              240

```
 1              MR. DUCK:  To the extent, you know, it's
 2         unclear in the record, these are not the
 3         State's exhibits, starting with Exhibit 15
 4         onward.
 5                        (Highlights of Prescribing
 6                         Information was marked as
 7                         Vorsanger 15 for identification,
 8                         as of this date.)
 9    Q    I've just handed you, Dr. Vorsanger, what I
10   marked as Exhibit 15.
11         Can you identify that document?
12    A    Yes.  This is the full prescribing
13   information for Duragesic, also known as the package
14   insert for the product.
15    Q    And does this package insert provide
16   information about the potential for abuse of the
17   product?
18    A    Yes, it does.  As a matter of fact, in the
19   black box warning, it talks very specifically in the
20   first bullet:  "Duragesic exposes users to risks of
21   addiction, abuse, and misuse, which can lead to
22   overdose and death."
23    Q    Does the insert then go on to describe
24   those risks?
25    A    Yes, it does.  As you go through the
```

1   package insert, there is a black box warning which

2   is described.  And as you go through further and

3   look in the package insert -- and the package insert

4   is information that prescribers use to learn about

5   the products and how to use it safe and effectively.

6          And if you go -- it talks about section

7   5.1, under "Warning and Precautions," where it

8   specifically discusses addiction, abuse, and misuse.

9   Q    And you've mentioned that it gives

10  information about how to use the product safely and

11  effectively.

12  A    Yes.

13  Q    Let me ask you to identify the parts of the

14  label where that's discussed.

15  A    Absolutely.

16         So, if you look -- as you go through the

17  label, the indications and usage are in section 1.

18         Dosing administration provides the --

19  provides information to the healthcare provider on

20  how to dose, how to titrate and maintain therapy,

21  and what dosage modifications may be needed,

22  depending on the patient's medical history.

23         So, for example, "Dosage Modifications in

24  Patients with Hepatic," that's liver impairment; or

25  "Patients with Renal," that's kidney impairment.

 1    And it goes on.

 2            It talks about dosage firms and strengths,

 3    which ones are available.

 4            It talks about the contraindications, where

 5    the drugs should not be used.

 6            And then at section 5 is "Warning and

 7    Precautions," and we talked a little bit about on --

 8    "Addiction, Abuse, and Misuse" is 1.

 9            It goes on to talk about its effect and how

10    it can compete with other medications and how the

11    body breaks down drugs, how to think about it if

12    patients have head injury, with increased pressure

13    in the -- on the brain because of that.

14            It has extensive experience -- discussions

15    about adverse events and talk -- in section 6, and

16    talks about clinical trial experience and about the

17    company's post-marketing experience.

18            And then "Use in Specific Populations."

19            "Drug Interactions," in 7.  What to think

20    about as you -- if you talk your -- as you talk to

21    patients about drugs, what -- you need to find out

22    what medications they're on.  We talked about taking

23    a history earlier today and finding out what other

24    drugs are.

25            And then section 8 uses it -- how it's used

```
 1    in specific populations; women who might be

 2    pregnant, breast feeding, and then for geriatric

 3    patients, et cetera.

 4          Section 9 goes through drug abuse and

 5    dependence.

 6          And then section 10 talks about potential

 7    overdose and goes on, in addition, to talk about the

 8    clinical pharmacology.

 9          So, the document really covers -- for me,

10    as a clinician, and when I read this and think about

11    it, quite a lot of information on how to use the

12    product safely and effectively and how to understand

13    how the product can be used in various patient

14    populations.

15    Q    Can you turn to page 12 of the document.

16    A    Yes.

17    Q    Can you -- you see the section 5.1,

18    entitled "Addiction, Abuse, and Misuse"?

19    A    I do.

20    Q    Can you read what information is given to

21    doctors in the second and third paragraph of that

22    section on those subjects.

23    A    Yes.

24          For the second paragraph, it says,

25    "Although the risk of addiction in any individual is
```

1    unknown, it can occur in patients appropriately

2    prescribed Duragesic.  Addiction can occur at

3    recommended doses and if the drug is misused or

4    abused."

5          And underneath that, it says, "Assess each

6    patient's risk for opioid addiction, abuse, or

7    misuse prior to prescribing Duragesic, and monitor

8    all patients receiving Duragesic for the development

9    of these behaviors and conditions.  Risks are

10   increased in patients with a personal or family

11   history of substance abuse (including drug or

12   alcohol abuse or addiction) or mental illness," and

13   the example they gave here is "major depression."

14   "The potential of these risks should not, however,

15   prevent the proper management of pain in any given

16   patient."

17       Q    Can you just continue, just to the end of

18   that paragraph?

19       A    Sure.  Yes.

20          "Patients at increased risk may be

21   prescribed opioids such as Duragesic, but use in

22   such patients necessitates intensive counseling

23   about the risks and proper use of Duragesic along

24   with intensive monitoring for signs of addiction,

25   abuse, and misuse."

```
 1        Q     And this package insert, do you know

 2   whether it undergoes a regulatory process?

 3        A     It does.  So, when a product is first

 4   approved, the package insert is created by

 5   discussion with FDA, based on the available data,

 6   and the package insert is updated periodically, as

 7   new safety information or other type of information

 8   that FDA and/or the company deems is important to

 9   put in there to inform both healthcare providers and

10   patients, as well.

11        Q     So, this is an FDA-approved information

12   that's provided?

13        A     Yes.  This is an FDA-approved document.

14        Q     Can you describe how Janssen monitors the

15   potential and actual abuse and misuse of Duragesic

16   in the real world?

17        A     Yes.  So, monitoring for abuse occurs in

18   two -- on two -- in two ways:

19              One, there is monitoring using systems of

20   passive surveillance, and we talked a little bit

21   about that.  They're not really passive, they're

22   getting data that come into the company either

23   through phone calls or through reports that come in

24   from healthcare providers and/or from patients.

25              They also -- databases are looked at.  So,
```

```
 1    Janssen maintains a database of all the adverse

 2    events of all of its medications.

 3         Janssen also reviews an FDA database for

 4    adverse events.  That FDA database is called AERS,

 5    the Janssen database is called SCEPTRE.  We talked a

 6    little bit about that earlier.  And those are the

 7    ways that the data are analyzed to look for all

 8    adverse events, including abuse, misuse, and

 9    addiction.

10         Q    What geography does SCEPTRE cover?

11         A    SCEPTRE covers the entire world.  So,

12    reports that we have coming in from around the world

13    for use of the product are reported in SCEPTRE.  The

14    information is processed by people with expertise to

15    look at those type of work.  Reports are compiled.

16    The adverse events are analyzed, reports are made,

17    and that information is submitted to FDA.

18         In addition, we have an active surveillance

19    program, that I had already testified that I set up

20    when I was at Janssen, that used information both

21    from RADARS and later from Inflexxion, and used

22    other databases, as well.

23         Q    What --

24         A    And that --

25         Q    I'm sorry.
```

 1    A    And that information was -- and I set those

 2   programs up specifically because it took time for

 3   the passive surveillance, for the information to

 4   come in, to be looked at, to be analyzed, and I

 5   wanted more real-world -- real-world, real-time

 6   information coming in.

 7         So, not only did I use RADARS and

 8   Inflexxion, that I had testified this morning, but I

 9   also set up a program of media monitoring, where I

10   had individuals looking at the lay press to see for

11   mentions of our products.

12         The pharmacovigilance group looks at

13   scientific articles, but the lay press wasn't looked

14   at, and now it is.  They may have looked at some of

15   the lay press, but I had a formal way that I looked

16   at it.

17         In addition, as I also testified, we set up

18   Internet monitoring to look not only at current

19   trends for how the product might be abused, but if

20   there was a change in those trends.

21    Q    Now, what's the overall purpose of looking

22   at all of these streams of information?

23    A    To understand the rates of abuse, and are

24   those changing with time, methods of abuse, are

25   those changing; so, that we can ensure that we can

1   inform not only the health regulatory authorities,

2   but also healthcare providers, on how the product

3   might be abused and if there are changes in the

4   abuse patterns.

5                    (JAN-MS-02321524 was marked as

6                    Vorsanger 16 for identification,

7                    as of this date.)

8   Q    I've handed you an exhibit that I've marked

9   as Vorsanger Exhibit 16.

10        Can you identify that document?

11  A    Yes.  The document says "Risk Management

12  Plan for Our Products," and it's dated May 9, 2005.

13  Q    And is that a document that you created?

14  A    This is a document that I either created or

15  provided the information that went into the

16  document.

17  Q    So, this describes the risk management plan

18  for Duragesic that you were just describing in your

19  prior answer?

20  A    That's correct, yes.

21  Q    Will you turn to the second slide.

22  A    Yes.

23  Q    Does this accurately describe why Janssen

24  created this Risk Management Strategy?

25  A    Yes, it does.

```
 1              So, the first item says, "Why create an
 2    RMP?" or risk management plan.  This is the strategy
 3    behind it, because what we believe at the company,
 4    and believed at the company, is it's the right thing
 5    to do.  We are marketing products that have a known
 6    abuse potential, and we want to understand the
 7    mentions of abuse, rates of abuse, and, again, if
 8    there is a change in the abuse pattern, that we're
 9    appropriately labeled for it, and that our
10    educational programs inform people who care for, not
11    only for patients, but are aware of the fact that
12    people who may seek to abuse the product, that
13    they're aware of that, as well.
14              The second bullet, it ultimately became
15    required by FDA.
16              And those are some of the main reasons we
17    have.
18        Q    Can you turn to page 11, slide 11.
19        A    Sure.
20        Q    Can you describe what this slide is
21    depicting?
22        A    So, when I put the program together, one of
23    the things that I was thinking about would be who
24    would be the individuals who would need to be part
25    of a risk management program to actively survey our
```

1    products?

2           So, if you look at the categories on the

3    top, we want to have individuals who are

4    knowledgeable about product labeling, for the

5    reasons I just spoke about; that if we needed to

6    change the label for any reason, they were in a

7    position to help with that.

