Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION

 3

      IN RE NATIONAL PRESCRIPTION
 4    OPIATE LITIGATION                 Hon. Dan A. Polster
                                        MDL No. 2804
 5    THIS DOCUMENT APPLIES TO ALL    No. 17-MD-2804
      CASES
 6    _____/

 7

 8                  HIGHLY CONFIDENTIAL -
         SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
 9

                        --  -- --
10

                THURSDAY, JANUARY 10, 2019
11

                        --  -- --
12

          Videotaped Deposition of DONALD WALKER, held
13    at the Law Offices of COVINGTON & BURLING, One Front
      Street, 35th Floor, San Francisco, California,
14    beginning at 8:57 a.m., before Sandra Bunch
      VanderPol, FAPR, RMR, CRR, CALIFORNIA CSR #3032
15

                        --  -- --
16

17

18

19

20

21

      _____
22
                  GOLKOW LITIGATION SERVICES
23        877.370.3377 ph | 917.591.5672 fax
                    Deps@golkow.com
24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    APPEARANCES
 2
        ERIC KENNEDY, ESQ.
 3      WEISMAN, KENNEDY & BERRIS CO., L.P.A.
        101 W. Prospect Avenue
 4      Midland Building, Suite 1600
        Cleveland, OH 44115
 5      (216) 781-1111
        Counsel for the Plaintiffs
 6
 7      EMILY JOHNSON HENN, ESQ.
        EMILY KVESELIS, ESQ.
 8      COVINGTON & BURLING LLP
        3000 El Camino Real
 9      5 Palo Alto Square
        Palo Alto, California 94306-2112
10      (650) 632-4715
        ehenn@cov.com
11      ekveselis@cov.com
        Counsel for Defendant McKesson and the
12      Witness
13
        ABIGAIL G. URQUHART, ESQ.
14      JONES DAY
        555 South Flower Street, 50th Floor
15      Los Angeles, CA 90071
        (213) 243-2884
16      urquhart@jonesday.com
        Counsel for Defendant Walmart
17
18      JOSEPH BUSHAR, ESQ. (Telephone/streaming)
        WILLIAMS & CONNOLLY, LLP
19      725 Twelfth Street, N.W.
        Washington, DC 20005
20      (650) 632-4715
        jbushar@wc.com
21      Counsel for Defendant Cardinal Health
22
    (Appearances continued on next page)
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (Continued)
 2          SAMANTHA L. ROCCHINO, ESQ.
            REED SMITH LLP (Telephone/Streaming)
 3          Three Logan Square
            1717 Arch Street, Suite 3100
 4          Philadelphia, Pennsylvania 19103
            (215) 851 8100
 5          srocchino@reedsmith.com
            Counsel for Defendant AmerisourceBergen
 6
 7          SCOTT LIVINGSTON, ESQ.
            MARCUS & SHAPIRA LLP
 8          One Oxford Centre, 35th Floor
            Pittsburgh, Pennsylvania 15219
 9          (412) 338-4690
            livingston@marcus-shapira.com
10          Counsel for Defendant HBC Company
11
            ERIC SHAPLAND, ESQ. (Telephone)
12          ARNOLD & PORTER KAYE SCHOLER, LLP
            44th Floor, 777 South Figueroa Street
13          Los Angeles, California 90017-5844
            (213) 243-4120
14          eric.Shapland@arnoldporter.com
            Counsel for Defendants Endo Pharmaceuticals,
15          Inc. and Endo Health Solutions, Inc.
16
            CIERA LOGAN, ESQ. (Telephone)
17          FOX ROTHSCHILD LLP
            1301 Atlantic Avenue
18          Midtown Building, Suite 400
            Atlantic City, New Jersey 08401-7212
19          (609) 572-2236
            clogan@foxrothschild.com
20          Counsel for Defendant Validus
            Pharmaceuticals
21
22
      (Appearances continued on next page)
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    APPEARANCES (Continued)
 2
        LINDA K. RURANGIRWA, ESQ. (Telephone/stream)
 3      COLLINSON, DAEHNKE, INLOW & GRECO
        2110 E. Flamingo Road, Suite 305
 4      Las Vegas, Nevada 89119
        (702) 979-2132
 5      Linda.rurangirwa@cdiglaw.com
        Counsel for Defendant C&R Pharmacy
 6
 7      JUSTIN C. TAYLOR, ESQ. (Video/realtime
        stream)
 8      BAILEY & WYANT, PLLC
        500 Virginia Street East | Suite 600
 9      Charleston, West Virginia 25301
        (304) 720-0714
10      Jtaylor@baileywyant.com
11
        JUSTIN MANN, ESQ. (Video/realtime stream)
12      ROPES & GRAY, LLP
        1211 Avenue of the Americas
13      New York, New York  10036-8704
        (212) 596-9175
14      Justin.mann@ropesgray.com
        Counsel for Defendant Mallinckrodt
15
16
17      LUCY ONYEFORO, ESQ. (Video/realtime stream)
        ALLEGAERT BERGER & VOGEL LLP
18      111 Broadway, 20th Floor
        New York, New York 10006
19      (212) 616-7060
        onyeforo@abv.com
20      Counsel for Defendant Rochester Drug
        Cooperative
21
22
     (Appearances continued on next page)
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    APPEARANCES:

2          CONOR B. O'CROININ, ESQ.
           ZUCKERMAN SPAEDER, LLP
3          100 East Pratt Street, Suite 2440
           Baltimore, Maryland 21202-1031
4          (212) 616-7060
           cocroinin@zuckerman.com
5          Counsel for Defendant CVS Indiana, L.L.C.,
           CVS Rx
6
7     Also Present:
8            BRIAN ASQUITH, Law Clerk
9            EVAN WOLFE, Technical Support
10           RYAN WONG, Videographer
11
12    Appearing Via Video/Realtime Stream:
13           AMY KENNEDY
14
                       --oOo--
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                   I N D E X
 2
     Examination by:                    Page
 3
         MR. KENNEDY                      15
 4       MS. HENN                        357
         MR. KENNEDY                     410
 5
                   --o0o--
 6
                 E X H I B I T S
 7
     MCK-WALKER        Description        Page
 8
```





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

E X H I B I T S

2

MCK-WALKER         Description                    Page



--o0o--

Highly Confidential - Subject to Further Confidentiality Review

```
 1              BE IT REMEMBERED that on Thursday, the 10th

 2    day of January, 2019, commencing at the hour of

 3    8:57 a.m. in the law offices of Covington & Burling,

 4    One Front Street, 35th Floor, San Francisco,

 5    California, before me, Sandra Bunch VanderPol, a

 6    Certified Shorthand Reporter in and for the State of

 7    California, personally appeared.

 8                   DONALD WALKER,

 9    called as a witness (McKesson), who, having been duly

10    sworn, was thereupon examined and interrogated as

11    hereinafter set forth.

12                        --o0o--

13              THE VIDEOGRAPHER:  We are now on the record.

14              My name is Ryan Wong.  I'm a videographer

15    for Golkow Litigation Services.  Today's date is

16    January 10th, 2019, and the time is 8:57 a.m.

17              This video deposition is being held in

18    San Francisco, California, in the matter of National

19    Prescription Opiate Litigation, for the United States

20    District Court, Northern District of Ohio.

21              The deponent is Donald Walker.

22              Would counsel please identify themselves for

23    the record.

24              MR. KENNEDY:  Eric Kennedy, on behalf of

25    plaintiffs.
```

```
1              MR. ASQUITH:  Brian Asquith, plaintiffs.

2              MR. WOLFE:  Evan Wolfe, tech support.

3              MS. URQUHART:  Abigail Urquhart, on behalf

4     of Walmart.

5              MR. LIVINGSTON:  Scott Livingston, on behalf

6     of HBC.

7              MR. O'CROININ:  Conor O'Croinin, on behalf

8     of CVS.

9              MS. KVESELIS:  Emily Kveselis, for McKesson

10    and the witness.

11             MS. HENN:  Emily Henn, from Covington &

12    Burling, on behalf of McKesson and Mr. Walker.

13             THE VIDEOGRAPHER:  On the phone?

14             MR. SHAPLAND:  Eric Shapland, on behalf of

15    Endo and Par, at Arnold & Porter.

16             MR. BUSHAR:  Joseph Bushar, of Williams &

17    Connolly, on behalf of Cardinal Health.

18             MS. RURANGIRWA:  Linda Rurangirwa.

19    Collinson, Daehnke, on behalf of C&R Pharmacy.

20             MS. ROCCHINO:  Samantha Rocchino, of Reed

21    Smith, LLP, on behalf of AmerisourceBergen Drug

22    Corporation.

23             THE VIDEOGRAPHER:  The court reporter is

24    Sandy VanderPol, and she will now swear in the

25    witness.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE REPORTER:  Raise your right hand,
 2    please.
 3                Do you solemnly swear or affirm that the
 4    testimony you are about to give in this proceeding
 5    will be the truth, the whole truth, and nothing but
 6    the truth, so help you God?
 7                THE WITNESS:  I do.
 8                        EXAMINATION
 9    BY MR. KENNEDY:
10          Q.     Sir, my name is Eric Kennedy.  You
11    understand that I represent the plaintiffs in this
12    case?
13          A.     I do.
14          Q.     And could you please state your full
15    name for the record.
16          A.     Donald Walker.
17          Q.     And are you currently employed?
18          A.     I am not.
19          Q.     And your prior employer was McKesson;
20    would that be true?
21          A.     That's correct.
22          Q.     And so the jury understands where we
23    are today, we are in San Francisco; are we not?
24          A.     Yes, we're in San Francisco.
25          Q.     And San Francisco would be the
```

```
 1    worldwide corporate headquarters of McKesson

 2    Corporation; would that be true?

 3            MS. HENN:  Objection to form.

 4            THE WITNESS:  McKesson's corporate

 5    headquarters is currently in San Francisco,

 6    California.

 7    BY MR. KENNEDY:

 8            Q.    And we are at the offices of your

 9    attorney at this present time; yes?

10            A.    Yes, we are.

11            Q.    When did you begin your career with

12    McKesson?

13            A.    I joined McKesson in 1987.

14            Q.    And when you joined them, what was

15    your position?

16            A.    My first position with McKesson was

17    as a Transportation Manager with one of the

18    subsidiary companies that McKesson had.

19            Q.    Were your responsibilities in any way

20    involved with the regulatory affairs at that time?

21            A.    No.

22            Q.    And what was the next position that

23    you held with McKesson?

24            A.    I held the position with the -- what

25    was then the McKesson Drug Company and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Transportation, and had responsibility for

 2    transportation planning.

 3            Q.      And when did you take that position?

 4            A.      About 1991.

 5            Q.      Did that position have anything to do

 6    with regulatory affairs of the distribution of

 7    opioids?

 8            A.      No, it did not.

 9            Q.      What did that position basically

10    involve?

11            A.      The transportation position that I

12    held was really a position of optimizing delivery

13    efficiencies for our distribution centers.

14            Q.      What was your next position at

15    McKesson?

16            A.      I was the Distribution Center Manager

17    of our Sacramento Distribution Center.

18            Q.      When did you take that position?

19            A.      My best recollection is about 1992.

20            Q.      And what were your duties and

21    responsibilities then, as the manager of a

22    distribution center?

23            A.      I had responsibility for oversight of

24    our daily distribution of pharmaceuticals to

25    pharmacies served by that distribution center.
```

1          Q.      And that position would have involved

2     the distribution of opioids; would it not?

3          A.      As part of our distribution, we did

4     distribute controlled substances to pharmacies.

5          Q.      Did you have any responsibility at

6     that point in time with respect to the creation,

7     management or implementation of anti-diversion

8     regulations and policies at McKesson?

9          MS. HENN:  Object to form.

10         THE WITNESS:  No.  At that time I was

11    executing against existing policies the company had

12    in place.

13    BY MR. KENNEDY:

14         Q.      What were in place from 1992 to the

15    late '90s?  What was the policy in place?

16         A.      There were -- the policies we had

17    were contained in our Operations Manuals that

18    specified our responsibilities to comply to

19    regulations for handling and distribution of

20    controlled substances.

21         Q.      We know about the existence of

22    Standard Operating Procedure 55.  Are you familiar

23    with that?

24         A.      Yes.

25         Q.      Was that the policy and procedure

 1   that was in place in the 1990s?

 2          A.     The Section 55 of our Operations

 3   Manual covered the responsibilities with the handling

 4   and distribution of controlled substances.

 5          Q.     Sir, that wasn't my question.  I was

 6   asking, was Standard Operating Procedure Section 55,

 7   was that the policy in place in the 1990s?

 8          A.     My recollection is that Section 55

 9   was the applicable policy in place during a period in

10   the 1990s.

11          Q.     How long did you hold the position as

12   a Distribution Center Manager?

13          A.     I recall it was approximately 18

14   months.

15          Q.     So sometime in 1993/'94, you took on

16   a new position?

17          A.     Yes.  In 19 -- in that time frame, I

18   don't recall exactly when, I was promoted to a new

19   position of Vice President of Distribution Operations

20   for their Western Region.

21          Q.     Western Region would be the western

22   part of the United States?

23          A.     Yes.

24          Q.     And what were your responsibilities

25   as VP of Distribution of the Western Region?

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.    I had responsibility for the
2   operations staff in the distribution centers that
3   comprised the Western Region.  So the distribution
4   center managers that operated those facilities
5   reported to me.
6            Q.    And at that point in time -- how
7   long -- how long did you hold that position?
8            A.    I held that position until about
9   1996.
10           Q.    And in that position, did you have
11  responsibility -- other than the following of SOP 55,
12  did you have any duties, responsibilities, with the
13  creation and the management of anti-diversion
14  policies and procedures at McKesson?
15           MS. HENN:  Objection to form.
16           THE WITNESS:  In that role I had
17  responsibility for the distribution centers and their
18  execution of their responsibilities under Section 55
19  to the handling and distribution of controlled
20  substances.
21  BY MR. KENNEDY:
22           Q.    You held that position till what
23  year, the VP of the Western Region?
24           A.    Approximately 1996.
25           Q.    And what position did you take in
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    1996?

 2            A.     In 1996 I was promoted to the Senior

 3    Vice President of Distribution for McKesson

 4    Pharmaceutical.

 5            Q.     Was that a new position also?

 6            MS. HENN:  Objection to form.

 7            THE WITNESS:  No.  That position, I

 8    succeeded an individual who retired from the company.

 9    BY MR. KENNEDY:

10            Q.     Is that the position you held until

11    the time of your retirement?

12            A.     Yes, with the exception of a period

13    of time from approximately 2000 to 2005 where I was

14    responsible for our Six Sigma organization.

15            Q.     And what is that?

16            A.     Six Sigma is a process improvement

17    methodology that we introduced to the company at that

18    time, and I was the senior leader of our Six Sigma.

19            Q.     Did the Six Sigma project in any way

20    relate to the distribution of opioids?

21            A.     Not that I recall.

22            Q.     From '96 to 2000, in this four-year

23    period, what are your responsibilities as a Senior VP

24    of Distribution as it related to the distribution of

25    opioids?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     As the Senior Vice President of

 2     Distribution, included in my responsibility was our

 3     Regulatory Affairs Group.  It was our overall

 4     responsibility to ensure that we were complying with

 5     regulations associated with the handling and

 6     distribution of controlled substances.

 7              Q.     And would that be on a national

 8     basis?

 9              A.     Yes.

10              Q.     Then from 2000 to 2005, when you no

11     longer had your responsibilities as Senior VP of

12     Distribution, who took over your responsibilities

13     during this five-year period?

14              A.     I recall there were two different

15     individuals that had responsibility during that time

16     frame, a Ron Bone and a Brian Magerkurth.

17              Q.     And so they had taken over your

18     responsibilities as it related to McKesson's

19     responsibilities as a distributor relating to the

20     distribution of opioids?

21              A.     During -- during that time they would

22     have had the responsibility for our Regulatory

23     Affairs, yes.

24              Q.     And would their responsibility and

25     your responsibility, when you were acting as the
```

Highly Confidential - Subject to Further Confidentiality Review

1    Senior VP, would that have related to the policies

2    and procedures of McKesson in relation to suspicious

3    order monitoring?

4              MS. HENN:  Objection to form.

5              THE WITNESS:  As part of our overall

6    policies, it did include reporting of suspicious

7    orders.

8                     (Exhibit No. 690 was marked.)

9    BY MR. KENNEDY:

10             Q.    I am going to show you what we have

11   marked as Plaintiffs' Exhibit 690, if you would,

12   please.

13             MS. HENN:  Do you have a second copy for the

14   counsel over here?  `

15             UNIDENTIFIED SPEAKER ON TELEPHONE:  And if

16   it does have a Bates number, if that could be read

17   into the record, it would be appreciated.

18             MR. KENNEDY:  The Bates number,

19   McKessonMDL00409116 -- that's the starting Bates --

20   to -73.  To -173.

21   BY MR. KENNEDY:

22             Q.    Mr. Walker, what is the date on this

23   document, if you look at the cover page?

24             A.    The date is March 12th, 2014.

25             Q.    Large capitals, "McKesson

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Corporation"?

 2           A.     Yes.

 3           Q.     And the title would be the,

 4   "Presentation to the U.S. Attorney's Office, Northern

 5   District of West Virginia, and DEA."  Do you see

 6   that?

 7           A.     Yes.

 8           Q.     If you will -- if you will go to page

 9   -122, the last three -- the last three numbers in the

10   bottom right-hand corner.

11           Is the title of this McKesson's Regulatory

12   Affairs team, Pre-Settlement"?

13           MS. HENN:  Objection to form.

14           THE WITNESS:  Yes.

15   BY MR. KENNEDY:

16           Q.     Presettlement would be prior to 2008;

17   would that be true?  There was a settlement between

18   McKesson and the DEA in 2008; do you recall that?

19           A.     I recall the settlement in 2008, yes.

20           Q.     And this is referencing a

21   pre-settlement; do you see that?

22           A.     I see that.

23           Q.     My question being, from 2000 to -- up

24   to 2008, the time of the settlement, would this have

25   been the regulatory team at McKesson?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. HENN:  Objection to form.

 2              THE WITNESS:  Can you repeat.

 3    BY MR. KENNEDY:

 4         Q.      In this time frame, prior to the

 5    settlement, prior to 2008, would this presentation to

 6    the government -- would this presentation to the

 7    government accurately reflect the regulatory team at

 8    McKesson?

 9         A.      The regulatory -- counsel, if your

10    question is if this was the regulatory team prior to

11    2008, yes.

12         Q.      And --

13         A.      I'm not familiar with this document.

14    So that's why I'm answering the question that way.

15         Q.      I just thought I might help you with

16    recollecting back to this period of time.

17              And so my question is, Bruce Russell is one

18    of three of the regulatory team.  Do you remember

19    when he was brought on at McKesson, prior to 2008 to

20    make up the regulatory team?

21         A.      I don't recall specifically when he

22    was brought on.  When I joined the company, Bruce was

23    already an employee of McKesson.

24         Q.      All right.  And do you know when he

25    took this position as part of the regulatory team?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      I don't recall specifically.  He held

 2    several -- several different positions.  I know that

 3    it did include regulatory, but I don't know the

 4    dates.

 5              Q.      And do you know when Mr. Hilliard was

 6    brought on and made part of the regulatory team at

 7    McKesson?

 8              A.      Again, I don't recall the specific

 9    date.  But Mr. Hilliard joined our regulatory team as

10    a result of our acquisition of Foxmeyer Corporation.

11              Q.      And when we talk about a regulatory

12    team, can we be in agreement we are talking about the

13    team that managed -- managed and implemented the

14    policies in relation to the distribution of opioids;

15    would that be correct?

16              MS. HENN:  Objection to form.

17              THE WITNESS:  The regulatory team had

18    responsibility for ensuring the policies were current

19    and in compliance with the regulation, and provided

20    oversight and guidance to our distribution center

21    teams to ensure that all of our distribution centers

22    were in compliance.

23    BY MR. KENNEDY:

24              Q.      And when we're talking about

25    compliance, we're talking about -- that would include
```

Highly Confidential - Subject to Further Confidentiality Review

1  compliance as it relates to the distribution of

2  opioids; true?

3          A.     It would include the distribution of

4  controlled substances, yes.

5          Q.     Opioids; correct?  They were a

6  controlled substance?

7          A.     The -- we had responsibility for all

8  controlled substances.

9          Q.     Okay.  I want you -- it's just a

10 simple "yes" or "no" question.

11         Opioids are a controlled substance; are they

12 not?  "Yes" or "no."

13         A.     I understand narcotics are a

14 controlled substance, as defined by the DEA, but I

15 don't have the expertise to understand.  We

16 understood them to be controlled substances.

17         Q.     Well, let me ask you this.  You were

18 in charge of regulatory; you worked at the

19 distribution center; you had a long career working

20 directly with the DEA; correct?  Correct?

21         MS. HENN:  Objection to form.

22         THE WITNESS:  I had a long career with

23 McKesson that included interaction with DEA.

24 BY MR. KENNEDY:

25         Q.     And are you saying that you have

Highly Confidential - Subject to Further Confidentiality Review

1   never understood that opioids were a controlled

2   substance?

3           A.      In the regulations, I understand

4   narcotics to be a controlled substance.  And what I

5   can't answer for you is whether opioids specifically

6   are called out in the regulation.

7           We were responsible for the oversight and

8   control of controlled substances, including

9   narcotics.

10          Q.      Okay.  My question is very simple.

11  In your long career at McKesson -- and at the end of

12  the day you were the boss with respect to

13  regulation -- and are you saying that, as you sit

14  here today, you never understood that opioids were a

15  controlled substance that the federal government was

16  addressing when they put the Controlled Substance Act

17  into law in 1970?  You never understood that; is that

18  your testimony, sir?

19          MS. HENN:  Objection to form.

20  BY MR. KENNEDY:

21          Q.      I'm asking you about opioids.

22          A.      Again, I very specifically understood

23  narcotics, and I --

24          Q.      And you didn't know about opioids?

25          A.      And I don't recall opioids being in

Highly Confidential - Subject to Further Confidentiality Review

1  the regulation.

2       Q.    Let me ask you, did you recall, in

3  your long, long career, did you know whether or not

4  oxycodones were within the topic of controlled

5  substances that the DEA and Congress of the

6  United States were intending to be within the purview

7  of what they wanted regulated?  Did you understand

8  oxycodones were a part of that?

9       MS. HENN:  Objection to form.

10      THE WITNESS:  I understood oxycodone to be a

11 Class 2 narcotic, yes.

12 BY MR. KENNEDY:

13      Q.    A controlled substance that you had

14 the responsibility at McKesson to regulate; correct?

15 You understood that?

16      A.    Yes.

17      Q.    Did you understand that hydrocodones

18 were within the purview of controlled substances that

19 the government and the DEA and Congress intended to

20 be subject to their regulation and distribution?

21      A.    Yes.

22      Q.    The three folks that we see here

23 making up the regulatory team -- and, again, when I

24 say "regulatory team" or "Regulatory Affairs," we

25 could understand that what we are talking about are

Highly Confidential - Subject to Further Confidentiality Review

1    the responsibilities of McKesson as it related to the

2    prevention of diversion of controlled substances; you

3    understand that?

4            MS. HENN:  Objection to form.

5            THE WITNESS:  I would describe our

6    regulatory team as having responsibility to ensure

7    that our distribution centers were complying with all

8    regulations, to which McKesson was obligated.

9    BY MR. KENNEDY:

10           Q.    Well, tell me what regulations

11   McKesson was obligated to with respect to the

12   distribution of controlled substances, then, so maybe

13   we can communicate better.  Tell me.

14           In this period prior to 2008, tell me the

15   regulations that you just referred to that McKesson

16   was responsible to follow.

17           A.    At a high level, the responsibility

18   of our distribution centers was to ensure the safe

19   handling, security, recordkeeping associated with the

20   distribution and handling of controlled substances

21   and to -- specifically under the regulation, to guard

22   against diversion and report suspicious orders.

23           Q.    And that was under this -- this

24   umbrella of Regulatory Affairs; correct?

25           A.    Yes, under our Regulatory Affairs

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Group, including our distribution centers, that was

 2   our compliance responsibility.

 3            Q.     And prior to 2008, as you've

 4   represented to the DEA in this slide presentation,

 5   prior to 2008, these three folks, Mr. Walker,

 6   Mr. Russell, Mr. Hilliard, they made up the

 7   regulatory team; true?

 8            MS. HENN:  Objection to the form.

 9            THE WITNESS:  Prior to 2008, this was the

10   regulatory team.

11   BY MR. KENNEDY:

12            Q.     So during this period prior to 2008,

13   I want to focus on 2005 to start with; all right?

14            A.     Okay.

15            Q.     2005 there was an opioid crisis in

16   the United States; was there not?

17            MS. HENN:  Objection to form.

18            THE WITNESS:  I -- I don't have the specific

19   knowledge or recollection that there was an opioid

20   crisis in the United States at the time.

21   BY MR. KENNEDY:

22            Q.     In 2005?

23            A.     Correct.

24            Q.     Let me ask you this.  Is it just that

25   you don't remember back to 2005, or is it that you
```

Highly Confidential - Subject to Further Confidentiality Review

1    believe that back in 2005 you weren't conscious of an

2    opioid crisis in this country?

