Highly Confidential - Subject to Further Confidentiality Review

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

IN RE:  NATIONAL       :  MDL NO. 2804
PRESCRIPTION OPIATE :
LITIGATION             :
----------------------------------------
                       :  CASE NO.
THIS DOCUMENT          :  1:17-MD-2804
RELATES TO ALL CASES:
                       :  Hon. Dan A.
                       :  Polster

- - -

Tuesday, December 4, 2018
- - -

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
        CONFIDENTIALITY REVIEW

- - -

        Videotaped deposition of
LISA WALKER, taken pursuant to notice,
was held at Golkow Litigation Services,
One Liberty Place, 1650 Market Street,
Suite 5150, Philadelphia, Pennsylvania
19103, beginning at 9:12 a.m., on the
above date, before Amanda Dee
Maslynsky-Miller, a Certified Realtime
Reporter.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 2

```
 1    APPEARANCES:
 2
 3         SEEGER WEISS, LLP
           BY: DAVID R. BUCHANAN, ESQUIRE
 4             SCOTT SIEGEL, PARALEGAL
               ELINA RAKHLIN, PARALEGAL
 5         77 Water Street
           8th Floor
 6         New York, New York 10005
           (212) 584-0700
 7         Dbuchanan@seegerweiss.com
           Representing the Plaintiffs
 8
 9
10         BRANSTETTER, STRANCH & JENNINGS, PLLC
           BY: JOE P. LENISKI JR., ESQUIRE
11         223 Rosa L. Parks Avenue
           Suite 200
12         Nashville, Tennessee 37203
           Joeyl@bsjfirm.com
13         Representing the Staubus
           Plaintiffs
14
15
16         GOODELL, DEVRIES, LEECH & DANN, LLP
           BY: ROBERT A. LIMBACHER, ESQUIRE
17         BY: ADAM S. TOLIN, ESQUIRE
           Two Commerce Square
18         2001 Market Street, Suite 3700
           Philadelphia, Pennsylvania 19103
19         (267) 765-3600
           Rlimbacher@gdldlaw.com
20         Atolin@gdldlaw.com
           Representing the Defendant,
21         Endo Pharmaceuticals
22
23
24
```

Page 3

```
 1    APPEARANCES:  (Continued)
 2
 3         WILLIAMS & CONNOLLY LLP
           BY: JOSHUA D. TULLY, ESQUIRE
 4         725 Twelfth Street, N.W.
           Washington, D.C. 20005
 5         (202) 434-5000
           Jtully@wc.com
 6         Representing the Defendant,
           Cardinal Health
 7
 8
 9         REED SMITH LLP
           BY: ANNE E. ROLLINS, ESQUIRE
10         Three Logan Square
           1717 Arch Street, Suite 3100
11         Philadelphia, Pennsylvania 19103
           (215) 851-8100
12         Arollins@reedsmith.com
           Representing the Defendant,
13         AmerisourceBergen
14
15
16         JONES DAY
           BY: SHIRLETHIA V. FRANKLIN, ESQUIRE
17         51 Louisiana Avenue, N.W.
           Washington, D.C. 20001
18         (202) 879-3939
           Sfranklin@jonesday.com
19         Representing the Defendant,
           Walmart
20
21
22
23
24
```

Page 4

```
 1    APPEARANCES:  (Continued)
 2    VIA TELEPHONE/LIVESTREAM:
 3
 4         HUGHES HUBBARD & REED LLP
           BY: TINA M. SCHAEFER, ESQUIRE
 5         2345 Grand Boulevard
           Suite 2000
 6         Kansas City, Missouri 64108
           (816) 709-4159
 7         Tina.schaefer@hugheshubbard.com
           Representing the Defendant,
 8         UCB, Inc
 9
10         FOX ROTHSCHILD LLP
           BY: EILEEN OAKES MUSKETT, ESQUIRE
11         1301 Atlantic Avenue
           Midtown Building, Suite 400
12         Atlantic City, New Jersey 08401
           (609) 348-4515
13         EMuskett@foxrothschild.com
           Representing the Defendant,
14         Validus Pharmaceuticals LLC
15
16
           COVINGTON & BURLING LLP
17         BY: J. ALEJANDRO BARRIENTOS, ESQUIRE
           One CityCenter
18         850 Tenth Street, NW
           Washington, DC 20001
19         (202) 662-5331
           Abarrientos@cov.com
20         Representing the Defendant,
           McKesson Corporation
21
22
23
24
```

Page 5

```
 1    APPEARANCES:  (Continued)
 2    VIA TELEPHONE/LIVESTREAM:
 3
 4         ULMER & BERNE LLP
           BY: PAUL J. (PJ) COSGROVE, ESQUIRE
 5         600 Vine Street
           Suite 2800
 6         Cincinnati, Ohio 45202
           (513) 698-5000
 7         Pcosgrove@ulmer.com
           Representing the Defendant,
 8         Gemini Laboratories, LLC,
           Arkansas (Elllington) State
 9         Court Case
10
11         ALLEGAERT BERGER & VOGEL LLP
           BY: JOHN S. CRAIG, ESQUIRE
12         111 Broadway, 20th Floor
           New York, New York 10006
13         (212) 616-7075
           Jcraig@abv.com
14         Representing the Defendant,
           Rochester Drug Corporation
15
16
17
18    ALSO PRESENT:
      Dan Lawlor, Videographer
19    Jobina Jones-McDonnell, In-house, Endo
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 6

```
 1              - - -
 2           I N D E X
 3              - - -
 4    Testimony of: LISA WALKER
 5
 6     By Mr Buchanan        13, 601
       By Mr Leniski          503
 7     By Mr Limbacher        555
 8
               - - -
 9
         E X H I B I T S
10
               - - -
11
      NO       DESCRIPTION        PAGE
12
      Endo-Walker
13    Exhibit-1   PAR_OPIOID_MDL_
          0001596408-442       78
14
      Endo-Walker
15    Exhibit-2  EPI000620553-554      208
16    Endo-Walker
      Exhibit-3  ENDO_OPIOID_MDL_
17        05948286-292         223
18    Endo-Walker
      Exhibit-4  UPSSCS0002032-051     240
19
      Endo-Walker
20    Exhibit-5  ENDO_OPIOID_MDL_
          05968962-963         247
21
      Endo-Walker
22    Exhibit-6  No Bates
          8/9/12 E-mail from Larry
23        Shaffer to Lisa Walker,
          Subject: FW: UPS's Know Your
24        Customer Program      258
```

Page 8

```
 1              - - -
 2        E X H I B I T S
 3              - - -
 4    NO        DESCRIPTION        PAGE
 5    Endo-Walker
      Exhibit-17  ENDO_OPIOID_MDL_
 6        02426557-560        378
 7    Endo-Walker
      Exhibit-18  ENDO_OPIOID_MDL_02426078  385
 8
      Endo-Walker
 9    Exhibit-19  ENDO_OPIOID_MDL_
          04881787-791        389
10
      Endo-Walker
11    Exhibit-20  Clawed Back
              Endo_Opioid_MDL_
12            01602884-890      408
13    Endo-Walker
      Exhibit-21  ENDO_OR-CID-00694084-087  414
14
      Endo-Walker
15    Exhibit-22  ENDO00259233-235      427
16    Endo-Walker
      Exhibit-23  No Bates
17        6/8/17 FDA News Release  444
18    Endo-Walker
      Exhibit-24  ENDO_DATA-OPIOID_
19            MDL-00000022,
          With Attachment      446
20
      Endo-Walker
21    Exhibit-25  ENDO_OPIOID_MDL_
          02062332-333        469
22
23
24
```

Page 7

```
 1              - - -
 2        E X H I B I T S
 3              - - -
 4    NO.       DESCRIPTION       PAGE
 5    Endo-Walker
      Exhibit-7   ENDO_OPIOID_MDL_
 6        02448133-142       263
 7    Endo-Walker
      Exhibit-8   ENDO_OPIOID_MDL_05950068,
 8        With Attachment     305
 9    Endo-Walker
      Exhibit-9   UPSSCS0002916-935    317
10
      Endo-Walker
11    Exhibit-10  UPSSCS0002991-3029   317
12    Endo-Walker
      Exhibit-11  ENDO_OPIOID_MDL_
13        02060862-891       318
14    Endo-Walker
      Exhibit-12  ENDO_OPIOID_MDL_
15        02988138-145       323
16    Endo-Walker
      Exhibit-13  ENDO_OPIOID_MDL_
17        01680920-975       330
18    Endo-Walker
      Exhibit-14  ENDO_OPIOID_MDL_
19        05948106-137       355
20    Endo-Walker
      Exhibit-15  ENDO_OPIOID_MDL_
21        05962953-956       359
22    Endo-Walker
      Exhibit-16  ENDO-CHI_LIT-001444050-053  367
23
24
```

Page 9

```
 1              - - -
 2        E X H I B I T S
 3              - - -
 4    NO.       DESCRIPTION       PAGE
 5    Endo-Walker
      Exhibit-26  ENDO_OPIOID_MDL_
 6        01681499-501       475
 7    Endo-Walker
      Exhibit-27  ENDO_OPIOID_MDL_
 8        02290107-110       485
 9    Endo-Walker
      Exhibit-28  ENDO_DATA-OPIOID_MDL
10        00000019, With Attachment  492
11    Endo-Walker
      Exhibit-29  ENDO_OPIOID_MDL_
12        01030692-698       509
13    Endo-Walker
      Exhibit-30  ENDO_OPIOID_MDL_
14        01033927-929       541
15    Endo-Walker
      Exhibit-31  ENDO_OPIOID_MDL_
16        00299957-0030002     564
17    Endo-Walker
      Exhibit-32  ENDO_OPIOID_MDL_
18        01239751-753       580
19    Endo-Walker
      Exhibit-33  PAR_OPIOID_MDL_
20        0000404095-097      587
21    Endo-Walker
      Exhibit-34  ENDO_OPIOID_MDL_
22        05948292-287 (Pages in
          Reverse sequential order)  590
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 10

```
1              - - -
2          E X H I B I T S
3              - - -
4    NO.      DESCRIPTION        PAGE
5    Endo-Walker
     Exhibit-35  ENDO_OPIOID_MDL_
6          00852918-925        616
7    Endo-Walker
     Exhibit-36  PAR_OPIOID_MDL_
8          0000404285         629
9    Endo-Walker
     Exhibit-37  No Bates
10         7/16/13 E-mail from Laurel
           McDermott to Sanjay Patel;
11         Subject: SOMS Customer
           Letter & Sales Rep Talking
12         Points            640
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 11

```
1              - - -
2       DEPOSITION SUPPORT INDEX
3              - - -
4
5    Direction to Witness Not to Answer
6    Page Line   Page Line   Page Line
7    None
8
9
10   Request for Production of Documents
11   Page Line   Page Line   Page Line
12   None
13
14
15   Stipulations
16   Page Line   Page Line   Page Line
17    12    1
18
19
20   Question Marked
21   Page Line   Page Line   Page Line
22    22    14   64   10
      59    4   290   14
23
24
```

Page 12

```
1              - - -
2          (It is hereby stipulated and
3    agreed by and among counsel that
4    sealing, filing and certification
5    are waived; and that all
6    objections, except as to the form
7    of the question, will be reserved
8    until the time of trial.)
9              - - -
10         VIDEO TECHNICIAN:  We are
11   now on the record.  My name is Dan
12   Lawlor.  I'm a videographer with
13   Golkow Litigation Services.
14   Today's date is December 4, 2018,
15   and the time is 9:12 a.m.
16         This video deposition is
17   being held in Philadelphia,
18   Pennsylvania, in the matter of
19   National Prescription Opiate
20   Litigation, MDL Number 2804.  The
21   deponent is Lisa Walker.
22         Counsel will be noted on the
23   stenographic record.  The court
24   reporter is Amanda Miller and will
```

Page 13

```
1    now swear in the witness.
2              - - -
3          LISA WALKER, after having
4    been duly sworn, was examined and
5    testified as follows:
6              - - -
7           EXAMINATION
8              - - -
9    BY MR. BUCHANAN:
10       Q.   Good morning, Ms. Walker.
11   My name is Dave Buchanan.
12         Can you state your full name
13   for the record, please?
14       A.   Lisa Walker.
15       Q.   And you're local here in the
16   Malvern area; is that right?
17       A.   Yes, correct.
18       Q.   And your current employer,
19   ma'am?
20       A.   Endo Pharmaceuticals.
21       Q.   And how long have you been
22   with Endo?
23       A.   Twenty years.
24       Q.   You started in 1998?
```

4  (Pages 10 to 13)

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1      A.  Yes.
2      Q.  Were you with the
3   predecessor company that was within
4   DuPont, or a predecessor company that was
5   involved in selling the same products
6   that Endo ultimately sold?
7      A.  Yes, I also worked for
8   DuPont.
9      Q.  So let's run through that a
10  little bit and figure out exactly where
11  you fit in the scheme of things.
12     First of all, before we get
13  too far down the road, have you been
14  deposed before?
15     A.  No, I have not.
16     Q.  I'm sure you've had some
17  time with counsel to get ready for today,
18  fair?
19     A.  Yes.
20     Q.  And you met with counsel
21  over a period of days?
22     A.  Yes.
23     Q.  And who did you meet with?
24     A.  Bob and Alex and Jobina.

Page 15

1      Q.  And how much time did you
2   spend doing that?
3      A.  About four days.
4      Q.  Four full days?
5      A.  No, just a few hours each
6   day.
7      Q.  And when was the last time
8   you did that?
9      A.  Yesterday.
10     Q.  Okay.  Twenty hours all
11  told?  What's a good estimate?
12     A.  I don't recall.  Probably
13  about 20 or so.
14     Q.  So I'm going to ask you
15  questions throughout the day.  I hope you
16  had a chance to discuss what the process
17  would involve with counsel before you got
18  here.
19     You're the guest of honor
20  today, so if you need a break, just let
21  me know.  Is that okay?
22     A.  Yes.
23     Q.  And if you don't understand
24  a question, just please ask me to restate

Page 16

1   it so I can reframe it and be as clear as
2   I can, okay?
3      A.  Uh-huh.
4      Q.  And I guess by the nod of
5   your head and the lack of an audible
6   response, I need to remind you of that.
7      The court reporter is here
8   and is going to take everything down.
9   The video may capture things in a
10  different way, but we do need to make
11  sure that you provide an audible
12  response, okay?  A yes or no if it's a
13  yes-or-no question, fair?
14     A.  Yes.
15     Q.  We'll probably go an hour
16  and-a-half or so between breaks.  If you
17  need something earlier, just let me know,
18  okay?
19     A.  That's fine.
20     MR. LIMBACHER:  Counsel,
21  just so you're aware, I think it
22  would be my preference if we stop
23  roughly about every hour.
24     MR. BUCHANAN:  Well, as I

Page 17

1   said, the witness is the star of
2   the show.
3   BY MR. BUCHANAN:
4      Q.  So we'll proceed until you
5   tell us you need a break.
6      Fair, ma'am?
7      A.  Yes.
8      Q.  Okay.  So let's dial back
9   the clock a little bit.
10     1998 to present, an Endo
11  employee?
12     A.  That's correct.
13     Q.  Prior to that point in time,
14  a DuPont employee?
15     A.  That's correct.
16     Q.  So the check you were
17  getting prior to 1998 came from E.I.
18  dupont de Nemours or some other company?
19     A.  It came from DuPont Merck
20  Pharmaceuticals.
21     Q.  Got you, okay.
22     And how long did you work
23  with them?
24     A.  Nine years.

5  (Pages 14 to 17)

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1   Q.   So that takes you back to
2   '89 or '90?
3   A.   1989 I started.
4   Q.   Working in Wilmington?
5   A.   No, out in Barlemo Plaza.
6   Q.   That's Delaware?
7   A.   Yes.
8   Q.   And what was your position
9   with DuPont, ma'am?
10   A.   When I started, I worked
11   off -- I worked in the mailroom pushing
12   the mail cart.
13   Q.   Okay.  So you worked in that
14   function from 1989 or so, and then you
15   advanced in the ranks at DuPont?
16   A.   Correct.  I moved to the
17   customer service department at DuPont
18   Merck around '91, '92.
19   Q.   Within DuPont Merck, did
20   they have a product line that was
21   controlled substances?
22   A.   Yes, they did.
23   Q.   And we're going to talk
24   about controlled substances at various

Page 19

1   points during today.
2       And do you understand what
3   those are?
4   A.   Yes.
5   Q.   And what are they?
6   A.   Controlled substances?
7   Q.   Yes.
8   A.   They are opioid products,
9   pain products that are stored differently
10   than other products within the warehouse.
11   Q.   Do you have -- you do have a
12   water if you need?
13   A.   Yes.
14   Q.   I'll need one throughout the
15   day, so please excuse me if I'm doing
16   that as I'm asking questions.
17       All right.  So DuPont had a
18   product line that was controlled
19   substances, fair?
20   A.   Yes.
21   Q.   And, obviously, when you're
22   in the mailroom, you probably didn't have
23   direct responsibility for oversight of
24   controlled substances.

Page 20

1       But did that change over the
2   years?
3   MR. LIMBACHER:  Object to
4   form.
5   THE WITNESS:  It didn't, no.
6   I had no control over that when I
7   worked at DuPont.
8   BY MR. BUCHANAN:
9   Q.   Oh, I see, okay.
10       So what was your role and
11   function at DuPont between '89/90 and
12   '98?
13   A.   Like I said, I worked in the
14   mailroom.  And then I was a clerical -- I
15   was a clerk within the customer service
16   department.  And then I became a customer
17   service rep.
18   Q.   Okay.  And as customer
19   service rep, what did you do for DuPont?
20   A.   Order entry, putting in
21   orders.
22   Q.   Customers would send in
23   orders, you would receive them
24   physically, probably, by fax or mail?

Page 21

1   A.   At that time, yes.
2   Q.   And then you would
3   physically key them into a computer
4   system and track the orders?
5   A.   Yes.
6   Q.   And was that really the
7   extent of your exposure to controlled
8   substance orders at that point in time?
9   A.   Yes, that's correct.
10   Q.   You weren't responsible for
11   filling the orders?
12   A.   No, I was not.
13   Q.   You weren't responsible for
14   selling to customers?
15   A.   No, I was not.
16   Q.   As a customer service rep,
17   you were the liaison between DuPont Merck
18   and the end customer, in terms of getting
19   their order physically input into the
20   system so it could be fulfilled?
21   A.   The end customer would be
22   the wholesaler.
23   Q.   Got it.
24       So DuPont Merck had

6 (Pages 18 to 21)

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1  wholesale customers?
2      A.  Yes.
3      Q.  Distributors as customers?
4      A.  I just -- I don't recall.
5  It was 20 years ago.  Mostly wholesalers.
6      Q.  Okay.  Let's step back in
7  time prior to your time at DuPont Merck.
8          Did you have any role and
9  involvement in the pharmaceutical
10  industry prior to 1989 or '90?
11     A.  No.
12     Q.  And what was your prior
13  employment?
14     A.  Prior to DuPont?
15     Q.  Yes.
16     A.  I was in college.
17     Q.  All right.  Graduated when?
18     A.  I graduated college in 1995.
19     Q.  Okay.  Started college when?
20     A.  Right after high school,
21  '87.
22     Q.  Got you.
23          So you were working at
24  DuPont while you were finishing college?

Page 23

1      A.  That's correct.
2      Q.  Okay.  And where did you go
3  to school?
4      A.  Wilmington College.
5      Q.  And that's Wilmington,
6  Delaware?
7      A.  Yes.
8      Q.  And you graduated with a
9  degree in some specialty?
10     A.  Business management,
11  Bachelor's.
12     Q.  Got you.
13          Did you go on to any
14  postgraduate further education?
15     A.  No.
16     Q.  Any certificate programs
17  anywhere, ma'am?
18     A.  No.
19     Q.  Any focus on medicine or
20  healthcare as part of your education?
21     A.  No.
22     Q.  So your education, we can
23  fairly characterize as was in business?
24     A.  Correct, yes.

Page 24

1      Q.  So since college, since
2  starting college, you've really had two
3  employers, DuPont Merck and Endo?
4      A.  That is correct.
5      Q.  You're still in the area
6  here?  Home?
7      A.  Home is in Pennsylvania,
8  yes.
9      Q.  And work every day, you're
10  driving out to Malvern?
11     A.  Yes.
12     Q.  And that's the home base for
13  Endo today?
14     A.  Yes.
15     Q.  Okay.  And your paycheck
16  today, what's the logo on the top, or
17  what's the name of the company that sends
18  your paycheck to you?
19     A.  Endo Pharmaceuticals.
20     Q.  Got you.
21          And is Endo Pharmaceuticals
22  a subsidiary, as you understand it, to
23  Endo the parent?
24          MR. LIMBACHER:  Object to

Page 25

1  form.
2  BY MR. BUCHANAN:
3      Q.  If you know.
4      A.  I don't know.  I can't
5  confirm.
6      Q.  Okay.  Endo Pharmaceuticals
7  has been in the business of selling
8  branded -- among other things, but in the
9  business of selling branded opioid
10  products for the time that you've been at
11  the company, fair?
12          MR. LIMBACHER:  Object to
13  form.
14          THE WITNESS:  Yes.
15  BY MR. BUCHANAN:
16     Q.  Endo Pharmaceuticals is a
17  manufacturer of opioids?
18          MR. LIMBACHER:  Object to
19  form.  Foundation.
20          THE WITNESS:  It depends on
21  what your definition of
22  "manufacturer" is.
23          Yes, we do own the products,
24  but we don't physically

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1     manufacture the products.
2   BY MR. BUCHANAN:
3     Q.   I understand.
4         You contract out to other
5   people to make them --
6     A.   Correct.
7     Q.   -- for you, but ultimately
8   on the label and everything it will say
9   you're the manufacturer, right?
10    A.   Yes.
11    Q.   And that's been true since
12  you've been there?
13        MR. LIMBACHER:  Object to
14        form.
15        THE WITNESS:  Yes.
16  BY MR. BUCHANAN:
17    Q.   Could you run through some
18  of the names of the products that are --
19  branded opioids that you've had a role
20  and involvement with while you've been at
21  Endo?
22    A.   Percocet, Opana, Zydone,
23  Belbuca.
24    Q.   That's a newer one?

Page 27

1     A.   Yes.
2     Q.   Percocet is a combination
3   narcotic together with aspirin -- or
4   acetaminophen, excuse me?
5         MR. LIMBACHER:  Object to
6         form.
7   BY MR. BUCHANAN:
8     Q.   Withdrawn.
9         Percocet is a combination of
10  acetaminophen and a narcotic?
11        MR. LIMBACHER:  If you know.
12        THE WITNESS:  I don't know
13        the -- I can't confirm the actual
14        ingredients of the product.
15  BY MR. BUCHANAN:
16    Q.   Do you know whether
17  Percocet, ma'am, has an active narcotic
18  in it?
19    A.   I know that Percocet is an
20  opioid, yes.  But the active ingredient,
21  I can't confirm that.
22    Q.   You don't know whether it's
23  oxycodone, hydrocodone, something else,
24  oxymorphone?

Page 28

1         MR. LIMBACHER:  Object to
2         form.
3         THE WITNESS:  I can't
4         confirm that, no.
5   BY MR. BUCHANAN:
6     Q.   Is it fair to say, ma'am,
7   over the time that you've been at Endo,
8   Endo has manufactured and shipped
9   billions of Percocet pills?
10        MR. LIMBACHER:  Object to
11        form.
12        THE WITNESS:  I can't
13        confirm the dollar value that you
14        just said.
15  BY MR. BUCHANAN:
16    Q.   I wasn't talking dollar
17  value.
18        Just billions of pills?
19        MR. LIMBACHER:  Same
20        objection.
21        THE WITNESS:  I can't
22        confirm the number of pills.
23  BY MR. BUCHANAN:
24    Q.   Let's talk about the

Page 29

1   positions, I guess, you had -- well, let
2   me finish this thread first.  Withdrawn.
3         Is it fair to say, ma'am,
4   over the time that you've been at Endo,
5   Endo has shipped hundreds of millions of
6   Opana pills?
7         MR. LIMBACHER:  Object to
8         form.
9         THE WITNESS:  Again, I can't
10        confirm the actual number of
11        pills.
12  BY MR. BUCHANAN:
13    Q.   I'm not asking for the
14  actual number.
15        Do you have a sense, though,
16  that over the time that you were there,
17  Endo has shipped hundreds of millions of
18  Opana ER pills?
19        MR. LIMBACHER:  Same
20        objection.
21        THE WITNESS:  Again, I'm
22        sorry, I can't confirm that
23        number.
24  BY MR. BUCHANAN:

8  (Pages 26 to 29)

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1        Q.  Endo was making a lot of
2    opioids, fair?
3            MR. LIMBACHER:  Object to
4    form.
5            THE WITNESS:  We make
6    opioids, yes.
7    BY MR. BUCHANAN:
8        Q.  You made a lot?
9            MR. LIMBACHER:  Object to
10   form.
11           THE WITNESS:  I'm not -- I
12   can't confirm that.  I don't know
13   what your definition of "a lot"
14   is.  I'm not going to -- I can't
15   answer that.
16   BY MR. BUCHANAN:
17       Q.  What's your definition of "a
18   lot," ma'am?
19           MR. LIMBACHER:  Same
20   objection.  Object to form.
21   BY MR. BUCHANAN:
22       Q.  Would 100 million be a lot?
23       A.  I can't speak to the number
24   of pills.  And I'm not going to speak to

Page 31

1    the number -- the dollar value.
2            I can't.  That's not --
3    that's not within my role.  I don't know.
4        Q.  Well, you saw orders cross
5    your desk, right?
6        A.  Yes.
7        Q.  And one of your jobs was to
8    evaluate orders if they were excessive,
9    right?
10       A.  Yes.
11       Q.  So what's a lot?
12           MR. LIMBACHER:  Object to
13   form.
14           THE WITNESS:  That's not a
15   fair question.  I don't know
16   what -- it depends what you're
17   talking about, a lot.  Each
18   customer is different.  Each
19   wholesaler is different.
20   BY MR. BUCHANAN:
21       Q.  What's excessive?
22           MR. LIMBACHER:  Object to
23   form.
24           THE WITNESS:  We had, you

Page 32

1    know, programs in place to monitor
2    excessive orders.
3    BY MR. BUCHANAN:
4        Q.  I'm just asking you what
5    excessive was.
6            MR. LIMBACHER:  Object to
7    form.  You're asking for a
8    definition from a dictionary?
9            MR. BUCHANAN:  Counsel, you
10   get to object to form.
11           MR. LIMBACHER:  No.  I'm
12   asking you to rephrase your
13   question, please.
14           MR. BUCHANAN:  No, that's
15   not the way it works.
16           MR. LIMBACHER:  I don't
17   understand.
18           MR. BUCHANAN:  It's my right
19   to rephrase my question.  Your
20   role is to tell me whether you
21   have an objection to form, for my
22   benefit.
23           MR. LIMBACHER:  And I'm
24   objecting -- I'm objecting to your

Page 33

1    question.
2            MR. BUCHANAN:  I'll ask you
3    if I need clarification.
4            MR. LIMBACHER:  I'm
5    objecting to your question.
6            I don't think we're here to
7    ask her for definitions of
8    individual words.
9            MR. BUCHANAN:  Move to
10   strike, counsel.
11           MR. LIMBACHER:  You have to
12   put it into some kind of context.
13           MR. BUCHANAN:  Just mark the
14   transcript, please.
15   BY MR. BUCHANAN:
16       Q.  Ma'am, I'd just like to
17   know, during your time at Endo, am I
18   correct that you had a role and
19   involvement for the monitoring of
20   suspicious orders?
21       A.  Yes.
22       Q.  Monitoring for suspicious
23   orders, among other things, includes
24   monitoring for excessive orders, right?

9  (Pages 30 to 33)

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1    A.   Yes.
2    Q.   Excessive by quantity,
3  right?
4    A.   We had an excessive -- we
5  had an excessive program and SOM programs
6  in place, yes.
7    Q.   And that was among your role
8  and functions over the time at Endo,
9  fair?
10    A.   Correct.
11    Q.   Okay.  So I'd like to know,
12  what's an excessive order?
13       MR. LIMBACHER:  Object to
14    form.
15       THE WITNESS:  We have
16    programs in place that monitor our
17    excessive orders and SOM programs
18    in place.  And those orders come
19    in, and they're reviewed and
20    they're released as necessary.
21       I'm not providing a
22    definition of an excessive order.
23  BY MR. BUCHANAN:
24    Q.   Well, you looked at the

Page 35

1  orders when they came across your desk?
2    A.   Yes.
3    Q.   Or came across your computer
4  screen?
5    A.   Me or somebody on my team,
6  yes.
7    Q.   And when you did that, one
8  of the things you were looking for was
9  whether they were excessive, right?
10    A.   We had a program in place
11  that would monitor our excessive orders.
12    Q.   Is that a yes answer to my
13  question, ma'am?
14    A.   We had --
15       MR. LIMBACHER:  Object to
16    form.
17  BY MR. BUCHANAN:
18    Q.   Is that a yes answer?
19       MR. LIMBACHER:  Object to
20    form.
21       THE WITNESS:  We had a
22    program in place that monitored
23    our excessive orders.
24  BY MR. BUCHANAN:

Page 36

1    Q.   I'm asking whether you
2  examined the orders?
3    A.   Yes.
4    Q.   Thank you.
5    A.   Based on our program.
6    Q.   And so over the course,
7  ma'am, of looking at those orders, you
8  saw orders for thousands and thousands
9  and tens of thousands of purchases for
10  bottles of Percocet, true?
11       MR. LIMBACHER:  Object to
12    form.
13       THE WITNESS:  I don't recall
14    actual numbers of bottles that
15    customers may or may not have
16    ordered.
17  BY MR. BUCHANAN:
18    Q.   You don't recall even having
19  the sense, ma'am, that in the orders that
20  you reviewed, tens of thousands of
21  bottles of Percocet, 100 and 500 count,
22  were purchased containing narcotics that
23  you manufactured, "you" meaning Endo?
24       MR. LIMBACHER:  Object to

Page 37

1    form.
2       THE WITNESS:  I can tell you
3    that our customers placed orders,
4    they went through our excessive
5    program and our SOM program, and
6    they were reviewed and released
7    based on -- based on our program.
8       That's what I can tell you.
9  BY MR. BUCHANAN:
10    Q.   As the person -- were you, I
11  mean, the person with that responsibility
12  within Endo with regard to branded
13  products?
14       MR. LIMBACHER:  Object to
15    form.  Time period.
16       THE WITNESS:  Repeat your
17    question.
18  BY MR. BUCHANAN:
19    Q.   Were you that person within
20  Endo who had responsibility for
21  ordering -- reviewing orders to determine
22  if they were suspicious?
23       MR. LIMBACHER:  Object to
24    form.

10  (Pages 34 to 37)

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1       THE WITNESS: What time
2   frame are you asking about?
3   BY MR. BUCHANAN:
4       Q.  That was a good tip from
5   your counsel, I guess.
6       MR. BUCHANAN: Counsel, I'm
7   going to ask you, if you have a
8   form objection, please state a
9   form objection. I'll decide
10  whether I need to re-ask it.
11      MR. LIMBACHER: And I will
12  make my objections as I think is
13  appropriate.
14      MR. BUCHANAN: That's
15  coaching.
16      MR. LIMBACHER: And I don't
17  appreciate the speeches, okay.
18      MR. BUCHANAN: Then you
19  should ask -- you should make
20  appropriate objections.
21      MR. LIMBACHER: I think I'm
22  doing that.
23      MR. BUCHANAN: This
24  deposition is supposed to proceed

Page 39

1   as if it was in court, unless this
2   witness is going to show up in
3   court.
4   BY MR. BUCHANAN:
5       Q.  Ma'am, are you planning to
6   come to court?
7       MR. LIMBACHER: Object to
8   form.
9       MR. BUCHANAN: Withdrawn.
10  BY MR. BUCHANAN:
11      Q.  When this case goes to trial
12  in September of this year, September of
13  2019, if we request your presence at
14  court, are you willing to come to
15  Cleveland and make your presence there
16  live?
17      MR. LIMBACHER: Object to
18  form.
19      THE WITNESS: If that's the
20  recommendation of my counsel, then
21  I will do that.
22  BY MR. BUCHANAN:
23      Q.  Okay. It would not be too
24  inconvenient for you to attend, correct?

Page 40

1       MR. LIMBACHER: Object to
2   form.
3       THE WITNESS: If that's the
4   recommendation of my counsel.
5   BY MR. BUCHANAN:
6       Q.  Thank you.
7       You stated that it depends
8   on what time as to what your role and
9   function would have been with regard to
10  suspicious orders.
11      Did I understand your
12  request for clarification correctly?
13      A.  Yes.
14      Q.  So when you started with
15  Endo, what was your role and function in
16  1998?
17      A.  I was a contract analyst.
18      Q.  At what point in time did
19  you have a role and function that gave
20  you oversight of suspicious orders?
21      MR. LIMBACHER: Object to
22  form.
23      THE WITNESS: I became the
24  director of the group in 2015.

Page 41

1   BY MR. BUCHANAN:
2       Q.  My question was, at what
3   point in time did you have a role and
4   function that gave you oversight of
5   suspicious orders?
6       MR. LIMBACHER: Object to
7   form.
8       THE WITNESS: I've always
9   been part of the customer service
10  and distribution group my entire
11  time at Endo. The ultimate
12  responsibility became when I
13  became a director in 2015.
14  BY MR. BUCHANAN:
15      Q.  Okay. When did you have any
16  oversight and responsibility for
17  monitoring for suspicious orders of your
18  customers?
19      A.  I don't recall.
20      MR. LIMBACHER: Object to
21  form.
22      THE WITNESS: Sorry.
23      I don't recall. I've been
24  with the company for 20 years.

11 (Pages 38 to 41)

Highly Confidential - Subject to Further Confidentiality Review

Page 42

```
1          Some time during that time frame.
2      I don't recall the exact time.
3  BY MR. BUCHANAN:
4      Q.   Can you identify somebody --
5  is there a time frame when you recall
6  that you did have that responsibility --
7          MR. LIMBACHER:  Same
8      objection.
9  BY MR. BUCHANAN:
10     Q.   -- prior to 2015?
11     A.   No, I don't recall the exact
12 date.
13     Q.   Well, if you weren't looking
14 at suspicious orders, ma'am, who was, or
15 orders to assess whether they were
16 suspicious, who was doing that?
17     A.   It could have been me.  It
18 could have been my boss at the time.  It
19 could have been somebody on the team.
20 There's a variety of people.
21     Q.   Okay.  What was the name of
22 your group?
23          Withdrawn.
24          What was the name of the
```

Page 44

```
1  Solutions, that does all of our
2  warehousing and distribution for us.
3  They also have an SOM program.
4          So there's a group of --
5  within customer service that manages
6  these orders.  And there's also the
7  regulatory group at UPS that does another
8  review of the orders.
9          So I wanted to make some
10 clarification there.
11     Q.   Within the labeling of the
12 products that you sold, the narcotics,
13 Endo is listed as the manufacturer?
14          MR. LIMBACHER:  Object to
15     form.
16          THE WITNESS:  Yes.
17 BY MR. BUCHANAN:
18     Q.   Okay.  Is UPS listed as the
19 manufacturer?
20     A.   No.
21     Q.   So getting back to my
22 question, the customer service function
23 is not within the regulatory group at
24 Endo, fair?
```

Page 43

```
1  group that had responsibility for
2  examining orders to see whether or not
3  they were suspicious?
4          MR. LIMBACHER:  Object to
5     form.
6          THE WITNESS:  Customer
7     service.
8  BY MR. BUCHANAN:
9      Q.   Customer service?
10     A.   It's the customer service
11 team, yes.
12     Q.   So the role and
13 responsibility -- withdrawn.
14          The group responsible for
15 evaluating orders to determine if they
16 were suspicious was in the customer
17 service function?
18     A.   Within Endo, yes.
19     Q.   Did Endo have a regulatory
20 group?
21     A.   So let me -- maybe I should
22 provide some clarification.
23          So Endo has a third-party
24 logistics company, UPS Supply Chain
```

Page 45

```
1      A.   Yes, that's correct.
2      Q.   The customer service
3  function is not in the, quote, compliance
4  group within Endo --
5      A.   That's correct.
6      Q.   -- fair?
7          The customer service
8  function is not in a DEA compliance
9  group, fair?
10     A.   At Endo, yes.
11          But, if I can also add,
12 again --
13     Q.   That was my only question,
14 ma'am.
15          MR. LIMBACHER:  You can
16     finish your answer.
17          Go ahead.
18          THE WITNESS:  Thank you.
19          MR. BUCHANAN:  Does it go to
20     my question?
21          MR. LIMBACHER:  You can
22     finish your answer.
23          She's entitled to finish her
24     answer.  You interrupted her,
```

Highly Confidential - Subject to Further Confidentiality Review

Page 46

```
 1       counsel.
 2            MR. BUCHANAN:  I don't think
 3   so.  I think, counsel, you'll have
 4   an opportunity -- you'll have an
 5   opportunity to direct examination.
 6            MR. LIMBACHER:  I think it
 7   was pretty clear you interrupted
 8   her.
 9            So why don't you go ahead
10   and finish your answer, if you
11   remember at this point.
12            MR. BUCHANAN:  I'll read the
13   question back to you, ma'am.
14            MR. LIMBACHER:  Why don't
15   you read the partial answer that
16   she gave and maybe that will
17   refresh her as to where she was
18   trying to go when you interrupted
19   her.
20   BY MR. BUCHANAN:
21       Q.   The customer service
22   function is not in a DEA compliance
23   group, fair?
24       A.   Yes.
```

Page 47

```
 1       Q.   Thank you.
 2       A.   But what I wanted to add to
 3   that, so as I stated, our products are
 4   shipped under -- let me back up.
 5            Endo has a 3PL, third-party
 6   logistics company, which is UPS Supply
 7   Chain Solutions.  Our products are
 8   shipped under UPS's DEA license.  UPS
 9   also has their own SOM program, which is
10   part of the regulatory group.
11            So the Endo products are
12   shipped and monitored -- sorry, the Endo
13   products are monitored through Endo's SOM
14   program and UPS's SOM program.  So I
15   wanted to make that clear to everybody
16   here.
17            MR. BUCHANAN:  I'll move to
18   strike as nonresponsive.
19   BY MR. BUCHANAN:
20       Q.   Do you remember my question?
21       A.   Yes, I remember your
22   question.
23       Q.   And what was it?
24       A.   If the customer service team
```

Page 48

```
 1   was part of regulatory.
 2       Q.   And is it?
 3            MR. LIMBACHER:  Object to
 4   form.  Asked and answered.
 5            THE WITNESS:  No, it's not.
 6   BY MR. BUCHANAN:
 7       Q.   Thank you.
 8            I was asking you earlier
 9   when you evolved into an oversight
10   responsibility or had some responsibility
11   for suspicious order monitoring.
12            Can you describe for me,
13   ma'am, when you had some responsibility
14   for that --
15            MR. LIMBACHER:  Object to
16   form.
17   BY MR. BUCHANAN:
18       Q.   -- for the first time?
19       A.   Can you clarify that?
20       Q.   In what way?
21       A.   I don't understand your
22   question exactly.
23       Q.   Okay.  As I understand it,
24   ma'am, and your company has told us, that
```

Page 49

```
 1   you had responsibility for suspicious
 2   order monitoring.
 3            When did you first have that
 4   responsibility?
 5       A.   So Endo has always had an
 6   excessive program in place since '99, and
 7   it's evolved over time.
 8       Q.   Okay.
 9       A.   I've always been part of the
10   customer service and distribution group
11   my entire -- my entire time at Endo.  I
12   became the director in 2015.
13            So the ultimate
14   responsibility was 2015.  But I've been
15   part of the team the entire time I've
16   been at Endo.
17       Q.   Who had that responsibility
18   in 2010?
19            MR. LIMBACHER:  Object to
20   form.
21            THE WITNESS:  I was not the
22   director of the group back then,
23   but it was part of my
24   responsibility, along with other
```

13 (Pages 46 to 49)

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1     team members.
2     BY MR. BUCHANAN:
3         Q.   Who was more senior to you
4     with that responsibility, then, in 2010?
5         A.   There was a director of the
6     team.
7         Q.   And who was that person?
8         A.   Her name was Jill Connell.
9         Q.   And would Ms. Connell review
10    the orders to determine whether they were
11    suspicious?
12        A.   No, no.  She would if I
13    needed her to.  But no, it was my
14    responsibility, or somebody on my team.
15        Q.   So as of 2010, I understand
16    Ms. Connell was senior to you, but you
17    had the responsibility for overseeing
18    whether the orders were suspicious or
19    not?
20             MR. LIMBACHER:  Object to
21    form.
22             THE WITNESS:  Yes.
23    BY MR. BUCHANAN:
24        Q.   Okay.  Let's dial the clock

Page 51

1     back to 2005.
2             Was there somebody more
3     senior to you, as of 2005, who had
4     responsibility to determine if the orders
5     were suspicious or not?
6         A.   Jill Connell was still --
7     was still the director at the time.
8         Q.   And was her role and
9     function in 2005 similar, in that
10    ultimately you could have asked her but
11    you handled it on a day-to-day basis?
12             MR. LIMBACHER:  Object to
13    form.
14             THE WITNESS:  Yes.
15    BY MR. BUCHANAN:
16        Q.   And that was the process and
17    structure that Endo had created to
18    oversee suspicious order monitoring of
19    its branded controlled substances, true?
20        A.   But --
21             MR. LIMBACHER:  Object to
22    form.
23    BY MR. BUCHANAN:
24        Q.   Is that a yes?

Page 52

1         A.   It is.
2             But I'd like to add.
3         Q.   Thank you.
4         A.   Again, I want to remind
5     everybody that Endo, we've had a
6     partnership with UPS Supply Chain
7     Solutions since 2000, who also had their
8     own SOM program.  So they were also part
9     of the equation of monitoring orders for
10    Endo.
11        Q.   I understand.
12             Endo is the manufacturer,
13    correct?
14             MR. LIMBACHER:  Object to
15    form, asked and answered.
16             THE WITNESS:  Yes.  Endo is
17        the manufacturer.
18             But our products, again, are
19        shipped under the UPS DEA license,
20        so they are part of the equation.
21    BY MR. BUCHANAN:
22        Q.   And we'll talk about UPS.  I
23    understand they had a role and function
24    during various points in time.

Page 53

1             I want to focus on Endo's
2     and your role and function, fair?  Is
3     that okay?
4         A.   Yes.
5         Q.   Okay.  I just want to
6     understand.  You had that responsibility
7     on a day-to-day basis -- withdrawn.
8             Focusing on suspicious order
9     monitoring, you had that responsibility
10    through the customer service function
11    within Endo, fair?
12             MR. LIMBACHER:  Object to
13    form.
14             THE WITNESS:  Yes.
15    BY MR. BUCHANAN:
16        Q.   For orders of Endo-branded
17    products, correct?
18        A.   What time frame are you
19    speaking of?
20        Q.   I'm speaking of from 1998
21    until present.
22        A.   Yes.
23        Q.   Okay.  So at all times that
24    you've been at Endo?

14  (Pages 50 to 53)

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1      A.   Yes, I've been part of the
2  same group for the entire time I've been
3  at Endo.
4      Q.   And one component of your
5  responsibilities within that group has
6  been to monitor for suspicious orders,
7  fair?
8          MR. LIMBACHER:  Object to
9  form.  Asked and answered.
10          THE WITNESS:  Yes.
11  BY MR. BUCHANAN:
12      Q.   Can you tell me at what
13  point in time you identified your first
14  suspicious order?
15          MR. LIMBACHER:  Object to
16  form.
17          THE WITNESS:  I don't
18  recall.
19  BY MR. BUCHANAN:
20      Q.   I guess, can you tell me at
21  what point in time you reported your
22  first suspicious order to the DEA?
23          MR. LIMBACHER:  Object to
24  form.

Page 55

1          THE WITNESS:  I don't -- we
2  haven't.  I never -- I don't
3  recall.
4  BY MR. BUCHANAN:
5      Q.   Has Endo ever reported a
6  suspicious order for one of its branded
7  products to the DEA?
8          MR. LIMBACHER:  Object to
9  form.
10          THE WITNESS:  No, we have
11  not.
12          If I could remind you again,
13  our products are shipped under
14  UPS's license.  So the person
15  reporting a suspicious order would
16  be UPS and not Endo.
17  BY MR. BUCHANAN:
18      Q.   Okay.  Let's stay with my
19  question first.
20          Has Endo ever reported a
21  suspicious order for one of its branded
22  products to the DEA?
23      A.   Not --
24          MR. LIMBACHER:  Object to

Page 56

1  form.
2          THE WITNESS:  Not that I
3  recall.
4  BY MR. BUCHANAN:
5      Q.   And you've been in that role
6  and function, the "role and function"
7  being monitoring for suspicious orders,
8  since 1998?
9          MR. LIMBACHER:  Object to
10  form.
11          THE WITNESS:  Yes.
12  BY MR. BUCHANAN:
13      Q.   You've seen thousands and
14  thousands and thousands of orders for
15  opioid products since 1998, true?
16      A.   We've had orders since 1998,
17  yes.
18      Q.   A lot of them?
19      A.   It depends on what your
20  definition of "a lot" is.
21      Q.   Okay.  My definition would
22  be orders for billions and billions of
23  opioid pills.
24          MR. LIMBACHER:  Object to

Page 57

1  form.  Asked and answered.
2          THE WITNESS:  I can't speak
3  to billions of pills.
4          But I can remind you again
5  that we've had an excessive
6  program in place since -- since
7  2000, since Endo -- you know,
8  since Endo started.  And orders
9  have been monitored since the
10  beginning.
11  BY MR. BUCHANAN:
12      Q.   So orders have been
13  monitored and, to the best of your
14  knowledge, Endo has never reported a
15  single order as a suspicious order to the
16  DEA; is that correct?
17          MR. LIMBACHER:  Object to
18  form.
19          THE WITNESS:  As I recall,
20  yes.
21  BY MR. BUCHANAN:
22      Q.   You highlighted that UPS
23  also was involved in your supply chain,
24  fair?

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1      A.   Yes.
2           MR. LIMBACHER:  Object to
3    form.  Misstates her testimony.
4           MR. BUCHANAN:  And, again,
5    it's object to form.  Don't
6    characterize whether I've
7    misstated any testimony.
8           MR. LIMBACHER:  I'm entitled
9    to make my objections --
10          MR. BUCHANAN:  You are not.
11          MR. LIMBACHER:  -- counsel.
12          MR. BUCHANAN:  You are not.
13          MR. LIMBACHER:  I'm not
14    limited to simply saying the three
15    words "object to form."
16          MR. BUCHANAN:  I would
17    invite you, in any courtroom, to
18    do that and see if you don't get a
19    reprimand from the court.
20          MR. LIMBACHER:  I've been in
21    many courtrooms, counsel --
22          MR. BUCHANAN:  This is
23    supposed to proceed --
24          MR. LIMBACHER:  -- and I've

Page 59

1    made objections many, many times
2    in front of a lot judges.  So
3    don't lecture me, please.
4           MR. BUCHANAN:  This is
5    supposed to proceed as if it's in
6    court.  I'll mark the transcript.
7    BY MR. BUCHANAN:
8       Q.   With regard to UPS's role in
9    overseeing -- withdrawn.
10          With regard to UPS's role in
11    fulfilling Endo's orders -- would that be
12    a fair characterization of one of their
13    roles, fulfilling Endo's orders?
14          MR. LIMBACHER:  Object to
15    form.
16          THE WITNESS:  They are a
17    part of the logistics company,
18    yes.  They do warehousing and
19    distribution for Endo.
20    BY MR. BUCHANAN:
21      Q.   I just want to make sure I'm
22    characterizing it in a way that's
23    reasonable from your perspective.
24          So with regard to their role

Page 60

1    in fulfilling orders, you identified that
2    they have a suspicious order monitoring
3    program as well, right?
4       A.   Yes, they do.
5       Q.   And of the orders that --
6    withdrawn.
7           Do I understand the workflow
8    correctly, that Endo is the manufacturer,
9    has relationships with customers of many
10    forms, true?
11          MR. LIMBACHER:  Object to
12    form.
13          THE WITNESS:  Our customers
14          for the opioid products are our
15          wholesalers.
16    BY MR. BUCHANAN:
17      Q.   You have wholesale
18    customers, true?
19      A.   Yes.
20      Q.   Companies like McKesson and
21    Cardinal and AmerisourceBergen, correct?
22      A.   That's correct.
23      Q.   You have other distribution
24    partners that you sell to as well, right?

Page 61

1           MR. LIMBACHER:  Object to
2    form.
3           THE WITNESS:  We have the
4          big three that you mentioned, plus
5          we have some regional wholesalers.
6    BY MR. BUCHANAN:
7       Q.   Do you sell direct to any
8    retail pharmacies?
9       A.   No, we do not.
10      Q.   Not today?  Not ever?
11      A.   Today, no.  We sold to
12    retail distribution centers many years
13    ago.
14      Q.   And just give me a window
15    for when that was happening.
16          MR. LIMBACHER:  Object to
17    form.
18          THE WITNESS:  Prior to 2005,
19          2006, if I recall correctly.
20    BY MR. BUCHANAN:
21      Q.   Okay.  So the orders come in
22    to Endo, as I understand the workflow.
23          Endo has a sales team that
24    interacts with the wholesale distributor

16  (Pages 58 to 61)

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1    customers, true?
2         A.    There is a sales team, yes.
3         Q.    Those sales folks do
4    whatever -- you're not in a sales
5    function, per se?
6         A.    No, I'm not.
7         Q.    You are in the business
8    side, though, of fulfilling orders, fair?
9         A.    Yes.
10        Q.    So those orders come in,
11   they either get keyed in or
12   electronically submitted to Endo?
13             MR. LIMBACHER:  Object to
14        form.
15   BY MR. BUCHANAN:
16        Q.    True?
17        A.    Yes.
18        Q.    There is some review that is
19   conducted of those orders at Endo --
20             MR. LIMBACHER:  Object to
21        form.
22   BY MR. BUCHANAN:
23        Q.    -- correct?
24        A.    Yes.  They go through

Page 63

1    multiple checks and balances within our
2    system.
3         Q.    And then they are
4    transmitted, ultimately, to your
5    third-party logistics company.
6             That would be UPS?
7         A.    Yes.  We send to them -- we
8    send the orders to them electronically
9    for fulfillment.
10        Q.    So you are the first check
11   on an order, "you" being Endo?
12             MR. LIMBACHER:  Object to
13        form.
14             THE WITNESS:  Endo is, yes.
15   BY MR. BUCHANAN:
16        Q.    And you and your team are
17   the people within Endo that are
18   monitoring for suspicious orders --
19        A.    We have a --
20        Q.    -- within Endo?
21        A.    We have a program within our
22   SAP system, yes.
23        Q.    And am I correct, then, in
24   understanding your testimony, ma'am, that

Page 64

1    since the time you've been at Endo,
2    between 1998 and present, no order has
3    been flagged as suspicious by you?
4             MR. LIMBACHER:  Object to
5        form.
6    BY MR. BUCHANAN:
7         Q.    By your group?
8             MR. LIMBACHER:  Misstates
9        her testimony.
10             MR. BUCHANAN:  I'll move to
11        strike again, counsel.
12             And mark the transcript,
13        please.
14   BY MR. BUCHANAN:
15        Q.    You can answer.
16        A.    Am I supposed to answer?
17        Q.    He'll do that throughout the
18   day, and it's supposed to be for my
19   benefit and not yours.  And I can reframe
20   my question if I need to.
21             So you can answer.
22        A.    So when orders -- if I --
23   could you make sure I understand your
24   question?  Could you please repeat it?

Page 65

1         Q.    Am I correct in
2    understanding your testimony, ma'am, that
3    since the time you've been at Endo,
4    between 1998 and present, no order has
5    been flagged as suspicious by your group?
6             MR. LIMBACHER:  Object to
7        form.
8             THE WITNESS:  So all orders
9        are -- that Endo receives go
10        through our SOM program, and there
11       is checks and balances within that
12       program.
13             MR. BUCHANAN:  I'm going to
14       move to strike as nonresponsive.
15   BY MR. BUCHANAN:
16        Q.    Can you answer my question,
17   ma'am?
18             Have you ever --
19        A.    Not that I recall, no.
20        Q.    Okay.  So over the course of
21   the 20 years that you've been in that
22   role, you have never flagged an order as
23   suspicious within your group at Endo,
24   true?

17  (Pages 62 to 65)

Page 66

1      MR. LIMBACHER:  Object to
2  form.  Misstates her testimony.
3      THE WITNESS:  Not that I
4  recall.
5  BY MR. BUCHANAN:
6      Q.   Let's talk about UPS.
7      So after the order clears
8  the Endo internal systems, through the
9  magic of electronics, somehow that order
10  is transmitted to UPS and captured by
11  their order processing system.
12      Would that be fair?
13      A.   The orders are sent to UPS
14  for fulfillment, yes.
15      Q.   And you said UPS has their
16  own checks where they monitor for
17  suspicious orders?
18      A.   Yes, they do.
19      Q.   And to the best of your
20  knowledge, ma'am, has UPS ever identified
21  any order that you have cleared as a
22  suspicious order?
23      MR. LIMBACHER:  Object to
24  form.

Page 67

1      THE WITNESS:  Not that I
2  recall, no.
3  BY MR. BUCHANAN:
4      Q.   And has UPS ever reported a
5  suspicious order for any Endo product
6  over the 20 years that you've been
7  working with them or their predecessor?
8      MR. LIMBACHER:  Object to
9  form.
10      THE WITNESS:  Not that I
11  recall.
12  BY MR. BUCHANAN:
13      Q.   So sitting here today, to
14  the best of your knowledge, as a person
15  who's had the role and responsibility
16  within Endo for looking at suspicious
17  orders, you're not aware of any orders
18  the company has received in 20 years that
19  have been reported to the DEA as
20  suspicious orders; would that be fair?
21      MR. LIMBACHER:  Object to
22  form.
23      THE WITNESS:  Like I stated,
24  we have an excessive program, SOM

Page 68

1  program, in place, orders go
2  through that program.  And they
3  are reviewed and released as
4  necessary.
5      And, no, nothing has been --
6  that I recall, nothing has been
7  reported to the DEA.
8  BY MR. BUCHANAN:
9      Q.   So the answer to my question
10  would be, over the 20 years you're not
11  aware of any order that's been
12  identified, by either Endo or UPS for an
13  Endo product, that's been identified as a
14  suspicious order, fair?
15      MR. LIMBACHER:  Object to
16  form.
17      THE WITNESS:  Not that I
18  recall.
19  BY MR. BUCHANAN:
20      Q.   Okay.  To clarify
21  organizationally, when we talk about
22  Endo, at a point in time, Endo acquired
23  another company known as Qualitest.
24      Do you recall that?

Page 69

1      A.   Yes.
2      Q.   Qualitest had its suite of
3  products; Endo Pharmaceuticals had its
4  suite of products, true?
5      A.   That's correct.
6      Q.   Qualitest was largely
7  focused on generics, while Endo was
8  focused on the branded, fair?
9      MR. LIMBACHER:  Object to
10  form.
11      THE WITNESS:  Yes.
12  BY MR. BUCHANAN:
13      Q.   Is that your understanding?
14      A.   Yes, correct.
15      Q.   There was a group over in
16  Qualitest that had a role and function,
17  at a point in time, with regard to
18  suspicious order monitoring of their
19  products, right?
20      A.   Yes, they did.  I can't
21  speak to it, but they did.
22      Q.   Okay.  With regard to Endo
23  Pharmaceutical's products, that role and
24  function resided -- currently resides

18 (Pages 66 to 69)

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1  with you as the last stop and previously
2  was one of your functions, right?
3      MR. LIMBACHER:  Object to
4  form.
5      THE WITNESS:  Was one of
6  my --
7  BY MR. BUCHANAN:
8      Q.  Was one of your
9  responsibilities?
10     A.  Yes, correct.
11     Q.  You testified on a few
12  occasions, ma'am, that during your time
13  over the last 20 years at Endo there was
14  an excessive order program that was in
15  place.
16     Do you recall that?
17     A.  Yes, there was.
18     Q.  I understand your testimony
19  that you never identified an order over
20  the 20 years within Endo as being
21  suspicious.
22     Do you recall that
23  testimony?
24     MR. LIMBACHER:  Object to

Page 71

1  form.  Asked and answered.
2      THE WITNESS:  Yes.
3  BY MR. BUCHANAN:
4      Q.  Did you ever identify an
5  order as excessive?
6      MR. LIMBACHER:  Object to
7  form.
8      THE WITNESS:  So as I
9  stated, you know, we have an
10  excessive program within Endo,
11  orders go through that program.
12  And if they kick out for any
13  reason, they are reviewed and
14  released as necessary.
15  BY MR. BUCHANAN:
16     Q.  Okay.  And when I said
17  "excessive," that is one of the things
18  that is reviewed in that program?
19     A.  Yes.
20     Q.  Over the course of your
21  years with Endo, ma'am, has the excessive
22  order program identified excessive
23  orders?
24     MR. LIMBACHER:  Object to

Page 72

1  form.
2      THE WITNESS:  Yes.  They
3  have been flagged as excessive.
4  But they are reviewed, like I
5  stated, and there's reasons that
6  you can release orders that are
7  flagged as excessive.
8  BY MR. BUCHANAN:
9      Q.  Okay.  And would it be fair,
10  ma'am, that over the years, you have
11  indeed identified orders as excessive in
12  quantity, true?
13     MR. LIMBACHER:  Object to
14  form.
15     THE WITNESS:  Yes, orders
16  that kicked out as excessive.
17  BY MR. BUCHANAN:
18     Q.  Would it be fair, ma'am,
19  that over the years at Endo, you
20  identified orders of unusual frequency?
21     MR. LIMBACHER:  Object to
22  form.
23     THE WITNESS:  What's your
24  definition of "unusual frequency"?

Page 73

1  BY MR. BUCHANAN:
2      Q.  Do you have one?
3      A.  I'm asking you what your
4  definition is.
5      Q.  I'll work with yours.
6      Do you have a definition of
7  "unusual"?
8      MR. LIMBACHER:  Object to
9  form.
10     THE WITNESS:  It depends.  I
11  don't know what you're asking.  So
12  you need to clarify for me.
13  BY MR. BUCHANAN:
14     Q.  Okay.  Did you understand
15  that one of your roles and functions, in
16  looking for suspicious orders, was to
17  look for orders of unusual frequency?
18     A.  Unusual frequency, it
19  depends.  I mean, there's a lot of
20  reasons orders may kick out as excessive.
21  It could be a holiday buying period.  It
22  could be a supply issue.  It could be a
23  back order.  It could be customers are
24  consolidating.

19 (Pages 70 to 73)

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1     There's many reasons that
2  are valid that orders would kick out as
3  excessive.
4     Q.   My question was simple.  And
5  it was really, just, did you understand
6  that one of your roles and functions, in
7  looking at suspicious orders, was to look
8  for orders of unusual frequency?
9     Did you understand that was
10  one of your roles and functions, ma'am?
11     MR. LIMBACHER:  Object to
12  form.
13     THE WITNESS:  What I can
14  tell you is we had an excessive
15  program.  And orders went through
16  that excessive program and orders
17  potentially kicked out as
18  excessive.  And then they are
19  reviewed.
20     That's how I'm going to
21  answer that question.
22  BY MR. BUCHANAN:
23     Q.   Okay.  Was one of your roles
24  and functions in looking at orders that

Page 75

1  came through your excessive program to
2  look for orders of unusual frequency?
3     MR. LIMBACHER:  Object to
4  form.
5     THE WITNESS:  I'm not -- I
6  think I answered your question.
7  BY MR. BUCHANAN:
8     Q.   Is that one of the things
9  you looked at, ma'am?
10     MR. LIMBACHER:  Object to
11  form.
12     THE WITNESS:  We had an
13  excessive program in place.  The
14  orders went through that excessive
15  program.  And they kicked out if
16  anything was beyond what the
17  program was in place.
18  BY MR. BUCHANAN:
19     Q.   Okay.
20     A.   And to review it.  And I
21  gave you specific answers as to -- or
22  specific reasons as to why orders may
23  have kicked out.
24     Q.   Okay.  Is one of the reasons

Page 76

1  unusual frequency?
2     MR. LIMBACHER:  Object to
3  form.  Vague.
4     THE WITNESS:  It's -- you
5  have to -- we can go round and
6  round about this.  But I don't
7  understand what you're asking, or
8  it's very vague what you're
9  asking.
10  BY MR. BUCHANAN:
11     Q.   Do you understand, ma'am,
12  that as a manufacturer of narcotics, Endo
13  had an obligation to maintain effective
14  controls to prevent diversion?
15     Did you have an
16  understanding of that at any point in
17  time?
18     MR. LIMBACHER:  Object to
19  form.
20     THE WITNESS:  Yes.  And as I
21  explained, we had the appropriate
22  checks and balances in place
23  within our system.
24     Can we take a break soon,

Page 77

1  please?  Can we take a break soon?
2     MR. LIMBACHER:  Sure.
3  Counsel, is that all right?  Is
4  this an appropriate place to take
5  a break?
6     MR. BUCHANAN:  I said the
7  witness can take one when she
8  wanted to, so I'll respect that.
9     MR. LIMBACHER:  Thank you.
10     VIDEO TECHNICIAN:  Off the
11  record.  The time is 9:54.
12        - - -
13     (Whereupon, a brief recess
14  was taken.)
15        - - -
16     VIDEO TECHNICIAN:  We're
17  going back on the record.
18  Beginning of Media File Number 2.
19  The time is 10:10.
20  BY MR. BUCHANAN:
21     Q.   Ma'am, did there come a time
22  in 2017 when you were approached by those
23  within Endo for information to respond to
24  a congressional inquiry concerning Endo's

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1  practices with regard to suspicious order
2  monitoring?
3        A.   Are you speaking of the
4  McCaskill?
5        Q.   Yes.
6        A.   Yes.
7        Q.   You're familiar with that
8  inquiry?
9        A.   Yes, I am.
10        Q.   And you provided information
11  in connection with it, true?
12        A.   Yes.
13        Q.   You've seen the response
14  that was sent to the Senate in connection
15  with that inquiry?
16        A.   Yes.
17        MR. BUCHANAN:  Can we get
18     669, please?
19        MR. SIEGEL:  Endo Walker
20     Number 1.
21        - - -
22        (Whereupon, EndoWalker
23     Exhibit-1,
24     PAR_OPIOID_MDL_0001596408-442, was

Page 79

1        marked for identification.)
2        - - -
3  BY MR. BUCHANAN:
4        Q.   You can do this either way,
5  whatever is most convenient for you,
6  ma'am.  We have it on the screen, and
7  there should have been two passed, one
8  that has the actual exhibit sticker on
9  it.
10        MR. BUCHANAN:  And one for
11     you, counsel.
12  BY MR. BUCHANAN:
13        Q.   I'm passing you what we
14  marked as Exhibit-1 to your deposition,
15  ma'am.  It's an attachment to the
16  transmittal to the Senate in connection
17  with this inquiry.
18        Did you -- just take a few
19  moments to turn the pages.  I'll zoom in
20  fairly specifically on Endo's response.
21  And "Endo" meaning Endo Pharmaceutical.
22        A.   Uh-huh.
23        Q.   I just want to make sure
24  this is something that you've seen and

Page 80

1  are familiar with.
2        A.   Yes, I've seen it.
3        Q.   You've seen it in the
4  ordinary course, or just seen it getting
5  ready for today?
6        MR. LIMBACHER:  Object to
7     form.
8        THE WITNESS:  I've seen it
9     when we were putting it together.
10  BY MR. BUCHANAN:
11        Q.   Okay.  You worked
12  internally, I assume also with outside
13  counsel at that time, in connection with
14  responding to the inquiry?
15        A.   Yes.
16        MR. LIMBACHER:  Object to
17     form.
18  BY MR. BUCHANAN:
19        Q.   Okay.  And this is the
20  attachment that accompanied the letter,
21  and there were other attachments, but one
22  of the attachments that accompanied the
23  letter.
24        Do you recognize it?

Page 81

1        A.   I do.
2        Q.   Let's go to -- would it be
3  fair, ma'am, that there was an inquiry
4  from Ranking Member McCaskill in the
5  summer of 2017 asking for particular
6  information from Endo in various areas,
7  true?
8        A.   Yes, that's correct.
9        Q.   Point one that's on the
10  first page, it says, Please describe any
11  suspicious order monitoring program Endo
12  and its subsidiaries have implemented,
13  including efforts to monitor, investigate
14  or report suspicious transactions between
15  its distributors and pharmacies and
16  efforts to analyze information related to
17  chargeback requests.
18        Did I read that correctly?
19        A.   Yes.
20        Q.   When you turn to the second
21  page -- and the first page is talking
22  about Par's SOM program.
23        Par is the successor by name
24  to Qualitest?

21  (Pages 78 to 81)

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1      A.   That's correct.
2      Q.   So we can understand, this
3   first piece they're referring to that
4   portion of the business that was either
5   Par or Qualitest in prior years, fair?
6          MR. LIMBACHER:  Object to
7      form.
8          THE WITNESS:  Yes, that's
9      correct.
10  BY MR. BUCHANAN:
11     Q.   When we go forward in time,
12  we see -- I shouldn't say "forward in
13  time" -- to the second page of the
14  document, it talks about Endo's SOM
15  program?
16     A.   Yes.
17     Q.   How do you pronounce that as
18  somebody in the field?  Do you pronounce
19  it SOM or S-O-M?  What's your parlance?
20     A.   I mostly say SOM.
21     Q.   Got you.
22          And did this, at the time,
23  ma'am, fairly summarize the then-current
24  practices of Endo with regard to

Page 83

1   suspicious order monitoring?
2          MR. LIMBACHER:  Object to
3      form.
4          THE WITNESS:  Yes, this is
5      our current SOM program.
6   BY MR. BUCHANAN:
7      Q.   And this was the program --
8   this is the program today?
9      A.   Yes, as of --
10         MR. LIMBACHER:  Object to
11     form.
12         THE WITNESS:  Yes, as of
13     today.  Yes.
14  BY MR. BUCHANAN:
15     Q.   And the program in 2017?
16     A.   Correct.
17     Q.   Endo changed its SOM program
18  at some point in time, 2014, 2015, true?
19     A.   In 2014 we made enhancements
20  to it, yes.
21     Q.   So this would describe the
22  as-enhanced program?
23     A.   That would be correct.
24     Q.   Am I correct, ma'am, that

Page 84

1   what this describes is essentially what
2   you were describing to us earlier today,
3   and that would be an order management
4   monitoring within the company's SAP
5   system?
6          MR. LIMBACHER:  Object to
7      form.
8          THE WITNESS:  Yes.  Our SOM
9      program is within our SAP system.
10  BY MR. BUCHANAN:
11     Q.   So what the company does is
12  it gets orders, they get either input or
13  electronically transmitted into the
14  company's SAP system today, correct?
15     A.   Yes.
16     Q.   Then there's an algorithm in
17  that particular system that evaluates
18  orders across different metrics; would
19  that be fair?
20     A.   Yes.
21     Q.   Which you told -- this
22  inquiry, responded to the Senate inquiry
23  was, it evaluates individual orders based
24  on quantity, size and frequency, QSF; is

Page 85

1   that right?
2      A.   Yes.
3      Q.   And then if the system
4   identifies a flag, then you have to clear
5   it, right?
6          MR. LIMBACHER:  Object to
7      form.
8          THE WITNESS:  If orders are
9      flagged, they are kicked out on
10     the report and they are reviewed
11     and then cleared.
12  BY MR. BUCHANAN:
13     Q.   And what the company did in
14  response to this inquiry is actually
15  produced, I believe, the orders that had
16  been flagged by its system over a
17  multi-year period of time and sent that
18  to the ranking member, fair?
19     A.   The orders that were
20  provided for this document were only for
21  certain states.  I believe it was only
22  for the state of Missouri.
23     Q.   Let's look at that.
24          It would be Exhibit B, is

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    that correct, where that was attached?
2         A.   Yes.
3         Q.   And looking at Exhibit B,
4    and I may refer, at times, to dot
5    numbers, you'll see them in the top right
6    corner, .14, for example.
7              So we're on .14 of Exhibit-1
8    to your deposition.  Confusingly, this
9    page is named Exhibit B.  But let's look
10   at that, for example.
11             Are these -- are these
12   orders that were identified by the
13   algorithm as orders requiring further
14   investigation?
15        A.   Yes.
16        Q.   Okay.  And so what we see
17   here when we look at it is the ship date,
18   the customer, customer name, customer
19   address, results of the investigation.
20             Do you see that?
21        A.   Uh-huh.
22        Q.   And then we see the ultimate
23   outcome on the right, right?
24             MR. BUCHANAN:  Is it

Page 87

1              possible to blow that up so we can
2              see the headings a little better?
3    BY MR. BUCHANAN:
4         Q.   Is that more discernible to
5    you, ma'am?
6         A.   I can see it.  It's fine.
7         Q.   Investigative results, that
8    would be the fourth column.
9              And then the fifth column
10   says what?
11        A.   The action that was
12   required.
13        Q.   Okay.  And so what we see
14   are, I don't know, pages on pages of
15   orders that fit the description of the
16   inquiry.
17             Was that just the state of
18   Missouri that you reported out?
19        A.   Correct.
20        Q.   So pages on pages of orders
21   for customers for the state of Missouri
22   that were flagged by the system as
23   excessive by one of those QSF factors,
24   right?

Page 88

1              MR. LIMBACHER:  Object to
2    form.
3              THE WITNESS:  Yes.
4    BY MR. BUCHANAN:
5         Q.   And those QSF factors would
6    be, you know, excessive by quantity,
7    excessive by size or excessive by
8    frequency or unusual in that regard,
9    right?
10             MR. LIMBACHER:  Object to
11   form.
12             THE WITNESS:  By quantity,
13   size or frequency, yes.
14   BY MR. BUCHANAN:
15        Q.   And so these all -- all
16   these orders tripped the wire, so to
17   speak, and got kicked out and required
18   some review; is that right?
19        A.   Yes.
20        Q.   And these are orders that
21   would have been internally investigated
22   by you or your team, fair?
23        A.   Yes, correct.
24        Q.   Okay.  And so I guess the

Page 89

1    far right column, we're back on .14,
2    please, we see kind of the results of
3    these outcomes -- or outcome or results
4    or action for each of these orders
5    following the investigative review by
6    your team, right?
7         A.   I'm sorry, say that one more
8    time.
9         Q.   Yeah.  So we see, in the far
10   right column, is the outcome of your
11   investigation, what happened with the
12   order --
13        A.   Right.
14        Q.   -- right?  Okay.
15             And for that first one
16   there, in May of 2014, what was the
17   conclusion?
18        A.   It was cleared after it was
19   reviewed.
20        Q.   How about for the next one?
21        A.   Cleared after review.
22        Q.   How about the next one?
23        A.   It's the same.  Cleared
24   after review.

23  (Pages 86 to 89)

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1        Q.   How about after that?
2        A.   It was cleared after review.
3        Q.   Would it be fair to say, I
4    guess, if we went through this
5    exercise -- we're now at
6    AmerisourceBergen; is that right?
7        A.   Yes.
8        Q.   And the flag is pended due
9    to order history is the investigative
10   reason.
11            Do you see that?
12       A.   Yes.
13       Q.   And you see cleared after
14   review, cleared after review, cleared
15   after review, cleared after review for
16   all these lines on this page on .14; is
17   that fair?
18       A.   That's correct.
19       Q.   And that would have been
20   cleared after review by you or your team?
21       A.   Yes.
22       Q.   And it wasn't a secret that
23   you and your team were doing this within
24   Endo, right?

Page 91

1            MR. LIMBACHER:  Object to
2        form.
3            THE WITNESS:  No.
4    BY MR. BUCHANAN:
5        Q.   I mean, you provided
6    reports, on a weekly or monthly basis, of
7    the orders that were investigated and
8    their status, right?
9            MR. LIMBACHER:  Object to
10       form.
11           THE WITNESS:  Repeat your
12       question.
13   BY MR. BUCHANAN:
14       Q.   You provided reports on the
15   orders that were pended and then cleared,
16   correct?
17       A.   No.  Reports were not
18   provided.
19       Q.   And then we see on the next
20   page, if we go to .15, let's just start
21   at the top again.  I guess we're still in
22   AmerisourceBergen.
23           And, again, this would just
24   be orders into Missouri, right?

Page 92

1        A.   Yes.
2        Q.   And what was the result, now
3    we're up to, I guess, 2014 for
4    AmerisourceBergen, or 6/27 of 2014.  It's
5    page .15 on the top right corner.
6            What was the outcome of that
7    particular order that was pended due to
8    order history?
9        A.   Cleared after review.
10       Q.   How about the next one?
11       A.   The same.
12       Q.   The next one?
13       A.   The same.
14       Q.   How about for the rest of
15   this page?
16       A.   Cleared after review.
17       Q.   A few dozen orders here for
18   AmerisourceBergen.
19           And then moving into Express
20   Scripts, orders were pended or held
21   initially or kicked out of the system for
22   various reasons, and then in each
23   instance, after a physical review by a
24   person, you or somebody on your team,

Page 93

1    they were cleared?
2            MR. LIMBACHER:  Object to
3        form.
4            THE WITNESS:  Correct.
5    BY MR. BUCHANAN:
6        Q.   And when we say "cleared
7    after review," that means that, then,
8    they are okay from your perspective with
9    regard to UPS, right?
10           MR. LIMBACHER:  Object to
11       form.
12           THE WITNESS:  Cleared after
13       review means they were cleared
14       from Endo's SAP system, but then
15       they were sent to UPS.  And then
16       they also went through UPS's SOM
17       program before they were
18       ultimately shipped out.
19   BY MR. BUCHANAN:
20       Q.   And then you would, under
21   your protocol, receive calls, from time
22   to time, from UPS about orders that were
23   kicked out of their system, correct?
24       A.   UPS will only reach out to

24  (Pages 90 to 93)

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1  me if they needed additional information
2  about an order.
3          Q.    So if they reached out to
4  you in connection with an order that was
5  pended by their system, they might call
6  you in the first instance, correct?
7              MR. LIMBACHER:  Object to
8      form.
9              THE WITNESS:  Repeat that.
10  BY MR. BUCHANAN:
11          Q.    Yes.
12      So UPS, you said, had their
13  own system to review?
14          A.    That's correct.
15          Q.    They had their own
16  algorithm, correct?
17          A.    Yes.
18          Q.    And sometimes there's things
19  that they couldn't address internally
20  within their system, correct?
21              MR. LIMBACHER:  Object to
22      form.
23              THE WITNESS:  If they needed
24      to, they would have reached out

Page 95

1      for additional information.
2  BY MR. BUCHANAN:
3          Q.    And you recall that over the
4  years they did?
5          A.    A few times, yes.
6          Q.    And in each instance when
7  they called you, you cleared it after
8  review, correct?
9              MR. LIMBACHER:  Object to
10      form.
11              THE WITNESS:  I would
12      provide information that UPS
13      needed, depending on what they
14      would need.
15  BY MR. BUCHANAN:
16          Q.    In no instance did you guide
17  UPS not to ship an order, correct?
18              MR. LIMBACHER:  Object to
19      form.
20              THE WITNESS:  UPS makes that
21      ultimate decision whether or not
22      to ship an order.
23          I would just provide
24      information to what UPS needed.  I

Page 96

1  would not tell them to ship or not
2  ship.
3  BY MR. BUCHANAN:
4          Q.    UPS did not reach out to
5  your customers directly, correct?
6          A.    No, they do not.  They reach
7  out to the client.
8          Q.    Right.  So in terms of any
9  assessment with regard to whether an
10  order was suspicious or not, they did not
11  relate or communicate directly with
12  Endo's customers, fair?
13          A.    Correct, right.  They
14  reached out to the client.
15          Q.    Any communication in that
16  regard, with regard to the ultimate
17  purchaser, I should say the ultimate
18  purchaser, in this instance, we're
19  looking on this page, the first line is
20  AmerisourceBergen Corporation, that would
21  have been Endo's customer for that
22  particular order, fair?
23              MR. LIMBACHER:  Object to
24      form.

Page 97

1              THE WITNESS:  Yes, yes.
2  BY MR. BUCHANAN:
3          Q.    So this was pended due to
4  order history.  And then we see, for many
5  of these on this page -- actually, all of
6  them on this page, they were cleared
7  after review, correct?
8          A.    Yes.
9          Q.    If it went to UPS, then it
10  tripped a wire there, they would, if they
11  needed more information and even
12  information from a customer, they would
13  reach out to Endo in the first instance,
14  not AmerisourceBergen, correct?
15              MR. LIMBACHER:  Object to
16      form.
17              THE WITNESS:  If they needed
18      information, yes.
19  BY MR. BUCHANAN:
20          Q.    Okay.  And at no point, to
21  your knowledge, did UPS ever reach out to
22  a customer of Endo's like
23  AmerisourceBergen for information to
24  clear an order or not, fair?

25  (Pages 94 to 97)

Highly Confidential - Subject to Further Confidentiality Review

Page 98

```
 1        A.   Not that I recall, no.  They
 2   reach out to the client.
 3        Q.   And you were the primary
 4   point of contact with UPS?
 5        A.   Yes.
 6            MR. LIMBACHER:  Object to
 7   form.
 8   BY MR. BUCHANAN:
 9        Q.   So we're on .16.  We've been
10   looking at orders into Missouri for Endo
11   products, Endo opioid products over the
12   years.
13            I guess we're still in
14   AmerisourceBergen now, moving into
15   Express Scripts at the bottom.
16            Can you tell us what the
17   result of your inquiry was, again, on the
18   first one here?  What is that, August of
19   2014?
20            MR. LIMBACHER:  Object to
21   form.
22            THE WITNESS:  Cleared after
23   review.
24   BY MR. BUCHANAN:
```

Page 99

```
 1        Q.   And again on this page,
 2   cleared after review, cleared after
 3   review, cleared after review, cleared
 4   after review, cleared after review,
 5   cleared after review, cleared after
 6   review, order on order on order, fair?
 7        A.   Correct.
 8        Q.   That was the determination
 9   with Endo with regard to each of these
10   orders, correct?
11        A.   Yes.
12        Q.   And you understand that when
13   it was cleared after review, from your
14   perspective, from Endo's perspective, it
15   was okay if UPS fulfilled the order,
16   fair?
17            MR. LIMBACHER:  Object to
18   form.
19            THE WITNESS:  No.  When the
20   orders are cleared from Endo, we
21   know that once they hit UPS's
22   system, they go through UPS's SOM
23   program.  And, yes.
24   BY MR. BUCHANAN:
```

Page 100

```
 1        Q.   From Endo's perspective, the
 2   order -- at that point in time, Endo did
 3   not flag an order as suspicious at that
 4   point in time, fair?
 5        A.   Depends on what your
 6   definition of "suspicious" is.
 7   Suspicious as in it was flagged from our
 8   SOM program?
 9        Q.   Well, is that suspicious?
10        A.   It --
11            MR. LIMBACHER:  Object to
12   form.
13            THE WITNESS:  No, not really
14   suspicious, it just -- more
15   information needed to be done with
16   that particular order.
17   BY MR. BUCHANAN:
18        Q.   Okay.  And with regard to
19   each of the orders we see on 669.16, the
20   top right corner of Exhibit-1 to your
21   deposition, we see all those orders were
22   cleared, correct?
23        A.   Uh-huh.
24        Q.   After review, right?
```

Page 101

```
 1        A.   Yes.
 2        Q.   Let's go to .17.
 3            Similar format.  Orders on
 4   orders for various of Endo's customers,
 5   correct?
 6        A.   Yes.
 7        Q.   There's various reasons why
 8   they were kicked out of the SAP system,
 9   correct?
10        A.   Correct.
11        Q.   And on the right, the
12   results of the investigation are noted,
13   fair?
14        A.   Yes.
15        Q.   And with regard to the
16   first, what was the result?
17        A.   Cleared after review.
18        Q.   And the second?
19        A.   The same.
20        Q.   The third?
21        A.   The same.
22        Q.   The next?
23        A.   The same.
24        Q.   For each one on this page,
```

26 (Pages 98 to 101)

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1      again, ma'am?
2          A.   That's correct.
3          Q.   Cleared after review?
4          A.   Uh-huh.
5          Q.   Okay.  And so what had to
6      happen is, the system flagged these
7      orders as orders that tripped the
8      algorithm for being excessive as to
9      quantity or frequency -- what was the
10     other QSF?
11         A.   Quantity, size and
12     frequency.
13         Q.   There you go.
14             They got kicked out of the
15     system or flagged within the system as
16     orders to be further investigated, right?
17             MR. LIMBACHER:  Object to
18     form.
19             THE WITNESS:  Yes.
20     BY MR. BUCHANAN:
21         Q.   When the system -- within
22     the system's perspective, these were
23     orders that needed to be physically
24     reviewed to determine if they were

Page 103

1      suspicious or not, fair?
2              MR. LIMBACHER:  Object to
3      form.
4              THE WITNESS:  They needed to
5      be reviewed, yes.
6      BY MR. BUCHANAN:
7          Q.   And at least with regard to
8      each of the orders that had been flagged
9      for further review on this page, the
10     determination of the human beings within
11     Endo that reviewed those orders is that
12     they were cleared for review, cleared,
13     correct, following review?
14         A.   They were -- correct.
15         Q.   Let's go to the next page,
16     .18.
17             Again, we're still just
18     looking at orders in Missouri, right?
19         A.   Yes.
20         Q.   And looking at
21     AmerisourceBergen, among other ordering
22     entities, customers of Endo, correct?
23         A.   Correct.
24         Q.   We see the rationale, at

Page 104

1      least on the first line, pended due to
2      order history.  We see underneath that,
3      other investigative results, pended due
4      to order history, pended due to order
5      history, correct?
6          A.   Yes.
7          Q.   And off to the right, we see
8      the response of your investigations, you
9      and your team's investigations, right?
10         A.   That's correct.
11         Q.   And in each case, cleared
12     after review, cleared after review,
13     cleared after review, cleared after
14     review, cleared after review?
15         A.   They were.  Yes, they were.
16             But as a reminder, once we
17     cleared them, they still go through UPS's
18     SOM program before they were a shipment
19     out to customers.
20         Q.   And you've told us already
21     that Endo, in circumstances where an
22     order would be flagged by UPS, if UPS
23     required additional information, they
24     would reach out to you, right?

Page 105

1          A.   Correct.  Yes, they would.
2          Q.   Can you recall a single
3      order that you were contacted on by UPS
4      that you directed them not to ship?
5              MR. LIMBACHER:  Object to
6      form.
7              THE WITNESS:  Not that I
8      recall.
9      BY MR. BUCHANAN:
10         Q.   Can you recall a single
11     order that got kicked out by UPS's system
12     that you identified as suspicious if they
13     asked for additional information from
14     you?
15             MR. LIMBACHER:  Object to
16     form.
17             THE WITNESS:  They've asked
18     for additional information on
19     occasion, yes.
20     BY MR. BUCHANAN:
21         Q.   Can you identify any order
22     that they asked you about that you
23     subsequently confirmed, yes, it's
24     suspicious?

27 (Pages 102 to 105)

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1          MR. LIMBACHER:  Object to
2     form.
3          THE WITNESS:  Not that I
4     recall.
5     BY MR. BUCHANAN:
6     Q.   Can you identify any order
7     that wasn't shipped by virtue of any of
8     the flags that were tripped in the system
9     following your reviews?
10         MR. LIMBACHER:  Object to
11    form.
12         THE WITNESS:  By Endo and
13    UPS's review?
14    BY MR. BUCHANAN:
15    Q.   Yes.
16    A.   Not that I recall.
17    Q.   Just looked at .17.  Let's
18    go to .18.
19         Again, we're looking at
20    additional purchase orders from various
21    Endo customers through the years.
22         Still limited to Missouri,
23    correct?
24         MR. LIMBACHER:  Object to

Page 107

1     form.
2          THE WITNESS:  Yes.
3     BY MR. BUCHANAN:
4     Q.   Is it your understanding
5     this entire Attachment B relates to
6     Missouri, ma'am?
7     A.   Yes, that's correct.
8     Q.   Okay.  We're on .18.
9          And we see orders from
10    AmerisourceBergen, among others, that
11    were pended due to order history,
12    correct?
13    A.   Correct.
14    Q.   And off to the right, we see
15    the results, cleared after review,
16    cleared after review, et cetera, et
17    cetera, right?
18    A.   Yes, they were.
19    Q.   None on this were held,
20    correct?
21    A.   No, they were not.
22    Q.   None were cancelled and no
23    one was reported?
24    A.   That's correct.

Page 108

1     Q.   Okay.
2          .20, same story?
3     A.   After the review, yes, they
4     were cleared.
5     Q.   .21, same story?
6          MR. LIMBACHER:  Object to
7     form.
8          THE WITNESS:  Yes.
9     BY MR. BUCHANAN:
10    Q.   I guess there was an
11    objection, so let me be more specific.
12    .21 reflects orders that
13    Endo received from Endo's customers,
14    correct?
15    A.   Yes, these are Endo's
16    customers' orders.
17    Q.   These are customer orders
18    into Missouri only, correct?
19    A.   Yes, into Missouri only.
20    Q.   There's a listing for a
21    reason for an investigation, correct?
22         Do you see that?
23    A.   Yes.
24    Q.   And then there's the outcome

Page 109

1     of that.  And it says, Cleared after
2     review, correct?
3     A.   That's correct.
4     Q.   In each instance on this
5     page, was every order cleared after
6     review?
7     A.   They were cleared after
8     review.  And, again, they went through
9     UPS's SOM program before they were
10    shipped.
11    Q.   Yes.  And I'm focused on
12    Endo's review in the first instance,
13    okay?
14         These were all cleared by
15    Endo's review, correct?
16    A.   I understand that.  But I
17    just wanted to point out that they also
18    go through UPS's SOM program.
19    Q.   And sitting here today,
20    ma'am, there are no orders that you're
21    aware of that weren't also cleared after
22    review by UPS, correct?
23         MR. LIMBACHER:  Object to
24    form.  Asked and answered.

28  (Pages 106 to 109)

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1          THE WITNESS:  They went
2    through UPS's SOM program.
3    BY MR. BUCHANAN:
4          Q.    Right.  And to the best of
5    your knowledge, even those that tripped
6    whatever algorithm they had, based on
7    either their own determination or their
8    interactions with you, they were all
9    cleared for review -- cleared to ship?
10         A.    They were, yes.
11         MR. LIMBACHER:  Object to
12   form.  Asked and answered.
13   BY MR. BUCHANAN:
14         Q.    Okay.  Let's go to .22.
15         Again, ma'am, now we're into
16   2015.  This looks like a sheet of just
17   AmerisourceBergen orders.
18         These were Endo's customers,
19   right?
20         A.    Uh-huh.
21         Q.    Orders through Endo,
22   correct?
23         A.    Yes.
24         Q.    Kicked out of the system

Page 111

1    because they tripped one of the
2    algorithms the company created to monitor
3    for suspicious orders, correct?
4          MR. LIMBACHER:  Object to
5    form.
6          THE WITNESS:  They were
7    kicked out for further review,
8    yes.
9    BY MR. BUCHANAN:
10         Q.    And when a human got
11   involved and looked at the orders, each
12   one of these orders was cleared, correct?
13         A.    That's correct.
14         Q.    Okay.  Let's go to page .23.
15         Just satisfy yourself,
16   ma'am, that we're still looking at Endo's
17   customers here.
18         A.    They are.
19         Q.    These are Endo orders?
20         A.    They are.
21         Q.    There is a computer
22   algorithm that was represented, in the
23   front of this Exhibit-1, to Congress that
24   identified orders of unusual QS&F.

Page 112

1          Do you recall that?
2          A.    They went through --
3          MR. LIMBACHER:  Object to
4    form.
5          THE WITNESS:  Sorry.
6          They went through our
7    excessive program and they kicked
8    out for further review, yes.
9    BY MR. BUCHANAN:
10         Q.    And the further review was,
11   what, for QS&F?
12         MR. LIMBACHER:  Object to
13   form.
14         THE WITNESS:  For the
15   quantity, size and frequency, yes.
16   BY MR. BUCHANAN:
17         Q.    So the company created an
18   algorithm in its order system, it
19   identified orders, and then,
20   notwithstanding that, those orders were
21   cleared and forwarded to UPS for
22   processing, correct?
23         MR. LIMBACHER:  Object to
24   form.

Page 113

1          THE WITNESS:  They were.
2          Another point of
3    clarification, you keep talking
4    about quantity, size and
5    frequency.  And another piece of
6    this was also reviewing the class
7    of trade as well.
8          So these orders also looked
9    on other wholesalers' ordering
10   patterns as well.
11   BY MR. BUCHANAN:
12         Q.    And the system, each of
13   these orders, by -- and these are big
14   customers, right?
15         MR. LIMBACHER:  Object to
16   form.
17         THE WITNESS:  We had three
18   big wholesalers which you know,
19   Endo as -- yes, correct.
20   BY MR. BUCHANAN:
21         Q.    So they are buying lots of
22   product, correct?
23         MR. LIMBACHER:  Object to
24   form.

29  (Pages 110 to 113)

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1      THE WITNESS: They are
2  buying product.
3  BY MR. BUCHANAN:
4      Q.   Okay.  You don't have a
5  sense of whether it was a lot or not?
6      MR. LIMBACHER: Object to
7  form.
8      THE WITNESS:  I can't tell
9  by this information, no.
10 BY MR. BUCHANAN:
11     Q.   And then after these orders
12 get kicked out by the algorithm, a human
13 being looks at them and cleared them
14 all --
15     MR. LIMBACHER: Object to
16 form.
17 BY MR. BUCHANAN:
18     Q.   -- right?
19     A.   Yes.
20     Q.   We see that on the
21 right-hand column on the screen, or on
22 the document itself?
23     A.   Yes.
24     Q.   Okay.  Let's go to .23.

Page 115

1      And you can look at it just
2  quickly, ma'am, and satisfy yourself that
3  we're still just looking at orders in
4  Missouri.
5      A.   Uh-huh.
6      Q.   Still looking at
7  AmerisourceBergen orders.
8      Came in to you, they tripped
9  the wire in your SAP system, correct?
10     MR. LIMBACHER: Object to
11 form.
12     THE WITNESS:  Correct.
13 BY MR. BUCHANAN:
14     Q.   All right.  Then a human
15 being got involved and cleared them --
16     MR. LIMBACHER: Object to
17 form.
18 BY MR. BUCHANAN:
19     Q.   -- right?
20     A.   Yes.
21     Q.   And you sent them off to UPS
22 for fulfillment, correct?
23     A.   After they've gone through
24 UPS's SOM program.

Page 116

1      Q.   And I think you have told us
2  already, ma'am, that if something got
3  flagged by their system and they required
4  information about the order, they would
5  contact you?
6      A.   If they required
7  information, yes.
8      Q.   And you do recall that
9  happening from time to time, correct?
10     A.   From time to time.
11     Q.   And you recall clearing
12 those orders, correct?
13     MR. LIMBACHER: Object to
14 form.  Misstates her testimony.
15     THE WITNESS:  I provided
16 information to UPS.  They had the
17 ultimate decision whether or not
18 to ship it or not.
19 BY MR. BUCHANAN:
20     Q.   Right.  You provided the
21 same type of information that you would
22 consider in internally clearing the
23 order, correct?
24     A.   No, it --

Page 117

1      MR. LIMBACHER: Object to
2  form.
3      THE WITNESS:  No, it would
4  depend on what they needed.
5  BY MR. BUCHANAN:
6      Q.   Understood.
7      Their order could kick out
8  of their system for a different reason
9  than it would for yours, right?
10     A.   Potentially, yes.
11     Q.   All right.  Let's go to .24.
12     We're still in orders that
13 were from Missouri customers of Endo,
14 right?
15     A.   Yes.
16     Q.   Buying narcotics, right?
17     MR. LIMBACHER: Object to
18 form.
19 BY MR. BUCHANAN:
20     Q.   You can answer.
21     A.   Yes.
22     Q.   Orders getting kicked for
23 tripping a wire for one of the quantity,
24 size and frequency characteristics,

30 (Pages 114 to 117)

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1   right?
2           MR. LIMBACHER:  Object to
3       form.
4           THE WITNESS:  Correct.
5   BY MR. BUCHANAN:
6       Q.   And notwithstanding that
7   they are getting flagged, these orders
8   are not being reported to the DEA,
9   correct?
10          MR. LIMBACHER:  Object to
11      form.
12          THE WITNESS:  These orders
13      kick out through our SOM program
14      for further review, correct.
15  BY MR. BUCHANAN:
16      Q.   The answer to my question,
17  just as a factual matter, ma'am, none of
18  these orders that we've looked at to this
19  point, and we're now up to .24, were
20  reported to DEA, correct?
21          MR. LIMBACHER:  Object to
22      form.
23          THE WITNESS:  No, not that I
24      recall.

Page 119

1   BY MR. BUCHANAN:
2       Q.   And after your review of the
3   orders on .24, they were cleared, right?
4       A.   Cleared to go to UPS through
5   their SOM program before shipping.
6       Q.   And which you note here is
7   cleared after review; that's what you
8   stated here, correct?
9           MR. LIMBACHER:  Object to
10      form.
11          THE WITNESS:  They are
12      cleared from Endo's SAP system,
13      and then they still go to UPS
14      through their SOM program before
15      shipping.
16  BY MR. BUCHANAN:
17      Q.   Let's stay with what's
18  written on this document back to the
19  Senate inquiry on .24.
20          What was the outcome listed
21  on the first line?
22      A.   Cleared for review.
23      Q.   Cleared after review, is
24  that what it says?

Page 120

1       A.   Sorry.  Cleared after
2   review.
3       Q.   And the next one says what?
4       A.   The same thing.
5       Q.   And the whole column says
6   that, right?
7       A.   Correct.
8       Q.   Let's go to .25.
9           You've got a lot of orders
10  into Missouri, don't you?
11          MR. LIMBACHER:  Object to
12      form.
13          THE WITNESS:  There's orders
14      into Missouri, yes.
15  BY MR. BUCHANAN:
16      Q.   In fact, these pages that
17  we've been looking at are all orders to
18  big entities, AmerisourceBergen, Express
19  Scripts.  I think we saw --
20      A.   Well, if you look about
21  Express Scripts, that was for a patient
22  assistance program, which is different
23  than a regular order.  So that's
24  different.

Page 121

1       Q.   We can agree
2   AmerisourceBergen is a big company?
3       A.   Yes.
4           MS. ROLLINS:  Object to the
5       form.
6           MR. LIMBACHER:  Object to
7       form.
8   BY MR. BUCHANAN:
9       Q.   Big customers of yours?
10      A.   They are.
11      Q.   So we're on here again and
12  we've got all these orders that are
13  tripping the wire by your internal
14  algorithm, true?
15          MR. LIMBACHER:  Object to
16      form.
17          THE WITNESS:  These went
18      through our excessive program,
19      yes, and needed -- for further
20      review.
21  BY MR. BUCHANAN:
22      Q.   And when a human being got
23  involved on .24, each of these orders was
24  cleared after review, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1          MR. LIMBACHER:  Object to
2    form.
3          THE WITNESS:  Correct.
4    BY MR. BUCHANAN:
5       Q.   Okay.  Let's go to .25.
6          Still looking at Endo's
7    customers?
8       A.   Yes.
9       Q.   Still looking at Missouri
10   orders?
11      A.   Yes.
12      Q.   Still seeing the reason
13   reported, in the fourth column, why it
14   triggered an investigation?
15      A.   Correct.
16      Q.   And still seeing the outcome
17   on the right as cleared after review?
18      A.   Correct.
19      Q.   In each instance for each
20   order, correct?
21      A.   Yes.
22          Another point of
23   clarification, this is -- each one of
24   these lines is not each order.  There's,

Page 123

1    you know, multiple lines on one order.
2    So I don't want you all to think this is,
3    you know, just all individual orders.
4       Q.   So what you're saying, if I
5    understand your testimony, ma'am, is that
6    there's, in fact, multiple line items
7    that fill this order?
8       A.   Correct, right.
9          MR. LIMBACHER:  Object to
10   form.
11   BY MR. BUCHANAN:
12      Q.   So let's now go to .26, for
13   example.  And thank you for that
14   clarification.
15      A.   Right.
16      Q.   We're looking at an order
17   from AmerisourceBergen, a ship date of
18   April 3, 2015, right?
19      A.   Yes.
20      Q.   Okay.  The order -- that's
21   the date the product was shipped,
22   correct?
23      A.   Based on what this is
24   saying, correct.

Page 124

1       Q.   That particular order
2    shipment might involve multiple line
3    items and different bottle counts for
4    different products, correct?
5          MR. LIMBACHER:  Object to
6    form.
7          THE WITNESS:  Uh-huh.
8    BY MR. BUCHANAN:
9       Q.   All right.  And where would
10   you go to figure out what was in that
11   order?
12          MR. LIMBACHER:  Object to
13   form.
14          THE WITNESS:  Our SAP
15   system.
16   BY MR. BUCHANAN:
17      Q.   How long have you been using
18   that to track your orders?
19      A.   Twenty years.
20      Q.   And so how would you figure
21   out what composed each of these orders?
22      A.   There's reports that kick
23   out from SAP.
24      Q.   And what's that report

Page 125

1    called?
2       A.   Orders on hold report, I
3    believe.
4       Q.   Okay.  And so the status of
5    all these orders would be orders on hold,
6    prior to them being cleared?
7          MR. LIMBACHER:  Object to
8    form.
9          THE WITNESS:  Correct.
10   BY MR. BUCHANAN:
11      Q.   So any order that has been
12   flagged, at any point in time by Endo's
13   algorithm, would have been an order on
14   hold, right?
15          MR. LIMBACHER:  Object to
16   form.
17          THE WITNESS:  Yes.
18   BY MR. BUCHANAN:
19      Q.   And then the order status
20   can be changed, right?
21          MR. LIMBACHER:  Object to
22   form.
23          THE WITNESS:  After review.
24   It can be released for shipping,

Highly Confidential - Subject to Further Confidentiality Review

Page 126

```
 1        yes.
 2   BY MR. BUCHANAN:
 3        Q.   So within your system, an
 4   order that trips the wire, so to speak,
 5   is an order on hold?
 6            MR. LIMBACHER:  Object to
 7   form.
 8            THE WITNESS:  Correct.
 9   BY MR. BUCHANAN:
10        Q.   And then I think you said
11   after it clears review it's then released
12   for shipping?
13        A.   It's released to UPS for the
14   order to go through UPS's SOM program
15   before it's released for shipping.
16
17
18
19
20
21
22
23
24
```



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 146



12    Q.    Okay.  If you wanted to get
13  a report of -- I've seen references to
14  pended orders and held orders.
15         Do you use that term the
16  same way?
17         MR. LIMBACHER:  Object to
18  form.
19  BY MR. BUCHANAN:
20    Q.    Are they interchangeable?
21         MR. LIMBACHER:  Object to
22  form.
23         THE WITNESS:  Yes.
24  BY MR. BUCHANAN:

Page 148

1   request is.
2          What are you asking?
3     Q.    I'm asking if you wanted to
4   get a list of all the orders that were
5   held --
6     A.    For --
7     Q.     -- or pended, to enable --
8   pended for suspicious order or excessive
9   quantity or tripping, whatever the
10  company's algorithm was at the particular
11  point in time, and subsequently
12  investigated and the reason for the --
13  clearing the order, what type of report
14  would you ask for?
15         MR. LIMBACHER:  Object to
16  form.
17         THE WITNESS:  Are you asking
18  for orders from a certain time in
19  history, or you're asking for
20  orders today?  Or currently on
21  hold?
22  BY MR. BUCHANAN:
23    Q.    Historical.
24         As we're looking at here,

Page 147

1     Q.    Okay.  Sometimes when UPS
2   was communicating with the company, they
3   would use the term "pended" as well.
4          I mean, did you understand
5   that to be an order they were holding?
6     A.    Yes.

Page 149

Page 150



```
23    BY MR. BUCHANAN:
24        Q.   Okay.  Let's kind of refocus
```

Page 151

```
 1    on Exhibit-1, .29, top right corner.
 2            And with regard to these
 3    from the -- these shipments, the first
 4    line says, what is it, October 28, 2015,
 5    we agree that it tripped the wire with
 6    regard to your system and it was cleared
 7    after review, correct?
 8            MR. LIMBACHER:  Object to
 9    form.
10            THE WITNESS:  I'm sorry,
11    which page are you on again?  29?
12    BY MR. BUCHANAN:
13        Q.   I was on .29, I'm looking at
14    the top right corner.
15        A.   Yes, cleared after review.
16        Q.   And so, too, with the rest
17    on this page, correct?
18        A.   Correct.
19        Q.   Still Missouri customers,
20    correct?
21        A.   Yes.
22        Q.   Let's go to .30.
23            Endo customers?
24        A.   Yes.  This is an Endo
```

Page 152

```
 1    customer.
 2        Q.   From Missouri?
 3        A.   Yes.
 4        Q.   And cleared after review?
 5        A.   Correct.
 6        Q.   Let's go to .31.
 7            MR. LIMBACHER:  Sorry, Dave,
 8    did somebody join on the phone?
 9            Maybe somebody signed off.
10            MR. COSGROVE:  Yes, this is
11    PJ Cosgrove, Ulmer Berne, for
12    Gemini Laboratories in New York
13    case.
14    BY MR. BUCHANAN:
15        Q.   Let's go to .31.  We're in
16    Exhibit-1 to your deposition, Exhibit B,
17    looking at the list of orders into --
18    shipped into Missouri.
19            Again, Endo customers,
20    correct?
21        A.   Yes, correct.
22        Q.   They tripped the QSF wire,
23    correct?
24            MR. LIMBACHER:  Object to
```

Page 153

```
 1    form.
 2            THE WITNESS:  They kicked
 3    out of our excessive program,
 4    correct.
 5    BY MR. BUCHANAN:
 6        Q.   You said "excessive
 7    program," that was your SOM program?
 8        A.   SOM program, sorry.
 9    Interchangeable.
10        Q.   Interchangeable to you?
11        A.   Yes.
12        Q.   And then an investigation
13    was conducted, in each instance, in each
14    row, cleared after review was the -- what
15    was reported out to the ranking member on
16    this one, correct?
17        A.   Yes.
18        Q.   All right.  Let's go to .32.
19            More of the same, ma'am?
20        A.   Correct.
21        Q.   Okay.  Still Endo customers
22    from Missouri?
23        A.   They are.
24        Q.   Tripped the wires?
```

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1          MR. LIMBACHER:  Object to
2     form.
3          THE WITNESS:  They did.
4     BY MR. BUCHANAN:
5          Q.   And I'm using that term, and
6     I just want to make sure, is that a fair
7     characterization --
8          A.   I would say they were kicked
9     out.
10         Q.   Kicked out is what --
11         A.   They were pend, held.
12         Q.   Okay.  So the system was
13    kicking them out and you were putting
14    them back in?
15         MR. LIMBACHER:  Object to
16    form.
17         THE WITNESS:  No, they were
18    kicked out and they were reviewed.
19    And then they were released to
20    UPS, which, again, went through
21    UPS's SOM program before shipping.
22    BY MR. BUCHANAN:
23         Q.   I wasn't trying to fuss with
24    you.  You said just "kicked out."

Page 155

1          If they were kicked out, you
2     brought them back into the flow, right?
3          MR. LIMBACHER:  Object to
4     form.
5          THE WITNESS:  Kicked out was
6     the word you used, but -- so they
7     went through our SOM -- they went
8     through our SOM program, they were
9     held, they were reviewed, and then
10    they were released to UPS.
11    BY MR. BUCHANAN:
12         Q.   Got you.
13         A.   And once they got to UPS,
14    they went through UPS's SOM program --
15         Q.   Right.
16         A.   -- before they were shipped.
17         MR. BUCHANAN:  Move to
18    strike.
19    BY MR. BUCHANAN:
20         Q.   I think we're on .32.
21         Again, all these orders,
22    ma'am, tripped one of the thresholds in
23    your algorithm, correct?
24         MR. LIMBACHER:  Object to

Page 156

1     form.
2     BY MR. BUCHANAN:
3          Q.   "Your" being Endo, correct?
4          A.   Yes.



Page 157

22         More of the same, Missouri
23    customers of Endo, correct?
24         A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1       Q.   Tripped the wires and held,
2  correct?
3            MR. LIMBACHER:  Object to
4       form.
5            THE WITNESS:  Correct.
6  BY MR. BUCHANAN:
7       Q.   When the human beings got
8  their hands on the order, they were
9  cleared after review, correct?
10           MR. LIMBACHER:  Object to
11      form.
12           THE WITNESS:  After they
13      were reviewed, yes.
14  BY MR. BUCHANAN:
15      Q.   Okay.  So, too, on .34.
16           More Endo customers from
17  Missouri?
18      A.   Yes.
19      Q.   Tripped the wire in Endo's
20  suspicious order monitoring system,
21  correct?
22           MR. LIMBACHER:  Object to
23      form.
24           THE WITNESS:  Correct.  And

Page 159

1       then they were reviewed and sent
2       to UPS for shipping.
3  BY MR. BUCHANAN:
4       Q.   Okay.  And then the
5  conclusion of your team was cleared after
6  review in each instance of these,
7  correct?
8       A.   Yes.
9            But as a reminder, once they
10  get to UPS, they go through UPS's SOM
11  program --
12           MR. BUCHANAN:  Move to
13      strike.
14           THE WITNESS:  -- before they
15      are released for shipping.
16           MR. BUCHANAN:  Move to
17      strike the nonresponsive portion.
18  BY MR. BUCHANAN:
19      Q.   We're on to .35.  And this
20  looks like the last of the orders just in
21  Missouri.
22           Again, Endo customers from
23  Missouri, correct?
24      A.   Yes.

Page 160

1       Q.   And these tripped the wire
2  in Endo's suspicious order system,
3  correct?
4            MR. LIMBACHER:  Object to
5       form.
6            THE WITNESS:  They were
7       reviewed.
8  BY MR. BUCHANAN:
9       Q.   And then they were reviewed
10  by a human being, and the hold was lifted
11  and they were -- a delivery note was sent
12  to UPS, fair?
13           MR. LIMBACHER:  Object to
14      form.
15           THE WITNESS:  It was sent to
16      UPS, yes.
17  BY MR. BUCHANAN:
18      Q.   And what's noted on the far
19  right is cleared after review, correct?
20      A.   Correct.
21      Q.   Okay.  I just want to
22  understand.
23           After looking at Exhibit-1,
24  I think what's happening today, or at

Page 161

1  least in 2017, is it correct, ma'am, that
2  what was described in the response, in
3  Exhibit-1 to the Ranking Member
4  McCaskill, that that accurately reflects
5  what you're doing today?
6            MR. LIMBACHER:  Object to
7       form.  Did you want her to review
8       the first several pages of the
9       exhibit?
10           MR. BUCHANAN:  I thought we
11      did.
12  BY MR. BUCHANAN:
13      Q.   You have before you an
14  Exhibit-1, ma'am.
15           I think you told us part was
16  for the generic business, Qualitest and
17  Par, correct?
18           MR. LIMBACHER:  I think you
19      told us that, but --
20           THE WITNESS:  Yes, the
21      beginning is for Par, our generics
22      division.
23  BY MR. BUCHANAN:
24      Q.   And the second part is for

41 (Pages 158 to 161)

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1    the branded division, correct?
2        A.   Yes.
3        Q.   And the part that's
4    summarized in Exhibit-1 for the branded
5    division, Endo, that's what the company
6    is doing to this day, correct?
7            MR. LIMBACHER:  Object to
8    form.
9            THE WITNESS:  Yes. Endo has
10   an SOM program in place.
11   BY MR. BUCHANAN:
12       Q.   And as reflected in
13   Exhibit-1, that is what Endo's SOM
14   program is today?
15           MR. LIMBACHER:  Object to
16   form.
17           THE WITNESS:  We have an SOM
18   program in place.  Orders are
19   reviewed, if they are pended or
20   held or kicked out, whatever word
21   you want to use.
22   BY MR. BUCHANAN:
23       Q.   Is the branded arm of Endo
24   reviewing IMS data concerning its

Page 163

1    products with regard to suspicious order
2    evaluation?
3            MR. LIMBACHER:  Object to
4    form.  Foundation.
5            THE WITNESS:  I can't speak
6    to IMS data.  That's not part of
7    my responsibility.
8    BY MR. BUCHANAN:
9        Q.   Do you understand what IMS
10   data is?
11       A.   I know what IMS data is,
12   yes.  But that's not part of my
13   responsibility.
14       Q.   What is IMS data?
15       A.   It's prescription data for
16   the products.
17       Q.   And you can see down to the
18   prescriber level.  You can also see at
19   the pharmacy level.
20           Are you aware of that?
21           MR. LIMBACHER:  Object to
22   form.
23           THE WITNESS:  I know what
24   IMS data is, yes.

Page 164

1    BY MR. BUCHANAN:
2        Q.   How about Wolters Kluwer; do
3    you use Wolters Kluwer data for anything?
4            MR. LIMBACHER:  Object to
5    form.
6            THE WITNESS:  I can't speak
7    to that.  I don't know.
8    BY MR. BUCHANAN:
9        Q.   Do you conduct due diligence
10   visits as part of your SOM program today?
11           MR. LIMBACHER:  Object to
12   form.
13   BY MR. BUCHANAN:
14       Q.   For branded?
15       A.   So our generic division,
16   which has the same customers as our
17   branded division, performed site visits
18   for our customers and the branded
19   division utilized that data.
20       Q.   When did you start doing
21   that for branded, ma'am?
22       A.   Our generic division has
23   always done site visits.
24       Q.   When did they start doing

Page 165

1    that?
2        A.   I don't recall the actual
3    date.
4        Q.   Do you have confidence they
5    were doing that back in 2010?
6            MR. LIMBACHER:  Object to
7    form.  Foundation.
8            THE WITNESS:  I can't -- I
9    don't recall.  I can't speak to
10   that.
11   BY MR. BUCHANAN:
12       Q.   If I understand your
13   testimony, the branded arm of Endo, or
14   Endo Pharmaceuticals, is relying on due
15   diligence visits of Par?
16           MR. LIMBACHER:  Object to
17   form.  Misstates her testimony.
18   BY MR. BUCHANAN:
19       Q.   Is that right?
20       A.   The Par generics division
21   did customer site visits, that's correct.
22   And Endo has the same limited customer
23   base and Par had the same customers.
24           Actually, Par had more

42  (Pages 162 to 165)

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1   customers than Endo.
2       Q.   And that's a good thing to
3   do?
4           MR. LIMBACHER:  Object to
5   form.
6   BY MR. BUCHANAN:
7       Q.   Site visits?
8       A.   I can't really speak to
9   that.
10      Q.   Well, you said --
11      A.   Par did it.  Par -- yes, I
12  mean, it's important to do site visits.
13      Q.   And it sounded like, from
14  your answer, that Endo was relying on
15  site visits that Qualitest or Par are
16  conducting as part of their process --
17          MR. LIMBACHER:  Object to
18  form.
19  BY MR. BUCHANAN:
20      Q.   -- is that right?
21      A.   I know that Par/Qualitest
22  did site visits of the customers, yes.
23      Q.   But correct me if I'm
24  misunderstanding your testimony, ma'am.

Page 167

1           I thought you answered to me
2   that, when I asked do you conduct site
3   visits on branded, that you were relying
4   on site visits that Qualitest or Par
5   conducted?
6       A.   Our generic --
7           MR. LIMBACHER:  Object to
8   form.
9           THE WITNESS:  Our generic
10  division, yes, that's correct.
11  BY MR. BUCHANAN:
12      Q.   So am I understanding your
13  testimony that you consider that part of
14  your efforts to combat diversion?
15          MR. LIMBACHER:  Object to
16  form.
17          THE WITNESS:  I don't know
18  how to answer that.
19          Could you say your question
20  again?
21  BY MR. BUCHANAN:
22      Q.   So am I understanding your
23  testimony correctly that you consider
24  those due diligence visits of Par and

Page 168

1   Qualitest to be part of Endo's efforts to
2   prevent -- to combat diversion of its
3   branded products?
4           MR. LIMBACHER:  Object to
5   form.
6           THE WITNESS:  One thing that
7   is slightly different between
8   branded and generics is branded
9   has the same customer base.  We
10  don't add new customers, as the
11  generic division may or may not
12  do.
13          So we have the same customer
14  base as our generic group.  So we
15  partnered with our generic group,
16  and we used their site visits of
17  the branded customers, because
18  it's the same customer base.
19          The generics may have more.
20  We have a limited customer base,
21  and that's the same customer base
22  that our generics also have.
23  BY MR. BUCHANAN:
24      Q.   Okay.  So have you ever been

Page 169

1   on a due diligence visit for one of
2   Endo's customers?
3       A.   No.
4       Q.   Have you ever been on a due
5   diligence visit for one of Endo's
6   customer's customers?
7           MR. LIMBACHER:  Object to
8   form.
9           THE WITNESS:  No.  Our
10  customer is the wholesaler.
11  BY MR. BUCHANAN:
12      Q.   Do you recognize a
13  responsibility by Endo to know its
14  customers?
15          MR. LIMBACHER:  Object to
16  form.
17          THE WITNESS:  Yes.
18  BY MR. BUCHANAN:
19      Q.   To ensure that its customers
20  are not engaging in -- withdrawn.
21          And to ensure that its
22  customers have good suspicious order
23  monitoring systems?
24      A.   I know that our customers,

43  (Pages 166 to 169)

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1    the wholesalers, have an SOM program in
2    place.
3         Q.    You're aware that they've
4    gotten -- they've had some problems, some
5    of your customers, true?
6         A.    I can't --
7              MR. LIMBACHER:  Object to
8    form.
9              THE WITNESS:  I can't speak
10   to that.
11   BY MR. BUCHANAN:
12        Q.    You're aware that some of
13   Endo's customers had their registrations
14   pulled?
15             MR. LIMBACHER:  Object to
16   form.
17             THE WITNESS:  I can't speak
18   to that.
19   BY MR. BUCHANAN:
20        Q.    You don't have an awareness
21   of that?
22        A.    I have an awareness, yes.
23   But I don't have any details that I can
24   provide.

Page 171

1         Q.    Well, did you attempt to
2    ensure that the customers you were
3    selling Endo's products to had good
4    suspicious order monitoring practices?
5              MR. LIMBACHER:  Object to
6    form.
7              THE WITNESS:  I know that
8    the wholesalers have SOM programs
9    in place.
10   BY MR. BUCHANAN:
11        Q.    And so please tell us about
12   how you conducted your due diligence on
13   that.
14             MR. LIMBACHER:  Object to
15   form.
16             THE WITNESS:  We just know,
17   just -- you know, our customers
18   have told us that they have SOM
19   programs in place.
20   BY MR. BUCHANAN:
21        Q.    Okay.
22        A.    I don't have the details of
23   those programs.  I just know that they
24   have one in place.

Page 172

1         Q.    Okay.  Well, as part of
2    evaluating your customer's due diligence
3    programs, did you collect them?
4         A.    No.  But our customer is the
5    wholesaler.  Who they ship to is on them,
6    not on Endo.
7         Q.    And the answer to my
8    question, just so I'm clear, is no?
9              You didn't collect them; is
10   that correct?
11             MR. LIMBACHER:  Object to
12   form.
13             THE WITNESS:  Did I collect
14   what?
15   BY MR. BUCHANAN:
16        Q.    Did you collect the SOM
17   programs and evaluate the SOM programs of
18   Endo's customers?
19             MR. LIMBACHER:  Object to
20   form.
21             THE WITNESS:  No, I did not.
22   BY MR. BUCHANAN:
23        Q.    Okay.
24        A.    Our Qualitest group may

Page 173

1    have, as part of their site visits.
2         Q.    Do you have an awareness,
3    sitting here today, as to what your
4    customers' SOM program looks like that
5    you were selling Endo-branded
6    pharmaceuticals to?
7              MR. LIMBACHER:  Object to
8    form.
9              THE WITNESS:  No, all I know
10   is they have an SOM program in
11   place.
12   BY MR. BUCHANAN:
13        Q.    Okay.  And have you seen the
14   SOM program for any of Endo's customers?
15             MR. LIMBACHER:  Object to
16   form.  Asked and answered.
17             THE WITNESS:  No, I have
18   not.
19   BY MR. BUCHANAN:
20        Q.    And have you personally
21   asked for it from any of Endo's
22   customers?
23        A.    I know that our wholesalers
24   have an SOM program in place.

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1      Q.   I don't think you're
2  following my question.  Let me see if I
3  can read it back.
4          Have you personally asked
5  for any of Endo's customers' SOM
6  programs, ma'am?
7      A.   I can tell you that I know
8  our wholesalers have an SOM program in
9  place.  I do not know any details behind
10 that SOM program, but I know they have
11 one in place.
12     Q.   My question is, have you
13 ever asked for any of your
14 wholesalers' --
15     A.   Not that I --
16     Q.   -- programs?
17     A.   Not that I recall.
18         MR. LIMBACHER:  We've been
19 going about an hour, Dave, is this
20 a good time to stop?
21         MR. BUCHANAN:  If you need
22 it, it's fine.
23         MR. LIMBACHER:  Thank you.
24         VIDEO TECHNICIAN:  Going off

Page 175

1  record.  The time is 11:14.
2              - - -
3          (Whereupon, a brief recess
4  was taken.)
5              - - -
6          VIDEO TECHNICIAN:  We're
7  going back on the record.  This is
8  the beginning of Media File Number
9  3.  The time is 11:33.
10 BY MR. BUCHANAN:
11     Q.   Ms. Walker, we're back on
12 the record.
13         You're still under oath.
14 You understand that, correct?
15     A.   Yes, I do.
16     Q.   I want to take us back to
17 your Exhibit-1.  You have the report.  It
18 says, Attachment.
19         With regard to Ranking
20 Member McCaskill's July 26, 2017 letter,
21 Endo provides the following response.
22         We were talking about Item
23 1, Please describe any suspicious order
24 monitoring program Endo and its

Page 176

1  subsidiaries have implemented, including
2  efforts to monitor, investigate or report
3  suspicious transactions between its
4  distributors and pharmacies and efforts
5  to analyze information related to
6  chargeback requests.
7          Do you see that?
8      A.   Yes, I do.
9      Q.   Okay.  There's a summary of
10 Par's SOM program on the front page,
11 correct?
12     A.   Yes.
13     Q.   And on the second page, we
14 begin the characterization of Endo's SOM
15 program.
16         Do you see that?
17     A.   I do see that.
18     Q.   Okay.  In regards to the
19 request from Ranking Member McCaskill
20 about chargeback information, I don't see
21 any response with regard to what Endo
22 does in that regard.
23         Do you?
24         MR. LIMBACHER:  Object to

Page 177

1  form.
2          THE WITNESS:  No.
3  Chargeback data is not listed
4  under the Endo SOM program.
5  BY MR. BUCHANAN:
6      Q.   So describe how Endo branded
7  uses chargeback data in connection with
8  its suspicious order monitoring program.
9      A.   Endo does not use the
10 chargeback data with our SOM program.
11     Q.   It doesn't use it today?
12     A.   No, we do not.
13     Q.   Didn't use it, obviously, in
14 2017 during the time of this, correct?
15     A.   That's correct.  In the --
16     Q.   And didn't --
17         MR. LIMBACHER:  Sorry, were
18 you finished in your answer?
19 BY MR. BUCHANAN:
20     Q.   Did you use it in 2017?
21     A.   No, we did not.
22         But I just wanted to point
23 out, the reason for that is the branded
24 opioid products are not on retail

45  (Pages 174 to 177)

Highly Confidential - Subject to Further Confidentiality Review

Page 178

```
 1   contracts, which is different from the
 2   generics division. So that's the reason
 3   why chargeback data was not utilized.
 4       Q.  Does the company not have
 5   any chargeback agreements with any of its
 6   distributors for branded products?
 7       A.  I can't speak to chargeback
 8   contracts, because that's not my area. I
 9   just know that the branded opioids are
10   not on retail-type contracts like
11   generics are. That's the only thing that
12   I can -- that I can speak of.
13       Q.  Well, is it your testimony,
14   ma'am, that the company does not have
15   chargeback data for branded products?
16           MR. LIMBACHER: Object to
17       form.
18           THE WITNESS: I can't
19       confirm that. There may be some,
20       but I know they're not on retail
21       contracts. There may be -- I
22       don't want to speculate, because
23       it's not my area of
24       responsibility. But there may be
```

Page 179

```
 1       some government contracts where
 2       there are branded opioid products.
 3   BY MR. BUCHANAN:
 4       Q.  Do you know, in connection
 5   with your agreements with UPS over the
 6   years, there's been provisions with
 7   regard to chargeback data with regard to
 8   Endo?
 9           MR. LIMBACHER: Object to
10       form.
11           THE WITNESS: UPS --
12   BY MR. BUCHANAN:
13       Q.  And who is going to handle
14   that responsibility?
15       A.  UPS does not handle any of
16   our chargeback data. Because, again,
17   retail contracts are not for branded
18   opioid products. There are no retail
19   contracts for that.
20       Q.  What is a chargeback, ma'am?
21       A.  You want me to explain what
22   a chargeback is?
23       Q.  Sure.
24       A.  A chargeback is, for
```

Page 180

```
 1   example, if we charge the wholesaler $10
 2   and then there's a retail contract for $5
 3   and the wholesaler charges it for $5 to
 4   XYZ retailer, the wholesaler charges us
 5   back the difference between $10 and $5.
 6       Q.  And you're saying your
 7   relationships with the wholesalers did
 8   not permit them to do that with regard to
 9   branded products?
10       A.  No, that's not --
11           MR. LIMBACHER: Object to
12       form. Misstates her testimony.
13           THE WITNESS: No, that's not
14       what I'm saying.
15           What I'm saying is, number
16       one, chargebacks and contracts is
17       not my responsibility. But from
18       what I know, branded opioid
19       products are not on any retail
20       contract. So there would be no
21       reason for the chargeback -- for
22       the wholesalers to send us
23       chargeback data if they're not on
24       contract.
```

Page 181

```
 1   BY MR. BUCHANAN:
 2       Q.  I'm just asking as a factual
 3   matter.
 4           Does the company have
 5   chargeback data with regard to its
 6   branded opioid products; yes or no?
 7           MR. LIMBACHER: Object to
 8       form. Asked and answered.
 9           THE WITNESS: I can't
10       confirm that. Like I said --
11   BY MR. BUCHANAN:
12       Q.  Do you know?
13       A.  I told you what I know. But
14   I -- I know they're not on retail
15   contracts, but I do not know -- I
16   believe, but I do not know if they're on
17   any government contracts. You have to
18   speak to somebody else within the
19   company.
20       Q.  So you disagree with others
21   within Endo who state that the company
22   has more chargeback data on branded
23   products?
24           MR. LIMBACHER: Object to
```

Highly Confidential - Subject to Further Confidentiality Review

Page 182

```
1           form.
2                 THE WITNESS:  I don't know
3       what that -- I don't know who
4       would say that.  I can't confirm
5       or deny that.
6       BY MR. BUCHANAN:
7            Q.   You said you can't confirm
8       or deny that.
9                 I mean, is this not your
10      area, ma'am?
11           A.   It's not my area.
12           Q.   So let's now step back.
13                Have you ever asked for
14      chargeback data with regard to branded
15      products?
16           A.   No, I have not.
17           Q.   Have you ever used
18      chargeback data as part of a suspicious
19      order monitoring protocol?
20                MR. LIMBACHER:  Object to
21      form.
22                THE WITNESS:  No.
23      BY MR. BUCHANAN:
24           Q.   When you look at the
```

Page 183

```
1       company's response to Senator McCaskill,
2       would you agree with me that there's no
3       statement in the response that the
4       company doesn't use chargeback data for
5       its branded products because the
6       chargeback data for branded products
7       would be of no use?
8                 MR. LIMBACHER:  Object to
9       form.
10      BY MR. BUCHANAN:
11           Q.   Would you agree it says
12      nothing like that?
13                MR. LIMBACHER:  The document
14      speaks for itself.  If you want
15      her to tell you what the document
16      says --
17                MR. BUCHANAN:  I don't, I
18      just want her to answer my
19      question.
20                MR. LIMBACHER:  -- then
21      you're going to have to give her
22      the opportunity to read the entire
23      document.
24      BY MR. BUCHANAN:
```

Page 184

```
1            Q.   Feel free to read --
2                 MR. LIMBACHER:  Do you want
3       her to do that?
4       BY MR. BUCHANAN:
5            Q.   Feel free to read the
6       characterization of Endo's SOM process,
7       ma'am.
8                 MR. LIMBACHER:  So starting
9       on the second page and going
10      through to the fifth page, I
11      believe.
12                THE WITNESS:  That's Par's.
13      BY MR. BUCHANAN:
14           Q.   Have you had a chance to
15      review it, ma'am?
16           A.   I have.
17           Q.   What answer did Endo provide
18      to Ranking Member McCaskill with regard
19      to its efforts to analyze chargeback
20      requests on its branded products?
21                MR. LIMBACHER:  Object to
22      form.
23                THE WITNESS:  It's not
24      listed.
```

Page 185

```
1       BY MR. BUCHANAN:
2            Q.   Decided not to answer the
3       request?
4                 MR. LIMBACHER:  Object to
5       form.
6                 THE WITNESS:  I can't speak
7       to that.  I don't know.  It's not
8       listed.
9       BY MR. BUCHANAN:
10           Q.   You reviewed this response
11      before it went in, fair?
12           A.   Yes.
13                MR. LIMBACHER:  Object to
14      form.
15      BY MR. BUCHANAN:
16           Q.   I'm assuming others within
17      the organization reviewed it as well,
18      correct?
19           A.   Yes.
20           Q.   Do you have an awareness of
21      that?
22           A.   Yes.  Yes, an awareness.
23           Q.   Folks in senior management
24      reviewed it, to your knowledge?
```

47 (Pages 182 to 185)

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1    MR. LIMBACHER: Object to
2  form.
3  BY MR. BUCHANAN:
4    Q.   Do you know?
5    A.   I don't know.
6    Q.   Okay.  We can agree that the
7  company, in responding to this inquiry,
8  didn't state that it doesn't use
9  chargeback information because it would
10  be of no value with regard to branded
11  products, correct?
12    MR. LIMBACHER: Object to
13  form.  The document speaks for
14  itself.
15  BY MR. BUCHANAN:
16    Q.   We can agree it doesn't say
17  that?
18    A.   After reading it, it does
19  not mention any chargeback data.
20    Q.   We can agree it doesn't say
21  that the company doesn't have chargeback
22  data with regard to branded products,
23  correct?
24    MR. LIMBACHER: Object to

Page 187

1  form.
2    THE WITNESS:  I don't think
3  it says that, it's just
4  chargebacks is just not listed.
5  BY MR. BUCHANAN:
6    Q.   It says nothing?
7    A.   Right.  It doesn't say one
8  way or the other.  It's just not listed.
9    Q.   It ignores the request?
10    MR. LIMBACHER: Object to
11  form.
12    THE WITNESS:  I -- it's not
13  listed.  That's all I can tell
14  you.
15  BY MR. BUCHANAN:
16    Q.   Well, the company did
17  provide something with regard to what
18  Qualitest was doing, right?
19    A.   Yes.
20    Q.   As part of your role and
21  function, or, I guess, as an employee of
22  Endo, do you complete periodic reviews of
23  your own performance, ma'am?
24    A.   Yes.  We do it every year.

Page 188

1    Q.   You've had some role and
2  involvement with regard to chargebacks
3  over the years; isn't that true?
4    A.   Years ago, yes.
5    Q.   So the company does have
6  chargeback data on its branded products,
7  correct?
8    MR. LIMBACHER: Object to
9  form.
10    THE WITNESS:  Yes.
11  BY MR. BUCHANAN:
12    Q.   And chargeback data provides
13  information at the retail level, correct?
14    A.   From what I know of
15  chargeback data for branded opioid
16  products, there are no -- they are not on
17  retail contracts, so you would not have
18  any chargeback data for retail.
19    Q.   Okay.  Have you looked at
20  the chargeback data for branded opioid
21  products, ma'am?
22    MR. LIMBACHER: Object to
23  form.
24    THE WITNESS:  Not recently,

Page 189

1  no, because it's not my area of
2  responsibility.
3  BY MR. BUCHANAN:
4    Q.   Have you examined chargeback
5  data for Endo's branded work to see
6  whether it has information at your
7  customers' customer level?
8    MR. LIMBACHER: Object to
9  form.
10    THE WITNESS:  No, I have
11  not.
12  BY MR. BUCHANAN:
13    Q.   At any point in time, when
14  you've had a role or responsibility for
15  suspicious orders within suspicious order
16  monitoring within Endo, you haven't
17  considered chargeback data, true?
18    MR. LIMBACHER: Object to
19  form.
20    THE WITNESS:  I had the
21  information that I needed to do my
22  job.
23  BY MR. BUCHANAN:
24    Q.   Not my question, ma'am.

48  (Pages 186 to 189)

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1          Just as a factual matter, in
2    doing your job, at any point in time did
3    you consider chargeback data as part of
4    the suspicious order monitoring function?
5          A.   No.
6          Q.   As part of your doing your
7    job, did you ever consider IMS data as
8    part of doing suspicious order
9    monitoring?
10         MR. LIMBACHER:  Object to
11   form.
12         THE WITNESS:  IMS is not
13   part of my job responsibility.
14   BY MR. BUCHANAN:
15         Q.   And you never considered it,
16   then, certainly, as part of suspicious
17   order monitoring, fair?
18         MR. LIMBACHER:  Object to
19   form.
20         THE WITNESS:  Not
21   particularly in my role.  But
22   there may have been other people
23   within Endo that has done
24   something with that data.  But not

Page 191

1    me.
2    BY MR. BUCHANAN:
3          Q.   Within --
4          A.   And I can't speak to other
5    roles within the company.
6          Q.   Within the suspicious order
7    monitoring role or function of Endo
8    branded products, to the best of your
9    knowledge, IMS data has never been a
10   component of that analysis, correct?
11         MR. LIMBACHER:  Object to
12   form.  Foundation.
13         THE WITNESS:  I had enough
14   data to do my job.  The IMS data
15   is part of another area of
16   responsibility within Endo.  They
17   may have.  I can't speak to it,
18   but they may have done something
19   with that.
20   BY MR. BUCHANAN:
21         Q.   The answer to my question,
22   then, would be, no, you didn't analyze
23   IMS data as part of your role and
24   function in suspicious order monitoring,

Page 192

1    fair?
2          MR. LIMBACHER:  Object to
3    form.
4          THE WITNESS: I had --
5          MR. LIMBACHER:  Misstates
6    her testimony.
7          THE WITNESS:  I had the data
8    that I needed to do my job.
9    BY MR. BUCHANAN:
10         Q.   Was that data IMS data,
11   ma'am?
12         A.   There's other -- IMS data is
13   not part of my responsibility.
14         Q.   Ma'am, just tell me, did you
15   consider IMS data in connection with your
16   role and function of monitoring
17   suspicious orders for Endo; yes or no?
18         MR. LIMBACHER:  Object to
19   form.  Asked and answered.
20         THE WITNESS:  I had the data
21   that I needed to do my job.  IMS
22   data is within another area within
23   Endo.  There's other people that
24   reviewed that data.  I did not.

Page 193

1    BY MR. BUCHANAN:
2          Q.   Did the other people within
3    Endo review IMS data for suspicious order
4    monitoring?
5          A.   I can't speak to that other
6    area of responsibility.  It's not my
7    area.
8          Q.   To the best of your
9    knowledge, sitting in this chair today,
10   Endo did not consider IMS data as part of
11   its suspicious order monitoring function,
12   correct?
13         MR. LIMBACHER:  Object to
14   form and foundation.
15   BY MR. BUCHANAN:
16         Q.   To the best of your
17   knowledge.  That's all we can get today,
18   ma'am.
19         A.   And I'm going to tell you
20   again, I had enough data -- I had the
21   data to do my job.  The IMS data was in
22   another area of responsibility within
23   Endo.  What they did or did not do with
24   that data, I cannot speak to.

49 (Pages 190 to 193)

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1    Q.   At any point in time, did
2  Endo ask one of its customers, one of its
3  distributor or wholesaler customers, to
4  reduce its order size to account for
5  pharmacy customers or other customers of
6  concern?
7         MR. LIMBACHER:  Object to
8    form.
9         THE WITNESS:  Not that I
10   recall.
11 BY MR. BUCHANAN:
12   Q.   Are you familiar with the
13 phrase "know your customer's customer"?
14   A.   Yes.
15   Q.   What does that mean, or what
16 does that mean to you, ma'am?
17   A.   Knowing who our customers
18 ship to.
19   Q.   Knowing whether they have a
20 proper purpose, right?
21        MR. LIMBACHER:  Object to
22   form.
23        THE WITNESS:  Potentially,
24   yes.

Page 195

1  BY MR. BUCHANAN:
2    Q.   At any point in time, did
3  Endo guide its distributor or wholesaler
4  customers to reduce the size of its
5  orders to account for certain of their
6  customers engaged in suspicious
7  activities?
8         MR. LIMBACHER:  Object to
9    form.
10        THE WITNESS:  Not that I
11   recall.
12 BY MR. BUCHANAN:
13   Q.   Do you have an awareness,
14 ma'am, that Qualitest did that at some
15 point in time?
16   A.   No.  That's the generics
17 division, no.
18   Q.   You didn't have visibility
19 to what the generic team was doing with
20 regard to their suspicious order
21 monitoring protocol?
22        MR. LIMBACHER:  Object to
23   form.
24        THE WITNESS:  No.

Page 196

1  BY MR. BUCHANAN:
2    Q.   So if Qualitest was, in
3  fact, guiding distributor and wholesaler
4  customers at a point in time, let's say
5  2014, that they would have to reduce
6  their orders to account for certain
7  customers of concern, that would be news
8  to you sitting here today?
9         MR. LIMBACHER:  Object to
10   form.
11        THE WITNESS:  That's the
12   generic side of the business.
13   That's not branded.  It's
14   different.
15 BY MR. BUCHANAN:
16   Q.   Well, you had interactions
17 with the generic side of the business,
18 correct?
19   A.   Yes, but not detail of what
20 they're shipping and not shipping, no.
21   Q.   Are you saying you didn't
22 have visibility to Qualitest's SOM
23 program?
24   A.   No, I did not.

Page 197

1         MR. LIMBACHER:  Object to
2    form.
3         THE WITNESS:  Sorry.
4         MR. LIMBACHER:  Asked and
5    answered.
6  BY MR. BUCHANAN:
7    Q.   To be clear, Qualitest and
8  Par, as the name changed, report to the
9  same corporate parent that Endo
10 Pharmaceuticals did, correct?
11        MR. LIMBACHER:  Object to
12   form.
13        THE WITNESS:  Yes.
14 BY MR. BUCHANAN:
15   Q.   You did not think it would
16 be of interest as to what your peer
17 company, owned by the same parent, was
18 doing with regard to suspicious order
19 monitoring?
20        MR. LIMBACHER:  Object to
21   form.
22        THE WITNESS:  That was not
23   part of my responsibility.  We
24   also have two different ERP

50  (Pages 194 to 197)

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1    systems.  So no.
2  BY MR. BUCHANAN:
3    Q.   Let's look at the document
4  we've been looking at, Exhibit-1.
5          669.2 is the page reference
6  at the top right.  It's Exhibit-1.  To
7  further supplement Par's SOM compliance
8  efforts, Par's DEA compliance team
9  reviews available chargeback data twice
10  per year.  Chargebacks provide
11  transactional data of Par NDC numbers at
12  the pharmacy level.  The chargeback
13  information for secondary customer
14  purchases is compared to national
15  averages.  If chargeback information
16  indicates a customer facility of
17  interest, Par follows these general
18  guidelines.
19          And then it continues.
20          Do you see that?
21    A.   Yes.
22    Q.   First, you saw this,
23  obviously, in 2017, correct?
24    A.   Correct.

Page 199

1    Q.   The company is not -- "the
2  company" being the one that you're
3  employed by, Endo Pharmaceuticals, has
4  not changed its SOM program since 2017,
5  correct?
6    A.   No, we have not changed it.
7    Q.   Okay.  Do you agree that
8  chargebacks provide transactional data of
9  Par NDC numbers at the pharmacy level?
10    A.   I can't speak to what Par
11  does and does not do.  I don't know their
12  systems.
13    Q.   Do you agree, as a general
14  matter, chargebacks provide transactional
15  data of NDC numbers at the pharmacy
16  level?
17          MR. LIMBACHER:  Object to
18  form.
19          THE WITNESS:  Yes.
20  BY MR. BUCHANAN:
21    Q.   Do you agree that it's
22  reasonable to compare chargeback
23  information for secondary customer
24  purchases to national averages as Par

Page 200

1  does?
2          MR. LIMBACHER:  Object to
3  form.
4          THE WITNESS:  I can't speak
5  to that.
6  BY MR. BUCHANAN:
7    Q.   Do you think it's a
8  reasonable thing to do?
9          MR. LIMBACHER:  Object to
10  form.
11          THE WITNESS:  I can't speak
12  to that.  I don't manage the
13  generics.
14  BY MR. BUCHANAN:
15    Q.   If you were told to do that,
16  you certainly should do it, right?
17          MR. LIMBACHER:  Object to
18  form.
19          THE WITNESS:  I don't manage
20  the generics.
21  BY MR. BUCHANAN:
22    Q.   Would you agree that if you
23  were told by the DEA to do it, you should
24  do it?

Page 201

1          MR. LIMBACHER:  Object to
2  form.
3          THE WITNESS:  If chargeback
4  data was available.
5  BY MR. BUCHANAN:
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1  [redacted]
2
3
4
5
6
7
8   a reasonable due diligence measure?
9       MR. LIMBACHER:  Object to
10      form.
11      THE WITNESS:  This is the
12      generics.  I can't speak to the
13      generics.  This is -- you are
14      speaking about generic product.  I
15      can't speak to the generics.
16  BY MR. BUCHANAN:
17      Q.   You have responsibility for
18  branded?
19      A.   Correct.  Branded.
20      Q.   Okay.  At what point in
21  time, ma'am, did you ask for chargeback
22  data on branded?
23      MR. LIMBACHER:  Object to
24      form.

Page 203

1   BY MR. BUCHANAN:
2       Q.   Just I want to know
3   factually, at what point in time did you
4   ask for it?
5       A.   So I'm going to try to
6   explain this one more time.
7       The branded and generic
8   products are different entities.  There
9   are no -- from my knowledge and what I
10  know, there are no branded contract --
11  retail contracts, which means you do not
12  have chargeback data for the branded
13  opioid products.  So you can't ask for
14  data that you do not have.
15      Q.   Do you remember my question?
16      A.   And I believe I answered it.
17      Q.   Factually, at what point in
18  time did you inquire about the use of
19  chargeback data?  Just let me know when
20  you did.
21      A.   How can you ask --
22      MR. LIMBACHER:  Object to
23      form.
24      THE WITNESS:  How can you

Page 204

1       ask for data that you don't have?
2   BY MR. BUCHANAN:
3       Q.   Would it surprise you,
4   ma'am, if there was chargeback data at
5   the pharmacy level for branded?
6       MR. LIMBACHER:  Object to
7       form.
8       THE WITNESS:  From what I
9       know, the chargeback data --
10  BY MR. BUCHANAN:
11      Q.   Would that surprise you?
12      A.   It probably would.
13      MR. LIMBACHER:  Let her
14      finish her answer, please.
15  BY MR. BUCHANAN:
16      Q.   Okay.
17      A.   But from what I know, the
18  chargeback data that we have for opioids
19  is related to the government contracts.
20  Again, contracts are not my area of
21  expertise, but that's my general
22  knowledge.
23      Q.   Okay.  And just to get an
24  answer to my question, it would surprise

Page 205

1   you if the company had chargeback data
2   for branded opioids at the pharmacy
3   level, correct?
4       MR. LIMBACHER:  Object to
5       form.
6       THE WITNESS:  Yes.
7   BY MR. BUCHANAN:
8       Q.   And we can agree that when
9   the company was responding to the Senate
10  inquiry here in 2017, it said nothing
11  about its ability or inability to get
12  chargeback data on its branded products,
13  correct?
14      MR. LIMBACHER:  Object to
15      form.  Asked and answered.
16      THE WITNESS:  Yes, that's
17      not listed in the document.
18  BY MR. BUCHANAN:
19      Q.   Okay.  You spent some time
20  in discussing with me -- or we spent some
21  time together talking about Exhibit-1,
22  with regard to what Endo was doing in
23  2017 with regard to suspicious order
24  management.

52 (Pages 202 to 205)

Highly Confidential - Subject to Further Confidentiality Review

Page 206

```
1          Do you recall that
2   discussion last hour?
3          A.   Yes.
4          Q.   It would be fair that prior
5   to 2014, Endo had a limited SOM program,
6   correct?
7          MR. LIMBACHER:  Object to
8   form.
9          THE WITNESS:  We had an SOM
10  program in place.  We did, yes.
11  BY MR. BUCHANAN:
12         Q.   It was a limited program?
13         MR. LIMBACHER:  Object to
14  form.
15         THE WITNESS:  We had a
16  program in place, and it changed
17  in 2014.
18  BY MR. BUCHANAN:
19         Q.   It was a limited program?
20  Are you hearing that word when I ask the
21  question?
22         A.   Yes, I hear it.  But what
23  I'm answering your question is we had an
24  SOM program in place.  And it changed in
```

Page 207

```
1   2014.
2          Q.   Was it limited prior to
3   2014, ma'am?
4          MR. LIMBACHER:  Object to
5   form.
6          THE WITNESS:  We had an SOM
7   program in place.
8   BY MR. BUCHANAN:
9          Q.   I'm aware that you did.
10  I'm asking you --
11         A.   I'm glad.
12         Q.   -- to characterize it.
13  Was it limited prior to
14  2014?
15         A.   It depends on what your
16  definition of "limited" is.  But we had a
17  program in place.
18         Q.   How about by your
19  definition, was it limited?
20         MR. LIMBACHER:  Object to
21  form.
22         THE WITNESS:  We had a
23  program in place and it changed
24  and it was -- it was changed and
```

Page 208

```
1   it was upgraded in 2014.
2   BY MR. BUCHANAN:
3          Q.   By your definition of
4   limited, ma'am, was it a limited program?
5          MR. LIMBACHER:  Object to
6   form.
7          THE WITNESS:  We had one in
8   place.  We can go round and round
9   about this.  But we had one in
10  place.
11  BY MR. BUCHANAN:
12         Q.   Okay.
13         MR. BUCHANAN:  Can I please
14  have 596 as next in order?  I
15  think we're up to only Exhibit-2.
16         MR. SIEGEL:  Walker-2.
17              - - -
18         (Whereupon, EndoWalker
19  Exhibit-2, EPI000620553-554, was
20  marked for identification.)
21              - - -
22         MR. BUCHANAN:  We'll get a
23  copy over to you.  It's on your
24  screen while we're getting it to
```

Page 209

```
1   you.
2   BY MR. BUCHANAN:
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 210

6  here in, what's this, October 2013,
7  right?
8       A.   Uh-huh.
9       Q.   Is that a yes answer, ma'am?
10      A.   Yes.  Sorry.
11      Q.   Sorry, I understood it, but
12  the transcript might not.
13      A.   My apologies.

Page 212

Page 211

Page 213

1       A.   Yes.
2       Q.   So, Opana ER, I mean, first
3  comes to market when?
4       A.   Some time in 2006, if I
5  remember the year.
6       Q.   Okay.  So some time in 2006,
7  Opana risk -- Opana ER enters the market,
8  and there's a reformulation that occurs
9  and it's released in, what is that, 2012?
10      A.   I don't know the dates off
11  the top of my head.
12      Q.   This could get confusing in
13  the deposition because I think the
14  company kept the same name, Opana ER.
15      What do you -- what did you
16  used to call it within the company, the
17  newer version of Opana ER?
18      A.   We've always just called
19  it -- I've always just called it Opana
20  ER.
21      Q.   Do you have an
22  understanding, ma'am, that the drug was
23  reformulated at a point in time?
24      A.   Yes.  I can't tell you the



54  (Pages 210 to 213)

Page 214

1    exact dates, but, yes.
2         Q.   That's fine.  I just want to
3    make sure we're communicating clearly.
4              Would it be fair for me to
5    call it the reformulated Opana ER if we
6    have to be specific about something, and
7    would you understand what I'm talking
8    about?
9         A.   That's fine.
10        Q.   So Opana ER is brought to
11   market, as you said, in 2006.



Page 216

Page 215

Page 217



**Page 220**

9    Q.   Okay.
10        MR. BUCHANAN:  Can I have
11   603, please?
12        MR. SIEGEL:  Walker-3.
13        MR. BUCHANAN:  Actually,
14   Scott, before we do that, I have
15   another document.  Don't put the
16   sticky on.
17        Thank you.  Can I have 679
18   as Walker-3?
19        MR. SIEGEL:  Walker-3.
20        MR. BUCHANAN:  Do we have
21   this one in redacted form, please?
22   Can we put the redacted version
23   up, please?  Take it off the
24   screen.

**Page 221**

1         We received a notice last
2    night of a document with one
3    sentence, I think, you wanted
4    redacted.  I was told you were
5    going to produce a redacted
6    version today.  I just drew a
7    black line over the -- what was
8    indicated as the portion you
9    wanted redacted.
10        Before we display it on the
11   screen, I'd like counsel to see
12   it.
13        MR. TOLIN:  Thank you.
14        MR. BUCHANAN:  If you have
15   what is going to be produced as
16   the redacted version, I'd be happy
17   to work with it.
18        MR. LIMBACHER:  Thank you.
19   Let me see.
20        MR. TOLIN:  Let me make sure
21   it's a duplicate document.
22        It looks like part of the
23   e-mail chain, including the part
24   that was clawed back and redacted,

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1    is included as part of the
2    document that you had marked.
3        So the document that I have
4    here is not as inclusive, in terms
5    of --
6        MR. BUCHANAN:  Can I see the
7    one that you've --
8        MR. TOLIN:  Yes.  Maybe you
9    can just use that one.  Sorry.
10       MR. BUCHANAN:  That's fine.
11   I believe it's fine.  Let me look
12   at it.
13       MS. RAKHLIN:  It's a
14   different version.
15       MR. BUCHANAN:  It's a
16   different document.
17       Counsel, if you can just
18   look at the portion that's been
19   redacted and confirm that you have
20   no objection to the document's
21   use.
22       MR. LIMBACHER:  Can we take
23   a short break?
24       MR. BUCHANAN:  That's fine.

Page 224

1    been redacted.  Can you hold it
2    up, please?
3        - - -
4        (Whereupon, a discussion off
5    the record occurred.)
6        - - -
7    BY MR. BUCHANAN:
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



Page 223

1        VIDEO TECHNICIAN:  Going off
2    the record.  The time is 12:08.
3        - - -
4        (Whereupon, a brief recess
5    was taken.)
6        - - -
7        VIDEO TECHNICIAN:  Going
8    back on the record.  This is the
9    beginning of Media File Number 4.
10   The time is 12:11.
11       - - -
12       (Whereupon, EndoWalker
13   Exhibit-3,
14   ENDO_OPIOID_MDL_05948286-292, was
15   marked for identification.)
16       - - -
17   BY MR. BUCHANAN:
18       Q.   Ms. Walker, we've passed you
19   Exhibit-3 to your deposition.  It's an
20   e-mail chain from early 2015.
21       MR. BUCHANAN:  On the
22   screen, please, could you take
23   that down.  What we need to do
24   is -- can I see the version that's

Page 225

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review



Page 226

Page 228

```
1
2    640, please?
3    BY MR. BUCHANAN:
```

Page 227

Page 229

```
24    MR. BUCHANAN:  Can I have
```

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Page 234



```
20   labeling for Endo's opioid products,
21   ma'am?
22        A.   I've seen the labeling
23   that's on the bottle.
24        Q.   And on the bottom of the
```

Page 236

```
 1   Endo could operate in this closed system
 2   of -- well, withdrawn.
 3            Do you have an
 4   understanding, ma'am, that manufacture,
 5   distribution and sale of opioids in this
 6   country requires a permission slip of
 7   sorts?
 8            MR. LIMBACHER:  Objection.
 9   Form and foundation.
10   BY MR. BUCHANAN:
11        Q.   Do you have that
12   understanding?
13            MR. LIMBACHER:  Asked and
14   answered.
15            THE WITNESS:  My
16   understanding is, within my role,
17   which is distribution, our
18   products are shipped under UPS
19   Supply Chain Solutions's DEA
20   license.  That is the customer --
21   that is the distribution site that
22   has the DEA license.  That is what
23   I know.  I cannot speak to any
24   other part of it.
```

Page 235

```
 1   bottle, does it say, not on the bottle --
 2   I'm sorry, withdrawn.
 3            On the label, the
 4   prescribing information that's provided
 5   to doctors, have you ever looked at that?
 6        A.   The package insert, is that
 7   what you're referring to?
 8        Q.   Yes.
 9        A.   Not in detail, no.
10        Q.   Have you ever looked to see
11   who is listed on the back of it?
12            MR. LIMBACHER:  Object to
13   form.
14            THE WITNESS:  No, I haven't.
15   BY MR. BUCHANAN:
16        Q.   As the manufacturer?
17        A.   I know the bottle has it.
18        Q.   And who does it list?
19        A.   Endo.
20        Q.   Okay.  It lists Endo as the
21   manufacturer, right?
22        A.   Yes.
23        Q.   Okay.  So I'm trying to
24   understand, ma'am, are you saying that
```

Page 237

```
 1   BY MR. BUCHANAN:
 2        Q.   Does Endo have a
 3   registration that applies to its
 4   activities with regard to Opana and
 5   Percocet, ma'am?
 6            MR. LIMBACHER:  Objection.
 7   Form and foundation.  Asked and
 8   answered.
 9            THE WITNESS:  You would need
10   to speak to other areas within
11   Endo.  I can't -- I don't know.  I
12   don't have the answer.
13   BY MR. BUCHANAN:
14        Q.   Have you ever discussed with
15   law enforcement authorities or the DEA --
16   have you ever been a part of
17   communications with the DEA, ma'am?
18            MR. LIMBACHER:  Object to
19   form.
20            THE WITNESS:  No, I have
21   not.
22   BY MR. BUCHANAN:
23        Q.   Have you ever been a part of
24   discussions with those in regulatory as
```

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1    to Endo's registration status?
2        A.   No, I have not.
3        Q.   If I were to ask you, ma'am,
4    what registration with the DEA, to your
5    understanding, authorized Endo's
6    activities with regard to Percocet and
7    Opana ER, what would you state?
8            MR. LIMBACHER:  Object to --
9    objection.  Form and foundation.
10           THE WITNESS:  I would state
11       that all of Endo's products are
12       shipped under UPS Supply Chain
13       Solutions's DEA license, and they
14       have a DEA license.
15   BY MR. BUCHANAN:
16       Q.   That's for shipping and
17   handling?
18       A.   And that is my
19   responsibility.
20       Q.   So the role and function
21   that you were engaged in with regard to
22   suspicious order monitoring, you were
23   just doing that as a responsible company,
24   is that your testimony, ma'am?

Page 239

1            MR. LIMBACHER:  Objection.
2    Form.
3    BY MR. BUCHANAN:
4        Q.   Or were you doing that as a
5    DEA registrant?
6            MR. LIMBACHER:  Objection.
7        Form.  Asked and answered.
8            THE WITNESS:  I can't speak
9        to Endo's DEA registration.  I can
10       speak to the fact that UPS Supply
11       Chain Solutions had a DEA
12       registration, a valid one, and our
13       products are shipped under UPS
14       Supply Chain Solutions's DEA
15       license.
16           Endo had a SOM program
17       in place.  And so did UPS Supply
18       Chain Solutions.  That's what I
19       can speak to.
20           MR. BUCHANAN:  Can I please
21       have 737, Scott?  You can just
22       pass it over to the witness.
23       Thank you.
24           MR. SIEGEL:  This is marked

Page 240

1    as Exhibit-4?
2            MR. LIMBACHER:  Yes, I think
3        we're at 4.
4              - - -
5            (Whereupon, EndoWalker
6        Exhibit-4, UPSSCS0002032-051, was
7        marked for identification.)
8              - - -
9    BY MR. BUCHANAN:
10       Q.   I'm passing you Exhibit-4 to
11   your deposition, ma'am.  It's a Know Your
12   Customer checklist.
13           Do you see that?
14       A.   Yes.
15       Q.   You were a customer of UPS,
16   fair?
17       A.   We were a client of UPS,
18   yes.
19           MR. LIMBACHER:  Take your
20       time and review the document.
21           THE WITNESS:  Okay.
22   BY MR. BUCHANAN:
23       Q.   In connection with your
24   dealings with UPS over the years, and

Page 241

1    after a point in time, I guess, in the
2    last few years, you started to get some
3    questionnaires from UPS, fair?
4        A.   Yes.
5        Q.   Were you the person who
6    completed those questionnaires?
7        A.   I am.
8        Q.   Look before you, ma'am, and
9    just satisfy yourself, for example, the
10   one on the first page, last two numbers
11   32, are --
12       A.   32.
13       Q.   -- is your 2016 response to
14   their questionnaire; is that right?
15       A.   Yes.
16       Q.   Okay.  And scrolling
17   forward -- and, by the way, who is Ms.
18   Lindell?
19       A.   She works for UPS in the
20   regulatory group.
21       Q.   Okay.  Somebody that you
22   dealt with there?
23       A.   Yes, I have.
24       Q.   Okay.  Scroll forward.

61  (Pages 238 to 241)

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1    And do you see, I believe
2  the last two numbers would be 40, do you
3  see your Know Your Customer checklist
4  from Endo for 2015 there?
5    A.   Yes.
6    Q.   And in the bottom right
7  corner, it says effective date June 11,
8  2013 for the form.
9    Do you see that?
10    A.   June 11, 2013, yes.
11    Q.   And you understand, though,
12  that you're providing this information --
13  you completed these for UPS, or for
14  your -- in response to the UPS request,
15  correct?
16    A.   I did.
17    Q.   Okay.  And you were accurate
18  when you did that?
19    MR. LIMBACHER:  Object to
20  form.
21    THE WITNESS:  I was what?
22  Sorry.
23  BY MR. BUCHANAN:
24    Q.   You were trying to be

Page 243

1  accurate when you did that?
2    A.   Yes.
3    Q.   Scrolling forward to 2046,
4  bottom right corner, the Bates numbers,
5  this would be Endo's response as of July
6  of 2013, fair?
7    A.   Yes.
8    Q.   Let's scroll to Page 2049,
9  again, in your 2013 response.
10    It asks, Question 15, What
11  methods of payment are you going to
12  accept from your customers?
13    A.   I'm sorry.  What page are
14  you on?
15    Q.   It's 2049.  It's on the
16  screen if that's easier.
17    A.   No, I have it.  Thank you.
18    Q.   Then you're asked the
19  question, Do you conduct on-site visits
20  of your customers, yes or no?
21    Do you see that?
22    A.   Yes, Number 16, yes.
23    Q.   And you said no, right?
24    A.   Correct.

Page 244

1    MR. LIMBACHER:  Object to
2  form.
3  BY MR. BUCHANAN:
4    Q.   That's the box you checked,
5  correct, ma'am?
6    A.   Yes.
7    Q.   Okay.  Let's scroll forward
8  in the document to Page 2043.
9    I guess we should have read
10  the sentence that was in the box, I
11  apologize.
12    You noted, Not at this time,
13  but Endo should have a program in place
14  by the end of 2013.
15    Do you see that?
16    A.   I do.
17    Q.   Okay.  And Endo didn't have
18  that program in place by the end of 2013,
19  correct?
20    A.   We utilized what Qualitest
21  was doing.
22    Q.   Let's look at what you said
23  next year when you answered this request.
24    I'm sorry, this would be

Page 245

1  2015.  Can we go to 2043?
2    Do you conduct on-site
3  visits of your customers?
4    What did you say?
5    A.   No.
6    Q.   Any explanation provided to
7  UPS?
8    A.   No explanation.
9    Q.   Okay.  So as of 2015, in
10  response to the question from, I guess,
11  your fulfillment company, do you conduct
12  on-site visits of your customer, Endo's
13  response was what, ma'am?
14    A.   What page?
15    Q.   2043.  The one on the
16  screen, I'm sorry, if that's easier.
17    A.   2043.  It says no.
18    Q.   Thank you.
19    And scroll forward in time
20  to 2035.  We're now in 2016.  You're
21  asked the question in Number 16.
22    Could you read that, ma'am?
23    A.   Yes.  It says no.
24    Q.   Do you conduct on-site

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1    visits of your customers?
2        And Endo replied?
3    A.   No.
4    Q.   And that was a true
5    statement?
6    A.   Correct.  Right.  Endo did
7    not.
8        Q.   And we can agree you
9    provided no explanation as to some other
10   source that was doing the customer review
11   for you, correct?
12       MR. LIMBACHER:  Object to
13       form.  The document speaks for
14       itself.
15       THE WITNESS:  No.
16   BY MR. BUCHANAN:
17       Q.   You filled this out, right?
18   A.   Right.  No, I did not
19   explain about Qualitest.
20       Q.   Okay.  And was UPS shipping
21   for Qualitest in 2013, ma'am?
22   A.   No, they were not.
23   Q.   In 2014?
24   A.   No.

Page 247

1    Q.   In 2015?
2    A.   No.
3    Q.   2016?
4    A.   No.
5    Q.   You can set that aside,
6    ma'am.
7        MR. BUCHANAN:  Next in
8        order, Scott, 753.
9        MR. LIMBACHER:  Dave,
10       whenever it's a good time to break
11       for lunch.  It's 12:30.
12       MR. BUCHANAN:  This will
13       take five minutes.  Fair?
14       MR. LIMBACHER:  That's fine.
15       MR. SIEGEL:  This is marked
16       as Walker-5.
17           - - -
18       (Whereupon, EndoWalker
19       Exhibit-5,
20       ENDO_OPIOID_MDL_05968962-963 was
21       marked for identification.)
22           - - -
23   BY MR. BUCHANAN:
24       Q.   Ms. Walker, we're passing

Page 248

1    you what we're marking as Exhibit-5 to
2    your deposition.  It's Bates stamped
3    Endo_Opioid_MDL, last three digits 962.
4        It's an e-mail exchange
5    between you and your colleague, Kim
6    Lindell at UPS.  I said "your
7    colleague" --
8        A.   She works at UPS.
9        Q.   -- your counterpart at UPS?
10       A.   She works in the regulatory
11   group at UPS.
12       Q.   Okay.  We're looking here in
13   the summer of -- excuse me, April of
14   2014, starting at the bottom, please.
15   External, getting to know your customers.
16       Do you see that?
17       A.   Yes.
18       Q.   Actually, I should probably
19   start at the bottom of the first page, so
20   we orient ourselves.
21       You sent an e-mail off to
22   Ms. Lindell in April of 2014, right?
23       A.   Yes, that's what this is
24   stating.

Page 249

1        Q.   Subject, Getting to know
2    your customers?
3        A.   Yes.
4        Q.   I guess it says, Getting to
5    you your customers, but you were saying
6    getting to know your customers,
7    essentially?
8        A.   Correct.
9        Q.   Hi, Kim, there have been
10   many discussions around getting to know
11   your customers at Endo and Qualitest.
12   With that being said, I was under the
13   impression that UPS was not required by
14   the DEA to perform these audits.
15       And what did you write after
16   that?
17       A.   And it was the
18   responsibility of the manufacturers.
19       Q.   And it was the
20   responsibility of the manufacturers.
21       That's what you wrote?
22       A.   That's what I wrote.
23       Q.   And that was your
24   understanding as of that point in time,

63  (Pages 246 to 249)

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1    correct, ma'am?
2         A.   Correct.
3         Q.   Because after all, it was
4    the manufacturers who had the sales force
5    and the customers, right?
6              MR. LIMBACHER:  Object to
7    form.
8              THE WITNESS:  Yes.
9    BY MR. BUCHANAN:
10        Q.   Endo had the sales force,
11   Endo had the relationships with the
12   distributors and the wholesalers, Endo
13   had the relationship to the people who
14   were placing the orders, correct?
15             MR. LIMBACHER:  Object to
16   form.
17             THE WITNESS:  We had the
18   relationship with the wholesalers.
19   BY MR. BUCHANAN:
20        Q.   Okay.  So after you wrote,
21   it was the responsibility of the
22   manufacturers, you responded -- or
23   questioned, Can you confirm my assumption
24   is correct?

Page 251

1              Did I read that correctly?
2         A.   You did.
3         Q.   Endo was looking at an
4    outside vendor to perform these audits
5    and someone mentioned to me that they
6    thought UPS had to perform these audits
7    as well, which I do not believe is true.
8              Did I read that correctly?
9         A.   You did.
10        Q.   So as of this point in time,
11   in 2014, you were clear, at least, that
12   UPS was not going to your customers to
13   know them, correct?
14        A.   In 2014, correct.
15        Q.   Okay.  And you got a
16   response from UPS, correct?
17        A.   Yes.
18        Q.   From -- this is the person
19   in regulatory affairs at UPS, correct?
20        A.   Yes.  Kim is in the
21   regulatory group.
22        Q.   Did you reach out -- did you
23   reach out to compliance and regulatory
24   affairs at Endo on this issue?

Page 252

1         A.   I don't recall.
2         Q.   Okay.  The reply you got
3    from Ms. Lindell was, Hi, Lisa, UPS does
4    have a Know Your Customer program in
5    place.  However, as a 3PL provider --
6    let's pause.  What is a 3PL provider?
7         A.   Third-party logistics.
8         Q.   As a third-party logistics
9    provider, we do not maintain the
10   relationship with our clients' (Endo)
11   customers.
12             And that was true, right?
13   They don't have a relationship with your
14   customers?
15        A.   No, they don't.
16        Q.   You may recall the survey
17   that we asked you to complete, she asks
18   with a question mark on the end.
19             Do you see that?
20        A.   Yes.
21        Q.   Do you recall that we looked
22   at those surveys, the Know Your Customer
23   checklist surveys a moment ago?
24        A.   Yes.

Page 253

1         Q.   And do you recall you
2    answering that Endo does not, in fact, go
3    and conduct customer due diligence,
4    correct?
5         A.   That is correct.
6         Q.   The survey contains
7    questions about your SOM program, process
8    for vetting new customers, customer
9    types, et cetera.  This allows us to do
10   our due diligence to the extent that we
11   can.  Having said that, we believe that
12   the DEA requires both the manufacturer
13   and the distributor have a program in
14   place.
15             Did I read that correctly?
16        A.   You did.
17        Q.   And that was your
18   understanding as well, as you noted on
19   the prior page, correct?
20        A.   Uh-huh.
21             MR. LIMBACHER:  Objection to
22   form.
23   BY MR. BUCHANAN:
24        Q.   That's a yes answer, ma'am?

64  (Pages 250 to 253)

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1      A.   Yes.
2      Q.   And then you replied to that
3  e-mail saying, So your Getting to Know
4  Your Customer program is around your
5  clients?
6           You're saying that to UPS,
7  correct?
8      A.   I am.
9      Q.   And "your clients," when
10  directing that to UPS, would be companies
11  like Endo, right?
12     A.   It would, yes.
13     Q.   And so your understanding,
14  ma'am, was that UPS's obligation was to
15  get to know companies like you, right?
16          MR. LIMBACHER:  Object to
17     form.
18          THE WITNESS:  In 2014, yes.
19  BY MR. BUCHANAN:
20     Q.   And that it was the
21  manufacturer's obligation to get to know
22  their customers and their customers'
23  customers, correct?
24          MR. LIMBACHER:  Object to

Page 255

1  form.  Misstates the evidence.
2          THE WITNESS:  Based on what
3  I know, yes.
4  BY MR. BUCHANAN:
5     Q.   Okay.
6          MR. BUCHANAN:  I think it's
7     a good place to break.
8          MR. LIMBACHER:  Do you want
9     to read the response from UPS or
10    do you want me to do that?
11         MR. BUCHANAN:  We can.  I
12    think I just did.
13         MR. LIMBACHER:  No, I don't
14    think so.
15  BY MR. BUCHANAN:
16    Q.   Friday, April 11, 2014.  So,
17  Kim, Getting to Know Your Customer
18  program is around your clients.  Thanks.
19         You responded -- withdrawn.
20  Let me start this over.
21         Where were we?
22         MR. BUCHANAN:  Middle of the
23    page, please.
24         MR. LIMBACHER:  Lisa sent a

Page 256

1  question and then --
2          MR. BUCHANAN:  I have it.
3     Yes.
4  BY MR. BUCHANAN:
5     Q.   Hi, Kim, so your Getting to
6  Know Your Customer program is around your
7  clients.  Thanks.  Lisa.
8          Did I read that correctly,
9  ma'am?
10    A.   Yes, you did.
11    Q.   And the reply you got from
12  Ms. Lindell to you was, Yes, and, to some
13  degree, your customers, based on the
14  information that you provide us.  The
15  original plan was to survey your
16  customers, but in the end we went down a
17  different path.
18          Did I read that correctly?
19    A.   You did.
20    Q.   And a response to the Know
21  Your Customer checklist that you sent
22  back to Ms. Lindell in 2013, did you
23  provide them with due diligence
24  information on your customers?

Page 257

1          MR. LIMBACHER:  Object to
2     form.
3          THE WITNESS:  No.
4  BY MR. BUCHANAN:
5     Q.   It was Endo's view that that
6  information was -- of its customers was
7  Endo's information, correct?
8          MR. LIMBACHER:  Object to
9     form.
10         THE WITNESS:  Say that
11    again.
12  BY MR. BUCHANAN:
13    Q.   It was Endo's understanding,
14  or at least your understanding at that
15  time, that the responsibility for your
16  customers rested with the manufacturer,
17  correct?
18         MR. LIMBACHER:  Object to
19    form.
20         THE WITNESS:  Yes.
21         MR. BUCHANAN:  Thank you.
22  No further questions.
23         VIDEO TECHNICIAN:  Going off
24  the record.  The time is 12:37.

65  (Pages 254 to 257)

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1             - - -
2        (Whereupon, a luncheon
3    recess was taken.)
4             - - -
5        VIDEO TECHNICIAN:  We're
6    going back on record.  Beginning
7    of Media File Number 5.  The time
8    is 1:32.
9    BY MR. BUCHANAN:
10       Q.    Ms. Walker, are you ready to
11   proceed?
12       A.    Yes.
13       Q.    You remain under oath.
14           You understand that,
15   correct?
16       A.    Yes.
17           MR. BUCHANAN:  Could I have
18   749, please, Scott?
19           MR. SIEGEL:  Marked as
20   Exhibit-6.
21           - - -
22       (Whereupon, EndoWalker
23   Exhibit-6, No Bates, 8/9/12 E-mail
24   from Larry Shaffer to Lisa Walker,

Page 259

1    Subject: FW: UPS's Know Your
2    Customer Program, was marked for
3    identification.)
4             - - -
5    BY MR. BUCHANAN:
6        Q.    Ma'am, I'm passing you an
7    exchange from 2012.  It's an e-mail
8    exchange between yourself and Mr.
9    Shaffer, July 25, 2012.
10           Do you see it on the screen?
11   There's a copy, if that's more
12   convenient, to look at on paper.
13       A.    Yes.
14       Q.    Who is Mr. Shaffer?
15       A.    I believe he worked at
16   Qualitest.
17       Q.    Okay.  You see he's -- there
18   is an exchange among yourself and others
19   that starts this.  It's on July 23rd,
20   2012 from yourself to Margaret
21   Richardson.
22           Who is she?
23       A.    She was a lawyer at one time
24   at Qualitest.

Page 260

1        Q.    Okay.  Ms. Connell, Ms.
2    Hernandez are cc'd on there.  And it's
3    entitled, UPS's Know Your Customer
4    program.
5           Do you see that, ma'am?
6        A.    Yes.
7        Q.    And then you see that Mrs.
8    Hernandez -- or Ms. Hernandez flips it
9    over to Mr. Shaffer.
10          Is it Shaffer or Shaffer?
11   How do you pronounce that?
12       A.    I believe it was Shaffer.
13       Q.    Still with the company?
14       A.    I don't know.
15       Q.    Okay.  And he then provides
16   his comments on this.
17          Do you see that?  On the
18   first page.
19       A.    Yes, I see that.  I'm just
20   reading it.
21       Q.    It's July 25, 2012, 4:54
22   p m., UPS's Know Your Customer program.
23   And he states, I just want to make sure
24   that I understand this.  The KYC

Page 261

1    documentation -- is that the way you
2    referred to Know Your Customer in your
3    field, ma'am?
4        A.    That's the way they refer to
5    it.  Not me.
6        Q.    Okay.  The KYC documentation
7    is in addition to an actual SOM system.
8    Please find my review with suggestions
9    below.
10          Have you seen this before,
11   ma'am?
12       A.    No, I have not.  I don't
13   recall seeing this.
14       Q.    We do see, I guess, at the
15   top of the page, if you read all the way
16   to the top, Mr. Shaffer forwarded it back
17   to you on August 9th, 2012, correct?
18       A.    Yes, I see that.
19       Q.    Hi, Lisa, per my voicemail,
20   below are my comments.  Thanks, Larry.
21          Do you see that?
22       A.    I do.
23       Q.    And then if you read down in
24   the Know Your Customer questionnaire,

66  (Pages 258 to 261)

Page 262

```
 1    customer key rating -- let's pause for a
 2    moment.
 3            Does this look familiar to
 4    you, ma'am?
 5            MR. LIMBACHER:  Object to
 6    form.
 7    BY MR. BUCHANAN:
 8        Q.   The Know Your Customer
 9    questionnaire?
10        A.   Is this -- I don't know what
11    this is.  Is this UPS's customer program
12    questions?  Is that what this is?
13        Q.   Do you recall getting, from
14    UPS, a questionnaire for your
15    consideration and review?
16            We looked at some that were
17    completed, but do you recall getting an
18    electronic version from UPS with their
19    answer key?
20        A.   No, I do not recall.
21        Q.   We're going to pause on this
22    exhibit for a moment, ma'am.  And I'm
23    going to forward to you the exchange you
24    had with UPS concerning this, okay?
```

Page 263

```
 1            MR. BUCHANAN:  What exhibit
 2    are we up to, Scott?
 3            MR. SIEGEL:  7.
 4            - - -
 5            (Whereupon, EndoWalker
 6    Exhibit-7,
 7    ENDO_OPIOID_MDL_02448133-142, was
 8    marked for identification.)
 9            - - -
10    BY MR. BUCHANAN:
11        Q.   It's Exhibit-566 in our
12    system, and it will be Exhibit-7 for the
13    deposition.
14            Do you have the exhibit
15    before you now, ma'am?
16        A.   I do.
17        Q.   So just take a moment to
18    turn the pages, and I'll just describe it
19    as you're looking at it.
20            This is an e-mail exchange
21    between yourself and a Warren Olson of
22    UPS, initially on May 22, 2012, with the
23    subject, Know Your Customer.
24            Do you see that?
```

Page 264

```
 1            MR. LIMBACHER:  Take your
 2    time and review the document.
 3            THE WITNESS:  Yeah, I -- I
 4    need to review this.
 5    BY MR. BUCHANAN:
 6        Q.   The earliest-in-time e-mail
 7    is at the bottom of the page.
 8            Do you see that?
 9        A.   Are you referring to the
10    e-mail on May 22nd?
11        Q.   That's correct.
12        A.   I see the e-mail.
13        Q.   From a Mr. Olson at UPS to
14    yourself, correct?
15        A.   Uh-huh, yes.
16        Q.   And the subject is, Know
17    Your Customer, right?
18        A.   That's what the e-mail
19    states.
20        Q.   Attached are the files we
21    will be reviewing today.
22            That's what he says to you,
23    correct?
24        A.   Yes.  Can I read this
```

Page 265

```
 1    document?  I need to understand what you
 2    guys gave to me.
 3        Q.   Sure.
 4        A.   Okay.
 5        Q.   And this was the initial
 6    outreach you got from UPS concerning
 7    their Know Your Customer program as they
 8    were considering their next steps, right?
 9            MR. LIMBACHER:  Object to
10    form.
11            THE WITNESS:  So this was --
12    this was prior to getting to know
13    the documents we looked at
14    earlier?
15    BY MR. BUCHANAN:
16        Q.   Exactly.
17        A.   I just want to make sure I
18    understand the time frame we're looking
19    at.
20        Q.   This is the summer of 2012,
21    correct?
22        A.   Yes.
23        Q.   And then we saw some
24    documents before lunch where you were
```

67 (Pages 262 to 265)

Page 266

1  actually given a questionnaire for
2  yourself as a customer.
3        Do you recall that?
4     A.  Yes.
5     Q.  And you completed three
6  years' worth of those in the exhibit that
7  I marked, correct?
8     A.  Yes.
9     Q.  And then you had a further
10 exchange with somebody from -- Ms.
11 Lindell, I think, in UPS compliance,
12 concerning your role as a manufacturer in
13 reaching out to your customers.
14       Do you recall that
15 discussion earlier, before lunch?
16       MR. LIMBACHER:  Object to
17    form.
18       THE WITNESS:  Yes.  We
19    reviewed the documents before
20    lunch, correct.
21 BY MR. BUCHANAN:
22    Q.  And so you'll see, as you
23 turn the pages here, there's a sample
24 questionnaire that's sent to you.

Page 267

1        And then if you go to 566.5,
2  that's the number in the top right
3  corner, you will see some answer keys.
4        Do you see that?
5     A.  I do.
6     Q.  Okay.  And the answer key
7  includes whether the risk would be low,
8  medium -- or L, M and H.
9        Do you see that?
10    A.  Uh-huh, yes.
11    Q.  Okay.  And depending on what
12 your answers were to particular
13 questions, that would either lean more
14 towards low or more towards high, right?
15    A.  Say that again.
16    Q.  Did you understand that UPS
17 was going to assess the answers they
18 received from the questionnaires?
19    A.  I did not -- no, I don't
20 recall that.
21    Q.  Okay.  Nonetheless, they
22 sent you the questionnaires they were
23 contemplating and their rating keys,
24 right?

Page 268

1        MR. LIMBACHER:  Object to
2    form.
3        THE WITNESS:  That's what
4    you provided to me, yes.
5  BY MR. BUCHANAN:
6     Q.  And they told you, don't
7  tell anybody, right?
8        MR. LIMBACHER:  Object to
9    form.
10       THE WITNESS:  That's what it
11   says in the e-mail.
12 BY MR. BUCHANAN:
13    Q.  I've also attached the
14 updated questionnaires (and rating keys,
15 don't tell anyone.)
16       Did I read that correctly,
17 ma'am?
18    A.  Yes.
19    Q.  You forwarded the
20 questionnaire you received from UPS
21 internal to Endo, correct?
22       Withdrawn.
23       You forwarded the
24 questionnaire that you received from UPS

Page 269

1  to your colleague, Mr. Shaffer at the
2  other Endo company, Qualitest, correct?
3     A.  I -- I don't recall.  I'm
4  just going by what you provided to me,
5  and I'm trying to follow the sequence of
6  events.
7     Q.  Am I correct, ma'am, that if
8  you look at Exhibit-6 --
9     A.  Which is 6?  This is 6,
10 okay.
11    Q.  Exhibit-6 is your
12 later-in-time e-mail to -- from August of
13 2012.
14       Do you see that?  I'm sorry,
15 withdrawn.
16       The last-in-time e-mail is
17 an e-mail from Mr. Shaffer to yourself on
18 August 9, 2012, correct?
19    A.  I see that.
20    Q.  And the subject is,
21 Forwarding UPS's Know Your Customer
22 program.
23       Do you see that?
24    A.  Yes.

68  (Pages 266 to 269)

Page 270

```
 1          Q.   And then do you see below
 2    that Mr. Shaffer has reproduced the
 3    customer questionnaire, and he's got some
 4    comments in there as well?
 5          Do you see that?
 6          A.   Selling products -- yes, I
 7    see that.
 8          Q.   And it seems that Mr.
 9    Shaffer left you a voicemail with his
10    comments as well?
11          A.   That's what the e-mail
12    states.
13          Q.   Did you have interactions
14    with regulatory and Qualitest relating to
15    suspicious order practices?
16          A.   Not that I recall.
17          Q.   Is Mr. Shaffer in regulatory
18    at Qualitest?
19          A.   I do not believe he was, no.
20          Q.   What group was he in?
21          A.   I believe he was part of
22    transportation or security, if I remember
23    correctly.
24          Q.   Okay.
```

Page 271

```
 1          A.   I could be wrong.  But I
 2    don't know.
 3          Q.   If we scroll down, do you
 4    see the version of the questionnaire that
 5    Mr. Shaffer commented on, correct?
 6          A.   Uh-huh.
 7          Q.   In his e-mail to you dated
 8    July 25, 2012, right?
 9          A.   Yes.
10          MR. LIMBACHER:  Object to
11    form.  It's an e-mail to Tracey
12    Hernandez.
13          MR. BUCHANAN:  I'm sorry.
14          THE WITNESS:  Sorry.
15    BY MR. BUCHANAN:
16          Q.   It was an e-mail from Mr.
17    Shaffer to Tracey Hernandez that was
18    forwarded to you a few weeks later,
19    correct?
20          A.   Yes.
21          Q.   Okay.  All right.  So in
22    this e-mail between Mr. Shaffer and Ms.
23    Hernandez that was forwarded to you, Mr.
24    Shaffer has got some comments on the
```

Page 272

```
 1    questionnaire, fair?
 2          A.   Based on what the e-mail
 3    states.
 4          Q.   I want to go down to
 5    hotspots, Item 3.  By 2012, the CDC had
 6    already identified the opioid crisis as
 7    an epidemic.
 8          Are you aware of that,
 9    ma'am?
10          MR. LIMBACHER:  Object to
11    form.
12          THE WITNESS:  I knew there
13    was an epidemic.  I couldn't tell
14    you the year.
15    BY MR. BUCHANAN:
16          Q.   By 2012, had you, within
17    Endo, identified hotspots for
18    diversion-related activity?
19          MR. LIMBACHER:  Object to
20    form.
21          THE WITNESS:  I can't speak
22    to other parts of Endo.
23    BY MR. BUCHANAN:
24          Q.   I'm just asking within --
```

Page 273

```
 1          A.   But, I mean, yes, we knew --
 2    I knew --
 3          Q.   Let me ask the question.
 4          A.   -- that there was an opioid
 5    epidemic, but I can't speak to other
 6    areas within Endo.
 7          Q.   This particular
 8    questionnaire, 3, What geographic areas
 9    will you be primarily distributing
10    product to, hotspot locations, Florida,
11    et cetera, equals H.
12          Do you see that?
13          A.   I do.
14          Q.   Did you recognize Florida as
15    a hotspot with regard to the opioid
16    epidemic in 2012, ma'am?
17          MR. LIMBACHER:  Object to
18    form.
19          THE WITNESS:  This
20    information that you're looking at
21    is regarding to our generics
22    division.  I can't speak to
23    anything.  This is generics.
24          Larry and Tracey are part of
```

69 (Pages 270 to 273)

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1    our generics division. I can't
2    speak to any of this.
3    BY MR. BUCHANAN:
4        Q.   So stay with me just on the
5    branded side, then.
6            As just a factual matter, in
7    2012, had you in the branded side
8    identified Florida as a hotspot location?
9            MR. LIMBACHER: Object to
10   form.
11           THE WITNESS: We knew that
12       there was opioid epidemics
13       throughout the country. I can't
14       confirm or deny -- I can't confirm
15       if we identified Florida back in
16       2012.
17   BY MR. BUCHANAN:
18       Q.   Okay. Larry's comment here
19   says, Suggest: Hotspot locations, and he
20   lists Florida.
21           Do you see that?
22       A.   I do see Florida.
23       Q.   Texas?
24       A.   Yes.

Page 275

1        Q.   Kentucky?
2        A.   I see that on your document.
3        Q.   Tennessee.
4            Do you see that?
5        A.   Yes.
6        Q.   California?
7        A.   Yes.
8        Q.   Illinois?
9        A.   Correct. I see it.
10       Q.   Nevada?
11       A.   Yes. But this is generics,
12   again.
13       Q.   All equals high, correct?
14       A.   But this is generics.
15       Q.   Do you understand that
16   there's only an opioid epidemic with
17   regard to generic drugs, ma'am?
18           MR. LIMBACHER: Object to
19       form. Argumentative.
20           THE WITNESS: No. What I'm
21       trying to tell you is I can't
22       speak to this document. This has
23       to do with generics.
24   BY MR. BUCHANAN:

Page 276

1        Q.   I'm asking you a question,
2    though.
3            Do you understand that
4    there's only an opioid epidemic with
5    regard to generic drugs?
6        A.   I know --
7            MR. LIMBACHER: Object to
8        form.
9            THE WITNESS: I know that
10       there's an opioid epidemic
11       throughout the country.
12   BY MR. BUCHANAN:
13       Q.   And you all were making
14   opioid branded drugs, right, in the Endo
15   Pharmaceuticals arm, correct?
16           MR. LIMBACHER: Object to
17       form.
18           THE WITNESS: There's
19       branded opioid products, correct.
20   BY MR. BUCHANAN:
21       Q.   At this point in time, you
22   were making Opana ER, right?
23       A.   Yes.
24       Q.   Opana?

Page 277

1        A.   Yes.
2        Q.   Percocet?
3        A.   Yes.
4        Q.   Selling hundreds of millions
5    of pills every year?
6        A.   I can't speak to the
7    number --
8            MR. LIMBACHER: Object to
9        form.
10           THE WITNESS: -- to the
11       number of pills.
12   BY MR. BUCHANAN:
13       Q.   Would you dispute that you
14   were selling hundreds of millions of
15   pills every year, ma'am?
16       A.   I don't --
17           MR. LIMBACHER: Object to
18       form.
19           THE WITNESS: I don't know
20       the number of pills.
21   BY MR. BUCHANAN:
22       Q.   As part of your suspicious
23   order monitoring practice, ma'am, did you
24   look at hotspot locations and evaluate

70  (Pages 274 to 277)

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1    your customers in particular with regard
2    to hotspot locations?
3            MR. LIMBACHER:  Object to
4    form.
5            THE WITNESS:  We had an SOM
6    program in place at both Endo and
7    UPS at that 2012.
8    BY MR. BUCHANAN:
9        Q.   Okay.  For example, did you
10   do any due diligence on your customers in
11   Florida?
12       A.   We had our SOM program in
13   place that looked at all orders.
14       Q.   Did you go and visit any
15   customers in Florida?
16           MR. LIMBACHER:  Object to
17   form.
18           THE WITNESS:  Did Endo?
19   Endo did not.  But as I stated
20   before, our Qualitest group
21   visited customers.
22   BY MR. BUCHANAN:
23       Q.   Not in 2012?
24           MR. LIMBACHER:  Object to

Page 279

1    form.
2            THE WITNESS:  I don't know
3    the exact date when they did.
4    BY MR. BUCHANAN:
5        Q.   Right.  Well, do you know
6    any of what Qualitest did, ma'am, other
7    than what you've been told in connection
8    with getting ready for today?
9            MR. LIMBACHER:  Object to
10   form.
11           MR. BUCHANAN:  I don't want
12   privileged.
13           MR. LIMBACHER:  I would
14   object to the statement by
15   counsel.
16   BY MR. BUCHANAN:
17       Q.   I'm assuming you spoke to
18   counsel to get ready for today, right?
19           MR. LIMBACHER:  And we've
20   covered that already.  Just, if
21   you could, rephrase your question,
22   please, counsel.
23   BY MR. BUCHANAN:
24       Q.   I don't want you to tell me

Page 280

1    what your counsel -- you and your counsel
2    discussed getting ready for today.
3            What's the earliest point in
4    time you have knowledge about Qualitest's
5    SOM practices, ma'am?
6            MR. LIMBACHER:  Object to
7    form.
8            THE WITNESS:  I can't speak
9    to Qualitest's SOM practice.
10   BY MR. BUCHANAN:
11       Q.   That's what I thought.
12           So with regard to branded's
13   practices, as of 2012, were you all
14   conducting due diligence visits on the
15   Florida customers?
16           MR. LIMBACHER:  Object to
17   form.  Asked and answered.
18           THE WITNESS:  As I stated
19   before, we had an SOM program in
20   place at both Endo and at UPS, and
21   that's how we reviewed our orders.
22   BY MR. BUCHANAN:
23       Q.   Okay.  And to answer my
24   question, though, were you conducting due

Page 281

1    diligence visits on your Florida
2    customers in 2012?
3            MR. LIMBACHER:  Object to
4    form.  Asked and answered.
5            THE WITNESS:  And within my
6    role, no.  But I can also not -- I
7    cannot speak to if anybody else
8    within Endo did anything within
9    the state of Florida.
10   BY MR. BUCHANAN:
11       Q.   Okay.  As I understand it
12   with regard to suspicious order
13   monitoring, that was your function within
14   the branded side, correct?
15       A.   Right.
16           MR. LIMBACHER:  Object to
17   form.
18   BY MR. BUCHANAN:
19       Q.   Did you ever conduct any due
20   diligence visits to Texas in 2012?
21           MR. LIMBACHER:  Object to
22   form.  Asked and answered.
23           THE WITNESS:  Within my
24   role, no.  But that doesn't

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1    mean -- or I cannot speak to
2    anything that was done within the
3    Endo Corporation, if anybody else
4    did.
5    BY MR. BUCHANAN:
6        Q.   You were in the suspicious
7    order monitoring role for Endo?
8        MR. LIMBACHER:  Object to
9    form.  Asked and answered.
10        THE WITNESS:  Yes.
11    BY MR. BUCHANAN:
12        Q.   Okay.  Anyone do it for
13    Texas, Tennessee, California, Illinois,
14    any of the other states that were
15    identified as hotspots --
16        MR. LIMBACHER:  Object to
17    form.
18    BY MR. BUCHANAN:
19        Q.   -- in this e-mail that was
20    forwarded to you in 2012?
21        A.   Within my role --
22        MR. LIMBACHER:  Object to
23    form.
24        THE WITNESS:  -- no, but I

Page 283

1    cannot speak to the rest of the
2    company.
3    BY MR. BUCHANAN:
4        Q.   Are you aware of any that
5    were conducted as of 2012 in these
6    hotspots, ma'am?
7        MR. LIMBACHER:  Object to
8    form.
9        THE WITNESS:  Within my
10    area, no.  But I cannot speak for
11    the rest of the company.
12    BY MR. BUCHANAN:
13        Q.   Sitting here today, you
14    can't say that any were conducted, fair?
15        MR. LIMBACHER:  Object to
16    form.
17        THE WITNESS:  Within my
18    role, no, but I cannot speak for
19    the rest of the company.
20    BY MR. BUCHANAN:
21        Q.   Let's focus now and zoom
22    down to Item 14.
23        There's a question about
24    whether you've got contract agreements

Page 284

1    with customers that you provide products
2    to.
3        Do you see that?
4        A.   Yes.  But this is the
5    generics answering that question, not the
6    branded side.
7        Q.   And it was forwarded to you,
8    right?
9        MR. LIMBACHER:  Object to
10    form.
11        THE WITNESS:  Yes.  But it's
12    the generic side of the business
13    answering those questions.
14    BY MR. BUCHANAN:
15        Q.   If you could just stay with
16    my questions, ma'am, it's going to go a
17    lot faster today.
18        MR. LIMBACHER:  It would go
19    faster if you would listen to her
20    answers, counsel.
21        MR. BUCHANAN:  I don't think
22    we have a responsive answer, so
23    we'll just keep doing it until we
24    do.

Page 285

1    BY MR. BUCHANAN:
2        Q.   With regard to Item 14,
3    there's a suggestion.
4        Do you see that?
5        A.   Yes, I see it.
6        Q.   So in conjunction with this
7    question, we should ask if they offer
8    sales or promotions of products to
9    customers.
10        Do you see that?
11        A.   It's written there, yes.
12        Q.   In the summer of 2014, one
13    of the things that -- excuse me.
14    Withdrawn.
15        In the summer of 2012, one
16    of the things that Qualitest was looking
17    at was its own Know Your Customer
18    program, right?
19        MR. LIMBACHER:  Object to
20    form.
21        THE WITNESS:  I can't
22    confirm that.
23    BY MR. BUCHANAN:
24        Q.   Okay.  It says, In

72  (Pages 282 to 285)

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1   connection with this question, we should
2   ask if they offer sales or promotions of
3   products to customers.  This is an area
4   that could contribute to excessive
5   ordering, as well as the use of the
6   verbiage of sales and promotions is a red
7   flag in itself.
8          Do you see that?
9          A.   I see it.
10         Q.   Do you agree, ma'am, that
11  sales and promotions of controlled
12  substances are a red flag for suspicious
13  orders?
14         MR. LIMBACHER:  Object to
15  form.
16         THE WITNESS:  I can't speak
17  to sales.  Sales is not my
18  responsibility.
19  BY MR. BUCHANAN:
20         Q.   Well, your responsibility
21  was overseeing suspicious orders, fair?
22         MR. LIMBACHER:  Object to
23  form.
24         THE WITNESS:  My

Page 287

1   responsibility was shipping
2   product to wholesalers.  I'm not
3   responsible for sales.  I don't
4   promote the product.  I'm not
5   responsible for sales.
6   BY MR. BUCHANAN:
7          Q.   As part of looking at
8   whether orders were suspicious, did you
9   look to see whether or not the company
10  had promotions on its products?
11         A.   That's not part of my job
12  responsibility.  There's other areas
13  within Endo --
14         Q.   Did you --
15         A.   -- that's their
16  responsibility.
17         Q.   Did you consider, ma'am,
18  whether offering promotions and sales, in
19  and of itself, is a suspicious order?
20         MR. LIMBACHER:  Object to
21  form.
22         THE WITNESS:  My
23  responsibility is shipping the
24  product to the wholesalers.  Sales

Page 288

1   of the product is not my
2   responsibility.  It's with other
3   organizations within the company.
4   BY MR. BUCHANAN:
5          Q.   Did you consider, ma'am,
6   whether offering promotions and sales, in
7   and of itself, of a controlled substance
8   would constitute a suspicious order?
9          A.   My responsibility --
10         MR. LIMBACHER:  Object to
11  form.  Asked and answered.  And,
12  counsel, with all due respect,
13  you've asked the same question now
14  multiple times.
15         MR. BUCHANAN:  I'm entitled
16  to an answer.
17         You can answer, ma'am.
18         MR. LIMBACHER:  I know you
19  don't like the answer that you're
20  getting.
21         MR. BUCHANAN:  I just don't
22  like your speaking objections.
23         MR. LIMBACHER:  Well, I
24  don't appreciate you asking my

Page 289

1   witness the same question over and
2   over and over simply because it's
3   not fitting into your very nice,
4   neat script of what you think this
5   litigation is all about.
6          MR. BUCHANAN:  Can I have
7   the question read back, please?
8          MR. LIMBACHER:  So with all
9   due respect, counsel, at some
10  point in time you have to stop
11  asking the same question just
12  because you don't like the answer
13  you're getting.
14         MR. BUCHANAN:  Do you feel
15  better now?
16         MR. LIMBACHER:  That's
17  defined as harassment of a
18  witness.
19         MR. BUCHANAN:  Can I have my
20  question read back?
21         MR. LIMBACHER:  I don't
22  appreciate the sarcasm, either.
23  I'm doing my job just as you're
24  doing yours.

73 (Pages 286 to 289)

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1    MR. BUCHANAN:  No, a
2 speaking objection is not your
3 job.
4    MR. LIMBACHER:  My job is to
5 protect my witness and protect my
6 client.
7    MR. BUCHANAN:  Not by --
8    MR. LIMBACHER:  And if you
9 are asking inappropriate questions
10 over and over and over, after I've
11 been very patient, then I am
12 entitled and, in fact, obligated
13 to speak up.
14    MR. BUCHANAN:  Please mark
15 the transcript.
16        - - -
17    (Whereupon, the court
18 reporter read the following part
19 of the record:
20    "Question:  Did you
21 consider, ma'am, whether offering
22 promotions and sales, in and of
23 itself, of a controlled substance
24 would constitute a suspicious

Page 291

1 order?")
2        - - -
3    MR. LIMBACHER:  Objection.
4 Form.  Foundation.  Asked and
5 answered.
6 BY MR. BUCHANAN:
7    Q.   You can answer.
8    A.   As I said previously, my
9 responsibility is shipping product to our
10 wholesalers.  The sale of the product is
11 not my responsibility.  There's other
12 areas within Endo that is responsible for
13 the sales and promotion of the product.
14    Q.   Did anyone within the
15 company, ma'am, ever tell you that, I
16 guess apart from this e-mail, that sales
17 or promotions of products to customers
18 could be a red flag for excessive
19 ordering?
20    A.   I had the necessary
21 information to do my job.  My job was
22 shipping product to wholesalers.  The
23 sale of the product is not within my area
24 of responsibility.

Page 292

1    Q.   Did you consider, ma'am,
2 sales and promotions a red flag with
3 regard to suspicious orders?
4    MR. LIMBACHER:  Objection to
5 the form.  Asked and answered.
6    THE WITNESS:  I had the
7 necessary information to do my
8 job.  My job was to ship to our
9 wholesalers.  We had the necessary
10 SOM programs in place at Endo and
11 at UPS.  The sale of the product
12 is with other areas within Endo.
13 It is not my responsibility.
14 BY MR. BUCHANAN:
15    Q.   And ship you did, right?
16    MR. LIMBACHER:  Objection.
17    THE WITNESS:  I shipped the
18 product within our SOM programs;
19 our program and at UPS's program.
20 BY MR. BUCHANAN:
21    Q.   Over and over and over and
22 over again for 20 years, when red flags
23 were raised, when wires were tripped and,
24 quote, a review was conducted, you

Page 293

1 cleared the orders and they shipped?
2    MR. LIMBACHER:  Objection to
3 the form.  Counsel --
4 BY MR. BUCHANAN:
5    Q.   True?
6    MR. LIMBACHER:  -- save your
7 closing argument for the jury,
8 please.
9 BY MR. BUCHANAN:
10    Q.   You can answer that.
11    MR. LIMBACHER:  Object to
12 form.  Asked and answered.
13    THE WITNESS:  I shipped the
14 product to our wholesalers.
15    And, again, and I'm going to
16 repeat this again and again, we
17 had the appropriate measures in
18 place at Endo and at UPS.  We had
19 an SOM program in place.  We
20 shipped to the wholesalers.
21 BY MR. BUCHANAN:
22    Q.   You were required to
23 maintain effective controls against
24 diversion, "you" being Endo, right?

74  (Pages 290 to 293)

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1          MR. LIMBACHER: Object to
2     form.
3          THE WITNESS: I cannot speak
4     for Endo as a company. I can
5     speak to my role within the
6     company.
7     BY MR. BUCHANAN:
8     Q.   You understood, ma'am,
9     operating within the closed system of
10    controlled substance distribution that
11    your company had an obligation to
12    maintain effective controls against
13    diversion, correct?
14         MR. LIMBACHER: Object to
15    form. Asked and answered.
16         THE WITNESS: There are
17    other areas within the company
18    that did many things regarding the
19    diversion of Opana that I cannot
20    speak to.
21         I can only speak to my job.
22    And my job was shipping to the
23    wholesalers.
24    BY MR. BUCHANAN:

Page 295

1     Q.   Did you have that
2     understanding, ma'am, that as a member of
3     the closed system for controlled
4     substance distribution that your company
5     had an obligation to maintain effective
6     controls against diversion; yes or no?
7          MR. LIMBACHER: Object to
8     the form and foundation.
9     BY MR. BUCHANAN:
10    Q.   Did you understand that?
11         MR. LIMBACHER: Asked and
12    answered.
13         THE WITNESS: I know that
14    Endo had a lot of different
15    programs in place to maintain --
16    sorry, wrong word -- to stop
17    diversion.
18         I cannot speak to all those
19    programs within Endo. I can only
20    speak to my job.
21    BY MR. BUCHANAN:
22    Q.   Okay. Within Endo branded,
23    ma'am, please share with us the other
24    effective controls the company maintained

Page 296

1     to prevent diversion that you know about.
2          MR. LIMBACHER: Object to
3     the form and foundation. You want
4     her to now testify about the
5     things she just told you she
6     couldn't testify about? Is that
7     the question?
8          MR. BUCHANAN: She said she
9     knows Endo has a lot of different
10    programs in place, so I'd like to
11    know what they are.
12         MR. LIMBACHER: And I can't
13    speak to all of those programs
14    within Endo, is her testimony.
15         So I want just to be clear
16    on the record that you're asking
17    her now to testify about things
18    that she's just said that she
19    cannot speak to. Is that what
20    we're doing now, counsel?
21         MR. BUCHANAN: You can
22    answer.
23         MR. LIMBACHER: Is that how
24    we're using our time?

Page 297

1          MR. BUCHANAN: We can
2     definitely use our time that way,
3     because she says she has knowledge
4     of it.
5     BY MR. BUCHANAN:
6     Q.   So please share with us,
7     ma'am, those effective controls against
8     diversion that you're aware of that Endo
9     had?
10         MR. LIMBACHER: Objection to
11    the form. Foundation. Asked and
12    answered.
13         THE WITNESS: Am I
14    answering? I'm sorry.
15    BY MR. BUCHANAN:
16    Q.   You can answer.
17         MR. LIMBACHER: Do you need
18    him to repeat the question?
19         THE WITNESS: Sure. Repeat
20    the question.
21    BY MR. BUCHANAN:
22    Q.   Please share with us, Ms.
23    Walker, the effective controls against
24    diversion that you're aware of that Endo

75  (Pages 294 to 297)

Highly Confidential - Subject to Further Confidentiality Review

Page 298

```
 1    had.
 2           MR. LIMBACHER:  Object to
 3    the form and foundation.  Asked
 4    and answered.
 5           THE WITNESS:  I know that
 6    Endo had other -- had programs in
 7    place.  I can't speak to them.
 8    They're not part -- they're not my
 9    responsibility.
10    BY MR. BUCHANAN:
11        Q.   Are you aware of any?
12           MR. LIMBACHER:  Object to
13    form.  And foundation.
14           THE WITNESS:  There are
15    programs in place that Endo did.
16    I cannot speak to them.  I can't
17    speak for the company.  I can only
18    speak for myself and my job.
19    BY MR. BUCHANAN:
20        Q.   Your job, as I understand
21    it, ma'am, was head of suspicious order
22    monitoring, correct?
23           MR. LIMBACHER:  Object to
24    form.
```

Page 299

```
 1           THE WITNESS:  Suspicious
 2    order monitoring was part of my
 3    job responsibility.
 4    BY MR. BUCHANAN:
 5        Q.   If we were to look for
 6    Endo's SOPs on suspicious order
 7    monitoring, we could see described at
 8    least what Endo did in regard to standard
 9    operating procedures with regard to
10    suspicious order monitoring, would that
11    be true?
12           MR. LIMBACHER:  Object to
13    form.
14           THE WITNESS:  I think we
15    already looked at the document
16    about our SOM program.
17    BY MR. BUCHANAN:
18        Q.   Does Endo even have SOPs for
19    suspicious order monitoring, ma'am?
20           MR. LIMBACHER:  Object to
21    form.
22           THE WITNESS:  We have that
23    document in place.  And many of
24    our SOPs are within UPS.
```

Page 300

```
 1    BY MR. BUCHANAN:
 2        Q.   Does Endo have SOPs for
 3    suspicious order monitoring?
 4        A.   We have --
 5           MR. LIMBACHER:  Object to
 6    form.
 7           THE WITNESS:  We have the
 8    document that we looked at, that
 9    we have already reviewed.  That's
10    the only document that I know of.
11    BY MR. BUCHANAN:
12        Q.   Okay.  Endo has standard
13    operating procedures as a general matter,
14    correct?
15           MR. LIMBACHER:  Object to
16    form.
17           THE WITNESS:  I'm sure some
18    areas do.  I can't speak to those.
19    BY MR. BUCHANAN:
20        Q.   Have you seen lists of Endo
21    standard operating procedures?
22        A.   No, I don't recall.
23        Q.   Would it surprise you,
24    ma'am, that Endo doesn't have standard
```

Page 301

```
 1    operating procedures for suspicious order
 2    monitoring?
 3           MR. LIMBACHER:  Object to
 4    the form.  Argumentative.
 5           THE WITNESS:  I have the
 6    document that we've already
 7    reviewed.  And we have UPS's
 8    document.  And we have work
 9    instructions within UPS.
10    BY MR. BUCHANAN:
11        Q.   The document that we
12    reviewed, could you identify it for the
13    record, just so we understand what you're
14    referring to as Endo's standard operating
15    procedures?
16           MR. LIMBACHER:  Object to
17    form.
18           THE WITNESS:  The document
19    that's attached to Number 3.  It's
20    this one.
21    BY MR. BUCHANAN:
22        Q.   What exhibit?
23           MR. LIMBACHER:  Exhibit-3.
24           THE WITNESS:  Exhibit-3.
```

76  (Pages 298 to 301)

Highly Confidential - Subject to Further Confidentiality Review

Page 302

```
 1    BY MR. BUCHANAN:
 2         Q.   Thank you.  Let's go to the
 3    next page, please.
 4              I'm sorry, let's go back to
 5    the first page, so we describe it for the
 6    record.
 7              This is an e-mail exchange
 8    that you're having in 2015, I guess it
 9    was an e-mail from Mr. Collins to
10    yourself on SOM program, to yourself.  I
11    think it says, Hi, Laura, but do you
12    understand that to be referring to you in
13    that e-mail, ma'am?
14         A.   Yes.
15         Q.   Hi, Laura.  Please provide
16    an update on Endo's SOM program, written
17    is fine.  Then he asks, Is this a joint
18    Endo/Qualitest program or does each
19    company have its own?
20              Do you see that e-mail?
21         A.   Yes.
22         Q.   And here is your response,
23    with your summary of the SOM program,
24    approved by legal and Brian Lortie,
```

Page 303

```
 1    correct?
 2         A.   Yes.
 3         Q.   Who is Brian Lortie?
 4         A.   At the time, he was -- I
 5    don't know his title, but he was over the
 6    branded division.
 7         Q.   Okay.  And if we go to the
 8    second page, this is the SOM's process
 9    flow?
10         A.   Yes.
11         Q.   And the document that
12    describes your current process with a
13    limited SOM program and the current SAP
14    system, correct, ma'am?
15              MR. LIMBACHER:  Object to
16    form.  Asked and answered.  We
17    covered this document at great
18    length, counsel.
19              THE WITNESS:  We've already
20    covered this.
21    BY MR. BUCHANAN:
22         Q.   And this is the document
23    you're stating is the standard operating
24    procedure, or something that is
```

Page 304

```
 1    functioning as one?
 2              MR. LIMBACHER:  Object to
 3    form.
 4              THE WITNESS:  This is the
 5    document that I have, yes.
 6    BY MR. BUCHANAN:
 7         Q.   It certainly doesn't state
 8    standard operating procedure, does it?
 9              MR. LIMBACHER:  Object to
10    form.  The document speaks for
11    itself.
12    BY MR. BUCHANAN:
13         Q.   Does it?
14         A.   No, it does not.
15         Q.   Standard operating
16    procedures within your company have a
17    standard form, correct?
18              MR. LIMBACHER:  Object to
19    form.  Foundation.
20              THE WITNESS:  I can't
21    confirm that.
22    BY MR. BUCHANAN:
23         Q.   You've never seen the
24    company's standard operating procedures,
```

Page 305

```
 1    ma'am?
 2              MR. LIMBACHER:  Object to
 3    form.
 4              THE WITNESS:  I've seen
 5    some, I'm sure.
 6    BY MR. BUCHANAN:
 7         Q.   Okay.
 8              MR. BUCHANAN:  Let's pass it
 9    over.
10              MR. SIEGEL:  Walker-8.
11                  - - -
12              (Whereupon, EndoWalker
13    Exhibit-8,
14    ENDO_OPIOID_MDL_05950068, With
15    Attachment was marked for
16    identification.)
17                  - - -
18    BY MR. BUCHANAN:
19         Q.   I'm passing you, ma'am,
20    what's been marked as Exhibit-8 to your
21    deposition.
22              It's from this 2012 window
23    we were just looking at with regard to
24    the questionnaire.  The latest-in-time
```

77  (Pages 302 to 305)

Page 306

1    e-mail is from you to a Mr. Koumou -- or
2    Ms. Koumou, Janice Koumou.
3          Do you see that?
4          MR. LIMBACHER:  She doesn't
5    have it yet.
6          Now she's got it.
7    BY MR. BUCHANAN:
8      Q.   Do you see the
9    latest-in-time e-mail at the top from
10   yourself to Ms. Connell?
11         She was your boss at the
12   time?
13     A.   Jill was, yes.
14     Q.   And Janice Koumou, who is
15   she?
16     A.   I don't recall who she is.
17     Q.   And as you scroll into this,
18   you can see a list of company's various
19   SOPs, 674.7, the top right corner.
20         Do you see those?
21     A.   What number again?
22     Q.   674.7, top right corner.
23     A.   Yes.
24     Q.   And then it lists various

Page 307

1    SOPs on the left, the titles of the SOPs,
2    and the various departments that are
3    responsible for the SOPs.
4          Do you see those?
5      A.   I do.
6      Q.   Do you recognize those
7    departments as departments within Endo?
8      A.   I recognize those documents.
9      Q.   Information management
10   clinical, nonclinical, pharmaceutical
11   development, quality assurance, et
12   cetera.
13         Do you see those?
14     A.   I do.
15     Q.   And the various titles off
16   to the left, SOP tends to be embedded in
17   the name of the various documents,
18   correct?
19     A.   I see it, yes.
20     Q.   Just take a moment and
21   review and see, in this listing of SOPs
22   with the company in 2012, whether there
23   are any SOPs for suspicious order
24   monitoring, excessive order management,

Page 308

1    Know Your Customer, Know Your Customer's
2    Customer, things like that.
3          MR. LIMBACHER:  Object to
4    form.
5          THE WITNESS:  There's none
6    listed.
7          MR. LIMBACHER:  Well, he's
8    not --
9    BY MR. BUCHANAN:
10     Q.   To your knowledge, ma'am,
11   are there --
12         MR. LIMBACHER:  -- limiting
13   himself to just that one page, I
14   assume.
15         THE WITNESS:  I was just
16   looking at this one page.
17         MR. BUCHANAN:  Feel free to
18   turn the pages.
19         MR. LIMBACHER:  And, I'm
20   sorry, is the representation that
21   this is a complete listing of the
22   Endo SOPs?
23   BY MR. BUCHANAN:
24     Q.   You can answer, ma'am.

Page 309

1          MR. LIMBACHER:  I was asking
2    for a representation.
3          MR. BUCHANAN:  I cannot
4    represent what's in your internal
5    systems.  I only have what you
6    produced to me.
7          MR. LIMBACHER:  We don't
8    know if this is a complete listing
9    of the SOPs.
10         MR. BUCHANAN:  If you
11   produced them all to me, then I
12   suppose that would be the
13   representation.  But I don't know
14   what you chose to produce or not.
15   BY MR. BUCHANAN:
16     Q.   Have you had a chance to
17   look at it, ma'am?
18     A.   I have.
19     Q.   Did you see any SOPs for
20   suspicious order monitoring?
21         MR. LIMBACHER:  Object to
22   form.
23         THE WITNESS:  None were
24   listed, no.

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1    BY MR. BUCHANAN:
2         Q.   Did you see any for Know
3    Your Customer?
4              MR. LIMBACHER:  Object to
5         form.
6              THE WITNESS:  No.
7    BY MR. BUCHANAN:
8         Q.   Did you see any for customer
9    due diligence visits?
10             MR. LIMBACHER:  Object to
11        form.
12             THE WITNESS:  No.
13   BY MR. BUCHANAN:
14        Q.   Did you see any for the
15   assessment or utilization of chargeback
16   information --
17             MR. LIMBACHER:  Object to
18        form.
19   BY MR. BUCHANAN:
20        Q.   -- and evaluating suspicious
21   orders?
22        A.   No.
23        Q.   If we go to the first page
24   of this document, 674.1, I just wanted to

Page 311

1    call out, in your exchange with Ms.
2    Koumou, it appears that it's you
3    forwarding this list of documents,
4    correct?  There are two files that you
5    forwarded?
6         A.   I don't recall this document
7    at all.  Just from what you're showing to
8    me.
9         Q.   I'm reading the e-mail that
10   was produced to us.
11             Do you see two documents
12   attached, one, customer service 2012
13   curriculum is one item, ma'am?
14             MR. LIMBACHER:  Which e-mail
15        are you referring to, counsel?
16             MR. BUCHANAN:  It's 674.1.
17             MR. LIMBACHER:  But which
18        e-mail on that page?
19             MR. BUCHANAN:  It's the
20        latest in time.
21   BY MR. BUCHANAN:
22        Q.   Do you see it on the screen,
23   ma'am?  It's highlighted for you.
24        A.   I see it, yes.

Page 312

1         Q.   Okay.  So one of the
2    documents you forwarded was this customer
3    service 2012 curriculum, correct?
4         A.   I see that attached, yes.
5         Q.   And then the other thing you
6    forwarded was master effective procedural
7    documents as of February 8, 2012,
8    correct?
9         A.   Say that again.  What do
10   you --
11        Q.   The other document that you
12   forwarded was master effective procedural
13   documents as of February 8, 2012,
14   correct?
15        A.   February 8th?
16        Q.   2/8/2012?
17        A.   I don't see 2/8/2012
18   anywhere.
19             MR. LIMBACHER:  He's
20        referring to here.
21             THE WITNESS:  Oh, that.
22   BY MR. BUCHANAN:
23        Q.   Do you see that?
24        A.   I see it, yes.

Page 313

1         Q.   And do you recognize, ma'am,
2    these SOPs and procedural documents that
3    are listed here to be SOPs of the
4    company?
5         A.   This is back from 2012.  I
6    don't recall if these were effective or
7    not in 2012.
8         Q.   Well, certainly, at least
9    the name of the file that you sent in
10   this exchange with Ms. Koumou was, master
11   effective procedural documents as of
12   February 8th, 2012, correct?
13             MR. LIMBACHER:  Object to
14        form.
15             THE WITNESS:  That's what it
16        says.
17   BY MR. BUCHANAN:
18        Q.   And in that list of
19   documents, as of February 8, 2012, you
20   didn't see any SOPs related to suspicious
21   order monitoring, correct?
22             MR. LIMBACHER:  Object to
23        form.  Asked and answered.
24             THE WITNESS:  No.

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1   Suspicious order monitoring is not
2   listed here.
3       But I need to remind you all
4   again that back in 2012, UPS had
5   their own SOM program in place,
6   along with UPS -- along with Endo.
7   BY MR. BUCHANAN:
8       Q.   And their own host of
9   problems, right?
10      MR. LIMBACHER: Object to
11  form. Argumentative.
12      THE WITNESS: What are you
13  asking?
14  BY MR. BUCHANAN:
15      Q.   I said -- you were
16  highlighting UPS.
17      You know they got written up
18  by the DEA, right?
19      MR. LIMBACHER: Object to
20  form. Argumentative.
21      THE WITNESS: I don't know
22  what you're referring to.
23  BY MR. BUCHANAN:
24      Q.   Well, we talked about Know

Page 315

1   Your Customer.
2       How about know your vendor?
3   Did UPS get in trouble with DEA, ma'am?
4       MR. LIMBACHER: Object to
5   form. Foundation.
6       THE WITNESS: I don't know
7   exactly what you are -- what
8   you're referring to.
9   BY MR. BUCHANAN:
10      Q.   What are you thinking of
11  when I say that?
12      MR. LIMBACHER: Object to
13  form.
14      THE WITNESS: I believe
15  you're referring to the UPS small
16  package side of the business,
17  which is completely different and
18  separate from the UPS Supply Chain
19  Solutions side of the business.
20      I believe that's what you
21  are referring to.
22  BY MR. BUCHANAN:
23      Q.   Did they enter into an
24  agreement with the DEA?

Page 316

1       MR. LIMBACHER: Object to
2   form.
3       THE WITNESS: I don't know
4   any details about that agreement,
5   if they did or if they didn't.
6   BY MR. BUCHANAN:
7       Q.   Were you aware of what was
8   going on with UPS? Were they keeping you
9   aware of the investigation with the DEA?
10      MR. LIMBACHER: Object to
11  form.
12      THE WITNESS: I don't
13  recall.
14      MR. LIMBACHER: And
15  foundation.
16      MR. BUCHANAN: Now is
17  probably as good a time as any.
18  Let's talk about those agreements.
19  BY MR. BUCHANAN:
20      Q.   As I understand it, Endo was
21  utilizing UPS -- well, what is LHSI?
22      A.   Livingston Healthcare.
23      Q.   Did that get acquired by
24  UPS?

Page 317

1       A.   Yes, they did.
2       Q.   Endo was using UPS, or that
3   predecessor company, to do order
4   fulfillments since '98, correct?
5       A.   We entered into an agreement
6   with them in January of -- sorry, in
7   April of 1999 is when they started.
8       Q.   Okay.
9       MR. BUCHANAN: Can I have
10  597, 598 and 600 in sequence,
11  please?
12      MR. SIEGEL: 597 is
13  Exhibit-9. 598 is Exhibit-10.
14  And 600 is Exhibit-11.
15      - - -
16      (Whereupon, EndoWalker
17  Exhibit-9, UPSSCS0002916-935, was
18  marked for identification.)
19      - - -
20      (Whereupon, EndoWalker
21  Exhibit-10, UPSSCS0002991-3029,
22  was marked for identification.)
23      - - -
24      (Whereupon, EndoWalker

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1    Exhibit-11,
2    ENDO_OPIOID_MDL_02060862-891, was
3    marked for identification.)
4         - - -
5         MR. BUCHANAN:  Can we start
6    with 597 on the screen, please?
7    That's Exhibit-9.
8    BY MR. BUCHANAN:
9         Q.   Ma'am, I'm passing you over
10   what's been marked as Exhibit-9 to your
11   deposition.  It's an agreement between
12   Endo Pharmaceuticals and Livingston
13   Healthcare Services, Inc.
14        MR. LIMBACHER:  She doesn't
15   have it yet, counsel.
16        This is 9, but not 10 and
17   11.
18        MR. BUCHANAN:  9 is what
19   we're referring to.
20        MR. LIMBACHER:  You want me
21   to show her 9 now --
22        MR. BUCHANAN:  Sure.
23        MR. LIMBACHER:  -- because I
24   got 9, 10 and 11.

Page 319

1    BY MR. BUCHANAN:
2         Q.   Do you have before you
3    what's been marked as Exhibit-9, an
4    agreement between Endo Pharmaceuticals
5    and Livingston Healthcare, ma'am?
6         A.   I have it.
7         Q.   Dated April 1, '99?
8         A.   Uh-huh.
9         Q.   Have you seen this agreement
10   before?
11        A.   I have, yes.
12        Q.   And was this the operating
13   agreement at the outset of the formation
14   of Endo with regard to the relationship
15   with Livingston Healthcare Services?
16        MR. LIMBACHER:  Object to
17   form.
18        THE WITNESS:  I believe so.
19   It was at the time.
20   BY MR. BUCHANAN:
21        Q.   Do you recognize this as the
22   earliest operative agreement between Endo
23   Pharmaceuticals and Livingston Healthcare
24   Services, which was later acquired by

Page 320

1    UPS?
2         A.   From what I remember, yes.
3         Q.   Okay.  Let's go to
4    Exhibit-10.
5         Exhibit-10 is an agreement
6    between Endo Pharmaceuticals and
7    Livingston Healthcare Services, Inc.,
8    effective February 1, 2000.  It states,
9    Execution copy February 1, 2000.
10        Do you recognize this,
11   ma'am, as the next agreement between Endo
12   Pharmaceuticals and Livingston Healthcare
13   Services, Inc. --
14        MR. LIMBACHER:  Object to
15   form.
16   BY MR. BUCHANAN:
17        Q.   -- with regard to what was
18   later called UPS's functions in
19   fulfilling Endo's orders?
20        MR. LIMBACHER:  Object to
21   form.
22        THE WITNESS:  UPS Supply
23   Chain Solutions, yes.
24   BY MR. BUCHANAN:

Page 321

1         Q.   Thank you.  Let's go to
2    Exhibit-11.
3         And I'll represent to you,
4    ma'am, that this is the next one that
5    we're aware of, I don't know if this is
6    the next one in sequence, the next one
7    they had, but Exhibit-11 is service
8    schedule Number 1, warehouse distribution
9    services, an agreement between UPS Supply
10   Chain Solutions, Inc. and Endo
11   Pharmaceuticals, Inc.
12        Do you recognize this
13   agreement, ma'am?
14        A.   I do.
15        Q.   Are you aware of any
16   agreements between Exhibit-10 and
17   Exhibit-11, date wise, meaning between
18   2000 and 2010, that concern the
19   relationship between Endo and UPS Supply
20   Chain Solutions?
21        MR. LIMBACHER:  Object to
22   form.
23        Counsel, do you have a date
24   on Exhibit-11?

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1          MR. BUCHANAN:  I think I
2     just said 2010.
3          MR. LIMBACHER:  I just can't
4     read the date on the top right
5     corner.
6          MR. BUCHANAN:  I think it's
7     in the second line.  You can
8     see --
9          MR. LIMBACHER:  Okay.  I
10    see.  Thank you.
11         THE WITNESS:  What was your
12    question, please?
13    BY MR. BUCHANAN:
14         Q.    My question was, are you
15    aware of any agreements between Endo and
16    UPS Supply Chain Solutions between in
17    that ten-year period other than, I
18    suppose, the two bookends we have,
19    Exhibits-10 and 11?
20         A.    From what I recall, I
21    believe this agreement and then we have
22    this new one.
23         Q.    Okay.
24         A.    I don't believe there was

Page 323

1     another agreement in between.
2          Q.    Okay.  So there were two --
3     the two originating agreements with
4     Livingston Healthcare and then we have
5     the 2010 agreement with UPS Supply Chain
6     Solutions; is that correct?
7          MR. LIMBACHER:  Object to
8     form.
9          THE WITNESS:  From what I
10    recall, yes.
11    BY MR. BUCHANAN:
12         Q.    Okay.  In connection with
13    your relationship with UPS, you crafted
14    work instructions over the years; is that
15    right?
16         A.    Yes, we have.
17         MR. BUCHANAN:  Could I
18    please have 656 and 655?
19         MR. SIEGEL:  655 is being
20    marked as Exhibit-12.
21              - - -
22         (Whereupon, EndoWalker
23    Exhibit-12,
24    ENDO_OPIOID_MDL_02988138-145, was

Page 324

1     marked for identification.)
2              - - -
3     BY MR. BUCHANAN:
4          Q.    Ma'am, what's marked as
5     Exhibit-12 is an e-mail from a Mr. Miller
6     at UPS to yourself, attaching -- the
7     subject is, WEP-04-04.03, order entry.
8              And on the next page, we see
9     a document named, Order entry for UPS
10    Supply Chain Solutions with the client
11    Endo Pharmaceuticals.
12              Do you see that?
13         A.    I do.
14         Q.    A document you're familiar
15    with?
16         A.    I am.
17         Q.    And is this the version of
18    Endo's work instructions with UPS from
19    this period of time in 2008, the
20    operative agreement?  I should say the
21    operative work instructions.
22         A.    During the time frame of
23    2008?
24         Q.    Yes, ma'am.

Page 325

1          A.    I would believe so.
2          Q.    Okay.
3          A.    There's no effective date,
4     so I don't know if we're looking at the
5     right document.
6          Q.    Where do you keep the work
7     instructions over the years that you've
8     had with UPS, ma'am?
9          A.    UPS --
10         MR. LIMBACHER:  Object to
11    form.
12         THE WITNESS:  They are a
13    UPS-controlled document, so they
14    rely -- they are housed with UPS.
15    But Endo, we receive copies of
16    them.
17    BY MR. BUCHANAN:
18         Q.    Right.  I take it, for this
19    relationship to work, you need to
20    understand what roles you have and what
21    roles they have, right?
22         A.    Correct.  The work
23    instructions are developed in conjunction
24    with both Endo and UPS, but they are a

Page 326

1  UPS-controlled document.
2      Q.  Understood.  The work
3  instructions are what guide how they are
4  handling things within their walls but
5  they, nonetheless, provide you an
6  opportunity to give feedback because
7  you're hiring them to do that function,
8  right?
9          MR. LIMBACHER:  Object to
10  form.
11          THE WITNESS:  UPS has
12      corporate SOPs.  And then they
13      have client-specific work
14      instructions.  These work
15      instructions are for Endo, for the
16      Endo business.
17  BY MR. BUCHANAN:
18      Q.  Okay.  And so these would
19  have been shared with you, and you would
20  have had an opportunity to provide input
21  on them, correct?
22      A.  Yes.
23      Q.  And did you?
24      A.  I would assume I did, yes.

Page 327

1      Q.  Okay.  Do you keep a file of
2  these somewhere in your department?
3      A.  Yes.  I have a binder of
4  them.
5      Q.  You have the binder of the
6  current versions as well as the old
7  versions?
8          MR. LIMBACHER:  Object to
9      form.
10          THE WITNESS:  I normally
11      just keep the current versions.
12  BY MR. BUCHANAN:
13      Q.  Is this still the current
14  version of the -- what's referred to as
15  order entry or the work instructions for
16  order entry?
17      A.  As of today?
18      Q.  Yes.
19      A.  I do not believe so.  I
20  believe there's another version, but I
21  can't confirm that without having the
22  documents.
23      Q.  Aside from the sense you
24  have in your body right now that there is

Page 328

1  another version other than this one, are
2  you aware of many other versions of the
3  work instructions entitled order entry?
4          MR. LIMBACHER:  Object to
5  form.



Page 329

23          MR. BUCHANAN:  Could we pass
24  the witness what we're marking as

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1   656?
2         MR. SIEGEL:  Walker
3   Exhibit-13.
4            - - -
5         (Whereupon, EndoWalker
6   Exhibit-13,
7   ENDO_OPIOID_MDL_01680920-975, was
8   marked for identification.)
9            - - -
10  BY MR. BUCHANAN:
11       Q.   I'm passing you, ma'am,
12  what's been marked as Exhibit-13 to your
13  deposition.
14       A.   Thanks.
15       Q.   This is a work instruction
16  entitled, Order processing.
17            Do you see that?  I'm sorry.
18  There's a cover e-mail, I was going to
19  direct you to Page .12.  You're free to
20  look at the intervening pages, but --
21       A.   I see it.
22       Q.   Okay.  Can we go to .12?
23       A.   .12?  Order processing.
24  This one, order processing?

Page 331

1         MR. LIMBACHER:  No, he's
2   looking at these.
3   BY MR. BUCHANAN:
4         Q.   Top right corner, I'm sorry,
5   ma'am.
6         A.   This one?
7         MR. LIMBACHER:  Yes.
8   BY MR. BUCHANAN:
9         Q.   Do you see that work
10  instruction?
11        A.   Order processing, I do.
12        Q.   Is that a work instruction
13  that you recognize?
14        A.   It is.
15        Q.   Something that's been shared
16  with you in the past?
17        A.   Yes, it has.
18        Q.   Is this the work instruction
19  with UPS that governs the handling of
20  orders for controlled substances?
21        MR. LIMBACHER:  Object to
22  form.
23        THE WITNESS:  Yes, it
24  references controlled substances.

Page 332

1   BY MR. BUCHANAN:
2         Q.   Okay.  Where are you
3   referring?  What page are you on?  I just
4   can't see over the table.
5         A.   .15.
6         Q.   Thank you.
7              Would that be the controlled
8   substance excess order check?
9         A.   Yes.
10        Q.   And just to orient us,
11  ma'am, this would be UPS's workflow with
12  regard to order processing after its been
13  released to them by Endo, fair?
14        A.   No, that's incorrect.
15        Q.   Okay.  What is it?
16        A.   This is the process within
17  Endo's SAP system.  Once the order gets
18  down to UPS's SOM program, it's a
19  completely different group and a
20  different process that reviews those
21  orders.
22        Q.   Okay.  So let's make sure we
23  understand this now.  4.3.7, Controlled
24  Substance Excessive Order Check.

Page 333

1              Do you see that heading?
2         A.   I do.
3         Q.   Customer service must print
4   this report several times per day in
5   order to resolve excessive order lines
6   prior to cutoff time where feasible.
7   This includes the release of CSOS orders.
8              Do you see that?
9         A.   I do.
10        Q.   CSOS, that's controlled
11  substance ordering system?
12        A.   Correct.  That's the
13  electronic version of a controlled order.
14        Q.   Right.  So in the old days,
15  it was more prevalent for people to fill
16  out a piece of paper and fax it or send
17  it; more recently, there's an electronic
18  system to allow controlled substance
19  orders to come in?
20        A.   Right.  Previously, it was a
21  DEA Form 222.  Now it's an electronic
22  version.
23        Q.   And then it says, next line
24  item, 4.3.7.2, The Endo associate

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1    director of customer service and
2    distribution either approves the order to
3    be released or contacts the customer to
4    obtain more information.
5           Did I read that correctly?
6      A.   You did.
7      Q.   If the order is greater than
8    the average of the customer's last three-
9    and twelve-month usage, the CMA contacts
10   Endo's associate director of customer
11   service.
12          Did I read that correctly?
13     A.   Uh-huh.
14     Q.   CMA is at UPS Supply Chain
15   Services?
16     A.   The CMA is another word for
17   customer service rep at UPS, yes.
18     Q.   So if the order was greater
19   than the customer's last three- or
20   twelve-month average, the CMA would
21   contact somebody in your group, right?
22     A.   Yes.
23     Q.   Okay.  The associate
24   director may instruct customer service to

Page 335

1    contact the customer to verify the amount
2    ordered and request an explanation as to
3    why their order was excessive, new
4    customer, new contracts, increased sales
5    or release the order.
6           Do you see that?
7      A.   I do.
8      Q.   CMA must enter the
9    explanation in the order notes, along
10   with the contact name of the customer.
11          Did I read that correctly?
12     A.   Yes.
13     Q.   Next line says, The CMA
14   reviews excessive orders and releases
15   them from excessive hold if the quantity
16   is less than 500 units.
17          Did I read that correctly?
18     A.   You did.
19     Q.   Were you aware of that?
20          MR. LIMBACHER:  Object to
21   form.
22          THE WITNESS:  Was I aware of
23   what?
24   BY MR. BUCHANAN:

Page 336

1      Q.   That the UPS customer
2    service rep would review excessive orders
3    and release them from excessive hold if
4    the quantity is less than 500 units?
5      A.   So I want to make sure that
6    we're all clear on what we're actually
7    looking at.
8           So UPS Supply Chain
9    Solutions's customer service uses Endo's
10   SAP system.  So this is all related to
11   Endo SAP system.
12          So when you're talking about
13   UPS releasing orders, it's with -- this
14   is the Endo system.  When Endo's are
15   released and sent to UPS, it goes through
16   UPS's SOM program, which is completely
17   separate from any -- completely separate
18   from this work instruction document.
19          I just want to make sure
20   everybody is on the same page on how this
21   is working.
22     Q.   That's helpful to
23   understand.
24          What you're saying is that

Page 337

1    you had people physically seated in an
2    UPS facility that were actually working
3    on -- they were UPS employees, but they
4    were working on your SAP system?
5      A.   Yes.  The Endo customer
6    service group is at UPS, and they are
7    dedicated to Endo.
8      Q.   Okay.  Just in terms of
9    where they get their paycheck, are they
10   UPS employees or are they Endo employees?
11          MR. LIMBACHER:  Object to
12   form.
13          THE WITNESS:  They are UPS
14   employees.
15   BY MR. BUCHANAN:
16     Q.   Okay.  So the UPS employees
17   are the employees doing the first check
18   on Endo's rules for excessive order
19   monitoring?
20     A.   Correct.  In conjunction
21   with myself at Endo, yes.  Yes, that's
22   correct.
23          But just for clarification
24   again, the UPS SOM program and people are

Page 338

1  not part of this group.  It's a
2  completely separate group within the
3  regulatory system.
4        Q.   Okay.  So let me just make
5  sure I'm understanding this, then.
6        So this controlled substance
7  excessive order check that's in the work
8  instructions for UPS, this is -- would
9  actually be what was, quote, Endo's
10  process within its SAP system as of this
11  point in time; is that fair?
12        A.   Right.  Whatever point in
13  time these work instructions are
14  effective.  I think this is under our
15  older program.  But yes.
16        Q.   So this is 2008.  And what
17  this says is, what we were looking at to
18  make an assessment of whether it's an
19  excessive order under Endo's rules at the
20  time was whether it was greater than the
21  average of the customer's last three- and
22  twelve-month usage, right?
23        A.   Right.  These was -- these
24  are work instructions before our update

Page 339

1  to SAP in '14.
2        Q.   Okay.  So that was the
3  general rule that you were applying to
4  flag an excessive order from Endo's
5  suspicious order monitoring process up
6  until 2014?
7        A.   The three- and twelve-month
8  average, yes, correct.
9        Q.   As a practical matter, it
10  was UPS employees who would be reviewing
11  those flags?
12        A.   In conjunction with Endo;
13  based on Endo's processes and based on
14  Endo's direction, yes.
15        Q.   Right.
16        A.   Correct.
17        Q.   So they were UPS employees
18  assessing orders as to whether they were
19  excessive or not based on the algorithm
20  that's reflected in 4.3.7.3, correct?
21        MR. LIMBACHER:  Object to
22  form.  Misstates the document.
23  Misstates the evidence.  Misstates
24  her testimony.

Page 340

1        THE WITNESS:  What's the --
2  clarify your question.
3  BY MR. BUCHANAN:
4        Q.   Do you see 4.3.7.3?
5        A.   I do.
6        Q.   Is that the general
7  algorithm that was Endo's suspicious
8  order flag up until 2014?
9        A.   At this time the three- and
10  twelve-month, that's correct.
11        Q.   Up until 2014, correct?
12        A.   Yes.
13        Q.   Okay.  So that would have
14  been the -- what would have, quote,
15  tripped the wire up until 2014?
16        MR. LIMBACHER:  Object to
17  form.
18  BY MR. BUCHANAN:
19        Q.   Correct?
20        A.   The order potentially could
21  kick out and a review would be done.
22        And, again, once the order
23  is released, it's sent to UPS and it goes
24  through UPS's SOM program, which is a

Page 341

1  completely separate group than this.
2        Q.   So what's happening here is
3  that the UPS employees are then reviewing
4  the orders that kick out, correct?
5        A.   The U -- to clarify, it's
6  the customer service team assigned to
7  Endo, not the regulatory team.  The UPS
8  customer service team assigned to Endo
9  looking at the Endo SAP system.
10        Q.   The UPS customer service
11  team that was performing at least the
12  first review of suspicious orders using
13  Endo's suspicious order or excessive
14  order test?
15        A.   Correct.  Right.
16        MR. LIMBACHER:  Object to
17  form.
18  BY MR. BUCHANAN:
19        Q.   So orders that were kicked
20  out as being excessive by that test would
21  then get reviewed by the UPS customer
22  service people, right?
23        MR. LIMBACHER:  Object to
24  form.

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1      THE WITNESS:  Correct.  In
2  conjunction with Endo, if they had
3  questions based on our work
4  instructions.
5  BY MR. BUCHANAN:
6      Q.   And by the work instructions
7  that you guys had agreed on, the customer
8  service representative from UPS could
9  release an excessive order if the
10  quantity was less than 500, 500 units,
11  correct?
12      MR. LIMBACHER:  Object to
13  form.
14      THE WITNESS:  That's what
15  this states, yes.
16  BY MR. BUCHANAN:
17      Q.   And that was the practice
18  that would have been followed under these
19  work instructions until they changed,
20  correct?
21      MR. LIMBACHER:  Object to
22  form.
23      THE WITNESS:  Correct.
24  BY MR. BUCHANAN:

Page 344

1      probably upgraded their system in
2  '14.
3  BY MR. BUCHANAN:
4      Q.   Do you know that?
5      A.   Do I know the work
6  instructions change?  I know that we have
7  current work instructions, yes.
8      Q.   Do your current work
9  instructions, ma'am, do they allow an
10  order to be cleared if it's just less
11  than 500 units?
12      A.   I would have to look at the
13  current work instructions.  I can't
14  confirm that right now.
15      Q.   Okay.  In other words, when
16  we talk about an order clearing, that
17  means you don't have to do further
18  investigation if it's smaller than 500
19  units, right?
20      MR. LIMBACHER:  Object to
21  form.
22      THE WITNESS:  That's what it
23  states.
24  BY MR. BUCHANAN:

Page 343

1      Q.   These were, quote, the rules
2  of the road for Endo's excessive order
3  flagging and clearing until 2014, right?
4      A.   Right.
5      MR. LIMBACHER:  Object to
6  form.
7      THE WITNESS:  Sorry.
8      But, again, you know, I'm
9  repeating myself, I know.  But
10  once they are released from our
11  system, they go through UPS's SOM
12  program before they are released
13  for shipping, which is a
14  completely separate algorithm,
15  separate system.
16  BY MR. BUCHANAN:
17      Q.   When did the work
18  instruction change with regard to
19  releasing orders that were smaller than
20  500 units?
21      MR. LIMBACHER:  Object to
22  form.
23      THE WITNESS:  I don't have
24  the exact date, but when SAP

Page 345

1      Q.   Okay.  And that's what you
2  did?
3      MR. LIMBACHER:  Object to
4  form.
5      THE WITNESS:  We had an
6  excessive program in place, and we
7  reviewed them and we released the
8  orders as appropriate.
9  BY MR. BUCHANAN:
10      Q.   And one of the reasons to
11  release an order was if it was smaller
12  than 500 units, right?
13      A.   We had our program in place.
14      MR. BUCHANAN:  We're getting
15  some feedback on the phone.  I
16  don't know if somebody doesn't
17  have their phone on mute.
18  BY MR. BUCHANAN:
19      Q.   All right.  And so if the
20  order was greater then 500 units, that
21  would be something that would have been
22  coordinated with the Endo supervisor; is
23  that right?
24      A.   Yes.

87  (Pages 342 to 345)

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1     Q.   Is the Endo supervisor you?
2     A.   Probably at that time, yes.
3     Q.   Okay.  Were you ever
4   physically at the same facility, ma'am,
5   with these UPS customer service people
6   that were doing this first-level review?
7     A.   Yes, I visit the UPS sites.
8     Q.   Not a matter of whether you
9   visited them.
10        Were you physically ever
11  present and working in that environment?
12        MR. LIMBACHER:  Object to
13  form.
14        THE WITNESS:  No, I work out
15  of the Malvern office.  But I do
16  visit UPS.
17  BY MR. BUCHANAN:
18    Q.   Was that -- so that work was
19  happening remote from where you were on a
20  day-to-day basis?
21    A.   Yes.
22    Q.   Okay.
23        MR. LIMBACHER:  Whenever is
24  a good time to stop.

Page 347

1         MR. BUCHANAN:  Can you go a
2   few more minutes, just so I can
3   finish this?
4         MR. LIMBACHER:  Are you okay
5   for a few more minutes?
6         THE WITNESS:  Yes.
7   BY MR. BUCHANAN:
8     Q.   And then it says, The CMA
9   will release the excessive order based on
10  one of the following excessive release
11  codes.
12        Right?
13    A.   Yes, that was in our old
14  system.
15    Q.   And these were the
16  documents -- this was the documentation
17  you would log into the system, 8050,
18  release due to growth factor, right?
19    A.   Yes.
20    Q.   Customer tells you they're
21  selling more, release it --
22        MR. LIMBACHER:  Object to
23  form.
24  BY MR. BUCHANAN:

Page 348

1     Q.   -- right?
2     A.   We had our program in place,
3   and we reviewed them and we released
4   them, yes.
5     Q.   And then let's go to
6   4.3.7.9.  Endo's associate director of
7   customer service and distribution
8   reserves the right to reduce the quantity
9   ordered and/or advise the deletion of an
10  order.
11        Do you see that?
12    A.   Yes, I see it.
13    Q.   Is that you?
14    A.   Yes, it was at the time.
15    Q.   So you could structure an
16  order if it was excessive?
17    A.   I could what?
18    Q.   You could reduce the size of
19  an order so it stayed below an excessive
20  threshold and then still ship?
21        MR. LIMBACHER:  Object to
22  form.
23        THE WITNESS:  No, I don't
24  believe that's what that says.

Page 349

1   BY MR. BUCHANAN:
2     Q.   Does it say you had the
3   right to reduce the quantity ordered
4   and/or advise the deletion of an order?
5     A.   If we deemed it suspicious
6   and we didn't want to ship it, yes.  But
7   I don't recall us ever doing that.
8     Q.   Okay.  You don't recall ever
9   reducing the size of an order to allow it
10  to ship?
11    A.   No, I do not.
12        MR. LIMBACHER:  Object to
13  form.
14  BY MR. BUCHANAN:
15    Q.   Do you have an understanding
16  as to whether that would be appropriate
17  or not, ma'am?
18        MR. LIMBACHER:  Object to
19  form.
20        THE WITNESS:  We had an
21  excessive program in place that
22  monitored our orders, and we would
23  review and release.
24  BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review

Page 350

```
1          Q.   Was it your understanding,
2   ma'am, that it was permissible for you to
3   reduce the size of the order so that it
4   would no longer be excessive in the
5   shipment and then clear it?
6          A.   I don't recall that.
7          MR. LIMBACHER:  Object to
8   form.
9   BY MR. BUCHANAN:
10         Q.   My question is, is it your
11  understanding that that would be
12  appropriate to do that?
13         A.   I don't recall.
14         Q.   In fact, did you later
15  learn, ma'am, that if you had done such a
16  thing that that would, in fact, be
17  something that you would have to report
18  to the DEA?
19         MR. LIMBACHER:  Object to
20  form.
21         THE WITNESS:  I don't
22  recall.  We had excessive programs
23  in place and so did UPS, and our
24  orders were monitored and they
```

Page 351

```
1   were shipped as appropriate,
2   between both the companies and
3   both our systems and both our
4   programs.
5   BY MR. BUCHANAN:
6          Q.   And if you had cut an order
7   and hadn't reported it to the DEA, that
8   would not be appropriate, would it,
9   ma'am?
10         MR. LIMBACHER:  Object to
11  form.  Foundation.
12         THE WITNESS:  I don't
13  recall.
14  BY MR. BUCHANAN:
15         Q.   If you had an order that was
16  excessive, in order to make it not
17  excessive as to quantity, as to size, as
18  to frequency, you had to reduce its size
19  or reduce the quantity, that would be
20  something you would have to report to the
21  DEA, right?
22         MR. LIMBACHER:  Object to
23  form.  Asked and answered.
24         THE WITNESS:  We had an
```

Page 352

```
1   excessive program in place and UPS
2   had an SOM program in place, and
3   orders were filtered through both
4   programs and reviewed and shipped
5   as necessary.
6          And I don't recall an order
7   being deemed as suspicious and
8   reported to the DEA.
9   BY MR. BUCHANAN:
10         Q.   Do you recall ever cutting
11  an order in size, ma'am --
12         A.   No, I do not.
13         Q.   -- so it was no longer
14  excessive in size?
15         A.   No, I do not.
16         MR. LIMBACHER:  Object to
17  form.  Asked and answered.
18         THE WITNESS:  I do not
19  recall.
20  BY MR. BUCHANAN:
21         Q.   Do you recall ever
22  authorizing people on your staff to cut
23  the size of an order so that it was no
24  longer excessive?
```

Page 353

```
1          A.   No.
2          MR. LIMBACHER:  Object to
3   form.  Asked and answered.
4   BY MR. BUCHANAN:
5          Q.   Would that be appropriate to
6   do, ma'am?
7          MR. LIMBACHER:  Object to
8   form.  Asked and answered.
9          THE WITNESS:  We had an
10  excessive program in place, at
11  both Endo and at UPS.
12  BY MR. BUCHANAN:
13         Q.   How is that responsive to my
14  question?
15         A.   I'm telling you what we had
16  in place.
17         Q.   I'm not asking you that.
18         A.   Well, that's what I'm
19  telling you.
20         Q.   I'm asking you -- the way
21  this works is we have questions and
22  answers.  I think you understand that by
23  this point in time.
24         My question to you, ma'am,
```

89 (Pages 350 to 353)

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1   is, to your understanding, would it be
2   appropriate for a company to cut -- for
3   you, in your role in suspicious order
4   monitoring, to cut an order in size that
5   had been flagged as excessive and then
6   ship it once it's no longer excessive and
7   not report that to the DEA?
8        MR. LIMBACHER:  Object to
9   form.
10       THE WITNESS:  I don't
11  recall.
12       MR. BUCHANAN:  We can take a
13  break.
14       VIDEO TECHNICIAN:  We are
15  going off record.  The time is
16  2:36.
17            - - -
18       (Whereupon, a brief recess
19  was taken.)
20            - - -
21       VIDEO TECHNICIAN:  We're
22  back on the record.  Beginning of
23  Media File Number 6.  The time is
24  2:54.

Page 355

1        MR. BUCHANAN:  Can I have
2   659, please, Scott, next in order?
3        MR. SIEGEL:  659 is being
4   marked as Walker-14.
5            - - -
6        (Whereupon, EndoWalker
7   Exhibit-14,
8   ENDO_OPIOID_MDL_05948106-137, was
9   marked for identification.)
10           - - -
11  BY MR. BUCHANAN:
12       Q.   I'm passing you, ma'am,
13  what's been marked as Exhibit-14 to your
14  deposition.
15       It's an e-mail exchange.
16  I'm going to direct you to one of the
17  constituent e-mails.  It looks like this
18  was kind of assembled as a compilation of
19  some form.
20       I'm going to direct your
21  attention to .27, top right corner.  It's
22  an e-mail from yourself --
23       A.   Sorry, you said 27?
24       Q.   .27, yes, top right corner.

Page 356

1        It's an e-mail from yourself
2   to Kayla Keinhofer, Robert Stuart and
3   Doug Azzalina and a couple of ccs on
4   there.
5        Do you see that?
6        A.   Yes.
7        Q.   And it's referring to an
8   interaction that you had with McKesson in
9   2009 relating to the shipment or
10  nonshipment of orders.
11       Do you recall that?
12       A.   I'm sorry, I was reading the
13  document.
14       Can you please repeat that.
15       Q.   Sure.  It's recalling to
16  certain McKesson service level penalties?
17       A.   Okay, yes.
18       Q.   In your agreement with
19  McKesson, were you required to ship a
20  minimum percentage of their order,
21  regardless?
22       MR. LIMBACHER:  Object to
23  form.
24       THE WITNESS:  This is back

Page 357

1   from 2010.  I don't recall.  I
2   would have to look at the actual
3   document.
4   BY MR. BUCHANAN:
5        Q.   Let's read the e-mail,
6   Monday, May 10, 2010.
7        As we discussed last week
8   during our meeting, attached is the list
9   of POs that McKesson ordered during the
10  last two weeks in December.  This
11  spreadsheet lists the PO number, order
12  quantity, ship quantity and dates.  I
13  know within the agreement there is
14  language around us shipping at least 20
15  percent of their order quantities.  I'm
16  not sure of the exact language.
17       Did I read that correctly,
18  ma'am?
19       A.   Yes.
20       Q.   Are you familiar with
21  service level agreements you had with
22  various of your distributors over time?
23       A.   I know the generic side of
24  the business had service level

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1    agreements, yes.
2        Q.    Okay.  It notes on the
3    bottom, McKesson ordered three times
4    their normal order amount.
5        Do you see that?
6        A.    I do.
7        Q.    Would three times the normal
8    order amount be excessive, ma'am?
9            MR. LIMBACHER:  Object to
10   form.
11           THE WITNESS:  To ground
12       everybody, based on these dates,
13       this is during a holiday period,
14       there is a lot of shifting of
15       orders, shutdown periods, that
16       kind of stuff.
17           So just because it says
18       three times the normal amount,
19       that doesn't mean it's actually
20       excessive, it could be because of
21       the holiday period, because we had
22       shipped to them for multiple
23       weeks.
24   BY MR. BUCHANAN:

Page 359

1        Q.    You wouldn't be surprised if
2    that order would have tripped an
3    excessive flag, though, correct?
4        A.    Correct.  But there's a
5    valid reason that it would kick out as
6    excessive.
7            MR. BUCHANAN:  You can take
8        that down.  684, please, Scott.
9            MR. SIEGEL:  684 is
10       Exhibit-15.
11           MR. BUCHANAN:  And if you
12       could pull it up on the screen.
13            - - -
14       (Whereupon, EndoWalker
15       Exhibit-15,
16       ENDO_OPIOID_MDL_05962953-956, was
17       marked for identification.)
18            - - -
19   BY MR. BUCHANAN:
20       Q.    This is an e-mail from
21   February 21, 2012 from yourself to a Mr.
22   Jennings, Weeks and Cheryl Matz, all at
23   UPS.
24       There's a new exhibit coming

Page 360

1    over the table to you.  You can set that
2    one aside.
3        A.    Not this one?
4        Q.    We'll probably come back to
5    that one in a moment.
6        Do you have the e-mail
7    before you, ma'am?
8        A.    Yes, I do.
9        Q.    It's an e-mail exchange
10   between yourself, internal Endo people,
11   and UPS folks concerning some orders that
12   were coming in, correct?
13       A.    Yes.
14       Q.    I guess the earliest in time
15   would be back on, let's see, .2 at the
16   bottom, an e-mail from yourself on
17   February 21, 2012 to Patricia Drayton,
18   Linda Cichocki, Deborah Robertson and
19   others with UPS, correct?
20       A.    Yes.
21           MR. LIMBACHER:  Take your
22       time and read the document.
23           THE WITNESS:  I know what it
24       is.

Page 361

1    BY MR. BUCHANAN:
2        Q.    It's an order of Opana ER,
3    10 milligram, C-II.
4        Is that Schedule II?
5        A.    Yes, it is.
6        Q.    Controlled substances?
7        A.    Controlled substance II,
8    yes.
9        Q.    Which would fit; Opana ER
10   was a controlled substance, correct?
11       A.    Correct, it is.
12       Q.    And to finish the subject
13   line, it says, Please ship direct to the
14   FDCs, McKesson.
15       What's an FDC?
16       A.    Foreign distribution center.
17       Q.    It then lists all their POs
18   for the Opana.
19       Do you see that?
20       A.    Yes.
21       Q.    PO is a purchase order?
22       A.    Yes, it is.
23       Q.    And on the next page, you'll
24   see a very lengthy listing of Opana

91 (Pages 358 to 361)

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1    purchase orders, correct?
2        A.   Correct.  Yes, this e-mail
3    is from McKesson.
4        Q.   And then if we follow up the
5    thread, we see at the top of Page 2, .2,
6    an e-mail from Ms. Matz.
7            And who is she with?  Is she
8    Endo or is she UPS?
9        A.   Cheryl Matz, she was with
10   Endo at the time.
11       Q.   And Endo, kind of in your
12   office there in Malvern, or was she down
13   sitting with the UPS employees?
14       A.   No, my office in Malvern.
15       Q.   And so she's saying, Hi,
16   Team, McKesson ordered more than their
17   allocated quantities, so in the unit ship
18   column I entered a revised quantity.
19   Please change the orders to reflect these
20   new quantities, and then you can release
21   these particular McKesson orders.
22   Cheryl.
23           Did I read that correctly?
24       A.   You did.

Page 363

1        Q.   And we see before that, all
2    the orders had gone on, quote, license
3    hold, correct?
4        A.   Yes, I see that.
5        Q.   And then you intervene, in
6    the middle of the page, you note, Cheryl
7    is reviewing the quantity.  Don't
8    review -- excuse me -- remove the manage
9    block until you hear from her or I.  You
10   can update the licenses in the meantime.
11           Correct?
12       A.   Yes, that's what it says.
13       Q.   And UPS gets back and says
14   they are going to work on the licenses
15   and wait for you on the quantities,
16   right?
17       A.   That's correct.
18       Q.   And then Cheryl, of course,
19   she changes the quantities, right?
20       A.   That's what it states.  I --
21   I'm -- I have stuff to add, but I'll wait
22   until you finish your questioning.
23       Q.   And then it's noted, further
24   upstream, Kathy Weeks -- who was Kathy

Page 364

1    Weeks with?
2        A.   Kathy worked for UPS.
3        Q.   And she notes, in the middle
4    of Page 1, The quantities have been
5    changed, correct?
6        A.   Yes.
7        Q.   And then, Orders can ship
8    out tomorrow following normal
9    verifications, SOM, et cetera.
10           That's from Mr. Jennings at
11   UPS, correct?
12       A.   That's correct.
13       Q.   And you say, Nice job
14   everyone, in your final e-mail in 2012
15   here, correct?
16       A.   Correct.
17       Q.   All right.  Then you say
18   you're going to look at the ABC orders
19   next?  Is that what you said?
20       A.   Yes, that's what I said.
21       Q.   Okay.
22       A.   So this e-mail --
23       Q.   I'm sorry, ma'am, there's
24   not a question.

Page 365

1            MR. LIMBACHER:  Do you want
2    to give her an opportunity to
3    provide some context?
4            MR. BUCHANAN:  I'm now
5    starting to get concerned about my
6    time.  So if you'd like to do it
7    on redirect, feel free.
8            - - -
9            (Whereupon, a discussion off
10   the record occurred.)
11           - - -
12           MR. LIMBACHER:  Did somebody
13   join?
14           THE WITNESS:  Can I provide
15   context with this, or are we
16   moving on?
17           MR. BUCHANAN:  There's not a
18   question pending, ma'am.
19           MR. LIMBACHER:  He doesn't
20   want you to do that now.
21           THE WITNESS:  Okay.
22   BY MR. BUCHANAN:
23       Q.   If we go to 683.6 on that
24   document, ma'am -- I'm sorry.

92  (Pages 362 to 365)

Highly Confidential - Subject to Further Confidentiality Review



Page 366

1      A.   683 --
2         MR. LIMBACHER:  Which
3   document?
4         MR. BUCHANAN:  Do we need a
5   new one?
6         MS. RAKHLIN:  Yes, it's a
7   new exhibit.
8         MR. BUCHANAN:  Let's move
9   on.
10  BY MR. BUCHANAN:
11     Q.   Did you -- we talked about
12  chargeback data earlier today.
13        Do you recall that
14  discussion?
15     A.   I do.
16
17
18
19
20
21
22
23
24

Page 368

1         MR. BUCHANAN:  Sorry about
2   that.
3         MR. LIMBACHER:  That's okay.
4   BY MR. BUCHANAN:
5      Q.   Do you see little 51 there
6   and little 52 in the bottom right
7   corners?
8      A.   51 and 52, yes, I see it.
9      Q.   This is a report for Opana
10  ER.
11        You all were selling Opana
12  ER in 2008, right?
13     A.   Yes, we were.
14
15
16
17
18
19
20
21
22
23
24

Page 367

1
2
3
4
5      Q.   Okay.
6         MR. BUCHANAN:  Could I have
7   635 and 36, please?  Let's do 636,
8   Scott.
9         MR. SIEGEL:  636 is being
10  marked as Exhibit-16.
11             - - -
12        (Whereupon, EndoWalker
13  Exhibit-16,
14  ENDO-CHI_LIT-001444050-053, was
15  marked for identification.)
16             - - -
17  BY MR. BUCHANAN:
18     Q.   Ma'am, I'm passing what we
19  marked as Exhibit-16 to your deposition.
20        It's a -- if we scroll to
21  little number 51 on the bottom right
22  corner.
23        MR. LIMBACHER:  She doesn't
24  have it yet, Dave.

Page 369

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 374

9      MR. BUCHANAN:  Then move to
10    strike your statements, counsel.
11      MR. LIMBACHER:  So you don't
12    want to cover it?
13      MR. BUCHANAN:  Now you're so
14    out of line.
15      MR. LIMBACHER:  It's a
16    simple question.
17      MR. BUCHANAN:  Could I
18    please have 640?
19   BY MR. BUCHANAN:
20    Q.   You had some role and
21   involvement over the years with HDMA; is
22   that fair?
23    A.   Yes.
24    Q.   And what's HDMA?

Page 376

Page 375

1    A.   The Healthcare Distribution
2   Management Association.  It's where
3   wholesalers and manufacturers belong to
4   the same organization.
5    Q.   And you go to meetings from
6   time to time?
7    A.   I go to their annual -- at
8   least -- sorry, at least one meeting a
9   year, yes.
10    Q.   When did you start doing
11   that?
12    A.   I don't recall the exact
13   time.
14    Q.   Way back in time?
15    A.   Yeah, 2002, 2003, 2004.

Page 377

Highly Confidential - Subject to Further Confidentiality Review



Page 378

```
 1
 2
 3
 4
 5
 6
 7
 8      Q.   Okay.
 9          MR. BUCHANAN:  Can we pass
10      675 over?
11          MR. SIEGEL:  It will be
12      marked as Exhibit-17.
13              - - -
14          (Whereupon, EndoWalker
15      Exhibit-17,
16      ENDO_OPIOID_MDL_02426557-560, was
17      marked for identification.)
18              - - -
19      BY MR. BUCHANAN:
20
21
22
23
24
```

Page 380

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 379

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 381

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

96  (Pages  378 to 381)

Highly Confidential - Subject to Further Confidentiality Review



Page 382

Page 384

18    MR. BUCHANAN:  Could I have,
19  please, 676, Scott.  What's the
20  next in order?
21    MR. SIEGEL:  676 is
22  Exhibit-18.
23    - - -
24    (Whereupon, EndoWalker

Page 383

Page 385

1  Exhibit-18,
2  ENDO_OPIOID_MDL_02426078, was
3  marked for identification.)
4    - - -
5  BY MR. BUCHANAN:
6    Q.   I'm passing you Exhibit-18,

Highly Confidential - Subject to Further Confidentiality Review



Page 386

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 388

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 387

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 389

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12  BY MR. BUCHANAN:
13    Q.    Okay.
14        MR. BUCHANAN:  Can I have,
15  please, Exhibit-640?
16        MR. SIEGEL:  640 is being
17  marked as Exhibit-19.
18          - - -
19        (Whereupon, EndoWalker
20  Exhibit-19,
21  ENDO_OPIOID_MDL_04881787-791, was
22  marked for identification.)
23          - - -
24  BY MR. BUCHANAN:
```

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 390

1      Q.   Did you keep up to date,
2   ma'am, on what the FDA -- excuse me,
3   withdrawn.
4           Did you keep up to date with
5   regard to what the DEA was saying your
6   obligations were with regard to
7   suspicious order monitoring?
8           MR. LIMBACHER:  Object to
9   form.
10          THE WITNESS:  In what way
11   are you referring to?
12   BY MR. BUCHANAN:
13          Q.   Guidances they issued,
14   actions they were taking against
15   distributors, actions they were taking
16   against then customers.
17          Did you keep up to date with
18   what they were saying were a
19   manufacturer's obligations?
20          A.   I mean, I knew of them.  But
21   I don't know the details behind them or
22   anything, no.
23          Q.   Okay.  I'm passing you,
24   ma'am, what's been marked as Exhibit --

Page 391

1           MR. BUCHANAN:  Which Scott?
2           MR. SIEGEL: 640 is 19.
3           MR. BUCHANAN:  Thank you.
4   BY MR. BUCHANAN:
5           Q.    -- marked as Exhibit-19 to
6   your deposition.

Page 392

Page 393

9   this refresh your recollection?

99  (Pages 390 to 393)

Highly Confidential - Subject to Further Confidentiality Review



Page 394

Page 396

1    forgot or ignored her prior
2    testimony.
3    BY MR. BUCHANAN:

Page 395

20    Q.   Okay.
21        MR. BUCHANAN:  That's a very
22    helpful cue, counsel.
23        MR. LIMBACHER:  With all due
24    respect, counsel, you either

Page 397

Highly Confidential - Subject to Further Confidentiality Review



Page 398

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 399

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 400

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 401

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19     Q.    Okay.  Directing your
20  attention to the third paragraph, ma'am.
21        It says, The regulation also
22  requires that the registrant inform the
23  local DEA division office of suspicious
24  orders when discovered by the registrant.
```

Highly Confidential - Subject to Further Confidentiality Review

| Page 402 | Page 404 |
|---|---|

Page 402

1    Do you see that?
2    A.   I do.
3    Q.   It continues in that
4    paragraph, Registrants must conduct an
5    independent analysis of suspicious orders
6    prior to completing a sale, to determine
7    whether the controlled substances are
8    likely to be diverted from legitimate
9    channels.
10    Did I read that correctly?
11    A.   Yes.
12    Q.   The next paragraph states
13    that, The regulations specifically states
14    suspicious orders include orders of an
15    unusual size, orders deviating
16    substantially from a normal pattern, and
17    orders of an unusual frequency.
18    Do you see that?
19    A.   Yes.
20    Q.   In fact, you had an
21    algorithm in place around the same time
22    frame that would monitor orders for
23    unusual size, correct?
24    A.   Size being one of them, yes.

Page 403

1    Q.   And quantity?
2    A.   Correct.
3    Q.   And frequency?
4    A.   Correct.
5    And class of trade.



Page 405

24    Q.   Thank you.



Page 406

1    Are you familiar with some
2  of the other DEA decisions and guidances
3  with regard to suspicious order
4  monitoring, ma'am?
5          MR. LIMBACHER:  Object to
6  form.
7          THE WITNESS:  Such as?
8  BY MR. BUCHANAN:
9      Q.   The Southwood
10  Pharmaceuticals?
11      A.   I'm sorry, who?
12      Q.   The Southwood
13  Pharmaceuticals decision?
14      A.   I don't know who -- what
15  that is, or who they are.
16      Q.   Did you keep abreast of the
17  various decisions and guidances of the
18  DEA as it related to suspicious order
19  monitoring?
20      A.   Me personally, no.
21      Q.   There were those in
22  compliance and regulatory that you
23  assumed were looking at that?
24          MR. LIMBACHER:  Object to

Page 407

1  form.
2          THE WITNESS:  I would
3  assume, yes.
4  BY MR. BUCHANAN:
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 408

1          MR. BUCHANAN:  Could I have
2  562?
3          MR. SIEGEL:  562 being
4  marked as Exhibit-20.
5          - - -
6          (Whereupon, EndoWalker
7  Exhibit-20, Clawed Back,
8  Endo_Opioid_MDL_01602884-890, was
9  marked for identification.)
10          - - -
11  BY MR. BUCHANAN:
12      Q.   By 2011, ma'am, there were
13  congressional hearings happening, right?
14  Actually, they were happening well before
15  that, true?
16          MR. LIMBACHER:  Object to
17  form.
18          THE WITNESS:  I can't
19  confirm or deny that.  I don't
20  know.
21  BY MR. BUCHANAN:
22      Q.   Did you -- I mean, did you
23  follow the broader climate and context
24  for the products that you were selling?

Page 409

1      A.   I know that there was an
2  opioid crisis, yes.  But I don't -- the
3  details, I don't know what you're
4  showing.  I don't have a document.
5          MR. BUCHANAN:  Can the
6  witness have a copy, please?
7          MR. LIMBACHER:  One second.
8          MR. BUCHANAN:  What's the
9  exhibit number?
10          MR. SIEGEL:  20.
11  BY MR. BUCHANAN:
12      Q.   Hopefully you're passed
13  Exhibit-20, ma'am.
14          It's an --
15      A.   I don't have --
16      Q.   -- April --
17      A.   I don't have the document.
18      Q.   Your counsel has both
19  copies.
20          MR. LIMBACHER:  Can I just
21  have a minute to confer with my
22  client?
23          MR. BUCHANAN:  Okay.
24          MR. LIMBACHER:  Thank you.

Highly Confidential - Subject to Further Confidentiality Review

Page 410

1    VIDEO TECHNICIAN:  We're
2  going off record.  The time is
3  3:33.
4          - - -
5    (Whereupon, a brief recess
6  was taken.)
7          - - -
8    VIDEO TECHNICIAN:  We're
9  back on the record.  Beginning of
10  Media File Number 7.  The time is
11  3:36.
12    MR. LIMBACHER:  Having had a
13  chance to review what's been
14  marked as Plaintiffs' Exhibit
15  Number 20, our position -- and
16  having had an opportunity to
17  confer with my client, our
18  position is that this is -- on its
19  face, appears to be a privileged
20  document, also potentially
21  containing work product of Endo
22  counsel.
23    And I would request that it
24  be clawed back, pursuant to the

Page 412

1    MR. BUCHANAN:  So I don't
2  believe I'm permitted to continue
3  to examine unless you permit me to
4  do so; is that right?
5    MR. LIMBACHER:  No, I don't
6  believe you are permitted to go
7  further on this.
8    And if this is something we
9  need to confer on after the fact
10  and see if there's something we
11  can do about it.  But, again, my
12  position is, on its face, it
13  pretty clearly would appear to be
14  a privileged communication and it
15  would contain views and advice of
16  counsel to Endo.
17    MR. BUCHANAN:  In that
18  regard, we disagree.  I understand
19  I'm foreclosed from examining this
20  witness on it.
21    To the extent everyone is
22  inconvenienced with resuming this
23  witness, I assume we've all
24  considered that before you

Page 411

1  procedures that are set forth
2  under the orders in this
3  litigation.
4    MR. BUCHANAN:  I've reviewed
5  the memo.  It's a memo from Alston
6  and Bird to Endo Pharmaceuticals.
7  It does not appear to be either
8  communicating legal advice or
9  seeking information from which to
10  render legal advice.
11    It's a report of a public
12  hearing that was conducted before
13  Congress.
14    I don't understand what the
15  basis for a work product would be
16  claimed.  It's a -- essentially an
17  account of a public hearing.  But
18  if you're -- you are entitled to
19  assert what you're entitled to
20  assert.  I believe it's without
21  basis or foundation.  And we'll
22  sort it out on the back end.
23    MR. LIMBACHER:  Okay.  I
24  appreciate that.

Page 413

1  articulated that.
2    I will press on.
3    Could I have, please,
4  Exhibit-563?
5    MR. LIMBACHER:  Dave, if you
6  don't mind, just for the record,
7  I'm going to read the MDL Bates
8  numbers of Exhibit-20.
9    MR. BUCHANAN:  That's fine.
10    MR. LIMBACHER:  So we're all
11  clear on that.
12    MR. BUCHANAN:  Do you want
13  to -- I guess we can't really
14  attach it.
15    MR. LIMBACHER:  But just so
16  people know what we're talking
17  about, it's
18  Endo_Opioid_MDL_01602884 to
19  01602890.
20    MR. BUCHANAN:  Okay.
21  BY MR. BUCHANAN:
22    Q.  I'm passing you over what
23  we're marking next in order for your
24  deposition, ma'am.  It's a DEA drug

Highly Confidential - Subject to Further Confidentiality Review



Page 414

```
 1    intelligence brief.
 2              - - -
 3           (Whereupon, EndoWalker
 4        Exhibit-21,
 5        ENDO_OR-CID-00694084-087, was
 6        marked for identification.)
 7              - - -
 8           MR. BUCHANAN:  What's next
 9        in order, Scott?
10           MR. SIEGEL:  Being marked as
11        Exhibit-21.
12    BY MR. BUCHANAN:
13        Q.   Exhibit-21 to your
14        deposition, ma'am.
15           MR. BUCHANAN:  And I assume
16        we'll keep the Exhibit-20 for the
17        prior one that was identified and
18        clawed back, or at least the claw
19        assertion was made on the record.
20    BY MR. BUCHANAN:
21        Q.   Before you, ma'am, should
22        be, if it's making its way down the
23
24
```

Page 416

Page 415

Page 417

Highly Confidential - Subject to Further Confidentiality Review



Page 418

Page 420

1    Pink O?  OM?  The O Bomb?
2         A.   No, none of these.  I didn't
3    know Opana or oxymorphone was called any
4    of this.

Page 419

3         Q.   Let's look at what it was
4    being called on the street.  Slang terms
5    for oxymorphone include Blues.
6         Did you know that?
7         A.   No, I did not.
8         Q.   How about Biscuits?
9         A.   No, I did not.
10        Q.   Blue Heaven?
11        A.   No.
12        Q.   New Blues?
13        A.   No.
14        Q.   Octagons?  Stop Signs?  Have
15   you heard of those?
16        A.   No -- well, I've heard of a
17   stop sign, but --
18        Q.   Not with regard to your
19   company's product?
20        A.   No.
21        Q.   Pink Heaven, did you know it
22   was referred to as that?
23        A.   No, I did not.
24        Q.   Pink Lady?  Mrs. O?  The

Page 421

Highly Confidential - Subject to Further Confidentiality Review

Page 422

20    form.  Foundation.  Counsel --
21  BY MR. BUCHANAN:
22    Q.  Right?
23       MR. LIMBACHER:  -- save the
24    speeching, the speechifying for

Page 424

1   this is my one chance to ask this
2   witness questions --
3        MR. LIMBACHER:  I am under
4   no obligation to respond to that
5   question.
6        MR. BUCHANAN:  Then I'm
7   going to ask my questions as I see
8   fit.
9        MR. LIMBACHER:  And I'm
10  going to object as I see fit, too.
11       MR. BUCHANAN:  Well, then,
12  just object to form, as you're
13  required and permitted to do.
14       MR. LIMBACHER:  I'm not
15  required to simply say object to
16  form.
17       MR. BUCHANAN:  Yes, you are.
18       MR. LIMBACHER:  Not under
19  these circumstances.
20       MR. BUCHANAN:  Okay.
21  Can I have a reread of the
22  question before the speech?
23            - - -
24       (Whereupon, the court

Page 423

1   the closing argument to the jury.
2        You're here to ask questions
3   about the facts and her personal
4   knowledge and experience.  She's
5   told you she's not familiar with
6   these terms.  She's given you what
7   information --
8        MR. BUCHANAN:  Now you're
9   just -- now you're just breaking
10  every rule.
11  BY MR. BUCHANAN:
12    Q.  All right.
13       MR. LIMBACHER:  You're
14  breaking every rule.
15       MR. BUCHANAN:  Can I reread
16  the question?
17       Not at all.  Are you going
18  to bring her to trial?  If you're
19  going to bring her to trial, I'll
20  just stop.
21       MR. LIMBACHER:  You're
22  breaking every rule.
23       MR. BUCHANAN:  Are you
24  bringing her to trial?  Because

Page 425

1   reporter read the following part
2   of the record:
3        "Question: And somehow,
4   ma'am, your drugs were the big
5   thing right now, the big thing
6   right now on the streets, what,
7   ten miles from Malvern,
8   Pennsylvania?")
9            - - -
10  BY MR. BUCHANAN:
11    Q.  Do you see that referenced
12  in the article, ma'am?
13       MR. LIMBACHER:  Object to
14  form and foundation.
15       THE WITNESS:  What am I
16  looking at again in the article?
17  BY MR. BUCHANAN:
18    Q.  The paragraph we looked at
19  under summary, May 2011, drug
20  intelligence brief, Philadelphia Division
21  Intelligence Program of the DEA, Opana,
22  oxymorphone abuse.
23       Do you see that, ma'am?
24    A.  It's written right here.

Page 426

1    Yes, I see it.
2        Q.   Oxymorphone, brand name
3    Opana, has been reported by several
4    sources of information as the big thing
5    right now in pharmaceutical drug abuse in
6    the region.
7            Did I read that correctly?
8            MR. LIMBACHER:  You read it
9    correctly this time.  And you read
10   it correctly the last time you
11   read it, too.
12   BY MR. BUCHANAN:
13       Q.   You can answer.
14       A.   I see it, yes.  That's the
15   way you read it.
16       Q.   Are you aware that those in
17   the DEA were saying that Opana misuse and
18   diversion was going to be the next
19   OxyContin epidemic?
20       A.   No, I didn't hear that from
21   the DEA.
22       Q.   Did anyone within Endo share
23   that with you?
24       A.   I cannot speak for other

Page 427

1    departments within Endo.
2        Q.   Did anyone within Endo share
3    that with you?
4        A.   No.
5            MR. LIMBACHER:  Object to
6    form.
7            MR. BUCHANAN:  564, please.
8            MR. SIEGEL:  564 is being
9    marked as Exhibit-22.
10           - - -
11           (Whereupon, EndoWalker
12       Exhibit-22, ENDO00259233-235, was
13       marked for identification.)
14           - - -
15           MR. BUCHANAN:  Pass it over,
16       please, Scott.
17   BY MR. BUCHANAN:
18       Q.   Ma'am, I'm passing you what
19   is an e-mail sent -- or a series of
20   e-mails sent in 2011 concerning DEA
21   representative comments.
22           I guess if we go to the
23   earliest-in-time e-mail, it's from June
24   25, 2011 from a few speakers.  Then

Page 428

1    there's a Vin Tormo forwarding this
2    e-mail along on June 27, 2011 to a series
3    of other employees of Endo.
4            Do you see that?
5        A.   June 27th?
6        Q.   In the middle of the second
7    page.
8        A.   I see it.
9        Q.   It says, FYI.
10           Do you see that paragraph?
11       A.   I do.
12       Q.   It's highlighted on the
13   screen, too, for your convenience.
14       A.   I got it.
15       Q.   One of our therapeutic
16   experts attending the ASIPP, American
17   Society of Interventional Pain
18   Physicians, meeting this past weekend and
19   informed Katherine Jackson, clinical
20   affairs manager/pain, Southeast, that a
21   speaker from the DEA made some comments
22   relating to Opana misuse and diversion.
23           Do you see that?
24       A.   I see it.

Page 429

1        Q.   We talked about that letter
2    from 2010 that you received in 2008 from
3    a Mr. Rannazzisi, do you recall that,
4    from the DEA?
5        A.   I didn't receive that.
6        Q.   Remember, Jill Connell sent
7    you a letter?
8        A.   She forwarded it to me, but
9    I didn't physically receive it from the
10   DEA.
11       Q.   Oh, I'm sorry.
12           You received that letter,
13   ma'am, as an attachment from your boss in
14   2008, correct?
15       A.   I don't -- according to the
16   e-mail, yes.  But I don't recall seeing
17   it.
18       Q.   Let's stay with the e-mail.
19           The e-mail reflects that
20   your boss forwarded to you a 2007 letter
21   from Mr. Rannazzisi of the DEA to
22   registrants, correct?
23       A.   Yes.
24       Q.   And we discussed a little

Highly Confidential - Subject to Further Confidentiality Review

Page 430

1   bit the obligation, under the Controlled
2   Substances Act, to maintain effective
3   controls against diversion.
4           Do you recall our discussion
5   on that?
6           MR. LIMBACHER: Object to
7   form.
8           THE WITNESS: Yes.
9   BY MR. BUCHANAN:
10      Q.  Do you recall your
11  acknowledgment that that was your
12  understanding, that if somebody is
13  selling controlled substances, you, in
14  fact, had that obligation?
15          MR. LIMBACHER: Object to
16  form.
17          THE WITNESS: Right. And I
18      think I explained what my
19      obligation was. And there was
20      other parts of the company and
21      their obligations that I can't
22      speak to.
23  BY MR. BUCHANAN:
24      Q.  So here we are in 2011.

Page 431

1   And, again, a statement about your
2   product, Opana, and misuse and diversion,
3   saying it was the next OxyContin
4   epidemic.
5           Do you see that?
6       A.  I see it in the e-mail,
7   sure.
8       Q.  Was that brought to your
9   attention by anybody within Endo?
10      A.  No. This e-mail was not
11  brought to my attention.
12      Q.  So those within Endo,
13  whoever was told that, didn't share that
14  with you?
15          MR. LIMBACHER: Object to
16      form.
17          THE WITNESS: Not that I
18      recall, no.
19  BY MR. BUCHANAN:
20      Q.  And we can see this
21  reference further below from a Mr. --
22  excuse me, Dr. Silverman, MD, that, I am
23  at the ASIFF national meeting in DC,
24  lecture on prescription drug abuse by

Page 432

1   director of abuse section, DEA. He says
2   Opana is the next OxyContin epidemic. He
3   says watch out for this drug.
4           Did I read that correctly?
5       A.  That's what it says in the
6   e-mail.
7       Q.  And that drug would have
8   been one of those drugs that you were
9   clearing orders for year after year after
10  year, at least in the Exhibit-1 that we
11  looked at, correct?
12          MR. LIMBACHER: Object to
13      form.
14          THE WITNESS: So if I can
15      remind you, I'm shipping to
16      wholesalers. I'm not shipping to
17      retail pharmacies. I'm shipping
18      to wholesalers. And these orders
19      have gone through multiple SOM
20      programs at Endo and at UPS.
21  BY MR. BUCHANAN:
22      Q.  Okay. In terms of the Know
23  Your Customer's Customer program, ma'am,
24  can you please describe the Know Your

Page 433

1   Customer's Customer program that Endo had
2   in 2011?
3           MR. LIMBACHER: Object to
4       form and foundation.
5           THE WITNESS: I can't recall
6       what we did back in 2011.
7   BY MR. BUCHANAN:
8       Q.  Didn't have a Know Your
9   Customer's Customer program in 2011, did
10  you, ma'am?
11          MR. LIMBACHER: Object to
12      form and foundation.
13          THE WITNESS: I can't recall
14      that.
15  BY MR. BUCHANAN:
16      Q.  And your customer's
17  customer, in the case of wholesale
18  customers, would be the very pharmacies
19  that you were just referring to, correct?
20          MR. LIMBACHER: Object to
21      form and foundation.
22          THE WITNESS: If that's who
23      the customers are. I can't -- I
24      can't -- I don't know who their

Highly Confidential - Subject to Further Confidentiality Review

Page 434

1    customers are.
2    BY MR. BUCHANAN:
3        Q.   Let's talk about Opana ER.
4        Opana ER is reformulated and
5    comes to market in 2011, right?  That was
6    your recollection at least earlier today.
7    Good enough for our conversation?
8        A.   Sure.  Some time in 2012.
9        Q.   It's on the market for
10   several years.
11       And you know there's some
12   safety issues that arise with that drug,
13   right?
14       MR. LIMBACHER:  Object to
15   form.
16       THE WITNESS:  There's
17   benefits to Opana.  And there are
18   safety issues with any opioid
19   medication.
20   BY MR. BUCHANAN:
21       Q.   Okay.  And doctors are still
22   prescribing the reformulated Opana ER
23   today?
24       MR. LIMBACHER:  Object to

Page 435

1    form and foundation.
2        THE WITNESS:  I can't speak
3    to what doctors are doing.
4    BY MR. BUCHANAN:
5        Q.   Well, we know you withdrew
6    it from the market, right?
7        MR. LIMBACHER:  Object to
8    form.  Misstates the evidence.
9        THE WITNESS:  I can't --
10       that's not part of my
11       responsibility.  That's somebody
12       else at Endo that worked with the
13       FDA on it.
14   BY MR. BUCHANAN:
15       Q.   Do you have that -- it's not
16   a matter of whose responsibility it is,
17   for the moment.
18       Do you have an awareness,
19   ma'am, that in 2017, the FDA said the
20   risks outweigh the benefits and asked you
21   to withdraw the drug?
22       MR. LIMBACHER:  Object to
23   form.
24       THE WITNESS:  I know that

Page 436

1    Endo withdrew the product from the
2    market, yes.
3    BY MR. BUCHANAN:
4        Q.   So Endo was told by the FDA
5    that the risks outweighed the benefit for
6    the product, right?
7        MR. LIMBACHER:  Object to
8    form and foundation.
9        THE WITNESS:  I don't know
10       that.  I don't know what decisions
11       were made at Endo and who they
12       talked to, as to why it was
13       withdrew from the market.
14       I just know that it was
15       withdrawn from the market.
16       MR. BUCHANAN:  Can I have
17       734, please?
18   BY MR. BUCHANAN:
19       Q.   Did you keep abreast of
20   these kind of reports on the street about
21   Opana being prone to abuse and misuse and
22   diversion?  Were you following news
23   reports, I mean, from the Philadelphia
24   office of the DEA?

Page 437

1        MR. LIMBACHER:  Object to
2    form.
3        THE WITNESS:  I knew that
4        there was an opioid epidemic.  But
5        there's other people within Endo
6        that would -- I would assume that
7        would follow that.  It's not my
8        area of responsibility.
9    BY MR. BUCHANAN:
10       Q.   Your area of responsibility
11   included suspicious order monitoring,
12   fair?
13       A.   For shipments to our
14   wholesalers.
15       Q.   Right.  And it's fair, if
16   you didn't clear those orders, they
17   wouldn't leave, right?
18       A.   Yes.
19       Q.   Okay.  So in order for those
20   drugs to get to the street, they had to
21   leave the manufacturers, right?
22       MR. LIMBACHER:  Object to
23   form.
24       THE WITNESS:  I had

Highly Confidential - Subject to Further Confidentiality Review

Page 438

1 shipments to the wholesalers.
2 After that is not my
3 responsibility.
4 BY MR. BUCHANAN:
5 Q. So your position, ma'am, is
6 Endo had no responsibility to the
7 customers -- to evaluate the customers of
8 Endo's customers?
9 A. Endo had other --
10 MR. LIMBACHER: Object to
11 form. Misstates her testimony.
12 Nice try, counsel.
13 BY MR. BUCHANAN:
14 Q. Please answer the question.
15 A. There's other departments
16 within Endo that reviewed or potentially
17 had, you know, reviewed suspicious order
18 monitoring or the abuse out there. That
19 was not me.
20 Q. What other department within
21 Endo was clearing suspicious orders,
22 ma'am?
23 MR. LIMBACHER: Object to
24 form. Misstates her testimony.

Page 439

1 THE WITNESS: Do I answer
2 that?
3 I do.
4 BY MR. BUCHANAN:
5 Q. You do.
6 A. But there's other areas
7 within Endo --
8 Q. Okay. And in terms of
9 clearing -- identifying suspicious orders
10 and releasing held orders, that was the
11 responsibility within your group,
12 correct?
13 A. To shipments to wholesalers.
14 How can --
15 Q. Do you have my question?
16 A. Pardon?
17 Q. Do you have my question,
18 ma'am?
19 A. Yes, I have your question.
20 And I answered your question.
21 Q. Let's stay with it, then.
22 In terms of identifying,
23 clearing, releasing suspicious orders,
24 that was a responsibility of your group,

Page 440

1 correct?
2 MR. LIMBACHER: Object to
3 form.
4 THE WITNESS: As I explained
5 throughout the entire day today --
6 BY MR. BUCHANAN:
7 Q. Is that a yes?
8 A. As I have explained --
9 MR. LIMBACHER: Let her
10 finish her answer.
11 THE WITNESS: -- throughout
12 the entire day --
13 MR. LIMBACHER: She hasn't
14 interrupted you.
15 THE WITNESS: -- throughout
16 the entire day today, Endo had
17 their own SOM program. UPS Supply
18 Chain Solutions, our 3PL partner,
19 had their own SOM program.
20 Both -- orders were -- flow
21 through both programs before they
22 were shipped.
23 BY MR. BUCHANAN:
24 Q. Okay.

Page 441

1 A. I'm not quite sure how many
2 times I need to explain that.
3 Q. You don't need to. You
4 don't need to.
5 You just need to answer my
6 question, ma'am.
7 A. I did answer your question.
8 Q. Okay. Then let's do it,
9 okay?
10 You talked about other
11 groups within Endo.
12 A. I can't speak about other
13 groups within Endo.
14 Q. Exactly. So stay, please,
15 with your group.
16 A. I am staying within my
17 group.
18 Q. And please let me finish my
19 question.
20 Your group had the
21 responsibility for identifying a
22 suspicious order within Endo, correct?
23 A. With shipment to
24 wholesalers, period. Period. Shipments

111 (Pages 438 to 441)

Highly Confidential - Subject to Further Confidentiality Review

Page 442

1   to wholesalers.
2       Q.   Orders from Endo's
3   customers, that was your job to identify
4   and report suspicious orders, right?
5       A.   Depends on what your --
6           MR. LIMBACHER:  Object to
7   form.  Foundation.  You've asked
8   this question --
9           THE WITNESS:  I don't know
10  how many times I have to do this.
11          MR. LIMBACHER:  -- multiple,
12  multiple times.
13  BY MR. BUCHANAN:
14      Q.   You can answer.
15      A.   How many times do I have to
16  answer the question?
17      Q.   You can just stay with my
18  question, and we'll be done.
19          MR. LIMBACHER:  Well, you've
20  asked it multiple times.  I think
21  you've got an answer on the record
22  many times.
23  BY MR. BUCHANAN:
24      Q.   Orders from Endo's

Page 443

1   customers --
2       A.   To wholesalers.
3       Q.   Whoever Endo's customers
4   are.
5       A.   Wholesalers, period.
6       Q.   Orders from Endo's
7   customers, it was your job to evaluate
8   those to identify if they were of unusual
9   size, quantity or frequency; yes or no?
10      A.   And class of trade.
11      Q.   And, later, class of trade?
12      A.   Yes.
13      Q.   Correct?
14          MR. LIMBACHER:  Object to
15  form.  Asked and answered.
16  BY MR. BUCHANAN:
17      Q.   No other group within Endo
18  was doing that, correct?
19          MR. LIMBACHER:  Object to
20  form.  Asked and answered.
21  BY MR. BUCHANAN:
22      Q.   No other group --
23      A.   Other groups within Endo may
24  have been monitoring different things,

Page 444

1   not shipments to wholesalers.
2       Q.   Okay.  And if you didn't
3   release those held orders, they didn't go
4   to the wholesalers, right?
5           MR. LIMBACHER:  Object to
6   form.  Argumentative.
7           THE WITNESS:  No, they
8   wouldn't have gone to the
9   wholesalers.
10  BY MR. BUCHANAN:
11      Q.   And you released every one
12  you got?
13      A.   Because they went through
14  our program and UPS's program.
15      Q.   Okay.  Let's talk about 734,
16  please.
17          MR. SIEGEL:  Exhibit-23.
18          - - -
19          (Whereupon, EndoWalker
20  Exhibit-23, No Bates, 6/8/17 FDA
21  News Release, was marked for
22  identification.)
23          - - -
24          MR. LIMBACHER:  We've been

Page 445

1   going about an hour, counsel.
2           THE WITNESS:  No, I want to
3   keep going and get this done.
4           MR. LIMBACHER:  We've been
5   going about an hour, so I would
6   like to --
7           MR. BUCHANAN:  The witness
8   wants to keep going.
9           MR. LIMBACHER:  With all due
10  respect, I'd like to take a break,
11  if now is an appropriate time.
12          MR. BUCHANAN:  That's fine.
13          MR. LIMBACHER:  Thank you.
14  Appreciate it.
15          VIDEO TECHNICIAN:  Off the
16  record.  The time is 3:57.
17          - - -
18          (Whereupon, a brief recess
19  was taken.)
20          - - -
21          MR. SIEGEL:  Exhibit-24.
22          - - -
23          (Whereupon, EndoWalker
24  Exhibit-24,

112  (Pages 442 to 445)

Highly Confidential - Subject to Further Confidentiality Review

Page 446

```
 1    ENDO_DATA-OPIOID_MDL-00000022,
 2    With Attachment, was marked for
 3    identification.)
 4            - - -
 5        VIDEO TECHNICIAN:  Going
 6    back on the record.  The beginning
 7    of Media File Number 8.  The time
 8    is 4:11.
 9        MR. SIEGEL:  652 is going
10    back on the record as Exhibit-24.
11        MR. LIMBACHER:  I don't have
12    a 23.
13        MR. BUCHANAN:  I think I
14    identified it, and we're getting
15    ready to pass it.  It was a notice
16    from the FDA.  I'm going to take
17    that out of order, so we'll get
18    back to 23 in a moment.
19  BY MR. BUCHANAN:
20    Q.   I'm passing you what we're
21    marking as Exhibit-24.
22        MR. BUCHANAN:  Counsel, to
23    save trees, I've only printed one
24    full copy of the exhibit.  The --
```

Page 447

```
 1    if you can read the full Bates
 2    numbers on the record, I would be
 3    grateful for the trees.
 4        MR. LIMBACHER:  Okay.
 5    Exhibit-24 Bates numbers appear to
 6    be Endo Opioid MDL22 through --
 7        MR. SIEGEL:  It's an Excel
 8    file.
 9        MR. TOLIN:  It's Endo Data.
10        MR. LIMBACHER:  Sorry, Endo
11    Data Opioid MDL22 -- I don't see
12    any Bates numbers after that.
13        MR. SIEGEL:  It's a native
14    file.
15        MR. BUCHANAN:  Thank you.
16    So it's a native file.  The file
17    was produced at that particular
18    Bates reference, and it's an Excel
19    printout.
20        Can you please pass counsel,
21    Scott, for his convenience, the
22    first 25 pages or so.  We are not
23    going to get beyond that.  But the
24    witness should have the full
```

Page 448

```
 1    version so the record has the full
 2    version.
 3  BY MR. BUCHANAN:
 4    Q.   Ma'am, I'm passing you what
 5    we just marked as --
 6        MR. BUCHANAN:  Was that 24,
 7    Scott?
 8        MR. SIEGEL:  Yes.
 9  BY MR. BUCHANAN:
10    Q.   -- Exhibit-24 to your
11    deposition.
12        It's a printout of an Excel
13    spreadsheet.  I see you nodding.
14        Does it look familiar to
15    you, or at least a format you're familiar
16    with?
17    A.   Yes.
18
19
20
21
22
23
24
```

Page 449

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 462

Page 463

you can set that aside.

I guess, just so the record is clear, you can identify the order from or the ship to state using that same chart, correct, of the customer?

A.   Yes.  It gives you who the

Page 464

customer is and which DC it's shipping to.

Q.   Great.  Thank you.

MR. BUCHANAN:  Scott, what was the exhibit number we marked 734 as before the break?

MR. SIEGEL:  23.

MR. BUCHANAN:  I'm passing you Exhibit-23, ma'am.

BY MR. BUCHANAN:

Q.   Do you recall before the break we were talking about Opana ER.

And in 2017, do you recall the FDA requesting the company to remove Opana ER from the market, correct?

A.   Yes.

Q.   First paragraph states, Today the U.S. Food and Drug Administration requested that Endo Pharmaceuticals remove its opioid pain medication, reformulated Opana ER, from the market.  After careful consideration, the agency is seeking removal based on its concern that the benefits of the drug

Page 465

may no longer outweigh the risks.

Do you see that, ma'am?

A.   Yes.

Q.   Is that your recollection of what happened in the summer of 2017?

A.   I know the FDA made a request for us to remove Opana.

Q.   Okay.

MR. BUCHANAN:  Could we have, please, 646?

BY MR. BUCHANAN:

Q.   So they request in June that the company remove Opana ER reformulated from the markets, correct?

A.   Uh-huh.

Q.   Did you continue selling it after that?

MR. LIMBACHER:  Object to form.  Foundation.

THE WITNESS:  The company worked with the FDA and a decision was made, we sold it through August 31st of '17.

BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review

Page 466

1      Q.   So you kept selling it after
2  the request from the FDA to withdraw it
3  from the market?
4      A.   I know that --
5           MR. LIMBACHER:  Object to
6  form and foundation.
7           THE WITNESS:  I know that
8  Endo worked with the FDA on a
9  cease distribution date, and it
10 was August 31st, 2017. I don't
11 know the decisions behind that
12 date, but I know that our ship
13 date was August 31st.
14 BY MR. BUCHANAN:
15     Q.   Do you remember trying to
16 blow it out?
17          MR. LIMBACHER:  Object to
18 form.
19 BY MR. BUCHANAN:
20     Q.   Going out of business
21 pricing?
22          MR. LIMBACHER:  Object to
23 form.
24          THE WITNESS:  No.

Page 467

1  BY MR. BUCHANAN:
2      Q.   So in June of 2017, the FDA
3  requests Endo to withdraw Opana ER from
4  the market, correct?
5      A.   Yes.
6      Q.   The company doesn't
7  immediately withdraw it from the market,
8  right?
9           MR. LIMBACHER:  Object to
10 form.
11          THE WITNESS:  I know that
12 the company worked with the FDA on
13 the -- an agreed-upon cease
14 shipping date was determined, and
15 that was August 31st.
16 BY MR. BUCHANAN:
17     Q.   Okay.
18     A.   There are benefits to Opana,
19 so we had to ensure that patients that
20 are using it correctly continue therapy
21 until they moved to a different therapy.
22     Q.   Do you recall the statements
23 of the FDA that the benefits no longer
24 outweighed the risks of Opana?

Page 468

1           MR. LIMBACHER:  Object to
2  form.
3           THE WITNESS:  All I can tell
4  you is that Endo worked with the
5  FDA, and the agreed-upon cease
6  shipping date was August 31st,
7  2017.
8  BY MR. BUCHANAN:
9      Q.   Do you recall when the
10 company went and talked to the FDA, I
11 guess it was a teleconference, in July of
12 2017, that the FDA once again said that
13 the benefits no longer outweighed the
14 risks of Opana ER?  Do you recall that,
15 ma'am?
16          MR. LIMBACHER:  Object to
17 form and foundation.
18          THE WITNESS:  I don't know
19 the outcome of that
20 teleconference.  I don't know
21 anything that went into that.
22 BY MR. BUCHANAN:
23     Q.   But as a factual matter, the
24 company continued to ship the product --

Page 469

1           MR. LIMBACHER:  Object to
2  form.
3  BY MR. BUCHANAN:
4      Q.   -- until the end of August;
5  is that correct?
6           MR. LIMBACHER:  Object to
7  form.  Asked and answered.
8           THE WITNESS:  All I can tell
9  you is I know that the -- Endo and
10 FDA agreed that August 31st, 2017
11 was going to be our last shipping
12 date.  I don't know the details
13 behind that date.  I don't know
14 what went into it.  I can just
15 tell you that was my last shipping
16 date.
17          MR. BUCHANAN:  Did we pass
18 it over, Scott?
19          MR. SIEGEL:  This is being
20 marked as Exhibit-25.
21              - - -
22          (Whereupon, EndoWalker
23 Exhibit-25,
24 ENDO_OPIOID_MDL_02062332-333, was

118  (Pages 466 to 469)

Highly Confidential - Subject to Further Confidentiality Review

Page 470

1    marked for identification.)
2         - - -
3  BY MR. BUCHANAN:
4    Q.   So this is an interaction
5  you're having, ma'am, after, I guess,
6  being alerted -- well, this is later in
7  time, right?
8         This is June 12, 2017.  This
9  would be after you got word of the FDA
10  requesting the withdrawal of Opana ER
11  from the market.
12        Do you recall that?
13   A.   Uh-huh.
14   Q.   Do you recall that?
15   A.   I'm sorry, the question?  I
16  was reading the e-mail so I can get up to
17  speed.
18        Say that again, please.
19   Q.   Do you recall that after,
20  what was it, early June 2017, the FDA
21  requested the withdraw of Opana ER from
22  the market?
23   A.   Yes.
24   Q.   And you recall -- I guess

Page 471

1  you were dealing and interacting with
2  various wholesalers, right?
3        MR. LIMBACHER:  Object to
4  form.
5        THE WITNESS:  Yes.
6  BY MR. BUCHANAN:
7    Q.   We're looking here at --
8        MR. BUCHANAN:  What did we
9  say this was, 26?
10        MR. SIEGEL:  25.
11  BY MR. BUCHANAN:
12   Q.   25, you're having some
13  interaction with Cardinal and McKesson
14  and with ABC, right?
15   A.   Yes.
16   Q.   Cardinal was looking into
17  what they were going to do, whether they
18  were going to continue to purchase this
19  drug that had been requested to be
20  withdrawn from the market, right?
21        MR. LIMBACHER:  Object to
22  form.
23        THE WITNESS:  Our
24  wholesalers were waiting for

Page 472

1  direction from Endo as to what we
2  were going to do after the FDA
3  made that announcement.
4  BY MR. BUCHANAN:
5    Q.   And on June 12, I guess, you
6  talked to ABC.  Is that
7  AmerisourceBergen, ma'am?
8    A.   Yes, it is.
9    Q.   And you write, We talked to
10  ABC and it's business as usual until they
11  hear direction from Endo.
12        Is that right?
13   A.   Correct.
14   Q.   Business as usual, they're
15  going to continue to buy?
16        MR. LIMBACHER:  Object to
17  form.
18        THE WITNESS:  Right.  Until
19  Endo made a decision of what we
20  were going to do.
21  BY MR. BUCHANAN:
22   Q.   And you talked to McKesson,
23  and McKesson was also saying shipping and
24  business as usual with regard to this

Page 473

1  drug that the FDA had said the benefits
2  no longer outweigh the risks; is that
3  right?
4        MR. LIMBACHER:  Object to
5  form.
6        THE WITNESS:  That's what
7  the FDA said, yes.  But Endo
8  continued to ship.
9  BY MR. BUCHANAN:
10   Q.   Yeah.  They did.
11        And they shipped until the
12  end of August 2017, right?
13        MR. LIMBACHER:  Object to
14  form.  Asked and answered multiple
15  times.
16        THE WITNESS:  I know that
17  date was agreed upon between Endo
18  and the FDA.
19  BY MR. BUCHANAN:
20   Q.   You shipped $50 million
21  worth of Opana ER after the FDA told you
22  that the benefits no longer outweigh the
23  risks, right?
24   A.   I can't --

119  (Pages 470 to 473)

Highly Confidential - Subject to Further Confidentiality Review

Page 474

1          MR. LIMBACHER:  Object to
2    form.  Foundation.
3          THE WITNESS:  I can't
4    confirm the dollar value.  I don't
5    know.
6    BY MR. BUCHANAN:
7          Q.   Do you remember discounting
8    Opana ER to blow it out?
9          MR. LIMBACHER:  Object to
10   form.  Foundation.
11   BY MR. BUCHANAN:
12         Q.   In August of 2017, having
13   special programs with your wholesalers
14   for this drug for which the benefits no
15   longer outweighed the risk?
16         MR. LIMBACHER:  Object to
17   form.  Foundation.
18         THE WITNESS:  I know that we
19   had to stop shipping on August
20   31st, 2017.
21         And there are benefits to
22   Opana.
23   BY MR. BUCHANAN:
24         Q.   Not that are outweighed --

Page 475

1    not that outweigh the risks, that's what
2    you were told, right?
3          MR. LIMBACHER:  Object to
4    form.
5          THE WITNESS:  That's what
6    the FDA stated.
7    BY MR. BUCHANAN:
8          Q.   Right.
9          MR. BUCHANAN:  Can I please
10   have 645?
11         MR. SIEGEL:  645 is being
12   marked as Exhibit-26.
13              - - -
14         (Whereupon, EndoWalker
15   Exhibit-26,
16   ENDO_OPIOID_MDL_01681499-501, was
17   marked for identification.)
18              - - -
19   BY MR. BUCHANAN:
20         Q.   I'm passing you what has
21   been marked as Exhibit-26 to your
22   deposition, ma'am.
23         We're at the end of August
24   2017.  You send an e-mail out to several

Page 476

1    colleagues at UPS talking about the Opana
2    transition, right?
3          A.   Uh-huh.
4          Q.   Do you recall this e-mail,
5    ma'am?
6          MR. LIMBACHER:  Take your
7    time and read the document.
8    BY MR. BUCHANAN:
9          Q.   Do you recall this e-mail,
10   ma'am?
11         A.   I do.
12         Q.   So August 22nd, 2017 would
13   be the earliest in time.  It's the bottom
14   of the first page.
15         You note there's going to be
16   a lot of information that you're going to
17   outline below, and you then set forth
18   various categories of information, fair?
19         A.   Yes.
20         Q.   Okay.  Orders, Some
21   wholesalers are participating in a
22   transition program in which they can
23   purchase certain inventory to ensure
24   patients have enough during this period.

Page 477

1          Did I read that correctly?
2          A.   Yes, you did.
3          Q.   Yeah.  You have alerted the
4    UPS SOM team about this program as the
5    orders will be larger than normal, right?
6          A.   Uh-huh.
7          Q.   Is that right?
8          A.   Yes.
9          Q.   There is a promotion set up
10   in SAP that will need to be applied to
11   the orders.
12         Do you recall that?
13         A.   That's what you're stating,
14   yes.
15         Q.   Well, that's what you wrote,
16   right?
17         A.   Yes.
18         Q.   Okay.  And what you were
19   doing is you were giving these
20   distributors 20 percent off, right?
21         MR. LIMBACHER:  Object to
22   form.
23         THE WITNESS:  I believe it
24   was something like that, yes.

120  (Pages 474 to 477)

Highly Confidential - Subject to Further Confidentiality Review

Page 478

1    BY MR. BUCHANAN:
2         Q.   20 percent off on a drug
3    that the benefits no longer outweigh the
4    risks, that you're pushing out the door
5    in the last two weeks of August 2017
6    before the cutoff, do I understand that
7    correctly?
8              MR. LIMBACHER:  Object to
9    form.
10             THE WITNESS:  But there are
11   patients that use this product and
12   need this product, and we wanted
13   to ensure there was enough out
14   there for these patients during
15   the transition period so they can
16   work with their healthcare
17   provider to go on to some type of
18   other therapy.
19   BY MR. BUCHANAN:
20        Q.   Getting back to my question,
21   ma'am, do I have correctly what, in fact,
22   you were doing at the end of August of
23   2017?
24             MR. LIMBACHER:  Object to

Page 479

1    form.  I think she answered your
2    question.
3              THE WITNESS:  I answered
4    your question.  That's what we
5    were doing.  We were shipping
6    these orders to ensure that
7    patients that needed this product
8    had enough during the transition
9    period so they could work with
10   their healthcare provider to go on
11   a different therapy.
12   BY MR. BUCHANAN:
13        Q.   20 percent off?
14        A.   I -- that was --
15             MR. LIMBACHER:  Object to
16   form.
17             THE WITNESS:  I had nothing
18   to do with that.
19   BY MR. BUCHANAN:
20        Q.   Is that a true statement, 20
21   percent off?
22        A.   I think there was 20 percent
23   off.  But that has nothing to do with me.
24   I don't make those decisions --

Page 480

1         Q.   20 percent off --
2              MR. LIMBACHER:  Object to
3    form.
4    BY MR. BUCHANAN:
5         Q.   -- blowing the inventory out
6    to your wholesale customers, right?
7              MR. LIMBACHER:  Object to
8    form.
9              THE WITNESS:  We were not
10   blowing inventory out to our
11   customers.  We wanted to ensure
12   there was enough on the market so
13   patients had enough during this
14   transition period.
15   BY MR. BUCHANAN:
16        Q.   In fact, ma'am, you told the
17   FDA, in the summer of 2017, you were
18   going to stop producing Opana then,
19   right?
20             MR. LIMBACHER:  Object to
21   form.
22   BY MR. BUCHANAN:
23        Q.   Stop making it --
24             MR. LIMBACHER:  Are you

Page 481

1    suggesting --
2    BY MR. BUCHANAN:
3         Q.   -- in July of 2017?
4              MR. LIMBACHER:  -- that Mrs.
5    Walker --
6    BY MR. BUCHANAN:
7         Q.   Are you aware of that?
8              MR. LIMBACHER:  -- made that
9    representation?
10   BY MR. BUCHANAN:
11        Q.   Are you aware of that?
12             MR. LIMBACHER:  Aware of
13   what?  What is the question?
14             MR. BUCHANAN:  If you would
15   stop stepping on my question, you
16   can read it.
17             MR. LIMBACHER:  I object to
18   the form of your question,
19   because --
20   BY MR. BUCHANAN:
21        Q.   Go ahead, you can answer.
22             MR. LIMBACHER:  -- it's
23   vague and unclear who you're
24   talking about.

121  (Pages 478 to 481)

Highly Confidential - Subject to Further Confidentiality Review

Page 482

1          THE WITNESS:  Clarify your
2    question, please.
3    BY MR. BUCHANAN:
4          Q.    Are you aware the company
5    represented to the FDA it was going to
6    stop making it in July of 2017?
7          MR. LIMBACHER:  Object to
8    form and foundation.
9    BY MR. BUCHANAN:
10         Q.    Stop making it then.
11         A.    We did stop making it.  We
12   did not make any more product.
13         Q.    So what you were doing,
14   then, at the end of the August of 2017
15   was blowing out your excess inventory for
16   20 percent off?
17         MR. LIMBACHER:  Object to
18   form and foundation.
19         THE WITNESS:  No.  We were
20   not.
21         MR. LIMBACHER:  Asked and
22   answered.
23   BY MR. BUCHANAN:
24         Q.    Is it not true that you

Page 483

1    offered a 20 percent discount on this
2    drug that the FDA had asked you to
3    withdraw from the market in June of 2017?
4    Is it true that you were doing that,
5    ma'am?
6          MR. LIMBACHER:  Object to
7    form.  Foundation.  Asked and
8    answered multiple times.
9          THE WITNESS:  I do not make
10   the decisions around any type of
11   promotion with our customers.
12         All I -- may I finish,
13   please?
14         All I can tell you is we --
15         MR. LIMBACHER:  You can
16   finish.
17         THE WITNESS:  All I can tell
18   you is we wanted to ensure that
19   there was enough inventory at the
20   pharmacies for patients as a
21   transition through this period as
22   they worked with a healthcare
23   provider to go on a different
24   therapy.

Page 484

1    BY MR. BUCHANAN:
2          Q.    Special offering for your
3    wholesalers, 20 percent discount on
4    Opana, before you voluntarily withdraw it
5    from the market on September 1, 2017;
6    that's what the company did, right?
7          MR. LIMBACHER:  Object to
8    form.  Foundation.  I don't know
9    what document you're reading from,
10   counsel.
11   BY MR. BUCHANAN:
12         Q.    Is that true?
13         MR. LIMBACHER:  Object to
14   form.  Foundation.
15         THE WITNESS:  I know that
16   there --
17         MR. LIMBACHER:  Asked and
18   answered.
19         THE WITNESS:  I don't make
20   the decisions around the offering
21   that was made.  That was not my
22   decision.
23   BY MR. BUCHANAN:
24         Q.    I just want to make sure the

Page 485

1    record is not fuzzy.
2          As a factual matter, are you
3    aware that two weeks before you were
4    scheduled to withdraw Opana ER from the
5    market, you offered your wholesalers a 20
6    percent discount on Opana ER?  Are you
7    aware of that?
8          A.    Yes, I am.
9          MR. LIMBACHER:  Object to
10   form.  Foundation.
11         MR. BUCHANAN:  Can I have,
12   please, 756?
13         MR. SIEGEL:  Being marked as
14   Exhibit-27.
15              - - -
16         (Whereupon, EndoWalker
17   Exhibit-27,
18   ENDO_OPIOID_MDL_02290107-110, was
19   marked for identification.)
20              - - -
21   BY MR. BUCHANAN:
22         Q.    I'm passing you, ma'am,
23   what's been marked as Exhibit-27 to your
24   deposition.

122  (Pages 482 to 485)

Highly Confidential - Subject to Further Confidentiality Review

Page 486

```
 1              It's an e-mail exchange
 2    beginning August 17th, 2017, right?
 3         A.   Yes.
 4         Q.   It's going from a Mary Jo
 5    Magrone to Sal Grausso.
 6              He was your boss at that
 7    point in time?
 8         A.   He was.
 9         Q.   Still is?
10         A.   Yes.
11         Q.   E-mail going to him and
12    others. It says, Dear branded pricing
13    committee.
14              Do you see that?
15         A.   I do.
16         Q.   Attached for your review is
17    an Opana ER wholesaler promotion to be
18    offered immediately upon BPC approval.
19    The offering includes a 20 percent
20    reduction from WAC -- what's that, ma'am?
21         A.   WAC, wholesaler price, list
22    price.
23         Q.   Wholesaler price?
24         A.   List price.
```

Page 488

```
 1         A.   Correct.
 2         Q.   You have that understanding,
 3    ma'am, that the FDA had said the benefits
 4    no longer outweigh the risks? Are you
 5    aware of that?
 6              MR. LIMBACHER: Object to
 7         form. Asked and answered.
 8              THE WITNESS: That's what
 9         the FDA said.
10    BY MR. BUCHANAN:
11         Q.   Issued a release in June of
12    2017 to that effect, correct?
13              MR. LIMBACHER: Object to
14         form. Asked and answered.
15              THE WITNESS: The FDA did,
16         yes.
17    BY MR. BUCHANAN:
18         Q.   Had an advisory committee,
19    what, back in March of 2017, correct?
20              MR. LIMBACHER: Object to
21         form. Foundation.
22              THE WITNESS: I can't speak
23         to that advisory committee. I
24         don't know what that is.
```

Page 487

```
 1         Q.   -- to be extended to the
 2    wholesaler segment as an off invoice
 3    discount.
 4              What's that mean?
 5         A.   They get 20 percent off the
 6    list price.
 7         Q.   And it looks like Ms.
 8    Magrone is looking for a prompt response
 9    so that this can be approved by the
10    pricing committee and get out to the
11    wholesalers, right?
12              MR. LIMBACHER: Object to
13         form.
14              THE WITNESS: Yes. She sent
15         this to the pricing committee.
16    BY MR. BUCHANAN:
17         Q.   Is your boss on the pricing
18    committee?
19         A.   Sal Grausso is listed, yes.
20         Q.   And we see on the next page,
21    Background market overview. On 9/1/17,
22    Endo will voluntarily withdraw Opana ER
23    from the market at the request of FDA.
24              Correct?
```

Page 489

```
 1    BY MR. BUCHANAN:
 2         Q.   So here we are two weeks
 3    before the drug gets pulled, and the
 4    background market overview reports to
 5    your customer segment that you're going
 6    to withdraw Opana ER at the request of
 7    the FDA on September 1, 2017, right?
 8         A.   That's what it states, yes.
 9         Q.   Okay. And then your
10    specific request, In support of the
11    above, this proposal requests approval
12    for the following wholesaler offering.
13              And, again, this is a
14    request for pricing approval to the brand
15    committee, correct?
16              MR. LIMBACHER: Object to
17         form.
18              THE WITNESS: It is.
19    BY MR. BUCHANAN:
20         Q.   Discount, 20 percent
21    discount from WAC given as an off invoice
22    discount, correct?
23         A.   Uh-huh.
24         Q.   Applied to all wholesalers,
```

123 (Pages 486 to 489)

Highly Confidential - Subject to Further Confidentiality Review

Page 490

1    right?
2         A.    If they participated.
3         Q.    Okay.  And you're offering a
4    one-time buy, right?
5         A.    It's a one-time order.  It's
6    a transition order.
7         Q.    And did you get any
8    excessive orders at the end of August
9    2017 for Opana ER?
10             MR. LIMBACHER:  Object to
11    form.
12             THE WITNESS:  I don't
13    recall.  I'm sure we did.  It's
14    probably in this listed.
15             But, again --
16    BY MR. BUCHANAN:
17         Q.    You would agree, ma'am, that
18    you didn't cease any orders, right?
19             MR. LIMBACHER:  Object to
20    form.
21             THE WITNESS:  We did not,
22    because this was a transition to
23    ensure our patients were properly
24    transitioned by their physician to

Page 491

1    another therapy, because they
2    could no longer take Opana.
3    BY MR. BUCHANAN:
4         Q.    Was that $100 million worth
5    of Opana that you sold, "you" being Endo,
6    after the FDA advisory committee in March
7    of 2017?
8         A.    I don't--
9             MR. LIMBACHER:  Object to
10    form and foundation.
11             THE WITNESS:  I have no
12    idea.  I can't confirm.  I don't
13    know what the sales were.
14    BY MR. BUCHANAN:
15         Q.    It sounds like you had
16    visibility, within your ordering system,
17    to the net revenue on a particular sale,
18    as well as the gross revenue, right?
19             MR. LIMBACHER:  Object to
20    form.
21             THE WITNESS:  It's on the
22    order.  But sales, that's not my
23    responsibility to know that.
24             MR. BUCHANAN:  651.

Page 492

1             - - -
2             (Whereupon, EndoWalker
3    Exhibit-28,
4    ENDO_DATA-OPIOID_MDL00000019, With
5    Attachment, was marked for
6    identification.)
7             - - -
8    BY MR. BUCHANAN:
9         Q.    I'm passing you next in
10    order, ma'am.
11             MR. SIEGEL:  It's being
12    marked as Exhibit-28.
13    BY MR. BUCHANAN:
14         Q.    Exhibit-28.
15             MR. LIMBACHER:  Can we pull
16    this up on the screen?  This is
17    produced natively, so let's go to
18    the first page of the spreadsheet.
19    Actually, let's go to the second
20    page of the spreadsheet.
21    BY MR. BUCHANAN:
22         Q.    Have you ever seen these
23    reports before?
24         A.    No.  I'm assuming this is

Page 493

1    out of SAP.
2         Q.    END contribution, MGN by
3    MPH.
4             Do you see that?
5         A.    I do.
6         Q.    Excluding Interco.
7             Do you see that?
8         A.    I do.
9         Q.    The product hierarchy lists
10    the product number and the product name.
11             Do you see that?
12         A.    Uh-huh.
13         Q.    You see what sheet we're on,
14    Opana ER.
15             Is that the sheet you're on?
16         A.    It just says, Opana.
17         Q.    If you go to the second
18    page.
19             You manufactured multiple
20    controlled substances, correct?
21             MR. LIMBACHER:  Object to
22    form.
23             THE WITNESS:  We do.
24    BY MR. BUCHANAN:

124  (Pages 490 to 493)

Highly Confidential - Subject to Further Confidentiality Review

Page 494

1    Q.    Okay.  If we go to that page
2 that says Opana ER, you see revenue?  Do
3 you see the top line, revenue?
4    A.    Yes.
5    Q.    And then there's Period 1,
6 2, 3, all the way up to 12, and then a
7 year to date at the end.
8        Do you see that, ma'am?
9    A.    I do.
10    Q.    Do you recognize period 1 as
11 the first month of the year and period 2
12 the second month?
13    A.    Yes.
14    Q.    You're familiar with reports
15 that look like this, right?
16    A.    This is a financial report,
17 I don't -- this is not something I see or
18 generate.
19    Q.    Okay.  That FDA advisory
20 committee to consider Opana ER that was
21 in March; is that right?
22    A.    I don't know.
23    Q.    We see revenue of Opana ER
24 from March was about $26 million, right?

Page 495

1        MR. LIMBACHER:  Object to
2 form.  Foundation.
3        THE WITNESS:  It says $26
4 million.
5 BY MR. BUCHANAN:
6    Q.    From April was $17.9
7 million, right?
8        MR. LIMBACHER:  Same
9 objection.
10        THE WITNESS:  That's what it
11 states.
12 BY MR. BUCHANAN:
13    Q.    For May is $22.8 million,
14 right?
15        MR. LIMBACHER:  Form and
16 foundation.
17        THE WITNESS:  That's what it
18 states.
19 BY MR. BUCHANAN:
20    Q.    From June is $21.8 million,
21 right?
22        MR. LIMBACHER:  Form and
23 foundation.
24        THE WITNESS:  Uh-huh.

Page 496

1 BY MR. BUCHANAN:
2    Q.    From July is $12.2 million,
3 right?
4    A.    Yes.
5        MR. LIMBACHER:  Objection.
6 Form and foundation.
7 BY MR. BUCHANAN:
8    Q.    Period 8, it looks like you
9 sold more in August than you did in July,
10 right?
11        MR. LIMBACHER:  Objection.
12 Form and foundation.
13        THE WITNESS:  That's what
14 this report states.
15 BY MR. BUCHANAN:
16    Q.    As you're going out of
17 business with Opana ER?
18    A.    I can't speak to this
19 report.  I don't know what's generated
20 behind this report.  This is a financial
21 report.  I'm not in finance.  I can't
22 speak to it.
23    Q.    Okay.  It's over $100
24 million in sales between March and the

Page 497

1 time you withdrew it from the market.
2        Did you know that, ma'am?
3    A.    No.
4        MR. LIMBACHER:  Objection.
5 Form and foundation.
6        THE WITNESS:  I did not.
7 Again, this is a financial
8 report, I'm not in finance.
9 BY MR. BUCHANAN:
10    Q.    Did you know it was more
11 than $50 million in sales -- or $50
12 million in sales between June and August
13 before you took it off the market?
14        MR. LIMBACHER:  Objection.
15 Form and foundation.
16 BY MR. BUCHANAN:
17    Q.    When the FDA requested in
18 June that it be withdrawn?
19    A.    I can't speak to the finance
20 of the company.  I'm not in finance.
21    Q.    I just wanted to -- while
22 we're on this sheet, you see there's a
23 line item on this sheet for chargebacks?
24    A.    I do.

Highly Confidential - Subject to Further Confidentiality Review

Page 498

1    Q.   Do you see each period is
2  reporting chargebacks?
3    A.   Yes.
4    Q.   And the sheet that we're
5  looking at is for Opana ER, correct?
6    A.   Yes.
7    Q.   All right.  Do you see for
8  August, Period 8 -- actually, if you look
9  about halfway down on the left, there is
10  a line item for sales promotions.
11    Do you see that?
12    A.  I do.
13    Q.   What sales promotion amount
14  was credited for January?
15    A.   Nothing.
16    Q.   What about was credited for
17  February?
18    MR. LIMBACHER:  Objection.
19  Form and foundation.  Objection to
20  all these questions with regard to
21  a document that she's told you
22  repeatedly she knows nothing
23  about --
24  BY MR. BUCHANAN:

Page 499

1    Q.   What amount --
2    MR. LIMBACHER:  -- and has
3  never seen before.
4    MR. BUCHANAN:  Move to
5  strike.
6    MR. LIMBACHER:  You're going
7  to have an opportunity to ask
8  these questions of people who
9  might actually know something
10  about it.
11  BY MR. BUCHANAN:
12    Q.   What amount for sales
13  promotions, ma'am, was credited for
14  Period 3, March of 2017?
15    MR. LIMBACHER:  Same
16  objection.  Form and foundation.
17    THE WITNESS:  Zero.
18  BY MR. BUCHANAN:
19    Q.   What amount was credited for
20  April?
21    MR. LIMBACHER:  Same
22  objection.  Form and foundation.
23    THE WITNESS:  Zero.
24  BY MR. BUCHANAN:

Page 500

1    Q.   What amount was credited for
2  May?
3    MR. LIMBACHER:  Same
4  objection.  Form and foundation.
5    THE WITNESS:  Zero.
6  BY MR. BUCHANAN:
7    Q.   How about June?
8    MR. LIMBACHER:  Same
9  objection.  Form and foundation.
10    THE WITNESS:  Zero.
11  BY MR. BUCHANAN:
12    Q.   July?
13    MR. LIMBACHER:  Same
14  objection.  Form and foundation.
15    THE WITNESS:  Zero.
16  BY MR. BUCHANAN:
17    Q.   And when you were blowing it
18  out in August, what amount was credited
19  for sales promotions?
20    MR. LIMBACHER:  Same
21  objection.  Form and foundation.
22  And argumentative.
23    THE WITNESS:  Blowing it out
24  is not my word.  We had to

Page 501

1  transition orders to our
2  wholesalers to ensure our patients
3  had enough inventory to get them
4  through the transition period as
5  they worked with their healthcare
6  provider on a new therapy.
7  BY MR. BUCHANAN:
8    Q.   What promotional amount did
9  you book on this sheet -- or the company
10  book on this sheet for promotional
11  activity of Opana in the days leading up
12  to its withdrawal from the market?
13    MR. LIMBACHER:  Objection.
14  Form and foundation.
15    THE WITNESS:  I'm not --
16  BY MR. BUCHANAN:
17    Q.   Just read the number, ma'am.
18    A.   It's 20 percent.  But that's
19  not my decision.  That's not my decision.
20    MR. BUCHANAN:  Let's take a
21  short break.
22    VIDEO TECHNICIAN:  We're
23  going off the record.  The time is
24  4:45.

Highly Confidential - Subject to Further Confidentiality Review

Page 502

1           - - -
2        (Whereupon, a brief recess
3    was taken.)
4           - - -
5        VIDEO TECHNICIAN:  Going
6    back on the record.  The beginning
7    of Media File 9.  The time is
8    5:02.
9        MR. BUCHANAN:  Mrs. Walker,
10   I have no further questions at
11   this time, subject to the issues
12   with the document that was
13   withdrawn on the basis of
14   privilege, and any further
15   questions that I have in follow-up
16   to the questions of any other
17   counsel today.
18       I'll pass the witness.
19       MR. LENISKI:  Thank you.
20          - - -
21       EXAMINATION
22          - - -
23   BY MR. LENISKI:
24       Q.   Good afternoon, Ms. Walker.

Page 503

1    My name is Joe Leniski, and I represent
2    clients who are proceeding in state court
3    in Tennessee.
4        So my questions today will
5    be largely pertaining to the state of
6    Tennessee.
7        A.   Okay.
8        MR. LENISKI:  Before we
9    proceed, I just have to state on
10   the record, we have a standing
11   objection, and adopt for purposes
12   of today, former objections we
13   made in other depositions about
14   the failure to produce documents
15   timely and the failure to
16   refute -- or the documents that
17   refute their assertion that
18   witness has any Tennessee-specific
19   knowledge and because Tennessee
20   rules of civil procedure don't
21   place the same restrictions on the
22   Tennessee state plaintiffs as they
23   do the plaintiffs proceeding in
24   the MDL.

Page 504

1        But we're appearing today in
2    continuity of our respect for both
3    the letter and the spirit of the
4    state and federal cooperation
5    protocol, without waiving these
6    objections and the right to
7    redepose Ms. Walker if necessary.
8        MR. LIMBACHER:  We
9    understand your position.
10       MR. LENISKI:  Thank you.
11   BY MR. LENISKI:
12       Q.   So, Ms. Walker, I'm Joe
13   Leniski, as I stated, I'm from Tennessee.
14   I represent a different group of
15   plaintiffs than the folks who were asking
16   questions this morning.  And I don't have
17   nearly as many questions.
18       A.   That's good, I guess.
19       Q.   So you can take that for
20   what it's worth.
21       First question is, do your
22   job duties regarding distribution at Endo
23   involve any Tennessee-specific
24   responsibilities?

Page 505

1        A.   I do not ship to any
2    customers in the state of Tennessee, as
3    far as the wholesalers are concerned.
4        Q.   So, to your knowledge, in
5    your 20 years at Endo, you never shipped
6    product to a wholesaler located in the
7    state of Tennessee; is that your
8    testimony?
9        A.   No.  Let me -- let me back
10   up.
11       Our largest customer,
12   McKesson's distribution center used to be
13   in the state of Tennessee until they
14   moved it to Mississippi.  So I used to
15   ship to McKesson in Tennessee.
16       Q.   Do you recall when that was?
17       A.   When they moved to
18   Mississippi?  No.  Around '13, '14, '15.
19   I don't know the exact date.
20       Q.   Do you remember anyone on
21   your team that had any Tennessee-specific
22   responsibilities?
23       A.   On my team?  No.
24       Q.   Do you know whether

Highly Confidential - Subject to Further Confidentiality Review

Page 506

1  Tennessee was a high-performing area as
2  far as Opana ER sales go?
3          MR. LIMBACHER:  Object to
4  form.
5          THE WITNESS:  I can't speak
6  to that.  I don't know.
7  BY MR. LENISKI:
8      Q.   Was the fact whether or not
9  Tennessee was a high-sales area for Opana
10  ER, was that relevant to your job duties?
11      A.   I only ship to wholesalers.
12  So once McKesson moved out of the state
13  of Tennessee into Mississippi, I didn't
14  ship to any wholesalers within the state
15  of Tennessee.
16      Q.   Which is not to say that you
17  weren't aware that Opana ER was being
18  prescribed and dispensed in the state of
19  Tennessee; is that your understanding?
20      A.   I don't have any
21  prescription data or dispense data.  That
22  wasn't part of my job responsibility.
23  That's another area within Endo.
24      Q.   So during your 20 years, did

Page 507

1  you have any awareness whether Opana ER
2  was being dispensed in the state of
3  Tennessee?
4      A.   No, I don't -- I can't
5  confirm that.
6      Q.   At least what you're
7  testifying to today is that was not
8  relevant to your job duties; is that what
9  you're testifying to?
10          MR. LIMBACHER:  Object to
11  form.
12          THE WITNESS:  That's
13  correct.  I only ship to
14  wholesalers.  So prescribing
15  information is not part of my job
16  responsibility.
17  BY MR. LENISKI:
18      Q.   Okay.  So in your role in
19  distribution, neither you nor your team
20  tracked the number of Opana ER units
21  being distributed in the state of
22  Tennessee?
23      A.   Not within my role, no.
24      Q.   And whether or not Tennessee

Page 508

1  was a state with rampant opioid abuse,
2  was that a factor relevant to your job
3  duties in distribution at Endo?
4          MR. LIMBACHER:  Object to
5  form.
6          THE WITNESS:  No, that
7  information wasn't provided to me.
8  BY MR. LENISKI:
9      Q.   Would you say that was
10  relevant to your job duties in Endo?
11          MR. LIMBACHER:  Object to
12  form.
13          THE WITNESS:  Prescription
14  data, again, is not part of my job
15  responsibility.  It's -- you know,
16  I don't have that information.
17  BY MR. LENISKI:
18      Q.   Okay.  And did you have any
19  knowledge about problem prescribers -- or
20  prescribers that Endo identified as being
21  problem prescribers in Tennessee during
22  your tenure?
23      A.   No.  Again, the sales data
24  and prescribing data is not within my

Page 509

1  area of responsibility.  I don't have
2  that information.  I don't have that
3  data.
4          MR. LENISKI:  This is
5  Exhibit-5.  Who else needs copies?
6          MR. LIMBACHER:  Thank you.
7          - - -
8          (Whereupon, EndoWalker
9  Exhibit-29,
10  ENDO_OPIOID_MDL_01030692-698, was
11  marked for identification.)
12          - - -
13  BY MR. LENISKI:
14      Q.   Ms. Walker, I've handed you
15  what we've identified as Exhibit-29 to
16  your deposition.
17          And my --
18      A.   Yes.
19      Q.   -- my question is going to
20  be whether or not you recognize this
21  document?
22      A.   This was an e-mail --
23      Q.   Okay.
24      A.   -- sent to me.

128  (Pages 506 to 509)

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Page 538



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 540

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23        - - -
24      (Whereupon, EndoWalker

---

Page 539

1         Do you know who the risk
2    management team at Endo was?
3         A.   I know that there was a
4    cross-functional risk management team,
5    yes.
6         Q.   Do you recall ever being a
7    member of that team?
8         A.   No, I was not.
9         Q.   Do you recall being copied
10   on e-mails where the minutes of such
11   meetings were sent to you?
12        A.   I don't recall off the top
13   of my head, no.
14        Q.   Do you know why such minutes
15   of those risk management team meetings
16   would have been sent to you for your
17   review?
18        MR. LIMBACHER:  Object to
19   form.
20        THE WITNESS:  I believe my
21   boss at the time was part of that
22   team.  I was not.
23   BY MR. LENISKI:
24        Q.   I'm sorry.  And who was your

Page 541

1    Exhibit-30,
2    ENDO_OPIOID_MDL_01033927-929, was
3    marked for identification.)
4         - - -
5    BY MR. LENISKI:
6         Q.   Ms. Walker, I've handed you
7    a document we've identified as Walker
8    Exhibit-30 to your deposition.
9         A.   Uh-huh.
10        Q.   It's a chain of e-mails,
11   first e-mail on the first page is from
12   you to a number of individuals with
13   @UPS.com e-mail addresses dated November
14   29th, 2012.
15        When you've had a chance to
16   review, my question is going to be if you
17   recognize this document.
18        A.   Are you talking about the
19   e-mail that Peter Jennings sent to me?
20        Q.   I'm talking about the entire
21   exhibit.
22        Do you recognize the
23   document?
24        A.   Yeah, I mean, it's an e-mail

Highly Confidential - Subject to Further Confidentiality Review

Page 542

1    between me and my UPS customer service
2    team.
3         Q.   Do you have any reason to
4    doubt that you received this e-mail in
5    the normal course of business on or about
6    the date of November 29th, 2012?
7         A.   I'm sure I did.
8         Q.   Okay.  Again, we have an
9    e-mail chain, which starts, if you flip
10   over the page at the bottom, 928.
11            There's an e-mail from
12   PBJ -- I'm sorry, PBJennings@UPS.com?
13        A.   Yes.
14        Q.   And that's Peter Jennings,
15   correct?
16        A.   It is.
17        Q.   And according to the e-mail,
18   his title was customer service
19   supervisor?
20        A.   He was, yes, at UPS.
21   Correct.
22        Q.   And he's e-mailing you
23   asking, Lisa, do you have more details
24   about what's going on with C-II products

Page 543

1    in Florida (the statewide restriction on
2    these products)?
3            Did I read that correctly?
4         A.   Yes.
5         Q.   And what did he mean by --
6    do you know what he meant by C-II
7    products?
8            MR. LIMBACHER:  Object to
9    form.
10           THE WITNESS:  C-II products,
11   yes, the controlled substance,
12   C-IIs.  Opioids, yes.
13   BY MR. LENISKI:
14        Q.   Schedule II controlled
15   products?
16        A.   Schedule IIs, yes.
17        Q.   That's correct?
18        A.   That's correct.
19        Q.   Flip over to page 928.  You
20   respond to Mr. Jennings on November 29th,
21   2012.
22           You say, I have no idea what
23   this is about.  Where did you hear this?
24        A.   Right.

Page 544

1         Q.   And then if you go to the
2    very next e-mail up at the top -- I'm
3    sorry, just up at the top of the previous
4    e-mail, he explains, We're getting calls
5    in the last week or two.  It sounds kind
6    of strange, but I think there is a
7    legitimate, full-fledged effort to
8    restrict C-IIs in the entire state of
9    Florida.  Sounds uncanny, but it's what
10   we're hearing.
11           Did I read that correctly?
12        A.   You did.
13        Q.   He even makes reference to
14   getting a call last week from a patient
15   about this issue; is that correct?
16        A.   That's what it states, yes.
17        Q.   And if you go up the e-mail
18   chain, after someone with the name it
19   looks like L-C-I-C-H-O-C-K-I?
20        A.   Linda Cichocki, yes.
21        Q.   What was what was her role
22   at UPS?
23        A.   She was a customer service
24   rep supporting Endo at UPS.

Page 545

1         Q.   She was on -- was she part
2    of the same team that Peter was?
3         A.   Yes.
4         Q.   So she writes, later on, on
5    November 29th and says, Pete, I just had
6    a call from a wheelchair-bound patient
7    who used our Opana locater service to
8    find her medication each month and this
9    month, just now when she called, she was
10   told the locater service is no longer
11   servicing the state of Michigan.  When I
12   asked -- when I called the Opana locater
13   service to ask about Florida, they stated
14   they can no -- they cannot tell me which
15   states they service or not, only do
16   searches by zip code.
17           Did I read that correctly?
18        A.   Yes.
19        Q.   Did you have an
20   understanding of what the Opana locater
21   service was at this time?
22        A.   When we had the supply issue
23   that I talked about earlier, Endo set up
24   a pharmacy locater so patients could find

Highly Confidential - Subject to Further Confidentiality Review

Page 546

```
 1    which pharmacies had Opana during our
 2    supply issues.  That's what that was set
 3    up for.
 4          Q.    Where was that set up?  Was
 5    it through a website?
 6          A.    I don't know.  That wasn't
 7    my responsibility.  That was done by the
 8    marketing team.  I don't know where -- I
 9    don't know what program or anything that
10    they used.
11          Q.    And was it intended to be
12    used by patients to be able to find Opana
13    to fill their prescriptions for Opana ER?
14          A.    During our supply disruption
15    only, yes.
16          Q.    How long did the Opana
17    locater service operate, to your
18    knowledge?
19          A.    All I can tell you is we had
20    our supply issue with Opana starting
21    December of '11 and went through mid
22    2012, third quarter of 2012.
23          Q.    This e-mail looks like it's
24    in November of 2012.  So the supply
```

Page 547

```
 1    issues you're referring to have ended by
 2    now; is that your testimony?
 3          A.    That's what I recall, yes.
 4          Q.    So there was something else
 5    going on in the state of Florida that's
 6    causing the issues in the e-mails,
 7    correct?
 8          A.    That's what --
 9          MR. LIMBACHER:  Object to
10    form.
11          THE WITNESS:  That's what I
12    would believe, based on the
13    e-mails.
14    BY MR. LENISKI:
15          Q.    In fact, if we look at the
16    e-mail just immediately preceding -- or
17    following the e-mail we just read, if you
18    look at the Page 927, at the bottom
19    there's an e-mail from you to Linda,
20    Peter and others --
21          A.    The team, yes.
22          Q.    -- responding to Linda.  And
23    you say, There is plenty of Opana out in
24    the market.
```

Page 548

```
 1          A.    Which tells me that our
 2    supply issue was over at this point.
 3          Q.    And you said, The Opana
 4    locater service was really needed during
 5    our shortage, correct?
 6          A.    That's correct.
 7          Q.    And you also go on, She
 8    should be able -- I'm sorry, We should be
 9    able to tell this patient she can call
10    any of her local pharmacies and with a
11    prescription, she should be able to have
12    it filled without any issues.
13          Correct?
14          A.    Right.  Based on the fact
15    that our wholesalers had inventory at
16    this time.
17          Q.    And, again, reading this
18    e-mail, it doesn't tell you or refresh
19    your recollection about how long the
20    Opana locater service was in effect?
21          A.    Right.  Based on reading the
22    e-mail and what I remember, I think it
23    was only during our shortage.
24          Q.    So the very next e-mail up
```

Page 549

```
 1    on this exhibit, the same page, 927,
 2    Peter Jennings responds to your e-mail
 3    about their being plenty of Opana in the
 4    market.
 5          And he says, Hi All.  I was
 6    down in Joanie's office a bit ago, and we
 7    talked to regulatory directly.  And they
 8    are not aware of any issue affecting
 9    Florida, not as a state.
10          Correct?
11          A.    Right.  To confirm, when
12    he's saying "regulatory," that's UPS's
13    regulatory group.
14          Q.    Fair enough.
15          He goes on, There could be,
16    quote, pockets of pharmacies that might
17    be having DEA issues, but doesn't appear
18    to be a state thing.
19          Did I read that correctly?
20          A.    Yes.
21          Q.    Now he asks you, Lisa,
22    underline, regulatory is still looking
23    into it but was curious if anything pops
24    up information-wise on your end.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 550

1          Did I read that correctly?
2     A.   Uh-huh.
3     Q.   Okay.  And let's skip up to
4  the very top of the page, where you
5  appear to be responding to the team,
6  including Linda and Peter, on --
7     A.   Yes.
8     Q.   -- November 29th.
9          You say, I know that
10 Cardinal has really increased their SOM
11 program, so I'm wondering if they are
12 cutting them off because they are
13 ordering too much.
14    A.   Right.
15    Q.   Did I read that correctly?
16    A.   You did.
17    Q.   Now, on what were you basing
18 that observation?
19    A.   Again, it's just --
20         MR. LIMBACHER:  Object to
21    form.
22         THE WITNESS:  -- like I
23    stated, that's just my opinion.  I
24    guess, if I recall, just

Page 551

1     conversations maybe with Cardinal
2     back at that time.  I don't really
3     remember.
4  BY MR. LENISKI:
5     Q.   Well, you make the
6  statement, it's affirmative, Cardinal has
7  really increased their SOM program,
8  right?
9     A.   I state that, yes.  That's
10 what it says.
11    Q.   Do you know -- you remember
12 having discussions with Cardinal on that
13 point?
14    A.   I don't remember having
15 discussions with Cardinal directly.  It's
16 back in 2012.  I don't remember.
17    Q.   Do you recall whether -- or
18 why Cardinal had increased their SOM
19 program at this time of November 2012?
20         MR. TULLY:  Object to the
21    form.
22         THE WITNESS:  Probably
23    because of the opioid crisis,
24    everybody was redoing their SOM

Page 552

1     programs or making enhancements
2     and making changes.
3  BY MR. LENISKI:
4     Q.   Were you aware of other
5  wholesalers who were increasing their SOM
6  program at the same time, late 2012?
7     A.   No.  All I know is our
8  wholesalers have an SOM program.  I don't
9  know the details behind the programs.
10    Q.   Why did Peter believe you
11 might have information about this issue
12 that's affecting Florida and pharmacies
13 not being able to get Opana ER?
14         MR. LIMBACHER:  Object to
15    form.
16 BY MR. LENISKI:
17    Q.   Do you have any idea?
18    A.   Because UPS is our 3PL,
19 third-party logistics company, and we
20 partner with them on anything to do with
21 Endo's business.  So it's not unusual for
22 him to reach out.
23    Q.   Did you represent to Peter
24 that you had understanding about your

Page 553

1  wholesalers' SOM programs in addition to
2  Endo's SOM program?
3     A.   I don't recall.  I mean,
4  just based on what my e-mail says, yes.
5     Q.   Was that something you
6  tracked, was what your wholesalers were
7  doing with their SOM programs?
8     A.   No.  We just know that our
9  wholesalers have SOM programs.  I don't
10 know the details behind the SOM programs
11 at our wholesalers.
12    Q.   And then you go on to say,
13 in the same e-mail, All we can state is
14 that we have plenty of inventory and it's
15 not on backorder and our wholesalers have
16 it in stock.
17         Correct?
18    A.   That's correct.  At this
19 time, obviously, we were off our supply
20 issue and our wholesalers have inventory.
21 If the patients can't get it, that's not
22 my -- all we can tell them is that it's
23 not on backorder.
24    Q.   Other than individuals in

Highly Confidential - Subject to Further Confidentiality Review

Page 554

1    this e-mail, did you discuss your
2    statement here that Cardinal may have
3    stopped shipping to Florida pharmacies
4    due to concerns about over-ordering with
5    anyone else at Endo?
6        A.    Not that I recall.
7        Q.    Never elevated that
8    observation to anyone else, to your
9    knowledge?
10        A.    Not that I recall.
11        Q.    Do you believe you're
12    obligated to do that?
13        MR. LIMBACHER:  Object to
14    form.
15        THE WITNESS:  No.
16        MR. LENISKI:  Ms. Walker,
17    pending any questions from
18    counsel, I think I'm finished.
19    Thank you very much.
20        MR. LIMBACHER:  Thank you.
21        VIDEO TECHNICIAN:  Going off
22    record.  The time is 5:42.
23            - - -
24        (Whereupon, a brief recess

Page 555

1    was taken.)
2            - - -
3        VIDEO TECHNICIAN:  We're
4    going back on the record.  The
5    beginning of Media File Number 10.
6    The time is 5:46.
7            - - -
8        EXAMINATION
9            - - -
10    BY MR. LIMBACHER:
11        Q.    Good evening, Mrs. Walker.
12    I know it's been a very long day, and I'm
13    sure you're very tired and are looking
14    forward to getting home.  But this is my
15    opportunity to ask you a few questions
16    and to kind of present you to the jury so
17    they have an opportunity to get to know
18    you just a little bit.
19        Can you tell us, and I know
20    some of these things we've covered
21    earlier, can you tell us, are you
22    currently employed at Endo?
23        A.    Yes, I am.
24        Q.    And when did you begin

Page 556

1    working for Endo?
2        A.    November 2nd, 1998.
3        Q.    And can you tell us your
4    current job title?
5        A.    I'm the director of
6    distribution and customer service for
7    Endo.
8        Q.    And before we get into your
9    job responsibilities and your history,
10    can you tell us, did you go to college?
11        A.    I did.
12        Q.    And where did you go?
13        A.    Wilmington College.
14        Q.    And when did you graduate?
15        A.    May of 1995.
16        Q.    What degree did you receive?
17        A.    Bachelor's in business
18    management.
19        Q.    And kind of walk us through,
20    very briefly, your work history after you
21    received your degree from Wilmington
22    College.
23        Where did you first work?
24        A.    I actually started working

Page 557

1    at DuPont in October of '89.  So I got my
2    degree at night going to Wilmington
3    College.
4        Q.    And when you first started
5    working at DuPont, what did you do?
6        A.    I delivered mail.  I pushed
7    a mail cart and delivered mail.
8        Q.    And about how long were you
9    doing that at DuPont?
10        A.    Probably about two years,
11    two-and-a-half, give or take.
12        Q.    And then at some point in
13    time, did you start to work in the
14    customer service department at DuPont?
15        A.    Yes.  Then I moved over to
16    the customer service department.  It was
17    DuPont Merck at the time.
18        Q.    And when did you join Endo?
19    I think you said 1998; is that right?
20        A.    Yes.  November of '98.
21        Q.    And in what department were
22    you first employed at Endo?
23        A.    I was -- I've always been in
24    the customer service and distribution

Highly Confidential - Subject to Further Confidentiality Review

Page 558

1   department at Endo.
2        Q.   And have you received any
3   promotions over the 20 years that you've
4   been working for Endo?
5        A.   Yes, a few.
6        Q.   And tell us, what are the
7   different roles and job titles that
8   you've held at Endo?
9        A.   I came in as a contract
10  analyst.  Then I was promoted to
11  supervisor of distribution, manager of --
12  I forget the exact title.  Manager within
13  customer service, then associate director
14  and then director.
15       Q.   And when did you become
16  associate director of customer service at
17  Endo, if you remember?
18       A.   2003, 2004, something like
19  that.
20       Q.   And when did you become the
21  director of customer service?
22       A.   2015.
23       Q.   And what have been your
24  basic job responsibilities over time, as

Page 559

1   both associate director and director of
2   customer service in distribution?
3        A.   One of the main functions is
4   to manage the UPS relationship.  And then
5   anything around customer service and
6   distribution for the branded products.
7        Q.   And before we get into
8   details, has Endo's distribution team had
9   a monitoring program in place to track
10  suspicious orders of branded opioids?
11       A.   Yes, we did.
12       Q.   And since you've been at the
13  company, has Endo's distribution team
14  always had safeguards in place to prevent
15  diversion of Endo's opioids?
16       MR. BUCHANAN:  Objection to
17  form.
18       THE WITNESS:  Yes, we have.
19  BY MR. LIMBACHER:
20       Q.   Now, let's walk through how
21  an order for branded opioids comes in to
22  the company.
23       First, who are Endo's
24  customers for their branded opioids?

Page 560

1        A.   As it relates to opioids,
2   the customers are our wholesalers.
3        Q.   And are there any
4   particularly large wholesaler customers
5   that Endo sells its branded opioids to?
6        A.   We have three large
7   wholesale customers; AmerisourceBergen,
8   Cardinal and McKesson.
9        Q.   And are the majority of the
10  sales of branded opioids, as you
11  understand it for Endo, sold to those
12  three large national wholesalers?
13       A.   Yes.  I believe they make up
14  about 90 percent of the business.
15       Q.   Do pharmacies ever place an
16  order with Endo for branded opioids?
17       A.   No.
18       Q.   What about a doctor's
19  office, do they ever order opioids
20  directly from Endo?
21       A.   No.
22       Q.   And what about a pain
23  clinic, do they ever order branded
24  opioids directly from Endo?

Page 561

1        A.   No.
2        Q.   What about manufacturing of
3   the branded opioids at Endo sales, has
4   Endo itself manufactured those branded
5   opioids?
6        A.   We've always had contract
7   manufacturers for Endo.
8        Q.   And once the branded opioids
9   are manufactured by the contract
10  manufacturers, where are they stored?
11       A.   Once they're made, they are
12  shipped to UPS Supply Chain Solutions in
13  Memphis, Tennessee.  And that's where the
14  distribution is done, and that's where
15  they are stored.
16       Q.   And how long has that been
17  the case?
18       A.   We've been in Memphis since
19  April of 2000.
20       Q.   And is the warehouse that's
21  in Tennessee, is it guarded?
22       A.   Yes.
23       Q.   And how are the branded
24  opioids then distributed from Endo to the

141  (Pages 558 to 561)

Highly Confidential - Subject to Further Confidentiality Review

Page 562

1   wholesaler customers that you identified?
2       A.   For the big three, they are
3   shipped on dedicated trucks directly from
4   the distribution center to the three big
5   wholesalers' national distribution
6   centers.
7       Q.   And what about for the other
8   regional wholesalers that you sell
9   branded opioids to?
10      A.   They are shipped -- because
11  of the order size, they are a little bit
12  smaller, so they are shipped UPS Second
13  Day Air.  And we use Second Day Air to
14  limit the time they're in transit.
15      Q.   And is there a company that
16  Endo has contracted with to actually
17  perform the distribution of the branded
18  opioids?
19      A.   UPS Supply Chain Solutions.
20      Q.   And is there a current
21  contract between Endo and UPS?
22      A.   Yes.
23      Q.   And what's the purpose of
24  that contract, as you understand it?

Page 563

1       A.   It's the contract that lays
2   out all the customer service functions
3   that they perform, plus the warehousing
4   and distribution and the freight that
5   they manage for Endo.
6       Q.   And I think we looked at
7   some of those contracts earlier, but how
8   long has Endo had that kind of a contract
9   with UPS to provide those services?
10      A.   Customer service started in
11  April of '99, and then distribution
12  started in April of 2000.
13      Q.   And has UPS had its own
14  suspicious order monitoring program that
15  it applies to orders for Endo's branded
16  opioids?
17      A.   Yes.
18      Q.   And how long has that been
19  the case, Mrs. Walker?
20      A.   It's been in their contract
21  since the beginning.
22      Q.   When Opana launched -- I
23  believe that was in 2006; is that right?
24      A.   Yes, I believe so.



142  (Pages 562 to 565)

Highly Confidential - Subject to Further Confidentiality Review



Page 566

Page 568

Page 567

Page 569

```
 9        Q.    And you have personal
10   knowledge with regard to what is set
11   forth in that language that I just read;
12   is that fair?
13        MR. BUCHANAN:  Same
14   objection.
15        THE WITNESS:  As far as it
16   relates to the distribution
17   center, yes.
18   BY MR. LIMBACHER:
19        Q.    Now, are there appendices to
20   the risk MAP document, do you recall?
21        A.    I believe there's a flow
22   chart.
23        Q.    Let's take a look, first of
24   all, at Appendix 2, which is on Page 42
```

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 570

```
 1   of Exhibit-31.
 2          MR. BUCHANAN:  Do you have a
 3   Bates number, counsel?
 4          MR. LIMBACHER:  I'm sorry?
 5          MR. BUCHANAN:  Bates number?
 6          MR. LIMBACHER:  Page 42.  So
 7   just internal numbering, okay.
 8          MR. TOLIN:  He's asking for
 9   the Bates number.
10          MR. LIMBACHER:  Oh, you're
11   looking for the Bates number?
12          MR. BUCHANAN:  That's fine.
13   I'm happy to use the internal
14   number.  I just wanted to make
15   sure I'm on the same page.
16   BY MR. LIMBACHER:
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 578

```
 1       Q.   If you turn to Page 29 of
 2   Exhibit-31.
 3       A.   I'm sorry, 29?
 4       Q.   Yes.
 5       A.   Okay, I'm there.
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22       Q.   I understand.
23           And if we go to Page 31 of
24   this document, under Section 4.2.
```

Page 580

Page 579

```
 1       A.   Yes.
 2       Q.   I think you got asked a
 3   couple of questions just a little while
 4   ago with regard to Endo's risk management
 5   team, which you said was a
 6   cross-functional team?
 7       A.   Yes.
 8       Q.   You were not a member of
 9   that team, as I understand it; is that
10   right?
11       A.   No, I was not.
12       Q.   But your boss was a member?
13       A.   At that time, yes.
14       Q.   And let's put Exhibit-31
15   aside.
16
17
18
19
20
21
22
23
24
```

Page 581

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS



Page 586

23  Q.   Let's take a look at the
24  next document that we'll mark as Exhibit

Page 588

1  BY MR. LIMBACHER:
2    Q.   And who is Tracey Hernandez?
3    A.   Tracey Hernandez was the DEA
4  compliance person at Qualitest/Par.

Page 587

Page 589

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 594

Page 596

```
12    questions, Ms. Walker.
13         If you can look at the
14    exhibits that you were asked questions
15    about before, I'd like you to pull out
16    Exhibit-15 and Exhibit-22.  If you can
17    find those.
18       A.   If I have 15 and 22?  I'm
19    sorry, I guess I should have kept them in
20    numerical order.
21       Q.   That's okay.  It's been a
22    long day.
23       A.   22.  What's this one?
24    That's 24.  22, got it.
```

Page 595

Page 597

```
1       Q.   You got it?
2       A.   Yes, I do.
3       Q.   Just a few questions.
4            With regard to Exhibit-15,
5     do you recall that you let counsel know
6     that you wanted to provide a little
7     context with regard to the e-mail
8     exchange that's shown here in Exhibit-15?
9        A.   Yes.
10           MR. BUCHANAN:  Objection to
11    form.
12           THE WITNESS:  Yes, I wanted
13    to provide some additional
14    information.
15    BY MR. LIMBACHER:
```

Highly Confidential - Subject to Further Confidentiality Review



| Page 598 | Page 600 |
| --- | --- |
| | much, Mrs. Walker. I really |
| | appreciate your time. |
| | MR. BUCHANAN: I'll have a |
| | few follow-ups. Can we go off? |
| | VIDEO TECHNICIAN: Going off |
| | record. The time is 6:23. |
| | - - - |
| | (Whereupon, a brief recess |
| | was taken.) |
| | - - - |

**Page 599**

Q. If you can turn to
Exhibit-22. I don't know if you recall
being asked a number of questions with
regard to this series of e-mails.
   Do you recall that?
   A. I remember discussing this
e-mail earlier today.
   Q. And the subject line is, DEA
representative comments on Opana.
   Do you remember that?
   A. That's what the e-mail
states, yes.
   Q. And there's quite a few
e-mails that are going back and forth
from a number of different people in
Exhibit-22; is that right?
   A. Yes.
   Q. Is your name anywhere on any
of these e-mails that are a part of
Exhibit-22?
   A. No, they are not.
   MR. LIMBACHER: Thanks very

**Page 601**

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Page 606



8      Q.   Okay.  You were asked some
9  questions about Exhibit-22.  I think the
10  question was, do you see your name
11  anywhere on here?
12         Exhibit-22, ma'am, was an
13  exchange where a number of folks within
14  Endo were discussing statements by the
15  DEA about Opana being subject to misuse
16  and diversion.
17         Do you recall that?
18      A.   That's what the e-mail
19  states.
20      Q.   That's what the e-mail
21  states.
22         And I think counsel asked
23  you whether you saw your name anywhere on
24  this thread, correct?

Page 607

1      A.    Correct.  And my name is not
2  on this thread.
3      Q.    Does it surprise you, ma'am,
4  that the DEA's concerns with regard to
5  Opana and the diversion and the abuse
6  were not shared with you?
7         MR. LIMBACHER:  Object to
8  form.
9         THE WITNESS:  Surprise?
10  BY MR. BUCHANAN:
11      Q.   Yes.
12         Are you surprised?
13         MR. LIMBACHER:  Object to
14  form.
15
16
17
18
19
20
21
22
23
24

Page 608

Page 609

153  (Pages 606 to 609)

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 614

7    Q.   I understand.  And I think
8  you were read and shown portions of this
9  document that related to Wolters Kluwer
10  data.
11       Do you recall that?
12    A.   Right.  And I also stated
13  that's not part of my area of
14  responsibility.  I believe I stated that.
15    Q.   Did anybody within the
16  company who had that responsibility ever
17  come to you and discuss their findings
18  with regard to review of that data?
19    A.   No.  But that doesn't mean
20  they didn't do what they were supposed to
21  do within the company.  I can't speak to
22  that.
23    Q.   Do you have any knowledge
24  that they even did it?

Page 615

1       MR. LIMBACHER:  Object to
2  form.
3       THE WITNESS:  I can't speak
4  to that.
5       MR. LIMBACHER:  Foundation.
6       THE WITNESS:  It's not my
7  area of responsibility.
8  BY MR. BUCHANAN:
9    Q.   Okay.  We were just
10  discussing, ma'am, Exhibit-31, which was
11  the risk minimization action plan.
12       In connection with the
13  launch of Opana ER, the company went out
14  and engaged with various law enforcement
15  authorities, correct?
16    A.   I can't --
17       MR. LIMBACHER:  Object to
18  form.  Foundation.
19       THE WITNESS:  I don't know
20  that.  I can't confirm that.
21  That's not my area of
22  responsibility.
23       MR. BUCHANAN:  Can I please
24  have --

Page 616

1       MR. SIEGEL:  552 as
2  Exhibit-35.
3          - - -
4       (Whereupon, EndoWalker
5  Exhibit-35,
6  ENDO_OPIOID_MDL_00852918-925, was
7  marked for identification.)
8          - - -
9  BY MR. BUCHANAN:
10    Q.   I'd like to direct your
11  attention, after you get it, ma'am, to
12  Page 552.3.
13       It's a law enforcement
14  outreach Q and A.  And you'll see the
15  prior page, 552.2, identified
16  prescription drug surveillance systems
17  and -- excuse me.
18       Let's start on the first
19  page, please, actually.
20       This is July 17th, 2006
21  graphic for diversion control from a
22  David Kerr to Heather Mullen.
23       Do you know who they are?
24    A.   No.

Page 617

1    Q.   David Kerr, vice president,
2  business development?
3    A.   He worked at Endo.
4    Q.   If we go to Page 552.3, it
5  says, Law enforcement outreach Q and A.
6       And it runs through several
7  of the questions and answers with law
8  enforcement on issues concerning Opana,
9  correct?
10    A.   That's what the document
11  states.
12    Q.   Towards the bottom, it
13  states, Do you check with IMS or some
14  other service for high script levels.
15       Do you see that question?
16       Do you see that question,
17  ma'am?
18    A.   Yes.  I was trying to find
19  it.  Sorry.
20    Q.   At the bottom, it says, Endo
21  will be monitoring order levels through
22  Wolters Kluwer Health and will evaluate
23  this information at least quarterly
24  through its risk management group to

Highly Confidential - Subject to Further Confidentiality Review

Page 618

1    detect unusual trends.
2        Do you see that?
3        A.   Yes.
4        Q.   Were you ever -- did you
5    ever receive any information from the
6    risk management group concerning unusual
7    trends with regard to Opana?
8        MR. LIMBACHER:  Object to
9    form.
10       THE WITNESS:  That's not my
11       area of responsibility.
12   BY MR. BUCHANAN:
13       Q.   Okay.
14       A.   Again, they talked about
15   this Wolters Kluwer data.  That's not my
16   area.
17       Q.   In the middle of the second
18   page -- excuse me, the next page on this
19   Q and A, 552.4, it says, We check on
20   suspicious orders in our area and advise
21   DEA.
22       Do you see that, ma'am?
23       A.   Yes.
24       Q.   And what did you represent

Page 620

1        We check on suspicious
2    orders in area and advise DEA.
3        Do you see that?
4        A.   Correct.  That's what I
5    read.
6        Q.   Oh, okay.  Maybe you skipped
7    the first couple words.
8        Endo will receive and
9    evaluate, at least quarterly, through its
10   risk management group, the Wolters Kluwer
11   data information reflecting purchases and
12   prescribing patterns.
13       Do you see that?
14       A.   I do.
15       Q.   If circumstances seem
16   suspicious, we will notify the law
17   enforcement and DEA.
18       Did I read that correctly?
19       A.   You did.
20       Q.   Okay.  We will monitor
21   orders for suspicious patterns.
22       Do you see that at the
23   bottom?
24       A.   Yes.

Page 619

1    to law enforcement authorities that you
2    would do in that regard?
3        MR. LIMBACHER:  Object to
4    form.  She didn't represent
5    anything, counsel.
6    BY MR. BUCHANAN:
7        Q.   What does it state that Endo
8    would do, ma'am?
9        MR. LIMBACHER:  I don't see
10       her name anywhere on this
11       document.
12       THE WITNESS:  Correct.  I
13       can read it for you, if you want
14       me to.
15   BY MR. BUCHANAN:
16       Q.   Please.
17       A.   Endo will receive and
18   evaluate, at least quarterly, through its
19   risk management group, the Wolters Kluwer
20   Health information reflecting purchases
21   and prescribing patterns.
22       Q.   Let's focus on this one.
23   I'm sorry, I think you're on the prior
24   page, ma'am.

Page 621

1        Q.   The Endo ordering system
2    produces an excessive order report, which
3    is reviewed by the customer service
4    managers for approval.  An excessive
5    order is defined as any order that
6    exceeds the prior three-month average
7    shipped and/or any order that exceeds the
8    prior twelve-month average shipped.
9        Did I read that correctly?
10       A.   You did.
11       Q.   And that was essentially the
12   algorithm that was in place at that point
13   in time to identify suspicious orders?
14       A.   Correct.
15       Q.   And then what does it say in
16   terms of approval?
17       A.   Approval to release
18   excessive orders of products must be
19   issued by the vice president or senior
20   vice president of Endo.
21       Q.   Okay.  When you got
22   excessive orders, ma'am -- and you got a
23   lot of them, right?
24       MR. LIMBACHER:  Object to

Highly Confidential - Subject to Further Confidentiality Review

Page 622

1      form.
2          THE WITNESS: We had -- we
3      had orders that kicked out on our
4      report, yes.
5  BY MR. BUCHANAN:
6      Q.   And we spent a considerable
7      amount of time reviewing just those
8      orders in Exhibit-1 into the state of
9      Missouri, correct?
10     A.   We did.
11     Q.   And in this statement to law
12     enforcement, it states, The approval to
13     release excessive orders of product must
14     be issued by a vice president or senior
15     vice president of Endo.
16         Is that correct?
17         MR. LIMBACHER:  Object to
18     form.
19         THE WITNESS:  That's what it
20     states.
21  BY MR. BUCHANAN:
22     Q.   Who is your -- who was the
23     vice president up the line from you in
24     2007, ma'am?

Page 623

1      A.   I don't recall.
2      Q.   I'm sorry, 2006?
3      A.   I don't recall.
4      Q.   Were you a vice president?
5      A.   No.
6      Q.   Were vice presidents
7      releasing orders that were identified on
8      the excessive order sheet, ma'am?
9      A.   No.
10         MR. LIMBACHER:  Object to
11     form.
12  BY MR. BUCHANAN:
13     Q.   Were senior vice presidents
14     of Endo the ones releasing excessive
15     orders --
16         MR. LIMBACHER:  Object to
17     form.
18         THE WITNESS:  No.
19  BY MR. BUCHANAN:
20     Q.   -- in 2006?
21         How about in 2010, were vice
22     presidents and senior vice presidents the
23     ones who were authorized to release
24     excessive orders?

Page 624

1      A.   Our orders went through our
2      SOM program and again at UPS.  And no.
3      Q.   Stay with my question,
4      ma'am.
5          In 2010, were vice
6      presidents and senior vice presidents
7      those that were authorized to release
8      orders and excessive orders?
9      A.   No.
10     Q.   To the best of your
11     knowledge, ma'am, did a vice president or
12     senior vice president ever release an
13     excessive order?
14         MR. LIMBACHER:  Object to
15     form.
16         THE WITNESS:  Not to my
17     knowledge.
18  BY MR. BUCHANAN:
19     Q.   So if these were the
20     representations of the company to law
21     enforcement and the DEA in 2006, would it
22     be fair to say it wasn't done that way?
23         MR. LIMBACHER:  Object to
24     form.

Page 625

1          THE WITNESS:  I don't know
2      what this document is.  I've never
3      seen this document until today.
4      So I don't know.
5  BY MR. BUCHANAN:
6      Q.   Looking at David Kerr, he
7      was, in fact, the vice president -- a
8      vice president with Endo Pharmaceutical,
9      Inc., correct?
10     A.   That's what it states on his
11     e-mail.
12     Q.   I am meeting with Philly DEA
13     tomorrow with Nick.  I am digging around
14     for that one-page graphic that is the
15     risk MAP showing the control flow
16     provided by Jill Connell.
17         Jill was your boss?
18     A.   She was.
19     Q.   And, Do you have access to
20     that copy and can you send today?
21         There's a reply from Heather
22     Mullen.
23         Who is Heather?
24     A.   I don't know.

Page 626

          Q.   Okay.  Yes, here it is.
Distribution chart, along with all the
docs that I put together that you might
use, in addition to a blue folder for law
enforcement meetings.
          Do you see that?
     A.  Yes.
     Q.   Let me know if you need
anything else and let me know how it
goes.
          Do you see that, ma'am?
     A.  I do.
     Q.   You were asked some
questions about Exhibit-15, which you
discussed in examination with me earlier
today.
          Do you recall discussing
this e-mail thread, Exhibit-15, that
counsel just asked you some follow-up
questions on?
     A.  Exhibit-15?
     Q.  Yes.
     A.  Yes.
     Q.   Okay.  I think you said that

Page 627

there was a reason why these orders had
to be cut in size or downsized.
          Do you recall that?
     A.  Correct.  We had a supply
issue at this time on Opana.
     Q.   We spent some time going
through a SAP report, a SOM audit trail
report.
          Do you recall doing that
with me?
     A.  I do.
     Q.   Does that system, in fact,
track whether orders were cut in size?
     A.  I would have to look at it
to confirm that.  But I would assume --
     Q.   The order that you
received --
     A.  -- yes.
     Q.   Does it keep track of
whether the company, notwithstanding the
initial order that was provided by the
customer, cut the order in size?
     A.  Yes, it keeps the history of
the order.

Page 628

          Q.   So there's, in fact, an
audit trail tracking the circumstances
when the company cut order size?
     A.  Within the order there is,
yes.
     Q.   And are the reasons for that
cut documented in the order system?
     A.  They should --
          MR. LIMBACHER:  Object to
form.
          THE WITNESS:  They should
be.
BY MR. BUCHANAN:
     Q.   To your knowledge, they are?
     A.  They should be, yes.
     Q.   Okay.  You were shown a
document, 35, Exhibit-35, UPS audit.
          Do you recall that?
     A.  Yes.
     Q.   That wasn't the first time
that you all audited UPS, correct?
     A.  No.  UPS has been audited
many times over the years.
     Q.   Okay.

Page 629

          MR. BUCHANAN:  Could I have
578, please?
          - - -
          (Whereupon, EndoWalker
Exhibit-36,
PAR_OPIOID_MDL_0000404285, was
marked for identification.)
          - - -
          MR. SIEGEL:  578 being
marked as Exhibit-36.
          MR. BUCHANAN:  Pass it over
to counsel, please, and one for
the witness.
BY MR. BUCHANAN:
     Q.   I'm showing you what's been
marked as Exhibit-36 to the deposition.
A summary of teleconference with UPS
regarding SOMS, February 13, 2013.
          Do you see that, ma'am?
     A.  I do.
     Q.   And you're listed as an
attendee at this meeting, right?
     A.  Uh-huh.
     Q.   Do you have it before you

Highly Confidential - Subject to Further Confidentiality Review

Page 630

1   now? I'm sorry, I can't see over the
2   screen.
3        A.   I do, I have it.
4        Q.   Thank you.
5             I'd like to direct your
6   attention -- you see this list of
7   questions reflected here?
8        A.   I see them, yes.
9        Q.   And then you see answers
10  following the questions in a different
11  color?
12       A.   Yes.
13       Q.   Let's scroll down here.
14  Start with 8.
15            Have you ever reported a
16  suspicious order to any regulatory agency
17  for an Endo/Qualitest product?
18            Do you see that question to
19  UPS?
20       A.   I do.
21       Q.   And what was the answer,
22  ma'am?
23       A.   No.
24       Q.   Do you ever visit customers

Page 631

1   in person who are deemed suspicious?
2             Do you see that question?
3        A.   I do.
4        Q.   It says, Not currently.
5             Right?
6        A.   That's what it says.
7        Q.   It says, Clients may have
8   their sales reps visit customers.
9             Do you see that?
10       A.   Yes, I see it.
11       Q.   Vis-à-vis the relationship
12  with UPS, you were the client, right?
13            MR. LIMBACHER:  Object to
14       form.
15            THE WITNESS:  Yes.  Endo was
16       the client at this time.
17  BY MR. BUCHANAN:
18       Q.   Do I understand your
19  testimony correctly, ma'am, that to the
20  best of your knowledge, as of 2013, Endo
21  was not visiting any of its customers
22  that it deemed suspicious, correct?
23            MR. LIMBACHER:  Object to
24       form.  Foundation.  Misstates her

Page 632

1   testimony.
2             THE WITNESS:  I believe
3        Qualitest was doing customer site
4        visits.
5   BY MR. BUCHANAN:
6        Q.   As of February 13, 2013,
7   ma'am?
8        A.   I don't know the exact date
9   that Qualitest started doing customer
10  visits, but I know they did customer
11  visits.
12       Q.   At a point in time they did,
13  correct?
14       A.   Correct.  I don't know the
15  date when that started.
16       Q.   You know they revamped their
17  SOM system, too, after the DEA came and
18  knocked on their door in 2013, right?
19            MR. LIMBACHER:  Object to
20       form.
21            THE WITNESS:  I can't speak
22       to Qualitest's SOM program.
23  BY MR. BUCHANAN:
24       Q.   Then let's focus on Endo's

Page 633

1   SOM program.
2             At this point in time, in
3   February of 2013, are you aware of any
4   Endo employees going and visiting
5   customers that it deemed suspicious?
6             MR. LIMBACHER:  Object to
7        form.  Asked and answered.
8             THE WITNESS:  Not that I
9        recall.
10  BY MR. BUCHANAN:
11       Q.   Any customers of Endo
12  customers that it seemed suspicious?
13            MR. LIMBACHER:  Object to
14       form.  Asked and answered.
15            THE WITNESS:  Not that I
16       recall.
17  BY MR. BUCHANAN:
18       Q.   Okay.  There's also a
19  question about how do you know your
20  customer's customer.
21            Do you see that?
22       A.   Question 10 I'm assuming
23  you're referring to?
24       Q.   Yes.

159 (Pages 630 to 633)

Highly Confidential - Subject to Further Confidentiality Review

Page 634

1    A.   Uh-huh.
2    Q.   It was a question that was
3  being put by Endo to UPS, right?
4    A.   Yes.
5    Q.   Okay.  And as of this point
6  in time, they didn't have that
7  functionality where they were visiting
8  customers' customers or knowing
9  customers' customers, right?
10       MR. LIMBACHER:  Object to
11    form.
12       THE WITNESS:  That's what it
13    states.
14  BY MR. BUCHANAN:
15    Q.   And you didn't either,
16  right?
17    A.   Endo did not provide -- do
18  not do site visits.  But I believe
19  Qualitest started to.  Again, I don't
20  know the exact date.
21    Q.   Let's just talk about Endo.
22       You do have knowledge about
23  Endo, correct?
24    A.   I do.

Page 635

1    Q.   And to the best of your
2  knowledge, Endo never conducted site
3  visits of its customers or its customers'
4  customers, correct?
5       MR. LIMBACHER:  Object to
6    form.  Asked and answered.
7       THE WITNESS:  Endo did not,
8    but our generics division,
9    Qualitest, did.
10  BY MR. BUCHANAN:
11    Q.   Do you know when that
12  started, ma'am?
13    A.   I do not know the exact date
14  at this time.
15    Q.   And you certainly couldn't
16  sit there and say they were doing it
17  prior to this teleconference, right?
18       MR. LIMBACHER:  Object to
19    form.
20       THE WITNESS:  No, I can't
21    confirm that.
22  BY MR. BUCHANAN:
23    Q.   Okay.  Who would be the
24  person to ask on that?

Page 636

1    A.   When Qualitest did their
2  site visits?
3    Q.   Uh-huh.
4    A.   Somebody from Qualitest.
5    Q.   Tracey Hernandez?
6    A.   That would be a person to
7  start with.
8    Q.   How about, Do you utilize
9  chargeback data?
10       That was a question from you
11  to UPS, right?
12    A.   That's correct.
13    Q.   Why were you asking UPS
14  whether they utilized chargeback data,
15  ma'am?
16    A.   Probably just trying to get
17  an understanding of their SOM program.
18    Q.   Did you, in fact, have an
19  understanding, at that point in time,
20  that the DEA wanted manufacturers to use
21  chargeback data?
22    A.   I can't recall.
23       MR. LIMBACHER:  Object to
24    form.

Page 637

1  BY MR. BUCHANAN:
2    Q.   Okay.  And they said, what?
3  They weren't doing that at that point in
4  time, right?
5       MR. LIMBACHER:  Object to
6    form.
7       THE WITNESS:  That's what it
8    states.
9  BY MR. BUCHANAN:
10    Q.   Okay.  Number 12, What type
11  of trending do you do, if any?
12       Do you see that question
13  from Endo to UPS?
14    A.   Uh-huh.
15    Q.   And why were you asking
16  about trending at that point in time?
17    A.   Probably just trying to get
18  an understanding of their SOM program.
19    Q.   Did you know that the DEA
20  was interested in manufacturers doing
21  trending analyses as of this point in
22  time?
23    A.   Not that I recall.
24       MR. LIMBACHER:  Object to

Highly Confidential - Subject to Further Confidentiality Review

Page 638

1    form.
2         THE WITNESS:  Not that I
3    recall.
4    BY MR. BUCHANAN:
5         Q.   As of this point in time, we
6    can agree that Endo wasn't doing
7    trending, correct?
8         MR. LIMBACHER:  Object to
9    form.  Misstates the evidence.
10        THE WITNESS:  Not that I
11   recall.
12   BY MR. BUCHANAN:
13        Q.   Okay.  Do you modify your
14   program based on current diversion
15   trends?
16        Do you see that item?
17        A.   I do.
18        Q.   And why were you asking UPS,
19   at this point in time, that question?
20        A.   Probably just trying to get
21   information about the SOM program.
22        Q.   In fact, you learned from
23   the DEA that they were interested in
24   manufacturers being sensitive to current

Page 639

1    diversion trends and modifying their
2    effective controls; isn't that right,
3    ma'am?
4         A.   I can't speak to that, no.
5         Q.   Okay.
6         MR. BUCHANAN:  Can I please
7    have 736?
8         How am I doing on time?
9         VIDEO TECHNICIAN:  You have
10   23 minutes.
11        MR. BUCHANAN:  Thank you.
12        Do you have it already over
13   there or you're waiting for it
14   from us?
15        MR. LIMBACHER:  What are we
16   talking about?
17        MR. BUCHANAN:  If we haven't
18   passed you a new exhibit, you
19   don't have it yet.
20        MR. LIMBACHER:  You have not
21   just yet.
22        MR. BUCHANAN:  Okay.
23        Can we agree, with all
24   counsel, to just do it on the

Page 640

1    screen and move this along?  We
2    can certainly supplement it for
3    the record and identify it by
4    Bates number.
5         MR. LIMBACHER:  Let's give
6    him just a minute or two more to
7    see.
8         MR. BUCHANAN:  If not, we'll
9    just make a copy outside.  It's
10   fine.
11        MR. LIMBACHER:  Do you have
12   a lot of questions?
13        MR. BUCHANAN:  I don't.
14        THE WITNESS:  I'm okay with
15   it on the screen, if you're okay
16   with it.
17        MR. LIMBACHER:  Let's just
18   see if he can find it.
19        MR. BUCHANAN:  Thank you.
20   Sorry to put you on the spot like
21   that, Scott.
22        MR. SIEGEL:  736, being
23   marked as Exhibit-37.
24        - - -

Page 641

1         (Whereupon, EndoWalker
2    Exhibit-37, No Bates, 7/16/13
3    E-mail from Laurel McDermott to
4    Sanjay Patel; Subject: SOMS
5    Customer Letter & Sales Rep
6    Talking Points, was marked for
7    identification.)
8         - - -
9    BY MR. BUCHANAN:
10        Q.   I'm passing over what we
11   marked as Exhibit-736 -- I'm sorry, 37.
12   Thank you.  It's been a day, my
13   apologies.
14        MR. LIMBACHER:  It's been a
15   long day.
16   BY MR. BUCHANAN:
17        Q.   It's an e-mail from Ms.
18   McDermott to yourself and two other
19   individuals.
20        Do you see this?
21        A.   Yes.
22        Q.   Sanjay Patel, Lisa Walker
23   and Kevin O'Brien as recipients?
24        A.   I see that.

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 642

1    Q.   Who is Laurel McDermott?
2    A.   She was an admin at the
3  time.
4    Q.   Sanjay Patel?
5    A.   I don't remember his title.
6    Q.   Which function?
7    A.   I believe supply chain,
8  maybe. I can't confirm.
9    Q.   Kevin O'Brien?
10   A.   He was my boss at the time.
11   Q.   So to three people in supply
12 chain?
13   A.   I was not part of supply
14 chain.
15   Q.   At this point in time?
16   A.   No, I was not.
17   Q.   What function would you
18 characterize your --
19   A.   I mean, I was in customer
20 service and distribution, but we were not
21 part of supply chain.
22   Q.   Understood, okay.
23        So yourself and your boss,
24 Mr. O'Brien. The subject is, SOMS

Page 643

1  customer letter and sales rep talking
2  points.
3        Do you see that?
4    A.   I do.
5    Q.   It says, Hi, Brian, you may
6  recall from various discussions that on
7  March 6, 2013, DEA notified Endo at a
8  meeting that took place in Washington the
9  need to bolster the suspicious order
10 monitoring program.
11       Do you see that?
12   A.   Yes.
13   Q.   They presented over 200
14 slides of data showing Endo/Qualitest
15 product sales specifically for those
16 distributors and pharmacies for which
17 they considered outliers and potential
18 diversion.
19       Did I read that correctly?
20   A.   Uh-huh.
21   Q.   DEA has asked Endo to
22 improve -- do you see that, ma'am?
23   A.   I do.
24   Q.   -- initial order evaluation

Page 644

1  for direct customers. UPS doing it for
2  Endo does not suffice.
3        Did I read that correctly?
4    A.   That's what it states. But
5  that's incorrect, because remember, we
6  had an SOM program in place at this time,
7  and so did UPS.
8        MR. BUCHANAN:  Move to
9  strike.
10 BY MR. BUCHANAN:
11   Q.   It says, DEA has asked Endo
12 to improve initial order evaluation for
13 direct customers. UPS doing it for Endo
14 does not suffice.
15       Did I read that correctly;
16 yes or no?
17   A.   Yes, you read it correctly.
18 But it's not a correct statement.
19   Q.   Thank you. Let's go on.
20       DEA has asked Endo to
21 improve use of chargeback data to review
22 indirect customers.
23       Did I read that correctly?
24   A.   You did.

Page 645

1    Q.   DEA has asked Endo to
2  improve customer due diligence visits,
3  potentially of both direct and indirect
4  customers.
5        Did I read that correctly?
6    A.   You did.
7    Q.   In addition, they have
8  stated they will inspect Endo by end of
9  year to ensure the corrective actions
10 have been implemented.
11       Correct?
12   A.   That's what it states.
13       MR. LIMBACHER:  Can I just
14 put on the record an objection to
15 questions with regard to
16 Exhibit-37, to the extent it's
17 outside of the scope of the direct
18 examination.
19       MR. BUCHANAN:  I think it's
20 fully within the scope. It's
21 fully within the scope. But,
22 sure, you can state that.
23 BY MR. BUCHANAN:
24   Q.   Attached documents list the

162  (Pages 642 to 645)

Page 646

1  requirements and the Qualitest progress
2  to date.  We are planning to update DEA
3  in approximately two months on the
4  progress we have made with Qualitest.  We
5  will need to similarly share our plans
6  with the branded products.
7           Did I read that correctly?
8        A.   You read it correctly, yes.
9        Q.   Did the DEA -- excuse me,
10  withdrawn.
11          We can agree that at no
12  point in time after this exchange and
13  after the meeting with the DEA in 2013
14  did Endo commence the use of chargeback
15  data to review indirect customers,
16  correct?
17          MR. LIMBACHER:  With regard
18  to branded opioids?
19          MR. BUCHANAN:  Yes.
20          THE WITNESS:  I was not part
21  of this discussion with the DEA on
22  March 6th, 2013.  And I think we
23  spoke earlier about the chargeback
24  data related to branded.

Page 647

1  BY MR. BUCHANAN:
2        Q.   Is that, then, you agree
3  with me, ma'am, that after this exchange
4  on which you're copied that purports to
5  memorialize or summarize, in some way, a
6  March 6th, 2013 DEA meeting, that after
7  that, the branded did not use chargeback
8  data to review indirect customers,
9  correct?
10          MR. LIMBACHER:  Object to
11  form.  Misstates her prior
12  testimony.
13  BY MR. BUCHANAN:
14        Q.   You can answer.
15          MR. LIMBACHER:  We can go
16  over it all over again if you
17  want.
18          MR. BUCHANAN:  I think a yes
19  would have been faster than your
20  speech.
21  BY MR. BUCHANAN:
22        Q.   Go ahead.
23        A.   No, we did not use
24  chargeback data.  But I believe I

Page 648

1  explained earlier as to why we did not.
2        Q.   And, again, confirming at
3  least their understanding, based on your
4  testimony today, customer due diligence,
5  in terms of Endo branded, were not
6  commenced of either direct or indirect
7  customers following the DEA visit,
8  correct, ma'am?
9          MR. LIMBACHER:  Object to
10  form.  Asked and answered.
11          THE WITNESS:  No, the
12  branded side did not.  But our
13  Qualitest partners did.
14  BY MR. BUCHANAN:
15        Q.   And did you keep a file of
16  the Qualitest due diligence visits in
17  your SOM group?
18        A.   No.  That was housed at
19  Qualitest.
20        Q.   So where would you go within
21  Endo, ma'am, to get the results of the
22  Qualitest due diligence visits so that
23  you could assess your customers and
24  customers of customers?

Page 649

1        A.   I would have gone to
2  Qualitest, if I needed to.
3        Q.   At what point in time did
4  you reach out to Qualitest and get the
5  results of their due diligence visits?
6          MR. LIMBACHER:  Object to
7  form.
8          THE WITNESS:  I didn't.
9  Because they didn't come to me
10  that there was an issue with the
11  Endo customers.
12  BY MR. BUCHANAN:
13        Q.   To the best of your
14  knowledge, ma'am, the results of the
15  Qualitest due diligence visits did not
16  impact any Endo customers, that's your
17  understanding?
18          MR. LIMBACHER:  Object to
19  form.
20          THE WITNESS:  That's my
21  understanding.
22          MR. BUCHANAN:  Thank you.
23  No further questions.
24          MR. LIMBACHER:  Can we just

163  (Pages 646 to 649)

Highly Confidential - Subject to Further Confidentiality Review

Page 650

1  take a very short break?
2  VIDEO TECHNICIAN: Going off
3  the record. The time is 6:57.
4  - - -
5  (Whereupon, a brief recess
6  was taken.)
7  - - -
8  MR. LIMBACHER: No further
9  questions. We are done. Thank
10  you very much.
11  - - -
12  (Whereupon, the deposition
13  concluded at 7:02 p m.)
14  - - -
15
16
17
18
19
20
21
22
23
24

Page 652

1  INSTRUCTIONS TO WITNESS
2
3  Please read your deposition
4  over carefully and make any necessary
5  corrections. You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8  After doing so, please sign
9  the errata sheet and date it.
10  You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14  It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you. If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 651

1  CERTIFICATE
2
3
4  I HEREBY CERTIFY that the
5  witness was duly sworn by me and that the
6  deposition is a true record of the
7  testimony given by the witness.
8
9
10
11  Amanda Maslynsky-Miller
   Certified Realtime Reporter
   Dated: December 5, 2018
12
13
14
15
16
17  (The foregoing certification
18  of this transcript does not apply to any
19  reproduction of the same by any means,
20  unless under the direct control and/or
21  supervision of the certifying reporter.)
22
23
24

Page 653

1  - - - - - -
   E R R A T A
2  - - - - - -
3  PAGE LINE CHANGE/REASON
4  ____ ____ _____
5  ____ ____ _____
6  ____ ____ _____
7  ____ ____ _____
8  ____ ____ _____
9  ____ ____ _____
10  ____ ____ _____
11  ____ ____ _____
12  ____ ____ _____
13  ____ ____ _____
14  ____ ____ _____
15  ____ ____ _____
16  ____ ____ _____
17  ____ ____ _____
18  ____ ____ _____
19  ____ ____ _____
20  ____ ____ _____
21  ____ ____ _____
22  ____ ____ _____
23  ____ ____ _____
24  ____ ____ _____

164 (Pages 650 to 653)

Highly Confidential - Subject to Further Confidentiality Review

Page 654

1       ACKNOWLEDGMENT OF DEPONENT
2
3           I,_____, do
        hereby certify that I have read the
        foregoing pages, 1 - 650, and that the
4       same is a correct transcription of the
        answers given by me to the questions
5       therein propounded, except for the
        corrections or changes in form or
6       substance, if any, noted in the attached
        Errata Sheet.
7
8       _____
        LISA WALKER            DATE
9
10
        Subscribed and sworn
11      to before me this
        _____ day of _____, 20____.
12
        My commission expires:_____
13
14      _____
        Notary Public
15
16
17
18
19
20
21
22
23
24

Page 655

1           LAWYER'S NOTES
2       PAGE  LINE
3       ____ ____ _____
4       ____ ____ _____
5       ____ ____ _____
6       ____ ____ _____
7       ____ ____ _____
8       ____ ____ _____
9       ____ ____ _____
10      ____ ____ _____
11      ____ ____ _____
12      ____ ____ _____
13      ____ ____ _____
14      ____ ____ _____
15      ____ ____ _____
16      ____ ____ _____
17      ____ ____ _____
18      ____ ____ _____
19      ____ ____ _____
20      ____ ____ _____
21      ____ ____ _____
22      ____ ____ _____
23      ____ ____ _____
24      ____ ____ _____