1          IN THE UNITED STATES DISTRICT COURT
2              NORTHERN DISTRICT OF OHIO
3                  EASTERN DIVISION
4
                ~~~~~~~~~~~~~~~~~~~~
5
6     IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804
      OPIATE LITIGATION
7                                  Case No. 17-md-2804
8                                  Judge Dan Aaron
      This document relates to:      Polster
9
10    The County of Cuyahoga v. Purdue
      Pharma L.P., et al.
11    Case No. 18-OP-45090
12    City of Cleveland, Ohio v. Purdue
      Pharma L.P., et al
13    Case No. 18-OP-45132
14    The County of Summit, Ohio, et al.
      v. Purdue Pharma L.P., et al.
15    Case No. 17-OP-45004
16
                ~~~~~~~~~~~~~~~~~~~~
17
18            Videotaped deposition of
                  CHERI WALTER
19
20              February 19, 2019
                   9:04 a.m.
21
22                 Taken at:
         Murray Murphy Moul & Basil LLP
23              1114 Dublin Road
                Columbus, Ohio
24
25        Renee L. Pellegrino, RPR, CLR

Page 2

1 APPEARANCES:
2 On behalf of Summit County and City of Akron:
    Motley Rice
3   ANNE KEARSE, ESQ.
    NATALIE DEYNEKA, ESQ.
4   28 Bridgeside Boulevard
    Mt. Pleasant, South Carolina  29464
5   (843) 216-9343
    akearse@motleyrice.com
6   ndeyneka@motleyrice.com
  On behalf of the Witness:
7   CHRISTINA SHAYNAK-DIAZ, ESQ.
8   3488 Woodland Avenue
    Hilliard, Ohio  43026-2101
9   (614) 832-9143
    sdlaw@outlook.com
10
  On behalf of Walmart, Inc.:
11  Jones Day
    BRANDY RANJAN, ESQ.
12  325 John J. McConnell Boulevard
    Suite 600
13  Columbus, Ohio  43215-2673
    (614) 469-3939
14  branjan@jonesday.com
15 On behalf of McKesson Corporation:
    (Via Telephone and Veritext Virtual)
16  Covington & Burling
    BRYANT PULSIPHER, ESQ.
17  One Front Street
    San Francisco, California  94111-5356
18  (415) 591-6000
    bpulsipher@cov.com
19
  On behalf of Cardinal Health:
20  Williams & Connolly LLP
    COLLEEN McNAMARA, ESQ.
21  725 12th Street, N.W.
    Washington, D.C.  20005
22  (202) 434-5186
    cmcnamara@wc.com
23      ~ ~ ~ ~ ~
24
25

Page 3

1 APPEARANCES, CONT'D:
2 On behalf of Johnson & Johnson and Janssen
    Pharmaceuticals, Inc.:
3   Tucker Ellis LLP
    TARIQ NAEEM, ESQ.
4   950 Main Avenue, Suite 1100
    Cleveland, Ohio  44113-7213
5   (216) 592-5000
    tariq.naeem@tuckerellis.com
6
  On behalf of CVS Indiana, LLC and CVS Rx Services,
7 Inc.:
    Zuckerman Spaeder LLC
8   KYLE A. CRAWFORD, ESQ.
    1800 M Street NW
9   Suite 1000
    Washington, D.C.  20036-5807
10  (202) 778-1825
    kcrawford@zuckerman.com
11
  On behalf of AmerisourceBergen Drug Corporation:
12  (Via Telephone and Veritext Virtual)
    Reed Smith
13  M. PATRICK YINGLING, ESQ.
    10 South Wacker Drive
14  40th Floor
    Chicago, Illinois  60606-7507
15  (312) 207-1000
    mpyingling@reedsmith.com
16
17 ALSO PRESENT:  Kurt Henschel, Videographer
18
        ~ ~ ~ ~ ~
19
20
21
22
23
24
25

Page 4

1         TRANSCRIPT INDEX
2
3 APPEARANCES ......................................2
4 INDEX OF EXHIBITS ..............................5
5 INDEX OF OBJECTIONS ..........................8
6
7 EXAMINATION OF CHERI WALTER:
8 BY MS. McNAMARA ...............................10
9 BY MR. CRAWFORD .............................194
10 BY MR. NAEEM .................................214
11 BY MS. RANJAN .................................240
12 BY MS. KEARSE .................................250
13
14 AFTERNOON SESSION ...........................146
15
16 REPORTER'S CERTIFICATE ....................262
17
18 EXHIBIT CUSTODY - RETAINED BY COURT REPORTER
19
20
21
22
23
24
25

Page 5

1       INDEX OF EXHIBITS
2
3  Number      Description        Marked
4
5 Exhibit 1   Cheri L. Walter, LICDC Website   17
6             Biography
7 Exhibit 2   Two-Page Document Entitled   53
8             "Ohio's Alcohol, Drug Addiction,
              and Mental Health Boards,
9             Community Boards Responding to
              Community Needs"
10 Exhibit 3  E-Mail from Cheri Walter to   61
11            Several Recipients, Dated April
              3, 2009, Beginning Bates Number
12            CUYAH_012387509 - Marked
              Confidential
13 Exhibit 4  E-Mail String, Beginning Bates   68
14            Number CUYAH_012384852 - Marked
              Confidential
15 Exhibit 5  Multi-Page Document Entitled   86
16            "Opiate Pharmacotherapy
              Whitepaper January 2007"
17 Exhibit 6  Opiate Task Force Meeting Notes,   94
18            March 17, 2010, Beginning Bates
              Number OACBHA-00010305
19 Exhibit 7  Multi-Page Document Entitled   96
20            "Community Opiate Task Force
              Development," Beginning Bates
21            Number OACBHA-00020567
22 Exhibit 8  Multi-Page Document Entitled   101
23            "Ohio's Opiate Epidemic:
              Responding With Prevention &
              Treatment," Beginning Bates
              Number OACBHA-00020498
24
25

2 (Pages 2 - 5)

Page 6

INDEX OF EXHIBITS, CONT'D

Exhibit 9   Multi-Page Document Entitled   116
            "Ohio's Opiate Epidemic:  A
            Summit on Policy, Prevention &
            Treatment," Beginning Bates
            Number CUYAH  015850477

Exhibit 10  Multi-Page Document Entitled   129
            "Ohio's 2012 Opiate Summit:
            Miles Traveled - Miles Ahead"

Exhibit 11  Ohio Legislative Update, Dated   140
            February 2012, Beginning Bates
            Number OhioMHAS S 001

Exhibit 12  Multi-Page Document Entitled   146
            "Ohio's Opiate Issues, Ashtabula
            County Opiate Summit," Dated
            October 14, 2011

Exhibit 13  E-Mail from Cheri Walter to    159
            Several Recipients, Dated
            October 17, 2013, Beginning
            Bates Number CUYAH_012613450 -
            Marked Confidential

Exhibit 14  Multi-Page Document Entitled   160
            "Ohio House of Representatives
            Prescription Drug Addiction and
            Healthcare Reform Legislative
            Study Committee Chairman's
            Report," Dated October 17, 2013,
            Beginning Bates Number
            CUYAH_012613466 - Marked
            Confidential

Exhibit 15  E-Mail from Cheri Walter to    169
            Several Recipients, Dated
            January 7, 2014, Beginning Bates
            Number CUYAH_012609544 - Marked
            Confidential

Exhibit 16  E-Mail String Bates Numbered   179
            SUMMIT_001090134

Page 8

INDEX OF OBJECTIONS

Objection .................................55
Objection .................................60
Objection .................................80
Objection .................................90
Objection ................................104
Objection ................................105
Objection ................................106
Objection ................................107
Objection ................................108
Objection ................................120
Objection ................................121
Objection ................................122
Objection ................................123
Objection ................................123
Objection ................................126
Objection ................................133
Objection ................................137
Objection ................................156
Objection ................................157
Objection ................................158
Objection ................................165
Objection ................................165
Objection ................................171
Objection ................................180
Objection ................................203
Objection ................................204
Objection ................................211
Objection ................................211
Objection ................................212
Objection ................................224
Objection ................................241
Objection ................................244
Objection ................................245
Objection ................................245
Objection ................................247
Objection ................................251
Objection ................................251
Objection ................................253
Objection ................................254
Objection ................................257
Objection ................................260

Page 7

INDEX OF EXHIBITS, CONT'D

Exhibit 17  E-Mail String Beginning Bates  183
            Number SUMMIT_001104515

Exhibit 18  Ohio Prescription Drug Abuse    198
            Task Force Final Report, Task
            Force Recommendations, Dated
            October 1, 2010

Exhibit 19  Testimony of Cheri L. Walter,   246
            Senate Finance Committee, Dated
            May 30, 2009

Page 9

1          THE VIDEOGRAPHER:  We're on the
2   record at 9:04.  Today's date is February 19,
3   2019.  We are here in the matter of the National
4   Prescription Opiate Litigation.  This deposition
5   is taking place in Columbus, Ohio.
6          Would counsel please identify
7   themselves for the record?
8          MS. SHAYNAK-DIAZ:  Christina
9   Shaynak-Diaz.  I represent the witness, Cheri
10  Walter.
11         MS. KEARSE:  Anne Kearse with Motley
12  Rice on behalf of the City of Akron and County
13  of Summit.
14         MS. DEYNEKA:  Natalie Deyneka with
15  Motley Rice on behalf of the City of Akron and
16  the County of Summit.
17         MS. RANJAN:  Brandy Ranjan from
18  Jones Day on behalf of Walmart.
19         MR. CRAWFORD:  Kyle Crawford on
20  behalf of CVS Indiana and CVS Rx Services.
21         MR. NAEEM:  Tariq Naeem, Tucker
22  Ellis, on behalf of Janssen Pharmaceuticals,
23  Inc. and Johnson & Johnson.
24         MS. McNAMARA:  Colleen McNamara from
25  Williams & Connolly on behalf of Cardinal

3 (Pages 6 - 9)

1 Health.
2        THE VIDEOGRAPHER:  And by telephone?
3        MR. YINGLING:  This is Patrick
4 Yingling with Reed Smith on behalf of
5 AmerisourceBergen.
6        MR. PULSIPHER:  Bryant Pulsipher,
7 Covington & Burling, on behalf of McKesson.
8        CHERI WALTER, of lawful age, called for
9 examination, as provided by the Federal Rules
10 of Civil Procedure, being by me first duly
11 sworn, as hereinafter certified, deposed and
12 said as follows:
13        EXAMINATION OF CHERI WALTER
14 BY MS. McNAMARA:
15    Q.   Good morning, Ms. Walter.
16    A.   Good morning.
17    Q.   Have you ever been deposed before?
18    A.   I have.
19    Q.   How many times?
20    A.   Well, it depends.  I mean, I don't
21 know how to answer that question.  When I worked
22 for the Department of Youth Services and the
23 Department of Job and Family Services, I
24 occasionally was deposed over labor things, and
25 so I don't know if that was the same -- so it

1 was by the unions.
2    Q.   Got it.
3    A.   And I've been deposed once
4 otherwise.
5    Q.   Once in the context of litigation?
6    A.   Yeah.
7    Q.   What was that case about?
8    A.   There was a litigation against the
9 Department of Job and Family Services and
10 Medicaid, and the lawsuit didn't really go
11 anywhere but I was deposed one time.  And it
12 wasn't against me.  It was against the
13 department.
14    Q.   Gotcha.
15        And about how long ago was that?
16    A.   Oh, it was the first year I was
17 there, so it would have probably been 2000 --
18 just 2000.
19    Q.   So it's been a while, it sounds
20 like?
21    A.   Yeah.
22    Q.   So I'll just start by going over
23 some ground rules to make it as painless as
24 possible today.
25        We have a court reporter here who is

1 taking down everything we say, so in order for
2 her to get a clear record, it's important that
3 we try not to talk over each other.
4    A.   Sure.
5    Q.   So I will do my best to wait for you
6 to finish answering all my questions and I'd
7 appreciate it if you did the same for me.  Okay?
8    A.   Sure.
9    Q.   It's also important, again for the
10 record, that you respond in words, which you've
11 been doing so far, because uh-huhs and unh-unhs
12 are difficult to transcribe.  Okay?
13    A.   Sure.
14    Q.   And we will take breaks
15 periodically.  If at any time you would like to
16 break, just let me know.  All I ask is that if
17 there's a pending question, you answer it before
18 we go off the record.
19    A.   Sure.
20    Q.   Is there any reason you might not be
21 able to testify truthfully and accurately today?
22    A.   No.
23    Q.   Great.
24        So you understand -- do you
25 understand that you are being deposed in

1 connection with some litigation?
2    A.   I do.
3    Q.   Do you have an understanding of the
4 subject matter of the litigation?
5    A.   Basically, yes.
6    Q.   And what's your understanding?
7    A.   My understanding is that several
8 cities or some cities and different governments
9 are suing some of the distributors and some of
10 the manufacturers in regards to the opiate
11 epidemic both in Ohio and elsewhere in the
12 country.
13    Q.   And how did you learn about the
14 cases?
15    A.   Well, based on my job, I certainly
16 read a lot about what's going on in the opiate
17 space, and there was some discussion on occasion
18 early on with my different boards because their
19 counties were getting involved.
20    Q.   Got it.
21        And you mentioned your job.  That's
22 your job as chief executive officer for the Ohio
23 Association of County Behavioral Health
24 Authorities?
25    A.   That's correct.

4 (Pages 10 - 13)

Page 14

1    Q.    And can we refer to that as OACBHA?
2    A.    Absolutely.
3    Q.    Great.  It is a pretty fun acronym
4  to say.
5          So do you have an understanding of
6  what the Plaintiffs in the litigation are
7  alleging the Defendants did wrong?
8    A.    I have a general idea.  I mean, I
9  believe that what I understand the Plaintiffs
10  are alleging is that because of the
11  over-prescribing of opiates, the belief is that
12  that contributed to the overall opiate epidemic.
13  I'm not always sure exactly how -- like I don't
14  understand at all how the pharmacies are here,
15  to be quite honest, so I guess beyond the wide
16  breadth of the lawsuit, but I do understand the
17  concept.
18    Q.    And do you know what kind of relief
19  the Plaintiffs are seeking in the case?
20    A.    I'm assuming financial.  I don't
21  know to what extent.
22    Q.    Do you know how the Plaintiff cities
23  and counties calculated the financial relief
24  they're seeking?
25    A.    I do not.

Page 15

1    Q.    Did you meet with anyone to prepare
2  for your deposition today?
3    A.    I did not.
4    Q.    Have you, before we all introduced
5  ourselves today, met with any of the attorneys
6  who are representing Summit County?
7    A.    I have not.  The only person I had
8  even talked to prior to this was Christina.
9    Q.    So also no for Cuyahoga County?
10    A.    No.
11    Q.    And no for any Defendant in the
12  case, correct?
13    A.    I have not talked to them.  I -- let
14  me be clear.  I knew that two of my directors
15  were involved with the lawsuit.  I actually
16  asked one of my directors because I knew he had
17  been deposed, and he said, "Cheri, we should not
18  talk about this."  The first question I was
19  asked was who I talked to.  So since then I've
20  talked to nobody.  I made it a conscious choice
21  and I talked to Christina about that.  So I've
22  talked to nobody.  And that was the extent of my
23  conversation with him, frankly.
24    Q.    And the two directors are Jerry --
25  one is Jerry Craig?

Page 16

1    A.    One is Jerry Craig and the other
2  one -- and I don't know whether both of them
3  have been deposed at this point, but it would
4  have been Scott Osiecki, because I believe
5  Cuyahoga County was one -- they were like the
6  Bellwether counties or something.  I don't quite
7  understand that, but that was my understanding.
8    Q.    Did you independently review any
9  documents relating to the subject matter of this
10  litigation?
11    A.    You know, I did not.  I've made a
12  conscious choice, because I'm not a party, to
13  not become more involved.
14    Q.    So throughout the day we are going
15  to be talking about opiates and opioids.
16    A.    Certainly.
17    Q.    Do you have an understanding of
18  those terms?
19    A.    I do.
20    Q.    Do you use the terms "opiate" and
21  "opioid" interchangeably?
22    A.    We do.  We try not always to but we
23  do.
24    Q.    Is there a difference between the
25  two in your mind?

Page 17

1    A.    Opiates tends to be more like the
2  heroin.  Opioids is the larger class of anything
3  that includes an opiate in it, whether it's
4  prescription drug or otherwise.
5    Q.    So let's start off by talking about
6  you and your background.
7    A.    Okay.
8    Q.    I'm going to mark this document as
9  Exhibit 1.
10          - - - - -
11          (Thereupon, Walter Deposition
12          Exhibit 1, Cheri L. Walter, LICDC
13          Website Biography, was marked for
14          purposes of identification.)
15          - - - - -
16    A.    This is kind of my biography, yeah.
17    Q.    Do you recognize this?
18    A.    Yes.
19    Q.    What is it?
20    A.    I believe it's my short bio on my
21  website is my guess, yes.
22    Q.    And did you prepare this?
23    A.    I think a staff prepared it for me,
24  but I certainly approved it, yes.
25    Q.    So your bio indicates that you got a

5 (Pages 14 - 17)

Page 18

1 Bachelor's from Blufton College; is that
2 correct?
3     A.   That's correct.
4     Q.   And so can you just walk us through
5 a chronology of your professional career since
6 you graduated from college through your current
7 position at OACBHA?
8     A.   Sure.
9         I actually -- I graduated from
10 Blufton College.  For a period of time I worked
11 for the City of Rittman as a dispatcher.  I was
12 waiting to go into a Master's program.  I
13 ultimately did not go into that Master's
14 program, at which time I worked for the
15 Department of Mental Health at Toledo Mental
16 Health Center.  At that time it was about a
17 1,500-bed state hospital.
18         After working there, I went to the
19 Center for Change, which was a drug and alcohol
20 program in Tiffin, Ohio.
21         Following that, I went to Sandusky
22 Alcoholism Center in a halfway house.  I worked
23 at a halfway house.
24         Following that, I came to Columbus
25 and worked at Maryhaven and helped open up their

Page 19

1 first adolescent drug and alcohol center.
2         When they closed a years later, I
3 worked for 15 years for the Department of Youth
4 Services and I ran all their drug and alcohol,
5 mental health, sex offenders, developmental
6 disability -- I ran all the programs for all the
7 institutions and for the department.  I was the
8 deputy director there.
9         From there I went for a couple
10 years, two and a half years -- actually, about
11 two years and eight months I was with the
12 Department of Job and Family Services.  I helped
13 merge the Department of Human Services and the
14 Department of OBES into what is now the
15 Department of Job and Family Services.
16         Following that, and for the last 17
17 and a half years, I have been at the Ohio
18 Association of County Behavioral Health
19 Authorities.  I helped establish the
20 association.  It was previously three
21 associations.  They disbanded those three
22 associations, decided to create one, and I was
23 the first CEO and have been there since.
24     Q.   Great.  Thank you.
25         So just to kind of go back and put a

Page 20

1 little bit of a timeline on that, so you were a
2 dispatcher for the City of Rittman briefly?
3     A.   One year.
4     Q.   One year.  And then you went to the
5 department of mental health at Toledo?
6     A.   About one year.
7     Q.   One year.  And what did you do
8 there?
9     A.   I was a recreational therapist
10 basically.  My degree was in health and
11 education at Blufton College.
12     Q.   And what does a recreational
13 therapist do?
14     A.   I actually worked second shift and
15 basically did recreational therapy with clients.
16 This was a state hospital, so these were
17 in-patient clients, so, you know, we just did
18 therapy type things with them.  It was not a
19 counselor position per se.  It was more of a rec
20 therapist.  You know, you took them out, you
21 played pool, you played games, those kind of
22 things, cards, just things to keep them active.
23 It was a long time ago.
24     Q.   And then you went to the Center for
25 Change?

Page 21

1     A.   I did.
2     Q.   How long were you there?
3     A.   I was there for about a year and a
4 half as a lead counselor, and I was asked then
5 by someone to go to Sandusky Valley Alcoholism
6 Center to be the assistant director over a
7 halfway house, and then the halfway house closed
8 and that was when I went to Maryhaven.
9     Q.   And how long were you assistant
10 director at the halfway house?
11     A.   It was so long ago.  Maybe a year,
12 year and a half.  Those three jobs were all in
13 pretty quick succession.
14     Q.   And then you went to Maryhaven?
15     A.   I did.
16     Q.   And about how long was that?
17     A.   That was about two and a half --
18 let's see.  It was maybe two and -- maybe three
19 and a half years, and then their unit closed.  A
20 lot of places closed.
21     Q.   The drug and alcohol adolescent --
22     A.   The adolescent center only.  The
23 inpatient adolescent center closed for a period
24 of time.
25     Q.   And then you were deputy director at

6 (Pages 18 - 21)

Page 22

1 the department?
2     A.   I went initially as an
3 administrator.  I helped open up their first
4 couple of residential drug and alcohol programs.
5 All in all, I was at the Department of Youth
6 Services about 15 years, so about six years as
7 an administrator and then eight plus years as a
8 deputy director.
9     Q.   And around what year did you start
10 with the Department of Youth Services?
11     A.   I believe -- I got to think.  I
12 believe it was in '85.
13     Q.   So you were there from roughly 1985
14 to roughly 2000?
15     A.   Yes.  I left there -- actually, I
16 left there in 1999, in November of '99.  Maybe
17 it was March of '99.  I don't remember.
18 Somewhere in there.  Actually, I believe it was
19 in March of '99 I left.
20     Q.   And as part of the many different
21 things you did there, it sounds like you
22 supervised or implemented programs relating to
23 substance use disorder?
24     A.   I did, for adolescents, yeah.  We
25 brought up several units within existing

Page 23

1 institutions and we actually created two
2 completely separate small treatment
3 institutions, one for young men and one for
4 young women, specific to drug and alcohol abuse.
5     Q.   And these are inpatient
6 institutions?
7     A.   Well, yes.  I mean, they were --
8 they were correctional institutions with
9 treatment programs within them.
10     Q.   At the time what was the most common
11 form of substance use disorder that these
12 patients had?
13     A.   A lot of alcohol, marijuana,
14 cocaine.  There may have been -- heroin would
15 have been pretty rare with kids that young.  So
16 the alcohol and marijuana would have been by far
17 the drugs of choice back then.
18     Q.   Any prescription drug abuse that you
19 recall?
20     A.   I'm not going to say there wasn't
21 any, but I don't remember it as at that point in
22 time having been prevalent.
23     Q.   And then you went to the Department
24 of Job and Family Services and you merged two
25 departments?

Page 24

1     A.   We did.  We helped merge two
2 departments.  It was human services, which had
3 at that point in time -- human services, it had
4 child welfare, it had Medicaid, it had child
5 support, and then there was the Bureau of
6 Employment Services.  And because human services
7 had so many welfare to work programs, they made
8 the decision to merge the two, and so because I
9 had worked a lot, they were having some problems
10 with child welfare and welfare and everything
11 going on, they asked me to come over and I
12 helped merge those two departments.
13     Q.   And they were merged into the --
14     A.   Department of Job and Family
15 Services, correct.
16     Q.   And that Department of Job and
17 Family Services still exists today?
18     A.   Correct.
19     Q.   And after that then you went and
20 helped establish OACBHA, correct?
21     A.   Correct.
22     Q.   So let's talk about OACBHA.
23         You alluded to the fact that three
24 organizations had existed previously.  Did I
25 hear that correctly?

Page 25

1     A.   Yeah.  There used to be -- well,
2 there still are technically -- three types of
3 boards.  There were ADAMH boards, alcohol drug
4 addiction and mental health boards, there were
5 just alcohol and drug abuse boards, and there
6 were community mental health boards.
7         At the time when I went, there were
8 43 combined boards, and then there were seven
9 separate alcohol and drug boards and seven
10 separate community mental health boards.  So for
11 a period of time before I ever got there, and I
12 never really worked with them that much, you had
13 one association just for the drug boards, you
14 had one association for what they called -- they
15 called it Met-Net at the time, which was all the
16 large mental health boards and a few of the
17 large combined boards, and then you had the
18 ADAMH board association.  So they had determined
19 that, in their legislative work and in their
20 advocacy work, having three different voices was
21 making no sense, so they brought all of those
22 associations down, they all came together,
23 created a charter, and decided to create one
24 association, and they hired me.
25     Q.   So what's the purpose of OACBHA?

7 (Pages 22 - 25)

Page 26

1    A.    We are the trade association for the
2 drug and alcohol and mental health boards across
3 the State of Ohio.  We represent them with the
4 legislature.  We represent them with the federal
5 government when necessary.  We represent them
6 with the administration, whether it's working
7 with the governor's office or one of the state
8 departments, Medicaid, alcohol and drug
9 addiction and mental health services.  It just
10 depends whichever department we need -- or
11 whichever department we need to work with.
12        We also do a fair amount of
13 education and training.  We hold conferences.
14 We hold a lot of educational different seminars
15 and so forth.  So we do a lot of that.  We do a
16 lot of mentoring with new directors.  We help
17 set up educational programs for new directors.
18 But in the cleanest sense, we're their trade
19 association.
20    Q.    So who are the members of -- strike
21 that.
22        So does OACBHA have members?
23    A.    We do.  Our members are the -- we
24 have 49 of the 51 alcohol, drug addiction and
25 mental health boards across the state as our

Page 27

1 members.
2    Q.    And do you have any members aside
3 from those boards?
4    A.    We do not at this point.  At one
5 point we had affiliate members.  We no longer
6 do.
7    Q.    And was that a choice to no longer
8 have affiliate members?
9    A.    It really wasn't something that took
10 off, so yes.
11    Q.    What does membership in OACBHA
12 entail for these counties?
13    A.    We try to create speaking with one
14 voice, so when they come together -- we have
15 bimonthly membership meetings.  We have
16 regular -- they elect their own leadership,
17 which is an executive council, to represent
18 them.  So we represent them with the
19 legislature.  We represent them with the
20 administration.  So it gives them that voice.
21 We provide them with a great deal of
22 information.  We do regular updates to them on
23 what's going on across the state, what's going
24 on with the budget.  We do budget advocacy for
25 them.  We represent not only the director of the

Page 28

1 board but we do a lot of work with board
2 members.
3        We've had a lot of turnover.  A lot
4 of my members have been retiring because they've
5 been in the field for a long time, so we also
6 help the board members, because each drug and
7 alcohol, mental health board has a local board
8 that's appointed by the county commissioners and
9 the governor's office, and so we help them.  If
10 they're hiring somebody new, we do succession
11 planning with them.  We actually do help them
12 set up -- do interviewing, anything like that.
13 So we offer that service to them.  We also do a
14 lot of training of local board members, which
15 are the community boards as well.
16    Q.    So what type of training do you
17 provide to local boards?
18    A.    Mostly things like we have one
19 that's called roles, rights and
20 responsibilities, so they know what their roles
21 are.  We do something pretty regularly called
22 state of the state, where we try to bring them
23 up to speed with what's going on at the
24 legislature and with the administration, maybe
25 with the federal government.

Page 29

1        We can do -- if they ask us to do
2 something specific -- we've gotten much more in
3 the last several years into strategic planning.
4 We've done several strategic planning sessions
5 with local boards, where we start from helping
6 them create visions and missions or updating
7 visions and missions all the way to developing a
8 strategic plan for a couple of years.
9        I don't do it, but I also have a
10 staff member who is responsible for something
11 called the Culture of Quality, which is
12 certifying boards, and she'll go out and train
13 on the -- I think there's 112 standards within
14 the Culture of Quality.  She'll go out and train
15 on those standards so a board knows how to
16 become certified and will help them develop a
17 plan to become certified.  Again, I don't
18 typically do that but I have a staff member that
19 does that.
20    Q.    And I think we're going to get into
21 a few of those things in more detail with some
22 documents later, but while we're on it, just on
23 the meetings point, you mentioned they're
24 bimonthly.  Does that mean -- I always get
25 confused -- twice a month or every other month?

8 (Pages 26 - 29)

1     A.   Sorry.  Every other month.
2     Q.   Okay.  Got it.
3          And how long are those meetings
4 typically?
5     A.   Typically we go from about 10 to 3.
6 If we have a really big agenda, we might go from
7 9:30 to 3:30, but they're typically 10 to 3.
8 Maybe once a year, and this has only happened
9 the last couple of years, we might do a retreat
10 that goes overnight.
11     Q.   And who typically attends those
12 meetings?
13     A.   Board directors and staff, so -- and
14 then if we have a guest speaker, and guest
15 speakers typically are someone from the state
16 department coming to give us an update about
17 what's going on within the department.
18          We occasionally might have a
19 legislator come talk to us if they've got some
20 bill pending that they want to inform us about,
21 but that would typically be who's there, and
22 then my staff and myself.
23     Q.   And is attendance mandatory for
24 members?
25     A.   It is not.

1     Q.   Do they typically attend in person,
2 by phone, combination?
3     A.   For our membership meetings, it's
4 only in person.  We don't have a phone option.
5     Q.   Are there agendas for those
6 membership meetings?
7     A.   Absolutely.
8     Q.   Who sets the agendas?
9     A.   I work in conjunction with my staff
10 and my president to set that agenda.
11     Q.   And the president, is that the
12 president of the executive council that you had
13 mentioned?
14     A.   That's correct.
15     Q.   So how do items get onto the agenda?
16 What's the process for that?
17     A.   Board directors, if they have a
18 specific issue they would want on there, they
19 let us know; otherwise, it's based pretty much
20 on what's going on.  I have a pretty good handle
21 on that and I'll talk to the president.
22          Our executive council meets every
23 month either by phone or in person and
24 oftentimes the executive council will help drive
25 what's on the next agenda as well.

1     Q.   Are minutes kept of the meetings?
2     A.   Correct.  Yes.
3     Q.   Who keeps the minutes?
4     A.   One of my staff.
5     Q.   And then are the minutes later
6 approved?
7     A.   Correct, at the following membership
8 meeting.
9     Q.   And by whom are they approved?
10     A.   The members.
11     Q.   Does OACBHA retain the minutes?
12     A.   We do.
13     Q.   Do you know how far back your
14 retention goes?
15     A.   I believe -- I don't want to swear
16 by this, but I believe we have them all the way
17 back to the beginning.  Todd keeps notebooks.
18 So I believe we do.
19     Q.   Does OACBHA follow any particular
20 procedure with respect to how it conducts the
21 meetings?
22     A.   I would say a loose interpretation
23 of Robert's Rules of Order.
24     Q.   And can you just give a brief
25 overview of OACBHA's interpretation of Robert's

1 Rules of Order?
2     A.   Sure.
3          We have minutes.  We have some
4 internal rules that minutes need to go out from
5 us after.  Within seven working days we send
6 them out.  If people have corrections, they'll
7 send them back.  When we have a membership
8 meeting, we take a motion and a second, there's
9 discussion, and then there's a vote.  And that
10 would be on all things, not just minutes.
11     Q.   Are members allowed to raise -- are
12 members able to raise new issues at the
13 membership meetings that are not already on the
14 agenda?
15     A.   Sure.
16     Q.   How does that work?
17     A.   It's not a formal process per se.
18 It typically happens in one of two ways.
19          In the last several years in the
20 beginning of our meeting we brought the director
21 of the Department of Mental Health and Addiction
22 Services, and he or she typically has 45 minutes
23 to an hour and he or she will go over kind of
24 what's going on in their department.  And there
25 are times that at the end she'll have or he'll

Page 34

1  have open discussion and our members will just
2  bring something up that had nothing to do with
3  anything that was on the agenda.
4       The other time that -- and it could
5  happen any time throughout, frankly, but the
6  other time that's most likely to happen is at
7  all meetings, time permitting, and typically it
8  happens, I do something called a CEO report,
9  where I just talk about the things that are
10  going on.  It's not abnormal for someone to just
11  ask a question that had nothing to do with
12  anything about the agenda and then we'll either
13  let them know what we know or we tell them we'll
14  do some research and find out.
15       Q.   You mentioned the executive council
16  of OACBHA that meets monthly.  Did I hear that
17  right?
18       A.   For the most part.  There are some
19  months where we don't meet, but typically
20  monthly.
21       Q.   How many people are on the executive
22  council?
23       A.   There's nine voting members, and
24  then members of committees often attend but
25  they're not a voting member unless they're both

Page 35

1  an executive council member and a committee
2  chair, some of which do have both jobs.
3       Q.   How are the members of the executive
4  council chosen?
5       A.   They are elected.  They are elected
6  for three years.  Our president then is elected
7  from within the existing executive council.  So
8  we have seven at large members, a president
9  elect, and a president.  The president elect
10  serves two years as president elect and then
11  serves two years as president.  The president
12  elect comes out of the existing seven at large
13  members.
14       Q.   And what's the function of the
15  executive council?
16       A.   The function of the executive
17  council is to kind of run the organization
18  overall.  Technically I report to the executive
19  council, the president, for the most part.  They
20  can take a position.  If there's not time to
21  have a meeting of the full membership, they may
22  take a position.  They can approve the budget,
23  those types of things.  They approve the dues.
24       The membership always has the right
25  to overrule an executive council decision by

Page 36

1  calling a special meeting, 60 percent vote, but
2  for the most part, on the day to day if things
3  come up, it's the executive council who is
4  making some of those decisions.
5       Q.   And in terms of the meetings, I take
6  it the executive council members would attend
7  those meetings?
8       A.   Correct.  And as I said, some --
9  they cannot send somebody in their place, but
10  also committee chairs can attend those meetings.
11  They also cannot send somebody in their place.
12       Q.   And do you also attend those
13  meetings?
14       A.   I do.
15       Q.   Do any other staff members?
16       A.   My two associate directors and my
17  one senior director or senior program director,
18  yes, attend that meeting.
19       Q.   Are there agendas for the executive
20  council meetings?
21       A.   Yes.
22       Q.   Who decides what goes on the --
23       A.   The executive -- the director,
24  president and I.
25       Q.   And who is responsible for actually

Page 37

1  maintaining the agenda?
2       A.   Again, Todd, Todd Hollett, who is
3  our operations administrator, has books of all
4  of those.
5       Q.   Are there certain topics or agenda
6  items that are discussed on a regular basis by
7  the executive council?
8       A.   Yes.  I mean, we always do the
9  minutes.  We always go over all of the
10  financials.  For the last couple of years
11  behavioral health redesign has been a big piece
12  that's been on all of our agendas.  There's
13  typically something related to Medicaid, and
14  then there's a CEO report and kind of whatever
15  is going on may be on there.
16       Q.   What's behavioral health redesign?
17       A.   There's been a huge change across
18  the State of Ohio in Medicaid and how that's run
19  within mental health and addiction, and so it's
20  called behavioral health redesign across the
21  state and it's been going on now for what, three
22  years about.
23       Q.   And does that relate to both mental
24  health and addiction services?
25       A.   It does.

10 (Pages 34 - 37)

Page 38

1    Q.   And what is being changed with
2  respect to addiction services?
3    A.   In respect to both, because it's not
4  one or the other, there have been several
5  changes.  I guess I can give you a little
6  chronology.
7         Boards used to oversee Medicaid.  In
8  2012 Medicaid was elevated.  Then I believe in
9  '15 there was Medicaid expansion, and then
10  starting in '16 there was BH redesign.  The
11  State of Ohio had to go to the national code set
12  because the State of Ohio, for behavioral
13  health, was a fee for service, and we had 18
14  codes we billed versus the national code set,
15  which is over a hundred, and so we had to go to
16  the national code set to be in alignment with
17  the national codes.  And then just this last
18  year we went from being fee for service to all
19  of behavioral health, with the exception of a
20  couple little pockets, was carved under managed
21  care.
22         And so all of those processes has
23  had a large steering committee, of which my
24  staff and I have been part of.  And steering
25  committee is relative.  It's kind of more of a

Page 39

1  report out.  But we've had the opportunity to
2  ask questions and get feedback, so we've been
3  part of that, so regularly report out on that.
4         We also regularly ask boards for
5  their feedback on specific issues and then feed
6  that back as well.
7    Q.   And in addition to those topics that
8  are regular agenda items for the executive
9  council, are there things that get -- are there
10  other topics that get added on in a more ad hoc
11  basis?
12    A.   On a regular ad hoc -- it's pretty
13  dynamic and fluid.  A lot of things come up at
14  those meetings.  Something could have been going
15  on.  Something could have happened with the
16  department.  Something could be going on with a
17  specific grant.  They're pretty organic.  It
18  depends what's going on around us to what those
19  meetings might be about.
20    Q.   And are minutes kept of those
21  meetings?
22    A.   That is correct.
23    Q.   And are they -- is there also an
24  approval process for those minutes?
25    A.   Same exact approval process.  They

Page 40

1  go out within seven working days after
2  typically.  They have a right to do feedback and
3  then there's a motion, any changes, motion and a
4  second, any changes, and then they're approved,
5  yes.
6    Q.   And OACBHA retains those minutes?
7    A.   We do.
8    Q.   So you are the chief executive
9  officer of OACBHA, correct?
10    A.   I am.
11    Q.   And how did you become CEO?
12    A.   Went through a couple of interviews
13  and I was hired.
14    Q.   Who hired you?
15    A.   The executive council at that time.
16    Q.   And was the -- strike that.
17         So can you explain to me the role of
18  the executive council in the genesis of OACBHA,
19  the merger of the three prior associations?
20    A.   Yes.
21         As I understand it -- now, some of
22  this happened before I came along, but as I
23  understand it, sitting board members from each
24  of the previous three organizations came
25  together, worked with each of their memberships

Page 41

1  to come to agreement to merge into a singular
2  association.  Then each of those groups, once
3  they voted, their -- I believe it was their
4  leadership that came together to form the first
5  executive council.
6         Our executive council today does not
7  look like our executive council then did.  It
8  has evolved.  But there were members from the
9  old ADAS Association, there were members from
10  the old Met-Net Association and there were
11  members from the ADAMH association.  So that's
12  three associations.  They came together.  Each
13  of them had equal members on the board.  And I
14  was interviewed by all of them.
15    Q.   And what were your main
16  responsibilities as CEO when you first started?
17    A.   Just to create the place.  There was
18  a temporary office that was being staffed by a
19  contract person.  So when I first started, I was
20  initially -- I can't remember if I was given
21  initially two or three positions, but I had to
22  hire staff, I had to create the office.  I had
23  to start working with -- I mean, we -- there was
24  a draft logo.  So, I mean, I had to do
25  everything from create logo to create letterhead

11 (Pages 38 - 41)

Page 42

1  to develop -- merge the banking systems. I
2  mean, it really was setting up the office. They
3  had some basic bylaws at that point in time and
4  they had some basic financial structure, but
5  they didn't really have -- they had no financial
6  rules in place. They had no policies and
7  procedures in place. I mean, I was doing all of
8  that.
9      Q.   And then after the organization got
10 up and running, what were your responsibilities?
11     A.   My responsibilities, again, were to
12 schedule the meetings, to schedule the
13 membership meetings, to work with the executive
14 council to determine kind of the focus. We did
15 some strategic planning for where the membership
16 wanted to go.
17         At that point in time there was a
18 large lawsuit going on. I don't even remember
19 what it was called. But there was a large
20 lawsuit going on between the boards and the
21 providers, and so I represented the boards at
22 those lawsuits. That lawsuit has long since
23 been gone. But it was a large lawsuit at that
24 point in time. So there was actually a lawyer,
25 Frank Hickman, that was contracted with the

Page 43

1  boards that was leading that. Vorys Sater
2  Seymour & Pease was the provider's lawyer. And
3  so there were a lot of meetings around that. I
4  attended a lot of meetings and reported back to
5  the membership on that.
6          It was creating things like -- there
7  were not orientation manuals for new directors.
8  I mean, there wasn't a mentoring process.
9  Within the first couple of years, maybe year
10 three, we started the Culture of Quality. So
11 there really wasn't any of that. I worked a lot
12 with -- because I came out of the Department of
13 Jobs and Family Services, the boards didn't
14 really have a relationship with Medicaid, so I
15 had to be very careful, obviously, about my
16 revolving door because I had supervised
17 Medicaid, but I started to create a relationship
18 with other departments other than just the
19 department of mental health at that time and the
20 department of alcohol and drug addiction
21 services.
22     Q.   What was the time frame that that
23 lawsuit was going on?
24     A.   Well, it was going on when I got
25 there. I honestly can't remember.

Page 44

1      THE WITNESS: Can I ask Christina?
2  Do you know when it ended?
3      Q.   You can just say you don't know.
4      A.   I don't know. Sorry. I don't know.
5      Q.   Do you remember what it was about?
6      A.   Yes. It was about -- it was about
7  how a board had paid a certain provider Medicaid
8  and their contracting with that particular
9  board, and then it just got into a much bigger
10 lawsuit overall. And mostly it was around how
11 boards chose to contract with certain providers,
12 and it was all wrapped up in that.
13     Q.   And you've mentioned the Culture of
14 Quality a few times. What is that?
15     A.   The Culture of Quality is a peer
16 certification process for local alcohol, drug
17 addiction and mental health boards. It's run
18 out of our office. Our office created it in
19 conjunction with a subcommittee of OACBHA, which
20 was members, to develop a set of standards, and
21 now, I believe the last I knew, 26 or 27 of the
22 boards are actually certified.
23         There are peer certifiers, which are
24 other directors or other executive staff from
25 board members. They go into an individual

Page 45

1  board, along with my staff person, Fonda
2  Freeman, and then they do a peer certification
3  audit. It's a two-day audit where they look at
4  all of the board's policies, procedures, making
5  sure that they're meeting all the state
6  standards, all the federal standards, all the
7  board guidelines. They speak with a board
8  member, they speak with a provider, I believe
9  they speak with a consumer just to make sure
10 that the board is really operating as they
11 should be in a quality manner day to day.
12     Q.   And the standards, do they relate to
13 quality of care?
14     A.   We do not. Our boards are not
15 providers of services. Our boards contract for
16 services. So this is actually the day-to-day
17 running of the office. More around how they
18 handle their grants, how they handle their
19 finances, how they handle their human resources.
20 Our boards are clients' rights officers, so we
21 make sure that piece is in place, all of those
22 kind of things. So we make sure that our boards
23 are in compliance with our statutory authority,
24 which is 340, that we're doing what needs to be
25 done there.

12 (Pages 42 - 45)

1    Q.   And OACBHA has other staff besides
2 just you, correct?
3    A.   That's correct.
4    Q.   How many staff did OACBHA -- one
5 would hope -- OACBHA have when you first started
6 as CEO?
7    A.   When I first started as CEO, it was
8 me, and there was a contract person there that
9 had been kind of helping with their meetings and
10 stuff.  So there was me, and then the next
11 person I hired was an office manager, and then
12 the person I brought on after that was a program
13 person.  So my first two people, one was an
14 office manager and one was a program person.
15 And then at different times, depending upon what
16 grants we've had or what we're doing, we've been
17 up in staff or down in staff.
18    Q.   And how many staff do you have
19 currently?
20    A.   I have two new ones starting today.
21 I'm not there.  As of today, there are eight of
22 us.  I have eight, counting me, so I have seven
23 staff.  I also have what's called a Vista
24 member, so that's an additional person.  And
25 that's part of the Center for National Service.

1 We run a grant for them.
2    Q.   Have you ever had any staff who
3 focused solely on opioid-related issues?
4    A.   I have no staff that focus on any
5 one thing in general, with the exception of my
6 Vista person at this moment.  I would say I have
7 been as much as anyone focused on the opiate
8 issue.  My associate director, Liz Henrich, has
9 been focused on this, and then I've had
10 different staff off and on who may have focused
11 some committee and so forth, but probably Liz
12 and I have been more focused on this than
13 anyone.
14    Q.   It's Liz Henrich?
15    A.   Liz Henrich, H-e-n-r-i-c-h.  Her
16 official name is Elizabeth.
17    Q.   And how long has she been with
18 OACBHA?
19    A.   Twelve years, I believe.
20    Q.   So you said that you focus on
21 opioid-related issues as much as anyone.  At the
22 present time, about what percentage of your time
23 would you say you spend dealing with issues
24 related to opioids?
25    A.   Boy, that's a tough one.  Let's say

1 30.  And that's a wild guess.  And more so right
2 at this moment, to be honest, because I was
3 appointed to the Ohio -- Recovery Ohio Advisory
4 Committee, which has been a focus on opiates,
5 and there was a lot of discussion of opiates
6 running up to the election.
7          We're also right at the beginning --
8 well, actually, we're right in the midst of
9 preparing for our upcoming opiate conference.
10 So Liz and I focus on that a little more right
11 now, and certainly here with the lawsuit.  But
12 just in general, right now I would say 30
13 percent.  And that ebbs and flows depending upon
14 what else is going on.
15    Q.   What was the first year that you
16 recall starting to focus on opioid-related
17 issues?
18    A.   The first time would have been -- it
19 was either in '02 or early '03, and I honestly
20 don't remember what the date was.  We were
21 contacted by someone who wondered if we would be
22 interested in a grant with Purdue Pharma called
23 Painfully Obvious.  So we had a Painfully
24 Obvious grant for maybe two years.  That would
25 have been the first time.

1    Q.   And what was the Painfully Obvious
2 grant for?
3    A.   Painfully Obvious was from Purdue
4 Pharma.  It was a -- kind of a prevention
5 program around prescription drugs.
6    Q.   And that went from 2002 to 2003 for
7 about two more years?
8    A.   It was two years.  I just don't
9 remember if it started in '02 or '03.
10    Q.   And aside from the Recovery Ohio
11 Advisory Committee and the upcoming opiate
12 conference, are there any particular
13 opioid-related initiatives you're working on
14 right now, also aside from this case today?
15    A.   I'm thinking.  Specific to opioids,
16 no.  I mean, I will say opioids come up just
17 about any time I'm doing any kind of policy work
18 or anything like that, but outside of what I'm
19 doing for Recovery Ohio or the conference, not
20 really.
21    Q.   And when you said opioids come up in
22 any policy work, that's relating to policy work
23 currently, correct?
24    A.   Yes.
25    Q.   How long has that been the case?

13 (Pages 46 - 49)

1     A.    Opiates just in general started
2 becoming an issue -- I mean, outside of the
3 Painfully Obvious grant, which was really a
4 grant opportunity more than a policy kind of
5 issue -- I'm trying to think.  It was before --
6 it was during -- early in the Strickland
7 administration I guess, so maybe 12 years ago,
8 when it really started -- maybe more like ten
9 years ago, when it started becoming more of an
10 issue.
11     Q.    And we'll circle back to some of
12 that and I'll show you some documents because
13 that's a while ago.
14     A.    Okay.
15     Q.    OACBHA has an annual budget?
16     A.    We do.
17     Q.    Where does the funding come from for
18 OACBHA?
19     A.    It comes from several different
20 places.  We -- over $500,000 of it comes from
21 dues, so dues is the single largest way we make
22 money.  We have several different grants that
23 help -- like right now I've got grants that are
24 paying for two staff in full.  It also helps
25 offset some of the supervision of those staff.

1            We have a lot of conferences,
2 whether it's the opiate conference.  We've done
3 two marijuana conferences in the last 18 months.
4 We arranged -- I think we did 15 or 16 BH
5 redesign -- regional meetings versus
6 conferences, so we sometimes raise money that
7 way.  So it comes from those -- either through
8 kind of educational events, where we are able to
9 either get sponsors, or charge a fee or our
10 dues.
11     Q.    And what are OACBHA's major types of
12 expenditures aside from administrative, staff
13 costs and overhead?
14     A.    Well, we don't do programming other
15 than conferences, so it would be conferences,
16 educational events, meetings that we would hold,
17 travel, those kind of things.
18     Q.    Setting aside the opiate
19 conferences, which we'll talk about in a bit,
20 has OACBHA done any educational events related
21 to opioids?
22     A.    Other than the conferences, we may
23 have before the first official conference done a
24 training on it.  I don't remember what we titled
25 our first one.  But outside of that, are we now

1 doing specific opioid kind of trainings, no.
2     Q.    So let's talk a little bit about the
3 local boards and their role in all this.
4            So in Ohio the local boards are
5 responsible for developing, funding,
6 administering and evaluating the local system of
7 mental health and addiction services; is that
8 fair?
9     A.    That's correct.
10     Q.    And the boards are created by
11 statute, correct?
12     A.    Correct.
13     Q.    And the statute establishes the
14 specific responsibilities of the board, correct?
15     A.    For the most part.  If I could, I
16 would say it either establishes or allows for,
17 because not all boards look exactly the same.
18     Q.    This is going to be Exhibit 2.
19            - - - - -
20            (Thereupon, Walter Deposition
21            Exhibit 2, Two-Page Document
22            Entitled "Ohio's Alcohol, Drug
23            Addiction, and Mental Health Boards,
24            Community Boards Responding to
25            Community Needs," was marked for

1            purposes of identification.)
2            - - - - -
3            MS. KEARSE:  Do you have the Bates
4 stamp?
5            MS. McNAMARA:  This is not produced.
6     Q.    Do you recognize this document?
7     A.    I do.
8     Q.    What is it?
9     A.    It's -- well, we shortly refer to it
10 as community boards community benefits, but it's
11 an educational piece that we tend to use with
12 legislators or outside of our system folks to
13 understand what boards are.
14     Q.    And this is available on your
15 website, correct?
16     A.    It is.
17     Q.    And I'll represent that's where I
18 downloaded it from.
19     A.    This is brand new.  This just came
20 out this January.
21            MS. KEARSE:  Counsel, we just want
22 to know where the documents came from for the
23 record.
24     A.    This one is brand new.  It is an
25 update of what was called "Community Boards

Page 54

1 Community Benefits."
2     Q.   So is it fair to say that one of the
3 benefits of having a local board as opposed to a
4 statewide entity is that you have board members
5 who live within the community and are able to
6 identify and respond to mental health and
7 addiction trends within the community?
8     A.   Absolutely.
9     Q.   So -- and would you agree that --
10 strike that.
11         So if you look at the document
12 about -- if you look at the third page of the
13 document, the one with "Powers and Duties of
14 Local ADAMHS Boards" at the top --
15     A.   Um-hum.
16     Q.   -- about two-thirds of the way down
17 the page it says, "Local boards are uniquely
18 positioned to rapidly identify changing
19 community needs, respond to crisis situations,
20 and serve as catalysts for change."
21         Do you agree with that?
22     A.   Absolutely.  I think it's one of the
23 largest benefits of having local boards versus
24 just a state-run system.
25     Q.   And that's been the case the entire

Page 55

1 time you've been CEO for OACBHA?
2         MS. KEARSE:  Object to form.
3     A.   That's correct.
4         THE WITNESS:  I don't know what that
5 means.  Can I ask?
6         MS. KEARSE:  That's an objection to
7 the way the question was asked just for the
8 record.
9         THE WITNESS:  The way I answered it
10 or --
11         MS. KEARSE:  No.  The question.
12         MS. McNAMARA:  My question.
13     Q.   And, in fact, would you agree that
14 it's the board's responsibility to identify
15 local health and mental addiction needs?
16     A.   I would say it is the local board's
17 responsibility in conjunction with other
18 partners.  I don't believe that it is the board
19 and the board alone.  That's why we consider our
20 boards the convenor of other members, whether
21 it's law enforcement, whether it's the health
22 department, whether it's health and human
23 services.  And I would say it's also a bit of
24 the state's responsibility because they're the
25 ones that tend to collect data and have more

Page 56

1 data on what is occurring across the state,
2 including sometimes they have local data based
3 on emergencies and so forth.
4     Q.   Got it.  So just to follow up on the
5 -- in conjunction with partners, you mentioned
6 law enforcement, state agencies.  What are the
7 other partners of the boards?
8     A.   You know, it can depend from board
9 to board, but I would say in general boards work
10 with their local health departments, they work
11 with law enforcement, they work with their local
12 judicial system.  They often work with their
13 local school systems with prevention.  They'll
14 work with their job and family services.  Many
15 of our boards have a prevention task force,
16 suicide task force, drug task force, and all of
17 those task forces would include other community
18 members depending upon who has expertise in that
19 area.
20         Our boards do a lot of work with
21 local businesses.  So our -- it's not abnormal
22 for our boards to work with like the Lion's Club
23 and the Eagles Club doing things.  Our boards
24 have relationships with their county
25 commissioners.  They have relationships with

Page 57

1 their county sheriffs.  So we really -- as we
2 see it and as we believe it, we believe boards
3 are the local experts, the local hubs for drug
4 and mental -- drug addiction, alcohol addiction
5 and mental health needs.
6     Q.   So if there is a mental health or
7 addiction-related crisis going on in the
8 community, you would expect the local board to
9 know about that, correct?
10     A.   We would certainly hope they do,
11 yes.
12     Q.   And if there is a mental health or
13 addiction-related epidemic going on in the
14 community, you would expect the local board to
15 know about that, correct?
16     A.   We would hope so, yes.
17     Q.   And you would expect them to be
18 taking steps to combat that epidemic or crisis,
19 correct?
20     A.   We would -- yeah.  We would expect
21 them to be working with their community partners
22 to figure out ways to best address that in their
23 local community.  And I would also say that
24 sometimes it's within the finances available.
25 We have boards who have different levels of

15 (Pages 54 - 57)

1 financial resources.  We have some boards with
2 levies, some boards without.  So it's sometimes
3 your ability to respond is based upon your
4 ability to pay for it.
5     Q.   You mentioned levies as a source of
6 funding for at least some of the boards?
7     A.   Correct.
8     Q.   What are the other sources of
9 funding for the boards?
10     A.   So local levies.  And I will tell
11 you we have 12 counties in the state that do not
12 have levies, so -- and we actually have a levy
13 map.
14        Boards get allocations from the
15 Department of Mental Health and Addiction
16 Service.  They get some of them via grant.  They
17 get some of them as general allocation through
18 the 421 line item.  That is their community
19 line.  Some of our boards may get some money
20 from the health department.  Some of our boards
21 get WIA, Workforce Investment Act, funds.  So it
22 depends.  Some of them do different grants.
23 Some of them will get community funds.  As I
24 said, we have 12 boards without levies.  We have
25 two boards, Cuyahoga County and Montgomery, that

1 are part of a health and human services levy, so
2 they actually get their allocations from their
3 county commissioners.  Some boards may get a
4 little bit of other money from county
5 commissioners.  Some boards get no money from
6 county commissioners outside of their local
7 levy.  Many of our boards have federal grants
8 that they've gone after through SAMHSA or some
9 other organization.  Some of our boards have
10 community foundation grants.  Some of them have
11 national foundation grants.  So there are many
12 different ways that our boards get levies, but I
13 would say the top two ways would be state
14 allocations and for some boards their local
15 levies.  For some boards their local levy is by
16 far their largest income source.
17     Q.   So you've heard people discuss an
18 opiate epidemic in Ohio, correct?
19     A.   Correct.
20     Q.   What do you understand opiate
21 epidemic to refer to?
22     A.   Well, several things in -- that I
23 understand it to be.
24        Certainly the overdose deaths is
25 maybe what the public sees as the largest

1 number, just the number of people who are
2 overdosing, even those that are not dying.  The
3 number of people that are accessing services.
4 Certainly I've done enough work with the Buckeye
5 Sheriff's Association and others to know the
6 crime that can be driven by the epidemic.
7        I am also -- well, I'll just leave
8 it at that.
9     Q.   And you're aware of the opiate
10 epidemic existing today, correct?
11     A.   Correct.
12     Q.   And, in fact, it's been going on for
13 a long time, correct?
14        MS. KEARSE:  Object to form.
15     A.   We have been focused on it probably
16 for the last ten years in some form or another.
17        THE WITNESS:  Can I ask a procedural
18 question?
19        MS. McNAMARA:  Sure.
20        THE WITNESS:  If you object, am I
21 supposed to answer?
22        MS. KEARSE:  Yes.
23        MS. McNAMARA:  Yes.  They'll tell
24 you not to answer.
25        MS. KEARSE:  It's for the record.

1        -  -  -  -  -
2        (Thereupon, Walter Deposition
3        Exhibit 3, E-Mail from Cheri Walter
4        to Several Recipients, Dated April
5        3, 2009, Beginning Bates Number
6        CUYAH_012387509 - Marked
7        Confidential, was marked for
8        purposes of identification.)
9        -  -  -  -  -
10     Q.   I'm going to hand you Exhibit 3.
11 Exhibit 3 is an e-mail from you to a long list
12 of people dated April 3rd, 2009.  The Bates
13 number is CUYAH_012387509.
14     A.   Okay.
15     Q.   Do you recognize this document?
16     A.   I believe I sent it.  It does not --
17 no, I don't remember it, but I'm sure I sent it,
18 yes.
19        MS. KEARSE:  And I'm going to say
20 for the record, when she reads the Bates stamp
21 numbers, that means it wasn't produced out of
22 the OACBHA files, it was produced out of
23 Cuyahoga County's files, correct?
24     A.   I'm sure I sent it.  I mean, it has
25 my name on it.

16 (Pages 58 - 61)

Page 62

1    Q.   And the subject line of this e-mail
2 is "Updates."
3        Do you see that?
4    A.   I do.
5    Q.   Now, this e-mail has a very long
6 list of recipients, correct?
7    A.   Correct.
8    Q.   So what is this group of people?
9 Who are these people who are receiving this
10 e-mail?
11    A.   I laugh only because it is a long
12 list.
13        I started out by doing something
14 called either updates or several things.  You'll
15 see both titles often.  And it initially started
16 out with all of my directors.  Well, many of my
17 directors then added staff.  So that's why you
18 have this list that is so long.  I'm betting
19 that everybody on here is either a director or a
20 staff member.  I would have to read it
21 specifically, but just in looking at it, that
22 appears true.
23        I also -- it appears that numerous
24 of these people are on here more than once.  I'm
25 not sure why that is.  But anyhow, it appears to

Page 63

1 be our members and/or their staff.  The cc are
2 all my staff.
3    Q.   And in the second line of the
4 recipient list do you see the name Bill Denihan?
5    A.   Yes.
6    Q.   Do you know Mr. Denihan?
7    A.   I do.
8    Q.   Who is he?
9    A.   He was the director of the Cuyahoga
10 County Alcohol, Drug Addiction and Mental Health
11 Board.  He has since retired.
12    Q.   And all the way down at the bottom
13 of the list, about three lines up from the
14 bottom on the right side, there's Tom Leffler.
15        Do you see that?
16    A.   I do.
17    Q.   Do you know Mr. Leffler?
18    A.   I've met him, yeah, but I don't know
19 him well like I know my directors.
20    Q.   Do you know -- and Mr. Leffler's
21 e-mail address is Lefflert@admboard.org.
22        Do you see that?
23    A.   I do.
24    Q.   Do you know which ADM Board
25 Mr. Leffler was affiliated with?

Page 64

1    A.   Based on the -- I'm going to assume
2 it's the -- the Summit County.
3    Q.   And this particular update, if you
4 look at the bottom of the first page onto the
5 second page, discusses a press conference.
6        Do you see that?
7    A.   I do.
8    Q.   And it talks about the front page
9 coverage of the press conference in the Dispatch
10 and coverage on NPR.
11        Do you see that?
12    A.   I do.
13    Q.   Then if you flip through the
14 attachments to the e-mail, there are a couple of
15 articles.  The first one is "Advocates Make Case
16 For Providing Addiction Treatment Services."
17 And that's on the page with the Bates number in
18 the lower right-hand corner ending in 517.
19        Do you see that?
20    A.   I do.
21    Q.   And is this article discussing the
22 press conference referred to in your updates
23 article?
24    A.   I'm assuming.  I honestly don't
25 know, but if it was attached, I'm guessing yes.

Page 65

1 I mean, I don't remember, to be real honest.
2    Q.   So you don't remember this
3 particular press conference in 2009?
4    A.   I do not.
5    Q.   Fair enough.
6        And the next article behind that
7 starting on page 518 looks like it comes from
8 Dispatch Politics with the title "Ohio Has OD
9 Epidemic."
10        Do you see that?
11    A.   I do.
12    Q.   And this article is discussing an
13 overdose epidemic; is that correct?
14    A.   Correct.
15    Q.   And the article points out in the
16 second paragraph that unintentional poisoning
17 deaths exceed the number of traffic fatalities.
18        Do you see that?
19    A.   I do.
20    Q.   And then in the fourth paragraph it
21 says, "The state agency calls it an epidemic."
22        Do you see that?
23    A.   Correct.  I do.
24    Q.   And it references -- and there was
25 a -- and just below that, two paragraphs down,

17 (Pages 62 - 65)

Page 66

1 it talks about the press conference and
2 references a backdrop of state budget cutbacks
3 for drug, alcohol and mental health treatment
4 programs.
5      Do you see that?
6    A.  I'm sorry.  Which paragraph?
7    Q.  It's the sixth paragraph down.  It
8 starts with "Officials gathered."
9    A.  Yes, I see it.
10    Q.  So do you recall what was going on
11 at the time around 2009 with respect to state
12 funding of mental health and addiction services?
13    A.  Specific to 2009, we would have been
14 on a biennial budget.  So I'm guessing we were
15 advocating on behalf of biennial budget funds.
16 There was a long period of time where we saw
17 cuts in drug and alcohol funding, and so I'm not
18 terribly surprised to see that we did a press
19 conference around that particular issue.
20    Q.  And then on the next page of that
21 article it actually quotes you in the second
22 paragraph saying, "Many Ohio counties have no
23 funds left over to provide services to middle or
24 lower income families who have minimal or no
25 healthcare benefits."

Page 67

1      Do you see that?
2    A.  I do.
3    Q.  And that's referencing the state
4 budget cutbacks that have been happening?
5    A.  I believe at that point it was, yes.
6    Q.  And the article goes on to discuss
7 how opiates specifically are largely responsible
8 for the alarming increase in drug poisoning
9 death rates, correct?
10    A.  Correct.
11    Q.  And the article specifically
12 references a number of prescription drugs a few
13 paragraphs down, including methadone, oxycodone,
14 hydrocodone and morphine, correct?
15    A.  Correct.
16    Q.  This was an article that you
17 forwarded at the time in 2009 to all of your
18 county board executive directors and a few staff
19 members, correct?
20    A.  I believe I probably did, yes.
21      - - - - -
22      (Thereupon, Walter Deposition
23      Exhibit 4, E-Mail String, Beginning
24      Bates Number CUYAH_012384852 -
25      Marked Confidential, was marked for

Page 68

1      purposes of identification.)
2      - - - - -
3    Q.  I'm going to hand you Exhibit 4.
4 This is an e-mail chain, the top e-mail from
5 Orman Hall on June 1st, 2009.  The Bates stamp
6 is CUYAH_012384852.
7    A.  This absolutely looks like something
8 I would have sent.
9    Q.  Pardon?
10    A.  This absolutely looks like an e-mail
11 I sent.
12    Q.  And the first e-mail is an e-mail
13 from you to, again, a long list of people, with
14 the subject line "Budget Alert," correct?
15    A.  Right.
16    Q.  And so let's start with that e-mail
17 and then move kind of up the chain.  What
18 particular budget is this discussing?  Is it a
19 biennial?
20    A.  A biennial budget, same as the one
21 before.
22    Q.  And a biennial budget means it's
23 done once every two years?
24    A.  Correct.
25    Q.  Is that still the process -- the

Page 69

1 budgeting process in Ohio?
2    A.  Correct.
3    Q.  And just in terms of a high level
4 walk-through of the budgeting process, do you
5 know which house is responsible for proposing
6 that budget?
7    A.  Neither house proposes.  The
8 governor's office proposes the budget.  It first
9 goes to the house, then goes to the senate.  The
10 house and senate often have their own.  And in
11 the last several years I would say the house in
12 particular has been exceptionally active in the
13 opiate epidemic in specific and has created
14 numerous funds around that, held many meetings
15 around that.  But yes, it goes governor to the
16 house to the senate.
17    Q.  Got it.
18      And then the governor ultimately
19 approves it?
20    A.  The governor ultimately signs it
21 with line item veto.
22    Q.  Is there any ability to change parts
23 of the budget midstream during the two-year
24 period if unexpected events or expenses occur?
25    A.  Yes.  I mean, I can't, but certainly

18 (Pages 66 - 69)

Page 70

1 the house and the governor or the senate can.
2 In the last several bienniums they've also -- it
3 started under Governor Kasich.  They did
4 something called a mid-biennium review, and in a
5 couple of those they made substantial changes
6 both to funding and to statutory authority.
7      Q.   You had mentioned that recently the
8 house has been very active in creating
9 opioid-related funds.
10          Did I hear that correctly?
11     A.   You did.
12     Q.   Are there any particular legislators
13 who are active on that issue?
14     A.   Correct.  Yes, there are.
15     Q.   Who are they?
16     A.   The most active would have been --
17 he is now the treasurer effectively, but Robert
18 Sprague, who was out of Findlay, was
19 exceptionally active.
20          Representative Smith out of Gallia,
21 Jackson and Meigs, both when he was the finance
22 chair, as he was the speaker, and I'm assuming
23 again he will, but he's always been very active.
24          Representative Scott Ryan has been
25 very active, both prior to becoming chair -- he

Page 71

1 was the finance chair for a while.  He's not any
2 longer.  But he's been fairly active.
3          Those three in my mind have been the
4 most active.
5          On the senate side, it would be
6 Senator Burke.
7      Q.   This budget alert, is this another
8 e-mail that you sent to the executive directors
9 and possibly some staff as well?
10     A.   It appears so, yes.
11     Q.   On the first line, toward the
12 right-hand side you see Mr. Denihan again?
13     A.   Yes, I do.
14     Q.   Next to that there's
15 billh@admboard.org.  Do you see that?
16     A.   Um-hum.  Bill Harper.
17     Q.   Bill Harper.
18          And at the time he was the executive
19 director of Summit County, correct?
20     A.   Correct.
21     Q.   Over the years have you worked with
22 Mr. Denihan on any initiatives related to
23 opioids?
24     A.   I believe he had a conference once
25 in Cuyahoga County that I presented at.  He was

Page 72

1 the president of my board for a period, so he
2 would have testified.  So I would have worked
3 with him in that capacity.  Bill was very active
4 in helping bring recovering individuals to the
5 opiate conference.  So I would have worked with
6 him in that capacity.
7          If I had worked on an initiative
8 language or anything, it would have been
9 specific to him being president and working with
10 the board, not outside of the board.
11     Q.   And Mr. Harper, have you had the
12 opportunity over the years to work with him on
13 any initiatives related to opioids?
14     A.   I don't believe I specifically
15 worked with Bill.  He was not the director there
16 long, and the other board he was director at
17 was -- I won't say.  I don't believe I did.  It
18 does not come to mind.
19     Q.   Now, your budget alert e-mail, at
20 the top of it there is an acronym ODADAS and a
21 number of bullet points underneath that.
22     A.   That would have been the Ohio
23 Department of Alcohol and Drug Addiction
24 Services prior to them merging into a single
25 department.

Page 73

1      Q.   And the first bullet point says, "In
2 the first year of the biennium (SFY 2010)."
3          Do you see that?
4      A.   I do.
5      Q.   And SFY means state fiscal year?
6      A.   Correct.
7      Q.   And then it goes on to say, "ODADAS
8 GRF was cut by $4,646,084"?
9      A.   Correct.
10     Q.   ODADAS GRF, what does GRF stand for?
11     A.   General revenue fund.
12     Q.   And it then says, "4.2 million comes
13 out of the 401 treatment line item and $404,571
14 comes out of the 404 prevention line item."
15          Do you see that?
16     A.   I do.
17     Q.   What's the 401 treatment line item?
18     A.   These were when ODADAS was its own
19 state department.  Those were direct funding
20 lines that went to the alcohol, drug addiction
21 and mental health boards, both of them.  One was
22 prevention specific.  The 401 was the more
23 general line.
24     Q.   401 was general and 404 was
25 prevention?

19 (Pages 70 - 73)

Page 74

1     A.   Yeah, more so.  Yes.
2     Q.   So this is money that would have
3 been distributed to local boards that was being
4 proposed to be cut?
5     A.   Correct.
6     Q.   And then it notes that in fiscal
7 year 2011 ODADAS would be cut $2,992,629, with
8 2.5 million out of the 401 line item and
9 $404,571 out of the 404 line item.
10     Do you see that?
11     A.   I do.
12     Q.   So those would have been further
13 cuts on top of fiscal year 2010?
14     A.   I can't say that because I don't
15 know if those were individual cuts or
16 accumulative.  I don't remember.
17     Q.   Fair enough.
18     And then on the next page there's a
19 separate set of bullet points under "ODMH."
20     Do you see that?
21     A.   I do.
22     Q.   And that is the Ohio Department of
23 Mental Health?
24     A.   It is.
25     Q.   And you mentioned that they have

Page 75

1 since merged into one department, correct?
2     A.   That's correct.
3     Q.   That's Ohio Mental Health and
4 Addiction Services?
5     A.   That's correct.
6     Q.   Okay if I call that Ohio MHAS?
7     A.   Absolutely.
8     Q.   I will indulge in the acronyms a
9 little bit after unpacking them.
10     So at the time of this e-mail,
11 alcohol and drug addiction services and mental
12 health services were separate budget items for
13 the state; is that correct?
14     A.   That's correct.
15     Q.   So if we wanted to look at funding
16 for treatment related to opiate use disorder at
17 the time, we would look at the ODADAS money?
18     A.   That's correct.
19     Q.   And at this time both ODADAS and
20 ODMH, both addiction services and mental health
21 were facing significant budget cuts; is that
22 correct?
23     A.   That is correct.
24     Q.   So you sent this budget alert to the
25 heads of local boards to alert them to these

Page 76

1 potential cuts that might affect the money that
2 was going directly to them.
3     Am I understanding that correctly?
4     A.   I sent it to alert them and I'm sure
5 to ask for their advocacy.
6     Q.   And then I was going to point to --
7 you go on to then urge them to call their
8 legislators to push for certain amendments,
9 correct?
10     A.   Correct.
11     Q.   And is this typical of one of the
12 things you do as CEO of OACBHA, to alert members
13 to propose changes of the budget and --
14     A.   Yes.  It's one of the most important
15 things we do.  I mean, we are just now embarking
16 upon this year's biennial budget, and as it was
17 here, this was a brand-new governor, so this
18 would have been when Governor Kasich took
19 office, and so we now have a new governor taking
20 office and so you tend to see a lot more change
21 when new governors come in.  But yes, that's one
22 of my main jobs.
23     Q.   And the page with the Bates number
24 ending in 855 --
25     A.   Correct.

Page 77

1     Q.   -- that references OACBHA working on
2 putting testimony together for Jodi, Tony
3 Pollard and you.  That's in the first full
4 paragraph.
5     Do you see that?
6     A.   Yes.
7     Q.   Who is Jodi?
8     A.   It would have been Jodi
9 Demo-Hodgins.  She was the director of the
10 Crawford-Marion Board.  She has since retired.
11 I'm assuming that's who that was, yes.
12     Q.   And who is Tony Pollard?
13     A.   Tony Pollard would have been the
14 director of the ADAMH Lawrence-Scioto Board.  He
15 has been gone for several years now as well.
16     Q.   And I'm sorry.  Did you say Sciota?
17     A.   ADAMH Lawrence-Scioto.  It's a
18 tri-county board.
19     Q.   Got it.
20     And do you remember offering
21 testimony on this particular budget?
22     A.   No.  No, I do not.  I mean, I'm sure
23 I did, but I don't remember it.  I give a lot of
24 testimony.
25     Q.   Is it typical for you to provide

20 (Pages 74 - 77)

1 testimony about budget issues that would affect
2 local boards?
3      A.   Every budget since I've been there
4 I've provided testimony on the budget.
5      Q.   And is that written testimony, oral
6 testimony, both?
7      A.   It could be either/or.
8      Q.   About how many times have you
9 provided oral testimony to the house or the
10 senate over the years?
11      A.   I honestly have no idea.  I just
12 don't know.  Many.  I just don't know other than
13 that.
14      Q.   Over 20?
15      A.   In the whole time I've been there,
16 probably, yes, on many different topics, not
17 just the biennial budget.
18      Q.   What other topics have you provided
19 testimony on in addition to the budget?
20      A.   BH redesign I've provided testimony
21 on.  There have been different bills that have
22 come up that I've provided testimony on.  It
23 just depends what the issue is.  There were
24 several bills that Representative Sprague had
25 that I provided testimony on.  So just different

1 bills.
2      Q.   Do you recall providing testimony on
3 anything related to opioids?
4      A.   Yes.
5      Q.   What was that?
6      A.   That's a good --
7      Q.   The substance of that?
8      A.   It would have been when
9 Representative Sprague was putting in place some
10 language around the ability of boards to own
11 recovery housing.  What I can't remember is if
12 it was testimony to the full house or whether it
13 was just in -- he held several what I would call
14 constituent meetings, stakeholder meetings, and
15 I don't remember which place I provided that,
16 but yes, specifically to that.
17      I also provided testimony for --
18 there was a bill that was put up around
19 crushable prescription drugs.  I don't remember
20 the bill, but I remember I provided testimony.
21      Q.   Crushable opioids?
22      A.   Yes.
23      Q.   In the next paragraph you mention
24 that you -- that "We have also worked to gear up
25 the recovery community to raise a ruckus about

1 the ODADAS budget."
2      A.   That sounds like me.
3      Q.   Do you see that?
4      A.   Uh-huh.
5      Q.   So who constitutes the recovery
6 community?
7      A.   Many different people.  It could be
8 individuals in recovery, which is family
9 members.  Some of the names on there are people
10 who run treatment programs.  Eloise, Carolyn
11 Gibbons and Jenny O'Keefe at that point all were
12 directors of treatment programs.  Donna Conley
13 at that time was the director of Ohio Citizens
14 Advocates, which is a group that represents
15 individuals in recovery.  So it would have been
16 people in recovery.  It would have been
17 individuals from treatment programs.  It would
18 have been individuals that run treatment
19 programs.  It would have been family members.
20 Just whomever we had worked with over the years.
21      Q.   And what does raising ruckus entail
22 in this context?
23      A.   I'm sure I was trying to gear them
24 up to send letters or make calls because of the
25 fact that we were getting cut, so we believed

1 that a loud voice would help.
2      Q.   And is it typical for you, as CEO of
3 OACBHA, to also engage the recovery community?
4      A.   Absolutely, yes.
5      Q.   Do you recall whether you were
6 successful in getting any amendments to this
7 proposed budget?
8      A.   We got some changes made to this
9 budget, but what I don't remember is if it was
10 with the initial budget or if it came later, but
11 there were some changes to the budget because I
12 remember there was a sitdown with Greg Moody
13 about why our budget was cut and there were some
14 changes made.
15      Q.   Some changes to provide additional
16 funds to boards?
17      A.   Yes.
18      Q.   So the next e-mail on the chain
19 comes from Elaine G-e-o-r-g-a-s.
20      A.   Georgas.
21      Q.   Georgas?
22      A.   Yes.
23      Q.   Thank you.
24      Who is she?
25      A.   Elaine is the director of the

21 (Pages 78 - 81)

Page 82

1 alcohol and drug addiction board of Lorain
2 County.
3    Q.   And in the second paragraph of her
4 e-mail she notes that right -- and I'll quote
5 from her e-mail, "Right now heroin costs less
6 than a six pack of beer, not just in our urban
7 areas, everywhere."
8         Do you see that?
9    A.   I do.
10    Q.   So she is flagging a problem of low
11 cost heroin, correct?
12    A.   It appears so, yes.
13    Q.   At the time she sent this e-mail
14 back in 2009, were you aware that there was a
15 problem of low cost heroin being everywhere, as
16 she says here?
17    A.   Yes.
18    Q.   Was there an upsurge of heroin use
19 around that time?
20    A.   Boy, in '09?  Possibly.  I mean, I
21 don't consciously know that I thought in '09
22 that heroin was the upsurge.
23    Q.   Do you recall their being an upsurge
24 at some other point in time?
25    A.   I mean, there had been.  We seen an

Page 83

1 increase -- as pill mills were closed, we
2 certainly saw an increase in heroin, yes.
3    Q.   The top e-mail in the chain is from
4 Orman Hall.
5         Do you see that?
6    A.   Correct.  I do.
7    Q.   Who is Mr. Hall?
8    A.   At the time he was the director of
9 the Fairfield County Board of Alcohol, Drug
10 Addiction and Mental Health Services.
11    Q.   Does he currently hold that
12 position?
13    A.   He does not.  He currently works for
14 HIDTA, the high intensity drug trafficking, and
15 he works for Ohio University.
16    Q.   And he also for a period of time led
17 GCOAT, the Governor's Cabinet Opiate Action
18 Team, correct?
19    A.   He did.  He was also the director of
20 the Department of Alcohol and Drug Addiction
21 Services prior to the merger.
22    Q.   Over the years have you worked with
23 Mr. Hall in any opioid-related initiatives?
24    A.   I have.
25    Q.   What are those?

Page 84

1    A.   I got to think about that.
2         When he was the director of
3 Fairfield County, I remember going to his board,
4 having some discussions with stakeholders.  He
5 was working on trying to do something specific
6 to opiates.  He was very into data and he had a
7 lot of data about the increase in his local jail
8 system specific to opiates.  And I don't
9 remember exactly what we were working on, but I
10 remember being there.  I was speaking with
11 different folks.  So there was that.
12         I worked with him on different
13 things when he was the director of alcohol and
14 drug addiction services, whether it was budget,
15 whatever the case may be.  I worked with him
16 there.  I have worked with him since he moved on
17 to HIDTA.  He's done several presentations at
18 our opiate conference.  It's not abnormal for
19 Orman out of the blue to send me an updated set
20 of maps as to what is going on, those kind of
21 things.
22    Q.   In his e-mail from June 1st, 2009 he
23 says, "Elaine is right about heroin.  Opiates
24 are a blight on our state and heroin addiction
25 may be a bigger problem in rural and suburban

Page 85

1 areas than in the big cities."
2         Did I read that correctly?
3    A.   Yes.
4    Q.   And did you agree at the time that
5 opiates were a blight on our state?
6    A.   I did agree that opiates were a
7 problem, yes.
8    Q.   And this e-mail, like the others,
9 went to a large group of people, correct?
10    A.   Yes.  It appears it was kind of a
11 respond to all to my initial e-mail.
12    Q.   And Mr. Denihan appears in the
13 second line of the list of recipients.
14         Do you see that?
15    A.   I do.
16    Q.   And he's followed on the list by
17 Mr. Harper?
18    A.   I see that.
19    Q.   And Mr. Leffler is two lines up from
20 the bottom of the list.
21         Do you see that?
22    A.   Yes, I do.
23         MS. McNAMARA:  I don't know how long
24 we've been going.  Do you want to take a few
25 minutes?

22 (Pages 82 - 85)

1      MS. KEARSE:  Sure.  We've been going
2  over an hour.
3      MS. SHAYNAK-DIAZ:  Yes.
4      THE VIDEOGRAPHER:  Off the record at
5  10:31.
6      (Recess had.)
7      THE VIDEOGRAPHER:  We're on the
8  record, 10:48.
9  BY MS. McNAMARA:
10     Q.   Welcome back.
11         - - - - -
12         (Thereupon, Walter Deposition
13         Exhibit 5, Multi-Page Document
14         Entitled "Opiate Pharmacotherapy
15         Whitepaper January 2007," was marked
16         for purposes of identification.)
17         - - - - -
18     Q.   I'm going to hand you what I've
19  marked as Exhibit 5.  I mentioned earlier off
20  the record a few of these documents didn't print
21  out with Bates numbers.  This one was produced
22  by OACBHA.  The Bates number is OACBHA-00004825,
23  and the title at the top is "Opiate
24  Pharmacotherapy White Paper January 2007."
25         So do you recognize this document?

1      A.   I do not.  I am guessing.  I
2  don't -- I'm guessing this came out of a
3  committee.  I did not -- I don't believe I
4  produced this document because I don't remember
5  it.  I'm sure -- if it has our logo on it, I
6  probably would have signed off on it.
7      Q.   But you did not?
8      A.   I do not believe I produced this
9  document, no, I do not.
10     Q.   And you don't know who wrote it?
11     A.   I don't.  I'm trying like crazy to
12  remember where this came from.
13     Q.   And the date on this is January
14  2007.
15         Do you see that?
16     A.   I do.  I just -- I don't remember.
17     Q.   I want to -- I just want to take a
18  look at page 5 of this.
19         MS. KEARSE:  Counsel, I'm going to
20  state an objection on this document.  The
21  witness has testified she's not familiar with
22  this document nor is she familiar with this
23  document being in her files, so I would object
24  to any line of questioning going into specifics
25  of the document.  The document is what it is, it

1  says what it says, so I object to asking the
2  witness about a document she is not familiar
3  with.
4      MS. McNAMARA:  Okay.  Please object
5  to form.
6      MS. KEARSE:  Well, you didn't ask a
7  question.
8      Q.   Page 5 references at the bottom of
9  the page "The Current Opiate 'Problem.'"
10         Do you see that?
11     A.   I do.
12     Q.   And it indicates that there has been
13  a recent escalation of opiate-related admissions
14  to Ohio treatment programs.
15         Do you see that?
16         MS. KEARSE:  Object to form.
17     A.   I do.
18     Q.   Do you recall that being the case in
19  2007?
20     A.   No.  I mean, I just -- I was not
21  that hands on into what treatment centers were
22  doing, so I -- I'm guessing this came out of one
23  of our committees.  We had a committee, so -- an
24  alcohol and drug addiction committee.  I'm
25  guessing this came out of that committee.

1  Again, I'm sure if I put our logo on, that it
2  would have been our committee.  I just don't
3  remember it personally.
4      Q.   So does OACBHA have standing
5  committees?
6      A.   We do.
7      Q.   What are those committees?
8      A.   Today?
9      Q.   Yes.
10     A.   Our committees are we have an opioid
11  committee, we have a hospital committee, we have
12  a suicide committee, we have a governance
13  committee, we have a recovery-oriented system of
14  care implementation committee.
15         How many committees have I named?
16         MS. SHAYNAK-DIAZ:  Five.
17     A.   We have a culture of quality board.
18  It's called a board but it's a committee.
19  Opioids?  I think I got them.
20     Q.   And have there been any committees
21  in the past during your tenure at OACBHA that
22  have since been discontinued?
23     A.   Correct.
24         And this particular paper I'm
25  guessing would have come -- we used to have two

23 (Pages 86 - 89)

Page 90

1 divisions.  We had a drug and alcohol division
2 and we had a mental health division.  That was
3 prior -- that was the initial design of the
4 organization, that there would be two divisions.
5 Sometime after the two departments merged, it
6 was determined that we would not have two
7 divisions, we would act as just one association
8 with other standing committees.  And we have had
9 other standing committees in the past.  We had a
10 prevention committee that is no longer in
11 existence.  We've had subcommittees.  I mean, so
12 we've had several different committees over --
13 oh, we also -- there's one more committee.  I'm
14 sorry.  We have an information management
15 committee.  I don't know how I forgot that one.
16 And a fiscal committee.  Now I got them all.
17      Q.    So this white paper would have come
18 out of the drug and alcohol division that no
19 longer exists within the organization?
20         MS. KEARSE:  Object to form.
21      A.    I can't say that for sure, but that
22 would be --
23      Q.    You mentioned that there is
24 currently an opioid committee?
25      A.    Correct.

Page 91

1      Q.    When was that started?
2      A.    Year, year -- about a year and a
3 half ago.
4      Q.    Whose idea was it to start that
5 committee?
6      A.    We disbanded our committees on -- we
7 disbanded our divisions at the time, about a
8 year and a half ago, maybe two years ago, and it
9 was decided to have an opiate committee and a
10 suicide committee because they didn't want
11 things to drop through the cracks.
12      Q.    How many members are on that
13 committee?
14      A.    It's not a standing membership.
15 It's always open to all members and staff to
16 attend.  And so it varies, depending upon the
17 topic of any given meeting.
18      Q.    And does it have regular meetings?
19      A.    Yes.  And when I say "regular," it's
20 as called.  Typically the opiate committee I
21 believe is meeting in person every other month.
22      Q.    And is there a person who leads that
23 committee?
24      A.    There is a chair of the committee,
25 correct.

Page 92

1      Q.    Who is the chair?
2      A.    The chair of the committee is Brad
3 Camp.  He is presently the director of the
4 Marion-Crawford Board.  I've had a staff person
5 who has been sitting on that committee who just
6 left me, frankly, so it is one of the new
7 positions I have started.  And I am often in
8 there, but not always.  I have personal staff
9 sit.
10      Q.    And who's the former staff member
11 who would attend?
12      A.    Tony Coder, and also my Vista person
13 has been in there, Liz Rosenberg, and I was in
14 many of them but not all of them.
15      Q.    So what has the opioid committee
16 done in the year to year and a half it's been in
17 existence?
18      A.    Probably the biggest thing we
19 focused on last year for the first time ever, we
20 created something called the Week of
21 Appreciation, and the opiate committee really
22 led that, and the Week of Appreciation then tied
23 into our opiate conference.  But the Week of
24 Appreciation was last April or -- April, May --
25 I think it was in April.  We decided we wanted

Page 93

1 to recognize first responders.  So we had a
2 whole campaign.  All of our boards got involved.
3 The state department gave us a small grant.  We
4 got another small grant.  So we got some money.
5 We recognized fire, police, sheriff, highway
6 patrol and emergency responders.  We did some
7 awards that were given at the opiate conference,
8 but many of our boards did local events where
9 they also went into treatment providers, they
10 went into emergency rooms, they went into
11 firehouses, but it was really because we were
12 seeing burnout and secondary trauma and we
13 wanted to spend some time thanking people, and
14 the tagline was "Bringing help, bringing hope,"
15 and we did a whole campaign around that.
16      Q.    This is going to be Exhibit 6.  This
17 is a document with the Bates number
18 OACBHA-00010305.
19         -  -  -  -  -
20         (Thereupon, Walter Deposition
21         Exhibit 6, Opiate Task Force Meeting
22         Notes, March 17, 2010, Beginning
23         Bates Number OACBHA-00010305, was
24         marked for purposes of
25         identification.)

24 (Pages 90 - 93)

Page 94

1                - - - - -
2        Q.   Do you recognize this document?
3        A.   I don't.
4        Q.   The document, at the top it says,
5    "Meeting Notes March 17th, 2010."
6            Do you see that?
7        A.   I do.
8        Q.   And there's a list of attendees
9    underneath it -- I'm sorry.  And it's meeting
10   notes from an opiate task force.
11           Do you see that?
12       A.   I do.
13       Q.   And on the list of attendees from
14   OACBHA there is you and Liz Henrich.
15           Do you see that?
16       A.   I see that.
17       Q.   And there are also attendees listed
18   from the governor's office of faith-based and
19   community initiatives from ODADAS, from the
20   Office of the Attorney General, and from OSU.
21           Do you see that?
22       A.   I do.
23       Q.   Do you recall attending this
24   meeting?
25       A.   I don't.

Page 95

1        Q.   Any reason to believe that you
2    didn't?
3        A.   No.  My name is on there.  I most
4    likely did.
5        Q.   Do you recall participating in an
6    opiate task force around 2010?
7        A.   I don't know that I was -- I was not
8    a regular member of this task force.  I may have
9    attended this particular meeting -- it looks
10   like these were local task forces.  I don't
11   remember -- I mean, I was not -- this looks like
12   this was the governor's opiate task force
13   meeting based on who was in attendance, but I
14   don't know, but that would be my guess, but --
15       Q.   So the second paragraph of the
16   document under --
17           MS. KEARSE:  I want to state my
18   objection on asking questions about a document
19   she's not familiar with and hasn't seen.
20       Q.   The second paragraph under
21   "GOFCBI" -- and that acronym is the Governor's
22   Office of Faith Based and Community Initiatives,
23   correct?
24       A.   Got it.  Yeah.
25       Q.   It says, "The GOFCBI is interested

Page 96

1    in participating in the community task forces by
2    providing additional support to the ten
3    communities that have been identified."
4            Do you see that?
5        A.   I do.
6        Q.   And do you recall ten community task
7    forces being developed or launched around this
8    time?
9        A.   Specifically, no.  This appears to
10   be a state initiative that I'm guessing I was
11   brought in to be informed about since they're
12   meeting with our boards.  But I was not
13   personally involved in this process that I
14   remember.
15                - - - - -
16           (Thereupon, Walter Deposition
17           Exhibit 7, Multi-Page Document
18           Entitled "Community Opiate Task
19           Force Development," Beginning Bates
20           Number OACBHA-00020567, was marked
21           for purposes of identification.)
22                - - - - -
23       Q.   This is a document with the Bates
24   number OACBHA-00020567.
25       A.   I'm trying to determine if this was

Page 97

1    the Don't Get Me Started campaign.
2        Q.   So this document has a title at the
3    top "Community Opiate Task Force Development."
4            Do you see that?
5        A.   I do.
6        Q.   Do you recognize this document?
7        A.   I don't recognize the document.  I
8    remember we did some of this work, but I don't,
9    off the top of my head, recognize the document.
10       Q.   And --
11           MS. KEARSE:  Again, just for the
12   record, I'll have an objection to asking
13   questions of documents she hasn't seen.
14       Q.   The first sentence of the document
15   says, "The Ohio Association of County Behavioral
16   Health Authorities will work with the Ohio
17   Department of Alcohol and Drug Addiction
18   Services to help ten alcohol, drug addiction and
19   mental health boards, ADMH boards, coordinate
20   the development of local opiate task forces in
21   ten areas in Ohio currently battling the opiate
22   epidemic."
23           Do you see that?
24       A.   I do.
25       Q.   And do you recall OACBHA working

25 (Pages 94 - 97)

Page 98

1 with ODADAS to coordinate development of those
2 ten task forces?
3     A.   I'm going to honestly say I don't
4 know if this is a grant proposal that was funded
5 or not.  It appears to be a grant proposal.  You
6 know, I've done so much work with opiates over
7 the years, I can't honestly say this specific
8 issue.  I don't remember this.  I'm just -- I'm
9 trying like crazy to remember this because we've
10 had several grants over the years, and I had one
11 called "Don't Get Me Started," and I just don't
12 know if that is this or not.  I'm honestly
13 giving you my best answer.
14     Q.   No problem.
15          The second page references an OACBHA
16 Learning Collaborative.
17          Do you see that?
18     A.   I do.
19     Q.   Do you know what that is?
20     A.   I know what a learning collaborative
21 is, yes.
22     Q.   What's the OACBHA learning
23 collaborative?
24     A.   Again, I don't remember this
25 specific learning collaborative.  And, again,

Page 99

1 we've had many of them over the years to address
2 drugs and alcohol and mental health.
3     Q.   So setting aside the document, do
4 you recall there being a learning collaborative
5 related to opioids?
6     A.   Well, we had the prevention -- or
7 not the prevention, the addiction -- the drug
8 addiction committee -- I don't remember these
9 boards coming together at least under me on a
10 regular basis to have a learning collaborative.
11 2010?  Maybe I should, but I just -- I don't
12 remember this.
13     Q.   Did you have a staff member at the
14 time who might have been working on this?
15     A.   Well, it appears that if this is
16 related to this, that Liz would have been with
17 me, but again, if we had had something like
18 this, I would have known.  It's just not ringing
19 a bell.
20     Q.   So the two documents I showed you
21 were related to the 2010 time frame.
22          Do you recall --
23          MS. KEARSE:  Object to form.
24     Q.   -- OACBHA being involved with any
25 opiate task forces during that time frame?

Page 100

1     A.   In 2010 we -- okay.  Here's what I
2 would remember, whether it was task forces or
3 otherwise.  We would have been involved with
4 opiates.  Orman would have been the director of
5 ODADAS.  So it was a primary issue, we were
6 dealing with it.  Probably the first year of our
7 opiate conference -- and we did have a year we
8 had an opiate conference where we focused on
9 task forces.  Again, I can't honestly say it was
10 2010, and I just -- we had a grant and it was a
11 Don't Get Me Started grant during that period of
12 time.  I didn't specifically remember that being
13 about task forces, though.  I remember it being
14 more about an opiate campaign.  So that's --
15 that's what's confusing me here a little bit.
16     Q.   No problem.  And I will -- I will
17 show you a document about that campaign later
18 on, but that's your best recollection about the
19 task forces, correct?
20     A.   Yeah.  Yeah.
21     Q.   So OACBHA has held a number of
22 different opiate conferences or summits over the
23 years?
24     A.   We have, correct.
25     Q.   And has that been an annual event

Page 101

1 over the past number of years?
2     A.   Yes.  We are about to have our tenth
3 one.  The first couple may have been closer than
4 just annual because we had kind of a smaller
5 one, then a bigger one.  It was all during that
6 time period.  But yes, we are about to have our
7 tenth one, and those are annual now.
8          - - - - -
9          (Thereupon, Walter Deposition
10          Exhibit 8, Multi-Page Document
11          Entitled "Ohio's Opiate Epidemic:
12          Responding With Prevention &
13          Treatment," Beginning Bates Number
14          OACBHA-00020498, was marked for
15          purposes of identification.)
16          - - - - -
17     Q.   This is going to be Exhibit 8.
18 Exhibit 8 is the Bates number OHCBHA-00020498.
19     A.   Okay.
20     Q.   Do you recognize this document?
21     A.   I've seen the document.
22     Q.   And the document is titled "Ohio's
23 Opiate Epidemic:  Responding with Prevention and
24 Treatment," correct?
25     A.   Um-hum.

26 (Pages 98 - 101)

Page 102

1    Q.   And is this a document that was
2  published by OACBHA?
3    A.   I believe it was, yes.
4    Q.   And do you know -- do you know who
5  actually wrote this document?
6    A.   I'm guessing it was a combination of
7  folks.  If I had to guess who the lead person
8  was, my best writer was Henrich, so I'm guessing
9  it was her, but again, I'm guessing that our
10  committee -- and it appears there was a planning
11  committee for the opiate conference, so I'm
12  guessing they all fed in because there's a lot
13  of stats here we wouldn't have had unless
14  someone gave them to us.  So that is my guess.
15    Q.   And this is the planning committee
16  for an opiate conference in 2011, correct --
17       MS. KEARSE:  Object to form.
18    Q.   -- looking at page 501?
19    A.   It appears to be, yes.
20    Q.   If you turn to the second page of
21  the document ending in 499, under "Background"
22  it says the opiate -- strike that.  "The
23  epidemic and other opiate addiction and
24  resulting overdose deaths in Ohio has made
25  headlines but improvements are slow in coming."

Page 103

1       Did I read that correctly?
2    A.   Um-hum.  Yes.
3    Q.   And do you agree that that's an
4  accurate statement about -- or as of 2011?
5    A.   Yes.  I mean, this would have been
6  probably right after the budget if this was in
7  '10, so yes.
8    Q.   Right after the biennial budget
9  would have been passed?
10    A.   Yeah.
11    Q.   And it goes on to reference an Ohio
12  Prescription Drug Abuse Task Force appointed by
13  Governor Strickland.
14       Do you see that?
15    A.   I do.
16    Q.   And it indicates that that task
17  force released recommendations on October 1st,
18  2010.
19       Do you see that?
20    A.   I do.
21    Q.   And do you recall that task force
22  sitting here today?
23    A.   I was not on that task force, so, I
24  mean, I recognize there were task forces, yes.
25    Q.   And the document says, and I'm

Page 104

1  quoting about halfway through the paragraph,
2  "Those recommendations were released on October
3  1st, 2010 into a black hole created by 2012-13
4  budget deficit of roughly 8 billion dollars and
5  a struggling alcohol and other drug treatment
6  system racked by previous budget cuts."
7       Do you see that?
8    A.   I do.
9    Q.   And is that an accurate statement
10  based on your recollection of 2011?
11    A.   At that time that would have been an
12  accurate statement that we had received several
13  budget cuts, yes.
14    Q.   And "released on October 1st, 2010
15  into a black hole," do you have an understanding
16  of what that metaphor means?
17       MS. KEARSE:  Object to form.
18    A.   I don't.  I didn't write that, so
19  no.
20    Q.   Do you recall any recommendations by
21  the task force or initiatives related to opioids
22  being put into effect in October 2010?
23    A.   Off the top of my head, I do not.
24    Q.   And it's fair to say that at that
25  time, as of 2010, the state was facing a pretty

Page 105

1  severe budget crisis, right?
2       MS. KEARSE:  Object to form.
3    A.   Yes.
4    Q.   And that was -- and do you recall
5  the factors that caused that budget crisis?
6    A.   The recession of 2008.  I mean, one
7  governor took over from the other governor and
8  there was a lot of talk.  I certainly personally
9  don't know why we had the budget hole we did.
10    Q.   And as we kind of talked about
11  before, there had been previous cuts to the
12  alcohol and drug addiction funding?
13    A.   That's correct.
14    Q.   And those budget cuts, did you
15  understand them to be related to the 8 billion
16  dollar budget deficit?
17    A.   That was the reference given.  I
18  don't really know why, but yes, there were
19  budget cuts during that period of time.
20    Q.   That was the explanation you were
21  given?
22    A.   That was the explanation everybody
23  was given for why there was a tight budget, so
24  -- and it was not just us.
25    Q.   And at that time, that 8 billion

27 (Pages 102 - 105)

Page 106

1 dollar budget deficit that the state had --
2 strike that.
3        In the next paragraph of the
4 document it says, "Ohio now recognizes that
5 lives are being lost and budgets are being
6 decimated by heroin and other opiate abuse,
7 related criminality and societal costs."
8        Do you see that?
9    A.   I'm sorry.  Where are you at?
10   Q.   Oh, I'm sorry.  In the second
11 paragraph of "Background."
12   A.   Yes, I see that.
13   Q.   And is that an accurate statement as
14 of 2011?
15   A.   Yeah, I would say that was.
16   Q.   And Ohio, that means counties and
17 cities across the state, correct?
18        MS. KEARSE:  Object to form.
19   A.   That would be my understanding, yes.
20   Q.   Was that your experience at the
21 time?
22   A.   Yes.
23   Q.   And so the epidemic of heroin and
24 opiate addiction, in your experience that was
25 not just limited to one or two counties, it was

Page 107

1 something affecting the entire state?
2        MS. KEARSE:  Object to form.
3    A.   That's correct.
4    Q.   So if you flip over to page 500, in
5 the first full paragraph there it says, "To help
6 move Ohio forward in addressing the OPDATF
7 recommendations and the widely perceived
8 deficits in treatment modalities for opiate
9 addiction, we are planning a second conference,
10 a part 2 to the March 2010 conference,
11 "Medication-Assisted Treatment:  Putting the
12 Brakes on the Opiate Epidemic."
13        Did I read that correctly?
14   A.   You did.
15   Q.   So do you have an understanding of
16 what the reference to "widely perceived deficits
17 in treatment modalities for opiate addiction"
18 means?
19   A.   Well, yes.  I think at this time
20 medication-assisted treatment was just becoming
21 the norm.  We didn't have enough trained doctors
22 across the state of Ohio.  We didn't have enough
23 treatment facilities that were using
24 medication-assisted treatment.  So I believe
25 that's what that references to, and there were

Page 108

1 not a lot of other options for treating opiate
2 addiction residentially.
3    Q.   And do you recall the reasons why
4 medication-assisted therapy was just becoming
5 the norm at that time?
6    A.   Do I recall the reason why it was
7 just becoming the norm?  I think across the
8 country it was just becoming the norm.  I mean,
9 there were new drugs coming on the market.
10 There were doctors needing to be trained.  I
11 think at that point SAMHSA maybe was doing the
12 Data 2000.  I mean, so there was just more going
13 on in general around the whole issue.  And Ohio
14 was taking a stronger look at the issue and
15 trying to do more.  Governor Kasich came in with
16 a different approach to dealing with the opiates
17 than the previous governor had had.
18   Q.   And the -- and Ohio is taking a
19 stronger interest in this because there were
20 more people seeking treatment for opiate use
21 disorder at the time; is that correct?
22        MS. SHAYNAK-DIAZ:  Object to form.
23   A.   Yes.  I mean, I think that and you
24 had a governor who was making it a bigger issue.
25   Q.   And the document references a March

Page 109

1 2010 conference on medication-assisted
2 treatment, putting the brakes on the opiate
3 epidemic.
4        Do you see that?
5    A.   I do.
6    Q.   Do you recall that conference?
7    A.   Vaguely.
8    Q.   Was that a conference that OACBHA
9 put on?
10   A.   I believe it was the first
11 conference that we put on.  It references it
12 being smaller, which our first one was, so I
13 believe it was our first, yes.
14   Q.   Did you personally have a role in
15 putting on that conference?
16   A.   Well, yes.  In that I'm the CEO, I
17 would have had a conference planning committee
18 and staff member who kind of led this
19 conference, but sure, I would have been
20 involved, absolutely.
21   Q.   And who would the staff member have
22 been?
23   A.   I'm guessing it would have been Liz
24 Henrich.
25   Q.   Whose idea was it to have that

28 (Pages 106 - 109)

Page 110

1  conference in 2010?
2      A.   It was a combination of things, if I
3  remember correctly.  We had several directors
4  that were working on our -- it would have been
5  the drug addiction division, and there were
6  different directors that were working locally
7  and it would have come up through that.  And I'm
8  sure we jumped on it because we liked to do
9  conferences.  So I'm guessing that that's where
10  that would have come from.
11      Q.   Do you happen to recall any of the
12  speakers or presenters from that?
13      A.   Oh, gosh.  No.
14      Q.   It was nine years ago.
15      A.   Sorry.  We've had a lot of them.
16      Q.   At the bottom of the page in the
17  last full paragraph there's a sentence that
18  says, "To have the greatest impact, education on
19  opiate issues and treatment must reach our legal
20  system since that system controls much of the
21  funding available."
22          Do you see that?
23      A.   I'm not sure which paragraph.  Are
24  you on 500 still?
25      Q.   500, the last full paragraph.

Page 111

1      A.   Got it, "Another area of expansion."
2  Yes.
3      Q.   And the last sentence about, "To
4  have the greatest impact, education on opiate
5  issues and treatment must reach our legal system
6  since that system controls much of the funding
7  available" --
8      A.   Correct.
9      Q.   -- do you have an understanding of
10  what that means?
11      A.   We had drug courts at the time, and
12  drug courts were getting folks involved into
13  treatment.  I'm not quite sure what they're
14  controlling the funding available other than the
15  thinking that it was through the drug courts
16  there were more funds.  I'm not sure why that
17  statement would have been made.
18      Q.   If you flip over to the next page of
19  the document that ends in 501 and onto 502 --
20      A.   Um-hum.
21      Q.   -- there is a list of people who
22  were invited to be on a conference planning
23  advisory committee.
24          Do you see that?
25      A.   I do.

Page 112

1      Q.   And the conference being planned is
2  to be held on April 12, 2011 in Columbus.
3          Do you see that?
4      A.   I do.
5      Q.   Do you know who selected this list
6  of people to be invited to the planning advisory
7  committee?
8      A.   I'm sure I had something to do with
9  it.  I'm guessing members of our committee,
10  which would have probably been John maybe and
11  Orman, seeing how they're from -- but I'm sure
12  we would have had many recommendations also
13  based on the fact of who attended our last
14  conference.  And just by looking at these names,
15  many of them were just because they're partners
16  that we work with on a regular basis.  I mean, I
17  look at Charleta and Ann and Janet.  Those are
18  all associations that we work with on a regular
19  basis, which is why they would have been on
20  there.  The folks from Ohio State University my
21  guess is presented at our first one.  The people
22  on the front page are our members.  And then you
23  again got the council, Behavioral Health and
24  Family Services.  I mean, these are all naturals
25  that would have been on a planning committee of

Page 113

1  this sort.
2      Q.   And in terms of the agencies that
3  you referenced as working with regularly, that
4  was Charleta Tavares at the Multiethnic
5  Advocates for Cultural Competence?
6      A.   All of these would have been part
7  of -- yes, like the Coalition for Healthy
8  Communities, which is a group of folks that work
9  regularly.  I mean, there's nobody on here that
10  I don't know that we haven't worked with at some
11  point in time or another, yes.
12      Q.   So have you worked with the -- going
13  back to Ms. Tavares, have you worked with the
14  Multiethnic Advocates for Cultural Competence on
15  anything related to opioids that you can recall?
16      A.   We -- no.  I'm guessing some of my
17  staff may have, but I don't know that we've done
18  a lot of work with MACC.
19      Q.   What about the Ohio Association of
20  Family Practitioners?
21      A.   Ann Spicer, only in the sense that
22  as part of the opiate conference, we would have
23  invited her, but I haven't had a lot of outside
24  working with Ann.  But she's also part of the
25  Coalition for Healthy Communities.  It's a

29 (Pages 110 - 113)

Page 114

1 coalition that meets monthly of many of these
2 same players, not all of them but many of them.
3 Charleta would have been on it.  Ann would have
4 been on it.  Janet would have been on it.
5 Michael would have been on it.  Pat would have
6 been on it.  Those are the people that would
7 have been on the Coalition for Healthy
8 Communities, which is how I would have worked
9 with them in other ways.
10    Q.    And the Coalition for Healthy
11 Communities, is that a separate organization
12 from OACBHA?
13    A.    It's not an organization.  It is a
14 coalition of people like me that come together.
15    Q.    So a coalition of heads of
16 organizations?
17    A.    Exactly, that meets monthly, but
18 it's not -- I don't think it's incorporated in
19 its own -- it, you know --
20    Q.    And has the Coalition for Healthy
21 Communities been involved in any opiate-related
22 initiatives?
23    A.    Not specific just focused on
24 opiates.  We've done budget advocacy, those kind
25 of things, all of us together, and there may

Page 115

1 have been an opiate issue, but as a whole it has
2 not specifically led any opiate initiatives, no.
3    Q.    Number two, the first person on the
4 list of the conference planning advisory
5 committee invitees is Dr. Christina Delos Reyes
6 from the ADAMHS Board of Cuyahoga County?
7    A.    Correct.
8    Q.    Do you know Dr. Delos Reyes?
9    A.    I do.
10    Q.    And in what context do you know her?
11    A.    Basically from -- she presented at
12 several of our opiate conferences.  She
13 presented on medication-assisted treatment.  She
14 would do Data 2000 training for us.  So I'm sure
15 I've run into her in other places, but
16 specifically she has done that for us and done
17 that work.
18    Q.    Up next to "Goals" on the same page,
19 501, it references a conference steering
20 committee.
21       Do you see that?
22    A.    Yes.  That would have been with
23 these below.
24    Q.    Is it the same list of people?
25    A.    Yeah.  I believe that's this

Page 116

1 (indicating).
2    Q.    This one is going to be 9.
3       - - - - -
4       (Thereupon, Walter Deposition
5       Exhibit 9, Multi-Page Document
6       Entitled "Ohio's Opiate Epidemic:  A
7       Summit on Policy, Prevention &
8       Treatment," Beginning Bates Number
9       CUYAH_015850477, was marked for
10       purposes of identification.)
11       - - - - -
12    A.    Well, that looks like ours.
13    Q.    Exhibit 9 is Bates labeled
14 CUYAH_015850477.
15       Do you recognize this document?
16    A.    I do.
17    Q.    What is it?
18    A.    It appears to be one of our opiate
19 conference packets.
20    Q.    And this particular packet
21 references a conference on April 5th, 2011; is
22 that correct?
23    A.    Correct.
24    Q.    And the title of the conference was
25 "Ohio's Opiate Epidemic, a Summit on Policy,

Page 117

1 Prevention and Treatment," correct?
2    A.    Correct.
3    Q.    And is Exhibit 9 a document that was
4 created by OACBHA?
5    A.    It was.
6    Q.    Who at OACBHA created the document?
7    A.    Liz Henrich.  I can tell you exactly
8 who created this.  This was definitely Liz.  All
9 the opiate conference documents were Liz.
10    Q.    So she would have been the one who
11 put together the agendas for these each year?
12    A.    Yes.  I mean, in consultation with
13 other folks, but she -- she is our lead person
14 on opiate conferences, yes, has been all along.
15    Q.    So the topic of this summit after
16 opiate epidemic was a summit on policy,
17 prevention and treatment, correct?
18    A.    Correct.
19    Q.    Who was responsible for choosing
20 that particular topic for this conference?
21    A.    Us and the committee.
22    Q.    The committee being a planning
23 advisory committee?
24    A.    The planning committee, correct.
25    Q.    And what was OACBHA's role in

30 (Pages 114 - 117)

Page 118

1 putting on this conference?
2    A.   It was us.  I mean, we did it.  We
3 hosted.  We would go out and find funding.  We'd
4 put together the agendas.  We put out a call for
5 papers, or in this case I think we just went to
6 individuals and asked them to present.  We file
7 for the CEUs.  We put all the documents
8 together.  We make all the copies for the
9 conference.  I have a whole other staff person
10 that's responsible for the facilities, the food,
11 all of that.  I mean, we do this.  This is our
12 conference.
13    Q.   Is there any other organization who
14 helped you put on the conference?
15    A.   Financially, possibly, but putting
16 it on other than we do get -- because it is now
17 so large at 1,200 people, we get other people
18 who volunteer to help us staff the date of, but
19 no, lock, stock and barrel, this is pretty much
20 us that does this.
21    Q.   And what would you say the purpose
22 of this conference was, this particular one in
23 2011?
24    A.   Education.  This was our second one.
25 I do remember this.  We -- initially -- and this

Page 119

1 would have been -- was this a two-dayer?  You
2 know, the topic it appears on this one was
3 particularly making sure that we were working
4 with law enforcement.  So, I mean, it was
5 educational.  It was to help people deal locally
6 with the epidemic.
7    Q.   And what were the types of people
8 who attended this conference?
9    A.   This particular one, geez, I can't
10 say exactly.  I mean, by looking at -- based on
11 the topic, I would guess that we had some law
12 enforcement folks.  I'm sure that we would have
13 had treatment providers, we would have had board
14 folks.  We may have had some legislators.  We
15 obviously had a couple presenting.  So it would
16 have been a wide variety of folks that are
17 working in the opiate space.
18    Q.   Did OACBHA advertise the conference?
19    A.   I'm sure we did, yes.
20    Q.   How did you do that?
21    A.   We would have done it through our
22 newsletter.  We would have sent it out through
23 our partners.  We don't, like, put it in a
24 newspaper or anything like that, but we send it
25 out through our partners.  We send it out to our

Page 120

1 boards, who send it out to all of their
2 providers.  We send it to the provider
3 organization.  All of those people that were on
4 that steering committee, I'm sure we would have
5 asked them, when it was time to register, to
6 send it out as well.
7    Q.   And when you say send it out through
8 partners, who are the partners you're referring
9 to?
10    A.   For the most part, the people that
11 were on that steering committee.  There may have
12 been another partner here that are asked, like
13 oftentimes I ask the county commissioners to
14 send some out, things like that, just whomever I
15 thought could get it out to people that might
16 have been appropriate to attend.
17    Q.   So as the CEO of OACBHA, which was
18 putting on this conference, was it your
19 understanding that Ohio was, in fact, suffering
20 from an opiate epidemic in 2011?
21        MS. KEARSE:  Object to the form.
22    A.   Yes.
23    Q.   And that the opiate epidemic was not
24 limited at that time -- strike that.
25        And that the opiate epidemic was not

Page 121

1 limited to particular counties or areas of the
2 state?
3        MS. KEARSE:  Object to form.
4    A.   It may not have been in each of the
5 88 counties, but it certainly wasn't limited to
6 one area.  It was across the state.
7    Q.   What's the basis of that
8 understanding?
9    A.   Working with my directors and
10 reading, talking to people.  I mean, this is my
11 profession.
12    Q.   We talked earlier about the OACBHA
13 membership meetings.
14    A.   Um-hum.
15    Q.   Was the opiate epidemic a topic of
16 discussion at those meetings around this time in
17 2011?
18    A.   I can only guess that it was.  I
19 mean, I don't remember off the top of my head
20 each meeting, but we would have talked about the
21 upcoming conference.  We may well have had --
22 talked about who they thought should present.
23 So yes, I would believe.  And plus with the
24 budget, yeah.
25    Q.   So the conference would have been

31 (Pages 118 - 121)

Page 122

1 discussed at the membership meeting?
2    A.   We always announce what we're doing,
3 when it is, all of that, yes.  We put save the
4 dates in their packets, absolutely.
5    Q.   And separate and apart from the
6 conference, was the opiate epidemic a frequent
7 topic of discussion at the meetings?
8       MS. KEARSE:  Object to form.
9    A.   At this point in time -- I'm not
10 going to say it didn't come up.  I'm sure it did
11 at some point.  But when we had the mental
12 health and the division, the alcohol and drug
13 division, I would say the intense focus would
14 have been more in the division meetings versus
15 the membership meetings, but I'm sure it came
16 up.
17    Q.   And the relevant division would have
18 been the alcohol and drug --
19    A.   Correct.
20    Q.   So people who attended the
21 membership meetings would have been aware that
22 OACBHA was putting on a conference about the
23 opiate epidemic in Ohio?
24    A.   Oh, absolutely.
25       MS. KEARSE:  Object to form.

Page 123

1    Q.   And people who attended the alcohol
2 and drug addiction meetings would have been --
3 would have also heard discussions about the
4 opiate epidemic separate and apart from the
5 conference?
6    A.   Most likely, yes.
7       MS. KEARSE:  Object to form.
8    Q.   And was it your understanding that
9 abuse of prescription opioids contributed to the
10 epidemic that was going on in 2011?
11    A.   Yes.
12    Q.   As well as abuse of illicit opioids
13 like heroin?
14    A.   Yes.
15    Q.   Who chose -- strike that.
16       So I take it OACBHA chose the name
17 of the summit, "Ohio's Opiate Epidemic"?
18    A.   I'm guessing we came up with that
19 name.
20    Q.   And if you flip ahead to the agenda
21 for the summit --
22    A.   Yes.
23    Q.   So you gave the welcome address,
24 correct?
25    A.   Apparently I did, yes.

Page 124

1    Q.   And you were followed by Governor
2 Kasich?
3    A.   Correct.
4    Q.   Who spoke about Ohio's opiate
5 epidemic, correct?
6    A.   Correct.
7    Q.   And then there were two other
8 representatives, Representative Johnson and
9 Representative Burke, who also spoke on the
10 opiate epidemic?
11    A.   Correct.
12    Q.   And the topic of their speech was
13 "Ohio's Opiate Epidemic - Addressing the
14 Problem," correct?
15    A.   Um-hum.
16    Q.   And then Mr. Hall, who was director
17 of ODADAS at the time, gave a presentation
18 called "Ohio's Opiate Epidemic - the Facts,"
19 correct?
20    A.   Correct.
21    Q.   And then after a break -- I'm going
22 to butcher this poor man's name, but
23 Dr. Wymyslo --
24    A.   Wymyslo.
25    Q.   Not too bad -- who was director of

Page 125

1 the Department of Health, gave a presentation on
2 "Ohio's Opiate Epidemic - A Public Health
3 Perspective," correct?
4    A.   I'm going to say correct as in that
5 is what is here.  Is it possible one of them
6 didn't show up?  It is possible.  I mean, I do
7 not remember in 2010, but -- or '11, but yes.
8 My guess is yes.
9    Q.   They were scheduled to?
10    A.   Yes.  I do know -- I remember the
11 governor absolutely being there.
12    Q.   And then there was, after that, an
13 opiate task force panel, correct?
14    A.   Correct.
15    Q.   And then another presentation by
16 Attorney General Mike DeWine on "Ohio's Opiate
17 Epidemic - A Public Safety Perspective,"
18 correct?
19    A.   Correct, although I'm not sure if he
20 actually was able to be there.  I remember we
21 had a conference once and one of his staff ended
22 up presenting for him and I'm not sure if this
23 was the one or not.
24    Q.   Got it.
25       But someone from the Attorney

32 (Pages 122 - 125)

Page 126

1 General's office presented on the opiate
2 epidemic?
3     A.  Yes.
4     Q.  So there were just at this
5 conference five different presentations on the
6 opiate epidemic specifically?
7     A.  Everything there was on the opiate
8 epidemic.
9     Q.  So fair to say that anybody
10 attending this conference would have been made
11 aware, if they weren't already, that there was
12 an opiate epidemic in Ohio?
13         MS. KEARSE:  Object to form.
14     A.  They would have heard that the
15 people presenting believed there was one, yes.
16     Q.  On the opiate drug task force panel,
17 the last person on the list is Vince Caraffi,
18 chair of the Cuyahoga County Opiate Task Force.
19         Do you see that?
20     A.  I do.
21     Q.  Do you know Mr. Caraffi?
22     A.  I do not.  I may have met him, but
23 to say his name if he walked in front of me, I
24 wouldn't know him, no.
25     Q.  And after the presentations there

Page 127

1 were a series of breakout sessions, correct?
2     A.  Correct.
3     Q.  And these are smaller sessions that
4 focus on more specific topics; is that fair?
5     A.  That's correct.
6     Q.  Who chose the topics for the
7 different breakout sessions?
8     A.  I'm going to guess I had some input,
9 Liz had some input, and our committee had input,
10 and we may -- and I don't know.  I mean, we do
11 this a lot now so it's very hard to keep one
12 separate from the other.  A lot of people
13 contact us and say we'd like to present on a
14 particular topic, so someone may have let us
15 know they would like to present, and I can't say
16 that one of these folks didn't do that.
17     Q.  Do you currently have a process for
18 selecting presenters?
19     A.  No, we do not.  We actually have a
20 call for papers.  This past year -- we have 60
21 sessions in our upcoming conference.  We had
22 over 80 presentations submitted.  I think it was
23 88.  Don't quote me on that number, but it was
24 over 80.  So we actually had to decide which
25 ones we were selecting.  We do call for papers

Page 128

1 for presentations for all our breakouts.  We do
2 not do a call for paper for key notes.  We make
3 decisions on who we want to invite to do key
4 notes.
5     Q.  And who is included in the "we"?
6     A.  Mostly Liz and I.  We run them by
7 our executive council, though, or we'll take
8 feedback.  We have people that maybe go to a
9 national conference, for example, and come back
10 and say, hey, you guys really need to reach out
11 to so and so.
12     Q.  And when did you start doing the
13 formal call for papers?
14     A.  That's a good question.  I don't
15 remember exactly which year.  It's been several
16 years.  I don't know which year that was.
17     Q.  And this conference back in 2011,
18 can you look at the left-hand column on page
19 480?  Dr. Delos Reyes gave a presentation on
20 "Introduction to Medication-Assisted Treatment
21 of Opioid Dependence," correct?
22     A.  Yes.  It appears so.
23     Q.  Did OACBHA track attendance at the
24 summit?
25     A.  Yes.  And I say yes in a bit of a

Page 129

1 qualified -- anybody who wanted any kind of CEUs
2 or board recognized clock hours which are for
3 addiction would have had to sign in and out.  I
4 mean, certainly we would have known who attended
5 based on who took name tags and so forth, but
6 yes.
7     Q.  Did you happen to track or look at
8 whether every county was represented at the
9 Summit?
10     A.  Not this particular one, no.  I
11 don't know.
12     Q.  This is going to be Exhibit 10.
13         - - - - -
14         (Thereupon, Walter Deposition
15         Exhibit 10, Multi-Page Document
16         Entitled "Ohio's 2012 Opiate Summit:
17         Miles Traveled - Miles Ahead," was
18         marked for purposes of
19         identification.)
20         - - - - -
21     Q.  Do you recognize this document?
22     A.  I do.
23     Q.  What is it?
24     A.  This is our 2012 opiate conference.
25         MS. KEARSE:  Do you have a Bates

33 (Pages 126 - 129)

Page 130

1 stamp number for this or is this --
2        MS. McNAMARA:  I downloaded this off
3 the website I'll represent.
4     A.   Didn't we send you all these?  I
5 thought we sent you all the --
6     Q.   You sent a lot.  I can't say off the
7 top of my head.
8     A.   I'm pretty sure we sent you all
9 that.
10        MS. KEARSE:  Just for the record
11 purposes, this is from the website.
12     Q.   This is currently posted on the
13 website.  And is this a document that was
14 published by OACBHA?
15     A.   It was.
16     Q.   And this is a conference that was
17 put on by OACBHA?
18     A.   It was.
19     Q.   And the conference -- the date of
20 the conference was May 7th to 8th, 2012,
21 correct?
22     A.   It was, yes.
23     Q.   The title of the Summit was "Miles
24 Traveled - Miles Ahead."
25        Do you see that?

Page 131

1     A.   I do.
2     Q.   Is there some significance to the
3 name?
4     A.   Were we trying to be snappy?  I
5 don't know.  Seriously, my guess is we were
6 looking at we had made some progress and there
7 was a lot more to be made.  I'm only guessing
8 that.  I mean, I'm sure we came up with the
9 name.
10     Q.   And this particular summit expanded
11 from the one-day summit the previous year into
12 two days?
13     A.   That's correct.  This is our first
14 two days.
15     Q.   And it looks like on the first day
16 there were some different pre-summit
17 presentations involved or offered, correct?
18     A.   Correct.
19     Q.   And one of those was the opiate
20 epidemic and its impact on medical and clinical
21 practices.
22        Do you see that?
23     A.   I do.
24     Q.   Now, just to back up for a minute.
25 How were the topics for the pre-summit

Page 132

1 presentation selected?
2     A.   Again, I'm assuming we had some form
3 of committee.  If not, just the division would
4 have given us some feedback on where we needed
5 to focus.  This one, and I believe the next one,
6 the first day was not just general sessions.
7 They were focused on a specific topic.
8     Q.   And then if you look at the next
9 page, another of the pre-summit presentations
10 was on Data 2000?
11     A.   Um-hum.
12     Q.   And that was led by Dr. Delos Reyes
13 from Cuyahoga County as well as Dr. Sybil Marsh,
14 correct?
15     A.   Correct.
16     Q.   What is Data 2000?
17     A.   Data 2000 is a training you have to
18 have in order to be able to prescribe an
19 buprenorphine or a suboxone type product.
20     Q.   And do you know how it came about
21 that Dr. Delos Reyes was one of the leaders of
22 this workshop?
23     A.   We know that she had provided the
24 training, so I'm sure we asked her to do it.
25 She was very well versed in this topic, and

Page 133

1 being that she was working with one of our
2 boards, she was pretty easy to reach out to.
3 She helped us out.
4     Q.   And turning to the next page with
5 the agenda for May 8th, you again gave the
6 welcome presentation, this time with
7 Mr. Denihan, correct?
8     A.   Correct.  I believe he was the
9 president of the association at the time, which
10 is why he would have done that.
11     Q.   Was it your understanding from
12 working with Mr. Denihan on this conference and
13 in OACBHA more generally that he was aware of an
14 opiate epidemic at this time?
15        MS. SHAYNAK-DIAZ:  Object to form.
16     A.   Yes.
17     Q.   How were the speakers for this
18 conference chosen?
19     A.   Again, we would have had to have a
20 conference committee just as an FYI.  In order
21 to get CEUs and RCHs, you always have to have a
22 committee helping you plan.  So we would have
23 had a committee so we would have gotten feedback
24 from them.  Again, I'm sure we got feedback from
25 our executive council and most likely the

34 (Pages 130 - 133)

Page 134

1  division, drug and alcohol, and maybe even Orman
2  Hall, who was the director at the time of the
3  department who was one of our funders.
4      Q.   And has it been a similar process
5  for selecting speakers at each of the
6  conferences?
7      A.   Until we went to the full-blown call
8  for papers, yes.
9      Q.   And was it a similar group of people
10 who would have decided the topics as well until
11 you went to the call for papers?
12     A.   You mean the breakouts and so forth?
13     Q.   The topics for the presentations.
14     A.   In general, yes.  We would not
15 necessarily.  They may have well told us what
16 their title was and the specifics, but in
17 general, we knew, I would think, what we were
18 looking for, yes.  I mean, if we reached out,
19 for example, to Director Krolokowski, we
20 wouldn't have told him what to present.  We
21 would have been asking the director of, you
22 know, the Office of National Drug Policy to come
23 give us his updates.  So he decided.  It just
24 depends on what the topic is.
25     Q.   So aside from you, have there been

Page 135

1  any regulars on the conference planning
2  committee over the years?
3      A.   Liz Henrich has been there for every
4  one.  I'm trying to think.  I've had a lot of
5  turnover in directors.  I'm trying to think if
6  any one of them has been there the whole time,
7  and probably not.
8      Q.   Would the president of the executive
9  council customarily participate on the
10 committee?
11     A.   Not necessarily.  We tended to lean
12 towards people -- because we were going for
13 certification, we wanted people who were
14 licensed or certified and it just depended.
15 And, frankly, we have presidents who have
16 different areas of expertise and different areas
17 of focus and it's possible one of our
18 president's main focus wasn't opiates so they
19 may not, in fact, have been on it.
20     Q.   And this conference also had a
21 series of breakout sessions?
22     A.   Correct.
23     Q.   Is that typical of all of the
24 conferences?
25     A.   Absolutely.

Page 136

1      Q.   On page 6 -- sorry.  On page 7 of
2  the document, the second breakout session listed
3  there is "House Bill 93:  Pill Mill Legislation
4  Affecting Change."
5          Do you see that?
6      A.   I do.
7      Q.   Do you know what a pill mill is?
8      A.   I do.
9      Q.   What is it?
10     A.   It was more so in southeast Ohio,
11 but it was doctors who set up practices where
12 basically what they did was prescribe opiates.
13 Sometimes it was cash and carry; sometimes it
14 wasn't.
15     Q.   And do you recall House Bill 93?
16     A.   In general, yes.
17     Q.   And what's your understanding of
18 what House Bill 93 did?
19     A.   Well, they were looking to shut down
20 pill mills.  I mean, that's really what they
21 were doing, and prescribing practices and so
22 forth is how they would go about doing that.
23     Q.   The description of this session
24 references the realities of its implementation
25 and impact in the last line.

Page 137

1          Do you see that?
2      A.   I do.
3      Q.   Do you have an understanding of what
4  that means?
5      A.   I don't know exactly what that
6  meant.  I think the -- I'll just leave it at
7  that.  I'm not exactly sure what that meant.
8      Q.   From your perspective at OACBHA, did
9  you see any unintended consequences or changes
10 as a result of pill mills being closed down?
11         MS. KEARSE:  Object to form.
12     A.   Yes.  I don't know that I would say
13 that they were unintended, but they were
14 unintended to some people.  As pill mills began
15 to close down, we began to see an increase in
16 the use of heroin and other drugs.  A good
17 addict, if they don't get the drug they have had
18 and they don't get into treatment, they will use
19 something else, and I think many of us did
20 anticipate exactly that happening.
21     Q.   Did OACBHA take a position on House
22 Bill 93 or any other legislation relating to
23 pill mills?
24     A.   I'm guessing we did, but honest to
25 God, I don't know what it was.

35 (Pages 134 - 137)

Page 138

1    Q.   The next session down on this page
2  is called "Alternatives to Opioid Use:  Pain
3  Management and Prescribing."
4        Do you see that?
5    A.   I do.
6    Q.   Do you happen to know the presenter,
7  Dr. Soin, S-o-i-n?
8    A.   No.  I may have met him as a
9  presenter, but other than that, no, I don't.
10    Q.   Do you know the other presenter, Dr.
11  Cass?
12    A.   I do not.
13    Q.   On the next page, the third section
14  down, the topic is "Strategies for Statewide
15  Awareness Campaigns."
16        Do you see that?
17    A.   I do.
18    Q.   And this particular session had five
19  different presenters, correct?
20    A.   Um-hum.
21    Q.   And one of them was Scott Osiecki,
22  Director of External Affairs for Cuyahoga County
23  ADAMHS Board, correct?
24    A.   Correct.
25    Q.   Do you know Mr. Osiecki?

Page 139

1    A.   I do.
2    Q.   Did you know him back then in 2012?
3    A.   I did.
4    Q.   Over the years have you worked with
5  Mr. Osiecki on any initiatives or projects
6  related to opioids?
7    A.   Specific to opioids, as I said, I
8  was in Cleveland at one point where they did a
9  conference and I went up there.  Scott may have
10  been involved in that.  I don't remember.  I
11  also believe that Scott may have been involved
12  at some point when we did some of the Don't Get
13  Me Started.  I was not leading that, but he may
14  have worked with us.
15    Q.   Do you know how he came to be
16  selected to be one of the presenters in the
17  session?
18    A.   I don't.
19        MS. McNAMARA:  I don't know how long
20  we've been going, but it's kind of a logical
21  point for a break for me, if that works for you.
22        THE VIDEOGRAPHER:  Off the record at
23  11:56.
24        (Recess had.)
25        THE VIDEOGRAPHER:  On the record,

Page 140

1  11:59.
2        - - - - -
3        (Thereupon, Walter Deposition
4        Exhibit 11, Ohio Legislative Update,
5        Dated February 2012, Beginning Bates
6        Number OhioMHAS S 001, was marked
7        for purposes of identification.)
8        - - - - -
9    Q.   I'm going to hand you what we're
10  marking as Exhibit 11.  This is a document that
11  was actually produced by Ohio MHAS.  The Bates
12  label is OhioMHAS S 001.
13    A.   I can't read the second page, so if
14  you want anything off of that --
15    Q.   No.  I probably can't either.
16        Have you seen this document before?
17    A.   Probably.  We didn't produce it, but
18  I've probably seen it.
19    Q.   And for the record, it's a document
20  Legislative Update dated February 2012.
21        Do you see that?
22    A.   I do.
23    Q.   And in the upper left-hand corner is
24  the logo for Ohio Department of Alcohol and Drug
25  Addiction Services.

Page 141

1        Do you see that?
2    A.   I do.
3    Q.   Now, on the front page of this
4  legislative update is an article about the Don't
5  Get Me Started campaign, correct?
6    A.   Correct.
7    Q.   What was the -- so what was the
8  Don't Get Me Started campaign?
9    A.   It was a marketing campaign to get
10  people to think twice about taking painkillers,
11  to talk about it.  It was a grant we received
12  for marketing purposes that we basically -- the
13  department did a lot of the lead on this.  It
14  was not just us.  They did a lot of the lead on
15  this.  We did a contract with -- I'm going to
16  smear their name, but Fahlgren Mortine or
17  whoever that group is who actually produced the
18  posters and all of that.  Everything had to be
19  approved by the Department of Mental Health --
20  I'm sorry, by the Department of Alcohol and Drug
21  Addiction Services.  I can tell you that the
22  person that worked directly with us from there
23  was Stacey Frohnapfel-Hasson.  My person again
24  would have been Liz because she does a lot of
25  our marketing stuff.  But I was aware of all of

36 (Pages 138 - 141)

Page 142

1 this, yes.
2    Q.    So Stacey -- what was her last name?
3    A.    Frohnapfel-Hasson.
4    Q.    And she was from ODADAS?
5    A.    She worked with ODADAS, yes.
6    Q.    And you mentioned that there was
7 a -- this was a grant for marketing purposes?
8    A.    Correct.
9    Q.    Where was that grant from?
10    A.    The Department of Alcohol and Drug
11 Addiction Services. We may -- this may have
12 been the first time we got some money from
13 Cardinal Health. I don't remember. Cardinal
14 Health may have been one of the grantees as part
15 of this as well.
16    Q.    And what was the purpose of the
17 Don't Get Me Started campaign?
18    A.    Again, educational purposes. There
19 were posters. I believe in some places there
20 were billboards. There was a website to get
21 people to think about it before they took
22 prescription drugs.
23    Q.    So this campaign specifically
24 related to prescription drug abuse, correct?
25    A.    I believe this was prescription

Page 143

1 drugs, yeah.
2    Q.    And this article indicates that the
3 campaign included a website; is that accurate?
4    A.    That is correct.
5    Q.    And it also included posters placed
6 at convenient stores and organizations around
7 the state?
8    A.    Correct.
9    Q.    Were there any other aspects of the
10 campaign that you can recall?
11    A.    You know, we pushed it out to the
12 board so that they could do it locally. There
13 were posters. There may have been like other
14 small things like magnet -- I believe there were
15 magnets that advertised the website that you
16 could go to. There may have been other small
17 tchotchke kind of things with the website on it.
18 I believe there were.
19    Q.    And how long did the campaign run?
20    A.    I think it only went for a couple of
21 years.
22    Q.    And it was launched around 2012?
23    A.    Um-hum. Actually, maybe in '11, '11
24 or '12, yeah. They actually went from this,
25 though, and then the state moved to Start

Page 144

1 Talking and this went away.
2    Q.    And the Don't Get Me Started
3 campaign ran across the state?
4    A.    It did, yes.
5    Q.    And it ran for a few years and then
6 the state launched a different campaign?
7    A.    I think it went for a couple years.
8    Q.    And that one was called?
9    A.    I believe it was called Start
10 Talking, and we did not do that campaign.
11    Q.    Has OACBHA been involved in any
12 other public awareness campaigns regarding the
13 opiate epidemic since Don't Get Me Started?
14    A.    Since Don't Get Me Started? Well,
15 we have a website, Recovery is Beautiful. It is
16 not opiate specific, but it is a website that
17 goes to individuals who have lived recovery.
18 They tell stories. We put up stories. We put
19 up blogs. Sometimes it's related to opiates.
20 Sometimes it's general addiction. Sometimes
21 it's mental health. But that's not a campaign
22 that's specific to opiates, but we have
23 certainly done that. We do one-pagers and I
24 know we sent them all to you. We do one-pagers
25 every month. Sometimes those are opiate

Page 145

1 specific. Sometimes they're not. So we send
2 those to thousands of people when we do them.
3 But it wouldn't be a campaign per se. It would
4 just be educational.
5    Q.    And to whom do those one-pagers get
6 distributed?
7    A.    Legislators. Many of the people
8 that were on that opiate task force, we send
9 them to their committees. All our boards get
10 them to give to their board directors. We give
11 them to the departments to send out. And I
12 think we have a mailing list right now of
13 about -- above and beyond that, about 6,000
14 people. And we always put the opiate ones in
15 the opiate conference packets.
16    MS. McNAMARA: Okay. So let's break
17 for lunch.
18    THE VIDEOGRAPHER: Off the record at
19 12:05.
20
21    (Luncheon recess taken.)
22
23
24
25

37 (Pages 142 - 145)

Page 146

1    THE VIDEOGRAPHER:  We're on the
2 record, 1:03.
3        - - - - -
4    AFTERNOON SESSION
5    CONTINUED EXAMINATION OF CHERI WALTER
6 BY MS. McNAMARA:
7    Q.   Welcome back.
8    A.   Thank you.
9        - - - - -
10       (Thereupon, Walter Deposition
11       Exhibit 12, Multi-Page Document
12       Entitled "Ohio's Opiate Issues,
13       Ashtabula County Opiate Summit,"
14       Dated October 14, 2011, was marked
15       for purposes of identification.)
16       - - - - -
17    Q.   I'm going to hand you what I've
18 marked as Exhibit 12.  This document was
19 produced by OACBHA with a Bates number
20 OACBHA-00004840.
21    A.   I had forgotten all about this one.
22 I'm ready.
23    Q.   Great.
24       Do you recognize this document?
25    A.   I do now.  I had forgotten all about

Page 147

1 it, but yes.
2    Q.   And, for the record, the document
3 title page says, "Ohio's Opiate Issues,
4 Ashtabula County Opiate Summit"; is that
5 correct?
6    A.   Correct.
7    Q.   And does this -- does this
8 document -- is this document a presentation that
9 you made at that summit?
10    A.   I believe so.
11    Q.   And the summit was October 14th,
12 2011, according to the document --
13    A.   Okay.
14    Q.   -- correct?
15       The Ashtabula Opiate Summit, was
16 that an OACBHA event?
17    A.   It was not.  I believe it was the
18 Ashtabula Board that put this on.
19    Q.   And was it a one-time event or is it
20 something that they --
21    A.   I can't answer that.  That's the
22 only time I ever went to their event.
23    Q.   And do you know or recall why
24 Ashtabula County -- strike that.
25       Do you know what prompted Ashtabula

Page 148

1 County to put on an opiate summit back in 2011?
2    A.   I don't know exactly.  My guess is
3 their task force -- they were not the only
4 county that's ever put one on.  Others have.
5    Q.   Do they have an opiate task force?
6    A.   I'm guessing they do, yes.
7    Q.   Who asked you to present at the
8 summit?
9    A.   I'm guessing Miriam Walton, who is
10 the director there.  I don't know who else from
11 Ashtabula County would have asked me.
12    Q.   Did you draft this presentation?
13    A.   I'm guessing Liz Henrich and I did,
14 but yes.
15    Q.   So can you flip ahead to -- I think
16 it's the sixth page -- that has "The Development
17 of an Epidemic" at the top?
18    A.   Got it.
19    Q.   Did you draft the language on this
20 slide?
21    A.   I'm sure we put the slide together.
22 Whether or not I took that from somebody else or
23 not, I can't answer.  But yeah, I'll own that,
24 sure.
25    Q.   But you would have approved this

Page 149

1 slide before you gave the presentation, correct?
2    A.   Yes.  Yes.  I'm just saying I don't
3 know if I maybe took this from some other
4 presentation that I had seen is what I'm saying.
5 I don't know that I'm original.  I don't want to
6 own somebody else's work.  But yeah.
7    Q.   Gotcha.  Fair enough.
8       And this particular slide, the topic
9 is "Development of an Epidemic," and it contains
10 a series of bullet points, correct?
11    A.   Correct.
12    Q.   And the first bullet point says,
13 "New and better pain medications became
14 available in the mid-1990s."
15    A.   Correct.
16    Q.   Do you see that?
17    A.   Correct.
18    Q.   And do you view that as a factor in
19 the development of the opiate epidemic?
20    A.   Yeah.
21    Q.   How is that?
22    A.   I think because of the -- the
23 advertising of the fact that America is a
24 company where people don't want pain and, you
25 know, we had the whole 5th vital sign, and I'm

38 (Pages 146 - 149)

Page 150

1 probably going on too long here, but anyhow, I
2 just think it all kind of led together.
3     Q.   The next bullet point said,
4 "Insurers promoted use of Rx drugs to reduce
5 more expensive hospital stays."
6        Do you see that?
7     A.  I do.
8     Q.   And do you believe that was a factor
9 in the development of the opiate epidemic?
10    A.  Yeah.  Yeah, I'm sure that I read
11 that somewhere and I used it, yes, but I do
12 believe that keeping people out of hospitals was
13 part of why things happened, yes.
14    Q.   So am I understanding correctly
15 you're saying people were prescribed drugs and
16 sent home rather than kept in the hospital?
17    A.   I believe that to be --
18    Q.   Prescribed prescription opioids
19 specifically?
20    A.   Yeah.  Yeah.
21    Q.   The next bullet point is "Changes in
22 prescribing laws took prescription opioids from
23 being restricted to hospitals to at-home use."
24        Do you see that?
25    A.   I do.

Page 151

1     Q.   And do you view that as a factor in
2 the development of the opiate epidemic?
3     A.  I do.  I think just the general
4 increased availability of opiates, yes.
5     Q.   Increased availability meaning
6 availability from doctors?
7     A.   Yeah.
8     Q.   Willingness of doctors to prescribe
9 opioids --
10    A.   Um-hum.
11    Q.   -- to be more precise?
12        THE COURT REPORTER:  I'm sorry.  Did
13 you answer?
14        THE WITNESS:  Yes.
15    Q.   The next bullet point is,
16 "Advertising by drug manufacturers drove demand
17 for drugs that had the ability to change a
18 patient's lifestyle."
19        Do you see that?
20    A.  I do.
21    Q.   And do you believe that's a factor
22 in the development of the opiate epidemic?
23    A.  I do.
24    Q.   With respect to advertising by drug
25 manufacturers, are you referring specifically to

Page 152

1 advertising for prescription opioids?
2     A.   In this particular case I probably
3 was, yes.
4     Q.   To whom?  Advertising to whom?
5 Sorry.
6     A.   To doctors.
7     Q.   And then the last bullet point is
8 "Shift in marketing from prescribers to
9 patients."
10        Do you see that?
11    A.   I do.
12    Q.   And do you believe that's a factor
13 in the development of the opiate epidemic?
14    A.   I do.
15    Q.   And shift in market -- shift in
16 marketing by whom?
17    A.   Prescription drug companies in
18 general.  I mean, even today we still see them
19 on the TV.  We see them, you know, in magazines,
20 and I just believe people began to believe they
21 didn't have to feel pain.
22    Q.   Do you recall seeing any
23 advertisements on TV for prescription opioids?
24    A.   I don't right off the top of my
25 head.

Page 153

1     Q.   Any advertisements in magazines for
2 prescription opioids?
3     A.   Not lately, no.  No.
4     Q.   If you flip ahead to the next set of
5 slides --
6     A.   Next -- oh, the maps?
7     Q.   Yes.  There are a series of heat
8 maps of the state of Ohio?
9     A.   Correct.
10    Q.   And these are maps that show the
11 percentage of client admissions for opiate abuse
12 and dependence, correct?
13    A.   Correct.
14    Q.   On the left underneath the legend
15 there's a text box that says, "This map
16 represents the percentage of clients in
17 treatment with an opioid-related diagnosis."
18        Do you see that?
19    A.   Correct.
20    Q.   Do you know what counts as an
21 opioid-related diagnosis?
22    A.   I believe in this case it could be
23 primary or secondary.
24    Q.   And what does primary or secondary
25 refer to?

39 (Pages 150 - 153)

Page 154

1    A.   Their drug of choice could be
2 opioids but yet they're addicted to alcohol, or
3 their drug of choice could be alcohol but yet
4 they've used opioids in their life as well and
5 they report that upon assessment.
6    Q.   So how did you get these maps?
7    A.   They came out of MACSIS. I believe
8 these maps were ones that I had seen Orman Hall
9 use in an opiate conference and I either asked
10 him for them or we already had them because we
11 had his presentation presentation is my guess.
12    Q.   And was that an OACBHA opiate
13 conference or --
14    A.   That he would have presented these
15 at, yes.
16    Q.   And these are -- in the upper
17 left-hand corner there is the Ohio Department of
18 Alcohol and Drug Addiction Services logo, right?
19    A.   Right.
20    Q.   Got it.
21        Do you know whether ODADAS created
22 and disseminated these maps regularly or was it
23 a special request or project by Mr. Hall?
24    A.   I don't know that they did them
25 regularly. I won't say that this was the only

Page 155

1 time I had ever seen them by far. I believe he
2 also had -- again, I shouldn't speak for him.
3 This was not the only time I had ever seen them.
4    Q.   The first of these maps is from
5 2001, correct?
6    A.   Correct.
7    Q.   And --
8    A.   Well, the data is from 2001.
9    Q.   Thank you.
10        So I'll back up to make the record
11 clearer.
12        So the first map contains data from
13 2001, correct?
14    A.   Correct.
15    Q.   And the data from 2001 shows that
16 the highest concentrations for opiate admissions
17 were in Cuyahoga County at 14.3 percent.
18        Do you see that?
19    A.   I do.
20    Q.   And, also, Summit County is the
21 fourth highest at 12.1 percent.
22        Do you see that?
23    A.   I do.
24    Q.   And then the next of the heat maps
25 contains data from 2003, correct?

Page 156

1    A.   Correct.
2    Q.   And, again, both Cuyahoga County and
3 Summit County are listed as having among the
4 highest concentrations for opiate admissions,
5 correct?
6    A.   Yes.
7    Q.   And at that point Cuyahoga County,
8 between 2001 and 2003, went up from 14.3 percent
9 to 16.3 percent, correct?
10    A.   Correct.
11    Q.   And Summit County went up from 12.1
12 to 12.7 percent, correct?
13    A.   Correct.
14    Q.   Now, the next map contains data from
15 2005, correct?
16    A.   Yes.
17    Q.   And this map -- there's been a
18 change in the five highest counties for
19 opioid-related diagnoses, correct?
20        MS. KEARSE:  Object to form.
21    A.   Ask the question again.
22    Q.   Yes. That was a terrible question.
23 Sorry.
24        So for the data from 2005, neither
25 Cuyahoga County nor Summit County are listed as

Page 157

1 counties with the highest opioid admissions,
2 correct?
3    A.   Correct.
4    Q.   Now, the highest is Scioto County,
5 with 34.4 percent, correct?
6    A.   Correct.
7    Q.   And meanwhile, Cuyahoga, which was
8 at 16.3 percent, actually dropped down to 12.8
9 percent.
10        Do you see that?
11        MS. KEARSE:  Object to form.
12    A.   I see that, correct.
13    Q.   And Summit County is at 12.8
14 percent, correct?
15    A.   Correct.
16    Q.   And if you go ahead to the last map,
17 which has the data from 2009 --
18    A.   Um-hum.
19    Q.   -- the highest there is again Scioto
20 County at 64.1 percent, correct?
21    A.   Correct.
22    Q.   And Cuyahoga County is now up to 19
23 percent, correct?
24    A.   Correct.
25    Q.   And Summit County is up to 15

40 (Pages 154 - 157)

Page 158

1 percent, correct?
2    A.   Correct.
3    Q.   Ashtabula County, up in the
4 northeast corner --
5    A.   Right.
6    Q.   -- is only 9.2 percent, correct?
7    A.   Correct.
8    Q.   But even at 9.2 percent, Ashtabula
9 County decided to have a summit on the opiate
10 epidemic in 2011, correct?
11    A.   Correct.
12    Q.   So even though they are -- have a
13 lower percentage of opioid-related diagnoses,
14 admissions, they were still aware that the
15 opiate epidemic was going on, correct?
16        MS. KEARSE:  Object to form.
17    A.   Correct.
18    Q.   If you flip ahead to the second to
19 last slide of the presentation right before the
20 thank you, there's a slide that says, "What This
21 Issue is Really About."
22        Do you see that?
23    A.   I do.
24    Q.   Do you remember what you said when
25 you put that slide up?

Page 159

1    A.   I have no idea.  I mean, seriously,
2 it was ten years ago or however long ago, eight
3 years ago.  I don't know what I said.  I mean --
4    Q.   Fair enough.
5    A.   I would pontificate, but it would
6 serve little purpose.
7        - - - - -
8        (Thereupon, Walter Deposition
9        Exhibit 13, E-Mail from Cheri Walter
10        to Several Recipients, Dated October
11        17, 2013, Beginning Bates Number
12        CUYAH_012613450 - Marked
13        Confidential, was marked for
14        purposes of identification.)
15        - - - - -
16        (Thereupon, Walter Deposition
17        Exhibit 14, Multi-Page Document
18        Entitled "Ohio House of
19        Representatives Prescription Drug
20        Addiction and Healthcare Reform
21        Legislative Study Committee
22        Chairman's Report," Dated October
23        17, 2013, Beginning Bates Number
24        CUYAH_012613466 - Marked
25        Confidential, was marked for

Page 160

1        purposes of identification.)
2        - - - - -
3    Q.   I'm going to hand you two documents,
4 which are going to be 13 and 14.
5    A.   Okay.
6    Q.   So Exhibit 13 has the Bates label
7 CUYAH_012613450.
8    A.   Right.
9    Q.   And this is an e-mail from you to a
10 long list of people.
11    A.   My membership, yes.
12    Q.   With the subject line "Several
13 Things/Updates."
14        Do you see that?
15    A.   Correct.
16    Q.   And the date on this is October 17,
17 2013, correct?
18    A.   Uh-huh.
19    Q.   Do you recall sending this e-mail?
20    A.   Not specifically, no, but I
21 absolutely believe it's mine, yes.
22    Q.   And you mentioned that the
23 recipients here were your members?
24    A.   Correct.
25    Q.   And among the recipients of this

Page 161

1 e-mail on the third line is Mr. Denihan.
2        Do you see that?
3    A.   Yes, I do.
4    Q.   And then if you go four lines down
5 from Mr. Denihan right on the left-hand side,
6 there's an e-mail address Craigg@admboard.org.
7        Do you see that?
8    A.   I do now, yes.
9    Q.   And do you know who -- whose e-mail
10 address that is?
11    A.   That's Jerry Craig, the director of
12 the Summit County Board.
13    Q.   And then if you go down toward the
14 bottom, about eight lines up, all the way on the
15 right side, is Scott Osiecki.
16        Do you see that?
17    A.   Yes.
18    Q.   And Mr. Osiecki is with the Cuyahoga
19 County ADAMHS Board, correct?
20    A.   Correct.
21    Q.   And then two lines up from the
22 bottom is Mr. Leffler?
23    A.   Correct.
24    Q.   And as your subject line indicates,
25 this e-mail contains updates on a number of

41 (Pages 158 - 161)

Page 162

1  different things?
2      A.   Correct.
3      Q.   The last of which is a Prescription
4  Drug Addiction and Healthcare Reform Study
5  Committee Press Conference.
6          Do you see that?
7      A.   I do.
8      Q.   And that was a press conference
9  about the issuance of the chairman's report from
10 the Prescription Drug Addiction and Healthcare
11 Reform Study Committee, correct?
12     A.   Correct.
13     Q.   And if you take a look at Exhibit
14 14, which I will represent to you is attached to
15 this e-mail, there were just some attachments in
16 between.  Is this a copy of Representative
17 Sprague's report?
18     A.   It appears to be, yes.
19     Q.   Do you recall reading Exhibit 14,
20 the chairman's report, around the time it was
21 issued in October 2013?
22     A.   I don't recall, but I'm sure I did.
23 Let's put it that way.  Yes.
24     Q.   Do you recall hearing about the
25 committee and the issuance of the report at the

Page 163

1  time?
2      A.   Yes, I do.
3      Q.   Do you recall talking about it with
4  other OACBHA members?
5      A.   The report itself, not necessarily,
6  other than the e-mail, but the process, yes,
7  because he was doing hearings around the state
8  and we had heard from some of our boards about
9  those hearings and so we were trying to make
10 sure they were aware that one could be coming to
11 their community, and if we knew, we tried to let
12 them know.  So about the process, yes.
13     Q.   The process for the committee's
14 investigation that led to the report?
15     A.   Yes.
16     Q.   Got it.
17          And if you turn to page -- pages 3
18 and 4 of the report, it lists the various
19 committee hearings around the state.
20          Do you see that?
21     A.   Yes, I do.
22     Q.   Did you personally attend any of
23 these hearings?
24     A.   God, we had so many different
25 hearings.  I don't believe -- I'm looking.  I

Page 164

1  don't believe I attended any of these four, but
2  I can't swear that I didn't because I've
3  attended some hearings before and I'm not sure
4  which round.
5      Q.   Do you recall providing testimony,
6  written or oral, to this particular committee?
7      A.   I'm sure I spoke with Representative
8  Sprague about this, so I'm guessing it's very
9  possible I did, but again, he's had so many
10 committees over the years that I'm not -- I just
11 don't know, but I'm sure I have talked with him
12 about this.
13     Q.   And has he had multiple committees
14 about opioids?
15     A.   He has had multiple committees about
16 opioids.  And I believe, honestly, this was his
17 first round of hearings.  He did more than one
18 round of hearings.
19     Q.   If you turn to page 6 of Exhibit 14,
20 the heading on that page is "A State-Sponsored
21 Problem."
22          Do you see that?
23     A.   I do.
24     Q.   And the report says, "The General
25 Assembly has great regulatory control over

Page 165

1  Ohio's medical system, and this addiction
2  epidemic could not have occurred at its current
3  level without mistakes that were made within the
4  General Assembly, the state medical regulatory
5  structure and by the individual physicians
6  themselves."
7          Now, based on your experience as CEO
8  at OACBHA and your interaction with the boards,
9  do you agree with that statement by the
10 committee?
11          MS. KEARSE:  Object to form.
12     A.   I don't know that I'm qualified to
13 say that because I believe people grow and
14 learn, so I don't know that I would -- I don't
15 know.  I don't know that I would say that.  I'm
16 not going to say that things couldn't have been
17 different.  But yeah.  Those weren't my words.
18     Q.   Do you believe that the general
19 assembly could have taken measures that might
20 have reduced or abated the epidemic along the
21 way?
22          MS. KEARSE:  Object to form.
23     A.   Yes.
24     Q.   The committee cites a number of
25 contributing factors underneath the paragraph I

42 (Pages 162 - 165)

Page 166

1 just read.
2      Do you see that?
3      A.   Um-hum.
4      Q.   And the first one is the passage of
5 the Intractable Pain Act in 1998.
6      Do you see that?
7      A.   I do.
8      Q.   And the committee described that act
9 as "opening the flood gates for doctors to treat
10 chronic pain with prescription opioids."
11      Do you see that?
12      A.   I do.
13      Q.   And do you understand that to be one
14 of the contributing factors?
15      A.   I honestly don't even know this act,
16 so I can't -- I can't even speak to that.
17      Q.   Fair enough.
18      The second contributing factor
19 listed references pain as the 5th vital sign.
20      Do you see that?
21      A.   I do.
22      Q.   And I think you said something
23 earlier in your testimony about pain is the 5th
24 vital sign, correct?
25      A.   Yes.

Page 167

1      Q.   During your work on opioid-related
2 issues over the years, have you ever spoken with
3 prescribers about their prescribing practices
4 regarding prescription opioids?
5      A.   Personally, other than at a
6 conference where maybe we were having a
7 discussion because we sometimes had, as you saw,
8 the early summits where we would have
9 discussions, but individually, not really.
10      Q.   Do you recall it being a topic at
11 some of the conferences?
12      A.   Yes.
13      Q.   Number 3 on here is the FDA approval
14 of several new and powerful opioid pain
15 medications.
16      Do you see that?
17      A.   I do.
18      Q.   And you listed a similar factor to
19 that in your presentation, correct?
20      A.   Correct.
21      Q.   The next one is our medication and
22 Medicare systems grading hospitals and
23 physicians on how effectively they treat pain.
24      Do you see that?
25      A.   I do.

Page 168

1      Q.   Are you familiar with that?
2      A.   Correct.  I am.
3      Q.   And do you view that as one of the
4 contributing factors to the opioid epidemic?
5      A.   I think that -- because I think that
6 grade is part of the whole 5th vital sign, I do
7 think that that contributed.
8      Q.   And then the last contributing
9 factor is direct consumer advertising molding
10 public opinion.
11      Do you see that?
12      A.   I do.
13      Q.   And you listed a similar factor in
14 your presentation, correct?
15      A.   Correct.
16      Q.   And Representative Sprague and his
17 committee proposed a number of legislative
18 measures --
19      A.   Correct.
20      Q.   -- as part of the report, correct?
21      - - - - -
22      (Thereupon, Walter Deposition
23      Exhibit 15, E-Mail from Cheri Walter
24      to Several Recipients, Dated January
25      7, 2014, Beginning Bates Number

Page 169

1      CUYAH_012609544 - Marked
2      Confidential, was marked for
3      purposes of identification.)
4      - - - - -
5      Q.   This is going to be Exhibit 15.
6      A.   So I'm done with this one
7 (indicating)?
8      Q.   Yes.
9      Exhibit 15 is Bates labeled
10 CUYAH_012609544.
11      A.   Okay.  I don't know that I know each
12 of these bills individually, but okay.
13      Q.   So this is an e-mail from you to a
14 long list of directors and staff?
15      A.   Correct.
16      Q.   Dated January 7, 2014, correct?
17      A.   Correct.
18      Q.   And this document is a -- is you
19 forwarding a summary of legislative proposals
20 addressing opiates, correct?
21      A.   Correct.
22      Q.   And fair to say that at least some
23 of these bills arose out of Representative
24 Sprague's committee and report?
25      A.   Correct.

43 (Pages 166 - 169)

Page 170

1    Q.    The cover e-mail references in the
2  second line bill briefings by Lisa.
3         Do you see that?
4    A.   That's what I was just going to say.
5  Lisa was a staff member of mine.  She was doing
6  legislative work.  That's what I was going to
7  say.
8    Q.   Is she still with OACBHA?
9    A.   She is not.  She is presently
10 working in the senate.
11   Q.   So if you could flip ahead to the
12 page with the Bates ending in 546, the fourth
13 page in, this one is discussing House Bill 332.
14        Do you see that?
15   A.   I do.
16   Q.   And the document describes House
17 Bill 332 as establishes standards and procedures
18 for opioid treatment of chronic intractable pain
19 resulting from non-cancer conditions and to
20 require that professional disciplinary action be
21 taken for failing to comply with those standards
22 and procedures.
23        Did I read that correctly?
24   A.   Correct.
25   Q.   And underneath the description of

Page 171

1  the bill provisions there's a comments section.
2         Do you see that?
3    A.   I do.
4    Q.   And in the comments section it says
5  in the second bullet point, "There could be
6  issues for those suffering with legitimate
7  chronic pain to obtain prescriptions necessary
8  as doctors could become weary of the provisions
9  that require the State Dental Board, the Board
10 of Nursing, the Board of Optometry, and the
11 Medical Board to take disciplinary action for
12 licensees who violate the provisions of the
13 bill."
14        Did I read that correctly?
15   A.   Correct.
16   Q.   So those potential issues with
17 people being able to obtain necessary
18 prescriptions, is that a matter of concern for
19 OACBHA?
20   A.   Sure.
21   Q.   And by extension, is that a matter
22 of concern for the local boards --
23        MS. SHAYNAK-DIAZ:  Object to form.
24   Q.   -- that you represent?
25   A.   I don't know how to answer this.  It

Page 172

1  is not a concern legally for OACBHA.  It would
2  be a concern in that we represent individuals in
3  recovery, and individuals in recovery should
4  have their entire life be healthy, and if
5  individuals are experiencing pain and can't get
6  appropriate treatment, we would not want to see
7  that happen.  So I think how this is
8  characterized is is it a concern.  So I think it
9  should be a concern of all of us that people can
10 get the treatment that they need, but is it a
11 legal concern that OACBHA or the boards have to
12 deal with, I would say no, that's not their job
13 really.
14   Q.   Do you know whether House Bill 332
15 passed?
16   A.   Many of these bills were wrapped
17 into a bigger bill and I don't know which parts
18 and pieces of each actually did end up staying.
19 I can tell you that many of these were not
20 passed as individual bills.  There was an
21 omnibus bill that was created eventually.
22   Q.   Do you recall whether OACBHA took a
23 formal position on HB 332?
24   A.   I do not recall that we did.  We may
25 have, but I don't recall that specifically.

Page 173

1    Q.   And if you flip ahead to the page
2  ending in 556 -- it's the last page of the
3  document.
4    A.   Yes.
5    Q.   -- this one relates to House Bill
6  369.
7         Do you see that?
8    A.   Right.
9    Q.   And the document indicates that
10 House Bill 369 is associated with Representative
11 Sprague.
12        Do you see that?
13   A.   I do.
14   Q.   Under the Bill Provisions, the first
15 bullet point indicates that House Bill 369 would
16 have required boards to establish a full
17 spectrum of care rather than the continuum of
18 care.
19        Do you see that?
20   A.   That is correct.
21   Q.   What does that mean?
22   A.   It meant that each board had to have
23 access to interventions, treatment, housing,
24 medication-assisted treatment.  There was a
25 specific continuum of care created and put in

44 (Pages 170 - 173)

1 statute specific to opiates above and beyond the
2 rest of the continuum of care that boards are
3 responsible for.  It also meant they had to be
4 either within their board area or there could be
5 some that were within a -- a mile radius of the
6 board area, like outpatient medication
7 treatment.  And that's just an example.  So the
8 board had to either have it within the area or
9 they had to have a waiver that it was within a
10 certain amount of travel distance for a couple
11 of them.  They had to have MAT, they had to have
12 outpatient treatment, they had to have
13 residential treatment, they had to have housing,
14 and there's a fifth one and I should really know
15 it and I don't remember it.
16     Q.    And that's as opposed to a continuum
17 of care?
18     A.    No.  They had to have a continuum of
19 care, but there were -- these specific ones had
20 to be within the board area.
21     Q.    Okay.
22     A.    So there are boards that contract
23 with other boards or in other places for some
24 services.  This required a certain set of opiate
25 continuum to be right in a given board area.

1     Q.    And the third bullet point there
2 indicates that the bill would have required the
3 Ohio MHAS director to withhold the funds
4 allocated --
5     A.    That's correct.
6     Q.    -- to an ADAMHS board if the board
7 did not provide that full spectrum of care?
8     A.    And that's -- whereas I don't know
9 that it was here, but the waiver was allowed in
10 a few certain cases, so that never -- that never
11 happened, although the continuum is required,
12 that was passed.
13     Q.    And this bill also would have
14 required each board to provide recovery housing?
15     A.    That's correct.
16     Q.    And what's recovery housing?
17     A.    There's many different definitions,
18 but basically they were looking for housing for
19 individuals who were in recovery from, in this
20 particular case, an opiate addiction.  It didn't
21 matter whether it was drugs or -- I mean
22 prescription drugs or heroin, but to be in
23 recovery.  It was expanded to allow people in
24 recovery from any addiction but they had to have
25 recovery housing.

1     Q.    And under the comments it says,
2 "This legislation, if enacted, could have
3 tremendous impacts on the boards."
4         Do you see that?
5     A.    I do.
6     Q.    And what would -- what were those
7 tremendous impacts?
8     A.    Well, funding, first of all.  Some
9 boards didn't have every service.  Funding was a
10 problem.  The concern with losing money.  Some
11 of our boards who tried to bring up recovery
12 housing experienced some not in my backyard kind
13 of experience, so it was an issue.
14 Medication-assisted treatment could become an
15 issue because there are some very rural counties
16 that don't have any doctors that are able to
17 prescribe medication-assisted treatment.  So
18 that could be a problem.  So yeah, there were
19 some concerns about this, and we managed to work
20 with the department and the legislature.  This
21 bill did, in fact, pass.
22     Q.    I was going to ask, did it, in fact,
23 pass?
24     A.    Yes.  I don't know if it was this
25 bill or if it was part of the omnibus, but this

1 section did, in fact, pass, yes.
2     Q.    So the full spectrum of care is now
3 required?
4     A.    Correct.
5     Q.    And the recovery housing, is that
6 required?
7     A.    That is correct.
8     Q.    Did the state -- strike that.
9         So if you go down to the section at
10 the bottom that says, "The following conditions
11 apply" on the last page of the document --
12     A.    Okay.
13     Q.    -- the second bullet point up from
14 the bottom indicates that the state would
15 provide funding for recovery housing for two
16 years?
17     A.    Correct.
18     Q.    And did the state, in fact, do that?
19     A.    Yes.  They have and they've
20 continued on past that because of some of the
21 federal grants that they've received.
22     Q.    So they're using federal money to do
23 that?
24     A.    They are using some of both.
25 There's some state capital funds for building

Page 178

1 things and then there is some additional federal
2 funds for building and then there is some --
3 Medicaid will fund some, and then there's some
4 that is federal funding.  So yeah.  It's been a
5 fairly robust funding system because of all the
6 additional federal funds that have come to Ohio.
7     Q.    Are the boards responsible for
8 funding?
9     A.    In some cases.  By law, boards can
10 determine what they want to use their local
11 levies unless there was specific language
12 within their levy that required them to use it
13 for a specific project.  And let me also say,
14 there are some funds, if they choose to take
15 them, that they have to spend on recovery
16 housing as well from the state.  If they take
17 them from the state, that's what it's required
18 to be utilized for.
19        Are we done with this one
20 (indicating)?
21     Q.    Yes.
22        - - - - -
23        (Thereupon, Walter Deposition
24        Exhibit 16, E-Mail String Bates
25        Numbered SUMMIT_001090134, was

Page 179

1        marked for purposes of
2        identification.)
3        - - - - -
4     Q.    This is going to be Exhibit 16.
5 I'll say for the record Exhibit 16 is the Bates
6 number SUMMIT_001090134.
7        Do you recognize this document?
8     A.    I do.
9     Q.    This is -- the top -- this is an
10 e-mail chain, with the top e-mail from you to
11 Mr. Craig dated November 2nd, 2017, correct?
12     A.    Correct.
13     Q.    And do you remember this particular
14 e-mail conversation?
15     A.    I do.
16     Q.    And the e-mail chain starts with an
17 e-mail from Mr. Craig to you, correct?
18     A.    Correct.
19     Q.    And in his first paragraph Mr. Craig
20 says, "Cheri, you are likely aware that our
21 county executive has been laying the groundwork
22 for a lawsuit against big pharma (for a lack of
23 a better term) to seek damages for the cost of
24 this epidemic."
25        Did I read that correctly?

Page 180

1     A.    Correct.
2     Q.    And Mr. Craig, as I think we said
3 before, is the executive director of Summit
4 County ADM Board, correct?
5     A.    Correct.
6     Q.    Were you aware prior to this e-mail
7 from Mr. Craig that Summit County was
8 considering filing a lawsuit seeking damages for
9 the opioid epidemic?
10        MS. KEARSE:  Object to form.
11     A.    Summit County specifically, maybe.
12 I knew that different counties had been talking
13 about it.  I had heard from a couple of
14 different directors, so I may well have heard
15 from Jerry, but I had heard from other
16 directors.  I knew that there was discussion in
17 many circles about either the state or
18 individual counties suing.
19     Q.    Was there potential of potential
20 lawsuits to recover damages for the opioid
21 epidemic at OACBHA board meetings?
22     A.    There was one that I'm aware of, and
23 basically after learning that some of the
24 counties were, in fact, filing a lawsuit, at one
25 of our membership meetings one of our directors

Page 181

1 asked if we should be involved.  I said let me
2 do a little bit of research.  I actually spoke
3 with folks at the County Commissioners
4 Association and found out they were not taking a
5 position.  So I went and advised my boards that
6 we should not get involved and we should not
7 take a position.  This should be individual
8 counties that make these decisions.  And that
9 was as far as we ever went with being involved,
10 unless somebody asked me a specific question
11 like this but, I mean, we as an association
12 made the determination not to be -- to be a
13 party of the lawsuit and decided not to
14 recommend to our boards one way or the other
15 whether they should be either.
16     Q.    And when you say party to the
17 lawsuit, you mean an actual plaintiff in the
18 lawsuit?
19     A.    Yes, either/or.  We decided not to
20 be a party in general.
21     Q.    You were just not taking a position
22 on the lawsuit?
23     A.    We were not taking a position.
24     Q.    In your response to Mr. Craig, you
25 said, "I have talked with several folks since

46 (Pages 178 - 181)

Page 182

1 the AG came out with his plan to litigate and
2 with his 12 point plan, to utilize the funds."
3        Do you see that?
4      A.   I do.
5      Q.   What plan to litigate are you
6 referring to there?
7      A.   We had heard -- I don't know exactly
8 what it was -- that he was looking at a lawsuit
9 across the board in general, and that was after
10 he had come out -- he had a 12-point plan that
11 was not just lawsuit related about opiates,
12 so --
13      Q.   And how did you learn about that
14 plan?
15      A.   The 12 point plan?  Oh, he was very
16 public about it.  I was probably at a meeting
17 where he introduced it, frankly.
18      Q.   And how did you learn about the
19 lawsuit?
20      A.   You know, I don't know specifically.
21 There were so many discussions around it.  I
22 just don't know at what point in time I knew
23 about it.
24      Q.   When you say "discussions" --
25      A.   I mean just informally I talked to a

Page 183

1 lot of different people.  I could have been
2 talking with someone at the Attorney General's
3 office.  As I said, I had heard from different
4 board directors.  You know, they would call me
5 up and say, hey, our county is thinking about
6 this, what do you think we should do about it.
7 And that was why I said to Jerry I think we
8 should have this conversation.  I mean -- and it
9 wasn't even just one county.  It wasn't even --
10 it wasn't the counties we've referred to here,
11 Cuyahoga or Summit.  I mean, I heard from a lot
12 of different counties, little counties, and they
13 just -- people weren't sure what they should do.
14      Q.   And did you have any -- strike that.
15          - - - - -
16          (Thereupon, Walter Deposition
17          Exhibit 17, E-Mail String Beginning
18          Bates Number SUMMIT_001104515, was
19          marked for purposes of
20          identification.)
21          - - - - -
22      Q.   This is going to be Exhibit 17,
23 which is an e-mail chain Bates labeled
24 SUMMIT_001104515.
25          And the top e-mail on this chain is

Page 184

1 from you to Mr. Craig dated May 3rd, 2018.
2        Do you see that?
3      A.   I do.
4      Q.   Do you remember this e-mail
5 conversation with Mr. Craig?
6      A.   I do.
7      Q.   And the e-mail chain starts with an
8 e-mail from you to Mr. Craig and Mr. Osiecki
9 asking if they would be willing to meet with Tim
10 Maglione.
11        Do you see that?
12      A.   I do.
13      Q.   Did I pronounce his last name
14 correctly?
15      A.   Correct.
16      Q.   Okay.  How do you know Mr. Maglione?
17      A.   I know him from his previous job and
18 I have met him since, but -- he was at the
19 medical board.  I don't know.  I had met him
20 previously, so I knew Tim.
21      Q.   And when you say "his previous job,"
22 what are you referring to?
23      A.   I can't remember if he was -- maybe
24 he's with the medical board now.  I had just met
25 Tim.  I don't remember.

Page 185

1      Q.   And so the first line of your e-mail
2 says, "Jerry and Scott, would the two of you be
3 willing to meet with Tim Maglione, Tim works as
4 the senior director of government relations for
5 the Ohio State Medical Association and he is
6 working and they are working with some of the
7 folks who are representing the counties involved
8 in suing the pharmaceutical companies."
9        Do you see that?
10      A.   I do.
11      Q.   What was Mr. Maglione's role with
12 respect to those counties and their lawsuits?
13      A.   I don't know what his role is with
14 those counties because we never had a meeting
15 with those two.  I met with Tim, and it seemed
16 to me he wanted to talk about how to utilize the
17 funds if, in fact, the lawsuit went forward.
18      Q.   Do you have an understanding of why
19 he reached out to you specifically?
20      A.   Probably just because I've been
21 around and I've done all the opiate conferences
22 and so forth and people know me in this space,
23 so I'm guessing -- plus, I think the thinking
24 was that if there was money, it would roll back
25 down through the boards because we as an

47 (Pages 182 - 185)

Page 186

1 association constantly reference the fact that
2 we think local moneys for drugs and alcohol or
3 mental health treatment should go through the
4 boards as the local administrators and planners
5 of services. So, I mean, I'm pretty consistent
6 about that in all topics when it comes to
7 finances. I did not go to the Cleveland area,
8 though. Tim met with me in my office.
9     Q.    And then the next sentence, you
10 said, "He came and met with us" --
11     A.    Yeah.
12     Q.    -- "as they wanted to know what the
13 role of the boards are and how they could help
14 in educating judges on the opiate issues."
15         Do you see that?
16     A.    I do.
17     Q.    So what did you mean by "what the
18 role of the boards are" in that context?
19     A.    I don't think he ever -- this had
20 nothing to do with the lawsuit. This was the
21 general role of the boards, like the community
22 boards, community benefits. And I still think
23 sometimes people don't understand what boards
24 really do do.
25         It, also -- part of the discussion

Page 187

1 was back to another piece of paper you had given
2 me earlier -- I saw it -- boards are their own
3 entities, they're not part of county government,
4 they're their own entities, and I don't think
5 people necessarily understand that moving
6 forward, and so there was some confusion as to
7 how was the board connected to the county versus
8 not being connected to the county, and we tried
9 to -- I tried to explain what their role was in
10 that they were a stand-alone entity.
11     Q.    Stand-alone entity in what respects?
12     A.    The boards do not report up through
13 the county commissioners. They have their own
14 boards. They are not responsible, which is why
15 there was a lot of confusion whether boards were
16 part of lawsuits, not part of lawsuits, did they
17 choose to be part of lawsuits. The county
18 commissioners appoint a percentage, let's just
19 say 14 -- there's 14 members. They would
20 appoint six of the board members. The
21 department would appoint eight of the -- no.
22 The other way around. Sorry. The county
23 commissioners would appoint eight and the
24 department would appoint six. So they appoint
25 members of the board, but other than that,

Page 188

1 county commissioners do not have oversight of a
2 local board. They are their own stand-alone
3 entity.
4     Q.    In the first sentence of that
5 paragraph --
6     A.    Which page are we on, 16?
7     Q.    Yes, still that page.
8         -- you reference "folks who are
9 representing the counties involved in suing the
10 pharmaceutical companies."
11         Do you see that?
12     A.    Which is that?
13     Q.    It's the third sentence -- or third
14 line down in the first paragraph.
15     A.    And he is working -- and they are
16 working with some of the folks who -- okay.
17 Yes.
18     Q.    Who were those folks that are
19 representing the counties?
20     A.    He had a couple people come with
21 him. I don't know who they were. I don't. I'm
22 trying to think who Tim brought with him. I
23 honestly don't remember.
24     Q.    Were they lawyers?
25     A.    Maybe. I honestly don't remember

Page 189

1 who he brought with him.
2     Q.    And then in the second paragraph,
3 and I think this is what you were alluding to,
4 your last sentence of that second paragraph
5 says, "They are also looking at how they want to
6 recommend that the money being earned from the
7 lawsuits would be distributed. I have already
8 let him know that I believe it needs to go
9 through the boards."
10     A.    Correct. That is correct.
11     Q.    Is that the position you articulated
12 a few minutes ago?
13     A.    Correct.
14     Q.    Do you know what type of damages
15 or -- strike that.
16         Do you know the basis for the
17 damages that the counties are claiming in these
18 lawsuits?
19     A.    I do not. I mean, I don't know
20 what -- maybe I do. I don't know amounts or
21 anything like that. I know that they've said
22 the reason that they have a suit is because of
23 the number of people in the child welfare system
24 or the number of people in the court system or
25 in the jails. If that's what you're referring

48 (Pages 186 - 189)

Page 190

1 to, yeah, I've heard that. I've not heard
2 anything beyond that.
3     Q.   So do you know whether all of the
4 expenditures they're seeking to recover were
5 expenditures by the boards or were they also
6 expenditures by other governmental entities?
7     A.   Assuming what I heard is correct, it
8 would be other governmental agencies because our
9 boards don't fund the court system, our boards
10 don't fund child welfare. I mean, they may fund
11 something within, but they're not the overall
12 funder.
13     Q.   Got it.
14         With respect to those expenditures
15 by other governmental entities like the courts
16 or child services, do you think that money
17 should go to the boards, too?
18     A.   No. No. I'm talking specifically
19 treatment services, prevention services.
20     Q.   Mr. Craig, in his response to you --
21     A.   Where are we at now?
22     Q.   On page 15. The middle of the page
23 starts his response.
24     A.   Got it.
25     Q.   In his second paragraph he says, "On

Page 191

1 a related note, I continue to have concerns
2 about what role the boards have with regard to
3 participation (as a county entity) in our
4 county's lawsuit. We are being asked for a
5 boatload of information from the attorneys
6 representing the county and there is a
7 presumption that we will cooperate and provide
8 anything they request from us. I'm concerned
9 that we are being dragged into this lawsuit as a
10 key witness and source of expenditures, et
11 cetera, without representation and without our
12 agreement to participate."
13         Do you see that?
14     A.   I do.
15     Q.   And did you discuss further with
16 Mr. Craig his concerns about, as he puts it
17 here, being dragged into the lawsuit as a key
18 witness and source of expenditures?
19         MS. KEARSE:  Object to form.
20     A.   Maybe. If I did, it was in a
21 general sense because by that point we had
22 already made a decision that we weren't taking a
23 position on local county politics.
24     Q.   In your response to Mr. Craig at the
25 top of the page, in your second paragraph you

Page 192

1 say -- you said, "Additionally, I will put this
2 on the executive council agenda as it will
3 impact all boards if the lawsuits are rolled
4 into a single settlement."
5         Do you see that?
6     A.   I do.
7     Q.   And did you, in fact, discuss these
8 lawsuits in the executive council?
9     A.   Again, maybe -- most likely, but we
10 didn't discuss individual lawsuits. I think the
11 discussion was I had with Ted Maglione, and
12 if these get rolled up, that we were already
13 advocating for the fact that money should come
14 out through the boards would have been the
15 discussion.
16     Q.   And when you say "out through the
17 boards," what does that mean?
18     A.   If treatment money comes down, we
19 believe -- again, if Children Services gets a
20 percentage, if law enforcement, whatever, but if
21 there's going to be money that's specific to
22 treatment or recovery housing or prevention, we
23 do believe that should go through the boards as
24 we do believe boards are in the position to
25 plan, again, and administer local services, and

Page 193

1 if it didn't go through the boards, we were
2 concerned there could be a duplication of
3 services in some places or somebody might not
4 know what the most critical need in the county
5 is if it didn't go through the board.
6     Q.   And that's because the board is in
7 the best position to identify the critical needs
8 in the county and distribute the money
9 accordingly?
10     A.   Yes, that's our belief.
11     Q.   To your knowledge, did a meeting
12 with -- a meeting between Mr. Craig and Tim
13 Maglione ever happen?
14     A.   You know, I am not sure. I am not
15 sure. I know that if one happened, I didn't go.
16     Q.   One more question on this.
17     A.   Sure.
18     Q.   Your last paragraph references "Tony
19 and I met with Tim."
20         Do you see that?
21     A.   Yeah, I do.
22     Q.   Who is Tony?
23     A.   Tony would have been -- oh, God.
24 I'm having a brain freeze. Tony just left my
25 staff. Tony Coder. Tony Coder was on my staff.

49 (Pages 190 - 193)

Page 194

1    MS. McNAMARA:  Ms. Walter, thank you
2 very much for your time.  That's all I have.  I
3 will have to hand you over to my colleagues.
4    THE WITNESS:  Yes.  I hear there's
5 some other questions.  Yes.  Thank you.
6    THE VIDEOGRAPHER:  Off the record,
7 1:59.
8    (Recess had.)
9    THE VIDEOGRAPHER:  On the record,
10 2:06.
11    EXAMINATION OF CHERI WALTER
12 BY MR. CRAWFORD:
13    Q.   Good afternoon, Ms. Walter.  My name
14 is Kyle Crawford and I'm an attorney who
15 represents CVS Indiana and CVS Rx Services.
16    A.   Okay.
17    Q.   Just for simplicity, I'll refer to
18 those as CVS.
19    A.   Okay.  Yep.
20    Q.   Have you heard of CVS Indiana?
21    A.   No.
22    Q.   Have you heard of CVS Rx Services?
23    A.   No.  I mean, I've heard of CVS, but
24 not specifically that it's consciously -- no.
25    Q.   And do you have any understanding of

Page 195

1 why CVS is named as a defendant in the opioid
2 lawsuits?
3    A.   No.
4    Q.   Do you have any understanding of why
5 Rite-Aid is named as a defendant in the opioid
6 lawsuits?
7    A.   Other than what I would deduce, but
8 no, not factually, I do not.
9    Q.   And what about Walgreens?
10    A.   Nope.
11    Q.   And Walmart?
12    A.   Nope.
13    Q.   And so I want to go back to
14 something you said at the very beginning of this
15 deposition, which is you said something along
16 the lines of you didn't understand why the
17 pharmacies were here.
18    Do you remember that?
19    A.   Yeah.  I believe I said that, yes,
20 because I was confused as to why you were here.
21    Q.   What do you mean by that?
22    A.   Apparently I did not know you were
23 part of this lawsuit so I didn't know why you
24 were in this particular deposition.
25    Q.   And so why are you surprised that

Page 196

1 the pharmacies are a part of this lawsuit?
2    A.   In the bigger picture, I guess -- I
3 don't understand.  I don't know why you're here.
4 I didn't know you were part of the lawsuit.  I
5 mean, I -- I guess I said it because I didn't
6 know you were part of this lawsuit.
7    Q.   And so during your time at OACBHA
8 have you ever communicated with anyone from CVS
9 about the opioid epidemic?
10    A.   Me personally, I don't think so.
11    Q.   What about anyone from your
12 organization?
13    A.   The only reason maybe is through a
14 conference, and there was a talk at one point --
15 I know, for example, that we talked with the
16 Kroger pharmacy, so I don't know who else, but
17 we were putting some of the Don't Get Me Started
18 website stuff on the prescription drug bags to
19 help people with the campaign, and I don't -- I
20 cannot say for sure no one ever talked to CVS,
21 but that's what it would have been about and
22 only that.
23    Q.   So you think it's possible that
24 someone spoke to CVS, but do you have a specific
25 recollection of someone speaking --

Page 197

1    A.   I do not personally, no.
2    Q.   So you have no idea who that would
3 have been at OACBHA who would have spoken to
4 somebody at CVS?
5    A.   It probably wouldn't have been
6 somebody from OACBHA.  It might have been the
7 department who was having some of those
8 discussions with people on behalf of the Don't
9 Get Me Started campaign.
10    Q.   And what do you believe the content
11 of that communication would have been?
12    A.   Again, the only thing that I've ever
13 known to talk to any pharmacy about was putting
14 some information on the pharmacy bags, if you
15 were having a problem, where to get help.  It
16 had nothing to do with the actual pharmaceutical
17 giving of medication.  It was just the pharmacy
18 bag and as a carrier of information.
19    Q.   And do you know if you or anyone
20 from OACBHA has spoken with someone from
21 Rite-Aid about the opioid crisis?
22    A.   No, not that I'm aware of.
23    Q.   What about Walgreens?
24    A.   Not that I'm aware of.
25    Q.   And what about Walmart?

50 (Pages 194 - 197)

Page 198

1    A.   Again, none of those that I am
2  personally aware that somebody from OACBHA would
3  have the discussion.
4       -  -  -  -  -
5       (Thereupon, Walter Deposition
6       Exhibit 18, Ohio Prescription Drug
7       Abuse Task Force Final Report, Task
8       Force Recommendations, Dated October
9       1, 2010, was marked for purposes of
10      identification.)
11      -  -  -  -  -
12      MR. CRAWFORD: I apologize. I don't
13  have any more copies.
14   Q.   This is the Ohio Prescription Drug
15  Abuse Task Force Final Report Dated October 1st,
16  2010.
17      Do you see that?
18   A.   I do.
19   Q.   And this is Bates number
20  OACBHA_58028.
21   A.   Okay.
22   Q.   I'd like you to go to the very end
23  of this document, to page 5802 -- I'm sorry.
24  There's two sets of numbers.  So if you look at
25  the top number.  I'd like you to go to 58095,

Page 199

1  which is an executive order.
2    A.   I'm sorry.  58095?
3    Q.   58028, and that's the bottom of the
4  --
5    A.   I got it.
6    Q.   And this is Executive Order 2010-4S,
7  establishing the Ohio Prescription Drug Abuse
8  Task Force.
9       Do you see that?
10   A.   I do.
11   Q.   Have you seen this executive order
12  before?
13   A.   Possibly.  I mean, honestly,
14  possibly.
15   Q.   And if you go to the page 5 of 5 of
16  this executive order, paragraph number 8, do you
17  see that it's signed on April 2nd, 2010?
18   A.   I do.
19   Q.   By Governor Strickland?
20   A.   I do.
21   Q.   Did you know that Governor
22  Strickland was going to sign an executive order
23  having to do with opioids before April 2nd,
24  2010?
25   A.   I don't remember.  I just do not

Page 200

1  remember.
2    Q.   So let's go back to the report
3  itself.
4       Have you seen this report before?
5    A.   Most likely, yes.  I mean, I don't
6  remember it.  It's nine years old.  But yes.
7  Most -- I'm guessing I did, yes.
8    Q.   Were you involved in drafting this
9  report?
10   A.   I was not.
11   Q.   I'd like to turn your attention to
12  page 73 of the report, which is Bates number
13  58085.  The second to last name on that page --
14   A.   I see that, yes.
15   Q.   -- is Stacey Frohnapfel-Hasson.
16      Do you see that?
17   A.   I do.
18   Q.   From the Ohio Association of County
19  Behavioral Health Authorities.
20   A.   I see that.
21   Q.   And the document indicates that she
22  was a member of the Public Health Work Group.
23      Do you see that?
24   A.   I do.
25   Q.   Do you know what Ms. Hasson did as a

Page 201

1  member of the Public Health Work Group?
2    A.   I do not.
3    Q.   Did she know that she was a member
4  of the Public Health Work Group?
5    A.   I'm sure I did if she was working
6  for me at the time, yes.
7    Q.   Do you know what she did as a member
8  of the Public Health Work Group?
9    A.   I do not.  She is a -- for us she
10  was doing our promotional campaign kind of
11  stuff, so I would assume it was something around
12  that, public health.  I'm not exactly sure.
13   Q.   If then you look to page 74, do you
14  see Liz Henrich's name?
15   A.   I do.
16   Q.   And the document indicates that she
17  was a member of the treatment work group.
18      Do you see that?
19   A.   I see that.
20   Q.   Did you know that she was a member
21  of the treatment work group?
22   A.   I'm sure at the time I did, yes.
23   Q.   Do you know what her involvement was
24  with the treatment work group?
25   A.   Other than as a member of the

51 (Pages 198 - 201)

Page 202

1 committee, no. I mean, I'm -- again, in both
2 cases I would assume they talked about what
3 boards do and what their role is, but neither of
4 them are clinicians, so neither of them would
5 have been talking from a clinical point of view.
6 Liz has never been a clinician. Neither has
7 Stacey.
8    Q.   Did you know that this report was
9 being drafted before it was published?
10    A.   I'm assuming, since I had staff on
11 both of those at some point, I knew that, yes.
12    Q.   Did you have any involvement
13 whatsoever, not necessarily writing the words in
14 the report but did anyone ask you for any
15 information or call you to talk to you about the
16 report before it came out?
17        MS. KEARSE:  Object to form. Asked
18 and answered.
19    A.   I'm going to assume if I had two
20 staff members on it, that at some point in time
21 they both talked to me about this, yes.
22    Q.   Do you know how far in advance
23 before this report came out they became
24 involved?
25    A.   No. I don't even remember it, so

Page 203

1 no, I do not.
2    Q.   You can put that document away. I
3 want to go back to Exhibit 5, which is the
4 opiate pharmacotherapy white paper. I'd like
5 you to go to page 6 of this white paper.
6        MS. KEARSE:  I objected to it the
7 last time because the witness is not familiar
8 with this paper or seen it before and I object
9 to asking her questions substantively about the
10 document.
11    Q.   And you see above where it says,
12 "Importance to ADAMH," the last bullet point
13 that starts with, "The opiate epidemic is
14 creating additional burdens on this already
15 taxed system."
16        Do you see that?
17    A.   Correct.
18    Q.   And I understand that you don't
19 remember seeing this paper?
20    A.   I just don't remember it, yeah.
21    Q.   But as of January 2007, is it
22 consistent with your understanding that there
23 was an opiate epidemic?
24        MS. KEARSE:  Object to form.
25    A.   I will say that in December of '07 I

Page 204

1 would have recognized there was an opiate issue.
2 Whether or not I would have called it an
3 epidemic at that point in time I can't respond
4 to.
5    Q.   And what's the difference between an
6 opiate issue and an opiate epidemic?
7    A.   I would have told you there was an
8 alcoholism issue at this time. I wouldn't
9 tell -- I might tell you there's an alcoholism
10 epidemic. But I would have told you there was
11 issues with cocaine and there was issues with
12 methamphetamine, but I don't think we described
13 any of them at this point in time as an
14 epidemic.
15    Q.   So do you disagree with what this
16 white paper indicates, that as of January 2007
17 that there was an opiate epidemic?
18    A.   I don't agree or disagree. I'm not
19 aware of this paper at that point in time and I
20 can't tell you what I thought in 2007.
21    Q.   But this white paper indicates there
22 was an opiate epidemic as of January 2007?
23        MS. KEARSE:  Object to form.
24        THE COURT REPORTER:  Did you answer?
25        THE WITNESS:  I did.

Page 205

1        THE COURT REPORTER:  And what was
2 your answer?
3        THE WITNESS:  The last question?
4        THE COURT REPORTER:  Yes.
5        THE WITNESS:  Did I think there was
6 an opiate epidemic in 2007. I said I can't
7 respond to what I thought in 2007?
8    Q.   Let's go back then because the last
9 question --
10        MR. CRAWFORD:  Do you mind reading
11 back the last question that I asked?
12        (Record read.)
13    A.   I agreed that the white paper stated
14 that.
15    Q.   So in response to Ms. McNamara's
16 questions about some of your discussions about
17 the opioid lawsuit, you said that the opioid
18 lawsuit was the topic of one OACBHA board
19 meeting.
20        Do you remember that?
21    A.   I don't think that I said it was
22 just one. It was on the agenda as specifically
23 one, yeah.
24    Q.   Do you remember when approximately
25 it was on the agenda of a board meeting?

52 (Pages 202 - 205)

Page 206

1     A.    The lawsuit, no.  We sent all our
2  minutes.  I'm not sure which one specifically it
3  was on.  It may have come up at others.  I mean,
4  we made a decision, so -- no, I don't know which
5  meeting.
6     Q.    And you also said that one of your
7  directors asked about the opioid lawsuit, which
8  is why -- which is why it became a topic of one
9  of the meetings.
10        Do you remember that?
11     A.    That's not exactly, I don't believe,
12  what I said.  I said at different times
13  several -- I said there were meetings where
14  somebody would ask that question, but yes, it
15  had become a topic of conversation because
16  different directors were being contacted by
17  their local counties or commissioners or they
18  were hearing from other directors that something
19  was going on.
20     Q.    And do you remember which specific
21  directors had asked about the lawsuit?
22     A.    I know that one of them was Jim
23  Adams in Geauga County.  I believe one of them
24  was -- I'm pretty sure one of them was Penny
25  Dehner in Paint Valley.  There may have been

Page 207

1  others.  Those are two for some reason I
2  remember.  Paint Valley is -- which county is
3  that?  It's like Chillicothe, that area.
4  There's five counties in there.
5     Q.    And have any of the counties asked
6  you for any information related to the opioid
7  lawsuits?
8     A.    Only Summit -- I was asked to give
9  Summit and Cuyahoga County the same thing that I
10  was asked for here.  That was the only
11  information I had been asked to give.  The
12  request for information that came from you all,
13  I was asked to give that same information to
14  Cuyahoga and Summit County.  That's the only
15  information I've given them.
16     Q.    And do you mean you were asked to
17  give that same information to Defendants at the
18  same time as the Plaintiffs?
19     A.    After.  After they found out that we
20  had been asked to -- we had been asked --
21  because I obviously told my executive council we
22  had received a subpoena.  I was asked then by
23  those two counties to give them copies of what
24  we had given in response to the subpoena.  It
25  was after the fact.

Page 208

1     Q.    So other than information in
2  response to a subpoena, have you given any other
3  information to any county in relation to the
4  opioid lawsuit?
5     A.    Given -- I mean, in response to --
6  as I said, I talked to some of them.  I had
7  questions.  I let them know what I had talked to
8  the county commissioners about.  I don't know
9  that anybody has specifically asked me to give
10  them information about the lawsuit.  I don't
11  think so.
12     Q.    Have you read the complaint?
13     A.    I have not.
14     Q.    Earlier -- and when I try and
15  summarize what you've said, my intention is not
16  to quote you, and if I do it incorrectly, please
17  let me know, but I heard you say the GA, meaning
18  the general assembly, could have taken measures
19  to abate the opioid epidemic.
20        Do you remember saying that?
21     A.    I remember it in response to a
22  specific question on a specific paper, yes, I
23  said that.
24     Q.    And what measures were you referring
25  to?

Page 209

1     A.    I don't know that I was referring to
2  any specific measure.  I was responding to -- to
3  -- in my mind probably I was thinking that
4  financially they could have given boards more
5  money for treatment, but I was responding to a
6  specific question on a specific comment in a
7  piece of paper.
8     Q.    And so generally speaking, what
9  measures -- and so let's put that document
10  aside.
11     A.    Got it.
12     Q.    Generally speaking, what measures do
13  you believe that the State of Ohio should have
14  taken to abate the opioid epidemic?
15     A.    I think we could have done more
16  education around it.  I think we could have put
17  more funding to treatment.  When we closed pill
18  mills, we knew -- those of us in the treatment
19  community knew there would be an outbreak of
20  heroin.  I think we could have done more there.
21  I mean, this is all personal opinion you're
22  asking me for now.  I think that we probably
23  could have done more educating people about
24  locking up their drugs early on.  I think we
25  could have done some more harm reduction.  I

53 (Pages 206 - 209)

Page 210

1  think we could have dealt with that.  I think we
2  could have dealt with doctor's concern about the
3  5th vital sign.  I mean, I think there are
4  things that could have been done.  I don't know
5  who was ultimately responsible for doing that.
6      Q.    And so I heard you say that --
7  something about the shutdown of pill mills
8  leading to an outbreak of heroin.  What do you
9  mean by that?
10     A.    I mean that a good addict -- and I
11  can say that because I'm in recovery -- a good
12  addict, if you take away their drugs, will find
13  another drug to replace it unless they get
14  treatment; and we closed pill mills without
15  necessarily referring everybody that was getting
16  their drugs through the pill mill to treatment,
17  and so there were many of us that assumed that
18  they would find other drugs.  And we saw an
19  increase in heroin, we've now seen an increase
20  in meth and cocaine.  I don't think a lot of us
21  were surprised to see that happen.
22     Q.    And so do you think that the State
23  of Ohio should have created a strategy to treat
24  folks once they shut down the pill mills?
25     A.    Yes, I do.

Page 211

1          MS. SHAYNAK-DIAZ:  Object to form.
2      Q.    And what strategy -- what treatment
3  strategies do you think Ohio should have taken?
4      A.    I think we -- we knew there wasn't
5  enough treatment capacity that if everybody who
6  was being given drugs through pill mills decided
7  they wanted treatment, there was not enough
8  capacity in Ohio to treat them all.
9      Q.    And what is your understanding of
10 when the State of Ohio began to shut down pill
11 mills?
12     A.    Let's see.  It was after Kasich
13 became governor and Mr. DeWine became AG.  I'm
14 guessing around '12 or '13.  I don't necessarily
15 know the exact date.  It was early on in their
16 administration.
17     Q.    So in or around 2012, 2013, when the
18 State of Ohio began shutting down pill mills,
19 you believe the state should have come up with
20 some treatment strategies?
21          MS. SHAYNAK-DIAZ:  Object to form.
22     A.    More treatment strategies, yes.
23     Q.    What kind of treatment strategies?
24     A.    Again, I think they needed to fund
25 an appropriate level of access to services.  We

Page 212

1  didn't have enough docs who were trained in
2  medication-assisted treatment to be able to
3  provide those services.  I just think we could
4  have done more.
5      Q.    And one of the consequences of not
6  having these treatment strategies in place is
7  that addicts turned to heroin?
8          MS. KEARSE:  Object to form.
9      A.    I believe that's true and so do many
10 others, yes.  But I'm going to also say not
11 everybody who lost access to their pills wanted
12 treatment either, so it's not like everybody
13 wanted access to treatment.  I just think that
14 that's one.
15     Q.    Now I want to turn back to some of
16 the opioid conferences that we discussed.
17          Has the opioid lawsuits ever been a
18 topic at one of OACBHA's opioid conferences?
19     A.    I don't think so, but I honestly
20 don't review each and every single presentation,
21 but I don't think so.
22     Q.    And so will it be a topic at this
23 upcoming year's conference?
24     A.    No, not that I'm aware of.  It is
25 not.  I mean, I've had a brief review, but I

Page 213

1  don't think so, no.
2      Q.    Has anyone asked to present on the
3  opioid lawsuits?
4      A.    I don't think so, no.
5      Q.    Early on you mentioned that 49 of 51
6  counties are members of OACBHA.
7          Do you remember that?
8      A.    Correct.
9      Q.    What are those two non-member
10 counties?
11     A.    Franklin and Hamilton.
12     Q.    And why are they not members?
13     A.    As I understand it, their concern
14 was that they are so much bigger than --
15 although Cuyahoga stayed -- they did not always
16 feel that some of the decisions by the other
17 counties were meeting their needs.
18     Q.    I'm going to get the name wrong and
19 I apologize.  Your attorney here is
20 Ms. Shaynak-Diaz?
21     A.    Correct.
22     Q.    Does she represent OACBHA?
23     A.    Well, kind of, yeah.  I mean, we
24 have her on retainer.  We use her more often
25 than not to answer questions, to do our legal

54 (Pages 210 - 213)

Page 214

1 FAQs, some of those kind of things.  I just
2 didn't think I should come here without an
3 attorney, so Christina made the most sense to
4 me.
5     Q.    And has she been OACBHA's lawyer --
6 or how long has she been OACBHA's lawyer?
7     A.    For a long time.  When -- probably
8 ten years.  I mean, she worked for me for a long
9 time, not as a lawyer but as a program
10 administrator who also happened to be a lawyer,
11 and then she went out and had her own
12 practice, we decided to use her.  More often
13 than not we use her on data things, HIPAA
14 things, those kind of things for our members,
15 not the lawsuit.
16         MR. CRAWFORD:  That's all I have.
17 Thank you very much, Ms. Walter.
18         THE WITNESS:  Sure.
19         EXAMINATION OF CHERI WALTER
20 BY MR. NAEEM:
21     Q.    Ms. Walter, I introduced myself at
22 the beginning.  For your benefit again --
23 obviously it's been a bit of a long time since
24 then -- my name is Tariq Naeem.  I'm here
25 representing Janssen Pharmaceuticals.

Page 215

1     A.    Okay.
2     Q.    I am going to jump around and try to
3 just follow up with some of the issues that have
4 already been discussed --
5     A.    Okay.
6     Q.    -- so there may be a lot of jumping
7 around.
8         I want to go back and talk about
9 OACBHA.  And can you tell me, how is the legal
10 entity of which OACBHA is organized?
11     A.    We actually have three legal
12 entities.  We're a 501(c)(3), we're a 501(c)(6),
13 and we have a recognized PAC.
14     Q.    Okay.  So is it not, for example,
15 organized under Ohio state law?
16     A.    Well, I assume that's state law.
17     Q.    Okay.  It is not --
18     A.    We are not part of the statute, no.
19     Q.    And it is not a public entity under
20 the State of Ohio laws?
21     A.    I don't know -- we're not a public
22 entity, no.  We are not a governmental entity.
23     Q.    Exactly.  Not a governmental entity.
24 Okay.
25         Now, the ADM boards themselves are

Page 216

1 organized under state law.  I believe you
2 testified to that a little bit earlier.
3     A.    Correct.
4     Q.    I want to be clear I understand what
5 you meant by that when you discussed it.  Does
6 that mean that the ADM boards are responsible to
7 the state or to the counties in which they are
8 sited?
9     A.    Neither.  They are responsible to
10 their board, their board of directors who are
11 appointed by either the state or the county.
12 But they do not report up through the state.
13 They do not report up through the county.
14 They're their own local governmental entity
15 through 340, their statute.
16     Q.    And each individual ADM Board or --
17 well, each individual ADM Board -- and I use
18 that loosely because I think you said that there
19 were different variations still amongst the
20 boards, but each individual ADM board is itself
21 independent and not related to the other 49
22 entities in the state of Ohio?
23     A.    Mostly.  The only reason I say
24 mostly, some of them have administrative service
25 agreements where they do back-room around, say,

Page 217

1 financials, or they may do back-room around data
2 collection.  They all go in together and jointly
3 hire someone to do that for them.  But they do
4 not report to their board, no.  They report to
5 their own board of directors.
6     Q.    Throughout the course of the day
7 there was some discussion about, obviously, the
8 documents that have been produced by OACBHA.
9 And I'm simply going to paraphrase.  You can
10 disagree with me if you want.  But it seems to
11 me that you were very familiar with the process
12 for how those documents were collected.  Is that
13 a fair statement?
14     A.    Yes, it is.
15     Q.    All right.  Did you yourself --
16     A.    Not a one.  Did not collect them.
17 We actually hired an outside contractor who knew
18 our system enough to be able to come in and do a
19 data search.  We knew we had so many documents.
20 I actually brought someone in from outside.
21     Q.    What was the name of the entity that
22 did that work?
23     A.    It was a person.  It was an
24 individual.  Her name was Mary Inbody.
25     Q.    And I'm sorry.  What was the last

55 (Pages 214 - 217)

Page 218

1 name?
2   A.   Mary Inbody.  She was a retired
3 staff of mine.
4   Q.   And who dictated to her what should
5 be searched and collected?
6   A.   I did.
7   Q.   You did.  Okay.  Was she responsible
8 for searching paper documents?
9   A.   Yes.  We had her search all of our
10 books of minutes.  We had her do a search of
11 both our foundation, all our conference
12 materials.  We had her search anything that had
13 opiate or opioid in it through an online search.
14 So yeah.  I mean, she spent several days
15 producing tons of documents.
16   Q.   And I understand -- and so I don't
17 mean to have this question sound redundant,
18 because you said you had her search
19 electronically for documents that referred to
20 opioid or opiate, for example, but what was --
21 what was your instruction to her as to what she
22 should go look for generally?
23   A.   Anything -- and I don't remember all
24 of them, but I had the subpoena.  We looked at
25 each of the areas of the subpoena.  I gave her a

Page 219

1 copy of the subpoena so that she could look for
2 all those types of documents.  So there were
3 some that were specific.  We were asked to
4 produce specific e-mails to either Cuyahoga
5 County or Summit County.  So I had her go look
6 at that.  We had her look through everything
7 that was related to the opiate conferences.  We
8 had her look through my e-mails.  We had her
9 look through membership minutes.  We had her
10 look through executive council minutes.  We had
11 her look through division minutes.  So we had
12 her look at a ton of different things, but we
13 utilized -- I utilized the subpoena itself as to
14 what we should go after.  We actually made -- we
15 had a couple of questions that I took through
16 Christina a couple of times about how large that
17 was and what were people really looking for.
18   Q.   And I want to maybe highlight what
19 you just said by using a specific example to
20 compare and contrast.
21       So you mentioned that one of the
22 things you looked for was communications with
23 Summit County and Cuyahoga County that are the
24 parties to this particular lawsuit.  Based on
25 that description you gave, is it fair for me to

Page 220

1 assume that if you had specific communications
2 with just someone from Lorain County, for
3 example, that that would not have been collected
4 and produced as part of this production?
5   A.   Probably, yes.
6   Q.   Other than providing the subpoena to
7 Ms. Inbody, was there any other written
8 instructions you provided for how she should
9 collect the documents that were produced?
10   A.   I think I walked her through that.
11 I don't even think I gave it to her in writing.
12   Q.   Okay.  If you could -- if you still
13 have the exhibits in front of you --
14   A.   I do.
15   Q.   If you could pull out Exhibit 12 and
16 Exhibit 14.
17   A.   Got them.
18   Q.   Let's start with Exhibit 12 and
19 let's turn to page -- I think it was 6 or 7, but
20 it was the page that said "The Development of an
21 Epidemic."
22   A.   Got it.
23   Q.   I just want to follow up with some
24 of the questions that Ms. McNamara asked you.
25 And, first of all, I thought I heard you

Page 221

1 describe for her that the information in the
2 slide came from a variety of sources that you
3 may have reviewed or that your staff reviewed to
4 put in here?
5   A.   Yeah.  I'm not sure where we got
6 them, maybe from a previous conference or
7 whatever.
8   Q.   Okay.  And would it be fair for me
9 to say that this slide does not represent all of
10 the potential reasons why this state is
11 currently undergoing or in the midst of an
12 opioid epidemic, fair?
13   A.   Sure, absolutely.
14   Q.   And, in fact, if we look at Exhibit
15 14 very quickly -- and Ms. McNamara walked you
16 through a couple items on page 6, if you
17 recall -- some of those are duplicative of
18 what's on the slide, but there's some
19 independent facts there regarding the causation
20 of the current opioid epidemic, agree?
21   A.   Sure.
22   Q.   Now, going back to Exhibit 12, there
23 are a couple of items on here specifically I
24 want to follow up on.
25       First of all, there -- the fourth

56 (Pages 218 - 221)

Page 222

1 bullet point, "Advertising by drug
2 manufacturers," do you see that one?
3     A.   I do.
4     Q.   Okay.  Now, is it your understanding
5 that that is a specific -- I'm sorry, a general
6 concern regarding drug advertising or a specific
7 concern about opioid advertising?
8     A.   I think in this specific issue I was
9 talking about drug manufacturers talking with
10 doctors specific to opioids.
11    Q.   Specific to opioids, okay.  And I
12 want to be clear because my questions to you
13 are, do you have any personal experience or have
14 you personally observed any opioid-related
15 manufacturing provided by drug manufacturers to
16 physicians?
17    A.   Personal knowledge, no.
18    Q.   And same question with respect to
19 what I think is contained in the fifth bullet
20 point, this description here of a shift in
21 marketing from prescribers to patients, is that
22 a general concern -- I'm sorry, a general
23 statement or opioid specific?
24    A.   More -- well, maybe both.
25    Q.   Okay.  So then let me follow up and

Page 223

1 ask you specifically, as you sit here today, do
2 you have any personal experience or did you
3 personally observe any opioid manufacturing --
4 I'm sorry, any opioid marketing directly from
5 the manufacturers to patients?
6     A.   At this time, no.  I mean, if you
7 throw suboxone in there, you got a different
8 ballgame.
9     Q.   Okay.  And that is a very good
10 point, and let me reask the question and limit
11 it strictly to opioid marketing for chronic
12 pain.
13    A.   No.  I've never personally seen it.
14    Q.   So no TV advertisements, no
15 newspaper articles?
16    A.   No.
17    Q.   With respect to -- and you're free
18 to look at Exhibit 12 or Exhibit 14, the two
19 pages we've just been discussing, but would you
20 agree with me that in addition to the items
21 mentioned here in Exhibit 12 and Exhibit 14,
22 that pill mills would be another factor in the
23 development of the opioid epidemic?
24    A.   Oh, absolutely I would agree with
25 that.

Page 224

1     Q.   And you would agree with me that
2 doctors who are involved with prescribing
3 opioids through pill mills were engaged in
4 the -- I'm sorry, were engaged in activities
5 designed to make money, not treat chronic pain?
6          MS. SHAYNAK-DIAZ:  Object to form.
7     A.   I would agree that I believe that.
8 I don't know that I can prove that.
9     Q.   We're here to talk about your
10 impression certainly, your knowledge.
11         Would you also agree with me that
12 diversion of medications would be a factor that
13 led to the development of the opioid epidemic?
14    A.   Absolutely.
15    Q.   And diversion can include people who
16 misuse opioid medications who have never had a
17 prescription for those medications?
18    A.   Absolutely.
19    Q.   I apologize if this was asked
20 already.  I know we've referred to your staff
21 throughout the course of the day.  But very
22 quickly, if we can do it quickly, you mentioned
23 that it's you and seven other people who make up
24 currently the staff?
25    A.   Correct.  Two more just started

Page 225

1 today.
2     Q.   Okay.  And you mentioned Liz
3 Henrich?
4     A.   She's associate CEO.
5     Q.   She's the --
6     A.   She's one of the two associate CEOs.
7     Q.   And we've obviously mentioned her
8 name in the context of opioid-related programs
9 or opioid-related conferences?
10    A.   Absolutely.
11    Q.   So clearly her role has some
12 involvement or some touch points to
13 opioid-related issues in the state of Ohio?
14    A.   Absolutely.
15    Q.   Okay.  You mentioned, I believe you
16 said, two associate CEOs?
17    A.   Um-hum.
18    Q.   Who is the second?
19    A.   Fonda Freeman.
20    Q.   Fonda Freeman?
21    A.   Fonda, F-o-n-d-a.
22    Q.   And what does her position entail as
23 associate CEO?
24    A.   Fonda really does not do -- well,
25 she's been involved with the Medicaid BH

Page 226

1 redesign.  She does all of our data stuff.  She
2 oversees my legal contract with Christina.  She
3 oversees my MIS contract with my MIS contractor.
4 She runs our fiscal committees.  She's in charge
5 of the Culture of Quality, which I talked about
6 earlier.  So she's more on that side.  She's
7 never been one to lead the conferences, do the
8 conferences, any of that.
9     Q.    So in addition to you and the two
10 associate CEOs, you also mentioned, at least
11 from a title perspective, a program director?
12     A.    Yes.  I have a new program director
13 that started today.  Actually, I have three new
14 people starting today, but he was with me once
15 before.  His name is Dontavius,
16 D-o-n-t-a-v-i-u-s, Jarrells, J-a-r-r-e-l-l-s.
17     Q.    Okay.  And who is he replacing in
18 that role?
19     A.    He's replacing Tony Coder.
20     Q.    And can you spell that last name?
21     A.    C-o-d-e-r.
22     Q.    And you did mention Mr. Coder with
23 respect to the discussions or the meeting with
24 the Ohio -- I'm sorry, Ohio State Medical
25 Association individual?

Page 227

1     A.    Correct.
2     Q.    What is the role of a program
3 director with OACBHA?
4     A.    Our program director oversees -- we
5 have a large mental health grant from the Feds.
6 It's called the MHTTC.  So he's overseeing that.
7 He oversees our suicide committee, our kids
8 committee, although I think we made a change
9 with the new person coming in.  My last program
10 director, we did a lot around the whole medical
11 marijuana.  He was an expert in medical
12 marijuana.  I'm changing that because my new
13 person does not have that expertise.  But he
14 does those kind of things.  He also -- he will
15 be working with CLAS, Culturally Linguistically
16 Appropriate Services.  He will be working with
17 bias kind of issues.  So he does a lot of just
18 programs.  Again, he was with me for about a
19 little over five years previously.  He's also
20 our lead person on recovery-oriented systems of
21 care, which is a huge project we've been rolling
22 out for the last several years.
23     Q.    And recovery-oriented systems of
24 care, what -- in a few sentences, if you can,
25 what is that?

Page 228

1     A.    Sure.
2         Recovery-oriented systems of care
3 are making sure that at the community level that
4 you're putting the clients first and not the
5 bureaucracy.  We have five criteria around it.
6 It is nationally recognized.  But again, it's
7 making sure that clients are at the table,
8 clients have a voice.  It's making sure that we
9 have access to treatment and that we look at
10 both mental illness and addiction as lifelong
11 chronic diseases, that it's not just about
12 treatment and we're done, these are diseases
13 that last for a lifetime.  We need to be adding
14 supports like peer supports, housing,
15 educational supports, employment support.  So
16 it's making sure you have a full continuum of
17 care that meets the needs of the individual.
18     Q.    Okay.  And is it accurate for me to
19 state that that program director role doesn't
20 actually implement the programs that you've
21 described, they work with the ADM boards or the
22 ADAMHS boards to implement those types of
23 programs?
24     A.    That's absolutely correct.
25     Q.    Okay.  So CEO, two associate CEOs

Page 229

1 and a program director.  And just at a very high
2 level, what are the other roles that are
3 entailed by the other, I guess, what, four staff
4 members?
5     A.    Four or three.  I have an
6 administrative -- an administrator over
7 operations.  He does my bookkeeping.  He does my
8 HR, all of those kind of things.  He does all
9 the facility management for all the conferences,
10 those kind of things.  So I have Todd.
11         I have a new person starting today
12 as a result of our mental health technology
13 transfer grant.  She will be specifically over
14 that, the mental health technology grant.
15         I also have a person who's over our
16 Vista project.  We have right now 31 -- we'll
17 have 26 Vista projects where we put Vista
18 members, which are service members doing -- it's
19 like a Peace Corps for the United States.
20 They'll be doing service in 26 counties.  Right
21 now we've got several of them out there.  We're
22 about to do a new year.  So we have a full-time
23 grant to hire that person as well.
24     Q.    Okay.  And when you say "service
25 members," you mean former members of the

58 (Pages 226 - 229)

Page 230

1  military?
2      A.   No.  It's a Vista member.  More
3  often than not, it's someone coming directly out
4  of college.  It's kind of like the Peace Corps
5  but it's the American Peace Corps.
6          And then I have a new administrative
7  assistant starting today as well, and that
8  position has been vacant for like a pretty long time,
9  actually, but we had so many other things going
10 on, so -- do you need those names?
11     Q.   No.  I just wanted to get a better
12 understanding of the organization that you're in
13 charge of.
14     A.   Sure.
15     Q.   There was -- and we can pull up the
16 exhibit if we need to, but as I recall, in one
17 of your e-mails from 2009 that you were shown,
18 there was an analysis of a house bill that did
19 not include a provision regarding use of excess
20 liquor profits to fund programs.
21         Do you recall that?  We can pull it
22 out.
23     A.   I believe it was the IDAT bill.  Is
24 that what you're thinking of?
25     Q.   I don't recall, and my question

Page 231

1  isn't specifically about the bill itself.  I
2  just want to kind of refresh.
3          Do you recall, though, that there
4  was some discussion about at one point in time
5  OACBHA was advocating for use of excess liquor
6  profits to fund treatment programs in the State
7  of Ohio?
8      A.   I'm sure we were.  Yes.
9      Q.   Well, let's pull it out.
10     A.   I'm not sure what -- because if
11 you're referring to IDAT --
12     Q.   I believe it was Exhibit 4.  If you
13 can pull that out.
14     A.   The Indigent Driver Alcohol
15 Treatment Fund, is that what you're referring
16 to?
17     Q.   So if we look at -- in the bottom
18 right-hand corner, there's a page that starts
19 with 4854, and at the bottom it's talking about
20 what we didn't get.
21         Do you see that?
22     A.   Other issues -- no change to
23 language -- yeah.
24     Q.   And then if we flip the page, the
25 third bullet point is, "No language about using

Page 232

1  excess liquor profits for ODADAS."
2      A.   Yeah.  So we must have been -- I
3  mean, I don't remember.  It was '09.  But we may
4  have been asking for excess liquor profits to go
5  into the boards, yes.
6      Q.   Okay.  And I just have a general
7  question, and that is, as we sit here today in
8  2019, are you aware whether there has ever been
9  a legislative adjustment that permits those
10 excess liquor profits to be diverted towards the
11 addiction treatment services provided by ADM
12 boards?
13     A.   Well, some liquor profits already do
14 go.  I don't know if it's been increased.  I
15 cannot answer that question.
16     Q.   Okay.  So what was the distinction
17 with no language about using excess liquor
18 profits?
19     A.   I think we must have meant that
20 there was some that was not being allocated to
21 anybody and could that become allocated to us.
22     Q.   Okay.  And so with that specific
23 provision about excess liquor profits, has there
24 ever been an adjustment to that formula for
25 dividing liquor --

Page 233

1      A.   That's what I'm saying.  Not that
2  I'm aware of.  I don't know.  I just don't know.
3  And I should be clear.  I don't think it's
4  liquor profits.  I think there's a special tax
5  for -- that a percentage goes to the boards.
6      Q.   And then are you aware of whether
7  that percentage has changed since --
8      A.   No, I'm not aware.  And I don't
9  think it has, but I'm not aware.
10     Q.   You've been asked a couple times
11 about the effect of House Bill 93, which shut
12 down pill mills, and the increase in use of
13 heroin.
14         Do you recall?
15     A.   I do.
16     Q.   And you were asked about -- or you
17 discussed at least the concept that certain
18 treatment professionals anticipated that people
19 addicted to pills would transition to heroin as
20 a result.
21         Do you recall?
22     A.   I do.
23     Q.   I don't want to talk about that in
24 substance, but I do want to ask whether you had
25 discussions at any OACBHA meetings about the

59 (Pages 230 - 233)

Page 234

1 potential consequence of increased heroin usage
2 as a result of pill mill closing.
3      A.   I can't say if we did or didn't,
4 honestly.
5      Q.   Do you recall having discussions
6 with any of the ADM representatives to OACBHA or
7 any of the ADM directors, I guess I should say,
8 about this issue about pill mills closing likely
9 to lead to increased heroin --
10      A.   I don't know that we had the
11 discussion before they started closing them.  I
12 have a pretty strong belief we probably
13 discussed the fact that we're not surprised this
14 is happening based on the fact that they're
15 closing pill mills and haven't put any money out
16 there.  Whether or not we had it prior to them
17 actually starting to close, I can't -- I don't
18 know.  I don't recollect.
19      Q.   And the same question but for the
20 legislature.  Do you recall having any
21 discussions around the passage of House Bill 93,
22 about the impact it would have on heroin use to
23 any members of legislature?
24      A.   You know, again, probably not ahead
25 of time, but probably afterwards with Robert

Page 235

1 Sprague.
2      Q.   And could you remind me who Robert
3 Sprague was?
4      A.   He's the house member who really
5 took the lead on all the opiate.  I believe 93
6 was his bill probably.
7      Q.   Okay.  Does OACBHA have involvement
8 in discussions with the legislature regarding
9 funding priorities for substance abuse
10 treatment?
11      A.   Through the budget process,
12 absolutely.
13      Q.   And can you describe that for me
14 just generally?
15      A.   I mean, generally we have a budget
16 position, we put that forward, and then once we
17 see the as introduced, we'll respond to the as
18 introduced and figure out what we believe is
19 happening.  If it looks like they're cutting
20 funds, we'll talk about the cut in funds, and we
21 may -- it may or may not be specific to opiates
22 because typically our funding doesn't come out
23 specific to opiates.  Our 421 line, which you
24 heard me talk about earlier, is more around the
25 issue, it is a more flexible fund.  We may -- if

Page 236

1 we're having discussions about the fact that
2 we've gotten cuts -- and we haven't gotten cuts
3 the last couple years, but if we're having
4 discussions about having gotten cuts, we may
5 look at what is driving the cost locally, and in
6 the past that's been opiates, it's been suicide,
7 it's been state hospitals, so in that sense we
8 would have those discussions, yes.
9      Q.   And do you prepare written materials
10 that are submitted to the legislature?
11      A.   Oftentimes, yes.
12      Q.   Do you provide testimony?
13      A.   Yes.
14      Q.   Do you know one way or the other
15 whether these materials were collected by
16 Ms. Inbody and produced?
17      A.   I would assume they were.  I don't
18 -- I did not go through each and every document
19 she pulled.
20      Q.   Does OACBHA assist local ADM
21 agencies in getting direct allocations from the
22 State of Ohio, grant money, for opioid-related
23 issues?
24      A.   No, because it's -- that's a little
25 political because we may have more than one

Page 237

1 board going after the same -- now, if it's a
2 non-competitive grant, for example, the state
3 opioid response money that has come down from
4 the Feds, we have worked on making sure that an
5 appropriate amount of that goes out to all local
6 boards, but we don't get into the grants where
7 it may be competitive from one county to
8 another.  But if it's a general allocation, we
9 absolutely get involved and try to work to get
10 as much money to go to local boards as possible.
11      Q.   Okay.  And does OACBHA assist local
12 ADM agencies in preparing financial reports?
13      A.   We do not.
14      Q.   Do you have an understanding of what
15 the requirements are under state law for local
16 ADM agencies with respect to state reporting?
17      A.   Yes.  And so we don't help them
18 prepare those individual reports, but Fonda
19 Dawkins, who -- or Fonda Freeman, who you heard
20 me refer to earlier -- sorry, she got married --
21 she works with them on what may be required in
22 those reports before they go out every year,
23 because they change sometimes from year to year,
24 and as you heard us talk about earlier, when
25 there became a requirement for a continuum of

60 (Pages 234 - 237)

1 care or a board could lose their money, she
2 helped figure out what that report should look
3 like so that a board could show how much money
4 they were getting but also how much they were
5 spending on those particular projects.  So in
6 that sense, she would, but she would not help
7 them prepare once the initial report template
8 went out.
9     Q.   And can you give us a sense of --
10 based on your knowledge and based on your role
11 as CEO of OACBHA, what are the reporting
12 requirements for local ADM agencies to the state
13 to account for the funds that are spent?
14     A.   Based on the requirements -- local
15 boards have to talk about all the funds they
16 spend whether or not they're state funds.  So
17 they have to tell them how they spend their levy
18 funds, they have to tell them how they spend
19 their federal funds.  Individual grants may have
20 different -- may have different requirements.
21         For example, the new state opioid
22 response, the SOR funds I'm sure somebody has
23 told you about, that have gone out, they have
24 their own reporting requirements.  Our boards
25 have annual budget reporting requirements in

1 order to draw down their funds.  So it's not the
2 same for every single fund source, but boards
3 have to report how they expend all their
4 dollars, and they also have to say what they
5 have in reserves.
6     Q.   Okay.  So if they're receiving money
7 from SAMHSA, for example, ADM is -- the local
8 ADM agency that's receiving the funds must
9 provide a report?
10     A.   Yeah.
11     Q.   Are those reports generally annually
12 or are they --
13     A.   There's a biannual report that's a
14 big report because that's where you have to say
15 what your continuum of care is, but I do think
16 there is annual reports.  And there's also --
17 again, you've got federal fiscal years and
18 you've got state fiscal years, so they're not
19 always on the same cycle.
20         MR. NAEEM:  Ms. Walter, I don't
21 think I have any questions further.  We may have
22 some more coming from another source, though, so
23 I will go ahead and pass the mic.
24         THE VIDEOGRAPHER:  Off the record.
25         (Short recess had.)

1         THE VIDEOGRAPHER:  On the record, 3
2 p.m.
3         EXAMINATION OF CHERI WALTER
4 BY MS. RANJAN:
5     Q.   Good afternoon, Ms. Walter.  My name
6 is Brandy Ranjan.  I represent Walmart in this
7 case.  I have, hopefully, just a few more
8 questions for you.  I think we just about
9 covered it at this point, so I appreciate you
10 being here today.
11     A.   No problem.
12     Q.   You are a licensed independent
13 chemical dependency counselor, correct?
14     A.   I am.
15     Q.   Can you explain to me what that
16 means?
17     A.   It means I'm licensed by the State
18 of Ohio to provide drug and alcohol treatment.
19     Q.   And in your work with OACBHA, you
20 have done -- also done extensive work related to
21 addiction treatment services?
22     A.   I have, but I do not provide direct
23 services, no.
24     Q.   And you also have a personal
25 experience with recovery?

1     A.   I do.
2     Q.   I believe you alluded to that
3 earlier.
4     A.   (Witness nodding head
5 affirmatively.)
6     Q.   Do you believe that addiction can be
7 overcome?
8     A.   I believe you can be in recovery,
9 yes.
10     Q.   And individuals with substance abuse
11 problems can recover to a point such that
12 they're no longer dependent on the substance?
13     A.   Correct.
14     Q.   And doing so requires an addicted
15 person to take personal responsibility for his
16 or her actions?
17         MS. KEARSE:  Object to form.
18     A.   Correct.
19     Q.   And it requires that person to seek
20 out recovery?
21     A.   No.
22     Q.   What's wrong with that statement?
23     A.   I have seen people get into recovery
24 because they didn't seek it out, but they maybe
25 were threatened with the loss of a job, they

61 (Pages 238 - 241)

Page 242

1 were threatened with sanctions by the court, so
2 they were more or less forced into treatment
3 versus seeking it out.
4     Q.   Okay.  And in those circumstances
5 the person chooses to stop abusing the
6 substance?
7     A.   At some point, yes.
8     Q.   Switching gears -- and I apologize
9 because I'm hitting on a number of different
10 topics here trying not to recover ground that's
11 already been covered.  I'm going to jump around
12 a little bit.  Can you take a look at what was
13 previously marked as Exhibit 3, please?  It was
14 an e-mail from you to the county board executive
15 directors.  It was the one with what we thought
16 was a pretty long "To" list.
17     A.   Got it.
18     Q.   Do you have it in front of you?
19     A.   I do.
20     Q.   If you could turn again to the first
21 article that was attached to the e-mail.  It's
22 the one titled "Advocates Make Case for
23 Providing Addiction Treatment Services."
24         Do you see that?
25     A.   Not the amendment but the --

Page 243

1     Q.   Correct.
2     A.   Okay.  Got it.
3     Q.   If you would look four paragraphs
4 down for me.
5     A.   Um-hum.
6     Q.   I'm just going to read it aloud.  It
7 says, "Coleman described the results of a 2008
8 study, 'Economic Costs and Benefits of
9 Treatment,' prepared for Maryhaven through
10 funding support from the Columbus Foundation,
11 which shows that treatment for alcohol and other
12 drug addiction provides cost benefits to
13 society.  According to the study, for every one
14 dollar spent on treatment services, there was a
15 cost benefit of at least $11 in health care
16 expenses, criminal justice costs and employment
17 gains."
18         Did I read that correctly?
19     A.   Yes.
20     Q.   You're familiar with that study,
21 right?
22     A.   Yes, I am.
23     Q.   In fact, you've relied on it in some
24 of your other work for OACBHA, correct?
25     A.   We have.

Page 244

1     Q.   And it's true that in your
2 experience, when public funding for addiction
3 treatment is cut, it results in increased
4 spending on healthcare?
5         MS. KEARSE:  Object to form.
6     A.   Not just healthcare but law
7 enforcement and other things, yes.
8     Q.   And jails and prisons?
9     A.   Jails and prison, child welfare.
10     Q.   And other types of public services?
11     A.   Child welfare, health and human
12 services, absolutely.
13     Q.   Emergency response services?
14     A.   Emergency response services, yes.
15     Q.   And was that also the case with the
16 state budget cuts for addiction treatment that
17 took place starting around 2010?
18     A.   That would have been our concern,
19 absolutely.
20     Q.   And did that actually come to
21 fruition?
22     A.   I can't necessarily speak -- well,
23 yeah, I can, to one system.  We've certainly
24 seen since 2010 an increase in the number of
25 children being taken out of home because of

Page 245

1 their parents' addiction, so the fact that there
2 was not the treatment available could absolutely
3 have had an impact on that.
4     Q.   And that was partially because of
5 cuts for addiction treatment funding?
6         MS. KEARSE:  Object to form.
7     A.   I can't make a one-to-one
8 correlation, but I can make a speculation that
9 that certainly could have impacted it.
10     Q.   In fact, you're confident enough in
11 that analysis that you testified to the Ohio
12 senate about that very possibility, right?
13         MS. KEARSE:  Object to form.
14     A.   Can I see what you're referring to?
15     Q.   Sure.
16     A.   I may well have, but I don't know
17 what you're referring to.
18     Q.   Absolutely.  Let's mark as Exhibit
19 19 --
20         - - - - -
21     (Thereupon, Walter Deposition
22     Exhibit 19, Testimony of Cheri L.
23     Walter, Senate Finance Committee,
24     Dated May 30, 2009, was marked for
25     purposes of identification.)

62 (Pages 242 - 245)

1            - - - - -
2       Q.   I've shown you Exhibit 19, which
3   appears to be your testimony to the senate
4   finance committee on May 30th, 2009.
5       A.   It is mine, yep.  Yeah, I stand by
6   what I said here, yes.
7       Q.   And that includes the prospect that
8   by cutting state funding for addiction treatment
9   services, the state could end up spending
10  exponentially more in state funded health, human
11  services and the correction system?
12      A.   I absolutely believe that.  Again, I
13  can't give you a one-on-one correlation, but I
14  absolutely believe that, yes.
15      Q.   And also jails and prisons and child
16  welfare, emergency care and homelessness?
17      A.   Correct.
18      Q.   Okay.  You can set that aside.
19           Could I direct your attention to
20  what was previously marked as Exhibit 14?  It's
21  the chairman's report for the prescription drug
22  addiction and healthcare reform legislative
23  study committee.
24      A.   Got it.
25      Q.   Could you take a look -- and again

1   we're changing gears here.  Sorry for skipping
2   around.  Could you take a look at the page
3   marked page 12, the last bullet point there,
4   "Access to Treatment"?
5       A.   Yes.  I'm there.
6       Q.   And the report says that Medicaid --
7   at least at this time "Medicaid does not pay for
8   residential treatment, or detox, which is the
9   first step of treatment.  It would be helpful to
10  change coverage so that Medicaid pays for a best
11  practice protocol like residential detox for ten
12  days, and then release with medication
13  assistance to intensive outpatient in the
14  patient's home county."
15           Did I read that correctly?
16           MS. KEARSE:  Object to form.
17      A.   You did.
18      Q.   Do you agree that this is one
19  potential area where the Ohio legislature could
20  have acted to increase addiction treatment
21  services?
22      A.   They have, in fact, done so.
23      Q.   Do you know when they did that?
24      A.   It went to the ACM level care --
25  geez, I don't know the exact date, but we have,

1   in fact, done that.  It does now pay for detox
2   and it will pay for residential treatment.  The
3   difference now is sometimes that has to have
4   prior approval from the managed care companies.
5   But yes, it will pay for it.  I want to say it
6   was four years ago, but I cannot give you an
7   exact date.
8       Q.   And do you agree that that was a
9   positive development in the law?
10      A.   Absolutely.
11      Q.   And the next couple of sentences
12  read, "Medicaid will not pay for the needed
13  medication assisted therapy drugs until an
14  addict has failed four to five times in
15  treatment.  Medication-assisted treatment is a
16  key ingredient in treating this problem."
17      A.   Where are you?
18      Q.   I'm in that same exact paragraph.
19      A.   Oh, sorry.
20      Q.   That's okay.  Let me know when
21  you're with me.
22      A.   I'm there.
23      Q.   "Medicaid will not pay for the
24  needed medication assisted therapy drugs until
25  an addict has failed four or five times in

1   treatment.  Medication-assisted treatment is a
2   key ingredient in treating this problem, and
3   without it, progress will be slow in curtailing
4   this epidemic."
5       A.   That has changed as well.
6       Q.   Right.  But at this time, which was
7   back in 2013, do you agree that this was an
8   issue for individuals who were seeking treatment
9   for addiction in Ohio?
10      A.   I know there was a fail first, where
11  you had to fail.  I don't know that that was the
12  exact language, but I believe that it was a
13  problem, yes, that not everyone would find
14  medication-assisted treatment.
15      Q.   And you said that that has also
16  changed since 2013?
17      A.   Yes.  Medication-assisted treatment
18  is now kind of considered the primary way to
19  deal with the opioid epidemic.
20      Q.   And do you know when that change
21  came about that Medicaid started funding
22  medication-assisted treatment?
23      A.   I don't.  I'm guessing it was around
24  the same time when the ACM level of care going
25  in -- I probably should know but I just don't

63 (Pages 246 - 249)

Page 250

1 know the date.
2     Q.   And, again, I take it that you
3 believe that that's a positive development in
4 the law?
5     A.   Absolutely.
6         MS. RANJAN:  I believe that's all I
7 have for the moment.
8         Anybody else?
9         MS. KEARSE:  Can we take a break?
10        THE VIDEOGRAPHER:  Off the record.
11         (Recess had.)
12        THE VIDEOGRAPHER:  On the record,
13 3:22.
14        EXAMINATION OF CHERI WALTER
15 BY MS. KEARSE:
16     Q.   Ms. Walter, thank you for being here
17 today.  As I mentioned earlier today, several
18 hours ago, my name is Anne Kearse and I
19 represent the City of Akron, the County of
20 Summit and also the ADM Board in Summit County,
21 and I just have a couple of follow-up questions
22 because you've been asked a lot of questions.
23     A.   Sure.
24     Q.   I believe the testimony that you've
25 given today is basically the fact that the

Page 251

1 people who take prescription opioids can become
2 addicted to opioids; is that fair?
3     A.   Sure.  Yeah.
4     Q.   And someone who becomes addicted to
5 opioids may be diagnosed with an opioid use
6 disorder.  Are you familiar with that?
7     A.   Um-hum.  Sure.
8     Q.   And would it be fair to say that the
9 problem of opioid addiction has been "especially
10 devastating" to the communities that you've been
11 involved with?
12        MS. RANJAN:  Objection to the form.
13     A.   I'm not sure what you mean,
14 especially devastating.  It's been devastating
15 as any addiction, but yes.
16     Q.   But it's been devastating to the
17 communities that you've been involved with?
18     A.   Sure, yeah.
19        MS. RANJAN:  Objection to form.
20     Q.   Ms. Walter, as someone who's been
21 involved with opioid addiction and addiction
22 generally, what is involved in treating persons
23 with an opioid use disorder or an opioid-related
24 addiction?
25     A.   It depends what form of treatment

Page 252

1 they go through.  I mean, typically they'll go
2 into possibly residential treatment, possibly
3 outpatient treatment.  They may or may not have
4 medication-assisted treatment.  There are still
5 some programs that are abstinence based versus
6 medication-assisted treatment based, but whether
7 they're getting medication-assisted treatment or
8 whether it's abstinence based, hopefully they're
9 also getting therapy because you have to deal
10 with some of the underlying issues with the
11 disease.
12        Some folks who have long-term opioid
13 addictions also need other therapies.  I mean,
14 they may be having health problems.  They may
15 need some form of residential treatment.  They
16 may or may not be homeless.  I mean, it just
17 depends what kind of situation they come from.
18 They may come from a family where that's not an
19 issue or they may come from living on the
20 streets or being homeless.  You just don't know.
21 So they may need housing, they may need
22 employment supports.  Many people with an
23 addiction in general, including an opioid
24 addiction, get involved with the law.  They may
25 end up in court.  They may or may not end up in

Page 253

1 jail.  It just depends.  And so they may need
2 some help with their legal history as well.  I
3 mean, it really is -- I mean, addiction is a
4 life-long disease and it's a disease that isn't
5 just the addiction.  I mean, it's a psychosocial
6 disease where you have to deal with the
7 psychological side of things, you have to deal
8 with the healthcare side of things and you have
9 to deal with the social side of things, whether
10 it's employment, housing or whatever the case
11 may be.  Addiction in general is a fairly
12 complex disease.
13     Q.   And so anyone that's looking for
14 programs or future programs regarding opioid
15 addiction would want to take all those things
16 into account?
17     A.   I would hope so, yes.
18     Q.   And I believe you testified that the
19 local boards and your association are in one of
20 the best positions to understand the critical
21 needs of the community.  Do you recall that
22 testimony?
23        MR. NAEEM:  Object to form and
24 foundation.
25     A.   I do.

64 (Pages 250 - 253)

Page 254

1    Q.   And as we sit here today, if we
2  wanted to make sure the testimony that you've
3  given today encompasses the various types of
4  treatments, I'm going to just ask you a
5  question.  What are the critical needs of the
6  community as it relates to the treatment of
7  opioid addiction that you see today?
8        MR. NAEEM:  Object to form and
9  foundation.
10     A.   Are you asking an individual
11  community or just in general?
12     Q.   In general.
13     A.   A community of -- I mean, again, you
14  have to have a way to identify people who have
15  the opioid or any addiction.  You have to be
16  able to assess them and determine what level.
17  There's the ASAM, the American Society of
18  Addiction Medicine, standards.  So somebody has
19  to be assessed, and based on that assessment, it
20  will determine what level of care they need.
21  Not everybody who has an opioid addiction needs
22  residential treatment.  Some people do.  Not
23  everybody who has an opioid addiction needs
24  medication-assisted treatment.  Some of them do.
25  Some of them don't.  Some don't want it.  It

Page 255

1  just depends.  So you have to have a continuum
2  of care that starts with being able to assess
3  and diagnose.
4        Once you've assessed and diagnosed
5  somebody of needing treatment, then you have to
6  have the levels of treatment necessary, which
7  can be outpatient, it can be intensive
8  outpatient, it can be residential.  Some people
9  may have to start off with withdrawal and
10  medication-assisted treatment.  You might have
11  to do induction.
12        Once they've gone through treatment,
13  whatever level that is, they will need some form
14  of after-care.  For some people, coming out of
15  residential treatment, that may mean they need
16  housing, that may mean they need job supports,
17  that may mean they need peer supports.  Peer
18  supporters can be a very big benefit in people
19  who are in recovery.
20        So you need that full continuum of
21  care.  And you need to recognize that someone
22  may leave treatment today, go out and be in
23  recovery, it is possible they will relapse.  It
24  doesn't mean they necessarily go back to square
25  one.  It means you have to figure out where they

Page 256

1  need to be back in that continuum to help them
2  begin to progress forward again.
3    Q.   So it can be a lifelong issue that
4  needs to be dealt with within the community and
5  for that individual?
6    A.   Yeah.  I mean, addiction is
7  lifelong, but people who are in recovery, like
8  me, I haven't needed services for years, and I
9  hope to God I never do again.  For some people
10  it may be treatment, get into recovery, get
11  sober, get clean, you're good to go.  For other
12  people they may fall in and out.
13    Q.   And I think earlier we talked about
14  Exhibit Number 17, which I'm not going to pull
15  out, but it was in regards to a meeting with Tim
16  Maglione.
17        Do you recall that?
18    A.   I do.
19    Q.   And it was in regards to how to best
20  utilize funds going forward if funds were made
21  available.
22        Do you recall that testimony?
23    A.   Yes.
24    Q.   Are these some of the things that
25  you would testify to in response to that type of

Page 257

1  question if you were asked that today?
2        MR. NAEEM:  Object to form.
3    A.   If I was asked how to utilize any
4  funds that may be available regardless of whom
5  it came from, the state or anybody else, or a
6  settlement, I think you need that continuum of
7  care available to all individuals.
8        What we also know about addiction is
9  when someone decides to get into addiction,
10  there needs to be services available when
11  they've made that determination.  Again, some
12  people are forced into treatment.  You know, if
13  you're in court and you need to get treatment in
14  order to -- if you're in drug court, then
15  treatment needs to be available.  If you decide
16  on your own to get treatment, then treatment
17  needs to be available.  If you have to wait six
18  weeks or however long, you could die before you
19  ever got to that treatment, so we need treatment
20  that's accessible when it's needed and we need
21  it in all communities, including very rural
22  communities.
23        And for some of our very rural
24  communities -- one of the things I haven't
25  mentioned is we need transportation.  You're not

65 (Pages 254 - 257)

Page 258

1 going to have a residential treatment program in
2 each and every community in Ohio. It doesn't
3 make sense. I mean, you know, really. But if
4 somebody needs to get to that residential
5 treatment program, they need to be able to get
6 there, their family needs to be able to
7 participate with them in treatment. So you need
8 those kind of things to wrap around it as well.
9     Q.   You testified earlier about the year
10 and a half you've been with the opioid committee
11 and their Week of Appreciation.
12         Do you recall that?
13     A.   Yes. That's been --
14     Q.   And you specifically mentioned the
15 various communities and their first responders,
16 of what they go through?
17     A.   Um-hum.
18     Q.   Can you explain that to me? What
19 are the first responders and why is it so
20 important to recognize them?
21     A.   Well, first responders -- in
22 general, as I said, first responders -- in this
23 particular case we were talking about uniformed
24 first responders, so we were talking law
25 enforcement, be it sheriff, police, highway

Page 259

1 patrol. We were talking firemen. We were
2 talking EMTs. A lot of those people, in some
3 areas, in some neighborhoods, in some
4 communities, have made repeated calls and
5 they've seen a lot of people die, and if they're
6 from a very rural community, more than likely
7 they know the person that's dying, and when you
8 see that many people die, that creates some
9 trauma in and of itself.
10         The other thing is, I mean, we have
11 story after story of individuals who overdose
12 multiple times, somebody revives them with
13 Narcan, somebody revives them, and our first
14 responders see them multiple times. And it can
15 become very frustrating to them if they see the
16 same person over and over and over. And so
17 there's a level of burnout, there's a level of
18 trauma, and so we -- we're trying to let them
19 know they're very much appreciated. We're
20 trying to give them a few tools to deal with
21 their trauma. We tried to give them -- one of
22 the things we gave was a flash drive, and on
23 that flash drive it helped them deal with their
24 own trauma, but we also put on that flash drive
25 how to protect yourself from fentanyl if you get

Page 260

1 involved in a situation where there's fentanyl.
2 Fentanyl was actually causing overdose of some
3 first responders, so we gave them all a tool.
4 So we just try to give them information to make
5 their job maybe a touch easier but also to let
6 them know that they're appreciated and that if
7 they are feeling stress and trauma or depressed
8 from seeing it, they shouldn't be beating
9 themselves up. They should avail themselves to
10 help. It's natural. Those kind of things.
11     Q.   Ms. Walter, would it be fair to say
12 that the cities, counties and local boards have
13 done the best that they could do with the
14 limited resources that they've had?
15         MR. NAEEM: Object to form and
16 foundation.
17     A.   I would like to think so, yes.
18         MS. KEARSE: Thank you. No further
19 questions.
20         THE VIDEOGRAPHER: Off the record,
21 3:32.
22
23     (Deposition concluded at 3:32 p.m.)
24         - - - - -
25

Page 261

1 Whereupon, counsel was requested to give
2 instruction regarding the witness' review of
3 the transcript pursuant to the Civil Rules.
4
5         SIGNATURE:
6 Transcript review was requested pursuant to
7 the applicable Rules of Civil Procedure.
8
9         TRANSCRIPT DELIVERY:
10 Counsel was requested to give instruction
11 regarding delivery date of transcript.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

66 (Pages 258 - 261)

Page 262

```
1          REPORTER'S CERTIFICATE
2  The State of Ohio,   )
3                       ) SS:
4  County of Cuyahoga.  )
5
6      I, Renee L. Pellegrino, a Notary Public
7  within and for the State of Ohio, duly
8  commissioned and qualified, do hereby certify
9  that the within named witness, CHERI WALTER, was by
10 me first duly sworn to testify the truth, the whole
11 truth and nothing but the truth in the cause
12 aforesaid; that the testimony then given by the
13 above referenced witness was by me reduced to
14 stenotypy in the presence of said witness;
15 afterwards transcribed, and that the foregoing is a
16 true and correct transcription of the testimony so
17 given by the above referenced witness.
18     I do further certify that this
19 deposition was taken at the time and place in the
20 foregoing caption specified and was completed
21 without adjournment.
22
23
24
25
```

Page 263

```
1      I do further certify that I am not a
2  relative, counsel or attorney for either party,
3  or otherwise interested in the event of this
4  action.
5      IN WITNESS WHEREOF, I have hereunto set
6  my hand and affixed my seal of office at
7  Cleveland, Ohio, on this 22nd day of February, 2019.
8
9
10
11
12  Renee L. Pellegrino
13  Renee L. Pellegrino, Notary Public
14  within and for the State of Ohio
15
16  My commission expires October 12, 2020.
17
18
19
20
21
22
23
24
25
```

Page 264

```
1          Veritext Legal Solutions
              1100 Superior Ave
2                Suite 1820
             Cleveland, Ohio 44114
3             Phone: 216-523-1313
4
   February 22, 2019
5
   To: Christina Shaynak-Diaz, Esq.
6
   Case Name: In Re: National Prescription Opiate Litigation v.
7
   Veritext Reference Number: 3216455
8
   Witness: Cheri Walter      Deposition Date:  2/19/2019
9
10 Dear Sir/Madam:
11
   Enclosed please find a deposition transcript.  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change.  Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext.com.
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived.
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA
```

Page 265

```
1          DEPOSITION REVIEW
           CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 3216455
3  CASE NAME: In Re: National Prescription Opiate Litigation
   DATE OF DEPOSITION: 2/19/2019
4  WITNESS' NAME: Cheri Walter
5      In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7      I have made no changes to the testimony
   as transcribed by the court reporter.
8
9  Date          Cheri Walter
10     Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
       They have read the transcript;
13     They signed the foregoing Sworn
       Statement; and
14     Their execution of this Statement is of
       their free act and deed.
15
       I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
18     Notary Public
19
       Commission Expiration Date
20
21
22
23
24
25
```

67 (Pages 262 - 265)

Page 266

```
 1          DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
 2
    ASSIGNMENT REFERENCE NO: 3216455
 3  CASE NAME: In Re: National Prescription Opiate Litigation
    DATE OF DEPOSITION: 2/19/2019
 4  WITNESS' NAME: Cheri Walter
 5      In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7      I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
 8  well as the reason(s) for the change(s).
 9      I request that these changes be entered
    as part of the record of my testimony.
10
        I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____
    Date            Cheri Walter
14
        Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17      They have read the transcript;
        They have listed all of their corrections
18   in the appended Errata Sheet;
        They signed the foregoing Sworn
19  Statement; and
        Their execution of this Statement is of
20   their free act and deed.
21      I have affixed my name and official seal
22  this _____ day of _____, 20____.
23  _____
        Notary Public
24
    _____
25  Commission Expiration Date
```

Page 267

```
 1          ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
 2          ASSIGNMENT NO: 2/19/2019
 3  PAGE/LINE(S) /       CHANGE       /REASON
 4  _____
 5  _____
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
    _____   _____
20  Date            Cheri Walter
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
        Notary Public
24
    _____
25  Commission Expiration Date
```

68 (Pages 266 - 267)

| & |
| --- |
| **&**   1:22 2:16,20 3:2 5:22 6:4 9:23,25 10:7 43:2 101:12 116:7 |

| 0 |
| --- |
| **00004825**   86:22 |
| **00004840**   146:20 |
| **00010305**   5:17 93:18,23 |
| **00020498**   5:23 101:14,18 |
| **00020567**   5:20 96:20,24 |
| **001**   6:9 140:6,12 |
| **001090134**   6:24 178:25 179:6 |
| **001104515**   7:3 183:18,24 |
| **012384852**   5:13 67:24 68:6 |
| **012387509**   5:11 61:6,13 |
| **012609544**   6:22 169:1,10 |
| **012613450**   6:14 159:12 160:7 |
| **012613466**   6:19 159:24 |
| **015850477**   6:5 116:9,14 |
| **02**   48:19 49:9 |
| **03**   48:19 49:9 |
| **07**   203:25 |
| **09**   82:20,21 232:3 |

| 1 |
| --- |
| **1**   5:5 7:6 17:9,12 198:9 |
| **1,200**   118:17 |

**1,500**   18:17
**10**   3:13 4:8 6:6 30:5,7 103:7 129:12,15
**1000**   3:9
**101**   5:21
**104**   8:5
**105**   8:5
**106**   8:6
**107**   8:6
**108**   8:7
**10:31**   86:5
**10:48**   86:8
**11**   6:8 125:7 140:4 140:10 143:23,23 243:15
**1100**   3:4 264:1
**1114**   1:23
**112**   29:13
**116**   6:3
**11:56**   139:23
**11:59**   140:1
**12**   6:10 50:7 58:11 58:24 112:2 143:24 146:11,18 182:2,10,15 211:14 220:15,18 221:22 223:18,21 247:3 263:16
**12.1**   155:21 156:11
**12.7**   156:12
**12.8**   157:8,13
**120**   8:7
**121**   8:8
**122**   8:8
**123**   8:9,9
**126**   8:10
**129**   6:6
**12:05**   145:19
**12th**   2:21

**13**   6:12 159:9 160:4,6 211:14
**133**   8:10
**137**   8:11
**14**   6:11,15 146:14 159:17 160:4 162:14,19 164:19 187:19,19 220:16 221:15 223:18,21 246:20
**14.3**   155:17 156:8
**140**   6:8
**146**   4:14 6:10
**14th**   147:11
**15**   6:20 19:3 22:6 38:9 51:4 157:25 168:23 169:5,9 190:22
**156**   8:11
**157**   8:12
**158**   8:12
**159**   6:12
**16**   6:23 38:10 51:4 178:24 179:4,5 188:6
**16.3**   156:9 157:8
**160**   6:15
**165**   8:13,13
**169**   6:20
**17**   1:7,15 5:5,17 6:13,18 7:3 19:16 93:22 159:11,23 160:16 183:17,22 256:14
**171**   8:14
**179**   6:23
**17th**   94:5
**18**   1:11,13 7:4 38:13 51:3 198:6
**180**   8:14

**1800**   3:8
**1820**   264:2
**183**   7:3
**19**   1:20 7:7 9:2 157:22 245:19,22 246:2
**194**   4:9
**198**   7:4
**1985**   22:13
**1990s**   149:14
**1998**   166:5
**1999**   22:16
**1:03**   146:2
**1:59**   194:7
**1st**   68:5 84:22 103:17 104:3,14 198:15

| 2 |
| --- |
| **2**   4:3 5:6 52:18,21 107:10 |
| **2,992,629**   74:7 |
| **2.5**   74:8 |
| **2/19/2019**   264:8 265:3 266:3 267:2 |
| **20**   78:14 265:16 266:22 267:22 |
| **2000**   11:17,18 22:14 108:12 115:14 132:10,16 132:17 |
| **20005**   2:21 |
| **2001**   155:5,8,13,15 156:8 |
| **2002**   49:6 |
| **2003**   49:6 155:25 156:8 |
| **20036-5807**   3:9 |
| **2005**   156:15,24 |
| **2007**   5:15 86:15,24 87:14 88:19 203:21 204:16,20 |

[2007 – 5th]

204:22 205:6,7
**2008** 105:6 243:7
**2009** 5:10 7:8 61:5
61:12 65:3 66:11
66:13 67:17 68:5
82:14 84:22
157:17 230:17
245:24 246:4
**2010** 5:17 7:6 73:2
74:13 93:22 94:5
95:6 99:11,21
100:1,10 103:18
104:3,14,22,25
107:10 109:1
110:1 125:7 198:9
198:16 199:17,24
244:17,24
**2010-4s** 199:6
**2011** 6:11 74:7
102:16 103:4
104:10 106:14
112:2 116:21
118:23 120:20
121:17 123:10
128:17 146:14
147:12 148:1
158:10
**2012** 6:6,8 38:8
129:16,24 130:20
139:2 140:5,20
143:22 211:17
**2012-13** 104:3
**2013** 6:13,18
159:11,23 160:17
162:21 211:17
249:7,16
**2014** 6:21 168:25
169:16
**2017** 179:11
**2018** 184:1

**2019** 1:20 9:3
232:8 263:7 264:4
**202** 2:22 3:10
**2020** 263:16
**203** 8:15
**204** 8:15
**207-1000** 3:15
**211** 8:16,16
**212** 8:17
**214** 4:10
**216** 3:5
**216-523-1313**
264:3
**216-9343** 2:5
**22** 264:4
**2227** 263:12
**224** 8:17
**22nd** 263:7
**240** 4:11
**241** 8:18
**244** 8:18
**245** 8:19,19
**246** 7:7
**247** 8:20
**250** 4:12
**251** 8:20,21
**253** 8:21
**254** 8:22
**257** 8:22
**26** 44:21 229:17,20
**260** 8:23
**262** 4:16
**27** 44:21
**28** 2:4
**2804** 1:6,7
**29464** 2:4
**2:06** 194:10
**2nd** 179:11 199:17
199:23

**3**

**3** 5:9,10 30:5,7
61:3,5,10,11
163:17 167:13
215:12 240:1
242:13
**30** 7:8 48:1,12
245:24
**30th** 246:4
**31** 229:16
**312** 3:15
**3216455** 264:7
265:2 266:2
**325** 2:12
**332** 170:13,17
172:14,23
**34.4** 157:5
**340** 45:24 216:15
**3488** 2:8
**369** 173:6,10,15
**3:22** 250:13
**3:30** 30:7
**3:32** 260:21,23
**3rd** 61:12 184:1

**4**

**4** 5:12 67:23 68:3
163:18 231:12
**4,646,084** 73:8
**4.2** 73:12
**401** 73:13,17,22,24
74:8
**404** 73:14,24 74:9
**404,571** 73:13 74:9
**40th** 3:14
**415** 2:18
**421** 58:18 235:23
**43** 25:8
**43026-2101** 2:8
**43215-2673** 2:13

**434-5186** 2:22
**44113-7213** 3:4
**44114** 264:2
**45** 33:22
**45004** 1:15
**45090** 1:11
**45132** 1:13
**469-3939** 2:13
**480** 128:19
**4854** 231:19
**49** 26:24 213:5
216:21
**499** 102:21

**5**

**5** 4:4 5:14 86:13
86:19 87:18 88:8
199:15,15 203:3
**500** 107:4 110:24
110:25
**500,000** 50:20
**501** 102:18 111:19
115:19 215:12,12
**502** 111:19
**51** 26:24 213:5
**517** 64:18
**518** 65:7
**53** 5:6
**546** 170:12
**55** 8:3
**556** 173:2
**5802** 198:23
**58028** 198:20
199:3
**58085** 200:13
**58095** 198:25
199:2
**591-6000** 2:18
**592-5000** 3:5
**5th** 116:21 149:25
166:19,23 168:6
210:3

[6 - addiction]

**6**

**6** 5:16 93:16,21
136:1 164:19
203:5 215:12
220:19 221:16
**6,000** 145:13
**60** 8:3 36:1 127:20
**600** 2:12
**60606-7507** 3:14
**61** 5:9
**614** 2:9,13
**64.1** 157:20
**68** 5:12

**7**

**7** 5:18 6:21 96:17
136:1 168:25
169:16 220:19
**725** 2:21
**73** 200:12
**74** 201:13
**778-1825** 3:10
**7th** 130:20

**8**

**8** 4:5 5:21 101:10
101:17,18 104:4
105:15,25 199:16
**80** 127:22,24
**832-9143** 2:9
**843** 2:5
**85** 22:12
**855** 76:24
**86** 5:14
**88** 8:4 121:5
127:23
**8th** 130:20 133:5

**9**

**9** 6:3 116:2,5,13
117:3
**9.2** 158:6,8

**90** 8:4
**93** 136:3,15,18
137:22 233:11
234:21 235:5
**94** 5:16
**94111-5356** 2:17
**950** 3:4
**96** 5:18
**99** 22:16,17,19
**9:04** 1:20 9:2
**9:30** 30:7

**a**

**a.m.** 1:20
**aaron** 1:8
**abate** 208:19
209:14
**abated** 165:20
**ability** 58:3,4
69:22 79:10
151:17
**able** 12:21 33:12
51:8 54:5 125:20
132:18 171:17
176:16 212:2
217:18 254:16
255:2 258:5,6
**abnormal** 34:10
56:21 84:18
**absolutely** 14:2
31:7 54:8,22 68:7
68:10 75:7 81:4
109:20 122:4,24
125:11 135:25
160:21 221:13
223:24 224:14,18
225:10,14 228:24
235:12 237:9
244:12,19 245:2
245:18 246:12,14
248:10 250:5

**abstinence** 252:5,8
**abuse** 7:4 23:4,18
25:5 103:12 106:6
123:9,12 142:24
153:11 198:7,15
199:7 235:9
241:10
**abusing** 242:5
**access** 173:23
211:25 212:11,13
228:9 247:4
**accessible** 257:20
**accessing** 60:3
**account** 238:13
253:16
**accumulative**
74:16
**accurate** 103:4
104:9,12 106:13
143:3 228:18
**accurately** 12:21
**acknowledge**
265:11 266:16
**acm** 247:24
249:24
**acronym** 14:3
72:20 95:21
**acronyms** 75:8
**act** 58:21 90:7
166:5,8,15 265:14
266:20
**acted** 247:20
**action** 83:17
170:20 171:11
263:4
**actions** 241:16
**active** 20:22 69:12
70:8,13,16,19,23
70:25 71:2,4 72:3
**activities** 224:4

**actual** 181:17
197:16
**ad** 39:10,12
**adamh** 25:3,18
41:11 77:14,17
203:12
**adamhs** 54:14
115:6 138:23
161:19 175:6
228:22
**adams** 206:23
**adas** 41:9
**added** 39:10 62:17
**addict** 137:17
210:10,12 248:14
248:25
**addicted** 154:2
233:19 241:14
251:2,4
**addiction** 5:7 6:16
25:4 26:9,24
33:21 37:19,24
38:2 43:20 44:17
52:7,23 54:7
55:15 57:4,4,7,13
58:15 63:10 64:16
66:12 72:23 73:20
75:4,11,20 82:1
83:10,20 84:14,24
88:24 97:17,18
99:7,8 102:23
105:12 106:24
107:9,17 108:2
110:5 123:2 129:3
140:25 141:21
142:11 144:20
154:18 159:20
162:4,10 165:1
175:20,24 228:10
232:11 240:21
241:6 242:23

243:12 244:2,16
245:1,5 246:8,22
247:20 249:9
251:9,15,21,21,24
252:23,24 253:3,5
253:11,15 254:7
254:15,18,21,23
256:6 257:8,9
**addictions** 252:13
**addicts** 212:7
**adding** 228:13
**addition** 39:7
78:19 223:20
226:9
**additional** 46:24
81:15 96:2 178:1
178:6 203:14
**additionally** 192:1
**address** 57:22
63:21 99:1 123:23
161:6,10 264:15
**addressing** 107:6
124:13 169:20
**adjournment**
262:21
**adjustment** 232:9
232:24
**adm** 63:24 180:4
215:25 216:6,16
216:17,20 228:21
232:11 234:6,7
236:20 237:12,16
238:12 239:7,8
250:20
**admboard.org.**
63:21 71:15 161:6
**admh** 97:19
**administer** 192:25
**administering**
52:6

**administration**
26:6 27:20 28:24
50:7 211:16
**administrative**
51:12 216:24
229:6 230:6
**administrator**
22:3,7 37:3
214:10 229:6
**administrators**
186:4
**admissions** 88:13
153:11 155:16
156:4 157:1
158:14
**adolescent** 19:1
21:21,22,23
**adolescents** 22:24
**advance** 202:22
**advertise** 119:18
**advertised** 143:15
**advertisements**
152:23 153:1
223:14
**advertising** 149:23
151:16,24 152:1,4
168:9 222:1,6,7
**advised** 181:5
**advisory** 48:3
49:11 111:23
112:6 115:4
117:23
**advocacy** 25:20
27:24 76:5 114:24
**advocates** 64:15
80:14 113:5,14
242:22
**advocating** 66:15
192:13 231:5
**affairs** 138:22

**affect** 76:1 78:1
**affiliate** 27:5,8
**affiliated** 63:25
**affirmatively**
241:5
**affixed** 263:6
265:15 266:21
**aforesaid** 262:12
**afternoon** 4:14
146:4 194:13
240:5
**ag** 182:1 211:13
**age** 10:8
**agencies** 56:6
113:2 190:8
236:21 237:12,16
238:12
**agency** 65:21
239:8
**agenda** 30:6 31:10
31:15,25 33:14
34:3,12 37:1,5
39:8 123:20 133:5
192:2 205:22,25
**agendas** 31:5,8
36:19 37:12
117:11 118:4
**ago** 11:15 20:23
21:11 50:7,9,13
91:3,8,8 110:14
159:2,2,3 189:12
248:6 250:18
**agree** 54:9,21
55:13 85:4,6
103:3 165:9
204:18 221:20
223:20,24 224:1,7
224:11 247:18
248:8 249:7
**agreed** 205:13

**agreement** 41:1
191:12
**agreements**
216:25
**ahead** 6:7 123:20
129:17 130:24
148:15 153:4
157:16 158:19
170:11 173:1
234:24 239:23
**aid** 195:5 197:21
**akearse** 2:5
**akron** 2:2 9:12,15
250:19
**al** 1:10,12,14,14
**alarming** 67:8
**alcohol** 5:7 18:19
19:1,4 21:21 22:4
23:4,13,16 25:3,5
25:9 26:2,8,24
28:7 43:20 44:16
52:22 57:4 63:10
66:3,17 72:23
73:20 75:11 82:1
83:9,20 84:13
88:24 90:1,18
97:17,18 99:2
104:5 105:12
122:12,18 123:1
134:1 140:24
141:20 142:10
154:2,3,18 186:2
231:14 240:18
243:11
**alcoholism** 18:22
21:5 204:8,9
**alert** 68:14 71:7
72:19 75:24,25
76:4,12
**alignment** 38:16

[alleging - assist]

**alleging**  14:7,10
**allocated**  175:4
232:20,21
**allocation**  58:17
237:8
**allocations**  58:14
59:2,14 236:21
**allow**  175:23
**allowed**  33:11
175:9
**allows**  52:16
**alluded**  24:23
241:2
**alluding**  189:3
**aloud**  243:6
**alternatives**  138:2
**amendment**
242:25
**amendments**  76:8
81:6
**america**  149:23
**american**  230:5
254:17
**amerisourceberg...**
3:11 10:5
**amount**  26:12
174:10 237:5
**amounts**  189:20
**analysis**  230:18
245:11
**ann**  112:17 113:21
113:24 114:3
**anne**  2:3 9:11
250:18
**announce**  122:2
**annual**  50:15
100:25 101:4,7
238:25 239:16
**annually**  239:11
**answer**  10:21
12:17 60:21,24

98:13 147:21
148:23 151:13
171:25 204:24
205:2 213:25
232:15
**answered**  55:9
202:18
**answering**  12:6
**anticipate**  137:20
**anticipated**  233:18
**anybody**  126:9
129:1 208:9
232:21 250:8
257:5
**apart**  122:5 123:4
**apologize**  198:12
213:19 224:19
242:8
**apparently**  123:25
195:22
**appear**  265:11
266:15
**appearances**  2:1
3:1 4:3
**appears**  62:22,23
62:25 71:10 82:12
85:10,12 96:9
98:5 99:15 102:10
102:19 116:18
119:2 128:22
162:18 246:3
**appended**  266:11
266:18
**applicable**  261:7
**apply**  177:11
**appoint**  187:18,20
187:21,23,24,24
**appointed**  28:8
48:3 103:12
216:11

**appreciate**  12:7
240:9
**appreciated**
259:19 260:6
**appreciation**
92:21,22,24
258:11
**approach**  108:16
**appropriate**
120:16 172:6
211:25 227:16
237:5
**approval**  39:24,25
167:13 248:4
**approve**  35:22,23
**approved**  17:24
32:6,9 40:4
141:19 148:25
**approves**  69:19
**approximately**
205:24
**april**  5:10 61:4,12
92:24,24,25 112:2
116:21 199:17,23
**area**  56:19 111:1
121:6 174:4,6,8,20
174:25 186:7
207:3 247:19
**areas**  82:7 85:1
97:21 121:1
135:16,16 218:25
259:3
**arose**  169:23
**arranged**  51:4
**article**  64:21,23
65:6,12,15 66:21
67:6,11,16 141:4
143:2 242:21
**articles**  64:15
223:15

**articulated**  189:11
**asam**  254:17
**ashtabula**  6:10
146:13 147:4,15
147:18,24,25
148:11 158:3,8
**aside**  27:2 49:10
49:14 51:12,18
99:3 134:25
209:10 246:18
**asked**  15:16,19
21:4 24:11 55:7
118:6 120:5,12
132:24 148:7,11
154:9 181:1,10
191:4 202:17
205:11 206:7,21
207:5,8,10,11,13
207:16,20,20,22
208:9 213:2 219:3
220:24 224:19
233:10,16 250:22
257:1,3
**asking**  88:1 95:18
97:12 134:21
184:9 203:9
209:22 232:4
254:10
**aspects**  143:9
**assembly**  164:25
165:4,19 208:18
**assess**  254:16
255:2
**assessed**  254:19
255:4
**assessment**  154:5
254:19
**assignment**  265:2
266:2 267:2
**assist**  236:20
237:11

**assistance** 247:13
**assistant** 21:6,9
  230:7
**assisted** 107:11,20
  107:24 108:4
  109:1 115:13
  128:20 173:24
  176:14,17 212:2
  248:13,15,24
  249:1,14,17,22
  252:4,6,7 254:24
  255:10
**associate** 36:16
  47:8 225:4,6,16,23
  226:10 228:25
**associated** 173:10
**association** 13:23
  19:18,20 25:13,14
  25:18,24 26:1,19
  41:2,9,10,11 60:5
  90:7 97:15 113:19
  133:9 181:4,11
  185:5 186:1
  200:18 226:25
  253:19
**associations** 19:21
  19:22 25:22 40:19
  41:12 112:18
**assume** 64:1
  201:11 202:2,19
  215:16 220:1
  236:17
**assumed** 210:17
**assuming** 14:20
  64:24 70:22 77:11
  132:2 190:7
  202:10
**attached** 64:25
  162:14 242:21
  266:7

**attachments** 64:14
  162:15
**attend** 31:1 34:24
  36:6,10,12,18
  91:16 92:11
  120:16 163:22
**attendance** 30:23
  95:13 128:23
**attended** 43:4 95:9
  112:13 119:8
  122:20 123:1
  129:4 164:1,3
**attendees** 94:8,13
  94:17
**attending** 94:23
  126:10
**attends** 30:11
**attention** 200:11
  246:19
**attorney** 94:20
  125:16,25 183:2
  194:14 213:19
  214:3 263:2
**attorneys** 15:5
  191:5
**audit** 45:3,3
**authorities** 13:24
  19:19 97:16
  200:19
**authority** 45:23
  70:6
**authorize** 266:11
**avail** 260:9
**availability** 151:4
  151:5,6
**available** 53:14
  57:24 110:21
  111:7,14 149:14
  245:2 256:21
  257:4,7,10,15,17

**ave** 264:1
**avenue** 2:8 3:4
**awards** 93:7
**aware** 60:9 82:14
  122:21 126:11
  133:13 141:25
  158:14 163:10
  179:20 180:6,22
  197:22,24 198:2
  204:19 212:24
  232:8 233:2,6,8,9
**awareness** 138:15
  144:12

**b**

**bachelor's** 18:1
**back** 19:25 23:17
  32:13,17 33:7
  39:6 43:4 50:11
  82:14 86:10
  113:13 128:9,17
  131:24 139:2
  146:7 148:1
  155:10 185:24
  187:1 195:13
  200:2 203:3 205:8
  205:11 212:15
  215:8 216:25
  217:1 221:22
  249:7 255:24
  256:1 264:15
**backdrop** 66:2
**background** 17:6
  102:21 106:11
**backyard** 176:12
**bad** 124:25
**bag** 197:18
**bags** 196:18
  197:14
**ballgame** 223:8
**banking** 42:1

**barrel** 118:19
**based** 13:15 31:19
  56:2 58:3 64:1
  94:18 95:13,22
  104:10 112:13
  119:10 129:5
  165:7 219:24
  234:14 238:10,10
  238:14 252:5,6,8
  254:19
**basic** 42:3,4
**basically** 13:5
  20:10,15 115:11
  136:12 141:12
  175:18 180:23
  250:25
**basil** 1:22
**basis** 37:6 39:11
  99:10 112:16,19
  121:7 189:16
**bates** 5:10,12,17
  5:19,22 6:4,8,14
  6:18,21,23 7:3
  53:3 61:5,12,20
  64:17 67:24 68:5
  76:23 86:21,22
  93:17,23 96:19,23
  101:13,18 116:8
  116:13 129:25
  140:5,11 146:19
  159:11,23 160:6
  168:25 169:9
  170:12 178:24
  179:5 183:18,23
  198:19 200:12
**battling** 97:21
**beating** 260:8
**beautiful** 144:15
**becoming** 50:2,9
  70:25 107:20
  108:4,7,8

**bed** 18:17
**beer** 82:6
**began** 137:14,15
  152:20 211:10,18
**beginning** 5:10,12
  5:17,19,22 6:4,8
  6:13,18,21 7:3
  32:17 33:20 48:7
  61:5 67:23 93:22
  96:19 101:13
  116:8 140:5
  159:11,23 168:25
  183:17 195:14
  214:22
**behalf** 2:2,7,10,15
  2:19 3:2,6,11 9:12
  9:15,18,20,22,25
  10:4,7 66:15
  197:8
**behavioral** 13:23
  19:18 37:11,16,20
  38:12,19 97:15
  112:23 200:19
**belief** 14:11
  193:10 234:12
**believe** 14:9 16:4
  17:20 22:11,12,18
  32:15,16,18 38:8
  41:3 44:21 45:8
  47:19 55:18 57:2
  57:2 61:16 67:5
  67:20 71:24 72:14
  72:17 87:3,8
  91:21 95:1 102:3
  107:24 109:10,13
  115:25 121:23
  132:5 133:8
  139:11 142:19,25
  143:14,18 144:9
  147:10,17 150:8
  150:12,17 151:21

152:12,20,20
153:22 154:7
155:1 160:21
163:25 164:1,16
165:13,18 189:8
192:19,23,24
195:19 197:10
206:11,23 209:13
211:19 212:9
216:1 224:7
225:15 230:23
231:12 235:5,18
241:2,6,8 246:12
246:14 249:12
250:3,6,24 253:18
**believed** 80:25
  126:15
**bell** 99:19
**bellwether** 16:6
**benefit** 214:22
  243:15 255:18
**benefits** 53:10
  54:1,3,23 66:25
  186:22 243:8,12
**best** 12:5 57:22
  98:13 100:18
  102:8 193:7
  247:10 253:20
  256:19 260:13
**better** 149:13
  179:23 230:11
**betting** 62:18
**beyond** 14:15
  145:13 174:1
  190:2
**bh** 38:10 51:4
  78:20 225:25
**biannual** 239:13
**bias** 227:17
**biennial** 66:14,15
  68:19,20,22 76:16

78:17 103:8
**biennium** 70:4
  73:2
**bienniums** 70:2
**big** 30:6 37:11
  85:1 179:22
  239:14 255:18
**bigger** 44:9 84:25
  101:5 108:24
  172:17 196:2
  213:14
**biggest** 92:18
**bill** 30:20 63:4
  71:16,17 72:3,15
  79:18,20 136:3,15
  136:18 137:22
  170:2,13,17 171:1
  171:13 172:14,17
  172:21 173:5,10
  173:14,15 175:2
  175:13 176:21,25
  230:18,23 231:1
  233:11 234:21
  235:6
**billboards** 142:20
**billed** 38:14
**billh** 71:15
**billion** 104:4
  105:15,25
**bills** 78:21,24 79:1
  169:12,23 172:16
  172:20
**bimonthly** 27:15
  29:24
**bio** 17:20,25
**biography** 5:5
  17:13,16
**bit** 20:1 51:19 52:2
  55:23 59:4 75:9
  100:15 128:25
  181:2 214:23

216:2 242:12
**black** 104:3,15
**blight** 84:24 85:5
**blogs** 144:19
**blown** 134:7
**blue** 84:19
**blufton** 18:1,10
  20:11
**board** 25:18 28:1
  28:1,6,7,7,14
  29:15 30:13 31:17
  40:23 41:13 44:7
  44:9,25 45:1,7,7
  45:10 52:14 54:3
  54:4 55:18,19
  56:8,9 57:8,14
  63:11,24 67:18
  72:1,10,10,16
  77:10,14,18 82:1
  83:9 84:3 89:17
  89:18 92:4 115:6
  119:13 129:2
  138:23 143:12
  145:10 147:18
  161:12,19 171:9,9
  171:10,11 173:22
  174:4,6,8,20,25
  175:6,6,14 180:4
  180:21 182:9
  183:4 184:19,24
  187:7,20,25 188:2
  193:5,6 205:18,25
  216:10,10,16,17
  216:20 217:4,5
  237:1 238:1,3
  242:14 250:20
**board's** 45:4 55:14
  55:16
**boards** 5:7,8 13:18
  25:3,4,5,6,8,9,10
  25:13,16,17 26:2

26:25 27:3 28:15
28:17 29:5,12
38:7 39:4 42:20
42:21 43:1,13
44:11,17,22 45:14
45:15,20,22 52:3,4
52:10,17,23,24
53:10,13,25 54:14
54:17,23 55:20
56:7,9,15,20,22,23
57:2,25 58:1,2,6,9
58:14,19,20,24,25
59:3,5,7,9,12,14
59:15 73:21 74:3
75:25 78:2 79:10
81:16 93:2,8
96:12 97:19,19
99:9 120:1 133:2
145:9 163:8 165:8
171:22 172:11
173:16 174:2,22
174:23 176:3,9,11
178:7,9 181:5,14
185:25 186:4,13
186:18,21,22,23
187:2,12,14,15
189:9 190:5,9,9,17
191:2 192:3,14,17
192:23,24 193:1
202:3 209:4
215:25 216:6,20
228:21,22 232:5
232:12 233:5
237:6,10 238:15
238:24 239:2
253:19 260:12
**boatload** 191:5
**bookkeeping**
229:7
**books** 37:3 218:10

**bottom** 63:12,14
64:4 85:20 88:8
110:16 161:14,22
177:10,14 199:3
231:17,19
**boulevard** 2:4,12
**box** 153:15
**boy** 47:25 82:20
**bpulsipher** 2:18
**brad** 92:2
**brain** 193:24
**brakes** 107:12
109:2
**brand** 53:19,24
76:17
**brandy** 2:11 9:17
240:6
**branjan** 2:14
**breadth** 14:16
**break** 12:16
124:21 139:21
145:16 250:9
**breakout** 127:1,7
135:21 136:2
**breakouts** 128:1
134:12
**breaks** 12:14
**bridgeside** 2:4
**brief** 32:24 212:25
**briefings** 170:2
**briefly** 20:2
**bring** 28:22 34:2
72:4 176:11
**bringing** 93:14,14
**brought** 22:25
25:21 33:20 46:12
96:11 188:22
189:1 217:20
**bryant** 2:16 10:6
**buckeye** 60:4

**budget** 27:24,24
35:22 50:15 66:2
66:14,15 67:4
68:14,18,20,22
69:6,8,23 71:7
72:19 75:12,21,24
76:13,16 77:21
78:1,3,4,17,19
80:1 81:7,9,10,11
81:13 84:14 103:6
103:8 104:4,6,13
105:1,5,9,14,16,19
105:23 106:1
114:24 121:24
235:11,15 238:25
244:16
**budgeting** 69:1,4
**budgets** 106:5
**building** 177:25
178:2
**bullet** 72:21 73:1
74:19 149:10,12
150:3,21 151:15
152:7 171:5
173:15 175:1
177:13 203:12
222:1,19 231:25
247:3
**buprenorphine**
132:19
**burdens** 203:14
**bureau** 24:5
**bureaucracy**
228:5
**burke** 71:6 124:9
**burling** 2:16 10:7
**burnout** 93:12
259:17
**businesses** 56:21
**butcher** 124:22

**bylaws** 42:3

**c**

**c** 47:15 215:12,12
226:21
**ca** 264:25
**cabinet** 83:17
**calculated** 14:23
**california** 2:17
**call** 75:6 76:7
79:13 118:4
127:20,25 128:2
128:13 134:7,11
183:4 202:15
**called** 10:8 25:14
25:15 28:19,21
29:11 34:8 37:20
42:19 46:23 48:22
53:25 62:14 70:4
89:18 91:20 92:20
98:11 124:18
138:2 144:8,9
204:2 227:6
**calling** 36:1
**calls** 65:21 80:24
259:4
**camp** 92:3
**campaign** 93:2,15
97:1 100:14,17
141:5,8,9 142:17
142:23 143:3,10
143:19 144:3,6,10
144:21 145:3
196:19 197:9
201:10
**campaigns** 138:15
144:12
**cancer** 170:19
**capacity** 72:3,6
211:5,8
**capital** 177:25

[caption - circle]

caption 262:20
caraffi 126:17,21
cardinal 2:19 9:25
 142:13,13
cards 20:22
care 38:21 45:13
 89:14 173:17,18
 173:25 174:2,17
 174:19 175:7
 177:2 227:21,24
 228:2,17 238:1
 239:15 243:15
 246:16 247:24
 248:4 249:24
 254:20 255:2,14
 255:21 257:7
career 18:5
careful 43:15
carolina 2:4
carolyn 80:10
carrier 197:18
carry 136:13
carved 38:20
case 1:7,11,13,15
 11:7 14:19 15:12
 49:14,25 54:25
 64:15 84:15 88:18
 118:5 152:2
 153:22 175:20
 240:7 242:22
 244:15 253:10
 258:23 264:6
 265:3 266:3
cases 13:14 175:10
 178:9 202:2
cash 136:13
cass 138:11
catalysts 54:20
causation 221:19
cause 262:11

caused 105:5
causing 260:2
cc 63:1
center 18:16,19,22
 19:1 20:24 21:6
 21:22,23 46:25
centers 88:21
ceo 19:23 34:8
 37:14 40:11 41:16
 46:6,7 55:1 76:12
 81:2 109:16
 120:17 165:7
 225:4,23 228:25
 238:11
ceos 225:6,16
 226:10 228:25
certain 37:5 44:7
 44:11 76:8 174:10
 174:24 175:10
 233:17
certainly 13:15
 16:16 17:24 48:11
 57:10 59:24 60:4
 69:25 83:2 105:8
 121:5 129:4
 144:23 224:10
 244:23 245:9
certificate 4:16
 262:1 266:11
certification 44:16
 45:2 135:13 265:1
 266:1
certified 10:11
 29:16,17 44:22
 135:14
certifiers 44:23
certify 262:8,18
 263:1
certifying 29:12
cetera 191:11

ceus 118:7 129:1
 133:21
chain 68:4,17
 81:18 83:3 179:10
 179:16 183:23,25
 184:7
chair 35:2 70:22
 70:25 71:1 91:24
 92:1,2 126:18
chairman's 6:17
 159:22 162:9,20
 246:21
chairs 36:10
change 18:19
 20:25 37:17 54:20
 69:22 76:20 136:4
 151:17 156:18
 227:8 231:22
 237:23 247:10
 249:20 264:13,14
 266:8 267:3
changed 38:1
 233:7 249:5,16
changes 38:5 40:3
 40:4 70:5 76:13
 81:8,11,14,15
 137:9 150:21
 264:12 265:7
 266:7,9
changing 54:18
 227:12 247:1
characterized
 172:8
charge 51:9 226:4
 230:13
charleta 112:17
 113:4 114:3
charter 25:23
chemical 240:13
cheri 1:18 4:7 5:5
 5:9 6:12,20 7:7

9:9 10:8,13 15:17
 17:12 61:3 146:5
 159:9 168:23
 179:20 194:11
 214:19 240:3
 245:22 250:14
 262:9 264:8 265:4
 265:9 266:4,13
 267:20
chicago 3:14
chief 13:22 40:8
child 24:4,4,10
 189:23 190:10,16
 244:9,11 246:15
children 192:19
 244:25
chillicothe 207:3
choice 15:20 16:12
 23:17 27:7 154:1
 154:3
choose 178:14
 187:17
chooses 242:5
choosing 117:19
chose 44:11
 123:15,16 127:6
chosen 35:4
 133:18
christina 2:7 9:8
 15:8,21 44:1
 115:5 214:3
 219:16 226:2
 264:5
chronic 166:10
 170:18 171:7
 223:11 224:5
 228:11
chronology 18:5
 38:6
circle 50:11

circles 180:17
circumstances 242:4
cites 165:24
cities 13:8,8 14:22 85:1 106:17 260:12
citizens 80:13
city 1:12 2:2 9:12 9:15 18:11 20:2 250:19
civil 10:10 261:3,7 265:5 266:5
claiming 189:17
clas 227:15
class 17:2
clean 256:11
cleanest 26:18
clear 12:2 15:14 216:4 222:12 233:3
clearer 155:11
clearly 225:11
cleveland 1:12 3:4 139:8 186:7 263:7 264:2
client 153:11
clients 20:15,17 45:20 153:16 228:4,7,8
clinical 131:20 202:5
clinician 202:6
clinicians 202:4
clock 129:2
close 137:15 234:17
closed 19:2 21:7 21:19,20,23 83:1 137:10 209:17 210:14

closer 101:3
closing 234:2,8,11 234:15
clr 1:25
club 56:22,23
cmcnamara 2:22
coalition 113:7,25 114:1,7,10,14,15 114:20
cocaine 23:14 204:11 210:20
code 38:11,14,16
coder 92:12 193:25,25 226:19 226:22
codes 38:14,17
coleman 243:7
collaborative 98:16,20,23,25 99:4,10
colleagues 194:3
collect 55:25 217:16 220:9
collected 217:12 218:5 220:3 236:15
collection 217:2
colleen 2:20 9:24
college 18:1,6,10 20:11 230:4
columbus 1:23 2:13 9:5 18:24 112:2 243:10
column 128:18
combat 57:18
combination 31:2 102:6 110:2
combined 25:8,17
come 24:11 27:14 30:19 36:3 39:13 41:1 49:16,21

50:17 72:18 76:21 78:22 89:25 90:17 110:7,10 114:14 122:10 128:9 134:22 178:6 182:10 188:20 192:13 206:3 211:19 214:2 217:18 235:22 237:3 244:20 252:17,18,19
comes 35:12 50:19 50:20 51:7 65:7 73:12,14 81:19 186:6 192:18
coming 30:16 99:9 102:25 108:9 163:10 227:9 230:3 239:22 255:14
comment 209:6
comments 171:1,4 176:1
commission 263:16 265:19 266:25 267:25
commissioned 262:8
commissioners 28:8 56:25 59:3,5 59:6 120:13 181:3 187:13,18,23 188:1 206:17 208:8
committee 6:17 7:7 35:1 36:10 38:23,25 47:11 48:4 49:11 87:3 88:23,24,25 89:2 89:11,11,12,13,14 89:18 90:10,13,15

90:16,24 91:5,9,10 91:13,20,23,24 92:2,5,15,21 99:8 102:10,11,15 109:17 111:23 112:7,9,25 115:5 115:20 117:21,22 117:23,24 120:4 120:11 127:9 132:3 133:20,22 133:23 135:2,10 159:21 162:5,11 162:25 163:19 164:6 165:10,24 166:8 168:17 169:24 202:1 227:7,8 245:23 246:4,23 258:10
committee's 163:13
committees 34:24 88:23 89:5,7,10,15 89:20 90:8,9,12 91:6 145:9 164:10 164:13,15 226:4
common 23:10
communicated 196:8
communication 197:11
communications 219:22 220:1
communities 96:3 113:8,25 114:8,11 114:21 251:10,17 257:21,22,24 258:15 259:4
community 5:8,8 5:19 25:6,10 28:15 52:24,25 53:10,10,25 54:1,5

[community - conversation]                                    Page 11

54:7,19 56:17
57:8,14,21,23
58:18,23 59:10
79:25 80:6 81:3
94:19 95:22 96:1
96:6,18 97:3
163:11 186:21,22
209:19 228:3
253:21 254:6,11
254:13 256:4
258:2 259:6
**companies** 152:17
185:8 188:10
248:4
**company** 149:24
**compare** 219:20
**competence** 113:5
113:14
**competitive** 237:2
237:7
**complaint** 208:12
**completed** 262:20
264:15
**completely** 23:2
**complex** 253:12
**compliance** 45:23
**comply** 170:21
**concentrations**
155:16 156:4
**concept** 14:17
233:17
**concern** 171:18,22
172:1,2,8,9,11
176:10 210:2
213:13 222:6,7,22
244:18
**concerned** 191:8
193:2
**concerns** 176:19
191:1,16

**concluded** 260:23
**conditions** 170:19
177:10
**conducts** 32:20
**conference** 48:9
49:12,19 51:2,23
64:5,9,22 65:3
66:1,19 71:24
72:5 84:18 92:23
93:7 100:7,8
102:11,16 107:9
107:10 109:1,6,8
109:11,15,17,19
110:1 111:22
112:1,14 113:22
115:4,19 116:19
116:21,24 117:9
117:20 118:1,9,12
118:14,22 119:8
119:18 120:18
121:21,25 122:6
122:22 123:5
125:21 126:5,10
127:21 128:9,17
129:24 130:16,19
130:20 133:12,18
133:20 135:1,20
139:9 145:15
154:9,11,13 162:5
162:8 167:6
196:14 212:23
218:11 221:6
**conferences** 26:13
51:1,3,6,15,15,19
51:22 100:22
110:9 115:12
117:14 134:6
135:24 167:11
185:21 212:16,18
219:7 225:9 226:7
226:8 229:9

**confident** 245:10
**confidential** 5:11
5:13 6:14,19,22
61:7 67:25 159:13
159:25 169:2
**confused** 29:25
195:20
**confusing** 100:15
**confusion** 187:6
187:15
**conjunction** 31:9
44:19 55:17 56:5
**conley** 80:12
**connected** 187:7,8
**connection** 13:1
**connolly** 2:20 9:25
**conscious** 15:20
16:12
**consciously** 82:21
194:24
**consequence**
234:1
**consequences**
137:9 212:5
**consider** 55:19
**considered** 249:18
**considering** 180:8
**consistent** 186:5
203:22
**constantly** 186:1
**constituent** 79:14
**constitutes** 80:5
**consultation**
117:12
**consumer** 45:9
168:9
**cont'd** 3:1 6:1 7:1
**contact** 127:13
**contacted** 48:21
206:16

**contained** 222:19
**contains** 149:9
155:12,25 156:14
161:25
**content** 197:10
**context** 11:5 80:22
115:10 186:18
225:8
**continue** 191:1
**continued** 146:5
177:20
**continuum** 173:17
173:25 174:2,16
174:18,25 175:11
228:16 237:25
239:15 255:1,20
256:1 257:6
**contract** 41:19
44:11 45:15 46:8
141:15 174:22
226:2,3
**contracted** 42:25
**contracting** 44:8
**contractor** 217:17
226:3
**contrast** 219:20
**contributed** 14:12
123:9 168:7
**contributing**
165:25 166:14,18
168:4,8
**control** 164:25
**controlling** 111:14
**controls** 110:20
111:6
**convenient** 143:6
**convenor** 55:20
**conversation**
15:23 179:14
183:8 184:5
206:15

cooperate 191:7
coordinate 97:19
98:1
copies 118:8
198:13 207:23
copy 162:16 219:1
corner 64:18
140:23 154:17
158:4 231:18
corporation 2:15
3:11
corps 229:19
230:4,5
correct 13:25
15:12 18:2,3
24:15,18,20,21
31:14 32:2,7 36:8
39:22 40:9 46:2,3
49:23 52:9,11,12
52:14 53:15 55:3
57:9,15,19 58:7
59:18,19 60:10,11
60:13 61:23 62:6
62:7 65:13,14,23
67:9,10,14,15,19
68:14,24 69:2
70:14 71:19,20
73:6,9 74:5 75:1,2
75:5,13,14,18,22
75:23 76:9,10,25
82:11 83:6,18
85:9 89:23 90:25
91:25 95:23
100:19,24 101:24
102:16 105:13
106:17 107:3
108:21 111:8
115:7 116:22,23
117:1,2,17,18,24
122:19 123:24
124:3,5,6,11,14,19

124:20 125:3,4,13
125:14,18,19
127:1,2,5 128:21
130:21 131:13,17
131:18 132:14,15
133:7,8 135:22
138:19,23,24
141:5,6 142:8,24
143:4,8 147:5,6,14
149:1,10,11,15,17
153:9,12,13,19
155:5,6,13,14,25
156:1,5,9,10,12,13
156:15,19 157:2,3
157:5,6,12,14,15
157:20,21,23,24
158:1,2,6,7,10,11
158:15,17 160:15
160:17,24 161:19
161:20,23 162:2
162:11,12 166:24
167:19,20 168:2
168:14,15,19,20
169:15,16,17,20
169:21,25 170:24
171:15 173:20
175:5,15 177:4,7
177:17 179:11,12
179:17,18 180:1,4
180:5 184:15
189:10,10,13
190:7 203:17
213:8,21 216:3
224:25 227:1
228:24 240:13
241:13,18 243:1
243:24 246:17
262:16
correction 246:11
correctional 23:8

corrections 33:6
264:12 266:17
correctly 24:25
70:10 76:3 85:2
103:1 107:13
110:3 150:14
170:23 171:14
179:25 184:14
243:18 247:15
correlation 245:8
246:13
cost 82:11,15
179:23 236:5
243:12,15
costs 51:13 82:5
106:7 243:8,16
council 27:17
31:12,22,24 34:15
34:22 35:1,4,7,15
35:17,19,25 36:3,6
36:20 37:7 39:9
40:15,18 41:5,6,7
42:14 112:23
128:7 133:25
135:9 192:2,8
207:21 219:10
counsel 9:6 53:21
87:19 261:1,10
263:2
counselor 20:19
21:4 240:13
counties 13:19
14:23 16:6 27:12
58:11 66:22
106:16,25 121:1,5
156:18 157:1
176:15 180:12,18
180:24 181:8
183:10,12,12
185:7,12,14 188:9
188:19 189:17

206:17 207:4,5,23
213:6,10,17 216:7
229:20 260:12
counting 46:22
country 13:12
108:8
counts 153:20
county 1:10,14 2:2
6:11 9:12,16
13:23 15:6,9 16:5
19:18 28:8 56:24
57:1 58:25 59:3,4
59:6 63:10 64:2
67:18 71:19,25
77:18 82:2 83:9
84:3 97:15 115:6
120:13 126:18
129:8 132:13
138:22 146:13
147:4,24 148:1,4
148:11 155:17,20
156:2,3,7,11,25,25
157:4,13,20,22,25
158:3,9 161:12,19
179:21 180:4,7,11
181:3 183:5,9
187:3,7,8,13,17,22
188:1 191:3,6,23
193:4,8 200:18
206:23 207:2,9,14
208:3,8 216:11,13
219:5,5,23,23
220:2 237:7
242:14 247:14
250:19,20 262:4
265:10 266:15
county's 61:23
191:4
couple 19:9 22:4
29:8 30:9 37:10
38:20 40:12 43:9

[couple - dealing]

64:14 70:5 101:3
119:15 143:20
144:7 174:10
180:13 188:20
219:15,16 221:16
221:23 233:10
236:3 248:11
250:21
**course** 217:6
224:21
**court** 1:1 4:18
11:25 151:12
189:24 190:9
204:24 205:1,4
242:1 252:25
257:13,14 265:7
**courts** 111:11,12
111:15 190:15
**cov.com** 2:18
**cover** 170:1
**coverage** 64:9,10
247:10
**covered** 240:9
242:11
**covington** 2:16
10:7
**cracks** 91:11
**craig** 15:25 16:1
161:11 179:11,17
179:19 180:2,7
181:24 184:1,5,8
190:20 191:16,24
193:12
**craigg** 161:6
**crawford** 3:8 4:9
9:19,19 77:10
92:4 194:12,14
198:12 205:10
214:16
**crazy** 87:11 98:9

**create** 19:22 25:23
27:13 29:6 41:17
41:22,25,25 43:17
**created** 23:1 25:23
44:18 52:10 69:13
92:20 104:3 117:4
117:6,8 154:21
172:21 173:25
210:23
**creates** 259:8
**creating** 43:6 70:8
203:14
**crime** 60:6
**criminal** 243:16
**criminality** 106:7
**crisis** 54:19 57:7
57:18 105:1,5
197:21
**criteria** 228:5
**critical** 193:4,7
253:20 254:5
**crushable** 79:19
79:21
**cultural** 113:5,14
**culturally** 227:15
**culture** 29:11,14
43:10 44:13,15
89:17 226:5
**current** 18:6 88:9
165:2 221:20
**currently** 46:19
49:23 83:11,13
90:24 97:21
127:17 130:12
221:11 224:24
**curtailing** 249:3
**custody** 4:18
**customarily** 135:9
**cut** 73:8 74:4,7
80:25 81:13
235:20 244:3

**cutbacks** 66:2
67:4
**cuts** 66:17 74:13
74:15 75:21 76:1
104:6,13 105:11
105:14,19 236:2,2
236:4 244:16
245:5
**cutting** 235:19
246:8
**cuyah** 5:11,13 6:5
6:14,19,22 61:6,13
67:24 68:6 116:9
116:14 159:12,24
160:7 169:1,10
**cuyahoga** 1:10
15:9 16:5 58:25
61:23 63:9 71:25
115:6 126:18
132:13 138:22
155:17 156:2,7,25
157:7,22 161:18
183:11 207:9,14
213:15 219:4,23
262:4
**cvs** 3:6,6 9:20,20
194:15,15,18,20
194:22,23 195:1
196:8,20,24 197:4
**cycle** 239:19

**d**

**d** 225:21 226:16
226:21
**d.c.** 2:21 3:9
**damages** 179:23
180:8,20 189:14
189:17
**dan** 1:8
**data** 55:25 56:1,2
84:6,7 108:12
115:14 132:10,16

132:17 155:8,12
155:15,25 156:14
156:24 157:17
214:13 217:1,19
226:1
**date** 9:2 48:20
87:13 118:18
130:19 160:16
211:15 247:25
248:7 250:1
261:11 264:8
265:3,9,19 266:3
266:13,25 267:20
267:25
**dated** 5:10 6:8,11
6:13,18,21 7:5,7
61:4,12 140:5,20
146:14 159:10,22
168:24 169:16
179:11 184:1
198:8,15 245:24
**dates** 122:4
**dawkins** 237:19
**day** 2:11 9:18
16:14 36:2,2 45:3
45:11,11,16,16
131:11,15 132:6
217:6 224:21
263:7 265:16
266:22 267:22
**dayer** 119:1
**days** 33:5 40:1
131:12,14 218:14
247:12 264:18
**deal** 27:21 119:5
172:12 249:19
252:9 253:6,7,9
259:20,23
**dealing** 47:23
100:6 108:16

**dealt** 210:1,2
256:4
**dear** 264:10
**death** 67:9
**deaths** 59:24
65:17 102:24
**december** 203:25
**decide** 127:24
257:15
**decided** 19:22
25:23 91:9 92:25
134:10,23 158:9
181:13,19 211:6
214:12
**decides** 36:22
257:9
**decimated** 106:6
**decision** 24:8
35:25 191:22
206:4
**decisions** 36:4
128:3 181:8
213:16
**deduce** 195:7
**deed** 265:14
266:20
**deemed** 264:19
**defendant** 15:11
195:1,5
**defendants** 14:7
207:17
**deficit** 104:4
105:16 106:1
**deficits** 107:8,16
**definitely** 117:8
**definitions** 175:17
**degree** 20:10
**dehner** 206:25
**delivery** 261:9,11
**delos** 115:5,8
128:19 132:12,21

**demand** 151:16
**demo** 77:9
**denihan** 63:4,6
71:12,22 85:12
133:7,12 161:1,5
**dental** 171:9
**department** 10:22
10:23 11:9,13
18:15 19:3,7,12,13
19:14,15 20:5
22:1,5,10 23:23
24:14,16 26:10,11
30:16,17 33:21,24
39:16 43:12,19,20
55:22 58:15,20
72:23,25 73:19
74:22 75:1 83:20
93:3 97:17 125:1
134:3 140:24
141:13,19,20
142:10 154:17
176:20 187:21,24
197:7 264:22
**departments**
23:25 24:2,12
26:8 43:18 56:10
90:5 145:11
**depend** 56:8
**depended** 135:14
**dependence**
128:21 153:12
**dependency**
240:13
**dependent** 241:12
**depending** 46:15
48:13 56:18 91:16
**depends** 10:20
26:10 39:18 58:22
78:23 134:24
251:25 252:17
253:1 255:1

**deposed** 10:11,17
10:24 11:3,11
12:25 15:17 16:3
**deposition** 1:18
9:4 15:2 17:11
52:20 61:2 67:22
86:12 93:20 96:16
101:9 116:4
129:14 140:3
146:10 159:8,16
168:22 178:23
183:16 195:15,24
198:5 245:21
260:23 262:19
264:8,11 265:1,3
266:1,3
**depressed** 260:7
**deputy** 19:8 21:25
22:8
**describe** 221:1
235:13
**described** 166:8
204:12 228:21
243:7
**describes** 170:16
**description** 5:3
136:23 170:25
219:25 222:20
**design** 90:3
**designed** 224:5
**detail** 29:21
**determination**
181:12 257:11
**determine** 42:14
96:25 178:10
254:16,20
**determined** 25:18
90:6
**detox** 247:8,11
248:1

**devastating**
251:10,14,14,16
**develop** 29:16
42:1 44:20
**developed** 96:7
**developing** 29:7
52:5
**development** 5:19
96:19 97:3,20
98:1 148:16 149:9
149:19 150:9
151:2,22 152:13
220:20 223:23
224:13 248:9
250:3
**developmental**
19:5
**dewine** 125:16
211:13
**deyneka** 2:3 9:14
9:14
**diagnose** 255:3
**diagnosed** 251:5
255:4
**diagnoses** 156:19
158:13
**diagnosis** 153:17
153:21
**diaz** 2:7 9:8,9 86:3
89:16 108:22
133:15 171:23
211:1,21 213:20
224:6 264:5
**dictated** 218:4
**die** 257:18 259:5,8
**difference** 16:24
204:5 248:3
**different** 13:8,18
22:20 25:20 26:14
46:15 47:10 50:19
50:22 57:25 58:22

59:12 78:16,21,25
80:7 84:11,12
90:12 100:22
108:16 110:6
126:5 127:7
131:16 135:16,16
138:19 144:6
162:1 163:24
165:17 175:17
180:12,14 183:1,3
183:12 206:12,16
216:19 219:12
223:7 238:20,20
242:9
**difficult** 12:12
**direct** 73:19 168:9
236:21 240:22
246:19
**directly** 76:2
141:22 223:4
230:3
**director** 19:8 21:6
21:10,25 22:8
27:25 33:20 36:17
36:17,23 47:8
62:19 63:9 71:19
72:15,16 77:9,14
80:13 81:25 83:8
83:19 84:2,13
92:3 100:4 124:16
124:25 134:2,19
134:21 138:22
148:10 161:11
175:3 180:3 185:4
226:11,12 227:3,4
227:10 228:19
229:1
**directors** 15:14,16
15:24 26:16,17
30:13 31:17 36:16
43:7 44:24 62:16

62:17 63:19 67:18
71:8 80:12 110:3
110:6 121:9 135:5
145:10 169:14
180:14,16,25
183:4 206:7,16,18
206:21 216:10
217:5 234:7
242:15
**disability** 19:6
**disagree** 204:15
204:18 217:10
**disbanded** 19:21
91:6,7
**disciplinary**
170:20 171:11
**discontinued**
89:22
**discuss** 59:17 67:6
191:15 192:7,10
**discussed** 37:6
122:1 212:16
215:4 216:5
233:17 234:13
**discusses** 64:5
**discussing** 64:21
65:12 68:18
170:13 223:19
**discussion** 13:17
33:9 34:1 48:5
121:16 122:7
167:7 180:16
186:25 192:11,15
198:3 217:7 231:4
234:11
**discussions** 84:4
123:3 167:9
182:21,24 197:8
205:16 226:23
233:25 234:5,21
235:8 236:1,4,8

**disease** 252:11
253:4,4,6,12
**diseases** 228:11,12
**disorder** 22:23
23:11 75:16
108:21 251:6,23
**dispatch** 64:9 65:8
**dispatcher** 18:11
20:2
**disseminated**
154:22
**distance** 174:10
**distinction** 232:16
**distribute** 193:8
**distributed** 74:3
145:6 189:7
**distributors** 13:9
**district** 1:1,2
**diversion** 224:12
224:15
**diverted** 232:10
**dividing** 232:25
**division** 1:3 90:1,2
90:18 110:5
122:12,13,14,17
132:3 134:1
219:11
**divisions** 90:1,4,7
91:7
**docs** 212:1
**doctor's** 210:2
**doctors** 107:21
108:10 136:11
151:6,8 152:6
166:9 171:8
176:16 222:10
224:2
**document** 1:8 5:6
5:14,18,21 6:3,6
6:10,15 17:8
52:21 53:6 54:11

54:13 61:15 86:13
86:25 87:4,9,20,22
87:23,25,25 88:2
93:17 94:2,4
95:16,18 96:17,23
97:2,6,7,9,14 99:3
100:17 101:10,20
101:21,22 102:1,5
102:21 103:25
106:4 108:25
111:19 116:5,15
117:3,6 129:15,21
130:13 136:2
140:10,16,19
146:11,18,24
147:2,8,8,12
159:17 169:18
170:16 173:3,9
177:11 179:7
198:23 200:21
201:16 203:2,10
209:9 236:18
**documents** 16:9
29:22 50:12 53:22
86:20 97:13 99:20
117:9 118:7 160:3
217:8,12,19 218:8
218:15,19 219:2
220:9
**doing** 12:11 42:7
45:24 46:16 49:17
49:19 52:1 56:23
62:13 88:22
108:11 122:2
128:12 136:21,22
163:7 170:5
201:10 210:5
229:18,20 241:14
**dollar** 105:16
106:1 243:14

| | | | |
|---|---|---|---|
| **dollars** 104:4 239:4 | 126:16 134:1,22 | **161**:25 162:15 | **effectively** 70:17 |
| **donna** 80:12 | 137:17 140:24 | 163:6 168:23 | 167:23 |
| **dontavius** 226:15 | 141:20 142:10,24 | 169:13 170:1 | **eight** 19:11 22:7 |
| **door** 43:16 | 151:16,24 152:17 | 178:24 179:10,10 | 46:21,22 159:2 |
| **downloaded** 53:18 130:2 | 154:1,3,18 159:19 | 179:14,16,17 | 161:14 187:21,23 |
| **dr** 115:5,8 124:23 | 162:4,10 196:18 | 180:6 183:17,23 | **either** 31:23 34:12 |
| 128:19 132:12,13 | 198:6,14 199:7 | 183:25 184:4,7,8 | 48:19 51:7,9 |
| 132:21 138:7,10 | 210:13 222:1,6,9 | 185:1 219:4,8 | 52:16 62:14,19 |
| **draft** 41:24 148:12 | 222:15 240:18 | 226:16,21 230:17 | 78:7 140:15 154:9 |
| 148:19 | 243:12 246:21 | 242:14,21 | 174:4,8 180:17 |
| **drafted** 202:9 | 257:14 | **eagles** 56:23 | 181:15,19 212:12 |
| **drafting** 200:8 | **drugs** 23:17 49:5 | **earlier** 86:19 | 216:11 219:4 |
| **dragged** 191:9,17 | 67:12 79:19 99:2 | 121:12 166:23 | 263:2 |
| **draw** 239:1 | 108:9 137:16 | 187:2 208:14 | **elaine** 81:19,25 |
| **drive** 3:13 31:24 | 142:22 143:1 | 216:2 226:6 | 84:23 |
| 259:22,23,24 | 150:4,15 151:17 | 235:24 237:20,24 | **elect** 27:16 35:9,9 |
| **driven** 60:6 | 175:21,22 186:2 | 241:3 250:17 | 35:10,12 |
| **driver** 231:14 | 209:24 210:12,16 | 256:13 258:9 | **elected** 35:5,5,6 |
| **driving** 236:5 | 210:18 211:6 | **early** 13:18 48:19 | **election** 48:6 |
| **drop** 91:11 | 248:13,24 | 50:6 167:8 209:24 | **electronically** |
| **dropped** 157:8 | **dublin** 1:23 | 211:15 213:5 | 218:19 |
| **drove** 151:16 | **dues** 35:23 50:21 | **earned** 189:6 | **elevated** 38:8 |
| **drug** 3:11 5:7 6:16 | 50:21 51:10 | **easier** 260:5 | **elizabeth** 47:16 |
| 7:4 17:4 18:19 | **duly** 10:10 262:7 | **eastern** 1:3 | **ellis** 3:3 9:22 |
| 19:1,4 21:21 22:4 | 262:10 | **easy** 133:2 | **eloise** 80:10 |
| 23:4,18 25:3,5,9 | **duplication** 193:2 | **ebbs** 48:13 | **else's** 149:6 |
| 25:13 26:2,8,24 | **duplicative** 221:17 | **economic** 243:8 | **email** 264:17 |
| 28:6 43:20 44:16 | **duties** 54:13 | **educating** 186:14 | **embarking** 76:15 |
| 52:22 56:16 57:3 | **dying** 60:2 259:7 | 209:23 | **emergencies** 56:3 |
| 57:4 63:10 66:3 | **dynamic** 39:13 | **education** 20:11 | **emergency** 93:6 |
| 66:17 67:8 72:23 | | 26:13 110:18 | 93:10 244:13,14 |
| 73:20 75:11 82:1 | **e** | 111:4 118:24 | 246:16 |
| 83:9,14,20 84:14 | **e** 5:9,12 6:12,20,23 | 209:16 | **employment** 24:6 |
| 88:24 90:1,18 | 7:3 47:15 61:3,11 | **educational** 26:14 | 228:15 243:16 |
| 97:17,18 99:7 | 62:1,5,10 63:21 | 26:17 51:8,16,20 | 252:22 253:10 |
| 103:12 104:5 | 64:14 67:23 68:4 | 53:11 119:5 | **emts** 259:2 |
| 105:12 110:5 | 68:4,10,12,12,16 | 142:18 145:4 | **enacted** 176:2 |
| 111:11,12,15 | 71:8 72:19 75:10 | 228:15 | **enclosed** 264:11 |
| 122:12,18 123:2 | 81:18,19 82:4,5,13 | **effect** 104:22 | **encompasses** |
| | 83:3 84:22 85:8 | 233:11 | 254:3 |
| | 85:11 159:9 160:9 | | |
| | 160:19 161:1,6,9 | | |

ended 44:2 125:21
ends 111:19
enforcement
  55:21 56:6,11
  119:4,12 192:20
  244:7 258:25
engage 81:3
engaged 224:3,4
entail 27:12 80:21
  225:22
entailed 229:3
entered 266:9
entire 54:25 107:1
  172:4 265:5 266:5
entities 187:3,4
  190:6,15 215:12
  216:22
entitled 5:6,14,18
  5:21 6:3,6,10,15
  52:22 86:14 96:18
  101:11 116:6
  129:16 146:12
  159:18
entity 54:4 187:10
  187:11 188:3
  191:3 215:10,19
  215:22,22,23
  216:14 217:21
epidemic 5:21 6:3
  13:11 14:12 57:13
  57:18 59:18,21
  60:6,10 65:9,13,21
  69:13 97:22
  101:11,23 102:23
  106:23 107:12
  109:3 116:6,25
  117:16 119:6
  120:20,23,25
  121:15 122:6,23
  123:4,10,17 124:5
  124:10,13,18

125:2,17 126:2,6,8
  126:12 131:20
  133:14 144:13
  148:17 149:9,19
  150:9 151:2,22
  152:13 158:10,15
  165:2,20 168:4
  179:24 180:9,21
  196:9 203:13,23
  204:3,6,10,14,17
  204:22 205:6
  208:19 209:14
  220:21 221:12,20
  223:23 224:13
  249:4,19
equal 41:13
errata 264:13,18
  266:7,10,18 267:1
escalation 88:13
especially 251:9
  251:14
esq 2:3,3,7,11,16
  2:20 3:3,8,13
  264:5
establish 19:19
  24:20 173:16
establishes 52:13
  52:16 170:17
establishing 199:7
et 1:10,12,14,14
  191:10
evaluating 52:6
event 100:25
  147:16,19,22
  263:3
events 51:8,16,20
  69:24 93:8
eventually 172:21
everybody 62:19
  105:22 210:15
  211:5 212:11,12

254:21,23
evolved 41:8
exact 39:25 211:15
  247:25 248:7,18
  249:12
exactly 14:13
  52:17 84:9 114:17
  117:7 119:10
  128:15 137:5,7,20
  148:2 182:7
  201:12 206:11
  215:23
examination 4:7
  10:9,13 146:5
  194:11 214:19
  240:3 250:14
example 128:9
  134:19 174:7
  196:15 215:14
  218:20 219:19
  220:3 237:2
  238:21 239:7
exceed 65:17
exception 38:19
  47:5
exceptionally
  69:12 70:19
excess 230:19
  231:5 232:1,4,10
  232:17,23
executed 266:10
execution 265:14
  266:19
executive 13:22
  27:17 31:12,22,24
  34:15,21 35:1,3,7
  35:15,16,18,25
  36:3,6,19,23 37:7
  39:8 40:8,15,18
  41:5,6,7 42:13
  44:24 67:18 71:8

71:18 128:7
  133:25 135:8
  179:21 180:3
  192:2,8 199:1,6,11
  199:16,22 207:21
  219:10 242:14
exhibit 4:18 5:5,6
  5:9,12,14,16,18,21
  6:3,6,8,10,12,15
  6:20,23 7:3,4,7
  17:9,12 52:18,21
  61:3,10,11 67:23
  68:3 86:13,19
  93:16,21 96:17
  101:10,17,18
  116:5,13 117:3
  129:12,15 140:4
  140:10 146:11,18
  159:9,17 160:6
  162:13,19 164:19
  168:23 169:5,9
  178:24 179:4,5
  183:17,22 198:6
  203:3 220:15,16
  220:18 221:14,22
  223:18,18,21,21
  230:16 231:12
  242:13 245:18,22
  246:2,20 256:14
exhibits 4:4 5:1
  6:1 7:1 220:13
existed 24:24
existence 90:11
  92:17
existing 22:25
  35:7,12 60:10
exists 24:17 90:19
expanded 131:10
  175:23
expansion 38:9
  111:1

expect 57:8,14,17
  57:20
expend 239:3
expenditures
  51:12 190:4,5,6,14
  191:10,18
expenses 69:24
  243:16
expensive 150:5
experience 106:20
  106:24 165:7
  176:13 222:13
  223:2 240:25
  244:2
experienced
  176:12
experiencing
  172:5
expert 227:11
expertise 56:18
  135:16 227:13
experts 57:3
expiration 265:19
  266:25 267:25
expires 263:16
explain 40:17
  187:9 240:15
  258:18
explanation
  105:20,22
exponentially
  246:10
extension 171:21
extensive 240:20
extent 14:21 15:22
external 138:22

**f**

f 225:21
facilities 107:23
  118:10

facility 229:9
facing 75:21
  104:25
fact 24:23 55:13
  60:12 80:25
  112:13 120:19
  135:19 149:23
  176:21,22 177:1
  177:18 180:24
  185:17 186:1
  192:7,13 207:25
  221:14 234:13,14
  236:1 243:23
  245:1,10 247:22
  248:1 250:25
factor 149:18
  150:8 151:1,21
  152:12 166:18
  167:18 168:9,13
  223:22 224:12
factors 105:5
  165:25 166:14
  168:4
facts 124:18
  221:19
factually 195:8
fahlgren 141:16
fail 249:10,11
failed 248:14,25
failing 170:21
fair 26:12 52:8
  54:2 65:5 74:17
  104:24 126:9
  127:4 149:7 159:4
  166:17 169:22
  217:13 219:25
  221:8,12 251:2,8
  260:11
fairfield 83:9 84:3
fairly 71:2 178:5
  253:11

faith 94:18 95:22
fall 256:12
familiar 87:21,22
  88:2 95:19 168:1
  203:7 217:11
  243:20 251:6
families 66:24
family 10:23 11:9
  19:12,15 23:24
  24:14,17 43:13
  56:14 80:8,19
  112:24 113:20
  252:18 258:6
faqs 214:1
far 12:11 23:16
  32:13 59:16 155:1
  181:9 202:22
fatalities 65:17
fda 167:13
february 1:20 6:8
  9:2 140:5,20
  263:7 264:4
fed 102:12
federal 10:9 26:4
  28:25 45:6 59:7
  177:21,22 178:1,4
  178:6 238:19
  239:17
feds 227:5 237:4
fee 38:13,18 51:9
feed 39:5
feedback 39:2,5
  40:2 128:8 132:4
  133:23,24
feel 152:21 213:16
feeling 260:7
fentanyl 259:25
  260:1,2
field 28:5
fifth 174:14
  222:19

figure 57:22
  235:18 238:2
  255:25
file 118:6
files 61:22,23
  87:23
filing 180:8,24
final 7:5 198:7,15
finance 7:7 70:21
  71:1 245:23 246:4
finances 45:19
  57:24 186:7
financial 14:20,23
  42:4,5 58:1
  237:12
financially 118:15
  209:4
financials 37:10
  217:1
find 34:14 118:3
  210:12,18 249:13
  264:11
findlay 70:18
finish 12:6
fire 93:5
firehouses 93:11
firemen 259:1
first 10:10 11:16
  15:18 19:1,23
  22:3 41:4,16,19
  43:9 46:5,7,13
  48:15,18,25 51:23
  51:25 64:4,15
  68:12 69:8 71:11
  73:1,2 77:3 92:19
  93:1 97:14 100:6
  101:3 107:5
  109:10,12,13
  112:21 115:3
  131:13,15 132:6
  142:12 149:12

155:4,12 164:17
166:4 173:14
176:8 179:19
185:1 188:4,14
220:25 221:25
228:4 242:20
247:9 249:10
258:15,19,21,22
258:24 259:13
260:3 262:10
**fiscal** 73:5 74:6,13
90:16 226:4
239:17,18
**five** 89:11 126:5
138:18 156:18
207:4 227:19
228:5 248:14,25
**flagging** 82:10
**flash** 259:22,23,24
**flexible** 235:25
**flip** 64:13 107:4
111:18 123:20
148:15 153:4
158:18 170:11
173:1 231:24
**flood** 166:9
**floor** 3:14
**flows** 48:13
**fluid** 39:13
**focus** 42:14 47:4
47:20 48:4,10,16
122:13 127:4
132:5 135:17,18
**focused** 47:3,7,9
47:12 60:15 92:19
100:8 114:23
132:7
**folks** 53:12 84:11
102:7 111:12
112:20 113:8
117:13 119:12,14

119:16 127:16
181:3,25 185:7
188:8,16,18
210:24 252:12
**follow** 32:19 56:4
215:3 220:23
221:24 222:25
250:21
**followed** 85:16
124:1
**following** 18:21,24
19:16 32:7 177:10
**follows** 10:12
**fonda** 45:1 225:19
225:20,21,24
237:18,19
**food** 118:10
**force** 5:16,19 7:5,5
56:15,16,16 93:21
94:10 95:6,8,12
96:19 97:3 103:12
103:17,21,23
104:21 125:13
126:16,18 145:8
148:3,5 198:7,8,15
199:8
**forced** 242:2
257:12
**forces** 56:17 95:10
96:1,7 97:20 98:2
99:25 100:2,9,13
100:19 103:24
**foregoing** 262:15
262:20 265:13
266:18
**forgot** 90:15
**forgotten** 146:21
146:25
**form** 23:11 41:4
55:2 60:14,16
88:5,16 90:20

99:23 102:17
104:17 105:2
106:18 107:2
108:22 120:21
121:3 122:8,25
123:7 126:13
132:2 133:15
137:11 156:20
157:11 158:16
165:11,22 171:23
180:10 191:19
202:17 203:24
204:23 211:1,21
212:8 224:6
241:17 244:5
245:6,13 247:16
251:12,19,25
252:15 253:23
254:8 255:13
257:2 260:15
**formal** 33:17
128:13 172:23
**former** 92:10
229:25
**formula** 232:24
**forth** 26:15 47:11
56:3 129:5 134:12
136:22 185:22
**forward** 107:6
185:17 187:6
235:16 256:2,20
264:15
**forwarded** 67:17
**forwarding**
169:19
**found** 181:4
207:19
**foundation** 59:10
59:11 218:11
243:10 253:24
254:9 260:16

**four** 161:4 164:1
229:3,5 243:3
248:6,14,25
**fourth** 65:20
155:21 170:12
221:25
**frame** 43:22 99:21
99:25
**francisco** 2:17
**frank** 42:25
**franklin** 213:11
**frankly** 15:23 34:5
92:6 135:15
182:17
**free** 223:17 265:14
266:20
**freeman** 45:2
225:19,20 237:19
**freeze** 193:24
**frequent** 122:6
**frohnapfel** 141:23
142:3 200:15
**front** 2:17 64:8
112:22 126:23
141:3 220:13
242:18
**fruition** 244:21
**frustrating** 259:15
**full** 35:21 50:24
77:3 79:12 107:5
110:17,25 134:7
173:16 175:7
177:2 228:16
229:22 255:20
**fun** 14:3
**function** 35:14,16
**fund** 73:11 178:3
190:9,10,10
211:24 230:20
231:6,15 235:25
239:2

**funded** 98:4
246:10
**funder** 190:12
**funders** 134:3
**funding** 50:17
52:5 58:6,9 66:12
66:17 70:6 73:19
75:15 105:12
110:21 111:6,14
118:3 176:8,9
177:15 178:4,5,8
209:17 235:9,22
243:10 244:2
245:5 246:8
249:21
**funds** 58:21,23
66:15,23 69:14
70:9 81:16 111:16
175:3 177:25
178:2,6,14 182:2
185:17 235:20,20
238:13,15,16,18
238:19,22 239:1,8
256:20,20 257:4
**further** 74:12
191:15 239:21
260:18 262:18
263:1
**future** 253:14
**fyi** 133:20

**g**

**g** 81:19,19
**ga** 208:17
**gains** 243:17
**gallia** 70:20
**games** 20:21
**gates** 166:9
**gathered** 66:8
**gcoat** 83:17
**gear** 79:24 80:23

**gears** 242:8 247:1
**geauga** 206:23
**geez** 119:9 247:25
**general** 14:8 47:5
48:12 50:1 56:9
58:17 73:11,23,24
94:20 108:13
125:16 132:6
134:14,17 136:16
144:20 151:3
152:18 164:24
165:4,18 181:20
182:9 186:21
191:21 208:18
222:5,22,22 232:6
237:8 252:23
253:11 254:11,12
258:22
**general's** 126:1
183:2
**generally** 133:13
209:8,12 218:22
235:14,15 239:11
251:22
**genesis** 40:18
**georgas** 81:20,21
**getting** 13:19
80:25 81:6 111:12
210:15 236:21
238:4 252:7,9
**gibbons** 80:11
**give** 30:16 32:24
38:5 77:23 134:23
145:10,10 207:8
207:11,13,17,23
208:9 238:9
246:13 248:6
259:20,21 260:4
261:1,10
**given** 41:20 91:17
93:7 105:17,21,23

132:4 174:25
187:1 207:15,24
208:2,5 209:4
211:6 250:25
254:3 262:12,17
**gives** 27:20
**giving** 98:13
197:17
**go** 11:10 12:18
18:12,13 19:25
21:5 29:12,14
30:5,6 33:4,23
37:9 38:11,15
40:1 42:16 44:25
76:7 118:3 128:8
136:22 143:16
157:16 161:4,13
177:9 186:3,7
189:8 190:17
192:23 193:1,5,15
195:13 198:22,25
199:15 200:2
203:3,5 205:8
215:8 217:2
218:22 219:5,14
232:4,14 236:18
237:10,22 239:23
252:1,1 255:22,24
256:11 258:16
**goals** 115:18
**god** 137:25 163:24
193:23 256:9
**goes** 30:10 32:14
36:22 67:6 69:9,9
69:15 73:7 103:11
144:17 233:5
237:5
**gofcbi** 95:21,25
**going** 11:22 13:16
16:14 17:8 23:20
24:11 27:23,23

28:23 29:20 30:17
31:20 33:24 34:10
37:15,21 39:14,16
39:18 42:18,20
43:23,24 48:14
52:18 57:7,13
60:12 61:10,19
64:1 66:10 68:3
76:2,6 84:3,20
85:24 86:1,18
87:19,24 93:16
98:3 101:17
108:12 113:12
116:2 122:10
123:10 124:21
125:4 127:8
129:12 135:12
139:20 140:9
141:15 146:17
150:1 158:15
160:3,4 165:16
169:5 170:4,6
176:22 179:4
183:22 192:21
199:22 202:19
206:19 212:10
213:18 215:2
217:9 221:22
230:9 237:1
242:11 243:6
249:24 254:4
256:14,20 258:1
**good** 10:15,16
31:20 79:6 128:14
137:16 194:13
210:10,11 223:9
240:5 256:11
**gosh** 110:13
**gotcha** 11:14
149:7

gotten  29:2 133:23
  236:2,2,4
governance  89:12
government  26:5
  28:25 185:4 187:3
governmental
  190:6,8,15 215:22
  215:23 216:14
governments  13:8
governor  69:15,18
  69:20 70:1,3
  76:17,18,19
  103:13 105:7,7
  108:15,17,24
  124:1 125:11
  199:19,21 211:13
governor's  26:7
  28:9 69:8 83:17
  94:18 95:12,21
governors  76:21
grade  168:6
grading  167:22
graduated  18:6,9
grant  39:17 47:1
  48:22,24 49:2
  50:3,4 58:16 93:3
  93:4 98:4,5
  100:10,11 141:11
  142:7,9 227:5
  229:13,14,23
  236:22 237:2
grantees  142:14
grants  45:18 46:16
  50:22,23 58:22
  59:7,10,11 98:10
  177:21 237:6
  238:19
great  12:23 14:3
  19:24 27:21
  146:23 164:25

greatest  110:18
  111:4
greg  81:12
grf  73:8,10,10
ground  11:23
  242:10
groundwork
  179:21
group  62:8 80:14
  85:9 113:8 134:9
  141:17 200:22
  201:1,4,8,17,21,24
groups  41:2
grow  165:13
guess  14:15 17:21
  38:5 48:1 50:7
  95:14 102:7,14
  112:21 119:11
  121:18 125:8
  127:8 131:5 148:2
  154:11 196:2,5
  229:3 234:7
guessing  64:25
  66:14 87:1,2
  88:22,25 89:25
  96:10 102:6,8,9,12
  109:23 110:9
  112:9 113:16
  123:18 131:7
  137:24 148:6,9,13
  164:8 185:23
  200:7 211:14
  249:23
guest  30:14,14
guidelines  45:7
guys  128:10

h

h  47:15,15
half  19:10,17 21:4
  21:12,17,19 91:3,8
  92:16 258:10

halfway  18:22,23
  21:7,7,10 104:1
hall  68:5 83:4,7,23
  124:16 134:2
  154:8,23
hamilton  213:11
hand  61:10 64:18
  68:3 71:12 86:18
  128:18 140:9,23
  146:17 154:17
  160:3 161:5 194:3
  231:18 263:6
handle  31:20
  45:18,18,19
hands  88:21
happen  34:5,6
  110:11 129:7
  138:6 172:7
  193:13 210:21
happened  30:8
  39:15 40:22
  150:13 175:11
  193:15 214:10
happening  67:4
  137:20 234:14
  235:19
happens  33:18
  34:8
hard  127:11
harm  209:25
harper  71:16,17
  72:11 85:17
hasson  141:23
  142:3 200:15,25
hb  172:23
he'll  33:25
head  97:9 104:23
  121:19 130:7
  152:25 241:4
heading  164:20

headlines  102:25
heads  75:25
  114:15
health  2:19 5:7
  10:1 13:23 18:15
  18:16 19:5,18
  20:5,10 25:4,6,10
  25:16 26:2,9,25
  28:7 33:21 37:11
  37:16,19,20,24
  38:13,19 43:19
  44:17 52:7,23
  54:6 55:15,21,22
  56:10 57:5,6,12
  58:15,20 59:1
  63:10 66:3,12
  73:21 74:23 75:3
  75:12,20 83:10
  90:2 97:16,19
  99:2 112:23
  122:12 125:1,2
  141:19 142:13,14
  144:21 186:3
  200:19,22 201:1,4
  201:8,12 227:5
  229:12,14 243:15
  244:11 246:10
  252:14
healthcare  6:17
  66:25 159:20
  162:4,10 244:4,6
  246:22 253:8
healthy  113:7,25
  114:7,10,20 172:4
hear  24:25 34:16
  70:10 194:4
heard  59:17 123:3
  126:14 163:8
  180:13,14,15
  182:7 183:3,11
  190:1,1,7 194:20

194:22,23 208:17
210:6 220:25
235:24 237:19,24
**hearing** 162:24
206:18
**hearings** 163:7,9
163:19,23,25
164:3,17,18
**heat** 153:7 155:24
**held** 69:14 79:13
100:21 112:2
**help** 26:16 28:6,9
28:11 29:16 31:24
50:23 81:1 93:14
97:18 107:5
118:18 119:5
186:13 196:19
197:15 237:17
238:6 253:2 256:1
260:10
**helped** 18:25
19:12,19 22:3
24:1,12,20 118:14
133:3 238:2
259:23
**helpful** 247:9
**helping** 29:5 46:9
72:4 133:22
**helps** 50:24
**henrich** 47:8,14,15
94:14 102:8
109:24 117:7
135:3 148:13
225:3
**henrich's** 201:14
**henschel** 3:17
**hereinafter** 10:11
**hereunto** 263:5
**heroin** 17:2 23:14
82:5,11,15,18,22
83:2 84:23,24

106:6,23 123:13
137:16 175:22
209:20 210:8,19
212:7 233:13,19
234:1,9,22
**hey** 128:10 183:5
**hickman** 42:25
**hidta** 83:14 84:17
**high** 69:3 83:14
229:1
**highest** 155:16,21
156:4,18 157:1,4
157:19
**highlight** 219:18
**highway** 93:5
258:25
**hilliard** 2:8
**hipaa** 214:13
**hire** 41:22 217:3
229:23
**hired** 25:24 40:13
40:14 46:11
217:17
**hiring** 28:10
**history** 253:2
**hitting** 242:9
**hoc** 39:10,12
**hodgins** 77:9
**hold** 26:13,14
51:16 83:11
**hole** 104:3,15
105:9
**hollett** 37:2
**home** 150:16,23
244:25 247:14
**homeless** 252:16
252:20
**homelessness**
246:16
**honest** 14:15 48:2
65:1 137:24

**honestly** 43:25
48:19 64:24 78:11
98:3,7,12 100:9
164:16 166:15
188:23,25 199:13
211:14 212:19
234:4
**hope** 46:5 57:10
57:16 93:14
253:17 256:9
**hopefully** 240:7
252:8
**hospital** 18:17
20:16 89:11 150:5
150:16
**hospitals** 150:12
150:23 167:22
236:7
**hosted** 118:3
**hour** 33:23 86:2
**hours** 129:2
250:18
**house** 6:16 18:22
18:23 21:7,7,10
69:5,7,9,10,11,16
70:1,8 78:9 79:12
136:3,15,18
137:21 159:18
170:13,16 172:14
173:5,10,15
230:18 233:11
234:21 235:4
**housing** 79:11
173:23 174:13
175:14,16,18,25
176:12 177:5,15
178:16 192:22
228:14 252:21
253:10 255:16
**hr** 229:8

**hubs** 57:3
**huge** 37:17 227:21
**huh** 80:4 160:18
**huhs** 12:11
**hum** 54:15 71:16
101:25 103:2
111:20 121:14
124:15 132:11
138:20 143:23
151:10 157:18
166:3 225:17
243:5 251:7
258:17
**human** 19:13 24:2
24:3,6 45:19
55:22 59:1 244:11
246:10
**hundred** 38:15
**hydrocodone**
67:14

**i**

**idat** 230:23 231:11
**idea** 14:8 78:11
91:4 109:25 159:1
197:2
**identification**
17:14 53:1 61:8
68:1 86:16 93:25
96:21 101:15
116:10 129:19
140:7 146:15
159:14 160:1
169:3 179:2
183:20 198:10
245:25
**identified** 96:3
**identify** 9:6 54:6
54:18 55:14 193:7
254:14
**illicit** 123:12

illinois  3:14
illness  228:10
impact  110:18
  111:4 131:20
  136:25 192:3
  234:22 245:3
impacted  245:9
impacts  176:3,7
implement  228:20
  228:22
implementation
  89:14 136:24
implemented
  22:22
importance
  203:12
important  12:2,9
  76:14 258:20
impression  224:10
improvements
  102:25
inbody  217:24
  218:2 220:7
  236:16
include  56:17
  224:15 230:19
included  128:5
  143:3,5 264:13
includes  17:3
  246:7
including  56:2
  67:13 252:23
  257:21
income  59:16
  66:24
incorporated
  114:18 266:12
incorrectly  208:16
increase  67:8 83:1
  83:2 84:7 137:15
  210:19,19 233:12

244:24 247:20
increased  151:4,5
  232:14 234:1,9
  244:3
independent
  216:21 221:19
  240:12
independently
  16:8
index  4:1,4,5 5:1
  6:1 7:1 8:1
indiana  3:6 9:20
  194:15,20
indicates  17:25
  88:12 103:16
  143:2 161:24
  173:9,15 175:2
  177:14 200:21
  201:16 204:16,21
indicating  116:1
  169:7 178:20
  264:13
indigent  231:14
individual  44:25
  74:15 165:5
  172:20 180:18
  181:7 192:10
  216:16,17,20
  217:24 226:25
  228:17 237:18
  238:19 254:10
  256:5
individually  167:9
  169:12
individuals  72:4
  80:8,15,17,18
  118:6 144:17
  172:2,3,5 175:19
  241:10 249:8
  257:7 259:11

induction  255:11
indulge  75:8
inform  30:20
informally  182:25
information  27:22
  90:14 191:5
  197:14,18 202:15
  207:6,11,12,13,15
  207:17 208:1,3,10
  221:1 260:4
informed  96:11
ingredient  248:16
  249:2
initial  81:10 85:11
  90:3 238:7
initially  22:2
  41:20,21 62:15
  118:25
initiative  72:7
  96:10
initiatives  49:13
  71:22 72:13 83:23
  94:19 95:22
  104:21 114:22
  115:2 139:5
inpatient  21:23
  23:5
input  127:8,9,9
institutions  19:7
  23:1,3,6,8
instruction  218:21
  261:2,10
instructions  220:8
insurers  150:4
intense  122:13
intensity  83:14
intensive  247:13
  255:7
intention  208:15
interaction  165:8

interchangeably
  16:21
interest  108:19
interested  48:22
  95:25 263:3
internal  33:4
interpretation
  32:22,25
interventions
  173:23
interviewed  41:14
interviewing
  28:12
interviews  40:12
intractable  166:5
  170:18
introduced  15:4
  182:17 214:21
  235:17,18
introduction
  128:20
investigation
  163:14
investment  58:21
invite  128:3
invited  111:22
  112:6 113:23
invitees  115:5
involved  13:19
  15:15 16:13 93:2
  96:13 99:24 100:3
  109:20 111:12
  114:21 131:17
  139:10,11 144:11
  181:1,6,9 185:7
  188:9 200:8
  202:24 224:2
  225:25 237:9
  251:11,17,21,22
  252:24 260:1

**involvement**
201:23 202:12
225:12 235:7
**issuance** 162:9,25
**issue** 31:18 47:8
50:2,5,10 66:19
70:13 78:23 98:8
100:5 108:13,14
108:24 115:1
158:21 176:13,15
204:1,6,8 222:8
234:8 235:25
249:8 252:19
256:3
**issued** 162:21
**issues** 6:10 33:12
39:5 47:3,21,23
48:17 78:1 110:19
111:5 146:12
147:3 167:2 171:6
171:16 186:14
204:11,11 215:3
225:13 227:17
231:22 236:23
252:10
**item** 58:18 69:21
73:13,14,17 74:8,9
**items** 31:15 37:6
39:8 75:12 221:16
221:23 223:20

**j**

**j** 2:12 226:16
**jackson** 70:21
**jail** 84:7 253:1
**jails** 189:25 244:8
244:9 246:15
**janet** 112:17 114:4
**janssen** 3:2 9:22
214:25
**january** 5:15 6:21
53:20 86:15,24

87:13 168:24
169:16 203:21
204:16,22
**jarrells** 226:16
**jenny** 80:11
**jerry** 15:24,25
16:1 161:11
180:15 183:7
185:2
**jim** 206:22
**job** 10:23 11:9
13:15,21,22 19:12
19:15 23:24 24:14
24:16 56:14
172:12 184:17,21
241:25 255:16
260:5
**jobs** 21:12 35:2
43:13 76:22
**jodi** 77:2,7,8
**john** 2:12 112:10
**johnson** 3:2,2 9:23
9:23 124:8
**jointly** 217:2
**jones** 2:11 9:18
**jonesday.com**
2:14
**judge** 1:8
**judges** 186:14
**judicial** 56:12
**jump** 215:2
242:11
**jumped** 110:8
**jumping** 215:6
**june** 68:5 84:22
**justice** 243:16

**k**

**kasich** 70:3 76:18
108:15 124:2
211:12

**kcrawford** 3:10
**kearse** 2:3 4:12
9:11,11 53:3,21
55:2,6,11 60:14,22
60:25 61:19 86:1
87:19 88:6,16
90:20 95:17 97:11
99:23 102:17
104:17 105:2
106:18 107:2
120:21 121:3
122:8,25 123:7
126:13 129:25
130:10 137:11
156:20 157:11
158:16 165:11,22
180:10 191:19
202:17 203:6,24
204:23 212:8
241:17 244:5
245:6,13 247:16
250:9,15,18
260:18
**keep** 20:22 127:11
**keeping** 150:12
**keeps** 32:3,17
**kept** 32:1 39:20
150:16
**key** 128:2,3
191:10,17 248:16
249:2
**kids** 23:15 227:7
**kind** 14:18 17:16
19:25 20:21 33:23
35:17 37:14 38:25
42:14 45:22 46:9
49:4,17 50:4 51:8
51:17 52:1 68:17
84:20 85:10 101:4
105:10 109:18
114:24 129:1

139:20 143:17
150:2 176:12
201:10 211:23
213:23 214:1,14
227:14,17 229:8
229:10 230:4
231:2 249:18
252:17 258:8
260:10
**knew** 15:14,16
44:21 134:17
163:11 180:12,16
182:22 184:20
202:11 209:18,19
211:4 217:17,19
**know** 10:21,25
12:16 14:18,21,22
16:2,11 20:17,20
28:20 31:19 32:13
34:13,13 44:2,3,4
44:4 53:22 55:4
56:8 57:9,15 60:5
63:6,17,18,19,20
63:24 64:25 69:5
74:15 78:12,12
82:21 85:23 87:10
90:15 95:7,14
98:4,6,12,19,20
102:4,4 105:9,18
112:5 113:10,17
114:19 115:8,10
119:2 125:10
126:21,24 127:10
127:15 128:16
129:11 131:5
132:20,23 134:22
136:7 137:5,12,25
138:6,10,25 139:2
139:15,19 143:11
144:24 147:23,25
148:2,10 149:3,5

149:25 152:19
153:20 154:21,24
159:3 161:9
163:12 164:11
165:12,14,15,15
166:15 169:11,11
171:25 172:14,17
174:14 175:8
176:24 182:7,20
182:20,22 183:4
184:16,17,19
185:13,22 186:12
188:21 189:8,14
189:16,19,20,21
190:3 193:4,14,15
195:22,23 196:3,4
196:6,15,16
197:19 199:21
200:25 201:3,7,20
201:23 202:8,22
206:4,22 208:7,8
208:17 209:1
210:4 211:15
215:21 224:8,20
232:14 233:2,2
234:10,18,24
236:14 245:16
247:23,25 248:20
249:10,11,20,25
250:1 252:20
257:8,12 258:3
259:7,19 260:6
**knowledge** 193:11
222:17 224:10
238:10
**known** 99:18
129:4 197:13
**knows** 29:15
**kroger** 196:16
**krolokowski**
134:19

**kurt** 3:17
**kyle** 3:8 9:19
194:14

**l**

**l** 1:25 5:5 7:7
17:12 226:16,16
245:22 262:6
263:13
**l.p.** 1:10,12,14
**label** 140:12 160:6
**labeled** 116:13
169:9 183:23
**labor** 10:24
**lack** 179:22
**language** 72:8
79:10 148:19
178:11 231:23,25
232:17 249:12
**large** 25:16,17
35:8,12 38:23
42:18,19,23 85:9
118:17 219:16
227:5
**largely** 67:7
**larger** 17:2
**largest** 50:21
54:23 59:16,25
**lately** 153:3
**laugh** 62:11
**launched** 96:7
143:22 144:6
**law** 55:21 56:6,11
119:4,11 178:9
192:20 215:15,16
216:1 237:15
244:6 248:9 250:4
252:24 258:24
**lawful** 10:8
**lawrence** 77:14,17
**laws** 150:22
215:20

**lawsuit** 11:10
14:16 15:15 42:18
42:20,22,23 43:23
44:10 48:11
179:22 180:8,24
181:13,17,18,22
182:8,11,19
185:17 186:20
191:4,9,17 195:23
196:1,4,6 205:17
205:18 206:1,7,21
208:4,10 214:15
219:24
**lawsuits** 42:22
180:20 185:12
187:16,16,17
189:7,18 192:3,8
192:10 195:2,6
207:7 212:17
213:3
**lawyer** 42:24 43:2
214:5,6,9,10
**lawyers** 188:24
**laying** 179:21
**lead** 21:4 102:7
117:13 141:13,14
226:7 227:20
234:9 235:5
**leaders** 132:21
**leadership** 27:16
41:4
**leading** 43:1
139:13 210:8
**leads** 91:22
**lean** 135:11
**learn** 13:13 165:14
182:13,18
**learning** 98:16,20
98:22,25 99:4,10
180:23

**leave** 60:7 137:6
255:22
**led** 83:16 92:22
109:18 115:2
132:12 150:2
163:14 224:13
**leffler** 63:14,17,25
85:19 161:22
**leffler's** 63:20
**lefflert** 63:21
**left** 22:15,16,19
66:23 92:6 128:18
140:23 153:14
154:17 161:5
193:24
**legal** 110:19 111:5
172:11 213:25
215:9,11 226:2
253:2 264:1 267:1
**legally** 172:1
**legend** 153:14
**legislation** 136:3
137:22 176:2
**legislative** 6:8,17
25:19 140:4,20
141:4 159:21
168:17 169:19
170:6 232:9
246:22
**legislator** 30:19
**legislators** 53:12
70:12 76:8 119:14
145:7
**legislature** 26:4
27:19 28:24
176:20 234:20,23
235:8 236:10
247:19
**legitimate** 171:6
**letter** 264:19

letterhead 41:25
letters 80:24
level 69:3 165:3
  211:25 228:3
  229:2 247:24
  249:24 254:16,20
  255:13 259:17,17
levels 57:25 255:6
levies 58:2,5,10,12
  58:24 59:12,15
  178:11
levy 58:12 59:1,7
  59:15 178:12
  238:17
licdc 5:5 17:12
licensed 135:14
  240:12,17
licensees 171:12
life 154:4 172:4
  253:4
lifelong 228:10
  256:3,7
lifestyle 151:18
lifetime 228:13
liked 110:8
limit 223:10
limited 106:25
  120:24 121:1,5
  260:14
line 58:18,19 62:1
  63:3 68:14 69:21
  71:11 73:13,14,17
  73:23 74:8,9
  85:13 87:24
  136:25 160:12
  161:1,24 170:2
  185:1 188:14
  235:23 264:13
  266:7 267:3
lines 63:13 73:20
  85:19 161:4,14,21

195:16
linguistically
  227:15
lion's 56:22
liquor 230:20
  231:5 232:1,4,10
  232:13,17,23,25
  233:4
lisa 170:2,5
list 61:11 62:6,12
  62:18 63:4,13
  68:13 85:13,16,20
  94:8,13 111:21
  112:5 115:4,24
  126:17 145:12
  160:10 169:14
  242:16
listed 94:17 136:2
  156:3,25 166:19
  167:18 168:13
  266:7,17
listing 266:7
lists 163:18
litigate 182:1,5
litigation 1:6 9:4
  11:5,8 13:1,4 14:6
  16:10 264:6 265:3
  266:3
little 20:1 38:5,20
  48:10 52:2 59:4
  75:9 100:15 159:6
  181:2 183:12
  216:2 227:19
  236:24 242:12
live 54:5
lived 144:17
lives 106:5
living 252:19
liz 47:8,11,14,15
  48:10 92:13 94:14
  99:16 109:23

117:7,8,9 127:9
128:6 135:3
141:24 148:13
201:14 202:6
225:2
llc 3:6,7
llp 1:22 2:20 3:3
local 28:7,14,17
  29:5 44:16 52:3,4
  52:6 54:3,14,17,23
  55:15,16 56:2,10
  56:11,13,21 57:3,3
  57:8,14,23 58:10
  59:6,14,15 74:3
  75:25 78:2 84:7
  93:8 95:10 97:20
  171:22 178:10
  186:2,4 188:2
  191:23 192:25
  206:17 216:14
  236:20 237:5,10
  237:11,15 238:12
  238:14 239:7
  253:19 260:12
locally 110:6
  119:5 143:12
  236:5
lock 118:19
locking 209:24
logical 139:20
logo 41:24,25 87:5
  89:1 140:24
  154:18
long 11:15 20:23
  21:2,9,11,16 28:5
  30:3 42:22 47:17
  49:25 60:13 61:11
  62:5,11,18 66:16
  68:13 72:16 85:23
  139:19 143:19
  150:1 159:2

160:10 169:14
214:6,7,8,23 230:8
242:16 252:12
253:4 257:18
longer 27:5,7 71:2
  90:10,19 241:12
look 41:7 45:3
  52:17 54:11,12
  64:4 75:15,17
  87:18 108:14
  112:17 128:18
  129:7 132:8
  162:13 198:24
  201:13 218:22
  219:1,5,6,8,9,10
  219:11,12 221:14
  223:18 228:9
  231:17 236:5
  238:2 242:12
  243:3 246:25
  247:2
looked 218:24
  219:22
looking 62:21
  102:18 112:14
  119:10 131:6
  134:18 136:19
  163:25 175:18
  182:8 189:5
  219:17 253:13
looks 65:7 68:7,10
  95:9,11 116:12
  131:15 235:19
loose 32:22
loosely 216:18
lorain 82:1 220:2
lose 238:1
losing 176:10
loss 241:25
lost 106:5 212:11

**lot** 13:16 21:20
23:13 24:9 26:14
26:15,16 28:1,3,3
28:14 39:13 43:3
43:4,11 48:5 51:1
56:20 76:20 77:23
84:7 102:12 105:8
108:1 110:15
113:18,23 127:11
127:12 130:6
131:7 135:4
141:13,14,24
183:1,11 187:15
210:20 215:6
227:10,17 250:22
259:2,5
**loud** 81:1
**low** 82:10,15
**lower** 64:18 66:24
158:13
**lunch** 145:17
**luncheon** 145:21

**m**

**m** 3:8,13
**macc** 113:18
**macsis** 154:7
**madam** 264:10
**magazines** 152:19
153:1
**maglione** 184:10
184:16 185:3
192:11 193:13
256:16
**maglione's** 185:11
**magnet** 143:14
**magnets** 143:15
**mail** 5:9,12 6:12
6:20,23 7:3 61:3
61:11 62:1,5,10
63:21 64:14 67:23
68:4,4,10,12,12,16

71:8 72:19 75:10
81:18 82:4,5,13
83:3 84:22 85:8
85:11 159:9 160:9
160:19 161:1,6,9
161:25 162:15
163:6 168:23
169:13 170:1
178:24 179:10,10
179:14,16,17
180:6 183:17,23
183:25 184:4,7,8
185:1 242:14,21
**mailing** 145:12
**mails** 219:4,8
230:17
**main** 3:4 41:15
76:22 135:18
**maintaining** 37:1
**major** 51:11
**making** 25:21 36:4
45:4 108:24 119:3
228:3,7,8,16 237:4
**man's** 124:22
**managed** 38:20
176:19 248:4
**management**
90:14 138:3 229:9
**manager** 46:11,14
**mandatory** 30:23
**manner** 45:11
**manuals** 43:7
**manufacturers**
13:10 151:16,25
222:2,9,15 223:5
**manufacturing**
222:15 223:3
**map** 58:13 153:15
155:12 156:14,17
157:16

**maps** 84:20 153:6
153:8,10 154:6,8
154:22 155:4,24
**march** 5:17 22:17
22:19 93:22 94:5
107:10 108:25
**marijuana** 23:13
23:16 51:3 227:11
227:12
**marion** 77:10 92:4
**mark** 17:8 245:18
**marked** 5:3,11,13
6:14,19,22 17:13
52:25 61:6,7
67:25,25 86:15,19
93:24 96:20
101:14 116:9
129:18 140:6
146:14,18 159:12
159:13,24,25
169:1,2 179:1
183:19 198:9
242:13 245:24
246:20 247:3
**market** 108:9
152:15
**marketing** 141:9
141:12,25 142:7
152:8,16 222:21
223:4,11
**marking** 140:10
**married** 237:20
**marsh** 132:13
**mary** 217:24
218:2
**maryhaven** 18:25
21:8,14 243:9
**master's** 18:12,13
**mat** 174:11
**materials** 218:12
236:9,15

**matter** 9:3 13:4
16:9 171:18,21
175:21
**mcconnell** 2:12
**mckesson** 2:15
10:7
**mcnamara** 2:20
4:8 9:24,24 10:14
53:5 55:12 60:19
60:23 85:23 86:9
88:4 130:2 139:19
145:16 146:6
194:1 220:24
221:15
**mcnamara's**
205:15
**md** 1:7
**mdl** 1:6
**mean** 10:20 14:8
23:7 29:24 37:8
41:23,24 42:2,7
43:8 49:16 50:2
61:24 65:1 69:25
76:15 77:22 82:20
82:25 88:20 90:11
95:11 103:5,24
105:6 108:8,12,23
112:16,24 113:9
117:12 118:2,11
119:4,10 121:10
121:19 125:6
127:10 129:4
131:8 134:12,18
136:20 152:18
159:1,3 173:21
175:21 181:11,17
182:25 183:8,11
186:5,17 189:19
190:10 192:17
194:23 195:21
196:5 199:13

200:5 202:1 206:3
207:16 208:5
209:21 210:3,9,10
212:25 213:23
214:8 216:6
218:14,17 223:6
229:25 232:3
235:15 251:13
252:1,13,16 253:3
253:3,5 254:13
255:15,16,17,24
256:6 258:3
259:10
**meaning** 151:5
208:17
**means** 55:5 61:21
68:22 73:5 104:16
106:16 107:18
111:10 137:4
240:16,17 255:25
**meant** 137:6,7
173:22 174:3
216:5 232:19
**measure** 209:2
**measures** 165:19
168:18 208:18,24
209:9,12
**medicaid** 11:10
24:4 26:8 37:13
37:18 38:7,8,9
43:14,17 44:7
178:3 225:25
247:6,7,10 248:12
248:23 249:21
**medical** 131:20
165:1,4 171:11
184:19,24 185:5
226:24 227:10,11
**medicare** 167:22
**medication** 107:11
107:20,24 108:4

109:1 115:13
128:20 167:21
173:24 174:6
176:14,17 197:17
212:2 247:12
248:13,15,24
249:1,14,17,22
252:4,6,7 254:24
255:10
**medications**
149:13 167:15
224:12,16,17
**medicine** 254:18
**meet** 15:1 34:19
184:9 185:3
**meeting** 5:16 32:8
33:8,20 35:21
36:1,18 45:5
91:17,21 93:21
94:5,9,24 95:9,13
96:12 121:20
122:1 182:16
185:14 193:11,12
205:19,25 206:5
213:17 226:23
256:15
**meetings** 27:15
29:23 30:3,12
31:3,6 32:1,21
33:13 34:7 36:5,7
36:10,13,20 39:14
39:19,21 42:12,13
43:3,4 46:9 51:5
51:16 69:14 79:14
79:14 91:18
121:13,16 122:7
122:14,15,21
123:2 180:21,25
206:9,13 233:25
**meets** 31:22 34:16
114:1,17 228:17

**meigs** 70:21
**member** 29:10,18
34:25 35:1 45:8
46:24 62:20 92:10
95:8 99:13 109:18
109:21 170:5
200:22 201:1,3,7
201:17,20,25
213:9 230:2 235:4
**members** 26:20,22
26:23 27:1,2,5,8
28:2,4,6,14 30:24
32:10 33:11,12
34:1,23,24 35:3,8
35:13 36:6,15
40:23 41:8,9,11,13
44:20,25 54:4
55:20 56:18 63:1
67:19 76:12 80:9
80:19 91:12,15
112:9,22 160:23
163:4 187:19,20
187:25 202:20
213:6,12 214:14
229:4,18,18,25,25
234:23
**membership**
27:11,15 31:3,6
32:7 33:7,13
35:21,24 42:13,15
43:5 91:14 121:13
122:1,15,21
160:11 180:25
219:9
**memberships**
40:25
**men** 23:3
**mental** 5:7 18:15
18:15 19:5 20:5
25:4,6,10,16 26:2
26:9,25 28:7

33:21 37:19,23
43:19 44:17 52:7
52:23 54:6 55:15
57:4,5,6,12 58:15
63:10 66:3,12
73:21 74:23 75:3
75:11,20 83:10
90:2 97:19 99:2
122:11 141:19
144:21 186:3
227:5 228:10
229:12,14
**mention** 79:23
226:22
**mentioned** 13:21
29:23 31:13 34:15
44:13 56:5 58:5
70:7 74:25 86:19
90:23 142:6
160:22 213:5
219:21 223:21
224:22 225:2,7,15
226:10 250:17
257:25 258:14
**mentoring** 26:16
43:8
**merge** 19:13 24:1
24:8,12 41:1 42:1
**merged** 23:24
24:13 75:1 90:5
**merger** 40:19
83:21
**merging** 72:24
**met** 15:5 25:15
41:10 63:18
126:22 138:8
184:18,19,24
185:15 186:8,10
192:11 193:19
**metaphor** 104:16

meth 210:20
methadone 67:13
methamphetamine
204:12
mhas 75:6 140:11
175:3
mhttc 227:6
mic 239:23
michael 114:5
mid 70:4 149:14
middle 66:23
190:22
midst 48:8 221:11
midstream 69:23
midwest 264:17
267:1
mike 125:16
mile 174:5
miles 6:7,7 129:17
129:17 130:23,24
military 230:1
mill 136:3,7
210:16 234:2
million 73:12 74:8
mills 83:1 136:20
137:10,14,23
209:18 210:7,14
210:24 211:6,11
211:18 223:22
224:3 233:12
234:8,15
mind 16:25 71:3
72:18 205:10
209:3
mine 160:21 170:5
218:3 246:5
minimal 66:24
minute 131:24
minutes 32:1,3,5
32:11 33:3,4,10,22
37:9 39:20,24

40:6 85:25 189:12
206:2 218:10
219:9,10,11
miriam 148:9
mis 226:3,3
missions 29:6,7
mistakes 165:3
misuse 224:16
modalities 107:8
107:17
molding 168:9
moment 47:6 48:2
250:7
money 50:22 51:6
58:19 59:4,5 74:2
75:17 76:1 93:4
142:12 176:10
177:22 185:24
189:6 190:16
192:13,18,21
193:8 209:5 224:5
234:15 236:22
237:3,10 238:1,3
239:6
moneys 186:2
montgomery
58:25
month 29:25,25
30:1 31:23 91:21
144:25
monthly 34:16,20
114:1,17
months 19:11
34:19 51:3
moody 81:12
morning 10:15,16
morphine 67:14
mortine 141:16
motion 33:8 40:3,3
motley 2:2 9:11,15

motleyrice.com
2:5,6
moul 1:22
move 68:17 107:6
moved 84:16
143:25
moving 187:5
mpyingling 3:15
mt 2:4
multi 5:14,18,21
6:3,6,10,15 86:13
96:17 101:10
116:5 129:15
146:11 159:17
multiethnic 113:4
113:14
multiple 164:13
164:15 259:12,14
murphy 1:22
murray 1:22

**n**

n 47:15 138:7
225:21 226:16
n.w. 2:21
naeem 3:3 4:10
9:21,21 214:20,24
239:20 253:23
254:8 257:2
260:15
name 47:16 61:25
63:4 95:3 123:16
123:19 124:22
126:23 129:5
131:3,9 141:16
142:2 184:13
194:13 200:13
201:14 213:18
214:24 217:21,24
218:1 225:8
226:15,20 240:5
250:18 264:6

265:3,4,15 266:3,4
266:21
named 89:15
195:1,5 262:9
names 80:9 112:14
230:10
narcan 259:13
natalie 2:3 9:14
national 1:6 9:3
38:11,14,16,17
46:25 59:11 128:9
134:22 264:6
265:3 266:3
nationally 228:6
natural 260:10
naturals 112:24
ndeyneka 2:6
necessarily 134:15
135:11 163:5
187:5 202:13
210:15 244:22
255:24
necessary 26:5
171:7,17 255:6
need 26:10,11 33:4
128:10 172:10
193:4 228:13
230:10,16 252:13
252:15,21,21
253:1 254:20
255:13,15,16,17
255:20,21 256:1
257:6,13,19,20,25
258:5,7
needed 132:4
211:24 248:12,24
256:8 257:20
needing 108:10
255:5
needs 5:8 45:24
52:25 54:19 55:15

**[needs - obvious]**

57:5 189:8 193:7
213:17 228:17
253:21 254:5,21
254:23 256:4
257:10,15,17
258:4,6
**neighborhoods**
259:3
**neither** 69:7
156:24 202:3,4,6
216:9
**net** 25:15 41:10
**never** 25:12
175:10,10 185:14
202:6 223:13
224:16 226:7
256:9
**new** 26:16,17
28:10 33:12 43:7
46:20 53:19,24
76:17,19,21 92:6
108:9 149:13
167:14 226:12,13
227:9,12 229:11
229:22 230:6
238:21
**newsletter** 119:22
**newspaper** 119:24
223:15
**nine** 34:23 110:14
200:6
**nodding** 241:4
**non** 170:19 213:9
237:2
**nope** 195:10,12
**norm** 107:21
108:5,7,8
**northeast** 158:4
**northern** 1:2
**notarized** 264:14

**notary** 262:6
263:13 264:25
265:10,18 266:15
266:23 267:23
**note** 191:1 264:12
**notebooks** 32:17
**notes** 5:16 74:6
82:4 93:22 94:5
94:10 128:2,4
**november** 22:16
179:11
**npr** 64:10
**number** 5:3,10,13
5:17,20,23 6:5,9
6:14,18,22 7:3
60:1,1,3 61:5,13
64:17 65:17 67:12
67:24 72:21 76:23
86:22 93:17,23
96:20,24 100:21
101:1,13,18 115:3
116:8 127:23
130:1 140:6
146:19 159:11,23
161:25 165:24
167:13 168:17,25
179:6 183:18
189:23,24 198:19
198:25 199:16
200:12 242:9
244:24 256:14
264:7,13
**numbered** 6:23
178:25
**numbers** 61:21
86:21 198:24
266:7
**numerous** 62:23
69:14
**nursing** 171:10

**nw** 3:8

**o**

**o** 81:19 138:7
225:21 226:16,21
**o'keefe** 80:11
**oacbha** 5:17,20,23
14:1 18:7 24:20
24:22 25:25 26:22
27:11 32:11,19
34:16 40:6,9,18
44:19 46:1,4,5
47:18 50:15,18
51:20 55:1 61:22
76:12 77:1 81:3
86:22,22 89:4,21
93:18,23 94:14
96:20,24 97:25
98:15,22 99:24
100:21 101:14
102:2 109:8
114:12 117:4,6
119:18 120:17
121:12 122:22
123:16 128:23
130:14,17 133:13
137:8,21 144:11
146:19,20 147:16
154:12 163:4
165:8 170:8
171:19 172:1,11
172:22 180:21
196:7 197:3,6,20
198:2,20 205:18
213:6,22 215:9,10
217:8 227:3 231:5
233:25 234:6
235:7 236:20
237:11 238:11
240:19 243:24
**oacbha's** 32:25
51:11 117:25

212:18 214:5,6
**obes** 19:14
**object** 55:2 60:14
60:20 87:23 88:1
88:4,16 90:20
99:23 102:17
104:17 105:2
106:18 107:2
108:22 120:21
121:3 122:8,25
123:7 126:13
133:15 137:11
156:20 157:11
158:16 165:11,22
171:23 180:10
191:19 202:17
203:8,24 204:23
211:1,21 212:8
224:6 241:17
244:5 245:6,13
247:16 253:23
254:8 257:2
260:15
**objected** 203:6
**objection** 8:3,3,4,4
8:5,5,6,6,7,7,8,8,9
8:9,10,10,11,11,12
8:12,13,13,14,14
8:15,15,16,16,17
8:17,18,18,19,19
8:20,20,21,21,22
8:22,23 55:6
87:20 95:18 97:12
251:12,19
**objections** 4:5 8:1
**observe** 223:3
**observed** 222:14
**obtain** 171:7,17
**obvious** 48:23,24
49:1,3 50:3

**obviously** 43:15
119:15 207:21
214:23 217:7
225:7
**occasion** 13:17
**occasionally** 10:24
30:18
**occur** 69:24
**occurred** 165:2
**occurring** 56:1
**october** 6:11,13,18
7:6 103:17 104:2
104:14,22 146:14
147:11 159:10,22
160:16 162:21
198:8,15 263:16
**od** 65:8
**odadas** 72:20 73:7
73:10,18 74:7
75:17,19 80:1
94:19 98:1 100:5
124:17 142:4,5
154:21 232:1
**odmh** 74:19 75:20
**offenders** 19:5
**offer** 28:13
**offered** 131:17
**offering** 77:20
**office** 26:7 28:9
41:18,22 42:2
44:18,18 45:17
46:11,14 69:8
76:19,20 94:18,20
95:22 126:1
134:22 183:3
186:8 263:6
**officer** 13:22 40:9
**officers** 45:20
**official** 47:16
51:23 265:15
266:21

**officials** 66:8
**offset** 50:25
**oftentimes** 31:24
120:13 236:11
**oh** 11:16 90:13
106:10 110:13
122:24 153:6
182:15 193:23
223:24 248:19
**ohcbha** 101:18
**ohio** 1:2,12,14,23
2:8,13 3:4 6:8,16
7:4 9:5 13:11,22
18:20 19:17 26:3
37:18 38:11,12
48:3,3 49:10,19
52:4 59:18 65:8
66:22 69:1 72:22
74:22 75:3,6
80:13 83:15 88:14
97:15,16,21
102:24 103:11
106:4,16 107:6,22
108:13,18 112:20
113:19 120:19
122:23 126:12
136:10 140:4,11
140:24 153:8
154:17 159:18
175:3 178:6 185:5
198:6,14 199:7
200:18 209:13
210:23 211:3,8,10
211:18 215:15,20
216:22 225:13
226:24,24 231:7
236:22 240:18
245:11 247:19
249:9 258:2 262:2
262:7 263:7,14
264:2

**ohio's** 5:7,21 6:3,6
6:10 52:22 101:11
101:22 116:6,25
123:17 124:4,13
124:18 125:2,16
129:16 146:12
147:3 165:1
**ohiomhas** 6:9
140:6,12
**okay** 12:7,12 17:7
30:2 50:14 61:14
75:6 88:4 100:1
101:19 145:16
147:13 160:5
169:11,12 174:21
177:12 184:16
188:16 194:16,19
198:21 215:1,5,14
215:17,24 218:7
220:12 221:8
222:4,11,25 223:9
225:2,15 226:17
228:18,25 229:24
232:6,16,22 235:7
237:11 239:6
242:4 243:2
246:18 248:20
**old** 41:9,10 200:6
**omnibus** 172:21
176:25
**once** 11:3,5 30:8
41:2 62:24 68:23
71:24 125:21
210:24 226:14
235:16 238:7
255:4,12
**ones** 46:20 55:25
127:25 145:14
154:8 174:19
**online** 218:13

**op** 1:11,13,15
**opdatf** 107:6
**open** 18:25 22:3
34:1 91:15
**opening** 166:9
**operating** 45:10
**operations** 37:3
229:7
**opiate** 1:6 5:15,16
5:19,21 6:3,6,10
6:11 9:4 13:10,16
14:12 16:20 17:3
47:7 48:9 49:11
51:2,18 59:18,20
60:9 69:13 72:5
75:16 83:17 84:18
86:14,23 88:9,13
91:9,20 92:21,23
93:7,21 94:10
95:6,12 96:18
97:3,20,21 99:25
100:7,8,14,22
101:11,23 102:11
102:16,22,23
106:6,24 107:8,12
107:17 108:1,20
109:2 110:19
111:4 113:22
114:21 115:1,2,12
116:6,18,25 117:9
117:14,16 119:17
120:20,23,25
121:15 122:6,23
123:4,17 124:4,10
124:13,18 125:2
125:13,16 126:1,6
126:7,12,16,18
129:16,24 131:19
133:14 144:13,16
144:25 145:8,14
145:15 146:12,13

147:3,4,15 148:1,5
149:19 150:9
151:2,22 152:13
153:11 154:9,12
155:16 156:4
158:9,15 174:24
175:20 185:21
186:14 203:4,13
203:23 204:1,6,6
204:17,22 205:6
218:13,20 219:7
235:5 264:6 265:3
266:3
**opiates**  14:11
16:15 17:1 48:4,5
50:1 67:7 84:6,8
84:23 85:5,6 98:6
100:4 108:16
114:24 135:18
136:12 144:19,22
151:4 169:20
174:1 182:11
235:21,23 236:6
**opinion**  168:10
209:21
**opioid**  16:21 47:3
47:21 48:16 49:13
52:1 70:9 83:23
89:10 90:24 92:15
128:21 138:2
153:17,21 156:19
157:1 158:13
167:1,14 168:4
170:18 180:9,20
195:1,5 196:9
197:21 205:17,17
206:7,21 207:6
208:4,19 209:14
212:16,17,18
213:3 218:13,20
221:12,20 222:7

222:14,23 223:3,4
223:11,23 224:13
224:16 225:8,9,13
236:22 237:3
238:21 249:19
251:5,9,21,23,23
252:12,23 253:14
254:7,15,21,23
258:10
**opioids**  16:15 17:2
47:24 49:15,16,21
51:21 71:23 72:13
79:3,21 89:19
99:5 104:21
113:15 123:9,12
139:6,7 150:18,22
151:9 152:1,23
153:2 154:2,4
164:14,16 166:10
167:4 199:23
222:10,11 224:3
251:1,2,5
**opportunity**  39:1
50:4 72:12
**opposed**  54:3
174:16
**option**  31:4
**options**  108:1
**optometry**  171:10
**oral**  78:5,9 164:6
**order**  12:1 32:23
33:1 132:18
133:20 199:1,6,11
199:16,22 239:1
257:14
**organic**  39:17
**organization**
35:17 42:9 59:9
90:4,19 114:11,13
118:13 120:3
196:12 230:12

**organizations**
24:24 40:24
114:16 143:6
**organized**  215:10
215:15 216:1
**orientation**  43:7
**oriented**  89:13
227:20,23 228:2
**original**  149:5
**orman**  68:5 83:4
84:19 100:4
112:11 134:1
154:8
**osiecki**  16:4
138:21,25 139:5
161:15,18 184:8
**osu**  94:20
**outbreak**  209:19
210:8
**outlook.com**  2:9
**outpatient**  174:6
174:12 247:13
252:3 255:7,8
**outside**  49:18 50:2
51:25 53:12 59:6
72:10 113:23
217:17,20
**overall**  14:12
35:18 44:10
190:11
**overcome**  241:7
**overdose**  59:24
65:13 102:24
259:11 260:2
**overdosing**  60:2
**overhead**  51:13
**overnight**  30:10
**overrule**  35:25
**oversee**  38:7
**overseeing**  227:6

**oversees**  226:2,3
227:4,7
**oversight**  188:1
**overview**  32:25
**oxycodone**  67:13

**p**

**p.m.**  240:2 260:23
**pac**  215:13
**pack**  82:6
**packet**  116:20
**packets**  116:19
122:4 145:15
**page**  5:6,14,18,21
6:3,6,10,15 52:21
54:12,17 64:4,5,8
64:17 65:7 66:20
74:18 76:23 86:13
87:18 88:8,9
96:17 98:15
101:10 102:18,20
107:4 110:16
111:18 112:22
115:18 116:5
128:18 129:15
132:9 133:4 136:1
136:1 138:1,13
140:13 141:3
146:11 147:3
148:16 159:17
163:17 164:19,20
170:12,13 173:1,2
177:11 188:6,7
190:22,22 191:25
198:23 199:15
200:12,13 201:13
203:5 220:19,20
221:16 231:18,24
247:2,3 264:13,15
266:7 267:3
**pagers**  144:23,24
145:5

**pages**  163:17
223:19
**paid**  44:7
**pain**  138:2 149:13
149:24 152:21
166:5,10,19,23
167:14,23 170:18
171:7 172:5
223:12 224:5
**painfully**  48:23,23
49:1,3 50:3
**painkillers**  141:10
**painless**  11:23
**paint**  206:25 207:2
**panel**  125:13
126:16
**paper**  86:24 89:24
90:17 128:2 187:1
203:4,5,8,19
204:16,19,21
205:13 208:22
209:7 218:8
**papers**  118:5
127:20,25 128:13
134:8,11
**paragraph**  65:16
65:20 66:6,7,22
77:4 79:23 82:3
95:15,20 104:1
106:3,11 107:5
110:17,23,25
165:25 179:19
188:5,14 189:2,4
190:25 191:25
193:18 199:16
248:18
**paragraphs**  65:25
67:13 243:3
**paraphrase**  217:9
**pardon**  68:9

**parents**  245:1
**part**  22:20 34:18
35:19 36:2 38:24
39:3 46:25 52:15
59:1 107:10 113:6
113:22,24 120:10
142:14 150:13
168:6,20 176:25
186:25 187:3,16
187:16,17 195:23
196:1,4,6 215:18
220:4 266:9
**partially**  245:4
**participate**  135:9
191:12 258:7
**participating**  95:5
96:1
**participation**
191:3
**particular**  32:19
44:8 49:12 64:3
65:3 66:19 68:18
69:12 70:12 77:21
89:24 95:9 116:20
117:20 118:22
119:9 121:1
127:14 129:10
131:10 138:18
149:8 152:2 164:6
175:20 179:13
195:24 219:24
238:5 258:23
**particularly**  119:3
**parties**  219:24
**partner**  120:12
**partners**  55:18
56:5,7 57:21
112:15 119:23,25
120:8,8
**parts**  69:22 172:17

**party**  16:12
181:13,16,20
263:2
**pass**  176:21,23
177:1 239:23
**passage**  166:4
234:21
**passed**  103:9
172:15,20 175:12
**pat**  114:5
**patient**  20:17
**patient's**  151:18
247:14
**patients**  23:12
152:9 222:21
223:5
**patrick**  3:13 10:3
**patrol**  93:6 259:1
**pay**  58:4 247:7
248:1,2,5,12,23
**paying**  50:24
**pays**  247:10
**peace**  229:19
230:4,5
**pease**  43:2
**peer**  44:15,23 45:2
228:14 255:17,17
**pellegrino**  1:25
262:6 263:13
**pending**  12:17
30:20
**penny**  206:24
**people**  33:6 34:21
46:13 59:17 60:1
60:3 61:12 62:8,9
62:24 68:13 80:7
80:9,16 85:9
93:13 108:20
111:21 112:6,21
114:6,14 115:24
118:17,17 119:5,7

120:3,10,15
121:10 122:20
123:1 126:15
127:12 128:8
134:9 135:12,13
137:14 141:10
142:21 145:2,7,14
149:24 150:12,15
152:20 160:10
165:13 171:17
172:9 175:23
183:1,13 185:22
186:23 187:5
188:20 189:23,24
196:19 197:8
209:23 219:17
224:15,23 226:14
233:18 241:23
251:1 252:22
254:14,22 255:8
255:14,18 256:7,9
256:12 257:12
259:2,5,8
**perceived**  107:7
107:16
**percent**  36:1 48:13
155:17,21 156:8,9
156:12 157:5,8,9
157:14,20,23
158:1,6,8
**percentage**  47:22
153:11,16 158:13
187:18 192:20
233:5,7
**period**  18:10
21:23 25:11 66:16
69:24 72:1 83:16
100:11 101:6
105:19
**periodically**  12:15

permits 232:9
permitting 34:7
person 15:7 31:1,4
31:23 41:19 45:1
46:8,11,12,13,14
46:24 47:6 91:21
91:22 92:4,12
102:7 115:3
117:13 118:9
126:17 141:22,23
217:23 227:9,13
227:20 229:11,15
229:23 241:15,19
242:5 259:7,16
personal 92:8
209:21 222:13,17
223:2 240:24
241:15
personally 89:3
96:13 105:8
109:14 163:22
167:5 196:10
197:1 198:2
222:14 223:3,13
265:11 266:15
persons 251:22
perspective 125:3
125:17 137:8
226:11
pharma 1:10,12
1:14 48:22 49:4
179:22
pharmaceutical
185:8 188:10
197:16
pharmaceuticals
3:2 9:22 214:25
pharmacies 14:14
195:17 196:1
pharmacotherapy
5:15 86:14,24

203:4
pharmacy 196:16
197:13,14,17
phone 31:2,4,23
264:3
physicians 165:5
167:23 222:16
picture 196:2
piece 37:11 45:21
53:11 187:1 209:7
pieces 172:18
pill 83:1 136:3,7
136:20 137:10,14
137:23 209:17
210:7,14,16,24
211:6,10,18
223:22 224:3
233:12 234:2,8,15
pills 212:11
233:19
place 9:5 36:9,11
41:17 42:6,7
45:21 79:9,15
212:6 244:17
262:19
placed 143:5
places 21:20 50:20
115:15 142:19
174:23 193:3
plaintiff 14:22
181:17
plaintiffs 14:6,9
14:19 207:18
plan 29:8,17
133:22 182:1,2,5
182:10,14,15
192:25
planned 112:1
planners 186:4
planning 28:11
29:3,4 42:15

102:10,15 107:9
109:17 111:22
112:6,25 115:4
117:22,24 135:1
played 20:21,21
players 114:2
pleasant 2:4
please 9:6 88:4
208:16 242:13
264:11,11
plus 22:7 121:23
185:23
pockets 38:20
point 16:3 23:21
24:3 27:4,5 29:23
42:3,17,24 67:5
73:1 76:6 80:11
82:24 108:11
113:11 122:9,11
139:8,12,21
149:12 150:3,21
151:15 152:7
156:7 171:5
173:15 175:1
177:13 182:2,10
182:15,22 191:21
196:14 202:5,11
202:20 203:12
204:3,13,19 222:1
222:20 223:10
231:4,25 240:9
241:11 242:7
247:3
points 65:15 72:21
74:19 149:10
225:12
poisoning 65:16
67:8
police 93:5 258:25
policies 42:6 45:4

policy 6:4 49:17
49:22,22 50:4
116:7,25 117:16
134:22
political 236:25
politics 65:8
191:23
pollard 77:3,12,13
polster 1:8
pontificate 159:5
pool 20:21
poor 124:22
position 18:7
20:19 35:20,22
83:12 137:21
172:23 181:5,7,21
181:23 189:11
191:23 192:24
193:7 225:22
230:8 235:16
positioned 54:18
positions 41:21
92:7 253:20
positive 248:9
250:3
possibility 245:12
possible 11:24
125:5,6 135:17
164:9 196:23
237:10 255:23
possibly 71:9
82:20 118:15
199:13,14 252:2,2
posted 130:12
posters 141:18
142:19 143:5,13
potential 76:1
171:16 180:19,19
221:10 234:1
247:19

powerful 167:14
powers 54:13
practice 214:12
  247:11
practices 131:21
  136:11,21 167:3
practitioners
  113:20
pre 131:16,25
  132:9
precise 151:11
prepare 15:1
  17:22 236:9
  237:18 238:7
prepared 17:23
  243:9
preparing 48:9
  237:12
prescribe 132:18
  136:12 151:8
  176:17
prescribed 150:15
  150:18
prescribers 152:8
  167:3 222:21
prescribing 14:11
  136:21 138:3
  150:22 167:3
  224:2
prescription 1:6
  6:16 7:4 9:4 17:4
  23:18 49:5 67:12
  79:19 103:12
  123:9 142:22,24
  142:25 150:18,22
  152:1,17,23 153:2
  159:19 162:3,10
  166:10 167:4
  175:22 196:18
  198:6,14 199:7
  224:17 246:21

251:1 264:6 265:3
  266:3
prescriptions
  171:7,18
presence 262:14
present 3:17 47:22
  118:6 121:22
  127:13,15 134:20
  148:7 213:2
presentation
  124:17 125:1,15
  128:19 132:1
  133:6 147:8
  148:12 149:1,4
  154:11 158:19
  167:19 168:14
  212:20
presentations
  84:17 126:5,25
  127:22 128:1
  131:17 132:9
  134:13
presented 71:25
  112:21 115:11,13
  126:1 154:14
presenter 138:6,9
  138:10
presenters 110:12
  127:18 138:19
  139:16
presenting 119:15
  125:22 126:15
presently 92:3
  170:9
president 31:10,11
  31:12,21 35:6,8,9
  35:9,10,11,11,19
  36:24 72:1,9
  133:9 135:8
president's 135:18

presidents 135:15
press 64:5,9,22
  65:3 66:1,18
  162:5,8
presumption
  191:7
pretty 14:3 21:13
  23:15 28:21 31:19
  31:20 39:12,17
  104:25 118:19
  130:8 133:2 186:5
  206:24 230:8
  234:12 242:16
prevalent 23:22
prevention 5:22
  6:4 49:4 56:13,15
  73:14,22,25 90:10
  99:6,7 101:12,23
  116:7 117:1,17
  190:19 192:22
previous 40:24
  104:6 105:11
  108:17 131:11
  184:17,21 221:6
previously 19:20
  24:24 184:20
  227:19 242:13
  246:20
primary 100:5
  153:23,24 249:18
print 86:20
prior 15:8 40:19
  70:25 72:24 83:21
  90:3 180:6 234:16
  248:4
priorities 235:9
prison 244:9
prisons 244:8
  246:15
probably 11:17
  47:11 60:15 67:20

78:16 87:6 92:18
  100:6 103:6
  112:10 135:7
  140:15,17,18
  150:1 152:2
  182:16 185:20
  197:5 209:3,22
  214:7 220:5
  234:12,24,25
  235:6 249:25
problem 82:10,15
  84:25 85:7 88:9
  98:14 100:16
  124:14 164:21
  176:10,18 197:15
  240:11 248:16
  249:2,13 251:9
problems 24:9
  241:11 252:14
procedural 60:17
procedure 10:10
  32:20 261:7 265:5
  266:5
procedures 42:7
  45:4 170:17,22
process 31:16
  33:17 39:24,25
  43:8 44:16 68:25
  69:1,4 96:13
  127:17 134:4
  163:6,12,13
  217:11 235:11
processes 38:22
produce 140:17
  219:4
produced 53:5
  61:21,22 86:21
  87:4,8 140:11
  141:17 146:19
  217:8 220:4,9
  236:16

producing 218:15
product 132:19
production 220:4
    264:15,17,22
profession 121:11
professional 18:5
    170:20
professionals
    233:18
profits 230:20
    231:6 232:1,4,10
    232:13,18,23
    233:4
program 18:12,14
    18:20 36:17 46:12
    46:14 49:5 214:9
    226:11,12 227:2,4
    227:9 228:19
    229:1 258:1,5
programming
    51:14
programs 19:6
    22:4,22 23:9 24:7
    26:17 66:4 80:10
    80:12,17,19 88:14
    225:8 227:18
    228:20,23 230:20
    231:6 252:5
    253:14,14
progress 131:6
    249:3 256:2
project 154:23
    178:13 227:21
    229:16
projects 139:5
    229:17 238:5
promoted 150:4
promotional
    201:10
prompted 147:25

pronounce 184:13
proposal 98:4,5
proposals 169:19
propose 76:13
proposed 74:4
    81:7 168:17
proposes 69:7,8
proposing 69:5
prospect 246:7
protect 259:25
protocol 247:11
prove 224:8
provide 27:21
    28:17 66:23 77:25
    81:15 175:7,14
    177:15 191:7
    212:3 236:12
    239:9 240:18,22
provided 10:9
    78:4,9,18,20,22,25
    79:15,17,20
    132:23 220:8
    222:15 232:11
provider 44:7 45:8
    120:2
provider's 43:2
providers 42:21
    44:11 45:15 93:9
    119:13 120:2
provides 243:12
providing 64:16
    79:2 96:2 164:5
    220:6 242:23
provision 230:19
    232:23
provisions 171:1,8
    171:12 173:14
psychological
    253:7
psychosocial
    253:5

public 59:25 125:2
    125:17 144:12
    168:10 182:16
    200:22 201:1,4,8
    201:12 215:19,21
    244:2,10 262:6
    263:13 265:10,18
    266:15,23 267:23
published 102:2
    130:14 202:9
pull 220:15 230:15
    230:21 231:9,13
    256:14
pulled 236:19
pulsipher 2:16
    10:6,6
purdue 1:10,12,14
    48:22 49:3
purpose 25:25
    118:21 142:16
    159:6
purposes 17:14
    53:1 61:8 68:1
    86:16 93:24 96:21
    101:15 116:10
    129:18 130:11
    140:7 141:12
    142:7,18 146:15
    159:14 160:1
    169:3 179:1
    183:19 198:9
    245:25
pursuant 261:3,6
push 76:8
pushed 143:11
put 19:25 79:18
    89:1 104:22 109:9
    109:11 117:11
    118:4,4,7,14
    119:23 122:3
    130:17 144:18,18

145:14 147:18
    148:1,4,21 158:25
    162:23 173:25
    192:1 203:2 209:9
    209:16 221:4
    229:17 234:15
    235:16 259:24
puts 191:16
putting 77:2 79:9
    107:11 109:2,15
    118:1,15 120:18
    122:22 196:17
    197:13 228:4

q

qualified 129:1
    165:12 262:8
quality 29:11,14
    43:10 44:14,15
    45:11,13 89:17
    226:5
question 10:21
    12:17 15:18 34:11
    55:7,11,12 60:18
    88:7 128:14
    156:21,22 181:10
    193:16 205:3,9,11
    206:14 208:22
    209:6 218:17
    222:18 223:10
    230:25 232:7,15
    234:19 254:5
    257:1
questioning 87:24
questions 12:6
    39:2 95:18 97:13
    194:5 203:9
    205:16 208:7
    213:25 219:15
    220:24 222:12
    239:21 240:8
    250:21,22 260:19

quick  21:13
quickly  221:15
  224:22,22
quite  14:15 16:6
  111:13
quote  82:4 127:23
  208:16
quotes  66:21
quoting  104:1

**r**

r  47:15 81:19
  226:16,16,21
racked  104:6
radius  174:5
raise  33:11,12
  51:6 79:25
raising  80:21
ran  19:4,6 144:3,5
ranjan  2:11 4:11
  9:17,17 240:4,6
  250:6 251:12,19
rapidly  54:18
rare  23:15
rates  67:9
rchs  133:21
reach  110:19
  111:5 128:10
  133:2
reached  134:18
  185:19
read  13:16 62:20
  85:2 103:1 107:13
  140:13 150:10
  166:1 170:23
  171:14 179:25
  205:12 208:12
  243:6,18 247:15
  248:12 265:5,6,12
  266:5,6,17
reading  121:10
  162:19 205:10

264:19
reads  61:20
ready  146:22
real  65:1
realities  136:24
really  11:10 25:12
  27:9 30:6 42:2,5
  43:11,14 45:10
  49:20 50:3,8 57:1
  92:21 93:11
  105:18 128:10
  136:20 158:21
  167:9 172:13
  174:14 186:24
  219:17 225:24
  235:4 253:3 258:3
reask  223:19
reason  12:20 95:1
  108:6 189:22
  196:13 207:1
  216:23 264:14
  266:8 267:3
reasons  108:3
  221:10
rec  20:19
recall  23:19 48:16
  66:10 79:2 81:5
  82:23 88:18 94:23
  95:5 96:6 97:25
  99:4,22 103:21
  104:20 105:4
  108:3,6 109:6
  110:11 113:15
  136:15 143:10
  147:23 152:22
  160:19 162:19,22
  162:24 163:3
  164:5 167:10
  172:22,24,25
  221:17 230:16,21
  230:25 231:3

233:14,21 234:5
  234:20 253:21
  256:17,22 258:12
receipt  264:18
received  104:12
  141:11 177:21
  207:22
receiving  62:9
  239:6,8
recess  86:6 139:24
  145:21 194:8
  239:25 250:11
recession  105:6
recipient  63:4
recipients  5:10
  6:13,21 61:4 62:6
  85:13 159:10
  160:23,25 168:24
recognize  17:17
  53:6 61:15 86:25
  93:1 94:2 97:6,7,9
  101:20 103:24
  116:15 129:21
  146:24 179:7
  255:21 258:20
recognized  93:5
  129:2 204:1
  215:13 228:6
recognizes  106:4
recollect  234:18
recollection
  100:18 104:10
  196:25
recommend
  181:14 189:6
recommendations
  7:5 103:17 104:2
  104:20 107:7
  112:12 198:8
record  9:2,7 12:2
  12:10,18 53:23

55:8 60:25 61:20
  86:4,8,20 97:12
  130:10 139:22,25
  140:19 145:18
  146:2 147:2
  155:10 179:5
  194:6,9 205:12
  239:24 240:1
  250:10,12 260:20
  266:9
recover  180:20
  190:4 241:11
  242:10
recovering  72:4
recovery  48:3
  49:10,19 79:11,25
  80:5,8,15,16 81:3
  89:13 144:15,17
  172:3,3 175:14,16
  175:19,23,24,25
  176:11 177:5,15
  178:15 192:22
  210:11 227:20,23
  228:2 240:25
  241:8,20,23
  255:19,23 256:7
  256:10
recreational  20:9
  20:12,15
redesign  37:11,16
  37:20 38:10 51:5
  78:20 226:1
reduce  150:4
reduced  165:20
  262:13
reduction  209:25
redundant  218:17
reed  3:12 10:4
reedsmith.com
  3:15

refer  14:1 53:9
59:21 153:25
194:17 237:20
reference  103:11
105:17 107:16
186:1 188:8 264:7
265:2 266:2
referenced  113:3
262:13,17 265:11
266:15
references  65:24
66:2 67:12 77:1
88:8 98:15 107:25
108:25 109:11
115:19 116:21
136:24 166:19
170:1 193:18
referencing  67:3
referred  64:22
183:10 218:19
224:20
referring  120:8
151:25 182:6
184:22 189:25
208:24 209:1
210:15 231:11,15
245:14,17
reform  6:17
159:20 162:4,11
246:22
refresh  231:2
regard  191:2
regarding  144:12
167:4 221:19
222:6 230:19
235:8 253:14
261:2,11
regardless  257:4
regards  13:10
256:15,19

regional  51:5
register  120:5
regular  27:16,22
37:6 39:8,12
91:18,19 95:8
99:10 112:16,18
regularly  28:21
39:3,4 113:3,9
154:22,25
regulars  135:1
regulatory  164:25
165:4
relapse  255:23
relate  37:23 45:12
related  37:13 47:3
47:21,24 48:16
49:13 51:20 57:7
57:13 70:9 71:22
72:13 75:16 79:3
83:23 88:13 99:5
99:16,21 104:21
105:15 106:7
113:15 114:21
139:6 142:24
144:19 153:17,21
156:19 158:13
167:1 182:11
191:1 207:6
216:21 219:7
222:14 225:8,9,13
236:22 240:20
251:23
relates  1:8 173:5
254:6
relating  16:9
22:22 49:22
137:22
relation  208:3
relations  185:4
relationship  43:14
43:17

relationships
56:24,25
relative  38:25
263:2
release  247:12
released  103:17
104:2,14
relevant  122:17
relied  243:23
relief  14:18,23
remember  22:17
23:21 41:20 42:18
43:25 44:5 48:20
49:9 51:24 61:17
65:1,2 74:16
77:20,23 79:11,15
79:19,20 81:9,12
84:3,9,10 87:4,12
87:16 89:3 95:11
96:14 97:8 98:8,9
98:24 99:8,12
100:2,12,13 110:3
118:25 121:19
125:7,10,20
128:15 139:10
142:13 158:24
174:15 179:13
184:4,23,25
188:23,25 195:18
199:25 200:1,6
202:25 203:19,20
205:20,24 206:10
206:20 207:2
208:20,21 213:7
218:23 232:3
remind  235:2
renee  1:25 262:6
263:13
repeated  259:4
replace  210:13

replacing  226:17
226:19
report  6:18 7:5
34:8 35:18 37:14
39:1,3 154:5
159:22 162:9,17
162:20,25 163:5
163:14,18 164:24
168:20 169:24
187:12 198:7,15
200:2,4,9,12 202:8
202:14,16,23
216:12,13 217:4,4
238:2,7 239:3,9,13
239:14 246:21
247:6
reported  43:4
reporter  4:18
11:25 151:12
204:24 205:1,4
265:7
reporter's  4:16
262:1
reporting  237:16
238:11,24,25
reports  237:12,18
237:22 239:11,16
represent  9:9 26:3
26:4,5 27:17,18,19
27:25 53:17 130:3
162:14 171:24
172:2 213:22
221:9 240:6
250:19
representation
191:11
representative
70:20,24 78:24
79:9 124:8,9
162:16 164:7
168:16 169:23

173:10

**representatives**
6:16 124:8 159:19
234:6

**represented** 42:21
129:8

**representing** 15:6
185:7 188:9,19
191:6 214:25

**represents** 80:14
153:16 194:15

**request** 154:23
191:8 207:12
266:9,11

**requested** 261:1,6
261:10

**require** 170:20
171:9

**required** 173:16
174:24 175:2,11
175:14 177:3,6
178:12,17 237:21
264:25

**requirement**
237:25

**requirements**
237:15 238:12,14
238:20,24,25

**requires** 241:14
241:19

**research** 34:14
181:2

**reserves** 239:5

**residential** 22:4
174:13 247:8,11
248:2 252:2,15
254:22 255:8,15
258:1,4

**residentially**
108:2

**resources** 45:19
58:1 260:14

**respect** 32:20 38:2
38:3 66:11 151:24
185:12 190:14
222:18 223:17
226:23 237:16

**respects** 187:11

**respond** 12:10
54:6,19 58:3
85:11 204:3 205:7
235:17

**responders** 93:1,6
258:15,19,21,22
258:24 259:14
260:3

**responding** 5:8,22
52:24 101:12,23
209:2,5

**response** 181:24
190:20,23 191:24
205:15 207:24
208:2,5,21 237:3
238:22 244:13,14
256:25

**responsibilities**
28:20 41:16 42:10
42:11 52:14

**responsibility**
55:14,17,24
241:15

**responsible** 29:10
36:25 52:5 67:7
69:5 117:19
118:10 174:3
178:7 187:14
210:5 216:6,9
218:7

**rest** 174:2

**restricted** 150:23

**result** 137:10
229:12 233:20
234:2

**resulting** 102:24
170:19

**results** 243:7
244:3

**retain** 32:11

**retained** 4:18

**retainer** 213:24

**retains** 40:6

**retention** 32:14

**retired** 63:11
77:10 218:2

**retiring** 28:4

**retreat** 30:9

**returned** 264:18

**revenue** 73:11

**review** 16:8 70:4
212:20,25 261:2,6
264:12 265:1
266:1

**reviewed** 221:3,3

**revives** 259:12,13

**revolving** 43:16

**reyes** 115:5,8
128:19 132:12,21

**rice** 2:2 9:12,15

**right** 34:17 35:24
40:2 48:1,7,8,10
48:12 49:14 50:23
63:14 64:18 68:15
71:12 82:4,5
84:23 103:6,8
105:1 145:12
152:24 154:18,19
158:5,19 160:8
161:5,15 173:8
174:25 217:15
229:16,20 231:18
243:21 245:12

249:6

**rights** 28:19 45:20

**ringing** 99:18

**rite** 195:5 197:21

**rittman** 18:11
20:2

**road** 1:23

**robert** 70:17
234:25 235:2

**robert's** 32:23,25

**robust** 178:5

**role** 40:17 52:3
109:14 117:25
185:11,13 186:13
186:18,21 187:9
191:2 202:3
225:11 226:18
227:2 228:19
238:10

**roles** 28:19,20
229:2

**roll** 185:24

**rolled** 192:3,12

**rolling** 227:21

**room** 216:25
217:1

**rooms** 93:10

**rosenberg** 92:13

**roughly** 22:13,14
104:4

**round** 164:4,17,18

**rpr** 1:25

**ruckus** 79:25
80:21

**rules** 10:9 11:23
32:23 33:1,4 42:6
261:3,7 265:5
266:5

**run** 35:17 37:18
44:17 47:1 54:24
80:10,18 115:15

128:6 143:19
**running** 42:10
45:17 48:6
**runs** 226:4
**rural** 84:25 176:15
257:21,23 259:6
**rx** 3:6 9:20 150:4
194:15,22
**ryan** 70:24

**s**

**s** 6:9 81:19 138:7
140:6,12 226:16
226:16 264:15
266:8,8 267:3
**safety** 125:17
**samhsa** 59:8
108:11 239:7
**san** 2:17
**sanctions** 242:1
**sandusky** 18:21
21:5
**sater** 43:1
**save** 122:3
**saw** 66:16 83:2
167:7 187:2
210:18
**saying** 66:22 149:2
149:4 150:15
208:20 233:1
**says** 54:17 65:21
73:1,12 82:16
84:23 88:1,1 94:4
95:25 97:15
102:22 103:25
106:4 107:5
110:18 147:3
149:12 153:15
158:20 164:24
171:4 176:1
177:10 179:20
185:2 189:5

190:25 203:11
243:7 247:6
**schedule** 42:12,12
**scheduled** 125:9
**school** 56:13
**sciota** 77:16
**scioto** 77:14,17
157:4,19
**scott** 16:4 70:24
138:21 139:9,11
161:15 185:2
**sdlaw** 2:9
**se** 20:19 33:17
145:3
**seal** 263:6 265:15
266:21
**search** 217:19
218:9,10,12,13,18
**searched** 218:5
**searching** 218:8
**second** 20:14 33:8
40:4 63:3 64:5
65:16 66:21 82:3
85:13 95:15,20
98:15 102:20
106:10 107:9
118:24 136:2
140:13 158:18
166:18 170:2
171:5 177:13
189:2,4 190:25
191:25 200:13
225:18
**secondary** 93:12
153:23,24
**section** 138:13
171:1,4 177:1,9
**see** 21:18 57:2
62:3,15 63:4,15,22
64:6,11,19 65:10
65:18,22 66:5,9,18

67:1 71:12,15
73:3,15 74:10,20
76:20 77:5 80:3
82:8 83:5 85:14
85:18,21 87:15
88:10,15 94:6,11
94:15,16,21 96:4
97:4,23 98:17
103:14,19 104:7
106:8,12 109:4
110:22 111:24
112:3 115:21
126:19 130:25
131:22 136:5
137:1,9,15 138:4
138:16 140:21
141:1 149:16
150:6,24 151:19
152:10,18,19
153:18 155:18,22
157:10,12 158:22
160:14 161:2,7,16
162:6 163:20
164:22 166:2,6,11
166:20 167:16,24
168:11 170:3,14
171:2 172:6 173:7
173:12,19 176:4
182:3 184:2,11
185:9 186:15
188:11 191:13
192:5 193:20
198:17 199:9,17
200:14,16,20,23
201:14,18,19
203:11,16 210:21
211:12 222:2
231:21 235:17
242:24 245:14
254:7 259:8,14,15

**seeing** 93:12
112:11 152:22
203:19 260:8
**seek** 179:23
241:19,24
**seeking** 14:19,24
108:20 180:8
190:4 242:3 249:8
**seen** 82:25 95:19
97:13 101:21
140:16,18 149:4
154:8 155:1,3
199:11 200:4
203:8 210:19
223:13 241:23
244:24 259:5
**sees** 59:25
**selected** 112:5
132:1 139:16
**selecting** 127:18
127:25 134:5
**seminars** 26:14
**senate** 7:7 69:9,10
69:16 70:1 71:5
78:10 170:10
245:12,23 246:3
**senator** 71:6
**send** 33:5,7 36:9
36:11 80:24 84:19
119:24,25 120:1,2
120:6,7,14 130:4
145:1,8,11
**sending** 160:19
**senior** 36:17,17
185:4
**sense** 25:21 26:18
113:21 191:21
214:3 236:7 238:6
238:9 258:3
**sent** 61:16,17,24
68:8,11 71:8

75:24 76:4 82:13
119:22 130:5,6,8
144:24 150:16
206:1
sentence 97:14
110:17 111:3
186:9 188:4,13
189:4
sentences 227:24
248:11
separate 23:2 25:9
25:10 74:19 75:12
114:11 122:5
123:4 127:12
series 127:1
135:21 149:10
153:7
seriously 131:5
159:1
serve 54:20 159:6
serves 35:10,11
service 28:13
38:13,18 46:25
58:16 176:9
216:24 229:18,20
229:24
services 3:6 9:20
10:22,23 11:9
19:4,12,13,15 22:6
22:10 23:24 24:2
24:3,6,6,15,17
26:9 33:22 37:24
38:2 43:13,21
45:15,16 52:7
55:23 56:14 59:1
60:3 64:16 66:12
66:23 72:24 75:4
75:11,12,20 83:10
83:21 84:14 97:18
112:24 140:25
141:21 142:11

154:18 174:24
186:5 190:16,19
190:19 192:19,25
193:3 194:15,22
211:25 212:3
227:16 232:11
240:21,23 242:23
243:14 244:10,12
244:13,14 246:9
246:11 247:21
256:8 257:10
session 4:14 136:2
136:23 138:1,18
139:17 146:4
sessions 29:4
127:1,3,7,21 132:6
135:21
set 26:17 28:12
31:10 38:11,14,16
44:20 74:19 84:19
136:11 153:4
174:24 246:18
263:5
sets 31:8 198:24
setting 42:2 51:18
99:3
settlement 192:4
257:6
seven 25:8,9 33:5
35:8,12 40:1
46:22 224:23
severe 105:1
sex 19:5
seymour 43:2
sfy 73:2,5
shaynak 2:7 9:8,9
86:3 89:16 108:22
133:15 171:23
211:1,21 213:20
224:6 264:5

she'll 29:12,14
33:25
sheet 264:13 266:7
266:10,18 267:1
sheriff 93:5
258:25
sheriff's 60:5
sheriffs 57:1
shift 20:14 152:8
152:15,15 222:20
short 17:20 239:25
shortly 53:9
show 50:12 100:17
125:6 153:10
238:3
showed 99:20
shown 230:17
246:2 264:16
shows 155:15
243:11
shut 136:19
210:24 211:10
233:11
shutdown 210:7
shutting 211:18
side 63:14 71:5,12
161:5,15 226:6
253:7,8,9
sign 129:3 149:25
166:19,24 168:6
199:22 210:3
signature 261:5
263:12 264:14
signed 87:6 199:17
265:13 266:18
significance 131:2
significant 75:21
signing 264:19
signs 69:20
similar 134:4,9
167:18 168:13

simplicity 194:17
simply 217:9
sincerely 264:21
single 50:21 72:24
192:4 212:20
239:2
singular 41:1
sir 264:10
sit 92:9 223:1
232:7 254:1
sitdown 81:12
sited 216:8
sitting 40:23 92:5
103:22
situation 252:17
260:1
situations 54:19
six 22:6 82:6
187:20,24 257:17
sixth 66:7 148:16
skipping 247:1
slide 148:20,21
149:1,8 158:19,20
158:25 221:2,9,18
slides 153:5
slow 102:25 249:3
small 23:2 93:3,4
143:14,16
smaller 101:4
109:12 127:3
smear 141:16
smith 3:12 10:4
70:20
snappy 131:4
sober 256:11
social 253:9
societal 106:7
society 243:13
254:17
soin 138:7

| | | | |
|---|---|---|---|
| **solely**  47:3 | **speaker**  30:14 | **specified**  262:20 | 67:18 71:9 91:15 |
| **solutions**  264:1 | 70:22 | **spectrum**  173:17 | 92:4,8,10 99:13 |
| 267:1 | **speakers**  30:15 | 175:7 177:2 | 109:18,21 113:17 |
| **somebody**  28:10 | 110:12 133:17 | **speculation**  245:8 | 118:9,18 125:21 |
| 36:9,11 148:22 | 134:5 | **speech**  124:12 | 169:14 170:5 |
| 149:6 181:10 | **speaking**  27:13 | **speed**  28:23 | 193:25,25 202:10 |
| 193:3 197:4,6 | 84:10 196:25 | **spell**  226:20 | 202:20 218:3 |
| 198:2 206:14 | 209:8,12 | **spend**  47:23 93:13 | 221:3 224:20,24 |
| 238:22 254:18 | **special**  36:1 | 178:15 238:16,17 | 229:3 |
| 255:5 258:4 | 154:23 233:4 | 238:18 | **staffed**  41:18 |
| 259:12,13 | **specific**  23:4 29:2 | **spending**  238:5 | **stakeholder**  79:14 |
| **sor**  238:22 | 31:18 39:5,17 | 244:4 246:9 | **stakeholders**  84:4 |
| **sorry**  30:1 44:4 | 49:15 52:1,14 | **spent**  218:14 | **stamp**  53:4 61:20 |
| 66:7 77:16 90:14 | 66:13 69:13 72:9 | 238:13 243:14 | 68:5 130:1 |
| 94:9 106:9,10 | 73:22 84:5,8 98:7 | **spicer**  113:21 | **stand**  73:10 |
| 110:15 136:1 | 98:25 114:23 | **spoke**  124:4,9 | 187:10,11 188:2 |
| 141:20 151:12 | 127:4 132:7 139:7 | 164:7 181:2 | 246:5 |
| 152:5 156:23 | 144:16,22 145:1 | 196:24 | **standards**  29:13 |
| 187:22 198:23 | 173:25 174:1,19 | **spoken**  167:2 | 29:15 44:20 45:6 |
| 199:2 217:25 | 178:11,13 181:10 | 197:3,20 | 45:6,12 170:17,21 |
| 222:5,22 223:4 | 192:21 196:24 | **sponsored**  164:20 | 254:18 |
| 224:4 226:24 | 206:20 208:22,22 | **sponsors**  51:9 | **standing**  89:4 90:8 |
| 237:20 247:1 | 209:2,6,6 219:3,4 | **sprague**  70:18 | 90:9 91:14 |
| 248:19 | 219:19 220:1 | 78:24 79:9 164:8 | **start**  11:22 17:5 |
| **sort**  113:1 | 222:5,6,8,10,11,23 | 168:16 173:11 | 22:9 29:5 41:23 |
| **sound**  218:17 | 232:22 235:21,23 | 235:1,3 | 68:16 91:4 128:12 |
| **sounds**  11:19 | **specifically**  62:21 | **sprague's**  162:17 | 143:25 144:9 |
| 22:21 80:2 | 67:7,11 72:14 | 169:24 | 220:18 255:9 |
| **source**  58:5 59:16 | 79:16 96:9 100:12 | **square**  255:24 | **started**  41:16,19 |
| 191:10,18 239:2 | 115:2,16 126:6 | **ss**  262:3 | 43:10,17 46:5,7 |
| 239:22 | 142:23 150:19 | **stacey**  141:23 | 49:9 50:1,8,9 |
| **sources**  58:8 221:2 | 151:25 160:20 | 142:2 200:15 | 62:13,15 70:3 |
| **south**  2:4 3:13 | 172:25 180:11 | 202:7 | 91:1 92:7 97:1 |
| **southeast**  136:10 | 182:20 185:19 | **staff**  17:23 29:10 | 98:11 100:11 |
| **space**  13:17 | 190:18 194:24 | 29:18 30:13,22 | 139:13 141:5,8 |
| 119:17 185:22 | 205:22 206:2 | 31:9 32:4 36:15 | 142:17 144:2,13 |
| **spaeder**  3:7 | 208:9 221:23 | 38:24 41:22 44:24 | 144:14 196:17 |
| **speak**  45:7,8,9 | 223:1 229:13 | 45:1 46:1,4,17,17 | 197:9 224:25 |
| 155:2 166:16 | 231:1 258:14 | 46:18,23 47:2,4,10 | 226:13 234:11 |
| 244:22 | **specifics**  87:24 | 50:24,25 51:12 | 249:21 |
| | 134:16 | 62:17,20 63:1,2 | |

**starting** 38:10
46:20 48:16 65:7
226:14 229:11
230:7 234:17
244:17
**starts** 66:8 179:16
184:7 190:23
203:13 231:18
255:2
**state** 18:17 20:16
26:3,7,25 27:23
28:22,22 30:15
37:18,21 38:11,12
45:5 54:24 56:1,6
58:11 59:13 65:21
66:2,11 67:3 73:5
73:19 75:13 84:24
85:5 87:20 93:3
95:17 96:10
104:25 106:1,17
107:1,22 112:20
121:2,6 143:7,25
144:3,6 153:8
163:7,19 164:20
165:4 171:9 177:8
177:14,18,25
178:16,17 180:17
185:5 209:13
210:22 211:10,18
211:19 215:15,16
215:20 216:1,7,11
216:12,22 221:10
225:13 226:24
228:19 231:6
236:7,22 237:2,15
237:16 238:12,16
238:21 239:18
240:17 244:16
246:8,9,10 257:5
262:2,7 263:14
265:10 266:15

**state's** 55:24
**stated** 205:13
**statement** 103:4
104:9,12 106:13
111:17 165:9
217:13 222:23
241:22 265:13,14
266:19,19
**states** 1:1 229:19
**statewide** 54:4
138:14
**stats** 102:13
**statute** 52:11,13
174:1 215:18
216:15
**statutory** 45:23
70:6
**stayed** 213:15
**staying** 172:18
**stays** 150:5
**steering** 38:23,24
115:19 120:4,11
**stenotypy** 262:14
**step** 247:9
**steps** 57:18
**stock** 118:19
**stop** 242:5
**stores** 143:6
**stories** 144:18,18
**story** 259:11,11
**strategic** 29:3,4,8
42:15
**strategies** 138:14
211:3,20,22,23
212:6
**strategy** 210:23
211:2
**street** 2:17,21 3:8
**streets** 252:20
**stress** 260:7

**strickland** 50:6
103:13 199:19,22
**strictly** 223:11
**strike** 26:20 40:16
54:10 102:22
106:2 120:24
123:15 147:24
177:8 183:14
189:15
**string** 5:12 6:23
7:3 67:23 178:24
183:17
**strong** 234:12
**stronger** 108:14
108:19
**structure** 42:4
165:5
**struggling** 104:5
**study** 6:17 159:21
162:4,11 243:8,13
243:20 246:23
**stuff** 46:10 141:25
196:18 201:11
226:1
**subcommittee**
44:19
**subcommittees**
90:11
**subject** 13:4 16:9
62:1 68:14 160:12
161:24
**submitted** 127:22
236:10
**suboxone** 132:19
223:7
**subpoena** 207:22
207:24 208:2
218:24,25 219:1
219:13 220:6
**subscribed** 265:10
266:14 267:21

**substance** 22:23
23:11 79:7 233:24
235:9 241:10,12
242:6
**substantial** 70:5
**substantively**
203:9
**suburban** 84:25
**successful** 81:6
**succession** 21:13
28:10
**suffering** 120:19
171:6
**suicide** 56:16
89:12 91:10 227:7
236:6
**suing** 13:9 180:18
185:8 188:9
**suit** 189:22
**suite** 2:12 3:4,9
264:2
**summarize** 208:15
**summary** 169:19
**summit** 1:14 2:2
6:4,6,11,24 7:3
9:13,16 15:6 64:2
71:19 116:7,25
117:15,16 123:17
123:21 128:24
129:9,16 130:23
131:10,11,16,25
132:9 146:13
147:4,9,11,15
148:1,8 155:20
156:3,11,25
157:13,25 158:9
161:12 178:25
179:6 180:3,7,11
183:11,18,24
207:8,9,14 219:5
219:23 250:20,20

summits 100:22
167:8
superior 264:1
supervised 22:22
43:16
supervision 50:25
support 24:5 96:2
228:15 243:10
supporters 255:18
supports 228:14
228:14,15 252:22
255:16,17
supposed 60:21
sure 12:4,8,13,19
14:13 18:8 33:2
33:15 45:5,9,21,22
60:19 61:17,24
62:25 76:4 77:22
80:23 86:1 87:5
89:1 90:21 109:19
110:8,23 111:13
111:16 112:8,11
115:14 119:3,12
119:19 120:4
122:10,15 125:19
125:22 130:8
131:8 132:24
133:24 137:7
148:21,24 150:10
162:22 163:10
164:3,7,11 171:20
183:13 193:14,15
193:17 196:20
201:5,12,22 206:2
206:24 214:18
221:5,13,21 228:1
228:3,7,8,16
230:14 231:8,10
237:4 238:22
245:15 250:23
251:3,7,13,18

254:2
surprised 66:18
195:25 210:21
234:13
swear 32:15 164:2
switching 242:8
sworn 10:11
262:10 265:10,13
266:14,18 267:21
sybil 132:13
system 52:6 53:12
54:24 56:12 84:8
89:13 104:6
110:20,20 111:5,6
165:1 178:5
189:23,24 190:9
203:15 217:18
244:23 246:11
systems 42:1
56:13 167:22
227:20,23 228:2

**t**

t 226:16
table 228:7
tagline 93:14
tags 129:5
take 12:14 33:8
35:20,22 36:5
85:24 87:17
123:16 128:7
137:21 162:13
171:11 178:14,16
181:7 210:12
241:15 242:12
246:25 247:2
250:2,9 251:1
253:15
taken 1:22 145:21
165:19 170:21
208:18 209:14
211:3 244:25

262:19
talk 12:3 15:18
24:22 30:19 31:21
34:9 51:19 52:2
105:8 141:11
185:16 196:14
197:13 202:15
215:8 224:9
233:23 235:20,24
237:24 238:15
talked 15:8,13,19
15:20,21,22
105:10 121:12,20
121:22 164:11
181:25 182:25
196:15,20 202:2
202:21 208:6,7
226:5 256:13
talking 16:15 17:5
121:10 144:1,10
163:3 180:12
183:2 190:18
202:5 222:9,9
231:19 258:23,24
259:1,2
talks 64:8 66:1
tariq 3:3 9:21
214:24
tariq.naeem 3:5
task 5:16,19 7:5,5
56:15,16,16,17
93:21 94:10 95:6
95:8,10,12 96:1,6
96:18 97:3,20
98:2 99:25 100:2
100:9,13,19
103:12,16,21,23
103:24 104:21
125:13 126:16,18
145:8 148:3,5
198:7,7,15 199:8

tavares 113:4,13
tax 233:4
taxed 203:15
tchotchke 143:17
team 83:18
technically 25:2
35:18
technology 229:12
229:14
ted 192:11
telephone 2:15
3:12 10:2
tell 34:13 58:10
60:23 117:7
141:21 144:18
172:19 204:9,9,20
215:9 238:17,18
template 238:7
temporary 41:18
ten 50:8 60:16
96:2,6 97:18,21
98:2 159:2 214:8
247:11
tend 53:11 55:25
76:20
tended 135:11
tends 17:1
tenth 101:2,7
tenure 89:21
term 179:23
252:12
terms 16:18,20
36:5 69:3 113:2
terrible 156:22
terribly 66:18
testified 72:2
87:21 216:2
245:11 253:18
258:9
testify 12:21
256:25 262:10

testimony   7:7 77:2
77:21,24 78:1,4,5
78:6,9,19,20,22,25
79:2,12,17,20
164:5 166:23
236:12 245:22
246:3 250:24
253:22 254:2
256:22 262:12,16
265:6,7 266:6,9,12
text   153:15
thank   19:24 81:23
146:8 155:9
158:20 194:1,5
214:17 250:16
260:18
thanking   93:13
therapies   252:13
therapist   20:9,13
20:20
therapy   20:15,18
108:4 248:13,24
252:9
thing   47:5 92:18
197:12 207:9
259:10
things   10:24 20:18
20:22,22 22:21
28:18 29:21 33:10
34:9 35:23 36:2
39:9,13 43:6
45:22 51:17 56:23
59:22 62:14 76:12
76:15 84:13,21
91:11 110:2
114:25 120:14
143:14,17 150:13
160:13 162:1
165:16 178:1
210:4 214:1,13,14
214:14 219:12,22

227:14 229:8,10
230:9 244:7 253:7
253:8,9,15 256:24
257:24 258:8
259:22 260:10
think   17:23 22:11
29:13,20 50:5
51:4 54:22 84:1
89:19 92:25
107:19 108:7,11
108:23 114:18
118:5 127:22
134:17 135:4,5
137:6,19 141:10
142:21 143:20
144:7 145:12
148:15 149:22
150:2 151:3
166:22 168:5,5,7
172:7,8 180:2
183:6,7 185:23
186:2,19,22 187:4
188:22 189:3
190:16 192:10
196:10,23 204:12
205:5,21 208:11
209:15,16,20,22
209:24 210:1,1,3
210:20,22 211:3,4
211:24 212:3,13
212:19,21 213:1,4
214:2 216:18
220:10,11,19
222:8,19 227:8
232:19 233:3,4,9
239:15,21 240:8
256:13 257:6
260:17
thinking   49:15
111:15 183:5
185:23 209:3

230:24
third   54:12 138:13
161:1 175:1
188:13,13 231:25
thirds   54:16
thirty   264:18
thought   82:21
120:15 121:22
130:5 204:20
205:7 220:25
242:15
thousands   145:2
threatened   241:25
242:1
three   19:20,21
21:12,18 24:23
25:2,20 35:6
37:21 40:19,24
41:12,21 43:10
63:13 71:3 215:11
226:13 229:5
throw   223:7
tied   92:22
tiffin   18:20
tight   105:23
tim   184:9,20,25
185:3,3,15 186:8
188:22 193:12,19
256:15
time   11:11 12:15
18:10,14,16 20:23
21:24 23:10,22
24:3 25:7,11,15
28:5 34:4,5,6,7
35:20 40:15 42:3
42:17,24 43:19,22
47:22,22 48:18,25
49:17 55:1 60:13
66:11,16 67:17
71:18 75:10,17,19
78:15 80:13 82:13

82:19,24 83:8,16
85:4 91:7 92:19
93:13 96:8 99:14
99:21,25 100:12
101:6 104:11,25
105:19,25 106:21
107:19 108:5,21
111:11 113:11
120:5,24 121:16
122:9 124:17
133:6,9,14 134:2
135:6 142:12
147:19,22 155:1,3
162:20 163:1
182:22 194:2
196:7 201:6,22
202:20 203:7
204:3,8,13,19
207:18 214:7,9,23
223:6 229:22
230:8 231:4
234:25 247:7
249:6,24 262:19
timeline   20:1
times   10:19 33:25
44:14 46:15 78:8
206:12 219:16
233:10 248:14,25
259:12,14
title   65:8 86:23
97:2 116:24
130:23 134:16
147:3 226:11
titled   51:24 101:22
242:22
titles   62:15
today   11:24 12:21
15:2,5 24:17 41:6
46:20,21 49:14
60:10 89:8 103:22
152:18 223:1

225:1 226:13,14
229:11 230:7
232:7 240:10
250:17,17,25
254:1,3,7 255:22
257:1
**today's** 9:2
**todd** 32:17 37:2,2
229:10
**told** 134:15,20
204:7,10 207:21
238:23
**toledo** 18:15 20:5
**tom** 63:14
**ton** 219:12
**tons** 218:15
**tony** 77:2,12,13
92:12 193:18,22
193:23,24,25,25
226:19
**tool** 260:3
**tools** 259:20
**top** 54:14 59:13
68:4 72:20 74:13
83:3 86:23 94:4
97:3,9 104:23
121:19 130:7
148:17 152:24
179:9,10 183:25
191:25 198:25
**topic** 91:17 117:15
117:20 119:2,11
121:15 122:7
124:12 127:14
132:7,25 134:24
138:14 149:8
167:10 205:18
206:8,15 212:18
212:22
**topics** 37:5 39:7,10
78:16,18 127:4,6

131:25 134:10,13
186:6 242:10
**touch** 225:12
260:5
**tough** 47:25
**track** 128:23
129:7
**trade** 26:1,18
**traffic** 65:17
**trafficking** 83:14
**train** 29:12,14
**trained** 107:21
108:10 212:1
**training** 26:13
28:14,16 51:24
115:14 132:17,24
**trainings** 52:1
**transcribe** 12:12
**transcribed**
262:15 265:7
**transcript** 4:1
261:3,6,9,11
264:11,12 265:5
265:12 266:5,11
266:17
**transcription**
262:16
**transfer** 229:13
**transition** 233:19
**transportation**
257:25
**trauma** 93:12
259:9,18,21,24
260:7
**travel** 51:17
174:10
**traveled** 6:7
129:17 130:24
**treasurer** 70:17
**treat** 166:9 167:23
210:23 211:8

224:5
**treating** 108:1
248:16 249:2
251:22
**treatment** 5:22 6:4
23:2,9 64:16 66:3
73:13,17 75:16
80:10,12,17,18
88:14,21 93:9
101:13,24 104:5
107:8,11,17,20,23
107:24 108:20
109:2 110:19
111:5,13 115:13
116:8 117:1,17
119:13 128:20
137:18 153:17
170:18 172:6,10
173:23,24 174:7
174:12,13 176:14
176:17 186:3
190:19 192:18,22
201:17,21,24
209:5,17,18
210:14,16 211:2,5
211:7,20,22,23
212:2,6,12,13
228:9,12 231:6,15
232:11 233:18
235:10 240:18,21
242:2,23 243:9,11
243:14 244:3,16
245:2,5 246:8
247:4,8,9,20 248:2
248:15,15 249:1,1
249:8,14,17,22
251:25 252:2,3,4,6
252:7,15 254:6,22
254:24 255:5,6,10
255:12,15,22
256:10 257:12,13

257:15,16,16,19
257:19 258:1,5,7
**treatments** 254:4
**tremendous** 176:3
176:7
**trends** 54:7
**tri** 77:18
**tried** 163:11
176:11 187:8,9
259:21
**true** 62:22 212:9
244:1 262:16
**truth** 262:10,11,11
**truthfully** 12:21
**try** 12:3 16:22
27:13 28:22
208:14 215:2
237:9 260:4
**trying** 50:5 80:23
84:5 87:11 96:25
98:9 108:15 131:4
135:4,5 163:9
188:22 242:10
259:18,20
**tucker** 3:3 9:21
**tuckerellis.com**
3:5
**turn** 102:20
163:17 164:19
200:11 212:15
220:19 242:20
**turned** 212:7
**turning** 133:4
**turnover** 28:3
135:5
**tv** 152:19,23
223:14
**twelve** 47:19
**twice** 29:25 141:10
**two** 5:6 15:14,24
16:25 19:10,11

**[two - virtual]**

21:17,18 23:1,24
24:1,8,12 33:18
35:10,11 36:16
41:21 45:3 46:13
46:20 48:24 49:7
49:8 50:24 51:3
52:21 54:16 58:25
59:13 65:25 68:23
69:23 85:19 89:25
90:4,5,6 91:8
99:20 106:25
115:3 119:1 124:7
131:12,14 160:3
161:21 177:15
185:2,15 198:24
202:19 207:1,23
213:9 223:18
224:25 225:6,16
226:9 228:25
**type**  20:18 28:16
132:19 189:14
256:25
**types**  25:2 35:23
51:11 119:7 219:2
228:22 244:10
254:3
**typical**  76:11
77:25 81:2 135:23
**typically**  29:18
30:4,5,7,11,15,21
31:1 33:18,22
34:7,19 37:13
40:2 91:20 235:22
252:1

**u**

**u**  226:16
**uh**  12:11 80:4
160:18
**ultimately**  18:13
69:18,20 210:5

**um**  54:15 71:16
101:25 103:2
111:20 121:14
124:15 132:11
138:20 143:23
151:10 157:18
166:3 225:17
243:5 251:7
258:17
**undergoing**
221:11
**underlying**  252:10
**underneath**  72:21
94:9 153:14
165:25 170:25
**understand**  12:24
12:25 14:9,14,16
16:7 40:21,23
53:13 59:20,23
105:15 166:13
186:23 187:5
195:16 196:3
203:18 213:13
216:4 218:16
253:20
**understanding**
13:3,6,7 14:5 16:7
16:17 76:3 104:15
106:19 107:15
111:9 120:19
121:8 123:8
133:11 136:17
137:3 150:14
185:18 194:25
195:4 203:22
211:9 222:4
230:12 237:14
**unexpected**  69:24
**unh**  12:11
**unhs**  12:11

**uniformed**  258:23
**unintended**  137:9
137:13,14
**unintentional**
65:16
**unions**  11:1
**uniquely**  54:17
**unit**  21:19
**united**  1:1 229:19
**units**  22:25
**university**  83:15
112:20
**unpacking**  75:9
**upcoming**  48:9
49:11 121:21
127:21 212:23
**update**  6:8 30:16
53:25 64:3 140:4
140:20 141:4
**updated**  84:19
**updates**  27:22
62:2,14 64:22
134:23 160:13
161:25
**updating**  29:6
**upper**  140:23
154:16
**upsurge**  82:18,22
82:23
**urban**  82:6
**urge**  76:7
**usage**  234:1
**use**  16:20 22:23
23:11 53:11 75:16
82:18 108:20
137:16,18 138:2
150:4,23 154:9
178:10,12 213:24
214:12,13 216:17
230:19 231:5
233:12 234:22

251:5,23
**utilize**  182:2
185:16 256:20
257:3
**utilized**  178:18
219:13,13

**v**

**v**  1:10,12,14
226:16 264:6
**vacant**  230:8
**vaguely**  109:7
**valley**  21:5 206:25
207:2
**variations**  216:19
**varies**  91:16
**variety**  119:16
221:2
**various**  163:18
254:3 258:15
**veritext**  2:15 3:12
264:1,7 267:1
**veritext.com.**
264:17
**versed**  132:25
**versus**  38:14 51:5
54:23 122:14
187:7 242:3 252:5
**veto**  69:21
**videographer**  3:17
9:1 10:2 86:4,7
139:22,25 145:18
146:1 194:6,9
239:24 240:1
250:10,12 260:20
**videotaped**  1:18
**view**  149:18 151:1
168:3 202:5
**vince**  126:17
**violate**  171:12
**virtual**  2:15 3:12

**[visions - work]**

**visions** 29:6,7
**vista** 46:23 47:6
92:12 229:16,17
229:17 230:2
**vital** 149:25
166:19,24 168:6
210:3
**voice** 27:14,20
81:1 228:8
**voices** 25:20
**volunteer** 118:18
**vorys** 43:1
**vote** 33:9 36:1
**voted** 41:3
**voting** 34:23,25

**w**

**wacker** 3:13
**wait** 12:5 257:17
**waiting** 18:12
**waived** 264:19
**waiver** 174:9
175:9
**walgreens** 195:9
197:23
**walk** 18:4 69:4
**walked** 126:23
220:10 221:15
**walmart** 2:10 9:18
195:11 197:25
240:6
**walter** 1:18 4:7
5:5,9 6:12,20 7:7
9:10 10:8,13,15
17:11,12 52:20
61:2,3 67:22
86:12 93:20 96:16
101:9 116:4
129:14 140:3
146:15,10 159:8,9
159:16 168:22,23
178:23 183:16

194:1,11,13 198:5
214:17,19,21
239:20 240:3,5
245:21,23 250:14
250:16 251:20
260:11 262:9
264:8 265:4,9
266:4,13 267:20
**walton** 148:9
**want** 30:20 31:18
32:15 53:21 85:24
87:17,17 91:10
95:17 128:3
140:14 149:5,24
172:6 178:10
189:5 195:13
203:3 212:15
215:8 216:4
217:10 219:18
220:23 221:24
222:12 231:2
233:23,24 248:5
253:15 254:25
**wanted** 42:16
75:15 92:25 93:13
129:1 135:13
185:16 186:12
211:7 212:11,13
230:11 254:2
**washington** 2:21
3:9
**way** 29:7 32:16
50:21 51:7 54:16
55:7,9 63:12
161:14 162:23
165:21 181:14
187:22 236:14
249:18 254:14
**ways** 33:18 57:22
59:12,13 114:9

**wc.com** 2:22
**we've** 28:3 29:2,4
39:1,2 46:16,16
51:2 85:24 86:1
90:11,12 98:9
99:1 110:15
113:17 114:24
139:20 183:10
210:19 223:19
224:20 225:7
227:21 229:21
236:2 244:23
**weary** 171:8
**website** 5:5 17:13
17:21 53:15 130:3
130:11,13 142:20
143:3,15,17
144:15,16 196:18
**week** 92:20,22,23
258:11
**weeks** 257:18
**welcome** 86:10
123:23 133:6
146:7
**welfare** 24:4,7,10
24:10 189:23
190:10 244:9,11
246:16
**went** 18:18,21
19:9 20:4,24 21:8
21:14 22:2 23:23
24:19 25:7 38:18
40:12 49:6 73:20
85:9 93:9,10,10
118:5 134:7,11
139:9 143:20,24
144:1,7 147:22
156:8,11 181:5,9
185:17 214:11
238:8 247:24

**whatsoever**
202:13
**whereof** 263:5
**whichever** 26:10
26:11
**white** 86:24 90:17
203:4,5 204:16,21
205:13
**whitepaper** 5:15
86:15
**wia** 58:21
**wide** 14:15 119:16
**widely** 107:7,16
**wild** 48:1
**williams** 2:20 9:25
**willing** 184:9
185:3
**willingness** 151:8
**withdrawal** 255:9
**withhold** 175:3
**witness** 2:7 9:9
44:1 55:4,9 60:17
60:20 87:21 88:2
151:14 191:10,18
194:4 203:7
204:25 205:3,5
214:18 241:4
261:2 262:9,13,14
262:17 263:5
264:8,11 265:1,4
265:11 266:1,4,15
**witness'** 264:14
**women** 23:4
**wondered** 48:21
**woodland** 2:8
**words** 12:10
165:17 202:13
**work** 24:7 25:19
25:20 26:11 28:1
31:9 33:16 42:13
49:17,22,22 56:9

[work - zuckerman.com]

56:10,11,12,14,20
56:22 60:4 72:12
97:8,16 98:6
112:16,18 113:8
113:18 115:17
149:6 167:1 170:6
176:19 200:22
201:1,4,8,17,21,24
217:22 228:21
237:9 240:19,20
243:24
**worked**   10:21
18:10,14,22,25
19:3 20:14 24:9
25:12 40:25 43:11
71:21 72:2,5,7,15
79:24 80:20 83:22
84:12,15,16
113:10,12,13
114:8 139:4,14
141:22 142:5
214:8 237:4
**workforce**   58:21
**working**   18:18
26:6 33:5 40:1
41:23 49:13 57:21
72:9 77:1 84:5,9
97:25 99:14 110:4
110:6 113:3,24
119:3,17 121:9
133:1,12 170:10
185:6,6 188:15,16
201:5 227:15,16
**works**   83:13,15
139:21 185:3
237:21
**workshop**   132:22
**wrap**   258:8
**wrapped**   44:12
172:16

**write**   104:18
**writer**   102:8
**writing**   202:13
220:11
**written**   78:5 164:6
220:7 236:9
**wrong**   14:7 213:18
241:22
**wrote**   87:10 102:5
**wymyslo**   124:23
124:24

### y

**yeah**   11:6,21
17:16 22:24 25:1
57:20 63:18 74:1
95:24 100:20,20
103:10 106:15
115:25 121:24
143:1,24 148:23
149:6,20 150:10
150:10,20,20
151:7 165:17
176:18 178:4
186:11 190:1
193:21 195:19
203:20 205:23
213:23 218:14
221:5 231:23
232:2 239:10
244:23 246:5
251:3,18 256:6
**year**   11:16 20:3,4
20:6,7 21:3,11,12
22:9 30:8 38:18
43:9 48:15 69:23
73:2,5 74:7,13
91:2,2,2,8 92:16
92:16,19 100:6,7
117:11 127:20
128:15,16 131:11
229:22 237:22,23

237:23 258:9
**year's**   76:16
212:23
**years**   19:2,3,10,10
19:11,17 21:19
22:6,6,7 29:3,8
30:9 33:19 35:6
35:10,11 37:10,22
43:9 47:19 48:24
49:7,8 50:7,9
60:16 68:23 69:11
71:21 72:12 77:15
78:10 80:20 83:22
91:8 98:7,10 99:1
100:23 101:1
110:14 128:16
135:2 139:4
143:21 144:5,7
159:2,3 164:10
167:2 177:16
200:6 214:8
227:19,22 236:3
239:17,18 248:6
256:8
**yep**   194:19 246:5
**yingling**   3:13 10:3
10:4
**young**   23:3,4,15
**youth**   10:22 19:3
22:5,10

### z

**zuckerman**   3:7
**zuckerman.com**
3:10

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

```
                    VERITEXT LEGAL SOLUTIONS
          COMPANY CERTIFICATE AND DISCLOSURE STATEMENT
```

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.