```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF OHIO
 3                 EASTERN DIVISION
 4                   -  -  -
 5   IN RE:  NATIONAL    :  MDL NO. 2804
     PRESCRIPTION OPIATE :
 6   LITIGATION          :
     ---------------------------------------
 7                       :  CASE NO.
     THIS DOCUMENT       :  1:17-MD-2804
 8   RELATES TO ALL CASES:
                          :  Hon. Dan A.
 9                       :  Polster
10                   -  -  -
            Friday, January 25, 2019
11                   -  -  -
12   HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
              CONFIDENTIALITY REVIEW
13
                     -  -  -
14
                  Videotaped deposition of
15   CELIA WEBER, taken pursuant to notice,
     was held at the law offices of Reed Smith
16   LLP, Three Logan Square, 1717 Arch
     Street, Suite 3100, Philadelphia,
17   Pennsylvania 19103, beginning at 2:43
     p.m., on the above date, before Amanda
18   Dee Maslynsky-Miller, a Certified
     Realtime Reporter.
19
                     -  -  -
20
21
22
23        GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
24           deps@golkow.com
```

**Page 2**

1  APPEARANCES:
2
3  BARON & BUDD, P.C.
   BY: SCOTT SIMMER, ESQUIRE
       KEN CAPESIUS, PARALEGAL
4  600 New Hampshire Avenue NW
   Suite 10A
5  Washington, DC 20037
   (202) 333-4562
6  Ssimmer@baronbudd.com
   Representing the Plaintiffs
7
8
9
10 REED SMITH, LLP
   BY: THOMAS H. SUDDATH JR., ESQUIRE
   BY: JOSEPH J. MAHADY, ESQUIRE
11 Three Logan Square
   1717 Arch Street
12 Philadelphia, Pennsylvania 19103
   (215) 851-8100
13 Tsuddath@reedsmith.com
   jmahady@reedsmith.com
14 Representing the Defendant,
   AmerisourceBergen Drug
15 Corporation
16
17 JONES DAY
   BY: SHIRLETHIA V. FRANKLIN, ESQUIRE
18 51 Louisiana Avenue, N.W.
   Washington, D.C. 20001
19 (202) 879-3939
   Sfranklin@jonesday.com
20 Representing the Defendant,
   Walmart
21
22
23
24

**Page 3**

1  APPEARANCES: (Continued)
2
3
4  PIETRAGALLO GORDON ALFANO BOSICK &
   RASPANTI, LLP
   BY: ERIK GIANNITRAPANI, ESQUIRE
5  1818 Market Street
   Suite 3402
6  Philadelphia, Pennsylvania 19103
   (215) 320-6200
7  Eg@pietragallo.com
   Representing the Defendant,
8  Cardinal Health, Inc.
9
10
11 COVINGTON & BURLING LLP
   BY: ALEXANDRA J. WIDAS, ESQUIRE
12 850 Tenth Street, NW
   Suite 856N
13 Washington, DC 20001
   (202) 662-5000
14 awidas@cov.com
   Representing the Defendant,
15 McKesson Corporation
16
17
18
19
20
21
22
23
24

**Page 4**

1  APPEARANCES: (Continued)
2  VIA TELEPHONE/LIVESTREAM:
3
   BARON & BUDD, P.C.
4  BY: WILLIAM POWERS, ESQUIRE
       EMMA KABOLI, PARALEGAL
5  600 New Hampshire Avenue NW
   Suite 10A
6  Washington, DC 20037
   (202) 333-4562
7  Wpowers@baronbudd.com
   - and -
8
9  BY: JAY LICHTER, ESQUIRE
       GRETCHEN KEARNEY, OFFICE MANAGER
10 15910 Ventura Boulevard
   #1600
11 Encino, California 91436
   (818) 839-2333
12 Jlichter@baronbudd.com
   Representing the Plaintiffs
13
14 BLASINGAME, BURCH, GARRARD &
   ASHLEY, P.C.
15 BY: ALEXANDRA K. HUGHES, ESQUIRE
16 440 College Avenue
   Suite 320
17 Athens Georgia 30601
   (706) 707-2762
18 Ahughes@bbga.com
   Representing the Plaintiffs
19
20 REED SMITH, LLP
   BY: ABIGAIL M. PIERCE, ESQUIRE
21 Three Logan Square
   1717 Arch Street
22 Philadelphia, Pennsylvania 19103
   (215) 851-8100
23 Abigail.pierce@reedsmith.com
   Representing the Defendant,
24 AmerisourceBergen Drug
   Corporation

**Page 5**

1  APPEARANCES: (Continued)
2  VIA TELEPHONE/LIVESTREAM:
3
4  ARNOLD & PORTER KAYE SCHOLER LLP
   BY: DAVID HIBEY, ESQUIRE
5  601 Massachusetts Ave, NW
   Washington, DC 20001
6  (202) 942-5000
   David_hibey@arnoldporter.com
7  Representing the Defendant,
   Endo Pharmaceuticals, Endo Health,
8  and Par Pharmaceuticals
9
10 ALSO PRESENT:
   Devyn Mulholland, Videographer
11 Christopher Casalenuovo,
   AmerisourceBergen Corporation
12 Drew Schinzel,
   AmerisourceBergen Corporation
13
14
15
16
17
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 6

1
2                  - - -
3              I N D E X
4                  - - -

   Testimony of: CELIA WEBER
5
      By Mr. Simmer            10
6
7
8                - - -
9          E X H I B I T S
10               - - -
11 NO.      DESCRIPTION        PAGE
12 AmerisourceBergen-Weber
   Exhibit-1   Celia Weber LinkedIn
13         Profile          16
14 AmerisourceBergen-Weber
   Exhibit-2   ABDCMDL00319748-753   52
15
   AmerisourceBergen-Weber
16 Exhibit-3   ABDCMDL00319756-807   52
17 AmerisourceBergen-Weber
   Exhibit-4   Insys-MDL-007726258-259   90
18
   AmerisourceBergen-Weber
19 Exhibit-5   Insys-MDL-007726260    94
20 AmerisourceBergen-Weber
   Exhibit-6   Insys-MDL-007754340-343   98
21
   AmerisourceBergen-Weber
22 Exhibit-7   Insys-MDL-007731066-072   107
23
24

Page 8

1
2              - - -
3       DEPOSITION SUPPORT INDEX
4              - - -

5   Direction to Witness Not to Answer
6   Page Line    Page Line    Page Line
7   None
8
9
10  Request for Production of Documents
11  Page Line    Page Line    Page Line
12  None
13
14
15  Stipulations
16  Page Line    Page Line    Page Line
17  9    1
18
19
20  Question Marked
21  Page Line    Page Line    Page Line
22  None
23
24

Page 7

1              - - -
2          E X H I B I T S
3              - - -
4  NO.      DESCRIPTION        PAGE
5  AmerisourceBergen-Weber
   Exhibit-8   ABDCMDL00045043-045   112
6
   AmerisourceBergen-Weber
7  Exhibit-9   Insys Therapeutics, Inc.,
         10-K, 12/31/16     116
8
   AmerisourceBergen-Weber
9  Exhibit-10   ABDCMDL00002123-125   121
10 AmerisourceBergen-Weber
   Exhibit-11   USDC District of
11         Massachusetts, USA V
           Babich, Burlakoff, Gurry,
12         Simon, Lee, Rowan   128
13
14
15
16
17
18
19
20
21
22
23
24

Page 9

1              - - -
2       (It is hereby stipulated and
3   agreed by and among counsel that
4   sealing, filing and certification
5   are waived; and that all
6   objections, except as to the form
7   of the question, will be reserved
8   until the time of trial.)
9              - - -
10      VIDEO TECHNICIAN:  We are
11  now on the record.  My name is
12  Devyn Mulholland, I'm a
13  videographer for Golkow Litigation
14  Services.  Today's date is January
15  25, 2019.  The time is 2:43 p.m.
16      This video deposition is
17  being held in Philadelphia,
18  Pennsylvania, in the matter of
19  National Prescription Opiate
20  Litigation.
21      The deponent is Celia Weber.
22  Counsel will be noted on the
23  stenographic record.  The court
24  reporter is Amanda Miller and will

Page 10

1     now swear in the witness.

2         - - -

3       CELIA WEBER, after having

4     been duly sworn, was examined and

5     testified as follows:

6         - - -

7       EXAMINATION

8         - - -

9 BY MR. SIMMER:

10   Q.  Good afternoon, Ms. Weber.

11 My name is Scott Simmer, I'm here on

12 behalf of the plaintiffs in this action.

13       Have you testified before in

14 any litigation?

15   A.  I have not.

16   Q.  Let me go over some of the

17 ground rules.  I expect your counsel may

18 have talked to you about that, too, but I

19 want to make should we're on the same

20 page.

21       Today I'm going to be asking

22 you a series of questions.  You will

23 answer.  It's important that we don't

24 talk over each other, so that let me

Page 11

1 complete my questions before you start to

2 answer.

3       The court reporter can only

4 take one of us down at a time.  It will

5 drive her crazy.  It's Friday afternoon.

6 We don't want to upset her.  So for that

7 reason, let's not speak over each other,

8 if we can.

9       Is that okay?

10   A.  Yes.

11   Q.  Please wait before I

12 complete my question before you begin to

13 answer, if you would.

14   A.  Right.

15   Q.  You have to answer fully and

16 accurately and verbally; you can't just

17 nod your head is what I mean.

18       Do you understand?

19   A.  Yes.

20   Q.  You're answering over me, so

21 be careful.

22       If you don't understand a

23 question, please say so, and I'll try to

24 rephrase it.  Otherwise, I'm going to

Page 12

1 assume you understand the question.

2       Is that fair?

3   A.  Yes, that's fair.

4   Q.  You understand you're to

5 answer these questions truthfully; is

6 that right?

7   A.  Yes.

8   Q.  And you understand what the

9 penalties are for failing to answer

10 truthfully, correct?

11   A.  Yes.

12   Q.  That's perjury, correct?

13   A.  Yes.

14   Q.  You can request a break at

15 any time.  I just ask if there's a

16 question pending, you answer before we

17 take our break.

18   A.  Yes.

19   Q.  From time to time, your

20 attorney or one of the other attorneys

21 may lodge an objection.  Unless they tell

22 you not to answer, you still must answer

23 the question.

24       Do you understand?

Page 13

1   A.  Yes.

2   Q.  Is there any reason why you

3 cannot testify truthfully or accurately

4 today?

5   A.  No.

6   Q.  What's your understanding of

7 why you are here today?

8   A.  The opioid litigation with

9 the state of Ohio, as it relates to

10 AmerisourceBergen and my role at

11 AmerisourceBergen.

12   Q.  Have you looked at any of

13 the pleadings that have been filed with

14 the court?

15   A.  No.

16   Q.  Did you meet with attorneys

17 representing the company in advance of

18 today's deposition?

19   A.  Yes.

20   Q.  Who did you meet with?

21   A.  Tom and Joe.

22   Q.  On how many occasions?

23   A.  Two.

24   Q.  And how long?

Page 14

1    A.    Approximately seven hours.
2    Q.    Did they show you any
3 documents?
4    A.    Yes.
5    Q.    How many?
6    A.    I don't recall the number.
7    Q.    Just generally, what types
8 of documents did they show you?
9    A.    Documents pertaining to work
10 that my team had done with pharmaceutical
11 manufacturers.
12    Q.    When you reference "my
13 team," what do you mean by that?
14    A.    I have two employees.
15    Q.    That means that you
16 supervise two individuals?
17    A.    Correct.
18    Q.    And who are they?
19    A.    Sheila Rizzo.  Kim Hamlin.
20    Q.    Spell Ms. Rizzo's last name.
21    A.    R-I-Z-Z-O.
22    Q.    And Ms. Hamlin's last name?
23    A.    H-A-M-L-I-N.
24    Q.    Have you been involved in

Page 15

1 litigation before?
2    A.    No.
3    Q.    Not as a party?
4    A.    No.
5    Q.    Have you ever testified in
6 any litigation as a witness?
7    A.    No.
8    Q.    Okay.  In advance of today's
9 deposition, did you provide your --
10 materials to the company's lawyers?
11    A.    I provided materials to
12 AmerisourceBergen's lawyers.
13    Q.    That's what I'm talking
14 about.
15    A.    Okay.
16    Q.    When I say "your lawyers," I
17 do mean the company's lawyers.  Thank
18 you.
19          Did you provide copies of
20 any hardcopy documents you have in your
21 possession?
22    A.    No.  Everything was
23 electronic.
24    Q.    Did you have hardcopy files?

