```
 1     IN THE DISTRICT COURT OF CLEVELAND COUNTY
                 STATE OF OKLAHOMA
 2

     STATE OF OKLAHOMA, ex rel.,
 3   MIKE HUNTER,
     ATTORNEY GENERAL OF OKLAHOMA,
 4
                Plaintiffs
 5
     vs.                     Case No. CJ-2017-816
 6
     (1) PURDUE PHARMA, L.P.;
 7   (2) PURDUE PHARMA, INC.;
     (3) THE PURDUE FREDERICK COMPANY;
 8   (4) TEVA PHARMACEUTICALS USA, INC.;
     (5) CEPHALON, INC.;
 9   (6) JOHNSON & JOHNSON;
     (7) JANSSEN PHARMACEUTICALS, INC.;
10   (8) ORTHO-McNEIL-JANSSEN
     PHARMACEUTICALS, INC., n/k/a
11   JANSSEN PHARMACEUTICALS, INC.;
     (9) JANSSEN PHARMACEUTICA, INC.,
12   n/k/a JANSSEN PHARMACEUTICALS, INC.;
     (10) ALLERGAN, PLC, f/k/a ACTAVIS PLC,
13   f/k/a ACTAVIS, INC., f/k/a WATSON
     PHARMACEUTICALS, INC.;
14   (11) WATSON LABORATORIES, INC.;
     (12) ACTAVIS, LLC; and
15   (13) ACTAVIS PHARMA, INC.,
     f/k/a WATSON PHARMA, INC.,
16
                Defendants.
17

18    VIDEOTAPED DEPOSITION OF LYNN WEBSTER, M.D.

19        TAKEN ON BEHALF OF THE PLAINTIFF

20   ON FEBRUARY 18, 2019, BEGINNING AT 9:11 A.M.

21             IN SALT LAKE CITY, UTAH

22

23

24   REPORTED BY:  VICKIE LARSEN, CSR/RMR

25
```

Confidential                                    JAN-MS-05484142

Lynn Webster, M.D.
February 18, 2019                                        2

```
 1              A P P E A R A N C E S

 2

 3    For the Plaintiffs:

 4            Trey Duck
              Ross Leonoudakis
 5            NIX, PATTERSON & ROACH, LLP
              3900 N. Capital of Texas Highway
 6            Building B, Suite 350
              Austin, Texas 78746
 7            512.328.5333
              Tduck@nixlaw.com
 8            Rossl@nixlaw.com

 9    For the Johnson & Johnson and Janssen
      Defendants:
10
              Houman Ehsan, M.D.
11            Ryan Snyder (present by phone)
              O'MELVENY & MYERS, LLP
12            400 South Hope Street, 18th Floor
              Los Angeles, California 90071
13            213.430.6000
              Hehsan@omm.com
14            Rsnyder@omm.com

15    For the Purdue Defendants:

16            Nathan E. Hoffman
              Margaret O'Connor (present by phone)
17            DECHERT LLP
              35 W. Wacker Drive, Suite 3400
18            Chicago, Illinois 60601
              312.646.5827
19            Nathan.hoffman@dechert.com

20            Elisabeth M. Mcomber
              SNELL & WILMER
21            15 West South Temple, Suite 1200
              Salt Lake City, Utah 84101
22            801.257.1900
              Emcomber@swlaw.com

23

24

25
```

U.S. LEGAL SUPPORT
(877) 479-2484

Confidential                                                    JAN-MS-05484143

Lynn Webster, M.D.
February 18, 2019                                        3

```
 1              A P P E A R A N C E S
                   (Continued)
 2
    For the Teva and Cephalon Defendants:
 3
            Brian M. Ercole
 4          MORGAN LEWIS
            200 South Biscayne Boulevard
 5          Suite 5300
            Miami, Florida 33131
 6          305.415.3416
            Brian.ercole@morganlewis.com
 7

 8   For the Witness:

 9          John Robinson
            Steven J. Zakrzewski
10          GORDON & REES SCULLY MANSUKHANI
            95 Glastonbury Boulevard
11          Suite 206
            Glastonbury, Connecticut 06033
12          860.278.7448
            Jjrobinson@grsm.com
13          Szakrzewski@grsm.com

14          Mark A. Nickel
            GORDON & REES
15          222 South Main Street, 5th Floor
            Salt Lake City, Utah 84101
16          801.204.9989
            Mnickel@grsm.com
17
    Also Present:
18
            Gavin Bohne, videographer
19

20

21

22                  -oOo-

23

24

25
```

Confidential                                                    JAN-MS-05484144

Lynn Webster, M.D.
February 18, 2019                                            4

```
 1

 2                        I N D E X

 3

 4     LYNN WEBSTER, M.D.                        Page

 5     MR. DUCK                                    12

 6     MR. ERCOLE                                 271

 7     MR. EHSAN                                  383

 8     MR. HOFFMAN                                443

 9     MR. ERCOLE                                 516

10     MR. LEONOUDAKIS                            539

11     MR. HOFFMAN                                555

12

13

14                        -oOo-

15

16

17                   E X H I B I T S

18

19     No.           Description              Page

20     Exhibit 1     Curriculum Vitae of Lynn    25

21                   Webster, M.D.

22     Exhibit 2     Memo dated July 16, 1990    54

23                   (Bates No.

24                   PDD9316718973-8975)

25     Exhibit 3     Teamlink article (Bates     63
```

U.S. LEGAL SUPPORT
(877) 479-2484

Confidential                                                    JAN-MS-05484145

```
 1              No. PDD9316703679-3690)

 2   Exhibit 4   Email string (Bates No.        70

 3              PKY183238394-395)

 4   Exhibit 5   Email string (Bates No.        78

 5              PKY181422992-2994)

 6   Exhibit 6   Proposed Target KOLs for       88

 7              PPR Communications

 8              (Bates No. PPLP00426891)

 9   Exhibit 7   GAO Prescription Drugs         94

10              OxyContin Abuse and

11              Diversion and Efforts to

12              Address the Problem

13   Exhibit 8   Statement of United          104

14              States Attorney John

15              Brownlee on the Guilty

16              Plea of the Purdue

17              Frederick Company and

18              its Executives for

19              Illegally Misbranding

20              OxyContin

21   Exhibit 9   Actiq Master Plan (Bates      127

22              No. TEVA_OK_00094174-

23              94234)

24   Exhibit 10  Curriculum Vitae of Lynn      128

25              Webster, M.D.
```

Confidential                                                    JAN-MS-05484146

Lynn Webster, M.D.
February 18, 2019                                    6

```
 1   Exhibit 11   PowerPoint presentation      139
 2                excerpt
 3   Exhibit 12   Teva Advocacy Mapping:       151
 4                Identifying Advocacy
 5                Partners to Enhance
 6                Patient Care, dated
 7                March 2013
 8   Exhibit 13   Duragesic Disease            179
 9                Modeling Workshop @
10                Takeaways dated
11                March 14, 2002
12   Exhibit 14   PAINS Project Overview       195
13                (Bates No.
14                JAN-MS-00397434-449)
15   Exhibit 15   Email from Myra              205
16                Christopher dated
17                11-6-2012 (Bates No.
18                JAN-MS-00264060-062)
19   Exhibit 16   PAINS Project, No Longer     220
20                Silent SWAT Team (Bates
21                No. FOLEY00007302)
22   Exhibit 17   Email from Heather           227
23                Thomson dated 2-18-2002
24                (Bates No.
25                JAN-MS-00492412-413)
```

Confidential                                                          JAN-MS-05484147

```
 1   Exhibit 18   United States Cancer        231

 2                Pain Relief Committee

 3                Request for Support

 4                dated February 17, 2016

 5                (Bates No.

 6                FOLE00001071-1079)

 7   Exhibit 19   Proposed Transmucosal       351

 8                Immediate Release

 9                Fentanyl (TIRF) Risk

10                Evaluation and

11                Mitigation Strategy

12                (REMS)

13   Exhibit 20   Article entitled           487

14                Pseudoaddiction

15                revisited: a commentary

16                on clinical and

17                historical

18                considerations

19   Exhibit 21   Article entitled The       497

20                Economic Impact of

21                Opioid Use in the

22                Management of Chronic

23                Nonmalignant Pain

24   Exhibit 22   Article entitled           501

25                American Academy of Pain
```

Confidential                                                      JAN-MS-05484148

|    |             |                          |     |
|----|-------------|--------------------------|-----|
| 1  |             | Medicine Response to     |     |
| 2  |             | PROP Petition to the FDA |     |
| 3  |             | That Seeks to Limit Pain |     |
| 4  |             | Medications for          |     |
| 5  |             | Legitimate Noncancer     |     |
| 6  |             | Pain Sufferers           |     |
| 7  | Exhibit 23  | Article entitled         | 517 |
| 8  |             | Breakthrough Pain in the |     |
| 9  |             | Management of Chronic    |     |
| 10 |             | Persistent Pain          |     |
| 11 |             | Syndromes                |     |
| 12 | Exhibit 24  | Article entitled Impact  | 528 |
| 13 |             | of Breakthrough Pain on  |     |
| 14 |             | Quality of Life in       |     |
| 15 |             | Patients with Chronic,   |     |
| 16 |             | Noncancer Pain: Pain     |     |
| 17 |             | Perceptions and Effect   |     |
| 18 |             | of Treatment with Oral   |     |
| 19 |             | Transmucosal Fentanyl    |     |
| 20 |             | Citrate                  |     |
| 21 | Exhibit 25  | Article entitled         | 533 |
| 22 |             | Fentanyl Buccal Tablet   |     |
| 23 |             | Compared with            |     |
| 24 |             | Immediate-Release        |     |
| 25 |             | Oxycodone for the        |     |

Confidential                                                    JAN-MS-05484149

Lynn Webster, M.D.
February 18, 2019                                    9

1                    Management of

2                    Breakthrough Pain in

3                    Opioid-Tolerant Patients

4                    with Chronic Cancer and

5                    Noncancer Pain: A

6                    randomized Double-Blind,

7                    Crossover Study Followed

8                    by a 12-Week Open-Label

9                    Phase to Evaluate

10                   Patient Outcomes

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential                                                                    JAN-MS-05484150

Lynn Webster, M.D.
February 18, 2019                                    10

```
 1    February 18, 2019              9:11 a.m.

 2            P R O C E E D I N G S

 3

 4            THE VIDEOGRAPHER:  This is the

 5       video recorded deposition of Lynn

 6       Webster, M.D., taken by the plaintiff,

 7       in the matter of State of Oklahoma v.

 8       Purdue Pharma, LP, et al. in the

 9       District Court of Cleveland County,

10       State of Oklahoma, Case No.

11       CJ-2017-816.

12            This deposition is being held

13       at PRA Health Sciences in Millcreek,

14       Utah, on February 18, 2019.

15            My name is Gavin Bohne from

16       U.S. Legal Support.  I am the video

17       specialist.  The court reporter is

18       Vickie Larsen, also from U.S. Legal

19       Support.  We're going on the record at

20       9:12 a.m.

21            Counsel will now state their

22       appearances for -- for the record and

23       the court reporter will then swear in

24       the witness.

25            MR. DUCK:  Trey Duck from Nix
```

Confidential                                                          JAN-MS-05484151

```
 1           Patterson on behalf of the State of

 2           Oklahoma.

 3                MR. ROBINSON:  John Robinson

 4           and Steve Zakrzewski of Gordon Rees

 5           Scully Mansukhani on behalf of

 6           Dr. Webster.

 7                MR. EHSAN:  Houman Ehsan,

 8           O'Melveny & Myers on behalf of the

 9           Johnson & Johnson defendants.

10                MR. HOFFMAN:  Nathan Hoffman on

11           behalf of Purdue.

12                MR. ERCOLE:  Bryan Ercole on

13           behalf of the Teva defendants.

14                MS. McOMBER:  Elisabeth

15           McOmber, local Utah for Purdue.

16                MR. ROBINSON:  And just

17           additionally, we expect arrival

18           shortly of Mark Nickel of our firm,

19           local Utah for Dr. Webster.

20

21                LYNN WEBSTER, M.D.,

22        called as a witness, having been duly

23     sworn, was examined and testified as follows:

24

25
```

Confidential                                                    JAN-MS-05484152

Lynn Webster, M.D.
February 18, 2019                                    12

```
 1                    EXAMINATION
 2   BY MR. DUCK:
 3        Q.    Sir, can you please state your
 4   name for the record.
 5        A.    Lynn Webster.
 6        Q.    All right.  And, Dr. Webster,
 7   you're here today to give a deposition in a
 8   case brought by the State of Oklahoma versus
 9   various manufacturers of opioid medications.
10   Do you understand that?
11        A.    Yes.
12        Q.    Have you had a chance to review
13   the petition or complaint in this case to
14   understand what the case is about?
15        A.    Yes, I think so.
16        Q.    And what is your understanding
17   of what this case is about?
18        A.    That the manufacturers of
19   opioids are responsible for a lot of harm
20   that's been created from opioids in the
21   country.
22        Q.    All right.  Thank you.  What
23   did you do to prepare for this deposition, if
24   anything?
25        A.    Really didn't do anything to
```

Confidential                                                          JAN-MS-05484153

Lynn Webster, M.D.
February 18, 2019                                13

```
 1    prepare.
 2         Q.    You're represented here by
 3    counsel today.  Are you paying for your own
 4    lawyers to represent you today?
 5         A.    No.
 6         Q.    Who's paying for your counsel?
 7         A.    The insurance company.
 8         Q.    Your malpractice insurance
 9    company?
10         A.    Not a malpractice insurance
11    company, it's -- it's a D&O insurance through
12    the American Academy of Pain Medication.
13         Q.    Okay.  So American Academy of
14    Pain Medicine, are you still involved with
15    the American Academy of Pain Medicine?
16         A.    I'm a member.
17         Q.    A member.
18               You used to be the president;
19    is that right?
20         A.    That's correct.
21         Q.    But today you're just a member?
22         A.    Correct.
23         Q.    Who started the AAPM?
24         A.    A group of physicians long ago.
25    I don't remember their names exactly.
```

Confidential                                                                      JAN-MS-05484154

Lynn Webster, M.D.
February 18, 2019                                                 14

1          Q.     It was around for a while

2     before you became the president?

3          A.     Yes.

4          Q.     How long were you the

5     president?

6          A.     One year.

7          Q.     And does the AAPM provide D&O

8     coverage for all of its members?

9          A.     No.

10         Q.     Which members does it provide

11    D&O coverage for?

12         A.     Well --

13                MR. ROBINSON:  Form.

14                You can answer if you know.

15                THE WITNESS:  I don't know who

16         they provide it to now.  They provided

17         it to me when I was president.

18         Q.     BY MR. DUCK:  And that carries

19    over forever?

20         A.     Well, I think it's because of

21    occurrences during that time.  I'm not sure,

22    actually.  I don't know.

23         Q.     I see.

24                So since some of the issues in

25    this case may overlap with the time when you

Confidential                                                          JAN-MS-05484155

 1   were president, that's why you're being

 2   provided the coverage?

 3        A.    I don't know, actually, how all

 4   of the insurance issues work.  I know that we

 5   submitted a claim and we're covered.

 6        Q.    Understood.

 7              How did you know to submit the

 8   claim to that insurance company?

 9              MR. ROBINSON:  Objection just

10        to the extent that if you know

11        personally, that's fine.  But if you

12        know through your communications with

13        your lawyers, you don't have to answer

14        that question.

15              THE WITNESS:  I know because

16        the executive director told us who it

17        was.

18        Q.    BY MR. DUCK:  Okay.  Who's the

19   executive director?

20        A.    Phil Saigh.

21        Q.    Can you spell that last name.

22        A.    S-A-I-G-H.

23        Q.    Thank you.

24              You understand that this

25   lawsuit involves three defendant families:

Confidential                                                                    JAN-MS-05484156

Lynn Webster, M.D.
February 18, 2019                                16

 1    The Purdue defendants, the Johnson & Johnson

 2    defendants, and the Teva defendants.

 3              Do you understand that?

 4        A.    Yes.

 5              MR. ERCOLE:  Objection to form.

 6           (Reporter clarification.)

 7              MR. ROBINSON:  Do you guys -- I

 8         don't care, but do you guys stipulate

 9         objection by one is good for all so

10         that these things move along?

11              MR. DUCK:  I'm good with one

12         objection from this half being good

13         for all, but not this half

14         (indicating).

15              MR. ROBINSON:  Okay.

16              MR. DUCK:  If that makes sense.

17              MR. ROBINSON:  That's fine.

18              MR. EHSAN:  An objection by any

19         of the manufacturer defendants is an

20         objection for all manufacturer

21         defendants.

22              MR. DUCK:  You got it.

23              MR. EHSAN:  Thank you.

24              MR. ROBINSON:  You understand

25         Dr. Webster is still a defendant in

Confidential                                                                 JAN-MS-05484157

Lynn Webster, M.D.
February 18, 2019                                    17

```
 1          other litigation, so we may be

 2          objecting here and there depending on

 3          those circumstances, even though he's

 4          a nonparty in the case.

 5                  MR. DUCK:  Yep.

 6          Q.    Okay.  You understand that the

 7   Purdue defendants are -- or the Purdue

 8   companies are defendants in this case; right?

 9          A.    That's my understanding.

10          Q.    And you understand that Johnson

11   & Johnson companies are defendants in this

12   case?

13          A.    Yes.

14          Q.    And last, you understand that

15   the Teva companies are defendants in this

16   case?

17          A.    Yes.

18                  MR. ERCOLE:  Objection to form.

19          Q.    BY MR. DUCK:  Are you aware

20   that Teva purchased Cephalon in the past?

21          A.    Yes.

22                  MR. ERCOLE:  Objection to form.

23          Q.    BY MR. DUCK:  And so what was

24   Cephalon is now part of Teva?

25                  MR. ERCOLE:  Objection to form.
```

Confidential                                                  JAN-MS-05484158

Lynn Webster, M.D.
February 18, 2019                                    18

```
 1                  MR. DUCK:  What's the
 2          objection?  I mean, it's just a fact.
 3                  MR. ERCOLE:  You're -- it's
 4          incorrect, and it's ambiguous as to
 5          which entities you're referring to.
 6          But if he can -- if you want to
 7          specify which Teva entity you're
 8          referring to, feel free to do so.
 9          Otherwise, it's, you know,
10          objectionable.
11          Q.     BY MR. DUCK:  Did you know that
12   Cephalon's now part of Teva?
13                  MR. ERCOLE:  Same objection.
14                  THE WITNESS:  At some level,
15          yeah.  I mean, I don't know if there
16          are divisions that are or are not,
17          but, yes, I know that they became one.
18          Q.     BY MR. DUCK:  Fair enough.
19                  And there were two primary
20   branded products at Cephalon, one was Actiq,
21   the other was Fentora, that are part of this
22   case.
23                  You understand that?
24          A.     Yes.
25                  MR. ERCOLE:  Objection to form.
```

U.S. LEGAL SUPPORT
(877) 479-2484

Confidential                                    JAN-MS-05484159

Lynn Webster, M.D.
February 18, 2019                                    19

```
 1          Q.      BY MR. DUCK:  And you

 2   understand that Actiq and Fentora, or their

 3   generic counterparts, are now a part of the

 4   Teva law -- excuse me -- the Teva portfolio?

 5          A.      Yes.

 6                  MR. ERCOLE:  Objection to form.

 7          Q.      BY MR. DUCK:  Okay.  Thanks.

 8                  You did some work for Cephalon

 9   in the past; isn't that right?

10          A.      Yes.

11          Q.      What exactly did you do?

12          A.      A couple of things.  I

13   consulted with them, with Cephalon, and I

14   believe I also conducted clinical trials.

15          Q.      Thank you.

16                  And did you ever do any work

17   for Purdue?

18          A.      Yes.

19          Q.      What did you do for Purdue?

20          A.      Same, I consulted with Purdue

21   and I did clinical trials.

22          Q.      Did you ever give any speeches

23   or talks or presentations for Cephalon?

24          A.      Yes.

25          Q.      What about Purdue?
```

Confidential                                                JAN-MS-05484160

Lynn Webster, M.D.
February 18, 2019                                              20

```
 1        A.      Not sure I did.  I can't recall

 2   ever giving any CME or non-CME talks for

 3   Purdue.  Can't remember doing that.

 4        Q.      Okay.  What about Johnson &

 5   Johnson, any of their --

 6        A.      I don't believe so.

 7        Q.      And you're -- you understand

 8   that Janssen is a Johnson & Johnson

 9   subsidiary?

10        A.      Correct.

11        Q.      And did you ever do any work

12   for Janssen?

13        A.      I can't remember doing any work

14   for Janssen.

15        Q.      Fair to say, at least for the

16   defendants in this lawsuit, you worked with

17   Cephalon more than the others?

18        A.      Yes.

19        Q.      And you -- excuse me -- new

20   question.

21                For your work with Cephalon,

22   you received payment for that work?

23                MR. ERCOLE:  Objection to form.

24                THE WITNESS:  For my consulting

25        work I did, yes.
```

Confidential                                                    JAN-MS-05484161

Lynn Webster, M.D.
February 18, 2019                                21

1        Q.      BY MR. DUCK:  And for the

2   presentations you gave?

3        A.      Yes.

4        Q.      Same for Purdue, the consulting

5   work, you were paid for that time?

6        A.      Yes.

7        Q.      Do you recall specifically the

8   kind of consulting work you did for Purdue?

9        A.      Yes.  They had a product, it's

10  called Butrans, which they wanted to get

11  approved by the FDA.  And they asked me to

12  help prepare them for an FDA advisory board

13  meeting.  So I spent some time working with

14  them to prepare for that outcome.

15       Q.      Butrans was ultimately approved

16  by the FDA?

17       A.      Yes, it was.

18       Q.      And for Cephalon, what kind of

19  consulting work did you do?

20       A.      There I did some speaking,

21  probably some ADCOM, but I -- you know, it's

22  been so long ago, I can't remember.  But I

23  did do some speaking and education of, I

24  believe, even physicians.

25       Q.      Education of physicians you

Confidential                                                    JAN-MS-05484162

Lynn Webster, M.D.
February 18, 2019                                    22

```
 1   say?

 2        A.     Yes.

 3        Q.     Did you ever train any other

 4   presenters for Purdue?

 5        A.     Yeah, that's what I'm talking

 6   about.

 7        Q.     Okay.

 8        A.     Not Purdue.  I don't know that

 9   I did that for Purdue.

10        Q.     But you did for Cephalon?

11        A.     I believe for Cephalon.  I'm

12   not sure.  I can't recall ever doing it for

13   Purdue.

14        Q.     And --

15        A.     But I have trained a lot of

16   doctors.

17        Q.     For Cephalon, was that training

18   of other doctors primarily for Actiq?

19        A.     No.  It was -- it was primarily

20   for risk and abuse of an opioid, of which

21   Actiq would be one.

22        Q.     Okay.  Understood.

23               Do you say Actiq or Actiq?

24        A.     I say Actiq.

25        Q.     Okay.  Thanks.
```

Confidential                                                    JAN-MS-05484163

```
 1              And you said "of an opioid."

 2   You're referring to TIRF opioids?

 3        A.    Well, that's what Cephalon had,

 4   but I -- my lectures were about all opioids.

 5   I didn't differentiate, necessarily, unless

 6   there was a specific topic on a TIRF product.

 7        Q.    Understood.

 8              Did you ever present any REMS

 9   programs for Cephalon?

10        A.    I believe so, yes.  I believe

11   so.

12        Q.    And that would have been with

13   respect to Actiq?

14        A.    Yes, or Fentora, or both.

15        Q.    When was the last time you did

16   work for Cephalon?

17        A.    Well, I can't remember that.

18   It's been a long time.  I mean, it was when

19   they existed, you know, before Teva at some

20   point, but I don't remember.

21        Q.    Have you ever done any work for

22   Teva?

23        A.    Oh, yes.

24        Q.    Okay.  What have you done for

25   Teva?
```

Confidential                                    JAN-MS-05484164

Lynn Webster, M.D.
February 18, 2019                                    24

 1        A.    I've consulted with them.  I've

 2   prepared -- helped them prepare for meetings

 3   with the ADCOM.  I've done clinical research

 4   as well.

 5        Q.    Did your work with Cephalon

 6   just carry over into Teva after Cephalon was

 7   acquired by Teva?

 8              MR. ERCOLE:  Objection to form.

 9              THE WITNESS:  I don't know what

10        you mean by that.  I think they're

11        totally separate entities.  They're

12        totally separate.  I never thought of

13        them as there was anything contiguous,

14        no.

15              MR. DUCK:  Okay.

16              THE WITNESS:  I mean, separate

17        agreements had to be issued.

18        Q.    BY MR. DUCK:  Let me ask it a

19   different way.

20              Did you ever do any work for

21   Cephalon and Teva before they were a part of

22   the same company?

23        A.    I can't remember if I did.

24        Q.    Okay.  What products did you

25   consult on with Teva?

Confidential                                                          JAN-MS-05484165

Lynn Webster, M.D.
February 18, 2019                                    25

```
 1        A.     They -- they had an abuse

 2   deterrent formulation that I helped them

 3   develop, basically.  I did their human abuse

 4   liability work here, and then I consulted

 5   with them on -- in preparing for the FDA with

 6   that.

 7        Q.     What drug was that?

 8        A.     I can't remember which one it

 9   was.

10        Q.     Was it approved?

11        A.     It was approved.  I believe it

12   was approved.

13        Q.     Okay.  When I got here today

14   there was a CV that your lawyers provided to

15   me.

16               Mark this as Exhibit 1 to your

17   deposition.

18   (Exhibit 1 was marked for identification.)

19        Q.     BY MR. DUCK:  When was this

20   last updated?

21        A.     June 16th -- of -- June of

22   2018.

23        Q.     All right.  Is there any reason

24   why it needs to be updated again since then

25   or is this reasonably up-to-date?
```

Confidential                                                        JAN-MS-05484166

Lynn Webster, M.D.
February 18, 2019                                        26

 1        A.    Well, there are more

 2   publications, there are more presentations,

 3   there are -- I've done more since the summer.

 4        Q.    Okay.  And we'll use this --

 5   use this if you -- if you need to.  I'd just

 6   like to ask you some questions about your

 7   background.

 8               I've been calling you

 9   Dr. Webster.  So you are a physician; right?

10        A.    Yes.

11        Q.    What kind of physician are you?

12   What do you practice?

13        A.    I'm specialized -- my original

14   board was in anesthesia.  So I'm

15   board-certified in anesthesia, pain medicine,

16   and addiction medicine.

17        Q.    Okay.  Board-certified by who?

18        A.    I was board-certified by the

19   American Board of Anesthesiology, by the

20   American Academy of Pain Medicine for pain,

21   and then by the American Society for

22   Addiction Medicine for addiction.

23        Q.    When did you become

24   board-certified for addiction?

25        A.    I'd have to look at my CV, just

Confidential                                        JAN-MS-05484167

Lynn Webster, M.D.
February 18, 2019                                    27

```
 1    one second.  1998.

 2         Q.     Thank you.

 3                And do you still currently

 4    practice in those same areas?

 5         A.     Well, I don't see patients, but

 6    I practice.  I conduct clinical research in

 7    the area of pain and addiction, as well as

 8    other areas.  So I practice medicine in the

 9    research area.

10         Q.     Why don't you see patients?

11         A.     Because I chose to do clinical

12    research.

13         Q.     Understood.

14                A part of your practice as both

15    a researcher and as a clinician involved

16    opioids; correct?

17         A.     Yes.

18         Q.     All right.  You'd agree with

19    me, Doctor, that opioids can be dangerous;

20    correct?

21                MR. ERCOLE:  Objection.

22                THE WITNESS:  Opioids can be

23        dangerous.

24         Q.     BY MR. DUCK:  They can be

25    deadly?
```

Confidential                                    JAN-MS-05484168

 1          A.      Yes.

 2          Q.      You'd agree with me that when

 3    it comes to prescribing opioids, physicians

 4    should be very careful?

 5          A.      Yes.

 6          Q.      By the same token, you would

 7    agree with me that when it comes to

 8    manufacturers promoting or marketing opioids,

 9    they likewise should be very careful;

10    correct?

11                  MR. ERCOLE:  Objection to form.

12                  MR. HOFFMAN:  Objection.

13                  THE WITNESS:  I don't know

14          anything about the marketing part.  I

15          think that -- I think that it needs to

16          be honest.  Always needs to be honest.

17          Q.    BY MR. DUCK:  Fair enough.

18                  So you'd agree with me that in

19    order for marketing to be done correctly with

20    respect to opioids, manufacturers need to be

21    honest; correct?

22                  MR. ERCOLE:  Objection to form.

23                  THE WITNESS:  Again, I don't

24          have anything to really say about any

25          pharmaceutical company's marketing,

Confidential                                                    JAN-MS-05484169

Lynn Webster, M.D.
February 18, 2019                                    29

```
 1          but I think that everyone in medicine
 2          needs to be honest.
 3          Q.     BY MR. DUCK:  Okay.  And in
 4     order to be honest, everybody in medicine
 5     needs to understand what it is they're
 6     talking about; right?
 7               MR. HOFFMAN:  Object to the
 8          form.
 9               MR. ERCOLE:  Same objection.
10               THE WITNESS:  I think that they
11          can be honest and not know what
12          they're talking about.
13          Q.     BY MR. DUCK:  Really?  Explain
14     that, please.
15          A.     Well, you can be honest, you
16     just don't know what you're talking about.
17          Q.     Yeah, wouldn't you need to say
18     I don't know what I'm talking about in order
19     to be honest there?
20          A.     No, because they may think they
21     know.
22          Q.     Okay.  So you're drawing a
23     distinction between someone who thinks they
24     know what they're talking about but they
25     don't, and therefore they're being honest
```

Confidential                                                    JAN-MS-05484170

```
 1   because they think they know what they're

 2   talking about?

 3        A.    Yeah, I think that -- I think

 4   that that happens.  I'll bet that happens in

 5   your life too.

 6        Q.    So with respect to opioids,

 7   that could be deadly, couldn't it?

 8             MR. ERCOLE:  Objection to form.

 9             THE WITNESS:  I think this is a

10        rabbit hole I can't go down.  I don't

11        know what you're talking about now.

12        You'd have to be more specific.

13        Q.    BY MR. DUCK:  Okay.  So if

14   someone, say for Purdue, a sales

15   representative, goes into a doctor's office

16   to talk to them about opioids, say OxyContin,

17   that sales rep doesn't know what he's talking

18   about, and he tells the doctor some things

19   about OxyContin.  That could be deadly,

20   couldn't it?

21             MR. HOFFMAN:  Object to form.

22        Assumes facts not in evidence.  Lacks

23        foundation.

24             THE WITNESS:  I don't know what

25        a -- who would go into the doctor's
```

Confidential                                    JAN-MS-05484171

```
 1        office?
 2                MR. DUCK:  A sales rep.
 3                THE WITNESS:  A sales rep.  So
 4        the sales rep is -- is going to say
 5        something that you say is dishonest?
 6        Q.    BY MR. DUCK:  Doesn't know what
 7   he's talking about.
 8                MR. HOFFMAN:  Same objections.
 9                THE WITNESS:  Well, I would
10        expect everybody to know what they're
11        talking about if they're going to go
12        into a physician's office.
13        Q.    BY MR. DUCK:  Agreed.  So we
14   can agree on that point.
15                A sales representative for a
16   opioid manufacturer should know what they're
17   talking about if they're going to make sales
18   calls; right?
19                MR. HOFFMAN:  Objection to
20        form.
21                THE WITNESS:  I would hope so.
22        Q.    BY MR. DUCK:  Well, they
23   should.  If they don't, they should not be
24   making sales calls; correct?
25                MR. ERCOLE:  Objection to form.
```

Confidential                                                    JAN-MS-05484172

1           THE WITNESS:  I'm not involved

2       with marketing or the sales of any --

3       any drugs.

4       Q.    BY MR. DUCK:  Well, sales

5  representatives have visited you in the past;

6  correct?

7       A.    Yes.

8       Q.    Sales representatives for

9  opioid manufacturers; right?

10      A.    Correct.

11      Q.    Sales representatives for the

12  defendants that are in this lawsuit; right?

13          MR. ERCOLE:  Objection to form.

14          THE WITNESS:  Yes.

15      Q.    BY MR. DUCK:  And you

16  understand that sales representatives for the

17  defendants in this lawsuit have visited

18  physicians all over this country; correct?

19      A.    Yes.

20      Q.    Did you ever train any sales

21  representatives?

22      A.    I don't know if I trained.  I

23  might have trained sales representatives on

24  the risk of drugs, or the risk of opioids.  I

25  mean, that -- that's kind of been my -- my

Confidential                                                    JAN-MS-05484173

```
 1    message my whole career is about the risk of

 2    opioids.

 3             And so I may have taught --

 4    there may have been sales reps in the

 5    audience at various times -- well, certainly

 6    in my national lectures, there are always

 7    drug reps in the audience listening to what I

 8    have to say, so I probably have taught reps.

 9       Q.    A sales representative should

10    understand the risks of opioids; correct?

11             MR. ERCOLE:  Objection to form.

12             THE WITNESS:  I think that

13         anyone involved in the field probably

14         ought to have a good understanding of

15         what the risks and benefits are.

16       Q.    BY MR. DUCK:  You mentioned

17    national presentations just now.  National

18    lectures?

19       A.    Yes.

20       Q.    What -- what national lectures

21    have you given?

22       A.    Well, I think I provided a

23    whole -- a list of different venues where

24    I've lectured, but over the last 20 years,

25    hundreds of lectures on a national level, the
```

Confidential                                                              JAN-MS-05484174

Lynn Webster, M.D.
February 18, 2019                                    34

1    NIH, the FDA, the American Academy of Pain

2    Medicine.  Huge number of different

3    organizations, I can't recall them all off

4    the top of my head.

5         Q.    And people come and visit and

6    attend those lectures from all over the

7    nation?

8         A.    Yes.

9         Q.    You've also given some lectures

10   in a teleconference format; is that right?

11        A.    I've done webinars, yes.

12        Q.    Okay.  Webinars.

13              And those, likewise, can be

14   attended by people from all over the nation?

15        A.    Correct.

16        Q.    And the national lectures and

17   webinars you've given related to opioids;

18   correct?

19        A.    Well --

20              MR. ROBINSON:  Form.

21              You can answer.

22              THE WITNESS:  I mean, I've

23        given more than just opioids, and most

24        of what I've lectured on are -- has

25        always been on the risk of opioids.

Confidential                                                    JAN-MS-05484175

Lynn Webster, M.D.
February 18, 2019                                    35

1          Q.     BY MR. DUCK:  Okay.  So the

2     national lectures and webinars you've given,

3     some of those were about the risks of

4     opioids; correct?

5          A.     Most were.

6          Q.     What are the risks of opioids?

7          A.     There's a long list:  Nausea,

8     vomiting, itching, endocrinopathies,

9     respiratory depression, abuse, addiction,

10    constipation.

11         Q.     Death is one?

12         A.     Oh, yes, death.

13         Q.     Overdose?

14         A.     Overdose.  Overdose death,

15    fatal overdose.

16         Q.     So you're not originally from

17    Utah I see; is that -- is that right?

18         A.     That's correct.

19         Q.     You're from Nebraska?

20         A.     Yes.

21         Q.     What brought you to Utah?

22         A.     I did my residency here.

23         Q.     And you did your residency in

24    what?

25         A.     Anesthesiology.

Confidential                                                        JAN-MS-05484176

Lynn Webster, M.D.
February 18, 2019                                    36

```
 1          Q.    Okay.  And after that what did
 2   you do after your residency?
 3          A.    I went into private practice at
 4   a local hospital.
 5          Q.    Practicing anesthesiology?
 6          A.    Yes.
 7          Q.    When did you go into pain
 8   management?
 9          A.    So I went into practice about
10   1990, and then in the late '80s -- I mean
11   1980.  1980.
12                And so the late '80s I
13   developed an acute pain service in our local
14   hospital, it was one of the first acute pain
15   services in the country.  That's when the
16   field of pain medicine started to emerge, in
17   the late '80s, early '90s.
18                And so I began then to be asked
19   to help treat pain patients, mostly cancer
20   patients.
21                And so I started to see
22   outpatient cancer patients, and that morphed
23   into seeing noncancer patients.
24                So it was a transition from the
25   late '80s to the mid '90s when I essentially
```

Confidential                                                    JAN-MS-05484177

Lynn Webster, M.D.
February 18, 2019                                37

1   became full-time in treating pain, and then

2   by 1998 I was treating addiction as well.

3        Q.     You said in the '80s that's

4   when the field of pain medicine began to

5   emerge?

6        A.     Correct.

7        Q.     There was no field of pain

8   medicine prior to 1980?

9        A.     That's correct.

10       Q.     What caused it to emerge?

11       A.     Huge need.  There was a huge

12  need.  I mean, there still is a huge need.

13  We know that in 2011 that we had solid

14  evidence that 120 million Americans, a huge

15  percent, have chronic pain.

16             And just this last week, NIH

17  gave a report that it's increased by almost

18  50 percent.  Now there's 170 million

19  Americans.

20             And prior to the 1990s, most of

21  these people were denied access to any care.

22  There was no treatment for people who were in

23  chronic pain.

24             So there was a huge need and a

25  void that people like myself were trying to

Confidential                                                    JAN-MS-05484178

Lynn Webster, M.D.
February 18, 2019                                    38

1    fill.  We thought that we could make a big

2    difference in the lives of millions of

3    people.

4         Q.    Okay.  There's a few things in

5    there.

6               You said in 2011 there's

7    evidence that 120 million people were in

8    pain?

9         A.    As reported by NIH, yes.

10        Q.    By the Institute of Medicine?

11        A.    Yes.

12        Q.    And you were part of a group of

13   people that helped get that report made --

14        A.    No.

15        Q.    -- is that right?

16        A.    No.

17        Q.    Did you have any involvement at

18   all with the 2011 IOM report?

19        A.    No.

20        Q.    Okay.  Have you heard of a

21   group called PAINS before?

22        A.    PAINS?  Yeah.  Yeah, that -- I

23   think that's -- yeah, I think so.

24        Q.    You were involved with that

25   group?

Confidential                                                          JAN-MS-05484179

Lynn Webster, M.D.
February 18, 2019                                39

```
 1        A.      I think I was.  It's been a
 2   while.
 3        Q.      All right.  So in 2011, 120
 4   million people are in pain, according to the
 5   IOM report; right?
 6        A.      Correct.
 7        Q.      Then you said there was
 8   evidence that that is increased by almost
 9   50 percent; right?
10        A.      By -- and by 2017, yes.
11        Q.      By 2017, that's increased by
12   50 percent.  So more people are in pain now
13   than were in 2011?
14        A.      Yeah, that's correct.
15        Q.      And you would agree with me
16   that over that period of time, more opioids
17   were being prescribed more regularly; right?
18            MR. ERCOLE:  Objection to form.
19            THE WITNESS:  Actually, there
20        were more opioids prescribed from the
21        late '90s until about 2012.  Maybe --
22        that's about the peak.  And from 2012
23        forward we've seen a decline in the
24        amount prescribed.
25        Q.      BY MR. DUCK:  All right.  So
```

Confidential                                                      JAN-MS-05484180

```
 1   from 1990 to 2012, opioid prescribing

 2   increases; correct?

 3        A.     Correct.

 4        Q.     And your testimony is also that

 5   over the same period of time, the number of

 6   people in pain has also increased?

 7        A.     Yes.

 8        Q.     That doesn't say a lot of good

 9   things about the efficacy of opioids, does

10   it, sir?

11        A.     I don't think it says anything

12   about the efficacy.

13        Q.     Well, what do you mean by that?

14        A.     Well, what's your question?

15        Q.     More people are being

16   prescribed opioids and more people are in

17   pain.  How does that make sense?

18              MR. ERCOLE:  Objection to form.

19              MR. ROBINSON:  Object to form.

20              MR. ERCOLE:  Foundation.

21              THE WITNESS:  I don't think I

22        understand your question.

23        Q.     BY MR. DUCK:  Fair enough.

24              What -- what evidence are you

25   pointing to for the 170 million Americans,
```

U.S. LEGAL SUPPORT
(877) 479-2484

Confidential                                                    JAN-MS-05484181

Lynn Webster, M.D.
February 18, 2019                                    41

```
 1   2017?

 2        A.    A recent publication that NIH

 3   cited.

 4        Q.    Also the Institute of Medicine?

 5        A.    I think it's National Institute

 6   of Health.

 7        Q.    Okay.

 8        A.    They didn't -- they funded the

 9   work, but they didn't do the work.  And so

10   they -- they issued a press release on it.

11        Q.    Who did the work?

12        A.    I'd have to go look at the

13   paper.  I forget who it was.

14        Q.    Okay.

15        A.    An academic site.

16        Q.    The 2011 report, NIH also

17   funded that; correct?

18        A.    Yes.

19        Q.    But they also did not do the

20   work there?

21        A.    That's correct.

22        Q.    Who did the work?

23        A.    I don't know.

24        Q.    1990, opioids were not being

25   prescribed very regularly for the treatment
```

Confidential                                    JAN-MS-05484182

Lynn Webster, M.D.
February 18, 2019                                    42

```
 1    of chronic noncancer pain; is that fair?
 2                MR. ERCOLE:  Objection to form.
 3                THE WITNESS:  Yeah, they
 4        weren't very often.
 5        Q.    BY MR. DUCK:  And long-acting
 6    opioids in 1990 were used sparingly; is that
 7    fair?
 8        A.    There weren't many long-acting
 9    opioids at the time.
10        Q.    Yeah.  We -- we would have had
11    MS Contin and Duragesic?
12        A.    I'm not sure when MS Contin was
13    introduced.  I don't think Duragesic was
14    introduced, but I don't know when it was
15    introduced.  But we didn't have much.
16        Q.    And you'd agree with me that
17    prior to the introduction of OxyContin, the
18    use of long-acting opioids to treat
19    nonmalignant chronic pain was rare; correct?
20                MR. ERCOLE:  Object to form.
21                THE WITNESS:  It was not
22        common.  I don't know if it's rare,
23        but it wasn't common.
24        Q.    BY MR. DUCK:  After the
25    introduction of OxyContin, the use of
```

Confidential                                    JAN-MS-05484183

Lynn Webster, M.D.
February 18, 2019                                43

```
 1   long-acting opioids to treat nonmalignant

 2   chronic pain became more common; right?

 3        A.    During that time, yes.

 4        Q.    It increased and, as you say,

 5   continued to increase until 2012?

 6        A.    About 2012.  The overall opioid

 7   prescribing increased until then.

 8        Q.    You're aware that there is an

 9   opioid crisis in this country?

10        A.    I know that that -- that we

11   have an opioid problem, yes.

12        Q.    And what do you mean by "opioid

13   problem"?

14             MR. ROBINSON:  Objection.

15        Form.

16             You can answer.

17             THE WITNESS:  Well, we have a

18        lot of people using opioids that

19        should not be using opioids.  There

20        are a lot of people who have developed

21        an opioid use disorder and too many

22        people have died from opioids.

23        Q.    BY MR. DUCK:  And that's a

24   problem that afflict -- afflicts this entire

25   country; correct?
```

Confidential                                                                                      JAN-MS-05484184

Lynn Webster, M.D.
February 18, 2019                                    44

```
 1                    MR. ERCOLE:  Objection to form.

 2                    THE WITNESS:  It afflicts our

 3          country and other countries.

 4          Q.    BY MR. DUCK:  And it afflicts

 5     the state of Utah; right?

 6          A.    Yes.

 7          Q.    And it afflicts the state of

 8     Oklahoma; right?

 9                    MR. ERCOLE:  Objection to form.

10                    THE WITNESS:  It involves

11          every -- everywhere in the country.

12          Q.    BY MR. DUCK:  Would you

13     consider yourself an advocate for the use of

14     opioids?

15                    MR. ROBINSON:  Objection.

16                    THE WITNESS:  No.

17          Q.    BY MR. DUCK:  Would you

18     consider yourself an advocate for the

19     increased use of opioids to treat noncancer

20     chronic pain?

21          A.    No.

22          Q.    In -- beginning in 1990 and

23     increasing through time, opioids were used

24     more commonly to treat noncancer chronic

25     pain; right?
```

Confidential                                                              JAN-MS-05484185

```
 1        A.      Yes.

 2                MR. EHSAN:  Object to form.

 3        Q.      BY MR. DUCK:  Who were the

 4   advocates for that?

 5                MR. ROBINSON:  Objection.

 6        Form.

 7                Answer if you know.

 8                THE WITNESS:  Yeah, I don't

 9        know who was an advocate for opioids.

10        I think that there needs to be a

11        distinction that people who are

12        advocating for people who are

13        suffering from pain to have access to

14        treatment is not the same thing as

15        advocating for opioids.

16                And there are a large number of

17        people who are -- who have a negative

18        attitude toward -- towards opioids

19        just because they're opioids.

20                But most of us, people like

21        myself, are advocates for give --

22        providing relief and suffering.  If

23        opioids can do that and they're safe

24        and appropriate, then -- then some

25        people see us as advocates for the
```

Confidential                                                                JAN-MS-05484186

Lynn Webster, M.D.
February 18, 2019                                    46

```
1          opioid, and that's not the case.  It's

2          about the patient, not the opioid.

3          Q.     BY MR. DUCK:  You've said "us"

4    a couple of times and you said "people like

5    me."  Who are you including in that?

6          A.     Just people that -- co-author

7    or speak on the same topic as me.

8          Q.     Can you provide some examples

9    of those people?

10         A.     No, I can't.

11         Q.     You don't have any idea?

12         A.     Well, I mean, you can look in

13   the literature and you can see yourself.

14         Q.     And your CV, for -- for

15   example?

16         A.     Yeah, you could probably see

17   coauthors.

18         Q.     Do you know who Aaron Gilson

19   is?

20         A.     Yes.

21         Q.     Do you know who Russell

22   Portenoy is?

23         A.     Yes.

24         Q.     Okay.  Would you include those

25   in that group?
```

Confidential                                                    JAN-MS-05484187

Lynn Webster, M.D.
February 18, 2019                    47

```
 1        A.     Yes.

 2        Q.     Thank you.

 3               You're aware that they've given

 4   depositions in this case as well?

 5        A.     I was not aware Aaron Gilson

 6   gave a deposition.

 7        Q.     You were aware that Russell

 8   Portenoy did?

 9               MR. ROBINSON:  Objection.

10        Form.

11               You can answer that question if

12        you know anything about it other than

13        your conversations with counsel.

14               THE WITNESS:  Okay.  I don't

15        know anything about it.

16        Q.     BY MR. DUCK:  You haven't read

17   the Russell Portenoy deposition?

18        A.     No.

19        Q.     And you weren't provided a copy

20   of that deposition?

21        A.     I was not.

22        Q.     Without telling me the

23   substance, do you have any understanding of

24   what the substance of that deposition was?

25        A.     No.
```

Confidential                                                                    JAN-MS-05484188

Lynn Webster, M.D.
February 18, 2019                                      48

1          Q.     You just know the fact that he

2    gave a deposition?

3          A.     Well, I know that he's been

4    named in the lawsuits like I have.  So it has

5    to be on the topic.

6          Q.     Have you and Dr. Portenoy

7    communicated about these lawsuits?

8          A.     No.

9          Q.     And you understand you're not a

10   defendant in this lawsuit; right?

11         A.     Yes.

12         Q.     Okay.  This lawsuit just

13   involves the -- the three manufacturer

14   families that I identified.

15                You understand that?

16         A.     Yes, I do.

17                MR. ERCOLE:  Objection to form.

18         Q.     BY MR. DUCK:  Now, earlier you

19   said you did some work or you were the

20   president of the American Academy of Pain

21   Medicine; right?

22         A.     Yes.

23         Q.     I also see in your CV that one

24   of your professional associations is the

25   American Pain Society?

Confidential                                                                                    JAN-MS-05484189

Lynn Webster, M.D.
February 18, 2019                                    49

1          A.      Yes.

2          Q.      You're a member of APS?

3          A.      Yes.

4          Q.      Have you ever held any

5    positions at APS?

6          A.      No officer role.

7          Q.      Any other kind of role?

8          A.      I might have been a committee

9    member once, maybe on a -- it was a low level

10   short time, but I can't remember.  I think I

11   was on a planning committee for an annual

12   meeting.

13         Q.      Dr. Portenoy was the

14   president -- past president of the APS;

15   right?

16         A.      Yes.

17         Q.      Have you ever heard of the

18   American Pain Foundation?

19         A.      I have.

20         Q.      What is the American Pain

21   Foundation?

22         A.      Well, it doesn't exist now.

23         Q.      What was it?

24         A.      I -- it was a foundation that

25   was focused on trying to help people in pain.

Confidential                                                          JAN-MS-05484190

Lynn Webster, M.D.
February 18, 2019                              50

```
 1          Q.     And do you understand it was
 2   the patient advocacy side of the APS?
 3          A.     It was a -- it was a patient
 4   advocacy organization.
 5          Q.     Are you aware of whether or not
 6   it was affiliated at all with APS?
 7          A.     Well, I don't -- I don't know
 8   that it was affiliated with APS.  I know some
 9   members of APS helped start or -- or a member
10   of the American Pain Foundation, but I'm not
11   sure it was a -- had any linkage.
12          Q.     You mentioned that it's no
13   longer in existence, the American Pain
14   Foundation; right?
15          A.     That's right.
16          Q.     Why is it no longer in
17   existence?
18          A.     Well, I don't have any
19   firsthand knowledge.  I know that they went
20   out of business.  That's all I know.
21          Q.     You're aware that they went out
22   of business in conjunction with a Senate
23   Finance Committee investigation; right?
24                 MR. HOFFMAN:  Object to the
25          form.
```

Confidential                                                    JAN-MS-05484191

Lynn Webster, M.D.
February 18, 2019                                    51

```
 1                MR. ROBINSON:  Form.

 2                THE WITNESS:  I don't believe

 3        it was in conjunction with that.  I

 4        think it was coincidental, from what I

 5        understand.

 6        Q.    BY MR. DUCK:  Okay.  What do

 7   you understand?

 8        A.    It's just what I read in the

 9   paper.  I think that there were a lot of

10   assumptions that I'm not sure have ever been

11   proven.

12        Q.    Were you asked to respond to

13   any subpoenas or inquiry letters sent by the

14   Senate Finance Committee investigation?

15        A.    No.  I'm named by the Senate

16   Finance Committee, but I don't believe I

17   personally was asked to respond.

18        Q.    And did you provide any

19   information to the Senate Finance Committee?

20        A.    No.

21        Q.    Have you ever testified before

22   Congress?

23        A.    No.

24        Q.    What's the National Pain

25   Foundation?
```

Confidential                                                    JAN-MS-05484192

Lynn Webster, M.D.
February 18, 2019                                          52

```
 1          A.      It's another foundation.

 2          Q.      Patient advocacy?

 3          A.      Yeah, patient advocacy.

 4          Q.      Would you consider the AAPM

 5    patient advocacy?

 6          A.      No.   AAPM is an advocacy for

 7    physicians who treat pain.   It's a

 8    professional organization.

 9          Q.      Professional society?

10          A.      Yes.

11          Q.      And you view that as different

12    than a patient advocacy foundation --

13          A.      Yes.

14          Q.      -- right?

15                  They do different things?

16          A.      They have different purposes,

17    yes.

18          Q.      Okay.  And what are those

19    different purposes?

20          A.      Well, patient advocacy is

21    advocating for patients.   And a professional

22    organization is really trying to enhance the

23    profession.   So it's really advocating for

24    the -- the physicians or the providers within

25    that organization.
```

Confidential                                      JAN-MS-05484193

Lynn Webster, M.D.
February 18, 2019                                    53

```
 1        Q.     Okay.  And education of
 2   physicians is one of the goals of
 3   professional societies?
 4        A.      In most of them, yes, and
 5   including AAPMed.
 6        Q.     And you say AAPMed to
 7   distinguish from AAPManagement?
 8        A.     Yeah, at the time, you know,
 9   they both were AAPM.  And so as -- the way I
10   speak often is AAPMed to make sure that you
11   understand the difference.
12        Q.     When did you first do work for
13   Purdue?
14        A.     I have no idea.  You'd have to
15   spend some time looking at my CV.
16        Q.     It's in here, though?
17        A.     Yeah, I think everything
18   that -- I mean, most anything I can recall
19   has been documented there.
20        Q.     You said you didn't recall when
21   MS Contin came out.  Do you remember that?
22        A.     Correct.
23        Q.     Do you know whether it was in
24   the '80s or in the '90s?
25        A.     No, I don't remember exactly.
```

Confidential                                                          JAN-MS-05484194

Lynn Webster, M.D.
February 18, 2019                                            54

1          Q.     Okay.

2     (Exhibit 2 was marked for identification.)

3          Q.     BY MR. DUCK:  I'm going to hand

4     you what's been marked as Exhibit 2.

5                MR. ROBINSON:  Just so the

6          record is clear, when we all announced

7          ourselves at the beginning of the

8          deposition, I'm not sure folks on the

9          phone announced themselves as

10         attending on the video.

11               But in addition, Mark Nickel,

12         as I indicated, about two minutes

13         after I said he would be showing up

14         has joined the deposition by phone, so

15         he's been here since the beginning.

16         Q.     BY MR. DUCK:  All right.  Have

17    you had a chance to look at this document?

18         A.     Yes.

19         Q.     Have you seen this before?

20         A.     No.

21         Q.     All right.  This is a 1990 memo

22    from Robert Kaiko.

23               Do you see that?

24         A.     Yes.

25         Q.     Do you know who that is?

Confidential                                          JAN-MS-05484195

Lynn Webster, M.D.
February 18, 2019                                                    55

```
 1        A.       No.

 2        Q.       Do you see the To line is to

 3   Paul Goldenheim, Richard S. Sackler, and

 4   Michael Friedman?

 5        A.       Yes.

 6        Q.       Do you recognize those names?

 7        A.       Only Sackler.

 8        Q.       Okay.  And who is --

 9        A.       And I think Friedman was a part

10   of Purdue, but I can't remember.

11        Q.       Okay.  Who is Sackler?

12        A.       Well, I know the last name and

13   that's associated with Purdue, the founders,

14   that's all I know.

15        Q.       Right.  You understand the

16   Sackler family are the owners of Purdue?

17        A.       Yeah.

18        Q.       And do you recognize Friedman

19   as the former CEO of Purdue?

20        A.       You have to tell me that.

21        Q.       Okay.  Yeah, we'll -- we'll --

22   we'll look at something later.

23                 All right.  The subject for

24   this memo is "Controlled Release Oxycodone."

25                 Do you see that?
```

Confidential                                                            JAN-MS-05484196

Lynn Webster, M.D.
February 18, 2019                                            56

```
 1        A.      Yes.

 2        Q.      I'll submit to you that this,

 3   Dr. Webster, is the square one of OxyContin.

 4   This is the starting place here.  You'll see

 5   there's also a background section.

 6                Do you see that?

 7                MR. HOFFMAN:  Just object to

 8        form.

 9                THE WITNESS:  Yeah.

10                MR. HOFFMAN:  Move to strike

11        counsel's testimony.

12        Q.      BY MR. DUCK:  You see that?

13        A.      Yes.

14        Q.      All right.  About halfway down

15   there's a sentence that starts, "The

16   time-action of oral oxycodone."

17                Do you see that?

18        A.      Yes.

19        Q.      All right.  That reads, "The

20   time-action of oral oxycodone and morphine

21   are likely to be comparable.  Relatively

22   little is known regarding the clinical

23   pharmacology of oxycodone.  It is thought to

24   have an elimination half-life which is

25   relatively short and comparable to that of
```

Confidential                                                                                JAN-MS-05484197

Lynn Webster, M.D.
February 18, 2019                                        57

```
 1   morphine, but a relatively small 'first pass'

 2   effect such that it is relatively more

 3   bioavailable orally as compared to morphine."

 4              Did I read those sentences

 5   right?

 6        A.    Yes.

 7        Q.    The next paragraph states, "In

 8   the U.S., oxycodone is utilized most commonly

 9   in combination with aspirin or acetaminophen

10   and because of this has an image of being an

11   'earlier stage' analgesic.  It is interesting

12   to note, however, that in the state of

13   Connecticut and perhaps other states, the

14   substance abuse officials consider oxycodone

15   combinations among the most abused of

16   Schedule II narcotics analgesic drugs.

17   Dr. William T. Beaver of Georgetown

18   University, in reviewing the clinical

19   pharmacology of combination analgesics, has

20   considered oxycodone a 'sleeping giant' in

21   that among all of the opioid analgesics

22   utilized in fixed combinations, oxycodone is

23   the only one with an analgesic potential" --

24   "potential comparable to that of morphine."

25              Did I read that correctly?
```

Confidential                                                          JAN-MS-05484198

Lynn Webster, M.D.
February 18, 2019                                    58

```
 1         A.     You did.

 2         Q.     Do you see that phrase

 3    "sleeping giant"?

 4         A.     Yes.

 5         Q.     Can you please remember that

 6    phrase for me.

 7         A.     Okay.

 8         Q.     It will be relevant later.

 9                The next section is titled

10    "Rationale for Another Controlled-Release

11    Opioid Analgesics"; right?

12         A.     Yes.

13         Q.     The first sentence states, "MS

14    Contin may eventually face such serious

15    generic competition that other

16    controlled-release opioids must be

17    considered.  Other pharmaceutical firms are

18    thought to also be developing other

19    controlled-release opioid analgesics."

20                Did I read that right?

21         A.     Yes.

22         Q.     Not the next paragraph, but the

23    next one states, "While we are 'going

24    laterally' with MS Contin to noncancer pain

25    indications, it would be unwise to 'put all
```

Confidential                                                        JAN-MS-05484199

Lynn Webster, M.D.
February 18, 2019                                    59

1    of our eggs into the MS Contin basket' in

2    face of the prospect of generic OxyContin

3    competition that would 'crush all of the

4    analgesic eggs.'

5              "It has also been said that

6    Purdue Frederick should market in

7    controlled-release formulation every major

8    opioid analgesic in combination analgesic."

9              Did I read those lines

10   correctly?

11       A.    Yes.

12             MR. HOFFMAN:  Place our

13       objection.  You didn't read it

14       correctly.  You said "OxyContin"

15       instead of "MS Contin," but the

16       document will speak for itself.

17       Q.    BY MR. DUCK:  All right.  On

18   the next page, you'll see that there's a

19   section entitled "Recent Meetings."

20       A.    Yes.

21       Q.     It states, "A recent meeting

22   with Michael Friedman, Paul Goldenheim and I

23   provided the basis for the proposed

24   positioning of controlled-release oxycodone

25   and for a priority clinical research program.

Confidential                                                  JAN-MS-05484200

Lynn Webster, M.D.
February 18, 2019                                    60

1     A subsequent with Dr. Richard Sackler and

2     Paul Goldenheim provide a basis for an

3     addition to the clinical research program.

4     Finally, the recent local R&D meeting

5     provided the basis for refinement of the

6     Phase I research program already conducted."

7            Correct?

8        A.    That's what it says.

9        Q.    All right.  Then you see

10   "Positioning" --

11       A.    Yes.

12       Q.    -- the next section?

13       A.    Uh-huh.

14       Q.    And then there are four bullet

15   points; right?

16       A.    Yes.

17       Q.    And the last bullet point says,

18   "Controlled-Release oxycodone may also be

19   positioned against numerous analgesics in

20   noncancer painful indications including

21   chronic nonmalignant pain and perioperative

22   uses so as not to (as previously discussed)

23   'crush all of the MS Contin eggs.'"

24            Did I read that right?

25       A.    That's what it says, yep.

Confidential                                    JAN-MS-05484201

Lynn Webster, M.D.
February 18, 2019                                          61

1          Q.     Okay.  So you said you had

2    never seen this before, this memo?

3          A.     That's correct.

4          Q.     And were you aware that in

5    1990, MS Contin, which you can tell from this

6    document was in existence at this time --

7          A.     Yes.

8          Q.     -- right?

9                 Was indicated for cancer pain?

10                MR. HOFFMAN:  Object to form.

11                THE WITNESS:  Well, I don't

12         remember what it was indicated for.

13         Q.     BY MR. DUCK:  You have no

14    reason to dispute that the indication for

15    MS Contin was cancer pain?

16                MR. HOFFMAN:  Objection.  Form.

17                THE WITNESS:  I have no reason

18         to dispute.

19         Q.     BY MR. DUCK:  All right.  And

20    you can see that in this memo, Purdue had

21    already started going lateral with MS Contin

22    into noncancer pain; right?

23                MR. HOFFMAN:  Object to form.

24         Foundation.

25                THE WITNESS:  Well, that's what

Confidential                                          JAN-MS-05484202

Lynn Webster, M.D.
February 18, 2019                              62

1        it says.

2        Q.    BY MR. DUCK:  And you can also

3    see from this memo that Purdue was concerned

4    that MS Contin was going to face generic

5    competition after it went off patent;

6    correct?

7              MR. HOFFMAN:  Same objections.

8              THE WITNESS:  That's what it

9        suggests, yeah.

10       Q.    BY MR. DUCK:  Did you know that

11   Purdue was looking for an opioid API to put

12   into its Contin time release formulation at

13   this time?

14       A.    No.

15             MR. HOFFMAN:  Objection to

16       form.  Foundation.

17       Q.    BY MR. DUCK:  Did you know that

18   Purdue had researched which opioid APIs

19   should go into its next formulation of an

20   opioid?

21       A.    I did not.

22             MR. HOFFMAN:  Same objection.

23       Q.    BY MR. DUCK:  And when I say

24   "API," you understand I mean active

25   pharmaceutical ingredient?

Confidential                                    JAN-MS-05484203

Lynn Webster, M.D.
February 18, 2019                                63

1          A.     I know.

2          Q.     Okay.  Thank you.  You can set

3    that aside for now.

4                 I'm going to hand you

5    Exhibit 3.

6    (Exhibit 3 was marked for identification.)

7          Q.     BY MR. DUCK:  Here you go.  And

8    I'm not going to ask you about every page of

9    this document.  You're welcome to spend as

10   much time as you want with it, but I'll be

11   asking you about Pages 1, 2, and 4.

12                MR. ROBINSON:  I think maybe

13           just read 1, 2, and 4.

14                THE WITNESS:  Yeah, I will.

15           The awakening the sleeping giant page.

16                MR. DUCK:  Yep, and that's

17           pretty much all I'm going to ask you

18           about.

19                MR. ROBINSON:  Why don't we see

20           if he needs -- if you feel like any of

21           the questioning requires you to

22           then read the --

23                THE WITNESS:  Okay.

24                MR. ROBINSON:  -- remainder of

25           the document, you are absolutely

Confidential                                                      JAN-MS-05484204

Lynn Webster, M.D.
February 18, 2019                                    64

1          entitled to that.

2                    THE WITNESS:  Okay.

3                    MR. ROBINSON:  But why don't we

4          see -- see if we can do this.

5                    MR. DUCK:  Okay.  Cool.  We'll

6          start on Page 1, then.

7          Q.    You'll see that this Exhibit 3

8     is a document entitled "Networking that works

9     Teamlink"; right?

10         A.    Yes.

11         Q.    And it's Volume 11, Number 1,

12    from the Purdue Frederick Company, winter

13    1996.

14                Do you see that?

15         A.    Yes.

16         Q.    I'll submit to you that this is

17    a sales force newsletter.

18                The -- the title on the first

19    page of this newsletter is "OxyContin The

20    Most Significant Launch in Purdue History."

21                Do you see that?

22         A.    I do.

23         Q.    And you were able to --

24                MR. HOFFMAN:  Sorry, Trey, can

25         you just give me a running object- --

Confidential                                                                          JAN-MS-05484205

 1          objection on lack of foundation?  I

 2          don't think you have any foundation

 3          for this witness.

 4                  MR. DUCK:  You can just object

 5          every time.  No running -- no running

 6          objections.

 7                  MR. HOFFMAN:  All right.

 8          Q.    BY MR. DUCK:  You see that

 9   title?

10          A.    I do.

11          Q.    All right.  So you also see a

12   picture -- it's hard to see -- this is the

13   way this document was produced to us, but

14   you'll see it shows a picture of a man

15   standing at a podium, next to it it says

16   "Richard Sackler, M.D. Senior Vice

17   President."

18                  You see that?

19          A.    I see it.  I can't tell the

20   image.

21          Q.    Right.  And you were able to

22   read, I believe, most of this speech that

23   Dr. Sackler gave to the sales force, and you

24   saw reference to a blizzard of '96.

25                  Do you see that?

Confidential                                                    JAN-MS-05484206

Lynn Webster, M.D.
February 18, 2019                                    66

```
 1          A.     Yes.

 2          Q.     Do you recall a blizzard of

 3    '96?

 4          A.     No.

 5          Q.     I was ten, I don't recall it at

 6    all.

 7                 On the next page there is a

 8    paragraph that is on the left-hand side,

 9    about halfway down it starts, "The

10    significance of the blizzard of '96."

11                 Do you see that?

12          A.     Yes.

13          Q.     And you'll recall from reading

14    this section there is a sort of vignette that

15    Dr. Sackler has painted, a sort of story that

16    he's telling the sales force; right?

17          A.     Yes.

18          Q.     And that paragraph as part of

19    this vignette states, "The significance of

20    the blizzard of '96 is that the launch of

21    OxyContin tablets will be followed by a

22    blizzard of prescriptions that will bury the

23    competition.  The prescription blizzard will

24    be so deep, dense and white that you will

25    never see their White Flag.  Commerce in
```

Confidential                                                          JAN-MS-05484207

Lynn Webster, M.D.
February 18, 2019                                    67

1    competitive products will come to a halt; on

2    the advice of the Law Department, let me

3    amend that.  Commerce in competitive products

4    will come to a virtual halt."

5                Did I read that paragraph

6         right?

7                MR. HOFFMAN:  Object to form.

8         Foundation.

9                THE WITNESS:  Yes.

10        Q.    BY MR. DUCK:  All right.  And

11   you're aware that OxyContin was approved at

12   the end of 1995 and the first full year of

13   marketing was in 1996?

14        A.    I don't know when they

15   marketed, but it was out in '96, yes.

16        Q.    Okay.  Thank you.

17                And have you ever seen this

18   document before?

19        A.    No.

20        Q.    And what do you think about

21   this document?

22                MR. HOFFMAN:  Objection.  Form.

23                MR. ROBINSON:  Form.

24                You can answer.

25                THE WITNESS:  To me, I think

Confidential                                                    JAN-MS-05484208

Lynn Webster, M.D.
February 18, 2019                                                    68

1              this is somebody who's trying to
2              promote his product to a sales staff.
3              Pump them up.
4         Q.    BY MR. DUCK:  Okay.  And on the
5    Page 4, you see that phrase "Awaken the
6    Sleeping Giant"?
7         A.    Yeah.
8         Q.    Remember that phrase "sleeping
9    giant" in Exhibit 2?
10              MR. HOFFMAN:  Object to form.
11         Foundation.
12              THE WITNESS:  Yes, that's
13         right.
14         Q.    BY MR. DUCK:  And that phrase
15    "sleeping giant" was referred to in
16    connection with the potential of oxycodone
17    with respect to morphine; right?
18              MR. ERCOLE:  Objection.
19              MR. HOFFMAN:  Same objections.
20              MR. ROBINSON:  You can look --
21         you can look at Exhibit 2 if you need
22         to look at it.
23              THE WITNESS:  Yeah, I can see
24         it.
25              It suggests that, yeah.

U.S. LEGAL SUPPORT
(877) 479-2484

Confidential                                                    JAN-MS-05484209

Lynn Webster, M.D.
February 18, 2019                              69

1          Q.      BY MR. DUCK:  And it also,

2     within the same paragraph, it's talking about

3     the abuse potential of oxycodone; isn't that

4     right?

5               MR. HOFFMAN:  Object to form.

6          Foundation.

7               THE WITNESS:  I'm sorry.  Point

8          that out to me, please.

9          Q.      BY MR. DUCK:  Yeah, the

10    sentence before.

11         A.      Up here?

12         Q.      Yeah, in paragraph -- in

13    Exhibit 2.

14              MR. HOFFMAN:  Same objections.

15              THE WITNESS:  Yes.  Right.

16         Q.      BY MR. DUCK:  Well, Purdue

17    awakened the sleeping giant, didn't they?

18              MR. HOFFMAN:  Object to the

19         form.

20              THE WITNESS:  I don't know what

21         you mean by that.

22              MR. DUCK:  Hopefully we'll find

23         out in this lawsuit.

24              Now I'm going to hand you what

25         we'll mark as Exhibit 4.

Confidential                                          JAN-MS-05484210

Lynn Webster, M.D.
February 18, 2019                                70

1   (Exhibit 4 was marked for identification.)

2            MR. HOFFMAN:  Object and move

3        to strike counsel's statement.

4            MR. DUCK:  What do you mean by

5        move -- who are you asking to strike?

6        What -- what are you asking for?

7            MR. HOFFMAN:  It's for the

8        record.  When you inappropriately make

9        comments on the record or testify, I'm

10       moving to strike so it's not part of

11       the record.

12           MR. DUCK:  Are you asking me?

13           MR. HOFFMAN:  I'm not asking

14       you.  I don't need to ask you.

15           MR. DUCK:  Well, my view is

16       that your motion's denied.

17           MR. HOFFMAN:  Okay.  Well, just

18       don't do it and I won't have to make a

19       motion.

20           MR. DUCK:  Just object, man.

21       Q.    All right.  I'm going to hand

22   you Exhibit 4.  And I'm going to read this

23   whole thing out loud, so if you want to just

24   start there and then we can read it together

25   and that will save us some time.

Confidential                                                    JAN-MS-05484211

Lynn Webster, M.D.
February 18, 2019                                          71

1          A.     Okay.  That sounds good.

2          Q.     Okay.  Now, Exhibit 4 is an

3     email from Michael Friedman.

4                 Do you see that?

5          A.     Yes.

6          Q.     And you mentioned earlier that

7     you recognized his name.  I'll submit to you

8     that he was a CEO of Purdue.

9                 MR. ROBINSON:  Objection to

10         form.

11                Go ahead.

12         Q.     BY MR. DUCK:  And do you have

13    any reason to dispute that?

14         A.     No.

15                MR. HOFFMAN:  Object to form.

16         Time frame.

17         Q.     BY MR. DUCK:  All right.  This

18    is dated May of 1997.

19                Do you see that at the top?

20         A.     I do.

21         Q.     All right.  It says in the

22    beginning of this email, "My purpose in

23    writing this memorandum is to clarify our

24    position on the very complex issues raised by

25    Mike Cullen during the Phase IV team meeting

Confidential                                          JAN-MS-05484212

Lynn Webster, M.D.
February 18, 2019                                          72

```
 1   and which are the subject of Dr. Richard's

 2   inquiry.

 3              "We are well aware of the view

 4   held by many physicians, that oxycodone is

 5   weaker than morphine.  We all know that this

 6   is a result of their association of oxycodone

 7   with less serious pain syndromes.  This

 8   association arises from their extensive

 9   experience with and use of oxycodone

10   combinations to treat pain arising from a

11   diverse set of causes, some serious, but most

12   less serious.  This 'personality' of

13   oxycodone is an integral part of the

14   'personality' of OxyContin.

15              "When we launched OxyContin, we

16   intentionally avoided a promotional theme

17   that would link OxyContin to cancer pain.  We

18   specifically linked OxyContin to the

19   oxycodone combinations with our 'old way, new

20   way' campaign.  We made sure that our initial

21   detail piece provided reps with the

22   opportunity to sell the product for a number

23   of different pain states.  With all of this,

24   we were still concerned that the drug would

25   be slotted for cancer pain and that we would
```

Confidential                                        JAN-MS-05484213

```
 1   encounter resistance in the nonmalignant pain
 2   market.
 3              "Our pricing of the product was
 4   geared towards the nonmalignant market.  We
 5   knew that it was priced low for the high dose
 6   cancer patient, we would be priced way too
 7   low.  For the standard nonmalignant pain
 8   patient, where we really wanted to make a
 9   market, we feared that the cancer pain
10   experts would object to the two to one ratio
11   and resulting cost of therapy for high dose
12   patients.  However, we had no choice given
13   our chosen position for OxyContin.  In any
14   case, we are developing hydromorphone OD for
15   the high dose patients.
16              "Despite our initial
17   uncertainty, we have been successful beyond
18   our" expectation -- "expectations in the
19   nonmalignant pain market.  Doctors use the
20   drug in nonmalignant pain because it is
21   effective and the 'personality' of OxyContin
22   is less threatening to them and their
23   patients than that of" morphine -- "the
24   morphine alternatives.  I apologize for this
25   unscientific term, but I feel it captures the
```

Confidential                                    JAN-MS-05484214

Lynn Webster, M.D.
February 18, 2019                                    74

```
 1   notion that there are images related to
 2   attributes that influence drug acceptance.
 3   While we might wish to see more of this
 4   product sold for cancer pain, it would be
 5   extremely dangerous at this early stage in
 6   the life of the product to tamper with this
 7   'personality,' to make physicians think that
 8   the drug is stronger or equal to morphine.
 9   We are better off expanding use of OxyContin
10   in nonmalignant pain states and waiting for
11   hydromorphone OD in 1999 to relaunch into
12   cancer pain.
13           "For the time being, I do not
14   plan to try to change the personality of
15   OxyContin.  We will continue to focus on
16   expanding the nonmalignant pain usage.  In
17   this group of patients, morphine is not an
18   alternative and the price is correct.
19           "We will continue to encourage
20   doctors treating cancer patients to start
21   earlier with OxyContin and avoid
22   combinations.  Hopefully they will achieve
23   good results and" that these patients -- "and
24   keep these patients on OxyContin.  For high
25   dose patients we will study the possibility
```

Confidential                                                    JAN-MS-05484215

Lynn Webster, M.D.
February 18, 2019                                            75

 1   of limiting or holding the price increase on

 2   the 80-milligram.  However, I think that our

 3   real future in high dose cancer pain will be

 4   linked to hydromorphone OD.

 5              "I do not plan to spend much

 6   time dealing with the one to two ratio issue.

 7   This is a red herring that is not relevant to

 8   the nonmalignant pain market.  We will

 9   provide our reps with the data and let them

10   use it as needed to diffuse situations where

11   it will work for them."

12              I know this is a little hard to

13   read, but do you believe I read this document

14   correctly?

15        A.    Yes, I think so.

16        Q.    All right.  Have you ever seen

17   this Exhibit 4 --

18        A.    No.

19        Q.    -- before?

20              Are you aware that at this time

21   shortly after OxyContin's launch, Purdue had

22   determined that it would be their course of

23   action to allow physicians to associate

24   OxyContin with combination oxycodone

25   products?

Confidential                                                    JAN-MS-05484216

Lynn Webster, M.D.
February 18, 2019                                    76

```
 1                 MR. HOFFMAN:  Objection.

 2        Foundation.

 3                 MR. ROBINSON:  Objection.

 4                 Counsel, you said "are you

 5        aware."  You mean are you as a result

 6        of reading this or were you --

 7                 MR. DUCK:  No.

 8        Q.    Were you -- were you aware?

 9        A.    No.

10        Q.    And had anybody at Purdue ever

11   told you that before?

12                 MR. HOFFMAN:  Object to form.

13                 THE WITNESS:  Oh, I don't -- I

14        can't remember back in the early -- in

15        the '90s what was told to me.

16        Q.    BY MR. DUCK:  Sure.  And have

17   you ever heard of an opioid or an API --

18   opioid API referred to as having a

19   personality?

20        A.    No.

21        Q.    And you saw that there was

22   reference at the bottom of Page 1 to that

23   unscientific term.

24                 You see that?

25                 MR. HOFFMAN:  Object to form
```

Confidential                                                                JAN-MS-05484217

Lynn Webster, M.D.
February 18, 2019                                    77

1          foundation.

2          Q.      BY MR. DUCK:  Or do you

3    remember that?

4          A.      Referenced?

5          Q.      Yeah.  Friedman says, "I

6    apologize for this unscientific term, but I

7    feel it captures the notion that there are

8    images related to attributes that influence

9    drug acceptance."

10         A.      You don't mean a citation.  You

11   mean just a --

12         Q.      Yeah, yeah, exactly.

13         A.      Okay, yes, I see that there.

14         Q.      And he's referring there to

15   this phrase "personality" that he's using;

16   right?

17         A.      Yes.

18         Q.      And you had never seen that

19   before, had you?

20         A.      No.

21         Q.      But you were aware that at this

22   point in time, oxycodone had been used

23   primarily in combination products; right?

24         A.      That's correct.

25         Q.      And that they were viewed as

Confidential                                                    JAN-MS-05484218

Lynn Webster, M.D.
February 18, 2019                                          78

```
 1   weaker opioids than, say, morphine?

 2              MR. ERCOLE:  Objection to form.

 3              THE WITNESS:  I don't believe

 4         that they were viewed weaker.

 5         Q.    BY MR. DUCK:  Well, you

 6   certainly agree that that's what Purdue is

 7   suggesting here; right?

 8         A.    Well, that's what --

 9              MR. HOFFMAN:  Objection to

10         form.  Foundation.

11              THE WITNESS:  That's what he

12         writes, but I don't think doctors

13         thought it was weaker.

14         Q.    BY MR. DUCK:  And what's your

15   basis for that?

16         A.    Because -- our clinical

17   experience.

18         Q.    Okay.  I'm going to hand you

19   Exhibit 5.

20   (Exhibit 5 was marked for identification.)

21         Q.    BY MR. DUCK:  This is an email

22   chain, so we'll start at the back and work

23   our way forward.  On the last page.

24         A.    The last page?

25         Q.    Yeah, exactly.
```

Confidential                                                   JAN-MS-05484219

Lynn Webster, M.D.
February 18, 2019                                              79

1          A.     Okay.

2          Q.     You might want to have

3    Exhibit 4 handy, because you'll see in the

4    first -- the first paragraph Michael Friedman

5    states that there was a complex issue raised

6    by Mike Cullen, and we'll see in Exhibit 5

7    there's an email from Michael Cullen.

8                 Do you see that?

9          A.     On the document you just gave

10   me?  Okay.  Yes.

11         Q.     And this is --

12         A.     Oh, yes.

13         Q.     This is dated June 1997.

14         A.     Yes.

15         Q.     A few days after the Exhibit 4

16   email; correct?

17         A.     Yes.

18         Q.     Okay.  The subject line is

19   "OxyContin Team Meeting"; correct?

20         A.     Yes.

21         Q.     All right.  This email from

22   Michael Cullen states, "In recent team

23   meetings, we have discussed the issue that

24   OxyContin is perceived by some physicians,

25   particularly oncologists, as not being as

Confidential                                          JAN-MS-05484220

Lynn Webster, M.D.
February 18, 2019                                    80

```
 1   strong as MS Contin.  Although this

 2   perception has had some effect with

 3   physicians switching to MS Contin with more

 4   severe cancer pain patients, it has actually

 5   had a positive effect with physicians' use in

 6   noncancer pain.

 7             "Since oxycodone is perceived

 8   as being" weaker -- "a 'weaker' opioid than

 9   morphine, it has resulted in OxyContin being

10   used much earlier for noncancer pain.

11   Physicians are positioning this product where

12   Percocet, hydrocodone and Tylenol with

13   codeine have been traditionally used.

14             "Since the noncancer pain

15   market is much greater than the cancer pain

16   market, it is important that we allow this

17   product to be positioned where it currently

18   is in the physician's mind.  If we stress the

19   power of OxyContin versus morphine, it may

20   help us in the smaller cancer pain market,

21   but hurt us in the larger potential noncancer

22   pain market.  Some physicians may start

23   positioning this product where morphine is

24   used and wait until pain is severe before

25   using it.
```

Confidential                                                                    JAN-MS-05484221

Lynn Webster, M.D.
February 18, 2019                                              81

1                    "Marketing has decided that the

2     efforts of the Phase IV team should be

3     predominantly focused on expanding OxyContin

4     use for noncancer pain.  Our approach to

5     cancer pain will be to get" -- "get

6     physicians to use it earlier, instead of

7     products such as Percocet, Vicodin, and

8     Tylenol 3.  The sales force can teach the

9     oncologists to properly dose and titrate

10    OxyContin to ensure that they stay with it as

11    the pain increases.  By doing this, the

12    oncologists will realize through experience

13    that OxyContin is effective.

14                    "It is important that we are

15    careful not to change the perception of

16    physicians towards oxycodone when developing

17    promotional pieces, symposia, review

18    articles, studies, et cetera.

19                    "We can discuss this issue

20    further at our next team meeting."

21                    All right.  Did I read that

22    right?

23                    MR. HOFFMAN:  Object to form.

24         Foundation.

25                    THE WITNESS:  Yes, I think you

Confidential                                                                    JAN-MS-05484222

Lynn Webster, M.D.
February 18, 2019                                    82

```
 1        read it correctly.
 2        Q.    BY MR. DUCK:  And have you ever
 3   seen this Exhibit 5 before?
 4        A.    No.
 5        Q.    Okay.  And, again, we see that
 6   they're stating here that physicians view
 7   oxycodone as a weaker opioid than morphine.
 8        A.    That's what it says.  I don't
 9   think that's true.
10              MR. HOFFMAN:  Object to form.
11        Q.    BY MR. DUCK:  Well, is
12   oxycodone a weaker opioid that morphine?
13        A.    No.
14        Q.    Is it a stronger opioid that
15   morphine?
16        A.    They're about the same, but a
17   little stronger.  On milligram to milligram
18   basis, it's stronger.
19        Q.    Oxycodone is stronger?
20        A.    Yes.
21        Q.    Than morphine?
22        A.    Yes.
23        Q.    Right.  And in 19- -- in 1997,
24   do you know if you were doing any work with
25   Purdue?
```

Confidential                                            JAN-MS-05484223

Lynn Webster, M.D.
February 18, 2019                                83

1          A.    I doubt it, but I don't know.

2          Q.    Okay.  And, again, no one from

3   Purdue, to your recollection, has ever told

4   you that at the time around the OxyContin

5   launch, it had determined that physicians

6   viewed oxycodone as weaker than morphine?

7               MR. HOFFMAN:  Object to form.

8          Foundation.

9               THE WITNESS:  I know of no one

10         who told me that, and I know of no

11         physician who thought that.

12         Q.    BY MR. DUCK:  Okay.  Are you

13   familiar with the kind of research that

14   Purdue was doing to determine what physicians

15   thought about OxyContin?

16         A.    No.

17               MR. HOFFMAN:  Object to form.

18         Q.    BY MR. DUCK:  You weren't

19   involved in that, were you?

20         A.    No.

21         Q.    You would agree with me that it

22   could be dangerous if physicians view

23   OxyContin or oxycodone as weaker than

24   morphine; correct?

25               MR. HOFFMAN:  Object to form.

Confidential                                                                 JAN-MS-05484224

Lynn Webster, M.D.
February 18, 2019                                    84

```
 1                THE WITNESS:  Not necessarily.

 2         Q.     BY MR. DUCK:  And why do you

 3   say that?

 4         A.     Because it's -- we assume all

 5   opioids have risk involved, and most of the

 6   risk is individualized to the patient.  It's

 7   not the drug.

 8                So it's not about the drug,

 9   it's always about the person with regard to

10   efficacy and safety.

11         Q.     And certainly you've got to

12   understand the risks associated with a drug

13   before you can tailor it for a particular

14   patient; right?

15         A.     Yes, I think you need to

16   understand the risks.  But across all

17   opioids, there are similar risks.  It's just

18   about the individual response to that

19   particular molecule that you have to be

20   concerned about.

21         Q.     Okay.  And you said you

22   personally weren't aware of any physician who

23   viewed oxycodone as weaker than morphine.

24   You said that; right?

25         A.     That's correct.
```

Confidential                                                    JAN-MS-05484225

Lynn Webster, M.D.
February 18, 2019                                      85

1          Q.    Okay.  You'd agree with me that
2     that would be a misperception?
3               MR. ERCOLE:  Objection to form.
4               THE WITNESS:  Well, I think
5          that it's a misperception to think
6          that oxycodone is weaker than
7          morphine.
8               Now, let's keep in mind
9          we're -- if we're talking about
10         extended release and only the
11         molecule, or if we're looking at
12         combinations, because combinations
13         might be viewed as weaker than an
14         extended release morphine.
15              MR. DUCK:  All right.
16              THE WITNESS:  So it depends on
17         how the question's asked.
18         Q.    BY MR. DUCK:  Understood.
19              You are aware, sir, that
20    oxycodone is an extended release -- excuse
21    me -- OxyContin is an extended release
22    oxycodone product; right?
23         A.    I am aware of that.
24         Q.    It is not a combination
25    product?

Confidential                                                          JAN-MS-05484226

Lynn Webster, M.D.
February 18, 2019                                        86

 1        A.     That's correct.

 2        Q.     And prior to OxyContin hitting

 3   the market, there had never been an extended

 4   release oxycodone product; isn't that right?

 5        A.     I wasn't aware of it.

 6        Q.     Right.  And so physicians'

 7   experience with oxycodone at that point in

 8   time before OxyContin was launched was with

 9   combination products; correct?

10        A.     That's correct.

11               MR. DUCK:  Would you guys like

12        to take a break?

13               THE WITNESS:  Yeah, I could go

14        to the bathroom.

15               MR. ROBINSON:  You need one?

16               THE WITNESS:  Yeah.

17               THE VIDEOGRAPHER:  Off the

18        record.  The time is 10:27.

19          (There was a break taken.)

20               THE VIDEOGRAPHER:  Returning on

21        the record, the time is 10:35.

22        Q.     BY MR. DUCK:  You mentioned

23   earlier that you personally have been visited

24   by sales representatives; right?

25        A.     Yes.

Confidential                                                     JAN-MS-05484227

Lynn Webster, M.D.
February 18, 2019                                    87

```
1              Q.     And you've been visited by

2     Purdue sales representatives?

3              A.     Oh, yes.

4              Q.     Are you aware that Purdue and

5     the other defendants in this lawsuit refer to

6     physicians upon whom they call as "targets"?

7                     MR. EHSAN:  Object to form.

8                     MR. ERCOLE:  Objection to form.

9                     THE WITNESS:  You know, I don't

10        know about targets.

11             Q.     BY MR. DUCK:  You never heard

12    that before?

13             A.     No.

14             Q.     Do you know that you had been

15    specifically identified by these defendants

16    as a target?

17                    MR. HOFFMAN:  Objection to

18        form.

19                    THE WITNESS:  No.

20             Q.     BY MR. DUCK:  Did you know that

21    you had been specifically identified by

22    Purdue as a key opinion leader target?

23                    MR. HOFFMAN:  Objection.

24        Foundation.

25                    THE WITNESS:  No.
```

U.S. LEGAL SUPPORT
(877) 479-2484

Confidential                                                        JAN-MS-05484228

Lynn Webster, M.D.
February 18, 2019                                    88

1          Q.      BY MR. DUCK:  Has any sales

2    representative ever referred to you to your

3    face as a target?

4          A.      No.

5          Q.      I'll give you an example here

6    of a document we'll mark as Exhibit 6.  This

7    was used in a prior deposition, so that's why

8    there's another sticker on it.

9    (Exhibit 6 was marked for identification.)

10         Q.      BY MR. DUCK:  You see this --

11   this document Exhibit 6 is titled "Proposed

12   Target KOLs For PPR Communications"?

13         A.      I see it.

14         Q.      You see who the last person on

15   the list is?

16         A.      Yes.

17         Q.      It's your name; right?

18         A.      That's my name.

19         Q.      Do you recognize some of the

20   other names on this list?

21         A.      I do.

22         Q.      Do you know who Charles Argoff

23   is?

24         A.      I do.

25         Q.      Do you know who Gerry Aronoff

Confidential                                                              JAN-MS-05484229

Lynn Webster, M.D.
February 18, 2019                                89

```
 1    is?

 2         A.    Yes.

 3         Q.    How about Myra Christopher?

 4         A.    Yes.

 5         Q.    Ted Cicero?

 6         A.    Yes.

 7         Q.    Barry Cole?

 8         A.    Yes.

 9         Q.    June Dahl?

10         A.    Yes.

11         Q.    Perry Fine, you know him;

12    right?

13         A.    Yes.

14         Q.    He's from Salt Lake City;

15    correct?

16         A.    Correct.

17         Q.    You've done a lot of work with

18    Perry Fine?

19               MR. ROBINSON:  Form.

20               THE WITNESS:  I don't know that

21         I've done a lot of work with Perry

22         Fine, no.

23         Q.    BY MR. DUCK:  Okay.  He's

24    someone you've worked with in the past?

25               MR. ROBINSON:  Form.
```

Confidential                                                    JAN-MS-05484230

1              You can answer.

2              THE WITNESS:  We've been on

3         maybe a -- on stage together or to

4         talk on CMEs, but we've never done

5         research or any formal work together.

6         Maybe an ADCOM, but not very often.

7         Q.    BY MR. DUCK:  Okay.  You'll see

8    Scott Fishman, you know who that is?

9         A.    Yes.

10        Q.    And you see Aaron Gilson there?

11        A.    Yes.

12        Q.    And I mentioned to you earlier,

13   he gave a deposition in this case?

14        A.    You did.

15        Q.    And then we also see Russ

16   Portenoy on the right side?

17        A.    Yes.

18        Q.    Alan Spanos, do you know who

19   that is?

20        A.    I do -- Alan Spanos.  No, I

21   don't know that.  I know the name, but I

22   don't know him.

23        Q.    Do you know anything about him?

24        A.    No.

25        Q.    And, again, you're the last

Confidential                                                    JAN-MS-05484231

 1    person on this list; right?

 2         A.    Yes.

 3         Q.    So how long have you been

 4    practicing, Dr. Webster?

 5         A.    I started practice in 1980.

 6         Q.    1980.  So --

 7         A.    I practiced for 30 years before

 8    I then moved to doing just clinical research.

 9         Q.    Okay.  30 years of practice?

10         A.    Of seeing patients.

11         Q.    Of seeing patients.

12               During that time you were

13    visited by sales representatives; right?

14         A.    Yes.

15         Q.    And until today, you had never

16    seen the phrase "target" with respect to

17    these companies identifying who they would

18    use, who they would call on; right?

19               MR. ERCOLE:  Objection to form.

20               THE WITNESS:  I've never seen

21         or heard that term, except I know that

22         I was a -- a KOL and that -- because

23         of the amount I published and the

24         respect I have in the field that --

25         that people sought out my opinion.

Confidential                                                                    JAN-MS-05484232

Lynn Webster, M.D.
February 18, 2019                                    92

1          Q.     BY MR. DUCK:  Do you know what

2     IMS data is?

3          A.     Yes.

4          Q.     You're aware that companies use

5     IMS data?

6          A.     Yes.

7          Q.     And you -- you know that IMS

8     data shows prescribing volume for a

9     particular physicians; correct?

10         A.     Yes.

11         Q.     So Purdue, for instance, can

12    determine what kinds of opioids you've

13    prescribed and how often you've prescribed

14    them?

15         A.     That's what I understand.

16         Q.     And you're aware that these

17    companies take IMS data and rank physicians

18    in what they call deciles?

19                MR. ERCOLE:  Objection to form.

20                MR. HOFFMAN:  Objection.  Form.

21                THE WITNESS:  I have heard

22         that, yes.

23         Q.     BY MR. DUCK:  And the top

24    deciles are typically the primary targets of

25    these defendants.  Did you know that?

Confidential                                                      JAN-MS-05484233

Lynn Webster, M.D.
February 18, 2019                                    93

```
 1              MR. ERCOLE:  Objection to form.
 2              THE WITNESS:  Well, the top
 3      deciles for opioid --
 4              MR. ROBINSON:  Listen to the
 5      question.
 6              Read it back.
 7              THE WITNESS:  What was it?
 8              MR. ROBINSON:  Read back the
 9      question.
10   (The record was read as follows:
11              "Q.  And the top deciles are
12      typically the primary targets of these
13      defendants.  Did you know that?")
14              THE WITNESS:  No.
15      Q.    BY MR. DUCK:  You never heard
16   that before; right?
17      A.    No.
18      Q.    You're surprised to find that
19   you were a higher decile position?
20      A.    No.
21      Q.    Because you prescribed opioids
22   during your practice regularly?
23      A.    Because my -- because my
24   practice was primarily chronic pain.  I was a
25   tertiary center and so naturally I would be
```

Confidential                                    JAN-MS-05484234

Lynn Webster, M.D.
February 18, 2019                                    94

 1   one of the highest prescribers.

 2        Q.    Right.  And you were,

 3   therefore, a target?

 4        A.    I don't know if I was a target,

 5   but I -- I was a high prescriber.  So by your

 6   definition, I probably was among that group.

 7        Q.    Have you read the 2003 GAO

 8   report about OxyContin?

 9        A.    No, I have not read it

10   completely.

11        Q.    Do you recall it coming out?

12        A.    There are so many different GAO

13   reports that I've scanned.  I think I have

14   read that and I do believe that I have -- am

15   familiar with parts of it, but I can't be

16   specific.

17        Q.    Okay.  I'll hand you a copy of

18   it.  We'll mark it as Exhibit 7.

19   (Exhibit 7 was marked for identification.)

20        Q.    BY MR. DUCK:  And in keeping

21   with your counsel's earlier idea, why don't I

22   point you to where --

23        A.    Good idea.

24        Q.    I'm just going to turn to the

25   second page here, and you'll see that well --

Confidential                                              JAN-MS-05484235

Lynn Webster, M.D.
February 18, 2019                                            95

 1   well -- sorry.  On the first page, you see

 2   this is the 2003 GAO Report to Congressional

 3   Requesters.  The title is "Prescription Drugs

 4   OxyContin Abuse and Diversion and Efforts to

 5   Address the Problem"; correct?

 6        A.    Yes.

 7        Q.    Were you aware there was an

 8   OxyContin specific GAO report?

 9        A.    You know, I can't remember at

10   this time if I was aware of it.

11        Q.    Okay.  On the second page there

12   is a highlights column on the left-hand side,

13   and there is a section entitled "Why GAO Did

14   This Study."

15             Do you see that?

16        A.    Yes.

17        Q.    And you're aware that "GAO"

18   stands for the United States General

19   Accounting Office?

20        A.    Correct.

21        Q.    And that section states, "Amid

22   heightened awareness that many patients with

23   cancer and other chronic diseases suffer from

24   undertreated pain, the Food and Drug

25   Administration (FDA) approved Purdue Pharma's

Confidential                                                    JAN-MS-05484236

Lynn Webster, M.D.
February 18, 2019                               96

```
 1    controlled-release pain reliever OxyContin in

 2    1995.  Sales grew rapidly, and by 2001

 3    OxyContin had become the most prescribed

 4    brand-name narcotic medication for treating

 5    moderate-to-severe pain.  In early 2000,

 6    reports began to" suffer about -- "surface

 7    about abuse and diversion for illicit use of

 8    OxyContin, which contains the opioid

 9    oxycodone.  GAO was asked to examine concerns

10    about these issues.  Specifically, GAO

11    reviewed (1) how OxyContin was marketed and

12    promoted (2) what factors contributed to the

13    abuse and diversion of OxyContin, and (3)

14    what actions have been taken to address

15    OxyContin abuse and diversion."

16              Did I read that right?

17        A.    Correct.

18        Q.    All right.  And on the right

19    side we see the section of this report

20    entitled "What GAO Found"; right?

21        A.    Correct.

22        Q.    All right.  That states,

23    "Purdue conducted an extensive campaign to

24    market and promote OxyContin using an

25    expanded sales force to encourage physicians,
```

Confidential                                                        JAN-MS-05484237

Lynn Webster, M.D.
February 18, 2019                                    97

1    including primary care specialists, to

2    prescribe OxyContin not only for cancer pain,

3    but also as an initial opioid treatment for

4    moderate-to-severe noncancer pain.  OxyContin

5    prescriptions, particularly those for

6    noncancer pain, grew rapidly, and by 2003

7    half of all OxyContin prescribers were

8    primary care physicians.  The Drug

9    Enforcement Administration (DEA) has

10   expressed concerns that Purdue's aggressive

11   marketing of OxyContin focused on promoting

12   the drug to treat a wide range of conditions

13   to physicians who may not have been

14   adequately trained in pain management.  FDA

15   has taken two actions against Purdue for

16   OxyContin advertising violations.  Further,

17   Purdue did not submit an OxyContin

18   promotional video for FDA review upon its

19   initial use in 1998 as required by FDA

20   regulations."

21           Did I read that paragraph

22   right?

23        A.    Yes.

24              MR. HOFFMAN:  Object to form.

25        Foundation.

Confidential                                                        JAN-MS-05484238

Lynn Webster, M.D.
February 18, 2019                                          98

 1          Q.     BY MR. DUCK:  Now, you're not a

 2    primary care physician, are you?

 3          A.     Correct.

 4          Q.     You're a pain management

 5    doctor; correct?

 6          A.     I'm a specialist, yes.

 7          Q.     Pain management specialist.

 8    Right.

 9                 Were you aware that Purdue was

10    primarily promoting OxyContin to primary care

11    physicians?

12                 MR. HOFFMAN:  Object to form.

13          Foundation.

14                 THE WITNESS:  No.

15          Q.     BY MR. DUCK:  And unlike you,

16    primary care physicians do not have the same

17    kind of training in pain management, do they?

18          A.     I don't think most people were

19    trained in pain medicine, and still are not.

20          Q.     Yeah, and most people weren't

21    trained about opioids --

22          A.     Correct.

23          Q.     -- the way you were; right?

24          A.     Well, I wasn't trained either.

25    I had to self-train.

Confidential                                          JAN-MS-05484239

```
 1          Q.     And you'll agree with me that

 2   most primary care physicians probably did not

 3   do the same kind of self-training about

 4   opioids that you did?

 5          A.     Yes, I think that's true.

 6                 MR. HOFFMAN:  Objection to

 7          form.

 8    (Mr. Leonoudakis joined the proceedings.)

 9                 MR. ROBINSON:  Let's get an

10          appearance for the record.

11                 MR. DUCK:  This is Ross -- Ross

12          Leonoudakis for Nix Patterson on

13          behalf of the State.

14          Q.     The next paragraph of this

15   section, Dr. Webster, states, "Several

16   factors may have contributed to the abuse and

17   diversion of OxyContin.  The active

18   ingredient in OxyContin is twice as potent as

19   morphine, which may have made it an

20   attractive target for misuse.  Further, the

21   original label safety warning advising

22   patients not to crush the tablets because of

23   the possible rapid release of a potentially

24   toxic amount of oxycodone may have

25   inadvertently alerted abusers to methods for
```

Confidential                                                                JAN-MS-05484240

Lynn Webster, M.D
February 18, 2019                                    100

1    abuse.  Moreover, the significant increase in

2    OxyContin's availability in the marketplace

3    may have increased opportunities to obtain

4    the drug illicitly in some states.  Finally,

5    the history of abuse and diversion of

6    prescription drugs, including opioids in some

7    states, may have predisposed certain areas to

8    problems with oxycodone.  However, GAO cannot

9    assess the relationship between the increased

10   availability of OxyContin and locations of

11   abuse and diversion because the data on abuse

12   and diversion are not reliable, comprehensive

13   or timely."

14           Did I read that right?

15       A.    Yes.

16       Q.    You're aware that around this

17   time what have been referred to as "hot

18   spots" of OxyContin abuse were cropping up?

19           MR. HOFFMAN:  Objection to

20       form.

21           THE WITNESS:  I -- you know,

22       I -- that sounds vaguely familiar, but

23       I'm -- I'm not keenly tuned in to

24       that.

25       Q.    BY MR. DUCK:  And were you

Confidential                                                    JAN-MS-05484241

Lynn Webster, M.D
February 18, 2019                                    101

```
 1    aware that Purdue aggressively promoted

 2    OxyContin following its launch?

 3              MR. HOFFMAN:  Object to form.

 4         Foundation.

 5              THE WITNESS:  I'm not aware of

 6         Purdue's marketing plan.

 7         Q.    BY MR. DUCK:  And the documents

 8    we've looked at today, in particular the

 9    Richard Sackler speech, suggested that

10    OxyContin would be aggressively promoted such

11    that a blizzard of prescriptions would

12    follow; correct?

13              MR. HOFFMAN:  Object to form.

14         Foundation.

15              THE WITNESS:  I think that's

16         what it implies for sure.

17         Q.    BY MR. DUCK:  If you'll turn to

18    Page 6.  The very last paragraph of this

19    Page 6 says, "We received comments on a draft

20    of this report from FDA, DEA, and Purdue."

21              You see that?

22         A.    Yes.

23         Q.    The last sentence of this --

24    well, let me just keep reading.  It goes on,

25    "Purdue agreed with our recommendation that
```

Confidential

JAN-MS-05484242

Lynn Webster, M.D
February 18, 2019                                              102

```
 1    risk management plans for Schedule II

 2    controlled substances contain a strategy for

 3    monitoring" -- "monitoring and identifying

 4    potential abuse and diversion problems.  DEA

 5    reiterated its statement that Purdue's

 6    aggressive marketing of OxyContin exacerbated

 7    the abuse and diversion problems and noted

 8    that its -- it is essential that risk

 9    management plans be put in place prior to the

10    introduction of controlled substances into

11    the marketplace.  Purdue said that the report

12    appeared to be fair and balanced, but that we

13    should add that the media is one of the

14    factors contributing to abuse and diversion

15    problems with OxyContin.  We incorporated

16    their technical comments where appropriate."

17              Were you aware that Purdue had

18    stated that this GAO report was fair and

19    balanced?

20         A.    I don't remember being aware of

21    that.

22              MR. HOFFMAN:  Sorry.  Object to

23         the form.  Foundation.

24         Q.    BY MR. DUCK:  And you have no

25    reason to disagree with the DEA's statement
```

Confidential                                              JAN-MS-05484243

```
 1    that Purdue's aggressive marketing of

 2    OxyContin exacerbated the abuse and diversion

 3    problems?

 4              MR. HOFFMAN:  Object to form.

 5              THE WITNESS:  I'm not so sure I

 6         would agree with most of what the DEA

 7         says.

 8         Q.    BY MR. DUCK:  And what do you

 9    mean by that?

10         A.    Because the DEA's been, I

11    think, a contributor to our problem, and they

12    often misstate what's really going on.

13         Q.    Well, it's true, sir, that the

14    DEA has investigated you; right?

15         A.    Yes, that's correct.

16         Q.    And you have a particular

17    distrust of the DEA; is that fair?

18         A.    Not because of that.  There was

19    no consequences of that.

20         Q.    Sir, are you aware that Purdue

21    pled guilty to a federal felony --

22         A.    Yes.

23         Q.    -- 2007?

24         A.    I knew -- party to Purdue or

25    Purdue, I'm not sure who it was, but there
```

Confidential                                                    JAN-MS-05484244

Lynn Webster, M.D
February 18, 2019                                    104

```
 1    was a guilty plea.

 2         Q.    And how did you become aware of

 3    that?

 4         A.    By reading it in the newspaper.

 5         Q.    Did Purdue ever send anybody to

 6    you and explain to you what had happened?

 7         A.    Not that I remember.

 8         Q.    Purdue ever send you an email

 9    or anything explaining what happened?

10         A.    Not that I remember.

11         Q.    Okay.  Do you know what the

12    Purdue guilty plea related to?

13         A.    Not the details.

14         Q.    Well, you're aware that it

15    related to their aggressive promotion of

16    OxyContin; correct?

17         A.    Yes, I think so.  That's what

18    it was about.

19         Q.    I'm going to hand you

20    Exhibit 8.

21    (Exhibit 8 was marked for identification.)

22         Q.    BY MR. DUCK:  This is the whole

23    thing, even starting with the statement by

24    the U.S. attorney that prosecuted Purdue.

25    And we're not going to look at this whole
```

Confidential                                                                     JAN-MS-05484245

Lynn Webster, M.D
February 18, 2019                              105

```
 1    thing, but I do want to point out a few

 2    things to you.

 3              First of all, have you seen

 4    this statement before?

 5        A.    No, not that I recall.

 6              MR. ROBINSON:  I think we can

 7        all agree it's too many pages to read

 8        the whole thing before he asks you a

 9        question.

10              MR. DUCK:  Yeah, I'm not --

11        yeah, I'm just going to ask a few

12        questions about --

13              MR. ZAKRZEWSKI:  Is this one

14        document?  Was this, you know,

15        produced as one document?

16              MR. DUCK:  This is the actual

17        document that you can pull from DOJ's

18        website.  It's one document.

19        Q.    All right.  So the first part

20    is the statement of United States attorney

21    John Brownlee on the guilty plea of the

22    Purdue Frederick Company and its executives

23    for illegally misbranding OxyContin; right?

24              MR. HOFFMAN:  Object to form.

25        Foundation.
```

Confidential                                        JAN-MS-05484246

Lynn Webster, M.D
February 18, 2019                                    106

1          Q.     BY MR. DUCK:  You see that?

2          A.     Yes, that's what the title is.

3          Q.     Sure.  And it's dated May 10,

4     2007, correct?

5          A.     Yes, it is.

6          Q.     It states, "One of the oldest

7     and most challenging medical mysteries is the

8     treatment of pain.  For centuries, scientists

9     and doctors have searched for a drug that

10    would safely relieve patients of their

11    chronic pain without inflicting the dangerous

12    side effects that routinely come from the use

13    of addictive narcotics.  The discovery of

14    this 'wonder' drug would bring hope and

15    relief to millions of suffering patients and

16    wealth beyond one's imagination to its

17    creators.

18             "In 1986, Purdue and its top

19    executives claimed that they had developed

20    such a drug; a safe drug that would help

21    those suffering in pain.  The name of that

22    drug was OxyContin.  Backed by an aggressive

23    marketing campaign, Purdue's OxyContin became

24    the new pain medication of choice for many

25    doctors and patients.  Purdue claimed it had

Confidential                                                    JAN-MS-05484247

Lynn Webster, M.D
February 18, 2019                                           107

```
 1   created the miracle drug - a low risk drug
 2   that could provide long acting pain relief
 3   but was less addictive and less subject to
 4   abuse.  Purdue's marketing campaign worked,
 5   and sales for OxyContin skyrocketed - making
 6   billions for Purdue and millions for its top
 7   executives.
 8             "But OxyContin offered no
 9   miracles to those suffering in pain.
10   Purdue's claim that OxyContin was less
11   addictive and less subject to abuse and
12   diversion were false - and Purdue knew its
13   claims were false.  The" results -- "The
14   result of their misrepresentations and crimes
15   sparked one of our nation's greatest
16   prescription drug failures.  OxyContin is
17   nothing more than pure oxycodone - a habit
18   forming narcotic derived from the opium
19   poppy.  Purdue's OxyContin never lived up to
20   its hype and never offered a low risk way of
21   reducing pain as promised.  Simply put, the
22   genesis of OxyContin was not the result of
23   good science or laboratory experiment.
24   OxyContin was the child of marketeers and
25   bottom line financial decision-making.
```

Confidential                                                          JAN-MS-05484248

Lynn Webster, M.D
February 18, 2019                                          108

```
 1            "Accordingly, this morning, in

 2   a federal courtroom in Abingdon, Virginia,

 3   the Purdue Frederick Company, the

 4   manufacturer and distributor of OxyContin,

 5   pleaded guilty to a felony charge of"

 6   illegal -- "illegally misbranding OxyContin

 7   in an effort to mislead and defraud

 8   physicians and consumers.  Purdue has agreed

 9   to pay over 600 million in criminal and civil

10   penalties, fines and forfeitures, subjected

11   itself to independent monitoring and an

12   extensive remedial action program,

13   acknowledged that it illegally marketed and

14   promoted OxyContin by falsely claiming that

15   OxyContin was less addictive, less subject to

16   abuse and diversion, and less likely to cause

17   withdrawal symptoms than other pain

18   medications, all in an effort to maximize

19   profits.  Also, Purdue's Chief Executive

20   Officer Michael Friedman, General Counsel

21   Howard Udell, and former Chief Medical

22   Officer Paul Goldenheim pleaded guilty to a

23   misdemeanor charge of misbranding OxyContin

24   and collectively agreed to pay 34.5 million

25   in penalties.  With its OxyContin, Purdue
```

Confidential

JAN-MS-05484249

Lynn Webster, M.D.
February 18, 2019                                    109

```
 1    unleashed a highly abusable, addictive,

 2    potentially dangerous drug on an unsuspecting

 3    and unknowing public.  For these

 4    misrepresentations and crimes, Purdue and its

 5    executives have been brought to justice."

 6               Did I read those paragraphs

 7    right?

 8               MR. HOFFMAN:  Object to form.

 9         Foundation.

10               THE WITNESS:  Yes.

11               MR. HOFFMAN:  Move to strike.

12         Q.    BY MR. DUCK:  All right.  If

13    you'll turn to the next document -- excuse

14    me -- the -- not the next document, but the

15    next one.  It's a -- it's a document entitled

16    "Agreed Statement of Facts," and it's not --

17    it's probably a third of the way through.  It

18    looks like this (indicating).

19               MR. ROBINSON:  Which?

20               THE WITNESS:  Is it this

21         (indicating)?

22               MR. DUCK:  That's it.

23         Q.    All right.  If you'll turn to

24    Page 9 of this Agreed Statement of Facts.  Do

25    you see Paragraph 29 there?
```

Confidential                                                    JAN-MS-05484250

Lynn Webster, M.D
February 18, 2019                                    110

1          A.     Yes.

2          Q.     And this is under the title

3     "Misbranding of OxyContin: Misleading Use of

4     Article to Claim No Withdrawal Or Tolerance";

5     right?

6          A.     Yes.

7          Q.     All right.  Paragraph 29

8     states, "In or about May 1997, certain Purdue

9     supervisors and employees stated that while

10    they were well aware of the incorrect view

11    held by many physicians that oxycodone was

12    weaker than morphine, they did not want to do

13    anything to make physicians think that

14    oxycodone was stronger or equal to morphine

15    or take any steps in the form of promotional

16    material, symposia, clinical publications,

17    conventions or communications with the field

18    force that would affect the unique position

19    that OxyContin had in many physician's

20    minds."

21                Right?  That's what it says?

22                MR. HOFFMAN:  Object to form.

23                THE WITNESS:  That's what it

24         says.

25         Q.     BY MR. DUCK:  And you'll see

Confidential                                                    JAN-MS-05484251

Lynn Webster, M.D
February 18, 2019                                    111

```
 1    that referenced in 1997, those are the exact

 2    emails that we looked at earlier; correct?

 3              MR. HOFFMAN:  Object to form.

 4         Foundation.

 5              THE WITNESS:  Yes.

 6         Q.    And you'll recall this document

 7    we're looking at right now is an Agreed

 8    Statement of Facts; right?

 9         A.    I don't know the legal stuff,

10    but sounds like they agreed to it or they

11    wouldn't have signed it or something, yeah.

12         Q.    Right.  And if you'll turn to

13    Page 16 of this document.  On this Page 16

14    and the various iterations of this Page 16

15    that follow, you'll see that all of the

16    Purdue defendants identified signed this

17    Agreed Statement of Facts; right?

18         A.    I see that.

19         Q.    You remember Michael Friedman,

20    he was on that original memo in 1990, wasn't

21    he?

22         A.    Yes.

23         Q.    He was the one that wrote that

24    email that we looked at that used the term

25    "personality"; correct?
```

Confidential                                                          JAN-MS-05484252

1          A.     Correct.

2          Q.     You'll recall that Paul

3    Goldenheim was on that original email -- memo

4    from 1990, wasn't he?

5          A.     Yes.

6          Q.     And he was the chief medical

7    officer for Purdue; isn't that right?

8          A.     Yes.

9          Q.     And they signed this Agreed

10   Statement of Facts as we see on these

11   Pages 16; correct?

12         A.     Correct.

13         Q.     Now, had you ever read that

14   Agreed Statement of Facts before?

15         A.     No.

16         Q.     Is this the first time you've

17   looked at detail -- looked in detail at the

18   Purdue guilty plea?

19         A.     I don't think I'm looking at it

20   in detail right now either.

21         Q.     I agree.

22                Is this the first time you've

23   looked at that level of detail?

24         A.     Yes, that's correct.

25         Q.     And this is a large document,

Confidential                                                          JAN-MS-05484253

1   isn't it?

2        A.     It would take me a while to

3   read it.

4        Q.     There's a lot more in there;

5   right?

6        A.     There's a lot there.

7        Q.     You'd agree with me that drug

8   manufacturers should not place profits over

9   patients, should they?

10              MR. ERCOLE:  Objection to the

11          form.

12              THE WITNESS:  I think that we

13          always have to have a focus on the

14          patient's well-being.

15       Q.     BY MR. DUCK:  Right.  That

16   should be the primary focus, shouldn't it?

17       A.     I think for all physicians,

18   everyone, that should be our primary focus,

19   including the government.

20       Q.     Including manufacturers of

21   opioids?

22       A.     Everyone should have -- we

23   should have our primary focus on the

24   well-being of people.

25       Q.     Okay.  And money or profits

Confidential                                                    JAN-MS-05484254

Lynn Webster, M.D
February 18, 2019                                    114

1    should never displace that primary focus?

2         A.    We should never harm people for

3    profit.  Intentionally harm.

4         Q.    And beyond that, the goal --

5    primary goal of a drug manufacturer should

6    never be to make money?

7              MR. ERCOLE:  Objection to form.

8              THE WITNESS:  No, that's not

9         true.  They're businesses.  They're

10        all -- they're all going to make

11        money.  I mean, how -- we couldn't

12        have innovation, we wouldn't have

13        cures for cancer today unless they

14        could make money.

15        Q.    BY MR. DUCK:  All right.  I

16   want to make sure I understand your

17   testimony.

18              Is it your testimony that

19   Purdue's primary goal should be to make

20   money?

21              MR. HOFFMAN:  Objection.

22              MR. ROBINSON:  Objection.

23        Form.

24              THE WITNESS:  That's not what I

25        said.

Confidential                                                          JAN-MS-05484255

1          Q.     BY MR. DUCK:  Okay.  Clarify.

2          A.     I do not -- I believe that

3   pharmaceutical companies have to make money

4   or they're not going to exist.  And

5   pharmaceutical companies can be of great

6   benefit to society, because they provide us

7   cures, they provide us treatments that we

8   need.

9                 But our focus always has to be

10  on improving health for the vast majority of

11  people.  And it's always a risk-benefit

12  analysis.  Not everyone's going to benefit

13  from all -- all of what a pharmaceutical

14  company's going to offer or for any

15  particular treatment.

16                So in the balance, there has to

17  be more good than harm.

18          Q.     Kind of sounds like you're

19  talking about utilitarianism; is that your --

20          A.     No, I'm not --

21                 MR ROBINSON:  Form.

22          Q.     BY MR. DUCK:  -- your world

23  view -- let me finish my question.

24                 MR. ROBINSON:  Yeah, sorry.

25          Q.     BY MR. DUCK:  Is utilitarianism

Confidential                                                    JAN-MS-05484256

Lynn Webster, M.D
February 18, 2019                                116

1     your philosophical world view?

2              MR. ROBINSON:  Objection.

3         Form.

4              MR. EHSAN:  Object to form.

5              THE WITNESS:  No.

6         Q.    BY MR. DUCK:  The greatest

7     amount of good for the greatest amount of

8     people; is that your --

9         A.    No.

10        Q.    -- philosophical world view?

11        A.    No.

12        Q.    Is it your philosophical world

13    view that the ends justify the means?

14             MR. ROBINSON:  Objection.

15             MR. ERCOLE:  Objection.  Form.

16             THE WITNESS:  I don't think

17        this is about my philosophical view.

18        I could tell you that I believe when I

19        evaluate patients in the clinic, that

20        I'm always looking at the risk-benefit

21        to any treatment option.

22             And if I have a pharmaceutical

23        drug that has a greater risk than

24        harm, then I'm not going to use it for

25        that particular patient.

Confidential                                                      JAN-MS-05484257

1            But the next patient may -- I

2        may view that there's greater benefit

3        than potential harm, and in that

4        person I think it would be warranted.

5            So I think that on a larger

6        scale we step back, and at the -- at

7        the pharmaceutical level, they have to

8        take the same perspective.

9            All drugs are poison.  There

10       are -- it's just about what the dose

11       is.  Aspirin, NSAIDS, everything has a

12       toxicity level.

13           What we have to do is identify

14       what is the proper dose, or whether a

15       dose or a drug should be used for a

16       particular patient population, and

17       then titrate to that particular

18       patient's needs.

19       Q.    Is it your opinion that as long

20   as pharmaceutical companies help more people

21   than they hurt, they should be allowed to

22   stay in business and make money?

23           MR. ROBINSON:  Objection.

24       Form.

25           MR. HOFFMAN:  Object to form.

Confidential                                                      JAN-MS-05484258

```
 1              THE WITNESS:  No, not

 2         necessarily.  I think that it isn't

 3         just the sum of the two.  I think that

 4         there has to be a lot of factors that

 5         have to be considered.

 6         Q.    BY MR. DUCK:  Okay.  Now, I

 7    asked you a question earlier and you also

 8    said no, not necessarily.  I want to -- I

 9    want to make sure that you understand my

10    question and that --

11         A.    Okay.  Good.

12         Q.    -- you answered the question I

13    ask.

14              Do you think that it is ever

15    appropriate for the primary objective of a

16    pharmaceutical company to be profits?

17              MR. HOFFMAN:  Object to form.

18              MR. ERCOLE:  Same objection.

19              THE WITNESS:  I think that is

20         the primary objective.  In the U.S.,

21         that is the primary objective of

22         pharmaceutical companies.

23              But you can -- you can have

24         mutual goals.  You can -- you can

25         shoot for making an improvement in
```

Confidential                                                                    JAN-MS-05484259

Lynn Webster, M.D.
February 18, 2019                                    119

```
 1          health care and profit from it.
 2          Q.    BY MR. DUCK:  Okay.  Now, the
 3    treatment of patients and the achievement of
 4    appropriate health care should not be
 5    compromised because of the profits objective.
 6               You agree with that; right?
 7               MR. ERCOLE:  Objection to form.
 8               THE WITNESS:  I think you're in
 9          generalities.  I think -- I think we
10          have to think about the benefit of all
11          of our patients and individualize the
12          care.
13          Q.    BY MR. DUCK:  Pharmaceutical
14    companies don't treat patients, do they?
15          A.    They make it available for us
16    to treat, that's right.
17          Q.    Doctors treat patients; right?
18          A.    Correct.
19          Q.    And pharmaceutical companies
20    send sales representatives to communicate
21    with physicians; correct?
22          A.    Most of them do.
23          Q.    And are you aware in this case
24    these defendants say that they send -- they
25    send sales representatives to educate
```

Confidential                                                        JAN-MS-05484260

Lynn Webster, M.D.
February 18, 2019                                    120

 1    physicians?

 2              MR. ERCOLE:  Objection to form.

 3              MR. ROBINSON:  Objection.

 4              THE WITNESS:  I think back in

 5         the '90s that sales reps were supposed

 6         to educate.

 7         Q.    BY MR. DUCK:  Okay.  And you've

 8    seen from the documents so far that the

 9    primary targets for Purdue, at least, were

10    primary care physicians; right?

11              MR. HOFFMAN:  Object to form.

12         Foundation.

13              THE WITNESS:  Well, you've

14         shown me documents here.  I'm not sure

15         these -- this is proposed targets.  I

16         don't think these are primarily --

17         Q.    BY MR. DUCK:  Well, you saw the

18    GAO report; right?

19         A.    Yeah, I saw that.

20         Q.    And you saw that more than half

21    of prescribers of OxyContin at the time of

22    that report in 2003 were primary care

23    physicians?

24              MR. HOFFMAN:  I'm sorry,

25         misstates the document.  It says

Confidential                                              JAN-MS-05484261

1          "nearly half," it doesn't say "more

2      than half."

3      Q.    BY MR. DUCK:  All right.  The

4   GAO report says that nearly half of the

5   prescribers of OxyContin were primary care

6   physicians; right?

7      A.    Most physicians who prescribe

8   medications are primary care.  There are far

9   more physicians -- primary care physicians

10  than there are specialists, so it would be --

11  it would be obvious that -- that primary care

12  would probably prescribe more of all drugs,

13  not just opioids.

14     Q.    Yeah, and maybe that's the

15  reason why Purdue targeted primary care --

16  primary care physicians?

17     A.    I don't know why --

18            MR. HOFFMAN:  Objection to

19     form.

20            MR. ROBINSON:  Objection.

21            THE WITNESS:  I don't know why

22     they targeted.

23     Q.    BY MR. DUCK:  Okay.  So did you

24  know that sales representatives don't even

25  have to have a science degree?  They could be

Confidential                                                    JAN-MS-05484262

Lynn Webster, M.D.
February 18, 2019                                    122

```
 1    an English major.  Did you know that?

 2         A.    Yes.

 3               MR. HOFFMAN:  Objection to

 4         form.

 5         Q.    BY MR. DUCK:  Does that

 6    surprise you?

 7         A.    You know, it doesn't matter who

 8    they are, to me, because I evaluate the

 9    science based upon my knowledge and

10    expertise, not really what a sales rep is

11    going to provide me.

12         Q.    How do you feel about an art

13    history major educating primary care

14    physicians about OxyContin in the 1990s?

15               MR. HOFFMAN:  Object to form.

16         Lacks foundation.

17               THE WITNESS:  No art history

18         major tried to educate me.

19         Q.    BY MR. DUCK:  How do you feel

20    about a graphic design major trying to

21    educate a family doctor about OxyContin in

22    1998?

23               MR. HOFFMAN:  Object to form.

24               MR. ROBINSON:  Objection.

25         Form.  Foundation.
```

Confidential                                                                JAN-MS-05484263

1        Q.      BY MR. DUCK:  It's

2  preposterous, isn't it, sir?

3        A.      Well, I don't know what they're

4  trying to educate.  I know what it is -- if

5  they're just bringing them literature as a

6  courier or as a librarian.  I mean,

7  librarians can teach too.  I mean, I'm not

8  here to say that's good or bad, because I

9  don't know what it is that they did.

10       Q.      BY MR. DUCK:  And did you know

11  that Purdue had over a thousand sales

12  representatives at a point in time?

13       A.      I have no idea what Purdue did.

14               MR. HOFFMAN:  Object to form.

15       Lacks foundation.

16       Q.      BY MR. DUCK:  No idea?

17       A.      No idea.

18       Q.      Are you defensive at all of

19  Purdue's marketing?

20               MR. ROBINSON:  Objection.

21               THE WITNESS:  Defensive?

22               MR. DUCK:  Yeah.

23               THE WITNESS:  You mean do I

24       think they did everything right?

25               MR. DUCK:  Right.

Confidential                                                                    JAN-MS-05484264

Lynn Webster, M.D
February 18, 2019                                    124

1                    THE WITNESS:  I have no idea

2         what they did.

3         Q.    BY MR. DUCK:  Do you have an

4    opinion at all about their marketing?

5                    MR. ROBINSON:  Objection.

6                    THE WITNESS:  I do not, because

7         I don't understand it and I have not

8         looked at -- looked at it.  I know

9         that I've read a lot in the media, and

10        obviously there are these lawsuits

11        that make you wonder what has --

12        what I don't know.

13        Q.    BY MR. DUCK:  Right.  Now, do

14   you have an opinion at all about the cause of

15   the current opioid crisis?

16        A.    I have quite a few opinions

17   about it.

18        Q.    Okay.  And what are those?

19        A.    Well, I think it's a -- it's a

20   complicated problem and it's multifactorial.

21   I believe that we got here because there was

22   a huge need to treat a large sector of

23   society that was undertreated, and insurance

24   companies weren't offering any alternative

25   treatment.  The cheapest treatment was an

Confidential                                              JAN-MS-05484265

Lynn Webster, M.D
February 18, 2019                    125

```
 1    opioid.

 2              Physicians were ill prepared to

 3    address pain.  They were even less prepared

 4    to use opioids.  I had no training about

 5    addiction when I was in medical school or in

 6    my residency program.  Most physicians still

 7    do not have hardly any knowledge about how to

 8    treat addiction, except for alcoholism.

 9              So our medical education

10    program, our governmental laws, I think the

11    insurance programs, the availability, the --

12    of the medication more -- was prescribed, it

13    was necessary for sure, that's how it got

14    diverted.

15              So it -- we have a lot of

16    factors that come together at a societal

17    level that created the crisis we have.

18        Q.    Thank you.

19              Based on what you know and

20    including what you've seen today, do you

21    think that Purdue was at least a cause of the

22    opioid crisis today?

23              MR. HOFFMAN:  Object to form.

24              THE WITNESS:  You know, as I

25        said, I think that there are multiple
```

Confidential                                    JAN-MS-05484266

```
 1        reasons why we are where we are today,

 2        and I think that everyone is a factor

 3        that -- that -- and we've all, in some

 4        way, contributed to where we are

 5        today.

 6             I don't know that anyone

 7        intentionally has created this

 8        problem.  I don't even blame the

 9        insurance companies for not providing

10        good alternative therapies, because

11        they were looking at their bottom

12        line, and they didn't know anything

13        about pain either.

14             I'm -- I -- I think that -- I

15        think that the insurance companies,

16        the medical education system, the

17        legal system, the DEA and the

18        pharmaceutical companies were all part

19        of what happened at the same time that

20        created our crisis.

21        Q.    BY MR. DUCK:  Now, you did more

22   work with Cephalon than you did with Purdue;

23   right?

24        A.    I don't know how much I did

25   with either, but I didn't do much work with
```

Confidential

JAN-MS-05484267

Lynn Webster, M.D.
February 18, 2019                                    127

```
 1    Purdue, and I didn't do much work with

 2    Cephalon, but I did work with them both.  I

 3    don't know how -- I don't know how to weigh

 4    that, is what I'm trying to say.

 5         Q.    Sure.  And you don't recall

 6    ever working with Janssen?

 7         A.    I don't recall working with

 8    Janssen.

 9         Q.    Does that mean you didn't or

10    you just don't recall?

11              MR. ROBINSON:  Objection.

12              THE WITNESS:  I don't recall.

13         Q.    BY MR. DUCK:  Okay.  Now,

14    Cephalon was the manufacturer of Actiq when

15    it was launched; correct?

16              MR. ERCOLE:  Objection to form.

17              THE WITNESS:  Cephalon was,

18         that's correct.

19    (Exhibit 9 was marked for identification.)

20         Q.    BY MR. DUCK:  And I'm handing

21    you Exhibit 9, which is the 2000 Actiq Master

22    Plan.

23              You see that?

24         A.    That's what it says.

25         Q.    It says, "Prepared by Cephalon
```

Confidential                                                    JAN-MS-05484268

Lynn Webster, M.D
February 18, 2019                          128

```
 1   SLC Management Team, Coordinated by Martha

 2   Arnold."  November 16, 2000; correct?

 3              MR. ERCOLE:  Objection to form.

 4        Foundation.

 5              THE WITNESS:  Yeah.

 6        Q.    BY MR. DUCK:  Do you know who

 7   Martha Arnold is?

 8        A.    That name sounds familiar, but

 9   I don't know her.

10        Q.    Okay.  At this time in 2000,

11   had you done any work for Cephalon?

12        A.    Oh, I'd have to look at my CV.

13   I don't remember.

14        Q.    Well, let's do that.  Your CV

15   is Exhibit 1, and to help you I have a second

16   CV which appears to be a little bit

17   different.  This will be Exhibit 10.

18   (Exhibit 10 was marked for identification.)

19        Q.    BY MR. DUCK:  And you'll see at

20   the bottom of Exhibit 10 we have a Janssen

21   Bates stamp, which means that I received this

22   document in this litigation from Janssen.

23              If you'll turn to Page 14,

24   that's where your presentations section

25   starts.
```

Confidential                                                          JAN-MS-05484269

1        A.      Okay.

2        Q.      Page 14 of Exhibit 10.  And I

3    believe, according to this CV, your first

4    Cephalon presentation was in February of

5    2003, but please correct me if I'm wrong.

6                MR. ERCOLE:  Objection.  Form.

7                MR. DUCK:  And that goes up on

8        Page 16, top of Page 16.

9                THE WITNESS:  Okay.  Yes.

10       Q.      BY MR. DUCK:  And we see a

11   number of Cephalon presentations on this

12   Page 16; correct?

13       A.      Yes.  And 17, yeah.

14       Q.      What is COGENIX?

15       A.      I don't recall exactly, but

16   it's probably a CME company.

17       Q.      Medical education company?

18       A.      Yeah.

19       Q.      And we also see Medicom, that's

20   another medical education?

21       A.      That is.  I do know that they

22   are.

23       Q.      Okay.  All right.  So let's

24   turn back to Exhibit 9, which is the Actiq

25   Master Plan.

Confidential                                                    JAN-MS-05484270

Lynn Webster, M.D
February 18, 2019                        130

```
 1              This is -- you know, assuming
 2    that your CV tells us when your first
 3    Cephalon presentation was, this master plan
 4    was before that.
 5              MR. ERCOLE:  Objection to form.
 6         Q.    BY MR. DUCK:  Right?
 7         A.    Yes.
 8         Q.    Because it's 2000; correct?
 9         A.    Yes.
10         Q.    Okay.  If you'll turn the page
11    to the Executive Summary, which is the third
12    page.
13              Do you see that "Executive
14    Summary"?
15         A.    Yes.
16         Q.    All right.  And then there's
17    "Lessons Learned."
18              Do you see that?
19         A.    Yes.
20         Q.    And there's a second paragraph
21    there, Paragraph 2.  You see it?
22         A.    Yes.
23         Q.    It states, "Actiq is a very
24    challenging product to write and physicians
25    have to be highly motivated to do so.  The
```

Confidential                                                      JAN-MS-05484271

Lynn Webster, M.D.
February 18, 2019                                    131

```
 1   'hassle factor' for using Actiq is high and

 2   all the factors outlined below contribute."

 3          Did I read that right?

 4      A.    Yes.

 5      Q.    And then there are four bullet

 6   points outlining the factors that contribute

 7   to the hassle factor; correct?

 8          MR. ERCOLE:  Objection to form.

 9          THE WITNESS:  Correct.

10      Q.    BY MR. DUCK:  And then do you

11   see the -- the paragraph after those bullet

12   points, it states, "All of these factors are

13   exacerbated by the fact that many

14   breakthrough cancer patients are terminally

15   ill.  The investment in education and

16   obtaining supply needs to be repeated for

17   each new patient.  These factors all

18   contribute to the difficulty we've had in

19   getting physicians to continue to write the

20   product after an initial trial."

21          Did I read that right?

22      A.    Correct.

23      Q.    Now, Actiq was indicated for

24   breakthrough cancer pain; correct?

25          MR. ERCOLE:  Objection to form.
```

Confidential                                                          JAN-MS-05484272

Lynn Webster, M.D
February 18, 2019                           132

```
 1              THE WITNESS:  That's the FDA

 2         indication.

 3         Q.    BY MR. DUCK:  Right.  That's

 4   all it was ever indicated for?

 5         A.    Correct.

 6         Q.    And in 2000 before you started

 7   your work with Cephalon, Cephalon was stating

 8   that one of the problems with sales is that

 9   breakthrough cancer patients are dying?

10              MR. ERCOLE:  Objection to form.

11         Q.    BY MR. DUCK:  Isn't that what

12   this says?

13              MR. ERCOLE:  Mischaracterizes

14         the document.

15              THE WITNESS:  I haven't read

16         that particular statement.

17         Q.    BY MR. DUCK:  Well, why don't

18   you read out loud for us that last paragraph

19   under those bullet points that I just read,

20   the one that starts "All of these factors are

21   exacerbated."

22         A.    All of these...

23              MR. ERCOLE:  The one that you

24         just read?

25              THE WITNESS:  "All of these
```

Confidential                                                           JAN-MS-05484273

Lynn Webster, M.D
February 18, 2019                                    133

1           factors are exacerbated by the fact

2           that many breakthrough cancer patients

3           are terminally ill."

4                   It doesn't mean that they're

5           dying.

6                   MR. DUCK:  Next sentence.

7                   THE WITNESS:  They died, but

8           terminally ill.

9                   "The investment in education

10          and obtaining supply needs to be

11          repeated for each new patient.  These

12          factors all contribute to a difficulty

13          we've had in getting physicians to

14          continue to write the product after

15          initial trial."

16          Q.    BY MR. DUCK:  Right.  Cephalon

17      had a drug that was indicated for patients

18      who many of whom were dying; isn't that

19      right?

20                  MR. ERCOLE:  Objection to form.

21          Lack of foundation.  Mischaracterizes.

22                  THE WITNESS:  They have an

23          indication for breakthrough cancer

24          pain.  You don't have to be dying from

25          cancer.

Confidential                                                   JAN-MS-05484274

Lynn Webster, M.D.
February 18, 2019                                        134

```
 1          Q.    BY MR. DUCK:  Well, this says
 2    "many breakthrough cancer patients are
 3    terminally ill"; right?
 4          A.    Many are.
 5                MR. ERCOLE:  Same objection.
 6          Q.    BY MR. DUCK:  And we've got to
 7    re-up the supply because they keep dying?
 8                MR. ERCOLE:  Objection to form.
 9                THE WITNESS:  That's not what
10          that says, and a lot of cancer
11          patients don't die.  But I get your
12          point that they -- they thought that
13          that was a limited -- I guess a
14          limited population for them to treat.
15          That's what that statement says.
16          Q.    BY MR. DUCK:  Right.  Have you
17    ever done any research into the tobacco
18    litigation of the 1990s and early 2000s?
19          A.    No.
20          Q.    Do you know that one of the
21    problems identified by tobacco companies is
22    that their customers were dying?
23                MR. ERCOLE:  Objection to form.
24          Foundation.
25          Q.    BY MR. DUCK:  They had to keep
```

Confidential                                                      JAN-MS-05484275

Lynn Webster, M.D
February 18, 2019                                135

```
 1    re-upping the supply?

 2              MR. ROBINSON:  Objection.

 3              MR. ERCOLE:  Same objections.

 4       Q.    BY MR. DUCK:  Were you aware of

 5    that?

 6       A.    I don't understand your logic

 7    there.

 8       Q.    You don't understand that?

 9       A.    No.

10       Q.    What don't you understand?

11       A.    I don't know what you're

12    asking.

13              MR. ROBINSON:  Just listen to

14         the question and answer the question.

15              You can read it back.

16    (The record was read as follows:

17              "Q.  Do you know that one of

18         the problems identified by tobacco

19         companies is that their customers were

20         dying?")

21              MR. ERCOLE:  Same objection.

22              THE WITNESS:  No, I'm not

23         aware.  I mean, obviously people all

24         die, but I'm not aware that that was

25         an issue for them.
```

Confidential                                                                      JAN-MS-05484276

Lynn Webster, M.D
February 18, 2019                                    136

1          Q.     BY MR. DUCK:  If you'll look at

2    the second page of this document, there is a

3    table of contents.

4                 Do you see that?

5          A.     Of which document, Actiq?

6          Q.     Yeah.  And do you see the

7    section under marketing that is paragraph or

8    Section 3.2.4?

9                 Do you see that?

10         A.     Yes.

11         Q.     What's the title of that

12   section?

13         A.     It says "Medical Education."

14         Q.     What page is that on?

15         A.     21.

16         Q.     Okay.  Let's flip to Page 21.

17   3.2.4.  Page 21.  You see 3.2.4?

18         A.     Yes.

19         Q.     What's the title of the section

20   on this Page 21?

21         A.     "Utilize Peer to Peer Influence

22   Opportunities to Generate Product Interest

23   and Overcome Prescribing Objections."

24         Q.     Is that synonymous with

25   "medical education" to you?

Confidential                                                                          JAN-MS-05484277

 1                  MR. ERCOLE:  Objection to form.

 2                  MR. ROBINSON:  Objection.

 3        Form.

 4                  THE WITNESS:  I think that

 5        medical education would fall into

 6        that.

 7        Q.    BY MR. DUCK:  Okay.  So on the

 8   table of contents, this section's entitled

 9   "Medical Education," but when you flip to the

10   page, it's entitled "Utilize Peer to Peer

11   Influence Opportunities to Generate Product

12   Interest and Overcome Prescribing

13   Objectives"; right?

14                  MR. ERCOLE:  Objection to form.

15                  THE WITNESS:  That's what it

16        says.

17        Q.    BY MR. DUCK:  Do you believe

18   that your medical education services that you

19   provided to Cephalon were appropriate peer to

20   peer influence opportunities?

21                  MR. ROBINSON:  Objection.

22        Form.

23                  MR. ERCOLE:  Same objection.

24                  THE WITNESS:  I don't know if

25        they were peer to peer opportunities

Confidential                                                JAN-MS-05484278

Lynn Webster, M.D
February 18, 2019                    138

1          for Cephalon.  My educational programs

2          were educational programs based upon

3          the science and the interest of

4          helping patients.

5          Q.    BY MR. DUCK:  Well, that's how

6     you viewed it; right?

7          A.    That's what it was.

8          Q.    Well, did you know that

9     Cephalon viewed medical education as an

10    opportunity to influence prescribing?

11              MR. ERCOLE:  Same -- same

12         objection.  Foundation.

13         Mischaracterizes.

14              THE WITNESS:  I don't know what

15         Cephalon thought, other than what

16         you're putting in front of me that

17         they've documented.

18         Q.    BY MR. DUCK:  Cephalon likewise

19    used this to target that we talked about.

20    Did you know that?

21              MR. ERCOLE:  Objection to form.

22              THE WITNESS:  I do not -- or

23         did not.

24         Q.    BY MR. DUCK:  Okay.  I'm going

25    to hand you Exhibit 11.

Confidential                                              JAN-MS-05484279

```
 1   (Exhibit 11 was marked for identification.)

 2        Q.    BY MR. DUCK:  Here you go, sir.

 3              You ever seen this document

 4   before?

 5        A.    No.

 6        Q.    All right.  This is a 2007

 7   marketing plan for Fentora, and it's a

 8   PowerPoint presentation; right?

 9              MR. ERCOLE:  Objection to form.

10        Foundation.

11              THE REPORTER:  I can't hear

12        you.

13              MR. ERCOLE:  Sorry.  Objection

14        to form, foundation, given that the

15        witness just testified he's never seen

16        the document before.

17        Q.    BY MR. DUCK:  Does this --

18        A.    Looks like it's part of the

19   PowerPoint, or could be.  I don't -- it's not

20   in a -- I don't know what it is.

21        Q.    Okay.

22        A.    Could be a PDF.  I don't know.

23        Q.    I'll represent to you that it

24   is part of a PowerPoint presentation.  It

25   was, like, a 250 page PowerPoint
```

Confidential

JAN-MS-05484280

Lynn Webster, M.D.
February 18, 2019                                          140

```
 1    presentation.

 2         A.    Okay.

 3               MR. ERCOLE:  Same objection.

 4         Q.    BY MR. DUCK:  And I didn't want

 5    to carry that here with four copies.  So this

 6    is an excerpt, and you'll see that on the

 7    second page, Page 2, there's a table of

 8    contents.

 9         A.    Yes.

10         Q.    See that?

11               And there's a section entitled

12    "Marketing Strategy"; right?

13         A.    I see it.

14               MR. ERCOLE:  Object to the

15         form.

16         Q.    BY MR. DUCK:  Below the fourth

17    bullet point is "Targeting"?

18               MR. ERCOLE:  Objection to form.

19         Q.    BY MR. DUCK:  Yes?

20         A.    Yes, I see it.

21         Q.    And you'll see this whole

22    presentation deals with Fentora.  You see at

23    the bottom right?

24               MR. ERCOLE:  Objection to form.

25               THE WITNESS:  Correct.
```

Confidential                                                          JAN-MS-05484281

Lynn Webster, M.D.
February 18, 2019                                    141

```
 1          Q.     BY MR. DUCK:  And then if
 2   you'll turn the page, I have very
 3   conveniently already skipped us to the
 4   targeting section, Page 100.
 5                Do you see that?
 6                MR. ERCOLE:  Objection to form.
 7                THE WITNESS:  Yes.
 8          Q.     BY MR. DUCK:  Again, Fentora
 9   targeting.  Now turn the page again and we
10   have a pyramid.
11                You see that?
12                MR. ERCOLE:  Objection to form.
13                THE WITNESS:  Yes.
14          Q.     BY MR. DUCK:  And at the very
15   top of the pyramid it says "core"; correct?
16                MR. ERCOLE:  Objection to form.
17                THE WITNESS:  Yes.
18          Q.     BY MR. DUCK:  And that -- you
19   see where it says D-E-C three through ten?
20          A.     Yes.
21          Q.     Do you know what that stands
22   for?
23                MR. ERCOLE:  Objection to form.
24          Foundation.  It's an incomplete
25          document.
```

Confidential                                                      JAN-MS-05484282

Lynn Webster, M.D
February 18, 2019                              142

```
 1              THE WITNESS:  Looks like a
 2        date, but I don't know.
 3        Q.    BY MR. DUCK:  All right.  I'll
 4   submit to you that stands for decile.
 5              MR. ERCOLE:  Objection.  Form.
 6        Foundation.
 7        Q.    BY MR. DUCK:  And that's the
 8   top of the pyramid, isn't it?
 9              MR. ERCOLE:  Same objections.
10              THE WITNESS:  It is.
11        Q.    BY MR. DUCK:  Now, if you'll
12   turn the page to the next page, there's a
13   section entitled "Prescriber's Reaction to
14   Messages".
15              MR. ERCOLE:  Objection to form.
16        Q.    BY MR. DUCK:  You see that?
17        A.    I do.
18        Q.    All right.  And then there's a
19   chart on this page; correct?
20              MR. ERCOLE:  Objection to form.
21              THE WITNESS:  Yes, there's a
22        graph.
23        Q.    BY MR. DUCK:  There's a graph.
24              And it's -- at the top it says
25   "motivation to prescribe"; right?
```

Confidential                                                          JAN-MS-05484283

Lynn Webster, M.D.
February 18, 2019                    143

```
 1                    MR. ERCOLE:  Objection to form.

 2                    THE WITNESS:  Correct.

 3          Q.     BY MR. DUCK:  Were you aware

 4    that Cephalon did research into what would

 5    motivate physicians to prescribe its opioids?

 6                    MR. ERCOLE:  Objection to form.

 7          Foundation.

 8                    THE WITNESS:  I'm not aware,

 9          but not surprised.

10          Q.     BY MR. DUCK:  Right.  And then

11    you see there's a pre-message and a

12    post-message measurement showing the

13    motivation to prescribe changes between

14    pre-message and post-message.

15                    Do you see that?

16                    MR. ERCOLE:  Objection to form.

17                    MR. ROBINSON:  Objection to

18          form.

19                    MR. ERCOLE:  Foundation.

20                    THE WITNESS:  I see that.

21          Q.     BY MR. DUCK:  And you see the

22    asterisk at the bottom?

23          A.     Yes.

24          Q.     It states, "To what degree does

25    this information motivate you to prescribe
```

Confidential                                                      JAN-MS-05484284

Lynn Webster, M.D
February 18, 2019                          144

```
 1    Fentora over other short-acting opioid

 2    medications for breakthrough pain"; right?

 3               MR. ERCOLE:  Objection to form.

 4               THE WITNESS:  Correct.

 5         Q.    BY MR. DUCK:  Turn the page

 6    with me and we've got another targeting, and

 7    literally there's a target on this page;

 8    right?

 9               MR. ERCOLE:  Objection to form.

10               THE WITNESS:  Yes.

11         Q.    BY MR. DUCK:  And there's a

12    bullseye in the middle; correct?

13               MR. ERCOLE:  Same objection.

14               THE WITNESS:  Yes.

15         Q.    BY MR. DUCK:  And there are

16    some abbreviations in that bullseye, BTP plus

17    RR -- ROO plus, A plus, and F plus.

18               You see that?

19               MR. ERCOLE:  Objection to form.

20               THE WITNESS:  Yes.

21         Q.    BY MR. DUCK:  Thankfully,

22    Cephalon has given us a key to the right.

23               Do you see that?

24               MR. ERCOLE:  Same objection.

25               THE WITNESS:  Yes.
```

Confidential                                                      JAN-MS-05484285

```
 1          Q.    BY MR. DUCK:  BTP plus means

 2    believe in BTP; right?

 3               MR. ERCOLE:  Objection to form.

 4               THE WITNESS:  Yes.

 5          Q.    BY MR. DUCK:  BTP is

 6    breakthrough pain, isn't it?

 7               MR. ROBINSON:  Objection.

 8               MR. ERCOLE:  Same objection.

 9               THE WITNESS:  I assume so.

10          Q.    BY MR. DUCK:  Right.  And now

11    Fentora was indicated for breakthrough cancer

12    pain?

13          A.    Correct.

14          Q.    There's no C in that

15    abbreviation, is there?

16               MR. ERCOLE:  Objection to form.

17               THE WITNESS:  Correct.

18          Q.    BY MR. DUCK:  All right.  The

19    next one is RR -- ROO plus, and that stands

20    for believe in ROO; right?

21          A.    Yes.

22               MR. ERCOLE:  Objection to form.

23          Q.    BY MR. DUCK:  ROO stands for

24    rapid onset opioid; correct?

25               MR. ROBINSON:  Objection.
```

Confidential                                                            JAN-MS-05484286

Lynn Webster, M.D.
February 18, 2019                           146

```
 1        Form.
 2                MR. ERCOLE:  Objection to form.
 3                THE WITNESS:  That's what I
 4        would assume.
 5        Q.    BY MR. DUCK:  Okay.  And the
 6   very next one is A plus.  That means like
 7   Actiq; correct?
 8                MR. ERCOLE:  Objection to form.
 9                THE WITNESS:  Yes.
10        Q.    BY MR. DUCK:  And then F plus,
11   that means like Fentora; correct?
12                MR. ERCOLE:  Objection to form.
13                THE WITNESS:  Yes.
14        Q.    BY MR. DUCK:  Okay.  And if all
15   of those conditions are present, we get the
16   bullseye?
17                MR. ERCOLE:  Objection to form.
18        Q.    BY MR. DUCK:  Correct?
19        A.    They're all positive in the
20   center.
21        Q.    Right.  In the middle.  And
22   that's the target.
23                You understand that's the kind
24   of physician that Cephalon wants to be their
25   primary bullseye target?
```

Confidential                                                        JAN-MS-05484287

Lynn Webster, M.D
February 18, 2019                        147

```
 1                  MR. ERCOLE:  Objection.

 2        Q.    BY MR. DUCK:  One that believes

 3   in breakthrough pain, believes in rapid onset

 4   opioids, likes Actiq, and like Fentora?

 5                  MR. ERCOLE:  Objection to form.

 6        Foundation.

 7                  THE WITNESS:  Makes sense to

 8        me.

 9        Q.    BY MR. DUCK:  Okay.  And the

10   top, again, what's the title of this slide?

11        A.    On the one that we just looked

12   at?

13        Q.    Yeah.

14        A.    Targeting.

15        Q.    Next page.  Again, what's the

16   title of this slide?

17        A.    Same.

18        Q.    Targeting; right?

19        A.    Yes.

20                  MR. ERCOLE:  Objection to form.

21        Q.    BY MR. DUCK:  You see the

22   "Objective"?

23                  MR. ERCOLE:  Same objection.

24                  THE WITNESS:  I do.

25        Q.    BY MR. DUCK:  It says,
```

Confidential                                                    JAN-MS-05484288

Lynn Webster, M.D.
February 18, 2019                               148

```
 1      "Maximize core prescriber to set the stage

 2   for expanded use.

 3            "Expand use with high opioid

 4   prescribers and low Actiq users"; correct?

 5            MR. ERCOLE:  Objection to form.

 6      Q.    BY MR. DUCK:  You see that?

 7      A.    Yes.

 8      Q.    All right.  Now, you would have

 9   been a core target for Cephalon, wouldn't

10   you?

11            MR. ERCOLE:  Objection to form.

12            MR. ROBINSON:  Objection.

13            THE WITNESS:  I don't know.

14      Q.    BY MR. DUCK:  Well, do you meet

15   all these criteria?  Do you believe in

16   breakthrough pain?

17      A.    I do.

18      Q.    Do you believe in rapid onset

19   opioids?

20      A.    I do.

21      Q.    Do you like Actiq?

22      A.    I do.

23      Q.    Do you like Fentora?

24      A.    I do.

25      Q.    All right.  You would have been
```

Confidential                                      JAN-MS-05484289

Lynn Webster, M.D
February 18, 2019                          149

1    a core target for Cephalon; right?

2          A.      Based on that.

3                  MR. ERCOLE:  Objection.  Form.

4          Q.     BY MR. DUCK:  And this says

5    expanded use.  "Maximize core prescriber to

6    set the stage for expanded use."

7                  Do you see that?

8                  MR. ERCOLE:  Same objection.

9          Also object again because it's an

10         incomplete document.

11         Q.     BY MR. DUCK:  You see that

12   expanded use?

13         A.      Are you on the last page?

14         Q.      Yes.

15         A.      104.  "Expand use with high

16   opioid prescribers," is that what you're

17   referring to?

18         Q.      The bullet point above that,

19   "Maximize core prescriber to set the stage

20   for expanded use."

21         A.      I see that.

22         Q.      Again, Fentora only ever had an

23   indication for breakthrough cancer pain;

24   correct?

25         A.      That's the FDA indication.

Confidential                                    JAN-MS-05484290

Lynn Webster, M.D
February 18, 2019                               150

1         Q.     Right.  Did you know that in

2    2008, which would be a year after this 2007

3    plan, Cephalon pled guilty to off-label

4    promotion for Actiq?

5              MR. ERCOLE:  Objection to form.

6              THE WITNESS:  I did not know

7         that.

8         Q.     BY MR. DUCK:  You didn't know

9    that?

10        A.     No.

11        Q.     Cephalon never came and told

12   you, hey, we pled guilty to off-label

13   promotion of Actiq?

14             MR. ERCOLE:  Same objection.

15             THE WITNESS:  I'm not aware of

16        that.

17        Q.     BY MR. DUCK:  Actiq only ever

18   had a breakthrough cancer pain indication;

19   right?

20        A.     That's all they had an FDA

21   indication for.  It was appropriate for

22   off-label use, though.

23        Q.     You're aware that

24   pharmaceutical companies cannot promote their

25   drugs for --

Confidential                                                    JAN-MS-05484291

1        A.      Yes.

2        Q.      -- off-label use?

3        A.      I'm aware that they cannot

4    promote.

5                MR. ERCOLE:  Objection to form.

6        Q.      BY MR. DUCK:  But you didn't

7    know that Cephalon did just that and then

8    pled guilty to it?

9        A.      I was not aware of that.

10       Q.      Okay.  I'm going to hand you

11   what we'll mark as Exhibit 13 -- or 12.

12    (Exhibit 12 was marked for identification.)

13               MR. ROBINSON:  Just a heads up,

14       lunch will be coming around noon.

15               MR. DUCK:  Y'all ordered lunch?

16               MR. ROBINSON:  We're bringing

17       it in so we can all eat something and

18       get back at it.

19               MR. DUCK:  Thank you very much.

20               MR. ROBINSON:  Sure.

21       Q.      BY MR. DUCK:  Okay.  This

22   Exhibit 12 is -- you see the Bates stamp at

23   the bottom, TEVA OK?

24       A.      Yes.

25       Q.      All right.  This document was

Confidential

JAN-MS-05484292

Lynn Webster, M.D
February 18, 2019                    152

1    produced by Teva in this litigation.  You see

2    the Teva logo at the top?

3         A.    Yes.

4               MR. ERCOLE:  Objection to form.

5         Q.    BY MR. DUCK:  The document's

6    titled "Teva Advocacy Mapping: Identifying

7    Advocacy Partners to Enhance Patient Care

8    March 2013."

9               Do you see that?

10              MR. ERCOLE:  Objection to form.

11         Foundation.

12              THE WITNESS:  Yes.

13         Q.    BY MR. DUCK:  All right.  On

14   the next page we see the beginning of a

15   PowerPoint presentation that's entitled,

16   again, "Teva Advocacy Mapping."  And we see a

17   number of different logos for certain

18   professional societies and patient advocacy

19   groups; right?

20         A.    Yes.

21              MR. ERCOLE:  Object to form.

22         Q.    BY MR. DUCK:  American Pain

23   Society, American Academy of Pain Management,

24   the American Cancer Society, U.S. Pain

25   Foundation, American Chronic Pain

Confidential                                            JAN-MS-05484293

1    Association, American Society For Pain

2    Management Nursing.  You see all those?

3        A.    I see them.

4        Q.    All right.  Were you aware that

5    Teva did mapping or research about all these

6    different groups?

7            MR. ERCOLE:  Objection to form.

8        Foundation.

9            THE WITNESS:  No.

10       Q.    BY MR. DUCK:  All right.  If

11   you'll turn the page to the second page of

12   the presentation, it says "Advocacy Mapping

13   Need" and there are three bullet points.

14           MR. ROBINSON:  Can we just do

15       this, I don't know how many pages

16       you're going to do this on, but maybe

17       he can give -- like if you're going to

18       spend some time on a page, at least

19       let him read it before we go diving

20       in.

21           MR. DUCK:  I'm going to -- I'm

22       going to ask you about the second

23       page.

24           MR. ROBINSON:  Okay.  So just

25       go ahead and read it and then let's

Confidential                                                              JAN-MS-05484294

```
 1          question.

 2                  THE WITNESS:  Me read it?

 3                  MR. ROBINSON:  Yeah, just go

 4          ahead and at least read the page he's

 5          going to ask you about, and if he's

 6          going to go somewhere else, then we'll

 7          go there next, but...

 8          Q.    BY MR. DUCK:  All right.  That

 9  first bullet point here on this second page

10  says, "Although Cephalon has a heritage

11  within the pain space, Teva is relatively new

12  to the pain community - specifically to those

13  who manage chronic pain.  It's critical to

14  engage patient and professional advocacy

15  groups to help establish positive

16  relationships with patients and HCPs";

17  correct?

18          A.    That's what it says, yes.

19          Q.    "HCP" stands or health care

20  provider professional?

21          A.    Correct.

22                  MR. ERCOLE:  Objection to form.

23          Foundation.

24          Q.    BY MR. DUCK:  The next bullet

25  point says, "GolinHarris analyzed the pain
```

Confidential                                                                JAN-MS-05484295

 1   oncology advocacy landscape to help identify

 2   and prioritize those groups with which Teva

 3   is most aligned.  This proprietary GH program

 4   is designed to help brands better understand

 5   potential allies and detractors as an

 6   important early step in developing strategies

 7   to engage and/or minimize them."

 8            Did I read that right?

 9            MR. ERCOLE:  Objection to form.

10       Foundation.

11            THE WITNESS:  Yes.

12       Q.    BY MR. DUCK:  Third bullet

13   point, "As the priorities differ for each

14   pain brand, GolinHarris created two reports:

15   one that evaluated pain groups and another

16   that looked at oncology groups"; correct?

17            MR. ERCOLE:  Objection to form.

18            THE WITNESS:  Yes.

19       Q.    BY MR. DUCK:  All right.  If

20   you'll turn to Page 6.  Well, actually, I'm

21   sorry, page -- I guess it's Page 5 but I

22   don't see a...

23            MR. ROBINSON:  What's the

24       Bates?

25            MR. DUCK:  621.

Confidential                                    JAN-MS-05484296

Lynn Webster, M.D
February 18, 2019                    156

```
 1              MR. ROBINSON:  Yeah, so it says

 2       621 in the --

 3              THE WITNESS:  Yeah, "Scoring

 4       Criteria"?

 5              MR. DUCK:  Right.

 6              MR. ROBINSON:  Go ahead and

 7       read it.

 8              THE WITNESS:  Okay.

 9       Q.    BY MR. DUCK:  So you saw a

10  reference to GolinHarris, and if you're not

11  familiar with them, I'll submit to you that's

12  a consulting company that Teva hired.

13              MR. ERCOLE:  Objection to form.

14       Foundation.

15              MR. DUCK:  I've proved this

16       document in the past.  Read the

17       depositions, you'd know that.

18              MR. ERCOLE:  Same objection.

19       Move to strike.

20              MR. DUCK:  Motion denied.

21              MR. ERCOLE:  Okay.  The witness

22       has already testified he's never seen

23       this document.  In fact, you've never

24       even asked the witness whether he's

25       seen this document or knows anything
```

Confidential                                                    JAN-MS-05484297

Lynn Webster, M.D
February 18, 2019                    157

```
 1        about it.
 2              MR. DUCK:  The fact that this
 3        guy worked for you guys for so long
 4        and you haven't shown him these
 5        documents is appalling.  I think he
 6        should see these documents.
 7              MR. ERCOLE:  Okay.  Why don't
 8        you ask if he's ever seen the
 9        document.  You may want to try and
10        establish that.
11        Q.    BY MR. DUCK:  So we've got the
12   scoring criteria that GolinHarris used to
13   evaluate the various societies or patient
14   advocacy groups listed here, and there are
15   seven bullet points.
16              You see those bullet points?
17        A.    I do.
18              MR. ERCOLE:  Objection to form.
19        Q.    BY MR. DUCK:  Says
20   organizational resources, membership,
21   visibilities, partnerships, issues,
22   influence, and focus on pain management;
23   right?  Those are the scoring criteria
24   identified; correct?
25              MR. ERCOLE:  Objection to form.
```

Confidential                                    JAN-MS-05484298

```
 1                    THE WITNESS:  That's what it

 2       says.

 3       Q.     BY MR. DUCK:  Okay.  On the

 4  next page, Page 6, feel free to take a minute

 5  or two to look at what this chart is.

 6       A.     Okay.

 7       Q.     So this is a chart that is

 8  showing where various professional societies

 9  or patient advocacy groups fall with respect

10  to them being a potential partner with Teva;

11  right?

12                    MR. ERCOLE:  Objection.

13       Objection to form.

14       Q.     BY MR. DUCK:  And the X axis is

15  whether it's a strong potential partner or

16  weak potential partner; right?

17                    MR. ERCOLE:  Same objection.

18                    THE WITNESS:  Yes.

19       Q.     BY MR. DUCK:  And the Y axis is

20  whether -- axis is whether the organization

21  has more clout and strength or less clout and

22  strength; correct?

23                    MR. ERCOLE:  Objection to form.

24                    THE WITNESS:  Yes.

25       Q.     BY MR. DUCK:  And do you see
```

Confidential                                                    JAN-MS-05484299

```
 1     AAPMedicine on here?

 2          A.     I do.

 3          Q.     And it's shown as being a

 4     strong potential partner with more clout and

 5     strength than others; right?

 6          A.     Yes.

 7          Q.     In fact, based on this chart,

 8     AAPMedicine is the organization that is most

 9     aligned with Teva; correct?

10               MR. ERCOLE:  Objection.

11               MR. ROBINSON:  Objection.

12          Form.

13               MR. DUCK:  It is the top left.

14               THE WITNESS:  I don't think

15          that it -- I don't think you can make

16          that statement.  You may make that

17          statement, but that's not what I would

18          say.  I would just say that

19          AAPMedicine has a lot of integrity and

20          leaders in the field.

21          Q.     BY MR. DUCK:  There is no other

22     organization on this chart that is in -- that

23     is closer to the top left corner than

24     AAPMedicine; isn't that right?

25               MR. ERCOLE:  Objection to form.
```

Confidential                                                                    JAN-MS-05484300

```
 1              THE WITNESS:  ASA is close.

 2      Q.    BY MR. DUCK:  Not closer than

 3  AAPMedicine, is it?

 4              MR. ERCOLE:  Same objection.

 5              THE WITNESS:  AAPMedicine's the

 6      top.

 7      Q.    BY MR. DUCK:  All right.  Did

 8  you know that Teva was doing this kind of

 9  tracking or mapping for these organizations?

10              MR. ERCOLE:  Objection.  Form.

11              THE WITNESS:  No.

12      Q.    BY MR. DUCK:  They never told

13  you that?

14              MR. ERCOLE:  Same objection.

15              THE WITNESS:  No.

16      Q.    BY MR. DUCK:  Okay.  I'd like

17  for you now to turn to -- and it gets a

18  little tricky with the page numbers.

19              MR. ROBINSON:  Just go to

20      Bates.

21              MR. DUCK:  Well, and -- but

22      it's stapled wrong, so I apologize.

23      But if you'll go to the page ending in

24      1650.

25              MR. ROBINSON:  Looks like that
```

Confidential                    JAN-MS-05484301

```
 1          (indicating).  Two more pages.  You

 2      got 50.

 3              THE WITNESS:  Right here.

 4      Q.    BY MR. DUCK:  Now, you were the

 5  president of the American Academy of Pain

 6  Medicine; right?

 7      A.    At one time, yes.

 8      Q.    Do you know what years?

 9      A.    No, I'd have to look.  I don't

10  remember exactly.  '12, '13.

11      Q.    Okay.  Thank you.

12              And, again, this is from

13  March 2013; right?

14              MR. ERCOLE:  Objection to form.

15      Q.    BY MR. DUCK:  This document?

16      A.    Yeah.

17      Q.    Okay.  And you'll see that we

18  have on this page ending in 1650 a summary of

19  the American Academy of Pain Medicine; right?

20      A.    I don't know if it's a summary.

21  You have a document here that has American

22  Academy of Pain Medicine at the top,

23  overview, yes.

24              MR. ROBINSON:  If you want to

25      take a minute to read it, you can do
```

Confidential                                    JAN-MS-05484302

```
 1          that.  Whatever you want to do.

 2                  THE WITNESS:  I'm okay.  I

 3          can -- guide me through it.

 4          Q.    BY MR. DUCK:  Sure.  And you'll

 5     see the bold titles, those correspond to the

 6     scorings criteria that we looked at earlier.

 7                  MR. ERCOLE:  Objection.

 8          Q.    BY MR. DUCK:  Organizational

 9     resources, membership, visibility,

10     partnership, issues, and influence.  And I'm

11     sorry the pages go the wrong way here but...

12          A.    Okay.

13                  MR. ERCOLE:  Is that a

14          question?  Objection to form, I guess,

15          if it's a question.

16                  MR. DUCK:  Good guess.

17          Q.    You see how those correspond to

18     the criteria?

19          A.    Yes.

20          Q.    All right.  So the -- on

21     Page 11, this page ending in 1650, it says,

22     "American Academy of Pain Medicine Overview."

23                  "As the leading medical

24     association that represents physicians

25     practicing comprehensive pain medicine, the
```

Confidential

JAN-MS-05484303

Lynn Webster, M.D
February 18, 2019                    163

```
 1   mission of the American Academy of Pain

 2   Medicine is to promote quality" of care --

 3   "quality care of patients with pain through

 4   research, education, and advocacy.  AAPM

 5   refers to itself as the voice of pain

 6   medicine.  AAPM's annual meeting is a leading

 7   meeting in the space where several pain

 8   related data announcements are made.  Teva is

 9   currently partnering with the organization on

10   a national survey that explores the

11   individual burdens of chronic pain patients."

12              Do you recall that national

13   survey?

14              MR. ERCOLE:  Objection.  Form.

15              THE WITNESS:  Not specifically,

16       no.

17       Q.    BY MR. DUCK:  Do you recall

18   AAPMed working with Teva?

19       A.    Yes, I remember working with

20   Teva and those -- that -- they were doing the

21   sort of thing that we would hope that they

22   would do to help -- help patients in our

23   society.

24       Q.    So if you'll go to the next

25   page, Page 12, and it's actually on the left
```

Confidential                                          JAN-MS-05484304

Lynn Webster, M.D
February 18, 2019                                    164

```
 1   side.

 2        A.     Yeah, okay.

 3        Q.     Okay.  You see we've got this

 4   media coverage section.  And you're mentioned

 5   there in the second bullet point, it says,

 6   "Recent coverage has increased slightly as a

 7   result of the investigation of AAPM President

 8   Dr. Webster.  His practice is under

 9   investigation for several deaths that

10   occurred throughout the years, but he is

11   still highly respected and defended among

12   peers."

13               Do you see that?

14        A.     Yes.

15        Q.     And then below that there's a

16   partnership section.  You see that?

17        A.     I do.

18        Q.     "Corporate members include

19   Endo, Medtronic, Neurogesx, Pfizer, PriCara,

20   Purdue, Horizon, and Teva.  Corporate members

21   receive a logo/description on the website,

22   participate in the annual corporate ad board,

23   acknowledgment in the quarterly publication

24   and annual meeting program book, and logo

25   inclusion/advertising at the annual meeting.
```

Confidential                                                      JAN-MS-05484305

Lynn Webster, M.D.
February 18, 2019                                     165

1    Cost is 9,500" bucks.

2                See that?

3        A.    Yes.

4        Q.    There's also mention here to a

5    survey sponsored by APS and AAPMed along with

6    Janssen Pharmaceutica; right?

7                MR. ERCOLE:  Objection to form.

8                THE WITNESS:  It says that.

9        Q.    BY MR. DUCK:  Do you remember

10   working with Janssen on that?

11               MR. ROBINSON:  Objection.

12       Form.  Read the entire bullet.

13               THE WITNESS:  I don't remember

14       that.

15       Q.    BY MR. DUCK:  Okay.  Last

16   bullet says, "Teva is also currently working

17   with the organization on a partnership to

18   create awareness of the individual burden of

19   pain."

20               Do you recall that?

21       A.    I don't recall it specifically.

22   I know that AAPMed continually worked to try

23   to bring awareness to the burden of pain, and

24   Teva could have been one of the partners.

25       Q.    Okay.  If you'll flip the page

Confidential

JAN-MS-05484306

Lynn Webster, M.D
February 18, 2019                      166

```
 1    to Page 13, and remember the page.  It's

 2    weird how you got to flip.

 3         A.    Yeah.

 4               I think they're setting up our

 5    lunch.  Okay.

 6         Q.    Now we've got the influence

 7    section here, and it says, AAPM is very

 8    active on the Hill, both on a state and

 9    national level and frequently issue position

10    papers."

11               Do you see that?

12         A.    I see it.

13         Q.    AAPM had a lobbying aspect to

14    it?

15         A.    No.  It had a partnership

16    within the Pain Care Coalition who had a -- I

17    believe it had lobbying.  But we never had

18    anything that was directly lobbying.

19         Q.    What was the Pain Care

20    Coalition?

21         A.    It's a group of organizations

22    like the American Society of

23    Anesthesiologists and the American Academy of

24    Pain Medicine, one or two other

25    organizations.
```

Confidential                                                           JAN-MS-05484307

1          Q.      Who started the Pain Care

2     Coalition?

3          A.      I have no idea.

4          Q.      It states, "It also worked as

5     part of a coalition with AAPM's committee for

6     legislative affairs, the Pain Care Coalition,

7     the American Pain Foundation, and other

8     organizations to secure the inclusion of pain

9     care in the ACA and the passage of two bills,

10    the 2009 National Defense Authorization Act,

11    and the Veteran's Pain Care Act of 2008,

12    provides a continuous stream of updates on

13    national and state legislation.  Finally,

14    AAPM points more than 40 state

15    representatives to monitor local issues and

16    assist in the quest for pain medicine

17    specialty recognition"; right?

18         A.      Yes.

19         Q.      Third bullet point states,

20    "AAPM is committed to helping meet the

21    deliverables identified in the IOM report.

22    Many of the AAPM's current educational

23    efforts can be viewed here," and there's a

24    link; correct?  Right?

25         A.      That's correct.

Confidential                                                                    JAN-MS-05484308

Lynn Webster, M.D
February 18, 2019                                168

```
 1         Q.      That IOM report is the report
 2    you were referring to earlier --
 3         A.      Correct.
 4         Q.      -- about undertreatment of
 5    pain?
 6         A.      Right.
 7                 MR. ERCOLE:  Objection to form.
 8         Q.      BY MR. DUCK:  Right?
 9         A.      That's correct.  Those are all
10    good things.
11         Q.      Is pain a disease?
12         A.      Can be.
13         Q.      Is pain a symptom?
14         A.      Can be.
15         Q.      When is it a disease and when
16    is it a symptom?
17         A.      Well, when -- it's a symptom
18    initially, but then it evolves into a disease
19    in some individuals.
20         Q.      What's that disease called?
21         A.      It depends.  It can be just
22    chronic pain.
23         Q.      Chronic pain is a disease?
24         A.      It can be, yes.
25         Q.      What causes it?
```

Confidential                                                                                JAN-MS-05484309

Lynn Webster, M.D
February 18, 2019                                     169

```
 1        A.      It's basically the -- the pain

 2   itself causes the brain to change

 3   structurally and functionally.  So when you

 4   have changes that are structural and

 5   functional, secondary to some pathology,

 6   which is an injury, then it becomes a

 7   disease.

 8        Q.      But you got to have that

 9   pathology?

10        A.      Well, you have to have

11   something that creates the problem.  It may

12   not be visible, but it's present.

13        Q.      Can pain exist without that

14   pathology?

15        A.      You have to have -- you have to

16   have some pathology to create the disease.

17        Q.      Do most physicians agree with

18   you on that point that --

19        A.      I have --

20        Q.      -- pain can be a disease?

21        A.      I have no idea what most

22   physicians think.

23        Q.      If you'll flip through that

24   document, you'll see there's an overview for

25   all of the other different organizations that
```

Confidential                                                              JAN-MS-05484310

Lynn Webster, M.D
February 18, 2019                              170

```
 1   are on that chart.  Did you know that Teva

 2   did this level of research on organizations

 3   that it would give money to?

 4              MR. ERCOLE:  Objection to form.

 5              THE WITNESS:  No.  Is this in

 6         the public domain?

 7              MR. DUCK:  Not to my knowledge.

 8              MR. ROBINSON:  Just -- just

 9         answer questions.  You answered.  You

10         said no.  We can move on.

11         Q.    BY MR. DUCK:  Why do you ask

12   whether that's in the public domain?

13         A.    It's interesting reading.

14         Q.    Do you think it should be in

15   the public domain?

16         A.    Not necessarily.  I mean, this

17   is Teva's product, it ought to be up to them

18   whether it's in the public domain, in my

19   view.

20         Q.    And my -- I'll represent to you

21   it was just produced in this litigation.  I

22   don't think it's in the public domain.  I

23   would be very surprised if it were.

24              MR. ERCOLE:  Objection to form,

25         I think, if that's a question.  Move
```

Confidential

JAN-MS-05484311

Lynn Webster, M.D
February 18, 2019                    171

1        to strike.

2              MR. DUCK:  I'm going into a

3        different document, do y'all want to

4        stop for lunch now?

5              MR. ROBINSON:  Probably good,

6        it's about five of; right?

7              MR. DUCK:  Yep.  Go off the

8        record.

9              THE VIDEOGRAPHER:  Going off

10       the record.  The time is 11:53.

11       (The lunch break was taken from

12         11:53 a.m. until 12:32 p.m.)

13             THE VIDEOGRAPHER:  Returning on

14       the record.  The time is 12:32.

15       Q.    BY MR. DUCK:  All right.  Have

16   you ever heard that some manufacturers of

17   opioids made representations that less than

18   1 percent of patients become addicted to

19   opioids?

20             MR. HOFFMAN:  Objection to

21       form.

22             THE WITNESS:  I don't know that

23       manufacturers have represented that,

24       but I do know that that has -- that's

25       been in the literature and has been

Confidential                                                    JAN-MS-05484312

Lynn Webster, M.D
February 18, 2019                          172

1          suggested, yes.

2          Q.    BY MR. DUCK:  What is the rate

3     of addiction for people taking opioids?

4          A.    No one really knows.  It's very

5     low.  And that may be accurate, actually, for

6     a majority of people.  The real key is to

7     identify the subset of individuals where the

8     risk is much higher, and that's harder to do.

9          Q.    So you said no one really

10    knows, and you said it's very low, that may

11    be accurate, but there are certain

12    individuals where the risk is higher?

13         A.    Yes.

14         Q.    Can anyone state what the

15    actual risk of addiction is with respect to a

16    particular opioid?

17              MR. HOFFMAN:  Objection to

18         form.

19              THE WITNESS:  I don't think

20         that we know exactly what the risk is

21         for a particular individual.  We know

22         what the general risk is for a

23         population exposed to different

24         chemicals.

25         Q.    BY MR. DUCK:  What about the

Confidential                                                    JAN-MS-05484313

1   American population?

2        A.    Well, we have a sense, but it's

3   a range.  We don't know specifically.

4        Q.    And we've never known, have we?

5             MR. HOFFMAN:  Objection to

6        form.

7             THE WITNESS:  No, we don't

8        know.  I mean, that evidence -- we

9        know that there is a risk, but we

10       don't know what that risk is in what

11       population.

12       Q.    BY MR. DUCK:  And because we

13  don't know today, it means that manufacturers

14  of opioids, the defendants in this lawsuit,

15  have never known what the rate of addiction

16  is with respect to their particular opioids;

17  true?

18            MR. HOFFMAN:  Object to form.

19       Foundation.

20            THE WITNESS:  Well, I think

21       that mischaracterizes it, to some

22       degree.  Because we know that the risk

23       of an opioid addiction to -- of

24       developing an opioid addiction for

25       most people is very low, and that the

Confidential

JAN-MS-05484314

Lynn Webster, M.D
February 18, 2019                                        174

1          purported less than 1 percent is

2          probably accurate for a majority of

3          Americans.

4                But as I said, unfortunately, a

5          lot of chronic pain patients have --

6          have risk factors, and that's

7          something we didn't know for a long

8          time.

9                And that's why we have to

10         assess for risk, stratify risk, and

11         try to mitigate the risk for the

12         higher risk populations.

13         Q.    BY MR. DUCK:  Would it have

14    been okay for anyone to say that without

15    qualification, the risk of opioid addiction

16    is less than 1 percent?

17                MR. ERCOLE:  Objection to form.

18                MR. HOFFMAN:  Foundation.

19                THE WITNESS:  I think we don't

20         know what that risk is, but we do know

21         that studies have demonstrated that

22         the risk is less than 1 percent in the

23         population that was studied.

24         Q.    BY MR. DUCK:  And what

25    populations were those?

Confidential                                        JAN-MS-05484315

Lynn Webster, M.D
February 18, 2019                                    175

```
 1        A.    Well, you'd have to look at the

 2   papers.  I mean, there are a lot of different

 3   papers that have different risk factors.  So,

 4   I mean, in different assessments, there are

 5   some papers that suggest the risk is much

 6   higher because they have a subset of the

 7   population that do have increased risk.

 8        Q.    How do you do a study on

 9   addiction?

10        A.    There are a lot of ways to do

11   studies.

12        Q.    How do you do a clinical trial

13   to determine whether or not someone will

14   become addicted to an opioid during chronic

15   opioid therapy?

16        A.    As I say, there are probably an

17   infinite number of ways to do that kind of a

18   study.

19        Q.    Is it ethical to perform

20   studies on people to see if they'll get

21   addicted?

22             MR. ERCOLE:  Objection to form.

23             THE WITNESS:  I think we are

24        always assessing whether or not -- I

25        mean, we -- there are a lot of
```

Confidential                                                          JAN-MS-05484316

Lynn Webster, M.D
February 18, 2019                              176

```
 1          studies -- if you're asking -- are you

 2          asking about a prospective study or a

 3          study?

 4          Q.    BY MR. DUCK:  Prospective

 5   study.

 6          A.    Well, I think we can assess

 7   whether or not people develop a disease of

 8   addiction if exposed over a period of time.

 9   That's possible to do.

10          Q.    Is it okay to bring in people

11   from a particular community and start giving

12   them opioids to see whether or not they'll

13   become addicted?

14                MR. EHSAN:  Object to form.

15                THE WITNESS:  I don't know how

16          you would do that.

17          Q.    BY MR. DUCK:  That wouldn't be

18   ethical, would it?

19                MR. EHSAN:  Object to form.

20                THE WITNESS:  I -- I don't -- I

21          think I need to know more information

22          about that to answer that question.

23                It is not uncommon for us to

24          assess the abuse potential of the

25          drugs with the population, that's what
```

Confidential                                                      JAN-MS-05484317

Lynn Webster, M.D
February 18, 2019                                    177

1              I do.  I assess the risk of or the

2         liking of a drug to a particular

3         population, and I compare different

4         drugs.

5         Q.     BY MR. DUCK:  Are those people

6    already addicted?

7         A.     No.

8         Q.     So you subject people to opioid

9    therapy to see whether or not they'll like it

10   and to see whether or not they'll get

11   addicted to it?

12              MR. ROBINSON:  Object to form.

13              THE WITNESS:  No.

14              MR. ERCOLE:  Objection.  Form.

15        Q.     BY MR. DUCK:  Well, what am I

16   missing?

17        A.     That -- you're confusing about

18   liking versus addiction.

19        Q.     Well, which one do you do?

20        A.     I --

21              MR. ROBINSON:  Objection.

22              THE WITNESS:  We assess whether

23        or not a subject likes it, and to what

24        degree they like it relative to a

25        comparator.

Confidential                                                      JAN-MS-05484318

Lynn Webster, M.D
February 18, 2019                    178

1          Q.     BY MR. DUCK:  Have you ever

2    done a clinical trial where you administered

3    chronic opioid therapy for one year to

4    patients to see if they would become

5    addicted?

6                 MR. EHSAN:  Object to form.

7                 THE WITNESS:  The purpose is

8          not in those studies.  There have been

9          studies that have been a year safety

10         studies to assess the number of people

11         that would meet the criteria of an

12         opioid use disorder.  Those studies do

13         exist.

14              But the purpose is not to

15         assess.  That would be a secondary

16         outcome measure of whether they

17         developed an addiction.

18         Q.     BY MR. DUCK:  Has there ever

19   been a clinical trial that assessed the risk

20   of addiction for chronic opioid therapy?

21                 MR. ROBINSON:  Objection.

22                 MR. EHSAN:  Object to form.

23                 THE WITNESS:  I'm not aware of

24         a study that was designed to determine

25         the risk, long-term risk, of

Confidential                                                    JAN-MS-05484319

Lynn Webster, M.D
February 18, 2019                        179

```
 1        addiction.

 2               There have been studies

 3        designed to assess the number of

 4        people who have met the criteria of

 5        addiction, but the primary outcome was

 6        something different.  Usually

 7        efficacy.

 8               MR. DUCK:  All right.  I'm

 9        going to hand you Exhibit 13.

10    (Exhibit 13 was marked for identification.)

11               THE WITNESS:  Do you want me to

12        read this or...

13        Q.    BY MR. DUCK:  Well, I'm going

14    to ask you first about Pages 4, 5 -- 4 and 5.

15        A.    Okay.

16               MR. EHSAN:  Counsel, is that

17        pages paginated as 4 and 5 or the

18        fourth and fifth page of the document?

19               MR. DUCK:  Paginated.

20               THE WITNESS:  Okay.

21        Q.    BY MR. DUCK:  All right.

22    Before I talk to you about Pages 4 and 5, I

23    just want to look at the cover page here,

24    which states, "Duragesic Disease Modeling

25    Workshop 2 Takeaways."
```

Confidential                                                    JAN-MS-05484320

```
 1              Do you see that?
 2     A.     Yes.
 3     Q.     It's a Johnson & Johnson logo;
 4  right?
 5     A.     Yes.
 6     Q.     And Duragesic is a Johnson &
 7  Johnson or Janssen opioid; correct?
 8              MR. EHSAN:  Object to form.
 9              THE WITNESS:  Correct.
10     Q.     BY MR. DUCK:  And it's dated
11  March 14, 2002; correct?
12     A.     Yes.
13     Q.     Do you see the small text at
14  the bottom of Page 1, the first page here?
15     A.     Yes.
16     Q.     You see reference there where
17  it notes that McKinsey & Company --
18     A.     Yes.
19     Q.     -- involved?
20              Do you know who McKinsey &
21  Company is?
22     A.     A consulting company, I
23  thought.
24     Q.     Yeah, business consulting firm.
25     A.     Yeah.
```

Confidential                                           JAN-MS-05484321

Lynn Webster, M.D.
February 18, 2019                                    181

1          Q.     Do you know anything about

2     McKinsey & Company's involvement in opioid

3     marketing plans?

4          A.     No.

5                 MR. EHSAN:  Object to form.

6          Q.     BY MR. DUCK:  Are you a named

7     defendant in the Massachusetts case?  State

8     of Massachusetts?

9          A.     I don't know.

10         Q.     I'm just wondering.

11                MR. ROBINSON:  You can answer

12         if you know.

13                THE WITNESS:  I don't know.

14         Q.     BY MR. DUCK:  Okay.  Have you

15    read the Massachusetts complaint at all?

16         A.     No.

17         Q.     Okay.  So if you'll turn to

18    Page 4, we'll see that there's Opportunity

19    No. 1, it's the title of this slide.  And it

20    says, "Increase share of patients shifting

21    from immediate release to sustained release

22    opioids captured by Duragesic."

23                Do you see that?

24         A.     Yes.

25         Q.     And then there's a couple of

Confidential                                                    JAN-MS-05484322

Lynn Webster, M.D.
February 18, 2019                          182

1    different columns, "Strategy," "Key

2    questions," "Analysis/Data," and "Key

3    contacts"; right?

4         A.    Yes.

5         Q.    All right.  The first strategy

6    listed here on Page 4 is "Redirect sales

7    force toward specific physician segments and

8    other key influencers."

9              See that?

10             MR. EHSAN:  Object to form.

11        Q.    BY MR. DUCK:  You see that

12   strategy?

13             MR. EHSAN:  Same objection.

14             THE WITNESS:  I'm missing --

15             MR. ROBINSON:  Page 4.

16             THE WITNESS:  Oh, yes.  I get

17        it.  Okay.  Strategy, yep.

18        Q.    BY MR. DUCK:  Strategy says,

19   "Redirect sales force toward specific

20   physician segments and other key

21   influencers"; right?

22             MR. EHSAN:  Objection to form.

23             THE WITNESS:  Yes.

24        Q.    BY MR. DUCK:  And then there's

25   key questions there.  Do you see those?

Confidential                                              JAN-MS-05484323

Lynn Webster, M.D
February 18, 2019                                    183

1          A.      Yes.

2          Q.      And there are five different

3    bullet points under key questions; correct?

4                  MR. EHSAN:  Object to form.

5                  THE WITNESS:  Yes.

6          Q.      BY MR. DUCK:  And the second

7    bullet point states, "How many chronic back

8    pain patients are currently receiving

9    long-term, high-dose regimens of short-acting

10   opioids?  Are we currently targeting the

11   physicians who prescribe these regimens?"

12                 Do you see that?

13         A.      Yes.

14                 MR. EHSAN:  Object to the form.

15         Q.      BY MR. DUCK:  So we've seen

16   Purdue and Cephalon, now you're seeing

17   Janssen and Johnson & Johnson also use the

18   word "targeting" with respect to visiting

19   prescribers.

20                 You see that?

21                 MR. EHSAN:  Object to the form.

22                 MR. HOFFMAN:  Object to form.

23         Foundation.

24         Q.      BY MR. DUCK:  Can you answer?

25         A.      Yes.

Confidential                                                        JAN-MS-05484324

Lynn Webster, M.D
February 18, 2019                                    184

1          Q.     The next bullet point says,

2     "What is pattern of opioid use from chronic

3     back pain in elderly/long term care?  Are we

4     properly targeting and influencing

5     prescription behavior in this setting?"

6               Do you see that?

7               MR. EHSAN:  Objection to form.

8               THE WITNESS:  I see it.

9          Q.     BY MR. DUCK:  And you're aware,

10    sir, generally that the purpose of

11    pharmaceutical companies' marketing efforts

12    is to influence prescribing?

13              MR. ERCOLE:  Objection.

14              MR. EHSAN:  Objection to form.

15              THE WITNESS:  Of course.

16         Q.     BY MR. DUCK:  And then the

17    fourth bullet point states, "Are we properly

18    targeting and influencing prescription

19    behavior in pain clinics?  Would creative

20    contracting help in this setting?"

21              Do you understand?

22              MR. EHSAN:  Objection to the

23         form.

24              THE WITNESS:  I see it.

25         Q.     BY MR. DUCK:  Now, you used to

Confidential                                                              JAN-MS-05484325

Lynn Webster, M.D
February 18, 2019                    185

1     run a pain clinic; right?

2          A.     Yes.

3          Q.     Were you aware that Johnson &

4     Johnson targeted and wanted to influence

5     prescribing at pain clinics?

6                 MR. EHSAN:  Objection to the

7          form.

8                 THE WITNESS:  I would have

9          assumed so, but I didn't know they

10         were targeting.

11         Q.     BY MR. DUCK:  And then the last

12    bullet point says, "Are certain physician

13    specialties more or less likely to prescribe

14    long-acting opioids?  Can we influence flows

15    to take advantage of this difference?"

16                Did I read that right?

17         A.     Yes.

18                MR. EHSAN:  Objection to form.

19         Q.     BY MR. DUCK:  And so on this

20    slide dealing with this particular strategy

21    and opportunity, we see the words "target"

22    and "influence" a number of times, don't we?

23                MR. EHSAN:  Objection to form.

24                THE WITNESS:  Yes.

25         Q.     BY MR. DUCK:  If you'll turn

Confidential                                                    JAN-MS-05484326

Lynn Webster, M.D.
February 18, 2019                    186

1    the page to page 5, we see some additional

2    strategies.  And do you see the third bullet

3    point under "Strategy"?

4         A.    Yes.

5         Q.    Can you please read that.

6         A.    "Target high abuse-risk

7    patients (males under 40)."

8         Q.    Right.  "Target high abuse-risk

9    patients (e.g. males under 40)."

10               Did you know that one of

11   Johnson & Johnson's strategies was to target

12   high abuse patients?

13               MR. EHSAN:  Object to the form.

14               THE WITNESS:  I didn't know

15         that that was one of their strategies.

16         I know that we generally thought that

17         a sustained release, like a Duragesic,

18         would be safer in high-risk people

19         than short acting.

20         Q.    BY MR. DUCK:  That's not

21   necessarily true, is it?

22               MR. EHSAN:  Object to form.

23               THE WITNESS:  It might be.  It

24         depends on how it's managed.

25         Q.    BY MR. DUCK:  You see that

Confidential                                                                    JAN-MS-05484327

```
 1    under "Key questions," the last bullet point

 2    there again, "What data will influence payers

 3    and physician's choice in the near term?"

 4                Do you see that word

 5    "influence" again?

 6         A.    Yes.

 7                MR. EHSAN:  Objection to the

 8         form.

 9         Q.    BY MR. DUCK:  If you'll turn

10    the page to Page 7, this is titled

11    "Opportunity No. 3: Increase Retention of

12    Chronic Back Pain Patients on Duragesic

13    Whenever Medically Appropriate."  See that?

14         A.    Yes.

15         Q.    Second strategy, "Target

16    patient/physician" with segments -- excuse

17    me -- "Target patient/physician segments with

18    high Duragesic duration."

19                You see that?

20                MR. EHSAN:  Object to the form.

21                THE WITNESS:  Yes.

22         Q.    BY MR. DUCK:  So so far in this

23    document we've seen Johnson & Johnson

24    targeting prescribers or physicians; right?

25                MR. EHSAN:  Object to the form.
```

Confidential                                                    JAN-MS-05484328

Lynn Webster, M.D
February 18, 2019                           188

```
 1              THE WITNESS:  They've

 2       identified physicians, yes.

 3       Q.    BY MR. DUCK:  As a target --

 4  and they use the word "target"?

 5              MR. EHSAN:  Object to the form.

 6              THE WITNESS:  They use that

 7       word, yes.

 8       Q.    BY MR. DUCK:  Now, we've also

 9  seen twice Johnson & Johnson, at least

10  through its consultant McKinsey & Company

11  targeting patients?

12              MR. EHSAN:  Object to the form.

13       Q.    BY MR. DUCK:  "Target

14  patient/physician segments with high

15  Duragesic duration," and back on Page 5

16  "Target high-abuse risk patients."

17              MR. EHSAN:  Same objection.

18       Q.    BY MR. DUCK:  Did you know that

19  Johnson & Johnson was targeting particular

20  patients?

21              MR. EHSAN:  Same objection.

22              THE WITNESS:  I think that's

23       misleading, the way that you phrase

24       this.  I think that -- that we -- we

25       prescribed and often would choose
```

Confidential                                                    JAN-MS-05484329

1          Duragesic in individuals we thought

2          were at greater risk.  So that's

3          consistent with the way I would

4          lecture, and I was under the belief it

5          would be safer for the patients than

6          if they were on short acting.

7               But it's not the patient, it's

8          that patient profile, that patient

9          type, that they would be -- I would

10         assume they would be looking at, but

11         that's my interpretation.

12         Q.    BY MR. DUCK:  Okay.  So you

13    didn't have anything to do with this

14    document, did you?

15         A.    No.

16         Q.    These aren't your words, are

17    they?

18         A.    No.

19         Q.    And you know they're not my

20    words.  I've just -- I'm reading this

21    document with you; right?

22         A.    Yes.

23               MR. EHSAN:  Objection to the

24         form.

25         Q.    BY MR. DUCK:  Now, you said

Confidential                                                    JAN-MS-05484330

Lynn Webster, M.D
February 18, 2019                    190

```
 1    that targeting high abuse risk patients would

 2    have been consistent with what you lecture

 3    on?

 4              MR. ROBINSON:  Objection to

 5         form.

 6              MR. EHSAN:  Same objection.

 7              THE WITNESS:  I think if

 8         somebody has --

 9              MR. ROBINSON:  Mischaracterizes

10         testimony.

11              THE WITNESS:  If somebody has

12         severe chronic pain and they are at a

13         high risk, we want to find the safest

14         way to deliver pain relief.  And if an

15         opioid is the only option, for

16         whatever reason -- and there are a lot

17         of different reasons -- then we'd want

18         to look at a way that's -- that may be

19         a Duragesic patch would be the safest

20         treatment option.

21         Q.    BY MR. DUCK:  When this was put

22    together in 2002, was it true that Duragesic

23    was safer than other opioids?

24              MR. EHSAN:  Object to the form.

25              THE WITNESS:  It's not the
```

Confidential                                                      JAN-MS-05484331

1        opioid, it's the delivery system.  So

2        Duragesic is fentanyl, and -- but the

3        delivery system was widely believed,

4        and still believes -- what most of us

5        still believe that if used properly,

6        it is probably safer in a high-risk

7        population.

8        Q.    BY MR. DUCK:  Probably?

9        A.    Well, generally speaking, it

10   is.

11        Q.    So for high abuse risk

12   patients, is it fair to say -- well, let me

13   ask you this:  Now, these aren't -- these

14   aren't my words, "Target high-abuse risk

15   patients," Page 5, McKinsey & Company,

16   Johnson & Johnson; right?

17             MR. EHSAN:  Object to the form.

18        Q.    BY MR. DUCK:  That's what it

19   says there?

20             MR. EHSAN:  Same objection.

21             THE WITNESS:  That's what it

22        says.

23        Q.    BY MR. DUCK:  Okay.  Now, my

24   question for you is this:  Did you ever know

25   that Johnson & Johnson had a strategy of

Confidential                                                    JAN-MS-05484332

```
 1    targeting high abuse risk patients?

 2              MR. EHSAN:  Object to the form.

 3              THE WITNESS:  No.

 4         Q.    BY MR. DUCK:  If you'll turn to

 5    Page 11.

 6              So we've got a flowchart here,

 7    and then there are comment boxes coming off

 8    of the flowcharts.  Do you see those three

 9    comment boxes?

10              MR. EHSAN:  Object to the form.

11              THE WITNESS:  Yes.

12         Q.    BY MR. DUCK:  All right.

13    Second -- you see the comment box at the

14    top -- top left side, the two bullet points

15    in it?

16         A.    I do.

17         Q.    Second bullet point -- well,

18    the first bullet point says, "What are

19    settings of care for opioid high-prescribers

20    and treaters of back pain (e.g.

21    elderly/long-term care)."

22              Second bullet point, "Are we

23    currently targeting and influencing these

24    groups properly?"

25              Did I read that right?
```

Confidential                                                          JAN-MS-05484333

```
 1                    MR. EHSAN:  Objection to form.
 2                    THE WITNESS:  Yes.
 3           Q.      BY MR. DUCK:  Comment box at
 4     the bottom of the page, "How can data mining
 5     influence physicians/payers to prefer
 6     Duragesic over other sustained release
 7     opioids?"
 8                    Did I read that right?
 9                    MR. EHSAN:  Objection to the
10           form.
11                    THE WITNESS:  Yes.
12           Q.      BY MR. DUCK:  Top right comment
13     box, "Which physicians are currently
14     prescribing the U.S.'s 80 million hydrocodone
15     scripts?"
16                    Second bullet point.  "Are they
17     currently being detailed for Duragesic?"
18                    Third bullet point, "How can
19     they be influenced?"
20                    Did I read that right?
21                    MR. EHSAN:  Objection to the
22           form.
23                    THE WITNESS:  Yes.
24           Q.      BY MR. DUCK:  You're aware that
25     "detailing" means sales call?
```

Confidential                                                              JAN-MS-05484334

Lynn Webster, M.D
February 18, 2019                    194

```
 1                  MR. EHSAN:  Objection to form.

 2                  THE WITNESS:  Sometimes detail

 3        means that, yes.

 4        Q.     BY MR. DUCK:  All right.  Now,

 5   every single one of these three comment boxes

 6   on this page, which is about how to get

 7   physician -- chronic pain back physicians to

 8   prescribe Duragesic.  Every single comment

 9   box has the word "influence" in it, doesn't

10   it?

11                  MR. EHSAN:  Objection to form.

12                  THE WITNESS:  I'm not sure it

13        all has "influence," but that's the

14        intent.  Yeah, influence, influence.

15        Yes, they do.

16        Q.     BY MR. DUCK:  Thank you.

17               And you'd never seen this

18   document before today; right?

19        A.     Correct.

20        Q.     Now, I asked you earlier about

21   a group called PAINS.  Remember that?

22        A.     Yes.

23        Q.     P-A-I-N-S.  And you were -- or

24   you did some work with PAINS; right?

25        A.     I may have.  It's been long
```

Confidential                                      JAN-MS-05484335

Lynn Webster, M.D
February 18, 2019                                  195

1    ago, but it's -- it's certainly possible.

2         Q.    Okay.  I'm going to hand you

3    Exhibit 14.

4    (Exhibit 14 was marked for identification.)

5         Q.    BY MR. DUCK:  All right.  So

6    this is a PAINS Project Overview; right?

7         A.    That's what it's titled, yes.

8         Q.    And you saw looking through

9    this that you were involved with the PAINS

10   Project?

11        A.    Yes.

12        Q.    Correct?

13        A.    I recall now.

14        Q.    What was PAINS?

15        A.    It's a project, basically.

16   It's a project that -- of making people aware

17   of the needs of people in pain.

18        Q.    And one of the particular

19   purposes of the PAINS Project was to make

20   people aware of the IOM report; right?

21        A.    Yes, that was one.

22             MR. EHSAN:  Object to form.

23        Q.    BY MR. DUCK:  Okay.  And if

24   you'll turn to the Bates number ending in

25   447.

Confidential                                                                              JAN-MS-05484336

Lynn Webster, M.D.
February 18, 2019                            196

```
 1         A.    Yes.
 2         Q.    We have the list of members and
 3    supporters.
 4               Do you see that?
 5         A.    Yes.
 6         Q.    We see the organizational
 7    members include the American Academy of Pain
 8    Management; right?
 9         A.    Yes.
10         Q.    American Pain Association;
11    correct?
12         A.    Yes.
13         Q.    The American Pain Foundation?
14         A.    Yes.
15         Q.    The American Pain Society?
16         A.    Yes.
17         Q.    Skip down a few, Janssen
18    Pharmaceutical Companies of Johnson &
19    Johnson?
20         A.    Yes.
21         Q.    And Purdue Pharma is there too;
22    correct?
23         A.    Yes.
24         Q.    All right.  And were you aware
25    at the time that all these different
```

Confidential                                                      JAN-MS-05484337

1    organizations were involved in PAINS?

2                MR. EHSAN:  Object to the form.

3                THE WITNESS:  I probably was.

4         Q.    BY MR. DUCK:  All right.  And

5    were you aware that Janssen in particular was

6    involved in starting PAINS?

7                MR. EHSAN:  Objection to the

8         form.

9                THE WITNESS:  I'm not sure I

10        was aware that they started it, but

11        I -- I think I was aware that they

12        were involved.

13        Q.    BY MR. DUCK:  Who reached out

14   to you to get you involved in PAINS?

15        A.    Myra Christopher.

16        Q.    And how did you know Myra

17   Christopher?

18        A.    Through association of the

19   American Academy of Pain Medicine.  She's

20   been a patient advocate in many areas.

21        Q.    Is she a physician?

22        A.    No.  She's a nurse.

23        Q.    On the first page of this

24   document, there's a quote that says,

25   "Addressing the enormous burden of pain will

Confidential                                                    JAN-MS-05484338

```
 1    require a cultural transformation.  Effective

 2    pain management is a moral imperative, a

 3    professional responsibility, and a duty of

 4    people in the healing professions."

 5              And that quote is attributed to

 6    the Institute of Medicine, Relieving Pain in

 7    America, 2011; correct?

 8         A.    Correct.

 9         Q.    That's the IOM report, isn't

10    it?

11         A.    Yes.

12              MR. EHSAN:  Objection to the

13         form.

14         Q.    BY MR. DUCK:  On the next page

15    states, "This policy brief series is an

16    overview of how policy decisions affect the

17    treatment of pain.  PAINS will continue to

18    develop more in-depth briefs on topics such

19    as:"  Then it lists some topics, doesn't it?

20         A.    Yes.

21         Q.    And the first one is "IOM

22    Report - Implications for States"; correct?

23         A.    Correct.

24         Q.    Please turn the page.  We have

25    an introduction for this brief, this policy
```

Confidential                                     JAN-MS-05484339

Lynn Webster, M.D
February 18, 2019                           199

1   brief, and it states, "Pain is one of the

2   most devastating public health problems

3   affecting Americans today.  In 2011, the

4   Institute of Medicine (IOM) published

5   Relieving Pain in America: a Blueprint For

6   Transforming Prevention, Care, Education and

7   Research, articulating the magnitude of this

8   issue.  Not including children, veterans and

9   those who are institutionalized, the IOM

10  reported that at least 100 million adults are

11  affected by pain at a cost of 560 to

12  $635 billion annually, including medical

13  expenses and lost wages."

14              Did I read those sentences

15  right?

16      A.    Correct.

17      Q.    Now, one of the goals of PAINS

18  was to disseminate that information about the

19  IOM report; correct?

20              MR. EHSAN:  Objection to form.

21              THE WITNESS:  I believe it was.

22      Q.    BY MR. DUCK:  And according to

23  PAINS, the country was experiencing vast

24  undertreatment of pain; is that fair?

25      A.    Was and still is.

Confidential                                                      JAN-MS-05484340

Lynn Webster, M.D
February 18, 2019                    200

```
 1          Q.    When did undertreatment of pain

 2    start?

 3               MR. EHSAN:  Objection.  Form.

 4               MR. ROBINSON:  Objection.

 5               THE WITNESS:  It's always

 6        been -- it's always been a problem.

 7          Q.    BY MR. DUCK:  But it's growing?

 8          A.    Yes.

 9          Q.    Now, you wouldn't testify here

10    today that somehow Americans, and Oklahomans

11    in particular, are weaker than they used to

12    be, would you?

13               MR. EHSAN:  Objection to the

14        form.

15               MR. ROBINSON:  Objection to

16        form.

17               THE WITNESS:  I have no idea if

18        they're weaker.

19          Q.    BY MR. DUCK:  Now, you started

20    practicing in 1980?

21          A.    Yes.

22          Q.    Opioids were used much, much

23    less commonly in the '80s than --

24          A.    Correct.

25          Q.    All right.  How many people
```

Confidential                    JAN-MS-05484341

Lynn Webster, M.D
February 18, 2019                                    201

```
 1    were in pain in the '80s?  Do you know?

 2         A.    I don't know.  I do know that

 3    many people were not treated who were in

 4    chronic pain.

 5         Q.    A smaller percentage of the

 6    American population was in pain in the '80s

 7    than today?

 8         A.    I don't know that.

 9               MR. EHSAN:  Objection to form.

10         Q.    BY MR. DUCK:  Do you have a

11    sense at all?

12         A.    I would say that there was a

13    smaller percentage.

14         Q.    Okay.  Why are more people in

15    pain today?

16         A.    There are several reasons.  One

17    is we have an aging population, and with age

18    we have more spine -- spine-related pain,

19    joint pain.

20               We have an epidemic of morbid

21    obesity, and morbid obesity increases the

22    weight on all of our joints so we have more

23    degenerative disease.  We have consequences

24    of obesity, like peripheral neuropathy.  We

25    are surviving cancer longer and we have
```

Confidential                                                          JAN-MS-05484342

Lynn Webster, M.D
February 18, 2019                                    202

1    cancer survival pain related problems from

2    chemotherapy, radiation.

3              We live much longer in life.

4    And about 10 to 20 percent of everybody who

5    undergoes an operation ends up with a chronic

6    pain problem due to that.  That's like an

7    annuity that keeps building.

8              So we have many reasons for us

9    to have far more people in pain today than we

10   did in the '80s.

11        Q.    Okay.  Now I've got a very

12   particular question for you, and I think it's

13   very simple, but please let me know if I need

14   to restate it, okay?  Is that fair?

15        A.    Sure.

16        Q.    Okay.  Opioids are not the

17   panacea for undertreated pain in America, are

18   they?

19              MR. HOFFMAN:  Objection to

20        form.

21              MR. EHSAN:  Objection.

22              MR. ROBINSON:  Objection to

23        form.

24              THE WITNESS:  Opioids are just

25        a form of treatment for -- for some

Confidential                                                  JAN-MS-05484343

1          patients with pain.

2          Q.    BY MR. DUCK:  Okay.  Now, it's

3    a yes or no question.  I'll ask it again.

4               Opioids are not the panacea for

5    undertreated pain in America; right?

6               MR. ERCOLE:  Object to form.

7               MR. ROBINSON:  Objection.

8               MR. HOFFMAN:  Object to form.

9          Asked and answered.

10              THE WITNESS:  I cannot answer

11         that yes or no.

12         Q.    BY MR. DUCK:  Okay.  Are

13   opioids the panacea?

14              MR. ROBINSON:  Objection.

15              THE WITNESS:  I cannot answer

16         that, because it sets it up

17         incorrectly.  There are some people

18         for whom an opioid is the only

19         treatment option.  And there are a lot

20         of people for whom an opioid should

21         never be prescribed.

22         Q.    BY MR. DUCK:  Prior to the

23   1990s, those people who you say opioids are

24   the only treatment option, what did they do?

25   Live in pain?

Confidential                                                    JAN-MS-05484344

Lynn Webster, M.D.
February 18, 2019                              204

```
 1         A.    Most of them suffered.  Many

 2   died young.  Many committed suicide.

 3         Q.    In the 1980s, we didn't have an

 4   opioid crisis, did we?

 5              MR. EHSAN:  Objection to the

 6         form.

 7              THE WITNESS:  We had a cocaine

 8         crisis, we had a substance abuse

 9         crisis, we had a heroin crisis.  If --

10         we didn't have a prescription drug

11         problem, but we did have a drug

12         problem.

13         Q.    BY MR. DUCK:  In the 1980s, we

14   didn't have an opioid crisis, did we?

15         A.    We --

16              MR. HOFFMAN:  Objection to

17         form.

18              THE WITNESS:  We had a heroin

19         crisis.

20         Q.    BY MR. DUCK:  In the 1980s, we

21   did not have a prescription opioid crisis,

22   sir?

23              MR. HOFFMAN:  Objection.

24              THE WITNESS:  I'm not aware of

25         any prescription opioid crisis.
```

Confidential                                        JAN-MS-05484345

1          Q.     BY MR. DUCK:  It's your

2    testimony in the 1980s we had a heroin

3    crisis?

4          A.     We had a heroin, cocaine.  We

5    substance use problems.

6          Q.     That's not my question.

7                 Is it your testimony that in

8    the 1980s there was a heroin crisis?

9          A.     Well, I don't -- I -- my

10   testimony is is that we had a problem with

11   heroin.  Whether it's defined as a crisis or

12   not, I have to leave that up to other people.

13         Q.     Okay.  I'm going to hand you

14   Exhibit 15.

15    (Exhibit 15 was marked for identification.)

16                THE WITNESS:  Yes.

17         Q.     BY MR. DUCK:  All right.  This

18   is an email from Myra Christopher; correct?

19         A.     Yes.

20         Q.     To Robyn Kohn; yes?

21         A.     Yes.

22         Q.     And it's dated November 2012;

23   correct?

24         A.     Correct.

25         Q.     You'll see that there's a

Confidential                                                                      JAN-MS-05484346

```
 1    Janssen Bates stamp at the bottom?

 2          A.     Yes.

 3          Q.     And you understand Robyn Kohn

 4    is an employee for Janssen?

 5                 MR. ROBINSON:  Objection.

 6                 You can answer.

 7                 MR. EHSAN:  Object to the form.

 8                 THE WITNESS:  I don't know.

 9          Q.     BY MR. DUCK:  You don't know

10    her?

11          A.     No.

12          Q.     Okay.  I thought you might know

13    her.

14          A.     No.

15          Q.     I'll submit to you she is.

16    She's going to be deposed in this case.

17                 MR. EHSAN:  Move to strike the

18          commentary.

19                 MR. DUCK:  Is it -- is there a

20          problem with that?

21                 MR. EHSAN:  You're here to ask

22          a -- was that a question?

23                 MR. DUCK:  To you, yeah.  Is

24          there a problem with that?

25                 MR. EHSAN:  No, no, no.  You
```

Confidential                                                              JAN-MS-05484347

1      said do you know -- did you ask him a

2      question about whether she was going

3      to be deposed or not.  If that's a

4      question, let me answer.  If you're

5      just making a comment, I'm moving to

6      strike the commentary.

7             MR. DUCK:  But why?  What's

8      wrong with the comment?

9             MR. EHSAN:  Because you're here

10     to ask questions, not provide

11     testimony or comment.

12            MR. DUCK:  Well, isn't she

13     being deposed in the case?

14            MR. EHSAN:  Again, I'm not --

15            MR. DUCK:  I mean, just object

16     for reasons that matter.

17            MR. EHSAN:  If you have a

18     question for the witness, ask your

19     question.

20            MR. DUCK:  I know that you like

21     to have some reason to object, but

22     it's just a silly reason to object.

23            MR. EHSAN:  Again, move to

24     strike the commentary.

25     Q.    BY MR. DUCK:  Myra Christopher

Confidential                                                    JAN-MS-05484348

1    is the person that kind of organized this

2    PAINS project; right?

3         A.    That's my understanding, yes.

4         Q.    And you see she's reporting, as

5    she had promised, to Robyn Kohn?

6              MR. EHSAN:  Object to form.

7         Q.    BY MR. DUCK:  And she says in

8    the first paragraph, "It has been six weeks

9    since we were together for the first annual

10   meeting of the Pain Action Alliance to

11   Implement a National Strategy (PAINS).  At

12   that meeting, I promised to keep you updated

13   on this initiative and progress made."

14              Did I read that right?

15        A.    Yes.

16        Q.    Okay.  And this is a lengthy

17   email covering a number of different things,

18   but you'll see that there's a steering

19   committee section about halfway down the

20   first page.

21        A.    Yes.

22        Q.    And there's a list of those who

23   have accepted the invitation.

24              Do you see that?

25        A.    Yes.

Confidential                                                    JAN-MS-05484349

Lynn Webster, M.D
February 18, 2019                                      209

```
 1          Q.      And you're listed there; right?

 2          A.      Correct.

 3          Q.      So Myra Christopher asked you

 4    to be a part of the steering committee for

 5    PAINS; correct?

 6          A.      Correct.

 7                  MR. EHSAN:  Object to the form.

 8          Q.      BY MR. DUCK:  And you accepted?

 9          A.      Yes.

10          Q.      All right.  At the bottom of

11    the page, there's a section entitled "PAINS'

12    Scope and Magnitude."

13                  Do you see that?

14          A.      Yes.

15          Q.      It says, "This concern was best

16    reflected in the question, 'What is it?'"

17    And then it goes on to explain, "PAINS is an

18    alliance of leaders working in professional

19    societies, patient advocacy organizations,

20    policy groups, individuals living with

21    chronic pain, payers in the private sector

22    working together towards a common vision and

23    mission.  Although we share a common goal,

24    i.e., to improve the lives of those who

25    struggle to live with chronic pain, we embody
```

Confidential                                          JAN-MS-05484350

Lynn Webster, M.D
February 18, 2019                    210

 1   diverse missions and expertise, and many of

 2   us do not have a history of working together.

 3   PAINS emerged in response to the Institute of

 4   Medicine's report, Relieving Pain in America.

 5   We are guided by the report's

 6   recommendations, and the notion that binds us

 7   together is the belief that there is a moral

 8   imperative to address this issue."

 9              Did I read that right?

10        A.    Correct.

11        Q.    On the next page, the -- this

12   section continues, and it says, "PAINS

13   attempts to foster communication and

14   collaboration among leaders in key

15   organizations.  It provides a mechanism and

16   infrastructure through which individuals in

17   organizations committed to this common goal

18   can work together to maximize the impact of

19   their individual organizational efforts,

20   engage in projects, and combine influence and

21   strength in order to address common concerns.

22   PAINS initiates projects only when the

23   steering committee agrees the effort is too

24   large for any single organization to assume.

25   Participants in PAINS have agreed to three

Confidential                                                    JAN-MS-05484351

```
 1    actions:

 2                "1.  To use our collective

 3    influence to engage governmental agencies

 4    (both state and federal) to respond to the

 5    IOM's recommendation;

 6                "2.  To educate" American --

 7    "the American public about the findings and

 8    recommendations of the IOM report and to

 9    engage them in reforming pain care; and;

10                "3.  To promote additional

11    biomedical and social science research

12    regarding chronic pain."

13                Did I read those right?

14        A.    You did.

15        Q.    So the first action listed

16    there is "To use our collective influence to

17    engage governmental agencies (both state and

18    federal) to respond to the IOM's

19    recommendations"; correct?

20        A.    Yes.

21        Q.    And "our collective," the

22    "our" -- "our" there refers to the

23    participants.  The participants' collective

24    influence; right?

25        A.    Members, yes.
```

Confidential                                                                 JAN-MS-05484352

```
 1              Q.     Yeah, and we looked at the

 2    previous exhibit, and those participants

 3    include both Janssen and Purdue; right?

 4              MR. EHSAN:  Objection to form.

 5              MR. HOFFMAN:  Object to the

 6         form.

 7              THE WITNESS:  No, I don't think

 8         that meant them.  I thought it meant

 9         the steering committee.

10              Q.     BY MR. DUCK:  Participants in

11    PAINS have agreed to three actions?

12              A.     Yeah, the participants.  I

13    don't know who the participants are, I guess.

14              Q.     Well, it lists the participants

15    in the paragraph preceding this.  "PAINS is

16    an alliance of leaders working in

17    professional societies, patient advocacy

18    organizations, policy groups, individuals

19    living with chronic pain, payers, private

20    sector working together" in a common goal to

21    provide -- "together toward a common vision

22    and mission."

23              You see that?

24              MR. ROBINSON:  Form.

25              You can answer.
```

Confidential                                                          JAN-MS-05484353

```
 1                 Object to form.

 2            MR. EHSAN:  Same objection.

 3            THE WITNESS:  Individuals,

 4       organizations committed to a common

 5       goal and work together to maximize the

 6       impact of individual organizational

 7       efforts to engage in projects.

 8            I don't see where it talks

 9       about pharmaceutical companies.

10       Q.    BY MR. DUCK:  Pharmaceutical

11  companies were the participants in PAINS.  We

12  saw that in the last exhibit; correct?

13       A.    They were a funder.

14            MR. EHSAN:  Objection to the

15       form.

16            THE WITNESS:  I don't know that

17       they were a participant.

18       Q.    BY MR. DUCK:  All right.  I

19  want you to go back to the first page.  You

20  see a section entitled "Expectations of those

21  who participate."  Did you read this

22  document?

23       A.    Have I read it?

24       Q.    Yeah.

25       A.    No.  I mean, I may have read it
```

Confidential                                    JAN-MS-05484354

Lynn Webster, M.D.
February 18, 2019                                214

```
 1    long ago, but I forgot everything.

 2         Q.    So this is six weeks in; right?

 3               MR. ROBINSON:  I'm sorry?

 4               THE WITNESS:  Yeah.

 5               MR. ROBINSON:  Repeat that

 6         question.

 7         Q.    BY MR. DUCK:  This is six weeks

 8    in?

 9         A.    Six weeks since the last

10    meeting.

11         Q.    Right.

12         A.    Yes.

13         Q.    And did you read the part where

14    organizations were going to take a while to

15    endorse PAINS and so Myra Christopher decided

16    that individuals would be listed with their

17    organization next to their name?

18               MR. EHSAN:  Object to the form.

19               THE WITNESS:  The background

20         here is I know that I was invited

21         because I was going to be the

22         president of the American Academy of

23         Pain Medicine.  And her effort -- her

24         effort through PAINS was to bring us

25         together collectively to help advance
```

Confidential                                                                                    JAN-MS-05484355

```
 1        the IOM report.

 2        Q.    BY MR. DUCK:  Right.  And part

 3   of the people that were brought together were

 4   pharmaceutical manufacturers?

 5        A.    Well, I -- I don't know about

 6   that.

 7             MR. EHSAN:  Objection to form.

 8             THE WITNESS:  I don't know that

 9        the pharmaceutical companies were a

10        part of this.  I never had any

11        engagement with anyone from the

12        pharmaceutical companies.

13             I know that the pharmaceutical

14        companies helped fund PAINS, but I'm

15        not sure that they had any other role

16        other than funding.  If they did, I'm

17        not aware of that.

18        Q.    BY MR. DUCK:  Okay.  Fair

19   enough.

20             You don't have any testimony on

21   that one way or another?

22        A.    I don't.

23        Q.    Okay.  Fair enough.

24             Is it your testimony that the

25   pharmaceutical manufacturers listed as
```

Confidential

JAN-MS-05484356

Lynn Webster, M.D
February 18, 2019                                216

```
 1    members of the PAINS project did not use

 2    PAINS to influence governmental agencies?

 3              MR. EHSAN:  Object to form.

 4         Q.    BY MR. DUCK:  Because you were

 5    defending them a little bit earlier, and I

 6    want to get your clear testimony on that.

 7              MR. EHSAN:  Same objection.

 8              THE WITNESS:  I'm defending

 9       who?

10         Q.    BY MR. DUCK:  Number 1 on

11    Page 2, "To use our collective influence to

12    engage governmental agencies (both state and

13    federal)."

14              You see that?

15         A.    Yeah, I -- for me, what that

16    refers to is the steering committee and

17    the -- and the organizations that we're part

18    of.

19         Q.    Did you use your collective

20    influence -- did you use your influence to

21    try to engage governmental agencies, both

22    state and federal?

23         A.    No.  I mean, no.

24         Q.    Did you do anything to try to

25    influence the State of Oklahoma, sir?
```

Confidential                                                                 JAN-MS-05484357

```
1              MR. ROBINSON:  Objection.

2              THE WITNESS:  No.

3              MR. EHSAN:  Same objection.

4       Q.    BY MR. DUCK:  All right.  Do

5  you have any understanding at all of what

6  Johnson & Johnson and Purdue did to influence

7  the State of Oklahoma?

8              MR. EHSAN:  Objection to form.

9              THE WITNESS:  No.

10      Q.    BY MR. DUCK:  And you're not

11 here today to testify that they didn't do

12 anything to influence the State of Oklahoma?

13      A.    I have no knowledge.

14             MR. EHSAN:  Same objection.

15      Q.    BY MR. DUCK:  Did you know that

16 Johnson & Johnson, Purdue, and Cephalon all

17 sent representatives to Oklahoma to lobby and

18 influence the state?

19             MR. EHSAN:  Objection to the

20      form.

21             MR. ROBINSON:  Objection.

22             MR. EHSAN:  Lacks foundation.

23             THE WITNESS:  No.

24      Q.    BY MR. DUCK:  Does that

25 surprise you?
```

Confidential                                                          JAN-MS-05484358

Lynn Webster, M.D.
February 18, 2019                                    218

```
 1                    MR. ERCOLE:  Same objection.

 2                    MR. ROBINSON:  Objection.

 3                    THE WITNESS:  You know, does

 4         what surprise me?

 5         Q.    BY MR. DUCK:  That these

 6    pharmaceutical companies sent people to lobby

 7    and influence decision-making in the state of

 8    Oklahoma?

 9                    MR. HOFFMAN:  Object to form.

10         Foundation.

11                    MR. ERCOLE:  Same objection.

12                    MR. ROBINSON:  Objection.

13                    THE WITNESS:  It wouldn't

14         surprise me that any business tries to

15         influence the success of their

16         business.

17         Q.    BY MR. DUCK:  Well, fair

18    enough.

19                    But you would agree with me

20    that not just every business in the United

21    States manufactures Schedule II dangerous and

22    addictive narcotics; right?

23                    MR. EHSAN:  Object to the form.

24                    MR. ROBINSON:  Objection.

25                    THE WITNESS:  That's correct,
```

Confidential                                                                    JAN-MS-05484359

Lynn Webster, M.D.
February 18, 2019                           219

```
 1          not every business manufactures

 2          Schedule II narcotics.

 3          Q.    BY MR. DUCK:  They're dangerous

 4    things, aren't they?

 5          A.    They can be dangerous.  They

 6    can be lifesaving too.

 7          Q.    They can kill you?

 8          A.    And they can also save your

 9    life.

10          Q.    Okay.  Let's talk about that.

11                I'm no physician, but is it

12    your testimony that opioids heal people?

13                MR. EHSAN:  Object to the form.

14                THE WITNESS:  No.

15          Q.    BY MR. DUCK:  Okay.  Are you

16    still part of the PAINS Project?

17          A.    I don't believe the PAINS

18    Project exists anymore.  I'm not sure.

19          Q.    Why not?  Why doesn't it exist?

20          A.    I don't know.

21          Q.    Sir, you were part of the PAINS

22    SWAT Team, weren't you?

23                MR. EHSAN:  Object to the form.

24                MR. ROBINSON:  Objection.

25          Form.
```

Confidential                                                    JAN-MS-05484360

Lynn Webster, M.D.
February 18, 2019                    220

```
 1              THE WITNESS:  I mean, I'm not

 2         sure what I was a part of.  I know I

 3         was trying to help advance the IOM

 4         report and I was willing to

 5         participate on their committees.

 6   (Exhibit 16 was marked for identification.)

 7         Q.    BY MR. DUCK:  I'm going to hand

 8   you Exhibit 16.  This is a document entitled

 9   "PAINS Project, No Longer Silence SWAT Team."

10              You see that?

11         A.    I see that.

12         Q.    Your name's listed there, isn't

13   it?

14         A.    Yes, it is.

15         Q.    Along with Bob Twillman,

16   Richard Payne, Myra Christopher, and several

17   others; right?

18         A.    Yep.

19         Q.    Have you ever seen this

20   document before?

21         A.    I don't know if I have.

22         Q.    So indeed you were a member of

23   the PAINS Project SWAT Team?

24              MR. ROBINSON:  Objection.

25         Form.
```

Confidential                                                    JAN-MS-05484361

```
1                   MR. EHSAN:  Same objection.

2                   THE WITNESS:  I don't know if I

3           agreed to be on a SWAT Team, but it's

4           listed me here and I -- honestly, I

5           don't have any objection to it either.

6           Q.    BY MR. DUCK:  Now, we've seen

7    that KOLs were targeted, including you

8    specifically; right?

9                   MR. EHSAN:  Object to the form.

10                  MR. ERCOLE:  Same objection.

11          Q.    BY MR. DUCK:  Yes?

12          A.    One of the documents you

13   pointed out listed me as a person of interest

14   for a company.

15          Q.    You've seen that medical

16   education was referred to as a peer to peer

17   influence opportunity, yes?

18          A.    Yes.

19                  MR. EHSAN:  Object to the form.

20                  THE WITNESS:  Yes.

21          Q.    BY MR. DUCK:  Sir, you had not

22   seen most of these documents before today;

23   isn't that fair?

24          A.    That's correct.

25          Q.    And you're aware that other
```

Confidential                                                                 JAN-MS-05484362

Lynn Webster, M.D.
February 18, 2019                                    222

```
 1    so-called KOLs have given depositions,

 2    testimony in this case; right?

 3              MR. ROBINSON:  Objection.  To

 4         the extent you know anything

 5         personally outside of any

 6         communications you've had with

 7         counsel.

 8              THE WITNESS:  I do not.

 9              MR. EHSAN:  Objection to the

10         form.

11              MR. ERCOLE:  Same objection.

12              THE WITNESS:  I do not know.

13    Q.    BY MR. DUCK:  Would it surprise

14    you to learn that other KOLs that have

15    testified in this case feel that they were

16    used by the pharmaceutical companies --

17              MR. EHSAN:  Objection.

18    Q.    BY MR. DUCK:  -- that are

19    defendants in this case?

20              MR. ERCOLE:  Objection.

21              MR. ROBINSON:  Objection.

22              THE WITNESS:  I'd be surprised

23         if that's what they thought.

24    Q.    BY MR. DUCK:  You would be?

25    A.    Uh-huh.
```

Confidential                                    JAN-MS-05484363

```
 1        Q.      Because you don't feel that

 2   way?

 3        A.      No.

 4        Q.      You don't feel like they used

 5   your influence to increase prescriptions of

 6   their drugs?

 7        A.      No, I do not.

 8        Q.      You don't feel that they asked

 9   you to be a key opinion leader or presenter

10   for them to increase peer to peer influence

11   opportunities?

12        A.      No, I think that that might be

13   true.

14              MR. EHSAN:  Objection.  Form.

15              THE WITNESS:  I mean, I think

16        that I'm well respected in my field,

17        and so to ask me to be involved in

18        anything that they're doing would

19        probably be something useful to them.

20        But that doesn't mean that I -- I did

21        anything to help them.

22        Q.      BY MR. DUCK:  Well, that may

23   not have been your intent, and that's not my

24   question.

25              My question is, you would agree
```

Confidential                                                    JAN-MS-05484364

Lynn Webster, M.D
February 18, 2019                    224

```
 1   that -- I think this is what you just said --

 2   that these defendants asked you to do things

 3   because they perceived a business positive?

 4            MR. EHSAN:  Objection to form.

 5            MR. ERCOLE:  Same objection.

 6       Mischaracterizes testimony.

 7            MR. EHSAN:  Object to form.

 8            THE WITNESS:  I've never

 9       perceived it that way.  I've always

10       perceived it that they respect what I

11       stand for and they appreciate my

12       views, and so they've asked me to

13       give -- probably be engaged because of

14       that.

15       Q.    BY MR. DUCK:  Now, if your

16   views were that opioids were terrible drugs

17   that should never be prescribed, these

18   defendants probably wouldn't have had you

19   speak for them, would they?

20            MR. HOFFMAN:  Object to form.

21            MR. ERCOLE:  Same objection.

22            THE WITNESS:  I always lectured

23       about how harmful they were.

24       That's -- that's what I lectured

25       about.  I rarely said anything other
```

Confidential                                                                    JAN-MS-05484365

Lynn Webster, M.D
February 18, 2019                                    225

```
 1          than how harmful the opioids were.  It

 2          was all about risk mitigation and that

 3          they can cause overdose and death.

 4          I'm -- I -- I think that they did

 5          engage me because that's exactly what

 6          I said.

 7          Q.    BY MR. DUCK:  Well, sir, isn't

 8   it true that you said these drugs are risky,

 9   but not so risky that we don't use them.  We

10   just have to use them in certain ways?

11              MR. ROBINSON:  Objection to

12          form.

13              You can answer.

14          Q.    BY MR. DUCK:  You never said

15   these drugs are so risky you should never use

16   them.  You never said that, did you?

17              MR. ERCOLE:  Objection to form.

18          Argumentative.

19              MR. ROBINSON:  Objection.

20              MR. ERCOLE:  Multiple

21          questions.

22              THE WITNESS:  I have said that

23          there's a subset of the populations

24          for whom the opioids should not be

25          prescribed.
```

Confidential

JAN-MS-05484366

Lynn Webster, M.D
February 18, 2019                                    226

1          Q.      BY MR. DUCK:  Which subsets?

2          A.      Well, it depends.  Risk

3   stratifying patients, looking at people who

4   have had a history of substance use disorder,

5   people who have abused the drugs before,

6   maybe individuals with severe mental health

7   problems.  They're at very high risk, and if

8   there's ever any other option then the

9   opioids should not be used.

10         Q.      All right.  Have you ever said

11  under no circumstances should opioids be used

12  for anybody in the population?  They are off

13  limits?

14              MR. EHSAN:  Objection to form.

15              THE WITNESS:  I've never said

16       that.

17         Q.      BY MR. DUCK:  And if you had,

18  that was your view, these companies that sell

19  opioids would not have hired you to talk for

20  them, would they?

21         A.      I don't know what they would

22  have done.

23              MR. ROBINSON:  Objection.

24       Foundation.

25              MR. DUCK:  Here's Exhibit 17.

Confidential                                                                    JAN-MS-05484367

1    (Exhibit 17 was marked for identification.)

2         Q.    BY MR. DUCK:  This is a Johnson

3    & Johnson email from someone named Heather

4    Thompson.  The subject's "KOL

5    categorization."

6              Do you see that?

7         A.    Uh-huh.

8         Q.    She says, "Team - Bruce asked

9    me to coordinate our completion of the

10   divisional objective to develop categories

11   for our KOLs as Opponents/Neutrals/Advocates

12   (henceforth O/N/A)."

13             You see that?

14        A.    Yes.

15        Q.    And she talks about -- she goes

16   on to say, "So far that easiest approach for

17   me has been to think about behaviors that we

18   can group together as indicative of each

19   position rather than go for some overriding

20   definition of each at this point anyway."

21             You see that?

22        A.    Yes.

23        Q.    And she's attached a starting

24   list of activities, and that's, I'll

25   represent to you, the second page of this

Confidential                                                                    JAN-MS-05484368

Lynn Webster, M.D
February 18, 2019                              228

```
 1    document.

 2         A.     Okay.

 3         Q.     You see that, we've got

 4    "Opponents," "Neutrals," "Advocates," and

 5    then lists of behaviors that would indicate

 6    whether a KOL fit within that particular

 7    category.

 8                You see that?

 9                MR. EHSAN:  Object to the form.

10                THE WITNESS:  I see that.

11         Q.     BY MR. DUCK:  Okay.  Back on

12    the first page, in the second paragraph

13    Heather Thompson says, "Another

14    consideration:  Remember the KOL I mentioned

15    during my presentation at the MA meeting in

16    Philly?  Told me he hated my company, would

17    never take" my money for -- "would never take

18    money for education from me, blah, blah?  By

19    these criteria, he wasn't an opponent.  I

20    don't think he should have been considered

21    one, either - he just likes a good argument.

22    Are you guys okay with the concept that just

23    because a KOL is obnoxious, difficult or a

24    pain it doesn't mean he or she is an

25    opponent?  Conversely, that a sweetie who
```

Confidential                                                      JAN-MS-05484369

```
 1   just isn't putting out for you shouldn't

 2   qualify as an advocate?"

 3            Did I read that -- those

 4   sentences right?

 5       A.    Correct.

 6            MR. EHSAN:  Object to the form.

 7       Q.    BY MR. DUCK:  Did you know that

 8   Janssen categorized KOLs this way?

 9            MR. EHSAN:  Objection to the

10       form.

11            THE WITNESS:  No.

12       Q.    BY MR. DUCK:  Do you know that

13   Janssen referred to KOLs as a potential

14   sweetie who just isn't putting out for you?

15            MR. EHSAN:  Object to the form.

16            THE WITNESS:  No.

17       Q.    BY MR. DUCK:  Turn the page,

18   let's look at "Opponent."  Heather Thompson

19   calls an opponent, "Not only are they not

20   helping, they are actively hurting the cause.

21   Can qualify by," and there's a list of bullet

22   points; right?

23            MR. ROBINSON:  Objection to

24       form.

25            THE WITNESS:  Yes, I see that.
```

Confidential                                                                JAN-MS-05484370

1          Q.      BY MR. DUCK:  Those bullet

2    points say, "Refusing to meet with the

3    Janssen MSL," medical science liaison; right?

4          A.      Yes.

5                  MR. EHSAN:  Objection to form.

6          Q.      BY MR. DUCK:  Second,

7    "Personally blocking access to the department

8    for the sales representatives as opposed to

9    merely observing a policy that someone else

10   put in place."

11                 Three, "Giving talks that

12   denigrate the use of opioids in general or

13   Duragesic specifically."

14                 Four, "Teaching residents and

15   fellows any of the above positions."

16                 Five, "Getting hysterical as

17         opposed to intelligently concerned,

18         about the abuse and diversion of

19         opioids."

20                 And last, "Spread 'urban myths'

21         about Duragesic (chicklets, shooting

22         up the gel, et cetera)."

23                 You see that?

24         A.      I do see that.

25         Q.      Those would be opponents;

Confidential                                    JAN-MS-05484371

```
 1    right?

 2         A.    That's what she has listed as.

 3         Q.    Yet that's not somebody that

 4    Janssen would want to be a KOL; correct?

 5              MR. EHSAN:  Objection to form.

 6              THE WITNESS:  That's what --

 7         that's what it implies, yes.

 8         Q.    BY MR. DUCK:  And you didn't

 9    know that Janssen was analyzing KOLs this

10    way, did you?

11         A.    No.

12              MR. EHSAN:  Objection to form.

13              MR. DUCK:  I'm going to hand

14         you Exhibit 18.

15     (Exhibit 18 was marked for identification.)

16              THE WITNESS:  Okay.

17         Q.    BY MR. DUCK:  You ever seen

18    this before?

19         A.    I think I have.  I didn't

20    remember it but...

21              MR. ROBINSON:  You can take as

22         long as you need to read it.

23              THE WITNESS:  I'm not sure I've

24         seen that first part, but I am aware

25         of "No Longer Silent" project.
```

Confidential

JAN-MS-05484372

```
 1          Q.      BY MR. DUCK:  It's part of the
 2   PAINS Project?
 3          A.      Yes.
 4          Q.      That was the name of the SWAT
 5   Team that we saw too; right?
 6          A.      I don't know --
 7                  MR. EHSAN:  Objection.
 8                  THE WITNESS:  I don't know if
 9          that was the name of the SWAT Team.
10          But I do know the project about No
11          Longer Silent, I do recall that.
12                  MR. EHSAN:  Objection to the
13          form of the question.
14          Q.      BY MR. DUCK:  Well, let's look
15   at the SWAT Team document you've got there in
16   front of you then.
17          A.      Oh, I see.  Okay.  It does have
18   that.  Yeah, "No Longer Silent."  Yeah, okay.
19          Q.      No Longer Silent SWAT Team is
20   what that's called; right?
21          A.      Yeah, okay.  Okay.
22          Q.      And if you'll turn to the page
23   ending -- well, it's Page 7.  There's two
24   Bates stamps on here, 1077 or 1066.
25                  Do you see that?
```

Confidential                                                    JAN-MS-05484373

Lynn Webster, M.D.
February 18, 2019                                   233

```
 1        A.    Yes.

 2        Q.    And you see the Foley Bates

 3   stamp?

 4        A.    Yes.

 5        Q.    These came from Kathleen Foley.

 6        A.    Yeah.

 7        Q.    Do you know who that is?

 8        A.    Yes.

 9        Q.    All right.  This is a document

10   entitled "United States Cancer Pain Relief

11   Committee"; right?

12        A.    Yes.

13        Q.    "Proposal, Project Title: No

14   Longer Silent"; right?

15        A.    Yes.

16        Q.    The background starts, "Opioids

17   had a checkered medical history.  Their use

18   has swung from one extreme to another";

19   right?

20        A.    Correct.

21              MR. EHSAN:  Object.

22        Q.    BY MR. DUCK:  Do you agree with

23   that?

24        A.    That their use has -- let me

25   see the sentence here.
```

Confidential                                                      JAN-MS-05484374

Lynn Webster, M.D.
February 18, 2019                                    234

```
 1                MR. ROBINSON:  Where are we?

 2                MR. ZAKRZEWSKI:  Which Bates

 3        numbered page are you on?  1076?

 4                MR. ROBINSON:  1076.  Foley

 5        1076 down at the bottom.

 6                THE WITNESS:  Which sentence?

 7        Q.    BY MR. DUCK:  Very first one

 8   under "Background:"  "Opioids have a

 9   checkered medical history.  Their use has

10   swung from one extreme to another."

11        A.    Yes, I agree.

12        Q.    The third paragraph starts

13   "Time released pain medications."

14                Do you see that?

15        A.    Yes.

16        Q.    Can you please read that

17   paragraph.

18        A.    "Time released pain medications

19   came into being and were aggressively

20   marketed, pain was established as 'The 5th

21   Vital Sign," the 0 to 10 Pain Scale was

22   widely adopted, the Joint Commission

23   established the routine assessment of pain as

24   a standard" care -- "of care, a distinction

25   was made between opioid 'dependence' and
```

Confidential                                                    JAN-MS-05484375

Lynn Webster, M.D
February 18, 2019                                    235

```
 1    'addiction,' and healthcare professionals and

 2    those struggling to live with chronic pain

 3    came to believe that, when prescribed

 4    appropriately, opioids were safe and

 5    effective.  Frankly, their risks were

 6    minimized, and from" 2000 -- I mean "1999 to

 7    2009, prescribing of opioids increased nearly

 8    four-fold.  It is often cited that in 2013,

 9    259 million prescriptions were written for

10    these medications - enough for every American

11    adult to have their own prescription."

12         Q.    Okay.  Anything in there you

13    disagree with?

14              MR. ERCOLE:  Objection.  Form.

15              THE WITNESS:  Well, frankly,

16         their risks were minimized.  That's

17         probably true by some people.  It was

18         never minimized by me.

19         Q.    BY MR. DUCK:  Fair enough.

20              Do you see reference to pain as

21    "The 5th Vital Sign"?

22         A.    Yes.

23         Q.    Are you aware that the White

24    House Commission that investigated the opioid

25    crisis found that pain as the fifth vital
```

Confidential                                                      JAN-MS-05484376

Lynn Webster, M.D
February 18, 2019                    236

```
 1    sign was a cause of the crisis?

 2         A.     Yeah, I disagree.

 3              MR. EHSAN:  Object to form.

 4         Q.     BY MR. DUCK:  You do disagree

 5    with that?

 6         A.     Uh-huh.

 7         Q.     Pain's not a vital sign,

 8    though, is it?

 9              MR. EHSAN:  Objection to form.

10              THE WITNESS:  It may not be a

11         vital sign, but it's vital to assess.

12         Q.     BY MR. DUCK:  Pain cannot be

13    objectively measured, can it?

14         A.     It's difficult to do.

15         Q.     It can't be objectively

16    measured?

17         A.     Well, there are people -- there

18    are people experimentally measuring pain with

19    functional MRIs.  It's not a standard of

20    care, won't be for a long time, but they are

21    quantitating pain.

22         Q.     As we sit here today, pain

23    cannot be objectively measured, can it?

24              MR. EHSAN:  Objection to form.

25              THE WITNESS:  That's not what I
```

Confidential                                                              JAN-MS-05484377

Lynn Webster, M.D.
February 18, 2019                        237

1              just said.  It can be, but it's

2         experimental.

3                    It's not clinically something

4         we can do.  But you can experimentally

5         quantitate pain, objectively measure

6         it.

7         Q.    BY MR. DUCK:  Fair enough.

8                    There's also a reference to a 0

9    to 10 pain scale?

10        A.    There is.

11                   MR. ROBINSON:  In the -- in

12        the --

13                   THE WITNESS:  In the article.

14        I said, yes.

15        Q.    BY MR. DUCK:  Okay.  Have you

16   ever heard of Partners Against Pain?

17        A.    Yes.

18        Q.    It was a Purdue patient

19   advocacy website; right?

20        A.    Yes.

21                   MR. EHSAN:  Object to form.

22        Q.    BY MR. DUCK:  Did you ever

23   receive one of these from Purdue?

24        A.    Probably.  It's very familiar.

25   I think everyone's received it.

Confidential                                                                 JAN-MS-05484378

Lynn Webster, M.D.
February 18, 2019                                    238

1      Q.    That's that pain scale, isn't

2   it?

3      A.    Yes.

4      Q.    And can you please hold that up

5   for the camera so that the jury can see what

6   it is we're talking about.

7            MR. EHSAN:  Can we mark that as

8       an exhibit, please?

9            MR. DUCK:  Thank you very much.

10           MR. EHSAN:  Just --

11     Q.    BY MR. DUCK:  This is

12  objective; right?  It's -- it's smiley faces

13  and frowny faces.  I mean subjective; right?

14     A.    It's subjective.

15           MR. EHSAN:  Objection to form.

16       Are we going to mark that as an

17       exhibit?

18           MR. DUCK:  I don't need to mark

19       it as an exhibit.

20           MR. EHSAN:  Well, move to

21       strike because you just used something

22       with the witness that you didn't mark

23       as an exhibit and won't be part of the

24       record when it's officially made

25       available.

Confidential                                                                JAN-MS-05484379

Lynn Webster, M.D
February 18, 2019                    239

```
 1        Q.    BY MR. DUCK:  It's subjective

 2   because it has smiley faces and frowny faces;

 3   right?

 4              MR. EHSAN:  Object to form.

 5         Move to strike entire line of

 6         testimony unless that -- that

 7         particular piece of demonstrative is

 8         marked as an exhibit.

 9              MR. HOFFMAN:  Agree.  Same.

10              THE WITNESS:  It's not

11         subjective because they have smiley

12         faces or any faces.  It's because the

13         person who's responding has to give

14         their impression of what those mean.

15        Q.    BY MR. DUCK:  Okay.  And a

16   physician has to rely on the patient to

17   accurately state where they fall on this

18   scale; correct?

19              MR. EHSAN:  Object to the form.

20              THE WITNESS:  No, the physician

21         doesn't have to rely on it, but we do

22         receive that as input when we do an

23         evaluation and make a decision about a

24         treatment plan.

25        Q.    BY MR. DUCK:  Well, you can't
```

Confidential                                                        JAN-MS-05484380

Lynn Webster, M.D.
February 18, 2019                                    240

```
 1    just look at a patient and tell them where

 2    they fall on this scale.  They tell you?

 3              MR. ERCOLE:  Objection to form.

 4              MR. ROBINSON:  Objection.

 5         Form.

 6              THE WITNESS:  Yes, that's

 7         correct.  We have to assess, we have

 8         to ask where they fit in that scale.

 9         Q.    BY MR. DUCK:  At what point are

10    opioids appropriate on the 1 to 10 scale?

11              MR. EHSAN:  Object to the form.

12              MR. ROBINSON:  Objection.

13              MR. ERCOLE:  Same objection.

14              THE WITNESS:  You cannot answer

15         that question without more

16         information.

17         Q.    BY MR. DUCK:  You see the

18    paragraph that starts "At the same time"?

19         A.    Yes.

20         Q.    The last sentence of that

21    paragraph states, "Even though Tom Frieden,

22    CDC's Director, has stated publicly that

23    there is at this time no evidence of a causal

24    connection between increased prescribing for

25    legitimate medical purposes and increased
```

Confidential                                    JAN-MS-05484381

Lynn Webster, M.D.
February 18, 2019                                   241

```
 1    abuse of opioids, there is clearly a

 2    correlation."

 3              Did I read that right?

 4        A.    You did.

 5        Q.    Do you agree with that?

 6        A.    There is no causal

 7    relationship, but there does appear to be a

 8    correlation, yes.

 9        Q.    So if you'll turn the page, the

10    budget requested here is 665,500 bucks;

11    right?

12        A.    Yes.

13        Q.    Turn the page again.  We saw

14    Myra Christopher and Bob Twillman listed

15    under "Personal Expenses Staff"?

16        A.    Yes.

17        Q.    And this is an itemization of

18    the expenses; right?

19        A.    Yes.

20        Q.    And their salaries are listed

21    there as $160,000 for an annual salary;

22    right?

23        A.    Yes.

24        Q.    And then you see where it says

25    SWAT Team members under "Consultants"?
```

Confidential                                                         JAN-MS-05484382

1        A.      Yes.

2        Q.      It says, "4 at 10K each - not

3   including pain"; correct?

4        A.      Correct.

5        Q.      So you were paid to be on this

6   committee?

7        A.      No, I don't believe so.

8                MR. EHSAN:  Object to form.

9        Q.      BY MR. DUCK:  The SWAT Team?

10       A.      I don't believe so.  I don't

11  believe I ever received any compensation.

12       Q.      Do you know who paid Myra

13  Christopher's annual salary?

14       A.      I do not.

15       Q.      What about Bob Twillman?

16       A.      I do not.

17       Q.      But you don't think you were

18  paid to be on the --

19               MR. ROBINSON:  Objection.

20       Asked and answered.

21       Q.      BY MR. DUCK:  -- the SWAT Team?

22       A.      I do not believe I was paid.

23               MR. ROBINSON:  Objection.

24               MR. DUCK:  All right.  Let's

25       take a break.

Confidential                                                    JAN-MS-05484383

```
 1              THE VIDEOGRAPHER:  Off the
 2         record.  The time is 1:39.
 3            (There was a break taken.)
 4              THE VIDEOGRAPHER:  Returning on
 5         the record.  The time is 1:52.
 6         Q.    BY MR. DUCK:  All right.
 7    Dr. Webster, you're familiar with the term
 8    pseudoaddiction; correct?
 9         A.    Yes.
10         Q.    And you have, in the past,
11    issued some -- or provided some -- some
12    education on pseudoaddiction; is that fair?
13         A.    Yes.
14         Q.    What is pseudoaddiction?
15         A.    It's a term to describe
16    behaviors.  And it was originally offered in
17    a manuscript describing a case report of a
18    young man that looked like he was -- he had
19    the same behavior as somebody who had
20    cravings for opioids and had addictive
21    behavior, so it was a behavioral observation.
22              And they realized because of
23    Sickle Cell Disease that if they treated that
24    behavior with an opioid, those behaviors
25    would disappear, so they coined the term
```

Confidential                                               JAN-MS-05484384

Lynn Webster, M.D
February 18, 2019                         244

```
 1    "pseudoaddiction."

 2         Q.    Who's "they"?  Who coined that

 3    term?

 4         A.    Well, Haddox was one of -- and

 5    Weissman.  It's Haddox and Weissman that

 6    originally wrote the paper.  Weissman and

 7    Haddox, actually.

 8         Q.    Do you know David Haddox?

 9         A.    Yes, I do.

10         Q.    And he works for Purdue now?

11         A.    That's correct.  Well --

12               MR. HOFFMAN:  No longer.

13               THE WITNESS:  No longer.

14         Q.    BY MR. DUCK:  He worked for

15    Purdue?

16         A.    He did.

17         Q.    So when he coined this term

18    pseudoaddiction, that was before he worked

19    for Purdue?

20         A.    Correct.

21         Q.    Then he went to work for

22    Purdue?

23         A.    I don't know the sequence of

24    his jobs.  I know -- I knew him when he was

25    at Georgia and he was in the pain clinic
```

Confidential                                                    JAN-MS-05484385

Lynn Webster, M.D
February 18, 2019                              245

```
 1    there.
 2          Q.     Do you think that the concept
 3    of pseudoaddiction was relied upon too
 4    heavily by people who were promoting opioids?
 5          A.     I this it's possible --
 6                 MR. EHSAN:  Objection.
 7                 MR. HOFFMAN:  Objection to
 8          form.
 9                 THE WITNESS:  Excuse me.
10                 Yes, I think -- I've written
11          that.  I've said that.  I thought that
12          it was probably used as an excuse
13          for -- in some instances to increase
14          the medicine without understanding --
15          increasing the dose of an opioid
16          without understanding that there could
17          be other drivers, not just pain.
18                 And that those other drivers
19          could be dangerous if that's the
20          reason that they're increasing the
21          opioids.
22                 So, yes, I've written that.
23          However, the concept is still valid.
24          Q.     BY MR. DUCK:  And in some
25    situations, I think the other drivers you're
```

Confidential                                                    JAN-MS-05484386

Lynn Webster, M.D
February 18, 2019                              246

```
 1    speaking of could actually be indications of
 2    addiction; right?
 3         A.    Or less than that, but still as
 4    problematic.  It could be somebody who has
 5    PTSD and that you can self-medicate for PTSD
 6    and other mental health problems that can end
 7    in death without having the disease of
 8    addiction.
 9         Q.    So you think it's important
10    that the reliance on pseudoaddiction as a
11    reason for increasing the dose be walked
12    back; right?
13         A.    I think --
14              MR. EHSAN:  Object to form.
15              THE WITNESS:  I think that
16         people have to understand that -- what
17         it really means, and that there are
18         other factors that -- other than
19         undertreated pain that can drive that
20         behavior.
21              It's -- it remains, as I've
22         written in my book, though, that the
23         only way you can differentiate that in
24         most people is to give them an opioid
25         to see if the behavior disappears.
```

Confidential                                              JAN-MS-05484387

1              And if it doesn't, then that --

2         that would suggest that this is an

3         aberrant behavior that needs to be

4         managed differently and not with an

5         opioid.

6         Q.    BY MR. DUCK:  Do you know if

7    anything's been done by opioid manufacturers

8    to walk back pseudoaddiction?

9              MR. EHSAN:  Objecting to the

10        form.

11             MR. ERCOLE:  Same objection.

12             MR. HOFFMAN:  Object to the

13        form.

14             THE WITNESS:  I don't know.

15        Q.    BY MR. DUCK:  I hear you saying

16   that you have made statements in public that

17   it should not be relied upon too heavily?

18        A.    I think you have to be

19   cautious, yes, that's correct.  I've made --

20   I've published, is what I've done.  I've

21   published a paper with Steven Passik

22   cautioning people about the use of it and

23   making sure that they understand what the

24   term really means and that we need to be

25   cognizant that there are other behaviors than

Confidential                                                    JAN-MS-05484388

 1    undertreated pain that can be dangerous.

 2         Q.    Do you think that it's likely

 3    that the concept of pseudoaddiction led

 4    physicians to prescribe opioids when they

 5    otherwise wouldn't have?

 6              MR. ERCOLE:  Objection to form.

 7              MR. HOFFMAN:  Object to the

 8         form.

 9              THE WITNESS:  I think it's a --

10         it's a minor issue.  It's not a big

11         issue.

12              There are far more issues out

13         there that are important that has

14         driven the amount of opioids that have

15         been prescribed, and to whom they've

16         been prescribed.  I think it's a --

17         almost a trivial issue.

18         Q.    BY MR. DUCK:  Now, you'll agree

19    with me that opioids have been

20    overprescribed?

21              MR. EHSAN:  Object to the form.

22              THE WITNESS:  I think that

23         they've been overprescribed for some

24         of the population.

25         Q.    BY MR. DUCK:  All right.  And

Confidential                                                                    JAN-MS-05484389

Lynn Webster, M.D
February 18, 2019                        249

```
 1    we've said throughout the day that there's an

 2    opioid crisis in this country; right?

 3         A.    Yes.

 4         Q.    And it's a public health issue?

 5         A.    It's a serious public health

 6    issue.

 7         Q.    And it affects a large number

 8    of people, doesn't it?

 9         A.    Yes, it does.

10         Q.    And it's something that needs

11    to be brought under control in this country?

12         A.    All public --

13              MR. EHSAN:  Object to form.

14              THE WITNESS:  -- health major

15         issues like this should be.  So should

16         alcoholism and tobacco use.  But, yes,

17         it's a -- it's caused havoc in many

18         homes and communities.

19         Q.    BY MR. DUCK:  What year was

20    that publication that you wrote with Steven

21    Passik on pseudoaddiction?  Do you know?

22         A.    I can look it up on my CV, if

23    you'd like me to, but I can't remember.

24         Q.    Okay.  It's on your CV, though?

25         A.    Yeah, for sure.
```

Confidential                                                        JAN-MS-05484390

Lynn Webster, M.D
February 18, 2019                    250

```
 1          Q.     Do you remember the title of
 2    it, or the approximate title?
 3          A.     It has "pseudoaddiction" in it,
 4    I think.
 5          Q.     Okay.
 6          A.     In the title.
 7          Q.     Fair enough.
 8          A.     There won't be many articles on
 9    pseudoaddiction.
10          Q.     We'll look ourselves.
11                 Now, you mentioned that --
12    earlier that this public health crisis that
13    we're in is multifactorial.
14                 Do you remember that?
15          A.     Yes.
16          Q.     And we talked earlier about
17    what those different factors might be.
18                 Do you recall that?
19          A.     Yes.
20                 MR. EHSAN:  Object to form.
21          Q.     BY MR. DUCK:  Now, we've talked
22    about three defendant families today:
23    Purdue, Johnson & Johnson, and Teva; correct?
24                 MR. ERCOLE:  Objection to form.
25                 THE WITNESS:  Correct.
```

Confidential                                                   JAN-MS-05484391

Lynn Webster, M.D
February 18, 2019                    251

1            Q.    BY MR. DUCK:  Now, I understand

2     your view is that there are many different

3     contributions to this crisis.  Would you

4     agree with me that the actions of Purdue are

5     at least one contribution to this crisis?

6                   MR. HOFFMAN:  Object to form.

7                   THE WITNESS:  You know, I don't

8           know what the pharmaceutical companies

9           contributions are to the crisis.  I

10          honestly don't know what they -- what

11          they -- how they have contributed to

12          the crisis.

13               I know that we've prescribed

14          more medicines as physicians that --

15          to a subset of the population than is

16          necessary, but I don't know to what

17          degree they have contributed to the

18          problem.

19               And what -- whatever degree of

20          problem or contribution pharmaceutical

21          companies have had, I'm not sure it

22          would have been the same if we'd have

23          had, you know, a different insurance

24          policy approach.

25               So I think it's very complex to

Confidential                                                    JAN-MS-05484392

```
 1          point a finger, because it is all

 2          interrelated.  One person is not -- or

 3          one party is not really responsible

 4          any more than the others.

 5          Q.    BY MR. DUCK:  And I appreciate

 6    that, and that's not exactly my question.

 7              And my question is, the

 8    marketing actions, other behaviors of Purdue,

 9    are they at least one of the contributions to

10    the cause of this crisis?  Even just one

11    person?

12          A.    No --

13              MR. HOFFMAN:  Object to form.

14          Foundation.

15              THE WITNESS:  I don't know what

16          they're marketing.  I know what some

17          of the documents are that have been

18          put in front of me, but I don't

19          understand a lot of what is behind all

20          of that, and I certainly haven't

21          studied it well enough to tell you

22          that they've contributed to the

23          problem.

24          Q.    BY MR. DUCK:  Okay.  So they're

25    the manufacturers of OxyContin; right?
```

Confidential                                                            JAN-MS-05484393

1        A.     Yes.

2        Q.     Without Purdue Pharma,

3   OxyContin may never have existed; isn't that

4   right?

5        A.     Well, I have no idea.  You

6   know, I mean --

7        Q.     Isn't it true?

8        A.     -- I have no idea.  Somebody

9   else could have developed a similar

10  formulation.  There are other formulations

11  like that out there now.

12       Q.     Purdue is the first one to make

13  it; right?

14       A.     Correct.

15       Q.     The other defendants in this

16  lawsuit are also manufacturers of these

17  opioids; right?

18            MR. EHSAN:  Objection to form.

19            MR. ERCOLE:  Objection.

20            THE WITNESS:  Yes.

21       Q.     BY MR. DUCK:  They all promoted

22  them?

23            MR. EHSAN:  Objection.

24            MR. ERCOLE:  Objection to form.

25            THE WITNESS:  Yes.

Confidential                                                    JAN-MS-05484394

Lynn Webster, M.D
February 18, 2019                           254

1        Q.     BY MR. DUCK:  They all did so

2   with the intent of influencing prescribing;

3   right?

4               MR. ERCOLE:  Objection to form.

5               THE WITNESS:  I would expect

6        so.  I mean, that's -- they're a

7        business, so they wanted to influence

8        prescribing.

9        Q.     BY MR. DUCK:  And we all know

10   that prescribing went up; right?

11       A.     We do.

12       Q.     And more opioids were

13   prescribed year after year between, say, 1990

14   and 2012; right?

15              MR. ERCOLE:  Objection to form.

16              THE WITNESS:  We did.  You

17       know, in the year 2009, there were

18       more overdose deaths from methadone

19       than there were from any other class

20       or -- class of opioid or type of

21       opioid.  And they represented only

22       2 percent of the opioids prescribed in

23       the country.

24              And a large part of that was

25       because the insurance companies

Confidential                                        JAN-MS-05484395

Lynn Webster, M.D
February 18, 2019                          255

```
 1            required that they stop paying for

 2            drugs like OxyContin, and start paying

 3            for drugs like methadone.

 4                 So I say that in the context

 5            that everything has a relationship

 6            on -- on everything else.  In -- a

 7            majority of the overdose deaths have

 8            occurred with the cheap, inexpensive

 9            drugs, not the brand drugs.

10                 Certainly a lot of problems

11            with OxyContin, and a lot of addiction

12            has developed because there were

13            people that should not have been

14            prescribed or they were diverted to a

15            population that abused them.

16                 MR. DUCK:  Okay.  Fair enough.

17       Q.    Now, prescribing went up,

18  didn't it?

19       A.    Prescribing went up.

20       Q.    And that was the intent of the

21  promotion of these opioids, to increase

22  prescribing?

23                 MR. ERCOLE:  Objection.  Form.

24       Q.    BY MR. DUCK:  Right?

25                 MR. ERCOLE:  Foundation.
```

Confidential                                        JAN-MS-05484396

Lynn Webster, M.D
February 18, 2019                    256

1              THE WITNESS:  I don't know

2         what -- I would expect they would want

3         more prescribing, but I believe that

4         there was an intent to help serve

5         and -- a need as well.

6              So I don't know what was more

7         important, meeting a need of

8         undertreated pain, or to increase the

9         revenue.  That's something you have to

10        get from them, not me.

11        Q.    BY MR. DUCK:  Sure.  And I'm

12   not asking you about revenue right now;

13   right?  Fair enough?  I haven't asked about

14   revenue right now?

15        A.    Well, increasing prescriptions

16   is revenue.

17        Q.    Okay.  I did ask if the intent

18   of promotion and marketing was to increase

19   prescriptions, but isn't that always the

20   intent of marketing and promotion, to cause

21   more sales of your product?

22              MR. ERCOLE:  Objection to form.

23              THE WITNESS:  I think that the

24        intent is probably to increase the

25        amount prescribed.

Confidential                                                    JAN-MS-05484397

1          Q.     BY MR. DUCK:  Right.  And that

2     happened, didn't it?

3          A.     It did.

4          Q.     Okay.  And so my question to

5     you is, in this opioid crisis we have today,

6     you would agree that it is a crisis of

7     overprescribing; right?

8               MR. EHSAN:  Object to form.

9               MR. HOFFMAN:  Object to the

10          form.

11               MR. ERCOLE:  Same objection.

12               THE WITNESS:  I don't think

13          it's necessarily a crisis of

14          overprescribing, because we still have

15          far more people who are not being

16          treated for their pain.

17               I think that it's a lack of

18          understanding who should be receiving

19          the medicine and then managing that

20          particular medication in that

21          population more than it is about

22          overprescribing.

23               MR. DUCK:  Okay.

24               THE WITNESS:  You know, half of

25          the patients following an operation

Confidential                                                      JAN-MS-05484398

```
1          don't use their medicines, but that's

2          not -- that's not -- that's

3          short-acting drugs, that's not the

4          extended release.  And that has been

5          happening since I was in medical

6          school in the '70s.

7               We still have -- we've always

8          had our surgeons prescribe more

9          medicine than is necessary.  But

10         something changed in the '90s and

11         2000s so now a lot of that ends up

12         being diverted, and that has

13         contributed to the problem.

14              So it's very complex to point

15         your finger at any one cause.

16         Q.    BY MR. DUCK:  Okay.  This is a

17   crisis of improper opioid prescribing.

18              Do you agree with that?

19         A.    No, not necessarily.

20              MR. ERCOLE:  Objection to form.

21              THE WITNESS:  I do not agree

22         that our opioid crisis -- you know,

23         we -- two-thirds of the opioids come

24         from China today, not from our

25         prescriptions.
```

Confidential                                                        JAN-MS-05484399

Lynn Webster, M.D
February 18, 2019                              259

```
 1        Q.    BY MR. DUCK:  Do you agree this
 2   is a crisis of addiction?
 3              MR. ERCOLE:  Objection to form.
 4              THE WITNESS:  I -- you define
 5        "crisis."
 6        Q.    BY MR. DUCK:  Well, I'm asking
 7   you what your definition is, and you've
 8   agreed there is a crisis; right?
 9        A.    Yeah, I think we have a drug
10   problem in this country.  We have a drug
11   crisis in this country.  We have illicit
12   drugs that are being abused.  Prescription
13   drugs that are being abused.  But I'm not
14   sure how many people who have been prescribed
15   appropriately the medicine have developed a
16   problem.
17        Q.    What is the crisis as you see
18   it?
19        A.    I think addiction is a big
20   crisis.  I think diversion is a problem.  I
21   think that the illicit trade of fentanyl and
22   heroin is a major part of our drug crisis.
23              I think methamphetamine is a
24   part of the crisis.  I think that the
25   indigent communities that have been abusing
```

Confidential                                              JAN-MS-05484400

Lynn Webster, M.D.
February 18, 2019                                      260

```
 1    the drugs because of the socioeconomic

 2    determinants that drive abuse are a part of

 3    the crisis.

 4         Q.    Okay.  Now, you said

 5    "addiction," and that was my very question.

 6    I said you agree that addiction is part of

 7    the crisis; right?

 8         A.    Addiction is a cause, yes.  I

 9    mean, it is a result, not a cause.  It is --

10         Q.    Okay.

11         A.    -- it is a result.

12         Q.    Another result of the crisis is

13    overdose; right?

14         A.    Death, yes.

15         Q.    Death.

16         A.    Fatal and nonfatal.

17         Q.    Exactly.  Okay.

18               And you're saying today that

19    you don't have -- you're incapable of telling

20    me whether the manufacturers of these

21    products contributed at all to this crisis?

22               MR. ERCOLE:  Objection to the

23         form.  Asked and answered.

24               MR. HOFFMAN:  Same objections.

25               THE WITNESS:  You know, I don't
```

Confidential                                                          JAN-MS-05484401

Lynn Webster, M.D
February 18, 2019                    261

```
1        know enough to answer that.  I do

2        believe that everybody in society has

3        probably contributed to the problem.

4        But I don't know enough about the

5        marketing plans and all of the stuff

6        that you've had me review here today,

7        how much of that really contributed.

8              We know that in states where

9        there is a large amount that has been

10        prescribed, it does not correlate with

11        the number of people who have

12        overdosed.

13              So there's no correlation when

14        you go state to state in certain

15        regions of volume of opioid prescribed

16        and overdose deaths.

17        Q.    BY MR. DUCK:  Okay.  And I've

18   showed you documents where Purdue pled guilty

19   to misbranding OxyContin; right?

20        A.    You did.

21        Q.    And I asked you, I don't think

22   you were aware that Cephalon pled guilty.

23   Did you say you weren't aware of that?

24        A.    I -- I said that I was --

25              MR. ERCOLE:  Objection to form.
```

Confidential                                                    JAN-MS-05484402

Lynn Webster, M.D
February 18, 2019                      262

```
 1              THE WITNESS:  Yes, I said I was
 2       not aware.
 3       Q.    BY MR. DUCK:  Okay.  And I've
 4   shown you documents that all of these
 5   defendants targeted prescribers; right?
 6              MR. EHSAN:  Object to the form.
 7              THE WITNESS:  You showed me
 8       that.
 9       Q.    BY MR. DUCK:  I've showed you
10   documents that these defendants intended
11   influence prescribing; correct?
12              MR. HOFFMAN:  Object to the
13       form.
14              THE WITNESS:  You did.
15       Q.    BY MR. DUCK:  You've agreed
16   with me that the prescribing of opioids, in
17   fact, did increase over this time period;
18   right?
19       A.    Correct.
20       Q.    And you've stated that there
21   are multiple different facets or causes of
22   this crisis; right?
23       A.    Correct.
24              MR. EHSAN:  Object to the form.
25       Q.    BY MR. DUCK:  And what you
```

Confidential                                          JAN-MS-05484403

Lynn Webster, M.D
February 18, 2019                                      263

```
 1    won't agree with me on is that these

 2    defendants are part of the cause?

 3              MR. ROBINSON:  Objection.

 4              MR. ERCOLE:  Same objection.

 5              MR. HOFFMAN:  Asked and

 6        answered.

 7              THE WITNESS:  I'm not agreeing

 8        or disagreeing with you.  I just don't

 9        know.

10        Q.    BY MR. DUCK:  You never looked

11    into it?

12        A.    Well, I mean --

13              MR. ERCOLE:  Objection to form.

14              THE WITNESS:  -- I read the

15        paper.  I'm here, right, so I know

16        that they're being accused of

17        contributing to the problem.

18              But I think the analysis of the

19        problem has not been thorough enough

20        to really conclude, in my mind, who's

21        mostly responsible.

22        Q.    BY MR. DUCK:  Okay.  And I

23    haven't asked you who's mostly responsible,

24    have I?

25        A.    No.
```

Confidential                                                          JAN-MS-05484404

Lynn Webster, M.D
February 18, 2019                    264

```
 1         Q.    I never used the word "mostly"

 2   in my question, did I?

 3         A.    No.

 4         Q.    That was something you said.

 5   And so I want to be clear that that's not

 6   what I've asked today; right?

 7         A.    You have not asked me who's

 8   mostly responsible.

 9         Q.    Okay.  You have not looked into

10   who is mostly responsible?

11         A.    I think I've studied the

12   problem of our opioid crisis probably as much

13   as anyone.

14         Q.    Okay.  But you don't know one

15   way or another whether these defendants were

16   a contributor?

17              MR. HOFFMAN:  Object to form.

18              THE WITNESS:  I don't know to

19         what degree they have contributed or

20         have not contributed, that is fair.

21         Q.    BY MR. DUCK:  And if there were

22   evidence that these defendants did contribute

23   to the crisis, you don't have any reason to

24   dispute that?

25              MR. HOFFMAN:  Objection to
```

Confidential                                                    JAN-MS-05484405

```
 1          form.

 2                   THE WITNESS:  I don't know

 3          anything about that.

 4          Q.    BY MR. DUCK:  And you can't

 5   dispute that --

 6          A.    I can't dispute anything I

 7   don't know.

 8                   MR. ERCOLE:  Object to form.

 9          Asked and answered.

10                   MR. DUCK:  Fair enough.

11          Q.    You're aware that the

12   defendants in this lawsuit have made a lot of

13   money from the sale of opioids?

14                   MR. EHSAN:  Objection to the

15          form.

16                   THE WITNESS:  That's what I

17          read.

18          Q.    BY MR. DUCK:  And that doesn't

19   surprise you, does it?

20          A.    Pharmaceutical companies do

21   pretty well, most of them.

22          Q.    They make a lot of money?

23          A.    Yes.

24          Q.    All right.  Have you heard

25   about -- well, let me ask you this:  You're
```

Confidential                                                  JAN-MS-05484406

Lynn Webster, M.D.
February 18, 2019                              266

```
 1   aware that in order to fix this crisis it's
 2   going to take a lot of money?
 3              MR. ERCOLE:  Objection to form.
 4              THE WITNESS:  I don't know how
 5        much money it's going to take.  I have
 6        no idea how much money it's going to
 7        take.  I think it takes more policy
 8        change than money.
 9        Q.    BY MR. DUCK:  You'd agree it's
10   going to take a lot of money, though, to --
11        A.    I have no idea.
12        Q.    Let me finish the question.
13              There are a lot of people who
14   are addicted to opioids today; right?
15        A.    There are a lot of people who
16   have an addiction, yes.
17        Q.    And they -- they need
18   treatment, don't they?
19        A.    They do.
20        Q.    And treatment can be expensive,
21   can't it?
22        A.    That's correct.
23        Q.    And you would agree with me
24   that to help those people to -- to climb out
25   of this addiction crisis and get treatment
```

Confidential                                                    JAN-MS-05484407

Lynn Webster, M.D
February 18, 2019                              267

1    for everybody it could be very, very

2    expensive, couldn't it?

3           A.     It could be.

4           Q.     And these defendants in this

5    lawsuit have made a lot of money selling the

6    very substance that these folks are addicted

7    to; isn't that fair?

8                  MR. EHSAN:  Objection to the

9           form.

10                 MR. HOFFMAN:  Objection to

11          form.

12                 THE WITNESS:  As I said

13          earlier, most of the people who are

14          addicted are not using prescription

15          drugs, they're using illicit drugs,

16          heroin and fentanyl.

17          Q.     BY MR. DUCK:  Were you aware

18   that 80 percent of new heroin users started

19   with prescription opioids?

20                 MR. ERCOLE:  Objection to form.

21                 MR. HOFFMAN:  Object to form.

22                 THE WITNESS:  That is not true.

23          That is what's reported in the

24          literature, but they actually started

25          in high school, 80 percent of those

Confidential                                                      JAN-MS-05484408

Lynn Webster, M.D
February 18, 2019                    268

1             were started -- started in high school

2             with other substances.

3                    So they started their substance

4             use disorder in adolescence, which is

5             when most biological triggers start a

6             substance use disorder.

7                    So it's been misreported that

8             heroin users primarily got started

9             with prescription drugs.

10                   Furthermore, even those who

11            were using heroin, were using diverted

12            drug, not prescribed drug.  It wasn't

13            that they were prescribed that then

14            led them to use their heroin, or

15            whatever they were using.

16       Q.    BY MR. DUCK:  It's a terrible

17   thing that teenagers and adolescents are

18   getting their hands on prescription opioids,

19   isn't it?

20                   MR. ERCOLE:  Objection.

21                   MR. EHSAN:  Object to the form.

22                   THE WITNESS:  Without a

23            prescription, that is a terrible

24            thing, yes.  It's deadly.

25       Q.    BY MR. DUCK:  Deadly,

Confidential                                                    JAN-MS-05484409

```
 1    dangerous, can cause addiction?

 2         A.     Absolutely.

 3         Q.     Right?

 4         A.     Yes.

 5         Q.     Teenagers are getting their

 6    hands on this stuff; right?

 7         A.     Yeah, absolutely, they have.

 8         Q.     And later in life they can

 9    become heroin addicts; isn't that true?

10              MR. ROBINSON:  Object to form.

11              MR. HOFFMAN:  Objection.

12              THE WITNESS:  They can.

13         Q.     BY MR. DUCK:  And they can die?

14         A.     They can.

15         Q.     And that's awful.

16         A.     It's tragic.

17         Q.     And the people that make opioid

18    prescription drugs are defendants in this

19    lawsuit; right?

20              MR. ERCOLE:  Objection to form.

21              THE WITNESS:  They are.

22              MR. DUCK:  Pass the witness.

23              MR. ROBINSON:  Okay.

24              MR. ERCOLE:  Do I need a mic

25         or...
```

Confidential                                                                 JAN-MS-05484410

Lynn Webster, M.D
February 18, 2019                        270

```
 1              MR. DUCK:  I'm going to be

 2        objecting to your questions, so I need

 3        a mic.

 4              MR. ROBINSON:  You guys don't

 5        have another mic?  I'm -- I'm -- it's

 6        my witness.

 7              MR. ERCOLE:  Okay.

 8              MR. EHSAN:  She can hear your

 9        objections, I'm sure.  She's -- we've

10        been objecting from this distance.

11              Are you refusing to pass the

12        mic?

13              MR. DUCK:  I mean, I want to be

14        on the record in the -- with the audio

15        recording.

16              THE VIDEOGRAPHER:  That's fine.

17        If you give me just two seconds to go

18        off the record, we can add on a mic.

19              MR. EHSAN:  Sure.  Thank you.

20              THE VIDEOGRAPHER:  Standby.

21        Going off the record.  The time is

22        2:13.

23          (There was a break taken.)

24              THE VIDEOGRAPHER:  Returning on

25        the record.  The time is 2:15.
```

Confidential                                                          JAN-MS-05484411

```
 1
 2                      EXAMINATION
 3   BY MR. ERCOLE:
 4        Q.    Good afternoon, Dr. Webster.
 5        A.    Hi.
 6        Q.    Have we ever met before?
 7        A.    This morning was the first
 8   time.
 9        Q.    Before today?
10        A.    No.
11        Q.    Before today have we ever
12   spoken before?
13        A.    No.
14        Q.    Where do you currently reside?
15        A.    You mean where do I work or
16   where do I live?
17        Q.    Where do you live?
18        A.    I live in Salt Lake City.
19        Q.    And where do you currently
20   work?
21        A.    Here in this building, which is
22   PRA Health Sciences.
23        Q.    Have you ever been to Oklahoma?
24        A.    I have.
25        Q.    Have you ever practiced
```

Confidential                                                        JAN-MS-05484412

```
 1    medicine in Oklahoma?

 2         A.    No.

 3         Q.    Have you ever been licensed to

 4    practice medicine in Oklahoma?

 5         A.    No.

 6         Q.    Ever treated any patients in

 7    Oklahoma?

 8              MR. DUCK:  Object to form.

 9              THE WITNESS:  I have treated

10         patients that lived in Oklahoma.  They

11         flew here.

12         Q.    BY MR. ERCOLE:  Do you recall

13    when you treated those patients?

14         A.    Well, in, you know, 2005,

15    probably, to 2010, roughly.

16         Q.    Do you know how many patients

17    you treated?

18         A.    No, just one.

19         Q.    One patient.

20              Did you prescribe opioids for

21    that patient?

22         A.    Yes.

23         Q.    Did that patient benefit from

24    opioids?

25              MR. DUCK:  Objection to form.
```

Confidential                                                          JAN-MS-05484413

Lynn Webster, M.D
February 18, 2019                    273

1              THE WITNESS:  Well, I thought

2       so; they thought so.

3       Q.    BY MR. ERCOLE:  Do you recall

4    which -- what type of opioid you prescribed

5    for that patient?

6       A.    Well, mostly I placed an

7    intrathecal pump.  So most of it was

8    delivered through a subcutaneous pump into

9    the spinal canal.  It wasn't oral medicine or

10   transmucosal or transdermal.

11      Q.    Do you recall who manufactured

12   that particular medicine?

13      A.    This would have been

14   compounded.

15      Q.    Are you aware of any marketing

16   materials that have ever been disseminated by

17   any of the defendants in this case in

18   Oklahoma?

19              MR. DUCK:  Objection to form.

20              THE WITNESS:  No.

21      Q.    BY MR. ERCOLE:  Are you aware

22   of any promotion at all by any of the

23   defendants in this case in Oklahoma?

24              MR. DUCK:  Objection to form.

25              THE WITNESS:  No.

Confidential                                                              JAN-MS-05484414

Lynn Webster, M.D
February 18, 2019                          274

```
 1              MR. DUCK:  Are you representing

 2         all the defendants right now or just

 3         the Teva defendants?

 4              MR. ERCOLE:  If you have an

 5         objection, you can -- you can state

 6         it.

 7              MR. DUCK:  Well, if -- I do if

 8         you're representing all of them.  If

 9         you're not --

10              MR. ERCOLE:  I think the

11         answer's -- I think the question's

12         pretty clear.  So...

13              MR. DUCK:  Well, I'm going to

14         object to them asking questions if

15         you're asking questions for all the

16         defendants.

17              MR. ERCOLE:  You can object

18         whatever you want, but they're going

19         to ask whatever questions they're

20         going to -- they're allowed to ask

21         here today.

22              So I am asking questions the

23         way I want to ask them, and they're

24         entitled to ask follow-up questions as

25         needed.
```

Confidential                                                                  JAN-MS-05484415

Lynn Webster, M.D.
February 18, 2019                                    275

```
 1              MR. DUCK:  I thought you guys
 2         didn't make statements on the record
 3         if they weren't questions, that's
 4         funny.
 5              MR. HOFFMAN:  He's responding
 6         to you.
 7              MR. DUCK:  Oh, my bad.
 8              MR. HOFFMAN:  If you hadn't
 9         said anything he wouldn't have to.
10              MR. DUCK:  Oh, my bad.
11         Q.    BY MR. ERCOLE:  Dr. Webster,
12    are you aware of -- of any -- any false
13    statements made by any of the defendants in
14    this case in Oklahoma?
15              MR. DUCK:  Object to form.
16              THE WITNESS:  "Defendants"
17         meaning the companies?
18         Q.    BY MR. ERCOLE:  The companies
19    that are named in this lawsuit.
20              MR. DUCK:  Object to form.
21              THE WITNESS:  No.
22         Q.    BY MR. ERCOLE:  Would you agree
23    that there are many different manufacturers
24    of opioids?
25         A.    Yes.
```

U.S. LEGAL SUPPORT
(877) 479-2484

Confidential                                                      JAN-MS-05484416

Lynn Webster, M.D.
February 18, 2019                                          276

1          Q.    And would you agree that there

2    are other opioid manufacturers beyond those

3    that are named as defendants in this

4    particular lawsuit?

5          A.    Yes.

6          Q.    And would you agree that opioid

7    manufacturers are not all the same?

8                MR. DUCK:  Objection to form.

9                MR. ROBINSON:  Objection.

10         Form.

11               THE WITNESS:  I'm not sure what

12         you mean by that.

13         Q.    BY MR. ERCOLE:  Sure.  Some --

14   would you agree that -- that opioid

15   manufacturers manufacture different types of

16   opioid medicines?

17         A.    Many do, yes.

18         Q.    And there are different types

19   of opioid medicines; correct?

20         A.    Correct.

21         Q.    Some of these medicines there

22   may be generic opioid medicines; correct?

23         A.    Yes.

24         Q.    There may be brand medicines;

25   correct?

Confidential                                                    JAN-MS-05484417

Lynn Webster, M.D
February 18, 2019                                    277

1          A.      Correct.

2          Q.      Some of the medicines can be

3    short-acting opioids?

4                  MR. DUCK:  Objection to form.

5                  THE WITNESS:  Some can be

6          short-acting.

7          Q.      BY MR. ERCOLE:  There can be

8    long-acting opioids?

9                  MR. DUCK:  Objection to form.

10                 THE WITNESS:  Yes.

11         Q.      BY MR. ERCOLE:  Are there other

12   differences between --

13         A.      Rapid onset, intra- --

14   intrathecal.

15         Q.      Any others?

16         A.      No.

17         Q.      Yeah, do you want to explain

18   what you mean by "rapid onset opioids"?

19         A.      I think of transmucosal as --

20   as a rapid onset.  So something that's

21   quickly absorbed so that immediate onset, and

22   it's usually transmucosal.  So Actiq would be

23   that example, or Fentora.

24         Q.      When you say "transmucosal" --

25   sorry, just for breaking it down even

Confidential                                                          JAN-MS-05484418

Lynn Webster, M.D
February 18, 2019                                       278

 1    farther -- what do you mean by that?

 2          A.     Well, you -- it's something you

 3    place in your mouth, and you place it on the

 4    mucosa, which is the inner lining of your

 5    mouth.  And that then goes across into the

 6    blood stream and is picked up.  So that's

 7    transmucosal.  So the mucous, mucosa, mucosa,

 8    so it's transmucosa.

 9          Q.     And you mentioned

10    "intrathecal," what do you mean by that?

11          A.     That's giving it into the

12    spinal canal.

13          Q.     Is it fair to say that with

14    respect to opioid manufacturers, different

15    opioid manufacturers may engage in different

16    types of promotional activities based upon

17    the -- the medicine that they manufacture?

18               MR. DUCK:  Objection.  Form.

19               THE WITNESS:  Yes.

20          Q.     BY MR. ERCOLE:  And some

21    manufacturers -- like some generic

22    manufacturers may not even promote their

23    medicines to doctors at all; is that fair to

24    say?

25               MR. DUCK:  Objection to form.

Confidential                                                          JAN-MS-05484419

Lynn Webster, M.D
February 18, 2019                    279

```
 1              THE WITNESS:  There are -- yes,
 2        a lot of generics don't spend any
 3        money on marketing or reaching out to
 4        doctors.
 5        Q.    BY MR. ERCOLE:  And is it fair
 6   to say that you can't just lump all opioid
 7   manufacturers together just like you can't
 8   lump all physicians together?
 9              MR. DUCK:  Objection to form.
10              THE WITNESS:  Well, I think --
11        it depends upon what level you're
12        talking about.  I mean, I think there
13        is -- each company is different, and
14        so they've got different products so
15        they would be different.
16        Q.    BY MR. ERCOLE:  Have you ever
17   heard of the company Actavis Pharma, Inc.?
18        A.    Yes.
19        Q.    Do you recall any
20   communications that you've had with Actavis
21   Pharma, Inc.?
22        A.    No, I don't recall it.  It's
23   possible, but I don't recall.
24        Q.    Do you recall, sitting here
25   today, any funding that you would have
```

Confidential                                                                    JAN-MS-05484420

Lynn Webster, M.D
February 18, 2019                                    280

```
 1   received from Actavis Pharma, Inc.?

 2        A.    I -- I can't recall ever

 3   receiving funding.

 4        Q.    Are you aware of any

 5   promotional or marketing statements about

 6   opioids that were ever made by Actavis

 7   Pharma, Inc.?

 8        A.    I cannot recall.

 9        Q.    Assuming -- sitting here today,

10   you're unaware of any false or misleading

11   statements that would have been made by

12   Actavis Pharma, Inc.?

13        A.    I don't --

14             MR. DUCK:  Objection to form.

15             THE WITNESS:  I don't recall.

16        Q.    BY MR. ERCOLE:  Have you ever

17   had any communications with Watson

18   Laboratories, Inc.?

19        A.    I know one of my former

20   employees moved to Watson, and so what do you

21   mean "communication"?  I'm not sure I talked

22   to him about anything they were doing, so it

23   kind of depends on what your question is.

24        Q.    Fair enough.

25             Do you recall receiving any
```

Confidential                                                    JAN-MS-05484421

Lynn Webster, M.D
February 18, 2019                    281

```
 1    funding from Watson Laboratories, Inc.?

 2         A.    No.

 3         Q.    Do you recall any promotional

 4    or marketing statements about opioids from

 5    Watson Laboratories, Inc.?

 6         A.    I don't recall any.

 7         Q.    Are you aware of any false or

 8    misleading statements by or attributable to

 9    Watson Laboratory, Inc.?

10              MR. DUCK:  Objection to form.

11              THE WITNESS:  I haven't seen

12         anything from them, I don't believe.

13         Q.    BY MR. ERCOLE:  And counsel

14    today for the -- for the State never

15    mentioned Actavis Pharma, Inc.; correct?

16              MR. DUCK:  Objection to form.

17              THE WITNESS:  I don't remember

18         that being mentioned.

19         Q.    BY MR. ERCOLE:  Sure.  He never

20    showed you any documents involving Actavis

21    Pharma, Inc., did -- did they?

22         A.    No, I don't think so.

23              MR. DUCK:  Objection to form.

24         Q.    BY MR. ERCOLE:  With respect to

25    Watson Laboratories, Inc., did counsel for
```

Confidential                                                      JAN-MS-05484422

Lynn Webster, M.D
February 18, 2019                                    282

```
 1    the State today ever show you any documents

 2    concerning Watson Laboratories, Inc.?

 3         A.    Not that I'm familiar.  No, I

 4    don't recall.

 5         Q.    Did counsel for the State ever

 6    reference Watson Laboratories, Inc.?

 7         A.    I don't believe so.

 8         Q.    How about Actavis, LLC, have

 9    you ever heard of that entity?

10         A.    Well, I know Actavis.  I don't

11    know what the other part of it is, and if

12    there's a difference.

13         Q.    Sure.  About -- ever received,

14    to the best of your recollection, any funding

15    from Actavis, LLC?

16         A.    Not that I recall.

17         Q.    Are you aware of any -- aware

18    of any promotional or marketing statements

19    about opioids that were ever made by Actavis,

20    LLC?

21         A.    No.

22         Q.    Aware of any false or

23    misleading statements attributable to

24    Actavis, LLC --

25         A.    No.
```

Confidential                                                          JAN-MS-05484423

Lynn Webster, M.D
February 18, 2019                         283

1          Q.      -- sitting here today?

2          A.      No.

3          Q.      You've -- counsel for the State

4    mentioned -- has used the word -- the name

5    "Teva."

6                  Do you recall that?

7          A.      Yes.

8          Q.      And counsel for the State never

9    differentiated as to what Teva entity it was

10   referring to or not referring to, but have

11   you ever heard of the -- of the company Teva

12   Pharmaceuticals USA?

13                 MR. DUCK:  Objection to form.

14                 THE WITNESS:  You know, I think

15           of Teva as Teva, and I'm not sure I

16           know the difference with -- if there

17           are different Tevas.

18         Q.      BY MR. ERCOLE:  Fair enough.

19                 Are you aware of any false or

20   misleading statements, sitting here today,

21   that Teva USA has made?

22                 MR. DUCK:  Objection to form.

23                 THE WITNESS:  No.

24         Q.      BY MR. ERCOLE:  Are you aware

25   of any marketing at all that Teva USA has

Confidential                                                         JAN-MS-05484424

Lynn Webster, M.D
February 18, 2019                    284

```
 1   done regarding opioids in Oklahoma?

 2               MR. DUCK:  Objection to form.

 3               THE WITNESS:  No.

 4        Q.    BY MR. ERCOLE:  There was some

 5   discussion earlier about Cephalon.  Do you

 6   recall that?

 7        A.    Yes.

 8        Q.    Cephalon is different than

 9   Teva; correct?

10        A.    Well, I don't know what you

11   mean by that.  Cephalon is what developed

12   Fentora and Actiq, and it was acquired by

13   Teva, is what my understanding is.  So it was

14   a different company, but then it folded into

15   Teva, is what my understanding is.

16        Q.    Would you be surprised to learn

17   that Teva USA and Cephalon are two distinct

18   companies even today?

19               MR. ROBINSON:  Objection.

20        Form.

21               THE WITNESS:  I guess I would

22        be surprised.  I didn't know that.

23        Q.    BY MR. ERCOLE:  With respect to

24   Cephalon, at any stage in time are you aware

25   of any false or misleading statements that
```

Confidential                                    JAN-MS-05484425

1    Cephalon has ever made?

2              MR. DUCK:  Objection to form.

3              THE WITNESS:  Only what was

4         presented to me today that the

5         Cephalon admitted to doing something

6         wrong.

7         Q.    BY MR. ERCOLE:  You have no

8    independent knowledge of that; correct?

9              MR. DUCK:  Objection.  Form.

10             THE WITNESS:  That's correct, I

11        don't.

12        Q.    BY MR. ERCOLE:  And you have no

13   independent knowledge, is it fair to say, of

14   any -- of any false or misleading statements

15   that Cephalon has ever made in the state of

16   Oklahoma; is that fair to say?

17             MR. DUCK:  Objection to form.

18             THE WITNESS:  That's correct.

19        Q.    BY MR. ERCOLE:  And sitting

20   here today, there were no documents presented

21   to you showing any false or misleading

22   statements made my Cephalon in the state of

23   Oklahoma; correct?

24        A.    Again, it's one document

25   that -- that the executives -- or there was

Confidential                                                    JAN-MS-05484426

 1    some kind of fine, and I don't know if that

 2    applied to Oklahoma or not.

 3         Q.     Are you aware that that was --

 4    are you aware that that was -- that addressed

 5    the issue of off-label promotion?

 6         A.     That's what he -- that's what I

 7    learned today.

 8         Q.     Sure.  And we'll get into sort

 9    of off-label prescribing issues, but is it

10    fair to say that off-label prescribing can,

11    in some instances, form the appropriate

12    standard of care for patients?

13              MR. DUCK:  Objection to form.

14              THE WITNESS:  Off-label

15         prescribing is common.  30 to

16         40 percent, probably, of all -- of all

17         prescribing across the board, all

18         medicines, is off-label.  And it's --

19         it's not uncommon to off-label --

20         prescribe off-label and that's why --

21         well, it's just not uncommon.

22         Q.     BY MR. ERCOLE:  And what is

23    sort of off-label prescribing, just to give

24    some additional context there?

25         A.     It just means --

Confidential                                                          JAN-MS-05484427

Lynn Webster, M.D.
February 18, 2019                          287

```
 1                    MR. DUCK:  Objection to form.

 2                    THE WITNESS:  It just -- what

 3          it means is that it's -- it's being

 4          used, it's being prescribed for a

 5          disease or a state that is not within

 6          the FDA package insert guideline.

 7          Doesn't have an approved FDA

 8          indication.

 9          Q.    BY MR. ERCOLE:  And is it fair

10   to say that, depending on context, some

11   off-label statements themselves may be

12   entirely true?

13                    MR. DUCK:  Objection.  Form.

14                    THE WITNESS:  Off-label

15          statements?

16                    MR. ROBINSON:  Objection.

17          Form.

18                    MR. ERCOLE:  Sure.

19                    THE WITNESS:  You -- you mean

20          making some statements about off-label

21          use could be true?

22                    MR. ERCOLE:  Yes.

23                    MR. DUCK:  Objection to form.

24                    THE WITNESS:  Yes, of course.

25          Q.    BY MR. ERCOLE:  And you say "of
```

Confidential                                                    JAN-MS-05484428

Lynn Webster, M.D.
February 18, 2019                    288

```
 1    course," what do -- what do you mean by that?
 2         A.    Well, I mean --
 3              MR. ROBINSON:  Objection.
 4              You can answer the question if
 5         you can answer that in a vacuum.  Go
 6         ahead.
 7              THE WITNESS:  Well, I think
 8         that it's very common for physicians
 9         to write something that has no FDA
10         indication because we believe it's the
11         appropriate thing.  And we may make
12         some statement that we believe it's
13         appropriate for that patient, for that
14         indication, for the -- whatever we're
15         prescribing, even though it's not a
16         part of the FDA indication.
17         Q.    BY MR. ERCOLE:  And just
18    because it's -- is it fair to say just
19    because it's a off-label statement doesn't
20    necessarily mean it's false or misleading in
21    any way?
22              MR. DUCK:  Objection to form.
23              THE WITNESS:  It means that the
24         FDA has not approved it.  That's all
25         it means.
```

Confidential                                        JAN-MS-05484429

Lynn Webster, M.D
February 18, 2019                              289

```
1          Q.      BY MR. ERCOLE:   Okay.   Are

2    you -- Dr. Webster, how many years of medical

3    training do you have?

4          A.      Well, I was formally trained

5    with five years of college and three years of

6    medical school, four years -- three years of

7    a residency, one fellowship, and then I

8    trained myself a lot after my postgraduate.

9          Q.      And as a trained medical

10   professional, is it fair to say that when

11   prescribing a medicine, you as the -- as the

12   doctor, as the trained medical professional,

13   are the one responsible for making the

14   prescribing decision for the patient?

15         A.      Yes, that's correct.

16         Q.      And is it fair to say that as a

17   trained medical professional, you have the

18   obligation to make prescribing decisions in

19   the best interest of your patients?

20         A.      That's correct.

21         Q.      And is it fair to say that as a

22   trained medical professional, you actually do

23   make prescribing decisions in the best

24   interest of your patient?

25         A.      We try.
```

Confidential                                                                                    JAN-MS-05484430

```
 1              MR. ROBINSON:  Objection.

 2         Form.  In context, you talking today?

 3         Q.    BY MR. ERCOLE:  I'm talk- -- at

 4    any -- at any point in time, you know, have

 5    you as a trained medical professional always

 6    attempted to make prescribing decisions in

 7    the best interest of your patient?

 8         A.    I think the key there is

 9    "attempted," key word.

10         Q.    There was some discussion

11    earlier today about visits by sales

12    representatives.

13              Do you recall that?

14         A.    Yes.

15         Q.    As a trained medical

16    professional, did you ever prescribe a

17    medicine because of some statement a sales

18    representative would have said to you?

19              MR. DUCK:  Objection.  Form.

20              THE WITNESS:  I think that

21         sales -- sales reps, or MSLs, whatever

22         they may be called, had -- did have

23         influence by providing me data,

24         information.  I think it was very

25         useful sometimes.
```

Confidential                                                                    JAN-MS-05484431

Lynn Webster, M.D.
February 18, 2019                                    291

```
 1              So, yes, I think they do.

 2         They -- they could -- they influenced

 3         me and I think they do influence

 4         physicians.

 5         Q.    BY MR. ERCOLE:  And at the end

 6    of the day, is it -- is it fair to say that

 7    with respect to your prescribing as the

 8    trained medical professional, you are the one

 9    that exercises your own independent medical

10    judgment as to what is in the best interest

11    of the patient?

12              MR. ROBINSON:  Objection.

13         Asked and answered.

14              Go ahead.

15              THE WITNESS:  Ultimately, it's

16         always my decision, regardless of what

17         somebody else has said, even another

18         physician.  It's still -- if I write

19         the script, I'm responsible.

20         Q.    BY MR. ERCOLE:  Sitting here

21    today, are you aware of any false or

22    misleading statement that any sales

23    representative has ever made to you about

24    opioids?

25              MR. DUCK:  Objection to form.
```

Confidential                                                    JAN-MS-05484432

Lynn Webster, M.D
February 18, 2019                    292

```
 1              THE WITNESS:  Well, I can't --
 2         I can't remember -- I can't remember
 3         anything that was false, but I do
 4         remember one time when a rep came in
 5         to me and wanted -- and was
 6         recommending that I use the medicine
 7         for postop pain, OxyContin, you know,
 8         for example.
 9              And I had told the rep that I
10         didn't think that was appropriate.  It
11         was an extended release for a short
12         period of time, and I did not believe
13         that was appropriate.
14              Now, I've learned that it's
15         very widely used for postop pain, for
16         postop acute pain, but I was
17         uncomfortable that the rep said that
18         to me, and she never repeated it.
19         Q.    BY MR. ERCOLE:  And in that
20    instance, you chose not to use the medicine
21    for postop pain --
22         A.    That's correct.
23         Q.    -- in that case?
24         A.    And I told her she shouldn't be
25    detailing it that way.
```

Confidential                                                      JAN-MS-05484433

Lynn Webster, M.D.
February 18, 2019                                       293

1          Q.      And in that instance, you

2    exercised your own independent medical

3    judgment; correct?

4          A.      Correct.

5          Q.      And as a trained medical

6    professional, is it fair to say that you're

7    familiar with the labels of the medicines

8    that you prescribe?

9          A.      Yes.

10         Q.      And is that the -- sort of --

11   is it fair to say that the content of the

12   labels -- of the medicines you prescribe is

13   one factor that you consider when deciding

14   whether to prescribe a medicine?

15         A.      Content of the label.  You mean

16   the -- I mean, there are a lot of things in

17   the label.  So we're looking at the drug

18   itself.  So what kind of a drug is it?

19               We're looking at the side

20   effect profile.  We're always looking at the

21   dose ranges that are in the label, and what

22   are the indications.  So you have to take all

23   of that into account.

24               But, ultimately, that was

25   always my decision.  But I'll have to tell

Confidential                                          JAN-MS-05484434

Lynn Webster, M.D.
February 18, 2019                                    294

```
 1   you, there are a lot of physicians who don't

 2   look at those labels.

 3        Q.    And at least with respect to

 4   your prescribing practices, would the risks

 5   of the medicine as set forth in the label be

 6   something that you would have considered as

 7   well in making that determination?

 8        A.    I would have.  I mean, I think

 9   that's -- that and the dosing.  Dosing and

10   risks.  Risks are really important.  And then

11   dosing to make sure you're within recommended

12   dosing means it's less -- less important that

13   it's effective than it is safe.

14        Q.    There have been discussions

15   today about CME programs that you've been

16   involved in.

17              Do you recall that?

18        A.    Yes.

19        Q.    What is a CME?

20        A.    Well, that's an educational

21   program where the content has to be

22   scientific and referenced.  It's got to be

23   factual.  And -- and so it's a educational

24   program that you can get credit for.

25        Q.    And when you say has "to be
```

Confidential                                                                      JAN-MS-05484435

Lynn Webster, M.D
February 18, 2019                                    295

1   factual," what do you mean by that?

2        A.     Well, you -- it can't be

3   promotional.  I mean, the big distinction is

4   between advocating for a product or something

5   versus stating what the science supports.

6   The literature.  Scientific reference.

7        Q.     The CMEs in which you were

8   involved in -- involved in, were they --

9   excuse me.  Let me start that question over

10  again.

11              The CMEs that you were involved

12  in, were they always fair and balanced?

13       A.     I always thought they were fair

14  and balanced.  I mean, all CME has to be

15  approved by an independent source that

16  evaluates whether it's fair and balanced.  So

17  that plus I never would have agreed to

18  participate in anything that I didn't think

19  was factual and honest.

20       Q.     And when you say "independent

21  source," what do you mean by "an independent

22  source"?

23       A.     There's an educational body

24  that -- you know, it's a national

25  organization that approves the CME

Confidential                                                          JAN-MS-05484436

```
 1   credentialing bodies, and they're the ones

 2   who have to review with their independent

 3   sources the content to make sure that it's

 4   fair and balanced.

 5        Q.    And with respect to CMEs that

 6   you were involved in, did you develop the

 7   content of those CMEs?

 8        A.    Often, not always.  I may not

 9   have had 100 percent input in all of them,

10   but most of the time I would contribute most

11   of the content.

12        Q.    And are you aware -- strike

13   that.

14             With respect to any of the CMEs

15   that you were involved in, are you aware of

16   any false or misleading statements that were

17   made?

18             MR. ROBINSON:  Objection.

19             MR. DUCK:  Objection to form.

20             MR. ROBINSON:  Form.

21             THE WITNESS:  I'm not aware of

22        anything false that I've ever said,

23        except maybe to my wife -- no.

24        Q.    BY MR. ERCOLE:  There was

25   some -- you mentioned before that you've
```

Confidential                                    JAN-MS-05484437

```
 1    given CMEs about the risks and abuses --

 2    well, the risk potential and abuse potential

 3    of opioids; correct?

 4         A.    Correct.

 5         Q.    And was that the -- strike

 6    that.

 7              When you say "risk potential

 8    and abuse potential of opioids," what are you

 9    referring to there?

10              MR. DUCK:  Objection to form.

11              THE WITNESS:  Well, and all

12         opioids have a risk of contributing to

13         abuse, addiction, overdose, and death.

14              And so most of my lectures were

15         to try to help physicians learn how to

16         assess for that risk, and so that's --

17         that's really a large part of it.

18              And different molecules would

19         have different risk profiles, and

20         whether they were short-acting, rapid

21         onset, or extended release.  So it was

22         all about trying to educate risk

23         mitigation to the prescribers.

24         Q.    BY MR. ERCOLE:  And the --

25    those CMEs that you're talking about here,
```

Confidential                                                          JAN-MS-05484438

Lynn Webster, M.D.
February 18, 2019                                    298

```
 1     they would have been developed independent of

 2     pharmaceutical companies; correct?

 3              MR. DUCK:  Objection to form.

 4              THE WITNESS:  By CM- -- by the

 5         definition of CME, they are

 6         independent.  They're funded by

 7         pharma, but they're not developed by

 8         pharma.

 9     Q.    BY MR. ERCOLE:  Sure.  With

10     respect to that funding, are you aware of any

11     CME where -- that you were involved in where

12     the funding somehow influenced the particular

13     opinion or discussion you were giving?

14              MR. DUCK:  Objection to form.

15              THE WITNESS:  I would not have

16         contact with the company, so I

17         wouldn't know that.

18     Q.    BY MR. ERCOLE:  And sort of the

19     -- strike that.

20              With respect to there was some

21     discussion, I believe, of speaker programs --

22     A.    Yes.

23     Q.    -- earlier.

24              What's a speaker program?

25     A.    Those are promotional programs.
```

Confidential                                                    JAN-MS-05484439

Lynn Webster, M.D
February 18, 2019                    299

```
 1    Those are educational but promotional.  I
 2    mean, those are where pharmaceutical
 3    companies or device companies contract with
 4    physicians to talk about their product in a
 5    promotional way.
 6         Q.    And did you serve as a speaker
 7    for Cephalon at some point?
 8         A.    I think Cephalon is the only
 9    company that I did that with for a short
10    time, and I can't remember how long, but I
11    did speak on the speaker bureau.  The content
12    was not promoting their product, though.  I
13    only spoke about the risk and abuse, and
14    that's the reason I would do it.
15         Q.    And with respect to the -- the
16    speaker programs that you did for Cephalon,
17    the opinions you gave regarding risks and
18    abuse, those were your own opinions; correct?
19              MR. DUCK:  Objection to form.
20              THE WITNESS:  Yes, that's
21         correct.
22         Q.    BY MR. ERCOLE:  And you
23    wouldn't have done those speaker programs if
24    they weren't your opinions; is that fair to
25    say?
```

Confidential                                                    JAN-MS-05484440

Lynn Webster, M.D
February 18, 2019                              300

```
 1                MR. DUCK:  Objection to form.

 2                THE WITNESS:  That is

 3        absolutely correct.  Much of it was

 4        based on my research and science.  And

 5        so, I mean, most of the -- of what's

 6        been developed in this field is -- is

 7        really come from my research and

 8        helped physicians understand what the

 9        risks are and how to mitigate those

10        risks.

11        Q.    BY MR. ERCOLE:  And with

12   respect to speaker programs that you did, do

13   you feel like they were helpful to

14   physicians?

15                MR. DUCK:  Objection to form.

16                THE WITNESS:  I was hopeful

17        that they were helpful.

18        Q.    BY MR. ERCOLE:  How about with

19   respect to the CMEs?

20                MR. DUCK:  Objection to form.

21                THE WITNESS:  So, yes, I mean,

22        I think when you can put out good

23        science that is new, I'm hoping that

24        -- and -- because it was the topic

25        area, I was hoping that it was useful
```

Confidential                                                        JAN-MS-05484441

```
 1          to the doctors.
 2          Q.    BY MR. ERCOLE:  Anything --
 3   anything false or misleading that you can
 4   recall ever saying in any speaker program
 5   that you were involved in?
 6               MR. ROBINSON:  Objection to
 7          form.
 8               MR. DUCK:  Objection to form.
 9               THE WITNESS:  No.
10          Q.    BY MR. ERCOLE:  Dr. Webster,
11   you've written books about opioids; is that
12   fair to say, or at least one book?
13               MR. ROBINSON:  Objection.
14               MR. DUCK:  Objection to form.
15               MR. ERCOLE:  All right.  Let me
16          ask it again.
17               MR. ROBINSON:  Lacks
18          foundation.
19          Q.    BY MR. ERCOLE:  Have you
20   written any -- any books about opioids?
21               MR. ROBINSON:  Objection.
22          Lacks foundation.  Form.
23               THE WITNESS:  I wrote a book
24          about how to prescribe opioids and
25          mitigate the risk for practitioners.
```

Confidential                                    JAN-MS-05484442

Lynn Webster, M.D.
February 18, 2019                        302

1          Q.     BY MR. ERCOLE:  And is that

2     entitled "Avoiding Opioid Abuse While

3     Managing Pain"?

4          A.     Yes.

5          Q.     Did any pharmaceutical company

6     involved in this lawsuit pay you to write

7     that book?

8          A.     No.

9          Q.     Did any pharmaceutical company

10    in this lawsuit influence the opinions

11    articulated in that book?

12               MR. DUCK:  Objection to form.

13               THE WITNESS:  I had no contact

14          with pharmaceutical companies with

15          regard to my book.  None, zero.

16         Q.     BY MR. ERCOLE:  So that book

17    reflects your opinions; correct?

18               MR. DUCK:  Objection to form.

19               THE WITNESS:  Well, it reflects

20          my opinion, but also the science.  I

21          mean, it's deeply referenced.

22         Q.     BY MR. ERCOLE:  Sure.  And I

23    apologize for that.

24               And when you say "references

25    the science," what are you referring to?

Confidential                                    JAN-MS-05484443

Lynn Webster, M.D
February 18, 2019                              303

1        A.    I'm talking about citations.  I

2   used -- I use what's in the literature to

3   help create the content of the book.

4        Q.    We looked at your CV today, I

5   think it's Exhibit 1.  Do you recall that?

6        A.    Yes.

7        Q.    And it -- the CV -- your CV

8   identifies several professional associations

9   that you were involved with?

10       A.    Correct.

11       Q.    And if you turn to, it looks

12  like Page 3 of Exhibit 1, there's a list, I

13  think, of professional associations; is that

14  fair to say?

15       A.    Yes.

16       Q.    Okay.  And the first one is the

17  American Pain Society.

18             Do you see that?

19       A.    Yes.

20       Q.    Okay.  What was the purpose

21  behind the American Pain Society?

22             MR. DUCK:  Objection to form.

23             THE WITNESS:  The purpose

24        behind -- well, I don't -- I don't

25        know what their official purpose is,

Confidential                                    JAN-MS-05484444

Lynn Webster, M.D.
February 18, 2019                              304

1          but it's an association of -- of

2          scientists, basic scientists and

3          clinicians to advance the field of

4          pain medicine.

5          Q.     BY MR. ERCOLE:  And was this

6    a -- a patient advocacy group or a

7    professional advocacy group?

8          A.     It's a professional, not

9    patient.  It's a professional group made up

10   of basic scientists, clinicians, nurses, the

11   whole spectrum.

12         Q.     And to the best of -- of your

13   knowledge, did the American Pain Society

14   operate independently from pharmaceutical

15   companies?

16              MR. DUCK:  Objection to form.

17              THE WITNESS:  It was a separate

18         entity.  I think that all professional

19         organizations receive funding from

20         pharmaceutical companies and device

21         companies, and maybe even others.  So

22         they -- they exist because of support

23         from, in a large part, pharmaceutical

24         companies.

25         Q.     BY MR. ERCOLE:  And did -- was

Confidential                                      JAN-MS-05484445

Lynn Webster, M.D
February 18, 2019                               305

```
 1    there -- do you believe the American Pain

 2    Society provided any benefit?

 3         A.      To me or to whom?

 4                 MR. DUCK:  Objection.  Form.

 5         Q.    BY MR. ERCOLE:  Generally to

 6    the -- to physicians.  To, you know,

 7    clinicians?

 8                 MR. DUCK:  Objection to form.

 9                 THE WITNESS:  It -- it had a

10         large basic science component, and it

11         was a way to advance the science and

12         make us all aware of it.

13                 It's a very strong organization

14         that has great importance, I think, to

15         the field, and ultimately patients.

16         Q.    BY MR. ERCOLE:  And when you

17    say "ultimately patients," what do you --

18    what do you mean by that?

19                 MR. DUCK:  Objection to form.

20                 THE WITNESS:  People in pain.

21         Q.    BY MR. ERCOLE:  And are you

22    aware -- you've mentioned funding by

23    pharmaceutical companies of the American Pain

24    Society.  Are you aware of any instance where

25    the -- the opinions of the American Pain
```

Confidential                                                    JAN-MS-05484446

Lynn Webster, M.D
February 18, 2019                    306

 1    Society were dictated by pharmaceutical

 2    companies?

 3         A.     No.

 4                MR. DUCK:  Objection to form.

 5                THE WITNESS:  No.

 6         Q.    BY MR. ERCOLE:  It was the --

 7    were the opinions of the American Pain

 8    Society reached, to the best of your

 9    knowledge, independently of -- of

10    pharmaceutical companies?

11                MR. DUCK:  Objection to form.

12                THE WITNESS:  I was never

13         involved in the management of the

14         American Pain Society, so I really

15         don't have any insight into any of

16         that.  I've been a member.  I think I

17         was on one committee once, so I really

18         have no insight to any of that.

19         Q.    BY MR. ERCOLE:  Sitting here

20    today, you're not aware of any instance where

21    a pharmaceutical company sort of influenced

22    any publication or opinion put forth by the

23    American Pain Society, are you?

24         A.     No.

25                MR. DUCK:  Objection to form.

Confidential                                                      JAN-MS-05484447

Lynn Webster, M.D
February 18, 2019                    307

```
 1                  MR. ROBINSON:  Objection to

 2        form.

 3        Q.     BY MR. ERCOLE:  You also listed

 4   here -- on here is the American Academy of

 5   Pain Medicine.

 6                  Do you see that?

 7        A.     Yes.

 8        Q.     And what was the purpose or the

 9   objective of the American Academy of Pain

10   Medicine?

11        A.     To advance the field of pain

12   medicine for clinicians.  As opposed to the

13   American Pain Society, which had a lot of

14   basic science and other disciplines, this was

15   for physicians.  To have a professional

16   organization to advance the field and to

17   support the growth of the field.

18        Q.     Did the American Academy of

19   Pain Medicine do that?

20                  MR. DUCK:  Objection to form.

21                  THE WITNESS:  I think so.  I

22        mean, we saw earlier that it was

23        highly respected by the industry.

24        Q.     BY MR. ERCOLE:  Are you aware

25   of -- well, let me rephrase that.
```

Confidential

JAN-MS-05484448

Lynn Webster, M.D
February 18, 2019                                    308

```
1              Did -- are you aware of any

2    instance where pharmaceutical companies

3    attempted to influence the -- the

4    publication -- any publications from the

5    American Academy of Pain Medicine?

6              MR. DUCK:  Objection to form.

7              THE WITNESS:  Well, the

8         American Academy of Pain Medicine

9         doesn't -- doesn't do that.  I mean,

10        there's a journal called Pain Medicine

11        which is owned by the American Academy

12        of Pain Medicine, and there's a

13        journal by -- that's owned by the

14        American Pain Society called The

15        Journal of Pain.

16             But I'm not aware of the

17        pharmaceutical companies having any

18        input, other than they have

19        publications that they may submit to

20        those two journals to -- to be peer

21        reviewed and then published.

22        Q.    BY MR. ERCOLE:  Other than

23   that, you're not aware of any influence by

24   the pharmaceutical companies of --

25        A.    No.
```

Confidential                                                                                    JAN-MS-05484449

Lynn Webster, M.D
February 18, 2019                              309

```
 1         Q.     -- as to the American Academy
 2    of Pain Medicine; correct?
 3         A.     No.  Correct.
 4         Q.     And the American Pain Society
 5    was -- was made up of trained medical
 6    professionals; correct?
 7              MR. DUCK:  Objection to form.
 8              THE WITNESS:  I think everyone
 9         was a medical professional of some
10         type.
11         Q.     BY MR. ERCOLE:  And the
12    American Academy of Pain Medicine was also
13    comprised of -- of medical professionals?
14         A.     Mostly physicians.
15              MR. DUCK:  Objection to form.
16              THE WITNESS:  Yeah.
17         Q.     BY MR. ERCOLE:  Are there
18    other -- you mentioned today earlier there
19    were sort of patient advocacy groups that you
20    were involved in; is that correct?
21              MR. DUCK:  Objection to form.
22              THE WITNESS:  Correct.  Well,
23         involved with.  There -- the National
24         Pain Foundation, I was a member of
25         their board for a very short time.
```

Confidential                                                          JAN-MS-05484450

```
 1            But I'm aware of others, but I haven't

 2            been involved with them.

 3                   I mean, U.S. Pain Foundation,

 4            which is current.  American Chronic

 5            Pain Association.  I'm familiar with

 6            them and I support them, but I'm not

 7            sure I -- I would say I've been

 8            involved with them.

 9       Q.     BY MR. ERCOLE:  Fair enough.

10                   Are you members of those

11   organizations?

12       A.     There is -- I don't think

13   there's a membership.

14       Q.     Okay.  With respect to the

15   National Pain Foundation, was that a patient

16   advocacy group?

17       A.     Yes, it was.

18       Q.     And just so the record is

19   clear, when you say "patient advocacy group,"

20   what exactly is that?

21       A.     You advocate for people in

22   pain.

23       Q.     And has the National Pain

24   Foundation, in -- in your view, helped people

25   in pain?
```

Confidential                                                  JAN-MS-05484451

```
 1         A.    You know, I don't know.  It
 2    existed -- I -- I -- I was invited on just at
 3    the end of its existence, and it couldn't get
 4    the funding to continue.  So it -- it had to
 5    close.
 6               But part of the reason that I
 7    was -- I was asked to participate was because
 8    I developed a educational program in the
 9    state of Utah called The Zero Unintentional
10    Overdose Death Campaign.  And that was where
11    we were looking to take it national, because
12    we had what appeared to be a significant
13    reduction in deaths here because of the
14    educational program.
15               So they wanted to take it
16    national, but they couldn't get the funding
17    to take it national.
18         Q.    Did the National Pain
19    Foundation put out publications at all?
20         A.    I don't believe so.  Maybe
21    pamphlets or something like that.  But,
22    again, I came in at the end.  I don't have
23    much history with them.
24         Q.    Sure.  You mentioned the U.S.
25    Pain Foundation?
```

Confidential                                                            JAN-MS-05484452

Lynn Webster, M.D
February 18, 2019                                          312

1        A.      Yes.

2        Q.      Okay.  Is that -- that's a

3   patient advocacy group too?

4        A.      Yes.

5        Q.      Are you still a member of that

6   particular foundation?

7        A.      Well, I've never been a member,

8   really.  I mean, I support the organization.

9        Q.      Any other patient advocacy

10  groups that you've been a member of?

11       A.      Yeah, the American Chronic Pain

12  Association.

13       Q.      Are you aware of -- are you

14  aware of any efforts by pharmaceutical

15  companies to -- strike that.

16              Are you aware of -- of any

17  instances where pharmaceutical companies have

18  influenced the opinions put forward by the

19  American Chronic Pain Association?

20              MR. DUCK:  Objection to form.

21              THE WITNESS:  You know, I don't

22       have any knowledge of the management

23       of the -- of those advocacy groups.

24       Q.      BY MR. ERCOLE:  Sitting here

25  today -- maybe we can just do this in a

U.S. LEGAL SUPPORT
(877) 479-2484

Confidential                                                          JAN-MS-05484453

Lynn Webster, M.D
February 18, 2019                                        313

 1   broad -- broad way -- sitting here today,

 2   with respect to any of the patient advocacy

 3   groups or the consumer -- or the physician

 4   advocacy groups that you've either been a

 5   member with or been involved in, are you

 6   aware of any instance where any

 7   pharmaceutical company has -- has influenced

 8   the content of any opinions or publications

 9   put forward by those associations?

10              MR. DUCK:  Objection to form.

11              THE WITNESS:  I'm not aware of

12        any.

13        Q.    BY MR. ERCOLE:  Dr. Webster,

14   you mentioned before that -- before getting

15   into more clinical research you were a

16   practicing physician; correct?

17        A.     Correct.

18        Q.     And how long again were you a

19   practicing physician?

20        A.     Started in 1980, so 30 years,

21   basically.  30 years is when I started

22   practice as an anesthesiologist.  By the end

23   of the '80s, so 20-some-plus years, I was

24   practicing chronic pain and cancer pain

25   management.

Confidential                                                    JAN-MS-05484454

Lynn Webster, M.D
February 18, 2019                                    314

1          Q.     And it's fair to say that

2    during that time period you prescribed

3    opioids for noncancer pain?

4          A.     Most of that time was for

5    noncancer pain.

6          Q.     And what are the -- can you

7    give me examples of some of the conditions

8    for which you've prescribed opioids for

9    noncancer pain?

10         A.     The most common reason or the

11   most common pain complaint is low back pain,

12   and -- and patients I would see, most of them

13   have had -- had had previous back operations.

14   Most of them had several back operations.

15              So it would be failed back

16   syndrome.  I took care of a lot of Complex

17   Regional Pain Syndrome, which is a neurologic

18   disease.  I took care of other neuropathies.

19   Peripheral neuropathy, pancreatitis,

20   interstitial cystitis, trigeminal neuralgia.

21   Yeah, ulcerative colitis, Crohn's Disease.

22   So a host of -- arthritis, rheumatoid

23   arthritis.  So a large number.

24         Q.     And, in your view, opioids were

25   appropriate to treat those conditions;

Confidential                                                                    JAN-MS-05484455

1    correct?

2          A.     In my view, most of the

3    patients whom I prescribed I believe they

4    were appropriate, that's correct.

5          Q.     And were there -- and when

6    you -- when you write -- when you, in the

7    past, when you wrote opioid prescriptions,

8    what were the considerations that you would

9    look at in figuring out whether to prescribe

10   an opioid for a particular patient or not?

11              MR. DUCK:  Objection to form.

12              THE WITNESS:  Well, I think

13        we -- a lot of -- there are a lot of

14        factors.  How long are they going to

15        have the pain?  What's the intensity

16        of the pain?  What are the co-morbid

17        medical conditions?

18              But more importantly, what are

19        the other options?  What else has been

20        tried?  Are they functionally

21        impaired?  How much do they need pain

22        relief versus what are the

23        consequences of not providing pain

24        relief?

25              And that's a dynamic process.

Confidential                                                          JAN-MS-05484456

Lynn Webster, M.D
February 18, 2019                    316

1          So every visit you're doing that kind

2      of an evaluation.

3      Q.     BY MR. ERCOLE:  Is it fair to

4  say every time a patient -- a patient comes

5  back to see you after being prescribed

6  opioids, you do that same type of analysis?

7      A.     Well, it's always something

8  that you're cognitively thinking about.  I

9  mean, you have to -- you have to make sure

10  that you're assessing is the potential

11  benefit outweighing the potential risk to

12  renew that script.

13      Q.     And is it fair to say it's an

14  individualized assessment for each patient?

15          MR. DUCK:  Objection to form.

16          THE WITNESS:  Yes.  You always

17      have to individualize the treatment.

18      Q.     BY MR. ERCOLE:  And I know you

19  mentioned this, but just so that my notes are

20  clear.  I assume risk of addiction would

21  be -- be one of the important --

22      A.     Well, yes.

23      Q.     -- criteria that you would look

24  at when figuring out whether to prescribe

25  opioids for a patient?

Confidential                                                    JAN-MS-05484457

1           MR. DUCK:  Objection to form.

2           THE WITNESS:  That's why I

3     developed the opioid risk tool.  The

4     reason I developed it was because

5     we -- I knew -- we all knew that

6     patients could get into trouble, they

7     could develop the disease of

8     addiction, they could abuse without

9     developing the disease of addiction.

10          And we as clinicians did not

11    understand how to identify people who

12    were at the greatest risk.  So I spent

13    a lot of time trying to understand

14    that, and that's why I came up with

15    the tool, and it's been very useful, I

16    think, clinically for -- for

17    clinicians to try to, most

18    importantly, ask the right questions.

19          It's not so much the -- the

20    value of the tool as it is that not

21    everybody is the same risk.  There's a

22    subset of the population who are at

23    tremendous risk, and -- and they

24    should not be prescribed if there's

25    any way to avoid an opioid.  That's

Confidential                                                                    JAN-MS-05484458

Lynn Webster, M.D
February 18, 2019                         318

1         what's important.

2         Q.      BY MR. ERCOLE:  And with

3    respect to the conditions that you identified

4    as having prescribed opioids to treat, have

5    there been examples where -- where patients

6    have benefited from the prescription of -- of

7    opioid for noncancer pain?

8         A.      I would -- I would think that

9    it would not be appropriate, would not be

10   ethical if I continue to prescribe and they

11   did not provide benefit.

12        Q.      Right.  So how about can you --

13   can you give us an example or two of patients

14   that have benefited?  I'm not asking for

15   specific names, but patients -- patients that

16   have benefited from the prescribing of

17   opioids for noncancer pain?

18        A.      Somebody who has had --

19             MR. DUCK:  Objection to form.

20             THE WITNESS:  -- six back

21        operations and they've come in because

22        their primary care doctor is feeling

23        uncomfortable with prescribing more

24        medicine.  The patient is supine,

25        laying at home, can't get out of the

Confidential                                                    JAN-MS-05484459

Lynn Webster, M.D
February 18, 2019                    319

```
 1        bed.  They drive in from Tooele, which

 2        is 30, 40 miles to the west.  And they

 3        have to lay in the back of their car

 4        in order to get in here and have

 5        somebody drive them in.

 6              So I evaluate them, and then I

 7        decide to change their medicines.

 8        And -- and as a result, they're able

 9        to sit at the dinner table.  Just sit

10        at the dinner table.  And he hadn't

11        been able to do that in years.  He had

12        to -- he had to be -- he had to have

13        his food brought to him.  He could not

14        walk outside of the house.

15              So, I mean, I can tell you that

16        I've had numerous other cases.  A lot

17        of people who were able to return to

18        work because they were able to be on

19        opioids, and this would be for

20        decades.  One, two decades.  And they

21        were very functional as a result of

22        the treatment.

23        Q.    BY MR. ERCOLE:  And but for

24   opioid therapy, they wouldn't have been able

25   to return to work; is that fair?
```

Confidential                                                                                    JAN-MS-05484460

```
 1                  MR. DUCK:  Objection to form.

 2                  THE WITNESS:  Largely because

 3          there were no other -- there weren't

 4          other alternatives insurance companies

 5          would cover.

 6                  But even if insurance companies

 7          would have covered alternatives that

 8          might have provided some benefit, they

 9          may not have provided the degree of

10          relief that these -- these patients --

11          some of these patients derive from

12          opioids.

13                  So, you know, as I've said

14          several times, there are a large

15          number of people who do well on

16          opioids for decades.  And they are

17          functional, there have been -- many

18          people have been able to return to

19          work, they can be engaged with their

20          family, they can go out to dinner,

21          they can play ball with their kids.

22                  And there's a subset of the

23          population that should not be

24          prescribed, because it is very

25          dangerous and they'll self-medicate
```

Confidential                                                                                      JAN-MS-05484461

Lynn Webster, M.D
February 18, 2019                    321

```
 1          themselves often, and -- and sometimes

 2          they'll die as a result.

 3          Q.    BY MR. ERCOLE:  And when you

 4     say -- strike that.

 5               We -- we've talked about --

 6     when you say "self-medicate themselves," what

 7     are you referring to?

 8          A.    That means they don't take the

 9     medicine as directed.  And there are a lot of

10     reasons.  People with severe pain -- opioids

11     are not that effective.  I mean, for a large

12     number of people, despite what I've just

13     said, they can be very helpful for some

14     people, but, you know, on an average, you

15     reduce their pain by about 30 percent.

16     That's all.

17               But for those people who have

18     severe pain, 30 percent reduction is the

19     difference between living or not living.

20          Q.    And what -- what do you mean by

21     that exactly?

22          A.    Well, sometimes --

23               MR. DUCK:  Objection to form.

24               THE WITNESS:  -- they being

25          supine and basically incapacitated
```

Confidential                                    JAN-MS-05484462

1          versus being up with their family and

2          being able to be engaged and sometimes

3          working.  That's what I mean.  I mean,

4          it's being a part of life or not a

5          part of life.

6          Q.    BY MR. ERCOLE:  The --

7     there's -- we talked about chronic pain

8     earlier.  You recall some of the testimony

9     you've given about chronic pain?

10         A.    I always talk about chronic

11    pain.

12         Q.    That was a poor question.

13               You've given some testimony

14    about the undertreatment of chronic pain?

15         A.    Yes.

16         Q.    What are the consequences of

17    undertreating pain?

18               MR. DUCK:  Objection to form.

19               MR. ERCOLE:  Strike that.  I'll

20         ask that again.

21         Q.    Are there consequences for

22    undertreating pain?

23               MR. DUCK:  Objection to form.

24               THE WITNESS:  Yes.

25         Q.    BY MR. ERCOLE:  Okay.  And --

Confidential                                                      JAN-MS-05484463

Lynn Webster, M.D
February 18, 2019                    323

```
 1    and what are those consequences?

 2              MR. DUCK:  Objection to form.

 3              THE WITNESS:  Disability,

 4         depression, suicide, lack of function.

 5         Often the people that have terrible

 6         pain are disengaged with their family,

 7         ends in divorce.  Children have

 8         problems engaging with that particular

 9         parent.

10              Every aspect of your life is

11         altered in a negative way when you

12         have chronic pain.  Every aspect.

13         Q.    BY MR. ERCOLE:  How about

14    suicide?  Is that a possible potential

15    consequence of --

16         A.    I said suicide.  And, yes,

17    suicide is a consequence.

18              I remember one individual that

19    I had been treating, and he had back pain, he

20    had had several back operations.  And he came

21    in and he was on what was considered rather a

22    high dose at the time.  I thought it was a

23    high dose, and I didn't see that he was

24    benefitting from that high dose.

25              So I told him I was going to
```

Confidential                                                          JAN-MS-05484464

```
1    take his dose down.  I took his dose down.

2    And the next month he came in and he said,

3    Doc, I just can't do it.

4               I said, I just can't see giving

5    you the higher dose.

6               So he and I -- basically -- he

7    didn't say much, but he says, Doc, I just

8    can't live with it.

9               And I said, No, we just -- we

10   just have to stay at these lower dose,

11   because I knew the consequences if -- if he

12   were to die of a heart attack, I'd be blamed

13   for overdose.

14              So I was thinking more of my

15   protection, self-protection.  But he goes

16   home and he writes a note to his daughter and

17   says I can't live and ends up killing himself

18   because I tapered him.

19              And today we're seeing a huge

20   number of people who are tape -- being forced

21   to tape -- be tapered off of their opioids

22   and are committing suicide.

23      Q.    And when you say being -- do

24   you know why they're being forced to --

25      A.    CDC guideline.
```

Confidential                                                                    JAN-MS-05484465

Lynn Webster, M.D
February 18, 2019                                    325

```
 1                  MR. DUCK:  Objection to form.
 2                  THE WITNESS:  They're trying to
 3          fall within the 80 milligram dose of
 4          the CDC guideline as suggested, and
 5          many -- many physicians feel that that
 6          is not just a suggestion, if they
 7          don't follow that, if they don't drop
 8          their patients down to that level,
 9          that they will be held accountable
10          should there be some adverse outcome.
11          Q.    BY MR. ERCOLE:  And do you feel
12     that at least for some -- and when you say
13     "milligram dose," what do you mean by that?
14                  MR. DUCK:  Objection to form.
15                  THE WITNESS:  It's
16          90 milligrams morphine equivalent.  So
17          something equal to that using some
18          kind of a conversion to that from a
19          different opioid.
20                  So oxycodone, you know, that --
21          it would be, like, 60 milligrams of
22          oxycodone per day.
23          Q.    BY MR. ERCOLE:  Do you feel
24     that at least for some patients suffering
25     from noncancer pain then that the dose above
```

Confidential                                                          JAN-MS-05484466

Lynn Webster, M.D
February 18, 2019                        326

1    90 milligrams may be appropriate?

2         A.     Yeah, there are --

3              MR. DUCK:  Objection to form.

4              THE WITNESS:  There are some

5         people that need much higher doses.  I

6         had people that were on a thousand

7         milligrams a day, and they had been

8         for a long time.  That's -- it -- you

9         have to individualize the therapy.

10        Q.    BY MR. ERCOLE:  Is chronic pain

11   separate from breakthrough pain?

12             MR. DUCK:  Objection to form.

13             THE WITNESS:  Well, I think

14        that there is some debate in the

15        literature about that.  There's some

16        people who don't believe that there is

17        really a breakthrough pain, and that

18        it is just part of chronic pain.

19             But I -- I -- it doesn't

20        matter.  I mean, to -- to me,

21        breakthrough pain is -- is something

22        that is usually quick in onset, very

23        intense, and dissipates quickly.

24             And you can't use traditional

25        medication, like an oral medication,

Confidential                                                    JAN-MS-05484467

Lynn Webster, M.D.
February 18, 2019                    327

1          usually, to treat that if it's severe

2          and it's frequent, because the

3          medicine takes longer than the

4          duration of the painful event.

5               And that painful event -- event

6          can be so disabling that you -- you

7          basically are incapacitated during

8          that time, or it's suicidal.

9               So that's when some of the

10         rapid onset, the Actiqs and the

11         Fentora-type drugs are useful.

12         Q.    BY MR. ERCOLE:  And does

13   breakthrough pain occur in noncancer

14   patients?

15              MR. DUCK:  Objection to form.

16              THE WITNESS:  Yes.  There is no

17         difference between cancer and

18         noncancer pain, except one person has

19         cancer.  The mechanism of pain is the

20         same.  It's a false statement.  I

21         mean, it's a false assumption premise

22         here for -- for us to differentiate

23         cancer from noncancer pain.

24              It's -- is it a somatic pain?

25         Is it visceral pain?  Is it

Confidential                                    JAN-MS-05484468

Lynn Webster, M.D
February 18, 2019                    328

```
 1            neuropathic pain?  And it shouldn't

 2            matter if it's cancer or noncancer.

 3                The FDA has even said that.

 4            The only difference here is that the

 5            FDA only approved these drugs because

 6            they thought they were risky in only

 7            cancer-related breakthrough pain.

 8            That is, the Actiq and the Fentora and

 9            the other rapid onset.

10       Q.    BY MR. ERCOLE:  And can Actiq

11  and Fentora be effective for addressing

12  non-breakthrough and noncancer pain?

13                MR. DUCK:  Objection to form.

14                THE WITNESS:  I prescribed it

15            to many people for noncancer

16            breakthrough pain, and I thought it

17            was very effective.

18       Q.    BY MR. ERCOLE:  Can you give me

19  sort of some examples where it was effective

20  for your patients?

21                MR. DUCK:  Objection to form.

22                THE WITNESS:  Sometimes you

23            would have people with a

24            radiculopathy.  That is a pain that

25            goes down an extremity.  Let's say
```

Confidential                                                    JAN-MS-05484469

Lynn Webster, M.D
February 18, 2019                    329

```
 1        somebody with a low back pain who had

 2        had previous back surgery, and

 3        sometimes they would just suddenly get

 4        a lancinating pain that they'd just

 5        crumble to the floor.

 6              So sometimes having an Actiq or

 7        Fentora available would provide them

 8        immediate relief so that they could

 9        get back up and -- and -- and be

10        functional.

11   Q.    BY MR. ERCOLE:  By prescribing

12  Actiq or Fentora for breakthrough pain in

13  those instances, do you know whether that

14  stated emergency room visits for those

15  particular patients?

16              MR. DUCK:  Objection to form.

17              THE WITNESS:  You know, I think

18        that that's all speculative.  I mean,

19        there are some -- there's some stuff

20        in the literature, but I don't have it

21        off the top of my head.

22   Q.    BY MR. ERCOLE:  You gave an

23  example of someone who had low back pain who

24  previously had back surgery as an example of

25  someone for whom you prescribed either Actiq
```

Confidential                                        JAN-MS-05484470

Lynn Webster, M.D
February 18, 2019                    330

1    or Fentora.

2              Are there other -- other

3    patients with noncancer pain that you

4    prescribed Actiq and Fentora for?

5         A.    Yes.

6              MR. DUCK:  Objection to form.

7              THE WITNESS:  Yes, often.

8         There's trigeminal neuralgia.  You

9         know, some type of a head and neck

10        pain, which is associated with the

11        greatest number of suicides because

12        it's the most difficult to treat.

13             So it's not -- it's not

14        headache pain, necessarily, but it is

15        a neuralgia, and it's a facial

16        neuralgia that is terribly intense and

17        disabling.

18             So that -- but, you know, even

19        Complex Regional Pain Syndrome, if

20        you're not on any other medicines and

21        they just have breakthrough pain

22        events because of some activation,

23        that -- it would be useful there too.

24        Or interstitial cystitis, that can be

25        terribly painful, and it's a way to

Confidential                                    JAN-MS-05484471

1          bring the pain under control.

2          Q.    BY MR. ERCOLE:  So just a

3    couple of follow-up questions on there,

4    because, I apologize, I am -- I am not a

5    physician.

6               So you mentioned -- you

7    mentioned "facial neuralgia."  What is that?

8               MR. DUCK:  Objection to form.

9               THE WITNESS:  Well, there are a

10         lot of facial neuralgia types, but if

11         there's a certain nerve that's being

12         pinched or it's been injured, maybe

13         there's been a dental procedure, for

14         example, and the nerve -- mandibular

15         nerve has been pierced or a drill has

16         gone into it, it can become a severe

17         life-long terrible pain.  Suicidal

18         level pain.

19              So that or you have one of the

20         nerves of the trigeminal nerve that

21         affects the face can have huge intense

22         pain, and it can be intermittent and

23         last for a short period of time or it

24         can last for a long, long period of

25         time, but it comes on in a rapid

Confidential
JAN-MS-05484472

Lynn Webster, M.D
February 18, 2019                              332

1          lancinating way.

2                   I forgot, was there something

3          else in that question?  Yeah, that

4          was -- that's neuralgia.  So it's a

5          nerve.  It's a pain related to the

6          nerve.

7          Q.    BY MR. ERCOLE:  Okay.  And you

8     mentioned interstitial --

9          A.    Cystitis.  Interstitial

10    cystitis.

11         Q.    What is that?

12         A.    Well, that's a -- that's an

13    inflammation of the bladder.  It's an

14    inflammatory bladder.

15         Q.    And in these instances where

16    you've prescribed Actiq and Fentora for

17    patients with breakthrough noncancer pain,

18    was -- did you feel like Actiq and Fentora

19    allowed the patients to become more

20    functional?

21         A.    Otherwise -- yes, or otherwise

22    I wouldn't have prescribed it.  I mean, there

23    were times that I didn't think it helped, and

24    I think -- and there were times when I think

25    people began to abuse it, so I would take

Confidential                                                                 JAN-MS-05484473

```
 1  them off and not prescribe it.

 2       Q.    And in those particular

 3  instances they would -- you would sort of

 4  assess the particular patient to figure out

 5  whether or not the patient was abusing the

 6  medicine; correct?

 7            MR. DUCK:  Objection to form.

 8            THE WITNESS:  To the best I

 9       could.  I mean, I -- the problem is,

10       is you can't always -- you can't

11       always know.  You just attempt to

12       assess whether they're following

13       the -- the directions and the use of

14       it and if it's helping them.

15       Q.    BY MR. ERCOLE:  And is it fair

16  to say that you've published articles about

17  breakthrough pain?

18       A.    Yes.

19       Q.    And you've published articles

20  about breakthrough noncancer pain; is that

21  fair to say?

22       A.    I believe I have, yes.

23            MR. DUCK:  Objection to form.

24       Q.    BY MR. ERCOLE:  With respect to

25  the articles that you've published about
```

Confidential                                              JAN-MS-05484474

Lynn Webster, M.D
February 18, 2019                                    334

1    breakthrough pain, were those articles

2    independently created by you as the author of

3    those articles?

4              MR. DUCK:  Objection to form.

5              THE WITNESS:  Well, if I -- if

6         I was an author, the content was mine.

7         Q.    BY MR. ERCOLE:  And is it fair

8    to say that with respect to any articles that

9    you had that you authored on breakthrough

10   pain, the opinions in those articles would

11   have been your opinions?

12        A.    Everything I've --

13             MR. DUCK:  Objection to form.

14             THE WITNESS:  -- authored is my

15        opinion.

16        Q.    BY MR. ERCOLE:  Are you aware

17   of any instance where a pharm- -- well,

18   strike that.

19             Have pharmaceutical companies

20   sometimes sponsored research that you've

21   done?

22             MR. DUCK:  Objection to form.

23             THE WITNESS:  Have -- yes, I've

24        conducted hundreds of trials, clinical

25        trials that pharmaceutical companies

Confidential                                                    JAN-MS-05484475

Lynn Webster, M.D
February 18, 2019                          335

1        have sponsored.

2        Q.    BY MR. ERCOLE:  And with

3   respect to those -- those trials, has the

4   fact that the pharmaceutical company --

5   companies sponsored those trials ever

6   influenced sort of the ultimate outcome of

7   those trials?

8              MR. DUCK:  Objection to form.

9              THE WITNESS:  The conduct of

10        the trial is not influenced by the

11        pharmaceutical company.  The

12        pharmaceutical company can help design

13        a study.  They often will design a

14        study or they'll, in some cases, ask

15        me to design the study or our team to

16        design a study.

17             I mean, there's a whole

18        spectrum of types of interactions.

19        But depending upon the -- the

20        pharmaceutical company, the larger

21        they are, the more resources they have

22        and the more likely they are to bring

23        me a protocol and say this is what

24        they would like to have conducted.

25             And so we become -- I become

Confidential                                                    JAN-MS-05484476

Lynn Webster, M.D
February 18, 2019                    336

1          the one who conducts it, I execute,

2          basically, the protocol after I review

3          it and make sure it's safe, and we

4          provide them the data.  Done.

5               Now, if they want to publish

6          the data or if I want to publish the

7          data, then it requires an interaction

8          between me and the pharmaceutical

9          company.  Sometimes they will want to

10         publish it and they'll invite me to be

11         a part of that publication.

12         Q.     BY MR. ERCOLE:  Is it fair to

13    say that at least with respect to any of the

14    articles that you've published that the --

15    the conclusions reached in those articles are

16    conclusions that you and you alone have

17    reached free from pharmaceutical influence?

18              MR. DUCK:  Objection to form.

19              THE WITNESS:  Well, I'm not

20         sure me alone.  I think that I'm

21         rarely a single author.  So -- but I

22         would not agree to be an author if I

23         didn't agree with the content and the

24         conclusions.

25         Q.     BY MR. ERCOLE:  And that's an

Confidential                                                    JAN-MS-05484477

Lynn Webster, M.D
February 18, 2019                           337

```
 1    independent assessment that you would make;

 2    correct?

 3          A.    Yes.

 4                MR. DUCK:  Objection to form.

 5                THE WITNESS:  I have refused to

 6          be an author on manuscripts where a

 7          pharmaceutical company -- and I think

 8          I mentioned it, maybe I didn't -- but

 9          I've been asked to put sentences in a

10          paper that I disagreed with, and I

11          refused to be an author as a result.

12          Q.    BY MR. ERCOLE:  I think we've

13    probably been going for about an hour, do you

14    want to take a couple minute break?

15          A.    No, I'm good.

16          Q.    Okay.  Fair enough.

17                What are -- have you ever heard

18    the -- strike that.

19                I think we -- we've used the

20    word or someone today has used the word

21    "REMS" or the acronym "REMS."  What is that?

22          A.    It --

23                MR. DUCK:  Objection to form.

24                THE WITNESS:  Risk evaluation

25          mitigation strategy.  This is an
```

Confidential                                        JAN-MS-05484478

1       attempt to educate -- basically

2       educate providers.  It's more than

3       just providers.  It's also the

4       patients that are -- there are

5       pamphlets, educational material for

6       pamphlets, for providers.  It's part

7       of a distribution system.  So it can

8       include a lot of different things.

9           And it's -- and it's

10      designed -- the FDA and pharmaceutical

11      company basically design the REMS

12      program.

13      Q.    BY MR. ERCOLE:  And are there

14  different types of REMS programs --

15      A.    Yes.

16      Q.    -- for different types of

17  opioids?

18      A.    Yes.  There are a whole host of

19  different types.  Not just the opioids, I

20  mean, there are REMS programs for

21  non-opioids.  I mean, it's a risk mitigation

22  strategy for drugs.  So there are a lot of

23  drugs that are dangerous that aren't opioids.

24  So there has to be some kind of a management

25  program to mitigate the harm to the public.

Confidential                                                          JAN-MS-05484479

Lynn Webster, M.D
February 18, 2019                                    339

1          Q.     And one of the things -- it's

2    fair to say one of the things REMS programs

3    do is sort of educate physicians on the risks

4    of the medicine subject to those programs?

5          A.     Yes.

6                 MR. DUCK:  Objection to form.

7          Q.     BY MR. ERCOLE:  And the -- with

8    respect to opioids, are there -- there are

9    separate REMS programs for long-acting

10   opioids?

11                MR. DUCK:  Objection to form.

12                THE WITNESS:  Well, there was.

13          One for long-acting, one for rapid

14          onset TIRFs, and then -- but recently

15          the FDA has required now

16          pharmaceutical companies to include

17          short-acting opioids.

18                So the long-acting/short-acting

19          fall into the same category.  The

20          TIRFs, though, the rapid onset are

21          usually a different set of educational

22          content.

23          Q.     BY MR. ERCOLE:  And we'll

24   address that shortly, but Actiq and Fentora

25   are TIRF medicines; is that fair to say?

Confidential                                                    JAN-MS-05484480

Lynn Webster, M.D
February 18, 2019                                    340

```
 1          A.      Yes.

 2                  MR. DUCK:  Objection to form.

 3          Q.      BY MR. ERCOLE:  And when you

 4   say "TIRF," what is -- what do you mean by

 5   TIRF?

 6          A.      I forget what it stands for

 7   right here -- right now, but, you know, it's

 8   a transmucosal media something fentanyl

 9   product.

10                  MR. DUCK:  Release.

11                  THE WITNESS:  Huh?

12                  MR. DUCK:  Release.

13                  THE WITNESS:  Release.  Yeah,

14       release.  Yeah, fentanyl.  Thank you.

15          Q.      BY MR. ERCOLE:  And there's

16   a -- is it fair to say since beginning of

17   2012 there's been a separate REMS program for

18   TIRF medicine?

19          A.      Yes.

20                  MR. DUCK:  Objection to form.

21          Q.      BY MR. ERCOLE:  And you

22   testified before that one of the ways that

23   the risks of opioids are disclosed is through

24   REMS programs, for instance; correct?

25                  MR. DUCK:  Objection to form.
```

Confidential                                                      JAN-MS-05484481

```
 1                THE WITNESS:  Yes.  I mean,
 2        that -- that's one way.
 3        Q.    BY MR. ERCOLE:  Is another way
 4   through the labels of the medicines
 5   themselves?
 6                MR. DUCK:  Objection to form.
 7                THE WITNESS:  Yes.
 8        Q.    BY MR. ERCOLE:  Other ways that
 9   the risks are -- of opioids are disclosed?
10        A.    I think the most common --
11   well, you know, I'm not sure how effective
12   the REMS are, or the labels, because I don't
13   think doctors read the labels.
14                I think the most common way is
15   for articles to be published and/or that at
16   professional meetings there are lectures
17   about what the risks are.
18                Those are generally well
19   attended and that's how the word gets out
20   about the real potential harm.
21        Q.    Are the -- for you as a
22   practicing physician, when did you first
23   become aware of the risks of -- of opioid
24   medicines as a category?
25        A.    When I went to medical school.
```

Confidential                                    JAN-MS-05484482

1        Q.    And what was taught then --

2    what was taught at medical school?

3        A.    Well, I mean, opioid -- we all

4    know that opioids can cause addiction.  We

5    knew that in -- you know, I mean, we're --

6    but basically it's ignored in medical school.

7    It was at least at the time I was there.  It

8    was never something that was addressed,

9    because people who got -- who developed an

10   opioid addiction were low lives, they were

11   not worthy of our time in medical school to

12   study.  They were -- it was a behavioral

13   thing, not a disease back then, so they were

14   discarded.

15             It wasn't until we really began

16   to -- in fact, the field of addiction

17   medicine with opioids was -- you know, they

18   -- they were -- the professional

19   organizations started with largely people who

20   had a substance use disorder, and so they

21   were trying to help themselves.

22             It wasn't until the field of

23   pain medicine emerged and that opioids are

24   used for chronic pain that we were asking the

25   questions.  Now, is this a safe thing to do

Confidential                                                          JAN-MS-05484483

Lynn Webster, M.D
February 18, 2019                    343

```
 1    long term?  Who's at risk?
 2             And then we began to realize
 3    that there were people that were at greater
 4    risk and probably shouldn't be prescribed.
 5             So this has been a continuing
 6    evolution, and even today we continue to
 7    learn both in the field of addiction
 8    medicine, as well as in the field of pain
 9    medicine, what the -- what risk factors are
10    important to look at and how we have to
11    manage it.  So it's been a continual
12    educational process.
13        Q.    Fair enough.
14             And just to go back to
15    something you mentioned, I think you did
16    mention that at least in medical school,
17    based upon the property -- properties of
18    opioids, aspiring physicians are taught about
19    the risks generally of opioids; correct?
20             MR. DUCK:  Objection to form.
21             THE WITNESS:  In medical school
22        we all know that opioids can be
23        associated with an addiction.  That's
24        about all we knew.
25             We didn't know how you got from
```

Confidential

JAN-MS-05484484

Lynn Webster, M.D.
February 18, 2019                                   344

1          exposure to the problem, or we didn't

2          know that there was a genetic subset,

3          we didn't know what environmental

4          factors contributed to it.

5          Q.     BY MR. ERCOLE:  Are -- do you

6     know whether medical schools today teach

7     those concepts?

8                MR. DUCK:  Objection to form.

9                THE WITNESS:  I don't know.  I

10         have read that there are some schools

11         that have curriculum about it.

12         Q.     BY MR. ERCOLE:  So just in

13    terms of -- of ways in which the risks of

14    opioids are disclosed to physicians, is it

15    fair to say that, at least at a high level,

16    medical schools teach about the risks of

17    opioids?

18               MR. DUCK:  Objection to form.

19               THE WITNESS:  I don't know what

20         they teach.  They didn't teach much

21         when I was in medical school, but that

22         was long ago.

23         Q.     BY MR. ERCOLE:  And is it fair

24    to say that we've talked about the labels of

25    the medicines, they disclose risks; correct?

Confidential                                                    JAN-MS-05484485

Lynn Webster, M.D
February 18, 2019                                    345

```
 1                    MR. DUCK:  Objection to form.

 2                    THE WITNESS:  Yes, they do.

 3          Q.     BY MR. ERCOLE:  And those are

 4     FDA approved labels; correct?

 5          A.     Yes.

 6                    MR. DUCK:  Objection to form.

 7          Q.     BY MR. ERCOLE:  And some of

 8     the -- some opioids have black box warnings

 9     with respect to the risks associated with

10     opioids; is that -- is that fair to say?

11          A.     Yes.

12                    MR. DUCK:  Objection to form.

13          Q.     BY MR. ERCOLE:  And what is a

14     black box warning?

15          A.     Well, additional risk --

16                    MR. DUCK:  Objection to form.

17                    THE WITNESS:  -- this is

18          something you have to take -- you have

19          to watch very carefully.  This is

20          added risk that needs to be understood

21          by the prescriber.

22          Q.     BY MR. ERCOLE:  And is it fair

23     to say that the point of those FDA approved

24     black box warnings is for prescribers to read

25     them and heed them?
```

Confidential                                                            JAN-MS-05484486

Lynn Webster, M.D.
February 18, 2019                                346

```
 1                    MR. DUCK:  Objection to form.

 2                    THE WITNESS:  That is the

 3         intent.

 4         Q.    BY MR. ERCOLE:  And I believe

 5    we mentioned before, we talked about the REMS

 6    programs, that's another source by which

 7    risks of opioids are disclosed to physicians;

 8    correct?

 9         A.    Yes.

10                    MR. DUCK:  Objection to form.

11         Q.    BY MR. ERCOLE:  And CME

12    programs are another source?

13         A.    Correct.

14                    MR. DUCK:  Objection to form.

15         Q.    BY MR. ERCOLE:  In particular,

16    your CME programs; right?  That you --

17         A.    Yes.

18         Q.    -- did with --

19         A.    I think I probably presented

20    more --

21                    MR. DUCK:  Objection to form.

22                    THE WITNESS:  -- CME programs

23         about the risk of opioids than

24         anybody.

25         Q.    BY MR. ERCOLE:  Are you aware
```

Confidential                                                                    JAN-MS-05484487

```
 1   of -- have you ever heard the phrase -- and

 2   Dr. Webster, the CME programs you just

 3   mentioned, some of those programs regarding

 4   the risks of opioids were funded by

 5   pharmaceutical companies; correct?

 6        A.    Yes.

 7              MR. DUCK:  Objection to form.

 8        Q.    BY MR. ERCOLE:  And some of

 9   those programs were funded by Cephalon;

10   correct?

11        A.    Yes.

12              MR. DUCK:  Objection to form.

13        Q.    BY MR. ERCOLE:  What is a --

14   have you ever heard the phrase "risk

15   management program"?

16              MR. DUCK:  Objection to form.

17              THE WITNESS:  Well, there was a

18        risk management program that was

19        before the REMS, I believe, yes.

20        Q.    BY MR. ERCOLE:  Okay.  And

21   was -- was the risk management programs, were

22   they sort of precursors to the -- to the REMS

23   program?

24        A.    That's my -- my recall is that

25   that's correct.
```

Confidential                                              JAN-MS-05484488

Lynn Webster, M.D
February 18, 2019                          348

```
 1          Q.    Okay.  And was the goal of risk

 2   management programs to convey the risks

 3   associated with medicine subject to those

 4   programs to physicians?

 5              MR. DUCK:  Objection to form.

 6              THE WITNESS:  That's my

 7         understanding, yes.  That's -- that's

 8         my recall.

 9          Q.    BY MR. ERCOLE:  And with

10   respect to Actiq, for instance, when that was

11   first approved, that had a risk management

12   program; correct?

13          A.    Yes --

14              MR. DUCK:  Objection to form.

15              THE WITNESS:  -- it wasn't as

16         sophisticated as it is today, but it

17         was -- it was -- yeah, Phase I of the

18         risk mitigation --

19          Q.    BY MR. ERCOLE:  And when --

20          A.    -- programs.

21          Q.    And when Fentora was first

22   approved, that also -- that medicine also had

23   a risk management program; correct?

24          A.    As I remember, yes.

25          Q.    And those risk management
```

Confidential                                                      JAN-MS-05484489

Lynn Webster, M.D
February 18, 2019                    349

```
1    programs, to the best of your recollection,

2    would have conveyed the FDA approved

3    indications for those medicines; correct?

4              MR. DUCK:  Objection to form.

5              THE WITNESS:  Yes.

6         Q.    BY MR. ERCOLE:  Were you -- we

7    mentioned -- we discussed the TIRF REMS --

8         A.    Yes.

9         Q.    -- program.

10              And -- and is the TIRF REMS

11   program the program -- FDA approved REMS

12   program applicable to the class of medicines

13   known as TIRF medicines?

14              MR. DUCK:  Objection to form.

15              THE WITNESS:  The -- was the

16        FDA REMS program?

17        Q.    BY MR. ERCOLE:  I'm asking

18   about the TIRF REMS program.

19        A.    Yes.

20        Q.    What is -- what is the -- what

21   is the TIRF REMS program?

22              MR. DUCK:  Objection to form.

23              THE WITNESS:  Well, those

24        are -- that's a different REMS program

25        that is -- that applies to the
```

Confidential                                                    JAN-MS-05484490

Lynn Webster, M.D
February 18, 2019                    350

```
 1        trans- -- transmucosal fentanyl

 2        products.

 3        Q.     BY MR. ERCOLE:  And Actiq and

 4    Fentora are examples of TIRF medicines;

 5    correct?

 6        A.     Correct.

 7        Q.     Cephalon manufactures Actiq and

 8    Fentora?

 9               MR. DUCK:  Objection to form.

10               THE WITNESS:  Correct.

11        Q.     BY MR. ERCOLE:  Do you know in

12    connection with the TIRF REMS program

13    -- strike that.

14               Have you ever been enrolled in

15    the TIRF REMS program?

16        A.     Yes.

17               MR. DUCK:  Objection to form.

18        Q.     BY MR. ERCOLE:  And what are

19    the -- do you know what requirements are --

20    must be satisfied before a prescription of

21    Actiq or Fentora can be written?

22        A.     Yeah --

23               MR. DUCK:  Objection to form.

24               THE WITNESS:  Yes, you -- you

25        have -- you have to pass, basically an
```

Confidential                                                                    JAN-MS-05484491

```
 1          exam, submit some content.  The bar is

 2          not high.

 3          Q.     BY MR. ERCOLE:  The examination

 4     that you're referencing -- strike that.

 5               When you say "pass an

 6     examination," are you referring to sort of

 7     passing a knowledge test?

 8          A.     Yes.

 9               MR. DUCK:  Objection to form.

10          Q.     BY MR. ERCOLE:  Just trying to

11     minimize the number of documents, sir, that

12     I've been using because I know you have a lot

13     of paper.

14          A.     You might not see me if they

15     keep growing.

16               MR. ERCOLE:  Can we mark this

17          as -- what exhibit are we on?

18               THE REPORTER:  19.

19     (Exhibit 19 was marked for identification.)

20          Q.     BY MR. ERCOLE:  Dr. Webster,

21     this is the -- it's a TIRF REMS program

22     documentation that we've been talking about.

23               Do you see that?

24          A.     Yes.

25          Q.     Okay.  And if you look on the
```

Confidential                                                          JAN-MS-05484492

```
 1    first page, it says "Initial REMS Approval."

 2               Do you see that?

 3         A.    Yes.

 4         Q.    And if you turn to the first

 5    page, if you look at -- at sort of the Goals,

 6    Number 1.

 7               Do you see that?

 8         A.    Yes.

 9         Q.    And it says, prescribing --

10    "The goals of the TIRF REMS Access program

11    are to mitigate the risk of misuse, abuse,

12    addiction, overdose and serious complications

13    due to medication errors by:"  And then it

14    says, "Prescribing and dispensing TIRF

15    medicines only to appropriate patients, which

16    includes use only in opioid-tolerant

17    patients."

18               Do you see that?

19         A.    Yes.

20         Q.    And then there are sort of

21    elements to assure safe use, number B --

22    letter B.

23               Do you see that?

24         A.    Yes.

25         Q.    Okay.  And it talks about
```

Confidential                                                                            JAN-MS-05484493

```
 1    "Healthcare providers who prescribe TIRF

 2    medicines for outpatient use are"

 3    specifically certified -- "specially

 4    certified."

 5              Did I read that right?

 6        A.    Yes.

 7        Q.    And then if you look to

 8    B(1)(b), it says, "To become certified to

 9    prescribe TIRF medicines, prescribers will be

10    required to enroll in the TIRF REMS Access

11    program.  Prescribers must complete the

12    following requirements to be enrolled:"

13              Do you see that?

14        A.    I do.

15              MR. DUCK:  Objection to form.

16        Q.    BY MR. ERCOLE:  And when you

17    talk about sort of the -- sort of -- you

18    mentioned before that before prescribing you

19    have to go through some type of knowledge

20    enrollment process; correct?

21        A.    Correct.

22        Q.    And that's what this section is

23    describing; correct?

24              MR. DUCK:  Objection to form.

25              THE WITNESS:  That's correct.
```

Confidential                                                                    JAN-MS-05484494

Lynn Webster, M.D
February 18, 2019                                        354

1          Q.     BY MR. ERCOLE:  And one of the

2    things that prescribers have to do is

3    complete a prescriber enrollment form; is

4    that fair to say?

5          A.     Yes.

6                 MR. DUCK:  Objection to form.

7          Q.     BY MR. ERCOLE:  And each

8    prescriber is required to acknowledge the

9    following, and then there's a whole list of

10   -- of things that a prescriber must

11   acknowledge; correct?

12                MR. DUCK:  Objection to form.

13                THE WITNESS:  Yes.

14         Q.     BY MR. ERCOLE:  Okay.  And one

15   of those things is that -- if you look to

16   small letter B.  Do you see that on Page 2?

17         A.     Yes.

18         Q.     "I understand that TIRF

19   medicines can be abused and this risk should

20   be considered when prescribing or dispensing

21   TIRF medicines in situations where I am

22   concerned about an increased risk of misuse,

23   abuse, or overdose, whether accidental or

24   intentional."

25                Is that correct?

Confidential                                                    JAN-MS-05484495

```
 1              MR. DUCK:  Objection to form.

 2              THE WITNESS:  That's what it

 3      says.

 4      Q.    BY MR. ERCOLE:  Okay.  So is it

 5  fair to say that before a prescriber, at

 6  least since -- since beginning of 2012 before

 7  a prescriber can write a prescription of

 8  Actiq or Fentora, that prescriber has to

 9  acknowledge that the medicine can be -- can

10  be abused and that this risk needs to be

11  considered in writing such a prescription?

12              MR. DUCK:  Objection to form.

13              THE WITNESS:  That's what this

14      says.

15      Q.    BY MR. ERCOLE:  And if you look

16  to -- on the next page, Page 3, it talks

17  about --

18      A.    Yes.

19      Q.    -- in letter C, "I understand

20  that TIRF medicines are indicated only for

21  the management of breakthrough pain in

22  patients with cancer who are already

23  receiving and who are tolerant to

24  around-the-clock opioid therapy for their

25  underlying persistent pain."
```

Confidential                                                    JAN-MS-05484496

```
 1                 Is that correct?

 2        A.     Yes.

 3               MR. DUCK:  Objection to form.

 4        Q.     BY MR. ERCOLE:  And is that --

 5   is that something else that prescribers need

 6   to acknowledge before they can write a

 7   prescription of Actiq or Fentora under the

 8   TIRF REMS program?

 9        A.     Well, that -- I mean, they have

10   to sign some document that says they agree

11   that they understand all of this.  Not that

12   they necessarily agreed, but they understand

13   it.

14        Q.     Sure.  Right.  That they

15   understand what the medicines are --

16        A.     What the rules are, yes.

17               MR. DUCK:  Objection to form.

18        Q.     BY MR. ERCOLE:  That doesn't --

19   that doesn't necessarily mean that the

20   medicines can't be effective for uses outside

21   of the cancer context; correct?

22               MR. DUCK:  Objection to form.

23               THE WITNESS:  Correct.

24        Q.     BY MR. ERCOLE:  But at a

25   minimum, it indicates that before a
```

Confidential                                                    JAN-MS-05484497

```
 1    prescription can be written, doctors have to

 2    be aware of what the -- what the

 3    indication -- FDA approved indications of

 4    those medicines are?

 5         A.    As long as --

 6               MR. DUCK:  Objection to form.

 7               MR. ERCOLE:  -- it's in this

 8         context, yes.

 9         Q.    BY MR. ERCOLE:  And if you look

10    down to little I on that page, the prescriber

11    also has to acknowledge that he or she will

12    complete and sign TIRF REMS Access

13    Patient-Prescriber Agreement Form with each

14    new patient.

15               Do you see that?

16         A.    Yes.

17         Q.    What is that?  Do you know what

18    that is?

19               MR. DUCK:  Objection to form.

20         Q.    BY MR. ERCOLE:  The

21    "Patient-Prescriber Agreement"?

22               MR. DUCK:  Objection to form.

23               THE WITNESS:  Well, it's

24         basically that the patient agrees

25         to -- or is -- is aware that it can
```

Confidential                                                                                    JAN-MS-05484498

1         cause harm too.

2              Q.    BY MR. ERCOLE:  And it's a --

3    an agreement that both doctor and patient

4    have to sign before a prescription of Actiq

5    or Fentora is written; correct?

6                   MR. DUCK:  Objection to form.

7                   THE WITNESS:  Yes.

8              Q.    BY MR. ERCOLE:  And if you --

9    if you look at letter K.

10             A.    Yes.

11             Q.    Talks about that "all follow-up

12   visits, I agree to assess the patient for

13   appropriateness of the dose of the TIRF

14   medicine, and for signs of misuse and abuse"?

15             A.    Yes.

16             Q.    And so is that your

17   understanding that under the TIRF REMS

18   program before a prescription can even be

19   written, doctors have to agree to assess the

20   patient for appropriateness of the TIRF

21   medicine and for signs of misuse and abuse?

22             A.    Yes.

23                  MR. DUCK:  Objection to form.

24             Q.    BY MR. ERCOLE:  And do you know

25   what the -- if you turn to the next page,

Confidential                                                    JAN-MS-05484499

 1    Page 4, there's a reference on the bottom

 2    again to the "Patient-Prescriber Agreement

 3    Form."

 4              Do you see that?

 5         A.    Yes.

 6         Q.    And it says, "I will ensure

 7    that the patient and/or caregiver understand

 8    that, in signing the Patient-Prescriber

 9    Agreement Form, they document the following:

10              "My prescriber has given me a

11    copy of the Medication Guide for the TIRF

12    medicine I have been prescribed, and has

13    reviewed it with me."

14              Do you see that?

15         A.    I see that.

16         Q.    Sure.  And at least under the

17    TIRF REMS program, is it fair to say that

18    before a Actiq or Fentora prescription can be

19    written, the prescriber to -- for a patient,

20    the prescriber has to review a copy of the

21    medication guide for that particular patient?

22              MR. DUCK:  Objection to form.

23              THE WITNESS:  That's what this

24         says.

25         Q.    BY MR. ERCOLE:  Do you know

Confidential                                                          JAN-MS-05484500

Lynn Webster, M.D
February 18, 2019                    360

1   what the medication guide is referring to

2   there?

3       A.    Yes.   It really is describing

4   the risk of the drug and how to use it.

5       Q.    And part of that medication

6   guide would include the -- the potential risk

7   of abuse and addiction; correct?

8       A.    Yes.

9           MR. DUCK:  Objection to form.

10          MR. ERCOLE:  Can we take a

11      five-minute break now, Doctor?  Is

12      that all right?

13          THE WITNESS:  Yeah.

14          THE VIDEOGRAPHER:  Off the

15      record.  The time is 3:39.

16       (There was a break taken.)

17      (Mr. Duck left the proceedings.)

18          THE VIDEOGRAPHER:  Returning on

19      the record.  The time is 3:53.

20          MR. ROBINSON:  This is John

21      Robinson on behalf of Dr. Webster.

22      Over the last week or two there have

23      been extensive discussions both by way

24      of phone calls and emails back and

25      forth between me and counsel for the

Confidential                                              JAN-MS-05484501

1          defendants in this matter.

2              There was the subpoena for

3          testimony that was served on

4          Dr. Webster by the plaintiffs, and

5          under Utah rules that would allow for

6          a four-hour deposition.

7              We have had ongoing

8          negotiations, which were never really

9          completed in the email, so I'm going

10         to attempt to do that right now.

11             For the deposition to continue

12         beyond that four-hour limit, because

13         there was no other validly served

14         subpoena on Dr. Webster, we came to

15         terms within the exchanges of emails

16         as it related to providing the

17         defendants with an additional amount

18         of time up to six hours to examine the

19         witness, with certain limitations,

20         which are all delineated in the

21         emails, as it relates to whether they

22         would seek any future additional

23         deposition of Dr. Webster.

24             The same will apply as it

25         relates to Drs. Fishman and Fine, but

Confidential                                                    JAN-MS-05484502

1        we'll deal with that later.  We may be

2        able to finish a written agreement by

3        then.  But because we have not

4        completed those negotiations, and the

5        reason being because of a dispute over

6        certain categories of documents also

7        being sought, we've agreed to sort of

8        table -- not sort of -- we've agreed

9        to table the issue of the document

10       dispute, but continued with the

11       examination and the agreement as it

12       relates to the continuing examination

13       of Dr. Webster with the -- with the

14       time limit and the limitations as it

15       relates to future depositions of

16       Dr. Webster, if at all.

17              And based on that part of the

18       agreement, we are proceeding beyond

19       the four hours today.

20              MR. HOFFMAN:  Yeah, so the only

21       addendum that I'll say to that is of

22       course we can serve our own subpoena.

23       The reason we haven't done that is

24       because of the agreement.  And so that

25       should be part of the record as well.

Confidential                                                                                    JAN-MS-05484503

Lynn Webster, M.D.
February 18, 2019                                    363

```
 1                 MR. ERCOLE:  We good?

 2                 MR. ROBINSON:  Yep.

 3                 MR. ERCOLE:  All right.

 4        Q.      We've been talking,

 5   Dr. Webster, about sort of the TIRF REMS

 6   program.  Do you recall that?

 7        A.      Yes.

 8        Q.      And have you -- sticking with

 9   that document, just one or two more questions

10   about that.

11        A.      Sure.

12        Q.      If you -- if you turn to

13   Page 5.

14        A.      Yes.

15        Q.      And look at the paragraph that

16   starts with the Number 5.

17        A.      Yes.

18        Q.      And this is, again, part of the

19   patient -- Patient-Prescriber Agreement Form

20   that the patient needs to sign.

21                Do you understand that?

22        A.      Correct.

23        Q.      And for Paragraph 5, it says,

24   "I understand that any TIRF medicine can

25   cause serious side effects, including
```

Confidential                                                    JAN-MS-05484504

1    life-threatening breathing problems which can

2    lead to death, especially if I do not take my

3    TIRF medicine exactly as my prescriber has

4    directed me to take it."

5              Do you see that?

6         A.    Yes.

7         Q.    And that's something that a

8    prescriber has to -- excuse me.  Strike that.

9              That is a certification that

10   the patient needs to make before a

11   prescription of Actiq or Fentora can be

12   written; correct?

13        A.    Correct.

14        Q.    And with respect to your

15   prescribing of -- of opioids generally, will

16   you discuss the risk and benefits of opioids

17   with -- -- strike that.

18              When you are writing

19   prescriptions of -- of opioids, would you

20   discuss the risks and benefits of those

21   opioids with your patients before writing a

22   prescription?

23        A.    I think I would discuss mostly

24   the serious risks.  I wouldn't -- I wouldn't

25   often talk -- it depends.  I mean, if it was

Confidential                                                          JAN-MS-05484505

Lynn Webster, M.D
February 18, 2019                      365

```
 1    the initiation of an opioid or if it -- I

 2    often saw patients that had been on opioids

 3    for a long time and they were referred to me

 4    because they were struggling.

 5                Either they had some problem

 6    with control, use disorder, or they had

 7    intractable pain and it wasn't working.

 8                So I think what my focus was

 9    the serious outcomes.  So that would be

10    abuse, addiction, and overdose.  And I

11    probably wouldn't always say, you know, these

12    are associated with endocrinopathies, and

13    this would be constipation from -- although I

14    always had an informed consent that listed

15    everything, that the patient signed.

16        Q.    And when you say "informed

17    consent," what are you referring to?

18        A.    It talks about the risks and

19    complications of the treatment of opioids, or

20    opioid therapy.  So it would list everything

21    that we know in the literature as a potential

22    complication, side effect or outcome.

23        Q.    Okay.  And the patient did sign

24    that document?

25        A.    Yes.
```

Confidential                                              JAN-MS-05484506

Lynn Webster, M.D
February 18, 2019                          366

```
1         Q.    Is that informed consent

2   document something that you've always used in

3   your practice before prescribing opioids?

4              MR. LEONOUDAKIS:  Objection.

5         Form.

6              THE WITNESS:  You know, I think

7         that -- I evolved thereto.  I mean,

8         you know, because when we first

9         started -- when I first started

10        prescribing, we -- I didn't know what

11        I knew five years later.

12             You know, I think that -- that

13        we all in the field continued to

14        evolve.  We didn't know what the risks

15        were, and we didn't know how to

16        mitigate or manage the risk in the

17        '90s.

18             So I think that we -- I think

19        it wasn't probably until late '90s

20        before I had an informed consent like

21        that that was that exhaustive, that

22        complete.

23             I mean, there was a whole

24        debate about should we have an opioid

25        agreement.  First, it was a contract,
```

Confidential                                                      JAN-MS-05484507

Lynn Webster, M.D
February 18, 2019                    367

```
 1          then it was an agreement, you know,

 2          because it seemed to have too much of

 3          a legal taint if it was a contract,

 4          then it was bilateral.

 5               So move to an agreement and --

 6          but then we decided that we had to

 7          have informed consent separate from an

 8          agreement.

 9               So it was an evolution.  But

10          I'm sure for the last decade I had the

11          consent.

12          Q.    BY MR. ERCOLE:  And it's your

13   recollection that at least from the late '90s

14   you've used -- you used an informed consent?

15          A.    And an agreement, opioid

16   agreement.  That's -- that would be my

17   recall.

18          Q.    And you referred to about --

19   you referred earlier -- in your last

20   statement about knowledge of what the risks

21   were.  You're referring to the risks of

22   addiction?

23               MR. ROBINSON:  Objection.

24               MR. LEONOUDAKIS:  Objection to

25          form.
```

Confidential                                                        JAN-MS-05484508

```
 1              THE WITNESS:  Risk of abuse,

 2         addiction, and overdose is what I

 3         would -- I was always most concerned

 4         about.  That's what I lectured about,

 5         that's what I wrote about, because

 6         everything else can be managed.

 7              I mean, a little pruritus, a

 8         little constipation, I mean, those are

 9         significant, but they're not

10         life-threatening.

11              So the abuse, the addiction,

12         and certainly overdose, those were

13         life-threatening and that was my major

14         concern.

15         Q.    BY MR. ERCOLE:  And those --

16    those risks, again, as we've been talking

17    about, have been spelled out in the -- and

18    included in the labels of opioid medicines;

19    correct?

20         A.    Yes, that's correct.

21         Q.    Regardless of whether

22    prescribers -- strike that.

23              You've always been aware of the

24    risks set forth in the labels of opioid

25    medicines before you've prescribed them;
```

Confidential                                                      JAN-MS-05484509

```
 1   correct?

 2               MR. LEONOUDAKIS:  Objection.

 3        Form.

 4               THE WITNESS:  Well, I think

 5        that I always knew that people could

 6        become addicted, and I also know,

 7        because I'm an anesthesiologist, if

 8        you give enough you can -- you can do

 9        heart bypass surgery, because I did,

10        you know.

11               I mean, that's what I did.  I

12        gave large amounts of IV opioids as

13        anesthetic.  So I'm keenly aware that

14        opioids could stop respiration if

15        you -- if you took too many.

16               I don't think we appreciated,

17        though, at what dose that would occur

18        or the combination, because I believe

19        I was the first to publish that the

20        use of a benzodiazepine, along with

21        opioids was -- was -- had greater risk

22        associated with an overdose.

23               And so, in fact, it doubles or

24        triples or quadruples the risk of an

25        overdose, depending upon the person
```

Confidential                                    JAN-MS-05484510

Lynn Webster, M.D
February 18, 2019                                    370

```
1              and the amount of medication.

2                    So we -- we did continue to

3          evolve throughout the '90s and in the

4          first decade, I think, of the century.

5          Q.     BY MR. ERCOLE:  Well, the --

6      with respect to the -- to the labels of

7      opioids, right, those are FDA mandated

8      labels; correct?

9          A.     That's correct.

10                 MR. LEONOUDAKIS:  Objection.

11         Form.

12         Q.     BY MR. ERCOLE:  Okay.  And

13     putting aside whether physicians actually do

14     or do not read labels, do you think it's --

15     that physicians should read the FDA approved

16     labels for Schedule II opioids before

17     prescribing them?

18         A.      Well, of course.  I mean, I

19     think for all medications you prescribe, you

20     need to understand particularly the safety

21     section and the dosing section.  But you

22     should read the whole label, or at least be

23     familiar with what is the content.

24         Q.      And when you refer to the

25     safety section, what exactly are you
```

Confidential                                                          JAN-MS-05484511

Lynn Webster, M.D
February 18, 2019                                    371

```
 1   referring to there?
 2        A.     Just anything that talks about
 3   safety.
 4        Q.     Before writing a -- before a
 5   physician writes a prescription --
 6        A.     You should have a good
 7   understanding of the safety of the drug
 8   before you prescribe it.  What its
 9   limitations are.
10        Q.     You mentioned earlier in your
11   testimony an opioid risk tool.  Do you recall
12   that?
13        A.     Yes.
14        Q.     And that's something you
15   developed?
16        A.     Yes.
17        Q.     And you developed that on your
18   own; is that correct?
19        A.     That's correct.
20        Q.     And pharmaceutical companies
21   didn't have any influence in the development
22   of that particular tool; correct?
23        A.     No, they didn't even know about
24   it --
25               MR. LEONOUDAKIS:  Objection.
```

Confidential                                    JAN-MS-05484512

Lynn Webster, M.D
February 18, 2019                                    372

1        Form.

2               THE WITNESS:  -- until I had it

3        published.

4        Q.    BY MR. ERCOLE:  And what is

5   that tool?

6        A.    It is -- it is a risk

7   assessment tool.  It's to assess whether --

8   it's to assess what the potential risks are

9   and stratify patients into a low, moderate,

10  or high risk grouping.

11              And the intent was to use it

12  before you prescribed an opioid, and you

13  would tailor your treatment, and even your

14  management, based upon the risk.

15              However, it's very important to

16  know that low risk does not mean no risk.

17  Nor does high risk mean you can't prescribe

18  to that population.

19              It just means that based upon

20  their history, a high risk person is most --

21  is more likely than the others to -- to

22  develop aberrant drug-related behaviors or

23  develop an addiction.

24       Q.    Do you know when that opioid

25  tool, risk tool that you identified was first

Confidential                                                          JAN-MS-05484513

1    published?

2         A.    It was in 2005, I believe.

3    It's on my CV.

4         Q.    Dr. Webster, I know we've

5    talked a lot about various programs and

6    publications.  Did you ever minimize the

7    risks of opioids?

8              MR. LEONOUDAKIS:  Objection.

9         Form.

10             MR. ROBINSON:  Objection.

11             THE WITNESS:  Well, I think

12        that when -- in -- in the '90s, again,

13        I -- I didn't understand the landscape

14        that I do now, or even at the turn of

15        the century around 2000, and I wasn't

16        sure if you were prescribing for a

17        chronic pain condition what the risk

18        would be.

19             I -- I was under the belief

20        that there would be little to no risk.

21        You know, it's like if -- if you're --

22        if you're taking a medicine, if you're

23        prescribed the medicine for the

24        treatment of pain, I don't believe

25        that there was a great risk.  I think

Confidential                                                              JAN-MS-05484514

Lynn Webster, M.D
February 18, 2019                              374

1           it -- at the beginning, they did not

2           believe there was much risk at all.

3                 And I think that that -- that

4           was just about not knowing and

5           probably not understanding how to

6           assess for risk at the time, because

7           there are a lot of people who have

8           chronic pain who have comorbid

9           medical -- mental health problems that

10          clearly increase the risk.

11                And so I would tell patients,

12          If you take the medicine as directed,

13          you should not have a problem with

14          addiction.

15                And I think that's true, but I

16          think it -- it didn't -- I didn't

17          appreciate that there were people that

18          probably were at greater risk at the

19          beginning.  But that's why I developed

20          the opioid risk tool, because I knew

21          that there was something more there.

22          And we were beginning to see people

23          with problems.

24                But who -- who and why, and how

25          do you -- how do you identify those

Confidential                                                    JAN-MS-05484515

Lynn Webster, M.D
February 18, 2019                                    375

```
 1        people, that's why I did the

 2        literature search.  I don't think I

 3        was unique.  I think that's the way we

 4        collectively in the field as experts

 5        understood where we were and where the

 6        science was at the time.

 7        Q.    BY MR. ERCOLE:  And -- and

 8   those views were -- were views that you

 9   independently developed based upon the

10   science and the field at that time?

11        A.    Yeah.  Wasn't from pharma.  I

12   mean, this is -- this is something that I

13   developed on my own because I wanted -- I

14   didn't want to cause any harm, and I wanted

15   to be a leader in the field to make sure that

16   others knew what I knew and what I'd learned,

17   what I'd published.

18        Q.    You were shown some documents

19   today pertaining to Cephalon and Teva.  Do

20   you recall that?

21        A.    Yes.

22              MR. LEONOUDAKIS:  Objection.

23        Form.

24        Q.    BY MR. ERCOLE:  If you turn to,

25   I believe it's Exhibit 9.  I think it's the
```

Confidential                                    JAN-MS-05484516

1    document with "Actiq" on the front of it.

2         A.    I see it.

3         Q.    Before today, did you have any

4    independent knowledge of this document?

5         A.    No.

6         Q.    Did you ever see this document

7    before?

8         A.    No.

9         Q.    Do you have any understanding

10   of the -- given that you -- strike that.

11              Given that you have no

12   independent knowledge of this document, did

13   you have any understanding of the intent of

14   this document?

15              MR. LEONOUDAKIS:  Objection.

16        Form.

17              THE WITNESS:  Not what we

18        reviewed today.  There are more pages

19        here than we reviewed earlier, so I

20        don't -- I can't comment on anything I

21        haven't reviewed.

22        Q.    BY MR. ERCOLE:  Sure.  At least

23   with respect to the -- to the pages that you

24   reviewed; correct?

25              I'll ask the question this way:

Confidential                                                    JAN-MS-05484517

 1                With respect to the pages that

 2    you reviewed, do you have any understanding

 3    of the intent or purpose behind them?

 4                MR. LEONOUDAKIS:  Objection.

 5        Form.

 6                THE WITNESS:  Prior to today?

 7        Q.    BY MR. ERCOLE:  Prior to today,

 8    correct.

 9        A.    No, I had no understanding.

10        Q.    Would you take a look at what I

11    believe is Exhibit 11 [sic].  It's a document

12    that has "Teva Advocacy" on it.

13                Do you see that?

14        A.    Yeah.  Yes.

15        Q.    Do you have any independent

16    understanding regarding the creation of this

17    particular document?

18        A.    No.

19        Q.    Do you have any independent

20    understanding of why certain language is

21    included or not included in this particular

22    document?

23                MR. LEONOUDAKIS:  Objection.

24        Form.

25                THE WITNESS:  No.

Confidential                                                                                JAN-MS-05484518

Lynn Webster, M.D
February 18, 2019                          378

```
 1          Q.     BY MR. ERCOLE:   It's not a

 2   document you created; correct?

 3          A.     I've never seen it before.

 4          Q.     And just for the record, the

 5   document that you are looking at, what --

 6   what is that particular document?

 7          A.     It's a -- what's it called --

 8   it's called "Marketing Plan 2007."

 9          Q.     Okay.

10          A.     "Confidential," is that the one

11   you're referring to?

12          Q.     It is not, but I'll ask

13   questions about that.

14          A.     Okay.

15          Q.     What exhibit number do you have

16   for that one?

17          A.     That's 11.

18          Q.     Okay.  So with respect to that

19   document, Exhibit 11, before today -- strike

20   that.

21                 Do you have any independent

22   knowledge of how that document was created?

23          A.     No.

24          Q.     Okay.  Any independent

25   knowledge of the meaning of this document?
```

Confidential                                                      JAN-MS-05484519

Lynn Webster, M.D.
February 18, 2019                                379

```
 1              MR. LEONOUDAKIS:  Objection.

 2        Form.

 3              THE WITNESS:  Only what was

 4        suggested earlier today by the

 5        plaintiffs.

 6        Q.    BY MR. ERCOLE:  And you -- you

 7   weren't involved in the creation of

 8   Exhibit 11; correct?

 9        A.    That's correct.

10        Q.    Okay.  And can you turn to the

11   document that references "Teva Advocacy

12   Mapping" on it.  I'm not sure which specific

13   exhibit that is.

14        A.    I see it.  It's 12.

15        Q.    Okay.  Before today, had you

16   ever seen this document?

17        A.    No.

18        Q.    Did you help create this

19   document?

20        A.    No.

21        Q.    Any independent knowledge

22   concerning this document?

23        A.    Prior to today?

24        Q.    Sure.

25        A.    No knowledge, no.  No.
```

Confidential                                                    JAN-MS-05484520

```
 1          Q.    Do you know -- do you have any

 2   independent knowledge of why this document

 3   was created?

 4               MR. LEONOUDAKIS:  Objection.

 5         Form.

 6               THE WITNESS:  Only what was

 7         suggested by the plaintiffs' counsel

 8         today.

 9          Q.    BY MR. ERCOLE:  You don't know

10   why Cephalon created this, other than what

11   the State has suggested; correct?

12          A.    Correct.

13          Q.    And when I say "Cephalon," I

14   misspoke.

15               You don't know why Teva may

16   have created this document, other than what

17   was suggested by the State's counsel;

18   correct?

19          A.    That's correct.

20               MR. LEONOUDAKIS:  Objection.

21         Form.

22               THE WITNESS:  Yes, that's

23         correct.

24          Q.    BY MR. ERCOLE:  And if you

25   look, turn to Page 3 -- or 2 of this
```

Confidential                                                                JAN-MS-05484521

Lynn Webster, M.D

February 18, 2019                                    381

```
 1   document, what's Bates-labeled

 2   Teva_OK_00101618.  Do you see that?  It's --

 3   it's marked as Page 2 on the page itself.

 4        A.    The one that says "Advocacy

 5   Mapping Need"?

 6        Q.    Yes.

 7        A.    Yes.

 8        Q.    See that?  Okay.

 9              And if you turn to the bottom

10   of this document, do you see what it says

11   there?  Am I reading that correct, does it

12   say "Draft: For Internal Review Only?

13        A.    Yes.

14        Q.    As far as you can tell, does

15   that suggest to you this was simply a draft

16   of a document?

17              MR. LEONOUDAKIS:  Objection.

18        Form.

19              THE WITNESS:  That's what it

20        says, draft.

21        Q.    BY MR. ERCOLE:  You don't know

22   one way or the other; correct?

23        A.    That's correct.

24              MR. LEONOUDAKIS:  Objection.

25        Form.
```

Confidential                                                      JAN-MS-05484522

Lynn Webster, M.D
February 18, 2019                                382

1          Q.     BY MR. ERCOLE:  Because you've

2   never seen the document before?

3          A.     That's correct.

4                 MR. LEONOUDAKIS:  Objection.

5      Form.

6          Q.     BY MR. ERCOLE:  Give me one

7   second, Doctor.

8          A.     Sure.

9          Q.     Thank you.

10                With respect to Teva USA and

11  Cephalon, do you have any knowledge of any

12  marketing related activity that they've done

13  in the state of Oklahoma?

14         A.     No.

15         Q.     Do you have any knowledge of

16  any marketing activity that Cephalon or Teva

17  USA have done outside of the state of

18  Oklahoma?

19         A.     Well, I guess I was a recipient

20  of some of the marketing material when I went

21  to professional meetings or when I was in

22  practice and I received it from Cephalon.

23         Q.     And with respect to that

24  material, anything sitting here today that

25  you can recall that was somehow false in

Confidential                                                        JAN-MS-05484523

1    there?

2         A.    No.

3         Q.    How about anything misleading

4    in there?

5         A.    Nothing that I recall.

6              MR. ERCOLE:  I think that's it

7         for me, so I'll pass -- pass the

8         mic -- microphone, I guess.

9              MR. LEONOUDAKIS:  I'm going to

10        object to any further questions by

11        defendants.  Y'all have been asking

12        and telling each other questions to

13        ask so we get around for the time

14        limitation, so do what you want, but I

15        would object.

16             MR. HOFFMAN:  We're not going

17        to take more than six hours anyway, so

18        don't worry.

19             MR. LEONOUDAKIS:  Okay.

20             MR. HOFFMAN:  If we get to six

21        hours, it's a proper objection, but

22        we're not even close.

23

24                    EXAMINATION

25   BY MR. EHSAN:

Confidential                                                    JAN-MS-05484524

Lynn Webster, M.D
February 18, 2019                                        384

```
 1         Q.     Good afternoon, Dr. Webster.

 2   My name is Houman Ehsan.  I think I

 3   introduced myself before the deposition, but

 4   I just wanted to do it on the record.

 5              You and I have never met before

 6   today; is that correct?

 7         A.     Correct.

 8         Q.     And I think I had -- may have

 9   mentioned to you before we went on the

10   record, I represent Johnson & Johnson and

11   Janssen defendants.

12              Doctor, where did you grow up?

13         A.     Where did I grow up?

14         Q.     Yes, sir.

15         A.     In Nebraska.

16         Q.     Did you have any experience

17   with patients suffering from chronic pain in

18   your childhood?

19         A.     Yes.

20         Q.     Would you mind sharing that

21   with us?

22         A.     I had a grandmother that had

23   multiple sclerosis, and we always had three

24   generations living in our home while growing

25   up.  And I was a farm boy, and we were poor.
```

Confidential                                                                      JAN-MS-05484525

 1   And my grandmother was unable to walk.  She

 2   had to be carried from room to room, from bed

 3   to a chair.

 4              And when I was a little boy

 5   about four or five, I remember that she'd be

 6   screaming in pain because she would have

 7   spasms in her legs that she couldn't -- she

 8   couldn't -- she couldn't keep from spasming,

 9   you know.  So her legs would just bounce up

10   and down, quiver.

11              And she would ask me to push

12   her feet into the soft pillow that she had in

13   her chair.  And I would do that until that

14   pain -- until -- until the spasms

15   disappeared.

16        Q.    Was she on any pain

17   medications?

18        A.    No.

19        Q.    You think the lack of pain

20   medications affected her quality of life?

21        A.    Oh, without a doubt.

22        Q.    Did that play a role in you

23   choosing to become a pain medicine doctor?

24        A.    I don't think so.  I was going

25   to be a vet.  I was a farm boy.  That's what

Confidential                                                                JAN-MS-05484526

Lynn Webster, M.D.
February 18, 2019                                386

```
 1    I knew.  It wasn't until I went to medical --

 2    I mean to college, I really wanted to

 3    understand the body, the human body, more

 4    than all of the animal bodies, I guess.  But

 5    I do remember my grandmother.

 6           Q.     Have you had occasion to treat

 7    patients with chronic pain for multiple

 8    sclerosis in your clinic days as a pain

 9    medicine doctor?

10           A.     The first person that I placed

11    an intrathecal pump in, that's the device

12    that goes underneath the skin and the

13    catheter is thread to the spinal canal, and I

14    infused medications in was a woman who had

15    multiple sclerosis.

16           Q.     Do you know one way or another

17    whether the intervention you performed on her

18    helped her condition?

19           A.     She claimed I -- it did help,

20    and I -- she was one of the first people in

21    my practice in the early '90s, and she stayed

22    with me until I -- 20 years until I retired

23    from my practice.

24           Q.     Did you ever think about the

25    fact that you were able to help this patient
```

Confidential                                                                                  JAN-MS-05484527

1   who suffered from the same condition as your

2   grandmother and how that made you feel?

3       A.      Well, you know, I think that

4   the reason I was in -- in the field of pain

5   medicine is because of the rewards I got.

6               I wrote a book for the public,

7   which you must have read to ask these

8   questions, because I -- I cited these two

9   examples, basically.  My grandmother and then

10  the woman that I placed this pump in.

11              But it is only one of thousands

12  of experiences that I had in my career where

13  I -- where I knew what I was doing made a --

14  made a big difference in the lives of my

15  patients.

16              I will also say, though, that I

17  often wondered when we saw in the news the

18  harm that these drugs were causing some

19  people, and the number of overdoses, if -- if

20  there were other alternatives, if there are

21  ways in which we could help these patients.

22              But it wouldn't take but one

23  more patient in that day for me to hear from

24  them how much better off they were because of

25  the treatment.  So it was every day a reward.

Confidential                                                    JAN-MS-05484528

Lynn Webster, M.D
February 18, 2019                          388

```
 1    Every day there was fear, but that's the

 2    reason I continued to -- to treat them is

 3    because -- because of the reward I got out of

 4    it.

 5              It wasn't because of finances.

 6    I could have been much better off if I'd have

 7    stayed in the operating room as an

 8    anesthesiologist.

 9        Q.    Thank you for sharing that,

10    Dr. Webster.

11              When you see a patient with

12    chronic pain, you don't know whether or not

13    an opioid medication is necessarily going to

14    help his or her condition; correct?

15        A.    Never can know a priori, no.

16        Q.    Likewise, you won't know

17    beforehand whether or not he or she's going

18    to suffer a side effect from the medication

19    that you're going to prescribe; correct?

20        A.    You never know the outcome.

21    You don't know who's going to have side

22    effects, complications.

23        Q.    For example, in the surgical

24    field, we'd say that there's a 3 percent

25    mortality risk for the surgery.  But you
```

Confidential                                JAN-MS-05484529

1   can't die 3 percent, you either survive or

2   you die; correct?

3        A.    That's right.  That's right.

4        Q.    So for any particular

5   individual, there are general data available

6   that can give you some sense of what you

7   might expect for the patient, but you can

8   never know unless you actually engage in the

9   treatment of the patient; correct?

10       A.    Correct.

11       Q.    So your job as a physician is

12  to assess the patient's individualized

13  profile against that general information,

14  decide whether the benefits of the medication

15  outweigh the risk given the certain degree of

16  uncertainty; correct?

17       A.    That's correct.

18       Q.    And you do that for every

19  patient; correct?

20       A.    Individually.

21       Q.    And for every medication you

22  prescribe; correct?

23       A.    Correct.

24       Q.    And it would be fair to say

25  that it should be what every doctor does in

Confidential                                    JAN-MS-05484530

```
 1    their practice daily; correct?

 2         A.      I would agree.

 3         Q.      And every time you rewrote a

 4    prescription for an opioid, you would

 5    undergo -- you would redo the assessment for

 6    that particular patient; correct?

 7         A.      Yes, I would.

 8         Q.      Then would you agree with me,

 9    Doctor, that you cannot a priori say a

10    certain patient cannot benefit from an

11    opioid?

12              MR. LEONOUDAKIS:  Objection to

13         form.

14              THE WITNESS:  I would agree

15         with that.

16         Q.    BY MR. EHSAN:  Likewise, you

17    cannot say a certain patient will definitely

18    benefit from an opioid?

19              MR. LEONOUDAKIS:  Objection.

20         Form.

21              THE WITNESS:  I agree.

22         Q.    BY MR. EHSAN:  Would it be, in

23    your opinion, valid to say for certain

24    diagnostic conditions -- strike that.  Let me

25    ask it this way.
```

Confidential                                                    JAN-MS-05484531

```
 1              Would you agree with me,

 2   Doctor, that it would not be medically

 3   appropriate to say pain from certain medical

 4   diagnoses should never be treated with an

 5   opioid?

 6              MR. LEONOUDAKIS:  Objection.

 7        Form.

 8              THE WITNESS:  I would agree

 9        with that.

10        Q.    BY MR. EHSAN:  Likewise, it

11   would be fair to say that pain from certain

12   medical conditions don't have to be treated

13   with an opioid?

14        A.    That's also true.

15        Q.    And as part of the individual

16   discussion that I think or -- strike that.

17              When you talk about

18   individualized risk assessment, I think you

19   brought up, for example, concurrent use of

20   benzodiazepines.

21              Do you recall that?

22        A.    Yes.

23        Q.    Now, whether a patient is on a

24   benzodiazepine has nothing to do directly

25   with their pain condition; correct?
```

Confidential                                                    JAN-MS-05484532

Lynn Webster, M.D
February 18, 2019                                    392

```
 1                   MR. LEONOUDAKIS:  Objection.

 2          Form.

 3                   THE WITNESS:  Directly, no.

 4          Q.    BY MR. EHSAN:  And it has

 5   nothing to do with the specific risk of the

 6   opioid separate and apart from the

 7   benzodiazepine; correct?

 8                   MR. LEONOUDAKIS:  Objection.

 9          Form.

10                   THE WITNESS:  I'm not sure I

11          under- --

12                   MR. EHSAN:  Sure.  Sure.  Let

13          me ask on a better question.

14                   THE WITNESS:  Okay.

15          Q.    BY MR. EHSAN:  And the opioid

16   medication has a risk that is assessed

17   independent of other concurrent medications;

18   correct?

19          A.    Yes.

20          Q.    However, there are instances

21   where the combination of medications can

22   alter the risk dynamic; correct?

23          A.    Correct.

24          Q.    And obviously you have to do an

25   individual patient history and physical to
```

Confidential                                                          JAN-MS-05484533

Lynn Webster, M.D
February 18, 2019                                        393

 1   know about some of those dynamic processes;

 2   correct?

 3          A.     That's correct.  Although

 4   you -- I think -- there was a long period of

 5   time we didn't know that there was an

 6   additive, if not synergistic, risk of

 7   overdose when opioids and benzos were

 8   combined.

 9               I believe, as I mentioned

10   earlier, I was the first to publish that

11   particular risk and sleep apnea, et cetera.

12               So for a long time we just

13   thought they were independent and had -- and

14   they were safe to be prescribed together.

15          Q.     Obviously, one of the things

16   that informs your medical judgment is your

17   personal experience in caring for your

18   patients; correct?

19          A.     It's the major one.

20          Q.     And if you were to believe, for

21   example, that no one ever got addicted to

22   opioid medication, your own patient

23   population would serve as a feedback loop to

24   test that theory; correct?

25          A.     That's correct.

Confidential                                                    JAN-MS-05484534

Lynn Webster, M.D.
February 18, 2019                                    394

1          Q.      So the very first patient that

2     would become addicted would disprove the idea

3     that the risk is zero; correct?

4          A.      Correct.

5          Q.      Likewise, the fact that you

6     have patients that go on for decades with

7     -- strike that.  Let me ask it this way:

8                  Do you have patients who have

9     been on opioid therapy for more than a decade

10    for chronic noncancer pain?

11         A.      Yes, I did.

12         Q.      And are some of those patients,

13    even after long treatment with opioids, still

14    have no evidence of an opioid use disorder?

15         A.      Yes.

16                 MR. LEONOUDAKIS:  Objection.

17         Form.

18         Q.      BY MR. EHSAN:  Therefore, then

19    it's also true that not every patient who

20    takes a opioid long-term will become

21    addicted; correct?

22         A.      That's correct.

23         Q.      So the issue is what -- how do

24    we deal with the reality in between those;

25    correct?

Confidential                                                              JAN-MS-05484535

Lynn Webster, M.D
February 18, 2019                              395

```
 1              MR. LEONOUDAKIS:  Objection to

 2       form.

 3              THE WITNESS:  That's correct.

 4       Q.    BY MR. EHSAN:  And I believe

 5  you testified that the most important point

 6  is proper patient selection; correct?

 7              MR. LEONOUDAKIS:  Objection.

 8       Form.

 9              THE WITNESS:  That is correct.

10       Q.    BY MR. EHSAN:  And in order to

11  select the right patient -- strike that.

12              The person in the best position

13  to make the proper patient selection is the

14  doctor prescribing the opioid; correct?

15              MR. LEONOUDAKIS:  Objection.

16       Form.

17              THE WITNESS:  Correct.

18       Q.    BY MR. EHSAN:  And although

19  information can be provided about general

20  risks of a medication, no one knows the

21  specifics of a patient that you will be then

22  making a prescribing decision for other than

23  the prescriber; correct?

24              MR. LEONOUDAKIS:  Objection.

25       Form.
```

Confidential                                                    JAN-MS-05484536

Lynn Webster, M.D
February 18, 2019                      396

```
 1              THE WITNESS:  That's the only

 2       way you know.

 3       Q.    BY MR. EHSAN:  So the drug

 4   company would have no way of knowing the

 5   specifics of every patient for whom you

 6   prescribed opioids; correct?

 7              MR. LEONOUDAKIS:  Objection.

 8       Form.

 9              THE WITNESS:  That's correct.

10       Q.    BY MR. EHSAN:  In your current

11   capacity as a clinical researcher, do you

12   work on clinical trials of opioids?

13       A.    Yes.

14       Q.    Do you work on blinded

15   control -- blinded trials?

16       A.    Yes.

17       Q.    Double blinded trials?

18       A.    Yes.

19       Q.    Now, is it fair to say that

20   some of these trials are sponsored by

21   pharmaceutical companies?

22       A.    Almost all of my research is

23   industry supported.

24       Q.    And in the cases where you're

25   blinded as to the -- whether or not the
```

Confidential                                                      JAN-MS-05484537

Lynn Webster, M.D
February 18, 2019                              397

1   patient is receiving the control arm versus

2   the active arm, you have no way of knowing

3   which patient is -- is on which arm,

4   that's -- is that correct?

5              MR. LEONOUDAKIS:  Objection.

6        Form.

7              THE WITNESS:  Double blind,

8        blinded studies you can't know, that's

9        correct.

10       Q.    BY MR. EHSAN:  So you would

11  have no way of knowing whether a positive

12  outcome is attributable to the control or the

13  active agent of interest; correct?

14             MR. LEONOUDAKIS:  Objection.

15       Form.

16             THE WITNESS:  Not during the

17       trial.  Only after the data's been

18       unblinded or after the data's

19       unblinded, the study's unblinded and

20       the data's analyzed.

21       Q.    BY MR. EHSAN:  So, therefore,

22  you have no way of align- -- well, strike

23  that.

24             And one of the advantages of

25  that kind of experimental control is that it

Confidential                                                              JAN-MS-05484538

Lynn Webster, M.D
February 18, 2019                          398

```
 1    eliminates any potential bias you may have

 2    for the control arm or the active ingredient;

 3    correct?

 4               MR. LEONOUDAKIS:  Objection.

 5         Form.

 6               THE WITNESS:  Correct.

 7         Q.    BY MR. EHSAN:  There was a

 8    discussion, I believe, of trigeminal

 9    neuralgia earlier.  Do you recall that

10    testimony?

11         A.    Yes.

12         Q.    And I think you used the word

13    "lancinating pain."  Do you recall that?

14         A.    Yes.

15         Q.    Just for the benefit of those

16    who may not know what that is, could you

17    explain what you meant by that term.

18         A.    Very sharp, sudden onset like

19    an electric shock.  Lightning bolt.

20         Q.    And that can be quite painful?

21         A.    Severe.

22         Q.    And I believe it was your

23    testimony that there's a high risk of suicide

24    in patients who suffer from this particular

25    condition?
```

Confidential                                                          JAN-MS-05484539

1        A.      All facial neuralgias.

2                MR. LEONOUDAKIS:  Objection.

3        Form.

4                THE WITNESS:  Trigeminal

5        neuralgia included, yes.

6        Q.      BY MR. EHSAN:  Dr. Webster, do

7   you know what a differential diagnosis is?

8        A.      Yes.

9        Q.      Could you please explain it.

10       A.      Somebody presents with

11   physical -- with a chief complaint, you do a

12   history and physical and you come up with the

13   diagnostic options.  So it's a whole list of

14   possible diagnoses that somebody could have

15   for that chief complaint history and physical

16   exam.

17       Q.      So the list of potential

18   medical explanations for the patient's

19   complaint; is that correct?

20               MR. LEONOUDAKIS:  Objection.

21       Form.

22               THE WITNESS:  Correct.

23       Q.      BY MR. EHSAN:  If you had a

24   chronic pain patient who complained of poor

25   pain control on opioid medication, would

Confidential                                                        JAN-MS-05484540

```
 1    there be a differential diagnosis for the

 2    explanation of the patient's symptoms?

 3              MR. LEONOUDAKIS:  Objection.

 4         Form.

 5              THE WITNESS:  Yes.

 6         Q.    BY MR. EHSAN:  That would

 7    include potentially drug-seeking behavior?

 8         A.    Correct.

 9              MR. LEONOUDAKIS:  Objection.

10         Form.

11         Q.    BY MR. EHSAN:  Noncompliance

12    with pain therapy?

13              MR. LEONOUDAKIS:  Objection.

14         Form.

15              THE WITNESS:  Correct.

16         Q.    BY MR. EHSAN:  It could also

17    include suboptimal therapy; is that correct?

18              MR. LEONOUDAKIS:  Objection.

19         Form.

20              THE WITNESS:  Correct.

21         Q.    BY MR. EHSAN:  And it could

22    include worsening of the underlying disease

23    that is causing his or her pain syndrome?

24              MR. LEONOUDAKIS:  Objection.

25         Form.
```

Confidential                                                                    JAN-MS-05484541

Lynn Webster, M.D.
February 18, 2019                                    401

1              THE WITNESS:  Correct.

2       Q.    BY MR. EHSAN:  So all of these

3  conditions would be on the differential;

4  correct?

5              MR. LEONOUDAKIS:  Objection.

6       Form.

7              THE WITNESS:  That's correct.

8       Q.    BY MR. EHSAN:  Any others you

9  can think of?

10      A.    No.

11      Q.    And it would be incumbent on

12  the treating physician to work up the patient

13  to see which of these potential explanations

14  was likely going on with that particular

15  patient; correct?

16      A.    That's correct.

17             MR. LEONOUDAKIS:  Objection.

18      Form.

19      Q.    BY MR. EHSAN:  And based on

20  that workup, the prescriber may decide that

21  -- strike that.

22             And based on that workup, the

23  doctor would then need to take appropriate

24  medical actions to address the patient's

25  underlying condition; correct?

Confidential                                                          JAN-MS-05484542

Lynn Webster, M.D.
February 18, 2019                                    402

1              MR. LEONOUDAKIS:  Objection.

2         Form.

3              THE WITNESS:  Yes.

4         Q.    BY MR. EHSAN:  And that may

5    include adding other treatment modalities

6    like physical therapy; correct?

7              MR. LEONOUDAKIS:  Objection.

8         Form.

9              THE WITNESS:  Correct.

10        Q.    BY MR. EHSAN:  And it may

11   include treating comorbid conditions like

12   depression; correct?

13        A.    Okay.

14             MR. LEONOUDAKIS:  Objection.

15        Form.

16        Q.    BY MR. EHSAN:  In fact, we

17   talked about -- or strike that.

18             I think you mentioned that

19   depression can be a significant comorbid

20   condition than complicates pain therapy;

21   correct?

22             MR. LEONOUDAKIS:  Objection.

23        Form.

24             THE WITNESS:  Yes.

25        Q.    BY MR. EHSAN:  Another

Confidential                                                    JAN-MS-05484543

Lynn Webster, M.D
February 18, 2019                                    403

```
 1    intervention a doctor may -- may take is

 2    adding or increasing non-opioid medication

 3    therapy as adjunct therapy for that patient;

 4    correct?

 5                MR. LEONOUDAKIS:  Objection.

 6         Form.

 7                THE WITNESS:  It may be the

 8         initial therapy, yes.

 9         Q.    BY MR. EHSAN:  And another

10    course of action may be for the doctor to add

11    or increase the opioid medication the patient

12    is receiving; correct?

13                MR. LEONOUDAKIS:  Objection.

14         Form.

15                THE WITNESS:  That's an option.

16         Q.    BY MR. EHSAN:  Now, we talked

17    about the concepts of pseudoaddiction.  Do

18    you recall that testimony?

19         A.    Yes.

20         Q.    Would you agree with, Doctor,

21    that pseudoaddiction is merely a reference to

22    the fact that suboptimal treatment with an

23    opioid is one potential explanation for why a

24    patient may be complaining of continued pain

25    despite opioid therapy?
```

Confidential                                                              JAN-MS-05484544

```
 1                MR. LEONOUDAKIS:  Objection.

 2        Form.

 3                THE WITNESS:  Yes, I think

 4        that's what I said earlier.

 5        Q.    BY MR. EHSAN:  And in fact, it

 6  is a way to articulate that the differential

 7  diagnosis should include suboptimal opioid

 8  therapy?

 9                MR. LEONOUDAKIS:  Objection.

10        Form.

11                THE WITNESS:  Or suboptimal

12        treatment, which could include opioid

13        therapy.

14        Q.    BY MR. EHSAN:  Fair enough.

15                Therefore, the actual concept

16  of pseudoaddiction as a consideration within

17  a differential is valid today as -- strike

18  that.

19                Would you agree that the

20  concept of suboptimal therapy as part of a

21  differential for a patient seeking additional

22  pain medication is an appropriate

23  consideration today?

24        A.    Yes.

25                MR. LEONOUDAKIS:  Objection.
```

Confidential                                                      JAN-MS-05484545

Lynn Webster, M.D
February 18, 2019                        405

```
 1          Form.
 2                  THE WITNESS:  I think I said
 3          that earlier too.
 4          Q.    BY MR. EHSAN:  And it was true
 5    even before the term pseudoaddiction was
 6    coined; is that correct?
 7                  MR. LEONOUDAKIS:  Objection.
 8          Form.
 9                  THE WITNESS:  That's -- yes.
10          Q.    BY MR. EHSAN:  And that hasn't
11    changed through time; correct?
12                  MR. LEONOUDAKIS:  Objection.
13          Form.
14                  THE WITNESS:  Has not, correct.
15          Has not changed.
16          Q.    BY MR. EHSAN:  I believe you
17    mentioned that in medical school you
18    understood something about the addictive risk
19    of -- of opioid medications.  Do you recall
20    that?
21          A.    Yes.
22          Q.    You understand, Doctor, that
23    opioid receptors work through the mu
24    -- strike that.
25                  Doctor, do you understand that
```

Confidential                                                                    JAN-MS-05484546

Lynn Webster, M.D.
February 18, 2019                                    406

1   opioid medications work through the mu

2   receptor?

3        A.     The agonized mu receptor.

4        Q.     And that they are generally

5   categorized as either full agonist or partial

6   agonists?

7        A.     Yes.

8               MR. LEONOUDAKIS:  Objection.

9        Form.

10              THE WITNESS:  There are other

11       opioids too.  Kappa, you know, there's

12       sigma, and there are other opioid

13       receptors, but the primary one is the

14       mu receptor.

15       Q.     BY MR. EHSAN:  And the mu

16  receptor is involved in pain perception

17  within the nervous system; correct?

18              MR. LEONOUDAKIS:  Objection.

19       Form.

20              THE WITNESS:  It -- it involves

21       the -- the transmission of pain, yes,

22       or the mitigation of the pain.

23       Modulation, rather.

24       Q.     BY MR. EHSAN:  And the mu

25  receptor also is involved in the brain's

Confidential                                                   JAN-MS-05484547

1    reward pathways; is that correct?

2        A.     That's correct.

3               MR. LEONOUDAKIS:  Objection.

4        Form.

5        Q.     BY MR. EHSAN:  So based on its

6    just mechanism of action, opioids have the

7    potential to reduce pain; correct?

8               MR. LEONOUDAKIS:  Objection.

9        Form.

10              THE WITNESS:  Correct.

11       Q.     BY MR. EHSAN:  And they also

12   have the potential to cause addiction;

13   correct?

14       A.     I don't believe drugs cause

15   addiction.  I think drugs facilitate

16   addiction.  Addiction is a biology problem,

17   not a drug problem.

18              So people who are genetically

19   or environmentally vulnerable and exposed to

20   a drug can develop the addiction.  But just

21   because you're exposed to a drug that is

22   rewarding doesn't mean you're going to

23   develop an addiction.

24       Q.     And thank you for that

25   clarification.  We should back up.

Confidential                                                      JAN-MS-05484548

Lynn Webster, M.D.
February 18, 2019                        408

```
 1              In fact, most Americans have

 2   taken an opioid in their lifetime?

 3              MR. LEONOUDAKIS:  Objection.

 4         Form.

 5              THE WITNESS:  Most Americans,

 6         by the end of their life, will have

 7         been exposed to opioids.

 8         Q.    BY MR. EHSAN:  And the vast

 9   majority of those individuals would not meet

10   the diagnostic criteria for opioid use

11   disorder; correct?

12              MR. LEONOUDAKIS:  Objection.

13         Form.

14              THE WITNESS:  Vast majority.

15         Q.    BY MR. EHSAN:  So to -- to go

16   back to what you said, that because of their

17   action on the mu receptor, opioids have a

18   potential to facilitate the development of

19   addiction; correct?

20              MR. LEONOUDAKIS:  Objection.

21         Form.

22              THE WITNESS:  I think it's the

23         action of the opioid receptor and the

24         release of dopamine.  Mu receptor is

25         just one of the receptors that the
```

Confidential                                                           JAN-MS-05484549

```
 1          opioid can agonize.

 2          Q.    BY MR. EHSAN:  And that

 3   pharmacology of opioids has not changed since

 4   that -- since the discovery of the mu

 5   receptor; correct?

 6              MR. LEONOUDAKIS:  Objection.

 7          Form.

 8              THE WITNESS:  The

 9          pharmacology -- our understanding of

10          it you mean?

11              MR. EHSAN:  Yes.

12              THE WITNESS:  That's correct.

13          Q.    BY MR. EHSAN:  So it is true

14   today that a mu receptor is involved in pain

15   mitigation the same as it was true whenever

16   that biology was elucidated regarding

17   opioids; is that correct?

18              MR. LEONOUDAKIS:  Objection.

19          Form.

20              THE WITNESS:  That's correct.

21          Q.    BY MR. EHSAN:  I'm sorry, I

22   don't know when the opioid receptor was --

23   was identified as such.

24              And, likewise, the fact that

25   opioids can, through the mu receptor and
```

Confidential                                              JAN-MS-05484550

Lynn Webster, M.D.
February 18, 2019                                    410

```
 1    dopamine action, facilitate potentially

 2    addiction in indi- -- vulnerable individuals

 3    is something that's understood today;

 4    correct?

 5              MR. LEONOUDAKIS:  Objection.

 6         Form.

 7              THE WITNESS:  Will you repeat

 8         that.

 9         Q.   BY MR. EHSAN:  Sure.  The fact

10    that a opioid medication, through its

11    interaction with the mu receptor and the

12    release of dopamine being able to facilitate

13    addiction in a vulnerable individual is known

14    today; correct?

15              MR. LEONOUDAKIS:  Objection.

16         Form.

17              THE WITNESS:  I don't like the

18         word "facilitate."  It allows the

19         disease of addiction to emerge.

20         Q.   BY MR. EHSAN:  Well, allow --

21    we'll take your terminology, Doctor, that it

22    is known today that opioids can allow the

23    disease of addiction to emerge; correct?

24         A.   Correct.

25         Q.   By their biological mechanism;
```

Confidential                                                                    JAN-MS-05484551

1    correct?

2         A.     Correct.

3         Q.     And this was known when you

4    were in medical school?

5         A.     No, I don't know it was known

6    then.  I think -- this is more of a knowledge

7    that it's been acquired since my medical

8    school.  I remember we were only identifying

9    mu receptors in -- in the spinal cord, in the

10   brain when I was in my residency.  I gave one

11   of the first lectures about it in -- at Utah.

12              So it -- I think the knowledge

13   really started to develop in the '80s.

14        Q.     So by 1990, would that have

15   been --

16              MR. LEONOUDAKIS:  Objection.

17        Form.

18              THE WITNESS:  Yes.

19        Q.     BY MR. EHSAN:  So in the 1990s

20   when these -- when long-acting opioids were

21   brought to market, do you have a recollection

22   of whether or not the FDA approved labeling

23   for these medications included mention of the

24   risk of addiction?

25        A.     I don't remember.

Confidential                                                    JAN-MS-05484552

Lynn Webster, M.D
February 18, 2019                                    412

1           Q.     Wouldn't surprise you if they

2    did; correct?

3                  MR. LEONOUDAKIS:  Objection.

4           Form.

5                  THE WITNESS:  I would expect

6           them too.

7           Q.     BY MR. EHSAN:  And, likewise,

8    if you were to tell a patient -- strike that.

9                  And, likewise, if you were

10   going to prescribe a narcotic -- an opioid

11   medication to a patient, you may not have

12   known about the specific risk in that

13   patient, but you knew generally that there

14   was a possibility that that patient could be

15   addicted to the medication you were

16   prescribing?

17                 MR. LEONOUDAKIS:  Objection.

18          Form.

19                 THE WITNESS:  That's correct.

20          Q.     BY MR. EHSAN:  And that would

21   at least be something you might mention to

22   the patient; correct?

23                 MR. LEONOUDAKIS:  Objection.

24          Form.

25                 THE WITNESS:  1990, I don't

Confidential                                    JAN-MS-05484553

1          know what I would have said.

2          Q.     BY MR. EHSAN:  How about 1995?

3          A.     I think I was concerned at --

4     by 1995.

5          Q.     And what I want to distinguish

6     here is the difference between your consent

7     form, which was a comprehensive written

8     document, versus the oral communication that

9     you might have with your patients prior to

10    the development of your written consent form,

11    okay?

12               So would you, before your

13    comprehensive written consent form, still

14    talk to patients orally about the potential

15    risk of addiction with opioids?

16         A.     In the '90s, I'm not sure how

17    much I conveyed about the risk of addiction

18    to people in pain, because it was our belief

19    that people in pain were somehow protected

20    about developing a problem with opioids.  So

21    I'm not sure I really knew anything to say.

22         Q.     In the early '90s, did you have

23    patients taking opioids for greater than a

24    year for chronic noncancer pain?

25         A.     Well, yes.  By the early '90s,

Confidential                                                      JAN-MS-05484554

Lynn Webster, M.D.
February 18, 2019                          414

```
 1   yes.

 2        Q.    Did any of those patients, your

 3   recollection, develop an opioid use disorder?

 4        A.    I can't recall that anyone did.

 5        Q.    So certainly if a significant

 6   number of your patients had begun to develop

 7   addiction with chronic use of opioids for

 8   noncancer pain, that would have been

 9   something that would have made an impression

10   on you?

11             MR. LEONOUDAKIS:  Objection.

12        Form.

13             THE WITNESS:  I actually did a

14        study when I developed the ORT and

15        looked at the prevalence of the -- the

16        number -- the percent of my population

17        that had met the criteria for

18        addiction, abuse, and what we would

19        call misses now.

20             And in my population, which was

21        high risk population, because I was a

22        tertiary referral center for people

23        who often had intractable pain, could

24        not be treated and/or had mental

25        health problems that placed them at a
```

Confidential                                                    JAN-MS-05484555

```
 1          high risk, the -- the incidence was 2

 2          to 5 percent that developed an

 3          addiction.

 4          Q.     BY MR. EHSAN:  That was your

 5   empirical observation within your patient

 6   population?

 7          A.     That's correct.

 8          Q.     And these would be the high

 9   risk patients; correct?

10          A.     These are the --

11                 MR. LEONOUDAKIS:  Objection.

12          Form.

13                 THE WITNESS:  Well, I don't

14          know if they were the high risk, but

15          that's what the result was, yes.

16          Q.     BY MR. EHSAN:  In 1992, if a

17   patient came to your office with chronic

18   noncancer pain and said -- and during the

19   history you obtained the information that he

20   was addicted to cigarettes, alcohol, cocaine,

21   methamphetamine, would that have raised a red

22   flag in your mind that he or she -- he may be

23   at a higher risk for developing opioid use

24   disorder should you prescribe him an opioid?

25                 MR. LEONOUDAKIS:  Objection.
```

Confidential                                                    JAN-MS-05484556

Lynn Webster, M.D
February 18, 2019                    416

```
 1          Form.
 2                  THE WITNESS:  I would have
 3          hoped so.
 4          Q.    BY MR. EHSAN:  And that would
 5   have been just good clinical judgment?
 6                  MR. LEONOUDAKIS:  Objection.
 7          Form.
 8                  THE WITNESS:  Yes.
 9          Q.    BY MR. EHSAN:  And when you
10   look at the statistics about addiction risk,
11   is it important to make sure that you
12   understand what patient population that risk
13   is being assessed in?
14                  MR. LEONOUDAKIS:  Objection.
15          Form.
16                  THE WITNESS:  Correct.
17          Q.    BY MR. EHSAN:  Because there's
18   a difference between the risk in someone who
19   is opioid naive and has never had an
20   addiction to any substance, versus someone
21   who I just described who has had multiple
22   other addictions; correct?
23                  MR. LEONOUDAKIS:  Objection.
24          Form.
25                  THE WITNESS:  Major difference.
```

Confidential                                                    JAN-MS-05484557

Lynn Webster, M.D
February 18, 2019                                        417

```
 1         Q.     BY MR. EHSAN:  And it would be

 2  poor medical judgment to conflate the risk in

 3  those two patients; correct?

 4                MR. LEONOUDAKIS:  Objection.

 5     Form.

 6                THE WITNESS:  That's correct.

 7     That would be a diplomatic way to say

 8     it.

 9         Q.     BY MR. EHSAN:  Now, Doctor,

10  have you had occasion to prescribe Duragesic

11  in your clinical practice?

12         A.     Yes.

13         Q.     What do you typically prescribe

14  Duragesic for in your clinical -- when you

15  had a clinical practice?

16         A.     It would be people who had

17  persistent pain.  It would be people that

18  couldn't derive a benefit from non-opioids.

19  There were few or no other treatment options.

20  Their pain was moderate to severe, and it

21  looked like it was going to be for a long

22  time.

23         Q.     Would it be fair to say that

24  the typical Duragesic patient would not be

25  opioid naive?
```

Confidential                                    JAN-MS-05484558

Lynn Webster, M.D.
February 18, 2019                              418

```
 1              MR. LEONOUDAKIS:  Objection.

 2         Form.

 3              THE WITNESS:  They would not be

 4         opioid naive because that -- you

 5         needed to have them opioid tolerant to

 6         start them on a Duragesic patch.

 7         Q.    BY MR. EHSAN:  And just so that

 8    we have a common language here, what is --

 9    what is your understanding of what the word

10    "opioid naive" means?

11         A.    People who had not been exposed

12    on a regular basis to an opioid.

13         Q.    So in your clinical practice,

14    would you say the vast majority of patients

15    you started on were -- well, strike that.

16              Would it be fair to say that in

17    your clinical practice, when you had one,

18    that the patients you started on Duragesic

19    had already been exposed to other opioid

20    medications?

21         A.    Everyone was on something else

22    before I started them on Duragesic.

23         Q.    So to the extent anyone who was

24    prescribed Duragesic by you developed an

25    opioid use disorder, you wouldn't be in a
```

Confidential                                              JAN-MS-05484559

Lynn Webster, M.D
February 18, 2019                    419

```
 1    position to know which, if any, opioid was

 2    the underlying cause of their opioid use

 3    disorder; correct?

 4              MR. LEONOUDAKIS:  Objection.

 5        Form.

 6              THE WITNESS:  Well, again, I

 7        don't believe opioids cause addiction.

 8        Q.    BY MR. EHSAN:  And you're

 9    absolutely right.  So let me ask you a

10    better -- ask a better question.

11              To the extent that an opioid

12    can allow for the disease addiction to

13    manifest itself, if someone has been on,

14    let's say three opioids before, and is then

15    transitioned to Duragesic and subsequently

16    diagnosed, you can't know exactly how the

17    sequencing of these drugs played a role in

18    the manifestation of the opioid use disorder;

19    correct?

20              MR. LEONOUDAKIS:  Objection.

21        Form.

22              THE WITNESS:  It's irrelevant,

23        because it's not about the drugs.

24        It's about the biology of the person.

25              So it doesn't matter if they
```

Confidential                                   JAN-MS-05484560

Lynn Webster, M.D.
February 18, 2019                                    420

```
 1         had hydrocodone, Tylenol 3, or -- or

 2         Percocet or -- or Duragesic, it -- it

 3         is about the biology.  If that person

 4         was vulnerable and they were exposed,

 5         you can't attribute it to any one of

 6         the opioids, although some opioids may

 7         be more likely in some people to

 8         create a problem because of their

 9         genetics.

10         Q.    BY MR. EHSAN:  I -- and I seem

11   to recall that there is a retrovirus that's

12   been found in certain people's genomes that

13   may have contributed to their ancestors

14   developing an additional genetic risk and has

15   been passed down through the generations?

16         A.    I remember reading that as

17   well.

18              MR. LEONOUDAKIS:  Objection.

19         Form.

20              THE WITNESS:  I don't know how

21         valid that is, but I remember reading

22         it.  It was very interesting.

23         Q.    BY MR. EHSAN:  It was very

24   interesting to me as well, Doctor.

25              So let me ask -- ask this
```

Confidential                                                            JAN-MS-05484561

```
 1   question slightly differently then.  Well,

 2   let me ask slightly different question.

 3                Duragesic has a transdermal

 4   delivery system; correct?

 5        A.     Yes.

 6                MR. LEONOUDAKIS:  Objection.

 7        Form.

 8        Q.     BY MR. EHSAN:  And that means

 9   that the drug passes through the skin and is

10   absorbed through the skin; correct?

11                MR. LEONOUDAKIS:  Objection.

12        Form.

13                THE WITNESS:  Yes.

14        Q.     BY MR. EHSAN:  And what is the

15   active ingredient in Duragesic patches?

16        A.     Fentanyl.

17        Q.     In your practice, did you -- in

18   your clinical practice when you had one, did

19   you see any advantage to a transdermal

20   delivery system for fentanyl?

21                MR. LEONOUDAKIS:  Objection.

22        Form.

23                THE WITNESS:  There were

24        advantages and disadvantages.

25        Q.     BY MR. EHSAN:  What were some
```

Confidential                                                    JAN-MS-05484562

```
 1    of the advantages?
 2         A.     They had a constant release.
 3    It was slow in onset, so there wasn't a rapid
 4    uptake, which tends to be most desired by
 5    abusers.
 6              You could -- elderly people
 7    wouldn't have to worry about taking their
 8    medicine on a regular basis.  So it -- its
 9    constant delivery was the main advantage.
10    And it also had less associated constipation,
11    and other side effects.
12         Q.     What were the disadvantages?
13         A.     The patch itself was
14    irritating.  It sometimes caused a rash on
15    the skin.  So it was -- and sometimes it
16    wouldn't stick, so it would fall off.  If you
17    were in a hot tub, it could increase the
18    delivery and it could get toxic.
19              But probably the greatest risk
20    is in the high -- higher risk population, it
21    could be taken off and manipulated and chewed
22    so you could get a dump, and that's lethal.
23         Q.     Did you have any of your
24    patients engage in that kind of behavior?
25         A.     I did.
```

Confidential                                                    JAN-MS-05484563

Lynn Webster, M.D
February 18, 2019                           423

1        Q.     Did you, in your clinical

2   practice, have occasion to prescribe Nucynta?

3        A.     Yes.

4        Q.     What was the -- if you recall,

5   what were the indications for which you

6   prescribed it?

7        A.     It -- just chronic pain.  I

8   mean, it's one of the options.  You never

9   know which opioid is -- is going to work for

10  a particular pain condition or for a

11  particular patient, because the -- they're

12  all different.  Their generics are different,

13  and what they've been on before.

14              So the side effect profiles are

15  all different with each individual.  So it

16  was a number of different types of chronic

17  pain.

18       Q.     Sitting here today, do you --

19  are you aware of any differences in the

20  mechanism of action of Nucynta versus other

21  full mu agonists?

22       A.     Yeah.  It's dual -- you know,

23  it's got dual mechanism.  So it's got central

24  mechanisms, and they're not -- it's not all

25  opioid that is contributing to the analgesia.

Confidential                                                    JAN-MS-05484564

Lynn Webster, M.D
February 18, 2019                               424

1        Q.     So does that mean that it had

2   the potential to benefit certain patients who

3   might not benefit from the more traditional

4   full mu agonists?

5        A.     Correct.

6               MR. LEONOUDAKIS:  Objection.

7        Form.

8               THE WITNESS:  That's correct.

9        Q.     BY MR. EHSAN:  In your clinical

10  practice, were you visited -- visited by any

11  pharmaceutical representatives from Janssen

12  regarding Duragesic?

13       A.     Yes.

14       Q.     Focusing on that, do you recall

15  any false statement any Duragesic

16  pharmaceutical rep ever told you?

17       A.     I never recall any -- anything

18  that was false.

19       Q.     Any misleading statement that

20  you recall from any Duragesic rep made to

21  you?

22       A.     No.

23       Q.     Did anyone from Janssen or J&J

24  ever ask you -- ask you to make a false

25  statement on the -- regarding Duragesic?

Confidential                                                    JAN-MS-05484565

Lynn Webster, M.D.
February 18, 2019                                          425

```
 1        A.      No.

 2        Q.      Did any Janssen rep,

 3   pharmaceutical rep ever ask you to make a

 4   misleading statement about Duragesic?

 5               MR. LEONOUDAKIS:  Objection.

 6        Form.

 7               THE WITNESS:  No.

 8        Q.      BY MR. EHSAN:  Focusing on

 9   Nucynta, were you ever visited by Janssen

10   Pharmaceutical representatives related to

11   Nucynta?

12        A.      I was visited by the Nucynta

13   rep.  I don't know if it was Janssen.

14        Q.      The reason -- the reason I make

15   a distinction is at some point the Nucynta

16   franchise was sold.

17        A.      Yeah, I know.

18        Q.      So I'm trying to --

19        A.      The Depo -- Depomed, and now

20   it's back to somebody else.  I believe it was

21   Janssen that -- because of the timing, since

22   I stopped practice in 2010.

23        Q.      Focusing on the Nucynta rep, do

24   you ever recall a Nucynta rep ever making any

25   false statement regarding Nucynta to you?
```

Confidential                                    JAN-MS-05484566

Lynn Webster, M.D.
February 18, 2019                                    426

```
 1        A.     No.

 2               MR. LEONOUDAKIS:  Objection.

 3       Form.

 4        Q.     BY MR. EHSAN:  Do you

 5   ever recall -- do you have a recollection of

 6   a Nucynta rep ever making a misleading

 7   statement about Nucynta to you?

 8               MR. LEONOUDAKIS:  Objection.

 9       Form.

10               THE WITNESS:  No.

11        Q.     BY MR. EHSAN:  Do you ever

12   recall a Nucynta rep asking you to make a

13   false statement regarding Nucynta?

14               MR. LEONOUDAKIS:  Objection.

15       Form.

16               THE WITNESS:  No.

17        Q.     BY MR. EHSAN:  Do you ever

18   recall a Nucynta rep asking to make a

19   misleading statement about Nucynta?

20               MR. LEONOUDAKIS:  Objection.

21       Form.

22               THE WITNESS:  No.

23        Q.     BY MR. EHSAN:  Have we went

24   through here today -- you were -- there was a

25   discussion about certain false marketing
```

Confidential                                    JAN-MS-05484567

```
 1    pleas.  Do you recall those?

 2         A.    Yes.

 3         Q.    You weren't shown any document

 4    that suggested that Janssen or J&J ever pled

 5    guilty to any false or misleading marketing

 6    regarding its opioid products, did you?

 7         A.    No.

 8         Q.    Are you, sitting here today,

 9    aware of any guilty plea by Janssen or

10    Johnson & Johnson regarding any of its opioid

11    medications?

12         A.    No.

13         Q.    Are you aware of any

14    accusations of false or misleading marketing

15    by Janssen or Johnson & Johnson?

16              MR. LEONOUDAKIS:  Objection.

17         Form.

18              THE WITNESS:  No.

19         Q.    BY MR. EHSAN:  Now, you

20    mentioned that sometimes a sales rep would

21    provide you data points that were quite

22    helpful.

23              Do you recall that testimony?

24         A.    Yes.

25         Q.    I just want to make sure we're
```

Confidential

JAN-MS-05484568

Lynn Webster, M.D
February 18, 2019                                    428

```
 1   clear on this.  You're saying that a rep

 2   provided you scientific information related

 3   to a drug, which upon your review, you found

 4   to be helpful?

 5        A.    Yes.

 6              MR. LEONOUDAKIS:  Objection.

 7        Form.

 8        Q.    BY MR. EHSAN:  That's different

 9   than the pharmaceutical rep told you X is

10   true without any support, and you believing

11   the rep that that X -- statement X is true;

12   correct?

13              MR. LEONOUDAKIS:  Objection.

14        Form.

15              THE WITNESS:  That is correct.

16        What I'm referring to is that they

17        would bring in a publication, or

18        they'd bring in some literature that

19        has the publication referenced.

20              And the -- and often that

21        publication, that manuscript would --

22        would be along with it so that I could

23        review it.

24        Q.    BY MR. EHSAN:  So just so we're

25   clear, so what you found helpful from
```

Confidential                                          JAN-MS-05484569

Lynn Webster, M.D.
February 18, 2019                                    429

```
 1    material -- from pharmaceutical reps was that

 2    they provided you the science that you could

 3    then review and draw your own independent

 4    conclusion of; is that correct?

 5         A.    That's correct.

 6               MR. LEONOUDAKIS:  Objection.

 7         Form.

 8         Q.    BY MR. EHSAN:  You were asked

 9    some questions earlier this morning regarding

10    the number of chronic pain patients in the

11    United States.

12               Do you recall that?

13         A.    I remember us talking about

14    that.

15         Q.    And the idea that why is it

16    that the number of chronic pain patients have

17    gone -- has gone up despite the fact that

18    opioids have gained more of a medical use

19    within the medical community; correct?

20         A.    Correct.

21         Q.    It's true, Doctor, that opioid

22    medications don't cure the underlying pain

23    condition; correct?

24         A.    That is correct.

25         Q.    So, therefore, the number of
```

Confidential                                                                    JAN-MS-05484570

1    patients who have chronic pain is a

2    reflection of the underlying diseases and

3    their prevalence that are causing the pain;

4    correct?

5         A.    That's correct.

6         Q.    So even if opioids were

7    100 percent effective, which they're not, the

8    number of people with chronic pain could

9    still increase because other diseases that

10   cause pain are increasing in the population;

11   correct?

12        A.    And it has.

13              MR. LEONOUDAKIS:  Objection.

14        Form.

15        Q.    BY MR. EHSAN:  And I think you

16   identified some reasons for why that

17   number --

18        A.    Right.

19        Q.    -- could be increasing in the

20   population; correct?

21        A.    That is correct.

22        Q.    Likewise, in discussing the GAO

23   report, there was a reference to the fact

24   that nearly 50 percent of individuals who --

25   or physicians who prescribed opioids were

Confidential                                                                              JAN-MS-05484571

 1    primary care doctors.

 2                 Do you recall that testimony?

 3         A.     Yes.

 4         Q.     But it's also true the total

 5    number of primary care doctors in the United

 6    States far outnumbers a pain specialist;

 7    correct?

 8                 MR. LEONOUDAKIS:  Objection.

 9         Form.

10                 THE WITNESS:  That is correct.

11         Q.     BY MR. EHSAN:  So if there

12    are -- there are 20 primary care doctors for

13    each pain medicine specialist, and only one

14    in ten primary care doctor prescribes

15    opioids, they still outnumber the pain care

16    docs two to one; correct?

17                 MR. LEONOUDAKIS:  Objection.

18         Form.

19                 THE WITNESS:  That's correct.

20         I thought I talked about that.

21         Q.     BY MR. EHSAN:  And that --

22    those numbers you were given don't in any

23    fashion or form reflect the total number of

24    prescriptions written by specialty; correct?

25                 MR. LEONOUDAKIS:  Objection.

Confidential                                    JAN-MS-05484572

```
 1          Form.
 2                  THE WITNESS:  Correct.
 3          Q.     BY MR. EHSAN:  So although
 4   there may be fewer -- there may be equal
 5   number of physicians prescribing specialist
 6   versus primary care, the total number of
 7   scripts could be vastly different; correct?
 8                  MR. LEONOUDAKIS:  Objection.
 9          Form.
10                  THE WITNESS:  Vastly different
11          for -- for patient per doctor, yes.
12          (Mark Nickel left the proceedings.)
13          Q.     BY MR. EHSAN:  Have you ever
14   prescribed an opioid medication for chronic
15   noncancer pain to a patient who had ongoing
16   opioid use disorder?
17          A.     Yes.
18          Q.     And have you had success
19   stories with patients that meet those
20   criteria?
21                  MR. LEONOUDAKIS:  Objection.
22          Form.
23                  THE WITNESS:  Depends on --
24          yes, I have.  It depends on the
25          magnitude of the opioid use disorder
```

Confidential                                                                 JAN-MS-05484573

Lynn Webster, M.D
February 18, 2019                    433

1          and how we define it.  So if it's

2          traditionally the individual who has

3          the disease of addiction, I have not

4          been successful, and I tried very

5          hard.  I was not successful in

6          treating people with addiction

7          long-term, people who had a severe

8          addiction problem using opioids.

9               But I had a large amount of

10         success with tight management of

11         individuals who misused or abused

12         their medicine who -- who might be

13         self-medicating a different mental

14         health problem, and that just required

15         tighter management.

16         Q.    BY MR. EHSAN:  The individual

17    who already has an opioid use disorder

18    would -- would be at the highest possible

19    risk for problems with ongoing opioid

20    therapy; correct?

21              MR. LEONOUDAKIS:  Objection.

22         Form.

23              THE WITNESS:  That's correct.

24         Q.    BY MR. EHSAN:  Because they

25    have an active addiction -- they have the

Confidential                                                      JAN-MS-05484574

Lynn Webster, M.D.
February 18, 2019                                    434

```
 1    active -- the disease of addiction as an

 2    active process, and you are now prescribing

 3    them an opioid; correct?

 4                MR. LEONOUDAKIS:  Objection.

 5         Form.

 6                THE WITNESS:  So if you're --

 7         if -- in the context of pain, that's

 8         true.  But all people on methadone

 9         maintenance treatment are being

10         prescribed methadone or a

11         buprenorphine, which is an active

12         opioid to an active state of

13         addiction.  So it depends on what

14         context we're looking at.

15         Q.    BY MR. EHSAN:  You brought up a

16    topic I was going to address next.  Before --

17    well, strike that.  Let me ask it this way:

18                Methadone was the first

19    long-acting opioid available in the United

20    States; correct?

21         A.    Correct.

22         Q.    And methadone has been used for

23    the treatment of opioid use disorder;

24    correct?

25         A.    Correct.
```

Confidential                                                    JAN-MS-05484575

Lynn Webster, M.D
February 18, 2019                    435

 1          Q.      Even though itself -- methadone

 2   itself is an opioid; correct?

 3          A.      Correct.

 4          Q.      And methadone is not without

 5   its own set of risks; correct?

 6          A.      I think I've described some of

 7   the problems earlier.

 8          Q.      Including potential cardiac

 9   arrhythmias; correct?

10          A.      Including arrhythmias, yes.

11          Q.      Presently, there are other

12   opioid medications that are used for the

13   treatment of opioid use disorder; correct?

14          A.      Correct.

15          Q.      So when you said you didn't

16   have very much success treating patients with

17   opioids when they had an ongoing opioid use

18   disorder, you were not talking about

19   medications that are used to treat opioid use

20   disorder; correct?

21          A.      That's correct, I was not

22   talking about them.

23          Q.      You were talking about the

24   management of their pain being unsuccessful

25   with an opioid that's more traditional;

Confidential                                                    JAN-MS-05484576

 1    correct?

 2         A.    Correct.  I did treat a number

 3    of people with buprenorphine.  I can't -- I

 4    couldn't legally treat them with methadone.

 5    I think that's part of a flaw and part of the

 6    reason we have the problem, our opioid

 7    crisis.

 8              We should be able to use

 9    methadone for the treatment of OUD, Opioid

10    Use Disorder, in people with chronic pain in

11    private practice, but the laws don't permit

12    it.

13              We can use buprenorphine, as

14    you're aware, and so I was successful in

15    treating people with an opioid use disorder

16    with buprenorphine that addressed their pain

17    and their addiction.

18         Q.    So just so that I'm clear,

19    there are restrictions on the prescribing of

20    methadone by outpatient physicians; correct?

21         A.    There are -- you can -- yeah.

22    You only can prescribe methadone for

23    addiction in a methadone treatment center,

24    which is federally licensed through SAMSHA.

25         Q.    Likewise, the prescribing of

Confidential                                              JAN-MS-05484577

Lynn Webster, M.D.
February 18, 2019                                    437

1    buprenorphine in many jurisdictions has

2    special requirements as well; correct?

3              MR. LEONOUDAKIS:  Objection.

4         Form.

5              THE WITNESS:  There's a special

6         license that's the requirement, and

7         there's a certain number of people you

8         can treat, but I think it's throughout

9         the country.

10        Q.    BY MR. EHSAN:  In the state of

11   Utah, who controls the requirements for

12   continuing medical education for licensed

13   physician?

14        A.    The medical board.

15        Q.    And is the medical board an arm

16   of the State?

17        A.    Yes.

18        Q.    Does the State of Utah require

19   all licensed physicians to take continuing

20   medical education courses on addiction with

21   op- -- risk with opioids?

22        A.    Not on addiction, but on how to

23   prescribe opioids.

24        Q.    Do you have an understanding if

25   the State wanted to force doctors to take

Confidential                                                    JAN-MS-05484578

Lynn Webster, M.D
February 18, 2019                    438

```
 1   courses on addiction, that it could?

 2              MR. LEONOUDAKIS:  Objection.

 3        Form.

 4              THE WITNESS:  Yes, I think they

 5        could.  I wrote the -- the educational

 6        content that was used for years here

 7        in the state.  It addressed the opioid

 8        abuse, much like my educational

 9        material that I talked about earlier.

10        So it was about abuse and addiction

11        and overdose.

12        Q.    BY MR. EHSAN:  So do you have

13   an understanding whether or not the states

14   could improve the level of education for

15   prescribers by changing the requirements of

16   continuing medical education in the state?

17              MR. LEONOUDAKIS:  Objection.

18        Form.

19              THE WITNESS:  That would be my

20        impression, yes, I believe that's

21        true.

22        Q.    BY MR. EHSAN:  And you think

23   that would be a good thing?

24              MR. LEONOUDAKIS:  Objection.

25        Form.
```

Confidential                    JAN-MS-05484579

Lynn Webster, M.D
February 18, 2019                          439

```
1              THE WITNESS:  I don't believe

2         physicians understand addiction very

3         well, and so the answer is yes.  I

4         believe more education is necessary in

5         the medical school, in our residency

6         programs, and for the graduates.

7         Q.    BY MR. EHSAN:  Just to wrap up

8    here, Doctor, I just have a few more

9    questions.

10             If you could look at Exhibit 13

11   that's in front of you, it was shown to you

12   earlier today.  It looks like this, if that

13   helps (indicating).

14        A.    Okay.

15             MR. ROBINSON:  You got it.

16             MR. EHSAN:  It's better if you

17        find your copy.  Take your time.

18             THE WITNESS:  All right.  Have

19        it.

20             MR. ROBINSON:  Yep.

21        Q.    BY MR. EHSAN:  So the --

22   Doctor, do you recall being shown this

23   document that is marked Exhibit 13 earlier

24   today?

25        A.    Yes.
```

Confidential                                          JAN-MS-05484580

1          Q.    I want to just turn your

2    attention to Page 4 of the document.  What is

3    paginated as Page 4 -- actually, the 5th page

4    of the document.

5               Do you remember being asked

6    questions about this particular page?

7          A.    Yes.

8          Q.    Do you see in the upper

9    right-hand, not corner, but slightly below

10   there's a -- a designation of "Preliminary"

11   in bold?

12         A.    I see it.

13         Q.    Have you -- have you had -- had

14   you seen this document before today?

15         A.    No.

16         Q.    Do you have any understanding

17   of how it was created?

18         A.    No.

19         Q.    Did you have any prior

20   understanding of why it was created?

21         A.    No.

22         Q.    Do you, sitting here today, do

23   you have any basis to know whether this was

24   the final or draft version of this document?

25               MR. LEONOUDAKIS:  Objection.

Confidential                                                          JAN-MS-05484581

Lynn Webster, M.D
February 18, 2019                    441

1          Form.

2                    THE WITNESS:  I have no way.

3          Q.    BY MR. EHSAN:  So any question

4   you may have answered regarding this document

5   was based on the fact of just what the

6   document said in -- on its face; correct?

7                    MR. LEONOUDAKIS:  Objection.

8          Form.

9                    THE WITNESS:  Correct.

10         Q.    BY MR. EHSAN:  So you have no

11  other way of interpreting information on this

12  document; correct?

13                   MR. LEONOUDAKIS:  Objection.

14         Form.

15                   THE WITNESS:  Correct.

16                   MR. EHSAN:  You can put that

17         one aside.  And if you could look at

18         Exhibit 15, which is a shorter

19         document, so it's easy to miss.  It's

20         an email chain.

21                   MR. ROBINSON:  It's an email.

22                   THE WITNESS:  Okay.  Got it.

23         Okay.

24         Q.    BY MR. EHSAN:  This is the

25  email string from Myra Christopher.  Do you

Confidential                                                      JAN-MS-05484582

```
 1    recall -- regarding PAINS update?

 2         A.    Yes.

 3         Q.    Do you recall looking at this

 4    document earlier?

 5         A.    Yes.

 6         Q.    Going to the last page of this

 7    document, how does she sign --

 8    Ms. Christopher, how does she sign the

 9    document?

10         A.    "Myra."

11         Q.    And then what is her title

12    underneath in the signature block?

13         A.    Oh, Kathleen M. Foley Chair,

14    Center For Practical Bioethics.

15         Q.    And this goes on to say "PAINS,

16    Facilitator"; correct?

17               MR. LEONOUDAKIS:  Objection.

18         Form.

19               THE WITNESS:  Correct.

20         Q.    BY MR. EHSAN:  Was she an

21    employee of a pharmaceutical company?

22         A.    No.

23         Q.    So this particular role she

24    played in facilitating the PAINS program, she

25    did that as a member of PAINS; correct?
```

Confidential                                                                      JAN-MS-05484583

Lynn Webster, M.D.
February 18, 2019                                    443

```
 1        A.      Correct.

 2        Q.      And she didn't -- she didn't

 3   have a simultaneous position with any

 4   pharmaceutical company that you're aware of;

 5   correct?

 6              MR. LEONOUDAKIS:  Objection.

 7         Form.

 8              THE WITNESS:  That's correct,

 9         not that I'm aware -- that I'm aware

10         of.

11              MR. EHSAN:  Thank you, Doctor.

12         That's all the questions I have.

13              MR. ROBINSON:  Need a quick

14         break?

15              THE WITNESS:  No, I'm good.

16              MR. ROBINSON:  We're down to

17         one more.  So...

18              THE WITNESS:  Yeah, let's go.

19

20                   EXAMINATION

21   BY MR. HOFFMAN:

22        Q.      Doctor, good evening.  My name,

23   again for the record, is Nathan Hoffman.  I

24   represent Purdue in this litigation, and now

25   it's my chance to ask you some questions,
```

Confidential                                                    JAN-MS-05484584

Lynn Webster, M.D.
February 18, 2019                    444

1    okay?

2           A.     Okay.

3           Q.     I'll try not to re-plow the

4    ground too much.

5           A.     Okay.

6           Q.     You testified earlier that you

7    became a pain specialist, I believe you said

8    in the late 1980s, in part because of what

9    you described as a huge need that was seen at

10   that time.

11                Do you recall that?

12                MR. LEONOUDAKIS:  Objection.

13        Form.

14                THE WITNESS:  I do.

15        Q.     BY MR. HOFFMAN:  What did you

16   mean by the "huge need" that was seen at that

17   time in pain specialty?

18        A.     Well, there -- there were a

19   huge number of people who had chronic pain,

20   who had pain, actually, cancer pain, even

21   acute pain, who -- who were not treated well.

22   It was not recognized as an area that

23   deserved much attention.

24                I thought it was a new

25   frontier.  I think once every generation or

Confidential                                                    JAN-MS-05484585

Lynn Webster, M.D.
February 18, 2019                                    445

1   so there's something that emerges in medicine

2   that can be dramatic, can be revolutionary,

3   and I thought that I was at the forefront of

4   a new frontier in medicine and was lucky

5   enough to be kind of a pioneer, and I thought

6   that -- that I could have a major impact on a

7   lot of people.

8       Q.    And do you believe that you

9   did?

10      A.    You know, I always hoped that I

11  have had.  You know, I think that in my

12  personal practice I had a huge number -- huge

13  number of reward -- -warding experiences, as

14  I've said.

15          But I -- I also hope that my

16  research, my writing has had even a greater

17  impact, and that's one of the reasons why in

18  2010 I stopped seeing patients.  I thought I

19  could do more good by doing clinical

20  research, have a -- have a larger statement,

21  footprint, if you will, and continue to

22  publish.

23      Q.    I believe you may have tried to

24  quantify it earlier, but correct me if I'm

25  wrong, I believe you said you believe that

Confidential                                                                              JAN-MS-05484586

Lynn Webster, M.D.
February 18, 2019                                              446

```
 1    there were thousands of patients that you

 2    believe you helped over time with managing

 3    their pain, including through opioid therapy;

 4    is that fair?

 5         A.    That's correct.

 6               MR. LEONOUDAKIS:  Objection.

 7         Form.

 8         Q.    BY MR. HOFFMAN:  You also cited

 9    some statistics earlier in your examination

10    in response to some questions by plaintiffs'

11    counsel.  You mentioned that in 2011 there

12    were approximately 120 million Americans

13    suffering from pain.

14               Did I hear that correct?

15         A.    According to the institute, IOM

16    report, yes.

17         Q.    Then you describe that the peak

18    of opioid prescriptions you believe occurred

19    in or around 2012; is that right?

20         A.    That's what the data looks

21    like, yes.

22         Q.    And have those opioid

23    prescriptions declined since then?

24         A.    Yes.

25         Q.    Currently, do you believe there
```

Confidential                                                          JAN-MS-05484587

Lynn Webster, M.D.
February 18, 2019                              447

1    is, in fact, undertreatment of pain with

2    opioids for appropriate patients?

3          A.    I believe there's --

4                MR. LEONOUDAKIS:  Objection.

5          Form.

6                THE WITNESS:  -- always been an

7          undertreatment of pain, and today it's

8          worse than it's been in a decade.

9          Q.    BY MR. HOFFMAN:  It's worse

10   than it's been in a decade, why -- why do you

11   see that?

12         A.    Well, because many physicians

13   feel forced to take their patients off of the

14   medicines.  They're afraid of sanctions,

15   legal ramifications.  They're afraid --

16   they're afraid.  And so many patients are

17   being forced to tolerate far less or no

18   medications.

19         Q.    And based upon your research,

20   your understanding of the literature, and

21   your publications, do you believe that the

22   situation you currently described is, in

23   fact, hurting pain patients?

24         A.    Without a doubt.  There are

25   millions of patients that are suffering today

Confidential                                                    JAN-MS-05484588

Lynn Webster, M.D.
February 18, 2019                              448

 1   that should not be suffering.

 2        Q.     You then quoted a statistic

 3   that just came out last week as recorded by

 4   the National Institutes of Health of 170

 5   million Americans currently in chronic pain;

 6   is that right?

 7        A.     That's what the statistic from

 8   NIH states.

 9        Q.     So if I understand you

10   correctly, 2011, 120 million Americans.  Now

11   currently, 2019, 170 million Americans.

12   Certainly that -- that problem of chronic

13   pain has increased over time; is that fair?

14        A.     Almost a 50 percent increase.

15   It's astounding, and yet we're not doing a

16   very good job of treating them.  Those who

17   had been treated well are being forced to

18   discontinue or dramatically reduce the amount

19   of medication.

20        Q.     And that's, in part, what you

21   described earlier, which is, doctors are

22   taking patients who were on opioids off of

23   opioids because they have some fear of

24   prescribing the products in the current

25   environment; is that fair?

Confidential                                                    JAN-MS-05484589

1          A.     That's correct.

2          Q.     Does that have anything to do

3    with a lack of efficacy of opioids for

4    appropriate patients?

5               MR. LEONOUDAKIS:  Objection.

6          Form.

7               THE WITNESS:  I don't believe

8          so.

9          Q.     BY MR. HOFFMAN:  You also

10   mentioned earlier that you believed that it

11   is vital to assess pain in response to some

12   questions by plaintiffs' counsel about the

13   so-called fifth vital sign.

14               Do you recall that?

15         A.     I do.

16         Q.     Why do you believe it's vital

17   to assess pain?

18         A.     Because it's one of -- it is

19   the Number 1 complaint that physicians hear.

20   Going into a physician's office, pain is the

21   chief complaint.  The Number 1 chief

22   complaint.

23               It is the most disabling, it

24   costs more than any other medical problem

25   that we have.  So -- and it is devastating,

Confidential                                                                    JAN-MS-05484590

Lynn Webster, M.D
February 18, 2019                          450

```
 1   in -- in so many different ways, as I

 2   outlined before.

 3              It may not be, quote, "a vital

 4   sign," but it is vital to assess.  And

 5   whether you want to call it a vital sign or

 6   not, it's still critically important to ask a

 7   person about their pain.  To ignore it is

 8   putting your head in the sand, and it's

 9   inhumane.

10        Q.    Now, you helped produce -- I

11   believe you were one of the producers or the

12   main producer of a video documentary that

13   aired on PBS, I believe in 2016 or 2017,

14   called The Painful Truth?

15        A.    Correct.

16        Q.    And just describe for us

17   generally, what -- what was that documentary

18   about?

19        A.    It was -- that was a

20   documentary about the plight we have with

21   chronic pain and opioids, and the problem

22   of -- of addiction in our country.  The

23   misuse of the opioids, but also the problem

24   that patients have in accessing treatment.

25              The failed system.  Our failed
```

Confidential                                      JAN-MS-05484591

 1   health care system, our failed social system,

 2   and why so many people are suffering.

 3        Q.    At that time, the video stated

 4   pain affects more Americans than any other

 5   health issue.

 6              Do you recall that, generally?

 7        A.    Yes, still true.  Now even more

 8   so.

 9        Q.    Okay.  The video also described

10   the fact that pain affects more Americans

11   than diabetes, heart disease, and cancer

12   combined.

13              Do you recall that?

14        A.    That's part of the IOM report.

15   That's where that came from.

16        Q.    And is that still true today?

17        A.    Yes, it is.

18        Q.    And is that one of the reasons

19   you continue to believe that it's vital to

20   assess and treat chronic pain?

21        A.    Yes.

22        Q.    In response to plaintiffs'

23   counsel's questions about pharmaceutical

24   companies putting profits over safety, you

25   mentioned that pharmaceutical companies can

Confidential

JAN-MS-05484592

Lynn Webster, M.D.
February 18, 2019                                    452

```
1    be of great benefit to society.

2              Do you recall that?

3              MR. LEONOUDAKIS:  Objection.

4         Form.

5              THE WITNESS:  I believe that.

6         I don't remember exactly that

7         statement, but I believe that.

8         Q.    BY MR. HOFFMAN:  Can you

9    elaborate on that?  What did you mean by

10   that, that pharmaceutical companies can be of

11   great benefit to society?

12        A.    Well, the pharmaceutical

13   companies have brought innovation, they've

14   brought cures to hundreds of diseases.

15   They've improved the quality of our life.

16   They've helped extend the life of the average

17   American.

18              So you -- you don't get that in

19   isolation.  The -- the pharmaceutical

20   companies have done a lot of good.

21              Now, I will say, pharmaceutical

22   companies have also created a huge financial

23   burden to our society, and a lot of people

24   can't afford the drugs.

25              But we -- we would not have the
```

Confidential                                    JAN-MS-05484593

1   quality of health we have today if we

2   wouldn't have invested -- or I should say

3   pharmaceutical companies wouldn't have

4   invested in the drugs.

5       Q.    And in that -- that concept --

6   context that you just described in terms of

7   price of medications and otherwise, does

8   managed care, do insurance companies also

9   play a role in that?

10          MR. LEONOUDAKIS:  Objection.

11      Form.

12          THE WITNESS:  They do.  In

13      fact, they play a major role in

14      determining the cost to consumers and

15      I think to society, in a negative way.

16      Q.    BY MR. HOFFMAN:  In response to

17  plaintiffs' counsel's questions again about

18  profits over safety, you stated that you

19  believe pharmaceutical companies can make an

20  improvement in health care and make a profit

21  at the same time.

22          Do you recall that?

23          MR. LEONOUDAKIS:  Objection.

24      Form.

25          THE WITNESS:  Yes, it -- I

Confidential                                                    JAN-MS-05484594

Lynn Webster, M.D.
February 18, 2019                                    454

```
 1          mean, that's what America's about.  I

 2          mean, I think it's not going to be

 3          government sponsored research that

 4          develops drugs.  That's just not going

 5          to happen.  We're not going to invest

 6          in it.

 7               So either we have to have a

 8          for-profit pharmaceutical industry, or

 9          we're not going to have the advances

10          made.

11          Q.    BY MR. HOFFMAN:  And it's fair

12   to say that improvement in health care and

13   making a profit are not mutually exclusive

14   endeavors; is that --

15          A.    That's what I was trying to say

16   earlier.

17               MR. LEONOUDAKIS:  Objection.

18          Form.

19               THE WITNESS:  I'm sorry.

20               That's what I was trying to say

21          earlier, yes.

22          Q.    BY MR. HOFFMAN:  In fact -- in

23   fact, those two interests of improving health

24   care and making a profit, those two interests

25   can be aligned, can't they?
```

Confidential                                                        JAN-MS-05484595

Lynn Webster, M.D
February 18, 2019                    455

```
 1                MR. LEONOUDAKIS:  Objection.

 2         Form.

 3                THE WITNESS:  They can be.

 4         They can be out of balance, though.  I

 5         mean, I think -- I just want to be

 6         measured here.

 7                I'm not -- I'm not cheerleading

 8         for the pharmaceutical companies to

 9         make grundles of money.  I want -- I

10         want everybody to have access to care,

11         and it's got to be affordable.

12         Q.    BY MR. HOFFMAN:  And insurance

13    companies can also determine what is actually

14    prescribed by physicians and will be covered

15    by the insurance; is that right?

16         A.    I don't think "can" --

17                MR. LEONOUDAKIS:  Objection.

18         Form.

19                THE WITNESS:  -- they do.

20         Q.    BY MR. HOFFMAN:  And is that

21    also a major driver of some of the current

22    situations we're seeing in terms of lack of

23    pain management?

24                MR. LEONOUDAKIS:  Objection.

25         Form.
```

Confidential                                                          JAN-MS-05484596

```
 1              THE WITNESS:  It's a -- I think

 2        it's the major form -- a major reason

 3        why we have an opioid crisis.

 4        Q.    BY MR. HOFFMAN:  Explain that.

 5   Why do you think that's a major reason?

 6        A.    Well, I think -- certainly it's

 7   one of the major reasons, and that's because

 8   pharmaceutical companies -- or, I mean, I

 9   should say the insurance industry denied

10   access to all of the alternative therapies,

11   and the only thing that they would cover for

12   a long time in the '90s and in the first

13   decade -- actually today -- I mean, it's

14   drugs.

15              And they only want to

16   prescribe -- they only want to cover the

17   cheapest of the drugs.  And that's why I

18   mentioned earlier to the plaintiffs' counsel

19   about in 2009 we had a third of all of the

20   unintentional overdose deaths were methadone,

21   and yet it only represented 2 percent of all

22   of the opioids prescribed, and that's because

23   it was cheap.

24              And the insurance companies

25   were forcing doctors to go to methadone.  And
```

Confidential                                                      JAN-MS-05484597

```
 1    so the insurance companies have a huge

 2    responsibility in this crisis.  They have not

 3    covered -- we've seen a decrease in the

 4    number of interdisciplinary, and

 5    multidisciplinary pain clinics since the year

 6    2000 plummet in the U.S.

 7              We're the only western

 8    civilized country where per capita there's

 9    been a decrease in multidisciplinary pain

10    clinics.

11              So what does that leave us?  It

12    frankly leaves us with few options.  And

13    they're not the expensive drugs that are the

14    options.  They're the cheapest ones, which

15    are the most dangerous, and this is because

16    of insurance companies.

17    Q.      Doctor, I want to ask you about

18    a few of the documents you were shown

19    earlier.  I'll just refer to them generally

20    so you won't have to dig them out.

21              There were a couple of

22    documents, email correspondence back in 1997,

23    May and June of 1997 that described some

24    internal analyses or perceptions at Purdue

25    regarding what some physicians believed about
```

Confidential                                                                    JAN-MS-05484598

Lynn Webster, M.D.
February 18, 2019                    458

```
 1    OxyContin versus MS Contin.

 2                Do you recall that generally?

 3         A.    Yeah.

 4         Q.    Okay.  And there was an

 5    individual at Purdue named Mike Cullen, and

 6    he said in the email that he believed

 7    OxyContin was perceived by some physicians as

 8    not being as strong as MS Contin.

 9                Do you recall that?

10         A.    I remember that.

11         Q.    And I believe your testimony

12    was you did not think doctors thought that

13    that was the case, that OxyContin was

14    perceived to be weaker than MS Contin; is

15    that right?

16         A.    I don't remember thinking that.

17    I don't know of anybody that I've -- I've had

18    conversations with who thought that.  It is

19    possible that since morphine was the

20    standard -- gold standard for decades to

21    treat cancer-related pain or acute postop

22    pain, that people thought it was the

23    strongest.

24                There are -- it's possible some

25    people thought that, but by -- by the time
```

Confidential                                                    JAN-MS-05484599

Lynn Webster, M.D
February 18, 2019                    459

```
 1   OxyContin came around, and even oxycodone, I

 2   don't believe that most physicians thought

 3   that.

 4        Q.    And you testified that you

 5   didn't have that perception?

 6        A.    I did not.

 7        Q.    Okay.  And why is that?  Why is

 8   it that you didn't have that perception at

 9   that time?

10        A.    My -- my clinical experience,

11   frankly.  I mean, part of it also was that

12   Percocet was pretty effective as a

13   short-term -- short-term opioid, short-acting

14   opioid.  It was very strong.

15             I didn't notice clinically in

16   my training any difference between that and

17   morphine, except that there were probably

18   fewer side effects with -- with -- with

19   Percocet, which is an oxycodone, of course,

20   drug.

21             There are fewer side effects,

22   adverse effects with oxycodone than there are

23   with morphine.  And that became attractive,

24   and that was one of the attractive reasons, I

25   think, why OxyContin sailed.  There were
```

Confidential                                                    JAN-MS-05484600

1    fewer adverse effects than with the other

2    opioids.

3         Q.    Would that be an important

4    consideration for you as a prescriber?

5               MR. LEONOUDAKIS:  Objection.

6         Form.

7               THE WITNESS:  It was a key

8         reason.  It's also one of the reasons

9         why Duragesic was -- was commonly

10        used, because there were fewer side

11        effects with it.

12               But, yes, if it's going to be

13        an oral drug, oxycodone had fewer side

14        effects, we had fewer complaints than

15        we did with morphine.

16        Q.    BY MR. HOFFMAN:  Now, we've had

17   some discussion generally about what's

18   referred to as extended release or

19   long-acting opioids versus something that's

20   called immediate release or fast-acting

21   opioids.  I'm sure you're familiar with that

22   concept?

23        A.    Yeah.

24        Q.    I don't know if we've described

25   on the record, however, you know, what the

Confidential                                                          JAN-MS-05484601

1    real differences are there.

2                So in terms of OxyContin being

3    an extended release or long-acting opioid,

4    what does that mean and what, if any, is --

5    and what is the significance of that in terms

6    of how the product worked?

7        A.    So I want to back up, because

8    it's important to have some basis here of

9    understanding of -- of what we as clinicians

10   were thinking in the '80s.

11               This was, as I say, when the

12   field of pain medicine was starting to bubble

13   a little bit in the early '80s.  It really

14   didn't emerge until the '90s.  But one of the

15   concepts was to treat acute pain differently

16   than with an IM injection in the hospital.

17               So you give morphine, Demerol,

18   or something, and it give you three to four

19   hours of relief.  But there were a number of

20   papers that were published in the anesthesia

21   literature that suggest we could get by with

22   less peaks and troughs, less risk of harm,

23   less rewarding properties if what we would do

24   is just give a sustained slow infusion, IV

25   infusion, and that's where the PCA was

Confidential                                                                JAN-MS-05484602

Lynn Webster, M.D
February 18, 2019                                    462

 1 | developed and introduced.

 2 |             So a patient-controlled

 3 | analgesia.  You hit the button and you can

 4 | get a little bit more, but you had a constant

 5 | release.

 6 |             So the concept within the

 7 | medical field, particularly in anesthesia,

 8 | was that a sustained release -- and there

 9 | were papers that showed you could get by with

10 | overall less opioid if there was a sustained

11 | release property, constant infusion, than if

12 | you were pulsing it with a shorter acting.

13 |             So when the extended release

14 | formulation of oxycodone or morphine and some

15 | of the other drugs, even Duragesic, when --

16 | later appeared, that concept fit, that we

17 | have now people who have persistent 24-hour

18 | pain, and if they're going to use something,

19 | it's going to be better than using every four

20 | hours.

21 |             Something -- we ought to have

22 | something that is sustained, because that's

23 | what the previous literature in the hospital

24 | would suggest.

25 |             So it would last four to

Confidential                                                                                    JAN-MS-05484603

Lynn Webster, M.D
February 18, 2019                              463

```
 1    12 hours.  OxyContin did not last 12 hours in

 2    my practice.  Rarely could it last 12 hours.

 3    But that was because tolerance develops to

 4    all opioids.

 5            And when tolerance develops to

 6    an opioid, then you basically taper off too

 7    quickly and you're going to have to dose it

 8    three times a day.

 9            And -- and what we didn't know,

10    however, is that the sustained release

11    formulations back then could be manipulated

12    and you could convert it into an immediate

13    release.

14            Which means it all appears

15    quickly and then dissipates, just like other

16    immediate release formulations, and that's

17    where some patients got into trouble.

18        Q.    So what you just described, for

19    example, with OxyContin being an extended

20    release formulation, that could be defeated

21    by a patient if the patient were to crush the

22    tablet and snort it or boil it down and

23    inject it?

24        A.    Or just chew it.

25            MR. LEONOUDAKIS:  Objection.
```

Confidential                                                                 JAN-MS-05484604

Lynn Webster, M.D.
February 18, 2019                                    464

1          Form.

2          Q.    BY MR. HOFFMAN:  Or just chew

3    it.

4                And, of course, that's not the

5    way that the drug would be prescribed to a

6    patient, so the patient would not be

7    obviously following the direction of the

8    physician; is that fair?

9                MR. LEONOUDAKIS:  Objection.

10        Form.

11               THE WITNESS:  That is correct.

12        Unfortunately, very innocent patients

13        who sometimes wanted to take less

14        would cut it and, you know, don't --

15        you can't do that.  But it defeated

16        the purpose when you did that, so it

17        was a -- basically became -- if it was

18        a 20 it became 10, that's immediate

19        release.  40, it was 20, that was

20        immediate release.

21               And so it defeated -- it

22        defeated that purpose, and then people

23        would start to take more.

24               So the lack of -- I mean, the

25        ability to manipulate that did

Confidential                                                                JAN-MS-05484605

Lynn Webster, M.D
February 18, 2019                                    465

```
 1          contribute to the problem, but none of

 2          us knew that.  The concept of an

 3          extended release was reasonable, but

 4          it wasn't maintained as a constant

 5          extended release because of basically

 6          the -- the physical structure of the

 7          pill.

 8          Q.    BY MR. HOFFMAN:  I think what

 9     you're describing is at the time, your

10     intention was that if an extended release

11     product were taken properly, that that may,

12     in fact, lead to reduced abuse liability

13     because of you didn't have those peaks and

14     valleys and you didn't have the immediate

15     rush of an immediate release oxycodone

16     product; is that right?

17               MR. LEONOUDAKIS:  Objection.

18          Form.

19               THE WITNESS:  That is what we

20          thought.  I -- there is no evidence of

21          that, however.  And we don't know that

22          even the -- the sustained release or

23          extended release formulations are

24          better than short term for efficacy.

25               We assumed it because of what I
```

Confidential                                                     JAN-MS-05484606

1       just said.  And I think it was

2       reasonable, it was logical, it was

3       okay to go down that path, but there's

4       no data that says that the extended

5       release provides greater efficacy.

6            It does provide greater

7       convenience to a lot of patients, but

8       when you can defeat that mechanism,

9       that became problematic.

10           We do believe, however -- and

11      here's part of the support for an

12      extended release, still today -- the

13      more rapid the onset, the risk -- the

14      greater the risk that it will be

15      rewarding to that vulnerable

16      population.

17           And a more rapid the onset and

18      the higher the Cmax, that is the blood

19      level, the greater the risk of

20      developing a higher level of up

21      regulation or physical dependence that

22      when you stop, you're going to go

23      through withdrawal.

24           Now, one of the big problems

25      that we have today is most people

Confidential                                                JAN-MS-05484607

```
 1        don't know that withdrawal is not

 2        addiction.  And that many clinicians

 3        today still don't understand the

 4        difference between physical dependence

 5        and -- and addiction.

 6              Meaning that if you begin to

 7        have some withdrawal, that doesn't

 8        mean that you're addicted.  But most

 9        doctors still think that if you go

10        into withdrawal, you have addiction.

11              So many people were classified,

12        and still are, or diagnosed as being

13        addicted, but they're not addicted,

14        they just became physically dependent

15        and were poorly managed.

16        Q.    BY MR. HOFFMAN:  Okay.  So

17   getting -- getting back, though, to what you

18   said a little bit earlier, which was there

19   was literature, there was thought out there,

20   perhaps even medical consensus at the time,

21   that extended release products -- that the

22   purpose -- one of the purposes behind them

23   was to try not -- try to avoid the immediate

24   rush or the immediate high of an extended

25   release product?
```

Confidential                                    JAN-MS-05484608

Lynn Webster, M.D.
February 18, 2019                                    468

```
 1        A.      The peaks and troughs --

 2                MR. LEONOUDAKIS:  Objection.

 3        Form.

 4                THE WITNESS:  -- that's

 5        correct.

 6        Q.     BY MR. HOFFMAN:  And that was

 7   in the literature at the time?

 8                MR. LEONOUDAKIS:  Objection.

 9        Form.

10                THE WITNESS:  That's correct.

11        Q.     BY MR. HOFFMAN:  One of the

12   other concepts, or one of the other benefits

13   that was certainly talked about in the

14   medical literature was the idea of dosing

15   less.  If you had to dose the product every

16   12 hours instead of every four hours, you may

17   be able to achieve pain management such that

18   a patient, for example, could sleep through

19   the night?

20        A.      Yes, that's correct.  That was

21   one of the advantages of the extended

22   release.

23        Q.      Okay.  And that was something

24   that was -- was published about at the time

25   and that was one of the thought processes
```

Confidential                                    JAN-MS-05484609

Lynn Webster, M.D.
February 18, 2019                    469

1    behind developing those products; is that

2    right?

3         A.    That's correct.

4               MR. LEONOUDAKIS:  Objection.

5    Form.

6         Q.    BY MR. HOFFMAN:  I want to go

7    now, Doctor, if we can -- I do want you to

8    pull out of your stack there the GAO report,

9    which is Exhibit 7.

10        A.    7?

11        Q.    Yeah, I just wanted to ask you

12   about a few things in the GAO report.

13        A.    Okay.

14        Q.    I know you were only shown

15   certain portions of the report, so if I ask

16   you to turn to a certain page, Doctor, and if

17   you need time to review it for context,

18   please just tell me and you can review it as

19   much as you'd like.

20             I'd like -- in the context of

21   what we talked about earlier in terms of

22   this -- this need for additional pain

23   management in the late '80s and early '90s, I

24   want to call your attention to what the GAO

25   said about that on Page 8 of its report.

Confidential                                                    JAN-MS-05484610

Lynn Webster, M.D
February 18, 2019                                      470

```
1    It's the pages at the bottom.  There's an

2    introductory section that has little I, I

3    guess it's three pages, and then it starts

4    with Page 1, and what I'm referring to is on

5    Page 8 of the actual report at the top.

6             Do you have that in front of --

7        A.    "Beginning" -- yeah, 8 here?

8        Q.    Yes.  Yes.

9             So I want to ask you about that

10   section.  It says, "Beginning in the

11   mid-1990s, various national pain-related

12   organizations issued pain treatment and

13   management guidelines, which included the use

14   of opioid analgesics in treating both cancer

15   and noncancer pain.  In 1995, the American

16   Pain Society recommended that pain should be

17   treated as the fifth vital sign to ensure

18   that it would become common practice for

19   health care providers to ask about pain when

20   conducting pain evaluations."

21             Do you see that?

22       A.    Yes.

23       Q.    And you're familiar with that

24   effort by the American Pain Society to make

25   pain something that -- that was an awareness
```

Confidential                                                      JAN-MS-05484611

Lynn Webster, M.D.
February 18, 2019                                    471

```
 1    of clinicians and something that would be

 2    checked and treated?

 3         A.    Yes.

 4         Q.    It goes on to say -- the GAO

 5    report says, "The practice guidelines issued

 6    by the Agency For Health Care Policy and

 7    Research provided physicians and other health

 8    care professionals with information on the

 9    management of acute pain in 1992 and cancer

10    pain in 1994, respectively."

11              Do you see that?

12         A.    Yes.

13         Q.    Are you familiar with some of

14    those practice guidelines?

15         A.    Yeah.

16         Q.    It goes on to read, "Health

17    care providers and hospitals were further

18    required to ensure that their patients

19    received appropriate pain treatment when the

20    Joint Commission on Accreditation of Health

21    Care Organizations (JCAHO), a national health

22    care facility standards-setting and

23    accrediting body, implemented its pain

24    standards for hospital accreditation in

25    2001."
```

Confidential                                                                        JAN-MS-05484612

Lynn Webster, M.D
February 18, 2019                              472

```
 1                Do you see that?

 2        A.    Yes.

 3        Q.    And a lot is said there, but

 4  essentially what does that mean or what --

 5  what's the importance of that?

 6        A.     Well, the importance is that we

 7  evaluate pain.  That's the bottom line, is

 8  that the -- that -- that the -- that pain was

 9  important to evaluate, and the reason that

10  was developed is because it had not been

11  before, and this was a way to startle the

12  medical community into thinking differently,

13  that this is an important assessment.

14                Called it a fifth vital sign

15  because that was easy.  Probably it was just

16  about promote- -- how do you -- how do you

17  market a phrase?  How do you market the

18  concept that -- how do you make doctors aware

19  that this is something important to do?

20                So as I said earlier, maybe

21  it's not a vital sign, but it is certainly

22  vital to assess, and it still is today.

23        Q.    And do you generally believe

24  that the description here by the GAO of what

25  was going on beginning in the 1990s, is
```

Confidential                                                              JAN-MS-05484613

Lynn Webster, M.D
February 18, 2019                    473

```
 1   that -- is that generally a fair
 2   description --
 3        A.    Yeah, I think that's fair.
 4        Q.    -- of the environment at the
 5   time?
 6        A.    Yeah.  Yep.
 7        Q.    And do you believe that this
 8   was a good faith effort by medical societies,
 9   medical associations to increase the
10   awareness and treatment of chronic pain?
11        A.    Yes.  What -- what we didn't
12   know is what we didn't know.  And that was
13   just assessing the pain and treating a number
14   was not enough.  It was maybe the wrong
15   thing.
16            Assessing the pain was right,
17   but if the pain is 8 over 10, you don't give
18   medicine until it's 2 over 10.  I mean, I
19   think that -- so there was a lapse in our
20   thinking, not intentional, and -- and it was
21   just the lack of our understanding of what it
22   meant to go from an 8 to a 2 and what the
23   potential danger of that would be.
24        Q.    So certainly the thought
25   process has evolved over time as more
```

Confidential                                        JAN-MS-05484614

Lynn Webster, M.D.
February 18, 2019                                    474

```
 1   patients were treated clinically; is that

 2   right?

 3        A.    That's correct.

 4              MR. LEONOUDAKIS:  Objection.

 5        Form.

 6        Q.    BY MR. HOFFMAN:  But certainly

 7   back at this time, would you agree that this

 8   was a good faith effort by the community to

 9   treat an unmet medical need?

10        A.    Yes.

11        Q.    If you turn one more page over,

12   it's on Page 9, the second -- second

13   paragraph there.  In this context it says,

14   "OxyContin sales and prescriptions grew

15   rabidly following its market introduction in

16   1996.  Fortuitous timing may have contributed

17   to this growth, as the launching of the drug

18   occurred during the national focus on the

19   inadequacy of patient pain treatment and

20   management."

21              Do you see that?

22        A.    Yes.

23        Q.    And that's what we have just

24   been describing --

25        A.    Correct.
```

Confidential

JAN-MS-05484615

1          Q.      -- previous page?

2          A.      Yeah.

3          Q.      Do you generally agree with

4     that?

5          A.      Yes.

6          Q.      And, in fact, didn't -- didn't

7     Congress, by the year 2000, declare the

8     decade of 2000-2010 the decade of pain --

9          A.      Pain --

10         Q.      -- management in this country?

11         A.      -- correct, it was.

12         Q.      And U.S. Congress actually

13    wanted this issue to be treated so seriously

14    they passed a bill in the United States

15    Congress to say that that decade should be

16    devoted to the treatment?

17         A.      Treatment of pain --

18                 MR. LEONOUDAKIS:  Objection.

19         Form.

20                 THE WITNESS:  -- and research

21         around it, that's correct.

22         Q.      BY MR. HOFFMAN:  An issue we

23    already talked about, but let me just call

24    your attention to it here in the GAO report,

25    which is on Page 29.

Confidential                                                          JAN-MS-05484616

1            Page 29, I'm going to focus on

2    the third paragraph in the page -- the

3    last -- last paragraph on the page.  It says,

4    "One factor that may have contributed to the

5    abuse and diversion of OxyContin was FDA's

6    original decision to label the drug as having

7    less abuse potential than other oxycodone

8    products because of its controlled-release

9    formulation.  FDA officials said when

10   OxyContin was approved the agency believed

11   that the controlled-release formulation would

12   result in less abuse potential because, when

13   taken properly, the drug would be absorbed

14   slowly, without an immediate rush or high."

15            Do you see that?

16       A.    I do.

17       Q.    And that's the issue that we

18   were just discussing a few moments ago;

19   right?

20       A.    Yeah.  FDA believed what I

21   believed; I believed what the FDA believed; I

22   think that's what the community believed.

23       Q.    And it was reasonable --

24       A.    That's what the science was.

25       Q.    That's what the science showed

Confidential                                                            JAN-MS-05484617

Lynn Webster, M.D
February 18, 2019                              477

```
 1   at the time, and that was reasonable to

 2   believe at the time?

 3        A.      Correct.

 4        Q.      In response to some of

 5   plaintiffs' counsel's questions earlier, you

 6   said a couple times that you have no opinion

 7   about Purdue's marketing.

 8                Do you recall that?

 9        A.      Yes.

10        Q.      Now, you -- have you been

11   exposed, when you were in clinical practice,

12   to various marketing efforts by Purdue as

13   well as other companies?

14        A.      Yes.

15        Q.      Do you believe Purdue's

16   marketing influenced you in any negative way

17   at that time?

18                MR. LEONOUDAKIS:  Objection

19        form.

20                THE WITNESS:  I don't know what

21        you mean by "negative way."

22        Q.      BY MR. HOFFMAN:  In other

23   words, you -- you described earlier a

24   situation where sales representatives would

25   come in and they would bring clinical
```

Confidential                                                    JAN-MS-05484618

Lynn Webster, M.D.
February 18, 2019                                      478

```
 1    reprints, data, they would bring proof

 2    sources, essentially, for what they were

 3    discussing with you?

 4         A.     Yes.

 5         Q.     They would also bring to you

 6    the FDA approved labeling or any labeling

 7    changes over time?

 8         A.     Yes.

 9         Q.     And I suspect that you would

10    agree that that's good information to have

11    and that may, in fact, be beneficial in your

12    practice?

13         A.     Yes.

14         Q.     So what I'm asking is, other

15    than that situation that you described, do

16    you believe that there were any circumstances

17    that you can recall where Purdue's marketing

18    somehow influenced you in a negative way, not

19    in the positive way you described, but in a

20    negative way?

21              MR. LEONOUDAKIS:  Objection.

22         Form.

23              THE WITNESS:  Yes, I mentioned

24         earlier, there was the one instance

25         when one of the reps came in and
```

Confidential                                                                    JAN-MS-05484619

Lynn Webster, M.D.
February 18, 2019                                    479

```
 1        wanted -- was recommending and wanted

 2        my support, basically, and me to

 3        prescribe OxyContin for acute pain.

 4        And I did not think that that was

 5        appropriate.

 6        Q.    BY MR. HOFFMAN:  Okay.  And you

 7   didn't do that?

 8        A.    I did not do that.

 9        Q.    Okay.  And that's the -- that's

10   the only time that you can recall any Purdue

11   sales rep ever saying anything to you that

12   you disagreed with?

13        A.    That's correct.

14        Q.    And you've been visited by

15   Purdue sales reps going back to the mid to

16   late '90s all the way up through 2010?

17        A.    Correct.

18        Q.    And you've been visited by

19   Purdue sales reps on dozens if not hundreds

20   of occasions?

21             MR. LEONOUDAKIS:  Objection.

22        Form.

23             THE WITNESS:  Yes.

24        Q.    BY MR. HOFFMAN:  And that's the

25   one instance that you recall?
```

Confidential                                                                    JAN-MS-05484620

Lynn Webster, M.D.
February 18, 2019                    480

1        A.     That's correct.

2        Q.     Do you recall what the --

3   when -- when did that occur?  Do you remember

4   what year it was?

5        A.     No, I don't, but I -- my guess

6   is it would have been early 2000s.

7        Q.     Okay.  Do you recall that at

8   one point in time the FDA approved labeling

9   actually described the clinical studies for

10  the approval of OxyContin in postoperative

11  patients?

12               MR. LEONOUDAKIS:  Objection.

13          Form.

14               THE WITNESS:  I think I've been

15          made aware of that at one point, but

16          I -- I don't really have much

17          recollection of it.

18       Q.     BY MR. HOFFMAN:  Okay.  If the

19  FDA approved labeling at that time described

20  postoperative studies of OxyContin in the FDA

21  approved labeling, would that be something

22  that would be consistent with what was

23  approved at the time?

24               MR. LEONOUDAKIS:  Objection.

25          Form.

Confidential                                    JAN-MS-05484621

Lynn Webster, M.D
February 18, 2019                              481

```
1                THE WITNESS:  Yes.

2        Q.    BY MR. HOFFMAN:  And setting

3   aside whether you agree or disagree with it,

4   and that's perfectly fine, if the rep were to

5   reference what was in the label, would that

6   be appropriate?

7        A.    Yes.  As long as it's in the

8   label, that would be appropriate.

9        Q.    And you did not believe at any

10  point in time that Purdue sales reps were

11  generally aggressive with you or told you how

12  to practice medicine?

13       A.    Never.

14             MR. LEONOUDAKIS:  Objection.

15       Form.

16       Q.    BY MR. HOFFMAN:  I know earlier

17  I think -- I think you described your process

18  for weighing the risk and benefits for

19  individual patients for opioids generally.  I

20  want to ask you about OxyContin specifically.

21             Once OxyContin was approved at

22  the end of '95 and it was marketed in 1996

23  forward, what approach did you take with your

24  patients when deciding whether to prescribe

25  OxyContin specifically?
```

Confidential                                                      JAN-MS-05484622

 1              Was it any different than other

 2    opioids, or was it generally how you've

 3    already described your process?

 4         A.    Well, I -- I think at the

 5    beginning I had to learn about what kind of

 6    effects the patients would have.  I mean,

 7    this is true for any new medication, and it

 8    was introduced during the time I practiced.

 9              There's always a trial and

10    error.  Always an experiment.  Experiment to

11    see if the side effects are going to be worse

12    than what the label says with -- you know,

13    it's built as, or if they're going to be --

14    if it's going to have the efficacy that is

15    promised.

16              So over a period of time, I --

17    I -- I felt that those who would benefit from

18    an oral extended release formulation were

19    those that had no other options, failed other

20    treatments, but had persistent pain.  And

21    that this was a reasonable option for them to

22    try.

23              So, you know, I -- like every

24    case, I had to evaluate each patient and

25    their risk for abuse, for example.  If there

Confidential                                                        JAN-MS-05484623

Lynn Webster, M.D.
February 18, 2019                          483

1    was a risk of abuse at some point, I probably

2    wouldn't give them an OxyContin, or a

3    hydrocodone.

4          Q.     And during what period of time

5    did you prescribe OxyContin for your

6    patients?

7          A.     Well, soon when it was

8    introduced until I stopped practice.

9          Q.     And your clinical practice was

10   in 2010?

11         A.     Yes.

12         Q.     And I take it it's fair to say

13   that you would not continue to prescribe

14   OxyContin unless you saw, for your individual

15   patients, that the benefits outweighed the

16   risk?

17                MR. LEONOUDAKIS:  Objection.

18         Form.

19                THE WITNESS:  That's correct.

20         Q.     BY MR. HOFFMAN:  I'm going to

21   move to a different topic.  Are you okay to

22   continue or --

23         A.     Yes, let's go.

24         Q.     Okay.  Pseudoaddiction.  You

25   had some discussion with plaintiffs' counsel

Confidential                                    JAN-MS-05484624

Lynn Webster, M.D.
February 18, 2019                                    484

1    earlier as well as co-counsel here about

2    pseudoaddiction.  I want to ask you about the

3    article that you published specifically.

4              You referenced an article you

5    published earlier, and I want to discuss that

6    with you --

7         A.    Okay.

8         Q.    -- a little bit.

9              But before we do, just to kind

10   of set the table, I think you described this

11   earlier, the original publication of the case

12   study in the 17-year-old patient who had

13   leukemia --

14        A.    Was it leukemia?  I

15   misunder- -- I forgot, I guess.  I thought it

16   was sickle cell.

17        Q.    Okay.  Well, whatever --

18        A.    That's what I said earlier.  So

19   I stand corrected.

20        Q.    Well, whatever -- that's fine.

21   I'm not --

22        A.    Okay.

23        Q.    But that original publication,

24   that came out in 1998; is that right?

25        A.    I don't remember.

Confidential                                                        JAN-MS-05484625

Lynn Webster, M.D.
February 18, 2019                                    485

```
 1        Q.     But it was some time ago?

 2        A.     Yeah.

 3        Q.     By Dr. Haddox and Dr. Weissman,

 4   I believe?

 5        A.     Correct.

 6        Q.     And do you know Dr. Haddox

 7   personally?

 8        A.     Yes, I do.

 9        Q.     You've had some experience with

10   him?

11        A.     Yes.

12        Q.     And he's a -- he's a doctor,

13   he's a scientist, he's a researcher who was

14   prominent in the pain medicine space for

15   decades; is that fair?

16             MR. LEONOUDAKIS:  Objection.

17        Form.

18             THE WITNESS:  Correct.

19        Q.     BY MR. HOFFMAN:  And he

20   published with Dr. Weissman that original

21   paper that discussed the concept of

22   pseudoaddiction; is that right?

23        A.     Correct.

24             MR. LEONOUDAKIS:  Objection.

25        Form.
```

Confidential                                                    JAN-MS-05484626

Lynn Webster, M.D
February 18, 2019                                        486

1          Q.     BY MR. HOFFMAN:  Do you have

2   some estimation of Dr. Haddox as a scientist

3   and -- and researcher?

4                  MR. LEONOUDAKIS:  Objection.

5         Form.

6                  THE WITNESS:  Well, I have a

7         huge amount of respect for Dr. Haddox.

8         I think he's a very, very

9         knowledgeable person, and he's not

10        only a physician, not in -- he was a

11        psychiatrist, he was an

12        anesthesiologist, he has a dental

13        degree on top of that.  So I have a

14        lot of respect for his knowledge and

15        his expertise.

16         Q.     BY MR. HOFFMAN:  And a number

17   of years after he published the article in

18   1989, Dr. Haddox, in fact, went to work for

19   Purdue.  We discussed that earlier; is

20   that --

21         A.     Yes.

22                 MR. LEONOUDAKIS:  Objection.

23        Form.

24         Q.     BY MR. HOFFMAN:  Now, you also

25   testified earlier that you believe the

Confidential                                                          JAN-MS-05484627

Lynn Webster, M.D
February 18, 2019                                    487

```
 1    concept of pseudoaddiction is still valid

 2    today; is that right?

 3         A.    That's correct.

 4         Q.    And you published an article in

 5    2011 that went through and in some detail

 6    discussed that concept and the application of

 7    the concept --

 8         A.    Correct.

 9         Q.    -- is that fair?

10         A.    Yes.

11         Q.    Okay.  Let me mark that as the

12    next exhibit in order.  I don't know what

13    number we're up to.

14              THE REPORTER:  20.

15              MR. HOFFMAN:  20.  Okay.  Will

16         you please mark that as 20.

17    (Exhibit 20 was marked for identification.)

18         Q.    BY MR. HOFFMAN:  And,

19    Dr. Webster, let me just start by asking you

20    if this is, in fact, the article you

21    described earlier with a couple of co-authors

22    of yours that involves the concept of

23    pseudoaddiction.  Is this the one you were

24    discussing earlier?

25         A.    Yes.
```

Confidential

JAN-MS-05484628

Lynn Webster, M.D
February 18, 2019                                      488

```
 1        Q.    Okay.  And it's entitled
 2   "Pseudoaddiction revisited: a commentary on
 3   clinical and historical considerations"; is
 4   that right?
 5        A.    Correct.
 6        Q.    And if you could just generally
 7   describe, what were you attempting to do, you
 8   and your co-authors when you researched and
 9   published this paper?
10             MR. LEONOUDAKIS:  Objection.
11        Form.
12             THE WITNESS:  So it's been
13        eight years since I've read this, I
14        think, so -- but I -- but what I
15        believe the intent here is that we
16        wanted to clarify that pseudoaddiction
17        is a behavior that could be misused,
18        and that we shouldn't be confusing
19        somebody's undertreated pain with
20        somebody's drug-seeking behavior.
21             And that was critically
22        important that was missed, I think,
23        prior to our publication here.
24        Q.    BY MR. HOFFMAN:  Okay.  And
25   part of what -- part of what you did in
```

Confidential                                                                 JAN-MS-05484629

Lynn Webster, M.D.
February 18, 2019                    489

1    putting this publication together was you and

2    your co-authors did a literature search and

3    you tried to determine how that concept of

4    pseudoaddiction had been cited in the

5    literature, as well as used by state pain

6    guidelines and other medical organizations

7    and associations as well; is that right?

8         A.    Yeah --

9              MR. LEONOUDAKIS:  Objection.

10        Form.

11             THE WITNESS:  -- that's right.

12        Q.    BY MR. HOFFMAN:  And, in fact,

13   if you look over at Page 242 of your article,

14   part of what you found, if you look down in

15   the second column down near the bottom,

16   couple sentences from the bottom it says

17   "Furthermore."

18             Do you see that sentence?

19        A.    Yes.

20        Q.    It says, "Furthermore, 396

21   pages in PDF format were found specifically

22   referring to the use of the term, or

23   proposing its use, in state pain guidelines."

24             Do you see that?

25        A.    Correct.

Confidential                                                    JAN-MS-05484630

Lynn Webster, M.D.
February 18, 2019                                    490

```
 1          Q.    And you mentioned some of the

 2    state pain guidelines that include a

 3    definition of pseudoaddiction?

 4          A.    Yes.

 5          Q.    And if you go on to the next

 6    page, it says, "In addition, 858 websites

 7    mention the term in the context of curriculum

 8    guidelines for medical schools and other

 9    health care programs."

10                Do you see that?

11          A.    Yes.

12          Q.    So it was widely being taught

13    over time, this concept of pseudoaddiction?

14          A.    Still is.

15          Q.    Still is -- still is today?

16          A.    Yes.

17          Q.    And then -- and then your

18    article states, "Finally, mentions of

19    pseudoaddiction in the Federation of State

20    Medical Boards, SAMSHA" -- does that stand

21    for Substance Abuse and Mental Health

22    Services Administration?

23          A.    It's -- yes.  Yes, I see SM --

24    yes, SAMSHA, yeah.

25          Q.    And that's an arm of the
```

Confidential                                                    JAN-MS-05484631

Lynn Webster, M.D
February 18, 2019                                491

```
 1   federal government?

 2        A.    Yes.

 3        Q.    Okay.  So "Finally, mentions of

 4   pseudoaddiction in the" federal -- "in the

 5   Federation of State Medical Boards, SAMSHA

 6   and the adoption of the term in the 1997

 7   American Society of Addiction Medicine policy

 8   statement were also prominent."

 9             Do you see that?

10        A.    Yes.

11        Q.    So it's fair to say that based

12   upon your literature review, that this

13   concept had -- had been widely accepted over

14   time?

15             MR. LEONOUDAKIS:  Objection.

16        Form.

17             THE WITNESS:  That's correct.

18        And as I say, it still is.

19        Q.    BY MR. HOFFMAN:  Okay.  Are you

20   aware that in this litigation and elsewhere,

21   you're being quoted by saying that

22   pseudoaddiction is a concept that we're

23   currently debunking?

24        A.    I gave a quote to a newspaper

25   journalist that I -- wherein I did say that.
```

Confidential                                                          JAN-MS-05484632

```
 1          Q.    Okay.  And did you feel like

 2   you were quoted accurately or the context of

 3   what you said was quoted accurately?

 4               MR. LEONOUDAKIS:  Objection

 5        form.

 6               THE WITNESS:  That -- they --

 7        we are trying to correct the use of

 8        the term.  Meaning that, as I've said

 9        here several times, it is not meant to

10        give people, clinicians, an excuse to

11        just keep increasing the dose, and

12        that's -- that's what I meant by that.

13               To -- to make sure that it's

14        appropriately understood, and that it

15        is -- it -- it's not misappropriately

16        used.

17          Q.    BY MR. HOFFMAN:  So if the

18   suggestion has been made that when you said

19   "debunking," the concept that means -- that

20   meant that you thought that pseudoaddiction

21   was somehow a myth or something that wasn't

22   valid --

23               MR. LEONOUDAKIS:  Objection.

24          Q.    BY MR. HOFFMAN:  -- that would

25   not be an appropriate representation of what
```

Confidential                                                          JAN-MS-05484633

```
 1    you meant?

 2                   MR. LEONOUDAKIS:  Objection

 3         form.

 4                   THE WITNESS:  No, that would

 5         not be correct.

 6         Q.    BY MR. HOFFMAN:  In fact, if we

 7    look at some of what you can -- tell me what

 8    you said in your article, and I'll refer you

 9    to Page 244, the first column down at the

10    bottom under the subheading "The place of

11    pseudoaddiction today."

12                   Do you see that?

13         A.    Yes.

14         Q.    You see where you state in the

15    article, "Pseudoaddiction is still a relevant

16    construct given the tremendous health problem

17    that is chronic pain, and considering how

18    poorly it is often treated."

19                   Do you see that?

20         A.    Yes.

21         Q.    You believe that's a true

22    statement?

23         A.    Yes.

24         Q.    And is it still true today?

25         A.    Yes.
```

Confidential                                                                    JAN-MS-05484634

Lynn Webster, M.D
February 18, 2019                          494

1          Q.     Okay.  And if you go over to

2     Page 246 in the "Conclusion" section, the

3     first sentence under "Conclusion," it says,

4     "It is clear that pseudoaddiction is an

5     important concept with historical influences

6     in clinical work, research, education and

7     regulatory facets of pain management."

8               Do you see that?

9          A.     Yes.

10         Q.     Do you believe that's true?

11         A.     Yes.

12         Q.     Is that still true today?

13         A.     Yes.

14         Q.     And down at the bottom of that

15    same column under "Conclusion," last full

16    paragraph, it reads, "Pseudoaddiction can

17    still be a viable and important way in which

18    to think about some aberrant drug-related

19    behaviors in some patients at some times."

20              Do you see that?

21         A.     Yes.

22         Q.     Do you believe that's true?

23         A.     Yes.

24         Q.     Is that still true today?

25         A.     Yes.  The key there is "some

Confidential                                              JAN-MS-05484635

Lynn Webster, M.D.
February 18, 2019                                    495

```
 1   patients."  And at the beginning -- and the

 2   reason I used that word debunked was to -- I

 3   should have used a different word -- it was

 4   really to clarify, not debunk.

 5        Q.    Clarify the appropriate use of

 6   the concept --

 7        A.    Correct.

 8        Q.    -- of pseudoaddiction?

 9        A.    That's correct.

10        Q.    You were also asked earlier

11   today by plaintiffs' counsel about the rate

12   of addiction with chronic opioid use, and you

13   described that rate of addiction as, quote,

14   "very low and that that was probably true for

15   a majority of patients."

16              Do you recall that?

17        A.    Yes.

18              MR. LEONOUDAKIS:  Objection.

19        Form.

20        Q.    BY MR. HOFFMAN:  Why did you

21   describe the rate of addiction with chronic

22   opioid use as "very low for the majority of

23   patients"?

24        A.    So I'll take the last half of

25   that.  I mean, there is a subset of the
```

Confidential                                    JAN-MS-05484636

Lynn Webster, M.D.
February 18, 2019                                    496

```
 1    patients where the risk of opioid use

 2    disorder is much higher.  Those who have had

 3    a previous substance use disorder, for

 4    example, PTSD, severe mental health problems.

 5    But for a majority of patients, the risk is

 6    very low.

 7                 And -- and there's -- there's a

 8    fair amount of literature out there, if

 9    people are interested, that support that.  It

10    may not be the direct objective of a study,

11    but you look at studies that are even trying

12    to discredit the use of opioids, those that

13    have been exposed for a long time, a year or

14    more, they find that there's very, very low

15    incidents of abuse.  But that's not the

16    focus, let's say, for some of these articles.

17    It's more about the lack of effectiveness in

18    some studies.

19        Q.    Okay.  But the -- there does

20    exist in the literature studies that have

21    examined this question of what is the rate of

22    addiction for patients on chronic opioid

23    therapy?

24        A.    Yes, there are many, and the

25    key to understanding or reading those
```

Confidential                                                                    JAN-MS-05484637

Lynn Webster, M.D
February 18, 2019                                    497

```
 1    manuscripts is what is the population that's

 2    being examined?  That's all about the risk

 3    stratification that I've been talking about.

 4         Q.    Okay.  Well, let me call your

 5    attention to two articles that you are a

 6    co-author on.

 7              Can we mark this as Exhibit 21,

 8    please.

 9    (Exhibit 21 was marked for identification.)

10         Q.    BY MR. HOFFMAN:  Dr. Webster,

11    we have handed to you Exhibit 21, which is a

12    piece entitled "Economic Impact of Opioid Use

13    and the Management of Chronic Nonmalignant

14    Pain," and you are a co-author of this

15    commentary; is that correct?

16         A.    Yes.

17         Q.    And maybe it's obvious from the

18    title, but what was the -- the general

19    purpose of -- of this commentary that you

20    published with Dr. Lipman?

21         A.    You know, this article, I think

22    we spent five years in preparing this

23    article, so this is a very old article, and

24    I'd have to read it to remember, honestly.

25    So...
```

Confidential                                                    JAN-MS-05484638

```
 1          Q.     Okay.  That -- that's fair.

 2                 Let me ask you about certain

 3    portions of it, and if you -- if you need to

 4    read more or --

 5          A.     Okay.

 6          Q.     -- look at the background and

 7    provide yourself with more detail, please

 8    feel free to do so.

 9                 But first, I guess just

10    following up on one of the points that you

11    made earlier in some of our discussion.  If

12    you can look at the second column on the

13    first page.

14                 And I know this is somewhat

15    dated, but the second column on the first

16    page right at the top it says, "Chronic pain

17    affected approximately 100 million people in

18    the United States in 2011 and was associated

19    with economic consequences ranging from 560

20    billion to 635 billion annually in medical

21    care and decreased productivity, underscoring

22    the need for more effective pain management

23    strategies."

24                 Do you see that?

25          A.     Yes.
```

Confidential                                                      JAN-MS-05484639

Lynn Webster, M.D.
February 18, 2019                          499

1          Q.     Is that what you were generally

2     describing earlier as some of the unfortunate

3     economic, the negative economic impacts of

4     untreated pain?

5          A.     Yes.

6          Q.     And you quantified that, at

7     least in 2011, as anywhere from 560 billion

8     to $635 billion annually in this country?

9          A.     It's not that I quan- -- I

10    didn't cite this.  This is a citation from

11    the IOM report.

12         Q.     Got it.  Sorry, I asked the

13    question inartfully.

14                You cited the IOM here as

15    quantifying what that negative economic

16    impact was?

17         A.     Correct.

18         Q.     Of untreated pain?

19         A.     Correct.  Well, of pain.

20         Q.     Pain.

21                And it's significant?

22         A.     Correct.

23         Q.     Okay.  So then going on to the

24    other point that we were just discussion --

25    just discussing in terms of the rate of

Confidential                                                          JAN-MS-05484640

 1    addiction with pain patients, I want to call

 2    your attention now to Page 892, down at the

 3    bottom, the second column, it's the very last

 4    sentence, it starts with "A 2008

 5    meta-analysis."

 6             Do you see that?

 7       A.    Yes.

 8       Q.    Okay.  It says, "A 2008

 9    meta-analysis that investigated studies of

10    addiction and aberrant drug-related behaviors

11    in CNMP patients found that, while the

12    overall percentage of patients considered to

13    be addicted was 3.27 percent, it was

14    0.19 percent in studies that included only

15    patients with no history of alcohol or

16    illicit drug abuse or addiction, suggesting

17    that the risk of addiction is low in most

18    patients."

19             Do you see that?

20       A.    Yes.

21       Q.    Before we talk about that some

22    more, "CNMP patients," what does -- what does

23    that mean?

24       A.    Chronic non -- nonmalignant

25    pain.

Confidential                                                    JAN-MS-05484641

Lynn Webster, M.D
February 18, 2019                                    501

 1          Q.     Okay.  So in those patients,

 2   this meta-analysis that you and your

 3   co-authors cite to, found that for patients

 4   with no history of alcohol or illicit drug

 5   abuse or addiction, the -- the rate of

 6   addiction in this meta-analysis was well less

 7   than 1 percent?

 8          A.     Correct.

 9          Q.     Okay.  And plaintiffs' counsel

10   asked you earlier about statements that were

11   in the literature previously about this rate

12   of addiction being less than 1 percent.  Do

13   you recall that?

14          A.     Yes.

15          Q.     And is this consistent with

16   that prior literature?

17          A.     Yes.

18          Q.     And this -- that was from an

19   article that you published in October of

20   2015; is that right?

21          A.     That's correct.

22          Q.     All right.  Let me hand to you

23   what we will mark as Exhibit 22.

24   (Exhibit 22 was marked for identification.)

25          Q.     BY MR. HOFFMAN:  Doctor, do you

Confidential                                             JAN-MS-05484642

Lynn Webster, M.D.
February 18, 2019                                    502

 1    recognize Exhibit 22 as an editorial that was

 2    published by the American Academy of Pain

 3    Medicine in response to a citizen petition

 4    that was filed by PROP -- P-R-O-P -- to the

 5    FDA regarding limiting pain medications for

 6    legitimate noncancer pain sufferers?

 7         A.    Yes.

 8         Q.    And you, in part, helped to

 9    author this -- this statement that then was

10    submitted to the FDA officials?

11         A.    Correct.

12         Q.    And part of what you talk about

13    in here is the rate of addiction.  Do you

14    recall that?

15         A.    Yes.

16         Q.    Okay.  If you turn to

17    Page 1262, and do you -- and what I'm going

18    to focus on is the top of the second column

19    on 1262.  But you recall earlier plaintiffs'

20    counsel asked you if there were any studies

21    on risk of addiction for chronic opioid

22    therapy.

23              Do you recall that?

24         A.    Yes.

25         Q.    And you said you generally

Confidential                                    JAN-MS-05484643

Lynn Webster, M.D.
February 18, 2019                                    503

1    believe that you had cited some of those --

2         A.    Yes.

3         Q.    -- in some of your

4    publications?

5               Well, if you look at the top of

6    Page 1262, the first full sentence, it reads,

7    "For patients who are able to sustain

8    long-term benefit from opioid therapy, the

9    risk of addiction appears to be low in some

10   studies.  In a review of 26 studies (total

11   enrollment" -- "total enrollment of

12   participants: 4,893) that reported data after

13   6 months of chronic pain treatment opioids,

14   signs of iatrogenic addiction were reported

15   in 0.27 percent of participants."

16              Do you see that?

17        A.    Yes.

18        Q.    And that's a citation to a

19   study that was published in 2010; is that

20   right?

21        A.    Correct.

22        Q.    Now, I don't know if we've

23   described what the iatrogenic addiction is

24   previously, but what -- what is that a

25   reference to?

Confidential                                                              JAN-MS-05484644

Lynn Webster, M.D.
February 18, 2019                                    504

```
 1        A.    Well, it means that they didn't

 2   have it before they were prescribed an

 3   opioid.

 4        Q.    Okay.

 5        A.    And so, you know, it's just

 6   that it occurred after starting to prescribe.

 7        Q.    So, again, they didn't have a

 8   history of that --

 9        A.    Correct.

10        Q.    -- type of abuse?

11        A.    Correct.

12        Q.    Okay.  So in this review of 26

13   studies with almost 5,000 participants,

14   again, the rate of addiction was well less

15   than 1 percent?

16        A.    Correct.

17              MR. LEONOUDAKIS:  Objection.

18        Form.

19        Q.    BY MR. HOFFMAN:  And is that

20   also consistent with some of the prior

21   literature that you've seen on the topic?

22        A.    Yes, and current.

23              MR. HOFFMAN:  I'd like to take

24        just a couple minute break so I can

25        decide --
```

Confidential                                    JAN-MS-05484645

Lynn Webster, M.D
February 18, 2019                    505

```
 1              THE WITNESS:  You bet.

 2              MR. HOFFMAN:  -- if we can wrap

 3      up.

 4              THE WITNESS:  I'll go to the

 5      bathroom, if that's all right.

 6              THE VIDEOGRAPHER:  Off the

 7      record.  The time is 6:00.

 8         (There was a break taken.)

 9              THE VIDEOGRAPHER:  Returning on

10      the record.  The time is 6:14.

11      Q.    BY MR. HOFFMAN:  Just going

12  back for a moment, Dr. Webster.  We had a

13  discussion about a Purdue sales rep and

14  something that she said about using OxyContin

15  and postoperative pain.  We've already

16  discussed that.  But I want to ask you a

17  question I guess more generally.

18              Other than that one instance

19  that we talked about where you didn't

20  prescribe for those types of patients or on

21  that basis, can you recall any other

22  statements by any pharmaceutical sales

23  representatives at any point in time that you

24  disagree with?

25      A.    No.
```

Confidential                                                    JAN-MS-05484646

Lynn Webster, M.D
February 18, 2019                                    506

```
 1          Q.    Do you believe that you ever
 2   did anything medically inappropriate for any
 3   of your patients based upon any marketing by
 4   pharmaceutical companies?
 5                MR. LEONOUDAKIS:  Objection,
 6        form.
 7                THE WITNESS:  No, I don't
 8        believe so.
 9          Q.    BY MR. HOFFMAN:  Do you believe
10   you ever did anything medically inappropriate
11   for your patients based upon any discussions
12   with pharmaceutical sales representatives?
13                MR. LEONOUDAKIS:  Objection.
14        Form.
15                THE WITNESS:  No.
16          Q.    BY MR. HOFFMAN:  And I take it
17   you're not aware of any doctors in the state
18   of Oklahoma who have ever done anything
19   medically inappropriate for their patients
20   based upon any marketing of pharmaceutical
21   companies or any discussions with sales
22   representatives?
23                MR. LEONOUDAKIS:  Objection.
24        Form.
25                THE WITNESS:  No.
```

Confidential                                                                                 JAN-MS-05484647

Lynn Webster, M.D
February 18, 2019                              507

```
 1         Q.    BY MR. HOFFMAN:  Now,

 2  plaintiffs' counsel did not share this with

 3  you earlier, but I'm going to read a quote

 4  from the State of Oklahoma's complaint in

 5  this case.  It's called a petition.  And I

 6  will read from Paragraph 62 of the State's

 7  petition.

 8              It reads, in part, "Like

 9  Dr. Portenoy, multiple defendants utilized

10  Dr. Webster as a KOL, providing him with

11  funding and consultant fees in exchange for

12  spreading their misrepresentations regarding

13  opioids and opioid use in general through

14  CMEs and speeches."

15              Were you aware that the State

16  had made that allegation against you?

17         A.    No.

18         Q.    Do you believe that in exchange

19  for consulting fees you have spread the

20  misrepresentations of any defendants in this

21  case?

22         A.    That's flatly wrong.

23         Q.    Just to wrap up, Doctor, you

24  did mention earlier that -- we had the

25  discussion about prescribing OxyContin for
```

Confidential                                                    JAN-MS-05484648

Lynn Webster, M.D
February 18, 2019                                    508

```
 1   some of your patients and that you believed

 2   that OxyContin was helpful or beneficial to

 3   them, otherwise you wouldn't prescribe it; is

 4   that fair?

 5        A.     That's correct.

 6               MR. LEONOUDAKIS:  Objection.

 7        Form.

 8        Q.    BY MR. HOFFMAN:  And you had a

 9   discussion with one of my co-counsel earlier

10   about the types of patients that may benefit

11   from opioids, and I want to ask you now

12   specifically about OxyContin.

13               For what types of -- of

14   patients in your practice did you prescribe

15   OxyContin, if you can describe some of those

16   patient types for me generally.

17        A.     It's -- it's really not the

18   types of -- did you ask about pain patients?

19   What kinds of pain?

20        Q.     Right, yeah.

21        A.     Well, it's not so much the type

22   of pain as it is the type of person.  But you

23   just look at the demographics, as I said

24   earlier, 50 percent of the people I treated

25   had back pain, and probably 20 or 30 percent
```

Confidential                                    JAN-MS-05484649

Lynn Webster, M.D
February 18, 2019                              509

 1  had arthritic problems of some type: knees,

 2  joints or something.

 3            Then probably neuropathic pain.

 4  Some fibromyalgia, and et cetera, and

 5  central -- central pain problems.

 6            The people that would be

 7  candidates would be people that had chronic

 8  persistent pain that was moderate to severe,

 9  not treatable with other alternatives, and I

10  thought would be long-term and probably not

11  at a high risk of abuse.

12       Q.    And based upon those

13  percentages that you just described, up to

14  50 percent with chronic back pain, I believe

15  you said 20 to 30 percent with other types of

16  nonmalignant -- nonmalignant pain, et cetera,

17  what would be the overall percentage of

18  patients in your practice that were cancer

19  patients versus noncancer patients that you

20  treated?

21       A.    So --

22            MR. LEONOUDAKIS:  Objection.

23       Form.

24            THE WITNESS:  At the beginning,

25       I saw more cancer patients, and I

Confidential                                         JAN-MS-05484650

 1          probably have about 10, 15 percent of

 2          my practice.  But by the year 2010, it

 3          was -- I had a rare patient that I

 4          treated with cancer.

 5          Q.    BY MR. HOFFMAN:  And by that

 6     time a majority of your patients --

 7          A.    Were not cancer.

 8          Q.    -- were treated for

 9     nonmalignant pain?

10          A.    Correct.

11          Q.    You described some benefits of

12     opioids earlier, and I want to try to apply

13     that to OxyContin and see if you will agree.

14               Will you agree that OxyContin

15     has helped some of your patients to be able

16     to return to work?

17          A.    Yes.

18               MR. LEONOUDAKIS:  Objection.

19          Form.

20          Q.    BY MR. HOFFMAN:  Will you agree

21     that OxyContin has helped some of your

22     patients be engaged with their families?

23               MR. LEONOUDAKIS:  Objection.

24          Form.

25               THE WITNESS:  Yes.

Confidential                                                    JAN-MS-05484651

Lynn Webster, M.D
February 18, 2019                                    511

```
 1         Q.      BY MR. HOFFMAN:  Do you agree

 2    that OxyContin has helped some of your

 3    patients be mobile and even be able to sit up

 4    at the dinner table, as you described?

 5              MR. LEONOUDAKIS:  Objection.

 6         Form.

 7              THE WITNESS:  Yes.

 8         Q.      BY MR. HOFFMAN:  Do you agree

 9    that OxyContin has helped some of your

10    patients be able to play with their children?

11              MR. LEONOUDAKIS:  Objection.

12         Form.

13              THE WITNESS:  Yes.

14         Q.      BY MR. HOFFMAN:  Do you agree

15    that OxyContin has helped some of your

16    patients get a good night's sleep that they

17    otherwise would be deprived from?

18              MR. LEONOUDAKIS:  Objection.

19         Form.

20              THE WITNESS:  It helped

21         facilitate sleep in a lot of patients,

22         yes.

23         Q.      BY MR. HOFFMAN:  If used

24    properly, do you agree that OxyContin can

25    help restore mobility and help prevent
```

Confidential                                                      JAN-MS-05484652

1    disability in some patients?

2              MR. LEONOUDAKIS:  Objection.

3         Form.

4              THE WITNESS:  In some patients,

5         yes.

6         Q.    BY MR. HOFFMAN:  Used properly,

7    do you agree OxyContin can help improve

8    ability to sleep, as you just described?

9              MR. LEONOUDAKIS:  Objection.

10        Form.

11             THE WITNESS:  Yes.

12        Q.    BY MR. HOFFMAN:  If used

13   properly, do you agree -- do you believe that

14   OxyContin can help alleviate depression and

15   depressive symptoms in some patients?

16             MR. LEONOUDAKIS:  Objection.

17        Form.

18             THE WITNESS:  If the depression

19        is due to the chronic pain.

20             MR. HOFFMAN:  Fair enough.

21             THE WITNESS:  Then, yes.

22        Q.    BY MR. HOFFMAN:  If used

23   properly, do you agree OxyContin can help

24   prevent even some instances of suicide that

25   may have occurred otherwise?

Confidential                                                              JAN-MS-05484653

Lynn Webster, M.D
February 18, 2019                                          513

```
 1                 MR. LEONOUDAKIS:  Objection.

 2        Form.

 3                 THE WITNESS:  That's a really

 4        difficult one, but I know I've seen

 5        suicide where pain was not controlled

 6        and OxyContin had helped a lot of

 7        patients.  I -- it's an inference, so

 8        I believe it's possible.

 9        Q.    BY MR. HOFFMAN:  Okay.  And if

10   used properly, do you believe OxyContin can

11   help restore function in some -- some

12   patients, including helping them to become

13   mobile and to engage more in everyday

14   activities?

15                 MR. LEONOUDAKIS:  Objection.

16        Form.

17                 THE WITNESS:  Yes.

18        Q.    BY MR. HOFFMAN:  And do you

19   also agree that if used properly, OxyContin

20   -- well, strike that.

21                 And, Doctor, you were asked

22   some questions earlier today about the

23   benefits and risk of opioids and -- and

24   weighing those benefits and risk.

25                 Are you aware that OxyContin is
```

Confidential                                                          JAN-MS-05484654

Lynn Webster, M.D
February 18, 2019                                    514

```
 1    still on the market today and it's still

 2    prescribed by physicians?

 3         A.    Yes.

 4         Q.    And in your work with FDA

 5    advisory committees, and some of the work

 6    you've done over time in conjunction with the

 7    FDA, are you aware that the FDA applies a

 8    standard to each drug on the market to

 9    determine whether or not the benefits

10    continue to outweigh the risks?

11         A.    I think that the FDA, once they

12    approve a drug, find that -- they continue to

13    evaluate all drugs, because they can pull

14    drugs from the market.

15              But I think once it's on the

16    market, it's -- it's more difficult for the

17    FDA to withdraw it.  They can still -- they

18    can still change the way it's being

19    prescribed.  But once it's on the market, the

20    FDA has a harder, I think, time making any

21    changes.

22         Q.    But it would be fair to say

23    that opioids in general, and OxyContin

24    specifically, have been re-examined by the

25    FDA, by GAO, by any number of governmental
```

Confidential                                                    JAN-MS-05484655

Lynn Webster, M.D
February 18, 2019                          515

```
1    institutions and organizations from the early

2    2000s all the way up to the present?

3                MR. LEONOUDAKIS:  Objection.

4         Form.

5                THE WITNESS:  Yes.

6         Q.    BY MR. HOFFMAN:  And been --

7    been the subject of enormous scrutiny; is

8    that fair?

9         A.    I know of no drug that's been

10   under more scrutiny.

11        Q.    And OxyContin remains on the

12   market, fully FDA approved today?

13        A.    Correct.

14                MR. HOFFMAN:  Okay.  Those are

15        all -- I'm sorry.

16        Q.    Oh, and in fact, in recent

17   years the FDA has even gone on to approve new

18   opioids that are now on the market; is that

19   right?

20                MR. LEONOUDAKIS:  Objection.

21        Form.

22                THE WITNESS:  Yes.

23        Q.    BY MR. HOFFMAN:  Including

24   opioids that are even stronger than

25   OxyContin?
```

Confidential                                    JAN-MS-05484656

```
 1              MR. LEONOUDAKIS:  Objection.

 2       Form.

 3       Q.    BY MR. HOFFMAN:  Or more

 4  potent, I guess I should say?

 5              MR. LEONOUDAKIS:  Same

 6       objection.

 7              THE WITNESS:  I don't know if

 8       they're more potent.

 9       Q.    BY MR. HOFFMAN:  Okay.  But

10  certainly in the same class of drug, the FDA

11  has approved several new opioid medications?

12       A.    Yes.  Most of them are

13  formulations, but, yes.

14              MR. HOFFMAN:  Okay.

15              MR. ERCOLE:  I have a couple of

16       follow-up questions.

17              MR. HOFFMAN:  Thank you,

18       Doctor.  Those are all the questions I

19       have.

20              THE WITNESS:  Okay.

21

22              RE-EXAMINATION

23  BY MR. ERCOLE:

24       Q.    Dr. Webster, we've talked a bit

25  about Actiq and Fentora today; correct?
```

Confidential                              JAN-MS-05484657

Lynn Webster, M.D
February 18, 2019                                517

1        A.      Correct.

2        Q.      And those are immediate release

3   short acting opioids; is that fair to say?

4        A.      I consider them rapid onset.

5        Q.      Rapid onset opioids.

6                Let's mark this as -- and

7   you've prescribed them to address

8   breakthrough pain; correct?

9        A.      Correct.

10       Q.      Okay.  Let's mark...

11   (Exhibit 23 was marked for identification.)

12       Q.      BY MR. ERCOLE:  Dr. Webster,

13   this is an article that you authored titled

14   "Breakthrough Pain and the Management of

15   Chronic Persistent Pain Syndromes"; is that

16   correct?

17                MR. LEONOUDAKIS:  Objection.

18       Form.

19                THE WITNESS:  Yes.

20       Q.      BY MR. ERCOLE:  Obviously feel

21   free to take a look at it and refamiliarize

22   yourself with it.

23                And it looks like it was

24   published in May of 2008; is that correct?

25                MR. LEONOUDAKIS:  Objection.

Confidential                                                                          JAN-MS-05484658

 1          Form.

 2          Q.     BY MR. ERCOLE:  If you look at

 3     the bottom of the first page.

 4          A.     Yes.  Correct.

 5          Q.     And there's a website

 6     www.ajmc.com?

 7          A.     Correct.

 8          Q.     Do you know what that refers

 9     to?

10          A.     I think -- I think that's the

11     journal.  I think that's the journal, or at

12     least the site it was published.

13          Q.     Sure.  If you turn to the page

14     that is -- if you look on the left-hand side.

15          A.     Which page?  I'm sorry.

16          Q.     Sure.  It's the page marked

17     S118.  It's on the --

18          A.     Yes.

19          Q.     -- left-hand side of the

20     document.

21          A.     Yes.

22          Q.     And it says "Prevalence of BTP

23     in Cancer and Noncancer Pain."

24                 Do you see that?

25                 MR. LEONOUDAKIS:  Objection.

Confidential                                                    JAN-MS-05484659

```
 1        Form.

 2                THE WITNESS:  I see it.

 3        Q.    BY MR. ERCOLE:  And what does

 4   BTP --

 5                MR. LEONOUDAKIS:  Objection.

 6        Form.

 7        Q.    BY MR. ERCOLE:  -- stand for?

 8        A.    Breakthrough pain.

 9        Q.    And it says, "Many patients

10   with chronic cancer pain experience BTP; most

11   studies put the prevalence in" that -- "in

12   the range of 65 percent to 85 percent."

13                MR. LEONOUDAKIS:  Objection.

14        Form.

15        Q.    BY MR. ERCOLE:  Do you see

16   that?

17        A.    Yes.

18        Q.    And was that accurate at that

19   time?

20                MR. LEONOUDAKIS:  Objection.

21        Form.

22                THE WITNESS:  It's referenced

23        with several references, so, yes, I

24        would assume so.

25        Q.    BY MR. ERCOLE:  Is that your
```

Confidential                                                    JAN-MS-05484660

1    understanding --

2         A.     Yes.

3         Q.     -- today as well?

4                MR. LEONOUDAKIS:  Objection

5         form.

6                THE WITNESS:  Yes.

7         Q.     BY MR. ERCOLE:  Okay.  And then

8    it goes on to say, "The prevalence of BPT in

9    noncancer patients is similar."

10               Do you see that?

11               MR. LEONOUDAKIS:  Objection.

12        Form.

13               THE WITNESS:  Correct.

14        Q.     BY MR. ERCOLE:  And it says,

15   "In a survey of 228 patients with diverse

16   types of noncancer chronic pain, 74 percent

17   experienced severe-to-excruciating BTP."

18               MR. LEONOUDAKIS:  Objection.

19        Form.

20               THE WITNESS:  Correct.

21        Q.     BY MR. ERCOLE:  And was that

22   accurate at that time?

23               MR. LEONOUDAKIS:  Objection.

24        Form.

25               THE WITNESS:  Yes.

Confidential                                                    JAN-MS-05484661

```
1          Q.     BY MR. ERCOLE:  Is it your

2   understanding that continues to be accurate?

3          A.     Correct.

4                 MR. LEONOUDAKIS:  Objection.

5          Form.

6                 THE WITNESS:  Just -- just to

7          reemphasize what I've said before,

8          there really shouldn't be a difference

9          between cancer and noncancer pain.

10         The mechanisms are not any different.

11         It's just that one population has

12         cancer, and the other doesn't.

13                The mechanism of producing the

14         pain are the same.  That's why these

15         have relative similar statistics.

16         Q.     BY MR. ERCOLE:  Okay.  And if

17  you keep -- if you look down in your article,

18  there's also a paragraph dealing with the

19  effect of BTP on patients.

20                Do you see that?

21         A.     I do.

22         Q.     Okay.  And it says, "BTP,

23  particularly when treatment is absent or

24  inadequate, damages the patient's quality of

25  life and reduces his or her ability to work
```

Confidential                                        JAN-MS-05484662

```
 1   and participate in other daily activities."

 2                Do you see that?

 3                MR. LEONOUDAKIS:  Objection.

 4        Form.

 5                THE WITNESS:  Yes.

 6        Q.    BY MR. ERCOLE:  And then it

 7   says, "Even brief but excruciating episodes

 8   can cause lasting harm."

 9                Is that accurate?

10                MR. LEONOUDAKIS:  Objection.

11        Form.

12                THE WITNESS:  Yes.

13        Q.    BY MR. ERCOLE:  Is that still

14   accurate today?

15                MR. LEONOUDAKIS:  Objection

16        form.

17                THE WITNESS:  Yes.

18        Q.    BY MR. ERCOLE:  And it says --

19   it keeps going, it says, "Patients who

20   experience BTP suffer heightened severe

21   chronic pain, worsened physical function, and

22   psychological distress"; is that correct?

23                MR. LEONOUDAKIS:  Objection

24        form.

25                THE WITNESS:  Yes.
```

Confidential                                                                    JAN-MS-05484663

Lynn Webster, M.D.
February 18, 2019                                        523

1          Q.    BY MR. ERCOLE:  Okay.  And that

2    remains the case today too; correct?

3               MR. LEONOUDAKIS:  Objection.

4          Form.

5               THE WITNESS:  Yes.

6          Q.    BY MR. ERCOLE:  And when you're

7    talking about BTP here, you're not

8    distinguishing between cancer and noncancer

9    pain; correct?

10              MR. LEONOUDAKIS:  Objection.

11         Form.

12              THE WITNESS:  Only when it's

13         referenced in a paper that is only

14         assessing cancer versus noncancer.

15         Q.    BY MR. ERCOLE:  Sure.  With

16   respect to Actiq or Fentora, when they're

17   used properly -- properly, can they reduce

18   breakthrough pain in patients?

19              MR. LEONOUDAKIS:  Objection.

20         Form.

21              THE WITNESS:  It -- it

22         addresses breakthrough pain.  So it --

23         it reduces the intensity of the pain.

24         It doesn't reduce the frequency of the

25         pain.

Confidential                                                    JAN-MS-05484664

Lynn Webster, M.D
February 18, 2019                        524

1          Q.     BY MR. ERCOLE:  But with

2    respect to the breakthrough pain, it -- Actiq

3    or Fentora, when at least used properly, can

4    reduce the intensity of that particular pain;

5    correct?

6               MR. LEONOUDAKIS:  Objection.

7          Form.

8               THE WITNESS:  Yes.

9          Q.     BY MR. ERCOLE:  And given that

10   it can reduce the intensity of that

11   breakthrough pain, can it improve physical

12   function, those medicines improve physical

13   functions for patients?

14              MR. LEONOUDAKIS:  Objection.

15         Form.

16              THE WITNESS:  Yes, that's what

17         I've cited.

18         Q.     BY MR. ERCOLE:  And the --

19   those medicines, when used appropriate, can

20   also help reduce, if not eliminate, certain

21   psychological distress associated with

22   breakthrough pain?

23              MR. LEONOUDAKIS:  Objection.

24         Form.

25              THE WITNESS:  Yes.

Confidential                                                                    JAN-MS-05484665

```
 1        Q.    BY MR. ERCOLE:  And when used

 2   properly, is it fair to say, at least for

 3   some patients, Actiq or Fentora may

 4   ultimately help avoid those patients having

 5   to go to the emergency room to address

 6   breakthrough pain?

 7              MR. LEONOUDAKIS:  Objection.

 8        Form.

 9              THE WITNESS:  That's one of the

10        reasons it was commonly prescribed.

11        Q.    BY MR. ERCOLE:  Other benefits

12   for Actiq and Fentora that you can think of?

13              MR. LEONOUDAKIS:  Objection.

14        Form.

15              THE WITNESS:  Well, I think

16        that it could mitigate the need for

17        higher around-the-clock medicine,

18        because if you have to take care of

19        the breakthrough pain that you can't

20        predict, that may mean that you have

21        to increase the dose of your sustained

22        release medicine, if it's somebody

23        that has persistent pain with

24        breakthrough pain.

25              So we use a short-acting as
```

Confidential                                                    JAN-MS-05484666

Lynn Webster, M.D
February 18, 2019                      526

```
 1          well as rapid onset opioids so that we

 2          can decrease the amount that is on a

 3          continuous basis and just use these

 4          then for those episodes that are

 5          severe enough that need some

 6          additional treatment.

 7          Q.    BY MR. ERCOLE:  And with

 8  respect to the -- how -- with respect to the

 9  patients that you prescribed Actiq and

10  Fentora for, did -- did at least some of

11  those patients, when medicine was used

12  properly, experience the benefits that you

13  you've just described?

14              MR. LEONOUDAKIS:  Objection.

15          Form.

16              THE WITNESS:  I believe so.

17          Q.    BY MR. ERCOLE:  And how long

18  did you prescribe Actiq and Fentora for

19  -- strike that.

20              Do you recall while you were a

21  practicing physician, over how many years you

22  would have prescribed Actiq and Fentora?

23              MR. LEONOUDAKIS:  Objection.

24          Form.

25              THE WITNESS:  From the time
```

Confidential                                                          JAN-MS-05484667

```
 1          that they were introduced until I

 2          discontinued practicing.

 3          Q.    BY MR. ERCOLE:  And with

 4   respect to the prescriptions of Actiq or

 5   Fentora that you wrote, you believed those

 6   were medically appropriate for the patients

 7   that you were writing those for; correct?

 8          A.    Of course.

 9                MR. LEONOUDAKIS:  Objection.

10          Form.

11          Q.    BY MR. ERCOLE:  Otherwise, you

12   wouldn't -- you wouldn't have written the

13   prescriptions; right?

14                MR. LEONOUDAKIS:  Objection.

15          Form.

16                THE WITNESS:  That's correct.

17          Q.    BY MR. ERCOLE:  And in fact,

18   you've done some clinical studies regarding

19   the efficacy of Actiq and Fentora; is that

20   correct?

21                MR. LEONOUDAKIS:  Objection.

22          Form.

23                THE WITNESS:  Correct.

24          Q.    BY MR. ERCOLE:  And you've

25   published some articles regarding the
```

Confidential                                                    JAN-MS-05484668

```
 1   efficacy of Actiq and Fentora with respect to

 2   treating breakthrough pain?

 3              MR. LEONOUDAKIS:  Objection.

 4        Form.

 5              THE WITNESS:  Correct.

 6   (Exhibit 24 was marked for identification.)

 7   (There was a discussion held off the record.)

 8        Q.    BY MR. ERCOLE:  Dr. Webster, do

 9   you recall this document?

10        A.    I do.

11        Q.    Is this a -- an article that

12   you published?

13        A.    I was an author of, yes.

14        Q.    You were one of the authors of

15   this particular --

16        A.    Correct.

17        Q.    -- article?

18              And there were other authors as

19   well; correct?

20        A.    Yes.

21        Q.    And those other authors are

22   listed on the -- on the front page?

23        A.    Correct.

24        Q.    And the title of the article is

25   "Impact of Breakthrough Pain on Quality of
```

Confidential                                                    JAN-MS-05484669

1    Life in Patients With Chronic Noncancer Pain:

2    Patient Perceptions and Effective Treatment

3    With Oral Transmucosal Fentanyl Citrate

4    (OTFC, Actiq)."

5              Did I read that correctly?

6        A.     Correct.

7        Q.     And "OTFC" is sort of the

8    molecule name of Actiq?

9              MR. LEONOUDAKIS:  Objection.

10       Form.

11             THE WITNESS:  It's actually not

12       a molecule, it's -- it's the delivery

13       system.  It's oral transmucosal

14       fentanyl citrate.  Same things as

15       Actiq.

16       Q.    BY MR. ERCOLE:  Okay.  Actiq is

17   another name for OTFC?

18       A.     Correct.

19             MR. LEONOUDAKIS:  Objection.

20       Form.

21       Q.    BY MR. ERCOLE:  And this

22   particular study looked at the impact of the

23   effective -- strike that.

24             This particular study looked at

25   the effective treatment of Actiq on patients

Confidential                                                    JAN-MS-05484670

 1    with chronic noncancer pain; is that fair to

 2    say?

 3                 MR. LEONOUDAKIS:  Objection.

 4          Form.

 5                 THE WITNESS:  That's correct.

 6          Q.    BY MR. ERCOLE:  Okay.  And if

 7    you turn to Page 286 of this particular

 8    study --

 9          A.    Yes.

10          Q.    -- there's a section marked

11    "Discussion."  Do you see that?

12          A.    Yes.

13                 MR. LEONOUDAKIS:  Objection.

14          Form.

15          Q.    BY MR. ERCOLE:  And if you look

16    at the -- the last paragraph on that page.

17          A.    Yes.

18          Q.    See that?

19                 And it says, "The addition of

20    OTFC for treatment of BTP was associated with

21    a high degree of patient satisfaction"; is

22    that right?

23                 MR. LEONOUDAKIS:  Objection --

24          objection.  Form.

25                 THE WITNESS:  Yes.

Confidential                                                    JAN-MS-05484671

1          Q.     BY MR. ERCOLE:  And then it

2    goes on to say, "The largest positive

3    differences seen were for 'satisfaction with

4    pain relief,' 'quickly relieves pain allowing

5    patients to go back to sleep,' 'works fast,'

6    and 'provides adequate relief.'"

7                Do you see that?

8                MR. LEONOUDAKIS:  Objection.

9          Form.

10               THE WITNESS:  Yes.

11         Q.     BY MR. ERCOLE:  And are those

12   benefits that you've seen with respect to

13   some of your patients as to Actiq, at least

14   when used properly?

15               MR. LEONOUDAKIS:  Objection.

16         Form.

17               THE WITNESS:  Yes.

18         Q.     BY MR. ERCOLE:  It goes on to

19   say, "Side effects with OTFC" -- again,

20   that's Actiq; correct?

21               MR. LEONOUDAKIS:  Objection.

22         Form.

23               THE WITNESS:  Correct.

24         Q.     BY MR. ERCOLE:  "Side effects

25   with OTFC were generally rated significantly

Confidential                                    JAN-MS-05484672

Lynn Webster, M.D
February 18, 2019                    532

1   less than with previous medications."

2            Do you see that?

3       A.    Correct.

4            MR. LEONOUDAKIS:  Objection.

5       Form.

6       Q.    BY MR. ERCOLE:  And then it

7   goes on to say, "OTFC was also associated

8   with improvements in several QOL domains."

9            Did I read that correctly?

10           MR. LEONOUDAKIS:  Objection.

11      Form.

12           THE WITNESS:  "QOL" is quality

13      of life, yes.

14      Q.    BY MR. ERCOLE:  Okay.  And then

15  the next sentence says, "The most positively

16  improved domains were enjoyment of life,

17  mood, and general activity level."

18           MR. LEONOUDAKIS:  Object --

19      objection.

20      Q.    BY MR. ERCOLE:  Is that -- is

21  that -- did I read that accurately?

22           MR. LEONOUDAKIS:  Objection.

23      Form.

24           THE WITNESS:  Yes.

25      Q.    BY MR. ERCOLE:  And so is it

Confidential                                                                    JAN-MS-05484673

Lynn Webster, M.D
February 18, 2019                                    533

1   fair to say one of the conclusions of the

2   study that you and the other authors did was

3   that -- that Actiq, at least for the patients

4   who received it, was associated with

5   improving enjoyment of life, improving mood,

6   and improving general activity level?

7              MR. LEONOUDAKIS:  Objection.

8        Form.

9              THE WITNESS:  Yes.

10       Q.    BY MR. ERCOLE:  Is that -- at

11  least are those results consistent with the

12  prescribing of Actiq for your patients, at

13  least when used appropriately?

14             MR. LEONOUDAKIS:  Objection.

15       Form.

16             THE WITNESS:  Yes.

17             MR. ERCOLE:  Okay.

18   (Exhibit 25 was marked for identification.)

19             THE WITNESS:  Did you guys

20       print my whole CV?

21             MR. ERCOLE:  Just a few -- a

22       few additional questions, Dr. Webster.

23       Q.    Is this a -- an article that

24  you were a co-author on?

25             MR. LEONOUDAKIS:  Objection.

Confidential                                                    JAN-MS-05484674

1          Form.

2                    THE WITNESS:  Yes.

3          Q.    BY MR. ERCOLE:  And there are

4     other co-authors listed for this particular

5     article; correct?

6          A.    Yes.

7          Q.    Okay.  And this was an article

8     published in Pain Medicine?

9                    MR. LEONOUDAKIS:  Objection.

10         Form.

11                   THE WITNESS:  Yes.

12         Q.    BY MR. ERCOLE:  And it was a --

13    says original research article; is that

14    right?

15                   MR. LEONOUDAKIS:  Objection.

16         Form.

17                   THE WITNESS:  Yes.

18         Q.    BY MR. ERCOLE:  And do you --

19    do you recall the particular study that was

20    done here?

21                   MR. LEONOUDAKIS:  Objection.

22         Form.

23                   THE WITNESS:  No, I -- I mean,

24         I remember just vaguely.  I'd have to

25         read this for me to be reminded.

Confidential                                                                    JAN-MS-05484675

```
 1        Q.    BY MR. ERCOLE:  Sure.  The

 2   title says "Fentanyl Buccal Tablet Compared

 3   With Immediate Release Oxycodone For the

 4   Management of Breakthrough Pain in Opioid

 5   Tolerant Patients With Chronic Cancer and

 6   Noncancer Pain: A Randomized Double-Blind

 7   Crossover Study Followed by a 12-Week

 8   Open-Label Phase to Evaluate Patient

 9   Outcomes."

10             Do you see that?

11        A.    Yes.

12             MR. LEONOUDAKIS:  Objection.

13        Form.

14        Q.    BY MR. ERCOLE:  And fentanyl

15   buccal tablet, is that referring to the

16   medicine that perhaps is more commonly known

17   as Fentora?

18             MR. LEONOUDAKIS:  Objection.

19        Form.

20             THE WITNESS:  Yes.

21        Q.    BY MR. ERCOLE:  Okay.  And I

22   don't need to belabor all of the details and

23   the statistics here, but if you turn to

24   the -- the last page, 1344.

25        A.    Yes.
```

Confidential                                              JAN-MS-05484676

Lynn Webster, M.D
February 18, 2019                                    536

```
 1          Q.    There's a -- at the end it says
 2    "In conclusion."
 3                Do you see that?
 4                MR. LEONOUDAKIS:  Objection.
 5         Form.
 6                THE WITNESS:  Yes.
 7          Q.    BY MR. ERCOLE:  It says, "In
 8    conclusion, fentanyl buccal tablet was
 9    associated with greater PR."
10                What does "PR" mean?
11                MR. LEONOUDAKIS:  Objection.
12         Form.
13                THE WITNESS:  Pain relief, I
14         believe.  It would be defined earlier.
15          Q.    BY MR. ERCOLE:  So it's your
16    understanding that "PR" was referring to
17    "pain relief"?
18          A.    I believe so.
19                MR. LEONOUDAKIS:  Objection.
20         Form.
21          Q.    BY MR. ERCOLE:  And it says,
22    "In conclusion, fentanyl buccal tablets were
23    associated with greater PR, including a more
24    rapid onset of analgesia, as well as better
25    functional improvement and patient
```

Confidential                                                                    JAN-MS-05484677

1   satisfaction than oxycodone for treatment of

2   BTP in opioid tolerant patients with chronic

3   pain."

4                Do you see that?

5                MR. LEONOUDAKIS:  Objection.

6         Form.

7                THE WITNESS:  Yes.

8         Q.    BY MR. ERCOLE:  And is that

9   your understanding of the conclusion that

10  you and the other co-authors drew from

11  this particular study that you did as to

12  Fentora?

13               MR. LEONOUDAKIS:  Objection.

14        Form.

15               THE WITNESS:  Yes.

16        Q.    BY MR. ERCOLE:  And at least

17  for some of your patients who used Fentora as

18  directed, is that consistent with what you

19  saw in your practice too?

20               MR. LEONOUDAKIS:  Objection.

21        Form.

22               THE WITNESS:  Yes.

23        Q.    BY MR. ERCOLE:  And you're

24  aware, Dr. Webster, that Actiq and

25  Fentora are -- are indicated only for

Confidential                                                    JAN-MS-05484678

```
 1   patients who are opioid tolerant; is that

 2   fair to say?

 3              MR. LEONOUDAKIS:  Objection.

 4        Form.

 5              THE WITNESS:  That's correct.

 6        Q.    BY MR. ERCOLE:  Okay.  And is

 7   that -- strike that.

 8              Is whether the patient was

 9   opioid tolerant something that you considered

10   in your practice as to whether to prescribe

11   Actiq or Fentora?

12              MR. LEONOUDAKIS:  Objection.

13        Form.

14              THE WITNESS:  Yes.

15        Q.    BY MR. ERCOLE:  And was that an

16   important consideration for you?

17              MR. LEONOUDAKIS:  Objection.

18        Form.

19              THE WITNESS:  Yes.

20              MR. ERCOLE:  Okay.  Thank you,

21        sir.  That's all I have.

22              THE WITNESS:  Okay.

23              MR. ROBINSON:  Okay.

24              MR. LEONOUDAKIS:  Just got a

25        few.
```

Confidential

JAN-MS-05484679

Lynn Webster, M.D
February 18, 2019                                    539

```
 1
 2                     EXAMINATION
 3   BY MR. LEONOUDAKIS:
 4        Q.    Dr. Webster, I want to be very
 5   clear about something.
 6                MR. ROBINSON:  Do you have a
 7        mic on?
 8                MR. LEONOUDAKIS:  Yeah, it's
 9        on.
10        Q.    Dr. Webster, I want to be very
11   clear about something.  You don't dispute
12   that we're suffering from an opioid crisis in
13   this country, do you?
14        A.    I do not dispute that.
15        Q.    Okay.  All three of the
16   defendants in this case, they do not dispute
17   that we're suffering from an opioid crisis as
18   well.
19                Now, who's responsible for it
20   we can talk a lot about.  But I want to make
21   sure that you -- this jury knows clearly that
22   you're not saying that there's not an opioid
23   crisis in this country.
24                So that being said, you're not
25   saying that we should prescribe more opioids
```

Confidential                                                    JAN-MS-05484680

Lynn Webster, M.D
February 18, 2019                          540

```
 1    in this country, are you?

 2              MR. ERCOLE:  Objection to form.

 3              MR. HOFFMAN:  Move to strike

 4        counsel's prior statement.

 5              THE WITNESS:  I don't know how

 6        many opioids we should prescribe, but

 7        we need to prescribe them wisely.

 8        Q.    BY MR. LEONOUDAKIS:  Okay.

 9   There were some discussion earlier about the

10   total number of people with untreated pain

11   continuing to go up.  Do you remember talking

12   about that with defense counsel?

13        A.    I do.

14        Q.    I think the number that was

15   cited was around 170 million; is that right?

16        A.    That's correct.

17        Q.    Okay.  Is it your testimony

18   that all those people need to be treated with

19   opioids?

20        A.    Of course not.

21              MR. ROBINSON:  Objection.

22        Q.    BY MR. LEONOUDAKIS:  Okay.

23   Those people -- what do you -- when you said

24   that those people need -- their pain needs to

25   be treated, how -- what were you saying as
```

Confidential                                                      JAN-MS-05484681

1    far as how they should be treated?

2              MR. EHSAN:  Object to form.

3              THE WITNESS:  I wasn't

4         suggesting how they would be treated.

5         I suggest -- what I was saying is that

6         they need to have their pain

7         addressed.

8         Q.    BY MR. LEONOUDAKIS:  Okay.

9    Whether it's through some sort of non-opioid

10   therapy or opioids?

11        A.    Correct.

12        Q.    Okay.  And earlier there was

13   also some discussion about who may be

14   responsible for this crisis, and you talked a

15   little bit about insurance companies.

16              Do you remember that?

17        A.    Yes.

18        Q.    And you said that insurance

19   companies may be partially responsible

20   because they did not cover non-opioid therapy

21   for pain; is that correct?

22        A.    That is correct.

23        Q.    Were you aware -- well, strike

24   that.

25              Did any of these drug company

Confidential                                                    JAN-MS-05484682

Lynn Webster, M.D
February 18, 2019                              542

```
 1    lawyers here today tell you about the tens of

 2    millions, if not hundreds of millions of

 3    dollars, they spend to make sure that their

 4    drugs are covered by insurance companies?

 5              MR. ERCOLE:  Objection to form.

 6              MR. HOFFMAN:  Objection.

 7              THE WITNESS:  No.

 8         Q.   BY MR. LEONOUDAKIS:  Did any of

 9    these drug company lawyers here today tell

10    you about the tens of millions if not

11    hundreds of millions of dollars they spend to

12    make sure that government payers cover their

13    drugs?

14              MR. HOFFMAN:  Object to form.

15              MR. ERCOLE:  Same objection.

16              THE WITNESS:  No.

17         Q.   BY MR. LEONOUDAKIS:  Did you

18    know that each one of these drug companies

19    goes and visits drug utilization boards in

20    the state of Oklahoma to make sure that they

21    cover their drugs?

22              MR. ERCOLE:  Objection to form.

23              THE WITNESS:  I'm sure they do.

24         Q.   BY MR. LEONOUDAKIS:  Did you

25    know that not one of these drug companies
```

Confidential                                                                                    JAN-MS-05484683

```
 1    spends any money to make sure that doctors

 2    can prescribe non-opioid therapy?

 3              MR. HOFFMAN:  Object to form.

 4         That's not true.

 5              THE WITNESS:  I don't know what

 6         they do.

 7              MR. HOFFMAN:  Not even close to

 8         true.

 9         Q.   BY MR. LEONOUDAKIS:  Okay.  I'm

10    going to pull out Exhibit 22 briefly.

11              Counsel for Purdue presented

12    Exhibit 22 and turned your attention to

13    Page 1262.  Can you turn there for me.

14         A.   Yes.

15         Q.   And he read a cite for you at

16    the top of the page in the second column,

17    starts with "For patients."

18              Do you see that?

19         A.   Yes.

20         Q.   And after he read that cite,

21    you both agreed that that said -- or that the

22    rate of addiction was well less than -- that

23    that supported the statement the rate of

24    addiction was well less than 1 percent.

25              Do you remember that?
```

Confidential                                                              JAN-MS-05484684

1       A.      Yes.

2       Q.      Okay.  And the cite here is to

3   cite 12, which we looked at; right?

4       A.      Yes.

5       Q.      On the back.

6       A.      Yeah.

7       Q.      And that says the Cochrane

8   Database System at the bottom, doesn't it?

9       A.      Yeah, by Noble.

10      Q.      Okay.  So you're familiar with

11  the Cochrane review; right?

12      A.      Yes.

13      Q.      And you're familiar that it is

14  a combination of 26 different studies, as it

15  said in the paper; correct?

16      A.      That's correct.

17      Q.      And you know, then, that the

18  Cochrane study was 26 different studies

19  pulled together; right?

20              MR. ERCOLE:  Objection to form.

21              THE WITNESS:  That's correct.

22      Q.      BY MR. LEONOUDAKIS:  And you

23  know not one of those studies was designed to

24  determine the risk of addiction for using

25  opioids long-term; correct?

Confidential                                                    JAN-MS-05484685

1               MR. ERCOLE:  Objection to form.

2               THE WITNESS:  I don't believe

3        the studies were designed to assess

4        the risk, that's correct.

5        Q.    BY MR. LEONOUDAKIS:  You're

6  aware not one of the studies included in the

7  Cochrane review conducted assessments of

8  patients for the development of addiction

9  using DSM criteria.  Don't you know that?

10       A.    I don't recall right now what

11  the criteria were.  I'd have to go back and

12  read it.

13       Q.    But you know that not one of

14  those studies individually was specifically

15  designed to determine the risk of addiction

16  in using opioids long-term for the treatment

17  of the chronic -- chronic cancer pain?

18       A.    I'd have to go back and re-read

19  the study, but I don't have any reason to

20  dispute what you're saying.

21       Q.    And so it would be misleading,

22  Dr. Webster, then to say that the Cochrane

23  review is evidence that the rate of addiction

24  for using opioids was less than 1 percent,

25  wouldn't it?

Confidential                                                    JAN-MS-05484686

```
 1              MR. ROBINSON:  Objection.

 2              MR. ERCOLE:  Objection to form.

 3              THE WITNESS:  No, I don't think

 4       that that would be misleading, because

 5       this was an assessment of those

 6       studies and meta-analysis that has

 7       tried to determine what the rate of

 8       addiction was in those studies, even

 9       though that wasn't a primary endpoint.

10       Q.    BY MR. LEONOUDAKIS:  And not

11  one of those studies individually supports

12  that statement that the rate of addiction was

13  well less than 1 percent, does it?

14              MR. ROBINSON:  Objection.

15       Form.

16              MR. ERCOLE:  Objection.  Form.

17              THE WITNESS:  I would have to

18       go back and read it.

19       Q.    BY MR. LEONOUDAKIS:  Okay.  Did

20  you participate at all in the coordination of

21  that study or the Cochrane interview?

22       A.    No.

23       Q.    Okay.  Were you part of

24  something called the Mayday Fellowship?

25       A.    Yes.
```

Confidential                                                                 JAN-MS-05484687

```
 1          Q.     You were a Mayday fellow,

 2    weren't you?

 3          A.     Yes.

 4          Q.     And the Mayday Fellowship

 5    provided funding to the Cochrane review,

 6    didn't it?

 7          A.     I don't know.

 8          Q.     You don't know?  You're not

 9    aware of that?

10          A.     No.

11          Q.     Okay.  Counsel for Purdue asked

12    you if you were aware of any other instances

13    where a sales rep said anything false or

14    misleading or -- I'm sorry.  Strike that.

15                 Counsel for Purdue asked you if

16    you were aware of any sales reps, other than

17    the one you mentioned, saying anything false

18    or misleading.

19                 Do you remember that?

20          A.     Yes.

21          Q.     And you said no; right?

22          A.     I don't remember any.

23          Q.     Okay.  But you are aware that

24    has happened; correct?

25                 MR. HOFFMAN:  Objection to
```

Confidential                                                    JAN-MS-05484688

```
 1        form.

 2               THE WITNESS:  Not in my clinic.

 3        Not that I'm aware of.

 4        Q.    BY MR. LEONOUDAKIS:  Right.

 5  But you saw -- well, we discussed earlier

 6  today that Purdue pled guilty for promoting

 7  its drugs mis- -- misbranding its drugs,

 8  didn't we?

 9        A.    You've showed me that they pled

10  guilty.

11        Q.    Yeah.  So somebody else was

12  doing it other than the one than visited you,

13  weren't they?

14               MR. HOFFMAN:  Object to form.

15               THE WITNESS:  I don't know what

16        they did.

17        Q.    BY MR. LEONOUDAKIS:  And we

18  looked at the GAO report, didn't we?

19        A.    We scanned it.

20        Q.    It talked about aggressive

21  opioid prescription, didn't it?

22               MR. EHSAN:  Object to the form.

23               MR. ROBINSON:  Objection.

24        Asked and answered.

25               THE WITNESS:  I'm not sure what
```

Confidential                                                    JAN-MS-05484689

Lynn Webster, M.D.
February 18, 2019                                   549

```
1              it said exactly.  I think that the GAO

2         did talk about aggressive marketing.

3         Q.    BY MR. LEONOUDAKIS:  And it

4    said that Purdue has been cited twice by the

5    FDA for using potentially false and

6    misleading medical journal advertisements for

7    OxyContin.

8              Do you remember that?

9              MR. HOFFMAN:  What page are you

10        on?

11             THE WITNESS:  I don't remember

12        that, but I can accept that.

13        Q.    BY MR. LEONOUDAKIS:  And

14   Purdue -- did you know that Purdue read and

15   agreed with this GAO report in 2003?

16             MR. ROBINSON:  Objection.

17        Asked and answered.

18             MR. HOFFMAN:  Foundation.

19             THE WITNESS:  No.

20        Q.    BY MR. LEONOUDAKIS:  Okay.  So

21   in 2003, Purdue was cited for potentially

22   false and misleading advertisements; correct?

23             MR. HOFFMAN:  Object to the

24        form.

25        Q.    BY MR. LEONOUDAKIS:  According
```

Confidential                                                          JAN-MS-05484690

```
 1   to the GAO report?

 2              MR. ROBINSON:  Asked and

 3        answered.

 4        Q.    BY MR. LEONOUDAKIS:  Correct?

 5        A.    I can assume, yes.

 6        Q.    And in 2007, they pled guilty

 7   to misbranding its drugs; right?

 8              MR. ROBINSON:  Asked and

 9        answered.

10              THE WITNESS:  That's fair.

11        Q.    BY MR. LEONOUDAKIS:

12   Dr. Webster, we talked earlier about

13   developing the opioid risk tool.  Do you

14   remember that?

15        A.    Yes.

16        Q.    You didn't develop that to help

17   drug companies sell opioids, did you?

18              MR. EHSAN:  Object to the form.

19              THE WITNESS:  No.

20        Q.    BY MR. LEONOUDAKIS:  That's

21   not -- that's not a marketing tool, is it?

22        A.    No.

23        Q.    Has any drug company or opioid

24   manufacturer ever asked you if they could use

25   your opioid risk tool as a marketing tool?
```

Confidential                                                                      JAN-MS-05484691

Lynn Webster, M.D
February 18, 2019                           551

1          A.     I don't know if they've asked

2     me if they could use it as a marketing tool.

3     I think they've asked -- many of them have

4     asked if they could use it as an educational

5     tool.

6          Q.     Okay.  Had you approved that

7     use?

8          A.     Yes.

9          Q.     And what did you understand

10    that they were going to be using that opioid

11    risk tool to do?

12         A.     To help education.  Educate

13    physicians about assessing risk.

14         Q.     And did you understand that

15    their sales reps were going to be handing

16    those opioid risk tools out to doctors?

17         A.     Yes, I believe so.

18         Q.     So you're aware that that

19    happened?

20         A.     Yeah.

21         Q.     Okay.  Counsel asked you

22    about -- I believe it was counsel for

23    Purdue -- asked you about the proper uses of

24    opioids.

25                Do you remember that?

Confidential                                                    JAN-MS-05484692

Lynn Webster, M.D
February 18, 2019                    552

1          A.      Yes.

2          Q.      And you testified about a lot

3   of different situations, I think you said

4   were benefits for opioids.

5                  Do you remember that?

6                  MR. EHSAN:  Object to the form.

7                  MR. ERCOLE:  Same objection.

8                  THE WITNESS:  Well, I don't

9          remember -- I don't know --

10                 MR. ROBINSON:  Same objection.

11                 THE WITNESS:  I have different

12         pain conditions that could be

13         candidates for it, yes.

14         Q.      BY MR. LEONOUDAKIS:  Okay.  And

15   he gave you a lot of examples and he said if

16   used properly, for example, patients can have

17   improved quality of life.

18                 Do you remember that?

19         A.      Those are outcomes, yes.

20                 MR. ERCOLE:  Objection.

21         Q.      BY MR. LEONOUDAKIS:  Isn't it

22   true, Dr. Webster, that even if used properly

23   you can get addicted to opioids?

24         A.      Not if you use it properly,

25   you're not going to get addicted.

Confidential

JAN-MS-05484693

Lynn Webster, M.D
February 18, 2019                                           553

```
 1         Q.    Isn't it true, Dr. Webster,
 2    that even if used properly you can die from
 3    opioids?
 4         A.    You can, yeah.  If you use it
 5    properly?  I don't know if you use it
 6    properly.  If it's been prescribed properly,
 7    you're not going to die from it.
 8         Q.    Is it your testimony,
 9    Dr. Webster, that every person that's died in
10    this country from an opioid overdose was
11    using their opioids improperly?
12              MR. ROBINSON:  Objection to
13         Form.
14              MR. ERCOLE:  Objection.  Form.
15              THE WITNESS:  I don't know why
16         everyone has died.  I know that most
17         of the people who have died have used
18         multiple drugs, it's multiple
19         injections, not just one, and most of
20         the deaths are not from prescription
21         drugs.
22         Q.    BY MR. LEONOUDAKIS:  How do you
23    know that, Dr. Webster?
24         A.    From the data from the CDC.
25         Q.    Data from the CDC?
```

Confidential                                                      JAN-MS-05484694

1        A.      Right.

2        Q.      What did it say to give you

3   that opinion?

4               MR. ERCOLE:  Objection to form.

5               THE WITNESS:  The data that's

6        produced says that most of the deaths

7        are illicit drugs, heroin and fentanyl

8        and other drugs.

9        Q.      BY MR. LEONOUDAKIS:  So you

10  agree with the data that CDC used?

11       A.      Well, I -- I could tell you

12  that that's my reference for that comment.

13       Q.      Okay.  Earlier you disagreed

14  with the CDC as far as how it was informing

15  doctors that they should prescribe opioids,

16  didn't you?

17       A.      I disagree with some of their

18  guidelines.

19       Q.      Okay.  So there are parts of

20  the CDC guidelines that you agree with, and

21  then parts you disagree with?

22       A.      That's correct.

23               MR. ERCOLE:  Objection.  Form.

24       Q.      BY MR. LEONOUDAKIS:  Do you

25  agree with their finding that there's no

Confidential                                                    JAN-MS-05484695

```
 1    evidence to support the benefit -- to support

 2    the use of opioids to treat -- opioids for

 3    chronic noncancer pain?

 4               MR. ERCOLE:  Objection.  Form.

 5               MR. HOFFMAN:  Objection.

 6               THE WITNESS:  No, I don't agree

 7         with that.

 8         Q.    BY MR. LEONOUDAKIS:  Do you

 9    agree with their finding that there is

10    evidence -- there is evidence that shows that

11    it is -- the risk outweigh the benefits for

12    using opioids to treat non -- chronic

13    noncancer pain?

14               MR. ERCOLE:  Objection to the

15         form.

16               THE WITNESS:  I disagree with

17         that.

18               MR. LEONOUDAKIS:  Okay.  All

19         right.  No further questions.

20               MR. HOFFMAN:  I have a couple

21         of quick follow-ups.

22               THE WITNESS:  Sure.

23

24                  RE-EXAMINATION

25    BY MR. HOFFMAN:
```

Confidential                                                          JAN-MS-05484696

Lynn Webster, M.D
February 18, 2019                                    556

1        Q.    Doctor, on the question of --

2   of long-term use of opioids or long-term use

3   for chronic pain, isn't it true that you in

4   fact have collected and published in some of

5   your publications about 15 different studies

6   on long-term use of opioids for chronic

7   noncancer pain?

8        A.    I don't know how many different

9   studies, but there have been quite a few

10  studies, yes.

11       Q.    There have been over a dozen

12  studies addressing the use of chronic -- use

13  of opioids for chronic pain in the three- to

14  six-month window or six months and beyond; is

15  that fair?

16       A.    Yes, that's fair.

17       Q.    And so there -- there are a

18  number of references in the literature that

19  support the long-term use of opioids?

20       A.    Yeah, well beyond what I've

21  published.

22       Q.    Okay.  And so to suggest that

23  there are not studies that support the

24  long-term use of opioids for chronic pain

25  would -- would not be correct?

Confidential                                                    JAN-MS-05484697

1        A.      It's false.

2        Q.      Plaintiffs' counsel also asked

3   you about whether all these studies were

4   designed to detect addiction, if that was an

5   endpoint of the study, those 26 studies in

6   the Cochrane meta-analysis.

7            Do you recall that?

8        A.      Yes.

9        Q.      Is that ever the endpoint of a

10  study that you do?

11       A.      It's not been an endpoint --

12  it's not been an endpoint of any study I've

13  done.

14       Q.      But at the same time, isn't it

15  true that any clinical study that involves

16  opioids monitors patients for signs of abuse

17  and addiction?

18            MR. LEONOUDAKIS:  Objection.

19       Form.

20            THE WITNESS:  Most should.

21       Q.      BY MR. HOFFMAN:  Okay.  And, in

22  fact, those 26 studies in the Cochrane

23  database, they did monitor for signs of abuse

24  and misuse, and that's how they came up with

25  their statistic; is that right?

Confidential                                                    JAN-MS-05484698

1        A.      That's correct.

2                MR. LEONOUDAKIS:  Objection.

3        Form.

4                THE WITNESS:  That's why it's a

5        meta-analysis.

6        Q.      BY MR. HOFFMAN:  So would it be

7   misleading to suggest that the Cochran

8   meta-analysis is not helpful and does not

9   help inform the rate of addiction?

10               MR. LEONOUDAKIS:  Objection.

11       Form.

12               THE WITNESS:  I think it's

13       misleading.

14               MR. HOFFMAN:  Those are all my

15       questions.  Thank you, Doctor.

16               MR. EHSAN:  Read and sign?

17               MR. ROBINSON:  Yeah.

18               THE VIDEOGRAPHER:  Off the

19       record.  The time is 6:56.

20    (The deposition was concluded at 6:56 p.m.)

21

22

23

24

25

Confidential                                                    JAN-MS-05484699

Lynn Webster, M.D.
February 18, 2019                                    559

```
 1   Case:  State of Oklahoma v. Purdue, et al.
     Case No.:  CJ-2017-816
 2   Date:  February 18, 2019
     Reporter:  Vickie Larsen, CSR/RMR
 3
                 WITNESS CERTIFICATE
 4
     State of Utah          )
 5                              ss.
     County of Salt Lake  )
 6
          I, LYNN WEBSTER, M.D., HEREBY DECLARE:
 7   That I am the witness referred to in the
     foregoing testimony; that I have read the
 8   transcript and know the contents thereof;
     that with these corrections I have noted this
 9   transcript truly and accurately reflects my
     testimony.
10   PAGE-LINE   CHANGE/CORRECTION        REASON

11   ____ ____   _____     _____

12   ____ ____   _____     _____

13   ____ ____   _____     _____

14   ____ ____   _____     _____

15   ____ ____   _____     ____

16   ____ ____   _____     _____

17   ____ ____   _____     _____

18   ____ ____   _____     _____

19    _____        No corrections were made.

20

21   _____
     LYNN WEBSTER, M.D.
22
     SUBSCRIBED and SWORN to before me on this
23   _____ day of _____, 2019, by LYNN
     WEBSTER, M.D.
24

25   _____
                          Notary Public
```

Confidential                                                                 JAN-MS-05484700

Lynn Webster, M.D.
February 18, 2019                                    560

```
 1                  Reporter's Certificate

 2     State of Utah        )
       County of Salt Lake  )
 3

 4          I, Vickie Larsen, Certified Shorthand

 5     Reporter and Registered Merit Reporter, in

 6     the State of Utah, do hereby certify:

 7          THAT the foregoing proceedings were

 8     taken before me at the time and place set

 9     forth herein; that the witness was duly sworn

10     to tell the truth, the whole truth, and

11     nothing but the truth; and that the

12     proceedings were taken down by me in

13     shorthand and thereafter transcribed into

14     typewriting under my direction and

15     supervision;

16          THAT the foregoing pages contain a true

17     and correct transcription of my said

18     shorthand notes so taken.

19          IN WITNESS WHEREOF, I have subscribed

20     my name this 20th day of February, 2019.

21

22

23              Vickie Larsen, CSR/RMR

24

25
```

Confidential                                        JAN-MS-05484701

Lynn Webster, M.D.
February 18, 2019

1

---

**$**

$160,000  241:21
$635  199:12 499:8

---

**(**

(1)  96:11
(2)  96:12
(3)  96:13

---

**-**

-warding  445:13

---

**0**

0  234:21 237:8
0.19  500:14
0.27  503:15

---

**1**

1  25:16,18 63:11,13
64:6,11 76:22 128:15
171:18 174:1,16,22
180:14 181:19 211:2
216:10 240:10 303:5,
12 352:6 449:19,21
470:4 501:7,12
504:15 543:24 545:24
546:13
10  106:3 128:17,18,20
129:2 202:4 234:21
237:9 240:10 464:18
473:17,18 510:1
100  141:4 199:10
296:9 430:7 498:17
104  149:15
1066  232:24
1076  234:3,4,5
1077  232:24
10:27  86:18
10:35  86:21
10K  242:2
11  64:11 138:25 139:1
162:21 192:5 377:11
378:17,19 379:8

---

11:53  171:10,12
12  151:11,12,22
161:10 163:25 379:14
463:1,2 468:16 544:3
12-week  535:7
120  37:14 38:7 39:3
446:12 448:10
1262  502:17,19 503:6
543:13
12:32  171:12,14
13  151:11 161:10
166:1 179:9,10
439:10,23
1344  535:24
14  128:23 129:2
180:11 195:3,4
15  205:14,15 441:18
510:1 556:5
16  111:13,14 112:11
128:2 129:8,12
220:6,8
1650  160:24 161:18
162:21
16th  25:21
17  129:13 226:25
227:1
17-year-old  484:12
170  37:18 40:25
448:4,11 540:15
18  10:1,14 231:14,15
559:2
19  351:18,19
19-  82:23
1980  36:11 37:8 91:5,
6 200:20 313:20
1980s  204:3,13,20
205:2,8 444:8
1986  106:18
1989  486:18
1990  36:10 40:1 41:24
42:6 44:22 54:21
61:5 111:20 112:4
254:13 411:14 412:25
1990s  37:20 122:14
134:18 203:23 411:19
472:25
1992  415:16 471:9
1994  471:10
1995  67:12 96:2
413:2,4 470:15

---

1996  64:13 67:13
474:16 481:22
1997  71:18 79:13
82:23 110:8 111:1
457:22,23 491:6
1998  27:1 37:2 97:19
122:22 484:24
1999  74:11 235:6
1:39  243:2
1:52  243:5

---

**2**

2  54:2,4 63:11,13
68:9,21 69:13 130:21
140:7 179:25 211:6
216:11 254:22 354:16
380:25 381:3 415:1
456:21 473:18,22
20  33:24 202:4 386:22
431:12 464:18,19
487:14,15,16,17
508:25 509:15
20-some-plus  313:23
2000  96:5 127:21
128:2,10 130:8 132:6
235:6 373:15 457:6
475:7
2000-2010  475:8
2000s  134:18 258:11
480:6 515:2
2001  96:2 471:25
2002  180:11 190:22
2003  94:7 95:2 97:6
120:22 129:5 549:15,
21
2005  272:14 373:2
2007  103:23 106:4
139:6 150:2 378:8
550:6
2008  150:2 167:11
500:4,8 517:24
2009  167:10 235:7
254:17 456:19
2010  272:15 425:22
445:18 479:16 483:10
503:19 510:2
2011  37:13 38:6,18
39:3,13 41:16 198:7
199:3 446:11 448:10
487:5 498:18 499:7

---

Confidential                                                                       JAN-MS-05484702

**2012**  39:21,22 40:1
43:5,6 205:22 254:14
340:17 355:6 446:19
**2013**  152:8 161:13
235:8
**2015**  501:20
**2016**  450:13
**2017**  39:10,11 41:1
450:13
**2018**  25:22
**2019**  10:1,14 448:11
559:2,23
**21**  136:15,16,17,20
497:7,9,11
**22**  501:23,24 502:1
543:10,12
**228**  520:15
**23**  517:11
**24**  528:6
**24-hour**  462:17
**242**  489:13
**244**  493:9
**246**  494:2
**25**  533:18
**250**  139:25
**259**  235:9
**26**  503:10 504:12
544:14,18 557:5,22
**286**  530:7
**29**  109:25 110:7
475:25 476:1
**2:13**  270:22
**2:15**  270:25

---

**3**

**3**  63:5,6 64:7 81:8
187:11 211:10 303:12
355:16 380:25 388:24
389:1 420:1
**3.2.4**  136:8,17
**3.27**  500:13
**30**  91:7,9 286:15
313:20,21 319:2
321:15,18 508:25
509:15
**34.5**  108:24
**396**  489:20
**3:39**  360:15

---

**3:53**  360:19

---

**4**

**4**  63:11,13 68:5 69:25
70:1,22 71:2 75:17
79:3,15 179:14,17,22
181:18 182:6,15
242:2 359:1 440:2,3
**4,893**  503:12
**40**  167:14 186:7,9
286:16 319:2 464:19
**447**  195:25

---

**5**

**5**  78:19,20 79:6 82:3
155:21 179:14,17,22
186:1 188:15 191:15
363:13,16,23 415:2
**5,000**  504:13
**50**  37:18 39:9,12
161:2 430:24 448:14
508:24 509:14
**560**  199:11 498:19
499:7
**5th**  234:20 235:21
440:3

---

**6**

**6**  88:6,9,11 101:18,19
155:20 158:4 503:13
**60**  325:21
**600**  108:9
**62**  507:6
**621**  155:25 156:2
**635**  498:20
**65**  519:12
**665,500**  241:10
**6:00**  505:7
**6:14**  505:10
**6:56**  558:19,20

---

**7**

**7**  94:18,19 187:10
232:23 469:9,10
**70s**  258:6

---

**74**  520:16

---

**8**

**8**  104:20,21 469:25
470:5,7 473:17,22
**80**  193:14 267:18,25
325:3
**80-milligram**  75:2
**80s**  36:10,12,17,25
37:3 53:24 200:23
201:1,6 202:10
313:23 411:13
461:10,13 469:23
**85**  519:12
**858**  490:6
**892**  500:2

---

**9**

**9**  109:24 127:19,21
129:24 375:25 474:12
**9,500**  165:1
**90**  325:16 326:1
**90s**  36:17,25 39:21
53:24 76:15 120:5
258:10 366:17,19
367:13 370:3 373:12
386:21 413:16,22,25
456:12 461:14 469:23
479:16
**95**  481:22
**96**  65:24 66:3,10,20
67:15
**9:11**  10:1
**9:12**  10:20

---

**A**

**a.m.**  10:1,20 171:12
**AAPM**  13:23 14:7 52:4,
6 53:9 163:4 164:7
166:7,13 167:14,20
**AAPM's**  163:6 167:5,22
**AAPMANAGEMENT**  53:7
**AAPMED**  53:5,6,10
163:18 165:5,22
**AAPMEDICINE**  159:1,8,
19,24 160:3

Confidential

JAN-MS-05484703

AAPMedicine's  160:5
Aaron  46:18 47:5
  90:10
abbreviation  145:15
abbreviations  144:16
aberrant  247:3 372:22
  494:18 500:10
ability  464:25 512:8
  521:25
Abingdon  108:2
absent  521:23
absolutely  63:25
  269:2,7 300:3 419:9
absorbed  277:21
  421:10 476:13
abusable  109:1
abuse  22:20 25:1,3
  35:9 57:14 69:3 95:4
  96:7,13,15 99:16
  100:1,5,11,18 102:4,
  7,14 103:2 107:4,11
  108:16 176:24 186:12
  190:1 191:11 192:1
  204:8 230:18 241:1
  260:2 297:2,8,13
  299:13,18 302:2
  317:8 332:25 352:11
  354:23 358:14,21
  360:7 365:10 368:1,
  11 414:18 438:8,10
  465:12 476:5,7,12
  482:25 483:1 490:21
  496:15 500:16 501:5
  504:10 509:11
  557:16,23
abuse-risk  186:6,8
abused  57:15 226:5
  255:15 259:12,13
  354:19 355:10 433:11
abusers  99:25 422:5
abuses  297:1
abusing  259:25 333:5
ACA  167:9
academic  41:15
Academy  13:12,13,15
  26:20 34:1 48:20
  152:23 161:5,19,22
  162:22 163:1 166:23
  196:7 197:19 214:22
  307:4,9,18 308:5,8,
  11 309:1,12 502:2

accept  549:12
acceptance  74:2 77:9
accepted  208:23 209:8
  491:13
access  37:21 45:13
  230:7 352:10 353:10
  357:12 455:10 456:10
accessing  450:24
accidental  354:23
account  293:23
accountable  325:9
Accounting  95:19
accreditation  471:20,
  24
accrediting  471:23
accurate  172:5,11
  174:2 519:18 520:22
  521:2 522:9,14
accurately  239:17
  492:2,3 532:21 559:9
accusations  427:14
accused  263:16
acetaminophen  57:9
achieve  74:22 468:17
achievement  119:3
acknowledge  354:8,11
  355:9 356:6 357:11
acknowledged  108:13
acknowledgment  164:23
acquired  24:7 284:12
  411:7
acronym  337:21
Act  167:10,11
Actavis  279:17,20
  280:1,6,12 281:15,20
  282:8,10,15,19,24
acting  107:2 186:19
  189:6 462:12 517:3
action  75:23 108:12
  208:10 211:15 403:10
  407:6 408:17,23
  410:1 423:20
actions  96:14 97:15
  211:1 212:11 251:4
  252:8 401:24
Actiq  18:20 19:2
  22:18,21,23,24 23:13
  127:14,21 129:24
  130:23 131:1,23
  136:5 146:7 147:4
  148:4,21 150:4,13,17

  277:22 284:12 328:8,
  10 329:6,12,25 330:4
  332:16,18 339:24
  348:10 350:3,7,21
  355:8 356:7 358:4
  359:18 364:11 376:1
  516:25 523:16 524:2
  525:3,12 526:9,18,22
  527:4,19 528:1
  529:4,8,15,16,25
  531:13,20 533:3,12
  537:24 538:11
Actiqs  327:10
activation  330:22
active  62:24 99:17
  166:8 397:2,13 398:2
  421:15 433:25 434:1,
  2,11,12
actively  229:20
activities  227:24
  278:16 513:14 522:1
activity  382:12,16
  532:17 533:6
actual  105:16 172:15
  404:15 470:5
acute  36:13,14 292:16
  444:21 458:21 461:15
  471:9 479:3
ad  164:22
ADCOM  21:21 24:3 90:6
add  102:13 270:18
  403:10
added  345:20
addendum  362:21
addicted  171:18
  175:14,21 176:13
  177:6,11 178:5
  266:14 267:6,14
  369:6 393:21 394:2,
  21 412:15 415:20
  467:8,13 500:13
  552:23,25
addiction  26:16,22,24
  27:7 35:9 37:2
  125:5,8 172:3,15
  173:15,23,24 174:15
  175:9 176:8 177:18
  178:17,20 179:1,5
  235:1 246:2,8 255:11
  259:2,19 260:5,6,8
  266:16,25 269:1
  297:13 316:20 317:8,

Confidential                                                      JAN-MS-05484704

Lynn Webster, M.D.
February 18, 2019

4

9 342:4,10,16 343:7,
23 352:12 360:7
365:10 367:22 368:2,
11 372:23 374:14
407:12,15,16,20,23
408:19 410:2,13,19,
23 411:24 413:15,17
414:7,18 415:3
416:10,20 419:7,12
433:3,6,8,25 434:1,
13 436:17,23 437:20,
22 438:1,10 439:2
450:22 467:2,5,10
491:7 495:12,13,21
496:22 500:1,10,16,
17 501:5,6,12
502:13,21 503:9,14,
23 504:14 543:22,24
544:24 545:8,15,23
546:8,12 557:4,17
558:9

**addictions** 416:22

**addictive** 106:13
107:3,11 108:15
109:1 218:22 243:20
405:18

**addicts** 269:9

**adding** 402:5 403:2

**addition** 54:11 60:3
490:6 530:19

**additional** 186:1
211:10 286:24 345:15
361:17,22 404:21
420:14 469:22 526:6
533:22

**additionally** 11:17

**additive** 393:6

**address** 95:5 96:14
125:3 210:8,21
339:24 401:24 434:16
517:7 525:5

**addressed** 286:4 342:8
436:16 438:7 541:7

**addresses** 523:22

**addressing** 197:25
328:11 556:12

**adequate** 531:6

**adequately** 97:14

**adjunct** 403:3

**administered** 178:2

**Administration** 95:25
97:9 490:22

**admitted** 285:5

**adolescence** 268:4

**adolescents** 268:17

**adopted** 234:22

**adoption** 491:6

**adult** 235:11

**adults** 199:10

**advance** 214:25 220:3
304:3 305:11 307:11,
16

**advances** 454:9

**advantage** 185:15
421:19 422:9

**advantages** 397:24
421:24 422:1 468:21

**adverse** 325:10 459:22
460:1

**advertisements** 549:6,
22

**advertising** 97:16

**advice** 67:2

**advising** 99:21

**advisory** 21:12 514:5

**advocacy** 50:2,4 52:2,
3,5,6,12,20 152:6,7,
16,18 153:12 154:14
155:1 157:14 158:9
163:4 209:19 212:17
237:19 304:6,7
309:19 310:16,19
312:3,9,23 313:2,4
377:12 379:11 381:4

**advocate** 44:13,18
45:9 197:20 229:2
310:21

**advocates** 45:4,21,25
228:4

**advocating** 45:12,15
52:21,23 295:4

**affairs** 167:6

**affect** 110:18 198:16

**affected** 199:11
385:20 498:17

**affecting** 199:3

**affects** 249:7 331:21
451:4,10

**affiliated** 50:6,8

**afflict** 43:24

**afflicts** 43:24 44:2,
4,7

**afford** 452:24

**affordable** 455:11

**afraid** 447:14,15,16

**afternoon** 271:4 384:1

**age** 201:17

**agencies** 211:3,17
216:2,12,21

**agency** 471:6 476:10

**agent** 397:13

**aggressive** 97:10
102:6 103:1 104:15
106:22 481:11 548:20
549:2

**aggressively** 101:1,10
234:19

**aging** 201:17

**agonist** 406:5

**agonists** 406:6 423:21
424:4

**agonize** 409:1

**agonized** 406:3

**agree** 27:18 28:2,7,18
31:14 39:15 42:16
78:6 83:21 85:1 99:1
103:6 105:7 112:21
113:7 119:6 169:17
218:19 223:25 233:22
234:11 239:9 241:5
248:18 251:4 257:6
258:18,21 259:1
260:6 263:1 266:9,23
275:22 276:1,6,14
336:22,23 356:10
358:12,19 390:2,8,
14,21 391:1,8 403:20
404:19 474:7 475:3
478:10 481:3 510:13,
14,20 511:1,8,14,24
512:7,13,23 513:19
554:10,20,25 555:6,9

**agreed** 31:13 101:25
108:8,24 109:16,24
111:7,10,17 112:9,14
210:25 212:11 221:3
259:8 262:15 295:17
356:12 362:7,8
543:21 549:15

**agreeing** 263:7

**agreement** 357:13,21
358:3 359:2,9 362:2,
11,18,24 363:19
366:25 367:1,5,8,15,

Confidential

JAN-MS-05484705

Lynn Webster, M.D.
February 18, 2019

5

16
agreements  24:17
agrees  210:23 357:24
ahead  71:11 153:25
  154:4 156:6 288:6
  291:14
aired  450:13
Alan  90:18,20
alcohol  415:20 500:15
  501:4
alcoholism  125:8
  249:16
alerted  99:25
align-  397:22
aligned  155:3 159:9
  454:25
allegation  507:16
alleviate  512:14
alliance  208:10
  209:18 212:16
allies  155:5
allowed  117:21 274:20
  332:19
allowing  531:4
alter  392:22
altered  323:11
alternative  74:18
  124:24 126:10 456:10
alternatives  73:24
  320:4,7 387:20 509:9
ambiguous  18:4
amend  67:3
America  198:7 199:5
  202:17 203:5 210:4
America's  454:1
American  13:12,13,15
  26:19,20,21 34:1
  48:20,25 49:18,20
  50:10,13 152:22,23,
  24,25 153:1 161:5,
  19,21 162:22 163:1
  166:22,23 167:7
  173:1 196:7,10,13,15
  197:19 201:6 211:6,7
  214:22 235:10
  303:17,21 304:13
  305:1,23,25 306:7,
  14,23 307:4,9,13,18
  308:5,8,11,14 309:1,
  4,12 310:4 312:11,19
  452:17 470:15,24

491:7 502:2
Americans  37:14,19
  40:25 174:3 199:3
  200:10 408:1,5
  446:12 448:5,10,11
  451:4,10
Amid  95:21
amount  39:24 91:23
  99:24 116:7 248:14
  256:25 261:9 361:17
  370:1 433:9 448:18
  486:7 496:8 526:2
amounts  369:12
analgesia  423:25
  462:3 536:24
analgesic  57:11,16,23
  59:4,8
analgesics  57:19,21
  58:11,19 60:19
  470:14
analyses  457:24
analysis  115:12
  263:18 316:6
Analysis/data  182:2
analyzed  154:25
  397:20
analyzing  231:9
ancestors  420:13
and/or  155:7 341:15
  359:7 414:24
anesthesia  26:14,15
  461:20 462:7
anesthesiologist
  313:22 369:7 388:8
  486:12
Anesthesiologists
  166:23
anesthesiology  26:19
  35:25 36:5
anesthetic  369:13
animal  386:4
announced  54:6,9
announcements  163:8
annual  49:11 163:6
  164:22,24,25 208:9
  241:21 242:13
annually  199:12
  498:20 499:8
annuity  202:7
answer's  274:11

anymore  219:18
anything's  247:7
API  62:11,24 76:17,18
APIS  62:18
apnea  393:11
apologize  73:24 77:6
  160:22 302:23 331:4
appalling  157:5
appearance  99:10
appearances  10:22
appeared  102:12
  311:12 462:16
appears  128:16 463:14
  503:9
applicable  349:12
application  487:6
applied  286:2
applies  349:25 514:7
apply  361:24 510:12
appreciated  369:16
approach  81:4 227:16
  251:24 481:23
appropriately  235:4
  259:15 492:14 533:13
appropriateness
  358:13,20
approval  352:1 480:10
approve  514:12 515:17
approved  21:11,15
  25:10,11,12 67:11
  95:25 287:7 288:24
  295:15 328:5 345:4,
  23 348:11,22 349:2,
  11 357:3 370:15
  411:22 476:10 478:6
  480:8,19,21,23
  481:21 515:12 516:11
  551:6
approves  295:25
approximate  250:2
approximately  446:12
  498:17
APS  49:2,5,14 50:2,6,
  8,9 165:5
area  27:7,9 300:25
  444:22
areas  27:4,8 100:7
  197:20
Argoff  88:22
argument  228:21

Confidential                                                                              JAN-MS-05484706

Lynn Webster, M.D.
February 18, 2019

6

Argumentative 225:18
arises 72:8
arising 72:10
arm 397:1,2,3 398:2
  437:15 490:25
Arnold 128:2,7
Aronoff 88:25
around-the-clock
  355:24 525:17
arrhythmias 435:9,10
arrival 11:17
art 122:12,17
arthritic 509:1
arthritis 314:22,23
article 110:4 237:13
  484:3,4 486:17
  487:4,20 489:13
  490:18 493:8,15
  497:21,23 501:19
  517:13 521:17
  528:11,17,24 533:23
  534:5,7,13
articles 81:18 250:8
  333:16,19,25 334:1,
  3,8,10 336:14,15
  341:15 496:16 497:5
  527:25
articulate 404:6
articulated 302:11
articulating 199:7
ASA 160:1
asks 105:8
aspect 166:13 323:10,
  12
aspirin 57:9 117:11
aspiring 343:18
assess 100:9 174:10
  176:6,24 177:1,22
  178:10,15 179:3
  236:11 240:7 297:16
  333:4,12 358:12,19
  372:7,8 374:6 389:12
  449:11,17 450:4
  451:20 472:22 545:3
assessed 178:19
  392:16 416:13
assessing 175:24
  316:10 473:13,16
  523:14 551:13
assessment 234:23
  316:14 337:1 372:7

390:5 391:18 472:13
  546:5
assessments 175:4
  545:7
assist 167:16
associate 75:23
association 72:6,8
  153:1 162:24 196:10
  197:18 304:1 310:5
  312:12,19
associations 48:24
  303:8,13 313:9 473:9
  489:7
assume 84:4 145:9
  146:4 189:10 210:24
  316:20 519:24 550:5
assumed 185:9 465:25
Assumes 30:22
assuming 130:1 280:9
assumption 327:21
assumptions 51:10
assure 352:21
asterisk 143:22
astounding 448:15
attached 227:23
attack 324:12
attempt 333:11 338:1
  361:10
attempted 290:6,9
  308:3
attempting 488:7
attempts 210:13
attend 34:6
attended 34:14 341:19
attending 54:10
attention 440:2
  444:23 469:24 475:24
  497:5 500:2 543:12
attitude 45:18
attorney 104:24
  105:20
attractive 99:20
  459:23,24
attributable 281:8
  282:23 397:12
attribute 420:5
attributed 198:5
attributes 74:2 77:8
audience 33:5,7

audio 270:14
author 334:2,6
  336:21,22 337:6,11
  502:9 528:13
authored 334:9,14
  517:13
Authorization 167:10
authors 528:14,18,21
  533:2
availability 100:2,10
  125:11
average 321:14 452:16
avoid 74:21 317:25
  467:23 525:4
avoided 72:16
Avoiding 302:2
Awaken 68:5
awakened 69:17
awakening 63:15
aware 17:19 43:8
  47:3,5,7 50:5,21
  61:4 67:11 72:3
  75:20 76:5,8 77:21
  84:22 85:19,23 86:5
  87:4 92:4,16 95:7,
  10,17 98:9 100:16
  101:1,5 102:17,20
  103:20 104:2,14
  110:10 119:23 135:4,
  23,24 143:3,8
  150:15,23 151:3,9
  153:4 178:23 184:9
  185:3 193:24 195:16,
  20 196:24 197:5,10,
  11 204:24 215:17
  221:25 231:24 235:23
  261:22,23 262:2
  265:11 266:1 267:17
  273:15,21 275:12
  280:4 281:7 282:17,
  22 283:19,24 284:24
  286:3,4 291:21
  296:12,15,21 298:10
  305:12,22,24 306:20
  307:24 308:1,16,23
  310:1 312:13,14,16
  313:6,11 334:16
  341:18 346:25 357:2,
  25 368:23 369:13
  423:19 427:9,13
  436:14 443:4,9
  472:18 480:15 491:20

Confidential

JAN-MS-05484707

506:17 507:15 513:25
514:7 537:24 541:23
545:6 547:9,12,16,23
548:3 551:18
**awareness** 95:22
165:18,23 470:25
473:10
**awful** 269:15
**axis** 158:14,19,20

**B**

**B(1)(b)** 353:8
**back** 76:14 78:22
93:6,8 117:6 120:4
129:24 135:15 151:18
183:7 184:3 187:12
188:15 192:20 194:7
213:19 228:11 246:12
247:8 314:11,13,14,
15 316:5 318:20
319:3 323:19,20
329:1,2,9,23,24
342:13 343:14 360:24
407:25 408:16 425:20
457:22 461:7 463:11
467:17 474:7 479:15
505:12 508:25 509:14
531:5 544:5 545:11,
18 546:18
**Backed** 106:22
**background** 26:7 56:5
214:19 233:16 234:8
498:6
**bad** 123:8 275:7,10
**balance** 115:16 455:4
**balanced** 102:12,19
295:12,14,16 296:4
**ball** 320:21
**bar** 351:1
**Barry** 89:7
**based** 122:9 125:19
138:2 149:2 159:7
278:16 300:4 343:17
362:17 372:14,19
375:9 401:19,22
407:5 441:5 447:19
491:11 506:3,11,20
509:12
**basic** 304:2,10 305:10
307:14

**basically** 25:3 169:1
195:15 313:21 321:25
324:6 327:7 336:2
338:1,11 342:6
350:25 357:24 387:9
463:6 464:17 465:5
479:2
**basis** 59:23 60:2,5
78:15 82:18 418:12
422:8 440:23 461:8
505:21 526:3
**basket'** 59:1
**Bates** 128:21 151:22
155:24 160:20 195:24
206:1 232:24 233:2
234:2
**Bates-labeled** 381:1
**bathroom** 86:14 505:5
**Beaver** 57:17
**bed** 319:1 385:2
**began** 36:18 37:4 96:6
332:25 342:15 343:2
**begin** 467:6
**beginning** 44:22 54:7,
15 71:22 152:14
340:16 355:6 374:1,
19,22 470:7,10
472:25 482:5 495:1
509:24
**begun** 414:6
**behalf** 11:1,5,8,11,13
99:13 360:21
**behavior** 184:5,19
243:19,21,24 246:20,
25 247:3 400:7
422:24 488:17,20
**behavioral** 243:21
342:12
**behaviors** 227:17
228:5 243:16,24
247:25 252:8 372:22
494:19 500:10
**belabor** 535:22
**belief** 189:4 210:7
373:19 413:18
**believed** 191:3 449:10
457:25 458:6 476:10,
20,21,22 508:1 527:5
**believes** 147:2,3
191:4
**believing** 428:10

**beneficial** 478:11
508:2
**benefit** 115:6,12
117:2 119:10 272:23
305:2 316:11 318:11
320:8 390:10,18
398:15 417:18 424:2,
3 452:1,11 482:17
503:8 508:10 555:1
**benefited** 318:6,14,16
**benefits** 33:15
364:16,20 389:14
468:12 481:18 483:15
510:11 513:23,24
514:9 525:11 526:12
531:12 552:4 555:11
**benefitting** 323:24
**benzodiazepine** 369:20
391:24 392:7
**benzodiazepines**
391:20
**benzos** 393:7
**bet** 30:4 505:1
**bias** 398:1
**big** 38:1 248:10
259:19 295:3 387:14
466:24
**bilateral** 367:4
**bill** 475:14
**billion** 199:12 498:20
499:7,8
**billions** 107:6
**bills** 167:9
**binds** 210:6
**bioavailable** 57:3
**Bioethics** 442:14
**biological** 268:5
410:25
**biology** 407:16 409:16
419:24 420:3
**biomedical** 211:11
**bit** 128:16 216:5
461:13 462:4 467:18
484:8 516:24 541:15
**black** 345:8,14,24
**bladder** 332:13,14
**blah** 228:18
**blame** 126:8
**blamed** 324:12
**blind** 397:7

Confidential

JAN-MS-05484708

blinded  396:14,15,17,
  25 397:8
blizzard  65:24 66:2,
  10,20,22,23 101:11
block  442:12
blocking  230:7
blood  278:6 466:18
Blueprint  199:5
board  21:12 26:14,19
  164:22 286:17 309:25
  437:14,15
board-certified
  26:15,17,18,24
boards  490:20 491:5
  542:19
Bob  220:15 241:14
  242:15
bodies  296:1 386:4
body  295:23 386:3
  471:23
Bohne  10:15
boil  463:22
bold  162:5 440:11
bolt  398:19
book  164:24 246:22
  301:12,23 302:7,11,
  15,16 303:3 387:6
books  301:11,20
bottom  76:22 107:25
  126:11 128:20 140:23
  143:22 151:23 180:14
  193:4 206:1 209:10
  234:5 359:1 381:9
  470:1 472:7 489:15,
  16 493:10 494:14
  500:3 518:3 544:8
bounce  385:9
box  192:13 193:3,13
  194:9 345:8,14,24
boxes  192:7,9 194:5
boy  384:25 385:4,25
BPT  520:8
brain  169:2 411:10
brain's  406:25
brand  155:14 255:9
  276:24
brand-name  96:4
branded  18:20
brands  155:4
break  86:12,19 171:11

242:25 243:3 270:23
  337:14 360:11,16
  443:14 504:24 505:8
breaking  277:25
breakthrough  131:14,
  24 132:9 133:2,23
  134:2 144:2 145:6,11
  147:3 148:16 149:23
  150:18 326:11,17,21
  327:13 328:7,16
  329:12 330:21 332:17
  333:17,20 334:1,9
  355:21 517:8,14
  519:8 523:18,22
  524:2,11,22 525:6,
  19,24 528:2,25 535:4
breathing  364:1
briefly  543:10
briefs  198:18
bring  106:14 165:23
  176:10 214:24 331:1
  335:22 428:17,18
  477:25 478:1,5
bringing  123:5 151:16
broad  313:1
brought  12:8 35:21
  109:5 215:3 249:11
  319:13 391:19 411:21
  434:15 452:13,14
Brownlee  105:21
Bruce  227:8
Bryan  11:12
BTP  144:16 145:1,2,5
  518:22 519:4,10
  520:17 521:19,22
  522:20 523:7 530:20
  537:2
bubble  461:12
buccal  535:2,15
  536:8,22
bucks  165:1 241:10
budget  241:10
building  202:7 271:21
built  482:13
bullet  60:14,17
  131:5,11 132:19
  140:17 149:18 153:13
  154:9,24 155:12
  157:15,16 164:5
  165:12,16 167:19
  183:3,7 184:1,17
  185:12 186:2 187:1

192:14,17,18,22
  193:16,18 229:21
  230:1
bullseye  144:12,16
  146:16,25
buprenorphine  434:11
  436:3,13,16 437:1
burden  165:18,23
  197:25 452:23
burdens  163:11
bureau  299:11
bury  66:22
business  50:20,22
  117:22 180:24
  218:14,16,20 219:1
  224:3 254:7
businesses  114:9
Butrans  21:10,15
button  462:3
bypass  369:9

C

call  87:6 91:18 92:18
  193:25 414:19 450:5
  469:24 475:23 497:4
  500:1
called  11:22 21:10
  38:21 168:20 194:21
  232:20 290:22
  308:10,14 311:9
  378:7,8 450:14
  460:20 472:14 507:5
  546:24
calling  26:8
calls  31:18,24 229:19
  360:24
camera  238:5
campaign  72:20 96:23
  106:23 107:4 311:10
canal  273:9 278:12
  386:13
cancer  36:19,22 61:9,
  15 72:17,25 73:6,9
  74:4,12,20 75:3
  80:4,15,20 81:5
  95:23 97:2 114:13
  131:14,24 132:9
  133:2,23,25 134:2,10
  145:11 149:23 150:18
  152:24 201:25 202:1

Confidential
JAN-MS-05484709

233:10 313:24
327:17,19,23 328:2
355:22 356:21 444:20
451:11 470:14 471:9
509:18,25 510:4,7
518:23 519:10 521:9,
12 523:8,14 535:5
545:17
**cancer-related** 328:7
458:21
**candidates** 509:7
552:13
**capacity** 396:11
**capita** 457:8
**captured** 181:22
**captures** 73:25 77:7
**car** 319:3
**cardiac** 435:8
**care** 16:8 37:21 97:1,
8 98:2,10,16 99:2
119:1,4,12 120:10,22
121:5,8,9,11,15,16
122:13 152:7 154:19
163:2,3 166:16,19
167:1,6,9,11 184:3
192:19,21 199:6
211:9 234:24 236:20
286:12 314:16,18
318:22 431:1,5,12,
14,15 432:6 451:1
453:8,20 454:12,24
455:10 470:19 471:6,
8,17,21,22 490:9
498:21 525:18
**career** 33:1 387:12
**careful** 28:4,9 81:15
**carefully** 345:19
**caregiver** 359:7
**caring** 393:17
**carried** 385:2
**carries** 14:18
**carry** 24:6 140:5
**case** 10:10 12:8,13,
14,17 14:25 17:4,8,
12,16 18:22 46:1
47:4 73:14 90:13
119:23 181:7 206:16
207:13 222:2,15,19
243:17 273:17,23
275:14 292:23 458:13
482:24 484:11 507:5,
21 523:2 539:16

559:1
**cases** 319:16 335:14
396:24
**categories** 227:10
362:6
**categorization** 227:5
**categorized** 229:8
406:5
**category** 228:7 339:19
341:24
**catheter** 386:13
**causal** 240:23 241:6
**caused** 37:10 249:17
422:14
**causing** 387:18 400:23
430:3
**cautioning** 247:22
**cautious** 247:19
**CDC** 324:25 325:4
553:24,25 554:10,14,
20
**CDC's** 240:22
**cell** 243:23 484:16
**center** 93:25 146:20
414:22 436:23 442:14
**central** 423:23 509:5
**centuries** 106:8
**century** 370:4 373:15
**CEO** 55:19 71:8
**Cephalon** 17:20,24
18:20 19:8,13,23
20:17,21 21:18
22:10,11,17 23:3,9,
16 24:5,6,21 126:22
127:2,14,17,25
128:11 129:4,11
130:3 132:7 133:16
137:19 138:1,9,15,18
143:4 144:22 146:24
148:9 149:1 150:3,11
151:7 154:10 183:16
217:16 261:22 284:5,
8,11,17,24 285:1,5,
15,22 299:7,8,16
347:9 350:7 375:19
380:10,13 382:11,16,
22
**Cephalon's** 18:12
**CERTIFICATE** 559:3
**certification** 364:9

**certified** 353:3,4,8
**cetera** 81:18 230:22
393:11 509:4,16
**chain** 78:22 441:20
**chair** 385:3,13 442:13
**challenging** 106:7
130:24
**chance** 12:12 54:17
443:25
**change** 74:14 81:15
169:2 266:8 319:7
514:18
**CHANGE/CORRECTION**
559:10
**changed** 258:10
405:11,15 409:3
**changing** 438:15
**charge** 108:5,23
**Charles** 88:22
**chart** 142:19 158:5,7
159:7,22 170:1
**cheap** 255:8 456:23
**cheapest** 124:25
456:17 457:14
**checked** 471:2
**checkered** 233:17
234:9
**cheerleading** 455:7
**chemicals** 172:24
**chemotherapy** 202:2
**chew** 463:24 464:2
**chewed** 422:21
**chicklets** 230:21
**chief** 108:19,21 112:6
399:11,15 449:21
**child** 107:24
**childhood** 384:18
**children** 199:8 323:7
511:10
**China** 258:24
**choice** 73:12 106:24
187:3
**choose** 188:25
**choosing** 385:23
**chose** 27:11 292:20
**chosen** 73:13
**Christopher** 89:3
197:15,17 205:18
207:25 209:3 214:15
220:16 241:14 441:25

Confidential                                                                                          JAN-MS-05484710

442:8
**Christopher's** 242:13
**chronic** 37:15,23
  42:1,19 43:2 44:20,
  24 60:21 93:24 95:23
  106:11 152:25 154:13
  163:11 168:22,23
  174:5 175:14 178:3,
  20 183:7 184:2
  187:12 190:12 194:7
  201:4 202:5 209:21,
  25 211:12 212:19
  235:2 310:4 312:11,
  19 313:24 322:7,9,
  10,14 323:12 326:10,
  18 342:24 373:17
  374:8 384:17 386:7
  388:12 394:10 399:24
  413:24 414:7 415:17
  423:7,16 429:10,16
  430:1,8 432:14
  436:10 444:19 448:5,
  12 450:21 451:20
  473:10 493:17
  495:12,21 496:22
  497:13 498:16 500:24
  502:21 503:13 509:7,
  14 512:19 517:15
  519:10 520:16 522:21
  529:1 530:1 535:5
  537:2 545:17 555:3,
  12 556:3,6,12,13,24
**Cicero** 89:5
**cigarettes** 415:20
**circumstances** 17:3
  226:11 478:16
**citation** 77:10 499:10
  503:18
**citations** 303:1
**cite** 499:10 501:3
  543:15,20 544:2,3
**cited** 41:3 235:8
  387:8 446:8 489:4
  499:14 503:1 524:17
  540:15 549:4,21
**citizen** 502:3
**citrate** 529:3,14
**City** 89:14 271:18
**civil** 108:9
**civilized** 457:8
**CJ-2017-816** 10:11
  559:1

**claim** 15:5,8 107:10
  110:4
**claimed** 106:19,25
  386:19
**claiming** 108:14
**claims** 107:13
**clarification** 16:6
  407:25
**clarify** 71:23 115:1
  488:16 495:4,5
**class** 254:19,20
  349:12 516:10
**classified** 467:11
**clear** 54:6 216:6
  264:5 274:12 310:19
  316:20 428:1,25
  436:18 494:4 539:5,
  11
**Cleveland** 10:9
**climb** 266:24
**clinic** 116:19 185:1
  244:25 386:8 548:2
**clinical** 19:14,21
  24:3 27:6,11 56:22
  57:18 59:25 60:3
  78:16 91:8 110:16
  175:12 178:2,19
  313:15 334:24
  396:11,12 416:5
  417:11,14,15 418:13,
  17 421:18 423:1
  424:9 445:19 459:10
  477:11,25 480:9
  483:9 488:3 494:6
  527:18 557:15
**clinically** 237:3
  317:16 459:15 474:1
**clinician** 27:15
**clinicians** 304:3,10
  305:7 307:12 317:10,
  17 461:9 467:2 471:1
  492:10
**clinics** 184:19 185:5
  457:5,10
**close** 160:1 311:5
  383:22 543:7
**closer** 159:23 160:2
**clout** 158:21 159:4
**CM-** 298:4
**Cmax** 466:18

**CME** 20:2 129:16
  294:15,19 295:14,25
  298:5,11 346:11,16,
  22 347:2
**CMES** 90:4 295:7,11
  296:5,7,14 297:1,25
  300:19 507:14
**CNMP** 500:11,22
**co-author** 46:6 497:6,
  14 533:24
**co-authors** 487:21
  488:8 489:2 501:3
  534:4 537:10
**co-counsel** 484:1
  508:9
**co-morbid** 315:16
**coalition** 166:16,20
  167:2,5,6
**coauthors** 46:17
**cocaine** 204:7 205:4
  415:20
**Cochran** 558:7
**Cochrane** 544:7,11,18
  545:7,22 546:21
  547:5 557:6,22
**codeine** 80:13
**COGENIX** 129:14
**cognitively** 316:8
**cognizant** 247:25
**coincidental** 51:4
**coined** 243:25 244:2,
  17 405:6
**Cole** 89:7
**colitis** 314:21
**collaboration** 210:14
**collected** 556:4
**collective** 211:2,16,
  21,23 216:11,19
**collectively** 108:24
  214:25 375:4
**college** 289:5 386:2
**column** 95:12 489:15
  493:9 494:15 498:12,
  15 500:3 502:18
  543:16
**columns** 182:1
**combination** 57:9,19
  59:8 75:24 77:23
  85:24 86:9 369:18
  392:21 544:14

Confidential                                                JAN-MS-05484711

Lynn Webster, M.D.
February 18, 2019

11

combinations 57:15,22
72:10,19 74:22 85:12
combine 210:20
combined 393:8 451:12
comment 192:7,9,13
193:3,12 194:5,8
207:5,8,11 376:20
554:12
commentary 206:18
207:6,24 488:2
497:15,19
comments 70:9 101:19
102:16
Commerce 66:25 67:3
Commission 234:22
235:24 471:20
committed 167:20
204:2 210:17 213:4
committee 49:8,11
50:23 51:14,16,19
167:5 208:19 209:4
210:23 212:9 216:16
233:11 242:6 306:17
committees 220:5
514:5
committing 324:22
common 42:22,23 43:2
209:22,23 210:17,21
212:20,21 213:4
286:15 288:8 314:10,
11 341:10,14 418:8
470:18
commonly 44:24 57:8
200:23 460:9 525:10
535:16
communicate 119:20
communicated 48:7
communication 210:13
280:21 413:8
communications 15:12
88:12 110:17 222:6
279:20 280:17
communities 249:18
259:25
community 154:12
176:11 429:19 472:12
474:8 476:22
comorbid 374:8
402:11,19
companies 17:8,11,15
91:17 92:4,17 115:3,

5 117:20 118:22
119:14,19 124:24
126:9,15,18 134:21
135:19 150:24 196:18
213:9,11 215:9,12,14
218:6 222:16 226:18
251:8,21 254:25
265:20 275:17,18
284:18 298:2 299:3
302:14 304:15,20,21,
24 305:23 306:2,10
308:2,17,24 312:15,
17 320:4,6 334:19,25
335:5 339:16 347:5
371:20 396:21
451:24,25 452:10,13,
20,22 453:3,8,19
455:8,13 456:8,24
457:1,16 477:13
506:4,21 541:15,19
542:4,18,25 550:17
companies' 184:11
company 13:7,9,11
15:8 24:22 64:12
105:22 108:3 118:16
129:16,17 156:12
180:17,21,22 188:10
191:15 221:14 228:16
279:13,17 283:11
284:14 298:16 299:9
302:5,9 306:21 313:7
335:4,11,12,20 336:9
337:7 338:11 396:4
442:21 443:4 541:25
542:9 550:23
company's 28:25
115:14 181:2
comparable 56:21,25
57:24
comparator 177:25
compare 177:3
compared 57:3 535:2
compensation 242:11
competition 58:15
59:3 62:5 66:23
competitive 67:1,3
complained 399:24
complaining 403:24
complaint 12:13
181:15 314:11
399:11,15,19 449:19,
21,22 507:4

complaints 460:14
complete 353:11 354:3
357:12 366:22
completed 361:9 362:4
completely 94:10
completion 227:9
complex 71:24 79:5
251:25 258:14 314:16
330:19
complicated 124:20
complicates 402:20
complication 365:22
complications 352:12
365:19 388:22
component 305:10
compounded 273:14
comprehensive 100:12
162:25 413:7,13
comprised 309:13
compromised 119:5
concept 228:22 245:2,
23 248:3 404:15,20
453:5 460:22 462:6,
16 465:2 472:18
485:21 487:1,6,7,22
489:3 490:13 491:13,
22 492:19 494:5
495:6
concepts 344:7 403:17
461:15 468:12
concern 209:15 368:14
concerned 62:3 72:24
84:20 230:17 354:22
368:3 413:3
concerns 96:9 97:10
210:21
conclude 263:20
concluded 558:20
conclusion 429:4
494:2,3,15 536:2,8,
22 537:9
conclusions 336:15,
16,24 533:1
concurrent 391:19
392:17
condition 373:17
386:18 387:1 388:14
391:25 398:25 401:25
402:20 423:10 429:23
conditions 97:12
146:15 314:7,25

Confidential

JAN-MS-05484712

315:17 318:3 390:24
391:12 401:3 402:11
552:12
conduct  27:6 335:9
conducted  19:14 60:6
96:23 334:24 335:24
545:7
conducting  470:20
conducts  336:1
Confidential  378:10
conflate  417:2
confusing  177:17
488:18
Congress  51:22 475:7,
12,15
Congressional  95:2
conjunction  50:22
51:3 514:6
Connecticut  57:13
connection  68:16
240:24 350:12
consensus  467:20
consent  365:14,17
366:1,20 367:7,11,14
413:6,10,13
consequence  323:15,17
consequences  103:19
201:23 315:23
322:16,21 323:1
324:11 498:19
consideration  228:14
404:16,23 460:4
538:16
considerations  315:8
488:3
considered  57:20
58:17 118:5 228:20
294:6 323:21 354:20
355:11 500:12 538:9
consistent  189:3
190:2 480:22 501:15
504:20 533:11 537:18
constant  422:2,9
462:4,11 465:4
constipation  35:10
365:13 368:8 422:10
construct  493:16
consult  24:25
consultant  188:10
507:11

Consultants  241:25
consulted  19:13,20
24:1 25:4
consulting  20:24
21:4,8,19 156:12
180:22,24 507:19
consumer  313:3
consumers  108:8
453:14
contact  298:16 302:13
contacts  182:3
content  293:11,15
294:21 296:3,7,11
299:11 303:3 313:8
334:6 336:23 339:22
351:1 370:23 438:6
contents  136:3 137:8
140:8 559:8
context  255:4 286:24
287:10 290:2 356:21
357:8 434:7,14 453:6
469:17,20 474:13
490:7 492:2
contiguous  24:13
Contin  42:11,12 53:21
58:14,24 59:1,15
60:23 61:5,15,21
62:4,12 80:1,3
458:1,8,14
continual  343:11
continually  165:22
continue  74:15,19
131:19 133:14 198:17
311:4 318:10 343:6
361:11 370:2 445:21
451:19 483:13,22
514:10,12
continued  43:5 362:10
366:13 388:2 403:24
continues  210:12
521:2
continuing  343:5
362:12 437:12,19
438:16 540:11
continuous  167:12
526:3
contract  299:3 366:25
367:3
contracting  184:20
contribute  131:2,6,18
133:12 264:22 296:10

465:1
contributed  96:12
99:16 126:4 251:11,
17 252:22 258:13
260:21 261:3,7
264:19,20 344:4
420:13 474:16 476:4
contributing  102:14
263:17 297:12 423:25
contribution  251:5,20
contributions  251:3,9
252:9
contributor  103:11
264:16
control  249:11 331:1
365:6 396:15 397:1,
12,25 398:2 399:25
controlled  55:24
102:2,10 513:5
controlled-release
58:10,16,19 59:7,24
60:18 96:1 476:8,11
controls  437:11
convenience  466:7
conveniently  141:3
conventions  110:17
conversations  47:13
458:18
Conversely  228:25
conversion  325:18
convert  463:12
convey  348:2
conveyed  349:2 413:17
Cool  64:5
coordinate  227:9
Coordinated  128:1
coordination  546:20
copies  140:5
copy  47:19 94:17
359:11,20 439:17
cord  411:9
core  141:15 148:1,9
149:1,5,19
corner  159:23 440:9
corporate  164:18,20,
22
correct  13:20,22
20:10 27:16,20
28:10,21 31:24 32:6,
10,18 33:10 34:15,18
35:4,18 37:6,9 39:6,

Confidential                                                        JAN-MS-05484713

14 40:2,3 41:17,21
42:19 43:25 53:22
60:7 61:3 62:6 74:18
77:24 79:16,19 83:24
84:25 86:1,9,10
89:15,16 92:9 95:5,
20 96:17,21 98:3,5,
22 101:12 103:15
104:16 106:4 111:2,
25 112:1,11,12,24
119:18,21 127:15,18
128:2 129:5,12 130:8
131:7,9,22,24 132:5
140:25 141:15 142:19
143:2 144:4,12
145:13,17,24 146:7,
11,18 148:4 149:24
154:17,21 155:16
157:24 158:22 159:9
167:24,25 168:3,9
180:7,9,11 183:3
194:19 195:12
196:11,22 198:7,8,
22,23 199:16,19
200:24 205:18,23,24
209:2,5,6 210:10
211:19 213:12 218:25
221:24 229:5 231:4
233:20 239:18 240:7
242:3,4 243:8
244:11,20 247:19
250:23,25 253:14
262:11,19,23 266:22
276:19,20,22,25
277:1 281:15 284:9
285:8,10,18,23
289:15,20 292:22
293:3,4 297:3,4
298:2 299:18,21
300:3 302:17 303:10
309:2,3,6,20,22
313:16,17 315:1,4
333:6 337:2 340:24
343:19 344:25 345:4
346:8,13 347:5,10,25
348:12,23 349:3
350:5,6,10 353:20,
21,23,25 354:11,25
356:1,21,23 358:5
360:7 363:22 364:12,
13 368:19,20 369:1
370:8,9 371:18,19,22
376:24 377:8 378:2
379:8,9 380:11,12,

18,19,23 381:11,22,
23 382:3 384:6,7
388:14,19 389:2,9,
10,16,17,19,22,23
390:1,6 391:25
392:7,18,22,23
393:2,3,18,24,25
394:3,4,21,22,25
395:3,6,9,14,17,23
396:6,9 397:4,9,13
398:3,6 399:19,22
400:8,15,17,20
401:1,4,7,15,16,25
402:6,9,12,21 403:4,
12 405:6,11,14
406:17 407:1,2,7,10,
13 408:11,19 409:5,
12,17,20 410:4,14,
23,24 411:1,2 412:2,
19,22 415:7,9
416:16,22 417:3,6
419:3,19 421:4,10
424:5,8 428:12,15
429:4,5,19,20,23,24
430:4,5,11,20,21
431:7,10,16,19,24
432:2,7 433:20,23
434:3,20,21,24,25
435:2,3,5,9,13,14,
20,21 436:1,2,20
437:2 441:6,9,12,15
442:16,19,25 443:1,
5,8 445:24 446:5,14
449:1 450:15 464:11
468:5,10,20 469:3
474:3,25 475:11,21
477:3 479:13,17
480:1 483:19 485:5,
18,23 487:3,8 488:5
489:25 491:17 492:7
493:5 495:7,9 497:15
499:17,19,22 501:8,
21 502:11 503:21
504:9,11,16 508:5
510:10 515:13 516:25
517:1,8,9,16,24
518:4,7 520:13,20
521:3 522:22 523:2,9
524:5 527:7,16,20,23
528:5,16,19,23
529:6,18 530:5
531:20,23 532:3
534:5 538:5 540:16
541:11,21,22 544:15,

16,21,25 545:4
547:24 549:22 550:4
554:22 556:25 558:1
**corrected** 484:19
**corrections** 559:8,19
**correctly** 28:19 57:25
59:10,14 75:14 82:1
448:10 529:5 532:9
**correlate** 261:10
**correlation** 241:2,8
261:13
**correspond** 162:5,17
**correspondence** 457:22
**cost** 73:11 165:1
199:11 453:14
**costs** 449:24
**counsel** 10:21 13:3,6
47:13 76:4 108:20
179:16 222:7 281:13,
25 282:5 283:3,8
360:25 380:7,17
446:11 449:12 456:18
483:25 495:11 501:9
502:20 507:2 540:12
543:11 547:11,15
551:21,22 557:2
**counsel's** 56:11 70:3
94:21 451:23 453:17
477:5 540:4
**counterparts** 19:3
**countries** 44:3
**country** 12:21 32:18
36:15 43:9,25 44:3,
11 199:23 249:2,11
254:23 259:10,11
437:9 450:22 457:8
475:10 499:8 539:13,
23 540:1 553:10
**County** 10:9 559:5
**couple** 19:12 46:4
181:25 331:3 337:14
457:21 477:6 487:21
489:16 504:24 516:15
555:20
**courier** 123:6
**courses** 437:20 438:1
**court** 10:9,17,23
**courtroom** 108:2
**cover** 179:23 320:5
456:11,16 541:20
542:12,21

Confidential                                                    JAN-MS-05484714

coverage  14:8,11 15:2
  164:4,6
covered  15:5 320:7
  455:14 457:3 542:4
covering  208:17
cravings  243:20
create  165:18 169:16
  303:3 379:18 420:8
created  12:20 107:1
  125:17 126:7,20
  155:14 334:2 378:2,
  22 380:3,10,16
  440:17,20 452:22
creates  169:11
creation  377:16 379:7
creative  184:19
creators  106:17
credentialing  296:1
credit  294:24
crimes  107:14 109:4
criminal  108:9
crisis  43:9 124:15
  125:17,22 126:20
  204:4,8,9,14,19,21,
  25 205:3,8,11 235:25
  236:1 249:2 250:12
  251:3,5,9,12 252:10
  257:5,6,13 258:17,22
  259:2,5,8,11,17,20,
  22,24 260:3,7,12,21
  262:22 264:12,23
  266:1,25 436:7 456:3
  457:2 539:12,17,23
  541:14
criteria  148:15 156:4
  157:12,23 162:6,18
  178:11 179:4 228:19
  316:23 408:10 414:17
  432:20 545:9,11
critical  154:13
critically  450:6
  488:21
Crohn's  314:21
cropping  100:18
Crossover  535:7
crumble  329:5
crush  59:3 60:23
  99:22 463:21
CSR/RMR  559:2
Cullen  71:25 79:6,7,
  22 458:5

cultural  198:1
cure  429:22
cures  114:13 115:7
  452:14
current  124:15 167:22
  310:4 396:10 448:24
  455:21 504:22
curriculum  344:11
  490:7
customers  134:22
  135:19
cut  464:14
CV  25:14 26:25 46:14
  48:23 53:15 128:12,
  14,16 129:3 130:2
  249:22,24 303:4,7
  373:3 533:20
cystitis  314:20
  330:24 332:9,10

D

D&o  13:11 14:7,11
D-E-C  141:19
Dahl  89:9
daily  390:1 522:1
damages  521:24
danger  473:23
dangerous  27:19,23
  74:5 83:22 106:11
  109:2 218:21 219:3,5
  245:19 248:1 269:1
  320:25 338:23 457:15
data  75:9 92:2,5,8,17
  100:11 163:8 187:2
  193:4 290:23 336:4,
  6,7 389:5 427:21
  446:20 466:4 478:1
  503:12 553:24,25
  554:5,10
data's  397:17,18,20
database  544:8 557:23
date  142:2 559:2
dated  71:18 79:13
  106:3 180:10 205:22
  498:15
daughter  324:16
David  244:8
day  249:1 291:6
  325:22 326:7 387:23,
  25 388:1 463:8

559:23
days  79:15 386:8
DEA  97:9 101:20 102:4
  103:6,14,17 126:17
DEA's  102:25 103:10
deadly  27:25 30:7,19
  268:24,25
deal  362:1 394:24
dealing  75:6 185:20
  521:18
deals  140:22
death  35:11,12,14
  225:3 246:7 260:14,
  15 297:13 311:10
  364:2
deaths  164:9 254:18
  255:7 261:16 311:13
  456:20 553:20 554:6
debate  326:14 366:24
debunk  495:4
debunked  495:2
debunking  491:23
  492:19
decade  367:10 370:4
  394:9 447:8,10
  456:13 475:8,15
decades  319:20 320:16
  394:6 458:20 485:15
decide  319:7 389:14
  401:20 504:25
decided  81:1 214:15
  367:6
deciding  293:13
  481:24
decile  93:19 142:4
deciles  92:18,24
  93:3,11
decision  239:23
  289:14 291:16 293:25
  395:22 476:6
decision-making
  107:25 218:7
decisions  198:16
  289:18,23 290:6
declare  475:7 559:6
decline  39:23
declined  446:23
decrease  457:3,9
  526:2
decreased  498:21

Confidential                                                    JAN-MS-05484715

deep  66:24
deeply  302:21
defeat  466:8
defeated  463:20
  464:15,21,22
defendant  15:25 16:25
  48:10 181:7 250:22
defendants  11:9,13
  16:1,2,19,21 17:7,8,
  11,15 20:16 32:12,17
  87:5,15 92:25 93:13
  111:16 119:24 173:14
  222:19 224:2,18
  253:15 262:5,10
  263:2 264:15,22
  265:12 267:4 269:18
  273:17,23 274:2,3,16
  275:13,16 276:3
  361:1,17 383:11
  384:11 507:9,20
  539:16
defended  164:11
defending  216:5,8
defense  167:10 540:12
defensive  123:18,21
define  259:4 433:1
defined  205:11 536:14
definition  94:6
  227:20 259:7 298:5
  490:3
defraud  108:7
degenerative  201:23
degree  121:25 143:24
  173:22 177:24
  251:17,19 264:19
  320:9 389:15 486:13
  530:21
delineated  361:20
deliver  190:14
deliverables  167:21
delivered  273:8
delivery  191:1,3
  421:4,20 422:9,18
  529:12
Demerol  461:17
demographics  508:23
demonstrated  174:21
demonstrative  239:7
denied  37:21 70:16
  156:20 456:9

denigrate  230:12
dense  66:24
dental  331:13 486:12
department  67:2 230:7
dependence  234:25
  466:21 467:4
dependent  467:14
depending  17:2 287:10
  335:19 369:25
depends  85:16 168:21
  186:24 226:2 279:11
  280:23 364:25
  432:23,24 434:13
Depo  425:19
Depomed  425:19
deposed  206:16 207:3,
  13
deposition  10:5,12
  12:7,23 25:17 47:6,
  17,20,24 48:2 54:8,
  14 88:7 90:13 361:6,
  11,23 384:3 558:20
depositions  47:4
  156:17 222:1 362:15
depression  35:9 323:4
  402:12,19 512:14,18
depressive  512:15
deprived  511:17
derive  320:11 417:18
derived  107:18
describe  243:15
  446:17 450:16 488:7
  495:21 508:15
describing  243:17
  353:23 360:3 465:9
  474:24 499:2
description  472:24
  473:2
deserved  444:23
design  122:20 335:12,
  13,15,16 338:11
designation  440:10
designed  155:4 178:24
  179:3 338:10 544:23
  545:3,15 557:4
desired  422:4
detail  72:21 112:17,
  20,23 194:2 487:5
  498:7
detailed  193:17

detailing  193:25
  292:25
details  104:13 535:22
detect  557:4
determinants  260:2
determination  294:7
determine  83:14 92:12
  175:13 178:24 455:13
  489:3 514:9 544:24
  545:15 546:7
determined  75:22 83:5
determining  453:14
deterrent  25:2
detractors  155:5
devastating  199:2
  449:25
develop  25:3 176:7
  198:18 227:10 296:6
  317:7 372:22,23
  407:20,23 411:13
  414:3,6 550:16
developed  36:13 43:20
  106:19 178:17 253:9
  255:12 259:15 284:11
  298:1,7 300:6 311:8
  317:3,4 342:9
  371:15,17 374:19
  375:9,13 414:14
  415:2 418:24 462:1
  472:10
developing  58:18
  73:14 81:16 155:6
  173:24 317:9 413:20
  415:23 420:14 466:20
  469:1 550:13
development  371:21
  408:18 413:10 545:8
develops  454:4 463:3,
  5
device  299:3 304:20
  386:11
devoted  475:16
diabetes  451:11
diagnosed  419:16
  467:12
diagnoses  391:4
  399:14
diagnosis  399:7 400:1
  404:7
diagnostic  390:24
  399:13 408:10

Confidential                                                    JAN-MS-05484716

dictated  306:1
die  134:11 135:24
  269:13 321:2 324:12
  389:1,2 553:2,7
died  43:22 133:7
  204:2 553:9,16,17
differ  155:13
difference  38:2 53:11
  185:15 282:12 283:16
  321:19 327:17 328:4
  387:14 413:6 416:18,
  25 459:16 467:4
  521:8
differences  277:12
  423:19 461:1 531:3
differential  399:7
  400:1 401:3 404:6,
  17,21
differentiate  23:5
  246:23 327:22
differentiated  283:9
differently  247:4
  421:1 461:15 472:12
difficult  228:23
  236:14 330:12 513:4
  514:16
difficulty  131:18
  133:12
diffuse  75:10
dig  457:20
dinner  319:9,10
  320:20 511:4
diplomatic  417:7
direct  496:10
directed  321:9 364:4
  374:12 537:18
direction  464:7
directions  333:13
directly  166:18
  391:24 392:3
director  15:16,19
  240:22
disability  323:3
  512:1
disabling  327:6
  330:17 449:23
disadvantages  421:24
  422:12
disagree  102:25
  235:13 236:2,4 481:3
  505:24 554:17,21

555:16
disagreed  337:10
  479:12 554:13
disagreeing  263:8
disappear  243:25
disappeared  385:15
disappears  246:25
discarded  342:14
disciplines  307:14
disclose  344:25
disclosed  340:23
  341:9 344:14 346:7
discontinue  448:18
discontinued  527:2
discovery  106:13
  409:4
discredit  496:12
discuss  81:19 364:16,
  20,23 484:5
discussed  60:22 79:23
  349:7 485:21 486:19
  487:6 505:16 548:5
discussing  430:22
  476:18 478:3 487:24
  499:25
discussion  284:5
  290:10 298:13,21
  391:16 398:8 426:25
  460:17 483:25 498:11
  499:24 505:13 507:25
  508:9 528:7 530:11
  540:9 541:13
discussions  294:14
  360:23 506:11,21
disease  168:11,15,18,
  20,23 169:7,16,20
  176:7 179:24 201:23
  243:23 246:7 287:5
  314:18,21 317:7,9
  342:13 400:22
  410:19,23 419:12
  433:3 434:1 451:11
diseases  95:23 430:2,
  9 452:14
disengaged  323:6
dishonest  31:5
disorder  43:21 178:12
  226:4 268:4,6 342:20
  365:6 394:14 408:11
  414:3 415:24 418:25
  419:3,18 432:16,25

433:17 434:23
  435:13,18,20 436:10,
  15 496:2,3
dispensing  352:14
  354:20
displace  114:1
disprove  394:2
dispute  61:14,18
  71:13 264:24 265:5,6
  362:5,10 539:11,14,
  16 545:20
disseminate  199:18
disseminated  273:16
dissipates  326:23
  463:15
distance  270:10
distinct  284:17
distinction  29:23
  45:11 234:24 295:3
  425:15
distinguish  53:7
  413:5
distinguishing  523:8
distress  522:22
  524:21
distribution  338:7
distributor  108:4
District  10:9
distrust  103:17
diverse  72:11 210:1
  520:15
diversion  95:4 96:7,
  13,15 99:17 100:5,
  11,12 102:4,7,14
  103:2 107:12 108:16
  230:18 259:20 476:5
diverted  125:14
  255:14 258:12 268:11
diving  153:19
divisional  227:10
divisions  18:16
divorce  323:7
Doc  324:3,7
docs  431:16
doctor  27:19 30:18
  98:5 122:21 289:12
  318:22 358:3 360:11
  382:7 384:12 385:23
  386:9 389:25 390:9
  391:2 395:14 401:23
  403:1,10,20 405:22,

Confidential                                                                JAN-MS-05484717

25 410:21 417:9
420:24 429:21 431:14
432:11 439:8,22
443:11,22 457:17
469:7,16 485:12
501:25 507:23 513:21
516:18 556:1 558:15
**doctor's** 30:15,25
**doctors** 22:16,18
73:19 74:20 78:12
106:9,25 119:17
278:23 279:4 301:1
341:13 357:1 358:19
431:1,5,12 437:25
448:21 456:25 458:12
467:9 472:18 506:17
543:1 551:16 554:15
**document** 54:17 59:16
61:6 63:9,25 64:8
65:13 67:18,21 75:13
79:9 88:6,11 105:14,
15,17,18 109:13,14,
15 111:6,13 112:25
120:25 128:22 132:14
136:2,5 139:3,16
141:25 149:10 151:25
156:16,23,25 157:9
161:15,21 169:24
171:3 179:18 187:23
189:14,21 194:18
197:24 213:22 220:8,
20 228:1 232:15
233:9 285:24 356:10
359:9 362:9 363:9
365:24 366:2 376:1,
4,6,12,14 377:11,17,
22 378:2,5,6,19,22,
25 379:11,16,19,22
380:2,16 381:1,10,16
382:2 413:8 427:3
439:23 440:2,4,14,24
441:4,6,12,19 442:4,
7,9 518:20 528:9
**document's** 152:5
**documentary** 450:12,
17,20
**documentation** 351:22
**documented** 53:19
138:17
**documents** 101:7
120:8,14 157:5,6
221:12,22 252:17
261:18 262:4,10

281:20 282:1 285:20
351:11 362:6 375:18
457:18,22
**DOJ's** 105:17
**dollars** 542:3,11
**domain** 170:6,12,15,
18,22
**domains** 532:8,16
**dopamine** 408:24
410:1,12
**dose** 73:5,11,15 74:25
75:3 81:9 117:10,14,
15 245:15 246:11
293:21 323:22,23,24
324:1,5,10 325:3,13,
25 358:13 369:17
463:7 468:15 492:11
525:21
**doses** 326:5
**dosing** 294:9,11,12
370:21 468:14
**Double** 396:17 397:7
**Double-blind** 535:6
**doubles** 369:23
**doubt** 83:1 385:21
447:24
**dozen** 556:11
**dozens** 479:19
**draft** 101:19 381:12,
15,20 440:24
**dramatic** 445:2
**dramatically** 448:18
**draw** 429:3
**drawing** 29:22
**drew** 537:10
**drill** 331:15
**drive** 246:19 260:2
319:1,5
**driven** 248:14
**driver** 455:21
**drivers** 245:17,18,25
**drop** 325:7
**Drs** 361:25
**drug** 25:7 33:7 72:24
73:20 74:2,8 77:9
84:7,8,12 95:24
97:8,12 100:4 106:9,
14,20,22 107:1,16
109:2 113:7 114:5
116:23 117:15 133:17
177:2 204:10,11

259:9,10,22 268:12
293:17,18 360:4
371:7 396:3 407:17,
20,21 421:9 428:3
459:20 460:13 464:5
474:17 476:6,13
500:16 501:4 514:8,
12 515:9 516:10
541:25 542:9,18,19,
25 550:17,23
**drug-related** 372:22
494:18 500:10
**drug-seeking** 400:7
488:20
**drugs** 32:3,24 57:16
95:3 100:6 117:9
121:12 150:25 176:25
177:4 223:6 224:16
225:8,15 226:5
255:2,3,9 258:3
259:12,13 260:1
267:15 268:9 269:18
327:11 328:5 338:22,
23 387:18 407:14,15
419:17,23 452:24
453:4 454:4 456:14,
17 457:13 462:15
514:13,14 542:4,13,
21 548:7 550:7
553:18,21 554:7,8
**DSM** 545:9
**dual** 423:22,23
**Duck** 10:25 12:2 14:18
15:18 16:11,16,22
17:5,19,23 18:1,11,
18 19:1,7 21:1
24:15,18 25:19 27:24
28:17 29:3,13 30:13
31:2,6,13,22 32:4,15
33:16 35:1 39:25
40:23 42:5,24 43:23
44:4,12,17 45:3 46:3
47:16 48:18 51:6
54:3,16 56:12 59:17
61:13,19 62:2,10,17,
23 63:7,16 64:5
65:4,8 67:10 68:4,14
69:1,9,16,22 70:4,
12,15,20 71:12,17
76:7,16 77:2 78:5,
14,21 82:2,11 83:12,
18 84:2 85:15,18
86:11,22 87:11,20

Confidential

JAN-MS-05484718

Lynn Webster, M.D.
February 18, 2019                                                              18

88:1,10 89:23 90:7
92:1,23 93:15 94:20
98:1,15 99:11 100:25
101:7,17 102:24
103:8 104:22 105:10,
16 106:1 109:12,22
110:25 113:15 114:15
115:1,22,25 116:6
118:6 119:2,13
120:7,17 121:3,23
122:5,19 123:1,10,
16,22,25 124:3,13
126:21 127:13,20
128:6,19 129:7,10
130:6 131:10 132:3,
11,17 133:6,16
134:1,6,16,25 135:4
136:1 137:7,17
138:5,18,24 139:2,17
140:4,16,19 141:1,8,
14,18 142:3,7,11,16,
23 143:3,10,21
144:5,11,15,21
145:1,5,10,18,23
146:5,10,14,18
147:2,9,21,25 148:6,
14 149:4,11 150:8,17
151:6,15,19,21
152:5,13,22 153:10,
21 154:8,24 155:12,
19,25 156:5,9,15,20
157:2,11,19 158:3,
14,19,25 159:13,21
160:2,7,12,16,21
161:4,15 162:4,8,16
163:17 165:9,15
168:8 170:7,11
171:2,7,15 172:2,25
173:12 174:13,24
176:4,17 177:5,15
178:1,18 179:8,13,
19,21 180:10 181:6,
14 182:11,18,24
183:6,15,24 184:9,
16,25 185:11,19,25
186:20,25 187:9,22
188:3,8,13,18
189:12,25 190:21
191:8,18,23 192:4,12
193:3,12,24 194:4,16
195:5,23 197:4,13
198:14 199:22 200:7,
19 201:10 203:2,12,
22 204:13,20 205:1,

17 206:9,19,23
207:7,12,15,20,25
208:7 209:8 212:10
213:10,18 214:7
215:2,18 216:4,10
217:4,10,15,24
218:5,17 219:3,15
220:7 221:6,11,21
222:13,18,24 223:22
224:15 225:7,14
226:1,17,25 227:2
228:11 229:7,12,17
230:1,6 231:8,13,17
232:1,14 233:22
234:7 235:19 236:4,
12 237:7,15,22
238:9,11,18 239:1,
15,25 240:9,17
242:9,21,24 243:6
244:14 245:24 247:6,
15 248:18,25 249:19
250:21 251:1 252:5,
24 253:21 254:1,9
255:16,24 256:11
257:1,23 258:16
259:1,6 261:17
262:3,9,15,25
263:10,22 264:21
265:4,10,18 266:9
267:17 268:16,25
269:13,22 270:1,13
272:8,25 273:19,24
274:1,7,13 275:1,7,
10,15,20 276:8
277:4,9 278:18,25
279:9 280:14 281:10,
16,23 283:13,22
284:2 285:2,9,17
286:13 287:1,13,23
288:22 290:19 291:25
296:19 297:10 298:3,
14 299:19 300:1,15,
20 301:8,14 302:12,
18 303:22 304:16
305:4,8,19 306:4,11,
25 307:20 308:6
309:7,15,21 312:20
313:10 315:11 316:15
317:1 318:19 320:1
321:23 322:18,23
323:2 325:1,14
326:3,12 327:15
328:13,21 329:16
330:6 331:8 333:7,23

334:4,13,22 335:8
336:18 337:4,23
339:6,11 340:2,10,
12,20,25 341:6
343:20 344:8,18
345:1,6,12,16 346:1,
10,14,21 347:7,12,16
348:5,14 349:4,14,22
350:9,17,23 351:9
353:15,24 354:6,12
355:1,12 356:3,17,22
357:6,19,22 358:6,23
359:22 360:9,17
**due** 202:6 352:13
512:19
**duly** 11:22
**dump** 422:22
**Duragesic** 42:11,13
179:24 180:6 181:22
186:17 187:12,18
188:15 189:1 190:19,
22 191:2 193:6,17
194:8 230:13,21
417:10,14,24 418:6,
18,22,24 419:15
420:2 421:3,15
424:12,15,20,25
425:4 460:9 462:15
**duration** 187:18
188:15 327:4
**duty** 198:3
**dying** 132:9 133:5,18,
24 134:7,22 135:20
**dynamic** 315:25 392:22
393:1

---

E

**e.g** 186:9 192:20
**earlier** 48:18 57:11
71:6 74:21 80:10
81:6 86:23 90:12
94:21 111:2 118:7
162:6 168:2 194:20
216:5 250:12,16
267:13 284:5 290:11
298:23 307:22 309:18
322:8 367:19 371:10
376:19 379:4 393:10
398:9 404:4 405:3
429:9 435:7 438:9
439:12,23 442:4

Confidential                                                    JAN-MS-05484719

444:6 445:24 446:9
448:21 449:10
454:16,21 456:18
457:19 467:18 469:21
472:20 477:5,23
478:24 481:16 484:1,
5,11,18 486:19,25
487:21,24 495:10
498:11 499:2 501:10
502:19 507:3,24
508:9,24 510:12
513:22 536:14 540:9
541:12 548:5 550:12
554:13
**early**  36:17 74:5
76:14 96:5 134:18
155:6 386:21 413:22,
25 461:13 469:23
480:6 515:1
**easiest**  227:16
**easy**  441:19 472:15
**eat**  151:17
**economic**  497:12
498:19 499:3,15
**editorial**  502:1
**educate**  119:25 120:6
122:18,21 123:4
211:6 297:22 338:1,2
339:3 551:12
**educating**  122:13
**education**  21:23,25
53:1 125:9 126:16
129:17,20 131:15
133:9 136:13,25
137:5,9,18 138:9
163:4 199:6 221:16
228:18 243:12
437:12,20 438:14,16
439:4 494:6 551:12
**educational**  138:1,2
167:22 294:20,23
295:23 299:1 311:8,
14 338:5 339:21
343:12 438:5,8 551:4
**effect**  57:2 80:2,5
293:20 365:22 388:18
423:14 521:19
**effective**  73:21 81:13
198:1 235:5 294:13
321:11 328:11,17,19
341:11 356:20 430:7
459:12 498:22 529:2,

23,25
**effectiveness**  496:17
**effects**  106:12 363:25
388:22 422:11
459:18,21,22 460:1,
11,14 482:6,11
531:19,24
**efficacy**  40:9,12
84:10 179:7 449:3
465:24 466:5 482:14
527:19 528:1
**effort**  108:7,18
210:23 214:23,24
470:24 473:8 474:8
**efforts**  81:2 95:4
167:23 184:11 210:19
213:7 312:14 477:12
**eggs**  59:1
**eggs.'**  59:4 60:23
**Ehsan**  11:7 16:18,23
45:2 87:7 116:4
176:14,19 178:6,22
179:16 180:8 181:5
182:10,13,22 183:4,
14,21 184:7,14,22
185:6,18,23 186:13,
22 187:7,20,25
188:5,12,17,21
189:23 190:6,24
191:17,20 192:2,10
193:1,9,21 194:1,11
195:22 197:2,7
198:12 199:20 200:3,
13 201:9 202:21
204:5 206:7,17,21,25
207:9,14,17,23 208:6
209:7 212:4 213:2,14
214:18 215:7 216:3,7
217:3,8,14,19,22
218:23 219:13,23
221:1,9,19 222:9,17
223:14 224:4,7
226:14 228:9 229:6,
9,15 230:5 231:5,12
232:7,12 233:21
236:3,9,24 237:21
238:7,10,15,20
239:4,19 240:11
242:8 245:6 246:14
247:9 248:21 249:13
250:20 253:18,23
257:8 262:6,24
265:14 267:8 268:21

270:8,19 383:25
384:2 390:16,22
391:10 392:4,12,15
394:18 395:4,10,18
396:3,10 397:10,21
398:7 399:6,23
400:6,11,16,21
401:2,8,19 402:4,10,
16,25 403:9,16
404:5,14 405:4,10,16
406:15,24 407:5,11
408:8,15 409:2,11,
13,21 410:9,20
411:19 412:7,20
413:2 415:4,16
416:4,9,17 417:1,9
418:7 419:8 420:10,
23 421:8,14,25 424:9
425:8 426:4,11,17,23
427:19 428:8,24
429:8 430:15 431:11,
21 432:3,13 433:16,
24 434:15 437:10
438:12,22 439:7,16,
21 441:3,10,16,24
442:20 443:11 541:2
548:22 550:18 552:6
558:16
**elaborate**  452:9
**elderly**  422:6
**elderly/long**  184:3
**elderly/long-term**
192:21
**electric**  398:19
**elements**  352:21
**eliminate**  524:20
**eliminates**  398:1
**elimination**  56:24
**Elisabeth**  11:14
**elucidated**  409:16
**email**  71:3,22 78:21
79:7,16,21 104:8
111:24 112:3 205:18
208:17 227:3 361:9
441:20,21,25 457:22
458:6
**emails**  111:2 360:24
361:15,21
**embody**  209:25
**emerge**  36:16 37:5,10
410:19,23 461:14

Confidential                                                              JAN-MS-05484720

emerged  210:3 342:23
emergency  329:14
  525:5
emerges  445:1
empirical  415:5
employee  206:4 442:21
employees  110:9
  280:20
encounter  73:1
encourage  74:19 96:25
end  67:12 246:6 291:5
  311:3,22 313:22
  408:6 481:22 536:1
endeavors  454:14
ending  160:23 161:18
  162:21 195:24 232:23
Endo  164:19
endocrinopathies  35:8
  365:12
endorse  214:15
endpoint  546:9 557:5,
  9,11,12
ends  116:13 202:5
  258:11 323:7 324:17
Enforcement  97:9
engage  154:14 155:7
  210:20 211:3,9,17
  213:7 216:12,21
  225:5 278:15 389:8
  422:24 513:13
engaged  224:13 320:19
  322:2 510:22
engagement  215:11
engaging  323:8
English  122:1
enhance  52:22 152:7
enjoyment  532:16
  533:5
enormous  197:25 515:7
enroll  353:10
enrolled  350:14
  353:12
enrollment  353:20
  354:3 503:11
ensure  81:10 359:6
  470:17 471:18
entire  43:24 165:12
  239:5
entities  18:5 24:11

entitled  59:19 64:1,8
  95:13 96:20 109:15
  137:8,10 140:11
  142:13 152:15 209:11
  213:20 220:8 233:10
  274:24 302:2 488:1
  497:12
entity  18:7 282:9
  283:9 304:18
environment  448:25
  473:4
environmental  344:3
environmentally
  407:19
epidemic  201:20
episodes  522:7 526:4
equal  74:8 110:14
  325:17 432:4
equivalent  325:16
Ercole  11:12 16:5
  17:18,22,25 18:3,13,
  25 19:6 20:23 24:8
  27:21 28:11,22 29:9
  30:8 31:25 32:13
  33:11 39:18 40:18,20
  42:2,20 44:1,9 48:17
  68:18 78:2 85:3 87:8
  91:19 92:19 93:1
  113:10 114:7 116:15
  118:18 119:7 120:2
  127:16 128:3 129:6
  130:5 131:8,25
  132:10,13,23 133:20
  134:5,8,23 135:3,21
  137:1,14,23 138:11,
  21 139:9,13 140:3,
  14,18,24 141:6,12,
  16,23 142:5,9,15,20
  143:1,6,16,19 144:3,
  9,13,19,24 145:3,8,
  16,22 146:2,8,12,17
  147:1,5,20,23 148:5,
  11 149:3,8 150:5,14
  151:5 152:4,10,21
  153:7 154:22 155:9,
  17 156:13,18,21
  157:7,18,25 158:12,
  17,23 159:10,25
  160:4,10,14 161:14
  162:7,13 163:14
  165:7 168:7 170:4,24
  174:17 175:22 177:14
  184:13 203:6 218:1,

11 221:10 222:11,20
  224:5,21 225:17,20
  235:14 240:3,13
  247:11 248:6 250:24
  253:19,24 254:4,15
  255:23,25 256:22
  257:11 258:20 259:3
  260:22 261:25 263:4,
  13 265:8 266:3
  267:20 268:20
  269:20,24 270:7
  271:3 272:12 273:3,
  21 274:4,10,17
  275:11,18,22 276:13
  277:7,11 278:20
  279:5,16 280:16
  281:13,19,24 283:18,
  24 284:4,23 285:7,
  12,19 286:22 287:9,
  18,22,25 288:17
  289:1 290:3 291:5,20
  292:19 296:24 297:24
  298:9,18 299:22
  300:11,18 301:2,10,
  15,19 302:1,16,22
  304:5,25 305:5,16,21
  306:6,19 307:3,24
  308:22 309:11,17
  310:9 312:24 313:13
  316:3,18 318:2
  319:23 321:3 322:6,
  19,25 323:13 325:11,
  23 326:10 327:12
  328:10,18 329:11,22
  331:2 332:7 333:15,
  24 334:7,16 335:2
  336:12,25 337:12
  338:13 339:7,23
  340:3,15,21 341:3,8
  344:5,12,23 345:3,7,
  13,22 346:4,11,15,25
  347:8,13,20 348:9,19
  349:6,17 350:3,11,18
  351:3,10,16,20
  353:16 354:1,7,14
  355:4,15 356:4,18,24
  357:7,9,20 358:2,8,
  24 359:25 360:10
  363:1,3 367:12
  368:15 370:5,12
  372:4 375:7,24
  376:22 377:7 378:1
  379:6 380:9,24
  381:21 382:1,6 383:6

Confidential                                                                    JAN-MS-05484721

516:15,23 517:12,20
518:2 519:3,7,15,25
520:7,14,21 521:1,16
522:6,13,18 523:1,6,
15 524:1,9,18 525:1,
11 526:7,17 527:3,
11,17,24 528:8
529:16,21 530:6,15
531:1,11,18,24
532:6,14,20,25
533:10,17,21 534:3,
12,18 535:1,14,21
536:7,15,21 537:8,
16,23 538:6,15,20
540:2 542:5,15,22
544:20 545:1 546:2,
16 552:7,20 553:14
554:4,23 555:4,14
**error**  482:10
**errors**  352:13
**essential**  102:8
**essentially**  36:25
472:4 478:2
**establish**  154:15
157:10
**established**  234:20,23
**estimation**  486:2
**et al**  10:8 559:1
**ethical**  175:19 176:18
318:10
**evaluate**  116:19 122:8
157:13 319:6 472:7,9
482:24 514:13 535:8
**evaluated**  155:15
**evaluates**  295:16
**evaluation**  239:23
316:2 337:24
**evaluations**  470:20
**evening**  443:22
**event**  327:4,5
**events**  330:22
**eventually**  58:14
**everyday**  513:13
**everyone's**  115:12
237:25
**evidence**  30:22 37:14
38:7 39:8 40:24
173:8 240:23 264:22
394:14 465:20 545:23
555:1,10

**evolution**  343:6 367:9
**evolve**  366:14 370:3
**evolved**  366:7 473:25
**evolves**  168:18
**exacerbated**  102:6
103:2 131:13 132:21
133:1
**exact**  111:1
**exam**  351:1 399:16
**examination**  12:1
271:2 351:3,6
362:11,12 383:24
443:20 446:9 539:2
**examine**  96:9 361:18
**examined**  11:23 496:21
497:2
**examples**  46:8 314:7
318:5 328:19 350:4
387:9 552:15
**excerpt**  140:6
**exchange**  507:11,18
**exchanges**  361:15
**exclusive**  454:13
**excruciating**  522:7
**excuse**  19:4 20:19
85:20 109:13 187:16
245:9,12 295:9 364:8
492:10
**execute**  336:1
**executive**  15:16,19
108:19 130:11,13
**executives**  105:22
106:19 107:7 109:5
285:25
**exercised**  293:2
**exercises**  291:9
**exhaustive**  366:21
**exhibit**  25:16,18
54:2,4 63:5,6 64:7
68:9,21 69:13,25
70:1,22 71:2 75:17
78:19,20 79:3,6,15
82:3 88:6,9,11
94:18,19 104:20,21
127:19,21 128:15,17,
18,20 129:2,24
138:25 139:1 151:11,
12,22 179:9,10
195:3,4 205:14,15
212:2 213:12 220:6,8
226:25 227:1 231:14,

15 238:8,17,19,23
239:8 303:5,12
351:17,19 375:25
377:11 378:15,19
379:8,13 439:10,23
441:18 469:9 487:12,
17 497:7,9,11
501:23,24 502:1
517:11 528:6 533:18
543:10,12
**exist**  49:22 115:4
169:13 178:13 219:19
304:22 496:20
**existed**  23:19 253:3
311:2
**existence**  50:13,17
61:6 311:3
**exists**  219:18
**Expand**  148:3 149:15
**expanded**  96:25 148:2
149:5,6,12,20
**expanding**  74:9,16
81:3
**expect**  11:17 31:10
254:5 256:2 389:7
412:5
**expectation**  73:18
**expectations**  73:18
213:20
**expenses**  199:13
241:15,18
**expensive**  266:20
267:2 457:13
**experience**  72:9 78:17
81:12 86:7 384:16
393:17 459:10 485:9
519:10 522:20 526:12
**experienced**  520:17
**experiences**  387:12
445:13
**experiencing**  199:23
**experiment**  107:23
482:10
**experimental**  237:2
397:25
**experimentally**  236:18
237:4
**expertise**  122:10
210:1 486:15
**experts**  73:10 375:4

Confidential
JAN-MS-05484722

explain  29:13 104:6
  209:17 277:17 398:17
  399:9 456:4
explaining  104:9
explanation  400:2
  403:23
explanations  399:18
  401:13
explores  163:10
exposed  172:23 176:8
  407:19,21 408:7
  418:11,19 420:4
  477:11 496:13
exposure  344:1
expressed  97:10
extend  452:16
extended  85:10,14,20,
  21 86:3 258:4 292:11
  297:21 460:18 461:3
  462:13 463:19 465:3,
  5,10,23 466:4,12
  467:21,24 468:21
  482:18
extensive  72:8 96:23
  108:12 360:23
extent  15:10 222:4
  418:23 419:11
extreme  233:18 234:10
extremely  74:5
extremity  328:25

---

F

face  58:14 59:2 62:4
  88:3 331:21 441:6
faces  238:12,13
  239:2,12
facets  262:21 494:7
facial  330:15 331:7,
  10 399:1
facilitate  407:15
  408:18 410:1,12,18
  511:21
facilitating  442:24
Facilitator  442:16
facility  471:22
fact  18:2 48:1 131:13
  133:1 156:23 157:2
  159:7 262:17 335:4
  342:16 369:23 386:25
  394:5 402:16 403:22

404:5 408:1 409:24
  410:9 429:17 430:23
  441:5 447:1,23
  451:10 453:13
  454:22,23 465:12
  475:6 478:11 486:18
  487:20 489:12 493:6
  515:16 527:17 556:4
  557:22
factor  126:2 131:1,7
  293:13 476:4
factors  96:12 99:16
  102:14 118:4 125:16
  131:2,6,12,17 132:20
  133:1,12 174:6 175:3
  246:18 250:17 315:14
  343:9 344:4
facts  30:22 109:16,24
  111:8,17 112:10,14
factual  294:23 295:1,
  19
failed  314:15 450:25
  451:1 482:19
failures  107:16
fair  18:18 20:15
  28:17 40:23 42:1,7
  102:12,18 103:17
  191:12 199:24 202:14
  215:18,23 218:17
  221:23 235:19 237:7
  243:12 250:7 255:16
  256:13 264:20 265:10
  267:7 278:13,23
  279:5 280:24 283:18
  285:13,16 286:10
  287:9 288:18 289:10,
  16,21 291:6 293:6,11
  295:12,13,16 296:4
  299:24 301:12 303:14
  310:9 314:1 316:3,13
  319:25 333:15,21
  334:7 336:12 337:16
  339:2,25 340:16
  343:13 344:15,23
  345:10,22 354:4
  355:5 359:17 389:24
  391:11 396:19 404:14
  417:23 418:16 446:4
  448:13,25 454:11
  464:8 473:1,3 483:12
  485:15 487:9 491:11
  496:8 498:1 508:4
  512:20 514:22 515:8

517:3 525:2 530:1
  533:1 538:2 550:10
  556:15,16
faith  473:8 474:8
fall  137:5 158:9
  239:17 240:2 325:3
  339:19 422:16
false  107:12,13
  275:12 280:10 281:7
  282:22 283:19 284:25
  285:14,21 288:20
  291:21 292:3 296:16,
  22 301:3 327:20,21
  382:25 424:15,18,24
  425:25 426:13,25
  427:5,14 547:13,17
  549:5,22 557:1
falsely  108:14
familiar  83:13 94:15
  100:22 128:8 156:11
  237:24 243:7 282:3
  293:7 310:5 370:23
  460:21 470:23 471:13
  544:10,13
families  15:25 48:14
  250:22 510:22
family  55:16 122:21
  320:20 322:1 323:6
farm  384:25 385:25
farther  278:1
fashion  431:23
fast  531:5
fast-acting  460:20
fatal  35:15 260:16
FDA  21:11,12,16 25:5
  34:1 95:25 97:14,18,
  19 101:20 132:1
  149:25 150:20 287:6,
  7 288:9,16,24 328:3,
  5 338:10 339:15
  345:4,23 349:2,11,16
  357:3 370:7,15
  411:22 476:9,20,21
  478:6 480:8,19,20
  502:5,10 514:4,7,11,
  17,20,25 515:12,17
  516:10 549:5
FDA's  476:5
fear  388:1 448:23
feared  73:9
February  10:1,14
  129:4 559:2

Confidential                                                                  JAN-MS-05484723

**federal**  103:21 108:2
  211:4,18 216:13,22
  491:1,4
**federally**  436:24
**Federation**  490:19
  491:5
**feedback**  393:23
**feel**  18:8 63:20 73:25
  77:7 122:12,19 158:4
  222:15 223:1,4,8
  300:13 325:5,11,23
  332:18 387:2 447:13
  492:1 498:8 517:20
**feeling**  318:22
**fees**  507:11,19
**feet**  385:12
**fellow**  547:1
**fellows**  230:15
**fellowship**  289:7
  546:24 547:4
**felony**  103:21 108:5
**felt**  482:17
**fentanyl**  191:2 259:21
  267:16 340:8,14
  350:1 421:16,20
  529:3,14 535:2,14
  536:8,22 554:7
**Fentora**  18:21 19:2
  23:14 139:7 140:22
  141:8 144:1 145:11
  146:11 147:4 148:23
  149:22 277:23 284:12
  328:8,11 329:7,12
  330:1,4 332:16,18
  339:24 348:21 350:4,
  8,21 355:8 356:7
  358:5 359:18 364:11
  516:25 523:16 524:3
  525:3,12 526:10,18,
  22 527:5,19 528:1
  535:17 537:12,17,25
  538:11
**Fentora-type**  327:11
**fewer**  432:4 459:18,21
  460:1,10,13,14
**fibromyalgia**  509:4
**field**  33:13 36:16
  37:4,7 91:24 110:17
  159:20 223:16 300:6
  304:3 305:15 307:11,
  16,17 342:16,22
  343:7,8 366:13

**375**:4,10,15 387:4
  388:24 461:12 462:7
**figure**  333:4
**figuring**  315:9 316:24
**filed**  502:4
**fill**  38:1
**final**  440:24
**Finally**  60:4 100:4
  167:13 490:18 491:3
**Finance**  50:23 51:14,
  16,19
**finances**  388:5
**financial**  107:25
  452:22
**find**  69:22 93:18
  190:13 439:17 496:14
  514:12
**finding**  554:25 555:9
**findings**  211:7
**fine**  15:11 16:17
  89:11,18,22 270:16
  286:1 361:25 481:4
  484:20
**fines**  108:10
**finger**  252:1 258:15
**finish**  115:23 266:12
  362:2
**firm**  11:18 180:24
**firms**  58:17
**firsthand**  50:19
**Fishman**  90:8 361:25
**fit**  228:6 240:8
  462:16
**five-minute**  360:11
**fix**  266:1
**fixed**  57:22
**flag**  66:25 415:22
**flatly**  507:22
**flaw**  436:5
**flew**  272:11
**flip**  136:16 137:9
  165:25 166:2 169:23
**floor**  329:5
**flowchart**  192:6
**flowcharts**  192:8
**flows**  185:14
**focus**  74:15 113:13,
  16,18,23 114:1 115:9
  157:22 365:8 474:18
  476:1 496:16 502:18

**focused**  49:25 81:3
  97:11
**Focusing**  424:14
  425:8,23
**folded**  284:14
**Foley**  233:2,5 234:4
  442:13
**folks**  54:8 267:6
**follow**  101:12 111:15
  325:7
**follow-up**  274:24
  331:3 358:11 516:16
**follow-ups**  555:21
**food**  95:24 319:13
**footprint**  445:21
**for-profit**  454:8
**force**  64:17 65:23
  66:16 81:8 96:25
  110:18 182:7,19
  437:25
**forced**  324:20,24
  447:13,17 448:17
**forcing**  456:25
**forefront**  445:3
**foregoing**  559:7
**forever**  14:19
**forfeitures**  108:10
**forget**  41:13 340:6
**forgot**  214:1 332:2
  484:15
**form**  14:13 16:5
  17:18,22,25 18:25
  19:6 20:23 24:8
  28:11,22 29:8 30:8,
  21 31:20,25 32:13
  33:11 34:20 39:18
  40:18,19 42:2,20
  43:15 44:1,9 45:2,6
  47:10 48:17 50:25
  51:1 56:8 61:10,16,
  23 62:16 67:7,22,23
  68:10 69:5,19 71:10,
  15 76:12,25 78:2,10
  81:23 82:10 83:7,17,
  25 85:3 87:7,8,18
  89:19,25 91:19
  92:19,20 93:1 97:24
  98:12 99:7 100:20
  101:3,13 102:23
  103:4 105:24 109:8
  110:15,22 111:3
  113:11 114:7,23

Confidential                                                                 JAN-MS-05484724

Lynn Webster, M.D.
February 18, 2019

24

115:21 116:3,4,15
117:24,25 118:17
119:7 120:2,11
121:19 122:4,15,23,
25 123:14 125:23
127:16 128:3 129:6
130:5 131:8,25
132:10 133:20 134:8,
23 137:1,3,14,22
138:21 139:9,14
140:15,18,24 141:6,
12,16,23 142:5,15,20
143:1,6,16,18 144:3,
9,19 145:3,16,22
146:1,2,8,12,17
147:5,20 148:5,11
149:3 150:5 151:5
152:4,10,21 153:7
154:22 155:9,17
156:13 157:18,25
158:13,23 159:12,25
160:10 161:14 162:14
163:14 165:7,12
168:7 170:4,24
171:21 172:18 173:6,
18 174:17 175:22
176:14,19 177:12,14
178:6,22 180:8 181:5
182:10,22 183:4,14,
21,22 184:7,14,23
185:7,18,23 186:13,
22 187:8,20,25
188:5,12 189:24
190:5,24 191:17
192:2,10 193:1,10,22
194:1,11 195:22
197:2,8 198:13
199:20 200:3,14,16
201:9 202:20,23,25
203:6,8 204:6,17
206:7 208:6 209:7
212:4,6,24 213:1,15
214:18 215:7 216:3
217:8,20 218:9,23
219:13,23,25 220:25
221:9,19 222:10
223:14 224:4,7,20
225:12,17 226:14
228:9 229:6,10,15,24
230:5 231:5,12
232:13 235:14 236:3,
9,24 237:21 238:15
239:4,19 240:3,5,11
242:8 245:8 246:14

247:10,13 248:6,8,21
249:13 250:20,24
251:6 252:13 253:18,
24 254:4,15 255:23
256:22 257:8,10
258:20 259:3 260:23
261:25 262:6,13,24
263:13 264:17 265:1,
8,15 266:3 267:9,11,
20,21 268:21 269:10,
20 272:8,25 273:19,
24 275:15,20 276:8,
10 277:4,9 278:18,25
279:9 280:14 281:10,
16,23 283:13,22
284:2,20 285:2,9,17
286:11,13 287:1,13,
17,23 288:22 290:2,
19 291:25 296:19,20
297:10 298:3,14
299:19 300:1,15,20
301:7,8,14,22
302:12,18 303:22
304:16 305:4,8,19
306:4,11,25 307:2,20
308:6 309:7,15,21
312:20 313:10 315:11
316:15 317:1 318:19
320:1 321:23 322:18,
23 323:2 325:1,14
326:3,12 327:15
328:13,21 329:16
330:6 331:8 333:7,23
334:4,13,22 335:8
336:18 337:4,23
339:6,11 340:2,20,25
341:6 343:20 344:8,
18 345:1,6,12,16
346:1,10,14,21
347:7,12,16 348:5,14
349:4,14,22 350:9,
17,23 351:9 353:15,
24 354:3,6,12 355:1,
12 356:3,17,22
357:6,13,19,22
358:6,23 359:3,9,22
360:9 363:19 366:5
367:25 369:3 370:11
372:1 373:9 375:23
376:16 377:5,24
379:2 380:5,21
381:18,25 382:5
390:13,20 391:7
392:2,9 394:17

395:2,8,16,25 396:8
397:6,15 398:5
399:3,21 400:4,10,
14,19,25 401:6,18
402:2,8,15,23 403:6,
14 404:2,10 405:1,8,
13 406:9,19 407:4,9
408:4,13,21 409:7,19
410:6,16 411:17
412:4,18,24 413:7,
10,13 414:12 415:12
416:1,7,15,24 417:5
418:2 419:5,21
420:19 421:7,12,22
424:7 425:6 426:3,9,
15,21 427:17 428:7,
14 429:7 430:14
431:9,18,23 432:1,9,
22 433:22 434:5
437:4 438:3,18,25
441:1,8,14 442:18
443:7 444:13 446:7
447:5 449:6 452:4
453:11,24 454:18
455:2,18,25 456:2
460:6 464:1,10
465:18 468:3,9 469:5
474:5 475:19 477:19
478:22 479:22
480:13,25 481:15
483:18 485:17,25
486:5,23 488:11
489:10 491:16 492:5
493:3 495:19 504:18
506:6,14,24 508:7
509:23 510:19,24
511:6,12,19 512:3,
10,17 513:2,16
515:4,21 516:2
517:18 518:1 519:1,
6,14,21 520:5,12,19,
24 521:5 522:4,11,
16,24 523:4,11,20
524:7,15,24 525:8,14
526:15,24 527:10,15,
22 528:4 529:10,20
530:4,14,24 531:9,
16,22 532:5,11,23
533:8,15 534:1,10,
16,22 535:13,19
536:5,12,20 537:6,
14,21 538:4,13,18
540:2 541:2 542:5,
14,22 543:3 544:20

Confidential

JAN-MS-05484725

545:1 546:2,15,16
548:1,14,22 549:24
550:18 552:6 553:13,
14 554:4,23 555:4,15
557:19 558:3,11
**formal** 90:5
**formally** 289:4
**format** 34:10 489:21
**forming** 107:18
**formulation** 25:2 59:7
62:12,19 253:10
462:14 463:20 476:9,
11 482:18
**formulations** 253:10
463:11,16 465:23
516:13
**Fortuitous** 474:16
**forward** 39:23 78:23
312:18 313:9 481:23
**foster** 210:13
**found** 96:20 235:25
420:12 428:3,25
489:14,21 500:11
501:3
**foundation** 30:23
40:20 49:18,21,24
50:10,14 51:25 52:1,
12 61:24 62:16 65:1,
2 67:8 68:11 69:6
76:2 77:1 78:10
81:24 83:8 87:24
97:25 98:13 101:4,14
102:23 105:25 109:9
111:4 120:12 122:16,
25 123:15 128:4
133:21 134:24 138:12
139:10,14 141:24
142:6 143:7,19 147:6
152:11,25 153:8
154:23 155:10 156:14
167:7 173:19 174:18
183:23 196:13 217:22
218:10 226:24 252:14
255:25 301:18,22
309:24 310:3,15,24
311:19,25 312:6
549:18
**founders** 55:13
**four-fold** 235:8
**four-hour** 361:6,12
**fourth** 140:16 179:18
184:17

**frame** 71:16
**franchise** 425:16
**frankly** 235:5,15
457:12 459:11
**Frederick** 59:6 64:12
105:22 108:3
**free** 18:8 158:4
336:17 498:8 517:21
**frequency** 523:24
**frequent** 327:2
**frequently** 166:9
**Frieden** 240:21
**Friedman** 55:4,9,18
59:22 71:3 77:5 79:4
108:20 111:19
**front** 138:16 232:16
252:18 376:1 439:11
470:6 528:22
**frontier** 444:25 445:4
**frowny** 238:13 239:2
**full** 67:12 406:5
423:21 424:4 494:15
503:6
**full-time** 37:1
**fully** 515:12
**function** 323:4 513:11
522:21 524:12
**functional** 169:5
236:19 319:21 320:17
329:10 332:20 536:25
**functionally** 169:3
315:20
**functions** 524:13
**fund** 215:14
**funded** 41:8,17 298:6
347:4,9
**funder** 213:13
**funding** 215:16 279:25
280:3 281:1 282:14
298:10,12 304:19
305:22 311:4,16
507:11 547:5
**funny** 275:4
**future** 75:3 361:22
362:15

---

G

---

**gained** 429:18
**GAO** 94:7,12 95:2,8,

13,17 96:9,10,20
100:8 102:18 120:18
121:4 430:22 469:8,
12,24 471:4 472:24
475:24 514:25 548:18
549:1,15 550:1
**gave** 21:2 37:17 47:6
48:2 65:23 79:9
90:13 299:17 329:22
369:12 411:10 491:24
552:15
**Gavin** 10:15
**geared** 73:4
**gel** 230:22
**general** 95:18 108:20
172:22 230:12 389:5,
13 395:19 497:18
507:13 514:23 532:17
533:6
**generalities** 119:9
**generally** 184:10
186:16 191:9 305:5
341:18 343:19 364:15
406:4 412:13 450:17
451:6 457:19 458:2
460:17 472:23 473:1
475:3 481:11,19
482:2 488:6 499:1
502:25 505:17 508:16
531:25
**Generate** 136:22
137:11
**generation** 444:25
**generations** 384:24
420:15
**generic** 19:3 58:15
59:2 62:4 276:22
278:21
**generics** 279:2 423:12
**genesis** 107:22
**genetic** 344:2 420:14
**genetically** 407:18
**genetics** 420:9
**genomes** 420:12
**Georgetown** 57:17
**Georgia** 244:25
**Gerry** 88:25
**GH** 155:3
**giant** 57:20 58:3
63:15 68:6,9,15
69:17

Confidential
JAN-MS-05484726

Gilson  46:18 47:5
  90:10
give  12:7 19:22 45:21
  64:25 88:5 153:17
  170:3 224:13 239:13
  246:24 270:17 286:23
  314:7 318:13 328:18
  369:8 382:6 389:6
  461:17,18,24 473:17
  483:2 492:10 554:2
giving  20:2 176:11
  230:11 278:11 298:13
  324:4
goal  114:4,5,19
  209:23 210:17 212:20
  213:5 348:1
goals  53:2 118:24
  199:17 352:5,10
gold  458:20
Goldenheim  55:3 59:22
  60:2 108:22 112:3
Golinharris  154:25
  155:14 156:10 157:12
good  16:9,11,12 33:14
  40:8 71:1 74:23
  94:23 107:23 115:17
  116:7 118:11 123:8
  126:10 162:16 168:10
  171:5 228:21 271:4
  300:22 337:15 363:1
  371:6 384:1 416:5
  438:23 443:15,22
  445:19 448:16 452:20
  473:8 474:8 478:10
  511:16
Gordon  11:4
government  113:19
  454:3 491:1 542:12
governmental  125:10
  211:3,17 216:2,12,21
  514:25
graduates  439:6
grandmother  384:22
  385:1 386:5 387:2,9
graph  142:22,23
graphic  122:20
great  115:5 305:14
  373:25 452:1,11
greater  80:15 116:23
  117:2 189:2 343:3
  369:21 374:18 413:23
  445:16 466:5,6,14,19

536:9,23
greatest  107:15
  116:6,7 317:12
  330:11 422:19
grew  96:2 97:6 474:14
ground  444:4
group  13:24 38:12,21,
  25 46:25 74:17 94:6
  166:21 194:21 227:18
  304:6,7,9 310:16,19
  312:3
grouping  372:10
groups  152:19 153:6
  154:15 155:2,15,16
  157:14 158:9 192:24
  209:20 212:18 309:19
  312:10,23 313:3,4
grow  384:12,13
growing  200:7 351:15
  384:24
growth  307:17 474:17
grundles  455:9
guess  134:13 155:21
  162:14,16 212:13
  284:21 382:19 383:8
  386:4 470:3 480:5
  484:15 498:9 505:17
  516:4
guide  162:3 359:11,21
  360:1,6
guided  210:5
guideline  287:6
  324:25 325:4
guidelines  470:13
  471:5,14 489:6,23
  490:2,8 554:18,20
guilty  103:21 104:1,
  12 105:21 108:5,22
  112:18 150:3,12
  151:8 261:18,22
  427:5,9 548:6,10
  550:6
guy  157:3
guys  16:7,8 86:11
  157:3 228:22 270:4
  275:1 533:19

**H**

habit  107:17

Haddox  244:4,5,7,8
  485:3,6 486:2,7,18
half  16:12,13 97:7
  120:20 121:1,2,4
  257:24 495:24
half-life  56:24
halfway  56:14 66:9
  208:19
halt  67:1,4
hand  54:3 63:4 69:24
  70:21 78:18 94:17
  104:19 138:25 151:10
  179:9 195:2 205:13
  220:7 231:13 501:22
handed  497:11
handing  127:20 551:15
hands  268:18 269:6
handy  79:3
happen  454:5
happened  104:6,9
  126:19 257:2 547:24
  551:19
happening  258:5
hard  65:12 75:12
  433:5
harder  172:8 514:20
harm  12:19 114:2,3
  115:17 116:24 117:3
  338:25 341:20 358:1
  375:14 387:18 461:22
  522:8
harmful  224:23 225:1
hassle  131:1,7
hated  228:16
havoc  249:17
HCP  154:19
HCPS  154:16
head  34:4 329:21
  330:9 450:8
headache  330:14
heads  151:13
heal  219:12
healing  198:4
health  10:13 41:6
  115:10 119:1,4
  154:19 199:2 226:6
  246:6 249:4,5,14
  250:12 271:22 374:9
  414:25 433:14 448:4
  451:1,5 453:1,20
  454:12,23 470:19

Confidential                                              JAN-MS-05484727

471:6,7,16,20,21
490:9,21 493:16
496:4
healthcare 235:1
353:1
hear 139:11 247:15
270:8 387:23 446:14
449:19
heard 38:20 49:17
76:17 87:11 91:21
92:21 93:15 171:16
237:16 265:24 279:17
282:9 283:11 337:17
347:1,14
heart 324:12 369:9
451:11
Heather 227:3 228:13
229:18
heavily 245:4 247:17
heed 345:25
heightened 95:22
522:20
held 10:12 49:4 72:4
110:11 325:9 528:7
helped 24:2 25:2
38:13 50:9 215:14
300:8 310:24 332:23
386:18 446:2 450:10
452:16 502:8 510:15,
21 511:2,9,15,20
513:6
helpful 300:13,17
321:13 427:22 428:4,
25 508:2 558:8
helping 138:4 167:20
229:20 333:14 513:12
helps 439:13
henceforth 227:12
heritage 154:10
heroin 204:9,18
205:2,4,8,11 259:22
267:16,18 268:8,11,
14 269:9 554:7
herring 75:7
hey 150:12
high 73:5,11,15 74:24
75:3 94:5 131:1
148:3 149:15 186:6,
8,12 187:18 188:14
190:1,13 191:11
192:1 226:7 267:25
268:1 323:22,23,24

344:15 351:2 372:10,
17,20 398:23 414:21
415:1,8,14 422:20
467:24 476:14 509:11
530:21
high-abuse 188:16
191:14
high-dose 183:9
high-prescribers
192:19
high-risk 186:18
191:6
higher 93:19 172:8,12
174:12 175:6 324:5
326:5 415:23 422:20
466:18,20 496:2
525:17
highest 94:1 433:18
highlights 95:12
highly 109:1 130:25
164:11 307:23
Hill 166:8
hired 156:12 226:19
historical 488:3
494:5
history 64:20 100:5
122:13,17 210:2
226:4 233:17 234:9
311:23 372:20 392:25
399:12,15 415:19
500:15 501:4 504:8
hit 462:3
hitting 86:2
Hoffman 11:10 28:12
29:7 30:21 31:8,19
50:24 56:7,10 59:12
61:10,16,23 62:7,15,
22 64:24 65:7 67:7,
22 68:10,19 69:5,14,
18 70:2,7,13,17
71:15 76:1,12,25
78:9 81:23 82:10
83:7,17,25 87:17,23
92:20 97:24 98:12
99:6 100:19 101:3,13
102:22 103:4 105:24
109:8,11 110:22
111:3 114:21 117:25
118:17 120:11,24
121:18 122:3,15,23
123:14 125:23 171:20
172:17 173:5,18

174:18 183:22 202:19
203:8 204:16,23
212:5 218:9 224:20
239:9 244:12 245:7
247:12 248:7 251:6
252:13 257:9 260:24
262:12 263:5 264:17,
25 267:10,21 269:11
275:5,8 362:20
383:16,20 443:21,23
444:15 446:8 447:9
449:9 452:8 453:16
454:11,22 455:12,20
456:4 460:16 464:2
465:8 467:16 468:6,
11 469:6 474:6
475:22 477:22 479:6,
24 480:18 481:2,16
483:20 485:19 486:1,
16,24 487:15,18
488:24 489:12 491:19
492:17,24 493:6
495:20 497:10 501:25
504:19,23 505:2,11
506:9,16 507:1 508:8
510:5,20 511:1,8,14,
23 512:6,12,20,22
513:9,18 515:6,14,23
516:3,9,14,17 540:3
542:6,14 543:3,7
547:25 548:14 549:9,
18,23 555:5,20,25
557:21 558:6,14
hold 238:4
holding 75:1
hole 30:10
home 318:25 324:16
384:24
homes 249:18
honest 28:16,21 29:2,
4,11,15,19,25 295:19
honestly 221:4 251:10
497:24
hope 31:21 106:14
163:21 445:15
hoped 416:3 445:10
hopeful 300:16
hoping 300:23,25
Horizon 164:20
hospital 36:4,14
461:16 462:23 471:24

Confidential

JAN-MS-05484728

hospitals  471:17
host  314:22 338:18
hot  100:17 422:17
Houman  11:7 384:2
hour  337:13
hours  361:18 362:19
    383:17,21 461:19
    462:20 463:1,2
    468:16
house  235:24 319:14
Howard  108:21
huge  34:2 37:11,12,
    14,24 124:22 324:19
    331:21 444:9,16,19
    445:12 452:22 457:1
    486:7
human  25:3 386:3
hundreds  33:25 334:24
    452:14 479:19 542:2,
    11
hurt  80:21 117:21
hurting  229:20 447:23
hydrocodone  80:12
    193:14 420:1 483:3
hydromorphone  73:14
    74:11 75:4
hype  107:20
hysterical  230:16

I

i.e.  209:24
iatrogenic  503:14,23
idea  46:11 53:14
    94:21,23 123:13,16,
    17 124:1 167:3
    169:21 200:17 253:5,
    8 266:6,11 394:2
    429:15 468:14
identification  25:18
    54:2 63:6 70:1 78:20
    88:9 94:19 104:21
    127:19 128:18 139:1
    151:12 179:10 195:4
    205:15 220:6 227:1
    231:15 351:19 487:17
    497:9 501:24 517:11
    528:6 533:18
identified  48:14
    87:15,21 111:16
    134:21 135:18 157:24

167:21 188:2 318:3
    372:25 409:23 430:16
identifies  303:8
identify  117:13 155:1
    172:7 317:11 374:25
identifying  91:17
    102:3 152:6 411:8
ignore  450:7
II  57:16 102:1 218:21
    219:2 370:16
ill  125:2 131:15
    133:3,8 134:3
illegal  108:6
illegally  105:23
    108:6,13
illicit  96:7 259:11,
    21 267:15 500:16
    501:4 554:7
illicitly  100:4
IM  461:16
image  57:10 65:20
images  74:1 77:8
imagination  106:16
impact  210:18 213:6
    445:6,17 497:12
    499:16 528:25 529:22
impacts  499:3
impaired  315:21
imperative  198:2
    210:8
Implement  208:11
implemented  471:23
Implications  198:22
implies  101:16 231:7
importance  305:14
    472:5,6
important  80:16 81:14
    155:6 246:9 248:13
    256:7 294:10,12
    316:21 318:1 343:10
    372:15 395:5 416:11
    450:6 460:3 461:8
    472:9,13,19 488:22
    494:5,17 538:16
importantly  315:18
    317:18
impression  239:14
    414:9 438:20
improper  258:17
improperly  553:11

improve  209:24 438:14
    512:7 524:11,12
improved  452:15
    532:16 552:17
improvement  118:25
    453:20 454:12 536:25
improvements  532:8
improving  115:10
    454:23 533:5,6
IMS  92:2,5,7,17
in-depth  198:18
inadequacy  474:19
inadequate  521:24
inadvertently  99:25
inappropriate  506:2,
    10,19
inappropriately  70:8
inartfully  499:13
incapable  260:19
incapacitated  321:25
    327:7
incidence  415:1
incidents  496:15
include  46:24 164:18
    196:7 212:3 338:8
    339:16 360:6 400:7,
    17,22 402:5,11
    404:7,12 490:2
included  368:18
    377:21 399:5 411:23
    470:13 500:14 545:6
includes  352:16
including  46:5 53:5
    60:20 97:1 100:6
    113:19,20 125:20
    199:8,12 221:7 242:3
    363:25 435:8,10
    446:3 513:12 515:23
    536:23
inclusion  167:8
inclusion/advertising
    164:25
incomplete  141:24
    149:10
incorporated  102:15
incorrect  18:4 110:10
incorrectly  203:17
increase  43:5 75:1
    100:1 181:20 187:11
    223:5,10 245:13
    255:21 256:8,18,24

Confidential

JAN-MS-05484729

Lynn Webster, M.D.
February 18, 2019

29

262:17 374:10 403:11
422:17 430:9 448:14
473:9 525:21
**increased** 37:17 39:8,
11 40:6 43:4,7 44:19
100:3,9 164:6 175:7
235:7 240:24,25
354:22 448:13
**increases** 40:2 81:11
201:21
**increasing** 44:23
245:15,20 246:11
256:15 403:2 430:10,
19 492:11
**incumbent** 401:11
**independent** 108:11
285:8,13 291:9 293:2
295:15,20,21 296:2
298:1,6 337:1 376:4,
12 377:15,19 378:21,
24 379:21 380:2
392:17 393:13 429:3
**independently** 304:14
306:9 334:2 375:9
**indi-** 410:2
**indicating** 16:14
109:18,21 161:1
439:13
**indication** 61:14
132:2 133:23 149:23,
25 150:18,21 287:8
288:10,14,16 357:3
**indications** 58:25
60:20 246:1 293:22
349:3 357:3 423:5
**indicative** 227:18
**indigent** 259:25
**individual** 84:18
163:11 165:18 172:21
210:19 213:6 323:18
389:5 391:15 392:25
410:13 423:15 433:2,
16 458:5 481:19
483:14
**individualize** 119:11
316:17 326:9
**individualized** 84:6
316:14 389:12 391:18
**individually** 389:20
545:14 546:11
**individuals** 168:19
172:7,12 189:1

209:20 210:16 212:18
213:3 214:16 226:6
408:9 410:2 430:24
433:11
**industry** 307:23
396:23 454:8 456:9
**inexpensive** 255:8
**inference** 513:7
**infinite** 175:17
**inflammation** 332:13
**inflammatory** 332:14
**inflicting** 106:11
**influence** 74:2 77:8
136:21 137:11,20
138:10 157:22 162:10
166:6 184:12 185:4,
14,22 187:2,5 193:5
194:9,13,14 210:20
211:3,16,24 216:2,
11,20,25 217:6,12,18
218:7,15 221:17
223:5,10 254:7
262:11 290:23 291:3
302:10 308:3,23
336:17 371:21
**influenced** 193:19
291:2 298:12 306:21
312:18 313:7 335:6,
10 477:16 478:18
**influencers** 182:8,21
**influences** 494:5
**influencing** 184:4,18
192:23 254:2
**inform** 558:9
**information** 51:19
143:25 176:21 199:18
240:16 290:24 389:13
395:19 415:19 428:2
441:11 471:8 478:10
**informed** 365:14,16
366:1,20 367:7,14
**informing** 554:14
**informs** 393:16
**infrastructure** 210:16
**infused** 386:14
**infusion** 461:24,25
462:11
**ingredient** 62:25
99:18 398:2 421:15
**inhumane** 450:9

**initial** 72:20 73:16
97:3,19 131:20
133:15 352:1 403:8
**initially** 168:18
**initiates** 210:22
**initiation** 365:1
**initiative** 208:13
**inject** 463:23
**injection** 461:16
**injections** 553:19
**injured** 331:12
**injury** 169:6
**innocent** 464:12
**innovation** 114:12
452:13
**input** 239:22 296:9
308:18
**inquiry** 51:13 72:2
**insert** 287:6
**insight** 306:15,18
**instance** 92:11 292:20
293:1 305:24 306:20
308:2 313:6 334:17
340:24 348:10 478:24
479:25 505:18
**instances** 245:13
286:11 312:17 329:13
332:15 333:3 392:20
512:24 547:12
**institute** 38:10 41:4,
5 198:6 199:4 210:3
446:15
**Institutes** 448:4
**institutionalized**
199:9
**institutions** 515:1
**insurance** 13:7,8,10,
11 15:4,8 124:23
125:11 126:9,15
251:23 254:25 320:4,
6 453:8 455:12,15
456:9,24 457:1,16
541:15,18 542:4
**integral** 72:13
**integrity** 159:19
**intelligently** 230:17
**intended** 262:10
**intense** 326:23 330:16
331:21
**intensity** 315:15
523:23 524:4,10

Confidential

JAN-MS-05484730

Lynn Webster, M.D.
February 18, 2019
30

intent  194:14 223:23
254:2 255:20 256:4,
17,20,24 346:3
372:11 376:13 377:3
488:15
intention  465:10
intentional  354:24
473:20
intentionally  72:16
114:3 126:7
interaction  336:7
410:11
interactions  335:18
interdisciplinary
457:4
interest  136:22
137:12 138:3 221:13
289:19,24 290:7
291:10 397:13
interested  496:9
interesting  57:11
170:13 420:22,24
interests  454:23,24
intermittent  331:22
internal  381:12
457:24
interpretation  189:11
interpreting  441:11
interrelated  252:2
interstitial  314:20
330:24 332:8,9
intervention  386:17
403:1
interview  546:21
intra-  277:13
intractable  365:7
414:23
intrathecal  273:7
277:14 278:10 386:11
introduced  42:13,14,
15 384:3 462:1 482:8
483:8 527:1
introduction  42:17,25
102:10 198:25 474:15
introductory  470:2
invest  454:5
invested  453:2,4
investigated  103:14
235:24 500:9
investigation  50:23
51:14 164:7,9

investment  131:15
133:9
invitation  208:23
invite  336:10
invited  214:20 311:2
involved  13:14 27:15
32:1 33:13 38:24
83:19 84:5 180:19
195:9 197:1,6,12,14
223:17 294:16 295:8,
11 296:6,15 298:11
301:5 302:6 303:9
306:13 309:20,23
310:2,8 313:5 379:7
406:16,25 409:14
involvement  38:17
181:2
involves  15:25 44:10
48:13 406:20 487:22
557:15
involving  281:20
IOM  38:18 39:5 167:21
168:1 195:20 198:9,
21 199:4,9,19 211:8
215:1 220:3 446:15
451:14 499:11,14
IOM's  211:5,18
irrelevant  419:22
irritating  422:14
isolation  452:19
issue  75:6 79:5,23
81:19 135:25 166:9
199:8 210:8 248:10,
11,17 249:4,6 286:5
362:9 394:23 451:5
475:13,22 476:17
issued  24:17 41:10
243:11 470:12 471:5
issues  14:24 15:4
71:24 96:10 157:21
162:10 167:15 248:12
249:15 286:9
it?'  209:16
itching  35:8
itemization  241:17
iterations  111:14
IV  71:25 81:2 369:12
461:24

J

J&J  424:23 427:4
Janssen  20:8,12,14
127:6,8 128:20,22
165:6,10 180:7
183:17 196:17 197:5
206:1,4 212:3 229:8,
13 230:3 231:4,9
384:11 424:11,23
425:2,9,13,21 427:4,
9,15
JCAHO  471:21
job  389:11 448:16
jobs  244:24
John  11:3 105:21
360:20
Johnson  11:9 16:1
17:10,11 20:4,5,8
180:3,6,7 183:17
185:3,4 186:11
187:23 188:9,19
191:16,25 196:18,19
217:6,16 227:2,3
250:23 384:10
427:10,15
Johnson's  186:11
joined  54:14 99:8
joint  201:19 234:22
471:20
joints  201:22 509:2
journal  308:10,13,15
518:11 549:6
journalist  491:25
journals  308:20
judgment  291:10 293:3
393:16 416:5 417:2
June  25:21 79:13 89:9
457:23
jurisdictions  437:1
jury  238:5 539:21
justice  109:5
justify  116:13

K

Kaiko  54:22
Kappa  406:11
Kathleen  233:5 442:13

Confidential

JAN-MS-05484731

Lynn Webster, M.D.
February 18, 2019                                                    31

keenly  100:23 369:13
keeping  94:20
key  87:22 144:22
    172:6 182:1,2,8,20,
    25 183:3 187:1
    210:14 223:9 290:8,9
    460:7 494:25 496:25
kids  320:21
kill  219:7
killing  324:17
kind  21:8,18 26:11
    32:25 49:7 83:13
    98:17 99:3 115:18
    146:23 160:8 175:17
    208:1 280:23 286:1
    293:18 316:1 325:18
    338:24 397:25 422:24
    445:5 482:5 484:9
kinds  92:12 508:19
knees  509:1
knew  73:5 103:24
    107:12 244:24 317:5
    324:11 342:5 343:24
    366:11 369:5 374:20
    375:16 386:1 387:13
    412:13 413:21 465:2
knowing  374:4 396:4
    397:2,11
knowledge  50:19 122:9
    125:7 170:7 217:13
    285:8,13 304:13
    306:9 312:22 351:7
    353:19 367:20 376:4,
    12 378:22,25 379:21,
    25 380:2 382:11,15
    411:6,12 486:14
knowledgeable  486:9
Kohn  205:20 206:3
    208:5
KOL  91:22 227:4
    228:6,14,23 231:4
    507:10
KOLS  88:12 221:7
    222:1,14 227:11
    229:8,13 231:9

L

label  99:21 293:15,
    17,21 294:5 370:22
    476:6 481:5,8 482:12

labeling  411:22 478:6
    480:8,19,21
labels  293:7,12 294:2
    341:4,12,13 344:24
    345:4 368:18,24
    370:6,8,14,16
Laboratories  280:18
    281:1,5,25 282:2,6
laboratory  107:23
    281:9
lack  65:1 133:21
    257:17 323:4 385:19
    449:3 455:22 464:24
    473:21 496:17
Lacks  30:22 122:16
    123:15 217:22
    301:17,22
Lake  89:14 271:18
    559:5
lancinating  329:4
    332:1 398:13
landscape  155:1
    373:13
language  377:20 418:8
lapse  473:19
large  45:16 112:25
    124:22 210:24 249:7
    254:24 261:9 297:17
    304:23 305:10 314:23
    320:14 321:11 369:12
    433:9
largely  320:2 342:19
larger  80:21 117:5
    335:20 445:20
largest  531:2
Larsen  10:18 559:2
lasting  522:8
late  36:10,12,17,25
    39:21 366:19 367:13
    444:8 469:23 479:16
lateral  61:21
laterally'  58:24
launch  64:20 66:20
    75:21 83:5 101:2
launched  72:15 86:8
    127:15
launching  474:17
law  19:4 67:2
laws  125:10 436:11
lawsuit  15:25 20:16
    32:12,17 48:10,12

69:23 87:5 173:14
    253:16 265:12 267:5
    269:19 275:19 276:4
    302:6,10
lawsuits  48:4,7
    124:10
lawyers  13:4 15:13
    25:14 542:1,9
lay  319:3
laying  318:25
lead  364:2 465:12
leader  87:22 223:9
    375:15
leaders  159:20 209:18
    210:14 212:16
leading  162:23 163:6
learn  222:14 284:16
    297:15 343:7 482:5
learned  130:17 286:7
    292:14 375:16
leave  205:12 457:11
leaves  457:12
lecture  189:4 190:2
lectured  33:24 34:24
    224:22,24 368:4
lectures  23:4 33:6,
    18,20,25 34:6,9,16
    35:2 297:14 341:16
    411:11
led  248:3 268:14
left  159:13,23 163:25
    192:14 360:17 432:12
left-hand  66:8 95:12
    518:14,19
legal  10:16,18 111:9
    126:17 367:3 447:15
legally  436:4
legislation  167:13
legislative  167:6
legitimate  240:25
    502:6
legs  385:7,9
lengthy  208:16
Leonoudakis  99:8,12
    366:4 367:24 369:2
    370:10 371:25 373:8
    375:22 376:15 377:4,
    23 379:1 380:4,20
    381:17,24 382:4
    383:9,19 390:12,19
    391:6 392:1,8 394:16

Confidential                                                                                          JAN-MS-05484732

395:1,7,15,24 396:7
397:5,14 398:4
399:2,20 400:3,9,13,
18,24 401:5,17
402:1,7,14,22 403:5,
13 404:1,9,25 405:7,
12 406:8,18 407:3,8
408:3,12,20 409:6,18
410:5,15 411:16
412:3,17,23 414:11
415:11,25 416:6,14,
23 417:4 418:1
419:4,20 420:18
421:6,11,21 424:6
425:5 426:2,8,14,20
427:16 428:6,13
429:6 430:13 431:8,
17,25 432:8,21
433:21 434:4 437:3
438:2,17,24 440:25
441:7,13 442:17
443:6 444:12 446:6
447:4 449:5 452:3
453:10,23 454:17
455:1,17,24 460:5
463:25 464:9 465:17
468:2,8 469:4 474:4
475:18 477:18 478:21
479:21 480:12,24
481:14 483:17
485:16,24 486:4,22
488:10 489:9 491:15
492:4,23 493:2
495:18 504:17 506:5,
13,23 508:6 509:22
510:18,23 511:5,11,
18 512:2,9,16 513:1,
15 515:3,20 516:1,5
517:17,25 518:25
519:5,13,20 520:4,
11,18,23 521:4
522:3,10,15,23
523:3,10,19 524:6,
14,23 525:7,13
526:14,23 527:9,14,
21 528:3 529:9,19
530:3,13,23 531:8,
15,21 532:4,10,18,22
533:7,14,25 534:9,
15,21 535:12,18
536:4,11,19 537:5,
13,20 538:3,12,17,24
539:3,8 540:8,22
541:8 542:8,17,24

543:9 544:22 545:5
546:10,19 548:4,17
549:3,13,20,25
550:4,11,20 552:14,
21 553:22 554:9,24
555:8,18 557:18
558:2,10
**Lessons** 130:17
**lethal** 422:22
**letter** 352:22 354:16
355:19 358:9
**letters** 51:13
**leukemia** 484:13,14
**level** 18:14 33:25
49:9 112:23 117:7,12
125:17 166:9 170:2
279:11 325:8 331:18
344:15 438:14
466:19,20 532:17
533:6
**liability** 25:4 465:12
**liaison** 230:3
**librarian** 123:6
**librarians** 123:7
**license** 437:6
**licensed** 272:3 436:24
437:12,19
**life** 30:5 74:6 202:3
219:9 269:8 322:4,5
323:10 385:20 408:6
452:15,16 521:25
529:1 532:13,16
533:5 552:17
**life-long** 331:17
**life-threatening**
364:1 368:10,13
**lifesaving** 219:6
**lifetime** 408:2
**Lightning** 398:19
**likes** 147:4 177:23
228:21
**likewise** 28:9 34:13
138:18 388:16 390:16
391:10 394:5 409:24
412:7,9 430:22
436:25
**liking** 177:2,18
**limit** 361:12 362:14
**limitation** 383:14
**limitations** 361:19
362:14 371:9

**limited** 134:13,14
**limiting** 75:1 502:5
**limits** 226:13
**lines** 59:9
**lining** 278:4
**link** 72:17 167:24
**linkage** 50:11
**linked** 72:18 75:4
**Lipman** 497:20
**list** 33:23 35:7
88:15,20 91:1 196:2
208:22 227:24 229:21
303:12 354:9 365:20
399:13,17
**listed** 157:14 182:6
209:1 211:15 214:16
215:25 220:12 221:4,
13 231:2 241:14,20
307:3 365:14 528:22
534:4
**listen** 93:4 135:13
**listening** 33:7
**lists** 198:19 212:14
228:5
**literally** 144:7
**literature** 46:13
123:5 171:25 267:24
295:6 303:2 326:15
329:20 365:21 375:2
428:18 447:20 461:21
462:23 467:19 468:7,
14 489:2,5 491:12
496:8,20 501:11,16
504:21 556:18
**litigation** 17:1
128:22 134:18 152:1
170:21 443:24 491:20
**live** 202:3 203:25
209:25 235:2 271:16,
17,18 324:8,17
**lived** 107:19 272:10
**lives** 38:2 209:24
342:10 387:14
**living** 209:20 212:19
321:19 384:24
**LLC** 282:8,15,20,24
**lobby** 217:17 218:6
**lobbying** 166:13,17,18
**local** 11:15,19 36:4,
13 60:4 167:15

Confidential                                                      JAN-MS-05484733

locations 100:10
logic 135:6
logical 466:2
logo 152:2 164:24
 180:3
logo/description
 164:21
logos 152:17
long 13:24 14:4 21:22
 23:18 35:7 91:3
 107:2 117:19 157:3
 174:7 194:25 214:1
 231:22 236:20 299:10
 313:18 315:14 326:8
 331:24 343:1 344:22
 357:5 365:3 393:4,12
 394:13 417:21 456:12
 481:7 496:13 526:17
long-acting 42:5,8,18
 43:1 185:14 277:8
 339:9,13 411:20
 434:19 460:19 461:3
long-acting/short-
acting 339:18
long-term 178:25
 183:9 394:20 433:7
 503:8 509:10 544:25
 545:16 556:2,6,19,24
longer 50:13,16
 201:25 202:3 220:9
 231:25 232:11,18,19
 233:14 244:12,13
 327:3
looked 101:8 111:2,24
 112:17,23 124:8
 147:11 155:16 162:6
 212:1 243:18 263:10
 264:9 303:4 414:15
 417:21 529:22,24
 544:3 548:18
loop 393:23
lost 199:13
lot 12:19 22:15 40:8
 43:18,20 51:9 89:17,
 21 113:4,6 118:4
 124:9 125:15 134:10
 159:19 174:5 175:2,
 10,25 190:16 203:19
 252:19 255:10,11
 258:11 265:12,22
 266:2,10,13,15 267:5
 279:2 289:8 293:16

294:1 307:13 314:16
315:13 317:13 319:16
321:9 331:10 338:8,
22 351:12 373:5
374:7 445:7 452:20,
23 466:7 472:3
486:14 511:21 513:6
539:20 552:2,15
loud 70:23 132:18
low 49:9 73:5,7
 107:1,20 148:4
 172:5,10 173:25
 314:11 329:1,23
 342:10 372:9,16
 495:14,22 496:6,14
 500:17 503:9
lower 324:10
LP 10:8
lucky 445:4
lump 279:6,8
lunch 151:14,15 166:5
 171:4,11
Lynn 10:5 11:21 12:5
 559:6,21,23

—————

M

M.D. 10:6 11:21 65:16
 559:6,21,23
MA 228:15
made 38:13 72:20
 99:19 163:8 171:17
 208:13 234:25 238:24
 247:16,19 265:12
 267:5 275:13 280:6,
 11 282:19 283:21
 285:1,15,22 291:23
 296:17 304:9 309:5
 387:2,13,14 414:9
 424:20 454:10 480:15
 492:18 498:11 507:16
 559:19
magnitude 199:7
 209:12 432:25
main 422:9 450:12
maintained 465:4
maintenance 434:9
major 59:7 122:1,13,
 18,20 249:14 259:22
 368:13 393:19 416:25
 445:6 453:13 455:21
 456:2,5,7

majority 115:10 172:6
 174:2 255:7 408:9,14
 418:14 495:15,22
 496:5 510:6
make 31:17 38:1 40:17
 53:10 70:8,18 73:8
 74:7 110:13 114:6,
 10,14,16,19 115:3
 117:22 118:9 119:15
 124:11 159:15,16
 195:19 239:23 253:12
 265:22 269:17 275:2
 288:11 289:18,23
 290:6 294:11 296:3
 305:12 316:9 336:3
 337:1 364:10 375:15
 395:13 416:11 424:24
 425:3,14 426:12,18
 427:25 453:19,20
 455:9 470:24 472:18
 492:13 539:20 542:3,
 12,20 543:1
makes 16:16 147:7
making 31:24 107:5
 118:25 195:16 207:5
 247:23 287:20 289:13
 294:7 395:22 425:24
 426:6 454:13,24
 514:20
males 186:7,9
malpractice 13:8,10
man 65:14 70:20
 243:18
manage 154:13 343:11
 366:16
managed 186:24 247:4
 368:6 453:8 467:15
management 36:8 97:14
 98:4,7,17 102:1,9
 128:1 152:23 153:2
 157:22 196:8 198:2
 306:13 312:22 313:25
 338:24 347:15,18,21
 348:2,11,23,25
 355:21 372:14
 433:10,15 435:24
 455:23 468:17 469:23
 470:13 471:9 474:20
 475:10 494:7 497:13
 498:22 517:14 535:4
managing 257:19 302:3
 446:2

Confidential                                                                    JAN-MS-05484734

Lynn Webster, M.D.
February 18, 2019

34

mandated 370:7
mandibular 331:14
manifest 419:13
manifestation 419:18
manipulate 464:25
manipulated 422:21
  463:11
Mansukhani 11:5
manufacture 276:15
  278:17
manufactured 273:11
manufacturer 16:19,20
  31:16 48:13 108:4
  114:5 127:14 550:24
manufacturers 12:9,18
  28:8,20 32:9 113:8,
  20 171:16,23 173:13
  215:4,25 247:7
  252:25 253:16 260:20
  275:23 276:2,7,15
  278:14,15,21,22
  279:7
manufactures 218:21
  219:1 350:7
manuscript 243:17
  428:21
manuscripts 337:6
  497:1
mapping 152:6,16
  153:5,12 160:9
  379:12 381:5
March 152:8 161:13
  180:11
mark 11:18 25:16
  54:11 69:25 88:6
  94:18 151:11 238:7,
  16,18,22 351:16
  432:12 487:11,16
  497:7 501:23 517:6,
  10
marked 25:18 54:2,4
  63:6 70:1 78:20 88:9
  94:19 104:21 127:19
  128:18 139:1 151:12
  179:10 195:4 205:15
  220:6 227:1 231:15
  239:8 351:19 381:3
  439:23 487:17 497:9
  501:24 517:11 518:16
  528:6 530:10 533:18
market 59:6 73:2,4,9,
  19 75:8 80:15,16,20,

22 86:3 96:24 411:21
  472:17 474:15 514:1,
  8,14,16,19 515:12,18
marketed 67:15 96:11
  108:13 234:20 481:22
marketeers 107:24
marketing 28:8,14,19,
  25 32:2 67:13 81:1
  97:11 101:6 102:6
  103:1 106:23 107:4
  123:19 124:4 136:7
  139:7 140:12 181:3
  184:11 252:8,16
  256:18,20 261:5
  273:15 279:3 280:5
  281:4 282:18 283:25
  378:8 382:12,16,20
  426:25 427:5,14
  477:7,12,16 478:17
  506:3,20 549:2
  550:21,25 551:2
marketplace 100:2
  102:11
Martha 128:1,7
Massachusetts 181:7,
  8,15
master 127:21 129:25
  130:3
material 110:16 338:5
  382:20,24 429:1
  438:9
materials 273:16
matter 10:7 122:7
  207:16 326:20 328:2
  361:1 419:25
maximize 108:18 148:1
  149:5,19 210:18
  213:5
Mayday 546:24 547:1,4
Mckinsey 180:17,20
  181:2 188:10 191:15
Mcomber 11:14,15
meaning 275:17 378:25
  467:6 492:8
means 116:13 128:21
  145:1 146:6,11
  173:13 193:25 194:3
  246:17 247:24 286:25
  287:3 288:23,25
  294:12 321:8 372:19
  418:10 421:8 463:14
  492:19 504:1

meant 212:8 398:17
  473:22 492:9,12,20
  493:1
measure 178:16 237:5
measured 236:13,16,23
  455:6
measurement 143:12
measuring 236:18
mechanism 210:15
  327:19 407:6 410:25
  423:20,23 466:8
  521:13
mechanisms 423:24
  521:10
media 102:13 124:9
  164:4 340:8
medical 106:7 108:21
  112:6 125:5,9 126:16
  129:17,20 136:13,25
  137:5,9,18 138:9
  162:23 199:12 221:15
  230:3 233:17 234:9
  240:25 258:5 289:2,
  6,9,12,17,22 290:5,
  15 291:8,9 293:2,5
  309:5,9,13 315:17
  341:25 342:2,6,11
  343:16,21 344:6,16,
  21 374:9 386:1
  391:3,12 393:16
  399:18 401:24 405:17
  411:4,7 417:2
  429:18,19 437:12,14,
  15,20 438:16 439:5
  449:24 462:7 467:20
  468:14 472:12 473:8,
  9 474:9 489:6 490:8,
  20 491:5 498:20
  549:6
medically 187:13
  391:2 506:2,10,19
  527:6
medication 13:12 96:4
  106:24 125:12 257:20
  326:25 352:13
  359:11,21 360:1,5
  370:1 388:13,18
  389:14,21 392:16
  393:22 395:20 399:25
  403:2,11 404:22
  410:10 412:11,15
  432:14 448:19 482:7

Confidential

JAN-MS-05484735

Lynn Webster, M.D.
February 18, 2019

35

medications  12:9
  108:18 121:8 144:2
  234:13,18 235:10
  370:19 385:17,20
  386:14 392:17,21
  405:19 406:1 411:23
  418:20 427:11 429:22
  435:12,19 447:18
  453:7 502:5 516:11
  532:1
medicine  13:14,15
  26:15,16,20,22 27:8
  29:1,4 34:2 36:16
  37:4,8 38:10 41:4
  48:21 98:19 161:6,
  19,22 162:22,25
  163:2,6 166:24
  167:16 197:19 198:6
  199:4 214:23 245:14
  257:19 258:9 259:15
  272:1,4 273:9,12
  278:17 289:11 290:17
  292:6,20 293:14
  294:5 304:4 307:5,
  10,12,19 308:5,8,10,
  12 309:2,12 318:24
  321:9 327:3 333:6
  339:4 340:18 342:17,
  23 343:8,9 348:3,22
  355:9 358:14,21
  359:12 363:24 364:3
  373:22,23 374:12
  385:23 386:9 387:5
  422:8 431:13 433:12
  445:1,4 461:12
  473:18 481:12 485:14
  491:7 502:3 525:17,
  22 526:11 534:8
  535:16
Medicine's  210:4
medicines  251:14
  258:1 276:16,19,21,
  22,24 277:2 278:23
  286:18 293:7,12
  319:7 330:20 339:25
  341:4,24 344:25
  349:3,12,13 350:4
  352:15 353:2,9
  354:19,21 355:20
  356:15,20 357:4
  368:18,25 447:14
  524:12,19
Medicom  129:19

Medtronic  164:19
meet  148:14 167:20
  178:11 230:2 408:9
  432:19
meeting  21:13 49:12
  59:21 60:4 71:25
  79:19 81:20 163:6,7
  164:24,25 208:10,12
  214:10 228:15 256:7
meetings  24:2 59:19
  79:23 341:16 382:21
member  13:16,17,21
  49:2,9 50:9 220:22
  306:16 309:24 312:5,
  7,10 313:5 442:25
members  14:8,10 50:9
  164:18,20 196:2,7
  211:25 216:1 241:25
  310:10
membership  157:20
  162:9 310:13
memo  54:21 55:24
  61:2,20 62:3 111:20
  112:3
memorandum  71:23
mental  226:6 246:6
  374:9 414:24 433:13
  490:21 496:4
mention  165:4 343:16
  411:23 412:21 490:7
  507:24
mentioned  33:16 50:12
  71:6 86:22 90:12
  164:4 228:14 250:11
  278:9 281:15,18
  283:4 296:25 305:22
  309:18 311:24 313:14
  316:19 331:6,7 332:8
  337:8 343:15 346:5
  347:3 349:7 353:18
  371:10 384:9 393:9
  402:18 405:17 427:20
  446:11 449:10 451:25
  456:18 478:23 490:1
  547:17
mentions  490:18 491:3
message  33:1
Messages  142:14
met  179:4 271:6 384:5
  414:17
meta-analysis  500:5,9
  501:2,6 546:6 557:6

558:5,8
methadone  254:18
  255:3 434:8,10,18,22
  435:1,4 436:4,9,20,
  22,23 456:20,25
methamphetamine
  259:23 415:21
methods  99:25
mic  269:24 270:3,5,
  12,18 383:8 539:7
Michael  55:4 59:22
  71:3 79:4,7,22
  108:20 111:19
microphone  383:8
mid  36:25 479:15
mid-1990s  470:11
middle  144:12 146:21
Mike  71:25 79:6 458:5
miles  319:2
Millcreek  10:13
milligram  82:17
  325:3,13
milligrams  325:16,21
  326:1,7
million  37:14,18 38:7
  39:4 40:25 108:9,24
  193:14 199:10 235:9
  446:12 448:5,10,11
  498:17 540:15
millions  38:2 106:15
  107:6 447:25 542:2,
  10,11
mind  80:18 85:8
  263:20 384:20 415:22
minds  110:20
mine  334:6
minimize  155:7 351:11
  373:6
minimized  235:6,16,18
minimum  356:25
mining  193:4
minor  248:10
minute  158:4 161:25
  337:14 504:24
minutes  54:12
miracle  107:1
miracles  107:9
mis-  548:7
misappropriately
  492:15

Confidential                                                                                          JAN-MS-05484736

misbranding 105:23
108:6,23 110:3
261:19 548:7 550:7
mischaracterizes
132:13 133:21 138:13
173:21 190:9 224:6
misdemeanor 108:23
mislead 108:7
misleading 110:3
188:23 280:10 281:8
282:23 283:20 284:25
285:14,21 288:20
291:22 296:16 301:3
383:3 424:19 425:4
426:6,19 427:5,14
545:21 546:4 547:14,
18 549:6,22 558:7,13
misperception 85:2,5
misreported 268:7
misrepresentations
107:14 109:4 507:12,
20
missed 488:22
misses 414:19
missing 177:16 182:14
mission 163:1 209:23
212:22
missions 210:1
misspoke 380:14
misstate 103:12
misstates 120:25
misunder- 484:15
misuse 99:20 352:11
354:22 358:14,21
450:23 557:24
misused 433:11 488:17
mitigate 174:11 300:9
301:25 338:25 352:11
366:16 525:16
mitigation 225:2
297:23 337:25 338:21
348:18 406:22 409:15
mobile 511:3 513:13
mobility 511:25
modalities 402:5
Modeling 179:24
moderate 372:9 417:20
509:8
moderate-to-severe
96:5 97:4

Modulation 406:23
molecule 84:19 85:11
529:8,12
molecules 297:18
moment 505:12
moments 476:18
money 113:25 114:6,
11,14,20 115:3
117:22 170:3 228:17,
18 265:13,22 266:2,
5,6,8,10 267:5 279:3
455:9 543:1
monitor 167:15 557:23
monitoring 102:3
108:11
monitors 557:16
month 324:2
months 503:13 556:14
mood 532:17 533:5
moral 198:2 210:7
morbid 201:20,21
morning 108:1 271:7
429:9
morphed 36:22
morphine 56:20 57:1,
3,24 68:17 72:5
73:23,24 74:8,17
78:1 80:9,19,23
82:7,12,15,21 83:6,
24 84:23 85:7,14
99:19 110:12,14
325:16 458:19
459:17,23 460:15
461:17 462:14
mortality 388:25
motion 70:19 156:20
motion's 70:16
motivate 143:5,25
motivated 130:25
motivation 142:25
143:13
mouth 278:3,5
move 16:10 56:10
70:2,5 109:11 156:19
170:10,25 206:17
207:23 238:20 239:5
367:5 483:21 540:3
moved 91:8 280:20
moving 70:10 207:5
MRIS 236:19

MSL 230:3
MSLS 290:21
mu 405:23 406:1,3,14,
15,24 408:17,24
409:4,14,25 410:11
411:9 423:21 424:4
mucosa 278:4,7
mucous 278:7
multidisciplinary
457:5,9
multifactorial 124:20
250:13
multiple 125:25
225:20 262:21 384:23
386:7,15 416:21
507:9 553:18
mutual 118:24
mutually 454:13
Myers 11:8
Myra 89:3 197:15,16
205:18 207:25 209:3
214:15 220:16 241:14
242:12 441:25 442:10
mysteries 106:7
myth 492:21
myths 230:20

N

naive 416:19 417:25
418:4,10
name's 220:12
named 48:4 51:15
181:6 227:3 275:19
276:3 458:5
names 13:25 55:6
88:20 318:15
narcotic 96:4 107:18
412:10
narcotics 57:16
106:13 218:22 219:2
Nathan 11:10 443:23
nation 34:7,14
nation's 107:15
national 33:6,17,20,
25 34:16 35:2 41:5
51:24 163:10,12
166:9 167:10,13
208:11 295:24 309:23
310:15,23 311:11,16,
17,18 448:4 470:11

Confidential

JAN-MS-05484737

471:21 474:18
**naturally** 93:25
**Nausea** 35:7
**Nebraska** 35:19 384:15
**necessarily** 23:5 84:1
  118:2,8 170:16
  186:21 257:13 258:19
  288:20 330:14
  356:12,19 388:13
**neck** 330:9
**needed** 75:10 274:25
  418:5
**negative** 45:17 323:11
  453:15 477:16,21
  478:18,20 499:3,15
**negotiations** 361:8
  362:4
**nerve** 331:11,14,15,20
  332:5,6
**nerves** 331:20
**nervous** 406:17
**Networking** 64:8
**neuralgia** 314:20
  330:8,15,16 331:7,10
  332:4 398:9 399:5
**neuralgias** 399:1
**Neurogesx** 164:19
**neurologic** 314:17
**neuropathic** 328:1
  509:3
**neuropathies** 314:18
**neuropathy** 201:24
  314:19
**Neutrals** 228:4
**news** 387:17
**newsletter** 64:17,19
**newspaper** 104:4
  491:24
**Nickel** 11:18 54:11
  432:12
**night** 468:19
**night's** 511:16
**NIH** 34:1 37:16 38:9
  41:2,16 448:8
**Nix** 10:25 99:12
**Noble** 544:9
**non-breakthrough**
  328:12
**non-cme** 20:2

**non-opioid** 403:2
  541:9,20 543:2
**non-opioids** 338:21
  417:18
**noncancer** 36:23 42:1
  44:19,24 58:24 60:20
  61:22 80:6,10,14,21
  81:4 97:4,6 314:3,5,
  9 318:7,17 325:25
  327:13,18,23 328:2,
  12,15 330:3 332:17
  333:20 394:10 413:24
  414:8 415:18 432:15
  470:15 502:6 509:19
  518:23 520:9,16
  521:9 523:8,14 529:1
  530:1 535:6 555:3,13
  556:7
**Noncompliance** 400:11
**nonfatal** 260:16
**nonmalignant** 42:19
  43:1 60:21 73:1,4,7,
  19,20 74:10,16 75:8
  497:13 500:24 509:16
  510:9
**nonparty** 17:4
**noon** 151:14
**Notary** 559:25
**note** 57:12 324:16
**noted** 102:7 559:8
**notes** 180:17 316:19
**notice** 459:15
**notion** 74:1 77:7
  210:6
**November** 128:2 205:22
**NSAIDS** 117:11
**Nucynta** 423:2,20
  425:9,11,12,15,23,
  24,25 426:6,7,12,13,
  18,19
**number** 34:2 40:5
  45:16 64:11 72:22
  129:11 152:17 175:17
  178:10 179:3 185:22
  195:24 208:17 216:10
  249:7 261:11 314:23
  320:15 321:12 324:20
  330:11 351:11 352:6,
  21 363:16 378:15
  387:19 414:6,16
  423:16 429:10,16,25
  430:8,17 431:5,23

432:5,6 436:2 437:7
  444:19 445:12,13
  449:19,21 457:4
  461:19 473:13 486:16
  487:13 514:25
  540:10,14 556:18
**numbered** 234:3
**numbers** 160:18 431:22
**numerous** 60:19 319:16
**nurse** 197:22
**nurses** 304:10
**Nursing** 153:2

---

O

**O'MELVENY** 11:8
**O/n/a** 227:12
**obesity** 201:21,24
**object** 29:7 30:21
  40:19 42:20 45:2
  50:24 56:7 61:10,23
  65:4 67:7 68:10
  69:5,18 70:2,20
  71:15 73:10 76:12,25
  81:23 82:10 83:7,17,
  25 87:7 97:24 98:12
  101:3,13 102:22
  103:4 105:24 109:8
  110:22 111:3 116:4
  117:25 118:17 120:11
  122:15,23 123:14
  125:23 140:14 149:9
  152:21 173:18
  176:14,19 177:12
  178:6,22 180:8 181:5
  182:10 183:4,14,21,
  22 186:13,22 187:20,
  25 188:5,12 190:24
  191:17 192:2,10
  195:22 197:2 203:6,8
  206:7 207:15,21,22
  208:6 209:7 212:5
  213:1 214:18 216:3
  218:9,23 219:13,23
  221:9,19 224:7,20
  228:9 229:6,15
  233:21 236:3 237:21
  239:4,19 240:11
  242:8 246:14 247:12
  248:7,21 249:13
  250:20 251:6 252:13
  257:8,9 262:6,12,24

Confidential                                                                                                  JAN-MS-05484738

264:17 265:8 267:21
268:21 269:10 272:8
274:14,17 275:15,20
383:10,15 532:18
541:2 542:14 543:3
548:14,22 549:23
550:18 552:6

**object-** 64:25

**objecting** 17:2 247:9
270:2,10

**objection** 15:9 16:5,
9,12,18,20 17:18,22,
25 18:2,13,25 19:6
20:23 24:8 27:21
28:11,12,22 29:9
30:8 31:19,25 32:13
33:11 39:18 40:18
42:2 43:14 44:1,9,15
45:5 47:9 48:17
59:13 61:16 62:15,22
65:1 67:22 68:18
71:9 76:1,3 78:2,9
85:3 87:8,17,23
91:19 92:19,20 93:1
99:6 100:19 113:10
114:7,21,22 116:2,
14,15 117:23 118:18
119:7 120:2,3
121:18,20 122:3,24
123:20 124:5 127:11,
16 128:3 129:6 130:5
131:8,25 132:10
133:20 134:5,8,23
135:2,21 137:1,2,14,
21,23 138:12,21
139:9,13 140:3,18,24
141:6,12,16,23
142:5,15,20 143:1,6,
16,17 144:3,9,13,19,
24 145:3,7,8,16,22,
25 146:2,8,12,17
147:1,5,20,23 148:5,
11,12 149:3,8 150:5,
14 151:5 152:4,10
153:7 154:22 155:9,
17 156:13,18 157:18,
25 158:12,13,17,23
159:10,11,25 160:4,
10,14 161:14 162:7,
14 163:14 165:7,11
168:7 170:4,24
171:20 172:17 173:5
174:17 175:22
177:14,21 178:21

182:13,22 184:7,13,
14,22 185:6,18,23
187:7 188:17,21
189:23 190:4,6
191:20 193:1,9,21
194:1,11 197:7
198:12 199:20 200:3,
4,13,15 201:9
202:19,21,22 203:7,
14 204:5,16,23 206:5
212:4 213:2,14 215:7
216:7 217:1,3,8,14,
19,21 218:1,2,11,12,
24 219:24 220:24
221:1,5,10 222:3,9,
11,17,20,21 223:14
224:4,5,21 225:11,
17,19 226:14,23
229:9,23 230:5
231:5,12 232:7,12
235:14 236:9,24
238:15 240:3,4,12,13
242:19,23 245:6,7
247:11 248:6 250:24
253:18,19,23,24
254:4,15 255:23
256:22 257:11 258:20
259:3 260:22 261:25
263:3,4,13 264:25
265:14 266:3 267:8,
10,20 268:20 269:11,
20 272:25 273:19,24
274:5 276:8,9 277:4,
9 278:18,25 279:9
280:14 281:10,16,23
283:13,22 284:2,19
285:2,9,17 286:13
287:1,13,16,23
288:3,22 290:1,19
291:12,25 296:18,19
297:10 298:3,14
299:19 300:1,15,20
301:6,8,13,14,21
302:12,18 303:22
304:16 305:4,8,19
306:4,11,25 307:1,20
308:6 309:7,15,21
312:20 313:10 315:11
316:15 317:1 318:19
320:1 321:23 322:18,
23 323:2 325:1,14
326:3,12 327:15
328:13,21 329:16
330:6 331:8 333:7,23

334:4,13,22 335:8
336:18 337:4,23
339:6,11 340:2,20,25
341:6 343:20 344:8,
18 345:1,6,12,16
346:1,10,14,21
347:7,12,16 348:5,14
349:4,14,22 350:9,
17,23 351:9 353:15,
24 354:6,12 355:1,12
356:3,17,22 357:6,
19,22 358:6,23
359:22 360:9 366:4
367:23,24 369:2
370:10 371:25 373:8,
10 375:22 376:15
377:4,23 379:1
380:4,20 381:17,24
382:4 383:21 390:12,
19 391:6 392:1,8
394:16 395:1,7,15,24
396:7 397:5,14 398:4
399:2,20 400:3,9,13,
18,24 401:5,17
402:1,7,14,22 403:5,
13 404:1,9,25 405:7,
12 406:8,18 407:3,8
408:3,12,20 409:6,18
410:5,15 411:16
412:3,17,23 414:11
415:11,25 416:6,14,
23 417:4 418:1
419:4,20 420:18
421:6,11,21 424:6
425:5 426:2,8,14,20
427:16 428:6,13
429:6 430:13 431:8,
17,25 432:8,21
433:21 434:4 437:3
438:2,17,24 440:25
441:7,13 442:17
443:6 444:12 446:6
447:4 449:5 452:3
453:10,23 454:17
455:1,17,24 460:5
463:25 464:9 465:17
468:2,8 469:4 474:4
475:18 477:18 478:21
479:21 480:12,24
481:14 483:17
485:16,24 486:4,22
488:10 489:9 491:15
492:4,23 493:2
495:18 504:17 506:5,

Confidential                                                                    JAN-MS-05484739

13,23 508:6 509:22
510:18,23 511:5,11,
18 512:2,9,16 513:1,
15 515:3,20 516:1,6
517:17,25 518:25
519:5,13,20 520:4,
11,18,23 521:4
522:3,10,15,23
523:3,10,19 524:6,
14,23 525:7,13
526:14,23 527:9,14,
21 528:3 529:9,19
530:3,13,23,24
531:8,15,21 532:4,
10,19,22 533:7,14,25
534:9,15,21 535:12,
18 536:4,11,19
537:5,13,20 538:3,
12,17 540:2,21
542:5,6,15,22 544:20
545:1 546:1,2,14,16
547:25 548:23 549:16
552:7,10,20 553:12,
14 554:4,23 555:4,5,
14 557:18 558:2,10
**objectionable**  18:10
**objections**  31:8 62:7
65:6 68:19 69:14
135:3 136:23 142:9
260:24 270:9
**objective**  118:15,20,
21 119:5 147:22
227:10 238:12 307:9
496:10
**objectively**  236:13,
15,23 237:5
**Objectives**  137:13
**obligation**  289:18
**obnoxious**  228:23
**observation**  243:21
415:5
**observing**  230:9
**obtain**  100:3
**obtained**  415:19
**obtaining**  131:16
133:10
**obvious**  121:11 497:17
**occasion**  386:6 417:10
423:2
**occasions**  479:20
**occur**  327:13 369:17
480:3

**occurred**  164:10 255:8
446:18 474:18 504:6
512:25
**occurrences**  14:21
**October**  501:19
**OD**  73:14 74:11 75:4
**off-label**  150:3,12,22
151:2 286:5,9,10,14,
18,19,20,23 287:11,
14,20 288:19
**offer**  115:14
**offered**  107:8,20
243:16
**offering**  124:24
**office**  30:15 31:1,12
95:19 415:17 449:20
**officer**  49:6 108:20,
22 112:7
**official**  303:25
**officially**  238:24
**officials**  57:14 476:9
502:10
**Oklahoma**  10:7,10 11:2
12:8 44:8 216:25
217:7,12,17 218:8
271:23 272:1,4,7,10
273:18,23 275:14
284:1 285:16,23
286:2 382:13,18
506:18 542:20 559:1
**Oklahoma's**  507:4
**Oklahomans**  200:10
**oldest**  106:6
**oncologists**  79:25
81:9,12
**oncology**  155:1,16
**one's**  106:16
**ongoing**  361:7 432:15
433:19 435:17
**onset**  145:24 147:3
148:18 277:13,18,20,
21 297:21 326:22
327:10 328:9 339:14,
20 398:18 422:3
466:13,17 517:4,5
526:1 536:24
**op-**  437:21
**Open-label**  535:8
**operate**  304:14
**operating**  388:7

**operation**  202:5
257:25
**operations**  314:13,14
318:21 323:20
**opinion**  87:22 91:25
117:19 124:4,14
223:9 298:13 302:20
306:22 334:15 390:23
477:6 554:3
**opinions**  124:16
299:17,18,24 302:10,
17 305:25 306:7
312:18 313:8 334:10,
11
**opioid**  12:9 22:20
23:1 31:16 32:9 40:1
43:6,9,11,12,21
46:1,2 57:21 58:11,
19 59:8 62:11,18,20
76:17,18 80:8 82:7,
12,14 93:3 96:8 97:3
124:15 125:1,22
144:1 145:24 148:3
149:16 172:16
173:23,24 174:15
175:14,15 177:8
178:3,12,20 180:7
181:2 184:2 190:15
191:1 192:19 203:18,
20 204:4,14,21,25
234:25 235:24 243:24
245:15 246:24 247:5,
7 249:2 254:20,21
257:5 258:17,22
261:15 264:12 269:17
273:4 276:2,6,14,16,
19,22 278:14,15
279:6 302:2 315:7,10
317:3,25 318:7
319:24 325:19 341:23
342:3,10 355:24
365:1,20 366:24
367:15 368:18,24
371:11 372:12,24
374:20 388:13 390:4,
11,18 391:5,13
392:6,15 393:22
394:9,14,20 395:14
399:25 403:11,23,25
404:7,12 405:19,23
406:1,12 408:2,10,23
409:1,22 410:10
412:10 414:3 415:23,

Confidential                                                                                       JAN-MS-05484740

24 416:19 417:25
418:4,5,10,12,19,25
419:1,2,11,18 423:9,
25 427:6,10 429:21
432:14,16,25 433:17,
19 434:3,12,19,23
435:2,12,13,17,19,25
436:6,9,15 438:7
446:3,18,22 456:3
459:13,14 461:3
462:10 463:6 470:14
495:12,22 496:1,22
497:12 502:21 503:8
504:3 507:13 516:11
535:4 537:2 538:1,9
539:12,17,22 548:21
550:13,23,25 551:10,
16 553:10

**opioid-tolerant**
352:16

**opioids** 12:19,20
23:2,4 27:16,19,22
28:3,8,20 30:6,16
32:24 33:2,10 34:17,
23,25 35:4,6 39:16,
20 40:9,16 41:24
42:6,9,18 43:1,18,
19,22 44:14,19,23
45:9,15,18,19,23
58:16 78:1 84:5,17
92:12 93:21 98:21
99:4 100:6 113:21
121:13 125:4 143:5
147:4 148:19 171:17,
19 172:3 173:14,16
176:12 181:22 183:10
185:14 190:23 193:7
200:22 202:16,24
203:4,13,23 219:12
224:16 225:1,24
226:9,11,19 230:12,
19 233:16 234:8
235:4,7 240:10 241:1
243:20 245:4,21
248:4,14,19 253:17
254:12,22 255:21
258:23 262:16 265:13
266:14 267:19 268:18
272:20,24 275:24
277:3,8,18 280:6
281:4 282:19 284:1
291:24 297:3,8,12
301:11,20,24 314:3,
8,24 316:6,25 318:4,

17 319:19 320:12,16
321:10 324:21
338:17,19,23 339:8,
10,17 340:23 341:9
342:4,17,23 343:18,
19,22 344:14,17
345:8,10 346:7,23
347:4 364:15,16,19,
21 365:2,19 366:3
369:12,14,21 370:7,
16 373:7 393:7
394:13 396:6,12
406:11 407:6 408:7,
17 409:3,17,25
410:22 411:20
413:15,20,23 414:7
419:7,14 420:6
429:18 430:6,25
431:15 433:8 435:17
437:21,23 447:2
448:22,23 449:3
450:21,23 456:22
460:2,19,21 463:4
481:19 482:2 496:12
503:13 507:13 508:11
510:12 513:23 514:23
515:18,24 517:3,5
526:1 539:25 540:6,
19 541:10 544:25
545:16,24 550:17
551:24 552:4,23
553:3,11 554:15
555:2,12 556:2,6,13,
19,24 557:16

**opium** 107:18
**opponent** 228:19,25
229:18,19
**opponents** 228:4
230:25
**Opponents/neutrals/
advocates** 227:11
**opportunities** 100:3
136:12 137:11,20,25
223:11
**opportunity** 72:22
138:10 181:18 185:21
187:11 221:17
**opposed** 230:8,17
307:12
**option** 116:21 190:15,
20 203:19,24 226:8
403:15 482:21

**options** 315:19 399:13
417:19 423:8 457:12,
14 482:19
**oral** 56:16,20 273:9
326:25 413:8 460:13
482:18 529:3,13
**orally** 57:3 413:14
**order** 28:19 29:4,18
210:21 266:1 319:4
395:10 487:12
**ordered** 151:15
**organization** 50:4
52:8,22,25 158:20
159:8,22 163:9
165:17 210:24 214:17
295:25 305:13 307:16
312:8
**organizational** 157:20
162:8 196:6 210:19
213:6
**organizations** 34:3
160:9 166:21,25
167:8 169:25 170:2
197:1 209:19 210:15,
17 212:18 213:4
214:14 216:17 304:19
310:11 342:19 470:12
471:21 489:6 515:1
**organized** 208:1
**original** 26:13 99:21
111:20 112:3 476:6
484:11,23 485:20
534:13
**originally** 35:16
243:16 244:6
**ORT** 414:14
**OTFC** 529:4,7,17
530:20 531:19,25
532:7
**OUD** 436:9
**outcome** 21:14 178:16
179:5 325:10 335:6
365:22 388:20 397:12
**outcomes** 365:9 535:9
552:19
**outlined** 131:2 450:2
**outlining** 131:6
**outnumber** 431:15
**outnumbers** 431:6
**outpatient** 36:22
353:2 436:20

Confidential JAN-MS-05484741

outweigh 389:15
514:10 555:11
outweighed 483:15
outweighing 316:11
Overcome 136:23
137:12
overdose 35:13,14,15
225:3 254:18 255:7
260:13 261:16 297:13
311:10 324:13 352:12
354:23 365:10 368:2,
12 369:22,25 393:7
438:11 456:20 553:10
overdosed 261:12
overdoses 387:19
overlap 14:25
overprescribed
248:20,23
overprescribing
257:7,14,22
overriding 227:19
overview 161:23
162:22 169:24 195:6
198:16
owned 308:11,13
owners 55:16
oxycodone 55:24
56:16,20,23 57:8,14,
20,22 59:24 60:18
68:16 69:3 72:4,6,9,
13,19 75:24 77:22
80:7 81:16 82:7,12,
19 83:6,23 84:23
85:6,20,22 86:4,7
96:9 99:24 100:8
107:17 110:11,14
325:20,22 459:1,19,
22 460:13 462:14
465:19 476:7 535:3
537:1

Oxycontin 30:16,19
42:17,25 56:3 59:2,
14 64:19 66:21 67:11
72:14,15,17,18
73:13,21 74:9,15,21,
24 75:24 79:19,24
80:9,19 81:3,10,13
83:4,15,23 85:21
86:2,8 94:8 95:4,8
96:1,3,8,11,13,15,24
97:2,4,7,11,16,17
98:10 99:17,18

100:10,18 101:2,10
102:6,15 103:2
104:16 105:23
106:22,23 107:5,8,
10,16,19,22,24
108:4,6,14,15,23,25
110:3,19 120:21
121:5 122:14,21
252:25 253:3 255:2,
11 261:19 292:7
458:1,7,13 459:1,25
461:2 463:1,19
474:14 476:5,10
479:3 480:10,20
481:20,21,25 483:2,
5,14 505:14 507:25
508:2,12,15 510:13,
14,21 511:2,9,15,24
512:7,14,23 513:6,
10,19,25 514:23
515:11,25 549:7
Oxycontin's 75:21
100:2

P

P-A-I-N-S 194:23
P-R-O-P 502:4
p.m. 171:12 558:20
package 287:6
PAGE-LINE 559:10
pages 63:11 105:7
112:11 153:15 161:1
162:11 179:14,17,22
376:18,23 377:1
470:1,3 489:21
paginated 179:17,19
440:3
paid 21:5 242:5,12,
18,22
pain 13:12,14,15
26:15,20 27:7 34:1
36:7,13,14,16,19
37:1,4,7,15,23 38:8
39:4,12 40:6,17
42:1,19 43:2 44:20,
25 45:13 48:20,25
49:18,20,25 50:10,13
51:24 52:7 58:24
60:21 61:9,15,22
72:7,10,17,23,25
73:1,7,9,19,20 74:4,

10,12,16 75:3,8
80:4,6,10,14,15,20,
22,24 81:4,5,11
93:24 95:24 96:1,5
97:2,4,6,14 98:4,7,
17,19 106:8,11,21,24
107:2,9,21 108:17
125:3 126:13 131:24
133:24 144:2 145:6,
12 147:3 148:16
149:23 150:18
152:22,23,24,25
153:1 154:11,12,13,
25 155:14,15 157:22
161:5,19,22 162:22,
25 163:1,3,5,7,11
165:19,23 166:16,19,
24 167:1,6,7,8,11,16
168:5,11,13,22,23
169:1,13,20 174:5
183:8 184:3,19
185:1,5 187:12
190:12,14 192:20
194:7 195:17 196:7,
10,13,15 197:19,25
198:2,6,17 199:1,5,
11,24 200:1 201:1,4,
6,15,18,19 202:1,6,
9,17 203:1,5,25
208:10 209:21,25
210:4 211:9,12
212:19 214:23 228:24
233:10 234:13,18,20,
21,23 235:2,20,25
236:12,18,21,22
237:5,9,16 238:1
242:3 244:25 245:17
246:19 248:1 256:8
257:16 292:7,15,16,
21 302:3 303:17,21
304:4,13 305:1,20,
23,25 306:7,14,23
307:5,9,11,13,19
308:5,8,10,12,14,15
309:2,4,12,24 310:3,
5,15,22,23,25
311:18,25 312:11,19
313:24 314:3,5,9,11,
17 315:15,16,21,23
318:7,17 321:10,15,
18 322:7,9,11,14,17,
22 323:6,12,19
325:25 326:10,11,17,
18,21 327:13,18,19,

Confidential
JAN-MS-05484742

23,24,25 328:1,7,12,
16,24 329:1,4,12,23
330:3,10,14,19,21
331:1,17,18,22
332:5,17 333:17,20
334:1,10 342:23,24
343:8 355:21,25
365:7 373:17,24
374:8 384:17 385:6,
14,16,19,23 386:7,8
387:4 388:12 391:3,
11,25 394:10 398:13
399:24,25 400:12,23
402:20 403:24 404:22
406:16,21,22 407:7
409:14 413:18,19,24
414:8,23 415:18
417:17,20 423:7,10,
17 429:10,16,22
430:1,3,8,10 431:6,
13,15 432:15 434:7
435:24 436:10,16
444:7,17,19,20,21
446:3,13 447:1,7,23
448:5,13 449:11,17,
20 450:7,21 451:4,
10,20 455:23 457:5,9
458:21,22 461:12,15
462:18 468:17 469:22
470:12,15,16,19,20,
24,25 471:9,10,19,23
472:7,8 473:10,13,
16,17 474:19 475:8,
9,17 479:3 482:20
485:14 488:19 489:5,
23 490:2 493:17
494:7 497:14 498:16,
22 499:4,18,19,20
500:1,25 502:2,5,6
503:13 505:15
508:18,19,22,25
509:3,5,8,14,16
510:9 512:19 513:5
517:8,14,15 518:23
519:8,10 520:16
521:9,14 522:21
523:9,18,22,23,25
524:2,4,11,22 525:6,
19,23,24 528:2,25
529:1 530:1 531:4
534:8 535:4,6
536:13,17 537:3
540:10,24 541:6,21
545:17 552:12 555:3,

13 556:3,7,13,24
**Pain's** 236:7
**pain-related** 470:11
**painful** 60:20 327:4,5
330:25 398:20 450:14
**PAINS** 38:21,22
194:21,24 195:6,9,
14,19 197:1,6,14
198:17 199:17,23
208:2,11 209:5,17
210:3,12,22,25
212:11,15 213:11
214:15,24 215:14
216:1,2 219:16,17,21
220:9,23 232:2
442:1,15,24,25
**PAINS'** 209:11
**painted** 66:15
**pamphlets** 311:21
338:5,6
**panacea** 202:17 203:4,
13
**pancreatitis** 314:19
**paper** 41:13 51:9
244:6 247:21 263:15
337:10 351:13 485:21
488:9 523:13 544:15
**papers** 166:10 175:2,
3,5 461:20 462:9
**paragraph** 57:7 58:22
66:8,18 67:5 69:2,12
79:4 97:21 99:14
101:18 109:25 110:7
130:20,21 131:11
132:18 136:7 208:8
212:15 228:12
234:12,17 240:18,21
363:15,23 474:13
476:2,3 494:16 507:6
521:18 530:16
**paragraphs** 109:6
**parent** 323:9
**part** 17:24 18:12,21
19:3 24:21 27:14
28:14 38:12 55:9
66:18 70:10 72:13
105:19 126:18
139:18,24 167:5
209:4 214:13 215:2,
10 216:17 219:16,21
220:2 231:24 232:1
238:23 254:24

259:22,24 260:2,6
263:2 282:11 288:16
297:17 304:23 311:6
322:4,5 326:18
336:11 338:6 360:5
362:17,25 363:18
391:15 404:20 436:5
444:8 448:20 451:14
459:11 466:11 488:25
489:14 502:8,12
507:8 546:23
**partial** 406:5
**partially** 541:19
**participant** 213:17
**participants** 210:25
211:23 212:2,10,12,
13,14 213:11 503:12,
15 504:13
**participants'** 211:23
**participate** 164:22
213:21 220:5 295:18
311:7 522:1 546:20
**partner** 158:10,15,16
159:4
**partnering** 163:9
**partners** 152:7 165:24
237:16
**partnership** 162:10
164:16 165:17 166:15
**partnerships** 157:21
**parts** 94:15 554:19,21
**party** 103:24 252:3
**pass** 57:1 269:22
270:11 350:25 351:5
383:7
**passage** 167:9
**passed** 420:15 475:14
**passes** 421:9
**Passik** 247:21 249:21
**passing** 351:7
**past** 17:20 19:9 32:5
49:14 89:24 156:16
243:10 315:7
**patch** 190:19 418:6
422:13
**patches** 421:15
**patent** 62:5
**path** 466:3
**pathology** 169:5,9,14,
16

Confidential                                                                    JAN-MS-05484743

Lynn Webster, M.D.
February 18, 2019
43

pathways 407:1
patient 46:2 50:2,3
  52:2,3,5,12,20 73:6,
  8 84:6,14 116:25
  117:1,16 131:17
  133:11 152:7,18
  154:14 157:13 158:9
  189:7,8 197:20
  209:19 212:17 237:18
  239:16 240:1 272:19,
  21,23 273:5 288:13
  289:14,24 290:7
  291:11 304:6,9
  309:19 310:15,19
  312:3,9 313:2 315:10
  316:4,14,25 318:24
  333:4,5 357:14,24
  358:3,12,20 359:7,
  19,21 363:19,20
  364:10 365:15,23
  386:25 387:23 388:11
  389:7,9,19 390:6,10,
  17 391:23 392:25
  393:22 394:1,19
  395:6,11,13,21 396:5
  397:1,3 399:24
  401:12,15 403:3,11,
  24 404:21 412:8,11,
  13,14,22 415:5,17
  416:12 417:24 423:11
  432:11,15 463:21
  464:6 468:18 474:19
  482:24 484:12 508:16
  510:3 529:2 530:21
  535:8 536:25 538:8
patient's 113:14
  117:18 389:12 399:18
  400:2 401:24 521:24
patient-controlled
  462:2
Patient-prescriber
  357:13,21 359:2,8
  363:19
patient/physician
  187:16,17 188:14
patients 27:5,10
  36:19,20,22,23 52:21
  73:12,15,23 74:17,
  20,23,24,25 80:4
  91:10,11 95:22 99:22
  106:10,15,25 113:9
  116:19 119:3,11,14,
  17 131:14 132:9

133:2,17 134:2,11
138:4 154:16 163:3,
11,22 171:18 174:5
178:4 181:20 183:8
186:7,9,12 187:12
188:11,16,20 189:5
190:1 191:12,15
192:1 203:1 226:3
257:25 272:6,10,13,
16 286:12 289:19
305:15,17 314:12
315:3 317:6 318:5,
13,15 320:10,11
325:8,24 327:14
328:20 329:15 330:3
332:17,19 338:4
352:15,17 355:22
364:21 365:2 372:9
374:11 384:17 386:7
387:15,21 393:18
394:6,8,12 398:24
413:9,14,23 414:2,6
415:9 417:3 418:14,
18 422:24 424:2
429:10,16 430:1
432:19 435:16 445:18
446:1 447:2,13,16,
23,25 448:22 449:4
450:24 463:17 464:12
466:7 471:18 474:1
480:11 481:19,24
482:6 483:6,15
494:19 495:1,15,23
496:1,5,22 500:1,11,
12,15,18,22 501:1,3
503:7 505:20 506:3,
11,19 508:1,10,14,18
509:18,19,25 510:6,
15,22 511:3,10,16,21
512:1,4,15 513:7,12
519:9 520:9,15
521:19 522:19 523:18
524:13 525:3,4
526:9,11 527:6
529:1,25 531:5,13
533:3,12 535:5
537:2,17 538:1
543:17 545:8 552:16
557:16
pattern 184:2
Patterson 11:1 99:12
Paul 55:3 59:22 60:2
  108:22 112:2

pay 108:9,24 302:6
payers 187:2 209:21
  212:19 542:12
paying 13:3,6 255:1,2
payment 20:22
Payne 220:16
PBS 450:13
PCA 461:25
PDF 139:22 489:21
peak 39:22 446:17
peaks 461:22 465:13
  468:1
peer 136:21 137:10,
  19,20,25 221:16
  223:10 308:20
peers 164:12
penalties 108:10,25
people 34:5,14 37:21,
  22,25 38:3,7,13
  39:4,12 40:6,15,16
  43:18,20,22 45:11,
  12,17,20,25 46:4,6,9
  49:25 91:25 98:18,20
  113:24 114:2 115:11
  116:8 117:20 135:23
  172:3,6 173:25
  175:20 176:7,10
  177:5,8 178:10 179:4
  186:18 195:16,17,20
  198:4 200:25 201:3,
  14 202:9 203:17,20,
  23 205:12 215:3
  218:6 219:12 226:3,5
  235:17 236:17,18
  245:4 246:16,24
  247:22 249:8 255:13
  257:15 259:14 261:11
  266:13,15,24 267:13
  269:17 305:20
  310:21,24 317:11
  319:17 320:15,18
  321:10,12,14,17
  323:5 324:20 326:5,
  6,16 328:15,23
  332:25 342:9,19
  343:3 369:5 374:7,
  17,22 375:1 386:20
  387:19 407:18
  413:18,19 414:22
  417:16,17 418:11
  420:7 422:6 430:8
  433:6,7 434:8 436:3,

Confidential

JAN-MS-05484744

Lynn Webster, M.D.
February 18, 2019

44

10,15 437:7 444:19
445:7 451:2 452:23
458:22,25 462:17
464:22 466:25 467:11
492:10 496:9 498:17
508:24 509:6,7
540:10,18,23,24
553:17
people's 420:12
perceived 79:24 80:7
224:3,9,10 458:7,14
percent 37:15,18
39:9,12 171:18
174:1,16,22 202:4
254:22 267:18,25
286:16 296:9 321:15,
18 388:24 389:1
414:16 415:2 430:7,
24 448:14 456:21
500:13,14 501:7,12
503:15 504:15
508:24,25 509:14,15
510:1 519:12 520:16
543:24 545:24 546:13
percentage 201:5,13
500:12 509:17
percentages 509:13
perception 80:2 81:15
406:16 459:5,8
perceptions 457:24
529:2
Percocet 80:12 81:7
420:2 459:12,19
perfectly 481:4
perform 175:19
performed 386:17
period 39:16 40:5
176:8 262:17 292:12
314:2 331:23,24
393:4 482:16 483:4
perioperative 60:21
peripheral 201:24
314:19
permit 436:11
Perry 89:11,18,21
persistent 355:25
417:17 462:17 482:20
509:8 517:15 525:23
person 84:9 88:14
91:1 117:4 208:1
221:13 239:13 252:2,
11 327:18 369:25

372:20 386:10 395:12
419:24 420:3 450:7
486:9 508:22 553:9
personal 241:15
393:17 445:12
personality 72:12,14
73:21 74:7,14 76:19
77:15 111:25
personally 15:11
51:17 84:22 86:23
222:5 230:7 485:7
perspective 117:8
pertaining 375:19
petition 12:13 502:3
507:5,7
Pfizer 164:19
pharm- 334:17
pharma 10:8 196:21
253:2 279:17,21
280:1,7,12 281:15,21
298:7,8 375:11
Pharma's 95:25
Pharmaceutica 165:6
pharmaceutical 28:25
58:17 62:25 115:3,5,
13 116:22 117:7,20
118:16,22 119:13,19
126:18 150:24 184:11
196:18 213:9,10
215:4,9,12,13,25
218:6 222:16 251:8,
20 265:20 298:2
299:2 302:5,9,14
304:14,20,23 305:23
306:1,10,21 308:2,
17,24 312:14,17
313:7 334:19,25
335:4,11,12,20
336:8,17 337:7
338:10 339:16 347:5
371:20 396:21
424:11,16 425:3,10
428:9 429:1 442:21
443:4 451:23,25
452:10,12,19,21
453:3,19 454:8 455:8
456:8 505:22 506:4,
12,20
Pharmaceuticals
283:12
pharmacology 56:23
57:19 409:3,9

Phase 60:6 71:25 81:2
348:17 535:8
Phil 15:20
Philly 228:16
philosophical 116:1,
10,12,17
phone 54:9,14 360:24
phrase 58:2,6 68:5,8,
14 77:15 91:16
188:23 347:1,14
472:17
physical 392:25
399:11,12,15 402:6
465:6 466:21 467:4
522:21 524:11,12
physically 467:14
physician 26:9,11
83:11 84:22 98:2
146:24 182:7,20
185:12 194:7 197:21
219:11 239:16,20
291:18 313:3,16,19
331:5 341:22 371:5
389:11 401:12 437:13
464:8 486:10 526:21
physician's 31:12
80:18 110:19 187:3
449:20
physicians 13:24
21:24,25 28:3 32:18
52:7,24 53:2 72:4
74:7 75:23 79:24
80:3,11,22 81:6,16
82:6 83:5,14,22 87:6
92:9,17 96:25 97:8,
13 98:11,16 99:2
108:8 110:11,13
113:17 119:21 120:1,
10,23 121:6,7,9,16
122:14 125:2,6
130:24 131:19 133:13
143:5 162:24 169:17,
22 183:11 187:24
188:2 193:13 194:7
248:4 251:14 279:8
288:8 291:4 294:1
297:15 299:4 300:8,
14 305:6 307:15
309:14 325:5 339:3
343:18 344:14 346:7
348:4 370:13,15
430:25 432:5 436:20
437:19 439:2 447:12

Confidential

JAN-MS-05484745

449:19 455:14 457:25
458:7 459:2 471:7
514:2 551:13
**physicians'** 80:5 86:6
**physicians/payers**
193:5
**picked** 278:6
**picture** 65:12,14
**piece** 72:21 239:7
497:12
**pieces** 81:17
**pierced** 331:15
**pill** 465:7
**pillow** 385:12
**pinched** 331:12
**pioneer** 445:5
**place** 56:4 59:12
102:9 113:8 230:10
278:3 493:10
**plaintiff** 10:6
**plaintiffs** 361:4
379:5
**plaintiffs'** 380:7
446:10 449:12 451:22
453:17 456:18 477:5
483:25 495:11 501:9
502:19 507:2 557:2
**plan** 74:14 75:5 101:6
127:22 129:25 130:3
139:7 150:3 239:24
378:8
**planning** 49:11
**plans** 102:1,9 181:3
261:5
**play** 320:21 385:22
453:9,13 511:10
**played** 419:17 442:24
**plea** 104:1,12 105:21
112:18 427:9
**pleaded** 108:5,22
**pleas** 427:1
**pled** 103:21 150:3,12
151:8 261:18,22
427:4 548:6,9 550:6
**plight** 450:20
**plummet** 457:6
**podium** 65:15
**point** 23:20 31:14
60:17 69:7 77:22
86:7 94:22 105:1
123:12 134:12 140:17

149:18 154:9,25
155:13 164:5 167:19
169:18 183:7 184:1,
17 185:12 186:3
187:1 192:17,18,22
193:16,18 227:20
240:9 252:1 258:14
290:4 299:7 345:23
395:5 425:15 480:8,
15 481:10 483:1
499:24 505:23
**pointed** 221:13
**pointing** 40:25
**points** 60:15 131:6,12
132:19 153:13
157:15,16 167:14
183:3 192:14 229:22
230:2 427:21 498:10
**poison** 117:9
**policy** 198:15,16,25
209:20 212:18 230:9
251:24 266:7 471:6
491:7
**poor** 322:12 384:25
399:24 417:2
**poorly** 467:15 493:18
**poppy** 107:19
**population** 117:16
134:14 172:23 173:1,
11 174:23 175:7
176:25 177:3 191:7
201:6,17 226:12
248:24 251:15 255:15
257:21 317:22 320:23
372:18 393:23
414:16,20,21 415:6
416:12 422:20
430:10,20 466:16
497:1 521:11
**populations** 174:12,25
225:23
**Portenoy** 46:22 47:8,
17 48:6 49:13 90:16
507:9
**portfolio** 19:4
**portions** 469:15 498:3
**position** 71:24 73:13
93:19 110:18 166:9
227:19 395:12 419:1
443:3
**positioned** 60:19
80:17

**positioning** 59:24
60:10 80:11,23
**positions** 49:5 230:15
**positive** 80:5 146:19
154:15 224:3 397:11
478:19 531:2
**positively** 532:15
**possibility** 74:25
412:14
**post-message** 143:12,
14
**postgraduate** 289:8
**postop** 292:7,15,16,21
458:21
**postoperative** 480:10,
20 505:15
**potent** 99:18 516:4,8
**potential** 57:23,24
68:16 69:3 80:21
102:4 117:3 155:5
158:10,15,16 159:4
176:24 229:13 297:2,
7,8 316:10,11 323:14
341:20 360:6 365:21
372:8 398:1 399:17
401:13 403:23 407:7,
12 408:18 413:14
424:2 435:8 473:23
476:7,12
**potentially** 99:23
109:2 400:7 410:1
549:5,21
**power** 80:19
**Powerpoint** 139:8,19,
24,25 152:15
**PPR** 88:12
**PR** 536:9,10,16,23
**PRA** 10:13 271:22
**Practical** 442:14
**practice** 26:12 27:4,
6,8,14 36:3,9 91:5,9
93:22,24 164:8 272:4
313:22 366:3 382:22
386:21,23 390:1
417:11,15 418:13,17
421:17,18 423:2
424:10 425:22 436:11
445:12 463:2 470:18
471:5,14 477:11
478:12 481:12 483:8,
9 508:14 509:18
510:2 537:19 538:10

Confidential                    JAN-MS-05484746

practiced  91:7 271:25
 482:8
practices  294:4
practicing  36:5 91:4
 162:25 200:20
 313:16,19,24 341:22
 526:21 527:2
practitioners  301:25
pre-message  143:11,14
preceding  212:15
precursors  347:22
predict  525:20
predisposed  100:7
predominantly  81:3
prefer  193:5
Preliminary  440:10
premise  327:21
prepare  12:23 13:1
 21:12,14 24:2
prepared  24:2 125:2,3
 127:25
preparing  25:5 497:22
preposterous  123:2
prescribe  97:2 121:7,
 12 142:25 143:5,13,
 25 183:11 185:13
 194:8 248:4 258:8
 272:20 286:20 290:16
 293:8,12,14 301:24
 315:9 316:24 318:10
 333:1 353:1,9 370:19
 371:8 372:17 388:19
 389:22 412:10 415:24
 417:10,13 423:2
 436:22 437:23 456:16
 479:3 481:24 483:5,
 13 504:6 505:20
 508:3,14 526:18
 538:10 539:25 540:6,
 7 543:2 554:15
prescribed  39:17,20,
 24 40:1 41:25 92:13
 93:21 96:3 125:12
 188:25 203:21 224:17
 225:25 235:3 248:15,
 16 251:13 254:13,22
 255:14 256:25 259:14
 261:10,15 268:12,13
 273:4 287:4 314:2,8
 315:3 316:5 317:24
 318:4 320:24 328:14
 329:25 330:4 332:16,

22 343:4 359:12
 368:25 372:12 373:23
 393:14 396:6 418:24
 423:6 430:25 432:14
 434:10 455:14 456:22
 464:5 504:2 514:2,19
 517:7 525:10 526:9,
 22 553:6
prescriber  94:5 148:1
 149:5,19 345:21
 354:3,8,10 355:5,7,8
 357:10 359:10,19,20
 364:3,8 395:23
 401:20 460:4
Prescriber's  142:13
prescribers  94:1 97:7
 120:21 121:5 148:4
 149:16 183:19 187:24
 262:5 297:23 345:24
 353:9,11 354:2 356:5
 368:22 438:15
prescribes  431:14
prescribing  28:3 40:1
 43:7 92:8 136:23
 137:12 138:10 184:12
 185:5 193:14 235:7
 240:24 254:2,8,10
 255:17,19,22 256:3
 258:17 262:11,16
 286:9,10,15,17,23
 288:15 289:11,14,18,
 23 290:6 291:7 294:4
 318:16,23 329:11
 352:9,14 353:18
 354:20 364:15 366:3,
 10 370:17 373:16
 395:14,22 412:16
 432:5 434:2 436:19,
 25 448:24 507:25
 533:12
prescription  66:23
 95:3 100:6 107:16
 184:5,18 204:10,21,
 25 235:11 259:12
 267:14,19 268:9,18,
 23 269:18 318:6
 350:20 355:7,11
 356:7 357:1 358:4,18
 359:18 364:11,22
 371:5 390:4 548:21
 553:20
prescriptions  66:22
 97:5 101:11 223:5

235:9 256:15,19
 258:25 315:7 364:19
 431:24 446:18,23
 474:14 527:4,13
present  23:8 146:15
 169:12 515:2
presentation  129:4
 130:3 139:8,24
 140:1,22 152:15
 153:12 228:15
presentations  19:23
 21:2 26:2 33:17
 128:24 129:11
presented  285:4,20
 346:19 543:11
presenter  223:9
presenters  22:4
Presently  435:11
presents  399:10
president  13:18 14:2,
 5,17 15:1 48:20
 49:14 65:17 161:5
 164:7 214:22
press  41:10
pretty  63:17 265:21
 274:12 459:12
prevalence  414:15
 430:3 518:22 519:11
 520:8
prevent  511:25 512:24
Prevention  199:6
previous  212:2 314:13
 329:2 462:23 475:1
 496:3 532:1
previously  60:22
 329:24 501:11 503:24
Pricara  164:19
price  74:18 75:1
 453:7
priced  73:5,6
pricing  73:3
primarily  22:18,19
 77:23 93:24 98:10
 120:16 268:8
primary  18:19 92:24
 93:12 97:1,8 98:2,
 10,16 99:2 113:16,
 18,23 114:1,5,19
 118:15,20,21 120:9,
 10,22 121:5,8,9,11,
 15,16 122:13 146:25

Confidential                                                 JAN-MS-05484747

179:5 318:22 406:13
431:1,5,12,14 432:6
546:9
**print** 533:20
**prior** 37:8,20 42:17
86:2 88:7 102:9
203:22 377:6,7
379:23 413:9 440:19
488:23 501:16 504:20
540:4
**priori** 388:15 390:9
**priorities** 155:13
**prioritize** 155:2
**priority** 59:25
**private** 36:3 209:21
212:19 436:11
**problem** 43:11,13,24
95:5 103:11 124:20
126:8 169:11 200:6
202:6 204:11,12
205:10 206:20,24
251:18,20 252:23
258:13 259:10,16,20
261:3 263:17,19
264:12 333:9 344:1
365:5 374:13 407:16,
17 413:20 420:8
433:8,14 436:6
448:12 449:24
450:21,23 465:1
493:16
**problematic** 246:4
466:9
**problems** 100:8 102:4,
7,15 103:3 132:8
134:21 135:18 199:2
202:1 205:5 226:7
246:6 255:10 323:8
364:1 374:9,23
414:25 433:19 435:7
466:24 496:4 509:1,5
**procedure** 331:13
**proceeding** 362:18
**proceedings** 99:8
360:17 432:12
**process** 315:25 343:12
353:20 434:2 473:25
481:17 482:3
**processes** 393:1
468:25
**produce** 450:10

**produced** 65:13 105:15
152:1 170:21 554:6
**producer** 450:12
**producers** 450:11
**producing** 521:13
**product** 21:9 23:6
68:2 72:22 73:3
74:4,6 80:11,17,23
85:22,25 86:4 130:24
131:20 133:14 136:22
137:11 170:17 256:21
295:4 299:4,12 340:9
461:6 465:11,16
467:25 468:15
**productivity** 498:21
**products** 18:20 24:24
67:1,3 75:25 77:23
81:7 86:9 260:21
279:14 350:2 427:6
448:24 467:21 469:1
476:8
**profession** 52:23
**professional** 48:24
52:8,9,21 53:3
152:18 154:14,20
158:8 198:3 209:18
212:17 289:10,12,17,
22 290:5,16 291:8
293:6 303:8,13
304:7,8,9,18 307:15
309:9 341:16 342:18
382:21
**professionals** 235:1
309:6,13 471:8
**professions** 198:4
**profile** 189:8 293:20
389:13
**profiles** 297:19
423:14
**profit** 114:3 119:1
453:20 454:13,24
**profits** 108:19 113:8,
25 118:16 119:5
451:24 453:18
**program** 59:25 60:3,6
108:12 125:6,10
155:3 164:24 294:21,
24 298:24 301:4
311:8,14 338:12,25
340:17 347:15,18,23
348:12,23 349:9,11,
12,16,18,21,24

350:12,15 351:21
352:10 353:11 356:8
358:18 359:17 363:6
442:24
**programs** 23:9 125:11
138:1,2 294:15
298:21,25 299:16,23
300:12 338:14,20
339:2,4,9 340:24
346:6,12,16,22
347:2,3,9,21 348:2,
4,20 349:1 373:5
439:6 490:9
**progress** 208:13
**project** 195:6,10,15,
16,19 208:2 216:1
219:16,18 220:9,23
231:25 232:2,10
233:13
**projects** 210:20,22
213:7
**prominent** 485:14
491:8
**promised** 107:21
208:5,12 482:15
**promote** 68:2 96:24
150:24 151:4 163:2
211:10 278:22
**promote-** 472:16
**promoted** 96:12 101:1,
10 108:14 253:21
**promoting** 28:8 97:11
98:10 245:4 299:12
548:6
**promotion** 104:15
150:4,13 255:21
256:18,20 273:22
286:5
**promotional** 72:16
81:17 97:18 110:15
278:16 280:5 281:3
282:18 295:3 298:25
299:1,5
**proof** 478:1
**PROP** 502:4
**proper** 117:14 383:21
395:6,13 551:23
**properly** 81:9 184:4,
17 191:5 192:24
465:11 476:13 511:24
512:6,13,23 513:10,
19 523:17 524:3

Confidential

JAN-MS-05484748

525:2 526:12 531:14
552:16,22,24 553:2,
5,6
**properties**  343:17
461:23
**property**  343:17
462:11
**Proposal**  233:13
**proposed**  59:23 88:11
120:15
**proposing**  489:23
**proprietary**  155:3
**prosecuted**  104:24
**prospect**  59:2
**prospective**  176:2,4
**protected**  413:19
**protection**  324:15
**protocol**  335:23 336:2
**proved**  156:15
**proven**  51:11
**provide**  14:7,10,16
46:8 51:18 60:2 75:9
107:2 115:6,7 122:11
207:10 212:21 318:11
329:7 336:4 427:21
466:6 498:7
**provided**  14:16 15:2
25:14 33:22 47:19
59:23 60:5 72:21
137:19 243:11 305:2
320:8,9 395:19 428:2
429:2 471:7 547:5
**provider**  154:20
**providers**  52:24
338:2,3,6 353:1
470:19 471:17
**providing**  45:22 126:9
290:23 315:23 361:16
507:10
**pruritus**  368:7
**pseudoaddiction**
243:8,12,14 244:1,18
245:3 246:10 247:8
248:3 249:21 250:3,9
403:17,21 404:16
405:5 483:24 484:2
485:22 487:1,23
488:2,16 489:4
490:3,13,19 491:4,22
492:20 493:11,15
494:4,16 495:8

**psychiatrist**  486:11
**psychological**  522:22
524:21
**PTSD**  246:5 496:4
**public**  109:3 170:6,
12,15,18,22 199:2
211:7 247:16 249:4,
5,12 250:12 338:25
387:6 559:25
**publication**  41:2
164:23 249:20 306:22
308:4 336:11 428:17,
19,21 484:11,23
488:23 489:1
**publications**  26:2
110:16 308:4,19
311:19 313:8 373:6
447:21 503:4 556:5
**publicly**  240:22
**publish**  336:5,6,10
369:19 393:10 445:22
**published**  91:23 199:4
247:20,21 308:21
333:16,19,25 336:14
341:15 372:3 373:1
375:17 461:20 468:24
484:3,5 485:20
486:17 487:4 488:9
497:20 501:19 502:2
503:19 517:24 518:12
527:25 528:12 534:8
556:4,21
**pull**  105:17 469:8
514:13 543:10
**pulled**  544:19
**pulsing**  462:12
**pump**  68:3 273:7,8
386:11 387:10
**purchased**  17:20
**Purdue**  10:8 11:11,15
16:1 17:7 19:17,19,
20,25 20:3 21:4,8
22:4,8,9,13 30:14
53:13 55:10,13,16,19
59:6 61:20 62:3,11,
18 64:12,20 69:16
71:8 75:21 76:10
78:6 82:25 83:3,14
87:2,4,22 92:11
95:25 96:23 97:15,17
98:9 101:1,20,25
102:11,17 103:20,24,

25 104:5,8,12,24
105:22 106:18,25
107:6,12 108:3,8,25
109:4 110:8 111:16
112:7,18 120:9
121:15 123:11,13
125:21 126:22 127:1
164:20 183:16 196:21
212:3 217:6,16
237:18,23 244:10,15,
19,22 250:23 251:4
252:8 253:2,12
261:18 443:24 457:24
458:5 477:12 479:10,
15,19 481:10 486:19
505:13 543:11
547:11,15 548:6
549:4,14,21 551:23
559:1
**Purdue's**  97:10 101:6
102:5 103:1 106:23
107:4,10,19 108:19
114:19 123:19 477:7,
15 478:17
**pure**  107:17
**purported**  174:1
**purpose**  71:22 178:7,
14 184:10 303:20,23,
25 307:8 377:3
464:16,22 467:22
497:19
**purposes**  52:16,19
195:19 240:25 467:22
**push**  385:11
**put**  58:25 62:11 102:9
107:21 190:21 230:10
252:18 300:22 306:22
311:19 312:18 313:9
337:9 441:16 519:11
**putting**  138:16 229:1,
14 370:13 450:8
451:24 489:1
**pyramid**  141:10,15
142:8

---

**Q**

**QOL**  532:8,12
**quadruples**  369:24
**qualification**  174:15
**qualify**  229:2,21

Confidential                                                          JAN-MS-05484749

quality  163:2,3
 385:20 452:15 453:1
 521:24 528:25 532:12
 552:17
quan-  499:9
quantified  499:6
quantify  445:24
quantifying  499:15
quantitate  237:5
quantitating  236:21
quarterly  164:23
quest  167:16
question  15:14 20:20
 40:14,22 47:11 93:5,
 9 105:9 115:23
 118:7,10,12 135:14
 154:1 162:14,15
 170:25 176:22 191:24
 202:12 203:3 205:6
 206:22 207:2,4,18,19
 209:16 214:6 223:24,
 25 232:13 240:15
 252:6,7 257:4 260:5
 264:2 266:12 280:23
 288:4 295:9 322:12
 332:3 376:25 392:13
 419:10 421:1,2 441:3
 496:21 499:13 505:17
 556:1
question's  85:17
 274:11
questioning  63:21
questions  26:6 105:12
 170:9 182:2,25 183:3
 187:1 207:10 225:21
 270:2 274:14,15,19,
 22,24 275:3 317:18
 331:3 342:25 363:9
 378:13 383:10,12
 387:8 429:9 439:9
 440:6 443:12,25
 446:10 449:12 451:23
 453:17 477:5 513:22
 516:16,18 533:22
 555:19 558:15
quick  326:22 443:13
 555:21
quickly  277:21 326:23
 463:7,15 531:4
quiver  385:10
quote  197:24 198:5
 450:3 491:24 495:13

507:3
quoted  448:2 491:21
 492:2,3

## R

R&d  60:4
rabbit  30:10
rabidly  474:15
radiation  202:2
radiculopathy  328:24
raised  71:24 79:5
 415:21
ramifications  447:15
Randomized  535:6
range  97:12 173:3
 519:12
ranges  293:21
ranging  498:19
rank  92:17
rapid  99:23 145:24
 147:3 148:18 277:13,
 18,20 297:20 327:10
 328:9 331:25 339:13,
 20 422:3 466:13,17
 517:4,5 526:1 536:24
rapidly  96:2 97:6
rare  42:19,22 510:3
rarely  224:25 336:21
 463:2
rash  422:14
rate  172:2 173:15
 495:11,13,21 496:21
 499:25 501:5,11
 502:13 504:14
 543:22,23 545:23
 546:7,12 558:9
rated  531:25
ratio  73:10 75:6
Rationale  58:10
RE-EXAMINATION  516:22
 555:24
re-examined  514:24
re-plow  444:3
re-read  545:18
re-up  134:7
re-upping  135:1
reached  197:13 306:8
 336:15,17

reaching  279:3
Reaction  142:13
read  47:16 51:8 57:4,
 25 58:20 59:9,13
 60:24 63:13,22 65:22
 67:5 70:22,24 75:13
 81:21 82:1 93:6,8,10
 94:7,9,14 96:16
 97:21 100:14 105:7
 109:6 112:13 113:3
 124:9 131:3,21
 132:15,18,19,24
 135:15,16 153:19,25
 154:2,4 155:8 156:7,
 16 161:25 165:12
 179:12 181:15 185:16
 186:5 192:25 193:8,
 20 199:14 208:14
 210:9 211:13 213:21,
 23,25 214:13 229:3
 231:22 234:16 241:3
 263:14 265:17 341:13
 344:10 345:24 353:5
 370:14,15,22 387:7
 471:16 488:13 497:24
 498:4 507:3,6 529:5
 532:9,21 534:25
 543:15,20 545:12
 546:18 549:14 558:16
 559:7
reading  66:13 76:6
 101:24 104:4 170:13
 189:20 381:11
 420:16,21 496:25
reads  56:19 494:16
 503:6 507:8
real  75:3 172:6
 341:20 461:1
reality  394:24
realize  81:12 343:2
realized  243:22
reason  25:23 61:14,17
 71:13 102:25 121:15
 190:16 207:21,22
 245:20 246:11 264:23
 299:14 311:6 314:10
 317:4 362:5,23 387:4
 388:2 425:14 436:6
 456:2,5 460:8 472:9
 495:2 545:19 559:10
reasonable  465:3
 466:2 476:23 477:1
 482:21

Confidential                                                                                              JAN-MS-05484750

reasons 126:1 190:17
  201:16 202:8 207:16
  321:10 430:16 445:17
  451:18 456:7 459:24
  460:8 525:10
recall 20:1 21:7
  22:12 34:3 53:18,20
  66:2,5,13 94:11
  105:5 111:6 112:2
  127:5,7,10,12 129:15
  163:12,17 165:20,21
  195:13 232:11 250:18
  272:12 273:3,11
  279:19,22,23,24
  280:2,8,15,25 281:3,
  6 282:4,16 283:6
  284:6 290:13 294:17
  301:4 303:5 322:8
  347:24 348:8 363:6
  367:17 371:11 375:20
  382:25 383:5 391:21
  398:9,13 403:18
  405:19 414:4 420:11
  423:4 424:14,17,20
  425:24 426:5,12,18
  427:1,23 429:12
  431:2 439:22 442:1,3
  444:11 449:14 451:6,
  13 452:2 453:22
  458:2,9 477:8 478:17
  479:10,25 480:2,7
  495:16 501:13
  502:14,19,23 505:21
  526:20 528:9 534:19
  545:10 557:7
receive 164:21 237:23
  239:22 304:19
received 20:22 101:19
  128:21 237:25 242:11
  280:1 282:13 382:22
  471:19 533:4
receiving 183:8
  257:18 280:3,25
  355:23 397:1 403:12
recent 41:2 59:19,21
  60:4 79:22 164:6
  515:16
recently 339:14
receptor 406:2,3,14,
  16,25 408:17,23,24
  409:5,14,22,25
  410:11

receptors 405:23
  406:13 408:25 411:9
recipient 382:19
recognition 167:17
recognize 55:6,18
  88:19 502:1
recognized 71:7
  444:22
recollection 83:3
  282:14 349:1 367:13
  411:21 414:3 426:5
  480:17
recommendation 101:25
  211:5
recommendations 210:6
  211:8,19
recommended 294:11
  470:16
recommending 292:6
  479:1
record 10:19,22 12:4
  54:6 70:8,9,11
  86:18,21 93:10 99:10
  135:16 171:8,10,14
  238:24 243:2,5
  270:14,18,21,25
  275:2 310:18 360:15,
  19 362:25 378:4
  384:4,10 443:23
  460:25 505:7,10
  528:7 558:19
recorded 10:5 448:3
recording 270:15
red 75:7 415:21
Redirect 182:6,19
redo 390:5
reduce 321:15 407:7
  448:18 523:17,24
  524:4,10,20
reduced 465:12
reduces 521:25 523:23
reducing 107:21
reduction 311:13
  321:18
reemphasize 521:7
Rees 11:4
refamiliarize 517:21
refer 87:5 370:24
  457:19 493:8
reference 65:24 76:22
  156:10 180:16 235:20

237:8 282:6 295:6
  359:1 403:21 430:23
  481:5 503:25 554:12
referenced 77:4 111:1
  294:22 302:21 428:19
  484:4 519:22 523:13
references 302:24
  379:11 519:23 556:18
referencing 351:4
referral 414:22
referred 68:15 76:18
  88:2 100:17 221:16
  229:13 365:3 367:18,
  19 460:18 559:7
referring 18:5,8 23:2
  77:14 149:17 168:2
  283:10 297:9 302:25
  321:7 351:6 360:1
  365:17 367:21 371:1
  378:11 428:16 470:4
  489:22 535:15 536:16
refers 163:5 211:22
  216:16 518:8
refinement 60:5
reflect 431:23
reflected 209:16
reflection 430:2
reflects 302:17,19
  559:9
reforming 211:9
refused 337:5,11
refusing 230:2 270:11
regard 84:9 302:15
regimens 183:9,11
Regional 314:17
  330:19
regions 261:15
regular 418:12 422:8
regularly 39:17 41:25
  93:22
regulation 466:21
regulations 97:20
regulatory 494:7
reiterated 102:5
related 34:17 74:1
  77:8 104:12,15 163:8
  202:1 332:5 361:16
  382:12 425:10 428:2
relates 361:21,25
  362:12,15

Confidential                                                                                          JAN-MS-05484751

Lynn Webster, M.D.
February 18, 2019

51

relationship  100:9
  241:7 255:5
relationships  154:16
relative  177:24
  521:15
relaunch  74:11
release  41:10 55:24
  62:12 85:10,14,20,21
  86:4 99:23 181:21
  186:17 193:6 258:4
  292:11 297:21
  340:10,12,13,14
  408:24 410:12 422:2
  460:18,20 461:3
  462:5,8,11,13
  463:10,13,16,20
  464:19,20 465:3,5,
  10,15,22,23 466:5,12
  467:21,25 468:22
  482:18 517:2 525:22
  535:3
released  234:13,18
relevant  58:8 75:7
  493:15
reliable  100:12
reliance  246:10
relied  245:3 247:17
relief  45:22 106:15
  107:2 190:14 233:10
  315:22,24 320:10
  329:8 461:19 536:13,
  17
relief,'  531:4
relief.'  531:6
relieve  106:10
reliever  96:1
relieves  531:4
Relieving  198:6 199:5
  210:4
rely  239:16,21
remainder  63:24
remains  246:21 515:11
  523:2
remedial  108:12
remember  13:25 20:3,
  13 21:22 23:17,20
  24:23 25:8 49:10
  53:21,25 55:10 58:5
  61:12 68:8 76:14
  77:3 95:9 102:20
  104:7,10 111:19

128:13 161:10 163:19
  165:9,13 166:1
  194:21 228:14 231:20
  249:23 250:1,14
  281:17 292:2,4
  299:10 323:18 348:24
  385:5 386:5 411:8,25
  420:16,21 429:13
  440:5 452:6 458:10,
  16 480:3 484:25
  497:24 534:24 540:11
  541:16 543:25
  547:19,22 549:8,11
  550:14 551:25 552:5,
  9,18
reminded  534:25
REMS  23:8 337:21
  338:11,14,20 339:2,9
  340:17,24 341:12
  346:5 347:19,22
  349:7,10,11,16,18,
  21,24 350:12,15
  351:21 352:1,10
  353:10 356:8 357:12
  358:17 359:17 363:5
renew  316:12
rep  30:17 31:2,3,4
  122:10 292:4,9,17
  424:16,20 425:2,3,
  13,23,24 426:6,12,18
  427:20 428:1,9,11
  479:11 481:4 505:13
  547:13
repeat  214:5 410:7
repeated  131:16
  133:11 292:18
rephrase  307:25
report  37:17 38:13,18
  39:5 41:16 94:8
  95:2,8 96:19 101:20
  102:11,18 120:18,22
  121:4 167:21 168:1
  195:20 198:9,22
  199:19 210:4 211:8
  215:1 220:4 243:17
  430:23 446:16 451:14
  469:8,12,15,25 470:5
  471:5 475:24 499:11
  548:18 549:15 550:1
report's  210:5
reported  38:9 199:10
  267:23 503:12,14

reporter  10:17,23
  16:6 139:11 351:18
  487:14 559:2
reporting  208:4
reports  94:13 96:6
  155:14
represent  13:4 139:23
  170:20 227:25 384:10
  443:24
representation  492:25
representations
  171:17
representative  30:15
  31:15 33:9 88:2
  290:18 291:23
representatives  32:5,
  8,11,16,21,23 86:24
  87:2 91:13 119:20,25
  121:24 123:12 167:15
  217:17 230:8 290:12
  424:11 425:10 477:24
  505:23 506:12,22
represented  13:2
  171:23 254:21 456:21
representing  274:1,8
represents  162:24
reprints  478:1
reps  33:4,7,8 72:21
  75:9 120:5 290:21
  429:1 478:25 479:15,
  19 481:10 547:16
  551:15
requested  241:10
Requesters  95:3
require  198:1 437:18
required  97:19 255:1
  339:15 353:10 354:8
  433:14 471:18
requirement  437:6
requirements  350:19
  353:12 437:2,11
  438:15
requires  63:21 336:7
research  24:3 27:6,9,
  12 59:25 60:3,6
  83:13 90:5 91:8
  134:17 143:4 153:5
  163:4 170:2 199:7
  211:11 300:4,7
  313:15 334:20 396:22
  445:16,20 447:19
  454:3 471:7 475:20

Confidential

JAN-MS-05484752

Lynn Webster, M.D.
February 18, 2019

52

researched  62:18
488:8
researcher  27:15
396:11 485:13 486:3
reside  271:14
residency  35:22,23
36:2 125:6 289:7
411:10 439:5
residents  230:14
resistance  73:1
resources  157:20
162:9 335:21
respect  23:13 28:20
30:6 68:17 91:16,24
158:9 172:15 173:16
183:18 224:10 278:14
281:24 284:23 291:7
294:3 296:5,14
298:10,20 299:15
300:12,19 310:14
313:2 318:3 333:24
334:8 335:3 336:13
339:8 345:9 348:10
364:14 370:6 376:23
377:1 378:18 382:10,
23 486:7,14 523:16
524:2 526:8 527:4
528:1 531:12
respected  164:11
223:16 307:23
respiration  369:14
respiratory  35:9
respond  51:12,17
211:4,18
responding  239:13
275:5
response  84:18 210:3
446:10 449:11 451:22
453:16 477:4 502:3
responsibility  198:3
457:2
responsible  12:19
252:3 263:21,23
264:8,10 289:13
291:19 539:19
541:14,19
restate  202:14
restore  511:25 513:11
restrictions  436:19
result  72:6 76:5
107:14,22 164:7

494:6 534:13
resulted  80:9
resulting  73:11
results  74:23 107:13
533:11
Retention  187:11
retired  386:22
retrovirus  420:11
return  319:17,25
320:18 510:16
Returning  86:20
171:13 243:4 270:24
360:18 505:9
revenue  256:9,12,14,
16
review  12:12 81:17
97:18 261:6 296:2
336:2 359:20 381:12
428:3,23 429:3
469:17,18 491:12
503:10 504:12 544:11
545:7,23 547:5
reviewed  96:11 308:21
359:13 376:18,19,21,
24 377:2
reviewing  57:18
revisited  488:2
revolutionary  445:2
reward  387:25 388:3
407:1 445:13
rewarding  407:22
461:23 466:15
rewards  387:5
rewrote  390:3
rheumatoid  314:22
Richard  55:3 60:1
65:16 101:9 220:16
Richard's  72:1
right-hand  440:9
risk  22:20 32:24 33:1
34:25 84:5,6 102:1,8
107:1,20 116:23
172:8,12,15,20,22
173:9,10,22 174:6,
10,11,12,15,20,22
175:3,5,7 177:1
178:19,25 188:16
189:2 190:1,13
191:11,14 192:1

225:2 226:2,7 297:2,
7,12,16,19,22 299:13
301:25 316:11,20
317:3,12,21,23
337:24 338:21 343:1,
4,9 345:15,20 346:23
347:14,18,21 348:1,
11,18,23,25 352:11
354:19,22 355:10
360:4,6 364:16
366:16 368:1 369:21,
24 371:11 372:6,10,
14,16,17,20,25
373:17,20,25 374:2,
6,10,18,20 388:25
389:15 391:18 392:5,
16,22 393:6,11 394:3
398:23 405:18 411:24
412:12 413:15,17
414:21 415:1,9,14,23
416:10,12,18 417:2
420:14 422:19,20
433:19 437:21 461:22
466:13,14,19 481:18
482:25 483:1,16
496:1,5 497:2 500:17
502:21 503:9 509:11
513:23,24 544:24
545:4,15 550:13,25
551:11,13,16 555:11
risk-benefit  115:11
116:20
risks  33:10,15 35:3,6
84:12,16,17 235:5,16
294:4,10 297:1
299:17 300:9,10
339:3 340:23 343:9,
17,23 343:19 344:13,
16,25 345:9 346:7
347:4 348:2 364:20,
24 365:18 366:14
367:20,21 368:16,24
372:8 373:7 395:20
435:5 514:10
risky  225:8,9,15
328:6
Robert  54:22
Robinson  11:3,16
14:13 15:9 16:7,15,
17,24 34:20 40:19
43:14 44:15 45:5
47:9 51:1 54:5
63:12,19,24 64:3

260:9,11,12 319:8,21
321:2 337:11 415:15
476:12

Confidential

JAN-MS-05484753

67:23 68:20 71:9
76:3 86:15 89:19,25
93:4,8 99:9 105:6
109:19 114:22
115:21,24 116:2,14
117:23 120:3 121:20
122:24 123:20 124:5
127:11 135:2,13
137:2,21 143:17
145:7,25 148:12
151:13,16,20 153:14,
24 154:3 155:23
156:1,6 159:11
160:19,25 161:24
165:11 170:8 171:5
177:12,21 178:21
181:11 182:15 190:4,
9 200:4,15 202:22
203:7,14 206:5
212:24 214:3,5
217:1,21 218:2,12,24
219:24 220:24 222:3,
21 225:11,19 226:23
229:23 231:21 234:1,
4 237:11 240:4,12
242:19,23 263:3
269:10,23 270:4
276:9 284:19 287:16
288:3 290:1 291:12
296:18,20 301:6,13,
17,21 307:1 360:20,
21 363:2 367:23
373:10 439:15,20
441:21 443:13,16
538:23 539:6 540:21
546:1,14 548:23
549:16 550:2,8
552:10 553:12 558:17
**Robyn**  205:20 206:3
208:5
**role**  49:6,7 215:15
385:22 419:17 442:23
453:9,13
**ROO**  144:17 145:19,20,
23
**room**  329:14 385:2
388:7 525:5
**Ross**  99:11
**roughly**  272:15
**routine**  234:23
**routinely**  106:12
**RR**  144:17 145:19

**rules**  356:16 361:5
**run**  185:1
**running**  64:25 65:5
**rush**  465:15 467:24
476:14
**Russ**  90:15
**Russell**  46:21 47:7,17

---

### S

**S-A-I-G-H**  15:22
**S118**  518:17
**Sackler**  55:3,7,11,16
60:1 65:16,23 66:15
101:9
**safe**  45:23 106:20
235:4 294:13 336:3
342:25 352:21 393:14
**safely**  106:10
**safer**  186:18 189:5
190:23 191:6
**safest**  190:13,19
**safety**  84:10 99:21
178:9 370:20,25
371:3,7 451:24
453:18
**Saigh**  15:20
**sailed**  459:25
**salaries**  241:20
**salary**  241:21 242:13
**sale**  265:13
**sales**  30:14,17 31:2,
3,4,15,17,24 32:2,4,
8,11,16,20,23 33:4,9
64:17 65:23 66:16
68:2 81:8 86:24 87:2
88:1 91:13 96:2,25
107:5 119:20,25
120:5 121:24 122:10
123:11 132:8 182:6,
19 193:25 230:8
256:21 290:11,17,21
291:22 427:20 474:14
477:24 479:11,15,19
481:10 505:13,22
506:12,21 547:13,16
551:15
**Salt**  89:14 271:18
559:5
**SAMSHA**  436:24 490:20,
24 491:5

**sanctions**  447:14
**sand**  450:8
**satisfaction**  530:21
531:3 537:1
**satisfied**  350:20
**save**  70:25 219:8
**scale**  117:6 234:21
237:9 238:1 239:18
240:2,8,10
**scanned**  94:13 548:19
**Schedule**  57:16 102:1
218:21 219:2 370:16
**school**  125:5 258:6
267:25 268:1 289:6
341:25 342:2,6,11
343:16,21 344:21
405:17 411:4,8 439:5
**schools**  344:6,10,16
490:8
**science**  107:23 121:25
122:9 138:3 211:11
230:3 295:5 300:4,23
302:20,25 305:10,11
307:14 375:6,10
429:2 476:24,25
**Sciences**  10:13 271:22
**scientific**  294:22
295:6 428:2
**scientist**  485:13
486:2
**scientists**  106:8
304:2,10
**sclerosis**  384:23
386:8,15
**Scope**  209:12
**scoring**  156:3 157:12,
23
**scorings**  162:6
**Scott**  90:8
**screaming**  385:6
**script**  291:19 316:12
**scripts**  193:15 432:7
**scrutiny**  515:7,10
**Scully**  11:5
**search**  375:2 489:2
**searched**  106:9
**secondary**  169:5
178:15
**seconds**  270:17
**section**  56:5 58:9
59:19 60:12 66:14

Confidential                                                          JAN-MS-05484754

95:13,21 96:19 99:15
128:24 136:7,8,12,19
140:11 141:4 142:13
164:4,16 166:7
208:19 209:11 210:12
213:20 353:22
370:21,25 470:2,10
494:2 530:10
**section's** 137:8
**sector** 124:22 209:21
212:20
**secure** 167:8
**seek** 361:22
**seeking** 404:21
**segments** 182:7,20
187:16,17 188:14
**select** 395:11
**selection** 395:6,13
**self-medicate** 246:5
320:25 321:6
**self-medicating**
433:13
**self-protection**
324:15
**self-train** 98:25
**self-training** 99:3
**sell** 72:22 226:18
550:17
**selling** 267:5
**Senate** 50:22 51:14,
15,19
**send** 104:5,8 119:20,
24,25
**Senior** 65:16
**sense** 16:16 40:17
147:7 173:2 201:11
389:6
**sentence** 56:15 58:13
69:10 101:23 133:6
233:25 234:6 240:20
489:18 494:3 500:4
503:6 532:15
**sentences** 57:4 199:14
229:4 337:9 489:16
**separate** 24:11,12,16
304:17 326:11 339:9
340:17 367:7 392:6
**sequence** 244:23
**sequencing** 419:17
**series** 198:15

**serve** 256:4 299:6
362:22 393:23
**served** 361:3,13
**service** 36:13
**services** 36:15 137:18
490:22
**set** 63:2 72:11 148:1
149:6,19 294:5
339:21 368:24 435:5
484:10
**sets** 203:16
**setting** 166:4 184:5,
20 481:2
**settings** 192:19
**severe** 80:4,24 190:12
226:6 321:10,18
327:1 331:16 398:21
417:20 433:7 496:4
509:8 522:20 526:5
**severe-to-excruciating**
520:17
**share** 181:20 209:23
507:2
**sharing** 384:20 388:9
**sharp** 398:18
**she'd** 385:5
**shifting** 181:20
**shock** 398:19
**shoot** 118:25
**shooting** 230:21
**short** 49:10 56:25
186:19 189:6 292:11
299:9 309:25 331:23
465:24 517:3
**short-acting** 144:1
183:9 258:3 277:3,6
297:20 339:17 459:13
525:25
**short-term** 459:13
**shorter** 441:18 462:12
**shortly** 11:18 75:21
339:24
**show** 282:1
**showed** 261:18 262:7,9
281:20 462:9 476:25
548:9
**showing** 54:13 143:12
158:8 285:21
**shown** 120:14 157:4
159:3 262:4 375:18
427:3 439:11,22

457:18 469:14
**shows** 65:14 92:8
555:10
**sic** 377:11
**sickle** 243:23 484:16
**side** 50:2 66:8 90:16
95:12 96:19 106:12
164:1 192:14 293:19
363:25 365:22
388:18,21 422:11
423:14 459:18,21
460:10,13 482:11
518:14,19 531:19,24
**sigma** 406:12
**sign** 234:21 235:21
236:1,7,11 356:10
357:12 358:4 363:20
365:23 442:7,8
449:13 450:4,5
470:17 472:14,21
558:16
**signature** 442:12
**signed** 111:11,16
112:9 365:15
**significance** 66:10,19
461:5
**significant** 64:20
100:1 311:12 368:9
402:19 414:5 499:21
**significantly** 531:25
**signing** 359:8
**signs** 358:14,21
503:14 557:16,23
**Silence** 220:9
**Silent** 231:25 232:11,
18,19 233:14
**silly** 207:22
**similar** 84:17 253:9
520:9 521:15
**simple** 202:13
**simply** 107:21 381:15
**simultaneous** 443:3
**single** 194:5,8 210:24
336:21
**sir** 12:3 40:10 85:19
103:13,20 123:2
139:2 184:10 204:22
216:25 219:21 221:21
225:7 351:11 384:14
538:21

Confidential                                                                  JAN-MS-05484755

**sit** 236:22 319:9
511:3
**site** 41:15 518:12
**sitting** 279:24 280:9
283:1,20 285:19
291:20 306:19 312:24
313:1 382:24 423:18
427:8 440:22
**situation** 447:22
477:24 478:15
**situations** 75:10
245:25 354:21 455:22
552:3
**six-month** 556:14
**skin** 386:12 421:9,10
422:15
**Skip** 196:17
**skipped** 141:3
**skyrocketed** 107:5
**SLC** 128:1
**sleep** 393:11 468:18
511:16,21 512:8
**sleep,'** 531:5
**sleeping** 57:20 58:3
63:15 68:6,8,15
69:17
**slide** 147:10,16
181:19 185:20
**slightly** 164:6 421:1,
2 440:9
**slotted** 72:25
**slow** 422:3 461:24
**slowly** 476:14
**SM** 490:23
**small** 57:1 180:13
354:16
**smaller** 80:20 201:5,
13
**smiley** 238:12 239:2,
11
**snort** 463:22
**so-called** 222:1
449:13
**social** 211:11 451:1
**societal** 125:16
**societies** 53:3 152:18
157:13 158:8 209:19
212:17 473:8
**society** 26:21 48:25
52:9 115:6 124:23
152:23,24 153:1

163:23 166:22 196:15
261:2 303:17,21
304:13 305:2,24
306:1,8,14,23 307:13
308:14 309:4 452:1,
11,23 453:15 470:16,
24 491:7
**socioeconomic** 260:1
**soft** 385:12
**sold** 74:4 425:16
**solid** 37:13
**somatic** 327:24
**somebody's** 488:19,20
**sophisticated** 348:16
**sort** 66:14,15 163:21
286:8,23 293:10
298:18 306:21 309:19
328:19 333:3 335:6
339:3 347:22 351:6
352:5,20 353:17
362:7,8 363:5 529:7
541:9
**sought** 91:25 362:7
**sounds** 71:1 100:22
111:10 115:18 128:8
**source** 295:15,21,22
346:6,12
**sources** 296:3 478:2
**space** 154:11 163:7
485:14
**Spanos** 90:18,20
**sparingly** 42:6
**sparked** 107:15
**spasming** 385:8
**spasms** 385:7,14
**speak** 46:7 53:10
59:16 224:19 299:11
**speaker** 298:21,24
299:6,11,16,23
300:12 301:4
**speaking** 21:20,23
191:9 246:1
**special** 437:2,5
**specialist** 10:17
98:6,7 431:6,13
432:5 444:7
**specialists** 97:1
121:10
**specialized** 26:13
**specially** 353:3

**specialties** 185:13
**specialty** 167:17
431:24 444:17
**specific** 23:6 30:12
94:16 95:8 182:7,19
318:15 379:12 392:5
412:12
**specifically** 21:7
72:18 87:15,21 96:10
154:12 163:15 165:21
173:3 221:8 230:13
353:3 481:20,25
484:3 489:21 508:12
514:24 545:14
**specifics** 395:21
396:5
**spectrum** 304:11
335:18
**speculative** 329:18
**speech** 65:22 101:9
**speeches** 19:22 507:14
**spell** 15:21
**spelled** 368:17
**spend** 53:15 63:9 75:5
153:18 279:2 542:3,
11
**spends** 543:1
**spent** 21:13 317:12
497:22
**spinal** 273:9 278:12
386:13 411:9
**spine** 201:18
**spine-related** 201:18
**spoke** 299:13
**spoken** 271:12
**sponsored** 165:5
334:20 335:1,5
396:20 454:3
**spots** 100:18
**spread** 230:20 507:19
**spreading** 507:12
**square** 56:3
**ss** 559:5
**stack** 469:8
**staff** 68:2 241:15
**stage** 57:11 74:5 90:3
148:1 149:6,19
284:24
**stamp** 128:21 151:22
206:1 233:3

Confidential

JAN-MS-05484756

stamps 232:24
stand 224:11 484:19
  490:20 519:7
standard 73:7 234:24
  236:19 286:12 458:20
  514:8
standards 471:24
standards-setting
  471:22
Standby 270:20
standing 65:15
stands 95:18 141:21
  142:4 145:19,23
  154:19 340:6
stapled 160:22
start 50:9 64:6 70:24
  74:20 78:22 80:22
  176:11 200:2 255:2
  268:5 295:9 418:6
  464:23 487:19
started 13:23 36:16,
  21 61:21 91:5 132:6
  167:1 197:10 200:19
  267:18,24 268:1,3,8
  313:20,21 342:19
  366:9 411:13 418:15,
  18,22
starting 56:4 104:23
  197:6 227:23 461:12
  504:6
startle 472:11
starts 56:15 66:9
  128:25 132:20 233:16
  234:12 240:18 363:16
  470:3 500:4 543:17
state 10:7,10,21 11:1
  12:3,8 44:5,7 57:12
  99:13 166:8 167:13,
  14 172:14 181:7
  211:4,17 216:12,22,
  25 217:7,12,18 218:7
  239:17 261:14 274:5
  281:14 282:1,5
  283:3,8 285:15,22
  287:5 311:9 380:11
  382:13,17 434:12
  437:10,16,18,25
  438:7,16 489:5,23
  490:2,19 491:5
  493:14 506:17 507:4,
  15 542:20 559:1,4

State's 380:17 507:6
stated 102:18 110:9
  240:22 262:20 329:14
  451:3 453:18
statement 70:3 102:5,
  25 104:23 105:4,20
  109:16,24 111:8,17
  112:10,14 132:16
  134:15 159:16,17
  288:12,19 290:17
  291:22 327:20 367:20
  424:15,19,25 425:4,
  25 426:7,13,19
  428:11 445:20 452:7
  491:8 493:22 502:9
  540:4 543:23 546:12
statements 247:16
  275:2,13 280:5,11
  281:4,8 282:18,23
  283:20 284:25
  285:14,22 287:11,15,
  20 296:16 501:10
  505:22
states 57:7,13 58:13,
  23 59:21 66:19 72:23
  74:10 79:5,22 95:18,
  21 96:22 99:15
  100:4,7 105:20 106:6
  110:8 130:23 131:12
  143:24 167:4,19
  179:24 183:7 184:17
  198:15,22 199:1
  218:21 233:10 240:21
  261:8 429:11 431:6
  434:20 438:13 448:8
  475:14 490:18 498:18
stating 82:6 132:7
  295:5
statistic 448:2,7
  557:25
statistics 416:10
  446:9 521:15 535:23
stay 81:10 117:22
  324:10
stayed 386:21 388:7
steering 208:18 209:4
  210:23 212:9 216:16
step 117:6 155:6
steps 110:15
Steve 11:4
Steven 247:21 249:20

stick 422:16
sticker 88:8
sticking 363:8
stipulate 16:8
stop 171:4 255:1
  369:14 466:22
stopped 425:22 445:18
  483:8
stories 432:19
story 66:15
strategies 155:6
  186:2,11,15 498:23
strategy 102:2 140:12
  182:1,5,12,17,18
  185:20 186:3 187:15
  191:25 208:11 337:25
  338:22
stratification 497:3
stratify 174:10 372:9
stratifying 226:3
stream 167:12 278:6
strength 158:21,22
  159:5 210:21
stress 80:18
strike 56:10 70:3,5,
  10 109:11 156:19
  171:1 206:17 207:6,
  24 238:21 239:5
  296:12 297:5 298:19
  312:15 321:4 322:19
  334:18 337:18 350:13
  351:4 364:8,17
  368:22 376:10 378:19
  390:24 391:16 394:7
  395:11 397:22 401:21
  402:17 404:17 405:24
  412:8 418:15 434:17
  513:20 526:19 529:23
  538:7 540:3 541:23
  547:14
string 441:25
strong 80:1 158:15
  159:4 305:13 458:8
  459:14
stronger 74:8 82:14,
  17,18,19 110:14
  515:24
strongest 458:23
structural 169:4
structurally 169:3

Confidential
JAN-MS-05484757

structure 465:6
struggle 209:25
struggling 235:2
  365:4
studied 174:23 252:21
  264:11
studies 81:18 174:21
  175:11,20 176:1
  178:8,9,10,12 179:2
  397:8 480:9,20
  496:11,18,20 500:9,
  14 502:20 503:10
  504:13 519:11 527:18
  544:14,18,23 545:3,
  6,14 546:6,8,11
  556:5,9,10,12,23
  557:3,5,22
study 74:25 95:14
  175:8,18 176:2,3,5
  178:24 335:13,14,15,
  16 342:12 414:14
  484:12 496:10 503:19
  529:22,24 530:8
  533:2 534:19 535:7
  537:11 544:18 545:19
  546:21 557:5,10,12,
  15
study's 397:19
stuff 111:9 261:5
  269:6 329:19
subcutaneous 273:8
subheading 493:10
subject 55:23 72:1
  79:18 107:3,11
  108:15 177:8,23
  339:4 348:3 515:7
subject's 227:4
subjected 108:10
subjective 238:13,14
  239:1,11
submit 15:7 56:2
  64:16 71:7 97:17
  142:4 156:11 206:15
  308:19 351:1
submitted 15:5 502:10
suboptimal 400:17
  403:22 404:7,11,20
subpoena 361:2,14
  362:22
subpoenas 51:13
SUBSCRIBED 559:22

subsequent 60:1
subsequently 419:15
subset 172:7 175:6
  225:23 251:15 317:22
  320:22 344:2 495:25
subsets 226:1
subsidiary 20:9
substance 47:23,24
  57:14 204:8 205:5
  226:4 267:6 268:3,6
  342:20 416:20 490:21
  496:3
substances 102:2,10
  268:2
success 218:15 432:18
  433:10 435:16
successful 73:17
  433:4,5 436:14
sudden 398:18
suddenly 329:3
suffer 95:23 96:6
  388:18 398:24 522:20
suffered 204:1 387:1
sufferers 502:6
suffering 45:13,22
  106:15,21 107:9
  325:24 384:17 446:13
  447:25 448:1 451:2
  539:12,17
suggest 175:5 247:2
  381:15 461:21 462:24
  541:5 556:22 558:7
suggested 101:9 172:1
  325:4 379:4 380:7,
  11,17 427:4
suggesting 78:7
  500:16 541:4
suggestion 325:6
  492:18
suggests 62:9 68:25
suicidal 327:8 331:17
suicide 204:2 323:4,
  14,16,17 324:22
  398:23 512:24 513:5
suicides 330:11
sum 118:3
summary 130:11,14
  161:18,20
summer 26:3
supervisors 110:9

supine 318:24 321:25
supply 131:16 133:10
  134:7 135:1
support 10:16,19
  304:22 307:17 310:6
  312:8 428:10 466:11
  479:2 496:9 555:1
  556:19,23
supported 396:23
  543:23
supporters 196:3
supports 295:5 546:11
supposed 120:5
surface 96:6
surgeons 258:8
surgery 329:2,24
  369:9 388:25
surgical 388:23
surprise 122:6 217:25
  218:4,14 222:13
  265:19 412:1
surprised 93:18 143:9
  170:23 222:22
  284:16,22
survey 163:10,13
  165:5 520:15
survival 202:1
survive 389:1
surviving 201:25
suspect 478:9
sustain 503:7
sustained 181:21
  186:17 193:6 461:24
  462:8,10,22 463:10
  465:22 525:21
SWAT 219:22 220:9,23
  221:3 232:4,9,15,19
  241:25 242:9,21
swear 10:23
sweetie 228:25 229:14
switching 80:3
sworn 11:23 559:22
swung 233:18 234:10
symposia 81:17 110:16
symptom 168:13,16,17
symptoms 108:17 400:2
  512:15
syndrome 314:16,17
  330:19 400:23
syndromes 72:7 517:15

Confidential

JAN-MS-05484758

synergistic  393:6
synonymous  136:24
system  126:16,17
  191:1,3 338:7 406:17
  421:4,20 450:25
  451:1 529:13 544:8

---

T

table  136:3 137:8
  140:7 319:9,10
  362:8,9 484:10 511:4
tablet  463:22 535:2,
  15 536:8
tablets  66:21 99:22
  536:22
tailor  84:13 372:13
taint  367:3
Takeaways  179:25
takes  266:7 327:3
  394:20
taking  172:3 373:22
  413:23 422:7 448:22
talk  30:16 90:4
  179:22 219:10 226:19
  299:4 322:10 353:17
  364:25 391:17 413:14
  500:21 502:12 539:20
  549:2
talk-  290:3
talked  138:19 250:16,
  21 280:21 321:5
  322:7 344:24 346:5
  373:5 402:17 403:16
  431:20 438:9 468:13
  469:21 475:23 505:19
  516:24 541:14 548:20
  550:12
talking  22:5 29:6,12,
  16,18,24 30:2,11,17
  31:7,11,17 69:2 85:9
  115:19 238:6 279:12
  290:2 297:25 303:1
  351:22 363:4 368:16
  429:13 435:18,22,23
  497:3 523:7 540:11
talks  19:23 20:2
  213:8 227:15 230:11
  352:25 355:16 358:11
  365:18 371:2
tamper  74:6

tape  324:20,21
taper  463:6
tapered  324:18,21
target  87:16,22 88:3,
  12 91:16 94:3,4
  99:20 138:19 144:7
  146:22,25 148:9
  149:1 185:21 186:6,
  8,11 187:15,17
  188:3,4,13,16 191:14
targeted  121:15,22
  185:4 221:7 262:5
targeting  140:17
  141:4,9 144:6
  147:14,18 183:10,18
  184:4,18 185:10
  187:24 188:11,19
  190:1 192:1,23
targets  87:6,10 92:24
  93:12 120:9,15
taught  33:3,8 342:1,2
  343:18 490:12
teach  81:8 123:7
  344:6,16,20
Teaching  230:14
team  71:25 79:19,22
  81:2,20 128:1 219:22
  220:9,23 221:3 227:8
  232:5,9,15,19 241:25
  242:9,21 335:15
Teamlink  64:9
technical  102:16
Ted  89:5
teenagers  268:17
  269:5
teleconference  34:10
telling  47:22 66:16
  260:19 383:12
tells  30:18 130:2
ten  66:5 141:19
  431:14
tens  542:1,10
term  73:25 76:23 77:6
  91:21 111:24 184:3
  187:3 243:7,15,25
  244:3,17 247:24
  343:1 398:17 405:5
  465:24 489:22 490:7
  491:6 492:8
terminally  131:14
  133:3,8 134:3

terminology  410:21
terms  344:13 361:15
  453:6 455:22 461:2,5
  469:21 499:25
terrible  224:16
  268:16,23 323:5
  331:17
terribly  330:16,25
tertiary  93:25 414:22
test  351:7 393:24
testified  11:23 51:21
  139:15 156:22 222:15
  340:22 395:5 444:6
  459:4 486:25 552:2
testify  70:9 200:9
  217:11
testimony  40:4 56:11
  114:17,18 190:10
  205:2,7,10 207:11
  215:20,24 216:6
  219:12 222:2 224:6
  239:6 322:8,13 361:3
  371:11 398:10,23
  403:18 427:23 431:2
  458:11 540:17 553:8
  559:7,9
Teva  11:13 16:2
  17:15,20,24 18:7,12
  19:4 23:19,22,25
  24:6,7,21,25 151:23
  152:1,2,6,16 153:5
  154:11 155:2 156:12
  158:10 159:9 160:8
  163:8,18,20 164:20
  165:16,24 170:1
  250:23 274:3 283:5,
  9,11,15,21,25 284:9,
  13,15,17 375:19
  377:12 379:11 380:15
  382:10,16
Teva's  170:17
Teva_ok_00101618
  381:2
Tevas  283:17
text  180:13
Thankfully  144:21
theme  72:16
theory  393:24
therapies  126:10
  456:10
therapy  73:11 175:15
  177:9 178:3,20

Confidential                                                          JAN-MS-05484759

319:24 326:9 355:24
365:20 394:9 400:12,
17 402:6,20 403:3,8,
25 404:8,13,20
433:20 446:3 496:23
502:22 503:8 541:10,
20 543:2
**thereof** 559:8
**thereto** 366:7
**thing** 45:14 70:23
104:23 105:1,8
163:21 268:17,24
288:11 342:13,25
438:23 456:11 473:15
**things** 16:10 19:12
30:18 38:4 40:9
52:15 105:2 168:10
208:17 219:4 224:2
293:16 338:8 339:1,2
354:2,10,15 393:15
469:12 529:14
**thinking** 316:8 324:14
458:16 461:10 472:12
473:20
**thinks** 29:23
**Thompson** 227:4 228:13
229:18
**thought** 24:12 38:1
56:23 58:18 78:13
83:11,15 134:12
138:15 180:23 186:16
189:1 206:12 212:8
222:23 245:11 273:1,
2 275:1 295:13
323:22 328:6,16
393:13 431:20 444:24
445:3,5,18 458:12,
18,22,25 459:2
465:20 467:19 468:25
473:24 484:15 492:20
509:10
**thousand** 123:11 326:6
**thousands** 387:11
446:1
**thread** 386:13
**threatening** 73:22
**three-** 556:13
**tight** 433:10
**tighter** 433:15
**time** 14:21,25 21:5,13
23:15,18 39:16 40:5
42:9 43:3 44:23

49:10 53:8,15 61:6
62:12,13 63:10 65:5
70:25 71:16 74:13
75:6,20 77:22 83:4
86:8,18,21 91:12
95:10 100:17 112:16,
22 120:21 123:12
126:19 128:10 153:18
161:7 171:10,14
174:8 176:8 196:25
234:13,18 236:20
240:18,23 243:2,5
262:17 270:21,25
271:8 284:24 290:4
292:4,12 296:10
299:10 309:25 314:2,
4 316:4 317:13
323:22 326:8 327:8
331:23,25 342:7,11
360:15,19 361:18
362:14 365:3 374:6
375:6,10 383:13
390:3 393:5,12
405:11 417:22 439:17
444:10,17 446:2
448:13 451:3 453:21
456:12 458:25 459:9
465:9 467:20 468:7,
24 469:17 473:5,25
474:7 477:1,2,17
478:7 479:10 480:8,
19,23 481:10 482:8,
16 483:4 485:1
490:13 491:14 496:13
505:7,10,23 510:6
514:6,20 519:19
520:22 526:25 557:14
558:19
**time-action** 56:16,20
**timely** 100:13
**times** 33:5 46:4
185:22 320:14
332:23,24 463:8
477:6 492:9 494:19
**timing** 425:21 474:16
**TIRF** 23:2,6 339:25
340:4,5,18 349:7,10,
13,18,21 350:4,12,15
351:21 352:10,14
353:1,9,10 354:18,21
355:20 356:8 357:12
358:13,17,20 359:11,
17 363:5,24 364:3

**TIRFS** 339:14,20
**title** 64:18 65:9 95:3
106:2 110:2 136:11,
19 147:10,16 181:19
233:13 250:1,2,6
442:11 497:18 528:24
535:2
**titled** 58:9 88:11
152:6 187:10 195:7
517:13
**titles** 162:5
**titrate** 81:9 117:17
**tobacco** 134:17,21
135:18 249:16
**today** 12:7 13:3,4,21
25:13 91:15 101:8
114:13 125:20,22
126:1,5 173:13
194:18 199:3 200:10
201:7,15 202:9
217:11 221:22 236:22
250:22 257:5 258:24
260:18 261:6 264:6
266:14 271:9,11
274:21 279:25 280:9
281:14 282:1 283:1,
20 284:18 285:4,20
286:7 290:2,11
291:21 294:15 303:4
306:20 309:18 312:25
313:1 324:19 337:20
343:6 344:6 348:16
362:19 375:19 376:3,
18 377:6,7 378:19
379:4,15,23 380:8
382:24 384:6 404:17,
23 409:14 410:3,14,
22 423:18 426:24
427:8 439:12,24
440:14,22 447:7,25
451:16 453:1 456:13
466:12,25 467:3
472:22 487:2 490:15
493:11,24 494:12,24
495:11 513:22 514:1
515:12 516:25 520:3
522:14 523:2 542:1,9
548:6
**token** 28:6
**told** 15:16 76:11,15
83:3,10 150:11
160:12 228:16 292:9,
24 323:25 424:16

Confidential                                                                    JAN-MS-05484760

428:9 481:11
tolerance  110:4
  463:3,5
tolerant  355:23 418:5
  535:5 537:2 538:1,9
tolerate  447:17
Tom  240:21
Tooele  319:1
tool  317:3,15,20
  371:11,22 372:5,7,25
  374:20 550:13,21,25
  551:2,5,11
tools  551:16
top  34:4 71:19 92:23
  93:2,11 106:18 107:6
  129:8 141:15 142:8,
  24 147:10 152:2
  159:13,23 160:6
  161:22 192:14 193:12
  329:21 470:5 486:13
  498:16 502:18 503:5
  543:16
topic  23:6 46:7 48:5
  300:24 434:16 483:21
  504:21
topics  198:18,19
total  431:4,23 432:6
  503:10,11 540:10
totally  24:11,12
toxic  99:24 422:18
toxicity  117:12
tracking  160:9
trade  259:21
traditional  326:24
  424:3 435:25
traditionally  80:13
  433:2
tragic  269:16
train  22:3 32:20
trained  22:15 32:22,
  23 97:14 98:19,21,24
  289:4,8,9,12,17,22
  290:5,15 291:8 293:5
  309:5
training  22:17 98:17
  125:4 289:3 459:16
trans-  350:1
transcript  559:8,9
transdermal  273:10
  421:3,19

transformation  198:1
Transforming  199:6
transition  36:24
transitioned  419:15
transmission  406:21
transmucosa  278:8
transmucosal  273:10
  277:19,22,24 278:7
  340:8 350:1 529:3,13
treat  36:19 42:18
  43:1 44:19,24 52:7
  72:10 97:12 119:14,
  16,17 124:22 125:8
  134:14 314:25 318:4
  327:1 330:12 386:6
  388:2 435:19 436:2,4
  437:8 451:20 458:21
  461:15 474:9 555:2,
  12
treatable  509:9
treated  201:3 243:23
  257:16 272:6,9,13,17
  391:4,12 414:24
  444:21 448:17 470:17
  471:2 474:1 475:13
  493:18 508:24 509:20
  510:4,8 540:18,25
  541:1,4
treaters  192:20
treating  37:1,2 74:20
  96:4 323:19 401:12
  402:11 433:6 435:16
  436:15 448:16 470:14
  473:13 528:2
treatment  37:22 41:25
  45:14 97:3 106:8
  115:15 116:21 119:3
  124:25 190:20 198:17
  202:25 203:19,24
  239:24 266:18,20,25
  316:17 319:22 365:19
  372:13 373:24 387:25
  389:9 394:13 402:5
  403:22 404:12 417:19
  434:9,23 435:13
  436:9,23 450:24
  470:12 471:19 473:10
  474:19 475:16,17
  503:13 521:23 526:6
  529:2,25 530:20
  537:1 545:16

treatments  115:7
  482:20
tremendous  317:23
  493:16
Trey  10:25 64:24
trial  131:20 133:15
  175:12 178:2,19
  335:10 397:17 482:9
trials  19:14,21
  334:24,25 335:3,5,7
  396:12,15,17,20
tricky  160:18
trigeminal  314:20
  330:8 331:20 398:8
  399:4
triggers  268:5
triples  369:24
trivial  248:17
trouble  317:6 463:17
troughs  461:22 468:1
true  82:9 99:5 103:13
  114:9 173:17 186:21
  190:22 223:13 225:8
  235:17 253:7 267:22
  269:9 287:12,21
  374:15 391:14 394:19
  405:4 409:13,15
  428:10,11 429:21
  431:4 434:8 438:21
  451:7,16 482:7
  493:21,24 494:10,12,
  22,24 495:14 543:4,8
  552:22 553:1 556:3
  557:15
Truth  450:14
tub  422:17
tuned  100:23
turn  94:24 101:17
  109:13,23 111:12
  128:23 129:24 130:10
  141:2,9 142:12 144:5
  153:11 155:20 160:17
  181:17 185:25 187:9
  192:4 195:24 198:24
  229:17 232:22 241:9,
  13 303:11 352:4
  358:25 363:12 373:14
  375:24 379:10 380:25
  381:9 440:1 469:16
  474:11 502:16 518:13
  530:7 535:23 543:13

Confidential

JAN-MS-05484761

Lynn Webster, M.D.
February 18, 2019
61

turned 543:12
Twillman 220:15
  241:14 242:15
two-thirds 258:23
Tylenol 80:12 81:8
  420:1
type 189:9 254:20
  273:4 309:10 316:6
  330:9 353:19 504:10
  508:21,22 509:1
types 276:15,18
  278:16 331:10 335:18
  338:14,16,19 423:16
  505:20 508:10,13,16,
  18 509:15 520:16
typical 417:24
typically 92:24 93:12
  417:13

                U

U.S. 10:16,18 57:8
  104:24 118:20 152:24
  310:3 311:24 457:6
  475:12
U.s.'s 193:14
Udell 108:21
Uh-huh 60:13 222:25
  227:7 236:6
ulcerative 314:21
ultimate 335:6
ultimately 21:15
  291:15 293:24
  305:15,17 525:4
unable 385:1
unaware 280:10
unblinded 397:18,19
uncertainty 73:17
  389:16
uncomfortable 292:17
  318:23
uncommon 176:23
  286:19,21
under- 392:11
undergo 390:5
undergoes 202:5
underlying 355:25
  400:22 401:25 419:2
  429:22 430:2
underneath 386:12
  442:12

underscoring 498:21
understand 12:10,14
  15:24 16:3,24 17:6,
  10,14 18:23 19:2
  20:7 29:5 32:16
  33:10 40:22 48:9,15
  50:1 51:5,7 53:11
  55:15 62:24 84:12,16
  92:15 114:16 118:9
  124:7 135:6,8,10
  146:23 155:4 184:21
  206:3 246:16 247:23
  251:1 252:19 300:8
  317:11,13 354:18
  355:19 356:11,12,15
  359:7 363:21,24
  370:20 373:13 386:3
  405:22,25 416:12
  439:2 448:9 467:3
  551:9,14
understanding 12:16
  17:9 33:14 47:23
  208:3 217:5 245:14,
  16 257:18 284:13,15
  348:7 358:17 371:7
  374:5 376:9,13
  377:2,9,16,20 409:9
  418:9 437:24 438:13
  440:16,20 447:20
  461:9 473:21 496:25
  520:1 521:2 536:16
  537:9
understood 15:6 22:22
  23:7 27:13 85:18
  345:20 375:5 405:18
  410:3 492:14
undertreated 95:24
  124:23 202:17 203:5
  246:19 248:1 256:8
  488:19
undertreating 322:17,
  22
undertreatment 168:4
  199:24 200:1 322:14
  447:1,7
unfortunate 499:2
unintentional 311:9
  456:20
unique 110:18 375:3
United 95:18 105:20
  218:20 233:10 429:11
  431:5 434:19 475:14
  498:18

University 57:18
unknowing 109:3
unleashed 109:1
unlike 98:15
unmet 474:9
unscientific 73:25
  76:23 77:6
unsuccessful 435:24
unsuspecting 109:2
untreated 499:4,18
  540:10
unwise 58:25
up-to-date 25:25
update 442:1
updated 25:20,24
  208:12
updates 167:12
upper 440:8
uptake 422:4
urban 230:20
USA 283:12,21,25
  284:17 382:10,17
usage 74:16
users 148:4 267:18
  268:8
Utah 10:14 11:15,19
  35:17,21 44:5 311:9
  361:5 411:11 437:11,
  18 559:4
utilitarianism
  115:19,25
utilization 542:19
Utilize 136:21 137:10
utilized 57:8,22
  507:9

                V

vacuum 288:5
vaguely 100:22 534:24
valid 245:23 390:23
  404:17 420:21 487:1
  492:22
validly 361:13
valleys 465:14
vast 115:10 199:23
  408:8,14 418:14
vastly 432:7,10
venues 33:23

Confidential                                                                    JAN-MS-05484762

version 440:24
versus 12:8 80:19
 177:18 295:5 315:22
 322:1 397:1 413:8
 416:20 423:20 432:6
 458:1 460:19 509:19
 523:14
vet 385:25
Veteran's 167:11
veterans 199:8
viable 494:17
Vice 65:16
Vickie 10:18 559:2
Vicodin 81:7
video 10:5,16 54:10
 97:18 450:12 451:3,9
view 52:11 70:15 72:3
 82:6 83:22 110:10
 115:23 116:1,10,13,
 17 117:2 170:19
 226:18 251:2 310:24
 314:24 315:2
viewed 77:25 78:4
 83:6 84:23 85:13
 138:6,9 167:23
views 224:12,16 375:8
vignette 66:14,19
violations 97:16
Virginia 108:2
virtual 67:4
visceral 327:25
visibilities 157:21
visibility 162:9
visible 169:12
vision 209:22 212:21
visit 34:5 316:1
visited 32:5,17 86:23
 87:1 91:13 424:10
 425:9,12 479:14,18
 548:12
visiting 183:18
visits 290:11 329:14
 358:12 542:19
vital 234:21 235:21,
 25 236:7,11 449:11,
 13,16 450:3,4,5
 451:19 470:17
 472:14,21,22
voice 163:5
void 37:25

volume 64:11 92:8
 261:15
vomiting 35:8
vulnerable 407:19
 410:2,13 420:4
 466:15

---

W

wages 199:13
wait 80:24
waiting 74:10
walk 247:8 319:14
 385:1
walked 246:11
wanted 21:10 73:8
 185:4 254:7 292:5
 311:15 375:13,14
 384:4 386:2 437:25
 464:13 469:11 475:13
 479:1 488:16
warning 99:21 345:14
warnings 345:8,24
warranted 117:4
watch 345:19
Watson 280:17,20
 281:1,5,9,25 282:2,6
way' 72:20
ways 175:10,17 225:10
 340:22 341:8 344:13
 387:21 450:1
weak 158:16
weaker 72:5 78:1,4,13
 80:8 82:7,12 83:6,23
 84:23 85:6,13 110:12
 200:11,18 458:14
wealth 106:16
webinars 34:11,12,17
 35:2
website 105:18 164:21
 237:19 518:5
websites 490:6
Webster 10:6 11:6,19,
 21 12:5,6 16:25 26:9
 56:3 91:4 99:15
 164:8 243:7 271:4
 275:11 289:2 301:10
 313:13 347:2 351:20
 360:21 361:4,14,23
 362:13,16 363:5
 373:4 384:1 388:10

399:6 487:19 497:10
 505:12 507:10 516:24
 517:12 528:8 533:22
 537:24 539:4,10
 545:22 550:12 552:22
 553:1,9,23 559:6,21,
 23
week 37:16 360:22
 448:3
weeks 208:8 214:2,7,9
weigh 127:3
weighing 481:18
 513:24
weight 201:22
weird 166:2
Weissman 244:5,6
 485:3,20
well-being 113:14,24
west 319:2
western 457:7
white 66:24,25 235:23
wide 97:12
widely 191:3 234:22
 292:15 490:12 491:13
wife 296:23
William 57:17
window 556:14
winter 64:12
wisely 540:7
withdraw 514:17
withdrawal 108:17
 110:4 466:23 467:1,
 7,10
woman 386:14 387:10
wondered 387:17
wondering 181:10
word 183:18 187:4
 188:4,7 194:9 264:1
 283:4 290:9 337:20
 341:19 398:12 410:18
 418:9 495:2,3
words 185:21 189:16,
 20 191:14 477:23
work 15:4 19:8,16
 20:11,13,21,22,25
 21:5,8,19 23:16,21
 24:5,20 25:4 41:9,
 11,20,22 48:19 53:12
 75:11 78:22 82:24
 89:17,21 90:5
 126:22,25 127:1,2

Confidential

JAN-MS-05484763

128:11 132:7 194:24
210:18 213:5 244:21
271:15,20 319:18,25
320:19 396:12,14
401:12 405:23 406:1
423:9 486:18 494:6
510:16 514:4,5
521:25
**worked** 20:16 89:24
107:4 157:3 165:22
167:4 244:14,18
461:6
**working** 21:13 127:6,7
163:18,19 165:10,16
209:18,22 210:2
212:16,20 322:3
365:7
**works** 64:8 244:10
531:5
**Workshop** 179:25
**workup** 401:20,22
**world** 115:22 116:1,
10,12
**worry** 383:18 422:7
**worse** 447:8,9 482:11
**worsened** 522:21
**worsening** 400:22
**worthy** 342:11
**wrap** 439:7 505:2
507:23
**write** 130:24 131:19
133:14 288:9 291:18
302:6 315:6 355:7
356:6
**writes** 78:12 324:16
371:5
**writing** 71:23 355:11
364:18,21 371:4
445:16 527:7
**written** 235:9 245:10,
22 246:22 301:11,20
350:21 357:1 358:5,
19 359:19 362:2
364:12 413:7,10,13
431:24 527:12
**wrong** 129:5 160:22
162:11 207:8 285:6
445:25 473:14 507:22
**wrote** 111:23 244:6
249:20 301:23 315:7
368:5 387:6 438:5
527:5

www.ajmc.com 518:6

_____

### Y

**y'all** 151:15 171:3
383:11
**year** 14:6 67:12 150:2
178:3,9 249:19
254:13,17 413:24
457:5 475:7 480:4
496:13 510:2
**years** 33:24 91:7,9
161:8 164:10 289:2,
5,6 313:20,21,23
319:11 366:11 386:22
438:6 486:17 488:13
497:22 515:17 526:21
**young** 204:2 243:18

_____

### Z

**Zakrzewski** 11:4
105:13 234:2

Confidential                                              JAN-MS-05484764