Highly Confidential - Subject to Further Confidentiality Review

```
 1            UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
 2                  EASTERN DIVISION

 3

      IN RE: NATIONAL      )
 4    PRESCRIPTION         )   MDL No. 2804
      OPIATE LITIGATION    )
 5    _____ )   Case No.
                           )   1:17-MD-2804
 6                         )
      THIS DOCUMENT RELATES )   Hon. Dan A.
 7    TO ALL CASES         )   Polster

 8
              WEDNESDAY, JANUARY 9, 2019
 9
         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10             CONFIDENTIALITY REVIEW
11                    - - -
12            Videotaped deposition of Michael
13    Wessler, held at the offices of STINSON
14    LEONARD STREET LLP, 7700 Forsyth Boulevard,
15    Suite 1000, St. Louis, Missouri, commencing
16    at 9:02 a.m., on the above date, before
17    Carrie A. Campbell, Registered Diplomate
18    Reporter and Certified Realtime Reporter.
19
20
21
22                    - - -
          GOLKOW LITIGATION SERVICES
23       877.370.3377 ph | 917.591.5672 fax
               deps@golkow.com
24
25
```

Page 2

1     A P P E A R A N C E S :
2
3     LIEFF CABRASER HEIMANN & BERNSTEIN,
      LLP
4     BY: MARK P. CHALOS
         mchalos@lchb.com
5     222 2nd Avenue South, Suite 1640
      Nashville, Tennessee 37201
6     (615) 313-9000
7     and
8     BY: PETER ROOS
         proos@lchb.com
9     275 Battery Street, 29th Floor
      San Francisco, California 94111
10    (415) 956-1000
      Counsel for Plaintiffs
11
12
      ROPES & GRAY, LLP
13    BY: WILLIAM DAVISON
         william.davison@ropesgray.com
14       MAX R. MAEROWITZ
         max.maerowitz@ropesgray.com
15    800 Boylston Street
      Boston, Massachusetts 02199-3600
16    (617) 951-7000
17
18    ARMSTRONG TEASDALE, LLP
      BY: SARAH E. HARMON
19       sharmon@armstrongteasdale.com
      7700 Forsyth Boulevard, Suite 1800
20    St. Louis, Missouri 63105
      (314) 621-5070
21    Counsel for Cardinal Health, Inc.
22
23
24
25

Page 3

1     JACKSON KELLY, PLLC
2     BY: SYLVIA WINSTON NICHOLS
         sylvia.winston@jacksonkelly.com
3        (VIA TELECONFERENCE)
      150 Clay Street, Suite 500
4     Morgantown, West Virginia 26501
      (304) 284-4138
5     Counsel for AmerisourceBergen
6
7     JONES DAY
      BY: NICHOLAS HODGES
8        rhodges@jonesday.com
      4655 Executive Drive, Suite 1500
9     San Diego, California 92121
      (858) 314-1200
10    Counsel for Walmart
11
12    FOX ROTHSCHILD LLP
      BY: ADAM BUSLER
13       abusler@foxrothschild.com
         (VIA TELECONFERENCE)
14    1301 Atlantic Avenue, Suite 400
      Atlantic City, New Jersey 08401
15    (609) 572-2355
16    Counsel for Validus Pharmaceuticals
17    ARNOLD & PORTER KAYE SCHOLER, LLP
      BY: DAVID HIBEY
18       david.hibey@arnoldporter.com
         (VIA TELECONFERENCE)
19    601 Massachusetts Avenue, NW
      Washington, DC 20001-3743
20    (202) 942-5000
      Counsel for Endo Pharmaceuticals
21    Inc., and Endo Health Solutions Inc.
22
23    VIDEOGRAPHER:
      JAMES ARNDT,
24       Golkow Litigation Services
25

Page 4

1                    INDEX
2                                PAGE
3     APPEARANCES.................................  2
4     EXAMINATIONS
5        BY MR. CHALOS.............................  9
6
7                 EXHIBITS
8     No.       Description           Page
9     Mallinckrodt   Plaintiffs' Notice of Oral     9
      Wessler 1      Videotaped Deposition of
10                   Michael Wessler and
                     Requests for Production of
11                   Documents
12    Mallinckrodt   Michael Wessler LinkedIn      14
      Wessler 2      profile printout
13
      Mallinckrodt   Performance Management        38
14    Wessler 3      Document, October 2004,
                     MNK-T1_0007845224 -
15                   MNK-T1_0007845241
16    Mallinckrodt   Organizational chart,         72
      Wessler 4      MNK-T1_0000000264 -
17                   MNK-T1_0000000287
18    Mallinckrodt   Separation of Employment      79
      Wessler 5      Agreement and General
19                   Release,
                     MNK-T1_0007845172 -
20                   MNK-T1_0007845199
21    Mallinckrodt   Separation Agreement          85
      Wessler 6      Summary for Payroll
22                   Purposes Only,
                     MNK-T1_0007845168 -
23                   MNK-T1_0007845171
24
25

Page 5

1     Mallinckrodt   Handwritten notes from        86
      Wessler 7      interview,
2                    MNK-T1_0007845318 -
                     MNK-T1_0007845323
3
      Mallinckrodt   Magnacet Presentation to      87
4     Wessler 8      Argent, 9/17/2007,
                     MNK-T1_0002713694
5
      Mallinckrodt   E-mail(s),                   106
6     Wessler 9      MNK-T1_0003065351
7     Mallinckrodt   Pharmacy Guaranteed Sales    110
      Wessler 10     Program Selling Scenario,
8                    MNK-T1_0003064798
9     Mallinckrodt   2009 TussiCaps A&P Budget    113
      Wessler 11     Presentation, December 10,
10                   2008,
                     MNK-T1_0001126586
11
      Mallinckrodt   Mallinckrodt Interoffice     124
12    Wessler 12     Correspondence, to VJ
                     Kalman from Marco Polizzi,
13                   MNK-T1_0007901756 -
                     MNK-T1_0007901762
14
      Mallinckrodt   FY10 TussiCaps and Exalgo    127
15    Wessler 13     Commercial Plans, October
                     28, 2009,
16                   MNK-T1_0001192760
17    Mallinckrodt   Covidien Specialty           145
      Wessler 14     Pharmaceuticals Medical
18                   Affairs Team Meeting,
                     February 18, 2010,
19                   MNK-T1_0001188838
20    Mallinckrodt   Exalgo 32mg Launch Update,   158
      Wessler 15     June 25, 2012,
21                   MNK-T1_000078285 -
                     MNK-T1_000078350
22
23
24
25

Highly Confidential - Subject to Further Confidentiality Review

---

Page 6

1  Mallinckrodt   FY15 Xartemis XR Brand   172
   Wessler 16    Planning, Key Strategic
2                Imperatives & Critical
                 Success Factors, August 7,
3                2014, Michael Wessler,
                 Product Director,
4                MNK-T1_0000942223
5  (Exhibits attached to the deposition.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 8

1  defendants.                    09:02:51
2       MR. HODGES:  Nick Hodges for    09:02:53
3  Walmart.                       09:02:53
4       MS. HARMON:  Sarah Harmon for    09:02:55
5  Cardinal Health.               09:02:55
6       VIDEOGRAPHER:  Will counsel    09:02:56
7  present on the phone please identify    09:02:57
8  themselves.                    09:02:59
9       MR. BUSLER:  This is Adam    09:03:05
10 Busler from Fox Rothschild on behalf    09:03:08
11 of Validus Pharmaceuticals.    09:03:08
12      MR. HIBEY:  David Hibey of    09:03:10
13 Arnold & Porter for Par and Endo.    09:03:12
14      MS. WINSTON:  Sylvia Winston    09:03:13
15 from Jackson Kelly for          09:03:17
16 AmerisourceBergen.             09:03:19
17      MR. CHALOS:  Adam, can you say    09:03:23
18 what company you're representing    09:03:26
19 again, please?                 09:03:27
20      MR. BUSLER:  It's Validus.    09:03:29
21      VIDEOGRAPHER:  The court    09:03:34
22 reporter is Carrie Campbell, and she    09:03:36
23 will now swear in the witness.    09:03:37
24
25

---

Page 7

1       VIDEOGRAPHER:  We are now on    09:01:46
2  the record.  My name is James Arndt.    09:02:09
3  I'm a videographer for Golkow    09:02:12
4  Litigation Services.           09:02:13
5       Today's date is January 9,    09:02:13
6  2019, and the time is 9:02 a.m.    09:02:17
7       This video deposition is being    09:02:21
8  held in St. Louis, Missouri, in the    09:02:22
9  matter of the National Prescription    09:02:24
10 Opiate Litigation for the United    09:02:26
11 States District Court for the Northern    09:02:28
12 District of Ohio, Eastern Division.    09:02:30
13      The deponent is Michael    09:02:31
14 Wessler.                       09:02:33
15      Will counsel please identify    09:02:33
16 themselves.                    09:02:34
17      MR. CHALOS:  Mark Chalos for    09:02:35
18 the plaintiffs.                09:02:37
19      MR. ROOS:  Peter Roos for the    09:02:39
20 plaintiffs.                    09:02:40
21      MR. DAVISON:  Williams Davison    09:02:42
22 on behalf of Mallinckrodt, LLC,    09:02:43
23 SpecGx, LLC, and the witness.    09:02:46
24      MR. MAEROWITZ:  And Max    09:02:48
25 Maerowitz on behalf of the same    09:02:49

---

Page 9

1       MICHAEL WESSLER,           09:03:43
2  of lawful age, having been first duly sworn
3  to tell the truth, the whole truth and
4  nothing but the truth, deposes and says on
5  behalf of the Plaintiffs, as follows:
6                                 09:03:43
7       DIRECT EXAMINATION          09:03:43
8  QUESTIONS BY MR. CHALOS:        09:03:44
9  Q.   Thank you, Mr. Wessler, for    09:03:45
10 being here today.              09:03:48
11      Have you ever given a         09:03:49
12 deposition before?             09:03:50
13 A.   No, I have not.           09:03:51
14 Q.   Okay.  So I'm sure you've    09:03:52
15 talked with your counsel about how to conduct  09:03:53
16 yourself here today.  If I ask a question    09:03:56
17 that you don't understand, will you please    09:03:59
18 let me know that you don't understand it?    09:04:01
19 A.   Yes.                     09:04:03
20 Q.   Okay.  And if you answer the    09:04:03
21 question, I'm going to assume that you    09:04:05
22 understood it.                 09:04:07
23      Is that fair?            09:04:07
24 A.   Yes.                     09:04:08
25      (Mallinckrodt-Wessler Exhibit 1    09:04:10

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1     marked for identification.)          09:04:10
2   QUESTIONS BY MR. CHALOS:               09:04:10
3     Q.   Okay.  Let me hand you what we  09:04:11
4   have marked as Exhibit Number 1, which is the  09:04:12
5   deposition notice for today.           09:04:15
6          We've got paper copies of most  09:04:22
7   of these -- extra paper copies of most of  09:04:25
8   them, but he's going to be putting them up on  09:04:29
9   the Elmo as well, so one way or another you  09:04:31
10  guys will be able to see them.          09:04:34
11         MR. CHALOS:  And before we get   09:04:36
12  into this, I just wanted to make one    09:04:37
13  statement for the record before I      09:04:39
14  forget.                                 09:04:40
15         We last night received about --  09:04:41
16  sometime after 9 p.m. local time a     09:04:44
17  batch of documents from Mallinckrodt   09:04:46
18  related to Mr. Wessler.  I believe     09:04:50
19  they came from his custodial file, and  09:04:52
20  I think there are somewhere north of   09:04:54
21  90 of those, 90 or 92 documents.  We   09:04:56
22  haven't had a chance to review those   09:05:03
23  and analyze those documents.           09:05:04
24         And I asked the Ropes & Gray     09:05:05
25  team to bring with them paper copies,  09:05:07

Page 11

1   which they did -- and thank you very   09:05:08
2   much for doing that, Mr. Davison --    09:05:10
3   but I want to make clear for the       09:05:11
4   record that we haven't really had a    09:05:13
5   chance to do anything meaningful with  09:05:14
6   those documents.                       09:05:16
7          So we'll reserve whatever        09:05:16
8   rights we have with respect to this    09:05:18
9   deposition and those documents, and    09:05:20
10  we're not waiving any rights we might   09:05:22
11  have by going forward today, so...     09:05:26
12         MR. DAVISON:  And understood     09:05:27
13  we're not waiving our rights to object  09:05:27
14  either.                                 09:05:29
15  QUESTIONS BY MR. CHALOS:               09:05:30
16    Q.   Okay.  So Exhibit Number 1, the  09:05:30
17  deposition notice for today, Mr. Wessler,  09:05:34
18  have you had a chance to review that   09:05:37
19  document?                               09:05:39
20    A.   Yes.                             09:05:39
21    Q.   Have you seen it before today?  09:05:40
22    A.   Yes.                             09:05:41
23    Q.   If you look at Schedule A of    09:05:42
24  the deposition notice, there lists three  09:05:49
25  requests for production of documents.  09:05:53

Page 12

1          Do you see that?  It starts on   09:05:55
2   page number 4 of Exhibit Number 1 on the very  09:05:57
3   bottom there, Request for Production    09:06:01
4   Number 1.                              09:06:02
5     A.   Oh, okay.                        09:06:03
6     Q.   And then it spills over the      09:06:03
7   next page where there's Request for    09:06:06
8   Productions Number 2 and 3.            09:06:08
9          Do you have any documents in     09:06:13
10  your possession that fit with the      09:06:17
11  descriptions in either Request for Production  09:06:19
12  1, 2 or 3?                              09:06:21
13    A.   Yes.                             09:06:22
14    Q.   Okay.  Have you produced those  09:06:23
15  to counsel for Mallinckrodt?           09:06:26
16    A.   Yes.                             09:06:29
17    Q.   Okay.  What did you have in     09:06:29
18  your possession?                       09:06:30
19    A.   Consistent with Request for     09:06:32
20  Production Number 1, a résumé.         09:06:37
21    Q.   Okay.                            09:06:39
22    A.   So that was -- that was         09:06:39
23  provided.                              09:06:41
24         And then I had a binder related  09:06:41
25  to the product launch of Xartemis and a  09:06:49

Page 13

1   couple of additional PowerPoint presentations  09:06:54
2   I think that were draft presentations for  09:06:58
3   Exalgo or Xartemis.  I can't recall off the  09:07:04
4   top of my head.                        09:07:09
5     Q.   Okay.  Did you have any other   09:07:09
6   documents in your possession that fit within  09:07:12
7   any of the categories in Exhibit 1?    09:07:14
8     A.   No.                             09:07:16
9     Q.   You produced those to counsel  09:07:17
10  for Mallinckrodt?                       09:07:19
11    A.   I did.                           09:07:20
12    Q.   When was that?                   09:07:20
13    A.   Early December.                  09:07:22
14         MR. CHALOS:  Do you know, have  09:07:30
15  we gotten those?                        09:07:32
16         MR. DAVISON:  You should have   09:07:33
17  received -- the résumé we received     09:07:33
18  later, and I think we just produced    09:07:34
19  the résumé last week, but the other    09:07:36
20  documents produced were, I believe, in  09:07:37
21  December, but you definitely have      09:07:39
22  them.                                   09:07:41
23         MR. CHALOS:  Okay.  Okay.  I    09:07:42
24  don't remember seeing the résumé, but  09:07:43
25  that may have been in that batch that  09:07:43

Page 14

1  came before last night, but --          09:07:45
2       MR. DAVISON:  I think it was        09:07:46
3  earlier, maybe earlier this week or      09:07:46
4  late last week.  I'm not completely      09:07:48
5  certain.                                 09:07:50
6       MR. CHALOS:  Got it.  Okay.         09:07:50
7  QUESTIONS BY MR. CHALOS:                 09:07:52
8       Q.   So as you sit here today, there 09:07:52
9  are no documents in your possession that fit 09:07:54
10 within the categories in Exhibit 1 that you 09:07:57
11 have not produced to counsel for         09:08:01
12 Mallinckrodt; is that correct?           09:08:02
13      A.   Correct.        09:08:03
14           (Mallinckrodt-Wessler Exhibit 2 09:08:05
15      marked for identification.)          09:08:06
16 QUESTIONS BY MR. CHALOS:                 09:08:06
17      Q.   Okay.  Let's mark as           09:08:06
18 Exhibit 2...               09:08:11
19      A.   Can I return this, or what do  09:08:20
20 I --                      09:08:21
21      Q.   Oh, right.  Good point.  Yeah, 09:08:21
22 if you could just leave it to the side -- 09:08:23
23      A.   Okay.           09:08:23
24      Q.   -- somewhere.  There's about an 09:08:25
25 80 percent chance that I'm going to take that 09:08:26

Page 15

1  and stash it in some of my papers and walk 09:08:28
2  out of here with it.  I know I'm not supposed 09:08:31
3  to.                       09:08:33
4       A.   Oh, okay.        09:08:34
5       Q.   Yeah.  But, yeah, you can just 09:08:35
6  put them to the side, and if it gets to be 09:08:36
7  too disorganized, let us know, and we can 09:08:37
8  maybe put them on a chair or something.  09:08:41
9       A.   Okay.           09:08:41
10      Q.   I tend not to go back to refer 09:08:42
11 to earlier exhibits, but then again,     09:08:43
12 sometimes I do.            09:08:45
13           Exhibit 2 is a printout from   09:08:46
14 LinkedIn that we printed a week or so ago. 09:08:50
15 Let me hand that to you --               09:08:54
16      A.   Okay.           09:08:54
17      Q.   -- and we've got some copies of 09:08:55
18 this as well.              09:08:56
19           And if you could take a look   09:08:57
20 through that.  My first question to you will 09:09:03
21 be is the information contained in Exhibit 2 09:09:05
22 accurate.  So you can just take a minute to 09:09:07
23 look at that.              09:09:12
24      A.   Yes.            09:09:13
25      Q.   Okay.  So the information       09:10:00

Page 16

1  contained in Exhibit 2 is accurate?      09:10:02
2       A.   Yes.            09:10:03
3       Q.   Did you input this information 09:10:03
4  into the LinkedIn system?                09:10:05
5       A.   I did.          09:10:06
6       Q.   Okay.  Let's go back for just  09:10:07
7  one second to the résumé that you produced to 09:10:12
8  your counsel and to Mallinckrodt's counsel. 09:10:14
9           Is the information contained    09:10:15
10 within that résumé accurate?             09:10:17
11      A.   It is.          09:10:18
12      Q.   Okay.  And is it --            09:10:19
13      A.   To my knowledge, yeah.         09:10:20
14      Q.   Okay.  And is it complete in   09:10:21
15 terms of your work history and educational 09:10:24
16 history?                   09:10:26
17      A.   My résumé?      09:10:26
18      Q.   Yes, sir.        09:10:27
19      A.   I believe so.  I might have    09:10:28
20 truncated it to a more germane experience, so 09:10:31
21 I'm not sure how far back, off the top of my 09:10:34
22 head, the résumé goes.                   09:10:36
23      Q.   Okay.  Let's talk now about    09:10:37
24 Exhibit 2, your LinkedIn entry.  And it has 09:10:40
25 you listed here as currently being the   09:10:47

Page 17

1  director of marketing for North America for 09:10:50
2  Curium Pharma.             09:10:53
3           Is that your current job?       09:10:55
4       A.   Correct.        09:10:56
5       Q.   What do you do with them?      09:10:57
6       A.   I'm responsible for helping to 09:10:58
7  develop a strategy to launch a new asset. 09:11:03
8       Q.   Okay.  What is the new asset?  09:11:06
9  I mean, is it public information, or is it 09:11:08
10 secret?                    09:11:11
11      A.   It is public information.  It's 09:11:11
12 copper 64 Dotatate.                      09:11:15
13      Q.   What is that?                  09:11:15
14      A.   It's a diagnostic agent.       09:11:16
15      Q.   Does Curium Pharmacy --        09:11:18
16 sorry -- Curium Pharma produce any opioids? 09:11:25
17      A.   Not to my knowledge.           09:11:28
18      Q.   Okay.  Do you in your current  09:11:30
19 job have anything to do with opioids?    09:11:32
20      A.   No.             09:11:33
21      Q.   In the introduction to your -- 09:11:33
22 I guess that's an introduction -- the first 09:11:38
23 section of your LinkedIn entry in Exhibit 2, 09:11:40
24 the second paragraph there it says, "Achieved 09:11:46
25 130 percent of the financial forecast of  09:11:50

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1  Exalgo with only nine months of preparation, 09:11:53
2  and ensured significant sales force 09:11:56
3  engagement through a robust communication and 09:12:00
4  incentive plan amidst another product 09:12:03
5  launch." 09:12:08
6      Do you see that? 09:12:08
7  A.  Yes. 09:12:08
8  Q.  Okay.  And that's referring to 09:12:09
9  your time at Mallinckrodt? 09:12:10
10  A.  Correct. 09:12:11
11  Q.  Okay.  And what was your role 09:12:11
12  with respect to Exalgo at Mallinckrodt? 09:12:16
13  A.  I helped develop the messaging 09:12:20
14  for the product and the sales collateral, 09:12:25
15  meaning the material that the sales force 09:12:28
16  used in their promotional efforts. 09:12:30
17  Q.  Was the messaging that you 09:12:32
18  helped develop limited to just the messaging 09:12:37
19  that the sales force would deliver or was the 09:12:39
20  messaging more broad than that? 09:12:42
21      MR. DAVISON:  Objection. 09:12:43
22      THE WITNESS:  It was the 09:12:44
23      messaging that the sales force 09:12:47
24      delivered, but we used that same 09:12:48
25      messaging in nonpersonal tactics as 09:12:52

Page 19

1  well. 09:12:55
2  QUESTIONS BY MR. CHALOS: 09:12:55
3  Q.  Okay.  What does that mean 09:12:55
4  "nonpersonal tactics"? 09:12:57
5  A.  So like e-mail blasts, digital 09:12:58
6  advertising, that type of thing. 09:13:01
7  Q.  And who was the target audience 09:13:03
8  of the nonpersonal tactics? 09:13:09
9  A.  Physicians pretty consistent 09:13:11
10  with the ones that we targeted through our 09:13:14
11  sales force. 09:13:16
12  Q.  Was the same messaging that you 09:13:16
13  developed for Exalgo also used for 09:13:21
14  pharmacies? 09:13:27
15  A.  There might be a few different 09:13:28
16  messages, but for the most part the messaging 09:13:34
17  was consistent. 09:13:38
18  Q.  So what I'm getting at is the 09:13:39
19  messaging that you helped deliver -- or 09:13:42
20  helped develop for Exalgo, was this the 09:13:44
21  totality of the messaging for Exalgo, however 09:13:47
22  it was used, or was there a separate group 09:13:50
23  that developed, for example, the messaging 09:13:52
24  for pharmacies? 09:13:55
25      MR. DAVISON:  Objection. 09:13:55

Page 20

1      THE WITNESS:  I'm not sure I 09:13:56
2      understand the question. 09:13:59
3  QUESTIONS BY MR. CHALOS: 09:13:59
4  Q.  Okay.  You know, let's put that 09:14:00
5  to the side.  When we get to your experience 09:14:03
6  at Mallinckrodt, maybe we'll dig into that a 09:14:05
7  little bit more. 09:14:08
8  A.  Okay. 09:14:09
9  Q.  Back to Exhibit Number 2, you 09:14:09
10  said that you "ensured significant sales 09:14:12
11  force engagement through a robust 09:14:14
12  communication and incentive plan amidst 09:14:16
13  another product launch."  Let's break that 09:14:20
14  down a little bit. 09:14:24
15      What was your role with respect 09:14:24
16  to the sales force engagement? 09:14:26
17  A.  We communicated with them 09:14:28
18  regularly, and we presented and helped to 09:14:33
19  train them at the sales force launch meeting. 09:14:36
20  Q.  Who is "we," when you say "we"? 09:14:39
21  A.  The marketing department. 09:14:44
22  Q.  Okay.  And what was your role 09:14:45
23  with respect to the sales force incentive 09:14:46
24  plan? 09:14:49
25  A.  I was aware of it and -- but 09:14:50

Page 21

1  that was -- I mean, it was a team, people 09:14:55
2  that had awareness of the sales incentive 09:14:58
3  plan, but that was really driven by sales 09:15:00
4  operations in terms of the framework of the 09:15:02
5  plan. 09:15:05
6  Q.  So your role with respect to 09:15:06
7  the incentive plan was just to be aware of 09:15:08
8  it? 09:15:11
9      MR. DAVISON:  Objection. 09:15:11
10      THE WITNESS:  Yeah, I was aware 09:15:12
11      of it. 09:15:13
12  QUESTIONS BY MR. CHALOS: 09:15:13
13  Q.  Did you have any role in 09:15:14
14  crafting the incentive plan for sales 09:15:15
15  representatives? 09:15:18
16  A.  Not really. 09:15:18
17  Q.  You go on to say here in 09:15:18
18  Exhibit 2 that "Also increased revenue more 09:15:23
19  than $20 million for Exalgo through the 09:15:26
20  development and execution of a molecule 09:15:29
21  matching strategy." 09:15:33
22      What is that? 09:15:35
23  A.  It's a strategy that we 09:15:36
24  developed to, I guess -- what's the best way 09:15:38
25  to frame this?  It was really to identify -- 09:15:48

Page 22

1  or work with physicians to help them perhaps  09:15:53
2  identify patients appropriate for Exalgo.  09:15:55
3       So hydromorphone, which is what  09:15:59
4  Exalgo is, is the active metabolite of  09:16:03
5  hydrocodone. So patients that fit the opioid  09:16:06
6  tolerant definition, that had previously been  09:16:10
7  exposed to hydrocodone, that had satisfactory  09:16:15
8  results, meaning they didn't experience a lot  09:16:18
9  of untoward effects, we felt that they might  09:16:21
10  be appropriate candidates because of the fact  09:16:23
11  they had been exposed to hydromorphone  09:16:26
12  previously through their exposure to  09:16:30
13  hydrocodone.  09:16:32
14       Q.   Okay. And you go on to say  09:16:32
15  here that you "drove widespread adoption  09:16:34
16  through a robust KOL," key opinion leader,  09:16:38
17  "satellite broadcast of the scientific  09:16:42
18  messaging to more than 1,000 physician  09:16:45
19  attendees."  09:16:49
20       What does that mean?  09:16:49
21       A.   We had a tactic where we  09:16:50
22  broadcast a -- our marketing messaging to  09:16:54
23  over a thousand physician attendees, and that  09:16:59
24  was a peer-to-peer tactic that we worked with  09:17:02
25  our medical affairs team on where, you know,  09:17:04

Page 23

1  physicians talked about the appropriate  09:17:08
2  patients for Exalgo, the benefits and risks,  09:17:12
3  and that was broadcast to a thousand or more  09:17:16
4  physicians -- or more additional physicians.  09:17:19
5       Q.   Was that a one-time event?  09:17:21
6       A.   I can't recall. I believe we  09:17:23
7  did it twice.  09:17:28
8       Q.   What's a key opinion leader?  09:17:28
9       A.   A key opinion leader is a  09:17:34
10  physician that is -- has a good reputation in  09:17:36
11  the community, and they are usually  09:17:42
12  well-published and perhaps in an academic  09:17:47
13  center.  09:17:50
14       Q.   What is the purpose of using a  09:17:51
15  key opinion leader in marketing?  09:17:57
16       MR. DAVISON: Objection.  09:17:59
17       THE WITNESS: I can say that we  09:17:59
18  felt like they were -- they added  09:18:04
19  credibility. It's just like any sort  09:18:07
20  of tactic where you get an expert; you  09:18:11
21  would get an expert to speak on a  09:18:16
22  topic.  09:18:17
23  QUESTIONS BY MR. CHALOS:  09:18:18
24       Q.   The intention of using key  09:18:20
25  opinion leaders was to increase the number of  09:18:21

