```
 1              IN THE UNITED STATES DISTRICT COURT

            FOR THE NORTHERN DISTRICT OF OHIO

 2                    EASTERN DIVISION

 3

 4

 5

     ***********************************

 6

     In re:  NATIONAL PRESCRIPTION       MDL NO. 2804

 7   OPIATE LITIGATION

 8

     This document relates to:          Case No.

 9                                       17-MD-2804

10

     All Cases                          Hon. Dan A. Polster

11   ***********************************

12                       * * *

                 WEDNESDAY, APRIL 24, 2019

13                       * * *

                  HIGHLY CONFIDENTIAL

14      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

                         * * *

15

16           Videotaped deposition of SCOTT

17      WEXELBLATT, M.D., held at the offices of

18      Vorys, Sater, Seymour and Pease, Suite 3500,

19      301 East Fourth Street, Great American Tower,

20      Cincinnati, Ohio, commencing at 9:23 a.m.,

21      on the above date, before Kimberley Keene,

22      Registered Professional Reporter.

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  A P P E A R A N C E S
 2   Representing the Plaintiffs
             Anne McGinness Kearse, Esquire
 3           Natalie Deyneka, Esquire
             Motley Rice LLC
 4           28 Bridgeside Boulevard
             Mt. Pleasant, South Carolina  29464
 5           843-216-9140
             akearse@motleyrice.com
 6           ndeyneka@motleyrice.com
 7
 8   Representing the Defendant CVS Indiana,
     CVS RX Services
 9           Adam Fotiades, Esquire
             Zuckerman Spaeder LLP
10           Suite 1000
             1800 M Street
11           Washington, DC  20036
             202-778-1800
12           afotiades@zuckerman.com
13
14   Representing the Defendant Walmart
             Kelly Bonovich, Esquire
15           Jones Day
             Suite 3500
16           77 West Wacker Street
             Chicago, Illinois 60601-1692
17           312-269-4251
             kbonovich@jonesday.com
18
19   Representing the Defendant AmerisourceBergen
             Eric Alexander, Esquire
20           Reed Smith LLP
             Suite 1100E
21           1301 K Street NW
             Washington DC  20005
22           202-414-9200
             ealexander@reedsmith.com
23
24
25
```

```
 1              A P P E A R A N C E S - continued
 2    Representing the Defendants Endo Health
      Solutions Inc., Endo Pharmaceuticals Inc.,
 3    Par Pharmaceutical, Inc.; Par Pharmaceutical
      Companies, Inc.,
 4    (FKA Par Pharmaceutical Holdings, Inc.)
              Wrede Smith, Esquire
 5            Arnold & Porter Kaye Scholer, LLP
              601 Massachusetts Avenue, NW
 6            Washington  DC  20001-3743
              202-942-5435
 7            wrede.smith@arnoldporter.com
 8
 9    Representing the Defendant Walgreens
              Peter Bensinger, Jr., Esquire
10            Bartlit Beck LLP
              54 West Hubbard Street
11            Chicago, Illinois  60654
              312-494-4426
12            Peter.Bensinger@BartlitBeck.com
13
14    Representing the Defendant McKesson
              Joseph Piorkowski, Jr., Esquire
15            The Piorkowski Law Firm, PC
              Suite 1000
16            1800 K Street, NW
              Washington, D.C.  20006
17            202-223-5535
              JPiorkowski@lawdoc1.com
18
19
20    Representing the Defendant Allergan Finance
              Paul J. Weeks, Esquire
21            Kirkland & Ellis LLP
              1301 Pennsylvania Avenue, N.W.
22            Washington, D.C.  20004
              202-389-5148
23            paul.weeks@kirkland.com
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A P P E A R A N C E S - continued

 2

 3   Representing the Defendant Teva
             Maureen Barber, Esquire
 4           Morgan Lewis & Bockius, LLP
             One Oxford Centre
 5           Thirty-Second Floor
             Pittsburgh, Pennsylvania  15219
 6           412-560-7463
             maureen.barber@morganlewis.com

 7

 8   Representing the Defendant Mallinckrodt
             FeiFei (Andrea) Ren, Esquire
 9           Ropes & Gray LLP
             1211 Avenue of the Americas
10           New York, New York  10036
             212-596-9000
11           andrea.ren@ropesgray.com

12

13   Representing the Defendant Purdue
             Elizabeth Ryan, Esquire
14           Lynn Pinker Cox Hurst, LLP
             Suite 2700
15           2100 Ross Avenue
             Dallas, Texas  75201
16           214-981-3839
             eryan@lynnllp.com

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A P P E A R A N C E S - continued

 2

 3   Representing the Defendant Henry Schein and
     Henry Schein Medical Systems
 4   (Via Speakerphone, Video Stream and Realtime)
             Christopher Boeck, Esquire
 5           Locke Lord LLP
             Chase Tower, Suite 2800
 6           2200 Ross Avenue
             Dallas, Texas  75201
 7           214-740-8482
             cboeck@locklord.com
 8

 9   Representing the Defendant HBC Company
     (Via Speakerphone, Video Stream and Realtime)
10           Elly Heller-Toig, Esquire
             Marcus & Shapira LLP
11           301 Grant Street
             Pittsburgh, Pennsylvania  15219
12           412-338-5227
             ehtoig@marcus-shapira.com
13

14

15   ALSO PRESENT:     Melinda Singiong, videographer

16

17

18

19

20

21

22

23

24

25
```

```
 1                    EXAMINATION INDEX
 2    Examination by Mr. Alexander....................   4
      Examination by Ms. Barber...................... 369
 3    Examination by Ms. Kearse...................... 373
      Re-examination by Mr. Alexander............... 383
 4    Re-examination by Ms. Kearse.................. 389
      Reporter's Certificate........................ 391
 5
 6                     EXHIBIT INDEX
 7    Wexelblatt-001................................ 189
      Expert Report of Scott L. Wexelblatt, 3-25-19
 8                                  Confidential
 9    Wexelblatt-002................................ 231
      Wexelblatt Materials Considered
10
11    Wexelblatt-003................................ 233
      Curriculum vitae
12
13    Wexelblatt-004................................ 245
      Merhar paper:  Retrospective review of
14    neurodevelopmental outcomes in infants treated for
      neonatal abstinence syndrome
15    J Perinatal. 2018 May
16
17    Wexelblatt-005................................ 245
      Hall paper:  Developmental Disorders and Medical
18    Complications Among Infants with Subclinical
      Intrauterine Opioid Exposures
19    Population Health Management Volume 22 Number 1, 2019
20
21    Wexelblatt-006................................ 246
      Baldacchino paper:  Neurobehavioral consequences
22    of chronic intrauterine opioid exposure in infants
      and preschool children:  a systematic review and
23    meta-analysis
      BMC Psychiatry 2014, 14:104
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                EXHIBIT INDEX - Continued
```

 2   Wexelblatt-007.................................. 246

     AGOC Committee Opinion, Number 711 August 2017

 3

 4   Wexelblatt-008.................................. 329

     Copy of NAS PowerPoint slides

 5

 6   Wexelblatt-009.................................. 375

     The OPQC paper:  Updates/changes to the

 7   recommended OPQC NAS Protocol

 8

 9   Wexelblatt-0010................................. 379

     Abstract:  Positive Predictive Value of

10   Administrative Data for Neonatal Abstinence Syndrome

     Pediatrics Volume 143, number 1, January 2019

11

12

13   Wexelblatt-0011................................. 381

     Erratum:  Neurobehavioral consequences of chronic

14   intrauterine opioid exposure in infants and preschool

     children: a systematic review and meta-analysis

15   BMC Psychiatry (2015) 15:134

```
16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE VIDEOGRAPHER:  We are now on the record.

 2   My name is Melinda Sindiong.  I'm the videographer for

 3   Golkow Technologies.  Today is April 24, 2019.  The

 4   time is 9:23.  The video deposition is being held in

 5   Cincinnati, Ohio in the matter of National

 6   Prescription Opiate Litigation, and this is for the

 7   U.S. District Court, Northern District of Ohio,

 8   Eastern Division.

 9              The deponent is Scott L. Wexelblatt, M.D.,

10   and the counsel will be noted on the stenographic

11   record.

12              The court reporter is Kim Keene, and will now

13   swear in the witness and we can proceed.

14

15                        *     *     *

16              SCOTT WEXELBLATT, M.D., after having first

17   been duly administered an oath, testified as follows:

18              THE WITNESS:  Yes.

19                        *     *     *

20

21                        EXAMINATION

22   BY MR. ALEXANDER:

23        Q.  State your name for the record, please.

24        A.  Scott Wexelblatt.

25        Q.  And your professional address?
```

```
 1        A.  3333 Burnet Avenue, Cincinnati, Ohio.

 2        Q.  How are you doing this morning?

 3        A.  Great.  How are you?

 4        Q.  Awesome.  Thanks for your patience while we

 5   got all of the moving pieces started.

 6            Do you understand that you are here to be

 7   deposed in connection with an expert report that was

 8   served with your name on it a couple of weeks ago from

 9   some cases brought by Cuyahoga and Summit County?

10        A.  Yes.

11        Q.  The report that we got was dated and had a

12   signature on it from March 25th.

13            Does that sound like the time that you did an

14   expert report?

15        A.  Yes.

16        Q.  Is the expert report that you completed

17   around March 25th of this year the only expert report

18   that you have completed in connection with opioid

19   litigation?

20        A.  Yes.

21        Q.  When I use the term "opioid," does that have

22   a specific meaning to you?

23        A.  Yes.

24        Q.  How do you use the term "opioid"?

25        A.  It covers all -- the difference between
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    opiate and opioid is purely naturally occurring versus

 2    synthetic, so opioid covers all opiates and opioids.

 3         Q.  Did you make any distinction as you use it in

 4    any of your professional writings between prescription

 5    opioids versus illicit opioids, including street drugs

 6    like heroin?

 7         A.  They all fall your opioids.

 8         Q.  And is that how you have used the term in

 9    your expert report in this case?

10         A.  Yes.

11         Q.  So, have you been an expert witness in other

12    cases before this one?

13         A.  Yes.

14         Q.  And have those been mostly medical

15    malpractice cases?

16         A.  Correct.

17         Q.  Do you have any questions about what it means

18    to be an expert witness?

19         A.  No.

20         Q.  Do you understand that when you did a report

21    and you dated it and signed it, that it was to include

22    all of the opinions that you would intend to offer at

23    trial?

24         A.  Yes.

25         Q.  Did you attempt to do so in the expert report
```

 1   for this case?

 2        A.  Yes.

 3        Q.  Did you attempt to set forth both opinions

 4   that would be harmful for the plaintiffs' case and

 5   helpful for the plaintiffs' case?

 6            MS. KEARSE:  Object to form.

 7        A.  I guess I don't understand what you're

 8   asking.

 9        Q.  Well, as an expert witness when you evaluate

10   whatever your subject matter is that is within your

11   area of expertise, do you attempt to set -- set forth

12   in your report the opinions that you have regardless

13   of whether they're good or bad for the party retaining

14   you?

15        A.  Correct.

16        Q.  And in this case, did you also set forth all

17   of the materials that you considered in forming your

18   opinions?

19        A.  Yes.

20        Q.  Okay.  And since you did your report, have

21   you formed any new opinions relevant to this case?

22        A.  No.

23        Q.  Have you looked at any additional materials

24   beyond what is disclosed in connection with your March

25   25, 2019 report?

```
 1        A.  I continue to review articles and

 2   publications as they come through, so it is hard to

 3   say if anything that I reviewed is something that

 4   you're going to ask about, I guess.

 5        Q.  Well, I'm not so focused about what I'm going

 6   to ask about.

 7        A.  Yeah.

 8        Q.  I'm more interested in whether there is any

 9   literature that has come out in the last, let's say,

10   four weeks that you think is pertinent to the subject

11   matter that we are discussing here today, or you

12   anticipate we are discussing today consistent with the

13   scope of your report?

14        A.  No.

15        Q.  Have you had any additional research efforts,

16   whether published or not, that pertain to the subject

17   matter that is addressed in your expert report in this

18   case?

19        A.  Can you repeat that one more time, please?

20        Q.  Sure.  Why don't I do it this way.  We got

21   with your report a copy of your CV.

22        A.  Uh-huh.

23        Q.  And plaintiffs' counsel was nice enough

24   before the deposition got started to give us an

25   updated version of your CV.
```

```
 1        A.  Correct.

 2        Q.  My understanding is that the nature of the

 3   update is to list some additional publications,

 4   including maybe some things that were previously

 5   published only in abstract form and are now full

 6   publications.

 7        A.  Correct, those were updated to dates.

 8        Q.  Is there any other change to your CV compared

 9   to the one we got?

10        A.  No.

11        Q.  So other than your own literature, is there

12   anything that you have reviewed over the last four

13   weeks that relates to the issue of neonatal abstinence

14   syndrome or any of the other areas addressed in your

15   expert report in this case?

16        A.  No.

17        Q.  In terms of your personal experience over the

18   last four weeks, have you continued to treat patients

19   and do the same sort of general responsibilities that

20   you had before you signed your expert report?

21        A.  Yes.

22        Q.  Is there anything in your mind, whether it is

23   material you considered or some new opinion you

24   formed, that requires you to supplement or amend your

25   report in any way?
```

```
 1       A.  No.

 2       Q.  So in other words, the report that we got

 3   about a month ago is still your report that includes

 4   all of your opinions, and the disclosures that went

 5   with it are accurate and complete, correct?

 6       A.  Correct.

 7       Q.  In connection with forming your expert

 8   opinions in this case, were there materials that you

 9   hoped to review or issues you hoped to address that

10   you weren't able to because of time constraints or not

11   getting information you wanted or anything like

12   that?

13       A.  No.

14       Q.  Do you have ongoing analyses in any of your

15   ongoing research that you are aware of the results of

16   them that but they haven't been yet published or

17   disclosed publicly?

18       A.  Yes.

19       Q.  Is there any of that that you intend to rely

20   on for your opinions in this case?

21       A.  Yeah.

22       Q.  So can you tell me what you're talking about

23   then?

24       A.  I have three papers that are pending or under

25   review currently.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   And are those all related to the work through

2  the Ohio Perinatal Quality Collaborative?

3      A.   One of them is.

4      Q.   And I don't know if you have these limits,

5  but sometimes researchers are unwilling to disclose

6  the subject matter of their research before it is

7  published.

8           Do you feel you're bound by such

9  limitation?

10     A.   I would feel comfortable discussing the

11  topics, but not the actual results until they are

12  published because that could interfere with getting

13  published.

14     Q.   Like an Ingelfinger rule sort of issue,

15  right?

16     A.   I don't know what that is.

17     Q.   Is any of the literature that you are in the

18  process of getting published going to change your

19  opinions in terms of what you recommend as a program

20  to be implemented or changed for Cuyahoga or Summit

21  County going forward?

22     A.   Possibly.

23     Q.   So subject to the limits you believe you have

24  and based on the information that you have currently

25  on those three papers, can you walk through them one

Highly Confidential - Subject to Further Confidentiality Review

 1   at a time and tell me --

 2        A.   Sure.

 3        Q.   -- what the subject matter is of the first

 4   paper?

 5        A.   So the first paper is regarding the OPQC

 6   summary report.  And it is really just summarizing --

 7             MS. HELLER-TOIG:  I'm -- this is Elly

 8   Heller-Toig.  I cannot hear him.

 9             MR. BOECK:  Agreed.  This is Chris Boeck on

10   behalf of Henry Schein.  I cannot hear the witness.

11             MS. HELLER-TOIG:  And also, the video is

12   gone.  I don't know if anyone else is experiencing

13   that.

14             MR. BOECK:  Same here.

15             MR. ALEXANDER:  I would suggest we go off the

16   record for like two minutes and try to fix it.  I

17   don't know that we've gotten the appearances of

18   anybody on the phone yet, other than the individual

19   who said he represented the Schein defendant.

20             THE REPORTER:  They were sent to me

21   yesterday.

22             MR. ALEXANDER:  Okay.

23             MS. HELLER-TOIG:  This is Elly Heller-Toig.

24   We represent HBC Service Company from Marcus &

25   Shapira.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. ALEXANDER:  I think we need agreement of

 2    plaintiffs' counsel to go off the record under the

 3    federal rules.

 4              MS. KEARSE:  Oh, I'm sorry.  I nodded yes.

 5              I'm fine with that.  Yes.

 6              THE VIDEOGRAPHER:  We are now going off

 7    record.  The time is 9:32.

 8              (Off-the-record discussion.)

 9              THE VIDEOGRAPHER:  We are now back on record.

10    The time is 9:43.

11              MR. ALEXANDER:  Hopefully, we fixed some of

12    our technical difficulties.

13    BY MR. ALEXANDER:

14       Q.  We had a pending question before the little

15    break there, and you are in the middle of your answer,

16    Dr. Wexelblatt.

17              Just to orient everybody, I'm going to have

18    the last question read back by the court reporter, and

19    then if you could start your answer concerning the

20    additional research papers in progress that you were

21    discussing.

22              (Previous questions/answers were read back by

23    the court reporter commencing as follows:

24              Question: So subject to the limits you

25    believe you have and based on the information that you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    have currently on those three papers, can you walk

 2    through them one at a time and tell me --

 3            Answer:  Sure.

 4            Question  -- what the subject matter is of

 5    the first paper?

 6            Answer:  So the first paper is regarding the

 7    OPGC summary report.  And it is really just

 8    summarizing...)

 9            THE WITNESS:  So the first paper is regarding

10    the OPQC --

11            THE REPORTER:  Oh, sorry.

12            THE WITNESS:  -- paper, and it's just a

13    summary of our findings after completing our

14    enrollment, which ended up being 9,000 -- over 9,000

15    patients.

16            The second paper --

17        Q.  Can I pause you there on the first paper?

18        A.  Correct.

19        Q.  So that has been submitted for publication to

20    a journal, correct?

21        A.  Correct.

22        Q.  Has that been accepted for publication?

23        A.  It is under review.

24        Q.  And which of your prior papers is this

25    essentially providing follow-up data on?  If you can
```

Highly Confidential - Subject to Further Confidentiality Review

1  do it by citation or --

2      A.  It would be the one that starts with Walsh,

3  and it talks about statewide collaborative.

4      Q.  Okay.

5      A.  And I think I'm the third author -- third

6  author on that paper.

7      Q.  If you go on to the second pending paper.

8      A.  That is regarding visual findings in infants

9  in our high-risk NAS follow-up clinic.  And that is a

10  follow-up of our abstract that is listed on the paper

11  that is being presented this weekend at Pediatric

12  Academic Society meeting.

13      Q.  Okay.

14      A.  And it's listing or showing the incidence of

15  visual disturbances at six months of infants that are

16  treated for NAS.

17      Q.  Is that strabismus or something else?

18      A.  Correct.

19      Q.  Any other end points in that study besides

20  strabismus?

21      A.  Those that went on to need surgery for

22  correction.

23      Q.  Okay.  And there is some prior literature on

24  that subject, correct --

25      A.  Correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.  -- that you cited already?

 2        A.  Uh-huh.

 3            And then the third paper is regarding the

 4    rates of Hepatitis C in opioid-exposed infants.

 5        Q.  Does that just look at incidence or does it

 6    talk about treatment?

 7        A.  It is talking about -- it's regarding

 8    identification and correct testing of infants at the

 9    correct time, and it is looking at the cascade of

10    underreported cases.

11        Q.  So, when we got started I didn't really go

12    over the ground rules of deposition because you're

13    close enough to the court reporter that she might kick

14    you if you, you know, run afoul of some unspoken

15    rules.  I'm going to speak a couple of them just to

16    make it a little smoother as we go forward.

17            Even though you're on video, it is important

18    that people not talk over one another because that

19    makes the court reporter's job hard, and we want to

20    make sure that the written transcript at the end of

21    the day accurately reflects what you know and think.

22            So, if you could do your best to not start

23    your answer until I finish my question, I am sure I'll

24    do the same on the other end.

25            Does that make sense?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.  Yes.

 2        Q.  If you need to take a break at any time, we

 3   will take a break.  If you don't understand my

 4   question, let me know.  I'll try to fix it and make it

 5   intelligible.

 6            Does that make sense?

 7        A.  Yes.

 8        Q.  If there is an objection, as there has been

 9   one or two so far, that is just as to the form.  If

10   you understand the question, if you can answer it, go

11   ahead and do so anyway.  If there is an instruction

12   not to answer, I'm not sure what that would be on, but

13   if there is, that is between you and plaintiffs'

14   counsel.

15            If you need to take a break to confer about

16   any issue in the deposition, please try not to do so

17   unless there is no pending question -- double

18   negative.  Try not to do it when there is a pending

19   question unless the conferral relates to whether

20   you're allowed to answer the question.

21            Does that all make sense?

22        A.  Yes.

23        Q.  Do you have any other questions for me about

24   the deposition procedure?

25        A.  No.
```

1      Q.  And you've been deposed a couple of times

2   before, correct?

3      A.  Correct.

4      Q.  Have you ever testified at trial?

5      A.  Once.

6      Q.  Was that in connection with a case where you

7   were an expert witness or some other type of case?

8      A.  Expert witness.

9      Q.  Have you ever testified in a case where you

10  were a party?

11     A.  No.

12     Q.  Have you ever been sued for medical

13  malpractice?

14     A.  No.

15     Q.  That's lucky.  Right?

16         MS. KEARSE:  Object to form.

17  BY MR. ALEXANDER:

18     Q.  So, let's go back to where we are on these

19  papers.

20         So these are three papers that are in the

21  process of trying to get published, correct?

22     A.  Correct.

23     Q.  You said the first one is review -- in the

24  middle of peer review.  The second one about visual

25  issues in neonatal abstinence syndrome of children.

```
 1              Is that pending publication, has that been
 2    accepted for publication?
 3         A.  It has not been accepted.  It's -- they're
 4    all under review.
 5         Q.  Do you have any other ongoing research where
 6    you're aware of the results and they have not yet been
 7    published and you intend to rely on them in connection
 8    with anything about your testimony for this case?
 9         A.  Not outside those three papers.
10         Q.  And without giving away anything that might
11    jeopardize the publication of the first paper, the
12    follow-up on the Walsh paper, are the results
13    dramatically different than what had been published
14    before in terms of any of the metrics that you are
15    tracking?
16         A.  No.
17         Q.  In the papers that you have been doing
18    through the OPQC, the Ohio Perinatal Quality
19    Collaborative, there is sometimes data presented by
20    regional, Region, 1, 2, 3, 4, 5 and 6, correct?
21         A.  Correct.
22         Q.  And some of the participating hospitals in
23    each of those regions are in Cuyahoga County and some
24    are in Summit County, correct?
25         A.  Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.  Do you know which number region Cuyahoga

2  is?

3      A.  When we publish it and when we started the

4  collaborative, we agreed to keep them confidential.

5      Q.  Okay.  I mean, are you blinded from that as

6  far as you're writing up the papers and evaluating the

7  data?

8      A.  I am not blinded.

9      Q.  So you do know which one is Cuyahoga and

10  which one is Summit, correct?

11      A.  Correct.

12      Q.  And are you willing to say that here today?

13      A.  No.

14      Q.  Do you rely on anything specific to Cuyahoga

15  and Summit County from those papers where the

16  particular region is applicable to Cuyahoga and Summit

17  is not included in the final publications in offering

18  any of your opinions in this case?

19      A.  No.

20      Q.  So let me just go back, because part of the

21  issue here, as you have said, is you've been asked to

22  offer opinions relating to neonatal abstinence

23  syndrome and impact on Cuyahoga and Summit Counties,

24  correct?

25      A.  Correct.

```
 1        Q.  Okay.  And you've never worked in Cuyahoga or

 2   Summit County, correct?

 3        A.  Not directly seeing patients.

 4        Q.  And you don't have any positions with either

 5   of those counties in terms of governmental positions

 6   or adjunct positions, correct?

 7        A.  Correct, I do not.

 8        Q.  Are you relying on any information that you

 9   gained that is specific to Cuyahoga or Summit County

10   through any of the work that you have done through the

11   OPQC?

12        A.  Working in collaboration with the leaders in

13   those regions, I have an understanding of what is

14   happening through OPQC.

15        Q.  And do you intend to offer any testimony at

16   trial based upon that understanding that you have

17   gathered through your work through OPQC that is not

18   reflected in the published papers that hide which

19   region is which?

20            MS. KEARSE:  Object to form.

21        A.  No.

22        Q.  In connection with your opinions on -- that

23   you are going to offer in this case, have you talked

24   to anybody for Cuyahoga or Summit County based upon

25   their particular experiences relating to neonatal
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    abstinence syndrome or maternal use of opioids or

 2    opiates?

 3         A.  We work in direct collaboration with, like,

 4    leaders from each of these -- the main six regions

 5    that we have, our six children hospitals.  And so

 6    there is a representative from each of those counties

 7    in this collaboration.

 8         Q.  Okay.  So in connection with your opinions in

 9    this case, so, in your report, you disclose that you

10    did literature review, you relied on your experience,

11    you, you know, generally thought about the issues that

12    you have been living for a decade or so now.

13         So what I'm asking is:  Specific to the work

14    that you did to prepare your opinions and -- and set

15    them out in a report for this case so we would know

16    what you were going to talk about and what you relied

17    on, did you actually talk to anybody from Cuyahoga or

18    Summit County about any of these issues?

19         A.  Not about writing up this report.

20         Q.  Did you talk to anybody from Cuyahoga County

21    -- take it one-by-one.

22         In connection with forming your opinions for

23    this case, did you talk to anybody from Cuyahoga

24    County about their experiences relating to -- did you

25    call it NAS?  Is that the abbreviation you would
```

 1  use?

 2      A.  Uh-huh.

 3      Q.  -- NAS or anything related to maternal use of

 4  opioids?

 5      A.  So I'm in connection with people at -- on

 6  monthly phone calls that are in that region.

 7      Q.  And do you intend to rely on any of that

 8  information for any of the testimony that you give in

 9  this case?

10      A.  It is all a part of it, correct.

11      Q.  And who have you talked to from Cuyahoga

12  County?

13      A.  So on our monthly calls, Susan Ford is out of

14  Rainbow Babies.  Michelle Walsh is part of Rainbow

15  Babies.  And Jay Iams is O.B. director -- I'm sorry,

16  he's not in Cuyahoga County.  I take that back.

17      Q.  Okay.  So, the first two individuals --

18      A.  Yes, those two reside in Cuyahoga County.

19      Q.  I'm not so focused on where they reside.  I'm

20  focused on where they work, though.

21      A.  Correct, that's where they work.

22      Q.  Okay.  And so, are there specific

23  conversations or information that you have gained from

24  your communications with these two individuals who

25  were coauthors on your papers that you intend to rely

Highly Confidential - Subject to Further Confidentiality Review

1   on in offering any of your testimony at trial?

2       A.  It is all a part of the OPQC project, so we

3   talk about there's different models in different parts

4   of the state.  So if that is what you're referring to,

5   then I guess it is specific to that.

6       Q.  And when you say specific models, do you mean

7   in terms of what Cuyahoga County is already doing to

8   address these sorts of issues?

9       A.  Correct.

10      Q.  And over time, as I understand it, part of

11  what OPQC has done is try to standardize some of the

12  models even though there are regional differences.

13          Is that a fair statement?

14      A.  That is.

15      Q.  Okay.  So, what the Cuyahoga model was at a

16  given point in time may not be what it is now because

17  it has been updated in various ways?

18      A.  Exactly.

19      Q.  And have you talked to these two coauthors

20  from Cuyahoga County about when it was that they first

21  started seeing a need to do more, to do different

22  things, to have increased efforts to try to address

23  issues of NAS or other public health impacts of

24  increasing maternal opioid use?

25      A.  Did you ask when or if?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.  Did you talk to them about the issue of when?

 2        A.  Yes.

 3        Q.  I had both of those words in there.

 4        A.  Yes.

 5        Q.  And did you gain an impression from them that

 6   this was something that they had been seeing for many

 7   years before you actually started collaborating in the

 8   collaborative?

 9            MS. KEARSE:  Object to form.

10        A.  The reason we started the collaborative was

11   based on the increase of incidence.

12        Q.  And so the collaborative itself started back

13   in 2007, correct?

14            MS. KEARSE:  Object to form.

15        Q.  The Ohio Perinatal Quality Collaborative

16   started in 2007?

17        A.  I'm not exactly sure when it was first

18   initiated.

19        Q.  And sometime after that, it set up a project

20   on neonatal abstinence syndrome, correct?

21        A.  Correct.

22        Q.  Do you know when that projected started?

23        A.  2014.

24        Q.  And the way it works -- have you been

25   involved with other projects with OPQC?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.  No -- well, yes.

 2        Q.  At any again time they may have multiple

 3   different projects that are kind of where they focus

 4   their efforts and then over time they may have some

 5   follow-up or monitoring of them over time, correct?

 6        A.  Correct.

 7        Q.  So, before a project like the neonatal

 8   abstinence syndrome project gets started, there is

 9   some ramp-up time, correct?

10        A.  Yes.

11            MS. KEARSE:  Object to form.

12        Q.  There is talking about basically where the

13   efforts are going to be focused, where money might be

14   given, who is going to participate, and that sort of

15   thing?

16            MS. KEARSE:  Object to form.

17        Q.  Correct?

18        A.  Yes.

19        Q.  Do you know when the talk about initiating a

20   neonatal abstinence syndrome project through the Ohio

21   Perinatal Quality Collaborative started?

22        A.  I think it happened after our first

23   publication in 2000 -- well, after our results were

24   finished in our Ohio Children's Hospital

25   Collaborative, research collaborative, which those --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   our initial results were compiled in 2013.  And then

 2   that's when the discussion was to spread it to OPQC

 3   outside of OCHA, O-C-H-A, Ohio Children's Hospital

 4   Research Association.

 5       Q.  So for the Ohio Children's Hospital Research

 6   Association --

 7       A.  Yeah.

 8       Q.  I'm sorry.  It's Ohio Children's Hospital

 9   Association?

10       A.  Yeah.

11       Q.  There's no "R" in there.

12       A.  Okay.

13       Q.  That's a long-standing entity that has been

14   around for way longer -- it's been since 2007,

15   correct?

16       A.  I'm not sure.

17       Q.  Okay.  How long have you been involved with

18   that entity?

19       A.  2012.

20       Q.  And how long have you been involved with the

21   OPQC?

22       A.  2014 directly as a faculty member; however, I

23   did work on their 39-week gestation project at one of

24   the hospitals prior to that.

25       Q.  So, do you recall when it was that you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    personally first had started having an interest in the

 2    need to do more to address rising rates of neonatal

 3    abstinence syndrome in the Cincinnati area or any

 4    other health impacts of increasing maternal use or use

 5    by women of childbearing age of opioids or opiates?

 6              MS. KEARSE:  Object to form.

 7         A.   Probably around 2010 or '11, right before we

 8    started the collaborative.

 9         Q.   And so -- so you started some research

10    efforts with colleagues down here starting around that

11    time, and then eventually it wasn't statewide; is that

12    a fair statement?

13         A.   No.

14         Q.   Give me the accurate statement then of --

15         A.   We had been addressing the problem locally,

16    then we really didn't want to make any significant

17    changes until we had data and research to support it.

18    And that's what we were able to obtain through OCHA's

19    first 18 months.

20         Q.   And so we talked about the two individuals

21    you ultimately have discussed this with from Cuyahoga

22    County, correct?

23         A.   Uh-huh.

24         Q.   Your coauthors?

25         A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   When you finally were kind of connected with

 2   them for statewide research efforts and quality

 3   improvement efforts through OPQC, did you find that

 4   they had had a parallel track of having local interest

 5   and electronic efforts for some period of time before

 6   you started talking about it?

 7        MS. KEARSE:  Object to form.

 8        A.   I know they had been working on it.

 9        Q.   Do you have an idea of how long they had been

10   working on it?

11        A.   I don't.

12        Q.   So, let's then do the other county, Summit

13   County.

14             Have you had communications about essentially

15   what efforts have been going on in Summit County, for

16   how long, how they have been going, with anybody who

17   actually works in Summit County that you intend to

18   rely on for your opinions in this case?

19        A.   Yeah.  So one of our coauthors, Jennifer

20   Grow, is out of Summit County.

21        Q.   Is that Dr. Grow?

22        A.   Correct.

23        Q.   So this is easy because it's just one person.

24             For Dr. Grow, when did you first start

25   talking to her about any of these issues?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.  2012.

 2        Q.  Okay.  And in 2012, was that through OCHA or

 3   OPQC?

 4        A.  OCHA.

 5        Q.  All right.  Did you gain an understanding

 6   from talking to Dr. Grow about how long there had been

 7   efforts or interest in Summit County of doing more to

 8   address rising rates of NAS and other health impacts

 9   of maternal use of opioids or opiates?

10            MS. KEARSE:  Object to form.

11        A.  I would not know the exact time, but I think

12   it is similar, within the year prior.

13        Q.  So, your impression is that this had been

14   something that people who specialized in this area in

15   Summit County had been aware that this was a rising

16   issue and needed essentially more effort to make for

17   better outcomes in the children and the mothers in

18   Summit County since at least 2011; is that correct?

19            MS. KEARSE:  Object to form.

20        A.  Correct.

21        Q.  And for Cuyahoga County, you think it is a

22   similar time period?

23        A.  Correct.

24        Q.  Ultimately, do you think that the current

25   programs that have been developed through your work
```

Highly Confidential - Subject to Further Confidentiality Review

 1   with OPQC have the ability to help improve outcomes

 2   for children and mothers affected by the maternal

 3   abuse of opioids or opiates?

 4        A.  Yes.

 5        Q.  And do you think that these are efforts that

 6   over time, as they have kind of evolved both in terms

 7   of the regional work you've done here and then the

 8   work done in other regions across the state, that

 9   those also had a benefit over the last several

10   years?

11        A.  Yes.

12        Q.  Is it your view that if these product --

13   these projects had been initiated kind of intensely

14   and statewide, or at least in Cuyahoga and Summit

15   County back in 2011 that things would be better off

16   than they are now in terms of children who have been

17   affected by NAS and other health impacts of maternal

18   abuse of opioids and opiates?

19        MS. KEARSE:  Object to form.  Calls for

20   speculation.

21        A.  I would have no idea.  I would have to -- how

22   to say what would happen if we did anything in the

23   past that would affect the future.

24        Q.  Well, I'm talking about as of now.  So, right

25   now, in Cincinnati, where you work -- at the hospitals

Highly Confidential - Subject to Further Confidentiality Review

1   where you work and where you have some idea into or

2   some insight into the programs that have been

3   placed -- do you think that they're doing a better job

4   than they were before you started these quality

5   control efforts, these development of standardized

6   protocols?

7           MS. KEARSE:  Object to form.

8       Q.  Correct?

9       A.  Yes, we have made improvements.

10      Q.  Improvements in terms of the outcomes of the

11  NAS children, that's one way you're counting an

12  improvement, correct?

13      A.  That is correct.

14      Q.  Okay.  And so some of the measures of

15  improvement might be that you reduce the hospital

16  stay, you reduce the total time on treatment with

17  opioids as part of medically assisted therapy,

18  correct?

19          MS. KEARSE:  Object to form.

20      A.  So we don't give MAT for infants.  We treat

21  withdrawal.  So that's -- just a nuance.

22          And we also have been measuring as part of

23  our MOMS Project with OPQC, by implementating

24  projects.  We have been showing to have improved in

25  MAT adherence, behavioral therapy also for the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    mothers.

 2        Q.  Okay.  So let's break it up because I was

 3    going to ask about the offspring, the children first.

 4        A.  Okay.

 5        Q.  So what are the measures that you think are

 6    appropriate to track in terms of improvements?  So we

 7    talked about average hospital stay at the time of

 8    delivery, correct?  That's one?

 9        A.  Average length of stay, correct.

10        Q.  And what else?

11        A.  Days of opioid treatment, percent that are

12    needing pharmacologic treatment.  And then that would

13    give you another measure, which we are now starting to

14    show in our paper that is pending, all babies that are

15    opioid exposed average length when you combined all of

16    them together.

17        Q.  And are you also tracking through any of this

18    the cost of hospital stays in the perinatal setting?

19        A.  Not a part of this project.

20        Q.  And that is something that is discussed in

21    some of the published papers, right?

22        A.  Correct.

23        Q.  That, in general, taking care of a NAS baby

24    in the hospital costs more than taking care of an

25    average baby because of longer average stays, medical
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   therapy, things like that?

 2       A.  Correct.

 3       Q.  I mean, pharmacotherapy, among other things,

 4   correct?

 5       A.  Correct.

 6       Q.  And so has there been any kind of tracking in

 7   terms of success of driving down costs?

 8       A.  We haven't measured it directly in any of our

 9   publications.  They have been estimates -- estimates

10   based on the average length of stay on statewide

11   data.

12       Q.  So like the periodic presentations that you

13   do through OPQC, we have some of your PowerPoints,

14   some of them identified with your report.

15           Those do track some of the metrics that you

16   are talking about, correct?

17       A.  Yes, they do.

18       Q.  And so you have statewide information where

19   you talk about that there is actually savings in

20   healthcare dollars, regardless of who pays them, by

21   the improvements that you are talking about,

22   correct?

23       A.  Yep.

24       Q.  So, if these measures had been initiated

25   earlier and you were able to drive down costs -- I'm
```

Highly Confidential - Subject to Further Confidentiality Review

1   sorry, drive down average length of stay, length of

2   opioid treatment, and some of these other metrics, you

3   expect that there would have been even greater cost

4   savings over time?

5          MS. KEARSE:  Object to form.

6      A.  We had to learn what worked to get to that

7   point.  So if we implement what we know now, then

8   yes.

9      Q.  And so the data, that -- since you

10  implemented the standard protocol, shows there has

11  been a reduction in most of these metrics over time;

12  not necessarily in a linear fashion, but overall it's

13  gone a little bit up and down, but all of these have

14  improved over the now, what, like seven years or so

15  since you initiated a standard protocol?

16     A.  Yeah.

17         MS. KEARSE:  Object to form.

18     Q.  And that's what you hoped for, right?

19     A.  Exactly.

20     Q.  So even though you haven't necessarily

21  tracked it in a dollar basis at any given time which

22  protocol saved what money, the earlier the protocol

23  was started, the earlier you get to a better or more

24  refined protocol, the better outcomes you get and the

25  more healthcare dollars you save, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KEARSE:  Object to form.

 2         A.   Yeah.  If you can decrease the length of

 3    stay, then you've obviously impacted the dollars.

 4         Q.   And some of the other things have potential

 5    long-term benefits, too.

 6              Your belief is that by having early

 7    appropriate treatment of the NAS offspring, you hope

 8    to be able to improve their long-term outcomes, too,

 9    right?

10         A.   Yes.

11         Q.   That would include like, less need for

12    behavioral intervention, less chance of long-term

13    addiction, less chance of other potential, at least

14    theoretical, complications in an NAS child, correct?

15              MS. KEARSE:  Object to form.

16         A.   We would want to improve all of those

17    things.

18         Q.   Are there other specific -- I mean, we were

19    -- it is my language, so I'm being a little general

20    and hopefully we can have a little more specific.

21              So are there other health outcomes that might

22    require medical or social services interventions or

23    even educational interventions that you hope to

24    improve by the work that you are doing in terms of

25    standardized protocols for treatment of NAS
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   children?

 2       A.  So it is a very evolving arena, and so when

 3   we are discussing some of the long-term outcomes,

 4   that's what we are trying to learn in our NAS

 5   high-risk follow-up clinic.

 6           And that's where we have sort of run into

 7   finding this visual disturbances, torticollis, other

 8   musculoskeletal issues that we are finding as we

 9   continue to look into this group.

10       Q.  So a couple of things there.  The torticollis

11   is like a kind of twisting of the neck, a stiffness of

12   the neck?

13       A.  That's a good layman's description.

14       Q.  And that tends to resolve on its own?

15       A.  With physical therapy.  It usually requires

16   physical therapy at this age.

17       Q.  It is a time limited phenomenon, it's not a

18   life-long issue?

19       A.  That's correct.

20       Q.  And the strabismus, some people require --

21   understand that this is an issue basically of the eye,

22   their ability to focus together in a -- like a

23   stereoscopic fashion?

24       A.  So a layman's version would be lazy eye.

25           So what we try to do, there is multiple
```

1   interventions you can try to do to prevent surgery to

2   correct.  And so there is patching or drops that you

3   would do on the good eye, so they would then try to

4   match each other so the pathways are there that you

5   wouldn't need corrective surgery if it doesn't -- if

6   it goes past too long of a time.

7       Q.  And is it the minority of cases with

8   strabismus that need corrective surgery, in your

9   experience?

10      A.  That's what we are looking into and

11  publishing, getting into it.

12      Q.  That data is not out yet?

13      A.  Correct.

14      Q.  From the larger literature on strabismus in

15  children who have maternal exposure to drugs, and I

16  think it has been tracked with various drugs over

17  decades, there is some information that the minority

18  of them actually go on to have surgery, correct?

19          MS. KEARSE:  Object to form.

20      A.  Correct.

21      Q.  And those that don't may just need glasses?

22      A.  Unknown.

23      Q.  So, your clinic -- I think you reference this

24  in your report -- is, as far as you know, the only

25  clinic that's doing kind of longitudinal following of

```
 1    the NAS children; is that correct?

 2        A.  I'm aware of a couple other in the country.

 3        Q.  Okay.  So from any of this long-term

 4    follow-up at your clinic, is there any data being

 5    generated that looks at long-term outcomes, the

 6    frequency of requiring additional interventions,

 7    healthcare costs or other additional costs associated

 8    with any of these issues beyond what you have already

 9    identified as pending publication?

10        A.  It is ongoing, correct.

11        Q.  Okay.  So are there other research efforts

12    that you are aware of where you have data in your head

13    relating to long-term health implications of being

14    born with NAS --

15            MS. KEARSE:  Objection.

16        Q.  -- that you intend to testify about at trial

17    but we don't know because they haven't been

18    published?

19            MS. KEARSE:  Object to form.

20        A.  Not that I haven't talked about in those

21    three papers.

22        Q.  Okay.  The general consensus is there is not

23    sufficient scientific evidence to say that there are

24    actually long-term detriments of NAS in terms of

25    deviating from the expected norm for educational
```

Highly Confidential - Subject to Further Confidentiality Review

 1   requirements, behavioral requirements, and the other

 2   metrics that you are talking about when you -- when

 3   you account for things like socioeconomic status, the

 4   number of parents in the household, and other just

 5   kind of social factors that are typically tracked in

 6   those states.

 7          Would you agree with that?

 8          MS. KEARSE:  Object to form.  Object to form,

 9   and I'm objecting to the questions of who is

10   testifying here, Counsel.

11          So, if you have a question about his

12   opinions, ask him his opinion, I think you are

13   actually putting testimony in the record  on that too,

14   of your opinions, so...

15          MR. ALEXANDER:  That's an improper objection

16   under the rules for this court.

17       Q.  But if you understand the question, go ahead,

18   please, Doctor.

19       A.  I wouldn't agree completely with that

20   statement.

21       Q.  Is there any specific area where you believe

22   there is a scientific consensus that there is a

23   long-term detriment requiring additional medical,

24   social or educational intervention long-term past,

25   let's say, six months, for an NAS baby?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.  Yes.

2        Q.  Okay.  What area?

3        A.  We have publication that looks at Bayley

4    scores, which is a developmental test that's done at

5    two years of age that showed a decrease in Bayley

6    scores to those that were -- infants that were

7    diagnosed with NAS compared to the normative.

8        Q.  That is one of your citations in your report,

9    correct?

10       A.  It is.

11       Q.  And even though they're lower than the norms

12   than the comparators of that study, they're still

13   within the normal range, correct?

14       A.  Their average is lower -- statistically lower

15   than the norm.  And then if you look at the range of

16   low scores, then the third and fourth quartile is

17   definitely out of the range.

18       Q.  And we can get to that paper later.

19       A.  Uh-huh.

20       Q.  But one of the issues in this area of

21   research, if you will, and there has been a lot of

22   research over the decades relating to babies whose

23   mothers used cocaine, specifically crack cocaine,

24   while they were pregnant and other drugs over time.

25           Do you agree with me so far:  There's been a
```

 1    lot of research on the issue of whether basically

 2    being born to a mother who was using drugs has

 3    long-term health impacts that require additional

 4    interventions?

 5        A.  I agree with that.

 6        Q.  So one of the issues in this area of trying

 7    to do good research is trying to weed out all of the

 8    confounding factors that you might have in some child

 9    who is born in that setting, but is going to

10    necessarily be raised with potential other problems,

11    whether they be poverty, limited educational access,

12    limited healthcare access, exposure to violence,

13    trauma, increased abuse rates, all of those sorts of

14    real-world considerations.

15            Those make it hard to do good research that

16    pulls out whether the fact of birth with some sort of

17    dependence has long-term impacts or the other things

18    do, right?

19            MS. KEARSE:  Object to form.

20        A.  I disagree with that statement.

21        Q.  Okay.  What is wrong about it?

22        A.  Our paper that we just got published looked

23    at discrepancies of opioid-exposed infants, and our

24    cohort that we matched them to that were opioid

25    exposed were that 15,000 -- I think it was 14,900,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    was based out of our primary care center inside

 2    Cincinnati Children's Hospital.

 3            So this is an inner-city population, very

 4    high Medicaid population, so we didn't directly look

 5    at the SES specifically; but our assumption based on

 6    knowing what our population is that we were dealing

 7    with a very similar SES as those that were opioid

 8    exposed.

 9        Q.  So you used the abbreviation SES.

10            What does that mean?

11        A.  Socioeconomic status.

12        Q.  So in addition to socioeconomic status, there

13    are other potential confounders, correct?

14        A.  Correct.

15        Q.  So one of the things you saw, if we are

16    talking about the same paper, is that the children who

17    were not living with their birth mother, the one who

18    was abusing drugs while pregnant, but were living with

19    a foster family, or an adoptive family, they didn't

20    have the difference in Bayley scores, did they?

21        A.  That's a different paper.

22        Q.  Okay.  So isn't that an issue for any of this

23    research:  That you have to look at whether they're

24    still living with the mother versus living somewhere

25    else?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.  The socioeconomic status that the baby is

2  living in does have an impact on their long-term

3  outcomes.

4    Q.  So what -- what are all of the individual

5  criteria that you would put in as being relevant to

6  incidence of behavioral issues, how long until they

7  speak, how long until -- you know, the -- the other

8  metrics of educational and behavioral performance that

9  are measured in your studies, what are the other

10  socioeconomic criteria that matter other than income

11  level?

12        MS. KEARSE:  Object to form.

13    A.  Maternal education.  Stuff that we have

14  talked about in our very first paper.  We looked at

15  maternal education.  We looked at insurance type.

16  That gives us an idea of the SES.

17        And those would have had the biggest --

18  gestational age is another big impact.

19    Q.  Okay.  So in the paper that you are talking

20  about, did you control for all of those?

21    A.  No.

22    Q.  Is there any paper that controls for all of

23  the confounding factors that you think exist that

24  shows that NAS birth status has long-term impacts on

25  Bayley scores or some other measure of functionality

Highly Confidential - Subject to Further Confidentiality Review

```
1    or education or social needs?

2           MS. KEARSE:  Object to form.

3      A.   That would be an impossible study to do.

4      Q.   So no, there isn't one?

5      A.   Correct.

6      Q.   So let me just go back for a second because I

7    want to make sure that we're on -- on the same page

8    with this.

9           The data that is in your papers and in some

10   of your presentation shows that about seven out of

11   eight NAS babies diagnosed in Ohio since you've been

12   tracking this since roughly 2011 are Medicaid,

13   correct?

14          MS. KEARSE:  Object to form.

15     Q.   Meaning their mother's insurance type is

16   Medicaid as opposed to private insurance or some other

17   pay?

18     A.   Roughly.  That's a good rough estimate.

19     Q.   86.4 percent, something like that?

20     A.   That seems very close, yes.

21     Q.   So in Ohio, the percentage on Medicaid is

22   less than half, correct?

23     A.   I don't know exact number.

24     Q.   It is in the same charts in your paper -- in

25   your report?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.  Okay.

2             MS. KEARSE:  Counsel --

3        Q.  Are you aware of that?

4             MS. KEARSE:  Counsel, if you want to refer to

5    a paper or something in his report --

6             MR. ALEXANDER:  I will when we need to.

7        A.  I wouldn't know the exact number off the top

8    of my head.

9        Q.  Do you know if it's more or less than half.

10       A.  It would probably be right around there, but

11   I would be -- not knowing exactly the number.

12       Q.  So does -- if it is about half, and the

13   percentage of NAS babies whose mothers are on Medicaid

14   is close to 90 percent, does that tell you anything

15   about the impact of socioeconomic status on the

16   incidence of NAS?

17            MS. KEARSE:  Object to form.

18       A.  It would imply that there is a higher impact

19   in the Medicaid population.

20       Q.  Have you identified other socioeconomic

21   drivers of the likelihood of being born with NAS other

22   than the fact of maternal drug use?

23       A.  Caucasian has been a factor.

24       Q.  Anything else?

25       A.  Not that I can think of off the top of my
```

1    head.

2       Q.   So I know you started by saying that your

3    studies and your series of studies through OPQC have

4    identified certain things, like insurance status, as

5    drivers of -- or essentially socioeconomic status that

6    you would be tracking in the research, correct?

7       A.   We track insurance type as an indicator.

8       Q.   What are the other indicators that you are

9    aware of that you don't track?

10      A.   Maternal education is something that we

11   usually don't track after that first paper.

12      Q.   Why not?

13      A.   It was just too hard to get all of that data

14   once we expanded our numbers.

15      Q.   And I -- by none of these questions do I mean

16   to minimize anything about the plight of a child who

17   has these sorts of issues or maternal drug use.

18          But this is a matter of:  You-guys have to

19   decide your research parameters, right?  You have to

20   figure out what you can track and what you don't?

21          MS. KEARSE:  Object to form.

22      A.   We come up with a list of things we are going

23   to track and -- before -- in our methodology before we

24   go ahead and start any research project.

25      Q.   And you try to track things that you think

Highly Confidential - Subject to Further Confidentiality Review

```
 1   are important to doing the research project in a
 2   serious and reliable way, correct?
 3        A.  Yes.
 4        Q.  Okay.  So part of the reason that you would
 5   track like insurance status is because the -- there
 6   are associations of poverty itself to some of the same
 7   things that you would be tracking, like the incidence
 8   of educational deficits, increased behavioral
 9   problems, et cetera, correct?
10        A.  That's an assumption.
11        Q.  Okay.  I mean, is there literature on that?
12        A.  Yes.
13        Q.  And you think the literature shows that there
14   is an association that there is a higher likelihood in
15   somebody who is on Medicaid versus somebody with
16   private insurance that their offspring will have
17   educational deficits compared to the norm?
18        A.  I don't think that's a good statement that I
19   would state.
20        Q.  How would you say it?
21        A.  I would state you have to look at each
22   individual on the individual basis, so if the -- I
23   wouldn't want to categorize somebody just because they
24   have Medicaid that they're not going to have an
25   educational outcome of a normal person.
```

```
 1         Q.  Statistically speaking, based upon broad

 2   population, is there some association between economic

 3   status and these sorts of educational metrics of how

 4   soon somebody speaks or reads or how they do on

 5   standardized scores?

 6         A.  I'm not aware of it.

 7         Q.  So why do you track Medicaid status?

 8         A.  We know that the burden -- NAS -- the

 9   incidence of NAS is higher in women that are falling

10   into the category of Caucasian and those on

11   Medicaid.

12         Q.  So are you aware of other factors that affect

13   the incidence in children of behavioral issues,

14   educational deficits, or any of the other sorts of

15   potential long-term impacts that you are actually

16   studying?

17             MS. KEARSE:  Object to form.

18         A.  I guess I don't know what you're asking

19   here.

20         Q.  Sure.  It was -- it was a horrendous

21   question.  I'll try to fix it.

22             So in your long-term studies at your clinic,

23   one of the things that you are tracking and that maybe

24   will do research on in the future will be things like

25   you said Bayley scores.  You also have some metrics of
```

```
 1   like self-reported behavioral issues.  You have how

 2   early it is that the child, like, speaks, correct?

 3           Those are some of them?

 4      A.  Yes, and utilization of resources in the

 5   medical community.

 6      Q.  What are the other indicators of educational

 7   or behavioral or medical needs that you are

 8   tracking?

 9      A.  Utilization of speech, OT, PT, are the main

10   ones, behavioral therapy and then subspecialties.

11      Q.  Is it your belief that all of the things that

12   you are tracking are more likely to be increased;

13   meaning there is a higher likelihood of a deficit in

14   one of these areas or a need for additional services

15   in the Medicaid population versus the non-Medicaid

16   population?

17           MS. KEARSE:  Object to form.

18      A.  So that's what we discuss in our last paper,

19   discrepancies where were able to compare it to the PPC

20   or primary care sender in our hospital, which was a

21   very high Medicaid.  And we did find a difference in

22   those that were opioid exposed compared to those that

23   were not.

24      Q.  That wasn't my question, though.  My question

25   was not anything about opioids.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              I just said:  Does Medicaid status, as far as
 2     you know, also affect the measures that you are
 3     talking about that you are tracking --
 4              MS. KEARSE:  Object to form.
 5        Q.  -- including how often they're using OT,
 6     occupation or physical therapy services?
 7        A.  So I don't know how that direct -- the answer
 8     to Medicaid status and utilization.  I just know in
 9     our comparator group, which was very high, we were
10     able to compare to that group.
11        Q.  Okay.  So are you aware of recognized
12     factors, other than the maternal drug use and Medicaid
13     status, that affect the need for additional social
14     services?
15        A.  I'm not aware of that.
16        Q.  Have you looked into that for any of your
17     work on this case?
18        A.  I have not.
19        Q.  Are you aware of other factors that affect
20     the incidence of educational deficits such as those
21     that you are tracking?
22        A.  We have stopped tracking the educational
23     level of the mothers.
24        Q.  I'm not talking about the mother.
25        A.  Okay.
```

```
 1        Q.  I'm talking about the kids.  For the

 2   offspring, one of the things you look at are some

 3   measures of essentially eventually once they get into

 4   school system and learning, how quickly they are able

 5   to what, speak, read?  There are other measures of

 6   educational deficits that you track, right?

 7        A.  We are looking into that, correct.

 8        Q.  Are there other risk factors that affect

 9   those measures?

10        A.  I'm sure there are.

11        Q.  Do you know what they are?

12        A.  I think it is multifactorial.  I wouldn't be

13   able to give you a direct answer.

14        Q.  Did you look into any of those issues in

15   connection with preparing your expert opinion in this

16   case?

17        A.  No.

18        Q.  So in the research that you are doing, there

19   is no effort to control for any potential confounders

20   that would be related to the risk factors for

21   educational deficits?

22            MS. KEARSE:  Object to form.

23        A.  So we have applied for a grant with trying to

24   add a control group, exactly, into our future study

25   that we have applied for a grant.  We have not
```

```
 1    received it yet.

 2        Q.  So I think we have come around to where we

 3    started.

 4            You've applied for a grant, but there is no

 5    ongoing research related to a way to have a

 6    accurate -- a representative control for all of the

 7    relevant -- as much as you can track -- risk factors

 8    for these sorts of deficits, needs for increased

 9    social services, et cetera, except for the fact of

10    being born with NAS status; is that correct?

11            MS. KEARSE:  Object to form.

12        A.  So we could not find any great literature

13    with a direct control group with the same

14    socioeconomic status.  I think when you do an

15    administrative database review, it's -- it -- it is

16    hard to separate those completely.

17        Q.  So are you trying to do some sort of

18    retrospective study or are you actually going to do

19    prospective study with a control group?

20        A.  We have a prospective.

21        Q.  Do you know what the risk factors are or the

22    criteria are that you are going to track to try to

23    establish what is a good control?

24        A.  So we are -- the main outcome -- the main

25    first two steps are going to be opioid exposure and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    non-opioid exposure and insurance status.

 2         Q.  What about all of the other stuff?

 3         A.  No.

 4         Q.  None of it?

 5             You're not going to track any of the things

 6    that you have already identified that affect the need

 7    for social services, educational outcomes,  Bayley

 8    scores, anything else?

 9             MS. KEARSE:  Objection.

10         A.  We are going to be tracking all those.  You

11    asked how we are going to control.

12         Q.  Okay.  So to establish your control group,

13    you need to have them be exactly the same as your

14    exposed group, except for the fact of exposure, right?

15             That's the goal of controlled clinical

16    research, right?

17         A.  There is different -- you can control for

18    certain factors and then you would then gather your

19    data and then see if there is a significance when you

20    break it down individually on certain other factors.

21         Q.  So --

22         A.  So our main two factors that we kept at the

23    top as our breaking point were opioid and insurance

24    status.

25             After that, we are going to look to see if
```

Highly Confidential - Subject to Further Confidentiality Review

1    there is a difference in those two groups.

2        Q.  Do you know what other criteria you are going

3    to look at, what other status you are going to look

4    at?

5        A.  We are going to be looking at

6    tobacco exposure.  We are going to be looking at all

7    of those previous outcomes of visual disturbances, OT,

8    PT, everything else we are tracking in our clinic,

9    except we are you now going to add a control group

10   into our clinic.

11       Q.  So for tobacco use, you're talking about

12   tobacco use while the mother was pregnant?

13       A.  Correct.

14       Q.  Okay.  And there is literature that

15   tobacco use while pregnant affects various measures

16   like birth weight at the time of delivery, correct?

17       A.  Correct.

18       Q.  And those also have an association in the

19   literature to a need for additional services and

20   increased frequency of educational deficits,

21   correct?

22            MS. KEARSE:  Object to form.

23       A.  Only for certain aspects.

24       Q.  And one of those cites that you have in your

25   report is to a study that looked at the incidence of

1    tobacco use in pregnant women by testing versus

2    self-reporting.

3            Do you remember that?

4        A.  Uh-huh.

5        Q.  Yes?

6        A.  Yes.

7        Q.  That's another rule I didn't go over.  It is

8    helpful --

9        A.  I forgot, yes.

10       Q.  -- to answer with words and not nods or

11   sounds.

12           So is one of the things that you would pay

13   attention to with tobacco use is whether increased

14   tobacco use while pregnant might be a confounding

15   factor for the need for social services, for

16   educational deficits or other things that look like

17   long-term impacts of neonatal abstinence syndrome?

18           MS. KEARSE:  Object to form.

19       A.  I'm not aware of any of that literature.

20       Q.  Is that part of what you are trying to

21   examine in the paper that you are going to do if you

22   get the funding?

23       A.  We are -- it's -- that would be a part of the

24   descriptive behavior.

25       Q.  Okay.  And is it true, as far as you know,

Highly Confidential - Subject to Further Confidentiality Review

1    that there is a correlation between women who smoke in

2    the third trimester of pregnancy and women who also

3    use illicit drugs while pregnant?

4        MS. KEARSE:  Object to form.

5        A.  Not aware of that.

6        Q.  Did you see that in the paper that you cited

7    on tobacco use?

8        A.  The way you asked is does cigarette use lead

9    to opioid.

10       Q.  I said is there a correlation between

11   tobacco use during the third trimester of pregnancy

12   and illicit drug use during pregnancy?

13       MS. KEARSE:  Object to form.

14       A.  The way you're asking if -- you would ask to

15   ask it the other way.

16       Q.  Okay.  So you think that drug use during

17   pregnancy, use of illicit drugs is associated with

18   increased use of tobacco during pregnancy, not the

19   other way around?

20       A.  Correct.

21       Q.  Are you going to track alcohol use during

22   pregnancy in the study that you are proposing?

23       A.  We look at self-report of alcohol use.

24       Q.  So like what we saw in the tobacco paper,

25   self-reporting tends to be about four to six times

```
 1    lower than testing for the metabolism -- the

 2    metabolites of tobacco, correct?

 3         A.  That is correct.

 4         Q.  So self-reporting of alcohol is going to

 5    underestimate alcohol use during pregnancy, right?

 6              MS. KEARSE:  Object to form.

 7         A.  That is correct.

 8         Q.  And is there some correlation between alcohol

 9    use, illicit drug use, and tobacco use, those all go

10    hand-in-hand?

11              MS. KEARSE:  Object to form.

12         A.  Alcohol hasn't really been looked at that

13    much because there is no test to determine that use at

14    a readily available process, and that's why we had to

15    rely on self-report.  It is purely a -- what lab test

16    can you get?

17         Q.  Okay.  So why do you look at alcohol abuse

18    during pregnancy?

19         A.  We know that that can lead to fetal alcohol

20    syndrome.

21         Q.  Have you ever come up with a plan for how to

22    improve outcomes with fetal alcohol syndrome in Ohio

23    or any portion of Ohio?

24         A.  I have not been part of that.

25         Q.  Did you still have fetal alcohol syndrome
```

```
 1    infants in your care or in the care at your

 2    hospitals?

 3        A.  We do.

 4        Q.  Have there been, as far as you know, public

 5    health efforts around the nation, and in southwest

 6    Ohio in particular, for as long as you've been a

 7    practicing doctor to try to reduce fetal alcohol

 8    syndrome?

 9        A.   It is part of the OB visits that are

10    discussing decrease in use.

11        Q.  And what about on your side, on the pediatric

12    side:  Do you participate in any of that at all in

13    terms of counseling to try to avoid fetal alcohol

14    syndrome and minimize its incidence?

15        A.  We usually are on the other -- I mean, we

16    work with the mother-infant dyad.  So when we have a

17    mom who is pregnant that we are seeing in the clinic,

18    we obviously would -- if the questions come up, we

19    would address it.

20        Q.  And despite the efforts, you haven't been

21    able to eliminate fetal alcohol syndrome?

22        A.  That is correct.

23        Q.  And anywhere in your report, do you talk

24    about the impact of fetal alcohol syndrome on the need

25    for additional public services or changes in hospital
```

```
 1   behavior -- or healthcare behavior more generally with

 2   regard to pregnant women?

 3       A.  I do not mention fetal alcohol syndrome.

 4       Q.  I mean, is it possible to really talk about

 5   optimizing maternal and fetal care without talking

 6   about alcohol abuse, abuse of other drugs, tobacco,

 7   while you're talking about opioids and opiates?

 8           MS. KEARSE:  Object to form.

 9       A.  Can you repeat that one more time?

10       Q.  Sure.  I'll actually do better.  I'll try to

11   break it down.

12           So I just asked generally about alcohol

13   abuse.

14           Alcohol abuse during pregnancy is a public

15   health issue, correct?

16       A.  Yes.

17       Q.  Okay.  And it has increased -- it is

18   associated with increased healthcare expenditures,

19   increased social services needs, educational deficits

20   and a variety of other sequelae, correct?

21           MS. KEARSE:  Object to form.

22       A.  It is.

23       Q.  Despite efforts for decades to try to

24   eliminate it, right?

25       A.  Correct.
```

1      Q.   Okay.  Other drugs, other than opioids or

2   opiates, can be abused during pregnancy as well,

3   correct?

4      A.   That is correct.

5      Q.   One of the things seen in your research, and

6   the research you cited, is that while opiate abuse

7   during pregnancy or opioid abuse during pregnancy has

8   gone up during the same study period, basically all

9   use of all drugs has gone up?

10          MS. KEARSE:  Object to form.

11     A.   Most, yes.

12     Q.   In general, women now, according to the data

13   that you have released to the years you've presented,

14   are more likely to use drugs while pregnant than they

15   used to be, and that's pretty much true across all

16   classes of drugs?

17          MS. KEARSE:  Object to form.

18     A.   Yes.

19     Q.   And cocaine abuse during pregnancy can have

20   an impact both on maternal health and fetal or --

21   health or health of the offspring, correct?

22     A.   It can have effect on maternal health and put

23   the infant at risk for certain conditions.

24     Q.   And infants at risk for certain conditions

25   certainly need additional -- on average, need more

```
 1    services in the postpartum period, correct?

 2        A.  Correct.

 3        Q.  And then there is the debate that we have

 4    talked about, about how long they might need

 5    additional services, correct?

 6        A.  That is correct.

 7        Q.  Is that still a debate in your community of

 8    pediatricians who focus on issues like the impact of

 9    maternal substance abuse?

10        A.  We don't do any extra testing or -- for

11    infants if they're exposed to solely cocaine.

12        Q.  So they need additional services in the

13    hospital, correct?

14        A.  If they're born premature from an abruption,

15    but otherwise, no, they do not.

16        Q.  And so the experience with cocaine is that --

17    I guess coming out of all of the research from the

18    crack epidemic -- is that there doesn't seem to be a

19    long-term need for additional educational or social

20    services support in those babies; is that correct?

21        A.  They do need elevated social service

22    follow-up, but that's because it is an at-risk

23    infant.

24        Q.  And is that because they were born with

25    withdrawal from cocaine, or is that because they're in
```

Highly Confidential - Subject to Further Confidentiality Review

 1    a household with a mother who might be still abusing

 2    cocaine or the other socioeconomic status overlays

 3    that we have talked about?

 4         MS. KEARSE:  Object to form.

 5         A.  I would say with your middle statement that

 6    it is due with a mother using illicit substance while

 7    pregnant.

 8         Q.  So for any illicit substance used by a mother

 9    there is going to be a need for additional follow-up

10    and monitoring, correct?

11         A.  Correct.

12         Q.  So even though that's part of your program,

13    that is not specific to opioid or opiate abusing

14    mothers, correct?

15         MS. KEARSE:  Object to form.

16         A.  That is correct.  We do a safety plan for

17    those that are exposed to illicit substances during

18    pregnancy.

19         Q.  So, for other categories, there is -- if you

20    -- some of the data that you actually showed is that

21    while prescription opioid abuse in Ohio among pregnant

22    women has dropped, it has been passed by cocaine and

23    benzodiazepines recently, correct?

24         MS. KEARSE:  Object to form.

25         A.  I don't think it has been passed.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.  So cocaine is higher now, benzodiazepine is

2    the last thing that was going up, prescription opiates

3    is going down, and now the last time they were at the

4    exact same level; is that right?

5         MS. KEARSE:  Object to form.

6    A.  They are very close together, correct, there

7    now.

8    Q.  What, like within a tenth of a percent?

9    A.  They're very close, correct.

10   Q.  Well, benzo use is going up and prescription

11   opioid use is dropping?

12   A.  Yes.

13   Q.  Okay.  So for the data for the last several

14   years, since roughly 2005, prescription opioid abuse

15   in Ohio has dropped and that is also seen in terms of

16   the usage patterns in pregnant women, correct?

17   A.  For prescription opioids, yes.

18   Q.  Okay.  So are there health consequences to

19   the mother, the unborn child or the infant with

20   benzodiazepine abuse during pregnancy?

21   A.  So you asked these questions there.

22        So the first one:  Is there increased risk

23   for mother?  If she's getting prescribed

24   benzodiazepines.

25   Q.  I was asking about abuse.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Abuse?

 2        Q.   I can start them over and break them up.

 3             So for abuse of benzodiazepines, are there

 4   health risks for a pregnant woman?

 5        A.   So if a person is using a prescribed -- any

 6   prescribed medication in an illicit manner, yes.

 7        Q.   Okay.  What are those health risks, as far as

 8   you know?

 9        A.   Well, they're -- put themselves at -- if

10   they're not following a physician's order, they're

11   putting them at risk for overdose.  They are not aware

12   of the other interactions that it can have with other

13   medications or substances.

14        Q.   All right.  Do you treat pregnant women at

15   all as a clinician?

16        A.   As a clinician, no.

17        Q.   And what about any prescriptions or treatment

18   of women at all, other than infants and small

19   children?

20        A.   I do not write prescriptions for pregnant

21   women.

22        Q.   Do you have a DA license?

23        A.   Yes, I do.

24        Q.   And on what occasions are you prescribing a

25   controlled substance?
```

```
 1        A.  So in the hospital, you -- we write for

 2   morphine, benzodiazepines, buprenorphine, methadone,

 3   but within the hospital that is a different -- you

 4   don't need a D -- that covers -- it is not part of a

 5   DEA separate licensure.

 6        Q.  And are those for children or adults?

 7        A.  Those are for newborns.

 8        Q.  Is there occasion outside of the hospital

 9   setting where you ever prescribe any of those

10   medicines?

11        A.  No.

12        Q.  Sir, let's go back to benzodiazepine abuse.

13        A.  Okay.

14        Q.  Are there risks in terms of the unborn child,

15   whether they be low birth weight, early birth,

16   rupture, any other consequences to the pregnancy

17   itself?

18        A.  Not that I'm aware of by pure abuse.  I don't

19   know if there is not any literature on that.

20        Q.  Have you looked into that for purposes of the

21   report here?

22        A.  No.

23        Q.  What about cocaine abuse or alcohol abuse?

24   Did you look at any of these issues related to those

25   in terms of health consequences to mothers, unborn
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   children or children?

 2        A.  No.  My focus was on the opioid exposed.

 3        Q.  And what about just in general nonopioid drug

 4   abuse?  Well, actually, stop.  I'll go back.  I missed

 5   one.

 6            Benzodiazepine abuse:  Does that have any

 7   long-term or short-term impacts in children who are

 8   born of a mother whose abusing benzodiazepines?

 9        A.  It does not affect their hospital stay in the

10   hospital.  And then long-term, like I don't know if

11   there -- we don't -- there is no special follow-up

12   that we do differently.

13        Q.  What about any other drugs of abuse during

14   pregnancy?

15            Are you aware of anything indicating that

16   other drugs, not -- not opioids or opiates, not

17   cocaine, not benzodiazepines, not alcohol, but other

18   drugs.  I guess it could be PCP.  It could be

19   marijuana.  It could be a variety of other drugs.

20            Are you aware of any impact those have on

21   pregnant women?

22            MS. KEARSE:  Object to form.

23        A.  Once -- it would go back to that previous

24   state of any illicit use of any substance that is not

25   being monitored puts the woman at risk for having
```

1    interactions, or not knowing what dosage they're

2    taking.  So there could always be an effect that

3    way.

4        Q.  Did you do any specific research or valuation

5    of the literature on this issue for your expert

6    opinions in this case?

7        A.  No.

8            MS. KEARSE:  Counsel, is this a good time for

9    a break?  I think we have been going over an hour.

10           MR. ALEXANDER:  I would like to just come to

11   a close on this line of questioning, which will only

12   take a couple of more minutes, if people's bladders

13   can handle that.

14           MS. KEARSE:  If it's a couple more minutes.

15   I'll try.

16   BY MR. ALEXANDER:

17       Q.  Sure.  In terms of the pregnancy itself, any

18   other drugs of abuse affect how long a pregnancy

19   lasts, its likelihood of resulting in rupture, early

20   delivery, low birth weight, any of those measures?

21           MS. KEARSE:  Object to form.

22       A.  Drug use.

23       Q.  Drug abuse other than the specific substances

24   we have gone over, like opioids, opiates, alcohol,

25   cocaine and benzodiazepines?

```
 1        A.  I just -- I wouldn't know how to -- what

 2   specific drug are you --

 3        Q.  Any of them.  Is there any other drug of

 4   abuse that is known to be abused by women who you're

 5   aware of that either you study, treat or followed

 6   literature on that affects pregnancy outcomes?

 7        A.  No.

 8        Q.  What about affects infants who are born from

 9   a woman who has abusing any of those additional drugs

10   or substances?

11        A.  It doesn't change our length of stay in the

12   hospital besides setting up a safety plan for the

13   dyad.

14        Q.  So if a woman is using, let's say, marijuana

15   while pregnant, and that's seen in your data,

16   correct?

17        A.  We did look at THC.

18        Q.  It's increasingly common and it is more

19   common than use of any prescription opioid, correct?

20            MS. KEARSE:  Object to form.

21        A.  I don't know the numbers off the exact -- off

22   the top.  I would have to look that up.

23        Q.  But you would defer to the charts in your

24   report, right?

25        A.  Yes.
```

```
 1          Q.  And the ones that you have attached?

 2          A.  Correct.

 3          Q.  I would say in general:  For anything that

 4     you published with your name on it, you expect that

 5     the data is accurate?

 6          A.  Yes, it is.

 7          Q.  Do you stand by the statements in your

 8     publications?

 9          A.  I do.

10          Q.  All of the things that you have cited in your

11     report, you chose to cite those specific pieces of

12     literature?

13          A.  Correct.

14          Q.  You stand by those as standing for whatever

15     you cited them for, right?

16          A.  Correct.

17          Q.  And are you aware of any specific areas where

18     you think that the published reports or articles that

19     you have cited are wrong in any way or you have

20     disagreements with what they're proposing?

21          A.  No, I do not.

22          Q.  Okay.  And I could say this probably in

23     general and then we can hit that promised break.

24              There are some of these recommendations of

25     professional organizations and governmental or
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    quasi-governmental entities that you have cited or a

 2    attached to your report, correct?

 3           There's ACOG statement and there is a World

 4    Health Organization statements, correct?

 5    A.  Yes.  I wouldn't know what you mean by

 6    "quasi" statements descriptor.

 7    Q.  I said quasi-governmental.

 8    A.  Okay.

 9    Q.  Anyway so we can call this professional

10    statements if you want, but they're also sometimes

11    from governmental entities or international entities,

12    correct?

13    A.  Yes.

14    Q.  You cited them and attached them to your

15    report?

16    A.  I did.

17    Q.  Is there -- are there areas where what you

18    recommend be done in Cuyahoga or Summit County going

19    forward are different than what they recommend?

20    A.  I -- I'm sure there must be one or two

21    statements that is different in my report than if you

22    read their full report would be different in all of

23    those separate entities.

24    Q.  The one that -- the one that would leap out

25    is that you are a little more bullish on using
```

1    buprenorphine as the primary therapy for treating

2    children when they're born with neonatal abstinence

3    syndrome than using Morphine; is that correct, or

4    methadone?

5            MS. KEARSE:  Object to form.

6       A.  I don't know about the adjective "bullish,"

7    but we have one of the few centers that have done

8    research on buprenorphine use in infants, yes.

9       Q.  And that's your first line?

10      A.  In some of our hospitals, not regionally.

11   Our recommendation is still methadone.

12      Q.  Are you aware of any data in any of the

13   things that you've cited, including those sorts of

14   governmental or professional statements that you think

15   is wrong or outdated or misrepresents trends in opioid

16   use or neonatal abstinence syndrome?

17      A.  So some of those reports are old, meaning

18   they more than three years old; so, yeah, I am sure

19   there is outdated information in all of them.

20      Q.  Is there any recommendation in any of those

21   statements that you no longer abide by?

22      A.  You mentioned multiple, CDC, WHO, ACOG, so

23   I'm sure we are not following all of those statements

24   that have been published in the last four years

25   because there's been an evolving field.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.  You also are an advocate and you recommend

 2   universal drug testing, not just universal screening,

 3   right?

 4        MS. KEARSE:  Object to form.

 5        A.  Yes.

 6        Q.  And that is one area where not everyone

 7   agrees with you, correct?

 8        A.  That is correct.

 9        Q.  Including that there are state laws that may

10   get in the way of that because it leads to, like,

11   criminal referrals and things like that when a woman

12   tests positive and, therefore, you might get women not

13   willing to participate in drug testing, right?

14        MS. KEARSE:  Object to form.

15        A.  That hasn't been shown.

16        Q.  Okay.

17        MS. KEARSE:  Counsel, I think I gave you

18   leeway.  You were finishing up your area and now we've

19   kind of gotten into a whole nother area.

20        MR. ALEXANDER:  Yeah.  So one -- one more

21   question, if I can.  Just one.

22        MS. KEARSE:  Just one.  I'm just trying to be

23   ever hour, I would, you know, assume let's try and

24   take a break, if we can.

25        MR. ALEXANDER:  Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KEARSE:  I don't know what is funny about

 2    that.

 3              MR. ALEXANDER:  Well, we don't always --

 4    we've had a number of depositions where we have gone

 5    two or more hours between breaks, but it's fine.

 6              I'm also laughing at the idea that I'm going

 7    to ask one question, but I will try.  I'll try.

 8              MS. KEARSE:  Or we can just take a break.

 9              MR. ALEXANDER:  No, because now I have a

10    question that I want to ask, so --

11        Q.  Dr. Wexelblatt --

12              MS. KEARSE:  I want to take a break.

13        Q.  -- is there any portion of your

14    recommendation that you have set forth in your report

15    that is specific to something that should be done for

16    Cuyahoga and Summit County as opposed to what you

17    would recommend for any other one or two of the 98

18    counties in Ohio?

19              MS. KEARSE:  Object to form.

20        A.  No.

21              MR. ALEXANDER:  Now is a good time for a

22    break.

23              MS. KEARSE:  Thank you.

24              THE VIDEOGRAPHER:  We're now going off

25    record.  The time is 10:50.
```

```
 1                (There was a brief recess.)

 2                THE VIDEOGRAPHER:   We are now back on record.

 3    The time is 11:10.

 4    BY MR. ALEXANDER:

 5        Q.   All right.   Dr. Wexelblatt, do you have any

 6    of your testimony thus far you need to change or amend

 7    in any way?

 8        A.   No.

 9        Q.   I have some follow-up on a little bit of the

10    stuff we were talking about before the break.

11                For the tracking of cocaine use in pregnant

12    women in any of the research efforts that you're

13    engaged in, do you go off of blood tests?  Do you go

14    off of self-reporting?  How do you track that?

15        A.   Regionally what we do is base it on maternal

16    urine drug testing at the time of delivery.

17        Q.   And do you find that you get more from urine

18    testing than you do from self-reporting?

19        A.   Yes.

20        Q.   Do you -- do you do anything to track the

21    issue of polypharmacy, which of the women have use of

22    not just one drug of abuse, but multiple drugs of

23    abuse, during pregnancy?

24        A.   We do track that.

25        Q.   Are you aware of any literature that
```

Highly Confidential - Subject to Further Confidentiality Review

1    polypharmacy, you know, multiple drugs of abuse, can

2    have a cumulative or additive effect in terms of the

3    effect on maternal health, pregnancy outcomes, or the

4    health or needs of the offspring?

5    A.  So to answer the last part of that, we do

6    know that if a baby is opioid exposed and has

7    polysubstance, that they do have more of a need for

8    adjunct therapy than that, that does not.

9    Q.  Okay.  And what about other polypharmacy

10    where a woman is abusing not opioids, but multiple

11    other drugs?

12    Is there any literature on any of those

13    outcomes?

14    A.  I'm not aware of any literature that looks at

15    that.

16    Q.  What about literature on the other part of

17    what you just answered, which is an effect on maternal

18    health or pregnancy outcomes from polypharmacy that

19    does involve opioids or opiates?

20    A.  On maternal health --

21    Q.  Yes.

22    A.  -- was the question?

23    Q.  No, you answered about --

24    A.  You had three questions.

25    Q.  Yeah.

```
 1        A.   And I went with the third part --

 2        Q.   It was --

 3        A.   -- on the infant.

 4        Q.   Right.  You answered about the infant.

 5             I also asked about --

 6        A.   Okay.

 7        Q.   -- maternal health and pregnancy outcomes.

 8        A.   So for maternal health, we know that moms

 9   that are in monosubstance therapy, or MAT, do better

10   than those that have polysubstance use when it refers

11   to opioids.

12             And then with pregnancy outcomes, I don't

13   think there's any differentiation besides on -- I

14   assume "outcomes," you mean by gestational age or

15   birth weight?

16        Q.   Those sorts of measures, yes.

17        A.   I don't think there is.

18        Q.   And I wasn't clear from your earlier answer

19   when I was asking about benzodiazepines.

20             Is there literature that's looked at whether

21   benzodiazepines affect the health of offspring or the

22   need for additional services or medical care?

23             I know you said you don't track that in your

24   clinic.

25        A.   That is correct.  We do not track that.
```

Highly Confidential - Subject to Further Confidentiality Review

1       Q.  Are you aware of any literature that's looked

2    at that issue specifically as whether maternal

3    benzodiazepine use can affect the health of the

4    offspring and their need for additional medical or

5    social services?

6       A.  I'm not aware of anything that would

7    differentiate illicit or prescribed benzodiazepine use

8    and outcomes.

9       Q.  And the -- you mentioned the use of databases

10   to do certain kind of tracking and analysis in a

11   retrospective fashion.

12      A.  I did mention that.

13      Q.  Are there current databases that you're using

14   for any research efforts?

15      A.  We use -- for most of our database that we

16   are using is our internal database, which is based off

17   our EHR and billing data.

18      Q.  Does it have a name, your database?

19      A.  I would have to -- I'm not aware of the --

20   it's -- we use our Epic database for our last paper

21   that we used.

22          When we have databases for our studies, they

23   were all through REDCap.  That was inputted data.

24      Q.  So do you know what the historic tracking is

25   in that database of, like, how they figure out alcohol

Highly Confidential - Subject to Further Confidentiality Review

 1    use, cocaine use, polypharmacy, or the other sorts of

 2    things that we have talked about in terms of maternal

 3    drugs of abuse, substances of abuse, or other effects

 4    on maternal health, pregnancy outcomes, or the health

 5    of offspring?

 6          MS. KEARSE:  Object to form.

 7    A.    To generally answer the -- the main databases

 8    usually are using an administrative database, which is

 9    based on the ICD-9 or 10 billing codes, based on the

10    hospital records.

11    Q.    So a lot of the stuff we've been talking

12    about is not going to be tracked, correct?

13    A.    We've talked about a lot.

14    Q.    Well so in terms of maternal drugs of abuse

15    and substance abuse, that's all not necessarily going

16    to be tracked with the level of detail that we're

17    talking about and have polypharmacy and the level of

18    smoking and things like that.

19          That's not in billing codes?

20    A.    No, that's incorrect, actually.

21    Q.    Okay.  Your ICD-9 codes tracks all of the

22    different substances of abuse during pregnancy?

23    A.    So, yeah, there was a recent paper in which I

24    didn't cite, but since you bring it up, I know there

25    is a paper out there by Patrick, who is a senior

Highly Confidential - Subject to Further Confidentiality Review

```
 1    author, that looked at administrative databases with

 2    predictive use and to look at if you had a certain

 3    diagnosis, was it correlated with the chart.

 4           So they looked at the diagnosis of NAS and

 5    correlated it to opioid use, and they found that the

 6    ICD-9 was 92 percent correlative, and the ICD-10 was

 7    98 percent correlative with direct patient -- with

 8    direct chart review.

 9    Q.  So do the billing codes track the level of

10    smoking, the level of cocaine use, the specifics of

11    polypharmacy?  Do they have that level of detail from

12    the databases that you're using?

13    A.  It's either -- it's a yes or no.  So you

14    either use or you did not use.  It does not have

15    specific numbers.

16    Q.  Okay.  So there's no quantification of the

17    timing of the substance abuse during the pregnancy?

18    Like whether it's first, second, or third trimester?

19    A.  Not for every single drug.  Usually tobacco

20    is broken into that, but other substances it's usually

21    not broken down that detailed.

22    Q.  And so for polypharmacy, will it check yes or

23    no for polypharmacy, or will it give some sort of

24    pull-down for all the various substances that are

25    involved in the polypharmacy?
```

```
 1              MS. KEARSE:  Object to form.

 2       A.  It will list all the exposures, and then if

 3  it's more than one, it's poly.

 4       Q.  I'm sorry to go back to this, but the ongoing

 5  paper you have related to hepatitis C, is your

 6  expectation that that is always through the use of

 7  drugs that involve needles?

 8       A.  No.

 9       Q.  How else might a mother get hepatitis C and

10  pass it on to a child?

11       A.  So your -- can you repeat the first question?

12  I think the way you asked it was if it was always

13  correlated with.

14       Q.  So I'll ask it again.

15       A.  Yes.

16       Q.  I mean, you can have her read it back, I

17  don't care, but I can -- so what sort of drug use can

18  be associated with maternal transmission of

19  hepatitis C to a child

20       A.  What we have found is that it's associated

21  with maternal opioid use.

22       Q.  So is that meaning that the -- they're taking

23  prescription pills pursuant to a prescription written

24  for them?

25       A.  So the level that we are able to look at, if
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    it's illicit, we can only break it down -- when we use
 2    the word "illicit," it means it wasn't prescribed.  So
 3    I can't differentiate usually between heroin or
 4    illicit use of Percocet, for example.
 5         Q.  Okay.  So based upon how you understand
 6    hepatitis C is transmitted in human populations, how
 7    do you believe the mothers are getting the
 8    hepatitis C?
 9         A.  It's usually bloodborne.  It is bloodborne.
10         Q.  So is that associated with use of drugs that
11    involve needles?
12         A.  Yes.
13         Q.  So do you know if any of that's going to be
14    pursuant to a legal prescription written for them?
15         A.  Can you repeat that?
16         Q.  Sure.  I mean, maybe you've covered it.
17              Do you think it's always related to the
18    illicit opioid or opiate use, correct?
19              MS. KEARSE:  Object to form.
20         A.  So our breakdown I would -- I don't have that
21    data in front of me, so I can't -- I don't know -- I
22    couldn't answer that a hundred percent when I say
23    "illicit" if we ever -- we look at illicit versus
24    prescribed.
25         Q.  I mean, is anybody getting prescribed opioids
```

Highly Confidential - Subject to Further Confidentiality Review

1    or opiates where they're injecting themselves and

2    sharing needles such as that it could be bloodborne?

3         A.  I think there's literature to suggest that

4    illicit use of prescription opioids is associated with

5    illicit use of injectables.

6         Q.  Okay.  So I'm not trying to be difficult, but

7    I'm trying to get to the actual time when the

8    transmission happens and what you're looking at.

9         A.  Uh-huh.

10        Q.  Is that to get the hepatitis C, somebody is

11   using an illicit drug that involves a needle, and so

12   you can have bloodborne transmission, correct?

13             MS. KEARSE:  Object to form.

14        A.  To get hepatitis C is bloodborne.

15        Q.  Okay.  And can that also be transmitted in

16   some other fashion, through unprotected sex or

17   anything like that, or is it always going to be

18   bloodborne?

19        A.  I think that the current understanding is

20   that it's always bloodborne.

21        Q.  Okay.  So that's never going to be directly

22   from the use of a prescription opioid, correct?

23        A.  If you -- you're -- can you get hepatitis C

24   from illicitly using a prescribed opioid?

25             Is that your question?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.  No, I didn't ask illicitly.

 2        A.  Okay.

 3        Q.  I'm saying:  Can you get hepatitis C from

 4   using a prescription opioid in a legal fashion, like

 5   pursuant to a prescription written for the person who

 6   actually takes it?

 7        A.  No.

 8        Q.  Okay.  So what you're alluding to is that

 9   there is some suggestion that some patients who

10   ultimately are using heroin, or other needle-borne

11   narcotics, are -- may have started with some other

12   drug or series of drugs before they get into heroin,

13   let's say.

14             That's what you're talking about, right?

15        A.  Uh-huh.  Yes.

16        Q.  Okay.  So by the way, in terms of that area,

17   the issue of, like, drug abuse patterns and the

18   neuropharmacology that relates to addiction, the

19   societal patterns of what's sometimes called the

20   gateway effect, whether that exists, doesn't exist,

21   how often it exists, those are all areas where you do

22   not hold yourself out as an expert, correct?

23             MS. KEARSE:  Object to form.

24        A.  Correct, in that I'm not an expert in that.

25        Q.  You're an expert in pediatrics, correct?
```

```
 1      A.  Yes.

 2      Q.  And you hold yourself out as an expert in --

 3  I guess it's described in the report here --

 4  maternal-fetal issues related to opiate exposure; is

 5  that correct?

 6      A.  It is.

 7      Q.  Are there any other areas where you hold

 8  yourself out as an expert?

 9      A.  No.

10      Q.  So, I mean, not to make it too simplistic:

11  But when you went to medical school and you picked the

12  area where you wanted to focus, all of your

13  specialized training has been in pediatrics,

14  correct?

15      A.  Yes.

16      Q.  Okay.  And so you don't hold yourself out as

17  an expert in treating pain, in pharmacology or

18  neuropharmacology of treating pain, any of the other

19  areas that we might talk about as being related to the

20  use of prescription or illicit opioids or opiates,

21  correct?

22          MS. KEARSE:  Object to form.

23      A.  It's a generalized statement, yes.

24      Q.  What about, like, obstetrics?  Are you an

25  expert in obstetrics?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.  No.

 2       Q.  Have you ever, outside of your early medical

 3  experience, participated -- well, let me ask it this

 4  way:  So in some of these treatment of the

 5  mother-child dyads, there's other healthcare

 6  professionals who are focused on the mother,

 7  correct?

 8       A.  We have specialists in our OPQC team that are

 9  maternal-fetal medicine, addiction medicine

10  specialists, obstetrics, social workers, yes.  We have

11  every field covered.

12       Q.  Okay.  And even though you're talking about

13  all of those fields here, your part where you're

14  actually an expert is on the pediatrics side?

15       MS. KEARSE:  Object to form.

16       A.  I do take care of pediatric patients,

17  correct.

18       Q.  Do you hold yourself out as an expert in

19  anything relating to the social services or

20  educational support that might be required because of

21  any kind of deficit in a newborn or a child?

22       A.  So when we take care of the patient, it's the

23  family that we are addressing.  So if a -- the whole

24  social service umbrella incorporates everything of the

25  family.
```

1      Q.   So let me break it down because I can give

2   some examples.

3           You've already talked about occupational

4   therapy and physical therapy and when those might be

5   required and how those might correct some of the sorts

6   of issues that you've identified, correct?

7      A.   That is correct.

8      Q.   So you're not an expert in occupational

9   therapy or physical therapy, correct?

10          MS. KEARSE:  Object to form.

11     A.   So to get into that field of OT or PT, they

12   need a referral from us.  So we determine if they need

13   those services.

14     Q.   Is that the extent of where you claim

15   expertise?

16     A.   Yes.

17     Q.   Okay.  What about anything relating to social

18   work or the sorts of social services that are

19   typically provided on a county basis in Ohio?

20     A.   Once again, it's knowing that they have a

21   need is our -- and then referral, and then

22   letting them take over.

23     Q.   What about, like, the specifics of the social

24   work or the social services part of that, how you

25   would form a specific plan and what kind of staffing

```
 1    you would need to implement additional care for a

 2    mother-child dyad affected by drug abuse?

 3          Those specifics would be beyond your

 4    expertise as well, correct?

 5          MS. KEARSE:  Object to form.

 6       A.  That is correct.

 7       Q.  And, therefore, that's -- and that's part of

 8    why in your report you didn't outline any specifics of

 9    what you think -- actually think social services would

10    need to provide, correct?

11       A.  Exactly.

12       Q.  And the same thing goes for any of these

13    areas in terms of obstetrical care or any of the

14    general topics that you've identified, that there

15    would be need for some sort of plan or some sort of

16    services to be provided to improve or -- I'm sorry --

17    as you say, optimize maternal-fetal outcomes.

18          Those sorts of specifics would need to be

19    provided by experts in the specific fields, not you?

20          MS. KEARSE:  Object to form.

21       A.  I agree with that.

22       Q.  And there's nowhere where, for this case,

23    you've gone forward and set out that level of detail

24    about what a specific program would need to include at

25    the level of detail that you would really need to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    implement a program, correct?

 2         MS. KEARSE:  Object to form.

 3    A.   Depends on what you mean by "detail," yes.

 4    Q.   Well, I mean, we know that when it comes to,

 5    like, the actual treatment of NAS children in the

 6    hospital, when you initiate medication, how you might

 7    do nonpharmacologic therapy, the -- what you might do

 8    to provide different types of nutrition through breast

 9    milk or formula, those sorts of things.

10         There are extensive plans that have been

11    published by you and by some of the entities that we

12    talked about, right?

13    A.   Yes.

14    Q.   Okay.  But in terms of the level of detail to

15    say actually how you would implement a plan and what

16    staffing you would need for a plan, what money you

17    would need for a plan, on any of the other aspects of

18    your report, that's not anywhere that you've adopted

19    or referenced, correct?

20         MS. KEARSE:  Object to form.

21    A.   That's accurate.

22    Q.   And as we said, the recommendations that you

23    have across the board aren't specific to the needs of

24    Cuyahoga or Summit County.

25         They're recommendations, I asked you before:
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    You would apply to any county in Ohio, but, in fact,

2    pretty much anywhere where they have babies being born

3    of mothers who are abusing drugs, correct?

4          MS. KEARSE:  Object to the form.

5    A.   This is purely on opioids abuse, yes.

6    Q.   Other than that, my statement is correct?

7    A.   Yes.

8    Q.   And some of the things that you're

9    recommending here are, frankly, recommendations you

10   would have with maternal abuse of any substance,

11   right?

12         MS. KEARSE:  Object to form.

13   Q.   Follow up when they go home to monitor for

14   additional needs?  The involvement of the family?

15   Consultation with social services to evaluate things

16   like outplacement needs, follow-up needs?

17         All of those things are the same things you

18   would recommend with any kind of maternal abuse of any

19   substance?

20         MS. KEARSE:  Object to form.

21   A.   Not necessarily.

22   Q.   Okay.  We would have to go through those one

23   by one to figure that out?

24   A.   Well I think that the social work aspect,

25   what you mentioned there, was definitely one for any,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   but there are specific follow-up differences that

 2   are for opioid exposed that are different.

 3       Q.  Okay.  We'll go through that later on.  I'm

 4   just going to give you a -- kind of a heads-up.

 5   Because one of the things that I think is important in

 6   your field, and I want to know if this makes sense

 7   because of how you do the research, and you work in

 8   public health, is that you need to get a bunch of

 9   stakeholders to actually implement any kind of change

10   to affect public health.

11          As you say in your presentations, "It takes a

12   village."

13          You think that's right, don't you?

14          MS. KEARSE:  Object to form.

15       A.  I do.

16       Q.  Okay.  So in terms of the stakeholders that

17   you would need to participate to implement your

18   general plan, kind of the end of your report, your

19   recommendations for improving outcomes, these aren't

20   just things that the county and people who work for

21   these counties would directly do.

22          This would involve third-party hospital

23   chains and healthcare practitioners making changes.

24   It would involve potentially changes to state, local,

25   and federal law.
```

Highly Confidential - Subject to Further Confidentiality Review

1          It would involve actions or changes in

2   behavior by a number of different actors or

3   stakeholders, correct?

4          MS. KEARSE:  Object to form.

5      A.  I'm not sure about laws needing to be

6   changed, but I think the other part of that question

7   was probably accurate.

8      Q.  Well, I mean, you didn't in any of your work

9   here do kind of a feasible analysis to see if any of

10  what you're proposing would run afoul of any laws or

11  would be in other ways not feasible to be implemented

12  in a particular county, correct?

13         MS. KEARSE:  Object to form.

14     A.  So what we -- what is in that report is

15  something that definitely is not against any laws, if

16  that's what -- that we are aware of, that I'm aware

17  of, if that was what you were asking me.

18     Q.  Yeah, kind of.  I asked if you did any kind

19  of analysis about feasibility, either in terms of

20  whether laws or the way laws are implemented would

21  need to be changed, or any other aspect of

22  feasibility, which would include access to additional

23  staffing and whether the third-party stakeholders that

24  you would need to participate would be willing to

25  participate?

Highly Confidential - Subject to Further Confidentiality Review

```
1              MS. KEARSE:  Object to form.

2         A.  No feasibility study was done.

3         Q.  Okay.  So, for instance, in terms of, like,

4    the issue of laws, and I -- we'll get to it when we

5    get to specifics, but I want to make sure you

6    understand what I mean as I go forward with my

7    questions, because I want to make sure you actually

8    understand my questions.

9         A.  Yeah.

10        Q.  So, like, one of the issues with universal

11   involuntary testing of drugs in connection with

12   maternal care is that there are places where there may

13   be some obligation to report illicit drug use or other

14   legal violations related to illicit drug use to

15   authorities, correct?

16        A.  We never do involuntary testing.

17        Q.  Okay.  So the women who come to any of the

18   facilities where you work or where you have some say

19   in terms of how they do testing, if they show up and

20   you say:  We have to do a test of your blood and your

21   urine to figure out if you're using drugs, they're

22   allowed to say:  I don't want you to test my drug, but

23   give me care anyway?

24        A.  They have to consent to be tested, correct.

25        Q.  Okay.  And what if they don't consent?  Do
```

1    they get care, or do they have to go somewhere else?

2         A.   We give them care.  We test the infant.

3         Q.   Okay.  So no matter what, the infant is going

4    to be tested.

5              They don't have to consent to that?

6         A.   Mother does not need to give us consent to

7    test the infant.

8         Q.   Okay.  So one of the things that's described

9    in some of your citations is that there are potential

10   ethical issues relating to doing this sort of testing.

11   If it creates a -- even at first consent, an

12   obligation to report somebody on for potential

13   criminal prosecution or other legal consequences,

14   including to, like, social services, where you might

15   have implications for custody and things like that,

16   right?

17        A.   Correct.  So at the time of that study, we

18   knew Tennessee was a voluntary -- that was a criminal

19   act.

20             However, I think that was written in 2014, or

21   published.  I think that law has changed since 2016 or

22   '18.

23        Q.   Do you know if there are any legal

24   impediments for doing the sort of testing that you

25   would recommend be done in Cuyahoga and Summit

1    County?

2        A.  So in Ohio, I know there is not.

3        Q.  What about, like -- let me ask this:  You

4    said that you've looked at the issue of whether the

5    possibility of legal ramifications, whether they be

6    prosecutions or custody actions, deter consent being

7    given to test maternal blood and urine, correct?

8            MS. KEARSE:  Object to form.

9        A.  We did a study to see if there was an

10   increase in home births in our region after

11   implementation of universal testing, and we did not

12   find that.

13       Q.  Okay.  Well is that the only potential

14   outcome of women who aren't willing to undergo the

15   testing?  I mean, they could give birth somewhere

16   else?  They could go to a different facility.

17           They -- there are other options, right?

18           MS. KEARSE:  Object to form.

19       A.  So we did this regionally, so our region

20   encounters -- there's 18 hospitals in our region, so

21   they would have to make a significant -- and we

22   haven't seen a decrease in our regional births, so

23   nobody is leaving the region as far as we are aware.

24       Q.  Does your region cross the river, right

25   there, to Kentucky?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.  It does cross to Kentucky.  It covers Indiana

 2   also.

 3      Q.  So is it your expectation that the risk of

 4   essentially legal implications from positive drug

 5   tests is not going to deter any opioid or

 6   opiate-abusing pregnant women from getting the kind of

 7   care that you recommend?

 8      A.  We have not seen any changes in our region

 9   since implementation.

10      Q.  That's good, right?

11      A.  It is.

12      Q.  And what are the -- what are the benefits, as

13   far as you're concerned, of having universal maternal

14   testing with consent?

15      A.  So there's multiple.  One is what we found in

16   our region, is that early identification that allows

17   us to know all opioid-exposed babies almost at the

18   time of delivery, so we can initiate the

19   nonpharmacologic treatment of that infant right away.

20           And this has led us to see a decrease in

21   our percentage of infants that are needing

22   pharmacologic treatment.

23           If you look at our regional compared to the

24   rest of the state, we are 12 percent lower in the

25   percentage of infants that need pharmacologic
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   treatment.

 2        Q.  And what do you attribute that to, that

 3   improvement?

 4        A.  It's one that we can initiate the

 5   nonpharmacologic treatment right away.  We have

 6   also -- our readmission rate, we -- it has not been

 7   increased, so we haven't seen any babies.  Even though

 8   we've seen an increased incidence of opioid use, we

 9   haven't seen an increase rate of readmissions for NAS

10   because we're not discharging babies home and having

11   them withdraw at home.  They're withdrawing in the

12   hospital.

13        Q.  So both of those are positive in terms of --

14        A.  Correct.

15        Q.  -- the health consequence for all of the

16   affected individuals, correct?

17        A.  That is correct.

18        Q.  And they also have cost savings because 12

19   percent less pharmacotherapy results in cost savings

20   and resource savings, correct?

21        A.  That is correct.  Another large benefit is

22   that we identify moms that have never been known to

23   have a substance use disorder, and we can then get

24   them into the care that they need to get in the

25   hospital time.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.  And is there any data suggesting that that's
2   happening more often?
3        A.  So we are -- I don't have data to show
4   there's an increased rate from hospital to care, but I
5   know there's an increase in care in our region.
6        Q.  So let's go back to where we were.
7             You said that there's 12 percent less than
8   the rest of Ohio in terms of pharmacotherapy initiated
9   with NAS, correct?
10       A.  That is correct.
11       Q.  You said there's also a lower readmission
12   rate in your region than the rest of Ohio?
13       A.  I did not state that.
14       Q.  So --
15       A.  We haven't seen an increase in our
16   readmissions for NAS even though the incidence of
17   exposure has increased.
18       Q.  Okay.  And do you also attribute that to your
19   program?
20       A.  I think that we are not discharging babies to
21   have them withdraw at home, which would make them be
22   readmitted.  So, yes, I do attribute it to that.
23       Q.  And that's in part because of having the
24   universal testing?
25       A.  Correct.
```

```
 1        Q.  Okay.  So have you done any kind of analysis

 2   of any of the cost savings associated with having

 3   universal testing, either -- just in terms of

 4   healthcare dollars or resources?

 5        A.  So we know that if you don't need

 6   pharmacologic treatment in that 12 percent, that that

 7   will decrease an average of 12 days of length of stay.

 8   So it would be the 12 percent times 12 days, times how

 9   many infants we have decreased.

10        Q.  Right.  So 12 days is about $40,000,

11   according to your data.

12            $3,300 a day on average, right?

13        A.  Yes, that is right.

14        Q.  And then -- so 12 percent of the total,

15   that's a significant cost savings by reducing the

16   pharmacotherapy incidents, correct?

17        A.  Right.  So our region is around 25,000

18   deliveries a year.

19        Q.  Okay.  And so if there is an impact on

20   readmission, it would also have healthcare savings for

21   that?

22        A.  Yes.

23        Q.  Do they have universal testing in Cuyahoga

24   and Summit County?

25        A.  No.
```

1      Q.  You think they should, right?

2      A.  Yes.

3      Q.  You think they should have initiated it

4   several years ago?

5          MS. KEARSE:  Object to form.

6      A.  I don't think the data was out there when you

7   mean several years ago.  I don't think our publish --

8   our paper was published until 2014, and it was novel.

9          It was one center, one site.  We hadn't

10  really spread it.  So our published paper was just on

11  a solo hospital here in our region.

12         We then did spread it to our regional

13  information, and then I think we really just published

14  that at the -- we have never published it, but we have

15  identified it through our OPQC database, so we just

16  are learning about it.

17     Q.  Okay.  So through the coordination through

18  OPQC, the results that you've had and the improved

19  outcomes in savings related to your program, including

20  universal testing of, mothers has been described to

21  the OPQC participants from Cuyahoga and Summit County

22  over the years, right?

23     A.  So this data is just evolving, and so we have

24  a -- we've never looked at all opioid exposed until

25  the end of our data collection, so '17 to -- you know,

Highly Confidential - Subject to Further Confidentiality Review

```
 1   2017 to '18, so we've just finalized that collection

 2   data, which is what we're -- you know, are just

 3   starting to address.

 4       Q.  In meetings of OPQC, going back to when you

 5   were talking about the NAS initiative in 2014, during

 6   that entire time, have you been suggesting that you

 7   think that universal testing is better than just

 8   universal screening?

 9       MS. KEARSE:  Objection to form.

10       A.  So we have had a phone call.  One of our

11   discussions was identification of the opioid-exposed

12   infant, and, yes, that was one of the talks on it.

13       Q.  And so that's, what, five years ago?

14       A.  No.  Within the last two years.

15       Q.  Okay.  Do you have any idea why they're not

16   doing universal testing now in Cuyahoga or Summit

17   County?

18       A.  It takes a regional approach, so we're lucky

19   enough in our region to have a collaborative where all

20   of the hospitals get together.

21           And so if you have competing hospitals in a

22   region and one says:  I'm not going to do universal

23   testing, then the whole region is not going to -- it's

24   not going to work, because then they're going to defer

25   to hospital A and B if they're not doing universal
```

1    testing but they know X and Y are doing universal

2    testing.

3          So you need a whole approach as a community,

4    and so we are lucky enough in our region to have one

5    group to lead this, which is Cincinnati Children's

6    Hospital.  And I think the other regions are -- I

7    don't know if there's collaboratives set up to

8    collaborate nicely.

9      Q.  Right.  So the region in which Cuyahoga

10   County resides and the region in which Summit County

11   resides, those are separate regions, correct?

12     A.  They are.

13     Q.  Okay.  So I'll ask about them separately.

14         Do you know anything about any history of

15   discussions among the various hospitals in the region

16   in which Cuyahoga County resides to -- about this

17   issue of adopting universal testing?

18     A.  There have been discussions, but no

19   adaptations.

20     Q.  Is there some hospital chain or hospital

21   that's opposed?

22     A.  I don't know if I could answer that question

23   without confidentiality that we have established in

24   our OPQC and OCHA database.

25     Q.  What confidentiality would that be?

```
 1        A.   Relieving -- showing one hospital.  We've

 2   always gone about de-identifying our hospital data

 3   because we don't want to say that this hospital is

 4   presumably doing better than this hospital because

 5   there's multiple factors that are resolved.

 6        Q.   So I'm not asking about how they're doing or

 7   what any data is.

 8             I'm asking about the discussions that you've

 9   heard about in Cuyahoga County about who might be

10   opposed to universal testing?

11             MS. KEARSE:  Objection.

12        A.   I've never sat in the room with all of the

13   hospitals there to discuss that in Cuyahoga County.

14        Q.   Or Cuyahoga County?

15        A.   Cuyahoga County, yes, that county.

16        Q.   So what about in Summit County, or the region

17   where they are?  Do you know anything about the

18   discussion there about universal testing?

19        A.   I do not know about that discussion at that

20   regional level.

21        Q.   But you know from your colleague there that

22   they haven't adopted it?

23        A.   I do, yes.

24        Q.   And can you think of any legitimate medical

25   reason, given the data that you think now exists, why
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    universal testing shouldn't have already been adopted

 2    in those counties?

 3           MS. KEARSE:  Object to form.

 4       A.  It takes a lot of work.  You have to work

 5    with your county level social workers to -- because

 6    the number of referrals do increase.  So we did --

 7    prior to initiating regional approach, we met with

 8    each one.

 9           We -- it takes a lot of collaboration and

10    extra work with the OBs on the front line, and so it

11    took awhile for us to get this set up.  Probably from

12    the time of our first publication to initiation, it

13    was probably an 18-month ramp up.

14       Q.  Are either of those counties in the middle of

15    a ramp up right now?

16       A.  Not that I'm aware.

17       Q.  So do you know if you need different

18    stakeholders to initiate this in Cuyahoga County or

19    Summit County in the sort of ones you described, OBs

20    and hospital chains and stuff?

21       A.  We have worked with -- so when we were

22    initiating in the Cincinnati counties, the Ohio

23    Hospital Association has been a good collaborator.

24    Hospital CEOs are always necessary to participate in

25    this, too, because it does cost money and takes away
```

```
 1    their bottom line.

 2         Q.   It costs money, but it has long-term

 3    savings?

 4              MS. KEARSE:  Object to form.

 5         A.   Correct.

 6         Q.   All right.  So, how does it work that

 7    universal testing actually leads to these benefits

 8    that you're talking about?  Is it that when there is

 9    universal testing, you don't have to wait until there

10    are symptoms of withdrawal to initiate appropriate

11    therapy?

12              MS. KEARSE:  Object to form.

13         A.   That's one of the benefits.

14         Q.   Okay.  So if there are two possibilities, one

15    is you don't have universal testing, you go off of

16    self-reporting, which is known to be an underreporting

17    for things like opioid use or other maternal drug use,

18    the same way it is with tobacco use, correct?

19              MS. KEARSE:  Object to form.

20         A.   That is correct.

21         Q.   And so there's going to be a percentage there

22    where there actually is fetal exposure to drugs, but

23    you guys don't know about it until the child is born

24    and you do testing of the meconium and whatever else

25    you test for drugs, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KEARSE:  Object to form.

 2         A.  Or they have signs and symptoms of

 3    withdrawal.

 4         Q.  And so by the time they have signs or

 5    symptoms or they get the results back of the testing

 6    that you do, you have lost time to initiate

 7    pharmacotherapy or more likely the nonpharmacotherapy,

 8    the supportive sorts of things, like the extra

 9    swaddling and other supportive therapies that you

10    recommend?

11         A.  The nonpharmacologic therapy is delayed.

12    Pharmacologic usually isn't delayed because that

13    doesn't happen.  Usually what we found, it was around

14    44 hours, so most of the time they're having signs and

15    symptoms or that testing is back on the infant by that

16    time.

17         Q.  And is there some additional costs associated

18    with the nonpharmacotherapy?

19         A.  There's no additional cost, but we do observe

20    babies longer if we know they're opioid exposed.

21         Q.  Does that mean they stay in the hospital

22    longer?

23         A.  Correct.

24         Q.  But that's -- that has also benefits, you

25    hope, because they'll -- you'll reduce readmission?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.  That is correct.

 2        Q.  Okay.  So the data that's been published that

 3   you've cited and you've worked on, some of that does

 4   look at some of the nonpharmacologic therapeutic

 5   interventions and their success in reducing length of

 6   stay and the amount of total drug that they would be

 7   given if they do need pharmacotherapy, correct?

 8        A.  Can you --

 9        Q.  Sure.  I'll make it more general.

10             So you're aware of literature both because

11   you've worked on it, because you've cited it, that

12   looks at essentially the positive impact of some of

13   the strategies for nonpharmacologic intervention in

14   NAS babies, correct?

15        A.  That is correct.

16        Q.  And so, in general, the non -- let's do it

17   this way:  The majority of NAS babies will not require

18   pharmacotherapy, correct?

19             MS. KEARSE:  Objection.

20        A.  That is correct.

21        Q.  And your goal is to reduce the percentage

22   that have pharmacotherapy essentially as low as

23   possible through effective nonpharmacologic

24   interventions?

25        A.  That is correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   Okay.  And your goal also is to reduce their

2   total length of stay, correct?

3        A.   Correct.

4        Q.   And your goal is to reduce the amount of drug

5   that they would be given in terms of, you know,

6   morphine equivalent units, or whatever, and how long

7   they're given drug if they do have to be given

8   pharmacotherapy, correct?

9        A.   That is correct.

10       Q.   Okay.  And in general, that's part of what

11  the OPQC initiative has been tracking, those sorts of

12  measures, right?

13       A.   Yes.

14       Q.   And they've generally improved in the right

15  direction that you want for all of them since you

16  started tracking them in around 2014, correct?

17       A.   That is correct.

18       Q.   Actually track them month by month across the

19  state, don't you?

20       A.   We do.

21       Q.   Okay.  And do you find that the counties with

22  the program that you recommend, as opposed to, like,

23  what they're doing up in Cuyahoga and Summit, actually

24  have better results?

25       A.   Can you -- you're asking if our region is
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    doing better than the other two regions?

 2        Q.  Yep.

 3        A.  I've compared our region to the statewide

 4    data, not individual county levels.

 5        Q.  Okay.  So you know you're doing better than

 6    the state?

 7        A.  Correct.

 8        Q.  On all of these metrics?

 9        A.  Yes.

10        Q.  Okay.  And that isn't just a coincidence.

11            That has to do with having a better plan that

12    includes universal maternal testing, correct?

13            MS. KEARSE:  Object to form.

14        A.  There's lots of things that go into it.

15    That's one of it.  And we are also one of the few

16    regions that is using buprenorphine, as you mentioned

17    earlier.

18        Q.  So are they using buprenorphine as a first

19    line up in Cuyahoga and Summit County?

20        A.  No.

21        Q.  Do you think they should be?

22        A.  There's no great formulation yet for

23    buprenorphine for infants, and the data is really only

24    out of our region and Philadelphia.  So that hasn't

25    been widely adapted even in our region.  We are still
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     focusing on the individual level.

 2            So to recommend it as a first-line therapy in

 3     a nonresearch environment, I don't -- that

 4     recommendation is not there yet.

 5       Q.  I understand you're talking about, like,

 6     national recommendations, what you consider to be

 7     standard of care.

 8            But you, Dr. Wexelblatt, as somebody in this

 9     area, thinks that buprenorphine should be the

10     first-line therapy for NAS children, right, or

11     infants?

12            MS. KEARSE:  Object.

13       A.  Not in every hospital setting.  It depends on

14     what your pharmacology support is at each hospital,

15     how you can compound it.  So our first-line therapy at

16     some of our hospitals where we can compound it is

17     buprenorphine.  At other level 2 hospitals, or more

18     rural settings, we use -- our recommendation would be

19     methadone.

20       Q.  Okay.  That kind of breakdown of what you

21     recommend, depending on the level of hospital, is that

22     what's going on up in Cuyahoga County now?

23            MS. KEARSE:  Object to the form.

24       A.  No.

25       Q.  You think they should be doing it the way you
```

Highly Confidential - Subject to Further Confidentiality Review

 1  are?

 2      A.  I think we have published a lot of

 3  information that has shown promising results.

 4      Q.  And you've been publishing that now over the

 5  last four or five years, correct?

 6      A.  Ish, yes.  Six.  Yeah.

 7      Q.  You think in your mind, Dr. Wexelblatt,

 8  there's enough information out here that Cuyahoga

 9  County, the different levels of hospitals, should be

10  doing it the way you recommend and are doing it down

11  here in this region?

12      A.  So our recommendation of methadone is part of

13  the OPQC protocol, so I know that those babies that

14  are being treated with methadone are following our

15  methadone protocol, which is -- which I know they are

16  following in Cuyahoga County.

17      Q.  Okay.  So you have a staggered recommendation

18  that there are certain types of hospital based upon

19  their level, their ability to, what, compound?

20      A.  Buprenorphine.

21      Q.  Is this -- is this a compounding issue?

22      A.  Yes, and it's also a long term.  There's not

23  been really any long-term studies at this point on

24  buprenorphine treatment with infants.

25      Q.  Okay.  So let's go back to -- you have a

```
1    recommendation that you're following in this region

2    that gives different first-line therapy

3    recommendations depending on essentially the level of

4    hospital and their capabilities, correct?

5         A.   A recommendation is to pick one opioid in

6    your hospital and follow that, opioid regimen

7    protocol.

8         Q.   Okay.  And that is not what's going on up in

9    Cuyahoga County as far as you know?

10        A.   No.  I know they are following that same

11   recommendation, pick one opioid and utilize that in

12   your hospital.

13        Q.   And are there any up in Cuyahoga County where

14   they're using buprenorphine as the first-line therapy

15   at equivalent hospitals to where buprenorphine is the

16   first-line therapy down in this region?

17        A.   Not that I am aware of.

18        Q.   Okay.  And you think they should be doing

19   that, right?

20        A.   Like I said, it's still in the research phase

21   that we're developing information, and I can

22   understand why hospitals haven't adopted it yet.

23        Q.   But you think using buprenorphine has, in

24   your mind, already sufficiently shown superior

25   performance to using methadone in the same setting for
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    treating infants with NAS who require

2    pharmacotherapy?

3            MS. KEARSE:  Objection.  Form.

4       A.  We have shown improvement within the

5    hospital, yes, of utilizing it.  Our hospital --

6    initial hospital stay has improved by using

7    buprenorphine.

8       Q.  Do you think that there has been adequate

9    testing on the safety and efficacy of buprenorphine in

10   this indication?

11      A.  There has not been a great long-term study of

12   any infants with buprenorphine treatment and their

13   long-term exposures.

14      Q.  So do you think it has been adequately tested

15   in the safety and efficacy or not so far?

16           MS. KEARSE:  Object to form.

17      A.  Yes, knowing that it's the same type of

18   formulation that we would see in the adult, just with

19   a little bit of a different compound.  It's not -- it

20   has to be liquefied instead of just a tablet, like it

21   is in the adults.

22      Q.  Okay.  So let's go to -- we've been talking

23   about Cuyahoga County.

24           Summit County, same thing:  Are they

25   following the recommendation, as far as you know, to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    pick one depending on the level of hospital?

 2         A.  Yes.

 3         Q.  Okay.

 4         A.  They are following that.

 5         Q.  Are any of the hospitals in Summit County

 6    having buprenorphine as the first-line therapy?

 7         A.  Not that I am aware of.

 8         Q.  Okay.  Are there hospitals there that you

 9    think have the same criteria as the hospitals here for

10    the same level to be able to use buprenorphine as a

11    first-line therapy?

12         A.  I would be making an assumption of their

13    capability, but I know that each county does have a

14    level 3 hospital in their county.

15         Q.  Okay.  So based upon your standards, you

16    think there should be at least one hospital in Summit

17    County using buprenorphine as first-line therapy, but

18    there isn't?

19              MS. KEARSE:  Object to the form.  Misstates

20    his testimony.

21         A.  I'm -- they -- our recommendation is to

22    initiate one opioid at the hospital, so which opioid

23    they pick, there's multiple variations.

24         Q.  I'm asking about Dr. Wexelblatt's view about

25    buprenorphine.  I'm not asking about the OPQC
```

Highly Confidential - Subject to Further Confidentiality Review

1    recommendation.

2            Based upon what you think is the right, you

3    as the expert in this field, think is the best way to

4    go for the best outcomes for NAS infants, you think

5    that at least one Summit County hospital should be

6    using buprenorphine as first-line therapy, but

7    currently there isn't any one right now?

8            MS. KEARSE:  Object to form.  Misstates his

9    testimony and argumentative.

10       A.  I think if they want to utilize it in a

11   research setting and continue to do research like we

12   are on it, that would be great.

13       Q.  Okay.  And is buprenorphine used in this

14   setting you think the standard of care now?

15       A.  No.

16       Q.  What's the standard of care?

17       A.  Methadone or morphine.

18       Q.  The use of buprenorphine in this setting,

19   treating NAS babies who require pharmacologic

20   intervention, is that an on-label or off-label use of

21   that drug?

22       A.  Off label.

23       Q.  Do you think it's appropriate?

24       A.  Yes.

25       Q.  Is that a decision you came to on your own,

Highly Confidential - Subject to Further Confidentiality Review

```
 1   or is that the result of some sort of marketing

 2   information you got from the manufacturer of

 3   buprenorphine?

 4       A.  No, that is purely work -- research with

 5   collaborators.

 6       Q.  And so do you -- when you recommend the

 7   initiation of buprenorphine in this context, do you do

 8   some sort of additional disclosure that this is an

 9   off-label use?

10       A.  Almost every drug we use in the NICU is off

11   label.

12       Q.  So that's a no?  You don't give them extra

13   information, frankly?

14       A.  That is correct, unless they are

15   participating in a research study, which we have done.

16       Q.  For research studies, do you have a consent

17   form, and somewhere in there it says:  By the way,

18   this is exploring a new indication that's not part of

19   what's approved for this drug?

20       A.  Correct.

21       Q.  So the same thing goes for use of methadone.

22           Is methadone in infants off label?

23       A.  Yes.

24       Q.  You think it's appropriate?

25       A.  Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   And use of -- what was the third one?

 2        A.   Morphine.

 3        Q.   Morphine.

 4             Morphine is also off label to be used in

 5   infants to treat NAS, correct?

 6        A.   That is correct.

 7        Q.   Same thing goes for those:  You don't have

 8   any kind of additional consent for normal clinical use

 9   outside of a clinical trial, correct?

10        A.   That is correct.

11        Q.   Okay.  In this area, you don't see anything

12   wrong at all with using these drugs in this off-label

13   fashion, correct?

14        A.   Correct.

15             MS. KEARSE:  Object to form.

16        Q.   And, in fact, it's standard of care, right?

17        A.   Yes.

18        Q.   And part of what you're recommending

19   globally -- I know you're not necessarily telling

20   everybody which drug to pick in which hospital -- is

21   to address the impacts of the opioid or opiate

22   epidemic in parts of Ohio through the off-label use of

23   prescription pharmaceuticals; is that correct?

24             MS. KEARSE:  Object to form.

25        A.   We are recommending an off-label use of the
```

 1    opioids, correct.

 2        Q.  And would you need to do anything extra in

 3    terms of deal with, like, a county or a state to have

 4    them essentially endorse an off-label use based on

 5    your experience?

 6        A.  Like I mentioned, every drug -- almost every

 7    drug we're using in the NICU is off label, so we --

 8    it's the standard of care to use off-label drugs in

 9    the NICUs.

10        Q.  Are you ever the one to prescribe a drug to

11    the mother?

12        A.  No.

13        Q.  People on your team do that, right?

14        A.  People on the OPQC -- yes.

15        Q.  But on the team at your hospital, as part of

16    the treatment of the mother-child dyad, somebody is

17    the one prescribing medication to the mother,

18    including the prescription of buprenorphine and other

19    drugs, to get through the pregnancy or to aid in any

20    sort of treatment of the opioid abuse, correct?

21            MS. KEARSE:  Object to form.

22        A.  That is correct.

23        Q.  And it -- as far as you know, that's also off

24    label, using that in a pregnant woman?

25            MS. KEARSE:  Object to form.

```
 1       A.  I'm not sure if it's off label for pregnant

 2   women.

 3       Q.  But as far as you understand, there is a

 4   standard of care treatment of pregnant women that

 5   involves medical professionals prescribing scheduled

 6   opioids and opioid antagonists as therapy for pregnant

 7   women?

 8       A.  MAT is part of the standard of care for

 9   pregnant women.

10       Q.  Okay.  And is there any kind of carve-out

11   that you're aware of where it's, here's what's

12   appropriate for MAT, but once they're pregnant, you

13   have to stop?

14       A.  So I know that's -- when you talk about

15   naltrexone and naloxone, we try to get them only on

16   buprenorphine or methadone for the moms.

17       Q.  Why is that?

18       A.  Just the literature about the safeties of

19   those and the long-term outcomes in the pregnancies.

20       Q.  And you also try to avoid withdrawal of the

21   mother during pregnancy, correct?

22       A.  Yes.

23       Q.  And that's one of the things that has been

24   addressed in the literature, is that the maternal and

25   fetal outcomes, including, like, early delivery, low
```

Highly Confidential - Subject to Further Confidentiality Review

1   birth weight, etcetera, those are affected when

2   there's an attempt to essentially get the mother to

3   stop using -- or stop abusing opioids or opiates

4   during pregnancy, correct?

5       A.  We do not recommend detoxification during

6   pregnancy.

7       Q.  Is that different than what I said about

8   getting -- trying to get somebody to stop using at

9   all?

10      A.  Yes.  So we wouldn't want to wean somebody

11  who's -- comes -- is on MAT, becomes pregnant.  We

12  wouldn't want them to take themselves off their

13  prescribed methadone or buprenorphine.

14      Q.  Are you ever the one to counsel a woman who

15  is pregnant and using, or abusing an illicit drug,

16  like heroin or one of these other medications that

17  you've been studying, about what the options are

18  relating to continuing or voluntarily discontinuing

19  the pregnancy?

20          MS. KEARSE:  Object to form.

21      Q.  Has that ever come up?

22      A.  We get involved when they're stabilized in

23  their MAT, but we do meet with moms prior to delivery

24  if they're -- once they're in a program in our

25  region.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.  What about, like, early on in the pregnancy,

2   in the first trimester?  Are you ever, Dr. Wexelblatt,

3   involved in any kind of counseling about you're now

4   pregnant, and you're abusing a drug, and here might be

5   your options relating to the health of the child and

6   decisions about the pregnancy?

7      A.  We are not involved in that.  I am not

8   involved in that discussion.

9      Q.  Are you aware of what those discussions are

10  like at your hospital?

11     A.  I know, from working with our OB colleagues,

12  what those discussions are about non-detoxification

13  and stabilization.

14     Q.  What about -- is there any discussion at all

15  about whether patients who are within a certain window

16  where it would be legal in Ohio to voluntarily

17  terminate pregnancies where there's abuse of heroin or

18  one of these other illicit drugs?

19        MS. KEARSE:  Object to form.

20     A.  Not aware of that ever occurring.

21     Q.  But you -- are you ever involved in the

22  contraception discussion postdelivery to encourage

23  somebody to go on, like, a long-acting reversible

24  contraception?

25     A.  I don't personally have that conversation

Highly Confidential - Subject to Further Confidentiality Review

```
 1   with the mother, but I know the OBs do.

 2       Q.  And that's part of your recommendation, is

 3   that should be -- I mean, that's recognized literature

 4   that you've cited, is that's an important public

 5   health thing, is trying to reduce unintended

 6   pregnancies, correct?

 7           MS. KEARSE:  Object to form.

 8       A.  Yes, that is correct.

 9       Q.  And is that something you consider to be part

10   of your overall proposal here, is that as much should

11   be done as possible to reduce unintended pregnancies

12   among drug abusing women in Cuyahoga and Summit

13   County?

14       A.  I wouldn't use the word "drug abusing."  It's

15   anybody in a -- substance use disorder would be a

16   better word.

17       Q.  Okay.  So is it your view, or your opinion as

18   part of your plan, that as much should be done as

19   possible to reduce unintended pregnancies among

20   somebody with a diagnosed substance abuse disorder in

21   Cuyahoga and Summit County?

22       A.  Yes.

23       Q.  Okay.  The data right now is that about 80

24   percent of the pregnancies in this population are

25   unintended, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.  And what do you find as "this population"?

 2      Q.  Well, I mean, this --

 3      A.  Yes.

 4      Q.  -- I'm quoting you from your report, so...

 5      A.  Yes.  If you're talking about opioid use,

 6  yes.

 7      Q.  You think it's different with other substance

 8  abuse?

 9      A.  I just didn't know what population, if you're

10  talking Summit County, Cuyahoga County, Hamilton

11  County, or just general.

12      Q.  Is it different in those different counties,

13  or do you only have national or statewide data?

14      A.  I didn't know if you were just talking 80

15  percent of all pregnancies.

16      Q.  I'm asking separate.  Okay.

17          So in this country, a high percentage of all

18  pregnancies are considered unintended, correct?

19      A.  Correct.

20      Q.  And from a public health perspective,

21  reducing unintended pregnancy is generally considered

22  a good thing, right?

23          MS. KEARSE:  Object to form.

24      A.  Yes.

25      Q.  For all populations, not just opioid abusing
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   or people with a substance abuse disorder, correct?

 2       A.  We know that it's associated with

 3   prematurity, so, yes.

 4       Q.  Among other things?

 5       A.  Correct.

 6       Q.  There are -- there are a number of negative

 7   consequences on a population basis of unintended

 8   pregnancy, and doctors and people who care about

 9   public health want to reduce the percentage of

10   unintended pregnancies in all populations, not just

11   those who abuse drugs, correct?

12       A.  Correct.

13       Q.  Okay.  And when you talk about it would be

14   advisable to reduce the percentage of unintended

15   pregnancies from 80 percent in women who abuse opioids

16   or opiates, you also think it would be good to reduce

17   the rate of unintended pregnancy in women who are

18   abusing any substance or combination of substances,

19   right?

20           MS. KEARSE:  Object to form.

21       A.  I would change the word "abuse" to anybody

22   with a substance use disorder, once again.

23       Q.  Otherwise agree with that?

24       A.  That decrease in the rate of short-term

25   interval is a good thing, if that --
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         Q.  So why are you saying a short-term interval?

2         A.  That's a medical -- you're saying the same

3    thing that I am.

4         Q.  Okay.

5         A.  Short term between pregnancies, so, yes.

6         Q.  Got it.  That's a whole other thing.

7         A.  Yeah.

8         Q.  You actually don't want a woman who has a

9    substance abuse disorder who's just delivered a child

10   to have an unintended pregnancy close in time because

11   that has additional negative impacts on the

12   development and health of the first child?

13        A.  No, it's the pregnancy.

14        Q.  The pregnancy?

15        A.  Yes.

16        Q.  Doesn't it also --

17        A.  That's the prematurity.

18        Q.  Doesn't it also affect the data on the

19   behavioral, educational, and social services needs of

20   the first child if there is an additional second

21   pregnancy in the same drug abusing mother?

22             MS. KEARSE:  Object to form.

23        A.  So are you talking about illicit use only,

24   then?  Because you're saying "drug abusing."

25        Q.  Yep.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.  So I don't know how you would differentiate

2   that.  I'm not aware of that data.

3        Q.  Makes sense, though, doesn't it?

4            MS. KEARSE:  Object to form.

5        A.  I don't know how -- the impact would have on

6   the infant that was already born?

7        Q.  Right.  So, like, splitting attention, and if

8   there are going to be two children under the age of 2

9   in a household, that, statistically speaking, is close

10  to 90 percent likely to be on Medicaid, that is likely

11  to have exposure -- increased exposure to trauma and

12  violence and abuse, to have increased incidence of

13  housing uncertainty and food uncertainty.

14           All of those sorts of factors that you lumped

15  under socioeconomic status, those are all known to

16  have implications for behavioral, educational, and

17  social services needs of children, right?

18           MS. KEARSE:  Object to the form.

19       A.  In that specific example you gave with all of

20  those negatives, correct.

21       Q.  And any one of those negatives is also known

22  to have negative implications for the social services,

23  medical, and educational needs of children, right?

24           MS. KEARSE:  Object to form.

25       A.  Each one individually, yes, but I don't know
```

Highly Confidential - Subject to Further Confidentiality Review

 1   about the short term -- we don't see twins.  When

 2   you're saying that it would deter the infant's

 3   attention, I don't think we've seen that.

 4        Q.  Okay.  So is there any effort going on right

 5   now, when you talk about the control study that you're

 6   applying for a grant to do, where you would be able to

 7   get down to the level of tracking the real world

 8   individualized inputs or factors that would affect

 9   behavioral, educational, and social services needs of

10   children other than just socioeconomic status?

11        MS. KEARSE:  Object to form.

12        A.  So our hope, if we're going back to this

13   other -- a control group, if we can pick the biggest

14   header that would control for most of those, then we

15   would address it.  So if we know that we can match

16   insurance type of public versus private, then most of

17   those -- all of those socioeconomic status stuff

18   should be equal.  We look at it and we track it to

19   see if it is.

20        Q.  Well what are you going to look --

21        A.  You can't do it up front.  That's not

22   possible.

23        Q.  What are you going to look at and track?  Are

24   you going to track, like, exposure to violence?

25   Abuse?  Housing uncertainty?  Food uncertainty?  You

Highly Confidential - Subject to Further Confidentiality Review

1    know, number of moves a year?

2         Like what are all of the factors you would

3    track?

4         A.  So regionally we would assume, if you're in

5    the same region with the same socioeconomic status,

6    all of those should be equal.

7         Q.  Except now you have the overlay of one is

8    somebody whose mother is abusing drugs, and one is

9    not.

10        A.  Not always abusing drugs.  Sometimes they're

11   substance -- they're exposed, but they're not

12   abusing.

13        Q.  Okay.  So in any of your data, are you going

14   to break it up by the way it is for people who are

15   abusing as opposed to having medically supervised

16   legal use of prescription opioids?

17        A.  We'll be tracking illicit versus

18   prescribed.

19        Q.  Okay.  Currently is there information that

20   shows that any of these outcomes are worse with

21   illicit use of opioids versus medically supervised

22   legal use of prescription opioids?

23        A.  Which measures?

24        Q.  Any of the measures you think are important

25   to track the negative impacts of neonatal abstinence

Highly Confidential - Subject to Further Confidentiality Review

```
 1   syndrome, short term or long term?

 2      A.  So we know there is a difference in illicit

 3   versus prescribed opioid use in NAS on some factors,

 4   yes.

 5      Q.  Which factors, sir?

 6      A.  So, we know percent that need pharmacologic

 7   treatment of stabilized MAT does -- the longer you're

 8   in it is better.

 9          We know that babies that have illicit use

10   show their onset of symptoms earlier than those with

11   prescribed, and sometimes that means they have a

12   shorter hospital stay.

13          And from a long-term out -- long term we

14   don't have that data yet that we have -- nobody has

15   really done that research yet.

16      Q.  Do you have an opinion, as you sit here

17   today, as to whether the long-term data is going to be

18   worse with illicit use of things like heroin and

19   fentanyl analogues versus just a mother who at some

20   term -- point during her pregnancy was taking a

21   prescription opioid under the supervision of a

22   doctor?

23      A.  I don't have that data at this time.  I don't

24   know that data.

25      Q.  Does any of the work you've done so far break
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    it up that way, where you can say:  Here's what we're

 2    seeing with illicit abuse of substances like heroin

 3    versus somebody whose -- where the infant's exposure

 4    during pregnancy was just from prescription opioid

 5    being used under the direction and prescription of a

 6    licensed healthcare professional?

 7         A.  So we do look at some of our papers short

 8    term -- short acting versus long acting.  So the long

 9    acting would only be methadone and buprenorphine.  The

10    short acting would lump heroin and Percocet

11    altogether, and so there have been differences there.

12    And --

13         Q.  But back to my question:  The answer is, no,

14    we don't have any data yet that looks at impacts on

15    NAS short term or long term and breaks them up based

16    upon whether the in utero exposure was pursuant to

17    illicit use of drugs or pursuant to all legal use of

18    prescription opioids under the direction of a licensed

19    healthcare professional?

20         MS. KEARSE:  Object to form.

21         A.  I think we did look at one of our papers that

22    had illicit versus prescribed.  I would have to go

23    through them all to find that reference.

24         Q.  Do you know which one that was?  Maybe I can

25    save you a step.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.  I think our very first paper, Hall

2    Wexelblatt -- the OCHA study in 2014 in Pediatrics

3    looked at that.

4        Q.  Okay.  That doesn't have long-term outcomes,

5    does it?

6        A.  It does not.

7        Q.  And do you have an opinion, as you sit here

8    today, that there are better or worse long-term

9    outcomes based upon legal use versus illegal use by

10   mothers who deliver NAS children?

11       A.  We don't have that data at this time.

12       Q.  And do you have an opinion, as you sit here

13   today, as to the percentage of NAS babies in Cuyahoga

14   or Summit County that are attributed to --

15   attributable to illicit versus legal use of

16   prescription opioids under the direction of a licensed

17   healthcare professional?

18       A.  I do not know their county-specific data.

19       Q.  And none of the -- actually none of the work

20   that you've done for this case so far, none of the

21   opinions you intend to offer, breaks anything up by

22   impacts of legal opioid use, where a doctor has

23   prescribed an opioid to a patient who takes it legally

24   under the direction of the doctor, versus all of the

25   various types of illicit drug use, including heroin,
```

```
 1    fentanyl analogues, combination of drugs on the

 2    street, all of that?

 3          MS. KEARSE:  Object to form.

 4       A.  Yeah.  From the infant side, they don't care

 5    why they're exposed to the opioid.  It's either

 6    they're exposed or not exposed.

 7       Q.  I understand that.

 8          But I'm saying:  For the opinions you intend

 9    to offer in the case, you're not, like, offering your

10    opinion where you're going to say, I can break this up

11    in terms of here are the impacts or here is the need

12    to do something different solely related to the legal

13    use of prescription opioids, correct?

14          MS. KEARSE:  Object to form.

15       A.  So we do recommend prescription MAT over

16    illicit use, so that would not fall into your category

17    there.

18       Q.  So let me break it up, then.

19          So one of the things that you talk about in

20    general, one of your identified topics, is the impact

21    of the opioid or opiate epidemic in Ohio, including

22    Cuyahoga and Summit County, correct?

23       A.  That is correct.

24       Q.  When you provide those opinions, none of

25    that -- none of those opinions are broken up to say,
```

Highly Confidential - Subject to Further Confidentiality Review

1    here is how much of this I think is related to illicit

2    use versus legal use, correct?

3        A.  I did not break that up, correct.

4        Q.  And for your proposals, although clearly

5    you're suggesting that legal use under the guidance of

6    licensed healthcare professionals as part of MAT or

7    pharmacotherapy of NAS infants, you're also not

8    breaking up anything about your outcome -- the

9    proposals you have to address these impacts based upon

10   legal use versus illicit use?

11       MS. KEARSE:  Object to form.

12       A.  I didn't break that out.

13       Q.  Okay.  You understand the issue, right?  You

14   understand the issue I'm highlighting for you?

15       A.  Not entirely know where you're going, but...

16       Q.  Okay.  Well let me make sure I understand

17   what you're opining on and what you're not opining on.

18           So nowhere in your intended testimony at

19   trial will you offer some sort of cost of remediating

20   or fixing any aspect of the opioid epidemic, including

21   in NAS babies or any maternal issues?

22           You're not giving any cost opinions at trial,

23   right?

24       MS. KEARSE:  Object to form.

25       A.  Just a generalized if you decrease the length

Highly Confidential - Subject to Further Confidentiality Review

1    of stay, you're going to decrease the cost.

2       Q.  Okay.  So basically you have things you want

3    to do to save money, save healthcare dollars?

4       A.  All we're proposing -- yes, that's one of the

5    goals, is to improve the outcomes.

6       Q.  Okay.  But you're not going to offer any

7    opinions about how much any of your plan would cost if

8    it were implemented in Cuyahoga County, Summit County,

9    or both, correct?

10      A.  That is correct.

11      Q.  Okay.  And you're certainly not offering some

12   sort of opinion about how much it would cost to just

13   address the portion of this that relates to people

14   taking legal prescription -- legal prescriptions of

15   prescription opioids?

16          MS. KEARSE:  Object to form.

17      A.  Correct.

18      Q.  Okay.  Do you have an understanding as to how

19   much of the NAS you see is related to legal use versus

20   illicit use?

21      A.  I would have to go back to our data to look

22   at that.  I don't know off the top of my head.

23      Q.  Okay.  Do you have a -- like a majority is

24   illicit?  Do you have an understanding at that level?

25      A.  I think a third is illicit.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.  A third is illicit?

2        A.  I think that's what we published in our first

3    paper.

4        Q.  Okay.  So you think two-thirds, then, are

5    people who are only taking while pregnant under the

6    direction of a -- of a doctor and they're not using

7    polypharmacy or some other illegal drugs at the same

8    time?

9        A.  So illicit opioid.  So the nonillicit would

10   include MAT and prescribed opioids.

11       Q.  Okay.  So --

12       A.  So any prescribed opioid.

13       Q.  What about the --

14       A.  I just --

15       Q.  I'm sorry.  I didn't mean to cut you off.

16       A.  I think that's what we published in our very

17   first paper, was our illicit use back then.

18       Q.  Do you have any opinions that would look at

19   impacts or what to do to fix any of the impacts that's

20   focused at all just on the prescription part of it?

21   Like patients who got a legal prescription for an

22   opioid and then took it pursuant to directions with no

23   other illegal drugs at the same time?

24            MS. KEARSE:  Object to form.

25       A.  What would be my recommendation?  Is that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   what you're asking?

 2        Q.  Do you intend to offer any opinions that's

 3   limited to just those issues?

 4        A.  Yeah.

 5        Q.  You do?

 6        A.  That if you never get a prescription, you're

 7   never going to have NAS.

 8        Q.  Okay.  So what about the percentage of people

 9   in Ohio who use heroin and heroin was the first drug

10   they ever used?

11          MS. KEARSE:  Object to form.

12        Q.  That happens, right?

13        A.  I'm sure it has.

14        Q.  I mean, NAS has been described in the medical

15   literature since, what, the 1970s?

16        A.  1975 was the first paper, correct.

17        Q.  I think I have it and have read it.  It was a

18   page-turner.

19          But the NAS that's described in the earliest

20   stuff was, what, related to methadone use in pregnant

21   women, or is it related to heroin?

22        A.  Heroin.

23        Q.  So there have been withdrawal and specific

24   clinical entity described from heroin use in pregnant

25   women for more than four decades now, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KEARSE:  Object to form.

 2         A.  That is correct.

 3         Q.  And do you know what percentage of the NAS

 4    babies that the drug use they have has only ever been

 5    legal?

 6              Let me withdraw that.  Let me -- let me fix

 7    it, I think, because we're including MAT, right?

 8              Nobody's -- the people aren't starting with

 9    MAT unless they already have an addiction or a

10    diagnosed disorder, correct?

11         A.  That is correct.

12         Q.  So, there's some portion of pregnant women

13    who are getting a legal prescription for an opioid for

14    chronic pain, for instance, right?

15         A.  That is correct.

16         Q.  And you have that in your hospitals,

17    correct?

18         A.  Yes.

19         Q.  Sometimes prescribed by your colleagues,

20    correct?

21         A.  Yes.

22         Q.  And you're not here to opine that

23    prescription use of opioids in pregnant women for an

24    indication like chronic pain is always wrong, are

25    you?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KEARSE:  Object to form.
 2        A.  No.
 3        Q.  In fact, it may be completely appropriate and
 4   standard of care, correct?
 5              MS. KEARSE:  Object to form.
 6        A.  Yes.
 7        Q.  And when it comes to medical-assisted
 8   therapy, that is that somewhere along the line,
 9   somebody has an addiction disorder that may involve
10   legal drugs or illegal drugs or some combination of
11   them, right?
12        A.  MAT is given in conjunction with behavioral
13   therapy for people that have a substance use disorder.
14        Q.  Do you intend to offer any opinions as to how
15   often MAT is required where somebody has only ever
16   taken a legal prescription in the amount given to
17   them?
18        A.  I do not know that information.
19        Q.  I mean, so the way it would work is, like,
20   you have a doctor, Dr. Wexelblatt, who writes a
21   prescription for an opioid for a particular patient
22   for an indication, and it has a certain drug and a
23   quantity and a dosage, and they can take it pursuant
24   to your recommendations, correct?
25              That's one way that somebody could be using
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   an opioid?

 2        A.  That is correct.

 3        Q.  Okay.  Does that ever happen?  Dr. Wexelblatt

 4   ever writes a prescription for an adult like that?

 5        A.  Do I --

 6        Q.  Yeah.

 7        A.  -- personally?  No.

 8        Q.  Have you ever written an opioid prescription

 9   for an adult?

10           MS. KEARSE:  Objection.

11        A.  No.

12        Q.  Have you ever written a prescription for an

13   adult for anything?

14        A.  Yes.

15        Q.  Back in, what, residency?  When would that

16   have been?

17        A.  Define adult age.

18        Q.  Well 18 or up.

19        A.  Yes, I have prescribed a -- an antibiotic for

20   a person between 18 and 20.

21        Q.  Okay.  I'm not going to --

22        A.  So that's -- pediatrics is allowed up to 21

23   in some areas.

24        Q.  Okay.  Fine.

25           That's it, though?  No --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Correct.  No nonantibiotics outside of their

 2   indication.

 3        Q.   Okay.  So do you know what percentage of the

 4   people who end up in MAT are only ever taking the

 5   prescriptions like you've described, which is, a

 6   doctor writes a specific prescription for a specific

 7   opioid in a specific dosage and frequency, and that's

 8   all the patient ever takes?  Never additional drug,

 9   never illegal drugs, never polypharmacy?

10             MS. KEARSE:  Object to form.

11        A.   I do not know those numbers.

12        Q.   And are you an expert on those sorts of data

13   or those sorts of trends?

14        A.   No.

15        Q.   Do you intend to opine at trial as to how

16   people get what their particular pathway is to get to

17   where they might ever be on MAT?

18        A.   Restate that --

19        Q.   Sure.

20        A.   -- one more time, please.

21        Q.   So, like, in the data that you track on

22   maternal drug use, you're tracking the use while

23   pregnant, right?

24        A.   Correct.

25        Q.   You don't do some sort of deep dive to go
```

1    back to how they got their drugs, where they first got

2    them, how much they were buying on the street, which

3    particular, you know, dealers they use, whether they

4    stole the drug, when they have ever, if ever, had a

5    legal prescription taken legally?

6         Do you go to that level of detail ever?

7         MS. KEARSE:  Objection.

8    A.  Oh, we have that discussion often with the

9    patient.

10   Q.  And is that tracked in a systematic

11   fashion?

12   A.  Not tracked --

13   Q.  Okay.

14   A.  -- but...

15   Q.  So do you -- do you have an impression as to

16   how often it is that the patients -- you end up

17   treating their children or their future children, how

18   often it is that they're getting to require

19   medical-assisted therapy where all they've ever done

20   is taken a legal prescription of an opioid and never

21   something else, something illegal, excessive,

22   violating doctor's recommendations, any of that?

23   A.  I have talked to many women that have had

24   that pathway.

25   Q.  And what about the later pathway, where along

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the way they also use street drugs, they take

 2    additional drugs beyond what they're prescribed?

 3         A.  I've seen that pathway also.

 4         Q.  Okay.  Do you intend to offer any opinions

 5    about how often either of those possibilities occur in

 6    your patient population?

 7         A.  I don't have a percentage of the patients I

 8    see, but I've seen those pathways.

 9         Q.  Both?

10         A.  Correct.

11         Q.  Do you hold yourself out as an expert in how

12    to treat the mothers in this situation?

13         A.  I -- the mother's addiction or the mother's

14    best therapy for a pregnant woman to do with a

15    substance use disorder?

16         Q.  How to treat the mother's addiction.

17         A.  So my -- I know the best course for her is to

18    be in an MAT versus a nonsupervised setting.

19         Q.  So for the work here, there is some data that

20    you've cited that's specific to Summit and Cuyahoga

21    County, correct?

22         A.  That is correct.

23         Q.  Typically from OPQC, that there is some data

24    that's generated where you have it on a

25    county-by-county basis, but there's some other
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    statewide kind of, I guess, databases that are

2    utilized to get percentages of admissions involving a

3    certain diagnosis, that sort of thing?

4         A.  So the ODH and the OHA have databases that

5    the information was collected from.

6         Q.  And the ones that you've identified in

7    connection with your report itself are the only

8    Cuyahoga or Summit-specific data that you considered

9    in forming your opinions, correct?

10        A.  Those are the only ones I included in that

11   report.

12        Q.  Okay.  Are there additional ones you

13   considered in forming your opinions that you haven't

14   disclosed?

15        A.  I know -- I -- we have access to all of the

16   counties, but did not put all 83 in the report.

17        Q.  Do you --

18        A.  The --

19        Q.  -- intend to go get data on Cuyahoga and

20   Summit County to supplement your report or look at

21   additional data beyond what you've already

22   disclosed?

23        A.  No.

24        Q.  So in this litigation, Cuyahoga County and

25   Summit County are parties, and they've filed
```

1    complaints and they've produced documents in

2    connection with the litigation, and they also have

3    representatives and employees, current and past, who

4    have given testimony.

5            Was that your understanding?

6       A.  I'm not aware of what they've done.

7       Q.  Have you ever looked at, like, complaints in

8    this case that were filed by either Cuyahoga or Summit

9    County?

10      A.  No.

11      Q.  Do you have an understanding of what they

12   allege?

13      A.  In a broad term maybe.

14      Q.  Can you give me your broad understanding of

15   what the counties allege?

16      A.  That there was oversupply and overmarketing

17   of opioids and overdistribution and over -- I guess --

18   I don't know, the -- distribution.

19      Q.  Based on your own personal knowledge as a

20   doctor in Ohio who's dealt with doctors in those

21   parts -- in those counties as well, do you intend to

22   talk about whether any of the Plaintiffs' allegations

23   are correct or incorrect relating to oversupply or

24   marketing?

25      A.  I haven't looked at their exact complaint,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    but I do have -- know the statewide data, the number

 2    of prescriptions that we've seen statewide.

 3         Q.  And that's the extent of what you can do, is

 4    you can say, I know that the prescriptions have gone

 5    up over time?

 6         A.  Correct.

 7         Q.  And then they drop starting several years

 8    ago, right?

 9         MS. KEARSE:  Object to form.

10         A.  They do decrease when we started working on

11    this in 2012, correct.

12         Q.  Right.  So for the last seven years, the

13    opioid prescriptions in Ohio have been dropping every

14    year?

15         MS. KEARSE:  Object to form.

16         A.  I think so, yes.

17         Q.  So do you know the names of any of the

18    Defendants in this litigation?

19         A.  No.  Well, I take that back.  I do know

20    possibly two, I think.

21         Q.  Who are the two you think you know?

22         A.  Purdue and Cardinal Health.

23         Q.  Okay.

24         A.  I don't know if I'm correct.

25         Q.  Do you intend to offer any testimony specific
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to either of them, what they did or didn't do, or

 2    should or shouldn't have done?

 3        A.  No.

 4        Q.  And so the other, like, 15 defendants, you

 5    certainly aren't offering any opinions specific to

 6    their conduct, correct?

 7        A.  I didn't know there was 17.

 8        Q.  So let's go back to the allegations of the

 9    Plaintiffs and what their information is.

10            We talked about conversations you may have

11    had through OPQC with people who work in those

12    counties, correct?  Remember that?

13        A.  Uh-huh.

14        Q.  And we talked about --

15        A.  Yes.

16        Q.  -- how you've seen some county-specific data

17    along the way, correct?

18            MS. KEARSE:  Object to form.

19        A.  It's regional data for OPQC.

20        Q.  I know --

21        A.  You're talking about OPQC now.

22        Q.  I'm not.

23            You've also seen some Cuyahoga and

24    Summit-specific date from some of the sources that

25    you've cited, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.   That is also correct.

2        Q.   So in connection with your role in this

3   litigation, have you read any testimony given by

4   anybody who is a representative of or ever worked for

5   Cuyahoga or Summit County?

6        A.   No.

7        Q.   Have you looked at any of the documents

8   they've produced in the litigation?

9        A.   No.

10        Q.   Have you looked at any of their discovery

11   responses explaining what they think their harms were

12   or what their particular allegations are, or any of

13   those other things?

14        A.   No.

15        Q.   What about anything from the Defendants?

16   Have you looked at any documents produced by any

17   Defendant?

18        A.   No.

19        Q.   Do you have the ability to offer any opinions

20   about whether any portion of any harm that's claimed

21   by Cuyahoga or Summit County was caused by any action

22   or inaction of any specific Defendant?

23        A.   I would have no idea at this point without

24   looking at anything.

25        Q.   And the same thing goes for groups of
```

Highly Confidential - Subject to Further Confidentiality Review

 1  Defendants?  You couldn't offer that testimony?

 2      A.  Wouldn't know who you were talking about, so,

 3  no.

 4      Q.  I didn't think so, but I'll spot you

 5  something:  There are manufacturers, and there are

 6  distributors, and there are retail pharmacy

 7  defendants.  Those are three ways that you might group

 8  this.

 9          You're not going to talk at trial about

10  anything the manufacturers as a whole did or didn't do

11  and how that caused any harm, correct?

12          MS. KEARSE:  Object to form.

13      A.  Not my area of expertise.

14      Q.  So you're not going to do it, right?

15      A.  Yeah, I would assume not.

16      Q.  Okay.  I mean, that's kind of the way this

17  works, is you disclose opinions, you claim expertise,

18  and as I understand you, Dr. Wexelblatt, you're going

19  to only try to offer opinions at trial that are

20  disclosed within your area of expertise and where

21  you've done enough research and evaluation that you

22  can offer an opinion.

23          Am I right so far?

24      A.  That is a hundred -- correct.

25      Q.  Okay.  So you're not going to offer any

Highly Confidential - Subject to Further Confidentiality Review

```
 1    opinions about what any group of distributors did or

 2    didn't do, or how that caused any harms, or what --

 3    anything would need to be done to try to fix any of

 4    that?

 5           MS. KEARSE:  Object to form.

 6      A.   That's correct.

 7      Q.   Same thing for the other group of the

 8    Defendants, the retail pharmacies, correct?

 9      A.   If they're mentioned, yes.

10      Q.   And so this brings us back to where we were

11    about the issue of licit versus illicit drugs.  I am

12    not sure you used the word "licit."  I just did.

13           But do you know what that means?

14      A.   Prescribed?

15      Q.   Well legal, yeah.

16      A.   Okay.

17      Q.   So -- because you could have a prescribed

18    drug that's used illegally, right?  Like you could --

19      A.   Right.

20      Q.   -- steel somebody's prescription or you could

21    give it to somebody else and then the use ultimately

22    is illegal or illicit, correct?

23      A.   You could -- yes, that is correct.  You could

24    illicitly use a prescribed substance.

25      Q.   In various ways, including buying and on the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    street after it's been stolen from a pharmacy or a

 2    truck, or whatever, right?

 3         A.  That's one way.

 4         Q.  And in none of your opinions that you're

 5    intending to offer at trial are you going to focus on

 6    what you recommend or any description of the impact on

 7    NAS or maternal fetal outcomes based solely on the

 8    legal use of prescription drugs by the patient who's

 9    supposed to be taking them and taking them according

10    to the directions of the doctor, correct?

11         MS. KEARSE:  Object to form.

12         A.  Yes, that is correct.

13         Q.  You're also not going to be offering any kind

14    of opinion, as I understand it, about how much things

15    would be better if basically Cuyahoga and Summit

16    County had been doing all of what you think had been

17    reasonable from the time when you think they should

18    have initiated it?

19         MS. KEARSE:  Object to form.  Misstates his

20    testimony.

21         A.  Yeah, I think it's unknown to say when --

22    what would change it.

23         Q.  Therefore, you're not doing that?

24         A.  I don't know how to answer that question.  I

25    don't know what you're --
```

```
 1       Q.  Let me -- let me ask this complete question:

 2   Given that you don't know how things would be

 3   different if Cuyahoga and Summit County had taken

 4   additional steps over time to address NAS and maternal

 5   use of opioids and opiates while pregnant, you don't

 6   intend to offer any testimony at trial that basically

 7   focuses on what additional things would need to be

 8   done now if they had done what you thought would have

 9   been appropriate?

10           MS. KEARSE:  Object to form.

11       A.  It's a long question.

12       Q.  It is.  I've been told to try again.

13           Let me ask it this way --

14           MS. KEARSE:  And I don't even know that it

15   was a question.

16           MR. ALEXANDER:  It was.  It was -- it was

17   most definitely a question.

18       Q.  So, Dr. Wexelblatt, do you have an

19   understanding at the level of detail of what's going

20   on down in your region as to what Cuyahoga County is

21   doing with regard to prevention, education and

22   training, supportive services, and intervention now?

23       A.  Their county compared to our county, do I

24   know the differences?

25       Q.  Yeah.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.  No.

 2        Q.  What about Summit County?  Do you know at a

 3   level of detail what Summit County is doing now in

 4   terms of -- these are your areas of recommendation:

 5   Prevention, education and training, supportive

 6   services, and interventions, specific to neonatal

 7   abstinence syndrome and impacts on maternal use of

 8   opioids and opiates?

 9        A.  I know that they are working on them all, but

10   not to the level of detail that I could compare one

11   county to another county.

12        Q.  So if we go back in time, do you know, like,

13   what Cuyahoga County was doing on these -- in these

14   broad areas back in 2010, '12, '14, '16, '18?  Are you

15   able to go backwards and say when they started,

16   whatever additional efforts they started?

17        A.  I'm not able to do that right this second.

18        Q.  Do you intend to do that for trial, where you

19   would basically do a comparison of what they've been

20   doing versus what you think they should be doing going

21   forward?

22        A.  I think -- don't know if there's anything

23   that they should be that they aren't doing without

24   going back in time and changing time.

25        Q.  Okay.  So setting aside the time machine
```

Highly Confidential - Subject to Further Confidentiality Review

1    option, you don't intend to offer the opinion at trial

2    that Cuyahoga County should be doing something

3    additional to what they're already currently doing in

4    2019?

5          MS. KEARSE:  Object to form.  Misstates his

6    testimony.

7       A.  I would not know if every single thing that

8    they have implemented at this time that would be in

9    that report.

10      Q.  I mean, your report doesn't really talk about

11   what they're doing in Cuyahoga County and Summit

12   County now, does it?

13      A.  Our recommendations are pretty much universal

14   that we know that there's a best -- sort of best

15   practice that should -- implementation, and what they

16   have done and not done, I am not aware of.

17      Q.  Right.  So just to make it clear, I was

18   asking about Cuyahoga County.

19          For Summit County, you also don't know what

20   they're doing now versus your recommendations,

21   correct?

22          MS. KEARSE:  Objection.

23      A.  For all of them, you are correct.

24      Q.  Okay.  And for Summit County at points in the

25   past, you don't know what they were doing then versus

1   your recommendations for what they should have been

2   doing in the past?

3        A.  For all of those recommendations, you are

4   correct.

5        Q.  So you don't intend to offer an opinion at

6   trial as to anything that Cuyahoga County should be

7   doing extra in 2019 compared to what they're doing

8   already?

9        MS. KEARSE:  Objection.  That misstates his

10  testimony.

11       A.  Can you repeat that one more time?  I --

12       Q.  Sure.  That was like the shortest one I've

13  asked all day.

14       A.  Yeah, I was just --

15       Q.  I will.

16       You don't intend to offer an opinion at trial

17  that Cuyahoga County should be doing anything extra in

18  2019 compared to what they're already doing?

19       MS. KEARSE:  Objection.

20       A.  Not a hundred percent sure if they're doing

21  all of that, but if they are not doing the

22  recommendations, then I would recommend it.

23       Q.  Okay.  So sitting here today, are you in a

24  position to offer any opinions that there are specific

25  additional things that Cuyahoga or Summit County need

1    to be doing going forward compared to what they're

2    already doing right now?

3            MS. KEARSE:  Object to form.

4        A.  It would be the recommendations in the report

5    is what we would recommend them be doing.

6        Q.  But you don't know how that relates to what

7    they're already doing?

8        A.  Countywide in each -- in the whole --

9    throughout the whole county, correct.

10       Q.  Or at any particular hospital in the county,

11   can you provide the level of detail of saying at, you

12   know, the Rainbow Health facility that's part of your

13   consortium in Cuyahoga County, how their current

14   practices relate to this and what they would need to

15   change as much as this relates to hospitals as to

16   other actors?

17           Can you do that?

18       A.  Not at the -- every hospital-specific level

19   in the county.

20       Q.  Okay.  And as we said, I mean, prevention,

21   education and training, supportive services, and

22   interventions, these are not just things you're asking

23   that hospitals should do; these are things that you're

24   asking various medical providers around the county

25   should do, various public servants, you know, social

Highly Confidential - Subject to Further Confidentiality Review

```
 1    services, other employees of the county should do,

 2    what you want patients to do, what you would want to

 3    be in a public education campaign.

 4         You're requiring a lot of actions not just by

 5    specific hospitals, but you're suggesting actions

 6    should be taken by a number of different actors in the

 7    communities, correct?

 8    A.  Correct.

 9    Q.  So going back to my question before:  Sitting

10    here today, you're not in a position to say any

11    additional things that any actor in Cuyahoga or Summit

12    County should be doing compared to what they're

13    already doing now?

14         MS. KEARSE:  Object to form.

15    A.  If they're not doing it, then I would

16    recommend them doing it.

17    Q.  And sitting here today, you're not in a

18    position to know what anybody is doing in these

19    counties with regard to any of these

20    recommendations?

21    A.  I know in the general terms, certain parts

22    are doing certain recommendations, but not every

23    hospital in every county and every social worker in

24    the whole county.

25    Q.  And to do any of these things -- kind of the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Section 4 of your report -- there would need to be

 2    detailed plans put forward, and various people would

 3    need to sign on, correct?

 4          MS. KEARSE:  Objection.

 5       A.  It would be a regional approach, correct.

 6       Q.  And as far as you know, that hasn't happened,

 7    and you can't say if it ever would work?

 8          MS. KEARSE:  Object to form.

 9       A.  I can't say it has happened, and I think it

10    would work if we implemented it.

11       Q.  No.  I mean, you can't say that all of the

12    people who would need to participate would ever sign

13    on and agree with your plan?

14          MS. KEARSE:  Object to form.

15       A.  I would hope they would.

16       Q.  Okay.  So do you know the difference between

17    hope and being able to opine under oath that something

18    is going to happen?

19          MS. KEARSE:  Object to form.

20       A.  Never used the word "opine" before, so I

21    don't know.

22       Q.  Let me see if I can ask this:  Sitting here

23    today, can you -- because it's in your report -- can

24    you offer an opinion to a reasonable degree of medical

25    certainty in the field of pediatrics and
```

Highly Confidential - Subject to Further Confidentiality Review

 1    maternal-fetal issues, as they relate to exposure and

 2    impact of in utero opioid exposure to infants, that

 3    the recommendations in your report would be adopted by

 4    all the necessary stakeholders in Cuyahoga or Summit

 5    County such that they actually would ever happen?

 6            MS. KEARSE:  Object to form.

 7        A.  Yes.

 8        Q.  Okay.  So who would need to sign on to make

 9    all of those recommendations happen?

10        A.  You would have to look at each one

11    individually.

12        Q.  Okay.  And have you done anything to figure

13    out if anybody up there agrees with you other than

14    your particular OPQC contacts?

15            MS. KEARSE:  Object to form.

16        A.  It's been adopted from mostly -- the NAS has

17    been adopted by our 52 hospitals that have

18    participated, so I know that these are definitely

19    reasonable approaches.  And I know our -- part of our

20    MOMS Plus project we have adopted in the -- our 29

21    centers that are involved from that have adopted, a

22    majority of these centers.

23            So, yes, this is definitely an approach that

24    has been shown to work.

25        Q.  Okay.  I appreciate your answer, but it's not

1    actually the question I asked.

2            I'm asking about the stakeholders for

3    Cuyahoga and Summit County who would need to sign on

4    to make this work.  It's not just hospitals.

5            It would need to be social services entities.

6    It would need to be healthcare providers outside of

7    hospitals.  It would need to be families.  It would

8    need to be whoever does public education.

9            It would be a lot of different people as part

10   of, you said, the village that it takes, right?

11       A.  It would take a village, correct.

12       Q.  Do you have the ability, as you sit here

13   today, to say that basically Cuyahoga and Summit

14   County would do all of these things?

15           All of the various actors that would be

16   necessary to buy on, or sign on, would sign on the way

17   they've done it down here in Cincinnati?

18       A.  No reason to think they wouldn't.

19       Q.  I'm sorry?

20       A.  There's no reason to think they wouldn't.

21       Q.  Would not; is that your --

22       A.  Correct.

23       Q.  Is that the best you can do?

24           MS. KEARSE:  Object to form.  Argumentative.

25       Q.  Is that the best you can do in terms of

Highly Confidential - Subject to Further Confidentiality Review

1   offering an opinion to a reasonable degree of medical

2   certainty about these plans ever being adopted in

3   these counties?

4       A.  "Is that the best I could do" would mean?

5       Q.  Well let me ask it directly:  As you sit here

6   today, can you opine that it is likely that every

7   necessary stakeholder in Cuyahoga County would agree

8   to make whatever additional changes were necessary to

9   follow your recommendations?

10      A.  I would think that it would be possible,

11  yes.

12      Q.  It would be possible?

13      A.  Doable, yes.

14      Q.  And so for Summit County, can you opine that

15  it's likely that all of the necessary stakeholders

16  would sign to take the additional steps to carry out

17  your recommendations?

18      A.  I do.

19          MR. ALEXANDER:  I don't know how long we've

20  been going, but now is probably a good time for a

21  break.

22          MS. KEARSE:  I was afraid to ask.

23          MR. ALEXANDER:  And hopefully lunch is even

24  here, so I would suggest a break unless somebody

25  disagrees.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KEARSE:  Okay.

 2              THE VIDEOGRAPHER:  We're now going off

 3    record.  The time is 12:44.

 4              (There was a luncheon recess.)

 5              THE VIDEOGRAPHER:  We are now back on record,

 6    and the time is 1:26.

 7         Q.  Dr. Wexelblatt, is there any of your

 8    testimony from the period before the break that you

 9    need to change or supplement in any way?

10         A.  Nope.

11         Q.  I want to just follow up on, I think, where

12    we were on a couple of things before the break.

13              The breakdown that you gave in some of your

14    papers and that you can talk about here in terms of

15    what drugs are being used in a mother who gives birth

16    to a child who's ultimately diagnosed with neonatal

17    abstinence syndrome, lumped together women taking MAT

18    with those taking other legal prescriptions for

19    opioids, correct?

20         A.  We stated the differences in some papers,

21    yes.

22         Q.  So in none of your papers or the data that is

23    being tracked is there a breakout of the legal

24    prescriptions that are not including MAT versus MAT

25    versus completely illicit -- illicit use of opioids or
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   opiates, correct?

 2        A.   I thought our first paper -- like I said, I

 3   did not get a chance to look -- broke down illicit of

 4   versus legal when we looked at short-acting versus

 5   long-acting, but I would have to go back to that.

 6        Q.   Okay.  But within licit use, it didn't break

 7   it up by MAT versus other use, correct?

 8        A.   Not that I am aware of without going back and

 9   reviewing our original paper that I broke it down, but

10   I would have to look at how we broke it down in the

11   table.

12        Q.   So if we talk about it here in terms of

13   opinions you're going to offer about the percentage of

14   NAS births in Ohio in general, the nation in general,

15   or Cuyahoga and Summit, in particular:  Do you have

16   the ability to say which portion of those relate to

17   MAT?

18        A.   Those would fall in the long-acting.

19        Q.   Okay.  So what percentage is that, do you

20   think?

21        A.   I would have to look at our paper.

22        Q.   What about the percentage that are completely

23   illicit use?

24        A.   I think our first paper stated 33 percent.  I

25   would have to look back at it.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   What about nonMAT legal use of a prescription

2  opioid, do you know what percentage those would be?

3      A.   I don't know off the top of my head.

4           Now, to expand on that, though, we are -- and

5  this might have gone back to your very first question

6  about stuff that is pending that just triggered my

7  mind.

8           Another grant that has not been signed

9  officially is looking at universal testing and

10 breaking it down by all of those differences that you

11 are describing.  So that information -- that study

12 should be implemented in -- assuming that the

13 signatures get through -- in August.

14     Q.   Okay.  And do you have any idea when that

15 research will be complete?

16     A.   It's a two-month study.

17     Q.   So do you intend to testify at trial about

18 the results of that study?

19     A.   We should have the information available, and

20 hopefully submitted for analysis.  I'm not sure if we

21 will have it, but we will -- it is all pending on when

22 we have those final analysis.

23     Q.   They -- they won't have been published yet?

24     A.   Correct.

25     Q.   Okay.  And your -- the way you're drawing

Highly Confidential - Subject to Further Confidentiality Review

1    line is:  You're not going to opine on it based upon

2    data unless it has been published or is otherwise

3    publicly available, correct?

4         MS. KEARSE:  Object to form.

5         A.  Correct.

6         Q.  So the specific drugs among the various the

7    various prescription drugs, regardless of how they're

8    obtained, do you have any ability to say which

9    percentage of the available prescription drugs

10   contribute to NAS in some form or fashion?

11        A.  I am not able to do it at this point.

12        Q.  And maybe just focusing on some of the big

13   categories.  Like heroin:  Do we know which portion of

14   the NAS offspring that you were able to track and

15   opine on are related to heroin use?

16        A.  I think that is in that third of illicit.

17        Q.  And for some portion of the MAT because they

18   may be using heroin before they got to the medically

19   assisted therapy?

20        A.  No.  The MAT would be separate.  So out of

21   that two-thirds that is not illicit, I would say

22   two-thirds of that is probably MAT.

23        Q.  Okay.  All right.  So, you think that

24   somewhere around, what, a sixth of the total is

25   prescription use that is not MAT?

```
 1        A.   That sounds about correct.

 2        Q.   And then for the two -- the four-ninths, give

 3   or take, of the total that is MAT, you think that

 4   those people before they got to MAT will have been

 5   using various drugs illegally, including heroin?

 6             MS. KEARSE:  Object to form.  Misstates his

 7   testimony.

 8        A.   Yeah.  I think the literature would suggest

 9   that they have all had prescription opioids that would

10   then lead to illicit use of other substances that

11   would then get them to that.

12        Q.   What do you mean, the literature suggests all

13   have had that?

14        A.   So the NIH states that 80 percent of people

15   that use heroin have started with a prescription

16   opioid.

17        Q.   So what the data actually says is that they

18   have had some prescription drug in their past, as

19   opposed to what they started with.

20             Those are different, right?

21        A.   So they have had prescription use prior to,

22   correct.

23        Q.   Right.  Not necessarily that the prescription

24   use is what led to some drug -- there could be ten

25   years in between them and they would be counted as a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    prior prescriptions, right?

 2         MS. KEARSE:  Object to form.

 3         A.  I'm not sure about the timing interval on

 4    that data.

 5         Q.  When you say 80 percent, you're not trying to

 6    say that 80 percent actually became addicted because

 7    of prescription as opposed to it's just something at

 8    some point in their history that's been documented?

 9         MS. KEARSE:  Object to form.

10         A.  I don't know if that is correlated.

11         Q.  Okay.  So for like any of the work that you

12    are doing now through OPQC, when you look at the issue

13    of use of prescription drugs at some point in the

14    past, are you using any state databases like the OARRS

15    database?

16         A.  We do that on an individual basis.

17         Q.  Okay.  Is there some written protocol for

18    doing that for when you check OARRS or when you do

19    other investigation to try to figure out what the --

20    what prescription history the patient has?

21         A.  We do that as part of our safety assessment

22    when we are trying to see if there is a prescription

23    opioid in -- the mother states that they had a

24    prescription opioid, we do an OARRS report to see if

25    that is, in fact, correct.
```

1    Q.  And so even if somebody pops up as having

2    received a prescription opioid through a prescription

3    as you figure out on OARRS, that doesn't mean that

4    they're not also getting illegal drugs or getting

5    prescription drugs in some illegal fashion, correct?

6        A.  Correct.

7        Q.  In fact, when you go to OARRS, did you ever

8    see that sometimes people have more than one

9    prescription from different doctors at the same

10   time?

11       A.  Yes.

12       Q.  Even though that's the whole point of what

13   OARRS is supposed to prevent, right?

14           MS. KEARSE:  Object to form.

15       A.  Well, it goes back in the history, so, yeah,

16   I mean --

17       Q.  Okay.  So have you heard of the concept of

18   medically appropriate use of an opioid or medically

19   necessary use of an opioid?

20       A.  Yes.

21       Q.  Do you know what percentage of the NAS babies

22   result from medically appropriate use outside of

23   MAT?

24       A.  That would be the one-sixth that we came up

25   previously.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.  And it's your view that if they were getting

 2   a prescription for an opioid, that would be medically

 3   appropriate use?

 4        A.  If they're using it per the prescription,

 5   which we -- so when we say there is a prescribed

 6   opioid, it is hard to know if it is illicit versus

 7   licit.

 8        Q.  Do you know what percentage of the patients

 9   who have legal prescription for an opioid are then

10   abusing it in some form or fashion?

11        A.  So I would say that more of the babies we see

12   with short-acting opioids are using it illicitly.

13        Q.  Okay.  So --

14        A.  If their baby is treated for NAS.

15        Q.  Right.  So less than one-sixth then of the

16   total NAS population are going to be people who are

17   getting heavy prescription for an opioid and are

18   actually using it according to doctor's instructions

19   without abuse outside of the MAT context?

20        A.  Yes.  So I think that number would probably

21   drop down to one-tenth or something like that.

22        Q.  Okay.  So 90 plus percent of the NAS babies

23   then are going to result from some form of medically

24   inappropriate use either current or in the past?

25            MS. KEARSE:  Object to form.
```

```
 1      A.  That's the assumption for the MAT, which is

 2   your biggest block, you would be making that

 3   assumption.

 4      Q.  You think that is a founded assumption based

 5   on the information that you have?

 6      A.  That most people on MAT have misused

 7   prescription opioids?

 8      Q.  Have taken and misused --

 9      A.  Yes.

10      Q.  -- opioids or only taken illicit opioids.

11      A.  So I think that the majority of people on MAT

12   have used -- are from -- they're on MAT due to a

13   substance use disorder, which would be from opioid

14   use, previous opioid use.

15      Q.  Okay.  So you think it is a well-founded

16   statement to say that more than 90 percent of the NAS

17   cases that you are aware of result from some degree of

18   medically inappropriate or illegal use, currently or

19   in the past?

20         MS. KEARSE:  Object to form.  Asked and

21   answered.  Misstates his testimony.

22      A.  I would state that MAT is the biggest group

23   of that.  So you would have to group that into the

24   suggestion that there had been previous use or misuse.

25   I don't know how the percentage of people that got
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   onto MAT with their opioid previous history is.
 2        Q.  Do you have any reason to believe that it
 3   would be different than what the data is on MAT use in
 4   general?
 5        A.  No.
 6        Q.  Okay.  So if the data is:  The vast majority
 7   of patients who ever end up in MAT use -- getting MAT
 8   have an opiate use disorder -- I'm sorry, a drug abuse
 9   disorder that relates to illicit drug use or improper
10   medically inappropriate use of prescription opioids,
11   then that would make sense that we are looking at
12   about 90 percent of the NAS cases that you see and
13   that you believe exist, including in Cuyahoga and
14   Summit County, are resulting from current or past
15   medically inappropriate or illegal use of opioids?
16        MS. KEARSE:  Object to form.  Misstates his
17   testimony.
18        A.  I think inappropriate would be a better word
19   than inappropriate use of opioids.
20        Q.  Okay.  And so for tracking this in terms of
21   the data here and the need for intervention, the vast
22   majority of the -- what is seen as an increase in NAS
23   over time then is going to relate to this
24   inappropriate use of opioids, including street drugs,
25   correct?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.  The increase in NAS is directory related to

2  the increased use of opioids.

3      Q.  Which you're saying 90 percent of that is

4  going to be inappropriate current or past use --

5          MS. KEARSE:  Objection to form.

6      Q.  -- on a patient-by-patient basis?

7      A.  Not -- I don't consider MAT to be

8  inappropriate use.

9      Q.  No, no.  Because we about how they get to

10  MAT.  I'm putting that together, right?

11          So if 90 percent of the opioid -- of the NAS

12  babies have mothers who have at least some point in

13  the past inappropriate use of opioids -- that's your

14  testimony so far -- then you would say that that's the

15  same thing for the increase of opioid of NAS --

16          MS. KEARSE:  Object to form.

17      Q.  -- in Ohio, including Cuyahoga and Summit

18  County, relates to inappropriate use?

19          MS. KEARSE:  Object to form.

20      A.  Like I said, that 90 percent is an estimate,

21  which I don't have any basis to really go on to that

22  besides --

23      Q.  Besides logic, and we've talked about that?

24          MS. KEARSE:  Objection.  Argumentative.

25      A.  I don't know if I would use the word logic,

Highly Confidential - Subject to Further Confidentiality Review

```
 1   but estimates.

 2        Q.  And your -- the current research you're aware

 3   of, including the Voyager databases cut don't allow

 4   you to provide more precise estimate about the

 5   percentage that result from inappropriate use?

 6        MS. KEARSE:  Objection.

 7        A.  That is correct.

 8        Q.  So I had asked about information on the

 9   defendants, and you said you remember two of the

10   defendants just by their name.

11        Have you had personal dealings with either of

12   those defendants you remembered by name?

13        A.  No.

14        Q.  Did you ask, in connection with preparing

15   your opinions, to get any data or information or

16   studies, anything that you didn't get?

17        A.  No.

18        Q.  Have you looked at the expert reports of any

19   other expert in the litigation?

20        A.  No.

21        Q.  Have you talked to any of the other experts

22   in the litigation?

23        A.  No.

24        Q.  Have you met with anybody other than the

25   plaintiffs' lawyers?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   No.

 2        Q.   Have you, in connection with your opinions in

 3   this case, reviewed any labels for any prescription

 4   opioid?

 5        A.   No.

 6        Q.   Have you ever read the labels for any

 7   prescription opioid?  And by "label" I mean like the

 8   prescribing information.

 9        A.   I have looked at the black box on

10   methadone.

11        Q.   Is that it?  That's the only time you've ever

12   looked at one of those?

13        A.   Yes.

14        Q.   So how many of them have you prescribed

15   total, methadone?

16        A.   Morphine and buprenorphine.

17        Q.   Okay.  And so for two of the drugs that you

18   prescribe on a regular basis, you've never even read

19   their labels?

20        A.   Correct.

21        Q.   And I'm going to go through some things that

22   I think we have a largely covered, or I think we have

23   a pretty good understanding of things that you're not

24   covering.  And I hope to just kind of go through them

25   quickly.  Frankly, I'm just telling you this so we can
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   get a little more to the meat, but I think we have
 2   identified kind of the parameters of your opinions.
 3           So, as I understand --
 4           MS. KEARSE:  Objection.  Form.
 5   Q.  -- it based upon --
 6           MR. ALEXANDER:  That was just a predicate.  I
 7   haven't asked a question yet.
 8           MS. KEARSE:  I know, but I think the record
 9   reflects all the testimony today, but go ahead.
10           MR. ALEXANDER:  Okay.
11   Q.  You're not offering any opinions as to the
12   cause of the opioid or opiate crisis or epidemic in
13   Ohio, correct?
14   A.  I think that is debatable.
15   Q.  Debatable whether you're offering opinions on
16   that?
17   A.  I think it might fall into this.
18   Q.  Well, so do you have some particular analysis
19   or expertise that allows you to talk about why it is
20   over the time period when we saw that the
21   prescriptions were rising and that the usage levels
22   were prescribed rising, that all of that was
23   happening?
24   A.  So I think that there is a direct correlation
25   with the increase prescriptions that were out there
```

1    with the increased rate of NAS.

2       Q.  Okay.  So do you know why the prescription

3    rate was increasing?

4       A.  No.

5       Q.  Okay.  Do you know anything about medical

6    standards in terms of prescribing opioids for pain

7    management and how those changed over time or any

8    other factors that led to changes in prescribing

9    practices?

10      A.  Yes.

11      Q.  Do you know about that outside of the area of

12   pediatrics?

13      A.  Yes.

14      Q.  Okay.  Is that something that you have done

15   for purposes of becoming an expert in this case?

16      A.  It's part of the general Ohio legislature for

17   all physicians.

18      Q.  Okay.  So you know that there was a time when

19   there was a change in how things were done for pain in

20   Ohio?

21      A.  For prescriptions -- opioids, yes.

22      Q.  Yeah.  What is your history there?  What is

23   the time frame that you are talking about?

24      A.  So in 2012, there was a mandate to decrease

25   the number and length of prescription opioids that was

Highly Confidential - Subject to Further Confidentiality Review

```
 1    enacted.

 2           And then there has also been changes more

 3    recently about who can prescribe buprenorphine and

 4    then there's also been legislative -- or mandates

 5    about how many patients a buprenorphine provider can

 6    have.

 7           So those are all legislative impacts that

 8    have been discussed as part of this -- these -- our

 9    projects.

10      Q.  What about when it started?  Were there

11    legislative efforts or changes across the state that

12    led to the increase prior to 2012?

13      A.  Not that I'm aware of.

14      Q.  Do you know anything about national standards

15    and how they might have changed over time leading to

16    some increase in prescribing?

17      A.  I know that the attorney general -- not --

18    Surgeon General had come out with a statement also for

19    national and then CDC also had statements in 2013

20    about guidelines for prescribing opioids.

21      Q.  What about before then?  Like back in like

22    the mid-2000s or early 2000s?

23      A.  I'm not aware of anything before 2012.

24      Q.  Do you know when the opioid crisis started?

25      A.  Going back, it looks like after -- 1999 is
```

Highly Confidential - Subject to Further Confidentiality Review

1    when we started to see the increase in prescription

2    opioids.

3        Q.  Are you going to talk about why that

4    happened?

5        A.  If asked.

6        Q.  Do you have an opinion to a reasonable degree

7    of medical certainty as to why it was that there was

8    an increase in that time period?

9        A.  I only know from the inpatient side that

10   that's when the fifth vital sign occurred for pain

11   management within the hospitals, and that seems to be

12   exactly when that was implicated.

13           Besides that, that would be the only thing

14   that I would be able to attribute.

15       Q.  So, other than the prescription side, what

16   about like the illicit drug side?  Do you know

17   anything about trends of heroin use and fentanyl

18   analogs or any other street drugs, how those have come

19   or gone or what their drivers have been over the last,

20   let's say, 15 years?

21       A.  I think we have a good idea about why in the

22   last four years that it has been increasing, or five

23   years.

24       Q.  And what are you talking about?

25       A.  As the prescription opioids decreased is when

1    we are seeing the exact increase of the heroin and the

2    fentanyl.

3        Q.  Do you know any other changes in terms of

4    like what is going on or what has gone on with cartel

5    activity or importation of illegal drugs from China

6    that involve, you know, designer drugs, to get around

7    like DA limits on drugs?

8            Do you know anything about any of that?

9        A.  Not outside of what I read on CNN.

10       Q.  So is that expert opinion or is that just

11   educated consumer?

12       A.  I don't know -- I would not be an expert on

13   cartel or Chinese manufacturing of fentanyl.

14       Q.  So other than saying in general you know

15   there was a time when the prescription -- the levels

16   of prescriptions in Ohio and the country went up, do

17   you have anything else to say about the cause of the

18   opioid or opiate crisis?

19           MS. KEARSE:  Object to form.

20       A.  No.

21       Q.  Do you know -- well, do you intend to offer

22   -- let me ask this way:  As I understand it, you don't

23   intend to offer any opinions as to the percentage of

24   harms in terms of NAS or any maternal-fetal issues

25   that relate solely to medically unnecessary

Highly Confidential - Subject to Further Confidentiality Review

```
 1   prescriptions of opioids?

 2           MS. KEARSE:  Object to form.

 3       A.  Did you mean to ask it as a double negative,

 4   or no?  Because I think you did.

 5       Q.  I think I did.

 6       A.  Okay.  So I --

 7       Q.  You don't intend to offer any opinions as to

 8   the harm that was attributed to the medically

 9   unnecessary prescription of opioids?

10           MS. KEARSE:  Object to form.

11       A.  Medically unnecessary?

12       Q.  Yeah.  Like -- so, every prescription that

13   got written and filled, there were healthcare

14   providers writing a script and them some pharmacy

15   filling it or some other way that it got dispensed.

16           Is that fair so far?

17       A.  That is correct.

18       Q.  Are you offering any opinions about the

19   conduct of any doctors or pharmacists or other people

20   in the healthcare chain that led to any particular

21   prescriptions being written and filled?

22       A.  So I think one of the problems was there were

23   some many prescriptions filled that people had extra,

24   and then there was misuse based on the extra unused

25   pills.  So I don't know if that would fall into this
```

Highly Confidential - Subject to Further Confidentiality Review

1    category or not.

2        Q.  Are you critical of other doctors or other

3    healthcare providers for writing prescriptions and

4    filling prescriptions that you think weren't

5    appropriate?

6        A.  I think that was done.

7        Q.  Do you have some expert opinions and a basis

8    to offer an opinion about how often that was done or

9    how much a part of the problem it was here?

10       A.  I couldn't give you the numbers or

11   percentages, but I can just tell you -- I just know

12   the data that shows the unintentional overdose from

13   prescription opioids increased.  So that would be the

14   only then I would feel comfortable talking about.

15       Q.  So your belief is that doctors bear some of

16   the responsibility for writing medically unnecessary

17   prescriptions?

18           MS. KEARSE:  Object to form.

19       A.  I think the education wasn't there to inform

20   people or it was just not known at that time.

21       Q.  So is that a yes:  You think doctors bear

22   some of the responsibility?

23           MS. KEARSE:  Object to form.

24       A.  Yes.

25       Q.  And do you intend to offer any opinions about

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the percentage of responsibility that goes on doctors

 2    across Ohio for writing medically unnecessary

 3    prescriptions?

 4          MS. KEARSE:  Object to form.

 5      A.  I would have no idea to -- how to quantify

 6    that.

 7      Q.  And you can't do that for Cuyahoga County or

 8    Summit County either, can you?

 9      A.  There would be no difference.

10      Q.  And what about any like individual, you know,

11    small nondefendant pharmacies or any particular

12    pharmacists who maybe have lost their license or gone

13    to jail over the years for conduct in relation to

14    dispensing controlled substances?  Are you aware of

15    anything about that?

16      A.  I am aware of that.

17      Q.  Do you think those folks bear some fault?

18          MS. KEARSE:  Object to form.

19      A.  Yes.

20      Q.  And you haven't formed any opinion about

21    percentage of fault attributable to that sort of

22    conduct in terms of the opioid crisis in Cuyahoga

23    County or Summit County, correct?

24      A.  Correct.

25      Q.  You don't intend to offer any opinions as to
```

Highly Confidential - Subject to Further Confidentiality Review

1   any expenses that have actually been incurred by

2   Cuyahoga or Summit County that are attributed to

3   anything about the opioid crisis, correct?

4       A.  I think in our report we put the attributed

5   accounts due to NAS in there -- or is that Ohio -- I

6   would have to look back at my report if it was

7   generalized to Ohio rates or if it was county-specific

8   rates.

9       Q.  So there is a general thing about the --

10  basically hospital costs paid by somebody relating to

11  NAS stays over a period of time.

12          Is that what you're talking about?

13      A.  Yes.

14      Q.  Okay.  And so as we have talked about, most

15  of these are paid by Medicaid, correct?

16      A.  Yes.

17      Q.  So that's not paid by Cuyahoga or Summit

18  County, correct?

19      A.  From their insurance?  It is paid by

20  Medicaid, statewide.

21      Q.  Right.  Okay.  So, is there any opinion that

22  you intend to offer about any expenses that Cuyahoga

23  County or Summit Count have actually already incurred

24  because of anything related to opioids?

25      A.  It would just be NAS-related.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.  And as we said, that is not actually a
 2   Cuyahoga or Summit expense, correct?
 3            MS. KEARSE:  Object to form.
 4        A.  Just the hospitals in those counties.
 5        Q.  And they get paid by?
 6        A.  Medicaid.
 7        Q.  Medicaid almost 90 percent and private
 8   insurers most of the rest, correct?
 9        A.  Correct.
10            MS. KEARSE:  Object to form.
11        Q.  So putting it together:  You're not opining
12   that Cuyahoga or Summit have actually incurred any
13   specific additional expenses or costs because of
14   anything relating to the opioid crisis, correct?
15            MS. KEARSE:  Object to form.
16        A.  I think the whole opioid epidemic has had a
17   large impact with loss of jobs, increased
18   incarceration.  So I think the impact, even though
19   outside of my expertise, that there has been an
20   impact.
21        Q.  So that whole thing you just said was outside
22   of your expertise, correct?
23        A.  Most -- the financial aspect, yes.  But the
24   other aspect, I think would fall.
25        Q.  Okay.  I mean, at trial, do you intend to
```

```
 1    offer any opinions within your area of expertise about

 2    anything relating to expenses incurred or that will be

 3    incurred by Cuyahoga or Summit County?

 4         MS. KEARSE:  Object to form.

 5         A.  No.

 6         Q.  Okay.  Your opinion is that the increase of

 7    NAS in Ohio is multifactorial, correct?

 8         MS. KEARSE:  Object to form.

 9         A.  Correct.

10         Q.  Can you list all of the factors that you

11    think should be accounted for in connection with

12    that?

13         A.  I think it is in the report.  So I might miss

14    one or two.  But it is multi-factorial.  It's based on

15    there is mom factors, there is genetic factors, there

16    is infant factors, there is exposure factors.

17              So, it is like I -- like you said, it's

18    multi-factorial.

19         Q.  Yeah.  I think actually you didn't list them,

20    you just use the word multi-factorial in paragraph 42

21    of your report.

22         A.  Okay.

23         Q.  But I want to make sure that we just don't

24    have shorthand for what all of those are.

25              I'm going to guess -- let me talk about a
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   specific section of the report.  I've marked as

2   deposition Exhibit 1 a copy of a report.

3        It says, In Re:  National Prescription Opiate

4   Litigation, MDL No. 2804.  Scott L. Wexelblatt, MD

5   Expert Report, March 25, 2019.

6        (AmerisourceBergen-Wexelblatt-001 was marked

7   for identification.)

8   Q.  So I didn't attach -- and this will be

9   separate, your CV and whatever -- there were some

10  attachments, and those will be separate.

11       So paragraph 42 is where we are.  And just to

12  orient, Exhibit 1 is what we have been referring to

13  as your report, correct?

14  A.  Yes.

15  Q.  And if you look on the last numbered page,

16  page 25, is that your signature from March 25, 2019?

17  A.  That is a computer generated, yes.

18  Q.  Okay.  How long before then had you started

19  your work on this report?

20  A.  I first met with plaintiffs' attorneys in

21  December, I think.

22  Q.  Do you know how many total hours you spent

23  preparing the report and other work that you did prior

24  to signing it?

25  A.  It was 15 hours.
```

1    Q.  Okay.  So your $650 an hour rate you billed

2    them about $10,000 worth of time?

3    A.  It was under that, correct.

4    Q.  What about additional time since March 25, do

5    you know how much you've spent?

6    A.  Since this report, I think we are at eight

7    hours right now, eight-ish.

8    Q.  Are you counting since we got started here

9    today?

10   A.  No.

11   Q.  Okay.  All right.  So what I was just asking

12   you about is paragraph 42, which is at the bottom of

13   page 16 of your report.

14   A.  So if you -- we have a diagram we posted in

15   our article, Neonatal Abstinence, An Overview.

16       An article in my CV called Neonatal

17   Abstinence, An Overview, which we have a table that

18   lists the multifactorial reasons for NAS. And I would

19   refer to that for the list of nine things that we

20   refer to.

21   Q.  Okay.  Maybe we will have time to pull that

22   one out.  I have it.

23   A.  Okay.

24   Q.  Do you have anything to add to that list that

25   is in that publication?

```
 1        A.   Okay.  So, since that time, I think we have

 2   -- the big boxes are probably the same, but there has

 3   been -- since that publication, I think hospital sites

 4   are -- there is more and more literature supporting

 5   different aspects that it may have been misstated in

 6   that paper, which was 2018.

 7        Q.   So not all women who give birth after taking

 8   some degree of opioid or opiate while pregnant have a

 9   baby who will ultimately be diagnosed as having NAS,

10   correct?

11        A.   So we define NAS in our statewide

12   collaborative as those that need pharmacologic

13   treatment.  So only 40 to 30 percent will meet that

14   definition of having NAS.  The others we would

15   classify as opioid exposed.

16        Q.   And so, we have seen different estimates of

17   the range of the -- of the NAS babies who require

18   pharmacologic intervention, but from the data track

19   that you have from OPQC, it is running around 40

20   percent?

21             MS. KEARSE:  Object to form.

22        A.   Forty-two percent, correct.

23        Q.   And you think that is an accurate percentage

24   based upon the diagnosis criteria that you are

25   using?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.  I know that's accurate, correct.

 2        Q.  And then the rest of them -- is there some

 3   percentage that will exhibit symptoms but not require

 4   pharmacologic intervention?

 5        A.  Yes.

 6        Q.  What percentage of opioid exposed infants is

 7   that?

 8        A.  So I would say the majority of babies that

 9   are opioid exposed show signs and symptoms, they just

10   don't need pharmacologic treatment.

11        Q.  What about where the exposure is in like the

12   first trimester but there's nothing the remaining

13   trimesters?

14        A.  Then that would be even less.

15        Q.  Is there data on that about the timing and

16   extent of exposure --

17        A.  There is.

18        Q.  -- as relate to the incidents?

19        A.  Yes.

20        Q.  Is it, in general, the more that's used, the

21   later it is in the pregnancy, the more likely there

22   are to be signs and symptoms of withdrawal?

23        A.  So there's two things that have been looked

24   at.  The -- the duration, meaning more than 90 days,

25   versus under 90 days, and then timing within 30 days
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of delivery versus longer than 30 days.

 2        Q.  Okay.  And you're not opining to a reasonable

 3    degree of medical certainty that the drugs we're

 4    talking about, the opioids, particularly the

 5    prescription opioids, have teratogenic effects,

 6    correct?

 7        A.  Teratogenic, we know that they may be

 8    associated with long-term outcomes, so we are not

 9    really understanding the pathway.  So if you use the

10    true definition of teratogenic, I couldn't -- I

11    wouldn't say a hundred percent, no, we don't know the

12    pathway of why we're having babies with strabismus

13    that are opioid exposed.

14        Q.  So sitting here today, you can't opine to a

15    reasonable degree of medical certainty that there are,

16    in fact, teratogenic effects of the prescription

17    opioids, correct?

18            MS. KEARSE:  Object to form.

19        A.  I would not -- I would say if we are

20    considering strabismus as part of teratogenic effect,

21    I would have to look at the true definition of what

22    that would mean.  So at this point, I would not be

23    able to give you a true answer.

24        Q.  And other than that, setting aside the

25    strabismus, you're not aware of any other possible
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    effect that would be considered teratogenic or

 2    iatrogenic, I guess, too?

 3        A.  Are outcomes, I think that would be the one

 4    that I would have to look at the definition of

 5    teratogenic to link it to.

 6        Q.  So do you intend to offer any opinions at

 7    trial that there were other nonparties in this case,

 8    other than prescribing doctors and individual nonchain

 9    pharmacies and pharmacists, who you think bear some

10    responsibility for the opioid crisis in Ohio?

11        MS. KEARSE:  Object to form.  Misstates his

12    testimony.

13        A.  No.

14        Q.  Well are there other third parties where you

15    think that they should have done more to help minimize

16    the effects on NAS babies and improving maternal

17    outcomes?

18        A.  I need to get more clarification on what you

19    mean by that.

20        Q.  Sure.  So in other words, do you intend to --

21    well, let me ask it this way:  So, you've identified,

22    and we've gone over this in general terms, that there

23    are additional things that you think should be done to

24    try to address NAS, correct?

25        A.  Yes.
```

1      Q.  And we can look at what has been done in

2  terms of the timing of implementing various changes or

3  protocols in hospitals in Cuyahoga and Summit County,

4  correct?

5      A.  We can go back?

6      Q.  We could look at the timing and see when

7  anybody implemented some additional measures or

8  considered them and didn't implement them, right?

9      A.  Yes, that would be possible.

10      Q.  So do you intend to opine that the

11  third-parties who maybe could have done more to help

12  minimize the effects of NAS have done all that they

13  could have?

14          MS. KEARSE:  Object to form.

15      A.  The third-parties being?

16      Q.  Hospitals and healthcare providers, and

17  anybody else who you have ultimately identified as

18  maybe needing some sort of push to do better going

19  forward.

20      A.  That I would state?

21      Q.  Let me -- the various third-parties, the

22  hospital, the doctors, all of that, I asked you about

23  whether there is some nonparties who bear fault for

24  creating the opioid crisis, right?

25          Now what I'm asking about it:  Do you

Highly Confidential - Subject to Further Confidentiality Review

1    criticize or do you intend to testify that they did

2    everything right, any of these third-parties in terms

3    of taking steps to minimize the effects of the opioid

4    crisis?

5           MS. KEARSE:  Object to form.

6      A.  So I think that what we lay out is the gold

7    standard and what we want to be implemented, and it's

8    not always able to be done due to resources.

9           So I don't think it's -- critical is a tough

10   word to use because there may not have been resources

11   to implement some of these protocols or suggestions.

12     Q.  Do you know anything about what resources

13   existed at various time in Cuyahoga or Summit County

14   to initiate any additional measures to address NAS?

15     A.  So we have worked on that since 2012 in all

16   of those counties.

17     Q.  Do you, sitting here today, know what

18   resources were available in terms of financial

19   resources, staffing, anything else you might have

20   needed as a resource to make any of these changes

21   happen over the last seven years?

22     A.  Specific staffing issues, no, I wouldn't even

23   know in our region.

24     Q.  What about money in the budgets?

25     A.  No.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.  Now, one of the things that you said in your

2    report that you were not going to address was the

3    issue of child maltreatment.

4        What does that mean:  child maltreatment?

5    A.  I would have to see where you're referring

6    that to.  You said in the report.  I -- can you show

7    me where in the report?

8    Q.  Probably not fast, but I'll just ask it.

9        So when you talk about the impact of maternal

10   use, you're talking about in terms of essentially

11   creating opioid exposure in utero that can result in

12   NAS or -- NAS or the need for additional treatment for

13   opioid exposure that doesn't result in a diagnosis of

14   NAS, correct?

15   A.  You're stating that NAS -- opioid exposure

16   doesn't always lead to NAS.  Is that what you just

17   stated?

18   Q.  Well, that's part of what you said, right?

19   A.  Yes.  I'm stating that.

20   Q.  Okay.

21   A.  I guess I don't know what you're asking right

22   now.

23   Q.  The focus of your report is on the need to

24   take steps to address essentially the impacts of use

25   by pregnant women of opioids that results in either

Highly Confidential - Subject to Further Confidentiality Review

1    NAS or having children born who had opioid exposure in

2    utero, correct?

3         A.   That's what this report is about, yes.

4         Q.   What you are not addressing are other effects

5    on child care or child health from a mother using

6    opioids, including illicit opioids and street drugs

7    when she's not pregnant, like when he's raising the

8    child, correct?

9         A.   This report is basically on women of

10   childbearing age and pregnant women, yes.

11        Q.   But not women of childbearing age when

12   they're not pregnant?

13             You're not offering any kind of testimony

14   about the impact in any direction of whether women who

15   are abusing opioids, including, you know, illicit

16   drugs, create other social services needs or

17   healthcare costs or otherwise negatively impact the

18   lives of their children because of their abuse?

19        A.   No, because we know that, as you mentioned

20   earlier, which I agreed to, was that we know that

21   using the illicit opioid use does lead to

22   unintentional pregnancies.  So you'd have to address

23   it as a whole pregnant age of -- childbearing age.

24        Q.   So is that the only area where you're talking

25   about use by a woman outside of pregnancy?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.  Childbearing age, correct.

 2        Q.  But in terms of leading to unintended

 3   pregnancies?

 4        A.  Correct.

 5        Q.  Are you going to say anything about other

 6   healthcare risks to the mother or other impacts on the

 7   child of a mother being somebody who has an opioid use

 8   disorder or is otherwise abusing opioids or street

 9   drugs?

10        A.  Yes.

11        Q.  What else are you going to testify about?

12        A.  The increased risk of hepatitis C.

13        Q.  That's on the paper when it comes out that we

14   don't have yet?

15        A.  Correct, but I think there is an overwhelming

16   amount of evidence out there about the hepatitis C

17   increases that are out there from the CDC.

18        Q.  So what are you doing to treat hepatitis C in

19   some portion of children who have it because their

20   mothers were drug abusers?

21        A.  So there is a new drug that is out there now

22   for pediatric use that -- so, now, the process that we

23   are doing is we're testing kids.  The earliest we can

24   test a toddler is at 18 months, and then the earliest

25   we can treat them is between two and three years of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   age based on what drug the GI, hepatologist think is

 2   the best for that case.  So we refer -- our job is to

 3   identify and then refer to the hepatologist.

 4        Q.  What is the drug?

 5        A.  I think there is a new one, and I don't know

 6   if it's -- I am not a hundred percent sure of the

 7   indications of what are the new FDA regulations on the

 8   drug and what the new trials are out there because it

 9   is changing.

10        Q.  Do you know the name?

11        A.  I -- I wouldn't -- I don't know off the top.

12   It's R-I-B-O and then something something something

13   something.

14        Q.  Clearly, you haven't prescribed that one

15   yet?

16        A.  No, I will not prescribe that.

17        Q.  Okay.  And you don't intend to offer opinions

18   at trial about the public health impact or the burden

19   on social services of anything relating to alcohol

20   abuse, correct?

21        A.  Not related to alcohol abuse.

22        Q.  Including concomitant alcohol abuse during

23   pregnancy in woman who are also abusing opioids;

24   that's not something you are going to talk about, are

25   you?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            MS. KEARSE:  Object to form.

 2       A.  That would fall under polysubstance abuse,

 3   opioid use, so I think that would fall under that.

 4       Q.  Okay.  And what is your best estimate or what

 5   opinion can you offer about the percentage of patients

 6   in Ohio who are abusing alcohol while pregnant in

 7   addition to abusing opioids?

 8       A.  I think our first paper stated that about 9

 9   percent.

10            UNIDENTIFIED SPEAKER:  I'm sorry?

11            THE WITNESS:  Nine percent for our first

12   paper.

13       Q.  What about alcohol use that falls short of

14   meeting the criteria for abuse, do you know what that

15   is?

16       A.  Our question was:  Was there use.  And I

17   would have to go back to how we -- in our methodology

18   of what we defined alcohol use, if it was

19   trimester-related or any use or misuse.

20       Q.  Have you ever done any research on fetal

21   alcohol syndrome?

22       A.  No.

23       Q.  Have you ever done any research on the

24   effects of alcohol during pregnancy?

25       A.  I have not done research on that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.  Do you know from your training if alcohol is

 2   teratogenic?

 3        A.  I know there is long-term outcomes from fetal

 4   alcohol syndrome.

 5        Q.  And it is considered teratogenic?

 6        A.  Like I said, the definition, I would have to

 7   look up to see what you define as teratogenic.

 8        Q.  I mean, there is physiologic manifestations,

 9   not just behavioral, right?

10        A.  Correct.

11        Q.  Like an actual defined set of things that can

12   be seen where you have differences from the norm in

13   terms of facial structure and various other things in

14   fetal alcohol syndrome, correct?

15        A.  Yes.

16        Q.  And there are other ways in which alcohol use

17   is considered teratogenic, correct?

18        A.  Yes.

19        Q.  And the harm to the infant -- or the -- I'll

20   say it more accurately.

21            The harm to the fetus from maternal use of

22   alcohol is because the infant -- uterus sac -- I'm

23   sorry.  Long day.

24            When a women drinks while pregnant, the

25   alcohol actually directly goes to the bloodstream and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    affects the fetus, correct?

 2         A.  It does cross through the placenta.

 3         Q.  Okay.  And the general consensus is that no

 4    amount of alcohol is safe during pregnancy?

 5         A.  I don't think they have -- I think that the

 6    recommendation is less than one glass per week.  I

 7    don't know the exact obstetric recommendations by

 8    ACOG.

 9         Q.  Do you know when it changes based upon

10    which --

11         A.  Trimester?

12         Q.  -- trimester of pregnancy you're in?

13         A.  I don't know those recommendation by ACOG.

14         Q.  And is it your understanding that the more a

15    woman drinks during -- of alcohol, not just water, the

16    more alcohol consumed during pregnancy, the greater

17    the risk is of adverse effects to the fetus?

18         A.  I think it's the amount and duration, the

19    same as it is with what we are finding with opioids.

20         Q.  And do you know what the specific criteria

21    are for fetal alcohol syndrome?

22         A.  It is based on facial features and small for

23    gestational age are the risk factors for referral.

24              And then once you have developmental delays,

25    then I think that's when the diagnosis is attached to
```

Highly Confidential - Subject to Further Confidentiality Review

1    the child.

2        Q.   Okay.  And what about increased incidence in

3    fetal alcohol exposure of poor balance control in the

4    infant, learning disorders, delayed mental

5    development, poor memory, problems with impulse

6    control and other behavioral problems?

7            Are you aware of any of those?

8            MS. KEARSE:  Object to form.

9        A.   So I know there are delays.  So going

10   through each one, I would have to -- I know there is

11   global delays.  So I would assume if you're reading

12   off a list, you got it from somewhere.

13       Q.   Okay.  And these are not time limited

14   problems as far as you know, that maternal use of

15   alcohol can lead to life-long issues with the infant

16   along the lines of what I have outlined?

17       A.   I haven't done a lot of research on fetal

18   alcohol syndrome.

19       Q.   So in the research that you are doing now on

20   opiate exposure during pregnancy, what level of detail

21   do you have on the amount and duration of alcohol

22   exposure during pregnancy?

23       A.   So that is self-report and obstetric

24   history.

25       Q.   Very inaccurate, right?

Highly Confidential - Subject to Further Confidentiality Review

```
1           MS. KEARSE:  Object to form.

2      A.  Yes.  Not "very."  It is you underestimated

3  based on true incidence.  If you correlate our other

4  studies, looking at report versus test.

5      Q.  Okay.  So I mean if -- you would expect that

6  some of the data that you have cited from tobacco use

7  during pregnancy would apply to alcohol as well?

8           That if women are underreporting tobacco use

9  by a factor of four to six, you would see something

10 probably similar to alcohol use?

11     A.  I don't know about those numbers.

12     Q.  Do you expect it is underreported

13 significantly?

14     A.  I wouldn't know about significantly.

15     Q.  Well do you expect that it's not just in

16 terms of what the fact of it, but that there is going

17 to be underreporting of extent and duration of alcohol

18 use during pregnancy?

19     A.  Do I -- so can you repeat that one more time?

20     Q.  Sure.  Do you expect that the underreporting

21 of -- from self-reporting of alcohol use during

22 pregnancy is going to extend to underreporting the

23 extent and duration of alcohol use?

24     A.  I think, yes, it would underestimate.

25     Q.  And so in any of the published papers that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   you have seen, is there information that allows you to

 2   reliably say how often babies born with NAS also have

 3   more than de minimus alcohol exposure in utero?

 4        A.   All I know is that in our NAS clinic we don't

 5   see -- it's been a -- we have not had the 9 percent or

 6   whatever percentage that we stated in our first study

 7   of baby with fetal alcohol syndrome and NAS.  So

 8   that's the only thing I can tell you, that what we see

 9   with opioid use and alcohol.

10        Q.   I just want to make sure I understand what

11   you're saying.

12             Do you -- you've seen that 9 percent of NAS

13   babies also have fetal alcohol syndrome?

14        A.   No.  That's what I'm saying.  We don't see

15   that.

16             So on our first paper reported 9 percent of

17   alcohol use with NAS, but we don't see the amount of

18   alcohol to cause fetal alcohol syndrome in our NAS

19   clinic.

20        Q.   We can go through them if we need to, but the

21   recommendations that you have in terms of supportive

22   services, intervention, education, for, you know,

23   women of childbearing age, some of these other things,

24   you, frankly, would include these same sort of

25   recommendations to try to limit alcohol use during
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   pregnancy, wouldn't you?

 2       A.  I think majority of these have probably

 3   already been done with alcohol.

 4       Q.  Okay.  So you think they should be done,

 5   right, still?

 6       A.  Oh, yeah.

 7       Q.  Okay.  Same thing for cocaine:  You think

 8   cocaine, a nonopioid -- opiate use during pregnancy

 9   should be discouraged as well through some of these

10   same measures?

11       A.  Yes.

12       Q.  Are there any specific measures here other

13   than how you would treat NAS itself that are different

14   for discouraging or addressing maternal abuse of other

15   drugs?

16       A.  Yes.

17       Q.  Which?

18       A.  Yes.  So we don't need to have MAT for

19   cocaine.

20           So when you look at our supportive services,

21   expanding MAT, the first two are definitely related

22   towards opioids.  Our third one looks like it's

23   related specifically to opioids, on buprenorphine.

24           Most of the time, we don't need residential

25   treatment for alcohol, ongoing care.  So it looks like
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   most of these -- I can go through each one -- are

 2   opioid specific.

 3          But I think the General Education and

 4   Training -- if you go up to B, those would definitely

 5   be for any drug.  But I think C is where we get to the

 6   opioid specific.

 7      Q.  Okay.  So, let's -- let's -- maybe we'll do

 8   it this way:  If you look at the nine little

 9   checkmarks on page 22 and 23 of your report,

10   Exhibit 1, under A. Prevention.

11      A.  Uh-huh.

12      Q.  All nine of those would have -- would apply,

13   or with slight modification, would apply to other

14   drugs or alcohol abuse, correct?

15          MS. KEARSE:  Object to form.

16      A.  I can read it just one each through, if you

17   like.

18          So the first one about delaying intervals,

19   pregnancy.  Yes.

20          Education.  Yes.

21          I think the third one is definitely -- could

22   be established to opioids or any other substance.

23          THE WITNESS:  Sit up.  Okay.  I was trying to

24   read it without my readers.

25      Q.  When I resume the question, it's more
```

1    question and answer since you were just given posture

2    advice.

3            THE REPORTER:  I just wanted you to move your

4    hand away from your mouth.

5            THE WITNESS:  Okay.

6        Q.  You're now I think at the fourth checkmark on

7    -- under Prevention on page 22 of your report.

8        A.  Yes.

9        Q.  The question is whether these relate to

10   substance abuse in general, including alcohol, or

11   whether they're just specific to opioid or opiate

12   abuse.

13       A.  So the fifth one, we are -- recommend the

14   NIDA scale that addresses --

15       Q.  You're on the fourth one.

16       A.  Okay.  The fourth one, provide counseling for

17   women -- impact of substance use on pregnancy.  So

18   that would be any drug, or all drugs.

19           The fifth one is -- we do focus on.  The NIDA

20   scale is specific for tobacco, alcohol and opioids.

21   And I think maybe the NIDA addresses illicit, so, yes.

22       Q.  You're on the sixth one?

23       A.  Yeah.  So the bottom -- the last one on

24   Page 22, Implement programs to improve and expand

25   screening.  Would be all.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.  Page 23, the first one.

 2        A.  So that is specific for NAS as that deals

 3   with trying to get -- once you define an obstetric

 4   plan with MAT is where you fall into -- that's what --

 5   the comprehensive obstetric team is where we have

 6   found in our statewide collaborative that you need a

 7   team approach to do that.

 8        Q.  And for other drug abuse during pregnancy,

 9   you don't need a team?

10        A.  No.  Because like I said, that refers back to

11   be MAT.  So most of -- the problem that we have found

12   is either addiction specialists don't feel comfortable

13   taking care of pregnant women and/or obstetrics people

14   don't feel comfortable writing MAT.  So that's why we

15   run into that team approach.

16        Q.  Second bullet on page 23.

17        A.  So I think that would -- be you could expand

18   it to all, that would be great.

19        Q.  Third one.

20        A.  So that is talking about opioid addiction

21   specifically.  So, I think if you wanted to expand

22   that to include other drugs, I think that would be

23   public education.  I think it has been out there for

24   tobacco and alcohol for quite awhile, but if --

25   you definitely could expand it.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.  I mean, one of the things you see in your
 2   papers is there's still a lot of smoking during
 3   pregnancy, especially in the subset of population that
 4   is poor?
 5        A.  Correct.  So yeah.  This would be great for
 6   all.
 7        Q.  Okay.  So for Education and Training, there
 8   are three listed.  All three of those education and
 9   training items are ones that you could expand to
10   address all substance abuse, including alcohol abuse,
11   right?
12            MS. KEARSE:  Object to form.
13        A.  I think that the middle one goes back to the
14   team approach that we are seeing specifically with
15   MAT.
16            So I would think the first one, for sure, is
17   generalizable.
18            Screening tools, once again, would go ahead
19   -- would be generalizable.
20        Q.  Well, the second one, it says:  Enhance
21   training for providers caring for pregnant women with
22   opioid use disorders to understand the complexity of
23   the woman's social, mental and physical problems.
24            One of the things in some of the literature
25   that you have written or cited is that it says there
```

 1    are essentially negative attitudes among a lot of

 2    healthcare providers -- and I know this is part of

 3    monthly presentations that the OPQC group does where

 4    they talk about there is a need to improve the

 5    attitudes of healthcare providers that substance abuse

 6    is a disease and they shouldn't blame the mother and

 7    they should consider things like overlays of history

 8    of abuse and trauma and things like that.

 9          Have I said that accurately?

10    A.  Yes, and that is going to make me want to go

11    back and say that's our fourth paper under review

12    right now, too.  We are publishing that data.

13          It's already been -- it's in process of being

14    published.

15    Q.  So the beginning when you said there are

16    three, there are really four?

17    A.   There is actually four, now that you brought

18    it up.  I forgot all about that paper, but thanks for

19    reminding me.

20    Q.  And there are two in grant review?

21    A.  Yes.

22    Q.  Any more?

23    A.  I think that's it.  You might trigger my

24    memory, but --

25    Q.  So for the fourth paper that is pending

1    publication, it has been submitted but it hasn't been

2    approved?

3        A.  Correct.

4        Q.  And do you intend to rely currently on

5    anything in that particular paper?

6        A.  It is talking about exactly what you just

7    said, how there is negative stigma and how we have

8    been able to improve that statewide through our OPQC

9    journey.

10       Q.  And that is also generalizable to substance

11   abuse disorders in mothers?

12       A.  No.  We just focused on opioid.  I think the

13   questions were -- we really only focused on opioid.

14       Q.  The need to enhance training for providers

15   caring for pregnant women with substance abuse

16   disorder is to understand the complexity of the

17   woman's social, mental and physical problems.

18           That is something that you think is true for

19   all substance abuse disorders, right?

20           MS. KEARSE:  Object to form.

21       A.  I think the education is out there on tobacco

22   and alcohol, but we could always do better.

23       Q.  What about cocaine and benzodiazepines and

24   the other drugs that we have seen that are

25   increasingly prevalent among pregnant woman in Ohio?

```
 1        A.   You are correct.

 2        Q.   So we should improve, through training, the

 3   attitudes of healthcare providers, correct?

 4        A.   For substance use disorders, correct.

 5        Q.   Not just opioids?

 6        A.   Include all substance use disorders.

 7        Q.   So going through the ones that we just talked

 8   about, taking these measures across the board for

 9   prevention and education and training to address all

10   substance abuse disorders would have other public

11   health benefits you believe, right?

12        A.   They could.

13        Q.   Including that there would be benefits that

14   would essentially accrue to pregnant women and

15   potentially others who are not abusing opioids or

16   opiates, correct?

17        A.   If we could decrease other problems

18   underlying that are not related to opioids, I think

19   that would be a great thing.

20        Q.   So the plan that you are calling for would

21   have benefits beyond just specifically addressing any

22   health affects of the opioid crisis?

23        A.   If you did any substance use and subtracted

24   the word opioid use, possibly.

25        Q.   Like some of the counseling that is at issue
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   here, I think is going to be -- I think doing things

2   like reducing unintended pregnancies, that has a lot

3   of additional public health benefits, right?

4        MS. KEARSE:  Object to form.

5        A.  Yes.

6        Q.  We're not -- that is not just something that

7   would need to be done because of anything about

8   opioids or opiates, correct?

9        A.  We just know it is higher in the opioid --

10  women with opioid use, or substance abuse disorder.

11       Q.  So in the next category for C, the first

12  three are specific to opioid abuse, correct?

13       A.  So they are regarding MAT, so that would be

14  just for opioid.

15       Q.  And then the fourth one:  Provide intensive

16  support to mothers during pregnancy, etcetera,

17  including outpatient programs.

18         That's generalizable for all of the substance

19  abuse, right?

20       A.  No, because most of those don't need ongoing

21  care outside of the postpartum period.  So like our --

22  so I think during that period is where we see a higher

23  risk.

24       Q.  You mean a "higher risk," of what:  Relapse

25  or suicide or what?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.  Overdose, yes.  Overdose deaths.

2        Q.  Intentional overdose deaths?

3        A.  No.

4            MS. KEARSE:  Object to form.

5        A.  Unintentional.

6        Q.  In some of your literature, that's a period

7    of a high intentional overdose, right?  The postpartum

8    period associated with depression.

9        A.  I don't think we -- there is differentiation

10   between intentional and unintentional.  It is just

11   overdose.

12       Q.  Okay.  So, the need for additional services

13   for people with a substance abuse disorder in the

14   postpartum period, you don't think that's

15   generalizable to all substance abuse of illicit

16   substances?

17       A.  It is higher in opioid.  So we know that the

18   7- to 12-month mark is the highest incidence of moms

19   having an unintentional overdose death.

20           So that is different.  We don't see that with

21   cocaine or alcohol or tobacco.

22       Q.  Is there a need for additional outpatient

23   programs for pregnant women who have other types of

24   substance abuse besides opioids?

25       A.  No.  I think if you did a safety plan at the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   time of delivery, you wouldn't need the postpartum

 2   period where that is specific to the opioid

 3   population.

 4       Q.  Next one says:  Implement coordinated care

 5   and connect mothers with outpatient support and

 6   treatment programs prior to discharge.

 7           You think that is generalizable to all

 8   substance abuse?

 9       A.  Once again, I would say that is opioid

10   specific most of the time because of the -- what we

11   just stated before, about the ongoing care that we

12   would see for that first year, if not longer.

13       Q.  What about next one:  Post -- provide

14   postpartum long-term addiction care.  That's

15   generalizable?

16           It's the last one on page 23.

17       A.  Yeah.  I think that goes into -- the way this

18   is formatted I think that -- is that?  So that is just

19   a stand-alone statement.

20           That long-term addiction is something that

21   that we see.  Most of the time it is ongoing usage

22   that we see more with opioid addicted women than we

23   do.

24           So I think that could be transferable to -- I

25   don't think we think about smoking mothers as having a
```

1    long-term care needed.

2         So some of it is related probably more to

3    ongoing use which we see in alcohol and opioids.

4         Q.   What about cocaine, benzodiazepines, other

5    drugs of abuse?

6         A.   I think care is always good.

7         Q.   Okay.  So the need for additional postpartum

8    long-term addiction care would apply to everything but

9    smoking, you think?

10        A.   I mean, it would be great to get people not

11   to smoke.

12        Q.   Okay.  So next one, top of page 24:  Provide

13   aftercare services to mothers so mothers can cope with

14   their addiction and learn about the special needs of

15   their infants.

16        Would that apply to any substance abuse that

17   involves an illicit drug?

18        A.   I think it's more -- when we talk about talk

19   about opioids is knowing that we want to get the

20   concept across that it is a life-long illness that,

21   you know, they need continuing care and MAT, whereas

22   some of the others are -- interventions are just stop

23   using.

24        Q.   Next one:  Create additional residential

25   treatment facilities for both the mother and infant.

```
 1              That's generalizable, right?

 2              MS. KEARSE:  Objection.

 3         A.  Once again, I don't see we think -- when we

 4    see the care for the mother and the infant dyad

 5    together, it is more of what we see with long-term

 6    care with moms maintaining their MAT for past the

 7    first year.

 8              And so that's where this statement was from.

 9    I had not thought about it the way you're addressing

10    it, but I don't think we would have to have

11    residential treatment for tobacco use.

12         Q.  Well, I asked you about illicit substances.

13         A.  Illicit, yeah.

14         Q.  So do you know in Cuyahoga or Summit County

15    what their capacity is in terms of residential

16    treatment facilities, whether they need more?

17         A.  So most of the -- when we did our MOMS Plus

18    program that we are doing now through OPQC, each

19    region is focused on a different model to see if we

20    can identify the best model of care.

21              And we have found that the resources just are

22    not there for enough -- or many residential treatment

23    facilities.  So when I say "additional," it may be

24    their first.  I'm not sure about their actual

25    resources in each county in this state.
```

1    It is -- really what we have been finding is

2    generalizable.  What works in one county -- just

3    because it's happening in one county, there's no

4    reason to make any county different in Ohio.

5    Q.  Okay.  So you can't opine that Cuyahoga or

6    Summit County need additional residential treatment

7    facilities for both mother and infant?

8    MS. KEARSE:  Objection.

9    A.  We know that there is not enough in any of

10   our counties.  So I could tell you that.

11   Q.  Do you know the number or a cost or any

12   details on that -- like that for residential treatment

13   facility?

14   A.  I don't know numbers or cost.

15   Q.  Okay.  Next one says:  Provide family-based

16   care to opioid exposed children as well as direct care

17   for parent in recovery or maintenance.

18   If we changed "opioid exposed" to a broader

19   definition of substance exposed, would that one apply

20   more broadly, too?

21   MS. KEARSE:  Object to form.

22   A.  So the family-based centered care is-- that

23   sort of incorporates what we have been doing with our

24   NAS high-risk follow-up clinic, because we have been

25   seeing that it looks like they need different care if

Highly Confidential - Subject to Further Confidentiality Review

```
1    they are opioid exposed.

2          So I think that's where this would be really

3    opioid specific because we know that the child has

4    different needs during their first two years.  So that

5    is why the family-centered care could incorporate the

6    mom and baby together.

7    Q.  So you said before that your NAS clinic is

8    one of the few in the country that is doing long-term

9    follow-up in study.

10         Do you know any other facilities doing

11   that?

12   A.  Yeah.  There is one in New Mexico, and I

13   don't know exactly which hospital they're correlated

14   to.  There is one in Boston and there is one in

15   Florida.

16   Q.  Do you know the names of the Boston or

17   Florida ones?

18   A.  So the Boston one, I think, is with Boston

19   Medical Center.  And the Florida one is the Hopkins

20   satellite in Tampa.

21   Q.  So the next one says, NAS:  Nurseries with

22   standardized evidence-based policies to assess and

23   treat infants with NAS.

24         Is that generalizable to any broader

25   substance abuse disorder?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.  No.

 2        Q.  Provide -- the next one:  Provide support to

 3   families to improve outcomes for infants with NAS

 4   through breastfeeding, visits, and other support.

 5             Some of that is generalizable, right?

 6             MS. KEARSE:  Object to form.

 7        A.  No, we wouldn't want somebody with illicit

 8   use to breastfeed.

 9        Q.  So for like smoking or alcohol, do you

10   recommend breastfeeding or not?

11        A.  For smoking, we -- those are not illicit

12   substances.

13        Q.  That's my question, because I asked you about

14   substance abuse.

15             This one:  Provide support to families to

16   improve their outcome for infants through

17   breastfeeding, visits, and other support.

18             That is only for opioids or you can't

19   generalize that for any substance abuse?

20             MS. KEARSE:  Object to form.

21        A.  So we wouldn't improve outcomes through

22   breastfeeding with other substances.  So this would be

23   purely for NAS.

24        Q.  What about visits and other support.  I mean,

25   you want to increase parental involvement in all of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    these kids, right?

 2        A.  Even kids that have no exposures.

 3        Q.  I mean, one of the things that you see is

 4    that the parental involvement, while the kid is in the

 5    hospital, while the NAS infant is in the hospital is,

 6    on average, relatively low, at about 58 percent of the

 7    visits or the intervals of checks?

 8        MS. KEARSE:  Object to form.

 9        A.  Actually, there is a study that showed you

10    can get up to a hundred percent.  The Walkman study

11    showed that if they to got it up to a hundred percent,

12    that those babies did better.

13        Q.  They just cut off nine days from their

14    average length of stay, right?

15        A.  Yes, you're correct.

16        Q.  So I'm talking about the average was about 58

17    percent, and it -- but they are able to say when you

18    got a hundred percent, they actually left -- left

19    earlier and did much better, right?

20        MS. KEARSE:  Object to form.

21        A.  It was a linear.  So 80 percent did better

22    than 20 percent.  So you could pick any higher number

23    is going to do better than any lower number.

24        Q.  Right.  So part of what you encourage is the

25    parents, whether they have opioid use disorders, or
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    some other substance abuse disorder, or nothing, to be

 2    present as much as possible while the baby is in the

 3    hospital?

 4            MS. KEARSE:  Object to form.

 5        A.  And the other substances aren't associated

 6    with a longer length of stay, so it doesn't really

 7    help.

 8        Q.  Okay.  Do you have an idea or -- I'm sorry.

 9            Do you have opinion as to why it is that the

10    average is less than 60 percent in terms of parental

11    involvement throughout the stay of an NAS baby?

12            MS. KEARSE:  Object to form.

13        A.  I have not practiced in their hospital, so I

14    couldn't tell you why their data was 60 percent.

15        Q.  What's it like at your hospital?

16        A.  It varies.  So we have some that are there a

17    hundred percent and we have some that are zero -- that

18    are there zero percent of the time because of

19    circumstances.

20        Q.  What do you mean by "circumstances"?

21        A.  That they are having -- moms have overdosed

22    in their rooms and have been in the intensive care

23    unit, so they are not in our unit with their baby.

24        Q.  Do you have an understanding of the average

25    at your hospital over time?
```

```
 1        A.  We haven't looked at that.

 2        Q.  Is it your impression that the more often the

 3   mother is present the better the baby does for NAS?

 4        MS. KEARSE:  Object to form.

 5        A.  We've never looked at it.  So I know

 6   Dr. Walkman and I think what they're -- the more a

 7   parent is there the easier it is to implement our

 8   non-pharmacologic bundle.  So that would go entail

 9   with improving outcomes.  So --

10        Q.  So the need to tell parents to be present for

11   their baby and to encourage support, that's specific

12   to NAS?

13        A.  Correct.

14        Q.  And do you have any experience that

15   encouraging support like that actually yields

16   benefits.

17        A.  Just in her report.

18        Q.  Right.  So when they had higher

19   participation, they had better outcomes?

20        A.  Right.

21        Q.  Question is:  Does encouraging it one way or

22   another actually make the mothers with a drug abuse

23   diagnosis actually show up more often?

24        A.  Yeah, it seems to be.  We haven't done any

25   research, but we know that when we sit down and talk
```

1    to moms and say, your baby is doing better when you're

2    here, stay on the couch that we have in the room, they

3    do it and they listen and it works.

4         Q.  And that's a new bit of advice?

5         A.  The meta-analysis just came out in the last

6    six, maybe 12 months, looking at rooming in to show

7    that it was, has improved care.

8         Q.  And which paper is that?

9         A.  It was a meta-analysis that came out, and I

10   would have to refer to my PowerPoint talk that was

11   just done in the past 12 months.

12        Q.  There is a rooming in paper that you cited?

13        A.  So there is a meta-analysis rooming in paper

14   that I cite in my most recent talk.

15        Q.  And so a meta-analysis takes multiple studies

16   and kind of combines them in some statistically

17   appropriate, you would hope, way to come to

18   conclusions and essentially provide higher power to

19   evaluate specific outcomes or end points?

20        A.  That's a --

21            MS. KEARSE:  Object to form.

22        A.  -- good summary.

23        Q.  You sometimes rely on meat-analyses,

24   correct?

25        A.  Yes.

```
 1        Q.   One of the meta-analyses you cited in

 2   connection with your report was a meta-analysis on

 3   whether there was any long-term effects of NAS.

 4        Do you remember that one?

 5        A.   No.   Which one?

 6        Q.   Why don't you look at footnote 35.  You say

 7   Baldacchino.  There is a cite on page 12 of your

 8   report.

 9        A.   Oh, here.

10        Q.   You cite it for the proposition:  Long-term

11   studies have shown that toddlers and young school-age

12   children with prenatal opioid exposure are more likely

13   to have impairments in cognition as well as poor

14   psychomotor and behavioral outcomes.

15        Do you see that?

16        A.   I do see that.  I'm reading it right now.

17   Yes.

18        Q.   And this particular paper is a meta-analysis,

19   right?

20        A.   Yes.

21        Q.   Do you have any problems with the conclusions

22   of the authors in this meta-analysis?

23        A.   Which one specifically?

24        Q.   Well, they have specific conclusions in their

25   paper where they concluded that their meta-analysis
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    showed no increased risk of anything, right?

 2        A.  I would have to look at that paper directly.

 3        Q.  So this is one of two papers that you have

 4    cited.  The other one happens to be footnote 70.

 5            Maybe it's just a coincidence.  The Merhar

 6    paper?

 7        A.  Merhar.  Yes.

 8        Q.  Page 20.  I think you have referenced this

 9    before.  This one was a review of neurodevelopmental

10    outcomes in infants.  So this is not a meta-analysis.

11    This is not a prospective study.  This is a

12    retrospective paper, correct?

13        A.  That is correct.

14        Q.  And is there a difference in your view in

15    terms of the reliability of a retrospective paper

16    versus a prospective study?

17            MS. KEARSE:  Object to form.

18        A.  It depends on -- usually, the gold standard

19    is a prospective, but I think if you have great data

20    that a retrospective study is -- definitely can give

21    you information.

22        Q.  Okay.  So there are actually two studies that

23    you have cited here in this particular citation.  I

24    think that we know the one above it is the torticollis

25    paper.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Uh-huh.

 2        Q.   You already mentioned this, right?

 3        A.   Yeah.

 4        Q.   So you say:  Infants with opioid exposures

 5   are more likely than infants with no drug exposures to

 6   be diagnosed with behavioral or emotional disorders,

 7   developmental delay, lower developmental scores,

 8   speech disorder, strabismus, increased incidence of

 9   torticollis and associated plagiocephaly, flat heads,

10   right, and more likely to be exposed to the

11   hepatitis C virus.

12             And then you cite both of those papers.

13             Do you see that?

14        A.   Yes, that is correct.

15        Q.   And the McAllister paper at footnote 69 is

16   the one with the torticollis and plagiocephaly,

17   correct?

18        A.   Yes.

19        Q.   So you're setting the next paper, the Merhar

20   paper for all of the rest of it, right?

21        A.   So that's a combination, and I think some of

22   that might have been associated with our development.

23   I might have been incorporating our last paper that I

24   have added onto our CV.

25        Q.   The hep C part?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.  No.  The one that is published, the

2   developmental outcomes comparisons with opioid

3   exposure.

4      Q.  So the question is:  Are there specific

5   papers besides the two that we have identified, Merhar

6   in footnote 70, and Baldacchino in footnote 35, that

7   you cite for the proposition that there is evidence

8   suggesting long-term deficits in terms of behavior,

9   emotion, developmental delay, lower developmental

10  scores?

11     A.  There are multiple other papers.  I just

12  didn't cite all of them.

13     Q.  Okay.  And the Baldacchino one obviously does

14  take ultimately multiple studies and puts them through

15  its meta-analysis, right?

16     A.  And the -- that publication -- what page was

17  that on again?

18     Q.  Twelve.

19     A.  Twelve?  So that meta-analysis was published

20  in 2014, meaning it went back to studies prior to that

21  time, where I don't think our numbers were as high.

22        So I think our more current data, which I

23  know all took place at our institution, I weighed more

24  than that meta-analysis.

25     Q.  Okay.  Can you identify those additional

Highly Confidential - Subject to Further Confidentiality Review

1   studies you're referencing?

2       A.  I think it is in one of PowerPoints I had, if

3   we have it.  There is a list of just a generalizable.

4   I know there is four that develop -- that talk about

5   neurodevelopmental outcomes.  I -- I talk -- we have a

6   generalized slide in one of our PowerPoints.

7           (AmerisourceBergen-Wexelblatt-002 was marked

8   for identification.)

9       Q.  So I'm handing you what's been marked as

10  Exhibit number 2 for the deposition.  There is an

11  additional copy there for plaintiffs' counsel.  And

12  this was provided with your report as Wexelblatt

13  Materials Considered.

14          Do you see this?

15      A.  Yep.

16      Q.  Are you familiar with this document and the

17  way it fits with your report, Exhibit 1?

18      A.  So, yeah.  That's the second paper that I was

19  talking about.  I may have put some of that

20  information into that footnote 69 and 70.

21      Q.  So let's just make sure it is clear for the

22  record.  So what this says is the materials you

23  considered are the ones referenced in the report,

24  which are the -- about 50 papers and citations in the

25  report, many of them in here twice, which is why the

 1   citation number is up.

 2          And then there are seven additional citations

 3   as things that you've considered, right?  So if you

 4   put together the citations in the report, plus the

 5   seven specific citations here, altogether then these

 6   are the, like I said, roughly 57 total citations or

 7   materials you considered in connection with doing your

 8   report, correct?

 9      A.  In addition to the other one that we

10   mentioned earlier about the administrative database.

11          MS. KEARSE:  Counsel, I would also say his

12   resume that has publications that he's published.  I

13   don't know if they're all cited or not, but I think

14   that was clear on that's his reliance on anything that

15   he's published as well.

16      Q.  Well, are there articles that you published

17   that aren't referenced in the report or listed here

18   that are relevant to the issues that we have been

19   discussing?

20      A.  Not on the updated CV.  They're all listed.

21          MR. ALEXANDER:  We will mark the updated CV

22   because you refer to it.  And frankly, I don't see any

23   need to mark the old one.  I only have one copy of the

24   updated CV, which plaintiffs' counsel provided

25   earlier.  I'll mark that as Exhibit 3.

```
 1              (AmerisourceBergen-Wexelblatt-003 was marked

 2     for identification.)

 3              THE WITNESS:  Do you need this, sir?

 4              MS. KEARSE:  That's the old one?

 5              MR. ALEXANDER:  That's the new one that you

 6     gave me.  You gave me one copy.

 7              MS. KEARSE:  Okay.

 8              MR. ALEXANDER:  I assume you have one

 9     yourself?

10              MS. KEARSE:  Yeah, I did.  So you're making

11     that an exhibit.  I though you said you were going to

12     use the old.

13              This is mine.  I don't need any other copy.

14        Q.  So what you were saying, Dr. Wexelblatt, is

15     that the paper here listed Hall, McCallister,

16     Wexelblatt, published last year in something called

17     the Population Health Management?

18        A.  So that actually wasn't published in 2018.

19     It was published in 2019.  The abstract was available

20     online in 2018, and that's why I updated it on the CV

21     to show when it was in press.

22        Q.  And that's called Developmental Disorder  --

23     I'm sorry, Development Disorders and Medical

24     Complications among Infant with Subclinical

25     Intrauterine Opioid Exposures?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   That is correct.

 2        Q.   Okay.  So, what does "subclinical" in this

 3   context mean?

 4        A.   Not needing pharmacologic treatment.

 5        Q.   Okay.  So these are not NAS babies, as you

 6   define them?

 7        A.   They are babies that have opioid exposure

 8   that are did not need pharmacologic treatment.

 9        Q.   In your report, you're not opining on the

10   need to do anything in terms of additional follow-up

11   specifically with this subset of opioid exposed but

12   non-NAS babies, correct?

13        A.   No.  Number 50 talks about closer follow-up

14   is needed for opioid exposed compared to nonopioid

15   exposed.

16        Q.   Is that the extent of the opinions you intend

17   to give on this subject?

18        A.   Well, more about what we are seeing, that

19   there are differences between opioid exposed not

20   needing pharmacologic treatment and those that are

21   nonopioid exposed.

22             And that is what we referenced multiple times

23   throughout the day today about when I compared them to

24   the 15,000 in our PP -- our primary care center,

25   that's the paper that it has been referring to.
```

```
 1      Q.  Okay.  So where we were when we got started

 2   on all of this was whether there were papers now in

 3   addition to these three, this 2019 Hall paper, and

 4   then the Merhar paper, and the Baldacchino paper that

 5   you cite as you sit here today for the proposition

 6   that there are long-term complications associated with

 7   either NAS or subclinical uterine opioid exposure?

 8      A.  Those are the ones I talk about in this

 9   paper.

10      Q.  Are there others that you can identify that

11   you think are authoritative or definitive on the

12   subject?

13      A.  Just the ones that we reference within these

14   papers I think give a background on each of these

15   subjects.

16      Q.  Okay.  And are there specific conditions or

17   findings that you would add to the list in paragraph

18   49 where you talked about -- and which we already

19   read -- behavioral or emotional disorders going down

20   through hepatitis C.

21          Are there other conditions that you would say

22   are more likely to occur because of in uterine -- in

23   utero opioid exposure whether it result in NAS or not?

24      A.  I think that's a pretty good list.

25      Q.  And are any of these shown to last after the
```

Highly Confidential - Subject to Further Confidentiality Review

1   age of two?

2       A.  Yes.

3       Q.  Which ones?

4       A.  Strabismic can.  Hepatitis C can.

5   Behavioral, emotional disorders can.  Developmental

6   delay can.  Lower developmental scores can.  And

7   speech disorders can.

8       Q.  Okay.  So --

9       A.  Mainly the only ones that are not that are

10  usually treated and addressed are the torticollis and

11  the plagiocephaly.

12      Q.  Okay.  And in terms of the behavioral and

13  emotional disorders, developmental delays, lower

14  developmental scores, speech disorder, I'll put those

15  together.

16          Those are not identified as being a specific

17  physiologic difference, correct?

18      A.  Define physiologic difference.

19      Q.  Well, for speech disorder, it is not like

20  there is a problem with the palate or the tongue.

21          These are essentially things measured by

22  behavior and testing as opposed to an observed

23  physical difference from the norm?

24      A.  There is no physical findings that would

25  impair speech from that, correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.  And the same thing for anything that

2    developmental delay, emotional disorders, lower

3    developmental scores, there is nothing that has been

4    described like there is a difference in brain

5    structure or some other anatomic structure that would

6    explain any of this?

7    A.   They're looking at MRIs, formation and brain,

8    so I don't know if we have that answer, but I know it

9    is being looked at.

10   Q.   And this is where we have the significant

11   issue we have talking about:  The import of or the

12   potential confounding factors of socioeconomic status

13   and other things that are potential determinants of

14   poor outcomes in terms of emotional delays, behavior,

15   developmental, when somebody is raised by somebody who

16   is addicted to drugs or is otherwise in one of these

17   circumstances that may be high trauma and high

18   difficulty --

19        MS. KEARSE:  Object to form.

20   Q.   -- correct?

21   A.   The thing is most of our patients with NAS

22   don't fall into that category.  The majority are

23   falling into MAT.  So that would maybe take that

24   out.

25   Q.   Are you seeing some difference on any of

Highly Confidential - Subject to Further Confidentiality Review

 1    these things with MAT-treated mothers who give birth

 2    to babies that have these -- well, let me ask it this

 3    way because -- the babies aren't treated.  You're

 4    talking about MAT to the mothers during pregnancy?

 5         A.   Correct.

 6         Q.   Versus illicit drug use during pregnancy?

 7         A.   So we are talking about their opioid

 8    exposure.

 9         Q.   Are you seeing some difference in terms of

10    long-terms effects that are nonphysiologic in nature,

11    depending on whether the mother received MAT during --

12    during pregnancy or whether she was using illicit

13    drugs during pregnancy?

14         A.   We are in -- our number of babies at this

15    time isn't powered enough to figure that out, but we

16    are looking at that.

17         Q.   Are you looking at that in connection with

18    any particular research project?

19         A.   It's part of our NAS clinic, which is a

20    hybrid -- clinical/research clinic.

21         Q.   And are you seeing anything so far that lets

22    you have a hint as to what the data shows?

23         A.   We are not powered yet, so we wouldn't look

24    until we had a large enough power to see.

25         Q.   Power and statistical considerations matter

Highly Confidential - Subject to Further Confidentiality Review

```
1   to you, right?

2       A.  Yes.

3       Q.  You're like a clean researcher, you want

4   statistical significance, you want to only have things

5   where the original selected end point is met according

6   to the original statistical criteria?

7           MS. KEARSE:  Object to form.

8       A.  And that's what I have used for -- reasons to

9   put papers in here.

10      Q.  You're not one of these people who will say

11  it is not statistically significant but there was some

12  trend and you're going to rely on that as showing

13  something as having been proven or demonstrated,

14  right?

15          MS. KEARSE:  Object to form.

16      A.  All of these things listed, especially on 49,

17  had a P value of less than .205.

18      Q.  And is that typically what you use in your

19  studies?

20      A.  Yes.

21          Can we take a break?

22          MS. KEARSE:  Is it a good time for break yet?

23          MR. ALEXANDER:  It's a good time for a break.

24          THE VIDEOGRAPHER:  We are now going off

25  record.  The time is 2:56.
```

```
 1                 (There was a brief recess.)

 2                 THE VIDEOGRAPHER:  We are now back on

 3      record.  The time is 3:30.

 4          Q.  Dr. Wexelblatt, we had a nice long break.

 5      You still going strong?

 6          A.  Yes, sir.

 7          Q.  Are there any of your opinions so far that

 8      you need to change or supplement in any way?

 9          A.  Yes, I did find that literature review that I

10      mentioned in my talk that discusses studies that have

11      shown infants being exposed to opioids at a higher

12      risk for.  If you would like that list.

13          Q.  Sure.  Can I see that, please?

14              How was it that you came to find this during

15      the break?

16          A.  We -- I have it on my computer, my docs.

17          Q.  Okay.  You went to look for it, is that what

18      you're saying?

19          A.  That we have -- yeah, it is on my --

20          Q.  You keep saying "we" sometimes and then "me."

21      So I'm just trying to understand what.

22              Did you find this during the break?

23          A.  I found it.  Anne has a copy of it from

24      previously giving it to her.

25          Q.  All right.  So looking at this, the paper
```

1    cited, if I understand the citation for Hall,

2    McAllister is the one we went over, that's your paper

3    that now is published in 2019, but it is described

4    here as being 2018 because that's when the abstract

5    was, correct?

6        A.   That was when it was available online,

7    correct.

8        Q.   And so we have one of the other papers we

9    already described, the Merhar paper.  And then there

10   are a couple other older papers.

11       A.   Right.

12       Q.   And then there is one other newer paper that

13   isn't described in here.  Morris and Hall, Wexelblatt,

14   McAllister abstract PES 2019.

15            What is that?

16       A.   That's one that we mentioned earlier with the

17   strabismus.

18       Q.   Okay.  All right.  So in terms of the issues

19   we were talking about before, neurodevelopmental

20   delays, executive functioning, memory, attention,

21   behavioral problems.

22            There is the Merhar paper, which is in the

23   report, the Hall paper, which we have identified

24   already, and then some other older papers, Sundelin,

25   Scovland and Conan and Burke, if I'm saying that name

Highly Confidential - Subject to Further Confidentiality Review

```
 1   right.  Had a couple Js in there somewhere.

 2          Does that sound about right?

 3      A.  If that's what that list says, yes.

 4      Q.  And so this is from a presentation that you

 5   gave how recently?

 6      A.  Within the last year.  I think this was from

 7   September at the Ohio AAP meeting, which is listed on

 8   my CV as my most second to recent talk.

 9      Q.  Is this the entire presentation?

10      A.  Looks like you had it all along.

11      Q.  And does it end with the thing about Abe

12   Lincoln?

13      A.  Yeah.

14      Q.  -- saying that the internet is fake and he's

15   taking a selfie, that's the one?

16      A.  That would be the one.

17      Q.  Okay.  And this is also where you have the,

18   It takes a village thing that we talked about?

19      A.  That's not in that doc, I don't think.

20      Q.  Okay.  Maybe some other piece.

21      A.  That's a OPQC one.

22          I talked over him.  I apologize

23      Q.  There was at least one other kind of silly

24   jokish thing in here besides the Abe Lincoln thing,

25   but we can find it another time.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.   Yeah.

2        Q.   So that was a talk that you gave called

3   neonatal abstinence syndrome delivered by you directly

4   at -- was that given at Cincinnati Children's or some

5   other venue for the talk?

6        A.   That was presented at the Ohio Chapter --

7   that was presented in Columbus, Ohio.

8        Q.   And what was the event?

9        A.   That was Ohio Chapter of American Academy of

10  Pediatrics annual meeting.

11       Q.   So the other silly thing I was thinking about

12  here is you've got an apples to oranges comparison of

13  LeBron James in a Heat jersey for some reason.  You

14  must not know your venue, or Michael Jordan from a

15  video game.

16            Do you remember that?

17       A.   Yes.

18       Q.   Do you stand by everything in this

19  PowerPoint?

20       A.   Yes.

21       Q.   Is there an updated version of this or is

22  this still one that you are giving?

23       A.   So I update it before any talk I give, so, to

24  update data or studies.  So, the most recent talk I

25  gave in March in 2019 at the Tristate Symposium was
```

1    more focused as it was a 15-minute presentation and

2    that was more -- those slides are -- it was mostly on

3    the epidemiology in our region.

4        Q.  Okay.

5        A.  But from that slide deck.  It is just not the

6    full slide deck.

7        Q.  Why don't we walk through then the papers

8    that we have that we have identified, including up to

9    the paper that you were on with Hall that published

10   earlier this year.  Okay?

11       A.  Okay.

12       Q.  So I've marked as Exhibit 4 -- did you say

13   it's Merhar, or do you pronounce it differently?

14       A.  Merhar.  But I'll know who you are referring

15   to if you say it that way.

16       Q.  So here is a copy for you marked as

17   Exhibit 4.  This is, for the record, the Merhar paper,

18   from Journal of Perinatology 2018, called Retrospect

19   review of neurodevelopmental outcomes in infants

20   treated for neonatal abstinence syndrome.  And there's

21   a copy for plaintiffs' counsel as well.

22            (AmerisourceBergen-Wexelblatt-004 was marked

23   for identification.)

24            MR. ALEXANDER:  Actually, I'm going to mark

25   four of them.  That will just speed it up.  And we

1    will go from there.

2           I have for you your paper, Exhibit 5.  This

3    is the Hall paper, Developmental Disorders and Medical

4    Complications Among Infants with Subclinical

5    Intrauterine Opioid Exposures, published earlier this

6    year in Population Health Management.

7           That's Exhibit 5, and there is a copy for

8    plaintiffs' counsel as well.

9           (AmerisourceBergen-Wexelblatt-005 marked was

10   for identification.)

11          MR. ALEXANDER:  I have the Baldacchino paper

12   that we mentioned as Exhibit 6.  That is

13   Neurobehavioral consequences of chronic intrauterine

14   opioid exposure in infants and preschool children:  a

15   systematic review and meta-analysis.

16          Published in BMC Psychiatry in 2014, and a

17   copy for plaintiffs' counsel.

18          I also have a copy of the ACOG Committee

19   Opinion Number 711 from ACOG and the American Society

20   of Addiction Medicine.  And that is from August of

21   2017.

22          A copy of that for plaintiffs' counsel as

23   well.

24          (AmerisourceBergen-Wexelblatt-006 was marked

25   for identification.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (AmerisourceBergen-Wexelblatt-007 was marked

 2      for identification.)

 3         Q.   What I would like to do -- we will start in

 4      maybe chronological order just so we understand

 5      because I think you have talked about the evolution of

 6      the literature in this area.

 7              So the first one  chronologically out of

 8      these, ignoring all of the references and stuff, is

 9      the Baldacchino paper.

10              Do you see that?

11         A.   Yes.

12         Q.   So that's Exhibit 6, correct?

13         A.   This one doesn't have a number on it.

14         Q.   Then you handed the one with the sticker to

15      the plaintiffs' counsel, and you always keep the one

16      with the stickers.

17              MS. KEARSE:  And I just messed all of these

18      up.  All right.  So this is --

19              Did I not give you a sticker copy?

20              THE WITNESS:  Yep.  It was in -- yeah.

21              MS. KEARSE:  So this is 6?

22              MR. ALEXANDER:  This is 6.

23              MS. KEARSE:  I don't want to slow the record

24      down, but can you just give me the numbers of what is

25      corresponding to what?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. ALEXANDER:  Five is Merhar.  Six is

 2    Baldacchino.

 3              THE WITNESS:  No.  Four is Merhar.

 4    Retrospective review is Number 4.

 5              Developmental disorders is Number 5.

 6              ACOG is 7.

 7        Q.  Okay.  Let's start with the first in time,

 8    Number 6, the Baldacchino paper, which we have talked

 9    about a little bit, correct?

10        A.  Yes.

11        Q.  Okay.  So, we have talked about what a

12    meta-analysis is, correct?

13        A.  Correct.

14        Q.  And you obviously didn't just read the

15    abstract; you read the whole paper, correct?

16        A.  Awhile ago on this paper, but yes.

17        Q.  When you write papers, do you ever have to

18    write up an abstract section to follow a specific

19    format to summarize what happens in the paper?

20        A.  Yes.  Each journal has different word

21    limitations and styles that they want.  So, majority,

22    the average I would say is 250 words is allowed for an

23    abstract.

24        Q.  And this paper is authors out of Scotland,

25    correct?
```

1      A.  It does say that they are out of University

2  of Dundee.

3      Q.  And do you know what the history is of trends

4  in terms of opioid exposure during pregnancy and high

5  opioid use in Scotland?

6      A.  No.

7      Q.  Do you know if that is one of places where

8  there has been a lot of research because they have

9  pretty high historic narcotic and opioid use among

10  European countries?

11          MS. KEARSE:  Object to form.

12      A.  I'm not aware of that.

13      Q.  Okay.  So under the Results section -- just

14  start with the abstract for completeness.

15          The second -- the third sentence says:  This

16  meta-analysis showed no significant impairments at a

17  nonconservative significance level of P less than 0.05

18  for cognitive psychomotor or observed behavioral

19  outcomes for chronic intrauterine exposed infants and

20  preschool children compared to nonexposed infants and

21  children.

22          Do you see that?

23      A.  I do see that.

24      Q.  And just so we are on the same page as it

25  relates to your presentation, cognitive, psychomotor,

Highly Confidential - Subject to Further Confidentiality Review

 1    and observed behavioral outcomes, those do overlap

 2    with the topics that you identify, right?

 3         A.  Correct.

 4         Q.  I mean, you don't have a psychomotor

 5    category, do you?

 6         A.  In which paper are you referring to?

 7         Q.  I was saying as you've broken it out in the

 8    one page from your presentation that you pulled out

 9    earlier.

10         A.  No, we don't break it out that way.

11         Q.  Okay.  But you have cognitive and behavioral,

12    correct?

13         A.  In my --

14         Q.  Executive functioning --

15         A.  Yes.

16         Q.  So we're talking about the same sort of

17    measures, correct?

18         A.  Correct.

19         Q.  And you said P -- a P value of .05 is what

20    you typically use in your studies, correct?

21         A.  Correct.

22         Q.  Which is the standard and what you think is

23    appropriate for doing research, right?

24         A.  I do agree with that.

25         Q.  So if you go to the body of paper, they talk

1   about their process for doing the meta-analysis, and

2   then they give their results with -- with regard to

3   each of the things that they looked at starting on

4   page 6 of 12.

5          Do you see that?

6      A.  Page 6 of 12, the Results section?

7      Q.  You see -- yeah, the top right corner, it

8   says page blank of 12.

9          Do you see that?  The top right corner of

10  each page --

11     A.  Yes.

12     Q.  -- it says page 6 of 12 or 7 of 12.

13     A.  Yes.

14     Q.  And so as you go through these, of

15  neurobehavioral function, and then the examination of

16  opioid exposed infants compared to nonopioid exposed

17  infants, with regard to each of these things they say,

18  -- this is their scientific language, the null

19  encompasses was not different, or it says the --

20  basically the language they use is that the null

21  hypothesis could not be rejected.

22         Do you see that language?

23     A.  Can you just -- where are you?  I'm sorry.  I

24  just --

25     Q.  It is under -- it's a repeating phrase that's

Highly Confidential - Subject to Further Confidentiality Review

```
 1   used in each of the sections starting on the right

 2   column of page 7 of 12.  And it doesn't really matter.

 3   I'm asking you what -- the phrase, "the null

 4   hypothesis could not be rejected" is basically, we

 5   couldn't establish that there was a difference?

 6        A.  Correct.  So that trend crosses the zero

 7   number, meaning you -- it doesn't meet the

 8   statistical, it is more of a trend in this -- the

 9   papers.

10        Q.  And so then if you go to the Discussion

11   section on page 8 of 12, they have a direct statement

12   for all of these:  Our findings -- so this is under

13   Discussion, Key findings -- and it looks like it is

14   about the third sentence.

15            It says:  Our findings indicate no

16   significant impairments in cognitive, psychomotor or

17   observed behavioral outcomes for chronic intrauterine

18   exposed infants and preschool children.

19            Do you see that?

20        A.  I do see that.

21        Q.  And you think that's a fair reading of their

22   research, correct?

23        A.  Right.  Well, in the last statement that

24   continues that, "...although in all domains there is

25   trend to poor outcomes..."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KEARSE:  Counsel, can I -- I know that

 2    you made this article an exhibit, but I don't think

 3    this is the final article of this paper.  There is a

 4    corrected publication of this.

 5              MR. ALEXANDER:  This is the citation that he

 6    has in his thing, and if it's an objection, then it's

 7    an objection.

 8              MS. KEARSE:  Okay.  Well, we can --

 9              MR. ALEXANDER:  This is what I believe is

10    exactly what he cited as is.

11              MS. KEARSE:  Maybe go off the record for a

12    second.

13       Q.  So I'm not sure I got an answer to my

14    question.

15              MR. ALEXANDER:  Could we have the answer read

16    back from the last pending question?

17              MS. KEARSE:  Well, I just don't want to

18    confuse the witness if this is not the specific

19    article in there, too, because there is a corrected

20    version of this article.  So --

21              MR. ALEXANDER:  I mean, I'm sure you're

22    allowed to object to form, and that's about it, but go

23    ahead.

24              MS. KEARSE:  Well, if this is not the updated

25    article, I'm here to amend it --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  Yeah, and --

 2              MS. KEARSE:  -- and to be asking about that.

 3              MR. ALEXANDER:  Yeah.  So, I'm sorry.

 4              Did we have an answer to the last question,

 5     ma'am?

 6              THE WITNESS:  So I was stating that

 7     "...although in all domains there was a poor

 8     trend...," so meaning that the P value wasn't

 9     significant, but it was above zero --

10         Q.  I'm sorry --

11         A.  -- is what their discussion is stating.

12         Q.  Do you think the statement, "Our findings

13     indicate no significant impairments..." for each of

14     these things is a fair statement of what they actually

15     found according to the scientific standards that they

16     used and you think should be used?

17         A.  And as long as you add in the last statement

18     that "there is trends to poor outcomes...," yes.

19         Q.  Right.  As we said earlier, you, as a

20     researcher and a rigorous scientific mind, don't go

21     off of mere trends, you require something to be

22     statistically significant before you would rely on it

23     as establishing anything, correct?

24         A.  Right.  So there is a trend, then we would

25     investigate it further.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.  Okay.  Got it.  That's why we are going

2   through these chronologically.

3        A.  Yes.

4        Q.  If you go to the page 10 of 12 that says

5   Clinical Relevance.

6            It says:  This meta-analysis helps in

7   supporting certain clinical observations in this

8   population.  The observed, if any, neurobehavioral

9   outcomes in infants and preschool children prenatally

10  exposed to opioids are very often attributed to

11  substance exposure.

12           Do you see that?

13       A.  I do see that.

14       Q.  However it is important to examine the

15  contribution of other influences on a child's

16  development.

17           Do you agree with that so far?

18       A.  I agree that's what is written, yes.

19       Q.  Do you agree with those two statements so

20  far, that often there will be maybe a facile

21  attribution to substance exposure, but it is important

22  to examine the contribution of other influences on a

23  child's development?

24       A.  Yeah.  That time when this was written in

25  2014, I think that was a very good statement.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.  It continues:  Ongoing maternal depressive

 2   illness is correlated with poor cognitive and motor

 3   development and increase in teacher and parent rated

 4   behavior problems in preschool children.  Poverty and

 5   low socioeconomic status is inversely related to

 6   children's developmental performance.

 7            You agree with both of those statements,

 8   right?

 9        A.  I'm -- and I don't know about this -- this

10   paper, I don't know if I correctly cited.

11            So I think this is the first time I am seeing

12   and I may have -- so I don't know if I put the correct

13   statement -- the title in this paper, but this is a

14   paper that I'm reviewing now.

15            MS. KEARSE:  Can we go off record one second?

16   I think it is --

17            THE VIDEOGRAPHER:  We are not off record.  Do

18   you agree to go off record?

19            MR. ALEXANDER:  No.

20            MS. KEARSE:  Okay.

21            MR. ALEXANDER:  I want him to answer the

22   questions I have.

23            MS. KEARSE:  Okay.

24            MR. ALEXANDER:  Without coaching.  And if he

25   can --
```

Highly Confidential - Subject to Further Confidentiality Review

 1          MS. KEARSE:  Well, I'm not coaching.  That's

 2    why I was going to go off record, so --

 3          MR. ALEXANDER:  Well, that's what's

 4    happening, so why don't we just go with question and

 5    answer.  If you need to clean it up, you can ask your

 6    own questions and then we get to ask ours after you

 7    ask yours.  That's how it works.

 8          I don't want to have my time taken up with

 9    this.

10          MS. KEARSE:  Okay.  Well, we'll correct it.

11      Q.  Dr. Wexelblatt --

12      A.  Yes, sir.

13      Q.  Okay.  So, if you continue on in the same

14    paragraph, it says:  Factors that become -- actually,

15    I'm sorry.

16          The last two sentences I asked you about, did

17    you agree with those, the one that starts with,

18    Ongoing maternal depressive illness and then continues

19    about poverty and low socioeconomic status?

20          Do you agree with those two statements?

21          MS. KEARSE:  I'm going to have a running

22    objection.  Until he has the article in front of him.

23    It's cited correctly, but it's not the actual article

24    that is -- that -- that there's an errata there,

25    correction of the --

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. ALEXANDER:  You can have a running
 2     objection.  That is an improper objection according to
 3     the Court's rules.
 4              MS. KEARSE:  Well, I'm just saying it's --
 5     you indicated it -- it was cited and you looked it up
 6     this way.  If you look it up in the publication, it's
 7     not this article.
 8              MR. ALEXANDER:  Again, coaching, improper
 9     objection.  Let's -- you can have a running objection,
10     so you don't need to keep coaching.  You can have him
11     just --
12              MS. KEARSE:  I'm not coaching.
13              MR. ALEXANDER:  -- answer the questions.
14              MS. KEARSE:  It's actually a fact of the
15     article.  You said you looked up from the citation,
16     and if you looked it up from the citation, I don't
17     think you would have pulled up this article.
18         Q.  Dr. Wexelblatt --
19              MS. KEARSE:  I would just say, this article,
20     there is a correction to it.  We will go over that on
21     redirect.
22
23     BY MR. ALEXANDER:
24         Q.  Dr. Wexelblatt, I'm not I got an answer to my
25     question.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              The sentences in the Clinical Relevance

 2    section of this paper that say:  Ongoing maternal

 3    depressive illness is correlated with poor cognitive

 4    and motor development and increase in teacher and

 5    parent rated behavior problems in preschool children;

 6    and:  Poverty and low socioeconomic status is

 7    inversely related to children's developmental

 8    performance.

 9              Do you agree with both of those?

10         A.  I would agree with the second one, and the

11    first one I do not know.

12         Q.  Okay.  This continues, if you go down a

13    little bit:  Factors that became significantly

14    associated with neurobehavioral outcomes included low

15    socioeconomic status, low maternal IQ, poor quality of

16    the home environment, and children's lead exposure.

17    Overall it is increasingly becoming evident that the

18    risk factors that can pre poor neurobehavioral

19    outcomes is not the drug-fuelled lifestyle or actual

20    substance exposure during pregnancy, but the presence

21    of multiple interrelated and weighted variables

22    cumulatively influencing neurobehavioral outcomes.

23              Do you see where I read?

24         A.  So is that -- I did see that and it is

25    referring to studies that happened around 2000 and
```

Highly Confidential - Subject to Further Confidentiality Review

 1   2001.  So, I think going back to that time period,

 2   that is probably is correct.

 3       Q.  Okay.  So, my question is:  Do you agree with

 4   those statements?

 5       A.  No.  Because I think that we have evolving

 6   information to go against that.

 7       Q.  Okay.  As of 2014, was it the consensus that

 8   it was the presence of multiple interrelated and

 9   weighted variables that have influenced

10   neurobehavioral outcomes in children who had in utero

11   exposure to opioids or opiates?

12       A.  I would have to change that date to 2002 is

13   the average, looks like, paper written during this

14   time period.  So you would have to go back to then,

15   not 2014 when it was published.

16           You would have to look at when the

17   meta-analysis looked at the papers.  And so those

18   papers are 2008, 1998, 2001, 2001, 2001.

19       Q.  Okay.  So then it continues:  The risk

20   factors were:  maternal mental health, maternal

21   attitudes towards parenting and maternal-child parent

22   interaction, maternal education, parental occupation,

23   minority status, stressful life events and family size

24   with not one risk factor contributing exclusively to

25   one cognitive or neurobehavioral outcome.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Do you see that?

 2        A.  Yes, I see that.

 3        Q.  Did you disagree with that one, too?

 4        A.  I think that was probably true in 2002.  I

 5   think we have had a lot more evolution in the

 6   literature to change that mind-set.

 7        Q.  So in terms of your ongoing research -- we

 8   have talked about this.

 9              You said that you track socioeconomic status,

10   and you're unable to keep tracking maternal education

11   level, correct?

12        A.  We are not unable to.  We have decided not to

13   because of the amount of time that it took to get that

14   information.  It wasn't easily pullable from the EHR,

15   that we decided to focus on things that we thought

16   were more important.

17        Q.  Okay.  So are you tracking maternal

18   depressive illness?

19        A.  That is part of the problem set.

20        Q.  So you will be going forward tracking that?

21        A.  We always have looked at that.

22        Q.  How about low maternal IQ, are you tracking

23   that?

24        A.  No.  But that is a -- listed on the mother's

25   problem list, so that is tracked.  If she does have a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   significantly lower IQ, that would fall outside of the

 2   standard deviations and make her have mental

 3   retardation.

 4       Q.  What about low -- I'm sorry, poor quality of

 5   the home environment?

 6       A.  That is not looked at.

 7       Q.  Child lead exposure?

 8       A.  Luckily, we are not seeing that much

 9   anymore.

10       Q.  Okay.  What about maternal mental health,

11   more broadly than just depression, are you tracking

12   that?

13       A.  We are addressing it in our MOMS Project,

14   yeah.  That's one of the main focuses is maternal

15   mental health.

16       Q.  I'm saying for your purposes of your

17   research.

18       A.  As part of our ongoing NAS clinic, yeah,

19   that's part -- one of -- we have the mom's problem

20   list in there.

21       Q.  The papers you published already don't track

22   that as a factor to correct for?

23       A.  Not everything we -- if there is stuff that

24   we are finding that doesn't have an effect to our

25   opinion, we don't list everything that may not be in
```

Highly Confidential - Subject to Further Confidentiality Review

1    there.

2        Q.  So if you try a correction, it wouldn't

3    change things; that's the whole point, right?

4        A.  Correct.

5        Q.  Okay.  So in your published papers on this

6    issue, you haven't corrected for maternal mental

7    health, maternal attitudes towards parenting and

8    maternal child parent interaction, correct?

9        A.  Correct.

10       Q.  And you haven't accounted for maternal

11   education --

12       A.  We have --

13       Q.  -- after that first paper?

14       A.  Yes, we have not continued that.

15       Q.  You haven't accounted for parental

16   occupation?

17       A.  Correct.

18       Q.  You said you accounted for race, that you

19   said you had some higher findings in Caucasians, so I

20   guess that means you have accounted for minority

21   status?

22       A.  Yes.

23       Q.  Stressful life events and family size, do you

24   account for either of those?

25       A.  We didn't find any change when we looked at

Highly Confidential - Subject to Further Confidentiality Review

 1    family size for our first one, so we stopped tracking

 2    it as it didn't have any risk factors.

 3         Q.  Okay.  Why don't we go to the next one in

 4    time.  The ACOG committee opinion, which should be

 5    Exhibit 7.

 6              And we talked about this earlier, in general,

 7    that you identify this and you talked about various

 8    recommendations this makes regarding treatment and

 9    diagnosis and screening with regard to opioid use --

10    opioid use disorder in pregnancy, correct?

11         A.  Correct.

12         Q.  And this is cited in your report in multiple

13    places, right?

14         A.  It is.

15         Q.  I'm going to jump to the relevant part for

16    our current discussion and then we may go back to a

17    little bit more.

18              This does have a discussion as of August of

19    2017 based upon the consensus work of a committee of

20    experts from the American College of Obstetricians and

21    Gynecologists, and the American Society of Addiction

22    Medicine.  It has a discussion about this issue of

23    long-term infant outcomes, correct?

24         A.  There is a section on that on page 10.

25         Q.  So on page 10, there is a section that talks

Highly Confidential - Subject to Further Confidentiality Review

1    about neonatal abstinence syndrome, correct?

2         A.  Yes.

3         Q.  And that's part of what you've actually cited

4    in your report, correct?

5         A.  I -- this is most of the information -- that

6    is -- a lot of information I think is -- I take that

7    back.

8              This stuff in -- under Neonatal Abstinence

9    Syndrome, I would have to review right now to see what

10   made it into the report or not.  As you know, there is

11   lot of papers that went into this.

12        Q.  Yeah.  So I mean, like for instance, I can --

13   I can help you.  If you go down about three-quarters

14   of way, there are things that I think are very

15   directly stated in your report as adopting the same

16   kind of recommendation.  I'm not saying you -- you

17   copied them or anything, but it is the same.

18             Each nursery should develop an evidence-based

19   written policy to assess and treat an infant with

20   neonatal abstinence syndrome and women should be

21   informed of key components of these policies.

22             That's very much like one of the proposals

23   we went over, right?

24        A.  Yeah.  I think that is taken from our paper

25   in Pediatrics.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.  And it says:  Families should be encouraged

2   to visit and care for their infants and women should

3   be supported in their effort to breastfeed their

4   infants, if appropriate?

5        A.  That is also correct.

6        Q.  Okay.  Are you a member of either of those

7   organizations, ACOG or ASAM?

8        A.  No.

9        Q.  Were you somebody who participated in this

10  ACOG Committee Opinion?

11       A.  No, but I think our papers are cite in it.

12       Q.  They are.  A couple of them.

13       A.  Yep.

14       Q.  So the Long-Term Infant Outcomes section is

15  right after the section of Neonatal Abstinence

16  Syndrome, correct?

17       A.  That is correct.

18       Q.  And it says:  Long-term outcomes of infants

19  with in utero opioid exposure have been evaluated in

20  several observational studies.

21            A major challenge in assessing these outcomes

22  is isolating the effects of opioid agonists from other

23  confounding factors such as use of other substances

24  (tobacco, alcohol, nonmedical drugs) and exposure to

25  environmental and other medical risk factors, e.g.,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    low socioeconomic status, poor prenatal care.

 2            Do you see that so far?

 3       A.   Correct.

 4       Q.   Do you agree with that so far?

 5       A.   I do.

 6       Q.   Do you agree that that is a challenge of

 7    doing research like this?

 8       A.   It is a challenge.

 9       Q.   For the most part, studies have been found --

10    I'm sorry.  I'll start over again:

11            For the most part, studies have not found

12    significant differences in cognitive development

13    between children up to five years of age exposed to

14    methadone in utero and control groups matched for age,

15    race and socioeconomic status, although scores were

16    often lower in both groups compared with population

17    data.

18            Do you see that?

19       A.   I do see that, and know that that was cited

20    from the one paper, yes.

21       Q.   Yeah, the citation 88 is to the Kaltenbach

22    paper --

23       A.   Uh-huh.

24       Q.   -- from 1984.

25       A.   That is correct.
```

Highly Confidential - Subject to Further Confidentiality Review

1     Q.  Okay.  I have that paper here if there is a

2  need to look at it, but I don't think there is for

3  these questions.

4        It says --

5        MS. KEARSE:  We offered it.  If he wants to

6  look at it.

7     Q.  -- Preventative interventions that focus on

8  supporting the woman and other caregivers in the early

9  and ongoing parenting years, enriching the early

10  experiences of children, improving the quality of the

11  home environment are likely to be beneficial.

12        Do you see that?

13     A.  I do.

14     Q.  And for the record, that's also based on a

15  really old paper.  That's one from the 1980s.  Okay.

16        So do you agree that this summary of what the

17  literature showed about long-term infant outcomes with

18  neonatal abstinence syndrome was correct as of August

19  of 2017?

20     A.  I think that shows that there was a lack

21  of -- that the best paper they could come up with was

22  from the late '90s, showed that there was a huge need

23  for research, is the way I read that section.

24     Q.  Okay.  So was this a correct statement of

25  what the literature showed as of August of 2017?

```
 1        A.  So that's when it was published, so I --

 2   knowing now a committee member -- opinions meet from

 3   the AAP standpoint, these are usually two years to

 4   develop.  So once again, we are going back to 2015

 5   when they were writing this information up.

 6            So, yeah, I think at that time we didn't have

 7   an evolving understanding of what the long-term

 8   outcomes are.

 9        Q.  If you go to the references, I know it

10   doesn't say exactly when this was all done --

11        A.  Uh-huh.

12        Q.  -- but if you go to the first two references,

13   you see that it shows that these were actually

14   retrieved in March of 2017.

15            Do you see that?

16        A.  For that.  I was talking about the long-term

17   outcomes section.

18        Q.  I understand.  I'm talking about when the

19   paper was prepared.

20        A.  Uh-huh.

21        Q.  The first two citations retrieved in 2017.

22   Next one is an article that only came out in 2016.

23   The one after that and the one after that, both

24   retrieved in March of 2017.

25            Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.  So I don't know what they immediate mean by
 2   "retrieved."  I would have to see when they were
 3   actually published, and I don't even know if that was
 4   -- because if you look at number two, it is actually
 5   talking about a 2011 study, it looks like.
 6        Q.  It's a 2013, that's what it says, actually.
 7        A.  Number 2 says "Drug Abuse Warning Network"
 8   2013 -- 2011.
 9        Q.  The publication from SAM says 2013.
10        A.  So "retrieve" must be when they downloaded
11   it, is what I'm reading that.
12        Q.  Okay.  So if you go on, there are other
13   studies or papers that weren't published until 2016 or
14   later --
15        A.  Looks like '16.
16        Q.  -- that are cited --
17        A.  Correct.  So that would -- like I said, it
18   takes it a full year to get these protocols,
19   correct.
20        Q.  Okay.  All right.  So was this a correct
21   statement of what the literature showed about
22   long-term effects, the possibility of long-term
23   effects in NAS infants as of roughly mid-2016 to
24   mid-2017?
25             MS. KEARSE:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.  Once again, I would look at their -- when

 2   they section -- when they looked at all of their

 3   references from that section, the most up-to-date one

 4   was 2013.

 5          So, I was -- I do think that this -- it was

 6   focused on the obstetrics side because this is ACOG.

 7   So I don't know where they were getting their

 8   information on neonatal abstinence syndrome or

 9   long-term outcomes besides literature review, which

10   shows that they were looking at certain papers.

11       Q.  Okay.  Why don't we go backwards for a little

12   bit in this paper, because this is something that you

13   have cited a couple of times.

14          Can you go then to the page 3, which is Role

15   of the Obstetrician-Gynecologist and Other Obstetric

16   Care Providers.

17          The last language on page 3, says:  Finally,

18   obstetric care providers have an ethical

19   responsibility to their pregnant and parenting

20   patients with substance use disorder to discourage the

21   separation of parents from their children solely based

22   on substance use disorder, either suspected or

23   confirmed.

24          Do you see that?

25       A.  I do.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Is this issue any part of your proposal, the
 2   issue of whether family separation should be
 3   encouraged or discouraged and what effect it has on
 4   the outcomes for the children?
 5        A.   So it would depend on each individual person.
 6   So if you just have a substance use disorder and
 7   you're in treatment, well, then, of course, that
 8   should not be a reason to separate the infant from
 9   their mother.
10        Q.   That wasn't my question.  I said is your plan
11   addressing at all the issue of how and when children
12   are separated from parents with a substance abuse
13   diagnosis, whether they're in treatment or not?
14        A.   That would go under social services.  That
15   would be their expertise.  So if we could expand our
16   social services abilities to then determine is this a
17   safe place for the infant, then, yes.
18        Q.   Okay.  So do you have specific
19   recommendations about this?
20        A.   So I think that would go back to our --
21   increasing our social services and our wraparound
22   services to the mom at the time of discharge to make
23   sure that she is getting the treatment she needs and
24   that she has all of the ability to take care of her
25   child.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              That would include being in a place in her

 2    recovery, if she does have substance abuse, where she

 3    is able to take care of a baby.

 4         Q.  Is there any indication that in some

 5    situations children do better after removal?

 6         A.  Define -- depends on what you mean "better."

 7         Q.  By the sorts of neurobehavioral outcomes that

 8    we have been talking about.

 9         A.  So that's going to come up in this next paper

10    that you're going to refer to.  We did show that

11    children who live with foster/adoptive families had

12    higher cognitive scores compared to those who were

13    with biological relatives.

14         Q.  Right.  Doesn't that tell you that sometimes

15    keeping a child with the biologic mother if she is

16    having issues with continuing drug use and drug abuse

17    can have a negative impact on the child?

18              MS. KEARSE:  Object.

19         A.  That's why I think you need to address it

20    individually and not based on a diagnosis.

21         Q.  And so is any portion of your proposal

22    addressing anything about the standards that are used

23    for when a child would be kept with the mother versus

24    pushed towards foster care or adoption?

25         A.  That's where our social services experts
```

1    would then determine based on their ability to

2    determine if this is a safe place for a child to go

3    would come into play.

4           So we would make the referral to the social

5    service and then let them decide with their abilities

6    to -- they have access to stuff that we don't have of

7    -- are there children in foster care, are there --

8    evidence of abuse that we are not -- have from our

9    end.  So that is where our social services can work

10   with the counties to know if this is a safe a place

11   for a baby or not.

12        Q.  So you defer to the experts in that field

13   about whether changes to how things are done in

14   Cuyahoga and Summit County would be beneficial?

15        A.  The disposition is really -- the experts are

16   the social services to make that determination.

17        Q.  So you defer to them on whether there should

18   be changes to how their policy is that -- in terms of

19   their criteria for when they recommend placement or

20   keeping a child with the mother?

21        A.  I --

22           MS. KEARSE:  Object to form.

23        A.  No.  I think their current policy is -- is

24   what we are doing.  That's what we are doing now.

25        Q.  I'm sorry.  You said you don't know what the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    policy is in Cuyahoga or Summit County on children's

 2    services at all, right?

 3           MS. KEARSE:  Object to form.

 4      A.   I work in five counties in this region, and

 5    they all basically have a process what they follow.

 6    So I can't imagine that of our five counties in our

 7    outreach here would be anything much different

 8    because they're a couple hundred miles north.

 9      Q.   Have you ever read any policies or any

10    documents at all from Children Family Services for

11    Cuyahoga County or any equivalent entity for Summit

12    County?

13      A.   No.

14      Q.   Okay.  If you go to the next section, Effects

15    of Opioid Use on Pregnancy and Pregnancy Outcomes.

16           It says:  The safety of opioids during early

17    pregnancy has been evaluated in a number of

18    observational studies.  Earlier reports have not shown

19    an increase in risks of birth defects after prenatal

20    exposure to oxycodone, propoxyphene and meperidine.

21           Do you see that?

22      A.   Yes.

23      Q.   And do you agree with that?

24      A.   I would have to look at those studies, but I

25    assume that they did their due diligence and that's
```

1    what those two studies referred to in 1981.

2        Q.  As it continues, it says:  The observed birth

3    defects -- from some other studies, observational

4    studies about possible like neuro tube defects --

5    remained rare and represent a minute increase in

6    absolute risk.

7            Do you see that?

8        A.  No, I don't.  Where did you jump down to?

9        Q.  Right in the middle of the paragraph.

10       A.  Oh, okay.

11       Q.  It says:  However, methodologic problems with

12   these studies exist with potential for recall, bias

13   and confounding.

14           Do you see that?

15       A.  Uh-huh.

16       Q.  So just to clarify.  What is recall, bias and

17   confounding?  How does it play into a -- an

18   observational retrospective study?

19       A.  So those are going on self-report.

20       Q.  That's a problem with relying on self-report

21   particularly about a history of drug use, right?

22       A.  And I would think -- the way I would read

23   that is, have you had a child with a neuro tube

24   defect?

25       Q.  And then they say --

Highly Confidential - Subject to Further Confidentiality Review

 1     A.  I --

 2     Q.  -- what they do is, they go backwards and

 3  say, what did you take when you were pregnant?

 4     A.  Correct.  I assume that's how that study was

 5  done.

 6     Q.  All right.  So the statement:  The observed

 7  birth defects remain rare and represent a minute

 8  increase in absolute risk, do you agree with that as a

 9  statement about birth defects with all prescription

10  opioids?

11     A.   I think that we have shown that there are

12  some outcomes that we are finding that have not been

13  able to be looked at in a way that these papers looked

14  at them.

15        So, I think at this time, based on those

16  studies, that is correct, but I think this is an

17  evolving field that we are learning more stuff about

18  as we continue to follow patients with NAS.

19     Q.  So if you go to the next section, Screening

20  for Opioid Use and Opioid Use Disorder in Pregnancy,

21  there's a discussion about ways that you can screen

22  and then some stuff about ways that you can test.

23        Do you see that?

24     A.  Yes.

25     Q.  If we go to the second paragraph, it says:

Highly Confidential - Subject to Further Confidentiality Review

1    Urine drug testing has also been used to detect and

2    confirm suspected substance use but should be

3    performed only with the patient's consent and in

4    compliance with state laws.

5            You alluded to that earlier, correct?

6        A.  We did talk about that.

7        Q.  Okay.  Continues on down.  It says:  Routine

8    urine drug screening is controversial for several

9    reasons.  And it gives some of those.

10           And then it continues on, it says:  Some

11   centers have implemented universal urine toxicology

12   screening for pregnant patients with one study finding

13   improved rates of detection of maternal substance use

14   compared with standard methods.

15           Do you see that?

16       A.  I do.

17       Q.  And do you know what study they're citing?

18       A.  That is a Wexelblatt study.

19       Q.  It sure is.  And is that right, that you had

20   a universal urine toxicology screening for pregnant

21   patients?

22       A.  It is actually urine toxicology testing for

23   patients.  Screening is different.

24       Q.  I'm -- I'm quoting their words.  I'm not --

25       A.  I know.  That's -- they were wrong.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.  So what did it mean that you had improved

2    rates of detection of maternal substance use compared

3    to the standard methods when you had universal testing

4    of urine?

5        A.  So, we -- universal screening is what the

6    recommendations are, meaning that you have a question

7    list or a checklist to determine if you do a test.

8            So what we did is we did -- tested every mom

9    that showed up, irrelevant of what she had on her

10   check box or what she said she did on her

11   questionnaire, her screen.

12           And what we found is -- we looked at every

13   positive toxicology test and went back and looked at

14   their moms, and said if she took the screen, would she

15   have been picked up.

16           And what we found out when we looked at the

17   opioid positive test, that only -- that 20 percent of

18   the babies that we identified from moms being

19   positive, they actually had a negative screen.

20           So we showed that the screen is not as useful

21   as a test.  A screen is not as useful as a test.

22       Q.  But it says it was universal urine

23   toxicology, and it says screening, but you say

24   testing.

25           Does that mean that this was only when they
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    gave consent or was it universal meaning everyone who

 2    showed up?

 3         A.  We obtained consent on everybody in the

 4    study.

 5         Q.  It continues talking about your study:

 6    However, the study did not use validated verbal

 7    screening tools in the comparison group, which limits

 8    the usefulness of these results.

 9             Do you agree with that?

10         A.  Yes.

11         Q.  Is that a disclosed weakness of your paper?

12             MS. KEARSE:  Object to form.

13         A.  No.  Because it was our standard of care in

14    our region, the screen that we utilized.

15             So to get a validated test which they mention

16    here as the 4Ps, the CRAFFT questionnaire or the NIDA

17    screen, those are really the only three validated

18    screens available.

19             Our region had a universal screen that we

20    used as our standard of care.  So that is what we

21    compared it to.  So just because a test has been

22    validated, I agree there are certain one that are

23    fantastic, but our thought was -- we thought our

24    screen was more vigorous than asking a mom four

25    questions.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.  Does the term mean anything to you when you

2    talk about a validated screen versus just one you

3    could use, a comprehensive screen or a more thorough

4    screen?

5    A.  I think validated, when it comes to screens,

6    just means that you had a research project involved in

7    determining the validity of the screen.

8         Ours was a standard of care, which means it

9    is what all of our hospitals in our region did.  So to

10   validate it, we would have had to compare it to

11   another screen or a different validated screen, but we

12   thought our risk-based screen was better than just

13   asking four questions.

14   Q.  Why don't we go to the Merhar paper, which is

15   Exhibit 4.

16        And you've talked about this and cited this

17   in your report, correct?

18   A.  Yes.

19   Q.  So, this is a Retrospective review of

20   neurodevelopmental outcomes in infants treated for

21   neonatal abstinence syndrome.

22        In terms of the study design, what is it to

23   do a retrospective cohort study?

24   A.  That means we went backwards in time.  We

25   picked a date and said we are going to go back and

Highly Confidential - Subject to Further Confidentiality Review

```
 1    look at people in the cohort.  And our cohort, we

 2    defined as infant that needed pharmacologic treatment

 3    for neonatal abstinence syndrome.

 4         Q.  You say "we."  You're not on this paper, but

 5    it was at your hospital?

 6         A.  Correct.  And it is at our follow-up

 7    clinic.

 8         Q.  And were you personally involved in designing

 9    or carrying out this paper?

10         A.  No, but I did review it for them.

11         Q.  So this involves 87 infants, correct?

12         A.  Yes.

13         Q.  So compared to like the total number of

14    infants involved in the meta-analysis by Baldacchino,

15    it's must smaller, correct?

16         A.  Correct.

17         Q.  And this wouldn't have met the entry criteria

18    for Baldacchino because it was retrospective cohort

19    study, correct?

20         A.  If that was what their cutoff was for their

21    prospective -- their meta-analysis, most of the time,

22    yes.

23         Q.  I mean -- and I'm not critical of this paper.

24    It is whatever it is.

25         A.  Yeah.
```

1     Q.   This is not a high level of scientific

2   evidence, right?

3          MS. KEARSE:  Object to form.

4     A.   No.   I would say this is one of the few

5   places where we have had such a large cohort of

6   pharmacologically treated.

7          So the difference between this cohort and

8   that cohort is that just looked at exposed.  This is

9   looking at treated.

10    Q.   Well, so are you familiar with evidence-based

11  medicine or any of the other standards where you have

12  kind of a level or classification for the class of

13  something?

14    A.   Sure.

15    Q.   So where would this retrospective cohort with

16  87 infants fall?

17    A.   I would have to look at the definitions to

18  give you the exact letter and number.

19    Q.   Okay.  But in general, retrospective cohorts

20  are lower down than prospective studies, particularly

21  prospective controlled studies, right?

22         MS. KEARSE:  Object to form.

23    A.   It depends on what you're looking at, because

24  certain things you can never do a prospective

25  double-blinded study on.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              So this is -- a lot of the times,

 2    retrospective studies are fantastic in giving you

 3    baseline data to move forward and develop what you

 4    want to address in a prospective study.

 5         Q.  Okay.  So why don't we go to the Subjects and

 6    Methods on page 2.  So it is described as a

 7    "retrospective chart review."

 8              Do you see that?

 9         A.  Uh-huh.

10         Q.  And it says, "with no parental consent

11    required."  It was the determination from your

12    hospital that parental consent was not required to do

13    this chart review study, correct?

14         A.  Correct.

15         Q.  And then there also -- because of the way

16    this is set up, there isn't a predetermined control

17    group, correct?

18         A.  Not in this study, correct.

19         Q.  It continues down towards the bottom of the

20    page.  It says that, "Data collected..."

21              Do you see this, about a --

22         A.  Yes, "...collected from the neonatal

23    period..."

24         Q.  Yes.  "...included gender, race, ethnicity,

25    maternal age, maternal substance use, gestational age,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    birth weight, breastfeeding, type of treatment for

 2    NAS, length of hospital stay, and with whom the infant

 3    was discharged home."

 4        Do you see that?

 5    A.  Yes.

 6    Q.  So, did this include any of these

 7    socioeconomic factors that we have talked about that

 8    affect neurodevelopment outcomes according to other

 9    research?

10    A.  It just looked at those listed.

11    Q.  Okay.  So like, mother's educational status,

12    mother's IQ, any measures of kind of home instability,

13    none of those factors are looked at here?

14        MS. KEARSE:  Object to form.

15    A.  Correct.

16    Q.  Okay.  And it says:  Infants were considered

17    exposed to a substance in utero with maternal urine at

18    delivery or infant urine, meconium or umbilical cord

19    toxicology screens were positive for that substance.

20        Do you see that?

21    A.  Yes.

22    Q.  And obviously, when we are talking about

23    substances, there is some identification of the

24    particular drugs at issue, but you don't necessarily

25    know when they were used and how much they were used,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    right?

 2        A.   We know it's last trimester because it is

 3    positive on the urine of the mom or the infant, and

 4    then a meconium and umbilical cord usually are last

 5    trimester, too.

 6        Q.   Okay.  And so that's the most you can do is

 7    it's sometime in the last trimester, but you don't

 8    necessarily know how much they took, specifically when

 9    they took it or how they got what they took?

10        A.   Not in this study.

11             MS. KEARSE:  Object to form.

12        Q.   And so for like how they got what they took,

13    is this one where there was some cross-referencing to

14    OARRS to see if there was a prescription?

15        A.   No.

16        Q.   And there certainly isn't like going back to

17    see if they were using illicit drugs, how they started

18    on using illicit drugs?

19        A.   That is correct.

20        Q.   And it says:  Due to universal maternal

21    toxicology screening in our region, all mothers and

22    infants had toxicology screens.

23             Do you see that?

24        A.   Yes.

25        Q.   "Infants were considered exposed to poly
```

Highly Confidential - Subject to Further Confidentiality Review

1   substances if they were exposed to drugs from more

2   than one class."

3         So I take it if they were exposed to a bunch

4   of drugs within one class, it wasn't considered poly

5   substance for this study?

6      A.  So it was an opioid plus something else,

7   because they had to be opioid exposed to be in this

8   clinic.

9      Q.  But if they were taking like heroin and

10  fentanyl and, you know, some -- some other street

11  drug, those would all just show up as opioid, not

12  polypharmacy?

13     A.  Depends on what street drug you're referring

14  to.

15     Q.  I'm sorry.  Some other opioid or opiate

16  street drug.

17     A.  So if it was an opioid, it would just be

18  classified as an opioid.

19     Q.  Okay.  Go to the Results section.  It says:

20  All mothers were Caucasian with a median maternal age

21  of 26 years, which reflects the demographics of the

22  opioid epidemic in our area.

23        What does that mean?  This is the second

24  paragraph under results.

25     A.  I see that.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              So "all" is not a correct statement because I

 2    think our paper showed 92 percent.  So I think that a

 3    better word would have been -- so I think "all" was

 4    the result, but the demographics, meaning that it is a

 5    mainly Caucasian disease that we're seeing is what

 6    they're referring to.

 7         Q.  So the -- I guess go backwards to be

 8    complete.  The birth weight here of 2.87 kilograms and

 9    that 14 percent were the first decile, is that kind of

10    within the normal range of birth weights?

11         A.  So three kilos is the average, so -- and this

12    2.87 is very consistent with what we found in our

13    first OCHA study.

14         Q.  I'm asking a slightly different question.

15    So this birth weight in terms of the median and the

16    percentage in the first decile, is that consistent

17    with the range of expected birth weights for nonopioid

18    exposed infants?

19         A.  It's a little bit lower.

20         Q.  And there are various reasons for low birth

21    weight, including various aspects of maternal care

22    throughout the pregnancy, right?

23         A.  There is multiple reasons for lower birth

24    weight.

25         Q.  You're not attributing that just to the
```

```
1    opioid or opiate exposure, correct?

2         A.   Correct.

3         Q.   Median gestational age was 38 weeks, a range

4    of 31 to 41, with four babies born at 34 weeks, one at

5    35 and six at 36.

6              Is that fairly typical in terms of when the

7    children are being born compared to a normal

8    population for this area?

9         A.   I think our norm -- I only know statewide

10   data.  I think it is 38 weeks is the median; but 38 --

11   I don't think this is statistically different than

12   what our normative is.

13        Q.   So not really born very early?

14        A.   Correct.

15        Q.   Okay.  Says "Almost all of our women..." --

16   this is after the statement about how they were all

17   Caucasian -- "used illicit substances during

18   pregnancy.  The majority were on therapy with

19   Methadone 38 percent or buprenorphine 24 percent at

20   the time of delivery."

21             So what did it tell you that they were all --

22   they -- almost all of them had used illicit

23   substances during the pregnancy?

24        A.   I don't know.  I would have to look at their

25   table.  As I said, I'm not an author on this.  I just
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   reviewed the writing, so I would have to look at
 2   Table 1.
 3       Q.  Table 1 is actually at the penultimate page,
 4   after the figures.
 5       A.  So Table 1 lists heroin as 67 percent.  So --
 6       Q.  And these go to more than a hundred, right?
 7   There is --
 8       A.  I don't know how -- if it was -- one of the
 9   -- so if you had a mom that had -- could be positive
10   for more than one, I don't think that this -- looking
11   back at this paper now that it has been published.
12           So if had you polysubstance abuse, you could
13   have heroin, cocaine, benzodiazepine.  So those
14   numbers would be one patient but it would be three
15   tics.  So just because the heroin, cocaine and
16   benzodiazepines, marijuana, all that is over a hundred
17   percent if you look -- add those together.
18           So I don't know where they got that
19   information from.
20       Q.  Just looking at it, two-thirds of the women
21   in this study were using heroin while pregnant, right?
22       A.  That's what is showing in this, yes.
23       Q.  What does that tell you about what we were
24   talking about earlier, about how the patients who may
25   be at -- medically assisted treatment by the time
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    they're delivering are using illicit substances while

2    pregnant as well?

3              MS. KEARSE:  Object to form.

4         A.  Yeah, it shows that it's happening.

5         Q.  And it suggests that -- well...

6              These are also fairly high use of wide range

7    of drugs while pregnant, not just drugs as part of

8    medical treatment to try to get them through the

9    pregnancy, right?

10             MS. KEARSE:  Object to form.

11        Q.  Not just MAT?

12        A.  Right.  So I think the MAT is 54 patients, so

13   that would attribute to a little over the -- looks

14   like that was at 60 percent, like we were talking

15   about.

16        Q.  That's basically the -- you add up the

17   methadone and the buprenorphine?

18        A.  Correct.

19        Q.  For 62 percent?

20        A.  Yes, that was sort of our estimate I think we

21   were doing earlier.

22        Q.  Okay.  So going back to where we were.

23             The -- that almost all the woman were using

24   illicit substances, including predominantly heroin,

25   while pregnant, does this tell us anything about the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    role of illicit substances used during pregnancy in

 2    relation to the NAS babies that you do see?

 3            MS. KEARSE:  Object to form.

 4       A.  So it depends on when this illicit use was.

 5    If it was in first trimester, before they got

 6    pregnant, that would count.  So I don't know what the

 7    effects it would have.

 8       Q.  I mean, it says "during pregnancy" here, it's

 9    not --

10       A.  It doesn't state when during the pregnancy,

11    correct.

12       Q.  All right.  So it continues down to the next

13    page, talking about some of the data about how they

14    were -- the infants were treated, how long they

15    stayed.  And then it says:  Child Protective Services

16    were involved in all cases.

17            Do you see that?

18       A.  Yes.

19       Q.  And is that unusual in your population?

20       A.  No.  Because anytime we have a positive

21    toxicology test, we involve social services,

22    especially if it is an opioid.

23       Q.  Only 26 percent -- percent of the infants

24    went home in the primary care of their mother.

25            Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.  Yes.

 2        Q.  Thirty went home in primary care of the

 3   father or another relative, and 44 percent went home

 4   to -- in foster care or with an adoptive facility.

 5             Now, that determination is made by the social

 6   services or Child Protective Services, not by any of

 7   your staff, correct?

 8        A.  It is a team approach, but, yeah, they make

 9   the final decision.

10        Q.  And is this fairly typical in your patient

11   population, that you're going to see about 44 percent

12   of the kids going home with -- to foster care or

13   adoptive family rather than the mother or any

14   relative?

15        A.  This is much higher than what we see

16   statewide and in our region.  So that's usually just

17   20 percent.

18             So this is -- showed that to -- and I think

19   that's where we get to the compliance of coming to the

20   -- was much higher with adoptive families, and that's

21   why they were able to participate in this

22   retrospective review.  So this is a different

23   population than what we are seeing in the general.

24        Q.  And this issue of going to an adoptive family

25   or foster care, can that itself have an effect on
```

Highly Confidential - Subject to Further Confidentiality Review

1   Bayley scores?

2       A.  We don't know.  We just know in this cohort

3   study that -- which is much higher than our regular

4   percentage of patients that go into foster care, they

5   did perform better.

6       Q.  So the paragraph that carries over from page

7   3 to page 4, it says:  Most children have Bayley

8   scores within the normal range for all three

9   subscales, although a large proportion did have scores

10  at least one standard deviation below the mean in at

11  least one subscale.

12          Do you see that.

13      A.  Yep.

14      Q.  Can you translate that to English?

15          MS. KEARSE:  Object to form.

16      A.  Layman's term, you mean?

17      Q.  Sure.

18      A.  Because it is English.

19          So one standard deviation is what we would

20  expect to be a normative Bell-shaped curve.  So if you

21  fall within that, you can still be statistically

22  within the norm, but you may be -- which we talk about

23  later on -- they talk about later on -- is

24  significantly -- statistically significantly lower.

25          So this four-point difference falls within

Highly Confidential - Subject to Further Confidentiality Review

1    the standard deviation of 15, meaning anything between

2    85 and 115 is our normative; but if you can show there

3    is a decrease, it just is a fact, it doesn't mean -- I

4    don't -- nobody knows what this four-point difference

5    means.

6        Q.  Okay.  So compared to some other exposures or

7    inputs or factors that affect Bayley scores, this is a

8    relatively mild deviation from the norm in a subset of

9    the things being tested?

10        MS. KEARSE:  Object to form.

11        A.  I don't know what adjective I would use.  It

12    is just significantly lower.  But long-term, I don't

13    think anybody knows what that four points is going to

14    mean.

15        Q.  Okay.  So it says:  Compared to the normative

16    Bayley data, mean of 100 standard deviation of 15,

17    children with NAS scored significantly lower on the

18    cognitive language and motor subscales, means of 96.5,

19    93.8 and 94.0, respectively, P less than 0.03 for all.

20        Do you see that?

21        A.  Yes, I do.

22        Q.  The word "significantly" there means

23    statistically significantly, correct?

24        A.  Yes.

25        Q.  It is not saying there is a known clinical

Highly Confidential - Subject to Further Confidentiality Review

```
 1   significance to this?

 2       A.   That is referring to the statistical

 3   significance.

 4       Q.   And what I said is also true:  That it is not

 5   known that there is clinical significance to any of

 6   these levels of difference?

 7       A.   It is unknown if this means anything long

 8   term.

 9       Q.   And then it says:  Children who live with

10   foster/adoptive families at follow-up, which is 44

11   percent, scored significantly higher on the cognitive

12   subscale than those who live with their mother or a

13   biological relative at a follow-up.

14            Do you see that.

15       A.   I do.

16       Q.   And again, that's like statistically

17   significant .03 for the P value, right?

18       A.   Correct.  That means they actually scored the

19   exact average in the foster family of a hundred.

20       Q.   And it says:  Language scores were not

21   different based on living situation, but children who

22   live with biological relatives were also slightly more

23   likely to have motor scores under 85.

24            Do you see that?

25       A.   I do.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.  So putting it together, what does this issue

 2   tell us about the more normal scores, if you will, of

 3   people placed with a -- children placed with foster or

 4   adoptive families versus being with their mother or a

 5   biologic relative?

 6      A.  It means they scored better on their Bayley's

 7   -- their Bayley's testing.

 8      Q.  Do you have a supposition as to why that

 9   would be?

10      A.  It is unclear.

11      Q.  Have you considered the possibility that is

12   what we saw in all of these other papers where it says

13   that other factors, like the mother's view of

14   parenting, her educational level, the uncertainty in

15   the family, all of these other factors that aren't

16   adequately covered just by income level might be

17   playing a role?

18      A.  It is multifactorial, so some of that

19   definitely comes in.  I don't think we have the income

20   level of the foster families or their socioeconomic

21   status.  So I think that's where it gets tricky.

22      Q.  And I don't mean to be mean at all, but in

23   general:  A child placed with an adoptive family in

24   this situation going from a population that is about

25   90 percent on Medicaid is not typically going to a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   worse financial situation or socioeconomic status than
 2   where they came from?
 3           MS. KEARSE:  Object to form.
 4       A.  I wouldn't know the socioeconomic status of
 5   our adoptive families.
 6       Q.  You think they're likely to be on Medicaid?
 7           MS. KEARSE:  Object to form.
 8       A.  They -- I wouldn't have any -- I don't know.
 9   I don't -- it wouldn't surprise me if some were.
10   Yeah.
11       Q.  So will you agree that, in general, the
12   children placed with a foster or adoptive family are
13   going to go to a family situation that is expected to
14   be more stable and more nurturing than the mother from
15   whom social services removed them?
16           MS. KEARSE:  Object to form.
17       A.  I think there is a significant background
18   check on adopt -- foster families to make sure that it
19   is a safe environment for them.
20       Q.  So in other words, you would hope so, right?
21   You would hope they're going to a better situation?
22       A.  Yes.
23           MS. KEARSE:  Object to form.
24       Q.  And those measures of a better situation,
25   including things like food on the table and less
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    chance of being exposed to traumatic events and
 2    violence are what you would hope to see when there is
 3    a successful placement, right?
 4         MS. KEARSE:  Object to form.
 5         A.  That is the whole premise behind foster
 6    system.
 7         Q.  And you would expect that those things would
 8    have an affect on Bayley scores?
 9         A.  I think this is the first study to look at
10    that, so it is definitely something that we --
11    definitely is intriguing and that would need further
12    investigating.
13         Q.  You would expect that they would have an
14    affect on -- whether it is Bayley scores or anything
15    else -- on neurodevelopment outcomes?
16         A.  The expectation is that it would be
17    beneficial, and -- so, yes.
18         Q.  So the indications in this paper of a slight
19    increased deviation from the norm in the children who
20    had NAS diagnosis was overwhelmingly driven by the
21    ones who stayed with their mother or a family relative
22    despite the social services evaluation, correct?
23         A.  In this population, so this, as they stated,
24    was very high illicit substance use, which as I stated
25    previously is not our normative generalized NAS.
```

```
 1        Q.  So we go to the Discussion, it says:  In this
 2   retrospective study, we evaluated outcomes at two
 3   years of age of a regional cohort of infants treated
 4   for NAS due to maternal opioid use.
 5             As we see largely driven by heroin use,
 6   correct?
 7             MS. KEARSE:  Object to form.
 8        A.  It just states "maternal opioid use," which I
 9   think majority were MAT.
10        Q.  We found that children with NAS performed
11   lower than the normative Bayley sample, although still
12   within the normal range in most cases.
13             Do you see that?
14        A.  Yes.
15        Q.  Is that an accurate statement?
16        A.  Yes.
17        Q.  It says:  We do believe that the four- to
18   six-point difference in Bayley scores is clinically
19   significant, although it is difficult to say whether
20   this will translate into later problems with school
21   performance or IQ.
22             Do you see that?
23        A.  I do.
24        Q.  And as we said, this four- to six-point
25   difference is driven solely by the ones -- the
```

Highly Confidential - Subject to Further Confidentiality Review

1    children who stayed with the mother or a family or a

2    relative, correct?

3        A.  You're compounding multiple different things,

4    so, if you --

5        Q.  I'm actually just doing the math, but because

6    there is no difference in the other group, this four-

7    to point-six difference has to come from a greater

8    than four- to six-point difference in the group that

9    stays with their mother or a relative?

10       MS. KEARSE:  Object to form.

11       A.  So the ones with foster didn't have a

12   decrease in all three categories, which the main group

13   did, so there is some overlap.  So you couldn't solely

14   base it on foster because then you would have seen a

15   decrease in all three, which you don't.

16       Q.  For some reason, language isn't as directly

17   correlated, right?

18       A.  Yeah.  So this is their discussion which

19   doesn't mean it is always a hundred percent correct.

20   If you can look back and show -- have the result or

21   the way you're interpreting it.

22       Q.  Okay.  So why don't we go to the next page,

23   page 5.  There is the third paragraph, second full

24   paragraph on that page, it says:  The mechanism behind

25   neurodevelopmental delays in children exposed to

Highly Confidential - Subject to Further Confidentiality Review

```
 1   opioids in utero and postnatally is not entirely

 2   clear.

 3           Do you see that?

 4       A.  I do.

 5       Q.  Discussion -- discusses some stuff about

 6   possible mechanisms.  And then it says:  Our finding

 7   of higher cognitive scores in children raised by

 8   foster/adoptive families suggest that socioeconomic

 9   factors do significantly affect outcomes in this

10   population.

11           Do you see that?

12       A.  I do.

13       Q.  Do you agree with that statement?

14       A.  Not a hundred percent, but I do see that it

15   improves some aspects.

16       Q.  Okay.  Why don't we go to the next page,

17   please.

18           It says:  We acknowledge that our study has

19   significant limitations notably the retrospective

20   observational design.

21           Do you see that?

22       A.  Yep.

23       Q.  We did not have a control group and we did

24   not have the accurate information on socioeconomic

25   status of the families.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Do you see that?

 2       A.  I do.

 3       Q.  And how could not having accurate information

 4  on socioeconomic of the families affect the results?

 5       A.  Because we know that socioeconomic status

 6  does have an effect on developmental outcomes.

 7       Q.  Of all the children with NAS in our region,

 8  only about 25 percent actually had a Bayley performed

 9  due to caregiver preference/no-shows which could have

10  led to selection bias.

11              What does "selection bias" mean in this

12  context?

13       A.  Meaning that if you get all of the foster

14  families to show up and agree and consent to the

15  testing, you are going to have families that are more

16  motivated and doing more interventions, most likely,

17  that may elevate that score section, whereas the ones

18  from the nonfoster family may only be consenting for

19  other reasons.

20       Q.  You agree with this observation about this is

21  a potential source of selection bias, correct?

22       A.  Yes.

23       Q.  Our findings could well be due to the

24  postnatal environment experienced by these children

25  and warrant a prospective study using standardized
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   measures of behavior and visual functioning in

 2   addition to neurodevelopment as well as standardized

 3   data collection of socioeconomic status.

 4        Do you see that?

 5   A.  I do.

 6   Q.  Do you agree with that statement?

 7   A.  I do agree.

 8   Q.  And is that prospective study underway?

 9   A.  That is what we have applied for the grant

10   for, yes.

11   Q.  Okay.  So you are going to use standardized

12   measures of behavioral and visual functioning, and

13   standardized data collection on socioeconomic status?

14   A.  That is what we discussed, yes.

15   Q.  So sitting here today given the need for

16   further research and these various observations about

17   the limitations of the design, you don't think that is

18   Merhar paper establishes neurodevelopment delays with

19   neonatal abstinence syndrome, do you?

20        MS. KEARSE:  Object to form.

21   A.  I think it shows that there is a significant

22   difference, a decrease.  And what that means is

23   unknown and that we need to further investigate to see

24   if there isn't a true association.

25   Q.  And it may not last past the time period
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    studied in this paper, right?

 2        A.  Correct.

 3        Q.  I mean the -- sometimes differences seen

 4    early in life normalize, right?

 5            MS. KEARSE:  Object to form.

 6        A.  If you can do early intervention.  The whole

 7    idea is to identify infants at risk and then get them

 8    into early intervention, which we know does help with

 9    long-term outcomes.

10        Q.  Okay.  Why don't we go to the next paper.

11            Do you have that in front of you?  The Hall

12    paper that you are on.

13        A.  Yes.

14        Q.  So you said that this was published in full

15    form earlier this year but it had been public in some

16    form last year, which is why it appears on your

17    presentation with a 2018 date, correct?

18        A.  Correct.

19        Q.  Let me just go to the end here.  Author

20    Disclosure Statement.

21            Do you see that see?

22        A.  Yes.

23        Q.  On the -- page 23 -- it is not actually 23,

24    it starts on page 19.  It is just fifth page of the

25    actual printout.
```

```
 1             But this is a statement that is a disclosure

 2   of possible conflicts and biases for you and the other

 3   two authors, correct?

 4        A.  Correct.

 5        Q.  And do you disclose here, Dr. Wexelblatt,

 6   that you're currently engaged as an expert witness for

 7   plaintiffs in opioid litigation?

 8        A.  At this time, I wasn't.

 9        Q.  It was published this year?

10        A.  It was submitted well before this.

11        Q.  So when did you have the last exchange in

12   terms of addressing any peer review comments or doing

13   any revisions or resubmissions for this paper?

14        A.  When it was accepted for e-publication in

15   2018 before whatever month that was on the original.

16        Q.  Okay.  So going forward, are you going to

17   disclose your work as an expert in this litigation

18   on other papers that relate to opioids?

19        A.  Yes.  Now that it is part of this, correct.

20        Q.  Okay.  And so what about when you present

21   publicly anytime this year because you said you were

22   retained what, December of last year, correct?

23        A.  December, correct.

24        Q.  So since December, since you were retained,

25   have you disclosed in any public forum when giving a
```

1  speech or presentation that you are working as an

2  expert for plaintiffs in opioid litigation?

3      A.  I have come to the -- since that time, I've

4  only given one talk at the Tristate Symposium, and I

5  think when we had to hand in our slides for that it

6  was probably right around the time, so I don't

7  remember if I did disclose that or not.

8      Q.  I mean, if we look at slides and there's no

9  disclosure, does it mean you didn't disclose it or

10 just didn't make it onto the slides?

11     A.  It would just mean didn't disclose it.

12     Q.  So what about any of your grants this year?

13 You submitted grant proposals, right?

14     A.  Yes.  So those are all listed, and we keep a

15 database at Cincinnati Children's Hospital for

16 disclosures.

17     Q.  Okay.  So all of your grant proposals so far

18 this year and going forward, like the ones you are

19 working on right now, will disclose that you're an

20 expert for plaintiffs, and I guess In Re: National

21 Prescription Opiate Litigation?

22     A.  It will.

23     Q.  Have you done that so for in anything that

24 has been filed, do you know?

25     A.  No, I have not.

Highly Confidential - Subject to Further Confidentiality Review

```
 1       Q.  Had you thought of it before today?

 2       A.  So expert witness is not always a conflict of

 3   interest listed for medical malpractice, but I guess

 4   this is -- I would discuss it with our IRB to see if

 5   we usually disclose everything.

 6       Q.  Dr. Wexelblatt, so this is the paper that you

 7   mentioned about.  We've talk about this before.

 8           Hall, as the lead author on the paper,

 9   Developmental Disorders and Medical Complications

10   Among Infants with Subclinical Intrauterine Opioid

11   Exposures.

12           So what are the comparison groups in this

13   paper?

14       A.  So there is three main groups.  The first one

15   was the 14,933 was based out of our primary care

16   clinic at Cincinnati Children's Hospital and they had

17   no opioid exposure.

18           The middle group is those with opioid

19   exposure without NAS, meaning they did not need

20   pharmacologic treatment.

21           And third group is opioid exposure with

22   pharmacologic treatment.

23       Q.  Okay.  So was there any attempt to look at

24   those different groups based upon socioeconomic

25   status, maternal education, any of the various issues
```

Highly Confidential - Subject to Further Confidentiality Review

1    that we have been discussing throughout about other

2    things that could be tracked in research?

3         A.  We did look at insurance type.

4         Q.  Okay.

5         A.  Race and ethnicity.

6         Q.  And you know enough from the work that you

7    have done that there are factors about the likelihood

8    of abusing opioids and using illicit opioids that are

9    broader than just insurance type and race, right?

10             MS. KEARSE:  Object to form.

11        A.  Yes.

12        Q.  And like from -- well, so is there any data

13   that says that these three groups are similar except

14   for opioid exposure and NAS diagnosis?

15        A.  There -- are they -- the question is:  Are

16   they similar?  Is that what you asked me?

17        Q.  So I mean, you can go to the next page,

18   page 22, where it gives the Demographics and Birth

19   Characteristics.

20        A.  Yeah.

21        Q.  And there are some differences in terms of

22   percentages between the three groups?

23        A.  Correct.

24        Q.  And obviously, one is really big and then the

25   other two are -- are small with NAS being about, I

Highly Confidential - Subject to Further Confidentiality Review

```
 1    guess, what, 28 percent or so of the exposure without
 2    NAS?
 3         A.  So those are two separate groups --
 4         Q.  Right.
 5         A.  -- so they're separate.
 6         Q.  Right.  I'm saying it is much smaller,
 7    therefore, it is hard to make direct comparisons with
 8    groups of this size?
 9              MS. KEARSE:  Object to form.
10         A.  It is what we see.  It probably ends up --
11    just doing the quick math -- what we see in our region
12    with around a 30 percent exposure with treatment rate.
13    So it should be less because not all of your exposed
14    babies are being treated in our region.
15         Q.  Did you determine any differences based upon
16    the information you did have about type of insurance,
17    race and ethnicity that indicated there were
18    differences between the three groups?
19         A.  Yeah.  We didn't do a statistical analysis to
20    -- it was more of just a -- of a descriptive what
21    those groups were.
22         Q.  Right.  I mean, the stats probably wouldn't
23    be that hard to do?
24         A.  Correct.
25         Q.  And for some reason, they weren't done
```

Highly Confidential - Subject to Further Confidentiality Review

1   here?

2        A.  Yeah, I don't know.

3        Q.  But if you look at it, the public or self-pay

4   among the nonexposed group is 50 percent, which is

5   similar to the state average?

6        A.  Correct.

7        Q.  And the public or self-pay among opioid

8   exposure without NAS was 84.6 percent, which is

9   similar to what you see for NAS around the state, but

10  indicates a much higher poverty percentage in this

11  group, correct?

12       A.  Correct.

13       Q.  And in opioid exposure with NAS, it's 95.7

14  percent, which is even higher than statewide for NAS

15  which indicates a strong correlation of poverty to not

16  just opioid exposure, but sufficient opioid exposure

17  to cause NAS, right?

18       A.  Correct.

19       Q.  I mean, this is pretty easy math and stats to

20  do if somebody chose to put it in a paper.

21       A.  Correct.

22           MS. KEARSE:  Object to form.

23       Q.  Why wasn't it in the paper?

24       A.  I don't know why the P value -- I know we had

25  that listed, and I don't know if the table just never

Highly Confidential - Subject to Further Confidentiality Review

```
 1    -- as we do papers, there is multiple revisions.

 2          And I know at one time we did have the

 3    P value, and I don't know why in the final publication

 4    it didn't get there

 5       Q.  Oh, so have you those P values somewhere,

 6    right?

 7       A.  I thought we did at one point in one of our

 8    versions.  I would have to go back to Dr. Hall and see

 9    where -- where those were.

10       Q.  Okay.  And I mean, we don't have to go

11    through this whole thing, but there are also

12    differences in race and ethnicity between the

13    different groups, right?

14          Like, for instance, non-Hispanic White in the

15    opioid exposure with NAS is almost 60 percent, which

16    is way higher than the other two groups?

17       A.  Correct.

18       Q.  So these groups are not similar?

19       A.  Correct.

20       Q.  So there is plenty of reason just on the

21    limited demographic information you have about

22    socioeconomic status and demographics to expect that

23    you are going to have worse scores with the opioid

24    exposure and NAS groups?

25          MS. KEARSE:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.  On certain subjects, you should expect that,
 2   but on others you shouldn't.
 3        Q.  Okay.  We don't know what other differences
 4   there might be between these groups that might
 5   independently suggest an increased risk of some of
 6   these deficits.
 7        A.  So torticollis and strabismus and
 8   plagiocephaly would have nothing to do with -- that's
 9   ever been stated, to my knowledge, based on
10   socioeconomic status.
11        Q.  So let me break it out for the -- frankly, we
12   have been really focusing on, which is issues like
13   developmental delays, behavioral and emotional
14   disorders, those issues, there may be confounding
15   factors that are more common in the exposed groups
16   than in the no detected exposure group, right?
17             MS. KEARSE:  Object to form.
18        A.  Those would be higher in the exposed group,
19   is what you stated, compared to no detected?
20        Q.  I said this may be factors that this paper
21   wasn't able to pick up that would cause higher
22   behavioral problems, emotional problems, developmental
23   delays, having --
24        A.  That is a limitation, correct.
25        Q.  -- nothing to do with exposure?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.  Correct.

 2        Q.  Same thing for HCV exposure, too, right?

 3        A.  I don't think so.  I don't know if there is

 4   much information on hepatitis C exposure and

 5   socioeconomic status that hasn't been associated with

 6   opioid use.

 7        Q.  Well I mean, there is people who share

 8   needles versus people who don't, right?  And that does

 9   have data suggesting it's more likely to have needle

10   sharing in certain socioeconomic groups compared to

11   others?

12        A.  Could be.

13        Q.  I mean, I'm not making this stuff up out of

14   thin air, right?

15        A.  No.

16        Q.  These are all issues that, frankly, are

17   limitations on the study?

18            MS. KEARSE:  Form.

19        A.  Correct.  We state our limitations,

20   definitely.

21        Q.  Well you state some of your limitations.  You

22   don't state any of the stuff that I just mentioned.

23            We'll get to the stated limitations on

24   page 23 in a second.

25        A.  Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.  Let's just go through this, I guess, probably

 2    a little more directly.

 3             Result section, page 21, it says:  In

 4    comparison to infants with no detected exposures,

 5    those with opioid exposure but no NAS were

 6    significantly more likely to be diagnosed with

 7    behavioral or emotional disorders, developmental

 8    delay, exposure to HCV, speech disorder and

 9    strabismus.

10             That's one of the findings that you have

11    cited on this -- for this paper, correct?

12        A.  Correct.

13        Q.  It says:  Opioid exposed infants without NAS

14    were significantly less likely to be diagnosed with

15    developmental delay, exposure to HCV, plagiocephaly,

16    sensory disorders, strabismus or torticollis than

17    opioid exposed infants who experience NAS.

18             Meaning basically as you go forward from

19    exposure without NAS to exposure with NAS, you had

20    even worse results?

21        A.  Correct.

22        Q.  Again, that also follows the trend of what we

23    have seen in terms of socioeconomic status and perhaps

24    some of the other indicators in this paper about

25    differences between the groups, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   A lot of confounders, correct.

 2        Q.   Compared to infants with no detected

 3   exposure, the diagnosis of developmental delay was

 4   highest among infants with NAS, 7.6 percent versus

 5   28.3 percent.  However, the diagnosis was still twice

 6   as likely among opioid exposed infants without NAS,

 7   7.6 compared to 15.6.

 8            So it's, again, one of the findings you cited

 9   with this paper, right?

10        A.   Correct.

11        Q.   Okay.  It says:  After correction for

12   multiple comparisons within the sensitivity analysis

13   of 8,049 Medicaid insured or self-paying patients,

14   rates were no longer statistically different comparing

15   opioid exposed infants without NAS to infants with no

16   detected exposures for the diagnoses of behavioral or

17   emotional disorders and speech disorder.

18            Do you see that?

19        A.   I do.

20        Q.   Okay.  Correct me if I'm wrong, but what that

21   means is once you account for the one thing we have

22   here about socioeconomic status, which is insurance,

23   that there is actually no difference for the exposed

24   group without NAS for those measures?

25        A.   When you do the multiple comparisons,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   correct.

 2       Q.  The one sort of adjustment for a confounding

 3   factor that is known shows that the difference goes

 4   away in the exposure without NAS group, correct?

 5       A.  Correct.

 6       Q.  And so for your view, this paper can't

 7   possibly stand for the position that exposure, opioid

 8   exposure without NAS increases the incidence of

 9   behavioral or emotional disorders or speech disorder,

10   correct?

11           MS. KEARSE:  Object to form.

12       A.  So that is looking at the middle group.

13       Q.  Yes, that was the question.

14       A.  Not the final -- those with NAS.

15       Q.  Correct, that was my question.

16       A.  So if you're looking at opioid exposure

17   without NAS, then that is correct.  But if you say

18   with NAS, we never -- that statistical significant is

19   still seen.

20       Q.  And where is that data shown?

21       A.  Significance of all other associations remain

22   unchanged (data not shown.)

23       Q.  Yeah.  Where is that math?  Where is that

24   data shown about what happens when you correct for

25   socioeconomic status and Medicaid payment?
```

Highly Confidential - Subject to Further Confidentiality Review

1     A.  So we state the one that -- we state that

2   opioid exposed infants without NAS.  It didn't make

3   that go away.  But when you did with NAS, it didn't.

4     Q.  What is the P value when you adjust for

5   Medicaid status?

6     A.  We don't show all of that data, but it stayed

7   -- it was significant.

8     Q.  Where is that data?

9     A.  It's in a computer somewhere.

10    Q.  Have you ever presented the full data from

11  this paper like at a public presentation?

12    A.  We had the data presented to the reviewers of

13  this journal that felt it was sufficient and

14  adequate.

15    Q.  So my -- that's kind of -- my question is:

16  You mentioned that there was something that maybe was

17  in the paper before it finally got published for the

18  last paper.

19        Do you have copies of the -- what was

20  submitted for publication in this Hall paper?

21    A.  I personally don't, but I know Dr. Hall

22  does.

23    Q.  What about the prior one that we went over

24  from your colleagues from the Merhar paper, do you

25  have a copy of what they asked you to review that got

Highly Confidential - Subject to Further Confidentiality Review

```
 1   submitted?

 2       A.  No, I don't.

 3       Q.  Do we know if there is data that was included

 4   in what got submitted to the journal that didn't make

 5   its way into the final publication in the Hall

 6   paper?

 7       A.  I do not know that.

 8       Q.  So what was the P value for behavioral,

 9   emotional disorders and speech disorder for the NAS

10   group once you accounted for Medicaid insured or

11   self-paying status?

12       A.  They remained unchanged per that statement

13   significant -- significance of all other associations

14   remained unchanged.  So they didn't change.

15           So that's why they were not shown because

16   there was no difference in the P values, whereas the

17   P values did change in the other ones.

18       Q.  I mean, what you are looking for there is

19   whether the P value crosses the threshold for .05,

20   right?

21       A.  So if it's unchanged, it's what's published

22   right there in the unadjusted variables here.

23       Q.  Well, it doesn't say that.  I don't mean to

24   pick, but it says "significance of all other

25   associations," it doesn't say the P value didn't
```

Highly Confidential - Subject to Further Confidentiality Review

1    change.

2         A.  The significance -- so that's just the

3    definition of what significant of .05.

4         Q.  Yes.  So my question to you was:  Do you know

5    what the P value was once the adjustment was done?

6         A.  It was under .05.

7         Q.  And data should exist somewhere with

8    Dr. Hall?

9         A.  It is listed in B, the preadjustment, but --

10        Q.  I'm asking about the adjusted data.  Is that

11   with Dr. Hall?

12        A.  Yes --

13            MS. KEARSE:  Objection.

14        A.  -- I assume it is with him.

15        Q.  Okay.  I mean, I didn't -- I didn't know if

16   it was with Dr. McAllister, so --

17        A.  No.  Dr. Hall is the bio informatics.

18        Q.  Okay.  The discussion says:  The study team

19   is unaware of previous studies focusing specifically

20   on diagnoses among opioid exposed infants who did not

21   express severe signs of withdrawal, most likely

22   because of difficulty in identifying these infants

23   without a universal mechanism for maternal drug

24   testing.

25            Is that still the case:  You are unaware of

Highly Confidential - Subject to Further Confidentiality Review

1    any other study that has this possible finding?

2         A.   Correct.

3         Q.   So this -- this study is kind of out on its

4    own as addressing these issues and having the findings

5    that, at least before they were adjusted, showed

6    increase, but after they were adjusted showed no

7    increase in this group?

8         MS. KEARSE:   Object to form.

9         A.   So the only things that didn't stay

10   significant were those two things that we list there,

11   but the other ones did stay significant.

12        Q.   Okay.  So let me ask it more directly then:

13   This -- is this the only study that you are aware of

14   that has the findings of increased risk of any of

15   these issues with opioid exposure without NAS?

16        A.   Yes.  So the significance changed for

17   behavioral and emotional disorders and speech

18   disorders, but they didn't change for the other things

19   that we state, like hepatitis C, sensory disorders,

20   strabismus and torticollis.

21        Q.   Okay.  So why don't we go to the next page.

22   It says:  There was notable limitations to this

23   analysis -- this is page 23, it says:  including

24   limitations inherent to the retrospective study

25   design.  Although opioid exposure was identified using

Highly Confidential - Subject to Further Confidentiality Review

```
 1    universal testing, details of exposure extent and

 2    duration were unavailable.

 3         Do you see that?

 4    A.  Yep.

 5    Q.  And we have talked about that as an issue

 6    with the database that you have and how it might

 7    affect your study results more generally, correct?

 8         MS. KEARSE:  Object to form.

 9    A.  That is true.

10    Q.  Neither did the study team have access to a

11    detailed profile of any polysubstance exposures.

12         Do you agree with that, too, right?

13    A.  I do.

14    Q.  Variability in exposure characteristics may

15    contribute to variation and rates of developmental

16    diagnoses and medical complications.  It is possible

17    that diagnosis rates underrepresent true incidence of

18    the conditions studied as children lost to follow-up

19    would not have been assigned diagnoses within this

20    CCHMC EHR.

21         To minimize the effects of any potential

22    differential in children lost to follow-up,

23    sensitivity analysis was conducted of Medicaid insured

24    and self-paying patients who were not likely to seek

25    care through the CCHMC system.  Although diagnoses of
```

1   behavioral or emotional disorders and speech disorder

2   were no longer statistically significant after

3   correction for multiple comparisons, based upon the

4   small P values, less than .05, it is possible those

5   differences would be significant given a larger cohort

6   of opioid exposed infants.

7           So, I'm looking through the limitations that

8   are described.  Is there any limitation that is

9   described along the lines of what we went over

10  earlier?

11      A.  Besides the -- what we adjusted for was the

12  Medicaid, which would adjust for the socioeconomic

13  status.

14      Q.  I mean, shouldn't this have said, we -- we

15  have concerns that any conclusions about the opioid

16  exposure without NAS and opioid exposure with NAS

17  findings are invalid because of the significant

18  differences between our three groups?

19          MS. KEARSE:  Object to form.

20      A.  No.

21      Q.  Okay.  Should it have at least raised that as

22  a direct concern about a limitation of the study?

23      A.  No, because we -- once you adjusted for

24  Medicaid, we only saw changes in two of the multiple

25  things that we were looking at.  So majority of things

Highly Confidential - Subject to Further Confidentiality Review

1    that we looked at didn't have significant changes.

2         Q.  So this continues, as these papers often do,

3    with a statement about kind of future work.

4              It says:  The study team plans to validate

5    these initial findings to further characterize risk

6    factors for developmental delays and complications and

7    to develop a standardized screening schedule for

8    earlier detection and referral of these high-risk

9    infants through enrollment and analysis of a

10   prospective cohort.

11             Do you see that?

12        A.  I do.

13        Q.  So these were not validated findings yet,

14   correct?

15        A.  No.  It means that's what we found in that

16   retrospective review.  The results speak for

17   themselves.  What we want to do is go prospectively

18   with a control group, which we mentioned multiple

19   times, to see what happens once you do it that way.

20        Q.  And do you have an idea when that research

21   will be concluded?

22        A.  That's the grant that we have applied for and

23   we are still waiting on the funding for that.

24        Q.  If you get the funding, when will that

25   research be concluded?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.  It is a two-year enrollment, so it would

2   enroll for two years and wait for -- we don't do the

3   Bayley's -- these testing until two years of age, so

4   it would be a four-year study.

5        Q.  Okay.  Okay.  So data might be made available

6   in some way in maybe 2023 and maybe published in maybe

7   2024?

8        A.  If that's the time line.

9        Q.  Okay.  So until then, there won't be, as far

10  as you know, prospective reliable data about

11  differences relating to developmental delays

12  associated with opioid exposures in utero?

13       MS. KEARSE:  Object to form.

14       A.  No, because we have ongoing study as part of

15  our NAS follow-up clinic that is under -- that

16  development of the clinic is to continue to enroll

17  patients.

18           And we always do -- we -- Bayley scores are

19  not part of the normative, so we enroll patients to do

20  that.  So it is an ongoing thing that we had done

21  since the establishment.  So we have ongoing data that

22  we are collecting.

23       Q.  Have you written to ACOG and told them that

24  you thought that their summary of the issue of

25  long-term effects from opioid exposure in utero are
```

```
 1    wrong or were presented in any kind of public forum by

 2    sending in a letter to the editor or commenting on

 3    somebody else's publication, anything to that effect,

 4    to say that the many, many, many statements that are

 5    out there that say that there is no data showing

 6    long-term effects are, in fact, wrong because of more

 7    recent research at your institute, sir?

 8        A.   I have not wrote any letters to any

 9    committees.

10        Q.  Or spoken publicly along the lines of, you

11    know, the data now establishes something different

12    than what is generally put forward in review articles

13    and committee opinions?

14        A.  So there is a large grant, which I'm not a

15    part of, that is submitted by Health and Human

16    Services that is addressing this exact issue.

17            Based on initial data that -- that -- the

18    NCIA -- the NIH is funding, looking at enrolling

19    patient with NAS to do MRIs and Bayley's to

20    definitively answer this question.  So that is a

21    multi-center trial that is being funded, and we should

22    know in July.

23        Q.  Who is taking the lead on that, as far as you

24    know?

25        A.  It is a multi-centered group, so it is
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    unknown.  There is multiple groups that applied, and

 2    so I don't know who is going to get that funding.

 3         Q.  Do you know of any ongoing research to look

 4    at the issue as to whether illicit drug use, like we

 5    saw was in two-thirds of the study population in the

 6    prior study, is in a -- more likely to produce kind of

 7    developmental delays if they exist than just use of

 8    prescription drugs within a prescription and under

 9    medical guidance?

10         MS. KEARSE:  Object to form.

11         A.  I'm not aware of data of that paper.

12         Q.  Do you have an opinion on that issue?

13         A.  If illicit use is associated with poor

14    outcomes?

15         Q.  Yes, sir.

16         A.  I think it is multifactorial, and I don't

17    know.

18         Q.  Part of the factors would be how the kids are

19    raised and how early inventions are, how effective

20    they are?

21         A.  What use and how long the use was.

22         Q.  Right.  So like chronic illicit use

23    throughout the pregnancy, including into the third

24    trimester, might be more likely to produce

25    neurodevelopmental delays than somebody who took a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   prescription opioid pursuant to prescription during

 2   the pregnancy?

 3        A.  So if they had a more recent and a longer

 4   use, then I would expect more worse outcomes.

 5        Q.  And also you'd expect worse outcomes with

 6   illicit use?

 7             MS. KEARSE:  Object to form.

 8        A.  Most likely, but it's unknown.

 9             MR. ALEXANDER:  I would suggest that we take

10   a break now so we can see how much time we have left.

11   We might switch questioners and then we can figure out

12   how much time is needed to finish up efficiently.

13             MS. KEARSE:  Okay.

14             THE VIDEOGRAPHER:  We are now going off

15   record.  The time is 5:10.

16             (There was a brief.)

17             THE VIDEOGRAPHER:  We are now back on record.

18   Time is 5:36.

19   BY MR. ALEXANDER:

20        Q.  Dr. Wexelblatt, is there any of your

21   testimony that thus far you need to change or

22   supplement in any way?

23        A.  No.

24        Q.  And during the break, did you have an

25   opportunity to look at anything relating to the
```

1   Baldacchino paper that we were talking about

2   earlier?

3      A.  We did.

4      Q.  And did you kind of go over some questions to

5   be asked about that?

6      A.  Did we go over questions?

7      Q.  Yeah.

8      A.  We went over the erratum that was

9   published.

10      Q.  Okay.  The citation in your report was the

11   actual paper I showed you, right?

12      A.  It links to -- since it wasn't republished,

13   that citation stays the same.  So on the erratum, it

14   was never republished, they just republished their

15   results, which is the same exact link.

16      Q.  Okay.  Did you look at any other studies or

17   anything during the break?

18      A.  Just that one study.

19      Q.  Have you looked at any additional materials

20   during any of the breaks beyond what has been

21   disclosed already?

22      A.  I looked at an abstract that I got in my

23   inbox about citations about breast milk and NAS, but

24   that's about it.

25

```
 1              (AmerisourceBergen-Wexelblatt-008 was marked

 2      for identification.)

 3         Q.   Okay.  I'm going have to reach now, but I

 4      marked as Exhibit 8 a copy of the PowerPoint that we

 5      had earlier, I guess, Counsel.

 6              We already went over this.  This is just so

 7      that it's not unclear what we were referencing when we

 8      had the questioning earlier.

 9              If you could just confirm that that is the

10      PowerPoint --

11         A.   Yep.

12         Q.   -- that we went over earlier.

13              And so you stand by everything in that

14      PowerPoint, right?

15         A.   Yes.

16         Q.   So if we can, I would like to go back to the

17      Hall paper for one second.  Some of language that we

18      were discussing.

19              Before the break, we talked about the issue

20      of the language where it says, significance of all

21      other associations remained unchanged (data not

22      shown).  And that was in reference to basically doing

23      an adjustment for Medicaid insured versus private pay,

24      correct?

25         A.   Medicaid insured or self-paying patients,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   correct.

 2        Q.  But the comparison is to private, right?

 3            MS. KEARSE:  Objection.

 4        A.  We did -- multiple comparison was in the

 5   sensitivity analysis of Medicaid insured.  Correct.

 6   We did it based on Medicaid insurance.

 7        Q.  Okay.  So if you go to Table 1 for the NAS

 8   group, out of that 138, four they didn't know their

 9   insurance, 132 were public or self-pay, and only 2

10   were private.

11            Do you see that?

12        A.  I do.

13        Q.  So based on what you noted about the -- the

14   statistics here, would it be possible to do an

15   adjustment for Medicaid status for the opioid exposure

16   with NAS group given that there are only two private

17   insured in that group?

18        A.  So we corrected in the middle group the

19   opioid exposure without NAS.  So it's a direct -- you

20   don't take out those are -- that you compare within

21   that group of Medicaid insurance or not.

22        Q.  The question was:  Whether when one does an

23   adjustment --

24        A.  Uh-huh.

25        Q.  -- for Medicaid status, whether that changes
```

Highly Confidential - Subject to Further Confidentiality Review

1    the data.

2         And we said that for the opioid exposure

3    without NAS doing that kind of adjustment changes the

4    P value for some of the outcomes but not others.

5         A.  So the way that you would do it is you would

6    compare that 133 in the public with this 7,517, the

7    public for the first -- the no detected exposures.

8    You would throw out the private and the unknown in

9    both, and say let's just look at Medicaid.

10        Q.  Oh.  So there wasn't an actual adjustment

11   that was done for Medicaid status, it was just a

12   sensitivity analysis?

13        A.  The sensitivity -- exactly, that's what it

14   states, is that within the sensitivity analysis.

15        Q.  Okay.  So was there an adjustment done in

16   this paper for Medicaid status for any of the

17   evaluations?

18        A.  So yes.  We did it with -- and found only

19   changes with emotional disorders and speech disorders,

20   and the significance are none of the others changed

21   below our cutoff value of .05.

22        Q.  Okay.  So for the NAS group, was there an

23   adjustment done for Medicaid status?

24        A.  So we did it within both groups and found

25   that the group that did change was only those opioid

 1    exposed without NAS in those two subcategories,

 2    correct.

 3        Q.  So you're not doing an adjustment just

 4    focused on the opioid exposure with NAS group solely

 5    compared to the no detected exposure group based upon

 6    Medicaid status as the adjustment?

 7        A.  So I don't remember what all of the multiple

 8    comparisons were within the sensitivity analysis.

 9    Dr. Hall is our bio informatics Ph.D, so I would have

10    to defer to him on what those actual mathematical

11    situations were.

12        Q.  Okay.  So to know if essentially there was an

13    adjustment for Medicaid status and it left the

14    differences significant for opioid exposure with NAS

15    with regard to developmental delay and these other

16    criteria, we would need to ask Dr. Hall or get

17    information from him, correct?

18        MS. KEARSE:  Object to form.

19        A.  We show that the significance is -- the

20    significance only changed on those two out of all the

21    other ones that we tried to look at.

22        Q.  But you don't know what adjustments he did?

23        A.  I don't know off the top of my head.

24        Q.  Okay.  Why don't we go back to your report,

25    Exhibit 1, please.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Is your primary position -- this is paragraph
 2   9, but maybe you can answer without it.
 3              Is your primary position in terms of the time
 4   you spent regional director of newborn care?
 5       A.  What is the question?
 6       Q.  Let me ask:  In your professional life, is
 7   there an allocation of your time between your
 8   different roles and responsibilities?
 9       A.  A general breakdown, yes, there is.
10       Q.  Can you give me the breakdown?
11       A.  So I do 50 percent clinical, 20 percent
12   administrative and 30 percent research, academic.
13       Q.  And where is the clinical work done?
14       A.  Multiple hospitals within our region.
15       Q.  Is it broken up between them in any
16   predictable way?
17       A.  I go to -- I am on staff at eight different
18   hospitals -- no, I take that back.  More.
19              Out of our 15 hospitals we cover, I'm on
20   staff at 14.  So I go to -- I'm on staff at 14 of our
21   15 hospitals our group covers.
22       Q.  And do you actually have your own patients or
23   are you more kind of floating in and assisting
24   others?
25       A.  So we see patients.  We make rounds on our
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   patients that are assigned to our group, which ends up

2   being 90 percent of all of the births in our region.

3       Q.  How many pediatricians are in your group?

4       A.  Sixty-nine.

5       Q.  And do you supervise them?

6       A.  I supervise the pediatricians in our

7   division, yes.

8       Q.  So how many?

9       A.  There's 20 of those.

10      Q.  Okay.  And so when you are doing rounds for

11  the cases assigned to your group, does that mean you

12  get roughly 5 percent of the cases?

13      A.  No.  So on that day at that hospital, it is

14  either a hundred percent or 50 percent of patients,

15  depending on which hospital we are at.

16      Q.  Okay.  That's for you personally?

17      A.  It is for whoever is at that hospital.

18      Q.  Okay.  I'm asking about you.

19      A.  Yes.

20      Q.  When you go to a hospital, you're taking care

21  of whoever the patients are that are there at that

22  time assigned to your group?

23      A.  Correct.

24      Q.  And do you have a practice of seeing patients

25  anywhere outside of what you described with the rounds
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of the various eight plus hospitals in the group in

 2    the area?

 3         A.  The 14 hospitals, no.

 4         Q.  Have you had any subspecialty training within

 5    pediatrics?

 6         A.  No.

 7         Q.  Is there any kind of subspecialty

 8    certification available within pediatrics?

 9         A.  There is multiple, yes.

10         Q.  Why don't you go to paragraph 15 of your

11    report, please.  So there is a description here of the

12    various kind of general things that you did to form

13    your opinions set forth in the report, correct?

14         A.  Correct.

15         Q.  And there is a reference here to

16    "authoritative services such as..." and you say CDC,

17    SAMHSA, ACOG, World Health Organization, ODHMS, ODH,

18    ODM.

19              It's like alphabet soup there.

20              Do you see that?

21         A.  I do.

22         Q.  And so are you saying that the publications

23    that you have cited from CDC, SAMHSA, World Health

24    Organization, et al., are all considered

25    authoritative?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Their organizations are.

 2        Q.   Oh, okay.  But when you cited specific

 3   publications from them, did you try to only cite

 4   things that you thought were actually authoritative?

 5        A.   I had stuck to their general reviews, yes.

 6        Q.   When you did a literature search of

 7   scientific publications, do you know what you were

 8   looking for?

 9        A.   Mostly stuff that I've come across in my

10   research, so it was mainly stuff that we have cited or

11   published on.

12        Q.   Pretty much things that you already knew?

13        A.   Yeah.

14        Q.   Did you have anybody who helped you in any of

15   your work preparing your opinion in this case?

16        A.   No.

17        Q.   Did you have any meetings or discussions at

18   all with anybody other than the lawyers?

19        A.   No.

20        Q.   The brief summary of opinions -- maybe we can

21   cover a lot of this because I think we have throughout

22   the day hit a bunch of these, but I have a couple of

23   questions that may speed things up.

24             A:   Under paragraph 15 says:  Use and

25   exposure of opioids among pregnant woman continues to
```

Highly Confidential - Subject to Further Confidentiality Review

1    grow throughout the United States.

2          Your information for Ohio and Cuyahoga and

3    Summit County in particular is that that usage has

4    dropped over the last couple of years, correct?

5          MS. KEARSE:  Object to form.

6       A.  The usage of opioid exposure has not

7    dropped.

8       Q.  It continues to grow among pregnant women?

9       A.  Yes.

10      Q.  What has dropped is prescription use,

11   right?

12      A.  Correct.

13      Q.  Okay.  C says:  Withdrawal signs develop --

14   and this is related to NAS -- in 55 to 94 percent of

15   opioid exposed infants.

16         And it says:  With 30 to 65 percent of those

17   infants requiring pharmacologic treatment for severe

18   withdrawal.

19         You said that in your work the reliable

20   number that you think is about, what, 42 percent?

21      A.  That's our statewide data.

22      Q.  For infants requiring pharmacologic treatment

23   for severe withdrawal?

24      A.  That is correct.

25      Q.  Meaning that 42 percent of those who have

1   symptoms have a diagnosis of NAS?

2       A.  That means that 40 percent of the patients

3   that are having severe enough withdrawal to need

4   pharmacologic treatment to get through it.

5       Q.  Okay.  So what percentage of all opioid

6   exposed infants have NAS?

7       A.  In our collaborative, we decided to call NAS

8   only those that had the most severe withdrawal that

9   need pharmacologic treatment.

10          So in that -- we came up with that definition

11  in 2012.  Now, some places describe NAS as babies

12  needing a higher level of care, meaning they are

13  admitted to Level 2 or 3 or 4 NICU, that that would be

14  considered NAS because they needed increased level of

15  care.  So that's where the differentiation can

16  happen.

17      Q.  So what percentage of all pregnancies that

18  involve opioid exposure result in the birth of a baby

19  that will be diagnosed with NAS?

20      A.  That's the 30 to 65 percent, depending on

21  what definition you are using.

22      Q.  But you think the right -- the right number,

23  according to your definition, is 40 percent?

24          MS. KEARSE:  Object to form.

25      A.  By our definition in Ohio, yeah, we feel

Highly Confidential - Subject to Further Confidentiality Review

```
 1   confident that's our numbers.
 2        Q.   You mentioned Level 3 and Level 4 NCIUs.
 3             How much of your time is spent in a NCIU?
 4        A.   I spend my time in a Level 2 NCIU.
 5        Q.   So do you ever spend any time in a Level 3 or
 6   Level 4 neonatal intensive care unit?
 7        A.   Just consulting with patient -- doctors on
 8   NAS cases, but not seeing actual patients.
 9        Q.   Are there some pediatricians who spend their
10   time not in that arena?
11        A.   Not in a Level 3 or 4.
12        Q.   Okay.  Those are more -- those are a
13   different subspecialty of medicine?
14        A.   That's -- neonatology fellowship is
15   required.
16        Q.   And is that considered a subspecialty of
17   pediatrics that we talked about?
18        A.   It is.
19        Q.   Is there a reason you chose not to do that?
20        A.   Time.
21        Q.   The percentage of NAS -- I guess for those
22   who define NAS as requiring a higher level of care and
23   therefore there is nonpharmacologic intervention, do
24   you know what percentage of NAS babies respond
25   favorably to nonpharmacologic intervention?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.  So babies -- all babies respond to

 2   nonpharmacologic intervention.

 3        Q.  Okay.  So as a general proposition, NAS

 4   treated either with pharmacologic intervention or

 5   nonpharmacologic intervention, according to the

 6   current standards, usually results in improvement?

 7        A.  Correct.

 8        Q.  D says:  The increasing number of women with

 9   opioid use disorder in Cuyahoga County and Summit

10   Counties and the growing incidence of NAS is a

11   significant public health issue.  The Counties will

12   need to build upon existing programs and develop new

13   multidisciplinary programs to improve the outcomes of

14   women with opioid use disorder, mothers, and infants.

15        So the statement here about "need to build

16   upon existing programs," is that intended to suggest

17   that you know what their existing programs are?

18        A.  At certain hospitals, yes.

19        Q.  What about all the programs in the county?

20        A.  I could never know all programs in all the

21   counties.

22        Q.  I mean, you're not just suggesting the

23   development of new programs at one or two hospitals in

24   each county, are you?

25        A.  Depends on how many hospitals are in each
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   county.

 2        Q.  How many hospitals with Level 2 units are

 3   there in Cuyahoga County?

 4        A.  I'm not aware of that number.

 5        Q.  What about 3 or 4?

 6        A.  I don't know.

 7        Q.  What about Summit County, do you know about

 8   Level 2 units there?

 9        A.  I take that back about Level 3 or 4 at

10   Cuyahoga.  I think it is three, but I do not know if

11   it's -- I think it is three.

12        Q.  Okay.

13        A.  And I think in Summit County it is one.

14        Q.  Okay.  So do you know the programs in place

15   at any of the Level 3 -- the hospitals with a Level 3

16   unit in Cuyahoga or Summit County?

17        A.  I am familiar with some of the programs,

18   yes.

19        Q.  Okay.  Enough to be able to opine in detail

20   about what would need to happen to build upon the

21   existing programs?

22        A.  So yeah, they all have infant structures in

23   place from our -- I know from our OPQC work, that they

24   have been working on this actively.

25        Q.  Do you know what all of the current programs
```

Highly Confidential - Subject to Further Confidentiality Review

1  in place in Cuyahoga and Summit County are that focus

2  us on prevention of NAS?

3      A.  I do not know all of the county programs that

4  are working on NAS.

5      Q.  Do you know any of the names of any of the

6  programs in place in Cuyahoga or Summit County that

7  look at ways to reduce the incidence of maternal use

8  of opioids and the resulting development of NAS in

9  some portion of their offspring?

10     A.  Yeah.  So we have worked with the folks in

11 those counties as part of OPQC MOMS Plus project.  The

12 actual names I couldn't tell you without going back

13 and looking them up, but we have worked with them --

14     Q.  Do you know --

15     A.  -- in both counties.

16     Q.  Do you know the names of any programs in

17 place in either county?

18     A.  The names of the actual programs?

19     Q.  Yeah.

20     A.  I probably couldn't tell you in our counties

21 the actual specific names.

22     Q.  E says:  Preventing opioid exposure among

23 women of childbearing age and pregnant women will

24 greatly reduce the number of babies with narcotic

25 exposure and reduce the need for treatment of NAS.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Do you have any data specific to Cuyahoga or

 2    Summit County about the unintended pregnancy rate

 3    among woman using or abusing opioids?

 4         A.  I don't know the specific rate of

 5    unintentional -- unintended pregnancy rate in those

 6    two counties.

 7         Q.  Do you know what the programs are in place to

 8    prevent opioid use in that population or prevent

 9    unintended pregnancy in that population?

10         A.  I wouldn't know the specific names.

11         Q.  Do you know anything that they do, anything

12    that those programs do?

13         A.  So I know the leaders of their regions who

14    specify in their region and wouldn't know their exact

15    names of their programs.

16              But myself, we just know what the concept is,

17    which we have been shown, but to -- the difference

18    between county X and Y doesn't really make a

19    difference.  It is the standardized approach, which

20    has been shown to make the difference.

21         Q.  Okay.  F says:  Effective prevention

22    programs will need to educate women of childbearing

23    age about substance abuse prevention and raise

24    awareness of the effects of opioid use prior to and

25    during pregnancy, and provide counseling for women
```

Highly Confidential - Subject to Further Confidentiality Review

1    being treated for opioid use disorder.

2         Do you know anything about the counseling

3    programs in effect in Cuyahoga or Summit County

4    relating to women and postpartum women in terms of

5    anything relating to be substance abuse?

6         A.  Once again, I just know their leaders in that

7    region, not the actual names of their specific

8    programs.

9         Q.  So you don't have specific changes or tweaks

10   to what they're already doing?

11        A.  I would work with their -- their regional

12   leader are the best ones to lead regional

13   improvement.

14        Q.  8 (sic) says:  Emergency rooms, health

15   clinics, community drug treatment centers, and other

16   service providers should expand screening programs in

17   order to identify women in need of intervention and

18   treatment referral.

19        And so like before, would you expand this to

20   all substance abuse, not just opioids or opiates?

21        A.  I think screening for all is great.

22        Q.  Do you know anything about the screening

23   programs in place in any emergency rooms, health

24   clinics, community drug treatment centers or other

25   service providers in Cuyahoga or Summit County in this

Highly Confidential - Subject to Further Confidentiality Review

```
 1   regard?
 2       A.  I know that our now -- our Narcan initiative
 3   statewide started in emergency rooms up in Cuyahoga
 4   County, but that is about it for the specific names
 5   and treatment programs --
 6       Q.  Like --
 7       A.  -- screening services.
 8       Q.  Do you know how many different emergency
 9   rooms, health clinic, community treatment centers, and
10   other service providers who would be dealing with
11   women in this context there are in Cuyahoga County?
12       A.  I would not know that number.
13       Q.  What about Summit County?
14       A.  I would not know that number.
15       Q.  To change the screening programs, there would
16   there need to be a change of behavior by literally
17   hundreds of different health care entities, correct?
18           MS. KEARSE:  Object to form.
19       A.  No.  It's something that would get a
20   collaboration to -- to -- we usually do this -- I
21   mean, we have made changes statewide on other issues
22   addressing with NAS and put in protocols in 52
23   hospitals.
24           And so we have a mechanism on how to spread
25   and emerge protocols that we know are best practice.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    So it would be the same thing with these facilities

 2    which are usually associated with a hospital.  You

 3    would go by system and then have them spread it out.

 4         Q.  Okay.  I think that we have talked about

 5    sub H, about recognizing barriers to treatment,

 6    correct

 7         A.  Correct.

 8         Q.  And we talked about I, about that you think

 9    that standardized assessments and treatment protocols

10    improve outcomes, correct?

11         A.  We have published on that, yes.

12         Q.  And we have talked about it during the

13    deposition, correct?

14         A.  Yes.

15         Q.  Do you have anything more to say about

16    that?

17         A.  Nope.

18         Q.  J says:  Universal maternal screening

19    prenatally and testing at the time of delivery

20    improves the identification of infants at risk for the

21    development of NAS.

22              We have talked about that one, too.

23              Do you know the differences in screening

24    practices and testing between the different healthcare

25    facilities in Cuyahoga and Summit County?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.  I do know that they do universal screening in
2    Cuyahoga County, and I'm -- not testing.  And I'm
3    pretty sure of -- that they're doing the same
4    universal screening, not testing, in Summit County.
5        Q.  Have you actually talked to your colleagues
6    there about the -- why you think it would be a good
7    idea for them to switch to the universal testing model
8    that you have down here?
9        A.  Yeah.  Like we stated, this was a OPQC phone
10   call that we did discuss.
11       Q.  K says:  Pharmacologic support for (sic)
12   opioids has been shown to be the best treatment when
13   medication is needed for withdrawal for babies with
14   NAS.
15           And we have talked about that, including your
16   preference for buprenorphine compared to methadone or
17   morphine, correct?
18       A.  You said "for opioids" instead of "with
19   opioids".  So not all babies with opioids need to be
20   treated, so I just want to fix that question that you
21   stated.  It's "with opioids," not "for opioids."
22       Q.  Okay.  Do you have anything you need to add
23   on K?
24       A.  No.
25       Q.  L:  Existing medication assisted treatment
```

```
 1    programs should be expanded, along with coordinated

 2    supportive services that mitigate barriers women may

 3    try in accessing these -- I'm sorry -- experience in

 4    accessing these treatment.

 5          So, we have talked about MAT programs a

 6    little bit in pregnant women.

 7          And you said that you are not personally

 8    involved in administering them or prescribing that,

 9    correct?

10    A.  Correct.

11    Q.  And do you have an understanding of what is

12    going on in Cuyahoga or Summit County now in terms of

13    what coordinated support services they have available

14    to address these issues and barriers for MAT?

15    A.  I just know the national data of 20 to 26

16    percent of women with substance use disorder are not

17    getting -- are only getting MAT.  So if that is a

18    national number, I would assume that we would be

19    seeing those same things in those two counties.

20    Q.  But you think it should be better, right?

21    A.  Oh, yeah.

22    Q.  And I mean, that is a multifactorial issue of

23    why 74 percent of women or any patient with a

24    substance use disorder like the opioid disorders at

25    issue here would actually seek treatment?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KEARSE:  Object to form.

 2        A.  Yeah.  There's -- yeah, we would want to

 3   improve that.

 4        Q.  Okay.  And so none of what actually what

 5   you're recommending would increase the percentage of

 6   women who are actually in MAT programs; is that

 7   right?

 8              MS. KEARSE:  Object to form.

 9        A.  I don't think that's a correct statement.

10        Q.  Well, you hope that that could be happening,

11   right, that you could increase the percentage of

12   treatment --

13        A.  I think with the right resources you could

14   improve that number and make a difference.

15        Q.  Have you spelled that out in the plan here on

16   how to fix that?

17        A.  How to expand by improving the access to

18   buprenorphine -- I think M addresses that.

19              And going back to alleviating barriers, H

20   addresses that, too.

21        Q.  Is there any model that has been implemented

22   anywhere in the country where the percentage has gone

23   up significantly from the roughly 26 percent that you

24   cited?

25        A.  Yes.  So our MOMS First program, which was
```

 1   part of the Cures Act compared women that were in our

 2   four pilot sites, and compared to the -- those that

 3   were not, and found that woman that were in our pilot

 4   studies had improvement in behavioral therapy and

 5   maintaining MAT throughout their pregnancy.

 6       Q.  Is there a program that has been implemented

 7   that has published research that shows a significant

 8   increase in the percentage of women in MAT programs?

 9       A.  I -- the OPQC data from the first MOM part

10   has not been published yet.

11       Q.  Do you -- can you disclose how much you think

12   that that MOM program has increased the access to

13   MAT?

14       A.  It is actually on the internet, so I'd have

15   to look it up, the website; but, yes, it is available.

16       Q.  Are you aware of any other published research

17   on this issue?

18       A.  No.

19       Q.  Or publicly available research on this

20   issue?

21       A.  Just that program.

22       Q.  O says:  The effective long-term care of

23   children and families impacted by opioids will require

24   programs that provide family centered care, such as

25   residential care for pregnant and postpartum women

Highly Confidential - Subject to Further Confidentiality Review

 1    with opioid use disorder, comprehensive pediatric

 2    care, such as regular preventative care for children;

 3    and developmental follow-up programs for children,

 4    which may include regular developmental screening,

 5    occupational therapy and physical therapy.

 6            In terms of specifically what is currently

 7    going on in Cuyahoga and Summit County with regard to

 8    these types of programs, can you give us that level of

 9    detail?

10        A.  So in Summit County, they have a family

11    centered care approach and a centering approach that

12    they're using for their mothers.

13            As far as following up a specialized NAS

14    clinic, I'm not aware that they have that yet.

15            In Cuyahoga County, they are doing the family

16    centered care also.  They were the urban arm of our

17    MOM One study.  And they are also not involved in the

18    developmental screening of NAS, but have applied for

19    the HEAL grant through NIH to look at that program.

20        Q.  What is the HEAL grant?

21        A.  That was what we mentioned earlier with the

22    NIH supported grant to look at MRIs and developmental

23    outcomes of infants who are opioid exposed.

24        Q.  So it says here "residential care for

25    pregnant and postpartum women," and it talks about

1    various other types of care that could be provided.

2         Do you know who, other than the county, each

3    county would need to participate to make this all

4    happen?

5         A.  So I know that we are utilizing that in our

6    region and has shown improvement; so that's where we

7    are at with the MOMS Plus program.  We are trying to

8    figure out which programs can be implemented in each

9    region.

10        Q.  So my question was inartful:  To implement

11   the changes that you are talking about in O or the

12   long-term care plan in subsection O on page 6, who

13   would need to participate other than the counties

14   themselves?

15        A.  They would need the hospital involvement and

16   the physician involvement.

17        Q.  Anything else?

18        A.  Besides physician and hospital and OT and PT

19   and screening programs, that would fall under the --

20   like our NAS high-risk clinic.

21        Q.  Do you know what standards are already in

22   place for occupational therapy or physical therapy to

23   help children with any of these developmental issues

24   specifically in the context of opioid use?

25        A.  Just when there is a need for referral is

```
 1   when they become involved.

 2        Q.   So you don't know if they have any protocols

 3   specific for this type of issue?

 4        A.   No.

 5        Q.   Okay.  But all of this stuff about long-term

 6   care of children in this context, is that all based

 7   upon specifically the idea of the -- or mitigating the

 8   potential long-term effects that we have been talking

 9   about with prior articles, or is this effective

10   long-term care of children for the panoply of reasons

11   why some child might have additional social services

12   needed --

13        A.   So we know that --

14        Q.   -- in this context?

15             MS. KEARSE:  Object to form.

16        A.   So we know that early invention does help no

17   matter what the etiology of the deficit is.  And so

18   knowing that this population is at a higher risk for

19   any of these issues, we know that early intervention

20   would help.

21        Q.   So in layman's terms, what that means is that

22   even if there is not a causal relationship between

23   opioid use in utero and long-term effects, these are

24   good suggestions anyway for a population at high risk

25   for developmental delays and additional needs?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KEARSE:  Object to form.

 2       A.  I wouldn't agree with your first part of that

 3  statement; but I would agree that the second part of

 4  the statement is correct.

 5       Q.  So the long-term care stuff that is in place

 6  is because this is kind of a high-risk, high-need

 7  population even if it weren't for opioid use

 8  in utero

 9              MS. KEARSE:  Object to form.

10       A.  That's known because we wouldn't know what

11  this population would look like if they didn't have

12  opioid exposure.

13       Q.  So it's -- is it good to be able to identify

14  this as a high-risk population because of continuing

15  maternal use or the other sort of socioeconomic

16  factors?

17       A.  It's good because we know that we are

18  starting to develop information that opioid use is

19  associated with these longer term problems.

20       Q.  Okay.  P says:  It is my opinion that an

21  optimal maternal care program -- and is that all of

22  what this is directed at, is getting an optimal

23  maternal care program?

24       A.  That's the goal, I think, of everybody,

25  yes.
```

1      Q.  -- would allow women with opioid use

2  disorders to be identified during pregnancy and

3  subsequently provided with prenatal care and other

4  supportive services.

5           The program would provide for the development

6  of an individualized treatment care plan for both

7  mother and baby, as well as a discharge plan with home

8  visitation, early intervention services and referrals

9  to other supportive services.

10           The reference here to "individualized

11  treatment care plan," obviously, you haven't written

12  up what the algorithm would be or the guidelines would

13  be for determining individual treatment care plans for

14  mothers and babies in these situations, correct?

15      A.  Correct.

16      Q.  And this optimal maternal care program that

17  you are talking about is not currently standard of

18  care in Cuyahoga and Summit County, correct?

19      A.  We are doing a lot of these things as part of

20  the MOMS Plus project.  All is -- all of them is not

21  currently being done, but I think they are definitely

22  doing some of them.  And so the optimal is to

23  incorporate all of them.

24      Q.  And is some of this stuff that would be part

25  of just the general transition over time to better

1    social services and better maternal care even if it

2    weren't focused on an opioid use population?

3            MS. KEARSE:  Object to form.

4        A.  If it wasn't associated with an opioid use?

5        Q.  Yes, sir.

6        A.  Then I don't think they would need all of

7    these plans.

8        Q.  Is some portion of what you are recommending

9    just improving general maternal and fetal outcomes in

10   children even without any possible impact of the

11   opioid use in utero?

12       A.  We wouldn't need early intervention services,

13   we wouldn't need a lot of this if they didn't have any

14   opioid use.  So, you can do it and it may change, but

15   it probably wouldn't have any changes if there wasn't

16   a need for it.

17       Q.  Okay.  This continues:  Care would be

18   coordinated through an interdisciplinary team that may

19   include specialists in perinatology, neonatology,

20   addiction medicine, psychiatry, social work, case

21   management, and nutrition.

22           Referrals to the program would come from

23   throughout the community, including emergency

24   departments, obstetric triage, women's healthcare

25   centers, family medicine providers, addiction medicine

```
 1    providers, community drug treatment centers and

 2    hospitals.

 3          Down here with the program that you have, is

 4    that where you get voluntary referrals from the

 5    community, from all of those sources?

 6          A.  We do receive referrals from those listed

 7    here, yes.

 8          Q.  Okay.  And is any of the suggestion about how

 9    you should get referrals specific to Cuyahoga or

10    Summit County or is this --

11          A.  This would be statewide.

12          Q.  Okay.  And would you need to get these

13    various entities, triage, women's healthcare, family

14    medicine, etcetera, to buy in upfront to participate

15    in an interdisciplinary team like this?

16          A.  I think majority of them are probably already

17    doing some aspects of it, just not all.

18          Q.  The specialists that are listed here,

19    perinatology, neonatology, addiction medicine,

20    psychiatry, social work, case management, nutrition,

21    are you an expert in any of those?

22          A.  I don't have pediatrics on there, you are

23    correct.  I didn't -- I assumed I was writing this and

24    it would be understood that I was part of this

25    program.  So I did leave out the word "pediatrics."
```

1    Q.  But the ones you've listed here in the bottom

2    of page 6, in paragraph P, these areas of expertise

3    are not areas that you have expertise in?

4    A.  No, but they are part of our collaboration.

5    Q.  Okay.  Maybe I can do it this way.  The next

6    section that talks about opioid use in the United

7    States and Ohio, do you know any specific factors of

8    what drove any of the opioid epidemic in Cuyahoga or

9    Summit County beyond general observations about what

10   often applies?

11        MS. KEARSE:  Object to form.

12   A.  I only have the statewide data on the

13   increased numbers of deaths and the number of

14   unintentional overdose deaths by Ohio, not by

15   county.

16   Q.  If you look through the various charts that

17   you have on page 8 and 9, you'll see that the number

18   of deaths -- I mean, these are all death focused --

19   but the deaths from opioids and various, whether

20   prescription or illicit, was climbing for a number of

21   years, at least for the period of time for these

22   charts.

23        Do you see that?

24   A.  Yes.

25   Q.  So when were the -- when was the increase in

Highly Confidential - Subject to Further Confidentiality Review

```
 1   death notable in Ohio according to these charts?  Was

 2   it back in the mid-2000s?  Was it by 2010?

 3          When was it apparent that there was an

 4   increase in total opioid, if you lump them all

 5   together, deaths in Ohio?

 6      A.  I mean, any death is notable, so I don't know

 7   what you mean by when it was noticed.

 8      Q.  Well, I mean, I mean for you, you said in the

 9   early parts of this decade is when you started

10   noticing an issue and you started focusing on

11   additional research and statewide coordination to

12   address what you saw would be a rising incidence of

13   NAS and increasing issues of maternal opioid abuse,

14   correct?

15      A.  So, yeah.  There has been a slow steady gain,

16   and then there was a sharp peak in around 2010.

17      Q.  So by around that time, based upon deaths and

18   other indicia of increasing opioid use, including in

19   women who ultimately got pregnant, it was all apparent

20   around the state by no later than 2010?

21          MS. KEARSE:  Object to form.

22      A.  It is when we started addressing it.  It

23   doesn't mean it wasn't notable.

24      Q.  I'm sorry?  It was when you started

25   addressing it?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Meaning we had -- funded research started

 2   coming, started discussion at that point, knowing that

 3   it takes a couple of years to get the funding in

 4   process.  That's why the projects never started in

 5   2012 when we had our founding started.

 6        Q.   Okay.

 7        A.   It doesn't mean that we weren't addressing it

 8   prior.

 9        Q.   And so when was it that people like you first

10   started noticing this was a problem and thinking about

11   fixing it?  Before 2010?

12             MS. KEARSE:  Object to form.

13        A.   Our data goes back to 2009, so I think that

14   is when we really started making a concerted effort to

15   start tracking it at the -- at our individual

16   hospitals locally.

17        Q.   And working towards --

18        A.   Improvement.

19        Q.   -- improvement?

20             Okay.  And why don't you go forward in this

21   to -- paragraph 26 is -- it says:  Increases in opioid

22   use among pregnant women includes increases in the use

23   of prescription opioids, medication assisted

24   treatment, increases in illicit drug use.

25             And it says:  Studies have shown substance
```

```
 1    use during pregnancy to be a ubiquitous problem

 2    affecting women across racial, socioeconomic status

 3    and age categories.

 4          Do you see that?

 5    A.  I do see that.

 6    Q.  What we have seen from all of your studies

 7    and everything we looked at, is that it's

 8    predominately and more likely among the poorest part

 9    of the society and most likely essentially in poor

10    Caucasians, non-Hispanic Caucasians in particular?

11          MS. KEARSE:  Object to form.

12    A.  That's what we are seeing in our state.

13    Q.  Is there some reason that you didn't put that

14    in this report?

15    A.  No.

16    Q.  Go to paragraph 28, please.

17          This is talking about risks of use by

18    pregnant woman.

19          So you, obviously, don't recommend withdrawal

20    during pregnancy, correct?

21    A.  Correct.

22    Q.  And then it says:  Other risks to the baby

23    include... is that a reference to withdrawal or just

24    use in pregnancy?

25    A.  Detoxification.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1      Q.  Okay.  And then this next sentence is what

2  leads to the cite for Baldacchino that we have talked

3  about at length, correct?  About what you say

4  long-term studies have shown?

5      A.  That is correct, and it is stated in his

6  erratum correctly.

7      Q.  And it says:  The mother may also be at risk

8  -- increased risk of HIV, HBV, HCV, malnutrition and

9  dangers associated with drug seeking behavior.

10         Have you seen an increase of HIV in your

11  patient population?

12      A.  So that is in referral to detoxification.  So

13  in our mothers for infants, we are seeing in Hamilton

14  County an increased rate of HIV in our region;

15  however, I don't know the breakdown of -- if it's

16  affected pregnant women yet.

17      Q.  And so HBV is hepatitis B?

18      A.  Correct.

19      Q.  And HCV is hepatitis C, and we've talked

20  about that, correct?

21      A.  We have.

22      Q.  Okay.  The issue of malnutrition in mothers,

23  is that tracked at all in any of your work in terms of

24  whether the women who are pregnant and abusing opioids

25  or are on medication-assisted treatment also tend to
```

Highly Confidential - Subject to Further Confidentiality Review

1    have malnutrition or other things during pregnancy

2    that can affect pregnancy outcomes?

3        A.  So that's with -- detoxification is what that

4    risk is referring to.

5        Q.  So do you see that in women who are not

6    undergoing detoxification but are actively using

7    during pregnancy?

8        A.  I -- we don't measure for that.

9        Q.  Do you see it?

10       A.  Not usually.

11       Q.  What about in -- what about tracking like the

12   number of prenatal visits during pregnancy, if that's

13   different depending on whether somebody is actively

14   abusing illicit drugs, under drug medication-assisted

15   treatment, or receiving another type of opioid

16   prescription from a doctor and using it legally?

17       A.  Can you repeat that?  I dozed.

18       Q.  Yeah.  I won't take it personally.

19           So is there an association between the number

20   of prenatal visits that a mother has and the health

21   outcomes of the pregnancy?

22       A.  We looked at that in our first paper.

23       Q.  And do you see a difference of prenatal

24   visits depending on whether the patient is using a

25   prescription opioid under the care of a doctor for

1    something like pain, getting medication-assisted

2    treatment, or actively using illicit drugs?

3        A.  The only information I know we have from our

4    MOMS Plus -- MOMS project was that being in a MAT

5    program, in one of our focus MAT programs, improved

6    the number of prenatal visits.

7        Q.  Let's go to paragraph 30.  It talks about --

8    this is one of the places the ACOG statement is here.

9            And then I'm probably going to lateral to

10   another questioner in a second.

11           Paragraph 30 talks about the ACOG statement

12   that we went over, which is Exhibit 7 or 8, I think.

13       A.  It is Number 7.

14       Q.  Your statement here on top of page 13 is:

15   The Committee's opinion is that the current standard

16   of care for pregnant women with opioid dependence is

17   referral for medication-assisted therapy with

18   methadone, but emerging evidence suggests that

19   buprenorphine also should be reconsidered.

20           Is there -- and then you can see it goes down

21   -- later in this, there is another reference to this

22   particular ACOG statement.

23           Is there anywhere in your report where you

24   raise disagreements that you have with the ACOG

25   statement relating to how they address long-term

Highly Confidential - Subject to Further Confidentiality Review

```
1    consequences of maternal use of opioids while

2    pregnant?

3         A.  I did not address my long -- concerns with

4    the long-term outcomes with ACOG.

5         Q.  Again like I said, another questioner is

6    going to ask some additional questions, but go to go

7    to paragraph 44, and there is a chart right after on

8    page 18, please, sir.

9         Do you see that the NAS rate in Summit County

10   is now about twice what it is in Cuyahoga County?

11        A.  I do.

12        Q.  Do you know why that is?

13        A.  We know that NAS is higher in rural areas

14   than urban.

15        Q.  Anything else?

16        A.  No, I do not know why else.

17        Q.  Are there other rates in other parts of Ohio

18   that are higher than 13.6 percent for Summit County?

19        A.  Yes.

20        Q.  Are those more rural areas?

21        A.  Yes.

22        Q.  Do you know anything about the nature of the

23   illegal drug trade in Cuyahoga County that might make

24   it that there is either less medically-assisted

25   treatment or more illicit drug use in pregnant
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   women?

 2       A.  I wouldn't know about the illegal drug

 3   trade.

 4       Q.  Do you know anything about the rates of

 5   medically -- MAT in Summit County and what drives

 6   that?

 7       A.  I do not know the rate of MAT in Summit

 8   County.

 9       Q.  Go to page 21, please.  You're talking about

10   the MOMS initiative and the MOMS Plus initiative.

11           Do you see those?

12       A.  Number 56?

13       Q.  Yes, sir.  That whole section, 56 through 60.

14           And Cuyahoga and Summit are participating in

15   MOMS Plus?

16       A.  Correct.

17       Q.  When did that start?

18       A.  So MOMS first project started in 2014 to

19   2016, and then it expanded -- we had one year off, and

20   then picked it back up in 2018 for the MOMS Plus

21   project.

22       Q.  And do you think that the MOMS Plus project

23   is helping even more than the MOMS project did?

24       A.  We are still collecting data, so it is -- I

25   can't answer that at this time.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.  Do you think the MOMS project was helpful?

2        A.  Yes.

3        Q.  Do you think it should have been initiated

4   earlier?

5        A.  We wouldn't have known which -- if it worked

6   without doing a pilot study and collecting data to

7   know which is the best program, or if any program was

8   better than the other.  So, I think that we need to

9   this as step-wide approach and find out what is the

10  best way to tackle the problem.

11       Q.  Where does the money for the MOMS Plus

12  program come from?

13       A.   I think that is through Department of

14  Medicaid, but I do not know for sure.

15           I know our OPQC funding was through them, but

16  I think -- I would have to look at the website to see

17  who is funding them.

18       Q.  What about the MOM program?

19       A.  That was through Ohio Department of Addiction

20  Medicine, I think, ODAM.

21       Q.  Are you aware of any of the programs that are

22  going on now in Cuyahoga or Summit County that relate

23  to the subjects that we have here, these kind of

24  recommendations that we have gone over in terms of

25  broad categories where Cuyahoga County or Summit
```

Highly Confidential - Subject to Further Confidentiality Review

1   County are actually paying for them with their own

2   money?

3        MS. KEARSE:  Object to form.

4   A.  I don't know how the funding is happening.

5   Q.  But the ones that you know about all involve

6   funding from other sources, not the counties

7   themselves, right?

8   A.  The funding, a lot of it is mostly for the

9   research component.  So the actual programs themselves

10  don't see any of the funding usually.  It is more for

11  the faculty doing the research component and data

12  collection is where that funding is going to.

13  Q.  Okay.  So as you sit here today, can you

14  offer testimony under oath that, in fact, Cuyahoga

15  County or Summit County are currently expending any of

16  their own money to do any of the programs that they

17  have in these areas?

18       MS. KEARSE:  Object.

19  A.  I would not know their budget.

20       MR. ALEXANDER:  Why don't we do a little

21  pause while we change the questioner, and then

22  depending on the questions from plaintiffs' counsel,

23  there may be some follow-up.

24       MS. KEARSE:  I think we need to see how many

25  minutes left to whoever is --

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE VIDEOGRAPHER:  You've got ten minutes.

 2              MR. ALEXANDER:  Why don't we go off the

 3    record to do the switch.

 4              THE VIDEOGRAPHER:  We are now going off

 5    record.  The time is 6:27.

 6              (There was a brief recess.)

 7              THE VIDEOGRAPHER:  We are now back on record.

 8    The time is 6:28.

 9                    EXAMINATION

10    BY MS. BARBER:

11       Q.  Good afternoon, Dr. Wexelblatt.  My name is

12    Maureen Barber.  I just have a few questions to ask of

13    you.

14              Do you personally prescribe opioids for

15    pain?

16              MS. KEARSE:  Objection.

17       A.  For pain outside of withdrawal for newborns?

18       Q.  Yes.  Do you prescribe any opioids for pain

19    outside of the MAT opioids that you prescribe?

20       A.  I don't prescribe MAT and I don't prescribe

21    opioids outside of the hospital.

22       Q.  Do any of the 69 pediatricians that you

23    supervise prescribe opioids for anything other than

24    the infants that you -- other -- for pain?

25       A.  I don't know if some -- some of our
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   pediatricians do work in general pediatric clinics, so

 2   I couldn't answer for them.

 3       Q.  Are -- you're familiar with a Dr. Stephen W.

 4   Patrick?

 5       A.  I am.

 6       Q.  You've cited to his work in your report?

 7       A.  I have.

 8       Q.  And you've relied on his work in support of

 9   your report that you have prepared in relation to this

10   litigation?

11       A.  I have cited his papers, correct.

12       Q.  And you -- you trust his work?

13           MS. KEARSE:  Object to form.

14       A.  Yes.

15       Q.  And you believe it's accurate?

16       A.  Yes.

17       Q.  You would consider him an expert in the

18   neonatal abstinence research, wouldn't you?

19       A.  I would.

20       Q.  Dr. Wexelblatt, all of the opinions that you

21   plan to offer at trial are contained in your March 25,

22   2019 expert report; isn't that correct?

23       A.  Yes, it is.

24       Q.  You don't intend to offer any opinion at

25   trial that is not contained in that report, do you?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.  Besides stuff that has come up during this

 2   deposition.

 3        Q.  The -- any additional opinions that you have

 4   provided during this deposition that are not in your

 5   report, you don't intend to offer those opinions at

 6   trial, do you?

 7             MS. KEARSE:  Object to form.

 8             Can you -- I think the record speaks for

 9   itself.

10        Q.  If you change any of your opinions or intend

11   to offer opinions at trial that are not contained in

12   your March 25, 2019 report, then you will amend your

13   report or supplement the report; isn't that correct?

14             MS. KEARSE:  Object to form.

15        A.  I think so, yes.  I don't know the

16   protocol.

17             MS. BARBER:  I don't have any further

18   questions.

19             MS. KEARSE:  Why don't we take a break?

20             Are you passing the witness?

21             MR. ALEXANDER:  Yeah.  I don't think we get

22   to hand back.

23             MS. KEARSE:  No.  No.  I'm just saying is

24   there anyone else?

25             MR. ALEXANDER:  I would say:  Why don't we
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    start -- we're all here.  I mean, why should we take

 2    another break?

 3            MS. KEARSE:  Because, Counsel, I'm going to

 4    take a break.

 5            If you're now done with the witness, I'm

 6    going to take a break.

 7            MR. ALEXANDER:  Is it going to be another

 8    half an hour break or just a short break?

 9            MS. KEARSE:  You know, I actually don't know.

10    So I'll let you know as soon as I come back.

11            I think I'm --

12            MR. ALEXANDER:  I mean, just once we pass the

13    witness, I don't think you're allowed to talk to him

14    before you ask your questions.  I don't think the

15    protocol allows that.

16            MS. KEARSE:  Can we go off the record,

17    please.

18            THE VIDEOGRAPHER:  Do you agree to go off the

19    record?

20            MR. ALEXANDER:  If you want to take a break,

21    that's fine.

22            MS. KEARSE:  Yeah.

23            THE VIDEOGRAPHER:  We are now going off

24    record.  The time is 6:32.

25            (Recess taken.)
```

```
 1              THE VIDEOGRAPHER:  We are now back on record,

 2    and the time is 6:54.

 3                        EXAMINATION

 4    BY MS. KEARSE:

 5        Q.  Good evening, Dr. Wexelblatt.  Thank you for

 6    the time that you have put in so for today.  I just

 7    have a couple of things I want to go over and make

 8    some clarifications for the record.

 9              And for -- your CV that I think is Exhibit

10    No. 3, that lists your education, your academic

11    appointments and your training and education?

12        A.  Yes.

13        Q.  Okay.  And you are board certified?

14        A.  I am.

15        Q.  And what are you board certified in?

16        A.  Pediatrics.

17        Q.  And you've published articles on your

18    research in peer-reviewed literature related to opioid

19    abuse?

20        A.  I have.  Sure.

21              MR. ALEXANDER:  Objection.  This is all

22    leading, but go ahead.

23              MS. KEARSE:  I'm just trying to speed it up.

24    I can take more time if you need.

25              MR. ALEXANDER:  It has nothing to do what I
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   need.

 2       Q.  Have you published in the literature about

 3   opioid use in women of childbearing age?

 4       A.  Yes.

 5       Q.  Okay.  And that's reflected in your CV?

 6       A.  It is.

 7       Q.  Okay.  And you've reviewed other research in

 8   regard to those same issues?

 9           MR. ALEXANDER:  Same objection.

10       A.  Yes.

11       Q.  Do you speak and present at medical

12   conferences?

13       A.  I have.

14       Q.  And do you present on opioid exposure

15   in utero

16       A.  I do.

17       Q.  And would you consider yourself an expert in

18   maternal-fetal issues, including those related to

19   opioid exposure?

20       A.  I would.

21       Q.  Okay.  And those are the things that you have

22   testified about today?

23       A.  Yes.

24       Q.  Doctor, you testified and mentioned several

25   times today about the OPQC.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Can you tell the jury what -- what is the
 2    OPQC?
 3         A.  So, the -- specific to the NAS project, it is
 4    a group of 52 hospitals that is working on quality
 5    improvement to opioid exposed infants.
 6         Q.  And what does OPQC stand for?
 7         A.  Ohio Perinatal Quality Collaborative.
 8         Q.  And does that collaborative include
 9    specialists from all over the state?
10         A.  It does.
11         Q.  And as part of your work and research, did
12    the OPQC make recommendations for treatment of NAS?
13         A.  It has.
14         Q.  Did they issue a protocol?
15         A.  We have.
16         Q.  And what was your role in the protocol?
17         A.  I was one of the lead authors in
18    implementation of the -- and development of the
19    protocol.
20         Q.  Doctor, I'm going to hand you what's been
21    marked as Exhibit Number 9.
22              Can you identify what I've just handed you as
23    Plaintiff's Exhibit No. 9?
24              (AmerisourceBergen-Wexelblatt-009 marked for
25    identification.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. ALEXANDER:  Do you have a copy, Counsel?

 2              MS. KEARSE:  Yes, I do.

 3              THE WITNESS:  It's --

 4              MS. KEARSE:  And this was attached to his

 5    report, so I believe you should have a copy of it as

 6    well.

 7              MR. ALEXANDER:  Thanks.

 8         Q.  And what is Exhibit No. 9?

 9         A.  This is our updated protocol to -- on how to

10    treat infants with NAS -- or with opioid exposure.

11         Q.  And can you just briefly for the -- for the

12    jury describe what the protocol is and why it is

13    important to have a protocol treatment of NAS.

14              MR. ALEXANDER:  Objection.  Compound.

15         A.  We have found that following a standardized

16    protocol has shown improvement of care for infants

17    with NAS.

18              And then this updated protocol was based on

19    further testing and information that we gathered

20    throughout our studying of this population.

21         Q.  And how long have you been involved with the

22    Ohio Perinatal Quality Collaborative?

23         A.  That started in 2014 after the OCHA project

24    ended.

25         Q.  And have you published on the research and
```

```
 1   studies by the OPQC?

 2       A.  Yes.

 3       Q.  And are those some of the publications you

 4   have either discussed today or referred to today in

 5   your testimony?

 6       A.  We have discussed it.

 7       Q.  Dr. Wexelblatt, we also discussed a lot today

 8   about different programs that could be implemented in

 9   order to improve public heath outcomes.

10           Do you recall that?

11       A.  I do.

12       Q.  Would it be fair to say that the opioid

13   epidemic is driving the need for programs you have

14   identified in your report?

15           MR. ALEXANDER:  Objection to form.

16       A.  Yes.

17       Q.  Doctor, you referred to the mother-child dyad

18   several times today.

19           Do you recall that?

20       A.  I do.

21       Q.  Can you describe -- what do you mean by the

22   "mother-child dyad"?

23       A.  So you have to look at them -- the mother and

24   the infant together.  So even though I'm a

25   pediatrician, I work directly with the mother.
```

1          And so do the obstetricians, they're working

2   with the mother to produce a healthy infant.  So when

3   we work together on this, you can't just focus and

4   silo only on one of them, you have to include both.

5      Q.  And in your testimony today, is it fair to

6   say that the opioid exposures have had the greatest

7   impact on the issues that you think are most pressing

8   for the mother-child dyad?

9          MR. ALEXANDER:  Objection to form.

10      A.  Yes.

11      Q.  Doctor, early on, there was some discussion

12   about off-label prescribing.

13          Do you recall that?

14      A.  I do.

15      Q.  Is it fair to say that off-label prescribing

16   is more common among populations that are frequently

17   excluded from clinical trials?

18          MR. ALEXANDER:  Objection to form.

19      A.  Yes.

20      Q.  What are some of the populations that would

21   be excluded from clinical trials?

22      A.  Incarcerated individuals, pregnant women

23   usually, and newborns.

24      Q.  And why is that?

25      A.  It is very hard -- to get FDA regulation, you

Highly Confidential - Subject to Further Confidentiality Review

```
 1    need to have vigorous double-blinded placebo trials.

 2    And that is very hard in pregnant and neonates to get

 3    large enough sample sizes to develop that.

 4           And especially in certain populations where

 5    doing a blinded nontreatment could be dangerous to the

 6    infant or newborn.

 7           And when it comes to incarcerated

 8    individuals, it is more that it's a coercion to sign

 9    up for a study to lead -- to consent to a study

10    without coercion being involved.  That also makes it

11    hard when you are talking about people with substance

12    use disorder also, which fall into that category.

13           (AmerisourceBergen-Wexelblatt-0010 was marked

14    for identification.)

15      Q.  I'm going to show you a document.  I'm just

16    marking it for the record and then I'll pass it to you

17    to see.  I, apparently, only have one copy, but I'll

18    lay the foundation and you can review it.

19           Doctor, earlier today, you were asked

20    questions and referred to a paper by Dr. Patrick

21    regarding the administrative data for neonatal

22    abstinence syndrome.

23           Do you recall that?

24      A.  I do.

25      Q.  I'm marking what is Exhibit No. 10, and I'd
```

1    just ask you:  Is that the article that you were

2    referring to?

3        A.  It is.

4            MS. KEARSE:  Counsel, if you would like to

5    take a look.  I'm really just marking that for the

6    record.

7        Q.  Is that an article that you rely on in your

8    opinions that you have given today?

9        A.  I have.

10       Q.  Okay.  Doctor, you were also asked about an

11   article and a citation -- an article by

12   Dr. Baldacchino.

13           Is that how you pronounce it?

14       A.  As far as I know.

15       Q.  And is it fair to say that sometimes there is

16   articles that are published that must be corrected

17   later?

18       A.  That is true.

19       Q.  And if the article is republished, there may

20   be a new citation?

21       A.  That is correct.

22       Q.  If the article has simply been corrected, it

23   may not be -- and not republished, a citation might

24   simply provide the same publication details as

25   before?

```
 1        A.   That's correct.

 2        Q.   I'm handing you what I'm going to mark as

 3   Exhibit No. 11.

 4             (AmerisourceBergen-Wexelblatt-0011 was marked

 5   for identification.)

 6        Q.   Doctor, if you can pull out Exhibit No. 6.

 7        A.   Yes.

 8        Q.   Is Exhibit No. 6 an article that

 9   Mr. Alexander showed you earlier that I laid out some

10   objections regarding whether or not there was a

11   current version of the article?

12             Do you recall that?

13        A.   I do recall that.

14        Q.   Okay.  What is -- and for the record, Exhibit

15   No. 6 is the Baldacchino article entitled

16   "Neurobehavioral consequences of chronic inuterine

17   [sic] opioid exposure to infants and preschool

18   children: a systematic review and meta-analysis."

19             And this is a paper that you cite in your

20   report; is that correct?

21        A.   That is correct.

22        Q.   Okay.  Can you tell jury what Exhibit 11

23   is?

24        A.   So this was the corrected and the reference

25   that we were referring to that showed that the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   meta-analysis did show significant changes --

 2   statistically significant changes -- with long-term

 3   chronic exposure.

 4       Q.  And does it -- the title of this paper say:

 5   Erratum:  Neurobehavioral consequences of chronic

 6   inuterine [sic] opioid exposure in infants and

 7   preschool children:  a systematic review and

 8   meta-analysis?

 9       A.  It is that.

10       Q.  And is this the correct version of the paper

11   that you were relying on in regard to your opinions

12   offered in this litigation?

13           MR. ALEXANDER:  Objection to form.

14       A.  It is.

15       Q.  And on the front page of the paper, it

16   actually talks about the correction?

17       A.  It does.

18       Q.  All right.  And can you tell us specifically

19   what was corrected in the paper in regards to the

20   various tables?

21       A.  Actually, all of the data.

22       Q.  Can you be more specific?

23       A.  Yeah.  So it states that:  The new conclusion

24   of the paper show significant impairments, at a

25   significant level of a P less than point -- 0.05 for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    cognitive, psychomotor and observed behavioral

 2    outcomes for chronic intrauterine opioid exposed

 3    infants and/or preschool children compared to

 4    nonopioid infants and children.  This is in contrast

 5    to a nonsignificant trend to poorer outcomes published

 6    -- reported previously.

 7         Q.  And this is the article that counsel refused

 8    to show you during your direct examination; is that

 9    correct?

10         MR. ALEXANDER:  Objection to form.

11    Mischaracterizes.

12         A.  Yes.

13         MS. KEARSE:  No further questions.

14                   RE-EXAMINATION

15    BY MR. ALEXANDER:

16         Q.  Some quick follow-up.

17         Dr. Wexelblatt, earlier you were asked some

18    questions about off-label use and how it relates to

19    clinical trials.

20         Do you remember those questions from

21    plaintiffs' counsel, from like four minutes ago?

22         A.  From plaintiff, yes.

23         Q.  Plaintiffs' counsel over there.

24         A.  Okay.

25         Q.  Do you hold yourself out as an expert in
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   anything relating to FDA approval of drugs, the FDA

2   process for clinical trials relating to drugs, any

3   specific FDA issues?

4       A.  I have been associated and part of some stuff

5   of that nature, so I have an understanding.

6       Q.  So do you hold yourself out in the community

7   as somebody who can provide expert opinions about how

8   to comply with FDA regulations relating to clinical

9   trials?

10      A.  No.  We have a lawyer in our division who

11  does that.

12      Q.  Have you done any kind of study or research

13  here about what the off-label approval practices are

14  with regard to drug indications for studies, clinical

15  studies, to figure out when and under what

16  circumstances FDA does approve special population

17  studies?

18      A.  What was first part of that question?

19      Q.  Have you done a study for the purposes of

20  this case?

21      A.  I have not done a study.

22      Q.  So like -- I mean, there are clinical studies

23  and there are drugs that are approved based on them

24  that are specifically in infants, right?

25      A.  I'm sure there are, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.  And there are definitely pediatric studies,

2   right?

3        A.  Yes.

4        Q.  So, I mean -- go back for a second on the

5   Baldacchino paper.

6            The citation here is not to the paper, the

7   citation included here is a different citation to an

8   erratum, correct?

9            That's what this thing is called, correct,

10  erratum?

11       A.  This is an erratum.  Correct.

12       Q.  It's the -- a fancy Latin word for the single

13  version of error, right?

14       A.  Correct.

15       Q.  So at some point after the original paper was

16  published and went through the peer-reviewed process,

17  somebody figured out that they did their calculations

18  wrong and they published a separate document that is

19  basically four pages long, saying all of what we said

20  before, we want to change because we realized we ran

21  our numbers wrong, essentially --

22       A.  Correct.

23       Q.  -- right?

24       A.  Correct.

25       Q.  Okay.  Did you cite this erratum in your
```

1    report?

2        A.   That is -- the version that I was citing was

3    the erratum version.

4        Q.   So you meant to cite the erratum, but you

5    cited the original paper?

6        A.   So I cited the original paper with the

7    erratum.  I think the way I was able to access it

8    through PubMed, it -- it has this as part of the

9    original attached to it now.

10       Q.   Okay.  So just in terms of the sequence of

11   this, this erratum came out in what year?

12       A.   2015.

13       Q.   So the original paper was published in '14.

14   We went over that.  The erratum came out in 2015.  And

15   then we saw the work that went on in 2016 and 2017,

16   resulting in the ACOG paper published in 2017, which

17   we marked as an exhibit and discussed at length,

18   correct?

19       A.   That sounds correct.

20       Q.   So this erratum about this meta-analysis and

21   its results was before ACOG said that there wasn't

22   essentially convincing evidence of long-term

23   behavioral consequences from neonatal abstinence

24   syndrome, right?

25            MS. KEARSE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.  I can't speak to why the authors didn't

 2   include this.

 3        Q.  I didn't ask you that.

 4        I said the time sequence is that:  This

 5   erratum was published about two years before the ACOG

 6   document said what it said that we went over

 7   earlier?

 8        A.  That is correct.

 9        Q.  And the gist of what ACOG had said,

10   regardless of why those experts for ACOG and SAMHSA

11   said what they said or what they reviewed, was

12   essentially they didn't find convincing evidence of

13   long-term behavioral or social effects associated with

14   NAS, correct?

15        A.  You included SAMHSA into that question, and I

16   don't agree.

17        Q.  I'm sorry.  I misspoke.  ASAM.  This is a

18   joint paper.  I'm sorry.  I didn't meant to interrupt

19   you.

20        A.  So I was just correcting that SAMHSA does not

21   have that statement.

22        Q.  So the statement that we went over we've been

23   calling the ACOG Committee Opinion is actually a joint

24   statement of the American College of Obstetricians and

25   Gynecologists, and a separate medical association
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    called the American Society of Addiction Medicine,

 2    correct?

 3         A.  Yes.  Those are the two adult components of

 4    that.

 5         Q.  Okay.  As we said, you're not a member of

 6    either of those organizations, correct?

 7         A.  You are correct.

 8         Q.  And collectively, these deal on kind of both

 9    ends.  They deal with the prescription and use of

10    opioids and they deal with issues relating to women of

11    childbearing age, including the consequences of

12    exposures during pregnancy, correct?

13         A.  They do deal with that.

14         Q.  Okay.  And so the statement that they -- they

15    had that we talked about is that basically studies

16    haven't they found significant differences in

17    cognitive development between children up to five

18    years of age, right?

19         A.  For the most -- they say:  For the most part,

20    studies have not found significant differences of

21    cognitive development.

22         Q.  And what they're talking about essentially

23    the way these things are written, there is a thing,

24    it's important to match for age, race and

25    socioeconomic status, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.  They say that is the major challenge when you

 2  are doing this literature search, yes.

 3      Q.  Okay.  All right.  So is there any portion of

 4  the testimony, other than relating to what you think

 5  the actual words are of the Baldacchino paper as

 6  amended by the erratum, that you gave on my

 7  questioning earlier today that you need to change or

 8  amend in any way?

 9      A.  Outside of that paper, I don't think there is

10  anything.

11          MR. ALEXANDER:  Well, those are all of the

12  questions that I have for you.

13          I would state for the record that I think it

14  is apparent that there are some potential

15  supplementation and data issues, depending on what

16  comes out in the future, and that we have discussed on

17  specific studies relating to the testimony here today,

18  but we will explore that outside of the deposition and

19  don't need to do any of it on the record.

20                      RE-EXAMINATION

21  BY MS. KEARSE:

22      Q.  I just have one follow-up question in regard

23  to the -- what was just asked about.

24          When you look at the ACOG -- when you look at

25  the paragraph that Counsel keeps referring you to and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   you go to the cited sources, is it fair that they're

 2   citing to sources from 1984 and in regard to what they

 3   looked at to make their statement about the long-term

 4   infant outcomes?

 5          MR. ALEXANDER:  Objection.  Asked and

 6   answered.

 7       A.  That is correct.

 8       Q.  So it's clear they didn't take into a -- they

 9   did not cite to -- to the papers that you've cited for

10   your opinions in regard to that very same issues; is

11   that fair?

12       A.  I agree with that statement.

13          MS. KEARSE:  No further questions.

14          THE VIDEOGRAPHER:  This adjourns the

15   deposition of Dr. Scott L. Wexelblatt.

16          We are now going off record.

17          The time is 7:13.

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2                      CERTIFICATE

 3

 4         I, Kimberley Ann Keene, a notary public,

 5    do hereby certify that the foregoing deposition of

 6              SCOTT WEXELBLATT, M.D.

 7    was taken before me at the time and place and for the

 8    purpose in the caption stated; that the witness was

 9    first duly sworn to tell the truth, the whole truth

10    and nothing but the truth; that the deposition was

11    taken before me stenographically and transcribed by

12    me; that the foregoing is a full, true and complete

13    transcript of the said deposition so given; that there

14    was no request that the witness read and sign the

15    transcript; that the appearances were as stated in the

16    caption.

17         I further certify that I am neither counsel or of

18    kin to any of the parties to this action, and am in no

19    way interested in the outcome of said action.

20         Witness my signature this 20th day of April,

21    2019.   My Commission Expires on September 16, 2020.

22

23         _____

           Kimberley Ann Keene

24         Registered Professional Reporter

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition

 4   over carefully and make any necessary

 5   corrections.  You should state the reason

 6   in the appropriate space on the errata

 7   sheet for any corrections that are made.

 8              After doing so, please sign

 9   the errata sheet and date it.

10              You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14              It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -  -  -  -

                    E  R  R  A  T  A

 2                    -  -  -  -  -  -

 3

 4     PAGE   LINE   CHANGE

 5     _____  _____  _____

 6        REASON:    _____

 7     _____  _____  _____

 8        REASON:    _____

 9     _____  _____  _____

10        REASON:    _____

11     _____  _____  _____

12        REASON:    _____

13     _____  _____  _____

14        REASON:    _____

15     _____  _____  _____

16        REASON:    _____

17     _____  _____  _____

18        REASON:    _____

19     _____  _____  _____

20        REASON:    _____

21     _____  _____  _____

22        REASON:    _____

23     _____  _____  _____

24        REASON:    _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2              ACKNOWLEDGMENT OF DEPONENT

 3

 4          I,_____, do

 5    hereby certify that I have read the

 6    foregoing pages, and that the same is

 7    a correct transcription of the answers

 8    given by me to the questions therein

 9    propounded, except for the corrections or

10    changes in form or substance, if any,

11    noted in the attached Errata Sheet.

12

13

14    _____

15     SCOTT WEXELBLATT, M.D.            DATE

16

17

18    Subscribed and sworn

      to before me this

19    _____ day of _____, 20_____.

20    My commission expires:_____

21

      _____

22    Notary Public

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

1                    LAWYER'S NOTES

2        PAGE  LINE

3        _____ _____  _____

4        _____ _____  _____

5        _____ _____  _____

6        _____ _____  _____

7        _____ _____  _____

8        _____ _____  _____

9        _____ _____  _____

10       _____ _____  _____

11       _____ _____  _____

12       _____ _____  _____

13       _____ _____  _____

14       _____ _____  _____

15       _____ _____  _____

16       _____ _____  _____

17       _____ _____  _____

18       _____ _____  _____

19       _____ _____  _____

20       _____ _____  _____

21       _____ _____  _____

22       _____ _____  _____

23       _____ _____  _____

24       _____ _____  _____

25       _____ _____  _____