Highly Confidential - Subject to Further Confidentiality Review

```
 1         IN THE UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF OHIO
 3                   EASTERN DIVISION
 4                      -  -  -
 5

      IN RE:  NATIONAL        :  HON. DAN A.
 6    PRESCRIPTION OPIATE      :  POLSTER
      LITIGATION               :
 7                             :  MDL NO. 2804
      APPLIES TO ALL CASES     :
 8                             :  CASE NO.
                               :  17-MD-2804
 9                             :
10          - HIGHLY CONFIDENTIAL -
11    SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
12                   VOLUME I
13                     -  -  -
14                 May 16, 2019
15                     -  -  -
16              Videotaped deposition of
      DR. SETH B. WHITELAW, taken pursuant to
17    notice, was held at the offices of Golkow
      Litigation Services, One Liberty Place,
18    1650 Market Street, Philadelphia,
      Pennsylvania beginning at 9:18 a.m., on
19    the above date, before Michelle L. Gray,
      a Registered Professional Reporter,
20    Certified Shorthand Reporter, Certified
      Realtime Reporter, and Notary Public.
21

                       -  -  -
22

           GOLKOW LITIGATION SERVICES
23     877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     APPEARANCES:

 2

       LEVIN PAPANTONIO THOMAS
 3     MITCHELL RAFFERTY & PROCTOR, PA
       BY:  BRANDON L. BOGLE, ESQ.
 4     316 South Baylen Street
       Suite 600
 5     Pensacola, Florida 32502
       (888) 435-7001
 6     bbogle@levinlaw.com
 7           - and -
 8     WEISMAN KENNEDY & BERRIS CO LPA
       BY:  DANIEL P. GOETZ, ESQ.
 9     1600 Midland Building
       101 W. Prospect Avenue
10     Cleveland, Ohio 44115
       (216) 781-1111
11     Dgoetz@weismanlaw.com
12           - and -
13     KELLER ROHRBACK, LLP
       BY:  DEAN N. KAWAMOTO, ESQ.
14     1201 Third Avenue
       Suite 3200
15     Seattle, Washington 98101
       dkawamoto@kellerrohrback.com
16     Representing the Plaintiffs

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES:  (Cont'd.)
 2

     COVINGTON & BURLING, LLP
 3   BY:  CHRISTOPHER K. EPPICH, ESQ.
     1999 Avenue of the Stars
 4   Los Angeles, California 90067
     (424) 332-4764
 5   Ceppich@cov.com
 6          - and -
 7   COVINGTON & BURLING, LLP
     BY:  MEGHAN E. MONAGHAN, ESQ.
 8   850 Tenth Street, NW
     Suite 586N
 9   Washington, D.C. 20001
     mmonaghan@cov.com
10   (202) 662-5110
     Representing the Defendant, McKesson
11   Corporation
12

     JONES DAY
13   BY:  CLAIRE E. CASTLES, ESQ.
     555 South Flower Street
14   Fiftieth Floor
     Los Angeles, California 90071
15   (213) 489-3939
     Ccastles@jonesday.com
16   Representing the Defendant, Walmart
17

     REED SMITH, LLP
18   BY:  SHANNON E. McCLURE, ESQ.
     BY:  JEFFREY R. MELTON, ESQ.
19   Three Logan Square
     1717 Arch Street, Suite 3100
20   Philadelphia, Pennsylvania 19103
     (215) 851-8226
21   smcclure@reedsmith.com
     jmelton@reedsmith.com
22   Representing the Defendant,
     AmerisourceBergen Drug Corporation
23
24
```

```
 1   APPEARANCES:  (Cont'd.)
 2
 3   BARTLIT BECK, LLP
     BY:  KATHERINE M. SWIFT, ESQ.
 4   54 West Hubbard Street
     Chicago, Illinois 60654
 5   (312) 494-4440
     katherine.swift@bartlit-beck.com
 6   Representing the Defendant, Walgreens
 7
     WILLIAMS & CONNOLLY, LLP
 8   By:  JENNIFER G. WICHT, ESQ.
     BY:  JOSHUA D. TULLY, ESQ.
 9   725 12th Street, NW
     Washington, D.C. 20005
10   (202) 434-5148
     jwicht@wc.com
11   Jtully@wc.com
     Representing the Defendant, Cardinal
12   Health
13
     ROPES & GRAY, LLP
14   BY:  WILLIAM DAVISON, ESQ.
     BY:  CASSANDRA A. LARUSSA, ESQ.
15   Prudential Tower
     800 Boylston Street
16   Boston, Massachusetts 02199
     (617) 951-7000
17   william.davison@ropesgray.com
     cassandra.larussa@ropesgray.com
18   Representing the Defendant,
     Mallinckrodt
19
20   TUCKER ELLIS, LLP
     BY:  JUSTIN E. RICE, ESQ.
21   950 Main Avenue, Suite 1100
     Cleveland, Ohio 44113
22   (216) 696-3670
     justin.rice@tuckerellis.com
23   Representing the Defendant, Janssen and
     Johnson & Johnson
24
```

```
 1    APPEARANCES:   (Cont'd.)
 2

 3    BARNES & THORNBURG, LLP
      BY:  WILLIAM A. HAHN, ESQ.
      11 South Meridian Street
 4    Indianapolis, Indiana 46204
      (317) 236-1313
 5    William.hahn@btlaw.com
      Representing the Defendant, H.D. Smith
 6

 7    MARCUS & SHAPIRA, LLP
      BY:  BENJAMIN A. KIFT, ESQ.
 8    One Oxford Centre, 35th Floor
      Pittsburgh, Pennsylvania 15219
 9    (412) 338-4683
      kift@marcus-shapira.com
10    Representing the Defendant, HBC
      Service Company
11

12    DECHERT, LLP
      BY:  JACQUELINE D. HARRINGTON, ESQ.
13    Three Bryant Park
      1095 Avenue of the Americas
14    New York, New York 10036
      (212) 698-3500
15    jacqueline.harrington@dechert.com
      Representing the Defendant, Purdue
16    Pharmaceuticals
17

18    FOLEY & LARDNER, LLP
      BY:  ANA M. FRANCISCO, ESQ.
      111 Huntington Avenue, Suite 2500
19    Boston, Massachusetts 02199
      (617) 502-3281
20    afrancisco@foley.com
      Representing Actavis Laboratories
21    UT, Inc., Actavis Pharma, Inc.,
      ANDA, Inc., and Actavis, Inc.,
22    (N/k/a Allergan Finance, LLC, Watson
      Laboratories, Inc.)
23

24
```

```
 1   APPEARANCES:  (Cont'd.)
 2
     ARNOLD & PORTER KAYE SCHOLER, LLP
 3   BY:  ALLISON B. RUMSEY, ESQ.
     601 Massachusetts Avenue, NW
 4   Washington, D.C. 20001
     (202) 942-5095
 5   allison.rumsey@arnoldporter.com
     Representing the Defendants, Endo Health
 6   Solutions Endo Pharmaceuticals, Inc.; Par
     Pharmaceutical Companies, Inc. f/k/a Par
 7   Pharmaceutical Holdings, Inc.
 8
     KIRKLAND & ELLIS, LLP
 9   BY:  ERICA B. ZOLNER, ESQ.
     300 North LaSalle Street
10   Chicago, Illinois 60654
     (312) 862-3247
11   erica.zolner@kirkland.com
     Representing the Defendant, Allergan
12   Finance
13
     ZUCKERMAN SPAEDER, LLP
14   BY:  PAUL B. HYNES, JR., ESQ.
     1800 M. Street NW, Suite 1000
15   Washington, D.C. 20036
     (202) 778-1845
16   phynes@zuckerman.com
     Representing the Defendant, CVS
17
18   MORGAN, LEWIS & BOCKIUS, LLP
     BY:  MELISSA M. COATES, ESQ.
19   200 S. Biscayne Boulevard
     Suite 5300
20   Miami, Florida 33131-2339
     (305) 415-3413
21   melissa.coates@morganlewis.com
     Representing the Defendants, Teva
22   Pharmaceuticals, Inc. Cephalon Inc,
     Watson Laboratories, Actavis LLC, Actavis
23   Pharma, Inc.
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   TELEPHONIC/STREAMING APPEARANCES:
 2   LEVIN PAPANTONIO THOMAS
     MITCHELL RAFFERTY & PROCTOR, PA
 3   BY:  PAGE POERSCHKE, ESQ.
     BY:  JEFF GADDY, ESQ.
 4   316 Baylen Street
     Pensacola, Florida 32502
 5   (850) 435-7000
     ppoerschke@levinlaw.com
 6   jgaddy@levinlaw.com
 7        - and -
 8   WEISMAN KENNEDY & BERRIS CO LPA
     BY:  ERIC KENNEDY, ESQ.
 9   1600 Midland Building
     101 W. Prospect Avenue
10   Cleveland, Ohio 44115
     (216) 781-1111
11   ekennedy@weismanlaw.com
     Representing the Plaintiffs
12
13   BRANSTETTER, STRANCH & JENNINGS, PLLC
     BY:  TRICIA HERZFELD, ESQ.
14   223 Rosa L. Parks Avenue
     Suite 200
15   Nashville, Tennessee 37203
     (615) 254-8801
16   Triciah@bsjfirm.com
     Representing the Tennessee Plaintiffs
17
18   WILLIAMS & CONNOLLY, LLP
     BY:  MIRANDA PETERSEN, ESQ.
19   725 12th Street, NW
     Washington, D.C. 20005
20   (202) 434-5148
     mpetersen@wc.com
21   Representing the Defendant, Cardinal
     Health
22
23
24
```

```
 1   TELEPHONIC/STREAMING APPEARANCES:
     (Cont'd.)
 2

 3

     ROPES & GRAY, LLP
 4   BY:  FEIFEI (ANDREA) REN, ESQ.
     1211 Avenue of the Americas
 5   New York, NY 10036
     (212) 596-9303
 6   Andrea.ren@ropesgray.com
     Representing the Defendant,
 7   Mallinckrodt

 8

     KIRKLAND & ELLIS, LLP
 9   BY:  KAITLYN COVERSTONE, ESQ.
     300 North LaSalle Street
10   Chicago, Illinois 60654
     (312) 862-7184
11   Kaitlyn.coverstone@kirkland.com
     Representing the Defendant, Allergan
12

13   FOLEY & LARDNER, LLP
     BY:  KATY E. KOSKI, ESQ.
14   111 Huntington Avenue, Suite 2500
     Boston, Massachusetts 02199
15   (617) 502-3281
     Kkoski@foley.com
16   Representing Actavis Laboratories
     UT, Inc., Actavis Pharma, Inc.,
17   ANDA, Inc., and Actavis,  Inc.,
     (n/k/a Allergan Finance, LLC, Watson
18   Laboratories, Inc.)

19

20

21

22

23

24
```

```
 1   TELEPHONIC/STREAMING APPEARANCES:
     (Cont'd.)
 2
 3   FOX ROTHSCHILD, LLP
     BY:  ZACHARY MARTIN, ESQ.
 4   2700 Kelly Road
     Suite 300
 5   Warrington, Pennsylvania 18976
     (215) 918-3680
 6   Zmartin@foxrothschild.com
     Representing the Defendant, Prescription
 7   Supply Inc.
 8
     MORGAN LEWIS & BOCKIUS, LLP
 9   BY:  CATHERINE ESCHBACH, ESQ.
     1000 Louisiana Street, Suite 4000
10   Houston, Texas 77002
     (713) 890-5719
11   Catherine.eschbach@morganlewis.com
     Rite Aid of Maryland, Inc., doing
12   business as Mid-Atlantic Customer Support
     Center
13
14   LOCKE LORD, LLP
     BY:  LAUREN MORGAN FINCHER, ESQ.
15   600 Congress Avenue, Suite 2200
     Austin, Texas 78701
16   (512) 305-4843
     lfincher@lockelord.com
17   Representing the Defendant, Henry Schein
18
     BAILEY WYANT PLLC
19   BY:  MICHAEL W. TAYLOR, ESQ.
     500 Virginia Street East
20   Suite 600
     Charleston, West Virginia 25301
21   (304) 345-4222
     mtaylor@baileywyant.com
22   Representing the Defendant, West
     Virginia Board of Pharmacy
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    APPEARANCES:   (Cont'd.)

2

3    ALSO PRESENT:

4

     Brianna Poff - Paralegal
5    Cody Hartzog - Paralegal
     Katie Mayo - Paralegal - (via telephone)
6    (Levin Papantonio)

7

     VIDEOTAPE TECHNICIAN:
8    David Lane

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    -   -   -
 2               I N D E X
 3                    -   -   -
 4

    Testimony of:
 5                        DR. SETH B. WHITELAW
 6         By Mr. Eppich                    15
 7         By Ms. Swift                    370
 8         By Ms. Fincher                  515
 9

                    -   -   -
10
               E X H I B I T S
11
                    -   -   -
12
13   NO.            DESCRIPTION            PAGE
14   Whitelaw-1    Notice of Deposition   15
15   Whitelaw-2    Expert Report of       28
                   Dr. Seth B. Whitelaw
16                 4/15/19
17   Whitelaw-3    Supplemental Report    28
                   Of Dr. Seth B.
18                 Whitelaw, 5/10/19
19   Whitelaw-4    Diversion Control     124
                   Division, Tite 21
20                 Of Federal Regulations
                   Part 1301
21
     Whitelaw-5    Report to the US      161
22                 Attorney General
                   By the Suspicious
23                 Orders Task Force
                   February 1999
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -
 2              E X H I B I T S  (Cont'd.)
 3                        -   -   -
 4
 5    NO.              DESCRIPTION            PAGE
 6    Whitelaw-6       Memo, 10/20/05          191
                       Subject, Internet
 7                     Presentation with
                       McKesson Corp.
 8                     On 9/1/05
                       MCKMDL00496859-75
 9
      Whitelaw-7       Diversion Control       223
10                     Division, Tite 21
                       Of Federal Regulations
11                     Part 1304
12    Whitelaw-8       Government Standards     277
                       Undermine Compliance
13                     Efforts in Life
                       Science Companies
14
      Whitelaw-9       McKesson Regulatory      316
15                     Investigative Report
                       MCKMDL00538943-46
16
      Whitelaw-10      Copy of Binder of        393
17                     Dr. Seth B. Whitelaw
                       (Expert Report)
18
      Whitelaw-11      McKesson Handwritten    394
19                     Notes, by Dr. Whitelaw
20    Whitelaw-12      Walgreens Handwritten   416
                       Notes, by Dr. Whitelaw
21
      Whitelaw-13      Chemical Handler's      512
22                     Manual
                       January 2004
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -

 2            DEPOSITION SUPPORT INDEX

 3                    -   -   -

 4

 5     Direction to Witness Not to Answer

 6     PAGE    LINE
       371     23

 7

 8     Request for Production of Documents

 9     PAGE    LINE
       None.

10

11     Stipulations

12     PAGE    LINE
       None.

13

14     Questions Marked

15     PAGE    LINE
       None.

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1                   -   -   -

2               THE VIDEOGRAPHER:  We are

3       now on the record.  My name is

4       David Lane, videographer for

5       Golkow Litigation Services.

6               Today's date is May 16,

7       2019.  Our time is 9:18 a.m.

8               This deposition is taking

9       place in Philadelphia,

10      Pennsylvania, in the matter of

11      National Prescription opiate

12      litigation MDL.

13              Our deponent today is

14      Dr. Seth Whitelaw.

15              Our counsel will be noted on

16      the stenographic record.

17              The court reporter is

18      Michelle Gray, who will now swear

19      in our witness.

20                  -   -   -

21              ... DR. SETH B. WHITELAW,

22      having been first duly sworn, was

23      examined and testified as follows:

24                  -   -   -

Highly Confidential - Subject to Further Confidentiality Review

1            THE VIDEOGRAPHER:  Please

2      begin.

3                  -   -   -

4                EXAMINATION

5                  -   -   -

6  BY MR. EPPICH:

7      Q.    Good morning, Mr. Whitelaw.

8  Thank you so much for coming in today.

9            I introduced myself earlier.

10  But again my name is Chris Eppich, and

11  I'm an attorney for McKesson --

12      A.    Okay.

13      Q.    -- one of the distributor

14  defendants in this litigation.

15      A.    Nice to meet you, Chris.

16      Q.    I'm going to be asking you a

17  few questions today.  And -- but let me,

18  before I get there, let me go ahead and

19  mark what's been -- what is your

20  deposition notice.  And I'll mark this as

21  Exhibit Number 1.

22            (Document marked for

23      identification as Exhibit

24      Whitelaw-1.)

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. EPPICH:

2         Q.    Dr. Whitelaw, you are

3    appearing today as an expert witness

4    retained by the plaintiffs?

5         A.    Yes, sir, I am.

6         Q.    Have you ever been deposed

7    before?

8         A.    No, I have never been

9    deposed.

10        Q.    Have you ever testified in

11   court or any hearings before?

12        A.    No, sir, I have not

13   testified in court or in hearings before.

14        Q.    Have you ever served as an

15   expert witness before?

16        A.    No, sir.

17        Q.    Have you served as a

18   consulting expert before?

19        A.    Yes, sir, I have served as a

20   consulting expert for a number of

21   companies over my career.

22        Q.    So because it's your first

23   deposition I'll just go over a couple of

24   the ground rules.  I'll ask the
```

Highly Confidential - Subject to Further Confidentiality Review

1  questions, and you'll answer the

2  questions.  I'll let you finish your

3  answers, but please let me finish my

4  questions first.

5             Your counsel's probably

6  asked you to pause for a few seconds so

7  he can get an objection in.

8             Plaintiffs' counsel -- or

9  excuse me.  If -- if you have any --

10  please ask me a question if you have any

11  time -- if you have any at any time.  If

12  you don't -- if you don't have any

13  concerns or questions with my questions,

14  I'll assume you understood them.

15             And if you need to take a

16  break at any time, just go ahead and ask

17  and we'll -- we can take a break.  I just

18  ask that if a question is pending, that

19  you answer the question before we take a

20  break.

21             Sound good?

22        A.    Sounds very good.

23        Q.    When were you first

24  contacted by the plaintiffs about

1    participating as an expert in this

2    litigation?

3           A.    It would have been November,

4    December time frame, 2018.  I can't be

5    precise on the date, but to the best of

6    my recollection.

7           Q.    This was last year?

8           A.    Yeah.  This would have been

9    last year.

10          Q.    And who contacted you?

11          A.    I honestly don't remember

12   the first contact.  But contact came from

13   the law firm of Seeger Weiss.

14          Q.    Did you work with anyone on

15   Seeger Weiss on -- on your report, on

16   preparing your report?

17          A.    Other than providing

18   invoices and things back and forth, no.

19          Q.    Which plaintiffs' counsel

20   have you been working with?

21          A.    I've worked with a number of

22   them --

23                MR. BOGLE:  Object to form.

24                You can answer.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. EPPICH:
 2         Q.    Can you tell me their names?
 3         A.    I can't give you a complete
 4    list.
 5         Q.    Is Mr. Bogle one of those
 6    counsel?
 7         A.    Yes, sir.
 8         Q.    And any other counsel in
 9    this room?
10         A.    All three of the
11    gentlemen -- the other two gentlemen that
12    are in the room.  Mr. Goetz and
13    Mr. Kawamoto as well.
14         Q.    Anyone else?
15         A.    As I said, I don't have a
16    complete list in my head so I can't run
17    down a list for you.
18         Q.    Before this case have you
19    worked with the Seeger Weiss firm before?
20         A.    No, sir, I have not.
21         Q.    Have you worked with the
22    Levin Papantonio firm before?
23         A.    No, sir.
24         Q.    How much are you billing per
```

Highly Confidential - Subject to Further Confidentiality Review

¹ hour for your work on this litigation?

²       A.    $400 an hour, sir, which is

³ my standard rate.

⁴       Q.    And is that hourly rate,

⁵ does it apply to preparation of your

⁶ report and testifying?

⁷       A.    Yes, sir, it does.

⁸       Q.    How much time have you spent

⁹ on this case so far?

¹⁰       A.    I have probably almost

¹¹ 1200 hours in.

¹²       Q.    So you've billed

¹³ approximately $480,000 to this case so

¹⁴ far; is that right?

¹⁵       A.    If you count both billed and

¹⁶ unbilled time, yeah, that would be about

¹⁷ the right number.

¹⁸       Q.    In these 1200 hours, what

¹⁹ have you done?

²⁰       A.    In these 1200 hours I've

²¹ actually produced a 300 -- the report

²² that you have in front of you which you

²³ are well aware of.  I have looked at six

²⁴ different defendants, from a federal

1   sentencing guideline compliance

2   perspective.  I have interviewed multiple

3   people on the plaintiffs' team.  I have

4   asked for lots of documents.  I have

5   reviewed those documents.  I have asked

6   for additional questions, follow-up, et

7   cetera.

8           Again, pretty much the

9   standard work that I would do in any kind

10   of a compliance assessment or compliance

11   investigation or compliance audit, is

12   what I have done.

13           Then to take that

14   information and then to compile it into

15   what you see today.

16      Q.   How much time did you spend

17   preparing your report?

18      A.   I'm not sure I understand

19   your question, sir.

20      Q.   Well, did you -- did you

21   write your report yourself?

22      A.   Yes, sir, I did.

23      Q.   How much time did you spend

24   writing your report?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    It's hard to split it out

2  from the 1200 hours, sir, because again

3  it was a work -- the report is a work in

4  progress that comes about as you review

5  documents, make notes, et cetera, and

6  eventually come out to writing the

7  report.  So I'm afraid I can't give you a

8  precise time.

9      Q.    How much time have you spent

10  preparing for your deposition today?

11      A.    Approximately 90 hours.

12      Q.    And how did you prepare for

13  your deposition?

14      A.    I spent a long time going

15  back over my report, re-reading it,

16  making sure that I understood what I had

17  written, looking at the documents that --

18  that were underlying it.

19          Basically, understanding how

20  the deposition process works, because as

21  you pointed out, I have not been deposed

22  before.

23      Q.    Did you prepare for this

24  deposition by yourself or with counsel?

1      A.     I prepared both, both on my

2  own and with assistance from counsel.

3      Q.     Which counsel did you meet

4  with to prepare for today's deposition?

5      A.     Certainly the three

6  gentlemen that are here.  And again, I

7  don't have a complete list of everybody

8  else I've met with.

9      Q.     Do you recall how many

10  meetings you had with counsel in

11  preparation for today's deposition?

12     A.     My recollection we were --

13  there were seven, somewhere between seven

14  and nine, something like that.

15     Q.     And about how long were

16  these meetings?

17     A.     They varied in length from,

18  you know, half a day to a couple hours.

19     Q.     So in preparation for

20  today's deposition, you mentioned a few

21  things you reviewed.  You reviewed your

22  report, you reviewed some of the

23  documents that you cite.  What -- what

24  other materials did you review in

1    preparation for today's deposition?

2         A.    I reviewed the new --

3    obviously you have my supplemental

4    report.  I reviewed the new developments

5    that had come out since I actually issued

6    the report.  And also certain documents

7    are listed in there as well.  Beyond that

8    I'm not sure -- I think that's the

9    complete universe to the best of my

10   recollection.

11        Q.    Did you review any documents

12   that are not listed in your report or

13   your supplemental report?

14        A.    Not that I --

15             MR. BOGLE:  Object to form.

16             THE WITNESS:  Not that I

17        recall.

18   BY MR. EPPICH:

19        Q.    Now, you list quite a few

20   documents in your reports.  How did you

21   choose which documents to review,

22   particularly from the defendants?

23        A.    I followed the same uniform

24   approach, as I said to you before.  I

1  followed the same uniform approach that I

2  do when I do any kind of a compliance

3  investigation, or compliance assessment.

4           I use the federal sentencing

5  guidelines as my sort of framework.  And

6  I asked counsel, in this case, serving

7  like I would a client, I need documents

8  in these particular areas, could you

9  please provide me with information that

10  relates to these particular areas.  And

11  they provided me with those documents.

12           If I was unclear or I didn't

13  get exactly -- it is an iterative

14  process.  So if I was unclear or I didn't

15  get what I was looking for, I asked

16  further follow-up questions.  I asked for

17  further information.  Once I got that

18  information, I then reviewed it.

19      Q.    What were the original

20  categories of documents that you

21  requested from plaintiffs' counsel?

22      A.    We can turn to my report and

23  we can go down the eight elements of the

24  federal sentencing guidelines if you'd

Highly Confidential - Subject to Further Confidentiality Review

1    like.

2            Q.    We can do that in a few

3    minutes.  But sitting here, just now, do

4    you recall any of the categories of

5    documents?

6                  MR. BOGLE:  If you need to

7            refer to your report, you can.

8                  THE WITNESS:  I'm going to

9            refer to my report.  Since he

10            wants to go down the categories,

11            let's go down the categories.

12    BY MR. EPPICH:

13            Q.    Why don't we go through that

14    later.  I'll strike the question.

15                  Did you review any

16    deposition transcripts?

17            A.    Yes, sir, I did.

18            Q.    Which -- did you read the

19    entire transcripts or just portions of

20    the transcripts?

21            A.    Depended on the witnesses.

22    I read some completely from beginning to

23    end and I read some that -- substantial

24    portions.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And how did you determine

2   whether or not to read the entire

3   deposition transcript or just a portion?

4      A.    I made a judgment call based

5   on what I was looking for.  And thanks to

6   the court reporter's keyword searches, it

7   makes it fairly easy to say if I'm

8   looking for a particular topic.  Let's

9   say I'm looking for training.  I can go

10  through the deposition and look at all

11  the instances of where training was.  And

12  read before and after and what was the

13  context of the question and try to

14  understand what it was.

15     Q.    Did plaintiffs' counsel

16  point you to any specific portions of

17  deposition transcripts?

18     A.    Not that I recall.

19     Q.    Did you review the exhibits

20  to each of the depositions?

21     A.    I didn't review every

22  exhibit.  Did I review exhibits, yes.

23  Actually my method, Chris, was -- thank

24  God for a 34-inch monitor that I had,

Highly Confidential - Subject to Further Confidentiality Review

1    because I was able to put the deposition

2    up.  And then you're talking about a

3    certain -- you know, certain document, I

4    put the document up.  And so I can see

5    the back and forth.  Again, that's the

6    only way that I'm going to get the

7    context of what was going on in those

8    depositions.

9              Q.    Why don't we go ahead and

10   mark your report.

11             (Document marked for

12             identification as Exhibit

13             Whitelaw-2.)

14   BY MR. EPPICH:

15             Q.    I'll mark your report, your

16   expert report that was served on

17   April 15th as Exhibit Number 2 and your

18   supplemental that was served on May 10th

19   as Exhibit 3.

20             (Document marked for

21             identification as Exhibit

22             Whitelaw-3.)

23             MR. BOGLE:  So one question

24             here just so I'm clear.  These two

Highly Confidential - Subject to Further Confidentiality Review

1          combined are Exhibit 2; is that

2          right?

3                  MR. EPPICH:  That's right.

4          At the break we'll combine them.

5                  MR. BOGLE:  That's fine.

6          Just to make sure we're clear.  So

7          that's the report entirely there,

8          I think.  And that's the

9          supplemental.

10                 THE WITNESS:  Thank you,

11         sir.

12    BY MR. EPPICH:

13         Q.    Before you, Dr. Whitelaw,

14    you have copies of your original report

15    from April 15th and your supplemental

16    report from May 10th.

17         A.    I do.

18         Q.    Do you have -- sitting here

19    today, do you have any plans to further

20    supplement your expert reports?

21                 MR. BOGLE:  Object to form.

22                 THE WITNESS:  It's awful

23         hard to tell you whether or not I

24         do.  It depends on if there are

1      new developments that are relevant

2      to the work that I've already

3      done, so...

4   BY MR. EPPICH:

5      Q.    But these reports express --

6   represent your complete set of opinions

7   in this case; is that true?

8      A.    At this moment in time, as

9   you'll notice in my original report, I

10  reserve the right to supplement the

11  report should new and additional

12  information come to light that's relevant

13  to the work that I've done.

14     Q.    Do you have any changes to

15  make to either of your reports sitting

16  here today?

17     A.    Not that I can think of.

18     Q.    You still hold all of the

19  opinions expressed in these reports?

20     A.    Yes, sir, I do.

21     Q.    In writing your report, did

22  you report -- did you write the first

23  draft of your report?

24     A.    Chris, I wrote every draft

1  of this report.

2          Q.    Did plaintiffs' counsel

3  comment or offer revisions to your report

4  at any time?

5          A.    Plaintiffs' counsel and I

6  had conversations to make sure what I saw

7  or what I thought I saw and I had gotten

8  the facts accurately or was I missing

9  something, yes.

10          Did they tell me what to

11  write?  Absolutely not.  These are my

12  words.  This is my work.  And this is how

13  I always do my work.

14          Q.    Did -- did they offer you

15  any edits to any of the lines or

16  sentences in your report?

17          A.    Perhaps they may have.  They

18  may have said, again, to make sure we

19  were factually correct.  If I got a date

20  wrong, a Bates number wrong, yeah.  I'm

21  sure they did.

22          Q.    Did they ask you to exclude

23  any sections or portions of your report?

24          A.    No, sir.  There was no

Highly Confidential - Subject to Further Confidentiality Review

1    exclusions.

2         Q.    Did you share drafts with

3    them?

4         A.    Yes, I did share drafts with

5    counsel.

6         Q.    How did you share drafts

7    with counsel?  Was it through the e-mail?

8         A.    Electronically.

9         Q.    Was that through e-mail?

10        A.    Yes, I believe so.

11        Q.    So you would send a copy of

12   your draft to plaintiffs' counsel for

13   them to review, and they would -- they

14   would respond by --

15        A.    I would tell them what I was

16   doing, so they can see the work that was

17   being done, were we on track, were we on

18   time, yes.  But if what you're getting at

19   is whether or not counsel directed me on

20   how to actually write this report, the

21   answer is absolutely not.

22        Q.    When did you form the

23   opinions that are expressed in your

24   report?

1          MR. BOGLE:  Object to form.

2     Vague and ambiguous.

3          THE WITNESS:  Could you be

4     more clear of the question that

5     you're asking?

6  BY MR. EPPICH:

7     Q.    When did you start to write

8  the report?  When did you put pen to

9  paper, is what I'm really asking.

10    A.    Is that what you're really

11 asking?  Okay.  I can tell you when I

12 started to put pen to paper.  Probably

13 put pen to paper beginning almost day one

14 because the federal sentencing

15 guidelines, standards were there.

16 Controlled substances standards were

17 there.  Start with the standards.

18         So have to write.  How do

19 you describe it.  How do I put it in

20 terms that the judge and the court can

21 understand.  How to explain it.

22         But as far as forming my

23 opinions about each individual client,

24 Chris, after I finished my review of the

Highly Confidential - Subject to Further Confidentiality Review

1    documents and interviews, et cetera, and

2    reading deposition testimony, that's

3    where -- where those opinions came about.

4         Q.    So you mentioned earlier

5    that you spoke with plaintiffs' counsel

6    about your report.  Did you speak with

7    anyone from Cuyahoga County?

8         A.    Specifically in Cuyahoga

9    County?

10        Q.    Well, any -- anyone that

11   works for the government, for the state,

12   for police departments.  Any -- any

13   government agencies.  Anyone from

14   Cuyahoga County?

15        A.    No, sir, I did not.

16        Q.    Did you speak with anyone

17   from Summit County?

18        A.    Again, same answer; no, I --

19   sir, I did not.

20        Q.    How about the city of Akron?

21        A.    No, sir, I did not.

22        Q.    City of Cleveland?

23        A.    No, sir.  I did not speak

24   with anybody from the city of Cleveland.

1    Q.    Have you spoken with any of

2  plaintiffs' other experts?

3    A.    Yes, I have.

4    Q.    Who have you -- which --

5  which other plaintiffs' experts have you

6  spoken with?

7    A.    I spoke at length with

8  Mr. Rafalski.  We had several

9  conversations.  Again, his expertise as a

10  DEA agent and certainly what DEA was

11  thinking at the time and how an inspector

12  would approach the controlled substances

13  regulations, were of particular

14  importance and use to me as far as

15  understanding what I was looking at, and

16  having an understanding of the DEA's

17  positions on certain topics.

18    Q.    Did you speak with any of

19  other -- any other of plaintiffs'

20  experts?

21    A.    Not that I can recall, sir.

22    Q.    Do you know Craig McCann?

23    A.    I don't know Craig McCann.

24  I know of Craig McCann.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Have you spoken with

2    Mr. McCann?

3    A.    No, sir, I have not.

4    Q.    Did you provide Mr. McCann

5    with any of your analysis or work?

6    A.    No.

7    Q.    Did you provide Mr. Rafalski

8    with any of your analysis or work?

9    A.    No, I did not provide

10   Mr. Rafalski with any of my analysis or

11   work.  I asked him questions, we had

12   telephone conversations.

13   Q.    In preparing your report or

14   reaching any of your opinions, did you

15   speak with anyone from the DEA?

16   A.    Well, I would assume

17   Mr. Rafalski counsel's former DEA, but if

18   you're asking me anybody -- are you

19   asking me the question of anybody

20   currently employed by DEA?

21   Q.    Yes, sir.

22   A.    No, sir, I did not speak to

23   anybody who is currently employed with

24   the Drug Enforcement Administration.

Highly Confidential - Subject to Further Confidentiality Review

¹      Q.    And other than Mr. Rafalski,

²  did you speak with anyone who was

³  formerly employed by the DEA in reaching

⁴  your opinions?

⁵      A.    No, sir, he was the only one

⁶  I spoke with.

⁷      Q.    Last summer did you attend a

⁸  meeting with plaintiffs' counsel and

⁹  several of the other expert witnesses in

¹⁰  this case?

¹¹      A.    Last summer?

¹²      Q.    Last summer.

¹³      A.    Can you -- can you be more

¹⁴  specific on last summer?

¹⁵      Q.    June 2018.

¹⁶      A.    No, sir, I did not.  As I

¹⁷  said to you, I wasn't -- they didn't

¹⁸  reach out to me until November 2018.

¹⁹      Q.    Have you attended any -- any

²⁰  meetings with plaintiffs' counsel and

²¹  other plaintiffs' experts in this case

²²  since you were retained in November of

²³  2018?

²⁴      A.    Could you say that question

1    again?

2          Q.    Yes, sir.

3                Have you attended any

4    meetings with plaintiffs' counsel and the

5    other plaintiffs' experts in this case

6    since you were retained in November 2018?

7          A.    Again, with the exception of

8    my conversations with Mr. Rafalski, the

9    answer is no.

10          Q.    Now, earlier you mentioned

11    that you interviewed people to prepare

12    your report.  Other than Mr. Rafalski,

13    was there anyone else that you

14    interviewed?

15          A.    When I meant interview, I

16    had conversations with various members of

17    the plaintiffs' counsel asking, this is

18    what I'm looking for, can you please

19    provide me with this information.

20          Q.    Okay.  Just -- just so I'm

21    clear.  You -- you have spoken with

22    plaintiffs' counsel and you've spoken

23    with Mr. Rafalski --

24          A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    -- in preparing your report.

2    And -- and no one else?

3    A.    That is correct.

4    Q.    Okay.  Thank you.

5          Why don't we turn to Page 4

6    in your expert report, Exhibit 2.

7    A.    Yeah.  In particular is

8    there someplace you want me to look?

9    Q.    Yes --

10         MR. BOGLE:  He'll guide you.

11   BY MR. EPPICH:

12   Q.    Just give me a minute --

13   give me a minute to flip the pages.

14         Dr. Whitelaw, I'm on Page 4,

15   the second full paragraph.  And I'm

16   looking at the second line of that

17   paragraph.

18         This is discussing your

19   consultation with Mr. Rafalski.

20         You say, "I discussed with

21   him how the DEA applies the Controlled

22   Substances Act, the accompanying

23   regulations, and the agency's guidance

24   when inspecting the controlled substances

1  anti-diversion efforts of a manufacturer

2  or a distributor, including" --

3  "including their suspicious order

4  monitoring programs.  We also discussed

5  what the DEA generally considers an

6  effective controlled substances

7  compliance program for a prudent

8  registrant."

9            Do you see that, sir?

10       A.    Yes, sir.  I see the -- I

11  see that paragraph, yes.

12       Q.    Did Mr. Rafalski explain to

13  you that he was prevented from sharing

14  any non-public information he had learned

15  during his time at the DEA based on an

16  instruction from the Department of

17  Justice?

18       A.    Mr. Rafalski expressed that

19  to me, yes.  And he also made it -- we

20  also made it clear that we were not going

21  to be asking about specific defendants.

22  We were asking general questions in

23  the -- about what a prudent registrant or

24  manufacturer needed to do.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.    What did Mr. Rafalski tell

2  you about how the DEA applied the -- the

3  Controlled Substances Act?

4       A.    Could you be more specific

5  in what you're asking me?

6       Q.    No, I'd appreciate if you

7  could answer that question.

8       A.    It's a pretty -- it's a

9  pretty broad --

10            I'm afraid you're asking a

11  very broad question.

12       Q.    Did you talk about the

13  Controlled Substances Act?

14       A.    Yes, we did.

15       Q.    And what did you discuss?

16       A.    The elements of what DEA

17  considered to be an effective

18  anti-diversion program.  What he -- what

19  is generally seen out there.  What -- we

20  talked about variances under guidance

21  that was there.  I mean, it was a broad

22  far-reaching conversation.

23       Q.    And did he talk to you about

24  how the DEA applies the regulations to

1    registrants?

2        A.    Again, I'm not sure I

3    understand the question.

4        Q.    Well, you're familiar with

5    suspicious order monitoring programs,

6    aren't you?

7        A.    Yes, I am.

8        Q.    And did Mr. Rafalski explain

9    to you how the DEA applies the Controlled

10   Substances Act to monitor or evaluate

11   suspicious order monitoring systems?

12       A.    We talked about how to -- we

13   talked about --

14            MR. BOGLE:  Just wait till

15        he finishes the question.

16            THE WITNESS:  I'm sorry.

17            MR. BOGLE:  Go ahead.

18            THE WITNESS:  I'm not

19        exactly sure what you're asking

20        me.

21            Are you asking me do I know,

22        did we discuss the fact that the

23        DEA conducts inspections of

24        registrants and that sort of

1    thing?  Yes, we did.

2         Beyond that, I'm not sure

3    exactly what you're looking for or

4    I really, truly do not understand

5    your question.

6    BY MR. EPPICH:

7         Q.    And what did Mr. Rafalski

8    tell you about how the DEA conducts

9    inspections?

10        A.    Mr. Rafalski told me that

11   they do -- there are four cause and

12   routine inspections that are done, both.

13   We didn't get into specifics of how they

14   choose registrants over another.  We just

15   generally talked about an inspection.

16        Q.    Did he tell you what the DEA

17   does during each of those inspections?

18        A.    We did not get into

19   precisely exactly how you walk through

20   and do an inspection, no.

21        Q.    He didn't tell you about any

22   of the DEA procedures or methods for

23   conducting those inspections?

24        A.    We probably talked about

1   them in general.  We did not talk about

2   them in specifics.  If you're asking me

3   did he show me a specific section in a

4   specific manual?  No, he did not.

5          Q.    Do you remember anything

6   about the substance of your discussion

7   with him about the DEA process for

8   conducting an inspection of a registrant?

9          A.    As I told you, we talked in

10  general terms.  We did not talk in

11  specifics about, you filed this paper on

12  this date, you walk in, you show your

13  credentials, et cetera.

14         Q.    I'm just trying to

15  understand what -- where -- what was the

16  general terms, general discussion that

17  you had, the substance of those general

18  discussions.  That's all I'm looking for.

19         A.    Well, the general substance

20  of those discussions were around, again,

21  what would you expect to see from a good

22  suspicious order monitoring program, what

23  would DEA expect from that when DEA talks

24  about when -- what's -- when discovered

1    and what do they generally look for.  How

2    do you -- you know, what do they

3    generally look for when they're looking

4    at thresholds in general.

5              Again, it was a very general

6    broad-brush discussion.

7          Q.    And what did Mr. Rafalski

8    say the DEA was looking for in a good

9    suspicious order monitoring program?

10         A.    Well, it's incorporated in

11   the report.  We can go through it in

12   Section 6 if you'd like.  Because it's

13   both my understanding of what should be

14   there, as well as, you know, as a

15   reflection of those conversations.  I

16   can't point to you specific Point A,

17   Point B, Point C, but we can certainly

18   walk through Section 6 if you'd like.

19         Q.    You can't recall any of the

20   points that Mr. Rafalski provided to you?

21         A.    No, sir.  I don't think

22   Mr. Rafalski, quote-unquote, provided me

23   with any points.  I think it was

24   conversation around this is what I'm

Highly Confidential - Subject to Further Confidentiality Review

1   seeing, this is what I would expect to

2   see.  He said, yes, that's what we would

3   expect to see as well.  It was that kind

4   of a conversation.

5          Q.    Did Mr. Rafalski discuss

6   with you the DEA's legal guidance when

7   inspecting a manufacturer or

8   distributor's controlled substance

9   anti-diversion efforts?

10         A.    Again, we discussed it

11  briefly as to what it -- what it was,

12  what was out there, had I -- my question

13  to him was had I seen the full panoply of

14  things that I needed to see.  Again, did

15  we get into the exact nuts and bolts of

16  every letter?  No, we did not.

17         Q.    What letters are you

18  referring to?

19         A.    I'm referring to the

20  Rannazzisi letters as part of guidance.

21  I mean, there were a lot of things of

22  guidance that we could have talked about.

23  But that's --

24         Q.    Did Mr. Rafalski tell you

Highly Confidential - Subject to Further Confidentiality Review

1    that the information he provided you on

2    these topics was based on his experience

3    and training at the DEA?

4          A.     Yes.  Actually, he did.  He

5    told me that it was based on his

6    experience and what he had encountered in

7    working for DEA, yes.

8          Q.     And it was your

9    understanding that Mr. Rafalski was

10   drawing on his experience and training

11   from his time at the DEA when he shared

12   this information with you?

13         A.     That was my understanding,

14   yes, sir.

15         Q.     How many conversations did

16   you have with Mr. Rafalski?

17         A.     I think it was four.

18         Q.     Do you remember when the

19   first conversation you had with

20   Mr. Rafalski took place?

21         A.     No, sir.  I can't.  I don't

22   have precise dates for you.  I'm sorry.

23         Q.     Was it in January or

24   February, or was it earlier in November,

Highly Confidential - Subject to Further Confidentiality Review

1    December?

2              MR. BOGLE:  Object to form.

3         Asked and answered.

4              THE WITNESS:  I honestly

5         don't remember the dates for you,

6         sir.

7    BY MR. EPPICH:

8         Q.    Do you remember how long the

9    conversation lasted?

10        A.    Not off the top of my head,

11   I don't.

12        Q.    Was it in person or on the

13   phone?

14        A.    It was on the phone.  That,

15   I do remember.  He's in -- I don't know

16   where he lives.  But he wasn't -- we're

17   not near each other.  Let's just put it

18   that way.

19        Q.    And were plaintiffs' counsel

20   present for these discussions?

21        A.    Yes.

22        Q.    Which plaintiffs' counsel?

23        A.    Well, I know Mr. Bogle was

24   present.  And beyond that I don't rightly

1   recall.

2         Q.    Was Mr. Bogle present for

3   all of your conversations with

4   Mr. Rafalski?

5         A.    Yes, I believe he was.

6         Q.    Do you recall any other

7   attorneys from the plaintiffs' side that

8   were present for any of your

9   conversations with Mr. Rafalski?

10        A.    As I said to you previously,

11  no, sir, I don't.

12        Q.    Was Mr. Mike Fuller present?

13        A.    I don't rightly recall, sir.

14        Q.    Was Ms. Amy Quezon?

15        A.    Again, I don't recall the

16  names of the counsel from the -- the

17  other counsel that might have been

18  present during the meeting.

19        Q.    Did you have any in-person

20  conversations with Mr. Rafalski?

21        A.    No, sir, I did not.

22        Q.    They were all by the phone?

23        A.    They were all by phone.

24        Q.    Dr. Whitelaw, if you could

1    turn to Appendix 1 of your first report.

2         A.    Okay.

3         Q.    Exhibit 2.  This is on Page

4    259.

5         A.    Yes, sir.

6         Q.    Is this a complete list of

7    all the materials you considered in

8    forming your opinions in your April 15

9    report?

10        A.    To the best of my knowledge,

11   it is complete, yes.

12        Q.    Did you consider anything

13   that's not listed in this -- in this

14   report -- excuse me -- in Appendix 1?

15        A.    I believe, as I just

16   answered to you, I believe it's fully --

17   it's full and complete.

18        Q.    And how were the documents

19   on this list selected?

20             MR. BOGLE:  Objection.

21        Asked and answered.

22             THE WITNESS:  Well, we can

23        go back over it again.  But we'll

24        take it from the top.

1        I start with the federal

2    sentencing guidelines.  They're

3    the eight elements in the federal

4    sentencing guidelines.

5        I asked counsel with each

6    defendant that I was asked to look

7    at, I'm looking for documents like

8    this.  Do we have any evidence of

9    this?  I'd like to see standard

10   operating procedures, please.  I'd

11   like to see this.  They produced

12   what they had.

13       If I was confused or didn't

14   understand what I got or I thought

15   there might be more, I said this

16   is what I'm looking for.  We

17   worked back and forth until I

18   thought I had a complete --

19   complete inventory of the

20   documents I would need to see to

21   be able to render my opinion.

22   BY MR. EPPICH:

23       Q.    And the plaintiffs' counsel

24   provided all these documents to you in

Highly Confidential - Subject to Further Confidentiality Review

1    response to your request, correct?

2          A.    There are documents that are

3    in here listed that actually are publicly

4    available documents from the web that I

5    was able to pull down, and those are

6    noted separately.

7                But if you're talking about

8    in section -- are we talking just Section

9    A?

10         Q.    Yes, sir.

11         A.    Okay.  The documents in

12   Section A were provided to me by counsel

13   at my direct request.

14         Q.    If you can turn to Page 276.

15   Pardon me.  Let's start with 275.  Page

16   275.

17         A.    Hang on a second.  Hang on a

18   second.  I'm getting there.

19         Q.    On Page 275, there's a

20   Section F, defendant discovery responses.

21         A.    Mm-hmm.

22         Q.    Did plaintiffs provide these

23   to you upon your request?

24         A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And looking at Page 276,

2    Section G, corporate witness depositions.

3          In response to your

4    requests, plaintiffs selected these

5    deposition transcripts and sent these to

6    you to review?

7    A.    If they fit the topics I was

8    looking for, and the end documents that

9    supported my understanding of what was

10   transpiring, these would be the witnesses

11   I would have interviewed in a company had

12   I been able to do live witness, you know,

13   interactions, yeah.

14   Q.    And in Section H, on

15   Page 277, there's some third-party

16   witness depositions.  Did plaintiffs'

17   counsel provide these deposition

18   transcripts to you in response to your

19   request?

20   A.    Yes.

21   Q.    Now, at any time did the

22   plaintiffs' counsel provide to you a

23   complete list of corporate witnesses or

24   third-party witnesses that had been

Highly Confidential - Subject to Further Confidentiality Review

1    deposed in this case?

2            MR. BOGLE:  Object to form.

3            THE WITNESS:  I don't recall

4        seeing a complete list.  But again

5        I was working defendant by

6        defendant.  So I'm not sure I saw

7        a unified list, if that's what

8        you're asking.

9   BY MR. EPPICH:

10       Q.    You reviewed additional

11  materials in support of your May 10

12  supplemental report, correct?

13       A.    I did.

14            Is there something in

15  particular you'd like to look at?

16       Q.    You reviewed McKesson due

17  diligence files; is that correct?

18            And for your reference, I'm

19  on Appendix A of your supplemental

20  report, Exhibit 3, Page 11.

21       A.    Thank you.  Thank you.  I'll

22  go there.

23            MR. BOGLE:  Can you restate

24        the question for him or read back

Highly Confidential - Subject to Further Confidentiality Review

1    or whatever?

2            MR. EPPICH:  I can restate

3    it.

4    BY MR. EPPICH:

5        Q.    Dr. Whitelaw, did you review

6    additional McKesson due diligence files

7    in your May 10 supplemental report?

8            MR. BOGLE:  Object to form.

9            THE WITNESS:  Yes, I did.

10   BY MR. EPPICH:

11       Q.    And when did you receive

12   these documents from the plaintiffs'

13   counsel?

14       A.    I can't really tell you when

15   I received them, when I first received

16   them from -- I'm sorry.  I've looked at

17   so many documents.  I can't tell you

18   specifically.

19       Q.    Was it after you served your

20   April 15th report?

21       A.    I believe so.

22       Q.    You don't recall?

23       A.    I don't recall.  As I said,

24   I've looked at a lot of files and a lot

Highly Confidential - Subject to Further Confidentiality Review

1    of paper.  So you're asking me, did I

2    look at this a second time, a third time,

3    the first time?  I don't remember.

4          Q.    Do you remember asking for

5    additional documents from plaintiffs'

6    counsel after you served your first

7    report?

8          A.    Yes, I do.

9          Q.    And the documents listed in

10   Appendix A would be the documents that

11   you requested, sir?

12         A.    Yes, it would be.

13         Q.    Now, you also reviewed

14   documents from Cardinal, CVS and

15   Walgreens that are listed in Appendix A;

16   is that correct?

17         A.    I did.

18         Q.    And you had received those

19   documents also after serving your first

20   report?

21         A.    Yes, sir.

22         Q.    For the documents listed in

23   Appendix A of your supplemental report,

24   did you request those documents or did

1    plaintiffs' counsel simply send them to

2    you and ask you to look at those

3    documents?

4                MR. BOGLE:  Are you

5         referring to a specific section or

6         just all of the documents, just so

7         we're clear?

8    BY MR. EPPICH:

9         Q.    Well, we could -- why don't

10   we start with a broader question.  All of

11   the documents and we can narrow it down

12   if we need to.

13                MR. BOGLE:  Okay.

14   BY MR. RIVERA:

15        Q.    All right.

16        A.    Which documents in which

17   section are we looking at please?

18        Q.    Well, I was thinking just of

19   all the documents in Appendix A.

20        A.    Okay.  All of the documents

21   in Appendix A -- Appendix -- the

22   documents in Sections A, B, and C, are

23   all the things that I was looking at and

24   there were things that I had found on my

1    own, so, they were not supplied.

2              In Section D, if that's

3    where you want to go, they were in

4    response to the ongoing continuing

5    requests for documents and new documents

6    that pertained to the sections, again,

7    from the eight elements of the federal

8    sentencing guidelines that pertained to

9    my framework.

10             So as new things became

11   available I looked at it.  If it was

12   relevant to the report that I was writing

13   and the framework I was using, there was

14   an on -- you know, it was an ongoing

15   request for anything new, please let me

16   see it.

17        Q.    Have you reviewed any

18   additional materials since your

19   supplemental report was served on

20   May 10th?

21        A.    Not that I can recall.

22        Q.    Have plaintiffs' counsel

23   sent -- has -- have plaintiffs' counsel

24   sent you any documents to review since

1    May 10th?

2              A.     Again, not that I recall.

3              Q.     Have you -- have you

4    reviewed the reports from any other

5    experts served in this litigation?

6              A.     No, sir, I have not.

7              Q.     And since you served your

8    supplemental report on May 10th, have

9    you -- have you reviewed any additional

10   deposition transcripts?

11             A.     No, I don't believe I have.

12             Q.     Mr. Whitelaw, let's take a

13   look at your CV which is in tab -- excuse

14   me, Exhibit 2 your first report.  It

15   starts on Page 279.

16             A.     Yes, sir.

17             Q.     Is this an up-to-date

18   version of your CV?

19             A.     Yeah, I believe it is.

20             Q.     And to the best of your

21   knowledge, it's complete and accurate?

22             A.     To the best of my knowledge

23   it is complete and accurate, sir.

24             Q.     You hold a law degree?

1        A.      I do.

2        Q.      You subsequently received an

3    LLM?

4        A.      Yes, sir, I did.

5        Q.      You also received a doctor

6    of judicial science, correct?

7        A.      I received an SJD from

8    Widener University in health law, yes,

9    sir.

10        Q.      And an SJD, I'm -- I'm not

11    familiar with it.  Is that a doctor of

12    judicial science?

13        A.      A doctorate of laws.

14        Q.      Are you a member of the

15    Virginia and Pennsylvania bars?

16        A.      I am.

17        Q.      Do you maintain active --

18    active bar licenses in these two states?

19        A.      I am inactive in Virginia.

20    I am active in Pennsylvania.  But in good

21    standing in both.

22        Q.      I would assume nothing less.

23                Let's look at Page 79.

24        A.      You mean 279?

1        Q.    I'm sorry, Page 279.  In

2    your professional summary.

3        A.    Yes, sir.

4        Q.    The second sentence in your

5    professional summary states, "His career

6    has focused on food and drug law and

7    corporate governance, as well as

8    designing and running compliance programs

9    within medical devices, pharmaceutical

10   sales and marketing, and pharmaceutical

11   R&D."

12            Did I read that correctly?

13       A.    Yes, I do believe you did.

14       Q.    And this is an accurate

15   statement?

16       A.    Yes, that is an accurate

17   statement.

18       Q.    Let's look at the next

19   sentence in this paragraph.  "He is a

20   licensed food and drug attorney, with a

21   doctorate in health law."

22            Those statement is also

23   accurate?

24       A.    Yes.

1     Q.    You are a licensed food and

2  drug attorney?

3     A.    I practice my specialty is

4  food and drug.

5     Q.    And you have a doctorate in

6  health law?

7     A.    I do, from Widener

8  University as we just discussed.

9     Q.    The next sentence reads,

10  "His forte is designing, building and

11  running life science compliance programs

12  from a 'blank sheet of paper.'"

13          Did I read that correctly?

14     A.    You did.

15     Q.    And is that statement

16  accurate?

17     A.    Yeah, I think it's an

18  accurate statement.

19     Q.    The statement does not

20  include the words wholesale

21  pharmaceutical distributors, correct?

22     A.    No, sir, it does not.

23     Q.    It does not include DEA

24  compliance programs, correct?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    DEA compliance programs, as

2  we will -- as noted in my report, are a

3  subset of the larger corporate compliance

4  program.

5            So you have a corporate

6  compliance program.  You have an

7  anti-diversion program under that.  You

8  have a suspicious order monitoring

9  program under that.

10           So it's all sort of a

11  subsumed in the bigger picture.  We are

12  talking compliance, we are talking

13  compliance with all laws and regulations,

14  the systems and processes designed at the

15  corporate level.

16      Q.    Have you designed a DEA

17  compliance program before?

18      A.    I have not designed a DEA

19  compliance program in the sense of a

20  controlled substances.  I have designed a

21  sample and sample accountability PDMA

22  compliance programs.  As you know, those

23  are substantially similar programs.  You

24  need to know who you are selling -- you

1  know, providing samples to, that they're

2  qualified to receive the samples, that

3  the inventories and samples that you

4  deliver are in fact given to sales reps,

5  are in fact -- are passed out to

6  healthcare providers, are in fact

7  accounted for.  Any elements of diversion

8  on the other hand are then reported

9  appropriately to the appropriate

10  agencies, et cetera.  So yes, I have done

11  that.

12      Q.   Now, do sample and sample

13  capacity programs and PDMA compliance

14  programs, do -- do those -- do those

15  programs use 21 U.S.C. 823?

16           MR. BOGLE:  Object to form.

17      You can answer if you understand.

18           THE WITNESS:  I'm not sure I

19      understand the question that he's

20      asking.

21  BY MR. EPPICH:

22      Q.   Well, do those programs, are

23  they governed by the Controlled

24  Substances Act and its affiliated

Highly Confidential - Subject to Further Confidentiality Review

1  regulations?

2      A.    Only if you're dropping

3  samples under a -- only if you're

4  dropping controlled substances samples,

5  then yes, it would apply.  If you're not

6  dropping controlled substances samples,

7  the answer is no, it would not apply.

8      Q.    Do either of those programs

9  use suspicious order monitoring programs

10  as defined by the Controlled Substances

11  Act and its affiliated regulations?

12      A.    Again, back to my original

13  answer, if you're dropping controlled

14  substances samples, you would need to

15  comply with the suspicious order

16  monitoring requirements, as well as the

17  PDMA requirements.  And if you're

18  dropping non controlled substances, then

19  the answer would be you do not need to

20  comply.

21      Q.    And did -- did any of the

22  programs that you designed drop sample --

23  controlled substances into them?

24      A.    Not that --

Highly Confidential - Subject to Further Confidentiality Review

1            MR. BOGLE:  Object to form.

2            Go ahead.

3            THE WITNESS:  That I

4       designed, no.  Although I was

5       working on a program for -- when I

6       was at Deloitte, we were working

7       on a program at the request of

8       Henry Schein.  We were bidding on

9       an opportunity.  And we were going

10      to be -- and we were laying out

11      how we designed our -- how you

12      would design that program, so.  So

13      to that extent, yes.

14   BY MR. EPPICH:

15      Q.    Did you win that business

16   for Henry Schein?

17      A.    No.  Unfortunately we

18   didn't.  My understanding from the

19   feedback I got from the partner, it was a

20   price point issue.

21      Q.    When was the first time that

22   you read 21 U.S.C. 823?

23      A.    Holy cow.  I've been doing

24   this 30 years.  I can't tell you.  But it

1    would have been a long time ago.  First

2    time I read it?  A long time ago.

3          Q.    You worked as an intern at

4    the office of chief counsel at FDA?

5          A.    I did for a period of time.

6          Q.    It was for one year,

7    correct?

8          A.    Correct.

9          Q.    That was from 1988 to 1989?

10         A.    That is correct.

11         Q.    And then you took an

12   associate position at Fox Bennett &

13   Turner?

14         A.    Mm-hmm.

15         Q.    That was your first position

16   after law school, right?

17         A.    Yeah.  That would have been

18   correct.

19         Q.    And Fox Bennett & Turner is

20   a private law firm?

21         A.    Yes.  Was originally Fox

22   Weinberg & Bennett.  Is now -- it was

23   then Fox Bennett & Turner.  I have no

24   idea what it's evolved into now, If the

1    firm is even still in existence at this

2    point.

3           Q.    Your work at the Fox Bennett

4    & Turner firm was on food, drug, and

5    environmental issues, correct?

6           A.    Correct.

7           Q.    After a year at Fox

8    Bennett & Turner, you moved to the

9    company of FD Inc.?

10          A.    Mm-hmm.

11          Q.    And you were the head of

12   sales and marketing?

13          A.    I did.

14          MR. BOGLE:  Make sure you

15          say yes or no rather than

16          "mm-hmm," just sort of -- so the

17          record is clear.  The court

18          reporter will get onto you a

19          little.

20          THE WITNESS:  Thank you.

21          MR. BOGLE:  She's nice,

22          but...

23          THE WITNESS:  I'll try to do

24          better.

1             MR. BOGLE:  You're fine.

2    BY MR. EPPICH:

3         Q.    You're doing fine.  So at FD

4    Incorporated, you were the head of sales

5    and marketing, correct?

6         A.    I was.

7         Q.    You were focused on

8    marketing strategies in this position?

9         A.    Yes, actually, I was.

10        Q.    For food and drug statutory

11   administrative and regulatory materials,

12   correct?

13        A.    Correct.

14        Q.    Now, after the FD company,

15   you became the senior attorney and

16   compliance coordinator at C.R. Bard; is

17   that right?

18        A.    Yes, sir, I did.

19        Q.    C.R. Bard is a medical

20   device manufacturer?

21        A.    Yes.

22        Q.    C.R. Bard manufactures

23   medical devices such as stents,

24   catheters, surgical mesh; is that true?

1    A.    Never -- my time, never

2  manufactured stents.  Surgical catheters,

3  yes.  Feeding tubes, yes.  Urological

4  catheters, yes.  Other specialty

5  catheters, yes.  And electrophysiology

6  devices.  It was a whole host of devices.

7    Q.    C.R. Bard is not a wholesale

8  drug distributor, is it?

9    A.    Not by the definition of

10  what a wholesale drug distributor is, no.

11    Q.    C.R. Bard does not

12  manufacture opioids?

13    A.    At least not when I was

14  there, no they did not.

15    Q.    C.R. Bard does not

16  distribute opioids?

17    A.    Not when -- during the time

18  that I was present.

19    Q.    Or any other controlled

20  substance?

21    A.    To the best of my knowledge,

22  again, not when I was there.

23    Q.    Did you provide any

24  compliance advice regarding the

Highly Confidential - Subject to Further Confidentiality Review

1    Controlled Substances Act in your

2    position at C.R. Bard?

3           A.    I may have.  I don't recall.

4    You're asking me -- you're asking me

5    something 30 years ago, so entirely

6    possible.  We used -- we had

7    laboratories.  We used controlled

8    substances in those laboratories to the

9    best of my recollection.  And is there a

10   chance I said something at some point on

11   it, yes.  Do I rightly remember, no, sir

12   I don't.

13          Q.    Did you provide any

14   compliance advice relating to a

15   suspicious order monitoring program while

16   at C.R. Bard?

17          A.    That I can say we did not

18   have.

19          Q.    After C.R. Bard, you became

20   the legal compliance officer at

21   SmithKline Beecham Pharmaceuticals?

22          A.    Beecham.  Yes.

23          Q.    Beecham, thank you.

24                And your CV says that you

1    created and implemented policies to

2    reduce the risk from perceived improper

3    influence with healthcare professionals;

4    is that right?

5         A.    That's part of what I did,

6    yes.

7         Q.    Those policies are

8    anti-kickback measures, right?

9         A.    They are not only

10   anti-kickback measures.  Again, as we

11   discussed earlier, I did PDMA work for

12   them as well and sample accountability

13   work as well.  They're not only

14   anti-kickback statutes.  There's false

15   claims work.

16        Q.    How much of your time was --

17   how much of your work at SmithKline

18   related to PDMAs and sample -- and sample

19   programs?

20        A.    Honestly, I spent at least a

21   quarter of my time, if not more, on that.

22   We had lots of investigations.  We had

23   lots of issues.  We were putting in new

24   systems, controls, writing new policies.

1    It was a substantial chunk of time.

2         Q.    And these policies, these

3    PDMA sample and sample policies that

4    you've mentioned a few times, they focus

5    on policies that govern providing samples

6    that are given to physicians, right?

7         A.    Correct.  But we're -- but

8    let's be clear.  The kinds of controls

9    that you're putting in around PDMA,

10   non-controlled substances samples are

11   substantially equivalent to what you're

12   doing in controlled substances work.

13         You need to know the right

14   people that you're dropping to.  You need

15   to account for your inventory.  You need

16   to look for suspicious behavior.  You

17   need to report suspicious behavior.  You

18   need to investigate red flags.  You need

19   to investigate noncompliance.  You need

20   to report noncompliance.

21         It's all, again, pretty much

22   substantially similar to the world of

23   controlled substances.  You're just

24   working with a different set of products.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    But the policies focus on

2  providing samples to physicians, that's

3  true, correct?

4    A.    That -- that is true.

5    Q.    Now, SmithKline was --

6    A.    Or other -- other

7  prescribers, so let's be clear.  You can

8  have nurse practitioners, or physician's

9  assistants, who also have prescribing

10  privileges.  We could provide samples to

11  them.

12    Q.    Thank you for that.

13        SmithKline was a

14  pharmaceutical manufacturer, right?

15    A.    That is correct.

16    Q.    SmithKline was not a

17  wholesale drug distributor?

18    A.    No, sir, it was not.

19    Q.    SmithKline did not

20  manufacture opioids, correct?

21    A.    No.

22    Q.    SmithKline did not

23  distribute opioids?

24    A.    To the best of my knowledge,

Highly Confidential - Subject to Further Confidentiality Review

1    no.  I don't believe we had any products

2    that were opioids.

3         Q.    And SmithKline did not

4    distribute controlled substances?

5         A.    Again, to the best of my

6    recollection, we did not distribute any

7    controlled substances.

8         Q.    Now, you were promoted -- or

9    excuse me.  Let me strike that.

10        At some point SmithKline

11   merged with Glaxo, correct?

12        A.    That is correct.

13        Q.    And you became the

14   compliance officer?

15        A.    I became the compliance

16   officer for the global R&D business unit.

17        Q.    You ensured that Glaxo --

18   and the new company was known as

19   GlaxoSmithKline?

20        A.    That's correct.

21        Q.    And you ensured in your

22   position that GlaxoSmithKline's global

23   research and development operations

24   complied with international regulatory

Highly Confidential - Subject to Further Confidentiality Review

1    requirements?

2            A.     Domestic and international,

3    yes.

4            Q.     Now, GlaxoSmithKline is a

5    pharmaceutical manufacturer, correct?

6            A.     Yes, sir, it is.

7            Q.     GlaxoSmithKline is not a

8    wholesale drug distributor?

9            A.     That is correct.

10           Q.     GlaxoSmithKline does not

11   manufacture opioids?

12           A.     No.  GlaxoSmithKline does

13   not manufacture opioids.  But let us be

14   clear, and especially in the research and

15   development arm, they use opioids.

16   Opioids are used in the testing.  So,

17   therefore, DEA compliance such as

18   security controls, vaults, sign-ins, all

19   that is absolutely relevant.  And yes, I

20   did work in that space.

21           Q.     But -- and I appreciate that

22   distinction.  But GlaxoSmithKline does

23   not manufacture opioids, correct?

24           A.     That is correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    GlaxoSmithKline does not

2  distribute opioids, correct?

3    A.    Correct.

4    Q.    GlaxoSmithKline does not

5  distribute controlled substances?

6    A.    That is correct.

7    Q.    After GlaxoSmithKline, you

8  became a director in the life sciences

9  compliance department at Deloitte &

10 Touche?

11   A.    I did.

12   Q.    Your LinkedIn page states

13 that you had a special focus on bribery

14 and corruption issues pertaining to

15 research trials, and grants, medical

16 affairs and medical science liaisons?

17   A.    That was certainly one of

18 the focuses.  But I had -- again, my

19 duties as a director of life sciences

20 buttoned up around a bunch -- bunch of

21 duties.

22          But, yes, my specialty was

23 that particular area.  I had a lot of

24 expertise in that space.

1    Q.    And turning back to your CV

2    that's attached to your report.  It says

3    "During your time at Deloitte & Touche,

4    you led the advisory practice" -- pardon,

5    you were the lead -- I'm going to strike

6    that.

7         When -- when you were --

8    when you were at Deloitte & Touche you

9    led the advisory practices transparency

10   team to advise clients on compliance with

11   the Sunshine Act and its international

12   equivalence?

13   A.    Yes, I did.

14   Q.    Now, the Sunshine Act is

15   governed by the centers for Medicare and

16   Medicaid services?

17   A.    Here in the United States,

18   yes.  It's also -- but the controlling

19   statute is the Affordable Care Act.

20   Q.    You did not provide any

21   compliance advice to wholesale

22   distributors while at Deloitte, correct?

23   A.    We had that discussion.  And

24   the answer was we were working, trying to

Highly Confidential - Subject to Further Confidentiality Review

1    work with, for example, with Henry Schein

2    and it did not come to fruition.  But did

3    I -- if the project had come to fruition,

4    I was the lead director on that project,

5    and yes, we would have.

6            Q.    But other than your pitch

7    for Henry Schein that did not come about,

8    you did not provide any compliance advice

9    to wholesale distributors at your job at

10   Deloitte?

11           MR. BOGLE:  Object to form.

12           THE WITNESS:  I'm pausing,

13       Chris, because we -- I did work on

14       and off with other wholesale

15       distributors on other issues.  I

16       was brought in with ABC, I think

17       at some point to advise on

18       anti-kickback and FCA.

19           But again, you're asking me

20       for conversations with other

21       partners.

22   BY MR. EPPICH:

23           Q.    I'm not interested in any

24   confidential information.  Just let me --

Highly Confidential - Subject to Further Confidentiality Review

1   let me be clear --

2          A.    I can't give you any more

3   other than -- other than, yeah, they were

4   clients of ours, and, yes, if they needed

5   compliance advice or --

6          Q.    Let me -- let me just ask

7   you --

8                MR. BOGLE:  Hold on, hold

9          on, hold on.  Are you finished

10         with your answer?

11               THE WITNESS:  Yeah.

12               MR. BOGLE:  Okay.

13               MR. EPPICH:  I was just

14         trying to stop him, because I -- I

15         don't want to get into any

16         confidential information --

17               MR. BOGLE:  Yeah, I don't

18         want you to either.

19               THE WITNESS:  I'm not going

20         to get you there.

21   BY MR. EPPICH:

22         Q.    Sir, I just -- I'm just -- I

23   just want to know generally, did you

24   provide any guidance to any wholesale

Highly Confidential - Subject to Further Confidentiality Review

1    distributor on the topic of suspicious

2    order monitoring programs while you

3    worked at Deloitte.

4         A.    Other than the topic we

5    discussed previously, no.

6         Q.    And that topic is the Henry

7    Schein?

8         A.    Henry Schein.

9         Q.    Thank you.

10         Did you provide any

11   compliance advice to opioid manufacturers

12   during your time at Deloitte?

13        A.    Yes.  I did provide

14   compliance advice.

15        Q.    And did you provide any

16   compliance advice -- and I'm just asking

17   for generally --

18        A.    I know.

19        Q.    -- on the -- on suspicious

20   order monitoring programs?

21        A.    Not that topic, per se, but

22   other topics.

23        Q.    After Deloitte you moved to

24   a company named Misonix?

Highly Confidential - Subject to Further Confidentiality Review

1         A.     Misonix.

2         Q.     Misonix.  I butchered that

3    one, didn't I?

4                You became the interim chief

5    compliance officer at Misonix?

6         A.     I was interim chief

7    compliance officer.

8         Q.     You were there for about

9    seven months?

10        A.     Yes.

11        Q.     And why -- why did you leave

12   after seven months?

13        A.     Because they no longer

14   needed the services that I was providing.

15   My job was to stand up and get the

16   compliance program running for that -- it

17   was a small company.

18        Q.     It was a medical device

19   company?

20        A.     Medical device company on

21   Long Island.

22        Q.     Misonix is not a wholesale

23   pharmaceutical distributor?

24        A.     No, sir.

1    Q.    Misonix does not manufacture
2  opioids?
3    A.    No.
4    Q.    Misonix does not manufacture
5  controlled substances, correct?
6    A.    No, sir, it does not.
7    Q.    Following your time at
8  Misonix, you started the Whitelaw
9  Compliance Group?
10    A.    No, actually the Whitelaw
11  Compliance Group predates my job -- my
12  job at Misonix.  And Misonix was part
13  of -- was a consulting gig.
14    Q.    Your current position is the
15  president and CEO of Whitelaw Compliance
16  Group, correct?
17    A.    Correct.  It's my company.
18    Q.    Your company is described in
19  your CV, as, "Focused exclusively to
20  small to medium-sized FDA-regulated
21  companies."  Is that right?
22    A.    That's -- that's the general
23  direction that I work in, yes.
24    Q.    You focus on small and

Highly Confidential - Subject to Further Confidentiality Review

1    medium-sized FDA regulatory companies?

2        A.    I do focus on them.

3        Q.    Your company does not focus

4    on compliance at large companies,

5    correct?

6            MR. BOGLE:  Object to form.

7            THE WITNESS:  Typically,

8        Chris, it doesn't, although I will

9        do work for large companies.

10       Typically the larger companies are

11       looking for the Deloitte &

12       Touches, the Pfizers.  And the

13       Pfizers of the world, GSKs of the

14       world are looking for the large

15       big four.  I'm not trying to

16       compete with the big four.  That's

17       not the services that I provide.

18   BY MR. EPPICH:

19       Q.    I was looking at your

20   company's website, specifically the

21   advertised services that you advertise.

22   And I saw that you -- you do not

23   advertise services for pharmaceutical

24   wholesale distributors, correct?

Highly Confidential - Subject to Further Confidentiality Review

1        A.     No, I don't.  I haven't.

2        Q.     You don't advertise services

3   for chain pharmacies, do you?

4        A.     No.  I have not explored

5   either of those two marketing segments,

6   although I have thought about expanding

7   into it.  But again you're talking to a

8   gentleman who runs his own firm, who does

9   both sales and delivery on the work that

10  I do.  So there's -- there's so much.

11  But would I do work for a wholesaler?

12  Yes.  Could I do work for a wholesaler?

13  Yes.  Could I do work for a chain

14  pharmacy?  Absolutely.

15       Q.     You also don't list

16  experiences or services concerning the

17  Controlled Substances Act on your

18  website, do you?

19       A.     I highlight the main areas

20  that I focus on.  I don't highlight every

21  area that I focus on.  And controlled

22  substances is not an area that is listed,

23  if that's what you're asking.

24       Q.     You don't list any of your

1    experiences or services concerning DEA on

2    your website, do you?

3         A.    Not that I rightly recall.

4         Q.    Mr. Whitelaw, you never

5    worked at the DEA, did you?

6         A.    No, sir.  I didn't.  I

7    didn't have the honor.

8         Q.    You've never worked at a

9    wholesale distributor?

10        A.    No.

11        Q.    Do you know how many

12   wholesale distributors are in the United

13   States right now?

14        A.    No.  Afraid I don't have a

15   hard count for you.

16        Q.    And you testified earlier

17   that you've never designed a compliance

18   program for wholesale distributor that's

19   currently in use, correct?

20        A.    No.  That's not what I

21   testified to.  You asked me if I did

22   controlled substances work.  As far as

23   designing compliance programs for others,

24   yes, I have.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Let me ask it a different
2  way then.  Have you designed a compliance
3  program for a pharmaceutical wholesale
4  distributor that is currently in use at
5  that distributor?
6            MR. BOGLE:  Object to form.
7            THE WITNESS:  I have no way
8       of knowing if the work that I did
9       is still being used.  So I can't
10      answer the question for you.  I'm
11      sorry.
12  BY MR. EPPICH:
13     Q.    Which compliance program are
14  you thinking of that you don't know if it
15  is or is not currently in use?
16     A.    You're asking me -- it would
17  have to be naming client names.
18            MR. BOGLE:  Yeah, I mean, if
19       you've got any confidentiality
20       issues --
21            THE WITNESS:  I've got
22       confidentiality issues on this.
23  BY MR. EPPICH:
24     Q.    Is this compliance program

Highly Confidential - Subject to Further Confidentiality Review

1    at any of the defendants named in this

2    litigation?

3         A.    Yes.

4         Q.    Have you ever worked at a

5    chain pharmacy?

6         A.    No, sir.

7         Q.    Have you ever designed a

8    compliance program for a large chain

9    pharmacy that is currently in use?

10         A.    No, sir.

11         Q.    Have you ever designed a

12    controlled substance compliance program

13    for a pharmaceutical manufacturer that is

14    currently in use?

15              MR. BOGLE:  Object to form.

16              THE WITNESS:  Again, I can't

17         answer that for you.  I don't

18         know.

19    BY MR. EPPICH:

20         Q.    On your CV, I notice that

21    your CV does not mention the Controlled

22    Substances Act; is that true?  Would you

23    agree?

24         A.    I would have to read it all

Highly Confidential - Subject to Further Confidentiality Review

```
 1   over again.  Do you want to give me a
 2   minute to read it to make sure that I can
 3   answer that honestly?
 4             MR. BOGLE:  If you need to
 5        read it, you can read it.
 6             THE WITNESS:  No, it doesn't
 7        say the magic word "controlled
 8        substances" in my resumé.
 9   BY MR. EPPICH:
10        Q.    Your CV doesn't mention
11   opioids, does it?
12        A.    No, it doesn't have that
13   magic word in there either.
14        Q.    And it doesn't mention
15   controlled substances?
16        A.    I believe I just answered
17   that question, and the answer is no, it
18   does not.
19        Q.    Your CV doesn't mention
20   diversion of opioids at all either, does
21   it?
22        A.    No, sir, it does not.
23        Q.    The DEA and the FDA, you're
24   familiar with those agencies?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    DEA and FDA?

2    Q.    Yes, sir.

3    A.    Yes, sir, I'm familiar with

4  both agencies.

5        Q.    And the DEA and the FDA are

6  different federal agencies, correct?

7        A.    Yes, that is correct.

8        Q.    DEA and FDA have different

9  regulatory focuses?

10            MR. BOGLE:  Object to form.

11            THE WITNESS:  So they have

12        different regulatory focuses, but

13        I would also qualify that there's

14        overlap between the two, and the

15        two work together in certain

16        instances, controlled substances

17        being an excellent example of

18        that.

19  BY MR. EPPICH:

20        Q.    Well, the DEA is the agency

21  with primary responsibility for enforcing

22  the Controlled Substances Act, correct?

23        A.    With the Controlled

24  Substances Act, yes.

1    Q.    And the FDA is not the

2  government agency charged with enforcing

3  the Controlled Substances Act, correct?

4    A.    That is --

5        MR. BOGLE:  Object to form.

6        THE WITNESS:  That is

7    correct.

8  BY MR. EPPICH:

9    Q.    FDA does not promulgate

10  regulations under the Controlled

11  Substances Act?

12    A.    I'm sorry.  Say that again,

13  please.

14    Q.    Does the FDA promulgate

15  regulations under the Controlled

16  Substances Act?

17    A.    Not usually.

18    Q.    Not ever, correct?

19    A.    To the best of my knowledge,

20  no.

21        MR. BOGLE:  Chris, if you're

22    shifting to another area, we've

23    been almost an hour ten I think.

24        MR. EPPICH:  Maybe ten more

```
1        questions, and then we'll be at a
2        good break.
3              MR. BOGLE:  That's fine.
4        That's fine.
5   BY MR. EPPICH:
6        Q.    I just want to finish up
7   your resumé, sir.
8              MR. BOGLE:  That's fine.
9   BY MR. EPPICH:
10       Q.    You teach as a senior fellow
11  and adjunct professor in life sciences
12  compliance at the Mitchell Hamline School
13  of Law in St. Paul, Minnesota, correct?
14       A.    Yes, sir, I do.
15       Q.    You currently teach there?
16       A.    Yes, sir, I do.  In fact I'm
17  grading final exams as we speak.
18       Q.    Do you live in Philadelphia
19  or do you live in St. Paul?
20       A.    I live in Philadelphia, sir.
21       Q.    Have you ever taught a class
22  on the Controlled Substances Act?
23             MR. BOGLE:  Object to form.
24             THE WITNESS:  No, not
```

1    directly.

2    BY MR. EPPICH:

3        Q.    Have you ever taught a law

4    school class on DEA compliance?

5        A.    Not with its sole focus

6    being DEA compliance, no.

7        Q.    Let me just ask you a quick

8    question about Page 283 of your -- of

9    your publications on your CV.

10       A.    Sure, just one second.  I'm

11   there.

12       Q.    Pages 283 to, I think, 286,

13   is this a complete list of your

14   publications, sir?

15       A.    To the best of my knowledge,

16   sir, it is.  I've written a lot over

17   30 years.  I try to be as complete and

18   thorough as possible.

19       Q.    Have you ever published an

20   article on DEA compliance?

21       A.    Not that I can -- when you

22   say did I ever publish, yes, in my

23   capacity working as an editor,

24   absolutely.  Have I actually -- I mean,

1    is that the question?

2         Q.    Have -- well, we'll take

3    them one at a time.  Have you ever

4    written an article on DEA compliance?

5         A.    I have to read through the

6    entire list to be absolutely sure.

7    But --

8              MR. BOGLE:  If you need to

9         look you can look.

10             THE WITNESS:  The answer to

11        your question is no.  No, sir.

12   BY MR. EPPICH:

13        Q.    Now, shifting to your

14   publication, your -- your work as an

15   editor --

16        A.    Yeah.

17        Q.    -- have you ever published

18   an article on a compliance program for a

19   wholesale pharmaceutical distributor?

20        A.    No.

21        Q.    Have you ever published an

22   article on DEA compliance for a

23   manufacturer?

24        A.    We've published articles in

1    general on DEA compliance.  On a specific

2    compliance program and the elements

3    necessary for a manufacturer, no, sir.

4              MR. EPPICH:  Let's go ahead

5         and take a break.  Let's go off

6         the record.

7              THE VIDEOGRAPHER:  Going off

8         the record, 10:26 a.m.

9              (Short break.)

10             THE VIDEOGRAPHER:  We are

11        back on the record at 10:44 a.m.

12   BY MR. EPPICH:

13        Q.    All right, Dr. Whitelaw, I

14   want to ask you a few more questions

15   about your work at C.R. Bard.  And this

16   is -- we are back on Page 281 of your

17   report.

18        A.    Okay.  Yes, of course.  I'm

19   here.

20        Q.    Now, it says -- it says that

21   you served as Bard's first compliance

22   officer, post-settlement.

23             Is that accurate?

24        A.    Yes, that's an accurate

1    statement, sir.

2         Q.    You then state you created

3    and implemented Bard's original medical

4    device compliance program to meet the

5    requirements of the federal sentencing

6    guidelines and Bard's plea agreement with

7    the U.S. Department of Justice, and

8    served as Bard's first compliance officer

9    post-settlement.

10             Is that -- is that accurate?

11        A.    That is all accurate, sir.

12        Q.    So you oversaw the design

13   and implementation of C.R. Bard's medical

14   device compliance program, is that true?

15        A.    I oversaw the implementation

16   and design of their corporate compliance

17   program, yes.

18        Q.    And their -- their corporate

19   compliance program was directed at

20   medical devices, correct?

21        A.    Their business was in

22   medical devices, yes.

23        Q.    When you designed C.R.

24   Bard's medical compliance program, you

1  designed the program to comply -- comply

2  with existing laws and regulations?

3          A.    Yes.

4          Q.    When you designed C.R.

5  Bard's compliance program, you relied on

6  the guidance from the relevant regulatory

7  agencies available at the time, correct?

8          A.    Well, that's part of what I

9  relied on.  I relied on an awful lot

10  more.  I also relied on the experience,

11  again, this would have been preguidance

12  from OIG and preguidance from department

13  of justice in this space, so the only

14  ones that had any real guidance were the

15  defense industry at the time.  So there

16  were a lot of conversations I had with

17  the folks at Boeing and other places to

18  understand what they had gone through

19  from a defense contracting compliance

20  program perspective.

21              See, you have to remember

22  this is the day when there was very

23  little out there.  This was new to the

24  life sciences industry as a whole and the

1    first time they had experiences with it.

2    So we had to look to other industries for

3    guidance and support and information

4    and -- but it was a wide ranging bit of

5    work that had to be done.

6           Q.    So designing this program,

7    you went out and sought all the guidance

8    that you could from the relevant folks

9    with information and you applied that

10   information that was available at -- at

11   that time in designing Bard's compliance

12   program?

13          A.    Correct.  Mm-hmm.

14          Q.    Now, was there any guidance

15   available from FDI -- let me strike that.

16                Was there any guidance

17   available from FDA at that time?

18                MR. BOGLE:  Object to form.

19          Vague and ambiguous.

20                THE WITNESS:  Could you be

21          more specific when you say type of

22          guidance?  Because obviously the

23          Food and Drug Administration puts

24          out lots and lots of guidance,

1           lots and lots of guidance around

2           medical devices too.

3   BY MR. EPPICH:

4           Q.     That's fair.

5           A.     I'm not sure I know what

6   you --

7           Q.     Did -- did DEA provide any

8   guidance that was relevant to the design

9   of C.R. Bard's compliance program that

10  was available at the time?

11                 MR. BOGLE:  Object to form.

12                 THE WITNESS:  Again, as I

13          said, I mean -- I mean, pick a

14          topic and we can find something

15          where there's relevant guidance.

16                 How do you write a 510(k).

17          When do you need to file a 510(k).

18          When do you need to do a clinical

19          trial.  How do you do a clinical

20          trial.  When do you have to file

21          an IDE.

22                 I'm -- I'm honestly, Chris,

23          not sure what you're asking me.

24          Can you be more specific, please?

```
 1    BY MR. EPPICH:

 2         Q.    I think you actually

 3    answered my question.

 4              So let me ask you a

 5    different question.

 6              You'd agree that it's

 7    appropriate for a regulated company like

 8    C.R. Bard to rely on the available

 9    guidance from the relevant regulatory

10    agency in the design of its compliance

11    programs?

12         A.    I believe that is one thing

13    to rely on.  I believe it's one thing to

14    use, is the relevant guidance that's

15    available, yes.  But obviously it's

16    guidance and guidance obviously has to be

17    tailored.  One of the keys to any -- a

18    good compliance program, as I emphasize

19    throughout the report is, you have to

20    tailor for the individual company, and

21    individual practices, and individual

22    structure.  It's a unique entity.

23              So while the framework and

24    the elements are all the same, and you
```

1  use the same elements, you use the same

2  elements over and over, the eight

3  elements that we talked about at the

4  beginning of this.  It has to be adapted

5  and tailored to your -- to the individual

6  company, in order to be deemed and

7  actually be effective.

8        Q.    So when you design C.R.

9  Bard's compliance program, you relied on

10  all of the information, all of this

11  information that you --

12        A.    I gathered as much --

13            MR. BOGLE:  Wait until he

14        finishes.

15  BY MR. EPPICH:

16        Q.    -- that was available to you

17  at the time, correct?

18            MR. BOGLE:  Object to form.

19            THE WITNESS:  I gathered as

20        much information as I could to

21        inform my decisions, yes.

22  BY MR. EPPICH:

23        Q.    You held this position at

24  C.R. Bard for about six years; is that

1   correct?

2       A.   That would be about right,

3   yeah.

4       Q.   And over that time, you'd

5   agree that technology changed, correct?

6        MR. BOGLE:  Object to form.

7      Vague and ambiguous.

8        THE WITNESS:  When you say

9      technology, what do you mean?

10  BY MR. EPPICH:

11      Q.   Computers got better.

12  Communication capabilities improved.

13  Technology improved.

14      A.   Technology did change, yes.

15      Q.   And you'd expect a

16  compliance program to change over time to

17  incorporate these changes to technology

18  as it became available, wouldn't you?

19      A.   I would expect them to take

20  it into account.  Whether they would

21  actually adopt it and incorporate and use

22  it, again depends on the individual needs

23  of the individual company.

24        I mean, if we -- if we go

1    back for example and take a look at

2    Misonix, if you have a 20-person,

3    40-person company, everybody is down the

4    hall from everybody else.  You might not

5    need, you know, a very large or

6    complicated learning management system.

7    You might be able to do it with just

8    paper records, which is what they did.

9             So it has to be adapted to

10   the -- to the actual client.

11        Q.   But you'd agree with me that

12   if the technology was useful for

13   improving the compliance program that

14   you'd expect the compliance program to

15   change to adopt that new and useful

16   technology?

17        A.   I think where I was going

18   before was the same place I am now, which

19   is you need to evaluate it.  And if it's

20   useful and effective and all the other

21   attributes you go to, incorporate what's

22   good, and don't incorporate what doesn't

23   work.  But it's not an automatic just

24   because technology changes, do you

1    incorporate it.  Not necessarily.

2              Again it depends on facts --

3    it depends on facts and circumstances,

4    the nature of the client, how they're

5    structured, how they're organized.  How

6    many people are involved, how many sites

7    are involved.  I mean, there are a whole

8    range of elements you can go down and

9    look at when we're evaluating whether

10   technology is a good fit or not.

11        Q.    And while you were at C.R.

12   Bard, did the C.R. Bard compliance

13   program incorporate or adopt -- change to

14   incorporate or adopt new technology?

15             MR. BOGLE:  Object to form.

16        Vague and ambiguous.

17             THE WITNESS:  Is there a

18        particular area you wish to talk

19        about or -- I mean, again, we had

20        better e-mail systems and e-mail

21        servers, had a better laptop.  I'm

22        not sure -- I'm not sure if you're

23        asking -- what you're asking in

24        particular.

1   BY MR. EPPICH:

2        Q.    For example, perhaps you

3   used -- when you -- when you started the

4   design of C.R. Bard compliance program in

5   2001, I believe it was, right?

6        A.    No.  I started with Bard

7   long before that.  I started with Bard in

8   1991.  I started working on the

9   compliance program in 1993.

10       Q.    Thank you.  Thank you for

11   that.  So when you started to work on the

12   compliance program in 1993, this is when

13   Windows 95, Microsoft Windows 95, was not

14   available, correct?

15       A.    I honestly don't remember

16   what we were working off of at the time.

17   I do remember -- seem to recall we were

18   working off of -- I think we were working

19   off of Lotus e-mail.

20       Q.    You were working off of

21   Lotus e-mail?  When you left C.R. Bard in

22   '97, was C.R. Bard's compliance program

23   still using Lotus?

24       A.    Actually, I believe we were.

1    I think we were using at that point it

2    had become the iteration called Lotus

3    Notes.

4              But I honestly -- it's so

5    long ago, I don't remember what the

6    e-mail system was.

7         Q.   The change from Lotus to --

8    excuse me, the change from Lotus e-mail

9    to Lotus Notes, that's an example of a

10   technology change that I'm thinking

11   about.

12             Are there other

13   technological changes like that,

14   technological advances that may have been

15   adopted into the C.R. Bard compliance

16   program during your time there?

17             MR. BOGLE:  Object to form.

18        Overbroad.

19             THE WITNESS:  Would you like

20        to narrow it or do we need to go

21        through everything, everything in

22        every area?

23             I mean, for example, did we

24        have a better adverse event

Highly Confidential - Subject to Further Confidentiality Review

1    detection system and signal

2    detection system?  Yes.  Did we

3    change technology?  Yes.  Do I

4    remember exactly what they were

5    and the names of all of them?  No.

6         Did it provide output

7    information that we then utilized

8    as part ever of our compliance

9    efforts?  Yes.

10   BY MR. EPPICH:

11        Q.    And the event detection

12   system -- strike that.

13             The adverse event -- strike

14   that again.

15             The adverse event detection

16   system that you just mentioned, that was

17   one example of improved technology that

18   Bard incorporated into their compliance

19   system while you were there, correct?

20        A.    Correct.

21        Q.    I'd like to ask you a few

22   questions about some terminology.

23        A.    Sure.

24        Q.    What is a DEA Form 222?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    DEA Form 22 is a form that

2   you have to file with the DEA when you're

3   distributing opioids, to my recollection.

4   But again I can go back and look at my

5   report if you'd like.  Can we go back and

6   look at the report?

7        Q.    Oh sure.

8        A.    My recollection of Form 222,

9   is the form that you file to DEA for

10  distributing substances -- controlled

11  substances.

12       Q.    Do you know who fills out a

13  Form 222?

14       A.    I believe it varies by

15  company, but the wholesaler.

16       Q.    The wholesaler fills out a

17  Form 222?

18       A.    Manufacturer.  You are

19  asking me, are you asking me a specific

20  job function, or are you asking me

21  companies?

22       Q.    I'm asking you who would

23  fill out a DEA Form 222?

24       A.    Depending on the company

Highly Confidential - Subject to Further Confidentiality Review

1   it's going to vary by job function,

2   whatever function is assigned to do it.

3        Q.   Do you know who at a

4   wholesale drug distributor would fill out

5   a Form 222?

6             MR. BOGLE:  Object to form.

7        Vague.

8             THE WITNESS:  Are we talking

9        about a specific drug distributor,

10       or are we talking drug

11       distributors in general?

12  BY MR. EPPICH:

13       Q.   We can take McKesson as an

14  example.  Who at McKesson fills out a

15  form 222?

16       A.   Let me go back and look at

17  my report, to be sure.  My recollection

18  is it was filled out by the distribution

19  center.

20       Q.   What is a DEA Form 106?

21       A.   I don't recall what a Form

22  106 is.

23       Q.   Have you heard the term DEA

24  Form 106 before?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yeah.  I've heard the term

2  before.  But I can't give you a precise

3  definition of the form.

4      Q.    What is the Ryan-Haight Act?

5      A.    Well, on that one, you've

6  got me, because I don't know.

7      Q.    Are you familiar with the

8  ARCOS database?

9      A.    Yes, I am familiar with the

10  ARCOS database.

11      Q.    What is ARCOS?

12      A.    My understanding is it is a

13  DEA database that records opioid

14  transactions.

15      Q.    And what types of entities

16  are required to report ARCOS data to the

17  DEA?

18      A.    I believe registrants are

19  required to do that.

20      Q.    Do you know which

21  registrants in particular?

22      A.    Not off the top of my head.

23      Q.    Do you know what is reported

24  by these registrants to the ARCOS

1  database?

2       A.     In general terms, yes.  Do I

3  know exactly every single field they are

4  required to report?  No, I do not.

5       Q.     In general terms then?

6       A.     Size, volume, customer, et

7  cetera.

8       Q.     Size, volume, customer?

9       A.     Of the orders.  Of orders.

10      Q.     And orders of what, sir?

11      A.     Opioids -- controlled

12  substances.

13      Q.     Are registrants required to

14  submit information on all controlled

15  substances or a subselection of

16  controlled substances to the ARCOS

17  database?

18           MR. BOGLE:  Object to form.

19           THE WITNESS:  Honestly I

20       didn't look at that to see what

21       the breadth of the ARCOS database

22       was.  I do know that they have to

23       submit it for opioids.

24  BY MR. EPPICH:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What is CSOS?

2    A.    You want to give me the

3  spelling of that so we are on the same

4  page?

5    Q.    C-S-O-S.

6    A.    Again, is there a specific

7  reference in the report that you would

8  like to go to, or are you just looking

9  for a general term, CSOS?  I'm not sure I

10  understand your question, sir.

11    Q.    Have you ever heard of CSOS

12  before?

13    A.    I have seen it as an acronym

14  used to describe controlled substances

15  ordering systems, yes.

16    Q.    And do you know anything

17  about CSOS other than the acronym?

18        MR. BOGLE:  Object to form,

19        vague.

20        THE WITNESS:  Again, can you

21        be more precise in what you're

22        looking for?

23  BY MR. EPPICH:

24    Q.    How do registrants use CSOS?

1          A.     Again, I'm not even sure I

2   know what you're talking about, per se,

3   because I'm not sure exactly, because

4   again I've seen CSOS used in different

5   acronyms to describe individual

6   registrants, controlled suspicious order

7   monitoring systems.  So I'm not exactly

8   sure where you're driving to.

9          Q.     Have you heard of the term

10  "Holy Trinity"?

11         A.     Yeah, I have heard the term,

12  "the Holy Trinity."

13         Q.     And what is the Holy

14  Trinity?

15         A.     We can go find it -- we can

16  go find it in my report.  I have it.

17  It's a -- it's a drug mixture or the

18  three drugs that are -- tend to be abused

19  together.

20            But I -- if you want the

21  specific drug names, we can go down and

22  find them.  It's in the report.

23            Would you like me to spend

24  the time to go find it?

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Maybe later.

2    A.    Okay.

3    Q.    Are you familiar with the

4    closed system of distribution?

5    A.    Yes, I am familiar with the

6    closed system of distribution.

7    Q.    You'd agree with me that

8    entities have different roles in the

9    control -- in the -- in the closed system

10   of drug distribution?

11   A.    Could you be more precise

12   when you say entities have -- what

13   entities are we talking about?  Which

14   ones are we making comparisons between?

15   Q.    Manufacturers are part of

16   the closed system of distribution?

17   A.    Yes, they are.

18   Q.    And their role is different

19   than the role of distributors in that

20   closed system, correct?

21        MR. BOGLE:  Object to form.

22        THE WITNESS:  Their

23        requirements are exactly the same.

24        How they implement them and what

1          they can see based on where they

2          are in the -- in the systems can

3          be different, yes.

4    BY MR. EPPICH:

5          Q.    Distributors are also part

6    of the closed system?

7          A.    Yes, sir, they are.

8          Q.    And distributors' role is

9    different from that of pharmacies in the

10   closed system?

11         A.    Well, in the sense that

12   pharmacies dispense medication and

13   distributors don't, yes.  They are a

14   different business model.

15         Q.    Pharmacies, of course, are

16   part of that closed system of drug

17   distribution?

18         A.    Yes, they are.

19         Q.    Pharmacies' role is

20   different than a physician's role in the

21   closed system, correct?

22              MR. BOGLE:  Object to form.

23         Vague.

24              THE WITNESS:  Could you be

1    more precise as to what you're

2    asking?

3  BY MR. EPPICH:

4        Q.    Well, pharmacies dispense

5  pharmaceuticals to fill prescriptions

6  written by physician -- physicians, isn't

7  that correct?

8        A.    Pharmacies dispense

9  prescriptions written by those who are

10  authorized to write -- authorized

11  prescribers can be more than physicians,

12  as we've mentioned before.  It could be

13  nurse practitioners and physician's

14  assistants.  But, yes, they fill

15  prescriptions provided to them by an

16  authorized prescriber.

17        Q.    And physicians then are also

18  part of this closed system of

19  distribution, correct?

20        A.    Physicians and others who

21  have prescribing privileges, yes.

22        Q.    DEA controls the closed

23  system of distribution, correct?

24              MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1        THE WITNESS:  Could you be

2      more precise, when you say

3      controls the closed system?

4      That's a very broad term when you

5      say controls.

6   BY MR. EPPICH:

7        Q.    Well, the DEA is the

8   governing agency that manages the closed

9   system of drug distribution, correct?

10        MR. BOGLE:  Object to form.

11        THE WITNESS:  Again -- I'm

12      not sure what you mean by manages,

13      could you help me out there?

14   BY MR. EPPICH:

15        Q.    DEA registers all persons

16   who handle controlled substances in the

17   closed system of distribution?

18        A.    Yes.  It requires

19   registration.

20        Q.    And each of the -- each of

21   the supply chain participants that we

22   just went through must be licensed by the

23   DEA, correct?

24        A.    Can you be more precise with

Highly Confidential - Subject to Further Confidentiality Review

1    that question?

2         Q.    Manufacturers must be

3    registered by the DEA in order to

4    participate in the closed system of

5    distribution, correct?

6         A.    In order to participate with

7    using -- selling controlled substances,

8    yes.

9         Q.    And distributors must be

10   registered by the DEA?

11        A.    To distribute controlled

12   substances, yes.  If they aren't

13   distributing controlled substances, no.

14        Q.    Pharmacies must be

15   registered with the DEA to distribute

16   controlled substances?

17        A.    Yes.

18        Q.    And doctors must be

19   registered with the DEA to -- to

20   distribute controlled substances,

21   correct?

22        A.    That is correct.

23        Q.    DEA also controls the amount

24   of controlled substances that are

Highly Confidential - Subject to Further Confidentiality Review

1   produced, bought, sold, or otherwise

2   transferred within this controlled --

3   within this closed system of drug

4   distribution?

5          MR. BOGLE:  Object to form.

6       Compound.

7          THE WITNESS:  Could you

8       rephrase the question for me?

9   BY MR. EPPICH:

10      Q.    DEA controls the amount of

11  controlled substances that are produced,

12  bought, sold, or otherwise transferred

13  within the closed system of drug

14  distribution?

15         MR. BOGLE:  Same objection.

16         THE WITNESS:  Again, it's an

17      overly broad question.  But if

18      you're asking me does DEA manage a

19      quota system around certain types

20      of products, controlled substances

21      we are talking about, the answer

22      is yes, they do.

23  BY MR. EPPICH:

24      Q.    And DEA controls the

1    transfer of the controlled substances

2    between manufacturers, distributors,

3    pharmacies, and prescribers, correct?

4                    MR. BOGLE:  Object to form.

5                    THE WITNESS:  Again, what do

6          you mean by controls the transfer?

7    BY MR. EPPICH:

8          Q.    What I mean is that they are

9    the agency that monitors, regulates, and

10   enforces the CSA and its regulations that

11   set forth the closed system of drug

12   distribution.

13                   MR. BOGLE:  Object to form.

14         Compound and overbroad.

15                   THE WITNESS:  Could you

16         repeat the question for me,

17         please?

18   BY MR. EPPICH:

19         Q.    You'd agree with me that the

20   DEA is the agency that monitors,

21   regulates, and enforces the Controlled

22   Substances Act and its accompanying

23   regulations?

24                   MR. BOGLE:  Same objection.

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  I agree that

2       the DEA has primary jurisdiction

3       when it comes -- certainly the

4       lead agency when it comes to

5       controlled substances, yes.

6   BY MR. EPPICH:

7       Q.    And part of those

8   responsibilities of the DEA is to control

9   and manage the closed system of

10  distribution, correct?

11          MR. BOGLE:  Object to form.

12          THE WITNESS:  Again, I'm not

13      sure what you mean by managed.

14  BY MR. EPPICH:

15      Q.    What word would you be

16  familiar with?  Let me strike that.

17          The DEA controls the amount

18  of opioids brought into the closed system

19  of drug distribution, correct?

20          MR. BOGLE:  Object to form.

21      Asked and answered.

22          THE WITNESS:  I think we've

23      covered this.

24          They control the quota

1    system, yes.

2    BY MR. EPPICH:

3        Q.    Let's turn in your expert

4    report, Exhibit 2, to Page 33.

5        A.    Could you say the page

6    again, please.

7        Q.    33.

8        A.    Yes, sir.  I think I'm

9    there.

10       Q.    So near the top of the

11   report, or excuse me, the top of Page 33,

12   there's -- you have summarized a list of

13   SOM requirements.

14             Do you see that, listed 1

15   through 6?

16       A.    Yes, I do see it.

17       Q.    SOM is suspicious order

18   monitoring, correct?

19       A.    Yes, as I'm using SOM.

20       Q.    Is this a complete list of

21   all the suspicious order monitoring

22   requirements?

23             MR. BOGLE:  Object to form.

24             THE WITNESS:  Honestly I

Highly Confidential - Subject to Further Confidentiality Review

1           can't tell you without going back

2           and reading the regulations.  If

3           you want we can go through the

4           regulations point by point, but

5           it's a fairly robust list.  I

6           can't tell you it's a complete

7           list.

8   BY MR. EPPICH:

9           Q.    For each of these

10  requirements, you cite the source for

11  which the requirement is derived,

12  correct?

13          A.    I do actually.

14          Q.    Let's walk through these

15  requirements.

16              The first one you list is,

17  "The customer must be known to determine

18  that the customer can lawfully receive

19  the shipment."

20              Do you see that?

21          A.    I do.

22          Q.    And you cite in Note 124 to

23  21 C.F.R. 1301.74(a), correct?

24          A.    That is what the citation

Highly Confidential - Subject to Further Confidentiality Review

1    says there, yes.

2         Q.    You would agree with me that

3    Section 74(a) does not require -- let me

4    strike that.

5              Let me go ahead and mark as

6    Exhibit Number 4 a copy of -- one second.

7         A.    No worries.

8              MR. BOGLE:  We got two days,

9         so we are at your leisure.

10             (Document marked for

11        identification as Exhibit

12        Whitelaw-4.)

13   BY MR. EPPICH:

14        Q.    All right.  Let's go ahead

15   and mark as Exhibit 4 a copy of Section

16   1301.74.

17             Sir, if you could read

18   1301.74.  It says, "Before distributing a

19   controlled substance to any person" --

20        A.    Are we reading the whole

21   section or just a subsection?  You said

22   1301.74?

23        Q.    I'm going to go ahead and

24   read -- I'm going to go ahead and read

1    Section (a) of 1301.74.

2          A.    Okay.

3          Q.    And I'll read it for the

4    record.  "Before distributing a

5    controlled substance to any person who

6    the registrant does not know to be

7    registered to possess the controlled

8    substance, the registrant shall make a

9    good faith inquiry, either with the

10   administration or with the appropriate

11   state-controlled substances registration

12   agency, if any, to determine that the

13   person is registered to possess the

14   controlled substance."

15          Do you see that, sir?

16         A.    Yes, sir.  I see that

17   section.

18         Q.    Now, Section (a) requires

19   the entity distributing a controlled

20   substance to determine that the person is

21   registered to possess the controlled

22   substance.  Isn't that what that says?

23         A.    Yes, I think that's a fair

24   reading of it.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So the entity distributing

2    the controlled substance needs to check

3    the registration status of the person who

4    is seeking the controlled substances,

5    correct?

6    A.    That again, I think, is a

7    fair reading.

8    Q.    And this requirement, this

9    only requirement that we see in

10   Section (a), that the distributor check

11   the registration status, is that what you

12   mean when you say, "The customer must be

13   known to determine that the customer can

14   lawfully receive the shipments"?

15   A.    I think you've overly

16   limited the section.  You said

17   distributors only.

18          What the section actually

19   says is, if you're shipping a controlled

20   substance to the person, you need to make

21   a good faith inquiry that the person

22   receiving it has a valid registration.

23   So if you're a manufacturer shipping a

24   bulk shipment to a distributor, they're

1  going to need to make sure that your

2  distributor has a -- is licensed to

3  receive that.

4       Q.    Thank you for that

5  clarification.  You're absolutely right.

6            The Subsection (a) requires

7  the registrant to check for a valid

8  registration, correct?

9       A.    That's what it says -- says

10  there, yes.

11       Q.    And that -- that's what you

12  mean when you state, "The customer must

13  be known to determine that the customer

14  can lawfully receive the shipment."  You

15  mean that the registrant needs to check

16  the registration, correct?

17       A.    Among other things, yes.

18  But that's what I'm citing to in

19  particular there, yes.  If you don't know

20  who you're shipping to, how can you check

21  a registration?

22       Q.    You mentioned "among other

23  things."  What other things?

24       A.    Has their license been

1    pulled.  Is it getting -- are there

2    enforcement actions to pull that license.

3    You know, are there reasons, other

4    reasons beyond just looking for the

5    registration, per se, that would lead you

6    to conclude that you probably don't want

7    to ship the substances without further

8    inquiry at this time.

9            Q.    And where in the statute

10   does it say that -- strike that.

11           Where in the registration

12   does it say that a registrant must look

13   to other --

14           A.    It doesn't say it in the

15   actual section.  So let's be clear.

16   Where it comes from is the statute, as

17   you started to say, that you have to have

18   an effective anti-diversion program.  So

19   you need to understand where your product

20   is going, including whether or not you

21   have a valid registration.  It's part of

22   the larger statutory obligation to

23   maintain an effective anti-diversion

24   program.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    The next requirement that

2  you list is, "There must be a designed

3  system."  Is that correct?

4      A.    I did.

5      Q.    And then you cite to 21

6  C.F.R. 1301.74(b) for that -- for

7  support, correct?

8      A.    Mm-hmm.

9      Q.    Are there any other sources

10  that you would cite for this requirement?

11      A.    Well, we did talk about the

12  statute.  So we go back to the statute of

13  what is an effective anti-diversion

14  program.  I'm sure we can go through lots

15  and lots of the guidance, if you want to

16  go through -- spend time going through

17  each and every letter that the DEA has

18  written for guidance.

19          But those are the two

20  things, like the Rannazzisi letters, that

21  come to mind -- top of mind.  But no, I

22  do not have a complete and exhaustive

23  list for you.

24      Q.    Is there a reason that you

Highly Confidential - Subject to Further Confidentiality Review

1  only cited 21 C.F.R. 1301.74(b) here in

2  Footnote 125?

3          A.    Other than it states that

4  you have to design and operate a system,

5  no.

6              I mean, again, I'm not sure

7  I understand your question.  I cited to

8  that because that's what it says in the

9  regulation.

10         Q.    The third requirement you

11  list is, "It must be operational,"

12  correct?

13         A.    Yeah.

14         Q.    And again, you cite to 21

15  C.F.R. 1301.74(b)?

16         A.    I do.

17         Q.    Are there any other sources

18  that you can think of for this

19  requirement?

20         A.    I think we covered --

21  covered it with the previous one, but we

22  can go back over it.  Controlled

23  Substances Act in and of itself.  Again,

24  for an effective -- for an effective

Highly Confidential - Subject to Further Confidentiality Review

1    anti-diversion program, if your system

2    doesn't work or doesn't operate, how can

3    you report anything?  So you obviously

4    have to have an operational system, and

5    it has to work.  You also have the

6    Rannazzisi letters and other guidance as

7    well, Chemical Handler's Manual.  I mean,

8    we can go through it in a complete list.

9                But I don't have a complete

10   list for you, but those certainly would

11   come to top of mind.

12        Q.    And the fourth requirement

13   that you list is, "It must identify

14   suspicious orders of controlled

15   substances."

16                Do you see that?

17        A.    I do.

18        Q.    And again, you cite to 21

19   C.F.R. 1301.74(b)?

20        A.    Yes.

21        Q.    The fifth requirement you

22   list is, "Orders can be suspicious

23   because of, A, unusual size; B,

24   substantial deviation from a normal

Highly Confidential - Subject to Further Confidentiality Review

1    pattern; or, C, unusual frequency."

2            And again you cite to 21

3    C.F.R. 1301.74(b), correct?

4        A.    That is correct.

5        Q.    Are there any other sources

6    that you would cite for this requirement?

7        A.    Again, let's go back to the

8    statute.  It's necessary for an effective

9    anti-diversion program, you need to be

10   flagging and reporting and finding and

11   holding and not shipping suspicious

12   orders.

13       Q.    Now, you mentioned the

14   statute.  And I believe you are referring

15   to 21 C.F.R. 800; is that correct?

16       A.    I don't know the exact

17   number.  I believe it's the Controlled

18   Substances Act.  We can go find the exact

19   statutory reference if you'd like.

20       Q.    And my apologies.  I think I

21   may have confused you.  I said C.F.R.  I

22   meant to say 21 U.S.C. 800.

23       A.    Again, it is where the

24   Controlled Substances Act is codified.

Highly Confidential - Subject to Further Confidentiality Review

1    Again, if you would like to find the

2    exact section, we can go back and do

3    that.

4         Q.    Is the term "suspicious

5    orders" defined in the CSA?

6         A.    My understanding is the

7    closest definition that we have is

8    defined in the implementing regulations.

9         Q.    Now, the final requirement

10   you list, 6, has two subparts.  I'm going

11   to take them one at a time.

12             The first part of the

13   requirement is, "Once a suspicious order

14   is discovered, A, the local DEA field

15   office must be informed."

16        A.    Mm-hmm.

17        Q.    And for that requirement you

18   cite again to Section 1301.74(b),

19   correct?

20        A.    Correct.

21        Q.    And are there any other

22   sources for this requirement?

23        A.    I think it's embodied in the

24   statute, if you want to go there, and

1    probably other guidance.  I don't have an

2    exhaustive list off the top of my head.

3          Q.    The second part of the

4    requirement that you list is, "Once a

5    suspicious order is discovered, B, the

6    order must be prevented from being filled

7    until it can be ascertained that the

8    order will not be diverted."

9          A.    Mm-hmm.

10         Q.    And for this requirement you

11   cite to the DEA 6 -- and I believe that's

12   June 12, 2012, letter; is that correct?

13         A.    That is what I -- that is

14   what I cited to there.

15         Q.    So the DEA's letter of

16   June 12, 2012, is the guidance from which

17   this requirement can be derived, correct?

18              MR. BOGLE:  Object to form.

19              THE WITNESS:  It is a place

20         where you can find that guidance.

21         But that guidance actually -- you

22         know, if we look at it, if we go

23         back again to the concept of --

24         let's start with the top level

Highly Confidential - Subject to Further Confidentiality Review

```
1              concept.
2                     You have to have an
3              effective program, anti-diversion
4              program.  So if you're shipping
5              things that you think are being
6              diverted, there's no way you can
7              claim you have an effective
8              anti-diversion program.  It just
9              doesn't work.
10                    So the thing has to be
11             stopped until you can figure out
12             whether or not you have detected
13             something that is really you think
14             is diversion or you don't think is
15             diversion.  And then in which case
16             you release it and let it ship.
17                    But you can't have an
18             effective program while you keep
19             on shipping out the door saying,
20             you know, it doesn't require me to
21             do that.  That doesn't work for
22             making an effective anti-diversion
23             program.
24      BY MR. EPPICH:
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So for this requirement you
2  would look to the CSA itself and the
3  June 12, 2012, letter as a source?
4    A.    And the regulation -- and
5  the regulation as well.  I would look to
6  it all.
7         Again, you're trying to read
8  everything in an isolated context.  And
9  that's not the way compliance
10 professionals work.  We don't read things
11 in isolated context.  We look at big
12 picture.  We look at the picture across
13 it to -- and, again, we're looking to
14 achieve an objective.  And what is the
15 objective here that's been set out for
16 distributors and manufacturers?  It is to
17 have an effective program to prevent
18 diversion.
19        So we're looking at the
20 bigger goal of where you're trying to get
21 to.  And so yes, we're looking at
22 guidance.  We're looking at a variety of
23 different things.
24        But you like to read things

Highly Confidential - Subject to Further Confidentiality Review

```
 1   in isolation.  And that's really not how
 2   we work.  We really work by reading it,
 3   looking across the spectrum.
 4           Q.    And I'm just -- I'm just
 5   looking for the sources that you would
 6   refer to for this requirement 6(b) of
 7   your list of SOM requirements.  And I
 8   believe you've mentioned the CSA, its
 9   regulations --
10           A.    And the guidance --
11           Q.    -- and the June 12, 2012 --
12           A.    That's one of the --
13           Q.    To --
14           A.    -- also there are other
15   letters --
16               MR. BOGLE:  Let him
17           finish --
18               THE WITNESS:  Sorry.
19   BY MR. EPPICH:
20           Q.    If we -- if we could just
21   not talk over each other?
22           A.    Sorry.  I'm -- apologize.
23           Q.    That's okay.  It's -- it's
24   easy to do that in a deposition.  Let me
```

1   go ahead and -- and restart.

2                 MR. BOGLE:  Yeah, if you

3          can.  Yeah.

4   BY MR. EPPICH:

5          Q.    You provided to us three

6   citations as support for the SOM

7   requirement that you set forth, 6(b).  I

8   believe you've identified the statute,

9   the CSA, and its accompanying

10  regulations, and the June 12, 2012, DEA

11  letter.

12                MR. BOGLE:  Just object as

13         misstates the testimony.

14                MR. EPPICH:  I'll move to

15         strike -- excuse me.  I'll -- I'll

16         strike the question.

17  BY MR. EPPICH:

18         Q.    I think you understand what

19  I'm trying to -- to ask you now.

20                What citations or what

21  support do you provide or can you provide

22  for the SOM requirement 6(b) on Page 33

23  of your report that states, "Once a

24  suspicious order is discovered, the order

Highly Confidential - Subject to Further Confidentiality Review

1  must be prevented from being filled until

2  it can be ascertained that the order will

3  not be diverted"?

4         A.     I can provide you that

5  letter.  I am aware of a similar

6  statement in the Chemical Handler's

7  Manual.  I'm also aware of the fact that

8  it's been stated as policy in the

9  administrate -- administrator's federal

10  registers in the Masters case.  There's a

11  variety of places that I can go to give

12  you exact references.

13             But I'm also saying to you,

14  it's embodied, it was embodied in the

15  concept of having an effective

16  anti-diversion program as far back as

17  1970.

18             MS. SWIFT:  Could you speak

19        up a little bit, please,

20        Mr. Whitelaw?  I'm having a hard

21        time hearing.

22             THE WITNESS:  I'm sorry, I'm

23        doing my best.

24  BY MR. EPPICH:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    If we can turn to Page 7 of

2    your report.

3          Under the section of your

4    report titled "Compliance Standards For

5    Corporate Compliance Programs," you first

6    list the federal sentencing guidelines.

7          Do you see that?

8    A.    Yes, sir, I do.

9    Q.    And specifically you rely on

10   Chapter 8 of the federal sentencing

11   guidelines, correct?

12   A.    I do, sir.

13   Q.    Chapter 8 outlines the

14   circumstances in which the standards in

15   Chapter 8 apply; is that correct?

16   A.    I'm sorry, could you restate

17   the question?  I'm not sure what you're

18   asking.

19   Q.    Chapter 8 outlines the

20   circumstances in which these standards

21   that are discussed in Chapter 8 apply?

22   A.    It doesn't -- no, it doesn't

23   necessarily list all the circumstances in

24   which it applies.  It says this is what a

1    company should have, and it gives the

2    framework of what is -- are the standards

3    around what is considered a good and

4    effective compliance program.

5         Q.    In a section entitled

6    "Applicability of Chapter 8," the federal

7    sentencing guidelines state, "This

8    chapter applies to the sentencing of all

9    organizations for felony and Class A

10   misdemeanor offenses"?

11        A.    That is what the title says,

12   yes.

13        Q.    The guidelines expressly

14   state that they are to be used for

15   criminal sentencing of organizations,

16   correct?

17        A.    That is certainly one of its

18   purposes, yes.

19        Q.    And you understand that this

20   is a civil litigation, this -- this

21   deposition is for a civil litigation,

22   correct?

23        A.    Clearly.

24        Q.    It's not a criminal case?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    To my knowledge, no, it's

2   not a criminal case.

3      Q.    And under the guideline's

4   own applicability section, the guidelines

5   are not applicable to this civil

6   litigation.

7            Would you agree?

8            MR. BOGLE:  Objection.

9            THE WITNESS:  No, sir, I

10       would not agree.  I fundamentally

11       disagree with where you are going

12       with this.

13            The guidelines are the basic

14       framework.  They are where

15       everybody starts.  It's where

16       industry starts.  It's where

17       compliance professionals start.

18       It's where good companies start,

19       et cetera.

20            It is the baseline.  It has

21       become the de facto set of

22       standards that you start with when

23       you're looking at and assessing

24       corporate compliance programs.

Highly Confidential - Subject to Further Confidentiality Review

1          Now, it happens to be

2     embodied in the section that has

3     that title as we just discussed,

4     but it is not just limited to

5     criminal actions.  And doing so is

6     not a good read of where the world

7     of compliance is and the way we do

8     things.  Because you use it.

9          And by the way, if it were

10    only limited to criminal things,

11    then I would wonder why everybody

12    is running around out there and

13    putting in their own compliance

14    programs, trying to follow these

15    guidelines.  It wouldn't make any

16    sense if you said it's only for

17    criminal.

18          People are doing it because

19    it's good business.  People are

20    doing it because it's a good --

21    it's effective in maintaining

22    compliance.

23          So those standards, although

24    they are embodied in that section,

Highly Confidential - Subject to Further Confidentiality Review

1        are actually the basis that we use

2        day in and day out as consultants,

3        compliance professionals, et

4        cetera, to do our job.

5    BY MR. EPPICH:

6        Q.    Are you familiar with the

7    2005 case of U.S. versus Booker?

8        A.    I am familiar with the case

9    of U.S. versus Booker.

10       Q.    And it's true that in U.S.

11   versus Booker, the United States Supreme

12   Court held that applying these federal

13   sentencing guidelines in a criminal

14   context is unconstitutional, did it not?

15            MR. BOGLE:  Object to form.

16            THE WITNESS:  I believe

17       that's an unfair reading of the

18       standard.  What they said is it

19       couldn't be the only reason and be

20       used.

21            A judge can consider the

22       federal sentencing guidelines and

23       sentencing organizations.  It

24       couldn't be the sole basis for

Highly Confidential - Subject to Further Confidentiality Review

1       sentencing organizations.

2  BY MR. EPPICH:

3       Q.    So the court has the

4  discretion whether or not to apply the

5  federal sentencing guidelines, correct?

6            MR. BOGLE:  Object to form.

7            THE WITNESS:  In what

8       context?  Are we talking just a

9       criminal context, are we talking

10      about a civil context?

11  BY MR. EPPICH:

12      Q.    In a --

13      A.    But in -- but in general, a

14  court has discretion to use them like

15  they use other standards, yes.

16      Q.    And the -- let me strike

17  that.

18            Let me go ahead and turn to

19  Page 9 of your report.

20            On Page 9, actually, the

21  middle of the page, sir, you discuss U.S.

22  versus C.R. Bard, the case of U.S. versus

23  C.R. Bard; is that correct?

24      A.    I do reference it there,

1    yes.

2          Q.    And specifically your report

3    cites to the plea agreement decision by

4    the court in that case, right?

5          A.    It references the actual

6    case, yes.

7          Q.    C.R. Bard is the medical

8    device company that you used to work for,

9    correct?

10         A.    That I used to work for,

11   yes.

12         Q.    The FDA brought criminal

13   charges against C.R. Bard, correct?

14         A.    That is correct.

15         Q.    And C.R. Bard pleaded guilty

16   to 391 felonies in that case?

17         A.    I need to see the actual

18   settlement to remember the exact number,

19   but I think you're in the ballpark.

20         Q.    Hundreds of felonies,

21   correct?

22         A.    It was quite a lot.

23         Q.    Now, you were the senior

24   attorney and compliance coordinator at

1    C.R. Bard at the time C.R. Bard pleaded

2    guilty to those felonies, right?

3         A.    Yes, I was, as a matter of

4    fact.

5         Q.    And the case that you cite

6    here in your report on Page 9, is the

7    court's acceptance of the plea agreement

8    for C.R. Bard felonies.  That's right,

9    right?

10        A.    Mm-hmm.

11             MR. BOGLE:  Make sure you

12        say yes --

13             THE WITNESS:  I'm sorry,

14        yes.

15             MR. EPPICH:  Thank you.

16   BY MR. EPPICH:

17        Q.    C.R. Bard pled guilty to

18   keeping adverse information from FDA

19   about angioplasty catheters, correct?

20        A.    That was certainly one of

21   the counts.  I don't remember all 390.

22   If you have a document for me to look at,

23   I'd be happy to look at it.

24        Q.    C.R. Bard illegally tested

Highly Confidential - Subject to Further Confidentiality Review

1   the catheters on humans without

2   permission from FDA, correct?

3            MR. BOGLE:  Object to form.

4            THE WITNESS:  Again, if you

5        have a document for me to look at,

6        I'll be happy to refresh my

7        recollection.

8   BY MR. EPPICH:

9        Q.    Well, do you recall if C.R.

10  Bard was being prosecuted for illegally

11  testing catheters on humans without

12  permission from the FDA?

13       A.    I believe that was one of

14  the counts.  Again, I -- it's been a long

15  time, and I would love to refresh my

16  memory.

17       Q.    Now, C.R. Bard was -- the

18  case that you cite of U.S. versus C.R.

19  Bard, this was a criminal enforcement

20  action by FDA against a medical device

21  company, correct?

22       A.    Yes.

23       Q.    The case did not involve a

24  wholesale drug distributor?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    No, sir.

2    Q.    The case did not involve a

3 pharmaceutical manufacturer of controlled

4 substances?

5    A.    No, sir.

6    Q.    The case did not involve the

7 DEA?

8    A.    No, sir, it did not.

9    Q.    The case did not arise under

10 the Controlled Substances Act?

11    A.    No, sir, it did not.

12    Q.    The case did not involve

13 controlled substances of any kind, did

14 it?

15    A.    No, it didn't.

16    Q.    If we can turn to Page 11.

17 On Page 11 of your report, sir, you

18 discuss certain guidances issued by the

19 office of the inspector general for

20 Health & Human Services, correct?

21    A.    Yes, I do.

22    Q.    Now, these OIG guidances

23 were issued by the Department of Health &

24 Human Services.  That's correct, right?

1          A.     Yes.

2          Q.     The OIG guidances were not

3     issued by DEA, correct?

4          A.     No, they weren't.

5          Q.     And the OIG guidances don't

6     address the Controlled Substances Act or

7     suspicious order monitoring?

8               MR. BOGLE:  Object to form.

9               THE WITNESS:  Could you

10          rephrase the question, please?

11    BY MR. EPPICH:

12         Q.     Do the OIG guidances address

13    the Controlled Substances Act or discuss

14    the Controlled Substances Act?

15              MR. BOGLE:  Same objection.

16              THE WITNESS:  Not in so many

17          words, no.  But again, I would go

18          back to the conversation that we

19          had earlier.  You're reading this

20          in a very narrow context.  In the

21          world of compliance, we look at a

22          lot of guidance.

23              The OIG guidance, the Bard

24          case, are all examples of putting

Highly Confidential - Subject to Further Confidentiality Review

1    good companies, whether they be

2    wholesalers or manufacturers or

3    whatever, on notice that

4    compliance is important, and

5    having an effective compliance

6    program is important, and here's

7    how to go about doing it.

8         So again, reading these

9    things in isolation, it is really

10   a very, very technical and narrow

11   read.  And good companies don't do

12   it that way.  Good companies

13   actually look at the entire

14   panoply of evidence and apply it

15   to their organizations.

16        So they're not just thinking

17   about this as, oh, this doesn't

18   apply.  It's not DEA.  We're not

19   looking at it that way.

20        MR. EPPICH:  I'll move to

21   strike everything after "no."

22   BY MR. EPPICH:

23        Q.    It's true that the OIG

24   guidances don't discuss suspicious order

1    monitoring for controlled substances,

2    correct?

3              MR. BOGLE:  Objection.

4         Asked and answered.

5              THE WITNESS:  Well, as we

6         can go back over again, you're

7         asking a very narrow question.

8         You are looking at it only in a

9         very narrow framework.

10             You are refusing to look at

11        it in a larger context.  And,

12        therefore, it has relevance, it is

13        important, and it helps inform

14        decisions on how to write an

15        effective -- put together an

16        effective compliance program,

17        whether it be for controlled

18        substances or another topic.

19   BY MR. EPPICH:

20        Q.    I appreciate that.  But my

21   question was a yes or no answer.  And

22   that was very simple and I would just

23   appreciate it if you would answer my

24   question.

1    The OIG guidance does not

2  discuss suspicious order monitoring of

3  controlled substances, correct?

4    A.    And my answer, which I will

5  go back to, is not in exquisitely

6  excruciating detail, but does it apply to

7  programs for controlled substances and

8  suspicious order monitoring?  I believe

9  it does.  And that is my opinion, that it

10  does.  And it informs people who are

11  building and running and maintaining

12  those programs how to do it.

13    Q.    And what is the basis for

14  this opinion that you're offering?

15    A.    This opinion is based on the

16  fact that I have done this for 30 years.

17  I am a compliance expert.  Building

18  compliance programs that actually work

19  and are effective is my job.  Assessing

20  whether or not other people's programs

21  are not built to work effectively is also

22  my job.

23    I'm basing it on experience

24  and I am basing it on that.

1    Q.    Now, Health & Human Services

2  has never issued a guidance for

3  pharmaceutical distributors, correct?

4    A.    That is correct, and noted

5  it as such in my report.

6    Q.    In fact, you state this, and

7  I believe it's Footnote 21 on Page 11.

8  And there you state, "To date the OIG has

9  published no specific compliance program

10  guidance document for distributors."

11          Is that -- is that accurate?

12    A.    That is an accurate

13  statement.  However, I also note at the

14  same time in my report, that OIG expects

15  you to look across industries at the

16  guidance and glean from those things that

17  are important and bring them home and use

18  them.

19    Q.    Let's look at the last full

20  paragraph on Page 11 of your report.

21          There you state, "Although

22  OIG never established specific compliance

23  program guidance for pharmaceutical

24  distributors, a close reading of the

1    guidance published in 2003 for

2    pharmaceutical manufacturers provides

3    many informative insights suitable for

4    distributors as well."

5              HHS has never instructed

6    pharmaceuticals distributors to use this

7    HHS OIG guidance prepared for the

8    pharmaceutical manufacturers, correct?

9              MR. BOGLE:  Object to form.

10             THE WITNESS:  Can you ask me

11        the question again?

12   BY MR. EPPICH:

13        Q.    HHS has never instructed

14   pharmaceutical distributors to use this

15   OIG guidance that was prepared for the

16   pharmaceutical manufacturers, correct?

17             MR. BOGLE:  Object to form.

18             THE WITNESS:  I would

19        disagree.  I would argue that if

20        you look at the top of Page 12:

21        "In addition, the compliance

22        program elements and potential

23        risk areas addressed in this

24        compliance program guidance," and

1    we're referring to the ones in the

2    pharmaceutical manufacturers

3    guidance, "may have also have

4    application to manufacturers and

5    other" -- "of other products that

6    may be reimbursed by federal

7    healthcare programs."

8         It's an example that the OIG

9    is saying, it shouldn't be read

10   into a vacuum, which I think we've

11   been having that discussion for

12   most of this morning.

13 BY MR. EPPICH:

14        Q.   But even in this quote that

15 you just read to me, and it's on the top

16 of Page 12 of your report, the OIG does

17 not say there that the guidance applies

18 to distributors, correct?

19             MR. BOGLE:  Object to form.

20             THE WITNESS:  Could you be

21        more clear in exactly what you're

22        asking?  Because I'm not sure what

23        you're asking.

24 BY MR. EPPICH:

Highly Confidential - Subject to Further Confidentiality Review

1   Q.   The language that you quoted

2   on Page 12 from the OIG does not

3   specifically state that this guidance

4   applies to pharmaceutical distributors,

5   correct?

6        MR. BOGLE:  Object as asked

7        and answered.

8   BY MR. EPPICH:

9   Q.   You can answer again.

10  A.   As I've said before, I

11  believe that that statement at the top is

12  a notice to other industries including

13  distributors that there are elements in

14  the program that they should be paying --

15  in the program guidance they should be

16  paying attention to, and incorporating

17  where -- where appropriate into their

18  programs.

19  Q.   Does the word distributors

20  appear in the quote that you have on the

21  top of Page 12?

22  A.   I do not see the word -- the

23  magic word distributor in the quote at

24  the top of Page 12.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    If we can turn to Page 16 of

2   your report.

3                On Page 16 of your report,

4   you have a section entitled "Controlled

5   Substances Security Manual & Suspicious

6   Order Task Force (1997 to 2004),"

7   correct?

8          A.    I do.

9          Q.    And here you discuss the

10  controlled substances suspicious order

11  task force?

12         A.    I do.

13         Q.    You are aware that members

14  of DEA's Office of Diversion Control

15  participated in the suspicious order task

16  force in the 1990s?

17         A.    Yes, I am.

18         Q.    Are you aware that as part

19  of the task force DEA worked with

20  registrants to develop an automated

21  suspicious order tracking system?

22         A.    I know it was a topic of

23  discussion.

24         Q.    Do you know if DEA was

Highly Confidential - Subject to Further Confidentiality Review

1  working with registrants in developing

2  that system?

3          MR. BOGLE:  Object to form.

4      Vague and overbroad.

5          THE WITNESS:  Again, what do

6      you mean by working with?

7  BY MR. EPPICH:

8      Q.   Well, did the DEA

9  communicate, work with, in the

10 development of that system?

11         MR. BOGLE:  Object to form.

12 BY MR. EPPICH:

13     Q.   If you know.

14     A.   I was not a party to the

15 minutes.  I would assume it was a topic

16 of discussion.  But can I tell you

17 exactly what was involved and what topics

18 were discussed and how they were

19 discussed, and all that, no, I can't.

20     Q.   Are you aware that the

21 suspicious order task force produced a

22 report in 1998?

23     A.   I am.

24     Q.   And this report outlined a

Highly Confidential - Subject to Further Confidentiality Review

1   system that DEA and the registrants

2   developed?

3               MR. BOGLE:  Object to form.

4               THE WITNESS:  I know it

5          outlined a system.  Again, who

6          developed it and what role each

7          party played in it, I don't know.

8   BY MR. EPPICH:

9          Q.    The system was described in

10  the DEA's document, the suspicious order

11  task force report in 1998, correct?

12         A.    Yes.

13         Q.    I'd like to talk about that

14  system for a moment.  Are you -- are you

15  familiar with the system that's described

16  in -- in that report?

17         A.    In general terms, yes.

18         Q.    Why don't we go ahead and --

19  and mark the suspicious order task force

20  report.

21             MR. BOGLE:  Chris, if we are

22         shifting gears, we've been going a

23         little over an hour again.  I

24         could use a restroom break myself,

Highly Confidential - Subject to Further Confidentiality Review

1       especially if we're going to a

2       different subject here.

3               MR. EPPICH:  We can take a

4       break, yeah.  Let's go off.

5               THE VIDEOGRAPHER:  Going off

6       the record.  11:42 a.m.

7               (Short break.)

8               THE VIDEOGRAPHER:  Back on

9       record at 12:02 p.m.

10  BY MR. EPPICH:

11      Q.    Dr. Whitelaw, I'm handing

12  you a copy of what's been marked as

13  Exhibit 5.

14              (Document marked for

15      identification as Exhibit

16      Whitelaw-5.)

17              MR. EPPICH:  And I have

18      copies for you as well.

19              THE WITNESS:  Great, thank

20      you.  Okay.

21  BY MR. EPPICH:

22      Q.    Exhibit 5 is a copy of the

23  report to the U.S. Attorney General by

24  the suspicious order task force,

1   Comprehensive Methamphetamine Control Act

2   of 1996 and supplemental report to the

3   Attorney General.

4           Dr. Whitelaw, are you

5   familiar with this report?

6      A.   I am familiar with the

7   report, yes.

8      Q.   If you would, could you turn

9   to Page 42 of the report.

10      A.   Do I have a minute to page

11   through the report?

12      Q.   Yeah, sure.

13      A.   Thanks.

14           MR. BOGLE:  And while he's

15      looking at that, Chris, you said

16      Page 42?

17           MR. EPPICH:  It's -- I

18      apologize.  It looks -- it looks

19      to me the Bates numbers might have

20      got cut off.

21   BY MR. EPPICH:

22      Q.   But I'm looking at

23   Exhibit 2.  And it's -- the bottom right

24   corner says, "SOTF Report Appendix A:4."

Highly Confidential - Subject to Further Confidentiality Review

1       Were you able to find that

2   page, Dr. Whitelaw?

3       A.    I was.  I'm still looking at

4   the rest of the document.  So give me a

5   minute, please.  But, yes, I found the

6   page.

7       All right.  Yeah, I'm there.

8       Q.    So on Page 42 -- Page 42 of

9   the report, or what is Exhibit 2 of this

10  report, on Page SOTF Report Appendix A-4,

11  the title reads "Suspicious Order

12  Reporting System of 1998 For Use in

13  Automated Tracking Systems," correct?

14      A.    That is an accurate reading

15  of that title, yes.

16      Q.    And the next title, the

17  title directly below that says, "The

18  current calculation being used for List I

19  chemicals and Schedule II to V controlled

20  substances."

21      Did I read that correctly?

22      A.    Yes, I think you did.

23      Q.    The automated tracking

24  system that's described on this page is

Highly Confidential - Subject to Further Confidentiality Review

1    for List I chemicals, correct?

2        A.    Yes, it is.

3        Q.    The automated tracking

4    system described on this page is for

5    Schedule II to V controlled substances as

6    set forth in the title, correct?

7              MR. BOGLE:  Object to form.

8         Incomplete.

9              THE WITNESS:  Could you

10        restate your question, please?

11   BY MR. EPPICH:

12        Q.    The automatic tracking

13   system described on this page is for

14   Schedule II to V controlled substances as

15   set forth in the title -- the subtitle

16   that we just read, correct?

17             MR. BOGLE:  Objection to

18        form.  Incomplete description of

19        the document.

20             THE WITNESS:  I would

21        disagree with how you're

22        characterizing it.  The title does

23        say List I chemicals and Schedules

24        II to V controlled substances.

1    However, if we skip down to, I

2    believe it's four on the page, and

3    you look at that note, it says,

4    "Note, Factor equals three for

5    C-II and C-III controlled

6    substances containing List I

7    chemicals."

8    I believe that a fair

9    reading of this actual document is

10    that it applies to Controls II

11    through V -- Schedule II through V

12    controlled substances to the

13    extent they contain listed

14    chemicals.

15    BY MR. EPPICH:

16    Q.    I appreciate that.  I wasn't

17    trying to mischaracterize the document.

18    I was simply trying just to learn or ask

19    whether or not this Exhibit 2 applied to

20    List I chemicals and Schedule II to V

21    controlled substances.

22    MR. BOGLE:  Same objection.

23    THE WITNESS:  I'm saying --

24    and I'm saying it applies to List

Highly Confidential - Subject to Further Confidentiality Review

1          I chemicals, yes, and it applies

2          to Schedules II through V only to

3          the extent that they contain List

4          I chemicals.

5    BY MR. EPPICH:

6          Q.    Now, the program described

7    in the report calculated monthly averages

8    based on the last 12 months of

9    purchasing, correct?

10         A.    That was a starting dataset,

11   yes.

12         Q.    The program described in the

13   report sets thresholds of three times the

14   monthly average for purchases of Schedule

15   II controlled substances?

16         A.    No, sir.  It sets three

17   times the monthly average for controlled

18   substances containing List I chemicals.

19         Q.    The program described in the

20   report identified orders that exceeded

21   the thresholds on a suspicious order

22   report, correct?

23         A.    I'm sorry.  I'm not sure I

24   understand your question.

1    Q.    Well, the program described

2  in the report, and the thresholds that

3  you just mentioned, the program instructs

4  the identification of suspicious

5  orders -- let me strike that.

6          Let's turn to Page 17 -- 17

7  of your report.

8      A.    Okay.  Just a minute.  Let

9  me get there for you.  Yes, sir.  I'm

10 here.

11     Q.    Looking at Section 5.3.2,

12 the Chemical Handler's Manual, on Page 17

13 of your report.

14         Do you see that?

15     A.    Yes, sir, I do.

16     Q.    In the first sentence on

17 this page, your report states, "The DEA

18 created the Chemical Handler's Manual in

19 response to the enactment of the various

20 chemical control laws amending the

21 original CSA, but also to provide general

22 guidance on complying with the CSA.

23         Did I read that correctly?

24     A.    Yes, you did.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So the DEA created the

2    Chemical Handler's to provide general

3    guidance for complying with the CSA,

4    correct?

5         A.    That was one of its aspects,

6    but of course the other aspect was to do

7    with how you're handling List I

8    chemicals.  And it was all in response to

9    the Methamphetamine Act.  So that's the

10   real context behind why the Chemical

11   Handler's Manual came into being in the

12   first place, but...

13             So it was actually, in a

14   way, a dual role.

15        Q.    In the second paragraph on

16   this page, sir, the first sentence

17   states, "The manual also outlined the

18   voluntary formula for use by distributors

19   to wholesale retail levels," correct?

20        A.    That is what -- my report

21   says, yes.

22        Q.    And you agree that this

23   formula was not mandatory?

24        A.    I agree to -- agree that

Highly Confidential - Subject to Further Confidentiality Review

1    that was the formula that was listed and

2    stated in the manual as being voluntary.

3         Q.    And you agree that a factor

4    of three that's discussed was also

5    voluntary, correct?

6         A.    I believe that the factor of

7    three that we're talking about was

8    voluntary in regard to List I chemicals

9    or Schedule II through V substances that

10   contained List I chemicals yes.

11        Q.    Now, in looking at the third

12   paragraph of your report, on Page 17.  In

13   the second and third sentences, you

14   state, "A plain reading of Appendix E-3,

15   is that if a Schedule II or III

16   controlled substance does not contain a

17   List I chemical, that factor is not

18   applicable.  Therefore, for opioid

19   products not containing a List I

20   chemical, that factor is not applicable."

21             Did I read that correctly?

22        A.    Yes, you did.

23        Q.    Now, let's just take a step

24   back for a moment.  DEA never told

Highly Confidential - Subject to Further Confidentiality Review

1    registrants not to apply the factor of

2    three, correct?

3              MR. BOGLE:  Object to form.

4         Vague and overbroad.

5              THE WITNESS:  I'm not sure I

6         understand your question.

7    BY MR. EPPICH:

8         Q.    Did DEA -- let me strike

9    that.

10             Are you aware of DEA ever

11   telling registrants not to apply the

12   factor of three?

13             MR. BOGLE:  Object to form.

14        Vague and overbroad.

15             THE WITNESS:  I think we'd

16        have to talk about in context.

17        Can you narrow the context?

18             It's such -- never, ever are

19        too broad for me to be able to say

20        one way or the other.

21   BY MR. EPPICH:

22        Q.    Are you aware if DEA ever

23   told registrants that they were

24   prohibited from applying factors other

1    than the factor of three?

2              MR. BOGLE:  Objection.

3         Vague, and overbroad as to time.

4              THE WITNESS:  I'm still not

5         sure I'm understanding what you're

6         looking for.

7    BY MR. EPPICH:

8         Q.    You rely on the chemical

9    handler's in certain parts of your

10   report, don't you?

11        A.    Could you explain what you

12   mean by rely on chemical handler's?

13        Q.    Well, let's --

14        A.    I mean, I cite to the

15   Chemical Handler's Manual, yes.

16        Q.    Let's turn to page --

17        A.    But I don't know what you

18   mean by rely.

19        Q.    Well, let's turn to Page 26.

20        A.    Okay.

21        Q.    Now, on Page 26 of your

22   report, the second full paragraph reads,

23   "As a threshold matter, the distributor

24   or manufacturer must determine if the

Highly Confidential - Subject to Further Confidentiality Review

1    controlled substance's customer is

2    properly licensed to possess the

3    controlled substance.  Both must also

4    take steps to know the customer."  In

5    the -- "In other words, they need" -- and

6    I quote -- "to take responsible measures

7    to verify the identity of their

8    customers, understand the normal and

9    expected transactions typically conducted

10   by those customers, and consequently

11   detect those transactions that are

12   suspicious in nature."

13              Do you see that, sir?

14        A.    I see that, but you didn't

15   read it correctly.  It's actually "to

16   take reasonable measures to verify the

17   identity of their customers, understand

18   the normal and expected transactions

19   typically conducted by those customers,

20   and consequently detect those

21   transactions that are suspicious in

22   nature."

23              Q.    And what do you cite for

24   that paragraph, sir?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     I cite to the Chemical

2  Handler's Manual.

3      Q.     So you apply the Chemical

4  Handler's Manual in this section of your

5  report, which is Section 6.1.2?  You're

6  applying --

7      A.     I reference it.

8      Q.     You reference it?

9      A.     Yes.

10     Q.     What is a List I chemical?

11     A.     A List I chemical is a

12  precursor that was listed in the

13  methamphetamine statute that can be used

14  to make methamphetamine.

15     Q.     The DEA has said that

16  because List I chemicals are frequently

17  precursors, DEA has found that List I

18  chemicals require a greater level of

19  control than other listed chemicals.  Is

20  that true?

21     A.     I'd say that is a fair -- a

22  fair reading of -- of where they were

23  going, yes.

24     Q.     And you acknowledge this in

1    Footnote 62 of your report, correct?

2    It's on Page 17.

3          A.    Let me go back to Page 17

4    and look at Footnote 62.

5                Yes, I see that.

6          Q.    Your report then says, "The

7    manual also outlined a voluntary formula

8    for use by distributors to wholesale and

9    retail levels."

10         A.    Mm-hmm.

11               MR. BOGLE:  Make sure you

12         say yes or no.

13               THE WITNESS:  Yes.

14   BY MR. EPPICH:

15         Q.    I'd like to talk about that

16   voluntary formula.  In your report you

17   say that "the Factor of 3 applies to

18   certain types of products, but not to

19   other types of products," correct?

20         A.    What I say is it applies to

21   List I chemicals and any List I chemical,

22   and controlled substances that contain a

23   List I chemical.

24         Q.    And your report says, on

Highly Confidential - Subject to Further Confidentiality Review

1    Page 17, "For opioid products not

2    containing a List I chemical, the factor

3    is not applicable," correct?

4         A.    That is a plain reading of

5    the appendix, yes.

6         Q.    So under your

7    interpretation, the Factor of 3 does not

8    apply to products that contain an opioid

9    but not a List I chemical, correct?

10        A.    Under my representation, if

11   it is a Schedule II through V product

12   that does not contain a List I chemical,

13   that Factor of 3 is not an appropriate

14   formula.

15        Q.    So a product that contains

16   an opioid but not a List I chemical, that

17   would be a product that it's not

18   applicable to, correct?

19             MR. BOGLE:  Objection.

20        Asked and answered.

21             THE WITNESS:  I believe I

22        asked and answered it for you.

23        But a -- if you're saying if it's

24        a schedule, if the opioid is

Highly Confidential - Subject to Further Confidentiality Review

1          scheduled, we'll make the

2          assumption that that's what you're

3          saying, then yes.

4     BY MR. EPPICH:

5          Q.    So this is one category,

6     okay, this is one category of products.

7               Your report then says,

8     "While the manufacturers and distributors

9     here utilize the Factor of 3 for setting

10    thresholds for opioid products, the

11    factor was based only on Schedule II and

12    III controlled substances containing

13    List I chemicals."

14              This is the other category,

15    right?

16         A.    I'm sorry.

17              MR. BOGLE:  Object to form.

18              THE WITNESS:  I'm not

19         following.

20    BY MR. EPPICH:

21         Q.    Well, your opinion is that

22    the Factor of 3 is only permitted for

23    Schedule II and III controlled substances

24    containing List I chemicals.

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yes.  That is my opinion.

2          Q.     I just want to discuss this

3     briefly so I can understand what

4     you're -- what you're saying.

5          A.     I understand.  And I'm

6     trying to be -- and Chris, I'm trying to

7     be clear for you.

8          Q.     Thank you, sir.

9               Your -- your report says

10    that "the Factor of 3 is permitted for a

11    combination product that contains an

12    opioid and a List I chemical," correct?

13         A.     I think that's a fair

14    reading of it, yes.

15         Q.     So an opioid is part of --

16    of this product -- the products in this

17    category?

18              MR. BOGLE:  Object to form.

19              THE WITNESS:  I'm not sure

20         by "this category" what we're

21         meaning.

22    BY MR. EPPICH:

23         Q.     Well, in a combination

24    product that contains an opioid and a

1  List I chemical, there's an opioid in

2  that product, correct?

3      A.    Under your hypothetical,

4  yes, that's what you just said.  You said

5  you have an opioid that contains a List I

6  chemical.

7      Q.    But the Factor of 3, in your

8  opinion, is not applicable for a product

9  that contains only an opioid, that is,

10  without a List I chemical?

11          MR. BOGLE:  Objection.

12      Asked and answered.

13          You can answer.

14          THE WITNESS:  That is --

15      that is my reading of the --

16      reading of the appendix, yes.  I

17      think that's a plain reading of

18      the appendix.

19  BY MR. EPPICH:

20      Q.    But the Factor of 3 as we

21  just discussed, that applied to a product

22  that contains an opioid and a List I

23  chemical.

24          Where I'm struggling is that

Highly Confidential - Subject to Further Confidentiality Review

1  both -- both types -- both of these

2  products that we talked about contain

3  opioids, correct?

4            MR. BOGLE:  Object to form.

5            THE WITNESS:  Which products

6       are we talking about?

7  BY MR. EPPICH:

8       Q.    Let's go ahead and look at

9  Page 18 of your report.

10           A.    Okay.  Sure.  I'm there.

11           Q.    On Page 18 you discuss what

12  term the DEA industry initiative and what

13  the DEA called the distributor initiative

14  program; is that correct?

15           A.    Yes, I -- yes, I do discuss

16  that.

17           Q.    You discuss meetings between

18  the DEA and McKesson, Cardinal, and ABDC

19  in your report, correct?

20           A.    Yes, sir, I do.

21           Q.    You understand that these

22  three briefings were entitled "Internet

23  Pharmacy Data" by the DEA?

24           A.    Yes, I am aware of it.  I

1    have looked at the slide decks

2    extensively.

3           Q.    That -- that's because the

4    DEA's anti-diversion efforts at this time

5    were focused on internet pharmacies.

6                MR. BOGLE:  Object to form.

7    BY MR. EPPICH:

8           Q.    Correct?

9                MR. BOGLE:  Broad.

10               THE WITNESS:  No, I think

11          that's -- I think that's a poor

12          characterization of it.  I think

13          DEA was always focused on

14          anti-diversion across the system.

15          I think there was a particular

16          heightened concern over internet

17          pharmacies.

18               But I think it's a

19          mischaracterization to say they

20          were only concerned about internet

21          pharmacies.

22   BY MR. EPPICH:

23          Q.    But -- but you'd agree with

24   me that in this time period, this 2005 to

Highly Confidential - Subject to Further Confidentiality Review

1    2008 time period, the DEA was focusing on

2    internet pharmacies?

3            A.    I would say --

4                  MR. BOGLE:  Object to form.

5            Go ahead.

6                  THE WITNESS:  No, I would

7            not agree with you.  As I just

8            said, I think it was a focus.  You

9            are trying to imply it's the only

10           focus, and I don't agree with you

11           on that point.

12   BY MR. EPPICH:

13           Q.    Are you aware that

14   Mr. Rannazzisi recently testified that

15   from 2005 to 2008 DEA's anti-diversion

16   efforts were focused on internet

17   pharmacies?

18                 MR. BOGLE:  Object to form.

19           If you want to show him the

20           testimony, I think he can comment.

21           Otherwise I don't think it's fair.

22           It's not on his listed material.

23           If you want to show him something,

24           I'm happy to have him comment on

Highly Confidential - Subject to Further Confidentiality Review

1    it.

2    BY MR. EPPICH:

3        Q.    You may answer the question.

4        A.    If you can ask --

5            MR. BOGLE:  To the extent

6        that you can without seeing it.

7            THE WITNESS:  I'm unable to

8        answer your question unless you

9        actually show me the testimony.  I

10       need to see what he said.  I have

11       no idea what he said.

12   BY MR. EPPICH:

13       Q.    You haven't reviewed the

14   testimony that Mr. Rannazzisi provided in

15   this litigation?

16       A.    I haven't reviewed the --

17   the testimony that Mr. Rannazzisi, that

18   you're referring to.  If you have

19   something that you want me to look at,

20   I'm more than happy to look at it right

21   now for you.

22       Q.    Did you request that

23   information, that deposition transcript

24   of Mr. Rannazzisi from your plaintiffs'

Highly Confidential - Subject to Further Confidentiality Review

1    counsel.

2         A.    I requested any and all DEA

3    correspondence and information regarding

4    the DEA, and DEA policies and positions.

5    From counsel.

6         Q.    And -- and plaintiffs'

7    counsel has not provided you with a copy

8    of Mr. Rannazzisi's transcript, correct?

9              MR. BOGLE:  I don't have it.

10             THE WITNESS:  I don't have a

11        copy.

12             MR. BOGLE:  Wasn't this

13        yesterday?

14   BY MR. EPPICH:

15        Q.    Let's look at Paragraph 2 on

16   Page 18.

17        A.    Can you tell me when it was

18   actually taken?  Because, I mean, as far

19   as I know, it hasn't -- it wasn't -- when

20   I wrote the report, it hadn't been taken.

21   Do you have a date on when -- did this

22   deposition actually occurred?

23        Q.    Let's go back to Page 18 of

24   your report, sir.  I'm looking at

Highly Confidential - Subject to Further Confidentiality Review

1    Paragraph 2.  Paragraph 2 you write,

2    "During those meetings, the DEA told the

3    participants that," and then you list

4    five points, correct?

5         A.    Yes, I did.

6         Q.    Now, you never attended any

7    of the distributor initiative briefings,

8    did you?

9         A.    No, sir.

10         Q.    You've not spoken to anyone

11    who attended those distributor briefings?

12         A.    I have not spoken directly

13    with anyone who has attended those

14    meetings, but I have reviewed the slide

15    decks that were given to each of the

16    defendants that are listed here as well

17    as the corresponding deposition testimony

18    around those meetings.

19         Q.    So the recitation in your

20    report that we see on what occurred at

21    these briefings is based only on your

22    review of these presentations and your

23    review of perhaps memorandum that the DEA

24    submitted from Mr. Rannazzisi and

1    Mr. Mapes?

2              MR. BOGLE:  Object to form.

3    BY MR. EPPICH:

4         Q.    Is that true?

5              MR. BOGLE:  Misstates

6         testimony.  You can answer.

7              THE WITNESS:  I think as I

8         tried to be clear, but I'll try to

9         be a little clearer, I looked at

10        the slide decks that were provided

11        to each of the distributors.  I

12        looked at whatever other

13        documentation was around the

14        characterization of those

15        meetings, including deposition

16        testimony, to understand what

17        transpired in those meetings as

18        best I could.  Obviously they're

19        before my time and I wasn't in

20        attendance.

21   BY MR. EPPICH:

22        Q.    Do you know of Kyle Wright?

23        A.    Do I know of Kyle Wright?

24        Q.    Do you know Kyle Wright?  Do

Highly Confidential - Subject to Further Confidentiality Review

1    you know --

2         A.    No, I do not know Kyle

3    Wright.

4         Q.    Do you know that Kyle Wright

5    worked at the DEA?

6         A.    As I just said, I don't know

7    Kyle Wright, so I can't answer that

8    question for you.

9         Q.    Did you know that Kyle

10   Wright was a DEA diversion investigator

11   who, along with Michael Mapes, conducted

12   the distributor initiative briefings?

13        A.    The name rings a bell.  But

14   again, I've seen hundreds of -- is there

15   a document that you want me to look at?

16   I'd be happy to look at the document and

17   refresh my recollection.  I've looked at

18   a lot of pages.

19        Q.    Did you review Mr. Wright's

20   deposition testimony in this case?

21        A.    Again, I have to go back to

22   my reliance list to double-check.

23             MR. BOGLE:  Do you want him

24        to check, Chris?

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. EPPICH:

2            Q.    It's on Page 77.

3                  MR. BOGLE:  277.

4                  MR. EPPICH:  277.  Pardon

5         me.

6                  THE WITNESS:  I did review

7         it.  I did look at it.

8    BY MR. EPPICH:

9            Q.    Did you review Mr. Wright's

10   deposition testimony in the case of U.S.

11   versus $463,497.72?

12           A.    I don't rightly recall all

13   the pieces of Mr. Wright deposition that

14   I reviewed.  So I'm sorry I can't answer

15   your question.

16           Q.    If you had reviewed it,

17   would it be listed here in Appendix I of

18   your report?

19           A.    If it's not in the

20   depositions listed -- if I reviewed it

21   and it's not buried in the depositions

22   that are listed here, I would have

23   reviewed it.  It would be listed

24   separately.  But if we are talking about

Highly Confidential - Subject to Further Confidentiality Review

1   something that's in his actual

2   deposition, like I said, the two volumes,

3   I don't rightly recall everything in each

4   volume.

5         Q.   Oh, let me be clear.  I

6   think we may be --

7         A.   I'm not sure what you're

8   asking.

9         Q.   -- confused.

10         So on Page 277 of your

11   report, sir, you list the deposition of

12   Kyle Wright, Volume I on February 28,

13   2019, and then a second volume from

14   March 4, 2019.

15         These deposition transcripts

16   are from this case, this MDL case.  Do

17   you agree with me there?

18         A.   Yes.

19         Q.   Mr. Wright gave testimony in

20   another case.  And that case is titled

21   U.S. versus 463,497 -- let me strike

22   that, because this is a little strange.

23         Mr. Wright's --

24   Mr. Wright -- are you aware that

Highly Confidential - Subject to Further Confidentiality Review

1    Mr. Wright gave testimony in the case of

2    U.S. versus $463,497.72?

3            A.    I honestly don't remember.

4            Q.    You didn't review any

5    testimony from that case?

6                 MR. BOGLE:  Object to form.

7                 THE WITNESS:  Again, unless

8            it was in the original depositions

9            that are listed here, then the

10           answer would have been no.

11   BY MR. EPPICH:

12           Q.    Are you aware that

13   Mr. Wright testified in that case under

14   oath that the distributor briefings

15   represented a change or transition in the

16   DEA's guidance regarding suspicious order

17   reporting?

18                 MR. BOGLE:  Object to form.

19           And unless you are going to show

20           him something.

21                 If you know without looking

22           at it, fine.

23                 THE WITNESS:  I don't know

24           without looking at it.

Highly Confidential - Subject to Further Confidentiality Review

1        MR. EPPICH:  And I'm asking

2    him are you aware.  So I think

3    that we're fine.

4  BY MR. EPPICH:

5        Q.    And are you aware, sir, that

6  Mr. Wright testified at trial in that

7  case that the change in DEA's guidance

8  was significant?

9        MR. BOGLE:  Same objection.

10        THE WITNESS:  If you have

11    something for me to review I'll be

12    happy to review it.  But again

13    without it, I can't comment.

14  BY MR. EPPICH:

15        Q.    Are you aware or not, sir,

16  sitting here today?

17        MR. BOGLE:  Same objection.

18        THE WITNESS:  I can't

19    comment without seeing what you're

20    referring to, because I don't know

21    what you're looking at.

22  BY MR. EPPICH:

23        Q.    Let's go ahead and mark as

24  Exhibit 6 a document bearing the Bates

Highly Confidential - Subject to Further Confidentiality Review

1    Number MCK-MDL_00496859.

2                (Document marked for

3           identification as Exhibit

4           Whitelaw-6.)

5    BY MR. EPPICH:

6           Q.    Exhibit 6 is a memorandum

7    from the DEA titled "Internet

8    Presentation with McKesson Corp. on

9    September 1, 2005," from Michael Mapes to

10   Joe Rannazzisi.  And attached to that is

11   the PowerPoint presentation that was

12   provided to McKesson on September 1,

13   2005.

14                Do you see that, sir?

15          A.    Yes, sir, I do see that.

16          Q.    And in looking at the

17   presentation that we see on the third

18   page of this document, you stated in your

19   report that the presentations provided to

20   McKesson, ABDC, and Cardinal were almost

21   identical, correct?

22          A.    That was a statement I made,

23   yes.

24          Q.    You reviewed these

1  presentations before, right?

2       A.    I have seen the versions of

3  them before, yes.

4       Q.    Now, in this presentation,

5  the DEA doesn't mention the words "know

6  your customer," correct?

7       A.    If you'll give me time to

8  review the entire -- to read the

9  document, I can tell you whether or not I

10 see the words in the presentation or not.

11           MR. BOGLE:  Yeah.  I mean,

12      if you need to.

13 BY MR. EPPICH:

14      Q.    Thanks.

15      A.    I am -- am going to need to

16 read it.

17           Can you ask me the question

18 again, please.

19      Q.    Dr. Whitelaw, have you had a

20 chance to review the exhibit?

21      A.    I have had a chance to

22 review the exhibit.  Thank you.

23      Q.    And DEA does not mention the

24 words "know your customer" in this

1    presentation?

2        A.    I do not see the words "know

3    your customer" in the presentation.

4        Q.    DEA does not set forth how a

5    distributor must conduct due diligence of

6    its customers in this presentation,

7    correct?

8            MR. BOGLE:  Object to form.

9            THE WITNESS:  I'm not

10        exactly sure what you mean by that

11        question, but perhaps you can help

12        me.

13   BY MR. EPPICH:

14       Q.    Well, DEA does not tell a

15   distributor how to identify a suspicious

16   order in the presentation, correct?

17           MR. BOGLE:  Object to form.

18           THE WITNESS:  I still think

19        you're being a little vague, but

20        let me see if I can try to

21        understand what you're asking me.

22            You are asking me do they

23        tell them the specific recipe list

24        to go down to determine if an

Highly Confidential - Subject to Further Confidentiality Review

1          order is suspicious?  Is that the

2          question?

3    BY MR. EPPICH:

4          Q.    You can answer that

5    question.

6          A.    They don't give you a

7    specific recipe list.  They do say in

8    here that you must take steps to

9    determine when orders are suspicious and

10   make a sales decision about them.  And

11   I'm looking at what's labeled Page 8 of

12   that presentation list.

13         Q.    But the DEA doesn't tell

14   distributors what steps those are or how

15   to identify those suspicious orders,

16   correct?

17              MR. BOGLE:  Object to form.

18              THE WITNESS:  Again, I'm

19         going to go back and ask you to be

20         a little more precise for me.

21              Are we talking about

22         providing them that they have to

23         go down and determine what a

24         suspicious order is, or are we

Highly Confidential - Subject to Further Confidentiality Review

1          talking about the specific ABCDEFG

2          steps that you have to take?

3          Which one are we talking about

4          please?

5     BY MR. EPPICH:

6          Q.    Specific steps.

7          A.    No, they do not tell you the

8     ABCDE -- the alphabet steps.

9          Q.    The DEA does not tell a

10    distributor it must block all suspicious

11    orders in this presentation, do they?

12             MR. BOGLE:  Object to form.

13             THE WITNESS:  I'd have to go

14          back to read it again to see if it

15          talks about blocking orders.  But

16          it certainly is in the Chemical

17          Handler's Manual, as well in the

18          2004.  So I believe it's implicit

19          in the statements that they are

20          making.  You can't sell suspicious

21          orders.  You are not supposed to

22          continue to distribute suspicious

23          orders.

24             But do I find the word block

Highly Confidential - Subject to Further Confidentiality Review

1    orders?  No.  I do not find the

2    specific word block orders to your

3    point.

4  BY MR. EPPICH:

5    Q.    And just so the record is

6  clear, you don't see the words blocked

7  orders in this presentation that we've

8  marked as Exhibit 6, correct?

9    A.    I did not see it.  But I

10  could go back through it again and

11  double-check.

12    Q.    Now, looking back on Page 18

13  of your report.  Your report states,

14  "Although couched in terms of

15  distributors, because the requirements

16  for manufacturers are the same, the DEA's

17  statements are part of this initiative

18  would apply to them too."

19         Do you see that?

20    A.    Yes.

21         MR. BOGLE:  Object to form.

22  BY MR. EPPICH:

23    Q.    Are you aware that these

24  briefings, these distributor initiative

Highly Confidential - Subject to Further Confidentiality Review

1    briefings, were private meetings between

2    the company and the DEA, correct?

3         A.    I know that they were

4    meetings between DEA and a company, but I

5    also know that they held many, many

6    meetings with many, many people.

7         Q.    But the distributor

8    briefings themselves were individual

9    meetings, correct, between a company and

10   the DEA?

11        A.    Yes, that's correct.  But as

12   we stated earlier, the slide decks and

13   the materials that the DEA was

14   presenting, was pretty much the same from

15   person in the meeting -- company in the

16   meeting, company in the meeting, company

17   in the meeting, so they were saying the

18   same things.  They were delivering the

19   same message is what I'm trying to say.

20        Q.    But the distributor briefing

21   meeting between the company and the DEA,

22   those were not public meetings, you'd

23   agree with me, right?

24        A.    I would agree with you that

Highly Confidential - Subject to Further Confidentiality Review

1  they appear not to be public meetings.

2          Q.     You're aware that the DEA

3  did not brief manufacturers as part of

4  the distributor briefings, correct?

5          A.     Yes.  I'm aware of that.

6          Q.     And manufacturers did not

7  attend the meetings between DEA and the

8  distributors, correct?

9          A.     Well, they certainly weren't

10  in the meeting that you've shown me.  I

11  haven't seen every distributor meeting,

12  so I can't comment on them all.  I can

13  comment on the one that's before me and I

14  can say they were not present.

15          Q.     How would manufacturers

16  learn the requirements that the DEA

17  provided in the DEA distributor briefings

18  if these meetings were private?

19          A.     Well, presumably they were

20  shared among trade associations.

21  Presumably another way is again the

22  manufacturers worked with these

23  distributors.  I would assume it would be

24  communication and -- and information that

Highly Confidential - Subject to Further Confidentiality Review

1    they would share amongst each other.

2                    They both had a -- look,

3    they both have the common goal of having

4    an effective anti-diversion program.  And

5    if there -- if distributors are being

6    asked to comply to something, it is not

7    unusual to share that information.

8                    When I was in industry, we

9    shared information about regulatory

10   positions and what we were learning all

11   the time.  We had a common -- we had a

12   common goal.  We were trying to get to

13   the same common goal.

14          Q.    But you're not aware of any

15   communication between the DEA to -- to

16   manufacturers where the contents of the

17   distributor briefings were provided?

18                    MR. BOGLE:  Object to form.

19                    THE WITNESS:  Could you be

20          more specific?

21   BY MR. EPPICH:

22          Q.    I think my question is

23   specific enough.

24          A.    Okay.  Well, I'm confused.

1  Let me ask a follow-up question of my

2  own.

3          Are you saying am I aware

4  that they ever issued any correspondence

5  to manufacturers that contained any of

6  the concepts that were discussed here?  I

7  would say that's not a fair reading.

8          If you're saying do I know

9  that they actually put a -- put a

10  distribution notice on it and shipped

11  them the presentation?  No, I have not

12  seen anything to that level of detail.

13      Q.    Let's turn to Page 19 of

14  your report, if we can.  And on Page 19

15  this is Section 5.3.4 titled "DEA Letters

16  to All Registrants (a/k/a The Rannazzisi

17  Letters) (2006 to 2012)."

18      A.    Correct.

19      Q.    Now, you write in this

20  section that "each letter focused on a

21  particular implementation topic,

22  providing DEA's current thinking about

23  what or was not effective," correct?

24      A.    I do.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What do you mean by

2  implementation topic?

3    A.    Well, I think when we talk

4  about how do you -- you know, what is --

5  what is meant by reporting suspicious

6  orders, when should they be reported, how

7  often should they be reported.  Those are

8  implementation kinds of topics.

9    Q.    Now, the DEA used these

10  Rannazzisi letters to address a

11  particular topic in each letter; is

12  that -- is that right?

13    A.    That was how I read them,

14  yes.

15    Q.    The letters were conveying

16  updates on the DEA's current thinking?

17         MR. BOGLE:  Object to form.

18         THE WITNESS:  The -- could

19    you -- again, I'm not -- could you

20    repeat the question, please?

21  BY MR. EPPICH:

22    Q.    You'd agree that the

23  Rannazzisi letters were expressing the

24  DEA's current thinking in providing

1    updates to the registrants, correct?

2              MR. BOGLE:  Object to form.

3              THE WITNESS:  I would say

4         they are certainly providing DEA's

5         thinking to registrants, yes.

6         Whether it was current or not, I

7         have no way of knowing.  Certainly

8         their thought process, yes.

9    BY MR. EPPICH:

10         Q.    Do you have any reason to

11   believe or think that it would not have

12   been their current thinking?

13         A.    Well, I think some of the

14   stuff that they were discussing and

15   reminding registrants of in those letters

16   go all the way back to 1970.  So you

17   can't call that -- at least in my mind

18   that's not current to me.  That's been

19   around for a long time.

20              So part of this was, you

21   know, part of this was sort of a

22   discussion of, was a reminder to the

23   registrants, what are your duties and

24   obligations.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And -- and that's fair.

2    Some of -- some of the information may

3    have been a reminder, but some of the

4    information would have also been new,

5    correct?

6              MR. BOGLE:  Object to form.

7              THE WITNESS:  No, I don't --

8    I don't think it was new.

9    BY MR. EPPICH:

10             Q.    Is that your opinion?

11             A.    I don't really think it was

12   new.  I think it was all there.  What may

13   be new to the point you're trying to make

14   is it's the first time that you've

15   actually seen them write it down,

16   potentially.  But I don't think the

17   concepts that are embedded in the

18   Rannazzisi letters are in any way, shape,

19   or form new.  I think they've been there

20   all along.

21             Again, we start from the

22   top.  What is an effective anti-diversion

23   program, and we work from there.  That's

24   the goal.

1    Q.    So your opinion sitting here

2    today is that the information contained

3    in the Rannazzisi letters was not new?

4          MR. BOGLE:  Objection.

5          Asked and answered.  You can

6          answer again.

7          THE WITNESS:  My opinion is

8          that this information was simply a

9          restatement of positions and

10          information that had been embodied

11          in the original statute from way

12          back in 1978, yes.  That's my

13          answer.

14    BY MR. EPPICH:

15    Q.    And what is the basis for

16    your opinion, sir?

17    A.    My expertise as a compliance

18    expert, my reading of the record, my

19    conversations with Mr. Rafalski.  And

20    all -- and going through the -- going

21    through this whole report process and

22    developing and looking at these records

23    and reading testimony and records, et

24    cetera, and talking to Rafalski, my

1    expertise in this area, et cetera.

2          Q.    Let's look at Page 20 of

3    your report.  On Page 20 in this

4    section -- this is Section 5.3.5.

5    Masters Pharmaceutical case.

6                Now in this section, you

7    discuss this Masters Pharmaceutical

8    decision, correct?

9          A.    I do.

10         Q.    In the first paragraph, and

11   I'm looking at the first sentence, your

12   report says, "The opinion of DEA's acting

13   administrator, Chuck Rosenberg, provides

14   guidance on the determination of exactly

15   when an order of unusual size, frequency,

16   or pattern is discovered as suspicious";

17   is that correct?

18         A.    That is what I said, yes.

19         Q.    Your opinions rest on

20   positions taken by the acting

21   administrator, Chuck Rosenberg, in the

22   Masters Pharmaceutical case?

23                MR. BOGLE:  Objection.

24         Vague and overbroad.

1           THE WITNESS:  You want to

2      define what you mean by rest?

3  BY MR. EPPICH:

4           Q.    You rely on the Masters

5  Pharmaceutical case, right?

6           A.    It is one factor of a series

7  of factors, as I said to you before, that

8  I looked at in formulating, like any good

9  compliance officer would do -- I looked

10  at the history, I've looked at where it's

11  come from, I've looked at previous

12  guidance, previous decisions.  Yes, it's

13  one data point, shall we say.

14           Q.    Chuck Rosenberg became the

15  acting administrator of DEA in 2015; is

16  that correct?

17           A.    I have no idea when Chuck

18  Rosenberg became the acting

19  administrator.  It wasn't relevant or

20  germane to this discussion.

21           Q.    Well, you're aware that he

22  was not the acting administrator before

23  the Masters decision came out, right?

24           A.    Again, it's not -- wasn't --

Highly Confidential - Subject to Further Confidentiality Review

1   no, I was not, nor is it relevant or

2   germane to the opinion I was giving.

3   What's relevant and germane is what he

4   actually wrote down in his opinion and

5   that he was the acting administrator at

6   the time that he wrote that opinion.

7              Those are what was -- that

8   was what was germane.

9        Q.    Mr. Rosenberg's opinion in

10  Masters Pharmaceuticals that you cited in

11  your report was published in the Federal

12  Register in September of 2015, correct?

13       A.    Correct.

14       Q.    And the DC Circuit Court

15  opinion, the court of appeals opinion, of

16  the Masters Pharmaceuticals case issued

17  in 2017, correct?

18       A.    That is correct.

19       Q.    An opinion issued by a DEA

20  administrator does not apply

21  retroactively, does it?

22             MR. BOGLE:  Object to form.

23             THE WITNESS:  I'm not sure I

24       understand your question.

1    BY MR. EPPICH:

2        Q.    Well, my question is whether

3    or not the opinions issued in the Federal

4    Register via DEA administrator do not

5    apply retroactively.

6              MR. BOGLE:  Same objection.

7    BY MR. EPPICH:

8        Q.    For example, the Masters

9    decision was published in 2015, in

10   September of 2015.  You wouldn't expect

11   the decision -- the DEA to apply the

12   decision of Masters Pharmaceuticals

13   retroactively, to dates and events before

14   September of 2015, would you?

15             MR. BOGLE:  Object to form.

16        Vague and overbroad.

17             THE WITNESS:  Again, I'm

18        still not sure I'm getting where

19        you're going.

20             I'm not sure of the question

21        that you're asking me.

22   BY MR. EPPICH:

23        Q.    Do regulatory decisions by

24   administrative law judges apply

Highly Confidential - Subject to Further Confidentiality Review

1    retroactively, or are they applied

2    forward looking?

3                    MR. BOGLE:  Object to form.

4          I think it's vague and overbroad.

5          Calls for speculation.

6                    THE WITNESS:  Yeah, I can't

7          answer that for you.  I'm sorry.

8    BY MR. EPPICH:

9          Q.    You don't know sitting here

10   today whether or not decisions are -- by

11   courts are applied retroactively?

12                   MR. BOGLE:  Same objections.

13   BY MR. EPPICH:

14         Q.    Let's turn to Page 20.

15         A.    It's a vague -- it's a

16   vague -- it's a vague question, and I

17   can't answer it unless you are going to

18   be a little more specific for me.

19         Q.    Let's move on.  We'll go to

20   Page 20, sir.

21         A.    Okay.

22         Q.    Back on Page 20.  Still on

23   Section 5.3.5 in the Masters

24   Pharmaceutical case.

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Where are we now, please?

2      Q.     Page 20.

3      A.     Page 20.  Yeah, I'm there.

4  Got it.

5      Q.     Section 5.3.5?

6      A.     Mm-hmm.

7      Q.     And I'm looking at the

8  second paragraph.

9      A.     Okay.

10     Q.     And there you acknowledge

11 that the regulations do not expressly

12 define what is meant by "when

13 discovered."

14            Did I read that correctly?

15     A.     Yes, you did read that

16 correctly.

17     Q.     And if we turn to Page 21 of

18 your report, you state --

19     A.     Where are you?  I'm on 21.

20 But where on 21, please?

21     Q.     I'm looking in the second

22 paragraph, sir, and I'm about four lines

23 down.  You say, "Therefore, based on the

24 guidance provided by acting Administrator

Highly Confidential - Subject to Further Confidentiality Review

1  Rosenberg's conclusion in the Masters

2  case, it is my opinion that this

3  investigatory period is less than a

4  week."

5       A.    Yes.

6       Q.    So your opinion is that

7  registrants have a week to determine if

8  an order is suspicious and should be

9  reported to DEA?  Is that your testimony?

10      A.    No.  I think -- I think if

11  you read what was being said here was

12  fairly clear.  You have a choice as a

13  registrant.  You can decide that you get

14  something that's suspicious and decide

15  that you don't want to do anything with

16  it.  You don't ship it.  You cancel it.

17  You dump it.  You don't want to

18  investigate it.  You report that to DEA

19  when you make that decision.

20            What I'm saying to you is I

21  do believe you have a period of time, and

22  I believe it's consistent with the way

23  DEA has applied the rules, to at least

24  determine whether or not you can clear

Highly Confidential - Subject to Further Confidentiality Review

1  the order that has flagged of any red

2  flags.  And if you can, then you can go

3  ahead and ship it and not report it.  If

4  you can't, you should still not report

5  it -- or I'm sorry, you should still

6  report it, but still not ship it.  And

7  you can continue on with your

8  investigation point from that point on.

9  But you can't sit there and do an

10  investigation forever.

11        Q.    And it's your opinion that

12  registrants have about a week to --

13        A.    I just think a week's a

14  reasonable amount of time to determine

15  whether you've got a fat-fingered order

16  or whether you've got another sort of

17  clerical error to that perspective to at

18  least make the decision.  And again,

19  we're talking about -- so let us be

20  clear.  We're talking about, they have a

21  point in time, about a week, to actually

22  get that information to DEA.

23              So here, I think I have a

24  suspicious order I can't clear, or --

1    But I don't think that that

2    says that that's the end of the

3    investigation and you have to walk away

4    from the shipment.  I think you can

5    continue to investigate after that week's

6    time.

7    Q.    Well, how did you decide on

8    a week as being the reasonable time

9    period for the investigation?

10    A.    Well, actually, if you go

11    back and you read the opinion, when you

12    read it pretty closely.  It's pretty

13    clear that it gives three different ways

14    of measurement.  One is a day, one is a

15    month, and one is a week.  And he says a

16    month is too long.  A day is too short.

17    A week is in the middle.

18    Plus if you look at other

19    regulatory constructs such as, you know,

20    suspicious order -- I'm sorry, adverse

21    events and others, you know, a week is a

22    reasonable amount -- is a fairly long

23    period of time and a reasonable amount of

24    time if you put the effort in to

Highly Confidential - Subject to Further Confidentiality Review

1    determine whether you think you can clear

2    the order from suspicion.

3         Q.    Has the DEA ever offered

4    guidance to registrants that one week is

5    a sufficient period of time to conduct

6    diligence on orders?

7         A.    I am unaware of them

8    actually putting a time frame in it.  The

9    regulation, as you know, says, when

10   discovered.  But I think a fair reading

11   also of the DEA's points about they don't

12   want a lot of white noise, in other words

13   they don't want fat fingered orders.

14   They don't want you simply to report

15   things just for the sake of reporting

16   them also factors in here -- so there's

17   a -- I believe you have a window of time

18   to make a determination of whether you

19   think the thing is still suspicious or

20   not.  And you're not reporting clerical

21   errors.

22              They don't want to have

23   that.  They've been pretty clear that

24   they didn't want to know about clerical

Highly Confidential - Subject to Further Confidentiality Review

1    errors.

2            Q.    Let's go back to Page 21 of

3    your report, sir.  And I'm in the second

4    paragraph.  In the second line of that

5    paragraph towards the end, "However, it

6    is reasonable to permit a brief

7    investigatory period to avoid the

8    submission of reports that have been

9    flagged by the system but clearly are not

10   suspicious as determined through

11   verifiable and documented means."

12            Did I read that correctly?

13           A.    I'm not sure exactly where

14   you are.  Can you read it to me again?

15           Q.    Yes, sir.  I apologize for

16   that.  I'm on the second line of

17   paragraph --

18           A.    Got it.

19           Q.    So, "However it is

20   reasonable to prepare a brief

21   investigatory period to avoid the

22   submission of reports that have been

23   flagged by the system but clearly are not

24   suspicious as determined through

1    verifiable and documented means."

2          A.    Yes.

3                MR. BOGLE:  Objection.

4          Misstated the -- I think you

5          missed a word or two there.

6    BY MR. EPPICH:

7          Q.    Okay.  I think we are on the

8    same page --

9                MR. BOGLE:  I think he knows

10         where you are reading from.

11               THE WITNESS:  I know where

12         you're reading from.

13   BY MR. EPPICH:

14         Q.    Sir, not -- not every

15   flagged order by an automated system is

16   suspicious, correct?

17               MR. BOGLE:  Object to form.

18               THE WITNESS:  How are we

19         defining the term "suspicious"?

20         Are we talking about that you have

21         a suspicion that you need to do

22         further investigation?  I would

23         say every flagged order that comes

24         out of the system requires you to

1      do extra work to figure out

2      whether or not there's an issue or

3      not.

4  BY MR. EPPICH:

5      Q.    Not every order above a

6  fixed volume is suspicious, correct?

7          MR. BOGLE:  Object to form.

8          THE WITNESS:  Could you be

9      more specific?

10  BY MR. EPPICH:

11      Q.    Well, say you have a

12  threshold set for a given pharmacy and a

13  given base code of drug.

14          Not every order that exceeds

15  that threshold is suspicious, correct?

16          MR. BOGLE:  Object to form.

17          THE WITNESS:  It's an awful

18      vague hypothetical.  You're

19      saying -- again I'm not exactly

20      sure what you're -- what you're

21      trying to inquire about.

22  BY MR. EPPICH:

23      Q.    Well, you'd agree with me

24  that when an automated system -- an

Highly Confidential - Subject to Further Confidentiality Review

1    automated system flags an order, perhaps

2    because that order is above that

3    threshold, that a registrant has to look

4    at the context of the order and the

5    customer, correct?

6              MR. BOGLE:  Object to form.

7              THE WITNESS:  I would say

8         that the -- my answer to your

9         question will be that the

10        registrant needs to examine the

11        order and understand why the flag

12        happened and determine whether or

13        not that's a -- something that

14        is -- something as simple as a

15        clerical error or something more

16        serious.

17   BY MR. EPPICH:

18        Q.    And to do that they would

19   look at the customer, correct?

20        A.    I think it's one factor

21   among many.

22        Q.    They'd also look at the

23   context of the order, wouldn't they?

24        A.    I think that's another

1   factor.  But not the only factors

2   necessarily.

3           Q.   Let's look at Page 25 of

4   your report quickly.  On Page 25 of your

5   report, you are discussing written

6   documentation.  And at the bottom of

7   Page 25 you say, and this, this is

8   actually the very last full paragraph on

9   the page, sir, in the first sentence.

10              "Thus, if there is no

11  documentation showing what is claimed,

12  the reasonable presumption is that it was

13  not accomplished."

14              Do you see that?

15          A.   Yes, I do.

16              MR. BOGLE:  I object.  It

17          says "what is claimed is

18          accomplished."  You missed a

19          couple of words there.

20              MR. EPPICH:  I'm sorry.  Let

21          me -- let me strike that and I'll

22          restart.

23  BY MR. EPPICH:

24          Q.   Sir, on the bottom of

Highly Confidential - Subject to Further Confidentiality Review

1    Page 25, the last sentence of the first

2    paragraph reads:  "Thus, if there is no

3    documentation showing what is claimed was

4    accomplished, the reasonable presumption

5    is that it was not accomplished."

6              Did I read that correctly?

7         A.    Yes, I believe you did.

8         Q.    Now, your report does not

9    cite to the regulations or the statute

10   that DEA issued -- that governed how long

11   a registrant must maintain written

12   documentation such as suspicious order

13   reports, correct?

14             MR. BOGLE:  Object to form.

15             THE WITNESS:  Well, again,

16        without seeing the exact code

17        sections you're referring to, I

18        can't answer your question.

19             Do you have something in

20        particular you want me to look at?

21   BY MR. EPPICH:

22        Q.    Are you aware that the DEA

23   has issued a regulation that governs the

24   length of time that written records must

Highly Confidential - Subject to Further Confidentiality Review

1    be maintained by a registrant?

2         A.    I am aware --

3              MR. BOGLE:  Objection.

4    Vague.  Overbroad.

5              You may answer.

6              THE WITNESS:  I am aware the

7         DEA has a regulation on the books

8         that talks about certain types of

9         documentation to be kept for

10        certain periods of time.

11   BY MR. EPPICH:

12        Q.    And are you aware of the

13   specific regulation I'm referring to with

14   respect to the Controlled Substances Act

15   and the suspicious order monitoring

16   programs?

17             MR. BOGLE:  Object to form.

18        Misstates the document.

19             THE WITNESS:  Can you give

20        me the regulation?  I'll be happy

21        to tell you whether I know it or I

22        don't.

23   BY MR. EPPICH:

24        Q.    Just asking, just sitting

1    here today, are you aware, sir?

2                MR. BOGLE:  Same objection.

3                THE WITNESS:  And I don't

4         mean to be argumentive, but I'm

5         really confused.  Since there are

6         lots of regulations out there, I

7         would really like to know what it

8         is you're looking at so that we

9         can have a real conversation on

10        it.

11   BY MR. EPPICH:

12        Q.    I understand.  Let me -- let

13   me just try and clarify.

14        A.    Okay.

15        Q.    Do you know how long the DEA

16   requires registrants to maintain due

17   diligence files in a suspicious order

18   monitoring program?

19                MR. BOGLE:  Objection.

20        Misstates the regulation itself.

21                THE WITNESS:  As I said to

22        you, I am familiar with a record

23        retentions regulation, but could I

24        see the actual regulation?

1    BY MR. EPPICH:

2         Q.    Sitting here today, you do

3    not know that time frame?

4              MR. BOGLE:  Objection.

5         Misstates his testimony.

6              THE WITNESS:  I didn't say

7         that.  I said I needed to look at

8         the regulation.

9    BY MR. EPPICH:

10             (Document marked for

11        identification as Exhibit

12        Whitelaw-7.)

13   BY MR. EPPICH:

14        Q.    I'm marking as Exhibit 7 a

15   copy of 21 C.F.R. 1304.04.

16        A.    Thank you.

17        Q.    Dr. Whitelaw, are you

18   familiar with Section 1304.04?

19        A.    Yes, sir, I am.

20        Q.    So I'm looking at

21   1304.04(a).  It says, "Except as provided

22   in Paragraphs (a)(1) and (a)(2) of this

23   section, every inventory and other

24   records required to be kept under this

1  part must be kept by the registrant and

2  be available for at least two years from

3  the date of such inventory or records for

4  inspection and copying by authorized

5  employees of the administration."

6          Did I read that correctly?

7     A.    Yeah, I think you did.

8     Q.    So there's a two-year

9  recordkeeping requirement for -- for

10 inventory or records under the DEA

11 regulations applicable to the CSA.

12 That's what this says, doesn't it?

13    A.    No, sir.  That's not what

14 this regulation says.

15    Q.    What does this regulation

16 say to you, sir?

17    A.    This regulation says that

18 there is a minimum of two years.  It says

19 for at least two years.

20    Q.    Have you discussed Section

21 1304.04(a) with anyone from the DEA?

22    A.    No, I have not.

23    Q.    Have you discussed Section

24 1304.04 with Mr. Rafalski?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Don't rightly recall that we

2   had a conversation on it.  We may have.

3   I don't recall off the top of my head.

4        Q.    Have you done any research

5   into the legislation history of Section

6   1304.04?

7        A.    Again, no, I have not.

8        Q.    Sitting here today it's your

9   opinion that Section 1304 requires a

10  registrant to keep documents for a

11  minimum of two years.  Is that what I'm

12  hearing?

13            MR. BOGLE:  Object to form.

14            THE WITNESS:  It says for --

15        I think --

16            MR. BOGLE:  Go ahead.

17            THE WITNESS:  I think the

18        plain reading of the section which

19        you just read to me, I believe the

20        key words you're looking for, it

21        says "for at least two years from

22        the date of such records."  And

23        "at least" does not mean just two.

24            At least, my reading of it

Highly Confidential - Subject to Further Confidentiality Review

1    and understanding of it, unless

2    I'm missing something, it's -- it

3    means it could be more than two.

4            MR. EPPICH:  Is this a good

5    time to take our lunch break?

6            MR. BOGLE:  Yeah, that's

7    fine.

8            THE VIDEOGRAPHER:  Off the

9    record, 1:04 p.m.

10                   -  -  -

11           (Lunch break.)

12                   -  -  -

13    A F T E R N O O N   S E S S I O N

14                   -  -  -

15           THE VIDEOGRAPHER:  Back on

16    the record at 1:58 p.m.

17                   -  -  -

18           EXAMINATION (Cont'd.)

19                   -  -  -

20  BY MR. EPPICH:

21       Q.   Dr. Whitelaw, let's turn to

22  Page 28 of your report.

23       A.   Sure.

24       Q.   And I'm looking in Section

1    6.2.1, attributes.

2          A.    I see where you are.  Yeah.

3          Q.    Now, sir, the first sentence

4    in the subsection says, "Within the

5    context of a controlled substances

6    compliance program, I would expect a good

7    anti-diversion program for both a

8    manufacturer and a distributor to have

9    the following attributes."

10          Do you see that?

11          A.    Yes, sir, I do.

12          Q.    And in the section you then

13    list what your report describes as

14    attributes of a good anti-diversion

15    program, correct?

16          A.    It defines attributes of

17    what I would expect to see from a good

18    anti-diversion compliance program, yes.

19          Q.    And it includes the sections

20    integration, high-level individual, and

21    then resources.

22          A.    Yes, I see them.

23          Q.    Now, in looking at

24    Subsection 6.2.1, you do not cite any

Highly Confidential - Subject to Further Confidentiality Review

1   materials to support the attributes you

2   identify, correct?

3         A.    There are no -- there are no

4   footnotes there, if that's what you're

5   asking me.

6         Q.    No cite -- that is what I'm

7   asking you.  Thank you.

8               And what is your support for

9   each of the attributes that you identify

10  in Section 6.2.1?

11        A.    Well, again, the attributes

12  build off of the previous sections that

13  we spent a lot of time on, both from a

14  corporate compliance and a controlled

15  substances compliance program, as well as

16  my more than 30 years experience doing

17  this, as an -- in designing and building

18  programs, and what runs and what's

19  effective and what, you know, isn't

20  effective, as well as my discussions with

21  Mr. Rafalski and my review of all the

22  documents in this case and information in

23  this case.

24        Q.    So it's fair to say that the

1    attributes listed on Pages 28 and 29 are

2    based on your knowledge and expertise

3    over your career, correct?

4              MR. BOGLE:  Objection.

5              THE WITNESS:  I think that's

6         a narrow reading of what I said.

7         I said that was an element of it,

8         plus all the other work that I had

9         done in this case, plus my

10        conversations with Mr. Rafalski,

11        et cetera.

12   BY MR. EPPICH:

13        Q.    Now, let's go to Section

14   6.3.1.

15        A.    Section 6.3.1.

16        Q.    This is on Page 30 of your

17   report.

18        A.    Okay.

19        Q.    And it's another section

20   entitled attributes.

21        A.    I understand.

22        Q.    And in the first sentence,

23   the first sentence of this subsection,

24   you state, "Within the context of a

Highly Confidential - Subject to Further Confidentiality Review

1    controlled substances compliance program,

2    I would expect the written standards and

3    a good anti-diversion program for both a

4    manufacturer and a distributor to have

5    the following attributes."

6              Then you list in what you

7    describe as the written standards of a

8    good anti-diversion program, correct?

9         A.    Yes.

10        Q.    And here you cite one source

11   in this section for the written standard

12   attributes; is that correct?

13        A.    I cite one example, yes.

14   And it's -- I believe you're -- are you

15   referring to Footnote 120?

16        Q.    I am.  I am.

17        A.    Okay.

18        Q.    The source that you cite is

19   a 2011 PowerPoint presentation from Mike

20   Kunkle?

21        A.    Mm-hmm.

22             MR. BOGLE:  Make sure you

23        say yes or no.

24             THE WITNESS:  Yes, it is.

```
 1    BY MR. EPPICH:

 2         Q.    Now, I looked at this

 3    presentation.  And the author describes

 4    the presentation as a, quote, "very basic

 5    primer I once created to teach a staff of

 6    technical writers about instructional

 7    design."

 8         A.    Right.

 9         Q.    The PowerPoint didn't

10    mention anything about wholesale

11    pharmaceutical distributors, did it?

12         A.    No, sir, it did not.

13         Q.    Did it mention anything

14    about pharmaceutical manufacturers?

15         A.    No, sir, it did not.  But it

16    wasn't being cited for those points.

17    What it was being cited for was the fact

18    that organizational design techniques and

19    how to build good training programs and

20    how to design them for learning for

21    adults, it's readily available

22    information that people can go out and

23    research on their own.  You don't have to

24    have a degree in instructional design.
```

Highly Confidential - Subject to Further Confidentiality Review

1   You don't have to have, you know, a
2   degree in learning.  You don't have to be
3   an education specialist.  You can
4   actually get guidance, pretty decent
5   guidance, on how to build programs,
6   training programs on your own by just
7   simply going out and Googling.
8        Q.    And the presentation also
9   didn't mention controlled substances, did
10  it?
11       A.    Again, as I think we just
12  covered, it was being cited for a
13  different reason.  And no, it did not
14  take into account controlled substances.
15  It was being cited for the fact that
16  instructional design principles are
17  fairly readily available and easy to
18  find.
19       Q.    Would you turn to Page 34 of
20  your report.  This is Section 6.4.1.
21  Again titled "Attributes."  Section 6.4.1
22  spans the pages of 34, 35, 36 and 37; is
23  that correct?
24       A.    Give me a minute to check

Highly Confidential - Subject to Further Confidentiality Review

1  the page numbers.  So what was your

2  question again?

3          Q.    I just want to make sure

4  that I'm reading the report correctly.

5  Section 6.4.1 spans pages 34, 35, 36, and

6  onto 37; is that correct?

7          A.    Correct.  That is correct.

8  That is correct.

9          Q.    Now, going back to Page 34.

10  In the first sentence of this subsection

11  your report states, and this is about

12  halfway through the first sentence of the

13  first paragraph -- "I would expect the

14  monitoring, auditing, and investigations

15  program for a robust distributor

16  anti-diversion program to have the

17  following attributes."

18              Do you see that, sir?

19          A.    I do.

20          Q.    And over the course of

21  Pages 34, 35, 36, and -- and half of 37

22  in this subsection, you do not cite any

23  sources for these attributes, do you?

24          A.    There are no footnotes, no,

Highly Confidential - Subject to Further Confidentiality Review

1    there are not.

2         Q.    And again the attributes

3    listed in this section are based on your

4    knowledge and experience and -- is that

5    accurate?

6         A.    Yes.  It's based on my

7    knowledge, experience, the data that I

8    have reviewed, the information I have

9    reviewed, my conversations with

10   Mr. Rafalski.  All of the above.

11        Q.    Let's go ahead and turn to

12   Page 38.  Section -- on page 38, you see

13   Section 6.5.1 titled "Attributes"?

14        A.    I do.

15        Q.    And in this -- in this

16   subsection, the first sentence reads,

17   "Within the context of a controlled

18   substances compliance program, I would

19   expect the corrective action and risk

20   assessment processes for both a robust

21   distributor and manufacturer

22   anti-diversion program to have the

23   following attributes."

24        A.    Mm-hmm.

1    Q.    And then you identify

2    Number 1, "Corrective Actions"; Number 2,

3    "Risk Assessments."  Do you see those,

4    sir?

5        A.    I do see them.

6        Q.    And again, you cite no

7    sources for any of these sentences in

8    this section, do you?

9        A.    There are no footnotes

10   associated with those sections.  But I

11   think a fair reading, again if you read

12   my report, if you happen to go back up,

13   for example, let's flip to Page 37, and

14   we look at the section entitled

15   "Corrective Actions & Risk Assessments,"

16   and you read down there, you'll notice a

17   great deal of sources cited.

18            So the way I organized each

19   of these sections, sir, was we started

20   out with a general discussion about

21   what -- what's available from the

22   standards perspective and cited to them.

23   And then we got into some specifics.

24            Okay.  So this is what it

Highly Confidential - Subject to Further Confidentiality Review

1  says.  So now how would you translate

2  that, which is what I do for a living.

3  That's the work I do is, here are the

4  standards, how do we apply them and make

5  an effective compliance program.

6          Q.    And so in this section, sir,

7  which is Section 6.5, "Corrective Actions

8  & Risk Assessments," you reviewed the

9  documents that are cited in

10  Footnotes 132, 133, 134, 135, and 136.

11  And using your experience and knowledge,

12  you prepared the attributes that we see

13  in Section 6.5.1?

14          A.    Correct.

15          Q.    And is that how you came up

16  with the attributes that we see listed

17  across all these various sections from

18  Pages 28 to 42?

19          MR. BOGLE:  Objection.

20      Vague and overbroad.

21          THE WITNESS:  I'm not sure I

22      know what you're asking.  Could

23      you be more specific?

24  BY MR. EPPICH:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      We can go through them, each

2   one at a time, that's fine.

3              Why don't we turn to page --

4   Page 41 of your report.  And Page 41, do

5   you see Section 6.6.3, sir?

6      A.      I will when I get there.

7   I'm not there yet.  Hang on a second.

8              Which section are you

9   looking for me to find?

10     Q.      Subsection 6.6.3.

11     A.      I do see it.  Yes, I do.

12     Q.      And -- and that section is

13  titled, "Attributes," sir?

14     A.      That section is titled

15  "Attributes."

16     Q.      And this section concerns

17  attributes of a disciplined system for

18  employees, distributor customers and

19  manufacturer customers, correct?

20     A.      Yes, that's a fair reading.

21     Q.      And you list what you

22  believe are the attributes for such a

23  program here in Section 6.6.3?

24     A.      Yes.

1    Q.    And once again, in

2   Section 6.6.3, you cite to no sources for

3   any of the attributes in the section,

4   correct?

5    A.    Well, I think we had that

6   conversation, but I think you need to go

7   back, and a fair reading of the sources

8   and support for that, although not every

9   item is -- it starts with 6.6,

10  "Accountability - Consistent

11  Enforcement," over on Page 39.

12  Translates over on Page 40.  And

13  continues all the way over to Page 41.

14   Q.    So the attributes that you

15  provide in Section 6.6.3, in preparing

16  those, you would have considered the

17  sources cited in Footnote 137, 138, 139,

18  140, 141, 142, 143 and 144, and based on

19  your experience and -- and knowledge,

20  prepared the attributes that we see in

21  Section 6.6.3?

22   A.    They would have been --

23  those were some of the things that I did

24  consider and that I have cited to there.

Highly Confidential - Subject to Further Confidentiality Review

1   And there would have been other documents

2   that I read as well.  But the sources and

3   support are there.  And they derive these

4   attributes from those sources based on my

5   experience as a compliance expert.  Which

6   was what I was asked to do.

7           Q.    Now, you -- sir, you

8   referenced conversations with

9   Mr. Rafalski as helping form your

10  opinions on the attributes that we have

11  just discussed.  Are you aware that

12  Mr. Rafalski, when asked about your

13  conversations with him, said, "I really

14  didn't see any connection between what

15  his," meaning your opinion, "was going to

16  be and my opinion.  But at the request of

17  plaintiffs' counsel we had a couple of

18  discussions."

19           Are you aware that

20  Mr. Rafalski said that?

21           A.    Is there something in

22  particular you would like me to review

23  and look at?  I haven't seen a document

24  to that effect.  Is there a document that

Highly Confidential - Subject to Further Confidentiality Review

1   you would like to show me?

2          Q.     Are you aware that

3   Mr. Rafalski said these things?

4          A.     I'm not sure in what -- in

5   what context you are referring to.  So

6   perhaps if you can give me some context

7   around it and show me a document, perhaps

8   I can comment further for you.

9          Q.     The context was when

10  Mr. Rafalski was asked about your

11  conversations with him.

12         A.     And when was Mr. Rafalski

13  asked about those conversations?  Can you

14  be more specific, please?

15         Q.     You're -- sitting here

16  today, you are not aware that he said

17  these words?  It's a pretty simple yes or

18  no question.

19         A.     Pretty simple yes or no

20  question is can you show me the context

21  and where you are deriving those words

22  from.  Would you please show me the

23  document?

24         Q.     Now, we established earlier

Highly Confidential - Subject to Further Confidentiality Review

1    that you never worked for the DEA,

2    correct?

3          A.    You did establish earlier I

4    have not had the honor of working for the

5    DEA.

6          Q.    And you've never worked at a

7    wholesale distributor or a chain

8    pharmacy?

9          A.    That is correct.

10         Q.    You've never developed a

11   compliance program currently in use by a

12   chain pharmacy?

13         A.    No, I have not designed a

14   compliance program that is in use by a

15   chain pharmacy.

16         Q.    And you've never designed a

17   controlled substances compliance program

18   currently in use by a pharmaceutical

19   manufacturer, correct?

20         A.    I believe we did have a bit

21   of discrepancy on that.  I can't comment

22   on that, because I don't know what's in

23   place since I left some of my former

24   employers.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.     Turn to Page 43 of your
 2    report.
 3            A.     Yes, sir.  Yep.
 4            Q.     On Page 43, we're in
 5    Section 7, which is titled "Measuring
 6    What Good Looks Like."
 7            A.     Yes.
 8            Q.     Do you see that?
 9            A.     I do.
10            Q.     In this section, there's a
11    Figure 2 that is titled "Compliance
12    Maturity & Program Effectiveness Model."
13            A.     Yep.
14            Q.     The figure is a little hard
15    for me to read.  Do you have a legible
16    version maybe that you use to -- to
17    create this figure?
18            A.     I'd have to -- if I do, I
19    don't know where it is right now.  I
20    don't have it handy.
21            Q.     Well, did you -- there's no
22    citation listed for this figure.  Did you
23    create this Figure 2, sir?
24            A.     Yes, I actually did create
```

1    Figure 2.  But it's based on a model and

2    models that are used in, throughout the

3    compliance sector, to describe where you

4    are on a continuum of maturity level.

5    It's a basic measurement tool.  It's used

6    by lots of people.

7          Q.    And have you -- have you

8    used this model and specifically Figure 2

9    in any other case?

10         A.    More --

11               MR. BOGLE:  Object to form.

12         Go ahead.

13               THE WITNESS:  Can you be

14         more specific when you say any

15         other case?

16   BY MR. EPPICH:

17         Q.    Well, have you used Figure 2

18   in any of your other work as an expert

19   witness?

20               MR. BOGLE:  Object to form.

21               THE WITNESS:  As an expert

22         witness in a litigation?  Can you

23         be -- again --

24   BY MR. EPPICH:

1          Q.      Yes, sir.

2          A.      -- be more -- what do you

3    mean by that?

4          Q.      As an expert in a

5    litigation, have you used Figure 2

6    before?

7          A.      Have I used Figure 2 before

8    as an expert in a litigation.  The answer

9    is no, because I haven't been an expert

10   in a litigation before.  As a compliance

11   expert in providing assessments and

12   advice and counsel to clients, yes, I

13   have used this before.

14         Q.      Have you published Figure 2

15   in any publications, any articles?

16         A.      No, I have not.

17         Q.      Do you know if anyone other

18   than yourself has used a scale such as

19   the one we see here in Figure 2?

20         A.      Yes, I've seen it before.

21              MR. BOGLE:  Hold on.  Hold

22         on.  Let him finish the question.

23              THE WITNESS:  Sorry.

24   BY MR. EPPICH:

1    Q.    You're fine.  It's hard

2  sometimes.

3          MR. BOGLE:  Can you restate

4      the question for him just so we're

5      clear.  I think he jumped on you.

6          MR. EPPICH:  I will.  I'm

7      trying to restate it in my head

8      first.

9          MR. BOGLE:  Okay.  That's

10     fine.

11  BY MR. EPPICH:

12   Q.    Dr. Whitelaw, are you aware

13  of anyone who has ever used a scale such

14  as the one that you prepared in Figure 2

15  to measure how a distributor complies

16  with the Controlled Substances Act and

17  its associated regulations?

18   A.    Not in that context, no.

19   Q.    Now, looking at -- looking

20  at your model in Figure 2, is there a

21  point system or some other system that

22  you apply to evaluate the maturity of the

23  compliance program?

24   A.    There is not a strict

Highly Confidential - Subject to Further Confidentiality Review

1    quantitative methodology.  It's more of a

2    qualitative assessment.

3            Q.    And does your report reflect

4    the nature of the qualitative assessment

5    to move from say foundational to

6    maturing, to advancing, to leading?

7            A.    Yeah.  I think if you look

8    at the bullet points underneath there,

9    and also if you look at the attributes

10   that we discussed before, you will come

11   up with that.

12           Q.    So the attributes that we

13   reviewed from Pages 28 to 42 and then the

14   bullet points that we see here under

15   Figure 2.

16           A.    Right.  They're all combined

17   together.

18           Q.    Now, have you applied Figure

19   2, your model, to the compliance programs

20   that are used by the defendants in this

21   litigation?

22           A.    Yes.  I believe we can go

23   find the page citations.  Yes, it was

24   used.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.     It was used by yourself,

2    sir?

3        A.     Yes, sir.

4        Q.     Now, sir, do you plan to use

5    and rely on your model that we see in

6    Figure 2 at trial?

7        A.     It's in my report, so

8    therefore it's subject to be used, yes.

9    I'm not sure I understand your question.

10       Q.     I think you did.  You

11   answered it sufficiently.  Thank you so

12   much.

13              Will you expect to use a

14   more legible version of this figure at

15   trial?

16              MR. BOGLE:  We can blow it

17         up for you after the depo, if that

18         will helps.

19              MR. EPPICH:  That would be

20         great, Brandon.  Thank you.

21              MR. BOGLE:  If that's your

22         only question, I can help you with

23         that one.

24              MR. EPPICH:  Thank you, sir.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. EPPICH:

2         Q.    Now, just one more question

3    on the Figure 2 before I -- before I move

4    on.  I was wondering, for each of the

5    bullet points that we see under each of

6    these categories, do you cite to any

7    support for the statements in those

8    bullet points?

9              MR. BOGLE:  Object to form.

10             THE WITNESS:  I'm not sure I

11        know what you're asking me.  Are

12        you asking are there any

13        footnotes?

14   BY MR. EPPICH:

15        Q.    Well, I'm asking -- and more

16   generally, let me just ask you a

17   question.  Let me -- let me just strike

18   all this, and I'll ask you a new

19   question.

20             What is the support for each

21   of the -- let me strike that.  I think we

22   already got this.  Pardon me.

23             Let me -- let's turn to your

24   supplemental report for a moment.

1    A.    Okay.  Yep.

2    Q.    Now, if you can turn to

3 Page 1 with me.

4    A.    With "Introduction" at the

5 top?

6    Q.    Yes, sir.

7    A.    Okay.

8    Q.    You have a section entitled

9 "Rochester Drug Cooperative."  It's

10 Section 2.

11         Do you see that?

12    A.    Yes, sir, I do actually.

13    Q.    Now, was it your idea to

14 include a section on the Rochester Drug

15 Cooperative in your report or did the

16 plaintiffs' attorney suggest this to you?

17    A.    It was mine.  I thought it

18 was germane to the work that I had done;

19 therefore, in an interest of making sure

20 the court had the best possible

21 information, because again I'm working

22 for the court, I thought this would be --

23 was germane and should be included.

24    Q.    When did you decide to

1   include it in a supplemental report?

2          A.    After I -- this occurred and

3   all happened after the original report

4   was issued.  I don't have a precise date

5   for you, but it would have been after the

6   original report was issued.

7          Q.    And when you decided to

8   include it in a supplemental report, were

9   you already planning to supplement your

10  report with other data or information?

11         A.    I don't rightly recall.

12         Q.    If we can turn to Page 2.

13  And underneath your table, or in

14  Section A, which is titled "General

15  Framework Employed By the DOJ," you have

16  a table.  And then that's a paragraph

17  below the table that reads, "It appears

18  that the DOJ applied a similar framework

19  to assess RDC's anti-diversion efforts.

20  It also" --

21              Did I read that correctly?

22         A.    Sorry.  Could you read that

23  back to me again?

24         Q.    Yes.  "It appears that the

Highly Confidential - Subject to Further Confidentiality Review

1    DOJ applied a similar framework to assess

2    RDC's anti-diversion efforts."

3              Do you see that, sir?

4         A.    Yes, sir, I do.

5         Q.    DOJ did not apply the

6    federal sentencing guidelines in the

7    Rochester plea agreement, correct?

8         A.    I'm not sure I follow the

9    question, please.

10        Q.    Well, my question is, did

11   the DOJ apply the federal sentencing

12   guidelines in the Rochester plea

13   agreement, if you know?

14        A.    What the DOJ appears to have

15   applied is the framework for what is in

16   effect a compliance program that is

17   derived out of the federal sentencing

18   guidelines.  So that's what it appears

19   that they did.  And by looking at how

20   they analyzed the statement of facts.

21        Q.    Well, do you know -- do you

22   know for a fact, sir, as you're sitting

23   here today, whether or not DOJ applied

24   those sentencing guidelines in the

1    Rochester plea agreement?

2            MR. BOGLE:  Objection.

3        Asked and answered.

4            THE WITNESS:  Again, it

5        appears that they took the

6        framework that's in effect a

7        compliance program out of the

8        federal sentencing guidelines and

9        applied that against the conduct

10       that they had observed.

11   BY MR. EPPICH:

12       Q.   Do you have any citation or

13   support for your statement that it

14   appears DOJ applied the federal

15   sentencing guidelines to the Rochester

16   plea agreement?

17       A.   Other than reading all of

18   the statement of facts and checking it

19   off against the elements of an effective

20   compliance program, I'm not sure exactly

21   what you're looking for, sir.

22       Q.   Is it your testimony that in

23   the statement of facts, it states that

24   the DOJ --

1      A.     No, it's my --

2      Q.     -- applied -- applied the

3  federal sentencing guidelines to the

4  Rochester plea agreement?

5      A.     No.  It's my testimony that

6  it appears they used the same elements

7  that are in the federal sentencing

8  guidelines that are the framework for an

9  effective compliance program and assessed

10  Rochester Drug Cooperative against that

11  framework.

12      Q.     Did the DOJ cite to the

13  federal sentencing guidelines in the plea

14  agreement, sir?

15      A.     If you have the plea

16  agreement I'll be happy to re-review it.

17  I can't recall without seeing the

18  document.

19      Q.     You don't know as you sit

20  here today?

21          MR. BOGLE:  Objection.

22      Asked and answered.

23          You can answer again.

24          THE WITNESS:  I would have

1    to see the document, please.

2    BY MR. EPPICH:

3         Q.    Do you intend to offer any

4    other opinions about Rochester Drug

5    Cooperative other than those listed in

6    your supplemental report, sir?

7         A.    Again, based on -- unless

8    any information changes, obviously as

9    we've said from the beginning, I reserve

10   the right to alter my opinions should new

11   evidence or additional evidence or

12   additional information come forward.

13        Q.    But sitting here today, you

14   have no other opinions about the

15   Rochester Drug Cooperative other than

16   what we find in your supplemental report,

17   correct?

18        A.    Sitting here today, yes.  I

19   believe what I have included in my

20   supplemental report is applicable to the

21   work that I've already done and that --

22   that's as far as I've gone.

23        Q.    If we could turn to Page 6

24   of your supplemental report.

Highly Confidential - Subject to Further Confidentiality Review

1                    And here we have Section 4,

2     titled "DOJ Updated Guidance on

3     Evaluating Corporate Compliance

4     Programs."

5                    Did I read that correctly?

6          A.      You did.

7          Q.      Your report does not mention

8     any particular defendant in your section

9     on DOJ's updated guidance, correct?

10         A.      That's correct.

11         Q.      Your report does not offer

12    any opinions applying the DOJ updated

13    guidance to any defendant, correct?

14         A.      No, sir, it does not.

15         Q.      Do you intend to offer any

16    opinions about the DOJ updated guidance

17    that are not in your report?

18         A.      Again, not unless facts and

19    circumstances change.  But not at this

20    moment in time.

21         Q.      We talked earlier about the

22    closed system of distribution.  And we

23    talked, and we discussed how every entity

24    involved with distributing opioids to

Highly Confidential - Subject to Further Confidentiality Review

1    patients must be registered with the DEA.

2    Do you remember that testimony earlier

3    today?

4         A.    I do remember our discussing

5    the closed system, yes.

6         Q.    And do you remember how each

7    of the manufacturers, distributors,

8    pharmacies, and prescribers must be

9    registered with the DEA --

10        A.    Yes, I do remember that

11   conversation.

12             MR. BOGLE:  Let him finish.

13   BY MR. EPPICH:

14        Q.    And it's true that none of

15   those individuals or entities can

16   lawfully handle opioids without the DEA

17   registration, correct?

18        A.    That is correct.

19        Q.    Now, if we can turn to

20   Page 128 of your report.

21        A.    Of the original report?

22        Q.    Yes, sir.  Of the original

23   report.

24        A.    Okay.  Thank you.  128.

Highly Confidential - Subject to Further Confidentiality Review

1    Okay.

2          Q.    Now, this is Section 11.2,

3    the "Executive Summary."  Here you

4    criticize registrants for requesting

5    guidance from DEA, do you not?

6                MR. BOGLE:  Object to form.

7                THE WITNESS:  Could you be

8          more specific on what it is you're

9          pointing to?

10   BY MR. EPPICH:

11         Q.    Sure.  Let -- why don't we

12   look at the fourth paragraph on Page 128.

13   It's the fourth full paragraph.

14         A.    Right.

15         Q.    And it says, "Expanding on

16   the" -- "on that notion of dialogue with

17   the DEA, AmerisourceBergen developed the

18   misguided narrative that it was entitled

19   to regular communications with the DEA,

20   including having DEA supply it with

21   information on diversionary customers and

22   review its systems."

23                Do you see that, sir?

24         A.    I do see that.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Are you aware that

2   registrants asked DEA for guidance on how

3   to design their suspicious order

4   monitoring programs?

5                MR. BOGLE:  Object to form.

6        Vague and ambiguous.

7                THE WITNESS:  Can you be a

8        bit more specific?

9   BY MR. EPPICH:

10       Q.    Why don't you answer my

11  question and we'll see if it takes us in

12  the direction that I'm -- that I'm

13  looking to go.

14       A.    Well, I'm confused exactly

15  what you're asking me.  So perhaps you

16  can restate the question.

17       Q.    Are you aware or are you not

18  aware that registrants asked DEA for

19  guidance on how to design their

20  suspicious order monitoring programs?

21               MR. BOGLE:  Object to form.

22               THE WITNESS:  I am aware

23        that there was -- were

24        conversations with DEA about the

1         systems.

2    BY MR. EPPICH:

3         Q.    Are you aware that

4    registrants asked DEA for guidance on due

5    diligence investigations of customers?

6              MR. BOGLE:  Object to form.

7              THE WITNESS:  In general

8         terms, yes.

9    BY MR. EPPICH:

10        Q.    Should registrants have not

11   asked the DEA for guidance on the

12   diligence investigations of customers?

13             MR. BOGLE:  Object to form.

14             THE WITNESS:  Are you

15        saying -- could you be more

16        specific what you're asking me?

17   BY MR. EPPICH:

18        Q.    In -- in your opinion,

19   should registrants have asked the DEA for

20   guidance on the diligence investigations

21   of their customers?

22             MR. BOGLE:  Object to form.

23             THE WITNESS:  Are you asking

24        in general terms about how to do a

Highly Confidential - Subject to Further Confidentiality Review

1        due diligence across all

2        customers, or are you talking

3        about specific customers?  I can't

4        tell from the question you're

5        asking me.

6   BY MR. EPPICH:

7        Q.    My apologies.  I'm asking in

8   general terms.

9             Generally speaking, is it

10  your opinion that a registrant should be

11  able to ask the DEA for guidance on due

12  diligence investigations of their

13  customers?

14       A.    On how to do due diligence

15  investigations of their customers?  Is

16  that the question?

17       Q.    Yes, sir.

18       A.    Yes, my general opinion is

19  you should be able to ask a question.

20       Q.    Are you aware that

21  registrants asked DEA for guidance on

22  what constituted a suspicious order?

23            MR. BOGLE:  Object to form.

24            THE WITNESS:  Again, can you

1          be more specific on what they

2          were -- when you say guidance,

3          guidance is a very nebulous term.

4     BY MR. EPPICH:

5          Q.     For example, how to identify

6     a suspicious order?

7          A.     Yes.  I am aware that they

8     have asked for guidance in that regard,

9     yes.

10          Q.     And is it your opinion that

11     registrants should be able to ask DEA for

12     guidance on how to identify a suspicious

13     order?

14          A.     It's my -- my opinion that

15     if you are not sure what the requirements

16     are, you should always ask the question.

17     I don't think it's inappropriate to ask a

18     question.  You may not get the answer.

19     You may not get a response.  But you can

20     ask a question.  I don't -- I'm not sure

21     there's anything wrong with asking

22     questions.  I'm not sure where you're --

23     I'm not sure what your question is.

24          Q.     And it's your opinion that

Highly Confidential - Subject to Further Confidentiality Review

1  if the registrants ask the DEA questions

2  such as the ones we've discussed, that

3  the DEA should provide a response,

4  correct?

5            MR. BOGLE:  Object to form.

6            THE WITNESS:  What type

7        of -- could you be more specific

8        as the type of response you are

9        asking for?

10 BY MR. EPPICH:

11      Q.    The DEA should answer

12 questions of the registrants, correct?

13      A.    Well, it would be more

14 specific.  Saying "I'm not going to

15 provide you with a response" is in fact a

16 response.  I don't mean to be pedantic.

17 But I am trying to understand what you're

18 asking.

19      Q.    Should the DEA provide a

20 substantive answer to the question?

21            MR. BOGLE:  Object to form.

22        Overbroad.

23            THE WITNESS:  I would say

24        that's outside the scope of my

1          expertise as to whether they

2          should or should not provide a

3          substantive response.

4    BY MR. EPPICH:

5          Q.    Well, as a registrant trying

6    to develop their suspicious order

7    monitoring program, and as a registrant

8    who has asked the DEA for example how to

9    identify a suspicious order, is it your

10   opinion that the DEA should provide a

11   substantive response to the registrant's

12   question?

13         A.    I'm having a hard time

14   answering your question, because in my

15   opinion they have provided substantive

16   responses.  They've provided guidance to

17   you.  It's there in the regulations,

18   so...

19              Because I'm not exactly sure

20   what you're looking for, other than --

21   you know, is your substantive response

22   that you go back and look at the existing

23   guidance?  Yeah, that's a substantive

24   response.  So I'm not sure what you mean

```
1    by substantive response.
2         Q.    So is the answer to my
3    question, yes, the DEA should provide
4    substantive response to registrants'
5    questions when they are trying to develop
6    their suspicious order monitoring
7    systems?
8              MR. BOGLE:  Objection.
9         Asked and answered.
10             THE WITNESS:  It depends on
11        what you mean by substantive
12        response.  I am struggling --
13        seriously struggling, Chris, with
14        your question because it's a very
15        broad -- you know, substantive is
16        very broad.  And I'm not sure
17        exactly what you are asking.
18   BY MR. EPPICH:
19        Q.    Should the DEA -- and let me
20   try and be more specific.
21             If a registrant who is
22   developing a suspicious order monitoring
23   system asks the DEA, how do I identify a
24   suspicious order, is it your opinion that
```

Highly Confidential - Subject to Further Confidentiality Review

1    the DEA should tell or -- tell the

2    registrant how to identify that

3    suspicious order?

4         A.    Again, the difficulty -- the

5    challenge and the difficulty for what

6    you're asking is the regulation says a

7    suspicious order is of unusual size,

8    unusual frequency, and unusual pattern.

9    That, in a way, you can argue is a how.

10             If DEA responded, in your

11   hypothetical -- let's use your

12   hypothetical.  DEA responded to that

13   person and said, "Look, go back to the

14   regulation and look," I would say that is

15   a substantive response, and that's a

16   substantive answer to your question that

17   you've asked.

18        Q.    And if the registrant was

19   still confused by the response from the

20   DEA as to the clarity of the definition

21   of suspicious order and the regulation,

22   is it your opinion that the DEA should

23   try to clarify its response to the

24   registrant?

Highly Confidential - Subject to Further Confidentiality Review

1           MR. BOGLE:  Object to form.

2           THE WITNESS:  Again, I think

3       we're going down an overly broad

4       road.  I'm not sure where you're

5       trying -- could you be a lot more

6       specific, and I'll try to answer

7       your question.

8   BY MR. EPPICH:

9       Q.    Do you agree that the DEA

10  should do everything it can to prevent

11  diversion?

12      A.    I think DEA should do

13  everything it can to effectuate the

14  mandate that it has been given.

15      Q.    And included in that mandate

16  is to prevent the diversion of controlled

17  substances, correct?

18      A.    Actually, the burden is

19  actually on the registrants to prevent --

20  have an effective anti-diversion program.

21      Q.    Is it your opinion sitting

22  here today that the DEA has no role or

23  responsibility in preventing diversion of

24  controlled substances?

Highly Confidential - Subject to Further Confidentiality Review

1           MR. BOGLE:  Objection.

2       Misstates testimony.

3           THE WITNESS:  That's not

4       what I said.  And what I'm saying

5       to you is, the registrant has the

6       responsibility, an undelegable

7       duty under the -- under the

8       Controlled Substances Act and the

9       regulations, to have an effective

10      anti-diversion program.

11          Does DEA have a role in

12      oversight, enforcement, whatever?

13      Yes, they do.

14  BY MR. EPPICH:

15      Q.    Would you agree that greater

16  collaboration between DEA and industry

17  could help reduce diversion?

18          MR. BOGLE:  Object to form.

19  BY MR. EPPICH:

20      Q.    Let me -- let me strike that

21  question.

22          Would you agree that greater

23  collaboration between DEA and industry

24  could help prevent diversion?

1           MR. BOGLE:  Same objection.

2           THE WITNESS:  I still think

3     it's an overly broad question.

4  BY MR. EPPICH:

5      Q.    You don't have a response to

6  my question, sir?

7      A.    I think my response to your

8  question would be this.  My response is:

9  I believe that greater communication

10 between DEA and registrants and good

11 communication is important.  I think it's

12 important in all regulatory functions and

13 all regulatory agencies.

14           Whether it will achieve the

15 objective that you outlaid of preventing

16 diversion or not, I can't answer to that.

17 That's outside of the scope of my ability

18 to answer that.  I don't have a crystal

19 ball.  What I can tell you is I think

20 it's a good thing to have good

21 communication.

22      Q.    And by greater communication

23 or good communication, do you mean

24 frequent communication as well?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    I think timely, sufficient,

2    there's so many factors that go into that

3    question.

4               Again I think having the

5    ability to ask questions and receive

6    responses, you know, and to talk to one

7    another, I think is important, period.

8               I am not going to opine on

9    how often, how -- frequency or whatever.

10   I think it depends on facts or

11   circumstances.

12        Q.    If we can turn to Page 62,

13   sir.

14        A.    Okay.  One minute.

15        Q.    In your report you state

16   that criticisms by industry --

17        A.    Hold on.  Hold on.  I'm not

18   even there yet.  Okay.  We're on 62.  And

19   where on 62 are you looking, please?

20        Q.    On Page 62, I'm in the first

21   full paragraph there under your list of

22   bullet points.

23               And starting in the second

24   line at the very end of the line it says,

Highly Confidential - Subject to Further Confidentiality Review

1    "In the case of McKesson, the narrative

2    about the DEA not providing the company

3    with enough direction to create an

4    effective compliance program persists and

5    has even been adopted by McKesson's board

6    of directors."

7            Do you see that, sir?

8        A.    Yes, sir, I do.

9        Q.    Now, you've -- you state

10   that criticisms by industry that DEA does

11   not provide sufficient guidance are a

12   narrative.  Is that your intent, sir, by

13   using the word "narrative"?

14           MR. BOGLE:  Object to form.

15   BY MR. EPPICH:

16       Q.    What is your intent with the

17   word "narrative"?  What do you mean by

18   that word?

19       A.    I think what I meant by the

20   word "narrative" is it's -- that's the

21   version of the way they see the world at

22   the moment.

23       Q.    Did you write the word

24   "narrative," or did plaintiffs' counsel

Highly Confidential - Subject to Further Confidentiality Review

1    edit this sentence to include the word

2    "narrative"?

3            A.    I wrote the word

4    "narrative."

5            Q.    You're aware that the DEA

6    has been repeatedly criticized for

7    failing to provide guidance to industry,

8    correct?

9                  MR. BOGLE:  Object to form.

10                 THE WITNESS:  Could you be

11        more specific?

12   BY MR. EPPICH:

13           Q.    Well, are you familiar with

14   the government accountability office, the

15   GAO?

16           A.    I am familiar with what the

17   GAO is, yes.

18           Q.    Are you aware that the GAO

19   issued a report in 2015 that criticized

20   DEA's responsiveness to industry?

21           A.    I need to see the document

22   to remember whether I saw it or not.

23   Again, as I've said before, I've seen a

24   lot of documents.

1    Q.    Have you reviewed any GAO

2    documents or reports in preparation of

3    your report?

4    A.    Well, let's go back and look

5    at the reliance materials and maybe we

6    can find it, but --

7    Q.    You don't recall sitting

8    here today?

9    A.    I can't -- as I said, I

10   can't recall -- I don't recall every

11   Bates number off the top of my head.  I

12   can go back and look through the reliance

13   materials and try to find it for you to

14   confirm or not.

15   Q.    Sitting here today, are you

16   aware the GAO recommended that DEA

17   provide greater guidance to distributors

18   regarding their roles and

19   responsibilities for suspicious order

20   monitoring reporting?

21        MR. BOGLE:  Objection to

22        form.

23        THE WITNESS:  Again, I'm

24        asking for the document that

1      you're referring to.  If you'd

2      like to show me something and have

3      me comment, I'll be happy to do

4      so.

5  BY MR. EPPICH:

6      Q.    Now, earlier today we

7  discussed acting administrator Chuck

8  Rosenberg.  Do you remember that

9  discussion?

10     A.    Yes, I do remember our

11  discussion.

12     Q.    And I believe that you

13  pointed to Dr. Rosenberg's opinions in

14  your report section on the Masters

15  pharmaceutical case, correct?

16     A.    I reported -- I pointed to

17  that, in particular, the federal register

18  notice containing those opinions.

19     Q.    Are you aware that

20  Mr. Rosenberg testified to Congress on

21  June 22, 2016, as the head of the DEA?

22     A.    Is there something in

23  particular that you would like me to look

24  at?  I will look at it again.

Highly Confidential - Subject to Further Confidentiality Review

1          Again, you are asking me

2     about -- I've looked at so many

3     documents, I can't remember all of them

4     off the top of my head.

5          If there's something in

6     particular you'd like me to look at, I'll

7     be happy to do so.

8     Q.    And sir, if -- and I

9     appreciate that, I appreciate that.

10          If there's -- if there's

11     testimony from a congressional record or

12     a GAO report that is not identified in

13     your report in Appendix 1or in the

14     supplemental report, it's fair to say

15     that you have not considered that

16     testimony or that report in forming your

17     opinions as stated in your reports,

18     correct?

19     A.    It's fair to say that I

20     don't believe I relied upon it, because I

21     believe I made the reliance list as

22     complete as I could possibly make it.

23     Q.    And the plaintiffs' counsel

24     did not provide you with copies of any

Highly Confidential - Subject to Further Confidentiality Review

```
 1    GAO reports or any congressional
 2    testimony, to your recollection?
 3            A.    I don't recall.  I honestly
 4    don't recall at this point.
 5            Q.    Now, sir, is it your opinion
 6    that companies should look to government
 7    guidances from the relevant regulatory
 8    agencies when designing their compliance
 9    programs?
10            A.    Yes, they should.
11            Q.    That would include the OIG
12    guidances that you discussed in your
13    report?
14            A.    Yes.
15            Q.    And perhaps even the DOJ
16    updated guidance on evaluating corporate
17    compliance programs that you discussed in
18    your supplemental report?
19            A.    Yes.
20            Q.    Is it your opinion that
21    companies should look at settlements and
22    precedents when designing their
23    compliance programs?
24            A.    Yes.
```

1    Q.    That would include the

2  Rochester Drug Cooperative deferred

3  prosecution agreement that we saw in your

4  supplemental report?

5    A.    Yes, sir.

6    Q.    And the U.S. versus C.R.

7  Bard plea agreement that you discuss in

8  your report?

9    A.    Yes, sir.

10    Q.    And the federal sentencing

11  guidelines that you discuss in your

12  report?

13    A.    Yes, sir.

14    Q.    Have you always held this

15  opinion, these opinions?

16    A.    Have I always held these

17  opinions?

18    Q.    Yes, sir.

19    A.    Ever since I've been a

20  compliance officer, yes.  Again, you use

21  what's available to you to build an

22  effective compliance program.  All this

23  material are data points that you can

24  draw from in building an effective

1   compliance program.

2          Q.    Now, you -- you actually

3   held though, the opposite view about

4   these opinions and about the value of

5   looking at guidances from regulatory

6   agencies, settlements, and prior

7   precedents, right?

8          A.    I'm not sure what you're

9   talking about, so I -- you're going to

10  have to be more specific, sir.

11              (Document marked for

12          identification as Exhibit

13          Whitelaw-8.)

14  BY MR. EPPICH:

15         Q.    Let me introduce as Exhibit

16  Number 8.  Exhibit Number 8 is an article

17  entitled "Government Standards Undermine

18  Compliance Efforts in Life Science

19  Companies," by Seth B. Whitelaw dated

20  March 7, 2018.  I'll hand you that, sir.

21         A.    Yeah, let me see it.

22         Q.    You are familiar with this

23  article, sir?

24         A.    I am.  Is there something in

1    particular that we want to look at in it?

2         Q.    Yeah.  So we -- if we turn

3    to Page 2.

4         A.    Mm-hmm.

5         Q.    And I'm looking at the

6    fourth paragraph down.  This was March 7,

7    2018.  This was roughly six months before

8    you were hired by the plaintiffs' counsel

9    for your expert role in this case,

10   correct?

11        A.    That would be about right.

12        Q.    On Page 2 of Exhibit 8,

13   we -- we read, "Although the government

14   remains steadfast, the companies must

15   individually tailor their compliance

16   programs to suit each business and

17   organization.  The OIG, among other

18   enforcement bodies, continue" --

19   "continues to embrace settlement

20   boilerplates and slowly increases the

21   burden and complexity for compliance

22   officers."

23             You previously wrote this

24   sentence, didn't you?

Highly Confidential - Subject to Further Confidentiality Review

1       A.    I did.

2       Q.    And in the next paragraph,

3   again before you were hired by the

4   plaintiffs in this case, you wrote, "To

5   make matters worse, these much touted

6   government guidance, settlements, and

7   precedents do not reflect leading

8   practices."

9             You wrote that too, correct?

10      A.    I did.

11      Q.    And before you were hired by

12  the plaintiffs, in the very last

13  paragraph on the -- on the next page.

14  Pardon me, on the first paragraph on the

15  next page.  Four lines down, you write,

16  "Therefore, the government provides

17  little guidance on how to design and

18  maintain a company culture that

19  encourages ethical decisionmaking and

20  conduct.  Ethics is the critical missing

21  ingredient in corporate integrity

22  agreements.  And as a result, these

23  documents so often used as the blueprint

24  for designing life science compliance

1    programs do not reflect the most current

2    thinking derived from experts across

3    industries."

4              You also wrote that,

5    correct?

6         A.    Yes, I did.

7         Q.    And then finally in the last

8    paragraph on this page, and I'm looking

9    at the last three lines of that

10   paragraph, you wrote, before you were

11   hired by the plaintiffs' counsel, that

12   "government enforcement agencies must

13   change their mindset and their own

14   measures of success beyond the number and

15   size of settlements."

16             You wrote that too, didn't

17   you?

18        A.    Yeah, I did write that.

19        Q.    Now, these were your

20   opinions before you were hired by the

21   plaintiffs for this litigation, correct?

22        A.    Those were my opinions as

23   expressed in this article; yes, I wrote

24   this article.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    And now that you're the

2    plaintiffs expert, you're offering the

3    opposite opinion, about the usefulness of

4    government guidances, settlements and

5    other precedents --

6                MR. BOGLE:  Object to form.

7                THE WITNESS:  No, I'm not.

8         No, I'm not.

9                I am not.  You are missing

10         the point.  The point of what I

11         was saying was the fact that if

12         you look at settlement agreements

13         in general, they are tailored to

14         specific conduct.  If you look at

15         the corporate integrity agreements

16         in particular is what I was

17         speaking to, in life sciences, we

18         are talking about specific forms

19         of conduct they were attempting to

20         address.

21                We weren't talking about the

22         overall ethics as a culture.  And

23         there's a whole discussion going

24         on in our -- in our business about

Highly Confidential - Subject to Further Confidentiality Review

1        the role of ethics and the review

2        of just basic compliance and where

3        do those two fit, how do you put

4        those two together, and how do you

5        make a good compliance culture.

6             The conversation I was

7        having, or at least the opinions

8        that I was expressing in here is

9        that my belief was that OIG in

10        particular needed to start

11        thinking about the ethical

12        component as much as they were

13        thinking about the basic

14        compliance component.

15             So that's not inconsistent

16        with the viewpoint that I've

17        expressed in this report.  In

18        fact, it is incredibly consistent.

19    BY MR. EPPICH:

20        Q.    You cite to this document in

21    your CV, sir?  Do you cite to what I've

22    marked --

23        A.    In my CV?

24        Q.    -- as Exhibit 9 -- or 8?

Highly Confidential - Subject to Further Confidentiality Review

1    Excuse me.

2          A.    In my CV or in my --

3          Q.    In your CV that's attached

4    to your -- to your report, sir.

5          A.    Are you looking for the

6    publications list or are you looking just

7    for the basic CV?  I'm trying to

8    understand where you're looking.

9          Q.    I'm asking if you identified

10   this particular article in the CV that

11   you've attached to your expert report in

12   this litigation, Exhibit 2?  Your CV

13   begins on Page 279.

14         A.    If it's not listed here, it

15   was left out by inadvertence.  But again

16   I've written a lot over 30 years.  I

17   don't remember every single article I've

18   written.  I did try to make this as

19   complete and thorough as I could possibly

20   make it for you.

21              MR. EPPICH:  We've been

22         going about an hour.

23              THE WITNESS:  Wait a minute.

24              MR. EPPICH:  I don't -- I

1   don't what you to testify what

2   counsel is telling you on the

3   side.  I don't think that's

4   appropriate.

5       MR. BOGLE:  It's right there

6   on 283.  I mean, I would assume

7   you want a complete record.  It's

8   right there on 283 in his report.

9       MR. EPPICH:  That's fine,

10  Brandon, but let's be above board.

11      MR. BOGLE:  I am.

12      MR. EPPICH:  Let's go

13  ahead -- let's go ahead and take a

14  break.

15      THE VIDEOGRAPHER:  Going off

16  the record at 2:53 p.m.

17      (Short break.)

18      THE VIDEOGRAPHER:  We are

19  back on the record at 3:11 p.m.

20      THE WITNESS:  Chris, before

21  we go on, I do want to clarify for

22  the record.  The publication that

23  we were discussing is in fact on

24  Page 283 of the -- it's in my

1    publications list.  I just didn't

2    see it when I eyeballed it quickly

3    for you.

4  BY MR. EPPICH:

5        Q.    Thank you.

6        A.    It's there.

7        Q.    Thank you, sir.  I

8  appreciate that.

9             Let's -- let's turn to Page

10  26 of your report.

11        A.    26?

12        Q.    Yes.

13        A.    Yes, sir.

14        Q.    And this is Section 6.1.2

15  titled "Suspicious Order Monitoring

16  Programs."  I'd like to talk to you about

17  some of your opinions in this section.

18  Let's look at the beginning of Paragraph

19  3.

20             And there you state --

21        A.    Is that the one that begins,

22  "As noted"?

23        Q.    Yes, sir.

24        A.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And it says, "As noted

2    throughout this report, the 'know your

3    customer,' or KYC concept, is critical to

4    having a successful SOM program."

5         Do you see that?

6    A.    Yes, sir.  I do see the

7    statement.

8    Q.    Okay.  Later in the same

9    paragraph, your report says -- and I'm

10   looking about six lines down, all the way

11   to the end of the sentence.  It says, "As

12   the DEA makes clear, the 'know your

13   customer' requirement is the basis for

14   determining whether a customer's

15   purchases are to be considered legitimate

16   or diversionary."

17        Do you see that, sir?

18   A.    I do see that statement,

19   yes.

20   Q.    And do you agree with that

21   statement?

22   A.    Yes, sir, I do.

23   Q.    So just because an order

24   meets the definition of suspicious under

Highly Confidential - Subject to Further Confidentiality Review

1    the regulation, you'd agree that that

2    does not mean the order is for an

3    illegitimate purpose?

4              MR. BOGLE:  Object to form.

5              THE WITNESS:  I would say

6         that if an order is deemed

7         suspicious or you think it's

8         suspicious, it needs further

9         investigation to determine the

10        nature of that order, including

11        all of the above.

12   BY MR. EPPICH:

13        Q.    And that's because the order

14   may not be for an illegitimate purpose.

15   You'd agree with me there?

16             MR. BOGLE:  Objection.

17        Asked and answered.

18             THE WITNESS:  It's a fairly

19        broad hypothetical, but yes, that

20        is a -- one of -- obviously there

21        are two possibilities here.  It's

22        legitimate or illegitimate.  There

23        are two possibilities.  It could

24        be A or B.  Yes.

1    BY MR. EPPICH:

2         Q.    And simply because an order

3    meets the definition of suspicious under

4    the regulation, that does not mean the

5    order is going to be diverted, correct?

6              MR. BOGLE:  Object to form.

7              THE WITNESS:  Could you be

8         more specific?  I mean...

9    BY MR. EPPICH:

10        Q.    Well, my question is simply

11   an order that meets the definition of

12   suspicious under the regulation, that

13   fact alone doesn't mean that that order

14   will be diverted?

15             MR. BOGLE:  Same objection.

16             THE WITNESS:  Again, I think

17        it is a possibility, but also

18        there are multiple possibilities.

19        So, yes, I would agree with you,

20        you do need to do further

21        investigation to determine what is

22        in fact going on, which was, I

23        think, the point that I tried to

24        make throughout my report.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. EPPICH:

2         Q.    And that's because the

3    investigation that you do could reveal

4    that is a legitimate explanation for why

5    a customer placed an order of unusual

6    size?

7         A.    There could be a legitimate

8    explanation.  There could be lots of

9    facts to take into account.  Again, it's

10   fact driven.  And as a result of being

11   fact driven, you need to do a thorough

12   due diligence and investigation program.

13   The problem is, is that I didn't see that

14   happening all that often.

15        Q.    Well, there may be

16   legitimate explanations for why a

17   customer places an order that deviates

18   substantially from normal pattern,

19   correct?

20             MR. BOGLE:  Object to form.

21             THE WITNESS:  There could be

22        lots of reasons for that to

23        happen, both legitimate and

24        illegitimate.  Again, we're back

Highly Confidential - Subject to Further Confidentiality Review

1    to the same point being made, is,

2    you need to do -- you need to

3    thoroughly know your customer.

4    You need to thoroughly need to

5    know the background of your

6    customer, and you need to do an

7    investigation for anything in

8    flags in your system.

9    BY MR. EPPICH:

10        Q.    And it's true that there may

11   be legitimate explanations for why a

12   customer places an order that deviates

13   its unusual frequent, correct?

14        A.    Again, we're talking in

15   hypothetical terms.  So hypothetically,

16   yes.

17        Q.    Now, sir, you're not

18   offering any opinions in this case that a

19   particular order to a distributor, a

20   defendant in this case, was suspicious?

21             MR. BOGLE:  Object to form.

22             THE WITNESS:  Could you be

23        more specific.  When you say I'm

24        not offering an opinion on

Highly Confidential - Subject to Further Confidentiality Review

1          suspicious -- I don't understand.

2     BY MR. EPPICH:

3          Q.     Have you reviewed any of the

4     orders placed to any of the distributors

5     or manufacturers in this case?

6          A.     Yes, I have.

7          Q.     Are you offering any

8     opinions in this case about the

9     legitimacy or the illegitimacy of those

10    orders?

11              MR. BOGLE:  Object to form.

12              THE WITNESS:  I'm offering

13         opinions as to whether or not,

14         when those orders, for whatever

15         reason were being examined, the

16         quality of the data that was being

17         generated to determine whether or

18         not -- I'm a compliance -- I'm a

19         processes guys, processes and

20         procedures.  I'm looking at your

21         processes and procedures.  I'm

22         looking at what your documentation

23         says in the record.  I'm making

24         opinions about the adequacy of

Highly Confidential - Subject to Further Confidentiality Review

1      that documentation and the

2      adequacy of that process and

3      whether or not you followed it or

4      not.

5  BY MR. EPPICH:

6      Q.    Right.  So I'm just trying

7  to get a sense for the scope of your

8  opinions.

9           Your opinions are about the

10  processes and procedures.  They are not

11  about whether a specific order to

12  McKesson for example, that happened on

13  September 7th of 2004, is a suspicious

14  order or not, correct?

15      A.    I am --

16           MR. BOGLE:  Object to form.

17      Go ahead.  Sorry.

18           THE WITNESS:  I am giving

19      you an opinion about whether or

20      not for that specific order, if

21      that's one of the orders that I

22      looked at, whether or not there's

23      adequate information in the file

24      whether McKesson followed the

Highly Confidential - Subject to Further Confidentiality Review

1          procedures that they said that

2          they were going to be doing at

3          that particular point in time.  In

4          fact, did they have a record, you

5          have a record to actually make a

6          judgment one way or the other.

7               Am I questioning your

8          individual judgment?  I'm

9          questioning the adequacy of the

10         record.

11    BY MR. EPPICH:

12         Q.    And any -- any of your

13    opinions on such orders, we would find

14    those in your report, correct?

15         A.    I believe you would.  Again,

16    I'd have to review every section of the

17    order.  But we can go through the entire

18    report if you'd like.

19         Q.    Have you looked at any

20    defendants' transactional data in this

21    case?

22         A.    Could you define what you

23    mean by transactional data?

24         Q.    Sales data, order data, any

1  transactional data, some of the ARCOS

2  data.  Have you reviewed any of that?

3       A.    Yes, I've reviewed some of

4  it.  I can't say exactly all the data

5  that I've looked at.  I have looked at a

6  lot of data.

7       Q.    Let's turn to Page 33 of

8  your report.  Page 33 in the Section 6.4,

9  "Monitoring, Auditing & Investigations."

10           And on Page 33 I'm looking

11  at the second full paragraph.  And

12  I'll -- and I'll read the sentence.  It

13  says, "Utilized correctly the

14  establishment of threshold" --

15  "thresholds, a cap on the amount of

16  controlled substances a customer can

17  order in a set period is an effective way

18  to identify, but not confirm suspicious

19  orders."

20           Did I read that correctly?

21      A.    Yes, I think you did.

22      Q.    Do you agree with that

23  statement?

24      A.    Yes, sir, I do.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Thresholds are a cap on the

2    amount of controlled substances that a

3    customer may order in a set time period;

4    is that correct?

5    A.    That's how I'm defining it,

6    yes.

7    Q.    And you'd agree that

8    establishing thresholds is an effective

9    way for a registrant to identify

10   suspicious orders?

11   A.    I say I would qualify that

12   to say to you, again the point I was

13   making is it's a way to start the

14   process.  It's a way to create a flag for

15   you to then to do further investigation

16   and further follow-up.  It's not the only

17   way, and it's not in and of itself

18   sufficient.

19   Q.    What -- what basis do you

20   have for -- for the opinions that you

21   express in this particular sentence, sir?

22   A.    I have, again, my work,

23   30 years as a compliance expert.  My work

24   in working on this case.  My reading of

1    the -- the rules, regulations and

2    guidance, et cetera, from DEA.  My

3    conversations with Mr. Rafalski, et

4    cetera.

5         Q.    But you don't have any

6    experience setting thresholds for opioid

7    products, do you?

8         A.    No, I have no experience

9    setting opioid thresholds products.  But

10   I do have experience in setting

11   thresholds for noncontrolled substances

12   samples.

13            Again, it's -- what criteria

14   do you need to look at to make sense,

15   what's the level that makes sense, and

16   then set the number.

17            But again, I'm also not a

18   statistician.  I would leave the actual

19   work to that to a statistician.  But yes,

20   I know how generally how you put a

21   threshold together and use it.

22        Q.    Let's go ahead and look at

23   the last two sentences on this Page 33.

24   They are -- they start on the second

Highly Confidential - Subject to Further Confidentiality Review

1  sentence of that last full paragraph.

2  And it reads, "However, if the

3  investigation determines that there is a

4  risk of diversion, the order must not be

5  filled and the company should contemplate

6  other appropriate steps for handling

7  future shipment requests.  Those steps

8  include refusing to ship any more

9  products to the customer, requiring the

10  customer to provide independent assurance

11  that a diversion situation is not

12  present, or terminating the customer

13  altogether."

14          Do you see that, sir?

15     A.    Yes, sir, I do.

16     Q.    And do you agree with these

17  statements?

18     A.    Yes, sir, I do.

19     Q.    When the company investigate

20  an order flagged as suspicious and finds

21  that it is a legitimate order, the order

22  can be shipped, correct?

23     A.    If the company investigates

24  the order and finds that the order in

Highly Confidential - Subject to Further Confidentiality Review

1  their mind, based on their investigation

2  and due diligence, is not suspicious,

3  then -- and -- and cleared all the red

4  flags that got it to flag in the first

5  place and have a legitimate rationale

6  behind it, yes, they can ship the order.

7      Q.    And after an order is

8  investigated and found not to be

9  suspicious, an order that follows that

10  order is not necessarily suspicious,

11  correct?

12          MR. BOGLE:  Object to form.

13          THE WITNESS:  I'm not sure.

14  Could you be a bit more specific?

15  BY MR. EPPICH:

16      Q.    Let me re-ask the question.

17          After an order is

18  investigated and found not to be

19  suspicious, an order that follows that

20  first order that was flagged is not

21  necessarily suspicious, as long as that

22  order is within the threshold limits set

23  by the program, you'd agree with that,

24  correct?

Highly Confidential - Subject to Further Confidentiality Review

1     MR. BOGLE:  Object to form.

2  Improper hypothetical.

3     THE WITNESS:  It's too broad

4  a hypothetical.  There are other

5  factors that can be -- again,

6  be -- be taken into account.

7  Thresholds are not the only way to

8  determine if an order is

9  suspicious.

10 BY MR. EPPICH:

11  Q.   Let me ask you a different

12 question.

13     After an order is

14 investigated and found -- let me strike

15 that.

16     If we call the order that

17 exceeds the threshold -- let me strike

18 that.

19     I'd like to talk to you

20 about the definition of a suspicious

21 order, sir.

22  A.   Are we looking at someplace

23 in particular in my report, sir?

24  Q.   Well, first -- and we'll get

Highly Confidential - Subject to Further Confidentiality Review

1    there -- what is the definition of a

2    suspicious order?

3          A.    I guess we can look.  You

4    gave me the regulation earlier.  Would

5    you like me to read the regulation back?

6          Q.    Sure.

7          A.    Okay.  I will.

8          Q.    It's Exhibit 4, sir.

9          A.    I'm finding it.  It says

10   "The registrant shall design and operate

11   a system to disclose to the registrant

12   suspicious orders of controlled

13   substances.  The registrant shall inform

14   the field division office of the

15   administration of his or her suspicious

16   orders when discovered by the registrant.

17   Suspicious orders include orders of

18   unusual size, orders deviating

19   substantially from a normal pattern, and

20   orders of unusual frequency."

21         Q.    Sir, do you believe the

22   language defining a suspicious order in

23   Section B of 1301.74 is clear?

24         A.    Yes, I do believe it's

Highly Confidential - Subject to Further Confidentiality Review

1    clear.

2         Q.    Do you believe the phrase

3    "order of unusual size" in the regulation

4    is clear?

5         A.    I believe you have to put it

6    in the context of the customer, which I

7    think is what the DEA has been telling

8    you all along, which is you have to know

9    your customer.  So if you put it into

10   context, yes, I think unusual size is

11   clear.  Again, it's tailored to the

12   individual customer.

13        Q.    You'd agree the regulation

14   does not define unusual size, correct?

15        A.    I would agree that there is

16   no precise definition of what unusual

17   size means in the regulation.

18        Q.    What is an order of unusual

19   size?

20        A.    I think -- I'm not sure what

21   you're asking me.  I mean, that's such an

22   open-ended question.

23        Q.    I'm asking if you can give

24   me an example of an order of unusual size

Highly Confidential - Subject to Further Confidentiality Review

1   within the definition of suspicious order

2   found in Section 1301.74(b).

3          A.    Again, because we have to

4   talk about customer in context and

5   everything else, I'm not sure that I can

6   give you what you're asking for.  You're

7   looking for -- it sounds like that you're

8   looking for a precise numerical value.

9   Is that what you're looking for?  I don't

10  understand.

11         Q.    Sitting here today, are you

12  able to provide me with the meaning of,

13  and I quote, "order of unusual size" as

14  found in the regulation Section

15  1301.74(b)?

16         A.    As I think we just discussed

17  1301.74(b) doesn't have a precise

18  definition of what an order of unusual

19  size is.

20         Q.    Sitting here today, you

21  personally do not have a definition of

22  what an order of unusual size is?

23              MR. BOGLE:  Object to form.

24         Asked and answered.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  Again, I think

2      it's such an open-ended question

3      that has -- that needs necessary

4      context around it, no, I do not

5      have a hypothetical definition for

6      you.

7  BY MR. EPPICH:

8      Q.    Do you believe that the

9  phrase "order deviating substantially

10  from a normal pattern" in the regulation

11  is clear?

12      A.    Again, yes, I think it's

13  clear if you set it in the context of a

14  particular customer.  I think once again

15  it has to be set into customer context.

16      Q.    You agree that the

17  regulation does not define "deviating

18  substantially"?

19      A.    I do not see a definition

20  for "deviating substantially" in the

21  regulations.

22      Q.    Well, in your opinion, sir,

23  what is an order deviating substantially

24  from a normal pattern?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I'm going to give you the

2  same answer that I gave to you on unusual

3  size.  It's all context driven.  It's

4  impossible to give you a blanket

5  one-size-fits-all definition.  We'd have

6  to look at it customer by customer, fact

7  pattern by fact pattern.

8    Q.    Do you believe the phrase

9  "order of unusual frequency" in the

10  regulation is clear?

11    A.    Again, the answer is yes, I

12  believe it's clear if you set it in the

13  appropriate context with the appropriate

14  customer.

15    Q.    The regulation does not

16  define unusual frequency?

17    A.    I do not see a definition of

18  unusual frequency in the regulation.

19    Q.    And in your opinion, sir,

20  what is an order of unusual frequency?

21    A.    Again, we're going to going

22  back to the same one.  I can't give you a

23  blanket definition of unusual frequency,

24  because it is fact dependent, fact driven

Highly Confidential - Subject to Further Confidentiality Review

1    and depends on the facts and

2    circumstances of your customer.

3             Q.    If we can turn to Page 117

4    of your report.  Sir, I'm looking at the

5    first two full paragraphs of this page.

6    I'm just going to read you what you wrote

7    in the second paragraph about Cardinal's

8    process for identifying suspicious

9    orders.

10            You say -- and this is the

11   first sentence of that second full

12   paragraph.

13            "Cardinal's process,

14   however, does not define significantly

15   larger, significantly more frequent, or

16   significant deviation.  Therefore, it is

17   unclear what significant means in this

18   context."

19            Do you see that, sir?

20       A.    I do.

21       Q.    How is unusual size, as

22   written in the regulation, clear, but the

23   use of "significantly larger" in

24   Cardinal's policy unclear?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Well, the regulation was

2    drafted for every registrant and it was

3    drafted for every customer out there.  So

4    it is a very broad standard.

5            In the case of Cardinal,

6    Cardinal is supposed to know their

7    customers and should be able to say what

8    does that mean in context of Cardinal's

9    customers and provide at least some level

10   of granularity and criteria around it.

11      Q.    Sir, how is deviating

12   substantially as written in the

13   suspicious order regulation clear, but

14   Cardinal's use of significant deviation

15   unclear?

16      A.    I think we're going to have

17   the same conversation.  But we'll go back

18   to it, which is, again, we're talking

19   about a regulation that is written for

20   all registrants, all customers.  In this

21   case we're talking about Cardinal and

22   Cardinal knowing Cardinal's customers and

23   being able to make some judgments based

24   on what they know about their customers.

1    Q.    And finally, sir, how is

2    unusual frequency as written in the

3    suspicious order regulation clear but

4    significantly more frequently as used in

5    Cardinal's policy unclear?

6    A.    Well, again, back to the

7    original answer.  We'll just do it in a

8    slightly different context, we're talking

9    about a regulation that's driven and

10   written for all registrants and all

11   customers.  And again, in this particular

12   case we are talking about a subset,

13   Cardinal's customers.  Cardinal having

14   knowledge of Cardinal's customers should

15   be able to define what that means, based

16   on Cardinal's customers.

17   Q.    Let's turn to Page 48 of

18   your report.

19   A.    Page 48, you said?  Is that

20   correct, Chris?

21   Q.    Yes, sir.  Page 48.

22   A.    Okay.  I'm here.

23   Q.    On Page 48, in Section 8.4,

24   which you've titled "An Integrated

1    Ecosystem," and in the last paragraph on

2    Page 48 you write, "Therefore, because

3    the closed system is an ecosystem, any

4    examination should look at the operation

5    of the full ecosystem as well as the

6    individual parts.  Euclid Family

7    Pharmacy, and CVS Stores 3322 and 4800

8    provide excellent examples to do so."

9            Do you see that, sir?

10    A.    I do.

11    Q.    What is your source for the

12    concept of a, quote, integrated

13    ecosystem?

14            A.    I think it follows what

15    we're talking about, what a closed loop

16    system.  Everybody has a role to play in

17    the closed loop system.  And the point

18    that I was making here around the

19    ecosystem is the fact that it is possible

20    to work with multiple players.  And if

21    you want to look at the "know your

22    customer" concept, you need to look at

23    the entire -- you just don't look at

24    yourself in isolation.  You look at all

1    the facts and circumstances and totality

2    that you have.

3          Q.    And so is it your opinion,

4    sir, that the closed system of drug

5    distribution is an example of an

6    integrated ecosystem?

7          A.    I believe the closed loop

8    system is an ecosystem in and of itself,

9    yes.

10         Q.    And that's based on your

11   years of experience and knowledge in this

12   field, sir?

13         A.    It's based on my experience

14   and knowledge in this field, yes, sir.

15         Q.    Now, you offer opinions on

16   three stores for your discussion on the

17   integrated ecosystem, Euclid Family

18   Pharmacy, CVS Store 3322 and CVS Store

19   4800.  Did you identify these stores

20   yourself?

21         A.    I'm not sure I'm asking -- I

22   understand.  Did I ask -- did I use these

23   stores myself, yes.  I asked for, again,

24   from counsel, to provide me with examples

1    of various pharmacies and stores, showing

2    due diligence, showing high level of

3    prescriptions in those various areas for

4    Cuyahoga and Summit Counties, and I read

5    the files that I had and worked from

6    there.

7         Q.    And plaintiffs' counsel

8    provided you with the identifications and

9    the files relating to the Euclid Family

10   Pharmacy and CVS Store 3322 and CVS Store

11   4800?

12        A.    Upon my request, yes, they

13   did.

14        Q.    Do you intend to offer

15   opinions on any other pharmacies as part

16   of the integrated ecosystem?

17             MR. BOGLE:  Object to form.

18             THE WITNESS:  I'm not

19        sure -- again, I'm not sure I

20        understand your point.

21   BY MR. EPPICH:

22        Q.    That's a fair point.  I

23   think the question was -- was a little

24   rough there.  Let me ask it a different

Highly Confidential - Subject to Further Confidentiality Review

1    way.

2              In your section on an

3    integrated ecosystem, you've identified

4    three pharmacies, the Euclid Family

5    Pharmacy, CVS Store 3322 and CVS Store

6    4800.

7              Sitting here today, do you

8    intend to offer opinions about any other

9    pharmacies as part of your discussion on

10   an integrated ecosystem?

11        A.    Assuming facts --

12             MR. BOGLE:  Object to form.

13             THE WITNESS:  Assuming facts

14        and circumstances don't change,

15        no.  But again, these three

16        pharmacies were listed as

17        examples.  Similar to the way,

18        Chris, that you do an audit.

19             You know, when you do an

20        audit and you are looking at

21        documents and you see an issue,

22        you highlight the issue using the

23        document -- using examples to

24        support it.  You don't -- it's not

1           an exhaustive list.  It's not

2           every pharmacy.  It's enough to

3           show that there is an issue.  This

4           was what I did in this particular

5           account.

6    BY MR. EPPICH:

7           Q.    Have you considered any

8    other pharmacies as part of your analysis

9    of an integrated ecosystem sitting here

10   today?

11          A.    I'm sure I did, because

12   obviously I got to these three.  So I

13   know I looked at others.  Can I tell you

14   which ones they were?  No, I can't.  Not

15   at this point.

16          Q.    Let's turn to Page 49 of

17   your report.  And here you discuss -- you

18   discuss the Euclid Family Pharmacy.

19              Now, specifically how did

20   you go about identifying the Euclid

21   Family Pharmacy as part of the integrated

22   ecosystem?

23              MR. BOGLE:  Objection.

24          Asked and answered.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  Again, I

2      looked at pharmacies that were

3      provided -- that were working in

4      Summit and Cuyahoga County.  They

5      happened to have high patterns of

6      opioids throughout the period --

7      the review period in time.

8          I started reading the

9      record, and in the case of Euclid

10     and the others that were there, I

11     was noticing what we are talking

12     about, a situation, again, where

13     we have multiple distribution --

14     distributors involved.

15         It's not just a single

16     distributor.  It's not just a

17     single entity registrant involved.

18     There are multiple registrants.

19 BY MR. EPPICH:

20     Q.   Did you evaluate other

21 pharmacies, aside from these three, when

22 you were forming opinions about an

23 integrated ecosystem?

24     A.   As I thought I answered

Highly Confidential - Subject to Further Confidentiality Review

1  before, I screened through -- I screened

2  a lot of pharmacies.  I looked at a lot

3  of different pharmacies, and some in

4  Cuyahoga County.

5       Q.    And do you recall any of the

6  pharmacies' names that you screened and

7  did not identify here in Section 8.4?

8       A.    As I said before, I do not

9  recall which individual pharmacies I

10  looked at.  I can't -- I've looked at a

11  lot of records and a lot of pharmacies,

12  so I can't give you an honest -- you

13  know, I can't honestly -- I'd be

14  guessing, and I don't guess.

15  ███        ████████████████████████

███  ██████████████████████████████████

███  ██████████████████████████████████

███  ███████████   ███████████████████████

███  ████████████

███         ███    ████████████████

███  ███████████████

███         ███    █████████████████████

███  ██████

███         ███    █████████████████

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20    Q.    Did you consider the Ohio

21  Bureau of Workers' Compensation

22  requirements in forming any of the

23  opinions in your report, sir?

24    A.    Again, they were not germane

Highly Confidential - Subject to Further Confidentiality Review

1    to my report, so the answer is no.

2         Q.    Are you aware that Euclid

3    Family Pharmacy still has an active DEA

4    registration?

5         A.    I haven't checked their DEA

6    registration anytime recently.  So I --

7    I'm unaware of that.

8         Q.    Have you ever checked the

9    Euclid Family Pharmacy registration?

10        A.    No, I have not independently

11   checked the Euclid Family Pharmacy's DEA

12   registration.  ████████████████████████████

     ██████████████████████████████████████████

     ██  ████████████████████████████████████

15              But beyond that, no.

16        Q.    Are you aware if the Euclid

17   Family Pharmacy is still registered by

18   the Ohio Board of Pharmacy?

19        A.    No, I am not aware.  Again,

20   it wasn't germane to this discussion.

21        Q.    You didn't check the

22   registration records of the Ohio Board of

23   Pharmacy?

24        A.    Again, it wasn't germane to

Highly Confidential - Subject to Further Confidentiality Review

1    the point and the discussion we were

2    having here, no.

3           Q.    Do you intend to offer any

4    opinions about Euclid Family Pharmacy

5    other than those set forth in your

6    report?

7           A.    Unless we have new facts and

8    circumstances, I think the point -- we

9    made the point about the store and what

10   we were trying -- what I was trying to

11   show.

12          Q.    Is the answer to my question

13   no?

14          A.    My answer to the question is

15   unless the facts and circumstances

16   change, I do not have any intention at

17   this moment in time of adding anything

18   new.

19          Q.    If we can turn back to

20   Page 51 of your report.  Under Section B,

21   CVS Store 3322.

22          A.    Yes.

23          Q.    And here -- how did you

24   identify CVS 3322 as part of your

1    integrated ecosystem?

2         A.    I used the same methodology

3    we used before, but we can go over it

4    again if you'd like.

5              I asked counsel for a list

6    of stores from Cuyahoga and Summit

7    Counties that had large volumes of

8    opioids, and then read the files and

9    selected the sample.

10        Q.    Sir, do you intend to offer

11   any opinions about CVS Store 3322 other

12   than those set forth in your report?

13        A.    Unless set facts and

14   circumstances change and new information

15   becomes available, I do not have any

16   intention at this time.

17        Q.    On Page 52 of your report,

18   you discuss CVS Store 4800 in Section C,

19   correct?

20        A.    I do.

21        Q.    Do you intend to offer any

22   opinions about CVS Store 4800 other than

23   those set forth in your report?

24        A.    Again, unless there is new

Highly Confidential - Subject to Further Confidentiality Review

1  information that comes to light and based

2  on facts and circumstances, I have no

3  present intention of adding things to

4  this report.

5          Q.    If we could continue, on

6  Page 53, it begins, Section 9 on McKesson

7  Corporation specifically.  And if you

8  wouldn't mind turning to Page 55.

9          A.    55, yes, sir.

10         Q.    This is under Subsection

11  9.3, "Impact."

12         A.    Yes.

13         Q.    Do you see that, sir?

14         A.    I do.

15         Q.    I'd like to read from the

16  first full paragraph on Page 55 which

17  states -- and pardon me, it's -- it's the

18  first full paragraph there.  It starts,

19  "As a result, various retail pharmacies

20  obtained high levels of opioids with

21  little or no investigation or

22  interrogation.  Below are a few

23  illustrative examples."

24             Then you have a discussion

1    of Acme 30, correct?

2         A.    I do.

3         Q.    Now, ██████ is the only

4    pharmacy in either Summit or Cuyahoga

5    County that you offer an opinion on

6    impact for, correct?

7         A.    Let me read the report.

8              MR. BOGLE:  Object to form.

9              THE WITNESS:  Could you be

10        more specific?

11   BY MR. EPPICH:

12        Q.    Is ██████ located in Summit

13   County or Cuyahoga County, Ohio, sir?

14        A.    According to my report here

15   it says Summit County, Ohio.

16        Q.    Is the ██████████████

17   located in Summit or Cuyahoga County?

18   And the ████████████, sir, is on

19   Page 57.

20        A.    ██████████████ is located

21   in Warren, which is in the county

22   adjacent to Summit and Cuyahoga County.

23        Q.    So ████████████, sir,

24   is not in Summit or Cuyahoga County?

Highly Confidential - Subject to Further Confidentiality Review

1     A.    That is correct.

2     Q.    On Page 58, there's

3   identified a ███████████████████.

4           Do you see that, sir?

5     A.    I do.

6     Q.    Is the Martella's Pharmacy

7   located in Summit or Cuyahoga County,

8   Ohio?

9     A.    No.

10    Q.    Do you intend to offer any

11  other opinions about ███████████████████

██  ████████████████████████████████████

██  █████████████████████████████████

██  ████████████████████████

15    A.    Again, I have no plans

16  unless facts and circumstances and new

17  information becomes available, I reserve

18  the right to amend my report.  But other

19  than that, I have no present plans to

20  amend it.

21    Q.    Do you intend to offer any

22  opinions -- any other opinions about ██████

██   ██  other than those set forth in your

24  report on Pages 55 and 56?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Once more, again, unless new

2  information becomes available that would

3  cause me to reconsider, I have no

4  intentions of amending the report at this

5  point in time.

6    Q.    Let's turn to Page 57 of

7  your report, sir.  ████████████████████

██████████████████████████████████████████

██  ██████████████████████

10    A.    I'm going to read the

11  section.  I'm aware that there was

12  recommendation for termination, yes.

13    Q.    Are you aware that the

14  ███████████████████ still possesses a valid

15  DEA registration?

16    A.    I have not checked the

17  ███████████████████ current DEA

18  registration.

19    Q.    Are you aware that the

20  ███████████████████ still possesses a valid

21  registration from the Ohio Board of

22  Pharmacy?

23    A.    I haven't checked ████████

██  ███████████████ current Ohio Board of Pharmacy

Highly Confidential - Subject to Further Confidentiality Review

1    license status.

2         Q.    Do you intend to offer any

3    opinions about the ████████████████

4    other than those set forth in your

5    report?

6         A.    At the present time I have

7    no intentions unless new information

8    becomes available of amending this

9    section on this -- in regards to ███████

10   ███████████

11        Q.    If we can turn to Page 58,

12   sir.  And your discussion of ██████████

13   ███████████

14        A.    I see it.

15        Q.    Now, ████████████████████ is

16   in Johnstown, Pennsylvania, correct?

17        A.    Yes, that is correct,

18   according to my report.

19        Q.    And Johnstown, Pennsylvania

20   is approximately 200 miles from

21   Cleveland, right?

22        A.    I have no idea.  I have not

23   measured the distance between Johnstown

24   and Cleveland.

1    Q.    Do you intend to offer any

2    opinions about ████████████████    other

3    than those set forth in your report?

4    A.    Again, unless there are new

5    facts or circumstances that come to

6    light, I have no present intention of

7    amending the report.

8    Q.    If we can turn to Page 68 of

9    your report.

10    I'm looking at

11    Section 9.4.4, "McKesson failed to

12    resource the controlled substance program

13    appropriately."

14    A.    Yeah, I see -- I see the

15    section where you're talking.

16    ██    ████████████████████

████    ████████████████    ████████████

████    ██████████████████████████████

████    ██████████████████████

████    ████████████████████████

████    ██████████████████████████████

████    ██████████████████████████████

████    ████████████████████████

████    ██████████████████████████████

Highly Confidential - Subject to Further Confidentiality Review

1

▪

▪

▪

▪

▪

▪      .

8         Q.    And you state in the

9 footnote of that sentence, that your

10 analysis is based on the assumption every

11 McKesson customer sells controlled

12 substances in 2014.

13            Did I understand that

14 correctly?

15         A.    You did.

16         Q.    Your analysis would be

17 different if not every McKesson customer

18 sold controlled substances in 2014,

19 correct?

20         A.    Yes.  There would be a

21 different number.

22         Q.    Your analysis here also

23 assumes that every McKesson customer that

24 sells controlled substances buys those

Highly Confidential - Subject to Further Confidentiality Review

1    controlled substances from McKesson,

2    correct?

3         A.    I'm sorry.  I'm not sure I

4    understand your question.

5         Q.    Your analysis assumes that

6    every McKesson customer that sells

7    controlled substances purchased those

8    controlled substances from McKesson,

9    correct?

10        A.    I'm assuming -- I was

11   talking only in terms of McKesson

12   customers period.  So I'm not sure I'm

13   understanding the distinction that you're

14   trying to make.

15        Q.    Sir, you're aware that a

16   pharmacy customer of McKesson's can also

17   be the pharmacy customer of a second

18   distributor, correct?

19        A.    There is that potential,

20   yes.

21        Q.    And it's true that

22   McKesson's pharmacy customer could be

23   purchasing its controlled substances from

24   that second supplier, correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    That is a possibility.

2    Q.    And so sir, your analysis

3 assumes that McKesson's customers that

4 sell controlled substances buys those

5 controlled substances from McKesson and

6 not some other distributor, correct?

7    A.    That's correct.

8    Q.    And so your analysis would

9 change if McKesson's customer who sells

10 controlled substances actually bought

11 their controlled substances from a

12 secondary supplier, correct?

13    A.    The numbers would

14 potentially change, yes.

15    Q.    If we can turn to Page 70.

16 The first paragraph states -- and I'm at

17 the very top of the page, sir.

18    A.    Hang on a second.  I'm

19 trying to get there.

20    ███        █████████████████

██    █████████████████████████

██    ███████████████████████████████████

██    ████████████████████████

██    ████████████████████████████████

Highly Confidential - Subject to Further Confidentiality Review



15    Q.    And in Footnote 298 on that

16  same page, you state that this analysis

17  assumes every McKesson customer sells

18  controlled substances.

19          So, again, your analysis

20  here also assumes that every McKesson

21  customer buys its controlled substances

22  from McKesson, correct?

23    A.    Yes.  That's what -- that's

24  what it says.

1    Q.    And your analysis -- and

2    your analysis also assumes that every

3    McKesson customer that sells controlled

4    substances buys those controlled

5    substances from McKesson?

6    A.    Yes.

7    Q.    Now, your analysis would be

8    different if not every McKesson customer

9    that sells controlled substances bought

10   those controlled substances from McKesson

11   or at all, correct?

12   A.    The numbers would be

13   different.  I think the point that I'm

14   trying to make here is based on the best

15   available evidence I have, if you try to

16   figure out what the workload facing the

17   McKesson staff were, they were under --

18   they were underresourced.

19          Because it's not just

20   looking at all suspicious orders.  It's

21   all the other things that go along,

22   training, education, looking and knowing

23   your customers, doing the profiles,

24   keeping them up-to-date, doing the

Highly Confidential - Subject to Further Confidentiality Review

1   investigation.  It's a lot of work.

2   Let's just be honest.  It's a lot of

3   work.

4                MR. EPPICH:  I'll move to

5        strike everything after "the

6        numbers would be different."

7   BY MR. EPPICH:

8        Q.    Sir, your analysis would be

9   different if not every McKesson customer

10  sold controlled substances in 2014,

11  correct?

12       A.    The underlying analysis that

13  there's too much work to be done by too

14  few people that is in my report would

15  still be there, whether the exact number

16  would be 833 or 750, that might change,

17  but the point I'm making that it was

18  underresourced is still a valid point.

19       Q.    And, sir, just to answer my

20  question.  Your analysis would be

21  different if not every McKesson customer

22  sold controlled substances in 2014, yes

23  or no?

24                MR. BOGLE:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1    Asked and answered.  You don't

2    have to answer it yes or no if

3    that's not the way you can answer

4    the question.

5        MR. EPPICH:  This is a yes

6    or no question.

7        MR. BOGLE:  That's not for

8    you to decide.

9        THE WITNESS:  I do not think

10   it's a yes or no answer.

11       Again, my analysis holds

12   that the staff are understaffed

13   and overworked for what was being

14   asked.

15       And yes, the underlying root

16   number might, in fact, change.



Highly Confidential - Subject to Further Confidentiality Review



11    Q.    Have you reviewed a

12 suspicious order report for McKesson?

13    A.    Have I ordered -- reviewed a

14 suspicious order report?  Which

15 particular report and particular time

16 period --

17    Q.    Have you reviewed -- have

18 you reviewed any suspicious order report

19 from McKesson?

20    A.    I have reviewed suspicious

21 order reports from McKesson.  It's called

22 a variety of different names, but yes.

23    Q.    How long does it take a

24 regulatory affairs employee to review a

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious order report?

2         A.    Again, just reviewing the

3    report is not enough.  You need to go

4    behind the order and find out the

5    background, pull the file, look at what

6    you have on file, know your customer.

7    There's a significant amount of workload

8    there.

9         Q.    Do you know how long it

10   takes a regulatory affairs employee to

11   review and analyze a suspicious order

12   report?

13        A.    I have no data on time

14   studies that they've done to review the

15   report.

16             MR. EPPICH:  Why don't --

17        why don't we take a quick break.

18             THE VIDEOGRAPHER:  Going off

19        the record at 4:00 p.m.

20             (Short break.)

21             THE VIDEOGRAPHER:  Back on

22        record at 4:17 p.m.

23   BY MR. EPPICH:

24        Q.    Dr. Whitehall, if we could

1   look at Page 76 of your report.

2          A.    Sure.

3          Q.    And here we are in

4   Section 9.5.4 which is titled "As early

5   as 2005, McKesson knew its SOM program

6   was not in compliance with DEA

7   requirements."

8                Are you there, sir?

9          A.    76, 9.5.4, right?

10         Q.    Yes, sir.

11         A.    I'm here.

12         Q.    Let's look at the last

13  paragraph on this page.

14         A.    Absolutely.

15         Q.    And it states, "At a later

16  meeting between McKesson and the DEA in

17  January of 2006, the DEA highlighted six

18  more McKesson pharmacy customers in

19  Florida which were purchasing large

20  quantities of hydrocodone."

21                Do you see that, sir?

22         A.    Yes, I do see that, yes, of

23  course.

24         Q.    And in that paragraph you

Highly Confidential - Subject to Further Confidentiality Review

```
1   discuss two of the pharmacies in the next

2   few sentences.  First one is ████████

█   ██████████

4              Do you see that?

5        A.    I do see that.

6        Q.    ████████████████████

█   ████████████████

8        A.    I do.

9        Q.    Are you aware that McKesson

10  terminated sales with the ████████

█   ██████████████████

12        A.    No, I was not aware that

13  they actually terminated them.

14        Q.    So you did not consider

15  those terminations in forming your

16  opinions expressed in your report, sir?

17        A.    I did not consider those

18  terminations relevant to the point I was

19  making here, which was that DEA was

20  telling McKesson back in January of 2006

21  that it had customers that were

22  purchasing large amounts of hydrocodone

23  in this case and asking why.  And why

24  were -- why were these sales not
```

Highly Confidential - Subject to Further Confidentiality Review

1  considered suspicious.  Yes, that was why

2  they were offered, but...

3          Q.    Sir, are you aware that

4  McKesson also terminated sales to the

5  other four pharmacies?

6              MR. BOGLE:  Objection to

7          form.  Vague as to time.

8              THE WITNESS:  Again, to the

9          point, do we know if -- can you be

10          more specific as to when they

11          terminated them?

12  BY MR. EPPICH:

13          Q.    Sir, I'm just asking you,

14  are you aware that McKesson terminated

15  sales to the other four pharmacies,

16  ███████████████████████████████████████

   ███████████████████████████████████████

18          A.    Again, no, I was not.  But

19  again, I was offering -- the look of the

20  discussion here was about the fact that

21  you were being put on -- McKesson was

22  being put on notice it had pharmacies

23  that were getting high amounts of opioids

24  in that particular period of time.

1      MR. EPPICH:  Move to strike

2      everything after "again I was

3      not."

4  BY MR. EPPICH:

5      Q.    Sir, did you consider those

6  terminations of those four pharmacies in

7  forming your opinions that are expressed

8  in your report?

9      A.    I considered those four

10 pharmacies in informing my report, based

11 on the fact they were getting high

12 amounts of opioids in that particular

13 period of time, and I was putting

14 McKesson on notice.

15      But in the case of those

16 particular pharmacies' terminations, it

17 was not germane to the discussion.

18      Q.    My apologies, sir.  Let me

19 restate my question because it was not

20 clear.

21      Did you consider the

22 terminations of these four pharmacies,

23 ███████████████████████████████████

█  ███████████████████████████████████ in

1    forming your opinions that are expressed

2    in your report?

3              MR. BOGLE:  Objection.

4         Asked and answered.

5              THE WITNESS:  Again, as I

6         was discussing, we were talking

7         about the sales to pharmacies,

8         those pharmacies in particular,

9         DEA telling McKesson that they

10        were purchasing large amounts of

11        opioids at that particular point

12        in time is putting McKesson on

13        notice that there were issues.

14             Did I look at the

15        terminations after that fact?  I

16        am not aware of having done so.

17   BY MR. EPPICH:

18        Q.    Let's go ahead and turn to

19   Page 82 of your report.  I want to

20   discuss the first sentence.

21        A.    Okay.  I'm getting there,

22   please.  Thank you.

23        Q.    Yes, sir.

24             And here -- here, sir, we

Highly Confidential - Subject to Further Confidentiality Review

1    are in Section 9.5.6, "Under the CSMP,

2    threshold setting combined with other

3    techniques resulted in a SOM program that

4    continued to be noncompliant with the

5    basic DEA requirements for controlled

6    substances, as well as the terms of the

7    company's 2008 settlement agreement."

8            And here on Page 82, I want

9    to discuss the first sentence in the

10   third full paragraph, which states:

11   "Finally, the way the CSMP was

12   structured, McKesson was not looking for

13   suspicious orders, but instead for

14   suspicious customers."

15           Do you see that, sir?

16       A.    Yes, I see that.

17       Q.    And there's a Footnote 381

18   after that sentence.

19           Do you see that, sir?

20       A.    I do see that, I do see the

21   footnote.

22       Q.    Now, the citation at

23   Footnote 381 says, "The W. Ihlenfeld

24   March 20, 2014, letter to G. Hobart at

Highly Confidential - Subject to Further Confidentiality Review

1    1."

2                    Do you see that, sir?

3         A.    I do see that sir.

4         Q.    Your source for this opinion

5    is the March -- strike that.

6                    William Ihlenfeld is the

7    former U.S. attorney for the Northern

8    District of West Virginia, is he not?

9         A.    I would have to see the

10   letter, because again, I've looked at

11   lots of letters.  So if you have

12   something in particular that you'd like

13   me to answer, could you please show me

14   the document we're talking about?

15        Q.    You're aware that this

16   letter was written by the DOJ, correct?

17        A.    I do know that it was

18   written by the DOJ, yes.

19        Q.    And you're aware that this

20   letter, written by the DOJ, contains

21   allegations, correct?

22        A.    Again, before I can comment

23   fully on it, I would need to see the

24   letter to refresh my recollection,

Highly Confidential - Subject to Further Confidentiality Review

1  please.

2       Q.    Well, you're relying on this

3  as a basis for this statement.  And I

4  think it's important for at least the

5  court to know whether or not you're

6  considering allegations and know you're

7  considering allegations, or if you're

8  considering a factually based document?

9            MR. BOGLE:  Object to form.

10  BY MR. EPPICH:

11       Q.    Do you know, sir, are you

12  relying on the allegations of the DOJ in

13  forming the opinion of the statement that

14  I just read?

15            MR. BOGLE:  Object to form.

16            THE WITNESS:  Again, as I

17            said to you, in order to be able

18            to answer your question, I need to

19            see the documents.  If you'd like

20            to show me the document, I'm

21            willing to have a conversation

22            with you about it.  But you're

23            asking me to try to remember one

24            of a lot of documents I looked at.

Highly Confidential - Subject to Further Confidentiality Review

1       And in a 300-page report, I'm just

2       not willing to go down that path

3       with you.

4   BY MR. EPPICH:

5       Q.    Well, as a lawyer, sir, you

6   understand that allegations in a letter

7   are not evidence, correct?

8           MR. BOGLE:  Object to form.

9           THE WITNESS:  I'm not sure I

10      understand your question.

11  BY MR. EPPICH:

12      Q.    Are allegations evidence,

13  sir?

14      A.    Allegations evidence?

15  Again, I'm not sure what you're asking.

16  It's a confusing question.  What are you

17  asking?

18      Q.    Are allegations of a

19  complaint considered evidence, sir, or do

20  they have to be proven in a court of law?

21      A.    Again, pardon me for being

22  pedantic.  I'm not sure what you're

23  trying to ask me for for the standpoint

24  of this report.  Let me try to answer

Highly Confidential - Subject to Further Confidentiality Review

1   what I can for you from the standpoint of

2   where I think you may be trying to ask.

3   I think I'm hearing from you is that

4   would I consider, you know, a written

5   letter from DEA, if I was a compliance

6   officer, as something, that I needed to

7   take into account and adjust my

8   compliance program for, if I were getting

9   allegations or a letter from them, yeah,

10  I would.

11           I would certainly evaluate

12  it and take it into account.  It's not

13  something that you discount lightly.

14           Statements by regulators

15  should never be discounted lightly.  But

16  I'm not sure what particular procedural

17  point you're trying to make.

18      Q.    What actual evidence are you

19  relying on in support of your opinion

20  that, "The way the CSMP was structured,

21  McKesson was not looking for suspicious

22  orders, but instead for suspicious

23  customers," as written on Page 82?

24      A.    Again, I cite to the

1  document.  I would need to see the

2  document to refresh my recollection.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15          If we can look at Page 87.

16    Page 87 is, has a section entitled "E.

17    Customer Due Diligence or Level 1

18    Review."

19          Do you see that?

20    A.    Yes, I see it.

21    Q.    And in this section you

22    discuss the Tug Valley Pharmacy?

23    A.    I do indeed.

24    Q.    Now, Tug Valley Pharmacy is

Highly Confidential - Subject to Further Confidentiality Review

```
 1    not located in Summit County, correct?

 2         A.     That is correct.

 3         Q.     Tug Valley Pharmacy is not

 4    located in Cuyahoga County, correct?

 5         A.     Yes, that's correct.

 6         Q.     Do Pages 87 and 88 of your

 7    report contain all of the opinions that

 8    you plan to offer on Tug Valley Pharmacy,

 9    sir?

10         A.     At the moment, unless facts

11    and circumstances change, yes.

12
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
1  ████████████████████████████████████

▋  ████████████████████████████████

▋  ████████████

▋           ▋      Sir, what documents did you

5  review to learn about the McKesson AGI

6  SOM program?

7           A.    I believe they are listed in

8  my report in the footnotes.  Would you --

9  we can go through every one of the

10 footnotes if you'd like.

11          Q.    Let's turn to Page 98 of

12 your report, sir.

13          A.    Absolutely.

14          Q.    Page 98 sets forth

15 Section 9.7, "Accountability - Consistent

16 Enforcement."

17          A.    I do, I see it.

18          Q.    And here you have a section

19 entitled 9 -- it's Section 9.7.1,

20 "Despite repeated breaches of company

21 policies and DEM" -- "DEA SOM

22 requirements, McKesson failed to

23 discipline those involved."

24                Do you see that, sir?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Yes, sir, I do.

2      Q.     ████████████████████

█  ████████████████████████████

█  ████████████████

5             Do you see that, sir?

6      A.     I see -- I see Donald

7  Walker.

8      Q.     Now, your report says, ████

█  ██████████████████████████████

█  ██████████████████████████████

█  ██████████████████████████████

█  ██████████████████████████████

13            Do you see that, sir?

14     A.     I do.

15     Q.     Now, I notice you did not

16  provide a source for your statement

17  there; is that correct?

18     A.     I don't see a footnote

19  there, no.

20     Q.     Well, the reason I'm curious

21  is because your sentence is factually

22  incorrect.  ████████████████████

█  ██████████████████████████████.

24  So my question for you is, where -- where

Highly Confidential - Subject to Further Confidentiality Review

1    did you get this information?

2         A.    I haven't seen anything that

3    says that that is factually incorrect.

4    Perhaps you'd like to share with me what

5    you have that is, and we can look at it

6    from there.

7         Q.    Have you spoken to

8    ███████████████

9         A.    No, sir.  I have not spoken

10   to ████████████  directly.

11        Q.    Have you personally

12   interviewed Mr. Walker?

13        A.    Sir, I reviewed his

14   deposition testimony, among other things.

15        Q.    How long did you spend

16   reviewing the deposition testimony of

17   ████████████?

18        A.    I can't tell you how many

19   hours precisely I spent reviewing his

20   deposition testimony.

21        Q.    Was it more than one hour?

22        A.    Yes, it was more than one

23   hour.

24        Q.    Was it more than five hours?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.     I have no idea from there.
2          Q.     Did you review the entire
3     transcript or just parts of the
4     transcript?
5          A.     I'd have to go back and look
6     at my notes to be sure.  But I believe I
7     looked at the entire transcript.  But I
8     don't remember.
9          Q.     Did you review every
10    exhibit?
11         A.     Again, I don't remember.
12         Q.     Did you review any documents
13    about ████████ not provided to you by
14    the plaintiffs' counsel?
15         A.     Not that I recall.  But
16    again they were provided to me by
17    plaintiffs' counsel in response to my
18    request.
19         Q.     Let's look at the next
20    employee, ████████ in Section B.
21         A.     Yep.
22         Q.     Have you ever spoken
23    personally to ████████?
24         A.     No, sir.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Did you personally interview

2  ▮▮▮▮▮▮▮▮▮▮?

3      A.    No, sir.

4      Q.    The materials considered in

5  your report states that you reviewed

6  ▮▮▮▮▮▮▮▮▮▮ deposition transcript; is

7  that true?

8      A.    That is true.

9      Q.    And how long did you spend

10 reviewing ▮▮▮▮▮▮▮▮▮▮ transcript?

11     A.    Again, I can't give you a

12 precise timeline.  I don't know.

13     Q.    Do you know if it was more

14 than an hour?

15     A.    I'm sure it was more than an

16 hour.

17     Q.    Do you know if you reviewed

18 the entire transcript or just parts of

19 the transcript?

20     A.    I don't remember at this

21 period of time.

22     Q.    Do you remember any

23 documents from ▮▮▮▮▮▮▮▮▮▮ transcript

24 that you did review?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Again, as I -- we can go

2    back and -- if you'd like we can go look

3    through the reliance list.  But I can't

4    recall them off the top of my head.

5        Q.    Did you take any notes from

6    your review of the transcript of

7    ██████████?

8        A.    I don't recall.

9        Q.    Do you -- did you -- you

10   mentioned some -- that you took some

11   notes on -- on your review of the

12   deposition transcript of ██████████.

13       A.    I'm not sure where you're

14   referring to.

15       Q.    Well, do you recall that

16   testimony you just provided to me, that

17   you took notes on the transcript of

18   ██████████

19            Let me strike that question.

20   I'll ask a simpler question.

21       A.    I'm not sure I'm --

22       Q.    Sir, in preparation of your

23   expert reports, your first report and

24   your supplemental report, did you create

Highly Confidential - Subject to Further Confidentiality Review

1    notes, documents, as you were learning,

2    tracking, developing the opinions in

3    your --

4         A.    I might have -- I might

5    have -- I might have made notes.

6              MR. BOGLE:  Let him finish.

7    BY MR. EPPICH:

8         Q.    Do you have copies of these

9    notes, sir?

10        A.    Not with me today, no.

11        Q.    But you do at your home or

12   your office?

13        A.    Yeah, I'm sure.

14        Q.    Are these -- are these notes

15   handwritten or are they on your computer?

16        A.    I honestly don't know.  I'm

17   going to guess there may be some

18   handwritten, and some computer.  I have

19   no idea.

20        Q.    Have you provided those

21   notes to your counsel for production in

22   this case?

23        A.    I have provided everything

24   counsel has asked me to provide.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     Let's go ahead and look at

2  the next employee in Section C, ███████

▪  ████████████████████   Have you ever

4  spoken personally to ██████████?

5      A.     No.

6      Q.     Did you interview

7  █████████?

8      A.     No.

9      Q.     The materials considered in

10 your report states that you reviewed

11 ████████████ deposition transcript.

12     A.     That is correct.

13     Q.     And how long did you spend

14 reviewing his transcript?

15     A.     More than an hour.

16     Q.     Did you review the entire

17 transcript?

18     A.     Again, I don't recall.

19     Q.     You don't recall if you just

20 reviewed portions?

21     A.     I don't.

22            MR. BOGLE:  Objection.

23     Asked and answered.

24 BY MR. EPPICH:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Did you review every single

2 exhibit to his deposition?

3    A.   I don't recall.

4    Q.   How many documents for

5 ███████████  did you review?

6         MR. BOGLE:  Objection to

7    form.  Vague and ambiguous.

8         THE WITNESS:  What do you

9    mean by documents?

10 BY MR. EPPICH:

11   Q.   How many McKesson documents

12 that ███████████ authored or was copied

13 on if a communication, did you review?

14   A.   I'm afraid I can't answer

15 that.  I don't know.  Again, I looked at

16 a lot of documents.  I can't give you a

17 number.  I wasn't keeping score on who

18 wrote what and how many -- and how many

19 did they write.  So I'm sorry.  I don't

20 have that.

21   Q.   Dr. Whitelaw, you never

22 personally interviewed any of these men?

23   A.   No, sir, I did not.

24   Q.   And you never reviewed

1    documents about them that were not

2    selected for you by plaintiffs' counsel?

3         A.    I reviewed documents that

4    were selected for me from the documents

5    that were produced based on my request

6    for documentation.

7         Q.    You know, I want to know,

8    sitting here today, in Section 9.7, what

9    right do you have to pass judgment on

10   these men and call for their careers?

11             MR. BOGLE:  Object to form.

12        Misstates the document.

13             THE WITNESS:  Number one, I

14        didn't pass judgment.  Number two,

15        I didn't call for their careers.

16        What I did say is these were men

17        who were in substantial authority

18        for running the program, and I

19        would have expected McKesson to

20        have taken appropriate action for

21        the fact that the program was

22        deficient, and these were the

23        folks who were involved in running

24        it, and I would have expected

Highly Confidential - Subject to Further Confidentiality Review

1           something to have been done about

2           it, and I don't see that.

3    BY MR. EPPICH:

4           Q.    But, sir, you've testified

5    that you have no DEA experience.

6                 MR. BOGLE:  Object to form.

7           He said he didn't work for DEA.

8                 THE WITNESS:  This is not a

9           DEA-relevant issue.  This is a

10          corporate compliance relevant

11          issue.  And even so, the question

12          is, they were substantially in

13          charge of these programs.  And I

14          have not seen McKesson take any

15          appropriate action to remove the

16          people who were supposed to be

17          running the program correctly and

18          overseeing it, and they're

19          accountable.  There's no

20          accountability that I could see.

21   BY MR. EPPICH:

22          Q.    Sir, you have no experience

23   working in the compliance department at a

24   pharmaceutical distributor, correct?

1      A.    I have not worked for a

2   pharmaceutical distributor, but I'm not

3   sure how that's particularly relevant to

4   this particular -- is particularly

5   germane to this issue.  Holding people

6   accountable who are supposed to be

7   running your compliance programs is

8   pretty germane issue and simple issue

9   across all the boards.

10      Q.    Well, I think it's relevant,

11   sir, because you took it upon yourself to

12   name three of McKesson's employees in

13   your report as employees that McKesson

14   should have taken some form of

15   disciplinary action against.

16            And I would like to know

17   what basis you have for making these

18   allegations in your report, sir?

19            MR. BOGLE:  Object to form.

20            THE WITNESS:  My

21       experience --

22            MR. BOGLE:  Go ahead.

23            THE WITNESS:  My experience

24       sitting here as a compliance

Highly Confidential - Subject to Further Confidentiality Review

1    officer and having dealt with

2    people in similar situations who

3    have failed to do their job, puts

4    me in a position to say, based on

5    the record that I have reviewed,

6    there is enough here to say

7    somebody should have taken some

8    action here.

9  BY MR. EPPICH:

10    Q.    That record, sir, are the

11  documents and testimony provided to you

12  by plaintiffs' counsel, correct?

13         MR. BOGLE:  Objection.

14    Asked and answered.

15         THE WITNESS:  Those

16    documents and record are what I

17    got in response to my request to

18    understand McKesson's program.

19  BY MR. EPPICH:

20    Q.    By plaintiffs' counsel,

21  correct?

22         MR. BOGLE:  Asked and

23    answered.

24         You can answer again.

Highly Confidential - Subject to Further Confidentiality Review

1        THE WITNESS:  By plaintiffs'
2    counsel.
3        MR. EPPICH:  Thank you, sir.
4    I'll pass the witness.  Let's go
5    off the record.
6        MR. BOGLE:  Before we go
7    off, just to make clear, because I
8    don't want you guys having a beef
9    with this.  He does have a couple
10    pages of specific McKesson notes
11    here.  So if you want to look at
12    that.  Because you asked him about
13    notes, and I think he forgot about
14    the fact that he's got two pages
15    here.
16        MR. EPPICH:  No.  That's
17    terrific.  You know, let's go on a
18    break, and we'll just go ahead and
19    make a copy of everything in that
20    binder that's notes or note-like.
21        MS. SWIFT:  Brandon, do you
22    know if he's got anything else for
23    us?
24        MR. BOGLE:  Has he taken

Highly Confidential - Subject to Further Confidentiality Review

1    notes, yeah.

2         MS. SWIFT:  Can we have it

3    before the exam instead of after?

4         MR. BOGLE:  Has he taken

5    notes today, yeah.

6         MS. SWIFT:  Does he have

7    anything else for us?

8         If you have them with you,

9    are you going to give them to us?

10        MR. BOGLE:  Yeah, sure.

11   When you get up to ask questions,

12   I'll give them to you.

13        You haven't made any

14   document requests.  So when you

15   ask the question asking for a

16   document, you get documents.

17        You haven't made document

18   requests in your deposition

19   notice.  So if you wanted

20   documents before the deposition,

21   you should have asked for them.

22        MS. SWIFT:  I'm asking for

23   them right now.

24        MR. BOGLE:  When you get up

1    and ask questions, we'll give them

2    to you.

3        MR. GOETZ:  There's a

4    distinction between notes that he

5    made when he's reviewing his

6    report when he's preparing his

7    draft and notes that he made that

8    he might refer to today during

9    testimony.

10        MR. BOGLE:  Right.

11        MR. GOETZ:  There is not

12   ruling in this case that says that

13   you're entitled to notes that he

14   made when he's reviewing

15   deposition testimony.

16        MR. BOGLE:  Right.  What we

17   have here today are the notes he

18   has potentially got --

19        MR. GOETZ:  And he thought

20   he might look at those notes while

21   he was testifying.

22        MR. EPPICH:  Let's go off

23   the record.

24        THE VIDEOGRAPHER:  Going off

Highly Confidential - Subject to Further Confidentiality Review

1        the record 4:44 p.m.

2              (Short break.)

3              THE VIDEOGRAPHER:  We are

4        back on the record at 5:01 p.m.

5                  -   -   -

6              EXAMINATION

7                  -   -   -

8   BY MS. SWIFT:

9        Q.    Good afternoon,

10   Mr. Whitelaw.  My name is Kate Swift, and

11   I represent Walgreens in this case.  When

12   we were off the record, I asked your

13   counsel for the notes that I understand

14   you have with you today that you prepared

15   while reviewing documents and depositions

16   in this case.  And your counsel declined

17   to provide me those notes.

18              I will ask again, now that

19   we're back on the record, will you please

20   provide the notes that you have that you

21   prepared while reading documents and

22   depositions in this case?

23              MR. BOGLE:  So to be clear,

24        as soon as he relies on them from

Highly Confidential - Subject to Further Confidentiality Review

```
 1              the deposition, I think you can
 2              have them.  At that point he's
 3              relied upon them.  Otherwise,
 4              you're not entitled to draft --
 5              anything he's created in the
 6              drafting process.
 7                   Unless you guys are saying
 8              across the board, then we need all
 9              your experts' notes they created
10              in drafting their reports.
11                   MR. GOETZ:  And I want to be
12              clear.  I did not indicate to you
13              that the notes that he had with
14              him today were those notes that he
15              made while he was reviewing
16              documents, while he was reviewing
17              testimony.
18                   What I had indicated to you
19              were those notes he had made that
20              he thought he might rely upon or
21              refer back to in order to aid in
22              his testimony.
23      BY MS. SWIFT:
24              Q.   Mr. Whitelaw, you
```

1    prepared -- strike that.

2              You testified earlier today

3    that you prepared notes while reviewing

4    the deposition of -- I believe it was a

5    Dr. Walker at McKesson.  Do you remember

6    that testimony?

7         A.    Yes, Kate, I do.

8         Q.    Do you have those notes with

9    you today, sir?

10        A.    No, Kate, I do not.

11        Q.    Do you have any notes with

12   you today that you prepared while

13   reviewing documents or testimony in this

14   case?

15             MR. BOGLE:  You can ask him

16        about Walgreens.  He's done with

17        the general stuff.  If you want to

18        rephrase as to Walgreens, go

19        ahead.

20             MS. SWIFT:  Are you going to

21        instruct him not to answer that I

22        just asked?

23             MR. BOGLE:  I am, yeah,

24        unless you're asking --

Highly Confidential - Subject to Further Confidentiality Review

1        MS. SWIFT:  What's the basis

2    of the instruction?

3        MR. BOGLE:  The court's

4    order as to what subsequent

5    examiners are allowed to examine

6    on, which is their defendant.  You

7    are Walgreens I believe, right?

8        MS. SWIFT:  If you're going

9    to instruct the witness not to

10    answer general questions, we're

11    going to need to call Special

12    Master Cohen.

13        MR. BOGLE:  Go ahead.

14        MS. SWIFT:  Go off the

15    record.

16        THE VIDEOGRAPHER:  Off the

17    record.  5:03 p.m.

18        (Brief recess.)

19        THE VIDEOGRAPHER:  Back on

20    the record at 5:06 p.m.

21    BY MS. SWIFT:

22        Q.   Mr. Whitelaw, did you

23    prepare notes while you were reviewing

24    documents and depositions in the course

1    of your work on this case?

2           A.     Yes, I did.

3           Q.     What did you do with those

4    notes?

5           A.     Kept one.  I'm not sure --

6    can you be more precise when you say what

7    did I do with those notes.

8           Q.     I mean, did you put them in

9    a drawer somewhere, did you use them for

10   any purpose after you prepared the notes?

11          A.     Again, I can't tell you

12   whether I used them for any purpose after

13   I prepared the notes.  I maintained the

14   notes.  I've held onto them.  I'm not

15   sure what you're looking for.

16          Q.     The notes didn't form the

17   first draft of your report?

18                 MR. BOGLE:  Object to form.

19          Vague and ambiguous.

20                 THE WITNESS:  Can you be

21          more precise?

22   BY MS. SWIFT:

23          Q.     Do you know what a draft of

24   a report is?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Yes, I know what a draft of

2     a report is.

3          Q.    Did the notes that you

4     prepared when you were reviewing

5     documents and testimony form the first

6     draft of your report?

7                MR. BOGLE:  Object to form.

8          Vague and ambiguous.

9                THE WITNESS:  Again, I know

10          what a draft is, Kate.  I don't

11          know what you're asking me.

12               Are you asking me did I

13          write -- handwrite my first draft

14          in my report?  I'm not sure I'm

15          understanding you.

16    BY MS. SWIFT:

17         Q.    I didn't ask you if you

18    handwrote your draft of your report.

19               I asked you if the notes

20    that you took while you were reading

21    documents and depositions in this case

22    formed the first draft or any draft of

23    your report.

24         A.    And again, I don't know what

1   you mean by formed.  So did I -- did I

2   use them to refer back to documents when

3   I was working on drafting the report,

4   yes.

5            But formed, I don't know

6   what you mean by formed.

7       Q.    All right.  Then we'll

8   request again production of all the notes

9   that you prepared while reading documents

10  and testimony in -- in your work on this

11  case.

12           MR. BOGLE:  Are you guys

13      doing the same thing for all your

14      experts?  It appears to be

15      contrary to CMO 1.  So if you guys

16      want to go back on all that, then

17      I think that's a much broader

18      discussion than just for this

19      deposition.

20           MS. SWIFT:  I don't hear him

21      telling me that he used it to form

22      a draft of his report.

23           MR. BOGLE:  I don't -- I

24      don't hear him saying anything

Highly Confidential - Subject to Further Confidentiality Review

1           that makes these discoverable.  So

2           that's fine.  You can request

3           whatever you want.  You ain't

4           getting them, but you can request

5           them.

6    BY MS. SWIFT:

7           Q.    Mr. Whitelaw, you understand

8    that the court's rules require you to

9    disclose all of your opinions in your

10   report, correct?

11          A.    Yes.

12          Q.    You also understand that the

13   rules require you to include the bases or

14   reasons supporting those opinions in your

15   report?

16          A.    Yes.

17          Q.    Are all of your opinions

18   included in your report?

19          A.    And supplemental report,

20   yes, to the best of my knowledge.

21          Q.    Are -- are all of the bases

22   for your opinions included in your

23   original report and your supplemental

24   report?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Again, Kate, to the best of

2    my knowledge, yes.

3        Q.    And -- and you understand

4    the point of those rules is so that we

5    can look at your report in advance of the

6    deposition and then ask you questions

7    about the opinions and the bases or what

8    supports those opinions.  You understand

9    that, right?

10        A.    I understand it.  I also

11    understand that just basic good

12    scholarship is you have to support your

13    opinions.  So yes, I understand the

14    concepts.

15        Q.    If it's not in your report,

16    we can't do that, you understand that,

17    sir, right?

18            MR. BOGLE:  Object to form.

19            THE WITNESS:  Yes, I

20        understand it.  Yes, I understand

21        that.

22    BY MS. SWIFT:

23        Q.    Throughout your report you

24    include footnotes with citations to

1    documents and testimony.  Is it fair to

2    say that those documents and that

3    testimony provide the specific support

4    for whatever you've just said in the body

5    of the report that's leading up to the

6    footnote?

7              MR. BOGLE:  Object to form.

8              THE WITNESS:  Can you

9         rephrase the question, because

10         again it's -- can you re-ask me

11         the question, because I lost the

12         train of thought.

13    BY MS. SWIFT:

14         Q.   You have footnotes in your

15    report, correct, sir?

16         A.   Yes, I do.

17         Q.   Is it fair to say that the

18    citations that appear in the footnotes of

19    your report provide the specific support

20    for whatever it is you have just said in

21    the body of the report leading up to the

22    footnote?

23         A.   That's usually how you use

24    footnotes, but, yes.

1    MR. BOGLE:  Object to form.

2  BY MS. SWIFT:

3    Q.    So if we wanted to figure

4  out what your basis was for a specific

5  point you've made in the body of the

6  report, we could look at the footnotes;

7  is that fair?

8    A.    That's where I would start

9  myself, yes.

10    Q.    Well, you said that's where

11  you would start.  Is there -- are you

12  trying to say that there's some

13  support --

14    A.    No, I'm --

15    MR. BOGLE:  Hold on.  Let

16    her finish.

17    THE WITNESS:  I'm sorry.

18  BY MS. SWIFT:

19    Q.    My question is -- well,

20  strike that.

21    Your report is hundreds of

22  pages long; is that fair, sir?

23    A.    Yes, it is.

24    Q.    And you also have attached a

Highly Confidential - Subject to Further Confidentiality Review

1    lengthy list of reliance materials,

2    correct, sir?

3          A.    That is correct.

4          Q.    So if we want to figure out

5    what the specific support is for a

6    particular point in the body of the

7    report, is it fair to say we could start

8    and end with the footnote --

9          A.    Yes.

10         Q.    -- that's cited?

11              MR. BOGLE:  Wait until she

12         finishes the question.

13   BY MS. SWIFT:

14         Q.    You're not going to come to

15   trial and offer different support than

16   what you've provided in the footnotes of

17   the report, are you, sir?

18              MR. BOGLE:  Object to form.

19              THE WITNESS:  Well, I'm not

20         sure I completely understand your

21         question.  If there are facts and

22         circumstances that change, new

23         evidence that comes about, I have

24         reserved the right to amend the

Highly Confidential - Subject to Further Confidentiality Review

1    report as you know.

2         But I'm not sure, so I'm not

3    sure what your question is.

4  BY MS. SWIFT:

5    Q.    Well, let me put it this

6  way.  If you have any additional things

7  you want to tell us about or that you --

8  at trial, you're saying you're going to

9  supplement your report and potentially

10 provide additional footnotes and that's

11 how we'll know what those supplemental

12 opinions are; is that fair?

13    A.    Again, if there's stuff that

14 needs to be addressed prior to testimony

15 and yeah, it needs to be -- and this body

16 of work needs to be updated, I would

17 provide a supplemental report.

18    Q.    I believe you told my

19 colleague earlier today that sitting here

20 today, you don't have any intention to

21 provide a supplemental report; is that

22 right?

23    A.    As of this moment in time,

24 no, I do not.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Would you agree with me,

2   Mr. Whitelaw, that guidance on best

3   practices for compliance changes over

4   time?

5            MR. BOGLE:  Object to form.

6        Vague and ambiguous.

7            THE WITNESS:  Can you be

8        more specific?  Are we talking

9        about a specific area?  Are we

10       talking general?  I'm not sure,

11       when we say compliance, we need to

12       be a bit more specific.

13  BY MS. SWIFT:

14       Q.    Well, as I understand your

15  testimony today, you hold yourself out as

16  a compliance professional who has offered

17  a variety of types of compliance services

18  throughout your 30-some-odd-year career.

19  Is that fair?

20       A.    That's a fair

21  characterization.

22       Q.    So I just want to ask you in

23  general terms, whether when you're

24  talking about guidance on best practices

1    for compliance, no matter what kind of

2    compliance, those best practices, that

3    guidance can change over the years; is

4    that fair?

5                    MR. BOGLE:  Object to form.

6            Vague and ambiguous.

7                    THE WITNESS:  I think it's

8            fair to say that compliance

9            programs were never intended to be

10           static, as I note in my report,

11           that things change, compliance

12           evolves, just like any other

13           program.

14   BY MS. SWIFT:

15           Q.    Would you agree that good

16   companies evolve to improve their

17   practices over time as guidance changes?

18           A.    I would say good -- I would

19   say good companies take into account

20   change in guidance, changing practice,

21   changing business models and adapt.

22           Q.    You would agree that even a

23   good company may never reach a perfect

24   state of compliance?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     I'm going to need you to be

2    more precise when you say "perfect state

3    of compliance."  What do you mean by

4    perfect?

5          Q.     Well, you're a compliance

6    professional.  Do you have a definition

7    that you use yourself for perfect

8    compliance?

9          A.     Kate, it's not a term I use.

10   I use the term "reasonable compliance."

11         Q.     Is that because a company --

12   it would be unreasonable to expect a

13   company to achieve perfect compliance?

14              MR. BOGLE:  Object to form.

15              THE WITNESS:  Again, we need

16         to be clear what we're defining as

17         perfect compliance.  I'm not sure

18         I understand what you mean by that

19         term.

20   BY MS. SWIFT:

21         Q.     Well, I asked you for your

22   definition so we can talk on the same

23   terms.

24         A.     Okay.  If you're saying do I

Highly Confidential - Subject to Further Confidentiality Review

1  believe that a customer will never make a

2  mistake, never fail to sign a piece of

3  paper or file a piece of paper on time or

4  things like that, do I believe that those

5  things will still happen even with the

6  compliance program?  Yes, I think that's

7  fair to say.

8         Q.    Is it fair to say that in

9  your view, even a good company will never

10  reach a perfect state of compliance?

11              MR. BOGLE:  Object to form.

12  BY MS. SWIFT:

13         Q.    Using your definition of the

14  term?

15         A.    I think it's fair to say

16  that you will always have a -- there's

17  always a chance of making a misstep, yes,

18  even with -- even with the most robust of

19  compliance programs.  It's not an

20  absolute guarantee, if that's what you're

21  asking me.

22         Q.    The fact that a company

23  makes improvements over time to its

24  compliance program, that doesn't mean the

1    company was necessarily in violation of

2    the law before the improvements were put

3    in place, right?

4              MR. BOGLE:  Object to form.

5         Vague and ambiguous.

6              THE WITNESS:  Again, I'm not

7         quite following you.  When we're

8         talking about -- again, what law

9         are we talking about?  What time

10        frame are we talking about?  What

11        are you talking about in

12        particular?

13   BY MS. SWIFT:

14        Q.   I wasn't talking about any

15   law in particular or any time frame.

16        A.   I'm just trying -- I'm

17   trying to understand your question.

18        Q.   We've talked a little bit

19   about the fact that it's a good thing for

20   companies to try to improve their

21   compliance programs over time, fair?

22        A.   Fair.

23        Q.   The fact that a company does

24   that, that it improves its compliance

1    program over time, that doesn't mean that

2    the old program was in violation of the

3    law necessarily, does it?

4                  MR. BOGLE:  Object to form.

5                  THE WITNESS:  Again, without

6          any -- looking at facts and

7          circumstances, I can't tell you

8          whether it is or it isn't.

9    BY MS. SWIFT:

10         Q.    Well, I mean you don't want

11   a company to not improve its program --

12         A.    No, a company should

13   always --

14                MR. BOGLE:  Wait for her to

15         finish.

16   BY MS. SWIFT:

17         Q.    You don't want a company to

18   not improve its programs based on a

19   concern that if it does that, its past

20   programs would be considered

21   noncompliant, correct?

22         A.    I think the problem with

23   your hypothetical is the fact that you

24   can't erase -- you can't erase the past.

1    So the incentive is to always continually

2    improve and move forward.  But what's

3    happened in the past has happened in the

4    past.  So, again, I'm not sure the

5    relevance of the question.

6           Q.    Well, I think you're

7    agreeing with me though.  Let me see if I

8    understand what you're saying.  I think

9    you have agreed that you wouldn't want a

10   company to -- I think static was the word

11   that you used.  You wouldn't want a

12   company to be static in its compliance

13   programs, correct?

14          A.    No, I would not expect to

15   see a good company be static in its

16   compliance.

17          Q.    And you wouldn't want a good

18   company to be afraid to change its

19   compliance program out of a concern that

20   its past programs would be deemed

21   noncompliant, fair?

22               MR. BOGLE:  Object to form.

23               THE WITNESS:  Again, as I

24      said to you, since you can't erase

Highly Confidential - Subject to Further Confidentiality Review

1           the past, I don't understand the

2           nature of the question.  It just

3           does not compute.  I'm sorry.

4    BY MS. SWIFT:

5           Q.    I'm -- it does not compute?

6           A.    In my head it doesn't

7    compute.  You can't -- you can't erase

8    the past, Kate.  So whatever happened in

9    the past, has happened in the past.

10   So --

11          Q.    You've worked with companies

12   on compliance programs a lot over the

13   years; is that fair?

14          A.    I have.

15          Q.    When you're sitting with

16   your clients -- and I'm not asking about

17   any particular client.

18          A.    I understand.

19          Q.    Have you had occasion to

20   talk about improving that company's

21   compliance program?

22          A.    Yes.

23          Q.    And you wouldn't recommend

24   to a company not to improve their

Highly Confidential - Subject to Further Confidentiality Review

1  compliance program out of a concern that

2  the past program would be deemed

3  noncompliant, would you?

4       A.    Kate, I think it's -- in my

5  experience, what you're asking is a

6  completely hypothetical question, because

7  I never had that conversation.  My

8  conversation with my clients have been,

9  we want to improve.  No one has asked --

10  has phrased that concern or asked it from

11  that particular point of view.

12       Q.    Would you --

13       A.    That's why I don't

14  understand the question that you're

15  asking.

16       Q.    Would you agree with me that

17  a fact that a company changes its

18  compliance program, improves its

19  compliance program, is a good thing?

20       A.    In general, yes.

21       Q.    That's what you want a

22  company to do, right?

23       A.    You want a company to

24  improve, yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Mr. Whitelaw, I believe you

2  testified earlier today that you haven't

3  ever spoken to Dr. McCann, the

4  plaintiffs' expert?

5    A.    That is what I did say to

6  you.

7    Q.    And if you -- do you have

8  your report in front of you?

9    A.    I do.

10    Q.    And, actually, I think you

11  have a copy of it that's marked as

12  Exhibit 2.  But you also have a binder

13  that you've been referring to throughout

14  the day; is that right?

15    A.    It's my report, yes.

16    Q.    Can we mark the binder as an

17  exhibit, please.  And we can make a copy

18  of it or do whatever we need to do.

19        MR. BOGLE:  Do you want to

20        put a sticker on it or do you want

21        me to?

22        MS. SWIFT:  I'll put a

23        sticker on it.  Let's mark it as

24        Exhibit 10.

Highly Confidential - Subject to Further Confidentiality Review

1              (Document marked for

2         identification as Exhibit

3         Whitelaw-10.)

4    BY MS. SWIFT:

5         Q.    What is in the binder,

6    Mr. Whitelaw?

7         A.    What's in the binder is a

8    copy of my report from April 15th.  A

9    copy of my supplemental report.  An extra

10   copy of the table of contents.  And those

11   were the --

12        Q.    These are the notes that we

13   can't have?

14        A.    Those are --

15             MR. BOGLE:  That's the

16        McKesson notes.

17             THE WITNESS:  The McKesson

18        notes.

19             MR. BOGLE:  I believe you

20        may have looked at it.  So I'm

21        letting them have them.

22             MS. SWIFT:  These notes we

23        can have?

24             MR. BOGLE:  The McKesson

Highly Confidential - Subject to Further Confidentiality Review

1    notes which I believe he may have

2    referred to, yes.

3           (Document marked for

4    identification as Exhibit

5    Whitelaw-11.)

6           MS. SWIFT:  I'm going to

7    mark the McKesson notes as

8    Exhibit 11.

9           And then -- so I'm going to

10   set the McKesson notes aside.

11   BY MS. SWIFT:

12          Q.    Then I think you said

13   there's an extra copy of the table of

14   contents --

15          A.    Just to make it easier

16   because it's -- again, it's a 300-page

17   report.

18          MR. BOGLE:  Wait for her to

19   finish.

20   BY MS. SWIFT:

21          Q.    And then the supplemental

22   report is also in here?

23          A.    Yes, ma'am.

24          Q.    And then everything that's

Highly Confidential - Subject to Further Confidentiality Review

1   in the three-hole binder is the same as

2   the initial report that you served on

3   April 15th; is that correct?

4          A.    Yes, I believe so.

5          Q.    And it looks like you have

6   added some tabs, some of which have notes

7   on them.  Is that fair?

8          A.    That's fair.

9          Q.    What was the purpose of the

10  tabs?

11         A.    The purpose of the tabs are

12  to help me navigate when you ask me

13  questions, and trying to make things move

14  more efficiently.

15         Q.    And you've also got your

16  appendices in here, right?

17         A.    Mm-hmm.

18         Q.    Great.  All right.  I'll

19  hand this back to you.  There's that.

20         A.    Thank you.

21         Q.    All right.  Turn -- turn if

22  you would please in Exhibit 10, the copy

23  of your report, to Page 278 which is in

24  your appendices.  It's in Appendix I if

1  I'm not mistaken.

2        A.    Okay.

3        Q.    You have included under the

4  list of "Other Non-Publicly Available

5  Materials," a handful of citations to

6  Appendix 9 of Dr. McCann's report,

7  correct?

8        A.    Yes, I did.

9        Q.    Are the citations to

10  Appendix 9 that are listed here, the only

11  pages of Appendix 9 that you reviewed?

12        A.    To the best of my

13  recollection, yes.

14        Q.    Are the pages of Appendix 9

15  that you've cited here in your report the

16  only pages of -- of Dr. McCann's entire

17  report that you have reviewed?

18        A.    Again, to the best of my

19  knowledge, yes.

20        Q.    You did not review

21  Appendix 10 to Dr. McCann's report?

22        A.    If it's not listed in my

23  reliance materials, then I don't recall

24  seeing it.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    And I just want to make a

2    clear yes or no on that because I know

3    we're focusing on one page of the

4    reliance materials, and I know there's a

5    lot of them in there.

6               Am I correct you did not

7    review Appendix 10 of Dr. McCann's

8    report?

9               Just yes or no.

10              MR. BOGLE:  If you can

11         answer it yes or no.

12              THE WITNESS:  I can't answer

13         it yes or no because I have no

14         idea what Appendix 10 might have

15         been.  So I have no clue how to

16         answer this.

17              Other than -- other than to

18         say what you see in front of you

19         in my reliance materials is as

20         full and complete a list of

21         everything I looked at as I could

22         make.

23    BY MS. SWIFT:

24         Q.    If you had reviewed

1    Appendix 10 of Dr. McCann's report, would

2    that appear here on Page 278?

3         A.   I would -- it should have.

4         Q.   If you had reviewed

5    Appendix 11 of Dr. McCann's report, would

6    that have appeared in the same section of

7    your reliance materials on Page 278?

8         A.   I believe so.

9         Q.   You don't recall sitting

10   here today reviewing Appendix 10 or 11 of

11   Dr. McCann's report?

12        A.   I do not recall reviewing

13   Appendix 10 and 11 of Dr. McCann's

14   report.

15        Q.   You never spoke with

16   Dr. McCann?

17        A.   No, I never spoke with

18   Dr. McCann.

19        Q.   Did you do anything to

20   verify the charts or bar graphs that

21   appear at these pages of Appendix 9 of

22   Dr. McCann's report that you cite?

23        A.   You mean did I crank the

24   numbers myself?  I'm -- I'm not sure --

1    Q.    That's exactly what I mean.

2    A.    No, I did not.

3    Q.    Did you do anything to

4    verify that Dr. McCann's charts

5    accurately reflect the pharmacies where

6    opioids got shipped?

7              MR. BOGLE:  Object to form.

8              THE WITNESS:  Can you be

9        more precise?

10   BY MS. SWIFT:

11   Q.    What don't you understand

12   about my question?

13   A.    I'm just trying to

14   understand specifically what you're

15   looking for.  And you're asking a very

16   broad question, do I understand

17   pharmacies and opioid.  I'm just trying

18   to be precise in exactly what you want to

19   know.

20   Q.    I asked you whether you did

21   anything to verify that in the charts

22   that Dr. McCann put together and that you

23   cite in your expert report in this case,

24   did you do anything to verify that those

1    charts accurately reflected the

2    pharmacies where the opioids in those --

3    those charts got shipped?

4              MR. BOGLE:  Object to form.

5              THE WITNESS:  Again, I did

6         not independently review the data

7         or validate the data in

8         Dr. McCann's report.

9    BY MS. SWIFT:

10        Q.    I apologize if you answered

11   this question earlier today and I just

12   missed it.  Did you read Mr. Rafalski's

13   report?

14        A.    No, ma'am, I did not.

15        Q.    Turn if you would to Page 45

16   of your report marked as Exhibit 10.

17   Page 45 starts at Section 8.2, "Group 2

18   Distributors," correct?

19        A.    Yes.

20        Q.    In the first paragraph of

21   that section you say that you understand

22   that the large national pharmacy or

23   retail chains have distribution

24   operations that only ever supplied

1    opioids to their own pharmacies, correct?

2         A.    That was -- yes, that's what

3    it says.

4         Q.    You understand that

5    Walgreens only ever distributed opioid

6    pain medication to its own pharmacies,

7    correct, sir?

8              MR. BOGLE:  Objection.

9         Asked and answered.

10             THE WITNESS:  From its own

11        distribution centers?  Yes, it

12        only distributed to its own

13        pharmacies, that's what I

14        understand.

15   BY MS. SWIFT:

16        Q.    Now, I'd like you to take a

17   look at the fifth paragraph in that

18   section, which is on Page 46.  It's the

19   paragraph that starts "again."

20             Do you see that?

21        A.    Yes.

22        Q.    In the middle of that

23   paragraph, you note that it's your

24   understanding that in the 2008, 2009 time

Highly Confidential - Subject to Further Confidentiality Review

1    frame, the chain pharmacies took

2    meaningful efforts to meet their legal,

3    regulatory, and societal obligations,

4    correct?

5              MR. BOGLE:  Object to form.

6              THE WITNESS:  I state that

7         the two Group 2 pharmacies that I

8         reviewed, Walgreens and CVS, and

9         that's an accurate statement.

10   BY MS. SWIFT:

11        Q.    In the next paragraph, you

12   assert that none of these so-called G2

13   distributors -- well, strike the

14   question.  The G2 distributors, does that

15   only include Walgreens and CVS?

16        A.    Yes.

17        Q.    Okay.  In the next

18   paragraph, you assert that neither of the

19   G2 distributors tried to incorporate

20   their own dispensing data into their

21   anti-diversion programs.

22              Do you see that?

23        A.    I see that.

24        Q.    What's your basis for that

Highly Confidential - Subject to Further Confidentiality Review

1    statement?

2         A.    Having reviewed the

3    documents, having asked for the

4    information, having looked at what they

5    were using to determine suspicious order

6    monitoring, based on my review I did not

7    see them using dispensing data in their

8    own -- to try to clear red flags for

9    various suspicious orders.

10        Q.    Am I correct that the

11   documents that you reviewed were provided

12   to you by the plaintiffs' counsel?

13        A.    In request to my asking for

14   documents -- again, using the federal

15   sentencing guideline framework, I asked

16   for, show me documents around standard

17   operating procedures, training,

18   education.  I asked for a lot of

19   documents.  And, yes, they were provided

20   by counsel.

21        Q.    You didn't see any documents

22   at all, none whatsoever, where Walgreens

23   employees were using dispensing data in

24   their suspicious order monitoring?

```
 1              MR. BOGLE:  Object to form.
 2              THE WITNESS:  Again, I'd
 3         have to go through the complete
 4         Walgreens section soup to nuts.
 5         But to the best of my
 6         recollection, I did not see
 7         anything that showed, on a
 8         systemic basis, that they were
 9         using dispensing data as part of
10         the program.
11    BY MS. SWIFT:
12         Q.    In the next paragraph on
13    Page 46, this is the paragraph that
14    starts "in addition."
15              Do you see that?
16         A.    Yes.
17         Q.    You state, "Those who were
18    charged with controlled substances
19    compliance invested substantial time and
20    resources trying not to classify
21    excessive pharmacy orders as suspicious,
22    so as not to disrupt product supply."
23              What is your basis for that
24    statement?
```

1    A.    Well, would you like to turn

2    to the Walgreens section and we can walk

3    through it?  Because it's based on my

4    document review, the depositions

5    reviewed, et cetera.  But if we want to

6    get down to specifics, I can walk you

7    through it.

8    Q.    Right now I'd just like to

9    ask you about the statement that I asked

10   you about on Page 46.  And I don't see a

11   footnote for that statement here.  Would

12   you agree with that, that there's no

13   footnotes cited on Page 46 for that

14   statement?

15   A.    I would agree with you

16   there's no footnotes cited for that

17   statement on Page 46, yes.

18   Q.    From your previous answer, I

19   take it that whatever basis you have for

20   the statement that Walgreens employees

21   invested substantial time and resources

22   trying not to classify excessive pharmacy

23   orders as suspicious so as not to disrupt

24   product supply, your support for that

1    statement is going to be in the section

2    of your report about Walgreens?

3              A.    That's what I'm telling you.

4              Q.    Have you ever talked to

5    anyone at Walgreens who told you they

6    were trying to avoid classifying pharmacy

7    orders as suspicious so as not to disrupt

8    product supply?

9              A.    No, ma'am, I have not talked

10   to anybody at Walgreens.

11             Q.    Is it your testimony that

12   you read that in a document somewhere?

13             A.    It is my testimony that I

14   read it in documents somewhere.

15             Q.    And I want to be clear with

16   my question.  There was a pronounce in

17   there that might have been ambiguous.

18                   Is it your testimony that

19   you read in a document somebody at

20   Walgreens saying in a document, we are

21   trying to avoid classifying pharmacy

22   orders as suspicious so as not to disrupt

23   product supply?  Is that your testimony?

24             A.    Are you asking me did I see

Highly Confidential - Subject to Further Confidentiality Review

1  that exact direct quote?  Is that what

2  you're looking for?  I'm not --

3         Q.    Yes.  That's what I'm asking

4  you.

5         A.    No, I did not see that exact

6  direct quote.

7         Q.    Did you see a document that

8  had the substance that I just included in

9  my previous question, maybe not the exact

10  quote, but somebody essentially saying,

11  hey, guys, let's invest time and

12  resources trying not to classify

13  excessive pharmacy orders as suspicious

14  so we won't disrupt our product supply?

15             MR. BOGLE:  Object to form.

16             THE WITNESS:  Could you be

17        more -- again, are you -- I'm not

18        sure exactly what you are looking

19        for me -- looking for to comment.

20  BY MS. SWIFT:

21         Q.    Well, you said that you

22  didn't see a document with that exact

23  quotation in it.

24         A.    No, I did not.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    I'm broadening it just a

2  little bit.  Now I'm asking, okay, not

3  that verbatim language, but language that

4  has the same substance to it.  Did you

5  see anything like that in the Walgreens

6  document?

7           MR. BOGLE:  Object to form.

8           THE WITNESS:  Yes, I did.

9  BY MS. SWIFT:

10     Q.    What did you see?  What

11 document?

12     A.    It was a series of

13 documents.  But document -- we can start

14 with Natasha Polster's deposition.

15     Q.    Okay.  What did she say?

16 What are you referring to?

17     A.    Let's walk -- let's walk

18 through the report.

19     Q.    The Walgreens section of the

20 report starts on Page 183.

21     A.    That is correct.

22     Q.    I'd like you to direct me to

23 what --

24     A.    I understand.

1      Q.      -- testimony of Ms. Polster

2   that you were just referring to?

3      A.      Mm-hmm, absolutely.  Yeah, I

4   would say it starts at on Page 188, at

5   13.4.1, and continues onto 189.

6      Q.      Is the specific testimony

7   that you're referring to from Ms. Polster

8   the testimony that "you have to take care

9   of the patient"?

10      A.      No.  Actually, that was part

11   of it.  But if you want the rest of it,

12   it's the one on Page 189 that talks about

13   the Walgreens system.  "The Walgreens

14   system was put into place to ensure

15   stores had proper quantities, not

16   necessarily to detect a red flag."

17      Q.      Just to make sure that I'm

18   clear, the paragraph that we were looking

19   at before on Page 46, the paragraph that

20   said, "Those who were charged with

21   controlled substances compliance invested

22   substantial time and resources trying not

23   to classify excessive pharmacy orders as

24   suspicious so as not to disrupt product

Highly Confidential - Subject to Further Confidentiality Review

1    supply," you testified the basis for that

2    statement with respect to Walgreens is

3    Ms. Polster's testimony that "you have to

4    take care of the patient" and --

5         A.    That's some of it.

6         Q.    I'm not done.

7              -- and her further testimony

8    in answer to the question, "Now,

9    Walgreens system, similar to my alarm, is

10   there to detect a potential red flag.

11   Would you agree with that?

12             "Answer:  It was put in

13   place to ensure that the stores had the

14   proper quantities, not necessarily to...

15   detect a red flag.  The whole idea was to

16   make sure the stores were getting the

17   quantities that they needed based on

18   their peer group."

19             Is that correct?

20        A.    That is part of the

21   testimony.  And then if you want to go

22   over and flip over to 202, we can walk

23   our way through some more of that.

24        Q.    All right.  What do you got

1    on Page 202?

2           A.    The whole discussion about

3    flagged orders are not suspicious orders.

4    We can read the whole section if you'd

5    like to walk all the way through it.

6           Q.    That's okay.  I'm familiar

7    with it.  It's your testimony that the

8    entire section entitled "Flagged Orders

9    Are Not Suspicious Orders," supports your

10   statement on Page 46 that Walgreens was

11   trying not to classify excessive pharmacy

12   orders as suspicious so as not to disrupt

13   product supply?

14          A.    Yes.

15          Q.    Anything else?

16          A.    We can keep going, but I

17   think that's -- that pretty much covers

18   it.

19          Q.    Well, I'd like to know

20   everything that covers it.

21          A.    I'll keep -- I'll keep

22   reading through.  It's your time.

23                I think you can go back to

24   Page 201.  Talk about the order of

Highly Confidential - Subject to Further Confidentiality Review

1    interest.  They are cutting orders in

2    particular.  The quote -- the quote

3    that's there.  "The item will be reduced

4    to nonsuspicious levels in order to

5    prevent suspicious from being sent over

6    to the DC."

7            Q.    It's your testimony that

8    Walgreens' practice in the time frame

9    that's addressed on Page 201 of cutting

10   orders supports your position that

11   Walgreens was trying not to classify

12   pharmacy orders as suspicious so as not

13   to disrupt product supply?

14           A.    That is what I'm saying.

15           Q.    Okay.

16           A.    I think that's part of it.

17   You asked me for every section in here

18   that applies to that statement.

19           Q.    Let me ask you this,

20   Mr. Whitelaw.  Other than Ms. Polster and

21   the two clips of testimony that we

22   discussed, who else do you think

23   specifically at Walgreens devoted

24   substantial time and resources trying to

1    avoid classifying excessive pharmacy

2    orders as suspicious?

3            A.    I can't give you a complete

4    list of people.

5            Q.    Can you name anybody else,

6    other than Ms. Polster?

7            A.    Again, I'd have to re-read

8    the whole section of the report.  If

9    you'd like me to do that, I can go

10   through it for you -- for you now.

11           Q.    You can't think of anybody

12   now without re-reading your entire

13   section on Walgreens?

14               MR. BOGLE:  You can read

15           your report if you need to.

16               MS. SWIFT:  No, I'm -- I'm

17           not -- that's not what I'm asking

18           him to do.  I'm asking if he can

19           do it without re-reading his

20           report.  If the answer is no,

21           that's fine.

22               THE WITNESS:  There's not a

23           name that comes to mind.

24   BY MS. SWIFT:

1    Q.    All right.  Let's go back to

2  Page 46, please.

3              THE WITNESS:  Can I have

4         Walgreens' notes?

5              MS. SWIFT:  He's asked to

6         refer to his notes, I'm going to

7         ask again for production of the

8         notes on Walgreens.

9              MR. BOGLE:  If he refers to

10        them, yeah.  He hasn't referred to

11        them yet.

12  BY MS. SWIFT:

13    Q.    Are those notes on Walgreens

14  that you're looking at, Mr. Whitelaw?

15    A.    Yes, Counsel, they are.

16    Q.    Are you, in fact, referring

17  to them at this moment?

18              MR. BOGLE:  You haven't

19        asked him a question.

20              MS. SWIFT:  I just asked him

21        a question.

22              MR. BOGLE:  You've asked him

23        to refer to them?

24              MS. SWIFT:  I asked him if

Highly Confidential - Subject to Further Confidentiality Review

1    he's referring to them right now.

2         THE WITNESS:  I'm looking at

3    them.

4         MS. SWIFT:  May I please

5    have the notes?

6         MR. BOGLE:  Sure.

7         MS. SWIFT:  And I'm going to

8    go off the record to look at the

9    notes for two minutes.

10        THE VIDEOGRAPHER:  Going off

11   the record --

12        MR. BOGLE:  We both have to

13   agree to go off the record.  I'm

14   not agreeing to go off the record.

15        MS. SWIFT:  Really?

16        MR. BOGLE:  Mm-hmm.

17        He's keeping the copy.

18        MS. SWIFT:  You're not going

19   to agree to go off the record to

20   look at the notes?

21        MR. BOGLE:  Unh-unh.

22        MS. SWIFT:  I'm going to

23   hand them -- I'm going to mark

24   them as Exhibit 12, these are the

1          Walgreens' notes.

2               (Document marked for

3          identification as Exhibit

4          Whitelaw-12.)

5     BY MS. SWIFT:

6          Q.    I'll hand them back to you

7     and we'll look at them at a break.  How

8     about that?

9          A.    I'm not sure where we are

10    right now.

11         Q.    Yeah, I'm not surprised.

12               You asked for the notes or

13    your counsel handed you the notes I

14    believe after I'd asked you if you could

15    name anybody else at Walgreens other than

16    Ms. Polster who you claim devoted

17    substantial time and resources to

18    avoiding identifying suspicious orders.

19               And I'll ask again, now that

20    you've had a chance to refer to the

21    notes, whether you can name anybody else

22    at Walgreens who you think did that?

23         A.    I would also add to that

24    collection, I mean let's go back to the

Highly Confidential - Subject to Further Confidentiality Review

1    back end -- back of the report, and we

2    can add the people who were responsible

3    for the actual programming in and of

4    itself.  So, you know.

5         Q.    If you turn to the very end

6    of the Walgreens section, I think I can

7    help you out.

8         A.    Yep.

9         Q.    It's Page 208.  The very

10   last paragraph of the Walgreens section.

11   Are you there?

12        A.    I am there.

13        Q.    You say, "The crucial

14   employees, with responsibility for

15   shaping, maintaining, and operating

16   Walgreens' anti-diversion program (e.g.

17   Natasha Polster, Edward Bratton and Rex

18   Swords)."

19             Are those the people that

20   you believe devoted substantial time and

21   resources to avoiding the classification

22   of suspicious orders?

23        A.    I believe they were -- they

24   were certainly some of the people that

Highly Confidential - Subject to Further Confidentiality Review

1   were involved in it, yes.

2           Q.    Can you name any others?

3           A.    I don't have an exhaustive

4   list for you, counsel.

5           Q.    You don't have a list in

6   your notes?

7           A.    I have a list of people that

8   I reference in this report, but I don't

9   have a list --

10          Q.    Okay.  We can move on.

11          A.    -- to be able to answer your

12  question.

13          Q.    Go back to Page 46, please.

14          A.    Yep.

15          Q.    Do you think it is a

16  conflict of interest for a chain pharmacy

17  to operate distribution centers that ship

18  medications to their own pharmacies?

19          A.    Do I think it's a conflict

20  of interest?

21          Q.    Yes.

22          A.    Do I think -- do you want to

23  define what you mean by conflict of

24  interest?

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    You don't know what a

2  conflict of interest is?

3    A.    I know what a conflict of

4  interest is.  I'm asking what you mean in

5  this context, Counsel.

6    Q.    Well, take a look at the --

7  let's see, where is it?  The second

8  paragraph from the bottom on Page 46,

9  after you talk about the folks at

10  Walgreens you claim devoted a lot of time

11  trying not to classify suspicious orders,

12  the next sentence you have there says,

13  "This constituted an inherent conflict of

14  interest."

15    Do you see that?

16    A.    I do.

17    Q.    What did you mean by that

18  statement?

19    A.    What I meant by that

20  statement is that if you were classifying

21  various and sundry and reporting various

22  and sundry orders as suspicious and you

23  were taking action against pharmacies,

24  your own in this case, that were ordering

Highly Confidential - Subject to Further Confidentiality Review

1    excessive quantities, in other words you

2    were not providing it to them, that's

3    going to impact your bottom line as a

4    company.  And the company, obviously

5    Walgreens, is in the business of making

6    money.

7              That is a conflict.  Can it

8    be mitigated?  Potentially.

9         Q.    So I'll ask my question

10   again.  Do you think it is a conflict of

11   interest for a chain pharmacy like

12   Walgreens to operate distribution centers

13   that at one point in time shipped

14   medications to their own pharmacies?

15        A.    I think it presents an

16   inherent conflict that can be, in fact,

17   mitigated appropriately.

18        Q.    What is the basis of your

19   belief that it is a conflict of interest

20   for a chain pharmacy to ship medications

21   to its own pharmacies via its own

22   distribution centers?

23        A.    Well --

24              MR. BOGLE:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1    Asked and answered.

2        THE WITNESS:  If we just

3    walk through it logically, the

4    people who are supposed to be the

5    gatekeepers are, in fact, being --

6    are, in fact, being incentivized

7    by the company.  And better the

8    company does, the better the

9    bonuses, et cetera.  So it's --

10   it's an inherent conflict to the

11   company.  You have the gatekeepers

12   in that -- in a difficult

13   position.  I didn't say it's --

14   that's a conflict position.

15   You're holding the company for

16   your job.

17 BY MS. SWIFT:

18       Q.   Do you have any other basis

19 or support for that opinion that you just

20 articulated?

21       A.   I am not sure what you're

22 looking for, Counsel.

23       Q.   Okay.  We can move on.

24            Do you understand -- strike

1    that.

2              All right.  In the eight

3    paragraph in this section, is the last

4    paragraph on Page 46, refers to your

5    compliance maturity and program

6    effectiveness scale.

7              Do you see that?

8        A.    Yes, I see that.

9        Q.    That's the Figure 2 on Page

10   43 that my colleague asked you about

11   earlier today, correct?

12       A.    That is correct.

13       Q.    Figure 2 on page 43, the

14   maturity scale, that's the model that you

15   made up for figuring out where in its

16   maturity level or life span a company is

17   with respect to compliance.  Is that a

18   roughly fair statement?

19             MR. BOGLE:  Object to form.

20             THE WITNESS:  No, I don't

21        think it's a fair statement.  It's

22        something -- you're characterizing

23        it as something that I made up.

24        No, it's something that is in

1           general use among compliance

2           professionals and others out

3           there.

4    BY MS. SWIFT:

5           Q.    You said that earlier today

6    as well, that you knew of others who had

7    used the compliance maturity scale.  Who

8    else has used it?

9           A.    I have seen it in use in my

10   time in Deloitte.  I've seen it used by

11   PwC.  I've seen it used by a variety of

12   different consultants and companies, even

13   some of my fellow colleagues when I was

14   an inhouse compliance officer used it

15   within their own organizations.

16          Q.    I believe you testified that

17   you created the compliance maturity

18   scale; is that correct?

19          A.    No, I testified that I

20   created this diagram that's in this

21   document, was what I created.

22          Q.    Okay.  Have you ever seen

23   the compliance maturity and program

24   effectiveness scale used publicly

Highly Confidential - Subject to Further Confidentiality Review

1    anywhere in the world?

2              MR. BOGLE:  Object to form.

3              THE WITNESS:  I'm assuming I

4         can Google it and find it.

5    BY MS. SWIFT:

6         Q.    We tried.  We couldn't.

7    Have you -- have you done that and seen

8    it used publicly somewhere?

9         A.    You know, actually I have.

10   I actually was able to Google Google

11   Images at one point, and it did come up.

12   Not the exact same -- again, it's -- the

13   compliance maturity model is usually

14   adapted.  Each individual consultant

15   or -- does some adaptation.  The words

16   may be slightly different.  But that

17   curve that we are talking about, the

18   basic four parameters, yeah, I've seen it

19   before.

20        Q.    I believe you testified

21   you've seen it used by people at Deloitte

22   and PwC; is that correct?

23        A.    I've seen it from PwC.  I

24   have seen it from Deloitte, yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Have you seen it anywhere
2  else?
3    A.    As I said, I seem to recall
4  some of my colleagues inhouse at other
5  companies using it, but I can't tell you
6  which companies and when and where, no.
7    Q.    You say in that paragraph on
8  Page 46 that the two chain pharmacies are
9  barely starting into the foundational
10  level of the maturity scale, correct?
11    A.    That's what I say.
12    Q.    And if there were a remedial
13  level, that's where they would be,
14  correct?
15    A.    That was my statement, yes.
16    Q.    Okay.  I understand that you
17  don't have a scoring method or a point
18  system for placing the pharmacies on your
19  maturity scale.  You said it today, it
20  was more of a qualitative assessment.  Is
21  that right?
22    A.    That's fair.
23    Q.    Are both of the chain
24  pharmacies that you looked at in the same

1    spot on the nonexistent remedial level of

2    the maturity scale?

3            A.    Again, I'd say by and large,

4    yes.

5            Q.    How can we tell that from

6    your report?  I mean, where do we look in

7    your report to determine how far

8    Walgreens is from making its way onto the

9    foundational level of the compliance

10   maturity scale?

11           A.    I didn't put you -- I didn't

12   put it on a graph, Counselor.

13           Q.    That's why I'm asking the

14   question, sir.

15           A.    No, I did not put it on a

16   graph.

17           Q.    And so how are we supposed

18   to know from your report how far off the

19   scale we are?

20           A.    I think you're missing the

21   point.  Is you're not even moving to the

22   right-hand side of the scale, Counselor.

23   You're not even halfway to moving toward

24   an effective compliance program.  You're

1  sitting at the left-hand edge.  I think

2  you are overcharacterizing it.

3       Q.   I understand that's your

4  position, sir.  And I'm just trying to

5  get an understanding of your opinions.

6  And what I would like to know is, how,

7  from your report, am I supposed to

8  determine how far off to the left-hand

9  side of the scale Walgreens is supposed

10 to be?

11      A.   And I guess what I'm trying

12 to say to you is I'm not sure that being

13 off to the left or how far off, if it's

14 one inch or three inches.  I think you're

15 missing the point.  You shouldn't be off

16 to the left-hand side at all.  You should

17 be more towards the middle, to the

18 right-hand side of the graph.  That's the

19 point.

20      Q.   I understand that's your

21 position, sir.  My question is coming

22 from a different place.  I'm not asking

23 right now what you think we should have

24 done differently.  I'm just trying to

Highly Confidential - Subject to Further Confidentiality Review

1    understand how I'm supposed to know where

2    you think we actually are.

3          A.    I think I told you where I

4    think you actually are.

5          Q.    But there's -- as you said a

6    moment ago, there's no graph or chart

7    that shows where Walgreens falls with

8    respect to the compliance maturity scale,

9    correct?  That's not in the report?

10         A.    There is no point on the

11   graph that I put Walgreens on, if that's

12   what you're asking, Counselor, no.

13         Q.    Turn if you would, please,

14   to Page 183, which is the start of the

15   Walgreens section.

16         A.    I'm here.

17         Q.    I notice you -- the heading

18   on this Section 13 is "Walgreens Boots

19   Alliance."  Is that correct?

20         A.    Correct.

21         Q.    The focus of the first

22   several paragraphs is also on Walgreens

23   Boots Alliance, right?

24         A.    And Walgreens too.  It's a

Highly Confidential - Subject to Further Confidentiality Review

1  history of your store, of the store and

2  the company.

3        Q.    But you note in Footnote

4  1051 that Walgreens Boots Alliance is not

5  a defendant in this case, correct?

6        A.    That's correct.

7        Q.    Walgreen Co. and Walgreen

8  Eastern Co. are the defendants in these

9  cases, correct?

10        A.    That's correct, Counselor.

11        Q.    Do you know whether

12  Walgreens Boots Alliance ever distributed

13  opioid pain medications to any Walgreens

14  pharmacy?

15        A.    During the time period that

16  we were looking at?

17        Q.    At any point in time.

18        A.    No, Counselor, I don't.

19        Q.    Did you check?

20        A.    No, I can't say I did.

21        Q.    You cite various figures for

22  Walgreens Boots Alliance on Page 183 of

23  your report, correct, sir?

24        A.    I do.

1    Q.    You don't cite any of those

2    same figures for Walgreen Co., right?

3    A.    No, I don't.

4    Q.    You also don't cite any of

5    those same figures for Walgreen Eastern

6    Co., correct?

7    A.    You are correct, I do not

8    cite separate figures for the 6A areas.

9    Q.    You says that Walgreens

10   Boots Alliance maintains a pharmaceutical

11   wholesale and distribution network that

12   includes over 390 distribution centers,

13   correct?

14   A.    Yes, that's what I say.

15   Q.    Turn to Page 184, please.

16   In the third paragraph of that page, you

17   see the paragraph that starts, "By 2012"?

18   Are you with me?

19   A.    Yes, I see it.

20   Q.    You note there that

21   Walgreens, the defendant in these cases,

22   only had 13 distribution centers

23   registered to distribute controlled

24   substances, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     Yes.
 2          Q.     Did you know that only five
 3   of those distribution centers ever
 4   distributed opioid pain medication into
 5   either Summit or Cuyahoga County?
 6          A.     I knew there were three.  I
 7   didn't know necessarily there were five.
 8   I know three of them.
 9          Q.     Did you look into that one
10   way or the other to see how many
11   distribution centers distributed into
12   Summit or Cuyahoga County?
13          A.     I believe I did.  But can't
14   exactly remember -- I remember looking
15   into asking where the primary was and
16   that's Perrysburg.  But beyond that, I
17   don't remember.
18          Q.     What's the basis of your
19   testimony that Perrysburg was the primary
20   distribution center?  Just because it was
21   in Ohio?
22          A.     No, I believe I -- I believe
23   it's in the Footnote 1068.  But I'd have
24   to look at the document.  If you want to
```

1  go through the document I can tell you

2  where I found it.

3       Q.    You -- you noted in that

4  same paragraph that only three of

5  Walgreens distribution centers ever

6  handled Schedule II controlled

7  substances, correct?

8       A.    Yes.

9       Q.    Turn to Page 185 please.

10 You understand that Walgreens stopped

11 distributing all controlled substances

12 into Ohio in 2013, right, sir?

13      A.    All controlled substances

14 into Ohio?  I understand they stopped

15 with Schedule IIs in 2013, that was by

16 the end of October when it was

17 reclassified, 2014 was when the actual

18 stop date was for everything.

19      Q.    So as far as your

20 understanding is though, Walgreens hasn't

21 distributed any type of opioid into Ohio

22 for at least five years, is that fair?

23      A.    I would say that that is

24 fair.

1    Q.    You don't have any opinion

2    about Walgreens' suspicious order

3    monitoring program after that point in

4    time, correct, sir?

5    A.    My examination ended with

6    the reclassification of hydrocodone in

7    October 2014.

8    Q.    On Page 185 you've got a

9    section that starts "Executive Summary."

10    Do you see that?

11    A.    I do.

12    Q.    And you say in the first

13    sentence, "The overall theme to the

14    Walgreens' controlled substances

15    compliance program is too little too

16    late," correct?

17    A.    That's what I saw.

18    Q.    How long should it take to

19    develop a suspicious order monitoring

20    program?

21    MR. BOGLE:  Object to form.

22    THE WITNESS:  Are we talking

23    a hypothetical situation?  From

24    where and which point?  I'm not

Highly Confidential - Subject to Further Confidentiality Review

1        sure what you're looking for,

2        Counsel.

3    BY MS. SWIFT:

4        Q.    I'm just asking in general.

5    Can you tell me how long it -- it is

6    supposed to take to develop a suspicious

7    order monitoring program?

8            MR. BOGLE:  Object to form.

9            THE WITNESS:  Well, I can

10           tell you how long it takes to put

11           in a regular compliance program.

12           It's anywhere from six to

13           12 months normally.  But again,

14           the comment I'm making here is you

15           were distributing -- Walgreens was

16           distributing opioids well before

17           it was trying to do significant

18           changes to its program in 2008 and

19           2009.  That's the -- and it

20           finally doesn't do -- you know, it

21           finally gets -- it's working on

22           it, and then in 2014 you're not

23           doing it anymore at all.

24   BY MS. SWIFT:

1    Q.    You said you could tell me

2    how long it takes to put in a regular

3    compliance program.  Does that mean you

4    can't tell me how long it should take to

5    put it together --

6         A.    It's going to vary by the --

7    it's going to vary --

8         Q.    I didn't finish my question.

9         A.    Sorry.

10        Q.    You said you can tell me how

11   long it takes to put in a regular

12   compliance program.  Does that mean you

13   can't tell me how long it would take to

14   put together a suspicious order

15   monitoring program?

16        A.    Without more details in the

17   company, its structure, its resources and

18   all the other components, no, I can't

19   tell you that.

20        Q.    Does it depend on the

21   company's business model?

22        A.    It depend -- that's a

23   factor.

24        Q.    Does it depend on how many

Highly Confidential - Subject to Further Confidentiality Review

1    customers the company has?

2         A.    That could be a factor.

3         Q.    Does it depend on what kind

4    of customers the company has?

5         A.    Again, could be a factor.

6         Q.    You don't provide an opinion

7    on how long it should take to develop a

8    suspicious order monitoring program in

9    your report, correct, sir, an actual

10   amount of time?

11        A.    An actual timeline.

12        Q.    Correct.

13        A.    No, I do not.

14        Q.    Is the time that it takes to

15   develop a suspicious order monitoring

16   program one of the factors you consider

17   in your compliance maturity scale?

18        A.    The overall time frame?  I'm

19   not sure I understand the -- the

20   question, Counsel.

21        Q.    Yeah.  I'm just asking if

22   whether the -- the amount of time it

23   takes to develop a suspicious order

24   monitoring program, is that something

1    that you consider in rating companies on

2    your compliance maturity scale?

3              MR. BOGLE:  Object to form.

4              THE WITNESS:  Again, it

5         would depend on the factor -- if

6         we are talking about you knew the

7         regulations were a certain point

8         and then it took you years to do

9         it, yes.

10             If we are talking -- again,

11        it's a quantitative assessment.

12        If you're asking me am I looking

13        at a specific timeline.

14   BY MS. SWIFT:

15        Q.    What I'm trying to get at

16   is, we've got this scale --

17        A.    Right.

18        Q.    -- on Page 43 and --

19             MR. BOGLE:  Wait until she

20        finishes.

21   BY MS. SWIFT:

22        Q.    -- you know, you know, I'm

23   wondering if a company takes six years to

24   develop their suspicious order monitoring

Highly Confidential - Subject to Further Confidentiality Review

1    program, does that put them one place on

2    the scale, whereas if they took three

3    years it puts them something at someplace

4    else on the scale.

5              Is that the kind of thing

6    that you did when you were rating us on

7    your maturity scale?

8         A.    I wouldn't say I rated you

9    on -- I wouldn't rate -- rated you

10   overall on the amount of time it took you

11   to get from A to B.

12             What I rated -- would have

13   rated you on for example, is if you're

14   trying to make a change and you know

15   you're trying to make a change and it's

16   taking you five years to make the change

17   that you knew -- you already said you

18   wanted to make.

19        Q.    Okay.  I don't understand

20   your answer.

21             You started off by saying

22   you wouldn't have rated us overall on the

23   amount of time --

24        A.    On the total time.  I'm

Highly Confidential - Subject to Further Confidentiality Review

1    not -- I'm not looking at a total time

2    scale.  What I'm saying to you is a

3    factor that I would have considered in

4    where you are on addressing compliance in

5    an effective manner would be if you know

6    you have a gap, how long is that gap open

7    before you actually try to close it or

8    before you actually get it closed.

9            Q.    You haven't provided any

10   analysis in your report laying out the

11   points where you think Walgreens took too

12   long to fix a gap, correct, sir?

13               MR. BOGLE:  Object to form.

14               THE WITNESS:  I have to go

15        back -- I have to go back and read

16        the whole section again.  If you'd

17        like we can do that.

18   BY MS. SWIFT:

19           Q.    Well, we are going to be

20   short on time at a certain point.  I'm

21   just asking, if sitting here today,

22   without re-reading again the Walgreens

23   section, can you tell me, you didn't do

24   any analysis in your report laying out

1    the points where you think Walgreens took

2    too long to fix a gap in its system?

3         A.    And again, I'm answering you

4    honestly, Counsel.  I looked at a lot of

5    stuff.  The document is 300 pages.  If

6    you want a precise answer, I'm going to

7    need time to review the report.

8         Q.    Well, let me ask it this

9    way.  If there's an analysis that you did

10   laying out all the points where you think

11   it took us too much time to fix a gap,

12   I'll find that in the Walgreens section

13   of the report?

14        A.    It should be in the section.

15        Q.    All right.  Take a look at

16   Page 186 if you would, please.

17             And actually, the lead-in to

18   it is at the bottom of 185.  Sorry about

19   that.

20             The last sentence on 185

21   says, "Some of the key contributing

22   factors to this 'too little too late'

23   approach and the failure of Walgreens to

24   take its corporate anti-diversion

Highly Confidential - Subject to Further Confidentiality Review

1    obligations seriously include," and then

2    on Page 186 we get three bullets,

3    correct?

4         A.    That's correct.

5         Q.    You say this is some of the

6    key contributing factors.  Did you leave

7    any contributing factors out?

8         A.    Not of the entire section.

9    Are you asking of the executive section?

10        Q.    I'm -- I'm trying to get a

11   handle on how the section is organized.

12        A.    Sure.

13        Q.    And this executive summary

14   section reads as though it is an

15   executive summary summarizing what

16   follows.  Is that fair?

17        A.    That's a fair assessment,

18   yes.

19        Q.    And what I want to know is

20   whether these three bullet lists are all

21   of your contributing factors, or if they

22   are, as you say, only some of them?  Did

23   that make sense?

24        A.    Yes, Counselor, it does.

Highly Confidential - Subject to Further Confidentiality Review

```
1    What I would say is they are the major
2    contributing factors.  I would not say
3    it's a complete and exhaustive list.
4         Q.    What contributing factors
5    did you leave off of the bullet list on
6    Page 186?
7         A.    Again, I'm going to have to
8    go through the whole report again and
9    read it again to refresh my memory to get
10   you a list for you.
11        Q.    You can't tell me a single
12   contributing factor that you left off the
13   list?
14        A.    I can't tell you without
15   reading the section again, no.
16        Q.    How many hours did you say
17   that you've worked on this case, sir?
18        A.    Oh, I said I worked on this
19   case at the moment, almost, what did I
20   say, almost 2,000 hours, somewhere in
21   there.
22        Q.    And can you remind me how
23   much you've billed to date?
24        A.    A little over $400,000.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    A little over $400,000 since

2  fall of 2018; is that fair?

3    A.    November 2018.

4    Q.    A little over $400,000 in

5  the past six months?

6    A.    Yes.

7    Q.    And you can't tell me

8  whether you left off any of the

9  contributing factors to your opinions

10  against Walgreens?

11    MR. BOGLE:  Objection.

12    Asked and answered.

13    THE WITNESS:  You asked me.

14    And, again, I'm not sure I -- the

15    question has changed.  So can we

16    go back and --

17  BY MS. SWIFT:

18    Q.    I'll re-ask the question.

19    A.    Thank you.

20    Q.    You've got three

21  contributing factors that you say

22  contribute to the too little too late

23  approach and the failure of Walgreens to

24  take its corporate anti-diversion

Highly Confidential - Subject to Further Confidentiality Review

1    obligations seriously.

2              And I understand from your

3    testimony so far, that these three

4    factors are not all of the factors, that

5    there are others that you left off of

6    this bullet list.  I just want to know

7    what you left off the list.

8         A.    And again, I'm trying to

9    tell you honestly.  I'll tell you, what

10   comes to mind -- and I can't give you an

11   exhaustive list, Counselor -- comes to

12   mind.  You had policies and procedures.

13   You didn't follow them.  You're supposed

14   to be doing due diligence, and you didn't

15   do a good job of the documentation

16   throughout.  That's -- that's something

17   that repeats throughout.

18        Q.    Okay.

19        A.    That's in there and

20   discussed in details in various sections.

21              MR. BOGLE:  I could use a

22         break.  We've been a little over

23         an hour.

24              THE WITNESS:  As could I.

Highly Confidential - Subject to Further Confidentiality Review

1          MR. BOGLE:  Good time for a

2     break?

3          THE VIDEOGRAPHER:  Going off

4     the record.  6:06 p.m.

5          (Short break.)

6          THE VIDEOGRAPHER:  Back on

7     the record at 6:20 p.m.

8  BY MS. SWIFT:

9          Q.   Mr. Whitelaw, do you have

10  Exhibit 12, your Walgreens notes in front

11  of you?

12         A.   Yes, Counselor, I do.

13         Q.   Is that your handwriting?

14         A.   Yes, actually, it is.

15         Q.   Did you take these notes

16  exclusively when you were reviewing

17  documents and testimony?  And what I mean

18  by that is I'm trying -- did you -- did

19  any of these notes -- were these notes

20  that you took while you had conversations

21  with Mr. Rafalski?

22         A.   No, Counselor, they were

23  not.

24         Q.   Okay.  Take a look if you

Highly Confidential - Subject to Further Confidentiality Review

1   would please, sir, at -- I think it's the

2   third page.

3           MR. BOGLE:  Sorry, you said

4       that you had other copies?

5           MS. SWIFT:  I handed them

6       out, sorry.

7   BY MS. SWIFT:

8       Q.    The third page that says,

9   "Flagged orders were not suspicious," at

10  the top of it.

11          Do you see that?

12      A.    I'm not sure I'm on the

13  right page.

14      Q.    I'm wondering if I'm missing

15  a page.

16      A.    I'm just trying to --

17      Q.    I think it's the fourth

18  page.  My apologies.

19      A.    Flagged order -- yeah, I got

20  it.

21      Q.    It says "Flagged orders were

22  not suspicious" at the top, correct?

23      A.    That's what it says.

24      Q.    Immediately under that, it

Highly Confidential - Subject to Further Confidentiality Review

1    says, "No pharmacy manager or pharmacist

2    doing anything nefarious," correct?

3         A.    Yes.

4         Q.    And then there's another

5    section below that that starts, "Outside

6    distributors."

7              Do you see that?

8         A.    Mm-hmm.  I do see it.

9         Q.    The second bullet under that

10   section says, "Not Walgreens' problem

11   because other distributors had own SOM

12   system," correct?

13        A.    Correct.

14        Q.    I believe you told me a few

15   minutes ago that you have no opinions

16   about Walgreens suspicious order

17   monitoring program after Walgreens

18   stopped distributing controlled

19   substances, correct?

20        A.    That's what I believe I told

21   you, yes.

22        Q.    Is that because after

23   Walgreens stopped distributing controlled

24   substances, Walgreens no longer had a

Highly Confidential - Subject to Further Confidentiality Review

1    legal obligation to maintain a suspicious

2    order monitoring program under the DEA's

3    regulations?

4         A.    Well, I would say to you,

5    Counselor, I would phrase it in a

6    slightly different way.  They were no

7    longer a distributor.  So as a

8    distributor, not distributing controlled

9    substances, they didn't have to come into

10   compliance with the distributor

11   requirements of the Controlled Substances

12   Act.

13        Q.    You can set the notes aside

14   for now, sir.

15        A.    Okay.

16        Q.    All right.  Turning back to

17   the three bullet points on Page 186, I

18   believe you told --

19        A.    Hang on a second.

20        Q.    Sure.

21        A.    Let me get to where you're

22   going.  Yes, I'm here.

23        Q.    I believe you told me that

24   these three bullet points, roughly

Highly Confidential - Subject to Further Confidentiality Review

1  speaking, are an executive summary of the

2  section of the report on Walgreens that

3  follows, correct?

4       A.    I would say the executive

5  summary in the Walgreens section is the

6  executive summary for Walgreens, and then

7  details follow in the report, yeah.

8       Q.    Do the three bullet points

9  summarize the section on Walgreens at a

10  high level?

11       A.    I think they're a high level

12  overview, yes.

13       Q.    I'd like to know how each of

14  these three factors affected your

15  assessment of Walgreens' compliance

16  program, okay.  I'll ask you some

17  questions.  But I just want to orient you

18  a little bit.

19       A.    Okay.  I think I got your

20  orientation.

21       Q.    Are any of the three factors

22  that appear in the executive summary more

23  important than the other two for your

24  assessment?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    No.   They're not in --

2    they're not in rank order, if that's what

3    you're asking.

4          Q.    That was my very next

5    question.

6                And I take it from your

7    previous testimony you did not assign

8    points to each factor or anything like

9    that?

10         A.    No, I didn't.

11         Q.    The first factor is singular

12   retail focus, correct?

13         A.    Correct.

14         Q.    You say, "Walgreens' efforts

15   to manage controlled substances

16   compliance focused primarily on ensuring

17   its anti-diversion program did not

18   impinge on the retail stores' ability to

19   obtain the volume of opioid products that

20   the stores requested," correct?

21         A.    That's what I have there,

22   yes.

23         Q.    And then you've also got a

24   quotation in here from Ms. Polster again

Highly Confidential - Subject to Further Confidentiality Review

1    about, "You've got to take care of the

2    patients," right?

3         A.    Correct.

4         Q.    Is it your opinion that

5    pharmacies should not take care of their

6    patients?

7              MR. BOGLE:  Object to form.

8              THE WITNESS:  Counselor,

9         it's not my opinion that

10        pharmacies should not take care of

11        their patients.  My opinion here,

12        and why this is offered, is that

13        you can't walk away from your

14        requirements under the Controlled

15        Substances Act as a distributor by

16        simply trying to make -- by simply

17        using "we've got to take care of

18        the patients" as a mantra for

19        noncompliance.  That's what I'm

20        saying.

21   BY MS. SWIFT:

22        Q.    Is it your opinion that,

23   although you can't walk away from your

24   regulatory requirements, you can walk

Highly Confidential - Subject to Further Confidentiality Review

1    away from the patients?

2              A.    I did not say --

3                    MR. BOGLE:  Object to form.

4                    THE WITNESS:  No, I did not

5         say that.

6    BY MS. SWIFT:

7              Q.    It's important for people

8    with legitimate medical needs to be able

9    to get their medication, right, sir?

10             A.    Yes, it's important.

11             Q.    The second factor that you

12   list is lack of time, attention and

13   resources, correct?

14             A.    I talk to it, yes.

15             Q.    You say that "the team

16   charged with controlled substances

17   compliance did not appreciate that

18   opioids were not 'widgets,'" correct,

19   sir?

20             A.    That is a statement that I

21   have in my report, yes.

22             Q.    And you've got widgets in

23   quotation marks, marks, right, sir?

24             A.    Mm-hmm.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    I noticed later on in the

2    Walgreens section you refer to one of the

3    Walgreens' employee's deposition

4    testimony where the word widgets was

5    used.  Is that the basis --

6        A.    That is a partial --

7        Q.    -- of the statement?

8        A.    That is the partial basis of

9    that statement.

10       Q.    Is there another basis for

11   the -- the statement that Walgreens did

12   not appreciate that opioids were not

13   widgets?

14       A.    I think if you look at the

15   way Walgreens approached the controlled

16   substances obligations overall, they lost

17   sight of the fact that they were dealing

18   with very dangerous products, and as a

19   result they simply became widgets.

20            It's a lot like -- akin to a

21   bank teller that starts to see money as

22   being nothing more than dirty paper.

23   It's the same sort of concept here.

24       Q.    I think maybe my question

Highly Confidential - Subject to Further Confidentiality Review

1  wasn't clear.  When I'm asking you for

2  the basis of a statement in your report,

3  what I'm looking for is a document or

4  some testimony or something else that --

5          A.    I'm looking --

6          Q.    -- that you're using to

7  support the statement.  Not a further

8  explanation of the statement.  Does that

9  make sense, sir?

10         A.    I think I understand you,

11 Counselor.

12         Q.    And so my question is

13 whether there's any other support for the

14 widgets statement other than the

15 testimony from the Walgreens employee who

16 used the word widgets?

17         A.    And I'm going to tell you

18 that I can't point you to a specific

19 document.  I reviewed a lot of documents

20 in the case of Walgreens.  And I think

21 you have to take the report in the

22 totality in which it is offered.

23              So you're looking for a

24 specific, and I'm trying to tell you you

1    need to look at the whole.

2           Q.    But to the extent that there

3    is any additional support, we're going to

4    find it in the footnotes in the Walgreens

5    section?

6           A.    I think you're going to find

7    it in the Walgreens report, yes.  And in

8    my reliance materials as well.

9           Q.    Well, now before we were

10   talking about the footnotes.  And my

11   understanding was that the footnotes are

12   the specific support for those statements

13   that are made in the given sections; is

14   that fair?

15          MR. BOGLE:  Object to form.

16          THE WITNESS:  They are a

17          good source of support.  I

18          wouldn't say they are the only

19          level of support.  Don't forget, I

20          have the 30 years of experience

21          doing -- doing this.  So my

22          experience comes into play there.

23          You can't footnote that.

24   BY MS. SWIFT:

Highly Confidential - Subject to Further Confidentiality Review

1     Q.  Understood.  And what I'm

2 talking -- and that's fair.

3     Setting aside your 30 years

4 of experience, when you've got a specific

5 document or a piece of testimony,

6 something you can actually put in a

7 footnote, you did that, right, sir?

8     A.  When I had something that

9 actually was good supportive evidence for

10 the point I was making and I put it in

11 the footnotes, tried to make them as

12 complete as possible, yes.

13     Q.  The third factor that you

14 provide on Page 186 is overreliance on

15 technology, correct, sir?

16     A.  That is correct, ma'am.

17     Q.  Now, you're not saying that

18 Walgreens should have done its suspicious

19 order monitoring manually for 8,000

20 stores, are you, sir?

21     A.  No, Counselor, I'm not.

22     Q.  Okay.  Technology is a

23 necessary part of a suspicious order

24 monitoring for a distributor like

1  Walgreens, wouldn't you agree with that,

2  sir?

3           A.    Given the size and factors

4  and number of stores that you're

5  responsible for, yes.  I would say

6  tech -- you're going to need the

7  assistance of technology.

8           Q.    The bottom paragraph under

9  those three bullet points says, "When

10  taken together, from 1998 to 2014,

11  Walgreens' controlled substance

12  compliance program was inadequate and in

13  my opinion did not rise to the

14  foundational level on the compliance,

15  maturity, and program effectiveness

16  model," correct?

17          A.    Yes, that's what it says.

18          Q.    Are you saying that

19  Walgreens' failures on these three

20  bullet-listed factors, that's what -- and

21  I understand is explained in more detail

22  later in the section on Walgreens.

23               But what you're saying as I

24  understand it, is that these three bullet

Highly Confidential - Subject to Further Confidentiality Review

1    points, these factors, are what led you

2    to conclude that Walgreens did not rise

3    to the foundational level on your

4    maturity scale that appears on Page 43?

5              MR. BOGLE:  Object to form.

6              THE WITNESS:  I think what

7         I'm trying to say, Counselor, is

8         you have to read the whole section

9         to get to that.

10             I'm saying I drew out three

11        broad themes that struck -- struck

12        me as I worked my way through the

13        Walgreens documents and testimony

14        from this period in time.  These

15        are the three broad things that

16        came, you know, that struck me --

17   BY MS. SWIFT:

18        Q.    But in --

19        A.    -- and I felt were important

20   to put.

21             They are not the only things

22   that would lead you to conclude that the

23   program was ineffective.

24        Q.    Well, all right.  But as I

Highly Confidential - Subject to Further Confidentiality Review

1  understand it, you can't help me

2  understand what other missing factors

3  there are from this page.  I've got to go

4  and -- and find that.  But it will be in

5  the Walgreens section, right?

6          A.    Well, hang on.  I think I

7  can generally help you, Counselor --

8          Q.    I -- I don't want you to do

9  that right now.  I'm just trying to --

10  what I'm trying to figure out is, in

11  terms of your methodology --

12          A.    Yeah.

13          Q.    -- these are, in broad

14  strokes, the three factors that led you

15  to conclude that we aren't even at the

16  foundational level of the maturity scale,

17  right?

18              MR. BOGLE:  Objection.

19          Asked and answered.

20              THE WITNESS:  I would say

21          they are three of the major

22          factors that lead me to that

23          position, yes.

24  BY MS. SWIFT:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  If we had done better

2    on one of these three factors, would we

3    have made our way onto the foundational

4    level of the maturity scale?

5    A.    I'm not sure, Counselor.

6    You have to look at the totality of the

7    specifics to be able to try to answer

8    that for you.

9    Q.    You can't tell me sitting

10   here today, after working on this case

11   for --

12   A.    I'd say --

13   Q.    -- almost six months,

14   whether doing better on any one of these

15   factors would have made it -- made us,

16   you know, no longer remedial and onto the

17   foundational level?

18   A.    You seem to be approaching

19   this from the standpoint of it being a

20   simple checklist.  So if I do better on

21   A, or if I do better on C, it gets me

22   over the hump to being foundational.

23   It's not -- compliance programs have to

24   be looked at in a totality and in a

Highly Confidential - Subject to Further Confidentiality Review

1    whole, and that's exactly what I did.

2              So I can't tell you that if

3    you check a certain box on a certain

4    piece of paper, that that's going to be

5    the deciding factor to get you over the

6    foundational level.

7         Q.    And that's not laid out

8    anywhere in your report either, sir, is

9    it, that, you know, if you had done X, Y,

10   and Z, then you would have been at the

11   foundational level?

12             MR. BOGLE:  Object to form.

13   BY MS. SWIFT:

14        Q.    Your report doesn't say

15   that, does it?

16             MR. BOGLE:  Object to form.

17             THE WITNESS:  I think if you

18        looked at the -- if you look at

19        the maturity model, you will see

20        sort of the things that are

21        considered when you look to say,

22        do you fit in one of those

23        buckets.  I think it's there in

24        the report in the beginning of the

Highly Confidential - Subject to Further Confidentiality Review

1      report.

2            But again, if you're looking

3      for, did I develop a distinctly --

4      a distinct scorecard with -- with

5      ratings, it's five points for

6      this, ten points for that, no, I

7      did not.

8   BY MS. SWIFT:

9        Q.   And you didn't lay out

10   anywhere in your report, here's what

11   Walgreens could have done to make its way

12   onto the foundational level of the

13   maturity scale, correct?

14        A.   Actually, I do lay out at

15   the beginning of the report in Section 6

16   the attributes of what a good compliance

17   program would look like.  So if you read

18   through that list and you match that up

19   with what was missing, you can see how

20   you can move up that scale, absolutely.

21        Q.   And it's your testimony that

22   if we put the pages of attributes

23   together with what you said in the

24   Walgreens section, we'd be able to figure

1  out how to place ourselves at any point

2  along the scale?

3          A.    No.   My testimony was that

4  you would be able to see how you could

5  move up the scale.  I didn't say that you

6  didn't do any particular one bucket or

7  another.

8          Q.    If Walgreens had done

9  whatever it was that we were supposed to

10  do to make our way to the foundational

11  level on your maturity scale, would that

12  have meant we were compliant with the

13  Controlled Substances Act?

14              MR. BOGLE:  Object to form.

15              THE WITNESS:  No, it

16          wouldn't necessarily mean you were

17          compliant with the Controlled

18          Substances Act.  It would mean

19          that you had the beginnings of

20          a -- you were starting on the

21          journey to an effective compliance

22          program.

23  BY MS. SWIFT:

24          Q.    What if we had done whatever

Highly Confidential - Subject to Further Confidentiality Review

1    it was we were supposed to do that would

2    take us to the maturing level of the

3    compliance -- of the maturity scale.

4    Would that have meant that we were

5    compliant with the Controlled Substances

6    Act?

7         A.    Again, without having

8    specifics, I can't give you a precise

9    answer.

10        Q.    Okay.  All right.  On Page

11   187, you start a discussion of three

12   Walgreens stores, correct?

13        A.    Yep, there are three there.

14        Q.    In your three examples, you

15   talk about actual orders those Walgreens

16   pharmacies placed with a Walgreens

17   distribution center, correct, sir?

18        A.    I talk about orders that

19   were placed with the distribution center,

20   yes.

21        Q.    Focusing first on Walgreens

22   Store 3226, you point out some actual

23   orders of oxycodone per month in three

24   months of 2010, correct?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      I did.

2       Q.      Your point is that Walgreens

3    needed to look at those orders to see

4    what was going on at that store in order

5    to determine whether diversion was

6    occurring; is that fair?

7       A.      They needed to do due

8    diligence on each of those orders to

9    understand why they were above the

10   thresholds.  That is my testimony, yes.

11

Highly Confidential - Subject to Further Confidentiality Review



15  you can't talk about any document that's

16  not in front of you?

17              MR. BOGLE:  Object to form.

18              THE WITNESS:  It's my

19      testimony that I've looked at so

20      many documents, and accuracy is so

21      important as you're stressing

22      right here with me right now, that

23      in order to be accurate I need to

24      see the document.  I think that's

1    only fair considering the amount

2    of work that I've done and the

3    amount of, you know, documents

4    that have been reviewed and size

5    of the report, et cetera.

6   BY MS. SWIFT:

7        Q.    Let's take a look at Store

8   3314, you include a table purporting to

9   show this store's oxycodone purchases by

10  year between 2006 and 2010, correct?

11       A.    That's what I have here,

12  yes.

13       Q.    And for the source of that

14  table, you cite an Exhibit 13 to Eric

15  Stahmann's deposition, correct?

16       A.    I believe that's correct.

17       Q.    Did you read Mr. Stahmann's

18  deposition transcript?

19       A.    I reviewed Mr. Stahmann's --

20  certain deposition transcripts.  Yes.

21       Q.    Do you know what Exhibit 13

22  is?

23       A.    Again, without seeing the

24  document to refresh my recollection, all

Highly Confidential - Subject to Further Confidentiality Review

1  I can go by is what I cited to in my

2  report here, opioid shipments to this

3  particular store by the distributor

4  being -- by distributor for 2006 to 2014.

5  That's what it purports to be.

6          Q.    I take it from the citation

7  to Exhibit 13 of Mr. Stahmann's

8  deposition that you looked at a document

9  with an exhibit sticker on it from his

10  deposition?

11          A.    Yeah, it would have been

12  digital, but yes.

13          Q.    Did you do anything to check

14  the accuracy of the information in

15  Exhibit 13 to Mr. Stahmann's deposition?

16          A.    Do you mean did I

17  independently go to source documents

18  behind 13?

19          Q.    Mm-hmm.

20          A.    No.

21          Q.    Did you do anything to

22  determine who created the spreadsheet

23  that appeared in Exhibit 13?

24          A.    No.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1    ████████████████████████

█    ███████████████████████████████

█    ███████████████████████████████

█    █████████████████████    ██████████████

█    ██████████████████

6    BY MS. SWIFT:

7         Q.    Are all of the opinions that

8    you have on these three Walgreens stores

9    contained right here on these two pages?

10        A.    I'm not sure I'm

11   understanding what you're asking me.

12   Counselor, are you asking me do I

13   reference the stores anywhere else in the

14   report?  I don't remember.

15        Q.    No.  No, I'm not.  I'm just

16   asking you whether you're planning on

17   coming to trial and saying anything else

18   about these three stores besides what

19   you've said in your report.

20        A.    As with everything else, if

21   the facts and circumstances change, I

22   reserve the right to amend my report.

23   But at this present time, no, I do not.

24        Q.    You say at the top of

1    Page 187 that these three stores are

2    "just a few examples," right, sir?

3           A.    Yes, counselor, I did.

4           Q.    You don't discuss any other

5    examples of Walgreens stores in your --

6    in your report, correct?

7           A.    No, I used these as three

8    examples.

9           Q.    Sorry, there's an ambiguity

10   in the answer.

11          Am I correct that there are

12   no other Walgreens stores discussed in

13   your report?

14          A.    I'd have to go through the

15   report to say do I ever discuss yet any

16   other Walgreens stores in my report to be

17   absolutely certain.

18          Q.    If it's not discussed in the

19   Walgreens section of the report, fair to

20   say you're not going to offer an opinion

21   about that Walgreens store at trial?

22          A.    I'm not planning to make any

23   amendments to the report, unless the

24   facts and circumstances change.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Did you consider any other

2  example Walgreens stores in working on

3  this case?

4      A.    Yes, I did.

5      Q.    Why didn't you include those

6  in your report?

7      A.    Well, Counselor, I went with

8  the audit theory that basically three

9  points make a curve.  You don't have to

10 be exhaustive.  And you don't have to

11 list every single example of poor due

12 diligence.  These three are good examples

13 of poor due diligence on -- on Walgreens'

14 part.

15     Q.    How many Walgreens stores

16 did you look at that you did not include

17 in your report?

18     A.    I don't know off the top of

19 my head.

20     Q.    Can you ballpark it?

21     A.    No, Counselor, I can't.

22     Q.    Was it more than five?

23     A.    Counselor, I can't ballpark

24 it.  You're asking me to remember what I

Highly Confidential - Subject to Further Confidentiality Review

1   looked at out of thousands of documents.

2       Q.    Well, I'm not asking you to

3   remember what you looked at out of

4   thousands of documents.  I'm asking you

5   to remember any other Walgreens store

6   that you considered and decided not to

7   include in your report.

8           MR. BOGLE:  Objection.

9       Asked and answered.

10          THE WITNESS:  Counselor, I

11      can't give you a number, I'm

12      sorry.

13  BY MS. SWIFT:

14      Q.    Take a look at Page 189,

15  please.

16      A.    Yep.

17      Q.    At the end of

18  Section 13.4.1, the last paragraph starts

19  consequently.

20          Do you see that?  It's

21  about --

22      A.    Yeah.

23      Q.    -- halfway down the page.

24      A.    Mm-hmm.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    You say, "Consequently, from
2  an inventory management perspective."
3  And my question for you is, if you're
4  looking at this from an inventory
5  management perspective, does that mean
6  you're not looking at it from a
7  suspicious order monitoring perspective?
8            MR. BOGLE:  Object to form.
9            THE WITNESS:  I'm not sure I
10       understand your question,
11       Counselor.
12  BY MS. SWIFT:
13       Q.    You -- you understand that
14  inventory management is different from
15  suspicious order monitoring, correct,
16  sir?
17       A.    Yes, I know -- I know that
18  it's different.
19       Q.    And what you're talking
20  about in this section of your report is
21  from an inventory management perspective,
22  correct, sir?
23       A.    No.  What I'm -- what I'm
24  saying here, Counselor, is, I believe,

1    again I'd love to re-read Mr. Murray's

2    deposition.  But my recollection is what

3    I'm talking about here is that Mr. Murray

4    was looking at suspicious order

5    monitoring only from an inventory

6    management perspective.

7         Q.    Are you sure that's what he

8    was talking about, when he -- when he was

9    saying a widget is a widget?

10        A.    I said -- Counselor, I would

11   need to see the actual deposition.

12        Q.    I understand.  I understand.

13        You quote Ms. Polster again

14   in this paragraph where she says, "The

15   whole point behind it, the system, was to

16   have simplicity."

17             Do you see that?

18        A.    Yes, I do see that.

19        Q.    Is it your opinion that

20   simplicity in an inventory management

21   system is inconsistent with a company's

22   anti-diversion obligations?

23             MR. BOGLE:  Object to form.

24             THE WITNESS:  No, Counselor,

Highly Confidential - Subject to Further Confidentiality Review

1            I'm not saying that at all.

2                 What I'm saying here is that

3            if that is your sole goal -- the

4            sole goal of a suspicious order

5            monitoring system should be

6            compliance, not necessarily

7            simplicity.  Now if you can get

8            both simplicity and compliance,

9            that's -- that's a great thing.

10                But, making simplicity your

11           primary focus over achieving

12           compliance, that's not where you

13           should be.

14      BY MS. SWIFT:

15           Q.    And it's your testimony that

16      this partial sentence from Ms. Polster's

17      deposition means that her sole goal was

18      to have simplicity; is that correct?

19           A.    No.  I said primary goal,

20      not sole goal.

21           Q.    But you're basing that on

22      this partial sentence from Ms. Polster's

23      deposition?

24           A.    That's one of the things I'm

1    basing it on --

2              MR. BOGLE:  Objection to

3         form.  Asked and answered.

4              THE WITNESS:  -- plus all

5         the other documents I've read and

6         the entire context of reading --

7         of working on this section.  As

8         well as my experience, Counselor.

9    BY MS. SWIFT:

10        Q.    Is it your opinion that

11   having simplicity in your inventory

12   system means you can't focus on your

13   anti-diversion obligations?

14             MR. BOGLE:  Object to form.

15             THE WITNESS:  I think I

16        answered the question.

17             I said if you put simplicity

18        above compliance, that's the --

19        that's the problem.  But trying to

20        get both, both -- as long as you

21        achieve compliance and you can

22        also achieve simplicity, that is

23        not an inherently bad thing.

24   BY MS. SWIFT:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    The next section, 13.4.2,

2    talks about codes of conduct, correct?

3         A.    It does.

4         Q.    You talk about a business

5    ethics code and a pharmacy code, right?

6         A.    Yes, I do.

7         Q.    You understand that not all

8    employees at Walgreens are pharmacists?

9         A.    Yes, I do understand that.

10        Q.    At Page 191 of the report

11   you see -- you say -- this is at the

12   beginning of the first full paragraph --

13   "The maintenance of two separated and

14   unlinked codes of conduct increases

15   complexity and the likelihood that the

16   two documents will become out of sync,"

17   correct?

18        A.    I did write that and say

19   that.

20        Q.    You're not saying that it's

21   a violation of the Controlled Substances

22   Act to have multiple codes of conduct

23   that are out of sync with each other, are

24   you, sir?

Highly Confidential - Subject to Further Confidentiality Review

1                    MR. BOGLE:  Object to form.

2                    THE WITNESS:  No.  What I'm

3            saying is it is a problem from

4            a -- from an effective compliance

5            program standpoint to have

6            multiple codes and policies that

7            are out of sync with one another.

8    BY MS. SWIFT:

9            Q.    It's also not a violation of

10   the DEA's suspicious order monitoring

11   program to have multiple codes of

12   conduct, correct, sir?

13                   MR. BOGLE:  Object to form.

14                   THE WITNESS:  Again,

15           Counselor, we're not just looking

16           at whether or not there's a

17           violation of the Controlled

18           Substances Act.  The work I was

19           asked to do was look at an

20           effective corporate and controlled

21           substance compliance program from

22           standards that a reasonable and

23           prudent company would use.  And

24           one thing that reasonable and

Highly Confidential - Subject to Further Confidentiality Review

```
 1              prudent companies do is try to

 2              make sure they don't have policies

 3              and procedures that get out of

 4              sync because you have multiple

 5              different versions of a document.

 6     BY MS. SWIFT:

 7         Q.    Fair to say, then, that a

 8     lot of the complaints you have about my

 9     client are not violations of the

10     Controlled Substances Act?

11              MR. BOGLE:  Object to form.

12         Misstates testimony.

13              THE WITNESS:  I don't think

14         that's what I said, Counselor.  I

15         said my primary -- what I was

16         looking at, and particularly in

17         the case of this, are indicia of

18         not having an effective program.

19         Multiple documents in

20         multiple different hands can get

21         out of sync.  And this was an

22         example of just what can happen

23         when you -- when that occurs.

24     BY MS. SWIFT:
```

1    Q.    The next section starting on

2    191 is titled "Organization."

3          Do you see that?

4    A.    Yes, I do.

5    Q.    You -- I understand that you

6    think Walgreens' organizational structure

7    was substandard.

8          Are you offering an opinion

9    that the Controlled Substances Act

10   requires Walgreens to have a particular

11   organizational structure?

12        MR. BOGLE:  Object to form.

13        THE WITNESS:  I am offering

14        an opinion that to have an

15        effective compliance program, and

16        that includes an effective

17        anti-diversion program and

18        anti-SOM -- effective SOM

19        program --

20   BY MS. SWIFT:

21   Q.    I'm sorry, sir.  It's

22   getting late, and I don't want to --

23        MR. BOGLE:  Whoa, whoa,

24        whoa.

1           MS. SWIFT:  No, I'm sorry.

2      He --

3           MR. BOGLE:  If you want to

4      withdraw your question, that's

5      fine.

6           MS. SWIFT:  I will --

7           MR. BOGLE:  He can -- he's

8      going to finish his answer.

9           MS. SWIFT:  I will withdraw

10      the question.

11           MR. BOGLE:  All right.

12      Fine.

13  BY MS. SWIFT:

14      Q.   And I'm going to ask you to

15  listen to my question.  I did not ask you

16  whether -- whether your opinion was -- I

17  didn't ask you about your opinion about

18  an effective compliance program.

19           I asked you whether you

20  think the Controlled Substances Act

21  requires Walgreens to have a particular

22  organizational structure.

23      A.   I think I would answer that

24  to you, Counselor, you are required to

Highly Confidential - Subject to Further Confidentiality Review

1    have an effective anti-diversion program.

2    Part of looking at all the factors around

3    what goes into an effective

4    anti-diversion program would be, giving

5    the people who are the gatekeepers

6    sufficient power, empowering them, if we

7    can use that overused word, and authority

8    to make changes and to achieve compliance

9    is an indicia of an effective program.

10          Q.    I don't understand if that's

11   an answer to my question.  Is that a yes,

12   that the Controlled Substances Act

13   requires a particular organizational

14   structure?

15               MR. BOGLE:  Object to form.

16               You can answer how you see

17          fit.  You don't have to say yes or

18          no.

19               THE WITNESS:  As I said to

20          you, I think having an empowered

21          controlled substances program team

22          is part of an indicia of an

23          effective compliance program and

24          effective anti-diversion program.

1    BY MS. SWIFT:

2         Q.    Do you believe that

3    Walgreens' organizational structure

4    violated the Controlled Substances Act?

5              MR. BOGLE:  Objection.

6         Asked and answered.

7    BY MS. SWIFT:

8         Q.    Yes or no?

9              MR. BOGLE:  You don't have

10        to say yes or no.

11             THE WITNESS:  I think I've

12        answered your question as best I

13        can, Counselor.

14             MS. SWIFT:  And I would just

15        like to -- maybe you haven't seen

16        Special Master Cohen's ruling from

17        the Eagleman deposition.

18             MR. BOGLE:  You can't force

19        him to say yes or no to all of

20        your questions.

21             MS. SWIFT:  I'm not forcing

22        him to do anything.  I'm entitled

23        to ask for a yes or no answer to a

24        yes or no question.

Highly Confidential - Subject to Further Confidentiality Review

```
1              MR. BOGLE:  He's entitled to
2         answer the question however he
3         sees fit.
4              MS. SWIFT:  Are you going
5         to -- is it your position that I'm
6         not entitled to ask for a yes or
7         no answer?
8              MR. BOGLE:  You can ask --
9         no, you can ask whatever you want.
10        He just doesn't have to give it to
11        you.
12             MS. SWIFT:  Are you going to
13        flout Special Master Cohen's
14        ruling that we are entitled to a
15        yes or no answer?
16             MR. BOGLE:  I'm letting him
17        answer the questions the way he
18        sees fit, which means if he
19        doesn't -- if he can't answer yes
20        or no, he's not forced to answer a
21        question a yes or no just because
22        you say he is.
23   BY MS. SWIFT:
24        Q.   Mr. Whitelaw, do you believe
```

1    that it's a violation of the DEA's

2    suspicious order monitoring regulation to

3    be organized the way that Walgreens was

4    organized in this time frame?  Yes or no,

5    please.

6                    MR. BOGLE:  Objection.

7         Asked and answered.

8                    Answer how you see fit.

9                    MS. SWIFT:  I asked about

10        the Controlled Substances Act

11        before.  Now I'm asking about the

12        DEA suspicious order monitoring.

13                    THE WITNESS:  I'm going to

14        answer you the same way, Counsel.

15        Because I'm going to go back to

16        the point in my report, which is

17        if you want to go back is to the

18        front of the report and we'll talk

19        about the Russian nesting dolls,

20        we can spend 20 minutes on that

21        and have that conversation.

22                    They're all part and parcel.

23        It all fits together.

24                    And again, what I'm saying

Highly Confidential - Subject to Further Confidentiality Review

1          to you is, part of having an

2          effective program is that the

3          people who are the gatekeepers

4          have to have sufficient

5          empowerment and authority to carry

6          out the duties they've been

7          assigned.  That is my opinion,

8          Counselor.

9     BY MS. SWIFT:

10          Q.    With respect, I do not know

11    whether your opinion is that Walgreens'

12    organizational structure violated either

13    the Controlled Substances Act or the

14    DEA's suspicious order monitoring

15    regulation.  I don't know the answer to

16    that question.  Will you please answer

17    it?

18          A.    I've answered it the best

19    way I can.

20          Q.    Okay.  Turning back to Page

21    186, please.  I'm sorry.  I misread my

22    own outline.  192, actually.  And the

23    reason I started to take you back --

24    well, it doesn't matter.

Highly Confidential - Subject to Further Confidentiality Review

1          MR. BOGLE:  She said 192.

2  BY MS. SWIFT:

3          Q.    192.  192.

4          A.    I'm sorry.  I misheard you.

5          Q.    No, it's because I goofed

6  you up.

7          A.    192?

8          Q.    Correct, sir.

9          A.    All right.  I'm at 192.

10          Q.    This is Section 13.4.3 on

11  Walgreens' failures to designate a

12  high-level individual or group with sole

13  responsibility for controlled substances

14  compliance --

15          A.    Yes.

16          Q.    -- or provide enough

17  resources for the group contributed to

18  its ineffective and dysfunctional

19  anti-diversion program, right, sir?

20          A.    Yes, sir.

21          Q.    You say in this section

22  that, "Responsibility for controlled

23  substances compliance was spread across

24  multiple departments as Walgreens

1    represented in an org chart from mid

2    2012," correct?

3            A.    That's what I say.  Yes.

4            Q.    Is it your opinion that

5    spreading responsibility for controlled

6    substances compliance across multiple

7    departments is a violation of the

8    Controlled Substances Act?

9            A.    No.  Counselor, what I've

10   been saying all along is it's an indicia

11   of an ineffective program.  What I'm

12   saying is that by spreading and diffusing

13   responsibility across, you're not

14   empowering the gatekeepers with

15   sufficient authority and empowerment to

16   carry out the duties they've been

17   assigned.  And it also makes it very

18   difficult to figure out who is the

19   decisionmaker in those cases, which all

20   leads to effectiveness of the program.

21           Q.    I take it that you would

22   give me the same answer to the question,

23   is spreading responsibility for

24   controlled substances compliance across

1    multiple departments a violation of the

2    DEA's suspicious order monitoring?

3           A.     Yes, Counselor, I will give

4    you exactly the same answer, because

5    again --

6           Q.     That's great.  That's all I

7    needed to know.

8           A.      -- they're all linked

9    together.

10          Q.     Turn to 193, please.  At the

11   top of that page you say, "Walgreens

12   diffused responsibility and

13   accountability to an informal working

14   committee," correct?

15          A.     That's what I've written,

16   yes.

17          Q.     Is it your opinion that that

18   is a violation of either the Controlled

19   Substances Act or the DEA's suspicious

20   order monitoring regulation?

21          A.     Again, what I'm talking

22   to -- what I was asked to look at, and

23   what I continually tell -- keep trying to

24   tell you that I was looking at, and you

1    keep wanting to go back to just the

2    controlled substances regulations and --

3    and all, and go no further.  I was asked

4    to look at whether the program was

5    effective in my opinion.  And in my

6    opinion, this is a symptom of an

7    ineffective program.

8         Q.    I want to be very clear

9    here.  You are absolutely right.  I do

10   want to focus only on the Controlled

11   Substances Act and this DEA's suspicious

12   order monitoring regulation.  Okay?

13   That's -- those -- that is what I'm

14   asking you questions about.

15        A.    And I'm saying to you you

16   can't do that.  From what I was asked to

17   do was look at effectiveness of a

18   program.  And to do that they all --

19   these pieces all fit together.

20        Q.    I understand that you did

21   more than that in your report.  I am

22   entitled to an answer to my questions

23   which may be narrower than what's in your

24   report.  Okay?

1    A.    And I'm trying to answer

2    your questions as best I can.

3         Q.    So I'll ask again whether

4    it's your opinion, really truly focusing

5    only on the Controlled Substances Act and

6    the DEA's suspicious order monitoring

7    regulation, is it a violation to diffuse

8    responsibility and accountability to an

9    informal working committee?

10        A.    And I'm saying to you,

11   Counselor, it's part and parcel of

12   looking at whether the program is

13   effective or not.  And that's what I was

14   looking at.

15        Q.    You testified a moment

16   ago -- you referred to the Russian

17   nesting dolls.  Let's look at the Russian

18   nesting dolls.

19        A.    Okay.  Let's look at the

20   Russian nesting dolls.

21        Q.    That's Page 7.

22        A.    Yeah, I'm there.

23        Q.    Is a fair reading of

24   Figure 1, which I'm going to refer to as

1  the Russian nesting dolls because you do,

2  okay?

3       A.    That's what I refer to it

4  as, yes.

5       Q.    Is a fair reading of

6  Figure 1 that the suspicious order

7  monitoring regulation, 1301.74(b) is

8  represented by the smallest circle in

9  Figure 1?

10      A.    Suspicious order monitoring

11  is represented by the smallest circle,

12  yes.

13      Q.    And then you've got a bigger

14  circle around that circle for a

15  controlled substances program.  Are you

16  trying to fit within that bigger circle

17  anything that would fall under the

18  Controlled Substances Act?

19      A.    I'm talking about an overall

20  anti-diversion program.  SOM is part of

21  an overall anti-diversion program.  It's

22  not the only piece.  It's a piece.

23      Q.    Is it your testimony that

24  there is no way to distinguish from what

1   would fit within the requirements of the

2   DEA's suspicious order monitoring program

3   from the rest of the work that you have

4   done with respect to compliance programs?

5            MR. BOGLE:  Object to form.

6            THE WITNESS:  I'm saying --

7       I'm saying they are all

8       interlinked is what I'm trying to

9       explain to you.

10  BY MS. SWIFT:

11      Q.    And I'm asking whether it's

12  possible to unlink them.

13      A.    I honestly do not believe

14  you can unlink them.  I believe they are

15  linked together.

16      Q.    Okay.  Let's go back to 192.

17      A.    I'm back there.

18      Q.    All right.  Actually I'm

19  going to skip ahead to page -- I think

20  it's 195.

21            195 talks about industry

22  guidelines.

23            Do you see that?

24      A.    No.  I'm not sure where you

Highly Confidential - Subject to Further Confidentiality Review

1    are.

2           Q.     The paragraph that starts,

3    "This lack of documentation."

4           A.     Yes, okay.

5           Q.     You mention that that's

6    contrary to industry guidelines as well.

7    And then you say "HDMA in its 2008

8    voluntary industry guidelines" --

9           A.     Right.

10          Q.     Do you know one way or

11   another whether Walgreens has ever been a

12   member of the HDMA?

13          A.     No, Counselor, I don't know

14   one way or the other.

15          Q.     Did you check?

16          A.     No, I did not.

17          Q.     Do you know whether

18   companies like Walgreens that are not

19   HDMA members might have reasons for doing

20   things a little differently than how HDMA

21   members do things?

22          A.     Well --

23                 MR. BOGLE:  Object to form.

24                 THE WITNESS:  -- I think we

Highly Confidential - Subject to Further Confidentiality Review

1    need to be clear that when we look

2    at the HDMA guidelines in and of

3    themselves, they, in fact, say

4    they must be adapted for

5    individual companies even among

6    the same class, if we are talking

7    about wholesale distributors.

8         So again, I think you're --

9    I think you're missing the point.

10   The HDMA guidelines talk about

11   good quality of documentation and

12   the importance of good quality

13   documentation and maintaining it.

14   These are principles that

15   certainly Walgreens could have

16   employed.

17 BY MS. SWIFT:

18        Q.    Could have -- you said could

19 have employed.

20        A.    Could have.

21        Q.    Was -- was it required to

22 employ?

23        A.    I believe if you want to

24 call your program effective, you have to

Highly Confidential - Subject to Further Confidentiality Review

1    have good quality documentation.  I think

2    that's a requirement.  Otherwise how can

3    you know what you've done or not done?

4           Q.    Sir --

5           A.    I can --

6                 MR. BOGLE:  Finish your

7           answer.  Are you done?

8                 THE WITNESS:  I'm done.

9    BY MS. SWIFT:

10          Q.    Do you know what the word

11   diversion is?

12          A.    Yeah.  If you want to get

13   the precise definition we can go back to

14   the front of the report.

15          Q.    I'd like to know if you can

16   give me a definition of diversion without

17   looking at something in your report.

18          A.    Again, to be absolutely

19   precise, I would love to give you that.

20   I'm going to go back to my report and

21   rely on my report.

22          Q.    It doesn't have to be that

23   precise.

24          A.    I'm going to rely on my

Highly Confidential - Subject to Further Confidentiality Review

```
1    report.
2               MR. BOGLE:  You can go to
3         your report.
4               THE WITNESS:  I'm going to
5         go with my --
6               MS. SWIFT:  I don't want to
7         know the definition that he has in
8         his report.
9    BY MS. SWIFT:
10        Q.    What I would like to know is
11   if you can give a definition without
12   looking at your report.  Yes or no?
13        A.    I'm going to look at my
14   report.
15        Q.    Okay.
16        A.    I want to look at my report.
17        Q.    That's fine.  We'll move on.
18        A.    Okay.
19        Q.    You haven't done any
20   analysis of any order that Walgreens
21   shipped to one of its pharmacies to
22   determine whether that order led to drugs
23   being diverted, correct, sir?
24        A.    Again, Counselor, I'm not
```

1    here to talk about whether or not there

2    was diversion.  What I'm talking about is

3    you had a process into place.  You didn't

4    follow -- you didn't follow your process

5    into place.

6              You had poor documentation

7    of the work that you did when you say you

8    did due diligence.  There's poor work

9    that's there.  And at the end of the day,

10   it's hard to know what the heck you did.

11   So I'm talking about the quality of your

12   program.

13             I'm not talking about

14   whether -- whether -- I'm not talking

15   about whether it led to diversion or not.

16   I'm just talking about you've got --

17   you've got a sloppy program.

18        Q.    Did you do any analysis to

19   see how often a Walgreens store had an

20   order rejected by a Walgreens

21   distribution center and then went to an

22   outside distributor to fill that order?

23             MR. BOGLE:  Object to form.

24   BY MS. SWIFT:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Just yes or no, if you could

2  please.

3          MR. BOGLE:  Answer how you

4      see fit.

5          THE WITNESS:  Again, I've

6      got to go back and look at exactly

7      what I looked at, but...

8  BY MS. SWIFT:

9    Q.    If you can't answer that

10  without looking at your report, we'll

11  move on.  Turn to Page 206, please.

12          Actually, let's go ahead and

13  go to 208.  We'll go back to that last

14  paragraph in the Walgreens section.

15    A.    Sure.

16    Q.    The one about the crucial

17  employees.

18    A.    Mm-hmm.

19    Q.    You wrote that it's your

20  understanding that Natasha Polster, Ed

21  Bratton and Rex Swords were the crucial

22  employees involved in shaping,

23  maintaining and operating Walgreens'

24  anti-diversion program, correct?

1          MR. BOGLE:  Object to form.

2          THE WITNESS:  That's what I

3     wrote.

4   BY MS. SWIFT:

5          Q.    You say that these crucial

6   employees continued in positions of

7   substantial authority at Walgreens after

8   the failure of its compliance program and

9   that Walgreens failed to "hold these

10  individuals accountable."

11          Do you think that

12  Ms. Polster, Mr. Bratton, and Mr. Swords

13  should have been fired?

14          A.    No, I said they should be

15  held accountable, Counselor.

16          Q.    Well, what do you mean by

17  that?  Do you think they should be

18  demoted?

19          A.    Counselor, there are whole a

20  lot of options to be looked at when you

21  holding someone accountable.  I did not

22  specify a remedy.

23          Q.    And I'm asking you what you

24  were thinking of for a remedy.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I wasn't thinking of a

2    precise remedy.  I was thinking of just

3    some form of accountability, which can

4    range to anything from, you know, loss a

5    bonus to demotion to transfer to

6    termination.  It's a range of factors.  I

7    wasn't making a judgment call as to a

8    particular remedy.  What I was saying was

9    I didn't see any remedy.

10    Q.    Were you disciplined at C.R.

11    Bard when that company pleaded guilty to

12    hundreds of felonies while you were a

13    lawyer there?

14    A.    I wasn't a lawyer there when

15    they pleaded guilty to a hundred -- to

16    the conduct -- when the conduct occurred.

17    I came in on board afterwards to clean it

18    up.

19    Q.    I'm going to ask you to take

20    a look at what I will mark -- if I can

21    have more stickers, please.  We talked

22    about the Chemical Handler's Manual a

23    little bit today, right, sir.

24    A.    Yeah, we did.  We had a

1    conversation about it.

2           Q.    Is it your testimony that

3    the Chemical Handler's Manual provides

4    guidance to distributors of controlled

5    substances?

6           A.    I'll say that one form of

7    guidance that's provided by DEA, yes.

8           Q.    All right.  Several times

9    today, you've said that various portions

10   of your report are based on your

11   knowledge, your experience, your review

12   of data in the case, conversations with

13   Mr. Rafalski, and a number of times I

14   noted on the transcript that you ended

15   those answers with "et cetera."

16              Do you recall that?

17          A.    I do recall that.

18          Q.    What are you including in

19   the "et cetera"?

20          A.    Publicly available

21   documents.  The list of what I looked at

22   and some of the things that I relied on

23   are in the front of the report.  We can

24   go down that list in detail if you'd

Highly Confidential - Subject to Further Confidentiality Review

1    like.

2         Q.    We'd need to look at the

3    footnotes --

4         A.    No, we'd need to look at --

5         Q.    -- in what you've actually

6    supported?

7         A.    No.  We look at the front.

8    I told you some of the things -- the list

9    of things that I relied upon is in the

10   front too.

11        Q.    Okay.

12        A.    General categories is what

13   you're looking for.

14        Q.    All right.  I'm going to try

15   to wrap it up here.

16             On Page 49 in the section on

17   Euclid Family Pharmacy.

18        A.    Okay.

19        Q.    Are you there?

20        A.    I think so.

21        Q.    You make reference to a

22   Timothy Williams, a licensed Ohio

23   pharmacist in the first paragraph.

24             Do you see that?

1      A.     Yes.

2      Q.     Do you have any idea whether

3   Mr. Williams is still licensed?

4      A.     No, ma'am, I don't.

5      Q.     Do you have any idea whether

6   Mr. Williams has ever been disciplined?

7      A.     No, ma'am, I don't.

8      Q.     Turn to Page 50, please.  In

9   the very last sentence on Page 50, you

10  make a reference to Dr. Patel.

11             Do you see that?

12     A.     I do see the reference to

13  Dr. Patel.

14     Q.     Do you know whether

15  Dr. Patel has ever lost his license?

16     A.     Again, I do not.  But it was

17  not germane to this discussion.  But what

18  we're talking about here is the fact that

19  80 percent of the oxycodone prescriptions

20  for that period of time were coming from

21  a single physician.  That should have

22  triggered a red flag with somebody.

23  Somebody should have done some digging.

24     Q.     Do you know --

Highly Confidential - Subject to Further Confidentiality Review

1        A.     That's all I'm saying.

2        Q.     Do you know whether

3   Dr. Patel was ever disciplined?

4        A.     No, Counselor.  But, again,

5   it wasn't germane to the discussion,

6   again, as we talked about.  What we're

7   talking about is the percentage of

8   business coming in from a single doctor

9   should have triggered somebody to look.

10       Q.     Can you look at Exhibit 5

11  for me, please.

12       A.     Yep.

13       Q.     Turn if you would, please,

14  to Page 22.

15       A.     Page 22.

16       Q.     Are you there?  This is a

17  section entitled "Wholesale

18  Distributors."

19              Do you see that?

20       A.     I do.

21       Q.     It says -- this is the

22  suspicious order task force report from

23  1998, correct, sir?

24       A.     That's what it appears to

1    be, yes.

2         Q.    You talk about this report

3    in your report?

4         A.    Briefly, yes.

5         Q.    Page 22 says that, "The

6    suspicious orders task force recommends

7    that those in the wholesale drug

8    distribution supply chain who are able to

9    use the DEA-approved suspicious order

10   monitoring system in use by wholesale

11   drug distributors for controlled

12   substances as enhanced by the task force

13   in Appendix A, Exhibit 2, for the

14   reporting of potentially suspicious

15   orders of listed chemicals, including

16   ephedrine, pseudoephedrine, and

17   phenylpropylamine," correct?

18        A.    Yes.

19        Q.    Then it goes on to say that,

20   "DEA will be responsible, upon subsequent

21   industry request, for providing certain

22   other data necessary to support the

23   baseline suspicious order monitoring

24   system for listed chemicals analogous to

1  that that's currently in use to monitor

2  controlled substance orders."  Correct,

3  sir?

4       A.    Yes, I see that.

5             MR. BOGLE:  Object to form.

6       I think you've missed some words

7       there.  But go ahead.

8  BY MS. SWIFT:

9       Q.    Then it says, "For

10 registrants in this supply chain who do

11 not choose to use this data" -- and I'm

12 skipping ahead -- "other DEA approved

13 methods will be used to identify orders

14 which could be considered excessive or

15 suspicious."  Correct?

16      A.    I'm sorry, Counselor, can

17 you go back again?  Because you -- by

18 skipping words, I'm not sure -- you

19 had --

20      Q.    I'll just read the sentence.

21      A.    That'd be great.

22      Q.    "For registrants in this

23 supply chain who do not choose to use

24 this data, customer and customer category

1    average purchases or other DEA-approved

2    methods will be used to identify orders

3    which could be considered excessive or

4    suspicious."

5              That's what it says?

6         A.    Yes, that's what it says.

7         Q.    Then it says, "This is

8    basically what is done for Schedules II

9    through V controlled substances, for

10   which base code ingredient and/or gram

11   weight equivalent information is not

12   available from DEA," correct?

13        A.    That's, again, what it says.

14        Q.    All right.  I have I think

15   one more question for you.  I'm going to

16   mark the Chemical Handler's Manual as

17   Exhibit 13.

18             (Document marked for

19        identification as Exhibit

20        Whitelaw-13.)

21   BY MS. SWIFT:

22        Q.    I'll hand you a copy of it.

23             You testified earlier today

24   that the Chemical Handler's Manual

1    instructs registrants to block orders.

2    I'd like you to tell me where.

3          A.    All right.  I'll read it for

4    you and find it for you, Counselor.

5                MS. SWIFT:  I'll note for

6          the record that we've been looking

7          for, I don't know, a minute or

8          two.  It's 7:15 p.m.

9                THE WITNESS:  This is the

10         section that you're looking for,

11         Counselor, is on 19.

12   BY MS. SWIFT:

13         Q.    Tell me what you're

14   referring to.

15         A.    I'm referring to the

16   paragraph that starts, "When a regulated

17   person suspects that an order may be

18   intended for illicit purposes, good

19   practice requires that every reasonably

20   effort" -- "every reasonable effort be

21   made to resolve those suspicions."

22         Q.    Okay.  Thank you.

23               MR. BOGLE:  Are you done?

24               THE WITNESS:  No, I was not.

Highly Confidential - Subject to Further Confidentiality Review

1      MR. BOGLE:  Then keep

2  reading.

3      THE WITNESS:  "In addition

4  to making the required reports,

5  the transaction should not be

6  completed until the customer is

7  able to eliminate the suspicions.

8  The distributor may have to forgo

9  some transactions.  When DEA

10  reviews the distributor decisions,

11  minor events are not cause for

12  government action.  At the same

13  time, a regulated person who fails

14  to implement a system to prevent

15  diversion will be closely

16  scrutinized and, if warranted, may

17  be subject to civil,

18  administrative, and criminal

19  penalties."

20  BY MS. SWIFT:

21      Q.   It is -- is it your

22  testimony that everything that's in the

23  Chemical Handler's Manual applies to

24  distributors of controlled substances?

Highly Confidential - Subject to Further Confidentiality Review

1            MR. BOGLE:  Object to form.

2            THE WITNESS:  I'm saying

3       that everything in the Chemical

4       Handler's Manual should be taken

5       into account and factored in to an

6       effective compliance program.

7            Again, what you all have

8       been complaining about is you

9       don't have enough guidance.  I

10      would say that this is pretty

11      clear guidance of what is being

12      expected.

13           MS. SWIFT:  I don't have any

14      further questions.

15           THE VIDEOGRAPHER:  Going off

16      the record at 7:18 p.m.

17           (Brief recess.)

18           THE VIDEOGRAPHER:  We are

19      back on the record at 7:19 p.m.

20                -  -  -

21           EXAMINATION

22                -  -  -

23   BY MS. FINCHER:

24           Q.    Great.  Dr. Whitelaw, good

1    evening.  My name is Lauren Fincher, and

2    I represent Henry Schein Inc. and Henry

3    Schein Medical Systems, Inc.

4              And I think this should be

5    very quick so we can get you out of here.

6              Dr. Whitelaw, do you have

7    any opinions regarding Henry Schein,

8    Inc.?

9         A.    Counselor, no, I do not.

10   I -- I did not finish my work on -- or

11   finish work on Henry Schein to formulate

12   those opinions.

13        Q.    And, Dr. Whitelaw, I

14   appreciate that.  And I understand from

15   your earlier testimony that you made a

16   pitch for Henry Schein work while you

17   were at Deloitte, correct?

18        A.    Yes, Counselor, that is

19   correct.

20        Q.    And is that what you were

21   referring to a moment ago?

22        A.    No.  I was referring to the

23   fact that it wasn't -- Henry Schein was

24   not one of the defendants I looked at for

Highly Confidential - Subject to Further Confidentiality Review

1    the basis for this report.  And,

2    therefore, I haven't come to no

3    conclusions about your suspicious order

4    monitoring program.  That -- that's what

5    I thought you were asking.

6         Q.    It is.  So just to confirm,

7    Dr. Whitelaw, you don't have any opinions

8    regarding Henry Schein Inc., correct?

9         A.    Not at this moment in time

10   that pertain to the work that I did in

11   this report, no.

12        Q.    And do you have any opinions

13   regarding Henry Schein Medical Systems

14   Inc.?

15        A.    Again, same -- same answers

16   to the questions, Counselor.  I didn't --

17   you know, they are not included in this

18   report, therefore, I'm not going to draw

19   any opinions.  I have no opinions to

20   draw.

21        Q.    Okay.  Great.

22             MS. FINCHER:  Thank you.

23        That's all the questions I have.

24             THE VIDEOGRAPHER:  Going off

Highly Confidential - Subject to Further Confidentiality Review

```
1              the record at 7:21 p.m.
2                   (Excused.)
3                   (Deposition adjourned at
4         approximately 7:21 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

1

2                    CERTIFICATE

3

4

5          I HEREBY CERTIFY that the
    witness was duly sworn by me and that the
6   deposition is a true record of the
    testimony given by the witness.

7

           It was requested before
8   completion of the deposition that the
    witness, DR. SETH B. WHITELAW , have the
9   opportunity to read and sign the
    deposition transcript.

10

11

12          _Michelle L Gray_____
    MICHELLE L. GRAY,
13  A Registered Professional
    Reporter, Certified Shorthand
14  Reporter, Certified Realtime
    Reporter and Notary Public
15  Dated:  May 17, 2019

16

17

18          (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)

23

24

Highly Confidential - Subject to Further Confidentiality Review

1                  INSTRUCTIONS TO WITNESS

2

3                  Please read your deposition

4    over carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8                     After doing so, please sign

9    the errata sheet and date it.

10                     You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14                     It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1                    -   -   -   -   -   -

                    E  R  R  A  T  A

2                    -   -   -   -   -   -

3

4     PAGE   LINE   CHANGE

5    _____  _____   _____

6        REASON: _____

7    _____  _____   _____

8        REASON: _____

9    _____  _____   _____

10       REASON: _____

11   _____  _____   _____

12       REASON: _____

13   _____  _____   _____

14       REASON: _____

15   _____  _____   _____

16       REASON: _____

17   _____  _____   _____

18       REASON: _____

19   _____  _____   _____

20       REASON: _____

21   _____  _____   _____

22       REASON: _____

23   _____  _____   _____

24       REASON: _____

Highly Confidential - Subject to Further Confidentiality Review

1

2                    ACKNOWLEDGMENT OF DEPONENT

3

4              I,_____, do

5    hereby certify that I have read the

6    foregoing pages, 1 - 523, and that the

7    same is a correct transcription of the

8    answers given by me to the questions

9    therein propounded, except for the

10   corrections or changes in form or

11   substance, if any, noted in the attached

12   Errata Sheet.

13

14

15   _____

16    DR. SETH B. WHITELAW                    DATE

17

18

19   Subscribed and sworn
     to before me this

20   _____ day of _____, 20_____.

21   My commission expires:_____

22

     _____

23   Notary Public

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          LAWYER'S NOTES

 2       PAGE    LINE

 3       _____   _____    _____

 4       _____   _____    _____

 5       _____   _____    _____

 6       _____   _____    _____

 7       _____   _____    _____

 8       _____   _____    _____

 9       _____   _____    _____

10       _____   _____    _____

11       _____   _____    _____

12       _____   _____    _____

13       _____   _____    _____

14       _____   _____    _____

15       _____   _____    _____

16       _____   _____    _____

17       _____   _____    _____

18       _____   _____    _____

19       _____   _____    _____

20       _____   _____    _____

21       _____   _____    _____

22       _____   _____    _____

23       _____   _____    _____

24       _____   _____    _____
```