Highly Confidential - Subject to Further Confidentiality Review

1           IN THE UNITED STATES DISTRICT COURT
2           FOR THE NORTHERN DISTRICT OF OHIO
3                   EASTERN DIVISION
4                       -  -  -
5

6   IN RE:  NATIONAL          :   HON. DAN A.
    PRESCRIPTION OPIATE       :   POLSTER
    LITIGATION                :
7                             :   MDL NO. 2804
    APPLIES TO ALL CASES      :
8                             :   CASE NO.
                              :   17-MD-2804
9                             :
10          - HIGHLY CONFIDENTIAL -
11   SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
12                   VOLUME II
13                      -  -  -
14               May 17, 2019
15                      -  -  -
16           Continued videotaped
    deposition of DR. SETH B. WHITELAW, taken
17   pursuant to notice, was held at the
    offices of Golkow Litigation Services,
18   One Liberty Place, 1650 Market Street,
    Philadelphia, Pennsylvania, beginning at
19   8:31 a.m., on the above date, before
    Michelle L. Gray, a Registered
20   Professional Reporter, Certified
    Shorthand Reporter, Certified Realtime
21   Reporter, and Notary Public.
22                      -  -  -
23           GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
24              deps@golkow.com

```
 1     APPEARANCES:
 2

       LEVIN PAPANTONIO THOMAS
 3     MITCHELL RAFFERTY & PROCTOR, PA
       BY:  BRANDON L. BOGLE, ESQ.
 4     316 South Baylen Street
       Suite 600
 5     Pensacola, Florida 32502
       (888) 435-7001
 6     bbogle@levinlaw.com
 7            - and -
 8     WEISMAN KENNEDY & BERRIS CO LPA
       BY:  DANIEL P. GOETZ, ESQ.
 9     1600 Midland Building
       101 W. Prospect Avenue
10     Cleveland, Ohio 44115
       (216) 781-1111
11     Dgoetz@weismanlaw.com
12            - and -
13     KELLER ROHRBACK, LLP
       BY:  DEAN N. KAWAMOTO, ESQ.
14     1201 Third Avenue
       Suite 3200
15     Seattle, Washington 98101
       dkawamoto@kellerrohrback.com
16     Representing the Plaintiffs
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES:  (Cont'd.)
 2

 3   COVINGTON & BURLING, LLP
     BY:  MEGHAN E. MONAGHAN, ESQ.
     850 Tenth Street, NW
 4   Suite 586N
     Washington, D.C. 20001
 5   mmonaghan@cov.com
     (202) 662-5110
 6   Representing the Defendant, McKesson
     Corporation
 7

 8   JONES DAY
     BY:  CLAIRE E. CASTLES, ESQ.
 9   555 South Flower Street
     Fiftieth Floor
10   Los Angeles, California 90071
     (213) 489-3939
11   Ccastles@jonesday.com
     Representing the Defendant, Walmart
12

13   REED SMITH, LLP
     BY:  SHANNON E. McCLURE, ESQ.
14   BY:  JEFFREY R. MELTON, ESQ.
     Three Logan Square
15   1717 Arch Street, Suite 3100
     Philadelphia, Pennsylvania 19103
16   (215) 851-8226
     smcclure@reedsmith.com
17   jmelton@reedsmith.com
     Representing the Defendant,
18   AmerisourceBergen Drug Corporation
19

20   BARTLIT BECK, LLP
     BY:  KATHERINE M. SWIFT, ESQ.
21   54 West Hubbard Street
     Chicago, Illinois 60654
22   (312) 494-4440
     katherine.swift@bartlit-beck.com
23   Representing the Defendant, Walgreens
24
```

```
 1   APPEARANCES:  (Cont'd.)
 2
     WILLIAMS & CONNOLLY, LLP
 3   By:  JENNIFER G. WICHT, ESQ.
     BY:  JOSHUA D. TULLY, ESQ.
 4   725 12th Street, NW
     Washington, D.C. 20005
 5   (202) 434-5148
     jwicht@wc.com
 6   jtully@wc.com
     Representing the Defendant, Cardinal
 7   Health
 8
     ROPES & GRAY, LLP
 9   BY:  WILLIAM DAVISON, ESQ.
     BY:  CASSANDRA A. LARUSSA, ESQ.
10   Prudential Tower
     800 Boylston Street
11   Boston, Massachusetts 02199
     (617) 951-7000
12   william.davison@ropesgray.com
     cassandra.larussa@ropesgray.com
13   Representing the Defendant,
     Mallinckrodt
14
15   TUCKER ELLIS, LLP
     BY:  JUSTIN E. RICE, ESQ.
16   950 Main Avenue, Suite 1100
     Cleveland, Ohio 44113
17   (216) 696-3670
     justin.rice@tuckerellis.com
18   Representing the Defendant, Janssen and
     Johnson & Johnson
19
20   BARNES & THORNBURG, LLP
     BY:  WILLIAM A. HAHN, ESQ.
21   11 South Meridian Street
     Indianapolis, Indiana 46204
22   (317) 236-1313
     William.hahn@btlaw.com
23   Representing the Defendant, H.D. Smith
24
```

```
 1    APPEARANCES:  (Cont'd.)
 2

 3    MARCUS & SHAPIRA, LLP
      BY:  BENJAMIN A. KIFT, ESQ.
      One Oxford Centre, 35th Floor
 4    Pittsburgh, Pennsylvania 15219
      (412) 338-4683
 5    Kift@marcus-shapira.com
      Representing the Defendant, HBC
 6    Service Company
 7

 8    DECHERT, LLP
      BY:  JACQUELINE D. HARRINGTON, ESQ.
      Three Bryant Park
 9    1095 Avenue of the Americas
      New York, New York 10036
10    (212) 698-3500
      jacqueline.harrington@dechert.com
11    Representing the Defendant, Purdue
      Pharmaceuticals
12

13    FOLEY & LARDNER, LLP
      BY:  ANA M. FRANCISCO, ESQ.
14    111 Huntington Avenue, Suite 2500
      Boston, Massachusetts 02199
15    (617) 502-3281
      afrancisco@foley.com
16    Representing Actavis Laboratories
      UT, Inc., Actavis Pharma, Inc.,
17    ANDA, Inc., and Actavis, Inc.,
      (n/k/a Allergan Finance, LLC, Watson
18    Laboratories, Inc.)
19

20    ARNOLD & PORTER KAYE SCHOLER, LLP
      BY:  ALLISON B. RUMSEY, ESQ.
      601 Massachusetts Avenue, NW
21    Washington, D.C. 20001
      (202) 942-5095
22    allison.rumsey@arnoldporter.com
      Representing the Defendants, Endo Health
23    Solutions Endo Pharmaceuticals, Inc.; Par
      Pharmaceutical Companies, Inc. f/k/a Par
24    Pharmaceutical Holdings, Inc.
```

```
 1    APPEARANCES:  (Cont'd.)

 2

 3    KIRKLAND & ELLIS, LLP
      BY:  ERICA B. ZOLNER, ESQ.
 4    300 North LaSalle Street
      Chicago, Illinois 60654
 5    (312) 862-3247
      erica.zolner@kirkland.com
 6    Representing the Defendant, Allergan
      Finance

 7

 8    ZUCKERMAN SPAEDER, LLP
      BY:  PAUL B. HYNES, JR., ESQ.
 9    1800 M. Street NW, Suite 1000
      Washington, D.C. 20036
10    (202) 778-1845
      phynes@zuckerman.com
11    Representing the Defendant, CVS

12

      MORGAN, LEWIS & BOCKIUS, LLP
13    BY:  MELISSA M. COATES, ESQ.
      200 S. Biscayne Boulevard
14    Suite 5300
      Miami, Florida 33131-2339
15    (305) 415-3413
      melissa.coates@morganlewis.com
16    Representing the Defendants, Teva
      Pharmaceuticals, Inc. Cephalon Inc,
17    Watson Laboratories, Actavis LLC, Actavis
      Pharma, Inc.

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    TELEPHONIC/STREAMING APPEARANCES:
 2

      MOTLEY RICE, LLC
 3    BY:  AMANDA UNTERREINER, ESQ.
      401 9th Street, NW
 4    Suite 1001
      Washington, D.C. 20004
 5    (202) 386-9626
      aunterreiner@motleyrice.com
 6

             - and -
 7

      BARON & BUDD, P.C.
 8    BY:  JAY LICHTER, ESQ.
      Encino Plaza
 9    15910 Ventura Boulevard
      Suite 1600
10    Encino, California 91436
      (818) 839-2333
11    jlichter@baronbudd.com
      Representing the Plaintiffs
12

13    BRANSTETTER, STRANCH & JENNINGS, PLLC
      BY:  TRICIA HERZFELD, ESQ.
14    223 Rosa L. Parks Avenue
      Suite 200
15    Nashville, Tennessee 37203
      (615) 254-8801
16    Triciah@bsjfirm.com
      Representing the Tennessee Plaintiffs
17

18

19

20

21

22

23

24
```

 1   TELEPHONIC/STREAMING APPEARANCES:
     (Cont'd.)
 2

 3

     WILLIAMS & CONNOLLY, LLP
 4   BY:  MIRANDA PETERSEN, ESQ.
     725 12th Street, NW
 5   Washington, D.C. 20005
     (202) 434-5148
 6   mpetersen@wc.com
     Representing the Defendant, Cardinal
 7   Health

 8

     ROPES & GRAY, LLP
 9   BY:  FEIFEI (ANDREA) REN, ESQ.
     1211 Avenue of the Americas
10   New York, NY 10036
     (212) 596-9303
11   andrea.ren@ropesgray.com
     Representing the Defendant,
12   Mallinckrodt

13

     KIRKLAND & ELLIS, LLP
14   BY:  KAITLYN COVERSTONE, ESQ.
     300 North LaSalle Street
15   Chicago, Illinois 60654
     (312) 862-7184
16   kaitlyn.coverstone@kirkland.com
     Representing the Defendant, Allergan
17   Finance

18

19

20

21

22

23

24

```
 1   TELEPHONIC/STREAMING APPEARANCES:
     (Cont'd.)
 2

 3   FOLEY & LARDNER, LLP
     BY:  KATY E. KOSKI, ESQ.
 4   111 Huntington Avenue, Suite 2500
     Boston, Massachusetts 02199
 5   (617) 502-3281
     Kkoski@foley.com
 6   Representing Actavis Laboratories
     UT, Inc., Actavis Pharma, Inc.,
 7   ANDA, Inc., and Actavis, Inc.,
     (n/k/a Allergan Finance, LLC, Watson
 8   Laboratories, Inc.)

 9

     FOX ROTHSCHILD, LLP
10   BY:  ZACHARY MARTIN, ESQ.
     2700 Kelly Road
11   Suite 300
     Warrington, Pennsylvania 18976
12   (215) 918-3680
     Zmartin@foxrothschild.com
13   Representing the Defendant, Prescription
     Supply Inc.
14

15   MORGAN LEWIS & BOCKIUS, LLP
     BY:  CATHERINE ESCHBACH, ESQ.
16   1000 Louisiana Street, Suite 4000
     Houston, Texas 77002
17   (713) 890-5719
     Catherine.eschbach@morganlewis.com
18   Rite Aid of Maryland, Inc., doing
     business as Mid-Atlantic Customer Support
19   Center

20

     LOCKE LORD, LLP
21   BY:  LAUREN MORGAN FINCHER, ESQ.
     600 Congress Avenue, Suite 2200
22   Austin, Texas 78701
     (512) 305-4843
23   lfincher@lockelord.com
     Representing the Defendant, Henry Schein
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   TELEPHONIC/STREAMING APPEARANCES:
     (Cont'd.)
 2

 3   BAILEY WYANT PLLC
     BY:  MICHAEL W. TAYLOR, ESQ.
 4   500 Virginia Street East
     Suite 600
 5   Charleston, West Virginia 25301
     (304) 345-4222
 6   mtaylor@baileywyant.com
     Representing the Defendant, West
 7   Virginia Board of Pharmacy
 8
     CAVITCH FAMILO & DURKIN, CO., L.P.A.
 9   BY:  ROBERT WEST, ESQ.
     1300 E. 9th Street
10   Cleveland, Ohio 44114
     rwest@cavitch.com
11   (216) 621-7860
     Representing the Defendant,
12   Discount Drug Mart
13
     ALSO PRESENT:
14
15   Brianna Poff - Paralegal
     Cody Hartzog - Paralegal
16   (Levin Papantonio)
17
     VIDEOTAPE TECHNICIAN:
18   David Lane
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                         -   -   -
 2                     I N D E X
 3                         -   -   -
 4
     Testimony of:
 5                           DR. SETH B. WHITELAW
 6          By Ms. Wicht                    539
 7          By Mr. Melton                   645
 8          By Mr. Hynes                    707
 9          By Mr. Davison                  821
10          By Mr. Bogle                    992
11
                         -   -   -
12
                     E X H I B I T S
13
                         -   -   -
14
15   NO.            DESCRIPTION              PAGE
16   Whitelaw-14    Hearing Before the       578
                    US House of Reps
17                  Committee on Energy
                    5/8/18
18                  (Barrett)
19   Whitelaw-15    Excerpt of Transcript 587
                    Of Steve Reardon
20                  11/30/18
21   Whitelaw-16    Excerpt of Transcript 589
                    Of William De Gutierrez
22                  Mahoney, 11/28/18
23   Whitelaw-17    Settlement & Release    675
                    Agreement
24                  ABDCMDL00279854-65
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -  -  -
 2            E X H I B I T S  (Cont'd.)
 3                      -  -  -
 4
 5     NO.            DESCRIPTION              PAGE
 6     Whitelaw-18   E-mail Thread            769
                     1/18/11
 7                   Subject, Control IRR
                     Dated 1/18/11
 8                   CVS-MDLT1-000101073
 9     Whitelaw-19   E-mail Thread            801
                     2/7/14
10                   Subject, Control/PSE
                     IRR
11                   CVS-MDLT1-000008496-99
12     Whitelaw-20   E-mail Thread            805
                     12/10/13
13                   Subject, Control/PSE
                     IRR
14                   CVS_MDLT1-000008483-87
15     Whitelaw-21   Appendix I: List of     822
                     Materials Considered
16
17     Whitelaw-22   E-mail Thread            868
                     12/1/10
18                   Subject, Additional
                     Feedback from Albany
19                   DEA on Mallinckrodt's
                     SOM Activities
20                   MNK-T1_0000372132
21     Whitelaw-23   Distinct Mallinckrodt 927
                     Documents Considered
22                   By Seth Whitelaw, Per Year
                     (Demonstrative)
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    -  -  -
2           E X H I B I T S  (Cont'd.)
3                    -  -  -
4
5   NO.            DESCRIPTION           PAGE
6   Whitelaw-24  Mallinckrodt            951
                 Handwritten
7                Notes, by Dr.
                 Whitelaw
8
9   Whitelaw-25  E-mail Thread,          952
                 11/14/11
10               Subject, Mallinckrodt
                 Suspicious Order
11               Monitoring
                 MNK-T1_0007711276-81
12
    Whitelaw-26  Notes from Meeting      956
13               At DEA St. Louis Office
                 11/1/10
14               MNK-T1_0000421974-75
15  Whitelaw-27  Letter, 12/20/07        989
                 From Rannazzisi
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    -   -   -

2              DEPOSITION SUPPORT INDEX

3                    -   -   -

4

5    Direction to Witness Not to Answer

6    PAGE    LINE
     None.

7

8    Request for Production of Documents

9    PAGE    LINE
     None.

10

11   Stipulations

12   PAGE    LINE
     None.

13

14   Questions Marked

15   PAGE    LINE
     None.

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -

 2             THE VIDEOGRAPHER:  Back on

 3       the record.

 4             My name is David Lane,

 5       videographer for Golkow Litigation

 6       Services.

 7             Today's date is May 17,

 8       2019, and our time is 8:31 a.m.

 9             This deposition is taking

10       place in Philadelphia,

11       Pennsylvania, in the matter of

12       National Prescription Opiate

13       Litigation MDL.

14             Our deponent today is

15       Dr. Seth Whitelaw.

16             Our counsel will be noted on

17       the stenographic record.

18             The court reporter today is

19       Michelle Gray.

20             Dr. Whitelaw, I just want to

21       remind you, you're still under

22       oath from yesterday.

23             THE WITNESS:  I understand.

24
```

Highly Confidential - Subject to Further Confidentiality Review

1                    -   -   -

2                ... DR. SETH B. WHITELAW,

3        having been previously sworn, was

4        examined and testified as follows:

5                    -   -   -

6            THE VIDEOGRAPHER: Please

7        begin.

8            MS. WICHT:  Good morning.

9            MR. BOGLE:  Before -- you

10       asked, I think, yesterday for

11       Figure 2 to be blown up from Page

12       43.  I've got five copies of that

13       here.

14           MS. WICHT:  Thank you.

15                   -   -   -

16             EXAMINATION

17                   -   -   -

18   BY MS. WICHT:

19       Q.    Okay.  Good morning,

20   Dr. Whitelaw?

21       A.    Good morning.

22       Q.    My name is Jennifer Wicht,

23   and I represent Cardinal Health.  I'm

24   going to be the first one asking you

1    questions this morning.

2          A.    Good morning, Jennifer.

3          Q.    It's nice to meet you.  So I

4    want to start, Dr. Whitelaw, by asking

5    you a couple of questions to make sure

6    that I understand the scope of your

7    opinions that you're offering about

8    Cardinal Health in your reports.  Okay?

9          A.    Okay.

10         Q.    So first of all,

11   Dr. Whitelaw, you are not offering any

12   opinions about any specific methodology

13   that Cardinal Health -- you believe

14   Cardinal Health should have used to

15   identify suspicious orders, correct?

16               MR. BOGLE:  Object to form.

17               THE WITNESS:  Could you be a

18        little more specific with that?

19        Because I'm not sure where you --

20        what you mean by methodology.

21   BY MS. WICHT:

22         Q.    Do you understand that there

23   are a variety of different ways that a

24   registrant could identify suspicious

Highly Confidential - Subject to Further Confidentiality Review

1    orders by -- placed by their customers?

2         A.    Are we talking about

3    thresholds?  Are we talking about

4    systems?  Again, methodology is a very

5    broad term in the world that I work in.

6    I need you to be -- I'm not trying to be

7    difficult.  Could you be a little more

8    precise.

9         Q.    Sure.  For example, a

10   registrant could use a methodology like

11   thresholds.  A registrant could use a

12   methodology that tracked growth over

13   time.  A registrant could use a variety

14   of different calculations or

15   methodologies in order to try to identify

16   suspicious orders, correct?

17        A.    That is correct.

18        Q.    And you are not offering an

19   opinion as to what particular methodology

20   or any particular methodology Cardinal

21   Health should have used --

22        A.    No, I'm not --

23        Q.    -- to identify suspicious

24   orders?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      -- offering an opinion--

2                  MR. BOGLE:  Just let her

3          finish.

4                  THE WITNESS:  Sorry.

5                  -- on a particular

6          methodology as the way that you've

7          just defined it.

8    BY MS. WICHT:

9          Q.      Thank you.  And you're not

10   offering any opinions about any

11   particular orders that were placed with

12   Cardinal Health that you believe in your

13   opinions were suspicious and not reported

14   to DEA, correct?

15                 MR. BOGLE:  Object to form.

16                 THE WITNESS:  Again, I think

17         we need to narrow what you're

18         asking, because I'm not sure.  You

19         are asking a very broad question.

20         Can we narrow it?

21   BY MS. WICHT:

22         Q.      Have you identified -- do

23   you have -- have you identified any

24   specific order placed by a customer to

1    Cardinal Health that you opine is

2    suspicious and should have been reported

3    to DEA but was not?

4                    MR. BOGLE:  Object to form.

5                    THE WITNESS:  Again, as I

6           mentioned yesterday, and I'll

7           reiterate for you today.  I am a

8           process and procedures and

9           compliance expert.  What I'm

10          looking at is, what did you guys

11          write down?  Did you follow it?

12          Is there a rationale behind the

13          decisions that were made and does

14          that rationale make any kind of

15          sense?  But that's what I'm

16          working on.

17   BY MS. WICHT:

18          Q.    So I understand that, and

19   you mentioned yesterday that you're

20   focused on process.  And I appreciate

21   that.

22                    What I'm trying to get at

23   now, Dr. Whitelaw, is the question of

24   whether -- and certainly you found flaws

1    in Cardinal Health's suspicious order

2    monitoring processes, correct?

3         A.    Yes, I did.

4         Q.    And we're going to -- we're

5    going to get into those.  But what I'm

6    trying to get to now is the question of

7    whether you identified whether those, in

8    your opinion, flawed processes, whether

9    you identified specific results that you

10   contend were improper?

11             MR. BOGLE:  Object to form.

12   BY MS. WICHT:

13        Q.    So my question is, are there

14   any particular orders that were placed

15   with Cardinal Health that you opine were

16   suspicious and were not reported to DEA?

17             MR. BOGLE:  Object to form.

18             THE WITNESS:  I am going to

19        go back to the four corners.

20        Again I'm not quite sure what

21        you're trying to -- trying to ask

22        me, because it seems to me to be a

23        two part question.

24             I saw orders that Cardinal

Highly Confidential - Subject to Further Confidentiality Review

1          Health should have investigated

2          further and didn't see any

3          investigation on it.

4    BY MS. WICHT:

5          Q.   Can you identify for me any

6    particular order placed by a Cardinal

7    Health customer that Cardinal Health, in

8    your opinion, should have reported to DEA

9    as suspicious and did not?

10         MR. BOGLE:  Object to form.

11         Asked and answered.

12         THE WITNESS:  Again, as I

13         said, I identified orders that I

14         saw that should have generated

15         additional due diligence.  And

16         what I saw was that that due

17         diligence was not there.

18   BY MS. WICHT:

19         Q.   If you had identified

20   specific orders, an order placed by X

21   customer on Y date, would those be

22   included in your report?

23         I'm sorry, let me -- let me

24   rephrase that.

1          If you had identified

2     particular -- a particular order that you

3     believed was suspicious and should have

4     been reported to DEA and was not, would

5     that be reflected in your report?

6          A.    Again, I am here as a

7     compliance expert, not drawing legal

8     conclusions.  So again I'm not sure what

9     you're asking me.

10         Q.    Can you identify for me any

11    order placed by any customer to Cardinal

12    Health that you believe was suspicious

13    and was not reported to DEA?

14              MR. BOGLE:  If you need to

15         refer to your report, you can.

16              THE WITNESS:  Let's go

17         through the report.  We can go

18         through the report and look at the

19         examples that are cited in my

20         report.  And I'm going to say --

21         and I'm going to offer you the

22         same answer that I gave you

23         before, which is I saw things that

24         should have generated additional

Highly Confidential - Subject to Further Confidentiality Review

1          inquiry by Cardinal Health.  I did

2          not see the additional inquiry

3          being done.

4     BY MS. WICHT:

5          Q.    So, respectfully my time

6     this morning is limited.  So I'm not

7     going to take time to go through the

8     report with you right now.

9               But my question is, I take

10    it from your answer then, that if you --

11    to the extent you identified any

12    suspicious orders that you contend should

13    have been reported and were not, they

14    will be identified in your report; is

15    that correct?

16         A.    As I said yesterday, and I

17    will make it clear again.  The approach

18    to the report is very similar to an

19    audit.  There are examples in there

20    indicating, showing the pattern of

21    practice with regards to process and

22    failure to follow process.  That's what's

23    in my report.

24         Q.    And if there are no specific

Highly Confidential - Subject to Further Confidentiality Review

¹ orders by any Cardinal Health customers

² identified in your report as suspicious,

³ but not reported to DEA, then it's fair

⁴ to assume that you did not identify any,

⁵ correct?

⁶         MR. BOGLE:  Object to form.

⁷         THE WITNESS:  Again, let's

⁸     go through the report and take a

⁹     look at.  I'm still having --

¹⁰     struggling with your question.

¹¹     So, I'm sorry.

¹² BY MS. WICHT:

¹³     Q.   Are you offering any

¹⁴ opinions, Dr. Whitelaw, concerning the

¹⁵ specific thresholds that Cardinal Health

¹⁶ set for any particular customer?

¹⁷         MR. BOGLE:  Object to form.

¹⁸         THE WITNESS:  Am I offering

¹⁹     any opinions about the thresholds?

²⁰ BY MS. WICHT:

²¹     Q.   Are you --

²²     A.   I -- you -- can you be more

²³ specific please?

²⁴     Q.   Are -- yes.  Are you

1    offering any opinions about the

2    thresholds that Cardinal Health set for a

3    specific customer, in other words, are

4    you offering an opinion that the

5    threshold for a particular pharmacy was X

6    and it should have been X minus 100?

7              MR. BOGLE:  Object to form.

8    BY MS. WICHT:

9         Q.    Are you offering any

10   opinions of that nature with regard to

11   Cardinal Health?

12             MR. BOGLE:  Same objection.

13             THE WITNESS:  Again, as I've

14        tried to be clear, the opinions

15        I'm offering with regards to,

16        let's just take thresholds, would

17        have been what's the documentation

18        behind it to justify setting a

19        threshold at X.

20   BY MS. WICHT:

21        Q.    So I understand, you're --

22   you're -- you've made clear that what

23   you're talking about is process.

24             What I'm trying to get to,

1    sir, is the outcome of that process.

2              I understand you believe

3    Cardinal Health's process for setting and

4    adjusting thresholds had flaws, correct?

5         A.    Yes.

6         Q.    Have you identified any

7    threshold for any Cardinal Health

8    customer that you believe was

9    inappropriately set --

10        A.    Again --

11             MR. BOGLE:  Just wait --

12   BY MS. WICHT:

13        Q.    -- as a result of the

14   process flaws that you identified?

15        A.    Again, outside the setting

16   of the actual number on whether it's

17   right or wrong, is outside of the scope

18   of what I was asked to look at.

19        Q.    And you're not offering any

20   opinions as I understand it,

21   Dr. Whitelaw, that any particular

22   shipment of opioids by Cardinal Health

23   was, in fact, diverted, correct?

24        A.    Again, my limit, the limits

Highly Confidential - Subject to Further Confidentiality Review

1   that I was asked to do, was look at

2   process, and whether the process was

3   followed.  I am not drawing any legal

4   conclusions.  I am simply noting the

5   process flaws and issues with the

6   current -- with the process that I

7   observed.

8        Q.    I don't think I'm asking you

9   about any legal conclusions.  I'm asking

10  you whether, as a factual matter, there's

11  any shipment of opioids by Cardinal

12  Health that you are opining was, in fact,

13  diverted to illegitimate use.

14       A.    Again, you know the scope of

15  the report.  It was outside of the scope.

16  I was not looking at that.  I was looking

17  at the process and whether the process

18  was being followed.

19       Q.    Okay.  Now, your report,

20  sir, lays out a variety of ways that you

21  believe Cardinal Health's anti-diversion

22  program was not effective, correct?

23       A.    Yes.

24       Q.    And I take it from the

1    testimony that you gave yesterday, that

2    you would agree with the premise that

3    there is no one correct way to run an

4    anti-diversion program, correct?

5                MR. BOGLE:  Object to form.

6                THE WITNESS:  I would agree

7          with the premise that any

8          anti-diversion program needs to be

9          tailored to the individual

10         company, which is consistent with

11         my experience as a compliance

12         expert and certainly fits with the

13         guidance that I have seen from the

14         DEA and others.

15   BY MS. WICHT:

16         Q.   So anti-diversion systems or

17   practices, you would expect them to vary

18   from company to company, correct?

19         A.   I would expect them to be

20   tailored appropriately to the -- from

21   company to company.

22         Q.   And you would expect, even

23   the anti-diversion processes and systems

24   within one company to vary over time,

Highly Confidential - Subject to Further Confidentiality Review

1    correct?

2            MR. BOGLE:  Object to form.

3            THE WITNESS:  What do you

4        mean by "vary over time"?

5    BY MS. WICHT:

6        Q.    You would expect them to

7    change over time to account for changing

8    circumstances, correct?

9            MR. BOGLE:  Object to form.

10           THE WITNESS:  Well, to

11       clarify, I would expect to see if

12       they are going to change, that

13       there would be improvement over

14       time.

15   BY MS. WICHT:

16       Q.    So there's not, in your

17   opinion, one correct form for an

18   anti-diversion system against which you

19   compared Cardinal Health and found them

20   lacking, correct?

21           MR. BOGLE:  Object to form.

22   BY MS. WICHT:

23       Q.    That wasn't the nature of

24   the analysis that you did?

Highly Confidential - Subject to Further Confidentiality Review

1           MR. BOGLE:  Object to form.

2      Misstates testimony.

3           THE WITNESS:  Could you ask

4      the question again?  I lost the

5      train of thought.

6  BY MS. WICHT:

7      Q.    Sure.  You are not -- the

8  nature of your analysis was not to

9  compare Cardinal Health's anti-diversion

10 processes against one -- against a one

11 correct formula for a program and find

12 them wanting as compared to that one

13 correct formula, correct?

14          MR. BOGLE:  Objection.

15     Misstates the testimony.

16          You can answer.

17          THE WITNESS:  As I said,

18     there is -- the standard is the

19     same for having -- you have to

20     have an effective anti-diversion

21     program.  That is going -- how you

22     implement that will vary from

23     company to company.  It must be

24     tailored to the company.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MS. WICHT:

2        Q.    You testified yesterday

3    about companies speaking with the

4    regulators who oversee their activities.

5    Seeking guidance from the regulators who

6    oversee their activities.  Do you recall

7    that subject generally from yesterday?

8        A.    I do recall that subject

9    generally.

10       Q.    Okay.  And I believe you

11   testified that you were aware that some

12   of the registrants involved in this case

13   communicated with DEA from time to time

14   to seek input about suspicious order

15   monitoring, correct?

16       A.    I'd say that's a fair

17   characterization.

18       Q.    And I believe you also

19   testified yesterday that there's

20   nothing -- there's nothing improper about

21   that, correct, about communicating with

22   regulators and seeking guidance from

23   them?

24       A.    No.  There's nothing

1    improper about doing it.  As I said

2    before, good communication is important.

3         Q.    Okay.  So -- and I

4    understand that we had a discussion

5    yesterday about whether or not regulators

6    should respond to those types of

7    communications.  And I'm not going there.

8    I'm leaving that to the side.

9              My question for you, though,

10   is, if the regulator does respond and

11   provides information or guidance back to

12   the registrant, would you agree that the

13   registrant should be able to rely on

14   what's said to them by the regulator?

15             MR. BOGLE:  Objection.

16        Vague and overbroad.

17             THE WITNESS:  Could you be a

18        bit more precise, please?

19   BY MS. WICHT:

20        Q.    Sure.  So if, for example, a

21   registrant has a conversation with a

22   regulator about the nature of their

23   suspicious order monitoring systems, and

24   the regulator says, you're doing the

1    right thing, you're headed in the right

2    direction.

3                Do you agree that the

4    company should be able to rely on that

5    statement from the regulator?

6        A.    I think you're going to have

7    to give more context to what that

8    communication looks like before I can

9    give you a response.

10               Do you have a specific fact

11   pattern, or is there a document that

12   you'd like me to look at?

13       Q.    Well, should the

14   registrant -- when a registrant

15   communicates with DEA, are they entitled

16   to assume that DEA is not lying to them

17   in response?

18               MR. BOGLE:  Object to form.

19               THE WITNESS:  Again, can

20           we -- you're talking about all

21           communications, any kind of

22           contact.  I think we need to

23           narrow that field, and what in

24           particular are you looking at?  Do

Highly Confidential - Subject to Further Confidentiality Review

1    you have a particular fact pattern

2    that you'd like me to talk about?

3    Or is there a particular document

4    that you'd like me to work with?

5  BY MS. WICHT:

6    Q.    I'm talking about

7  communications with DEA concerning

8  suspicious order monitoring practices.

9    If a registrant has a

10  communication with DEA about their

11  suspicious order monitoring practices, is

12  the registrant entitled to rely on

13  whatever information or input DEA

14  provides back to them?

15    MR. BOGLE:  Object to form.

16    Vague and overbroad.

17    THE WITNESS:  All right.

18    Let me try to ask some questions

19    that might help me answer your

20    question.

21    Is there a particular person

22    or position that we are talking

23    about that communication

24    occurring?  Are we talking at the

Highly Confidential - Subject to Further Confidentiality Review

1    investigator level?  The district

2    office level?  Headquarters level?

3    When you say DEA, they employ a

4    large number of employees.  So I'm

5    having trouble figuring out what

6    you're really seeking information

7    on.

8  BY MS. WICHT:

9    Q.    Does it matter?  Are

10  registrants entitled to rely on

11  headquarters but not entitled to rely on

12  field agents or vice versa?

13    A.    I think as I tried to make

14  clear yesterday, policy -- when you're

15  looking for policy pronouncements, those

16  need to come from headquarters.  And

17  those usually do come from headquarters.

18        Again, it does happen.

19  People are people.  If you get something

20  that didn't make sense or the answer that

21  you get doesn't make sense compared to

22  what you know the policy is, then you

23  need to seek clarification up the chain

24  of command until you get a policy

1    response.

2         Q.    I want to talk about your

3    report for -- turn to your report,

4    Dr. Whitelaw, which is marked as

5    Exhibit 2.

6         A.    Is there a specific page?

7         Q.    On Page 45.

8         A.    I'm there.

9         Q.    In the last paragraph before

10   Section 8.2, you offered the opinion that

11   Cardinal Health, among other customers,

12   scored no higher than the midpoint of the

13   foundational level on your compliance

14   maturity and program effectiveness model,

15   correct?

16        A.    That's what I opined, yes.

17        Q.    When you offered that

18   opinion, are you -- does your opinion

19   relate to the suspicious order monitoring

20   program, the controlled substances

21   compliance program, or the corporate

22   compliance program as a whole?  And I'm

23   referring to the three components of your

24   Russian nesting dolls.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    And I would say it relates

2    to all three components because they're

3    all interrelated and all interconnected.

4    Q.    Okay.  So you're offering an

5    opinion about Cardinal Health's -- not

6    just Cardinal Health suspicious order

7    monitoring program, but also its

8    controlled substances compliance program

9    and its corporate compliance program,

10   correct?

11   A.    Again, as we've talked about

12   under the Russian nesting dolls, if

13   one -- you can't claim you have an

14   effective -- we'll start at the top of

15   the house.  You can't claim that you have

16   an effective corporate compliance program

17   if you do not have an effective

18   anti-diversion program, and if you do not

19   have an effective suspicious order

20   monitoring program.  They all nest

21   together.  They're all interrelated.

22   They're all interconnected.

23   Q.    So as part of your

24   evaluation of Cardinal Health's overall

Highly Confidential - Subject to Further Confidentiality Review

1  controlled substances compliance program,

2  did you make any evaluation of the

3  company's practices with respect to

4  physical security for opioids?

5      A.   Again, I was looking

6  primarily -- the focus was suspicious

7  order monitoring and moving from there.

8  So again, if the suspicious order

9  monitoring program is a problem, the

10  anti-diversion program is not a -- can't

11  be deemed to be effective, neither can

12  the corporate compliance program be

13  deemed effective.  That is the opinion

14  that I am offering.

15      Q.   Okay.  So then, I take it

16  from your answer then, that things

17  outside of the suspicious order

18  monitoring component of the controlled

19  substances compliance program, you did

20  not look at, correct?

21          MR. BOGLE:  Object to form.

22          THE WITNESS:  To your

23      specific question about whether I

24      looked at physical and vault

Highly Confidential - Subject to Further Confidentiality Review

1    security, I did not.

2    BY MS. WICHT:

3         Q.    Did you look at Cardinal

4    Health's compliance with regulations

5    related to security and transport of

6    opioids?

7         A.    I did not.  It was outside

8    of the scope of what I was asked to look

9    at.

10        Q.    Did you look at Cardinal

11   Health's practices with respect to theft

12   and loss of controlled substances?

13        A.    Again, it was not in the

14   scope of what I was asked to look at.

15        Q.    So what I'm trying to

16   understand versus going through all of

17   these individually, is that you did not

18   look at compliance practices and

19   processes outside of the suspicious order

20   monitoring function; is that correct?

21             MR. BOGLE:  Object to form.

22        Misstates the report.

23             THE WITNESS:  I think the

24        better way to characterize it, to

1            try to be helpful to you, is the

2            focus was on suspicious order

3            monitoring, as well as those

4            things in the anti-diversion

5            program and those in the corporate

6            compliance program that would bear

7            on it.

8                 Again, as I've said before,

9            this is an integrated system.  And

10           so trying to tease out one bucket

11           versus another bucket versus

12           another bucket, which is why the

13           diagram is drawn the way it is,

14           you cannot separate them from each

15           other.  They are an integrated

16           whole.

17     BY MS. WICHT:

18           Q.   So fair to say that you did

19     not evaluate practices or processes in

20     Cardinal Health's compliance program

21     except to the extent that they related to

22     suspicious order monitoring, correct?

23                 MR. BOGLE:  Object to form.

24                 THE WITNESS:  I think that

Highly Confidential - Subject to Further Confidentiality Review

1          misstated what I said to the

2          extent that it related to or

3          impacted on suspicious order

4          monitoring, I did evaluate those.

5     BY MS. WICHT:

6          Q.    Well, that's what I said.

7     To the extent that they related to

8     suspicious order monitoring.

9          A.    And I'm adding the term "or

10    impacted" to be precise with you.

11         Q.    Okay.  If you would turn to

12    Page 100 of your report, please.

13                This is your section that's

14    specific to Cardinal Health, correct?

15         A.    Yes.

16         Q.    And on Page 100 and 101 you

17    refer to a couple of enforcement actions

18    against Cardinal Health.  Do you recall

19    that?

20         A.    Yes, ma'am, I do recall

21    referring to those enforcement actions.

22         Q.    Now, none of the enforcement

23    actions against Cardinal Health that you

24    discuss occurred in Cuyahoga County or

1    Summit County, Ohio, correct?

2         A.    That is correct.

3         Q.    And none of the -- well, do

4    you know what -- which Cardinal Health

5    distribution center primarily served

6    Cuyahoga County and Summit County?

7         A.    I'd have to go back and look

8    at my report, but not off the top of my

9    head, I do not.

10        Q.    Okay.  If I tell you it was

11   Wheeling, West Virginia, does that sound

12   familiar to you or do you think that's

13   something that you were aware of?

14        A.    If you tell me Wheeling --

15   Wheeling, West Virginia, the name sounds

16   familiar, but again I cannot, without

17   doing more digging definitively answer

18   your question for you.

19        Q.    And are you aware that none

20   of the enforcement actions against

21   Cardinal Health that you refer to in your

22   report concern the Wheeling, West

23   Virginia, distribution center?

24             MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1                THE WITNESS:  Yes, I'm aware

2        of that.

3    BY MS. WICHT:

4        Q.    Now, you testified about

5    Section 10.2 of your report is the

6    executive summary as to Cardinal Health,

7    correct?

8        A.    Yes, that's what it states.

9        Q.    And if I understood your

10   testimony yesterday, this section is

11   basically an attempt to summarize,

12   provide an executive summary of the

13   detail regarding Cardinal Health that

14   follows in the rest of the section; is

15   that correct?

16       A.    I would say that is correct.

17       Q.    Okay.  And you -- so some of

18   your opinions that you summarize in the

19   executive summary about Cardinal Health,

20   one of your opinions is that Cardinal

21   Health was over reliant on technology in

22   controlled substances compliance efforts?

23       A.    May I ask -- may I ask where

24   you're reading from?

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Yes, sir.  Page 101.  The

2    first full paragraph on the page.

3    A.    I see the paragraph.  I'm

4    there.

5    Q.    And -- and one of your

6    opinions is that Cardinal Health's over

7    reliance on technology played a prominent

8    role in what you believe to be the

9    failure of its controlled substance

10   compliance program, correct?

11   A.    I believe it played a role,

12   yes.

13   Q.    And then if we go down to

14   the next paragraph below that, which is

15   just a one-sentence paragraph, you say,

16   "In the case of technology, Cardinal

17   placed a premium on its analytical

18   systems to detect suspicious orders and

19   potential diversion while neglecting the

20   importance of the human element and

21   making sense from the data outputs."

22   Do you see that?

23   A.    Yes, I do.

24   Q.    And that's your opinion?

1          A.     That is my opinion.

2          Q.     So I want to turn, sir, to

3     some of the detail about Cardinal Health

4     provided in your report.  And if you

5     would turn to Page 117, please.

6          A.     I'm there.

7          Q.     If you look at the second

8     paragraph on that page, you may recall we

9     talked about this a bit yesterday where

10    you identify the fact that Cardinal's

11    process doesn't define significantly

12    larger, significantly more frequent, and

13    significant deviation.  Are you with me?

14         A.     I'm there.

15         Q.     Okay.  And then you say, "In

16    all" -- at the end of that paragraph:

17    "In all three cases, the standard

18    operating procedure just required QRA

19    personnel to use available information

20    and experience to make reportability

21    determinations."

22              Do you see that?

23         A.     I do.

24         Q.     And if you look at the

Highly Confidential - Subject to Further Confidentiality Review

1    beginning of that section on the report,

2    it appears to me that the time frame that

3    your criticism is directed at is from

4    2008 through 2016.  Would you agree with

5    that?

6         A.    Where are you looking

7    please?

8         Q.    I'm looking at the beginning

9    of that Section B, "Threshold Events."

10   You say, "During this period Cardinal

11   Health implemented certain SOPs and they

12   ultimately retired them in 2016"?

13        A.    Could you restate -- could

14   you repeat -- repeat the question for me

15   please?

16        Q.    Sure.  So your criticism,

17   one of your criticisms on Page 117 is

18   that the SOP in your view was faulty in

19   that it required Cardinal Health's QRA

20   personnel to use available information

21   and experience to make decisions,

22   correct?

23             MR. BOGLE:  Object to form,

24        misstates the document.

1          THE WITNESS:  No, that's not

2     correct.

3          The issue wasn't the fact

4     that it asked the QA -- RA

5     personnel to use available

6     information and experience.  The

7     problem with the SOP is it doesn't

8     provide any kind of boundaries or

9     guidelines on what available

10    information to look -- look at and

11    how to make those decisions.  So

12    there's no decisionmaking

13    criteria.  There's no set of

14    documents to evaluate.  There's no

15    consistent process to be applied

16    which leads to inconsistency in

17    decisions between one person and

18    another person, if you don't

19    provide any sort of boundary lines

20    or goalposts.  That's -- that's

21    basic compliance work, is to try

22    to create consistency in the

23    systems.  You do that by putting

24    out criteria for people to follow,

Highly Confidential - Subject to Further Confidentiality Review

1    so that Person A and Person B

2    achieve the same outcome on the

3    same set of facts.

4  BY MS. WICHT:

5    Q.   Okay.  Well, so let's talk

6  about that, sir.  On Page 124 of your

7  report.  At the very top of the page, you

8  talk about some work instructions for

9  Cardinal Health anti-diversion personnel.

10    Do you see that, sir?

11    A.   I do.

12    Q.   And you fault the work

13  instructions, you find fault with the

14  work instructions for providing what you

15  call a loophole where ███████████████

██  ████████████████████████████,

17  correct?

18    A.   I'd say that's a fair

19  characterization.

20    Q.   And do you recall that those

21  work instructions provide significant --

22  well, let me strike that.

23    Do you recall the guidance

24  that is provided in the work instructions

Highly Confidential - Subject to Further Confidentiality Review

1    for when ███████████████████████████

2    ███████████████████████

3          A.    I'd have to look at the

4    document.  Do you have a document for me

5    to look at?

6          Q.    Sure.  You actually attached

7    it to your report, sir.  It's in the

8    back.  At Appendix D on Page 249.  Or at

9    least you attached a snippet of it.

10            Are you there?

11          A.    I'm getting there.  Yeah,

12    I'm there.  Thank you.

13          Q.    Okay.  Sure.  So this isn't

14    the whole document, but I guess it's a

15    clip of it that you -- you felt

16    appropriate to attach to your report.

17            But these are the -- do you

18    recognize these to be the work

19    instructions that provide ████████████

20    ██████████████████████████

21          A.    I recognize it to be a table

22    that is taken out of a multi-page

23    document called "The Work Instructions,"

24    yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Do you recognize it to be

2  the portion of the work instructions

3  that, in fact, ███████████████████

   █ ██████████████████████████████████

   █ █████████████████████████████████

6      A.    Again, it's a snippet from a

7  multi-page document.  It's a ██████████

   █ ██████████████████████████████████

   █ █████████  Yes, I do recognize that.

10  It's not the entire document.

11      Q.    Agreed.  It's -- it's what

12  you saw fit to include in the report.

13          And you agree that that

14  ███████████████████████████████████████

   █ ███████████████████████████████████

   █ ████████████████████████████████████

   █ ██████████████████████████  correct?

18      A.    Can you say the question

19  again for me?  You lost me somewhere

20  there.

21      Q.    Sure.  The -- the ██████████

   █ ████████████████████████████████████

   █ █████████████████████████████████████

   █ ████████████████████████████████████

Highly Confidential - Subject to Further Confidentiality Review

1 ███████████████████████████████

2 ██ ███████████

3       A.    It provides some guidance.

4 It's not the complete guidance.  As we've

5 discussed, it's a ████████████████████

6 taken from a multi-page work instruction

7 document.

8       Q.    Is it your opinion that the

9 guidance provided to employees on when

10 ██████████████████████████████████████

11 ██ ████████████████████████

12       A.    Again, I would have to

13 review the entire work instruction

14 documents.  So if you have a copy of that

15 I'll be happy to look through it again.

16       Q.    So the snippet of a document

17 that you chose to include in your report

18 is not sufficient for you to make that

19 determination; is that correct?

20           MR. BOGLE:  Object to form.

21           THE WITNESS:  The snippet of

22      the document that I included was

23      to show ███████████████████  It

24      wasn't necessarily to describe all

1      the guidance provided in the work

2      instruction.

3  BY MS. WICHT:

4      Q.    I'm not asking you about all

5  the guidance provided in the work

6  instructions, sir.  I'm asking you about

7  the guidance provided about when

8  ████████████████████████████████

9  ████████████████████████████████████

10      As I understand your

11  testimony, you're telling me that the

12  portion of the information that you

13  included in your report is not sufficient

14  to allow you to form an opinion about

15  whether that guidance was adequate,

16  correct?

17      MR. BOGLE:  Object to form.

18      THE WITNESS:  I think as I

19      keep trying to convey to you you

20      need to look at the entire work

21      instruction.

22  BY MS. WICHT:

23      Q.    But you didn't put the

24  entire work instruction in the table of

```
 1    your report, correct?

 2          A.    I didn't put the entire

 3    document of all the documents in my

 4    report, so I'm not exactly sure what your

 5    point is, Counselor.

 6          Q.    You quote -- back on Page

 7    101 in the executive summary of your

 8    report.  You quote some testimony by

 9    Mr. George Barrett, the former CEO of

10    Cardinal Health on Page 101.

11                Do you see that?

12          A.    Where are you looking in

13    particular?

14          Q.    I'm looking at the indented

15    block quotes on Page 101.

16          A.    I see them.

17          Q.    Did you review

18    Mr. Barrett's -- the entirety of

19    Mr. Barrett's testimony to Congress?

20          A.    Yes, as a matter of fact, I

21    did read the entire document.

22          Q.    Okay.  Do you recall

23    Mr. Barrett testifying that Cardinal

24    Health has terminated or refused to
```

Highly Confidential - Subject to Further Confidentiality Review

1    distribute controlled substances to over

2    a thousand pharmacies?  Did you see that

3    testimony?

4           A.    I'm sure I did see it.  I

5    read the whole document.  But I would

6    have to see it again to refresh my

7    recollection.

8               (Document marked for

9               identification as Exhibit

10              Whitelaw-14.)

11              MR. BOGLE:  What's the

12              exhibit number?

13              MS. WICHT:  14.

14   BY MS. WICHT:

15          Q.    And I'll ask you to turn,

16   sir, to Page 5 --

17          A.    May I have --

18          Q.    -- of that testimony.

19          A.    May I have a minute to

20   review the whole document?

21          Q.    No.  If you're going to read

22   the whole document, I'm not going to ask

23   the question.  Because I don't have time.

24              MR. BOGLE:  You're entitled

Highly Confidential - Subject to Further Confidentiality Review

1   to read the document.

2          THE WITNESS:  I'm going to

3          read the whole document, so --

4   BY MS. WICHT:

5          Q.   Okay.  Then let's move on.

6   Do you recall, without reading the entire

7   document, Mr. Barrett testifying that

8   Cardinal Health had terminated or refused

9   to distribute controlled substances to

10  over a thousand pharmacies?

11         A.   As I said before, I would

12  need the whole document to refresh my

13  recollection.  But we apparently don't

14  have time.

15         Q.   Okay.  So you don't --

16  sitting here right now, you don't recall

17  that testimony?

18         A.   I can't recall it off the

19  top of my head.

20         Q.   Sitting here today, do you

21  recall Mr. Barrett's testimony on Page 5

22  of his written testimony that from 2008

23  to the present, Cardinal Health had

24  stopped suspicious orders for the

1    shipment of hundreds of millions of

2    dosage units of controlled substances?

3                Do you recall that?

4        A.    Again, without looking at

5    the document, I -- I've read a lot of

6    documents.  I can't precisely recall what

7    he said, all of the statements in that

8    testimony.

9                Q.    You're welcome to look at

10   Page 5 of the written testimony, which is

11   where those appear, sir, but I'm not

12   going to ask you about anything else in

13   the document, so I'm not going to have

14   you take the time to read through the

15   whole thing.

16                But you opined in your

17   report that -- well, let me -- let me

18   strike that.

19                Did you consider those

20   facts, those two facts offered by

21   Mr. Barrett in forming your conclusions

22   Cardinal Health's suspicious order

23   monitoring program?

24        A.    I'm sure I considered those

1    facts in looking again at Mr. Barrett's

2    testimony.  I read his testimony from

3    beginning to end.  So at some point it

4    had to have factored in.

5         Q.   So would you agree that

6    those facts are relevant to your analysis

7    of whether Cardinal Health -- and I'm

8    quoting from Page 101 of your report --

9    that Cardinal Health developed a program

10   that was -- allowed Cardinal to "avoid

11   identifying orders as suspicious and

12   continue supplying customers that it knew

13   or should have known were engaging in

14   diversion-related behavior"?

15        A.   Can you be more specific?

16   What are you looking for, Counsel?

17        Q.   My question is, whether

18   those facts as testified to by

19   Mr. Barrett in Congress, do you agree

20   that those facts are relevant to your

21   conclusion that Cardinal Health was

22   attempting to avoid identifying orders as

23   suspicious and continue supplying

24   customers it knew or should have known

1  were engaged in diversion?

2       A.    Well, again, you're --

3  information is always relevant and needs

4  to be considered.  In this particular

5  case, I have no way of verifying

6  Mr. Barrett's statements one way or the

7  other.

8            I looked at the record of

9  the other -- the totality of the record,

10  including Mr. Barrett's statements in

11  coming -- in forming my opinions.  I

12  didn't just form it off of a single piece

13  of paper.

14       Q.    So when you opined that

15  Cardinal Health was attempting to avoid

16  identifying orders as suspicious and

17  continue supplying customers it knew were

18  diverting, did you consider the number of

19  customers that Cardinal Health has cut

20  off from supplying controlled substances?

21            MR. BOGLE:  Objection.

22            Asked and answered.  You can

23            answer again.

24            THE WITNESS:  Again, I

1          looked at the totality of the

2          record.  And as I said to you, I

3          did read Mr. Barrett's testimony

4          as part of the record I looked at

5          in forming my opinions.

6    BY MS. WICHT:

7          Q.    How many customers do you

8    think Cardinal Health should have cut

9    off, if it had an effective -- in your

10   view, effective suspicious order

11   monitoring system?

12         A.    I'm not here to opine on a

13   specific number.  As I said I was looking

14   at process and failure to follow process,

15   and whether the process was robust or

16   not.  I have no way of knowing what the

17   right number of customers to be

18   terminated would have been.

19         Q.    And I take it your answer

20   would be the same if I asked the question

21   about suspicious order reporting as

22   opposed to termination of customers,

23   correct?

24              MR. BOGLE:  Object to form.



1          THE WITNESS:  Again, I

2      looked at process, whether you

3      followed the process, whether

4      there's enough to understand how

5      the process worked.

6          So my answer would be

7      exactly the same.  I'm not here to

8      tell you what is the right number

9      of suspicious orders.

10   BY MS. WICHT:

11       Q.    If you would turn, sir, to

12   Page 104 of your report.  This is the

13   section of your report that's about your

14   opinions about Cardinal Health's culture?

15       A.    Yes.

16       Q.    Are you there?

17       A.    I'm there.

18   ███   ████   ████████

██  ███████████████████████

██  ██████████████████████

██  █████████████████████

██  ███████████████████████

██  ███████████████████████

██  ████████████████████████

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5      Q.    Did you review any testimony

6   about that e-mail that you can recall?

7      A.    Again, I've reviewed a lot

8   of testimony, so I can't say if I've

9   reviewed a specific piece of testimony or

10  not.

11     Q.    Fair enough.  And you cited

12  that particular e-mail as an example in

13  your report of one of the flaws -- or of

14  Cardinal Health's flawed corporate

15  culture, correct?

16     A.    I cited it as an example,

17  yes.

18     Q.    Did you -- well, are you --

19  you're familiar with a Cardinal Health

20  employee named Gilberto Quintero?

21     A.    Yes, I am familiar with him.

22     Q.    And -- and that -- looking

23  at your reliance list, I don't believe

24  you reviewed Mr. Quintero's testimony in

Highly Confidential - Subject to Further Confidentiality Review

1    this case at all; is that correct?

2           A.    Again, I would have to go

3    back to the reliance list.

4           Q.    Feel free to do that, sir.

5    The list of depositions is on Page 276

6    and 277.

7           A.    I don't see it on my list.

8           Q.    Okay.  So you didn't review

9    the testimony given by Mr. Quintero in

10   this matter then, correct?

11          A.    To the best of my knowledge,

12   relying on my reliance list, no.

13          Q.    Okay.  So then, you're not

14   aware, I assume, since you didn't review

15   the testimony, that Mr. Quintero

16   testified that that statement by

17   Mr. Mahoney was not true, correct?

18          A.    I am not aware of that

19   statement.

20          Q.    Did you review any testimony

21   by Mr. Reardon regarding this e-mail?

22          A.    Again, I'd have to go back

23   to the reliance list.

24          Q.    And Mr. Reardon is on your

Highly Confidential - Subject to Further Confidentiality Review

1    list, so I'll represent to you that it

2    appears to me that -- well, all I can say

3    is he's on your list.  That should mean

4    that you reviewed his testimony, correct?

5            A.    I reviewed his testimony.

6            Q.    Okay.  Do you recall

7    Mr. Reardon testifying that he never said

8    to Mr. Mahoney that Cardinal Health does

9    not report suspicious orders?

10           A.    I do not recall it.  But

11   again I've reviewed a lot of depositions

12   and testimony.  So I can't say I recall

13   it off the top of my head.

14           Q.    I'm happy to show it to you

15   if you'd like to see it.

16           A.    Sure.

17           Q.    Okay.

18                 (Document marked for

19                 identification as Exhibit

20                 Whitelaw-15.)

21                 MS. WICHT:  Sorry, I'm not

22                 trying to throw it at you.

23   BY MS. WICHT:

24           Q.    This is Exhibit Number 15,

Highly Confidential - Subject to Further Confidentiality Review

1    which is an excerpt from the testimony of

2    Steve Reardon, a former employee of

3    Cardinal Health.

4              Do you see that?

5         A.    I do see that that's what it

6    represents and purports to be, yes.

7         Q.    Okay.  And on Page 38, which

8    we've provided for you, sir, you can feel

9    free to take a look at the -- the few

10   questions that come before that.  You'll

11   see that Mr. Reardon is being questioned

12   about this document.

13             And do you see Mr. Reardon

14   answering questions saying that he did

15   not make the comment that's recited in

16   this e-mail?

17        A.    If I can have a second,

18   Counselor, I'm...

19        Q.    Sure.

20        A.    Yes, I see that he said

21   that.

22        Q.    And did you review any

23   testimony by Mr. Mahoney on this e-mail?

24   And I'll represent to you again that

Highly Confidential - Subject to Further Confidentiality Review

¹ Mr. Mahoney does appear in your list of

² reliance materials.

³          A.     I -- I know I reviewed

⁴ his -- some -- I reviewed his testimony.

⁵ I can't again recall a specific section

⁶ out of multiple pages.

⁷          Q.     Are you -- do you recall

⁸ that Mr. Mahoney testified about this

⁹ e-mail, "I believe that in my writing

¹⁰ this, I misspoke and I was referring to

¹¹ when they shut customers down because

¹² they were suspicious customers."

¹³          Do you recall seeing that in

¹⁴ Mr. Mahoney's deposition testimony?

¹⁵          A.     Again, I don't recall it.

¹⁶          (Document marked for

¹⁷          identification as Exhibit

¹⁸          Whitelaw-16.)

¹⁹ BY MS. WICHT:

²⁰          Q.     I'll mark it as Exhibit 16,

²¹ just so that you have it in front of you,

²² sir.  Sorry.

²³          So this is an excerpt from

²⁴ the testimony of Mr. Mahoney.

1          Do you see that?

2     A.    Yes, I see that.

3     Q.    And the discussion of the

4  document begins on Page 424, which we've

5  excerpted for you.  And do you see, the

6  testimony that I quoted for you is on

7  Page 425?

8     A.    I'm getting there.  I see

9  it.

10     Q.    My question for you, sir, is

11  if all of the participants in this

12  supposed discussion that's recounted on

13  Page 105 of your report deny the accuracy

14  of that e-mail, does that affect your

15  opinion that the e-mail supports the

16  conclusions in your report?

17     A.    No, Counselor, it doesn't

18  change my opinion.

19     Q.    So the fact that all three

20  individuals who were involved in that

21  conversation deny that it occurred as

22  reported here on Page 105 of your report

23  has no impact on your conclusions about

24  the e-mail?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Does not change --

2                MR. BOGLE:  Let her finish.

3                THE WITNESS:  That is

4          correct, it does not change my

5          opinion.  Again, we are talking

6          about opinions that are offered

7          after the fact when they are

8          confronted with something that is

9          unpleasant.  And there was no

10         attempt made for example, when the

11         original e-mail was written to

12         correct the misstatements that are

13         in the original e-mail.

14    BY MS. WICHT:

15         Q.    Well, how do you know that?

16         A.    I didn't see anything.

17         Q.    Do you know that it doesn't

18    exist?

19         A.    No, but I don't know that it

20    didn't -- that it exists or doesn't

21    exist.  But I didn't see anything that

22    says there was any contemporaneous

23    attempt to correct the record.  And if

24    this was a -- again, standard practice is

Highly Confidential - Subject to Further Confidentiality Review

1    if you misstate or you make a mistake of

2    this kind of magnitude in an e-mail, you

3    correct it with a follow-up, that is

4    standard practice.  That's what I would

5    have expected to see.  I did not see it

6    here.

7              Q.    So are you then offering an

8    opinion that Mr. Mahoney, Mr. Reardon,

9    and Mr. Quintero all lied under oath?

10             A.    No, ma'am.

11             Q.    Is that what you're

12   testifying to here today?

13             A.    No, ma'am, I'm not.  We know

14   the e-mail exists.  We know the statement

15   exists.

16             Q.    Okay.  You in your report,

17   you reach several conclusions about

18   Cardinal Health's standard operating

19   procedures, correct?  And I'm referring

20   to -- I'll direct you to Section 10.5.1

21   of your report, which begins on Page 108.

22             A.    Okay.

23             Q.    And you say in the third

24   paragraph on that page, you describe

Highly Confidential - Subject to Further Confidentiality Review

1   Cardinal Health's anti-diversion program

2   from 2007 to 2012 as convoluted and you

3   state that it was difficult to determine

4   across the five key SOPs that comprised

5   the program where one ends and the other

6   begins.

7           Do you see that opinion?

8       A.    Yes, I do.

9       Q.    And that's your opinion,

10  correct?

11      A.    That is my opinion.

12      Q.    Okay.  Are you familiar with

13  Mr. Michael Moné, a Cardinal Health

14  employee?

15      A.    Yes.

16      Q.    And you are aware that

17  Mr. Moné had, as I think you described it

18  on Page 107, Mr. Moné had operational

19  responsibility for the controlled

20  substances program during this period of

21  time, correct?

22      A.    I recall that, yes.

23      Q.    Okay.  And Mr. Moné was --

24  do you recall that Mr. Moné was listed as

1   an approver on most of the standard

2   operating procedures that you reviewed

3   from this period of time?

4        A.    I would have to go back and

5   look at the actual documents to confirm

6   that, Counselor.  So no, I don't recall

7   it off the top of my head.

8        Q.    Now, you didn't review any

9   testimony by Mr. Moné in connection with

10  your work in this case, correct?

11       A.    Again, let's go back to the

12  reliance list.

13       Q.    Well, I can represent to you

14  that he's not on the reliance list,

15  because -- are you aware that plaintiffs

16  chose not to take Mr. Moné's deposition

17  in this case?

18       A.    No, Counselor, I was not

19  aware of that.

20       Q.    Okay.  So obviously if his

21  deposition wasn't taken, then you didn't

22  review it, correct?

23       A.    Obviously.

24       Q.    So you don't know whether

1   Mr. Moné views the standard operating

2   procedures as convoluted, correct?

3           A.    No, Counselor, I do not.

4   But the relevant statement -- what

5   you're -- the relevance here, from a

6   compliance perspective, is I, as an

7   outsider, or a new employee, put myself

8   in a new employee's shoes, should be able

9   to read the documents on their face and

10  understand them, and I'm afraid, as I

11  read them and I've read lots of SOPs in

12  my career, written lots of SOPs in my

13  career, I had trouble understanding it.

14          So if I'm having trouble

15  understanding it, I don't know how you

16  explain it to a more junior -- you know,

17  to the basic members of staff.

18          MS. WICHT:  Move to strike

19      everything after, "No, Counselor,

20      I do not."

21  BY MS. WICHT:

22          Q.    So SOPs are not directed at

23  the outside world, are they,

24  Dr. Whitelaw?

1          MR. BOGLE:  Object to form.

2          THE WITNESS:  SOPs are

3     directed both internally and

4     externally.  You write them for

5     two audiences normally.  You write

6     them to instruct staff on what

7     they're doing.  But you're also

8     writing them because you're going

9     to be evaluated on them by

10     regulators and others to show you

11     have a system, an adequate and

12     effective system and process in

13     place and that you're following

14     that process.

15  BY MS. WICHT:

16     Q.    Now, you -- although you

17  didn't review any testimony by Mr. Moné,

18  obviously.  You did review the testimony

19  of various individuals who reported to

20  Mr. Moné, correct?

21     A.    I did.

22     Q.    Including Mr. Morse,

23  Mr. Forst, a variety -- Mr. Rausch.

24          Do those -- are those names

1    familiar to you as people who reported to

2    Mr. Moné?

3        A.    Yes, those names are

4    familiar to me.

5        Q.    You reviewed their

6    testimony, correct?

7        A.    Yes.

8        Q.    Okay.  Do you recall seeing

9    any testimony by any of those individuals

10   that they didn't understand Cardinal

11   Health's SOPs?

12       A.    Without reviewing each of

13   their individual testimonies again, off

14   the top of my head, I do not recall.

15       Q.    If you would turn to your

16   reliance list and to the deposition

17   transcripts that you reviewed again, sir,

18   on Page 276 and 277.

19       A.    276, yes.

20       Q.    Okay.  Are you familiar with

21   an individual named Kimberly

22   Anna-Soisson, a director of regulatory

23   management at Cardinal Health?

24       A.    I am -- that name does ring

1    a bell.

2        Q.    But her deposition is not

3    one of the ones that you reviewed,

4    correct?

5        A.    It's not on my list that I

6    can see.

7        Q.    Are you familiar with a

8    former Cardinal Health employee named

9    Doug Emma, a manage -- excuse me -- a

10   manager within the regulatory department?

11       A.    Again, without going through

12   the section and looking at all the names,

13   I don't remember the name off the top of

14   my head.

15       Q.    Okay.  And you didn't review

16   any deposition testimony by Mr. Emma,

17   correct?

18       A.    I don't see it on my

19   reliance list.

20       Q.    How about Shirleen Justice,

21   a new account specialist in quality and

22   regulatory affairs, did you review any

23   testimony -- are you familiar with

24   Ms. Justice, first of all?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     The name doesn't ring a bell
2    Counselor.  We can go down my reliance
3    list.
4          Q.     Did you review her
5    deposition testimony?
6          A.     If it's not on my reliance
7    list, then I did not review her
8    testimony.
9          Q.     Okay.  I'll represent that
10   it's not on the list.
11              And we already established
12   that you didn't review any testimony by
13   Mr. Quintero, the senior vice president
14   of QRA at Cardinal Health, correct?
15         A.     Yes.
16         Q.     And are you familiar with a
17   gentleman named Rich Ryu, spelled R-Y-U,
18   a director of advanced analytics in
19   Cardinal Health's quality and regulatory
20   affairs department?
21         A.     Again, the name -- I've
22   reviewed so many documents from so many
23   people.  I don't recall the name rightly.
24         Q.     But you didn't review

Highly Confidential - Subject to Further Confidentiality Review

1    Mr. Ryu's deposition transcript, correct?

2         A.    Let me look at my reliance

3    list again.

4         Q.    Sure.

5         A.    No, Jennifer, I did not

6    review the testimony according to my

7    reliance list.

8         Q.    Okay.  How about Mr. Craig

9    Baranski, the director of operations for

10   the Wheeling, West Virginia, distribution

11   center at Cardinal Health?  You didn't

12   review his testimony either, did you?

13        A.    Again, I'm going to go back

14   through the list.  Again, I don't see his

15   name on my list.

16        Q.    Just two more.  It's getting

17   a little tedious here.  How about Ray

18   Carney, the director of independent

19   retail sales for the Wheeling, West

20   Virginia, distribution center at Cardinal

21   Health?  Did you review his deposition

22   testimony?

23        A.    Again, I don't see it on my

24   list.

1    Q.    And how about Thomas

2  Convery, who was a pharmacy business

3  consultant that was in the sales

4  organization?  Did you review his

5  testimony?

6    A.    I don't see him on my list.

7    Q.    Okay.  So we've gone through

8  now a list of nine individuals from

9  Cardinal Health.  Now, were you aware of

10  whether or not those individuals provided

11  testimony in this case?

12    A.    Counselor, I don't rightly

13  recall the list of everybody who produced

14  testimony or not in this case.  So like I

15  said, I've looked at so many depositions.

16  I can't tell you off the top of my head.

17    Q.    So four of those individuals

18  worked directly in Cardinal Health's

19  anti-diversion program.  And then there

20  was Mr. Moné, who was obviously the --

21  had operational responsibility for the

22  program.

23         Do you think it would have

24  been helpful to review testimony from

1    those individuals before you reached

2    conclusions about Cardinal Health's

3    anti-diversion program?

4              MR. BOGLE:  Object to form.

5              THE WITNESS:  I --

6         Counselor, without knowing what's

7         in the depositions, I can't make a

8         statement one way or the other on

9         that.

10   BY MS. WICHT:

11        Q.   Okay.  Fair to say, if

12   you -- it's possible that if you reviewed

13   deposition testimony from those six

14   individuals or maybe even all nine of the

15   individuals who I listed about Cardinal

16   Health's anti-diversion program, do you

17   think it's possible that your opinions

18   would be different?

19             MR. BOGLE:  Object to form.

20             THE WITNESS:  Anything is

21        possible.  But I don't see

22        anything that would have changed

23        my overall conclusion that the

24        SOPs, for example, were difficult

Highly Confidential - Subject to Further Confidentiality Review

1    and convoluted to read.  That

2    would not have changed, depending

3    on what they had to say about it.

4         MS. WICHT:  Move to strike

5    after -- everything after,

6    "Anything is possible."

7  BY MS. WICHT:

8       Q.    So I want to go back to a

9  subject that you touched on previously a

10  moment ago.  You testified yesterday, I

11  believe -- please correct me if I'm

12  wrong -- that DEA did not provide precise

13  definitions of unusual size, unusual

14  frequency, or substantial deviation from

15  a normal pattern.  Do you recall that

16  testimony from yesterday?

17       A.    I do.

18       Q.    Generally?

19       A.    Generally.

20       Q.    Okay.  And I think you

21  said -- again, please correct me if I'm

22  wrong -- that it would be impossible for

23  DEA to give a blanket definition of those

24  words, because it's too fact dependent;

1    is that correct?

2          A.    That's not exactly -- that

3    is not what I said.  What I said is DEA

4    does not give that, because they're

5    writing a regulation.  My understanding,

6    they're writing a regulation for multiple

7    different companies and multiple

8    different business models.  And so the

9    regulation is written in more general

10   terms.

11         Q.    And then you were asked

12   about the fact that Cardinal Health's

13   SOPs used the words "significantly

14   larger."  That's on Page 117 of your

15   report.

16         A.    I see it.

17         Q.    And I believe your testimony

18   yesterday was that you believed that,

19   unlike DEA, who is writing for the entire

20   registrant community, you believed that

21   Cardinal Health should be able to provide

22   additional granularity in its SOPs since

23   they only relate to Cardinal Health's

24   customers; is that correct?

1    A.    I believe Cardinal Health

2    should know Cardinal Health's customers

3    and be able to provide some criteria of

4    what those generic terms mean, yes.

5    Q.    Now, as you recited in your

6    report, Cardinal Health has -- serves

7    more than 26,000 pharmacies, correct?

8    A.    What page are we on?

9    Q.    100.

10    A.    I see it.

11    Q.    And again, as you describe

12    it in your report in the paragraph above

13    that, those customers might include

14    hospitals, correct?

15    A.    They might.

16    Q.    And pharmacies, correct?

17    A.    They might.

18    Q.    Both retail, independents,

19    and chains?

20    A.    That's certainly plausible.

21    Q.    And healthcare systems,

22    correct?

23    A.    Yes.

24    Q.    Ambulatory surgery centers,

1    correct?

2          A.    Correct.

3          Q.    Clinical laboratories,

4    correct?

5          A.    Correct.

6          Q.    And physician offices,

7    correct?

8          A.    Potentially.

9          Q.    And do you believe, of the

10   26,000 pharmacy customers that you cite

11   in your report, are all those customers

12   all approximately the same size, do you

13   believe?

14              MR. BOGLE:  Object to form.

15              THE WITNESS:  I think you

16        are missing the point.

17              The point was --

18   BY MS. WICHT:

19         Q.    I -- I -- respectfully,

20   sir --

21              MR. BOGLE:  You can answer

22        the question.

23   BY MS. WICHT:

24         Q.    -- I have very limited

Highly Confidential - Subject to Further Confidentiality Review

1    time --

2                MR. BOGLE:  If you want

3          to -- you want to withdraw the

4          question, that's fine.  He's going

5          to answer it, otherwise.  Your

6          call.

7                MS. WICHT:  I withdraw the

8          question.

9    BY MS. WICHT:

10         Q.     Is it your opinion that the

11   26,000 pharmacy customers that Cardinal

12   Health serves are all approximately the

13   same size?

14               MR. BOGLE:  Object to form.

15               THE WITNESS:  Again, as I

16         was saying, you are missing the

17         point.

18               The point here is there

19         needs to be more granularity to

20         very imprecise terms to provide

21         appropriate guidance to the staff

22         responsible for suspicious order

23         monitoring.

24   BY MS. WICHT:

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Sir --

2        A.    That's my point.

3        Q.    Sir, I appreciate that you

4    want to jump to the end and give the

5    speech that you want to give.  But the

6    way that this works is that I ask

7    questions and you answer the questions

8    that are asked.  You don't get to just

9    jump ahead to the end.  So let me ask my

10   question one more time.

11             Is it your opinion as you

12   sit here today, that the 26,000 pharmacy

13   customers that Cardinal Health serves are

14   all approximately the same size?

15             MR. BOGLE:  Object to form.

16             THE WITNESS:  I did not give

17        an opinion one way or the other on

18        the 26,000 customers that --

19   BY MS. WICHT:

20        Q.    Fair.

21             And the definition of

22   suspicious order is the same for all

23   customers, correct?

24        A.    The regulatory definition is

Highly Confidential - Subject to Further Confidentiality Review

1    the same for what constitutes a

2    suspicious order.

3            Q.    So, is it your opinion that,

4    as you sit here today, that Cardinal

5    Health should have been able to write a

6    standard operating procedure that

7    provided granularity as to the definition

8    of a suspicious order for 26,000

9    different customers of diverse sizes and

10   types?  Is that your opinion?

11               MR. BOGLE:  Object to form.

12               THE WITNESS:  Could you

13        repeat the question for me?

14   BY MS. WICHT:

15            Q.    Sure.

16               Is it your opinion as you

17   sit here today that Cardinal Health

18   should have been able to write a standard

19   operating procedure that provided

20   granularity as to the definition of a

21   suspicious order for 26,000 different

22   customers of diverse sizes and types?

23               MR. BOGLE:  Object to form.

24               THE WITNESS:  Again, because

1    I think we were trying to discuss,

2    the point here is you can

3    classify, you can group, you can

4    do things to put pharmacies and

5    different pharmacies and different

6    business models into different

7    classes and then set thresholds

8    and other requirements based on

9    that.

10    What I'm saying is, just

11    having an open-ended,

12    significantly larger,

13    significantly greater, those are

14    incredibly imprecise terms.  There

15    needs to be more precision around

16    those terms.

17 BY MS. WICHT:

18    Q.    Did you review Cardinal

19 Health's policies and procedures to

20 determine whether they did, in fact,

21 group pharmacies by size and business

22 model as part of their suspicious order

23 monitoring system?

24    A.    Let me flip through my

1    report.  I can tell you.

2            I did.

3        Q.    Where are you reading, sir?

4        A.    If you happen to look on

5    114, the quote under establishing

6    thresholds.

7        Q.    Okay.  And that block quote

8    that you just directed me to on Page 114

9    reflects that, as one part of its process

10   to establish threshold limits, Cardinal

11   Health differentiated customers through

12   segmentation by size and/or specialty,

13   correct?

14       A.    Yes, that's what I directed

15   you to.

16       Q.    Okay.  So Cardinal Health

17   did, in fact, group pharmacies by size

18   and specialty as part of their suspicious

19   order monitoring program, correct?

20           MR. BOGLE:  Object to form.

21           THE WITNESS:  Could you

22       restate the question?

23   BY MS. WICHT:

24       Q.    Sure.

1          As part of the processes for

2    its suspicious order monitoring program,

3    Cardinal Health did, in fact,

4    differentiate customers through

5    segmentation by size and/or specialty,

6    correct?

7          A.    Well, that's what the SOP

8    says is that's what you are supposed to

9    do.

10          Q.    Okay.  Dr. Whitelaw, do you

11    have a set of notes related to Cardinal

12    Health that you prepared as part of your

13    deposition prep?

14          A.    Yes, I do.

15          Q.    Did you review those notes

16    last night or this morning in preparation

17    for your deposition testimony today?

18          A.    No, I did not.

19          MS. WICHT:  Okay.  We've

20          been going about an hour and ten

21          minutes.  If we can take a break.

22          MR. BOGLE:  Okay.

23          THE VIDEOGRAPHER:  Going off

24          the record at 9:41 a.m.

Highly Confidential - Subject to Further Confidentiality Review

1               (Short break.)

2               THE VIDEOGRAPHER:  We are

3       back on the record at 9:57 a.m.

4   BY MS. WICHT:

5       Q.    Dr. Whitelaw, I'm going to

6   ask you questions about a few of the

7   specific pharmacies that are identified

8   in your report now.

9               If you would turn to Page

10  51, please.

11      A.    You said 51, correct?

12      Q.    Yes, sir, Page 51.  Your

13  section about CVS Store 3322.

14              Do you see that?

15      A.    I do.

16      Q.    And in your report you note

17  that Cardinal Health distributed

18  hydrocodone to this CVS location,

19  correct?

20      A.    That's what it says in the

21  report, yes.

22      Q.    And this CVS Store 3322, as

23  you note, is located on Brookpark Road in

24  Cleveland, Ohio, correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    That's the address I had in

2  the documents I saw, yes.

3    Q.    Do you know anything about

4  the area surrounding that location, sir?

5          MR. BOGLE:  Object to form.

6          THE WITNESS:  Could you be

7    more specific?

8  BY MS. WICHT:

9    Q.    Have you ever been there?

10    A.    No, I have not.

11    Q.    Did you look it up on Google

12  Maps as part of your work on this case?

13    A.    No, I did not.

14    Q.    Are you aware of whether

15  there are any medical centers nearby that

16  CVS location?

17    A.    No, I am not.

18    Q.    Are you familiar with a

19  Saint Vincent Charity Medical Center

20  nearby that pharmacy?

21    A.    No, I am not aware of it.

22    Q.    Are you familiar with a

23  Veterans Affairs outpatient clinic that's

24  about ten minutes away from that

Highly Confidential - Subject to Further Confidentiality Review

1    pharmacy?

2         A.    No, I am not.

3         Q.    Did you compare the volumes

4    of hydrocodone and oxycodone at CVS 3322

5    that are recited in your report, to

6    volumes of noncontrolled substances that

7    were distributed to that store?

8         A.    No, Counselor, I did not.

9         Q.    Did you review Cardinal

10   Health's tableau files related to CVS

11   Store 3322?

12        A.    No, I did not.

13        Q.    Are you aware of there -- of

14   DEA taking any enforcement action against

15   CVS Store 3322?

16        A.    I am not aware of that, no.

17        Q.    Are you aware of the

18   pharmacy or any of its pharmacists having

19   their license suspended related to

20   controlled substances?

21        A.    Counselor, we can go through

22   lots of documents.  I looked at lots of

23   documents.  This store is offered up for

24   the fact that when I look at the due

1    diligence file from behind this store, I

2    didn't see adequate documentation to

3    explain any of the things, for example,

4    or any of the contributing factors that

5    you were talking about, such as distance

6    from a hospital or geographic location,

7    et cetera.  I didn't see that.  That was

8    the point that I was making here.

9           Q.    You didn't review Cardinal

10   Health's Tableau file, correct?

11          A.    No, I did not review

12   Cardinal Health's Tableau file.

13          Q.    So you don't know what

14   information about the pharmacy's

15   contained there, correct?

16          A.    Again, I reviewed the due

17   diligence files on this -- that I was

18   provided on this particular pharmacy and

19   I didn't see any of the information that

20   you're talking about in the file that I

21   recall.

22          Q.    Did you review any Cardinal

23   Health documentation about the thresholds

24   for this particular pharmacy?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I'm sorry.  I'm not sure I'm

2  following your question.

3    Q.    Did you review any Cardinal

4  Health documentation about the

5  thresholds, the controlled substance

6  thresholds, that Cardinal Health set for

7  this particular CVS Store 3322?

8    A.    Again, if it was in the due

9  diligence file, I reviewed it.  If it

10  wasn't in the due diligence file, I did

11  not review it.

12    Q.    Do you recall whether it was

13  or wasn't?

14    A.    I don't rightly recall.

15  I've looked at -- as I've said I looked

16  at a lot of pharmacies.  If you have

17  something in particular that you'd like

18  me to consider, please show it to me.

19  I'm happy to consider it now.

20    Q.    So the question I was asking

21  you before, sir, was whether you're aware

22  of CVS Store 3322 or any of the

23  pharmacists who work there having

24  discipline against their licenses related

Highly Confidential - Subject to Further Confidentiality Review

1    to controlled substance dispensing.

2            A.    And I'm going back to my --

3            Q.    Are you aware of that?

4            A.    I'm going back to my

5    original answer.  I reviewed the due

6    diligence file.  This pharmacy was

7    offered up in my report as an example of

8    poor due diligence -- documented due

9    diligence.  That's why it's here.

10           Q.    Sir, respectfully, I'm not

11   asking you what you reviewed.  I'm asking

12   you, as you sit here today, whether you

13   are aware of any discipline against CVS

14   Store 3322 or any of its pharmacists in

15   connection with controlled substance

16   dispensing?

17           A.    Counselor, as I've said and

18   I tried to be honest and open and

19   transparent with you, I've reviewed a lot

20   of files on a lot of different

21   pharmacies, and no, I don't recall it off

22   the top of my head.

23           Q.    Are you offering an opinion

24   that CVS Store 3322, that Cardinal should

1    have cut off distributions to that

2    customer?

3                    MR. BOGLE:  Object to form.

4                    THE WITNESS:  As I said, my

5            opinion is limited to the fact

6            that if you looked at the volumes,

7            it should have triggered due

8            diligence.  There should be a

9            robust due diligence file.  I

10           reviewed the due diligence file

11           that was provided, and I found it

12           to be lacking.  That was what I

13           was reviewing.

14   BY MS. WICHT:

15           Q.    Based on that answer, and on

16   your report, then, I understand that you

17   are not offering an opinion that Cardinal

18   Health should have cut off distribution

19   of controlled substances to CVS

20   Store 3322, correct?

21                   MR. BOGLE:  Object to form.

22                   THE WITNESS:  What I'm

23           offering an opinion to is the

24           adequacy of the due diligence

1      documentation that I was provided

2      and reviewed.  And so I can't --

3      because of the documentation that

4      I have, I couldn't give you a

5      recommendation one way or the

6      other on the store.

7           I'm looking for adequate

8      documentation.  I don't find it.

9 BY MS. WICHT:

10          Q.    Do you -- are you offering

11 the opinion that CVS Store 3322 should

12 have been shut down by the DEA?

13          MR. BOGLE:  Object to form.

14     Asked and answered.

15          MS. WICHT:  No, I was asking

16     about Cardinal Health's.

17          MR. BOGLE:  All right.  He's

18     given you --

19          MS. WICHT:  I'm asking about

20     DEA now.

21          MR. BOGLE:  He's given you

22     the scope of his opinion though.

23     If you ask him essentially the

24     same question phrased a bunch of

1          different ways -- but you can burn

2          your time that way if you want.

3          Go ahead.

4               THE WITNESS:  Could I have

5          the question again, please.

6     BY MS. WICHT:

7          Q.    Are you offering the opinion

8     that CVS Store 3322 should have been shut

9     down by the DEA?

10         A.    Well, for one thing, I don't

11    purport to speak for the DEA at all in my

12    report.  It's not in the scope of my

13    review.  And that is not what we were

14    covering here.  Again, we were covering

15    the adequacy of the due diligence file

16    that Cardinal was responsible for and

17    that I reviewed.

18         Q.    So I want to turn to CVS

19    Store 4800 on the next page, please.

20         A.    Sure.

21         Q.    And this store is located at

22    590 East Market Street in Akron, Ohio,

23    correct?

24         A.    That is the -- what I

1    learned from the files, yes.

2           Q.    Have you ever been to that

3    location, sir?

4           A.    I have not been to Akron,

5    no.  I haven't had the pleasure.

6           Q.    Are you aware of whether

7    there are any medical centers nearby CVS

8    Store 4800?

9           A.    No, I am not.  But again,

10   we're talking about the adequacy of the

11   due diligence file that was on record.

12   And what I reviewed was in your due

13   diligence files that were provided to me.

14          Q.    Are you familiar with Summa

15   Rehab Hospital located across the street

16   from that CVS location?

17          A.    I do not rightly recall it.

18   But again, if it was in the due diligence

19   file, I'm sure I saw it.

20          Q.    Are you familiar with Akron

21   City Hospital, three -- excuse me, three

22   minutes from the location of CVS Store

23   4800?

24          A.    Again, if it was in the due

1  diligence file, I would have reviewed it.

2       Q.    Are you familiar with the

3  Summa Health Emergency Department that's

4  four minutes from that CVS location?

5       A.    Again, if it was in the due

6  diligence file, I would have reviewed it.

7       Q.    So the due diligence files

8  that you're referring to for CVS 4800 and

9  CVS 3322, those were provided to you by

10  the plaintiff attorneys, correct?

11       A.    At my request.

12       Q.    At your request.

13  Understood.  Did you review anything

14  outside of the due diligence file about

15  those two customers?

16       A.    I have reviewed a lot of

17  documents, Counselor.  I can't rightly

18  tell you what all I did.  I reviewed lots

19  of documents.

20       Q.    What can you name for me, as

21  you sit here today, having billed

22  1,200 hours to this case in the last 6

23  months, what can you name for me here

24  today that you reviewed about CVS 4800 or

1  CVS 3322 outside of the due diligence

2  files?

3         A.    Counselor, I looked at a lot

4  of paper.  I can't tell you a specific

5  document off the top of my head without

6  reviewing the report.  But if you'd like

7  to walk through the report and all the

8  citations, we can do that.

9         Q.    Okay.  Well, that was going

10  to be my next question, sir.

11               Fair to say that anything

12  you relied on, you would have cited in

13  the report, correct?

14               MR. BOGLE:  Object to form.

15               THE WITNESS:  Fair to say

16         that I would have -- it would be

17         in the report.

18  BY MS. WICHT:

19         Q.    And the question of whether

20  Cardinal Health should have ceased

21  controlled substances distributions to

22  CVS Store 4800, I take it your answer, as

23  it was for the other location, was going

24  to be that was outside the scope of your

Highly Confidential - Subject to Further Confidentiality Review

1  review, correct?

2          A.    Again, I was not making an

3  opinion on whether or not Cardinal should

4  have terminated the store or ceased

5  distribution to the store.  What I was

6  discussing was the due diligence

7  activities about this particular store.

8          Q.    Okay.  There's a couple more

9  pharmacies discussed in your report.  If

10  you turn to Page 102, please.

11          A.    Sure.

12          Q.    Do you see there's a

13  discussion there of a CareMed Pharmacy?

14          A.    I'm getting there.  I see

15  it.

16          Q.    That pharmacy is in Florida,

17  correct, sir?

18          A.    That is correct.

19          Q.    Do you have any knowledge of

20  any individual in Summit County or

21  Cuyahoga County, Ohio, obtaining opioids

22  that Cardinal Health distributed to

23  CareMed Pharmacy?

24          A.    No, Counselor, I don't.  But

1    again your program was a national

2    program.  You did --

3         Q.    I -- you answered my

4    question, sir.

5              MR. BOGLE:  You can -- you

6         can finish your answer.

7              THE WITNESS:  You were --

8         the program I looked at was on a

9         national basis, so it involved

10        pharmacies from all over the

11        country.  Therefore, how you

12        treated and followed your policies

13        or didn't follow your policies is

14        relevant to this discussion for

15        Summit and Cuyahoga County.  But

16        it's relevant to how you ran your

17        program.

18             And in this case I found the

19        program lacking, because you

20        had -- where you did have policies

21        they were unclear.  And where you

22        had -- and on a number of

23        occasions, you didn't follow them.

24   BY MS. WICHT:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Sir, my question had nothing

2    to do with policies.  Nothing to do with

3    policies.

4          I have very limited time.

5    I'm going to ask you again to please

6    answer the questions that I ask.

7          If you turn to Page 103 --

8    A.    I am trying to answer your

9    question.

10    Q.    -- there is a pharmacy

11    CVS 219 that's discussed in your report,

12    correct?

13    A.    I see CVS Pharmacy 219.

14    Q.    And that pharmacy is located

15    in Florida, correct?

16    A.    That pharmacy is located in

17    Florida.

18    Q.    And you have no knowledge,

19    sir, of any individual from Summit or

20    Cuyahoga County, Ohio, receiving opioids

21    that Cardinal Health distributed to

22    Pharmacy 219, correct?

23    A.    Again, as I've stated to

24    you, these pharmacies are examples of the

1    process and policies and failure to

2    follow those processes and to design an

3    adequate system which you ran on a

4    national basis, they are examples, and

5    that's why they are included in this

6    report.

7         Q.    So you didn't actually

8    answer my question at all that time.

9              Is it correct that you have

10   no knowledge of any individual from

11   Summit County or Cuyahoga County, Ohio,

12   receiving opioids that Cardinal Health

13   distributed to pharmacy 2 -- pharmacy

14   CVS 219 in Florida?

15        A.    I have no specific knowledge

16   of anybody in Cuyahoga or Summit County

17   receiving product from this particular

18   CVS store.

19        Q.    I'm going to ask you a

20   question about regulatory guidance, sir.

21   I think a few times in your testimony

22   you've referred to guidance from DEA in

23   the form of letters or presentations or

24   discussions, correct?

Highly Confidential - Subject to Further Confidentiality Review

1          Do you recall very generally

2    discussing that guidance?

3          A.    Yes, I do.

4          Q.    And it's correct, sir, that

5    guidance, regulatory guidance is not law,

6    correct?

7               MR. BOGLE:  Object to form.

8               THE WITNESS:  It's not

9          statute.  It's not regulations,

10         that's true.

11    BY MS. WICHT:

12         Q.    So if a registrant does not

13    comply with guidance, the registrant is

14    not breaking the law, correct?

15              MR. BOGLE:  Object to form.

16              THE WITNESS:  Again, I can't

17         make a judgment one way or the

18         other.  I'd have to know more

19         facts and circumstances to be able

20         to opine on that.

21    BY MS. WICHT:

22         Q.    Is it your opinion that

23    there is some circumstance in which a

24    failure to comply -- strike that.

1          Guidance does not have the

2     force of law, correct?

3          MR. BOGLE:  Object to form.

4          THE WITNESS:  I am not here

5          to offer a legal opinion.  I'm

6          going to tell you how we use

7          guidance as a compliance officer

8          if you'd like.

9     BY MS. WICHT:

10          Q.    No thank you.

11          A.    I use guidance as --

12          Q.    Sir --

13          A.    -- as one way of looking --

14          Q.    Sir, I did not ask that

15     question, sir.

16          MR. BOGLE:  You can finish

17          your answer.

18          MS. WICHT:  He

19          acknowledged --

20          MR. BOGLE:  Withdraw the

21          question.  Withdraw the question.

22          MS. WICHT:  He acknowledged

23          that he was moving on to speak

24          about a different topic.  He said,

1     "I'm not here to offer a legal

2     opinion, but I'll be happy to tell

3     you how guidance works for

4     compliance officers if you'd

5     like."

6          That was not the question I

7     asked.  I'm moving on.

8          MR. BOGLE:  Are you still

9     answering?

10          THE WITNESS:  I would still

11     give an answer.  Yes.

12          MR. BOGLE:  Finish your

13     answer.

14          THE WITNESS:  My answer

15     would be, we use guidance as a way

16     of informing us on how to frame

17     out and comply with regulations

18     and statutes.

19          It is useful information, we

20     use it that way.

21  BY MS. WICHT:

22     Q.    Does a guidance letter

23  create a legal obligation?

24          MR. BOGLE:  Object to form.

1           THE WITNESS:  I'm not here

2      to offer a legal opinion one way

3      or the other on guidance

4      documents.  I'm here as a

5      compliance expert.

6           But I am going to tell you

7      that if you don't --

8  BY MS. WICHT:

9      Q.    Sir, I'd like to talk --

10     A.    -- if you don't follow

11 guidance, you are running a risk as a

12 company.  That's what I would tell my

13 clients and have told my clients.

14 Guidance is useful and should be at least

15 factored into the decisionmaking process.

16          MS. WICHT:  So, Counsel, I'm

17     just putting you on notice right

18     now, that I'm -- I'm going to hold

19     the deposition open -- I'm going

20     to move to strike all the

21     nonresponsive speeches that the

22     witness is giving.  I'm going to

23     hold the deposition open.  I'm not

24     going to conclude it today,

Highly Confidential - Subject to Further Confidentiality Review

1           because he's not answering the

2           questions that are posed to him.

3           So I'm putting you on notice of

4           that right now.  Let's move on to

5           something else.

6                   MS. CASTLES:  Join.

7                   MS. MONAGHAN:  Join.

8                   MS. McCLURE:  Join.

9                   MR. BOGLE:  I think he's

10          answering just fine.  I think he's

11          answering just fine.

12  BY MS. WICHT:

13          Q.    So I'd like to ask you a

14  question about Page 104 of your report,

15  sir.  Going back to your discussion of

16  Cardinal Health's corporate culture.

17          A.    I'm there.

18          Q.    Okay.  The first sentence of

19  Section 10.4.1 says, "Cardinal culture

20  was and continues to be myopically

21  focused on increasing revenues and

22  cutting costs."

23                  Is that your opinion?

24          A.    That is my opinion.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Are -- do you know anything

2   about Cardinal Health's program called

3   Generation Rx?

4      A.    Not off the top of my head,

5   that I can recall, Counselor.

6      Q.    You are not familiar with

7   that drug abuse and misuse prevention

8   program that Cardinal Health created in

9   partnership with the Ohio State

10  University College of Pharmacy?

11     A.    Counselor, it was not

12  something I looked at and it was not part

13  of this report, no.

14     Q.    Okay.  All right.  Do you

15  know anything about Cardinal Health's

16  opioid action program?

17     A.    No, Counselor, I don't.

18     Q.    Okay.

19     A.    But if you have something

20  you'd like me to look at, I'd be happy to

21  look at it right now for you.

22          Is there a --

23     Q.    You talked in your report

24  generally about the concept of

1   accountability.  Do you recall that?

2          A.    Yes.

3          Q.    Okay.  And that refers to

4   accountability for employees who, in your

5   opinion, performed inadequately in their

6   compliance functions, correct?

7          A.    I would say that was one

8   facet of it.  The other facet of

9   accountability had to do with how you

10  handle customers that don't follow or

11  won't give you documents, won't

12  provide -- provide help, won't follow

13  your procedures and procedures --

14         Q.    Okay.  So I'm --

15         A.    -- or follow contracts.  So

16  we're talking about both.

17         Q.    I'm focused at the moment on

18  the issue of accountability for

19  employees.  Okay?

20         A.    Okay.

21         Q.    So -- and I think you said

22  yesterday that accountability doesn't

23  necessarily require the termination of

24  an -- of an employee, correct, in your

1  opinion?

2       A.    I said accountability, there

3  were a range of options.  Termination was

4  a possibility.

5       Q.    Okay.  And reduction in pay

6  or bonus, that was another possibility

7  that I think you mentioned?

8       A.    All fact and circumstance

9  driven.

10       Q.    Okay.  And transfer to

11  another part of the organization, that

12  was another possible --

13       A.    It was possible.

14       Q.    Excuse me.  Let me finish

15  the question.  Thank you.

16            That's another -- excuse me.

17  Lost my train of thought.

18            Transfer to another part of

19  the organization is another possibly way

20  that a company could have accountability

21  for employees, correct?

22       A.    It is another possibly way,

23  yes.

24       Q.    Okay.  You -- on Page 120 of

1    your report, sir, you discuss Cardinal

2    Health --

3              A.    Which page are we on?

4              Q.    120, sir.

5              A.    Okay.  I'm there.

6              Q.    You discuss Cardinal Health

7    notifying customers on their invoices

8    that their orders had been held pending

9    regulatory review.  Do you recall that?

10             A.    Is there a specific

11   paragraph on this page?

12             Q.    Top paragraph.  No, I'm

13   sorry, the third paragraph on the page.

14   "The customer will see on the invoice

15   held pending regulatory review."

16                   Do you see that?

17             A.    I do see that.

18             Q.    Okay.  Do you -- is it your

19   opinion that it was improper for Cardinal

20   to notify its customers that their

21   invoices were being held -- I'm sorry,

22   that their order -- orders were being

23   held pending regulatory review?

24             A.    I didn't say it was

Highly Confidential - Subject to Further Confidentiality Review

1  improper.  What I said was it gave

2  customers a way of understanding what

3  their thresholds were without

4  communicating it directly.  They could

5  back into the thresholds, and it was

6  something that needed to be factored in

7  and taken into account.

8         Q.    I take it it was outside the

9  scope of your work in this case to

10 determine whether any customer actually

11 backed into their thresholds and used

12 that information to work around the

13 thresholds, correct?

14             MR. BOGLE:  Object to form.

15             THE WITNESS:  Again, I'm

16       speaking to the process.

17 BY MS. WICHT:

18        Q.    So I think that's yes,

19 right, it was outside the scope of your

20 work in this case to determine whether

21 that actually happened with any specific

22 customer?

23        A.    It was outside of my scope

24 to look at it in the case of a specific

1  customer.

2       Q.    Okay.  I believe you

3  testified yesterday, sir, but please

4  correct me if I'm wrong, that you did

5  compliance program-related work for a

6  distributor who is named as a defendant

7  in this case; is that correct?

8       A.    That was -- again, I have to

9  look at the transcript to remember

10 exactly what I said.  But I believe that

11 is correct.

12      Q.    Did that work include --

13 strike that.

14            Was that work in your

15 capacity as a consultant at your current

16 company?

17      A.    No, it was not.

18      Q.    In what capacity did you do

19 that work?

20      A.    It would have been when I

21 was working for Deloitte, to the best of

22 my recollection.

23      Q.    Okay.  Did that work include

24 consulting on the distributor's

1    suspicious order monitoring program?

2          A.    Well, again, I'm not sure

3    which distributor we are talking about.

4    Can we be a little more precise?

5          Q.    I'm talking about whichever

6    distributor you did work for.

7          A.    Well, okay --

8          MR. BOGLE:  If we can keep

9          it down over there, please, and be

10         respectful and professional.

11         MS. WICHT:  I just -- let

12         the record reflect that the

13         witness is smiling as well.  I --

14         nobody was --

15         THE WITNESS:  I'm trying to

16         understand --

17         MR. BOGLE:  It was on video.

18         You don't need to have the record

19         reflect anything.

20         MS. WICHT:  I agree.  It

21         will reflect that he was smiling.

22         MR. BOGLE:  Whether he's

23         smiling has nothing to do with

24         whether 20 people are laughing out

Highly Confidential - Subject to Further Confidentiality Review

1          loud while you're asking

2          questions.

3     BY MS. WICHT:

4          Q.    The compliance

5     program-related work that you did for a

6     distributor who is named as a defendant

7     in this case, did it include consulting

8     with respect to that distributor's

9     suspicious order monitoring program?

10         A.    To the best of my

11    recollection, Counselor, no it did not.

12         Q.    Okay.  And if you look at

13    Page 2 in your report, the second

14    paragraph on that page says, "None of the

15    organizations reviewed in this report

16    have employed me or engaged the services

17    of me and my firm."  And my question is,

18    is that a true statement?

19         A.    Yes, I believe it is a true

20    statement.

21         Q.    Okay.  Yesterday at one

22    point during your testimony, you referred

23    to the fact that you were working for the

24    court.  Do you recall saying that?

1     A.     I do recall saying that.

2     Q.     So I want to be clear about

3  that, sir.  You haven't been engaged by

4  the court to serve as an expert in this

5  case, correct?

6     A.     No, I have not.

7     Q.     You are engaged by plaintiff

8  attorneys, correct?

9     A.     That is correct.

10     Q.     And it's not the court who

11  owes you about $480,000 at this point,

12  correct?  It's the plaintiff attorneys,

13  correct?

14     A.     That is correct.  However, I

15  feel that I have an obligation to the

16  court to do the very best work that I

17  can, because it's not just plaintiffs'

18  counsel that's reading it.  You're

19  reading it.  The judge is going to be

20  reading my report.  So, therefore, I

21  believe that there's an obligation to do

22  the very best work possible.

23     Q.     How much of your current

24  business is consulting for plaintiffs in

Highly Confidential - Subject to Further Confidentiality Review

1  this case?

2      A.    I don't rightly know off the

3  top of my head.

4      Q.    Do you have other work

5  currently?

6      A.    Yeah, I do currently.

7      Q.    Okay.  Would you say that

8  your consulting work for plaintiffs in

9  this case is more than 50 percent of your

10  current work?

11          MR. BOGLE:  Object to form.

12      Asked and answered.

13          THE WITNESS:  As I said,

14      Counselor, I don't have a precise

15      number for you.

16  BY MS. WICHT:

17      Q.    So you're the -- are you the

18  sole employee of your business?

19      A.    Yes, Counselor, I am.

20      Q.    So you -- you manage it, you

21  operate it, you do everything with

22  respect to the business, correct?

23      A.    I do.

24      Q.    And you, as you sit here

1    today, cannot tell me what percentage of

2    your current business approximately is

3    consulting for plaintiffs in this case,

4    correct?

5              MR. BOGLE:  Objection.

6         Asked and answered.

7              THE WITNESS:  Counselor, I

8         can't.

9              MS. WICHT:  Okay.  I have

10        many, many more lines of

11        questioning that I have not had

12        time to get into today both

13        because of the time constraints of

14        the deposition, and because of

15        respectfully, in my opinion, the

16        answers that the witness has

17        provided.  In deference to my

18        colleagues, who are on the defense

19        side I'm going to pass the witness

20        now.  But I have more examination

21        to do, and I am going to hold the

22        deposition open and reserve the

23        right to seek more time or other

24        relief.  If we can go off the

Highly Confidential - Subject to Further Confidentiality Review

1    record in order to hand over the

2    mic please.

3            THE VIDEOGRAPHER:  Going off

4    the record at 10:23 a.m.

5            (Brief pause.)

6            THE VIDEOGRAPHER:  We are

7    back on record at 10:29 a.m.

8                    -  -  -

9                 EXAMINATION

10                   -  -  -

11   BY MR. MELTON:

12           Q.    Good morning, Dr. Whitelaw.

13           A.    Good morning.

14           Q.    My name is Jeffrey Melton,

15   and I represent AmerisourceBergen Drug

16   Corporation.

17           A.    Nice to meet you.

18           Q.    Nice to meet you as well.

19                 Before we really get started

20   I wanted to follow up on one question

21   that Ms. Wicht was asking you about her

22   line of questions.

23           A.    Sure.

24           Q.    I thought I heard you

1    testify yesterday that the compliance

2    work that you had done for a defendant in

3    this case, I thought I heard you say that

4    it was ABC.  Did I hear that correctly

5    yesterday?

6         A.    No, I don't think you did.

7    I'm not sure I said a defendant.

8         Q.    Okay.  Is it possible that

9    if I heard ABC, it was, you know, ABC,

10   meaning a string of letters and not ABC

11   meaning AmerisourceBergen Corporation?

12        A.    Again, I don't recall --

13   without going back and looking at the

14   testimony, I don't remember.  But I don't

15   recall saying I worked for a particular

16   client.  I think I was giving a series of

17   clients as examples of clients that

18   Deloitte served.  But I don't think I was

19   naming a specific client.

20        Q.    So it was not your intention

21   to name ABC?

22        A.    It was not my intention.  If

23   you heard that that way, that was not my

24   intention.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Have you ever done any work

2   for AmerisourceBergen?

3      A.    Not that I can recall, no.

4      Q.    Is AmerisourceBergen one of

5   the companies that's evaluated in your

6   report that's marked as Exhibit 2?

7      A.    Yes, it is.

8      Q.    Is there a -- do you recall

9   whether there is a review time period for

10   the AmerisourceBergen section?

11      A.    Not off the top of my head.

12   But I can go and flip to the section and

13   look if you'd like.

14      Q.    That's okay.  We'll get to

15   it.

16      A.    Okay.

17      Q.    Did you review any documents

18   that informed your opinion on ABC that

19   you did not cite to in your report?

20      A.    I looked at a lot of

21   documents.  If I used it to support the

22   positions that I -- it was in, it would

23   have been in the report.  But I can't

24   rule out, I've looked at a lot of

1    documents -- you know, I've looked at a

2    lot of documents.

3              Q.    Did you review any documents

4    that informed your opinion on ABC that

5    you did not list --

6              A.    Not to the best of my --

7              MR. BOGLE:  Wait until he

8         finishes.

9              THE WITNESS:  I'm sorry.

10   Can you ask the question again?

11   BY MR. MELTON:

12             Q.    Sure.

13             A.    I didn't mean to interrupt

14   you.

15             Q.    Did you review any documents

16   that informed your opinion on ABC that

17   you did not list as reliance materials in

18   your report?

19             A.    Not that I can recall, sir.

20             Q.    Okay.  Let's -- let's take a

21   look at Page 126 of your report that's

22   marked as Exhibit 2.

23             A.    126.

24             Okay.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And this is the start of the
2   ABC section of your report, correct?
3      A.    Mm-hmm, yes, it is.
4      Q.    Okay.  Can you flip to
5   Page 128?
6      A.    I'm there.
7      Q.    Okay.  Now, on Page 128
8   approximately, it's -- it's in the third
9   paragraph, you use the phrase "bare
10  minimums," do you see that?
11     A.    Yeah, I saw it.
12     Q.    What do you mean by bare
13  minimums?
14     A.    What I mean by bare
15  minimums, where you were doing just
16  enough, or trying to set up a program
17  that went just -- was just barely
18  effective.  So you were doing the bare
19  minimums of what you needed to do.  You
20  weren't trying to stand -- ABC was not
21  trying to stand out as a stellar
22  performer.  They were just doing the
23  basics that they had to do to get by.
24  That's what I meant.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So the minimum to meet the

2  regulations, but nothing more, is that

3  your testimony?

4          MR. BOGLE:  Object to form.

5          THE WITNESS:  The minimums

6      to meet your obligations and

7      nothing more.

8  BY MR. MELTON:

9      Q.    Now, yesterday we talked a

10 lot about your chart that's on Page 43 of

11 your report.

12     A.    I'm there.

13     Q.    Where is the bare minimum

14 located on this chart, if you can tell

15 me?

16     A.    The words "bare minimum" are

17 not on the chart.

18     Q.    So from -- from left to

19 right on the chart, if you had to place

20 the bare minimum into one of the four

21 categories, where would it be?

22     A.    Left, in the foundational.

23     Q.    All right.  Let's flip to

24 Page 129 of your report.

Highly Confidential - Subject to Further Confidentiality Review

1      A.    I think I'm there.

2      Q.    Now, do you see the last

3  sentence before it says Clark Lowcost

4  Pharmacy, where it says, "Below are just

5  a few examples illustrating how ABC's

6  approach to its anti-diversion program

7  translated into various retail pharmacy

8  stores obtaining high levels of opioids

9  with little or no investigation or

10  interrogation."

11          Did I read that correctly?

12      A.    Yes, you did read that

13  correctly.

14      Q.    Clark Lowcost Pharmacy is

15  one such example?

16      A.    Clark Lowcost Pharmacy was

17  one of the examples in the report, yes.

18      Q.    And on the next page, on

19  Page 130, Church Square Pharmacy is

20  identified?

21      A.    Yes.

22      Q.    And is Church Square

23  Pharmacy a second example?

24      A.    Yes, it is.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Would you define two

2   customer examples as various retail

3   pharmacy stores as quoted from the

4   sentence just before Clark Lowcost

5   Pharmacy?

6             MR. BOGLE:  Object to form.

7             THE WITNESS:  I believe they

8        are retail pharmacies, yes.

9   BY MR. MELTON:

10     Q.    Is it your opinion that two

11  examples of retail pharmacies would form

12  a pattern?

13     A.    I'm saying I cited two

14  examples in my report.  I think you can

15  start to see the pattern.  I think there

16  is a pattern here.

17     Q.    With two pharmacies there's

18  a pattern, that's what you're telling me?

19     A.    I cited two pharmacies as

20  examples.  There are other examples

21  potentially.  But I'm saying, if -- if

22  you look, they are illustrative of the

23  issues discussed further on in the

24  report.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Did you identify any other

2    examples of pharmacies in your report for

3    ABC?

4    A.    We can go through the whole

5    section, but the only two I remember are

6    these two off -- you know, in the

7    front-end.  But again I can go through my

8    whole report if you'd like.

9    Q.    That's okay.

10    Did you identify these

11    pharmacies yourself?

12    A.    Yes, actually I did identify

13    both of these pharmacies myself.  Again,

14    I asked counsel, as I testified to

15    yesterday, for pharmacies in Summit and

16    Cuyahoga County.  I went through various

17    files and I picked these two as

18    illustrative examples.

19    Q.    But you didn't say to

20    counsel, please give me the file for

21    Clark Lowcost Pharmacy, did you?

22    A.    I asked counsel to give me

23    files for pharmacies in Cuyahoga and

24    Summit Counties that had high indications

1  of opioid usage, serviced by ABC, as I

2  did for the other defendants as well.

3        Q.    Other than Clark Lowcost

4  Pharmacy and Church Square Pharmacy

5  identified in your report, do you intend

6  to offer any opinions for other ABC

7  customers as examples of retail pharmacy

8  stores obtaining high levels of opioids

9  without investigation or interrogation?

10       A.    At this point in time

11  without new evidence or facts to be

12  considered, as again as I've said before,

13  I hold my report open to reflecting new

14  information.  At this point in time I

15  have no intention.

16       Q.    What do you mean by the term

17  "interrogation"?

18       A.    What I meant by is asking

19  the question why and trying to find the

20  answer as to why.  These are high levels

21  of opioid usage and I didn't see an

22  adequate interrogation as in why is this

23  happening.  There's not -- the

24  documentation was not solid enough for me

1    to make a determination that there was a

2    close examination in an attempt to answer

3    the question why.  That to me is

4    interrogation.

5          Q.    Is Clark Lowcost Pharmacy

6    located in Cuyahoga County?

7          A.    According to my report, yes,

8    it is.

9          Q.    And also according to your

10   report, ABC completed a threshold review

11   request for this pharmacy in

12   October 2010; is that correct?

13         A.    Yes.  I saw it.

14         Q.    And the threshold review

15   request was submitted by Ron Kline,

16   correct?

17         A.    Yeah.  That's what the

18   report says.

19         Q.    Have you ever spoken to

20   Mr. Kline?

21         A.    No, I have not spoken

22   directly to Mr. Kline.

23         Q.    Have you ever read any

24   testimony from Mr. Kline?

1     A.    Well, let's go back to the

2   reliance list.  We can go down my

3   deposition list.  So I'd -- I'd have to

4   look there to be able to tell -- answer

5   your question.  So if you can give me a

6   minute.

7     Q.    If I told you he was not

8   deposed in this case --

9     A.    I'd still like to check my

10   own records if you don't mind.

11     Q.    Sure.  It's 276 is where it

12   starts.

13     A.    I know.  I'm just trying to

14   flip to the page.  I don't see it on the

15   list.

16     Q.    Did you interview anyone at

17   ABC regarding this threshold request for

18   Clark Lowcost Pharmacy?

19     A.    No, I did not approach

20   anyone at ABC directly, no.

21     Q.    Did you review ABC's

22   transactional data for Clark Lowcost

23   Pharmacy?

24     A.    Again, if I reviewed it, and

Highly Confidential - Subject to Further Confidentiality Review

1    it was in the file, I would have reviewed

2    it.  I can't tell you off the top of my

3    head other than what's in the report.

4          Q.    Okay.  I'll represent to you

5    that I did not see a reference to ABC

6    transactional data in -- in your report.

7    Did you review ABC's --

8          A.    Well, again, I think it

9    depends on, Counselor, what we're talking

10   about.  I mean, I would need your help

11   here to understand what you mean by

12   transactional data, because I would say

13   looking at threshold allotments and

14   actual threshold amounts, that is

15   arguably transactional data.  So I'm not

16   sure what you mean by transactional data.

17         Q.    Line-by-line sales data.

18         A.    Not that I recall.

19         Q.    Okay.  Did you review ABC's

20   Tableau files that were produced in this

21   case?

22         A.    Again, not to my -- I don't

23   have a recollection of it.

24         Q.    Now, looking at Page 129.

1    Do you see, sort of in the middle of the

2    page, where there's a one, two and three

3    listed?

4            A.    I'm sorry, 129, you said?

5            Q.    Yep.

6            A.    Yes, I do.

7            Q.    Is it your opinion that a

8    customer located within several miles of

9    two hospitals is a red flag?

10           A.    I'm not saying it's a red

11   flag.  What I'm saying is it's something

12   to be -- it's a factor to be considered

13   looking at how you're setting thresholds.

14   It's information.

15           Q.    Is it also a factor to be

16   considered that a customer is located

17   within several miles of a hospital with a

18   pain clinic?

19           A.    Again, pain clinics are --

20   have been considered red flags by the DEA

21   in this whole, you know, in Florida and

22   other places.  So it is something -- it

23   is another factor to factor in.  It is

24   certainly something to explore.

1    Q.    What is the basis of your

2  statement that pain clinics have been

3  identified as red flags by the DEA?

4    A.    I'd have to go back and pull

5  the front of the report and go through

6  the guidance.  But I remember it being

7  guidance.  I don't have an exact

8  reference for you.

9    Q.    So your testimony is that

10 somewhere in your report --

11   A.    My testimony is, I believe,

12 somewhere in the front of the report

13 where we talk about DEA guidance, there

14 is an indicia of diversion.  And I

15 believe it's in the Rannazzisi letters.

16 But don't ask me to go farther and tell

17 you which date unless you want me to

18 spend some time -- your time looking it

19 up.

20   Q.    No, that's okay.  Do you

21 recall yesterday testifying that you

22 spoke to Mr. Rafalski, an expert in this

23 case?

24   A.    I do.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Did you speak to

2   Mr. Rafalski about red flags?

3    A.    I may have.  I can't rightly

4   recall whether we spoke -- I'm sure we

5   did speak about it.

6    Q.    What do you recall about

7   that conversation?

8    A.    I recall that we sort of

9   talked about red flags in general.  I

10   think pain clinics were one of the things

11   that he brought -- we discussed.  I'm --

12   beyond that.  I can't recall.  I cannot

13   recall the exact substance of that

14   conversation.

15    Q.    But it's your testimony that

16   Mr. Rafalski told you that pain clinics

17   are a red flag?

18         MR. BOGLE:  Object to form.

19         THE WITNESS:  I'm -- no, my

20      testimony is I believe we

21      discussed pain clinics as a red

22      flag.

23         I can't go any further than

24      that, because I don't rightly

1    recall all the details of that

2    conversation.

3    BY MR. MELTON:

4          Q.    Is a customer that's located

5    close to a family practice with a pain

6    clinic also a red flag?

7          A.    Again, I think it's

8    something that you need to look at.  When

9    I say red flag, it's something that

10   raises -- it requires some additional

11   investigation and due diligence.  That's

12   what I'm talking about when I mean red

13   flag.

14         Q.    Have you ever heard of a

15   company called the Pharma Compliance

16   Group?

17         A.    Yes, I know the Pharma

18   Compliance Group.  Why?

19         Q.    Are you aware that the

20   Pharma Compliance Group conducts site

21   visits for AmerisourceBergen?

22         A.    No, Counselor, I wasn't.

23         Q.    Are you aware that the

24   Pharma Compliance Group conducted a site

Highly Confidential - Subject to Further Confidentiality Review

1   visit of Clark Lowcost Pharmacy on behalf

2   of AmerisourceBergen?

3              MR. BOGLE:  Object to form.

4        Vague and ambiguous.

5              THE WITNESS:  Can you give

6        me more specifics?  Because I

7        looked at a lot of documents.  I

8        don't recall that in a document

9        that I saw in what I reviewed.

10       But if you have -- and, again, if

11       you have something that you'd like

12       me to review now, I'm more than

13       happy to take a look at it for

14       you.

15  BY MR. MELTON:

16       Q.   So if you did rely on a

17  Pharma Compliance Site visit report, it

18  would be noted as a footnote or in the

19  reliance material in your report,

20  correct?

21       A.   It would be noted in --

22  certainly in the reliance materials

23  and/or footnote, yes.

24       Q.   Now --

1      A.     Again, if you have a

2   document that you'd like me to consider

3   and look at and talk about, I'm more than

4   happy to do that if you have it.

5      Q.     No, that's okay.  On Page

6   130, if you can flip to Page 130 where it

7   says "Church Square Pharmacy."  Church

8   Square Pharmacy is also located in

9   Cuyahoga County; is that correct?

10      A.     That is correct.

11      Q.     And ABC also completed a

12   threshold review for Church Square

13   Pharmacy?

14      A.     I see that, yes.

15      Q.     And it's the same Ron Kline

16   who submitted the form, correct?

17      A.     I believe that it is

18   correct.

19      Q.     Do you know how many

20   customers ABC services in Cuyahoga

21   County?

22      A.     Not off the top of my head,

23   Counselor.  I can go back and look at my

24   report to see if it's in there.

1    Q.    Was this information that
2  you requested?
3        A.    Counselor, I requested a lot
4  of information.  I'm sure I did request a
5  number of -- of customers.  Honestly, I
6  can't tell you precisely every list of
7  requests that I made from counsel.  So
8  I'm sorry.
9        Q.    Have you identified any ABC
10 customers in Summit County that are
11 examples of retail pharmacy stores
12 obtaining high levels of opioids without
13 investigation or interrogation?
14       A.    Again, Counselor, I can't
15 tell you because I don't remember all the
16 pharmacies that I looked at.
17       Q.    But if you -- if you had
18 identified a customer in Summit County,
19 it would be noted in your report,
20 correct?
21       A.    It might have been.  Again,
22 I was looking for examples.  I picked
23 some examples, illustrative, just like
24 you do in an audit.  I can't tell you

Highly Confidential - Subject to Further Confidentiality Review

1  without more precision and looking at

2  individual pharmacies whether it would

3  have made it into the report or not.

4  So...

5      Q.    I'll back up to Clark

6  Lowcost Pharmacy just for one second.  Do

7  Pages 129 -- the section begins on page

8  129 and goes to 130.

9      A.    Correct.

10      Q.    Are Pages 129 and 130 --

11  strike that.

12          Do Pages 129 and 130 contain

13  all of the opinions that you intend to

14  offer regarding Clark Lowcost Pharmacy?

15      A.    Again, as we discussed

16  previously, unless there is new

17  information that comes to light that

18  warrants a review, at this moment in time

19  I believe I will be offering no more

20  opinions on these -- on this pharmacy.

21      Q.    Same question about Church

22  Square Pharmacy.  Does page -- do Pages

23  130 and 131 contain all of the opinions

24  that you intend to offer regarding Church

1   Square Pharmacy?

2        A.    Again, unless anything new

3   comes to light that warrants me to

4   revisit it as per my report, as I state

5   upfront, it is my intention at this

6   moment not to add anything to the report

7   on this issue.

8        Q.    Do you intend to add

9   anything to the report for Summit County

10  customers?

11       A.    Again, unless I had

12  something -- again, as I said, I will

13  supplement this report as important new

14  data comes forward.  It is not my

15  intention at this point to supplement my

16  report.

17       Q.    All right.  Now I want to

18  ask you some questions about

19  AmerisourceBergen's order monitoring

20  program.  And let's take a look at Page

21  138 of your report.

22       A.    Okay.  I'm there.

23       Q.    Do you see where it says

24  11.5.1, "Prior to 2007

Highly Confidential - Subject to Further Confidentiality Review

1    AmerisourceBergen's two-part controlled

2    substance program was at best rudimentary

3    and not compliant with DEA regulatory

4    requirements"?

5            A.    Yes, I see that.

6            Q.    Is the time period covered

7    by this section prior to 2007, does that

8    mean 1997 to 2007?

9            A.    Well, we have to go to the

10   front of the report, what we said at the

11   start of the period was --

12           Q.    I think you can look in the

13   second paragraph of this section.

14           A.    Okay.  I would say 1997 to

15   2007 is accurate counselor.

16           Q.    And during that time period,

17   1997 to 2007, the DEA had the authority

18   to inspect AmerisourceBergen's

19   distribution centers, correct?

20           A.    Yes.  They did have that

21   authority.

22           Q.    Was the DEA in the best

23   position to determine whether ABC was

24   compliant with DEA's regulatory

Highly Confidential - Subject to Further Confidentiality Review

1    requirements?

2              MR. BOGLE:  Object to form.

3              THE WITNESS:  No, Counselor,

4         you were in the best -- ABC was in

5         the best position to determine

6         whether it was compliant with the

7         regulations.  The onus is on the

8         registrant to be in compliance

9         with the regulations.

10   BY MR. MELTON:

11        Q.    And which regulatory

12   requirements are you referring to?

13        A.    The Controlled Substances

14   Act, controlled substances regulatory

15   regulations.

16        Q.    Now, I noticed in the

17   section that Footnotes 737 738, 740, 741,

18   742, and 743 all refer to the Chris

19   Zimmerman deposition transcript; is that

20   correct?

21        A.    They all refer to that

22   deposition transcript, yes.

23        Q.    You've reviewed Chris

24   Zimmerman's deposition transcript in

1    preparing your report?

2         A.    I did review Chris

3    Zimmerman's deposition transcript in

4    preparing this report.

5         Q.    Did you review the

6    deposition transcript in its entirety?

7         A.    I believe I did.  I'm pretty

8    sure I read the whole thing.  But, again,

9    I read a lot of depositions, so I can't

10   be absolutely certain.

11        Q.    Are you aware that

12   Mr. Zimmerman testified that he was part

13   of the DEA's suspicious order task force

14   in 1998?

15        A.    I vaguely recall him saying

16   something like that in his deposition,

17   yes.

18        Q.    Are you aware that

19   Mr. Zimmerman testified that ABC

20   implemented a suspicious order monitoring

21   program in 1998 working with DEA?

22             MR. BOGLE:  Object to form.

23             THE WITNESS:  I do -- again

24        have a general recollection of

1          that.  Again, if there's specific

2          statements that you'd like me to

3          look at in his deposition, I'm

4          happy to look at them now to

5          refresh my recollection.

6    BY MR. MELTON:

7          Q.    But as you sit here today,

8    you have a general recollection but could

9    not tell me one way or the other unless

10   you reviewed Mr. Zimmerman's transcript?

11         A.    Well, again, to be precise,

12   you're asking me to be incredibly

13   precise.  I would need to see the

14   document to be incredibly precise.  To

15   the best of my knowledge and

16   recollection, I do recall something in

17   his deposition to that effect.

18         Q.    Are you aware that

19   Mr. Zimmerman testified that ABC

20   implemented a suspicious order monitoring

21   program in 1998 that was approved by the

22   DEA?

23              MR. BOGLE:  Object to form.

24              THE WITNESS:  Again, I don't

1      recall that off the top of my

2      head.  Do you have -- again, do

3      you have something in particular

4      that you'd like me to look at?

5  BY MR. MELTON:

6      Q.    Whether ABC had a suspicious

7  order monitoring program that was

8  approved by the DEA, would that

9  information be germane to your evaluation

10  of ABC's compliance program?

11      A.    Can you give me the question

12  again, please, Counselor?

13      Q.    Whether ABC had a suspicious

14  order monitoring program that was

15  approved by the DEA as Mr. Zimmerman

16  testified, would that information be

17  germane to your evaluation of ABC's

18  program prior to 2007?

19      A.    It would certainly be

20  information that I would consider, but I

21  don't see how it would affect the

22  opinions that I've rendered in this case.

23      Q.    Let's go back to Page 132 of

24  your report.

Highly Confidential - Subject to Further Confidentiality Review

1          A.     I'm here.

2          Q.     So in the second full

3   paragraph in the middle, do you see where

4   it says "however"?  And the statement

5   reads, "However, the DEA was not

6   obligated to participate in or provide

7   input on ABC's program and doing so would

8   have run contrary to the DEA's

9   long-standing position that it does not

10  endorse particular systems or programs."

11         A.     I see that.

12         Q.     Now, I note that there's no

13  citation provided for that statement.

14  What is the basis for that statement?

15         A.     Again, I'd have to go to the

16  front of the report and go find you the

17  exact citations to the controlled

18  substances guidance.  But we can page

19  through the report if you'd like,

20  Counsel.

21         Q.     But you would agree that

22  there's no citation to this statement --

23  this section.

24         A.     I would agree --

Highly Confidential - Subject to Further Confidentiality Review

1    MR. BOGLE:  Wait until he

2    finishes.

3    THE WITNESS:  Sorry.

4  BY MR. MELTON:

5    Q.    You would agree that there's

6  no citation to anything for this

7  statement?

8    A.    I would agree there's no

9  footnote here.

10    Q.    Did you speak to

11  Mr. Rafalski about this topic?

12    A.    I may have.  Again, as I

13  told you I don't have a detailed

14  recollection of my conversations on all

15  topics with Mr. Rafalski.  We talked

16  about a lot of different topics, DEA

17  internal.  But I do believe we had that

18  conversation.

19    Q.    You also reviewed the

20  deposition transcript of Steve Mays in

21  preparing your report; is that correct?

22    A.    Yes.

23    Q.    Did you review the entire

24  transcript for Mr. Mays?

1          A.    Again, Counselor, I don't

2    remember whether I reviewed the full

3    transcript or not.  I can't tell you.

4          Q.    Are you aware that Mr. Mays

5    testified that ABC worked closely with

6    the DEA to develop enhancements to its

7    program in 2007?

8              MR. BOGLE:  Object to form.

9              THE WITNESS:  Again

10         Counselor, generically, yes.  Do I

11         recall a specific reference?  No.

12   BY MR. MELTON:

13         Q.    Now, you also reviewed the

14   settlement agreement entered into between

15   ABDC and the DEA in 2007 in formulating

16   your report, correct?

17         A.    I did.

18         Q.    Would you agree that ABDC is

19   obligated to comply with the terms of the

20   2007 settlement agreement?

21         A.    May I see the document again

22   to refresh my recollection again?  You're

23   asking me specific questions about

24   specific documents, and I reviewed a lot

1    of documents.  It would be helpful to see

2    the document.

3             Q.    We'll get there.  Just more

4    generically, would you agree that the

5    parties to an agreement are bound by that

6    agreement?

7             A.    Again, I would agree that

8    parties sign an agreement, it's like a

9    contract if that's what you're asking,

10   Counselor.  Again, I'm not sure what

11   you're asking.

12            Q.    And so if there is a

13   contract, the parties are bound by that

14   contract?

15            A.    That's usually the way we do

16   business.

17                 (Document marked for

18                 identification as Exhibit

19                 Whitelaw-17.)

20   BY MR. MELTON:

21            Q.    So I've marked the 2007

22   settlement agreement as Exhibit Number

23   17.

24            A.    Okay.

1          Q.     The document is Bates

2     labeled ABDCMDL 00279854 to 865.  You can

3     take a minute and familiarize yourself

4     with that.

5          A.     Sure.  Thank you.  I see it.

6          Q.     So I'd like to direct your

7     attention to Page 2 of the document where

8     it says, "Obligations of

9     AmerisourceBergen."

10         A.     I see it.

11         Q.     Do you see paragraph little

12    (a), where it says, "AmerisourceBergen

13    agrees to maintain a compliance program

14    designed to detect and prevent diversion

15    of controlled substances which shall

16    apply to the Orlando facility and all

17    other existing and future distribution

18    centers of AmerisourceBergen in the

19    United States"?

20              Do you see that?

21         A.     Yes, I see that section.

22         Q.     And then at the bottom of

23    Page 2, moving onto Page 3, Subsection C,

24    where it says, "Any material breach of

1    subsections Roman numeral II(1)(a) or (b)

2    of this agreement by AmerisourceBergen

3    after DEA restores the Orlando facility's

4    registration, may be a basis upon which

5    DEA can issue an order to show cause

6    seeking the revocation of the DEA

7    certificate of registration associated

8    with the distribution center whose

9    conduct is related to the material breach

10   of the agreement."

11            Do you see that?

12       A.    I do see that.

13       Q.    Aside from this 2007 issue

14   with the DEA, has AmerisourceBergen been

15   the subject of a second enforcement

16   action by the DEA?

17       A.    Not to the best of my

18   knowledge, it has not.

19       Q.    Has AmerisourceBergen paid

20   any fines relating to the diversion of

21   controlled substances after 2007?

22       A.    Again, not to the best of my

23   knowledge.

24       Q.    Are you aware that

1    AmerisourceBergen didn't pay a fine in

2    2007 either?

3          A.    Yes, I am aware of that.

4          Q.    Now, on Page 3 of the

5    document, where it says, "Obligations of

6    DEA"?

7          A.    Yep.

8          Q.    Do you see that?

9          A.    I do see that.

10          Q.    And Subsection A where it

11    says, "The DEA shall continue to provide

12    diversion, prevention, and awareness

13    training as practicable to retail

14    pharmacy and industry members at

15    AmerisourceBergen trade shows and through

16    written materials"?

17          A.    I see it.

18          Q.    So the DEA was obligated by

19    this agreement to provide diversion

20    prevention and awareness training at ABC

21    trade shows; is that correct?

22          A.    That's what it states on the

23    face of the document, yes.

24          Q.    Moving onto Subsection C.

Highly Confidential - Subject to Further Confidentiality Review

¹ Do you see where it says, "The DEA shall

² conduct reviews of the functionality of

³ AmerisourceBergen's diversion compliance

⁴ program at up to five distribution

⁵ centers of AmerisourceBergen"?

⁶         A.    Yes, I do see the -- I see

⁷ what you're reading from, yes.

⁸         Q.    So AmerisourceBergen had to

⁹ pass functionality reviews by the DEA to

¹⁰ get their immediate suspension order

¹¹ lifted; is that correct?

¹²             MR. BOGLE:  Object to form.

¹³             THE WITNESS:  What I see

¹⁴         here is simply a statement that

¹⁵         they shall conduct reviews of

¹⁶         functionality at up to five

¹⁷         distribution centers.  That's all

¹⁸         I see here.

¹⁹ BY MR. MELTON:

²⁰         Q.    So DEA reviewed

²¹ AmerisourceBergen's program at up to five

²² distribution centers, is that fair?

²³             MR. BOGLE:  Object to form.

²⁴             THE WITNESS:  I can't

1      comment on whether they did or did

2      not review them.  I'm saying that

3      this was -- well, there was an

4      obligation that reads just like we

5      read the sentence back, in this

6      document.  That's all I can state

7      to.

8            The document says what you

9      say it says.

10   BY MR. MELTON:

11      Q.    On Pages 4 and 5 of the

12   document, do you see the section titled

13   "Joint Obligations of the Parties"?

14      A.    Hang on a second.  I see

15   Section 3, "Joint Obligation of Parties,"

16   yes.

17      Q.    And in that section,

18   Subsection B where it says, "DEA and

19   AmerisourceBergen shall meet no less than

20   annually at DEA headquarters to discuss,

21   rely, suggestions for improvements at

22   AmerisourceBergen's compliance program to

23   detect and prevent diversion of

24   controlled substances; two, any concerns

1    of the DEA related to the sales pattern

2    of controlled substances by

3    AmerisourceBergen; and three, any other

4    issues of concern to either party."

5             Do you see that?

6        A.    I do see that.

7        Q.    So according to this

8    section, DEA was obligated to provide

9    input on AmerisourceBergen's program at

10   annual meetings; is that correct?

11            MR. BOGLE:  Object to form.

12            THE WITNESS:  Counselor,

13       I -- I read it that they were --

14       there was a meeting to talk about

15       suggestions and improvements in

16       AmerisourceBergen's compliance

17       program.  That a topic of

18       discussion at those meetings would

19       be any concerns that DEA might

20       have and any other issues of

21       concerns to either of the parties.

22            Beyond that I can't comment

23       on --

24   BY MR. MELTON:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     You testified that there was
2  a meeting, but this paragraph is in the
3  section titled "Joint Obligations of the
4  Parties," correct?
5      A.     It is in the section of
6  the -- of the agreement called "Joint
7  Obligations of the Parties."
8      Q.     So there was a joint
9  obligation of the parties to have
10 meetings?
11     A.     All I can go is -- by is
12 what the words are on the page.  And the
13 words on the page say, "The DEA and
14 AmerisourceBergen shall meet no less than
15 annually at DEA headquarters."
16     Q.     Setting aside this document
17 for a moment.  Were you present at the
18 2007 DEA industry conference?
19     A.     No, I was not.
20     Q.     Were you present at the 2009
21 DEA industry conference?
22     A.     Again, no, I was not.
23     Q.     Let's turn to Page 143 of
24 your report.

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Sure.

2          Q.     Okay.  Do you see on the

3    first full paragraph towards the end

4    where it says, "ABC effectively ensured

5    that the thresholds rarely would be hit,

6    thus avoiding the need to hold orders"?

7          A.     Yes.

8          Q.     What is the basis for that

9    statement?

10         A.     Well, we can go back through

11   the whole section and talk about how they

12   were setting thresholds and size, if

13   you'd like to go, walk our way through

14   it.

15              But the size of the

16   thresholds were such, and the systems and

17   the way they were implementing the

18   process was such that it was rare that

19   these thresholds would ever be hit and

20   ever be triggered.  But we can talk about

21   each of them in detail if you'd like.

22         Q.     That's okay.

23              The -- is it your opinion

24   that the program implemented by

1  AmerisourceBergen in 2007 effectively

2  ensured that the thresholds rarely would

3  be hit, thus avoiding the need to hold

4  the orders?

5       A.    I'm saying -- can you

6  rephrase the question again for me

7  please?

8       Q.    Is it your opinion that the

9  order monitoring program implemented in

10  2007 by AmerisourceBergen effectively

11  ensured that the thresholds rarely would

12  be hit, thus avoiding the need to hold

13  the orders?

14       A.    That's what I'm saying.

15       Q.    Did the DEA observe that

16  when they conducted their functionality

17  reviews at the five distribution centers

18  in 2007?

19       A.    I have no idea what DEA

20  observed or did not observe.

21            Again, if you have something

22  that you'd like me to look at in

23  particular, I'm happy to examine it now.

24       Q.    Let's turn to Page 144 of

Highly Confidential - Subject to Further Confidentiality Review

1  your report.

2          A.    Okay.

3          Q.    Do you see up at the top,

4  the last sentence of that carryover

5  paragraph where it says, "In the eyes of

6  the DEA's limits, ABC's basic unadjusted

7  thresholds started out at suspicious

8  order levels"?

9          A.    I see it.

10          Q.    Did the DEA also make that

11  observation when they conducted the

12  functionality reviews at five

13  AmerisourceBergen distribution centers in

14  2007?

15          A.    Again, Counselor, I don't

16  know what DEA observed at those five --

17  in those observations.  But again, if you

18  have a document you'd like me to review,

19  I'd be happy to review them.

20          Q.    I'm just asking for your

21  opinion.

22          A.    Without seeing a document, I

23  cannot form an opinion.

24          Q.    Let's take a look at

Highly Confidential - Subject to Further Confidentiality Review

1    Page 145.  It's the section that is

2    labeled "C. OMP - Setting the Record

3    Straight."

4         A.    Yep, I see it.

5         Q.    And it continues to

6    Page 147?

7         A.    I see it.

8         Q.    Do you recall the documents

9    that you reviewed that were titled

10   "Setting the Record Straight"?

11        A.    I do recall them.  And I

12   believe they are listed here in the

13   footnotes.

14        Q.    If you look at Page 147, the

15   last paragraph of this section, the

16   middle of the paragraph, it says, "I can

17   only conclude that ABC made the change to

18   allow its sales force to provide

19   customers with valuable coaching on how

20   to avoid their orders being labeled as

21   suspicious, thereby undermining the SOM

22   program even further."

23           Do you see that?

24        A.    Yep.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Now, there's no citation

2    after that statement.  So what is the

3    basis for that opinion or conclusion?

4         A.    The fact that you had it in

5    the original version and then was

6    stripped out -- the sentence, "Notifying

7    a customer that they had been reported to

8    the DEA or state would defeat the purpose

9    of the monitoring program," was then

10   stripped out of your October version,

11   which is what we're talking about here.

12             So the removal of that

13   sentence, all I -- all I could conclude

14   is you wanted to -- that sentence was

15   removed to allow notifications to occur.

16        Q.    In the many documents that

17   you reviewed in this case, you did not

18   find an example of ABC's sales force

19   providing valuable coaching to customers

20   to avoid having their orders labeled as

21   suspicious; is that correct?

22             MR. BOGLE:  Object to form.

23             THE WITNESS:  I looked at a

24        lot of documents, Counselor.  I

Highly Confidential - Subject to Further Confidentiality Review

1        can't tell you off the top of my

2        head if I saw anything -- a

3        particular document.

4            Again, if there's a

5        particular document that you'd

6        like me to review, I would be

7        happy to do so.

8   BY MR. MELTON:

9        Q.    If you had seen such a

10  document, it would be noted in your

11  report; is that correct?

12       A.    Counselor, I noted what was

13  relevant to formulate my opinions in the

14  report.  You're asking me a hypothetical

15  of a hypothetical document.  I can't

16  answer that question.

17       Q.    A document that essentially

18  proves your conclusion to be accurate

19  would be relevant to your report,

20  correct?

21       A.    If I saw relevant documents,

22  I, again, more than likely would have

23  cited to it.  But again, I can't tell you

24  unless you've got a specific document or

Highly Confidential - Subject to Further Confidentiality Review

1  specific fact pattern, it's hard for me

2  to -- you're asking me to play what if.

3          Q.    And there's nothing cited

4  after the statement that we are talking

5  about correct?

6          A.    There is no footnote.

7          Q.    Okay.  Now continuing on

8  Page 147 where it says, "Low volume

9  accounts."

10          A.    It does.

11          Q.    In the second paragraph,

12  about halfway in, you write, "In other

13  words."

14              Do you see that statement?

15          A.    Yes.

16          Q.    The statement that begins,

17  "In other words"?

18          A.    Mm-hmm.  I see the

19  statement.

20          Q.    Now, this statement that you

21  make here is essentially paraphrasing

22  something that you found somewhere else,

23  correct?

24              MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  Could you

2      re-ask the question again?

3   BY MR. MELTON:

4          Q.    Sure.  It states, "In other

5   words," and then explains what you're

6   trying to get at.  So by saying "in other

7   words," it was not in the original

8   document, correct?

9          MR. BOGLE:  Object to form.

10          THE WITNESS:  It is my

11      reading of the document and what

12      the document actually says

13      referencing back to Footnote 789.

14   BY MR. MELTON:

15          Q.    But if Document 789 actually

16   said what you say it says, you would have

17   quoted it, correct?

18          MR. BOGLE:  Object to form.

19          THE WITNESS:  I might have.

20      I might not have.  Counselor,

21      again, you're asking me to play

22      what-if games.

23   BY MR. MELTON:

24          Q.    In fact, Footnote 789, you

Highly Confidential - Subject to Further Confidentiality Review

1    did quote from the document; is that

2    right?

3           A.    I did quote from the

4    document.

5           Q.    Continuing on in that

6    paragraph, do you see where it says,

7    "Neither Mr. Zimmerman nor Mays in their

8    depositions could provide an alternate

9    rationale for the document"?

10               Do you see that?

11          A.    I do.

12          Q.    And I notice that there's

13   also no citation listed there; is that

14   correct?

15          A.    There is no footnote listed

16   there, no.

17          Q.    Had Mr. Zimmerman or

18   Mr. Mays been asked about this in their

19   deposition, would you have cited to the

20   testimony?

21               MR. BOGLE:  Object to form.

22               THE WITNESS:  Counselor, I

23          don't remember what was in those

24          depositions on this issue.  I

1        have -- I'd have to look at the

2        specifics.

3    BY MR. MELTON:

4        Q.    Okay.  Let's take a look at

5    Page 132 of your report.

6        A.    I'm there.

7        Q.    The third full paragraph

8    starts with, "This private face also."

9            Do you see that?

10       A.    Mm-hmm.

11       Q.    So in 2015,

12   AmerisourceBergen engaged FTI Consulting

13   Inc.'s health solutions practice; is that

14   correct?

15       A.    That's what this report

16   says, yes.

17       Q.    Is there anything wrong with

18   ABC engaging an outside consultant to

19   evaluate their anti-diversion program?

20       A.    No.  There's nothing wrong

21   with engaging an outside consultant, no.

22       Q.    In your 30 years of

23   experience in compliance, this is the

24   type of behavior that we would like to

Highly Confidential - Subject to Further Confidentiality Review

1    see out of companies; is that correct?

2         A.    Well, we have to take it

3    through the whole full circle.  We would

4    like to see them engage outside

5    consultants to improve their programs and

6    then actually follow through and make

7    those improvements that are recommended.

8    That would be what we -- that's the real

9    goal of what we're looking for.

10        Q.    You reviewed the deposition

11   transcript of David May; is that correct?

12        A.    I did.

13        Q.    And you take issue with some

14   of the statements that Mr. May made about

15   the FTI findings; is that correct?

16        A.    I do.

17        Q.    Now, on Page 133 of your

18   report at the top, the last sentence

19   states, "Not only did Mr. May disagree

20   with the findings, but ABC also did not

21   implement any changes in its policies and

22   procedures as a result of the FTI

23   report."

24              Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    I do.

2        Q.    And it notes that Footnote

3   707 details the basis for that statement,

4   correct?

5        A.    That's what it says.

6        Q.    Footnote 707 also notes that

7   Mr. May testified that he conducted his

8   own review, "And we made changes to the

9   program."

10            Do you see that?

11       A.    Yes.

12       Q.    And it says -- in between

13  the two quotes for Footnote 707, it says

14  "but CF"?

15       A.    Compare.

16            MR. BOGLE:  Wait until he

17       asks you a question.

18            MR. MELTON:  That was going

19       to be my question.

20            MR. BOGLE:  That's fine.  It

21       may have been.  I just want to

22       make sure he's actually answering

23       a question.

24            MS. McCLURE:  Good guess.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. MELTON:

2         Q.    It was a good guess.  Do you

3    know who Mr. May was referring to when he

4    said "we made changes to the program"?

5         A.    I believe he was referring

6    to ABC, but more precisely than that, no.

7         Q.    Are you aware that FTI was

8    hired to evaluate and enhance ABC's order

9    monitoring program in 2014?

10         A.    I don't recall seeing any

11    documents on that.  I don't.

12         Q.    Okay.  Would you agree that

13    at least as of 2016, ABC made a number of

14    changes acting on the FTI findings?

15              MR. BOGLE:  Object to form.

16              THE WITNESS:  Let's go back.

17         Do you have a specific section of

18         the report that you'd like to look

19         at?

20    BY MR. MELTON:

21         Q.    Sure.  Let's look at Page

22    154.

23         A.    Okay.

24         Q.    Do you see in the paragraph

1    at the top of the page where it says,

2    halfway through it says, "Therefore,

3    despite Mr. May's contention that FTI's

4    findings were incorrect, it appears that

5    ABC proceeded to act on them in an effort

6    to create 'more standardized, automated

7    and objective processes to drive

8    decisions and processes'"?

9         A.    I do see that statement.

10        Q.    So it looks like ABC did act

11   on the FTI findings; is that correct?

12        A.    Eventually, yes.  But again

13   we can go back and look at Mr. May's

14   testimony and that, if I recall the date,

15   we are talking about an event several

16   years prior to that when those findings

17   were -- original findings were presented

18   to ABC.

19             So if you give me a second.

20        Q.    I didn't ask you to go back

21   and look at Mr. May's testimony.

22        A.    I would like to, I mean,

23   let's be accurate.

24        Q.    Do you have Mr. May's

Highly Confidential - Subject to Further Confidentiality Review

1    testimony?

2          A.    No, I know.  Let's go back

3    and look at the report, what I say in my

4    report.

5                As I recall the findings,

6    and I can get you the date of when FTI

7    actually made their findings, that

8    several years had transpired.  That's --

9          Q.    How about Page 132,

10   Footnote 704?

11         A.    Yes.

12         Q.    What is the date that's

13   listed?

14         A.    I have 2015.

15         Q.    Is there a month listed?

16         A.    August.

17         Q.    And a day?

18         A.    Yes, there's a day.

19         Q.    What is -- what is the date

20   that is listed?

21         A.    August 25th.

22         Q.    August 25th of 2015,

23   correct?

24         A.    Correct.

1          Q.    So if we look back at

2     Page 154.

3          A.    2016.

4          Q.    So a couple months --

5          MR. BOGLE:  Wait for the

6          question.

7     BY MR. MELTON:

8          Q.    So a couple months had

9     passed between the FTI findings and the

10    enhancements that were rolled out in

11    2016?

12         MR. BOGLE:  Object to form.

13         THE WITNESS:  I don't know

14         the exact month that they rolled

15         out in 2016.

16    BY MR. MELTON:

17         Q.    Take a look at Page 157.

18    The section continues onto Page 158.

19         A.    I see it.

20         Q.    Do you recall reviewing

21    audits of ABC's program that were

22    conducted by Michael Mapes?

23         A.    I recall the documents that

24    are cited here, yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And it's your opinion that

2    ABC did not have a robust internal audit

3    process; is that correct?

4    A.    That was my opinion, yes.

5    Q.    And that's your opinion

6    because Mr. Mapes utilized the checklist;

7    is that correct?

8         MR. BOGLE:  Object to form.

9         THE WITNESS:  No, that's not

10        my only reason.  A checklist, per

11        se, is not the issue.  There is no

12        context around it that you'd

13        expect to see in an audit.

14        What were the actual

15        transactions that were reviewed,

16        what was the sample that was

17        pulled, what are the management

18        responses, what's the corrective

19        action plan.  All that is part and

20        parcel of a formal audit program.

21        This is more of just a quick and

22        dirty -- as I cite, quality

23        control checklist.  It's not a

24        real -- in my opinion, it is not a

Highly Confidential - Subject to Further Confidentiality Review

1          real formal audit program.

2   BY MR. MELTON:

3          Q.    Staying on Page 158.  Do you

4   see Section 11.6.1?

5          A.    I do.

6          Q.    Discussing accountability?

7          A.    I do.

8          Q.    Now, there are three

9   individuals listed in this section; is

10  that correct?

11         A.    There were three of the

12  individuals listed in this section, yes.

13         Q.    And we've discussed all

14  three of these individuals today,

15  Mr. Zimmerman, Mr. Mays, and Mr. May; is

16  that correct?

17         A.    Yes, they've come up today.

18         Q.    Now, you testified yesterday

19  that holding someone accountable could

20  range from a loss of bonus, demotion,

21  transfer, or termination; is that

22  correct?

23         A.    Correct.

24         Q.    Do you know whether any of

1   these three men have lost the bonus?

2       A.   I didn't see anything on the

3   record that showed accountability.

4       Q.   Do you know whether any of

5   these three men have been demoted?

6       A.   Again, I didn't see -- I

7   didn't see anything in -- in my review of

8   the records.

9       Q.   Do you know whether any of

10   these three men have been transferred

11   from their positions?

12       A.   Except for the fact

13   Mr. Zimmerman is no longer chief

14   compliance officer, again I didn't see

15   any evidence on the record.

16       Q.   Aside from the fact that

17   they've not been fired from

18   AmerisourceBergen, what basis do you have

19   to say that they've not been held

20   accountable?

21       A.   I haven't seen anything that

22   shows they have been accountable or shows

23   they have been accountable.

24          Again, Counselor, if there's

1    something you'd like me to consider and

2    look at I'll be happy to look at right

3    now.

4         Q.    As you sit here today, do

5    you intend to supplement your report with

6    regard to AmerisourceBergen?

7         A.    Again, I reserve the right

8    to supplement my report based on new

9    information as it becomes available, and

10   that's pertinent and germane to what I

11   opined on.  But I have no present plan at

12   the moment for amending the report.

13        Q.    Are you relying today on any

14   notes that you made to refresh your

15   recollection regarding AmerisourceBergen

16   in advance of testifying today?

17        A.    No.  I'm testifying from

18   my -- we went through my report.

19        Q.    Did you bring any notes with

20   you today regarding AmerisourceBergen?

21        A.    I don't have any notes with

22   me right now.

23        Q.    Just one more item that I

24   want to clear up.  We talked about this a

1    little bit at the beginning, but the --

2    we've reviewed the transcript from

3    yesterday and the -- the -- when I

4    thought I heard ABC, I'll represent to

5    you that the transcript says, "I was

6    brought in with ABC, I think at some

7    point, to advise on antikickback and

8    FCA."

9                You're now saying today that

10   your testimony did not refer to

11   AmerisourceBergen, correct?

12       A.    I'm saying today if I said

13   that I said I didn't recall.  I was quite

14   accurate in saying I didn't recall what

15   I'd said yesterday.  Thank you for going

16   back.

17                Again, I don't have any

18   specific recollection of a specific

19   project, no, Counselor, I don't.

20                I thought I did.  I was

21   probably mistaken.

22       Q.    So you have no specific

23   recollection of doing any work for ABC?

24       A.    I did not -- no specific

1  recollection of doing work for ABC, no.

2  I think what I would have been referring

3  to, if I did anything, would have been a

4  partner in the Deloitte practice would

5  have consulted me and I would have made

6  some statements about antikickback and --

7  and FCA.

8          But again, you're asking me

9  from awhile ago, I don't rightly recall.

10      Q.    Statements about

11  antikickback, this -- what you just

12  mentioned --

13      A.    You had asked me --

14          MR. BOGLE:  Wait, wait,

15      wait.

16  BY MR. MELTON:

17      Q.    What you just mentioned

18  about the -- the partner at Deloitte,

19  statements about antikickback and FCA, to

20  AmerisourceBergen?

21      A.    Again, I don't rightly

22  recall.  I was a compliance consultant in

23  the form that I am in now within Deloitte

24  as well.  So I -- people would come to me

Highly Confidential - Subject to Further Confidentiality Review

1    and say well, what do you think about,

2    what are the rules on, that's what I'm --

3    that's what I have a vague recollection

4    of.

5         Q.   Did you or did you not do

6    any work --

7         A.   I did not do --

8              MR. BOGLE:  Whoa, whoa,

9         whoa.  Let him finish.

10             THE WITNESS:  I'm sorry.

11   BY MR. MELTON:

12        Q.   Did you or did you not do

13   any work at Deloitte regarding

14   AmerisourceBergen?

15        A.   To the best of my knowledge,

16   counselor, I did not bill any time to

17   AmerisourceBergen as a client while I was

18   at Deloitte.

19        Q.   I didn't ask you whether you

20   billed any time.  My question was whether

21   you did any work regarding

22   AmerisourceBergen.

23        A.   That's the best way I can

24   tell you whether or not I did work, would

1    be -- if I did work, it would have been

2    billed time.  And I don't recall billing

3    any time to AmerisourceBergen as an

4    account.

5         Q.    So if you did not bill time

6    to AmerisourceBergen, then you did not do

7    work for AmerisourceBergen, correct?

8         A.    As far as I -- it certainly

9    would have been unbillable time.  Like I

10    said, I don't rightly recall.  I'm sorry.

11    It's been a while.

12         Q.    So you don't know whether

13    you did any work for AmerisourceBergen?

14              MR. BOGLE:  Object to form.

15         Asked and answered.

16              THE WITNESS:  I will answer

17         the question the best I can again,

18         Counselor.  I did not bill any

19         time to the AmerisourceBergen

20         account that I recollect doing

21         when I was at Deloitte.

22              MR. MELTON:  At this time

23         I'm going to pass the witness.

24         Let's go off the record.

Highly Confidential - Subject to Further Confidentiality Review

 1                  THE VIDEOGRAPHER:  Going off

 2          the record.  11:31 a.m.

 3                  (Short break.)

 4                  THE VIDEOGRAPHER:  We are

 5          back on the record at 11:46 a.m.

 6                     -  -  -

 7                  EXAMINATION

 8                     -  -  -

 9      BY MR. HYNES:

10          Q.    Good morning, Dr. Whitelaw.

11      My name is Paul Hynes.  We met off the

12      record.  I represent CVS in this case.

13                  First, sir, do you have any

14      opinions about CVS that are not in your

15      report or your supplemental report?

16          A.    No, sir.  My report is, and

17      supplemental are part of the record.

18          Q.    Okay.  And do you have any

19      intention currently to offer any opinions

20      about CVS that are not in either report?

21          A.    I have no current intentions

22      to do that.

23          Q.    Okay.  And do your reports

24      cite all the evidence that you're relying

Highly Confidential - Subject to Further Confidentiality Review

1   on to support your opinions about CVS?

2        A.    With the exception of my

3   30 years' experience of being a

4   compliance officer and -- but if you're

5   looking for documents, yes.

6        Q.    Okay.  And do you have any

7   intention currently to rely on any

8   evidence not cited in your reports to

9   support your opinions about CVS?

10       A.    Again, other than my

11  30 years' experience and my conversations

12  that we talked about in depth with

13  Mr. Rafalski, no.  But those are cited --

14  that conversation is cited in the report

15  too, so...

16       Q.    I want to talk about your

17  review of CVS documents.  Did you follow

18  the same process for CVS that you

19  described yesterday that you requested

20  certain categories of documents from

21  plaintiffs' counsel?

22       A.    Yes, sir, I did.

23       Q.    I want to turn to pages 276

24  and 77 of your report.  It's in the

Highly Confidential - Subject to Further Confidentiality Review

1   appendices.

2        A.    Okay.

3        Q.    You list there 16 CVS

4   depositions.  Did you review all of those

5   deposition transcripts or just portions?

6        A.    I can't tell you at this

7   point whether I reviewed all or portions

8   at this point, considering the number of

9   deposition transcripts that I worked

10  with.

11       Q.    Can you tell me whether you

12  reviewed the entirety of any of those

13  depositions?

14       A.    I believe I reviewed the

15  entirety of some of them, but I can't

16  tell you which ones right off the top of

17  my head right now.

18       Q.    Okay.  Did you request any

19  depositions from counsel that were not

20  provided to you?

21       A.    I -- everything I requested

22  from counsel was provided for me if they

23  could find it in their files.

24       Q.    Okay.  And did you watch any

Highly Confidential - Subject to Further Confidentiality Review

1    videos of the CVS depositions listed in

2    your appendices?

3        A.    No, I reviewed the written

4    transcripts.

5        Q.    Sir, did you prepare any

6    notes to possibly be used to refresh your

7    recollection during this deposition

8    related to CVS?

9        A.    Yes, I did.

10       Q.    Okay.  I would just ask that

11   if you do use those notes, you tell me.

12   Is that fair?

13       A.    That -- ask the gentleman to

14   my left.

15            MR. BOGLE:  Yes.  If he uses

16       them, yeah, of course, yes.

17   BY MR. HYNES:

18       Q.    I want to talk about how you

19   drafted your report.  Did plaintiffs'

20   counsel draft any of the CVS sections of

21   your reports?

22       A.    No, they did not.

23       Q.    Did they draft any of the

24   CVS paragraphs of your reports?

1    A.    No, they did not.

2    Q.    Any sentence in the CVS

3  sections of your reports?

4    A.    No.  I drafted everything.

5    Q.    Did they provide any edits

6  to the CVS sections of your reports?

7    A.    No they didn't provide

8  edits.  They may have provided comments

9  where I was factually incorrect or had a

10  wrong Bates stamp number or something

11  along those lines, but no.

12    Q.    Were those comments conveyed

13  to you orally or in written form?

14    A.    Probably both.

15    Q.    Okay.  So is it your

16  testimony, sir, that not a single word in

17  the CVS sections of your report came from

18  plaintiffs' counsel?

19    A.    It's my testimony I wrote

20  this report soup to nuts, yes.

21    Q.    Did plaintiffs' counsel

22  provide you with a list or outline of

23  opinions to give about CVS?

24    A.    Absolutely not.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    A list or outline of CVS

2  issues to consider?

3      A.    No.  That I recall, no.

4      Q.    A list or outline of CVS

5  facts to address?

6      A.    Again, not that I recall.

7      Q.    Sir, I want you to turn to

8  Page 161 of your report, please.

9      A.    I'm here.

10     Q.    Okay.  And it's the last

11 sentence above Section 12.3.  And it's

12 actually the second-to-last line going

13 onto the last line there.  You state, "If

14 the mode model had a remedial level, I

15 would place a CVS program there."

16           Do you see that?

17     A.    I do.

18     Q.    When you say the CVS

19 program, are you referring to the CVS SOM

20 program?

21     A.    I'm referring to the CVS

22 anti-diversion program, of which SOM is a

23 key component of it.

24     Q.    Okay.  Have you evaluated

Highly Confidential - Subject to Further Confidentiality Review

1    any other CVS anti-diversion programs?

2                    MR. BOGLE:  Object to form.

3                    THE WITNESS:  I'm not sure I

4           understand.

5    BY MR. HYNES:

6           Q.    Have you evaluated any CVS

7    anti-diversion programs other than the

8    CVS SOM program?

9                    MR. BOGLE:  Object to form.

10                   THE WITNESS:  Again, I think

11          I have covered this before.  The

12          focus was on SOM.  They all fit

13          together.  I focused on -- I did

14          focus on suspicious order

15          monitoring.  In the context of a

16          broader anti-diversion program, in

17          the context of a broader corporate

18          compliance program.

19   BY MR. HYNES:

20          Q.    Okay.  So you didn't review

21   any documents related to CVS's theft and

22   loss reporting?

23          A.    No, I did not.

24          Q.    Or any documents related to

Highly Confidential - Subject to Further Confidentiality Review

1    its pharmacy-level anti-diversion

2    programs?

3              A.    No, I did not.

4              Q.    Okay.  The model that you

5    discuss here, have you ever, in all the

6    times that you've used that model, found

7    an SOM program to score above the

8    foundational level?

9              MR. BOGLE:  For clarity, are

10        you talking about Figure 2?  When

11        you say model?  I just want to

12        make sure --

13              MR. HYNES:  Yeah.

14              THE WITNESS:  I don't know

15        what model you're talking about.

16   BY MR. HYNES:

17              Q.    The -- yeah, Figure 2.

18   Where -- the one in front of you there.

19   This model right here.

20              A.    That model?

21              Q.    Yeah.

22              A.    And all the time that I've

23   used it for an SOM?

24              Q.    Yeah.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Applied to an SOM program

2  alone?

3    Q.    Yes, have you ever found,

4  when you applied it to a SOM program,

5  have you found such a program to score

6  above the foundational level?

7    A.    No, I have not.

8    Q.    Before you were engaged in

9  this case, had you ever used this model

10  to evaluate an SOM program?

11    A.    No, I had not.  But it is a

12  standard compliance maturity model that

13  I've used to evaluate compliance

14  programs.

15    Q.    But not an SOM program

16  before you were --

17    A.    Not an SOM --

18    Q.    -- engaged in this case?

19    A.    -- program, per se.

20    Q.    I want to turn to --

21        MR. BOGLE:  Just wait until

22    he finishes.

23  BY MR. HYNES:

24    Q.    -- CVS's distribution

Highly Confidential - Subject to Further Confidentiality Review

1    business.  You know that CVS is a

2    national chain pharmacy, correct?

3           A.     Yes, sir, I do.

4           Q.     Okay.  And I think you state

5    in your report, it has 9,800 retail

6    pharmacies.  Page 159.

7           A.     I believe that's --

8           Q.     Approximately.

9           A.     Approximately.  That number

10   rings a bell.

11          Q.     I'm not trying to test you

12   on that.

13                 Are -- are you aware how

14   many retail pharmacies CVS has in

15   Cuyahoga and Summit Counties?

16          A.     Not off the top -- the

17   number?  I don't have a hard number off

18   the top of my head.

19          Q.     Is that something you looked

20   into when you were evaluating CVS's SOM

21   program?

22          A.     Again, I evaluated a lot of

23   different things in the SOM program.  And

24   I may have looked into it.  Again, I

Highly Confidential - Subject to Further Confidentiality Review

1  can't rightly recall.  It doesn't -- I

2  don't have a recollection of it for you.

3          Q.    Okay.  And are you aware of

4  how many CVS warehouses distributed to

5  CVS retail pharmacies in Cuyahoga and

6  Summit County?

7          A.    My understanding, based on

8  my review, was it was in the -- the

9  Indianapolis distribution center was

10  distributing into Summit and Cuyahoga

11  County.  That's what I have.

12          Q.    Okay.  And are you aware

13  that like Walgreens, CVS only distributes

14  to itself, to -- to its own pharmacies?

15          A.    Yeah, I believe that was

16  what was noted in my report.

17          Q.    So it doesn't distribute to

18  pain clinics, correct?

19          A.    I know it distributes to its

20  own pharmacies.

21          Q.    Okay.  So you -- you are

22  aware then that it doesn't distribute to

23  pain clinics?

24          A.    If they are not owned by

Highly Confidential - Subject to Further Confidentiality Review

1  CVS, I'm aware that they only distribute

2  to CVS entities.

3      Q.    Okay.  Are you familiar with

4  the pharmaceutical drugs distributed by

5  CVS warehouses?

6          MR. BOGLE:  Object to form.

7      Vague and overbroad.

8          THE WITNESS:  Can you be

9      more specific?

10 BY MR. HYNES:

11     Q.    Are you aware that CVS does

12 not distribute Schedule II controlled

13 drugs?

14     A.    Does not.

15     Q.    Yes.

16     A.    Yes, I am aware of that.

17     Q.    And are you aware that of

18 the prescription opioids at issue in this

19 case, CVS only distributed hydrocodone

20 combination products?

21     A.    Yes, I am aware of that.

22     Q.    All right.  I'm going to

23 refer to those as HCPs throughout the

24 day.  It's just easier to say.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Okay.

2    Q.    So CVS produced

3  transactional data in this case showing

4  all of its shipments of controlled and

5  noncontrolled drugs to Cuyahoga and

6  Summit County.  Have you reviewed that

7  transactional data?

8    A.    No, I have not reviewed all

9  of that transactional data.

10    Q.    Have you reviewed any of it?

11    A.    Again, I don't recall.

12    Q.    Okay.  So is it fair to say

13  you're not familiar with the percentage

14  of shipments CVS made to Cuyahoga and

15  Summit County that were controlled drugs

16  versus noncontrolled drugs?

17    A.    I would say that if it's

18  not -- not referenced in the report, I

19  don't recall it.

20    Q.    And you are also not aware

21  of the percentage of shipments that CVS

22  made to those two counties that were HCPs

23  versus other kinds of drugs?

24    A.    Again, if it's not in the

Highly Confidential - Subject to Further Confidentiality Review

1    report I don't recall it.

2         Q.    Okay.  Did you make a

3    determination whether any of the

4    shipments in the transactional data that

5    CVS made to those two counties were

6    diverted?

7              MR. BOGLE:  Object to form.

8              THE WITNESS:  I'll go back

9         to where -- what I was asked to

10        look at.

11   BY MR. HYNES:

12        Q.    Okay.

13        A.    I was asked to look at the

14   SOM program, anti-diversion program,

15   corporate compliance program, from a

16   process, procedure, and following it

17   standpoint.

18             That was what I was asked to

19   do, and that's what this report covers.

20        Q.    Okay.  That's -- that's

21   fair.  I just want to make sure then, you

22   didn't -- you didn't take it a step

23   further and determine whether any HCPs

24   distributed by CVS in the Cuyahoga and

1    Summit Counties were diverted?

2         A.    I stayed and looked at it

3    from a corporate compliance program,

4    effectiveness setup, and whether it was

5    followed, and that's as far as my report

6    goes.

7         Q.    Okay.  Could you answer -- I

8    don't want to be difficult.  I would like

9    a yes or no answer.  It's a pretty simple

10   question.

11              Did you determine whether

12   any of those shipments were diverted?

13        A.    No, sir.  I did not --

14        Q.    Thank you.

15        A.    -- determine that.

16        Q.    Sir, you discuss -- let's

17   get to the page.  Let's turn to Pages 161

18   and 162 of your report.

19        A.    Okay.

20        Q.    You discuss there two CVS

21   pharmacies in Indiana.  One in Vincennes,

22   Indiana, and one in Columbus, Indiana.

23        A.    Mm-hmm.

24              MR. BOGLE:  Make sure you

Highly Confidential - Subject to Further Confidentiality Review

1          say yes or no.

2                THE WITNESS:  Yes, I do.

3    BY MR. HYNES:

4          Q.    Sir, you cite the volume of

5    HCP tablets distributed to those stores

6    between January 2012 and October 2013,

7    correct?

8          A.    I do.

9          Q.    And that's based on an

10   e-mail that a DEA agent sent to a CVS

11   employee, correct?

12         A.    Correct.

13         Q.    Did you go back and --

14   strike that.

15               Did you consider any other

16   data about these stores such as the

17   overall volume of controlled substances

18   that they dispensed?

19         A.    What I considered, or at

20   least asked for, was additional evidence

21   of due diligence by CVS on these

22   particular stores in response to this

23   query about dosages.  And I didn't really

24   see an effective due diligence file.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    So you didn't -- you didn't

2   see any due diligence files related to

3   these two pharmacies?

4      A.    I did not.

5      Q.    Okay.  And you are aware,

6   and I just said it.  But you are aware

7   these pharmacies are located in Indiana,

8   right?

9      A.    I am aware that these two

10  pharmacies are located in Indiana.  But

11  again CVS, like all the other defendants

12  in this case, were running national --

13     Q.    That's fair.  That --

14     A.    -- programs.

15     Q.    But I just want to get to

16  your point about due diligence files.

17  And this case involves Cuyahoga and

18  Summit Counties.  Okay?

19     A.    I'm aware of that.

20     Q.    Are you aware that the

21  discovery links in this case only

22  obligated CVS to produce due diligence

23  files related to Cuyahoga and Summit

24  Counties?

1    A.    I'm not sure I knew exactly

2  what the complete limits of your

3  discovery requests were.  Again, I

4  requested due diligence files on these --

5  on these stores and I didn't see

6  anything.

7    Q.    So you are not aware that

8  CVS did not have an obligation to produce

9  due diligence files related to

10  distribution to these stores?

11    A.    Not that I can rightly

12  recall.

13    Q.    That's not something

14  plaintiffs' counsel told you?

15    A.    Again, I don't recall.

16    Q.    Okay.  That's fine.

17         Sir, are you aware of any

18  HCPs dispensed by these two stores that

19  ended up in Cuyahoga and Summit Counties?

20    A.    No, I didn't.  Again, it was

21  outside the scope of this report.

22    Q.    Okay.  On Page 162 you

23  discuss three corporate integrity

24  agreements that CVS entered into with the

1    Office of Inspector General for HHS.

2          A.    I do.

3          Q.    And you'd agree, sir, that

4    those agreements are not related to CVS's

5    SOM system?

6          A.    Yes.  As -- as stated in the

7    report.

8          Q.    Yeah.  You state in your

9    report that they are not even related to

10   controlled substances, correct?

11         A.    That is correct.

12         Q.    And on 162 going over to

13   163, you discuss three settlement

14   agreements that CVS entered into with

15   DEA; is that right?

16         A.    That is correct.

17         Q.    And the first one relates to

18   sales of PSE, pseudoephedrine products.

19         A.    It does.

20         Q.    In California and Nevada in

21   2007 and 2008, correct?

22         A.    Correct.

23              MR. BOGLE:  Just make sure

24         he's totally done.  Give him maybe

Highly Confidential - Subject to Further Confidentiality Review

1          a second to make sure he's totally

2          done.

3                  MR. HYNES:  That's fine.

4          That's fine.

5   BY MR. HYNES:

6          Q.    So those agreements did not

7   involve controlled substances, did they,

8   that agreement?

9          A.    They -- that agreement did

10  not.

11         Q.    And it did not involve

12  Cuyahoga and Summit Counties?

13         A.    No, sir, it did not.

14         Q.    And then you talk about two

15  other agreements.  One relates to

16  recordkeeping violations by CVS retail

17  pharmacies in Oklahoma, correct?

18         A.    I do.

19         Q.    And the other -- but is that

20  what one of them relates to?

21         A.    I do talk about an Oklahoma

22  case, yes.

23         Q.    Okay.  And that involves a

24  recordkeeping violations by CVS retail

1    pharmacies in Oklahoma?

2         A.    To the best of my

3    recollection, yes.

4         Q.    Okay.  Thanks.  And the

5    other one relates to the theft and loss

6    reporting by CVS retail pharmacies in two

7    counties in New York; is that correct?

8         A.    That is correct.

9         Q.    Okay.  So neither of those

10   settlements involved CVS's SOM program,

11   did they?

12        A.    No.

13        MR. BOGLE:  Object to form.

14   BY MR. HYNES:

15        Q.    And neither involved CVS

16   warehouses in Indianapolis, Indiana --

17        A.    To the best --

18        Q.    -- or Chemung, New York?

19        A.    To the best of my knowledge,

20   no.

21        Q.    And neither involved CVS

22   retail pharmacies in Cuyahoga and Summit

23   Counties?

24        A.    Again to the best of my

Highly Confidential - Subject to Further Confidentiality Review

1  knowledge, no, they did not.

2      Q.    Okay.  Sir, are you aware

3  that CVS has never entered into a

4  settlement agreement with DEA related to

5  its SOM program for controlled

6  substances?

7      A.    I am aware.

8      Q.    Okay.  And you're aware that

9  CVS has never paid a fine to DEA related

10  is its SOM program for controlled

11  substances?

12      A.    Yes.

13      Q.    And you're aware that CVS

14  has never been involved in any litigation

15  with DEA related to its SOM program for

16  controlled substances?

17      A.    At least what litigation

18  that I know about that's on the public

19  record, yes, I would agree with your

20  statement.

21      Q.    Did you -- okay.  And did

22  you go look at the public record to

23  investigate --

24      A.    I did.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      -- CVS litigation?

2              MR. BOGLE:  Wait until he's

3      done.

4  BY MR. HYNES:

5      Q.      You answered.  That's okay.

6      A.      I did.

7              MR. BOGLE:  You're going to

8      get strangled by the court

9      reporter here in a minute.

10             THE WITNESS:  I know she's

11     going to kill me.

12  BY MR. HYNES:

13     Q.      Apologize to her, not to me.

14             THE WITNESS:  Sorry,

15     Michelle.

16  BY MR. HYNES:

17     Q.      All right.  Let's talk about

18     the automated SOM system that you

19     discussed in your -- in the CVS section

20     of your report.

21             Are you aware that that

22     system was designed by a company called

23     Cegedim Dendrite?

24     A.      Can we go to the section of

Highly Confidential - Subject to Further Confidentiality Review

 1    the report --

 2            Q.    Yeah.

 3            A.    -- that you're referring to?

 4            Q.    Sure.

 5            A.    Where are you referring to,

 6    would be helpful to know.

 7            Q.    You discuss throughout most

 8    of the --

 9            A.    I guess, is there a

10    particular section you'd like to --

11            Q.    No, I don't have one in mind

12    right now.  I'm just --

13            A.    Okay.  That's all right.

14            Q.    I have some very general

15    questions about the system.  Are you

16    aware that it was designed by a company

17    called Cegedim Dendrite?

18            A.    Yes, sir, I am.

19            Q.    Are you familiar with that

20    company?

21            A.    Yes, I am familiar with the

22    company.

23            Q.    Are you aware that it

24    designed SOM systems for several

Highly Confidential - Subject to Further Confidentiality Review

1    different -- actually many different DEA

2    registrants?

3          A.    I'm -- I'm aware they had a

4    DEA SOM program -- practice.  I would

5    assume that they designed multiple

6    systems for multiple clients, but it's an

7    assumption.

8          Q.    Okay.  And are you also

9    aware that the company was -- or at least

10   its DEA compliance division was run by

11   Ronald Buzzeo?

12         A.    I'm familiar with the name,

13   yes.

14         Q.    You are.  Have you ever met

15   Mr. Buzzeo?

16         A.    This entire -- Counselor,

17   you're seeing a puzzled look because I've

18   gone to lots of conferences over 30

19   years.  It's entirely possible our paths

20   have crossed.  I don't rightly recall the

21   man, but --

22         Q.    Okay.

23         A.    -- it's entirely possible

24   that we shook hands at some point at some

1  conference.

2         Q.    Okay.  Conferences.  Sir,

3  the DEA held distributor conferences in

4  2013, '15, and '16.  Did you attend any

5  of those?

6         A.    No, I did not.

7         Q.    Okay.  And they also -- the

8  DEA also held national conferences on

9  pharmaceutical and chemical diversion

10  every year from 2008 to '12 and then 2014

11  and '17.  Did you attend any of those?

12         A.    No, I did not.

13         Q.    Okay.  And then it also

14  held -- it's held several practitioner

15  awareness conferences since 2018.  Have

16  you attended any of those?

17         A.    No.

18         Q.    Okay.  And going back to

19  Mr. Buzzeo.  Are you aware that he

20  previously worked at the DEA?

21         A.    Yes, I am aware of that.

22         Q.    Do you know what his

23  position was?

24         A.    No, sir, I don't recall.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  If I told you that he

2    was the former deputy director of the

3    DEA's office of diversion control, do you

4    have any reason to think that's not

5    accurate?

6    A.    I don't have any reason to

7    dispute it one way or another.  I have no

8    opinion.

9    Q.    Okay.  All right.  Thank

10   you.

11        We're going to talk about

12   this.  So I'm just going to call it the

13   Buzzeo system.  It's a lot easier to say

14   than Cegedim Dendrite.  Is that all -- is

15   that fair?  That's what we've called it

16   in our depositions?

17   A.    That's fair.

18   Q.    Okay.  Are you familiar with

19   the algorithm used by the Buzzeo system?

20   A.    Yes, I'm familiar with the

21   documents that I reviewed that discuss

22   the algorithm from the Buzzeo system.

23   Q.    Are you familiar with how

24   the algorithm works?

1          A.     In general terms, yeah.  I'm

2     not a statistician.

3          Q.     Okay.  So could you explain

4     to me the coefficients and the math

5     behind it?

6          A.     Absolutely not.

7          Q.     Okay.  Did you try to learn

8     the math behind it?

9          A.     No.  I'm not a statistician.

10          Q.     Okay.  Then, is it fair to

11     say that you're not giving an opinion

12     about the sufficiency of the algorithm

13     itself, just focused on the algorithm?

14          A.     I am not giving an opinion

15     on the sufficiency of the algorithm

16     itself.  What I was talking about was how

17     the algorithm ended up being used and was

18     put into practice and process.

19          Q.     Yeah.  And we'll talk about

20     that.  Okay.  And are you familiar with

21     the daily report that was generated by

22     the algorithm?

23          A.     Well, I guess we have to be

24     specific about what period of time.  Are

Highly Confidential - Subject to Further Confidentiality Review

1    you referring to the IRR?

2         Q.    Yes, the IRR?

3         A.    Which -- which report --

4         Q.    Yeah, the IRR.

5         A.    Yes, I am familiar with the

6    IRR report.

7         Q.    Thank you.  And did you

8    review any IRRs?

9         A.    I reviewed IRRs, yes.

10        Q.    How many?

11        A.    I don't remember.

12        Q.    How did you select the ones

13   you reviewed?

14        A.    I asked for IRRs.  Please

15   submit -- you know, give me IRR reports

16   to review.  I didn't --

17        Q.    And counsel provided those

18   to you?

19        A.    Counsel provided me with

20   what they had.

21        Q.    You don't know how many?

22        A.    I don't recall.

23        Q.    Okay.  Do you know if you

24   reviewed -- these were used from

Highly Confidential - Subject to Further Confidentiality Review

1    roughly -- I think the ones that we were

2    able to locate and produce from 2010

3    through early 2014.  Did you review IRRs

4    from, you know, each year or --

5         A.    Counsel --

6         Q.    -- a representative sample?

7               MR. BOGLE:  Wait until he's

8         done.

9               THE WITNESS:  I reviewed the

10        sample.  I can't tell you how I

11        picked the sample.  And I can't

12        tell you what I remember from the

13        sample at this point in time.  I

14        reviewed a lot of documents.

15   BY MR. HYNES:

16        Q.    Okay.  Page 167 of your

17   report talks about --

18        A.    Which page, please?

19        Q.    167.

20        A.    I'm sorry.

21        Q.    No, no.  I talk fast.  You

22   talk about an IRR for the Indianapolis

23   distribution center from November 30,

24   2010.

Highly Confidential - Subject to Further Confidentiality Review

1           Do you see that?

2      A.    I do.

3      Q.    Do you recall reviewing that

4  IRR?

5      A.    I do actually.

6      Q.    Okay.  And is it possible

7  that that was the only IRR you reviewed?

8      A.    I could go back to my

9  reliance materials and try to drag --

10  drag it out for you.  I don't remember.

11      Q.    Okay.  Okay.  Then I'll move

12  on.  Thank you.

13           Can you tell me what the

14  average size of an IRR is?  Like, how

15  many -- how many pages are typically in

16  an IRR?

17      A.    Again, I can tell you what I

18  reviewed and the pages that I got from

19  that.  Again, I can't tell you what an

20  average number of pages.  I didn't do an

21  average page count.

22      Q.    Okay.  Did you look to see

23  on average how many HCP orders were in an

24  IRR?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Again, I can remember

2  reviewing the IRR.  I can't be more

3  specific at this point in time.

4    Q.    Okay.  Are you familiar with

5  the data that's presented for an order on

6  the IRR?

7    A.    Again, I've looked at an

8  IRR.  Can I recall the exact fields that

9  are on there?  No.  But if you have a

10  document you'd like to show me,

11  counselor, I'm happy to look at it again.

12    Q.    So you can't tell me what

13  the binary day related to, the binary day

14  field related to?

15    A.    As I said, I don't remember

16  the specifics fields on the IRR.  Again,

17  if there's a document you'd like me to

18  look to, I'll be happy to look to it.

19    Q.    I don't have one with me

20  here, sir.  So I'm sorry.  I just want

21  to -- did you make any effort to

22  understand the various different data

23  fields presented on the IRR?

24    A.    Counselor, I looked at the

Highly Confidential - Subject to Further Confidentiality Review

1  IRR.  I examined the IRR.  I made an

2  effort to look at the fields.  Beyond

3  that I can't tell you.  I -- you are

4  asking for precision I can't give you.

5  But again, I'm happy to look at a

6  document if you have one.

7      Q.    Okay.  Sitting here today,

8  you can't tell me what for example, the

9  PZ scores are, or the -- the trend above

10  month or the trend slip.  You can't tell

11  me what those data fields --

12      A.    No, I cannot tell you.

13      Q.    Okay.  Sir, I'll move to

14  Page 173 of your report.

15      A.    Which page, please?

16      Q.    173.

17      A.    Okay.

18      Q.    And I want to draw your

19  attention -- I'll let you get there

20  first.  It's the first full paragraph on

21  that page.

22      A.    Okay.

23      Q.    And it's the -- the second

24  to last sentence in that paragraph.  You

1    write, "If an order is more likely to fit

2    the DEA's definition of a suspicious

3    order, the CCS-SOMS program, 'pends' or

4    flags an order that may be suspicious."

5             Do you see that?

6         A.    I do see that.

7         Q.    Okay.  And then moving down

8    under Section 3, "Item Review Reports."

9    I want to draw your attention to the

10   first sentence, and -- and after the

11   comma you write, "The IRR became the

12   vehicle by which pended orders (i.e.,

13   orders that scored above .15 and thus

14   were suspicious)."

15            So I just -- if you can help

16   me.

17            Is it -- is it your

18   recollection or your view that an order

19   flagged on the IRR was an order that may

20   be suspicious and needed to be

21   investigated, or -- or it was an order

22   that was suspicious?

23        A.    What I'm saying is that if

24   the order flagged from the algorithm is

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious in the sense it needs further

2    investigation.

3           Q.    You're not saying that every

4    order that flags on the IRR has to be

5    reported to DEA?

6               MR. BOGLE:  Object to form.

7               THE WITNESS:  Can you be

8         more precise?

9    BY MR. HYNES:

10          Q.    Yes.

11              You're -- you're familiar

12   with the requirement that a DEA

13   registrant report a suspicious order to

14   DEA?

15          A.    Yes.

16          Q.    Correct?

17          A.    I am familiar with it.

18          Q.    Okay.  So is it your opinion

19   that CVS was obligated to report to DEA

20   every order that flagged on an IRR?

21          A.    I believe my opinion has

22   been consistent throughout, which is any

23   order that flagged on an IRR needed

24   further investigation to determine

Highly Confidential - Subject to Further Confidentiality Review

1   whether the red flags, that fact it

2   flagged on the system, did -- was

3   something that could be resolved or not

4   resolved, and if it can't be resolved, it

5   needs to be reported to the DEA.

6           But at the same time, those

7   orders should be held and not shipped

8   until you come to a final determination.

9           Q.    Okay.  Staying on page --

10  I'm finding a page number.  Give me one

11  second.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  I want to discuss the

2  first paragraph under Section 4, second

3  sentence.  You say --

4      A.    I'm sorry.  First paragraph?

5      Q.    First paragraph under

6  Section 4, in the second sentence of that

7  paragraph.  175.

8           MR. BOGLE:  You are on the

9       wrong page.

10           THE WITNESS:  Thank you.

11  BY MR. HYNES:

12

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1    BY MR. HYNES:

2          Q.    But sitting here today you

3    don't recall any testimony that went to

4    that issue?

5          A.    I don't recall anything that

6    stands out that I can remember.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1
 ▪
 ▪
 4        Q.    But you didn't -- you didn't
 5   examine this issue at the transactional
 6   level, yes or no?
 7             MR. BOGLE:  Object to form.
 8             THE WITNESS:  Again, that
 9        wasn't the purpose of the review.
10   BY MR. HYNES:
11
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



MR. HYNES:

24          Q.    Sir, the IRR was first

1    reviewed at the Lumberton distribution

2    center, right?

3           A.    That's my recollection.

4           Q.    By Mr. Mortelitti?

5           A.    That is also my

6    recollection.

7           Q.    And you write he had no

8    prior experience with suspicious order

9    monitoring.

10          A.    I can go back and look at

11   the report, but yes, I recall that.

12          Q.    Okay.  But you also don't

13   have any prior experience with suspicious

14   order monitoring, do you?

15              MR. BOGLE:  Object to form.

16          Misstates testimony.

17              THE WITNESS:  I'm not sure I

18          understand what you mean.  I do

19          have experience working in

20          regulated -- I did -- I have

21          reviewed the requirements around

22          being a suspicious order

23          monitoring.  If you asked if I

24          built and designed a system, no, I

Highly Confidential - Subject to Further Confidentiality Review

1    haven't.  But that's already on

2    the record.

3  BY MR. HYNES:

4        Q.    You've never operated an SOM

5  system either, have you?

6              MR. BOGLE:  Object to form.

7              THE WITNESS:  No.  My role

8        is -- no, I have not.

9  BY MR. HYNES:

10       Q.    You've never audited an SOM

11  system, have you?

12             MR. BOGLE:  Object to form.

13             THE WITNESS:  No, I have not

14       audited an SOM system.  But I

15       have -- I have audited PDMA

16       systems which are substantially

17       similar.

18  BY MR. HYNES:

19       Q.    But not an SOM system?

20       A.    Not an SOM system.

21       Q.    And you write that "CVS had

22  one person doing the daily review of the

23  IRR."

24             But there were people in the

Highly Confidential - Subject to Further Confidentiality Review

1  field who investigated orders that were

2  referred by Mr. Mortelitti, weren't

3  there?

4        A.    Again, I didn't see evidence

5  of those orders being investigated in the

6  field.

7        Q.    You didn't see evidence of

8  those orders being investigated in the

9  field?

10       A.    I did not see the people

11  that he's referring to in his testimony,

12  the field analyst.

13       Q.    Are you aware that -- that

14  the plaintiffs did not take the

15  deposition of any of those people?

16             MR. BOGLE:  Object to form.

17  BY MR. HYNES:

18       Q.    Are you aware that -- that

19  the plaintiffs chose not to take the

20  deposition of any of those people?

21             MR. BOGLE:  Object to form.

22             THE WITNESS:  No, I'm not.

23  ████████████████████

██        ███        ████████████████

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6      Q.    But you don't believe him?

7            MR. BOGLE:  Object to form.

8            THE WITNESS:  It's not a

9      question of belief.  It's a

10     question of I did not see any

11     documentation to support the claim

12     that he was making.

13           It's not a question of

14     belief.  It's just I didn't see

15     anything on the record one way or

16     the other.

17  BY MR. HYNES:

18     Q.    Do you find Mr. Mortelitti

19  to be credible?

20           MR. BOGLE:  Object to form.

21           THE WITNESS:  I'm not making

22     a judgment on Mr. Mortelitti's

23     credibility or -- one way or the

24     other.  I'm simply looking at what

1    he's saying and saying can I find

2    evidence one way or the other to

3    support it.

4          In a typical way that you do

5    an audit.  The -- the audit says

6    we're doing some -- we're doing X

7    and you go to look for support

8    behind that to see whether X is

9    actually happening or not.

10         What I'm saying is I saw an

11   absence on the record.

12   BY MR. HYNES:

13   ■        ████████████████████████

■   █████████████████████████████

■   █████████████████████████████

■   ████████████████████████

■   ███████████

■   ■        ██████████████████████

■   ████████

■   ■        █████████     █████████████

■   ■        ████████████████

■   ■        ███████     ██████████

■   ████████████████████████████████

■   ███████████████████████

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



18          MR. HYNES:  I move to

19     strike -- to strike everything

20     after "again I don't recall" --

21     "recall it."

22 BY MR. HYNES:

23          Q.     Turning to Page 179.  You

24     say, "Ultimately Ms. Hinkle gained two

Highly Confidential - Subject to Further Confidentiality Review

1    loss prevention analysts assigned to the

2    SOM program."

3              Who are -- who are the two

4    loss prevention analysts you're referring

5    to?

6         A.    I'd have to go back and

7    look -- and look at her testimony and go

8    back to -- refer to the report and read

9    it.  Do you want to take the time?

10        Q.    The names aren't in your

11   report.

12        A.    Then I'd have to go back and

13   reconstruct it.  I don't rightly know the

14   names off the top of my head.

15        Q.    Okay.  And are you aware

16   that at some point in mid 2012, the IRR

17   process shifted to the Indianapolis DC?

18        A.    I am -- I do have

19   recollection of that.

20        Q.    You do?

21        A.    I do.

22        Q.    Okay.  And can you tell me,

23   when the program was in Indianapolis, who

24   worked on it?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I don't recall at this

2  point.

3    Q.    You don't recall.  Are you

4  aware of any -- did you see any evidence

5  indicating that when the program was in

6  Knox -- excuse me, was in Indianapolis,

7  that any outside -- outside consultants

8  who were former DEA agents assisted with

9  the process?

10    A.    Is there a specific document

11  or a specific section you're referring

12  to, counsel?  Because at this point I'm

13  not sure what you're asking.

14    Q.    I'm just asking sitting here

15  today, do you recall reviewing any

16  evidence, any documents, or any testimony

17  indicating that outside consultants who

18  were former DEA agents assisted with the

19  operation of the SOM program when it was

20  in Indianapolis.

21         MR. BOGLE:  Object to form.

22  BY MR. HYNES:

23    Q.    It's a yes or no question.

24    A.    I don't have any

Highly Confidential - Subject to Further Confidentiality Review

 1    recollection of any -- of seeing those

 2    documents, but again, if there's

 3    something you would like me to review,

 4    I'd be happy to review it.

 5              MR. BOGLE:  When you reach a

 6         good stopping point, I was going

 7         to break for lunch.

 8              MR. HYNES:  Let's go off the

 9         record for a moment.

10              THE VIDEOGRAPHER:  Going off

11         the record, 12:45 p.m.

12                   -  -  -

13              (Lunch break.)

14                   -  -  -

15      A F T E R N O O N   S E S S I O N

16                   -  -  -

17              THE VIDEOGRAPHER:  We are

18         back on the record at 1:34 p.m.

19                   -  -  -

20              EXAMINATION (Cont'd.)

21                   -  -  -

22    BY MR. HYNES:

23         Q.    Welcome back, Dr. Whitelaw.

24         A.    Thank you, sir.

1        Q.      I'm going to turn your

2    attention to Page 168 of your report.

3        A.      168 you said, yes?

4        Q.      Yes, that's correct.

5        A.      Okay.  I'm here.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6          Q.     You are aware, aren't you,

7     that CVS produced some of its DEA SOPs to

8     the DEA during DEA inspections?  Have you

9     seen documents indicating that?

10          A.     Again, I looked at a lot of

11     documents, Paul.  I don't -- can't --

12     unless you can point me to a specific

13     document and help me here, I don't have a

14     recollection of it.

15          Q.     All right.  So sitting here

16     today, you are not aware that CVS ever

17     produced the DEA SOP --

18          A.     I --

19          MR. BOGLE:  Wait until he

20     finishes.

21     BY MR. HYNES:

22          Q.     -- to DEA.

23          MR. HYNES:  Thanks.

24          MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review



1    You can answer.

2    THE WITNESS:  Again, I

3    don't.

4  BY MR. HYNES:

5

21    opinion whatsoever at the moment.

22  BY MR. HYNES:

23    Q.    I want to turn your

24  attention to Page 170 of your report.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I'm there.

2    Q.    Last paragraph, first

3  sentence, you state that -- and this

4  relates to the PDMR reports.  Do you

5  remember those?

6    A.    I do remember those.

7    Q.    You state that, "The

8  reports" -- this is the first sentence of

9  the last paragraph -- "were deficient as

10  an SOM report."

11           Do you see that?  Do you see

12  that, sir?

13    A.    I do see that.

14    Q.    Okay.  And then going up

15  above the block quoted language, you say

16  CVS represented that PDMR reports were

17  part of the company's efforts to monitor

18  suspicious orders.

19           Do you see that?

20    A.    I do see that.

21    Q.    Can you tell me where CVS

22  said that?

23    A.    I can't point to a specific

24  quote right at this moment.  No.

1    Q.    Let's look at the block

2  moment.  And there you're quoting the

3  deposition testimony of Mark Vernazza.

4  Do you know who Mark Vernazza is?

5    A.    Yes, I do know who Mark

6  Vernazza is.

7    Q.    And who is he?

8    A.    As I recall, he was counsel

9  for CVS.  He was also the 30(b)(6)

10  witness.

11    Q.    That's right.  That's right.

12  So he was giving CVS's testimony, would

13  you agree with that, as a corporate

14  witness?

15    A.    Yes.

16    ███    ███████████████████████████

███  ████████████████████████████

███  ███████████████████████████  █████

███  ██████████████████████████████

███  ██████████████████████  ████████

███  █████████████████████████████████

███  ████████████████████████████████

███  ████████████████████████████████████

███  ███████████████████

Highly Confidential - Subject to Further Confidentiality Review



13      Q.    Do you have any other reason
14  to believe that the PDMR reports were SOM
15  reports?
16      A.    Actually, at the moment, I
17  don't have a document that I can point
18  to.
19      Q.    Okay.  We've talked a lot
20  about the IRR, right?
21      A.    We have talked a lot about
22  the IRR.
23      Q.    And would you agree that
24  that's a SOM report?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    I would say that the IRR is

2     a report of orders that have flagged to

3     be --

4          Q.    Flagged orders as

5     potentially suspicious?

6               MR. BOGLE:  Wait until he

7          finishes, Counsel.

8               Are you finished?  Finish

9          your answer, and then he'll --

10              MR. HYNES:  Sorry about

11         that.

12              THE WITNESS:  Can you back

13         up and ask the question again?

14    BY MR. HYNES:

15         Q.    Would you agree that the

16    IRRs were the report that CVS used to

17    evaluate whether orders were suspicious,

18    the report that CVS used in its SOM

19    program?

20         A.    I would say it was a tool

21    that was used in the SOMs program.  Yes.

22         Q.    Would you agree that it's a

23    SOM report?

24         A.    I think we're splitting

Highly Confidential - Subject to Further Confidentiality Review

1    hairs.  I would say it's closer to being

2    a SOMs report if it -- based on what I

3    know of the algorithm, but again I'm not

4    a --

5          Q.    Closer than --

6                MR. BOGLE:  Are you done?

7                THE WITNESS:  Because of the

8          complexity of the algorithm and

9          all of the factors that I saw, no,

10         I did not understand the math.

11         But I'm not a mathematician.  I'm

12         not sure.  So it's pretty

13         complicated.  It looked, at least

14         on its face, based on my

15         understanding that it would be

16         closer to a SOMs report in the

17         sense that it was looking at

18         pattern and frequency and sizes,

19         well, from what I can tell.

20    BY MR. HYNES:

21         Q.    And --

22         A.    And scoring the order, and

23    then above a certain score, those orders

24    were then hitting the IRR as needing

Highly Confidential - Subject to Further Confidentiality Review

1    further follow-up in due diligence.

2         Q.    When you say closer to a SOM

3    report, you mean closer to the PDMR

4    report?  Is that the comparison that

5    you're making?

6         A.    I think that's the

7    comparison I'm drawing.

8         Q.    Okay.  Okay.  And the last

9    sentence of that last paragraph, you

10   conclude that the PDMR reports were

11   ineffective anti-diversion control.

12             Do you see that statement?

13        A.    I do see that statement.

14        Q.    You are aware, aren't you,

15   Dr. Whitelaw, that those reports were one

16   of several tools that CVS used to prevent

17   diversion?

18             MR. BOGLE:  Object to form.

19             THE WITNESS:  Would you

20        clarify those reports?

21   BY MR. HYNES:

22        Q.    The PDMR reports.

23        A.    Which reports are you

24   talking about?

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    The PDMR reports, those were

2  one of several reports that CVS used to

3  prevent diversion.

4          MR. BOGLE:  Object to form.

5          THE WITNESS:  I would

6        testify that that was the only

7        report that I saw that was even an

8        attempt at a suspicious order.

9        I'm not sure what you're referring

10       to.  So can you help me here?

11 BY MR. HYNES:

12   Q.    I'm just -- I'm just trying

13 to establish that the PDMR reports were

14 one of several reports that CVS used in

15 it's anti-diversion program.  For

16 example, the IRR report is a different

17 report than the PDMR report and also was

18 used in an anti-diversion manner.

19         MR. BOGLE:  Object to form.

20 BY MR. HYNES:

21   Q.    Do you agree with that?

22   A.    Yes, I agree.

23   Q.    Okay.  Sir, the PDMR

24 reports, did you review any of those?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Honestly, I can't remember

2  at this point.

3    Q.    Can you tell me what they

4  looked at?

5    A.    Again, I can't remember at

6  this point in time.  I'm sorry.

7    Q.    Do you know whether --

8    A.    Do you have a document that

9  you would like me to look at?

10    Q.    I don't.  Do you know

11  whether they incorporated dispensing

12  data?

13    A.    Again, I'd like to see the

14  report to be absolutely certain.  I

15  don't -- I would be speculating.

16    Q.    Well, you write on Page 170

17  that the reports compared orders made

18  with distribution centers to dispensing.

19  So does that refresh your recollection

20  that these reports incorporated

21  dispensing data?

22         MR. BOGLE:  Can you tell me

23      exactly where you're looking at

24      here?  I'm not seeing where you

1      are at.  I'm not saying it's not

2      on here.  I just don't see where

3      you're at.

4              MR. HYNES:  I'm going to go

5      to a different part in this.

6  BY MR. HYNES:

7      Q.    First paragraph under the

8  PDMR reports.  Second to last sentence,

9  "Their reports that show how much was

10 shipped to and dispensed from a

11 pharmacy."

12              Do you see that?

13     A.    I see it.

14     Q.    Do you recall writing it?

15     A.    I do recall writing it.

16     Q.    Okay.  So does that refresh

17 your recollection that these reports

18 incorporated dispensing data?

19     A.    In some form or another they

20 incorporated dispensing data.

21              MR. BOGLE:  Object to form.

22              THE VIDEOGRAPHER:  If you

23     can just pull your mic down.

24 BY MR. HYNES:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Sir, you state on Page 178,

2   so eight pages up.  The first sentence

3   under Number 2, "Use of MicroStrategy."

4   Do you see that?

5            I'll give you some time to

6   get there.

7      A.    I do see it.

8      Q.    First sentence, second line,

9   you say that "Only tools" -- actually,

10  let me go back to the first line.

11            "Although it is not

12  completely clear, it appears that"..."the

13  only tools available for the due

14  diligence follow-up prior to 2012 were

15  the PDMR (VIPER) reports."

16            Do you see that?

17     A.    I do see that.

18     Q.    And if you look at

19  Footnote 1018, you quote Mr. Mortelitti's

20  testimony.

21     A.    I did.

22     Q.    At Pages 67 to 68.  But he

23  testified that he didn't know what the

24  field viper analyst had access to.  Do

Highly Confidential - Subject to Further Confidentiality Review

1    you remember reviewing that testimony?

2           A.    I would need to see his

3    testimony again.  And again it's --

4    you're asking me specifics about specific

5    testimony.  If you have something to show

6    me, I will look at it.

7           Q.    Well, my question for you --

8           A.    This is not a memory test,

9    Paul.

10          Q.    Understood.  Understood.  I

11   have limited time.

12                My question to you is, are

13   you aware of any other evidence in the

14   record indicating that the PDMR reports

15   were the only tools available for due

16   diligence prior to 2012?

17          A.    And my answer would be I'm

18   not aware at --

19          Q.    Okay.

20          A.    -- without looking through

21   the report and his testimony.

22          Q.    Thank you.

23                Yesterday you testified, and

24   I had the court reporter pull this for

Highly Confidential - Subject to Further Confidentiality Review

1    me, and I can show it to you.  This was

2    during Walgreens questioning.

3              You said, "Having reviewed

4    the documents, having asked for the

5    information, having looked at what they

6    were using to determine suspicious order

7    monitoring, based on my review, I did not

8    see them" -- and "them" you're referring

9    to CVS and Walgreens -- "using dispensing

10   data in their own -- to try to clear red

11   flags for various suspicious orders."

12             Do you remember giving

13   testimony yesterday that you did not see

14   any documents indicating that CVS and

15   Walgreens had used dispensing data to try

16   to clear red flags?

17             MR. BOGLE:  Since you've got

18        it pulled, can you show him the

19        question and answer?

20             MR. HYNES:  Yeah.

21             MR. BOGLE:  The full

22        question and answer?

23             MR. HYNES:  I've underlined

24        it right there.

Highly Confidential - Subject to Further Confidentiality Review

1      THE WITNESS:  I see it.

2      MR. HYNES:  I'll take that

3  back.  Thanks, Brandon.

4  BY MR. HYNES:

5      Q.   On Page 178 of your report,

6  last paragraph, are you there?

7      A.   I'm there.



Highly Confidential - Subject to Further Confidentiality Review

1  ████████████████████████████████████

   ██  ████████████████   ████████████████

   ██  ██████████████████████   ████████████

   ██  ████████████████   ████████████████

   ██  ██████

6      Q.    Okay.  You --

7      A.    And --

8      Q.    Go ahead.

9            MR. BOGLE:  Go ahead.

10           THE WITNESS:  If I wasn't

11     clear then, I'm trying to be clear

12     now.

13  BY MR. HYNES:

14     Q.    Okay.  So your testimony was

15  you had not seen any documents, any

16  documents that showed CVS or Walgreens

17  using dispensing data.

18           Is it your testimony today

19  that you have seen documents showing CVS

20  using dispensing data to clear red flags?

21           MR. BOGLE:  Object to form.

22           THE WITNESS:  I have seen

23     the availability of the tool.  I

24     have not seen anywhere in the due

1      diligence files presented that you

2      were using prescription data.  And

3      I know from the documents I

4      reviewed that you were only

5      looking at a handful of those

6      IRRs.

7  BY MR. HYNES:

8      Q.    Did you ask counsel for due

9  diligence documents indicating whether

10 CVS used dispensing data to clear red

11 flags?

12     A.    I believe I did.

13     Q.    And you didn't receive any?

14          MR. BOGLE:  Object to form.

15          THE WITNESS:  Again, all

16     the -- all the documents I've

17     reviewed, I can't remember every

18     document I've reviewed.

19 BY MR. HYNES:

20     Q.    Okay.

21          (Document marked for

22     identification as Exhibit

23     Whitelaw-19.)

24 BY MR. HYNES:

1          Q.    This will be Exhibit

2    Whitelaw 19.

3              MR. HYNES:  I put it on the

4         wrong one.

5    BY MR. HYNES:

6          Q.    Here you go, Dr. Whitelaw.

7          A.    Thanks.

8              MR. HYNES:  Did you guys get

9         a copy?

10              MR. BOGLE:  Yeah.

11   BY MR. HYNES:

12         Q.    Sir, I'll give you a minute

13   to take a look at the document.

14              MR. BOGLE:  Do you want him

15         to just let you know when he's

16         done?

17              MR. HYNES:  Sure.

18              MR. BOGLE:  Will that help

19         you?

20              MR. HYNES:  Sure.

21   BY MR. HYNES:

22         Q.    Ready, sir?

23         A.    I'm ready.

24         Q.    Sir, this is a document that

Highly Confidential - Subject to Further Confidentiality Review

 1    your counsel Mr. Goetz used at the

 2    deposition of Aaron Burtner.  Do you

 3    recall seeing this document?

 4         A.    I can go to my reliance

 5    list, but I don't recall it off the top

 6    of my head.

 7         Q.    Did you review Mr. Burtner's

 8    deposition transcript in its entirety?

 9         A.    Again, I don't recall that I

10    reviewed Mr. Burtner's testimony in its

11    entirety or not.

12         Q.    Okay.  And then sitting

13    back, when you reviewed a deposition,

14    would you -- transcript, would you also

15    review the exhibits?

16         A.    Yes.

17         Q.    Sir, this is an e-mail dated

18    February 7, 2014, from Shauna Helfrich.

19              Do you see that on the first

20    page?

21         A.    I do.

22

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1 ███████████████████████████████

██ ████ █████████████████████

██ ████████████████████████████████

██ ██████████████████

5          (Document marked for

6      identification as Exhibit

7      Whitelaw-20.)

8  BY MR. HYNES:

9      Q.    We'll mark this as Whitelaw

10  20.

11          MR. HYNES:  That's for him.

12      And this one is for you gentlemen.

13  BY MR. HYNES:

14      Q.    Dr. Whitelaw, to save you a

15  little bit of time.  I just want to ask

16  you about the first page and the last

17  page.

18      A.    Let me just go through the

19  whole document.  But I appreciate you

20  trying to save me some time.

21          I see it.

22      Q.    This is a document that

23  Mr. Goetz used during the deposition of

24  Gary Milikan.  Do you recall reviewing

Highly Confidential - Subject to Further Confidentiality Review

```
 1   this document before today?
 2        A.    I do not recall, but I can
 3   go and check the reliance list if you
 4   would like.
 5        Q.    That's not necessary.
 6              You see the date of the
 7   document, December 10, 2013, on the first
 8   page?
 9        A.    I do see that document.
10        Q.    Okay.
11        A.    Or I'm sorry -- that date.
12   Pardon me.
13        Q.    You see it's from Shauna
14   Helfrich?
15        A.    I see it's from Shauna
16   Helfrich.
17
```

Highly Confidential - Subject to Further Confidentiality Review



17      Q.      Okay.   Thank you.  Let's

18  turn to Page 179.

19          The last paragraph, you say,

20  "Delivered at the end of 2012, AGI Store

21  Metrics was the successor program to the

22  MicroStrategy tool."

23          Do you see that?

24          And do you remember what the

Highly Confidential - Subject to Further Confidentiality Review

1    Store Metrics were?

2         A.    Yes, I do remember what the

3    Store Metrics were.  And I do remember

4    writing this sentence.  And I do remember

5    reading this document.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

24          Q.     Okay.  Sir, you're also

Highly Confidential - Subject to Further Confidentiality Review

1  aware that the outside vendors had their

2  own SOM systems?

3       A.    I am aware that they had own

4  SOM systems.

5       Q.    Just turn back a page to

6  Page 181.

7       A.    Mm-hmm.

8       Q.    You have a table there.  And

9  it's titled "Summary of Aaron Burtner LP

10 Analyst Time Studies (June-July 2012)."

11       Do you see that?

12       A.    I do.

13       Q.    And right above that, you

14 write, "Below is a chart showing a

15 representative 12 days in 2012 which

16 demonstrates how few orders were sent for

17 investigation across Mr. Burtner's five

18 distribution centers."

19       Do you see that?

20       A.    I do.

21       Q.    Okay.  First, you say

22 Mr. Burtner's five distribution centers.

23 So you are aware at the time that CVS had

24 about ten distribution centers that

1    were -- that were distributing controlled

2    substances to CVS retail pharmacies?

3              A.    I am.

4              Q.    And that Mr. Burtner

5    reviewed the IRR for half of those

6    distribution centers?

7              A.    Well, if there were ten, as

8    you represent, yes.  Five is half of ten.

9    So, yes.

10             Q.    Okay.  And then you say a

11   representative 12 days.  Did you choose

12   those 12 days that you put in here.

13   When?

14                   And I say that, did you

15   choose the time studies for those --

16   these 12 days?

17             A.    Did I choose the time

18   studies?  I pulled this from an exhibit,

19   a -- a deposition exhibit from

20   Mr. Burtner.  So I believe they were

21   already chosen for his deposition.  I was

22   pulling the actual exhibit.

23             Q.    Okay.  So --

24             A.    And the exhibit is listed

Highly Confidential - Subject to Further Confidentiality Review

1   here.  I pulled these studies, yes.

2           Q.    Okay.

3           A.    I asked for them.

4           Q.    And these were all the ones

5   that were used in his deposition,

6   correct?

7           A.    Yes.  To the best of my

8   knowledge.

9           Q.    So these are the ones that

10  the plaintiffs' counsel selected to use

11  in his deposition?

12          A.    I believe that is an

13  accurate representation.

14          Q.    And Mr. Goetz did that

15  deposition, right?

16          A.    I don't know who -- I don't

17  recall who was at that deposition.

18          Q.    Okay.  Did you review time

19  studies for any other day besides these

20  12 days?

21          A.    I honestly can't recall.  I

22  honestly don't remember.

23          Q.    So can you tell me what

24  makes these 12 a representative sample?

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.    Other than being a
2   representative sample of a certain period
3   in time, they are just a sample.
4            Q.    So you don't know how these
5   12 were selected from the broader
6   collection of time studies?
7            A.    I don't recall.
8            Q.    So it's possible that you --
9   you might have selected these 12 from the
10  larger category?
11           MR. BOGLE:  Object to form.
12           THE WITNESS:  Again, as I
13           said to you, I asked for time
14           studies and I reviewed those time
15           studies.  Now I'm trying to
16           remember -- I don't remember how
17           I -- exactly how they ended up in
18           the table that I put together, I'm
19           sorry.
20  BY MR. HYNES:
21           Q.    No, no, that's fair.  That's
22  fair.
23           A.    At this point I can't get
24  you there.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    If you don't recall, you

2    don't recall.

3         A.    I don't recall.

4         Q.    Did you review the IRRs

5    related to these time studies?

6         A.    Again, I don't recall.

7         Q.    So you don't know how many

8    pages the IRRs were --

9              MR. BOGLE:  Object to form.

10   BY MR. HYNES:

11        Q.    -- that these time studies

12   relate to?

13             MR. BOGLE:  Object to form.

14             THE WITNESS:  Again, as I

15        said, I don't recall.

16   BY MR. HYNES:

17        Q.    Okay.  You don't know how

18   many total orders are reflected in those

19   IRRs?

20             MR. BOGLE:  Object to form.

21             THE WITNESS:  Again, I don't

22        recall.

23   BY MR. HYNES:

24        Q.    Okay.  Do you think at any

Highly Confidential - Subject to Further Confidentiality Review

1  point in time you knew?

2      A.    I'm afraid I can't answer

3  your question.  I don't recall.

4      Q.    Did you make an attempt to

5  investigate the IRRs that these time

6  studies relate to?

7      A.    I'm sure I did.  I don't

8  recall specifically.  So you're asking me

9  to speculate.  I don't -- I don't have a

10  list of everything I looked at or

11  everything I -- haven't -- you know,

12  below.

13          But yes, I normally would

14  have tried to look for additional data.

15  But I don't -- can't tell you

16  specifically, I'm sorry.

17      Q.    If you had looked at them,

18  would they be cited in your report?

19      A.    Again, if they were relevant

20  to the report I would have cited them.

21  They certainly would have been in the

22  reliance list.

23          MR. HYNES:  All right.  I'll

24      pass the witness.  And I'll just

Highly Confidential - Subject to Further Confidentiality Review

1    state on the record as other

2    defendants have said:  I do have a

3    lot more questions for you.  My

4    time is limited.  So I do reserve

5    my right to seek more time.  Thank

6    you for your time today.

7            THE VIDEOGRAPHER:  Going off

8    the record.  The time is 2:14 p.m.

9            (Short break.)

10           THE VIDEOGRAPHER:  We are

11    back on the record at 2:29 p.m.

12                -  -  -

13              EXAMINATION

14                -  -  -

15    BY MR. DAVISON:

16        Q.    Good afternoon,

17    Dr. Whitelaw.  My name is William

18    Davison.  I represent Mallinckrodt in

19    this matter, which is one of the entities

20    that you wrote your report on.

21            As we're getting towards the

22    end of the day and it's Friday night, I'm

23    going to try and help make this as

24    efficient as possible.

Highly Confidential - Subject to Further Confidentiality Review

1          So I'm going to mark

2    Exhibit 21, which is simply another copy

3    of your appendix of materials considered.

4    I'm hopeful that way we won't have to be

5    flipping back and forth as we're looking

6    at things as we go through.  Does that

7    make sense to you?

8          A.    That does make sense to me.

9          Q.    All right.  We'll try and

10   save some time.

11               (Document marked for

12               identification as Exhibit

13               Whitelaw-21.)

14   BY MR. DAVISON:

15          Q.    So, Dr. Whitelaw, a few

16   clarifying questions that I wanted to

17   talk to you about with respect to your

18   qualifications.

19               As you mentioned yesterday

20   that you have past compliance experience

21   in designing sample programs for

22   noncontrolled substances, correct?

23          A.    That is what I said, yes.

24          Q.    And you testified that these

1  sample programs involved the delivery of

2  samples to healthcare professionals, like

3  physicians, nurse practitioners, and

4  physician assistants; is that correct?

5      A.    Yeah, that's what I said.

6      Q.    You testified that this was

7  delivered by sales representatives to

8  those healthcare professionals, correct?

9      A.    On the sample -- on the

10  programs I worked on, yes.

11      Q.    And so just to confirm, your

12  compliance work there was helping to

13  establish a compliant procedure for the

14  sales representatives to provide samples

15  to healthcare providers.

16      A.    No.  I think that

17  underrepresents the work that I did.  It

18  wasn't just a procedure.  It was a

19  process.  And to also investigate

20  outliers, to investigate data as it came

21  up, to the -- the equivalent of what

22  we've been talking about all day is due

23  diligence.  But due diligence on the

24  sample side, et cetera.  So it was

1    working on the entire process, not just a

2    procedure.

3            Q.    Fair enough.  So it's

4    broader than a procedure.  And I guess my

5    question was more focused.  One of the

6    goals of the processes that you were

7    creating was to ensure that there was a

8    compliant way for sales representatives

9    to provide the samples to healthcare

10   providers, correct?

11           A.    Yes, including preventing --

12   obviously the goal being to prevent

13   samples going astray, a/k/a diversion.

14           Q.    Of course.  And in designing

15   this compliance program, did you consult

16   OIG guidance?

17           A.    I'm sure I did.

18           Q.    And you would have consulted

19   OIG advisory opinions?

20           A.    I would have consulted any

21   relevant guidance at the time, yes.

22           Q.    That could include corporate

23   integrity agreements?

24           A.    It could.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And would it include
2  settlements?
3    A.    It could.
4    Q.    And, sir, speaking of OIG,
5  are you aware that the OIG provided
6  guidance for compliance programs for
7  physicians in 2000?
8    A.    Yes, I am.
9    Q.    Did you consult it for the
10  sample programs that you would have --
11  the sample compliance programs that you
12  would have designed?
13    A.    Honestly I don't remember
14  everything that I looked at at that time.
15  It's been a while.
16    Q.    Okay.  Did you consult this
17  when you wrote your report?
18    A.    I'm sorry.
19    Q.    By this -- apologies.
20    A.    Please.
21    Q.    Did you consult the OIG
22  guidance for compliance programs for
23  physicians dated from 2000 in writing
24  your report?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I did look at it.  It's

2  footnoted in my report.  So obviously I

3  did look through it and look at it, yes.

4    Q.    All right.  So the

5  compliance program for physicians is

6  footnoted in your report is your

7  recollection?

8    A.    It is.

9    Q.    Okay.  Thank you.  Now, you

10  stated just a little while ago to

11  Mr. Hynes that you've never operated or

12  audited a suspicious order monitoring

13  system; is that correct?

14    A.    That is what I told him,

15  yes.

16    Q.    Okay.  Do you consider

17  yourself an expert on suspicious order

18  monitoring?

19    A.    I believe, based on the work

20  that I have done, my 30 years'

21  experience, all that I have reviewed, all

22  the DEA guidance I have reviewed, my

23  conversations with Mr. Rafalski, yes, I

24  would say that I am qualified to be a

1    SOMs expert.

2          Q.    And prior to your

3    discussions with Mr. Rafalski, all of the

4    documents that you reviewed for this

5    litigation, all of the deposition

6    transcripts, all of that work that you

7    did for this litigation, would you have

8    considered yourself a suspicious order

9    monitoring expert?

10              MR. BOGLE:  Object to form.

11              THE WITNESS:  Could you be

12         more -- again, could you repeat

13         the question?  I'm sorry.  It's

14         been a long day.

15   BY MR. DAVISON:

16         Q.    Understood, sir.  So prior

17   to the work that you did for this

18   litigation, which we've discussed

19   included reviewing, you know, hundreds of

20   thousands of documents, deposition

21   transcripts, discussions with

22   Mr. Rafalski, did you consider yourself a

23   suspicious order monitoring expert?

24              MR. BOGLE:  Same objection.

Highly Confidential - Subject to Further Confidentiality Review

1    THE WITNESS:  Honestly, I

2    don't rightly recall if I ever

3    thought of it in those terms.

4  BY MR. DAVISON:

5    Q.    So your answer is that you

6  never really thought about it one way or

7  another --

8    A.    I'm a compliance expert.

9    Q.    -- whether you were a

10  suspicious order monitoring -- excuse me.

11  Sorry.

12    A.    Sorry.

13    Q.    She's going to -- it's late

14  for her as well, so.

15    A.    Apologies.

16    Q.    No problem.

17    So you didn't think of it

18  one way or another as to whether you were

19  a suspicious order monitoring expert?

20    MR. BOGLE:  Object to form.

21  Asked and answered.

22    THE WITNESS:  As I said, I

23  don't recall.  Again, I'm a

24  compliance expert.  I work in a

1    variety of different areas.  I'm

2    not sure that I reflected on it

3    the way you're asking me to.

4  BY MR. DAVISON:

5    Q.    Okay.  Prior to this

6  litigation, have you ever held yourself

7  out to a potential client as a suspicious

8  order monitoring expert?

9    A.    Other than the work that I

10  did on a proposal for Deloitte, which,

11  again, was more of a compliance process

12  assessment for suspicious order

13  monitoring program, I don't recall ever

14  putting that moniker on my name.

15    Q.    So you didn't tell Henry

16  Schein that you were an -- that you were

17  an expert in suspicious order monitoring

18  when you made that pitch, correct?

19    MR. BOGLE:  Objection.

20  Misstates testimony.

21    THE WITNESS:  As I said, I

22  think I answered your question as

23  best I can.  I don't have anything

24  else to add to that answer.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. DAVISON:

2         Q.    All right.  So I think you

3    said, "I don't recall ever putting that

4    moniker on my name."  Is that accurate?

5              MR. BOGLE:  That's part of

6         his answer.

7              THE WITNESS:  That was part

8         of my answer.

9    BY MR. DAVISON:

10        Q.    Okay.  Sir, you are

11   providing an opinion regarding the

12   relevant standards surrounding the

13   design, implementation, and operation of

14   corporate and controlled substances

15   compliance programs for the

16   pharmaceutical industry; is that correct?

17        A.    Can you --

18        Q.    If you want to look, I'm

19   on -- I'm on Page 2 --

20        A.    Where are we?

21        Q.    -- of your report.  Just

22   taking what you say your scope is.

23        A.    No, I know.  I'm just asking

24   where you are.  That's helpful for me.

1          Okay.  Where are you now?

2          Q.    I'm on Page 2.  If you look

3    at Number 1 under scope.

4          A.    Number 1 under scope, okay.

5          Q.    So I'm going to repeat the

6    question.  You were providing an opinion

7    regarding the relevant standards

8    surrounding the design, implementation

9    and operation of corporate and controlled

10   substances compliance programs for the

11   pharmaceutical industry; is that

12   accurate?

13         A.    That's what it says.

14         Q.    Was that what you are

15   providing an opinion on?

16         A.    Yes.

17         Q.    Okay.  You were also

18   providing an opinion regarding the

19   application of those standards to

20   manufacturers and distributors of

21   controlled substances, correct?

22         A.    That is correct.

23         Q.    You also are providing an

24   opinion on the effectiveness of the

1    compliance programs for five distributors

2    and one manufacturer of prescription

3    opioid medicinal products based upon

4    available documentation from 1996 to

5    2018, correct?

6          A.    That is also correct.

7          Q.    Did plaintiffs' counsel

8    select the five distributors and one

9    manufacturer on which you wrote your

10   report?

11               MR. BOGLE:  Objection.

12               THE WITNESS:  These were the

13        ones that they asked me to do a

14        review of, yes.

15   BY MR. DAVISON:

16         Q.    The only manufacturer for

17   which you are providing an opinion on the

18   effectiveness of its compliance program

19   is Mallinckrodt, correct?

20         A.    I was only asked to look at

21   Mallinckrodt.

22         Q.    Well, sir, my question is a

23   little bit different.  The only

24   manufacturer for which you are providing

Highly Confidential - Subject to Further Confidentiality Review

1    an opinion on the effectiveness of its

2    compliance program is Mallinckrodt,

3    correct?

4          A.    Mallinckrodt is the only

5    manufacturer in my report, sir.

6          Q.    So the answer to that

7    question is yes?

8          A.    The answer to that question

9    is yes.

10         Q.    Thank you.  You do not

11   intend to offer an opinion at this time

12   regarding any other manufacturer's

13   compliance program, correct?

14         A.    Not at this time.

15         Q.    You do not intend to offer

16   an opinion regarding the application of

17   your opinions regarding the standards

18   surrounding the design, implementation,

19   and operation of controlled substances

20   compliance programs to any other

21   manufacturers program at this time,

22   correct?

23              MR. BOGLE:  Object to form.

24   BY MR. DAVISON:

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    Do you want me to start

2  again?

3     A.    Yeah, and read it a bit

4  slower or at least give me something to

5  look at it because that's an awful lot

6  of -- that's a whole mouthful of words.

7     Q.    Let's -- we'll strike that

8  one.

9           You do not intend to offer

10  any opinions regarding any other

11  manufacturer defendant in this litigation

12  at this time, correct?

13     A.    Not at this time.

14     Q.    And there is nothing in your

15  report regarding any other manufacturer

16  of controlled substances other than

17  Mallinckrodt, correct?

18          MR. BOGLE:  Object to form.

19          THE WITNESS:  No, I think

20          that's inaccurate.  There are a

21          couple references in my report to

22          Endo and Purdue up in the front of

23          the report.

24  BY MR. DAVISON:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    But you didn't review their

2    suspicious order monitoring program,

3    correct?

4        A.    No.  There's no review of

5    another manufacturer's suspicious order

6    monitoring program in my report.

7        Q.    All right.  So I think I

8    have an understanding of kind of the

9    opinions at a high level.  I'd like to

10   discuss just a couple of questions

11   regarding opinions you're not offering.

12   Okay?

13       A.    Sure.

14       Q.    So you stated earlier today

15   that you're here as a compliance expert,

16   so you are not drawing legal conclusions,

17   correct?

18       A.    Yes, sir, that is correct.

19       Q.    So you're not offering a

20   legal conclusion as to whether any

21   defendant violated the Controlled

22   Substances Act, correct?

23       A.    That is correct.

24       Q.    You are not offering a legal

Highly Confidential - Subject to Further Confidentiality Review

1    conclusion as to whether any defendant

2    violated the SOM regulation?

3            A.    Correct.

4            Q.    And when you were questioned

5    earlier today by Cardinal's counsel, you

6    stated that the question of whether any

7    of Cardinal's products were diverted was

8    outside the scope of your report.

9                 Is the same true for

10   Mallinckrodt's products?

11           A.    The same holds true for

12   Mallinckrodt, yes.

13           Q.    And is the same true for all

14   of the distributors and manufacturers in

15   your report's box?

16           A.    Could you give me the

17   question again, please?

18           Q.    Yes.  No problem.

19   Understood.

20                 With respect to Cardinal

21   earlier today, you stated that the

22   question of whether any product was

23   diverted was outside the scope of your

24   report.  Is the same true for all of the

1    distributors, pharmacies and

2    manufacturers that you reviewed?

3           A.    Again, as I said, same thing

4    for Cardinal I would say for every other

5    defendant is the same.  I looked at the

6    policies and the process and the systems,

7    and that is what I'm rendering my -- my

8    opinions on.

9           Q.    So the answer to that is

10   yes?

11          A.    The answer to that is I'm

12   not making statements about whether any

13   particular order was diverted or not

14   diverted.

15          Q.    Thank you, sir.

16                Now, sir, in evaluating the

17   effectiveness of Mallinckrodt's

18   compliance program, you utilized the

19   methodology that have used -- that you

20   have used during the last 30 years when

21   auditing or investigating compliance

22   issues; is that correct?

23          A.    I think that's a fair way of

24   characterizing it, yes.

1          Q.    So I want to -- I want to

2    understand a little bit more about the

3    methodology that you've used in your

4    30 years of experience.

5          A.    Sure.

6          Q.    What is your practice

7    generally when you select data or

8    documents for a sample?

9                MR. BOGLE:  Object to form.

10         Vague and ambiguous.

11   BY MR. DAVISON:

12         Q.    Let me see if I can narrow

13   it down for you.  I'll withdraw that

14   question.

15         A.    That would be real helpful.

16         Q.    No problem.

17                Generally in your

18   experience, when you're selecting data or

19   documents to review, do you do a random

20   sample?

21                MR. BOGLE:  Object to form.

22                THE WITNESS:  You're still

23         going to have to narrow it down

24         further.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. DAVISON:

2         Q.    Are you familiar with OIG

3    toolkits and resources like RAT-STATS to

4    select random samples?

5         A.    I am familiar with what

6    those are, yes.

7         Q.    Okay.  And that's a way to

8    select random samples of data or

9    documents for review, correct?

10        A.    But it's not a way of

11   utilizing and looking at process systems

12   and process and controls for compliance

13   programs, per se.  That's not how we

14   do -- that's not how I do that, no.

15        Q.    So when you're looking at

16   processes and controls for compliance

17   programs, you do not use random sampling?

18        A.    No.  I actually ask you what

19   the standards are that you're doing and

20   how are you working against those

21   standard and show me how those are

22   actually working.

23        Q.    Okay.  So talking about what

24   you specifically reviewed today and as

Highly Confidential - Subject to Further Confidentiality Review

1   part of your methodology.  It's fair to

2   say that you reviewed a number of

3   standard operating procedures; is that

4   correct?

5          A.    I reviewed a number of

6   documents that were supposed -- that were

7   purported to be standard operating

8   procedures or draft standard operating

9   procedures, yes.

10         Q.    And you also reviewed

11  e-mails for each of the individual

12  manufacturers, distributors, pharmacies,

13  that you looked at, internal e-mails?

14         A.    E-mails were part of it.

15         Q.    And generally, in your

16  compliance history, one way of gaining

17  information would be to interview

18  employees of a client, correct?

19         A.    That is one way to do it,

20  yes.

21         Q.    And -- and here I understand

22  there weren't interviews, but you

23  reviewed deposition transcripts.  Is that

24  fair?

1      A.    That is fair.  But in the

2  same way that I interviewed, just so we

3  are completely clear, that I would have

4  interviewed Mallinckrodt employees if I

5  were working -- Mallinckrodt was my

6  direct client.  I worked through

7  plaintiffs and plaintiffs' counsel and

8  interviewed them the same way, saying

9  this is what I'm looking for, these are

10  the documents I need to do my review,

11  this is what I'm looking for.

12          It's the same kind of

13  conversation.  When I got them, review

14  them, and I look at them and, you know,

15  again, ask for clarifying questions, ask

16  for clarifying documents, et cetera.  So

17  it's the same methodology.

18      Q.    All right.  So generally the

19  same methodology.  And -- and another

20  piece that -- that you'd review would be

21  correspondence with regulatory or

22  government agencies, correct?

23      A.    That is correct.

24      Q.    All right.  And you'd agree

1  with me that all of these pieces are

2  important when you're evaluating the

3  compliance program of a client?

4       A.    I would say all the -- all

5  the general categories of documents we

6  are talking about are important, yes.

7       Q.    So for example, you can't

8  just review a company's standard

9  operating procedures, because you

10 wouldn't know how the standard operating

11 procedures were being applied?

12      A.    I would say that's an

13 accurate statement.  You're looking for

14 not only what did you write down, but

15 what are you doing in practice.

16      Q.    So reviewing standard

17 operating procedures alone wouldn't be

18 sufficient to draw a conclusion relating

19 to a client's compliance program?

20      A.    Well, it would certainly be

21 sufficient to draw a conclusion about a

22 complying -- compliance program's written

23 standards section, yes.  If you're asking

24 me do I think it's sufficient to draw

1    about an entire compliance program, no.

2    I think you need to look at more.

3         Q.    And with respect to the work

4    that you did here, which is to look, as I

5    understand, at the anti-diversion

6    compliance programs for the -- the

7    defendants at issue here, it wouldn't be

8    sufficient, correct?

9              MR. BOGLE:  Object to form.

10             THE WITNESS:  It wouldn't be

11        sufficient.  Could you be clear

12        what you mean by "it"?

13   BY MR. DAVISON:

14        Q.    Solely reviewing standard

15   operating procedures.

16             MR. BOGLE:  Object to form.

17             THE WITNESS:  Again, we're

18        talking about a type of compliance

19        program.  So the same way of doing

20        it and same document -- types of

21        documents you would be looking

22        for.  It'd almost translate all

23        the way down the line as we've

24        discussed, we'd be looking at it

Highly Confidential - Subject to Further Confidentiality Review

1       in the same way.

2   BY MR. DAVISON:

3       Q.    So I -- I think your answer

4   was that solely reviewing standard

5   operating procedures would not be

6   sufficient alone.

7               MR. BOGLE:  Object to form.

8               THE WITNESS:  Would --

9           again, to -- to be precise, would

10          not be sufficient alone to judge

11          the entire program.  But is

12          sufficient to judge the written

13          standard section of the program,

14          yes.

15  BY MR. DAVISON:

16      Q.    Dr. Whitelaw, you mentioned,

17  I think multiple times, and I apologize

18  for bringing this back up.  But you had

19  consulted with James Rafalski in writing

20  your report, correct?

21      A.    That is what I've stated.

22      Q.    So I do have a couple of

23  individual questions for Mallinckrodt.

24              Did you and Mr. Rafalski

Highly Confidential - Subject to Further Confidentiality Review

1    discuss any specific topics or issues

2    related to Mallinckrodt?

3            A.    No, not that I recall.  I do

4    not believe we talked about Mallinckrodt

5    at all.

6            Q.    So you didn't discuss with

7    Mr. Rafalski the DEA's investigation of

8    Mallinckrodt's SOM program?

9            A.    No, sir.  We did not talk

10   about that.  We talked in general

11   terms -- so we can be clear.  He and I

12   had general conversations about a

13   manufacturer's SOMs program.  And sort of

14   a discussion around, you know, discussing

15   the distributor's program and a

16   manufacturer's program, how DEA looks at

17   them, you know, each one, a general

18   approach.  But we did not get into the

19   specifics --

20           Q.    Was --

21           A.    -- regarding Mallinckrodt.

22           Q.    Excuse me.  I apologize.

23           A.    We did not get into

24   specifics regarding Mallinckrodt.

1    Q.    Was Mr. Rafalski aware that

2    the only manufacturer for which you are

3    conducting a review was Mallinckrodt?

4    A.    I have no idea what he --

5    what he was aware of not aware of.

6    Q.    Did Mr. Rafalski suggest any

7    particular Mallinckrodt documents that

8    you should review?

9         MR. BOGLE:  Object to form.

10        THE WITNESS:  Again, I think

11        I tried to make it as clear as I

12        can.  We did not discuss

13        Mallinckrodt in specifics at all.

14        We talked about manufacturers'

15        SOMs programs and distributor SOMs

16        programs to the best of my

17        recollection.

18   BY MR. DAVISON:

19        Q.    All right.  So, sir,

20   yesterday you talked about the closed

21   system of distribution for controlled

22   substances, correct?

23        A.    We touched on it, yes.

24        Q.    All right.  Would you agree

Highly Confidential - Subject to Further Confidentiality Review

1  with me that generally a controlled

2  substance travels through that system

3  from a manufacturer to a distributor or

4  wholesaler, then to the pharmacy, and

5  then it's to the patient based on a

6  prescription by a physician?

7       A.    Generally, the only caveat

8  that I would add is by someone licensed

9  to prescribe a controlled substance.  And

10  let's be clear, it can be more than a

11  physician.

12       Q.    Fair enough.  And, sir, are

13  you aware that manufacturer registrants

14  generally sell their product to

15  wholesalers, distributors, or to

16  distributing chain pharmacies?

17       A.    In general, yes.

18       Q.    What do you mean by in

19  general, sir?

20       A.    I'm sure there are

21  exceptions.  You said -- you asked me,

22  was I generally aware.  I answered your

23  question.

24       Q.    All right.  So would you

1   agree with me that generally a

2   manufacturer doesn't sell to individual

3   pharmacies?

4          A.    Only indirectly.  If you're

5   saying from the wholesaler to the

6   pharmacy, your product travels down that

7   pipeline, that I would say is a general

8   statement.

9          Q.    Okay.  So you said only

10  indirectly.  I guess I just want to make

11  this clear.  A manufacturer sells to the

12  wholesaler, correct?

13         A.    Right.  That's what I mean

14  by indirect.

15         Q.    But they are not selling it

16  to the pharmacy?

17         A.    They're selling it to the

18  wholesaler who's then in turn filling the

19  orders coming from the pharmacy.  That

20  was the discussion that we just had, yes.

21         Q.    Okay.  Correct.  I was just

22  trying to be clear on the selling

23  indirectly, what you mean by that?

24         A.    That's what I meant by that.

1    Q.    Okay.  Sir, I'm going to
2  turn to Page 36 of your report.
3    A.    Of course.
4    Q.    Thank you.  If you look at
5  Section B of your report.
6    A.    Mm-hmm.
7    Q.    You write, "For a
8  manufacturer's anti-diversion program, I
9  would expect to see."
10    Did I read that correctly?
11    A.    You did.
12    Q.    All right.  And you list
13  four separate headings with some
14  sub-bullets underneath them, correct?
15    A.    Yes, actually, I did.
16    Q.    And, sir, there's no
17  citations in this section of your report,
18  correct?
19    MR. BOGLE:  Objection.
20    Asked and answered previously.
21    But you can answer again.
22    THE WITNESS:  There are no
23    footnotes here, no.
24  BY MR. DAVISON:

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    And you said earlier that

2     generally if there was a document that

3     supported your proposition, you would

4     footnote it in your report, correct?

5               MR. BOGLE:  Object to form.

6               THE WITNESS:  Again, I'm

7          still not sure what -- I did

8          not -- there are no footnotes

9          here, if that's what you're asking

10         me.  There are no footnotes right

11         here.

12    BY MR. DAVISON:

13         Q.    So going through these,

14    you're not claiming that each of these

15    expectations that you've laid out here is

16    something that's explicitly stated within

17    the Controlled Substances Act, correct?

18              (Brief interruption.)

19    BY MR. DAVISON:

20         Q.    I'll repeat the question for

21    you.

22         A.    Thank you.

23         Q.    So going through each of

24    these expectations, it's not something

Highly Confidential - Subject to Further Confidentiality Review

1   that's explicitly stated within the

2   Controlled Substances Act, correct?

3           MR. BOGLE:  Object to form.

4           THE WITNESS:  Either that --

5       again, I need you to be more

6       clear, because as far as I'm

7       concerned, what I would expect to

8       see for a good compliance program

9       in this area, an anti-diversion

10      program, and these attributes are

11      what I see is embedded in the

12      overall concept of having an

13      effective -- an effective

14      anti-diversion program.  So...

15  BY MR. DAVISON:

16      Q.   And so that's why I said

17  explicitly.  So I understand your view is

18  that these are implicit in having

19  effective controls against diversion,

20  those four words.

21          It's not explicitly listed

22  that a manufacturer must know their

23  customer within that statute, correct?

24          MR. BOGLE:  Object to form.

1                THE WITNESS:  If you're

2      asking me are those words in the

3      statute?  Is that the question?

4  BY MR. DAVISON:

5      Q.    That's what I'm asking you.

6  Yes.

7      A.    No, they're not.

8      Q.    Okay.  And if any of the

9  words that are here under your

10  expectations were in the Controlled

11  Substances Act statute, you would have

12  cited to it, correct?

13           MR. BOGLE:  Objection to

14      form.

15           THE WITNESS:  It would have

16      been cited somewhere in the

17      report, yes.

18  BY MR. DAVISON:

19      Q.    Well, generally good

20  scholarship is to cite to what you're

21  actually -- within the report, correct?

22           MR. BOGLE:  Object to form.

23           THE WITNESS:  And if you

24      note it, I do cite by section.

Highly Confidential - Subject to Further Confidentiality Review

1        And then you'll notice there are

2        discussions before each of the

3        sections of attributes, which is

4        how it was organized.  And I

5        believe we did have that

6        discussion yesterday.

7 BY MR. DAVISON:

8     Q.    Yeah, I'm referring to a

9 separate section.  No one talked about

10 this section yesterday.

11    A.    I understand that.  I'm

12 saying the way this whole part of the

13 report was organized, there is a general

14 discussion up front, the citations, and

15 then there are the attributes that are

16 listed.  And there are not -- as we have

17 covered, there are not footnotes here.

18    Q.    So I can go back to the

19 earlier sections in your report and I'll

20 find where these expectations come from,

21 correct?

22    A.    You will see where those

23 concepts and expectations come from.

24    Q.    Got it.  And that's based on

1  your review of the guidance, your

2  experience, and your review of all the

3  documents that we've been discussing for

4  the past two days?

5      A.    Correct.  And my

6  conversation with Mr. Rafalski, et

7  cetera.  It's the whole kit and caboodle.

8      Q.    All right.  I'm going to

9  understand these -- because we don't have

10  anything specific, I'm just going to call

11  these Dr. Whitelaw's expectations for a

12  good program.  All right?

13          Starting with "know your

14  customer," you write, "The manufacturer

15  has and retains current granular and

16  specific knowledge about each distributor

17  of its controlled substance and their

18  unique circumstances including all the

19  information outlined in the distributor

20  section."

21          And then you state, "The

22  manufacturers should conduct distributor

23  site visits to review the distributors'

24  anti-diversion controls," correct?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Yes.  That's what I say.

2        Q.    And again, this is based on

3   all of the pages that lead up to Page 36,

4   correct?

5              MR. BOGLE:  Object to form.

6              THE WITNESS:  That, plus my

7         expectation, plus my discussions

8         with Mr. Rafalski, plus my review

9         of all the documents in this case.

10  BY MR. DAVISON:

11       Q.    Sir, have you seen -- strike

12  that.

13             You're aware that DEA

14  conducts audits of distributors, correct?

15       A.    Yes, I'm aware of that.

16       Q.    All right.  And that DEA

17  reviews distributors' SOM programs,

18  correct?

19             MR. BOGLE:  Object to form.

20             THE WITNESS:  Yes, I'm aware

21        of that as well.

22  BY MR. DAVISON:

23       Q.    And that DEA reviews

24  distributors' anti-diversion controls?

1      A.     From time to time, yes.

2      Q.     All right.  So

3  Dr. Whitelaw's expectation is that

4  manufacturers conduct reviews and audits

5  of distributors on top of what DEA does,

6  correct?

7           MR. BOGLE:  Object to form.

8           THE WITNESS:  They -- they

9           are your customers.  You should be

10          aware of what they are doing and

11          comfortable with the way they are

12          acting.  That is just good

13          third-party management, which is

14          part of an effective compliance

15          program.

16             Again, when you go back to

17          the federal sentencing guidelines,

18          the front of the report, if we

19          really want to discuss it in

20          detail, yeah, my expectation was

21          that you manage your own third

22          parties as well and not just

23          simply rely on the DEA.

24  BY MR. DAVISON:

1    Q.    And --

2    A.    The DEA gives you a piece of

3  information and it's information that you

4  should take into account.  But it

5  doesn't -- it doesn't extract

6  Mallinckrodt from the requirement that it

7  should go out and make sure that the

8  people that it's selling its products to

9  are behaving in a way it expects them to

10  behave.

11    Q.    Your expectation, sir, is

12  that manufacturers will hold their

13  distributors to a higher standard than

14  what DEA does, correct?

15        MR. BOGLE:  Object to form.

16    Misstates his testimony.

17        THE WITNESS:  You are

18    completely misstating what I said.

19    I said I expect you to go out and

20    look at your customers for the

21    products that you're selling and

22    ensure yourself that you're

23    comfortable with the way they are

24    behaving since they are selling

Highly Confidential - Subject to Further Confidentiality Review

1          your products.  You have a duty to

2          oversee those people who you

3          contract with.

4    BY MR. DAVISON:

5          Q.    All right, sir.  So if DEA

6    audits a distributor, gives them a clean

7    audit, and a month later Mallinckrodt

8    audits the distributor, can Mallinckrodt

9    rely on the DEA's audit?

10               MR. BOGLE:  Objection.

11         Vague.  Ambiguous.  Overly broad.

12               THE WITNESS:  Would you like

13         to explain to me what you mean by

14         rely?  Because that's a fairly

15         broad statement here.

16   BY MR. DAVISON:

17         Q.    So, sir, when -- when you

18   advise clients, you don't tell them to

19   rely on what the government does?

20               MR. BOGLE:  Objection.

21               THE WITNESS:  I don't know

22         what you mean by rely.  Could you

23         please be clearer?

24               MR. DAVISON:  Strike -- move

Highly Confidential - Subject to Further Confidentiality Review

1          to strike the question.

2    BY MR. DAVISON:

3          Q.    All right.  You also stated

4    that "manufacturers are to utilize where

5    appropriate information derived from

6    chargeback data," correct?

7          A.    That is what I state here,

8    yes.

9          Q.    All right.  So, sir, what's

10   a chargeback?

11         A.    Well, let's go to my report

12   and we can go pull the definition that I

13   used in my report, sir --

14         Q.    Strike that question.

15         Sitting here today, without

16   looking at your report, can you tell me

17   what a chargeback is?

18         A.    I think to be completely

19   clear we should use the definition that's

20   in my report.  And we can go to that, and

21   that's the definition I'm using.

22         Q.    So, sir, your answer is no?

23         MR. BOGLE:  Objection.

24         Misstates his testimony.

1       THE WITNESS:  I said I'd

2       like to go and use the definition

3       that I have in my report and make

4       it completely accurate for the

5       record.

6    BY MR. DAVISON:

7       Q.    So, sir, you are concerned

8    that you cannot provide me with an

9    accurate definition of a chargeback

10   without looking at your report, correct?

11      MR. BOGLE:  Objection.

12      Misstates testimony.

13      THE WITNESS:  That's not

14      what I'm saying.

15   BY MR. DAVISON:

16      Q.    So sitting here today,

17   without looking at your report, what is a

18   chargeback?

19      A.    As I said to you, I'm going

20   to go to my -- refer to my report and

21   tell you the definition that was used --

22   that I used in this report.

23      Q.    All right.  Since you can't

24   tell me about it, why don't we go to your

1    report.  Tell me what the chargeback is.

2              MR. BOGLE:  That's not what

3        he said.

4              Go ahead, go to your report.

5              THE WITNESS:  Okay.  We

6        will.

7              The definition that I'm

8        using for chargeback is on

9        Page 233.

10   BY MR. DAVISON:

11       Q.    Okay.  So what's the

12   definition?

13       A.    Chargebacks are basically --

14   "Chargebacks are a common pharmaceutical

15   tool used by manufacturers to make

16   distributors whole when they sell

17   pharmaceuticals to pharmacies at prices

18   below what the distributor paid to the

19   manufacturer."

20       Q.    And, sir, have you ever

21   reviewed chargeback data in your 30 years

22   of experience?

23       A.    To my knowledge, I honestly

24   don't remember.  I've reviewed a lot of

Highly Confidential - Subject to Further Confidentiality Review

1  data over my 30 years' experience.  So I

2  can't tell you whether or not I -- I

3  can't tell you.

4          Q.    Sir, prior to your

5  engagement for this litigation, did you

6  know what a chargeback was?

7          A.    Yes, I knew what a

8  chargeback was before this.

9          Q.    You are aware that

10  chargeback data provides a limited subset

11  of information, correct?

12              MR. BOGLE:  Object to form.

13              THE WITNESS:  Can you define

14          what you mean by "limited subset

15          of information"?

16  BY MR. DAVISON:

17          Q.    Sure.  It provides a limited

18  amount of information relating the actual

19  sale of the product from the distributor

20  to the pharmacy.

21          A.    I understand it provides

22  information about that.

23          Q.    What information does it

24  provide?

1    A.    Do we need to go into

2  every -- you know where the product --

3  you know where the wholesaler is selling,

4  and the amounts that are being sold to a

5  particular pharmacy, and you know what

6  the cost basis is and it's coming back to

7  you.  So you know where your product is

8  going at the end of the day.

9    Q.    Does Mallinckrodt receive

10  chargeback data for every sale that a

11  distributor makes to a pharmacy?

12    A.    No, I don't believe it does.

13    Q.    And sir, just to be clear,

14  the term "chargeback" is not used in the

15  Controlled Substances Act -- excuse me.

16  Strike that.

17         The term "chargeback" is not

18  used in the anti-diversion piece of the

19  Controlled Substances Act, correct?

20    A.    It is not -- those

21  specific -- that specific term or

22  specific words are not used.

23    Q.    So again, your view that a

24  manufacturer needs to look at chargeback

1  data comes from your reading of the

2  obligation to maintain effective controls

3  against diversion, is that fair?

4       A.    It comes from my reading.

5  It also comes from the administrator's

6  position in -- in the Masters case and

7  others, that if you have information that

8  is potentially useful in operating your

9  suspicious order monitoring program, you

10  should be using that information.

11  Chargeback data is a piece of information

12  that you have access to that you should

13  be utilizing.

14       Q.    And just to be clear, you're

15  not claiming that the Masters decision

16  stated anything about chargebacks, you're

17  instead broadening it out to include

18  chargebacks?

19          MR. BOGLE:  Object to form.

20          THE WITNESS:  I'm broadening

21        it out to describe what the

22        administrator, my reading of the

23        administrator's opinion was.  That

24        if you have information that bears

Highly Confidential - Subject to Further Confidentiality Review

1    on diversion, a manufacturer in

2    this case, cannot turn a blind eye

3    to that information, but should

4    utilize that information to the

5    extent possible.

6  BY MR. DAVISON:

7        Q.    And, sir, in your 30 years

8  of experience, have you ever advised a

9  pharmaceutical manufacturer to utilize

10  chargeback data in its compliance

11  program?

12        A.    Not for the areas that I was

13  looking at at the time, no.  But if you

14  wanted it in general terms, I would have

15  advised them to use all available data.

16  I would tell any client to use all

17  available data that's pertinent to the

18  topic we are talking about.

19        MR. DAVISON:  Move to strike

20    everything following "I was

21    looking at the time, no."

22  BY MR. DAVISON:

23        Q.    Sir, we've -- people have

24  talked with you about the DEA witnesses

Highly Confidential - Subject to Further Confidentiality Review

1    that have provided testimony in this

2    case.

3              Do you recall that?

4         A.    I recall that.

5         Q.    All right.  And sir, I think

6    you testified that you reviewed Kyle

7    Wright's deposition transcript.

8              Do you recall that?

9         A.    I do recall that.

10        Q.    Are you aware that

11   Mr. Wright stated that chargebacks play

12   no role in suspicious order monitoring?

13             MR. BOGLE:  Object to form.

14             THE WITNESS:  Again, I don't

15        recall it off the top of my head.

16        No, I don't.  Do you have a

17        document that you would like me to

18        look at?

19   BY MR. DAVISON:

20        Q.    Well, sir, if the DEA says

21   that the chargebacks play no role in

22   suspicious order monitoring, would that

23   affect your opinion at all?

24             MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1              THE WITNESS:  No, actually

2         it wouldn't affect my opinion at

3         all.

4    BY MR. DAVISON:

5         Q.    Okay.  Now, sir, did you

6    request from plaintiffs' counsel all

7    documents reflecting communications

8    between Mallinckrodt and DEA relating to

9    its suspicious order monitoring and

10   anti-diversion programs?

11        A.    Yes, I believe I did.

12        Q.    So your expectation is that

13   you've reviewed all the documents

14   reflecting communications between DEA and

15   Mallinckrodt regarding Mallinckrodt's SOM

16   and anti-diversion programs, correct?

17             MR. BOGLE:  Object to form.

18             THE WITNESS:  No, I think

19        you're overstating what I said.

20             I said -- you asked me did I

21        ask counsel for any -- for the DEA

22        correspondence.  I said I did.

23             Then you turned it around

24        and said have I reviewed

Highly Confidential - Subject to Further Confidentiality Review

1          everything.  And the answer is,

2          well, I reviewed everything that

3          they would have had in their files

4          that they provided to me.

5              So if there's something that

6          you haven't given to plaintiffs'

7          counsel, there's no way I could

8          have reviewed that.

9     BY MR. DAVISON:

10          Q.    That's completely fair, sir.

11    So let me try to be a little more clear

12    on that.

13          A.    Okay.

14          Q.    So your expectation is that

15    plaintiffs' counsel provided you with

16    everything in their files that reflected

17    communications between Mallinckrodt and

18    DEA regarding its suspicious order

19    monitoring and anti-diversion program?

20          A.    That is my expectation.

21              (Document marked for

22          identification as Exhibit

23          Whitelaw-22.)

24    BY MR. DAVISON:

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Sir, I'm handing you what's

2   been marked as Exhibit 22.

3        A.    Okay.

4        Q.    Have you finished reviewing?

5        A.    I have.

6        Q.    Sir, do you recall seeing

7   this document?

8        A.    Again, I've seen so many

9   documents.  I'm going to go to the

10  reliance list and double-check it.

11       Q.    Sir, I've looked.  I don't

12  think it's in here.  But go ahead and

13  double-check my looking.

14            And, sir, if it helps out, I

15  think the Mallinckrodt materials are Page

16  267, 268, and 269.

17       A.    I don't see it on the list.

18       Q.    Okay.  So, sir, the e-mail

19  here reflects discussion over "know your

20  customer's customer."  Are you familiar

21  with that term?

22       A.    I am familiar with that

23  term.

24       Q.    And what do you understand

Highly Confidential - Subject to Further Confidentiality Review

```
1   "know your customer's customer" to mean

2   for a pharmaceutical manufacturer?

3        A.    It means the pharmaceutical

4   manufacturer should understand who the

5   distributor is in fact selling to.  In

6   your case, if we used your general case

7   that you provided earlier, to the

8   pharmacy.

9        Q.    Thank you, sir.

10            And one way of looking at

11   that would be through chargeback data; is

12   that fair?

13        A.    That is one piece of data

14   that would be useful, yes.

15        Q.    Okay.  Do you see here that

16   Eileen Spalding states that she had had a

17   conversation with DI Heather White?  Do

18   you know who DI Heather White is?

19        A.    I can only suppose she is a

20   diversion investigator, but I don't know

21   who she is personally, no.

22        Q.    And that, "DI White had

23   stated that she had called NYC and no one

24   there, including Sue Baker, DPM, has
```

1    heard anything about know your customer's

2    customer and the regulations do not

3    reflect such a requirement."

4              Did I read that correctly?

5        A.     I believe you did read that

6    correctly.

7        Q.     So this is the DEA telling

8    Mallinckrodt that there's no regulatory

9    requirement to know their customer's

10   customer, correct?

11             MR. BOGLE:  Object to form.

12         Misstates the document.

13             THE WITNESS:  No, I actually

14         do not agree with you, because the

15         policy from the DEA comes from

16         corporate headquarters.  As best I

17         can tell, without knowing DI

18         Heather White, she is a field

19         investigator.

20             And, therefore, she may have

21         stated this.  All I can -- all I

22         can say is that's what the record

23         reflects, is that Ms. Spalding had

24         a conversation with Ms. White and

1          Ms. White said -- supposedly said

2          this.

3              But I can't say that that's

4          DEA's policy or -- without more.

5              This is a -- Mallinckrodt's

6          employee's recollection of a

7          conversation with a potential -- I

8          believe diversion investigator.

9          Whether or not it's an accurate

10         representation of the conversation

11         or not, I have no way of knowing.

12         I just know what's on the

13         document.

14   BY MR. DAVISON:

15         Q.    Yeah, you haven't seen this

16   document because plaintiffs didn't

17   provide it to you, correct?

18              MR. BOGLE:  Object to form.

19              THE WITNESS:  I don't recall

20         seeing this document.  But I can't

21         tell you why I didn't see the

22         document.  I can't go any further

23         than that.

24   BY MR. DAVISON:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    All the documents that you

2    received to review for this case came

3    from plaintiffs' counsel, correct?

4         MR. BOGLE:  Object to form.

5    Misstates his prior testimony.

6    BY MR. DAVISON:

7         Q.    Strike that.

8              All of the Mallinckrodt

9    produced documents in this litigation

10   that you received came from plaintiffs'

11   counsel, correct?

12        A.    That is correct.

13        Q.    Did Mr. Rafalski tell you

14   that this was a requirement of the SOM

15   regulation?

16        A.    Again --

17        Q.    Strike that.

18             Did Mr. Rafalski tell you

19   that monitoring chargebacks was a

20   requirement of the Controlled Substances

21   Act?

22        A.    Again, I don't rightly

23   recall our conversation around

24   chargebacks any more than it's a good

Highly Confidential - Subject to Further Confidentiality Review

1    source of information to be used by a

2    prudent manufacturer to know their

3    customer's customer.  Beyond that general

4    discussion, I don't recall the specifics.

5           Q.    And sir, you testified

6    earlier that some of your understanding

7    that you used in this litigation

8    regarding the suspicious order monitoring

9    regulation, Controlled Substances Act,

10   came from Mr. Rafalski, correct?

11                MR. BOGLE:  Object to form.

12                THE WITNESS:  I testified

13          that I had conversations with

14          Mr. Rafalski about the Controlled

15          Substances Act and regulations and

16          how DEA operates, yes.

17   BY MR. DAVISON:

18          Q.    Mr. Rafalski never worked in

19   DEA headquarters, correct?

20          A.    I honestly don't know his

21   complete background.  So I can't --

22   without reviewing his background once

23   more, I can't tell you one way or the

24   other because I can't remember it in all

1    that detail.

2          Q.    What was Mr. Rafalski's job

3    title?

4          A.    As I said to you, I don't

5    remember it off the top of my head.  So

6    if there's a document you'd like me to

7    look at, I'll be happy to.

8          Q.    Sir, does it help refresh

9    your recollection that Mr. Rafalski was a

10   diversion investigator in the Detroit

11   field office?

12         A.    Again, I'd like to see

13   whatever document you're referring to,

14   Counsel, because if --

15         Q.    If Mr. Rafalski never worked

16   at DEA headquarters, could Mallinckrodt

17   have relied on his understanding of the

18   Controlled Substances Act?

19              MR. BOGLE:  Object to form.

20              THE WITNESS:  Again, I'd

21         like to know what you mean by

22         "rely."

23   BY MR. DAVISON:

24         Q.    Well, I asked you earlier

1   with respect to Exhibit 22, whether this

2   was an example of DEA telling

3   Mallinckrodt that there's no regulatory

4   requirement to know the customer's

5   customer.

6           And I'm paraphrasing.  But

7   one of the statements that you made was

8   that no, because the policy from DEA

9   comes from corporate headquarters.

10          So I -- question, was your

11  concern that that information was coming

12  from a field office?

13          MR. BOGLE:  Object to form.

14          THE WITNESS:  Well, first

15      off, my concern with the document

16      that you had showed me was it is a

17      Mallinckrodt employee's

18      recollection of a conversation

19      rather than -- rather than any --

20      of how that conversation

21      transpired, there's no way to say

22      whether or not that's an accurate

23      version of the conversation or

24      not.

1          So I honestly don't know

2     what DI Heather White actually

3     said, except for the way it's

4     represented on the document.

5     That's my first concern.

6          My second concern would be,

7     again, if you get something, you

8     know, regulatory professionals and

9     compliance professionals know

10    that, again, if you get -- if you

11    hear something from a field office

12    that doesn't comport with what

13    you've heard before, you need to

14    go to the source that makes

15    policy, in this case we are

16    talking DEA headquarters, and

17    inquire further.

18          Hey, am I hearing what's

19    right?  Is this the right

20    statement of the policy?  Et

21    cetera.  Because, again, employees

22    in the field -- and Mallinckrodt

23    has the same experience with sales

24    reps -- sometimes do not state

1          policy correctly.

2    BY MR. DAVISON:

3          Q.    Fair enough, sir.

4                So if there is -- strike

5    that.

6                If the interpretation of the

7    requirements of the Controlled Substances

8    Act for manufacturers differ between

9    Mr. Rafalski, who is at a field office,

10   and members of DEA who are at

11   headquarters, you would say that you

12   listen to the members of DEA that are at

13   headquarters, correct?

14               MR. BOGLE:  Object to form.

15          Misstates his testimony.

16               THE WITNESS:  Again, I would

17          say you would -- you would inquire

18          from headquarters, this is what

19          I've heard, is this accurate, and

20          get a read from headquarters of

21          whether or not what you're hearing

22          is accurate or not.

23   BY MR. DAVISON:

24          Q.    And headquarters' view is

Highly Confidential - Subject to Further Confidentiality Review

1    what determines there, correct?

2         A.    Headquarters sets policies

3    that if you want to know what the DEA's

4    policy is on a particular topic, you need

5    to hear it from headquarters.

6         Q.    Thank you, sir.

7              I'd like to -- so we were

8    talking about chargeback data.  And we --

9    we went a little afield.  But turning

10   back to chargeback data, sir.

11             In your report do you

12   suggest any metric or method to use in

13   analyzing chargeback data?

14        A.    I don't suggest utilizing a

15   specific methodology for analyzing it.

16   What I'm saying is it's a set of data

17   that you -- that a manufacturer should

18   incorporate into their suspicious order

19   monitoring program as appropriate.

20             For example, as you and I

21   just discussed, not everything has a

22   chargeback, so obviously for certain

23   transactions you can't use data that

24   doesn't exist.

1    What I'm saying is it's up

2    to the manufacturer to incorporate it and

3    they should make an effort to use that

4    data.

5         Q.    And, sir, with respect to

6    using that data, it could be used

7    differently by different manufacturers,

8    correct?

9              MR. BOGLE:  Object to form.

10             THE WITNESS:  Could you --

11        could you restate the question for

12        me, please?

13   BY MR. DAVISON:

14        Q.    Sure.

15             Under the -- the

16   Dr. Whitelaw good manufacturers

17   controlled substances compliance

18   program -- or excuse me, anti-diversion

19   compliance program --

20        A.    You mean under the

21   attributes that I list in my report that

22   I gleaned from experience in the federal

23   sentencing guidelines and Controlled

24   Substances Act, et cetera?  Is that what

Highly Confidential - Subject to Further Confidentiality Review

1   we're referring to?

2      Q.    The attributes that are

3   listed in your report on Page 36.

4      A.    Okay.  Great.

5      Q.    You don't define a way that

6   you expect manufacturers to monitor

7   chargebacks, correct?

8      A.    No, I do not define a

9   specific way for...

10     Q.    Are you aware of DEA ever

11  suggesting a specific metric or method

12  that manufacturers are to use in

13  analyzing chargeback data?

14          MR. BOGLE:  Object to form.

15          THE WITNESS:  No, I am not

16      aware of DEA ever suggesting a

17      specific methodology to analyze

18      and review chargeback data.

19  BY MR. DAVISON:

20     Q.    So under the expectations

21  that you have for a manufacturer's

22  program, is one way the manufacturer

23  could utilize chargeback data to utilize

24  the data to look at its distributors and

1    where the product is going, and inform

2    DEA of that information regarding its

3    distributor customers?

4              MR. BOGLE:  Object to form.

5              THE WITNESS:  Well, that's

6         certainly part of the equation.

7         You're missing the last part of

8         the equation, which would be, if

9         you think you need to inform DEA

10        and your product is going in the

11        wrong -- going in the wrong

12        direction because of chargeback

13        data, you should be taking steps

14        to make sure that that product

15        doesn't -- that product pipeline

16        doesn't continue to flow.

17   BY MR. DAVISON:

18        Q.    And would one way of doing

19   that be to restrict chargebacks so

20   that -- for certain pharmacies that you

21   may have questions about?

22             MR. BOGLE:  Object to form.

23             THE WITNESS:  Again, it's a

24        partial -- partial answer.  But

1    again, you want to talk about the

2    bigger picture?  That is one part

3    of it.  But, again, you should

4    also then be looking at your

5    distributors and asking them some

6    serious questions as to, all

7    right, if I'm seeing this behavior

8    from this pharmacy, and it looks

9    to be an outlier, and I am

10   concerned about it, could you

11   please tell me what you're doing

12   about it, because you're my

13   distributor.

14 BY MR. DAVISON:

15        Q.    Fair enough.

16             So one thing you could do is

17   you could restrict the chargebacks, then

18   conduct an audit of the distributor,

19   correct?

20        A.    Yes.  And at the same time

21   request that the distributor stop filling

22   orders for that particular pharmacy that

23   you are concerned about with your

24   product, so that again you're not making

1    the problem worse.

2           Q.    Fair enough.

3                 Now, sir, I'd like -- we can

4    turn back to 36 just so we're on the same

5    page.

6           A.    Sure.

7           Q.    All right.  So Number 2

8    here, we have individual retail pharmacy

9    activity.  And I think we've discussed

10   maybe a little bit about this already

11   with respect to chargebacks.

12                But -- but my question was,

13   you write, "Like the distributor

14   thresholds outlined above, the

15   manufacturer establishes ordering levels

16   for specific pharmacies which if exceeded

17   trigger the manufacturer to be concerned

18   that the orders are suspicious and that

19   action is needed."

20                What does that mean, sir?

21          A.    I'm not sure where you're --

22   what it means is for each pharmacy you're

23   selling to, you are tracking your product

24   going to, you should establish thresholds

Highly Confidential - Subject to Further Confidentiality Review

1    or some sort of flag of when the ordering

2    pattern, volume, frequency, becomes of

3    concern, that leads you to want to do

4    further inquiry and find out what's going

5    on.

6            Q.    All right.  So I just want

7    to make sure I understand.  You said for

8    each pharmacy you're selling to.  Who is

9    the "your" there?

10           A.    The manufacturer.

11           Q.    Okay.  So if the

12   manufacturer is not selling to individual

13   retail pharmacies --

14           A.    Through the -- no, I'm

15   talking about --

16               MR. BOGLE:  Wait, wait.

17           Wait until --

18               THE WITNESS:  Sorry.

19               MR. BOGLE:  Wait until he

20           finishes his question.

21   BY MR. DAVISON:

22           Q.    So if the manufacturer is

23   not selling to individual retail

24   pharmacies, then this would not apply,

1    correct?

2                MR. BOGLE:  Object to form.

3                THE WITNESS:  I think you're

4           misunderstand -- I probably wasn't

5           clear.  What I'm saying is

6           wherever your product is ending up

7           in pharmacy hands, you should have

8           thresholds, especially for this

9           type of product -- we're talking

10          about opioids -- and be looking at

11          their patterns.

12   BY MR. DAVISON:

13          Q.    So just so I follow this,

14   even though a manufacturer is not selling

15   to any of these pharmacies, they should

16   set a threshold level of pills purchased

17   from all distributors?

18                MR. BOGLE:  Object to form.

19                THE WITNESS:  What I'm

20          saying is you should have a

21          threshold of what -- of your

22          product going into that pharmacy,

23          and what you start to get

24          uncomfortable at.  That's what I'm

Highly Confidential - Subject to Further Confidentiality Review

1          trying -- that's what I'm trying

2          to say.

3     BY MR. DAVISON:

4          Q.    And how would you track

5     that?

6          A.    I'm sorry?  Probably

7     starting with chargeback data, but there

8     might be other ways.  Again, I wasn't

9     trying to give you an exhaustive list.

10         Q.    All right.  And so for every

11    pharmacy that buys from any distributor,

12    Mallinckrodt should set a threshold

13    across all distributors, and if it goes

14    above that threshold, then would report

15    it to DEA?

16         A.    I didn't say report it to

17    DEA.

18              MR. BOGLE:  Object to form.

19              THE WITNESS:  I said

20         investigate it further.  That

21         could be contacting your

22         wholesaler and asking what's going

23         on.  You could be conducting your

24         own investigation, your own audit

1    of the wholesaler.  But again, you

2    should be asking the question why.

3    You need to have something that

4    triggers the question why and you

5    should be asking the question, why

6    is this happening, why am I seeing

7    what I'm seeing, and is it a

8    problem or isn't it.

9 BY MR. DAVISON:

10    Q.    Sir, you're aware that

11 manufacturers receive chargebacks after

12 the sales have been made, correct?

13    A.    Yes.  I'm aware of that

14 fact.

15    Q.    You write in, in

16 subsection --

17    A.    But it doesn't any --

18    Q.    Excuse me, sir.  You write

19 in Subsection A --

20         MR. BOGLE:  Were you done?

21 BY MR. DAVISON:

22    Q.    -- "Where appropriate,

23 information" --

24    A.    No, I wasn't.

1       Q.    -- "obtained through the

2    manufacturer's sample accountability

3    program is factored into the controlled

4    substance monitoring program."

5               Did I read that correctly?

6               MR. BOGLE:  Why don't you

7          let him finish his last answer

8          before you ask that question.

9               MR. DAVISON:  No.  Special

10         Master Cohen had very clear on an

11         order on this.  If you're going to

12         continue to flout it, we can call

13         him on it.  But it's my

14         deposition.  It's not a trial

15         deposition.  It's a discovery

16         deposition.  And if he's going to

17         say things that are not responsive

18         to the question --

19              MR. BOGLE:  I think he

20         was -- we didn't know what he was

21         going to say.  You stopped him

22         from saying anything.

23              Listen, if you want to go

24         on, then let me make a note that

Highly Confidential - Subject to Further Confidentiality Review

1          you are not letting the witness

2          finish his answer.

3    BY MR. DAVISON:

4          Q.    Sir, go ahead and finish,

5    and we'll make a note of an inappropriate

6    objection from your counsel.

7               THE WITNESS:  That's fine.

8          Can you read back where we were

9          because I've lost track.

10              (Whereupon, the court

11         reporter read back the requested

12         portion of testimony.)

13              THE WITNESS:  I am aware

14         that chargeback data are received

15         after -- received retrospectively,

16         which is what your question was,

17         but it doesn't make using it or

18         not using it any less valid.

19              You are talking about a

20         timing issue here.  I'm not saying

21         just because it's not realtime

22         data, which is what you are

23         describing, doesn't make its use

24         or rejection of use any less --

1          it's not less valid just because

2          it's retrospective data.  It's

3          still data.

4                  MR. DAVISON:  Moving -- move

5          to strike everything after "I am

6          aware that chargeback data are

7          received retrospectively, which is

8          what your question was."

9    BY MR. DAVISON:

10         Q.    All right.  I'd like to turn

11   to Subsection A of Number 2.

12                 You write, "Where

13   appropriate information obtained through

14   the manufacturer's sample accountability,

15   e.g., PDMA program, is factored into the

16   controlled substances monitoring

17   program."

18                 Sir, did Mallinckrodt

19   provide samples of the controlled

20   substances at issue in this case?

21         A.    To my knowledge, no, they

22   did not.

23         Q.    All right.  And you are only

24   stating that this would be where

1    appropriate, correct?

2         A.    That was why it was stated

3    as where appropriate.

4         Q.    And so for Mallinckrodt, and

5    with respect to the opioids at issue in

6    this case, it would not be something that

7    would be utilized in a controlled

8    substances --

9         A.    I was talking from a bigger

10   picture.  If you are dropping

11   noncontrolled samples, obviously you're

12   not dropping controlled samples.  You

13   have data that comes out of that system,

14   you should make use of it if it's

15   relevant, if it overlaps a particular

16   prescriber for example, overlaps a

17   particular pharmacy.

18              Again, the whole

19   conversation we're having around is know

20   your customer's customer.  And,

21   therefore, using any and all data

22   available to you that you have available

23   to you, to create as fair and accurate a

24   profile of your customer's customer as

Highly Confidential - Subject to Further Confidentiality Review

1    you can.

2          Q.    Sir, have you ever seen

3    written documentation from the Drug

4    Enforcement Agency that state a

5    manufacturer has an obligation to know

6    its customer customer -- customer's

7    customer?

8                MR. BOGLE:  Object to form.

9                THE WITNESS:  I'm sorry.

10          Can you state that again.

11    BY MR. DAVISON:

12          Q.    Yeah.  Have you ever seen

13    written documentation from the Drug

14    Enforcement Agency that requires a

15    manufacturer to know its customer's

16    customer?

17                MR. BOGLE:  Object to form.

18                THE WITNESS:  I have to go

19          back and review my entire report

20          from beginning find -- to look to

21          answer your question completely.

22          We can do that if you'd like.

23    BY MR. DAVISON:

24          Q.    So sitting here today

1    without reviewing your report, you can't

2    answer that question.  Is that fair?

3           MR. BOGLE:  Object to form.

4        Misstates his testimony.

5           THE WITNESS:  What I said

6        was I'd have to review it to be

7        able to find the specific document

8        that you're looking for.  I don't

9        recall a specific document off the

10       top of my head.

11   BY MR. DAVISON:

12       Q.   Well, do you recall

13   generally that DEA guidance exists that a

14   manufacturer is required to review its

15   customer's customer?

16       A.   Again, I would want to

17   review my report.

18       Q.   So you don't have a

19   recollection of that sitting here today?

20       A.   I can't recall off the top

21   of my head.

22       Q.   Thank you, sir.

23           MR. BOGLE:  When you reach a

24       good stopping point, we're a

1          little over an hour.  Take a quick

2          break.

3                  MR. DAVISON:  Yeah, right

4          now is actually a good breaking

5          place.

6                  THE VIDEOGRAPHER:  Going off

7          the record at 3:30 p.m.

8                  (Short break.)

9                  THE VIDEOGRAPHER:  Back on

10          the record at 3:45 p.m.

11  BY MR. DAVISON:

12          Q.    All right.  Dr. Whitelaw,

13  I'm on Page 36 and 37 of your report.

14          A.    I'm still here, yes.

15          Q.    Great.  So I'm on actually,

16  37, I should say, so you don't have to

17  turn the page.

18          A.    Okay.

19          Q.    So we talked a little bit

20  about actions that a manufacturer could

21  take if they have questions about a

22  pharmacy that is purchasing their product

23  from a distributor, correct?

24          A.    That is correct.  We did

1  have that conversation.

2       Q.   And would those be the

3  actions that you'd expect -- so you'd

4  expect certain actions under Number 3 of

5  your expectations labeled "Taking

6  Action"?  Is that what you're referring

7  to?

8       A.   Yeah, that's what I'm

9  referring to.  Yes.

10       Q.   You -- excuse me.

11       You write, "The manufacturer

12  notifies and provides details of the

13  suspicious activity to both the DEA and

14  the distributor," correct?

15       A.   That's what I'm suggesting,

16  yes.

17       Q.   So that could be in a

18  letter -- letter that the manufacturer

19  sends to a distributor, the DEA at the

20  same time, saying we have some concerns

21  about this pharmacy, correct?

22       A.   I would say that would be --

23  certainly be one method of doing it, yes.

24       Q.   All right.  "The

1  manufacturer demands the distributor, and

2  any secondary distributor if known,

3  follow up and take appropriate action

4  regarding the highlighted pharmacies."

5          That's letter B of your

6  "Taking Action," correct?

7      A.    That is correct.

8      Q.    And one way of doing that

9  would be to request the due diligence

10 files from the distributor so the

11 manufacturer can look at what the

12 distributor knows about the pharmacy,

13 correct?

14     A.    That's one method.  Not the

15 only method.  But certainly an -- a

16 method.

17     Q.    And, "The manufacturer

18 maintains contact with the distributor

19 and any secondary distributor if known,

20 requiring them to provide details on the

21 outcome of any investigations including

22 actions taken by the distributors against

23 the pharmacies."

24          And this could be included

Highly Confidential - Subject to Further Confidentiality Review

1    through an audit or a follow-up

2    conversation with the distributor,

3    correct?

4         A.    Either, you could do either.

5    My suggestion would be that you would

6    probably want to have follow-up

7    conversation with the distributor.

8    Because if you're doing an audit on a

9    annual basis, which it tends to be

10   usually an annual audit cycle, a year is

11   an awful long time to wait to follow up

12   to make sure that this hasn't fallen into

13   the black hole.

14         So that's really what we are

15   talking about here, is you provide the

16   information to the distributor and the

17   distributor doesn't do anything to it.

18   And nobody bothers to follow up till a

19   year or more has passed.  So that was

20   the...

21         Q.    Looking at Number 4 of your

22   expectations, lists audits.  "The

23   manufacturer conducts both routine and

24   for-cause audits of these distributors

Highly Confidential - Subject to Further Confidentiality Review

1    anti-diversion programs," correct?

2         A.    Yes.

3         Q.    Are you aware that

4    Mallinckrodt conducted audits of its

5    distributor customers?

6              MR. BOGLE:  Objection as to

7         time.  Form as to time.

8              THE WITNESS:  Can you be

9         more specific for me, please?

10   BY MR. DAVISON:

11        Q.    Well, my question is -- is

12   general now.  So all the time of your

13   review period, which I think was 1996 to

14   2018.

15        A.    I'd have to go back and look

16   at my report to be absolutely certain.

17   So give me a minute.

18        Q.    So I just want to -- the

19   question is yes or no.  Are you aware

20   whether Mallinckrodt did audits of

21   distributors during your review period?

22              MR. BOGLE:  Object to form.

23              THE WITNESS:  And again,

24        I -- to be precise in my answer to

Highly Confidential - Subject to Further Confidentiality Review

1          you, I would need to consult my

2          report.  So if you're going to let

3          me consult my report, I can give

4          you an answer.  Otherwise...

5    BY MR. DAVISON:

6          Q.    Sir, do you plan to bring

7    your report with you to trial?

8          A.    I would plan to have it

9    available, if needed.  Why?

10          Q.    So do you plan to review it

11   when you're on the jury stand?

12          A.    I honestly hadn't thought

13   that far ahead if you want to -- to be

14   honest.

15          Q.    So you may sit there in

16   front of a jury with your report in front

17   of you, to look back on as you're

18   answering questions from plaintiffs

19   during the trial?

20              MR. BOGLE:  Object to form.

21              THE WITNESS:  Again, we're

22          here -- we're here at a

23          deposition.  We haven't gotten to

24          that level of discussion.  So I'm

Highly Confidential - Subject to Further Confidentiality Review

1       going to say to you, I don't know.

2   BY MR. DAVISON:

3       Q.    Sir, out of the -- let me

4   ask a question because I've forgotten the

5   number.

6            How many hours have you

7   spent on your report in preparation for

8   this case?

9       A.    Around 1200.

10      Q.    Okay.  That's what I

11  thought, but I wasn't certain so I didn't

12  want to get it wrong.

13           How many of those 1200 hours

14  were spent in your review of

15  Mallinckrodt?

16      A.    I would have to go look at

17  precisely.  But it -- for each one,

18  each -- in general, each company I looked

19  at took about a month's worth of work.

20      Q.    So you spent about a month's

21  worth of work on Mallinckrodt and you

22  can't recall without going back into your

23  report whether Mallinckrodt ever

24  conducted an audit of one of its

Highly Confidential - Subject to Further Confidentiality Review

1    distributor customers?

2              MR. BOGLE:  Object to form.

3              THE WITNESS:  What I'm

4         saying, sir, is I would want to

5         consult my reports so that I give

6         you an accurate answer.  That's

7         what I've been saying to you all

8         along.

9    BY MR. DAVISON:

10        Q.    All right.  So the answer is

11   you can't tell me the answer without

12   looking at your report?

13             MR. BOGLE:  Object to form.

14             THE WITNESS:  Did he say

15        anything?

16             MR. BOGLE:  You can answer.

17             THE WITNESS:  I'm not sure

18        there was a question, but...

19   BY MR. DAVISON:

20        Q.    So the answer is that you

21   cannot tell me yes or no whether

22   Mallinckrodt has done an audit of a

23   distributor customer without reviewing

24   your report?

```
 1                    MR. BOGLE:  Object to form.
 2                    THE WITNESS:  What -- what
 3          I'm telling you is I would like to
 4          review my report before I answer
 5          your question.
 6   BY MR. DAVISON:
 7          Q.   So, sir, that's not an
 8   answer to my question.
 9                    My question is yes or no,
10   can you tell me?
11                    MR. BOGLE:  Object to form.
12                    THE WITNESS:  I can't recall
13          off the top of my head without
14          reviewing my report.
15   BY MR. DAVISON:
16          Q.   That's exactly the answer
17   that I was asking a question about, sir,
18   thank you.
19                    All right.  Sir, if you can
20   turn to Page 42 of your report.
21          A.   Yes.
22          Q.   In Section 6.7, it says,
23   "Manufacturer - Prescriber Relationship,"
24   right?
```

1    A.    It does.

2    Q.    And you state that "a

3  manufacturer should instruct and require

4  its sales representatives and inhouse

5  field support and marketing personnel to

6  provide any observations of potential

7  diversionary behavior to their inhouse

8  compliance department for further

9  evaluation and potential action,"

10  correct?

11    A.    That is correct.

12    Q.    And, sir, is -- is this

13  something that's explicitly laid out in

14  the CSA?

15    A.    It is embedded in the CSA.

16    Q.    And it's embedded under

17  those -- those four words of controls

18  against effective diversion, correct?

19        MR. BOGLE:  Object to form.

20        THE WITNESS:  Yes, as well

21     as under the federal sentencing

22     guidelines of what an effective

23     compliance program looks like as

24     well, so...

Highly Confidential - Subject to Further Confidentiality Review

 1              MR. DAVISON:  Move to strike

 2         as nonresponsive "as well as under

 3         the federal sentencing guidelines

 4         of what an effective compliance

 5         program looks like as well."

 6    BY MR. DAVISON:

 7         Q.    And, sir, there's nothing in

 8    the suspicious order monitoring

 9    regulation that requires sales reps to be

10    involved in monitoring physicians,

11    correct?

12              MR. BOGLE:  Object to form.

13              THE WITNESS:  Could you

14         state the question again for me,

15         please?

16    BY MR. DAVISON:

17         Q.    There's nothing in the

18    suspicious order monitoring regulation

19    that requires sales reps to be involved

20    in monitoring physician behavior,

21    correct?

22              MR. BOGLE:  Object to form.

23              THE WITNESS:  There is no

24         specific wording in the

1    regulation.

2  BY MR. DAVISON:

3    Q.    Thank you.

4          Sir, you understand the

5  differences between generic

6  pharmaceutical products and branded

7  pharmaceutical products?

8    A.    I do.

9    Q.    All right.  And you

10  understand that generics products are --

11  are not promoted by a field sales force

12  that interacts with physicians, correct?

13    A.    In general, no, they are

14  not.

15    Q.    Okay.  And, sir,

16  Mallinckrodt did not promote its generic

17  products with a field sales force that

18  interacted directly with the physicians,

19  correct?

20    A.    I did not see anything to

21  that effect.

22    Q.    And so you're not claiming

23  that there is an obligation of a generic

24  manufacturer to somehow promote its --

Highly Confidential - Subject to Further Confidentiality Review

1    excuse me -- strike that.

2              You're not claiming that a

3    generic manufacturer has an obligation to

4    monitor physicians through a sales force,

5    correct?

6              MR. BOGLE:  Object to form.

7              THE WITNESS:  I think you're

8         missing the whole point of this

9         section, which is basically, if

10        you have a sales force and the

11        sales force calls on the

12        physician, and they observe bad

13        behavior, troubling behavior is

14        perhaps a better term, that

15        information should be taken back

16        to headquarters and reported to

17        the compliance department.  You

18        just don't ignore it and pretend

19        it's not happening.  That's what

20        I'm talking about.

21   BY MR. DAVISON:

22        Q.    And so within that statement

23   is, if you don't have a sales force, you

24   don't have an obligation to create one to

Highly Confidential - Subject to Further Confidentiality Review

1    somehow monitor physicians, correct?

2         A.    I'm not saying that you have

3    to create a sales force.  I'm saying

4    again the whole gist of this is you have

5    available information, if you have boots

6    on the ground, if you have people out

7    there who are observing behavior and they

8    see something that's troubling, you know,

9    it's about as basic as what you see on

10   Amtrak these days.  If you see something,

11   say something.

12        Q.    And all of that -- that

13   obligation, again, comes from the four

14   words "effective controls against

15   diversion," right?

16        A.    It comes from the federal

17   sentencing guidelines together with the

18   four words of "effective controls against

19   diversion," yes.

20        Q.    You also mention IMS data,

21   correct?

22        A.    Is there a particular

23   section that you're looking at?

24        Q.    Yeah.  Page 43.  At the top.

Highly Confidential - Subject to Further Confidentiality Review

 1   "Upon receipt of this information, the

 2   compliance department or other

 3   experienced investigators should conduct

 4   an appropriate investigation to determine

 5   the validity of the information using all

 6   available sources of information, e.g.,

 7   the internet, IMS data, et cetera."

 8          A.    Yes.  I see what I said.

 9          Q.    All right.  You're aware

10   that not all manufacturers purchase IMS

11   data, correct?

12          A.    I am aware of that fact.

13          Q.    And you're not stating that

14   there's a requirement under the CSA for a

15   manufacturer to purchase IMS data, right?

16               MR. BOGLE:  Object to form.

17               THE WITNESS:  Again, I think

18          we're missing the point of what

19          I'm conveying.  If IMS data is

20          available, it should be used.

21               If you have data inhouse

22          that you have access to that's

23          pertinent to keeping, you know, to

24          keeping an eye out for suspicious

Highly Confidential - Subject to Further Confidentiality Review

1    behavior, you should be using that

2    data.

3  BY MR. DAVISON:

4         Q.    And sir, I understand that,

5  I just want to be clear, I don't think

6  I'm missing the point.  I'm asking you

7  specific questions about whether or not

8  things have to use it.  The reason I'm

9  doing that is because we need to have an

10 understanding of what your opinions are.

11            So I understand what you

12 said, but if you could answer my

13 question.

14            A manufacturer is not

15 required by the CSA to purchase IMS data,

16 correct?

17            MR. BOGLE:  Object to form.

18            THE WITNESS:  The words

19        "purchase IMS data" are not in the

20        CSA requirements, no.

21 BY MR. DAVISON:

22         Q.    And even under your opinion,

23 you're not saying that they are required

24 to do that, whether the words are in the

1     CSA or not?

2              MR. BOGLE:  Object to form.

3              THE WITNESS:  What I'm

4         saying, obviously, if the words

5         were in the CSA that would be a

6         different story, but since they

7         are not, what we're talking

8         about -- no, I'm not saying that

9         you have to go out and buy it.

10        I'm saying if you have it inhouse,

11        you ought to be using it.

12             MR. DAVISON:  Can we go off

13        the record for just a second.  My

14        battery is almost dead on this.

15             THE VIDEOGRAPHER:  Going off

16        the record 3:57 p.m.

17             (Brief pause.)

18             THE VIDEOGRAPHER:  Back on

19        the record at 3:57 p.m.

20    BY MR. DAVISON:

21        Q.   All right, sir.  We've

22    talked about the general expectations.

23    I'd now like to turn to your review

24    specifically of Mallinckrodt.  And just

1    to help you out with that.  It starts on

2    Page 208.  But I wanted to start by

3    asking about your evaluation.  If you can

4    turn to Page 43.  Sorry.

5        A.    Okay.

6        Q.    All right.  So at the bottom

7    of the page, you write, "For each company

8    the analysis focuses on answering two

9    questions.  The first question is whether

10   objective evidence exists supporting that

11   the company being reviewed worked to

12   establish a suspicious order monitoring

13   system as well as controlled substances

14   and corporate compliance programs."

15           Did I review that correctly?

16   Excuse me.  Did I read that correctly?

17       A.    Yes.

18       Q.    Sir, did you find objective

19   evidence that Mallinckrodt worked to

20   establish a suspicious order monitoring

21   system as well as controlled substances

22   and corporate compliance programs?

23           MR. BOGLE:  Object to form.

24           THE WITNESS:  Yes, I did.

 1    BY MR. DAVISON:

 2        Q.    Thank you.  And so the

 3    second question is, "Whether there is

 4    objective evidence showing that the

 5    company met its three-prong program

 6    effectiveness requirement by:  A, having

 7    a program that prevents and detects

 8    criminal conduct by an organization's

 9    employees; and B, maintaining effective

10    controls against diversion; including, C,

11    maintaining and operating an effective

12    system to identify, hold, investigate,

13    and report suspicious orders of

14    controlled substances."

15            Did I read that correctly?

16        A.    Yes.

17        Q.    So with respect to the

18    Mallinckrodt section of your report, was

19    your focus on answering that second

20    question?

21            MR. BOGLE:  Object to form.

22        Overbroad.

23            THE WITNESS:  Well, my focus

24        was answering both questions, but

1    we obviously had enough evidence

2    that I reviewed to get past the

3    first level.  So yes, it was on

4    the second -- the details are on

5    the second part, yes.

6  BY MR. DAVISON:

7        Q.    Thank you.  You can turn to

8  Page 208.

9              Sir, in your evaluation of

10  Mallinckrodt's suspicious order

11  monitoring -- excuse me.  Strike that.

12             In your evaluation of

13  Mallinckrodt's anti-diversion compliance

14  program, you used the same methodology

15  that we discussed earlier, correct?

16        A.    Yes, sir.

17        Q.    So you reviewed the standard

18  operating procedures?

19        A.    I reviewed a whole host of

20  information I asked for.  I applied my

21  expertise and experience, looked at those

22  documents, conversations.  It's the

23  same -- it's the same methodology that I

24  applied to every other company reviewed

1    in this report.

2           Q.    And that's because

3    compliance programs have to be looked at

4    in the totality, correct?

5           A.    I believe so, yes.

6           Q.    And I believe you testified

7    earlier that you had requested certain

8    categories of documents from plaintiffs

9    and that those categories were based on

10   the seven, now eight federal sentencing

11   guidelines; is that correct?

12          A.    Yes.  That's the framework I

13   was using, yes.

14          Q.    And -- and you also stated

15   that you requested transcripts from the

16   plaintiffs' attorneys, correct?

17          A.    You mean deposition

18   transcripts?

19          Q.    Absolutely.  Deposition

20   transcripts.

21          A.    Yes, I requested deposition

22   transcripts.

23          Q.    Okay.  And when you

24   requested transcripts, did you request

Highly Confidential - Subject to Further Confidentiality Review

1    categories of transcripts?

2            MR. BOGLE:  Object to form.

3            THE WITNESS:  I requested

4        people's transcripts.  I'm not

5        sure -- I'm not sure I'm following

6        you yet.

7    BY MR. DAVISON:

8        Q.   Well, how did you determine

9    which people to request a transcript for?

10       A.    I utilized the

11   organizational charts that I had seen,

12   had -- had conversations with counsel,

13   who were -- who was likely to have the

14   most responsive information based on the

15   depositions that have been taken in the

16   categories I was looking in.  It was a

17   whole series of -- it was an iterative

18   process.

19       Q.   All right.  And so you

20   stated that you utilized the

21   organizational charts --

22       A.    When I had them.

23       Q.    Excuse me.  The part -- you

24   utilized them as one of other ways of --

Highly Confidential - Subject to Further Confidentiality Review

```
 1   of reviewing them, correct?

 2        A.    Yes.

 3        Q.    And did you request

 4   transcripts for example, for each

 5   employee that was a member of a certain

 6   category?

 7        A.    I'm not sure I'm

 8   following -- you've lost me.

 9        Q.    Fair enough.

10             Sir, you reviewed

11   transcripts of Mallinckrodt's national

12   account managers; is that correct?

13        A.    Yes.  I reviewed

14   transcripts.

15        Q.    Did you request from

16   plaintiffs' counsel that they provide you

17   transcripts of every national account

18   manager for which a deposition was taken?

19        A.    I honestly don't recall

20   whether I asked for all or some.  I can't

21   tell you at this point.

22        Q.    Would it be your standard

23   practice to -- to interview every

24   employee within a certain title?
```

Highly Confidential - Subject to Further Confidentiality Review

1          MR. BOGLE:  Object to form.

2          MR. DAVISON:  Strike that,

3     that was a bad question.

4  BY MR. DAVISON:

5     Q.    Under your methodology that

6  we had discussed earlier --

7     A.    Yes.

8     Q.    -- would your expectation be

9  that you would interview multiple

10  employees with the same position?

11          MR. BOGLE:  Object to form.

12          THE WITNESS:  Again,

13     within -- I would interview those

14     employees I needed or felt were

15     necessary to form my opinion.

16          I don't have a set number.

17     If you're looking for a set

18     number, I don't have that.  I

19     don't -- I don't use a set number.

20  BY MR. DAVISON:

21     Q.    And you don't recall, with

22  respect to Mallinckrodt, whether you

23  requested from plaintiffs all of the

24  deposition transcripts of national

Highly Confidential - Subject to Further Confidentiality Review

1    account managers or only a couple?

2          A.    I honestly do not recall.

3          Q.    Do you remember whether you

4    asked for testimony of national account

5    managers at all?

6          A.    I did ask for depositions

7    from national account managers.

8          Q.    And did you request specific

9    people?

10         A.    As I said, I don't recall

11   this precise request.  I do know I

12   requested national account manager

13   depositions.

14         Q.    Did you request deposition

15   transcripts of sales reps?

16         A.    I don't recall a specific

17   request for those.

18         Q.    Did you request deposition

19   transcripts for Mallinckrodt's head of

20   sales?

21         A.    Again, I don't recall a

22   specific request for that deposition.

23         Q.    Sir, did you request the

24   deposition transcript of Mallinckrodt's

Highly Confidential - Subject to Further Confidentiality Review

1    manager of controlled substance

2    compliance?

3         A.    Can you be more specific on

4    period of time, because again I know

5    people's titles change.  Yes, I would

6    have requested the key controlled

7    substances personnel.  So can you -- I

8    need you to be more specific.

9         Q.    Sure.  Did you request

10   deposition transcripts from

11   Mallinckrodt's current manager of

12   controlled substance compliance?

13              MR. BOGLE:  Object to form.

14              THE WITNESS:  Again, I would

15         have asked for transcripts from

16         the key people responsible for

17         controlled substance compliance

18         review.  And again, if you're

19         asking me about a specific name --

20   BY MR. DAVISON:

21         Q.    Well, based on a -- on a job

22   title, sir, would a manager of controlled

23   substance compliance be someone that

24   would be important to review in

Highly Confidential - Subject to Further Confidentiality Review

1    evaluating a manufacturer's controlled

2    substance compliance program?

3                    MR. BOGLE:  Object to form.

4                    THE WITNESS:  There is a

5            potential, but there's also the

6            potential that you are looking for

7            the if.  You're saying -- are they

8            the head of the programs?  Are

9            they the ones ultimately

10           responsible?  Are they the highest

11           authority responsible?  Do they

12           have day-to-day operational

13           oversight?

14                   There are a number of

15           factors in selecting whether or

16           not you talk to certain people.

17   BY MR. DAVISON:

18           Q.    Well, sir, you -- you would

19   agree with me that to do an effective

20   internal investigation, you can't just

21   talk to the highest people up there,

22   right?

23                   MR. BOGLE:  Object to form.

24                   THE WITNESS:  I think it

Highly Confidential - Subject to Further Confidentiality Review

1    depends on the kind of

2    investigation you're doing and

3    what you're investigating.

4  BY MR. DAVISON:

5       Q.   Well, with -- with your

6  investigation for this litigation of

7  Mallinckrodt, would it have been

8  sufficient for you to just talk to the

9  highest people at Mallinckrodt?

10            MR. BOGLE:  Object to form.

11            THE WITNESS:  Well, you're

12       making it sound like all I did was

13       look at -- again, if that was all

14       you did was -- was depositions in

15       a -- in a vacuum, no, it would not

16       be.

17            But again there's a whole

18       lot of other documents and

19       information that went into this

20       review.

21  BY MR. DAVISON:

22       Q.   Sir, did you request from

23  plaintiffs that they provide you with

24  testimony -- excuse me -- deposition

1  transcripts of any testimony taken for

2  people in Mallinckrodt's controlled

3  substance compliance department?

4           MR. BOGLE:  Object to form.

5           THE WITNESS:  To the best of

6      my recollection, I did.

7  BY MR. DAVISON:

8      Q.    Sir, do you know who Eileen

9  Spalding is?

10     A.    I know the name.

11     Q.    I'll represent to you that

12 she is Mallinckrodt's current manager of

13 controlled substance compliance.  Do you

14 recall reviewing her testimony?

15     A.    I honestly don't recall her

16 deposition.  But I can go -- again, let's

17 look at the reliance list.  It will tell

18 you whose depositions --

19     Q.    No problem, sir, that's on

20 Page 2 -- 277.

21     A.    I do not see her deposition.

22     Q.    Plaintiffs didn't give you

23 Eileen Spalding's deposition transcript,

24 correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    What I said was, I don't

2  recall reviewing Eileen Spalding's

3  deposition transcript.

4    Q.    Well, if you had reviewed

5  it, it would be right here in -- in your

6  report, right, sir?

7    A.    Unless it was mistakenly

8  left off, yes, it should be there.

9    Q.    All right.  And did you

10  review all the transcripts that

11  plaintiffs provided you?

12    A.    Again, I don't remember all

13  the transcripts that I have.  I've seen

14  so many transcripts.  So I -- I can't

15  answer that question.

16    Q.    I think my question is a

17  little bit different.  I'm not asking if

18  you remember all -- all the transcripts

19  you have.

20    I'm asking if you reviewed

21  all the transcripts that plaintiffs

22  provided you.

23    A.    Well, since the only

24  transcripts I reviewed would have come

Highly Confidential - Subject to Further Confidentiality Review

1  from my requests of plaintiffs' counsel,

2  again I don't -- don't know all of the

3  list I have.  But again, everything

4  that's on my list here, I did review.

5       Q.    And was it your practice in

6  the -- the 1200 hours that you spent, to

7  review all of the transcripts that

8  plaintiffs' counsel provided you?

9       A.    Again, if I had it, I would

10  have looked at it.

11       Q.    Thank you, sir.

12            Sir, are you offering an

13  opinion as to the effectiveness of

14  Mallinckrodt's current controlled

15  substances compliance program?

16       A.    I am offering an opinion

17  based on Mallinckrodt's controlled

18  substances compliance program for the

19  period that's in my report.

20       Q.    All right.  So not one for

21  today, correct?

22            MR. BOGLE:  Object to form.

23            THE WITNESS:  I'm sorry?

24  BY MR. DAVISON:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    You are not offering an

2    opinion as to Mallinckrodt's current

3    controlled substances compliance program?

4    A.    I'm offering it for the time

5    frame that's set out in my report.

6    Q.    And the time frame set out

7    in your report is 1996 to 2018; is that

8    correct?

9    A.    That is correct.

10   Q.    So you're offering an

11   opinion on Mallinckrodt's controlled

12   substances compliance program in 2018,

13   correct?

14   A.    Correct.

15   Q.    2017?

16   A.    Yes.

17   Q.    We can go all the way back

18   to 1996?

19   A.    We can.

20   Q.    So you're offering an

21   opinion for every single year of

22   Mallinckrodt's controlled substance

23   compliance program 1996 to 2018?

24   A.    I am offering an opinion

1    about the effectiveness of the program

2    for that period of time.

3         Q.    Sir, sitting here today, can

4    you think of a single document that you

5    reviewed regarding Mallinckrodt's

6    controlled substance compliance program

7    that was later than 2012?

8         A.    Again, I don't recall.  I'd

9    have to go look at all the documents and

10   all the dates, sir.

11        Q.    Fair enough.

12             (Document marked for

13             identification as Exhibit

14             Whitelaw-23.)

15   BY MR. DAVISON:

16        Q.    I'm going to mark

17   Exhibit 23, which is a chart that may

18   help us a little bit.  We put this

19   together.  This isn't anything that

20   Mallinckrodt has produced.

21             But, sir, I know you

22   reviewed a number of documents.  You

23   reviewed about 150 out of the 1.6 million

24   that Mallinckrodt produced.  So we

Highly Confidential - Subject to Further Confidentiality Review

1    thought it would be helpful to put

2    together a chart to show you what year

3    those documents came from.

4            A.    Okay.

5            Q.    So go ahead and take a look

6    at this chart.  Do you need any time?

7            A.    I can see the chart.

8            Q.    All right.  So, sir, if you

9    look at the chart, it appears that you

10   reviewed four documents from 2018,

11   correct?

12               MR. BOGLE:  Does this

13        include deposition exhibits?

14               MR. DAVISON:  This includes

15        the documents that are listed on

16        his relied upon document.

17               MR. BOGLE:  So it does

18        include deposition exhibits?

19               MR. DAVISON:  I'm not sure

20        if it does include deposition

21        exhibits.  I'm not going to

22        represent that it does.

23               MR. BOGLE:  Okay.

24               THE WITNESS:  So I see that

Highly Confidential - Subject to Further Confidentiality Review

1      your chart says four, yes.

2  BY MR. DAVISON:

3      Q.    Okay.  Sir, in looking at

4  this chart, from 2013 to 2018, you

5  reviewed a total of 11 documents,

6  correct?

7      A.    Those are the numbers that

8  you have, yes.

9      Q.    Well, sitting here today do

10  you have any reason to doubt those

11  numbers?

12          MR. BOGLE:  Object to form.

13          THE WITNESS:  I think you

14      just raised one question.  You

15      don't know whether it includes

16      deposition exhibits or not.  So

17      I'm just going by the numbers that

18      are on your page.

19  BY MR. DAVISON:

20      Q.    All right.  Well, sir, can

21  you recall a single document that you

22  actually put a citation to in your report

23  from Mallinckrodt's SOM program post

24  2012?

1        A.     Considering I have several

2    thousand footnotes, no, not off the top

3    of my head right here.

4        Q.     Well, sir, if all of your

5    citations are prior to 2012, those are

6    the documents that you thought were most

7    important, right?

8            MR. BOGLE:  Object to form.

9            THE WITNESS:  Again, as I

10         said to you, you asked me if I

11         could recall.  I told you I've got

12         thousands of footnotes.  I can't

13         recall.

14   BY MR. DAVISON:

15       Q.     Sir, what's the basis for

16   your statement that Mallinckrodt's

17   controlled substances compliance program

18   was not effective in 2016?

19           MR. BOGLE:  Object to form.

20           THE WITNESS:  Could you

21         restate the question for me,

22         please?

23   BY MR. DAVISON:

24       Q.     Sir, what is the basis for

1    your statement that Mallinckrodt's

2    controlled substances compliance program

3    was not effective in 2016?

4         A.    I'd have to go back and

5    review my report to be able to give you

6    an answer to that question.

7         Q.    So you can't recall sitting

8    here today without going through your

9    report any basis for a claim that

10   Mallinckrodt's suspicious order

11   monitoring program was not effective in

12   2016?

13        A.    I can't tell you without

14   reviewing my report in detail.

15        Q.    Are you aware that

16   Mr. Rafalski said that he had no opinion

17   as to the effectiveness of Mallinckrodt's

18   suspicious order monitoring program post

19   2011?

20        A.    I am not aware of what

21   Mr. Rafalski said about Mallinckrodt at

22   all.

23        Q.    And, sir, if the only

24   documents you reviewed from 2000 -- from

Highly Confidential - Subject to Further Confidentiality Review

1  post 2012 relating to Mallinckrodt's

2  controlled substances compliance program

3  were standard operating procedures, you'd

4  agree with me that that is not sufficient

5  for you to make a determination as to the

6  effectiveness of Mallinckrodt's

7  controlled substance compliance program,

8  right?

9            MR. BOGLE:  Object to form.

10            THE WITNESS:  Do you want to

11       restate the question?

12            MR. DAVISON:  Can we read it

13       back?

14            (Whereupon, the court

15       reporter read back the requested

16       portion of testimony.)

17            THE WITNESS:  If that was

18       the only documents that I

19       reviewed, I'm not sure how -- I'm

20       not sure what I can tell you on

21       that.

22  BY MR. DAVISON:

23       Q.    Well, I think we agreed

24  earlier that looking at SOPs alone is not

1    consistent with your methodology for

2    evaluating the controlled substance

3    compliance program, correct?

4         A.    Not a complete holistic

5    program, no.  But you're assuming that

6    that's the only -- those are the only

7    documents that I looked at.  Don't forget

8    that I looked at depositions, et cetera,

9    so...

10        Q.    So I think your answer then,

11   if -- again, a hypothetical -- the only

12   documents that you looked at that were

13   post 2012 were standard operating

14   procedures, that would not be sufficient

15   for you to draw a conclusion as to the

16   effectiveness of Mallinckrodt's

17   controlled substance compliance program?

18             MR. BOGLE:  Object to form.

19             THE WITNESS:  Can you say it

20        again?

21             Brandon, can we take a

22        break?  I need -- I need --

23   BY MR. DAVISON:

24        Q.    There's a question pending.

1        MR. BOGLE:  You can answer

2        the question and then we'll take a

3        break.

4        MR. DAVISON:  Yeah, that's

5        fine.

6        THE WITNESS:  I need to go

7        to the bathroom, actually.

8    BY MR. DAVISON:

9        Q.    I just want an answer to my

10   question, and then we'll take a break.

11       A.    Sure.

12       Q.    So this is a hypothetical.

13   If the only documents that you looked at,

14   that were post 2012, that would not be

15   sufficient for you to draw a conclusion

16   as to the effectiveness of

17   Mallinckrodt's -- I'm going to strike

18   that and start over because reading it --

19       THE COURT REPORTER:  You can

20       stop it.  You can stop the

21       movement.

22   BY MR. DAVISON:

23       Q.    Sir, if the only documents,

24   if the only Mallinckrodt documents that

1   you looked at post 2012 were standard

2   operating procedures, you would agree

3   with me that under your methodology, that

4   is not sufficient for you to draw a

5   conclusion as to the effectiveness of

6   Mallinckrodt's controlled substance

7   compliance program?

8            MR. BOGLE:  Object to form.

9            THE WITNESS:  I would say it

10       would be -- if that were the case,

11       I would say, it would be

12       sufficient to at least note that

13       there's a deficiency in the

14       program around written standards.

15  BY MR. DAVISON:

16       Q.    And, sir, just one more

17  question.  If you didn't write in your

18  report specific deficiencies relating to

19  standard operating procedures, are you

20  intending to offer an opinion as with

21  respect to those deficiencies?

22       A.    I am not at this point

23  expecting to amend this report unless

24  there's new and available information for

1    me to work with.

2         Q.    So sitting here today the

3    answer to that question is no?

4              MR. BOGLE:  You can answer

5         that, and then we're taking a

6         break.

7              MR. DAVISON:  Yeah.

8              THE WITNESS:  As I said,

9         unless there's new available

10        information I need to consider, I

11        am not -- at this current point I

12        have no intention of amending the

13        report.

14             MR. BOGLE:  All right.

15             MR. DAVISON:  We can go off

16        the record.

17             THE VIDEOGRAPHER:  Going off

18        the record at 4:19 p.m.

19             (Short break.)

20             THE VIDEOGRAPHER:  Back on

21        the record at 4:34 p.m.

22   BY MR. DAVISON:

23        Q.    All right.  Dr. Whitelaw, we

24   were earlier talking about kind of the --

1    the time period for your review of

2    Mallinckrodt's anti-diversion compliance

3    program.  Can you recall any documents

4    that you reviewed relating to

5    Mallinckrodt's anti-diversion compliance

6    program from prior to 2006?

7         A.    You are asking me to recall

8    specific documents.  I can't recall

9    specific documents.  But you've obviously

10   charted it out.

11             One thing I wasn't clear,

12   when we broke, was, I did ask for

13   documents and did look at documents all

14   the way through 2018.  And if you look at

15   the -- as you correctly noted, and we

16   were correctly having that discussion

17   right when the break took place, from

18   2012 onward, I haven't seen enough

19   documentation to be able to form an

20   opinion on the adequacy of an

21   anti-diversion program from Mallinckrodt

22   post 2012.

23             I would need to see

24   additional information.  One of the

1   things that would be, obviously for me

2   would be particularly critical, and

3   something I know I asked for, there

4   weren't any documents to be had, would

5   have been audits.

6           Q.    So, sir, I want to unpack

7   that a little bit.

8           A.    Sure.

9           Q.    Are you stating today that

10  you cannot offer an opinion as to the

11  adequacy of Mallinckrodt's anti-diversion

12  program post 2012?

13          A.    That is what I'm saying.  I

14  do not have enough information to offer

15  an opinion for or against.

16          Q.    All right.  So at trial,

17  you're not planning to offer an opinion

18  one way or the other regarding

19  Mallinckrodt's anti-diversion program

20  post 2012, correct?

21          A.    Unless additional

22  information that is relevant to this

23  report became available and to be

24  considered, I have no present intention

1    of doing that.

2            Q.    Okay.  And if additional

3    information, you'd of course be required

4    to write a new report and we'd do this

5    all over again, correct?

6                    MR. BOGLE:  Object to form.

7                    THE WITNESS:  We'd certainly

8            be doing a supplement and having a

9            further conversation on a

10           supplement I'm sure.

11   BY MR. DAVISON:

12           Q.    But you don't intend to

13   offer a supplement sitting here today?

14                   MR. BOGLE:  Object to form.

15                   THE WITNESS:  As I said, and

16           I've stated on the record right

17           now, no, I have no intention of

18           offering a supplement as we

19           described post 2012 on

20           Mallinckrodt's program without any

21           additional information.

22   BY MR. DAVISON:

23           Q.    Thank you, sir.

24                   So I want to -- I want to go

Highly Confidential - Subject to Further Confidentiality Review

1    back to the beginning of the time period

2    for your -- your review.

3             Are you offering an opinion

4    as to the adequacy of Mallinckrodt's

5    controlled substance compliance program

6    from 1996 to 2006?

7        A.    Again, I think we need to

8    look at the documents, where they fall

9    out.  I'm looking at your program from

10   just before 2007, probably up through

11   2012 to be precise is where I had

12   documents.  Although I asked for

13   documents going all the way back in time.

14       Q.    So your report is offering

15   an opinion as to Mallinckrodt's

16   suspicious -- excuse me.  Strike that.

17            Your report offers an

18   opinion as to the effectiveness of

19   Mallinckrodt's anti-diversion program

20   from 2007 to 2012, correct?

21            MR. BOGLE:  Object to form.

22            THE WITNESS:  I think to be

23        precise, it would probably be more

24        like 2008 to 2012.  That's the

1          window in time that I have

2          documents, sufficient documents

3          for, to form an opinion.

4     BY MR. DAVISON:

5          Q.     Thank you, sir.

6                 And, sir, is that consistent

7     with your memory of the documents that

8     you reviewed?

9          A.     Yes, I think it is

10    consistent with my -- the memory of the

11    documents.  I'm not saying I didn't see

12    any documents.  I'm saying I didn't see

13    the bulk of the documents fell out in

14    your bell curve.

15         Q.     And, sir, just -- just so

16    we're clear, sitting here today, you do

17    not intend to offer an opinion as to the

18    effectiveness of Mallinckrodt's

19    anti-diversion compliance program from

20    1996 to 2007, correct?

21                MR. BOGLE:  Object to form.

22                THE WITNESS:  Again, I have

23         no -- unless I see some additional

24         information that warrants me to

Highly Confidential - Subject to Further Confidentiality Review

1    revisit this issue, I do not have

2    a present intention of amending my

3    report as it stands today.

4  BY MR. DAVISON:

5    Q.    Thank you, sir.

6         Sir, on Page 215 of your

7  report you reference an individual named

8  Victor Borelli.  I'm looking at the third

9  paragraph.  It starts:  "Mr. Borelli

10  worked for Mallinckrodt from 2005 to

11  2012"?

12    A.    Yes, as a matter of fact I

13  see the reference.  I do.

14    Q.    All right.  And, sir, do you

15  also recall that in your report you

16  reference an individual from Mallinckrodt

17  named Hugh O'Neill?

18    A.    Yes, sir.  I actually do

19  remember referencing an individual,

20  Mr. Hugh O'Neill.

21    Q.    You are aware that

22  Mr. O'Neill joined Mallinckrodt in 2013?

23    A.    Yes, I'm aware that

24  Mr. O'Neill joined Mallinckrodt in 2013.

1    Q.    So you have no reason to

2  believe that Mr. O'Neill and Mr. Borelli

3  ever overlapped at Mallinckrodt, correct?

4    A.    That is correct.  I have --

5  have no reason to believe that they ever

6  overlapped at Mallinckrodt.

7    Q.    Sir, if you can turn to

8  Page 234 of your report.

9    A.    Yes, I see it.

10    Q.    You write -- I'm at the

11  third paragraph down.

12    A.    Third paragraph down.

13    Q.    It says "When Mallinckrodt."

14          Do you see that?

15    A.    Yes.

16    Q.    That's where it starts.

17  "When Mallinckrodt subsequently notified

18  distributors that it would not pay

19  chargeback on sales to multi-distributor

20  customers, Mallinckrodt failed to report

21  any of the orders that gave rise to

22  multi-distributor sales to the DEA as

23  suspicious."

24          All right, sir.  Earlier

Highly Confidential - Subject to Further Confidentiality Review

1    today, we talked a little bit briefly

2    about Mallinckrodt's chargeback

3    restriction program.  Are you familiar

4    with Mallinckrodt's chargeback

5    restriction program?

6          A.    In broad general terms, yes.

7    But would you care to refresh my

8    recollection of the conversation.  Be

9    happy to.  It's -- it's been 14 hours,

10   guys.

11         Q.    Fair enough.

12               Mallinckrodt at times would

13   restrict chargeback payments --

14         A.    Yes.

15         Q.    -- with respect to certain

16   downstream pharmacies, do you recall

17   that?

18         A.    Yes.  Now I understand what

19   you are referring to.  Thank you for

20   clarifying.

21         Q.    Not a problem.

22               Did you analyze

23   Mallinckrodt's chargeback restriction

24   program as part of your anti-diversion

1    compliance review?

2              MR. BOGLE:  Object to form.

3              THE WITNESS:  I looked at --

4         I looked at how Mallinckrodt was

5         using chargeback data and

6         incorporating it into the SOMs

7         program as part of my review.

8    BY MR. DAVISON:

9         Q.    And did you find flaws with

10   Mallinckrodt's chargeback restriction

11   program?

12             MR. BOGLE:  Object to form.

13             THE WITNESS:  I did not find

14        flaws with the restriction

15        program, per se.  What I found a

16        flaw with was the presence of the

17        fact that Mallinckrodt had access

18        to this data for a long period of

19        time.  And it wasn't until 2010

20        roughly that you started to use it

21        in the SOMs program.  That was the

22        issue that I was raising with

23        chargebacks in particular.

24   BY MR. DAVISON:

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    So -- so the flaw wasn't

2    with what Mallinckrodt did with it, but

3    when they started doing it.  Is that

4    fair?

5               MR. BOGLE:  Object to form.

6               THE WITNESS:  Well, some of

7          it is a flaw of what Mallinckrodt

8          did or didn't do with it, but the

9          other part of the flaw is the fact

10         that there was data that

11         indicated, as my report indicates,

12         and I think we can go to the page

13         for example, on Page 235,

14         Mallinckrodt had visibility to

15         similar data that indicated that

16         you were working and dealing with

17         some pretty unsavory, shall we

18         say, distributors, and nothing was

19         done about it, even though you had

20         the presence of the data inhouse

21         until the DEA took action.  So

22         that's another issue that I have

23         with how you used the data.

24    BY MR. DAVISON:

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    Do you recall what

2  distributors you're referring to as

3  unsavory?

4     A.    I believe the ones that I'm

5  referring to are on Page 235.  So we're

6  looking at things like Harvard Drug

7  Group, Masters, Value Drug.  I mean, we

8  could go through the entire list if you

9  would like.

10     Q.    And, sir, are you aware that

11  Mallinckrodt audited Masters?

12          MR. BOGLE:  Object to form.

13          THE WITNESS:  I am aware

14     that you had a relationship with

15     Masters.  I saw some documentation

16     surrounding it.  But I didn't see

17     any indication that you -- that

18     showed a -- there was a deep dive

19     or a detailed review of Master.  I

20     didn't see that.

21  BY MR. DAVISON:

22     Q.    So you did not see a

23  detailed audit report from January of

24  2011 with respect to Masters

1    Pharmaceutical?

2        A.    I don't rightly recall a

3    detailed audit report from Masters

4    Pharmaceuticals in 2011.  I just don't.

5    I'm sorry.

6        Q.    All right.  That's fair.  Do

7    you recall that Mallinckrodt stopped

8    shipping oxy 30 to Masters in the fall of

9    2010?

10       A.    Again, my issue was that you

11   had data on hand, and it took the DEA to

12   take action against distributors for

13   Mallinckrodt to essentially stop.

14       Q.    Well, sir, Masters DEA

15   didn't take action against until June of

16   2011.  So are you aware that Mallinckrodt

17   stopped shipping oxy 30 for a period of

18   time starting in the fall of 2010?

19       A.    Again, I have a vague

20   recollection of something similar to

21   that, but I can't point to a document if

22   that's what you're asking.

23       Q.    That's fair enough.  So when

24   you say that Mallinckrodt took no action,

1    that's not correct?

2             A.    Took limited action.

3                   MR. BOGLE:  Object to form.

4    BY MR. DAVISON:

5             Q.    In your view, Mallinckrodt

6    took limited action with respect to

7    Masters.

8                   So you write here that,

9    "When Mallinckrodt subsequently notified

10   distributors that it would not pay

11   chargebacks on sales to multi-distributor

12   customers" --

13            A.    Hold on, Counsel.

14            Q.    I apologize.

15            A.    Where are you, please.

16            Q.    Fair enough.

17            A.    You've lost me.

18            Q.    We're still in that third

19   paragraph --

20            A.    Third paragraph.

21            Q.    -- of page 234?

22            A.    Third paragraph, 234.  Is

23   that where we are?

24            Q.    Yeah, that's where we are.

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.     Okay.  Thank you.
2        Q.     "When Mallinckrodt
3   subsequently notified distributors that
4   it would not pay chargebacks on sales to
5   multi-distributor customers, Mallinckrodt
6   failed to report any of the orders that
7   gave rise to multi-distributor sales to
8   the DEA as suspicious."
9             And you cite to Ginger
10  Collier's deposition for that
11  proposition.  Do you know who Ginger
12  Collier is?
13       A.     I don't recall her title off
14  the top of my head.  But, actually, you
15  have my notes, right?
16            MR. BOGLE:  I'll give it to
17       you.
18            THE WITNESS:  Can I have my
19       notes?
20            Thank you.
21  BY MR. DAVISON:
22       Q.     So just so you have the --
23  the question was just, do you know what
24  Ginger Collier's title is?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.     I do now.

2      Q.     All right.  You refreshed

3  your recollection with your notes?

4      A.     I have.  Director of

5  marketing.

6      Q.     All right.  I'm sorry.  Go

7  ahead.

8      A.     Director of marketing.

9      Q.     Can we go ahead and mark

10  those notes?

11          MR. BOGLE:  Sure.

12          MR. DAVISON:  Thank you.

13          MR. BOGLE:  You're welcome.

14          (Document marked for

15      identification as Exhibit

16      Whitelaw-24.)

17  BY MR. DAVISON:

18      Q.     All right.  So this is

19  Exhibit 24, which are copies of notes

20  that Dr. Whitelaw utilized in his

21  deposition.  We'll make copies for

22  everyone after we get through.

23      A.     Thank you.

24      Q.     All right.  So I'm going to

1    mark Exhibit 25.

2          A.    Okay.

3                (Document marked for

4          identification as Exhibit

5          Whitelaw-25.)

6    BY MR. DAVISON:

7          Q.    There you go.

8          A.    Thank you.

9          Q.    And so again, we were on

10   Page 234.  And just so you know what

11   we're looking at, you had a statement

12   that Mallinckrodt notified distributors

13   that it would not pay chargebacks, but

14   Mallinckrodt failed to report any of the

15   orders that gave rise to

16   multi-distributor sales to the DEA as

17   suspicious.

18                Just let me know when you're

19   ready, sir.

20          A.    Absolutely will let you know

21   when I'm ready.  Thank you.

22          Q.    Sir, do you remember

23   reviewing this document?

24          A.    I remember seeing this

1    document, yes.

2          Q.    Okay.  And, sir, is this an

3    example of Mallinckrodt reporting

4    chargeback restrictions to the DEA under

5    21 C.F.R. 1301.74(b)?

6          A.    It is an example of

7    notifying -- as I read the document, it's

8    a letter that they are sending to various

9    pharmacies with a copy to DEA of the

10   pharmacies that they are notifying that

11   they will no longer pay chargebacks for.

12         Q.    So is this different from

13   what you referenced when you said,

14   "Mallinckrodt failed to report any of the

15   orders that gave rise to

16   multi-distributor sales to the DEA as

17   suspicious"?

18         A.    Well, again, I would say it

19   is different on the grounds of what we're

20   talking about, is you're saying I'm

21   not -- I'm no longer -- at least as I

22   read it, this document is a form letter,

23   and the list of -- supposedly, I guess,

24   the list of addressees is Attachment 1,

Highly Confidential - Subject to Further Confidentiality Review

1    that this letter was all going to.  Going

2    to stop processing chargeback data.

3                But I don't see anywhere in

4    this letter where we talk about specific

5    orders.  What I do is specific

6    distributors.

7         Q.    So, sir, your statement here

8    is not that Mallinckrodt didn't report

9    the pharmacies to DEA, but rather that

10   Mallinckrodt is obligated to report each

11   individual chargeback to DEA?

12               MR. BOGLE:  Object to form.

13               THE WITNESS:  I didn't say

14          chargeback.  If you notice my

15          report was careful to say orders.

16   BY MR. DAVISON:

17        Q.    Well, so what orders are you

18   talking about?

19               MR. BOGLE:  Object to form.

20               THE WITNESS:  I'm talking

21          about the orders that went to

22          these pharmacies.  What I'm saying

23          to you is you've given notice to

24          DEA you are cutting off these

Highly Confidential - Subject to Further Confidentiality Review

1     various pharmacies.  But you're

2     not giving any details behind

3     that.

4 BY MR. DAVISON:

5     Q.  Sir, you're aware that

6 through ARCOS data, DEA has access to

7 every single order that a pharmacy places

8 from a distributor, correct?

9     A.  I am aware of the ARCOS

10 dataset, yes.

11     Q.  And so the issue you have

12 with what Mallinckrodt did here is that

13 while we provided them information on

14 pharmacies for which we had questions, we

15 didn't provide them with the data on the

16 orders which they already had, correct?

17     MR. BOGLE:  Object to form.

18     THE WITNESS:  I believe

19     that's what I noted in my report,

20     yes.

21 BY MR. DAVISON:

22     Q.  Are you aware that in

23 November of 2010, Mallinckrodt requested

24 a meeting with DEA to present to DEA its

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious order monitoring program?

2         A.    I recall a request for a

3    meeting.  I can't point to a specific

4    document.  Is there a specific place in

5    the report that we want to look at?

6         Q.    No, I'll provide you with a

7    document.  That will make it easier.

8         A.    Great.

9         Q.    Trying to make your life

10   easy.

11        A.    I appreciate that.

12        Q.    All right.  Exhibit 26.

13             (Document marked for

14        identification as Exhibit

15        Whitelaw-26.)

16             THE WITNESS:  Thank you so

17        very much.

18             MR. DAVISON:  Just for the

19        people on the phone, this is Bates

20        number -- I'm sorry about that.

21        This is MNK-T1_ --

22             MR. BOGLE:  Just -- I think

23        you gave me something new.

24   BY MR. DAVISON:

1    Q.    MNK-T1_0000421974.

2    A.    I see the document, yes.

3    Q.    Sir, do you have a

4  recollection of reviewing this document

5  in preparation of your report?

6    A.    I do recollect seeing this

7  document in the past, yes.

8    Q.    Okay.  And, sir, this looks

9  like notes from a meeting at DEA

10  St. Louis office, 11/01/10, correct?

11    A.    That's what it appears to

12  be, yes.  That's certainly what the title

13  of the document is.

14    Q.    All right.  You have no

15  reason to doubt that's what this document

16  is?

17    A.    No, I don't have any reason

18  to doubt it.

19    Q.    And under overview, it

20  states, "Mallinckrodt started the meeting

21  by indicating the appointment had been

22  requested to discuss Mallinckrodt's

23  enhancements to suspicious order

24  monitoring program, further to provide

Highly Confidential - Subject to Further Confidentiality Review

1    DEA new statistical data that has been

2    gathered from sales chargeback monitoring

3    system."

4             Did I read that correctly?

5        A.    I believe you did read that

6    correctly.

7        Q.    All right.  Sir, do you have

8    any reason to doubt that that's the

9    reason Mallinckrodt requested the

10   meeting?

11            MR. BOGLE:  Object to form.

12            THE WITNESS:  All I know is

13       what's written here in front of me

14       on the document.  So I can't make

15       any other judgments than what I'm

16       seeing and reading on the

17       document.

18   BY MR. DAVISON:

19       Q.    And that's true for -- for

20   every document you reviewed in this case,

21   correct?

22       A.    I have to rely on the

23   documents if that's what you're asking,

24   yes, in -- in conjunction with the other

Highly Confidential - Subject to Further Confidentiality Review

1    things I've looked at like deposition

2    testimony, et cetera.

3            So it's part of what I

4    relied on.

5        Q.    Fair enough.

6            So this document is no

7    different from the other e-mails that are

8    cited in -- in your report.  You rely on

9    that, the transcripts, everything we

10   discussed earlier with our methodology,

11   correct?

12       A.    Correct.

13       Q.    If you read down --

14   actually, let's -- let's move up.  The

15   DEA attendees.  One of the attendees is

16   Scott Collier, diversion program manager

17   (DPM).

18       A.    I see that.

19       Q.    Do you see that?

20       A.    Yes, I do, sir.

21       Q.    Do you know who Scott

22   Collier is?

23       A.    Not personally.  I know who

24   he is as represented here.

1    Q.    Do you know where in the DEA

2  hierarchy a diversion program manager is

3  compared to a diversion investigator?

4    A.    Well, I would assume a

5  diversion program manager is higher than

6  a diversion investigator, but exactly how

7  many steps separate the two, I don't know

8  off the top of my head.

9    Q.    All right.  And if

10  Mr. Rafalski testified that the diversion

11  program manager is -- is two steps up

12  from a diversion investigator, you'd have

13  no reason to doubt that?

14    A.    I would have no reason to

15  doubt that, no.

16    Q.    And so if you go -- the

17  general feedback from DEA St. Louis, it

18  states, "The DPM commented that the

19  information Mallinckrodt presented was

20  the best suspicious order monitoring

21  process he has seen to date and what he

22  expected from Mallinckrodt as an industry

23  leader."

24         Did I read that correctly?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    I do believe that you did

2    read that correctly.

3          Q.    Sir, do you have any reason

4    to doubt that the diversion program

5    manager said that about Mallinckrodt's

6    suspicious order monitoring program in

7    2010?

8                MR. BOGLE:  Object to form.

9                THE WITNESS:  Could you

10          be -- could you restate the

11          question for me, please?

12   BY MR. DAVISON:

13         Q.    Do you have any reason to

14   doubt that the diversion program manager

15   from DEA St. Louis stated that

16   "Mallinckrodt's suspicious order

17   monitoring process was the best that he

18   had seen to date and what he expected

19   from Mallinckrodt as an industry leader"?

20               MR. BOGLE:  Same objection.

21               THE WITNESS:  Again, all I

22          can comment on is this is a

23          document that appears -- which I'm

24          not even sure who created the

1       document, because it's not clear

2       from the document that I'm

3       reading -- but assuming it's a

4       Mallinckrodt employee who created

5       it, it is their recollection of

6       the meeting and I have no way of

7       knowing whether that's an accurate

8       statement by Mr. Collier or not.

9       All I know is what I'm reading

10      here.

11  BY MR. DAVISON:

12      Q.    And you didn't make any

13  attempt to interview Mr. Collier about

14  it, correct?

15      A.    No, sir, I did not interview

16  Mr. Collier.

17      Q.    And the same is true with

18  respect to every other e-mail that you

19  cited in your report, you only have the

20  knowledge of what's on the document,

21  right?

22      MR. BOGLE:  Object to form.

23      THE WITNESS:  As I said, I

24      think we -- I think I was a little

1        clearer than that, but I only have

2        what's through knowledge of the

3        e-mails and the documents that I

4        see in front of me, as well as any

5        corresponding deposition

6        testimony, and any other documents

7        that, you know, are interplayed or

8        attachments or whatever else I

9        have to work with.

10   BY MR. DAVISON:

11        Q.    And the depositions that you

12   reviewed relating to Mallinckrodt

13   employees, those were taken by

14   plaintiffs' counsel, correct?

15        A.    Yes, Counsel, I believe they

16   were.

17        Q.    Did plaintiffs' counsel ever

18   ask any of Mallinckrodt's employees about

19   this document?

20        A.    Honestly I can't -- I've

21   reviewed quite a few depositions and I

22   don't honestly remember the details of

23   every deposition, so I can't tell you off

24   the top of my head, Counsel.

1    Q.    So nothing stands out in

2  your mind as this being asked about in a

3  deposition, correct?

4    A.    Nothing stands out that I

5  seem to remember.

6    Q.    And so there's no deposition

7  testimony that would call into

8  question -- strike that.

9         Can you think of any

10  deposition testimony that you reviewed

11  that would call into question the

12  accuracy of the statement that the DPM

13  commented that "the information

14  Mallinckrodt presented was the best

15  suspicious order monitoring process he

16  has seen to date and what he expected

17  from Mallinckrodt as an industry leader"?

18         MR. BOGLE:  Object to form.

19         THE WITNESS:  Again,

20      Counsel, I don't recall anything

21      in a deposition transcript to that

22      effect.

23  BY MR. DAVISON:

24    Q.    Now, if the DPM comment --

1    made that statement, do you think

2    Mallinckrodt could have relied upon it?

3                 MR. BOGLE:  Object to form.

4                 THE WITNESS:  Again, I think

5           it goes back to saying, if he made

6           the comment, he made the comment.

7           I don't know whether he made the

8           comment or he didn't.  So I really

9           can't comment one way or the

10          other.

11   BY MR. DAVISON:

12          Q.    And, sir, did you take this

13   document into account when making your

14   conclusions about the effectiveness of

15   Mallinckrodt's anti-diversion compliance

16   program in 2010?

17          A.    Yes, I did.

18          Q.    But you didn't cite this

19   document anywhere in your report,

20   correct?

21          A.    No, sir, I did not.

22          Q.    Do you think it's not

23   relevant what DEA says about a

24   registrant's suspicious order monitoring

1  program?

2            MR. BOGLE:  Object to form.

3       Mischaracterizes the document, as

4       to speaking to DEA as a whole.

5            THE WITNESS:  Could you

6       restate the question?

7  BY MR. DAVISON:

8       Q.    Yeah.  Do you think it's not

9  relevant what a diversion program manager

10  of DEA says about a registrant's

11  suspicious order monitoring program?

12       A.    I didn't say that,

13  Counselor.

14            What I said was I can't tell

15  from this document, number one, whether

16  or not he actually made the comment or

17  not; and number two, in making that

18  comment, I have no idea what that -- if

19  there was any surrounding context is,

20  because I don't see here, and I don't

21  recall seeing what exactly was the

22  context of the conversation as well as

23  the presentation that was given.  So I

24  don't know.

1    Q.    So it's fair to say under

2    your methodology, you would not rely upon

3    meeting notes, correct?

4              MR. BOGLE:  Object to form.

5         Misstates testimony.

6              THE WITNESS:  I don't think

7         that that's what I'm saying.  I'm

8         saying to you -- you're asking --

9         again, what exactly are you asking

10        me, Counsel?

11   BY MR. DAVISON:

12   Q.    Do you think it's not

13   relevant what a diversion program manager

14   of DEA says about a registrant's

15   suspicious order monitoring program?

16             MR. BOGLE:  Object to form.

17             THE WITNESS:  I would say

18        that it is something to take into

19        account.

20   BY MR. DAVISON:

21   Q.    So you took this into

22   account in coming to your conclusion that

23   Mallinckrodt's anti-diversion compliance

24   program in 2010 was not effective,

1    correct?

2         A.    It was --

3              MR. BOGLE:  Asked and

4         answered.  You can answer again.

5              THE WITNESS:  It was one of

6         many things I considered, but yes,

7         I took it into account.

8    BY MR. DAVISON:

9         Q.    The next page states, "While

10   DEA cannot technically approve the

11   suspicious order monitoring program of

12   any registrant, the message from DEA was

13   that Mallinckrodt was on" -- "is on the

14   right track."

15             Did I read that correctly?

16        A.    Yes, I believe you did read

17   the notes correctly.

18        Q.    And you took this into

19   account in coming to your conclusion that

20   Mallinckrodt's anti-diversion compliance

21   program was not effective in 2010,

22   correct?

23             MR. BOGLE:  Objection.

24        Asked and answered.

Highly Confidential - Subject to Further Confidentiality Review

1           MR. DAVISON:  It's a

2      different statement.

3           THE WITNESS:  Same answer as

4      before.

5  BY MR. DAVISON:

6      Q.    And you didn't cite to that

7  statement in your report either?

8      A.    No, Counselor, I did not

9  cite to that statement in my report

10 either.

11     Q.    Do you think this document

12 is important?

13          MR. BOGLE:  Object to form.

14          THE WITNESS:  Can you be a

15     lot more specific?

16 BY MR. DAVISON:

17     Q.    Sure.

18     A.    Because, I mean, that's a --

19     Q.    Sure.  We'll go there.

20     A.    You can drive a truck

21 through that.

22     Q.    You talked earlier about the

23 importance of looking at communications

24 with your regulator when you're analyzing

1    compliance?

2         A.    Right.  I did.

3         Q.    So this is a memo of

4    communications with Mallinckrodt's

5    regulator -- excuse me -- regulator

6    relating to its controlled substances

7    compliance, correct?

8              MR. BOGLE:  Object to form.

9              THE WITNESS:  No, actually,

10         I don't see it as a communication

11         with Mallinckrodt's regulator.

12         What I see it is a recollection of

13         meeting notes between Mallinckrodt

14         and the DEA.  I don't see this

15         as -- I don't see this, these

16         statements being made on official

17         DEA letterhead signed by the

18         diversion program manager.  I

19         don't see anything official about

20         it.

21              So I -- other than the fact

22         that there was a meeting, and this

23         is the person's recollection of

24         the meeting that occurred, I'm

Highly Confidential - Subject to Further Confidentiality Review

1          afraid I don't see this as an

2          official communication, if that's

3          where you're going.

4    BY MR. DAVISON:

5          Q.    No, I didn't -- I didn't ask

6    that.  But I just want to understand

7    this.  So you haven't seen any notes from

8    DEA about this meeting that would

9    contradict this, correct?

10              MR. BOGLE:  Object to form.

11              THE WITNESS:  I haven't seen

12         any meeting notes period that

13         would give me a direction of

14         whether it occurred, didn't occur,

15         this was said, that was said.  I

16         have nothing.

17   BY MR. DAVISON:

18         Q.    And you haven't spoken to

19   anyone DEA -- at DEA about this meeting?

20              MR. BOGLE:  Objection.

21              THE WITNESS:  No, sir.  I

22         have not spoken to anyone at DEA

23         about this particular meeting.

24   BY MR. DAVISON:

1          Q.    So the only evidence that

2    you have about this meeting is this

3    document, correct?

4                MR. BOGLE:  Object to form.

5                THE WITNESS:  The only

6          evidence I have about this meeting

7          is what I've seen right here.

8    BY MR. DAVISON:

9          Q.    All right.  And although you

10   have nothing that contradicts this

11   evidence, you stated that because it's

12   meeting notes, you're not sure what

13   anyone said, correct?

14                MR. BOGLE:  Object to form.

15                THE WITNESS:  I'm saying to

16          you -- you're saying this is --

17          you have represented or at least

18          were representing, if I understood

19          you correctly, that this is what

20          DEA -- this was DEA's position to

21          Mallinckrodt at that time, and I'm

22          saying that I can't ascertain

23          that.  I can tell you that this is

24          somebody's recollection of what

1          they thought was said in the

2          meeting by the DPM.  Whether it

3          was or was not, I don't know.

4    BY MR. DAVISON:

5          Q.    Sir, do you believe that

6    this was actually stated at the meeting?

7               MR. BOGLE:  Objection.

8          Asked and answered.

9               THE WITNESS:  I have told

10         you I don't have an opinion one

11         way or the other.  I don't have

12         enough information to work from,

13         as to whether or not this is an

14         accurate -- this is what was said

15         in the meeting.

16   BY MR. DAVISON:

17         Q.    So to have enough

18   information, when you have meeting notes,

19   you would need someone else's notes as

20   well to make that --

21         A.    I'd need more corroboration.

22   It could be notes.  It could be

23   testimony, it could be other things to

24   look at other than just a single --

1          Q.    All right.  So a single

2     piece of meeting notes is not sufficient

3     for you?

4                MR. BOGLE:  Object to form.

5          That's a question?

6     BY MR. DAVISON:

7          Q.    Yes.  Let me rephrase.

8                MR. BOGLE:  I just didn't

9          know if it was a question.

10    BY MR. DAVISON:

11         Q.    A single set of meeting

12    notes without corroborating evidence is

13    not sufficient in your methodology for

14    reviewing a controlled substance

15    compliance program?

16               MR. BOGLE:  Object to form.

17         Misstates his testimony.

18               THE WITNESS:  Again, that's

19         not what I'm saying.  I'm saying a

20         single piece of meeting notes made

21         by a registrant purporting to bind

22         the DEA to a policy statement, I

23         would need to see something more

24         official or more corroborating

Highly Confidential - Subject to Further Confidentiality Review

1           evidence to say whether or not

2           that actually was said or not.  I

3           don't know.  I honestly don't

4           know.

5   BY MR. DAVISON:

6           Q.    Is it fair to say that you

7   would take the same approach if you had a

8   single piece of meeting notes made by a

9   Detroit diversion investigator purporting

10  to bind the DEA to a policy statement?

11          MR. BOGLE:  Object to form.

12          THE WITNESS:  If I had a

13          single piece of meeting notes

14          purporting to state -- to state

15          DEA policy that that was what's

16          stated in the meeting, I would

17          still want to see more additional

18          evidence.

19  BY MR. DAVISON:

20          Q.    Sir, based on your 30 years

21  of -- of experience, I assume you are

22  familiar with memorandum of agreements in

23  the pharmaceutical industry, correct?

24          A.    Yes, I am.

1      Q.    And these are essentially

2  agreements between a pharmaceutical

3  industry member or company and the

4  government, correct?

5      A.    It's a broad

6  characterization, but I think it's a fair

7  characterization.

8      Q.    And in those agreements,

9  let's use the term "manufacturer" to make

10  it a little -- little easier here.

11      A.    Okay.  That would be

12  helpful.

13      Q.    A manufacturer could agree

14  in an MOA to do more than is required by

15  the statute, correct?

16          MR. BOGLE:  Objection.

17      Vague and overbroad.

18          THE WITNESS:  Could you be a

19      little more specific on where you

20      are trying to go?  Because I'm not

21      sure of your question.

22  BY MR. DAVISON:

23      Q.    Well, sure.  So let's talk

24  about the CSA.  Actually let's talk about

Highly Confidential - Subject to Further Confidentiality Review

1    the suspicious ordering monitoring

2    regulation.  Are you familiar with that,

3    we talked about it earlier?

4         A.    I am familiar with that,

5    certainly.

6         Q.    So a manufacturer could

7    agree in an MOA to do more than is

8    required by the suspicious order

9    monitoring regulation?

10             MR. BOGLE:  Object to form.

11             THE WITNESS:  Again, we're

12         talking about an incredibly broad

13         brush hypothetical.  I would

14         assume --

15   BY MR. DAVISON:

16        Q.    Sure.  Let's -- let's --

17        A.    -- in regards to any

18   standard, a manufacturer could decide to

19   go above and beyond, yes.

20        Q.    And it could have entered

21   into a memorandum of agreement to do

22   that, correct?

23             MR. BOGLE:  Object to form.

24             THE WITNESS:  Assuming the

1    other side was willing to agree to

2    it, I would assume you could enter

3    into an agreement.

4  BY MR. DAVISON:

5    Q.    So for example, if the CSA

6  requires that a manufacturer check the

7  locks on its vaults once per day, a

8  manufacturer could enter into an MOA that

9  they are going to check the locks on its

10  vault four times a day, correct?

11    A.    Well, they certainly could

12  propose it.  Whether or not that gets

13  agreed to, but --

14    Q.    Fair enough.  And if the

15  government agreed?

16    A.    Yes, then you'd enter into

17  an agreement.

18        MR. BOGLE:  Wait for him to

19    finish the question.

20  BY MR. DAVISON:

21    Q.    And you'd agree with me,

22  sir, that that does not then mean that

23  the CSA requires everyone, all

24  manufacturers, to check the locks on

1    their vaults four times per day?

2              MR. BOGLE:  Object to form.

3              THE WITNESS:  I would say

4         the agreement -- again, it would

5         depend on how the agreement is

6         actually written.

7              But the agreement -- if the

8         agreement is only between two

9         parties I would say that we are

10        talking about the two parties.

11        But it does -- I think you need to

12        be careful here, Counsel, because

13        at least in my world, we look

14        at -- for example, let's take a

15        Corporate Integrity Agreement.

16        It's not binding, but it does

17        provide guidance as to where DEA's

18        thinking is.

19             And guidance as to what is

20        industry leading practice, so

21        other manufacturers should, in

22        fact, take note of it.

23   BY MR. DAVISON:

24             Q.   So it's guidance, not an

Highly Confidential - Subject to Further Confidentiality Review

1    obligation, correct?

2              MR. BOGLE:  Object to form.

3              THE WITNESS:  Between the

4         parties that are not -- the

5         parties of the memorandum, yes.

6         But it -- it's data that should be

7         factored in.

8    BY MR. DAVISON:

9         Q.    Fair enough.

10             MR. DAVISON:  Let's go ahead

11        and we'll take a quick break.

12        There's only ten minutes left.  So

13        if we can go off the record.

14             THE VIDEOGRAPHER:  Going off

15        the record.  5:11 p.m.

16             (Short break.)

17             THE VIDEOGRAPHER:  We are

18        back on the record at 5:35 p.m.

19   BY MR. DAVISON:

20        Q.    All right.  Dr. Whitelaw, I

21   do have one more document to discuss

22   today.

23        A.    Okay.

24        Q.    I -- I think we talked, you

Highly Confidential - Subject to Further Confidentiality Review

1    agreed kind of your opinion starts in

2    2007.  So I want to start in 2007 with

3    the DEA guidance that was provided in a

4    December guidance level -- guidance

5    document.

6               The Bates number is USDEA

7    00005941.  Sir, you can go ahead and take

8    a look at that document.

9         A.    Okay.

10        Q.    Sir, have you seen this

11   document before?

12        A.    Yes, sir, I have actually.

13        Q.    Have you seen this document

14   prior to your engagement in this

15   litigation?

16        A.    I can't rightly recall

17   whether I've seen it prior to this

18   litigation, but -- so I can't -- I can't

19   answer that for you, sorry.

20        Q.    And, sir, this is guidance

21   that's on a DEA letterhead, correct?

22        A.    Yes, as it appears to be.

23        Q.    And it says, "Letter is

24   being sent to every entity in the United

Highly Confidential - Subject to Further Confidentiality Review

1    States registered with the Drug

2    Enforcement Administration, DEA, to

3    manufacture or distribute controlled

4    substances."

5              Do you see that?

6         A.    I do see that, yes.

7         Q.    Now sir, this is the DEA

8    guidance from December 20, 2007.  Do you

9    see anything in this guidance that says a

10   manufacturer needs to look at chargeback

11   data?

12        A.    I do not see anything in

13   this document where the word -- I do not

14   see the words "chargeback data" in this

15   discussion.

16        Q.    Is there anything in this

17   document that you would interpret to

18   require a manufacturer to review

19   chargeback data?

20        A.    Yes, actually I would.

21        Q.    Where is that, sir?

22        A.    I would look on Page 2.  I

23   would look at the top of the page for

24   starters.  And I would look at the

1    sentence that reads, "The determination

2    of whether an order is suspicious depends

3    not only on the ordering patterns of the

4    particular customer, but also on patterns

5    of the registrant's customer, based on

6    patterns throughout the relevant segment

7    of the regulated industry."

8         Q.    And we talked earlier, a

9    manufacturer registrant's customer base

10   are distributors, correct?

11        A.    We talked earlier that

12   that's their direct customer, yes.

13        Q.    You're not claiming now that

14   Mallinckrodts are selling directly to

15   individual pharmacies, correct?

16        A.    I am not claiming that

17   Mallinckrodt is selling to individual

18   pharmacies.

19        Q.    All right.  And this states,

20   I think the -- the sentence you read

21   says, "The determination of whether an

22   order is suspicious depends not only on

23   the ordering patterns of the particular

24   customer, but also on the patterns of the

1    registrant's customer base and the

2    patterns throughout the relevant segment

3    of the regulated industry."

4                Sir, a chargeback is not an

5    order, correct?

6                MR. BOGLE:  Object to form.

7                THE WITNESS:  I would say a

8         chargeback is not an order.

9    BY MR. DAVISON:

10        Q.    All right.  And this does

11   not reference a chargeback, correct?

12        A.    This does not reference the

13   chargeback.

14        Q.    And, sir, is there anything

15   in this letter that explicitly states

16   that a manufacturer must know its

17   customer's customer?

18        A.    I do not see the words "know

19   your customer's customer" in this

20   particular letter that you are showing

21   me.

22        Q.    And there's nothing in here

23   stating that a manufacturer needs to

24   monitor pharmacies that order from

1    distributors, correct?

2              MR. BOGLE:  Object to form.

3              THE WITNESS:  Could you

4         restate the question for me

5         please, Counsel?

6    BY MR. DAVISON:

7         Q.    And there's nothing in here

8    stating that a manufacturer needs to

9    monitor pharmacies that order from

10   distributors, correct?

11             MR. BOGLE:  Object to form.

12             THE WITNESS:  I do not see

13        those words in this letter that --

14        in this document that you're

15        showing me right at this moment.

16   BY MR. DAVISON:

17        Q.    Sir, would you agree that

18   the focus of this letter is on monitoring

19   orders from a registrant's customer?

20             MR. BOGLE:  Object to form.

21             THE WITNESS:  No, Counselor,

22        I would disagree with that.  I

23        think it's on anti-diversion in

24        general and suspicious -- and

1    suspicious order monitoring as

2    well, but I believe we are talking

3    about -- because as he starts out

4    in his letter on the first full

5    paragraph -- sorry, second full

6    paragraph on the first page, he

7    talks about the controlled

8    substances statute and where we

9    were talking about that, those

10   favorite words of yours, of the

11   anti-diversion program, having an

12   effective anti-diversion program.

13   BY MR. DAVISON:

14        Q.    All right.  So I think your

15   statement was that this covers

16   anti-diversion in general as well as

17   suspicious order monitoring.

18             Focusing on suspicious

19   ordering monitoring, would you agree that

20   the focus of this letter with respect to

21   suspicious order monitoring is on

22   monitoring a registrant's direct

23   customers?

24             MR. BOGLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1            THE WITNESS:  No, Counselor.

2       I just see the term "customer."  I

3       don't see customers, indirect

4       customers.  I just see customers.

5       So I'm sorry.  I don't.

6  BY MR. DAVISON:

7       Q.    I think you said already

8  that for a manufacturer, its customers

9  are distributors, correct?

10           MR. BOGLE:  Object to form.

11           THE WITNESS:  In most cases,

12      yes, that's what I did say.

13  BY MR. DAVISON:

14      Q.    All right.  So you're not

15  saying that manufacturers are selling to

16  individual pharmacies?

17           MR. BOGLE:  Object to form.

18           THE WITNESS:  I was saying

19      to you that I didn't --

20      Mallinckrodt wasn't selling to

21      individual pharmacies that I was

22      aware of.

23  BY MR. DAVISON:

24      Q.    Fair enough.  That's the

1  only one that you reviewed, correct?

2          A.    Correct.

3          Q.    All right.  Are you aware of

4  any official DEA guidance after this

5  December 20, 2007 -- excuse me.  Strike

6  that.

7                Are you aware of any

8  official DEA guidance after this

9  December 20, 2007, letter but before

10  Mallinckrodt started monitoring

11  chargebacks that stated a manufacturer

12  needs to know its customer's customers?

13               MR. BOGLE:  Object to form.

14               THE WITNESS:  Counselor, let

15       me go through my report.

16  BY MR. DAVISON:

17          Q.    So sitting here today,

18  without going through your report, you're

19  not aware of any DEA guidance that stated

20  that?

21               MR. BOGLE:  Object to form.

22               THE WITNESS:  Counsel, as I

23       said, I need to look at my report

24       if you want me to answer the

Highly Confidential - Subject to Further Confidentiality Review

1        question.

2   BY MR. DAVISON:

3        Q.    So you can't answer the

4   question without looking at your report?

5             MR. BOGLE:  Object to form.

6             THE WITNESS:  I want to be

7        sure on what I'm answering to you,

8        so I would like to look at my

9        report.

10            (Document marked for

11       identification as Exhibit

12       Whitelaw-27.)

13  BY MR. DAVISON:

14       Q.    Okay.  Sir, are you aware of

15  DEA ever sending a letter like this to

16  manufacturers telling them that they need

17  to monitor chargeback data?

18            MR. BOGLE:  Object to form.

19            THE WITNESS:  Could you ask

20       that question again, please.

21  BY MR. DAVISON:

22       Q.    Yeah, no problem.  Are you

23  aware of DEA ever sending a letter like

24  Exhibit 27, telling manufacturers that

Highly Confidential - Subject to Further Confidentiality Review

1    they're obligated to monitor chargeback

2    data?

3              MR. BOGLE:  Object to form.

4              THE WITNESS:  Well, I think

5         I'm going to have to break your --

6         break your question down into two

7         parts.  I'm aware of the fact that

8         letters like this were sent to

9         manufacturers.  I don't recall in

10        the letters that I have seen,

11        seeing anything referencing --

12        seeing the words "chargeback

13        data."

14   BY MR. DAVISON:

15        Q.    And, sir, earlier we talked

16   about how corporate integrity agreements

17   and MOAs are guidance, correct?

18             MR. BOGLE:  Object to form.

19             THE WITNESS:  Well --

20   BY MR. DAVISON:

21        Q.    Or strike that.

22             Earlier today we talked

23   about how MOAs can be used by others in

24   the industry that have not signed the MOA

1    as guidance, correct?

2         A.    Yes, we did talk about that.

3         Q.    And this letter here, would

4    you agree that this is a piece of

5    guidance provided to industry?

6         A.    I would agree that it looks

7    like an official piece of guidance

8    provided to industry, yes.

9         Q.    And guidance doesn't

10   necessarily create an obligation,

11   correct?

12              MR. BOGLE:  Object to form.

13              THE WITNESS:  When you say

14         "obligation," could you be a bit

15         more specific?

16   BY MR. DAVISON:

17        Q.    Yeah.  Guidance doesn't

18   necessarily create a new obligation under

19   a statute?

20              MR. BOGLE:  Object to form.

21              THE WITNESS:  I believe

22         guidance expounds on existing

23         statutes and regulations and

24         provides additional clarity.

1              MR. BOGLE:  We are at

2        14 hours.

3              MR. DAVISON:  All right.  I

4        see my time is up.  I know that a

5        number of individuals did not have

6        enough time to question the

7        witness, given the multitude of

8        opinions, the length of the

9        report, and the witness's answers.

10       So we reserve the right to reopen

11       the deposition as necessary.  Off

12       the record.

13             THE VIDEOGRAPHER:  Going off

14       the record 5:46 p.m.

15             (Brief pause.)

16             THE VIDEOGRAPHER:  Back on

17       the record at 5:48 p.m.

18                   -  -  -

19                EXAMINATION

20                   -  -  -

21    BY MR. BOGLE:

22         Q.   Hi, Dr. Whitelaw.  I've got

23    a -- my name is Brandon Bogle.  I've got

24    a few follow-up questions for you.  Can

Highly Confidential - Subject to Further Confidentiality Review

1    you go back to Exhibit 26 for me, please?

2          A.    Yes, sir.  I have it in

3    front of me.

4          Q.    Okay.  Do you recall being

5    asked some questions about this document?

6          A.    Yes, I do.

7          Q.    Okay.  And do you recall

8    specifically being asked some questions

9    about statements from an individual from

10   DEA, Scott Collier?

11         A.    Yes, I do recall that.

12         Q.    Okay.  And this document,

13   does it indicate what information was

14   presented by Mallinckrodt at this meeting

15   to Scott Collier?

16         A.    No, sir, it does not.

17         Q.    Okay.  And could you go

18   specifically to Page 209 of your report

19   for me, please?

20         A.    Yes, sir.  I'm there.

21         Q.    Okay.  And if you look at

22   the last paragraph here on this page you

23   note, "In 2017, Mallinckrodt entered into

24   an agreement with the DEA to resolve the

Highly Confidential - Subject to Further Confidentiality Review

1    agency's ongoing investigations and

2    settled allegations made by the DEA that

3    the company, prior to 2012, failed to

4    maintain and operate an effective

5    anti-diversion program."

6              Did I read that correctly?

7       A.    Yes, sir, I think you did.

8       Q.    And you see there, you cite

9    to a Footnote 1238?

10      A.    I do.

11      Q.    Okay.  And in Footnote 1238

12   if you see in the last parenthetical, you

13   note, "The investigation related to the

14   settlement" -- the formal investigation

15   DEA -- "The formal DEA investigation

16   began in September of 2011."

17             Do you see that?

18      A.    Yes, sir, I do.

19      Q.    Okay.  The information that

20   you discussed related to the 2017

21   settlement agreement and the time period

22   in which the investigation related to it

23   occurred, how does that impact the

24   statements for -- the alleged statements

1    from Scott Collier in Exhibit 26 in your

2    view?

3              MR. DAVISON:  Objection to

4         form.

5              THE WITNESS:  Basically what

6         this says to me is that this was

7         not -- his position, assuming this

8         was, in fact, what he said at that

9         time in that report and at that

10        statement in that meeting is not

11        consistent with DEA's position

12        overall, as evidenced by the fact

13        that they commenced an

14        investigation and subsequently

15        Mallinckrodt settled with the DEA

16        in 2017 for controlled substances

17        issues and anti-diversion issues.

18   BY MR. BOGLE:

19        Q.   Okay.  Do you recall earlier

20   in your discussion with Mallinckrodt's

21   counsel, providing testimony to the

22   effect that you were not expressing any

23   opinions about Mallinckrodt's suspicious

24   order monitoring program prior to 2008?

1    A.    Yes, I do recall that.

2    Q.    Okay.  Could I direct you to

3  Page 219 of your report please?

4    A.    Absolutely.  I am there.

5    Q.    And if you see the first

6  sentence on this page it says, "Prior to

7  2008, Mallinckrodt's anti-diversion

8  program was marked by an absence of

9  formal written standards."

10          Do you see that statement?

11    A.    Yes, I do.

12    Q.    Is that a statement that you

13  wrote in this report?

14    A.    Yes, it's a statement I

15  wrote in this report.

16    Q.    Do you still believe that

17  statement to be true today?

18    A.    Yes, I still believe that

19  statement to be true today.

20    Q.    Okay.  And if we can now go

21  to Page 216 of your report.

22          If you see under 14.4.2 A,

23  the first sentence there states, "Prior

24  to March 2008, there is scant evidence

1    that Mallinckrodt had a formally

2    designated SOM team."

3            Do you see that?

4        A.    Yes, I do.

5        Q.    Do you write that statement

6    in your report?

7        A.    Yes.

8        Q.    Do you still hold that

9    opinion today?

10       A.    Yes, I still believe that's

11   correct.

12       Q.    So given these two opinions,

13   Number 1 that prior to March 2008 there

14   is scant evidence that Mallinckrodt had a

15   formally designated SOM team, and that

16   prior to 2008 there was an absence of

17   formal written standards surrounding

18   anti-diversion, what does that say in

19   your mind concerning whether you actually

20   are offering opinions that there were

21   defects in Mallinckrodt's anti-diversion

22   program prior to 2008?

23            MR. DAVISON:  Objection to

24       form.

1              MS. CASTLES:  Object to

2         form.

3              MS. MONAGHAN:  Object to

4         form.

5              THE WITNESS:  I would offer

6         the opinion that, in fact, it

7         is -- there are defects in

8         Mallinckrodt's program prior to

9         2008 based on this evidence and

10        the fact that there -- there is

11        nothing to indicate there -- the

12        existence of that formal program.

13   BY MR. BOGLE:

14        Q.    And the last thing I want to

15   discuss with you, if you can go to

16   Page 128 of your report.

17        A.    All right.  Flipping there.

18              Okay.  Got it.

19        Q.    Okay.  If we can go to the

20   third paragraph here.

21        A.    Okay.

22        Q.    You state, "But they" -- and

23   the "they" here you are talking about

24   ABC, correct?

Highly Confidential - Subject to Further Confidentiality Review

 1          A.      That is correct.

 2          Q.      "But they worked to

 3    configure a program that only addressed

 4    the bare minimums and did not interfere

 5    with ABC's pursuit of ever increasing

 6    revenues."

 7                  Do you see that statement?

 8          A.      Yes, sir, I do see the

 9    statement.

10          Q.      Do you recall being asked

11    some questions earlier today about this

12    statement concerning ABC doing the bare

13    minimums in this regard?

14          A.      Yes, I do recall having a

15    conversation on that.

16          Q.      Okay.  And -- and in this

17    report and your prior testimony today on

18    that issue, what were you intending to

19    convey about ABC doing the bare minimum

20    in this context?

21                  MS. CASTLES:  Object to

22          form.

23                  MR. HYNES:  Object to form.

24                  MR. MELTON:  Object to form.

1                    MS. MONAGHAN:  Object to

2          form.

3                    THE WITNESS:  What I was

4          trying to convey, and apparently,

5          again, I don't think I was very

6          clear.  What I was trying to

7          convey, when I said bare minimums,

8          I mean just the bare minimum, in

9          other words, just what's necessary

10          to -- to avoid an enforcement

11          action or other regulatory

12          sanctions from DEA.

13   BY MR. BOGLE:

14          Q.    During the review period for

15   ABC specifically, what is your opinion

16   concerning whether ABC acted as a

17   responsible and reasonable distributor as

18   to their SOMs and anti-diversion program?

19                    UNIDENTIFIED LAWYER:

20          Objection to form.

21                    THE WITNESS:  I would argue

22          that they were not reasonable.

23   BY MR. BOGLE:

24          Q.    Is that an opinion you still

1    hold today?

2          A.    That is an opinion I still

3    hold today.

4                MR. BOGLE:  No further

5        questions.

6                MR. DAVISON:  Go off.

7                THE VIDEOGRAPHER:  Going off

8        the record, 5:54 p.m.

9                (Brief recess.)

10               THE VIDEOGRAPHER:  Back on

11       record, 5:58 p.m.

12               MR. DAVISON:  Dr. Whitelaw,

13       thank you for your time today.  I

14       personally have no further

15       questions.

16               But again as I mentioned

17       earlier, reserve the rights for

18       the defendants that did not have

19       time and for Mallinckrodt because

20       we did not get to cover all -- all

21       of your opinions.

22               MR. BOGLE:  Is anybody else

23       asking?  Or is that for everybody?

24               MR. DAVISON:  Everybody,

Highly Confidential - Subject to Further Confidentiality Review

1          correct.

2                  THE VIDEOGRAPHER:  This ends

3          today's deposition.  We're going

4          off the record at 5:58 p.m.

5                  (Excused.)

6                  (Deposition concluded at

7          approximately 5:58 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1

2                         CERTIFICATE

3

4

5           I HEREBY CERTIFY that the
    witness was duly sworn by me and that the
6   deposition is a true record of the
    testimony given by the witness.

7

            It was requested before
8   completion of the deposition that the
    witness, DR. SETH B. WHITELAW, have the
9   opportunity to read and sign the
    deposition transcript.

10

11

12      _Michelle L. Gray_____

        MICHELLE L. GRAY,
13      A Registered Professional
        Reporter, Certified Shorthand
14      Reporter, Certified Realtime
        Reporter and Notary Public
15      Dated:  May 20, 2019

16

17

18           (The foregoing certification
19   of this transcript does not apply to any
20   reproduction of the same by any means,
21   unless under the direct control and/or
22   supervision of the certifying reporter.)

23

24

Highly Confidential - Subject to Further Confidentiality Review

# INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Highly Confidential - Subject to Further Confidentiality Review

1                    _   _   _   _   _   _

                    E  R  R  A  T  A

2                    _   _   _   _   _   _

3

4        PAGE    LINE    CHANGE

5        _____   _____   _____

6           REASON: _____

7        _____   _____   _____

8           REASON: _____

9        _____   _____   _____

10          REASON: _____

11       _____   _____   _____

12          REASON: _____

13       _____   _____   _____

14          REASON: _____

15       _____   _____   _____

16          REASON: _____

17       _____   _____   _____

18          REASON: _____

19       _____   _____   _____

20          REASON: _____

21       _____   _____   _____

22          REASON: _____

23       _____   _____   _____

24          REASON: _____

Highly Confidential - Subject to Further Confidentiality Review

1

2              ACKNOWLEDGMENT OF DEPONENT

3

4              I,_____, do

5    hereby certify that I have read the

6    foregoing pages, 524 - 1007, and that the

7    same is a correct transcription of the

8    answers given by me to the questions

9    therein propounded, except for the

10   corrections or changes in form or

11   substance, if any, noted in the attached

12   Errata Sheet.

13

14

15   _____

16    DR. SETH B. WHITELAW                 DATE

17

18

19   Subscribed and sworn
     to before me this

20   _____ day of _____, 20_____.

21   My commission expires:_____

22

     _____

23   Notary Public

24

Highly Confidential - Subject to Further Confidentiality Review

1                        LAWYER'S NOTES

2      PAGE   LINE

3      _____  _____   _____

4      _____  _____   _____

5      _____  _____   _____

6      _____  _____   _____

7      _____  _____   _____

8      _____  _____   _____

9      _____  _____   _____

10     _____  _____   _____

11     _____  _____   _____

12     _____  _____   _____

13     _____  _____   _____

14     _____  _____   _____

15     _____  _____   _____

16     _____  _____   _____

17     _____  _____   _____

18     _____  _____   _____

19     _____  _____   _____

20     _____  _____   _____

21     _____  _____   _____

22     _____  _____   _____

23     _____  _____   _____

24     _____  _____   _____