Page 339

1              IN THE UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF OHIO

3                      EASTERN DIVISION

4

                  ~~~~~~~~~~~~~~~~~~~~~

5

6     IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804
      OPIATE LITIGATION

7                                     Case No. 17-md-2804

8                                     Judge Dan Aaron
      This document relates to:       Polster

9

10    County of Cuyahoga v. Purdue
      Pharma L.P., et al.

11    Case No. 17-OP-45004

12    City of Cleveland, Ohio v. Purdue
      Pharma L.P., et al.

13    Case No. 18-OP-45132

14    The County of Summit, Ohio, et al.
      v. Purdue Pharma L.P., et al.

15    Case No. 18-OP-45090

16                  ~~~~~~~~~~~~~~~~~~~~~

17                       Volume 2
              Continued videotaped deposition of

18                  CALVIN D. WILLIAMS

19

                      March 29, 2019

20                     11:14 a.m.

21

22                     Taken at:
                      Ulmer & Berne

23          1660 W. 2nd Street, Suite 1100
                    Cleveland, Ohio

24

25         Renee L. Pellegrino, RPR, CLR

Page 340

```
1  APPEARANCES:
2  On behalf of the City of Cleveland:
     Baron & Budd, P.C.
3    MARK PIFKO, ESQ.
     15910 Ventura Boulevard
4    Suite 1600
     Encino, California 91436
5    (818) 839-2333
     mpifko@baronbudd.com
6      - and -
     Zashin & Rich
7    AMI J. PATEL, ESQ.
     950 Main Avenue, Fourth Floor
8    Cleveland, Ohio 44113
     (216) 696-4441
9    ajp@zrlaw.com
10 City of Cleveland:
     ELENA BOOP, ESQ.
11   601 Lakeside Avenue, Room 106
     Cleveland, Ohio 44114
12   (216) 664-3727
     eboop@city.cleveland.oh.us
13
     On behalf of Walmart, Inc.:
14   Jones Day
     PATRICIA OCHMAN, ESQ.
15   North Point, 901 Lakeside Avenue
     Cleveland, Ohio 44114-1190
16   (216) 586-3939
     pochman@jonesday.com
17
     On behalf of Endo Pharmaceuticals, Inc., Endo
18 Health Solutions, Inc., Par Pharmaceuticals,
   Inc. and Par Pharmaceutical Companies, Inc.:
19   Arnold & Porter
     JOHN A. FREEDMAN, ESQ.
20   601 Massachusetts Avenue, N.W.
     Washington, D.C. 20001-3743
21   (202) 942-5316
     john.freedman@arnoldporter.com
22
        ~ ~ ~ ~ ~
23
24
25
```

Page 341

```
1  APPEARANCES, CONT'D:
2  On behalf of McKesson Corporation:
     Covington & Burling LLP
3    SONYA D. WINNER, ESQ.
     One Front Street
4    San Francisco, California 94111-5356
     (415) 591-6000
5    swinner@cov.com
        - and -
6    Covington & Burling LLP
     John W. Zipp, ESQ.
7    One CityCenter
     850 Tenth Street, NW
8    Washington, D.C. 20001-4956
     (202) 662-6000
9    zipp@cov.com
10 On behalf of AmerisourceBergen Drug Corporation:
     Reed Smith
11   (Via Telephone and Veritext Virtual Stream)
     LUKE PORTER, ESQ.
12   101 2nd Street, Suite 800
     San Francisco, California 94105
13   (415) 659-5652
     luke.porter@reedsmith.com
14
     On behalf of CVS Indiana, LLC and CVS Rx
15 Services, Inc.:
     Zuckerman Spaeder
16   ANTHONY M. RUIZ, ESQ.
     1800 M Street NW, Suite 1000
17   Washington, D.C. 20036-5807
     (202) 778-1823
18   aruiz@zuckermanspaeder.com
19 On behalf of Johnson & Johnson and Janssen:
     Tucker Ellis LLP
20   JEFFREY M. WHITESELL, ESQ.
     950 Main Avenue, Suite 1000
21   Cleveland, Ohio 44113-7213
     (216) 696-4889
22   jeffrey.whitesell@tuckerellis.com
23
     ALSO PRESENT: Kurt Henschel, Videographer
24
25      ~ ~ ~ ~ ~
```

Page 342

```
1              TRANSCRIPT INDEX
2
3  APPEARANCES ................................340
4  INDEX OF EXHIBITS .........................343
5  INDEX OF OBJECTIONS ........................345
6
7  EXAMINATION OF CALVIN WILLIAMS:
8  BY MS. WINNER .............................347
9  BY MR. ZIPP ..............................396
10 BY MR. PIFKO ..............................429
11 BY MS. WINNER .............................435
12
13 REPORTER'S CERTIFICATE .....................440
14
15 EXHIBIT CUSTODY - RETAINED BY COURT REPORTER
16
17
18
19
20
21
22
23
24
25
```

Page 343

```
1              INDEX OF EXHIBITS
2
3  Number        Description         Marked
4
5  Exhibit 28  E-Mail from Daniel Williams to  350
               Several Recipients, dated
6              October 22, 2018, with
               Attachments, Beginning Bates
7              Number CLEVE_003981505 - Marked
               Highly Confidential
8
   Exhibit 29  E-Mail from Dornat Drummond to  377
9              Calvin Williams, dated June 14,
               2016, with Attachments,
10             Beginning Bates Number
               CLEVE_004057069 - Marked Highly
11             Confidential
12 Exhibit 30  Multi-Page Document Entitled   387
               "CDP Heroin/Fentanyl Strategy,
13             Draft 9-29-16," Beginning Bates
               Number CLEVE_002715524 - Marked
14             Confidential
15 Exhibit 31  E-Mail From Dornat Drummond to  388
               Calvin Williams, dated November
16             16, 2016, with Attachment
17 Exhibit 32  E-Mail from Dornat Drummond to  392
               Calvin Williams, dated November
18             16, 2016, Beginning Bates Number
               CLEVE_002715127
19
   Exhibit 33  Weekly Summary Statistics Report 397
20             Beginning Bates Number
               CLEVE_002369389
21
   Exhibit 34  Bureau of Special Services      403
22             Monthly Stat Sheet Beginning
               Bates Number CLEVE_003394701
23
   Exhibit 35  E-Mail from Michael McGrath to  407
24             David Carroll, dated January 6,
               2019, with Attachment, Beginning
25             Bates Number CLEVE_002605707
```

2 (Pages 340 - 343)

Page 344

INDEX OF EXHIBITS, CONT'D

Exhibit 36  E-Mail from Katherine Cruz to   415
Various Recipients, dated June
29, 2010, with Attachment,
Beginning Bates Number
CLEVE_003285751 - Marked Highly
Confidential

Exhibit 37  E-Mail String Beginning Bates   420
Number July 16, 2015 - Marked
Highly Confidential

Page 345

INDEX OF OBJECTIONS

Objection .................................362
Objection .................................362
Objection .................................363
Objection .................................363
Objection .................................364
Objection .................................364
Objection .................................365
Objection .................................366
Objection .................................366
Objection .................................367
Objection .................................368
Objection .................................369
Objection .................................371
Objection .................................373
Objection .................................376
Objection .................................378
Objection .................................384
Objection .................................385
Objection .................................386
Objection .................................393
Objection .................................395
Objection .................................399
Objection .................................400
Objection .................................402
Objection .................................404
Objection .................................405
Objection .................................408
Objection .................................410
Objection .................................413
Objection .................................414
Objection .................................416
Objection .................................417
Objection .................................422
Objection .................................426
Objection .................................427
Objection .................................428
Objection .................................434
Objection .................................435

Page 346

1  THE VIDEOGRAPHER:  We're on the
2  record at 11:14.  Today's date is March 29th,
3  2019.  This is the matter of National
4  Prescription Opiate Litigation.  This deposition
5  is taking place in Cleveland, Ohio.
6      Would counsel please identify
7  themselves for the record?
8      MR. PIFKO:  Mark Pifko from Baron &
9  Budd, on behalf of the witness, the City of
10  Cleveland and the Plaintiffs Executive
11  Committee.
12      MS. PATEL:  Ami Patel, Zashin &
13  Rich, on behalf of Plaintiff, City of Cleveland.
14      MS. BOOP:  Elena Boop, City of
15  Cleveland Law Department.
16      MR. FREEDMAN:  John Freedman, Arnold
17  & Porter, for the Endo Defendants.
18      MR. WHITESELL:  Jeff Whitesell from
19  Tucker Ellis on behalf of Johnson & Johnson and
20  Janssen.
21      MS. OCHMAN:  Patricia Ochman, Jones
22  Day, for Walmart.
23      MR. RUIZ:  Anthony Ruiz from
24  Zuckerman Spaeder on behalf of CVS Rx Services,
25  Inc. and CVS Indiana, LLC.

Page 347

1      MR. ZIPP:  John Zipp, Covington &
2  Burling, on behalf of McKesson.
3      MS. WINNER:  Sonya Winner from
4  Covington & Burling on behalf of McKesson.
5      And on the phone?  Do we have
6  anybody on the phone?
7      MR. PORTER:  Luke Porter, Reed
8  Smith, on behalf of AmerisourceBergen.
9      MS. WINNER:  Anyone else on the
10  phone?
11      CALVIN D. WILLIAMS, of lawful age, called
12  for examination, as provided by the Federal
13  Rules of Civil Procedure, being by me first duly
14  sworn, as hereinafter certified, deposed and
15  said as follows:
16      EXAMINATION OF CALVIN D. WILLIAMS
17  BY MS. WINNER:
18  Q.   Good morning.
19  A.   Good morning.
20  Q.   We are resuming your prior
21  deposition and we are going to do our utmost not
22  to repeat anything we talked about before, and
23  if I fail in that regard, I'm sure Mr. Pifko
24  will remind me.
25      Do you have any medical impairment

3 (Pages 344 - 347)

1 or other reason why you might be unable to give
2 complete and truthful testimony today?
3    A.   No.
4    Q.   I'm not going to go back through all
5 the drill about -- you know, the introductory
6 drill about a deposition.  The only thing I
7 would remind you of is that if I ask a question
8 that you think is unclear, you're not sure what
9 I'm asking, please speak up about that and I
10 will try to rephrase it.  Okay?
11    A.   I will.
12    Q.   Can you just confirm what your
13 current position is today?
14    A.   I am currently the chief of the
15 Division of Police for the City of Cleveland.
16    Q.   And so your -- your title and your
17 position and your job responsibilities are the
18 same as they were when you last appeared for a
19 deposition, correct?
20    A.   That's correct.
21    Q.   What, if anything, have you done to
22 prepare for your deposition session here today?
23    A.   Just talked to the attorneys for the
24 city.
25    Q.   And when did you do that?

1    A.   This morning.
2    Q.   Did you review any documents as part
3 of your preparation?
4    A.   Yes.
5    Q.   Did any of those documents help you
6 to remember things?
7    A.   No.  Just to review.
8    Q.   Have you reviewed the transcript of
9 your prior deposition session?
10    A.   Yes.  It's been a while.
11        MS. WINNER:  I'd like to ask the
12 reporter to mark as Exhibit 28 a multi-page
13 document.  It's an e-mail with attachments.  The
14 e-mail is from Daniel Williams to several
15 people, including Calvin Williams, dated October
16 22nd, 2018.  The production number -- the first
17 page is CLEVE_003981505.
18        - - - - -
19        (Thereupon, Williams Deposition
20        Exhibit 28, E-Mail from Daniel
21        Williams to Several Recipients,
22        dated October 22, 2018, with
23        Attachments, Beginning Bates Number
24        CLEVE_003981505 - Marked Highly
25        Confidential, was marked for

1        purposes of identification.)
2        - - - - -
3    Q.   Sir, do you recognize this?
4        MR. PIFKO:  I just want to assert
5 for the record I'm flagging if the Justice of
6 Department has any objections.  We'll have them
7 review this.  But you can ask questions.
8    A.   The attached e-mail, yes.
9    Q.   And this e-mail has two attachments;
10 one is the memorandum of understanding about the
11 Cleveland OCDETF Strike Force, correct?
12    A.   Yes.
13    Q.   And you signed this agreement on
14 behalf of the city, did you not?
15    A.   Yes, I did.
16    Q.   And then if you turn to -- into the
17 exhibit to the page that has at the bottom --
18 just on the bottom right -- well, actually, no,
19 it's not.  This was produced in native format,
20 so we don't have a production number, but if you
21 turn to the page after the one with production
22 number ending in 528, at the bottom there's a
23 set of PowerPoint slides.  Yes, we're in the
24 same place.  And this is -- do you recognize
25 this PowerPoint collection?

1    A.   I don't know if this is the exact
2 PowerPoint, but there was a presentation done by
3 the U.S. Attorney's Office on the OCDETF Strike
4 Force, yes.
5    Q.   To whom was that presentation
6 presented?
7    A.   Honestly, I can't remember.
8    Q.   Were you present during the
9 presentation?
10    A.   Yes.  And we've had quite a few
11 presentations on this particular topic, so I
12 can't remember the exact details of this
13 presentation and who was present and when it was
14 done.
15    Q.   Well, the cover e-mail on the first
16 page of this exhibit refers to an announcement
17 at the U.S. Attorney's Office that was scheduled
18 for later that week, if you look at the second
19 paragraph of the e-mail.
20    A.   Yes.
21    Q.   Do you recall there being an
22 announcement made around that time?
23    A.   There was an announcement.  I don't
24 know exactly what day it happened on.  I know
25 the date changed a couple times.  And, actually,

4 (Pages 348 - 351)

Page 352

1 the location of the presentation changed.
2    Q.   And when the announcement was made,
3 was this a public meeting that the press was
4 invited to?
5    A.   Yes.
6    Q.   And were you present at that
7 meeting?
8    A.   Honestly, I can't remember.  Again,
9 this process went on for a few months and there
10 were quite a few meetings in connection with it
11 and there were also some dates and times for
12 announcements and signing of the MOU that were
13 changed, so I can't tell you specifically if I
14 was at this exact presentation.
15    Q.   Do you know if the mayor attended
16 the public announcement?
17    A.   I couldn't tell you.  You would have
18 to check his calendar.
19    Q.   Well, if you would turn to the
20 PowerPoint exhibit, to this e-mail.  I'd like to
21 ask you some questions about that.
22       Were you given an opportunity to
23 review drafts of this PowerPoint in advance?
24    A.   Again, I'm not sure.  We went
25 through this process probably for about six

Page 353

1 months, and there were a lot of meetings, there
2 was a lot of discussion on how this would be
3 rolled out, so I can't tell you specifically for
4 this PowerPoint whether or not I reviewed it.
5    Q.   Who was on point for the division
6 for purposes of negotiating this arrangement?
7    A.   I don't think it was so much a
8 negotiation but a process of partners looking at
9 how we fit into it, and that was Commander Gary
10 Gingell.
11    Q.   And what was your involvement?
12    A.   As one of the partners, as one of
13 the partners for the lead agencies, FBI, DEA,
14 ATF, Customs and Border, Homeland Security.  The
15 lead agency -- the agency heads for those
16 particular agencies themselves came together to
17 talk about different parts of what this thing
18 would look like.
19    Q.   If you would turn to page 4 of the
20 PowerPoint.  The page numbers are in the lower
21 right-hand corner of each slide.
22    A.   Okay.
23    Q.   And there's a listing there of
24 participants, federal participants in the strike
25 force, correct?

Page 354

1    A.   Yes.
2    Q.   And when it says, "122 Federal
3 Partners," what does the number 122 refer to as
4 you understand it?
5    A.   As I understand it, it refers to
6 individual federal agents assigned --
7 potentially assigned to the strike force.
8    Q.   So that would include, for example,
9 56 FBI personnel?
10    A.   Correct.
11    Q.   And what does HSI stand for?
12    A.   Homeland Security.
13    Q.   And USMS, what is that?
14    A.   United States Marshal Service.
15    Q.   And USBP, is that border patrol?
16    A.   Yes.
17    Q.   And USPIS, who is that?
18    A.   I -- I think that's the U.S. postal
19 inspectors.
20    Q.   Okay.  And then if you turn to the
21 next page --
22    A.   Yes.
23    Q.   -- it says -- there's then a list of
24 the local partners, and one of them is CPD?
25    A.   Yes.

Page 355

1    Q.   And by -- and that's your division,
2 correct?
3    A.   That's correct.
4    Q.   And the number 68 appears there.
5 Who is that -- who -- who is within that 68?
6    A.   Not all inclusive, but that includes
7 some members of our narcotics unit, includes
8 members of our gang impact squad, our special
9 weapons and tactics unit, as well as some of our
10 task force officers assigned to various federal
11 task force operations.
12    Q.   So this would include people in
13 addition to those who are currently assigned to
14 narcotics?
15    A.   Yes.
16    Q.   What -- will those individuals, say
17 the people who are assigned from narcotics --
18 will their duties change when they become part
19 of the strike force?
20    A.   Yes and no.  I mean, their primary
21 duties are narcotics enforcement, but the strike
22 force model kind of looks at collaboration
23 throughout all the agencies represented in the
24 strike force.
25    Q.   Well, when -- does the strike force

Page 356

1 permit you to leverage the resources of these
2 federal participants and other participants in
3 doing the law enforcement work that your
4 officers currently engage in?
5     A.   It's a collaboration of all those
6 agencies and the work that has to be done
7 throughout all the agencies listed.
8     Q.   Will they be required to do work
9 that is in addition to work that they currently
10 do?
11    A.   Yes.
12    Q.   And can you give me an example of
13 something they will be required to do that they
14 didn't have to do -- don't have to do today?
15    A.   Can you clarify exactly, because
16 there are several units within the division that
17 will be involved in that strike force?
18    Q.   Sure.  Let me start with narcotics.
19    A.   Okay.
20    Q.   The people from -- will everybody
21 from narcotics be moved into the strike force or
22 will only some of them?
23    A.   We're still working through that.
24    Q.   Okay.  Well, for the people who will
25 be moved over, whoever that turns out to be,

Page 357

1 will they be required to undertake duties that
2 are in addition to what they do today?
3     A.   Yes.
4     Q.   And can you give us some examples of
5 that?
6     A.   Mainly the duties of Division of
7 Police officers assigned to the strike force
8 will be to assist in the investigations, in the
9 operations, whether it be intelligence
10 gathering, whether it be -- some of what the
11 OCDETF component does is, you know, wires, so to
12 speak, Title II or Title III wires -- I'm sorry,
13 I'm not sure of the exact number -- and some
14 officers will be required to what we call sit
15 those wires sometimes.  Some officers will be
16 required to do things in an undercover capacity
17 or just assisting these other agencies in
18 executing search warrants and compiling
19 information and presenting to either the U.S.
20 Attorney or the county prosecutor's office.
21    Q.   Will they still be involved in --
22 will all this work still involve law enforcement
23 work to address crime in Cleveland?
24    A.   Crime in Northeast Ohio, yes.
25    Q.   By Northeast Ohio, you know, what is

Page 358

1 included in that?
2     A.   The Northern District of Ohio.  It's
3 not specific to just Cleveland proper.
4     Q.   Will they be working cases in Akron?
5     A.   If there's a nexus that leads to the
6 strike force with either someone from DEA or
7 FBI, yes.
8     Q.   Is Akron contributing anybody to
9 this strike force?
10    A.   No, not that I'm aware of.
11    Q.   Why not?
12    A.   Unless they're one of the partners
13 and have task force officers assigned to one of
14 those, no.  And I'm not sure if Akron is in the
15 Northern District.  I'm not sure.
16    Q.   Okay.  It is for the courts.  I just
17 don't know whether it is for this purpose or
18 not.
19    A.   Um-hum.
20    Q.   Are there any other large cities
21 that you know are covered by this strike force's
22 region?
23    A.   Well, basically it is most of or if
24 not all of Cuyahoga County for the most part.
25    Q.   So you anticipate that the

Page 359

1 operations of the strike force will be
2 predominantly focused on Cuyahoga County?
3     A.   Correct.
4     Q.   Under CPD there's OSP.  What does
5 that stand for?
6     A.   Ohio State Patrol.
7     Q.   So they will be contributing eight
8 people to the strike force?
9     A.   That's the number that's on there
10 now, yes.
11    Q.   By the way, has this strike force
12 actually gotten up and running yet?
13    A.   No.
14    Q.   When do you anticipate that will
15 happen?
16    A.   I don't know.  Hopefully by 2020.
17    Q.   And one of the aspects of it is a
18 co-location in a new building; is that correct?
19    A.   That's correct.
20    Q.   Has work begun in constructing that
21 new building?
22    A.   Again, I don't know.  I know they're
23 working on the parameters with, you know, the
24 partners that are tasked with that, so --
25    Q.   Do you anticipate that there are --

6 (Pages 356 - 359)

Page 360

1 any aspects of the strike force activities will
2 start before that building is finished and
3 opened?
4     A.    That's a tough question to answer.
5 It depends on -- a lot of it depends on our
6 federal partners and how they actually want to
7 commence this.
8     Q.    And are you still, you collectively
9 for the division, engaged in discussions with
10 them about how it's going to get up and running?
11    A.    Yes.
12    Q.    Then under OSP it says, "HIDTA 18."
13 Again, we're on page 5 of this exhibit.
14    A.    Yes.
15    Q.    And who are those 18 people going to
16 be from?  Where are those 18 people going to be
17 from?
18    A.    That's our HIDTA office for Cuyahoga
19 County and it's all the folks that are assigned
20 to HIDTA.
21    Q.    Does that include the Cleveland
22 Police division people who are assigned to
23 HIDTA?
24    A.    Yes.
25    Q.    So that would be in addition to the

Page 361

1 68?
2     A.    Yes, or -- I think that includes the
3 68, because our officers that -- and detectives
4 that are assigned to task force operations, like
5 HIDTA, like the FBI's task force, will be
6 included in that 68.
7     Q.    So the 68 and the 18 may overlap
8 here?
9     A.    Yes.
10    Q.    And then the next line, it says,
11 "Prosecutor," and USAO I assume is the U.S.
12 Attorney's Office.  And CCPO, is that the
13 Cuyahoga County Prosecutor's Office?
14    A.    That's correct.
15    Q.    If you would turn, then, to page 9
16 of the PowerPoint.  If you could just read that
17 slide to yourself and I'll ask you a couple
18 questions.
19    A.    Okay.
20    Q.    And there's a reference in the first
21 bullet point to a focus on addressing the
22 emerging narcotics and violent crime threats in
23 Greater Cleveland.
24        Do you see that?
25    A.    Yes.

