Highly Confidential - Subject to Further Confidentiality Review

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                   -   -   -
 5   IN RE:  NATIONAL    :  MDL NO. 2804
     PRESCRIPTION OPIATE :
 6   LITIGATION          :
     ----------------------------------------
 7                       :  CASE NO.
     THIS DOCUMENT        :  1:17-MD-2804
 8   RELATES TO ALL CASES:
                          :  Hon. Dan A.
 9                        :  Polster
10                   -   -   -
          Thursday, January 24, 2019
11                   -   -   -
12   HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
              CONFIDENTIALITY REVIEW
13
                     -   -   -
14
             Videotaped deposition of
15   MARIAN WOOD, taken pursuant to notice,
     was held at Homewood Suites by Hilton
16   4170 Philadelphia Road, Bel Air, Maryland
     21015, beginning at 9:33 a.m., on the
17   above date, before Amanda Dee
     Maslynsky-Miller, a Certified Realtime
18   Reporter.
19                   -   -   -
20
21
22
             GOLKOW LITIGATION SERVICES
23       877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 2

```
 1   APPEARANCES:
 2
 3       BARON & BUDD, P.C.
         BY:  WILLIAM POWERS, ESQUIRE
 4       EMMA KABOLI, PARALEGAL
         600 New Hampshire Avenue NW
 5       Suite 10A
         Washington, DC 20037
 6       Wpowers@baronbudd.com
         Ekaboli@baronbudd.com
 7       Representing the Plaintiffs
 8
 9
         MORGAN, LEWIS & BOCKIUS LLP
10       BY:  JOHN P. LAVELLE, JR., ESQUIRE
         1701 Market Street
11       Philadelphia, Pennsylvania 19103
         (215) 963-4824
12       John.lavelle@morganlewis.com
13       - and -
14       BY:  MATTHEW R. LADD, ESQUIRE
         101 Park Avenue
15       New York, New York 10178
         (212) 309-6141
16       Matthew.ladd@morganlewis.com
         Representing the Defendant,
17       Rite Aid
18
19
20
21
22
23
24
```

Page 3

```
 1   APPEARANCES:  (Continued)
 2   VIA TELEPHONE/LIVESTREAM:
 3
 4       BLASINGAME, BURCH, GARRARD &
         ASHLEY, P.C.
 5       BY:  ALEXANDRA K. HUGHES, ESQUIRE
         440 College Avenue
 6       Suite 320
         Athens Georgia 30601
 7       (706) 707-2762
         Ahughes@bbga.com
 8       Representing the Plaintiffs
 9
10
         ARNOLD & PORTER KAYE SCHOLER LLP
11       BY: HEATHER A. HOSMER, ESQUIRE
         601 Massachusetts Ave, NW
12       Washington, DC 20001
         (202) 942-5000
13       heather.hosmer@arnoldporter.com
         Representing the Defendant,
14       Endo Pharmaceuticals
15
16
         GIBBONS PC
17       BY:  PAUL E. ASFENDIS, ESQUIRE
         One Pennsylvania Plaza
18       37th Floor
         New York, New York 10119
19       (212) 613-2000
         Pasfendis@gibbonslaw.com
20       Representing the Defendant,
         AmerisourceBergen Corporation
21
22
23
24
```

Page 4

```
 1   APPEARANCES:  (Continued)
 2   VIA TELEPHONE/LIVESTREAM:
 3
 4       JONES DAY
         BY:  JASON Z. ZHOU, ESQUIRE
 5       77 West Wacker
         Chicago, Illinois 60601
 6       (312) 782-3939
         Jzhou@jonesday.com
 7       Representing the Defendant,
         Walmart
 8
 9
10       BAILEY & WYANT PLLC
         BY:  MICHAEL W. TAYLOR, ESQUIRE
11       500 Virginia Street East
         Suite 600
12       Charleston, West Virginia 25301
         (304) 345-4222
13       Mtaylor@baileywyant.com
         Representing the Defendant,
14       West Virginia Board of Pharmacy
15
16
     ALSO PRESENT:
17   Dan Lawlor, Videographer
     Jeff Sayres, Trial Technician
18
19
20
21
22
23
24
```