8           We wanted to make sure that education was

9    represented, as I've already testified, on what may

10   or may not need to be changed.

11          We wanted to ensure that our launch

12   promotion activities were robust, that they captured

13   what we knew about the product and most up-to-date

14   information about safe and effective use of the

15   product.

16          The individuals who are responsible for the

17   product, including regulatory affairs, medical

18   affairs, representation from the research and

19   development group -- we had a representative from

20   our legal group.  The med affairs was responsible

21   for the active surveillance, as I've testified.  The

22   passive surveillance program was from our

23   pharmacovigilance group.  And we had people who sat

24   on this risk management team, from our supply chain

25   group, to inform really the other people in the

1  organization who handled the product who were

2  responsible for the product, if there were any

3  issues that came up around the diversion.

4      Q    What was the external advisory board that's

5  referred to here, in the box under "Review with

6  independent external advisory board"?

7      A    Right.  So, when I put this together, the

8  group of individuals on the risk management team

9  were fairly straightforward for me.  As I mentioned,

10 these are the people that worked with the drug every

11 day at the company.

12         I wanted to make sure that we weren't

13 siloed and that we had external expertise from

14 people who could help us with safety issues, if

15 those arose, and to provide guidance to us.

16         So, I assembled people with knowledgeable

17 backgrounds from a number of different areas, and I

18 met with them or other members of the company had

19 met with them to talk about potential safety issues

20 and to share some of the data that we had observed

21 from RADARS, at that point in time, to get their

22 feedback and opinion.

23     Q    Can you tell me who were the members of

24 that external review committee?

25     A    Yes.  So, we wanted an individual who was

```
 1    knowledgeable in FDA requirements and product

 2    labeling.  So, Cynthia McCormick, at that time, had

 3    led the FDA.  And I had reached out to her.  She was

 4    interested in this committee.  So, she was our FDA

 5    representative on the external review committee.

 6           I also wanted somebody from DEA who was

 7    knowledgeable about DEA processes and et cetera.

 8    So, I reached out and contacted Mr. Frank Sapienza,

 9    and he also joined in and provided DEA perspective,

10    as we talked about our opioid medications.

11           I wanted someone with expertise in pain

12    management, a physician who was an expert in pain

13    management, who also knew our products well.  And

14    so, Dr. James Otis, up in Boston, who prescribes

15    Duragesic for -- or prescribed Duragesic for his

16    patients, was a member of the committee, as well.

17           I also felt it was important to have

18    someone who could provide us with an ethical

19    perspective.  We certainly had the credo as the

20    guiding principles for our ethics, but I wanted

21    somebody outside the company who could kind of look

22    in and help us with this.  So, Art Caplan was

23    someone who was an ethicist, well-known.  I reached

24    out to him, and he sat on the committee, as well.

25           And then lastly, since active surveillance
```

1    was a new methodology for me, I didn't have a lot of

2    experience with it, I wanted to have someone with

3    expertise in signal detection methodology.  So,

4    Annette Stemhagen, who is someone who has expertise

5    from that, joined it, as well.

6              And I met quarterly with the external

7    review committee.  We discussed issues that came up.

8    Some of what we might be thinking about, if a

9    potential safety issue did arise, that was something

10   that we could discuss with them to get their input

11   and their feedback.

12             MR. LIFLAND:  Let's get the next document.

13        A    Are you done with this?

14        Q    Yeah.

15                       (JAN-MS-02305132 was marked as

16                       Vorsanger 17 for identification,

17                       as of this date.)

18             MR. DUCK:  Thank you.

19        Q    There you go.  I just handed you what I've

20   marked as Exhibit 17.

21             Have you seen that document before?

22        A    Yes, I have.

23        Q    And can you describe what it is?

24        A    So, the title of the document is "Risk

25   Management Overview," a presentation that was put

 1   together by the person who was my supervisor at the

 2   time, Dr. Bruce Moskovitz.

 3           Ortho-McNeil Janssen Scientific Affairs was

 4   another product company that went on to become part

 5   of J&J -- or Janssen, I'm sorry.  It was a J&J

 6   company, it became part of Janssen.

 7           And the date of the presentation was 20th

 8   of April 2007.

 9       Q    And what does the presentation describe?

10       A    So, it starts with a discussion of the drug

11   safety landscape and how FDA reviews it and provides

12   guidance.

13       Q    Well, let me just -- I didn't mean to have

14   you go through everything.

15           Just in high level, what is this slide deck

16   about?

17       A    So, this is about risk management, risk

18   management guidance, the goals of setting up a risk

19   management program, the types of interventions that

20   need to have [sic], and the tools that were needed

21   on what we need to develop to use -- to develop this

22   type of a program.

23       Q    And if you turn about, I want to say, a

24   third of the way in, you'll see that there's a slide

25   that's entitled "Duragesic Risk Management Plan."

 1          Do you see that?

 2      A    Yes.

 3      Q    And does that refer to the same plan that

 4  we were discussing in the prior questions about the

 5  last exhibit?

 6      A    Yes.  It talks about, on the next page, the

 7  risk management strategy, how you stratify risks,

 8  how you address risks and look at data to understand

 9  it, how you manage it and assess it.

10          And underneath it, the boxes entitled

11  "Labeling, Education, Launch/Promotion,

12  Surveillance," et cetera, come directly from the

13  risk management team and the risk management program

14  that I had set up for the -- with the company.

15      Q    Let's turn to the slides that describe the

16  elements of the surveillance plan.  If you keep

17  going, you'll see there's a slide on internal review

18  committee and external review committee.

19      A    Right.

20      Q    Those are the two committees that you

21  described in your prior answer?

22      A    Right.  So, I didn't talk about the

23  internal review committee yet, which I'm happy to do

24  now.

25      Q    Okay.

1       A      The external -- let me spend a moment on

2    the product risk management team, before I get to

3    the other -- just to briefly touch about -- on it.

4              Remember, I said the people who are

5    responsible for the compound at the company -- so,

6    there's someone from medical affairs.  I was the

7    chairperson for it.  There was somebody from our

8    safety group, regulatory affairs, medical affairs,

9    from R&D.  We had somebody from marketing, as well,

10   and from some of our global groups.  And our ad hoc,

11   as needed, was -- we had legal, we had J&J's

12   security, and other groups, as well.

13             Now, to talk about -- let me find the slide

14   for the internal review committee that you were

15   asking me about.  Okay, I have it.

16             So, all of the people that were on the risk

17   management team and that were part of it, the people

18   whom they reported into, the vice president-level

19   individuals, were part of the internal review

20   committee.  So, this was senior management at the

21   company.

22             And as you can see, it says, "Membership

23   (functional senior management)."  And these

24   categories correspond to the people that were

25   actually in it.

 1        And on the right side, it talks about the

 2   responsibilities of this.  This was a

 3   decision-making body.  So, after the risk management

 4   team -- and I've described that already -- comes up

 5   and reviews the available data, they will make

 6   recommendations to the internal review committee,

 7   which essentially are a lot of their supervisors or

 8   maybe even a level above their supervisors.  This

 9   team will then review the data, review the

10   suggestions made by the product risk management

11   team, and make certain types of recommendations.

12        If we also feel that we need help from the

13   external review committee -- and I discussed the

14   external review committee already, and who was on

15   that -- then the data could be shared not only --

16   would be shared not only with that, but could be

17   shared certainly with the external review

18   committees, as well.

19   Q    And there is a next -- there's another

20   slide that references the external review committee.

21        That's the same committee that you already

22   described the membership of?

23   A    Precisely, yes.

24   Q    Turn to the next slide after that.

25   A    Which one is that?

1    Q    It's --

2    A    Passive surveillance?

3    Q    Passive surveillance, yes.

4    A    Okay.  Did I go past it?

5    Q    You went past it.  You went past it.

6    A    Oh, okay.  I'll go back.  Is it the other

7  way?

8    Q    Yeah, I think it is the other way.

9  External review committee, and then you go two

10  slides.

11    A    Here it is.  Okay, great.

12         Okay.  So, the passive surveillance --

13    Q    Let me ask you a question, first.

14    A    Sure, sorry.

15    Q    I'm sorry to keep it in the

16  question-and-answer format.

17         Can you describe what this slide depicts?

18    A    Yes.  So, this, this slide discusses the

19  passive surveillance and some of the databases that

20  are used.

21         We already talked about information coming

22  in from adverse events, but other data that were

23  looked at as part of the passive surveillance

24  methodologies -- the databases were DAWN, and we

25  talked about that; the Toxic Exposure Surveillance

```
 1   system, TESS, which I think was a forerunner of the

 2   Poison, U.S. Poison Control Network; National

 3   Forensic Laboratory Information System, the NFLIS;

 4   and another database called Intercontinental

 5   Marketing Services, IMS; so, the Health LRx

 6   database, looking at prescriptions.

 7        Q    And just briefly, what was DAWN?

 8        A    So, DAWN, it was a network that looked at

 9   individuals presenting to emergency rooms with, with

10   overdose or -- from opioid analgesics.

11        Q    And you mentioned TESS was poison control?

12        A    I believe that was a forerunner for the

13   U.S. Poison Control Network.

14        Q    And NFLIS -- it says "forensic

15   laboratory" -- what kind of information would be

16   retrieved from that?

17        A    So, my recollection was that the NFLIS had

18   information from forensic -- things that came about

19   as far as law enforcement activities, where

20   medications may have been seized or they became --

21   medications at crime scenes or something like that,

22   to see what drugs were.

23        Q    And how about IMS?

24        A    IMS is -- the IMS database was looking at

25   prescriptions, and I guess to be able to use
```

1   demographics on who was using the drug -- who was

2   being prescribed the drug, how, and et cetera,

3   dosing, et cetera.

4       Q    If you look at the next slide, there is a

5   table that, again, refers to "Passive Surveillance:

6   Monitoring Activities by Risk."

7           Can you explain what that slide is

8   depicting?