3            A.     I don't recall when the term --

4    basically, the public information associated with

5    what eventually was termed "the opioid crisis" first

6    was identified.

7            Q.     Well, let me ask.  In 2005 you

8    understood McKesson was selling more opioid narcotics

9    than any company in the United States?  You knew

10   that, didn't you?

11           MS. HENN:  Objection to form.

12           THE WITNESS:  No, I don't have any specific

13   information or recollection that our quantities were

14   the largest in the United States.

15   BY MR. KENNEDY:

16           Q.     As you sit here today, do you know

17   and do you understand that over the years McKesson

18   has been the largest distributor of opioids in this

19   country?

20           MS. HENN:  Objection to form.

21           THE WITNESS:  No, I don't have that

22   knowledge.

23   BY MR. KENNEDY:

24           Q.     In 2005 McKesson was selling

25   oxycodones, were they not?

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.     In 2005 I believe that McKesson

2   was -- oxycodone was one of the controlled substances

3   we sold.

4              Q.     McKesson was selling hydrocodones;

5   were they not?

6              A.     In 2005?

7              Q.     Yes.

8              A.     Yes.

9              Q.     And if I were to tell you that with

10  respect to narcotics and controlled substances, by

11  2005 McKesson was probably selling over a billion

12  dollars worth of those narcotics, would that be

13  contrary to your memory and your belief of the level

14  of sales of McKesson in 2005?

15             MS. HENN:  Objection to form.

16             THE WITNESS:  I don't have any specific

17  knowledge in what our sales quantities of those

18  substances were at that time.

19  BY MR. KENNEDY:

20             Q.     Let me ask you -- see if we can
```

Highly Confidential - Subject to Further Confidentiality Review



10        Q.      That's not what I'm asking you.  And

11   you -- you're the right guy, and you understand --

12   you heard my question; did you not?

13        MS. HENN:  Counsel, could you just ask a

14   question, please.

15   BY MR. KENNEDY:

16        Q.      Did you hear my question, sir?

17        A.      I heard your question.

18        Q.      Did you understand my question?

19        A.      I understood your question.

20        Q.      I'm going to ask it again, maybe in a

21   little different way.

Highly Confidential - Subject to Further Confidentiality Review



10        Q.      And I'm going to move to strike.  And

11   I'm going to ask you again.

12            I want to know about your responsibility to

13   know.  I don't want you to parrot something that you

14   want to say or have been prepared to say.  I want you

15   to answer my question; all right?

Highly Confidential - Subject to Further Confidentiality Review



12          Q.    So are you going to refuse to answer

13   that question?  I want to know, and I will move on.

14   If you are not going to answer that question, I will

15   move on.

16          Are you refusing to answer my question?

17          MS. HENN:  Counsel, please just pose

18   questions.  He will answer them.

19   BY MR. KENNEDY:

20          Q.    Are you refusing to answer my

21   question, sir?

22          MS. HENN:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



18          Q.     And I've written that accurately;

19    correct?  Simple question.  If I haven't, I will

20    rewrite it; I will write more.

21          Have I written that correctly with respect

22    to Mr. Walker's view as head of regulatory, your view

23    of McKesson's responsibility?

24          MS. HENN:  Objection to form.

25    ///

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. KENNEDY:

2         Q.    Have I written that accurately, sir?

3         A.    That appears to be what I said.

4         Q.    Very good.  All right.

5         So let's take a look at whether or not

6    McKesson fulfilled its responsibility --

7    all right? -- according to Mr. Walker's view of their

8    responsibility.  All right?

9         A.    Okay.

10                  (Exhibit No. 801 was marked.)

11        MR. KENNEDY:  If you can give me

12   Exhibit 688, please.

13                  (Exhibit No. 688 was marked.)

14   BY MR. KENNEDY:

15        Q.    So let's look at McKesson's

16   fulfilling of its responsibility, then, as you have

17   described it.  This is Exhibit 688, Bates -00496859

18   to -875.

19        This is a memorandum.  Do you see that up at

20   the top, it says, "Memorandum"?

21        A.    Yes.  Give me just a minute.

22        Yes.

23   BY MR. KENNEDY:

24        Q.    And this is a Memorandum.  This is a

25   DEA document; is it not?  Do you see the DEA logo,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   U.S. Department of Justice, Drug Enforcement

 2   Administration?  This is a memo from the DEA, from

 3   their documents; true?

 4           A.    That's what's on the document, yes.

 5           Q.    Well, Mr. Walker, you have seen this

 6   document before; have you not?  This came from your

 7   files.

 8           A.    Yes, I have seen this document.

 9           MS. HENN:  Objection to form.

10   BY MR. KENNEDY:

11           Q.    When was the last time you saw this

12   document?

13           A.    I believe the most recent was in

14   preparation for this deposition.

15           Q.    All right.  So this is a memorandum.
```

25           Q.    And this is an internal memoranda

Highly Confidential - Subject to Further Confidentiality Review

1    that Mr. Mapes, from the DEA, created for Joseph

2    Rannazzisi of the DEA; true?  Is that true?

3         A.     That would appear to be correct.

4         Q.     And you know who Mr. Rannazzisi of

5    the DEA is, do you not?

6         A.     Yes, I do.

7         Q.     He held an important position with

8    the DEA; did he not?

9         A.     Mr. Rannazzisi was the head of

10   diversion control.

11        Q.     And that's an important position; is

12   it not?

13        A.     I believe so.

14        Q.     All right.  Let's read the first

21              of reading).

22              He's from McKesson; right?

23              MS. HENN:  Objection to form.

24   BY MR. KENNEDY:

25        Q.     He's legal counsel at McKesson?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Mr. Gilbert is outside counsel for

 2   McKesson.

 3              Q.      All right.  A lawyer; right?

 4              A.      Yes, he's a lawyer.

 5              Q.      Ronald Bone, Senior Vice President,

 6   Distribution Support.  He's from McKesson; correct?

 7              A.      Yes.

 8              Q.      Gary Hilliard, Director of Regulatory

 9   Affairs was present; right?

10              A.      Yes.

11              Q.      And as far as that -- the hierarchy,

12   the chain of command in Regulatory, he was right

13   underneath you or he was two down from you; correct?

14   We just looked at that.

15              A.      At -- that's not accurate.  At this

16   time I was not in the role of Senior Vice President

17   of Distribution.  But ultimately he was.

18              Q.      Okay.  And Michael Mapes, from the

19   DEA, was at the meeting; true?  Is that what it

20   indicates?

21              A.      That's what the document indicates.

22              Q.      Charles E. Trant, Office of Chief

23   Counsel, Diversion and Regulatory Litigation

24   Division, that was a lawyer from the DEA present at

25   the meeting; true?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. HENN:  Objection to form.

 2              THE WITNESS:  Again, that's what the

 3    document represents.

 4    BY MR. KENNEDY:

 5          Q.    Jim Crawford, from the DEA, he was

 6    also there; correct?

 7          A.    According to the document.

 8          Q.    Kyle Wright, from the DEA, was also

 9    at the meeting, according to the document?

10          A.    Yes, that's what's written.

11          Q.    That last sentence in the first

12    paragraph states:
```

21          Q.    And you understand that they said

22    they wanted to talk to you about source of supply.

23    That's McKesson, because McKesson is a source of

24    supply to pharmacies; true?

25              MS. HENN:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

```
1   BY MR. KENNEDY:

2           Q.    That's what they are talking about?

3           A.    McKesson's role in the pharmaceutical

4   supply chain is to supply pharmacies.

5           Q.    They are a source of supply?  That's

6   what they are talking about in this memo; true?

7           MS. HENN:  Objection to form.

8           THE WITNESS:  I'm not sure what their intent

9   in writing the "source of supply."  But McKesson does

10  supply pharmacies.

11  BY MR. KENNEDY:

12          Q.    Are you telling me, you don't know

13  what they mean by "source of supply"?  You don't know

14  what that means?

15          MS. HENN:  Objection to form.  Asked and

16  answered.

17  BY MR. KENNEDY:

18          Q.    Is that your testimony?

19          MS. HENN:  Same objection.

20          THE WITNESS:  Again, I'm not sure

21  specifically what Mr. Mapes is intending or meaning

22  there.  What I can assure you is that McKesson

23  supplies pharmacies.

24  BY MR. KENNEDY:

25          Q.    All right.  From your background,
```

Highly Confidential - Subject to Further Confidentiality Review

11          Q.      Let me ask you, meetings like this

12    didn't happen every week with the DEA where lawyers

13    are involved, the DEA is bringing all these folks,

14    and McKesson is bringing all these folks?  These type

15    meetings with the DEA did not happen every week;

16    would that be true?

17          A.      Meetings at DEA headquarters were

18    not, you know, frequent.

19          Q.      This didn't even happen every month,

20    where this many people from McKesson were brought in

21    to meet this many people at DEA headquarters?  It

22    didn't even happen once a month; did it?

23          A.      Not that I recall.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



18          Q.       McKesson, when they provided us with

19     this document, put a black box.  Do you know why that

20     black box is there?

21              MS. HENN:  Objection to form.

22              THE WITNESS:  No, I do not.

23     BY MR. KENNEDY:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12          Q.      Now, you have reviewed this document

13    within the last few weeks; true?

14          A.      Yes, I believe so.

15          Q.      And you clearly would have seen this

16    document back in 2005, 2006?  We got it out of your

17    files; correct?  You saw it back then; right?

18          MS. HENN:  Objection to form.

19          THE WITNESS:  I don't recall seeing this

20    document, this internal DEA document, prior to the

21    review with counsel.

22    BY MR. KENNEDY:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



25          MR. KENNEDY:  All right.  Let's go four

Highly Confidential - Subject to Further Confidentiality Review

 1    months later.  All right.  Four months later.  If we

 2    could look at Exhibit 689, please.

 3                    (Exhibit No. 689 was marked.)

 4            MR. KENNEDY:  That's a Bates -00496876 to

 5    -878.

 6            Q.     You have got a September 1 meeting,

 7    2005.  I want to talk about four months later.  You

 8    have seen this document; have you not?

 9            A.     Yes, I have.

10            Q.     This is from your files.

11            A.     Yes, I have seen this document.

12            MS. HENN:  Objection to form.

13    BY MR. KENNEDY:

14            Q.     This is another -- this is another

15    DEA memo; is it not?

16            A.     It would appear to be a DEA memo,

17    yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.      Now, this is a DEA memo, again,

 2    written to Mr. Rannazzisi; correct?

 3              A.      That's correct.

 4              Q.      Let's look to the first paragraph.
```

The second paragraph states:

```
14              (Reading) Representing McKesson

15              Corporation were Donald G.  Walker" --

16         That's you; right?

17              A.      Yes, it is.

18              Q.      You're at the second meeting; right?

19              A.      Yes, I was at this meeting.

20              Q.      And that point you were Senior Vice

21    President of Distribution Operations; correct?

22              A.      That is correct.

23              Q.      So you're sitting on top of

24    Regulatory Affairs at that point; true?

25              A.      Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.     Bill Mahoney, Distribution Center
 2    Manager, Lakeland Distribution Center, Florida, was
 3    there; right?  McKesson employee; true?
 4              A.     Yes.
 5              Q.     Gary Hilliard, Director of Regulatory
 6    Affairs, was there; right?
 7              A.     Yes.
 8              Q.     McKesson.  He's from McKesson; right?
 9              A.     Yes, he was.
10              Q.     And John Gilbert, one of McKesson's
11    lawyers was present; true?
12              A.     That is correct.
13              Q.     And it says -- next paragraph down it
14    outlines now who is there from the DEA.  It says:
15                   (Reading) Representing Drug
16                   Enforcement Administration (DEA)
17                   Office of Diversion Control (OD) were
18                   Joseph Rannazzisi, Deputy Assistant
19                   Administrator, Michael R. Mapes,
20                   Chief, E-Commerce Section (end of
21                   reading).
22                   Another DEA person; true?
23              A.     Yes.
24              Q.     Kyle Wright, Chief E-Commerce
25    Operations from the DEA was present; right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     Yes.

 2              Q.     And then Charles E. Trant, a DEA

 3     Chief Counsel, a lawyer, was also present; right?

 4              A.     That's what's represented on the

 5     document, yes.

 6              Q.     The next paragraph down.  Could you

 7     read that to us.  Read the next paragraph down.
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



6    BY MR. KENNEDY:

7         Q.    The next bullet point down, "The

8    E-Commerce Section" -- that's the DEA -- "retrieved

9    ARCOS data" -- and that's a database where the DEA

10   can look at what McKesson is actually distributing

11   and selling; true?  That's what the ARCOS data is?

12        A.    The ARCOS data is data that we

13   provided -- that is required by the regulation.  So

14   it is data of sales of controlled substances that are

15   required to be reported.

16        Q.    So it states:

Highly Confidential - Subject to Further Confidentiality Review



22          Q.      You know that at this point in time,

23    the DEA, their statistics in ARCOS, were showing that

24    the average monthly, average monthly distribution by

25    a distributorship of McKesson was 5,000 units of

Highly Confidential - Subject to Further Confidentiality Review

1    hydrocodone?  Do you remember that?  Remember that

2    communication, all during this period?

3              MS. HENN:  Objection to form.

4              THE WITNESS:  I recall DEA indicating that

5    5,000 doses of controlled substances was average.

6    BY MR. KENNEDY:

7              Q.    That's an average monthly dose;

8    right?

9              A.    That's what I recall.

Highly Confidential - Subject to Further Confidentiality Review



13          Q.     Let me ask you this.  Forget the

14   averages and forget everything else.  You were

15   involved in this, sir, for how many years?

16          A.     Probably 15 years in the role.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



14          Q.      -- you don't have any knowledge

15   whether these are correct?  You were directly

16   involved with this memo from the beginning, and this

17   led to negotiations and a settlement, and McKesson

18   losing its license to distribute opioids and a

19   $13 million fine; did it not?  You were directly

20   involved with that; were you not?

21          MS. HENN:  Objection to form.

22          THE WITNESS:  I was directly involved in the

23   settlement with DEA and the penalties that were

24   associated with that.

25   ///

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. KENNEDY:



Highly Confidential - Subject to Further Confidentiality Review



19          MR. KENNEDY:  Could I have the Elmo, please.

20          MS. HENN:  Counsel, we have been going over

21     an hour.  Would this be a decent time for a five-,

22     ten-minute break?

23          MR. KENNEDY:  Sure.

24          THE VIDEOGRAPHER:  We are going off the

25     record.  The time is 10:07 a.m.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (Recess taken.)

 2              THE VIDEOGRAPHER:  We are back on the

 3    record.  The time is 10:22 a.m.

 4    BY MR. KENNEDY:
```

21              Q.     Hydrocodone is a controlled

22    substance; right?

23              A.     Yes, it is.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20   BY MR. KENNEDY:

21          Q.    Sir, you sat through the meetings,

22   the negotiations, the pleadings, and all of the legal

23   proceedings with respect to this event; did you not?

24          A.    No, that's not accurate.  I did not

25   sit through all the meetings and negotiations that

Highly Confidential - Subject to Further Confidentiality Review

```
1    took place between counsels.

2          Q.    Did you sign the agreement with the

3    DEA in relation to these violations, these sales of

4    hydrocodones?  Did you sign the very settlement

5    agreement; sir?

6          A.    I signed the 2008 memorandum

7    agreement, yes.

8          Q.    Let me back up, because I just -- I

9    just want to be clear about it.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



24    BY MR. KENNEDY:

25         Q.    And that means you're not going to be

Highly Confidential - Subject to Further Confidentiality Review

1    able to sell narcotics to pharmacies: Right?  If you

2    have got to give your registration back, that's what

3    that means?

4            A.    If a registration is suspended or

5    revoked, then you're unable to sell controlled

6    substances.

17   BY MR. KENNEDY:

18           Q.    And you ended up surrendering your

19   registration; didn't you?

20           MS. HENN:  Objection to form.

21           THE WITNESS:  Counsel, that's not correct.

22   We had a limited suspension of certain controlled

23   substances from certain distribution centers, is the

24   result of the agreement with DEA.

25   ///

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. KENNEDY:

2          Q.    We will look at that specifically.

3    Let's go down to -- after some bullet points, I want

4    to go down to the paragraph that starts with

5    "Through."

6          Do you see this paragraph that starts with

7    "Through"?
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

6        Q.     And tell the jury what generic

7    hydrocodones are.

8        A.     In all pharmaceuticals or medicines,

9    as a brand drug comes to market, it stays brand for a

10   period of time, at which time a generic drug can be

11   manufactured that has the same pharmacological

12   characteristics as the brand medication.  So it's

13   very common in pharmaceutical industry for generics.

14   Amoxicillin is probably the best example that

15   everybody would know.

16       Q.     And, sir, the majority of

17   hydrocodones that McKesson was selling were generic;

18   were they not?

19       A.     I do not know what quantities were

20   brand versus generic at that point in time.

21       Q.     In a general sense, that has always

22   been true at McKesson?  You sell more generics than

23   you do brand name controlled substances; hasn't that

24   always be true?

25       MS. HENN:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review



1          THE WITNESS:  Again, I don't have any

2    specific knowledge one way or the other.

3    BY MR. KENNEDY:



Highly Confidential - Subject to Further Confidentiality Review

7    BY MR. KENNEDY:

8         Q.    Sir, McKesson had the duty since 1970

9    to identify and report suspicious orders of

10   controlled substances; did they not?

11        A.    I don't know specifically when the

12   CFR was generated.  It was in the early '70s.  But in

13   the time that I was there, we had the responsibility.

14        Q.    And that included generic

15   hydrocodones, did it not, that duty, that

16   responsibility?

17        MS. HENN:  Objection to form.  Lacks

18   foundation.

19        THE WITNESS:  We were responsible to report

20   the sales of all pharmaceutical or controlled

21   substances that were reportable to the DEA.

22        MR. KENNEDY:  Okay.  I'm going to ask to

23   strike your answer.  Could you read back my question,

24   sir.  I want you to listen real careful, and I want

25   you to answer this question.  Not what you want to

Highly Confidential - Subject to Further Confidentiality Review

```
 1   answer.  I want you to answer what I'm asking this

 2   point forward, if you could.

 3              MS. HENN:  Objection to form.

 4              MR. KENNEDY:  Could you read it back,

 5   please.

 6              (Record read as follows:  QUESTION:

 7              And that included generic

 8              hydrocodones, did it not, that duty,

 9              that responsibility?)

10              MS. HENN:  Same objection.  Lacks

11   foundation.

12              THE WITNESS:  Hydrocodone -- all hydrocodone

13   was a reportable controlled substance.

14   BY MR. KENNEDY:

15        Q.    Including generic hydrocodone; true?

16        A.    Including generic hydrocodone, yes.

17        Q.    Because generic hydrocodone, sir, is

18   just as addictive as brand-name hydrocodone; is it

19   not?

20              MS. HENN:  Objection to form.

21              THE WITNESS:  I have no expertise on

22   addiction rates or addiction.  So I can't comment

23   whether -- one versus the other.

24   BY MR. KENNEDY:

25        Q.    They weren't any different
```

Highly Confidential - Subject to Further Confidentiality Review

1    chemically; were they?

2         MS. HENN:  Objection to form.

3    BY MR. KENNEDY:

4         Q.    Branded versus generic aren't

5    different chemically?

6         A.    Generally, my understanding is that

7    they were very close, if not identical, in terms of

8    chemical makeup.  But, again, I don't have the level

9    of expertise to testify absolutely that they were the

10   same.

11        Q.    Generic hydrocodone, sir, your

12   understanding generic hydrocodone was just as likely

13   to cause an overdose and death as a named brand

14   hydrocodone; true?

15        MS. HENN:  Objection to form.

16        THE WITNESS:  My understanding is that

17   generic hydrocodone, as it's designed for medical

18   purposes, it was the same as brand hydrocodone.

19   BY MR. KENNEDY:

Highly Confidential - Subject to Further Confidentiality Review



19   BY MR. KENNEDY:

20          Q.    By 2005, though, you understood, did

21   you not, that hydrocodones were one of the major

22   causes of addictions in the United States?  You knew

23   that by 2005; didn't you?

24          MS. HENN:  Objection to form.

25          THE WITNESS:  I don't recall, you know,

```
 1   specifically having any awareness of hydrocodone

 2   being a national issue in 2005.

 3   BY MR. KENNEDY:

 4        Q.    By 2005, sir, didn't you understand

 5   that hydrocodones were one of the most highly

 6   diverted drugs in this country?

 7        MS. HENN:  Objection to form.  Lacks

 8   foundation.

 9   BY MR. KENNEDY:

10        Q.    Do you understand that by 2005?

11        MS. HENN:  Same objection.

12        THE WITNESS:  I don't -- I don't have any --

13   any recollection or knowledge of that.

14   BY MR. KENNEDY:

15        Q.    So at this point in time, in 2005 to

16   early 2006, when you have this period where you sell

17   two million hydrocodones, are you saying that you did

18   not understand that hydrocodones were one of the most

19   highly diverted drugs in this country?  You didn't

20   know that?

21        MS. HENN:  Objection.  Asked and answered.

22   Lacks foundation.

23        THE WITNESS:  I had no knowledge or

24   understanding of addiction rates of hydrocodone.

25   ///
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. KENNEDY:

 2         Q.    You had been selling hydrocodones for

 3    a decade or more, making millions of dollars, and you

 4    didn't understand that; is that your testimony?

 5         MS. HENN:  Objection.  Asked and answered.

 6    Lacks foundation.

 7         THE WITNESS:  In 2005 I had no knowledge and

 8    don't recall.

 9         MR. KENNEDY:  I am going to give you

10    Exhibit 695.

11                   (Exhibit No. 695 was marked.)

12    BY MR. KENNEDY:

13         Q.    Sir, I'm going to show you --

14         MS. HENN:  Counsel, this appears to have

15    been printed without Bates number or confidentiality

16    stamp.  So we would just ask, for the record, that

17    those -- the number and the confidentiality

18    designation be read into the record, if you have it.

19         MR. KENNEDY:  The Bates numbers?

20         MS. HENN:  The Bates number, so the people

21    on the phone know what you're looking at.