Page 16

1    A.    No.
2    Q.    Did you give your computer
3 to AmerisourceBergen's counsel?
4    A.    I didn't physically give the
5 computer to them.
6    Q.    But they did have access to
7 it?
8    A.    Correct.
9          - - -
10          (Whereupon,
11          AmerisourceBergen-Weber Exhibit-1,
12          Celia Weber LinkedIn Profile, was
13          marked for identification.)
14          - - -
15 BY MR. SIMMER:
16    Q.    I'll hand you what we marked
17 as Weber Exhibit Number 1.  I'll identify
18 it for the record as your LinkedIn page.
19 It's a two-page document, if you could
20 take a look at that.
21          I'd like to start with your
22 education, if I could.  It says you
23 attended Western Wisconsin Vocational
24 College, correct?

Page 17

1    A.    Yes.
2    Q.    What years did you go there?
3    A.    1977 to 1979.
4    Q.    And what did you major in?
5    A.    Associate of science degree,
6 specializing in human resources.
7    Q.    And you received a diploma?
8    A.    An Associate's Degree.
9    Q.    It says next you attended
10 the University of North Texas, correct?
11    A.    Correct.
12    Q.    What was your major?
13    A.    I didn't really have a
14 major.  I took classes there.
15    Q.    And did you receive a
16 degree?
17    A.    No.
18    Q.    Have you had any other
19 education after high school, beyond
20 what's indicated on your profile?
21    A.    No.
22    Q.    So it says that you left the
23 University of North Texas in 1984,
24 correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    A.   I took classes during that
2  period of time, as part time.
3    Q.   Okay.  I just want to go
4  from there.
5         Your first employment after
6  you -- at least as you indicate here, was
7  at FoxMeyer Drug Company; is that
8  correct?
9    A.   My first employment listed
10 here is FoxMeyer Drug Company, yes.
11   Q.   Did you have positions prior
12 to FoxMeyer that are not listed on your
13 profile?
14   A.   Yes.
15   Q.   And what were they?  Just go
16 in the order if you can.
17   A.   Hunt International.
18   Q.   What did you do there?
19   A.   I was the office manager.
20   Q.   And what years were you
21 there?
22   A.   I don't know.  I don't
23 recall.
24   Q.   And what was your next

Page 19

1  employment after Hunt International?
2    A.   FoxMeyer.
3    Q.   And what were your
4  responsibilities at FoxMeyer Drug
5  Company?
6    A.   So my last role was in
7  national accounts, sort of an internal
8  administrative role.
9    Q.   You had a prior position of
10 some kind?
11   A.   I was on the conversion
12 team.
13   Q.   What were your
14 responsibilities?
15   A.   I trained employees at
16 companies that FoxMeyer had acquired.
17   Q.   And then when you became --
18 I guess, when you assumed the role in
19 national accounts, what were your
20 responsibilities?
21   A.   I was the internal nonsales
22 liaison with our larger chain customers.
23   Q.   By "chain," what are you
24 referring to?

Page 20

1    A.   Sorry.  Pharmacy chain.
2    Q.   What chain pharmacies did
3  you have responsibility for?
4    A.   The biggest one was Walmart.
5    Q.   And there were others?
6    A.   Kmart.  And I don't recall
7  the others.
8    Q.   You left that job in April
9  of -- or in 1998, correct?
10   A.   Correct.
11   Q.   It says your next position
12 was at Goldline Laboratories, correct?
13   A.   Correct.
14   Q.   And it says you were a
15 national accounts/sales manager/regional
16 accounts.
17        Is that different positions,
18 or is that the entire title for one
19 position?
20   A.   Different positions.
21   Q.   Okay.  What was your first
22 position at Goldline?
23   A.   Regional accounts.
24   Q.   And what were your

Page 21

1  responsibilities?
2    A.   I called on smaller regional
3  chains in the South.
4    Q.   Are these pharmacy chains
5  that you called on?
6    A.   Pharmacy chains, also
7  wholesalers.
8    Q.   Then it says you were a
9  sales manager after that?
10   A.   Correct.
11   Q.   And what was in that -- what
12 were the responsibilities for that
13 position?
14   A.   I managed a small team of
15 salespeople that called on independent
16 drug stores.
17   Q.   Was that throughout the
18 United States?
19   A.   In the Western United
20 States.
21   Q.   It says the next position
22 you held was national accounts, right?
23   A.   Correct.
24   Q.   And what were your

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1  responsibilities for that?
2      A.  So I had -- I called on
3  larger customers, both chains and
4  wholesalers.
5      Q.  And what chains did you call
6  on?
7      A.  So I had Kroger.  Most of
8  them are out of business.  Walmart.
9  Kmart.
10          That's all I can remember at
11  this point.
12      Q.  What wholesalers did you
13  call on?
14      A.  Bergen, FoxMeyer, Finley
15  Western.  That's all I can remember.
16      Q.  You left that position -- or
17  that employment with Goldline in May of
18  1998, correct?
19      A.  Correct.
20      Q.  It says your next job was
21  with AmerisourceBergen?
22      A.  No, it was with Bergen
23  Brunswig.
24      Q.  It says on your bio, or your

Page 23

1  profile, that it was AmerisourceBergen.
2          But AmerisourceBergen didn't
3  exist yet; is that right?
4      A.  Right.  It says, Formerly
5  Bergen Brunswig.
6      Q.  And it says your position
7  was as health systems account manager; is
8  that right?
9      A.  Correct.
10      Q.  And what were your
11  responsibilities?
12      A.  I called on hospital
13  pharmacies in the North Texas area.
14      Q.  And you held that position
15  until January 2002?
16      A.  Correct.
17      Q.  And that was the position
18  you held the entire time?
19      A.  Correct.
20      Q.  What were your -- what was
21  your reason for leaving that position?
22      A.  I had a better job
23  opportunity.
24      Q.  Your next position was at

Page 24

1  Walsh Healthcare Solutions, right?
2      A.  Correct.
3      Q.  And it says directed --
4  strike that -- it says, Director, branded
5  Rx?
6      A.  Correct.
7      Q.  What were your
8  responsibilities?
9      A.  I negotiated and managed
10  distribution agreements with branded
11  pharmaceutical companies.
12      Q.  I'm not familiar with Walsh
13  Healthcare Solutions.
14          What is that?
15      A.  They are a regional
16  wholesaler that has since been acquired.
17      Q.  It says you had that
18  position for -- from January 2002 to May
19  2004, correct?
20      A.  Correct.
21      Q.  And what was your leaving --
22  reason for leaving that job?
23      A.  They were acquired by
24  another company, and the corporate office

Page 25

1  was moved somewhere else.
2      Q.  Okay.  So I do have it right
3  that you then went on to F. Dohmen,
4  Dohmen Distribution Partners?
5      A.  Correct.
6      Q.  And what is that company?
7      A.  It's another regional
8  wholesaler distributor.
9      Q.  It says you were a director,
10  branded Rx, right?
11      A.  Right.
12      Q.  What were your
13  responsibilities?
14      A.  Managing the distribution
15  agreements with branded manufacturers.
16      Q.  Just so that we understand
17  clearly for the record, you mentioned
18  distribution agreements with regard to
19  Walsh Healthcare also.
20          What is a distribution
21  agreement, as you're using it?
22      A.  Distribution agreement
23  memorializes the terms and conditions
24  between the wholesaler distributor and

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1  the manufacturer, such as payment days
2  for invoices.
3      Q.   What do you mean by "payment
4  days for invoices"?
5      A.   Like, the terms of doing
6  business together, when the invoice is
7  going to be due.
8      Q.   Okay.  You held that
9  position until June 2006; is that
10 correct?
11     A.   Correct.
12     Q.   And your next job was at
13 Cardinal, correct?
14     A.   Correct.
15     Q.   There you were the director
16 of pharmaceutical strategic sourcing,
17 correct?
18     A.   Correct.
19     Q.   And what was your
20 responsibilities?
21     A.   To manage distribution
22 agreements with branded manufacturers.
23     Q.   And what branded
24 manufacturers were you dealing with?

Page 27

1      A.   At that company, I had --
2  not all of them, so -- let's see.
3          I recall having AstraZeneca,
4  Eisai, Biogen.
5      Q.   You're using that term again
6  "distribution agreements."
7          What these things were you
8  were negotiating, was that materially
9  different than you had already been doing
10 in your other positions you had held with
11 other companies?
12     A.   No.
13     Q.   So what we're talking about
14 is the distribution of pharmaceutical
15 products to pharmacies, right?
16     A.   No.
17     Q.   So who are you
18 distributing -- strike that.
19          Who are the agreements with?
20     A.   The agreements are with the
21 manufacturer.
22     Q.   So it's the drug
23 manufacturer, and they are selling drugs
24 to the distributor; is that right?

Page 28

1      A.   Yes.
2      Q.   Did you work on any aspect
3  of the distribution of the drugs to
4  pharmacies in your job at Cardinal?
5      A.   No.
6      Q.   You left in July 2008,
7  correct?
8      A.   Correct.
9      Q.   Why did you leave?
10     A.   A big reorganization, in
11 which my level was eliminated.
12     Q.   It says your next position
13 was at AmerisourceBergen; is that
14 correct?
15     A.   Correct.
16     Q.   Was it always
17 AmerisourceBergen in the time that you've
18 worked there?
19     A.   Yes.
20     Q.   And it says that you were
21 first the director of branded Rx; is that
22 correct?
23     A.   Correct.
24     Q.   What were your

Page 29

1  responsibilities?
2      A.   Distribution agreements with
3  branded manufacturers.
4      Q.   Which specific manufacturers
5  were you working with?
6      A.   I had Bristol-Myers Squibb,
7  Johnson & Johnson, Sanofi-Aventis.
8      Q.   So in that position, working
9  with those particular manufacturers, what
10 did you do in the negotiation with them?
11     A.   For the distribution
12 agreement?
13     Q.   Yes, ma'am.
14     A.   Part of it was -- part of a
15 distribution agreement involves, you
16 know, terms and conditions.  It could
17 involve how recalls and returns are
18 handled, deductions.
19          Things that happen in the
20 course of those transactions between --
21 business transactions between the
22 manufacturer and the wholesale
23 distributor.
24     Q.   So it's not strictly limited

Page 30

1  to the negotiation of the terms of the
2  distribution agreement; is that right?
3      MR. SUDDATH: Objection to
4  the form.
5      THE WITNESS: Those would be
6  in the distribution agreement.
7  BY MR. SIMMER:
8      Q.  I guess I'm trying to
9  understand is, all you did was negotiate
10  an agreement.
11      And once that agreement was
12  signed, were your responsibilities done?
13      A.  No. In that role, we would
14  be kind of the point of contact for the
15  manufacturer, if there were any issues
16  related to the performance of those
17  things that were called out in the
18  distribution agreement.
19      Q.  So whose agreement is it
20  that you're negotiating from?  Is it the
21  AmerisourceBergen agreement?  Or is it
22  the drug company's agreement that you're
23  working off of?
24      A.  It will differ depending on

Page 31

1  the manufacturer. Many times, it was
2  AmerisourceBergen's-authored agreement
3  template and sometimes it was the
4  manufacturer's.
5      Q.  With respect to the actual
6  terms and conditions, if it was an
7  AmerisourceBergen agreement, did those
8  terms and conditions ever get changed in
9  the agreement that you were negotiating?
10      A.  They could.
11      Q.  Did you have signatory
12  authority on those agreements?
13      A.  I did not.
14      Q.  Who has signatory authority?
15      A.  Somebody at the VP level.
16      Q.  So you would workup the
17  agreement, the terms and conditions, and
18  whatever it was with the particular
19  company, and somebody else, then, signed
20  off on it?
21      A.  Right. There would be
22  multiple people involved in working
23  through the agreement. Other departments
24  that were impacted by the agreement. And

Page 32

1  then somebody at the VP level would sign.
2      Q.  I may have missed this, did
3  you tell us what companies you had
4  responsibility for?
5      A.  I did. I mentioned some of
6  the companies, Eisai, BMS,
7  Sanofi-Aventis, J&J.
8      Q.  Eisai, you'd better spell
9  that for the record.
10      A.  E-I-S-A-I.
11      Q.  Did you have responsibility
12  for any controlled substances?
13      A.  I didn't have responsibility
14  for any products.
15      Q.  So the agreements, that
16  would have covered a distribution of drug
17  products, right?
18      A.  It would have -- they cover
19  the transactional how you do business
20  together, for when the wholesaler is
21  purchasing the product.
22      Q.  And in that case,
23  AmerisourceBergen is purchasing the
24  product, right?