Page 24

1  prescriptions for Mallinckrodt product?  09:18:25
2       MR. DAVISON: Objection.  09:18:27
3       THE WITNESS: Is that -- I'm  09:18:28
4  sorry, is that a question?  09:18:32
5  QUESTIONS BY MR. CHALOS:  09:18:33
6       Q.   Oh, yes, that is a question.  09:18:33
7  Yes.  09:18:35
8       A.   Okay. Can you -- can you  09:18:35
9  repeat the question?  09:18:36
10       Q.   Sure, yes.  09:18:37
11       And from time to time,  09:18:38
12  Mr. Davison or someone else may make an  09:18:39
13  objection.  09:18:42
14       A.   Yes.  09:18:42
15       Q.   And unless they tell you not to  09:18:42
16  answer, you can go ahead and answer the  09:18:44
17  question and pay no mind to --  09:18:46
18       A.   Understand.  09:18:48
19       Q.   -- the lawyers' back and forth.  09:18:50
20       So the question was: The  09:18:52
21  intention of using key opinion leaders was to  09:18:53
22  increase the number of prescriptions of  09:18:55
23  Mallinckrodt products where appropriate?  09:18:58
24       MR. DAVISON: Same objection.  09:19:00
25       THE WITNESS: The intention of  09:19:01

Page 25

1  using a key opinion leader is to  09:19:03
2  appropriately educate physicians on  09:19:05
3  the risks and benefits of the product  09:19:07
4  so that they can make the decision on,  09:19:10
5  you know, the appropriate patients.  09:19:13
6  QUESTIONS BY MR. CHALOS:  09:19:14
7       Q.   And the hope, from a marketing  09:19:15
8  standpoint, is that that information  09:19:18
9  encourages an increase in the number of  09:19:19
10  Mallinckrodt products -- prescriptions where  09:19:23
11  they're appropriate to use; is that fair to  09:19:25
12  say?  09:19:27
13       A.   The intent is to, again,  09:19:27
14  appropriately educate physicians on the risks  09:19:29
15  and benefits of the product so that they can  09:19:32
16  make the decision ultimately on which  09:19:34
17  patients they should use the product.  09:19:38
18       Q.   And when more prescriptions for  09:19:40
19  the Mallinckrodt product are written, the  09:19:51
20  marketing efforts are considered to be more  09:19:56
21  successful?  09:20:00
22       MR. DAVISON: Objection.  09:20:00
23       THE WITNESS: As long as it's  09:20:00
24  for the right patients and the  09:20:02
25  appropriate patients.  09:20:03

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1  QUESTIONS BY MR. CHALOS:                09:20:05
2    Q.   Then yes?                    09:20:06
3    A.   Yes.                        09:20:07
4    Q.   Okay.  Right.  That's what I'm   09:20:08
5  driving at.                          09:20:13
6        So I'm not suggesting that your    09:20:13
7  marketing efforts were encouraging     09:20:16
8  prescriptions for inappropriate patients.  09:20:18
9  What I'm trying to understand is that when   09:20:21
10  you undertake from a marketing standpoint   09:20:25
11  something like a broadcast of key opinion   09:20:27
12  leaders to more than a thousand physicians,   09:20:29
13  from a marketing standpoint, the hope is that   09:20:31
14  that will, for the appropriate patients,    09:20:34
15  drive up the number of prescriptions for that  09:20:38
16  product; is that fair to say?            09:20:40
17    A.   Yes, it's to -- it's to --     09:20:41
18  again, as long as we're clear that it's for   09:20:45
19  the appropriate patients and that ultimately,  09:20:48
20  you know, it's the physician's decision    09:20:51
21  regarding that.                     09:20:54
22    Q.   Then the answer is yes?       09:20:54
23    A.   Yes.                      09:20:58
24    Q.   Okay.  Yeah, sorry, we're     09:20:59
25  just -- we are communicating, but you have to   09:21:00

Page 27

1  sort of verbalize the answer, yes, no, I    09:21:04
2  don't know --                       09:21:07
3    A.   I understand.               09:21:08
4    Q.   -- and feel free to explain as   09:21:08
5  long as you want.  But it's not exactly a   09:21:11
6  regular conversation.                 09:21:13
7    A.   Understand.                09:21:17
8    Q.   Okay.  So let me see if I can   09:21:17
9  do that again so we can clear up the record.  09:21:19
10        From a marketing standpoint,    09:21:22
11  the purpose of doing and undertaking like   09:21:24
12  having key opinion leaders at a satellite   09:21:28
13  broadcast to more than a thousand physicians   09:21:31
14  is to, for the appropriate patients, increase  09:21:33
15  the number of prescriptions for Mallinckrodt  09:21:36
16  products?                          09:21:38
17        MR. DAVISON:  Objection to      09:21:38
18  form.                            09:21:39
19        THE WITNESS:  It's -- again,    09:21:39
20  it's to differentiate our product from     09:21:40
21  the competitive products so that we      09:21:43
22  can educate physicians on the          09:21:47
23  features, benefits and risks of our       09:21:48
24  product.                          09:21:50
25

Page 28

1  QUESTIONS BY MR. CHALOS:                09:21:50
2    Q.   With the goal of, for the       09:21:54
3  appropriate patients, increasing the number   09:21:56
4  of Mallinckrodt prescriptions?           09:21:58
5        MR. DAVISON:  Objection.        09:22:00
6        THE WITNESS:  Yes.            09:22:01
7  QUESTIONS BY MR. CHALOS:                09:22:01
8    Q.   You list here your jobs, back    09:22:08
9  to Exhibit 2, your jobs with Mallinckrodt --   09:22:11
10  well, let me take it more broadly.        09:22:13
11        You start in the present, and    09:22:16
12  you go back to your time with Jones Pharma,   09:22:18
13  Inc., which was February 1996 through     09:22:24
14  July 2001.                         09:22:27
15        Do you see that?             09:22:27
16    A.   Yes.                      09:22:27
17    Q.   Did you have any other jobs in   09:22:29
18  the pharmaceutical industry between 1996 and   09:22:32
19  the present that are not listed in Exhibit 2?  09:22:36
20        And you can take as much time    09:22:43
21  as you need to review that.            09:22:45
22    A.   No.                      09:22:46
23    Q.   Okay.  In what -- well, let me   09:22:55
24  just take it company by company.         09:23:01
25        For Jones Pharma, did you have   09:23:03

Page 29

1  anything to do with opioids there?        09:23:04
2    A.   No.                      09:23:05
3    Q.   And for Biomedical Systems, did   09:23:06
4  you have anything to do with opioids there?   09:23:09
5    A.   No.                      09:23:11
6    Q.   So your only professional       09:23:12
7  experience with opioids was during the time   09:23:13
8  that you were at Mallinckrodt?           09:23:15
9    A.   Yes.                      09:23:16
10    Q.   Okay.  And you were there for   09:23:16
11  14 years?                         09:23:18
12    A.   Yes.                     09:23:19
13    Q.   The opioid products that you    09:23:19
14  were involved with professionally at       09:23:31
15  Mallinckrodt, let me list the ones that I   09:23:32
16  know of, and tell me if I miss any.       09:23:36
17        TussiCaps, Magnacet, Exalgo and   09:23:39
18  Xartemis.                         09:23:42
19        Were there any others that you   09:23:44
20  were involved with at Mallinckrodt?  We're   09:23:46
21  talking about opioids.                09:23:47
22    A.   No.                      09:23:48
23    Q.   Okay.  Let's start with        09:23:50
24  Tussi -- no, sorry, Magnacet.           09:24:02
25        Magnacet was the first time;    09:24:04

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1    is that right?                        09:24:06
2        A.    I believe so, yes.          09:24:06
3        Q.    Okay.  Let's start with     09:24:07
4    Magnacet here.                        09:24:09
5            You list in Exhibit 2 on the  09:24:10
6    second page under your role as a senior  09:24:12
7    product manager, October 2006 to      09:24:16
8    November 2009, you said you "led the  09:24:20
9    commercial launch of Magnacet and TussiCaps,  09:24:21
10   inclusive of prelaunch market development,  09:24:26
11   manufacturing and clinical development  09:24:30
12   management."                          09:24:32
13           Do you see that?              09:24:32
14       A.    Yes.                        09:24:33
15       Q.    And that's true for Magnacet?  09:24:33
16       A.    That's not true for Magnacet.  09:24:36
17   That's more true for TussiCaps.       09:24:38
18       Q.    Okay.  What was your role with  09:24:40
19   respect to Magnacet?                  09:24:41
20       A.    I helped to develop the     09:24:43
21   marketing message for Magnacet and the sales  09:24:46
22   collateral.                           09:24:52
23       Q.    What is sales collateral?   09:24:52
24       A.    Like a sales aid.           09:24:54
25       Q.    Does that include like the pens  09:24:57

Page 31

1    and pads and that stuff that you used to be  09:25:00
2    able to do?                           09:25:02
3        A.    Yes.  Yes.                  09:25:03
4        Q.    Okay.  That's called sales  09:25:04
5    collateral?                           09:25:07
6        A.    Yeah.                       09:25:07
7        Q.    Okay.  I learned a new word at  09:25:08
8    the last deposition, too, armamentarium.  09:25:12
9        A.    Armamentarium?              09:25:15
10       Q.    Armamentarium.  Yeah, there...  09:25:17
11           Okay.  So you developed the   09:25:19
12   messaging and the sales collateral for  09:25:20
13   Magnacet?                             09:25:23
14       A.    Yes.                        09:25:24
15       Q.    Okay.  Did you do anything else  09:25:24
16   with respect to Magnacet?             09:25:26
17       A.    Not that I can recall.      09:25:27
18       Q.    Okay.  What was Magnacet?    09:25:33
19       A.    It was an oxycodone-        09:25:34
20   acetaminophen combination product.    09:25:37
21       Q.    For what type of patients was  09:25:40
22   Magnacet typically prescribed?  Was it acute  09:25:52
23   pain or chronic pain or...            09:25:55
24           MR. DAVISON:  Objection.      09:25:56
25           THE WITNESS:  I believe it was  09:25:57

Page 32

1    acute pain.  That was the indication.  09:25:58
2    QUESTIONS BY MR. CHALOS:              09:26:04
3        Q.    Okay.  Is that still on the  09:26:05
4    market, Magnacet?                     09:26:13
5        A.    I do not believe so.        09:26:14
6        Q.    Was it removed from the market  09:26:16
7    while you were at Mallinckrodt?       09:26:18
8        A.    I do not believe so.        09:26:19
9        Q.    Do you think it's been removed  09:26:20
10   since then?                           09:26:23
11       A.    I believe so.               09:26:24
12       Q.    Do you have any idea when?   09:26:24
13       A.    No, I do not.               09:26:28
14       Q.    Do you know why it was removed  09:26:28
15   from the market?                      09:26:31
16           MR. DAVISON:  Objection.      09:26:32
17           THE WITNESS:  I do not.       09:26:32
18   QUESTIONS BY MR. CHALOS:              09:26:33
19       Q.    Okay.  For how long a period of  09:26:34
20   time did Mallinckrodt actively promote  09:26:35
21   Magnacet?                             09:26:39
22       A.    I can't recall.             09:26:40
23       Q.    Was it promoted during the  09:26:41
24   entire time that you were at Mallinckrodt?  09:26:43
25       A.    No.                         09:26:45

Page 33

1        Q.    Okay.  So there came a time  09:26:45
2    somewhere along the way during your 14 years  09:26:48
3    there that Mallinckrodt decided to no longer  09:26:51
4    actively promote Magnacet?            09:26:54
5        A.    Correct.                    09:26:56
6        Q.    Were you involved in that    09:26:57
7    addition at all?                      09:26:58
8        A.    No.  I believe they sold the  09:26:59
9    asset.                                09:27:00
10       Q.    Sold the product?           09:27:02
11       A.    Yes.                        09:27:03
12       Q.    The drug?  Okay.  Got it.   09:27:03
13           They didn't -- somebody else  09:27:06
14   took it over?                         09:27:08
15       A.    That's my understanding.    09:27:09
16       Q.    Okay.  You go on to say here,  09:27:11
17   "Within two years of launch, achieved full  09:27:15
18   payback on Magnacet through development and  09:27:18
19   execution of a strategic promotional  09:27:21
20   messaging strategy."                  09:27:24
21           Do you see that?              09:27:25
22       A.    Yes.                        09:27:25
23       Q.    What does that mean?        09:27:25
24       A.    That we were able to fully   09:27:27
25   cover the cost of purchasing Magnacet through  09:27:32

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 the marketing messaging and sales force 09:27:39
2 efforts. 09:27:44
3 Q. Meaning the sales of Magnacet 09:27:45
4 were sufficient to cover with the revenue 09:27:51
5 generated by the costs of purchasing the 09:27:55
6 Magnacet product? 09:28:00
7 A. Correct. 09:28:01
8 Q. Okay. Did you, at any time 09:28:02
9 while you were at Mallinckrodt, develop a 09:28:06
10 method for measuring the return on investment 09:28:09
11 for marketing expenditures? 09:28:12
12 MR. DAVISON: Objection. 09:28:14
13 THE WITNESS: I'm not sure I 09:28:15
14 understand the question. Can you 09:28:20
15 repeat that? 09:28:22
16 QUESTIONS BY MR. CHALOS: 09:28:23
17 Q. Sure. 09:28:23
18 Did you -- let me ask it maybe 09:28:23
19 a different way. 09:28:25
20 Did you -- when you were at 09:28:25
21 Mallinckrodt, did you ever have any 09:28:26
22 experience with assessing the return on 09:28:27
23 investment for marketing expenditures? 09:28:30
24 MR. DAVISON: Objection. 09:28:32
25 THE WITNESS: I'm sure we did. 09:28:33

Page 35

1 QUESTIONS BY MR. CHALOS: 09:28:34
2 Q. Okay. Did you have any role in 09:28:34
3 that? 09:28:36
4 A. Generally I did not calculate 09:28:37
5 the return on investment. That was handled 09:28:43
6 by another group in the organization. 09:28:45
7 Usually sales operations. 09:28:48
8 Q. Do you know how they calculated 09:28:49
9 the return on investment for marketing 09:28:54
10 expenditures? 09:28:57
11 MR. DAVISON: Objection. 09:28:58
12 THE WITNESS: I can't speculate 09:28:59
13 on how they did it. 09:29:00
14 QUESTIONS BY MR. CHALOS: 09:29:01
15 Q. Was that -- was that 09:29:01
16 calculation, meaning the return on investment 09:29:06
17 for marketing expenditures, was that done for 09:29:08
18 all four of the opioid products that you were 09:29:10
19 involved with at Mallinckrodt, to your 09:29:13
20 knowledge? 09:29:16
21 A. Generally -- that's a very 09:29:16
22 broad question. 09:29:24
23 Can you ask it maybe a 09:29:24
24 different way? 09:29:26
25 Q. Yeah. 09:29:27

Page 36

1 So the return on investment for 09:29:28
2 the marketing expenditures for a product, was 09:29:33
3 that done for each of the four opioid 09:29:36
4 products that you were involved with? 09:29:38
5 A. Generally, you do like return 09:29:40
6 on investment for a specific marketing 09:29:42
7 tactic, not for an overall brand. 09:29:45
8 Q. Okay. What do you mean by 09:29:48
9 that? 09:29:49
10 A. So you had asked earlier about 09:29:49
11 the satellite broadcast. 09:29:52
12 Q. Uh-huh. 09:29:54
13 A. So you would calculate the -- 09:29:55
14 sales operations would look at the physicians 09:29:58
15 that attended, and they would calculate 09:30:00
16 potential return on investment on that 09:30:02
17 specific tactic but not on the entirety of 09:30:04
18 the brand. 09:30:09
19 Q. I see. 09:30:09
20 Was that calculation done for 09:30:09
21 tactics for all four of the opioids that you 09:30:15
22 were involved with at Mallinckrodt? 09:30:19
23 A. I can't remember. 09:30:20
24 Q. Was there a return on 09:30:21
25 investment calculation made for each of the 09:30:24

Page 37

1 marketing undertakings while you were at 09:30:29
2 Mallinckrodt? 09:30:32
3 MR. DAVISON: Objection. 09:30:32
4 THE WITNESS: So for every 09:30:33
5 marketing tactic, was a return on 09:30:34
6 investment calculated? 09:30:38
7 QUESTIONS BY MR. CHALOS: 09:30:39
8 Q. Yeah, in categorical terms. In 09:30:39
9 other words -- well, let me ask you. How was 09:30:41
10 it -- let me try it a different way. 09:30:43
11 How was it -- when you were at 09:30:45
12 Mallinckrodt, how did the company decide 09:30:46
13 whether to conduct a return on investment for 09:30:48
14 a marketing expenditure? 09:30:51
15 MR. DAVISON: Objection. 09:30:52
16 THE WITNESS: I think it really 09:30:53
17 depended on the feasibility of that 09:30:57
18 analysis based on the tactic itself. 09:30:59
19 QUESTIONS BY MR. CHALOS: 09:31:02
20 Q. Okay. And what do you mean by 09:31:02
21 that? 09:31:03
22 A. A journal ad, for example, 09:31:03
23 might be very, very difficult to calculate 09:31:09
24 the return on investment because you don't 09:31:10
25 know what specific physicians might have 09:31:12

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1 looked at it. So there are certain 09:31:14
2 limitations based on the tactic, probably, to 09:31:19
3 the ability to calculate that. 09:31:23
4 Q. What would be a tactic that 09:31:25
5 would be easier to calculate the return on 09:31:26
6 investment for? 09:31:31
7 A. Sort of a -- like an e-mail 09:31:32
8 blast. 09:31:35
9 Q. Where you could then measure -- 09:31:37
10 you can calculate how much it cost to do the 09:31:44
11 e-mail blast, and then you know the doctors 09:31:46
12 to whom it went, and then you calculate 09:31:49
13 whether they prescribed additional 09:31:50
14 Mallinckrodt products after the e-mail blast? 09:31:53
15 Is that roughly how it 09:31:54
16 happened? 09:31:56
17 MR. DAVISON: Objection. 09:31:56
18 THE WITNESS: I believe so. 09:31:56
19 QUESTIONS BY MR. CHALOS: 09:31:56
20 Q. Okay. 09:31:56
21 A. But again, I mentioned a lot of 09:31:57
22 times the sales operations group actually did 09:31:59
23 the analysis. 09:32:02
24 (Mallinckrodt-Wessler Exhibit 3 09:32:03
25 marked for identification.) 09:32:04

Page 39

1 QUESTIONS BY MR. CHALOS: 09:32:04
2 Q. Got it. Let's mark this as the 09:32:04
3 next exhibit. 09:32:06
4 Okay. So we've marked as 09:32:07
5 Exhibit 3 a document that has the Bates range 09:32:21
6 MNK-T1_0007845224 through 7845241. And it 09:32:24
7 says it's a performance management document, 09:32:37
8 October 2004. 09:32:42
9 This is the "this is your life" 09:32:44
10 portion of the deposition. This is your 09:32:48
11 performance evaluation to 2004. 09:32:50
12 A. Okay. 09:32:52
13 Q. And you can read the whole 09:32:52
14 thing if you want. I'm going to refer you 09:32:56
15 specifically to page 4 of the document, and 09:32:58
16 I'm going to ask you about -- there's one 09:33:00
17 particular sentence in there I wanted to ask 09:33:03
18 you about. It's under actual results, right 09:33:05
19 kind of in the middle of the page. 09:33:07
20 A. Okay. 09:33:10
21 Q. It's one page further along. 09:33:11
22 It says 4 at the bottom, but it's Bates 09:33:14
23 number MNK-T1_0007845230. 09:33:17
24 And the sentence I want to ask 09:33:30
25 you about there is the second one in the 09:33:32

Page 40

1 center of the page under actual result. It 09:33:34
2 says, "He created the database to measure the 09:33:36
3 ROI on many of the marketing programs and 09:33:40
4 trained the marketing analysts on its use." 09:33:44
5 Do you see that? 09:33:47
6 A. Yes. 09:33:47
7 Q. What is that referring to? 09:33:47
8 A. That was referring to my time 09:33:48
9 prior to being in marketing, when I was -- I 09:33:55
10 can't remember my title at the time. I think 09:33:58
11 manager of sales administration. I worked 09:34:01
12 with an outside vendor to create a call 09:34:04
13 reporting database. 09:34:07
14 Q. Call reporting database? 09:34:08
15 A. Yes. 09:34:11
16 Q. Okay. What was the purpose of 09:34:12
17 that? 09:34:13
18 A. So that representatives could 09:34:13
19 enter into this database calls that they had 09:34:17
20 made to physicians so that we could see, you 09:34:21
21 know, which physicians the representatives 09:34:25
22 were detailing and educating. 09:34:27
23 Q. And how did that measure the 09:34:29
24 ROI on many of the marketing programs? 09:34:35
25 A. We would look at a program that 09:34:39

Page 41

1 they did, and if that information was entered 09:34:42
2 in the call reporting database, we could 09:34:45
3 match that up to prescribing data to see 09:34:47
4 potentially what the impact was prior to the 09:34:52
5 tactic and post the tactic. 09:34:55
6 Q. Was there a database that 09:34:58
7 served a similar function in place during the 09:35:07
8 entire rest of the time you were at 09:35:11
9 Mallinckrodt -- 09:35:12
10 MR. DAVISON: Objection. 09:35:13
11 QUESTIONS BY MR. CHALOS: 09:35:13
12 Q. -- to your knowledge? 09:35:14
13 MR. DAVISON: Objection. 09:35:14
14 Sorry. 09:35:15
15 THE WITNESS: I believe that 09:35:15
16 there was a call reporting database, 09:35:16
17 but this particular one that I worked 09:35:18
18 on was disbanded. 09:35:21
19 QUESTIONS BY MR. CHALOS: 09:35:24
20 Q. Do you remember when that was? 09:35:28
21 A. I honestly do not. 09:35:31
22 Q. So the database that's 09:35:31
23 referenced on the page 4 of Exhibit 3 is the 09:35:35
24 call reporting database? 09:35:39
25 A. Correct. 09:35:41

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1    Q.   Okay.  So there's no separate        09:35:42
2   database intended to measure the ROI for    09:35:44
3   marketing programs?                         09:35:47
4        MR. DAVISON:  Objection.               09:35:49
5        THE WITNESS:  Not to my                09:35:49
6   knowledge.                                  09:35:51
7   QUESTIONS BY MR. CHALOS:                    09:35:51
8    Q.   Okay.  Was the call reporting         09:35:53
9   database used, after they phased out the one   09:35:55
10  you created with the outside vendor, was that  09:36:01
11  used to measure ROI on marketing expenditures  09:36:03
12  as well?                                    09:36:06
13       MR. DAVISON:  Objection.               09:36:06
14       THE WITNESS:  I'm sorry, I'm           09:36:06
15   not sure I understand the question.        09:36:08
16  QUESTIONS BY MR. CHALOS:                    09:36:09
17   Q.   Sure.  Okay.                          09:36:09
18        So you, I think, said that the        09:36:10
19  database that you created with the outside   09:36:12
20  vendor to record call reports, that was     09:36:13
21  phased out at some point --                 09:36:17
22   A.   Correct.                              09:36:20
23   Q.   -- and replaced -- that was           09:36:20
24  replaced with another database?             09:36:21
25   A.   I believe so.                         09:36:24

Page 43

1    Q.   Was that new database used to         09:36:24
2   measure the ROI on marketing expenditures as   09:36:26
3   well?                                       09:36:29
4    A.   Again, this was when I was in a       09:36:29
5   sales operations role, and so I would imagine   09:36:33
6   that, you know, the sales operations folks   09:36:36
7   probably used a similar type of methodology,   09:36:38
8   but I can't really speculate on how they did   09:36:42
9   it.                                         09:36:44
10   Q.   Did you see any ROI                   09:36:44
11  calculations for marketing expenditures with   09:36:50
12  respect to Xartemis?                        09:36:53
13   A.   I believe so, but I can't             09:36:57
14  remember specifically.                      09:37:03
15   Q.   Okay.  And did you see any ROI        09:37:04
16  calculations for marketing expenditures with   09:37:06
17  respect to Exalgo?                          09:37:10
18   A.   I'm sure I did, but I -- again,       09:37:12
19  I can't remember the specifics.             09:37:14
20   Q.   How about for Magnacet?              09:37:15
21   A.   I can't recall.                       09:37:18
22   Q.   Okay.  How about TussiCaps?          09:37:19
23   A.   I can't recall.                       09:37:22
24   Q.   When you were at Mallinckrodt,       09:37:23
25  how did the company measure the success of a   09:37:29

Page 44

1   marketing tactic?                           09:37:32
2        MR. DAVISON:  Objection.               09:37:34
3        THE WITNESS:  Sometimes -- you         09:37:35
4    know, again, I mentioned that it's         09:37:43
5    difficult at times to measure the          09:37:46
6    success of a marketing tactic, so a        09:37:48
7    lot of times it was really, did we hit     09:37:51
8    the goal or did we not hit the goal        09:37:53
9    for the product.                           09:37:56
10  QUESTIONS BY MR. CHALOS:                    09:37:56
11   Q.   In terms of number of                 09:37:57
12  prescriptions?                              09:37:58
13   A.   Right.                                09:37:58
14   Q.   Okay.  Were there any other           09:37:59
15  metrics used while you were at Mallinckrodt   09:38:02
16  to measure whether a marketing tactic was   09:38:05
17  successful, other than the number of        09:38:09
18  prescriptions written for Mallinckrodt      09:38:11
19  product?                                    09:38:13
20   A.   Yes.                                  09:38:13
21       MR. DAVISON:  Objection.               09:38:13
22  QUESTIONS BY MR. CHALOS:                    09:38:14
23   Q.   Okay.  What other metrics were        09:38:14
24  used?                                       09:38:16
25   A.   It depends on, again, the             09:38:16

Page 45

1   specific tactic.                            09:38:18
2    Q.   And what would be an example of       09:38:20
3   another metric?                             09:38:21
4    A.   Number of views of an e-mail.         09:38:22
5   Number of views of a digital ad.            09:38:27
6    Q.   How would Mallinckrodt, while         09:38:30
7   you were there, how would they measure the   09:38:40
8   number of prescriptions written for a       09:38:44
9   Mallinckrodt product?                       09:38:46
10       MR. DAVISON:  Objection.               09:38:48
11       THE WITNESS:  It depends on the        09:38:48
12   product.                                   09:38:50
13  QUESTIONS BY MR. CHALOS:                    09:38:50
14   Q.   Okay.  What do you mean by            09:38:50
15  that?                                       09:38:51
16   A.   Well, they would usually             09:38:54
17  purchase the data from IMS.                  09:38:56
18   Q.   And that would tell them the          09:38:59
19  number of prescriptions written for that    09:39:00
20  product at a given time period?             09:39:02
21   A.   Correct.                              09:39:04
22   Q.   In terms of measuring the             09:39:04
23  effectiveness of a marketing tactic while you   09:39:09
24  were at Mallinckrodt, was the primary method   09:39:12
25  for measuring the success the number of     09:39:16

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1 prescriptions written? 09:39:18
2 MR. DAVISON: Objection. 09:39:19
3 THE WITNESS: I don't -- I 09:39:20
4 don't recall if that was the primary 09:39:31
5 objective. It was -- it was part of 09:39:33
6 the analysis. 09:39:35
7 QUESTIONS BY MR. CHALOS: 09:39:35
8 Q. Was the marketing efforts that 09:39:40
9 you were involved with for Magnacet, were 09:39:45
10 they successful in increasing the number of 09:39:49
11 prescriptions for Magnacet? 09:39:53
12 MR. DAVISON: Objection. 09:39:55
13 THE WITNESS: Well, the product 09:39:56
14 was newly launched, so it went from 09:39:58
15 zero to something, but the ultimate 09:40:01
16 market share of that product, I 09:40:03
17 believe, was under 1 percent, so... 09:40:05
18 QUESTIONS BY MR. CHALOS: 09:40:07
19 Q. Meaning of the total market for 09:40:08
20 similar opioids? 09:40:10
21 A. Uh-huh. 09:40:11
22 Q. Is that a yes? 09:40:12
23 A. Yes, I'm sorry. 09:40:13
24 Q. That's fine. You're doing 09:40:14
25 great on that so far. 09:40:15