Page 362

1     Q.    And do you understand that to be the
2 principal mission of this strike force?
3        MR. PIFKO:  Objection to form.
4     A.    The principal mission?
5     Q.    Yes.
6     A.    I think it's a little more complex
7 than that.  From the City of Cleveland's
8 perspective, of course it's always violent crime
9 and the things that kind of feed on the crime,
10 drugs, money and guns.  From the federal
11 standpoint, you'd have to ask the individual
12 agencies what their priorities are.
13    Q.    So from your perspective for the
14 City of Cleveland then, it would be to address,
15 as you said, violent crime, the things that feed
16 on violent crime, correct?
17    A.    Right, drugs, money and guns.
18    Q.    Okay.  And when you say "drugs,"
19 what drugs do you include in that?
20    A.    All of them.
21    Q.    Do all drugs feed violent crime to
22 the same extent?
23        MR. PIFKO:  Objection to form.
24    A.    All illegal drugs, as well as some
25 drugs that aren't illegal, yes.

Page 363

1     Q.    Do some of them have more of an
2 impact on violent crime than others?
3        MR. PIFKO:  Objection to form.
4     A.    More of an impact?
5     Q.    On violent crime.  Are there some
6 drugs that are more associated with violent
7 crime than other drugs?
8        MR. PIFKO:  Objection to form.
9     A.    I think historically, yes, and those
10 are the illegal drugs, historically.
11    Q.    Is it different today than it has
12 been historically?
13    A.    I think it is.
14    Q.    And in what way is it different
15 today?
16    A.    Probably the reason we're sitting
17 here today is because of, you know, the opioid
18 crisis and that drug, which is a legal drug, or
19 legal drugs that have kind of spurred the
20 illegal drug trade to explode.
21    Q.    Well, let me ask you this:  Is
22 there -- in terms -- just focusing on the
23 illegal activities that relate specifically to
24 legal opioids, leaving aside heroin and fentanyl
25 or other illegal opioids, focusing just on the

7 (Pages 360 - 363)

Page 364

1  legal opioids, do you -- have you seen much
2  violent crime that's associated just with people
3  stealing or whatever else they do illegally with
4  prescription opioids?
5       MR. PIFKO:  Objection to form.
6    A.  Yes.  Yes.
7    Q.  And what kinds of violent crimes do
8  you see associated just with prescription
9  opioids?
10   A.  I'm sure that we can go back in the
11 record and take a look at things like robberies,
12 home burglaries, things like that, for people
13 that wanted to get either access to prescription
14 medication or money to buy those things.
15   Q.  Is it -- is the amount of violent
16 crime associated with prescription opioids the
17 same as the amount of violent crime that you see
18 with respect to cocaine, for example?
19       MR. PIFKO:  Objection to form.
20   A.  Again, I'd probably have to answer
21 that two ways.  Historically, no, but currently,
22 I mean, the reason we're sitting here is because
23 you really can't divorce those two things right
24 now.
25   Q.  All right.  But what I'm asking you

Page 365

1  to do is -- there are crimes that people commit
2  relating specifically to prescription opioids,
3  correct?
4    A.  Yes.
5    Q.  For example, people might rob them
6  from a house?
7    A.  Yes.
8    Q.  And that would be a crime?
9    A.  Yes.
10   Q.  It might be a violent crime, it
11 might not, but it might be a violent crime?
12   A.  Yes.
13   Q.  But the amount of violent crime that
14 you see for cocaine, for example, is typically
15 higher, is it not?
16       MR. PIFKO:  Objection to form.
17   A.  Again, traditionally, and I'm
18 talking going back, you know, a decade or so --
19 traditionally, your preference would be right,
20 but as we look at the last, I'd say, six, seven,
21 eight, nine years, I don't think you can divorce
22 the two.
23   Q.  So what you're saying is that the
24 reason you say you can't divorce -- when you say
25 you can't divorce the two, what you mean is that

Page 366

1  you need to take into account the violent crime
2  associated with heroin and other illegal
3  opioids?  Is that what you're saying?
4       MR. PIFKO:  Objection to form.
5    A.  I think I'm saying the opposite.
6  You need to take into account the violent crime
7  associated with prescription drugs that also
8  leads to the -- that also matches itself up with
9  everything related to illegal drugs.
10   Q.  There is -- going back to page 9 of
11 the PowerPoint, you have -- there's a list of
12 four categories of significant cases.
13       Do you see that?
14   A.  Yes.
15   Q.  And one is "Long-term
16 fentanyl/opioid investigations."
17       Do you see that?
18   A.  Yes.
19   Q.  And does that refer to illegal
20 trafficking in those drugs?
21       MR. PIFKO:  Objection to form.
22   A.  Again, I think it refers to the
23 entire gamut of how both legal and illegal drugs
24 cross paths and how that leads to overdoses,
25 deaths and violence in the city.

Page 367

1    Q.  Are you expecting this strike force
2  to do any work specific to prescription opioids?
3    A.  I think --
4       MR. PIFKO:  Objection to form.
5    A.  I think you would have to ask the
6  DEA about that.  I know they are looking at
7  every aspect of drug trafficking, whether legal
8  or illegal.
9    Q.  Are you aware of anything specific
10 that this strike force is expected to do
11 relating to prescription opioids?
12   A.  Prescription opioids?
13   Q.  Yes.
14   A.  Again, I think the DEA has the lead
15 on that.  You would have to talk to them.
16   Q.  So you don't know?
17   A.  No, I don't know.
18   Q.  And you also referred -- you
19 referred to three drivers of violent crime.  One
20 was drugs?
21   A.  Drugs.
22   Q.  One was guns?
23   A.  Yes.
24   Q.  And one was money?
25   A.  Correct.

8 (Pages 364 - 367)

Page 368

1   Q.   When you say "money," what are you
2   referring to?
3       A.   It's all about money.  It's all
4   about money.  Whether you're trafficking in
5   drugs or guns, it's all about money.
6       Q.   Are there other activities relating
7   to money that lead to violent crime?
8       A.   I'm sorry.  I don't get the --
9       Q.   Well, you say it's all about money,
10  but presumably people are doing things to get
11  money, correct?
12      A.   Correct.
13      Q.   Well, what kinds of activities to
14  get money, other than selling guns and drugs,
15  are you focused on in terms of violent crime?
16          MR. PIFKO:  Objection to form.
17      A.   I don't get your question.
18      Q.   All right.  Well, let me ask it this
19  way:  You say guns, drugs and money.  Let's talk
20  about guns for a minute.  Part of what your
21  focus is on there is just people selling drugs
22  and -- selling guns and using guns, correct?
23      A.   Correct.
24      Q.   And you arrest people for that?
25      A.   Yes.

Page 369

1       Q.   And some of those people I assume
2   are involved in drug trafficking?
3       A.   Correct.
4       Q.   And some of them are not, correct?
5       A.   Most are, but yeah, some aren't.
6   Yes.
7       Q.   But there are people who buy and
8   sell and use guns illegally in Cleveland who are
9   not involved in narcotics trafficking, correct?
10          MR. PIFKO:  Objection to form.
11      A.   Very few.
12      Q.   Very few?
13      A.   Yes.
14      Q.   Has anybody tried to calculate how
15  many they are?
16      A.   No.  I can tell you that most of our
17  arrests that involve gun seizures and things
18  like that have some kind of nexus to drug
19  trafficking.
20      Q.   And that would be a variety of
21  drugs, including cocaine, heroin, meth?
22      A.   All drugs, yes.
23      Q.   Does everybody sell all -- who's
24  involved in drug trafficking sell all drugs or
25  do people specialize?

Page 370

1       A.   No.  It depends.
2       Q.   All right.  If you would turn to the
3   next page.  I have a question on the very last
4   bullet point on page 10 of the PowerPoint.  It
5   refers to Cleveland's unique gang problem.  What
6   is Cleveland's unique gang problem?
7       A.   I think it's kind of explained in
8   that bullet itself.  You know, there are some
9   cities around the country that have regimented,
10  structured criminal gangs, criminal enterprises,
11  and you don't see that to that degree here in
12  Cleveland.  Most of the gangs are fractured,
13  they're loosely affiliated groups in
14  neighborhoods and people like that, so it's a
15  lot harder to attack that if there's no head, if
16  there's no structure as far as people that do
17  that type of activity, so it's a lot harder to
18  attack.
19      Q.   And is that a new issue in Cleveland
20  or has it been that way for a long time?
21      A.   It comes and goes, to be honest.
22      Q.   Is there any -- has the coming and
23  going been influenced in any way by changes over
24  time in the drug trade?
25      A.   Of course.  When there's more

Page 371

1   availability for stuff, you get these gangs kind
2   of, I guess, organizing a lot better, so they're
3   not fighting each other for territory and things
4   like that all the time.
5       Q.   If you would turn to page 16 of the
6   PowerPoint that's in Exhibit 28, there's a slide
7   about "Narcotics Defendants Indicted."
8           Do you see that?
9       A.   Yes.
10      Q.   Are these statistics that you're
11  familiar with?
12      A.   No, not really, and it doesn't
13  really have a context as far as are these
14  federal indictments, state indictments.
15      Q.   Well, I had a question and maybe you
16  can or can't answer this.  One of the things
17  that strikes -- that sticks out about this
18  particular slide is that the indictments -- the
19  second highest year for indictments is 2007, the
20  highest is 2017, and then there's quite a drop
21  from 2007 to 2008.
22          Do you have any idea of what the
23  reason for that could be?
24          MR. PIFKO:  Objection to form.
25      A.   I think it goes back to 2000 -- if

9 (Pages 368 - 371)

1 my memory serves me correctly, 2005, '06, '07
2 there was a huge -- I wouldn't say a drug war,
3 but there was a huge amount of drug activity
4 through violent gangs in the City of Cleveland,
5 and we made a ton of arrests during those years
6 and that's probably why you see it going down
7 shortly thereafter and then you see things start
8 to spike, you know, according to what I can
9 remember, when we had the opioid stuff start to
10 take hold and then things started to go back up
11 again.
12     Q.    What -- were there any particular
13 drugs that were predominantly involved in that
14 earlier period?
15     A.    In 2005, '06, and '07?
16     Q.    Yes.
17     A.    Again, back in those years I think
18 the things that we were seeing out there on the
19 streets of the city of Cleveland were the
20 illegal drugs, mainly crack cocaine.
21     Q.    Some heroin also?
22     A.    No, not really, not so much; mainly
23 crack cocaine.
24     Q.    If you would turn to page 25 of the
25 PowerPoint.  And this is a graph that shows

1 overdose deaths from various drugs.
2         Do you see that?
3     A.    Yes.
4     Q.    And do you see that one of the --
5 one of the lines -- there's a line here for
6 heroin, there's a line here for cocaine, there's
7 one for fentanyl and so on.
8         Do you see that?
9     A.    Yes.
10     Q.    If you look at the line that's
11 got -- I think it's the triangles for cocaine --
12     A.    Okay.  I think I'm looking at the
13 right one.  This is hard to --
14     Q.    It is a little hard.  It was
15 probably in color in the original.
16     A.    Um-hum.
17     Q.    It shows a spike in cocaine over the
18 last couple years to 349 in 2017.
19         Do you see that?
20         MR. PIFKO:  Objection to form.
21     A.    Yes.
22     Q.    Were you aware of increasing
23 overdoses deaths from cocaine during that
24 period?
25     A.    Is the question specifically

1 pertaining to cocaine or deaths overall, because
2 that period showed them spike in all categories?
3     Q.    I'm asking you specifically about
4 cocaine.
5     A.    Yes, everything.
6     Q.    Had you been aware that cocaine
7 deaths were -- had gone up significantly during
8 that period?
9     A.    I was aware that all deaths were
10 going up due to overdoses in all these drug
11 categories.
12     Q.    But I'm asking you specifically
13 about cocaine.  Were you aware that overdoses
14 for cocaine had gone up?
15     A.    I guess my answer is yes.  All the
16 drug categories of overdose deaths had
17 increased, including cocaine.
18     Q.    Did anybody talk to you about what
19 reasons might be behind the increase in overdose
20 deaths for cocaine specifically?
21     A.    Because cocaine was being mixed with
22 other drugs.
23     Q.    Who told you that?
24     A.    Probably a variety of people, from
25 the ME's office to our own narcotics folks.

1     Q.    If you would turn to page 30 of the
2 PowerPoint.  And I think you said earlier that
3 you thought that USPIS refers to the Postal
4 Inspection Service?
5     A.    Yes.
6     Q.    So this slide is talking about --
7 what does the word "interdiction" mean in this
8 context?
9     A.    It means to stop the flow of.
10     Q.    So this is stopping illegal
11 shipments into the area of these drugs?
12     A.    Correct.
13     Q.    If you would turn to page 53 of the
14 PowerPoint.  This slide talks about threats that
15 the strike force would be taking a look at.  Am
16 I reading that right?
17     A.    Yes.  This is some of them, yes.
18     Q.    Are there threats that you think
19 should have been listed here that are not?
20     A.    Well, again, this is a PowerPoint
21 presentation.  It's not the entire strategic
22 plan for the strike force.
23     Q.    Well, do you think that the most
24 important threats, the top priority threats, are
25 listed here?

Page 376

1     A.   I'm sorry?
2     Q.   Does this list include what you
3   would consider to be the top priority threats
4   that the strike force should be looking at?
5         MR. PIFKO:  Objection to form.
6     A.   Well, again, I think all these
7   threats tie into what I talked about earlier,
8   violent crime and drugs, guns and money.
9     Q.   Does -- all right.  But my question
10  is, are there any sort of top -- well, let me
11  ask it this way:  Are there any priority threats
12  that you think are more important than those
13  that are listed here that are not on the list?
14    A.   Again, I don't think this is an
15  all-inclusive list, but for the city of
16  Cleveland it gets at our priority threats,
17  drugs, guns and money, which lead to violent
18  crime.
19        MS. WINNER:  I'd like to ask the
20  reporter to mark as Exhibit 29 an e-mail with an
21  attachment, or it may be a couple of
22  attachments.  The first -- the e-mail is from
23  Dornat Drummond to Calvin Williams dated June
24  14, 2016 and the production number on the first
25  page is CLEVE_004057069.

Page 377

1              - - - - -
2         (Thereupon, Williams Deposition
3         Exhibit 29, E-Mail from Dornat
4         Drummond to Calvin Williams, dated
5         June 14, 2016, with Attachments,
6         Beginning Bates Number
7         CLEVE_004057069 - Marked Highly
8         Confidential, was marked for
9         purposes of identification.)
10             - - - - -
11    Q.   Have you seen this before?
12    A.   Yes.
13    Q.   And you were a recipient of this
14  e-mail?
15    A.   Yes.
16    Q.   Who is Dornat Drummond?
17    A.   He's the deputy chief of field
18  operations for the Cleveland Division of Police.
19    Q.   And does Michael Butler report to
20  him?
21    A.   Yes.
22    Q.   And Michael Butler is the person who
23  is primarily responsible for the staffing study
24  that is addressed in the attachment to this
25  e-mail, correct?

Page 378

1     A.   Yes.  He was the lead for the study.
2     Q.   Are you familiar with the -- with
3   this attachment that begins with production
4   number 071 in the bottom right-hand corner?
5   That would be the third page of the exhibit.
6     A.   Yes.
7     Q.   Does this -- I want to show you --
8   I'm not going to ask you any more questions
9   about it, but I want to show you, just so we're
10  on the same page, what was marked as Exhibit 21
11  to your previous deposition, and ask you if --
12  if there is a relationship between the study
13  that's in Exhibit 29 and the report that's in
14  Exhibit 21.
15        MR. PIFKO:  Objection to form.
16    A.   They're both related to the staffing
17  of the Division of Police, and I'm trying to
18  decipher whether this is the final or not, but
19  we started this process in late 2015 and
20  finished it in 2018, so there are probably -- I
21  don't know -- half a dozen drafts of the study
22  itself and the final plan.
23    Q.   So does Exhibit 21 reflect some of
24  the analysis work that Lieutenant Butler did in
25  preparing the final plan?

Page 379

1     A.   Some of it, yes.
2     Q.   So going back to Exhibit -- you can
3   put Exhibit 21 aside.  We're not going to spend
4   any more time on that.  But just turning back,
5   then, to Exhibit 29 and the study that is
6   attached to that, if you would turn to -- there
7   aren't any separate page numbers, so if you turn
8   to the production number at the bottom, it's --
9   076 is the last three digits.  There's a heading
10  just a little bit down the page saying, "Mission
11  Oriented Staffing Questionnaire."
12    A.   Yes.
13    Q.   Do you see that?
14    A.   Yes.
15    Q.   Were you familiar with the Mission
16  Oriented Staffing Questionnaire?
17    A.   Yes.
18    Q.   And were you briefed on the plans
19  for that questionnaire and how it was
20  implemented?
21    A.   Not all the questions, but yes, we
22  talked about how we would actually set up this
23  questionnaire.
24    Q.   And what was the purpose of the
25  questionnaire?

11 (Pages 376 - 379)

Page 380

1     A.     Basically to survey the members, the
2  supervisors of the division, to really drill
3  down into their day-to-day tasks and
4  assignments.
5          And if I could kind of clarify one
6  thing.
7     Q.     Sure.
8     A.     I think what we're looking at here
9  in 20 -- Exhibit 29 is a lot of the study work
10  that was done to produce Exhibit 21.
11    Q.     Thank you.
12         So one of the -- so one of the
13  things the questionnaire was doing was just
14  gathering basic information about what people
15  were doing, correct?
16    A.     Correct.
17    Q.     There was also an element that asked
18  various units to provide a -- a self-evaluation
19  of their current success at performing their
20  tasks?
21    A.     I don't remember that part exactly,
22  but, I mean, we could go through this to see
23  exactly the questions that were asked of the
24  particular units within the division.
25    Q.     Well, let me ask you to look at the

Page 381

1  page that's got production number 080, and
2  there's a heading at the top that says, "Mission
3  Oriented Staffing Questionnaire Results."
4     A.     Yes.
5     Q.     And the text -- there's a chart
6  with --
7          (Interruption.)
8          THE WITNESS:  Sorry.
9          MS. WINNER:  Do you need to stop?
10         THE WITNESS:  No.  I thought I
11  turned it off.  Sorry.
12         MS. WINNER:  Okay.
13         THE WITNESS:  Okay.  Sorry.  My
14  apologies.
15         MS. WINNER:  No problem.
16    Q.     There's a table that lists results
17  for the various units, and then above that is
18  text that reads, "As related in the previous
19  section, each unit was requested to provide a
20  self-assessment of their ability to complete
21  their mission essential tasks.  Those tasks have
22  been averaged across each unit and provided
23  here."  And then it provides the results,
24  correct?
25    A.     Yes.

Page 382

1     Q.     Did you -- were these results used
2  as an input in the staffing recommendations that
3  went into the final report?
4     A.     Yes.
5     Q.     Who is responsible for each unit for
6  providing the self-ratings that are reported
7  here?
8     A.     It was a combination of both
9  supervisors and the officers assigned to the
10  various units.
11    Q.     So, for example, if we look at the
12  traffic unit, which is the top of the third
13  column, that would -- that would have been the
14  commander of the traffic unit and others in that
15  unit?
16    A.     Correct.
17    Q.     How about the narcotics unit?  Who
18  would have provided the response for that?
19    A.     The same thing.
20    Q.     Would it have been Commander
21  Gingell?
22    A.     Yes.
23    Q.     Anybody in addition to him?
24    A.     And whoever he deemed from his
25  staff, be it detectives or supervisors from that

Page 383

1  unit.
2     Q.     Now, the narcotics unit, which is
3  the third from the bottom, provides a 100
4  percent self-rate.
5          Do you see that?
6     A.     Yes.
7     Q.     And what do you understand that to
8  mean?
9     A.     That given the tools that they need
10  for their job and personnel, they could do it at
11  100 percent at that time.
12    Q.     And these were all -- all of these
13  ratings were required to be made based on
14  current staffing levels, correct?
15    A.     I'm not a hundred percent sure, but
16  again, this was in 2016 and it was -- I don't
17  know.  I would have to look back through the
18  document to make sure.
19    Q.     Well, let's look two pages back.
20  It's the page where the text begins at the top,
21  "The self-assessment of each mission essential
22  tasks was an effort to receive feedback
23  regarding how well the unit performs even though
24  they may be understaffed."
25    A.     Yes.

12 (Pages 380 - 383)

Page 384

1    Q.   Is that consistent with your
2  understanding of what people were asked to
3  report on?
4         MR. PIFKO:  Objection to form.
5    A.   Yes.
6         Could I add some context to that?
7    Q.   Sure.  Absolutely.
8    A.   And I'm glad you pointed me back to
9  that part of the study because it kind of shows
10 that there are some units that are understaffed,
11 but they have the supervisors, the members in
12 that unit that -- regardless of the staffing,
13 that basically get the job done, and that can
14 only go on for so long, until all that -- all
15 those folks and the people within that unit or
16 that operation get burnt out.  So that's why we
17 really did the study, to take a look at, you
18 know, even if you're understaffed, you know,
19 what type of job you're doing, and for the most
20 part we know that based on the things that we
21 get back from these units, but at a certain
22 point in time it's not going to be enough and
23 those folks are going to get burnt out.
24    Q.   But the majority of the units that
25 responded to this report felt that at current

Page 385

1  staffing levels they weren't able to fully
2  complete their mission, correct?
3         MR. PIFKO:  Objection to form.
4    A.   The majority?
5    Q.   Yes.
6    A.   Well, if you look at the averages, I
7  would say that the majority said that they could
8  at their current staffing level.
9    Q.   Well, they were less than a hundred
10 percent, the majority were less than a hundred
11 percent, correct?
12    A.   I wouldn't say the majority, but a
13 lot of our units are less than a hundred percent
14 staffing, but if you look at the percentages --
15 and I'd probably draw the line at about the 60s,
16 60 percent that starts at the transport unit.
17 Over two-thirds of the unit basically think they
18 can provide at least a minimum level of service
19 at the current staffing, but again, when you do
20 that over and over again, people get burnt out
21 and that level goes down considerably as time
22 goes on.
23    Q.   But am I correct that the majority
24 reported less than a hundred percent?
25         MR. PIFKO:  Objection to form.