Page 5

```
 1              - - -
 2            I N D E X
 3              - - -
 4
     Testimony of: MARIAN WOOD
 5
         By Mr. Powers
 6       By Mr. Lavelle
 7
 8              - - -
 9          E X H I B I T S
10              - - -
```

```
11   NO.       DESCRIPTION             PAGE
12   Rite Aid-Wood
     Exhibit-1   Rite_Aid_OMDL_0013471      70
13
     Rite Aid-Wood
14   Exhibit-2   Rite_Aid_OMDL_0013855-858  82
15   Rite Aid-Wood
     Exhibit-3   Rite_Aid_OMDL_0014804-874  103
16
     Rite Aid-Wood
17   Exhibit-4   Rite_Aid_OMDL_0016253-255  131
18   Rite Aid-Wood
     Exhibit-5   Rite_Aid_OMDL_0009868-877  153
19
     Rite Aid-Wood
20   Exhibit-6   Rite_Aid_OMDL_0021630-643  165
21   Rite Aid-Wood
     Exhibit-7   Rite_Aid_OMDL_0012519-520  172
22
     Rite Aid-Wood
23   Exhibit-8   Rite_Aid_OMDL_0013106-107  180
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 6

1            - - -
2        E X H I B I T S
3            - - -
4  NO.     DESCRIPTION          PAGE
5  Rite Aid-Wood
   Exhibit-9   Rite_Aid_OMDL_0013110
6        With attachment        195
7  Rite Aid-Wood
   Exhibit-10   Rite_Aid_OMDL_0003635-671  198
8
   Rite Aid-Wood
9  Exhibit-11   Rite_Aid_OMDL_0012500-502  212
10 Rite Aid-Wood
   Exhibit-12   Rite_Aid_OMDL_0046566-567  217
11
   Rite Aid-Wood
12 Exhibit-13   Rite_Aid_OMDL_0015219      230
13 Rite Aid-Wood
   Exhibit-14   Rite_Aid_OMDL_0017238-242  237
14
   Rite Aid-Wood
15 Exhibit-15   Rite_Aid_OMDL_0015077-081  250
16
17
18
19
20
21
22
23
24

Page 7

1            - - -
2    DEPOSITION SUPPORT INDEX
3            - - -
4
5  Direction to Witness Not to Answer
6  Page Line   Page Line   Page Line
7  None
8
9
10 Request for Production of Documents
11 Page Line   Page Line   Page Line
12 None
13
14
15 Stipulations
16 Page Line   Page Line   Page Line
17 8    1
18
19
20 Question Marked
21 Page Line   Page Line   Page Line
22 None
23
24

Page 8

1            - - -
2        (It is hereby stipulated and
3  agreed by and among counsel that
4  sealing, filing and certification
5  are waived; and that all
6  objections, except as to the form
7  of the question, will be reserved
8  until the time of trial.)
9            - - -
10       VIDEO TECHNICIAN:  We are
11 now on the record.  My name is Ray
12 Moore, I'm a videographer for
13 Golkow Litigation Services.
14 Today's date is January 24th,
15 2019, and the time is 9:33 a.m.
16       This video deposition is
17 being held in Bel Air, Maryland,
18 in the matter, In Re National
19 Prescription Opiate Litigation for
20 the United States District Court
21 for the Northern District of Ohio,
22 Eastern Division, MDL Number 2804.
23       The deponent is Marian Wood.
24 Counsel will be noted on the

Page 9

1  stenographic record.  The court
2  reporter is Amanda Miller and will
3  now swear in the witness.
4            - - -
5        MARIAN WOOD, after having
6  been duly sworn, was examined and
7  testified as follows:
8            - - -
9        EXAMINATION
10           - - -
11 BY MR. POWERS:
12     Q.   Good morning, Ms. Wood.
13     A.   Good morning.
14     Q.   My name is Will Powers, and
15 I represent the plaintiffs in this
16 litigation.
17       Can you just state your full
18 name and spell it for the record?
19     A.   Marian Louise Wood.
20 M-A-R-I-A-N, L-O-U-I-S-E, W-O-O-D.
21     Q.   Great.  And we're here for
22 your deposition today.
23       Do you understand that?
24     A.   Yes.

Page 10

1    Q.    Have you ever been deposed
2  before?
3    A.    Yes.
4    Q.    When was that?
5    A.    Somewhere between 2009 and
6  2014.
7    Q.    And what was that in
8  connection with?
9    A.    EEOC.
10   Q.    Ever been deposed besides
11 that EEOC deposition?
12   A.    No.
13   Q.    And what was that EEOC
14 deposition about?
15   A.    An employee, they wanted to
16 limit where he could go because he had a
17 disability and they were concerned with
18 his safety, and they were saying that we
19 couldn't limit where he could go.
20   Q.    Were you a witness in that
21 proceeding?
22   A.    Yes.
23   Q.    You were not a party in that
24 proceeding?  You weren't being sued or

Page 11

1  the one doing the suing?
2    A.    No.
3    Q.    You have been deposed
4  before, but I want to go over some ground
5  rules just so we're all on the same page
6  before we get started.
7          Because the court reporter
8  is here writing everything down that is
9  being said, I want to make sure that only
10 one of us is talking at a time.  So even
11 though you may anticipate a question or
12 think you know where I'm going with
13 something, I just ask you to allow me to
14 finish my question before you start
15 speaking, and I'll do likewise for you.
16         Is that okay?
17   A.    Yes.
18   Q.    And also for the same reason
19 that the court reporter needs to take a
20 written record of this deposition here
21 today, I need verbal answers from you so
22 that she can get them down on the
23 transcript; so no uh-uhs, uh-huhs, nods
24 of the head or shakes of the head,

Page 12

1  something like that.
2          Is that okay?
3    A.    Yes.
4    Q.    And if there's any reason
5  you don't understand a question or it
6  requires some sort of clarification,
7  explanation of the words I'm using,
8  anything like that, just let me know and
9  I can clarify the question.
10         Is that okay?
11   A.    Yes.
12   Q.    So if you answer my
13 questions, we'll agree that you
14 understand the question that has been
15 asked, okay?
16   A.    Yes.
17   Q.    Are you currently suffering
18 from any medical disease or illness that
19 in any way interferes with your ability
20 to answer truthfully and completely my
21 questions here today?
22   A.    I don't believe so.
23   Q.    Are you taking any
24 medication or drugs that may in any way

Page 13

1  interfere with the testimony you're going
2  to give here today?
3    A.    No.
4    Q.    And you were just sworn in
5  by the court reporter.
6          Do you understand that the
7  court reporter has put you under oath
8  here today just as you would be in a
9  courtroom at trial?
10   A.    Yes.
11   Q.    So because you're under
12 oath, if you lie or provide intentionally
13 misleading answers, you may be subject to
14 criminal or civil penalties.
15         Do you understand that?
16   A.    Yes.
17   Q.    And we can take breaks when
18 you need them.  I just ask, if there's a
19 question pending, that you answer the
20 question before we take a break.
21         Is that okay?
22   A.    Yes.
23         MR. LAVELLE:  The witness
24 reserves the right to consult with

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1 counsel on issues of privilege.
2 BY MR. POWERS:
3    Q.   And as your counsel just
4 did, your counsel may object from time to
5 time to my questions, but I'm still
6 entitled to an answer to my question
7 unless he specifically instructs you not
8 to answer.
9        Is that okay?
10   A.   Yes.
11   Q.   Okay, Ms. Wood, I want to
12 start with your educational background.
13       Did you complete high
14 school?
15   A.   Yes.
16   Q.   Where was that?
17   A.   Northern High School.
18   Q.   And is this here in
19 Maryland?
20   A.   It's in Baltimore.
21   Q.   And what year was that?
22   A.   '73 -- I went through and
23 finished 12th grade, but I didn't get my
24 diploma.  They -- I had to finish one

Page 15

1 more course.  So --
2    Q.   Did you ever finish that
3 course?
4    A.   Yes.
5    Q.   When did you --
6    A.   I got my diploma.
7    Q.   What was your diploma date?
8    A.   '73, I believe.
9    Q.   Any education beyond high
10 school?
11   A.   No.
12   Q.   Any certifications of any
13 kind beyond high school?
14   A.   Where I worked before, I
15 would take classes on different things,
16 interviewing techniques, security.
17   Q.   And you say where you worked
18 before, do you mean before you were
19 working at Rite Aid?
20   A.   In different places that I
21 worked.
22   Q.   Where did you work before
23 Rite Aid?
24   A.   Let's see, before Rite Aid I

Page 16

1 worked at Joseph's Country Inn
2 Restaurant.  I worked at Caldor, Best
3 Products, Johnny Unitas Golden Arm
4 Restaurant.  I think that's it.
5    Q.   Where did you work -- let me
6 ask the question differently.
7        When did you first start
8 working at Rite Aid?
9    A.   1998.
10   Q.   Did you ever work at
11 anywhere dealing with controlled
12 substances or pharmacy before starting
13 working at Rite Aid?
14   A.   No.
15       MR. LAVELLE:  Object to
16   form.
17 BY MR. POWERS:
18   Q.   What did you do immediately
19 preceding starting to work at Rite Aid?
20   A.   Can you repeat that?
21   Q.   Sure.
22       When did you -- so you first
23 started working at Rite Aid in 1998.
24 What was the job you had immediately

Page 17

1 preceding starting to work at Rite Aid?
2    A.   Joseph's Country Inn.
3    Q.   And when you started working
4 at Rite Aid in 1998, what was your
5 position?
6    A.   I started as an inventory
7 control partner.
8    Q.   And where was your job
9 located, like, in Maryland or somewhere
10 else?
11       MR. LAVELLE:  Object to
12   form.
13       THE WITNESS:  Perryman.
14 BY MR. POWERS:
15   Q.   And when you say "Perryman,"
16 you mean the Perryman distribution
17 center?
18   A.   Yes.
19   Q.   Have you worked at the
20 Perryman distribution center from 1998
21 continuously until now?
22   A.   I'm not employed there.
23   Q.   When did you stop being
24 employed at Rite Aid?

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    A.    October of 2014.
2    Q.    Between 1998 and 2014, when
3  you were employed at Rite Aid, did you
4  work only at the Perryman distribution
5  center?
6    A.    As far as I can remember.
7    Q.    So when we talk about your
8  employment at Rite Aid, we can agree that
9  we're just talking about between '98 and
10  2014.
11        Is that okay?
12    A.    Yes.
13    Q.    So you started in 1998 at
14  Rite Aid as an inventory control partner.
15        What were your job duties as
16  an inventory control partner?
17    A.    We would start out by -- we
18  were just starting out, so we would --
19  they would run picks, and then we would
20  audit the totes.
21    Q.    When you say "we were just
22  starting out," what do you mean by that?
23    A.    It was a startup.  We were
24  opening the building.

Page 19

1    Q.    So the Perryman facility
2  opened around 1998, then?
3    A.    Yes.
4    Q.    How long were you an
5  inventory control partner for?
6    A.    I can't be exact.
7    Q.    Approximately.
8    A.    I don't remember.
9    Q.    What was your next position
10  after an inventory control partner?
11    A.    I believe I went to regional
12  cigarettes.
13    Q.    What was your job title at
14  that point?
15    A.    I don't remember.
16    Q.    And when you say "regional
17  cigarettes," is that the department name,
18  or something else?
19        MR. LAVELLE:  Object to
20  form.
21        THE WITNESS:  Can you repeat
22  that?
23  BY MR. POWERS:
24    Q.    Sure.

Page 20

1        You said you went to go work
2  in regional cigarettes.
3        What do you mean by
4  "regional cigarettes"?  Is that the
5  department?  Is that the unit?  What is
6  it -- how does that fit into the
7  organizational structure?
8    A.    Regional --
9        MR. LAVELLE:  Object to
10  form.
11        THE WITNESS:  Okay.  It's a
12  department within Perryman.
13  BY MR. POWERS:
14    Q.    And when you were an
15  inventory control partner before that,
16  was that in a separate department?
17    A.    Yes.
18    Q.    What department was that in?
19    A.    Inventory control.
20    Q.    When you were in the
21  regional cigarettes department, what were
22  your job responsibilities?
23    A.    Supervising the personnel,
24  making a schedule.

Page 21

1    Q.    What were the personnel you
2  were supervising doing?
3    A.    They were picking and
4  stamping and packing cigarettes.
5    Q.    Anything else besides
6  supervising them and making a schedule
7  that you did while you worked in the
8  regional cigarettes department?
9    A.    We would inventory.
10    Q.    Anything else?
11    A.    I don't remember.
12    Q.    How long did you work in the
13  regional cigarettes department?
14    A.    I don't remember.
15    Q.    What did you do after the
16  regional cigarettes department?
17    A.    I went into Rx.
18    Q.    And when you say "Rx," is
19  that shorthand for pharmacy department?
20    A.    Yes.
21    Q.    And is that a separate
22  department from the inventory control and
23  regional cigarettes departments?
24    A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1     Q.   Do you remember when you
2 started in the Rx department?
3     A.   No.
4     Q.   Even if you don't remember
5 exactly, do you have an approximation
6 about when you started in the Rx
7 department?
8     A.   It could have been around
9 2000.
10     Q.   But it's safe to say that
11 you've been working in the Rx department
12 long -- never mind. Scratch that.
13      And did you stay in the Rx
14 department from around 2000 until when
15 you left Rite Aid in 2014?
16     A.   No.
17     Q.   Where did you move after the
18 Rx department?
19     A.   For a time in there, I moved
20 over to what was called the replenishment
21 department.
22     Q.   And when did you do that?
23     A.   I don't remember.
24     Q.   Approximately when did you

Page 23

1 move over to the replenishment
2 department?
3     A.   2007 or '08.
4     Q.   And do you know how long you
5 stayed in the replenishment department
6 for?
7     A.   Not really.
8     Q.   Can you approximate how long
9 you stayed in the replenishment
10 department?
11     A.   If I guess, it might have
12 been about a year.
13     Q.   So you would have been in
14 the replenishment department from about
15 2007 or 2008, and then you left around
16 2008 to 2009, something like that?
17     A.   I don't remember.
18     Q.   And after the replenishment
19 department, where did you go next?
20     A.   I went back into Rx, the
21 pharmacy department.
22     Q.   And when you went back to
23 the Rx department after being in the
24 replenishment department, is that where

Page 24

1 you stayed until 2014?
2     A.   Yes.
3     Q.   Going back to your first
4 time in the pharmacy department
5 between -- around 2000 to 2007, what was
6 your job title?
7     A.   When I first went in, I went
8 in as assistant manager in the controlled
9 drug cage.
10     Q.   Did you have any other
11 titles during that 2000 to 2007 time
12 frame?
13     A.   Can you repeat that?
14     Q.   Sure.
15      When you were in the
16 pharmacy department the first time,
17 between approximately 2000 to 2007, did
18 you have any other titles besides
19 assistant manager of the controlled drug
20 cage?
21     A.   Yes.
22     Q.   What were those titles?
23     A.   DEA coordinator.
24     Q.   Anything else?

Page 25

1     A.   Department manager.
2     Q.   Anything else?
3     A.   When I stepped down from
4 being department manager, I was -- I went
5 down to the lead level, supervisor level,
6 which is the DEA coordinator level.
7     Q.   Just so I have the sequence
8 correct here.
9      So you started in the
10 pharmacy department as an assistant
11 manager of the controlled drug cage.
12 Then you moved to the DEA coordinator
13 position. Then department manager. And
14 then you stepped back down to the DEA
15 coordinator.
16      Do I have that sequence
17 correct?
18     A.   No.
19     Q.   Okay. Can you correct me?
20     A.   From department manager, I
21 stepped down into a lead-type position in
22 the cage until I went into replenishment.
23     Q.   When you say "lead type," I
24 thought you said that that's sort of like

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1  a DEA coordinator.
2      A.   It's a lead, it would be the
3  level, it's not a -- the DEA coordinator
4  didn't really have a level.  But when I
5  stepped down, I stepped down to the -- to
6  an hourly, that's probably more
7  appropriate.
8      Q.   So the department manager
9  would be above the DEA coordinator
10 position?
11     A.   Yes.
12     Q.   And the DEA coordinator
13 position would be qualified as a lead
14 position?
15     A.   The best that I can
16 remember.
17     Q.   And those lead level
18 positions, those are all hourly
19 positions; is that right?
20     A.   I want to correct something.
21     Q.   Sure.
22     A.   The coordinator, when I was
23 there, it was assistant manager level,
24 because I was assistant manager.

Page 27

1      Once I left, it was taken by
2  a lead level, which is hourly.
3      Q.   Is assistant manager level
4  higher than a lead --
5      A.   Yes.
6      Q.   -- level?
7      MR. LAVELLE:  Wait until the
8      question is finished before you
9      answer the question.
10     THE WITNESS:  Sorry.
11     MR. LAVELLE:  No problem.
12     MR. POWERS:  It's okay.
13     Just so we're clear.  I know you
14     can anticipate, like a normal
15     conversation, you would -- that
16     would be fine.  But just here, let
17     me finish my question completely,
18     and then you can answer.
19 BY MR. POWERS:
20     Q.   How come you left the
21 pharmacy department to go to the
22 replenishment department?
23     A.   An opening came up, and I
24 wanted to take it.

Page 28

1      Q.   So it was your decision to
2  move from the pharmacy department to the
3  replenishment department?
4      A.   Yes.
5      Q.   What did you do in the
6  replenishment department?
7      A.   I did clerical work.
8      Q.   And what was your title
9  while you were in the replenishment
10 department?
11     A.   I don't remember.
12     Q.   Did you have multiple titles
13 while you were in the replenishment
14 department?
15     A.   I don't remember.
16     Q.   But you were only there, in
17 the replenishment department, for about a
18 year-ish, you said?
19     A.   About.
20     Q.   How come you left the
21 replenishment department and went back to
22 the pharmacy department?
23     A.   The opening came back up for
24 a DEA coordinator.

Page 29

1      Q.   So when you went back to the
2  pharmacy department after being in the
3  replenishment department, you came back
4  as a DEA coordinator; is that right?
5      A.   I believe so.
6      Q.   Did you have any other
7  titles between when you came back to the
8  pharmacy department and when you left
9  Rite Aid in 2014, besides DEA
10 coordinator?
11     A.   Can you repeat that?
12     Q.   Sure.
13     When you were in the
14 pharmacy department after you were in the
15 replenishment department, did you have
16 any other titles besides DEA coordinator?
17     A.   Not that I recall.
18     Q.   So you were a DEA
19 coordinator the entire time that you were
20 in the pharmacy department, after being
21 in the replenishment department?
22     A.   Yes.
23     Q.   What were your job
24 responsibilities as a DEA coordinator

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1  during that time frame?
2      A.   To oversee people, some
3  training, recordkeeping.
4      Q.   So you said "oversee people,
5  some training, and recordkeeping."
6          Anything else?
7      A.   Inventories.
8      Q.   Anything else?
9      A.   Communications.  Helping out
10 in the cage when needed.
11         That's all I can remember
12 right now.
13     Q.   You said you had the
14 position of DEA coordinator.
15         Are there more than one DEA
16 coordinator?
17         MR. LAVELLE:  Object to
18     form.
19         THE WITNESS:  I don't
20     understand.
21 BY MR. POWERS:
22     Q.   Are there multiple DEA
23 coordinators at the Rite Aid facility in
24 Perryman?

Page 31

1      A.   We had a security version of
2  DEA coordinator who would handle all the
3  cameras and security, audits.
4      Q.   What was the title of that
5  position?
6      A.   I believe it was security
7  DEA coordinator.
8      Q.   Who held that position?
9      A.   The only one that I can
10 recall is Larry Ringgold.
11     Q.   My question, though, is,
12 besides yourself, were there any other
13 DEA coordinators at Perryman?
14         MR. LAVELLE:  Object to the
15     form.  Objection.  Asked and
16     answered.
17         THE WITNESS:  I'm confused.
18 BY MR. POWERS:
19     Q.   Sure.
20         Did anyone else have the
21 same title as you?  Were there multiple
22 DEA coordinators?
23     A.   There was others, yes.
24     Q.   Who were those DEA

Page 32

1  coordinators?
2      A.   It was Debra Chase.
3      Q.   Anyone else?
4      A.   I don't think so.
5      Q.   How about from when you were
6  in the pharmacy department before you
7  went to the replenishment department,
8  were there other DEA coordinators at that
9  time period?
10     A.   Not that I recall.
11     Q.   How about when you became
12 department manager, who was the DEA
13 coordinator at that point?
14     A.   That was Debra Chase.
15     Q.   So besides yourself and
16 Debra Chase, was there anyone else that
17 ever held the position of DEA coordinator
18 at the Perryman facility, to the best of
19 your knowledge?
20     A.   That's all I can remember.
21     Q.   Who was your department
22 manager when you were in the pharmacy
23 department?
24     A.   One of them was Clint.  I

Page 33

1  can't remember his last name.
2      Q.   Anybody else?
3      A.   I believe so, I just can't
4  remember right now.
5      Q.   And am I correct that as a
6  DEA coordinator, you would have been
7  reporting to the department manager?
8      A.   Yes, at times.
9      Q.   Who else would you report
10 to?
11     A.   The GM, general manager.
12     Q.   Who was the GM while you
13 were a DEA coordinator?
14     A.   There were several.  Gary
15 Kanopka.
16     Q.   I've got to ask you your
17 best attempt at spelling his last name.
18     A.   K-O-N-O-P-K-A.
19     Q.   Besides Gary Konopka, who
20 else?
21     A.   Oh, my gosh.  I can remember
22 a couple, but I can't say positive it was
23 when I was in pharmacy, because we went
24 through several.

Page 34

1    Q.   Who were the other ones you
2 remember?
3    A.   Steve Lawrence.
4    Q.   Anyone else?
5    A.   Tim Peifley.
6    Q.   And do you know how to spell
7 Peifley?
8    A.   P-E-I-F-L-E-Y, I think.
9    Q.   Any other GMs?
10    A.   I believe there was, I just
11 don't remember.
12    Q.   So besides the department
13 managers and the general managers, was
14 there anyone else you would have reported
15 to as the DEA coordinator?
16    A.   The ops manager.
17    Q.   Who were the ops managers
18 you remember?
19    A.   There was Keith Frost.  I
20 know I had Robyn Stasney at one time, I
21 just don't remember when.
22    Q.   I'm sorry, what's the
23 spelling of Robyn's last name?
24    A.   S-T-A -- S-T-A-S-N-E-Y --

Page 35

1 N-Y.  I'm sorry, I'm not sure.
2    Q.   That's fine.  It's not a
3 spelling test.
4         Anyone else who was an ops
5 manager besides Frost and Stasney?
6    A.   I don't remember.
7    Q.   Besides the department
8 managers, the GMs and the ops managers,
9 anyone else you would have reported to as
10 a DEA coordinator?
11    A.   Kevin Mitchell.
12    Q.   What was Kevin Mitchell's
13 position?
14    A.   He was the regulatory
15 compliance manager.
16    Q.   Anyone else who was a
17 regulatory compliance manager?
18    A.   There was -- I'm not sure of
19 the titles, but I believe there was a
20 Chris Belli.
21         That's all I remember right
22 now.
23    Q.   Besides everyone we've
24 talked about so far, anyone else that you

Page 36

1 reported to as a DEA compliance manager?
2    A.   There might have been.  I
3 just don't remember right off.
4    Q.   Even if you don't remember
5 the name, how about the general position
6 name that you would have reported to?
7    A.   I don't remember.
8    Q.   Did you report to the
9 Government Affairs Office at all?
10    A.   At times, yes.
11    Q.   Were they your -- would you
12 consider them your supervisors?
13    A.   I'm confused.
14    Q.   Okay.  I'm just trying to
15 figure out the chain of command.
16         So did you report to the
17 Government Affairs Office or just deal
18 with the Government Affairs Office?  Do
19 you understand the distinction?
20    A.   I --
21         MR. LAVELLE:  Object to
22 form.
23         THE WITNESS:  Repeat it one
24 more time.

Page 37

1 BY MR. POWERS:
2    Q.   Sure.
3         You're familiar with the
4 Government Affairs Office, right?
5    A.   Yes.
6    Q.   Would you consider them your
7 supervisors?
8    A.   I don't think I did, no.
9    Q.   But you did deal with people
10 from the Government Affairs Office; is
11 that right?
12    A.   Yes.  Yes.
13    Q.   Who did you deal with from
14 the Government Affairs Office?
15    A.   The only one I can remember
16 right now is Janet Hart.
17    Q.   Okay.  I want to go back to
18 your job duties as a DEA coordinator.
19         How were you trained for
20 your job as a DEA coordinator?
21    A.   Kevin Mitchell and I would
22 read through the CFR, the DEA regulatory
23 compliance.  That's all I remember right
24 now.

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1    Q.    Did anyone else train you
2  besides Kevin Mitchell?
3    A.    We would have an outside
4  agency come in and give us guidance.
5    Q.    Who was that outside agency?
6    A.    Buzzeo.
7    Q.    I'll talk about that in a
8  second.
9          Going back to your training
10  with Kevin Mitchell, you said you read
11  the CFR and you looked at DEA regulatory
12  compliance, right?
13    A.    Yes.
14    Q.    Anything else?
15          MR. LAVELLE:  Objection.
16  Asked and answered.
17          THE WITNESS:  I don't
18  remember.
19  BY MR. POWERS:
20    Q.    Were there any formal Rite
21  Aid training materials that you received
22  to train you as a DEA coordinator?
23    A.    We had -- we had a manual.
24  We had the regulatory compliance.

Page 39

1          I don't remember.
2    Q.    You mentioned a manual.
3  What was -- do you remember the name of
4  that manual?  Did it have a name?
5          MR. LAVELLE:  Object to
6  form.
7          THE WITNESS:  Did it have a
8  name?  I don't remember.
9  BY MR. POWERS:
10    Q.    Was that a hardcopy manual?
11    A.    Yes.
12    Q.    You mentioned an outside
13  agency that came in and trained you.
14  When did that occur?
15    A.    They didn't train me, they
16  were a training tool.
17    Q.    Okay.  Can you explain the
18  distinction there?
19    A.    They would -- they came in
20  and audited us and would give us guidance
21  in any area that we might need it.
22    Q.    How often did Buzzeo come in
23  and audit you?
24    A.    I'm not sure.

Page 40

1    Q.    More or less than ten times?
2    A.    I believe it was less than
3  ten times.
4    Q.    More or less than five
5  times?
6    A.    I believe it was less than
7  five times.
8    Q.    And they -- when Buzzeo came
9  and, you said, audited you, was that
10  while you were a part of the pharmacy
11  department?
12    A.    Yes.
13    Q.    Was it part -- was it when
14  you were part of the pharmacy department
15  after being in the replenishment
16  department?
17    A.    No.
18    Q.    It was before you went to
19  the replenishment department when Buzzeo
20  came and audited you?
21    A.    Yes.
22    Q.    Did Buzzeo ever come after
23  you left the replenishment department and
24  went back to the pharmacy department?

Page 41

1          MR. LAVELLE:  Object to
2  form.
3          THE WITNESS:  Can you repeat
4  that?
5  BY MR. POWERS:
6    Q.    Sure.  Maybe it will be
7  helpful to clarify.
8          You were in the pharmacy
9  department in two different time periods,
10  right?
11    A.    Yes.
12    Q.    So you were in the pharmacy
13  department before you went to the
14  replenishment department, and then you
15  were in the pharmacy department after you
16  left the replenishment department, right?
17    A.    Yes.
18    Q.    So can we agree that we can
19  refer to the time period when you were in
20  the pharmacy department before you went
21  to the replenishment department as your
22  first time in the pharmacy department?
23          Is that okay?
24    A.    Yes.

Page 42

```
1    Q.   And then we can refer to the
2  time you were in the pharmacy department
3  after you left the replenishment
4  department as your second time in the
5  pharmacy department.
6         Is that okay?
7    A.   Yes.
8    Q.   Okay.  So just so we're
9  clear, when Buzzeo came and audited you,
10 that was during your first time in the
11 pharmacy department; is that right?
12   A.   Yes.
13   Q.   Did they ever -- did Buzzeo
14 ever come and audit the pharmacy
15 department during your second time in the
16 pharmacy department?
17   A.   I don't recall.
18   Q.   You don't recall them ever
19 coming during that second time in the
20 pharmacy department?
21        MR. LAVELLE:  Object to
22   form.  Objection.  Asked and
23   answered.
24        THE WITNESS:  I don't
```

Page 43

```
1    recall.
2  BY MR. POWERS:
3    Q.   And when Buzzeo came, was
4  that physically that Buzzeo came to the
5  Perryman facility?
6    A.   Yes.
7    Q.   Do you know who came, as
8  part of the Buzzeo team, to the Perryman
9  facility?
10   A.   The first time that I recall
11 it was Ron Buzzeo.
12   Q.   Anyone else besides Ron
13 Buzzeo?
14   A.   I don't remember.
15   Q.   What kind of things did Ron
16 Buzzeo do with you during that audit?
17   A.   He did an audit of what a
18 DEA audit would be.
19   Q.   Was it sort of a practice
20 DEA audit?
21        MR. LAVELLE:  Object to
22   form.
23        THE WITNESS:  Repeat that.
24 BY MR. POWERS:
```

Page 44

```
1    Q.   Sure.
2         When Ron Buzzeo did his
3  audit, was it to prepare Rite Aid for an
4  actual DEA audit?
5    A.   Okay, I'm confused.
6         When he came, he came to
7  audit us and help us see if we needed to
8  work on anything.
9    Q.   And was the purpose of the
10 audit to prepare the Perryman facility
11 for a DEA audit?
12   A.   No, it was to make sure we
13 were prepared.
14   Q.   Prepared for a DEA audit?
15   A.   Yes.
16   Q.   Okay.  And when Ron Buzzeo
17 came and did this audit, did he give you
18 any written materials?
19   A.   I don't remember.
20   Q.   Do you know if he prepared
21 any written materials generally?
22   A.   I don't remember.
23   Q.   Do you know if anyone at
24 Rite Aid got any written materials from
```

Page 45

```
1  Ron Buzzeo as a result of that audit?
2    A.   I think Kevin might have --
3  might have sent out a Sysm or something.
4  That's the only thing I can think of.
5    Q.   I'm sorry, you said might
6  have sent out a Sysm.
7         What is that?
8    A.   An e-mail type -- it's --
9  SYSMs are kind of like e-mails for the
10 system.
11   Q.   And is that S-Y-S-M?
12   A.   Yes.
13   Q.   And was that a separate
14 system from your e-mail system at Rite
15 Aid?
16   A.   Yes.
17   Q.   How is it different?
18   A.   I don't know.
19   Q.   Would you use the Sysm for
20 different things than you did use e-mail
21 for?
22   A.   I believe we used the Sysm
23 first, and then we went -- I don't
24 remember.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1 Q. Did the Sysm and e-mail
2 exist at the same time period?
3 A. I don't remember.
4 Q. Could you e-mail -- strike
5 that.
6 Could you use the Sysm to
7 contact people outside of Rite Aid?
8 A. I'm confused.
9 Q. Sure.
10 A. No. You could only use it
11 to contact people within the system.
12 Q. So Sysm was a Rite Aid
13 internal system?
14 A. I believe, yes.
15 Q. Did you have a different
16 e-mail address from, for lack of a better
17 term, a Sysm address?
18 MR. LAVELLE: Object to
19 form.
20 THE WITNESS: I don't
21 remember.
22 BY MR. POWERS:
23 Q. Do you remember when Rite
24 Aid stopped using Sysm?