9       A    Yes.  So, the slide says "Passive

10  Surveillance:  Monitoring Activities by Risk."  It

11  talks about the type of risk.  And the risks that

12  are listed in the table are "Abuse, Overdose,

13  Misuse, Diversion," and on the bottom is "Other

14  Adverse Events of Interest."  And then looks at the

15  various passive surveillance methodologies to look

16  at these various adverse events.

17          So, the J&J database, which we discussed is

18  SCEPTRE, looks at all of them.  The FDA AERS

19  database, which we discussed, also looks at all of

20  them.  So, both look at abuse, overdose, misuse,

21  diversion, and other AEs of interest.

22          TESS, we talked about, looks at abuse,

23  overdose, and misuse.

24          The NFLIS looks at diversion.

25          The IMS LRx looks at misuse.

 1            And the DAWN data looks at abuse and

 2    overdose.

 3        Q    If you turn to the next slide, entitled

 4    "Active Surveillance."

 5        A    Okay.

 6        Q    What is active surveillance?

 7        A    So, as I had testified, active surveillance

 8    was a system that I worked with the company to put

 9    in place to get more real-time or more information

10    that could come in more quickly to the company for

11    us to be able to act on if we became aware of

12    issues.

13            So, we have discussed RADARS.  That was one

14    of the sources of data that came in for analysis.

15        Q    And that had several components, I take it?

16        A    It did.

17        Q    And we can discuss those -- we'll get to

18    those, but could you explain what the media

19    monitoring and Internet monitoring were, before we

20    do that?

21        A    Yes.  So, media monitoring was monitoring

22    for the lay press for potential mentions of

23    Duragesic.  And it would help us with trends or

24    reasons which people might be describing either

25    abusing it or what might be going on.

 1          And Internet monitoring, in the 2005

 2   timeframe, which would be about 10 years, I guess,

 3   from when the Internet became more widely available

 4   in 1995 -- we thought it would be important to see

 5   whether addicts were talking about how they might be

 6   abusing our product.  And, in fact, they were.

 7          And Pinney Associates, which is a company

 8   that has expertise in abuse, did the Internet

 9   monitoring for us, went to the websites that addicts

10   go to, to understand how our product may be abused,

11   the methodologies, and whether there were

12   conversations about how it would be used [sic], with

13   the purpose of understanding what addicts thought

14   about our drug, and if there were changes, as we

15   talked about earlier today, in patterns of abuse

16   that could occur, we would be able to detect that,

17   and, again, inform through our education and other

18   places, to be able to do that.

19     Q    Can you turn to the next slide and explain

20   what that slide is depicting?

21     A    So, this slide says, "Active Surveillance:

22   RADARS," and it talks about the RADARS networks that

23   we had, that I worked on when I was there, and there

24   were four.

25          There was the Key Informant Network, the

 1    Law Enforcement Network, the American Association

 2    for the Treatment of Opioid Dependence -- and that's

 3    called AATOD -- and the Poison Control Network.

 4         Q    What was the Key Informant Network?

 5         A    So, the Key Informant Network, I believe,

 6    was a network that is run by Dr. Cicero, and I

 7    believe these are surveys that go out to individuals

 8    who work with people who would abuse opioid

 9    medications or are addicted to them, to inform us on

10    the various medications that those people use, and

11    to have an idea about how much they use and how

12    they're used.

13         Q    What's the Law Enforcement Network?

14         A    The Law Enforcement Network was a network

15    that was run formerly by Dr. James Inciardi.  It was

16    taken over by his wife, I believe, after he passed

17    away.  And that got information from individuals in

18    law enforcement who may have been associated with

19    either -- and I'm not sure specifically exactly

20    where they got the information -- these were surveys

21    of law enforcement officials about what they had

22    heard about our products, our product, about

23    Duragesic, and ultimately the other products, as

24    well, that got folded in.

25         Q    And the Poison Control Network?

```
 1       A     Poison Control was U.S. Poison Control.
 2   So, people either called, called in to have --
 3   wanted to talk about what issues were going on, if
 4   there was overdose or misuse or inappropriate use of
 5   our products, and that information would be
 6   collected by the U.S. Poison Control Network.
 7       Q     Were there additional elements that came
 8   online with RADARS later on?
 9       A     So, later on, RADARS made available a
10   college survey, which was a survey of college
11   students.  I was particularly interested in that,
12   along with the company, because this was a
13   population of individuals who liked to experiment
14   with these types of medications.  And we wanted to
15   understand whether our medications would be
16   desirable to them.
17       Q     Let's take a look at the next slide.
18       A     Going the other way?
19       Q     Yeah.  Just the first of these charts, the
20   one that's entitled "Key Informant Data."
21       A     Okay.
22       Q     And can you explain what this chart is
23   showing?
24       A     Yes.  So, these are -- the slide is
25   entitled "Key Informant Data:  Average Number of
```

 1   Cases by Drug and Responding Informant 2002 to

 2   2005."

 3          And on the X axis, it has starting from the

 4   first quarter of 2002 through the first quarter of

 5   2005.  On the Y axis is the average number of cases.

 6   And then on the bottom, it talks about buprenorphine

 7   cases, morphine, fentanyl, other oxycodone,

 8   hydrocodone cases, et cetera.

 9       Q    And so, what are these lines on the chart

10   reporting?

11       A    So, these are the average number of cases,

12   and it's broken down by opioid.

13       Q    Okay.  Where does fentanyl appear?

14       A    So, fentanyl is the green line.  You can

15   see, starting in 2002 -- again, Duragesic would have

16   been on the market since 1990.  Since 2002, it had

17   been out for about 12 years.  And it had fentanyl

18   cases.  But this is not only Duragesic.  This might

19   have been if there was illegal fentanyl and other

20   things that contributed to fentanyl.

21          And what you can see with these data is

22   that the line for fentanyl is low and remains

23   consistently low through the timeframe of 2002 and

24   2005.

25          These data are important, also, because

```
 1    recall that I said Janssen didn't join RADARS until

 2    2005, 2006.  But the data became available to us,

 3    because we wanted to understand what data had been

 4    collected by Purdue, as far -- as part of the data

 5    looking at these opioids.  So, it gave us an

 6    opportunity for a snapshot in time, to go as far

 7    back as 2002 and provide this type of information to

 8    us.

 9        Q    Can you look at the next slide.

10        A    Yes.

11        Q    Can you describe what that depicts?

12        A    Yes.  So, this slide -- this slide is

13    entitled "Law Enforcement Network Data:  Drug

14    Diversion Total Mentions 2002 to 2004."  Again, this

15    is from the Law Enforcement Network that I just

16    talked about.

17        Q    Where does fentanyl appear on that?

18        A    So, fentanyl is the green line here, with

19    the triangles.  And here, what you can see, starting

20    from the first quarter of '02 to the second quarter

21    of '04 -- I'm not sure what the X axis is -- or the

22    Y axis.  The X axis is the dates I just gave you.

23             These are some of the compounds tracked by

24    RADARS, not all opioids.  And mentions of fentanyl

25    remain fairly stable during that period from 2002 to
```

```
 1   2004.  They tend to be low compared to some of the

 2   other opioids that are here, and a stable pattern.

 3        Q    Can you take a look at the next slide.

 4        A    So, the --

 5        Q    Can you describe what this slide is

 6   predicting -- describing?

 7        A    Yes.  So, the slide I'm looking at is

 8   called the "AATOD Report."  These are individuals

 9   presenting with a history of drug addiction,

10   seeking -- going to methadone maintenance programs,

11   the drugs most commonly abused in prior month, and

12   admission to the Methadone Maintenance Treatment

13   Program, MMTP.  The number here is, N is equal to a

14   thousand, is 1,137.  And it lists the highest, from

15   the highest to the lowest of the reports by people

16   presenting to these types of treatment programs.

17        Q    And where does fentanyl appear in that

18   estimate?

19        A    So, fentanyl appears the third from the

20   bottom.  And it's amongst the lowest.

21        Q    Can you turn to the slide -- I think it's

22   two slides down, with the map of the United States

23   on it, and explain what that slide is depicting?

24        A    Yes.  So, this slide is entitled the

25   "RADARS System Poison Control Center Coverage."
```

1          At this time, when this deck was created,

2     it said there were 38 poison centers serving over

3     200 million Americans -- "people are currently

4     enrolled or in paper stage -- paperwork stage."  So,

5     these centers may be coming up at that time.

6          Q     And if you go to the next slide, and

7     explain that one.

8          A     In here, it says "PCC Data," Poison Control

9     Center, "Data:  Intentional Exposure Rates by

10    Quarter for All Sites Combined."

11         Q     So, these are rates of what?

12         A     These are rates per hundred thousand

13    population.  So, the point was raised:  What is the

14    denominator?  And the data now would have a

15    denominator with the rates per hundred thousand

16    population within the U.S.

17              And on the X axis, it's between -- it's the

18    first quarter of '03 to the second quarter of '05.

19    These are the opioid analgesics that are tracked by

20    RADARS -- or were tracked by RADARS at that time.

21              Fentanyl is the green line with the

22    triangle, and it's among the lowest opioids listed

23    here from opioids that are tracked by RADARS, again,

24    for the timeframe that we're talking about.