22         MR. KENNEDY:  These are not Bates numbered.

23    This comes from the U.S. Department of Justice, Drug

24    Enforcement Administration.

25         MS. HENN:  Has it not been produced in this
```

Highly Confidential - Subject to Further Confidentiality Review

1    litigation?

2          MR. KENNEDY:  Well, I can't tell you I've

3    got a memory of all 20 million documents produced, so

4    I really don't know.

5          MS. HENN:  Okay.

6    BY MR. KENNEDY:

7          Q.    Do you see the DEA logo on

8    Exhibit 695, sir?

9          A.    Yes, I do.

10         Q.    Does it say, "U.S. Department of

11   Justice, Drug Enforcement Administration"; correct?

12         A.    Yes.

13         Q.    Do you see the Bates stamp there?

14   They are -- they are not Bates stamped, but a date

15   stamp of July 28, 2004; do you see that?

16         A.    Yes.

17         Q.    And you were just telling me you

18   don't think you had knowledge of -- with respect to

19   the diversion, the addiction of hydrocodones in 2005.

20   That's what we were talking about; right?

21         MS. HENN:  Objection.  Asked and answered.

22   BY MR. KENNEDY:

23         Q.    Correct, sir?  Is that what we just

24   were talking about, your knowledge in 2005; right?

25         A.    That's correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.     And then in 2005 you were the boss
 2   with respect to McKesson's regulation, diversion of
 3   controlled substances; correct?
 4              MS. HENN:  Objection.  Lacks foundation.
 5              THE WITNESS:  In the latter part of 2005, I
 6   assumed that responsibility.
 7   BY MR. KENNEDY:
 8              Q.     All right.  And this is July '04.  So
 9   this is -- this is even before that date; right?  So
10   this is available before that date; all right?
11              MS. HENN:  Objection to form.
12   BY MR. KENNEDY:
13              Q.     Go to page 2.  132 at the bottom,
14   page 2 up at the top.  The second sentence,
15   "Despite."  Does it state:
16              (Reading) Despite their obvious
17              utility in medical practice, as stated
18              above, hydrocodone products are among
19              the most popular pharmaceutical drugs
20              associated with drug diversion,
21              trafficking, abuse and addiction (end
22              of reading)?
23         Is it your testimony you did not know that
24   in 2005?
25              A.     Counsel, as I answered, I do not
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    recall having any specific knowledge of hydrocodone

 2    or this issue.  This is the first time I've seen this

 3    document and had no other personal knowledge.

 4         Q.    Well, you're in charge of Regulatory

 5    in 2005; right?

 6         MS. HENN:  Objection to form.

 7         THE WITNESS:  I assume --

 8    BY MR. KENNEDY:

 9         Q.    Correct?

10         A.    I assumed responsibility for

11    Regulatory in September of 2005.

12         Q.    And McKesson is selling millions upon

13    millions of hydrocodones in 2005; are they not?

14         A.    I don't know specifically the

15    quantities that we were selling.  We sold hydrocodone

16    as one of the controlled substances we provided to

17    our licensed pharmacies.

18         Q.    Look at the first bullet.  And this

19    is a -- this is in a government available document.

20    Look at the first bullet, "Hydrocodone has an abuse

21    liability similar to morphine."

22         Did you know that?

23         MS. HENN:  Objection to form.

24    BY MR. KENNEDY:

25         Q.    Did you know that in 2005?
```

Highly Confidential - Subject to Further Confidentiality Review

 1          A.    No, Counsel, I -- as I said, I don't

 2   have and did not have any personal knowledge of, you

 3   know, hydrocodone or its comparison to morphine.

 4          Q.    Look at the next bullet, first

 5   sentence.  Now you're in charge of making sure that

 6   hydrocodones as a controlled substance are not being

 7   diverted; correct?

 8          A.    We had the responsibility --

 9          Q.    I asked you about, were you in charge

10   of that responsibility?

11          MS. HENN:  Objection to form.

12          Let the witness finish his answer, please.

13          THE WITNESS:  I had responsibility for our

14   regulatory and our compliance, which included

15   guarding against and preventing -- guarding against

16   the diversion of controlled substances.

17   BY MR. KENNEDY:

18          Q.    Does the next bullet point in this

19   DEA document say, "Hydrocodone products are

20   associated with significant diversion"?  Does it

21   state that?

22          A.    Paragraph 2, that's what the document

23   says.  And DEA is alleging, yes.

24          Q.    You say, "DEA is alleging."  Is that

25   what you said?  Did you say, "DEA is alleging"?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     This is -- this is their document.

2          Q.     When you say "allege," you didn't --

3     there's not much question about that.  This is more

4     than an allegation.  That's the truth in 2005, from

5     everything you know, sir?  Fifteen years in this,

6     that's the truth; is it not?

7          MS. HENN:  Objection to form.  Lacks

8     foundation.

9          THE WITNESS:  Counsel, again, I -- as I

10    stated, I do not remember having any specific

11    recollection around discussions either -- or

12    documents around hydrocodone's addictive and its

13    comparison to others.

14    BY MR. KENNEDY:

15         Q.     I just want to go back.

16         A.     I'm just simply looking at the

17    document and trying to answer your question.

18         Q.     I just want to ask you real simple.

19    You used the words, "DEA alleges."  Was the problem

20    in 2005 that you and McKesson thought that these were

21    just DEA allegations with respect to hydrocodones and

22    diversion?  Did you think these were just

23    allegations?

24         MS. HENN:  Objection to form.

25    Mischaracterizing the testimony and lacks foundation.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. KENNEDY:

 2           Q.      Is that what you thought in 2005,

 3    sir?

 4           A.      Counsel, I was answering your

 5    question specific to this document.  I don't know.

 6    And certainly I'm not sure I can answer the question

 7    as you asked it.

 8           Q.      Next says -- next bullet, first

 9    sentence, "Hydrocodone products are associated with

10    significant drug abuse."

11           Did you know that in 2005, as the person who

12    was in charge of Regulatory?  Did you know that?

13           MS. HENN:  Objection to form.

14           THE WITNESS:  Again, I don't recall being

15    specifically aware of a hydrocodone drug abuse issue.

16    BY MR. KENNEDY:

17           Q.      The next bullet:

18               (Reading) Poison control data, DAWN

19               medical examiner (ME) data and other

20               ME data indicate that hydrocodone

21               deaths are numerous, widespread and

22               increasing in number (end of reading).
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
6                     (Exhibit No. 693 was marked.)

7    BY MR. KENNEDY:

8          Q.     Showing you what has been marked as

9    Exhibit 693.  693, all right, which is No. -497154.

10         Go to the second page, if you would.  And I

11   believe this is a document prepared by the DEA and

12   provided to us by McKesson.

13         Do you see the chart on page -155?  Do you

14   see that?

15         A.     Yes.

16         Q.     Now, this is McKesson hydrocodone

17   sales and distributions from October 1, now, to

18   January 31, a four-month period.  We've been talking

19   about just 11 days in October.

20         This is a four-month period; do you see

21   that?

22         A.     Yes.

23         Q.     This is in Florida, just Florida;

24   all right?
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



23    BY MR. KENNEDY:

24           Q.     You do know that the DEA gets its

25    numbers from ARCOS; correct?  The ARCOS database,

1    that's where the DEA gets its number; true?

2             MS. HENN:  Objection to form.

3             THE WITNESS:  I know that ARCOS is one of

4    the sources of DEA's data.  But I don't know that

5    it's exclusive.

6    BY MR. KENNEDY:

7             Q.    And tell the jury who provides the

8    DEA with the ARCOS data on your sales.  Who provides

9    that to them?

10            A.    We submit on a monthly basis, as

11   required by the regulation, the ARCOS data on the

12   sales of controlled substances that are required to

13   be reported.

14            Q.    McKesson gives them the numbers on

15   what you're selling them; right?

16            A.    We provide the ARCOS data to DEA.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

6    BY MR. KENNEDY:

7              Q.      And that included, number one,

8    identifying orders of unusual size; correct?

9              MS. HENN:   Objection to form.

10             THE WITNESS:   In the suspicious order

11   regulation, unusual size is called out.

12   BY MR. KENNEDY:

23             Q.      Absolutely.  And that's more than

24   just making sure you're selling to a pharmacy that's

25   got a license; right?  Correct?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      And report to the DEA.

13   BY MR. KENNEDY:

14          Q.      You don't remember that that is the

15   reason that you got fined $13 million?

16          MS. HENN:  Objection to form.  Lacks

17   foundation.

18   BY MR. KENNEDY:

19          Q.      You don't remember?

20          A.      I don't remember or have any

21   independent knowledge of whether or not any of these

22   pharmacies ever reported to DEA during that time

23   frame.

24          Q.      All right.  Sir, I wrote down some of

25   the dates of what we have been talking about so we

Highly Confidential - Subject to Further Confidentiality Review

1    can put it all together here, everything we have been

2    talking about.





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



11                    (Exhibit No. 802 was marked.)

12          MR. KENNEDY:  Well, sir, let's -- let me

13   show you Exhibit 686.

14                    (Exhibit No. 686 was marked.)

15   BY MR. KENNEDY:

16          Q.    686 does not have Bates numbers.

17   Sir, you indicate you don't have any knowledge of

18   McKesson -- McKesson sending massive amounts around

19   the country of hydrocodone -- excuse me,

20   hydrocodones.  This is a Settlement Agreement.  Look

21   at that first sentence.

22                    (Reading) This is a Settlement

23                    Agreement entered into on April 30th,

24                    2008, between the United States

25                    Department of Justice, through the

```
 1                   United States Attorney's Office, for

 2                   the Districts of Maryland, Middle

 3                   Florida, Southern Texas, Colorado,

 4                   Utah, and Eastern California (end of

 5                   reading).

 6           Do you see that?

 7           A.    I see that.

 8           Q.    And the Settlement Agreement is with

 9  McKesson Corporation; true?

10           A.    Yes.

11           Q.    You signed this document; did you

12  not?

13           A.    Yes, I did.

14           Q.    And that's why I'm asking, why is it

15  that you didn't have any knowledge that this was

16  going on across the country?  You signed this

17  document; didn't you?

18           MS. HENN:  Objection to form.

19           THE WITNESS:  I signed this document,

20  Counsel.

21  BY MR. KENNEDY:

22           Q.    Let's go to the next page, down to

23  No. 8 on the next page.  See where it says, on No. 8,

24  paragraph 8, "The Covered Conduct shall mean the

25  following alleged conduct"?  Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     Yes.

 2              Q.     "A:  Within the District of

 3    Maryland" --  and that's not Florida; right?  Can we

 4    agree that's not Florida?

 5              A.     Maryland is not Florida.

 6              Q.     (Reading) -- from January 2005?

 7                     through October 2006,

 8                     McKesson-Landover sold approximately

 9                     three million dosage units of

10                     hydrocodone to New Care Pharmacy in

11                     Baltimore and failed to report these

12                     sales as suspicious orders to DEA when

13                     discovered, as required by and in

14                     violation of 21 C.F.R 1301.74(b), and

15                     21 U.S.C. 842 (a)(5) (end of reading).

16              Do you see that?

17              A.     Yes.

18              Q.     That's 150,000 hydrocodones a month,

19    if I did the math right.  Do you see that?  That

20    would be 30 times the national average?

21              MS. HENN:  Objection to form.

22    BY MR. KENNEDY:

23              Q.     The DEA national average; right?  If

24    I did my math right.

25              MS. HENN:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. KENNEDY:

 2            Q.     Do you see that?

 3            A.     Again, if using DEA's average, which

 4    I can neither support or refute, and the dosage units

 5    here, that your math is correct.

 6            Q.     That's Maryland; right?  So let's

 7    go -- No. B, that's the Middle District of Florida,

 8    and that's probably what we've been talking about;

 9    correct?

10            A.     Yes.

11            Q.     And then go to C.  Now we're in the

12    Southern District of Texas; right?  And does it

13    state:

14                   (Reading) from February to December of

15                   2007, McKesson-Conroe sold

16                   approximately 2.6 million dosage units

17                   of hydrocodone to Mercury Drive

18                   Pharmacy and Maswoswe's Alternative

19                   Pharmacy and failed to report those

20                   sales as suspicious orders to DEA when

21                   discovered (end of reading).

22            Did I read that right?

23            A.     Yes, you read that correctly.

24            Q.     And that's over eight months.  And

25    that would be about 150,000 a month, if I did my math
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    right; correct?

 2            A.    If you divide what that says, that

 3    would be correct for the two pharmacies.

 4            Q.    And, again, if the DEA was correct,

 5    and that the national average is about 5,000 a month,

 6    what's this?  About 30 times?  30 times the national

 7    average; right?

 8            MS. HENN:  Objection to form.

 9    BY MR. KENNEDY:

10            Q.    Correct?

11            A.    Are you referring to the Texas

12    pharmacies?

13            Q.    We're on Texas, yes, sir.

14            A.    If the math -- but, again, it would

15    be -- there's two pharmacies involved.  But your math

16    would be correct.

17            Q.    And not one order was reported to the

18    DEA; was it?

19            MS. HENN:  Objection to form.  Lacks

20    foundation.

21    BY MR. KENNEDY:

22            Q.    Is that right?

23            A.    I don't have any specific knowledge

24    of what was or wasn't reported to DEA.

25            Q.    What does it state here.  "Failed to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    report these sales as suspicious orders to the DEA";

 2    does it say that?

 3             A.    That's what it says.  That was the

 4    allegation.

 5             Q.    Did you sign this?

 6             A.    I did.

 7             Q.    Let's go to D on the next page.  This

 8    is Colorado now.  It states:

 9                   (Reading) With respect to Colorado,

10                   from September 2005 through November

11                   of 2007, McKesson-Aurora sold large

12                   quantities of hydrocodone to three

13                   Colorado pharmacies (end of reading).

14             Is that what it states with respect to

15    Colorado?

16             A.    That is correct.

17             Q.    E, now we're in Utah:

18                   (Reading) From January 2005 through

19                   October 2007, McKesson-Salt Lake City

20                   sold approximately 825,000 dosage

21                   units of hydrocodone, oxycodone,

22                   Fentanyl and Methadone to the

23                   Blackfeet Clinic in Browning, Montana

24                   (end of reading).

25             Does it state that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     Yes, that's what it states.

 2              Q.     And, again, failed to report any of

 3    these to the DEA as suspicious orders; true?

 4              MS. HENN:  Objection to form.  Lacks

 5    foundation.

 6    BY MR. KENNEDY:

 7              Q.     Correct?

 8              MS. HENN:  Same objections.

 9              THE WITNESS:  What is written is that

10    allegation.

11    BY MR. KENNEDY:

12              Q.     You signed the document; right?

13              A.     I signed the agreement.

14              Q.     And, again, just to backtrack a

15    second.  The responsibility of McKesson, with respect

16    to suspicious orders, included identifying orders of

17    unusual size; true?  Is that true?

18              A.     As part of the regulation, size is a

19    factor.

20              Q.     Part of your responsibility, is to

21    identify unusual orders of size; correct?

22              MS. HENN:  Objection to form.

23              THE WITNESS:  We were responsible for

24    reporting suspicious orders, which included unusual

25    size.
```

```
 1   BY MR. KENNEDY:

 2         Q.    Sir, I asked you a "yes" or "no"

 3   question.  And we have a limited amount of time here.

 4   And I know you've been instructed to repeat my

 5   question in your answer to take up time.  But if I

 6   asked you a "yes" or "no" question, I want you to

 7   answer it "yes" or "no" so we can move forward with

 8   this and not waste time having you repeat my question

 9   in every answer, as you've been instructed to.

10   All right?

11         MS. HENN:  Counsel, I don't appreciate the

12   kind of --

13         MR. KENNEDY:  But it's the truth.

14         MS. HENN:  -- allegation you're making.

15         MR. KENNEDY:  It's the truth, and you know

16   that.

17         MS. HENN:  You don't know that.  And you're

18   just arguing with the witness and wasting time.

19         MR. KENNEDY:  Are you going to deny that

20   that's the truth?

21         MS. HENN:  I am --

22         MR. KENNEDY:  Are you going to deny that

23   that is the truth of how he has been prepared?

24         MS. HENN:  Counsel, you know you have no

25   right to know anything about how he has been
```

1    prepared.  He is here to answer your questions and

2    has been doing that in good faith, and I suggest you

3    move on and ask the question.

4            MR. KENNEDY:  Absolutely.  Because you know

5    I have no right to know how you have prepared the

6    witness, you know --

7            MS. HENN:  Counsel --

8            MR. KENNEDY:  -- you can get away with

9    instructing him to repeat my question and every

10   answer to waste our seven hours.

11           MS. HENN:  Counsel, you have no basis and no

12   right to make these allegations and waste time in the

13   deposition.

14           Mr. Walker has come from retirement to spend

15   time answering your questions, and he's doing a

16   good-faith job of that.  And I suggest we move on

17   from this tantrum and --

18           MR. KENNEDY:  It's not a tantrum.

19           MS. HENN:  -- pay attention to the job at

20   hand.

21           If you would like to call the Special Master

22   and have him review this transcript, I think he will

23   agree that the witness is doing a fine job of

24   responding to your argumentative questions, and will

25   continue to do that throughout the day.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. KENNEDY:  Nobody answers questions in

 2    that fashion unless they are told to do so.  I

 3    don't -- I don't blame him one bit.  He's a gentleman

 4    coming here from his retirement and having to answer

 5    these questions because of the company that he worked

 6    for and what they did to this country.

 7              What I am objecting to is the way you have

 8    instructed this witness to waste our time.

 9              MS. HENN:  Counsel --

10              MR. KENNEDY:  That's what I am objecting to.

11    So let's be clear.

12              MS. HENN:  Are you done with your speech now

13    so we can move on?

14              MR. KENNEDY:  I all am done, so let's move

15    on.

16              MS. HENN:  Thank you.

17              MR. KENNEDY:  I hope, I just hope that he

18    ceases and stops what he is doing.

19              MS. HENN:  He's not doing anything of the

20    sort.  And I suggest we focus on the task at hand.

21    BY MR. KENNEDY:

22         Q.      Sir, let's now go to California, if

23    we could.  Does this Settlement Agreement, in

24    California state, that:

25              (Reading) From October of '07 through
```

```
 1              June of '07, McKesson-West Sacramento

 2              suffered the theft of significant loss

 3              of controlled substances on 28

 4              separate occasions and failed to

 5              timely submit required theft and loss

 6              reports to the DEA (end of reading)?

 7         Is that what it states here?  Now, this is

 8   California.

 9         A.    That's what it states.

10         MR. KENNEDY:  I want you to look at

11   Exhibit 688.

12         I'm sorry, 687.

13              (Exhibit No. 687 was marked.)

14         MR. KENNEDY:  687 Exhibit starts with Bates

15   -00574724 and ends with -4744.

16         Q.    Mr. Walker, have you seen this

17   document before?

18         A.    Yes, I have.

19         Q.    And this would relate to a meeting of

20   "Directors of Regulatory"?  Is that what it says?

21         A.    Yes.

22         Q.    This would have been in Dallas, March

23   5-6, 2008; true?

24         A.    Yes.

25         Q.    Do you remember who was present at
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    this meeting?

 2            A.     I don't remember specifically all the

 3    participants.  I know that our newly-hired Director

 4    of Regulatory Affairs and my Regulatory staff was

 5    there.  But I don't know who else might have been

 6    there.

 7            Q.     And the purpose of the meeting was

 8    what?

 9            A.     As I recall, the purpose of the

10    meeting was to review with the Regulatory staff and

11    then expanded the overview of the Memorandum of

12    Agreement that we were moving forward with.  We

13    hadn't signed it yet, but we were very close.  So we

14    had the components.

15            Q.     That was the Memorandum of Agreement

16    that we just talked about with the DEA, with the

17    Department of Justice?

18            A.     Yes, the same memorandum.

19            Q.     And it was signed by you, and it was

20    also signed by Mr. Hammergren, that agreement with

21    the DEA; was it not?

22            A.     I'd -- I'd have to look.

23            Q.     Let me ask you this.  Where -- in

24    relation to the company in 2008, where were you with

25    respect to -- Mr. Hammergren was the CEO?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.      Yes, he's the CEO.

 2            Q.      Where did you sit in relation to the

 3    CEO in your responsibility as with the VP of

 4    Distribution and Operations?  Where did you sit in

 5    relation to Mr. Hammergren?

 6            A.      Probably best described as not very

 7    close.  But it was several levels, you know, down in

 8    the organization.

 9            Q.      Would you interact with him?  You

10    were both in San Francisco; right?

11            A.      There were occasions that I

12    interacted with Mr. Hammergren.

13            Q.      What committees did you sit on?  I

14    know that -- we know your title.  But were you a part

15    of any management committees at McKesson?  And I'm

16    talking about the '08 period.

17            A.      Yes.  So in that time frame in my

18    role, I was part of the -- I will use your term --

19    management committee that oversaw -- oversaw the

20    pharmaceutical business.

21            Q.      Okay.  So the management committee

22    that oversaw the pharmaceutical business.  And a

23    significant part of McKesson's business was the

24    pharmaceutical business, I assume?

25            A.      Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1             Q.     And when -- who all was on the
 2   management committee of pharmaceuticals?
 3             MS. HENN:  Objection to form.
 4   BY MR. KENNEDY:
 5             Q.     And, again, we're on the 2008 period.
 6             A.     At a -- at a high level, the
 7   president of U.S. Pharma and then individuals that
 8   had leadership positions in sales, inventory,
 9   vendor-manufacturer relationships, HR, and marketing,
10   I.T.  I mean, sort of --
11             Q.     Ten members?  Twenty members?
12             A.     My best recollection is about ten.
13             Q.     And their responsibility was -- was
14   what this management committee of U.S. -- this is
15   U.S. pharmaceuticals?
16             A.     Yes.  U.S. pharmaceuticals.
17             Q.     And what was the responsibility of
18   this management committee that you sat on?
19             A.     Again, at a high level, it was really
20   to collaborate to provide overall guidance and
21   direction.  And there was, you know, the normal
22   planning/budgeting processes that we went through.
23             Q.     All right.  Let's -- let's go back to
24   this meeting, then, that was -- that was held in 2008
25   with the Directors of Regulatory.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              If you can go to page -- the Bates in the
 2    bottom of -4733.  Did you run this meeting?
 3         A.     Yes, I did.
 4         Q.     Did you prepare these slide
 5    presentations?
 6         A.     Looking at it, I don't specifically
 7    put in the slide presentation.  But it was consistent
 8    with one that I would do.
 9         Q.     All right.  Well, let's look, then,
10    at this page of the 2008 slide presentation.  And
11    this is talking about the 2008 Settlement Agreement
12    that is reached with the Department of Justice and
13    the DEA; correct?
14         A.     Correct.
15         Q.     And this is in relation to what we
16    have been talking about for the last hour; true?
17         A.     Yes.
18         Q.     And does this slide presentation
19    state that -- the first -- the first bullet, "Six
20    different McKesson facilities involved"; right?
21         A.     Yes.
22         Q.     And we went over those six different
23    facilities, I think.  Florida, Maryland, Texas, Utah;
24    correct?  Those are the ones we went through?
25         A.     That's correct.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



     6          Q.     And does it state, Conroe DC -- that

     7    would be Texas, Conroe?

     8          A.     Yes.

    23    BY MR. KENNEDY:

    24          Q.     Sir, at this point in time, these

    25    allegations, which are 2004, 2005, 2006, at that

Highly Confidential - Subject to Further Confidentiality Review

1  point in time were the suspicious order monitoring

2  policies of McKesson national?

3          A.    Yes.  It was a single system.  So the

4  answer is, yes.

5          Q.    So the policies and the procedures

6  that led at least to what you considered to be the

7  allegations of these extraordinary sales, those

8  policies and procedures were the same in Maryland,

9  Ohio, West Virginia, Utah, Florida; would that be

10  true?

11          A.    Yes.

12          Q.    And as the person in charge, sitting

13  on the top of this, did you make every effort to make

14  sure that the implementation of the policies and

15  procedures relating to suspicious order monitoring,

16  that they were being implemented uniformly across the

17  country?

18          MS. HENN:  Objection to form.

19          THE WITNESS:  Yes, we had a system in place

20  that was reporting regularly to DEA suspicious

21  orders.

22  BY MR. KENNEDY:

23          Q.    So the answer would be, yes, you, as

24  the boss, made an effort to make sure that your

25  policies with respect to suspicious orders were being

Highly Confidential - Subject to Further Confidentiality Review

```
 1    implemented uniformly across the country; true?

 2          A.     Yes.

 3          Q.     You didn't want somebody doing

 4    something different in California than they were

 5    doing in Maryland; did you?

 6          A.     The system was one system.  So the

 7    uniform reporting and report generation was the same

 8    across the country.

 9          Q.     And would I be correct that you had

10    meetings amongst the Directors of Regulatory Affairs

11    from different regions, you had meetings and calls to

12    make sure that the policies with respect to

13    suspicious order monitoring were being implemented

14    and used by them uniformly; true?

15          MS. HENN:  Objection to form.  Lacks

16    foundation.

17          THE WITNESS:  Can you clarify the time frame

18    you're referring to.

19    BY MR. KENNEDY:

20          Q.     Again, let's -- the entire time that

21    you were the head of -- excuse me.  You were the head

22    of Regulatory.  You would have meetings and

23    conference calls in an attempt to make sure that your

24    policies with respect to suspicious order monitoring

25    were being implemented uniformly across the country;
```

Highly Confidential - Subject to Further Confidentiality Review

1  right?