Page 33

1      A.  Correct.
2      Q.  My question is, those
3  products that were subject to this
4  agreement, or to that negotiation, were
5  any of them controlled substances?
6      MR. SUDDATH: Objection to
7  form.
8      THE WITNESS: For the
9  agreements that I managed the
10  negotiation for, I don't know if
11  any of them -- I don't recall if
12  any of them were controlled
13  substances.
14  BY MR. SIMMER:
15      Q.  How many total manufacturers
16  are you responsible for?  You've only
17  mentioned three.
18      A.  I probably had 50, would be
19  the most that I had.
20      Q.  So when you have
21  responsibility for a particular
22  manufacturer, you're responsible for all
23  that manufacturer's drugs and the
24  negotiations on behalf of

Page 34

1 AmerisourceBergen; isn't that right?
2     MR. SUDDATH: Objection to
3 form.
4     THE WITNESS: The drugs
5 aren't called out in the
6 agreement. It's -- what's in the
7 agreement is the business -- the
8 transactions that we're doing with
9 the manufacturer. It's not
10 specific to product.
11 BY MR. SIMMER:
12    Q.   And what are the
13 transactions you're doing with the
14 manufacturers that are called out?
15    A.   Placing orders, being
16 invoiced, paying bills, chargebacks,
17 returns, data that they -- that they get.
18    Q.   So this has to do with all
19 the transactions for the drug products
20 that are being purchased from the
21 manufacturer, right?
22    A.   Yes, it would -- yes.
23    Q.   Again, just to be clear, in
24 those negotiations you have with the

Page 35

1 manufacturer, say, Johnson & Johnson,
2 were there some drug products that you
3 were not responsible for?
4     A.   The agreements didn't call
5 out the products.
6     Q.   Again, I'm trying to
7 understand.
8        So this negotiation for all
9 of the transactions related to Johnson &
10 Johnson, were there any drug products
11 that Johnson & Johnson sells that you did
12 not actually have responsibility for?
13     MR. SUDDATH: Objection to
14 form.
15     THE WITNESS: I don't know,
16 because I don't know everything
17 that Johnson & Johnson sells. So
18 I don't know if it covered all
19 their products or not.
20 BY MR. SIMMER:
21    Q.   Did you have the
22 responsibility for their division
23 Janssen?
24     MR. SUDDATH: Objection to

Page 36

1 form.
2     THE WITNESS: Janssen is not
3 a company name that we contracted
4 with.
5 BY MR. SIMMER:
6    Q.   So if they had controlled
7 substances products that are specific as
8 to Janssen, that's not something that you
9 would know anything about?
10    A.   No.
11    Q.   It says your next position
12 at AmerisourceBergen was as senior
13 director, marketing and operations,
14 correct?
15    A.   Correct.
16    Q.   Is that a different function
17 than you'd been performing before?
18    A.   It is.
19    Q.   And how does it differ?
20    A.   It doesn't involve
21 negotiating distribution agreements.
22 It's 50 percent operational and 50
23 percent more on the, like, educational
24 awareness product side.

Page 37

1    Q.   With regard to the 50
2 percent that is operations, what are your
3 job responsibilities?
4    A.   We facilitate getting all
5 the paperwork when a new item is launched
6 or a new supplier is about to
7 commercialize their first product, to
8 make sure that, you know, all the
9 licensing is gathered, indemnifications,
10 insurance, those -- you know, those kind
11 of legal, regulatory kind of things that
12 we have to gather.
13    Q.   So you're just gathering the
14 paperwork for a new supplier that is
15 about to commercialize their first
16 product, right?
17     MR. SUDDATH: Objection to
18 form.
19     THE WITNESS: A new
20 manufacturer that hasn't done
21 business with us before, right.
22 There are certain things that we
23 have to have in order to begin a
24 business relationship with them.

Highly Confidential - Subject to Further Confidentiality Review

Page 38

BY MR. SIMMER:

Q. Okay. Does that also include a distribution agreement?

A. Yes. But that was not my responsibility. That is not my responsibility.

Q. Okay. It's a little confusing. You said, yes, but you didn't have responsibility for it.

What responsibility did you have for the distribution agreement for this new supplier?

A. The new supplier receives a packet from us with instructions on everything that we're going to require in order to be able to do business with them.

One of those things is the distribution agreement. However, my team in the operations side of my job doesn't negotiate those agreements. That would be the people in my old role.

Q. So what is the actual department that you're a part of in this

Page 39

position of senior director, marketing and operations?

A. Strategic global sourcing.

Q. And who is the head of strategic global sourcing?

A. Akin Odutola.

Q. Can you spell that, please?

A. O-D-O -- it would be bad if I got this wrong -- T-O -- no. O-D-U-T-O-L-A. Akin, A-K-I-N.

Q. And that's the person you report to?

A. No, he's the head of strategic global sourcing.

Q. Who do you report to?

A. Brian Dimaio, D-I-M-A-I-O.

Q. And what's his title?

A. Senior director of business insights.

Q. A moment ago, you were referring to people that worked with you on this operations function you're talking about.

Do I take it, then, that

Page 40

you're a manager of some individuals under you?

A. On the operations role, Kim Hamlin.

Q. I think you told us how to spell her name earlier.

A. Yes.

Q. And what is her title?

A. Manager of operations.

Q. This position, in terms of operations, is that strictly with regard to new suppliers who are trying to commercialize a new drug product?

A. And new items, are the primary --

Q. So it could be a situation where a drug company that -- is an existing drug company, but they're launching a new drug; is that right?

A. Correct.

Q. Okay. What are some controlled substances that you've had the responsibility for in this operations position, either a new supplier who's

Page 41

commercializing a new product or an existing supplier that is launching a new product?

MR. SUDDATH: Objection to form.

THE WITNESS: I guess -- I don't know. I can't think of a -- a brand new supplier, probably BDSI, Bio -- BioDelivery Services, Inc.

BY MR. SIMMER:

Q. And they had an opioid product?

A. They had a C-II for the treatment of opioid addiction.

Q. What was the name of that product?

A. Bunavail, B-U-N-A-V-A-I-L.

Q. Were there other new suppliers that were launching opioid products where you had responsibility?

A. I don't recall.

Q. How about Insys?

A. Insys.

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1  Q.  I-N-S-Y-S.
2  A.  I don't recall if they were
3 set up as a new supplier when I was in --
4 since I've been in that operations role.
5  Q.  What about with regard to
6 existing drug companies that were
7 launching new products, are there any
8 opioids that you can think of that you
9 had responsibility for with regard to
10 operations?
11  A.  Not that I can think of, no.
12  Q.  You said the other half of
13 your job had to do with marketing; is
14 that correct?
15  MR. SUDDATH:  Objection to
16  form.
17  THE WITNESS:  Educational
18  product awareness campaigns,
19  correct.
20 BY MR. SIMMER:
21  Q.  And what do you do in that
22 position, in terms of educational product
23 awareness campaigns?
24  A.  We present to the

Page 43

1 manufacturers our capabilities for
2 helping message our customers around
3 their -- the educational messaging that
4 they've -- that they have internally
5 approved.
6  Q.  We'll go through this in a
7 minute.
8  But these are services that
9 AmerisourceBergen sells to drug
10 manufacturers; is that right?
11  A.  That we sell to our
12 suppliers, right.
13  Q.  Okay.  So you don't sell
14 these to drug manufacturers?
15  A.  Some of these companies have
16 the marketing rights to the products,
17 they are not necessarily the
18 manufacturer.
19  Q.  What are some examples of
20 some companies that have marketing rights
21 but are not necessarily the manufacturer?
22  A.  I don't recall.
23  Q.  You also said that you
24 present your capabilities for helping

Page 44

1 message your customers.  Let me break
2 that down a bit.
3  What do you mean by
4 "capabilities"?
5  A.  Types of communication
6 vehicles.
7  Q.  I thought I would get
8 clarity when you answered the question
9 and now I'm more confused.
10  What do you mean by "types
11 of communication vehicles"?
12  A.  It could be e-mail.  It
13 could be a phone call.  It could be a
14 direct mail piece.
15  Those would be examples of
16 types of communication vehicles.
17  Q.  So are we talking about ways
18 that you could communicate, with your
19 customers, information about the specific
20 drug products?
21  A.  It would be communicating
22 specific messages about certain products.
23  Q.  What do you mean by
24 "specific messages"?

Page 45

1  A.  Well, we wouldn't be just
2 talking about the product in general.
3 These would be documents that were
4 authored by the supplier, and had gone
5 through their internal approval process,
6 that they want our customers to see that
7 educational information.
8  Q.  You've referred several
9 times in your answers to "customers."
10  Who do you consider to be
11 your customers that you're talking about
12 here?
13  A.  AmerisourceBergen's
14 customers?
15  Q.  Yes, ma'am.
16  A.  All of the -- I mean,
17 there's a lot of customers.
18  Chain pharmacy, independent
19 pharmacy, hospitals.
20  Q.  Hospital pharmacies?
21  A.  Right.
22  Q.  Good Neighbor Pharmacy,
23 that's the network that AmerisourceBergen
24 owns, correct?

Page 46

1  A.  Yes.  They're --
2      MR. SUDDATH:  Go ahead.
3      THE WITNESS:  They're
4  independent pharmacies, they're
5  not owned.
6  BY MR. SIMMER:
7  Q.  But the network itself is
8  something that AmerisourceBergen set up
9  and is proprietary to it, right?
10  A.  I don't --
11     MR. SUDDATH:  Object to the
12  form.
13     THE WITNESS:  And I don't
14  work for GNP and I don't work for
15  Drug Corp, so I can't really talk
16  about GNP.
17  BY MR. SIMMER:
18  Q.  But that's an example of a
19  customer that you would be communicating
20  with on behalf of these suppliers, right?
21     MR. SUDDATH:  Objection to
22  form.
23     THE WITNESS:  Could be, but
24  not necessarily.

Page 47

1  BY MR. SIMMER:
2  Q.  So what we're talking about
3  here, in terms of the marketing function
4  that you have been performing on behalf
5  of AmerisourceBergen, when did you start
6  doing that?
7      MR. SUDDATH:  Objection.
8  Form.
9      THE WITNESS:  So I moved
10  into that role for working with
11  manufacturers on educational and
12  product awareness approximately
13  four years ago.
14  BY MR. SIMMER:
15  Q.  Is that something the
16  company had been doing before you assumed
17  that position?
18  A.  No.
19  Q.  So this is a new position?
20  A.  Correct.
21  Q.  So the company hadn't been
22  doing this kind of marketing to suppliers
23  before you took this position?
24     MR. SUDDATH:  Objection to

Page 48

1  form.
2      THE WITNESS:  The people
3  that managed the distribution
4  agreements may have done just a
5  little, off the side of their
6  desk.
7      But other wholesalers do the
8  product promotion, do the
9  educational and product awareness
10  campaigns quite robustly.  So we
11  finally, you know, started that
12  position.
13  BY MR. SIMMER:
14  Q.  Let me make sure I
15  understand.
16     So you say "other
17  wholesalers" began doing that.
18     Who are you referring to?
19  A.  I'm sorry, you have to
20  repeat the question again.
21  Q.  You said that "other
22  wholesalers" were doing this quite
23  robustly.
24     Who are you referring to?

Page 49

1  A.  Cardinal.  Since I worked
2  there, I knew they had a department like
3  that.
4  Q.  Who else?
5  A.  I hadn't worked for any
6  other wholesaler, so.
7  Q.  Just Cardinal, then?
8  A.  Is the only one that I
9  worked for that I know of, yes.
10  Q.  Do you have P&L
11  responsibility for either of these
12  functions, either in marketing and/or
13  operations?
14  A.  I do not.
15     MR. SUDDATH:  Objection to
16  form.
17  BY MR. SIMMER:
18  Q.  And I cannot pronounce his
19  name again -- but is there P&L
20  responsibility for anyone in your
21  division for this, either the marketing
22  or the operations function?
23     MR. SUDDATH:  Objection to
24  form.

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1      THE WITNESS: No, it's not
2 called out as a separate line on
3 the P&L of Akin Odutola.
4 BY MR. SIMMER:
5      Q. So where does the -- for
6 example, the marketing, which is a
7 service, a set of services that are sold
8 to suppliers, where does that show up in
9 the company's profit and loss statements?
10      MR. SUDDATH: Objection to
11 form.
12      THE WITNESS: I have no
13 idea.
14 BY MR. SIMMER:
15      Q. Do you have budget
16 responsibilities?
17      A. No.
18      Q. How much money does the
19 company make, on average, annually in
20 this marketing function you're
21 performing?
22      MR. SUDDATH: Objection to
23 form.
24      THE WITNESS: The revenue of

Page 51

1 that I track in fiscal '18 was
2 about -- close to $1 million.
3 BY MR. SIMMER:
4      Q. So that's the sum total of
5 every marketing item that ran through
6 your function; is that correct?
7      MR. SUDDATH: Objection to
8 form.
9      THE WITNESS: To the best of
10 my knowledge, that's the number
11 for the educational and product
12 awareness campaigns that my team
13 performed.
14 BY MR. SIMMER:
15      Q. I'm just trying to
16 establish, there's no other person that's
17 doing something similar in that there
18 would be another way that this revenue is
19 coming in, other than what you all are
20 doing.
21      A. For branded manufacturers,
22 that is correct.
23      Q. Is there a similar function
24 for generic manufacturers?