Page 47

1 Magnacet was for acute pain; is 09:40:17
2 that right? 09:40:20
3 A. That's my recollection. 09:40:20
4 Q. So acute pain is not 09:40:22
5 necessarily opioid-tolerant patients; is that 09:40:25
6 right? 09:40:27
7 A. Generally, yes, you are 09:40:27
8 correct, it's not for opioid-tolerant 09:40:29
9 patients. 09:40:33
10 Q. Okay. So put another way, 09:40:33
11 acute pain -- acute pain patients are 09:40:34
12 generally patients who have not had prior 09:40:38
13 exposure to opioids? 09:40:41
14 MR. DAVISON: Objection. 09:40:42
15 THE WITNESS: I can't say 09:40:42
16 generally. They can be. 09:40:43
17 QUESTIONS BY MR. CHALOS: 09:40:45
18 Q. So they may be new to opioids; 09:40:45
19 they may not be? 09:40:47
20 A. Correct. 09:40:48
21 Q. Did Mallinckrodt undertake to 09:40:50
22 measure how many of the patients that were 09:40:52
23 prescribed Magnacet were new to opioids? 09:40:56
24 MR. DAVISON: Objection. 09:40:58
25 THE WITNESS: I cannot recall. 09:40:59

Page 48

1 QUESTIONS BY MR. CHALOS: 09:41:00
2 Q. Do you recall with respect to 09:41:04
3 any of the opioid products that you were 09:41:05
4 involved with at Mallinckrodt, whether 09:41:10
5 Mallinckrodt measured what percentage of the 09:41:11
6 patients who received prescriptions for that 09:41:15
7 product were new to opioids? 09:41:16
8 MR. DAVISON: Objection. 09:41:19
9 THE WITNESS: I don't recall. 09:41:20
10 I mean, I -- certainly with Exalgo 09:41:22
11 it's for -- it was for opioid-tolerant 09:41:24
12 patients, so we certainly wouldn't 09:41:28
13 look for patients to have been 09:41:29
14 opioid-naïve. 09:41:32
15 QUESTIONS BY MR. CHALOS: 09:41:33
16 Q. Opioid-naïve is the term for 09:41:33
17 patients who had not had prior exposure to 09:41:35
18 opioids? 09:41:37
19 A. Correct. 09:41:37
20 Q. So for TussiCaps, Magnacet and 09:41:38
21 Xartemis, the patients who received 09:41:44
22 prescriptions for those drugs included 09:41:48
23 opioid-naïve patients? 09:41:50
24 MR. DAVISON: Objection. 09:41:52
25 THE WITNESS: I don't -- I 09:41:52

Page 49

1 can't say that. 09:41:53
2 QUESTIONS BY MR. CHALOS: 09:41:54
3 Q. There was nothing -- well, let 09:41:59
4 me rephrase it. 09:42:00
5 The marketing for -- 09:42:00
6 A. And if I could clarify. 09:42:01
7 Q. Yeah, sure. 09:42:02
8 A. I'm sorry. TussiCaps is not 09:42:03
9 indicated for -- was not indicated for pain. 09:42:04
10 So that's a cough and cold product, so that's 09:42:07
11 a different product altogether. It does have 09:42:10
12 an opioid component, the hydrocodone 09:42:13
13 component, but it's not indicated for pain at 09:42:15
14 all. 09:42:18
15 Q. Okay. Was TussiCaps indicated 09:42:18
16 for only opioid-tolerant patients? 09:42:20
17 A. That's kind of taking it out of 09:42:23
18 context. It's indicated for cough and cold, 09:42:25
19 so the FDA didn't render an opinion on 09:42:29
20 whether the patient had to have exposure to 09:42:30
21 an opioid or not. 09:42:32
22 Q. Okay. So among the target -- 09:42:33
23 among the appropriate patients for TussiCaps 09:42:37
24 would be opioid-naïve patients? 09:42:39
25 MR. DAVISON: Objection. 09:42:41

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1    THE WITNESS: It kind of          09:42:42
2    doesn't work that way.          09:42:43
3  QUESTIONS BY MR. CHALOS:          09:42:44
4    Q.    Okay. What do you mean?     09:42:44
5    A.    Again, the FDA didn't make a --   09:42:45
6  doesn't make a statement on whether or not a   09:42:50
7  patient has to have prior exposure or not     09:42:52
8  because it's not a pain product. It's     09:42:55
9  indicated for cough and cold, so functionally   09:42:58
10  the indication is only around cough and cold,   09:43:01
11  not opioid tolerance or lack thereof.     09:43:03
12    Q.    So the FDA provided no guidance   09:43:06
13  one way or the other on whether it's    09:43:08
14  appropriate for patients who are     09:43:10
15  opioid-naïve?          09:43:13
16    MR. DAVISON: Objection.       09:43:14
17    THE WITNESS: They were       09:43:15
18    completely silent on that.     09:43:16
19  QUESTIONS BY MR. CHALOS:          09:43:17
20    Q.    What about Mallinckrodt's     09:43:17
21  marketing? Did -- for TussiCaps. Did     09:43:18
22  Mallinckrodt's marketing for TussiCaps say    09:43:22
23  anything one way or another as to whether it   09:43:27
24  appropriate only for patients who were    09:43:30
25  opioid-tolerant?          09:43:32

Page 51

1    A.    No, the marketing materials     09:43:32
2  were consistent with the package insert.    09:43:34
3    Q.    Okay. So the marketing     09:43:36
4  materials were silent as to whether it should   09:43:37
5  be limited only to opioid-tolerant patients?   09:43:38
6    MR. DAVISON: Objection.       09:43:41
7    THE WITNESS: Consistent with     09:43:41
8    the PI.          09:43:42
9  QUESTIONS BY MR. CHALOS:          09:43:43
10    Q.    Okay. So let me try that     09:43:43
11  again.          09:43:48
12    The marketing materials for     09:43:48
13  TussiCaps, did they say anything one way or   09:43:50
14  another as to whether TussiCaps was    09:43:53
15  appropriate for opioid-naïve patients?    09:43:56
16    MR. DAVISON: Objection.       09:43:59
17    THE WITNESS: Did not.       09:43:59
18  QUESTIONS BY MR. CHALOS:          09:44:00
19    Q.    Okay. Back to Exhibit     09:44:12
20  Number 2, your LinkedIn under the senior    09:44:14
21  product manager section on page 2. The last   09:44:18
22  sentence, "Accelerated TussiCaps uptake    09:44:29
23  through development and execution of an    09:44:32
24  award-winning prelaunch marketing campaign."   09:44:34
25    Do you see that?       09:44:37

Page 52

1    A.    Yes.          09:44:38
2    Q.    What are you referencing there?   09:44:38
3    A.    It was a campaign that we     09:44:40
4  launched to speak to the safety components of   09:44:44
5  taking cough and cold medications.     09:44:52
6    Q.    Okay. Was TussiCaps a new     09:44:55
7  product?          09:44:57
8    A.    It was.          09:44:57
9    Q.    And it was a bioequivalent of   09:44:58
10  an existing product; is that right?    09:45:00
11    A.    It was.          09:45:01
12    Q.    What was the existing product?   09:45:01
13    A.    I believe it was Tussionex.     09:45:03
14    Q.    Okay. Was that a Mallinckrodt   09:45:05
15  product?          09:45:07
16    A.    It was not.          09:45:07
17    Q.    What does it mean to be a     09:45:08
18  bioequivalent?          09:45:13
19    MR. DAVISON: Objection.       09:45:16
20    THE WITNESS: I can't really     09:45:17
21    speak to that. That's outside my area   09:45:20
22    of expertise.          09:45:22
23  QUESTIONS BY MR. CHALOS:          09:45:22
24    Q.    Okay. Was there -- okay.     09:45:23
25    So here you said "accelerated     09:45:26

Page 53

1  TussiCaps uptake." What does that mean?    09:45:28
2    A.    We -- the prescription volume   09:45:30
3  went up.          09:45:36
4    Q.    TussiCaps was -- you said it's   09:45:38
5  a cough and cold medicine?      09:45:45
6    A.    Correct.          09:45:46
7    Q.    Was there an indication for     09:45:47
8  children as well?          09:45:49
9    A.    I believe so.          09:45:50
10    Q.    Do you remember what age     09:45:52
11  children were included in the indication for   09:45:54
12  TussiCaps?          09:45:57
13    A.    I do not.          09:45:58
14    Q.    Is TussiCaps still on the     09:45:59
15  market?          09:46:06
16    A.    I don't know. Again, I believe   09:46:06
17  Mallinckrodt sold that asset.      09:46:10
18    Q.    Do you recall when that was?   09:46:12
19    A.    I do not.          09:46:13
20    Q.    Okay. Let's move up here and   09:46:14
21  we're still on Exhibit 2. The position is   09:46:20
22  product director, November 2009 to June 2015.   09:46:23
23    Do you see that?       09:46:28
24    A.    Yes.          09:46:28
25    Q.    You said, "I led     09:46:28

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1  commercialization, launched strategy and          09:46:31
2  lifecycle management for Xartemis and Exalgo    09:46:33
3  tablets."                                        09:46:38
4        Do you see that?                           09:46:39
5     A.    Yes.                                     09:46:40
6     Q.    Okay.  What does the                     09:46:40
7  commercialization mean?                          09:46:41
8     A.    It's principally the marketing          09:46:42
9  messaging and collateral development.           09:46:44
10    Q.    What's the launch strategy?             09:46:46
11    A.    It's sort of the marketing              09:46:53
12  plan, the tactics that we would undertake.      09:46:56
13    Q.    Okay.  And lifecycle                     09:46:59
14  management, what does that mean?                09:47:03
15    A.    Working with medical affairs            09:47:04
16  and a large group of cohorts to understand if   09:47:10
17  there are opportunities to work with the FDA    09:47:14
18  on additional indications or anything like      09:47:16
19  that.                                           09:47:18
20    Q.    Okay.  And if you go to the             09:47:19
21  next paragraph it says, the second sentence,    09:47:22
22  "Generated more than $250 million in total      09:47:25
23  revenue from the approval of a product          09:47:28
24  extension."                                     09:47:32
25        What does that mean?                       09:47:33

Page 55

1     A.    That's approval of a                     09:47:34
2  32-milligram strength of Exalgo.                09:47:36
3     Q.    And how was that $250 million           09:47:40
4  measured?  That's the total revenue from         09:47:44
5  sales of the 32-milligram dosage of Exalgo?      09:47:49
6        MR. DAVISON:  Objection.                   09:47:53
7        THE WITNESS:  I believe so.                09:47:53
8  QUESTIONS BY MR. CHALOS:                          09:47:54
9     Q.    You go on to say, "I was a              09:48:01
10  key contributor in the development of the       09:48:03
11  commercial framework for the submission to      09:48:05
12  petition FDA for approval."                      09:48:09
13        What does that mean?                       09:48:10
14    A.    It was looking at the marketing         09:48:12
15  landscape, I believe.  I can't remember         09:48:18
16  specifically the -- all the components.         09:48:26
17    Q.    If you move down here in this           09:48:26
18  same Exhibit 2, product manager, November      09:48:32
19  2005 to October 2006.                           09:48:36
20        Do you see that?                           09:48:38
21    A.    Yes.                                     09:48:38
22    Q.    Second sentence there,                   09:48:38
23  "Exceeded net sales and prescription demand     09:48:42
24  budgets for Restoril 7.5 milligrams,            09:48:45
25  22.5 milligrams, and tofranil PM, and          09:48:50

Page 56

1  optimized the physician sampling strategy to    09:48:55
2  accelerate ROI."                                 09:49:00
3        Do you see that?                           09:49:02
4     A.    Yes.                                     09:49:02
5     Q.    ROI is return on investment?           09:49:03
6     A.    Yes.                                     09:49:05
7     Q.    Okay.  What does that mean,             09:49:05
8  "optimize the physician sampling strategy to    09:49:06
9  accelerate ROI"?                                 09:49:09
10    A.    I honestly can't remember.  I          09:49:11
11  believe that we did an evaluation or an         09:49:15
12  analysis of the sampling program.              09:49:17
13    Q.    What is the sampling program?          09:49:22
14        MR. DAVISON:  Objection.                   09:49:24
15        THE WITNESS:  It was physician            09:49:24
16  sampling, so, you know, providing              09:49:27
17  samples of product.                             09:49:30
18  QUESTIONS BY MR. CHALOS:                          09:49:32
19    Q.    Oh, I see.  Providing samples          09:49:34
20  of the product to physicians for use with       09:49:36
21  patients?                                        09:49:38
22    A.    Correct.                                09:49:38
23    Q.    Okay.  It's not a sampling of          09:49:39
24  physicians?                                      09:49:41
25    A.    Correct.                                09:49:41

Page 57

1     Q.    Got it.  Okay.                          09:49:41
2        What was your -- let's take                09:49:51
3  your last position as product director with     09:49:55
4  Mallinckrodt.                                    09:49:58
5        Did you have any role in                   09:49:59
6  setting the marketing budget?                    09:50:00
7     A.    I proposed a marketing budget,         09:50:02
8  but ultimately I wasn't the decision-maker.     09:50:07
9     Q.    Who made the decision about --         09:50:10
10  who ultimately approved the marketing budget   09:50:13
11  when you were in the role as product           09:50:15
12  director?                                        09:50:17
13    A.    Generally it was the general           09:50:17
14  manager or president of the business unit.      09:50:20
15    Q.    Were you the person who                 09:50:24
16  gathered the information and prepared the       09:50:28
17  budget for approval?                             09:50:30
18    A.    Oftentimes.                             09:50:31
19    Q.    Was that true with respect to          09:50:33
20  Xartemis and Exalgo?                             09:50:38
21        MR. DAVISON:  Objection.                   09:50:41
22        THE WITNESS:  I believe so.               09:50:42
23  QUESTIONS BY MR. CHALOS:                          09:50:43
24    Q.    With respect to Xartemis and           09:50:48
25  Exalgo -- well, scratch that.  Let me start     09:50:51

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1  again.                                    09:50:54
2        With respect to the marketing        09:50:54
3  budgets that you were responsible for      09:50:55
4  preparing, how did you measure whether those  09:51:00
5  expenditures were successful on an ongoing  09:51:03
6  basis?                                    09:51:08
7        MR. DAVISON: Objection.             09:51:08
8  QUESTIONS BY MR. CHALOS:
9     Q.  Do you follow what I'm saying?     09:51:09
10    A.  I would say consistent with        09:51:12
11 what you asked before, sometimes we would  09:51:16
12 work with sales operations to determine if  09:51:19
13 there was an ROI on the marketing tactic, but  09:51:23
14 that wasn't always the case. It really     09:51:26
15 depended on the viability of an ROI analysis.  09:51:28
16    Q.  So where you could do -- where     09:51:32
17 the company could do an ROI analysis, did it  09:51:35
18 typically do an ROI analysis for marketing  09:51:37
19 expenditures?                             09:51:39
20       MR. DAVISON: Objection.             09:51:40
21       THE WITNESS: Sometimes.             09:51:40
22 QUESTIONS BY MR. CHALOS:                  09:51:41
23    Q.  Were there times where it could    09:51:41
24 do an ROI -- like it was feasible to do an  09:51:44
25 ROI calculation for marketing expenditure but  09:51:47

Page 59

1  the company chose not to do it?           09:51:50
2        MR. DAVISON: Objection.             09:51:52
3        THE WITNESS: I can't -- I           09:51:52
4     don't remember.                        09:51:53
5  QUESTIONS BY MR. CHALOS:                  09:51:53
6     Q.  When there was an ROI analysis    09:52:03
7  done of a marketing expenditure, how would  09:52:04
8  that be presented? In other words, was there  09:52:07
9  a form that was used, or was it a PowerPoint?  09:52:09
10       MR. DAVISON: Objection.             09:52:14
11       THE WITNESS: It really              09:52:14
12    probably depended on the time and on   09:52:15
13    the tactic.                            09:52:18
14 QUESTIONS BY MR. CHALOS:                  09:52:18
15    Q.  Okay. What do you mean by         09:52:19
16 that?                                     09:52:20
17    A.  There wasn't a specific           09:52:20
18 formulaic approach to how it was presented.  09:52:25
19    Q.  Did you yourself ever do an ROI   09:52:27
20 calculation for a marketing tactic while you  09:52:35
21 were at Mallinckrodt?                     09:52:37
22    A.  I'm sure I did.                    09:52:38
23    Q.  Do you recall how you presented   09:52:39
24 those findings?                           09:52:46
25    A.  It would again depend on the      09:52:47

Page 60

1  circumstance. Sometimes it would be       09:52:51
2  PowerPoint or sometimes it would be Excel.  09:52:52
3  It really depended.                       09:52:55
4     Q.  Who would you typically present   09:52:56
5  that to?                                  09:52:58
6     A.  It probably varied, but it        09:52:59
7  would be marketing folks and perhaps, you  09:53:03
8  know, the general manager.                09:53:07
9     Q.  Was there any sort of regular     09:53:09
10 interval where you had to present an ROI for  09:53:16
11 the marketing budget in terms of quarterly  09:53:19
12 or, you know, annually or something like   09:53:22
13 that?                                     09:53:24
14    A.  Not that I can recall.            09:53:24
15    Q.  When you presented your           09:53:26
16 marketing budgets for approval at          09:53:27
17 Mallinckrodt, the ones that you prepared, did  09:53:30
18 you have to make a presentation on the -- on  09:53:34
19 the budget itself to somebody?            09:53:38
20    A.  Generally.                        09:53:40
21    Q.  Who would you typically make      09:53:41
22 that to? Was it your boss?                09:53:43
23    A.  Yes.                              09:53:45
24    Q.  As part of that, did you ever     09:53:45
25 present ROIs from prior years' budgets?    09:53:48

Page 61

1     A.  I can't recall if that was        09:53:51
2  specifically included.                    09:53:54
3     Q.  Did you have marketing training   09:53:54
4  or -- I'm sorry, marketing education when you  09:54:07
5  were in college?                          09:54:10
6     A.  No.                               09:54:11
7     Q.  How did you get into marketing?   09:54:11
8        MR. DAVISON: Objection.            09:54:13
9        THE WITNESS: Essentially           09:54:14
10    through my marketing manager role,     09:54:18
11    which was more of a business           09:54:20
12    development role.                      09:54:21
13 QUESTIONS BY MR. CHALOS:                  09:54:22
14    Q.  Okay. And this is -- you're       09:54:23
15 talking about the time at Mallinckrodt from  09:54:24
16 July 2004 through November 2005?          09:54:27
17    A.  Yes.                              09:54:29
18    Q.  Okay. What do you mean when       09:54:30
19 you say it was more of a business development  09:54:32
20 role?                                     09:54:34
21    A.  That role was looking at          09:54:35
22 licensing opportunities, so that marketing  09:54:38
23 manager role was really more of a business  09:54:43
24 development role.                         09:54:44
25    Q.  Okay. So how did you learn how    09:54:45

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1　to do marketing?　　　　　　09:54:48
2　　　　MR. DAVISON: Objection.　09:54:51
3　　　　THE WITNESS: Most of it was on　09:54:52
4　　the job.　　　　　　09:54:54
5　QUESTIONS BY MR. CHALOS:　　09:54:54
6　　Q.　Have you ever had any formal　09:54:56
7　education on marketing?　　　09:54:57
8　　A.　I believe I went to a training　09:54:58
9　class.　　　　　　09:55:02
10　　Q.　With -- while you were at　09:55:02
11　Mallinckrodt?　　　　　09:55:07
12　　A.　Correct.　　　　09:55:07
13　　Q.　Okay. When was that?　　09:55:08
14　　A.　I can't recall.　　　09:55:09
15　　Q.　Was it just one class?　　09:55:10
16　　A.　It was a couple of days.　09:55:12
17　　Q.　Who put that on?　　　09:55:15
18　　A.　I believe it was Rosenblatt and　09:55:18
19　Clouber.　　　　　　09:55:22
20　　Q.　What is that?　　　09:55:22
21　　A.　It's a marketing firm.　　09:55:23
22　　Q.　Here in St. Louis?　　09:55:25
23　　A.　No.　　　　　09:55:29
24　　Q.　Where was that?　　　09:55:30
25　　A.　I don't remember.　　09:55:31

Page 63

1　　Q.　Was that while you were in the　09:55:32
2　marketing manager role, do you think?　09:55:40
3　　A.　I can't recall. Either that or　09:55:43
4　probably the product manager role.　09:55:45
5　　Q.　Okay. So sometime between '04　09:55:46
6　and '06?　　　　　　09:55:49
7　　A.　That's my recollection.　09:55:50
8　　Q.　Okay. And that was -- other　09:55:50
9　than that few days' class with Rosenblatt and　09:55:51
10　Clouber, did you have any other formal　09:55:56
11　education in marketing?　　　09:55:57
12　　A.　Not that I can recall.　09:55:58
13　　Q.　What is the definition of　09:56:00
14　"marketing" in your mind?　　09:56:03
15　　　　MR. DAVISON: Objection.　09:56:04
16　　　　THE WITNESS: That's a really　09:56:04
17　　broad question.　　　09:56:06
18　QUESTIONS BY MR. CHALOS:　　09:56:07
19　　Q.　Yes, I agree with that.　09:56:10
20　　　　Do you have a working　09:56:11
21　definition of "marketing" in your mind?　09:56:12
22　　　　MR. DAVISON: Objection.　09:56:14
23　　　　THE WITNESS: Not that I can　09:56:15
24　　probably articulate.　　09:56:22
25

Page 64

1　QUESTIONS BY MR. CHALOS:　　09:56:24
2　　Q.　One of the goals of marketing　09:56:35
3　is to sell products, would you agree with　09:56:37
4　that?　　　　　　09:56:39
5　　　　MR. DAVISON: Objection.　09:56:41
6　　　　THE WITNESS: I would say the　09:56:41
7　　goal of marketing is to differentiate　09:56:44
8　　your product from the competition.　09:56:46
9　QUESTIONS BY MR. CHALOS:　　09:56:48
10　　Q.　Is one of the goals of　09:56:54
11　marketing to sell products?　　09:56:55
12　　　　MR. DAVISON: Objection.　09:56:58
13　　　　THE WITNESS: I would say it　09:56:58
14　　depends on the circumstances and　09:56:59
15　　depends on...　　　　09:57:00
16　QUESTIONS BY MR. CHALOS:　　09:57:04
17　　Q.　Are there any circumstances in　09:57:04
18　which one of the goals of marketing is to　09:57:06
19　sell products?　　　　09:57:08
20　　　　MR. DAVISON: Objection.　09:57:09
21　　　　THE WITNESS: That's really　09:57:10
22　　speculative.　　　　09:57:11
23　QUESTIONS BY MR. CHALOS:　　09:57:18
24　　Q.　Can you think of any　09:57:19
25　circumstances where the goal of marketing is　09:57:20

Page 65

1　to sell products?　　　　09:57:22
2　　A.　Again, that's really　09:57:25
3　speculative.　　　　09:57:28
4　　Q.　You can't think of any　09:57:29
5　circumstances where the goal of marketing　09:57:33
6　would be to sell products?　　09:57:34
7　　A.　Generally, marketing isn't　09:57:37
8　responsible for the sales of the product.　09:57:40
9　　Q.　What is marketing responsible　09:57:43
10　for?　　　　　　09:57:44
11　　　　MR. DAVISON: Objection.　09:57:45
12　　　　THE WITNESS: Developing the　09:57:46
13　　marketing material and the　　09:57:48
14　　communication material.　　09:57:49
15　QUESTIONS BY MR. CHALOS:　　09:57:50
16　　Q.　Is one of the purposes of　09:58:10
17　marketing to create goodwill for a company?　09:58:12
18　　　　MR. DAVISON: Objection.　09:58:17
19　　　　THE WITNESS: I think, you　09:58:18
20　　know, ultimately that -- I don't know　09:58:23
21　　if that -- that falls into marketing　09:58:24
22　　or not. Depends on the organization.　09:58:26
23　QUESTIONS BY MR. CHALOS:　　09:58:31
24　　Q.　Was one of the purposes of the　09:58:31
25　marketing efforts that you undertook at　09:58:33

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1    Mallinckrodt to create goodwill for the      09:58:35
2    company?                                     09:58:37
3          MR. DAVISON: Objection.                09:58:40
4          THE WITNESS: I don't believe           09:58:40
5    that was a specific goal. I think            09:58:44
6    there were probably other -- there           09:58:47
7    were probably other functional areas         09:58:50
8    in the organization that were                09:58:56
9    responsible for that.                        09:58:56
10   QUESTIONS BY MR. CHALOS:                      09:58:57
11         Q.   Like what?                         09:58:59
12         A.   Probably advocacy and              09:59:00
13   communications.                               09:59:09
14         Q.   So what did you believe was the   09:59:09
15   goal of marketing while you were the product  09:59:16
16   director at Mallinckrodt?                      09:59:22
17         MR. DAVISON: Objection.                 09:59:24
18         THE WITNESS: To develop                 09:59:24
19   product, to develop marketing                 09:59:27
20   messages, to differentiate our product        09:59:30
21   from competitors.                             09:59:33
22   QUESTIONS BY MR. CHALOS:                      09:59:34
23         Q.   Was that true for the entire      09:59:38
24   time you were at Mallinckrodt?                 09:59:40
25         A.   Yes.                               09:59:41

Page 67

1          Q.   Do you agree that a company       09:59:42
2    engaged in pharmaceutical marketing must      09:59:58
3    never put patients at risk by putting profits 10:00:00
4    over patient safety when marketing a product? 10:00:03
5          MR. DAVISON: Objection.                 10:00:06
6          THE WITNESS: I'm sorry, can            10:00:07
7    you repeat that?                              10:00:08
8    QUESTIONS BY MR. CHALOS:                      10:00:08
9          Q.   Sure.                              10:00:09
10         Do you agree that a                     10:00:09
11   pharmaceutical company, when engaged in       10:00:10
12   marketing, must never put patients at risk by 10:00:13
13   putting profits over patient safety?          10:00:16
14         MR. DAVISON: Objection.                 10:00:18
15         THE WITNESS: I believe that            10:00:19
16   pharmaceutical companies should engage        10:00:23
17   in truthful -- truthful promotion of          10:00:25
18   their product, but ultimately it's the        10:00:28
19   physician's decision to ascertain the         10:00:31
20   appropriate patient for the product.          10:00:34
21   QUESTIONS BY MR. CHALOS:                      10:00:36
22         Q.   Why is it important that          10:00:37
23   pharmaceutical companies should engage in     10:00:39
24   truthful promotion of their product?          10:00:41
25         MR. DAVISON: Objection.                 10:00:43

Page 68

1          THE WITNESS: So that                   10:00:44
2    physicians can make an appropriate            10:00:45
3    decision for viable candidates for the        10:00:48
4    specific therapy.                             10:00:51
5    QUESTIONS BY MR. CHALOS:                      10:00:53
6          Q.   And the decisions that            10:00:54
7    physicians make about a company's product are 10:00:57
8    influenced at least in part by the            10:01:02
9    information that the pharmaceutical company    10:01:04
10   provides through its marketing?               10:01:05
11         MR. DAVISON: Objection.                 10:01:07
12         THE WITNESS: I can't speculate         10:01:07
13   on how physicians make decisions.             10:01:08
14   QUESTIONS BY MR. CHALOS:                      10:01:10
15         Q.   Well, one of the intentions       10:01:10
16   of -- one of the goals of marketing is to     10:01:13
17   give information to physicians, right?         10:01:14
18         A.   Correct.                           10:01:15
19         Q.   And one of the goals of           10:01:16
20   marketing is that physicians use that         10:01:21
21   information, at least in part, to make         10:01:24
22   decisions about whether to prescribe the      10:01:26
23   company's products?                           10:01:28
24         MR. DAVISON: Objection.                 10:01:29
25         THE WITNESS: Probably.                 10:01:30

Page 69

1    QUESTIONS BY MR. CHALOS:                      10:01:31
2          Q.   Why do you say "probably"?        10:01:33
3    That's not one of the goals of marketing?     10:01:35
4          A.   No, I don't know how -- and I     10:01:36
5    can't speculate on how physicians make        10:01:39
6    decisions.                                    10:01:41
7          Q.   Yeah, right. I'm not asking       10:01:41
8    whether they do.                              10:01:43
9          What I'm asking is, one of the         10:01:43
10   goals from the marketing standpoint of        10:01:45
11   providing information to physicians is that   10:01:47
12   the physicians would then use that            10:01:48
13   information to help decide whether to use the 10:01:50
14   company's products?                           10:01:53
15         MR. DAVISON: Objection.                 10:01:53
16         THE WITNESS: Correct.                   10:01:54
17   QUESTIONS BY MR. CHALOS:                      10:01:54
18         Q.   And in that context, the -- it    10:01:55
19   is very important that the information that   10:01:59
20   comes through marketing to the physician from 10:02:01
21   the pharmaceutical company is accurate,       10:02:04
22   right?                                        10:02:06
23         MR. DAVISON: Objection.                 10:02:06
24         THE WITNESS: And consistent           10:02:06
25   with the label.                               10:02:07