Page 386

1    A.   Again, I'd have to look back through
2  the entire document to see what the levels were,
3  but I wouldn't say the majority of the units are
4  understaffed.
5    Q.   How many self-reported at a
6  hundred -- gave a self-rating of a hundred
7  percent on the table that appears on the page
8  with the production number 080?
9    A.   13.
10   Q.   And that is less than half, correct?
11   A.   I'm sorry?
12   Q.   That's considerably less than half
13 of the units that are listed on this page,
14 correct?
15   A.   Yes.
16        MS. WINNER:  I'd like to ask the
17 reporter to mark as Exhibit 30 a document
18 entitled "CDP Heroin/Fentanyl Strategy, Draft
19 9-29-16."  The production number at the bottom
20 of the first page ends in the digits 15524.
21        -  -  -  -  -
22        (Thereupon, Williams Deposition
23        Exhibit 30, Multi-Page Document
24        Entitled "CDP Heroin/Fentanyl
25        Strategy, Draft 9-29-16," Beginning

Page 387

1        Bates Number CLEVE_002715524 -
2        Marked Confidential, was marked for
3        purposes of identification.)
4        -  -  -  -  -
5    Q.   Are you familiar with this document?
6    A.   I can't say specifically that I am.
7    Q.   Did you receive outlines of a
8  heroin/fentanyl strategy from Commander Gingell?
9    A.   I probably received a dozen outlines
10 from Commander Gingell on strategies.
11   Q.   And those are strategies relating to
12 heroin and fentanyl?
13   A.   Related to narcotics in general and
14 their mission.  I can't say that this is one I
15 received directly, and it's marked "draft," so
16 --
17   Q.   Well, it was produced from your
18 files, so I just wanted to know if you were
19 familiar with it.
20   A.   I can't say that I'm a hundred
21 percent sure I actually looked at this.
22   Q.   I'd like to ask the reporter to mark
23 as Exhibit 31 an e-mail with an attachment.  The
24 e-mail is from Jennifer Ciaccia -- does that --
25   A.   Ciaccia.

13 (Pages 384 - 387)

Page 388

1    Q.   -- Ciaccia, okay, to a number of
2  people, including Calvin Williams, dated May
3  25th, 2017.  The last four digits of the
4  production number are 4960.
5              - - - - -
6         (Thereupon, Williams Deposition
7         Exhibit 31, E-Mail From Dornat
8         Drummond to Calvin Williams, dated
9         November 16, 2016, with Attachment,
10        was marked for purposes of
11        identification.)
12             - - - - -
13   Q.   Are you familiar with this exhibit?
14   A.   Yes.
15   Q.   And who is the sender?
16   A.   Sergeant Jennifer Ciaccia.  She's
17 the public information officer for the Division
18 of Police.
19   Q.   And she is sending you a draft press
20 release for the Narcan roll out.
21        Do you see that?
22   A.   Yes.
23   Q.   And what was the Narcan roll out?
24   A.   It was basically the announcement
25 that Division of Police members would be

Page 389

1  equipped with Narcan.
2    Q.   And then the draft of the release is
3  the exhibit to this e-mail, correct?
4    A.   Yes.
5    Q.   And in the second paragraph of the
6  release there's a reference to -- there's a
7  description of the training curriculum.  If you
8  would just read that to yourself.
9    A.   Okay.
10   Q.   Is that an accurate description of
11 the training curriculum for Narcan that was used
12 at this time?
13   A.   I'd have to defer to the actual
14 training.  I don't know.
15   Q.   One of the things it says is the
16 training curriculum takes one hour.  Does that
17 sound right to you?
18   A.   I think it was a little more than
19 that, but --
20   Q.   How much more?
21   A.   I think cars were out of service for
22 at least a couple hours, but again, I'd have
23 to -- I mean, EMS has the exact curriculum
24 because they taught it.
25   Q.   Once an officer had been trained,

Page 390

1  did he receive or she receive Narcan right away
2  for subsequent shifts or did you wait until
3  everybody was trained and then roll it out to
4  everybody at once?
5    A.   I can't specifically remember, but I
6  know that once -- once the training was
7  completed, the Narcan was actually placed in
8  individual zone cars.  The officers didn't
9  receive it themselves.  It was in the car in a
10 kit for the officers to deploy if they needed
11 it.
12   Q.   So did you wait until all the
13 officers using that unit had been trained before
14 the kit was put in the car or did you --
15   A.   Again, I really can't remember, but
16 more than likely we probably waited until
17 everybody got trained because we didn't want the
18 kit in the car with two officers who weren't
19 trained to use and then not be able to utilize
20 it.
21   Q.   The last paragraph of this exhibit,
22 the last sentence says, "The total start-up cost
23 of the project is $34,000."
24        Do you see that?
25   A.   Yes.

Page 391

1    Q.   Is that an accurate number?
2    A.   Again, I couldn't tell you.  I don't
3  know if that number is based on the Narcan kits
4  themselves, if it's based on the overtime for
5  officers that had to be taken off the roll to be
6  trained, the training time for EMS personnel
7  themselves.  We'd have to look further into
8  that.
9    Q.   I take it that we'd have to answer
10 the question you just posed before we could
11 figure out where we would find it in the budget?
12   A.   I don't know if you would actually
13 find it in the budget.  I don't know if it was
14 something that they actually put in the budget.
15 I think it was something that we were going to
16 do, we did it, and then we calculated probably
17 the cost afterwards.
18        MS. WINNER:  I ask the reporter to
19 mark -- ask the reporter to mark as Exhibit 32
20 an e-mail to Calvin Williams from Dornat
21 Drummond dated November 16th, 2016 with an
22 attachment; production number, last four digits
23 is 5127.
24             - - - - -
25        (Thereupon, Williams Deposition

14 (Pages 388 - 391)

1     Exhibit 32, E-Mail from Dornat
2     Drummond to Calvin Williams, dated
3     November 16, 2016, Beginning Bates
4     Number CLEVE_002715127, was marked
5     for purposes of identification.)
6         - - - - - -
7     Q.   Have you had a chance to look at
8  this exhibit?
9     A.   Yes.
10    Q.   Do you recognize it?
11    A.   Yes.
12    Q.   Can you tell us what the violent
13 crime response initiative was?
14    A.   I think it's spelled out there.
15 It's -- you know, from time to time law
16 enforcement agencies will pool all their
17 resources for a specified time period and
18 conduct initiatives, whether it's a traffic
19 initiative, whether it's a crime initiative,
20 whether it's a community engagement initiative.
21 This was a violent crime response initiative.
22    Q.   And over what period of time was
23 this -- was the violent crime response
24 initiative, in fact, implemented?
25    A.   Yes.

1     Q.   And over what period of time?
2     A.   I'd have to go back and look at the
3  stats on this.  Probably a minimum of 30 days,
4  but I'm not exactly sure.
5     Q.   And was there anything in particular
6  that caused you to do it at that time?
7     A.   Again --
8         MR. PIFKO:  Objection to form.
9     A.   -- agencies from time to time take a
10 look at things that are happening within their
11 jurisdictions and they pool all resources to
12 attack it for a certain time period.
13    Q.   Was there any particular trigger for
14 this one?
15    A.   Not that I can remember offhand, but
16 I'm sure there was something out there going on.
17    Q.   Was it successful?
18    A.   You know, these things are sometimes
19 hit or miss.  It depends on the time of year.
20 It depends on the resources.  It depends on a
21 lot of things.  I think for the most part it was
22 probably successful in the things that we wanted
23 to do out there.
24    Q.   And what were you trying to achieve
25 with this particular initiative?

1     A.   Violent crime reduction.
2     Q.   Just generally?
3     A.   Yeah, generally, and those things,
4  as you can see in the document, the agencies
5  involved, the people that were a part of the
6  initiative and some of their responsibilities
7  were folded into this initiative also, like
8  warrant service from the U.S. Marshals and our
9  fugitive guys.
10    Q.   Who was responsible for this
11 initiative?
12    A.   Deputy Chief Drummond.
13    Q.   And why was Deputy Chief Drummond
14 responsible for it?
15    A.   Because he has the bulk of the
16 resources in field operations.
17    Q.   Is he generally the person who's in
18 charge of initiatives?
19    A.   Depends on what the initiative is.
20    Q.   Have you had other violent crime
21 response initiatives over the last few years
22 since you've been chief?
23    A.   Yes.
24    Q.   How many?
25    A.   I couldn't give you a number.

1     Q.   More than ten?
2     A.   Yes.
3     Q.   More than 20?
4     A.   Probably, yes.
5     Q.   Have you had any initiatives during
6  the period you've been chief that were directed
7  at anything else?
8     A.   Again, they come in the form of
9  traffic initiatives, if there are traffic issues
10 going on.  You know, community engagement
11 initiatives where we want to get out there.
12 Recruitment initiatives.  I mean, there are -- I
13 don't know -- a dozen things that we do out
14 there where we have targeted resources.
15    Q.   Were there any other initiatives
16 during that period that related to any kind of
17 major crimes?
18        MR. PIFKO:  Objection to form.
19    A.   During?
20    Q.   During the time you've been chief.
21    A.   Yes.
22    Q.   And can you tell me what kinds of
23 crimes you've had initiatives for?
24    A.   We attack violent crime as one -- as
25 one entity.  I don't think we separate it out

15 (Pages 392 - 395)

Page 396

1  too much.  Sometimes we do.  Sometimes there is
2  just felony warrant service.  And that
3  encompasses whether it's drug dealers or rape
4  suspects or homicide suspects.  Again, we would
5  have to go back and look through everything
6  that's happened over the last five years, but we
7  do a ton of initiatives every year.
8      MS. WINNER:  Why don't we take a
9  break, a short break.
10      THE VIDEOGRAPHER:  Off the record,
11  12:20.
12      (Recess had.)
13      THE VIDEOGRAPHER:  On the record,
14  12:33.
15      EXAMINATION OF CALVIN D. WILLIAMS
16  BY MR. ZIPP:
17      Q.  Good afternoon, Chief Williams.
18      A.  Good afternoon.
19      Q.  I introduced myself earlier but my
20  name is John Zipp of the law firm Covington &
21  Burling and I represent McKesson.
22      MR. ZIPP:  I would like to ask the
23  court reporter to please mark as Williams
24  Exhibit 33 a multi-page document bearing Bates
25  number CLEVE_002369389.

Page 397

1          - - - - -
2      (Thereupon, Williams Deposition
3      Exhibit 33, Weekly Summary
4      Statistics Report Beginning Bates
5      Number CLEVE_002369389, was marked
6      for purposes of identification.)
7          - - - - -
8      Q.  Chief Williams, do you recognize
9  this document?
10      A.  Yes.
11      Q.  What is it?
12      A.  This is a weekly summary stats
13  report, we call a CERP report, for week 17 of
14  2018.
15      Q.  Okay.  And this CERP report, this
16  particular document, is comparing week 17 in
17  2018 to the same week but in 2017, correct?
18      A.  Right.  And also a week-to-week
19  comparison to -- week 16 to 17, 17 to 18.
20      Q.  And the data -- where does this data
21  that is populated here -- where does this come
22  from?
23      A.  It comes out of our record
24  management system.
25      Q.  And what is that?

Page 398

1      A.  Our LERM system.
2      Q.  Your LERM system?
3      A.  Yes.
4      Q.  And who creates this document?
5      A.  Crime analysis unit.
6      Q.  And what is the crime analysis unit?
7      A.  They basically put together stat
8  reports that -- they basically put together
9  crime reports and stat reports from our record
10  management system.
11      Q.  And is this CERP report sent to
12  everyone in the division?
13      A.  It's sent to the command staff.
14      Q.  And what is the purpose of it?
15      A.  For one, it keeps us up on what our
16  actual numbers are as far as Part 1 crime,
17  enforcement activities, and it also gives the
18  various commanders an idea of what's happening
19  within their specific areas because it goes into
20  a district-by-district comparison of the same
21  numbers.
22      Q.  So it is used to evaluate how the
23  department is handling certain investigations or
24  types of investigations?
25      A.  No.  This is just a breakdown of the

Page 399

1  actual hard crime numbers and enforcement
2  numbers for the division.
3      Q.  Is it used in any way to determine
4  resources, if you need more resources?
5      A.  Sometimes.  It can be.
6      Q.  In what way?
7      A.  Well, for example, if we're
8  experiencing a huge uptick in, say, felonious
9  assaults in a certain neighborhood, then we
10  would deploy resources to that neighborhood to
11  assist that district commander.
12      Q.  And would that only be temporarily?
13      A.  Yes.
14      Q.  And you receive this, correct?
15      A.  Yes.
16      Q.  On a weekly basis?
17      A.  Correct.
18      Q.  And when you receive this document,
19  what is the first thing that you do when you
20  look at it?
21      MR. PIFKO:  Objection to form.
22      A.  The first thing that I do?
23      Q.  Yes.
24      A.  I review it.
25      Q.  What are you looking for?

16 (Pages 396 - 399)

Page 400

1    A.   Everything.  I look, you know, cover
2  to cover on what we're doing.
3    Q.   Based off of this document, have you
4  implemented any changes yourself?
5    A.   Yes.
6    Q.   What were those changes?
7        MR. PIFKO:  Objection to form.
8    A.   Probably -- I don't know -- three,
9  four dozen things.  Curfew enforcement,
10  nighttime curfew.  We made sure that our
11  districts out there did what we talked about
12  earlier, special initiatives to address
13  nighttime curfew.
14    Q.   If you look down in the middle of
15  the page, it says, "Enforcement Actions."
16    A.   Yes.
17    Q.   And there are four that are listed
18  under "Arrests."
19        Do you see that?
20    A.   Yes.
21    Q.   Why are those four specific ones
22  listed there?
23    A.   It's just traditionally how this
24  document has been set up over the years.
25    Q.   Are those four that are the most

Page 401

1  important to Cleveland Police Department?
2    A.   Well, I wouldn't say the most
3  important, but they do touch on the things that
4  we really track, weapons, narcotics.  The grand
5  theft motor vehicle was probably thrown in there
6  at a time where we had elevated levels of motor
7  vehicles being stolen so we wanted to
8  specifically look at that.  But again, this
9  document kind of changes over time.
10    Q.   And specifically looking at
11  narcotics for the week -- the week of 2018
12  compared to the week of 2017, there's a
13  reduction of 17 arrests, correct?
14    A.   There were -- for this week, this
15  specific week in 2017, there were -- for
16  narcotics there were 671 narcotics arrests, and
17  for that same time period in 2018 there were 482
18  narcotics arrests.
19    Q.   Chief Williams, I'm looking at
20  the -- not the year-to-date but specifically
21  just that week.
22    A.   Oh, week to week?
23    Q.   Yes.
24    A.   Okay.  There were 47 in the same
25  week in 2017 and 30 in 2018.

Page 402

1    Q.   So that is 17 fewer arrests in 2018?
2    A.   Yes.  Yes, you're right.
3    Q.   And then if you look at the
4  year-to-date, the change between 2017 and 2018
5  is negative 28 percent?
6    A.   Correct.
7    Q.   So that means that there was a
8  reduction in narcotics arrests by 28 percent?
9    A.   Correct, over that time period.
10    Q.   Now, looking just at the very top
11  here, it says, "2018 total homicides 33."
12        Do you see that?
13    A.   2017?
14    Q.   No; no; no.  At the very top, before
15  you actually get into the chart, if you read
16  along --
17    A.   Yes.  Okay.
18    Q.   Now, does that data include heroin
19  overdoses?
20    A.   For homicides, no.
21    Q.   Isn't it true that when detectives
22  respond to a suspected overdose, they treat it
23  as a homicide scene now?
24        MR. PIFKO:  Objection to form.
25    A.   They treat it as a death scene

Page 403

1  that's investigated, yes.
2    Q.   Is anywhere in here reflected heroin
3  overdoses?
4    A.   No.
5        MR. ZIPP:  I would like to ask the
6  court reporter to please mark as Williams
7  Exhibit 34 a three-page document bearing Bates
8  number CLEVE_003394701.
9            - - - - -
10        (Thereupon, Williams Deposition
11        Exhibit 34, Bureau of Special
12        Services Monthly Stat Sheet
13        Beginning Bates Number
14        CLEVE_003394701, was marked for
15        purposes of identification.)
16            - - - - -
17    Q.   Chief Williams, do you recognize
18  this document?
19    A.   Yes.
20    Q.   What is it?
21    A.   It's a monthly stats sheet for the
22  Bureau of Special Services.
23    Q.   Is this monthly stat sheet something
24  that is -- how do these two documents -- how
25  does Exhibit 33 and the monthly stat sheet

17 (Pages 400 - 403)

Page 404

1 interact?
2      MR. PIFKO:  Objection to form.
3      A.   The only way they should interact --
4 well, they interact in a couple of categories
5 here, felony and misdemeanor drug arrests,
6 prostitution arrests, and I think we also look
7 at alcohol arrests, or citations I should say.
8 This is a sheet that's completed by the district
9 level vice units that's sent down and then it's
10 compiled in the monthly stats.
11     Q.   And so this is created every month?
12     A.   Yes.
13     Q.   And you mentioned who creates it.
14 Is there a particular person in each district
15 that creates it?
16     A.   Somebody from that vice unit.
17     Q.   Someone from that vice unit?
18     A.   Right.
19     Q.   Do you know who created this one for
20 the fifth district vice unit?
21     A.   I don't know who created it, but I
22 know at the time back in 2012 Lieutenant Purcell
23 is the supervisor of that unit that signed off
24 on it.
25     Q.   And these are generated in the

Page 405

1 ordinary course of operations, correct?
2      A.   Yes.
3      Q.   And in creating this document, they
4 try to be as accurate as possible?
5      MR. PIFKO:  Objection to form.
6      A.   They try, yes.
7      Q.   And does every district receive a
8 copy of the other district's monthly statistics?
9      A.   No.  They can look at the CERP
10 report for a lot of that, or if they want to
11 exchange district to district, they can.
12     Q.   What is the purpose then of creating
13 these monthly statistics?
14     A.   Stats.  We're an agency that keeps
15 numbers.
16     Q.   Does that impact your staffing
17 levels?
18     A.   Sometimes, yes.
19     Q.   So if, for example, you see that a
20 particular district has more of one type of
21 arrest or crime, will you reallocate officers to
22 that district?
23     A.   Again, for a short period of time,
24 yes.
25     Q.   And you said -- does this

Page 406

1 information all come from LERMs?
2      A.   Yes.
3      Q.   When you were a commander of the
4 fifth district, which was 2006 to 2011, correct?
5      A.   The fifth and the third, correct.
6      Q.   When they shifted?
7      A.   Yes.
8      Q.   Were these types of documents
9 produced during that time?
10     A.   Yes.
11     Q.   And during that time you -- these
12 documents kept track of felony drug arrests,
13 correct?
14     A.   Correct.
15     Q.   As well as narcotics that were
16 seized?
17     A.   Yes.
18     Q.   And during that time they also kept
19 track of the quantity of prescription pills that
20 were seized, correct?
21     A.   Correct.
22          I'm sorry.  At the district level?
23     Q.   Yes.
24     A.   Yes.
25     Q.   Thank you.

Page 407

1      MR. ZIPP:  I'd like to ask the court
2 reporter to please mark as Williams Exhibit 35
3 an e-mail from James McPike to David Carroll, a
4 three-page -- or four-page document from McGrath
5 to David Carroll, bearing Bates number
6 002605707.
7      - - - - -
8      (Thereupon, Williams Deposition
9      Exhibit 35, E-Mail from Michael
10     McGrath to David Carroll, dated
11     January 6, 2019, with Attachment,
12     Beginning Bates Number
13     CLEVE_002605707, was marked for
14     purposes of identification.)
15     - - - - -
16     Q.   Chief Williams, do you recognize
17 this e-mail?
18     A.   Yes.
19     Q.   And you received this e-mail,
20 correct?
21     A.   Yes.
22     Q.   It was forwarded to you?
23     A.   Um-hum.
24     Q.   If you look at the bottom of the
25 first page where the e-mail chain actually

18 (Pages 404 - 407)

Page 408

1  starts, you will see that it was sent originally
2  from James McPike to David Carroll, correct?
3      A.  Correct.
4      Q.  Who is James McPike?
5      A.  He's a captain in the fifth
6  district.
7      Q.  And David Carroll is the acting
8  commissioner of corrections?
9      A.  Yes.
10     Q.  Is he still a police officer with --
11     A.  Yes.
12     Q.  -- the Cleveland Division of Police?
13     A.  Yes.
14     Q.  And in looking at the e-mail, it
15  says that -- or Mr. McPike states that "The
16  county jail is turning away our prisoners."  I
17  presume "our prisoners" means the Cleveland
18  Division of Police prisoners?
19         MR. PIFKO:  Objection to form.
20     A.  Yes.
21     Q.  And he goes on to say, "in droves
22  and giving our officers the attached document,"
23  which is the next two pages of Exhibit 35,
24  correct?
25     A.  Yes.