Page 47

1 A. No.
2 Q. Do you remember if it was
3 before your second time in the pharmacy
4 department?
5 A. I don't remember.
6 Q. Was Rite Aid still using
7 Sysm when you left in 2014?
8 A. I don't remember.
9 Q. And you stated that the
10 Buzzeo company may have come multiple
11 times to audit the Perryman facility.
12 Do you know, during any one
13 of those times, did Buzzeo give any
14 written materials to anyone at Rite Aid?
15 A. I don't remember.
16 Q. Did you personally ever get
17 any written materials as a result of one
18 of these Buzzeo audits?
19 A. I don't remember.
20 Q. Who would have gotten
21 written materials from a Buzzeo audit?
22 MR. LAVELLE: Object to
23 form.
24 THE WITNESS: I don't --

Page 48

1 BY MR. POWERS:
2 Q. Do you remember if there was
3 any meetings or phone calls to discuss
4 the results of the Buzzeo audits?
5 A. I know there was discussion.
6 I just can't tell you when, who.
7 Q. Who would have been involved
8 in those discussions?
9 A. Well, I know Kevin Mitchell
10 would.
11 Q. Anyone else you can think
12 of?
13 A. I'm not sure.
14 Q. And we've been talking about
15 the Buzzeo company doing these audits. I
16 think you first mentioned them in the
17 context of training.
18 Are you saying that the
19 audits are the same thing as the
20 training?
21 A. When he first came in, it
22 was a guide, used as a guide to me; it
23 was a type of training to see, you know,
24 what to expect, what we need to do.

Page 49

1 So, yes, I guess you could
2 consider it a type of training. But it
3 wasn't -- it wasn't, like, directly
4 teaching me. It was just more like
5 guidance.
6 Q. Besides the audits, was
7 there any separate training that Buzzeo
8 did during your time at Rite Aid?
9 A. We went to Buzzeo
10 conferences. I could not tell you when.
11 I know I went to at least two.
12 Q. You said "we went to Buzzeo
13 conferences."
14 Who are you referring to
15 when you said "we"?
16 A. Other people from Rite Aid,
17 Kevin Mitchell, being one. I can't
18 remember, but I believe Barbara from
19 California went, the DEA coordinator in
20 California.
21 That's all I can remember.
22 Q. Do you remember Barbara's
23 last name?
24 A. Barbara -- Barbara -- no.

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1    Q.   If I said Lusaro, does that
2  sound --
3    A.   Yes.
4    Q.   -- familiar?
5        MR. LAVELLE:  Just wait
6    until the -- the question is
7    finished before you answer.
8        THE WITNESS:  Sorry.
9        MR. LAVELLE:  That's okay.
10   We just need to make sure the
11   record is clear.
12 BY MR. POWERS:
13   Q.   So I'll ask that again.
14       The Barbara that went with
15 you to the Buzzeo conferences, was that
16 Barbara Lusaro?
17   A.   I remember her being at at
18 least one.
19   Q.   But her name was Barbara
20 Lusaro?
21   A.   I believe.
22   Q.   Do you know if you went to
23 those Buzzeo conferences during your
24 first time in the pharmacy department?

Page 51

1    A.   I believe I went to at least
2  one of them, yes.
3    Q.   Did you go to a Buzzeo
4  conference during your second time in the
5  pharmacy department?
6    A.   I believe I went to one.
7    Q.   Do you know where that
8  Buzzeo conference was?
9    A.   The first one was in Crystal
10 City.  The second one was in -- it was
11 the National Harbor.
12   Q.   And that's National Harbor
13 in Maryland, outside of DC?
14   A.   Yes.
15   Q.   Did any other DEA
16 coordinators go to those Buzzeo
17 conferences?
18   A.   I remember Barbara being at
19 one.  That's all I remember.
20   Q.   How about Kimberly Birklin,
21 did she ever go to a Buzzeo conference?
22   A.   I can't remember.
23   Q.   Besides the Buzzeo audits
24 and the Buzzeo conferences, anything else

Page 52

1  that Buzzeo did with you while at the --
2  you were at Rite Aid?
3    A.   I believe they came in at a
4  time to help format specific procedures
5  for VAWD verification.
6    Q.   Do you remember when that
7  was?
8    A.   No.
9    Q.   Was that during your first
10 time in the Rx department or your second
11 time in the Rx department?
12   A.   I don't remember.
13   Q.   And when you say format
14 procedures for log verification, can you
15 explain what you mean by that?
16   A.   VAWD is a verified
17 accredited wholesale certification, and
18 they wanted our procedures in a specific
19 format.  And so we thought we would bring
20 Ron in and --
21   Q.   I'm sorry, I think I
22 misheard you before.
23       You said "VAWD"
24 verification, not "log" verification; is

Page 53

1  that correct?
2    A.   VAWD.
3    Q.   V-A-W-D?
4    A.   Yes.
5    Q.   So the Buzzeo firm helped
6  you format procedures for VAWD
7  verification?
8    A.   Yes.
9    Q.   And were written materials
10 generated as part of that interaction
11 with Buzzeo?
12   A.   Yes.  I believe they came up
13 with -- using our procedures, came up
14 with the formatted -- a formatted
15 version.
16   Q.   And when you say "formatted
17 version," what do you mean by that?
18   A.   The way it's -- the way it's
19 put into the book, the way it's
20 paragraphed and headings and numbers, and
21 the way it's formatted.
22   Q.   Is the way that the written
23 document is formatted important for the
24 VAWD certification?

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1  A.  I believe it was important
2 to VAWD.
3  Q.  Did Buzzeo give you
4 substantive feedback on what the actual
5 document should say?
6  A.  I don't recall that.
7  Q.  So was Buzzeo there just to
8 help with the technical formatting of the
9 actual document?
10  MR. LAVELLE:  Object to
11 form.
12  THE WITNESS:  Can you repeat
13 that?
14 BY MR. POWERS:
15  Q.  Sure.
16  Was Buzzeo's role in helping
17 for the VAWD certification just to help
18 you format and put numbers and paragraphs
19 on the document?
20  A.  Okay, I'm confused.
21  Can you repeat that one more
22 time?
23  Q.  Sure.
24  So when Buzzeo came in to

Page 55

1 help you with the VAWD verification -- is
2 it verification or certification?
3  A.  It was certification.
4  But it wasn't Buzzeo, it was
5 one of his employees.
6  Q.  So when I say "Buzzeo" here,
7 I just mean the Buzzeo company.
8  Is that what it was called
9 at that point?
10  A.  Yes.
11  Q.  So someone from the Buzzeo
12 company came in and helped with the VAWD
13 certification; is that right?
14  A.  They helped format the
15 manual.
16  Q.  And what manual was that?
17  A.  The VAWD manual.
18  Q.  And is the VAWD manual a
19 Rite Aid document?
20  A.  Yes.
21  Q.  And when you say they
22 "helped format the VAWD manual," what do
23 you mean by that?
24  A.  They helped put it in a

Page 56

1 format that VAWD wanted to see it in.
2  Q.  And when you say "put it in
3 a format that VAWD wanted to see it in,"
4 are you talking about just things like
5 putting in page numbers and numbering
6 paragraphs and maybe changing fonts, or
7 are you talking about something more
8 substantive?
9  MR. LAVELLE:  Object to
10 form.
11  THE WITNESS:  From what I
12 can remember, it was they just --
13 they wanted a specific form, and
14 that's what I can remember.
15 BY MR. POWERS:
16  Q.  But my question is, did the
17 Buzzeo company provide any substantive
18 feedback on what should be in that VAWD
19 manual, besides the formatting of it?
20  MR. LAVELLE:  Object to
21 form.  Objection.  Asked and
22 answered.
23  THE WITNESS:  I don't
24 remember.

Page 57

1 BY MR. POWERS:
2  Q.  Besides the Buzzeo audits,
3 the Buzzeo conferences and the assistance
4 with the VAWD verification, did Buzzeo's
5 company ever do anything else for Rite
6 Aid?
7  A.  I don't remember.
8  Q.  I want to go back to the
9 Buzzeo conferences for a second.
10  Did you ever receive any
11 written materials as a result of
12 attending one of those conferences?
13  A.  I believe I did.
14  Q.  And what did you do with
15 that written material?
16  A.  I probably would have kept
17 it in my office so that anyone could see
18 it.
19  Q.  Did you receive that written
20 material in hardcopy form?
21  A.  I believe so.
22  Q.  Do you know if you received
23 it in electronic form?
24  A.  I don't remember.

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1    Q.   What kind of materials did
2  you receive from the Buzzeo conferences?
3    A.   They were just like little
4  pamphlets or flyer-type things.
5    Q.   And you said you kept those
6  in your office so anyone can see them.
7         Do you know if anyone ever
8  came in and referenced those materials?
9    A.   I want to clarify, it wasn't
10 a lot.  It was just a few flyers and
11 things.
12        I don't recall who all would
13 have seen them.
14   Q.   Did you ever talk to anyone
15 about what you learned at those Buzzeo
16 conferences?
17   A.   Yes.
18   Q.   Who?
19   A.   Whoever my manager was at
20 the time.
21   Q.   Do you remember who the
22 manager was you talked to about the
23 Buzzeo conferences?
24   A.   No.

Page 59

1    Q.   When you say "manager,"
2  would that have been the general manager
3  or the department manager?
4         MR. LAVELLE:  Object to
5    form.
6  BY MR. POWERS:
7    Q.   Or someone else?
8         MR. LAVELLE:  Same
9    objection.
10        THE WITNESS:  Can you repeat
11   that?
12 BY MR. POWERS:
13   Q.   You said you would talk to
14 whoever your manager was at the time
15 about the Buzzeo conferences you went to,
16 right?
17   A.   Yes.
18   Q.   I'm just trying to figure
19 out what manager you're talking about.
20        Who would be the manager you
21 talked to?
22   A.   I don't recall.
23   Q.   And when you say "manager,"
24 do you mean department manager?  General

Page 60

1  manager?  Regulatory compliance manager?
2  Which manager?
3         MR. LAVELLE:  Object to
4    form.
5         THE WITNESS:  I don't
6    remember the specific manager.
7  BY MR. POWERS:
8    Q.   Do you remember talking to
9  anyone besides your manager about those
10 Buzzeo conferences?
11   A.   I don't remember.
12   Q.   But it's safe to say you
13 didn't come back and hold some sort of
14 discussion with the staff about what you
15 learned at the Buzzeo conferences?
16        MR. LAVELLE:  Object to
17   form.
18        THE WITNESS:  If I learned
19   anything that was different or
20   new, I would have -- I believe I
21   would have shared it with the
22   employees and my manager.
23 BY MR. POWERS:
24   Q.   And when you say "the

Page 61

1  employees," who would -- who would that
2  have been?
3    A.   The employees in the
4  controlled drug cage.
5    Q.   How would you have shared
6  that information with them?
7    A.   Probably in the morning
8  meeting.
9    Q.   What are morning meetings?
10   A.   To go over anything we
11 needed to let them know, anything that
12 was going on.
13   Q.   Did you have a morning
14 meeting every morning?
15   A.   I don't remember.
16   Q.   Was there any regular
17 schedule that the morning meetings
18 happened on?
19   A.   I don't remember.
20   Q.   Who would attend the morning
21 meetings?
22   A.   The employees.
23   Q.   When you say "the
24 employees," you mean the controlled cage

Page 62

1 employees, or all the employees?
2     MR. LAVELLE:  Object to
3 form.
4     THE WITNESS:  The control --
5 Sorry.
6     MR. LAVELLE:  It's okay.
7     THE WITNESS:  The controlled
8 cage employees.
9 BY MR. POWERS:
10    Q.   Just so I have it clear, the
11 morning meetings were for controlled cage
12 employees only; is that right?
13    A.   The meeting that I would
14 have in the cage, would be for the cage,
15 yes.
16     MR. LAVELLE:  Counsel, we've
17 been going for about an hour, or
18 close to an hour.  Can we take a
19 break when convenient?
20     MR. POWERS:  Yes.  Maybe
21 just a couple more questions, and
22 then we can take a break.
23     MR. LAVELLE:  Okay.  Thank
24 you.

Page 63

1 BY MR. POWERS:
2    Q.   Besides training with Kevin
3 Mitchell and the Buzzeo trainings we've
4 just discussed, did you have any other
5 trainings for your role as DEA
6 coordinator?
7    A.   Other than reading the
8 manuals and the CFR, I don't recall.
9     MR. POWERS:  Okay.  We can
10 take a break now.
11     MR. LAVELLE:  Thank you.
12     VIDEO TECHNICIAN:  The time
13 is now 10:25 a.m.  We are going
14 off the record.
15      - - -
16     (Whereupon, a brief recess
17 was taken.)
18      - - -
19     VIDEO TECHNICIAN:  The time
20 is now 10:42 a.m.  We are back on
21 the record.
22 BY MR. POWERS:
23    Q.   Welcome back, Ms. Wood.
24 Before we took a break, we were

Page 64

1 discussing the Buzzeo conferences.
2     Do you recall that?
3    A.   Yes.
4    Q.   What was discussed at those
5 Buzzeo conferences you went to?
6    A.   I don't remember everything.
7    Q.   To the best of your
8 recollection, what was discussed?
9     MR. ZHOU:  Can someone
10 unmute the line?
11     MR. POWERS:  Sorry
12 about that.  Can you hear us now?
13     MR. ZHOU:  Yes, we can hear
14 you now.
15 BY MR. POWERS:
16    Q.   So before we got interrupted
17 there, to the best of your recollection,
18 what was discussed at the Buzzeo
19 conferences you attended?
20    A.   I'm drawing a blank.
21    Q.   Do you remember anything at
22 all?
23    A.   Not right this minute, no.
24    Q.   At the Buzzeo conferences

Page 65

1 you attended, were suspicious order
2 monitoring programs discussed?
3    A.   I couldn't swear to it.
4    Q.   What do you mean by you
5 "couldn't swear to it"?
6    A.   I really don't remember
7 every -- I don't remember what all was
8 discussed.
9    Q.   We talked a little bit about
10 who you talked with at the distribution
11 center about your time at the Buzzeo
12 conferences, right?
13    A.   Yes.
14    Q.   Did you ever discuss the
15 Buzzeo conferences with anyone outside of
16 the distribution center?
17    A.   I would have probably talked
18 to Kevin, but -- if he didn't go.  But I
19 believe he was there.
20    Q.   Anyone else besides Kevin
21 you would have talked to about them?
22     MR. LAVELLE:  Object to
23 form.
24     THE WITNESS:  I don't

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1  remember.
2  BY MR. POWERS:
3  Q.   How about other distribution
4  center employees, did you ever talk to
5  them about what happened at the Buzzeo
6  conferences?
7  A.   I don't remember.
8  Q.   I've been using the word
9  "talk."
10  When I say "talk," I mean
11  communicate in any way, whether it's
12  phone, e-mail, anything.
13  Is your answer the same?
14  A.   I don't --
15  MR. LAVELLE:  Object to
16  form.
17  THE WITNESS:  I don't
18  remember.
19  BY MR. POWERS:
20  Q.   And I realize when we were
21  going through your job history, I didn't
22  ask, after leaving Rite Aid in 2014, what
23  did you do after that?
24  A.   I took about two weeks off,

Page 67

1  and then got a job with another company.
2  Q.   What company was that?
3  A.   MTM Ventures.
4  Q.   What does MTM Ventures do?
5  A.   It's a trucking company.
6  Q.   How long did you work at MTM
7  Ventures for?
8  A.   I'm currently there.
9  Q.   Why did you leave Rite Aid
10  in 2014?
11  A.   My -- they were closing the
12  pharmacy for distribution, and my
13  position was going away.
14  Q.   Did you ever try to get
15  another position at Rite Aid not in the
16  pharmacy department?
17  A.   No.
18  MR. POWERS:  So as I told
19  Mr. Lavelle before the deposition
20  started, we had some issues with
21  our documents.  So these are
22  actually double-sided copies, most
23  of them are double-sided copies
24  from our own binders, and we don't

Page 68

1  have, other than for the witness,
2  additional hardcopy documents.
3  We can work out with counsel
4  about how we want to put the
5  documents in the final record.
6  But for now, and if it's all right
7  with Mr. Lavelle, I'm just going
8  to hand the witness a hardcopy
9  version, but it has three-hole
10  punches from our own binder.  It's
11  no different than what was in the
12  database itself.
13  Is that okay?
14  MR. LAVELLE:  Yes, that's
15  fine, as long as I can look at the
16  document along with the witness.
17  MR. POWERS:  Right.  And
18  we'll have it up on the screen as
19  well for other counsel at the
20  table,  so they can -- so everyone
21  can be on the same page with the
22  exhibits.
23  MR. LAVELLE:  And as we have
24  done in a couple of other

Page 69

1  depositions where we had some
2  document production issues, we can
3  confer after the deposition on
4  getting an agreed-upon set of
5  exhibits substituted in to attach
6  to the transcript.
7  MR. POWERS:  Yes, that's
8  fine.
9  BY MR. POWERS:
10  Q.   Ms. Wood, I'm going to hand
11  you what's been marked as Wood Exhibit-1.
12  It is a printout of a spreadsheet with
13  the Bates number Rite_Aid_OMDL_0013471.
14  Why don't you take a minute
15  and look at that document?
16  - - -
17  (Whereupon, Rite Aid-Wood
18  Exhibit-1, Rite_Aid_OMDL_0013471,
19  was marked for identification.)
20  - - -
21  BY MR. POWERS:
22  Q.   And I'll tell you right now,
23  it's somewhat -- it's somewhat long.  So
24  I'm just going to ask you a couple of

Page 70

1 questions about specific parts of it.
2 So, hopefully, that will
3 help you review it more quickly.
4 MR. LAVELLE: The print is
5 small, so --
6 THE WITNESS: It is.
7 MR. LAVELLE: -- if you have
8 trouble seeing the print --
9 MR. POWERS: If you look at
10 it on the screen, it might be a
11 little bit more easy to read.
12 MR. LAVELLE: But just take
13 a look at the document and when
14 you've had a chance to eyeball it
15 all, you can tell him that you're
16 ready to answer questions about
17 it.
18 BY MR. POWERS:
19 Q. Do you know what this
20 document is in Exhibit-1?
21 A. Yes.
22 Q. What is the document?
23 A. It's the government agency
24 correspondence.