25         Q     And if you could turn just two more slides

```
 1    down to the slide that's entitled "How well does the

 2    J&J RMP work?"

 3            Do you see that one?

 4      A    I do.

 5      Q    Can you explain what that's describing?

 6      A    Yes.  So, one of the questions that come up

 7    about risk management plans is, how effective are

 8    they, other than collecting data?

 9            So, this slide depicts a story that took

10    place by using the RADARS methodology.  And it's

11    entitled "How well does the J&J RMP work?  The

12    Fentanyl-Tainted Heroin Story."

13            So, we became aware of reports of heroin

14    addicts dying of heroin containing fentanyl, in

15    2006.  I got a call from RADARS saying that there

16    was this concern about fentanyl.

17            And because Duragesic patch that we talked

18    about contains fentanyl, our question, which is on

19    this slide here, is:  "Was the fentanyl coming from

20    the Duragesic patches?"

21            Our media monitoring, which we talked

22    about, which monitors the lay press -- and we got a

23    call from Poison Control that detected the signal at

24    the initial outbreak -- and that people may recall,

25    in '06, that some of the major cities in the United
```

```
 1   States were first getting reports of this illegal

 2   fentanyl.

 3          The company, in response to this,

 4   dispatched a former -- a person who formerly worked

 5   at DEA to investigate on our behalf, and learned

 6   that fentanyl was shown to be made from a

 7   clandestine laboratory in Mexico and was not part of

 8   the fentanyl that came from the Duragesic system.

 9          So, here, in 2006, we already had a plan in

10   place, we already had an awareness of this illegal

11   fentanyl going on, and being tainted for the heroin

12   in the United States.  And we were able to identify

13   that it was not our fentanyl that was part of that.

14                      (JAN-MS-00151777 was marked as

15                      Vorsanger 18 for identification,

16                      as of this date.)

17   Q    I'm going to hand you a document that I've

18   marked as Vorsanger Exhibit 18.

19          Can you identify Exhibit 18?

20   A    Yes.  The document is entitled the "Fourth

21   Risk Management Plan Progress Report" for Duragesic.

22   Q    Is this a document that you've seen before?

23   A    Yes.  I was identified as one of the

24   authors on the document.

25   Q    So, this is a document that you were one of
```

January 17, 2019                            271

```
 1   the authors of --

 2        A     Yes, that's correct.

 3        Q     -- at the time this was prepared?

 4        A     That's correct.

 5        Q     And what is the document?

 6        A     This was information that was sent to FDA.

 7   It was put together by a multifunctional group, with

 8   individuals both from our pharmacovigilance group,

 9   as well as people from medical affairs, someone from

10   our regulatory affairs group.  We had somebody from

11   a -- from our pharm -- from our marketing group and

12   somebody from supply.

13        Q     And it's entitled "Fourth Risk Management

14   Plan Progress Report."

15        A     That's correct.

16        Q     Were there other progress reports?

17        A     Yes, there would have been other ones

18   before that.  This is the fourth one, and there were

19   other ones that would have predated this.  This one

20   is dated 16th June 2008.

21        Q     And did they all follow, generally, this

22   format?

23        A     Yes, they did.  The data that we had we

24   would have included in those reports.

25        Q     And can you confirm that -- I don't want to
```

1    spend a lot of time on it.  It's a big document --

2    that this document reports on the same elements that

3    you just talked about from the presentation; the

4    active surveillance, the passive surveillance?

5        A    Yes.

6        Q    Is that all reported on in this progress

7    report?

8        A    Yes.  If you look at the table of contents,

9    yes.

10       Q    Now, over the years, the company prepared a

11   number of these periodic reports on a regular basis?

12       A    That's correct.  These were reports that

13   were required to be submitted to the FDA as part of

14   the FDA processes.

15       Q    And what did the company see in terms of

16   safety signals, over the years, as the company

17   tracked this information in the RFP for Duragesic?

18       A    Right.  So, for Duragesic, as I had

19   testified earlier, we, we looked through both the

20   active and surveillance using the methodologies for

21   both.  And we saw, in general, low mentions of abuse

22   of Duragesic -- not zero, but low mentions of abuse.

23       Q    Did the company ever review its

24   pharmacovigilance data to look at the question of

25   iatrogenic addiction?

```
 1      A    Yes, it did.  I believe the timeframe was

 2   2005 or thereabouts.  The company was asked by, I

 3   believe, FDA, and possibly other regulatory

 4   authorities, to look at rates of iatrogenic

 5   addiction and did look at that for our products.

 6           We may have undertaken that, as well, on

 7   our own, but I think there may have been other

 8   interest, as well.

 9      Q    I'm going to hand you a document I've

10   marked as Vorsanger 19.

11                       (JAN-MS-02754767 THROUGH 783 was

12                        marked as Vorsanger 19 for

13                        identification, as of this

14                        date.)

15      Q    Can you explain what this document is?

16      A    Yes.  So, the document is entitled

17   "Cumulative Review of Iatrogenic Addiction

18   Associated with the Use of Transdermal Duragesic" --

19   and in parentheses -- "(fentanyl) Patch."  The date

20   of the document is September the 6th, 2006.  And I

21   believe the document was prepared by our

22   pharmacovigilance group.

23      Q    And this is a review of data from where?

24      A    This is a review of data worldwide for

25   Duragesic.  And I believe some of this methodology
```

 1    was -- may have been requested by the FDA.

 2           And again, as I mentioned, the products

 3    that were reviewed were the fentanyl matrix patch,

 4    which would have been used in Europe at this time;

 5    and the fentanyl reservoir patch, which was the

 6    Duragesic patch that we had been talking about.

 7      Q    And what were the events that were

 8    reviewed?

 9      A    So, what we looked at is the number of

10    cases of confirmed addiction that took place, and we

11    looked at that as a function.

12           And the denominator we looked at is the

13    number of patient days.  And that's the number of

14    days that patients were actually on a transdermal

15    fentanyl patch, either the matrix patch or the

16    Duragesic patch.

17           The number of --

18      Q    What period of time did that cover?

19      A    Let me confirm what that is.

20           I believe that was from the time that

21    product was first introduced into market until 2006,

22    but let me just confirm that.

23           Yes.  It's based on 596,725,348 patches of

24    fentanyl sold or distributed from the time of launch

25    through June 2005.

1        Q     And what is the exposure in terms of

2   patient days that that translates to?

3        A     Right.  So, I had talked about patient

4   days.  And the total exposure was 1,611,158,440.

5        Q     And how many cases of addiction were found

6   in that database over that period of time?

7        A     103 cases were identified.

8        Q     And what was the conclusion of this review

9   of addiction cases?

10       A     So, for the 103 cases out of the total

11  number, we have -- we are -- our conclusion was that

12  the rates of -- the rate of iatrogenic addiction for

13  the transdermal fentanyl patch was very rare, but

14  I'll read the conclusion from the report.

15            "A review of 103 cases that reported drug

16  dependence associated with chronic use of

17  transdermal fentanyl patch indicates that the risk

18  of iatrogenic addiction is very rare.  The Company

19  Court Data Sheet adequately communicates the risk

20  associated with this product."

21            And the reason why we put this in is we

22  were asked to see if our company core data sheet

23  adequately reflected the information on iatrogenic

24  addiction.  And the report concluded that the

25  information in the company, company core data sheet

 1    was correct.

 2        Q    And are you aware of other literature that

 3    describes the rate of addiction in chronic pain

 4    patients for opioids more generally?

 5        A    So, there are two articles that I had

 6    reviewed that look at iatrogenic addiction.  One was

 7    the study by Fishbain, and I believe it was 2008.

 8    And there was a Cochrane review looking at

 9    iatrogenic addiction -- Roger Choo [sic] I think is

10    the senior author -- and I believe that was 2010.

11        Q    I will mark as Exhibit 20 --

12            MR. DUCK:  Did you mean Robert Chou --

13         Roger Chou, C-H-O-U?

14            THE WITNESS:  C-H-O -- I believe it's -- I

15         think -- is it Chou or Choo?  See, I think it's

16         C-H-O-U.

17            MR. DUCK:  As long as we are talking about

18         the same person.

19            THE WITNESS:  I think -- yeah, it's Roger

20         C-H-O-U.  I think it's Chou.

21                        (Review Article was marked as

22                         Vorsanger 20 for identification,

23                         as of this date.)

24        Q    I'm placing before you an article I've

25    marked as Exhibit 20.

 1              Can you identify that?

 2       A    (No verbal response.)

 3       Q    Can you identify Exhibit 20?

 4       A    Oh, sorry.

 5              Yes.  This is a review article by Fishbain

 6  and colleagues entitled "What Percentage of Chronic

 7  Nonmalignant Pain Patients Exposed to Chronic Opioid

 8  Analgesic Therapy Develop Abuse/Addiction and/or

 9  Aberrant Drug-Related Behaviors?  A Structured

10  Evidence-Based Review."

11       Q    What is a structured, evidence-based

12  review?

13       A    So, the nature of how the review is

14  conducted that they looked at -- a number of

15  articles -- they report 67 reports -- that they

16  looked at a number of articles and determined the

17  level of quality that they required to have in their

18  reports to be able to come up and look at these to

19  decide, again, what type of -- what a -- you know,

20  what kind of rates of abuse and addiction are

21  iatrogenic addiction.

22              And so, this was a structured approach

23  about reviewing them, identifying the quality of

24  evidence, the information that was in there, et

25  cetera.

1     Q    And what was the conclusion of the article?

2     A    The conclusion that the authors came up

3  with -- and I'm reading it, quote, from the article:

4  "The results of this evidence-based structure review

5  indicate that COAT" -- which stands for chronic

6  opioid analgesic therapy -- "exposure will lead to

7  abuse/addiction in a very small percentage of

8  patients.  This percentage can be dramatically

9  decreased by preselecting CPP" -- so, let me look

10  and see what the "CPP" is.  That's "chronic pain

11  patients" -- "for no previous or current history of

12  drug/alcohol abuse/addiction [sic]."

13     Q    I'll hand you what I've marked as Vorsanger

14  Exhibit 21.

15                    (Long-term opioid management for

16                    chronic noncancer pain (Review)

17                    was marked as Vorsanger 21 for

18                    identification, as of this

19                    date.)

20     Q    Can you identify Exhibit 21?

21     A    Yes.  This is the Cochrane review that I

22  had referenced earlier, and it's entitled "Long-term

23  opioid management for chronic noncancer pain," a

24  "(Review)."  And the last author on it is Roger

25  Chou, C-H-O-U.

1      Q    And what is the -- it says on the front

2    "Cochrane Library."