2          A.      Generally I would answer that

3  question, yes, Counsel.  The reason I asked you the

4  question about the time frame is at this point this

5  was the initial meeting that I had with newly-hired

6  directors.  So prior to that meeting, they would not

7  have been involved in any of the suspicious orders.

8  So I want to be accurate in my response to you.

9          Q.      Okay.  But from '08 forward, while

10  you were in charge, again, you would have meetings,

11  you would have memos, you would have calls in an

12  attempt to make sure that your policies were being

13  implemented uniformly across the country; true?

14          MS. HENN:  Objection to form.  Compound.

15  Lacks foundation.

16          THE WITNESS:  So subsequent to the 2008

17  agreement with the regulatory team, we had regular

18  conference calls, regular discussions to ensure that

19  we were executing our regulatory responsibilities

20  uniformly across the country; so yes.

21  BY MR. KENNEDY:

22          Q.      You don't want Mr. Oriente in the

23  East doing something different from Mr. McDonald in

24  the West, doing something different than Mr. Gustin

25  in the Midwest; true?

```
 1              A.     Generally that would be accurate.

 2              MS. HENN:  Counsel, we have been going about

 3     an hour and ten minutes.  Take another break.

 4              MR. KENNEDY:  I about to switch to a new

 5     topic.  That's good.

 6              THE VIDEOGRAPHER:  We are going off the

 7     record.  The time is 11:31 a.m.

 8              (Recess taken.)

 9              THE VIDEOGRAPHER:  We are back on the

10     record.  The time is 11:49 a.m.

11     BY MR. KENNEDY:

12              Q.     All right.  Mr. Walker, it's still

13     Eric Kennedy after our break.  I know you might be

14     disappointed, but it's still me.

15              I'm going to switch gears.  I want to talk

16     about the 2008 CSMP, the Controlled Substances

17     Monitoring Program.  You remember that program?

18              A.     Yes.

19              Q.     That was a program that McKesson

20     developed and put into place in 2008; is that true?

21              A.     Yes, that is correct.
```

Highly Confidential - Subject to Further Confidentiality Review



22          Q.     Let me -- let me show you

23     Exhibit 672.  And if you keep this exhibit in front

24     of you even after this series of questions, because

25     we're going to refer back to this quite a bit,

Highly Confidential - Subject to Further Confidentiality Review

```
 1   all right?

 2            A.     That would be fine.

 3                   (Exhibit No. 672 was marked.)

 4   BY MR. KENNEDY:

 5            Q.     This is the McKesson's 2008

 6   Controlled Substance Monitoring Program; is it not?

 7            A.     What this document is, is a -- the

 8   Operations Manual entry and documentation of how to

 9   execute against the Controlled Substance Monitoring

10   Program.  That's probably the best way to describe

11   it.

12            Q.     Was there any document that McKesson

13   has that is more comprehensive and detailed with

14   respect to your suspicious order monitoring system

15   than this document from the period of 2008 to, let's

16   say, 2014?  Any document other than this that is more

17   comprehensive?

18            A.     Probably this would be the most

19   comprehensive document.

20            MS. HENN:  Counsel, just to clarify the

21   record.  You had referred to this as the 2008

22   program, but I see it as a 2013 version.  I just want

23   to make sure the record is clear on that.

24   BY MR. KENNEDY:

25            Q.     Okay.  This is the revised version
```

Highly Confidential - Subject to Further Confidentiality Review

 1    that comes into play in 2008; correct?  The original

 2    version is 2008?

 3            A.    Just a moment, Counsel.

 4            MR. KENNEDY:  I was -- this is when it's

 5    printed, 2013.  When it's printed.

 6            MS. HENN:  If you look on one of the last

 7    pages, it will show you the revisions history.

 8            MR. KENNEDY:  All right.

 9            MS. HENN:  And the last revision I see is

10    from 11-29-2013.

11            MR. KENNEDY:  All right.

12            MS. HENN:  Sorry.  March 20th, 2013.

13    BY MR. KENNEDY:

14            Q.    And this program came into place, as

15    I said before, in 2008; did it not?

16            A.    That is correct.

17            Q.    And it was revised various times, as

18    we have seen, up through '13; correct?

19            A.    Yes.

20            Q.    And if I make reference to something

21    here in my questioning that wasn't in existence in

22    2008, you will let me know; all right?

23            MS. HENN:  Objection to form.

24            THE WITNESS:  I will let you know.

25    ///

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. KENNEDY:

 2        Q.     All right.  So this is the program

 3   that comes into place, the Controlled Substances

 4   Monitoring Program, in 2008; would that be correct?

 5        A.     Yes.  This is the Controlled

 6   Substance Monitoring Program overview that we would

 7   put in our Operations Manual.

 8        Q.     And we were talking about this

 9   threshold system.  And do you see where it says,

10   "Purpose"?

11        A.     Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

 5          MR. KENNEDY:  We will take a look.

 6                    (Exhibit No. 755 was marked.)

 7   BY MR. KENNEDY:

 8          Q.     Showing you Exhibit 755, Bates

 9   -409289 to -299.  Is this the Settlement and Release

10   Agreement and Administrative Memorandum and Agreement

11   between McKesson and the Department of Justice and

12   the DEA?

13          A.     I understand this to be that, yes.

14          Q.     And if you will go to Attachment 6,

15   or Bates No. -298 down at the bottom.  Do you see --

16   under the -291, is what we're looking for.

17          And, again, you were a signatory on this

18   agreement?  Thank you.  Is that correct?

19          A.     Yes, I was.

20          Q.     And -291, on Bates -291, if you will

21   go to that.  And do you see the section, "Obligations

22   of McKesson"?

23          You might want to look at the first four

24   lines.  "Obligations of McKesson."  And these are the

25   obligations under the agreement that McKesson agreed

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to with the Department of Justice and DEA; right?

 2            Does it state:

 3                (Reading) McKesson agrees to maintain

 4                a compliance program designed to

 5                detect and prevent diversion of

 6                controlled substances as required

 7                under the CSA and applicable DEA

 8                regulations.  This program shall

 9                include procedures to review orders

10                for controlled substances.  Orders

11                that exceed established thresholds and

12                criteria will be reviewed by a

13                McKesson employee (end of reading).

14            Do you see that?

15            A.    Yes.

16            Q.    So the agreement with the DEA

17    mentions thresholds; correct?

18            A.    Yes.
```

25            Q.    And it states that you're going to

Highly Confidential - Subject to Further Confidentiality Review

```
 1   make informed decisions at McKesson based upon these

 2   established thresholds; true?  That's what your

 3   program states?

 4           MS. HENN:  You're referring to Exhibit 672?

 5           MR. KENNEDY:  Yeah, I'm talking about the

 6   program.  We're not talking about the --

 7           MS. HENN:  It's a different exhibit.

 8           THE WITNESS:  Okay.  Okay.  Can you

 9   repeat --

10   BY MR. KENNEDY:

11           Q.    Yes, my question is --

12           A.    I'm sorry.  I was still --

13           Q.    -- your agreement with the DEA talked

14   about thresholds; true?

15           A.    Correct.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

8        Q.      All right.  And McKesson -- if we

9    look at this program and how it's divided up, there

10   were basically two different groups of customers.

11   One, the big chain pharmacies, the RNAs, the regional

12   national accounts; correct?

13       A.      That's one large customer group.

14       Q.      And the other major customer group

15   that's defined in your monitoring program were the

16   ISMCs, or the independent small, medium chains;

17   correct?

18       A.      That was also included.  But that

19   wasn't the totality of every registrant that we

20   provided controlled substance to.  So the two groups

21   that you mentioned in addition to that, would be what

22   we called our hospital or MHS group.  So these were

23   hospitals, institutions, surgery centers.  And then

24   probably the fourth big category was the federal

25   government.

Highly Confidential - Subject to Further Confidentiality Review

1           Q.     All right.  I'm going to talk about

2      the two.  I want to talk about the big chain

3      pharmacies, the RNAs; all right?  And I want to talk

4      about the smaller chains, the independents and the

5      smalls; all right?

6           A.     Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

3                    (Exhibit No. 676 was marked.)

4     BY MR. KENNEDY:

5            Q.     Let me show you Exhibit -- you

6     were -- you don't think that's accurate, but you

7     were -- you were the boss at this point in time in

8     '08; correct?

9            A.     Yes.

10           Q.     I'm going to show you Exhibit 676.

11    And that's Bates -542108 to -110.

12           This is an email from Tom McDonald.  Do you

13    see that?  The first page.

14           A.     Yes.

15           Q.     And who was Tom McDonald in this time

16    period of 12 -- or excuse me, 2012?  Who was he?

17           A.     Tom McDonald was the Director of

18    Regulatory Affairs for the Western part of the

19    United States.

20           Q.     And so he was, what, one of four

21    directors; true?  Or one of five at that point?

22           A.     I don't recall specifically whether

23    we had four or six at the time.  But one of four or

24    six.

25           Q.     And he's sending an email to an

Highly Confidential - Subject to Further Confidentiality Review

```
 1    extraordinarily large group of people.  Can you --

 2    are you able to kind of look through that and say

 3    this is -- who this group is?

 4            A.     Based on the names here, this is a

 5    combination of our sales and operations teams in the

 6    West Region.

 7            Q.     And you're copied on this; right?

 8    Donald Walker, CC.

 9            A.     Yes, I am.

10            Q.     So you would have gotten this; right?

11            A.     Yes.

12            Q.     Subject, "Ongoing due diligence, new

13    questionnaires and dispensing data."  Do you see

14    that?

15            A.     Yes.

16            Q.     It says high -- importance is high;

17    right?

18            A.     Yes.

19            Q.     Look to the next page, if you would,

20    -109, all the way toward the bottom, the paragraph

21    that starts with, "Additionally."

22            A.     Can I have a moment just to review

23    the rest of the document?

24            Q.     Sure.

25            A.     I'm not --
```

Highly Confidential - Subject to Further Confidentiality Review



1             (Witness reviewing document.)

2        A.    Okay.

3        Q.    Look at the paragraph.  This is

4   Mr. McDonald.  You're copied on this.  The paragraph

5   that starts, "Additionally."

6             He states:

Highly Confidential - Subject to Further Confidentiality Review

8    BY MR. KENNEDY:

9         Q.    And tell the jury, dispensing data

10   from a pharmacy, what is that?

11        A.    The data that a pharmacy may or may

12   not provide was data around the quantities of a given

13   pharmaceutical or medicine that they would dispense.

14   So it was a summary document.

15        Q.    So dispensing data is going to tell

16   McKesson how much the CVS store on Main Street, how

17   much Oxycontin they are selling; right?  That's what

18   it would tell McKesson; correct?

19        A.    I can't answer that accurately,

20   Counsel, because your example of a CVS store would

21   not be an example of that.

22        Q.    All right.  Okay.  Take CVS out.

23        A.    I'm trying to answer you accurately.

24        Q.    Let's talk about an independent

25   pharmacy on Main Street.  They provide you with

Highly Confidential - Subject to Further Confidentiality Review

1   dispensing data.  It's going to tell McKesson how

2   much Oxycontin that they are selling, actually

3   dispensing, filling prescriptions and dispensing;

4   that's what dispensing data is?

5          MS. HENN:  Objection to form.

6          THE WITNESS:  Dispensing data should

7   represent that, yes.

8   BY MR. KENNEDY:

9          Q.    So Mr. McDonald, head of the Western

10  Region, in this email he says:

Highly Confidential - Subject to Further Confidentiality Review



11    BY MR. KENNEDY:

12            Q.      I understand.  We know that to be

13    true, because we're reading the document.  I'm asking

14    about your opinion.  You were the boss.  You were

15    above Mr. McDonald.  You were the one that was in

16    charge of the implementation of the policies and

17    procedures at McKesson.

18            Do you agree, Mr. Walker, as being the boss?

19    Do you agree with his statement?

20            MS. HENN:  Objection to form.

21    BY MR. KENNEDY:

22            Q.      And he states:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

7          Q.      And he's in charge -- Mr. McDonald is

8     in charge of the Western Region.  How many states did

9     that include?  What states?

10         A.      If there were just four of the DRAs

11    at the time, he would have had the western states,

12    and from Colorado, north to Wyoming, south to

13    Arizona -- I can't remember -- New Mexico west.

14         Q.      California?

15         A.      California.

16         Q.      Arizona?

17         A.      California, Arizona, Oregon,

18    Washington, Colorado, New Mexico.

19         Q.      He's in charge of thousands of

20    pharmacies, thousands of customers; is he not?

21         A.      There -- there were a lot of

22    pharmacies in the west.

Highly Confidential - Subject to Further Confidentiality Review

 6    BY MR. KENNEDY:

 7           Q.    All right.  We will look at documents

 8    in a minute.  But I'm going to write that down.

 9    All right.

10           So I wrote dispensing -- I wrote your name,

11    Mr. Walker, "Dispensing data does not include cash

12    payment information."  Is that your -- is that your

13    testimony?

14           MS. HENN:  Objection to form.

15           THE WITNESS:  That was not my testimony.

16    What I said is your question statement was not

17    accurate.

18    BY MR. KENNEDY:

19           Q.    If you get dispensing data from a

20    pharmacy, you're going to be able to see cash

21    payments; are you not, sir?

22           A.    Not necessarily.

23           Q.    In many instances will you be able to

24    see that, sir?

25           A.    If -- if the pharmacist chooses to

Highly Confidential - Subject to Further Confidentiality Review

1    enter a cash payment in their pharmacy terminal

2    system where this data originates, then, yes, it will

3    show up.

4          Q.    All right.

5          A.    If he chooses not to do that, it

6    won't show up.

7          Q.    All right.  And so you're getting

8    dispensing data.  And if the pharmacist is putting

9    cash payments in, all right, you're going to be able

10   to see cash payments -- correct? -- from what you

11   just said, if the pharmacist is entering it; true?

12         MS. HENN:  Objection to form.

13   BY MR. KENNEDY:

14         Q.    True?

15         A.    If the pharmacist enters it into the

16   pharmacy terminal system, we would see that.

17         Q.    And a certain percentage of cash

18   payments for opioids for narcotics is evidence of

19   diversion; is it not?

20         MS. HENN:  Objection to form.

21         THE WITNESS:  The DEA identified cash

22   payment percentage as a potential indicator.

23   BY MR. KENNEDY:

24         Q.    All right.  And if you get dispensing

25   data, as indicated in this memo, it's going to tell

Highly Confidential - Subject to Further Confidentiality Review

1    you who the prescribing doctors are; is it not?

2        MS. HENN:  Objection to form.

3        THE WITNESS:  If the data is complete, we

4    would see the doctors -- generally see the doctors in

5    the dispensing data.

6    BY MR. KENNEDY:

7        Q.    And that would allow McKesson to

8    determine whether a small group of doctors is

9    prescribing a large amount of opioids; correct?  You

10   would be able to do that if you had the dispensing

11   data; true?

12       MS. HENN:  Objection to form.

13       THE WITNESS:  I'm not sure I can answer that

14   accurately.  Generally, if the physicians are in

15   there and the data was complete, not -- our challenge

16   was, is the data wasn't always complete.  So I'm

17   reluctant to say that that is accurate.

18   BY MR. KENNEDY:

19       Q.    If you have accurate prescribing

20   data, McKesson would be able to determine whether a

21   small group of doctors is ordering a large percentage

22   of the opioids from that pharmacy; correct?  You're

23   able to do that?

24       A.    If the data was accurate, yes.

25       Q.    And the DEA told you back in '06 that

Highly Confidential - Subject to Further Confidentiality Review

1    that's one of the things that you should look for;

2    true?  Back in '06 they told you?

3           MS. HENN:  Objection to form.  Lacks

4    foundation.

5           THE WITNESS:  Repeat your question, Counsel.

6    BY MR. KENNEDY:

7           Q.    And the DEA told you back in 2006

8    that's one of the things you should look for, a small

9    number of doctors ordering a large percent of the

10   opioids from a pharmacy?  That's one of the things

11   you should look for?

12          A.    My recollection of the document, the

13   documents state that is one of the areas that they

14   outlined.

15          Q.    And if you had the doctor's name from

16   the prescribing -- or the prescribing data, you

17   could -- McKesson could research as to whether or not

18   this physician was having problems with any medical

19   board; couldn't you?

20          MS. HENN:  Objection to form.

21   BY MR. KENNEDY:

22          Q.    If you had that data?

23          A.    I believe, Counsel -- I didn't

24   specifically make any type of inquiries myself, but

25   my understanding was, is that we -- you had the

1  ability to identify any doctors if, in fact, there

2  was documentation on state medical board sites.

3          Q.     And if you got the dispensing data,

5  you can now actually see if a pharmacy is purchasing

6  opioids from other distributors, other than just

7  McKesson; correct?

8          MS. HENN:  Objection to form.  Lacks

9  foundation.

10         THE WITNESS:  I don't recall that we had the

11  ability or felt we had the ability to determine

12  multiple distribution -- distributors supplying a

13  pharmacy through dispensing data.

14  BY MR. KENNEDY:

15         Q.     Let me ask you this.  If the

16  dispensing data says that a particular pharmacy is

17  dispensing, selling 1,000 Oxycontins in a month, and

18  your records say you're selling them only 500, then

19  you can reasonably conclude that they are getting

20  Oxycontins from somebody other than just McKesson;

21  right?

22         MS. HENN:  Objection.  Calls for

23  speculation.

24         THE WITNESS:  Counsel, there are so many

25  variables in pharmacy behavior, in terms of inventory

Highly Confidential - Subject to Further Confidentiality Review

1   management, again, it's very difficult for me to

2   answer accurately whether that could take place.

3   BY MR. KENNEDY:

4        Q.    If you have the dispensing data,

5   McKesson would be able to determine the percentage of

6   controlled substances against total prescriptions?

7   They would be able to calculate that, wouldn't they?

8        MS. HENN:  Objection.  Lack of foundation.

9   Speculation.

10       THE WITNESS:  Counsel, I'm having a

11  difficult time answering the question.  I think it's

12  an oversimplification of analysis of the value of

13  this dispensing data.

14       As I stated, it was a very valuable tool to

15  us, but it was a single tool.  We had other data

16  points that we needed to understand.

17  BY MR. KENNEDY:

18       Q.    Isn't that exactly one of the things

19  that the DEA told McKesson in 2006 you ought to be

20  looking to, the percentage of controlled substances

21  that a pharmacy was selling against its total

22  prescription sales?  Isn't that one of the specific

23  items that DEA informed you in 2006 you should be

24  looking at?

25       MS. HENN:  Objection.  Lack of foundation.

Highly Confidential - Subject to Further Confidentiality Review

```
1   BY MR. KENNEDY:

2           Q.      Correct?

3           A.      My recollection, was that the

4   percentage of controlled substance sales were a point

5   of indication.

6           MR. KENNEDY:  All right.  So we've got
```

look to another region, all right?  Let's look to

Exhibit 680.

```
11                  (Exhibit No. 680 was marked.)

12          MS. HENN:  Thank you.

13  BY MR. KENNEDY:

14          Q.      Exhibit 680 is -492821 to -492823.

15  This is an email from Dave Gustin; correct?

16          A.      Yes.

17          Q.      Tell the jury who Dave Gustin was?

18          A.      Dave Gustin was the Director of

19  Regulatory Affairs, DRA, for the Central Region.

20          Q.      And the Central Region, how many

21  states are in the Central Region?

22          A.      I don't know specifically the number

23  of states going from memory here, but it's basically

24  the Midwest, stretching down into Kentucky.  So Iowa,

25  Nebraska, Minnesota, Illinois, Indiana.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.      Well, between Mr. McDonald now and

2     Mr. Gustin, they probably account for more than half

3     of the country; would that be right?

4              A.      Certainly half the geography.

5              Q.      Thousands of pharmacies; right?

6              A.      There would be a large number of

7     pharmacies in that area.

8              Q.      And Mr. Gustin -- now, this is

9     1-16-12.  This is about the same time of McDonald's

10    email talking about dispensing data.  And can you

11    tell us who's this large group of people that he

12    seems to be sending this email to?

13             A.      This appears to be the North Central

14    Region Sales and Operations teams.

15             Q.      Look at the next page, if you would.

16    See on the next page, a January 5, 2012, email from

17    Dave Gustin?

18             A.      Yes.

19             Q.      Another large group of people?

20             A.      Yes.

21             Q.      In the first paragraph does he state:
```

Highly Confidential - Subject to Further Confidentiality Review



9        Q.      So he's talking about requirements,

10   and he's talking about the Controlled Substances

11   Monitoring Program of 2008; true?

12        A.      Yes.

13        Q.      And that program applied nationally;

14   did it not?

15        A.      Yes, it did.

16        Q.      Look at the next page, if you would,

17   page -23.  In big capital letters, "Dispensing data."

18   Do you see that?

19        A.      Yes.

20        Q.      Now, this is Mr. Gustin, and he is

21   the Director of Regulatory Affairs for the entire

22   North Central Region of the United States; true?

23        A.      Yes.

24        Q.      And he states, and he seems -- maybe

25   he's parroting Mr. McDonald.  But now he is writing

Highly Confidential - Subject to Further Confidentiality Review

1    to his region:





7    BY MR. KENNEDY:

8            Q.     All right.  Well, look at -- look at

9    your Controlled Substances Monitoring Program, if you

10   would, the program you put in place in 2008, which is

11   Exhibit 672?  Back to 672, if you could.

12           MS. HENN:  The 2013 version?

13           MR. KENNEDY:  Yes.

14           THE WITNESS:  I see it.

15   BY MR. KENNEDY:

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. KENNEDY:

 2          Q.    Let's go back, then, if we could, to

 3   Exhibit 680.  This is Mr. Gustin, from the North

 4   Central Region; correct?

 5          A.    Yes.

 6          Q.    And he's writing his region.  And if

 7   we look to bullet point 2, he states:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



24          MR. KENNEDY:  Let's look at 681,

25    Exhibit 681.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (Exhibit No. 681 was marked.)

 2  BY MR. KENNEDY:

 3         Q.     Showing you what has been marked as

 4  Exhibit 681, which is -490953 to -54.  Now, this is
```

<br>

<br>

```
 7  we have an email by Joe Lumpkin.

 8             Who was Joe Lumpkin?

 9         A.     Joe Lumpkin was one of two of our

10  DRAs that we assigned to the Northeast Region.

11         Q.     And, now, on November 30, 2012, he

12  sends an email to a large group of people; does he

13  not?

14         A.     Yes.

15         Q.     And he says, "Northeast Team," right,

16  at the beginning?

17         A.     Yes.

18         Q.     And he says, "As of December 1,

19  please be aware it is required for any ISMC" -- and

20  that would be the independent small, medium chains;

21  right?

22         A.     Yes.

23         Q.     He says:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16    BY MR. KENNEDY:

17              Q.     And these are exactly the things that

18    you told us the DEA said to look out for in 2006;

19    right?

20              MS. HENN:  Objection.  Lacks foundation.

21    BY MR. KENNEDY:

22              Q.     It's now 2012.  The DEA said to

23    McKesson in 2006, these are some of the things to

24    look out for?

25              MS. HENN:  Same objection.

1    BY MR. KENNEDY:

2        Q.    Correct?

3        A.    I'm not -- I'm not sure I understand

4    your question, Counsel.  The DEA outlined the items

5    such as this in 2006, that is correct.

6        Q.    And my point is, sir, it's six years

7    later -- it's 2012 -- and the entire Eastern Region

8    is saying, as of December 1, 2012, six years after

9    these have been outlined by the DEA, we're going to

10   start doing this; correct?

11       MS. HENN:  Objection.  Mischaracterizes the

12   document.  Lack of foundation.

13       THE WITNESS:  I wouldn't agree with that

14   statement.  We had a number of tools we used

15   throughout the time that we executed CSMP.

16   BY MR. KENNEDY:

17       Q.    Sir, other than the dispensing data,

18   where are you going to get the names of the doctors

19   prescribing medications?  Where are you getting the

20   names?