Page 52

1      A. I do not know. I don't work
2 on the generic side.
3      - - -
4      (Whereupon,
5 AmerisourceBergen-Weber Exhibit-2,
6 ABDCMDL00319748-753, was marked
7 for identification.)
8      - - -
9      (Whereupon,
10 AmerisourceBergen-Weber Exhibit-3,
11 ABDCMDL00319756-807, was marked
12 for identification.)
13      - - -
14 BY MR. SIMMER:
15      Q. I'm going to hand you two
16 exhibits. The first one that we've
17 marked as Weber Exhibit-2, and the second
18 one as Weber Exhibit-3.
19      And I'll identify them for
20 the record as you review those. The
21 first exhibit is an e-mail, e-mail
22 string, Bates labeled ABDCMDL00319748
23 through 00319753. And the second is a
24 document -- actually, it was attached to

Page 53

1 this, we're marking as a separate
2 exhibit, ABDCMDL00319756 through 319807.
3      And the e-mail string, I'm
4 only going to use it just for
5 identification purposes to establish the
6 fact the attachment came with it. And
7 I'll show your name in it.
8      So feel free to look at the
9 entire e-mail string, but there's nothing
10 else I'm going to be asking you about in
11 it.
12      So then I'm going to ask you
13 some questions about the attachment, this
14 PowerPoint presentation.
15      A. I'm sorry, you're not going
16 to ask me any questions about the e-mail?
17      Q. No, not really. I just want
18 to point your name out as being someone
19 who -- I guess, you appear at the end of
20 the e-mail string.
21      I just want to establish
22 that this is a document that you would
23 have had access to before.
24      A. Understood.

Page 54

1    Q.   I just want to direct your
2   attention to the e-mail string.  This is
3   dated June 4th, 2015 from Rick
4   Aloi@bellsouth.net to Kim Hamlin and you,
5   and the subject line is Re Beach product
6   launch.
7        Do you see that?
8    A.   Yes.
9    Q.   Do you know who Beach is?
10   A.   No, I don't.
11   Q.   You see in the attachment it
12  says, Zamicet mailer final.
13       Do you know what that's in
14  reference to?
15   A.   Just from what I've read
16  from here I do, yeah.
17   Q.   What's your understanding,
18  based on what you've read here?
19   A.   I don't understand -- I
20  don't know what your question is.
21   Q.   I asked you if you
22  understood what the Zamicet mailer final
23  was, and you said you did based on having
24  read this.

Page 55

1        So I'm trying to understand
2   what your understanding is.
3    A.   I mean, I understand what
4   this e-mail says.  I'm not familiar with
5   Zamicet or their mailer.
6    Q.   Do you recall having the
7   situation where there was, apparently, a
8   supplier and/or a drug company that was
9   launching a product, Zamicet?
10   A.   No, I do not recall.
11   Q.   You see also where it says,
12  Final product promotion services, in the
13  attachment line?
14   A.   Yes.
15   Q.   And if I can direct your
16  attention to the next exhibit.
17       Are you familiar with this
18  PowerPoint slide presentation, product
19  promotion services?
20   A.   Yes, I am.
21   Q.   And what is this document?
22   A.   This is a document that we,
23  at that time, we were presenting to
24  manufacturers as a visual to talk about

Page 56

1   the various communication campaigns we
2   had for their educational and awareness
3   materials.
4    Q.   So when you talked about
5   communications that AmerisourceBergen
6   could do to its customers earlier, is
7   that what you're talking about here, is
8   the communications campaigns?
9    A.   Correct.
10   Q.   And you see on the front of
11  this, it says, May 2015?
12   A.   Yes.
13   Q.   In your answer a moment ago,
14  you seemed to indicate that this has
15  changed since then.
16       How has it changed?
17   A.   It's just like any document
18  gets tweaked over time, as -- you know,
19  so this particular one no longer
20  separates health systems from retail.
21   Q.   These are still services
22  that you offer to suppliers, right?
23       MR. SUDDATH:  Objection.
24  Form.

Page 57

1        THE WITNESS:  I don't know.
2        I'd have to look at it to see if
3        what we do today is -- for
4        educational campaigns is any
5        different than what's in this
6        document.
7   BY MR. SIMMER:
8    Q.   I'm just speaking generally
9   about educational campaigns; the company
10  still offers educational campaigns to
11  suppliers, right?
12   A.   Correct.
13   Q.   So in the suite of services
14  that are available to suppliers, I take
15  it that's changed over time?
16   A.   Yes.
17   Q.   There's some services that
18  you've added to the suite of services
19  that you offer to suppliers?
20   A.   Yes.
21   Q.   And some that you don't
22  offer any longer, right?
23   A.   Yes.
24   Q.   But the basic concept is,

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1 you're still offering these educational
2 services on behalf of suppliers, right?
3      MR. SUDDATH:  Objection.
4 Form.
5      THE WITNESS:  We offer the
6      manufacturers the opportunity to
7      reach our customers, with their
8      educational materials, through
9      these different kind of campaigns,
10      yes.
11 BY MR. SIMMER:
12      Q.   So let me make sure I
13 understand the educational campaign
14 services that AmerisourceBergen offers.
15      Who controls the content
16 that's provided to your customers?
17      A.   The manufacturer.  The
18 supplier.
19      Q.   You answered two different
20 things.  I thought you had corrected me
21 earlier and said that it had to be the
22 supplier.
23      So can you clarify your
24 answer this time?

Page 59

1      Is it the manufacturer that
2 controls the content or is it the
3 supplier?
4      A.   It's the supplier.
5      Q.   And in some instances, they
6 are the same entity, right?
7      A.   Correct.
8      Q.   Some instances not, because
9 I think you said that there are companies
10 that have the marketing rights that are
11 not necessarily the supplier, right --
12 not necessarily the manufacturer, right?
13      A.   Correct.
14      Q.   So in the second slide of
15 this presentation, I'm talking Bates
16 ending 319757, do you see where you say
17 here, Increase product awareness and
18 engagement through effective marketing
19 programs that leverage our knowledge,
20 reach and partnership?
21      Do you see that?
22      A.   Yes.
23      Q.   I want to make sure I
24 understand what the meaning of this is.

Page 60

1      And you have an
2 understanding of what this means, right?
3      A.   Yes.
4      Q.   Did you have a hand in
5 preparing this presentation?
6      A.   Yes.
7      Q.   You were head of the
8 department that does this work, right?
9      MR. SUDDATH:  Objection to
10 form.
11      THE WITNESS:  We would have
12      put this together, but we would
13      have not been the final approvers
14      of it.
15 BY MR. SIMMER:
16      Q.   I'm just trying to
17 understand that this language is language
18 you're familiar with, right?
19      A.   Yes.
20      Q.   What do you mean by "product
21 awareness"?
22      A.   It's meant to be a general
23 statement of product awareness, what --
24 depending on what -- depending on what

Page 61

1 the goal of the manufacturer was,
2 clinical, or whatever.
3      Q.   You're not saying there that
4 AmerisourceBergen actually is the one --
5 is the author of that particular piece in
6 terms of bringing awareness to a product,
7 right?
8      MR. SUDDATH:  Objection to
9      form.
10      THE WITNESS:  The material
11      is authored by the supplier, not
12      by AmerisourceBergen.
13 BY MR. SIMMER:
14      Q.   What do you mean by
15 "engagement"?
16      MR. SUDDATH:  Objection to
17      form.
18      THE WITNESS:  I don't know.
19      I mean -- no, I don't really know
20      what that means.
21      I'd have to think about
22      that.  It's a marketing fluffy
23      word.
24 BY MR. SIMMER:

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1  Q.  Sounds good, though?
2  A.  It does.
3  Q.  What do you mean by
4  "effective marketing program"?
5      MR. SUDDATH:  Objection to
6  form.
7      THE WITNESS:  This would
8  mean that if we say we're going to
9  accomplish something, you know,
10 reach a certain number of people,
11 that we actually can reach that
12 number.
13 BY MR. SIMMER:
14 Q.  You go on to say that,
15 Leverage our knowledge, reach and
16 partnership.
17      What do you mean by that?
18 A.  I don't --
19      MR. SUDDATH:  Objection to
20 form.
21      THE WITNESS:  I don't know,
22 because that's not -- those aren't
23 my words.  That's an
24 AmerisourceBergen slogan.  So --

Page 63

1  BY MR. SIMMER:
2  Q.  AmerisourceBergen has a
3  slogan that's like that?
4  A.  Well, I shouldn't say
5  slogan.
6      That language came from
7  corporate marketing.  So I can't speak to
8  what is meant by that.
9  Q.  So there's no implication
10 intended here that AmerisourceBergen is
11 in any way bringing its knowledge, reach
12 and partnership to change the substance
13 of these marketing communications, is
14 there?
15     MR. SUDDATH:  Objection to
16 form.
17     THE WITNESS:  We don't
18 change the substance of a
19 supplier's -- no, we don't -- we
20 don't touch the content.  That has
21 to be from the supplier.
22 BY MR. SIMMER:
23 Q.  In the course of doing these
24 marketing campaigns that you've been

Page 64

1  talking about, what does
2  AmerisourceBergen do to ensure that the
3  manufacturer's advertisements meet FDA
4  marketing requirements?
5      MR. SUDDATH:  Objection to
6  form.
7      THE WITNESS:
8  AmerisourceBergen doesn't have FDA
9  marketing requirements.  The
10 material comes from the
11 manufacturer, from the supplier.
12 BY MR. SIMMER:
13 Q.  That wasn't my question.
14     I asked what
15 AmerisourceBergen does to make sure that
16 the marketing materials that you are
17 handing on to your customers have met FDA
18 marketing requirements?
19     MR. SUDDATH:  Objection to
20 form.
21     THE WITNESS:  I have no
22 knowledge about FDA marketing
23 requirements, so I can't answer
24 that.

Page 65

1  BY MR. SIMMER:
2  Q.  Do you do -- do you have a
3  hand in the negotiation of the services
4  agreements that the company enters into
5  with the suppliers for these services?
6  A.  For these services?
7  Q.  Yes, ma'am.
8  A.  Yes.
9  Q.  What is your role in the
10 preparation of those service agreements?
11 A.  Currently, it's an oversight
12 role.  I have a manager that creates the
13 document.
14 Q.  Who is that?
15 A.  Sheila Rizzo.
16 Q.  Do you know whether the
17 marketing materials that
18 AmerisourceBergen is communicating to its
19 customers have been submitted to the FDA
20 for review and approval?
21     MR. SUDDATH:  Objection to
22 form.
23     THE WITNESS:  I would not
24 know that.

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1  BY MR. SIMMER:
2      Q.   Do you know whether
3  AmerisourceBergen offered these marketing
4  programs for controlled substances?
5          MR. SUDDATH:  Objection to
6  form.
7          THE WITNESS: I'm sorry, ask
8  me again.  I -- I zoned out for a
9  second.
10 BY MR. SIMMER:
11     Q.   See, when he objects it
12 throws you off, doesn't it?
13         MR. SUDDATH:  Just trying to
14     make sure the record is accurate.
15         MR. SIMMER:  Trying to throw
16     me off is what he's trying to do.
17 BY MR. SIMMER:
18     Q.   Do you know whether
19 AmerisourceBergen offered these marketing
20 programs for controlled substances?
21         MR. SUDDATH:  Objection to
22     form.
23         THE WITNESS:  No, I don't.
24     I couldn't say they were

Page 67

1      specifically offered to them.
2  BY MR. SIMMER:
3      Q.   So when you enter into one
4  of these services agreements with a
5  supplier, does the supplier come in and
6  train your team about how they want to
7  promote their products?
8          MR. SUDDATH:  Objection to
9      form.
10         THE WITNESS:  No.
11 BY MR. SIMMER:
12     Q.   Why don't you talk to us
13 about the kinds of services that are
14 offered in these agreements?
15     A.   E-mail, for example.
16         What do you --
17     Q.   Beyond e-mail, what other
18 services do you offer to the suppliers?
19     A.   Banner ads, telesales,
20 direct mail, special delivery, invoice
21 messaging, a couple of hardcopy
22 publications.
23         I think I got them all.
24         MR. SUDDATH:  Mr. Simmer, if

Page 68

1      you're -- is this a good time for
2  a break?
3          MR. SIMMER:  We'll take a
4  break.
5          VIDEO TECHNICIAN:  Off the
6  record.  3:39 p.m.
7          - - -
8          (Whereupon, a brief recess
9  was taken.)
10         - - -
11         VIDEO TECHNICIAN:  We're
12     back on the record at 3:58 p.m.
13 BY MR. SIMMER:
14     Q.   Ma'am, can I ask you to just
15 take a look at some of the slides in this
16 presentation?
17         Could you look at the slide
18 that says, Direct mail?  And it's 319777.
19     A.   Okay.
20     Q.   We're on the same page?
21     A.   Yep.
22     Q.   I think this talks about a
23 direct mail campaign that you would offer
24 to suppliers, right?