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1 QUESTIONS BY MR. CHALOS: 10:02:07
2 Q. Okay. So, yes, accurate and 10:02:07
3 also consistent with the label? 10:02:10
4 A. Yes. 10:02:11
5 Q. Okay. From a marketing 10:02:12
6 standpoint, do you agree that pharmaceutical 10:02:18
7 companies have a heightened responsibility to 10:02:21
8 provide truthful information to the users of 10:02:25
9 its products? 10:02:28
10 MR. DAVISON: Objection. 10:02:28
11 THE WITNESS: I don't know what 10:02:29
12 constitutes heightened responsibility. 10:02:29
13 They have a responsibility. 10:02:31
14 QUESTIONS BY MR. CHALOS: 10:02:33
15 Q. If you need a break at any 10:02:41
16 time, let me know. 10:02:43
17 MR. DAVISON: We've been going 10:02:44
18 about an hour, so if, you know, you 10:02:46
19 come to a good spot. 10:02:48
20 MR. CHALOS: Yeah, let me get 10:02:50
21 to a good spot. I'll get there pretty 10:02:51
22 soon, we'll take a break. But if you 10:02:54
23 need to force a break at any time, let 10:02:54
24 us know. 10:02:57
25 THE WITNESS: Okay. 10:02:57

Page 71

1 QUESTIONS BY MR. CHALOS: 10:02:57
2 Q. While you were at Mallinckrodt, 10:02:58
3 was the marketing messaging the same 10:02:59
4 nationwide? 10:03:02
5 A. Yes, meaning -- can I clarify 10:03:04
6 that? 10:03:06
7 Q. Absolutely, please do. 10:03:07
8 A. So meaning did we use the same 10:03:09
9 marketing message regardless of state or 10:03:12
10 geography? 10:03:14
11 Q. Yes, sir. 10:03:16
12 A. Yes, that's my understanding 10:03:16
13 and recollection. 10:03:17
14 Q. Okay. So the marketing 10:03:17
15 messaging that was used, let's say, in Ohio 10:03:19
16 was the same as the messaging used in 10:03:21
17 California, for example? 10:03:23
18 A. Yes. 10:03:24
19 MR. CHALOS: Okay. This is 10:03:25
20 probably a good spot to take a break 10:03:26
21 then. 10:03:27
22 THE WITNESS: Okay. 10:03:28
23 VIDEOGRAPHER: We are going off 10:03:30
24 the record at 10:03 a.m. 10:03:35
25 (Off the record at 10:03 a.m.) 10:03:37

Page 72

1 VIDEOGRAPHER: We are back on 10:08:31
2 the record at 10:13 a.m. 10:13:24
3 (Mallinckrodt-Wessler Exhibit 4 10:13:26
4 marked for identification.) 10:13:27
5 QUESTIONS BY MR. CHALOS: 10:13:27
6 Q. Let's mark as the next numbered 10:13:27
7 exhibit, Exhibit 4, a document that starts 10:13:30
8 with MNK-T1_0000000264 through 287. And 10:13:32
9 this, I'll represent to you, is an 10:13:49
10 organizational chart that was produced to us 10:13:50
11 in this litigation. It was previously marked 10:13:54
12 as Exhibit 2 to Mr. Wickline's deposition on 10:13:57
13 November 13th of 2018. For some reason it 10:14:01
14 says 2015 on the sticker. 10:14:11
15 A. Is that a -- well, that might 10:14:13
16 be a weird 8. 10:14:15
17 Q. Is it? Okay. It could be. 10:14:18
18 Anyway, so that's Exhibit 10:14:23
19 Number 4. I'm really going to ask you about 10:14:30
20 the first page here, because on the side it 10:14:32
21 says -- it's dated 4/1 of '13. You can take 10:14:33
22 a look through the whole document, but my 10:14:39
23 question is going to be limited to the first 10:14:41
24 page. 10:14:44
25 Do you see your name there sort 10:14:44

Page 73

1 of middle -- if you turn it landscape, 10:14:46
2 middle, lower middle, kind of? 10:14:49
3 A. Yes. 10:14:51
4 Q. And it's got you on this 10:14:51
5 diagram reporting directly to the vice 10:14:54
6 president of marketing, who at this time was 10:14:56
7 Terry Terifay. 10:14:59
8 Do you see that? 10:15:01
9 A. Yes. 10:15:01
10 Q. Okay. Is that the -- this was 10:15:02
11 in your position as product director; is that 10:15:05
12 right? 10:15:07
13 A. Yes, but I was a product 10:15:07
14 director, I believe, before this particular 10:15:12
15 organizational structure as well. 10:15:15
16 Q. Okay. Was there -- in your 10:15:17
17 role as product director, did you always 10:15:22
18 report to a vice president of marketing? 10:15:24
19 A. No. 10:15:26
20 Q. Who else did you report to? 10:15:27
21 A. Senior director of marketing. 10:15:29
22 Q. Okay. Is that -- who was that? 10:15:32
23 A. Rod Novak. 10:15:34
24 Q. So as a product director, 10:15:37
25 there's a time where you reported to the 10:15:39

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1  senior director of marketing?                 10:15:42
2      A.    Yes.                                 10:15:43
3      Q.    Okay.  When was that?                10:15:44
4      A.    I think it was around the 2009       10:15:45
5  time frame, but I can't remember              10:15:51
6  specifically.                                 10:15:52
7      Q.    Okay.  And at some point then        10:15:52
8  you were -- your direct reporting chain was   10:15:55
9  changed to where you reported directly to the 10:15:58
10 vice president of marketing?                   10:16:00
11     A.    That's correct.                      10:16:01
12     Q.    And you think it was around          10:16:01
13 that time, 2009, 2010?                         10:16:02
14     A.    I think it was when Terry came       10:16:04
15 on board, so I can't recall that --           10:16:07
16     Q.    Okay.                                10:16:11
17     A.    -- date.                             10:16:13
18     Q.    Okay.  It has November 14th of       10:16:14
19 2011, listed under Terry Terifay, vice        10:16:18
20 president of marketing.                        10:16:22
21          Do you see that?                      10:16:23
22     A.    Yes.                                 10:16:23
23     Q.    Do you think -- is that -- is        10:16:23
24 that consistent with your memory, that he      10:16:27
25 came on board sometime in 2011?               10:16:28

Page 75

1      A.    Around there.  That's               10:16:30
2  consistent with what I remember.              10:16:31
3      Q.    Okay.  In your role as senior       10:16:32
4  product manager, to whom did you report?      10:16:36
5  Both name and position, if you remember.      10:16:41
6      A.    I believe there was a time I        10:16:43
7  reported to a product director, Geoffrey      10:16:48
8  Arbuckle, early on, and then I believe Rod    10:16:54
9  Novak.                                        10:16:56
10     Q.    Is Mr. Novak still with            10:16:57
11 Mallinckrodt?                                  10:17:00
12     A.    I do not believe so.                10:17:00
13          MR. DAVISON:  Objection.             10:17:02
14 QUESTIONS BY MR. CHALOS:                       10:17:02
15     Q.    Okay.  Do you keep up with          10:17:03
16 anyone at Mallinckrodt presently?             10:17:04
17     A.    I do.                                10:17:06
18     Q.    Who do you keep up with over        10:17:08
19 there?                                         10:17:10
20     A.    Rod.  I do talk to Rod.  Mike       10:17:10
21 Patterson.  And those are probably the two    10:17:16
22 people I talk to.                              10:17:21
23     Q.    Okay.  Mr. Patterson still with     10:17:22
24 the company?                                   10:17:24
25     A.    No.                                  10:17:24

Page 76

1      Q.    Okay.  Do you keep up with          10:17:25
2  anyone who's still with Mallinckrodt?         10:17:26
3      A.    Not really.                          10:17:27
4      Q.    Okay.  Are you like Facebook        10:17:29
5  friends or something?                          10:17:32
6      A.    I'm not on Facebook.                 10:17:33
7      Q.    Oh, good for you.  Good.  It's      10:17:34
8  just a waste of time, I think, anyway.        10:17:36
9          Where is Mr. Patterson now?           10:17:38
10     A.    Curium.                              10:17:47
11     Q.    Is that the company you're          10:17:47
12 with?                                          10:17:49
13     A.    Correct.                             10:17:49
14     Q.    How about Mr. Novak?                 10:17:50
15     A.    I believe he's with a company       10:17:53
16 called GeneriCo.                               10:17:55
17     Q.    What do they do?                     10:17:57
18     A.    I -- I mean, they -- they, I       10:17:59
19 think, have generic pharmaceutical products,  10:18:00
20 but I don't know much beyond that             10:18:03
21 specifically.                                  10:18:04
22     Q.    You know, there's one other        10:18:05
23 page I'd like to ask you about, the second to 10:18:13
24 last page where it's got your direct reports. 10:18:14
25          MR. DAVISON:  You're looking at     10:18:24

Page 77

1  286 Bates number?                             10:18:26
2          MR. CHALOS:  Yes, Bates number        10:18:27
3  286, yes, sir.  Thanks.                       10:18:29
4          THE WITNESS:  Okay.                    10:18:32
5  QUESTIONS BY MR. CHALOS:                       10:18:32
6      Q.    Okay.  It says -- it's got you      10:18:33
7  listed as the director of pharma product, and 10:18:35
8  then it has two direct reports to you:        10:18:38
9  Melissa Falcone and Jennifer Lierman.         10:18:40
10         Do you see that?                       10:18:43
11     A.    Yes.                                 10:18:43
12     Q.    Okay.  Was there a time where       10:18:44
13 Melissa Falcone no longer reported to you?    10:18:45
14     A.    Yes.                                 10:18:49
15     Q.    Okay.  Did she get promoted?        10:18:50
16     A.    Yes.                                 10:18:51
17     Q.    To what job did she get             10:18:52
18 promoted?                                      10:18:54
19     A.    She was the special assistant      10:18:54
20 to the VP of commercial operations or         10:18:59
21 something like that.                           10:19:02
22     Q.    Okay.  Do you know where she is     10:19:03
23 now?  Is she still with Mallinckrodt?         10:19:04
24     A.    I believe so.                        10:19:06
25     Q.    Do you keep up with her?           10:19:07

Page 78

```
 1      A.   No, not really.         10:19:10
 2      Q.   You left the company in 2015;   10:19:11
 3  is that right?                    10:19:19
 4      A.   Correct.                 10:19:19
 5      Q.   Okay.  Why did you leave?    10:19:20
 6      A.   I was severed.           10:19:21
 7      Q.   What does that mean?     10:19:23
 8      A.   The company no longer needed my   10:19:23
 9  services.                         10:19:25
10      Q.   Why?  Do you know?       10:19:29
11           MR. DAVISON:  Objection.    10:19:30
12           THE WITNESS:  I think they   10:19:30
13      phased out an entire business unit of   10:19:31
14      which I was a part of.        10:19:35
15  QUESTIONS BY MR. CHALOS:         10:19:36
16      Q.   At which business unit was    10:19:36
17  that?                             10:19:37
18      A.   The business unit that was   10:19:38
19  promoting Xartemis XR.            10:19:40
20      Q.   Did that correspond with the   10:19:43
21  time where the company was -- decided to no   10:19:47
22  longer promote Xartemis?          10:19:50
23           MR. DAVISON:  Objection.    10:19:53
24           THE WITNESS:  That's my   10:19:54
25      understanding.                10:19:54
```

Page 79

```
 1  QUESTIONS BY MR. CHALOS:         10:19:54
 2      Q.   How much notice were you given   10:19:56
 3  that you were being severed?      10:19:57
 4      A.   I don't -- I don't believe any.   10:19:59
 5  I think the -- we found out on a phone call   10:20:04
 6  on a Friday or a Monday, and they gave us --   10:20:07
 7  or they gave me -- I should speak   10:20:11
 8  specifically about myself -- they gave me   10:20:16
 9  like a couple of weeks.           10:20:17
10           So, I mean, in terms of notice,   10:20:19
11  I got notified I had a couple of weeks to   10:20:20
12  finish up any projects, and that was it.   10:20:25
13      Q.   You ultimately negotiated a   10:20:28
14  severance with the company; is that right?   10:20:35
15      A.   I did receive a severance.   10:20:37
16      Q.   Okay.  Well, was it six months'   10:20:39
17  pay?  Is that right?              10:20:42
18      A.   I believe so.            10:20:42
19           (Mallinckrodt-Wessler Exhibit 5   10:20:43
20      marked for identification.)   10:20:43
21  QUESTIONS BY MR. CHALOS:         10:20:43
22      Q.   Okay.  Let's mark as the next   10:20:44
23  numbered exhibit the severance agreement.   10:20:46
24           So let's mark as Exhibit   10:20:51
25  Number 5 MNK-T1_0007845172 through 5199.   10:21:22
```

Page 80

```
 1  It's Exhibit Number 5.           10:21:33
 2           And you can look through that   10:21:41
 3  as much as you need to.  I can tell you the   10:21:42
 4  questions I'm going to have are going to   10:21:46
 5  be -- probably start with page 3 of 14 about   10:21:49
 6  your salary and bonus.            10:21:53
 7           Are you ready?           10:22:00
 8      A.   Sure.                    10:22:49
 9      Q.   Okay.  So if you look at   10:22:50
10  Exhibit 5, page 3, which it ends in Bates   10:22:53
11  5176, it says -- looking at 2 A, salary   10:22:58
12  continuation payment,             10:23:10
13           So it says there that the   10:23:12
14  agreement was they'll pay you █ weeks of   10:23:15
15  salary, weekly gross of █████.    10:23:17
16  Do you see that?                  10:23:21
17           MR. DAVISON:  Objection.    10:23:22
18           THE WITNESS:  I do.      10:23:23
19  QUESTIONS BY MR. CHALOS:         10:23:23
20      Q.   Did I get that wrong?    10:23:24
21           MR. DAVISON:  I think it's   10:23:25
22      biweekly.                     10:23:27
23           MR. CHALOS:  Oh, right.  You   10:23:27
24      got to read the line before that.   10:23:28
25
```

Page 81

```
 1  QUESTIONS BY MR. CHALOS:         10:23:31
 2      Q.   Okay.  I mean, I was trying to   10:23:31
 3  get you a little more money out of the deal.   10:23:34
 4      A.   Where were you years ago?   10:23:38
 5      Q.   Okay.  So there -- they agreed   10:23:40
 6  to pay you basically █████ salary; is   10:23:42
 7  that right?                       10:23:45
 8      A.   ██████, yes.             10:23:45
 9      Q.   Yeah.  Okay.             10:23:47
10           And then you also were eligible   10:23:48
11  to receive your incentive bonus gross of   10:23:50
12  ████.  That's in paragraph B.     10:23:55
13           Do you see that?         10:23:59
14      A.   Yes.                     10:24:00
15      Q.   Did you receive that bonus?   10:24:00
16      A.   I did.                   10:24:01
17      Q.   Okay.  Did you ever receive any   10:24:02
18  stock options from Mallinckrodt?   10:24:04
19      A.   ████                     10:24:06
20      Q.   ███████████████████████   10:24:07
21  ████████████████████             10:24:09
22      A.   ████                     10:24:10
23      Q.   Do you hold any stock currently   10:24:10
24  in Mallinckrodt?                  10:24:12
25      A.   Not that I'm aware of.  I mean,   10:24:12
```

Highly Confidential - Subject to Further Confidentiality Review



Page 82

1    it might be through a -- you know, like a --    10:24:15
2    what is that called?    10:24:23
3        Q.    A mutual fund?    10:24:24
4        A.    Yes.  Yes.  But not    10:24:24
5    specifically.    10:24:26
6        Q.    10:24:26
7                                    10:24:28
8        A.    10:24:28
9        Q.    10:24:29
10                                    10:24:31
11       A.    10:24:31
12       Q.    10:24:32
13                                    10:24:35
14                                    10:24:36
15       A.    10:24:38
16                                    10:24:42
17                                    10:24:45
18       Q.    10:24:47
19                                    10:24:48
20       A.    10:24:48
21                                    10:24:52
22             .    10:24:54
23                                    10:24:54
24                                    10:24:57
25                                    10:24:59

Page 83

1                                    10:25:00
2                                    10:25:02
3        A.    10:25:02
4        Q.    If you turn to what's marked as    10:25:04
5    7 of 14, it ends in Bates 5184.  Okay.  So    10:25:09
6    we're at page 7 of Exhibit 5, noncompetition,    10:25:36
7    C 1.    10:25:42
8        Do you see that?    10:25:43
9        A.    I do.    10:25:43
10       Q.    Okay.  Did you -- for the    10:25:44
11   period of 12 months after you left    10:25:48
12   Mallinckrodt, did you refrain from working in    10:25:50
13   the pharmaceutical industry?    10:25:55
14           MR. DAVISON:  Objection.    10:25:56
15           THE WITNESS:  I don't think    10:25:57
16       that that's what the noncompete is.    10:26:00
17   QUESTIONS BY MR. CHALOS:    10:26:04
18       Q.    Okay.  How did you interpret    10:26:04
19   the noncompete?    10:26:06
20       A.    That it was specific to related    10:26:06
21   therapeutic areas or related areas.  But I --    10:26:11
22   I went to work at Biomedical Systems, which    10:26:17
23   is not a pharma company.    10:26:19
24       Q.    Ah, okay.    10:26:20
25           Did you make your employment    10:26:21

Page 84

1    decisions for -- after you left Mallinckrodt    10:26:24
2    based -- or factoring in this provision of    10:26:29
3    your severance agreement that is labeled here    10:26:34
4    as noncompetition?    10:26:36
5            MR. DAVISON:  Objection.    10:26:37
6            THE WITNESS:  I'm sure that was    10:26:38
7        part of the decision, but it was    10:26:39
8        really more driven out of a need to    10:26:40
9        get a job.    10:26:42
10   QUESTIONS BY MR. CHALOS:    10:26:42
11       Q.    Right.  Okay.    10:26:43
12           If you turn over to 9, page 9    10:26:45
13   of Exhibit 5, there's a provision here,    10:26:49
14   paragraph 7.  It says, "Nondisparagement.    10:26:54
15   Subject to the provision of this section    10:27:02
16   entitled Permissible Disclosures, employee    10:27:05
17   agrees employee will not disparage or subvert    10:27:09
18   the company or make any statement reflecting    10:27:14
19   negatively on the company, its affiliated    10:27:17
20   corporations or entities," et cetera, et    10:27:21
21   cetera.    10:27:22
22           Do you see that?    10:27:22
23       A.    I do.    10:27:22
24       Q.    Is this provision in this    10:27:23
25   agreement something that is impacting your    10:27:27

Page 85

1    answers here today in any way?    10:27:29
2        A.    No.  I'd honestly forgotten    10:27:31
3    about this.    10:27:37
4        Q.    Okay.  So your answers here    10:27:38
5    today are being made irrespective of any    10:27:41
6    provision in your severance agreement?    10:27:46
7        A.    Correct.    10:27:47
8        Q.    Okay.  You can put Exhibit 5    10:27:48
9    aside.    10:27:51
10           (Mallinckrodt-Wessler Exhibit 6    10:27:55
11       marked for identification.)    10:27:56
12   QUESTIONS BY MR. CHALOS:    10:27:56
13       Q.    We'll mark as Exhibit Number 6    10:28:06
14   a document that is MNK-T1_0007845168    10:28:10
15   through 5171.    10:28:18
16           And if you look at Exhibit    10:28:39
17   Number 6, it has your final base salary with    10:28:46
18   the company at the time of your termination    10:28:51
19   as                    10:28:53
20           Do you see that?    10:28:57
21       A.    Yes.    10:28:58
22       Q.    Is that accurate?    10:28:58
23       A.    That's my recollection.    10:29:00
24       Q.    And you received a bonus of    10:29:02
25                    in a lump sum, is that right, in that    10:29:06

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1 year?                                    10:29:12
2        MR. DAVISON:  Objection.         10:29:12
3        THE WITNESS:  Yes, that's my      10:29:12
4 recollection.                            10:29:13
5 QUESTIONS BY MR. CHALOS:                 10:29:13
6    Q.   Did they pay you at the time of  10:29:14
7 your severance?                          10:29:15
8    A.   I believe some time elapsed.  I  10:29:16
9 can't remember what the -- but it was roughly  10:29:19
10 the time of the separation.             10:29:20
11   Q.   Okay.  You can put that aside    10:29:22
12 then.                                    10:29:46
13        Have you ever seen your          10:30:16
14 personnel file at Mallinckrodt?         10:30:31
15   A.   Not that I can recall.           10:30:32
16        (Mallinckrodt-Wessler Exhibit 7  10:30:38
17        marked for identification.)      10:30:39
18 QUESTIONS BY MR. CHALOS:                10:30:39
19   Q.   Let's mark this as an exhibit.   10:30:39
20 Okay.  So we'll mark as Exhibit Number 7  10:31:06
21 MNK-T1_0007845318 through 5323.  And these  10:31:13
22 are handwritten notes, it looks like, of an  10:31:23
23 interview.  Somebody did an interview of you.  10:31:31
24        Have you ever seen this before?   10:31:41
25   A.   I have not.  Not to my           10:31:42

Page 87

1 recollection.                            10:31:44
2    Q.   Okay.  Do you have any idea      10:31:45
3 whose handwriting that is?               10:31:50
4    A.   I do not.                        10:31:51
5    Q.   Okay.  Well, you can put that    10:31:52
6 aside then.  I wanted you to see that so you  10:31:54
7 can, when you look at your deposition, see  10:32:00
8 the interview notes from your first      10:32:03
9 interview.                               10:32:06
10   A.   Duly noted.                      10:32:06
11   Q.   Yeah, doesn't really have        10:32:06
12 anything to do with anything.           10:32:06
13   A.   They have pretty penmanship.     10:32:08
14   Q.   They do.  They do.  Little like  10:32:09
15 time capsules.                          10:32:12
16        (Mallinckrodt-Wessler Exhibit 8  10:32:14
17        marked for identification.)      10:32:17
18 QUESTIONS BY MR. CHALOS:                10:32:17
19   Q.   Let's talk about then Magnacet.  10:32:17
20        We'll mark as the next numbered  10:32:46
21 exhibit a document, it looks like some kind  10:32:48
22 of presentation.  This will be marked as  10:32:53
23 Exhibit Number 8, MNK-T1_0002713694.  And it  10:32:55
24 ends -- oh, it's in native format, so we  10:33:17
25 don't have an end Bates.  Okay.  Well, it  10:33:20

Page 88

1 starts at the Bates number I just gave.  10:33:22
2 We'll call it Exhibit 8.  And you can take as  10:33:25
3 much time as you need to review that.    10:33:36
4        My first question will be, do     10:33:37
5 you know who prepared this presentation?  10:33:41
6    A.   I can't recall.                  10:33:45
7    Q.   And you can review as much of    10:33:48
8 this as you need.  I'll ask you specific  10:33:55
9 questions about specific slides.         10:33:57
10 Unfortunately they're not numbered, so we'll  10:34:00
11 just have to put them up on the screen here.  10:34:03
12        But the first page says it's a    10:34:07
13 presentation to Argent dated 9/17 of 2007.  10:34:08
14        Do you know what Argent is?       10:34:13
15   A.   I believe that they were the     10:34:15
16 partner from where we licensed the asset, but  10:34:19
17 I can't remember specifically.           10:34:23
18   Q.   Okay.  Okay.  Have you had a      10:34:25
19 chance to review Exhibit 8?             10:37:08
20   A.   I have.                          10:37:10
21   Q.   Okay.  Do you -- have you ever   10:37:11
22 seen this document before today?         10:37:13
23   A.   It looks vaguely familiar, but   10:37:14
24 I can't recollect the specifics.         10:37:17
25   Q.   Do you have any idea who         10:37:19

Page 89

1 originally prepared this document?       10:37:22
2        MR. DAVISON:  Objection.         10:37:24
3        THE WITNESS:  I can't remember.   10:37:24
4 QUESTIONS BY MR. CHALOS:                 10:37:26
5    Q.   Okay.  Let me just ask you       10:37:26
6 about a few -- the statements in here.  So if  10:37:28
7 you flip over to the second page, it says,  10:37:34
8 "Franchise positioning."                 10:37:39
9        Do you see that?                   10:37:41
10        Magnacet --                       10:37:42
11   A.   I'm sorry, is this -- is this    10:37:43
12 the page you're on?                      10:37:44
13   Q.   Yeah, franchise positioning.     10:37:45
14 And he's also got it up there.           10:37:47
15   A.   Oh, I'm sorry.                   10:37:49
16   Q.   Yeah.  Yeah, they're not         10:37:50
17 numbered, so we'll just have to kind of  10:37:53
18 follow along with each other.            10:37:55
19        "Franchise positioning" is what   10:37:57
20 it says on the heading of the page.  It says  10:37:59
21 "The only pain product to combine four    10:38:01
22 different dose strengths of oxycodone with  10:38:03
23 400 milligrams of APAP."                 10:38:06
24        Do you see that?                   10:38:08
25   A.   Yes.                             10:38:09

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1    Q.    What is APAP?                10:38:09
2    A.    Acetaminophen.              10:38:10
3    Q.    Okay.  So there were -- the    10:38:11
4  dosage in Magnacet of acetaminophen stayed  10:38:24
5  the same, but then the dose of oxycodone    10:38:16
6  varied among the four different strengths; is  10:38:21
7  that right?                         10:38:23
8    A.    Correct.                    10:38:23
9    Q.    If you turn to the, let me see,  10:38:25
10  one, two, three, fourth page, it says,    10:38:39
11  "Physician sales aid," and there's a picture  10:38:45
12  of a race car, The Pain Relief Challenge.  10:38:47
13        Do you see that?              10:38:58
14    A.    Okay.  Yes.                 10:38:59
15    Q.    Is this a marketing piece that   10:38:59
16  you developed?                      10:39:01
17    A.    Myself and others.          10:39:01
18    Q.    Okay.  But your team within    10:39:02
19  Mallinckrodt developed this?            10:39:04
20    A.    Yeah.  I think at the time I   10:39:05
21  was like just a product manager.        10:39:06
22    Q.    Okay.                      10:39:08
23    A.    So it would have been somebody  10:39:08
24  else's team, technically.              10:39:10
25    Q.    Right.  Yeah, this is -- if   10:39:11

Page 91

1  this is in '07, you were a senior product   10:39:13
2  manager; is that right?                10:39:16
3    A.    I can't remember my title.  If  10:39:19
4  that's what it says.                  10:39:21
5    Q.    Yeah.  This is dated 9/17 of   10:39:22
6  2007.  According to your LinkedIn, you became  10:39:27
7  a senior product manager October of 2006 to  10:39:29
8  November 2007.                      10:39:33
9        Does that sound right?          10:39:33
10    A.    Yes.  To my recollection.     10:39:34
11    Q.    Okay.  If you look at the next  10:39:35
12  page, it's physician sales aid front cover  10:39:42
13  continued.  The second put there says,   10:39:45
14  "Mallinckrodt is launching a new product."  10:39:53
15  Under that it says, "Leverage our reputation.  10:39:56
16  Number one producer of bulk narcotics."    10:40:00
17        Do you see that?              10:40:03
18    A.    Uh-huh.                    10:40:03
19    Q.    What does that mean?          10:40:03
20        MR. DAVISON:  Objection.        10:40:04
21  QUESTIONS BY MR. CHALOS:              10:40:06
22    Q.    If you know?                10:40:06
23    A.    I mean, I think that that had   10:40:07
24  to do with our manufacturing of active    10:40:11
25  pharmaceutical ingredients.            10:40:13