Page 409

1      Q.  Mr. McPike then goes on to say that
2  there were -- because of this, there were 18
3  officers off the road, correct?
4      A.  That's what he states, yes.
5      Q.  And what does that mean?
6      A.  It means in some way, shape or form
7  there were 18 patrol officers that were either
8  stuck at the jail or at a hospital facility and
9  not answering calls for service.
10     Q.  And if they're stuck at the jail or
11  at the hospital, that means that that's less
12  time that they're out on the streets
13  investigating crimes?
14     A.  Yes.
15     Q.  Or responding to incidents?
16     A.  Correct.
17     Q.  Now, this new policy was made
18  effective on December 31st, 2018, so quite
19  recently, correct?
20     A.  According to this document, yes.
21     Q.  Do you have any reason to believe
22  that it was implemented earlier than that?
23     A.  Well, I mean, this is according to
24  the document.  The City of Cleveland never
25  officially received this document.

Page 410

1      Q.  Why is that?
2      A.  You would have to ask the county
3  sheriff's office.  I don't know.
4      Q.  So you -- but you received it -- the
5  first time you received it was on January 5th in
6  an attachment to an e-mail?
7      A.  Yes.
8      Q.  So the City of Cleveland was not
9  involved at all in the decision or this new
10  policy implementation by the county jail?
11         MR. PIFKO:  Objection to form.
12     A.  No.  The city does not run the
13  county jail.
14     Q.  But they weren't involved at all?
15     A.  No.
16     Q.  It's my understanding that -- so the
17  City of Cleveland does not run a jail, correct?
18     A.  That's correct.
19     Q.  And you send your -- or the police
20  department sends Cleveland Division of Police
21  prisoners to Cuyahoga County jail?
22     A.  That's correct.
23     Q.  And there's an agreement that it's
24  $99 a day per prisoner, correct?
25     A.  Yes.

Page 411

1      Q.  Do you know who was involved in
2  enacting this policy?
3      A.  A lot of folks from city hall,
4  public safety director, Commissioner Carroll.  A
5  lot of people from the city side.
6      Q.  And you played -- did you play --
7  you specifically play any role in the creation
8  of this?
9      A.  No.
10     Q.  What impact has this policy had on
11  the Cleveland Division of Police's ability to
12  effectively investigate crimes?
13         MR. PIFKO:  What policy are we
14  talking about?  When you say "this," it's not
15  clear to me.
16         MR. ZIPP:  The policy that we're
17  looking at, Exhibit 35, that no person can be
18  accepted into our custody until there's an
19  approval from a registered nurse.
20     Q.  You can answer.
21     A.  I don't know if I can answer that
22  specifically because we're still working through
23  this particular issue with the county jail.
24     Q.  So this issue hasn't been resolved
25  yet?

19 (Pages 408 - 411)

Page 412

1    A.    No, not a hundred percent; no.
2    Q.    And when you say we are still
3  working through this issue, who is that?
4    A.    Myself, the law department, director
5  of public safety.
6    Q.    And what are you trying to
7  accomplish when you're working through this?
8    A.    First off, we're trying to get an
9  understanding of the policy itself.  We have
10  issues with some of the prisoners that are
11  turned away and the reasoning for it, so we're
12  trying to work through that with the county
13  staff.
14    Q.    And what are those issues?
15    A.    Basically that some of these people
16  should not be turned away, they should be
17  accepted into the jail.
18    Q.    And what is the county jail's
19  position on that?
20    A.    This policy.
21    Q.    In your discussions with them, do
22  they just cite this policy?
23    A.    Yes.
24    Q.    They don't provide any other
25  reasoning why?

Page 413

1    A.    Not to this point, but again, we're
2  still working through it.
3    Q.    And since that time -- when did
4  you -- strike that.
5        When did you begin discussions
6  concerning this issue?
7    A.    I don't know.  Probably shortly
8  after this started happening the first of the
9  year.
10    Q.    And on this day the issue still
11  persists?
12    A.    I'm sorry?
13        MR. PIFKO:  Objection to form.
14    Q.    Strike that.
15        On -- today there are still
16  prisoners that are Cleveland Division of Police
17  prisoners that are still being turned away based
18  upon the policy that was enacted on December
19  31st?
20    A.    Yes.
21    Q.    Do you have a sense of the number of
22  individuals that have been rejected by the jail?
23    A.    Not exactly, but I'm sure
24  Commissioner Carroll does.
25    Q.    Was this something that saved the

Page 414

1  county money?
2        MR. PIFKO:  Objection to form.
3    A.    I don't know, and I don't know if I
4  really should get too deep into the city's
5  contract with another agency that we're still
6  trying to work out kinks in this.  I don't know.
7  I'm asking my counsel.  I mean, the city has a
8  contract with the Cuyahoga County Sheriff's
9  Department to accept prisoners, and there's some
10  issues with it that we're trying to work out.
11    Q.    Can you tell me some of the other
12  issues that you're trying to work out aside from
13  just this policy?
14        MR. PIFKO:  To the extent there's
15  attorney-client communications, I'll instruct
16  you not to answer.  Aside from attorney-client
17  communications, you can answer.
18    A.    It's all being talked or worked out
19  between our city attorneys and the attorneys for
20  the Cuyahoga County Jail.
21    Q.    Is Captain Gerome involved in it
22  now?
23    A.    I don't know.  I couldn't tell you
24  who from their side.  I've talked with the
25  sheriff.  I don't know who else is involved.

Page 415

1    Q.    Okay.  Do you know if this policy
2  has cost the City of Cleveland more money?
3    A.    I'm sure it has.
4    Q.    In what ways?
5    A.    Hospital cost.
6    Q.    Hospital cost why?
7    A.    Any prisoner that we take to the
8  hospital, the city has to pay for that.
9        MR. ZIPP:  I would like to ask the
10  court reporter to please mark as Williams
11  Exhibit 36 an e-mail from Katherine Cruz on June
12  29th, 2010, Bates number 003285751.
13        - - - - -
14        (Thereupon, Williams Deposition
15        Exhibit 36, E-Mail from Katherine
16        Cruz to Various Recipients, dated
17        June 29, 2010, with Attachment,
18        Beginning Bates Number
19        CLEVE_003285751 - Marked Highly
20        Confidential, was marked for
21        purposes of identification.)
22        - - - - -
23    Q.    Chief Williams, have you received
24  e-mails like this from crime analysis?
25        MR. PIFKO:  Objection to form.

20 (Pages 412 - 415)

Page 416

1    Q.   I'll rephrase that.
2         Chief Williams, have you received
3  e-mails from crime analysis before?
4    A.   Yes.
5    Q.   And in those e-mails have they
6  contained news alerts?
7    A.   From crime analysis, no.
8    Q.   So this, Exhibit 37, is unique for
9  crime analysis to send that?
10        MR. PIFKO:  I think it's 36.
11   Q.   I apologize.  36.
12   A.   At this present day and time, yes.
13   Q.   How about now?
14   A.   That's what I'm saying, we -- crime
15 analysis does not send out bulletins and alerts.
16 That's not their function.
17   Q.   And their function, as you said
18 earlier, was to generate CERP reports and so on?
19   A.   Correct.
20   Q.   Does crime analysis also -- is one
21 of their functions to identify trends or new
22 trends in crime?
23   A.   Yes.
24   Q.   And when they do this, is the only
25 way that they notify the division through CERP

Page 417

1  reports?
2    A.   No; no.  They can send individual
3  notifications, and usually they do that upon
4  request by a unit or operation within the
5  division to take a look at certain things and
6  then send that report to them.
7    Q.   Are there any other instances in
8  which crime analysis finds a -- or discovers a
9  new type of trend or an increasing trend without
10 being asked to look into it?
11        MR. PIFKO:  Objection to form.
12   A.   No.  That's not what they do.
13   Q.   That's not what they do?
14   A.   No.
15   Q.   Do you know if Detective Kathy Cruz
16 is still with the Cleveland Police Department?
17   A.   She is not.
18   Q.   Do you know when she left the
19 Cleveland Police Department?
20   A.   Not exactly.  She retired -- I don't
21 know -- either '17 or '18.
22   Q.   And this e-mail, if you look at the
23 subject, it says, "Michigan OxyContin coming to
24 Ohio," correct?
25   A.   Yes.

Page 418

1    Q.   If you flip to the third page, this
2  is a report from HIDTA, correct?
3    A.   Correct.
4    Q.   And does HIDTA -- is this a type of
5  document that HIDTA regularly generates?
6    A.   Yes.
7    Q.   And this particular -- would you
8  refer to it as a report or a news alert?
9    A.   A bulletin.
10   Q.   A bulletin?
11   A.   Yes.
12   Q.   And this particular bulletin is from
13 May of 2010, correct, if you flip to the next
14 page over, at the very top?
15   A.   Yeah.  That second page says, "May
16 2010."
17   Q.   Do you have any reason to believe
18 that the first page is not connected to the
19 second page?
20   A.   Yeah.  Yes.  I'm sorry.  It's not --
21 I mean, the bottom of the first page reads, "The
22 following four summaries are from case reports
23 of undercover buys, seizures and," and then the
24 top of the next page says "Case Summary" and
25 gets into a totally different subject matter.

Page 419

1  So I don't know what's missing and what's not.
2    Q.   Okay.  But if you look at the first
3  page, it says -- the first line says, "Over the
4  past two years several law enforcement agencies
5  in Ohio seized large amounts of OxyContin that
6  were diverted or originated in Michigan."
7         Did I read that correctly?
8    A.   Yes.
9    Q.   And if you flip to the second page,
10 the third paragraph starts with, "In July of
11 2009 the Lakewood Police narcotics unit seized
12 300 OxyContin 800 milligram pills from a subject
13 also known to deal marijuana."
14   A.   Yes, I see that.
15   Q.   Now, Lakewood Police narcotics unit,
16 Lakewood is a city in Cuyahoga County, correct?
17   A.   Correct.
18        MR. ZIPP:  I would like to ask the
19 court reporter to please mark as Williams
20 Exhibit 37 a three-page document -- e-mail
21 rather, from Chief Williams, Calvin Williams,
22 dated July 16th, 2014, bearing Bates number
23 003958369.
24        - - - - -
25        (Thereupon, Williams Deposition

21 (Pages 416 - 419)

Page 420

1     Exhibit 37, E-Mail String Beginning
2     Bates Number July 16, 2015 - Marked
3     Highly Confidential, was marked for
4     purposes of identification.)
5     - - - - -
6     Q.   Chief Williams, do you recognize
7 this e-mail, this document?
8     A.   Yes.
9     Q.   And that is -- you are the Calvin
10 Williams that sent this e-mail, correct, at the
11 top?
12    A.   Yes.
13    Q.   Sharon Dumas forwarded you this
14 e-mail on July 16th, correct?
15    A.   Yes.
16    Q.   And who is Sharon Dumas?
17    A.   Sharon Dumas is the finance director
18 for the City of Cleveland.
19    Q.   And if you go down the page, I know
20 I'm going to pronounce her name probably
21 incorrectly, but it's Olushola Ojo?
22    A.   His name, Olushola.
23    Q.   And what is his position?
24    A.   He worked in the finance department.
25 He's no longer with the city.

Page 421

1     Q.   He goes on to state that -- and if
2 you look at the bottom, that "Police OT" -- OT
3 refers to overtime, correct?
4     A.   Correct.
5     Q.   -- "was the worst pay period in the
6 last five years," correct?
7     A.   That's what he says, yes.
8     Q.   And if you look at the numbers at
9 the first row from pay period 13 of 2014 to pay
10 period 14 of 2014 -- and a pay period is two
11 weeks, correct?
12    A.   Correct.
13    Q.   And the numbers below that reflect
14 the dollar amount that was paid in overtime?
15    A.   Correct.
16    Q.   And then the third column says, "PP
17 to PP Variance," so pay period to pay period in
18 variance?
19    A.   Correct.
20    Q.   And the variance between those two
21 pay periods was $136,826, correct?
22    A.   Correct.
23    Q.   And if you look down to the second
24 row, the pay period between 2013 -- pay period
25 14 of 2013 compared to the pay period 14 of

Page 422

1 2014, the variance there was $232,165, correct?
2     A.   Yes.
3     Q.   Can you explain why there was such a
4 large increase?
5     A.   Sitting here today, no, actually I
6 couldn't.  I'd have to go back through 2014
7 records to see exactly what our response was to
8 this.
9     Q.   There is a different response aside
10 from the one that you sent up here?
11    A.   I'm sure there is somewhere that we
12 actually explained what that overtime cost was
13 for.
14    Q.   And you can't -- nothing stands out
15 in your mind from that pay period?
16    A.   From back in June of 2014, no.
17    Q.   This would have been roughly six
18 months after taking over as chief, correct?
19    A.   Correct.
20    Q.   You would agree, though, that this
21 increase is not solely because the Division of
22 Police is combating overdose deaths, correct?
23        MR. PIFKO:  Objection to form.
24    A.   Again, I'd have to take a look at
25 what our response was to tell you exactly.

Page 423

1     Q.   Looking at the first page in the
2 middle there, Ms. Dumas --
3     A.   Dumas.
4     Q.   -- states that "Police OT:  This is
5 crazy and undeniably abusive."  Would you agree
6 with that?
7     A.   No.
8     Q.   What do you consider abusive
9 overtime?
10    A.   Unnecessarily generated overtime.
11    Q.   And you don't think that this was
12 unnecessarily generated overtime?
13    A.   Of course not.
14    Q.   Then why was your response "No OT
15 unless approved at the DC level"?  Why didn't
16 you --
17    A.   Because there had to be an immediate
18 look at this, so we wanted to hold all that
19 stuff until we can take a look and see exactly
20 why the variances, why the OT was so high.
21    Q.   And sitting here today, you don't
22 recall why?
23    A.   No.  I mean, we get these reports
24 every two weeks, so this is one of -- I don't
25 know -- over five years, you know, 50 reports.

22 (Pages 420 - 423)

Page 424

1    Q.    And so you get these types of
2  reports every few weeks where they say that
3  police overtime is crazy and undeniably abusive?
4    A.    We've gotten a lot of them where not
5  in those terms but we need to look at our
6  overtime, yes.
7    Q.    And since then have there been
8  changes in policy to reduce the amount of
9  overtime?
10    A.    That was it, it's approved at the
11  deputy chief level.
12    Q.    So walk me through that.  Does that
13  mean that all overtime has to be approved at the
14  deputy chief level?
15    A.    Not all overtime.  There is some
16  overtime that's -- for example, court time.  If
17  an officer goes to court, contractually there's
18  an amount of overtime that that officer is paid.
19  We don't have to monitor that.  We review that
20  from time to time with our inspections unit to
21  make sure it's in line with the contract.  There
22  is some discretionary overtime that the DCs have
23  to approve.  Overtime for an officer staying to
24  do certain things or coming in for a special
25  detail, that has to be approved at the DCs

Page 425

1  level.
2    Q.    Does this have to be approved prior
3  to the officer completing the overtime?
4    A.    Yes.
5    Q.    So aside from court, attending
6  court, are there any other instances in which
7  overtime does not have to be approved prior to?
8    A.    I'm sure there are a few.  I can't
9  think of them all right now.  I mean, field
10  training officer time is contractual.  Court
11  time is contractual.  Our range time is
12  contractual.  I mean, there -- I'd have to bring
13  our timekeeping person or look at the manual to
14  tell you what automatically goes in, and then
15  the other discretionary overtime has to be
16  approved.
17    Q.    What about for investigations; does
18  that have to be approved prior?  If a police
19  officer wants to conduct further investigation,
20  does that overtime have to be approved prior to
21  conducting that investigation?
22    A.    Yes.
23    Q.    And that has to be approved by the
24  deputy chief?
25    A.    Yes.

Page 426

1    Q.    Gary Gingell is not a deputy chief,
2  correct?
3    A.    No.
4    Q.    So he would not be able to approve
5  overtime?
6        MR. PIFKO:  Objection to form.
7    A.    He would run that through his deputy
8  chief and get it approved prior to.
9    Q.    And who is the deputy chief?
10    A.    Currently Harold Pretel.
11    Q.    Back to that middle e-mail there.
12  It says, "Shola is going to calculate the
13  deficit position and we are going to need to
14  transfer from your trust fund immediately."
15        What does that mean?
16    A.    Where are you reading from?
17    Q.    That middle line where I just read,
18  "Police OT:  This is crazy and undeniably
19  abusive."
20    A.    Oh, okay.
21        That means they want to take that
22  overage out of another line item from the budget
23  or another place within the division.
24    Q.    And what is that place?
25    A.    Well, the director, I think,

Page 427

1  probably mistakenly, wants to take it from the
2  law enforcement trust fund monies.
3    Q.    Why is that mistakenly?
4    A.    There are federal guidelines for the
5  law enforcement trust fund.
6    Q.    And would that not permit them to
7  take money to pay for overtime?
8        MR. PIFKO:  Objection to form.
9    A.    I haven't looked at the guidelines
10  lately, but I think that would be something that
11  would definitely have to be talked about before
12  it's done.
13    Q.    Who would it have to be talked about
14  with?
15    A.    With the Department of Justice, the
16  office that administers the trust fund program.
17    Q.    What are the funds -- what is the
18  money that is in the law enforcement trust fund
19  used for?
20    A.    It's used for training, used for
21  equipment, used to buy law enforcement-related
22  equipment, send officers to training, things
23  like that.
24    Q.    And do you know one way or another
25  if it's ever used to pay for overtime?

23 (Pages 424 - 427)

Page 428

1    A.    I don't know one way or another.
2    Q.    In this particular instance --
3 strike that.
4         Paying overtime for this, it says
5 "to calculate the deficit position." Would that
6 need to come from the budget that is allocated
7 to the Cleveland Police Department?
8    A.    Yes.
9    Q.    And then looking back up at what you
10 said, "No overtime unless approved at the DC
11 level" -- so how did you implement that policy?
12    A.    There it is.
13    Q.    Did you tell -- I don't see the
14 district -- or the deputy chief included here.
15    A.    All the deputy chiefs were included.
16    Q.    Who is the deputy chief that you
17 just mentioned at this time?
18    A.    Howard Pretel.  He was not a deputy
19 chief in 2014.
20    Q.    So how does he know about this
21 policy now?
22         MR. PIFKO:  Objection to form.
23    A.    Because it was passed on to him by
24 the prior deputy chief and all the other deputy
25 chiefs.

Page 429

1    Q.    And this policy is still implemented
2 to this day?
3    A.    Yes.
4    Q.    Do the numbers down here reflect any
5 overtime that the department will be reimbursed
6 for through grants or some other means?
7    A.    I'm sure it does, yes.
8    Q.    Do you know how much of that?
9    A.    No.  Again, we'd have to go back and
10 look at the actual records.  I mean, this is a
11 general fund thing.  Everything goes through the
12 general fund.
13         MR. ZIPP:  Why don't we take a quick
14 break.
15         THE VIDEOGRAPHER:  Off the record,
16 1:10.
17         (Recess had.)
18         THE VIDEOGRAPHER:  On the record,
19 1:15.
20         MR. ZIPP:  Chief Williams, thank
21 you.  I have no further questions for today.
22         EXAMINATION OF CALVIN D. WILLIAMS
23 BY MR. PIFKO:
24    Q.    Chief, I have a few questions for
25 you.

Page 430

1         MS. WINNER:  It's Mr. Pifko talking
2 now.
3    Q.    I want to call your attention back
4 to Exhibit 28.  Sorry.  Wrong one.  29.
5         MS. WINNER:  Can you just remind me
6 what 29 is?
7         MR. PIFKO:  Yes.  It's the -- it's
8 got an e-mail on the cover but it's the resource
9 study and deployment proposal document.
10         MS. WINNER:  Thank you.
11    Q.    Let me know when you're there.
12    A.    Okay.
13    Q.    If you want to turn to the page
14 that's Bates labeled 4057080.  Let me know when
15 you're there.
16    A.    Yes.
17    Q.    You recall discussing these
18 self-assessment percentages?
19    A.    Yes, I do.
20    Q.    Do you understand what the questions
21 were designed to be getting at with the
22 self-assessment questionnaire?
23    A.    The purpose for the self-assessment
24 was to get from the individual units and
25 operations whether or not they thought they

Page 431

1 could fulfill their core functions for the
2 Division of Police.
3    Q.    When you say "whether or not they
4 could fulfill their core functions," what do you
5 mean by that?
6    A.    Well, within an organization like
7 ours, an organization that, you know, has almost
8 2,000 employees, there's a lot of sometimes
9 overlap in duties and responsibilities from
10 operation to operation, from unit to unit.  One
11 thing we tried to do in this study is to
12 identify all that.  And if you look at the
13 study, it's kind of referred to as mission
14 creep.  We tried to identify that, have them not
15 concentrate on that but concentrate on their
16 specific function and mission of the division,
17 and then give us feedback on that, because that
18 mission creek part of the function that some of
19 these units are tasked with doing, we wanted to
20 carve that out and then have specific personnel,
21 funding, resource allocation for that so people
22 aren't doing double and triple duty.
23    Q.    Can you give me an example of a task
24 that you would deem to be mission creep in the
25 context of what you were just saying?