Page 71

1 Q. What does the document
2 reflect?
3 A. It reflects communications
4 to us or to government agencies.
5 Q. And would this sort of
6 government agency correspondence log
7 reflect all communications that the
8 Perryman distribution center had with
9 government agencies?
10 A. I believe so.
11 Q. And it looks like, on the
12 first page of Exhibit-1, it has a column
13 there that says, Person making contact,
14 over on the left.
15 Do you see that?
16 A. Yes.
17 Q. And it looks like your name
18 appears in that column, right?
19 A. Yes.
20 Q. Does that column represent
21 the person who spoke with the government
22 agency?
23 A. Not necessarily.
24 Q. Can you explain what that

Page 72

1 column is, then?
2 A. That is saying who -- it
3 wasn't necessarily a conversation. In
4 this case, it was a fax, it was a person
5 sending a fax.
6 Q. But the person making
7 contact column would represent the person
8 who initiates the particular contact; is
9 that right?
10 A. Yes.
11 Q. And that could be either
12 someone from Rite Aid or it can be
13 someone from a government agency, right?
14 A. Yes.
15 Q. Could it be anyone else in
16 that column?
17 A. I'm not sure.
18 Q. And then it looks like
19 there's a reason/result column.
20 Do you see that?
21 A. Yes.
22 Q. What does that column show?
23 A. That's the reason for the
24 contact.

Page 73

1 Q. And then the person
2 contacted column, I take that to be the
3 person who was being contacted by either
4 someone from Rite Aid or someone from the
5 government agency; is that right?
6 A. Yes.
7 Q. Where is this log kept at
8 the distribution center?
9 A. It was kept -- to the best
10 of my knowledge, it was kept in the DEA
11 office.
12 Q. Where is the DEA office?
13 A. It was on the mezzanine
14 level.
15 Q. But that would have been at
16 the Perryman distribution center?
17 A. Yes.
18 Q. And was this kept in
19 electronic form?
20 A. Yes. But it doesn't mean it
21 couldn't have possibly been a
22 handwritten.
23 Q. Okay. Can you explain that
24 to me?

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    A.   Something could have been
2  handwritten on it, on the log.
3    Q.   So there was a copy that
4  existed in hardcopy as well?
5    A.   I'm trying to remember.
6       I believe that it was put in
7  electronic form.
8    Q.   So was there a hardcopy that
9  then was transcribed into an electronic
10 form and that's how it was kept?
11      MR. LAVELLE:  Object to
12    form.
13      THE WITNESS:  I'm trying to
14    remember.
15      I believe that it was all
16    electronic, and the pages were
17    printed into the binder.  I
18    believe.
19 BY MR. POWERS:
20   Q.   So to the best of your
21 recollection, the entries were made
22 electronically and then those pages were
23 printed out and put in a hardcopy copy of
24 the correspondence, the government

Page 75

1  correspondence log?
2    A.   Yes, that's what I remember.
3    Q.   Who would use this
4  government correspondence log?
5    A.   I would put entries in.
6  Debra Chase would.  I think that's all.
7    Q.   So even if, like on Page 1
8  here, about halfway down, for the date
9  4/4/12, it looks like the name Keith
10 Frost is in the column for person making
11 contact.
12      Do you see that?
13   A.   Yes.
14   Q.   So even though Keith Frost
15 is the person making contact, you would
16 be the one to write in this log?
17   A.   I believe he would give me
18 the information and I would enter it.
19   Q.   So the person in the person
20 making contact column would not
21 necessarily be the one who made the
22 entries into this log; is that right?
23   A.   Not necessarily.
24   Q.   Would anyone ever go back

Page 76

1  and consult this log after the entries
2  were made?
3    A.   I don't remember.
4    Q.   Why did you keep this
5  government agency correspondence log?
6    A.   I believe it's something
7  that we were supposed to maintain.
8    Q.   You said you were supposed
9  to maintain it.
10      Do you know why you were
11 supposed to maintain it?
12   A.   I can't remember.
13   Q.   Do you know what required
14 you to maintain it?
15      MR. LAVELLE:  Object to
16    form.  Objection.  Asked and
17    answered.
18      THE WITNESS:  I can't
19    remember.
20 BY MR. POWERS:
21   Q.   Do you know if it was a DEA
22 regulation that required you to have a
23 log like this?
24   A.   I can't remember.

Page 77

1    Q.   Do you know if it was a Rite
2  Aid policy that you had to have a log
3  like this?
4    A.   I can't remember.
5    Q.   And was this kept up until
6  the time you left Rite Aid in 2014?
7    A.   I believe so.
8    Q.   Would records of DEA contact
9  be in any other place besides in this log
10 reflected in Exhibit-1?
11   A.   I'm not sure.
12   Q.   How about, to the best of
13 your knowledge, was there any other place
14 that contact with s government agency was
15 kept, besides in a log like the one
16 represented in Exhibit-1?
17      MR. LAVELLE:  Object to
18    form.
19      THE WITNESS:  To the best of
20    my knowledge, there might have
21    been one up in the front offices.
22    But I -- I'm not positive.
23 BY MR. POWERS:
24   Q.   The front offices at the

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1 Perryman distribution center?
2    A.   Yes.
3    Q.   And if you'd turn to Page 9
4 of Exhibit-1. And the page numbers are
5 in the bottom right-hand corner, and it's
6 about a quarter of the way down the page.
7 It's for the date of 9/17/09.
8        The first entry there with
9 Kevin Johnson in the first column, do you
10 see that?
11       It might be easier here on
12 the screen, too. He has it highlighted
13 for you.
14       Do you see that on the
15 screen?
16    A.   Yes.
17    Q.   So we're looking at Page 9
18 of Exhibit-1.
19       And in the reason/result
20 column there, it says, DEA inspection,
21 Kevin Johnson and William Reed.
22       Do you see that?
23    A.   Yes.
24    Q.   Can you tell me what that

Page 79

1 reflects?
2    A.   That we had a DEA inspection
3 with Agents Kevin Johnson and William
4 Reed.
5    Q.   So would this log, this
6 government agency correspondence log,
7 have a record of every time the Perryman
8 distribution center got a visit from the
9 DEA?
10    A.   That was the intent of it.
11    Q.   How about, would this log
12 represent or have a record of every time
13 the Perryman distribution center was
14 visited by any government agency?
15    A.   This log would only be
16 anything involving the controlled drug
17 cage.
18    Q.   So this log is specifically
19 for the controlled drug cage, not the
20 Perryman distribution center at large?
21    A.   The best that I can
22 remember.
23    Q.   So any audits of the
24 controlled drug operations at the

Page 80

1 Perryman facility by a government agency
2 would be reflected on a log like in
3 Exhibit-1?
4    A.   That was the intent.
5    Q.   I think you said before that
6 you never went back and referenced this
7 log yourself after the entries were made.
8        But do you know if anyone
9 else would go back and reference this log
10 for any reason?
11    A.   I don't know.
12    Q.   Would anyone else besides
13 the people who worked in the controlled
14 drug cage have access to this log?
15    A.   Not that I know of.
16       Can I --
17    Q.   Go ahead.
18    A.   -- change that?
19       When you say that, like if a
20 boss or something wanted to see it, they
21 could. But they would have to come up
22 and look at it.
23    Q.   Did anyone ever do that?
24    A.   I don't recall.

Page 81

1    Q.   When you say "a boss," that
2 would mean someone who wasn't working
3 full time in the controlled drug cage,
4 but would be a manager of someone who
5 worked in the controlled drug cage; is
6 that right?
7    A.   It would be a department
8 manager, ops manager, general manager
9 or --
10    Q.   You can put that Exhibit-1
11 to the side.
12       And just so we're clear, we
13 talked about it a little bit before, but
14 Rite Aid distributed controlled
15 substances from the Perryman distribution
16 center, correct?
17    A.   Yes.
18    Q.   And that was up until 2014,
19 right?
20    A.   Yes.
21       - - -
22       (Whereupon, Rite Aid-Wood
23 Exhibit-2,
24 Rite_Aid_OMDL_0013855-858, was

Page 82

1    marked for identification.)
2            - - -
3    BY MR. POWERS:
4        Q.   I'm going to hand you what's
5    been marked as Exhibit-2.  This is Bates
6    number Rite_Aid_OMDL_0013855 through
7    3858.  It's a double-sided exhibit.
8            Take a look at Exhibit-2.
9        A.   It starts back here, right?
10       Q.   Yes.  It would start from
11   the back forward, yes.
12           And I'll represent to you
13   the form on the very last page of
14   Exhibit-2 is actually the attachment to
15   the e-mail chain that's reflected in the
16   other pages of Exhibit-2.
17           I'll direct your attention
18   to the page ending in Bates number 3856.
19   It's the back of the first page in that
20   Exhibit-2.
21           The second e-mail on the
22   page there looks like it is Keith Frost
23   sent an e-mail to you, Mwood@riteaid.com.
24           Do you see that?

Page 83

1        A.   Yes.
2        Q.   And it looks like Keith
3    Frost asks you, Marian, can you fill this
4    out and return to Jessica Dowel and cc me
5    and Kevin?  Thanks, Keith.
6            Do you see that?
7        A.   Yes.
8        Q.   Who is Jessica Dowel?
9        A.   I don't remember.
10       Q.   What is Keith Frost asking
11   you to fill out here?
12       A.   I don't remember this, but I
13   assume it's this, because it's attached.
14       Q.   When you say "this," it
15   looks like you're referring to the last
16   page of Exhibit-2, which is the
17   attachment to the e-mail.
18           Going back to the e-mails
19   themselves, it looks like Keith Frost
20   asked you to fill it out.  And then
21   eventually, at the top of Exhibit-2, the
22   first page, Bates number 3855, you say,
23   Jessica, I faxed the completed copy to
24   you.  It would not let me fill in the top

Page 84

1    questions.
2            Do you see that?
3        A.   Yes.
4        Q.   And the date on this e-mail
5    is, it looks like, March 31st, 2011.
6            Do you see that?
7        A.   Yes.
8        Q.   And I have a question for
9    you.
10           In the cc line, there's a
11   Marian L. Wood, spelled M-A-R-I-A-N, and
12   it looks like it's from a Marion Wood,
13   M-A-R-I-O-N.
14           Do you see that?  What is
15   the difference there?
16       A.   None that I know of.
17       Q.   Well, they looks like
18   they're spelled differently, right, the
19   two Marians?
20       A.   Yes.
21       Q.   Is that both your e-mail
22   address?
23       A.   I don't understand.
24       Q.   So it looks like there's a

Page 85

1    Marian spelled with an A and a Marion
2    spelled with an O.
3            Do you see that?
4        A.   Yes.
5        Q.   Are those people reflected
6    in those two different spellings both
7    you?
8        A.   As far as I know.
9        Q.   Do you know why there's a
10   difference in spelling?
11       A.   I don't know.
12       Q.   Is it because one is the
13   e-mail address and one is the Sysm
14   address?
15       A.   I don't know.
16       Q.   But you don't know any other
17   Marian Woods that worked at Rite Aid, do
18   you?
19       A.   No.
20       Q.   In that top e-mail, it says
21   that you faxed the completed copy to
22   Jessica Dowel, right?
23       A.   Yes.
24       Q.   And it looks like there's an

Page 86

1  attachment there.  And it says, Form, a
2  long underscore, V9distributors.doc.
3         Do you see that?
4     A.  Yes.
5     Q.   And I'll represent to you
6  that the form that is that attachment is
7  the last page of Exhibit-2.
8         How come Keith Frost asked
9  you to fill out this form?
10       MR. LAVELLE:  Object to
11  form.
12  BY MR. POWERS:
13    Q.   Do you know why Keith Frost
14  asked you to fill out this form?
15    A.   I assumed he thought I knew
16  the answers.
17    Q.   And the top of the last page
18  of Exhibit-2, it looks like the date
19  there is July 27th, 2018.
20       Do you see that?
21    A.   Yes.
22    Q.   It appears to me that date
23  is wrong, because this was attached to an
24  e-mail in 2011.

Page 87

1         Would you agree with me?
2     A.  I guess.
3     Q.   But you were not working at
4  Rite Aid in 2018, right?
5     A.  2018, no.
6     Q.   And what is this form that
7  you filled out on the last page of
8  Exhibit-2?
9     A.  I can't say that I filled
10  this form out, if it's 2018.
11    Q.   Well, I'll tell you that the
12  form represented in Exhibit -- the last
13  page of Exhibit-2 was the one attached to
14  this e-mail chain from 2011 in the
15  documents that we have.
16       So it looks like you said, I
17  faxed a completed copy to you in the
18  first e-mail there.
19       So it looks like, from that
20  e-mail, that you did complete this form,
21  even if the date on it is wrong, right?
22       MR. LAVELLE:  Objection to
23  the form of the question.
24       THE WITNESS:  I don't feel

Page 88

1  comfortable saying yes with that
2  date on it.  And I don't recall
3  this document, so.
4  BY MR. POWERS:
5     Q.   Did you ever fill out a
6  document similar to this?
7     A.   I don't remember.
8     Q.   I'm going to direct you down
9  to the last question there in this form,
10  on the last page of Exhibit-2.
11       It says, Does your company
12  refrain from filling orders issued by
13  practitioners based solely on an online
14  questionnaire, without the benefit of a
15  medical exam or bona fide doctor/patient
16  relationship?
17       Do you see that?
18    A.   Yes.
19    Q.   How would you have answered
20  that question when you were at Rite Aid
21  in 2011 when these e-mails were sent?
22       MR. LAVELLE:  Object to
23  form.
24       THE WITNESS:  I don't know,

Page 89

1  because it's not something I -- I
2  don't know.
3  BY MR. POWERS:
4     Q.   Do you know if Rite Aid
5  refrained from filling orders issued by
6  practitioners based solely on an online
7  questionnaire without the benefit of a
8  medical exam or bona fide doctor/patient
9  relationship?
10    A.   That's not my area.
11    Q.   Whose area would that have
12  been?
13    A.   If I'm reading this right,
14  it sounds like a pharmacist.
15    Q.   How about the question above
16  that, If you have an Internet site, does
17  it refrain from facilitating the
18  acquisition of controlled substances from
19  a practitioner with whom the buyer has no
20  prior personal relationships?
21       Do you see that?
22    A.   Yes, I see it.
23    Q.   Would you have been the
24  person who would have been able to answer

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1  that question in 2011?
2       MR. LAVELLE:  Object to
3     form.
4       THE WITNESS:  I don't recall
5     this at all, so --
6  BY MR. POWERS:
7     Q.   I'm not asking now if you
8  recall this particular document.
9       I'm just asking you, who
10 would have been the person, in 2011, who
11 would have been able to certify the
12 answer to that question that I just read
13 to you?
14    A.   Can you repeat the question?
15    Q.   Who at Rite Aid would have
16 been able to answer and certify a
17 question about whether Rite Aid has an
18 Internet site and whether that Internet
19 site refrains from facilitating the
20 acquisition of controlled substances from
21 practitioners with whom the buyer has no
22 prior personal relationship?
23      MR. LAVELLE:  Object to
24    form.

Page 91

1       THE WITNESS:  I don't know.
2     I don't --
3  BY MR. POWERS:
4     Q.   You don't know who at Rite
5  Aid would be able to answer that
6  question?
7       MR. LAVELLE:  Object to
8     form.  Objection.  Asked and
9     answered.
10      THE WITNESS:  I'm not sure
11    how to answer that.
12 BY MR. POWERS:
13    Q.   You're not sure how to
14 answer that question, or you're not sure
15 who would have been able to answer that
16 question?
17    A.   Both.
18      MR. LAVELLE:  Object to
19    form.
20 BY MR. POWERS:
21    Q.   But you would not have been
22 the person to answer that question; is
23 that right?
24    A.   I don't recall.

Page 92

1     Q.   When you were working at
2  Rite Aid, did you have, as part of your
3  job responsibilities, the knowledge to
4  answer the question in that row I just
5  read?
6       MR. LAVELLE:  Object to
7     form.
8       THE WITNESS:  I can't
9     remember.
10 BY MR. POWERS:
11    Q.   Moving up to the next one,
12 above that column we were just looking
13 at, the one that starts, Do you
14 refrain -- do you see where I'm at?
15    A.   Yes.
16    Q.   Who at Rite Aid would be
17 able to have answered this question in
18 2011, Do you refrain from offering to
19 facilitate the acquisition of controlled
20 substances from a practitioner with whom
21 the buyer has no prior personal
22 relationship?
23      MR. LAVELLE:  Object to
24    form.