3          What's the Cochrane Library?

4      A    So, the Cochrane Library is a database of

5    systemic reviews.  And the people who do these

6    reviews look at a wide variety of studies, they

7    identify the level of evidence in each of these

8    studies and what the quality might be, pardon me,

9    and then do a conclusion based on those data.

10     Q    And what's the conclusion of this review

11   relating to addiction?

12     A    So, I'm going to read that from the article

13   itself.

14          The article -- the authors have a

15   conclusion, but I like the conclusion that they also

16   have in plain language.  It's a "Plain Language

17   Summary."  And what that says:  "The findings of

18   this systemic review suggest that proper management

19   of a type of strong painkiller (opioids) in

20   well-selected patients with no history of substance

21   abuse -- addiction or abuse can lead to long-term

22   pain relief for some patients with a very small

23   (although not zero) risk of developing addiction,

24   abuse, or other serious side effects.  However, the

25   evidence supporting these conclusions is weak" --

1    so, they talk about the level of evidence that they

2    have -- "and long-term studies are needed to

3    identify the patients who are most likely to benefit

4    from treatment."

5        Q    Let's switch gears and talk about Nucynta.

6             What were your responsibilities for

7    Nucynta?

8        A    So, I was a senior medical director when

9    Nucynta was approved, working at the U.S. medical

10   affairs group at Janssen.  And my responsibilities

11   were similar to what I've already described.  I was

12   responsible for the design of clinical studies, if

13   we had decided that we wanted to have studies; to

14   review data that had come in from the studies that

15   were done by our research and development group.

16            I published a number of post hoc analysis

17   from the data that were done by R&D group.  I

18   continued to work with our outcomes research group.

19   I continued to work with our pharmacovigilance

20   group.  I continued to do some work -- do work on

21   the promotional review committee, as I had

22   mentioned.  And then continued to run the active

23   surveillance program, amongst other activities, as

24   well.

25       Q    What is Nucynta?

1      A     Nucynta is an opioid analgesic.

2      Q     And is it different from other opioid

3  analgesics?

4      A     Yes.  An analgesic is a pain medication.

5            Nucynta is different from other pain

6  medications.  It's a semisynthetic opioid pain

7  medication.  Although its exact mechanism of action

8  is unknown, the preclinical studies suggest that it

9  has two mechanisms of action:  One is a typical

10  opioid-type effect, and the second one is a

11  norepinephrine reuptake inhibitory effect.  And it's

12  believed that both of those mechanisms provide pain

13  control.

14      Q     And what's the significance of having two

15  mechanisms of action?

16      A     Well, the opioid effect from Nucynta is

17  weaker from -- than some of the other strong

18  opioids, such as oxycodone or morphine.

19            But by having the two mechanisms -- and in

20  clinical studies, we were able to show that the

21  product delivered very effective -- was both -- the

22  efficacy was similar to oxycodone, although the

23  studies weren't powered specifically to look at

24  that, but we certainly saw that in our studies, and

25  had -- was quite effective.

1    Q    What about with regard to adverse event

2    profile?

3    A    So, because the effect that the opioid

4    receptor is -- was postulated or hypothesized, and

5    certainly thought to be -- from other studies, to be

6    weaker than a strong opioid, we thought that it

7    might be likely that there may be less abuse

8    associated with tapentadol compared to some of the

9    stronger opioids, such as oxycodone or morphine.

10   Q    How about other adverse events?

11   A    So, in addition to that, we saw -- because,

12   again, less of an effect on the opioid receptor

13   relative to the other ones, we saw some potential GI

14   benefits, as well, which, which -- the reason was

15   that we talked about.

16   Q    And what's the approved indication for

17   Nucynta immediate-release version?

18   A    So, Nucynta immediate-release is approved

19   for the treatment of acute pain.  What we're -- and

20   I'm paraphrasing it now -- for moderate to severe

21   acute pain in patients requiring opioid analgesics,

22   where medications of -- that were -- and I'm just

23   describing what's in the package insert -- where

24   lesser medications would be inadequate to provide

25   pain control to those patients.

```
 1      Q    And for the exact wording of that, we would

 2   go to the FDA package insert for Nucynta --

 3      A    Yes.  So --

 4      Q    -- similar to the one that we looked at for

 5   Duragesic?

 6      A    -- we could do that and read the exact

 7   indication for that and for ER.  But I do not -- I

 8   don't have them memorized at this point.

 9      Q    What is the approved, so far as you

10   remember, the approved indication for the

11   extended-release Nucynta?

12      A    So, the approved indication for extended

13   release is for pain -- as I recall it, is -- and

14   again, you -- one can go to the package label for

15   the exact wording -- for pain severe enough to

16   require an opioid analgesic around the clock for an

17   extended period of time, where the pain cannot be

18   treated by lesser methods.

19      Q    And which conditions was Nucynta ER

20   indicated for?

21      A    So, Nucynta ER is indicated for chronic

22   pain regardless of ideology.

23      Q    And anything else?

24      A    It has another indication for neuropathic

25   pain.
```

```
 1       Q     What is neuropathic pain?

 2       A     So, neuropathic pain is pain associated

 3   with nerve.  It can be nerve injury.  This is

 4   important because for people who have neuropathic

 5   pain, some patients describe opioids as being not

 6   very effective to treat the neuropathic pain.

 7             So, the fact that we were able to

 8   demonstrate that tapentadol is effective in the

 9   treatment of neuropathic pain -- and we had good

10   clinical data to support that -- placebo-controlled

11   trials enabled us to promote it and also to be in a

12   position for physicians to understand that there is

13   an opioid analgesic that may be helpful in treating

14   their patients with neuropathic pain.

15       Q     Were there any aspects of Nucynta that made

16   the product less attractive for abusers?

17       A     So, the immediate release formulation, it

18   may be less attractive to abusers, because we talked

19   about the, the dual mechanism and some of those

20   reasons.

21             For the extended-release formulation, it

22   was the same drug, tapentadol, but the company

23   realized that if we were introducing an

24   extended-release opioid into the marketplace with

25   what was being discussed about opioid abuse, that we
```

 1   thought it would be important to put a coating on

 2   that had abuse-deterrent qualities.

 3        We didn't have labeling for it, but we had

 4   lab studies that were done by our colleagues at

 5   Gruenthal to show that the product was very

 6   difficult to -- the -- that formulation was

 7   difficult to defeat using the typical type of

 8   methods that people who would abuse or are addicted

 9   to these products would use to try to break in to

10   get to the tapentadol.

11   Q    That was going to be my next question.

12        Did you undertake testing to determine the

13   effectiveness of the protective coating?

14   A    We did in the laboratory tests, yes.

15   Q    And what kinds of tests were those?

16   A    Those were tests where the tablets were

17   hammered or exposed to common solvents or other ways

18   that addicts might typically try and break in.  And

19   the coating was resistant to those types of

20   methodologies.

21   Q    And was that data made public?

22   A    It was.  A number of articles were

23   published, and I co-authored some of those.

24                        (Evaluation of the

25                         tamper-resistant properties of

Gary Vorsanger, M.D.
January 17, 2019                                          286

```
 1                    tapentadol extended-release

 2                    tablets: Results of in vitro

 3                    laboratory analyses was marked

 4                    as Vorsanger 22 for

 5                    identification, as of this

 6                    date.)

 7      Q    I've handed you what I've marked as

 8 Vorsanger Exhibit 22.

 9           Can you identify that document?

10      A    Yes.  So, this is one of the articles that

11 I just referenced.  It's entitled "Evaluation of the

12 tamper-resistant properties of tapentadol

13 extended-release tablets:  Results of in vitro

14 laboratory analyses."

15      Q    And what were the conclusions of that

16 article?

17      A    So, the conclusions of the article were as

18 follows, and I'll read the conclusion verbatim.

19           "In vitro results from tampering attempts

20 presented herein demonstrate that tapentadol ER

21 tablets were resistant to those forms of physical

22 manipulation.  Tapentadol ER tablets were also

23 generally resistant to dissolution in most solvents.

24 Developing tamper-resistant formulations is an

25 important step in strategies to mitigate opioid
```

 1   abuse."

 2      Q    Did the labeling for the extended-release

 3   Nucynta include a claim that the product was

 4   abuse-deterrent?

 5      A    No, it did not.

 6      Q    Why not?

 7      A    FDA had developed specific guidelines on

 8   the types of studies that would need to be done to

 9   have language in the package insert to make those

10   claims, and those -- all of those studies that would

11   need to be done to be able to have that language

12   were not done; and, therefore, that language was not

13   put into the package insert.

14      Q    Did you have data on whether -- or that

15   spoke to the question of whether Nucynta, in either

16   formulation, was less attractive to abusers?

17      A    Yes, we did.

18      Q    What kind of data?

19      A    So, I had undertaken a study with a number

20   of authors.  I believe they were, some of them

21   were -- or many of them were, were scientists

22   working as a RADARS advisory board.  And I believe

23   Dr. Hilary Surratt was probably the first author.

24   And we looked, in part, on the street price of the

25   medications.  What would the street price be to

 1  addicts who -- to evaluate the various opioid

 2  medications?  That was a study that was done.

 3          The street price was, I believe -- and I

 4  don't have the article in front of me -- highest for

 5  a drug like OxyContin and lowest for a drug like

 6  tapentadol.

 7      Q    If you thought the product was going to be

 8  less attractive to abusers, why did the company

 9  bother with a tamper-resistant formulation?

10      A    The company realized that, in the United

11  States, if we were going to bring an

12  extended-release formulation into the U.S. market,

13  that the responsible thing to do would be to have

14  some type of abuse-deterrent methodology, even

15  though we knew, from the IR formulation of

16  tapentadol, which was brought to market two years

17  earlier, that this was not a substance that was --

18  appeared to be very desirable to people who wanted

19  to abuse the product, from all of the methodology

20  that I had already gone over today.

21          But still, in all, we felt it was the right

22  thing to do; so, we introduced this protective

23  covering.