21       MS. HENN:  Objection to form.

22   BY MR. KENNEDY:

23       Q.    Tell us.

24       A.    I'm not aware of all the potential

25   sources, but -- that we could get for, you know,

Highly Confidential - Subject to Further Confidentiality Review

```
 1   doctors prescribing.

 2          Q.      Other than the dispensing data, where

 3   are you going to find out what's getting paid for in

 4   cash, sir?  Like the DEA said six years earlier you

 5   ought to look for, where are you going to find that

 6   information without the dispensing data?

 7          MS. HENN:  Objection to form.  Calls for

 8   speculation.

 9          THE WITNESS:  I really don't know.  I

10   mean --

11   BY MR. KENNEDY:

12          Q.      Tell me, how are you going to run

13   percentages of controlled substances at a particular

14   pharmacy versus total prescriptions without

15   dispensing data, sir?  Tell me that.  Where are you

16   going to get it?

17          MS. HENN:  Objection to form.

18          THE WITNESS:  Again, I would -- I would

19   speculate.  But I would like to clarify that DEA's

20   guidance in 2006 was percentage of sales of

21   controlled substances to total pharmacy sales.

22   BY MR. KENNEDY:

23          Q.      And where are you going to get that

24   information other than dispensing data?

25          A.      We would have that information from a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    sales standpoint.

 2            Q.     Your sales standpoint, not the total

 3    sales; correct?  Your sales --

 4            MS. HENN:  Objection.  Calls for

 5    speculation.

 6    BY MR. KENNEDY:

 7            Q.     -- but not the total sales of a

 8    pharmacy; true?

 9            MS. HENN:  Calls for speculation.

10            THE WITNESS:  Again, we -- we could look at

11    the sales record as a percentage of sales to a given

12    pharmacy.

13    BY MR. KENNEDY:

14            Q.     McKesson's data, not the pharmacy's;

15    true?

16            MS. HENN:  Objection to form.

17    BY MR. KENNEDY:

18            Q.     True?

19            A.     This was McKesson's data.

20            Q.     Right.  You can't do it for the

21    pharmacy because you don't know how many different

22    folks they are buying from; right?

23            MS. HENN:  Objection to form.  Calls for

24    speculation.

25    ///
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. KENNEDY:

 2          Q.      Correct?

 3          A.      Again, I don't know that I can answer

 4   because there's a number of different tools that we

 5   could use to understand if a pharmacy was just our

 6   customer.

 7          Q.      Tell me where in 2012, without the

 8   dispensing data, you can find out the total amount of

 9   oxycodone being sold by a particular pharmacy?  Tell

10   me.

11          MS. HENN:  Objection to form.  Calls for

12   speculation.

13          THE WITNESS:  I don't know.

14   BY MR. KENNEDY:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20          MS. HENN:  I think we are going to have to

21      go off the record.

22          THE VIDEOGRAPHER:  We are going off the

23      record.  The time is 12:44 p.m.

24          (Lunch recess taken at 12:44 p.m.)

25                  --oOo--

```
 1    AFTERNOON SESSION                          1:19 P.M.

 2                        --o0o--

 3          THE VIDEOGRAPHER:  We are back on the

 4    record.  The time is 1:19 p.m.

 5    BY MR. KENNEDY:

 6          Q.    All right.  Mr. Walker, we've talked

 7    a bit about the independents, the small, medium, the

 8    smaller chains.  I want to switch gears now and talk

 9    to you about what McKesson called the RNAs, or the

10    regional national accounts; all right?

11          A.    Yes.

12          Q.    You're familiar with RNA, regional

13    national account terminology?

14          A.    The -- yes, I am.  The correct

15    terminology is retail national account.

16          Q.    I'm sorry.  Those would be the big

17    chains?

18          A.    Big chains.

19          Q.    The CVS, the Walgreens, the Walmarts,

20    the Rite Aids; correct?

21          A.    That size chain, yes.

22          Q.    Those are big customers; we agree?

23    The big chains were big customers to McKesson?

24          A.    Yes.

25          Q.    Probably over a billion dollars worth
```

Highly Confidential - Subject to Further Confidentiality Review

1   of business with big -- big national pharmacies?

2          MS. HENN:  Objection.  Lacks foundation.

3          THE WITNESS:  I don't recall the specific

4   sales volume, but they are large -- they were large

5   customers.

6   BY MR. KENNEDY:

7          Q.    I mean, would you disagree if I were

8   to say that probably the majority of McKesson's

9   controlled substance sales were being made to the big

10  retail national accounts?

11         MS. HENN:  Objection to form.  Lacks

12  foundation.

13         THE WITNESS:  I actually cannot say because

14  it would be speculative, just due to the business

15  models of particularly some of the hospital accounts.

16  BY MR. KENNEDY:

17         Q.    All right.  Anyway, the big national

18  accounts made up 16,000-plus individual pharmacies;

19  does that sound right?

20         MS. HENN:  Objection to form.

21         THE WITNESS:  I don't recall specifically

22  the number of pharmacies that were involved in that

23  segment.

24  BY MR. KENNEDY:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13    BY MR. KENNEDY:

14           Q.     Now, with respect to threshold

15    increases.  We talked about threshold increases in

16    the smaller chains.  Let's talk about threshold

17    increases with respect to the big chains.

18           From time to time McKesson would increase

19    thresholds for pharmacies that were part of a large

20    retail account; correct?

21           MS. HENN:  Objection to form.

22           THE WITNESS:  Yes, we -- we would increase

23    thresholds.

24    BY MR. KENNEDY:

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



17        Q.      Who is Elaine Thomet, if I'm saying

18   that right?

19        A.      I'm sorry.  Can you spell the last

20   name.

21        Q.      T-h-o-m-e-t.

22        A.      Thomet.

23        Q.      Thomet.  I am very sorry.  I wasn't

24   even close.

25              Who is she or who was she in this period of

Highly Confidential - Subject to Further Confidentiality Review

1    '08 to, let's say, '14, 2014?

2           A.    My recollection is Elaine and her

3    responsibilities during that time frame, she worked

4    in our retail national account support team.  She was

5    a -- as I understood it -- I don't remember her

6    title -- was primarily a liaison, you know, from the

7    retail national account support team into operations

8    and others.

9           Q.    Okay.  She would liaison into

10   regulatory?

11          A.    On occasion, I believe that's

12   correct.

13          MR. KENNEDY:  Let's look at Exhibit 677.

14                (Exhibit No. 677 was marked.)

15          MR. KENNEDY:  And that is Bates -52132 to

16   -375.

17          Q.    I want to look at an email, the top

18   email on the first page, -72.

19          A.    I haven't seen this document before.

20   Could I just --

21          Q.    Sure.

22          A.    -- have a moment to familiarize

23   myself?

24          Q.    Please.

25          A.    Thank you.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (Witness reviewing document.)

 2         A.    Okay.

 3         Q.    If you want to look -- look to page

 4   -74.  That would be the third page in.

 5         And you remember, we've had a discussion

 6   about dispensing data and whether or not that was

 7   required for an increase in a drug threshold for the

 8   smaller independent accounts.  Do you recall that

 9   discussion we had?  Correct?

10         A.    I'm sorry.  Repeat your question.

11         Q.    We've -- we've had a discussion --

12   I've asked you about the requirement for dispensing

13   data in -- when increasing the threshold of an

14   independent or smaller chain.  You recall that

15   discussion?

16         A.    Yes.

17         MS. HENN:  Objection to form.

18   BY MR. KENNEDY:

19         Q.    So I want to have that discussion now

20   with respect to the regional national accounts.

21         If you look to page -74, down at the bottom,

22   you will see a November 1, 2012, email, it looks like

23   from Perry Anderson, where it says:

24              (Reading) Hi, Dan, quick question.

25              See Frank's email below regarding CSMP
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 threshold adjustments (end of

 2                 reading).

 3            That's Controlled Substance Monitoring

 4     Program; right?

 5            A.    Yes.

 6            Q.    And they are asking about threshold

 7     adjustments.  And he says, "Is it common -- common

 8     practice in RNA" -- that would be the big chains;

 9     right?  Right?  RNA?

10            A.    Yes.

11            Q.    (Reading) Is it common practice

12                 in RNA to change thresholds without

13                 asking for this similar backup, or is

14                 it more or less done by RNA support

15                 team behind the scenes for RNA

16                 accounts (end of reading)?

17            Now, go back to -74.  And here seems to be

18     the response.  Dan Jeffries responds:

19                 (Reading) We do -- we adjust at the

20                 request of the customer, but we don't

21                 ask for dispense data (end of

22                 reading).

23            Do you see that?

24            A.    Yes.

25            Q.    He's talking about the regional
```

Highly Confidential - Subject to Further Confidentiality Review

1   national accounts.  Was that the policy -- and it's

2   2012 -- that with respect to increases in the

3   thresholds for pharmacies that were a part of the big

4   chains, you did not ask for dispensing data?

5            MS. HENN:  Objection to form.

6            THE WITNESS:  Generally we did not ask for

7   any dispensing data from our retail national account

8   pharmacies.

9   BY MR. KENNEDY:

10           Q.    Go to page -72, the first page.  Now,

11  this is an email from Elaine Thomet on 11-2-12.  And

12  she says:

13                (Reading) If it helps, I will add some

14                clarification.  What Frank may not

15                understand is that with RNA, the big

16                accounts, we are able to establish the

17                regulatory relationship with their

18                headquarters and not at store level

19                (end of reading).

20           Now, that's what we were talking about.  You

21  were addressing the headquarters as opposed to the

22  individual stores when it came to the big national

23  accounts; true?

24           A.    We used the headquarters.

25           Q.    She then says:

```
 1                    (Reading) After their thresholds have

 2                    been initially set up, based on their

 3                    required usage data or historical

 4                    data, if they were a customer back

 5                    when we implemented the CSMP, then any

 6                    time they exceed their threshold, we

 7                    review it and working with their

 8                    headquarters and our regulatory team,

 9                    determine if the store should be

10                    allowed an increase.  If the HQs

11                    agreed, then the presumption is made

12                    that they have done their due

13                    diligence.  It also means that we are

14                    not talking to the direct purchaser --

15                    that's the individual pharmacy -- but,

16                    rather, a representative from

17                    headquarters, preferably in Regulatory

18                    Loss Prevention, Asset Control,

19                    et cetera (end of reading).

20            Do you see that?

21            A.    Yes.

22            Q.    And was that basically then the

23   practice?  If headquarters said a threshold increase

24   is okay, there was at least -- in the words of

25   Ms. Thomet, there was a presumption that the
```

Highly Confidential - Subject to Further Confidentiality Review

1    headquarters of the national chain had done their due

2    diligence -- had done their due diligence; is that

3    correct?

4              A.    It is -- it is correct that we

5    utilized the retail national chains' headquarters

6    regulatory and oversight groups to assist us in

7    ensuring that any threshold increases were

8    appropriate.

9              Q.    And you would assume that they did

10   their due diligence when saying a threshold increase

11   is okay, according to -- at least to Elaine Thomet?

12             A.    Based -- based on our discussions

13   with headquarters and understanding what their

14   internal procedures were and how they conducted

15   oversight of their pharmacies, yes.

16             Q.    No prescribing data was required to

17   grant a threshold increase for the pharmacy at a

18   large chain; correct?  We just went through that.

19   True?

20             A.    No.

21             MS. HENN:  Objection to form.

22   BY MR. KENNEDY:

23             Q.    And so McKesson, when increasing the

24   threshold of a pharmacy at a large chain, had no

25   direct knowledge of the physicians who were writing

Highly Confidential - Subject to Further Confidentiality Review

1   the prescriptions at the pharmacies for the large

2   national accounts; true?

3          A.     That is -- that is correct.

4          Q.     You weren't able to check to see if

5   any of these physicians had an issue with a medical

6   board in the large national chains, correct, because

7   you didn't have their identity?  Couldn't do that;

8   true?

9          MS. HENN:  Objection to form.  Calls for

10  speculation.

11  BY MR. KENNEDY:

12         Q.     Correct?

13         A.     It is probably more accurate to state

14  that we did not have the detail of their -- of their

15  prescriptions and the items that would be included in

16  that prescription data.

17         Q.     All right.  And that would include

18  the identity of the doctor; correct?

19         A.     Presumably, yes.

20         Q.     It would include the data that would

21  allow you to accurately run percentages on controlled

22  purchases versus non-controlled purchases; correct?

23         MS. HENN:  Objection to form.

24         THE WITNESS:  We wouldn't have that ability.

25  ///

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

 7            Q.      And the DEA had informed McKesson,

 8    had they not, that a list of pain clinics were a big

 9    problem in our country?  They had told you that; had

10    they not?

11            MS. HENN:  Objection to form.  Lacks

12    foundation.

13            THE WITNESS:  In a prior meeting and some

14    communications, the DEA identified pain clinics.

15            MR. KENNEDY:  Let me show you Exhibit 752.

16                  (Exhibit No. 752 was marked.)

17            MR. KENNEDY:  752 is Bates -498169 to -183.

18            Q.      This is an email from you; is it not?

19            A.      Yes.

20            Q.      Dated May 2nd, 2012; is that right?

21            A.      Yes.

22            Q.      And it looks like you're sending it

23    out to a variety of the Directors of Regulatory

24    Affairs and folks in somewhat management positions as

25    it relates to Regulatory Affairs; right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            MS. HENN:  Counsel, let me just ask the

 2    videographer, could you please close the door.  Thank

 3    you.

 4            Could you go ahead and repeat that.  I'm

 5    sorry.

 6            MR. KENNEDY:  Yes.

 7            Q.     This email is being sent out by you

 8    in 2012, it looks like, to the DRAs, the Directors of

 9    Regulatory Affairs, and -- maybe just Directors of

10    Regulatory Affairs; right?

11            A.     It appears to be restricted to the

12    regulatory team.

13            Q.     And if you want to look at -174.

14    And, again, this is something -- is this a slide,

15    sir, that you would have prepared?

16            A.     Yes.

17            Q.     And at -174, in your slide show, "How

18    the DEA sees it."  Does it state:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

6            MS. HENN:  Objection.  Asked and answered.

7   BY MR. KENNEDY:

8            Q.     Is that your slide?

9            A.     This is -- this is a slide that I

10   created.

Highly Confidential - Subject to Further Confidentiality Review



15          Q.      So the big chain pharmacies represent

16    16,000 individual pharmacies.  And I can't remember

17    if we agreed to that number.  Does that sound about

18    right, 16,000 individual pharmacies for the big

19    national chains?

20          MS. HENN:  Objection to form.  Lacks

21    foundation.

22          THE WITNESS:  I didn't -- I didn't agree or

23    disagree.  I just don't know.

24    BY MR. KENNEDY:

Highly Confidential - Subject to Further Confidentiality Review

10    BY MR. KENNEDY:

11         Q.    Well, let me ask, did McKesson ever

12    think that -- let's say, for example, did they ever

13    think that CVS would report themselves to the DEA?

14         A.    I'm not sure I understand that

15    question.

16         Q.    Did McKesson ever believe that CVS,

17    for example, CVS headquarters, would report one of

18    their own pharmacies to the DEA?

19         A.    I can't answer the question.  I

20    don't -- I don't know.

21         Q.    I mean, did CVS ever sit there and

22    say, well, we think that CVS headquarters will

23    contact the DEA and tell them we have a pharmacy in

24    West Virginia that is violating the law, and we think

25    you should close them down?  Do you think that they

Highly Confidential - Subject to Further Confidentiality Review

```
1    would ever do that?

2           MS. HENN:  Objection to form.  Calls for

3    speculation.

4           THE WITNESS:  Again, I can't answer what CVS

5    would or would not do with information that they

6    received.

7    BY MR. KENNEDY:
```

Highly Confidential - Subject to Further Confidentiality Review

12          MR. KENNEDY:  Give me 684.

13                 (Exhibit No. 684 was marked.)

14          MR. KENNEDY:  I am going to show you

15     Exhibit 684, which is McKesson -513746.

16     BY MR. KENNEDY:

17          Q.     This is an email from Elaine Thomet.

18     And I believe her title was Director of RNA Support

19     Solutions.  Does that sound right?

20          A.     Hang on just a moment.  Let me take a

21     real quick look.

22                 To answer your first question, her title is

23     Director of Business Process.

24          Q.     Oh, right.  So she would understand

25     the process of what you folks were doing?  That's

Highly Confidential - Subject to Further Confidentiality Review



1    kind of what her job was, the process?

2             A.    I believe that she understood our

3    processes.

4             Q.    She sends an email on January 2,

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



23        MR. KENNEDY:  Let me show you Exhibit 685.

24             (Exhibit No. 685 was marked.)

25        MR. KENNEDY:  685 is Bates -498295 to -307.

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.      Do you remember this document?

2              A.      Yes, I do.

3              Q.      And this is a PowerPoint that was put

4    together for presentation to the DEA; true?

5              A.      The date of this document is -- and

6    my understanding of this document, based on the date

7    here, is that it was a document that we put together

8    for a review with various DEA field offices and DEA.

9              Q.      Did you prepare this?

10             A.      I prepared the original, yes.

11             Q.      Go to page -302, if you would.  See

12   where it says, "Level 1 Review"?

13             A.      Yes.

14             Q.      That's what we've been talking about

15   with respect to the large chain pharmacies; right?

16             A.      Yes.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13          MR. KENNEDY:  Give me 682.

14                    (Exhibit No. 682 was marked.)

15          MR. KENNEDY:  Let me show you Exhibit 682.

16          Q.     This is a graph of data that we put

17   together, all right?  And it is based upon -- I will

18   tell you, it is based upon McKesson's transaction

19   data and sales that they provided to us.  All right?

20          And so let me ask you, Rite Aid, was that a

21   big national account, one of the big retail RNA

22   accounts at McKesson?

23          A.     Rite Aid was and is a large customer

24   of McKesson.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

3              MS. HENN:  And, Counsel, I will just note

4      for the record that this data is all produced highly

5      confidential, and this should be marked when you

6      create exhibits with that information.

7              So we will ask that the court reporter mark

8      this 682 as highly confidential.

9      BY MR. KENNEDY:

Highly Confidential - Subject to Further Confidentiality Review



19          MR. KENNEDY:  Give me 678.

20                  (Exhibit No. 678 was marked.)

21    BY MR. KENNEDY:

22          Q.    I am going to show you Exhibit 678,

23    which we don't have Bates numbers on.  Let me give

24    you this.  It's 445881-4.

25          If you go down to the bottom, this is an

Highly Confidential - Subject to Further Confidentiality Review

```
 1    email by Elaine Thomet again, July 17, 2014.  I want

 2    to see if you agree with this.  Do you see the second

 3    page?

 4          A.    Hang on just a moment.  Let me just

 5    take a quick look.

 6          Okay.  Counsel, you directed me to the

 7    second page?

 8          Q.    Yes.  Look at the second page, the

 9    big letters.  I mean, you just looked at it.  She

10    is -- she's talking about setting up informational

11    phone calls; is she not?

12          A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review



19    BY MR. KENNEDY:

20          Q.    Well, let me just -- well, first,

21    tight controls.  You understand CVS was fined

22    $130 million with respect to violations of the

23    Controlled Substances Act, $130 million fines, as you

24    tell us they had these very, very tight controls?

25    You knew that in your position, didn't you?

```
 1              MS. HENN:  Objection to form.  Lacks
 2      foundation.
 3      BY MR. KENNEDY:
 4              Q.    You knew that; did you not?
 5              A.    I was aware CVS had paid some
 6      penalties.  I don't recall the amount nor do I recall
 7      the events or the issues.
```

13              Q.    And proxy means you are giving
14      someone else authority to act for you; is that what
15      it means?
16              MS. HENN:  Objection to form.  Calls for
17      speculation.
18              THE WITNESS:  Generally, I would understand
19      that.
20      BY MR. KENNEDY:

Highly Confidential - Subject to Further Confidentiality Review



24          Q.      It's 2014, all right, when she is

25    saying that.  2014 is the date of this, is it not,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    for this educational webinar?

 2              MS. HENN:  Objection to form.

 3    BY MR. KENNEDY:

 4         Q.     Is that right?

 5              MS. HENN:  Mischaracterizes the document.

 6    BY MR. KENNEDY:

 7         Q.     2014?

 8         A.     The document is dated in 2014.
```

19         Q.     And it's eight years after the DEA

20    told McKesson this is what diversion looks like;

21    right?  Eight years?

22              MS. HENN:  Objection to form.  Lacks

23    foundation.

24    BY MR. KENNEDY:

25         Q.     Eight years, sir?

```
 1              MS. HENN:  Mischaracterizes the document.

 2              THE WITNESS:  I think better -- a better

 3      characterization there is that it was eight years

 4      after DEA identified issues with Internet pharmacies.

 5      They didn't reveal all of this -- these issues.

 6              And, frankly, as we evolved our program and

 7      gained additional information and additional

 8      knowledge and ability to utilize data, we expanded

 9      our enforcement and -- well, not enforcement, but our

10      oversight effort in every way that we could.

11      BY MR. KENNEDY:
```

23      BY MR. KENNEDY:

24              Q.     And it took you eight years?

25              MS. HENN:  Same objection.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. KENNEDY:

 2          Q.     Eight years to modify your program

 3   after being told by the DEA this is important

 4   information to have in identifying suspicious orders

 5   and diversion; correct?

 6          MS. HENN:  Objection.  Lacks foundation.

 7   Mischaracterizes the documents.

 8   BY MR. KENNEDY:

 9          Q.     Is that right, sir, eight years to

10   develop it?

11          A.     It is eight years between 2006 and

12   2014.  But it is not correct that DEA identified all

13   the issues and all the information that we have

14   discussed in terms of prescription data.  And during

15   that time frame, prescription data resources and

16   capabilities increased significantly with technology.
```

Highly Confidential - Subject to Further Confidentiality Review



13    BY MR. KENNEDY:

14           Q.     Sir, let me ask you this.  You're

15    familiar with the Controlled Substance Act of 1970;

16    is that right?

17           A.     Yes.

18           Q.     And then the regulations we've talked

19    about after that relating to suspicious order

20    monitoring that came into effect, I think, in 1971?

21    We spoke about that regulation; true?

22           A.     Yes, I'm familiar with that.

23           Q.     Did the United States Congress ever

24    say that McKesson could give the pharmacies and the

25    big national accounts their proxy and allow them to

Highly Confidential - Subject to Further Confidentiality Review

1    monitor themselves?  Did Congress ever state that?

2              MS. HENN:  Objection to form.  Calls for

3    speculation.

4              THE WITNESS:  Ask the question again,

5    Counsel.  I'm not sure I understand what you're

6    asking.

7    BY MR. KENNEDY:

25   ///

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. KENNEDY:

2           Q.    Sir, a pharmacy is not a distributor;

3    correct?

4           MS. HENN:  Objection to form.

5    BY MR. KENNEDY:

6           Q.    With respect to what we're talking

7    about, some of the pharmacies would distribute to

8    themselves.  But outside of that, what we're talking

9    about is, let's say, pharmacies that are not

10   self-warehousing, they have a duty and a

11   responsibility under the law as a pharmacy; correct?

12          MS. HENN:  Objection to form.

13   BY MR. KENNEDY:

14          Q.    Is that right?

15          MS. HENN:  Lacks foundation.

16          THE WITNESS:  I'm not familiar with pharmacy

17   legal requirements.  I understand distributor.

18   BY MR. KENNEDY:

19          Q.    All right.  But didn't you just tell

20   us you, as a distributor, were relying upon the

21   pharmacy and what they were required to do under the

22   law?

23          MS. HENN:  Same objections.

24   BY MR. KENNEDY:

25          Q.    And now you don't know what their
```

Highly Confidential - Subject to Further Confidentiality Review

1    requirements are?

2           A.    What I was answering was the chains

3    that we're discussing were self-warehousing chains

4    and had a distributor registration as well as a

5    pharmacy registration.

16   BY MR. KENNEDY:

17          Q.    You understand that the

18   responsibilities under the law for a pharmacy to

19   prevent a diversion is different than the

20   responsibilities under the law of a distributor?

21   They are different; correct?

22          A.    I don't understand specifically the

23   regulations associated with pharmacy.  I've never

24   reviewed them.  But generally I understand that they

25   are different.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.      Right.  And the way Congress set this

2    up, because they did not want a crisis, is they gave

3    responsibilities to the distributors, and they gave a

4    separate responsibility to the pharmacies, a belt and

5    a suspenders?  It wasn't one or the other.  Congress

6    wanted both to have responsibilities to prevent the

7    diversion of dangerous drugs into the communities;

8    right?  A separate set of responsibilities for each;

9    correct?