Page 69

1      A.   Correct.
2      Q.   So over on the right-hand it
3  talks about value delivered; is that
4  right?
5      A.   I see that.
6      Q.   And it says that -- and you
7  can help me understand this, that first
8  bullet, Over ████ active unique health
9  systems accounts.
10         What's that referring to?
11     A.   Hospitals.
12     Q.   Are those hospitals that
13 AmerisourceBergen has as customers that
14 it can contact on behalf of suppliers?
15     A.   Correct.
16     Q.   And it says, ████ active
17 retail accounts.
18         What's that in reference to?
19     A.   Retail accounts that
20 AmerisourceBergen does business with.
21     Q.   And it involves ████
22 physician practice locations, correct?
23     A.   Correct.
24     Q.   Look at the -- two slides

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1 later, 319779.
2          This has to do with e-mail
3 blasts.
4          Do you see that?
5     A.   Yes.
6     Q.   And over on the value
7 delivered portion of this, do you see
8 where that first bullet, it says, Over
9 ███████ active pharmacy e-mails and
10 contacts?
11    A.   Yes.
12    Q.   What's that in reference to?
13    A.   The e-mail addresses that we
14 have that we are able to send e-mails to
15 those.  They have not opted out.
16    Q.   And where it says, 8,896
17 physician practices, what's that in
18 reference to?
19    A.   That would be a number that
20 we would have gotten from a business unit
21 that distributes to physician practices.
22 So I don't really know what that
23 references.
24    Q.   Am I right, though, that it

Page 71

1 indicates how many physician practices
2 that you're representing to suppliers
3 that you have access to through your --
4 through your e-mail blast, right?
5          MR. SUDDATH:  Objection to
6     form.
7          THE WITNESS:  I don't know,
8     because that number was just given
9     to us.
10 BY MR. SIMMER:
11    Q.   Okay.  Where it says, at the
12 last bullet, Average open rate of 14
13 percent, what's that mean?
14         MR. SUDDATH:  Objection to
15    form.
16         THE WITNESS:  So an open
17    rate on an e-mail is -- refers to
18    if the e-mail is opened by the
19    recipient.
20 BY MR. SIMMER:
21    Q.   So you're representing to a
22 potential supplier -- or, excuse me --
23 strike that.
24         You're representing to a

Page 72

1 supplier that you have an average e-mail
2 open rate of 14 percent, right?
3          MR. SUDDATH:  Objection to
4     form.
5          THE WITNESS:  Correct.
6 BY MR. SIMMER:
7     Q.   Okay.  Look two slides
8 later, the slide ending 319781, Call
9 campaign case study.
10         Do you see that?
11    A.   I do.
12    Q.   And if I understand what's
13 on this page, it is talking about a
14 particular call campaign that you
15 undertook for a supplier, right?
16         MR. SUDDATH:  Objection to
17    form.
18         THE WITNESS:  I didn't do
19    the call campaign, so I don't know
20    anything about it other than what
21    it says here.
22 BY MR. SIMMER:
23    Q.   But that's what the slide
24 says, right?

Page 73

1     A.   That's what it says.
2     Q.   And it says, Product launch
3 support in retail.
4          What is that referring to?
5          MR. SUDDATH:  Objection to
6     form.
7          THE WITNESS:  It would refer
8     to a product that was new to the
9     market, that was distributed to
10    retail pharmacies for their
11    patients.
12 BY MR. SIMMER:
13    Q.   Okay.  Do you know what
14 particular product this is in reference
15 to?
16    A.   I do not.
17    Q.   When it says, under
18 objective, Increase product awareness and
19 take orders prior to new product launch,
20 those are the two objectives for this
21 particular campaign; is that right?
22         MR. SUDDATH:  Objection to
23    form.
24         THE WITNESS:  Again, I

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1 didn't write this or do this
2 campaign. So I do not know, other
3 than I can read what it says.
4 BY MR. SIMMER:
5 Q. That's all you know, what it
6 says here, nothing beyond that?
7 A. Nothing beyond that.
8 Q. You would agree with me,
9 though, when it says, over in the
10 right-hand side, $2 million preorder
11 sales generated in 17 days, in big print,
12 that's representing that your call
13 campaign had a hand in $2 million of
14 preordered sales, right?
15 MR. SUDDATH: Objection to
16 form.
17 THE WITNESS: I don't know
18 the accuracy of that. I don't
19 know anything about it.
20 BY MR. SIMMER:
21 Q. Who prepared that slide?
22 A. I do not know.
23 Q. But this is something that
24 you and the folks working for you send to

Page 75

1 prospective supplier customers, right?
2 A. Correct -- no, not
3 customers.
4 Q. Strike that.
5 Suppliers that you're trying
6 to sell these services to, right?
7 A. Correct.
8 Q. You're not telling them
9 things that are false, are you?
10 A. No.
11 Q. So that's represented to be
12 a true statement, right?
13 MR. SUDDATH: Objection to
14 form.
15 THE WITNESS: I don't know.
16 I didn't do the campaign, and I
17 didn't put these words here. So I
18 would hope that it represents
19 truth, but I don't know.
20 BY MR. SIMMER:
21 Q. But it is your department
22 that sends this slide deck out to
23 suppliers and -- representing the kind of
24 services that you offer, right?

Page 76

1 MR. SUDDATH: Objection to
2 form.
3 THE WITNESS: We use this
4 deck, yes.
5 BY MR. SIMMER:
6 Q. Turn to the section of the
7 slide deck, it's two pages back, where it
8 says, Good Neighbor Pharmacy. I'm just
9 looking at that slide.
10 A. Yes.
11 Q. I think, and I just want to
12 get a clear record, you understand what a
13 Good Neighbor Pharmacy is, right?
14 A. I do.
15 Q. You don't work for them, I
16 think that's what you represented
17 earlier, right?
18 A. Correct.
19 Q. But you have a familiarity
20 with what it is, right?
21 A. A familiarity, yes.
22 Q. So this section of your
23 slide presentation about your services,
24 your marketing services you're offering

Page 77

1 to suppliers, is talking about
2 Amerisource's ability to get in contact
3 with Good Neighbor Pharmacies, right?
4 MR. SUDDATH: Objection to
5 form.
6 THE WITNESS: No, I don't --
7 no, I wouldn't say it's talking
8 about getting in contact with Good
9 Neighbor Pharmacy. No.
10 BY MR. SIMMER:
11 Q. What is this section saying,
12 then?
13 A. It's educating the
14 manufacturer on why it might be important
15 to include Good Neighbor Pharmacy in
16 their educational and awareness
17 campaigns.
18 We're trying to show how
19 large they are, how, you know, strong.
20 Q. Turn two slides later,
21 319786, where it says, Who is Good
22 Neighbor Pharmacy?
23 Do you see that?
24 A. Yes.

Page 78

1    Q.   Right below that, do you see
2  where it says, Good Neighbor Pharmacy is
3  one of the largest networks of
4  independent pharmacies and sixth-largest
5  retail pharmacy chain in the U.S.
6         Do you see that?
7    A.   Uh-huh.
8    Q.   Is that a correct statement?
9    A.   I don't know.
10   Q.   Well, you don't mean it to
11 be incorrect, right?
12        MR. SUDDATH:  Objection to
13   form.
14        THE WITNESS:  I don't mean
15   it to be incorrect.
16 BY MR. SIMMER:
17   Q.   When you send this slide
18 deck to a potential supplier, customer of
19 this service, you mean for this
20 information to be accurate, don't you?
21        MR. SUDDATH:  Objection to
22   form.
23        THE WITNESS:  At the point
24   in time where this was put

Page 79

1    together by Good Neighbor
2    Pharmacy, I would assume that it
3    would be correct.
4  BY MR. SIMMER:
5    Q.   And do you see where it
6  says, in that first bullet, Over 3,100
7  members in the U.S., including Alaska,
8  Hawaii, Guam, Puerto Rico and the U.S.
9  Virgin Islands?
10   A.   I see that.
11   Q.   So that's representing what?
12        MR. SUDDATH:  Objection to
13   form.
14        THE WITNESS:  I don't know.
15   I didn't author this.  This came
16   from Good Neighbor Pharmacy.
17 BY MR. SIMMER:
18   Q.   Have you ever given this
19 presentation to a customer -- strike
20 that.
21        Have you ever given this
22 presentation to a supplier?
23   A.   Yes.
24   Q.   When you get to that slide,

Page 80

1  you just repeat the information and don't
2  have any idea what it means?
3        MR. SUDDATH:  Objection to
4    form.
5        THE WITNESS:  I give the
6    presentation.
7  BY MR. SIMMER:
8    Q.   But you don't know what it
9  means?
10   A.   I don't understand the
11 question, that I don't know what it
12 means.
13        I mean, I know what the
14 words mean.  I don't understand what
15 you're asking.
16   Q.   When it says, Over 3,100
17 members, what does that mean?
18   A.   There are 3,100 independent
19 pharmacies that have the signage Good
20 Neighbor Pharmacy, and whatever else is
21 involved.
22        I don't know what else is
23 involved, because I'm not part of Good
24 Neighbor Pharmacy.

Page 81

1    Q.   And you understand that
2  AmerisourceBergen's subsidiary is the
3  owner of Good Neighbor Pharmacy network,
4  right?
5        MR. SUDDATH:  Objection to
6    form.
7        THE WITNESS:  No, I don't
8    know.
9  BY MR. SIMMER:
10   Q.   You don't have any idea what
11 the relationship between
12 AmerisourceBergen and Good Neighbor
13 Pharmacy is?
14   A.   AmerisourceBergen
15 Corporation?
16   Q.   Yes, sir -- yes, ma'am.
17   A.   I don't know what the
18 legal -- I don't know legally how it's
19 structured, no.
20   Q.   What's your understanding,
21 legal or not, of the relationship between
22 AmerisourceBergen and Good Neighbor
23 Pharmacy?
24   A.   I'm not from the Good

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1 Neighbor Pharmacy area. Good Neighbor
2 Pharmacy is a banner under which
3 independents can stay independent
4 retailers and have some synergies.
5    Q.   Look at the next page, Bates
6 ending 319787, where it says, Where is
7 Good Neighbor Pharmacy?
8        Do you see that?
9    A.   Yes.
10    Q.   What is this representing?
11        MR. SUDDATH:  Objection to
12    form.
13        THE WITNESS:  When it was
14    given to us for the deck, it was
15    to represent how many Good
16    Neighbor Pharmacy banner stores
17    were in each state.
18 BY MR. SIMMER:
19    Q.   And do you see where in Ohio
20 it says, 131?
21    A.   I see 131. And I think I
22 know that's the state of Ohio, so --
23    Q.   And what's your
24 understanding that's representing?

Page 83

1    A.   That there are -- my
2 understanding is this represents there
3 are 131 accounts, stores, independent
4 pharmacies, that have a Good Neighbor
5 Pharmacy banner.
6    Q.   Look two slides later, Bates
7 ending 3l9790.
8        The slide is the -- the
9 heading says, Good Neighbor Pharmacy
10 direct mail.
11        Do you see where it says,
12 Value delivered?
13    A.   Yes.
14    Q.   When the deck says "value
15 delivered," what does that mean?
16        MR. SUDDATH:  Objection to
17    form.
18        THE WITNESS:  It's a clever
19    heading to call to the attention
20    of the manufacturer that this is
21    the scope of this particular
22    marketing campaign.
23 BY MR. SIMMER:
24    Q.   Isn't it the value of the

Page 84

1 services that were delivered?
2        MR. SUDDATH:  Objection to
3    form.
4        THE WITNESS:  I don't
5    understand the question.
6 BY MR. SIMMER:
7    Q.   The value of the services
8 that were delivered?
9        MR. SUDDATH:  Objection to
10    form.
11        THE WITNESS:  No.
12 BY MR. SIMMER:
13    Q.   What's it mean by "value,"
14 then?
15        MR. SUDDATH:  Objection to
16    form.
17        THE WITNESS:  If the
18    manufacturer is trying to reach
19    stores with their educational
20    information, the value of focusing
21    on Good Neighbor Pharmacy could
22    be, you know, that we have this
23    capability.
24        But it's not a -- it's not a

Page 85

1    monetary value or, you know, that
2    kind of value.
3 BY MR. SIMMER:
4    Q.   Then there's a section in
5 the slide deck, beginning 3l9794, about
6 physicians and clinics.
7        What's your understanding is
8 included in that section of the slide
9 deck?
10    A.   So this section of the slide
11 deck was not authored by my group at all.
12 It was -- this comes from another
13 business unit that distributes to
14 physicians and clinics.
15        So we didn't -- this is not
16 authored by my team.
17    Q.   But this is a presentation,
18 you said a moment ago, that you have
19 actually given, right?
20    A.   Yes.
21        And if you notice, this is
22 broken up into three sections; retail,
23 health systems, physicians and clinics.
24 And 99 percent of the time, we did not

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1  present this section.
2      Q.   Who presents it?
3      A.   The information comes from
4  another business unit, and I -- I've not
5  seen them present it.  But we got it from
6  another business unit.
7      Q.   But this is a presentation
8  that you've sent on to suppliers, right?
9          MR. SUDDATH:  Objection to
10  form.
11         THE WITNESS:  It's a section
12     of our presentation that has gone
13     to manufacturer --
14  BY MR. SIMMER:
15     Q.   You're just --
16     A.   -- suppliers, correct.
17     Q.   You're just saying that --
18  I'm sorry, did I interrupt you?
19     A.   No.
20     Q.   You're just saying that this
21  section of the presentation you didn't
22  actually present, you just hand the
23  presentation, the entire presentation on,
24  but some sections you had nothing to do

Page 87

1  with; do I have it right?
2      A.   So, generally, the
3  presentations are given, not just sent
4  on.
5          And what I'm saying is we
6  don't present this section very often,
7  because this is covered by a different
8  business unit.
9      Q.   So if I were to ask you, for
10  example, on Slide 319795, about this
11  direct mail where it says that it has a
12  reach of ████ physician customer
13  practice locations, do you know what
14  that's in reference to?
15         MR. SUDDATH:  Objection to
16     form.
17         THE WITNESS:  No.
18  BY MR. SIMMER:
19     Q.   Do you know what a CSRA
20  stands for?
21     A.   Yes.
22     Q.   What's it stand for?
23     A.   Corporate security and
24  regulatory affairs.