Page 92

1    Q.    Those were for products beyond  10:40:14
2  just the branded Mallinckrodt products,    10:40:20
3  including generics and others?          10:40:22
4    A.    Correct.                    10:40:23
5        MR. DAVISON:  Objection.        10:40:23
6  QUESTIONS BY MR. CHALOS:              10:40:23
7    Q.    Okay.  Did you ever, while you   10:40:24
8  were at Mallinckrodt, have any role with   10:40:26
9  respect to generic products?            10:40:27
10    A.    No.                        10:40:29
11    Q.    Who did the marketing messaging  10:40:29
12  for generic products at Mallinckrodt?      10:40:32
13        MR. DAVISON:  Objection.        10:40:32
14        THE WITNESS:  I don't recall.   10:40:34
15  QUESTIONS BY MR. CHALOS:              10:40:35
16    Q.    Was it a different group       10:40:36
17  entirely from your group?              10:40:38
18    A.    Yes.                       10:40:39
19    Q.    Was there also a bulk narcotics  10:40:40
20  group or division within Mallinckrodt when  10:40:46
21  you were there?                     10:40:48
22    A.    I believe they were called API.  10:40:48
23    Q.    What is that?                10:40:51
24    A.    Active pharmaceutical         10:40:52
25  ingredients.                        10:40:54

Page 93

1    Q.    Did they have a marketing unit  10:40:55
2  as well?                           10:40:57
3    A.    I don't --                  10:40:57
4        MR. DAVISON:  Objection.        10:40:58
5        THE WITNESS:  I don't know.     10:40:59
6  QUESTIONS BY MR. CHALOS:              10:40:59
7    Q.    Okay.  I don't know how to say   10:40:59
8  where this is, but it says, "Premium items."  10:41:09
9  It's like not quite halfway through.  It    10:41:18
10  looks like that.  It's a picture of a pen.  10:41:21
11    A.    Okay.  Is it the pen or the   10:41:24
12  cube?                              10:41:25
13    Q.    Well, let me start with the    10:41:26
14  pen.  Yeah.                         10:41:28
15        So if you look at the page it    10:41:29
16  says, "Premium items, Magnacet pens, MK8736."  10:41:33
17        Do you see that?              10:41:40
18    A.    I do.                      10:41:41
19    Q.    Is this an example of the sales  10:41:41
20  collateral that you talked about earlier?  10:41:43
21    A.    Yeah, the tchotchkes or...    10:41:44
22    Q.    That's what I would call them,  10:41:47
23  tchotchkes, yeah.                    10:41:49
24        So what does MK8736 mean?        10:41:50
25    A.    That refers to the order      10:41:55

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1 number.                                    10:41:56
2     Q.    Okay.  Got it.            10:41:57
3         And then if you flip a couple    10:41:59
4 more, another one of the tchotchkes, or sales    10:42:00
5 collateral, is a Magnacet race car mint tin?    10:42:13
6     A.    Okay.                    10:42:16
7     Q.    Do you see that?            10:42:16
8     A.    Yes.                    10:42:17
9     Q.    Does that -- did these ever go    10:42:18
10 into actual production and get handed out?    10:42:21
11         MR. DAVISON:  Objection.        10:42:24
12         THE WITNESS:  Uh-huh.            10:42:24
13 QUESTIONS BY MR. CHALOS:                10:42:25
14     Q.    Is that a yes?            10:42:25
15     A.    Yes, I'm sorry.            10:42:26
16     Q.    That's okay.                10:42:26
17         And if you flip over one more,    10:42:28
18 there's a die cast race car clock.        10:42:31
19         Do you see that?            10:42:35
20     A.    Yes.                    10:42:36
21     Q.    Is that something that got    10:42:36
22 handed out as well?                    10:42:39
23         MR. DAVISON:  Objection.        10:42:40
24         THE WITNESS:  That's my        10:42:40
25     understanding, yeah.            10:42:41

Page 95

1 QUESTIONS BY MR. CHALOS:                10:42:42
2     Q.    Did you keep one of those?    10:42:42
3     A.    I did not.                10:42:44
4     Q.    Ah, too bad.  It's pretty cool.    10:42:44
5         What was the purpose of the    10:42:48
6 sales collateral such as these cars and the    10:42:55
7 pens and pads and all that?            10:42:58
8         MR. DAVISON:  Objection.        10:42:59
9         THE WITNESS:  Brand awareness.    10:43:00
10 QUESTIONS BY MR. CHALOS:                10:43:03
11     Q.    What would be done with these    10:43:04
12 products?  Would they be given to physicians?    10:43:06
13     A.    Yeah.                    10:43:08
14         MR. DAVISON:  Objection.        10:43:10
15         THE WITNESS:  Or nursing staff.    10:43:10
16     But again, that was -- you know, they    10:43:11
17     were handed out through the sales    10:43:13
18     force.                    10:43:15
19 QUESTIONS BY MR. CHALOS:                10:43:15
20     Q.    Okay.  If you keep turning    10:43:23
21 to -- it says, "Pharmacy sales aid, front    10:43:24
22 cover continued."  Yeah, that's it, you got    10:43:27
23 it.                            10:43:35
24         So it looks like -- it's after    10:43:35
25 another picture.                    10:43:44

Page 96

1     A.    Okay.                    10:43:45
2     Q.    You find it?                10:43:45
3         The third bullet says, "Proceed    10:43:46
4 with caution when positioning this product."    10:43:48
5         I should say, at the top of the    10:43:50
6 page it says, "Pharmacy sales aid, front    10:43:52
7 cover continued."                    10:43:55
8         And then the third bullet says,    10:43:56
9 "Proceed with caution when positioning this    10:43:57
10 product to pharmacists."                10:43:59
11         And then the sub-bullet there    10:44:01
12 says, "Mallinckrodt generics sells oxy/APAP    10:44:02
13 combination products."                10:44:06
14         Do you see that?            10:44:06
15     A.    Yes.                    10:44:08
16     Q.    So was one of the concerns when    10:44:09
17 marketing Magnacet that you didn't want to    10:44:10
18 cannibalize the generics market for similar    10:44:17
19 products?                    10:44:21
20         MR. DAVISON:  Objection.        10:44:21
21         THE WITNESS:  I can't recall    10:44:22
22     specifically.                10:44:26
23 QUESTIONS BY MR. CHALOS:                10:44:26
24     Q.    Okay.  Do you recall a concern    10:44:27
25 that -- with Magnacet that pharmacists would    10:44:50

Page 97

1 attempt to fill that prescription with a    10:44:54
2 generic?                        10:44:57
3         MR. DAVISON:  Objection.        10:44:57
4         THE WITNESS:  I'm sure that    10:44:58
5     that was something that came up.    10:45:03
6 QUESTIONS BY MR. CHALOS:                10:45:07
7     Q.    And one of the ways for dealing    10:45:10
8 with that was Mallinckrodt produced a    10:45:12
9 prescription pad that had a signature line    10:45:16
10 that says "dispense as written"; is that    10:45:21
11 right?                        10:45:25
12         MR. DAVISON:  Objection.        10:45:25
13         THE WITNESS:  We didn't produce    10:45:25
14     a prescription pad that had "dispense    10:45:26
15     as written."                10:45:27
16 QUESTIONS BY MR. CHALOS:                10:45:28
17     Q.    Okay.                    10:45:28
18     A.    That might have been        10:45:29
19 illustrative in the sales aid, but we didn't    10:45:31
20 produce a prescription pad with "dispense as    10:45:36
21 written."                        10:45:38
22     Q.    Okay.  If you turn to -- yeah,    10:45:40
23 it says, "Pharmacy sales aid inside spread,"    10:45:45
24 page 2.                        10:45:52
25         Well, let's start with the race    10:45:56

Page 98

1  car. So is that -- I think I understand. So    10:45:58
2  that prescription pad in the upper right of    10:46:05
3  that sales aid says "dispense as written," I    10:46:09
4  think.                                          10:46:15
5      A.    Correct.                             10:46:15
6      Q.    Okay. And so the graph --            10:46:16
7  okay. And if you turn two more pages            10:46:18
8  forward, yeah, it says "prescription pad."      10:46:22
9            That's referencing the               10:46:28
10 prescription pad in that pharmacy sales aid?    10:46:30
11           MR. DAVISON: Objection.              10:46:32
12           THE WITNESS: Okay.                   10:46:33
13 QUESTIONS BY MR. CHALOS:                        10:46:34
14     Q.    Is that -- is that what your         10:46:34
15 recollection is?                                10:46:36
16           MR. DAVISON: I think you're on       10:46:36
17     the wrong --                               10:46:37
18 QUESTIONS BY MR. CHALOS:                        10:46:38
19     Q.    Oh, yeah, I'm sorry.                 10:46:39
20     A.    I'm sorry.                           10:46:40
21     Q.    Yeah.                                10:46:41
22     A.    Oh, this is it. Okay.                10:46:42
23     Q.    Yeah. So if you look -- it          10:46:44
24 says "Prescription" -- "Pharmacy sales aid      10:46:46
25 inside spread, page 2, continued" at the top.   10:46:48

Page 99

1      A.    I'm sorry, yeah, okay. I think       10:46:50
2  I'm in the right spot.                          10:46:53
3      Q.    Yeah. And then it says               10:46:55
4  "prescription pad." And then the, whatever,     10:46:55
5  third or fourth bullet down it says,            10:46:55
6  "Signature on the 'dispense as written line'    10:46:58
7  reinforces that no substitution should occur    10:47:02
8  with the product."                              10:47:04
9      A.    Okay.                                10:47:05
10     Q.    Do you see that?                     10:47:05
11           That's a reference, that             10:47:05
12 signature pad -- sorry, the prescription pad    10:47:06
13 is a reference to the one in the sales aid?     10:47:06
14           MR. DAVISON: Objection.              10:47:09
15           THE WITNESS: That's my --            10:47:10
16     that's my recollection.                    10:47:10
17 QUESTIONS BY MR. CHALOS:                        10:47:11
18     Q.    Okay. So Mallinckrodt, to your       10:47:11
19 recollection, never produced a prescription    10:47:12
20 pad for doctors to use; is that right?          10:47:15
21     A.    That's my recollection.             10:47:17
22           MR. DAVISON: Objection.              10:47:18
23 QUESTIONS BY MR. CHALOS:                        10:47:18
24     Q.    Okay. Okay. If you could turn        10:47:20
25 to the page that says, "Pharmacy promotion      10:47:36

Page 100

1  piece, back cover, continued."                  10:47:39
2      A.    Is this the --                       10:47:50
3      Q.    No. If you would -- keep             10:47:51
4  going, it says --                               10:47:53
5           MR. DAVISON: One more.                10:47:54
6           THE WITNESS: Okay.                    10:47:55
7  QUESTIONS BY MR. CHALOS:                        10:47:57
8      Q.    You see it says, "Pharmacy           10:47:57
9  promotion piece, back cover, continued,         10:47:59
10 details of the program." And it references a    10:48:01
11 $40 per bottle rebate underneath that. It       10:48:04
12 says, "Very attractive offer."                  10:48:06
13           Do you see that?                     10:48:09
14     A.    Uh-huh.                              10:48:09
15     Q.    Okay. Was there a rebate at          10:48:10
16 some point for pharmacies in connection with    10:48:12
17 Magnacet?                                       10:48:13
18           MR. DAVISON: Objection.              10:48:13
19           THE WITNESS: Not that I can --       10:48:13
20     I can't recall, but based on this, it      10:48:15
21     seems that that's the case.                10:48:18
22 QUESTIONS BY MR. CHALOS:                        10:48:19
23     Q.    Okay. Do you recall some kind        10:48:19
24 of rebate program associated with Magnacet?     10:48:26
25           MR. DAVISON: Objection.              10:48:29

Page 101

1           THE WITNESS: Not specifically.        10:48:29
2  QUESTIONS BY MR. CHALOS:                        10:48:29
3      Q.    Okay. Okay. If you could turn        10:48:30
4  further along to it says, "Magnacet            10:48:35
5  patient access program."                        10:48:38
6           I think most of the other            10:48:39
7  presentations have page numbers, so --         10:48:43
8      A.    Okay.                                10:48:45
9      Q.    -- it won't be this tedious.        10:48:45
10 This one. Yeah, that's it.                      10:48:50
11     A.    I'm sorry.                           10:48:51
12           MR. DAVISON: Next page.             10:48:52
13           THE WITNESS: Okay. Okay.            10:48:53
14 QUESTIONS BY MR. CHALOS:                        10:48:57
15     Q.    Yeah, there you got it.            10:48:58
16           It says, "Magnacet patient          10:48:59
17 access program, co-pay discount cards,          10:49:01
18 discount from their third-party payer           10:49:05
19 co-pay."                                        10:49:09
20           And the next bullet says, "$30     10:49:10
21 off initial three fills with minimum            10:49:12
22 patient" -- "with MIN patient responsibility    10:49:15
23 of $5."                                         10:49:17
24           Do you see that?                     10:49:18
25     A.    Yes.                                 10:49:18

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1    Q.   Do you recall a patient co-pay    10:49:19
2  discount program with Magnacet?    10:49:21
3    A.   Generally, yes.    10:49:22
4    Q.   And by that program, it would    10:49:24
5  be some reduced co-pay for the patients?    10:49:27
6    A.   Correct.    10:49:29
7    Q.   Okay.  If you flip over to the    10:49:30
8  next page, "Guaranteed sales program."    10:49:36
9          Do you recall there being a    10:49:43
10  guaranteed sales program for pharmacies    10:49:44
11  associated with Magnacet?    10:49:48
12          MR. DAVISON:  Objection.    10:49:50
13          THE WITNESS:  Not specifically,    10:49:50
14  but, I mean, I see this here.    10:49:57
15  QUESTIONS BY MR. CHALOS:    10:49:58
16    Q.   Yeah, do you -- do you    10:49:58
17  understand what a guaranteed sales program    10:49:59
18  is?    10:50:01
19          MR. DAVISON:  Objection.    10:50:01
20          THE WITNESS:  I believe so.    10:50:02
21  QUESTIONS BY MR. CHALOS:    10:50:06
22    Q.   How do those programs work in    10:50:07
23  general?    10:50:09
24          MR. DAVISON:  Objection.    10:50:10
25          THE WITNESS:  Well, I think    10:50:11

Page 103

1  this might have been, looking at this,    10:50:13
2  the only time that we did this, so    10:50:15
3  I -- I don't know generally how they    10:50:17
4  work, but I think specifically how    10:50:19
5  this one worked is -- well, I actually    10:50:21
6  shouldn't speak to that.  I basically    10:50:26
7  would have to read off of this.    10:50:27
8  QUESTIONS BY MR. CHALOS:    10:50:29
9    Q.   Do you recall there being a    10:50:29
10  guaranteed sales program with Magnacet?    10:50:31
11    A.   Not before you put this in    10:50:34
12  front of me.    10:50:36
13    Q.   Okay.  Okay.  You can put that    10:50:37
14  aside.    10:50:45
15          One of the tools that    10:50:46
16  Mallinckrodt salespeople used was a -- was    10:51:10
17  scripts for selling scenarios and    10:51:16
18  interactions with doctors; is that right?    10:51:21
19          MR. DAVISON:  Objection.    10:51:22
20          THE WITNESS:  Can you be more    10:51:23
21  specific or can you --    10:51:25
22  QUESTIONS BY MR. CHALOS:    10:51:26
23    Q.   Yeah.    10:51:27
24    A.   I'm not sure I understand the    10:51:27
25  question.    10:51:30

Page 104

1    Q.   Did you -- when you were at    10:51:30
2  Mallinckrodt, did you ever recall seeing a    10:51:31
3  script that was given to sales    10:51:40
4  representatives to simulate an interaction    10:51:41
5  with the doctor?    10:51:44
6          MR. DAVISON:  Objection.    10:51:45
7          THE WITNESS:  Did I ever, yes,    10:51:45
8  I'm sure.    10:51:47
9  QUESTIONS BY MR. CHALOS:    10:51:47
10    Q.   Was that -- were those scripts    10:51:48
11  developed by the marketing department?    10:51:50
12    A.   We would participate, but I    10:51:51
13  think generally they were developed by the    10:51:54
14  training department.    10:51:55
15    Q.   Was the training department    10:51:55
16  separate from the marketing department?    10:52:01
17    A.   Yes.    10:52:02
18    Q.   Was that located within the    10:52:02
19  sales group?    10:52:05
20    A.   To be honest, it probably    10:52:07
21  varied over my tenure.  I think initially it    10:52:11
22  was sales and sales training or sales    10:52:14
23  operations and training.  I think it    10:52:17
24  fluctuated over time.    10:52:18
25    Q.   Okay.  Were you ever part of    10:52:20

Page 105

1  the sales training group?    10:52:21
2    A.   I was not part of the sales    10:52:22
3  training group.    10:52:24
4    Q.   Did you ever have a role in    10:52:24
5  sales training while you were at    10:52:26
6  Mallinckrodt?    10:52:27
7          MR. DAVISON:  Objection.    10:52:28
8          THE WITNESS:  I'm -- not    10:52:28
9  explicitly.    10:52:33
10  QUESTIONS BY MR. CHALOS:    10:52:33
11    Q.   Was the division of labor    10:52:42
12  between the sales group and the marketing    10:52:45
13  group, was that consistent over time when you    10:52:46
14  were at Mallinckrodt, or did that change?    10:52:49
15          MR. DAVISON:  Objection.    10:52:53
16          THE WITNESS:  I think it was    10:52:54
17  pretty consistent over time.    10:52:57
18  QUESTIONS BY MR. CHALOS:    10:52:58
19    Q.   Okay.  So what did the sales    10:52:58
20  group do versus the marketing group with    10:53:01
21  respect to the opioid products, let's say?    10:53:03
22          MR. DAVISON:  Objection.    10:53:06
23          THE WITNESS:  The sales group    10:53:06
24  talked to physicians and promoted the    10:53:07
25  product, specifically the risks and    10:53:11

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1     benefits of the product. They          10:53:16
2     educated them, the physicians.         10:53:17
3     Whereas the marketing really -- group  10:53:20
4     developed the marketing message.       10:53:22
5   QUESTIONS BY MR. CHALOS:                 10:53:23
6     Q.   Okay. What was your role in       10:53:23
7   developing the launch plan for Magnacet? 10:53:28
8     A.   I participated in that. I         10:53:32
9   think that at the time Geoffrey Arbuckle was  10:53:39
10  the head of the marketing.               10:53:42
11        (Mallinckrodt-Wessler Exhibit 9   10:53:57
12  marked for identification.)              10:53:57
13  QUESTIONS BY MR. CHALOS:                 10:53:57
14    Q.   Let's mark as Exhibit Number 9    10:53:57
15  an e-mail, MNK-T1_0003065351.            10:54:02
16        Have you had a chance to review    10:54:16
17  that?                                    10:54:40
18    A.   Yes.                              10:54:40
19    Q.   Okay. This is an e-mail dated     10:54:41
20  February 21st of 2007 at 5:31 p.m. from you  10:54:44
21  to somebody named Jason Jones.           10:54:49
22        Do you see that?                   10:54:51
23    A.   Yes.                              10:54:51
24    Q.   Do you know who Jason Jones is?   10:54:52
25    A.   Yes.                              10:54:53

Page 107

1     Q.   Who is that?                      10:54:54
2     A.   He was a former employee of       10:54:55
3   Mallinckrodt.                            10:54:58
4     Q.   I mean, what was his role?        10:54:59
5     A.   It varied pretty substantially.   10:55:01
6     Q.   Do you have any idea of what      10:55:04
7   his role was in 2007?                    10:55:06
8     A.   I don't, off the top of my        10:55:07
9   head.                                    10:55:10
10    Q.   Okay. Well, in this e-mail you    10:55:10
11  said to Mr. Jones, "Magnacet is a product  10:55:11
12  which maximizes the analgesia provided in an  10:55:16
13  oxycodone/APAP combination product while  10:55:20
14  remaining below the 4-gram threshold at two  10:55:24
15  tablet QID dosing by virtue of the unique  10:55:28
16  400-milligram dose."                     10:55:33
17        The next line is, "Purchase now    10:55:34
18  and receive a $40 rebate per bottle, up to a  10:55:36
19  maximum of $80 or two bottles per pharmacy."  10:55:39
20        Do you see that?                   10:55:44
21    A.   Yes.                              10:55:44
22    Q.   Okay. Does that refresh your      10:55:44
23  recollection as to what role Mr. Jones may  10:55:48
24  have had?                                10:55:51
25        Did he have something to do        10:55:51

Page 108

1   with pharmacies?                         10:55:52
2     A.   He -- I know he worked in the     10:55:53
3   managed care area, which dealt with      10:55:55
4   pharmacies and dealt with managed care   10:55:57
5   payers, but as I mentioned, I don't recollect  10:56:02
6   what position he was in at this time.    10:56:05
7     Q.   Okay. And next line here is,      10:56:06
8   "Our sales force is actively creating demand  10:56:08
9   in physicians' offices in your proximity."  10:56:10
10        Do you see that?                   10:56:13
11    A.   Yes.                              10:56:13
12    Q.   And that was one of the goals     10:56:14
13  of the sales force, was to actively create  10:56:15
14  demand for Mallinckrodt products?        10:56:17
15        MR. DAVISON: Objection.           10:56:20
16        THE WITNESS: The role of the       10:56:21
17    sales force was to educate physicians   10:56:22
18    on the risks and benefits of the       10:56:24
19    product so the physicians could make   10:56:26
20    the decision on the appropriate        10:56:27
21    patients for the therapy.             10:56:29
22  QUESTIONS BY MR. CHALOS:                 10:56:34
23    Q.   What does "actively" creating     10:56:35
24  demand mean here?                        10:56:37
25        MR. DAVISON: Objection.           10:56:38

Page 109

1         THE WITNESS: That -- that I        10:56:39
2     can't really speculate on -- because I  10:56:39
3     can't remember the context of this     10:56:41
4     e-mail at all.                         10:56:41
5   QUESTIONS BY MR. CHALOS:                 10:56:42
6     Q.   Okay. Was that phrase            10:56:43
7   "actively" creating demand something that you  10:56:45
8   used when you worked at Mallinckrodt in terms  10:56:49
9   of the role of the sales force?          10:56:51
10        MR. DAVISON: Objection.           10:56:53
11        THE WITNESS: Well, as it's         10:56:54
12    here in front of me in 2007, it        10:56:57
13    appears I used it once, but I can't     10:56:59
14    speak to whether I used it frequently   10:57:03
15    or not.                                10:57:05
16  QUESTIONS BY MR. CHALOS:                 10:57:06
17    Q.   Okay. Well, is one of the         10:57:06
18  roles of the sales force at Mallinckrodt to  10:57:13
19  actively create demand for Mallinckrodt   10:57:15
20  products?                                10:57:17
21        MR. DAVISON: Objection.           10:57:18
22        THE WITNESS: One of the roles      10:57:18
23    is to, again, educate physicians so     10:57:20
24    that they can make the decision.        10:57:24
25

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1 QUESTIONS BY MR. CHALOS: 10:57:25
2 Q. Right. 10:57:25
3 Was -- I understand it was that 10:57:25
4 a role, but was one of their goals of the 10:57:27
5 sales force to actively create demand for 10:57:29
6 Mallinckrodt products? 10:57:32
7 MR. DAVISON: Objection. 10:57:33
8 THE WITNESS: In the 10:57:33
9 appropriate patient types, subject to 10:57:34
10 physicians' discretion, yes. 10:57:37
11 (Mallinckrodt-Wessler Exhibit 10:57:42
12 10 marked for identification.) 10:57:44
13 QUESTIONS BY MR. CHALOS: 10:57:46
14 Q. Okay. We'll mark Exhibit 10:57:46
15 Number 10 here, which is MNK-T1_0003064798. 10:57:47
16 And on the top of this document it says, 10:58:04
17 "Pharmacy guaranteed sales program selling 10:58:06
18 scenario." 10:58:11
19 Do you see that? 10:58:11
20 A. I do see that. 10:58:12
21 Q. Okay. You can take as much as 10:58:12
22 you need to review the document. My first 10:58:14
23 question will be is do you know who prepared 10:58:15
24 this document? 10:58:18
25 A. I do not know who prepared 10:58:20

Page 111

1 this. 10:58:28
2 And I -- after we get through 10:58:29
3 these questions -- 10:58:31
4 Q. Yes. 10:58:31
5 A. -- could I use the restroom? 10:58:32
6 Q. Absolutely. Yes. 10:58:33
7 A. Okay. 10:58:33
8 Q. Let's finish with this 10:58:34
9 document, if you can hold it. 10:58:35
10 A. Absolutely, I can. 10:58:37
11 Q. Okay. But if we get emergency 10:58:38
12 status, let me know. 10:58:40
13 A. No, I just wanted to... 10:58:41
14 Q. Yes, sure. 10:58:43
15 A. So in answer to your question I 10:58:48
16 believe you asked, I do not know who prepared 10:58:51
17 this document. 10:58:53
18 Q. Okay. Is this the type of 10:58:53
19 document, when you were at Mallinckrodt, that 10:58:55
20 would come from the marketing department? 10:58:57
21 MR. DAVISON: Objection. 10:58:58
22 THE WITNESS: I can't remember 10:58:59
23 who would produce this. It could have 10:59:02
24 been marketing; it could have been 10:59:04
25 sales training. 10:59:06

Page 112

1 QUESTIONS BY MR. CHALOS: 10:59:06
2 Q. Okay. Were sales 10:59:07
3 representatives told to call on pharmacies as 10:59:14
4 well with respect to Magnacet? 10:59:19
5 MR. DAVISON: Objection. 10:59:20
6 THE WITNESS: I can't recall 10:59:20
7 specifically. I mean, based on the 10:59:22
8 fact that we had a program, I'm sure 10:59:23
9 that they did call on pharmacies. 10:59:26
10 QUESTIONS BY MR. CHALOS: 10:59:28
11 Q. Okay. If you look at the 10:59:28
12 second -- well, third paragraph, it says, 10:59:32
13 "Rep: I have been driving physician demand 10:59:35
14 in the area for Magnacet, and my company is 10:59:38
15 so confident we will generate prescriptions 10:59:42
16 that we will guarantee it." 10:59:43
17 Do you see that? 10:59:45
18 A. Uh-huh. 10:59:45
19 Q. Okay. Is that a message that 10:59:47
20 came from the marketing department, to your 10:59:56
21 recollection? 10:59:58
22 MR. DAVISON: Objection. 10:59:58
23 THE WITNESS: I don't recall. 10:59:59
24 And I don't know if this was a draft 11:00:00
25 document or -- you know, I don't 11:00:01

Page 113

1 really recall. 11:00:03
2 QUESTIONS BY MR. CHALOS: 11:00:04
3 Q. Okay. You don't know who 11:00:05
4 prepared this? 11:00:07
5 A. I don't -- I don't remember who 11:00:08
6 prepared the -- 11:00:09
7 Q. While you were at Mallinckrodt, 11:00:10
8 did you -- do you recall ever hearing the 11:00:13
9 terms "driving physician demand" or something 11:00:16
10 like that? 11:00:19
11 MR. DAVISON: Objection. 11:00:19
12 THE WITNESS: I can't recall. 11:00:20
13 MR. CHALOS: Okay. Okay. You 11:00:21
14 can put that aside for now, and let's 11:00:30
15 take a quick break. 11:00:33
16 VIDEOGRAPHER: We are going off 11:00:34
17 the record at 11 a.m. 11:00:35
18 (Off the record at 11:00 a.m.) 11:00:37
19 VIDEOGRAPHER: We are back on 11:09:49
20 the record at 11:09 a.m. 11:10:04
21 (Mallinckrodt-Wessler Exhibit 11:10:06
22 11 marked for identification.) 11:10:07
23 QUESTIONS BY MR. CHALOS: 11:10:07
24 Q. Okay. Let's mark as Exhibit 11:10:07
25 Number 11 MNK-T1_0001126586, and it's another 11:10:09