24 (Pages 428 - 431)

Page 432

1      A.   Well, I can give you a couple.
2           One is some of the technology
3   functions within the division.  Historically, we
4   basically take in police officers, certified
5   police officers, and assign them to do technical
6   projects, IT projects within the division, not
7   so much based on, you know, any divisional
8   training or expertise but on their own personal
9   expertise, be it in technology as far as
10  hardware or software.  Those officers would be
11  taken from another operation and basically
12  assigned to assist on these technical projects,
13  in a sense either doing double duty or still
14  being counted in that other operation but not
15  available to them because we now have them doing
16  this technical project.
17          So we separated that out and we now
18  have a technology integration unit that
19  specifically trains, vets and hires folks just
20  to do the technology piece.  So I'm not a patrol
21  officer assigned to district 4 on afternoon
22  shift, but because I'm an IT geek, they took me
23  away and put me downtown to do this IT project.
24  I'm now assigned to that technology integration
25  unit, and that unit has a staffing and budget

Page 433

1   and everything else.
2           And the same thing -- you know, the
3   specific unit that we talked about was
4   narcotics.  Our HIDI guys only do HIDI-related
5   things.  They don't go out and do other
6   narcotics investigations.  They don't
7   participate in the other things that -- excuse
8   me, that narcotics does on a day-to-day basis.
9   They only do HIDI.
10          So when Commander Gingell and folks
11  were answering this question about whether or
12  not they could fulfill their mission, their
13  mission is, you know, drug investigation across
14  the city, and what they basically did before
15  they had HIDI guys and all this other stuff that
16  kind of creeps into the narcotics mission.
17      Q.   And that was separated out -- the
18  HIDI tasks were separated out from the
19  traditional narcotics tasks?
20      A.   Yes.  I mean, if you look at our
21  final staffing plan for the division, although
22  it's still under kind of that special ops
23  narcotics umbrella, there's a separate
24  designation for HIDI detectives.
25      Q.   Did you understand, like in the

Page 434

1   example of narcotics, for this response to mean
2   that anyone in the narcotics division felt that
3   they had adequate staffing to combat all
4   drug-related crime in the community?
5           MS. WINNER:  Object to the form of
6   the question.  Leading.
7      A.   Well, you know, I'm looking right
8   now -- and, again, this report was a few years
9   ago -- at a lot of these places, a lot of the
10  units within the division that say a hundred
11  percent satisfaction with what they can do with
12  the resources they have, and I can tell you it's
13  not that way.  We have a lot of hard working,
14  conscientious officers and supervisors that kind
15  of bust their behinds day in and day out to get
16  the job done regardless of the resources.  And I
17  think a lot of this is, you know, pride from
18  folks, yeah, we can get it done with what we
19  got, although everybody within the division, no
20  matter what unit they're in, is always asking
21  for additional resources.
22      Q.   Has Commander Gingell made a request
23  to you or anyone else within the management of
24  the Division of Police for additional resources
25  to combat narcotics crime?

Page 435

1      A.   Three weeks ago, yes.  All the time.
2   There's a running joke in command staff that
3   Commander Gingell, when it's his turn to talk in
4   command staff, is going to ask for additional
5   resources.
6      Q.   Based on your understanding of the
7   narcotics crime in the community, do you believe
8   that there are additional resources necessary to
9   combat narcotics crime in the community?
10          MS. WINNER:  Object to the form of
11  the question.
12      A.   Definitely.  Definitely.
13  Definitely.  We see it every day.  We see it
14  every day, day in and day out.
15          MR. PIFKO:  I don't have any further
16  questions.
17  FURTHER EXAMINATION OF CALVIN D. WILLIAMS
18  BY MS. WINNER:
19      Q.   Okay.  Just a couple of follow-up
20  questions.
21          Did you -- have you ever discussed
22  with Commander Gingell his responses to the
23  survey that's reflected in Exhibit 29?
24      A.   No.  I didn't have to because,
25  again, whenever Gary and I sit down and talk

Page 436

1  about things within his area of operation,
2  there's always the ask for additional personnel.
3      Q.   And he's been asking for additional
4  personnel for as long as you can remember,
5  correct?
6      A.   Yeah.  I mean, you can go back
7  through the e-mail chains and the memos and --
8  yes.
9      Q.   And for years he was asking for
10  additional resources and was not getting them,
11  correct?
12      A.   He carved out and got the resources
13  available through the division, yes, he did.
14      Q.   When was he given additional
15  resources?  When was he first given additional
16  resources after --
17      A.   He has the resources for the entire
18  division at his disposal.  All of our vice unit
19  detectives and supervisors were investigating
20  overdose deaths.  All of our patrol officers
21  were administering Narcan.
22      Q.   But he was asking for additional
23  resources in the narcotics unit, was he not?
24      A.   Yes.
25      Q.   And for years he was not getting

Page 437

1  that, correct?
2      A.   He was asking for resources just
3  like, again, every other unit within the
4  division.
5      Q.   And he was asking for resources,
6  additional resources, in the narcotics unit,
7  additional staffing in the narcotics unit, and
8  he was not given it, correct?
9      A.   He was given support from the entire
10  division.
11      Q.   And that's all he was given,
12  correct?
13      A.   No.  He carved out five or six guys
14  just to do death investigations.  I don't think
15  you see that across the country.
16      Q.   But he carved those out of his
17  existing narcotic staff and he was not given
18  additional staffing in the narcotics unit for
19  that purpose?
20      A.   Yes.  He carved those guys out, and
21  the conversation we had earlier about overtime,
22  that's -- I wouldn't say the majority, but
23  that's a big part of what HIDI does, they
24  respond day in and day out, nights, days,
25  mornings, weekends -- it doesn't matter -- and a

Page 438

1  lot of it on overtime just for those members.
2      Q.   Do you -- going back to my original
3  question, did you ever talk to Commander Gingell
4  specifically about his response to the
5  self-assessment questionnaire?
6      A.   No.
7          MS. WINNER:  No further questions.
8          THE VIDEOGRAPHER:  Off the record,
9  1:24.
10
11      (Deposition concluded at 1:24 p.m.)
12          - - - - -
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 439

1  Whereupon, counsel was requested to give
2  instruction regarding the witness' review of
3  the transcript pursuant to the Civil Rules.
4
5          SIGNATURE:
6  Transcript review was requested pursuant to
7  the applicable Rules of Civil Procedure.
8
9          TRANSCRIPT DELIVERY:
10  Counsel was requested to give instruction
11  regarding delivery date of transcript.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

26 (Pages 436 - 439)

Page 440

```
 1          REPORTER'S CERTIFICATE
 2  The State of Ohio,   )
 3                       ) SS:
 4  County of Cuyahoga.  )
 5
 6       I, Renee L. Pellegrino, a Notary
 7  Public within and for the State of Ohio, duly
 8  commissioned and qualified, do hereby certify
 9  that the within named witness, CALVIN D.
10  WILLIAMS, was by me first duly sworn to testify
11  the truth, the whole truth and nothing but the
12  truth in the cause aforesaid; that the testimony
13  then given by the above referenced witness was
14  by me reduced to stenotypy in the presence of
15  said witness; afterwards transcribed, and that
16  the foregoing is a true and correct
17  transcription of the testimony so given by the
18  above referenced witness.
19       I do further certify that this
20  deposition was taken at the time and place in
21  the foregoing caption specified and was
22  completed without adjournment.
23
24
25
```

Page 441

```
 1       I do further certify that I am not a
 2  relative, counsel or attorney for either party,
 3  or otherwise interested in the event of this
 4  action.
 5       IN WITNESS WHEREOF, I have hereunto
 6  set my hand and affixed my seal of office at
 7  Cleveland, Ohio, on this 3rd day of April,
 8  2019.
 9
10
11
12
13  _Renee L. Pellegrino_
14  Renee L. Pellegrino, Notary Public
15  within and for the State of Ohio
16
17  My commission expires October 12, 2020.
18
19
20
21
22
23
24
25
```

Page 442

```
 1              Veritext Legal Solutions
                   1100 Superior Ave
 2                    Suite 1820
                  Cleveland, Ohio 44114
 3               Phone: 216-523-1313
 4
    April 3, 2019
 5
 6  To: Mark Pifko, Esq.
 7  Case Name: In Re: National Prescription Opiate Litigation v.
 8  Veritext Reference Number: 3272030
 9  Witness:  Calvin D. Williams     Deposition Date:  3/29/2019
10  Dear Sir/Madam:
11
    Enclosed please find a deposition transcript.  Please have the witness
12  review the transcript and note any changes or corrections on the
13  included errata sheet, indicating the page, line number, change, and
14  the reason for the change.  Have the witness' signature notarized and
15  forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
    If the errata is not returned within thirty days of your receipt of
19  this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA
```

Page 443

```
 1          DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
 2
    ASSIGNMENT REFERENCE NO: 3272030
 3  CASE NAME: In Re: National Prescription Opiate Litigation
    DATE OF DEPOSITION: 3/29/2019
 4  WITNESS' NAME: Calvin D. Williams
 5      In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7      I have made no changes to the testimony
    as transcribed by the court reporter.
 8
 9  Date          Calvin D. Williams
10      Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
        They have read the transcript;
13      They signed the foregoing Sworn
        Statement; and
14      Their execution of this Statement is of
        their free act and deed.
15
        I have affixed my name and official seal
16
    this _____ day of_____, 20____.
17
18      _____
        Notary Public
19      _____
        Commission Expiration Date
20
21
22
23
24
25
```

27 (Pages 440 - 443)

Page 444

1      DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
2
      ASSIGNMENT REFERENCE NO: 3272030
3   CASE NAME: In Re: National Prescription Opiate Litigation
      DATE OF DEPOSITION: 3/29/2019
4   WITNESS' NAME: Calvin D. Williams
5      In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7      I have listed my changes on the attached
      Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9      I request that these changes be entered
      as part of the record of my testimony.
10
      I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
      that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____
      Date          Calvin D. Williams
14
      Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
      the referenced witness did personally appear
16  and acknowledge that:
17      They have read the transcript;
          They have listed all of their corrections
18      in the appended Errata Sheet;
          They signed the foregoing Sworn
19      Statement; and
          Their execution of this Statement is of
20      their free act and deed.
21      I have affixed my name and official seal
22  this _____ day of _____, 20_____.
23  _____
          Notary Public
24
      _____
25      Commission Expiration Date

Page 445

1           ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS MIDWEST
2           ASSIGNMENT NO: 3/29/2019
3   PAGE/LINE(S) /       CHANGE       /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
      _____        _____
20  Date          Calvin D. Williams
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
          Notary Public
24
      _____
25      Commission Expiration Date

28 (Pages 444 - 445)

| & |
| --- |
| **&** 339:22 340:2,6 340:19 341:2,6,19 346:8,12,17,19 347:1,4 396:20 |

| 0 |
| --- |
| **002369389** 343:20 396:25 397:5 |
| **002605707** 343:25 407:6,13 |
| **002715127** 343:18 392:4 |
| **002715524** 343:13 387:1 |
| **003285751** 344:5 415:12,19 |
| **003394701** 343:22 403:8,14 |
| **003958369** 419:23 |
| **003981505** 343:7 349:17,24 |
| **004057069** 343:10 376:25 377:7 |
| **06** 372:1,15 |
| **07** 372:1,15 |
| **071** 378:4 |
| **076** 379:9 |
| **080** 381:1 386:8 |

| 1 |
| --- |
| **1** 398:16 |
| **10** 370:4 |
| **100** 383:3,11 |
| **1000** 341:16,20 |
| **101** 341:12 |
| **106** 340:11 |
| **1100** 339:23 442:1 |
| **11:14** 339:20 346:2 |
| **12** 441:17 |

**122** 354:2,3
**12:20** 396:11
**12:33** 396:14
**13** 386:9 421:9
**136,826** 421:21
**14** 343:9 376:24 377:5 421:10,25 421:25
**15524** 386:20
**15910** 340:3
**16** 343:16,18 344:7 371:5 388:9 392:3 397:19 420:2
**1600** 340:4
**1660** 339:23
**16th** 391:21 419:22 420:14
**17** 339:7,11 397:13 397:16,19,19 401:13 402:1 417:21
**18** 339:13,15 360:12,15,16 361:7 397:19 409:2,7 417:21
**1800** 341:16
**1820** 442:2
**1:10** 429:16
**1:15** 429:19
**1:24** 438:9,11

| 2 |
| --- |
| **2** 339:17 |
| **2,000** 431:8 |
| **20** 380:9 395:3 443:16 444:22 445:22 |
| **2000** 371:25 |
| **20001-3743** 340:20 |
| **20001-4956** 341:8 |

**20036-5807** 341:17
**2005** 372:1,15
**2006** 406:4
**2007** 371:19,21
**2008** 371:21
**2009** 419:11
**2010** 344:4 415:12 415:17 418:13,16
**2011** 406:4
**2012** 404:22
**2013** 421:24,25
**2014** 419:22 421:9 421:10 422:1,6,16 428:19
**2015** 344:7 378:19 420:2
**2016** 343:9,16,18 376:24 377:5 383:16 388:9 391:21 392:3
**2017** 371:20 373:18 388:3 397:17 401:12,15 401:25 402:4,13
**2018** 343:6 349:16 349:22 378:20 397:14,17 401:11 401:17,25 402:1,4 402:11 409:18
**2019** 339:19 343:24 346:3 407:11 441:8 442:4
**202** 340:21 341:8 341:17
**2020** 359:16 441:17
**21** 378:10,14,23 379:3 380:10

**216** 340:8,12,16 341:21
**216-523-1313** 442:3
**22** 343:6 349:22
**2227** 441:13
**22nd** 349:16
**232,165** 422:1
**25** 372:24
**25th** 388:3
**28** 343:5 349:12,20 371:6 402:5,8 430:4
**2804** 339:6,7
**29** 339:19 343:8 344:4 376:20 377:3 378:13 379:5 380:9 415:17 430:4,6 435:23
**29th** 346:2 415:12
**2nd** 339:23 341:12

| 3 |
| --- |
| **3** 442:4 |
| **3/29/2019** 442:8 443:3 444:3 445:2 |
| **30** 343:12 375:1 386:17,23 393:3 401:25 |
| **300** 419:12 |
| **31** 343:15 387:23 388:7 |
| **31st** 409:18 413:19 |
| **32** 343:17 391:19 392:1 |
| **3272030** 442:7 443:2 444:2 |
| **33** 343:19 396:24 397:3 402:11 403:25 |

| | **4** | **5** | **942-5316**  340:21 |
|---|---|---|---|

**34**  343:21 403:7,11
**34,000**  390:23
**340**  342:3
**343**  342:4
**345**  342:5
**347**  342:8
**349**  373:18
**35**  343:23 407:2,9
  408:23 411:17
**350**  343:5
**36**  344:3 415:11,15
  416:10,11
**362**  345:3,3
**363**  345:4,4
**364**  345:5,5
**365**  345:6
**366**  345:6,7
**367**  345:7
**368**  345:8
**369**  345:8
**37**  344:6 416:8
  419:20 420:1
**371**  345:9
**373**  345:9
**376**  345:10
**377**  343:8
**378**  345:10
**384**  345:11
**385**  345:11
**386**  345:12
**387**  343:12
**388**  343:15
**392**  343:17
**393**  345:12
**395**  345:13
**396**  342:9
**397**  343:19
**399**  345:13
**3rd**  441:7

**4**  353:19 432:21
**400**  345:14
**402**  345:14
**403**  343:21
**404**  345:15
**405**  345:15
**4057080**  430:14
**407**  343:23
**408**  345:16
**410**  345:16
**413**  345:17
**414**  345:17
**415**  341:4,13 344:3
**416**  345:18
**417**  345:18
**420**  344:6
**422**  345:19
**426**  345:19
**427**  345:20
**428**  345:20
**429**  342:10
**434**  345:21
**435**  342:11 345:21
**440**  342:13
**44113**  340:8
**44113-7213**
  341:21
**44114**  340:11
  442:2
**44114-1190**
  340:15
**45004**  339:11
**45090**  339:15
**45132**  339:13
**47**  401:24
**482**  401:17
**4960**  388:4

**5**  360:13
**50**  423:25
**5127**  391:23
**528**  350:22
**53**  375:13
**56**  354:9
**586-3939**  340:16
**591-6000**  341:4
**5th**  410:5

**6**

**6**  343:24 407:11
**60**  385:16
**601**  340:11,20
**60s**  385:15
**659-5652**  341:13
**662-6000**  341:8
**664-3727**  340:12
**671**  401:16
**68**  355:4,5 361:1,3
  361:6,7
**696-4441**  340:8
**696-4889**  341:21

**7**

**778-1823**  341:17

**8**

**800**  341:12 419:12
**818**  340:5
**839-2333**  340:5
**850**  341:7

**9**

**9**  361:15 366:10
**9-29-16**  343:13
  386:19,25
**901**  340:15
**91436**  340:4
**94105**  341:12
**94111-5356**  341:4

**942-5316**  340:21
**950**  340:7 341:20
**99**  410:24

**a**

**a.m.**  339:20
**aaron**  339:8
**ability**  381:20
  411:11
**able**  385:1 390:19
  426:4
**absolutely**  384:7
**abusive**  423:5,8
  424:3 426:19
**accept**  414:9
**accepted**  411:18
  412:17
**access**  364:13
**accomplish**  412:7
**account**  366:1,6
**accurate**  389:10
  391:1 405:4
**achieve**  393:24
**acknowledge**
  443:11 444:16
**act**  443:14 444:20
**acting**  408:7
**action**  441:4
**actions**  400:15
**activities**  360:1
  363:23 368:6,13
  398:17
**activity**  370:17
  372:3
**actual**  389:13
  398:16 399:1
  429:10
**add**  384:6
**addition**  355:13
  356:9 357:2
  360:25 382:23

[additional - attachments]

additional  434:21
  434:24 435:4,8
  436:2,3,10,14,15
  436:22 437:6,7,18
address  357:23
  362:14 400:12
  442:15
addressed  377:24
addressing  361:21
adequate  434:3
adjournment
  440:22
administering
  436:21
administers
  427:16
advance  352:23
affiliated  370:13
affixed  441:6
  443:15 444:21
aforesaid  440:12
afternoon  396:17
  396:18 432:21
age  347:11
agencies  353:13
  353:16 355:23
  356:6,7 357:17
  362:12 392:16
  393:9 394:4 419:4
agency  353:15,15
  405:14 414:5
agents  354:6
ago  434:9 435:1
agree  422:20
  423:5
agreement  350:13
  410:23
ajp  340:9
akron  358:4,8,14
al  339:10,12,14,14

alcohol  404:7
alert  418:8
alerts  416:6,15
allocated  428:6
allocation  431:21
amerisourceberg...
  341:10 347:8
ami  340:7 346:12
amount  364:15,17
  365:13 372:3
  421:14 424:8,18
amounts  419:5
analysis  378:24
  398:5,6 415:24
  416:3,7,9,15,20
  417:8
announcement
  351:16,22,23
  352:2,16 388:24
announcements
  352:12
answer  360:4
  364:20 371:16
  374:15 391:9
  411:20,21 414:16
  414:17
answering  409:9
  433:11
anthony  341:16
  346:23
anticipate  358:25
  359:14,25
anybody  347:6
  358:8 369:14
  374:18 382:23
apologies  381:14
apologize  416:11
appear  443:11
  444:15
appearances
  340:1 341:1 342:3

appeared  348:18
appears  355:4
  386:7
appended  444:11
  444:18
applicable  439:7
approval  411:19
approve  424:23
  426:4
approved  423:15
  424:10,13,25
  425:2,7,16,18,20
  425:23 426:8
  428:10
april  441:7 442:4
area  375:11 436:1
areas  398:19
arnold  340:19
  346:16
arnoldporter.com
  340:21
arrangement
  353:6
arrest  368:24
  405:21
arrests  369:17
  372:5 400:18
  401:13,16,18
  402:1,8 404:5,6,7
  406:12
aruiz  341:18
aside  363:24 379:3
  414:12,16 422:9
  425:5
asked  380:17,23
  384:2 417:10
asking  348:9
  364:25 374:3,12
  414:7 434:20
  436:3,9,22 437:2,5

aspect  367:7
aspects  359:17
  360:1
assaults  399:9
assert  350:4
assessment  381:20
  383:21 430:18,22
  430:23 438:5
assign  432:5
assigned  354:6,7
  355:10,13,17
  357:7 358:13
  360:19,22 361:4
  382:9 432:12,21
  432:24
assignment  443:2
  444:2 445:2
assignments  380:4
assist  357:8
  399:11 432:12
assisting  357:17
associated  363:6
  364:2,8,16 366:2,7
assume  361:11
  369:1
atf  353:14
attached  350:8
  379:6 408:22
  444:7
attachment
  343:16,24 344:4
  376:21 377:24
  378:3 387:23
  388:9 391:22
  407:11 410:6
  415:17
attachments  343:6
  343:9 349:13,23
  350:9 376:22
  377:5

**attack** 370:15,18
393:12 395:24
**attended** 352:15
**attending** 425:5
**attention** 430:3
**attorney** 357:20
414:15,16 441:2
**attorney's** 351:3
351:17 361:12
**attorneys** 348:23
414:19,19
**authorize** 444:11
**automatically**
425:14
**availability** 371:1
**available** 432:15
436:13
**ave** 442:1
**avenue** 340:7,11
340:15,20 341:20
**averaged** 381:22
**averages** 385:6
**aware** 358:10
367:9 373:22
374:6,9,13

**b**

**back** 348:4 364:10
365:18 366:10
371:25 372:10,17
379:2,4 383:17,19
384:8,21 386:1
393:2 396:5
404:22 422:6,16
426:11 428:9
429:9 430:3 436:6
438:2 442:15
**baron** 340:2 346:8
**baronbudd.com**
340:5
**based** 383:13
384:20 391:3,4

**400:3** 413:17
432:7 435:6
**basic** 380:14
**basically** 358:23
380:1 384:13
385:17 388:24
398:7,8 412:15
432:4,11 433:14
**basis** 399:16 433:8
**bates** 343:6,10,13
343:18,20,22,25
344:4,6 349:23
377:6 387:1 392:3
396:24 397:4
403:7,13 407:5,12
415:12,18 419:22
420:2 430:14
**bearing** 396:24
403:7 407:5
419:22
**beginning** 343:6
343:10,13,18,20
343:22,24 344:4,6
349:23 377:6
386:25 392:3
397:4 403:13
407:12 415:18
420:1
**begins** 378:3
383:20
**begun** 359:20
**behalf** 340:2,13,17
341:2,10,14,19
346:9,13,19,24
347:2,4,8 350:14
**behinds** 434:15
**believe** 409:21
418:17 435:7
**berne** 339:22
**better** 371:2