Page 93

1       THE WITNESS:  I don't know.
2  BY MR. POWERS:
3     Q.   Would that person have been
4  you?
5     A.   I don't recall.
6     Q.   Could you have answered this
7  question about whether Rite Aid refrained
8  from offering to facilitate the
9  acquisition of controlled substances from
10 a practitioner with whom the buyer has no
11 prior personal relationship in 2011?
12      MR. LAVELLE:  Object to
13    form.
14      THE WITNESS:  I don't
15    remember what I would have known
16    back then.
17 BY MR. POWERS:
18    Q.   Moving up to the next row.
19      That row asks, Does your
20 company refrain from affiliation with an
21 Internet site that solicits or services
22 orders for controlled substances?
23      Would you have been able to
24 answer this question in 2011?

Page 94

1   MR. LAVELLE:  Object to
2   form.
3   THE WITNESS:  I feel the
4   same with the whole thing.
5   BY MR. POWERS:
6   Q.   When you say "the whole
7   thing," you mean every single question on
8   the last page of Exhibit-2?
9   A.   What I've read, I just
10  don't -- I don't recall it.  And I don't
11  recall if I -- I can't say right now
12  that, yes, I did or didn't know all this.
13  But I don't -- I don't
14  remember.
15  Q.   Moving up one more row, it
16  asks, Does your company have a
17  documented, quote, suspicious order
18  monitoring program, end quote, as
19  required by DEA per 21 C.F.R. 1301.74(b)?
20  Do you see that?
21  A.   Yes.
22  Q.   Would you have been the
23  person who could answer this question
24  that I just read in 2011?

Page 95

1   MR. LAVELLE:  Object to
2   form.
3   THE WITNESS:  I did know,
4   yes, that we had a suspicious
5   order monitoring.
6   But I still don't remember
7   any of this.
8   BY MR. POWERS:
9   Q.   I'm not asking if you
10  specifically remember this particular
11  form.
12  I'm just saying that
13  question on this form, could you have
14  answered that question in 2011?
15  MR. LAVELLE:  Object to
16  form.  Objection.  Asked and
17  answered.
18  THE WITNESS:  I don't
19  remember.
20  BY MR. POWERS:
21  Q.   You were the DEA
22  coordinator, right?
23  A.   Yes.
24  Q.   And this is talking about

Page 96

1   DEA regulations, right?
2   A.   Yes.
3   Q.   Did Rite Aid have a
4   documented suspicious order program in
5   2011?
6   MR. LAVELLE:  Object to
7   form.
8   THE WITNESS:  We had a
9   monitoring program.
10  BY MR. POWERS:
11  Q.   Is that different than a
12  suspicious order monitoring program?
13  A.   It was -- it was
14  excessive/suspicious.
15  Q.   Are excessive orders
16  different than suspicious orders?
17  A.   Yes.
18  Q.   How so?
19  A.   Excessive is when they're
20  over ordered, they're not necessarily
21  suspicious.
22  Q.   What do you mean by "over
23  ordered"?
24  A.   Over ordered as in ordered

Page 97

1   too many of what was allowed.
2   Q.   How did you determine what
3   was allowed?
4   A.   We had a -- we had an --
5   order monitoring limits for different
6   counts, pill counts.
7   Q.   Were those called
8   thresholds?
9   A.   Yes.
10  Q.   And this question asks, in
11  the last page of Exhibit-2, whether Rite
12  Aid has a documented suspicious order
13  monitoring program.
14  Do you know if Rite Aid had
15  a documented suspicious order monitoring
16  program?
17  A.   I'm not sure how to answer
18  that.
19  Yes, we had a program.  Yes.
20  I believe, yes.
21  Q.   How was it documented?
22  A.   Can you repeat that?
23  Q.   How was the suspicious order
24  monitoring program Rite Aid had

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1  documented?
2      A.   Are you saying how was the
3  program documented?  I'm -- can you
4  repeat that?
5      Q.   Sure.
6          You testified earlier that
7  Rite Aid had a suspicious/excessive order
8  monitoring program, right?
9      A.   Yes.
10     Q.   How was that program
11  documented?
12     A.   I'm not sure how to answer
13  that.
14         We have a log that we would
15  write the orders in.  But I'm having a
16  problem answering this because we never
17  had a suspicious order.  So I don't know
18  if I'm answering this correctly.
19     Q.   My question now is not about
20  whether or not you had a suspicious order
21  or not.
22         My question is just, was the
23  suspicious/excessive order monitoring
24  program that Rite Aid had documented in

Page 99

1  any way?
2          MR. LAVELLE:  Object to
3      form.
4          THE WITNESS:  I'm very
5      confused.  I'm sorry.
6  BY MR. POWERS:
7      Q.   Okay.  What are you confused
8  about?
9      A.   We had a -- the order
10  monitoring that could -- had we had
11  suspicious orders, would have been along
12  with that.  But I can't remember exactly
13  the wording of what we did have.
14     Q.   Was the suspicious/excessive
15  order monitoring program written down
16  anywhere?
17     A.   Yes.
18     Q.   Where was it written down?
19     A.   In the procedure manual.
20     Q.   Anywhere else?
21     A.   I don't remember.
22     Q.   You also mentioned some
23  logs.
24         What were those logs you

Page 100

1  talked about earlier?
2      A.   They were logs that we used
3  to note orders that were above what was
4  allowed.
5      Q.   And that would have been
6  above-threshold orders, right?
7      A.   Also anything that just
8  didn't look right.  So it wasn't
9  necessarily always above the threshold.
10     Q.   Besides those logs and the
11  procedure manual, was the
12  suspicious/excessive order monitoring
13  program at Rite Aid documented anywhere
14  else?
15     A.   I'm drawing a blank.  I
16  don't know.
17     Q.   You were the DEA
18  coordinator, though, right?
19     A.   Yes.
20     Q.   You don't know where it was
21  besides those two locations?
22     A.   I don't --
23         MR. LAVELLE:  Object to
24      form.  Objection.  Asked and

Page 101

1      answered.
2          THE WITNESS:  I don't
3      recall.
4  BY MR. POWERS:
5      Q.   The last -- or the top row
6  there on the last page of Exhibit-2 says,
7  Does your company verify that your
8  customers have a suspicious order
9  monitoring program as described by 21
10  C.F.R. 1301.74(b)?
11         Do you see that?
12         MR. LAVELLE:  Object to
13      form.
14         THE WITNESS:  Yes.
15  BY MR. POWERS:
16     Q.   Do you know who the
17  customers here would be for Rite Aid
18  referred to in this question?
19     A.   I'm not sure.
20     Q.   And just to be clear,
21  besides the second row there about the
22  suspicious order monitoring program as
23  required by DEA, the other questions,
24  you're not sure who at Rite Aid would

Page 102

1 have been able to answer those questions,
2 right?
3          MR. LAVELLE:  Object to
4     form.  Objection.  Asked and
5     answered.
6          THE WITNESS:  No.
7 BY MR. POWERS:
8     Q.   And just to be clear, I
9 asked, you're not sure, and you answered
10 no, meaning --
11     A.   I'm not sure.
12     Q.   Okay.  Do you remember if
13 anyone else besides yourself filled out a
14 form similar to this one in the last page
15 of Exhibit-2?
16          MR. LAVELLE:  Object to
17     form.
18          THE WITNESS:  I don't know.
19 BY MR. POWERS:
20     Q.   Did you ever fill out any
21 other forms that were sent by
22 pharmaceutical manufacturers?
23     A.   I don't recall.
24     Q.   You can put that exhibit to

Page 103

1 the side.
2          MR. LAVELLE:  You can put it
3     over there.
4          Great.  Thank you.
5          - - -
6     (Whereupon, Rite Aid-Wood
7     Exhibit-3,
8     Rite_Aid_OMDL_0014804-874, was
9     marked for identification.)
10          - - -
11 BY MR. POWERS:
12     Q.   I'm going to hand you what's
13 been marked Wood Exhibit-3.  It's a
14 document with the Bates number
15 Rite_Aid_OMDL_0014804 through 14874.
16          Once again, it's sort of a
17 lengthy document.  If you want to flip
18 through it and familiarize yourself with
19 it, I'm only going to ask you questions
20 about a specific page.
21          Are you familiar with this
22 document in Exhibit-3?
23     A.   I believe so.
24     Q.   What is the document in

Page 104

1 Exhibit-3?
2     A.   The DEA regulatory
3 compliance.
4     Q.   And is this the same
5 document you referred to before that you
6 used in your training with Kevin
7 Mitchell?
8     A.   I believe so.
9     Q.   I think you referred to it
10 as the DEA regulatory compliance manual
11 before.
12          Is that the same thing as
13 what's in Exhibit-3?
14     A.   I believe so.
15     Q.   Where was this document kept
16 at the distribution center?
17     A.   I believe it was in the DEA
18 office.
19     Q.   Was it kept in hardcopy?
20     A.   Yes.
21     Q.   Was -- were electronic
22 versions of this document made available
23 to anyone?
24     A.   I'm not sure.

Page 105

1     Q.   So if it was kept in the DEA
2 office, who would have had access to this
3 document?
4     A.   I guess anyone that wanted
5 to see it.
6     Q.   I'm going to direct your
7 attention to the page with the Bates
8 number 14828.
9          Do you see that in the
10 bottom right-hand corner?  The title of
11 that page I'm looking for is, Section VI,
12 Suspicious Order Monitoring.
13          Are you on that page?
14     A.   Yes.
15     Q.   Is this what you were
16 referring to in your previous testimony
17 about the documented suspicious order
18 monitoring program?
19     A.   Yes.
20     Q.   Just this page here?
21     A.   Can you repeat that?
22     Q.   Sure.
23          When we talked about the
24 suspicious/excessive monitoring program

Page 106

1 Rite Aid had, does this page here in
2 Exhibit-3, Page 14828, is that the extent
3 of the excessive/suspicious order
4 monitoring program that Rite Aid had?
5     MR. LAVELLE: Object to
6     form.
7     THE WITNESS: This is one of
8     them.
9 BY MR. POWERS:
10   Q. One of what?
11   A. The order monitoring.
12   Q. The other being the logs you
13 talked about?
14   A. The training, we also had
15 one for training.
16   Q. So you have this page here
17 in Exhibit-3, Page 14828; you have the
18 logs; and then you have a third document,
19 a training document; is that right?
20   A. I believe.
21   Q. Let's look at this page here
22 in Exhibit-3, Page 14828.
23     Look at the -- Paragraph
24 Number 1 there. It says, All orders

Page 107

1 containing controlled substances are
2 reviewed and verified for order quantity
3 and size to not exceed the determined
4 order history threshold.
5     Do you see that?
6   A. Yes.
7   Q. How were the orders reviewed
8 and verified?
9   A. The orders themselves, they
10 came through our automated system. So --
11   Q. How were those orders that
12 came through the automated system
13 reviewed and verified?
14   A. Okay, I'm confused.
15   Q. Okay.
16   A. I can only comment on what
17 came through to us to pick.
18   Q. Okay. So how were the
19 orders that came through to the Perryman
20 distribution center reviewed and verified
21 pursuant to this policy?
22   A. We had an established
23 threshold. And if -- any orders that
24 were above that, we would put in the log

Page 108

1 and call the store, if we could, and
2 verify the quantity.
3     But they were never allowed
4 to get over the threshold.
5   Q. So in your review of the
6 order, you just looked to see if it
7 exceeds the threshold, right?
8   A. Yes.
9   Q. In the second sentence in
10 Paragraph Number 1, it says, Any order
11 exceeding the threshold is immediately
12 forwarded to the department manager for
13 further investigation.
14     Who would the department
15 manager referred to here be?
16   A. Whoever the manager was at
17 the time.
18   Q. When it says "department
19 manager," that's a different position
20 than the DEA coordinator?
21     MR. LAVELLE: Object to
22     form.
23     THE WITNESS: I'm sorry, can
24     you repeat?

Page 109

1 BY MR. POWERS:
2   Q. Sure.
3     I'm just trying to figure
4 out who the department manager that these
5 orders exceeding the threshold would have
6 been forwarded to.
7   A. I don't know that they were
8 forwarded to the department manager. I'm
9 kind of confused a little bit.
10     The orders that were above
11 the threshold would have been logged and
12 called. They wouldn't necessarily be
13 taken all the way to the department
14 manager level.
15   Q. So in your experience, the
16 department manager was not always
17 forwarded the orders that came in above
18 the threshold; is that right?
19   A. Yes.
20   Q. So that would have been a
21 violation of this policy, as it's written
22 right here, right?
23     MR. LAVELLE: Object to
24     form.

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1  THE WITNESS: I'm not sure.
2  BY MR. POWERS:
3  Q.  I mean, as I read this, it
4  says, Any order exceeding the threshold
5  is immediately forwarded to the
6  department manager for further
7  investigation, right?
8  And what you're saying is
9  that they were not always forwarded to
10  the department manager, right?
11  MR. LAVELLE: Object to
12  form.
13  THE WITNESS: I'm not sure
14  that -- I don't -- I don't
15  believe -- the only way I could
16  answer this is while we were
17  working -- I don't know how to
18  answer this.
19  I don't know how to answer
20  you.
21  BY MR. POWERS:
22  Q.  And it says here the
23  department manager is forwarded these
24  orders for, quote, further investigation,

Page 111

1  right?
2  A.  Yes, that's what it says.
3  Q.  Do you know of any time that
4  a department manager did further
5  investigation of an order that came in
6  over the threshold?
7  A.  I believe we -- we
8  determined this as if it were suspicious,
9  it would go to the department manager
10  level. But I can't -- I don't know.
11  Q.  But it doesn't say --
12  A.  I can't remember.
13  Q.  I'm sorry. Are you done?
14  A.  Yes.
15  Q.  But it doesn't say only
16  involve department managers when the
17  order is suspicious, right?
18  It says, Any order exceeding
19  the threshold should be immediately
20  forwarded to the department manager,
21  right? That's what it says?
22  MR. LAVELLE: Object to
23  form.
24  THE WITNESS: That's what it

Page 112

1  says.
2  BY MR. POWERS:
3  Q.  And you don't know of any
4  department manager that did an
5  investigation after being forwarded an
6  order that was above threshold, right?
7  A.  Not department manager, no.
8  Q.  Moving down to the Paragraph
9  Number 2, Suspicious orders include
10  orders of unusual size, orders deviating
11  substantially from a normal pattern, and
12  orders of unusual frequency.
13  Do you see that?
14  A.  Yes.
15  Q.  How did you determine if
16  these orders were of unusual size?
17  A.  When an order came down --
18  we basically went with the threshold.
19  When an order came down, it needed to be
20  within the threshold. If it was over the
21  threshold, then we would log it in the
22  book. Or if it just seemed unusual, we
23  would log that as well.
24  Q.  So in terms of unusual size,

Page 113

1  it was, basically, whether or not the
2  order exceeded the threshold? That's
3  what qualified it as unusual, right?
4  MR. LAVELLE: Object to
5  form.
6  THE WITNESS: Not
7  necessarily.
8  BY MR. POWERS:
9  Q.  Besides exceeding -- let me
10  back up, actually.
11  So if the order exceeded the
12  threshold, would you qualify that as an
13  unusual sized order?
14  A.  If it exceeded the
15  threshold, we would call on it, yes.
16  Q.  When you say -- what do you
17  mean when you say "we would call on it"?
18  A.  When it lit up and it was
19  above the threshold, we would try to stop
20  the pick and call the store and let them
21  know that it exceeds the threshold, we
22  can't -- that we are not going to be able
23  to send it to them.
24  Q.  Besides when an order

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1 exceeded the thresholds, how would you
2 determine if an order was of unusual
3 size?
4    A.   Sometimes it just seemed too
5 high for what that item was picking that
6 day.  And we would -- it just looked out
7 of the ordinary, so we would call and
8 verify it.
9    Q.   When you say it "looked out
10 of the ordinary," was that just based on
11 your own personal experience?
12    A.   Based on the pattern of the
13 day, something is picking 2, 2, 2, and
14 then something comes up 10, you just
15 might want to call on it.  And we would
16 do that.
17    Q.   The next one there, it
18 says -- back in Paragraph 2, it says,
19 Orders deviating substantially from a
20 normal pattern.
21      Do you see that?
22    A.   Uh-huh.
23    Q.   How did you determine
24 whether an order deviated substantially

Page 115

1 from a normal pattern?
2    A.   I'm not sure.
3    Q.   Did you ever determine
4 whether an order deviated from a normal
5 pattern yourself?
6      MR. LAVELLE:  Object to
7 form.
8      THE WITNESS:  I'm not sure
9 how to answer that.  The orders
10 came down to us that were --
11 electronically.
12      So I'm not sure how to
13 answer that.
14 BY MR. POWERS:
15    Q.   Who would determine whether
16 an order was deviating substantially from
17 a normal pattern?
18    A.   I'm not sure.
19    Q.   Would it be the pickers who
20 would have to determine that?
21    A.   Oh, okay.  While a picker is
22 picking and they see something unusual,
23 even if it's within the threshold, yes,
24 they would.