24      Q    What did the company do to encourage safe

25  and effective use of Nucynta and Nucynta ER?

1        A    So, to encourage safe and effective use of

2    the product, it was done through a number of ways.

3            We worked closely with regulatory agencies

4    to ensure that our product labeling was up to date,

5    had the most accurate information about our

6    products; we also had educational courses; and there

7    was a Nucynta REMS, as well.

8        Q    Can you explain what a REMS is?

9        A    Yes.  So, "REMS" stands for "Risk

10   Evaluation and Mitigation Strategy."  The REMS was

11   put together, and I believe REMS were required for

12   all of the extended-release opioids.

13           And REMS really was a convenient tool for

14   prescribers or clinicians to capture important

15   information about the product for its safe and

16   effective use.  It was an excellent educational tool

17   and contained a lot of information.

18           My opinion also is that it was handy and

19   easy to use.  There was a lot of important

20   information that you could use.  There was a quiz

21   that you could take to see how well you understood

22   it, and we -- the company collected -- this was all

23   voluntary; they didn't have to do the quiz, if they

24   didn't want to -- if they wanted to send it to the

25   company, it would give us an idea of how well people

```
 1   understood the information in there.

 2                     (JAN-MS-01489228 through 275 was

 3                     marked as Vorsanger 23 for

 4                     identification, as of this

 5                     date.)

 6   Q    I've handed you what I marked as Vorsanger

 7   Exhibit 23.

 8        Can you identify that document?

 9   A    Yes.  This is the REMS for tapentadol.

10   Q    And you're familiar with this from your

11   time at Janssen?

12   A    Yes.

13   Q    And when you say it's the REMS, there -- in

14   section II, it describes REMS elements.

15        Can you explain what those are?

16   A    Yes.  So, the REMS elements are how the

17   medication guide -- and that talks a little bit

18   about what we need to know.  And then there is a

19   thing called ETASU, an "Elements to Assure Safe

20   Use."

21        So, the medication guide is something that

22   can be shared with patients, how to use the

23   medication.  And it says that -- to keep the

24   extended release away, safe away from children.

25   Accidental use by a child, even in a medical
```

1    emergency can result in death, and talks about that.

2           And this -- and this directions are read

3    the med guide that comes with Nucynta ER before you

4    start taking it.  So, we're telling patients that

5    this is important information that they need to have

6    and they need to read before they start taking the

7    medication.

8        Q    Does the REMS also include training

9    materials for physicians?

10       A    That's right.  So, there are -- there's

11   materials in here, it says, under "Elements to

12   Assure Safe Use," the ETASU, "Healthcare

13   professionals who prescribe...will receive

14   training."  That information is in the REMS.

15          And we -- Janssen "will ensure that the

16   training will be provided to healthcare

17   professionals who prescribe Nucynta ER."  And, "To

18   become trained, each prescriber will be provided

19   with the ER educational materials," which were

20   included in the REMS.

21          And then the training material, I think, is

22   important for proper patient selection, appropriate

23   dosing.

24          "General principles of safe opioid use,"

25   and information -- including "information about

 1  opioid abuse and how to identify patients who are at

 2  risk for addiction."

 3          "Potential abuse, misuse, overdose, and

 4  addiction from exposure to opioids" is discussed and

 5  the risks are gone over, as well.

 6          So -- and it goes on and on, in quite a --

 7  it's quite a lot of information, I think, included

 8  in the document.

 9      Q    Let's take a look at Exhibit -- I think

10  it's Appendix 3, page -- it's page 21 of the

11  document.

12      A    Okay.  Appendix 3.

13      Q    What is Appendix 3?

14      A    "Prescribing Nucynta ER Healthcare

15  Professional Educational Program:  A Guide for

16  Healthcare Professionals Who Intend to Prescribe

17  Nucynta ER."

18      Q    And is that the physician educational

19  material that you were just describing?

20      A    That's correct, yes.

21      Q    And can you turn to page 29 of that -- or

22  I'm sorry, 28.

23      A    Yes.

24      Q    Does that have any discussion of the risk

25  of addiction?

1     A     Yes.  So, "Nucynta ER Risks, Abuse, Misuse,

2  and Addiction," in the document, as you indicated,

3  on page 28 talks a little bit about the risk of

4  addiction.

5          Do you want me to read this or just

6  identify --

7     Q     No.  My only question is whether addiction

8  is covered in the educational materials.

9     A     Yes.  Yes, it is.

10    Q     How are these materials disseminated?

11    A     So, these were disseminated free of charge

12  to people who were prescribers of the medication,

13  and then they could go through it.  And as I

14  mentioned, if they wanted to, there was an optional

15  quiz they could take.

16    Q     Did they go out via your healthcare

17  professional letter?

18    A     Yes, I believe that they did.

19    Q     What else did Janssen do to ensure safe and

20  effective use of Nucynta?

21    A     Well, we continued to monitor the product,

22  to ensure that we understood about its -- the abuse

23  that was going on.  We talked about that, as well.

24    Q     Well, you described the safety surveillance

25  program for Duragesic.

```
 1      A    Correct.

 2      Q    Was the one for Nucynta similar?

 3      A    The same program.  The same, the same type

 4  of elements that we used for Duragesic were used for

 5  Nucynta, as well.

 6      Q    So, that would include SCEPTRE?

 7      A    So, that would include passive surveillance

 8  using SCEPTRE and FDA AERS that we talked about, the

 9  databases that were appropriate.  We also had RADARS

10  data, that we've talked about.

11           And with Nucynta, we brought on an

12  additional methodology that we didn't have for

13  RADARS; we also brought on our work from Inflexxion.

14  And the Inflexxion data were important with this

15  because it provided additional information for us.

16           So, Inflexxion had one network, which

17  looked at individuals coming in for treatment for

18  substance abuse.

19           But another program that Inflexxion had,

20  which I was interested in, was a thing called teen

21  CHAT.  So, now we were able to identify and

22  understand how opioid analgesics might be abused in

23  an age group that -- a younger age group, teenagers.

24  So, that was an important, I believe, an important

25  addition to provide more information so we could
```

 1   really understand even more about the abuse of our

 2   products.

 3                      (JAN-MS-00228548 was marked as

 4                      Vorsanger 24 for identification,

 5                      as of this date.)

 6        Q    So, I'm going to hand you a document that

 7   I've marked as Vorsanger Exhibit 24.

 8             Can you identify this document?

 9        A    Yes.  This document is entitled "Nucynta,"

10   and in parentheses, "(Tapentadol) Extended-Release:

11   The Fourth Safety Surveillance Plan Progress

12   Report."

13        Q    And this would be -- what kind of report is

14   this?

15        A    Well, this is a safety report that would

16   contain information from our pharmacovigilance

17   group, as well as information from -- and we talked

18   about the passive surveillance and the work that

19   they do, as well as the active surveillance

20   materials that I've been talking about.

21        Q    So, these are combined periodically in

22   progress reports?

23        A    Yes, that's correct.  So, this information

24   was presented to FDA at regular intervals, as

25   requested by FDA, when they wanted to see this

 1    material.  And it captured a lot of -- extensively,

 2    the information that we have and had as a company

 3    about all of the methodology and all of that work.

 4        Q    If you turn to the table of contents,

 5    page 9.

 6        A    Uh-huh.

 7        Q    There is a reference to "NAVIPPRO systems

 8    programs"?

 9        A    Yes.

10        Q    What is that?

11        A    So, NAVIPPRO is the work from Inflexxion

12    that I just spoke about.  That was their system for

13    monitoring for abuse.  And it had multiple elements,

14    some of which I've touched on.

15             The AS --

16        Q    And --

17        A    Sorry.

18        Q    -- you described the teen chat program;

19    that's what's referred to here as --

20        A    Yes.

21        Q    -- "CHAT."

22        A    Yes.

23        Q    And what were the other elements?

24        A    So, the ASI-MV, as -- my recollection was,

25    this was a computerized version of the ASI-MV for

```
 1    individuals coming in to treat for substance abuse.

 2            Inflexxion took over the web monitoring

 3    from Pinney.  So, we continued to monitor for

 4    Internet mentions of abuse of our products, I think

 5    going way back from the work that we started with

 6    Duragesic and continued, but this was a different

 7    company that took it over.

 8        Q    And if you could turn to page 81 of the

 9    report.  And if you look at the first full -- I

10    guess the last part of the carryover paragraph on

11    page 81, does that describe the objectives of the

12    NAVIPPRO program?

13        A    Yes.  It talks about the objectives for the

14    ASI-MV and talks a little -- talks more about some

15    of the methodology involved in the ASI-MV, and how

16    it collects data, et cetera.  And there are some

17    tables in here, as well, talking about it.

18            There's geographical -- it looks like there

19    is something on geographical distribution.

20            And it talks about various opioid

21    analgesics in table 14.

22        Q    And can you just read that last sentence of

23    the carryover paragraph on 81?

24        A    Yes.

25            "The ASI-MV assessment gathers
```

1    self-reported data in near real time on respondents

2    from a network of facilities across the United

3    States.  These facilities utilize the assessment for

4    treatment planning and triage in relation to

5    substance abuse problems."

6        Q    And how about in the prior section there,

7    on the top of 81, the last sentence, again, of the

8    carryover product [sic]?

9        A    In this report?

10       Q    No.  Before that.

11       A    Oh.

12       Q    The last sentence there.

13       A    The last sentence, sure.

14            "The various data sources are intended to

15   complement each other; an indication of increased

16   abuse of a particular product found in one data

17   source can be examined and evaluated with other

18   sources within NAVIPPRO.  Continuous examination of

19   these data streams allows monitoring of trends over

20   time for drug abuse at a product-specific level."

21       Q    And what did the surveillance show, again,

22   over the years that the company looked at it, for

23   the Nucynta products?