10           MS. HENN:  Objection to form.

11           THE WITNESS:  Again, I -- I don't know what

12   Congress's intent necessarily was.  I understand the

13   regulation.

14   BY MR. KENNEDY:

15           Q.      And you understand the regulation

16   gave a responsibility and a set of responsibilities

17   to the two different entities?  Distributors, you've

18   got your jobs, and pharmacies, you have your job;

19   correct?

20           A.      I understand the distributor

21   responsibilities.

22           Q.      Nowhere did it ever say that if the

23   pharmacy has responsibility, us as distributors, we

24   don't have any responsibility to prevent diversion?

25   That has never been stated anywhere; correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. HENN:  Objection to form.
 2              THE WITNESS:  Again, I -- the regulations
 3    are very clear what our responsibilities are.
 4              MS. HENN:  Counsel, is this another good
 5    time for a break?  It's been an hour.
 6              MR. KENNEDY:  Give me five minutes.
 7              MS. HENN:  Are you comfortable going five
 8    minutes?
 9              THE WITNESS:  That's fine.
10              MR. KENNEDY:  Let me show you Exhibit 674,
11    if I could.
12              MS. HENN:  Thank you.
13                   (Exhibit No. 674 was marked.)
14    BY MR. KENNEDY:
15         Q.    This is Bates -507218 to -507220.
16    This is an email from Michael Oriente, if you look at
17    the top.  Who is Michael Oriente?
18         A.    Michael Oriente was -- was and is the
19    Director of Regulatory Affairs for the East Region --
20    Northeast Region.
21         Q.    So a big responsibility.  He's one of
22    four/six people; correct?
23         A.    Yes, at that point in time.
24         Q.    And at this point in time, he is also
25    responsible for managing and monitoring some of the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    large national chains; true?

 2            A.      Yes.

 3            Q.      And this is April of 2011.  And does

 4    he state, "Dave" -- and he's sending an email to Dave

 5    Gustin, who is another Regulatory Affairs person;

 6    right?  He's in the Midwest; right?

 7            A.      Yes.

 8            Q.      He also has some responsibility for

 9    these big national chains; right?

10            A.      Yes.

11            Q.      And does he state, "Dave, can you ask

12    RNA" -- and that's the regional national account

13    portion of McKesson; right?

14            A.      Yes.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

5       Q.      And do you know he was responsible

6   for CVS for a certain portion of time; did you know

7   that?

8       A.      I don't recall.

9       Q.      He was in charge of Rite Aid for a

10  certain portion of time; do you know that?

11      A.      I do recall he had responsibility for

12  Rite Aid.

13      Q.      Kroger's?

14      A.      Again, I don't remember all the ones

15  that he had.

16      Q.      Costco; do you remember that?

17      MS. HENN:  Objection to form.  Lacks

18  foundation.

19      THE WITNESS:  Again, I don't -- I don't

20  recall specifically.

21  BY MR. KENNEDY:

Highly Confidential - Subject to Further Confidentiality Review



16    BY MR. KENNEDY:

17           Q.    Well, at this point in time -- maybe

18    there's been change, maybe people are moving around,

19    but this man, in charge of CVS and Rite Aid and

20    Costco and Krogers, he doesn't even know who to call;

21    right?

22           MS. HENN:  Objection.

23    BY MR. KENNEDY:

24           Q.    At this point he doesn't even know

25    who to call?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. HENN:  Objection to form.  Lacks

 2      foundation.

 3      BY MR. KENNEDY:

 4              Q.     Isn't that what this is saying at

 5      this moment in time?

 6              A.     No, that's not accurate.  I don't

 7      believe that this is that at all.  I think he is

 8      ensuring that he has right information.

 9      BY MR. KENNEDY:
```

Highly Confidential - Subject to Further Confidentiality Review

 9          Q.     Well, not so much interaction that

10   Mr. Oriente even knows who to call; right?

11          MS. HENN:  Objection to form.

12          THE WITNESS:  Again, I think it's simply, as

13   I read this and understand the question, is more of

14   an update and clarification of who the contact people

15   are.

16          MS. HENN:  Go off the record.

17          THE VIDEOGRAPHER:  We are going off the

18   record.  The time is 2:29 p.m.

19          (Recess taken.)

20          THE VIDEOGRAPHER:  We are back on the

21   record.  The time is 2:46 p.m.

22   BY MR. KENNEDY:

23          Q.     Mr. Walker, we have been talking

24   about the large national --

25          THE VIDEOGRAPHER:  Sorry, Counsel, your

1    microphone.

2              MR. KENNEDY:  Oh, yeah.

3         Q.    All right.  Let me start all over.

4    Mr. Walker, we have been talking about the large

5    national accounts, and I want to talk specifically

6    about CVS; all right?

7         A.    Okay.

8         Q.    CVS was a large national account;

9    were they not?

10        A.    CVS is a large national retail chain.

11        Q.    More than that, CVS, certainly while

12   you were at McKesson, was -- they were McKesson's

13   largest customer; were they not?

14             MS. HENN:  Objection to form.  Lacks

15   foundation.

16             THE WITNESS:  I don't recall specifically

17   where they were.  They were a large customer, but we

18   were not the sole supplier.  So I don't know exactly

19   what their position was in our business.

20   BY MR. KENNEDY:

21        Q.    Well, you know that in the 2010,

22   2012, 2014 era, they were a customer purchasing in

23   excess of $10 billion --

24             MS. HENN:  Objection to form.  Lacks

25   foundation.

Highly Confidential - Subject to Further Confidentiality Review

```
1   BY MR. KENNEDY:

2         Q.    -- from McKesson?  Did you know that?

3   $10 billion?

4         A.    I don't have any specific knowledge

5   of what their sales volume was then.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



19          MR. KENNEDY:  We will go through the

20     refusals.  We will do that at one at a time.

21          Let's start with 698.  Let's start in 2008

22     and your discussions with CVS and trying to get them

23     involved with your monitoring program.

24                    (Exhibit No. 698 was marked.)

25          MR. KENNEDY:  -627161 to -162.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  Can I have a minute to review.
 2    I just --
 3              MR. KENNEDY:  Please.  Please.
 4              THE WITNESS:  -- haven't seen the document
 5    before.
 6              (Witness reviewing document.)
 7              THE WITNESS:  Okay.
 8    BY MR. KENNEDY:
 9         Q.    All right.  Let's start at the
10    bottom.  That's the first email in time.  This is
11    from Michael Oriente, an email; correct?
12         A.    Yes.
13         Q.    And he was one of the Directors of
14    Regulatory Affairs, who at that time was monitoring
15    the CVS stores; would that be accurate?
16         A.    I believe that's correct.
17         Q.    And it's April 24, 2008.  This is
18    about the time that you're beginning the
19    implementation of the monitoring program at McKesson;
20    true?
21         A.    Yes, we were implementing.
22         Q.    And this is an email to you; right?
23         A.    It's addressed to me.
24         Q.    And he is recapping a call with CVS
25    on that day; right?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Yes.

2          Q.      And he starts off, "Don" -- and

3    that's you.  And he states:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



25          Q.      And, sir, you were -- you were in

Highly Confidential - Subject to Further Confidentiality Review

1    charge of all the regulatory during this period, were

2    you not, 2010, 2011, and 2012?  You were in charge --

3         A.    Yes.

4         Q.    -- correct?

24        MR. KENNEDY:  We were talking about CVS, I

25   believe, in April of '08.  Let's go four months

Highly Confidential - Subject to Further Confidentiality Review

```
 1   later, in July of '08.

 2          THE REPORTER:  What number is that?

 3          MR. ASQUITH:  699.

 4                 (Exhibit No. 699 was marked.)

 5   BY MR. KENNEDY:

 6          Q.    I'm going to ask you about page -70?

 7          MS. URQUHART:  Could we get a Bates number?

 8          MR. KENNEDY:  -627168 to -172.

 9          Q.    On page -170 --

10          A.    Can you just -- I haven't seen this

11   document.  I am not familiar with it at all.

12          Q.    Okay.  All right.

13          (Witness reviewing document.)

14          A.    Okay.

15          Q.    Go to page -170, please.  Do you see

16   there, there is an email from Mr. Oriente, dated

17   July 22, 2008.  And this email is to you; correct?

18          A.    Yes.

19          Q.    And you're responsible for Regulatory

20   at that point in time; are you not?

21          A.    Yes, I'm still responsible for

22   Regulatory.

23          Q.    And it says:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

 7          Q.     Well, let me ask you this.  What do

 8    you think Viper was monitoring?  Was it monitoring

 9    controlled substances?

10          MS. HENN:  Objection.  Calls for

11    speculation.

12    BY MR. KENNEDY:

13          Q.     Or you just don't have any idea?

14          A.     I can't speculate, because I just

15    don't know.

16          Q.     Well, this whole email is about the

17    Controlled Substances Monitoring Program; isn't it?

18          A.     Yes, it is.

19          Q.     And it says that CVS has got a

20    monitoring program.  Do you think they are monitoring

21    something other than controlled substances?

22          A.     Again, I don't have any -- any

23    specific knowledge or -- other than to speculate that

24    that's about controlled substances.

25          Q.     So you think that they're talking

Highly Confidential - Subject to Further Confidentiality Review

1   about monitoring toothbrushes?

2          MS. HENN:  Objection to form.  Asked and

3   answered.  Calls for speculation.

4          THE WITNESS:  Counsel, I'm trying to be

5   clear that I did not and do not understand what Viper

6   monitored, and, therefore, I can't answer your

7   question specifically whether it did or did not

8   include anything other than controlled substances or

9   whether -- you know, what it oversaw.

10  BY MR. KENNEDY:

11         Q.    Well, let me -- this is an email to

12  you.  You're in charge of Regulatory, which relates

13  to controlled substances; right?

14         A.    Yes.

15         Q.    The topic -- or the subject of the

16  email is your Controlled Substances Monitoring

17  Program; correct?  Correct?

18         A.    Yes.

19         Q.    They are talking about thresholds and

20  Threshold Change Requests relating to controlled

21  substances; are they not?

22         A.    Yes.

23         Q.    Right?  They are talking about

24  thresholds in relationship to controlled substances;

25  are they not?

1          A.     The discussion is around thresholds

2     and controlled substances.

3          Q.     And so where it says they have a

4     monitoring program at CVS, isn't it real easy to

5     conclude that they are talking about monitoring of

6     controlled substances when you read this?

7          MS. HENN:  Objection to form.  Asked and

8     answered.  Calls for speculation.  Guess.

9          THE WITNESS:  Counsel, I am trying to

10    testify to that which I know.  I do not know exactly

11    what Viper monitored.

12    BY MR. KENNEDY:

13         Q.     All right.  And you can't put all of

14    the content of this email together and conclude that

15    Viper is monitoring controlled substances?  You can't

16    do that; is that what you're telling us?  Under your

17    oath, on the record, you can't put all that together

18    from this email that you received?

19         MS. HENN:  Objection to form.  Asked and

20    answered.  Calling for speculation.

21         THE WITNESS:  Very clearly, I can only

22    testify to that which I absolutely know.

23    BY MR. KENNEDY:

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 5              MR. KENNEDY:  Mark this, please.

 6              THE REPORTER:  803.

 7                      (Exhibit No. 803 was marked.)

 8              MR. KENNEDY:  I show you Exhibit 700.

 9                      (Exhibit No. 700 was marked.)

10     BY MR. KENNEDY:

11         Q.     I show you Exhibit 700, which is

12     -555948 to -950.

13              (Witness reviewing document.)

14         Q.     You get an email from Elaine Thomet,

15     August 26, '08.  We're still talking about CVS, and

16     it is -- you are copied on this email; are you not?

17         A.     Yes, I am.

18         Q.     And it says:

19              (Reading) Team, here's the recap from

20              our meeting with Don this morning (end

21              of reading).

22         And Don is you; right?

23         A.     Yes.

24         Q.     And it says:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12          MR. KENNEDY:  All right.  Let's go forward,

13     then, a couple months into this, in November of '08,

14     and look at 701.

15                    (Exhibit No. 701 was marked.)

16     BY MR. KENNEDY:

17          Q.    I'm looking at the Elaine Thomet's

18     email, November 12 of 2008, to you and others.  But

19     it's sent to you.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

10    BY MR. KENNEDY:

11            Q.      And you don't know what Viper is;

12    right?

13            A.      I don't remember what Viper is.

14            Q.      Did anybody ever know what Viper was?

15            A.      I don't know.

16            Q.      You don't know.

17            Would you be surprised to know that Viper is

18    not a Controlled Substance Monitoring Program for any

19    controlled substances that CVS purchased from

20    McKesson?

21            MS. HENN:  Objection to form.  Lack --

22    BY MR. KENNEDY:

23            Q.      Would that be surprising to you?

24            MS. HENN:  Objection to form.  Lacks

25    foundation.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  Again, I don't have any

2    knowledge of Viper, how CVS used Viper, what it did.

3    I just can't answer your question.

4    BY MR. KENNEDY:



Highly Confidential - Subject to Further Confidentiality Review



11          MR. KENNEDY:  Let's go to Exhibit 702.

12                    (Exhibit No. 702 was marked.)

13          MS. HENN:  Thank you.

14          MR. KENNEDY:  This is an email from Ned.

15          MS. URQUHART:  Could we get the Bates

16    number, please.

17          MR. KENNEDY:  -627150 to -158.

18          Q.    This is from Ned McKenna of McKesson;

19    correct?

20          A.    Yes.

21          Q.    And it's being sent to CVS; correct?

22          A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review



```
 6          Q.     Did you see this document, probably

 7   back in December of '08?

 8          A.     I was copied on it.  I don't -- I

 9   don't recall.

10          Q.     Go to page -157.  Do you see the "Go

11   Forward Proposal" on page -157?
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

 4          MR. KENNEDY:  Let's look how that worked,

 5    all right?  Give me 703, please.

 6                    (Exhibit No. 703 was marked.)

 7          MR. KENNEDY:  This is Exhibit 703, -535756

 8    to -901.

 9          Q.    I'm going to start with the bottom

10    email.  That's from Dave Gustin.  All right?

11          A.    Okay.

12          Q.    And the subject is, "Hydrocodone

13    Increase."  We know what hydrocodone is, right, a

14    controlled substance?  Right?

15          A.    Yes.

16          Q.    And it says:

23          What does that stand for?

24          A.    I don't know.

25          Q.    That's related to the hydrocodone;

Highly Confidential - Subject to Further Confidentiality Review

```
1    right?  So you're going to increase the hydrocodone

2    THD for WM.  Is that Walmart?

3              A.     I believe so.
```



Highly Confidential - Subject to Further Confidentiality Review



20   Now we're two years later with CVS; all right?

21   Exhibit 704.

22              (Exhibit No. 704 was marked.)

23              MR. KENNEDY:  -512900 to -01 and then -02.

24              Q.    If you will go to page -- the first

25   page, -900, Exhibit 704, the bottom email.  That's

Highly Confidential - Subject to Further Confidentiality Review

```
 1    from Rhonda Fargo, that bottom email?

 2              A.     The bottom of -900?

 3              Q.     Yes.

 4              A.     Yes.

 5              Q.     And now it's February of 2010, two

 6    years after the CSMP has been put into place.  And

 7    she's sending an email to different directors in

 8    Regulatory Affairs; correct?

 9              A.     Yes.

10              Q.     She says:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

6           MS. HENN:  Objection to form.  Lacks

7    foundation.

8           Counsel, we're over an hour.  Take a five-,

9    ten-minute break.

10          THE VIDEOGRAPHER:  We are going off the

11   record.  The time is 3:51 p.m.

12          (Recess taken.)

13          THE VIDEOGRAPHER:  We are back on the

14   record.  The time is 4:07 p.m.

15          MR. KENNEDY:  I show you Exhibit 713, which

16   is Bates -627066.

17                   (Exhibit No. 713 was marked.)

18   BY MR. KENNEDY:

19          Q.    Do you see that email?  I just wanted

20   to look at the last sentence in that email.

21          A.    I see the email there.

22          Q.    You're right.  Do you see that

23   last --

24          A.    The last sentence at the bottom?

25          Q.    Yes.  Ned is from -- Ned is from

Highly Confidential - Subject to Further Confidentiality Review

1   McKesson?

2          A.     Ned is from McKesson.



Highly Confidential - Subject to Further Confidentiality Review



18          MR. KENNEDY:  All right.  And give me

19     Exhibit 706, please.

20                    (Exhibit No. 706 was marked.)

21          MR. KENNEDY:  706, Bates -620748 to -49.

22          Q.    I want to look at the second email

23     down from Ned McKenna to Brian Whalen.  And you are

24     copied.  And this is August 6, 2010.  All right?

25          A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     And does that email -- and it's CVS

2    Action Plans.  That's the subject; true?  Do you see

3    that?

4          A.     Yes.

5          Q.     And it states:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



10      Q.     This is 2010, two years after the

11  original CSMP; is it not, sir?

12      A.     Two years after we implemented.

20      MR. KENNEDY:  Let's look at the CVS program

21  and where it led to; all right?  Give me Exhibit 708,

22  please.

23                  (Exhibit No. 708 was marked.)

24  BY MR. KENNEDY:

25      Q.     The metadata indicates that this is

Highly Confidential - Subject to Further Confidentiality Review

1    from February 8 of 2010.

2          THE VIDEOGRAPHER:  Sorry, sir.  I think

3    you're hitting the --

4          THE WITNESS:  Oh, did it again.

5    BY MR. KENNEDY:

18         MR. KENNEDY:  710, Exhibit 710.

19              (Exhibit No. 710 was marked.)

20         MS. HENN:  Are we done with 708?

21         MR. KENNEDY:  Yes.

22         MS. HENN:  Okay.

23    BY MR. KENNEDY:

24         Q.    Do you see the email -- the email is

25    from Tom McDonald, 2-8-2010; do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     And it's a CVS threshold discussion.

2     And does it say:



Highly Confidential - Subject to Further Confidentiality Review

11          MR. KENNEDY:  That's 2010.  Let's go two

12    years forward and look at CVS and see how the

13    threshold system was working.

14          Let's go to 2012, Exhibit 709.

15                 (Exhibit No. 709 was marked.)

16    BY MR. KENNEDY:

17          Q.    This is from Tom McDonald.  Tom

18    McDonald, at this point in time, he was the Director

19    of Regulatory Affairs and was responsible for CVS;

20    was he not?

21          MS. HENN:  Objection to form.  Lacks

22    foundation.

23    BY MR. KENNEDY:

24          Q.    2012.

25          A.    I believe in 2012 Tom McDonald was --

Highly Confidential - Subject to Further Confidentiality Review

1   oversaw CVS.



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



23          Q.     And oxycodone, sir, was at the center

24     of the opioid crisis in this country by 2012; was it

25     not?

Highly Confidential - Subject to Further Confidentiality Review

```
1           A.      In 2012 oxycodone had been identified

2    as a controlled substance that was being abused.

3           Q.      Not "a."  "The."

4           You know well that by 2012 oxycodone was in

5    the middle of the opioid crisis; was it not?

6           A.      It was one of the controlled

7    substances that was of concern being abused.

8           Q.      Let me ask you:  Not one of; was

9    oxycodone the number one addictor and killer in the

10   United States with respect to this opioid crisis by

11   2012?  Number one; was it not, sir?

12          MS. HENN:  Objection to form.  Asked and

13   answered.  And lacks foundation.

14          THE WITNESS:  I can't answer its position.

15   What I can absolutely assure you is that there were

16   other controlled substances that were of concern

17   across the country for abuse.

18   BY MR. KENNEDY:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



18          Q.     And, sir, the law says you stop

19   shipping until you do your due diligence; isn't that

20   what the law says?

21          MS. HENN:  Objection to form.  Lack of

22   foundation.

23   BY MR. KENNEDY:

24          Q.     Right?

25          A.     No, that --

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    This is 2012.

 2              A.    Can I finish, Counsel.

 3         MS. HENN:  Yes, you can.

 4  BY MR. KENNEDY:

 5              Q.    My question is --

 6         MS. HENN:  Counsel, he would like to finish

 7  his answer.

 8         MR. KENNEDY:  I didn't finish my question.

 9              Q.    Isn't that the law in 2012, you don't

10  ship if you have a concern?

11         MS. HENN:  Mr. Walker, do you need the prior

12  question back so you can answer?

13         MR. KENNEDY:  It's the same question.

14         THE WITNESS:  I think I can answer the

15  question.

16         MS. HENN:  Okay.

17         THE WITNESS:  Counsel, there is no

18  regulation to stop shipping controlled substances.

19  The regulation requires that we report suspicious

20  orders.

21         MR. KENNEDY:  We're going to write this one

22  down.

23              Q.    How long has that been your view?  In

24  2007 -- let's start with 2007 -- was McKesson

25  required to not ship until it did its due diligence
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    on potentially suspicious orders?  Was that required

 2    in 2007?

 3              MS. HENN:  Objection to form.

 4    BY MR. KENNEDY:

 5              Q.    Don't ship until we do our due

 6    diligence?

 7              MS. HENN:  Objection to form.  Lack of

 8    foundation.

 9    BY MR. KENNEDY:

10              Q.    Was that required of McKesson in

11    2007, do not ship until we do our due diligence?

12              MS. HENN:  Same objection.

13              THE WITNESS:  There is no regulatory

14    requirement to not ship.  There is a regulatory

15    requirement to report.

16    BY MR. KENNEDY:

17              Q.    All right.  And did the DEA tell you

18    in 2006 that you are required not to ship until you

19    do your due diligence on a potentially suspicious

20    order?  Did they tell you that in '06 in a letter to

21    McKesson?

22              MS. HENN:  Objection to form.  Lacks

23    foundation.

24    BY MR. KENNEDY:

25              Q.    Did they tell you that in '06 in a
```

Highly Confidential - Subject to Further Confidentiality Review

1    letter to McKesson?

2         A.    In 2006 their guidance and direction

3    was, do not ship.  And the requirement is at the

4    point that we determine an order to be suspicious.



Highly Confidential - Subject to Further Confidentiality Review



25          MR. KENNEDY:  I show you 707.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (Exhibit No. 707 was marked.)

 2   BY MR. KENNEDY:

 3           Q.    A PowerPoint prepared by you?

 4           MS. URQUHART:  Could we get the Bates

 5   number, please?

 6           MR. KENNEDY:  Pardon me?

 7           MS. URQUHART:  Could we get the Bates

 8   number, please?

 9           MR. KENNEDY:  Just don't interrupt my

10   question, and I will be right back with you,

11   all right?

12           Q.    707, Exhibit 707, is a PowerPoint,

13   "CVS - Regulatory PowerPoint"; is it not?

14           THE WITNESS:  This is a -- appears to be a

15   PowerPoint presentation from McKesson to CVS.

16   BY MR. KENNEDY:

17           Q.    So my answer is, "Yes"?  Is the

18   answer to my question, "Yes"?

19           MS. HENN:  Objection to form.

20           THE WITNESS:  It's a McKesson PowerPoint.

21   You asked if it was a CVS PowerPoint.  It's a

22   McKesson PowerPoint.

23   BY MR. KENNEDY:

24           Q.    Does it say, "CVS - Regulatory

25   Review"?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      It's a CVS regulatory review.

 2          Q.      Prepared by you?

 3          A.      Yes.

 4          Q.      Bates No. -497980 to -89.  This is

 5   March of 2012?  Is that correct?

 6          A.      Yes, that's the date on the document.
```

Highly Confidential - Subject to Further Confidentiality Review



18          Q.      And the DEA had been talking to you

19     about this being important since 2006; right?

20          MS. HENN:  Objection to form.  Lack of

21     foundation.

22          THE WITNESS:  The DEA had identified

23     prescribing doctors as an area of focus.

24     BY MR. KENNEDY:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



19          Q.     And -- and the DEA had been telling

20   you since 2006, this is important information to have

21   to identify diversion; correct?

22          MS. HENN:  Objection to form.  Lacks

23   foundation.