Page 88

1      Q.   Did you work with CSRA to
2  review or approve the manufacture --
3  strike that.
4          Did you work with CSRA to
5  review or approve the supplier materials
6  that you sent on to your customers?
7          MR. SUDDATH:  Objection to
8      form.
9          THE WITNESS:  No.  Me and my
10     team did not specifically work
11     with CSRA.
12         I don't know how else
13     they -- I don't know if they were
14     involved some other way, but I
15     didn't.
16  BY MR. SIMMER:
17     Q.   Am I right that at various
18  times you had a role in manufacturer
19  advisory boards?
20         MR. SUDDATH:  Object to the
21     form.
22         THE WITNESS:  I have
23     participated in a handful of
24     manufacturer advisory boards --

Page 89

1  BY MR. SIMMER:
2      Q.   So is the answer --
3      A.   -- in my career.
4      Q.   -- to my question, yes?
5      A.   In my career, yes.
6      Q.   And what are the
7  manufacturer advisory boards?
8      A.   There's none that take place
9  now, to my knowledge.
10         But they were where the
11  manufacturer would bring people in from
12  the industry, across their customers, be
13  it wholesalers or retailers, to get
14  feedback from them.
15     Q.   Feedback about what?
16     A.   An example would be a
17  product that was being launched, and
18  feedback was, what if we use this bottle
19  size?  What if we use this bottle
20  configuration?  Does it work well within
21  your automation in your warehouse?
22         You know, those kind of
23  things.
24     Q.   I'll hand you what we marked

Page 90

1 as Weber Exhibit-4.
2          - - -
3          (Whereupon,
4     AmerisourceBergen-Weber Exhibit-4,
5     Insys-MDL-007726258-259, was
6     marked for identification.)
7          - - -
8 BY MR. SIMMER:
9     Q.   I'll have you -- or identify
10 that in a moment.  But I'll identify it
11 for the record as an e-mail string, Bates
12 ending -- Insys-MDL-007726258 through
13 007726259.
14        MR. SUDDATH:  Excuse me, Mr.
15     Simmer, do you have an attachment
16     to this?
17        MR. SIMMER:  I'm going to
18     hand it out as an exhibit in just
19     a moment.
20        MR. SUDDATH:  Okay.  Got it.
21     Thank you.
22 BY MR. SIMMER:
23     Q.   Do you see that this is an
24 e-mail from Dina Gabriele at

Page 91

1 AmerisourceBergen, dated August 7,
2 2012 --
3     A.   Yes.
4     Q.   -- to a group of
5 individuals?
6        Would those have been the
7 manufacturer advisory board participants
8 in the "to" line?
9     A.   Yes.
10    Q.   Can you tell from this what
11 companies were in attendance at this
12 manufacturer advisory board?
13    A.   Yes.
14    Q.   Can you just tell --
15 identify, for the record, which companies
16 are included here?
17    A.   Upsher-Smith.  I'm not sure
18 where Brandon was at the time, Metysis,
19 probably.  Bayer.  I don't know about
20 Lovena.  Takeda.  Boehringer Ingelheim.
21 Novo Nordisk.  Merck.  AstraZeneca.
22 Pfizer.  AbbVie.  Esai.  Bausch and Lomb.
23 J&J.  I'm not sure about Walt.
24    Q.   It appears Insys was one of

Page 92

1 the attendees as well, right?
2     A.   I don't know at that point
3 in time if Dion worked for -- which
4 company he worked for.
5     Q.   But Dion, at one point,
6 worked for Insys, right?
7     A.   Yes.
8     Q.   And it says, Subject, MAB
9 agenda/topics.
10        What does "MAB" stand for?
11    A.   Manufacturer advisory board.
12    Q.   You see on the "cc" line a
13 group of individuals.
14        Who are those?
15    A.   They are all -- were
16 AmerisourceBergen employees.
17    Q.   So Michael Kody is an
18 AmerisourceBergen employee, correct?
19    A.   Former.
20    Q.   Melissa Lattanzi?
21    A.   Current.
22    Q.   Akin Odutola?
23    A.   Current.
24    Q.   Jack Callahan?

Page 93

1     A.   Current.
2     Q.   Michael Cristinzio?
3     A.   Former.
4     Q.   Elizabeth McMahon?
5     A.   Current.
6     Q.   And Dina Gabriele?
7     A.   Current.
8     Q.   So that appears to be the
9 individuals from AmerisourceBergen that
10 had some role in the manufacturer
11 advisory board, correct?
12        MR. SUDDATH:  Objection to
13     form.
14        THE WITNESS:  No, not
15     necessarily a role.  Most of us
16     were simply attendees.
17 BY MR. SIMMER:
18    Q.   By "role" I mean that either
19 were presenters and/or simply attending.
20    A.   Yes.
21    Q.   Do you see in the first
22 paragraph in Ms. Gabriele's e-mail she
23 says, Please find attached a draft of the
24 agenda and topics we plan to discuss.

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1 This year, the structure of the meeting
2 will be slightly different. There will
3 be three discussion topics: Managed
4 provider networks, pathway to
5 pharmaceutical tracking, and data --
6 strike that -- pathway to pharmaceutical
7 tracking, and data for strategic
8 decisions.
9        Do you see that?
10 A.   Yes.
11           - - -
12      (Whereupon,
13      AmerisourceBergen-Weber Exhibit-5,
14      Insys-MDL-007726260, was marked
15      for identification.)
16           - - -
17 BY MR. SIMMER:
18     Q.   I'll hand you what we marked
19 as Weber Exhibit-5. I'll identify it for
20 the record as Insys-MDL-007726260
21 through -- I guess this was produced
22 natively, so they just put the Bates
23 number on the first page only.
24        Did you have an opportunity

Page 95

1 to review this document?
2     A.   Yes.
3     Q.   Do you have an idea of what
4 this is?
5     A.   I didn't recall it.
6     Q.   But this is the manufacturer
7 advisory board that you were in
8 attendance at?
9     A.   Correct.
10     Q.   And it looks like this was
11 distributed in advance of this
12 manufacturer advisory board, correct?
13     A.   It looks that way to me,
14 too.
15     Q.   And, again, the purpose of
16 the manufacturer advisory board is to do
17 what?
18        MR. SUDDATH: Objection to
19     form.
20        THE WITNESS: To ask
21     manufacturers' opinions about
22     industry issues that impact both
23     of us.
24 BY MR. SIMMER:

Page 96

1     Q.   Can I direct your attention
2 to the slide, MAB Topic 1, managed
3 provider networks?
4        Do you see where it says,
5 Preparation questions?
6     A.   Yes.
7     Q.   The first bullet right below
8 that, do you see where it says, and I'll
9 quote, How can manufacturers partner with
10 providers to facilitate patient
11 compliance?
12        Do you see that?
13     A.   I see that.
14     Q.   What's your understanding
15 that's saying?
16     A.   I have no idea.
17     Q.   So when we're talking about
18 manufacturers, those are the -- that's
19 asking those in attendance, the
20 manufacturer representatives, is it not,
21 what their views are about how they can
22 partner -- and what is meant by
23 "partner," do you have any clue?
24        MR. SUDDATH: Objection to

Page 97

1     form.
2        THE WITNESS: I wouldn't
3     know.
4 BY MR. SIMMER:
5     Q.   And when it references
6 "providers," do you know what that is in
7 reference to?
8        MR. SUDDATH: Objection to
9     form.
10        THE WITNESS: I don't know
11     what this question refers to.
12 BY MR. SIMMER:
13     Q.   Okay. I'll direct your
14 attention to the last slide in the deck,
15 MAB Topic 3: Data for strategic
16 decisions.
17     A.   Okay.
18     Q.   And it has a series of trade
19 questions, all of them having to do with
20 data.
21        What's your understanding
22 is -- that AmerisourceBergen is doing
23 asking these drug companies about data?
24        MR. SUDDATH: Objection to

Page 98

1    form.
2        THE WITNESS:  There's
3    data -- certain data is
4    contractually, we're contractually
5    required to share with the
6    manufacturer about their own
7    company's inventory position in
8    our distribution centers, right.
9    And that sort of data, that's
10   what's referred to in the 852/867.
11       So we are just asking, if
12   they had a wish list of what I
13   really want to see, you know, is
14   there something more that they
15   would want that data to provide
16   them, in the context of what it is
17   today, right?
18       It's just, today, it's, I
19   sold 300 bottles and now I have 30
20   left on the shelf.
21           - - -
22       (Whereupon,
23   AmerisourceBergen-Weber Exhibit-6,
24   Insys-MDL-007754340-343, was

Page 99

1    marked for identification.)
2           - - -
3    BY MR. SIMMER:
4        Q.   I'll hand you what we've
5    marked as Weber Exhibit-6. I'll identify
6    it for the record as Insys-MDL-007754340
7    through 007754343.
8        A.   Just so I understand what
9    I'm looking at here, not all the
10   attachments are included?
11       Q.   I'm giving you what was
12   produced to us. So this is the way it
13   came to us.
14       Let me ask you some
15   questions about this.
16       Before I forget, the e-mail
17   two exhibits ago seemed to indicate that
18   these manufacturer advisory boards were
19   held annually; is that correct?
20       A.   At a point in time, yes,
21   they were held annually.
22       Q.   So there came a time when
23   the manufacturer advisory boards were
24   stopped; is that correct?

Page 100

1        A.   Yes. The structure is not
2    called the manufacturer advisory board.
3        Q.   I don't follow your answer.
4        You say the structure is
5    not called --
6        A.   So the name is not
7    manufacturer advisory board. That the
8    manufacturer advisory board doesn't
9    exist.
10       Q.   So is there something else
11   that is being held instead of the
12   manufacturer advisory board that goes by
13   a different name?
14       MR. SUDDATH:  Objection to
15   form.
16       THE WITNESS:  It's -- there
17   is -- there are manufacturer
18   meetings. But they are not the
19   manufacturer advisory board. So
20   there are manufacturer-facing
21   groups, meetings with those types
22   of people, but at a higher level
23   than the people that are on this
24   e-mail, called manufacturer

Page 101

1    planning council.
2    BY MR. SIMMER:
3        Q.   And those are meetings that
4    AmerisourceBergen holds with
5    manufacturers, correct?
6        A.   Correct.
7        THE WITNESS:  Sorry, my mic
8    came off.
9    BY MR. SIMMER:
10       Q.   Now, is it the case that
11   those manufacturer planning council
12   meetings took the place of the
13   manufacturer advisory boards?
14       A.   I guess you could say they
15   took the place. But they are not -- to
16   my knowledge, they are not the same
17   meetings.
18       I don't attend the
19   manufacturer planning council meetings,
20   so I couldn't really say that they took
21   the place.
22       Q.   I think you're saying that
23   higher-level employees -- strike that.
24       I think you're saying that

Page 102

1 higher-level representatives from the
2 manufacturers that are in attendance than
3 are on this list are the ones that come
4 to these councils, right?
5     A.   Yes, because --
6         MR. SUDDATH:  Objection to
7 form.
8         You can go ahead.
9         THE WITNESS:  My
10 understanding is the topics are
11 very strategic as opposed to
12 tactical, so there -- it's
13 higher-level people.
14 BY MR. SIMMER:
15     Q.   And what types of strategic
16 areas are discussed at these manufacturer
17 planning council meetings?
18         MR. SUDDATH:  Objection.
19         THE WITNESS:  I don't
20 attend, so I don't know.  And I
21 don't recall if I heard them, the
22 topics, before.
23 BY MR. SIMMER:
24     Q.   Who attends on behalf of

Page 103

1 AmerisourceBergen?
2         MR. SUDDATH:  Objection to
3 form.
4         THE WITNESS:  I don't know
5 specifically.
6 BY MR. SIMMER:
7     Q.   How often are they held?
8         MR. SUDDATH:  Objection.
9         THE WITNESS:  I don't know.
10 I couldn't tell you for sure.
11 BY MR. SIMMER:
12     Q.   Is AmerisourceBergen the
13 only distributor that attends these
14 meetings?
15         MR. SUDDATH:  Objection to
16 form.
17         THE WITNESS:  Well, yes.
18 Yes.
19 BY MR. SIMMER:
20     Q.   So AmerisourceBergen is the
21 convener of these planning council
22 meetings?
23         MR. SUDDATH:  Objection to
24 form.