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1  presentation with no page numbers.          11:10:21
2      A.   Okay.  No problem.                  11:10:25
3      Q.   The first page says, "2009          11:10:26
4  TussiCaps A&P budget presentation," and it's  11:10:28
5  dated December the 10th of 2008.             11:10:33
6          My first question to you will        11:10:36
7  be what is A&P?                              11:10:39
8      A.   I believe advertising and           11:10:42
9  promotion.                                   11:10:43
10     Q.   Okay.  Okay.  Have you had a        11:10:44
11 chance to review that?                       11:13:10
12     A.   I have.                             11:13:10
13     Q.   Okay.  Have you seen this           11:13:11
14 document before today?                       11:13:12
15     A.   I can't recall.                     11:13:13
16     Q.   Was this a document that you        11:13:14
17 prepared?                                    11:13:18
18         MR. DAVISON:  Objection.             11:13:18
19         THE WITNESS:  I can't recall.        11:13:19
20 QUESTIONS BY MR. CHALOS:                     11:13:20
21     Q.   And was your role in 2008 with      11:13:21
22 respect to TussiCaps related to preparing A&P  11:13:27
23 budgets?                                     11:13:33
24     A.   Yes.                                11:13:33
25     Q.   Okay.  Was there anybody else       11:13:34

Page 115

1  in that role as well at that time?           11:13:35
2      A.   Whoever else would have been in     11:13:37
3  marketing at that time.                      11:13:39
4      Q.   Okay.  So you may have prepared     11:13:41
5  this; is that possible?                      11:13:44
6          MR. DAVISON:  Objection.             11:13:47
7          THE WITNESS:  It is possible.        11:13:48
8  QUESTIONS BY MR. CHALOS:                     11:13:49
9      Q.   You just don't remember?           11:13:49
10     A.   I do not.                           11:13:50
11     Q.   Okay.  Well, let me ask you         11:13:52
12 about a few things here.  If you could turn   11:13:54
13 to -- to this third page, it says, "Cough and  11:13:57
14 cold market."                                11:14:04
15         It says, "The fiscal year '08        11:14:15
16 and '09 cough and cold market is in a state   11:14:16
17 of flux.  September 28, 2007, FDA announced   11:14:20
18 removal of approximately 200 hydrocodone      11:14:25
19 products from the market."                   11:14:26
20         Do you see that?                     11:14:27
21     A.   Yes.                                11:14:28
22     Q.   Do you recall what that was all     11:14:28
23 about?                                       11:14:30
24         MR. DAVISON:  Objection.             11:14:31
25         THE WITNESS:  Just vaguely.          11:14:31

Page 116

1  The FDA -- there were products that          11:14:36
2  were unapproved.  They were -- I don't       11:14:38
3  know what kind of a -- I'm not a             11:14:40
4  regulatory expert, but I think they          11:14:42
5  were grandfathered or something like         11:14:46
6  that so they weren't officially              11:14:47
7  subject to FDA approval.  They               11:14:49
8  predated that, so I believe the FDA          11:14:50
9  removed them from the marketplace.           11:14:52
10 QUESTIONS BY MR. CHALOS:                     11:14:53
11     Q.   If you turn to, I don't know,       11:15:05
12 it's eight or ten pages in, it says, "2009    11:15:07
13 A&P overview."                               11:15:10
14     A.   Okay.                               11:15:15
15     Q.   It says at the top,                 11:15:18
16 "$7.11 million investment in total."         11:15:21
17         Do you see that?                     11:15:26
18     A.   Yes.                                11:15:26
19     Q.   And there's a breakdown among       11:15:27
20 five categories.                             11:15:28
21         Do you see that?                     11:15:29
22     A.   Yes, I see that.                    11:15:30
23     Q.   Okay.  So is that -- do you         11:15:31
24 recall that the -- well, let me back up.      11:15:35
25         Does that mean that the              11:15:36

Page 117

1  investment in A&P -- and what was A&P again?  11:15:38
2      A.   Advertising and promotion.         11:15:43
3      Q.   Yeah, the investment in            11:15:44
4  advertising and promotion in 2009 for        11:15:45
5  TussiCaps was -- the expenditure was         11:15:49
6  $7.1 million?                                11:15:53
7          MR. DAVISON:  Objection.            11:15:54
8          THE WITNESS:  I don't know,         11:15:54
9  because I don't know if this is final,        11:15:56
10 a draft or this was what we may have          11:15:57
11 proposed, so I frankly don't know.           11:16:00
12 QUESTIONS BY MR. CHALOS:                     11:16:05
13     Q.   Okay.  If you turn over to the      11:16:06
14 next page, it says, "Operational tactic and   11:16:13
15 budget."                                     11:16:16
16         The second big bullet says,          11:16:18
17 "276 million incremented monthly based upon   11:16:23
18 the initial tactical plan."                  11:16:25
19         Do you see that?                     11:16:27
20     A.   I'm losing --                       11:16:28
21     Q.   Okay.  It's "Operational            11:16:29
22 tactics and budget."                         11:16:31
23     A.   This is where I'm at --             11:16:34
24     Q.   Yeah.                               11:16:34
25     A.   -- but that doesn't look like       11:16:35

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1   that.                                11:16:36
2         MR. DAVISON: I think you went   11:16:36
3   too far.                             11:16:37
4         MR. CHALOS: I think one page    11:16:38
5   prior to that.                       11:16:39
6         THE WITNESS: Okay.             11:16:40
7         MR. CHALOS: You're right,      11:16:40
8   Peter. Yeah.                         11:16:42
9   QUESTIONS BY MR. CHALOS:             11:16:43
10     Q.   Do you see that?             11:16:44
11     A.   Yes.                         11:16:44
12     Q.   And okay. It says, "276M     11:16:45
13  incremented monthly based upon initial  11:16:49
14  tactical plan."                      11:16:51
15         Do you see that?              11:16:53
16     A.   Yes.                         11:16:53
17     Q.   Is that -- what is 276 -- is  11:16:53
18  that 276 million?                    11:16:55
19         MR. DAVISON: Objection.       11:16:56
20         THE WITNESS: I can't recall,  11:16:56
21     but that seems like that would be way  11:16:58
22     inordinately high.                11:17:00
23  QUESTIONS BY MR. CHALOS:             11:17:02
24     Q.   Yeah. Okay. Right.          11:17:02
25         Did you have any role when you  11:17:16

Page 119

1   were at Mallinckrodt in developing any of the  11:17:17
2   medical literature, medical studies,  11:17:20
3   regarding any of the Mallinckrodt products?  11:17:24
4     A.   The clinical trials and things  11:17:26
5   like that?                           11:17:27
6     Q.   No, I mean the -- well, let's  11:17:28
7   start with that, yes, clinical trials?  11:17:31
8     A.   No.                          11:17:33
9     Q.   Okay. What about the         11:17:33
10  literature that -- postmarketing literature,  11:17:35
11  did you have any role in developing any of  11:17:38
12  that?                                11:17:40
13         MR. DAVISON: Objection.       11:17:40
14         THE WITNESS: Writing it or --  11:17:41
15     no.                              11:17:43
16  QUESTIONS BY MR. CHALOS:             11:17:43
17     Q.   In deciding what areas needed  11:17:44
18  to be addressed through medical literature,  11:17:46
19  did you have any role in deciding that?  11:17:49
20     A.   Not as it related to medical  11:17:50
21  literature.                          11:17:52
22     Q.   Okay. If you flip over to --  11:17:53
23  it says, "Clinical peer to peer: Budget and  11:17:59
24  tactics."                            11:18:02
25         This page says, "Clinical peer  11:18:20

Page 120

1   to peer: Budget and tactics, third-party  11:18:27
2   partnership, evaluating American College of  11:18:31
3   Emergency Physicians as a possible partner."  11:18:34
4         Do you see that?              11:18:35
5     A.   Yes.                         11:18:35
6     Q.   Did you have any role as --   11:18:36
7   with Mallinckrodt in determining which  11:18:39
8   third-party partnerships the company should  11:18:42
9   enter into?                          11:18:44
10         MR. DAVISON: Objection.       11:18:44
11         THE WITNESS: Maybe identifying  11:18:45
12     them but not owning those         11:18:47
13     partnerships, and I frankly don't  11:18:49
14     remember any of this.            11:18:51
15  QUESTIONS BY MR. CHALOS:             11:18:52
16     Q.   Okay. It says, "Personal     11:18:52
17  promotion: Budget and tactics" on top. And  11:19:24
18  then it says "trials" -- there it is, "trial  11:19:26
19  scripts." Yeah.                      11:19:30
20     A.   I'm sorry.                   11:19:59
21     Q.   That's okay. It's cumbersome  11:19:59
22  here.                                11:20:00
23     A.   Okay.                       11:20:01
24     Q.   "Personal promotion" and "trial  11:20:03
25  scripts" is what it says.            11:20:03

Page 121

1     A.   Okay.                        11:20:03
2     Q.   "Integral tool to garner      11:20:06
3   initial trial," under that it says, "Four  11:20:08
4   free capsules with accompanying      11:20:11
5   prescription."                       11:20:13
6         Do you see that?              11:20:14
7     A.   Yes.                         11:20:14
8     Q.   Do you recall with TussiCaps if  11:20:14
9   there was a program where patients would  11:20:15
10  receive four free capsules with a    11:20:17
11  prescription?                        11:20:20
12         MR. DAVISON: Objection.       11:20:20
13         THE WITNESS: Now that you've  11:20:21
14     put this in front of me.          11:20:22
15  QUESTIONS BY MR. CHALOS:             11:20:24
16     Q.   Okay. Do you also recall a    11:20:24
17  discount for patients, or is that something  11:20:28
18  you were just -- if you look at -- sorry.  11:20:29
19  Look at the next page, if you would.  11:20:31
20         "Personal promotion: Budget    11:20:33
21  and tactics, co-pay discount coupons."  11:20:37
22         It says, "10 percent discount  11:20:42
23  of patient out-of-pocket costs."     11:20:46
24         Do you see that?              11:20:49
25     A.   It says, "$10 discount when   11:20:49

Page 122

1  accompanied" --                    11:20:50
2      Q.   Yeah.  What did I say, 10       11:20:50
3  percent?
4      A.   Yeah.
5      Q.   $10, yeah, $10.
6           Do you see that?
7      A.   Yes.
8      Q.   Do you recall that program as    11:20:53
9  you sit here today?              11:20:55
10     A.   Yeah, now that you put it in      11:20:55
11 front of me.                     11:20:57
12     Q.   Okay.  If you turn to           11:20:57
13 nonpersonal promotion website.        11:21:14
14          Do you recall there being a      11:21:24
15 website capthecough.com associated with   11:21:26
16 TussiCaps?                       11:21:32
17     A.   Now, again, now that you put it  11:21:33
18 in front of me.                   11:21:35
19     Q.   Okay.  Did that ever go online,  11:21:36
20 do you remember, that website?        11:21:39
21     A.   I believe so.  I can't recall    11:21:40
22 specifically.                    11:21:43
23     Q.   Flip to the next page, digital   11:21:43
24 advertising.  It references, "Banner ads,  11:21:54
25 skyscraper ads, to drive health care    11:21:58

Page 123

1  practitioners and patients to our website."  11:22:00
2           Do you see that?           11:22:04
3           MR. DAVISON:  Objection.       11:22:04
4           THE WITNESS:  Uh-huh.         11:22:05
5  QUESTIONS BY MR. CHALOS:            11:22:05
6      Q.   Is that something that ever      11:22:05
7  happened?                        11:22:06
8      A.   Or I should say yes.  Sorry.     11:22:06
9      Q.   Yeah, you got it.           11:22:08
10          Was that -- were there ever      11:22:09
11 skyscraper ads associated with TussiCaps, to  11:22:11
12 your knowledge?                   11:22:14
13     A.   I can't recall.             11:22:14
14     Q.   Okay.  If you flip over to the   11:22:15
15 page that says, "Nonpersonal promotion,    11:22:26
16 budget and tactics, Catalina marketing    11:22:29
17 initiative.  Target patients filling    11:22:32
18 three-plus Tussionex prescriptions in rolling  11:22:44
19 three" -- sorry -- "rolling six-month      11:22:47
20 period."                         11:22:50
21          Do you see where it says that?   11:22:50
22     A.   Yes.                      11:22:51
23     Q.   Do you recall the Catalina      11:22:51
24 marketing initiative?             11:22:53
25     A.   I recall it generally.  I can't  11:22:56

Page 124

1  remember if we fielded this initiative or   11:22:57
2  not.                             11:23:00
3      Q.   Okay.  Meaning whether you       11:23:00
4  implemented it?                   11:23:02
5      A.   Correct.                   11:23:02
6      Q.   Okay.  Is TussiCaps still on     11:23:03
7  the market?                      11:23:11
8      A.   I honestly can't recall.  Or I   11:23:11
9  don't -- I mean, I shouldn't say I can't   11:23:16
10 recall.  I don't know.  Because as I     11:23:17
11 mentioned before, I think Mallinckrodt sold  11:23:20
12 this asset.                      11:23:21
13     Q.   Okay.  So we may only have one   11:23:22
14 copy.                            11:23:38
15          MR. DAVISON:  We have some      11:23:40
16     copies here.                  11:23:41
17          (Mallinckrodt-Wessler Exhibit   11:23:53
18     12 marked for identification.)      11:23:53
19 QUESTIONS BY MR. CHALOS:            11:23:53
20     Q.   Let's mark as Exhibit 12 a      11:24:00
21 document, MNK-T1_0007901756 through 1762.   11:24:01
22 Here you are.  And you can look at the entire  11:24:15
23 document.                        11:24:24
24          What I'm going to ask you about  11:24:24
25 is under the marketing section on page 1760.  11:24:26

Page 125

1  There's also a 5 in the upper right corner of  11:24:31
2  that page.  But you can read as much of this  11:24:34
3  as you need to get context.          11:24:37
4           And the date on the document    11:24:47
5  was -- sorry about that.  The date on the   11:24:48
6  document is July 6, 2004.          11:24:52
7      A.   Okay.                     11:26:44
8      Q.   Okay.  So this is something      11:26:44
9  that is entitled "Monthly Report June."    11:26:50
10          Do you see that?           11:26:53
11     A.   Yes.                      11:26:53
12     Q.   Do you recognize this format?    11:26:54
13     A.   I don't recall it.          11:26:56
14     Q.   Okay.  You're in 20 -- I'm      11:26:58
15 sorry, 2004.  What was your role at      11:27:02
16 Mallinckrodt then?  Do you remember?      11:27:06
17     A.   I believe it was prior to my     11:27:11
18 role in marketing.  I don't remember the   11:27:14
19 specific title.                  11:27:16
20     Q.   Sales operation?             11:27:16
21     A.   Probably at that time.         11:27:17
22     Q.   Okay.  So if you look at that    11:27:20
23 page --                          11:27:22
24     A.   Yeah, actually --            11:27:23
25     Q.   Sorry, yeah.                11:27:24

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1     A.   -- it says I got promoted to     11:27:25
2  marketing manager, new products.  So on     11:27:27
3  page 7.                          11:27:29
4     Q.   Yeah.                     11:27:30
5     A.   So that would have been before     11:27:30
6  my role in marketing.              11:27:32
7     Q.   Okay.  So in the section here     11:27:33
8  that -- on page 1760, it's page 5 of     11:27:36
9  Exhibit 12, the marketing section?     11:27:40
10    A.   Yes.                      11:27:42
11    Q.   At that time did you have     11:27:43
12 anything to do with preparing or presenting     11:27:45
13 the marking section here?          11:27:49
14    A.   I do not remember.          11:27:50
15    Q.   Okay.  And what I'm asking     11:27:51
16 specifically about is the section there that     11:27:54
17 says, "Results against performance metrics,     11:27:56
18 marketing physician productivity and ROI on     11:27:59
19 marketing programs."              11:28:03
20         Do you see that?           11:28:04
21    A.   Yes.                      11:28:04
22    Q.   Okay.  As you sit here today,     11:28:05
23 do you recall having anything to do with that     11:28:07
24 portion of this report?           11:28:09
25    A.   Not that I can recall.     11:28:10

Page 127

1     Q.   Okay.  Okay.  We can put that     11:28:11
2  aside then.                      11:28:15
3         What was your role with respect     11:28:16
4  to Exalgo at Mallinckrodt?         11:28:27
5     A.   I was, I believe, the product     11:28:31
6  director at that time.             11:28:35
7     Q.   Okay.  What does that mean in     11:28:36
8  terms of your duties?              11:28:38
9     A.   I was responsible for          11:28:40
10 development of marketing messaging and     11:28:43
11 development of the marketing collateral or     11:28:46
12 sales pieces.                      11:28:49
13         (Mallinckrodt-Wessler Exhibit     11:29:27
14    13 marked for identification.)     11:29:27
15 QUESTIONS BY MR. CHALOS:            11:29:27
16    Q.   So we'll mark as Exhibit 13     11:29:37
17 MNK-T1_0001192760.  It's another native     11:29:40
18 document, but these slides have numbers on     11:29:50
19 them.                            11:29:54
20         So the first page says, "Fiscal     11:29:56
21 year '10, TussiCaps and Exalgo commercial     11:29:58
22 plans dated October 28th of 2009."     11:30:02
23         Was it your responsibility at     11:30:10
24 that time in 2009 to develop the commercial     11:30:12
25 plans for TussiCaps and Exalgo?     11:30:14

Page 128

1         MR. DAVISON:  Objection.     11:30:17
2         THE WITNESS:  I believe I     11:30:18
3  certainly played a role in that.     11:30:20
4  QUESTIONS BY MR. CHALOS:            11:30:21
5     Q.   You can take as much time as     11:31:13
6  you need to review this.  My first question     11:31:16
7  will be about page 11, Exhibit 13.     11:31:18
8     A.   Okay.                     11:31:43
9     Q.   From a marketing standpoint,     11:31:44
10 was TussiCaps considered a success?     11:31:46
11        MR. DAVISON:  Objection.     11:31:48
12        THE WITNESS:  I can't really     11:31:49
13 recall.  I don't know how it did     11:31:53
14 relative to budget in terms of the     11:31:55
15 forecast goal.                    11:31:58
16 QUESTIONS BY MR. CHALOS:            11:31:58
17    Q.   How about Exalgo?  From a     11:32:00
18 marketing standpoint, was Exalgo considered a     11:32:02
19 success?                         11:32:05
20        MR. DAVISON:  Objection.     11:32:05
21        THE WITNESS:  I know that it --     11:32:06
22 I probably don't believe so, given the     11:32:12
23 really low market share.  I think on     11:32:14
24 page 12 it's, you know, less than     11:32:17
25 1 percent.  It's .37 percent TRx     11:32:19

Page 129

1  market share objective.  So it was a     11:32:23
2  very small product.               11:32:25
3  QUESTIONS BY MR. CHALOS:            11:32:26
4     Q.   Was there ever a time where     11:32:28
5  Exalgo, from a marketing standpoint, was     11:32:31
6  considered successful?             11:32:33
7         MR. DAVISON:  Objection.     11:32:34
8         THE WITNESS:  Not that I can     11:32:35
9  recall.  But I guess it would     11:32:36
10 fundamentally depend on who you asked.     11:32:43
11 QUESTIONS BY MR. CHALOS:            11:32:46
12    Q.   And I think -- well, was     11:32:47
13 Xartemis, from a marketing standpoint --     11:32:53
14 sorry -- Xartemis, from a marketing     11:32:57
15 standpoint, considered to be successful?     11:32:59
16        MR. DAVISON:  Objection.     11:33:00
17        THE WITNESS:  Ah, no.     11:33:00
18 QUESTIONS BY MR. CHALOS:            11:33:01
19    Q.   Probably doesn't depend on who     11:33:02
20 you asked for that one.            11:33:04
21    A.   Well, I mean, I'm severed as a     11:33:05
22 consequence.                      11:33:08
23    Q.   Okay.  Let's look at page --     11:33:09
24 actually, page 8 of Exhibit 13.  It says,     11:33:13
25 "Exalgo TOWS."                    11:33:23

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1    Do you see that?    11:33:25
2    A.    Yeah.    11:33:25
3    Q.    I think TOWS stands for    11:33:26
4    threats, opportunities, weaknesses and    11:33:29
5    strengths.    11:33:31
6    Does that sound right?    11:33:31
7    MR. DAVISON:  Objection.    11:33:32
8    THE WITNESS:  Seems reasonable.    11:33:32
9    QUESTIONS BY MR. CHALOS:    11:33:34
10    Q.    Okay.  I'm going to ask you    11:33:35
11    about a couple of these phrases here.    11:33:36
12    First of all, let me back up.    11:33:39
13    How -- how were the threats,    11:33:40
14    opportunities, weaknesses and strengths of    11:33:43
15    Exalgo determined in 2009?    11:33:46
16    MR. DAVISON:  Objection.    11:33:50
17    THE WITNESS:  I can't recall at    11:33:50
18    that time.    11:33:52
19    QUESTIONS BY MR. CHALOS:    11:33:52
20    Q.    Was that something within your    11:33:53
21    area of responsibility?    11:33:54
22    A.    I probably would have    11:33:55
23    contributed.    11:33:59
24    Q.    Okay.  If you look at the    11:34:00
25    weaknesses box on page 8 of Exhibit 13, do    11:34:05

Page 131

1    you see that?    11:34:10
2    A.    Yes.    11:34:10
3    Q.    The second bullet point says,    11:34:11
4    "Physician concerns regarding abuse potential    11:34:13
5    related to hydromorphone."    11:34:15
6    Do you see that?    11:34:18
7    A.    Yes.    11:34:18
8    Q.    Do you have any idea what that    11:34:19
9    means?    11:34:20
10    A.    I think physicians were    11:34:20
11    concerned about the potency of hydromorphone    11:34:26
12    relative to morphine.    11:34:30
13    Q.    Hydromorphone being more potent    11:34:31
14    than morphine?    11:34:34
15    A.    Yes.    11:34:36
16    Q.    And how did you know that at    11:34:36
17    that time?    11:34:38
18    A.    I can't recall specifically,    11:34:38
19    but it's in the literature.    11:34:42
20    Q.    If you go down to threats, that    11:34:43
21    section?    11:34:48
22    A.    Yes.    11:34:50
23    Q.    The third bullet, "Abuse,    11:34:50
24    misuse and diversion."    11:34:55
25    Do you see that?    11:34:57

Page 132

1    A.    Yes.    11:34:58
2    Q.    How was that a threat to    11:34:58
3    Exalgo?    11:34:59
4    MR. DAVISON:  Objection.    11:35:00
5    THE WITNESS:  I think that    11:35:01
6    would leave certainly a stain on the    11:35:06
7    reputation of the company and on the    11:35:08
8    product, so we were diligent about    11:35:10
9    trying to do what we could to make    11:35:14
10    sure that the product was used in a    11:35:16
11    safe manner.  That was really    11:35:19
12    important in our promotional efforts.    11:35:22
13    QUESTIONS BY MR. CHALOS:    11:35:23
14    Q.    What was -- what did the    11:35:24
15    company do to prevent or reduce diversion of    11:35:26
16    its products at that time?    11:35:30
17    MR. DAVISON:  Objection.    11:35:31
18    THE WITNESS:  I can't recall    11:35:32
19    specifically.  That was outside my    11:35:34
20    area of expertise.    11:35:36
21    QUESTIONS BY MR. CHALOS:    11:35:37
22    Q.    Okay.  The next bullet says,    11:35:38
23    "Possible Palladone reentry."    11:35:41
24    Do you see that?    11:35:43
25    A.    Yes.    11:35:43

Page 133

1    Q.    What was -- what is Palladone?    11:35:44
2    A.    Palladone, I believe, was a    11:35:46
3    hydromorphone extended release product that    11:35:48
4    another company had at one time, had in    11:35:51
5    development.  I can't remember the specifics.    11:35:56
6    Q.    Okay.  And the next bullet    11:35:58
7    says, "Reluctance to use potent opioids for    11:36:00
8    chronic, noncancer pain."    11:36:03
9    Do you see that?    11:36:05
10    A.    Yes.    11:36:06
11    Q.    What does that mean?    11:36:06
12    MR. DAVISON:  Objection.    11:36:07
13    THE WITNESS:  I can't recall    11:36:08
14    specifically.    11:36:11
15    QUESTIONS BY MR. CHALOS:    11:36:11
16    Q.    Was one of the goals of the    11:36:13
17    Exalgo marketing to give information to    11:36:16
18    physicians about using Exalgo for chronic,    11:36:20
19    noncancer pain?    11:36:24
20    A.    The product was studied    11:36:26
21    predominantly in chronic, noncancer pain.    11:36:29
22    The whole pivotal phase III trial was based,    11:36:33
23    I believe, predominantly on even low back    11:36:37
24    pain, so consistent with the package insert    11:36:40
25    is how we promoted the product.    11:36:44

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1     Q.    And one of the marketing      11:36:46
2  messages for promoting Exalgo was that Exalgo  11:36:48
3  could be used with chronic, noncancer pain;    11:36:52
4  is that fair?                        11:36:55
5     A.    I'm not sure that we were     11:36:55
6  specific in terms of whether it was chronic,   11:36:57
7  noncancer or cancer pain.  I believe the       11:36:59
8  indication wasn't that specific.     11:37:02
9     Q.    So the marketing message was  11:37:04
10  Exalgo can be used for patients with chronic   11:37:08
11  pain, irrespective --               11:37:11
12         MR. DAVISON:  Objection.       11:37:13
13         THE WITNESS:  Who are          11:37:13
14     opioid-tolerant.                 11:37:15
15  QUESTIONS BY MR. CHALOS:             11:37:16
16     Q.    Right.                      11:37:16
17     A.    And I believe there were other  11:37:17
18  nuances to that as well.  So we promoted the   11:37:18
19  product consistent with the product  11:37:20
20  indication.                         11:37:21
21     Q.    Okay.  But one of the        11:37:21
22  indications was chronic pain, irrespective of  11:37:23
23  whether it was cancer or noncancer?  11:37:26
24     A.    It wasn't that specific.  It  11:37:27
25  was silent on that, so it didn't say the       11:37:29

Page 135

1  specific source of the chronic pain.  11:37:31
2     Q.    Okay.  So the marketing       11:37:35
3  message -- one of the marketing messages with  11:37:36
4  Exalgo is this is indicated for patients with  11:37:40
5  chronic pain, period?                11:37:42
6         MR. DAVISON:  Objection.       11:37:43
7         THE WITNESS:  I believe it was  11:37:44
8     opioid-tolerant, chronic pain.     11:37:44
9  QUESTIONS BY MR. CHALOS:             11:37:47
10     Q.    Okay.  If you turn to page 17  11:37:47
11  of Exhibit 13, it says, "Tactics and tools"    11:37:51
12  on top.                             11:37:57
13     A.    Okay.                       11:38:04
14     Q.    Do you see that?             11:38:04
15         And there's three columns and  11:38:06
16  three rows --                       11:38:10
17     A.    Okay.  Yeah.                 11:38:14
18     Q.    -- of different tactics and   11:38:15
19  tools.                              11:38:17
20         Do you see that?              11:38:17
21     A.    Yes.                        11:38:18
22     Q.    Does this page include the    11:38:18
23  tactics and tools that Mallinckrodt used to    11:38:20
24  promote Exalgo?                      11:38:29
25         MR. DAVISON:  Objection.       11:38:29

Page 136

1         THE WITNESS:  I'm pretty sure   11:38:30
2     that this is a draft.  I don't know  11:38:32
3     that this represents the final     11:38:34
4     tactical tactics that we fielded.  11:38:37
5  QUESTIONS BY MR. CHALOS:             11:38:40
6     Q.    And do you think there were   11:38:41
7  more tactics and tools or fewer tactics and    11:38:46
8  tools that were ultimately used?     11:38:48
9     A.    I can't say.  I mean, I can   11:38:49
10  tell you specifically that the Portenoy        11:38:51
11  Summit, I don't think that was ever used,      11:38:54
12  that was ever a tactic that was fielded, so    11:38:56
13  that's why it stands out to me.      11:38:58
14     Q.    Got it.                     11:38:59
15         Do any of these other tactics  11:39:00
16  and tools stand out to you as tactics and      11:39:02
17  tools that were not used to promote Exalgo?    11:39:06
18     A.    I don't know that we ever did a  11:39:11
19  MOD video.                           11:39:14
20     Q.    What is an MOD video?         11:39:17
21     A.    I can't remember.  I think it  11:39:20
22  has to do with a method of action or -- you    11:39:21
23  know.                               11:39:26
24     Q.    That's under the patient      11:39:26
25  welcome kit --                      11:39:28