**big** 437:23
**bit** 379:10
**boop** 340:10
346:14,14
**border** 353:14
354:15
**bottom** 350:17,18
350:22 378:4
379:8 383:3
386:19 407:24
418:21 421:2
**boulevard** 340:3
**break** 396:9,9
429:14
**breakdown**
398:25
**briefed** 379:18
**bring** 425:12
**budd** 340:2 346:9
**budget** 391:11,13
391:14 426:22
428:6 432:25
**building** 359:18
359:21 360:2
**bulk** 394:15
**bullet** 361:21
370:4,8
**bulletin** 418:9,10
418:12
**bulletins** 416:15
**bureau** 343:21
403:11,22
**burglaries** 364:12
**burling** 341:2,6
347:2,4 396:21
**burnt** 384:16,23
385:20
**bust** 434:15
**butler** 377:19,22
378:24

**buy** 364:14 369:7
427:21
**buys** 418:23

**c**

**ca** 442:25
**calculate** 369:14
426:12 428:5
**calculated** 391:16
**calendar** 352:18
**california** 340:4
341:4,12
**call** 357:14 397:13
430:3
**called** 347:11
**calls** 409:9
**calvin** 339:18
342:7 343:9,15,17
347:11,16 349:15
376:23 377:4
388:2,8 391:20
392:2 396:15
419:21 420:9
429:22 435:17
440:9 442:8 443:4
443:9 444:4,13
445:20
**capacity** 357:16
**captain** 408:5
414:21
**caption** 440:21
**car** 390:9,14,18
**carroll** 343:24
407:3,5,10 408:2,7
411:4 413:24
**cars** 389:21 390:8
**carve** 431:20
**carved** 436:12
437:13,16,20
**case** 339:7,11,13
339:15 418:22,24
442:6 443:3 444:3

[cases - compiling]

**cases** 358:4 366:12

**categories** 366:12
374:2,11,16 404:4

**cause** 440:12

**caused** 393:6

**ccpo** 361:12

**cdp** 343:12 386:18
386:24

**cerp** 397:13,15
398:11 405:9
416:18,25

**certain** 384:21
393:12 398:23
399:9 417:5
424:24

**certificate** 342:13
440:1 444:11

**certification** 443:1
444:1

**certified** 347:14
432:4

**certify** 440:8,19
441:1

**chain** 407:25

**chains** 436:7

**chance** 392:7

**change** 355:18
402:4 442:13,14
444:8 445:3

**changed** 351:25
352:1,13

**changes** 370:23
400:4,6 401:9
424:8 442:12
443:7 444:7,9

**charge** 394:18

**chart** 381:5
402:15

**check** 352:18

**chief** 348:14
377:17 394:12,13

**394:22 395:6,20**
396:17 397:8
401:19 403:17
407:16 415:23
416:2 419:21
420:6 422:18
424:11,14 425:24
426:1,8,9 428:14
428:16,19,24
429:20,24

**chiefs** 428:15,25

**ciaccia** 387:24,25
388:1,16

**citations** 404:7

**cite** 412:22

**cities** 358:20 370:9

**city** 339:12 340:2
340:10 346:9,13
346:14 348:15,24
350:14 362:7,14
366:25 372:4,19
376:15 409:24
410:8,12,17 411:3
411:5 414:7,19
415:2,8 419:16
420:18,25 433:14

**city's** 414:4

**city.cleveland.o...**
340:12

**citycenter** 341:7

**civil** 347:13 439:3
439:7 443:5 444:5

**clarify** 356:15
380:5

**clear** 411:15

**cleve** 343:7,10,13
343:18,20,22,25
344:5 349:17,24
376:25 377:7
387:1 392:4
396:25 397:5

**403:8,14 407:13**
415:19

**cleveland** 339:12
339:23 340:2,8,10
340:11,15 341:21
346:5,10,13,15
348:15 350:11
357:23 358:3
360:21 361:23
362:14 369:8
370:12,19 372:4
372:19 376:16
377:18 401:1
408:12,17 409:24
410:8,17,20
411:11 413:16
415:2 417:16,19
420:18 428:7
441:7 442:2

**cleveland's** 362:7
370:5,6

**client** 414:15,16

**clr** 339:25

**cocaine** 364:18
365:14 369:21
372:20,23 373:6
373:11,17,23
374:1,4,6,13,14,17
374:20,21

**collaboration**
355:22 356:5

**collection** 350:25

**collectively** 360:8

**color** 373:15

**column** 382:13
421:16

**combat** 434:3,25
435:9

**combating** 422:22

**combination**
382:8

**come** 395:8 397:21
406:1 428:6

**comes** 370:21
397:23

**coming** 370:22
417:23 424:24

**command** 398:13
435:2,4

**commander** 353:9
382:14,20 387:8
387:10 399:11
406:3 433:10
434:22 435:3,22
438:3

**commanders**
398:18

**commence** 360:7

**commission**
441:17 443:19
444:25 445:25

**commissioned**
440:8

**commissioner**
408:8 411:4
413:24

**commit** 365:1

**committee** 346:11

**communications**
414:15,17

**community**
392:20 395:10
434:4 435:7,9

**companies** 340:18

**compared** 401:12
421:25

**comparing** 397:16

**comparison**
397:19 398:20

**compiled** 404:10

**compiling** 357:18

complete 348:2
  381:20 385:2
completed 390:7
  404:8 440:22
  442:15
completing 425:3
complex 362:6
component 357:11
concentrate
  431:15,15
concerning 413:6
concluded 438:11
conduct 392:18
  425:19
conducting 425:21
confidential 343:7
  343:11,14 344:5,7
  349:25 377:8
  387:2 415:20
  420:3
confirm 348:12
connected 418:18
connection 352:10
conscientious
  434:14
consider 376:3
  423:8
considerably
  385:21 386:12
consistent 384:1
constructing
  359:20
cont'd 341:1 344:1
contained 416:6
context 371:13
  375:8 384:6
  431:25
continued 339:17
contract 414:5,8
  424:21

contractual
  425:10,11,12
contractually
  424:17
contributing
  358:8 359:7
conversation
  437:21
copy 405:8
core 431:1,4
corner 353:21
  378:4
corporation 341:2
  341:10
correct 348:19,20
  350:11 353:25
  354:10 355:2,3
  359:3,18,19
  361:14 362:16
  365:3 367:25
  368:11,12,22,23
  369:3,4,9 375:12
  377:25 380:15,16
  381:24 382:16
  383:14 385:2,11
  385:23 386:10,14
  389:3 397:17
  399:14,17 401:13
  402:6,9 405:1
  406:4,5,13,14,20
  406:21 407:20
  408:2,3,24 409:3
  409:16,19 410:17
  410:18,22,24
  416:19 417:24
  418:2,3,13 419:16
  419:17 420:10,14
  421:3,4,6,11,12,15
  421:19,21,22
  422:1,18,19,22
  426:2 436:5,11

437:1,8,12 440:16
corrections 408:8
  442:12 444:17
correctly 372:1
  419:7
cost 390:22 391:17
  415:2,5,6 422:12
counsel 346:6
  414:7 439:1,10
  441:2
counted 432:14
country 370:9
  437:15
county 339:10,14
  357:20 358:24
  359:2 360:19
  361:13 408:16
  410:2,10,13,21
  411:23 412:12,18
  414:1,8,20 419:16
  440:4 443:10
  444:15
couple 351:25
  361:17 373:18
  376:21 389:22
  404:4 432:1
  435:19
course 362:8
  370:25 405:1
  423:13
court 339:1
  342:15 396:23
  403:6 407:1
  415:10 419:19
  424:16,17 425:5,6
  425:10 443:7
courts 358:16
cov.com 341:5,9
cover 351:15
  400:1,2 430:8

covered 358:21
covington 341:2,6
  347:1,4 396:20
cpd 354:24 359:4
crack 372:20,23
crazy 423:5 424:3
  426:18
created 404:11,19
  404:21
creates 398:4
  404:13,15
creating 405:3,12
creation 411:7
creek 431:18
creep 431:14,24
creeps 433:16
crime 357:23,24
  361:22 362:8,9,15
  362:16,21 363:2,5
  363:7 364:2,16,17
  365:8,10,11,13
  366:1,6 367:19
  368:7,15 376:8,18
  392:13,19,21,23
  394:1,20 395:24
  398:5,6,9,16 399:1
  405:21 415:24
  416:3,7,9,14,20,22
  417:8 434:4,25
  435:7,9
crimes 364:7
  365:1 395:17,23
  409:13 411:12
criminal 370:10
  370:10
crisis 363:18
cross 366:24
cruz 344:3 415:11
  415:16 417:15
curfew 400:9,10
  400:13

**current**  348:13 380:19 383:14 384:25 385:8,19
**currently**  348:14 355:13 356:4,9 364:21 426:10
**curriculum**  389:7 389:11,16,23
**custody**  342:15 411:18
**customs**  353:14
**cuyahoga**  339:10 358:24 359:2 360:18 361:13 410:21 414:8,20 419:16 440:4
**cvs**  341:14,14 346:24,25

**d**

**d**  339:18 341:3 347:11,16 396:15 429:22 435:17 440:9 442:8 443:4 443:9 444:4,13 445:20
**d.c.**  340:20 341:8 341:17
**dan**  339:8
**daniel**  343:5 349:14,20
**data**  397:20,20 402:18
**date**  346:2 351:25 401:20 402:4 439:11 442:8 443:3,9,19 444:3 444:13,25 445:20 445:25
**dated**  343:5,9,15 343:17,24 344:3 349:15,22 376:23

**377:4 388:2,8 391:21 392:2 407:10 415:16 419:22
**dates**  352:11
**david**  343:24 407:3,5,10 408:2,7
**day**  340:14 346:22 351:24 380:3,3 410:24 413:10 416:12 429:2 433:8,8 434:15,15 435:13,14,14,14 437:24,24 441:7 443:16 444:22 445:22
**days**  393:3 437:24 442:18
**dc**  423:15 428:10
**dcs**  424:22,25
**dea**  353:13 358:6 367:6,14
**deal**  419:13
**dealers**  396:3
**dear**  442:10
**death**  402:25 437:14
**deaths**  366:25 373:1,23 374:1,7,9 374:16,20 422:22 436:20
**decade**  365:18
**december**  409:18 413:18
**decipher**  378:18
**decision**  410:9
**deed**  443:14 444:20
**deem**  431:24
**deemed**  382:24 442:19

**deep**  414:4
**defendants**  346:17 371:7
**defer**  389:13
**deficit**  426:13 428:5
**definitely**  427:11 435:12,12,13
**degree**  370:11
**delivery**  439:9,11
**department** 346:15 350:6 398:23 401:1 410:20 412:4 414:9 417:16,19 420:24 427:15 428:7 429:5 442:22
**depends**  360:5,5 370:1 393:19,20 393:20 394:19
**deploy**  390:10 399:10
**deployment**  430:9
**deposed**  347:14
**deposition**  339:17 346:4 347:21 348:6,19,22 349:9 349:19 377:2 378:11 386:22 388:6 391:25 397:2 403:10 407:8 415:14 419:25 438:11 440:20 442:8,11 443:1,3 444:1,3
**deputy**  377:17 394:12,13 424:11 424:14 425:24 426:1,7,9 428:14 428:15,16,18,24

**428:24
**description**  343:3 389:7,10
**designation** 433:24
**designed**  430:21
**detail**  424:25
**details**  351:12
**detective**  417:15
**detectives**  361:3 382:25 402:21 433:24 436:19
**determine**  399:3
**different**  353:17 363:11,14 418:25 422:9
**digits**  379:9 386:20 388:3 391:22
**directed**  395:6
**directly**  387:15
**director**  411:4 412:4 420:17 426:25
**discovers**  417:8
**discretionary** 424:22 425:15
**discussed**  435:21
**discussing**  430:17
**discussion**  353:2
**discussions**  360:9 412:21 413:5
**disposal**  436:18
**district**  339:1,2 358:2,15 398:20 398:20 399:11 404:8,14,20 405:7 405:11,11,20,22 406:4,22 408:6 428:14 432:21

**district's** 405:8
**districts** 400:11
**diverted** 419:6
**division** 339:3
348:15 353:5
355:1 356:16
357:6 360:9,22
377:18 378:17
380:2,24 388:17
388:25 398:12
399:2 408:12,18
410:20 411:11
413:16 416:25
417:5 422:21
426:23 431:2,16
432:3,6 433:21
434:2,10,19,24
436:13,18 437:4
437:10
**divisional** 432:7
**divorce** 364:23
365:21,24,25
**document** 339:8
343:12 349:13
383:18 386:2,17
386:23 387:5
394:4 396:24
397:9,16 398:4
399:18 400:3,24
401:9 403:7,18
405:3 407:4
408:22 409:20,24
409:25 418:5
419:20 420:7
430:9
**documents** 349:2
349:5 403:24
406:8,12
**doing** 356:3
368:10 380:13,15
384:19 400:2

431:19,22 432:13
432:15
**dollar** 421:14
**dornat** 343:8,15
343:17 376:23
377:3,16 388:7
391:20 392:1
**double** 431:22
432:13
**downtown** 432:23
**dozen** 378:21
387:9 395:13
400:9
**draft** 343:13
386:18,25 387:15
388:19 389:2
**drafts** 352:23
378:21
**draw** 385:15
**drill** 348:5,6 380:2
**drivers** 367:19
**drop** 371:20
**droves** 408:21
**drug** 341:10
363:18,18,20
367:7 369:2,18,24
370:24 372:2,3
374:10,16 396:3
404:5 406:12
433:13 434:4
**drugs** 362:10,17
362:18,19,21,24
362:25 363:6,7,10
363:19 366:7,9,20
366:23 367:20,21
368:5,14,19,21
369:21,22,24
372:13,20 373:1
374:22 375:11
376:8,17

**drummond** 343:8
343:15,17 376:23
377:4,16 388:8
391:21 392:2
394:12,13
**due** 374:10
**duly** 347:13 440:7
440:10
**dumas** 420:13,16
420:17 423:2,3
**duties** 355:18,21
357:1,6 431:9
**duty** 431:22
432:13

**e**

**e** 343:5,8,15,17,23
344:3,6 349:13,14
349:20 350:8,9
351:15,19 352:20
376:20,22 377:3
377:14,25 387:23
387:24 388:7
389:3 391:20
392:1 407:3,9,17
407:19,25 408:14
410:6 415:11,15
415:24 416:3,5
417:22 419:20
420:1,7,10,14
426:11 430:8
436:7
**earlier** 372:14
375:2 376:7
396:19 400:12
409:22 416:18
437:21
**eastern** 339:3
**eboop** 340:12
**effective** 409:18
**effectively** 411:12

**effort** 383:22
**eight** 359:7 365:21
either 357:19
358:6 364:13
409:7 417:21
432:13 441:2
**element** 380:17
**elena** 340:10
346:14
**elevated** 401:6
**ellis** 341:19 346:19
**email** 442:17
**emerging** 361:22
**employees** 431:8
**ems** 389:23 391:6
**enacted** 413:18
**enacting** 411:2
**encino** 340:4
**enclosed** 442:11
**encompasses**
396:3
**endo** 340:17,17
346:17
**ends** 386:20
**enforcement**
355:21 356:3
357:22 392:16
398:17 399:1
400:9,15 419:4
427:2,5,18,21
**engage** 356:4
**engaged** 360:9
**engagement**
392:20 395:10
**entered** 444:9
**enterprises** 370:10
**entire** 366:23
375:21 386:2
436:17 437:9
443:5 444:5

entitled 343:12
386:18,24
entity 395:25
equipment 427:21
427:22
equipped 389:1
errata 442:13,18
444:7,10,18 445:1
esq 340:3,7,10,14
340:19 341:3,6,11
341:16,20 442:5
essential 381:21
383:21
et 339:10,12,14,14
evaluate 398:22
evaluation 380:18
event 441:3
everybody 356:20
369:23 390:3,4,17
434:19
exact 351:1,12
352:14 357:13
389:23
exactly 351:24
356:15 380:21,23
393:4 413:23
417:20 422:7,25
423:19
examination 342:7
347:12,16 396:15
429:22 435:17
example 354:8
356:12 364:18
365:5,14 382:11
399:7 405:19
424:16 431:23
434:1
examples 357:4
exchange 405:11
excuse 433:7

executed 444:10
executing 357:18
execution 443:14
444:19
executive 346:10
exhibit 342:15
343:5,8,12,15,17
343:19,21,23
344:3,6 349:12,20
350:17 351:16
352:20 360:13
371:6 376:20
377:3 378:5,10,13
378:14,23 379:2,3
379:5 380:9,10
386:17,23 387:23
388:7,13 389:3
390:21 391:19
392:1,8 396:24
397:3 403:7,11,25
407:2,9 408:23
411:17 415:11,15
416:8 419:20
420:1 430:4
435:23
exhibits 342:4
343:1 344:1
existing 437:17
expected 367:10
expecting 367:1
experiencing
399:8
expertise 432:8,9
expiration 443:19
444:25 445:25
expires 441:17
explain 422:3
explained 370:7
422:12
explode 363:20

extent 362:22
414:14

### f

facility 409:8
fact 392:24
fail 347:23
familiar 371:11
378:2 379:15
387:5,19 388:13
far 370:16 371:13
398:16 432:9
fbi 353:13 354:9
358:7
fbi's 361:5
federal 347:12
353:24 354:2,6
355:10 356:2
360:6 362:10
371:14 427:4
feed 362:9,15,21
feedback 383:22
431:17
felonious 399:8
felony 396:2 404:5
406:12
felt 384:25 434:2
fentanyl 343:12
363:24 366:16
373:7 386:18,24
387:8,12
fewer 402:1
field 377:17
394:16 425:9
fifth 404:20 406:4
406:5 408:5
fighting 371:3
figure 391:11
files 387:18
final 378:18,22,25
382:3 433:21

finance 420:17,24
find 391:11,13
442:11
finds 417:8
finished 360:2
378:20
firm 396:20
first 347:13
349:16 351:15
361:20 376:22,24
386:20 399:19,22
407:25 410:5
412:8 413:8
418:18,21 419:2,3
421:9 423:1
436:15 440:10
fit 353:9
five 396:6 421:6
423:25 437:13
flagging 350:5
flip 418:1,13 419:9
floor 340:7
flow 375:9
focus 361:21
368:21
focused 359:2
368:15
focusing 363:22
363:25
folded 394:7
folks 360:19
374:25 384:15,23
411:3 432:19
433:10 434:18
follow 435:19
following 418:22
follows 347:15
force 350:11 351:4
353:25 354:7
355:10,11,19,22
355:24,25 356:17

356:21 357:7
358:6,9,13 359:1,8
359:11 360:1
361:4,5 362:2
367:1,10 375:15
375:22 376:4
force's 358:21
foregoing 440:16
440:21 443:13
444:18
form 362:3,23
363:3,8 364:5,19
365:16 366:4,21
367:4 368:16
369:10 371:24
373:20 376:5
378:15 384:4
385:3,25 393:8
395:8,18 399:21
400:7 402:24
404:2 405:5
408:19 409:6
410:11 413:13
414:2 415:25
417:11 422:23
426:6 427:8
428:22 434:5
435:10
format 350:19
forward 442:15
forwarded 407:22
420:13
four 366:12 388:3
391:22 400:9,17
400:21,25 407:4
418:22
fourth 340:7
fractured 370:12
francisco 341:4,12
free 443:14 444:20

freedman 340:19
346:16,16
front 341:3
fugitive 394:9
fulfill 431:1,4
433:12
fully 385:1
function 416:16
416:17 431:16,18
functions 416:21
431:1,4 432:3
fund 426:14 427:2
427:5,16,18
429:11,12
funding 431:21
funds 427:17
further 391:7
425:19 429:21
435:15,17 438:7
440:19 441:1

**g**

gamut 366:23
gang 355:8 370:5
370:6
gangs 370:10,12
371:1 372:4
gary 353:9 426:1
435:25
gathering 357:10
380:14
geek 432:22
general 387:13
429:11,12
generally 394:2,3
394:17
generate 416:18
generated 404:25
423:10,12
generates 418:5
gerome 414:21

getting 430:21
436:10,25
gingell 353:10
382:21 387:8,10
426:1 433:10
434:22 435:3,22
438:3
give 348:1 356:12
357:4 394:25
431:17,23 432:1
439:1,10
given 352:22
383:9 436:14,15
437:8,9,11,17
440:13,17
gives 398:17
giving 408:22
glad 384:8
go 348:4 364:10
372:10 380:22
384:14 393:2
396:5 420:19
422:6 429:9 433:5
436:6
goes 370:21
371:25 385:21,22
398:19 408:21
409:1 421:1
424:17 425:14
429:11
going 347:21
348:4 360:10,15
360:16 365:18
366:10 370:23
372:6 374:10
378:8 379:2,3
384:22,23 391:15
393:16 395:10
420:20 426:12,13
435:4 438:2

good 347:18,19
396:17,18
gotten 359:12
424:4
grand 401:4
grants 429:6
graph 372:25
greater 361:23
groups 370:13
guess 371:2
374:15
guidelines 427:4,9
gun 369:17
guns 362:10,17
367:22 368:5,14
368:19,20,22,22
369:8 376:8,17
guys 394:9 433:4
433:15 437:13,20

**h**

half 378:21 386:10
386:12
hall 411:3
hand 353:21 378:4
441:6
handling 398:23
happen 359:15
happened 351:24
396:6
happening 393:10
398:18 413:8
hard 373:13,14
399:1 434:13
harder 370:15,17
hardware 432:10
harold 426:10
head 370:15
heading 379:9
381:2
heads 353:15