Page 116

1    Q.   So it was the picker's
2 responsibility to determine whether an
3 order deviated substantially from a
4 normal pattern?
5    A.   Not necessarily.
6    Q.   Who else could make that
7 determination?
8    A.   I'm not sure that was within
9 our area that we could do that.
10    Q.   When you say "our area,"
11 whose area?
12    A.   The DC, the department doing
13 the picking.
14    Q.   So the distribution center
15 itself did not determine whether orders
16 deviated substantially from a normal
17 pattern?
18      MR. LAVELLE:  Object to
19 form.
20      THE WITNESS:  The orders
21 were generated.  It came down
22 electronically.  And we would pick
23 what was lit up to pick.
24      I'm not sure that that was

Page 117

1 something that we could detect.
2 BY MR. POWERS:
3    Q.   Who would detect that?
4    A.   I believe it could -- I'm
5 not sure.
6      Give me -- let me read this
7 again.
8      We Pick to Lights.  So I'm
9 not sure that we would know a pattern,
10 because we only pick what is generated
11 from the system.
12    Q.   And when you say "we,"
13 you're referring to the distribution
14 center employees?
15    A.   The pickers, the people
16 doing the picking.
17    Q.   How about the next one
18 there, orders of unusual frequency?
19      Do you see that in Paragraph
20 Number 2?
21    A.   Yes.
22    Q.   Who would be responsible for
23 recognizing orders of unusual frequency?
24    A.   To my knowledge, the orders

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1  could only generate through the
2  replenishment system. So I don't know
3  how to answer that.
4        There are only -- the orders
5  only come down guided by the
6  replenishment or the corporate system.
7  So they would determine the frequency of
8  what we were picking.
9     Q.  Okay. I understand that the
10 replenishment system generates the
11 orders, right?
12    A.  Yes.
13       Excuse me. I'm not sure
14 it's just replenishment, but --
15    Q.  The orders get generated by
16 a system?
17    A.  Yes.
18    Q.  Okay. By the Rite Aid
19 ordering system, we'll call it.
20       Is that okay?
21    A.  Okay.
22    Q.  So the Rite Aid ordering
23 system generates orders that go to the
24 DC, right?

Page 119

1     A.  Yes.
2     Q.  And the DC center -- the
3  distribution center employees, are they
4  able to identify orders of unusual
5  frequency?
6     A.  As I am understanding it,
7  no.
8     Q.  Are the DC employees able to
9  identify orders that deviate
10 substantially from a normal pattern?
11       MR. LAVELLE: Object to
12    form. Objection. Asked and
13    answered.
14       THE WITNESS: That's what I
15    was going to say, that's what I
16    was talking about earlier.
17 BY MR. POWERS:
18    Q.  And your answer earlier was
19 that the DC employees were not able to
20 identify orders that deviated
21 substantially from a normal pattern,
22 right?
23       MR. LAVELLE: Object to
24    form.

Page 120

1        THE WITNESS: I didn't know
2     that's what you just asked me.
3  BY MR. POWERS:
4     Q.  So my question was, the DC
5  employees were not able to identify
6  orders that deviated substantially from a
7  normal pattern, right?
8        MR. LAVELLE: Object to
9     form.
10       THE WITNESS: Can you repeat
11    that?
12 BY MR. POWERS:
13    Q.  Sure.
14       The DC employees were not
15 able to identify orders that deviated
16 substantially from a normal pattern,
17 correct?
18       MR. LAVELLE: Object to
19    form.
20       THE WITNESS: Only as I
21    stated before.
22 BY MR. POWERS:
23    Q.  What did you state before?
24 Sorry.

Page 121

1        MR. LAVELLE: Object to
2     form.
3        THE WITNESS: Do I answer?
4        MR. POWERS: You can go
5     ahead and answer.
6        THE WITNESS: When I stated
7     that they -- while they were
8     picking, if they saw a quantity
9     that looked like it was too much,
10    even though it was within the
11    threshold, that's what I meant
12    when they can --
13 BY MR. POWERS:
14    Q.  But that goes to the size of
15 the order, correct?
16       MR. LAVELLE: Object to
17    form.
18       THE WITNESS: The -- repeat
19    that again.
20 BY MR. POWERS:
21    Q.  You said that the pickers,
22 if they saw a quantity that looked like
23 it was too much.
24       So you're talking about the

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1 size of the order there, right?
2          MR. LAVELLE:  Object to
3     form.
4          THE WITNESS:  The quantity,
5     yes.
6 BY MR. POWERS:
7     Q.   But the distribution center
8 employees would not have an ability to --
9 have an ability to notice whether the
10 orders coming through the ordering system
11 were deviating from a normal pattern,
12 right?
13          MR. LAVELLE:  Object to
14     form.
15          THE WITNESS:  I believe I
16     stated before, no, I don't believe
17     we would be able to.
18 BY MR. POWERS:
19     Q.   And when you say "we," you
20 mean the distribution center employees?
21     A.   Yes.
22          MR. LAVELLE:  Counsel, we've
23     been going for over an hour.  Can
24     we take a break?

Page 123

1          MR. POWERS:  I have a couple
2     more questions on this document,
3     and then we can take a break.  Is
4     that all right?
5     Is that okay with you?
6          THE WITNESS:  Yes.
7 BY MR. POWERS:
8     Q.   In Paragraph 3 there, it
9 says, A review is performed to determine
10 the legitimacy of the order.
11          Do you see that?
12     A.   Yes.
13     Q.   Who performed that review?
14     A.   Okay.  This is -- in what
15 respect?
16     Q.   I'm just asking what it
17 means when it says on this page, A review
18 is performed to determine the legitimacy
19 of the order?
20          What does that mean?
21     A.   Well, on this page, it's
22 saying it's a suspicious order.  So a
23 review would be determined if it were a
24 suspicious order.

Page 124

1     Q.   How do you determine whether
2 it's a suspicious order?
3     A.   I'm drawing a blank.  I'm
4 sorry.
5          What was the question?
6     Q.   So you said a review would
7 be determined if it were a suspicious
8 order.
9          I'm asking, how do you
10 determine whether something is a
11 suspicious order or not?
12     A.   If an order came down that
13 was large and we called and whatever --
14 let's see here.
15          Okay.  When the orders came
16 down, we would check on the quantity if
17 it was too large.  And we never had a
18 suspicious order, that's why I'm having a
19 little bit of a problem here.
20          I don't know.  I'm drawing a
21 blank right now.
22     Q.   So this page we've been
23 looking at here, Page 14828, is this
24 procedure outlined in this document how

Page 125

1 to determine whether an order is
2 suspicious?
3     A.   I believe so.  It's to
4 detect suspicious orders.
5     Q.   So then moving back to
6 Paragraph 3, it says, A review is
7 performed to determine the legitimacy of
8 the order, right?
9          I'm just asking who did that
10 review.
11     A.   When we had -- when the
12 order came down, it was too much, the
13 pickers would call the stores.
14     Q.   And is that the review
15 referred to in Paragraph 3 here?
16     A.   If -- I'm not sure how to
17 answer this.  If something would have
18 come up that just didn't, you know,
19 didn't seem right, then it would have
20 been reviewed or elevated.
21     Q.   But that's my question.
22          Who would have done that
23 review?
24     A.   I guess it would start with

Page 126

1 the lead or the coordinator, department
2 manager.
3     Q.   Did you personally do any
4 reviews like you are talking about?
5     A.   I'm not sure I understand
6 what you mean by "review."
7     Q.   I'm talking about when you
8 referred to an order coming in that
9 looked unusual for any way -- for any
10 reason, and you said a review was done,
11 right?
12     A.   No.  I said that we called
13 the store to verify it.
14     Q.   So calling the store to
15 verify the order is different than the
16 review outlined here in Paragraph 3 in
17 Exhibit-3?
18         MR. LAVELLE:  Object to
19     form.
20 BY MR. POWERS:
21     Q.   Is that right?
22     A.   What was that?
23     Q.   So we've been talking about
24 the first sentence of Paragraph 3, which

Page 127

1 says, A review is performed to determine
2 the legitimacy of the order.
3         Do you see that?
4     A.   Yes.
5     Q.   Is that review talked about
6 in that sentence different than calling
7 the store that placed the order?
8         MR. LAVELLE:  Object to
9     form.
10         THE WITNESS:  I'm not sure
11     how to answer it.  I don't know.
12 BY MR. POWERS:
13     Q.   Did you do anything else
14 when an order came in over threshold
15 besides call the store?
16     A.   If it -- repeat that.
17     Q.   Did you do anything else
18 when an order came in over threshold
19 besides call the store that placed the
20 over-threshold order?
21     A.   I don't remember.
22     Q.   And just to be clear, you
23 don't remember doing anything besides
24 calling the store; is that right?

Page 128

1         MR. LAVELLE:  Object to
2     form.
3         THE WITNESS:  I'm saying I
4     don't remember if we did anything
5     else.
6 BY MR. POWERS:
7     Q.   In Paragraph 4 there, it
8 says, An order which is determined to be
9 suspicious will be immediately reported
10 to the corporate office, who will notify
11 the local DEA field division office of
12 the Administration.
13         Do you see that?
14         MR. LAVELLE:  Object to
15     form.
16         THE WITNESS:  I see it.
17 BY MR. POWERS:
18     Q.   During your time at Rite
19 Aid, no order was ever determined to be
20 suspicious; is that right?
21     A.   I don't recall any.
22     Q.   And then Paragraph 5 there
23 says, If a suspicious order is reported
24 to corporate, the corporate Government

Page 129

1 Affairs will determine whether to, quote,
2 ship, unquote, or, quote, do not ship,
3 unquote.
4         Do you see that?
5     A.   Yes.
6     Q.   I take it, then, if you
7 never had any suspicious orders, you
8 never got a decision from the corporate
9 Government Affairs Office whether to ship
10 or do not ship; is that right?
11     A.   Yes.
12     Q.   Do you know who at
13 Government Affairs would have made a
14 decision to ship or not ship?
15     A.   I am not sure.  Probably
16 Janet Hart.
17     Q.   Paragraph 6 there on Page
18 14828, says, All discussions,
19 investigations and reports will be
20 maintained in the file designated, quote,
21 suspicious orders.
22         Do you see that?
23     A.   Yes.
24     Q.   Where is that file kept?

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1    A.   I'm confused.  We didn't
2 have any, so there wasn't a file.
3    Q.   So there was no file, to
4 your knowledge, that was designated a
5 suspicious order file during your time at
6 Rite Aid; is that right?
7    A.   That I can recall.
8       MR. POWERS:  Okay.  We can
9    take a break now.
10      VIDEO TECHNICIAN:  The time
11   is now 11:54 a.m.  We are going
12   off the record.
13          - - -
14      (Whereupon, a luncheon
15   recess was taken.)
16          - - -
17      VIDEO TECHNICIAN:  The time
18   is now 12:40 p.m.  We are back on
19   the record.
20 BY MR. POWERS:
21   Q.   Welcome back, Ms. Wood.
22   A.   Thank you.
23          - - -
24      (Whereupon, Rite Aid-Wood

Page 131

1    Exhibit-4,
2    Rite_Aid_OMDL_0016253-255, was
3    marked for identification.)
4          - - -
5 BY MR. POWERS:
6    Q.   I'm going to hand you what
7 has been marked as Wood Exhibit -- sorry,
8 you can put that to the side -- Wood
9 Exhibit-4, which is Bates numbered
10 Rite_Aid_OMDL_0016253 through 6255.
11      Take a look at that
12 document.
13      Are you familiar with the
14 document in Exhibit-4?
15   A.   Yes.
16   Q.   What is the document in
17 Exhibit-4?
18   A.   It's a controlled drug
19 above-average order monitoring program.
20   Q.   Did you author this
21 document?
22   A.   I believe so.
23   Q.   Why did you author this
24 document?

Page 132

1    A.   As a training tool.
2    Q.   Do you know when the first
3 version of this document in Exhibit-4 was
4 first written by you?
5       MR. LAVELLE:  Object to
6    form.
7       THE WITNESS:  I believe once
8    I became DEA coordinator, I used
9    it as a training -- created them
10   as training tools.
11 BY MR. POWERS:
12   Q.   And was that during your
13 first stint in the pharmacy department?
14   A.   Yes.
15   Q.   And who would you use this
16 document in Exhibit-4, the controlled
17 drug above-average order monitoring
18 program, to train with?
19      Who would you train with
20 this document here in Exhibit-4?
21   A.   Okay.  The employee
22 working -- that was going to work in the
23 cage.
24   Q.   So you would use this

Page 133

1 document in Exhibit-4 to train all of the
2 employees that would have worked in the
3 controlled drug cage at the Perryman
4 distribution center; is that right?
5    A.   Yes.
6    Q.   And it looks like there are
7 signature pages on the -- or a signature
8 page on the last page of Exhibit-4.
9       Is that something you would
10 get signed after the training?
11   A.   Yes.
12   Q.   And when you say you use
13 this in training the controlled cage
14 employees, how would you use this
15 document?
16      MR. LAVELLE:  Object to
17   form.
18      THE WITNESS:  When we were
19   training, we would use -- we would
20   give them this form to read, and
21   then explain it.
22      Once we were sure they
23   understood, we would have them
24   sign it.

Page 134

BY MR. POWERS:

Q.   And when you first authored this document in Exhibit-4, what did you rely on to put this document together?

A.   My knowledge and the threshold and what we would do to monitor these.

Q.   How did you gain your knowledge about what should go in this document in Exhibit-4?

A.   I'm not sure.  I'm sure other tools, but I don't remember exactly.

Q.   Do you remember anything you used to inform you about what to put in this particular document in Exhibit-4?

A.   Well, I know I used the threshold numbers to put in here.  Probably -- I'm not sure.

Q.   Did you consult any documentation to put -- to write the exhibit here in Exhibit-4?

MR. LAVELLE:  Object to form.

Page 135

THE WITNESS:  I'm not -- I don't remember.

BY MR. POWERS:

Q.   Did you refer to any documents produced by or written by Buzzeo to put together Exhibit-4?

A.   I don't remember.

Q.   Did you talk to anyone about what should be in this controlled drug order -- controlled drug above-average order monitoring program document?

A.   I don't remember.

Q.   Did you talk to Janet Hart about what should be included in this document in Exhibit-4?

A.   I don't remember.

Q.   You don't remember talking to anyone about what should be put in here?

MR. LAVELLE:  Object to form.

THE WITNESS:  I don't remember specifically, because it was a long time ago.

Page 136

BY MR. POWERS:

Q.   When you put this written document together in Exhibit-4, was it just a written articulation of the policies that were already in place?

A.   Can you repeat that?

Q.   Sure.

When you put this controlled drug above-average order monitoring program document reflected in Exhibit-4 together, when you wrote it, was it just an articulation, meaning just writing down the policies that you were already following at that time?

MR. LAVELLE:  Object to form.

THE WITNESS:  This was made to be put in layman's terms for the pickers to follow.

BY MR. POWERS:

Q.   Was it somewhere else written -- was the information in Exhibit-4 somewhere else not in layman's terms?

Page 137

A.   I'm not sure how to answer that.  But a lot -- some of these documents could be confusing, and we tried to make it as simplistic as possible so that it would -- for learning, you know, for -- easier for them to learn and understand.

Q.   I guess what I'm asking, though, is, was this document new when you first wrote it?  Was this a new procedure?

MR. LAVELLE:  Object to form.

THE WITNESS:  Only as I rewrote it.  We did have a policy, but this is -- I rewrote it as a training tool.

BY MR. POWERS:

Q.   You said you had a policy.

Was that policy written anywhere before this document in Exhibit-4?

A.   I don't remember.

Q.   The first paragraph, in all

Page 138

1 caps there, says, The person who picks a
2 controlled drug order is responsible for
3 alerting the supervisor on duty of
4 unusually high order quantities.
5        Do you see that?
6     A.   Yes.
7     Q.   How did you explain, when
8 you were using this as a training
9 document, what constituted an unusually
10 high order quantity?
11     A.   As I recall, it would have
12 been -- it would have been large amounts
13 over the threshold.
14     Q.   Any other criteria, besides
15 being above the threshold, to determine
16 what is an unusually high order?
17     A.   Can you repeat that?
18     Q.   Were there any other
19 criteria, besides being above the
20 threshold, used to determine what
21 constituted an unusually high order
22 quantity?
23     A.   I believe it was mainly
24 anything above the threshold or anything

Page 139

1 that seemed too high.
2     Q.   When you say "seemed too
3 high," who made that determination?
4     A.   The picker.
5     Q.   What was the picker supposed
6 to rely on to make the determination if
7 something was too high?
8     A.   As I stated earlier, as
9 they're picking and something picks at a
10 certain amount and then all of a sudden
11 there's five times that, that would
12 trigger them to think, I wonder if this
13 is -- you know, if this is too much or
14 whatever.  And they would call on it.
15     Q.   But there wasn't a set
16 criteria for that, right?
17     A.   No.
18     Q.   It's just what the picker
19 thought might be unusual?
20     A.   At that time, yes.
21     Q.   In the first paragraph
22 there, it says, in the second sentence,
23 The associates will look up the tote
24 number to identify the store the order is

Page 140

1 being picked for and immediately contact
2 the pharmacy manager or pharmacist on
3 duty to verify the ordered quantity.
4        Do you see that?
5     A.   Yes.
6     Q.   So this is referring to an
7 order that comes in over the thresholds,
8 and then a call is supposed to be placed
9 to that particular pharmacy that ordered
10 it, right?
11        MR. LAVELLE:  Object to
12     form.
13        THE WITNESS:  A call would
14     be placed if it could be placed.
15 BY MR. POWERS:
16     Q.   When could it not be placed?
17     A.   Usually, during the night
18 shift.
19     Q.   So is that if a store put in
20 an order at the end of the day and then
21 the order is being picked overnight, the
22 pharmacy -- excuse me, the distribution
23 center would not be able to contact that
24 pharmacy; is that right?