24       A    For the Nucynta products, the data from the

25   NAVIPPRO system was very similar in conclusion to

```
 1    what I had also reported for the work that came out

 2    of RADARS.

 3            And both systems, together, identified, in

 4    general, low mentions of abuse of Nucynta.

 5       Q    Now, counsel showed you a -- an exhibit --

 6    I think it was marked as Exhibit 10.  Do you still

 7    have that?

 8       A    Let's see.  What number, I'm sorry?

 9       Q    Ten.

10       A    Okay.

11                      (Exhibit 10 was shown to the

12                      witness.)

13       Q    Could you explain what that data is?

14       A    So, these are data that were generated for

15    SCEPTRE.  These look like raw data to me.  These are

16    data that describe reports of Nucynta with the

17    reaction of drug abuse.  These may be -- this is

18    information that would come into the company.  Some

19    of it may have come in from RADARS; it may have come

20    in from other sources, as well.  And these data

21    would be analyzed, duplications would be removed.

22    And then, for the information, where we had

23    information, we would generate reports.  And those

24    reports would be put as part of a safety -- put

25    information as part of a submission for a safety
```

 1   report to the FDA.

 2       Q    So, after the data were analyzed, would an

 3   assessment be made as to whether there was a safety

 4   signal that the data were suggesting?

 5       A    Yes.  So, as part of the activities, of not

 6   only processing, as to -- it would be ongoing,

 7   looking at it to see whether there was any

 8   suggestion that there was a safety signal.  And if

 9   so, we were to determine what that would be.  And

10   then if, if there was a need be, we would act on

11   that signal.

12       Q    And that would be reflected in the analysis

13   that's presented in the reports of the analysis of

14   the SCEPTRE data?

15       A    Yes.  And that would be information that

16   would be shared, yes, through -- in the

17   pharmacovigilance group and then, as I already

18   mentioned, with FDA.

19       Q    And do you recall whether there were safety

20   signals with regard to Nucynta or Nucynta ER that

21   suggested a higher rate of abuse?

22       A    No, I do not.

23       Q    I also want to show you an exhibit that

24   counsel marked as Exhibit 3.

25                        (Exhibit 3 was shown to the

January 17, 2019                     301

```
 1                        witness.)

 2       A    Okay.

 3       Q    This is a series of emails between you and

 4  Rick Dart.

 5            Do you remember that discussion earlier

 6  this morning?

 7       A    Yes, I do.

 8       Q    And Dr. Dart was with RADARS?

 9       A    That's correct, yes.

10       Q    And you had sent Dr. Dart some emails

11  concerning a paper that RADARS was preparing with

12  some other authors?

13       A    Yes, that's right.

14       Q    And you read a number of these emails into

15  the record at the request of the State's counsel.

16            But he didn't ask you to read the -- your

17  reply to Dr. Dart in response to his email asking if

18  you wanted to comment on the paper.

19            Can you just read that reply into the

20  record?  That's the second email down in the chain.

21       A    Yes, I can.

22            This is, as you already indicated, an email

23  from me to Dr. Dart.  The subject is "Generic Drugs

24  Paper," and the date is May the 9th of 2007.

25            And what I wrote to Rick Dart was the
```

```
 1    following:

 2            "Rick,

 3            "Thanks for asking.  The company's position

 4    is one in which we prefer to be 'hands off.'  The

 5    intent is to ensure the unimpeded flow of academic

 6    information by industry.  What we would ask is that

 7    we have a review only to ensure fair balance of our

 8    product but not" -- and I underline "not" -- "to

 9    provide input into the science or strategic

10    description of the manuscript."

11            And I signed it.

12     Q    And what did you mean by that?

13     A    It was our position that the data were

14    generated by RADARS.  They had the best

15    understanding of what the data meant.  We wanted the

16    conclusions from the data to be RADARS' conclusions

17    and not Janssen's conclusions, and that they would

18    come up with that independently.

19            But we wanted to make sure that whatever is

20    written about the product -- let's say it's

21    mechanism of action -- or if there were any clinical

22    information or other things that the RADARS office

23    decided that they wanted to include, that we would

24    have an opportunity to review just to ensure that

25    that information was presented fairly and in fair
```

```
 1    balance.

 2            MR. LIFLAND:  No further questions.

 3            MR. DUCK:  Okay.  Let's take a break,

 4        because I think Amanda needs a little break,

 5        and then we'll come back in 5 minutes.  How

 6        about that?  And I'll ask you some more

 7        questions.

 8            THE WITNESS:  Okay.

 9            THE VIDEOGRAPHER:  Off, 4:22.

10                  (Recess taken.)

11            THE VIDEOGRAPHER:  We're back at 4:33.

12    FURTHER EXAMINATION BY

13    MR. DUCK:

14       Q    All right.  You understand you're still

15    under oath?

16       A    Yes, sir.

17       Q    Okay.  Has Janssen asked you to be an

18    expert witness in this case?

19       A    Not specific -- not directly.

20       Q    Have they asked you indirectly?

21       A    They had -- we were discussing whether I

22    might be a representative, but this is something

23    that I -- I had other things that I was doing, and I

24    was not able to fulfill that role.

25       Q    Are you intending to serve as an expert
```

```
 1   witness in this case in the future?

 2        A    I don't know.  At the moment, I don't know.

 3        Q    Are you being paid to be here today?

 4        A    No, I'm not.

 5        Q    Since you retired from Janssen or Johnson &

 6   Johnson, have you worked or consulted on any

 7   litigation for those companies?

 8        A    No.  I provided testimony for another --

 9   for the MDL litigation, and that's it.

10        Q    The MDL opioid litigation?

11        A    That's right.

12        Q    Has Janssen or Johnson & Johnson asked you

13   to testify at the trial of this Oklahoma case?

14        A    No, they have not.

15        Q    If they do, would you be willing to come to

16   Oklahoma to testify at Janssen's request?

17             MR. LIFLAND:  Object to the form of the

18        question.

19        A    I'd have to think about that, because I've

20   been a witness of fact, and that was sort of where I

21   was.  So, I don't -- I haven't thought about

22   anything beyond that.

23        Q    Are you able to travel?

24        A    I'm able to travel, depending on what else

25   might be going on in my life.  But, yes, I'm able to
```

1    get on a plane if I have to.

2         Q    Okay.  You're physically able to?

3         A    Yes, I am.

4         Q    All right.  Are you going to be out of the

5    country or otherwise indisposed for the months of

6    June, July, or August?

7         A    I don't know.

8         Q    Currently, you don't have plans to be

9    indisposed for those entire three months?

10        A    Not that I know of.

11        Q    You know that heroin was originally

12   manufactured by Bayer in Germany?

13        A    I had heard something, but I -- it's not a

14   fact that I have at my fingertips.

15        Q    You didn't know heroin was first used as a

16   medicine?

17        A    I, I believe so, but I, I -- again, it's

18   something I don't have as a direct fact, but it

19   sounds like something I might have heard.

20        Q    Did you know that heroin was marketed as

21   nonaddictive?

22        A    No, I did not know that.

23        Q    And that would be wrong, because heroin is

24   addictive, right?

25             MR. LIFLAND:  Object to the form of the

 1        question.

 2        A    When it was marketed at the time, it may or

 3   may not have -- they may or may not have known it

 4   was addictive.  But we know subsequently it is

 5   addictive.

 6        Q    Yes, it is.

 7             When Duragesic first hit the market,

 8   Janssen did not market it for noncancer pain; isn't

 9   that right?

10        A    Again, that happened before I was at the

11   company, in the period of 1990 to 2005.

12             That may be my hearing aid that you're --

13        Q    Oh, I'm sorry.

14        A    Yeah, that's fine.

15             And so, it's my understanding it was used

16   for noncancer-related pain -- for cancer-related

17   pain.  I'm sorry.

18        Q    You're aware that, during the '90s, Janssen

19   was originally apprehensive to promote Duragesic for

20   use in noncancer pain?

21        A    So, I --

22             MR. LIFLAND:  Object to the form of the

23        question.

24        A    I believe that question was asked earlier

25   of me, and I believe my response at the time was:  I

 1   did not have information that I could confirm that

 2   statement.

 3       Q    You're saying that's something I asked you

 4   earlier?

 5       A    Yes, you did.  I believe you did.

 6       Q    And you don't know, one way or another?

 7       A    Correct.

 8       Q    You talked about the abuse-deterrent

 9   formulation for Nucynta when your lawyer asked you

10   questions.

11           Do you remember that?

12       A    For ER, Nucynta ER, the abuse-deterrent for

13   Nucynta ER.

14       Q    Sure.

15       A    Yes.

16       Q    You said that wasn't in the package insert,

17   right?

18       A    So, what I had testified was that there is

19   no labeling in the package insert for language

20   around abuse deterrence for that formulation,

21   correct.

22       Q    Right.

23       A    Yes.

24       Q    Did Janssen get the FDA's approval to

25   actually make Nucynta ER abuse-deterrent?

```
 1       A    I don't remember what discussions went back

 2   and forth on it.  But the -- in order to have that

 3   type -- and I want to make sure I'm answering your

 4   question; so, if not, please tell me -- in order to

 5   get that type of labeling, there were a series of --

 6   there were a series of studies that would needed to

 7   have been done.

 8            And I don't know if that answers your

 9   question or not.

10       Q    Yeah, I'm not worried about the labeling.

11       A    Okay.

12       Q    I understand your testimony there.

13            My question is:  Before Janssen actually

14   made the tablets abuse-deterrent, physically --

15       A    Yes.

16       Q    -- did Janssen obtain FDA approval to do

17   that?

18       A    So, the original -- the studies were

19   actually done without the abuse-deterrent

20   formulation.  The abuse-deterrent formulation was

21   then introduced, and I believe bioequivalence

22   studies needed to be done to show that the drugs

23   with the abuse-deterrent formulation were

24   bioequivalent to the nonabuse-deterrent formulation

25   tablets, so that we could use that.  So -- but I
```

```
 1   don't know what discussions Janssen and FDA had

 2   around that.

 3          So, the drug could be -- could have been

 4   approved without the abuse-deterrent formulations,

 5   based on the clinical data, but they had done

 6   bioequivalence studies.

 7   Q    So, you don't know, one way or another,

 8   whether the FDA approved the abuse-deterrent

 9   formulation in Nucynta ER, as opposed to the

10   nonabuse-deterrent formulation?

11   A    So, I don't know the -- and I'm trying --

12   so, the answer is no.  I want to give you a simple

13   answer on that.  But I wanted to give you an

14   accurate answer was -- how the studies were done --

15   Q    Is Janssen --

16   A    -- which I did.

17   Q    Thank you.

18          Is Janssen required to obtain FDA approval

19   to make its products safer?

20   A    I'm not sure I understand what that

21   question is.

22   Q    What don't you understand?

23   A    In what way would they be required to do

24   that?  What do you mean by that?

25   Q    I don't know.  I'm asking you.
```

 1      A    So, if a product was going to be developed

 2   with certain attributes, then discussions would need

 3   to go on between a company, Janssen, and FDA for

 4   what the attributes of the product would be.  So, if

 5   the company felt that this was something that would

 6   be safer, in order to be able to make a label claim

 7   that it would be safer, the studies would need to be

 8   done, and those studies are studies that would need

 9   to be done in discussion with FDA.