24   BY MR. KENNEDY:

25          Q.     It's six years later.

Highly Confidential - Subject to Further Confidentiality Review



1              A.      DEA had identified cash sales as a

2       potential indicator.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



19    BY MR. KENNEDY:

20            Q.      Let's switch topics.  We will talk

21    about sales, McKesson, sales and promotion as it

22    related to the Controlled Substances Monitoring

23    Program.

24            Can we agree that sales should have nothing

25    to do with the Controlled Substances Monitoring

 1   Program, should not have anything to do with it?  Do

 2   you agree with that?

 3          A.     Can I clarify, Counsel.  Are you

 4   referring to our sales force?

 5          Q.     Your sales force, your sales

 6   strategy, your sales goal should have nothing to do

 7   with your job as the head of Regulatory to monitor

 8   controlled substances?

 9          MS. HENN:  Objection to form.  Compound.

10          THE WITNESS:  I would not agree that our

11   sales force should not be involved in the Controlled

12   Substance Monitoring Program.  I would agree that

13   sales never influenced our decisions around our

14   regulatory responsibilities.

15   BY MR. KENNEDY:

16          Q.     Okay.  Well, let's look at that.

17   Let's look at that.

18          First of all, how many sales reps -- did you

19   know how many national sales reps McKesson had,

20   regional sales manager?  Hundreds?

21          A.     I'm going to -- it would be a guess

22   that we had -- it would probably be less -- you know,

23   150 or less.  I really don't remember exactly.

24          Q.     And the First Service -- the sales

25   assistants, the First Service folks that were located

1    down in Texas, I think I've read there were a hundred

2    sales assistants down in Texas; do you recall that?

3    First Service.

4           MS. HENN:  Objection.  Objection to form.

5           THE WITNESS:  Counsel, our -- it's called

6    Service First.

7           MR. KENNEDY:  I'm sorry.

8           THE WITNESS:  Our Service First organization

9    was not just a sales support organization.  It was

10   really a customer -- customer service call center.

11   BY MR. KENNEDY:

12          Q.    You had the Regional Sales Managers.

13   How many District sales folks above the -- above the

14   Regional Sales Managers were there?  If there's 100

15   to 150 Sales Managers, how many District sales folks

16   were above them?

17          MS. HENN:  Objection to form.  Lacks

18   foundation.

19          THE WITNESS:  I don't remember specifically

20   how many there were.

21   BY MR. KENNEDY:

22          Q.    How many marketing folks were there,

23   people that had put together the marketing sales

24   programs above the -- let's say the District Sales

25   Manager?  How many were those in that department,

Highly Confidential - Subject to Further Confidentiality Review

1   let's say, nationally?

2           MS. HENN:  Objection to form.

3           THE WITNESS:  Our marketing group was not

4   based in the field.  We had a marketing group that

5   was headquartered.  I don't remember what the

6   specific number of marketing people we had.  I

7   would -- I would estimate, and it would be a pure

8   estimation, it was probably 35.

9   BY MR. KENNEDY:

10          Q.    So you maybe have 150 Sales Managers

11  across the country, and you've got District Sales

12  Managers above them.  McKesson has got 35 people

13  working in marketing.  Is that in San Francisco?

14  Would that be here?

15          A.    Yes.  All the marketing at the time

16  was at our headquarters in San Francisco.

17          Q.    And you've got a hundred customer

18  service reps sitting at a call center.  They were

19  down in Texas; right?

20          MS. HENN:  Objection to form.  Lacks

21  foundation.

22          THE WITNESS:  Our Service First organization

23  was based in Texas, and we also had a satellite --

24  and at that time I think we had a satellite in

25  Phoenix that, again, I can't remember specifically

1  how many people were there.

2  BY MR. KENNEDY:

3          Q.    And I'm -- I'm -- for what we've

4  said, I'm counting up close to -- close to 300 people

5  in marketing and sales at McKesson; would that be

6  about right?

7          MS. HENN:  Objection to form.  Lacks

8  foundation.

9          THE WITNESS:  Again, I'm concerned about

10 guessing on the numbers.

11         MR. KENNEDY:  All right.

12         THE WITNESS:  But it's --

13 BY MR. KENNEDY:

14         Q.    Well, one thing you're not guessing

15 on back in 2006 or '7, in Regulatory, watching

16 opioids, there was three; right?  Three people?

17         MS. HENN:  Objection to form.  Lacks

18 foundation.

19 BY MR. KENNEDY:

20         Q.    Three?

21         A.    That -- that's not accurate because

22 our Field Operations Team, our Distribution Center

23 Managers, and their second in command were also very

24 heavily involved in regulatory compliance.

25         Q.    Five hours ago didn't we look at a

Highly Confidential - Subject to Further Confidentiality Review

```
 1    slide you presented to the DEA and said, prior to

 2    2008 our regulatory team had three people?

 3            MS. HENN:  Objection to form.

 4    BY MR. KENNEDY:

 5            Q.    You, Mr. Hilliard, and another

 6    gentleman.  Isn't that the representation to the DEA

 7    on the slide that we looked at six hours ago?

 8            MS. HENN:  Objection to form.

 9    Mischaracterizing the document.

10            THE WITNESS:  What I was representing in

11    that document was what our Regulatory Affairs staff

12    group was.  Again, we very strongly utilized our

13    Field Operations Teams in terms of our regulatory

14    compliance, and ensured that at a local level we had

15    oversight.

16    BY MR. KENNEDY:

17            Q.    Sir, McKesson paid a $13 million fine

18    in 2008; correct?

19            A.    We paid -- as a result of the

20    agreement, we paid a penalty of $13 million.

21            Q.    So the answer would be "Yes"; right?

22            MS. HENN:  Objection to form.  Asked and

23    answered.

24    BY MR. KENNEDY:

25            Q.    Would the answer be "Yes"?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.      We paid the $13 million penalty.

2          Q.      The answer would be "Yes"; correct?

3          MS. HENN:  Objection to form.  Asked and

4    answered.

5    BY MR. KENNEDY:

6          Q.      It's a "yes" or "no."  The answer

7    would be, yes, you paid a $13 million fine; true?

8          A.      We paid a $13 million penalty.

9          Q.      Okay.  Maybe I -- would I be

10   correct -- it's kind of a "yes" or "no."  Simple.

11   Would I be correct you paid a $13 million penalty in

12   2008?

13         A.      That's correct.

14         Q.      Leading up to that, prior to 2008,

15   you folks began to meet and discuss the creation of a

16   new monitoring program; did you not?

17         A.      Internally?

18         Q.      Yes.

19         A.      Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13          MR. KENNEDY:  Give me 722, please.

14                    (Exhibit No. 722 was marked.)

15  BY MR. KENNEDY:

16          Q.    You have seen this document before;

17  haven't you, sir?

18          A.    Give me a minute.  I don't think

19  I've -- certainly, if it's an email that I generated.

20  But I don't remember having seen it.

21          Q.    Bates No. -543914 to -16.

22          A.    Okay.

23          Q.    Go to the last page, -916, because

24  this is where this exchange begins.

25          Okay.  You see the email from Gary Hilliard?

1    And this is October 23, 2006.  This is during the

2    period when you're trying to put together your

3    monitoring program; correct?

4         A.    Yes, this would be during the time

5    frame we were creating the IT development for --

6         Q.    And Gary Hilliard --

7         MS. HENN:  Did you finish your answer, sir?

8         THE WITNESS:  The IT development program for

9    the CSMP.

10        MS. HENN:  Thank you.

11   BY MR. KENNEDY:

12        Q.    Gary Hilliard, at that point he is

13   the Director of Regulatory Affairs; right?

14        A.    I believe Gary's title at the time

15   was Regulatory.  He's on the Regulatory staff, and I

16   believe that title is correct.

17        Q.    He states in this email -- do you

18   know Sharon Mackarness?  Who that is?

19        A.    I'm familiar with the name.  Sharon

20   Mackarness was one of our -- the McKesson I.T.

21   associates who was responsible for pieces of

22   development and interface with CSMP.

23        Q.    This is a year-and-a-half before your

24   monitoring program goes into place; true?

25        MS. HENN:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

1    Mischaracterizes the evidence.

2          THE WITNESS:  October 2006.  We implemented

3    in the spring of 2008.  So roughly that time frame.

4    BY MR. KENNEDY:

5          Q.    It states:

Highly Confidential - Subject to Further Confidentiality Review

12          MS. HENN:  Objection to form.

13    BY MR. KENNEDY:

14          Q.    That's basically what she's saying?

15    She's responding, and she's asking some I.T.

16    questions about the establishment of the program?

17          A.    It appears that she is asking

18    questions to get the information she needs for system

19    design.

20          Q.    And she is -- again, she's

21    referencing a meeting that occurred that morning,

22    October 26, 2006; right?

23          A.    Yes.

24          Q.    And go to the earlier page, -15.  The

25    same day Sharon McGinnis -- Mackarness, excuse me,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    from I.T. at McKesson, she writes an email to Gary

 2    Hilliard; correct?

 3            A.     At the bottom of the page, yes.

 4            Q.     And she copies two other folks.

 5    VanderWerf; correct?

 6            A.     Yes.

 7            Q.     And she says, "Gary," right?  Gary?

 8            A.     Yes.

 9            Q.     In the second paragraph she says,

10    "JD," and that's probably referencing Jean-Dou up

11    ahead?  Up above, JD?

12            A.     Yes.

13            Q.     Do you know JD, who he was?

14            A.     Another I.T. individual.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



23        MS. HENN:  Objection to form.  Lacks

24    foundation.

25    ///

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. KENNEDY:

 2        Q.     Isn't that true, sir?

 3        A.     I'm not sure I understand the

 4   question as asked.

 5        Q.     Well, we will go through some detail,

 6   then.

 7        First of all, you knew and understood that

 8   the salespeople at McKesson were paid on commission;

 9   did you not?

10        A.     Our sales force was -- has a

11   portion -- my understanding is a portion of their

12   compensation, there was variable compensation

13   associated with various programs.

14        Q.     The more they sold, the more money

15   they made, very simple; isn't that true?

16        MS. HENN:  Objection to form.  Lacks

17   foundation.

18        THE WITNESS:  To my knowledge, that's not

19   accurate.  It wasn't -- it's not that simple of a

20   calculation or process.

21   BY MR. KENNEDY:

22        Q.     In fact, didn't you know and

23   understand that a salesperson could double, could

24   double their annual income based upon sales?

25        A.     I don't have any specific knowledge
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    on what the percentages or the proportions were.
```

17   BY MR. KENNEDY:

18          Q.    All right.  Salespeople also got paid

19   if they brought in a new pharmacy, a new customer

20   into McKesson; didn't they?  They also got paid if

21   they did that; true?

22          MS. HENN:  Objection to form.  Lacks

23   foundation.

24          THE WITNESS:  Again, I don't have any

25   specific knowledge of what they were paid.  But I

Highly Confidential - Subject to Further Confidentiality Review

```
1    believe there was compensation associated with new

2    business.

3    BY MR. KENNEDY:

4         Q.    And, sir, before McKesson -- under

5    their 2008 program, before McKesson would sell

6    opioids to a pharmacy, they went through an

7    on-boarding process; did they not?

8         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

7        Q.      And McKesson knew and you knew and

8    the salespeople knew that if we bring in a new

9    customer, number one, I'm going to get a bonus as a

10   salesperson for bringing in a new customer, and,

11   number two, my sales are going to increase if I get a

12   new customer, and I'm going to make more money; you

13   all knew that, right?

14        MS. HENN:  Objection to form.

15   BY MR. KENNEDY:

16        Q.      You knew that?

17        A.      Again, I think that's oversimplfying

18   the sales force compensation.

19        Q.      Now, also built right into your

20   program for the salespeople, you told us -- we've

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



19        MR. KENNEDY:  Let's look at Exhibit 730.

20        I'm going to withdraw that exhibit.  Give me

21    732, please.

22                  (Exhibit No. 732 was marked.)

23    BY MR. KENNEDY:

24        Q.    Do you see this email?  This is from

25    you dated 9-17-13; do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Yes.

 2              Q.      And the next page says, "Controlled

 3     Substances Regulatory Org Structure."  Do you see

 4     that?

 5              A.      Yes.

 6              Q.      This is created by you?

 7              A.      Yes.

 8              Q.      And this is 2013.  And if you go to

 9     page -500.  Do you see that?  Look at the second

10     bullet point.  Do you see that second bullet point?

11              A.      Yes.

12              Q.      In 2013 you write:
```

Highly Confidential - Subject to Further Confidentiality Review

 8   BY MR. KENNEDY:

 9        Q.     And, sir, over and above these

10   salespeople that we're talking about, you had -- you

11   had marketing people at McKesson; did you not?  We

12   have talked about them.

13        MS. HENN:  Objection to forms.  Lacks

14   foundation.

15   BY MR. KENNEDY:

16        Q.     There were marketing people at

17   McKesson; were there not?

18        A.     Yes, there was a marketing

19   department.

20        Q.     And while you were trying to control

21   the flow of opioids into the communities and the

22   pharmacy, the marketing people were trying to sell

23   more opioids; were they not?

24        MS. HENN:  Objection to form.  Lacks

25   foundation.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  No, that's not accurate.

 2              MR. KENNEDY:  720.

 3                   (Exhibit No. 720 was marked.)

 4    BY MR. KENNEDY:

 5         Q.    The first email in time is number one

 6    at the bottom.  That's where it starts in time.

 7    -543462 to -63.

 8              This is an email from Scott Mooney, and this

 9    is to you, January 16 of 2008, importance high.  It

10    states:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



11          Q.     Now I want to go to two months later.

12  Tell the jury what fentanyl is?

13          A.     Fentanyl is a Schedule 2 narcotic.

14          Q.     And is it the most powerful,

15  dangerous of all the narcotics you sell?

16          MS. HENN:  Objection to form.  Lacks

17  foundation.

18  BY MR. KENNEDY:

19          Q.     Is that true, sir?

20          A.     I do not know.  I know it's a very

21  powerful pain control narcotic.

22          MR. KENNEDY:  714.

23                 (Exhibit No. 714 was marked.)

24  BY MR. KENNEDY:

25          Q.     There's an email down at the bottom.

Highly Confidential - Subject to Further Confidentiality Review

```
1    Kenneth Ball.  And this is two years after you're

2    saying we've got to discuss promos.  And he states:
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

3      Q.      Let's look to 2012, two years later,

4  two years after that 7-19.

5      A.      Again, Counsel, we would not have

6  changed any thresholds on any of our customers in

7  support of any promotions.

8      Q.      Mr. Walker, you got fined

9  $150 million in 2018 for changing thresholds; didn't

10  you?

11      MS. HENN:  Objection to form.  Lacks

12  foundation.

13  BY MR. KENNEDY:

14      Q.      Is that true?  Did you get fined

15  $150 million in 2018, McKesson?

16      A.      I wasn't with McKesson at the time.

17  I understand that McKesson paid $150 million.

18                  (Exhibit No. 719 was marked.)

19  BY MR. KENNEDY:

20      Q.      Let's go to 719.  We're still on

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15   BY MR. KENNEDY:

16        Q.    Let's go to 2013, a year later.

17        MS. HENN:  Could we just get information

18   about how much time is on the record at this point?

19        MR. KENNEDY:  I'm going to finish these, and

20   then we are done.

21        MS. HENN:  Yeah, I just want to check.

22        MR. KENNEDY:  Five minutes left.

23        MS. HENN:  Good.  But let's get --

24        MR. KENNEDY:  As soon as I wrap this up.

25        MS. HENN:  How much time?

Highly Confidential - Subject to Further Confidentiality Review

1          THE VIDEOGRAPHER:  I think it is ten minutes

2    left.

3          MS. HENN:  Okay.

4              (Exhibit No. 721 was marked.)

5    BY MR. KENNEDY:

6          Q.    Let's go to the next.  It's 2013.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

5          Q.     Do you know how many people

6    hydrocodone was killing a year at the time of this --

7    of this promotion in 2013?  Do you know that?

8          A.     No, I don't have any specific

9    information on that.

10          MR. KENNEDY:  Let's look at 718.  We are

11    still in 2013.

12                 (Exhibit No. 718 was marked.)

13    BY MR. KENNEDY:

14          Q.     This is Exhibit 718, -546932 to -34.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

 4    BY MR. KENNEDY:

 5          Q.      And, sir, when you say you are not

 6    going to change thresholds without justification, let

 7    me ask you very clearly, isn't it true that McKesson

 8    got fined $150 million in a 2018 agreement based upon

 9    conduct, increasing thresholds without

10    documentations, during this very time period, 2012,

11    2013, 2014?

12          MS. HENN:  Objection to form.  Lacks

13    foundation.

14    BY MR. KENNEDY:

15          Q.      Do you recall that?

16          A.      Counsel, as I -- as I answered, the

17    agreement or document of 2014 or '15, whatever it

18    was, I was not with the company.  I have no specific

19    knowledge of the settlement.

20          I do know that McKesson paid 150.  I do not

21    understand or have reviewed the details of that

22    settlement.

23          MS. HENN:  Counsel, I think we're about at

24    time, if you want to ask your last question.

25          MR. KENNEDY:  All done.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. HENN:  Great.  So I guess we will go off

 2    the record.

 3              THE VIDEOGRAPHER:  We are going off the

 4    record.  The time is 5:34 p.m.

 5              (Recess taken.)

 6              THE VIDEOGRAPHER:  We are back on the

 7    record.  The time is 5:54 p.m.

 8                        EXAMINATION

 9    BY MS. HENN:

10         Q.    Good evening, Mr. Walker.

11         A.    Good evening.

12         Q.    Mr. Walker, you testified earlier

13    today that you joined McKesson in 1987; is that

14    correct?

15         A.    That is correct.

16         Q.    Before joining McKesson, where did

17    you work?

18         A.    Prior to -- immediately prior to

19    working for McKesson, I worked for a grocery

20    wholesale distributor, a trucking company.  And then

21    prior to that, I spent ten years in law enforcement.

22         Q.    What roles did you play in law

23    enforcement?

24         A.    I was a city police officer in a city

25    in the East Bay of San Francisco.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.     Back to your time at McKesson.  Could

2   you describe for the jury the various positions you

3   held at McKesson beginning in 1987.

4        A.     1987 I joined the company with a

5   subsidiary company in the transportation group,

6   transportation and warehousing.  And that company

7   transitioned to the McKesson Drug Company in roughly

8   1991.  Was in a staff role for a short period of

9   time, a staff role in transportation.

10        Then I became the Distribution Center

11  Manager in Sacramento, promoted to the Vice President

12  of Distribution Operations for the Western Region.

13  It was a newly-created position.

14        And subsequently, in roughly 1996, I was

15  promoted to the Senior Vice President of Distribution

16  for McKesson Pharmaceutical.

17        Q.     And when did you become Senior Vice

18  President of Distribution for McKesson

19  Pharmaceutical?

20        A.     It was 1996.  I don't remember

21  exactly when in '96.

22        Q.     And that was also the position you

23  held when you retired from McKesson; is that correct?

24        A.     Yes, it was.

25        Q.     When did you retire?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      June of 2015.

 2              Q.      You've mentioned today that your

 3     former employer, McKesson, is a wholesale distributor

 4     of pharmaceuticals.  Can you describe how that

 5     business operates at a high level?

 6              A.      At a high level, McKesson, as the

 7     other major distributors operate, we purchase

 8     pharmaceuticals and medicines from the manufacturers.

 9     We virtually warehoused all of the various

10     medications of manufacturers in our warehouses.

11              And on a daily basis, we supplied those

12     pharmaceuticals to pharmacies.  And the major groups

13     of pharmacies that we had were -- are independent

14     pharmacies, single owner; or generally our retail

15     national account customers, which were the large

16     chains, like Rite Aid, and CVS and Walmart; our

17     hospital group; and then the federal government.

18              Q.      And briefly, what were your job

19     responsibilities as Senior Vice President of

20     distribution operations at McKesson?

21              A.      I was the senior staff operations

22     person for McKesson.  I had the overall

23     responsibility for the distribution network.

24              On my staff I had a support team made up of

25     a Transportation Group, an I.T. Support Group, our
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Regulatory Affairs Group was in there, and I had a

 2    group that was responsible for construction and

 3    building of our distribution centers.

 4          Q.     You mentioned Regulatory Affairs.

 5    What kind of regulatory affairs matters were you

 6    responsible for as Senior Vice President of

 7    operations -- distribution operations, I should say?

 8          A.     McKesson, and the wholesalers as an

 9    industry, are highly regulated.  We have

10    responsibilities for a number of regulatory

11    requirements.  The FAA, the Department of

12    Transportation, DOT, OSHA.  We had hazardous material

13    requirements.  Certainly we had responsibility for

14    compliance with DEA regulations.  And various state

15    and local regulations as well.
```

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



```
 9              Q.     And you described earlier to
10    Mr. Kennedy that you had a five-year period, I think
11    it was, when you ran McKesson's Six Sigma program; is
12    that correct?
13              A.     That's correct.  Roughly, in 2000 to
14    2005 I was not the Senior Vice President of
15    Operations, Distribution Operations, and did not have
16    responsibility for Regulatory during that time frame,
17    but was responsible for our Six Sigma process
18    improvement.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

13          MS. HENN:  I'd like to show you an exhibit.

14   Let's get this marked as 84.

15          THE REPORTER:  804.

16          MS. HENN:  804.  Thank you.

17               (Exhibit No. 804 was marked.)

18   BY MS. HENN:

19          Q.    Mr. Walker, the court reporter handed

20   you an Exhibit No. -- that's been marked 804.  The

21   Bates number is -571361 through -65.

22          MR. KENNEDY:  Counsel, 804, is this a

23   defense exhibit?

24          MS. HENN:  It is.

25          MR. KENNEDY:  Okay.  Defense Exhibit 804.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE REPORTER:  I just continued, if that's

 2   okay, on the sequence.

 3              MR. KENNEDY:  Oh, okay.

 4   BY MS. HENN:

 5         Q.     Mr. Walker, do you recognize

 6   Exhibit 804?

 7         A.     Yes, I do.

 8         Q.     What is Exhibit 804?
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



20        Q.    Mr. Kennedy had a lot of questions

21   for you earlier today about a 2008 Settlement

22   Agreement between McKesson and the DEA.  Do you

23   recall those questions?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

5          Q.      Did the 2008 Settlement Agreement

6     have provisions in it about what was to replace the

7     DU45 reporting?

8          A.      Specifically in the Settlement

9     Agreement, it was agreed that there would be a

10    significant change in suspicious order reporting.

11    That at an agreed-upon time, we would cease providing

12    them a -- the DU45 suspicious order reporting, and we

13    would replace it with a format that was mutually

14    agreed upon between the two parties.

15         And probably the most significant change was

16    that we would no longer report suspicious orders to

17    field offices, as stated in the regulation because,

18    in fact, that we would be reporting directly to DEA

19    headquarters.  And from that, we recognized that

20    there would be a mutual effort from the two I.T.

21    groups, being DEA and McKesson, to develop the

22    system's interface to execute the suspicious order

23    reporting.

24         MS. HENN:  I'd like to mark as Exhibit 805,

25    Defense Exhibit 805, a copy of the Settlement and

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Release Agreement from 2008.

 2                   (Exhibit No. 805 was marked.)

 3   BY MS. HENN:

 4          Q.    Mr. Walker, do you recognize

 5   Exhibit 805?  The Bates number is -516360.

 6          A.    Yes, I do.

 7          Q.    Were you involved -- or let me just

 8   ask you, what was your involvement in the process

 9   that led to this 2008 Settlement Agreement with the

10   DEA?

11          MR. KENNEDY:  Okay.  Just to interrupt.

12   This has already been marked, do you understand?  So

13   you have -- this exhibit will be marked twice?

14          MS. HENN:  I'm not sure it's the same Bates

15   numbered version, but --

16          MR. KENNEDY:  All right.

17          MS. HENN:  -- that's fine.

18          Q.    Did you want me to repeat the

19   question?

20          A.    No.  I think I remember your

21   question.

22          Q.    Okay.

23          A.    My -- my role in the overall

24   Settlement Agreement was to provide feedback to

25   counsel, who was interacting with DEA counsel, and to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    primarily focus on operationalizing the commitments
 2    that we were negotiating, making in the -- in the
 3    agreement.
 4            Q.     And in the agreement you mentioned
 5    there were provisions dealing with suspicious order
 6    reporting.  Could you point us to those provisions
 7    that you were referring to?
 8            A.     Well, the first is -- is under "Terms
 9    and Conditions" on page 3, 1(a), Obligations of
10    McKesson to -- Obligations of McKesson.  And (a) --
11    do you want me to read this, Counsel, or --
12            Q.     Yes, please.
13            A.     (Reading) McKesson agrees to
14                   maintain a compliance program designed
15                   to detect and prevent diversion of
16                   controlled substances as required
17                   under the CSA and applicable DEA
18                   regulations.  This program shall
19                   include procedures for -- to review
20                   orders for controlled substances.
21                   Orders that exceed established
22                   thresholds and criteria will be
23                   reviewed by a McKesson employee
24                   trained to detect suspicious orders
25                   for the purposes of determining
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              whether such orders should not be

 2              filled and reported to the DEA or,

 3              based on a detailed review, the order

 4              is for a legitimate purpose and the

 5              controlled substances are not likely

 6              to be diverted into other than

 7              legitimate medical, scientific, and

 8              industrial channels.  Orders

 9              identified as suspicious will be

10              reported to the DEA as discussed in

11              subsection II (end of reading).

12         Do you want me to continue?

13         This compliance program shall apply --

14         Q.    Actually, Mr. Walker, I would like to

15    stick on the subject of suspicious orders.  So let's

16    continue to that cross-reference.

17         A.    Okay.  II.1(c).  II.1(c):

18              (Reading) McKesson shall inform DEA of

19              suspicious orders as required by 21

20              C.F.R in a format mutually and

21              responsibly agreed upon by the

22              parties, except that contrary to DEA

23              regulations, McKesson shall inform DEA

24              headquarters rather than the local

25              field office of suspicious orders,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          unless and until advised otherwise in

 2          writing by DEA headquarters.  DEA

 3          agrees to notify all of the DEA Field

 4          Offices within 30 days of the

 5          effective date of this agreement that

 6          McKesson will no longer be required to

 7          provide suspicious order reports or

 8          any other types of reports regarding

 9          excessive purchases or controlled

10          substances to the DEA Field Offices,

11          and that this agreement shall

12          supersede any DEA regulatory

13          requirements to report suspicious

14          orders to DEA (end of reading).
```

Highly Confidential - Subject to Further Confidentiality Review

2              You have described the Lifestyle Drug

3    Monitoring Program.  Earlier today Mr. Kennedy asked

4    you a lot of questions about the next program that

5    McKesson developed.  That was called what?

6              A.     The Controlled Substance Monitoring

7    Program, or CSMP.

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

3        MS. HENN:  Let's mark another exhibit,

4    No. -- Defense Exhibit 806.

5                    (Exhibit No. 806 was marked.)