Page 104

1         THE WITNESS:  I don't know
2 what "convener" means, sorry.
3 BY MR. SIMMER:
4     Q.   Well, let me clarify, then.
5         Are they the ones that send
6 out the invitations to the manufacturers
7 to attend these planning council
8 meetings?
9     A.   Correct.
10         MR. SUDDATH:  Objection to
11 form.
12 BY MR. SIMMER:
13     Q.   You talked over each other.
14 Let's make sure we get that.
15         You said that they do send
16 out the invitations; isn't that right?
17     A.   Correct.
18         MR. SUDDATH:  Objection.
19 BY MR. SIMMER:
20     Q.   Do you know what
21 manufacturers attend these meetings?
22     A.   I do not.
23     Q.   How is it you know about
24 these meetings?

Page 105

1     A.   It was a topic at a recent
2 staff meeting.
3     Q.   And what did you hear about
4 that?
5     A.   I don't recall.  It
6 didn't -- it wasn't applicable to me, it
7 was just a topic on the agenda.
8     Q.   So the -- what I've handed
9 you as Exhibit-6 is an e-mail from Dina
10 Gabriele to -- I think it looks like the
11 same individuals we just looked at in the
12 prior e-mail string, right?
13         It's a group of drug company
14 representatives, and the cc a group of
15 AmerisourceBergen employees, if I have it
16 right, correct?
17     A.   It looks -- the manufacturer
18 employees look to be the same, and
19 there's additional AmerisourceBergen
20 people on there.
21     Q.   When it says, Subject, 2012
22 manufacturer advisory board meeting
23 recap/summaries, do you have an
24 understanding what that's in reference

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1 to?
2      A.   It's a post-meeting summary.
3      Q.   Okay.  Can I direct your
4 attention to the attachment to this
5 e-mail?  It appears to be the notes to
6 this meeting.
7          Do you see what I'm saying?
8      A.   Yes.
9      Q.   Can I direct your attention
10 to Bates ending 7754342, where it says at
11 the bottom of the page,
12 Patient/prescriber data.
13         Do you see that?
14     A.   I see that.
15     Q.   This seems to be a reference
16 to the AmerisourceBergen data that is
17 being provided to manufacturers.
18         Do you agree with me?
19         MR. SUDDATH:  Objection.
20         THE WITNESS:  I have no
21     idea.
22 BY MR. SIMMER:
23     Q.   So what's represented in
24 these notes, you don't have any idea what

Page 107

1 this content means?
2      A.   I don't have any idea what
3 that content means, that
4 patient/prescriber data.
5             - - -
6          (Whereupon,
7          AmerisourceBergen-Weber Exhibit-7,
8          Insys-MDL-007731066-072, was
9          marked for identification.)
10            - - -
11 BY MR. SIMMER:
12     Q.   I asked you earlier today if
13 you had responsibilities for the new
14 supplier Insys, I-N-S-Y-S, Therapeutics
15 that was launching a drug product.
16         Do you remember that you had
17 responsibility for Insys?
18         MR. SUDDATH:  Objection.
19         THE WITNESS:  I think I told
20     you I didn't remember whether I
21     was in my current role when Insys
22     was set up as a supplier or not.
23 BY MR. SIMMER:
24     Q.   Okay.  I'll hand you what we

Page 108

1 marked as Exhibit-7, Insys-MDL-007731066
2 and it goes through Bates ending
3 007731072.
4          I'll represent to you there
5 were a whole stack of exhibits attached
6 to this.  We only printed several of them
7 for -- to save some trees.
8          While you can feel free to
9 look at all of the attachments, I have
10 just some pretty general questions about
11 them, so you don't have to be responsible
12 for the content of those attachments.
13         Can I direct your attention
14 to the second page of this exhibit that's
15 Bates ending 7731067 --
16     A.   Okay.
17     Q.   -- the e-mail from Jim
18 Papazis, dated January 9th, 2012, to
19 Elizabeth McMahon.
20         Do you see that?
21     A.   Yes.
22     Q.   Am I right that she is a --
23 she was, at least at this time, an
24 AmerisourceBergen employee?

Page 109

1      A.   Correct.
2      Q.   And do you see in his e-mail
3 where he says, Elizabeth, let me
4 introduce myself.  My name is Jim
5 Papazis, and I am the director, managed
6 markets at Insys Therapeutics.  We at
7 Insys have just received FDA approval for
8 our first product, Subsys.  Joe Puma at
9 Alkermes forwarded your contact
10 information to me.  We would like to
11 begin the new vendor process and fill out
12 the necessary paperwork.
13         Do you see that?
14     A.   Yes.
15     Q.   And then two days later, Ms.
16 McMahon responds, Hi Jim, the ABDC
17 contact for new supplier setup is Celia
18 Weber.
19         That's you, right?
20     A.   Correct.
21     Q.   And then do you see in the
22 next e-mail in the string is from you,
23 dated two days later, to Mr. Papazis.
24         Do you see where I'm

Page 110

1 talking?
2    A.   Yes.
3    Q.   And you say, Mr. Papazis,
4 attached are all the informational and
5 required documents that AmerisourceBergen
6 Drug Corporation will need from Insys in
7 order to evaluate setting the company up
8 as a supplier.
9       Do you see that?
10   A.   Yes.
11   Q.   Do you see, in the second
12 paragraph where you say, and I'll quote,
13 While all the documents are generally
14 self-explanatory, please feel free to
15 contact me with any questions you may
16 have.  I will be your main contact
17 throughout the setup process.
18       Do you see that?
19   A.   Yes.
20   Q.   I think we talked about that
21 earlier, with a new supplier, that you
22 had the role, through the setup process,
23 to gather the necessary information; is
24 that right?

Page 111

1    A.   Yes.
2    Q.   Would you have had a role in
3 the -- strike that.
4       You sent Mr. Papazis, it
5 appears, the distribution agreement; is
6 that right?
7       I think it's called the
8 distribution services agreement.
9    A.   Yes.
10   Q.   And so I think you said
11 earlier that you handed the actual
12 negotiation of that agreement off to
13 someone else in your organization, right?
14   A.   Yes.  So when I reference,
15 Once set up, Insys will be assigned to a
16 category manager, that's the person that
17 would negotiate the distribution
18 agreement, unless it was assigned to me.
19      Because this e-mail is from
20 a period of time before I was the senior
21 director of operations and marketing.  So
22 this would have been in my old role as
23 the -- managing distribution agreements.
24   Q.   Do you recall also entering

Page 112

1 into a distribution services agreement
2 with Insys?
3    A.   I don't recall, but we would
4 have.
5          - - -
6       (Whereupon,
7       AmerisourceBergen-Weber Exhibit-8,
8       ABDCMDL00045043-045, was marked
9       for identification.)
10         - - -
11 BY MR. SIMMER:
12   Q.   I'll hand you what we marked
13 as Weber Exhibit-8.  I'll identify it for
14 the record as ABDCMDL00045043 through
15 45045.
16      Do you see where, at the top
17 of this document, actually, the word is
18 misspelled, but it says, Amendment to
19 distribution services agreement?
20   A.   It is misspelled.
21      Yes, I see that.
22   Q.   It's the English teacher in
23 me, I can't get over that stuff.
24      Would you agree with me this

Page 113

1 appears to be an amendment to the
2 distribution services agreement that the
3 company had already entered into with
4 Insys?
5    A.   Yes, that's what it appears
6 to me.
7    Q.   And do you see where, in the
8 whereas clauses, it talks about, in the
9 second paragraph, I'll read it into the
10 record, Where a supplier has FDA approval
11 for the products listed on the attached
12 Schedule I, collectively transmucosal
13 immediate-release fentanyl (TIRF) REMS
14 products, closed quote, which are subject
15 to a FDA-mandated risk evaluation and
16 mitigation strategy program (TIRF) REMS
17 program, closed quote, closed parens.
18      What's your understanding of
19 what this is talking about?
20      MR. SUDDATH:  Objection.
21      THE WITNESS:  The REMS
22 program that the FDA has mandated
23 for this requires the wholesaler
24 to do some additional work to make

Highly Confidential - Subject to Further Confidentiality Review

|  | Page 114 |
|---|---|

1     sure that only eligible pharmacy
2     customers receive the product.
3 BY MR. SIMMER:
4     Q.   And so our record is clear,
5 what do you understand the REMS -- REMS
6 program to include?
7        MR. SUDDATH: Objection.
8        THE WITNESS: I couldn't say
9     what it -- without reading from
10     this, I couldn't, off the top of
11     my head, say what all is included
12     in obligations under the REMS
13     mandates.
14 BY MR. SIMMER:
15     Q.   It appears to be something
16 that the FDA mandated that Insys supply;
17 is that right?
18        MR. SUDDATH: Objection.
19        THE WITNESS: I wouldn't
20     know that, other than what it says
21     here about it being an FDA
22     program.
23 BY MR. SIMMER:
24     Q.   Do you recall this

|  | Page 115 |
|---|---|

1 particular amendment?
2     A.   No.
3     Q.   So do I have it right that
4 this would have been an agreement that
5 you would have not -- other than sending
6 it on to Insys, you would have had no
7 role in the negotiation of?
8     A.   That is correct.
9     Q.   So if I were to ask you
10 questions about who signed this agreement
11 for Insys, you wouldn't know who that
12 person is?
13     A.   I couldn't say, without you
14 asking me the question whether I knew
15 that person or not.
16     Q.   Do you know who Michael
17 Babich is?
18     A.   No, I don't know him.
19     Q.   He's the person who signed
20 the agreement for Insys, and he
21 represents his title as president and
22 CEO?
23     A.   I don't know him.
24     Q.   Okay.

|  | Page 116 |
|---|---|

1        - - -
2     (Whereupon,
3     AmerisourceBergen-Weber Exhibit-9,
4     Insys Therapeutics, Inc., 10-K,
5     12/31/16, was marked for
6     identification.)
7        - - -
8 BY MR. SIMMER:
9     Q.   Is it fair to say the
10 distribution services that
11 AmerisourceBergen offers would be quite
12 important to a product launch for a new
13 supplier, a new drug company like Insys?
14        MR. SUDDATH: Objection to
15     form.
16        THE WITNESS: I couldn't
17     rate that differently than
18     anything else a manufacturer might
19     do for their product launch.
20 BY MR. SIMMER:
21     Q.   You've been negotiating and
22 handling distribution agreements for
23 years, right?
24     A.   Uh-huh.

|  | Page 117 |
|---|---|

1     Q.   And am I right that there
2 are three principal distributors of drugs
3 in America, right?
4     A.   Today that's true, yes.
5     Q.   So we're talking about
6 Cardinal, McKesson and AmerisourceBergen,
7 right?
8     A.   Correct.
9     Q.   And so a company like Insys,
10 if it doesn't have a distribution
11 agreement with AmerisourceBergen, it's
12 going to find it pretty difficult to
13 distribute its product; isn't that right?
14        MR. SUDDATH: Objection.
15        THE WITNESS: I couldn't
16     answer for the manufacturer on
17     what their commercialization
18     strategy is.
19 BY MR. SIMMER:
20     Q.   I'll hand you what we marked
21 as Weber Exhibit-9. I'll represent to
22 you this is a 200-page document, and what
23 we did is just produce or -- here, three
24 pages.