Page 137

1     A.    Yes.                        11:39:28
2     Q.    -- you're talking about?      11:39:29
3         Okay.  Any others stand out as  11:39:32
4  not being used for Exalgo?           11:39:33
5     A.    Not that I can recall.        11:39:35
6     Q.    Okay.  Do any of these stand   11:39:36
7  out to you as things that you did, in fact,    11:39:39
8  use with Exalgo?                     11:39:42
9     A.    Well, I know that we had a     11:39:43
10  master sales and leave-behinds, so, yes.       11:39:45
11     Q.    You did lunch and learn       11:39:48
12  programs?                           11:39:50
13         MR. DAVISON:  Objection.       11:39:51
14         THE WITNESS:  I believe so.    11:39:51
15  QUESTIONS BY MR. CHALOS:             11:39:52
16     Q.    Used clinical reprints?       11:39:53
17     A.    I can't recall.              11:39:54
18     Q.    How about physician welcome   11:39:55
19  kit?                                11:39:56
20     A.    I can't recall.              11:39:57
21     Q.    Dosing conversion tool?       11:39:58
22     A.    I believe so.                11:40:01
23     Q.    I think you did an iPad app for  11:40:03
24  that as well?                       11:40:06
25     A.    I believe so.                11:40:07

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1    Q.    Okay.  What is a Fingertip        11:40:07
2    Formulary?                               11:40:10
3        A.    Fingertip Formulary is a tool    11:40:10
4    where you can see for a specific managed care  11:40:14
5    plan how Exalgo is covered, what tier it is,  11:40:22
6    tier 1, 2, 3, et cetera.                  11:40:25
7        Q.    Did the company prepare a        11:40:28
8    Fingertip Formulary for Exalgo?           11:40:31
9        A.    I believe they partnered with    11:40:32
10   Fingertip Formulary for that, yes.        11:40:34
11       Q.    Oh, okay.                        11:40:36
12             How about a product monograph?   11:40:38
13       A.    I believe so.                    11:40:39
14       Q.    Okay.  And Mallinckrodt used     11:40:40
15   speaker programs for -- to promote Exalgo?  11:40:43
16       A.    Yes.                             11:40:45
17       Q.    Used advisory boards as well to  11:40:46
18   promote Exalgo?                           11:40:48
19       A.    An advisory board is used to     11:40:49
20   generate feedback from physicians, but it's  11:40:54
21   not necessarily used as a promotional tool.  11:40:56
22   But I can't remember.  I believe we did an  11:40:59
23   advisory board for Exalgo.                11:41:01
24       Q.    Okay.  What is a product         11:41:03
25   theatre?                                  11:41:07

Page 139

1        A.    A product theatre, I honestly   11:41:08
2    don't know because I don't believe we did  11:41:11
3    those.                                    11:41:13
4        Q.    Okay.  Did Mallinckrodt use a    11:41:13
5    PR campaign in association with Exalgo?    11:41:18
6        A.    We had a PR -- we had a PR       11:41:22
7    group that we used, though I don't know    11:41:25
8    that -- I don't recall what tactics we used.  11:41:28
9    That was -- usually fell under the auspices  11:41:31
10   of our communications group.              11:41:34
11       Q.    Okay.  Was there a publication   11:41:35
12   strategy for Exalgo?                      11:41:36
13       A.    I believe our medical affairs    11:41:37
14   group developed one.                      11:41:39
15       Q.    Okay.  And how about a product   11:41:40
16   website?                                  11:41:42
17       A.    We did have a product website.   11:41:42
18       Q.    Was there a direct mail          11:41:44
19   program?                                  11:41:47
20       A.    I can't recall specifically.     11:41:47
21       Q.    Okay.  How about an MD alert?    11:41:48
22       A.    I can't recall on that.          11:41:51
23       Q.    Okay.  Were there journal ads    11:41:53
24   associated with Exalgo?                   11:41:54
25       A.    Yes, I believe so.               11:41:55

Page 140

1        Q.    Okay.  Direct mail campaign?     11:41:57
2        A.    I can't recall.                  11:42:00
3        Q.    Okay.  With respect to           11:42:01
4    wholesalers, retail pharmacy and MCO, what is  11:42:04
5    MCO?                                      11:42:07
6        A.    I believe it stands for managed  11:42:08
7    care organizations.                       11:42:10
8        Q.    Were there pharmacy              11:42:11
9    sales aids produced in -- associated with  11:42:13
10   Exalgo?                                   11:42:17
11       A.    I believe so.  I don't know if   11:42:17
12   it was separate from the physician sales aid  11:42:18
13   or not.  I can't recall.                  11:42:21
14       Q.    Okay.  Were there leave-behinds  11:42:22
15   for wholesalers, retailer pharmacy and MCOs?  11:42:24
16       A.    I believe so.                    11:42:28
17       Q.    What about lunch and learn       11:42:29
18   programs?                                 11:42:30
19       A.    I can't recall specifically.     11:42:31
20       Q.    Were there clinical preprints    11:42:32
21   for that group?                           11:42:38
22       A.    I can't recall for that group.   11:42:38
23       Q.    How about Fingertip             11:42:40
24   Formularies?                              11:42:42
25       A.    Yeah, as I mentioned, I believe  11:42:42

Page 141

1    that was a tactic that was developed.     11:42:44
2        Q.    Stocking request forms, were     11:42:45
3    those done?                               11:42:50
4        A.    I believe so.                    11:42:50
5        Q.    How about trade -- well, let me  11:42:51
6    go back.  What are stocking request forms?  11:42:53
7        A.    It would be a piece of paper     11:42:56
8    that a physician would sign indicating their  11:42:58
9    desire to prescribe Exalgo.  That would then  11:43:05
10   go to the pharmacy as sort of a testament for  11:43:09
11   them to stock the product because they had a  11:43:12
12   physician that wanted to prescribe the     11:43:14
13   product.                                  11:43:15
14       Q.    How would those stocking        11:43:15
15   request forms get to the pharmacy?         11:43:17
16           MR. DAVISON:  Objection.          11:43:19
17           THE WITNESS:  I don't know        11:43:19
18       specifically.                          11:43:21
19   QUESTIONS BY MR. CHALOS:                   11:43:21
20       Q.    Is that something that the       11:43:22
21   sales reps would bring to the pharmacy?    11:43:23
22           MR. DAVISON:  Objection.          11:43:25
23           THE WITNESS:  I believe they      11:43:25
24       could, but I don't know specifically.  11:43:26
25

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1  QUESTIONS BY MR. CHALOS:            11:43:27
2      Q.   Okay.  What are trade      11:43:29
3  communications?                     11:43:31
4      A.   I don't know.              11:43:31
5      Q.   How about product monographs?  11:43:32
6      A.   Yeah, that -- that was     11:43:34
7  developed.                          11:43:36
8      Q.   Okay.  Did you have any role in  11:43:36
9  determining whether wholesalers would get  11:43:39
10 rebates on any of the Mallinckrodt products?  11:43:43
11     A.   I did not.                 11:43:44
12     Q.   Were there speaker programs for  11:43:45
13 the wholesalers, retail pharmacies or MCOs?  11:43:48
14     A.   Generally not.             11:43:51
15     Q.   How about an advisory board?  11:43:53
16     A.   Not that I can recall.     11:43:55
17     Q.   Okay.  Did you have any role in  11:43:56
18 discussions with third-party payers about  11:44:02
19 getting Exalgo on formularies?      11:44:05
20     A.   No.                        11:44:07
21     Q.   Okay.  What is a pharmacy  11:44:07
22 Pharm/alert?                        11:44:11
23     A.   I think it's like a -- an  11:44:12
24 e-mail blast.                       11:44:16
25     Q.   Okay.  And did -- were there  11:44:17

Page 143

1  any pharmacy Pharm/alerts associated with  11:44:19
2  Exalgo?                             11:44:23
3      A.   I can't recall specifically.  11:44:23
4      Q.   Okay.                      11:44:25
5      A.   I believe so.              11:44:25
6      Q.   But you believe so, you said?  11:44:26
7      A.   Yes.                       11:44:27
8      Q.   Okay.  How about an MCO    11:44:28
9  contracting?                        11:44:30
10     A.   I'm sure we contracted with  11:44:30
11 managed care organizations.         11:44:32
12     Q.   Okay.  And then with respect to  11:44:33
13 tactics and tools associated with patients,  11:44:35
14 was there a patient welcome kit developed?  11:44:38
15     A.   I believe so.              11:44:42
16     Q.   Okay.  What does patient   11:44:42
17 education mean there?               11:44:44
18     A.   I believe it was a brochure  11:44:44
19 that -- that talked about how to safely use  11:44:47
20 the product, so it reinforced the medication  11:44:53
21 guide developed by the FDA for the product in  11:44:56
22 association with the package insert.  11:44:58
23     Q.   Okay.  Was there a co-pay  11:45:02
24 discount program for Exalgo?        11:45:04
25     A.   I believe so.              11:45:05

Page 144

1      Q.   And the MOD video you don't --  11:45:06
2      A.   I can't remember.          11:45:09
3      Q.   Okay.  How about a transition  11:45:10
4  tool?                               11:45:12
5      A.   I can't remember that      11:45:12
6  specifically.                       11:45:13
7      Q.   Okay.  Was there a product  11:45:14
8  website developed that had a section intended  11:45:15
9  to target patients?                 11:45:20
10     A.   I believe there was a section  11:45:22
11 for patients that is written in a language  11:45:24
12 that patients can understand their  11:45:29
13 requirements about, you know, the education  11:45:31
14 level that you have to target for that  11:45:33
15 language.                           11:45:35
16     Q.   Okay.  And if you flip to the  11:45:36
17 next page, page 18, yeah, budget allocation,  11:45:40
18 I haven't added all these up, but do you  11:45:51
19 recall whether the final budget allocation  11:45:56
20 for fiscal year 2010 ended up breaking down  11:45:59
21 the way it's depicted on page 18 of  11:46:06
22 Exhibit 13?                         11:46:12
23     A.   I can't recall.            11:46:12
24     Q.   Okay.  You can put that aside  11:46:13
25 for now.                            11:46:15

Page 145

1           (Mallinckrodt-Wessler Exhibit  11:46:41
2      14 marked for identification.)  11:46:41
3  QUESTIONS BY MR. CHALOS:            11:46:42
4      Q.   Let's mark as Exhibit 14 a  11:46:42
5  document, Bates MNK-T1_0001188838.  And it is  11:46:44
6  a presentation that says, "Specialty  11:46:53
7  pharmaceuticals, medical affairs team  11:46:56
8  meeting, February 18, 2010."        11:46:59
9           Hand you that.  And it's a  11:47:02
10 relatively long document here.  I'm going to  11:47:08
11 focus you on the Exalgo section.  You can  11:47:11
12 feel free to review as much of this as you  11:47:17
13 want, but the Exalgo plan which starts, it  11:47:21
14 looks like, page 21 and goes through page 36.  11:47:25
15 But you can look through the whole document  11:47:43
16 if you'd like.                      11:47:45
17          Tell me when you've had a    11:47:46
18 chance to review all of that.       11:49:32
19     A.   Certainly.                 11:49:33
20     Q.   My first question is going to  11:49:37
21 be -- if you look at the second page, it  11:49:41
22 says, "Exalgo plan, Mike."          11:49:42
23          My question is going to be, is  11:49:43
24 that you?                           11:49:48
25     A.   I can't recall this        11:49:48

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1  specifically, but I would presume that "Mike"  11:50:04
2  is me.                                         11:50:07
3      Q.   Okay.  So let's start at --           11:50:08
4  let's see here.  We'll look at the Exalgo      11:50:13
5  section here starting on page 21.  It's not    11:50:15
6  numbered, but it comes --                      11:50:21
7      A.   Oh, I thought it was numbered.        11:50:23
8      Q.   It is.  I'm saying that that          11:50:25
9  page is not numbered.                          11:50:28
10     A.   Oh, okay.                              11:50:28
11     Q.   It says, "Exalgo plan."  It's         11:50:32
12 on the cover page.                             11:50:32
13     A.   Yes.                                   11:50:32
14     Q.   It's between 21 and -- I'm            11:50:34
15 sorry, it's between 20 and 22, so we'll call   11:50:34
16 it 21.                                         11:50:36
17     A.   Okay.                                  11:50:36
18     Q.   So do you know whether you            11:50:39
19 prepared this section of the presentation?     11:50:44
20     A.   I do not.                              11:50:46
21     Q.   Okay.  Do you recall presenting       11:50:46
22 this section at a medical affairs team         11:50:49
23 meeting in 2010?                               11:50:51
24     MR. DAVISON:  Objection.                    11:50:53
25     THE WITNESS:  I do not.                     11:50:53

Page 147

1  QUESTIONS BY MR. CHALOS:                       11:50:54
2      Q.   Okay.  Let's look at then             11:50:57
3  page 24 --                                     11:51:09
4      A.   Okay.                                  11:51:10
5      Q.   -- "Exalgo brand strategy."           11:51:11
6          Is the brand strategy something        11:51:17
7  that you had a role in developing?             11:51:19
8      A.   I believe so.                          11:51:20
9      Q.   Okay.  First, on the left-hand        11:51:21
10 side, the top bullet point there says,         11:51:26
11 "Barriers, negative perceptions of            11:51:28
12 hydromorphone:  Old, too potent and street     11:51:31
13 value, and in parentheses, abuse."             11:51:35
14         Do you see that?                        11:51:37
15     A.   Yes.                                   11:51:38
16     Q.   Okay.  Do you have any idea           11:51:38
17 what that means as you sit here today?         11:51:39
18     A.   I think that that was a               11:51:41
19 perception that was common for Dilaudid,       11:51:44
20 which was the immediate release hydromorphone  11:51:47
21 product.                                       11:51:51
22     Q.   How did you know that at the          11:51:51
23 time?                                          11:51:53
24     MR. DAVISON:  Objection.                    11:51:53
25     THE WITNESS:  I can't remember.            11:51:54

Page 148

1      I can't recall.                            11:51:55
2  QUESTIONS BY MR. CHALOS:                       11:51:55
3      Q.   Is there an opioid problem in         11:52:07
4  the US today?                                  11:52:09
5      MR. DAVISON:  Objection.                    11:52:10
6      THE WITNESS:  That's a very                11:52:10
7  broad question.                                11:52:15
8  QUESTIONS BY MR. CHALOS:                       11:52:17
9      Q.   Yeah.                                  11:52:17
10     A.   Can you be more specific?             11:52:17
11     Q.   Yeah.  Have you heard anything        11:52:18
12 about the issue of opioids in the United       11:52:20
13 States today?                                  11:52:23
14     MR. DAVISON:  Objection.  Form.            11:52:23
15     THE WITNESS:  Sure, it's on the           11:52:24
16 news.                                          11:52:25
17 QUESTIONS BY MR. CHALOS:                       11:52:26
18     Q.   Yeah.                                  11:52:26
19         What have you heard about it?          11:52:26
20     A.   Just what you mentioned, that         11:52:27
21 there's an opioid problem.                     11:52:30
22     Q.   Do you think that                     11:52:31
23 Mallinckrodt's marketing of opioids had any    11:52:40
24 role in causing or contributing to the opioid  11:52:44
25 problem that we have today?                    11:52:47

Page 149

1      MR. DAVISON:  Objection.                    11:52:48
2      THE WITNESS:  No.                           11:52:48
3  QUESTIONS BY MR. CHALOS:                       11:52:48
4      Q.   Why do you say that?                  11:52:50
5      A.   I believe our materials were          11:52:51
6  compliant with FDA regulations, and I believe  11:52:53
7  we marketed the products responsibly.  And     11:52:56
8  ultimately it was physicians who made          11:53:00
9  decisions on to whom to prescribe products.    11:53:02
10     Q.   Do you think physicians ever          11:53:05
11 prescribed Mallinckrodt products              11:53:09
12 inappropriately?                               11:53:10
13     MR. DAVISON:  Objection.                    11:53:11
14     THE WITNESS:  I can't                      11:53:11
15 speculate.                                     11:53:12
16 QUESTIONS BY MR. CHALOS:                       11:53:12
17     Q.   If you'd look at page 27 --          11:53:16
18 sorry, 25, "Exalgo brand strategy."  Look at   11:53:20
19 the left side of strategy, bottom bullet       11:53:40
20 point:  "Disrupt and gradient prescribing      11:53:44
21 habits through the value proposition for       11:53:46
22 Exalgo."                                       11:53:49
23         Do you see that?                        11:53:49
24     A.   Yes.                                   11:53:49
25     Q.   What does that mean?                  11:53:49

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1    MR. DAVISON: Objection.                11:53:51
2    THE WITNESS: Differentiate             11:53:52
3    Exalgo from competitive products.      11:53:54
4    QUESTIONS BY MR. CHALOS:               11:53:56
5    Q.   Okay. Let's go back one page      11:53:58
6    to page 24, under Barriers. The last bullet   11:53:59
7    said, "One of the barriers is engrained       11:54:06
8    prescribing habits that reserve use."         11:54:08
9         Do you see that?                  11:54:11
10   A.   No.                              11:54:11
11   Q.   Bottom left under "Reposition    11:54:12
12   Hydromorphone Barriers."               11:54:16
13   A.   Oh, okay.                        11:54:17
14   Q.   "Engrained prescribing habits    11:54:18
15   that reserve use."                     11:54:19
16        Do you see that?                  11:54:20
17   A.   Yes.                             11:54:21
18   Q.   What does that mean?             11:54:22
19        MR. DAVISON: Objection.          11:54:23
20        THE WITNESS: I can't recall.     11:54:24
21   QUESTIONS BY MR. CHALOS:               11:54:24
22   Q.   Okay. Is one of the goals of     11:54:27
23   Mallinckrodt's marketing of Exalgo to change   11:54:30
24   the physician's prescribing habits to include  11:54:33
25   Mallinckrodt's product?                11:54:37

Page 151

1         MR. DAVISON: Objection.          11:54:38
2         THE WITNESS: I would say the     11:54:39
3    goal of our product promotion is to   11:54:40
4    educate physicians on the safe and    11:54:45
5    appropriate use of Exalgo and         11:54:49
6    differentiate it from the competition 11:54:51
7    so that they could make a decision on 11:54:53
8    to whom to prescribe the product.     11:54:55
9    QUESTIONS BY MR. CHALOS:               11:54:57
10   Q.   Was the hope of -- or I'm        11:55:00
11   sorry. Was the goal of the marketing effort    11:55:01
12   to have physicians prescribe competitors'      11:55:03
13   products?                             11:55:08
14        MR. DAVISON: Objection.          11:55:08
15        THE WITNESS: I don't believe     11:55:09
16   that was a goal unless it was for -- I  11:55:10
17   mean, it's all about prescribing it    11:55:14
18   for the appropriate patients, so if    11:55:15
19   competitive product made more sense    11:55:19
20   for that particular physician. But     11:55:20
21   that's all within the purview of the   11:55:22
22   physician and their decision,          11:55:24
23   ultimately.                           11:55:28
24   QUESTIONS BY MR. CHALOS:               11:55:28
25   Q.   So it didn't matter to           11:55:28

Page 152

1    Mallinckrodt whether physicians prescribed    11:55:30
2    competitors' products or their own products?   11:55:31
3         MR. DAVISON: Objection.          11:55:35
4         THE WITNESS: Does it matter      11:55:35
5    whether -- well, it was -- we were     11:55:39
6    most concerned with making sure that   11:55:40
7    physicians wrote the product for       11:55:42
8    patients for whom they felt made the   11:55:44
9    most sense for Exalgo and they were    11:55:47
10   the appropriate patients.             11:55:49
11   QUESTIONS BY MR. CHALOS:               11:55:51
12   Q.   Right.                          11:55:51
13        At the end of the day, though,   11:55:51
14   the bottom line was, your goal as a marketing  11:55:52
15   man was to get physicians to prescribe 11:55:54
16   Mallinckrodt products, right?          11:55:56
17        MR. DAVISON: Objection.          11:55:57
18        THE WITNESS: For the            11:55:57
19   appropriate patients.                 11:55:57
20   QUESTIONS BY MR. CHALOS:               11:55:59
21   Q.   Yes, for the appropriate        11:55:59
22   patients?                             11:56:00
23   A.   Yes, for the appropriate        11:56:00
24   patients.                             11:56:01
25   Q.   Okay. If you look at page 27    11:56:02

Page 153

1    of Exhibit 14, "Exalgo positioning."  11:56:06
2         Do you see that?                  11:56:17
3    A.   Yes.                             11:56:17
4    Q.   It says, "For opioid-tolerant   11:56:17
5    patients with moderate to severe chronic      11:56:24
6    pain, Exalgo provides smooth, steady  11:56:26
7    hydromorphone blood levels that eliminate the  11:56:29
8    peaks and troughs resulting in 24-hour,        11:56:31
9    continuous chronic pain relief."      11:56:34
10        Do you see that?                  11:56:36
11   A.   Yes.                             11:56:37
12   Q.   That is an accurate statement   11:56:38
13   of the positioning of Exalgo in the market?    11:56:39
14        MR. DAVISON: Objection.          11:56:42
15        THE WITNESS: As I recall.        11:56:43
16   QUESTIONS BY MR. CHALOS:               11:56:44
17   Q.   Yeah. Okay.                      11:56:44
18        And the marketing messages that  11:56:49
19   were associated with Exalgo were in support    11:56:51
20   of this positioning?                   11:56:54
21        MR. DAVISON: Objection.          11:56:56
22        THE WITNESS: Assuming this is    11:56:57
23   the final positioning statement. I    11:56:57
24   think this might have been a document  11:56:59
25   that was developed prior to the       11:57:01

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1    launch.                              11:57:03
2    QUESTIONS BY MR. CHALOS:              11:57:04
3        Q.   Okay.  Do you recall any     11:57:04
4    changes to the positioning of Exalgo?  11:57:05
5        A.   I don't remember.            11:57:07
6        Q.   If you flip over to 28, Core  11:57:08
7    Messaging, the first bullet point is, "New  11:57:15
8    therapies are needed in the treatment of  11:57:27
9    chronic pain."                        11:57:28
10       Do you see that?                 11:57:29
11       A.   Yes.                        11:57:29
12       Q.   What does that mean?        11:57:29
13           MR. DAVISON:  Objection.     11:57:31
14           THE WITNESS:  I believe that it  11:57:31
15   means that it's important for         11:57:32
16   physicians to have multiple options in  11:57:34
17   managing patients with chronic pain.  11:57:36
18   QUESTIONS BY MR. CHALOS:              11:57:38
19       Q.   Let's flip over to page 34 in  11:57:47
20   Exhibit 14, "Exalgo Tactical Components."  11:57:52
21       Do you see that?                 11:57:59
22       A.   Yes.                        11:58:00
23       Q.   Okay.  These -- it's got, let  11:58:02
24   me see, five categories here:  nonpersonal,  11:58:06
25   medical education, personal, planning and  11:58:10

Page 155

1    market research.                      11:58:13
2        Do you see that?                 11:58:14
3        A.   Yes.                        11:58:15
4        Q.   Are these all categories that  11:58:15
5    ultimately Mallinckrodt undertook tactics in  11:58:18
6    with respect to Exalgo?              11:58:22
7            MR. DAVISON:  Objection.     11:58:23
8            THE WITNESS:  I can't recall in  11:58:23
9    2010.                                11:58:28
10   QUESTIONS BY MR. CHALOS:              11:58:28
11       Q.   Okay.  What about throughout  11:58:29
12   the life of the Exalgo product's promotion?  11:58:30
13       A.   I'm not sure I understand the  11:58:34
14   question.                            11:58:35
15       Q.   Yeah, these -- I'm saying, did  11:58:35
16   Mallinckrodt use tactics from all five of  11:58:37
17   these categories in connection with promoting  11:58:40
18   Exalgo at any time?                  11:58:44
19           MR. DAVISON:  Objection.     11:58:44
20           THE WITNESS:  Perhaps.  I     11:58:45
21   believe so.  I can't recall          11:58:49
22   specifically.  I believe so.         11:58:50
23       If you're asking did              11:58:52
24   Mallinckrodt embark upon, you know,   11:58:53
25   tactics from each one of these five  11:58:58

Page 156

1    categories throughout the life of     11:59:01
2    Exalgo, I believe that is the case.   11:59:02
3    QUESTIONS BY MR. CHALOS:              11:59:03
4        Q.   Okay.  If you flip over to the  11:59:04
5    next page, 35, "Critical success factors for  11:59:05
6    Exalgo."                             11:59:14
7        Do you see that?                 11:59:14
8        A.   Yes.                        11:59:15
9        Q.   Okay.  The third one, "Pharmacy  11:59:15
10   stocking to enable demand generation."  11:59:19
11       Do you see that?                 11:59:21
12       A.   Yes.                        11:59:21
13       Q.   There is that "demand        11:59:22
14   generation" phrase again.            11:59:25
15       Did that come out of your         11:59:26
16   mouth; do you think?                 11:59:28
17           MR. DAVISON:  Objection.     11:59:28
18           THE WITNESS:  I don't remember.  11:59:29
19   QUESTIONS BY MR. CHALOS:              11:59:29
20       Q.   Okay.  "Pharmacy stocking to  11:59:30
21   enable demand generation," what does that  11:59:31
22   mean?                                11:59:33
23           MR. DAVISON:  Objection.     11:59:33
24           THE WITNESS:  I believe that  11:59:34
25   means having the product available for  11:59:35

Page 157

1    physicians when they prescribed the   11:59:39
2    product for appropriate patients.    11:59:43
3    QUESTIONS BY MR. CHALOS:              11:59:44
4        Q.   Okay.  And who was going to  11:59:44
5    generate the demand in this concept?  11:59:45
6            MR. DAVISON:  Objection.     11:59:48
7            THE WITNESS:  That has to do  11:59:50
8    with physicians prescribing the       11:59:52
9    product, so the sales force would be  11:59:54
10   responsible for educating physicians  11:59:56
11   on the product for the appropriate   11:59:59
12   patients.                            12:00:01
13   QUESTIONS BY MR. CHALOS:              12:00:01
14       Q.   Okay.  With the goal of      12:00:01
15   generating demand for prescriptions for  12:00:03
16   appropriate patients?               12:00:05
17           MR. DAVISON:  Objection.     12:00:06
18           THE WITNESS:  With the goal of,  12:00:06
19   you know, the physician writing the  12:00:08
20   product when appropriate.            12:00:09
21   QUESTIONS BY MR. CHALOS:              12:00:10
22       Q.   Okay.  You can put that aside  12:00:11
23   then.                                12:00:15
24           THE WITNESS:  Are we going to  12:00:33
25   be taking take a lunch break soon?   12:00:33

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1    MR. CHALOS: Well, what I was    12:00:35
2  hoping is maybe we can get through    12:00:36
3  this and skip lunch and just be done,    12:00:38
4  if you guys can power through a little    12:00:39
5  bit.    12:00:41
6    MR. DAVISON: Why don't we take    12:00:41
7  a quick break and we can discuss --    12:00:42
8    THE WITNESS: Yeah, I just need    12:00:43
9  a quick --    12:00:44
10    MR. CHALOS: No problem. And    12:00:44
11  then I think I could probably do the    12:00:45
12  rest in 45 minutes, so...    12:00:47
13    MR. DAVISON: Okay.    12:00:48
14    VIDEOGRAPHER: We are going off    12:00:49
15  the record at 12 p.m.    12:00:50
16    (Off the record at 12:00 p m.)    12:00:52
17    VIDEOGRAPHER: We are back on    12:07:49
18  the record at 12:07 p.m.    12:07:50
19    (Mallinckrodt-Wessler Exhibit    12:07:52
20  15 marked for identification.)    12:07:53
21  QUESTIONS BY MR. CHALOS:    12:07:53
22    Q.  Okay. Let's mark as Exhibit 15    12:07:54
23  MNK-T1_0000778285 through 8350. It's    12:07:56
24  Exhibit 15.    12:08:09
25    A.  Okay.    12:08:09