**health** 340:18
**help** 349:5
**henschel** 341:23
**hereinafter** 347:14
**hereunto** 441:5
**heroin** 343:12
363:24 366:2
369:21 372:21
373:6 386:18,24
387:8,12 402:18
403:2
**hidi** 433:4,4,9,15
433:18,24 437:23
**hidta** 360:12,18,20
360:23 361:5
418:2,4,5
**high** 423:20
**higher** 365:15
**highest** 371:19,20
**highly** 343:7,10
344:5,7 349:24
377:7 415:19
420:3
**hires** 432:19
**historically** 363:9
363:10,12 364:21
432:3
**hit** 393:19
**hold** 372:10
423:18
**home** 364:12
**homeland** 353:14
354:12
**homicide** 396:4
402:23
**homicides** 402:11
402:20
**honest** 370:21
**honestly** 351:7
352:8

**hopefully** 359:16
**hospital** 409:8,11
415:5,6,8
**hour** 389:16
**hours** 389:22
**house** 365:6
**howard** 428:18
**hsi** 354:11
**huge** 372:2,3
399:8
**hum** 358:19
373:16 407:23
**hundred** 383:15
385:9,10,13,24
386:6,6 387:20
412:1 434:10

**i**

**idea** 371:22
398:18
**identification**
350:1 377:9 387:3
388:11 392:5
397:6 403:15
407:14 415:21
420:4
**identify** 346:6
416:21 431:12,14
**ii** 357:12
**iii** 357:12
**illegal** 362:24,25
363:10,20,23,25
366:2,9,19,23
367:8 372:20
375:10
**illegally** 364:3
369:8
**immediate** 423:17
**immediately**
426:14
**impact** 355:8
363:2,4 405:16

411:10
**impairment**
347:25
**implement** 428:11
**implementation**
410:10
**implemented**
379:20 392:24
400:4 409:22
429:1
**important** 375:24
376:12 401:1,3
**incidents** 409:15
**include** 354:8
355:12 360:21
362:19 376:2
402:18
**included** 358:1
361:6 428:14,15
442:13
**includes** 355:6,7
361:2
**including** 349:15
369:21 374:17
388:2
**inclusive** 355:6
376:15
**incorporated**
444:12
**incorrectly** 420:21
**increase** 374:19
422:4,21
**increased** 374:17
**increasing** 373:22
417:9
**index** 342:1,4,5
343:1 344:1 345:1
**indiana** 341:14
346:25
**indicating** 442:13

**indicted** 371:7
**indictments**
371:14,14,18,19
**individual** 354:6
362:11 390:8
417:2 430:24
**individuals** 355:16
413:22
**influenced** 370:23
**information**
357:19 380:14
388:17 406:1
**initiative** 392:13
392:19,19,20,21
392:24 393:25
394:6,7,11,19
**initiatives** 392:18
394:18,21 395:5,9
395:11,12,15,23
396:7 400:12
**input** 382:2
**inspection** 375:4
**inspections** 424:20
**inspectors** 354:19
**instance** 428:2
**instances** 417:7
425:6
**instruct** 414:15
**instruction** 439:2
439:10
**integration** 432:18
432:24
**intelligence** 357:9
**interact** 404:1,3,4
**interdiction** 375:7
**interested** 441:3
**interruption** 381:7
**introduced** 396:19
**introductory**
348:5

**investigate** 411:12
**investigated** 403:1
**investigating**
  409:13 436:19
**investigation**
  425:19,21 433:13
**investigations**
  357:8 366:16
  398:23,24 425:17
  433:6 437:14
**invited** 352:4
**involve** 357:22
  369:17
**involved** 356:17
  357:21 369:2,9,24
  372:13 394:5
  410:9,14 411:1
  414:21,25
**involvement**
  353:11
**issue** 370:19
  411:23,24 412:3
  413:6,10
**issues** 395:9
  412:10,14 414:10
  414:12
**item** 426:22

**j**

**j** 340:7
**jail** 408:16 409:8
  409:10 410:10,13
  410:17,21 411:23
  412:17 413:22
  414:20
**jail's** 412:18
**james** 407:3 408:2
  408:4
**janssen** 341:19
  346:20
**january** 343:24
  407:11 410:5

**jeff** 346:18
**jeffrey** 341:20
**jeffrey.whitesell**
  341:22
**jennifer** 387:24
  388:16
**job** 348:17 383:10
  384:13,19 434:16
**john** 340:19 341:6
  346:16 347:1
  396:20
**john.freedman**
  340:21
**johnson** 341:19,19
  346:19,19
**joke** 435:2
**jones** 340:14
  346:21
**jonesday.com**
  340:16
**judge** 339:8
**july** 344:7 419:10
  419:22 420:2,14
**june** 343:9 344:3
  376:23 377:5
  415:11,17 422:16
**jurisdictions**
  393:11
**justice** 350:5
  427:15

**k**

**katherine** 344:3
  415:11,15
**kathy** 417:15
**keeps** 398:15
  405:14
**kept** 406:12,18
**kind** 355:22 362:9
  363:19 369:18
  370:7 371:1 380:5
  384:9 395:16

401:9 431:13
  433:16,22 434:14
**kinds** 364:7
  368:13 395:22
**kinks** 414:6
**kit** 390:10,14,18
**kits** 391:3
**know** 348:5 351:1
  351:24,24 352:15
  357:11,25 358:17
  358:21 359:16,22
  359:22,23 363:17
  365:18 367:6,16
  367:17 370:8
  372:8 378:21
  383:17 384:18,18
  384:20 387:18
  389:14 390:6
  391:3,12,13
  392:15 393:18
  395:10,13 400:1,8
  404:19,21,22
  410:3 411:1,21
  413:7 414:3,3,6,23
  414:25 415:1
  417:15,18,21
  419:1 420:19
  423:25,25 427:24
  428:1,20 429:8
  430:11,14 431:7
  432:7 433:2,13
  434:7,17
**known** 419:13
**kurt** 341:23

**l**

**l** 339:25 440:6
  441:14
**l.p.** 339:10,12,14
**labeled** 430:14
**lakeside** 340:11,15

**lakewood** 419:11
  419:15,16
**large** 358:20 419:5
  422:4
**late** 378:19
**lately** 427:10
**law** 346:15 356:3
  357:22 392:15
  396:20 412:4
  419:4 427:2,5,18
  427:21
**lawful** 347:11
**lead** 353:13,15
  367:14 368:7
  376:17 378:1
**leading** 434:6
**leads** 358:5 366:8
  366:24
**leaving** 363:24
**left** 417:18
**legal** 363:18,19,24
  364:1 366:23
  367:7 442:1 445:1
**lerm** 398:1,2
**lerms** 406:1
**letter** 442:19
**level** 385:8,18,21
  404:9 406:22
  423:15 424:11,14
  425:1 428:11
**levels** 383:14
  385:1 386:2 401:6
  405:17
**leverage** 356:1
**lieutenant** 378:24
  404:22
**line** 361:10 373:5
  373:6,10 385:15
  419:3 424:21
  426:17,22 442:13
  444:7 445:3

**lines** 373:5
**list** 354:23 366:11 376:2,13,15
**listed** 356:7 375:19,25 376:13 386:13 400:17,22 444:7,17
**listing** 353:23 444:7
**lists** 381:16
**litigation** 339:6 346:4 442:6 443:3 444:3
**little** 362:6 373:14 379:10 389:18
**llc** 341:14 346:25
**llp** 341:2,6,19
**local** 354:24
**location** 352:1 359:18
**long** 366:15 370:20 384:14 436:4
**longer** 420:25
**look** 351:18 353:18 364:11 365:20 373:10 375:15 380:25 382:11 383:17,19 384:17 385:6,14 386:1 391:7 392:7 393:2,10 396:5 399:20 400:1,14 401:8 402:3 404:6 405:9 407:24 417:5,10,22 419:2 421:2,8,23 422:24 423:18,19 424:5 425:13 429:10 431:12 433:20

**looked** 387:21 427:9
**looking** 353:8 367:6 373:12 376:4 380:8 399:25 401:10,19 402:10 408:14 411:17 423:1 428:9 434:7
**looks** 355:22
**loosely** 370:13
**lot** 353:1,2 360:5 370:15,17 371:2 380:9 385:13 393:21 405:10 411:3,5 424:4 431:8 434:9,9,13 434:17 438:1
**lower** 353:20
**luke** 341:11 347:7
**luke.porter** 341:13

**m**

**m** 341:16,16,20
**madam** 442:10
**mail** 343:5,8,15,17 343:23 344:3,6 349:13,14,20 350:8,9 351:15,19 352:20 376:20,22 377:3,14,25 387:23,24 388:7 389:3 391:20 392:1 407:3,9,17 407:19,25 408:14 410:6 415:11,15 417:22 419:20 420:1,7,10,14 426:11 430:8 436:7

**mails** 415:24 416:3,5
**main** 340:7 341:20
**major** 395:17
**majority** 384:24 385:4,7,10,12,23 386:3 437:22
**management** 397:24 398:10 434:23
**manual** 425:13
**march** 339:19 346:2
**marijuana** 419:13
**mark** 340:3 346:8 349:12 376:20 386:17 387:22 391:19,19 396:23 403:6 407:2 415:10 419:19 442:5
**marked** 343:3,7 343:10,13 344:5,7 349:24,25 377:7,8 378:10 387:2,2,15 388:10 392:4 397:5 403:14 407:13 415:19,20 420:2,3
**marshal** 354:14
**marshals** 394:8
**massachusetts** 340:20
**matches** 366:8
**matter** 346:3 418:25 434:20 437:25
**mayor** 352:15
**mcgrath** 343:23 407:4,10

**mckesson** 341:2 347:2,4 396:21
**mcpike** 407:3 408:2,4,15 409:1
**md** 339:7
**mdl** 339:6
**me's** 374:25
**mean** 355:20 364:22 365:25 375:7 380:22 383:8 389:23 395:12 409:5,23 414:7 418:21 423:23 424:13 425:9,12 426:15 429:10 431:5 433:20 434:1 436:6
**means** 375:9 402:7 408:17 409:6,11 426:21 429:6
**medical** 347:25
**medication** 364:14
**meeting** 352:3,7
**meetings** 352:10 353:1
**members** 355:7,8 380:1 384:11 388:25 438:1
**memorandum** 350:10
**memory** 372:1
**memos** 436:7
**mentioned** 404:13 428:17
**meth** 369:21
**michael** 343:23 377:19,22 407:9
**michigan** 417:23 419:6

middle 400:14
423:2 426:11,17
midwest 442:17
445:1
milligram 419:12
mind 422:15
minimum 385:18
393:3
minute 368:20
misdemeanor
404:5
missing 419:1
mission 362:2,4
379:10,15 381:2
381:21 383:21
385:2 387:14
431:13,16,18,24
433:12,13,16
mistakenly 427:1
427:3
mixed 374:21
model 355:22
money 362:10,17
364:14 367:24
368:1,3,4,5,7,9,11
368:14,19 376:8
376:17 414:1
415:2 427:7,18
monies 427:2
monitor 424:19
month 404:11
monthly 343:22
403:12,21,23,25
404:10 405:8,13
months 352:9
353:1 422:18
morning 347:18
347:19 349:1
mornings 437:25
motor 401:5,6

mou 352:12
moved 356:21,25
mpifko 340:5
multi 343:12
349:12 386:23
396:24

**n**

n.w. 340:20
name 396:20
420:20,22 442:6
443:3,4,15 444:3,4
444:21
named 440:9
narcan 388:20,23
389:1,11 390:1,7
391:3 436:21
narcotic 437:17
narcotics 355:7,14
355:17,21 356:18
356:21 361:22
369:9 371:7
374:25 382:17
383:2 387:13
401:4,11,16,16,18
402:8 406:15
419:11,15 433:4,6
433:8,16,19,23
434:1,2,25 435:7,9
436:23 437:6,7,18
national 339:6
346:3 442:6 443:3
444:3
native 350:19
necessary 435:8
need 366:1,6 381:9
383:9 399:4 424:5
426:13 428:6
needed 390:10
negative 402:5
negotiating 353:6

negotiation 353:8
neighborhood
399:9,10
neighborhoods
370:14
never 409:24
new 359:18,21
370:19 409:17
410:9 416:21
417:9
news 416:6 418:8
nexus 358:5
369:18
nights 437:24
nighttime 400:10
400:13
nine 365:21
north 340:15
northeast 357:24
357:25
northern 339:2
358:2,15
notarized 442:14
notary 440:6
441:14 442:25
443:10,18 444:15
444:23 445:23
note 442:12
notifications 417:3
notify 416:25
november 343:15
343:17 388:9
391:21 392:3
number 343:3,7
343:10,13,18,20
343:22,25 344:4,7
349:16,23 350:20
350:22 354:3
355:4 357:13
359:9 376:24
377:6 378:4 379:8

381:1 386:8,19
387:1 388:1,4
391:1,3,22 392:4
394:25 396:25
397:5 403:8,13
407:5,12 413:21
415:12,18 419:22
420:2 442:7,13
numbers 353:20
379:7 398:16,21
399:1,2 405:15
421:8,13 429:4
444:7
nurse 411:19
nw 341:7,16

**o**

object 434:5
435:10
objection 345:3,3
345:4,4,5,5,6,6,7,7
345:8,8,9,9,10,10
345:11,11,12,12
345:13,13,14,14
345:15,15,16,16
345:17,17,18,18
345:19,19,20,20
345:21,21 362:3
362:23 363:3,8
364:5,19 365:16
366:4,21 367:4
368:16 369:10
371:24 373:20
376:5 378:15
384:4 385:3,25
393:8 395:18
399:21 400:7
402:24 404:2
405:5 408:19
410:11 413:13
414:2 415:25
417:11 422:23

[objection - partners]

426:6 427:8
428:22
**objections** 342:5
345:1 350:6
**ocdetf** 350:11
351:3 357:11
**ochman** 340:14
346:21,21
**october** 343:6
349:15,22 441:17
**offhand** 393:15
**office** 351:3,17
357:20 360:18
361:12,13 374:25
410:3 427:16
441:6
**officer** 388:17
389:25 408:10
424:17,18,23
425:3,10,19
432:21
**officers** 355:10
356:4 357:7,14,15
358:13 361:3
382:9 390:8,10,13
390:18 391:5
405:21 408:22
409:3,7 427:22
432:4,5,10 434:14
436:20
**official** 443:15
444:21
**officially** 409:25
**oh** 401:22 426:20
**ohio** 339:2,12,14
339:23 340:8,11
340:15 341:21
346:5 357:24,25
358:2 359:6
417:24 419:5
440:2,7 441:7,15

442:2
**ojo** 420:21
**okay** 348:10
353:22 354:20
356:19,24 358:16
361:19 362:18
373:12 381:12,13
388:1 389:9
397:15 401:24
402:17 415:1
419:2 426:20
430:12 435:19
**olushola** 420:21
420:22
**once** 389:25 390:4
390:6,6
**ones** 400:21
**op** 339:11,13,15
**opened** 360:3
**operation** 384:16
417:4 431:10,10
432:11,14 436:1
**operations** 355:11
357:9 359:1 361:4
377:18 394:16
405:1 430:25
**opiate** 339:6 346:4
442:6 443:3 444:3
**opioid** 363:17
366:16 372:9
**opioids** 363:24,25
364:1,4,9,16 365:2
366:3 367:2,11,12
**opportunity**
352:22
**opposite** 366:5
**ops** 433:22
**ordinary** 405:1
**organization**
431:6,7

**organizing** 371:2
**oriented** 379:11
379:16 381:3
**original** 373:15
438:2
**originally** 408:1
**originated** 419:6
**osp** 359:4 360:12
**ot** 421:2,2 423:4
423:14,20 426:18
**outlines** 387:7,9
**overage** 426:22
**overall** 374:1
**overdose** 373:1
374:16,19 402:22
422:22 436:20
**overdoses** 366:24
373:23 374:10,13
402:19 403:3
**overlap** 361:7
431:9
**overtime** 391:4
421:3,14 422:12
423:9,10,12 424:3
424:6,9,13,15,16
424:18,22,23
425:3,7,15,20
426:5 427:7,25
428:4,10 429:5
437:21 438:1
**oxycontin** 417:23
419:5,12

**p**

**p.c.** 340:2
**p.m.** 438:11
**page** 343:12
349:12,17 350:17
350:21 351:16
353:19,20 354:21
360:13 361:15
366:10 370:3,4

371:5 372:24
375:1,13 376:25
378:5,10 379:7,10
381:1 383:20
386:7,13,20,23
396:24 400:15
403:7 407:4,4,25
418:1,14,15,18,19
418:21,24 419:3,9
419:20 420:19
423:1 430:13
442:13,15 444:7
445:3
**pages** 383:19
408:23
**paid** 421:14
424:18
**par** 340:18,18
**paragraph** 351:19
389:5 390:21
419:10
**parameters**
359:23
**part** 349:2 355:18
358:24 368:20
380:21 384:9,20
393:21 394:5
398:16 431:18
437:23 444:9
**participants**
353:24,24 356:2,2
**participate** 433:7
**particular** 351:11
353:16 371:18
372:12 380:24
393:5,13,25
397:16 404:14
405:20 411:23
418:7,12 428:2
**partners** 353:8,12
353:13 354:3,24

358:12 359:24
360:6
**parts**  353:17
**party**  441:2
**passed**  428:23
**patel**  340:7 346:12
346:12
**paths**  366:24
**patricia**  340:14
346:21
**patrol**  354:15
359:6 409:7
432:20 436:20
**pay**  415:8 421:5,9
421:9,10,17,17,21
421:24,24,25
422:15 427:7,25
**paying**  428:4
**pellegrino**  339:25
440:6 441:14
**people**  349:15
355:12,17 356:20
356:24 359:8
360:15,16,22
364:2,12 365:1,5
368:10,21,24
369:1,7,25 370:14
370:16 374:24
380:14 384:2,15
385:20 388:2
394:5 411:5
412:15 431:21
**percent**  383:4,11
383:15 385:10,11
385:13,16,24
386:7 387:21
402:5,8 412:1
434:11
**percentages**
385:14 430:18

**performing**
380:19
**performs**  383:23
**period**  372:14
373:24 374:2,8
392:17,22 393:1
393:12 395:6,16
401:17 402:9
405:23 421:5,9,10
421:10,17,17,24
421:24,25 422:15
**periods**  421:21
**permit**  356:1
427:6
**persists**  413:11
**person**  377:22
394:17 404:14
411:17 425:13
**personal**  432:8
**personally**  443:11
444:15
**personnel**  354:9
383:10 391:6
431:20 436:2,4
**perspective**  362:8
362:13
**pertaining**  374:1
**pharma**  339:10,12
339:14
**pharmaceutical**
340:18
**pharmaceuticals**
340:17,18
**phone**  347:5,6,10
442:3
**piece**  432:20
**pifko**  340:3 342:10
346:8,8 347:23
350:4 362:3,23
363:3,8 364:5,19
365:16 366:4,21

367:4 368:16
369:10 371:24
373:20 376:5
378:15 384:4
385:3,25 393:8
395:18 399:21
400:7 402:24
404:2 405:5
408:19 410:11
411:13 413:13
414:2,14 415:25
416:10 417:11
422:23 426:6
427:8 428:22
429:23 430:1,7
435:15 442:5
**pills**  406:19
419:12
**place**  346:5 350:24
426:23,24 440:20
**placed**  390:7
**places**  434:9
**plaintiff**  346:13
**plaintiffs**  346:10
**plan**  375:22
378:22,25 433:21
**plans**  379:18
**play**  411:6,7
**played**  411:6
**please**  346:6 348:9
396:23 403:6
407:2 415:10
419:19 442:11,11
**pochman**  340:16
**point**  340:15 353:5
361:21 370:4
384:22 413:1
**pointed**  384:8
**police**  348:15
357:7 360:22
377:18 378:17

388:18,25 401:1
408:10,12,18
410:19,20 413:16
417:16,19 419:11
419:15 421:2
422:22 423:4
424:3 425:18
426:18 428:7
431:2 432:4,5
434:24
**police's**  411:17
**policy**  409:17
410:10 411:2,10
411:13,16 412:9
412:20,22 413:18
414:13 415:1
424:8 428:11,21
429:1
**polster**  339:8
**pool**  392:16
393:11
**populated**  397:21
**porter**  340:19
341:11 346:17
347:7,7
**posed**  391:10
**position**  348:13,17
412:19 420:23
426:13 428:5
**possible**  405:4
**postal**  354:18
375:3
**potentially**  354:7
**powerpoint**
350:23,25 351:2
352:20,23 353:4
353:20 361:16
366:11 370:4
371:6 372:25
375:2,14,20

pp  421:16,17
predominantly
  359:2 372:13
preference  365:19
preparation  349:3
prepare  348:22
preparing  378:25
prescription  339:6
  346:4 364:4,8,13
  364:16 365:2
  366:7 367:2,11,12
  406:19 442:6
  443:3 444:3
presence  440:14
present  341:23
  351:8,13 352:6
  416:12
presentation
  351:2,5,9,13 352:1
  352:14 375:21
presentations
  351:11
presented  351:6
presenting  357:19
press  352:3 388:19
presumably
  368:10
presume  408:17
pretel  426:10
  428:18
previous  378:11
  381:18
pride  434:17
primarily  377:23
primary  355:20
principal  362:2,4
prior  347:20 349:9
  425:2,7,18,20
  426:8 428:24
priorities  362:12

priority  375:24
  376:3,11,16
prisoner  410:24
  415:7
prisoners  408:16
  408:17,18 410:21
  412:10 413:16,17
  414:9
probably  352:25
  363:16 364:20
  372:6 373:15
  374:24 378:20
  385:15 387:9
  390:16 391:16
  393:3,22 395:4
  400:8 401:5 413:7
  420:20 427:1
problem  370:5,6
  381:15
procedure  347:13
  439:7 443:5 444:5
process  352:9,25
  353:8 378:19
produce  380:10
produced  350:19
  387:17 406:9
production  349:16
  350:20,21 376:24
  378:3 379:8 381:1
  386:8,19 388:4
  391:22 442:15,17
  442:22
program  427:16
project  390:23
  432:16,23
projects  432:6,6
  432:12
pronounce  420:20
proper  358:3
proposal  430:9

prosecutor  361:11
prosecutor's
  357:20 361:13
prostitution  404:6
provide  380:18
  381:19 385:18
  412:24
provided  347:12
  381:22 382:18
provides  381:23
  383:3
providing  382:6
public  352:3,16
  388:17 411:4
  412:5 440:7
  441:14 443:10,18
  444:15,23 445:23
purcell  404:22
purdue  339:10,12
  339:14
purpose  358:17
  379:24 398:14
  405:12 430:23
  437:19
purposes  350:1
  353:6 377:9 387:3
  388:10 392:5
  397:6 403:15
  407:14 415:21
  420:4
pursuant  439:3,6
put  379:3 390:14
  391:14 398:7,8
  432:23

                q
qualified  440:8
quantity  406:19
question  348:7
  360:4 368:17
  370:3 371:15
  373:25 376:9