Page 141

1     A.   In the -- at night when they
2 pick, no, they couldn't, because the
3 stores would be closed.  But they would
4 short it to the allowed threshold.
5     Q.   So if it came in and they
6 were picking the order overnight, they
7 wouldn't wait until the morning to call
8 the pharmacy, would they?
9     A.   It depends.  But they have
10 to -- each order has to be completed
11 before they could go on.  So they would
12 have to pick it complete.
13        And then if it's really
14 high, they would set it aside for us to
15 check on.
16     Q.   When you say "us," who are
17 you referring to?
18     A.   The early -- the morning
19 shift.
20     Q.   Did that ever happen, in
21 your experience?
22     A.   I vaguely remember, yes.
23     Q.   How often, when an order was
24 picked overnight, would it be left for

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1 the morning shift to then call the
2 pharmacy about?
3      A.   Not very often.  Only if it
4 was unusual or --
5      Q.   But most of the time they
6 would just cut it down to the threshold
7 and ship it --
8      A.   It would be --
9      Q.   -- without calling the
10 pharmacy; is that right?
11          MR. LAVELLE:  Just wait
12      until the question is finished
13      before you answer the question.
14          THE WITNESS:  Yes.
15 BY MR. POWERS:
16      Q.   And it says here, If you are
17 able to call the pharmacy manager or
18 pharmacists, the person was to verify the
19 ordered quantity.
20          Do you see that?
21      A.   Where is that?
22      Q.   I'm sorry.  It's the last --
23 looking at the same sentence, the last
24 sentence of the first non-capitalized

Page 143

1 paragraph.  It's on the screen here, too.
2      A.   I'm sorry.
3      Q.   That's okay.
4      A.   Okay.
5      Q.   It says they were supposed
6 to -- the pharmacy manager or pharmacist
7 was supposed to be contacted to verify
8 the ordered quantity.
9          Do you see that, where we
10 are now?
11      A.   Yes.
12      Q.   Who would make that call to
13 verify the order quantity?
14      A.   The picker.
15      Q.   Would you ever make those
16 calls?
17      A.   Yes, on occasion.
18      Q.   Why would you make those
19 calls instead of the picker?
20      A.   If they were extremely busy.
21      Q.   Were the pickers often
22 extremely busy?
23      A.   We were busy.  I mean, I
24 don't know -- most of the time they were

Page 144

1 done by the picker.
2      Q.   And the picker was just
3 trying to make sure that the amount that
4 the store ordered was correct when they
5 called the pharmacy about the
6 over-threshold order, right?
7      A.   Repeat that.
8      Q.   When the picker called to
9 verify the ordered quantity, they were
10 just calling to see whether that quantity
11 was correct when it was entered into the
12 system by the pharmacy, right?
13      A.   Yes.
14      Q.   Then the next paragraph
15 there says, If the store verifies the
16 quantity is correct, the associate
17 notifies them that we cannot send more
18 than 50 units.  This amount is being
19 based on a six-week average movement test
20 of all controlled drugs.
21          Do you see that?
22      A.   Yes.
23      Q.   What is the average --
24 six-week average movement test of all

Page 145

1 controlled drugs?
2      A.   That was conducted by
3 corporate.
4      Q.   Who at corporate conducted
5 that?
6      A.   I believe it was -- I
7 believe it was Janet's team, but I'm not
8 positive.
9      Q.   Even though Janet's team may
10 have been the one conducting that average
11 movement test, do you know what that
12 average movement test consisted of?
13          MR. LAVELLE:  Object to
14      form.
15          THE WITNESS:  I'm not
16      positive, except for what it says
17      here, it was based on the
18      movement, average movement.
19 BY MR. POWERS:
20      Q.   In your understanding, what
21 does "the average movement" refer to
22 here?
23      A.   What the average sales for
24 the store had.

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1    Q.    The threshold was the same
2  for all Rite Aid stores that you
3  distributed to from the Perryman
4  distribution center, right?
5    A.    There were a few exceptions.
6    Q.    Besides those few
7  exceptions, it was all the same
8  threshold, right?
9    A.    I believe, yes.
10   Q.    So you wrote this document,
11 and you did not know what the average
12 movement test was; is that right?
13       MR. LAVELLE:  Object to
14   form.  Objection.  Asked and
15   answered.
16 BY MR. POWERS:
17   Q.    You can answer.
18   A.    Can you repeat that?
19   Q.    Sure.
20       You testified that you wrote
21 this form in Exhibit-4, right?
22   A.    Yes.
23   Q.    But you also testified that
24 you don't know what the six-week average

Page 147

1  movement test of all controlled drugs is,
2  right?
3        MR. LAVELLE:  Object to
4    form.
5        THE WITNESS:  What I said --
6    what I believe I said was this was
7    conducted by Janet's people.  And
8    for me to write it here, I got
9    that information from them.
10 BY MR. POWERS:
11   Q.    Did you ever come to an
12 understanding of what that test was and
13 how it was conducted?
14   A.    The only thing I know is
15 that it was based on a six-week average
16 movement.  Because that's what I was
17 told.
18   Q.    Did you ever ask what a
19 six-week average movement was?
20   A.    I don't believe so.
21   Q.    Then on the second page of
22 Exhibit-4, the Bates 16254, is that the
23 place in this document where you were
24 noting the exceptions to those blanket

Page 148

1  thresholds we were talking about?
2        MR. LAVELLE:  Object to
3    form.
4        THE WITNESS:  Repeat it.
5  BY MR. POWERS:
6    Q.    You said there were a couple
7  stores that had exceptions to the
8  universal threshold that Rite Aid had
9  when it was distributing controlled
10 substances, right?
11   A.    Yes.
12   Q.    Are those exceptions the
13 ones noted here on the second page of
14 Exhibit-4?
15   A.    I can't say these were all
16 the exceptions.  These were the
17 exceptions at that time this was written.
18   Q.    But that's where the
19 exceptions would have been noted?
20   A.    Repeat that.
21   Q.    But the second page of
22 Exhibit-4 would be where the exceptions
23 to the blanket threshold would have been
24 noted; is that right?

Page 149

1    A.    One of the places.
2    Q.    Where else would they have
3  been noted?
4    A.    There -- we had little
5  posters that we put in sleeves and put
6  them along the Pick to Light in the
7  replenishment area.
8    Q.    Anywhere else?
9    A.    Or verification area.
10   Q.    Anywhere else?
11   A.    I'm not sure.
12   Q.    Back to the first page of
13 Exhibit-4, the very first sentence in the
14 first lower-case paragraph there.
15       It says, When the Pick to
16 Light indicates quantities greater than
17 50 pieces of an item with a tab count of
18 100 or liquids, 10-tab count of 500, 5
19 for tab count of 1,000, the pick is
20 automatically stopped.
21       Do you see that?
22   A.    Yes.
23   Q.    Is that the threshold you're
24 talking about?

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1  A.   Yes.

2  Q.   And it looks like here
3 you're describing the threshold in terms
4 of tab counts, right?

5  A.   It's based -- it's actually
6 the selling units, 50 selling units or 5
7 selling units.

8  Q.   I'm sorry, I've never heard
9 the term "selling units" before.

10  Can you explain what that
11 is?

12  A.   The 50 -- it's for the --
13 okay.  50 pieces of the -- of an item
14 would be 50 selling units.  It's not 50
15 pills, it's 50 selling units.

16  Q.   So a selling unit could be
17 like a bottle of --

18  A.   Yes.

19  Q.   -- 100 pills?

20  MR. LAVELLE:  Please wait
21 until the question is finished
22 before you answer it.

23  THE WITNESS:  Sorry.

24  MR. LAVELLE:  That's okay.

Page 151

1  THE WITNESS:  Yes.

2  MR. LAVELLE:  It's okay.

3 BY MR. POWERS:

4  Q.   So is the threshold based in
5 selling units or was it based in
6 something else?

7  A.   The threshold was based by
8 the movement of the item.  And we put it
9 down into the pickers' selling units.

10  Q.   And you said before that all
11 the people who worked in the controlled
12 drug cage would have had to sign this
13 particular document, as reflected in
14 Exhibit-4.

15  Was anyone ever disciplined
16 for not following the procedures outlined
17 in Exhibit-4?

18  A.   I don't recall.

19  Q.   Is that -- is following the
20 procedures outlined in Exhibit-4
21 something that the pickers would have
22 been evaluated on in their job
23 assessments?

24  A.   They would have been

Page 152

1 evaluated on their performance, which all
2 procedures are part of.

3  Q.   So they would have been
4 evaluated on how well they adhered to
5 this controlled drug above-average order
6 monitoring program, but you're not aware
7 of anyone who was actually disciplined
8 for not following it, right?

9  MR. LAVELLE:  Object to
10 form.

11  THE WITNESS:  I don't
12 recall.  There -- can you repeat
13 your question?

14 BY MR. POWERS:

15  Q.   You don't recall anyone
16 being disciplined for not following the
17 above-average order monitoring program,
18 as reflected in Exhibit-4; is that right?

19  MR. LAVELLE:  Object to
20 form.  Objection.  Asked and
21 answered.

22  THE WITNESS:  Not that I
23 recall.

24 BY MR. POWERS:

Page 153

1  Q.   You can put that exhibit
2 aside.

3  - - -

4  (Whereupon, Rite Aid-Wood
5  Exhibit-5,
6  Rite_Aid_OMDL_0009868-877, was
7  marked for identification.)

8  - - -

9 BY MR. POWERS:

10  Q.   I'm going to hand you what
11 we marked as Exhibit-5, which is Bates
12 number Rite_Aid_OMDL_0009868 through
13 9877.

14  Go ahead and take a look at
15 that document.

16  In the first page of
17 Exhibit-5, it looks like this is an
18 e-mail chain.  And at the bottom there,
19 Kimberly Brown is forwarding you an
20 e-mail with the subject line, Cage trash
21 procedure.

22  And it says, Marian, please
23 forward any cage procedures that apply to
24 IB to Brian Sordillo.

Page 154

1       Do you see that?

2     A.   Yes.

3     Q.   Who is Kimberly Brown?

4     A.   She was the pharmacy

5 department manager.

6     Q.   Would that have been the

7 pharmacy department manager for Perryman?

8     A.   Yes.

9     Q.   Did she have responsibility

10 for any other distribution center besides

11 Perryman?

12     A.   Not to my knowledge.

13     Q.   And who is Brian Sordillo?

14     A.   According to this, he was

15 the inbound manager.

16     Q.   So "IB" means inbound?

17     A.   Yes.

18     Q.   And that would have been

19 also someone who worked at the Perryman

20 facility?

21     A.   Yes.

22     Q.   And then you reply, in the

23 top e-mail there, to Brian Sordillo and

24 Kim Brown, and you say, Brian, I am in

Page 155

1 the process of updating/completing our

2 files. I am attaching the procedures

3 that I need the following people to sign

4 and return to me. I need all four

5 procedures from each of these folks. If

6 they have access to the cage, they need

7 to know these procedures.

8       Do you see that?

9     A.   Yes.

10     Q.   And it looks like underneath

11 the heading of this e-mail, there's a

12 couple of attachments.

13       And it looks like you attach

14 four procedures, right?

15     A.   Yes.

16     Q.   And these are the four

17 procedures that everyone working in the

18 cage needs to have, correct?

19       MR. LAVELLE:  Object to

20     form.

21       THE WITNESS:  These

22     particular procedures were just

23     for these people. But anyone in

24     the cage would have these, yes.

Page 156

1 BY MR. POWERS:

2     Q.   Are these four procedures

3 the entirety of the procedures that

4 anyone in the cage would need to have had

5 read and signed?

6       MR. LAVELLE:  Object to

7     form.

8       THE WITNESS:  Okay. Can you

9     repeat that?

10 BY MR. POWERS:

11     Q.   Are these four procedures

12 here on this e-mail as attachments the

13 only four procedures that everyone in the

14 cage would have needed to have read and

15 signed?

16       MR. LAVELLE:  Object to

17     form.

18       THE WITNESS:  No.

19     Can I explain this?

20 BY MR. POWERS:

21     Q.   Sure.

22     A.   Okay. These four were given

23 to the receivers because they are the

24 only ones that would -- that they would

Page 157

1 have anything to do with.

2     Q.   So there's other procedures

3 that people working in the cage would

4 have needed to have read and signed

5 besides these four procedures; is that

6 right?

7     A.   Yes.

8     Q.   What other procedures would

9 they have needed to have read and signed?

10       MR. LAVELLE:  Object to

11     form.

12       THE WITNESS:  I can't say

13     exactly. I can give you some.

14 BY MR. POWERS:

15     Q.   Sure.

16     A.   Picking procedures;

17 replenishment procedures; order

18 monitoring procedures; the trash is here;

19 exit.

20       I believe there were others,

21 I just don't remember exactly.

22     Q.   How come these people

23 identified in Exhibit-5 would not need to

24 have looked at the, or beyond looked,

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1 needed to have read and signed the
2 above-average order monitoring
3 procedures?
4          MR. LAVELLE:  Object to
5 form.
6          THE WITNESS:  They didn't
7 have anything to do with picking.
8 They only received product.
9 BY MR. POWERS:
10     Q.    So only the pickers would
11 have needed to have read and signed the
12 above-average monitoring procedures that
13 we just talked about in Exhibit-4?
14     A.    All regular cage personnel.
15 The receivers only needed to know these
16 things.
17     Q.    I'm going to direct your
18 attention to the Bates number 9874 in
19 Exhibit-5, which is the document
20 entitled, Drug Diversion Training.
21          Do you see that?
22     A.    Yes.
23     Q.    Who wrote this document?
24     A.    I prepared it.

Page 159

1     Q.    Did you prepare all the
2 procedures contained in Exhibit-5?
3     A.    Yes, I believe so.
4     Q.    Going back to the drug
5 diversion training, the Bates number 9874
6 and 9875, when did you prepare this
7 document first?
8     A.    That would have been in the
9 beginning.
10     Q.    When is "the beginning"?
11     A.    When I started in the cage
12 and creating the documents.
13     Q.    Why were you the person who
14 was tasked with preparing this document?
15     A.    I'm not sure.  I wanted to
16 have something that -- I just wanted to
17 have these for training purposes.
18     Q.    Did any training documents
19 exist about drug diversion before you
20 created this document with Bates 9874 to
21 9875?
22     A.    Yes.
23     Q.    What were those documents?
24     A.    It was the regulatory -- DEA

Page 160

1 regulatory compliance, I believe.
2     Q.    Was that the manual we
3 talked about earlier today?
4     A.    Yes.  I believe, yes.
5     Q.    When you put together the
6 drug diversion training document here in
7 Exhibit-5, what did you use to put this
8 document together?
9     A.    I used the CFR, which is the
10 Code of Federal Regulations.
11     Q.    Anything else besides the
12 CFR?
13     A.    This almost entire thing
14 came out of the CFR.
15     Q.    That wasn't really my
16 question, though.
17          Did you use anything besides
18 the CFR to put this document together?
19     A.    I don't remember.  I don't
20 think so.
21     Q.    Did you talk to anyone about
22 putting this document together?
23     A.    I believe I would have
24 talked to Kevin.

Page 161

1     Q.    Anyone besides Kevin?
2     A.    I don't remember.
3     Q.    So on the Page 9875, the
4 last paragraph there says, It is the
5 position of the DEA that employees who
6 possess, sell, use or divert controlled
7 substances will be subject themselves not
8 only to state or federal prosecution for
9 any illicit activity, but also shall
10 immediately become the subject of
11 independent action by their employer.  It
12 is the policy of Rite Aid that any
13 associate that engages in prohibited
14 conduct is subject to disciplinary
15 action, including suspension or
16 termination of employment.
17          Do you see that?
18     A.    Yes, sir.
19     Q.    Do you know if anyone at
20 Rite Aid, to the best of your personal
21 knowledge, was ever subject to
22 disciplinary action because of the
23 activities described in this particular
24 training?

Page 162

1    MR. LAVELLE:  Object to
2  form.
3    THE WITNESS:  I don't recall
4  anyone being -- what was -- can
5  you repeat the question?
6  BY MR. POWERS:
7    Q.   It says that it is the
8  policy of Rite Aid that any associate
9  that engages in prohibited conduct is
10  subject to disciplinary action.
11    Do you know of anyone,
12  during your time at Rite Aid, that was
13  subject to disciplinary action because of
14  the prohibited conduct explained in this
15  drug diversion training?
16    A.   Not that I recall.
17    Q.   These trainings we've been
18  talking about, the drug diversion
19  training in Exhibit-5, the other
20  procedures in Exhibit-5, where were those
21  signed copies of those procedures kept?
22    A.   All signed copies were kept
23  in a file, that person's name in the
24  file, in the DEA office.

Page 163

1    Q.   So were the files organized
2  by person or by the particular training
3  itself?
4    MR. LAVELLE:  Object to
5  form.
6  BY MR. POWERS:
7    Q.   You can go ahead.
8    A.   The files that I maintained
9  were by person, with a checklist of every
10  procedure and the date they signed it,
11  along with the copy of their -- along
12  with their signature sheet.
13    Q.   So if you wanted to figure
14  out all the employees who signed the drug
15  diversion training, you would have to
16  individually go to each individual
17  person's file and collect them that way?
18    There's not a central
19  repository, here are all the drug
20  diversion sheets signed together?
21    MR. LAVELLE:  Object to
22  form.
23    THE WITNESS:  I'm not sure.
24  BY MR. POWERS:

Page 164

1    Q.   It's not a trick question.
2    I'm just trying to figure
3  out that the signed drug diversion
4  training sheets, they were organized and
5  filed by person who signed them, right?
6    A.   Yes.
7    Q.   So there wasn't a file
8  labeled, drug diversion signed sheets,
9  where everyone's drug diversion sheet was
10  in, right?
11    A.   I don't think so.
12    Q.   But you would be the person
13  who would know that, right?
14    A.   It was a long time ago.
15    Q.   But you would have -- you
16  would have been the person that kept that
17  file?
18    A.   Yes, I believe so.  Yes.
19    - - -
20    (Whereupon, Rite Aid-Wood
21    Exhibit-6,
22    Rite_Aid_OMDL_0021630-643, was
23    marked for identification.)
24    - - -

Page 165

1  BY MR. POWERS:
2    Q.   I'm going to hand you what's
3  been marked as Exhibit-6.  And this Bates
4  number is Rite_Aid_OMDL_0021630 through
5  1643.
6    Take a look at that.
7    Are you familiar with the
8  document in Exhibit-6?
9    A.   I'm not sure.
10    Q.   You don't recall this
11  document at all?
12    A.   I don't know.
13    Q.   It looks like on the first
14  page there of Exhibit-6, underneath those
15  boxes at the top, it says, Number ADM-23.
16    Do you know what that number
17  reflects?
18    A.   I'm not sure.
19    Q.   Did Rite Aid refer to
20  different policies and procedures with
21  these ADM numbers?
22    A.   I'm not sure.  Mainly
23  because this format doesn't look -- I
24  just don't recall it.