10      Q    I know this might be difficult, because

11   you've done this for so long, but let -- I'm not

12   asking about label changes right now.  I'm just

13   asking about reformulation, which is what happened

14   with Nucynta ER, right?  No label change, but it did

15   have an abuse-deterrent formulation, right?

16      A    It -- and I apologize, Counselor.  So, it

17   had a formulation that had abuse-deterrent

18   qualities, but we didn't market it that way.

19      Q    Okay.  Great.  We're on the same page.

20      A    Okay.

21      Q    That's what I'm talking about.

22      A    Right.

23      Q    It would have been okay for Janssen to sell

24   Nucynta ER without the abuse-deterrent --

25      A    Yes.

```
 1      Q    -- qualities?

 2      A    That's correct.

 3      Q    Right?

 4      A    Yes.

 5      Q    But Janssen sold it with the

 6   abuse-deterrent qualities, even though that wasn't

 7   in the label?

 8      A    Yes.

 9      Q    Janssen, in your view, went beyond what it

10   had to do?

11      A    Yes.

12      Q    And my question is:  Did Janssen have to

13   obtain FDA approval to do that?

14      A    Yes, to put the formulation on there, they

15   would have had to have some kind of discussion with

16   FDA about it.

17      Q    Thank you.

18      A    Okay.  Sorry it took so long to get.

19      Q    That's okay.

20           You said "some discussion."

21           Do you mean the FDA formally approved?

22      A    Yes.  They would have to have dialogue with

23   the FDA about what was intended, what would be done,

24   et cetera.

25      Q    What did you do to prepare for this
```

1    deposition?

2        A    I met with my attorneys, these gentlemen.

3        Q    And they are your attorneys, right?

4        A    They are both the company and mine, yes.

5        Q    Are you paying them for their time?

6        A    No, sir, I'm not.

7        Q    How many times did you meet with them?

8        A    We met several times.

9        Q    How many times?

10       A    Two -- we met three times.

11       Q    Before today?

12       A    Yes.

13       Q    Okay.  When was that?

14       A    Earlier in the week, several times, three

15   times.

16       Q    This week?

17       A    Yes.

18       Q    For how many hours each time?

19       A    I don't recall exactly.  There were periods

20   of time during two days and a short session the

21   third day.

22       Q    And that was for preparation for this

23   deposition?

24       A    Yes, that's correct.

25       Q    I've asked you questions about what you

```
 1    learned and what you knew from your time working at

 2    Janssen, right?

 3        A    I'm sorry, say it again?

 4        Q    I've asked you questions about what you

 5    knew and what you learned from working at Janssen --

 6        A    Yes.

 7        Q    -- correct?

 8        A    You did.

 9        Q    What did you need to be prepped about for

10    this deposition?

11             MR. LIFLAND:  Object to the form of the

12        question.

13        A    Well, some of it would be to review some

14    information that I may not have seen for a while.

15        Q    What information?

16        A    Some of the --

17             MR. LIFLAND:  Object to the form of the

18        question.

19        A    Some of the information from some of the

20    articles, to review again what we talked about,

21    iatrogenic addiction.  So, the articles that I

22    looked at were -- that I -- that was discussed were

23    articles that I hadn't seen.

24        Q    Why does that require lawyers?

25             MR. LIFLAND:  Object to the form of the
```

```
 1        question.

 2      A    It was information that I was interested in

 3   and that went over -- and they were -- provided that

 4   information to me.

 5      Q    How many documents did you review in

 6   preparation for this deposition?

 7      A    I don't recall.

 8      Q    Approximately?

 9      A    I don't know.  There was some emails and

10   some other documents.  I don't recall.

11      Q    More than 10?

12      A    No, I don't think so.

13      Q    Less than 10?

14      A    I -- again, I don't recall.  So, now I'm

15   being asked to say, well, okay, being -- given that

16   I don't recall, yeah, I would say less than --

17   that's probably right.

18      Q    It was this week.

19      A    Yes.

20      Q    I mean, it's not that hard to remember what

21   happened this week, is it, sir?

22      A    No.  But if I -- I'm someone who tends to

23   answer in a precise manner.  So, if I can't give you

24   a precise answer, I would, I would qualify that,

25   which I did.
```

```
 1            But it would be probably less than 10, 10

 2   or less.

 3       Q    Okay.  Because that happened this week, you

 4   had trouble remembering, and I've asked you

 5   questions about the last 19 years.

 6       A    Yes, sir.

 7       Q    Have you had trouble remembering things --

 8       A    No, sir, I don't.

 9            MR. LIFLAND:  Object to the form of the

10        question.

11       Q    Okay.

12       A    I just wanted to be accurate in terms of

13   what I had, in giving the information I provide.

14       Q    Who did you talk to in preparation for this

15   deposition, other than your attorneys?

16       A    No one.

17       Q    You didn't talk to anybody at Janssen?

18       A    I had one, I had one conversation with

19   Bruce Moskovitz.

20       Q    Okay.  What did y'all talk about?

21       A    Bruce wanted, just, me to review the

22   information around the active surveillance, the

23   active surveillance methodologies.

24       Q    Okay.  What specifically did he tell you?

25       A    He was just -- I worked with Bruce, and I
```

```
 1    had developed it.  So, he had some questions about

 2    what were some of the programs that were in place

 3    before RADARS.  So, we talked briefly about that.

 4         Q    Have you covered all of those issues today?

 5         A    Yes, we did.

 6         Q    Why did Bruce Moskovitz reach out to you?

 7    For his deposition or for your deposition?

 8         A    For -- he had some questions on what he

 9    wanted to know, and he wanted to make -- and since I

10    had developed these programs and I worked on them,

11    he reached out to me to make sure that his

12    information was correct.

13         Q    Because he was being deposed?

14         A    Yes.

15         Q    All right.  Did y'all talk about your

16    deposition today, you and Bruce?

17         A    No.

18         Q    Did you talk to anybody else at Janssen?

19         A    No.

20         Q    Did you talk to anybody else, other than a

21    person at Janssen or other than your lawyer -- just

22    anybody -- about this deposition?

23         A    I did not.

24              MR. DUCK:  Pass the witness.

25              MR. LIFLAND:  No questions.
```

January 17, 2019                              317

1            MR. FIORE:  Nothing from Teva.

2            MS. NEWSOME:  No questions.

3            MR. DUCK:  Thank you for your time, sir.

4            THE WITNESS:  Thank you.

5            MR. DUCK:  We're all done.

6            THE VIDEOGRAPHER:  Off, 4:46.

7                     (Time adjourned: 4:46 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3            I, AMANDA McCREDO, a Shorthand Reporter

 4        and Notary Public of the State of New Jersey,

 5        do hereby certify:

 6        That the witness whose examination is

 7        hereinbefore set forth, was duly sworn, and

 8        that such examination is a true record of the

 9        testimony given by such witness.

10        I further certify that I am not related to any

11        of the parties to this action by blood or

12        marriage; and that I am in no way interested in

13        the outcome of this matter.

14

15

16

17                  AMANDA McCREDO

18

19

20

21

22

23

24

25
```

```
 1              ERRATA SHEET FOR THE TRANSCRIPT OF:

 2   Case Name:        State of Oklahoma v. Purdue Pharma,
                       et al.
 3
     Dep. Date:        January 17, 2019
 4
     Deponent:         Gary Vorsanger, M.D., Ph.D.
 5

 6
                       CORRECTIONS:
 7
     Pg.  Ln.  Now Reads          Should Read        Reason
 8
     ___  ___  _____    _____   _____
 9
     ___  ___  _____    _____   _____
10
     ___  ___  _____    _____   _____
11
     ___  ___  _____    _____   _____
12
     ___  ___  _____    _____   _____
13
     ___  ___  _____    _____   _____
14
     ___  ___  _____    _____   _____
15
     ___  ___  _____    _____   _____
16
     ___  ___  _____    _____   _____
17
     ___  ___  _____    _____   _____
18
                                _____
19
                                Signature of Deponent
20
     SUBSCRIBED AND SWORN BEFORE ME
21
     THIS___DAY OF_____, 20__
22

23

24   _____

25   (Notary Public)  MY COMMISSION EXPIRES:_____
```

```
 1                  ACKNOWLEDGMENT OF DEPONENT

 2           I,                              , do hereby

 3           certify that I have read the foregoing

 4           pages, and that the same is a correct

 5           transcription of the answers given by me

 6           to the questions therein propounded,

 7           except for the corrections or changes in

 8           form or substance, if any, noted in the

 9           attached Errata Sheet.

10

11

12                    _____

                          GARY VORSANGER, M.D., Ph.D.
13

14   Subscribed and sworn to

15   before me on this_____ day

16   of _____, _____.

17   _____

18   Notary Public

19

20

21

22

23

24

25
```