6    BY MS. HENN:

7        Q.    Mr. Walker, you've been handed

8    Defense Exhibit 806, which is Bates

9    No. McKesson-WVA-167.

10            Do you recognize this document?

11        A.    Yes, I do.

12        Q.    What is this?

Highly Confidential - Subject to Further Confidentiality Review

3              MS. HENN:  Let's take a look at another

4      exhibit, which I will mark -- ask the court reporter

5      to mark as 807, Defense Exhibit 807.

6                     (Exhibit No. 807 was marked.)

7      BY MS. HENN:

8              Q.     Mr. Walker, you've been handed

9      Defense Exhibit 807, which is a Bates No. MCK-WVA-88.

10             Do you recognize this document?

11             A.     Yes, I do.

12             Q.     What is it?

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



24        MS. HENN:  I'd like to mark another exhibit,

25     ask the court reporter to mark this as Defense

Highly Confidential - Subject to Further Confidentiality Review

1    Exhibit 808, please.

2                    (Exhibit No. 808 was marked.)

3    BY MS. HENN:



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

6          MS. HENN:  Let's take a look at another

7    exhibit.  This is internal No. 6.  And I'm going to

8    have the court reporter mark this one as Defense

9    Exhibit 80?

10          THE REPORTER:  809.

11               (Exhibit No. 809 was marked.)

12   BY MS. HENN:

13          Q.    Mr. Walker, you've been handed a

14   document marked Defense Exhibit 809, Bates

15   No. MCK-WVA-163.

16          Do you recognize Exhibit 809?

17          A.    Yes, I do.

18          Q.    What is it?

Highly Confidential - Subject to Further Confidentiality Review

 9          Q.     Who is Maureen O'Keefe?

10          A.     I don't -- she's staff coordinator,

11   according to the memo from Kyle.  She was on the

12   diversion staff.

13          MS. HENN:  Okay.  And let's mark another

14   exhibit.  This will be -- I will ask that this be

15   marked Defense Exhibit 810, please.

16                 (Exhibit No. 810 was marked.)

17   BY MS. HENN:

18          Q.     You've been handed Defense

19   Exhibit 810 Bates No. MCK-WVA-187.

20          Do you recognize this document, Mr. Walker?

21          A.     Yes, I do.

22          Q.     What is it?

Highly Confidential - Subject to Further Confidentiality Review

11          MS. HENN:  I will show you one more example.

12    We will mark this exhibit as Defense Exhibit 811,

13    please.

14                    (Exhibit No. 811 was marked.)

15    BY MS. HENN:

16          Q.    Mr. Walker, you've been handed

17    Defense Exhibit 811.  And I don't think we have a

18    Bates number, but I will try to find out what that

19    is.  Oh, actually, I know what it is, but it's not

20    appearing on the document.  The Bates number is

21    -534479.

22          Mr. Walker, do you recognize Exhibit 811?

23          A.    Yes, I do.

24          Q.    What is it?

Highly Confidential - Subject to Further Confidentiality Review



20          MS. HENN:  Okay.  I'd like to mark this

21     exhibit as 812, Defense Exhibit 812, please.  But

22     Counsel, a similar document was marked, but this is

23     different, a different version.

24                    (Exhibit No. 812 was marked.)

25     ///

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. HENN:

 2           Q.     Mr. Walker, you've been handed

 3    Defense Exhibit 812.  And the Bates number, again, is

 4    not appearing on the document you have, but it's

 5    -542494.  Or maybe it is on yours, not on mine.

 6           A.     I got it.

 7           Q.     What is Exhibit 812, if you recognize

 8    it?
```

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16          MS. HENN:  Let's just mark quickly another

17    exhibit, defense Exhibit 812.

18          THE REPORTER:  813.

19          MS. HENN:  813, thank you.

20              (Exhibit No. 813 was marked.)

21    BY MS. HENN:

22          Q.    Mr. Walker, I hand you Defense

23    Exhibit 813, Bates No. MCK-WVA-230.

24          Do you recognize that document?

25          A.    Yes, I do.

Highly Confidential - Subject to Further Confidentiality Review



1          Q.     What is it?

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

12          MS. HENN:  Thank you very much, Mr. Walker.

13     I have no further questions.

14          Do you mind if we take a break?  It's been a

15     long time.  Let's go off the record, please.

16          THE VIDEOGRAPHER:  We are going off the

17     record.  The time is 7:14 p.m.

18          (Recess taken.)

19          THE VIDEOGRAPHER:  We are back on the

20     record.  The time is 7:38 p.m.

21               FURTHER EXAMINATION

22     BY MR. KENNEDY:

23          Q.    Mr. Walker, this is Eric Kennedy.

24     I'm allowed to ask you some questions in response to

25     the questions that your lawyer asked you a few

Highly Confidential - Subject to Further Confidentiality Review

```
1    moments ago; all right?

2            A.    I understand that.

3            Q.    And I'm going to try to keep it brief

4    because I know it's late in the day.

5            One of the things that you were shown by

6    McKesson's lawyer was Defense Exhibit 804.  And that

7    was a January 18, 2006, letter written by a gentleman

8    at McKesson to the DEA.  It was written by Paul

9    Julian.  Do you remember that?  Do you remember

10   talking about that?

11           A.    Yes.
```

24   BY MR. KENNEDY:

```
25           Q.    All right.  And you -- actually, I
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    think you read a footnote on page -1362 of the letter

 2    written to the DEA.  Do you remember reading that

 3    footnote?

 4          MS. HENN:  Objection to form.

 5    BY MR. KENNEDY:

 6          Q.    Sir, do you remember reading that

 7    footnote?

 8          A.    Counselor, I remember describing the

 9    content of the footnote.  I don't remember that -- I

10    don't recall that I read it specifically.  I just

11    want to be clear.
```

Highly Confidential - Subject to Further Confidentiality Review

```
8            MR. KENNEDY:  Could you give me 686,

9     Exhibit 686.

10           Q.    And this is the Settlement Agreement

11    with respect to the Internet pharmacy dosages; right?

12           I'm going to pull it up so we can look at

13    it.

14           MS. HENN:  Well, he may want it.

15    BY MR. KENNEDY:

16           Q.    If you will go to the second page of

17    that Settlement Agreement.

18           A.    I got it.

19           MS. HENN:  Great.

20    BY MR. KENNEDY:

21           Q.    And so the DEA, the conduct that they

22    were talking about was three million dosages to

23    Maryland; right?  In Maryland, three million doses.

24    2.1 million into Florida.  2.6 million into Texas.

25    824,000 into Utah.  Right?
```

Highly Confidential - Subject to Further Confidentiality Review

1         I mean, that's what this DEA settlement was

2    all about for conduct in '04, '05, and '06; right?

3    Correct?

4         A.    This settlement covered the

5    allegations that DEA made.  So yes.

Highly Confidential - Subject to Further Confidentiality Review



```
 1    BY MR. KENNEDY:

 2          Q.    Between 2000 and 2005, you said you

 3    were out of Regulatory for that period of time, and

 4    what was your job?

 5          A.    I was -- I can't remember my specific

 6    title, but I was the Senior Vice President overseeing

 7    Six Sigma.

 8          Q.    And what did that involve?  Did that

 9    involve regulation of controlled substances?

10          A.    Not at all.

11          Q.    Not at all.

12          How many meetings with the DEA did you go to

13    between 2000 and 2005?

14          A.    None.

15          Q.    How many DEA seminars did you go to

16    between 2000 and 2005?

17          A.    None that I remember.

18          Q.    How many regulatory meetings did you

19    go to at McKesson between 2000 and 2005 with respect

20    to controlled substances?

21          A.    I don't recall going to any.
```

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

 4              MS. HENN:  Counsel, I'm going -- we're going

 5       to need to go off the record so the court reporter

 6       can get her car out of the garage.

 7              THE VIDEOGRAPHER:  We are going off the

 8       record.  The time is 7:50 p.m.

 9              (Off the record.)

10              THE VIDEOGRAPHER:  We are back on the

11       record.  The time is 7:58 p.m.

12       BY MR. KENNEDY:

Highly Confidential - Subject to Further Confidentiality Review



10    BY MR. KENNEDY:

11          Q.    Let's look at how diligent you were

12    in executing, then.  Let's look at Exhibit 730, if we

13    could.

14          MR. ASQUITH:  It's a new one.

15          MS. HENN:  Do you have a copy?  That's the

16    only copy.

17          Oh, this is an exhibit you withdrew.  There

18    you go.

19                (Exhibit No. 730 was marked.)

20    BY MR. KENNEDY:

Highly Confidential - Subject to Further Confidentiality Review



15    BY MR. KENNEDY:

16           Q.     Exhibit 730 is an audit done by

17    McKesson in March of 2011.  Is that what it says on

18    the cover page, March of 2011 Audit Report?

19           A.     Yes.

20           Q.     If you go to page -498069.  Do you

21    see that?  "Level 1 Forms," do you see that title?

22    Level 1 Forms.

23           A.     Yes.

24           Q.     Delran, what is that?  Is that one of

25    your distribution centers?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Delran, New Jersey was one of our

2    distribution centers.



Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.     Now, New Castle.  This is another

2    distribution center; right?

3              A.     Yes.

4              Q.     Under that one it says:
```

Q.     Washington Court House, is that

another distribution center?

```
16             A.     Yes, it is.

17             Q.     Does that say:
```

```
25             Q.     Conroe, on the next page.  That's
```

Highly Confidential - Subject to Further Confidentiality Review



1    another distribution center; is it not?

2          A.    Yes, it is.

3          Q.    Does that state:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



24    BY MR. KENNEDY:

25         Q.    Is Landover one of your distribution

Highly Confidential - Subject to Further Confidentiality Review

```
 1   centers, sir?

 2           A.      Landover was one of our distribution

 3   centers.  It closed in 2012, I believe.

 4           Q.      And this comes from the DEA, so you

 5   should be aware of this.
```

```
23   BY MR. KENNEDY:

24           Q.      Livonia, is that a distribution

25   center of McKesson?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Yes, it is.

 2          Q.      In Michigan?

 3          A.      Michigan.
```

19    BY MR. KENNEDY:

20          Q.      Lakeland, Florida, that's a

21    distribution center; correct?

22          A.      Yes.

Highly Confidential - Subject to Further Confidentiality Review



7    BY MR. KENNEDY:

8              Q.     Metheun, Massachusetts, is that

9    another distribution center?

10             A.     Yes, it is.

25             Q.     Sir, didn't McKesson get fined

Highly Confidential - Subject to Further Confidentiality Review

```
1    $150 million by the DEA because of their failures

2    with respect to the 2008 program, leading all the way

3    up from 2008 and '09, '10, '11, '12, '13, '14, '15,

4    '16, and '17?  $150 million.

5              MS. HENN:  Objection to form.

6    BY MR. KENNEDY:

7         Q.    Do you recall that, sir?

8              MS. HENN:  Objection to form.  Lacks

9    foundation.  Mischaracterizes.

10             THE WITNESS:  All that I'm aware of is

11   that -- and because it was public information, is

12   that McKesson paid $150 million.  I don't understand

13   any of the details of the settlement, of the

14   documentation, because all of it occurred after I

15   left the company.

16   BY MR. KENNEDY:

17        Q.    When did you leave the company?

18        A.    In June of 2015.

19        Q.    And the DEA fine of $150 million

20   involved conduct from '08 to '15, while you were the

21   head of Regulatory; do you understand that?

22             MS. HENN:  Objection to form.  Lacks

23   foundation.

24             THE WITNESS:  Again, Counsel, I was not here

25   when they -- all of that was finalized and completed.
```

Highly Confidential - Subject to Further Confidentiality Review

1    So I don't understand what was in the allegations

2    presented by the DEA.

3          MR. KENNEDY:  Give me P.88, please.  This is

4    Exhibit 814.

5                    (Exhibit No. 814 was marked.)

6    BY MR. KENNEDY:

7          Q.    If you will look at that very last

8    page.  Do you see that this is dated 1-5-17, at least

9    the signatures, one of the signatures?  1-5-17, it's

10   on the back cover.

11         A.    Yes.

12         Q.    If you look at the front cover, the

13   front page, is this titled, "Administrative

14   Memorandum Agreement?

15         A.    Yes, it is.

16         Q.    And does the first paragraph say:

17             (Reading) The Administrative

18             Memorandum Agreement is entered into

19             by and between the United States

20             Department of Justice, Drug

21             Enforcement Administration, and

22             McKesson Corporation (end of reading)?

23         Is that what it says?

24         A.    Yes.

25         Q.    And if you'll go to page 88.3 up at

Highly Confidential - Subject to Further Confidentiality Review

```
 1   the -- up at the top.  And look at No. 2.  Does No. 2

 2   say, "Acceptance of Responsibility"?

 3            A.    Yes.

 4            Q.    That's acceptance of responsibility

 5   by McKesson; isn't it, sir?

 6            MS. HENN:  Objection to form.

 7   BY MR. KENNEDY:

 8            Q.    Is that what that means?

 9            MS. HENN:  Objection to form.

10            THE WITNESS:  That's what it says, Counsel.

11   Quite honestly, I don't know under the legal terms of

12   a settlement agreement what that means.  I don't have

13   the legal expertise.

14   BY MR. KENNEDY:

15            Q.    Well, so what I'm -- can you explain

16   to me how you can come in here and tell us that

17   McKesson was diligent and aggressive in following and

18   implementing its 2008 agreement, and you haven't read

19   the settlement covering that same period of time with

20   respect to the implementation of that program?  How

21   can you -- how can you not have read this?

22            MS. HENN:  Objection to form.

23            THE WITNESS:  Counsel, I wasn't with the

24   company when -- to my knowledge, when this document

25   was -- was generated.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. KENNEDY:

 2          Q.     How many hours have you spent with

 3   McKesson's lawyer prior to today reviewing documents

 4   and other materials in preparation for today's

 5   testimony?  How many hours, sir?

 6          A.     A number of them.

 7          Q.     How many, sir?

 8          A.     Five or six.

 9          Q.     And how many different days, sir?

10          A.     How many different days?

11          Q.     Yes.

12          A.     Five or six.

13          Q.     Five or six days?

14          A.     Yes.

15          Q.     And they never showed you this

16   document before you came in here to testify that

17   McKesson was aggressive and diligent in implementing

18   its policies?  You were never shown this?

19          A.     In reviewing this document, I think

20   it was shown.  This document, I believe, we did not

21   cover in detail.

22          Q.     Well, under "Acceptance and

23   Responsibility," go down about four or five lines

24   down in the middle where the sentence starts with,

25   "McKesson."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Does it state:

 2                   (Reading) McKesson acknowledges that,

 3                   at various times during the period

 4                   from January 1, 2009, up through and

 5                   including the effective date of this

 6                   agreement (the covered period of

 7                   time), it did not identify or report

 8                   to DEA certain orders placed by

 9                   certain pharmacies which should have

10                   been detected by McKesson as

11                   suspicious based upon the guidance

12                   contained in the DEA letters about the

13                   requirements set forth in 21 C.F.R

14                   1301.74(b) and 21 U.S.C 842(a)(5)

15                   (end of reading)?

16              Do you see where it states that McKesson

17      acknowledged those failures; sir?  Is that what it

18      states?

19                   MS. HENN:  Objection to form.

20                   THE WITNESS:  That's what the document

21      states.

22      BY MR. KENNEDY:

23              Q.    Look down to the next paragraph, if

24      you would.  About five lines down it starts with

25      "McKesson."  Do you see that?
```

```
 1            A.     Yes.

 2            Q.     Does it state, again:

 3                   (Reading) McKesson acknowledges that,

 4                   at various times during the covered

 5                   time period, it did not identify or

 6                   report to DEA certain orders placed by

 7                   certain pharmacies which should have

 8                   been detected by McKesson as

 9                   suspicious in a manner fully

10                   consistent with requirements set forth

11                   in the 2008 Memorandum of

12                   Understanding (end of reading)?

13            Is that what it states?

14            A.     That's -- yes, that's what it states.

15            Q.     Covered conduct, No. 3, A.  Does it

16      state:

17                   (Reading) McKesson failed to maintain

18                   effective controls against diversion

19                   of particular controlled substances

20                   into other than legitimate medical,

21                   scientific, and industrial channels by

22                   sales to certain of its customers in

23                   violation of the Controlled Substance

24                   Act and the Controlled Substance Act's

25                   implementing regulations (end of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 reading)?

 2            Does it say that?

 3       A.    Yes.

 4       Q.    And then does it outline the

 5  different distribution centers where these failures

 6  occurred, sir?

 7            MS. HENN:  Objection to form.

 8  Mischaracterizing the document.

 9  BY MR. KENNEDY:

10       Q.    Does it outline the distribution

11  centers where this conduct occurred?

12            MS. HENN:  Same objection.

13  BY MR. KENNEDY:

14       Q.    Does it, sir?

15       A.    Just a minute.

16            What I -- what I read is that the

17  distribution centers listed there -- it said at

18  McKesson -- at the distribution centers, including

19  the following, with the list of distribution centers

20  that are down below.

21       Q.    Right.  Distribution center --

22  McKesson Distribution Center in Colorado, Illinois,

23  New Jersey, Wisconsin, Florida, Maryland, Nebraska,

24  Michigan, Massachusetts, and California; correct?

25            A.    That's what's written in the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    document.
```

 7              Q.    Let's look to the next page.  If we

 8    look at C, this was specific to what you've been

 9    telling us.  Does it state on C:

10                    (Reading) McKesson failed to follow

11                    the procedures and policies set forth

12                    in the McKesson CSMP to detect and

13                    disclose suspicious orders of

14                    controlled substances (end of

15                    reading)?

16              Is that what it states, sir?

17              A.    Yes, that's what the document states.

18              Q.    Does it next state:

19                    (Reading) Among other things, McKesson

20                    failed to conduct adequate due

21                    diligence of its customers, failed to

22                    keep complete and accurate records of

23                    the CSMP files maintained for many of

24                    its customers, and bypassed suspicious

25                    order reporting procedures set forth

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  in McKesson's CSMP (end of reading)?

 2             Did I read that right?

 3        A.     You read that correctly.

 4        Q.     And, sir, could we agree -- and I'm

 5   only going to ask you one more time.  Could we agree

 6   that writing a policy, putting it on paper, meeting

 7   with the FDA [sic] and saying these are our policies,

 8   that doesn't do anybody any good unless you follow

 9   your own policies?

10             MS. HENN:  Objection to form.

11   BY MR. KENNEDY:

12        Q.     Could we agree to that, sir?

13        A.     I don't agree with that statement.  I

14   strongly believe that we were executing and doing

15   everything in our capability that we could to manage

16   our Controlled Substance Monitoring Program.

17        Q.     And the FDA [sic] disagreed when they

18   fined you $150 million; correct?

19             MS. HENN:  Objection to form.

20             THE WITNESS:  Again, I'm not going to

21   speculate, because I wasn't involved in the process

22   of how that was negotiated and reached.

23             MR. KENNEDY:  I have nothing further.  Thank

24   you, sir.

25             MS. HENN:  We have no further questions
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    either.

2            We have just two things to note.  We would

3    request that the transcript be designated highly

4    confidential pending review and further designations.

5            And we request that the witness have the

6    opportunity to read and sign.

7            Thank you very much.

8            THE VIDEOGRAPHER:  This concludes the video

9    deposition of Donald Walker, consisting of eight

10   media.

11           The time is 8:23 p.m.  We are off the

12   record.

13           (The deposition was concluded at 8:23 p.m.)

14                   --o0o--

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

1            Please be advised I have read the foregoing

2    deposition, and I state there are:

3    (Check one)    _____NO CORRECTIONS

4                   _____CORRECTIONS PER ATTACHED

5

6

7         _____

8         DONALD WALKER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1              DEPONENT'S CHANGES OR CORRECTIONS

 2   Note:  If you are adding to your testimony, print the

 3   exact words you want to add.  If you are deleting from

 4   your testimony, print the exact words you want to

 5   delete.  Specify with "Add" or "Delete" and sign this

 6   form.

 7   DEPOSITION OF:  DONALD WALKER

 8   CASE:  IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION

 9   DATE OF DEPOSITION:  JANUARY 10, 2019

10   PAGE        LINE     CHANGE/ADD/DELETE/REASON

11   _____     _____  _____

12   _____     _____  _____

13   _____     _____  _____

14   _____     _____  _____

15   _____     _____  _____

16   _____     _____  _____

17   _____     _____  _____

18   _____     _____  _____

19   _____     _____  _____

20   _____     _____  _____

21   _____     _____  _____

22   _____     _____  _____

23   _____     _____  _____

24   DEPONENT'S SIGNATURE _____

25   DATE_____
```

```
 1                    CERTIFICATE OF REPORTER

 2          I, SANDRA BUNCH VANDER POL, a Certified

 3   Shorthand Reporter, hereby certify that the witness in

 4   the foregoing deposition was by me duly sworn to tell

 5   the truth, the whole truth and nothing but the truth

 6   in the within-entitled cause;

 7          That said deposition was taken down in shorthand

 8   by me, a disinterested person, at the time and place

 9   therein stated, and that the testimony of the said

10   witness was thereafter reduced to typewriting, by

11   computer, under my direction and supervision;

12          That before completion of the deposition, review

13   of the transcript was requested.  If requested, any

14   changes made by the deponent (and provided to the

15   reporter) during the period allowed are appended

16   hereto.

17          I further certify that I am not of counsel or

18   attorney for either or any of the parties to the said

19   deposition, nor in any way interested in the event of

20   this cause, and that I am not related to any of the

21   parties thereto.

22   DATED:  JANUARY 14, 2019

23          _____

                SANDRA BUNCH VANDER POL, CSR 3032

24

25
```