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1    And I'll identify it for the
2  record as the Insys Therapeutics, Inc.,
3  Form 10-K, dated 12/31/2016.  We
4  replicated here the first page of the
5  10-K and then Page 33.
6    And for your purposes, I'd
7  like to direct your attention to Page 33
8  and just have you look at, in the middle
9  of the page, you see the heading where it
10  says, We depend on wholesale
11  pharmaceutical distributors for retail
12  distribution of Subsys.  If we lose any
13  of our significant wholesale
14  pharmaceutical distributors, our business
15  could be harmed.
16    Do you see that?
17    A.  I see that.
18    Q.  Let me direct your attention
19  to the language below that.
20    I'll read it into the
21  record, and I quote, The majority of our
22  sales of Subsys are to wholesale
23  pharmaceutical distributors who, in turn,
24  sell the products to pharmacies,

Page 119

1  hospitals and other customers.  For the
2  year ended December 31, 2016, four
3  wholesale pharmaceutical distributors,
4  Rochester Drug Cooperative, Inc.,
5  AmerisourceBergen Corporation, McKesson
6  Corporation, and Cardinal Health, Inc.,
7  individually comprised approximately 15
8  percent, 17 percent, 16 percent and 14
9  percent respectively of our total gross
10  sales of Subsys.  The loss by us of any
11  of these wholesale pharmaceutical
12  distributor's accounts or a material
13  reduction in their purchases could have a
14  material adverse effect on our business,
15  results of our -- strike -- results of
16  operations, financial condition and
17  prospects.
18    Do you see that?
19    A.  Uh-huh.
20    Q.  Other than my fumbling there
21  for a moment, did I read that correctly?
22    A.  Yes.
23    Q.  Do you see where they say
24  that the loss of the distributor account

Page 120

1  with any of these distributors would have
2  a material adverse effect on their
3  business?
4    MR. SUDDATH:  Objection.
5    THE WITNESS:  Are you asking
6  did I -- do I see that?
7  BY MR. SIMMER:
8    Q.  Yes.
9    A.  Yes, I see that.
10    Q.  And so any reason to dispute
11  that the loss of a relationship of
12  AmerisourceBergen would be material to
13  the Insys business?
14    MR. SUDDATH:  Objection.
15    THE WITNESS:  I could not
16  comment on something that was
17  written by Insys.  And I --
18  BY MR. SIMMER:
19    Q.  No reason to believe that's
20  an incorrect statement, however, right?
21    MR. SUDDATH:  Objection.
22    THE WITNESS:  I couldn't get
23  inside the author's head and know
24  whether this was correct or not.

Page 121

1  BY MR. SIMMER:
2    Q.  Okay.
3    - - -
4    (Whereupon,
5    AmerisourceBergen-Weber
6    Exhibit-10, ABDCMDL00002123-125,
7    was marked for identification.)
8    - - -
9  BY MR. SIMMER:
10    Q.  I'll hand you what we marked
11  as Weber Exhibit-10.  I'll identify it
12  for the record as --
13    MR. SIMMER:  Tom, would it
14  be okay if I use the bottom Bates
15  on this?  There are two of them on
16  here.  I think the one is -- for
17  the MDL is what we can use for our
18  purposes.
19    MR. SUDDATH:  That's fine,
20  Mr. Simmer.
21  BY MR. SIMMER:
22    Q.  I'll identify for the record
23  as ABDCMDL00002123 through 2125.
24    You see on the heading on

Page 122

1 the first page, it says, Services
2 Agreement?
3     A.    Yes.
4     Q.    And do you see where it
5 says, This is a service agreement by and
6 between Purdue Pharma, LP and
7 AmerisourceBergen Services Corporation?
8     A.    Yes.
9     Q.    So I think this is an
10 agreement for the kind of services that
11 we were talking -- we've been talking
12 about today, the marketing services that
13 AmerisourceBergen offers to suppliers,
14 right?
15         MR. SUDDATH:  Objection to
16     form.
17         THE WITNESS:  This is a
18     services agreement for educational
19     and product awareness, yes.
20 BY MR. SIMMER:
21     Q.    And this particular example,
22 it's with Purdue Pharmaceuticals, right?
23     A.    Correct.
24     Q.    Do you see in the second

Page 123

1 paragraph, do you see where it says, and
2 I'll quote, Vendor is engaged by company
3 to educate pharmacies about Butrans,
4 buprenorphine transdermal system, using
5 ABC's custom connect e-mail campaign
6 services to reach and message pharmacy
7 customers targeting products as
8 determined by Purdue.
9         Do you see that?
10     A.    Yes.
11     Q.    So what's being offered here
12 to Purdue?
13     A.    An e-mail that they author
14 that goes out to specific customers of
15 ABDC.
16     Q.    And there are bullets below
17 that.
18         Do you see where it says, A
19 one-time customizable e-mail blast to
20 target customer?
21     A.    Right.
22     Q.    A second bullet, Pricing
23 includes up to 5,000 targets.
24         Third bullet, The estimated

Page 124

1 number of targets for this specific
2 campaign is 2,000.
3     A.    Yes.
4     Q.    Last bullet is, Additional
5 fees may apply for additional targets.
6 Target deployment is no later than
7 December 31, 2016.
8         Is that right?
9     A.    Correct.
10     Q.    So this is describing what
11 it is AmerisourceBergen is actually going
12 to do under this services agreement,
13 right?
14         MR. SUDDATH:  Objection to
15     form.
16         THE WITNESS:  Broadly, yes.
17 BY MR. SIMMER:
18     Q.    Is there more to it than
19 that?
20     A.    No.
21     Q.    Can I direct your attention
22 to Page 2, the bottom of the page?
23         And you see the paragraph
24 where it says, Notices?

Page 125

1     A.    Yes.
2     Q.    And you see, and I'll quote,
3 All legal notices or demands provided for
4 by this agreement will be in writing and
5 will be deemed to have been given when
6 delivered by certified mail, return
7 receipt requested or by overnight
8 courier.
9         Do you see that?
10     A.    Yes.
11     Q.    And you see it has three
12 different blocks below that?
13     A.    Yes.
14     Q.    And where it says, To
15 vendor, over to the right, it says,
16 AmerisourceBergen Corporation, and then
17 you see, Attention:  Celia Weber.
18         Do you see that?
19     A.    Yes.
20     Q.    So you are the person that,
21 under this agreement, is to receive
22 notice of any -- of any kind under this
23 agreement, right?
24         MR. SUDDATH:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1 form.
2 THE WITNESS: This was
3 obviously an error by our legal
4 department. Because, generally,
5 there's another paragraph that
6 says it should also go to general
7 counsel.
8 But I see what you're
9 saying.
10 BY MR. SIMMER:
11 Q. You would agree with me
12 that's your name, right?
13 A. Yep.
14 Q. So if there's any notice
15 about this agreement, it's supposed to
16 come to you, right?
17 MR. SUDDATH: Objection to
18 form.
19 THE WITNESS: That's how I
20 read it, too, yep.
21 BY MR. SIMMER:
22 Q. And the signature on this
23 agreement, I think, is the individual you
24 said that was the head of the division

Page 127

1 you work in, right?
2 A. Correct.
3 Q. Now, let me just go back
4 here.
5 We've looked at the
6 distribution agreement and the materials
7 that you forwarded on to Insys for its
8 drug Subsys, which you saw was a
9 controlled substance, right?
10 A. Uh-huh, right.
11 Q. And we have one here with
12 Purdue for the drug Butrans, which is
13 also a controlled substance, right?
14 A. Two distinctly different
15 contracts.
16 Q. I understand.
17 A. Right.
18 Q. I guess my question is, in
19 the course of entering into these
20 different kinds of agreements, is that
21 something that CSRA would have had an
22 input on?
23 MR. SUDDATH: Objection.
24 THE WITNESS: Specifically,

Page 128

1 they have input into any supplier
2 that is set up in the system to do
3 business with, they approve the
4 various licensing.
5 - - -
6 (Whereupon,
7 AmerisourceBergen-Weber
8 Exhibit-11, USDC District of
9 Massachusetts, USA V Babich,
10 Burlakoff, Gurry, Simon, Lee,
11 Rowan, was marked for
12 identification.)
13 - - -
14 BY MR. SIMMER:
15 Q. Are you aware of the fact
16 that Insys has been -- strike that.
17 Are you aware of the fact
18 that a number of individuals at Insys
19 have been indicted?
20 A. No.
21 Q. I'll hand you what has been
22 marked as Exhibit-11. I'll identify it
23 for the record. I'm just going to look
24 at a couple of pages in it, so I'm not

Page 129

1 expecting you to have any knowledge about
2 it.
3 This is a pleading entitled,
4 United States of America versus six
5 individuals, Michael L. Babich, Alec
6 Burlakoff, Michael Gurry, Richard Simon,
7 Sunrise Lee and Joseph A. Rowan. It's
8 dated December 6th, 2016.
9 You see the top of the page
10 there?
11 A. Yes.
12 Q. You say that you're not
13 familiar with the fact that Insys
14 indicted -- these individuals -- strike
15 that -- these individuals at Insys were
16 indicted?
17 A. No, I don't recall that.
18 Q. Can I direct your attention
19 to Page 6, Paragraph 12? Let me read
20 this into the record.
21 Do you see where it says,
22 and I'll quote, By bribing practitioners
23 to write prescriptions for fentanyl spray
24 and then defrauding insurers, the

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1  defendants and coconspirators, known and
2  unknown to the grand jury, dramatically
3  increased the volume of prescriptions
4  written for fentanyl spray, and
5  thereafter, the rate at which insurers
6  approved payment for the drug, generating
7  substantial profits for the company, the
8  defendants and coconspirators, known and
9  unknown to the grand jury, including the
10 coconspirator practitioners.
11         Do you see that?
12     A.   I see that.
13     Q.   Were you aware of this at
14 all?
15     A.   No.
16     Q.   Look at Paragraph 19, if you
17 would.
18         Do you see where it says,
19 The TIRF REMS access program included
20 several elements designed to protect
21 patients from the risks associated with
22 TIRF drugs.  The program required, among
23 other things, that TIRF medicines only be
24 dispensed to an outpatient when the

Page 131

1  practitioner prescribing the drug, the
2  patient, and the pharmacy dispensing the
3  TIRF medicine had each been educated
4  about the risks associated with the drug.
5         Do you see that?
6     A.   Yes.
7     Q.   And I can read more of this,
8  and I don't know that that's absolutely
9  necessary.
10         This is something you're
11 just not familiar with; am I right?
12     A.   Correct.  This is not in my
13 area.
14     Q.   Let me ask you, if you had
15 been aware of the fact that these
16 individuals were indicted, including the
17 CEO of the company, would you have
18 entered into this services agreement that
19 we just looked at a moment ago?
20         MR. SUDDATH:  Objection.
21         THE WITNESS:  I couldn't
22     speak to that at all.  That's way
23     above my pay grade.
24 BY MR. SIMMER:

Page 132

1     Q.   Who would I speak to about
2  that, in terms of finding out whether
3  AmerisourceBergen would have entered into
4  a services agreement like that with
5  Insys, in light of the fact that these
6  individuals were indicted?
7         MR. SUDDATH:  Objection.
8         THE WITNESS:  I have no
9     idea.
10         MR. SIMMER:  I have nothing
11     further.
12         VIDEO TECHNICIAN:  Off
13     record at 5:08 p.m.
14         - - -
15         (Whereupon, the deposition
16     was concluded at 5:08 p.m.)
17         - - -
18
19
20
21
22
23
24

Page 133

1         CERTIFICATE
2
3
4         I HEREBY CERTIFY that the
5  witness was duly sworn by me and that the
6  deposition is a true record of the
7  testimony given by the witness.
8
9
10
         Amanda Maslynsky-Miller
11       Certified Realtime Reporter
         Dated:  January 27, 2019
12
13
14
15
16
17         (The foregoing certification
18 of this transcript does not apply to any
19 reproduction of the same by any means,
20 unless under the direct control and/or
21 supervision of the certifying reporter.)
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 134

## INSTRUCTIONS TO WITNESS

1
2
3       Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8       After doing so, please sign
9  the errata sheet and date it.
10      You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14      It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 136

## ACKNOWLEDGMENT OF DEPONENT

1
2
3       I,_____, do
   hereby certify that I have read the
   foregoing pages,  1 - 132, and that the
4  same is a correct transcription of the
   answers given by me to the questions
5  therein propounded, except for the
   corrections or changes in form or
6  substance, if any, noted in the attached
   Errata Sheet.
7
8
   _____
9  CELIA WEBER          DATE
10
   Subscribed and sworn
11  to before me this
   _____ day of _____, 20____.
12
   My commission expires:_____
13
14 _____
   Notary Public
15
16
17
18
19
20
21
22
23
24

Page 135

1         - - - - - -
       E R R A T A
2         - - - - - -
3  PAGE  LINE  CHANGE/REASON
4  _____ _____ _____
5  _____ _____ _____
6  _____ _____ _____
7  _____ _____ _____
8  _____ _____ _____
9  _____ _____ _____
10 _____ _____ _____
11 _____ _____ _____
12 _____ _____ _____
13 _____ _____ _____
14 _____ _____ _____
15 _____ _____ _____
16 _____ _____ _____
17 _____ _____ _____
18 _____ _____ _____
19 _____ _____ _____
20 _____ _____ _____
21 _____ _____ _____
22 _____ _____ _____
23 _____ _____ _____
24 _____ _____ _____

Page 137

1      LAWYER'S NOTES
2  PAGE  LINE
3  _____ _____ _____
4  _____ _____ _____
5  _____ _____ _____
6  _____ _____ _____
7  _____ _____ _____
8  _____ _____ _____
9  _____ _____ _____
10 _____ _____ _____
11 _____ _____ _____
12 _____ _____ _____
13 _____ _____ _____
14 _____ _____ _____
15 _____ _____ _____
16 _____ _____ _____
17 _____ _____ _____
18 _____ _____ _____
19 _____ _____ _____
20 _____ _____ _____
21 _____ _____ _____
22 _____ _____ _____
23 _____ _____ _____
24 _____ _____ _____