Page 159

1    Q.  You can take as much time as    12:08:09
2  you need to review that.    12:08:15
3    My first question will be what    12:08:24
4  role, if any, did you have in preparing this    12:08:26
5  document?    12:08:28
6    A.  Okay.    12:08:28
7    Q.  Okay. So what role, if any,    12:11:31
8  did you have in preparing this document?    12:11:35
9    A.  I don't recall specifically,    12:11:37
10  but I'm sure I participated in, you know,    12:11:39
11  development of the market -- some of the    12:11:43
12  marketing components of this.    12:11:44
13    Q.  Okay.    12:11:46
14    A.  But I can't recall specifically    12:11:46
15  who developed this.    12:11:47
16    Q.  Was this launch update    12:11:48
17  presented at a meeting of some kind?    12:11:51
18    A.  It seems so.    12:11:53
19    Q.  Okay.    12:11:55
20    A.  I don't know if this was    12:11:55
21  ultimately presented, but it would make    12:11:56
22  sense.    12:12:01
23    Q.  Okay. The front page says,    12:12:02
24  "32-milligram launch update, June 25th of    12:12:03
25  2012."    12:12:07

Page 160

1    Do you recall a launch meeting    12:12:08
2  for Exalgo at some point?    12:12:10
3    A.  There were lots of launch    12:12:12
4  meetings.    12:12:15
5    Can you be more specific?    12:12:15
6    Q.  Yeah. I mean, was there one    12:12:16
7  big, like, kickoff launch event?    12:12:19
8    A.  With the sales force or period    12:12:21
9  or --    12:12:23
10    Q.  Well, let's start with the    12:12:23
11  sales force.    12:12:25
12    Was there one with the sales    12:12:25
13  force?    12:12:27
14    A.  There was one with the sales    12:12:27
15  force where we trained them on, you know, the    12:12:29
16  new marketing tools.    12:12:30
17    Q.  Okay. Was there one with    12:12:31
18  anybody other than the sales force?    12:12:32
19    A.  Not that I recall. But, I    12:12:33
20  mean, there were all kinds of meetings that    12:12:36
21  talked about the launch of the product --    12:12:37
22    Q.  Okay.    12:12:39
23    A.  -- certainly.    12:12:40
24    Q.  Let's look at the page -- let    12:12:42
25  me see. It's 8288. It's like the fourth    12:12:46

Page 161

1  page of Exhibit 15.    12:12:51
2    Market opportunity?    12:12:54
3    A.  Yeah.    12:12:58
4    Q.  It says, "High-strength    12:12:59
5  prescriptions make up 66 percent of the    12:13:02
6  market dollars."    12:13:10
7    Do you see that?    12:13:11
8    A.  Yes.    12:13:12
9    Q.  Okay. There's a source,    12:13:13
10  IMS/NSP, written on the bottom left.    12:13:15
11    Do you see that?    12:13:18
12    A.  Yes.    12:13:18
13    Q.  Is this data that you think you    12:13:19
14  pulled together for this presentation?    12:13:20
15    A.  I don't recall. I think    12:13:22
16  generally this type of information would be    12:13:24
17  pulled from the ops team.    12:13:26
18    Q.  The ops team?    12:13:28
19    A.  Sales operations.    12:13:30
20    Q.  Okay.    12:13:31
21    A.  Because I don't remember having    12:13:31
22  access to IMS/NSP.    12:13:33
23    Q.  Okay. If you would turn,    12:13:37
24  please, to 8293, Launch Objectives.    12:13:42
25    Did you have any role in    12:13:55

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1 preparing this section, do you think, launch 12:14:02
2 objectives? 12:14:06
3 A. I really don't remember. 12:14:06
4 Q. Okay. If you look at -- and 12:14:07
5 let's back up here. 12:14:10
6 The 32-milligram launch, this 12:14:11
7 is a new dosage of an existing product on the 12:14:14
8 market, Exalgo, right? 12:14:17
9 A. Correct. 12:14:18
10 Q. So prior to this launch, the -- 12:14:18
11 Exalgo was available in up to 16-milligram 12:14:22
12 dosage? 12:14:25
13 A. Specifically 8-milligram, 12:14:25
14 12-milligram and 16-milligram strengths. 12:14:27
15 Q. Okay. So what was being 12:14:28
16 launched here in 2012 was same drug but at a 12:14:31
17 higher dosage level; is that right? 12:14:35
18 A. Yes. 12:14:37
19 Q. Okay. The -- under launch 12:14:38
20 objectives, back to page 8923, the fifth row 12:14:45
21 says, "Exalgo mean dose exit as a launch 12:14:49
22 objective." Fiscal year '12 was 12:14:54
23 21 milligrams. Fiscal year '13 was 12:14:57
24 32 milligrams. 12:14:59
25 Do you see that? 12:15:00

Page 163

1 A. Yes. 12:15:00
2 Q. Do you have any idea what all 12:15:00
3 of that means? 12:15:01
4 A. I do not recall. 12:15:02
5 Q. Was one of the launch 12:15:03
6 objectives to increase the mean dose of 12:15:07
7 Exalgo among patients? 12:15:09
8 MR. DAVISON: Objection. 12:15:10
9 THE WITNESS: Not that I can 12:15:13
10 recall. 12:15:14
11 QUESTIONS BY MR. CHALOS: 12:15:14
12 Q. Okay. Were you involved in the 12:15:19
13 pricing of Exalgo? 12:15:20
14 A. I participated in meetings on 12:15:22
15 the pricing. 12:15:24
16 Q. Okay. Did you have input into 12:15:25
17 the pricing strategy? 12:15:26
18 A. Limited. 12:15:28
19 Q. Limited to what? 12:15:30
20 A. I mean, I had input, but I 12:15:31
21 wasn't a decision-maker on the final price. 12:15:34
22 Q. Okay. If you look at 12:15:36
23 page 8303, "Pricing sensitivity analysis, 12:15:45
24 executive summary." 12:15:53
25 Do you see that? 12:15:53

Page 164

1 A. Yes. 12:15:55
2 Q. Okay. And you can look at all 12:15:56
3 this, but the recommendation ultimately was 12:15:59
4 that a 5 percent premium price on the 12:16:03
5 32-milligram dose at launch realizes about 8 12:16:07
6 million in net sales. 12:16:10
7 Do you see that? 12:16:11
8 A. Yes. 12:16:12
9 MR. DAVISON: Objection. 12:16:13
10 QUESTIONS BY MR. CHALOS: 12:16:13
11 Q. Did you have any role in 12:16:13
12 forming that recommendation? 12:16:16
13 A. Not that I can recall. 12:16:17
14 Q. You can flip then to page 8305. 12:16:19
15 It says, "Wholesaler off invoice-OI." 12:16:31
16 Do you see that? 12:16:36
17 A. Yes. 12:16:36
18 Q. What does that mean? 12:16:38
19 A. I don't recall. 12:16:39
20 Q. Did you have any role in 12:16:40
21 establishing an off-invoice program for 12:16:45
22 wholesalers? 12:16:49
23 MR. DAVISON: Objection. 12:16:49
24 THE WITNESS: Not that I can 12:16:49
25 recall. That was generally handled by 12:16:51

Page 165

1 our sort of trade group. 12:16:53
2 QUESTIONS BY MR. CHALOS: 12:16:53
3 Q. Okay. If you flip then to 12:16:54
4 8307, "Retail stocking incentive program." 12:17:02
5 It's "pharmacy stock incentive program 12:17:09
6 considerations for 32-milligram launch." 12:17:12
7 Did you have any role in the 12:17:14
8 retail stocking incentive program for 12:17:16
9 pharmacies? 12:17:19
10 A. Similar to the previous 12:17:20
11 question, not that I can recall. It was 12:17:22
12 usually handled by our trade group. 12:17:24
13 Q. Okay. Let's flip these to 12:17:28
14 8309, "Stocking Tools." 12:17:33
15 "Physician stocking request 12:17:34
16 pad." 12:17:45
17 Do you see that pad? 12:17:45
18 A. Yes. 12:17:46
19 Q. Is this -- in the bottom right 12:17:47
20 there's a little picture of something called 12:17:50
21 a physician stocking request. 12:17:51
22 Do you see that? 12:17:53
23 A. Yes. 12:17:54
24 Q. Is that something that was 12:17:54
25 printed by Mallinckrodt and given to doctors? 12:17:56

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1    A.   It wasn't printed by          12:17:59
2  Mallinckrodt; it was printed by one of our    12:18:00
3  printing vendors.  But, yes, it was -- it was  12:18:02
4  used by the sales representatives.       12:18:07
5    Q.    Okay.  And they would present    12:18:10
6  this to a doctor for the doctor's signature?   12:18:11
7         MR. DAVISON:  Objection.       12:18:14
8         THE WITNESS:  I believe so.     12:18:15
9  QUESTIONS BY MR. CHALOS:             12:18:18
10   Q.    Okay.              12:18:21
11   A.   I know that's how they were      12:18:22
12 trained.               12:18:24
13   Q.    That is how they were trained?   12:18:24
14   A.   I believe so.          12:18:26
15   Q.    Okay.  Were they also trained    12:18:27
16 to then carry the physician stocking request  12:18:28
17 to the pharmacy themselves, meaning the sales  12:18:31
18 reps do that?            12:18:35
19        MR. DAVISON:  Objection.       12:18:36
20        THE WITNESS:  I believe they     12:18:37
21 would.                12:18:40
22 QUESTIONS BY MR. CHALOS:             12:18:40
23   Q.    Is that how they were trained?   12:18:40
24   A.   I believe so.          12:18:41
25   Q.    Okay.              12:18:42

Page 167

1    A.   But I can't recall          12:18:42
2  specifically.             12:18:43
3    Q.    All right.  Let's go back to    12:18:44
4  8308, which is the preceding page.  It's     12:18:46
5  "Trade Communications."            12:18:53
6         Do you see that?           12:18:54
7    A.   Yes.               12:18:54
8    Q.    "e-Pharm alert to coincide with  12:18:55
9  product availability, reaching 176,000     12:18:58
10 pharmacists."            12:19:01
11        Do you see that?           12:19:01
12   A.   Yes.               12:19:01
13   Q.    Was that actually done in       12:19:02
14 connection with the Exalgo 32 milligrams?    12:19:04
15   A.   I can't recall.          12:19:05
16   Q.    Was there a product           12:19:06
17 announcement letter to retailers in        12:19:07
18 connection with this launch?           12:19:10
19   A.   I can't recall if that ever     12:19:11
20 went out.             12:19:13
21   Q.    Okay.  Do you know whether any   12:19:14
22 of the bullet points on page 8308 of       12:19:15
23 Exhibit 15 ever actually occurred with      12:19:21
24 respect to Exalgo 32 milligrams?         12:19:22
25   A.   I cannot recall.          12:19:24

Page 168

1    Q.    Okay.  Let's please turn to     12:19:25
2  8312, "New Dose Conversion Tools."        12:19:32
3         First bullet point is, "New     12:19:39
4  dosing guide rolled out at April POA       12:19:50
5  meeting."              12:19:53
6         Do you see that?           12:19:54
7    A.   Yes.               12:19:54
8    Q.    What's POA?             12:19:55
9    A.   I think it's plan of action.    12:19:55
10   Q.    Okay.  Was there a new dosing   12:19:57
11 guide produced in connection with Exalgo     12:19:58
12 32 milligrams?           12:20:00
13   A.   I believe so, but I can't       12:20:01
14 recall.               12:20:03
15   Q.    Okay.  Was there a free trial   12:20:03
16 program for patients to receive a free trial  12:20:07
17 of Exalgo?             12:20:10
18   A.   I believe so.          12:20:10
19   Q.    Okay.  Was there a new iPad app  12:20:11
20 introduced at some point?          12:20:14
21   A.   I believe so.          12:20:14
22   Q.    And do you know, was there an   12:20:15
23 Exalgo regional teleconference series?     12:20:17
24   A.   That, I don't know.        12:20:20
25   Q.    Okay.  If you'd flip to the    12:20:22

Page 169

1  next page, 8313.           12:20:23
2    A.   Yes.               12:20:30
3    Q.    Was there a three-star        12:20:31
4  prescriber and 16-milligram pharmacy       12:20:33
5  targeting program rolled out with respect to  12:20:35
6  Exalgo 32 milligrams?          12:20:37
7         MR. DAVISON:  Objection.       12:20:38
8         THE WITNESS:  Not that I can    12:20:38
9  recall.               12:20:39
10 QUESTIONS BY MR. CHALOS:             12:20:39
11   Q.    Okay.  Let's flip, please, to   12:20:40
12 82 -- sorry, 8323.           12:20:52
13   A.   Sorry, you said 8323?        12:20:55
14   Q.    8323, yes, sir, "Concept rank."  12:20:58
15   A.   Okay.              12:21:01
16   Q.    And there are one, two, three,  12:21:02
17 four, five marketing concepts outlined here  12:21:08
18 with little pictures on the right.       12:21:14
19        Do you see that?           12:21:16
20   A.   Yes.               12:21:16
21   Q.    Were all five of these concepts  12:21:17
22 ultimately used with connection -- in       12:21:19
23 connection with Exalgo 32 milligrams?      12:21:22
24   A.   No.               12:21:23
25   Q.    Which ones were used, if you    12:21:24

Highly Confidential - Subject to Further Confidentiality Review

Page 170

```
1   remember?                        12:21:25
2       A.   I believe just the top one.   12:21:25
3       Q.   "Change the face of pain"?    12:21:27
4       A.   Correct.                 12:21:28
5       Q.   Okay.  With the woman peeling    12:21:29
6   her face off?                     12:21:33
7            MR. DAVISON:  Objection.    12:21:34
8            THE WITNESS:  Correct.     12:21:34
9   QUESTIONS BY MR. CHALOS:          12:21:35
10      Q.   Okay.  Did you design that   12:21:36
11  concept?                          12:21:37
12      A.   I did not.               12:21:37
13      Q.   Do you know who did?       12:21:38
14      A.   Our advertising agency.    12:21:40
15      Q.   Okay.  If you can flip to 8337   12:21:42
16  of Exhibit 15, "Catalina marketing   12:21:47
17  persistency."                     12:22:03
18           Do you see that?          12:22:04
19      A.   Yes.                     12:22:05
20      Q.   There's a program design with a   12:22:05
21  set of bullet points about messaging Exalgo   12:22:07
22  patients.                         12:22:08
23           Did that ever actually happen?   12:22:08
24      A.   Not to my recollection.    12:22:11
25      Q.   Catalina marketing, is that an   12:22:12
```

Page 171

```
1   outside vendor?                   12:22:14
2       A.   I believe so.            12:22:15
3       Q.   Okay.  Was there ever any   12:22:16
4   messaging to existing Exalgo patients   12:22:18
5   directly?                         12:22:26
6            MR. DAVISON:  Objection.    12:22:27
7            THE WITNESS:  Not that I can   12:22:27
8   recall.                           12:22:29
9   QUESTIONS BY MR. CHALOS:          12:22:29
10      Q.   In other words, they're out   12:22:30
11  running a program where -- messages going out   12:22:34
12  to Exalgo patients when they're filling the   12:22:36
13  prescription, between the fills and being   12:22:38
14  late on fills.                    12:22:41
15           Is there any such program,   12:22:42
16  whether it's Catalina or any other vendor?   12:22:44
17           MR. DAVISON:  Objection.    12:22:47
18           THE WITNESS:  Is there any such   12:22:47
19      a program, or did Exalgo use any such   12:22:49
20      a program?                    12:22:51
21  QUESTIONS BY MR. CHALOS:          12:22:52
22      Q.   Right, did Exalgo use any such   12:22:52
23  a program.                        12:22:54
24      A.   Not to my knowledge.  Not that   12:22:55
25  I can remember.                   12:22:58
```

Page 172

```
1       Q.   Okay.  How about if you flip to   12:22:58
2   the next page, "Adheris Marketing   12:22:59
3   Persistency."                     12:23:05
4            Was this program ever       12:23:12
5   implemented with respect to Exalgo?   12:23:14
6       A.   Not to my knowledge.       12:23:15
7            (Mallinckrodt-Wessler Exhibit   12:23:32
8       16 marked for identification.)   12:23:32
9   QUESTIONS BY MR. CHALOS:          12:23:32
10      Q.   I'll mark as Exhibit 16    12:23:41
11  MNK-T1_0000942223, and it says "FY '15   12:23:48
12  Xartemis XR Brand Planning, Key Strategic   12:23:58
13  Imperatives and Critical Success Factors,   12:24:01
14  August 7, 2014, Michael Wessler, product   12:24:05
15  director."                        12:24:08
16           First question will be, did you   12:24:09
17  prepare this or was it prepared at your   12:24:26
18  direction?                        12:24:27
19           Okay.  You ready?         12:26:49
20      A.   Yes.                     12:26:50
21      Q.   So did you prepare this     12:26:50
22  preparation or was it prepared at your   12:26:53
23  direction?                        12:26:55
24      A.   I don't recall specifically.   12:26:55
25      Q.   Do you recall giving this    12:26:59
```

Page 173

```
1   presentation somewhere?           12:27:01
2       A.   I don't recall.          12:27:02
3       Q.   Xartemis was -- well, let's   12:27:04
4   flip over to the second page.  We'll just   12:27:11
5   look at this.                     12:27:14
6       A.   Sure.                    12:27:15
7       Q.   The brand vision for Xartemis   12:27:15
8   was to establish Xartemis XR as the   12:27:17
9   first-line opioid agent for acute pain in   12:27:22
10  targeted accounts; is that right?   12:27:25
11      A.   That's what it says, yes.   12:27:27
12      Q.   What is a targeted account?   12:27:29
13      A.   That would be physicians'   12:27:32
14  offices where our sales representatives were   12:27:34
15  educating.                        12:27:38
16      Q.   Okay.  If you flip, please,   12:27:40
17  to -- well, no page numbers.  Strategic   12:28:00
18  imperative number 1, the second page of it,   12:28:04
19  it says, "key insight" -- oh, wait.  Whoa,   12:28:08
20  wait a minute.  What?  There are --   12:28:10
21           So "Strategic imperative   12:28:13
22  number 1, key insight, surgery center   12:28:15
23  show" -- no, it's the next one, I think.   12:28:20
24  Yeah, there it is.                 12:28:24
25           Okay.  Well, it says,      12:28:25
```

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1 "Strategic imperative number 1, CSF 2,     12:28:30
2 explore leveraging hospital sales force."     12:28:36
3          Do you see that?          12:28:40
4     A.   Yes.               12:28:40
5     Q.   Okay.  I'm looking at the third   12:28:41
6 major bullet on the right, "Although not a     12:28:59
7 strong revenue driver, hospital channel     12:28:47
8 provides access to discharge RX."     12:28:50
9          Do you see that?          12:28:53
10    A.   Yes.               12:28:53
11    Q.   Okay.  What role did you have,   12:28:54
12 if any, at Mallinckrodt in marketing to     12:28:55
13 hospitals?               12:28:59
14    A.   I believe that at this time,     12:29:04
15 this was around the time of the OFIRMEV sales 12:29:10
16 force, which was -- which was an     12:29:14
17 acetaminophen IV product that came on board,   12:29:16
18 and this is talking about leveraging that     12:29:19
19 sales force in the promotion of Xartemis XR.   12:29:22
20    Q.   Okay.  OFIRMEV is          12:29:25
21 O-F-I-R-M-E-V?          12:29:29
22    A.   Sorry, I almost have to see it   12:29:30
23 written out.  I believe so.          12:29:32
24    Q.   I'm just reading it from that   12:29:33
25 page.               12:29:36

Page 175

1     A.   Oh, okay.  Oh, there it is,     12:29:37
2 yes, I'm sorry.          12:29:38
3     Q.   Okay.  What was OFIRMEV?     12:29:39
4     A.   An intravenous acetaminophen   12:29:43
5 product.               12:29:46
6     Q.   Okay.  Nonopioid?          12:29:46
7     A.   Correct.          12:29:48
8     Q.   Okay.  So did you have any role 12:29:48
9 in marketing OFIRMEV?          12:29:49
10    A.   Very peripherally towards the   12:29:51
11 end of my time at Mallinckrodt.          12:29:58
12    Q.   And what was your role?     12:29:59
13    A.   I think I reviewed a couple of   12:30:00
14 tactics.  It was, like I said, towards the   12:30:02
15 end of my time at Mallinckrodt.  I don't     12:30:04
16 remember what specifically they were, though. 12:30:10
17    Q.   Did you have any role in     12:30:11
18 marketing to hospital formularies?     12:30:12
19    A.   Not to hospital formularies,   12:30:15
20 no.               12:30:19
21    Q.   Okay.  If you flip to the next   12:30:19
22 page, "Key insights, lack of consensus and no 12:30:21
23 established guidelines for the treatment of   12:30:29
24 acute pain."          12:30:31
25          Do you see that?          12:30:31

Page 176

1     A.   Yes.               12:30:32
2     Q.   Do you know what that means?   12:30:32
3     A.   I don't remember specifically.   12:30:34
4 I believe that there weren't any sort of     12:30:39
5 guidelines from any physician society around   12:30:41
6 specifically what products to use and how to   12:30:47
7 treat acute pain.          12:30:49
8     Q.   Were there ever any established 12:30:51
9 guidelines developed for treatment of acute   12:30:53
10 pain, to your knowledge?          12:30:54
11         MR. DAVISON:  Objection.     12:30:55
12         THE WITNESS:  I don't know.     12:30:55
13 QUESTIONS BY MR. CHALOS:          12:30:56
14    Q.   What was MNK 155?          12:30:57
15    A.   That was a product in          12:31:00
16 development at Mallinckrodt.          12:31:04
17    Q.   Did it ever make it to market?   12:31:05
18    A.   I do not recall.  I don't     12:31:07
19 believe so.          12:31:09
20    Q.   Let's flip to "Strategic     12:31:09
21 imperative number 3, key insights, around     12:31:19
22 30 percent of commercial ads."  Yeah, that's   12:31:25
23 it.  You got it.          12:31:27
24         Strategic imperative number 3,   12:31:29
25 I'm looking at the third bullet point, "Top   12:31:33

Page 177

1 limitations to use Xartemis XR prescribing   12:31:36
2 are patient out-of-pocket costs and managed   12:31:39
3 care coverage."          12:31:41
4          Do you see that?          12:31:42
5     A.   Yes.               12:31:43
6     Q.   What does that mean?          12:31:44
7     A.   That means that we were not     12:31:46
8 well-covered on managed care plans.  Our     12:31:48
9 Xartemis XR was not well-covered on managed   12:31:52
10 care plans.          12:31:55
11    Q.   Did you play a role in          12:31:55
12 marketing Xartemis to managed care plans?     12:31:56
13         MR. DAVISON:  Objection.     12:31:59
14         THE WITNESS:  No.  That was     12:31:59
15    handled by our managed care group.     12:32:00
16 QUESTIONS BY MR. CHALOS:          12:32:02
17    Q.   Okay.  Next bullet is,          12:32:02
18 "Coverage is consistent with other recently   12:32:06
19 launched brands; however, market is          12:32:08
20 ubiquitously generic."          12:32:13
21         Do you see that?          12:32:15
22    A.   Yes.               12:32:15
23    Q.   What does that mean?          12:32:15
24    A.   That means the acute pain     12:32:18
25 market is -- consists mostly of generic     12:32:20

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1  products.                          12:32:24
2      Q.   That was a challenge to      12:32:24
3  marketing Xartemis?                  12:32:34
4      A.   Yeah, the fact that Xartemis XR  12:32:38
5  had a high co-pay relative to the competitive  12:32:41
6  products, yes.                      12:32:46
7      Q.   And Mallinckrodt put in place a  12:32:46
8  co-pay discount program for Xartemis at some  12:32:50
9  point?                              12:32:56
10     A.   I believe so.              12:32:56
11         MR. CHALOS:  Okay.  You can put  12:33:04
12  that aside for now.                 12:33:04
13         I may be about finished, so why  12:33:06
14  don't we -- we don't have to get up.  12:33:08
15  If you can just let Peter and I go   12:33:11
16  talk for just a minute, and then -- so  12:33:14
17  we may be just about finished, or may  12:33:17
18  be finished.                        12:33:20
19         VIDEOGRAPHER:  We are going off  12:33:20
20  the record at 12:33 p.m.            12:33:21
21      (Off the record at 12:33 p.m.)    12:33:23
22         VIDEOGRAPHER:  We are back on  12:35:55
23  the record at 12:35 p.m.            12:35:56
24         MR. CHALOS:  Okay.  Thank you  12:35:58
25  for being here today, Mr. Wessler.  I  12:35:59

Page 179

1  have no more questions for you at this  12:36:01
2  time subject to our discussion at the  12:36:02
3  beginning of the deposition.  So thank  12:36:03
4  you.                                12:36:04
5         THE WITNESS:  Thank you.      12:36:04
6         VIDEOGRAPHER:  We are going off  12:36:06
7  the record at 12:35 p.m.            12:36:07
8  (Deposition concluded at 12:35 p.m.)  12:36:09
9          _ _ _ _ _ _ _

Page 180

CERTIFICATE

        I, CARRIE A. CAMPBELL, Registered
Diplomate Reporter, Certified Realtime
Reporter and Certified Shorthand Reporter, do
hereby certify that prior to the commencement
of the examination, Michael Wessler was duly
sworn by me to testify to the truth, the
whole truth and nothing but the truth.
        I DO FURTHER CERTIFY that the
foregoing is a verbatim transcript of the
testimony as taken stenographically by and
before me at the time, place and on the date
hereinbefore set forth, to the best of my
ability.
        I DO FURTHER CERTIFY that I am
neither a relative nor employee nor attorney
nor counsel of any of the parties to this
action, and that I am neither a relative nor
employee of such attorney or counsel, and
that I am not financially interested in the
action.


        _____
        CARRIE A. CAMPBELL,
        NCRA Registered Diplomate Reporter
        Certified Realtime Reporter
        Notary Public
        Dated:  January 16, 2019

Page 181

INSTRUCTIONS TO WITNESS

        Please read your deposition over
carefully and make any necessary corrections.
You should state the reason in the
appropriate space on the errata sheet for any
corrections that are made.
        After doing so, please sign the
errata sheet and date it.  You are signing
same subject to the changes you have noted on
the errata sheet, which will be attached to
your deposition.
        It is imperative that you return
the original errata sheet to the deposing
attorney within thirty (30) days of receipt
of the deposition transcript by you.  If you
fail to do so, the deposition transcript may
be deemed to be accurate and may be used in
court.

Highly Confidential - Subject to Further Confidentiality Review

| | Page 182 |
|---|---|
| | |

**Page 182**

ACKNOWLEDGMENT OF DEPONENT

1

2

3

4       I,_____, do
hereby certify that I have read the foregoing

5   pages and that the same is a correct
transcription of the answers given by me to

6   the questions therein propounded, except for
the corrections or changes in form or

7   substance, if any, noted in the attached
Errata Sheet.

8

9

10

11

12

_____
Michael Wessler          DATE

13

14

15   Subscribed and sworn to before me this

16   _____ day of _____, 20 _____.

17   My commission expires: _____

18

19   Notary Public

20

21

22

23

24

25

**Page 184**

1       _ _ _ _ _ _ _

LAWYER'S NOTES

2       _ _ _ _ _ _ _

3   PAGE   LINE

4   ____  ____  _____

5   ____  ____  _____

6   ____  ____  _____

7   ____  ____  _____

8   ____  ____  _____

9   ____  ____  _____

10  ____  ____  _____

11  ____  ____  _____

12  ____  ____  _____

13  ____  ____  _____

14  ____  ____  _____

15  ____  ____  _____

16  ____  ____  _____

17  ____  ____  _____

18  ____  ____  _____

19  ____  ____  _____

20  ____  ____  _____

21  ____  ____  _____

22  ____  ____  _____

23  ____  ____  _____

24  ____  ____  _____

25

**Page 183**

1       _ _ _ _ _ _ _

ERRATA

2       _ _ _ _ _ _ _

3   PAGE   LINE  CHANGE/REASON

4   ____  ____  _____

5   ____  ____  _____

6   ____  ____  _____

7   ____  ____  _____

8   ____  ____  _____

9   ____  ____  _____

10  ____  ____  _____

11  ____  ____  _____

12  ____  ____  _____

13  ____  ____  _____

14  ____  ____  _____

15  ____  ____  _____

16  ____  ____  _____

17  ____  ____  _____

18  ____  ____  _____

19  ____  ____  _____

20  ____  ____  _____

21  ____  ____  _____

22  ____  ____  _____

23  ____  ____  _____

24  ____  ____  _____

25