391:10 433:11
  434:6 435:11
  438:3
questionnaire
  379:11,16,19,23
  379:25 380:13
  381:3 430:22
  438:5
questions  350:7
  352:21 361:18
  378:8 379:21
  380:23 429:21,24
  430:20 435:16,20
  438:7
quick  429:13
quite  351:10
  352:10 371:20
  409:18

                r
range  425:11
rape  396:3
rate  383:4
rating  386:6
ratings  382:6
  383:13
read  361:16 389:8
  402:15 419:7
  426:17 443:5,6,12
  444:5,6,17
reading  375:16
  426:16 442:19
reads  381:18
  418:21
reallocate  405:21
really  364:23
  371:12,13 372:22
  380:2 384:17
  390:15 401:4
  414:4
reason  348:1
  363:16 364:22

365:24 371:23
409:21 418:17
442:14 444:8
445:3
**reasoning** 412:11
412:25
**reasons** 374:19
**recall** 351:21
423:22 430:17
**receipt** 442:18
**receive** 383:22
387:7 390:1,1,9
399:14,18 405:7
**received** 387:9,15
407:19 409:25
410:4,5 415:23
416:2
**recess** 396:12
429:17
**recipient** 377:13
**recipients** 343:5
344:3 349:21
415:16
**recognize** 350:3
350:24 392:10
397:8 403:17
407:16 420:6
**recommendations**
382:2
**record** 346:2,7
350:5 364:11
396:10,13 397:23
398:9 429:15,18
438:8 444:9
**records** 422:7
429:10
**recruitment**
395:12
**reduce** 424:8
**reduced** 440:14

**reduction** 394:1
401:13 402:8
**reed** 341:10 347:7
**reedsmith.com**
341:13
**refer** 354:3 366:19
418:8
**reference** 361:20
389:6 442:7 443:2
444:2
**referenced** 440:13
440:18 443:11
444:15
**referred** 367:18
367:19 431:13
**referring** 368:2
**refers** 351:16
354:5 366:22
370:5 375:3 421:3
**reflect** 378:23
421:13 429:4
**reflected** 403:2
435:23
**regard** 347:23
**regarding** 383:23
439:2,11
**regardless** 384:12
434:16
**regimented** 370:9
**region** 358:22
**registered** 411:19
**regularly** 418:5
**reimbursed** 429:5
**rejected** 413:22
**relate** 363:23
**related** 366:9
378:16 381:18
387:13 395:16
427:21 433:4
434:4

**relates** 339:8
**relating** 365:2
367:11 368:6
387:11
**relationship**
378:12
**relative** 441:2
**release** 388:20
389:2,6
**remember** 349:6
351:7,12 352:8
372:9 380:21
390:5,15 393:15
436:4
**remind** 347:24
348:7 430:5
**renee** 339:25
440:6 441:14
**repeat** 347:22
**rephrase** 348:10
416:1
**report** 343:19
377:19 378:13
382:3 384:3,25
397:4,13,13,15
398:11 405:10
417:6 418:2,8
434:8
**reported** 382:6
385:24 386:5
**reporter** 342:15
349:12 376:20
386:17 387:22
391:18,19 396:23
403:6 407:2
415:10 419:19
443:7
**reporter's** 342:13
440:1
**reports** 398:8,9,9
416:18 417:1

418:22 423:23,25
424:2
**represent** 396:21
**represented**
355:23
**request** 417:4
434:22 444:9,11
**requested** 381:19
439:1,6,10
**required** 356:8,13
357:1,14,16
383:13 442:25
**resolved** 411:24
**resource** 430:8
431:21
**resources** 356:1
392:17 393:11,20
394:16 395:14
399:4,4,10 434:12
434:16,21,24
435:5,8 436:10,12
436:15,16,17,23
437:2,5,6
**respect** 364:18
**respond** 402:22
437:24
**responded** 384:25
**responding** 409:15
**response** 382:18
392:13,21,23
394:21 422:7,9,25
423:14 434:1
438:4
**responses** 435:22
**responsibilities**
348:17 394:6
431:9
**responsible**
377:23 382:5
394:10,14

**results** 381:3,16
  381:23 382:1
**resuming** 347:20
**retained** 342:15
**retired** 417:20
**returned** 442:18
**review** 349:2,7
  350:7 352:23
  399:24 424:19
  439:2,6 442:12
  443:1 444:1
**reviewed** 349:8
  353:4
**rich** 340:6 346:13
**right** 350:18
  353:21 362:17
  364:23,25 365:19
  368:18 370:2
  373:13 375:16
  376:9 378:4
  389:17 390:1
  397:18 402:2
  404:18 425:9
  434:7
**road** 409:3
**rob** 365:5
**robberies** 364:11
**role** 411:7
**roll** 388:20,23
  390:3 391:5
**rolled** 353:3
**room** 340:11
**roughly** 422:17
**row** 421:9,24
**rpr** 339:25
**ruiz** 341:16 346:23
  346:23
**rules** 347:13 439:3
  439:7 443:5 444:5
**run** 410:12,17
  426:7

**running** 359:12
  360:10 435:2
**rx** 341:14 346:24

**s**

**s** 442:15 444:8,8
  445:3
**safety** 411:4 412:5
**san** 341:4,12
**satisfaction**
  434:11
**saved** 413:25
**saying** 365:23
  366:3,5 379:10
  416:14 431:25
**says** 354:2,23
  360:12 361:10
  381:2 389:15
  390:22 400:15
  402:11 408:15
  417:23 418:15,24
  419:3,3 421:7,16
  426:12 428:4
**scene** 402:23,25
**scheduled** 351:17
**seal** 441:6 443:15
  444:21
**search** 357:18
**second** 351:18
  371:19 389:5
  418:15,19 419:9
  421:23
**section** 381:19
**security** 353:14
  354:12
**see** 361:24 364:8
  364:17 365:14
  366:13,17 370:11
  371:8 372:6,7
  373:2,4,8,19
  379:13 380:22
  383:5 386:2

388:21 390:24
  394:4 400:19
  402:12 405:19
  408:1 419:14
  422:7 423:19
  428:13 435:13,13
  437:15
**seeing** 372:18
**seen** 364:1 377:11
**seized** 406:16,20
  419:5,11
**seizures** 369:17
  418:23
**self** 380:18 381:20
  382:6 383:4,21
  386:5,6 430:18,22
  430:23 438:5
**sell** 369:8,23,24
**selling** 368:14,21
  368:22
**send** 410:19 416:9
  416:15 417:2,6
  427:22
**sender** 388:15
**sending** 388:19
**sends** 410:20
**sense** 413:21
  432:13
**sent** 398:11,13
  404:9 408:1
  420:10 422:10
**sentence** 390:22
**separate** 379:7
  395:25 433:23
**separated** 432:17
  433:17,18
**sergeant** 388:16
**serves** 372:1
**service** 354:14
  375:4 385:18
  389:21 394:8

396:2 409:9
**services** 341:15
  343:21 346:24
  403:12,22
**session** 348:22
  349:9
**set** 350:23 379:22
  400:24 441:6
**seven** 365:20
**shape** 409:6
**sharon** 420:13,16
  420:17
**sheet** 343:22
  403:12,21,23,25
  404:8 442:13
  444:7,10,18 445:1
**sheriff** 414:25
**sheriff's** 410:3
  414:8
**shift** 432:22
**shifted** 406:6
**shifts** 390:2
**shipments** 375:11
**shola** 426:12
**short** 396:9 405:23
**shortly** 372:7
  413:7
**show** 378:7,9
**showed** 374:2
**shown** 442:16
**shows** 372:25
  373:17 384:9
**side** 411:5 414:24
**signature** 439:5
  441:13 442:14
**signed** 350:13
  404:23 443:13
  444:18
**significant** 366:12
**significantly** 374:7

signing  352:12
  442:19
sincerely  442:21
sir  350:3 442:10
sit  357:14 435:25
sitting  363:16
  364:22 422:5
  423:21
six  352:25 365:20
  422:17 437:13
slide  353:21
  361:17 371:6,18
  375:6,14
slides  350:23
smith  341:10
  347:8
software  432:10
solely  422:21
solutions  340:18
  442:1 445:1
somebody  404:16
sonya  341:3 347:3
sorry  357:12
  368:8 376:1 381:8
  381:11,13 386:11
  406:22 413:12
  418:20 430:4
sort  376:10
sound  389:17
spaeder  341:15
  346:24
speak  348:9
  357:12
special  343:21
  355:8 400:12
  403:11,22 424:24
  433:22
specialize  369:25
specific  358:3
  367:2,9 398:19
  400:21 401:15

431:16,20 433:3
specifically  352:13
  353:3 363:23
  365:2 373:25
  374:3,12,20 387:6
  390:5 401:8,10,20
  411:7,22 432:19
  438:4
specified  392:17
  440:21
spelled  392:14
spend  379:3
spike  372:8 373:17
  374:2
spurred  363:19
squad  355:8
ss  440:3
staff  382:25
  398:13 412:13
  435:2,4 437:17
staffing  377:23
  378:16 379:11,16
  381:3 382:2
  383:14 384:12
  385:1,8,14,19
  405:16 432:25
  433:21 434:3
  437:7,18
stand  354:11
  359:5
standpoint  362:11
stands  422:14
start  356:18 360:2
  372:7,9 390:22
started  372:10
  378:19 413:8
starts  385:16
  408:1 419:10
stat  343:22 398:7
  398:9 403:12,23
  403:25

state  359:6 371:14
  421:1 440:2,7
  441:15 443:10
  444:15
statement  443:13
  443:14 444:19,19
states  339:1
  354:14 408:15
  409:4 423:4
statistics  343:19
  371:10 397:4
  405:8,13
stats  393:3 397:12
  403:21 404:10
  405:14
staying  424:23
stealing  364:3
stenotypy  440:14
sticks  371:17
stolen  401:7
stop  375:9 381:9
stopping  375:10
strategic  375:21
strategies  387:10
  387:11
strategy  343:12
  386:18,25 387:8
stream  341:11
street  339:23
  341:3,7,12,16
streets  372:19
  409:12
strike  350:11
  351:3 353:24
  354:7 355:19,21
  355:24,25 356:17
  356:21 357:7
  358:6,9,21 359:1,8
  359:11 360:1
  362:2 367:1,10
  375:15,22 376:4

413:4,14 428:3
strikes  371:17
string  344:6 420:1
structure  370:16
structured  370:10
stuck  409:8,10
study  377:23
  378:1,12,21 379:5
  380:9 384:9,17
  430:9 431:11,13
stuff  371:1 372:9
  423:19 433:15
subject  417:23
  418:25 419:12
subscribed  443:10
  444:14 445:21
subsequent  390:2
success  380:19
successful  393:17
  393:22
suite  339:23 340:4
  341:12,16,20
  442:2
summaries  418:22
summary  343:19
  397:3,12 418:24
summit  339:14
superior  442:1
supervisor  404:23
supervisors  380:2
  382:9,25 384:11
  434:14 436:19
support  437:9
sure  347:23 348:8
  352:24 356:18
  357:13 358:14,15
  364:10 380:7
  383:15,18 384:7
  387:21 393:4,16
  400:10 413:23
  415:3 422:11

424:21 425:8
429:7
**survey** 380:1
435:23
**suspected** 402:22
**suspects** 396:4,4
**swinner** 341:5
**sworn** 347:14
440:10 443:10,13
444:14,18 445:21
**system** 397:24
398:1,2,10

**t**

**table** 381:16 386:7
**tactics** 355:9
**take** 364:11 366:1
366:6 372:10
384:17 391:9
393:9 396:8 415:7
417:5 422:24
423:19 426:21
427:1,7 429:13
432:4
**taken** 339:22
391:5 432:11
440:20
**takes** 389:16
**talk** 353:17 367:15
368:19 374:18
435:3,25 438:3
**talked** 347:22
348:23 376:7
379:22 400:11
414:18,24 427:11
427:13 433:3
**talking** 365:18
375:6 411:14
430:1
**talks** 375:14
**targeted** 395:14

**task** 355:10,11
358:13 361:4,5
431:23
**tasked** 359:24
431:19
**tasks** 380:3,20
381:21,21 383:22
433:18,19
**taught** 389:24
**technical** 432:5,12
432:16
**technology** 432:2
432:9,18,20,24
**telephone** 341:11
**tell** 352:13,17
353:3 369:16
391:2 392:12
395:22 414:11,23
422:25 425:14
428:13 434:12
**temporarily**
399:12
**ten** 395:1
**tenth** 341:7
**term** 366:15
**terms** 363:22
368:15 424:5
**territory** 371:3
**testify** 440:10
**testimony** 348:2
440:12,17 443:6,7
444:6,9,12
**text** 381:5,18
383:20
**thank** 380:11
406:25 429:20
430:10
**theft** 401:5
**thing** 348:6 353:17
380:6 382:19
399:19,22 429:11

431:11 433:2
**things** 349:6
357:16 362:9,15
364:11,12,14,23
368:10 369:17
371:3,16 372:7,10
372:18 380:13
384:20 389:15
393:10,18,21,22
394:3 395:13
400:9 401:3 417:5
424:24 427:22
433:5,7 436:1
**think** 348:8 353:7
354:18 361:2
362:6 363:9,13
365:21 366:5,22
367:3,5,14 370:7
371:25 372:17
373:11,12 375:2
375:18,23 376:6
376:12,14 380:8
385:17 389:18,21
391:15 392:14
393:21 395:25
404:6 416:10
423:11 425:9
426:25 427:10
434:17 437:14
**third** 378:5 382:12
383:3 406:5 418:1
419:10 421:16
**thirds** 385:17
**thirty** 442:18
**thought** 375:3
381:10 430:25
**threats** 361:22
375:14,18,24,24
376:3,7,11,16
**three** 367:19 379:9
400:8 403:7 407:4

419:20 435:1
**thrown** 401:5
**tie** 376:7
**time** 351:22
370:20,24 371:4
379:4 383:11
384:22 385:21
389:12 391:6
392:15,15,17,22
393:1,6,9,9,12,19
395:20 401:6,9,17
402:9 404:22
405:23 406:9,11
406:18 409:12
410:5 413:3
416:12 424:16,20
424:20 425:10,11
425:11 428:17
435:1 440:20
**timekeeping**
425:13
**times** 351:25
352:11
**title** 348:16 357:12
357:12
**today** 348:2,13,22
356:14 357:2
363:11,15,17
413:15 422:5
423:21 429:21
**today's** 346:2
**told** 374:23
**ton** 372:5 396:7
**tools** 383:9
**top** 375:24 376:3
376:10 381:2
382:12 383:20
402:10,14 418:14
418:24 420:11
**topic** 351:11

total  390:22
  402:11
totally  418:25
touch  401:3
tough  360:4
track  401:4
  406:12,19
trade  363:20
  370:24
traditional  433:19
traditionally
  365:17,19 400:23
traffic  382:12,14
  392:18 395:9,9
trafficking  366:20
  367:7 368:4 369:2
  369:9,19,24
trained  389:25
  390:3,13,17,19
  391:6
training  389:7,11
  389:14,16 390:6
  391:6 425:10
  427:20,22 432:8
trains  432:19
transcribed
  440:15 443:7
transcript  342:1
  349:8 439:3,6,9,11
  442:11,12 443:5
  443:12 444:5,11
  444:17
transcription
  440:17
transfer  426:14
transport  385:16
treat  402:22,25
trend  417:9,9
trends  416:21,22
triangles  373:11

tried  369:14
  431:11,14
trigger  393:13
triple  431:22
true  402:21
  440:16
trust  426:14 427:2
  427:5,16,18
truth  440:11,11,12
truthful  348:2
try  348:10 405:4,6
trying  378:17
  393:24 412:6,8,12
  414:6,10,12
tucker  341:19
  346:19
tuckerellis.com
  341:22
turn  350:16,21
  352:19 353:19
  354:20 361:15
  370:2 371:5
  372:24 375:1,13
  379:6,7 430:13
  435:3
turned  381:11
  412:11,16 413:17
turning  379:4
  408:16
turns  356:25
two  350:9 364:21
  364:23 365:22,25
  383:19 385:17
  390:18 403:24
  408:23 419:4
  421:10,20 423:24
type  370:17
  384:19 405:20
  417:9 418:4
types  398:24 406:8
  424:1

typically  365:14

**u**

u.s.  351:3,17
  354:18 357:19
  361:11 394:8
ulmer  339:22
um  358:19 373:16
  407:23
umbrella  433:23
unable  348:1
unclear  348:8
undeniably  423:5
  424:3 426:18
undercover
  357:16 418:23
understaffed
  383:24 384:10,18
  386:4
understand  354:4
  354:5 362:1 383:7
  430:20 433:25
understanding
  350:10 384:2
  410:16 412:9
  435:6
undertake  357:1
unique  370:5,6
  416:8
unit  355:7,9
  381:19,22 382:5
  382:12,14,15,17
  383:1,2,23 384:12
  384:15 385:16,17
  390:13 398:5,6
  404:16,17,20,23
  417:4 419:11,15
  424:20 431:10,10
  432:18,25,25
  433:3 434:20
  436:18,23 437:3,6
  437:7,18

united  339:1
  354:14
units  356:16
  380:18,24 381:17
  382:10 384:10,21
  384:24 385:13
  386:3,13 404:9
  430:24 431:19
  434:10
unnecessarily
  423:10,12
uptick  399:8
usao  361:11
usbp  354:15
use  369:8 390:19
usms  354:13
uspis  354:17 375:3
usually  417:3
utilize  390:19
utmost  347:21

**v**

v  339:10,12,14
  442:6
variance  421:17
  421:18,20 422:1
variances  423:20
variety  369:20
  374:24
various  344:3
  355:10 373:1
  380:18 381:17
  382:10 398:18
  415:16
vehicle  401:5
vehicles  401:7
ventura  340:3
veritext  341:11
  442:1,7 445:1
veritext.com.
  442:17

vets 432:19
vice 404:9,16,17
    404:20 436:18
videographer
    341:23 346:1
    396:10,13 429:15
    429:18 438:8
videotaped 339:17
violence 366:25
violent 361:22
    362:8,15,16,21
    363:2,5,6 364:2,7
    364:15,17 365:10
    365:11,13 366:1,6
    367:19 368:7,15
    372:4 376:8,17
    392:12,21,23
    394:1,20 395:24
virtual 341:11
volume 339:17

**w**

w 339:23 341:6
wait 390:2,12
waited 390:16
waived 442:19
walk 424:12
walmart 340:13
    346:22
want 350:4 360:6
    378:7,9 390:17
    395:11 405:10
    426:21 430:3,13
wanted 364:13
    387:18 393:22
    401:7 423:18
    431:19
wants 425:19
    427:1
war 372:2
warrant 394:8
    396:2

warrants 357:18
washington
    340:20 341:8,17
way 359:11 363:14
    368:19 370:20,23
    376:11 399:3,6
    404:3 409:6
    416:25 427:24
    428:1 434:13
ways 364:21 415:4
we've 351:10
    424:4
weapons 355:9
    401:4
week 351:18
    397:13,16,17,18
    397:18,19 401:11
    401:11,12,14,15
    401:21,22,22,25
weekends 437:25
weekly 343:19
    397:3,12 399:16
weeks 421:11
    423:24 424:2
    435:1
went 352:9,24
    382:3
whereof 441:5
whitesell 341:20
    346:18,18
williams 339:18
    342:7 343:5,9,15
    343:17 347:11,16
    349:14,15,19,21
    376:23 377:2,4
    386:22 388:2,6,8
    391:20,25 392:2
    396:15,17,23
    397:2,8 401:19
    403:6,10,17 407:2
    407:8,16 415:10

415:14,23 416:2
    419:19,21,21,25
    420:6,10 429:20
    429:22 435:17
    440:10 442:8
    443:4,9 444:4,13
    445:20
winner 341:3
    342:8,11 347:3,3,9
    347:17 349:11
    376:19 381:9,12
    381:15 386:16
    391:18 396:8
    430:1,5,10 434:5
    435:10,18 438:7
wires 357:11,12
    357:15
witness 346:9
    381:8,10,13 439:2
    440:9,13,15,18
    441:5 442:8,11
    443:1,4,11 444:1,4
    444:15
witness' 442:14
word 375:7
work 356:3,6,8,9
    357:22,23 359:20
    367:2 378:24
    380:9 412:12
    414:6,10,12
worked 414:18
    420:24
working 356:23
    358:4 359:23
    411:22 412:3,7
    413:2 434:13
worst 421:5
wrong 430:4

**y**

yeah 369:5 394:3
    418:15,20 434:18
    436:6
year 371:19
    393:19 396:7
    401:20 402:4
    413:9
years 365:21
    372:5,17 373:18
    394:21 396:6
    400:24 419:4
    421:6 423:25
    434:8 436:9,25

**z**

zashin 340:6
    346:12
zipp 341:6,9 342:9
    347:1,1 396:16,20
    396:22 403:5
    407:1 411:16
    415:9 419:18
    429:13,20
zone 390:8
zrlaw.com 340:9
zuckerman 341:15
    346:24
zuckermanspaed...
    341:18

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.