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1    Q.   Putting aside the formatting
2  for a second of Exhibit-6, did Rite Aid
3  have policies and procedures that it
4  referred to with ADM numbers?
5    A.   It looks vaguely familiar,
6  but I'm not sure.
7    Q.   It looks to me like this is
8  a procedure for regulatory inspections.
9      Does that look like the same
10 thing to you?
11     MR. LAVELLE:  Object to
12   form.
13     THE WITNESS:  It says
14   regulatory inspections.
15 BY MR. POWERS:
16   Q.   Do you recall having a
17 policy and procedure for regulatory
18 inspections while you were at Rite Aid?
19   A.   I'm pretty sure we had one,
20 yeah.
21   Q.   Does this look like that --
22   A.   I'm not sure.
23   Q.   -- policy -- sorry, let me
24 just finish my question.

Page 167

1      Does this look like that
2  policy and procedure in its substance,
3  even if it's not the exact format you
4  remember?
5    A.   It looks familiar, but I'm
6  just not -- I'm not sure.
7    Q.   You said you were pretty
8  sure that you had a policy and procedure
9  for regulatory inspections while you were
10 at Rite Aid.
11     Where was that procedure
12 kept?
13   A.   It would have been in the
14 procedural -- the -- I believe the
15 regulatory compliance procedure.
16     I know we used one of those
17 documents to help us train and -- for
18 inspections.
19   Q.   What is the regulatory
20 compliance procedure?
21   A.   Excuse me?
22   Q.   I asked where the procedures
23 for regulatory inspections were kept, and
24 you said, I believe it would have been

Page 168

1  kept in the regulatory compliance
2  procedure.
3    A.   I misspoke.  The regulatory
4  compliance book.
5    Q.   Is that the same book we
6  were looking at before?
7      MR. LAVELLE:  Object to
8    form.
9      THE WITNESS:  I believe so,
10   but I'm not positive.
11 BY MR. POWERS:
12   Q.   You can put aside Exhibit-6
13 for a second.
14     Going back to Exhibits-4 and
15 5 --
16     MR. LAVELLE:  You need to
17   pull up those, please.
18 BY MR. POWERS:
19   Q.   -- the training materials
20 that you wrote up --
21     MR. LAVELLE:  4 and 5.
22 BY MR. POWERS:
23   Q.   -- that you had the people
24 sign.

Page 169

1      MR. LAVELLE:  Here, give
2    them to me.
3      All right.  5 and 4.
4      THE WITNESS:  Okay.
5      MR. LAVELLE:  Put these over
6    by the court reporter.  Thank you.
7  BY MR. POWERS:
8    Q.   When did you go over those
9  training materials with employees at the
10 distribution center?
11   A.   When they came into the
12 cage.
13   Q.   Did you only go over those
14 policies when they first came into the
15 cage?
16   A.   Repeat that.
17   Q.   Did you only go over the
18 policies, as reflected in Exhibits-4 and
19 5, when the employees first started
20 working in the controlled drug cage?
21   A.   That's one of the times.
22     And then we would do, like,
23 refreshers.  We tried to do them at least
24 once a year to just go over the

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1  procedures, for ones that had been there
2  a while.
3      Q.   You said you "tried" to go
4  over them once a year.
5          So that means that you
6  didn't necessarily do it once every year;
7  is that right?
8          MR. LAVELLE:  Object to
9      form.
10         THE WITNESS:  I'm not sure.
11 BY MR. POWERS:
12     Q.   Was there any requirement or
13 policy that said you had to do
14 retrainings on those once a year?
15     A.   I don't remember.  There
16 might have been, I just don't remember.
17     Q.   And besides training with
18 you on those policies that we're talking
19 about in Exhibits-4 and 5, would the
20 employees who worked in the controlled
21 drug cage ever get other training on drug
22 diversion and above-average order
23 monitoring procedures from anyone else?
24         MR. LAVELLE:  Object to

Page 171

1      form.
2          THE WITNESS:  If -- when
3      Debra was the DEA coordinator, she
4      might have.  So she could have as
5      well.
6  BY MR. POWERS:
7      Q.   Besides you and Debra, would
8  anyone else have trained the employees in
9  the controlled cage on the above-average
10 order monitoring and drug diversion
11 policies?
12     A.   I don't think so.
13     Q.   You can put those exhibits
14 back.
15         - - -
16     (Whereupon, Rite Aid-Wood
17     Exhibit-7,
18     Rite_Aid_OMDL_0012519-520, was
19     marked for identification.)
20         - - -
21 BY MR. POWERS:
22     Q.   I'm going to hand you what's
23 been marked as Exhibit-7.  And the Bates
24 number on this exhibit is

Page 172

1  Rite_Aid_OMDL_0012519 through 12520.  But
2  the attachment to this e-mail, the Bates
3  number, 12520, was actually an Excel
4  spreadsheet, so it's just the one Bates
5  number, even though it's multiple pages.
6          And it looks like the
7  Exhibit-7 is an e-mail from you to Kim
8  Brown and copying Debra Chase; is that
9  right?
10     A.   Yes.

Page 173



Case: 1:17-md-02804-DAP Doc #: 1985-22 Filed: 07/24/19 45 of 68. PageID #: 260483





Page 178

Page 179

5     MR. POWERS:  We've been
6  going about an hour.  This is
7  actually a good time to break.
8     VIDEO TECHNICIAN:  The time
9  is now 1:30 p.m.  We're going off
10  the record.
11     - - -
12     (Whereupon, a brief recess
13  was taken.)
14     - - -
15     VIDEO TECHNICIAN:  The time
16  is now 1:44 p.m.  We are back on
17  the record.
18  BY MR. POWERS:
19     Q.   Welcome back, Ms. Wood.
20     A.   Thank you.
21     Q.   I'm going to hand you what's
22  been marked as Exhibit-8.  The Bates
23  number on this document is
24  Rite_Aid_OMDL_0013106 through 13107.  And

Page 180

1  13107 is another Excel spreadsheet, so
2  even though it spans multiple paper
3  pages, it was a single Bates number
4  because it was produced as an Excel
5  spreadsheet.
6     - - -
7     (Whereupon, Rite Aid-Wood
8     Exhibit-8,
9     Rite_Aid_OMDL_0013106-107, was
10     marked for identification.)
11     - - -
12  BY MR. POWERS:
13     Q.   Take a look at that exhibit
14  and let me know when you're done.
15     What is the document in
16  Exhibit-8?

Page 181

Highly Confidential - Subject to Further Confidentiality Review



Page 182

Page 184

Page 183

Page 185

Case: 1:17-md-02804-DAP Doc #: 1985-22 Filed: 07/24/19 48 of 68. PageID #: 260486



Page 186

Page 188

Page 187

Page 189



Page 194

4  BY MR. POWERS:
5      Q.   I'm going to hand you what
6  has been marked as Exhibit-9, which is
7  Bates number Rite_Aid_OMDL_0013110.
8          Take a look at that.
9              -  -  -
10         (Whereupon, Rite Aid-Wood
11     Exhibit-9, Rite_Aid_OMDL_0013110,
12     with attachment, was marked for
13     identification.)
14             -  -  -
15  BY MR. POWERS:

Page 195

Page 196

Page 197

18      Q.   You can put that exhibit
19  aside.
20             -  -  -
21         (Whereupon, Rite Aid-Wood
22     Exhibit-10,
23     Rite_Aid_OMDL_0003635-671, was
24     marked for identification.)



Highly Confidential - Subject to Further Confidentiality Review



Page 198

1           - - -
2   BY MR. POWERS:
3        Q.   I'm going to show you a
4   document that's been now marked as
5   Exhibit-10.  And it's
6   Rite_Aid_OMDL_0003635 through 3671.
7           It's got a lot of pages in
8   here.  I'm going to ask you to review the
9   document, but I'll let you know that I am
10  going to direct you to a couple
11  particular places I want to ask questions
12  about.
13          What is the document in
14  front of you as Exhibit-10?







Page 210

Page 211

Page 212

1    What is the document in
2  front of you in Exhibit-11?

Page 213

12    Q.   We're done with that
13  exhibit.
14        -  -  -
15      (Whereupon, Rite Aid-Wood
16    Exhibit-11,
17    Rite_Aid_OMDL_0012500-502, was
18    marked for identification.)
19        -  -  -
20  BY MR. POWERS:
21    Q.   I'm going to hand you what's
22  been marked as Exhibit-11.  The Bates
23  number on this exhibit is
24  Rite_Aid_OMDL_0012500 through 2502.

Highly Confidential - Subject to Further Confidentiality Review



Page 214

Page 216

Page 215

Page 217

3    Q.   We're done with that one.
4             - - -
5         (Whereupon, Rite Aid-Wood
6    Exhibit-12,
7    Rite_Aid_OMDL_0046566-567, was
8    marked for identification.)
9             - - -
10   BY MR. POWERS:
11       Q.   I'm going to hand you what's
12   been marked as Exhibit-12.  It's a
13   document Bates labeled
14   Rite_Aid_OMDL_0046566 to 46567.



Page 218
Page 220
Page 219
Page 221





Highly Confidential - Subject to Further Confidentiality Review



Page 230

1    Exhibit-12.
2          - - -
3          (Whereupon, Rite Aid-Wood
4    Exhibit-13, Rite_Aid_OMDL_0015219,
5    was marked for identification.)
6          - - -
7    BY MR. POWERS:
8       Q.   I'm going to hand you what's
9    been marked as Exhibit-13.  It's an
10   e-mail with the Bates label
11   Rite_Aid_OMDL_0015219.

Highly Confidential - Subject to Further Confidentiality Review



Page 234

Page 236

18    MR. POWERS:  We can take a
19  break here.
20    VIDEO TECHNICIAN:  The time
21  is now 2:44 p.m.  We're going off
22  the record.
23    - - -
24    (Whereupon, a brief recess

Page 235

8    MR. LAVELLE:  Wait.  He
9  hasn't asked a question.  He's
10  just explaining what he's doing,
11  which is asking the same question
12  over and over again.
13    When he asks a question,
14  maybe you can answer it.
15  BY MR. POWERS:

Page 237

1  was taken.)
2    - - -
3    VIDEO TECHNICIAN:  The time
4  is now 3:01 p.m.  We are back on
5  the record.
6    - - -
7    (Whereupon, Rite Aid-Wood
8  Exhibit-14,
9  Rite_Aid_OMDL_0017238-242, was
10  marked for identification.)
11    - - -
12  BY MR. POWERS:
13    Q.   Welcome back, Ms. Wood.
14    I'm going to hand you what's
15  been marked as Exhibit-14.  It is Bates
16  stamped number Rite_Aid_OMDL_0017238
17  through 17242.
18    Are you familiar with the
19  e-mail string represented in Exhibit-14?
20    A.   Yes, from what I just read.
21    Q.   When was the last time you
22  saw this e-mail string?
23    A.   The last time I saw this, I
24  saw some of it through my lawyer.



Page 238

1      Q.   And you're pointing to Mr.
2   Lavelle there?
3      A.   Yes, I'm sorry.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 246

Page 248

23    MR. POWERS:  I think that's
24  all I have.  We can go off the

Page 247

Page 249

1  record.
2     VIDEO TECHNICIAN:  The time
3  is now 3:15 p.m.  We are going off
4  the record.
5        - - -
6     (Whereupon, a brief recess
7  was taken.)
8        - - -
9     VIDEO TECHNICIAN:  The time
10 is now 3:32 p.m.  We are back on
11 the record.
12       - - -
13    EXAMINATION
14       - - -
15 BY MR. LAVELLE:
16    Q.   Good afternoon, Ms. Wood.
17 John Lavelle, representing Rite Aid.
18       I just have one particular
19 document I wanted to ask you a few
20 questions about, if I may.
21    A.   Yes, sir.
22    Q.   I want to show you what we
23 marked for identification as Exhibit
24 Wood-15.

Page 250

```
1         - - -
2         (Whereupon, Rite Aid-Wood
3     Exhibit-15,
4     Rite_Aid_OMDL_0015077-081, was
5     marked for identification.)
6         - - -
7  BY MR. LAVELLE:
8     Q.   Please take a look at that
9  and let me know when you're ready to
10 answer a couple questions about it.
11        MS. HOSMER:  Mr. Lavelle,
12    can you read the Bates number,
13    please?
14        MR. LAVELLE:  Yes, I'm
15    sorry, I should have done that.
16    It's Rite_Aid_OMDL_0015077 through
17    15081.
18 BY MR. LAVELLE:
19    Q.   Ms. Wood, are you ready to
20 answer some questions about this?
21    A.   Yes.
22    Q.   I've put in front of you
23 what we marked for identification as
24 Wood-15.  I just gave the Bates Number
```

Page 251

```
1  range.  And it's an e-mail chain with an
2  attachment.
3         Do you recognize this?
4     A.   Yes.
```





Page 254

4      Q.   Do you understand what .doc
5   means when it refers to an attachment?
6   Is that a document?
7      A.   I don't think I do -- yes, I
8   believe so, a document.

Highly Confidential - Subject to Further Confidentiality Review

Page 258

7        MR. LAVELLE:  Thank you, Ms.
8   Wood.  That's all I have.
9        MR. POWERS:  I'm just going
10  to have a few follow-up questions.
11  I think we need to switch seats
12  again.
13       VIDEO TECHNICIAN:  The time
14  is now 3:39 p.m.  We are going off
15  the record.
16            - - -
17       (Whereupon, a discussion off
18  the record occurred.)
19            - - -
20       VIDEO TECHNICIAN:  The time
21  is now 3:40 p.m.  We are back on
22  the record.
23            - - -
24       EXAMINATION

Page 259

1            - - -
2   BY MR. POWERS:
3        Q.   So, Ms. Wood, your counsel
4   was just going through Exhibit-15 with
5   you, right?
6        A.   Yes.



Highly Confidential - Subject to Further Confidentiality Review



Page 262

16    MR. POWERS:  That's all I
17  have.

Page 263

1      VIDEO TECHNICIAN:  The time
2  is now 3:43 p.m.  This concludes
3  today's deposition.  We're going
4  off the record.
5         - - -
6      (Whereupon, the deposition
7  concluded at 3:43 p.m.)
8         - - -

Page 264

1         CERTIFICATE
2
3
4      I HEREBY CERTIFY that the
5  witness was duly sworn by me and that the
6  deposition is a true record of the
7  testimony given by the witness.
8
9
10
11      Amanda Maslynsky-Miller
12      Certified Realtime Reporter
13      Dated:  January 27, 2019
14
15
16
17
18
19      (The foregoing certification
20  of this transcript does not apply to any
21  reproduction of the same by any means,
22  unless under the direct control and/or
23  supervision of the certifying reporter.)
24

Page 265

1      INSTRUCTIONS TO WITNESS
2
3      Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8      After doing so, please sign
9  the errata sheet and date it.
10      You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14      It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1      - - - - - -
2      E R R A T A
3      - - - - - -
4    PAGE  LINE  CHANGE/REASON
5    _____ _____ _____
6    _____ _____ _____
7    _____ _____ _____
8    _____ _____ _____
9    _____ _____ _____
10   _____ _____ _____
11   _____ _____ _____
12   _____ _____ _____
13   _____ _____ _____
14   _____ _____ _____
15   _____ _____ _____
16   _____ _____ _____
17   _____ _____ _____
18   _____ _____ _____
19   _____ _____ _____
20   _____ _____ _____
21   _____ _____ _____
22   _____ _____ _____
23   _____ _____ _____
24   _____ _____ _____

Page 268

1        LAWYER'S NOTES
2    PAGE  LINE
3    _____ _____ _____
4    _____ _____ _____
5    _____ _____ _____
6    _____ _____ _____
7    _____ _____ _____
8    _____ _____ _____
9    _____ _____ _____
10   _____ _____ _____
11   _____ _____ _____
12   _____ _____ _____
13   _____ _____ _____
14   _____ _____ _____
15   _____ _____ _____
16   _____ _____ _____
17   _____ _____ _____
18   _____ _____ _____
19   _____ _____ _____
20   _____ _____ _____
21   _____ _____ _____
22   _____ _____ _____
23   _____ _____ _____
24   _____ _____ _____

Page 267

1    ACKNOWLEDGMENT OF DEPONENT
2
3        I,_____, do
4    hereby certify that I have read the
5    foregoing pages,  1 - 263, and that the
6    same is a correct transcription of the
7    answers given by me to the questions
8    therein propounded, except for the
9    corrections or changes in form or
10   substance, if any, noted in the attached
11   Errata Sheet.
12
13   _____
14   MARIAN WOOD          DATE
15
16
17   Subscribed and sworn
18   to before me this
19   _____ day of _____, 20____.
20
     My commission expires:_____
21
22   _____
     Notary Public
23
24