Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF OHIO

 3                   EASTERN DIVISION

 4

 5   ---------------------------) MDL No. 2804

 6   IN RE NATIONAL PRESCRIPTION  )

 7   OPIATE LITIGATION            )

 8                                ) Case No. 17-md-2804

 9   This document relates to:    )

10   All Cases                    )

11   ---------------------------) Hon. Dan A. Polster

12

13                  HIGHLY CONFIDENTIAL

14        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

15

16             The videotaped deposition of MARY WOODS,

17   called for examination, taken pursuant to the Federal

18   Rules of Civil Procedure of the United States District

19   Courts pertaining to the taking of depositions, taken

20   before JULIANA F. ZAJICEK, a Registered Professional

21   Reporter and a Certified Shorthand Reporter, at Lieff

22   Cabraser Heimann & Bernstein, 8th Floor, 250 Hudson

23   Street, New York, New York, on January 10, 2019, at

24   9:10 a.m.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2    ON BEHALF OF THE PLAINTIFFS:
 3         ROBBINS GELLER RUDMAN & DOWD LLP
           655 West Broadway, Suite 1900
 4         San Diego, California 92101
           619-231-1058
 5         BY:  THOMAS E. EGLER, ESQ.
                tegler@rgrdlaw.com
 6
                      -and-
 7
           ROBBINS GELLER RUDMAN & DOWD LLP
 8         Post-Montgomery Center
           One Montgomery Street, Suite 1800
 9         San Francisco, California 94104
           415-288-4545
10         BY:  KELLI BLACK, ESQ.
                kblack@rgrdlaw.com
11
12    ON BEHALF OF AMERISOURCEBERGEN CORPORATION and
      AMERISOURCEBERGEN DRUG CORPORATION:
13
           REED SMITH LLP
14         Three Logan Square
           1717 Arch Street, Suite 3100
15         Philadelphia, Pennsylvania 19103
           215-851-8100
16         BY:  CHRISTIAN SAUCEDO, ESQ. (Telephonically)
                csaucedo@reedsmith.com
17
18    ON BEHALF OF CEPHALON, INC., TEVA PHARMACEUTICALS USA,
      INC., ACTAVIS LLC, ACTAVIS PHARMA, INC., AND WATSON
19    LABORATORIES, INC.:
20         MORGAN LEWIS & BOCKIUS LLP
           1701 Market Street
21         Philadelphia, Pennsylvania 19103-2921
           215-963-5000
22         BY:  ADAM HAMMOUD, ESQ.
                adam.hammoud@morganlewis.com
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES: (Continued)
 2    ON BEHALF OF CARDINAL HEALTH, INC.:
 3         FARRELL FRITZ P.C.
           400 RXR Plaza
 4         Uniondale, New York 11556
           516-227-0620
 5         BY:  KEVIN P. MULRY, ESQ.
                kmulry@farrellfritz.com
 6
 7    ON BEHALF OF ENDO HEALTH SOLUTIONS INC., ENDO
      PHARMACEUTICALS INC., PAR PHARMACEUTICAL COMPANIES,
 8    INC.:
 9         BAKER HOSTETLER
           Key Tower
10         127 Public Square, Suite 2000
           Cleveland, OH 44114-1214
11         216-861-6486
           BY:  DOUG SHIVELY, ESQ. (Telephonically)
12              dshively@bakerlaw.com
13
      ON BEHALF OF WALMART INC.:
14
           JONES DAY
15         150 West Jefferson, Suite 2100
           Detroit, Michigan 48226-4438
16         313-733-3939
           BY:  LOUIS P. GABEL, ESQ.
17              lpgabel@jonesday.com
18
      ON BEHALF OF ALLERGAN:
19
           KIRKLAND & ELLIS LLP
20         655 Fifteenth Street, N.W.
           Washington, D.C. 20005-5793
21         202-879-5211
           BY:  JENNIFER LEVY, ESQ.
22              jennifer.levy@kirkland.com
23                   -and-
24
```

```
 1    APPEARANCES: (Continued)

 2    ON BEHALF OF ALLERGAN:

 3          KIRKLAND & ELLIS LLP

            300 North LaSalle Street

 4          Chicago, Illinois 60654

            312-862-3429

 5          BY:  KAITLYN COVERSTONE, ESQ.

                 kaitlyn.coverstone@kirkland.com

 6

 7

 8

 9    ALSO PRESENT:

10          MS. LYNNE FISCHMAN UNIMAN (Telephonically).

11

12

13

14    THE VIDEOGRAPHER:

15          MR. ERIC DAVIDSON,

            Golkow Litigation Services.

16

17

18

19

20

21

22

23

24
```

```
 1                        I N D E X

 2

 3   WITNESS:                                      PAGE:

 4    MARY WOODS

 5        EXAM BY MR. EGLER....................     7

 6        EXAM BY MS. LEVY.....................   190

 7        FURTHER EXAM BY MR. EGLER............   190

 8

 9                        *****

10

11                  E X H I B I T S

12   ALLERGAN - WOODS EXHIBIT            MARKED FOR ID

13    No. 30    E-mail chain, top one from Mary     25
                Woods to Eileen Mesis, among

14              others, 2/9/04, Subject: Re:
                Suspicious Order Reports;

15              ALLERGAN_MDL_02166476 - 477

16    No. 31    E-mail chain, top one from Mary     31
                Woods to Andrew Boyer and Judith

17              Callahan, 10/04/11, Subject:
                Investigation Summary - DEA

18              Affairs, w/attachment;
                ALLERGAN_MDL_02187196 - 199

19

      No. 32    E-mail, SOMS Update with One Note   43

20              attachment;
                ALLERGAN_MDL_03835569 - 637

21

      No. 33    E-mail from Mary Woods to Andrew    67

22              Boyer, 11/08/11, Subject: 2012
                Budget Customer Relations

23              Presentation MW 3.pptx - slide 4
                modified using marketing template,

24              w/attachment: ALLERGAN_MDL_02187056 - 091
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              E X H I B I T S (Continued)

 2    ALLERGAN - WOODS EXHIBIT              MARKED FOR ID

 3    No. 34    E-mail from Lisa Scott to Andrew     83
                Boyer, among others, 12/13/12,
 4              Subject: Summary: Capital
                Wholesale, w/attachment;
 5              ALLERGAN_MDL_02187194 - 195

 6    No. 35    Document titled: "Customer          90
                Relations Operations," Mary Woods,
 7              Exec. Director Customer Relations
                Operations - 2012;
 8              ALLERGAN_MDL_03802654 - 687

 9    No. 36    Document titled: "Actavis          142
                Transition," Tuesday, July 31,
10              2012, 10:12 PM;
                ALLERGAN_MDL_03776365 - 387
11
      No. 37    Document titled: "Kick Off Meeting  184
12              5/13"; ALLERGAN_MDL_03755062 - 078

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        THE VIDEOGRAPHER:  We are now on the record.  My

 2   name is Eric Davidson.  I am the videographer for

 3   Golkow Litigation Services.  Today's date is Thursday,

 4   January 10th, 2019, and the time is approximately

 5   9:10 a.m.

 6             This video deposition is being held at

 7   250 Hudson Street, 8th Floor, New York, New York, in

 8   the matters of National Prescription Opiate Litigation

 9   for the United States District Court, Northern

10   District of Ohio, Eastern Division.

11             The deponent is Mary Woods.

12             At this time counsel will be noted on the

13   stenographic record.

14             The court reporter is Juliana, and she may

15   now swear in the witness.

16                  (WHEREUPON, the witness was duly

17                   sworn.)

18                     MARY WOODS,

19   called as a witness herein, having been first duly

20   sworn, was examined and testified as follows:

21                     EXAMINATION

22   BY MR. EGLER:

23        Q.    Hi, Ms. Woods.  Thanks for coming back

24   today.
```

 1              Again, my name is Tom Egler.  I represent

 2   the Plaintiffs in this case.  I work for a law firm

 3   called Robbins Geller Rudman & Dowd.

 4              Yesterday we talked about a number of

 5   issues and today I want to go into more depth about

 6   your personal memories and your personal activities at

 7   Watson and then Actavis and now Allergan.

 8              So can we start out, can you tell me where

 9   you went to college?

10       A.    I went to community college, only I

11   studied at Moraine Valley.  I do not have -- I did not

12   complete my degree.  And, um, that's it.

13       Q.    All right.  And then when did you start

14   working for Watson?

15       A.    I started working for Watson in 1998.

16       Q.    And when you started working for Watson,

17   where did you work?

18       A.    I worked in Glenview, Illinois.

19       Q.    And then at some point did you move to

20   California for work?

21       A.    I did.

22       Q.    When was that?

23       A.    In 1999.

24       Q.    When you moved to California for work at

Highly Confidential - Subject to Further Confidentiality Review

1    Watson, what was your job title?

2         A.    I believe my job title -- I've had

3    several, so I have to think about this.  I believe my

4    job title was associate director of call center

5    operations, I believe.  I -- I can't be positive.

6         Q.    As you think about it, was the call center

7    operations group that you worked with part of the

8    customer service group at Watson?

9              Let me ask this question a little bit more

10   generally.

11             When you worked at Watson, did you have

12   something that you would now identify as a customer

13   service group, did the company have a customer service

14   group?

15        A.    Watson did have a customer service group.

16        Q.    As you think of it, was the call center

17   that you worked for in the late '90s part of that

18   customer service group?

19        A.    In the late '90s, customer service was

20   part of the call center group.

21        Q.    All right.  Was -- was customer service a

22   part of the call center group or the other way around?

23        A.    No.  The customer service group was part

24   of the call center group --

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Oh, okay.

 2        A.    -- in the late '90s.

 3        Q.    All right.

 4              So what did the call center -- let me

 5   start over.

 6              What did the customer service group at

 7   Watson do in the late '90s?

 8        A.    To the best of my knowledge --

 9        Q.    Uh-huh.

10        A.    -- this is a long time ago, their role was

11   to support the direct customers of Watson.  That's

12   what their job was.

13        Q.    All right.  And then what did the call

14   center group that the customer service group was a

15   part of do?

16        A.    So in addition to customer service, as I

17   mentioned, there was other groups and there would have

18   been a small inside sales team, and their role was to

19   contact other -- other types of customers and their

20   orders went through the wholesalers, as I mentioned

21   yesterday, it was --

22        Q.    All right.

23        A.    -- hospitals.  They -- it was a detailing

24   team that contacted, I think I mentioned yesterday,
```

 1    women's healthcare, it was dermatology, things like

 2    that.

 3         Q.    With regard to the -- the answer you gave

 4    just now, you used the term "inside sales."

 5              What does that term mean to you in the

 6    context of your work?

 7         A.    So, in the context of my work, inside

 8    sales means there -- they would have been contacting

 9    people regarding products sold by the company at that

10    time and selling products to them and they shipped

11    through the wholesaler.  It was whole -- through --

12    you know, through their primary wholesaler.

13         Q.    So as you think of the people who were in

14    the inside sales group at that time, with the

15    understanding that we are talking about 20 years ago

16    at least, were they -- would you characterize them as

17    salespeople or customer service people or both or

18    something else?

19         A.    I would say they were probably both.

20         Q.    Okay.

21         A.    They probably had a role to inform them

22    about -- you know, they would look and see what

23    products they had typically purchased and then they

24    would also handle any service issue they would have

1   had, but the sale or the products shipped through the

2   wholesaler, so most probably service issues would have

3   gone through the wholesalers.

4        Q.    All right.  As you think of it, with

5   regard to the inside sales group that you're -- we've

6   been talking about, would those people have been able

7   to or responsible for selling any controlled

8   substances?

9        A.    I -- I really can't remember, because it

10  was so long ago, exactly what the product line was

11  back then.

12       Q.    All right.  All right.

13             Let's -- we are going to take a short trip

14  through your career so we can just get some names down

15  now.

16             So you started at Watson and then in 19 --

17  in late '90s you went to California and --

18       A.    Can I make one correction on that?

19       Q.    Sure.

20       A.    I started at Rugby Laboratories --

21       Q.    Okay.

22       A.    -- in 1995.  They were acquired by Watson

23  in 1998.

24       Q.    All right.  So and then after you started

1    working in California, did your job title change at

2    any point?

3         A.    Yes.

4         Q.    Okay.  Can you tell me generally what the

5    various job titles you had in California were?

6         A.    So I'll do this to the best of my

7    recollection.

8         Q.    Sure.

9         A.    Obviously it has been many years.

10           So I would have been, I believe,

11   associate -- I'm going by my memory here, associate

12   director of call center operations and then I believe

13   I would have become a director of call center

14   operations, and then we very early on did not have an

15   inside sales team or a detailing team any longer, and

16   then I believe I changed to director of customer

17   relations or customer support.  I can't recall what

18   the title was.  And then at some point I became an

19   executive director of customer relations or something

20   like that.  And then that would have probably been the

21   extent in California.

22        Q.    Okay.  And then at some point you left

23   California for the East Coast for work, is that right?

24        A.    That is correct.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     When was that?

2      A.     Approximately five years ago, so I think

3   that would have been around 2000 and -- I think it was

4   around 2014, maybe '13, maybe '13.

5      Q.     When you came to work in New Jersey, who

6   was your employer?

7      A.     When I came to work in New Jersey,

8   Actavis, Inc.

9      Q.     When you started working for Actavis,

10  Inc., and I'll -- I'll -- we went through the -- let

11  me start over.

12         We went through the significance of the

13  comma and naming issues yesterday, and my

14  understanding is that the Actavis, Inc. is the

15  combined Actavis and Watson entity and that

16  Actavis Inc. is the pre-merger Actavis entity.

17         Is that your understanding as well?

18     A.     Yes, my understanding is Actavis, Inc. is

19  after the merger.

20     Q.     All right.  So I'll try to use

21  Actavis, Inc. today so we are on the same page,

22  because I know you never worked for Actavis Inc., and

23  if I miss it and we both notice it or if you notice

24  it, just let me know.  But I'll -- I have the

1    understanding that you never worked for Actavis Inc.

2    and want to make sure that you don't have -- or I

3    understand that you don't have personal knowledge of

4    what was going on there.

5              So with regard to Actavis, Inc., when you

6    started working for them in New Jersey, where did you

7    work physically in New Jersey?

8         A.   I physically worked in Parsippany,

9    New Jersey.

10        Q.   Do you remember the address of the office

11   building where you worked?

12        A.   I'm trying to think of which location that

13   we were at.

14             I believe it is -- not off the top of my

15   head, but...

16        Q.   All right.  Do you remember -- let me put

17   it -- so, with regard to --

18        A.   Interpace Parkway, 400 Interpace Parkway.

19        Q.   Great.  All right.

20             And if you think of it, there was more

21   than one physical location for Actavis white collar

22   workers in New Jersey, is that right?

23        A.   The only location that I can recall for

24   Actavis, Inc. in New Jersey, there was multiple

1    buildings on the campus there, but, I mean, we -- but

2    that's the only location I can remember.

3        Q.    All right.

4            With regard to the building where you

5    worked, how many stories was it?

6        A.    I believe it was four stories.

7        Q.    Okay.  And as you think about the

8    people -- let me start over.

9            As you think about the -- the groups that

10   were on the floor where you worked, do you have a

11   memory of which operating groups or divisions were on

12   the floor where you worked?

13       A.    When I started, yes, I was on a floor

14   with -- to the best of my recollection, the teams that

15   were on the floor with me were IT, my team, I think

16   that was the gist of where I was at, to the best of my

17   knowledge.

18       Q.    Okay.  And when you think about the --

19   what you termed as your team in the Interpace Parkway

20   building, about how many people are you thinking of?

21       A.    On my team at the time probably maybe 14,

22   15 people.

23       Q.    All right.  As you think about it, with

24   regard to your team, keeping in that word, were you

1    the leader of the team?

2         A.    Yes, I was.

3         Q.    And who was directly below you?

4         A.    I had two departments under me at the

5    time.  I had an order management team and I had a

6    support services team which was licensed -- licensing

7    and customer master.

8         Q.    The "customer master" term that you use,

9    are those the people who would have worked responding

10   to orders that had pended in the suspicious order

11   monitoring system?

12        A.    So, customer master and licensing were one

13   team, so it was that team that was responsible, yes.

14        Q.    Okay.  So on that team, the customer -- on

15   those two teams that you are talking about, can you

16   tell me about how many people were on them?

17        A.    So on the -- I'm sorry.  I had one other

18   team at the same time which was -- I believe at that

19   time we also had some -- this is just going back.  I'm

20   trying to recollect this.  So I believe we also had --

21   and maybe not.  I'm going to stick with that because

22   I -- I really can't recall, so I don't want to provide

23   something that's not accurate.

24        Q.    Um-hum.

1       A.      So on the license master and customer

2    master side, I would think we had five or six people,

3    we had some administrative people.

4       Q.      Does the five or six include the

5    administrative people?

6       A.      No.

7       Q.      Okay.

8       A.      And then we had -- and then the balance of

9    the people would have been on the order management

10   side.

11      Q.      What did the order management -- let me

12   start over.

13              What did the people on the order

14   management side do?

15      A.      The people on the order management side

16   used the Edge system that we spoke about yesterday,

17   evaluating orders as they came in to the system

18   against the amount of inventory customers were allowed

19   to receive.  They ran analytical reports on inventory

20   and forecasting.  They managed 852 data that came in

21   from the wholesalers, 867 data that came in from the

22   wholesalers, they worked with the supply chain teams

23   on inventory, we also had a person on that team that

24   managed vendor managed inventory (VMI), there was --

 1    we -- we had some responsibilities to Walmart on

 2    vendor managed inventory using their retailing system.

 3    So they did a lot of analytical work.  So that was the

 4    gist of what their role was.

 5         Q.    All right.

 6               With regard to the other -- well, so

 7    that's the order management group that you were

 8    talking about and the other people that you were

 9    talking about were the license master and the customer

10    master people.

11               Is there -- are there -- were there any

12    other groups that you worked with at this time when

13    you first started in New Jersey for Actavis, Inc.?

14         A.    I really -- I can't recollect.  I do not

15    believe so.

16         Q.    All right.  With regard to the license

17    master and the customer master people, I think you had

18    said those were the people who would analyze orders

19    that had pended in the suspicious order monitoring

20    system, is that right?

21         A.    That is correct.

22         Q.    So do you have a -- a feeling or knowledge

23    about how much of -- about how much of those people's

24    time was spent on a day-to-day basis analyzing orders

1    that had pended in the suspicious order monitoring

2    system?

3         A.    Well, so to the best of my recollection, I

4    mean, that was a significant amount of their time

5    during the day, because they were in that role all day

6    long as orders would come in and pend and they would

7    have to evaluate and review those orders and so that

8    was a primary part of their role.

9         Q.    We had talked about -- we had talked about

10   this yesterday, and I just want to make sure I'm clear

11   on the context of it.

12              The suspicious order monitoring system at

13   Actavis and at Watson when you worked there as well,

14   had -- it was applicable to all controlled substances,

15   is that right?

16        A.    That is correct.

17        Q.    And I asked that because the case that we

18   are talking about here relates to substances that were

19   on Schedule II and at some point Schedule III of the

20   suspicious -- or the Controlled Substances Act, but

21   there are five total schedules, is that right?

22        A.    That's correct.

23        Q.    So when you talk about the --

24        A.    The CSA law doesn't specify that you can

```
 1    exclude other drugs from suspicious order monitoring.

 2        Q.    Did you ever do an examination while you

 3    were at Actavis, Inc. or Watson of about how much the

 4    license master or customer master staff, how much of

 5    their time was spent working on Schedule II controlled

 6    substances that Watson or Actavis manufactured?

 7        A.    We -- we didn't separate out how much time

 8    was for C-IIs versus all of the controlleds because

 9    they all pended if it's -- you know, they are all

10    under the Act, so we didn't separate out just opioids

11    versus -- or C-IIs versus C-II through V.

12        Q.    Do you remember whether there was ever a

13    time when you worked at Actavis or Watson that the

14    conditions for an order to pend were different for

15    C-II drugs than they were for C-III through V?

16        A.    Yes.

17        Q.    All right.  And when was that?

18        A.    So that was controlled by our controlled

19    substance compliance team --

20        Q.    Uh-huh.

21        A.    -- and they could have made changes to

22    that at any time they felt that there was the need to

23    make that change, and they did that.  I can't recall

24    the exact timeframe of that.  They were very diligent
```

1    about making those changes.  I -- I don't want to give

2    a timeframe because I -- I really don't know the exact

3    timeframe, but it was reviewed frequently and they

4    would make the changes as necessary.

5         Q.   As you think of it, did that change take

6    place while you were in New Jersey or in California?

7         A.    It took -- it happened when I was in both

8    locations.

9         Q.    All right.  Did it happen -- well, I guess

10   it did happen more than once then?

11        A.    Yes.

12        Q.    All right.  Do you remember about how many

13   times it happened?

14        A.    I can't recall the number of times it

15   happened.

16        Q.    So as you think of it, who would be the

17   person most responsible for the issues that we're

18   talking about now deciding the -- the level for which

19   a order would pend on various schedules of the

20   Controlled Substance Act?

21        A.    I'm -- I'm sorry.  What do you mean by

22   "issues"?

23        Q.    Oh, so you had said that the controlled

24   substance compliance team --

1      A.      Uh-huh.

2      Q.      -- at Actavis and Watson made changes to

3  the level at which an order would pend on the

4  suspicious order monitoring system depending on which

5  schedule it was under the Controlled Substance Act?

6      A.      Correct.

7      Q.      So who would be most responsible for that

8  issue?

9      A.      For that activity?

10     Q.      Yes.

11     A.      So, the controlled substance compliance

12  team would make a determination on how to -- you know,

13  on what changes needed to be made, and it was the

14  controlled substance compliance team that could go in

15  and make those changes.

16     Q.      And who on the team, as you think of it,

17  was most responsible for that?

18     A.      So, Tom Napoli at that -- at that time --

19     Q.      Okay.

20     A.      -- would be able to do that or -- and

21  Tracey Hernandez's time when she was here, they would

22  be able to make those changes.

23     Q.      Okay.

24     A.      Or give direction to make those changes.

```
1       Q.    Do you remember the first time the --

2  okay.

3             Do you remember the first time the level

4  at which an order pended on the suspicious order

5  monitoring system was modified based on the drug's

6  placement on a -- a Controlled Substance Act schedule?

7       A.    I -- I really couldn't remember the first

8  time.

9       Q.    All right.

10            All right.  So we are going to go through

11  some documents, as we did yesterday.

12      A.    Okay.

13      Q.    Oh, so, all right.  You had mentioned

14  earlier that there is a -- this order management

15  group --

16      A.    Uh-huh.

17      Q.    -- as well, right?

18      A.    Correct.

19      Q.    And you had mentioned that -- the term

20  "VMI"?

21      A.    Vendor managed inventory.

22      Q.    Yeah.

23            What does vendor managed inventory mean to

24  you?
```

```
 1        A.      So, vendor managed inventory is a process

 2   in which you have the ability to work with a vendor to

 3   help them manage their inventory.  Most of the time

 4   you are using their systems.  In the case of Walmart,

 5   we used their systems and we helped to review their

 6   inventory with them and they would make us go into

 7   Retail Link and review their systems, make sure they

 8   didn't have outs and things like that.

 9        Q.      With regard to any -- any shipments or

10   orders that were made through any VMI system at

11   Actavis or Watson, do you know whether those orders

12   would have been monitored by the suspicious order

13   monitoring program at Actavis or Watson?

14        A.      Every single order would have gone

15   through --

16        Q.      All right.

17        A.      -- our system.

18        Q.      All right.  I'm going to hand you what

19   we'll mark as Exhibit 30 for this deposition.

20                    (WHEREUPON, a certain document was

21                    marked Allergan - Woods Deposition

22                    Exhibit No. 30, for identification,

23                    as of 01/10/2019.)

24   BY MR. EGLER:
```

```
1       Q.    Because of the physical setup, I'm going

2   to hand you two copies, one for your counsel.

3       A.    Okay.  Sure.

4       Q.    And, Ms. Woods, could you look at what

5   I've marked as Exhibit 30, and as you are looking at

6   it, I'll read into the record its Bates stamps are

7   Allergan_MDL_02166476 and 477.

8             And when you are ready, can you tell me

9   what this appears to you to be?

10      A.    Sure.  Let me just read this.

11      Q.    Yeah.

12      A.    Okay.  I've read it.

13      Q.    All right.  What does this appear to you

14  to be?

15      A.    So Tracey Hernandez headed up the DEA

16  compliance team.  This appears to me that she is

17  stating filings for the DEA suspicious orders should

18  go through her team.

19      Q.    Does this seem to be a -- an e-mail chain

20  among you and other people at Watson Pharma, Inc.?

21      A.    Correct.

22      Q.    And the date on the e-mails is January and

23  February of 2004, is that right?

24      A.    Yes, that is correct.
```

1       Q.     So about 15 years ago at this point, is

2   that right?

3       A.     Yes, correct.

4       Q.     So for the e-mails that appear on here,

5   there is a name Tracey Hernandez who we have discussed

6   a little bit earlier and a woman named Christine

7   Marino.

8              Do you see her name right there?

9       A.     Yes, I do.

10      Q.     Who is Christine Marino?

11      A.     Christine Marino was a supervisor of

12  customer service and she was also a representative.  I

13  don't know which position at this time.

14      Q.     When you say "representative," what does

15  that mean?

16      A.     A customer service representative.

17      Q.     All right.  And then there is another name

18  there, Eileen Mesis, M-e-s-i-s?

19      A.     Correct.  She was a manager of customer

20  service.

21      Q.     All right.  And then Judy Callahan.  Who

22  is Judy Callahan?

23      A.     Judy Callahan was a -- a manager of

24  customer service at this time.

1    Q.    And in the first e-mail in time on this

2    exhibit, which is at the bottom of the second page,

3    it's a Ms. Marino -- or Ms. Hernandez writing to

4    Ms. Marino and Ms. Callahan:

5           "Chris/Judy, Can you please tell me who at

6    DEA you have on record to send these reports to if you

7    ever need to?"

8           And Ms. Hernandez replies:  "I have not

9    had to forward suspicious reports.  You may want to

10   cover this with Mary Woods."

11          And then you respond on the first page --

12   A.    Uh-huh.

13   Q.    "We have never needed to file a report.

14   Any time there was a question during the order process

15   of a suspicious order quantity, we went," and then in

16   parentheses, "(and still follow the same

17   procedure)," and then close parentheses, "back to a

18   customer to let them know we would need to notify the

19   DEA due to the quantity they wanted to order.  In

20   response, they either reduced the quantity or

21   cancelled the order."

22          Do you see that there?

23   A.    Yes, I do.

24   Q.    And then you -- you go on:

```
 1              "Most all customers understand the issues

 2     and do not want to bring attention to these large

 3     purchases."

 4              So at this time in January of 2004, do you

 5     remember whether it was an official policy of Watson

 6     Pharma to allow customers to reduce quantities in

 7     order to avoid having to file a -- a DEA suspicious

 8     order report?

 9        A.    I absolutely do not remember from 2004.

10        Q.    All right.  So with regard to this

11     response that you give on this e-mail, do you

12     remember -- as you sit here today, do you remember

13     writing this e-mail?

14        A.    Not from 2004.

15        Q.    Right.  With that understanding, it's

16     15 years ago.

17              Do you have an understanding about whether

18     it was the case that you and people you worked with

19     would allow customers to reduce the quantity of orders

20     that had pended in a system in order to avoid filing a

21     suspicious order report with the DEA?

22        A.    Nobody would have ever done it with any

23     intention to avoid filing a report with the DEA.  If

24     the customer would have come to us and said, you know,
```

1    reduce the quantity, I don't -- I can't recollect

2    from, you know, 15 years ago --

3         Q.    Right.

4         A.    -- what the policy would have been or the

5    justification from 15 years ago.

6         Q.    But in the e-mail you wrote, they either

7    cancelled the order or reduced the amount --

8         A.    Yes, I did.

9         Q.    -- is that right?

10            So do you have any reason to believe it

11    wasn't a regular process to allow customers to reduce

12    their orders at that time?

13        A.    I -- I can't respond to what happened

14    15 years ago.  I'd have to have more information.

15        Q.    As you sit here today, you don't have any

16    reason to believe that that wasn't the case, right?

17        A.    I don't have any be -- reason to believe

18    it was or wasn't.  I don't know.

19        Q.    Well, you -- you wrote it at the time,

20    right, in 2004?

21        A.    I probably wrote a lot of things at the

22    time that I probably can't recollect.

23        Q.    Would you have written something that you

24    didn't believe was true at the time in 2004?

1     A.    I wouldn't write something I didn't

2   believe was true at that point in time for that

3   e-mail.

4     Q.    So you must have believed that that was

5   actually the case, that customers would have

6   reduced --

7     A.    For this incident.

8     MS. LEVY:  Hang on a second.  Let him finish his

9   question.

10  BY MR. EGLER:

11    Q.    Customers would have been able to reduce

12  their order in order to avoid a DEA report being

13  filed, is that right?

14    A.    I'm reading what's in the e-mail.  That's

15  the best I can respond to it.

16    Q.    All right.

17          All right.  You can set this document

18  aside.

19                (WHEREUPON, a certain document was

20                 marked Allergan - Woods Deposition

21                 Exhibit No. 31, for identification,

22                 as of 01/10/2019.)

23  BY MR. EGLER:

24    Q.    So I'll hand you what we'll mark as

```
 1   Exhibit 31.

 2           Again, there is two -- two copies there.

 3      A.   Sure.

 4      Q.   And can you look through what I've marked

 5   as Exhibit 31?  And as you are looking through it,

 6   I'll read on the record, it's Bates numbered

 7   Allergan_MDL_02187196 through 87199.

 8           And when you are ready, can you tell me

 9   what this appears to you to be?

10      A.   Okay.

11      Q.   All right.  Ms. Woods, what does this

12   appear to you to be?

13      A.   This was an e-mail that we were -- that I

14   sent to Andy Boyer, who is the VP of our sales and

15   marketing team.

16      Q.   The e-mail is dated October 4th, 2011, is

17   this right?

18      A.   That is correct.

19      Q.   And at this point you were still working

20   in Corona, California, is that right?

21      A.   That is correct.

22      Q.   And still working for Watson still?

23      A.   Correct.

24      Q.   I don't know if we've raised his name
```

1  earlier, but, again, who is Andy Boyer?

2      A.    I believe at this time he was a vice

3  president of sales and marketing.  I believe that was

4  his title.

5      Q.    All right.  And he was at Watson, is that

6  right?

7      A.    Yes, that is correct.

8      Q.    Below his name is the name

9  Judith Callahan.

10          Do you know who Ms. Callahan is?

11     A.    Yes.  Judy was the -- she -- I'm not sure

12  her title at the time, but she worked on my team.

13     Q.    Okay.  At this time, 2011, late 2011, what

14  was your team at Watson?

15     A.    My team at Watson was customer service and

16  it would have also included order processing and

17  master data and -- order processing, master data,

18  licensing.

19     Q.    Okay.

20     A.    And I think we would have had a small

21  group called account management which was a customer

22  service group that handled orders for, like, contract

23  manufacturing customers.

24     Q.    As you think of it, around this time in

1    2011, were you responsible for anybody with, as you

2    had said before, inside sales responsibilities?

3        A.    No.

4        Q.    And were you responsible at this time for

5    anybody with any sales responsibilities as you think

6    of it?

7        A.    No.

8        Q.    So with regard to the people that you

9    managed and yourself around this time, you didn't

10   have, as you think of it, any sales responsibilities?

11       A.    No, I did not.

12       Q.    And Mr. Boyer, he did have sales

13   responsibilities, is that right?

14       A.    The national -- to the best of my

15   recollection, the national account managers reported

16   into him or indirectly reported in to him.

17       Q.    And then Ms. Callahan, did she have sales

18   responsibilities?

19       A.    No.

20       Q.    Oh, and she worked for you, is that

21   correct?

22       A.    That's correct.

23       Q.    All right.  So do you remember -- do you

24   remember this particular e-mail that I've marked --

```
 1        A.     I do.

 2        Q.     -- as Exhibit 31?

 3               Can you tell me what you remember about

 4   it?

 5        A.     I remember that -- I remember the

 6   communication with our DEA affairs and compliance team

 7   specifically regarding Top Rx.

 8        Q.     Okay.  And what was Top Rx?

 9        A.     To the best of my knowledge, Top Rx was a

10   distributor.

11        Q.     All right.  So do you remember ever

12   meeting anyone from Top Rx in the course of your work?

13        A.     I do not personally remember meeting

14   somebody in person from Top Rx.

15        Q.     Do you remember whether there was ever a

16   meeting with anyone from Top Rx at the Corona site at

17   Watson at any time?

18        A.     At our Corona site?

19        Q.     Yes.

20        A.     I -- I couldn't remember that.

21        Q.     All right.  Do you remember -- all right.

22               So in the e-mail that appears earlier in

23   time, at the bottom of this first page of Exhibit 31,

24   there is a name Lisa Scott.
```

Highly Confidential — Subject to Further Confidentiality Review

```
 1              Do you see that there?

 2      A.    Yes, I do.

 3      Q.    And who is Lisa Scott?

 4      A.    She worked on Tom Napoli's team as a

 5  security and compliance auditor.

 6      Q.    All right.  And so the Tom Napoli's team,

 7  is that the controlled substance compliance team that

 8  we were talking about before?

 9      A.    Yes, you are correct.

10      Q.    So, going back up to the top of the page,

11  you write to Mr. Boyer:

12              "Andy, I need to meet with you, and most

13  likely, Allan and Tony at the same time, to discuss

14  the results of the Top Rx investigation."

15      A.    Uh-huh.

16      Q.    "We can make some decisions during this

17  call."

18      A.    Um-hum.

19      Q.    Who are Tony and Allan that you refer to

20  in this?

21      A.    Allan was the head of national sales and

22  Tony was the representative that handled Top Rx to the

23  best of my recollection.

24      Q.    Do you remember their last names?
```

1      A.     Tony Giannone, please don't ask me how to

2   spell that.

3      Q.     All right.

4      A.     And Allan Slavsky.

5      Q.     All right.  Do you remember whether around

6   this time, October 2011, you had a meeting with Allan,

7   Tony and Andy Boyer about Top Rx?

8      A.     I'm -- I'm sure we would have.  I can't

9   tell you the exact time or date, but if I would have

10  written this to them, then we most likely would have

11  had that call.

12     Q.     So with regard to this issue, I think, as

13  you have been describing it, it was a report from the

14  controlled substance compliance team that was sent to

15  you and you passed it on to Mr. Boyer and Allan and

16  Tony, is that right?

17     A.     Yes, that's our process.

18     Q.     All right.  So can you describe the

19  process that you are thinking of here, why that would

20  have occurred --

21     A.     Uh-huh.

22     Q.     -- and what the circumstances was?

23     A.     Yes.

24            If we were going to stop selling to a

```
1    customer, we would notify the sales and marketing team

2    in advance so that they would be alerted that a letter

3    was going to go and that if they wanted to have

4    participation to communicate to the customer we were

5    stopping to sell to them or at least they would have

6    knowledge of it.

7         Q.    All right.  So as you think about the

8    process that you're describing, when you talked to

9    Mr. Boyer and people from his team, would anyone from

10   the controlled substance compliance team be involved

11   in those discussions?

12        A.    Yes, they would.

13        Q.    Okay.  As you think about this meeting

14   that you're setting up in this e-mail, who from the

15   controlled substance compliance team would have been

16   in the meeting?

17        A.    Either Lisa or Tom or both of them.

18        Q.    And that's Lisa Scott and Tom Napoli?

19        A.    Yes, that is correct.

20        Q.    All right.  So, but you don't have a

21   recollection with regard to any particular meeting

22   about -- that related to this e-mail about whether

23   Ms. Scott or Mr. Napoli were in the meeting?

24        A.    I mean, I -- I don't see it documented,
```

1    but they would have been in the meeting.

2         Q.    All right.

3         A.    I wouldn't have had the meeting without

4    them unless they -- unless for some reason they

5    couldn't have made it, but they were always

6    participating in those calls.

7         Q.    All right.  And you say at the bottom of

8    that -- well, going on into the e-mail, I had read the

9    first two sentences.

10             "All Rx" -- and that stands for

11   prescription, is that right, or -- or "Rx orders,"

12   what does that mean?

13        A.    I -- it -- "All Rx orders are currently

14   shipping," meaning but no controlleds, right, so that

15   means products that are not controlleds.

16        Q.    Okay.

17             "I briefly spoke with Tony this a.m., and

18   told him I would have the details later today.  I

19   believe you are all together, so if you can let me

20   know when we can work out a meeting time, that would

21   be great.  Not sure of you have an opportunity to be

22   in a confidential area, but you will need one for this

23   conversation.  The timing is somewhat critical since

24   Top Rx continues to follow up on their control orders.

1  I did reach out to Rita and Scott last night to let

2  them know we would be trying to complete the review

3  today.  Let me know what may work for you."

4        And then you say, "Thanks Andy" and "Best

5  Regards" and then your e-mail signature.

6        So, with regard to this issue, what was

7  your responsibility in the process of what's described

8  here?

9        A.   My responsibility would have just to have

10  been set up the call and to communicate to the team

11  and to coordinate the call with the compliance team.

12        Q.   Okay.  So, and I guess where I'm asking

13  is, you had the controlled substance compliance

14  team --

15        A.   Correct.

16        Q.   -- and you have Mr. Boyer's team, the

17  sales people, and then you have your group, and why

18  would your group become involved in the process like

19  this?

20        A.   Because I am customer relations, right.

21  So I'm the liaison between compliance and the

22  customer.

23        Q.   Okay.  So -- good.  Thank you.

24        The -- the -- the controlled substance

1    compliance team itself would not communicate with the

2    customers, is that fair to say?

3         A.    Yes, they would.

4         Q.    Okay.

5         A.    But if it was to have something initial

6    like this, then if there is orders that pended, the

7    customer is going to call us first to say, Where is my

8    order, right.  We would be the first line to say, We

9    are still investigating.  And then when it comes to

10   something that becomes an order of interest or

11   suspect, we would get compliance involved.

12        Q.    All right.

13        A.    So we -- we were the liaison between the

14   customer and compliance.

15        Q.    Then who, if anyone, at Watson while you

16   worked there was ultimately responsible for informing

17   any customer that they were being cut off from

18   controlled substance shipments?

19        A.    Those were done in partnership calls and

20   that would have been the compliance team and typically

21   myself on the call and sometimes Andy would join on

22   those calls as well to show that he was in alignment

23   with the compliance team, he was always in alignment

24   with the compliance team, and that we were a joint

```
 1    group to say this is it, this is our decision, don't

 2    come back to marketing to ask, because you are not

 3    getting it.  So it was a joint group.

 4         Q.    All right.  So do you remember whether

 5    ultimately Watson cut off Top Rx from controlled

 6    substance sales sometime after this memo was written?

 7         A.    Yes.

 8         Q.    All right.  Do you remember what

 9    subsequently occurred, if anything?

10         A.    I remember that we stopped selling

11    controlled substances to them, I remember there was a

12    list of requirements that they would have had to

13    comply with before we would start to sell them again.

14         Q.    All right.  And looking at the Page 3 of

15    Exhibit 31, there is a -- what's referred to as an

16    investigation summary.

17              Do you see that there?

18         A.    I do.

19         Q.    Do you know who or which group would have

20    been responsible for writing the investigation summary

21    that appears there?

22         A.    The controlled substance compliance team.

23         Q.    All right.  All right.

24              All right.  You can set this document
```

1    aside.  All right.  Now this is going to be a little

2    complicated.

3         A.    That's okay.

4         Q.    All right.  So...

5         A.    I'll follow it to the best of my ability.

6         Q.    Right.

7                    (WHEREUPON, a certain document was

8                     marked Allergan - Woods Deposition

9                     Exhibit No. 32, for identification,

10                    as of 01/10/2019.)

11   BY MR. EGLER:

12        Q.    So I'm going to hand you what we'll mark

13   as Exhibit 32.

14              And, Ms. Woods, I'm going to ask you

15   first:  Have you ever used the program Microsoft One

16   Note?

17        A.    Yes.

18        Q.    All right.  Now, do you use the program

19   Microsoft One Note in the -- in your current work?

20        A.    Yes.

21        Q.    When did you start using it?

22        A.    Approximately 2010.

23        Q.    So have you ever printed out in long form

24   one of the Microsoft note records that you have

```
1    compiled as part of your work?

2         A.    I can't say that I have.

3         Q.    Okay.  And it's not common for people --

4         A.    Maybe or maybe not.

5         Q.    And it's not common for people to print

6    out the Microsoft notes, is that your understanding?

7         A.    I would say that's probably --

8         Q.    Okay.

9         A.    -- a good summation.

10        Q.    And that's my understanding -- that's my

11   understanding as well.

12              My understanding is that what I've handed

13   you as Exhibit 32 is a printout of a Microsoft One

14   Note note.

15              As you look at the format of the -- of the

16   content inside this note, does it appear to you to

17   be -- and you can take your time, but does it appear

18   to you to be something that would have been the

19   content that you would have put into a Microsoft note

20   around this time, starting, as the first page says,

21   June 22nd, 2010?

22        A.    I'll need a minute to look through this.

23        Q.    Absolutely.

24        A.    It looks like One Note.
```

1    Q.    All right.  So I want to get an

2  understanding, and, again, with the understanding that

3  you've said you don't regularly print these things

4  out, but as you look at the first page of this

5  Exhibit 32, if you had copied and pasted a e-mail or

6  something into your One Note, is that how it would

7  appear on your screen?

8    A.    Yes.

9    Q.    All right.  And as you go -- well, let me

10  start over.

11         You said you started using this One Note

12  system in 2010.  Can you describe to me how you used

13  the One Note system at work, how you personally used

14  it?

15    A.    How I -- how I personally used One Note?

16    Q.    Yes.

17    A.    I'm not sure -- can you explain a little

18  bit more?  I'm -- I'm not sure what you mean, how I

19  used One Note.

20    Q.    So my understanding of One Note is that

21  you can take the content of e-mails or web pages or

22  screen shots or anything else and put them one after

23  the other into a note in the One Note system and so

24  you can keep subject matter or whatever you want in

Highly Confidential - Subject to Further Confidentiality Review

```
 1   one file.

 2            Is that your understanding as well?

 3       A.   Yes.

 4       Q.   And as part of your work, would you take

 5   e-mails and web pages and -- and screen shots of

 6   things and put them into notes so as to keep them in

 7   subject matter groupings?

 8       A.   If I felt that it was important or

 9   relevant.

10       Q.   All right.  And did you make it a -- a

11   habit of -- did you make a habit of doing that as part

12   of your work?

13       A.   If it was related to maybe a project or a

14   subject we were working on.

15       Q.   Okay.  And as part of your work, were you

16   trained to use the One Note system for that purpose?

17       A.   I think it was a personal choice based on

18   the person --

19       Q.   Okay.

20       A.   -- what tool you were going to use.

21       Q.   All right.  So -- and, again, because --

22   you know, we've looked at a couple of e-mails and

23   attachments, and I think you've seen those before, and

24   since my experience with using One Notes and -- and
```

1  discussing them is limited, I -- I just want to make

2  sure that I'm understanding why this document would

3  appear the way it is and what you would have used it

4  for.

5          So as you look at this particular

6  document, can you describe to me what -- what it is?

7      A.   I -- I don't know where this was retrieved

8  out of One Note, so it's a little bit difficult for me

9  to --

10     Q.   I can represent to you that the -- this

11  one, and I'm going to show you a couple other ones,

12  were listed with you as a custodian on them, so...

13     A.   I'm sure.

14     Q.   And so I don't -- I don't have much more

15  information --

16     A.   Okay.

17     Q.   -- than that, but they were produced as a

18  file.

19     A.   Okay.

20     Q.   And, you know, I -- that's about all of

21  the representation I can make to you.  And with the

22  understanding that this is a little bit cumbersome and

23  it doesn't look anything like the way you would

24  approach it on a computer screen --

```
 1        A.    Right.

 2        Q.    -- I hope you can understand with me that

 3   this is the situation that we are in.

 4        A.    Yeah.

 5        Q.    That -- that this was produced to us as

 6   being from your files and -- and it appears to me, and

 7   I think it appears to you, as what a One Note file

 8   would appear as if it was printed out.

 9             So the first page of this is called "SOMS

10   update," the first page of this 32.

11             Can you turn to what's marked on the

12   bottom as "Native file download Page 44."  It's Bates

13   No. 5612.

14        A.    5612.

15        MS. LEVY:  What are the last four digits?

16        THE WITNESS:  12.

17        MR. EGLER:  5612.

18   BY THE WITNESS:

19        A.    I'm almost there.

20             Okay.  The one that's dated from 2012?

21   BY MR. EGLER:

22        Q.    Yes.

23        A.    Okay.

24        Q.    So in the course of using your One Note at
```

1    your work, could you have copied and pasted an e-mail

2    into the One Note system?

3        A.    Yes.

4        Q.    Does this appear to you what that might

5    be?

6        A.    Yes.

7        Q.    All right.  And the -- the e-mail seems to

8    be named "Re:  Hydrocodone supply issues - market

9    demand."

10            Do you see that there?

11       A.    Correct.

12       Q.    So do you know -- do you have an

13   understanding of what hydrocodone is?

14       A.    Yes, I do.

15       Q.    What is hydrocodone?

16       A.    In this point in 2012 it was a C-III

17   controlled substance.

18       Q.    Uh-huh.  Do you know -- do you have a

19   memory of what the brand name was for hydrocodone?

20       A.    I don't know because this was -- I mean, I

21   guess it depends on the strength and the -- the

22   strength of the product, so different ones were

23   different brand names.

24       Q.    And the e-mail seems to come from a person

```
 1    named Toni M. Picone.

 2              Do you see that?

 3       A.    Yes, I do.

 4       Q.    Who is Ms. Picone?

 5       A.    Her title is at the bottom of the page.

 6    So she was a senior marketing manager.

 7       Q.    All right.  And it goes to you and

 8    Napoleon D. Clark.

 9       A.    Correct.

10       Q.    Who is Mr. Clark?

11       A.    Napoleon also worked in marketing.

12       Q.    All right.

13              And Ms. Picone writes to you and Mr. Clark

14    and there are some cc's on there.

15              "Hello All, Please see answers to the

16    below questions per our meeting today.  Amneal,

17    Qualitest and Mallinckrodt are the suppliers that

18    customers are telling us are the reasons for the

19    supply shortages in the market.  Amneal has

20    discontinued to select customers only, and

21    Mallinckrodt sent letters that they have backlog and

22    are trying to ramp up as a result of quota."

23              Do you see that there?

24       A.    I do.
```

```
1        Q.    So with regard to the three names that are

2   listed there, Amneal, Qualitest and Mallinckrodt, do

3   you recognize those names?

4        A.    I do.

5        Q.    Are those manufacturers of prescription

6   drugs?

7        A.    Yes, they are, to the best of my

8   knowledge.

9        Q.    All right.  And do you remember around

10  this time whether Watson made generic hydrocodone?

11       A.    Yes, I believe that would have been the

12  case.

13       Q.    All right.  So with regard to this issue,

14  Ms. Picone is responding to an e-mail from you that

15  appears on the following page, is that right?

16       A.    I'll have to take a look for a minute.

17       Q.    All right.  And it's Page 5613.

18       A.    Okay.  I do see the e-mail.

19       Q.    And you write to Ms. Picone and Mr. Clark:

20            "Hi Napoleon and Toni, I have a few

21  marketing questions regarding the hydrocodone market

22  demand which I am hoping you can assist with.  As you

23  know, the increased order volume in many of the

24  hydrocone" -- "hydrocodone SKUs has been significant
```

1   over the past several weeks.  I am intending to use

2   the information provided to discuss the market demand

3   and market share with the DEA compliance team."

4        A.    Uh-huh.

5        Q.    Do you see that there?

6        A.    I do.

7        Q.    And then you ask a series of questions

8   that follow in the e-mail.

9             As you think about this, was it common for

10  you to ask the marketing team questions about market

11  demand and market share for the generic opioid drugs

12  that Watson made?

13       A.    It was -- it -- it was critical that we

14  ask the internal teams about market shortages, if you

15  remember from the policy we reviewed yesterday --

16       Q.    Uh-huh.

17       A.    -- is one of the tools when we would see

18  increases in orders come through.  This was my way of

19  going to the team and asking them about what was going

20  on in the market regarding the market shortages, which

21  is what Toni responded to.

22       Q.    And this e-mail that you write, the first

23  e-mail, April 17th, 2012, it doesn't relate to any

24  particular pended order, is that right, as far as you

```
 1    can tell?

 2         A.    Well, what it -- what it -- if you read in

 3    the e-mail, it says:

 4               "As you know, the increased order volume

 5    in many hydrocodone SKUs has been significant over the

 6    past few weeks."

 7               I had a concern which I reached out and

 8    asked them about.

 9         Q.    Uh-huh.

10         A.    And I needed to understand what was going

11    on in the industry.  Part of our process was to

12    request information about shortages in the

13    marketplace.

14         Q.    So --

15         A.    And as you can see, I copied the

16    compliance team on the e-mail.

17         Q.    Right.  So the cc's that you sent to are

18    Lisa Scott, Tom Napoli, Sandra Simmons, who I think

19    we've talked about today earlier?

20         A.    Yes, you are correct.

21         Q.    And then Scott Soltis, who I don't --

22         A.    Which was Tom Napoli's boss.

23         Q.    All right.

24               So -- and, again, you -- you ask about
```

```
 1    market-wide issues and you use the term "hydrocodone

 2    SKUs"?

 3         A.    SKUs.

 4         Q.    SKUs.  And it's --

 5         A.    Stock keeping units.

 6         Q.    All right.  And that's S-K-U-s?

 7         A.    Correct.

 8         Q.    And so with regard to that term

 9    "hydrocodone SKUs," as you think of it, we had talked

10    yesterday about a -- is it a DEA number for a drug or

11    a --

12         A.    NDC number.

13         Q.    NDC number?

14         A.    Correct.

15         Q.    Is there a difference between a NDC number

16    and a SKU?

17         A.    They are relatable.

18         Q.    Okay.  Would -- as you think of it, any

19    ent -- any drug that had a -- let me start over.

20               Anything that had an NDC number, would it

21    have a different SKU than other similar drugs made by

22    different manufacturers?

23         A.    So we'll relate to what I said yesterday,

24    right?  So each -- each product has its own NDC
```

1    number.  So one SKU would equal one NDC number.

2         Q.    All right.  So with regard to this, you're

3    trying to find out about the various hydrocodone SKUs

4    presenting a market demand in the supply chain.

5              Do you see that there?

6         A.    I do.

7         Q.    And as I think you said, this related to,

8    as you say, the market demand and increased order

9    volume in hydrocodone that you had seen around this

10   time?

11        A.    That's correct.

12        Q.    So with regard to the -- the market demand

13   and the response that you received from Ms. Picone,

14   about how often as you think about it did you in

15   the -- in your group seek this type of market wide

16   data from the sales team in making decisions with

17   regard to pended order on the suspicious order

18   monitoring system?

19        A.    We would reach out any time to them or any

20   other internal sources or use any other tools that we

21   needed to make a decision as often as necessary.

22        Q.    So with regard to the market wide

23   consideration of hydrocodone SKUs, was it a regular

24   practice or policy of your group to understand the

Highly Confidential - Subject to Further Confidentiality Review

1    market wide demand for the SKUs when -- when looking

2    at pended orders in the suspicious order monitoring

3    system?

4         A.    It was our practice to understand if there

5    was a shortage in the market which would create an

6    increase for Watson.

7         Q.    All right.  Beyond the -- beyond a

8    situation where there is a shortage in the market, was

9    it ever the policy of the -- of your group at Watson

10   to examine the market-wide or geographic area-wide

11   demand for a particular controlled substance SKUs when

12   considering a -- a order that had pended on the

13   suspicious order monitoring system?

14        A.    Well, we are not marketing, we are not --

15   typically we are not investigating every single SKU in

16   the -- and the marketing background of a SKU.  We are

17   interested in changes in size, frequency and pattern,

18   so...

19        Q.    As you -- so we had talked about Amneal

20   and Qualitest and Mallinckrodt.

21             Do you know whether each of those

22   companies made brand name or generic versions of the

23   hydrocodone?

24        A.    I didn't investigate other companies,

1    quite honestly.

2        Q.    Okay.  But as you sit here, just with your

3    general knowledge of the -- of the industry, was

4    Mallinckrodt, as you think of it, a brand name

5    producer of hydrocodone?

6        A.    I believe that's the case.

7        Q.    Okay.  How about Amneal?

8        A.    I can't recall if Amneal made brand

9    products or not at that time or now.

10       Q.    Okay.  How about Qualitest?

11       A.    I did not recall Qualitest being a brand

12   company.

13       Q.    Okay.  So with regard to the market-wide

14   intelligence that you're reaching out to the marketing

15   team for on these issues relating to hydrocodone and

16   the shortage, can you think of any particular time

17   where you or your group reached out to the marketing

18   team to find market-wide intelligence on -- on demand

19   for other opioids even where there wasn't a shortage?

20       A.    I can't recall off the top of my head --

21       Q.    Okay.

22       A.    -- if we did or didn't.

23       Q.    And when you asked for this information in

24   April of 2012, you asked for it on April 17th, 2012,

```
 1     and the response from Ms. Picone came April 26th.

 2              Do you see that there?

 3        A.    I do.

 4        Q.    Do you remember this particular e-mail?

 5        A.    Well, I'm -- as I'm reading it today,

 6     probably because it refreshes my memory.

 7        Q.    Okay.  Do you remember what, if anything,

 8     you did with the information that Ms. Picone sent to

 9     you?

10        A.    I -- I don't, but it's information that we

11     would have obviously used.  I -- I don't remember

12     exactly.

13        Q.    So as you think of the market-wide data

14     that Ms. Picone sent to you -- well, let me start

15     over.

16              As you think about the hydrocodone

17     market-wide data that Ms. Picone sent to you, was

18     there any formal -- formal process by which the -- the

19     group that you headed up at Watson would rec --

20     receive or expect to receive market-wide information

21     about controlled substances, and particularly opioid

22     controlled substances to inform decisions about the

23     suspicious order monitoring system?

24        MS. LEVY:  Object to the form.
```

```
 1            You can answer.

 2    BY THE WITNESS:

 3        A.    Yeah, I'm -- I'm -- I'm sorry, I don't

 4    understand it.

 5    BY MR. EGLER:

 6        Q.    So, like yesterday we were talking about

 7    the suspicious order monitoring system and the -- what

 8    causes things to pend on the suspicious order

 9    monitoring system.  And I think we had talked about

10    how the -- the data that the suspicious order

11    monitoring system used related to orders and prior

12    orders of a particular NDC code that was produced by

13    Watson, is that right?

14        A.    (Nodding head.)

15        Q.    I -- I have to -- you have to say --

16        A.    I think I'm trying --

17        Q.    -- yes or no.

18        A.    I'm trying to follow you and I'm not

19    following you so well.

20        Q.    So --

21        A.    So...

22        Q.    Well, let me ask it again -- or let me say

23    this again.

24            So yesterday we were talking about the
```

1    suspicious order monitoring system?

2         A.    Correct.

3         Q.    And the various policies, right?

4         A.    Correct.

5         Q.    And at some point we had been talking

6    about the data that went into the suspicious order

7    monitoring system as an input, right?  And my

8    understanding is that the data that would go into the

9    suspicious order monitoring system at Watson and

10   Actavis Inc. related to prior orders by customers of

11   Watson or Actavis, Inc. drugs, is that right?

12        A.    Yes, that's correct.

13        Q.    And it didn't include, say, for generics,

14   market-wide orders of -- of controlled substances, is

15   that right?

16        A.    When you say "market-wide," what do you

17   mean by market-wide orders?

18        Q.    Well, let's take for an example, again,

19   hypothetically, as we were talking about yesterday,

20   oxycodone, right, and if there was a -- and we had

21   talked about yesterday oxycodone and, say, a

22   20-milligram pill of oxycodone and I think you had

23   said yesterday the -- the Watson -- if Watson made

24   such a pill, it would have a particular NDC code and

1    if another company made similar generic, it would have

2    a separate NDC code, is that right?

3        A.    That is correct.

4        Q.    So with regard to the Watson and then

5    Actavis, Inc. suspicious order monitoring systems, the

6    system would track the Watson or the Actavis NDC code

7    but not any other similar NDC code, is that right?

8        A.    That is correct.

9        Q.    So --

10       A.    Yes, there was no interoperable system

11   tracking -- all of -- all manufacturers' data in one

12   system is what I stated, that is correct.

13       Q.    And what I had asked you earlier, a few

14   minutes ago, is with regard to the Watson and Actavis

15   suspicious order monitoring system, was there a formal

16   process by which the -- by which your group would seek

17   or expect to receive market-wide data for similar NDC

18   codes to inform the suspicious order monitoring

19   system?

20       A.    We used the tools that are outlined in the

21   policy, right, which we went through yesterday.

22       Q.    So is the answer yes --

23       A.    I -- I --

24       Q.    -- yes or no?

 1      A.    I don't --

 2      Q.    Okay.

 3      A.    -- it's not market-wide data, right?

 4      Q.    Uh-huh.

 5      A.    It's -- it's the data that is available

 6  for all of us to use, which is 867 data, 852 data.  We

 7  went through this yesterday.  The compliance team used

 8  chargeback data.  So the data that is available is,

 9  you know, what our teams used.

10      Q.    And the -- the 852 and 867 data that you

11  are talking about and the chargeback data would

12  contain the information about the Watson or Actavis,

13  Inc. NDC codes, is that right?

14      A.    Yes, our product -- because it --

15  because -- to the best of my knowledge there was no

16  interoperable system with all other manufacturers'

17  data, because that would be confidential, that we

18  could use.  And there was no DEA system that allowed

19  us to see everybody else's data at the time.  We used

20  the tools we have available to us.

21      Q.    And there was no -- but in that -- the

22  e-mail that we are looking at here on Page 613 -- 612

23  and 613 of Exhibit 32, you are reaching out to the

24  marketing group for data about the similar hydrocodone

1    SKUs that would be the similar NDC codes, is that

2    right?

3        A.    Which they got from customers telling

4    them.

5        Q.    Right.  But generally with regard to

6    informing the decisions of the suspicious order

7    monitoring system at Watson and Actavis Inc., it was

8    not the practice to seek out that type of data on an

9    ongoing or regular basis, is that right?

10       A.    We didn't reach out to marketing unless we

11   had a need to reach out to marketing because something

12   was identified as an order of interest.  If it was an

13   order of interest, we would reach out.

14       Q.    And it wasn't the expectation of your

15   group at Watson or Actavis Inc. that the marketing

16   people would supply the type of parallel SKU

17   information on a regular basis that you are seeking in

18   this e-mail on Page 613, is that right?

19       A.    That's correct, we did not reach out to

20   marketing unless we had a reason to.

21       Q.    All right.

22             Can you move ahead into this document

23   on -- just two pages -- Allergan_MDL_03835617.  And

24   this is another of the variety of issues that I wanted

1    to discuss with you about the format and generally

2    looking at a -- this Microsoft One Note.

3            When -- when you look at this page that's

4    35617, starting at the top there, it says:  "Meeting

5    1/18/2013."

6            Can you identify what this is?  And...

7    A.    It appears to -- it appears to be meeting

8    notes from January 18th of 2013.

9    Q.    Okay.  And do you know who would have

10   written the notes that appear here on this Page 617?

11   A.    I have to make an assumption that if you

12   got it from my One Note it would have been my meeting

13   notes.

14   Q.    All right.  So there is a -- the first

15   statement there that appears on Page 5617 below the

16   Meeting 1/18/2013 states:

17           "As discussed prior to the holidays, I

18   would like to provide a brief update on what Actavis

19   has done with respect to monitoring data of controlled

20   products down to a pharmacy level."

21           And then it says:  "I would like to

22   highlight some discussions that were underway with

23   customers at the time of the acquisition to ensure

24   these are not overlooked as we move forward."

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 And then:  "Additional follow-up is needed

 2      to address concerns that we had identified following

 3      our review of sales data, and I want to ensure this

 4      gets the proper attention it needs."

 5                 So, do you recognize that as your words?

 6           A.    No.  Now that you are reading that, I

 7      would think -- let me -- let me read a little bit

 8      further, please.

 9           Q.    Okay.  Yeah, absolutely.

10           A.    There is no name on this, but this appears

11      to be somebody from the Actavis team that would

12      have -- Actavis Inc. team that would have forwarded

13      this to us at the time that we were entering the

14      acquisition, because of the date on here, because this

15      is a summary of the Actavis Inc. system.

16           Q.    All right.  So this might be part of an

17      e-mail that you copied in but --

18           A.    Yes, correct.

19           Q.    But it doesn't have the -- the to and from

20      and date?

21           A.    It does not.

22           Q.    So these words that appear on the 5617

23      page, you don't recognize these as your words?

24           A.    No, they are not, and it specifically
```

1    states on that note I have added my Actavis

2    colleagues, so it had to have come from somebody from

3    Actavis Inc.

4         Q.    All right.  Good.

5              So in the second paragraph there, the

6    person -- the author writes:

7              "I was going to include DNAs for some of

8    the accounts involved in some current discussions, but

9    thought we may want to start off with some high-level

10   planning discussions and drill down into the details

11   as a second step."

12             As you think about your work, does that

13   term "DNAs" have a meaning to you in the context of

14   this document?

15        A.    You know, I don't want to put words into

16   the person's mouth that wrote this.

17        Q.    Right.

18        A.    I know a DNA as director of national

19   accounts.  That's the only term I know it as.

20        Q.    Okay.

21             Do you remember having a meeting with

22   directors of national accounts from Actavis around

23   this timeframe, January 2013?

24        A.    I don't even know who all of the directors

```
1    of national accounts at Actavis were.

2         Q.    All right.

3               All right.  You can set this document

4    aside.

5         MR. EGLER:  And why don't we take a break.

6         THE VIDEOGRAPHER:  The time is approximately

7    10:32 a.m. and we are going off the record.

8                    (WHEREUPON, a recess was had

9                     from 10:32 to 10:48 a.m.)

10        THE VIDEOGRAPHER:  We are back on the record.

11   The time is approximately 10:48 a.m.

12   BY MR. EGLER:

13        Q.    All right.  Ms. Woods, thanks for coming

14   back.

15              I -- I -- I'm going to show you the next

16   exhibit, and we'll mark it as Exhibit 33.

17                   (WHEREUPON, a certain document was

18                    marked Allergan - Woods Deposition

19                    Exhibit No. 33, for identification,

20                    as of 01/10/2019.)

21   BY MR. EGLER:

22        Q.    And just so you know, my practice is to go

23   in time, because I think it is easier to understand

24   things, but because of the nature of the last
```

1  exhibit was multiple years in one document, we are

2  going to jump around a little bit.

3       A.    Okay.

4       Q.    All right, so...

5             So Exhibit 33, can you look through it and

6  as you are looking through it, I'll read on the

7  record, it's Allergan_MDL_02187056 through 87091.  And

8  I'm going to note that in the middle of this document

9  on 87072 and up through 080 there are a number of

10 pages that say "produced as native."

11      A.    Oh, that are blank, they are blank ones?

12      Q.    They are blank and they are produced as

13 natives.

14      A.    Okay.

15      Q.    My understanding is that they are Excel

16 spreadsheets.  I don't know what they say and I'm not

17 going to ask you any questions about them, but it is a

18 production issue and it is not anything that relates

19 to the document itself.

20      A.    Okay.

21      Q.    So, but that being said, when you are

22 ready, can you tell me what this document appears to

23 you to be?

24      A.    It appears to be a 2012 budget proposal.

1    Q.    All right.  So in -- in the first page is

2  an e-mail from you to Mr. Boyer, is that right?

3    A.    That's correct.

4    Q.    And was it part of your job at Watson to

5  send something like this, a 2012 budget proposal, to

6  Mr. Boyer?

7    A.    Yes.

8    Q.    Okay.  And do you know what, if anything,

9  Mr. Boyer's responsibility was with regard to the

10 annual budget of the customer rela -- relations group

11 that you headed up at Watson?

12   A.    I reported to Andy Boyer.

13   Q.    All right.  So is it fair to say, then,

14 that Mr. Boyer was in charge of the -- assigning a

15 budget to the customer relations operations group at

16 Watson?

17   A.    He was responsible to get it approved.

18   Q.    I'm sorry.  He was responsible to get

19 it --

20   A.    Get my budget approved --

21   Q.    Okay.

22   A.    -- for my headcount.

23   Q.    And who would approve your budget?

24   A.    I believe our executive board.

```
1        Q.    Do you remember the names of any members

2   of the executive board around this time, end of

3   2001 -- or I'm sorry -- end of 2011?

4        A.    I believe in this period of time it would

5   have been Robert Stewart and Paul Bisaro, if I'm not

6   mistaken.

7        Q.    Mr. Bisaro, do you remember what his title

8   was or generally what his responsibilities were at

9   Watson?

10       A.    I believe he was our CEO and president at

11  the time.

12       Q.    All right.  And Mr. Stewart, do you

13  remember what his responsibilities or title were?

14       A.    I believe he would have been our COO.  I

15  don't have any charts in front of me, so I'm not

16  100 percent correct on this.

17       Q.    Can you think of anybody else who might

18  have been on the executive board at Watson around this

19  time?

20       A.    Siggi Olafsson may have been on our board

21  at that time, Andy may have reported into him at that

22  time.  I'm just not sure of that other time period

23  right now, if that's the case.

24       Q.    Who is Mr. -- is it Mr. Olafsson?
```

```
 1       A.    Olafsson.

 2             He would have been -- let's see.  What's

 3   the date on this?

 4       Q.    It is the end of 2011.

 5       A.    Oh, November 11th.  No, I don't think he

 6   was at the time.  I take that back.  I -- it would

 7   have probably been after -- well, I don't know.  I

 8   think he was.  He would have probably been responsible

 9   for either global or US sales and marketing.  I'm not

10   sure.  Probably global sales and marketing at the

11   time.

12       Q.    So, can you turn -- oh, so when you look

13   at the second page going forward into this document,

14   it's marked as Exhibit 33, do you, independent of the

15   exhibit that I handed you, have a memory of submitting

16   a proposed budget to Mr. Boyer at the end of 2011?

17       A.    At the end of -- do I remember doing this,

18   is that the question?

19       Q.    Yes.  That's a much easier question to

20   ask.

21       A.    Well, I was required to do it every year,

22   so...

23       Q.    All right.  But sitting here today, you

24   don't have a particular memory of this particular
```

 1    budget proposal?

 2         A.    Probably not from 2011.

 3         Q.    Right.  So can you turn into Page 7066

 4    into this Exhibit 33.

 5               And at the top of the page there, 066, it

 6    states:

 7               "2011, YTD," and in parentheses the

 8    word "(August)" and then "productivity statistics."

 9               Do you remember productivity statistics

10    like this being collected and maintained in your group

11    as part of its work at Watson around this time, end of

12    2011?

13         A.    Yes, that is correct.

14         Q.    All right.  I'd like to go through the

15    charts that appear below on this Page 066 and go

16    through them with you and have you explain them to me,

17    not all of them, but just some of them.

18               So, first of all, why would you present

19    this as part of your budget to Mr. Boyer?

20         A.    Well, we provided them not just in the

21    budget but we provided them probably quarterly as

22    well, just as part of our job responsibility.

23         Q.    So the first header there is "Customer

24    Relations - Key Performance Indicator."

1          Do you see that there?

2     A.    I do.

3     Q.    And then the second one is "Transactional

4   Statistics - Customer Relations and Support Services"?

5     A.    Correct.

6     Q.    So, and inside that second one is "Master

7   Data Statistics" and "(monthly average per MDA)"?

8     A.    Correct.

9     Q.    What does the term "MDA" in there mean?

10    A.    I believe at the time it was master data

11  administrator.

12    Q.    And below there it states:

13          "Customer/license master record

14  review/administration" and then "SOMS Validations" and

15  then "CARS record review/administration."

16          Can you tell me in the context of this

17  document what those three terms mean and what the

18  statistics that appear on the further right-hand

19  columns mean?

20    A.    So, I'll do this to the best of my

21  recollection because this is obviously a long time

22  ago.

23    Q.    Right.

24    A.    Customer/license master record review and

1    administration, any time we had to change a license, a

2    customer license, update it, change it or create it,

3    or any part of a customer master record, such as name,

4    address, street number, postal code, anything like

5    that, that is a record change, and this would indicate

6    that in the year of -- you know, in each year what per

7    each person the average amount that they were changing

8    monthly per person.

9              And the same thing on SOMS validations,

10   how many each person was identifying or how many each

11   valid -- how many validations each person on the team

12   was addressing each and every month.

13             And the same thing, CARS was contract --

14   the contract system, and if there were updates that

15   had to be addressed for each contract customer, same

16   thing.  Maybe it was, like, a HIN number or a license

17   number or something like that for a contract customer.

18             Master record, they would have to go in

19   and do those as well, and that was the amount of

20   records they had to update in that system each month.

21        Q.    Okay.  So you used the term "HIN numbers,"

22   is that HIN?

23        A.    Health identification number.

24        Q.    All right.  So, and the -- the middle one

1    there, it says "SOMS validations"?

2        A.    Correct.

3        Q.    What does the term "SOMS validation" mean?

4        A.    That would -- that would be the SOMS pend

5    and investigation.

6        Q.    So with regard to the numbers that appear

7    on the right, in 2010 there was an -- for each person

8    and the relevant person in the group, they performed

9    167 SOMS validations per month, is that right?

10       A.    Per each person.

11       Q.    Right.  And then each person performed an

12   average of 280 SOMS validations per month in year to

13   date August 2011, is that right?

14       A.    That is correct.

15       Q.    All right.  And then it says there is a

16   67.7 percent increase?

17       A.    Per person.

18       Q.    Per person.

19            Do you remember being surprised that there

20   is a 67 percent -- 67.7 percent increase in SOMS

21   validations at Watson in 2010 to year to date

22   August 2011?

23       A.    I couldn't tell you at this time if I

24   thought that at that time.

1    Q.    Do you remember ever having a discussion

2  that the average number of SOMS validations per month

3  per employee had increased by two-thirds between

4  August -- or between 2010 and August 2011?

5    A.    We evaluated it every month and would

6  analyze the situation.

7    Q.    But do you remember in particular ever

8  commenting or hear anybody else commenting that the

9  average number of SOMS validations per month per

10 person had increased substantially?

11   A.    Yes.

12   Q.    Okay.  Do you remember any particular

13 conversations about that?

14   A.    To the back of my -- best of my

15 recollection, myself and Sandra Simmons would meet up

16 with Tom and we would have a discussion about it.

17   Q.    Do you remember whether there was any plan

18 of action or -- or plan to address the increased

19 number of monthly average per person SOMS validations?

20   A.    There could have been.  We could have

21 talked to Tom, we could have evaluated what the cause

22 was and then determine if anything needed to be or

23 could have been based on how the system was set up.

24   Q.    Do you remember whether there actually

```
 1    were any conversations like that?

 2         A.    Yes, there were.

 3         Q.    So can you tell me about them?

 4         A.    I don't remember the exact conversations.

 5    I do remember they took place.

 6         Q.    Okay.  And who was in the conversations?

 7         A.    It would have been myself and Sandra

 8    Simmons and Tom Napoli, to the best of -- to the best

 9    of my knowledge.  There could have been other people.

10         Q.    And do you remember what the result of the

11    conversations were?

12         A.    I don't recall exactly what the change was

13    in it, but I do know there were some changes that he

14    felt were very low risk.

15         Q.    Can you describe generally what the

16    changes were and were there more people hired or

17    something else?

18         A.    I can't recall right off the top of my

19    head.

20         Q.    All right.  And you are looking through it

21    and the -- I was going to ask you to do that next, if

22    there is a headcount --

23         A.    That's what I was looking for.

24         Q.    All right.
```

```
 1                  If there is a headcount increase or some

 2    other proposal inside the budget to address that

 3    issue.

 4        A.    I don't see that addressed in here.

 5        Q.    And the -- the SOMS validations or the --

 6    the group that performs the SOMS validations is not

 7    broken out as a separate budget item in this document,

 8    is that right?

 9        A.    No, it is not.

10        Q.    And as you look at the subsequent pages

11    here, for example, the Page 070, there are various

12    organizational charts.

13                  Do you see that?

14        A.    I do.

15        Q.    And the -- the one on Page 7070 has on the

16    right-hand side Sandra Simmons.

17                  Do you see that there?

18        A.    I do.

19        Q.    And underneath there are various names.

20                  Is there one person who would be most

21    responsible for the SOMS validations in that group?

22        A.    It would have been the three people on the

23    right-hand side, Vicky Lepore, Mary Moskello and Larry

24    Shaffer.
```

1    Q.    Is there anything else as you read this

2    070 page who would have been a responsible for the

3    SOMS validations?

4    A.    Sandra Simmons would have had the ability

5    to also participate in there.

6    Q.    All right.  So when you -- you go up to

7    the preceding page, the 069, and it is just like a --

8    above here, and there is a "High Level Org Chart,"

9    that's what it's titled, "Customers Relations

10   Operations," quote, "High Level Org Chart," it says

11   Sandra Simmons on the right-hand side.

12         Does that describe the number of people

13   who were handling the SOMS validations?

14   A.    It's -- it's encompassed under her team as

15   well.

16   Q.    All right.  So it says there, "three

17   master data administrators" and "three order

18   processing administrators"?

19   A.    Correct.

20   Q.    Would there be other people in the

21   customer relations operations who would have worked

22   with the SOMS validations?

23   A.    Not that I can recall.

24   Q.    Okay.  And would it have been the three

1    master data administrators as well as the three order

2    processing administrators or just one of those two?

3         A.    I only recollect that the master data

4    administrators had the ability to do that.

5         Q.    All right.  So out of all of the people

6    who are mentioned in the 060 -- or 069 and 070 charts

7    as you think about it, the people most responsible for

8    the SOMS validations would have been the three master

9    data administrators who were listed in the 069 chart,

10   is that fair to say?

11        A.    Yes, at this point in time that's my

12   recollection.

13        Q.    All right.

14              And is there anything on that chart or

15   anyone else anywhere else in this document that you

16   recognize as -- as a request to increase that number

17   of master data administrators?

18        A.    Not to the best of my knowledge.

19        Q.    All right.

20              And as you go further into this document,

21   starting on Page 081 and through the end of the

22   document, there are various other or -- organizational

23   charts.

24              And can you -- as you look at them today,

Highly Confidential - Subject to Further Confidentiality Review

```
 1   do you have a memory of who would have prepared these

 2   charts?

 3        A.    I don't even know what time period these

 4   would have been from.

 5        Q.    Okay.  So if you turn to Page 084 there is

 6   a notation there.  It states:  "Sandra Simmons,

 7   Manager - Support Services, Morristown"?

 8        A.    Correct.

 9        Q.    And it says -- below her there is a

10   statement that says, "Open Position, OP Supervisor"

11   and then JoAnne Wo- --

12        A.    Wobeser.

13        Q.    Wobeser, W-o-b-e-s-e-r.  And it says:

14   "Department Coordinator Morristown."  And then next to

15   that it says:  "Victoria Lepore, Customer Master

16   Administrator, Morristown" and then "Jeanette

17   Huebner"?

18        A.    Huebner.

19        Q.    Huebner.  And it is "Customer Master

20   Administrator, Morristown," and then "Mary Moskello,"

21   M-o-s-k-e-l-l-o, "Licensing Administrator,

22   Morristown," and "Larry Shaffer, Licensing

23   Administrator, Morristown."

24              Now, as you read this organizational
```

1    chart, does it relate to the three people who are

2    mentioned in the 069 page as the three data

3    administrators?

4        A.    Vicky Lepore, Mary and Larry I would be --

5    believe would be.  That would be correct, Larry, Mary,

6    and Vicky are the three same people.  And Sandra

7    Simmons.

8        Q.    And then the 069 chart states the three

9    order processing administrators.

10            Are those the other three people there,

11   the open position, Ms. Wobeser and Ms. Huebner?

12       A.    This -- this chart on 084 appears to be

13   completely irrelevant to this period of time.

14       Q.    Oh.

15       A.    I don't know where this is from.

16       Q.    All right.  I'm sorry.

17       A.    No, that's okay.

18       Q.    I -- I'll tell you just from our -- our

19   processes, this was produced as a -- what's referred

20   to as a family, so I just printed out the whole thing

21   because I thought it was a bulk unit.

22       A.    Yeah, this is completely a different

23   period of time.  I --

24       Q.    Okay.

```
 1       A.     -- I don't know when this is from.

 2       Q.     Well, then that's fine.

 3       A.     That's okay.

 4       Q.     So then set it a -- set it aside.  All

 5   right.  And I think that's all we have for this

 6   document.

 7              All right.  And I'll hand you what we'll

 8   mark as Exhibit 34.

 9                  (WHEREUPON, a certain document was

10                  marked Allergan - Woods Deposition

11                  Exhibit No. 34, for identification,

12                  as of 01/10/2019.)

13   BY MR. EGLER:

14       Q.     Ms. Woods, can you look at what I've

15   marked as Exhibit 34, and as you are looking at it,

16   I'll read into the record, it's noted as Bates numbers

17   Allergan_MDL_02187194 through 87195.

18              And when you are ready, can you tell me

19   what this appears to you to be?

20       A.     This is an e-mail from DEA compliance to

21   Andy Boyer and Scott Soltis regarding Capital

22   Wholesale.

23       Q.     Okay.  And the date on this is

24   December 13th, 2012, is that right?
```

```
1       A.    That is correct.

2       Q.    So do you have a memory independent of

3    this document of a investigation of an entity called

4    Capital Wholesale?

5       A.    I do.

6       Q.    What do you remember about that?

7       A.    I remember that we discontinued the sales

8    of controlled substances to Capital Wholesale.

9       Q.    Do you remember ever sitting down in a

10   meeting discussing that with other people at Watson?

11      A.    I do.

12      Q.    All right.  And this is right -- excuse

13   me -- around the time of the Watson/Actavis merger, is

14   that right?

15      A.    Yes.

16      Q.    All right.  Do you remember whether as

17   part of this process the people -- anyone from Actavis

18   was involved in the decision to cut off Capital

19   Wholesale?

20      A.    I do not.  I would -- I -- I do not

21   believe they would have been involved.  I don't recall

22   them being in the meeting.

23      Q.    All right.  So do you remember around the

24   end of 2012 whether there was a -- there was
```

1  communication between you and your equivalent with

2  regard to suspicious order monitoring systems at

3  Actavis on any issues?

4      A.   I -- I can't recall if there was or was

5  not.

6      Q.   All right.  Do you remember ever meeting

7  with someone from Capital Wholesale Drug around this

8  time?

9      A.   Can you be specific when you say

10 "meeting"?

11     Q.   Oh, did you have an in-person meeting with

12 them?

13     A.   I did not have an in-person meeting with

14 them.

15     Q.   Do you remember ever talking on the phone

16 with anyone from Capital Wholesale Drug?

17     A.   Yes, I believe I did.

18     Q.   Okay.  Do you remember any part of that

19 conversation or the nature of it or anything?

20     A.   Yes.  We had a partnership call with them.

21     Q.   Okay.  When you say "a partnership call,"

22 what does that mean?

23     A.   A partnership call was a very commonplace

24 between myself, the compliance team and our customers

1    if we had concerns about their orders of controlled

2    substances.

3         Q.    All right.  So the term "partnership call"

4    in the -- in the context of your work is a term of

5    art, is that fair to say?

6         A.    I guess you could say that.

7         Q.    Because you wouldn't typically have a

8    partnership call when things were going well, is that

9    right?

10        MS. LEVY:  I'm going to object to form.

11   BY THE WITNESS:

12        A.    We had partnership calls to make sure they

13   were aware of our concerns.

14   BY MR. EGLER:

15        Q.    Right.

16        A.    And to gain information.

17        Q.    And I guess what I was saying was, the

18   partnership call wasn't a -- a regularly-scheduled

19   event like quarterly or monthly or annually?

20        A.    No, I would -- I wouldn't say that.  Maybe

21   not with the compliance team, but we did have other

22   partnership calls with customers for, like,

23   forecasting just on standard products and, you know,

24   other business needs.

1      Q.    If -- if you became involved, you

2    personally became involved in a partnership call,

3    would that be part of a regularly-convened partnership

4    call?

5      A.    I'm sorry.

6      MS. LEVY:  Object to the form.

7    BY THE WITNESS:

8      A.    Yeah, I'm -- I'm -- I'm a little bit

9    confused.

10    BY MR. EGLER:

11      Q.    So you had said that Watson in your

12    estimation had regular partnership calls with its

13    customers, and at the same time there are also

14    partnership calls that involved the controlled

15    substance compliance team and -- and your

16    organization.

17            Would your organization be involved in the

18    regularly-held partnership calls?

19      A.    I was involved in some standard

20    partnership calls that we had outside of the scope of

21    suspicious order monitoring partnership calls, but I

22    was involved in every controlled substance partnership

23    call with customers to the beck of -- best of my

24    recollection.

```
1          Q.     Do you remember the circumstances under

2    which you'd be involved in a regularly-held

3    partnership call?

4          A.     Yes, I do.

5          Q.     What would be the circumstances?

6          A.     You know, I would join our team members

7    that were responsible for supporting the wholesalers

8    on, you know, forecasts or if there was a shipping

9    issue, if our distribution center was going to be on

10   the call, if they needed to change an order date or a

11   ship date, or general things like that just to ensure

12   our team was doing their job correctly and --

13         Q.     So on --

14         A.     -- doing the best service to customers.

15         Q.     -- on the regularly-held partnership calls

16   that you attended, would you attend to discuss part of

17   the suspicious order monitoring system or any pending

18   orders or something like that?

19         A.     If it was a partnership call for

20   controlled substances, typically we would have the

21   compliance team on the phone with us.

22         Q.     All right.  And who from the compliance

23   team -- let me start over.

24                So the compliance team as -- as I've been
```

1 understanding it today, was separate from your

2 organization, is that right?

3        A.    I'm sorry.  Separate from my organization

4 meaning?

5        Q.    You were in customer service and the

6 compliance team was not -- you did not report to them

7 and they did not report to you, is that right?

8        A.    That is correct.

9        Q.    So on an organizational chart, you

10 wouldn't be above or below the compliance team?

11        A.    That is correct.

12        Q.    So to the extent they appeared on a

13 regularly-held partnership call and -- and you or

14 someone from your team appeared on a partnership call,

15 would you have different issues to talk about or would

16 you appear for the same reasons, for different reasons

17 or something else?

18        A.    They generally -- it was a joint

19 partnership call that was agreed upon and they were --

20 there was a set agenda typically and we would -- yeah,

21 it was for the same -- it was for the same agenda, we

22 were on there for the same agenda.

23        Q.    All right.  All right.  You can set this

24 document aside.

```
 1                    Ms. Woods, I'm going to hand you what

 2    we'll mark as Exhibit 35.

 3                         (WHEREUPON, a certain document was

 4                          marked Allergan - Woods Deposition

 5                          Exhibit No. 35, for identification,

 6                          as of 01/10/2019.)

 7    BY MR. EGLER:

 8         Q.    Ms. Woods, can you look through

 9    Exhibit 35, and I'll represent to you, again, this was

10    produced to us in this case, and as it was produced

11    electronically, you were listed as the custodian of

12    it, and -- but this was the entire family of

13    documents.  It didn't have another -- it wasn't

14    attached to an e-mail or something like that.

15                    So can you look through it and -- and as

16    you are looking through it, I'll read on the record,

17    it is Allergan_MDL_03802654 through 2687.

18                    And when you are ready, can you tell me

19    whether you recognize this document?

20         A.    It looks familiar.

21         Q.    Okay.  What is it?

22         A.    So periodically we would do presentations

23    to other teams within the organization, other

24    responsibilities of our team, so this looks like a
```

1  presentation that we put together to do a presentation

2  to a team.

3      Q.    Do you remember what team you presented

4  this presentation to?

5      A.    I do not.

6      Q.    And your name appears on the first page of

7  this Exhibit 35, is that right?

8      A.    It does.

9      Q.    Do you remember whether you made this --

10 let me start over, use a better verb.

11          Do you remember whether you presented the

12 data that appears in this document, Exhibit 35, to

13 someone in 2012?

14     A.    I don't -- I don't, but that's what this

15 was prepared for.

16     Q.    And as part of your work at Watson

17 Pharmaceuticals, would you regularly do these types of

18 presentations?

19     A.    I wouldn't say regularly, but we did do

20 them on occasion.

21     Q.    All right.  So as you go into this

22 document, there is the same -- on Page 2 of the -- or

23 the second page of the document, they are not listed

24 by page number, but the second page of the document,

```
 1    which is 2655 on the Bates number, there is the same

 2    type of "High Level Org Chart."

 3              Do you see that there?

 4         A.    I do.

 5         Q.    And then on the next page, it says

 6    "DNA/CRA Alignment."

 7              Do you see that on Page 56?

 8         A.    I do.

 9         Q.    So the DNA, I think you had said before,

10    is director of national accounts?

11         A.    That is correct.

12         Q.    And what does CRA mean in the context of

13    your work?

14         A.    Customer relations administrator.

15         Q.    Okay.  What does a customer administrator

16    relay -- could you say that again?

17         A.    Customer relations administrator.

18         Q.    What is a customer relations

19    administrator?

20         A.    It is basically a customer service

21    representative.

22         Q.    All right.  So as you look at the headers

23    that appear at the top of this Page 656, does that

24    show the alignment between the customer relations
```

 1    administrator and the director of national accounts at

 2    Watson around 2012 as you understand it?

 3         A.    Yes, that's -- appears to be what that is.

 4         Q.    So for each of the director of national

 5    accounts, there was a separate customer relations

 6    administrator, is that right?

 7         A.    Yes.

 8         Q.    All right.  So I want to look at a couple

 9    of -- a couple of names that appear on this page.

10              The first one -- well, let's start over.

11              Who on this list is the DNA and who on

12    this list is the CRA?

13         A.    The person on the top row --

14         Q.    Uh-huh.

15         A.    -- is the director of national accounts.

16         Q.    Okay.

17         A.    And the person on the sub row below that

18    is the customer relations administrator.  And you'll

19    see there are two.  So there is two customer relations

20    administrators on each row that help support the

21    director of national accounts.

22         Q.    All right.  And we finally have the

23    spelling of Tony's last name, right?

24         A.    We sure do.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    All right.  So Tony Giannone, is that how

2  you say it?

3    A.    Close enough.

4    Q.    All right.  It is G-i-a-n-n-o-n-e.  And he

5  appears on the upper left-hand side there.

6          So underneath his name and underneath the

7  other names, there is a -- various company names

8  listed there.  What does that represent as you read

9  this list?

10    A.    Those would be the accounts under each one

11  of the director of national account's territories.

12    Q.    So the national -- the director of

13  national accounts would have those companies as his or

14  her customers and then the customer relations

15  administrators would also support those companies, is

16  that right?

17    A.    That is correct.

18    Q.    All right.  So like the first one there is

19  AmerisourceBergen?

20    A.    Correct.

21    Q.    And so at this time at the end of -- no.

22  Let me start over.

23          At this time in the year 2012, as you

24  think of it, does this -- does this accurately reflect

1    the breakup between the various directors of national

2    accounts and the customer relations administrators at

3    Watson?

4        A.    To the best of my knowledge.

5        Q.    All right.  So --

6        A.    At the point that this was created.

7        Q.    Right.

8              And a -- as you read this document, so far

9    there is no indication about the particular day inside

10   2012 where this document was created or present --

11   presented, right?

12       A.    That's correct.

13       Q.    All right.

14             And so in the second column there is Vince

15   Rin- --

16       A.    Rinaudo.

17       Q.    Rinaudo.

18       A.    Uh-huh.

19       Q.    It is R-i-n-a-u-d-o.

20             And -- and his parallel customer relations

21   administrators are Renee Hernandez and Jeff Gee?

22       A.    That is correct.

23       Q.    And his -- his name is spelled G-e-e.

24       A.    Correct.

```
 1        Q.     And underneath him, about half the way

 2   down is the word "McKesson," is that right?

 3        A.     Half the way down.

 4               Yes, that is correct.

 5        Q.     All right.  And then David Schmidt is

 6   listed as the next director of national account and

 7   Michelle Garcia and Christi Hammonds are the parallel

 8   customer relations administrator.  And then Maureen

 9   Bennett is listed as a director national of account --

10        A.     Barrett.

11        Q.     Barrett?

12        A.     It is two Rs, correct.

13        Q.     Sorry.  And it is B-a-r-r-e-t-t.

14               And it's -- the parallel customer

15   relations administrators are Bea Padilla,

16   P-a-d-i-l-l-a, and Vicky Goldy, G-o-l-d-y, right?

17        A.     Correct.

18        Q.     And then underneath the Maureen Barrett

19   there is the word "Anda."

20               Do you see that there?

21        A.     I do.

22        Q.     Do you know what Anda is?

23        A.     Anda is a distributor.

24        Q.     All right.  Do you know who owned Anda at
```

```
 1    this time?

 2         A.    Yes.  They were owned by Watson.

 3         Q.    All right.  So with regard to the sales

 4    or -- or -- or relationship with Anda, do you know

 5    whether they were treated as a -- as a sales account

 6    or some other treatment was given to them that was

 7    different from other?

 8         A.    Absolutely no different treatment.

 9         Q.    All right.  So there is Anda that's listed

10    there -- oh, at some point did Watson or one of its

11    successors sell Anda to someone else?

12         A.    That probably would not be a question for

13    me.  I'm sorry.

14         Q.    Right.  Let me ask this.

15               Do you know whether Anda is still part of

16    Allergan?

17         A.    Anda is not a part of Allergan.

18         Q.    Today?

19         A.    Correct.

20         Q.    All right.  So, and then moving down

21    there, there is the word "Cardinal."

22               Do you see that there?

23         A.    I do.

24         Q.    All right.
```

```
 1              And so that would indicate that

 2   Ms. Barrett and then pare -- in a parallel fashion

 3   Ms. Padilla and Ms. Goldy were responsible for the

 4   Cardinal account, is that right?

 5        A.    That is correct.

 6        Q.    All right.  So let's move on.

 7        A.    One part I just want to go back --

 8        Q.    Oh, yeah.

 9        A.    -- Anda.

10              I should state, like, as far as my side of

11   the business goes, Anda was handled completely

12   independently.  I don't know from an entity setup or

13   anything if they were different.  So I just --

14        Q.    Right.

15        A.    -- have to clarify that because that is

16   not my side of the business.

17        Q.    No, I appreciate you saying that.

18        A.    Okay.

19        Q.    And -- and, again, today, yeah, I am

20   asking just for your personal knowledge.

21        A.    Yes, that's -- I just wanted to clarify,

22   I -- I -- I wouldn't be able to help on that end of

23   it.

24        Q.    Right, right.
```

Highly Confidential -- Subject to Further Confidentiality Review

1           Yeah, and so what I'm asking is everything

2    you say today in the con -- is in the context of your

3    own knowledge.  There is no expectation that you would

4    go out and find the answers --

5        A.    Right.

6        Q.    -- or stuff like that.

7              All right.  All right.  Great.

8              So can you move ahead into this document

9    and look at what's marked as Exhibit 5 -- or 659.  It

10   is, like, three pages ahead.

11             All right?  And it's different from the

12   other pages that we've looked at so far.

13             Do you recognize what this Page 659 is?

14       A.    It looks like it is a notes page at the

15   bottom of a slide.

16       Q.    So these are notes that would appear in

17   a -- in a PowerPoint presentation, is that right?

18       A.    That appears to be what that is.

19       Q.    Do you remember typing notes like this as

20   part of your work at Watson?

21       A.    If I needed to remember something on a

22   slide.

23       Q.    All right.  And these notes would appear

24   to you during the presentation but not necessarily

1    appear if you were showing the presentation up on a

2    screen or something?

3         A.    That would be correct.

4         Q.    All right.  So going to the next page,

5    Page 660, this is similar to the budget summary that

6    we were looking at before, is that right?

7         A.    That is correct.

8         Q.    All right.  And as you go down into this

9    budget summary, again, the term masta -- "master data

10   statistics" appears about three-quarters of the way

11   down, is that right?

12        A.    Yes, it does.

13        Q.    All right.  So -- and this is a little bit

14   different from the one that we had been looking at

15   before.  It seems to have a broader group of numbers

16   listed.

17              So for SOM validations, do you see that?

18        A.    I do.

19        Q.    It says the monthly average per MDA of

20   SOMS validations in 2009 was 62.

21              Is that right?

22        A.    That's what it states.

23        Q.    And then it states that in 2010 the

24   monthly average per MDA SOMS validation was 167, is

1    that right?

2        A.    That is correct.

3        Q.    And then it states that the year to date

4    October 2011, the monthly average per MDA SOMS

5    validations is 280?

6        A.    Correct.

7        Q.    And in the last column over, it states

8    that the 2009 year to date versus -- no -- 2011 year

9    to date versus 2009 year to date percent of change for

10   the monthly average per MDA SOMS validation is

11   351.6 percent, is that right?

12       A.    That is correct.

13       Q.    And do you remember why you presented that

14   particular piece of information in -- in this

15   presentation?

16       A.    Because it was part of the productivity

17   statistics.

18       Q.    All right.  So that would signify

19   substantially increased productivity, is that right?

20       A.    Yes, it would.

21       Q.    All right.  Do you remember ever having a

22   discussion about whether to increase the headcount

23   with regard to SOMS validations around this time?

24       A.    Well, this would have been around the same

1  period of time.  It could have been that we had a

2  headcount decrease which could have been leading to

3  that increase.  I don't -- I don't recollect.

4      Q.   All right.  So the increase in average --

5  the increase in the monthly average per MDA of SOMS

6  validations may have, and you don't know either way,

7  may have been created by a decrease in the number of

8  people performing SOMS validations, is that right?

9      A.   Or because we were bringing on Actavis

10  employees.  Right?  This is right at the Actavis...

11      Q.   So people would have been let go --

12      A.   We --

13      Q.   -- in --

14      A.   No.  My point is, right, we have an

15  increase, but we might not have brought on extra

16  headcount because we were going to be gaining

17  employees.

18      Q.   Okay.  So is it fair to say if there were

19  a decrease, you might have recognized it as a

20  temporary decrease that would have been subsequently

21  increased after the merger had been completed?

22      A.   I might have gained employees after the --

23      Q.   Yeah.

24      A.   -- acquisition.

1      Q.    All right.

2            So moving on into this document, the two

3   pages -- or one page ahead -- wait, next two pages

4   ahead, Page 662, it says, "2012 Objection" --

5   "Objectives," and it states:  "SOMS Systems - Partner

6   With DEA Affairs to" and then it says:  "DEA affairs

7   initiative - MD owner in SAP."

8            As you read that language that's there,

9   could you explain what your impression is what that

10  means?

11     A.    I don't know what the initiative was

12  now --

13     Q.    Okay.

14     A.    -- back from 2012.

15     Q.    All right.  But we are getting closer than

16  2004, right?

17     A.    Yeah, we are getting closer.

18     Q.    All right.

19           All right.  So you, as you sit here today,

20  you don't have a memory of what the DEA affairs

21  initiative was.

22           And then there is that word -- or that

23  term "MD owner in SAP."

24           Do you have a memory or an impression of

1    what that means?

2        A.    I mean, I know MD is master data, but I'm

3    not sure what the initiative was that would have been

4    captured under that without more detail.

5        Q.    All right.  So can you turn to the next

6    page, and it's Page 663, and it says "Controlled

7    Substance Compliance," and then colon, "A

8    Collaborative Team Approach."

9             Do you see that?

10       A.    I do.

11       Q.    And then there is a picture on that

12   page above there.  It's an oxycodone and acetaminophen

13   tablets.

14            Do you see that there?

15       A.    I do.

16       Q.    Do you remember around this time whether

17   Watson was shipping oxycodone and acetaminophen

18   tablets?

19       A.    I'm assuming from the picture we must have

20   been.

21       Q.    All right.  So the next page states:

22            "What is SOM," and then in parentheses,

23   "(Suspicious order management)?"  And then it's noted

24   as 664 in the Bates numbers.

1    A.    Um-hum.

2    Q.    And this page lists out some text and it

3  says:

4          "SOM," and then in parentheses,

5  "(Suspicious Order Management)," close parentheses,

6  "is a DEA requirement," and then parentheses, "(21 CFR

7  1301.74)," and then in parentheses the letter "(b)"

8  which, and then it's italicized, "specific re" --

9  "specifically requires that a registrant 'design and

10  operate a system to disclose to the registrant

11  suspicious orders of controlled substances.'"

12          And then the next group of text says:

13          "What is a 'suspicious' order?"

14  "'Suspicious,'" and close quote, "order."

15          It says:  "DEA 21 CFR 1301.74(b) describes

16  suspicious orders as having significant deviation in

17  Order Size," and then in parentheses, "(Quantity),

18  Order Frequency, and/or Order Pattern."

19          Do you remember why you put this language

20  in this presentation?

21    A.    Well, whatever team we were giving this

22  for we were talking about this particular process,

23  that this may have been at a DEA summit with the rest

24  of the controlled substance compliance team that would

 1    have benefited from this.

 2         Q.    Okay.  Do you remember where you got the

 3    language for this for the 21 CFR 1301.74(b)?

 4         A.    This might have come from compliance.

 5    This might have come from a compliance presentation.

 6    This was a separate presentation at one time.

 7         Q.    All right.  So -- because the language of

 8    the CFR is slightly different.

 9         A.    Different, uh-huh.

10         Q.    It doesn't say "suspicious orders as

11    having" it says "including" as opposed to "as."

12              Do you remember making that distinction?

13         A.    I -- I don't remember creating this slide

14    myself, so...

15         Q.    Okay.  Do you remember ever -- anybody

16    ever pointing that out to you?

17         A.    No, I -- I don't.

18         Q.    All right.  So in that --

19         A.    This slide could have been changed at some

20    point.  I don't know.

21         Q.    All right.  And then as you go down, it

22    states:  "Anti-diversion is proactive, not reactive."

23              Do you see that there?

24         A.    Yes, I do.

1    Q.   And it says:  "Controlled substance

2  regis" -- "registrants are required to place on hold,

3  investigate, and disclose to the DEA all suspicious,"

4  and then it says in bold and capitals, "ORDERS of

5  controlled substances;" and then in bold and capitals

6  the word "NOT suspicious," and then bold and capitals

7  the word "SALES after the fact."

8       Do you remember writing that?

9    A.   No.

10    Q.   All right.  Do you remember discussing

11  that concept that the -- the DEA required report of

12  suspicious orders of controlled substances and not

13  suspicious sales after the fact around this time,

14  2012, with people at Watson?

15    A.   I remember attending DEA summits that we

16  had at our company where this was a topic in general

17  and we discussed all of this.

18    Q.   When you use the term "DEA summit," just

19  so we're clear, was someone from the DEA in attendance

20  at those DEA summits or was it a summit of the DEA

21  group at Watson?

22    A.   There would be DEA summits where we would

23  have people from the DEA actually come in to the

24  company.  I don't remember the exact time, but this

1  would have probably come from that meeting or

2  presentation.

3       Q.   Do you remember a particular DEA summit

4  around this time, 2012, where that issue that the

5  orders of controlled substances, not suspicious sales

6  after the fact, was discussed?

7       A.   I believe that this presentation would

8  have come from that summit or likely right before.

9       Q.   Do you remember who from the DEA was at

10 Watson at the time?

11      A.   I -- I don't remember who.  Tom sets --

12 Tom Napoli set those up, so I don't remember who the

13 representative was.

14      Q.   Okay.  Do you remember ever meeting a

15 representative from the DEA around this time period in

16 2012?

17      A.   I could have.  I probably don't remember

18 the name of the person.

19      Q.   Okay.  You don't remember either way?

20      A.   I don't remember it either way.

21      Q.   All right.

22           All right.  So the next page, 665, there

23 is another note page, is that right?

24      A.   Yes.

1    Q.    It says:

2         "Protects Watson, protects your customers.

3    We are required to know our customer's customer."

4         Now, that appears to be a note, is that

5    right?

6    A.    That appears to be a note.

7    Q.    All right.  So do you remember writing

8    that sentence:

9         "Protects Watson, protects your customers.

10   We are required to know our customer's customer"?

11   A.    No, I don't -- I don't know that this was

12   my part of the presentation.  I can't say one way or

13   another.

14   Q.    Okay.  Do you remember ever using that

15   phrase or that sentence:  "Protects Watson, protects

16   your customer"?

17   A.    I can't say one way or another.

18   Q.    Okay.  Do you remember around this

19   timeframe ever using the second sentence:  "We are

20   required to know our customer's customer"?

21   A.    I don't know if I did at that time or not.

22   Q.    All right.  So moving on into this

23   document, it's Page 2666, there is another chart that

24   says:  "SOMS System Flow."

Highly Confidential - Subject to Further Confidentiality Review

```
1              Do you see that there?

2       A.    I do.

3       Q.    Do you remember who created this

4  flowchart?

5       A.    This is -- this would have been created by

6  our SAP team is how the flow worked.

7       Q.    And as you think of it, around this time,

8  2012, who was on the SAP team?

9       A.    Oh, gosh.  I don't know if I can remember

10 the people that were in IT.

11      Q.    Was there a particular person on the SAP

12 team that supported the -- the customer service group

13 that you were a head of?

14      A.    This would not have been a customer

15 service function.

16      Q.    Okay.

17      A.    This would have been a different function.

18 This -- yeah, there wasn't people assigned to customer

19 service.

20      Q.    Okay.  So as you think of this, the SOM

21 system flow being a function of a different group,

22 what group would it have been a function of?

23      A.    This would have been under probably order

24 to cash and this would have been -- this would have
```

1   actually been developed when we put SAP in in 2004,

2   this would have been configuration.

3        Q.    Okay.  So below the -- or in the bottom

4   half of the Page 666 that's the SOM system flow --

5        A.    Correct.

6        Q.    -- there is a box and inside the box it

7   says "SOMS validation system," right?

8        A.    Correct.

9        Q.    And it has various diamonds and squares?

10       A.    Um-hum.

11       Q.    And do you know what that is supposed to

12   represent?

13       A.    Yes, I do.

14       Q.    What does [sic] that supposed to

15   represent?

16       A.    So, this is the blocks for the different

17   validations for order quantity, which would be size;

18   frequency based on monthly averages, how many times

19   they ordered; pattern; and then also in addition to

20   size, frequency and pattern, we also went above and

21   beyond that and as you could see on the last couple,

22   it was also measuring up against classes of trade so

23   that we could look and see if customers, even

24   regarding size and frequency, how they measured up --

1    up against other people that were in the same classes

2    of the trade in there.  So if you were a wholesaler,

3    it measured you up against other wholesalers based on

4    your order size and monthly averages.

5              So it measured people on order, order

6    size, order frequency, and up against people in their

7    same kind of class of trades.

8         Q.    So yesterday we were talking about a -- an

9    algorithm that was part --

10        A.    Yes.

11        Q.    -- of the SOMS validation system.

12              Is that what this is?

13        A.    Yes.

14        Q.    All right.  And as you think of it, is

15   this the entire algorithm as it is presented or was

16   there more to it?

17        A.    This would be the system logic, that would

18   be correct.

19        Q.    Okay.  And that's a term you used

20   yesterday was "the system logic"?

21        A.    Yes --

22        Q.    Right?

23        A.    -- um-hum.

24        Q.    I think you had said the system logic that

1  you were talking about came from the DEA website, is

2  that right?

3      A.    Yeah, DEA.DOJ.gov, yep.

4      Q.    All right.

5      A.    Dot com.  Uh-huh.

6      Q.    So, with res --

7      A.    Well, I did -- what I said was I don't

8  know if that's where it came from, but what I

9  commented on is that this mimics that.  From my

10 knowledge, it mimics that.

11          Now, whether that's where we took it from

12 or that's how Tracey, where she got it from, I don't

13 know.  I just know that that's what it appears to be.

14     Q.    Okay.  And you used that term "class of

15 trade" --

16     A.    Uh-huh.

17     Q.    -- for COT that appears on this Page 2666.

18          The class of trade data that you are

19 thinking of --

20     A.    Uh-huh.

21     Q.    -- we had been talking earlier about sales

22 data that was sales of at -- at this time Watson

23 product and sales data that was not only Watson but

24 other comparable NDC number product.

1               Is it your impression that this COT data

2       that's listed there was only Watson product that was

3       sold to these other --

4           A.     Yes.  We wouldn't be able to capture other

5       people's NDC numbers in our ERP system.

6           Q.     All right.  And there was never an

7       attempt, as far as you know, to do that, is that

8       right?

9           A.     I don't even know how you would do that.

10          Q.     All right.

11          A.     That would mean that you would have to

12      have every single customer, every single

13      manufacturer's data in your ERP system.  I think that

14      would be illegal.  I don't think they would allow you

15      to have their information in your system.

16          Q.     Do you know whether there was ever an

17      attempt to examine any information that Watson had

18      acquired regarding comparable NDC numbers to import

19      into the SOM system?

20          A.     I -- I don't even know how you do that.  I

21      mean -- I mean, you have to think about the amount of

22      data.  I -- that would be taking every single

23      manufacturer's data that has a like product and

24      creating your own interoperable system.  I can't even

```
 1   imagine the on taking of that.  And you would have to

 2   have an agreement by every manufacturer.  It would

 3   have to be -- it would have to basically be an

 4   agreement by all companies to create an interoperable

 5   system.  And I don't know if that was ever a

 6   discussion.

 7          I know that -- I think, you know, from

 8   what I remember having conversations with Tom about

 9   this several times is going back to the DEA to say,

10   Can we have this discussion about creating an

11   interoperable system so that this data would be

12   available.  And I don't think we -- you know, I -- I

13   don't know what the response was.  I know it didn't

14   happen.

15          I don't know, you know, exactly -- he

16   might have more information on the outcome of that,

17   but the on taking to be able to make that happen, and

18   it would be like you having your own personal computer

19   and you going to somebody and saying, like, I want all

20   of your data, but I want it in my computer.  And you

21   are not going to get an agreement from people.  They

22   are going to say, Well, wait, you are going to have

23   all of my market data and all of my information and

24   nobody is going to agree to that.
```

 1              So I'm -- I'm not sure.  Tom probably

 2      would be able to provide information from the DEA.

 3          Q.    So with regard to the term you used there,

 4      "market data," there were sources of market data that

 5      Watson as a company either purchased or came into

 6      possession of regarding other NDCs, is that correct?

 7          A.    The tools that we had available to us that

 8      provided -- I'm -- I'm not sure.  I'm not a marketing

 9      person --

10          Q.    Uh-huh.

11          A.    -- so I don't -- and when you say "other

12      marketing tools," what are you referring to?

13          Q.    Well, so, for example, one of the earlier

14      exhibits that we looked at when you reached out to the

15      marketing group and asked for market data on

16      comparable what you referred to as SKUs then, that

17      type of data was available to the marketing team,

18      right?

19          A.    Yeah, so what they commented on is that

20      was customer feedback that they received.

21          Q.    Uh-huh.

22          A.    Is that what you are referring to, is

23      actual customer feedback?

24          Q.    It was data, wasn't it?

1       A.    I think that memo said that it was

2    customer feedback that they had.

3       Q.    All right.  I guess we can look at it.

4       MR. EGLER:  Do you have it?

5    BY THE WITNESS:

6       A.    If I'm not mistaken, that's what Toni had

7    commented back on.

8            I'm sorry.  I thought she just said

9    feedback, on feedback --

10   BY MR. EGLER:

11      Q.    No, that's fine.

12      A.    -- from our customers.

13      MS. COVERSTONE:  I think that's at 612.

14   BY THE WITNESS:

15      A.    Is that at 612?

16   BY MR. EGLER:

17      Q.    So at -- on this Page 612 --

18      A.    Yeah.

19      Q.    -- there is various text, and at the

20   bottom Ms. Picone says:

21           "I have attached recent TRx data from IMS

22   so you can see the market trends by competitor."

23      A.    So that's --

24      Q.    Do you see that there?

```
1       A.      -- IMS data --

2       Q.      Uh-huh.

3       A.      -- is what you are referring to?

4       Q.      Yeah.

5       A.      So I'm not sure how that would go.

6               So that is total Rx data that comes in

7       from IMS.  How -- I -- I'm not sure how that would

8       actually assist us because it doesn't tell us -- I'm

9       not sure that that's going to tell us -- that's --

10      that's when a prescription gets written, but it

11      doesn't tell us who actually is getting, as a total Rx

12      is the script.  I'm not sure that that tells us what

13      wholesaler or what pharmacy.  I don't know how that

14      feeds into a --

15      Q.      Do you know whether there --

16      A.      -- SOMS system.

17      Q.      Oh, go ahead.

18              Do you know whether there was ever an

19      attempt to find data that would break down from a

20      distributor or a pharmacy point of view either from

21      IMS or any other source a -- a view of complimentary

22      SKUs or NDC codes that could be fed into the SOMS

23      system?

24      A.      So, at my level, being on the SOMS
```

1    operational side, I wasn't inv -- involved in, you

2    know, working groups of people doing that.

3         Q.    Uh-huh.

4         A.    The compliance teams probably were.  I

5    think they would be good people to ask about, like,

6    what the working teams were trying to create to come

7    up with that, but at my level on the operational side,

8    we were not involved in those working groups.

9         Q.    And you don't remember having any of those

10   conversations, is that fair to say?

11        A.    No.  I mean, I remember going to Tom and

12   saying, Is there a way to get interoperable data, has

13   there been discussions on this.  I remember having

14   that discussion to see, because there wasn't a way for

15   us to have an interoperable system with all of the

16   manufacturers' data.

17        Q.    And when you asked the marketing team to

18   provide detailed data on other NDC codes, as in

19   Exhibit 32, they provided it to you, right?

20        A.    Well, they provided what we asked for, but

21   TRx data doesn't really help us.  I mean, I can't --

22   like when you go to look at the number of TRxs at a

23   pharmacy, the pharmacy data doesn't tell me much.  It

24   doesn't tell me what wholesaler it is going through.

```
 1    It doesn't tell me -- it just tells me what the doctor

 2    is writing, but I don't sell to a doctor.

 3         Q.    Would it give you the number of

 4    prescriptions written in, say, an SMSA, like a

 5    statistical metropolitan area, for those codes?

 6         A.    It -- it could break it down by state or

 7    something like that.

 8         Q.    Yeah.

 9              So -- but you didn't try to import that

10    type of information into the SOMS system, right?

11         A.    I'm just still trying to figure out how

12    that would help us.  We did go to look at other

13    systems, as you know, that would have more statistics

14    behind them --

15         Q.    Uh-huh.

16         A.    -- but at this time, the time that you are

17    talking about, our system was meeting the requirements

18    in 2012 and beyond the requirements in 2012.

19         Q.    When you say that, what do you mean,

20    "meeting the requirements"?

21         A.    The Controlled Substance Act requirements.

22         Q.    And how did you come to understand that

23    you were meeting the Controlled Substances Act

24    requirements?
```

```
 1        A.    Well, because, you know, we, as I stated

 2   before, working with Tom and working with our

 3   compliance team, they are the ones that provided the

 4   requirements to us and we based it on what the

 5   requirements were at that given time.

 6        Q.    How did you come to an understanding of

 7   what the requirements were?

 8        A.    I'm sorry?

 9        Q.    How did you come to an understanding of

10   what the requirements were?

11        A.    So, the controlled substance compliance

12   team provides -- are the ones that work with the DEA

13   and they are the ones that review our system and

14   ensure that the system is providing what it needs to

15   be doing and that we are going at least -- or doing

16   what we are supposed to be doing using the system and

17   our processes to do thorough investigations.

18        Q.    Okay.  And I want to be clear just because

19   you used the word "they" in your response and there

20   were two antecedents before it.  You said "they are

21   the ones" who do two things.

22              When you said that, did you mean --

23        A.    "They" the controlled substance compliance

24   team.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Not the D -- not the DEA?

2      A.    Correct.

3      Q.    Okay.  All right.

4            So let's move on into this document to the

5      next page, 667, the SOMS Collaborative Review slide.

6      And can you look at this page and tell me whether you

7      remember putting this together.

8      A.    We would have put the box on the left

9      together that supported the balance, the -- the flow

10     is out of SAP from our SAP team.

11     Q.    And that says "Analysis of SOMS Forms"?

12     A.    That is correct.

13     Q.    All right.  And this is -- we talked about

14     this a little bit yesterday.  It says:

15           "During the analysis we use" -- I'm sorry.

16     It says:

17           "During the analysis, we attempt to use

18     all of the information we have on hand before reaching

19     out to the customer.  We have multiple tools to

20     accomplish this.  A few examples of the tools we use

21     are," and then there are A's and I think they are

22     bullet points.  It says:

23           "Check call log to see if we previously

24     contacted the customer using the current month for the

1    product."  And then a dash underneath there, it says:

2    "If so, reanalyze to determine another" -- "if another

3    investigation/customer contact is needed."  And then

4    it says:  "Review 852 and 867," and then in

5    parentheses, "(when available)."  And then it says:

6    "Review past shipping history of product," and then it

7    says in parentheses:  "(YOY/YTD comparison)."  And

8    then it says:  "Contact internal departments to see if

9    they have additional information.  Demand Management,

10   Marketing and CRA."  And then it says:  "Look for

11   order pattern."  And then the last one is:  "Customer

12   contact."

13            And as you think of it, those are the

14   typical processes that the SOMS group would use to

15   analyze a pended order, is that right?

16        A.    I would say those -- those are the typical

17   ones, correct.

18        Q.    All right.  And there may have been other

19   ones as we discussed yesterday, is that right?

20        A.    That is correct.

21        Q.    All right.  Then going onto the next page,

22   668, it is a "SOMS Block Example."

23            Do you see what that is?

24        A.    I do.

1    Q.    What is that?

2    A.    So if an order pends, that would be the

3    alert that they would get to -- to start the review

4    process.

5    Q.    All right.  When you say "they," what does

6    that mean?

7    A.    The master data team that's responsible to

8    do the first review.

9    Q.    All right.  Then the next page is "852

10   Data Example."  It is Page 669.

11   A.    That's correct.

12   Q.    And can you tell me what this shows?

13   A.    Yes.  It -- so an 852 data example is the

14   data that they would review.  So it just comes in like

15   this.  They are going to look for a particular

16   product, but it would show the name of the product,

17   the NDC number, the quantity the customer has on hand.

18   And there is -- at the top you'll see it says "Week

19   Ending," so it is just for that period of time, that

20   week, and then the following week.

21        So it will say how many is on hand, how

22   many -- their average they are selling out per week,

23   the number of days on hand they typically have, the

24   number of weeks on hand and the weekly sold or daily

1    sold here.  So that's -- that's what that data

2    typically reflects.

3         Q.    All right.  And the days on hand is the

4    DOH number, is that right?

5         A.    That is correct.

6         Q.    And the weeks on hand is the WOH number?

7         A.    That is correct.

8         Q.    And with regard to this Page 669 and the

9    852 data, it is your understanding that the only 852

10   data that Watson would typically get would be data

11   about its own NDC code products, is that right?

12        A.    Yes, that is correct.

13        Q.    All right.  And moving down to the 867

14   data example on Page 670, what does this show?

15        A.    This shows the -- it appears to be the

16   start and the end date of this particular transaction.

17   The DEA number, the ship from DEA number, the ship to

18   DEA number, the ship from name, who shipped the

19   product, the ship to state, the ship from zip code --

20   or I'm sorry -- the ship to zip code.

21             I can't really see the in -- it looks like

22   the invoice date.

23        Q.    Uh-huh.

24        A.    The product ID, the quantity that would

1    have been shipped, and the price, the contract price.

2        Q.    All right.  So with regard to this chart,

3    do you remember why this chart was included in the

4    presentation that is shown here as Exhibit 35?

5        A.    It is an example of 66 -- 867 data that we

6    would use if we had to check to see who is getting

7    particular product.

8        Q.    Okay.

9              That term, it says "Prod" and then capital

10   "Id" there.  It is the third-from-the-last --

11   third-from-the-right column.

12             Do you recognize those as NDC numbers or

13   something else?

14       A.    I do recognize them as NDC numbers.  A

15   product ID and a NDC may not be tip -- one in the

16   same, but this is an NDC number.

17       Q.    All right.  And so with regard to the NDC

18   or product ID number, as you think of it, would that

19   be an individual bottle that would have a particular

20   number of pills in it?

21       A.    Yes, it would be a unit.  It would be a --

22   a stock keeping unit.  To the best of my knowledge,

23   that would be a stock keeping unit NDC number.

24       Q.    All right.  Let's move -- move on into

1    this document.  The next one is the Page 671, "YOY/YTD

2    Comparison Example."

3              And is this also information that would

4    come from Watson's records?

5        A.    Yes.

6        Q.    All right.  And then the next page is 672.

7    It says, "E-Mail Verbiage."

8              Can you tell me what this shows?

9        A.    Yes.  When we sent an order -- when we

10   notified a customer that we needed justification, we

11   sent them an e-mail with the CFR information and

12   requested them to reply with justification.

13       Q.    All right.  So is it fair to say this

14   would be the first step in analyzing an order that had

15   pended under Watson's suspicious order monitoring

16   policy by the master data administrator?

17       A.    Not necessarily the first step.  We would

18   probably do some of the other steps that we laid out

19   previously on this page.  So it says:

20              "During the analysis, we attempt to use

21   all of the information with multiple tools on hand

22   before reaching out to the customer."

23              So we will try to conduct several of the

24   other tools before we reach out to them so we have

```
 1   significant knowledge before we ask them for a

 2   justification.

 3        Q.   All right.  So the order may be cleared

 4   before this type of e-mail ever goes out?

 5        A.   It could be, yes.

 6        Q.   Then the next page is 673 and it says:

 7   "'Order of Interest' Evaluation/Investigation."

 8             And you -- can you tell me what it shows

 9   on this page?

10        A.   It is a little bit about the evaluation

11   process, when it gets escalated to the DEA affairs

12   department and...

13        Q.   And the data that's here or the

14   information that's here quotes a -- what's referred to

15   as "December 2007 DEA letter."  It says:

16             "Registrants must conduct an independent

17   analysis of suspicious orders prior to completing a

18   sale to determine whether the controlled substances

19   are likely to be diverted from legitimate channels."

20             Do you see that there?

21        A.   I do.

22        Q.   So do you remember ever reading the letter

23   that's referred to here, December 2007 DEA letter?

24        A.   I do.
```

1        Q.     Do you -- do you remember when you first

2    saw it?

3        A.     I -- I remember seeing it with Tom when he

4    met with us and I believe we also saw it in one of our

5    DEA annual trainings or meetings.

6        Q.     Okay.  Do you remember the -- what year

7    that was when you first saw it?

8        A.     I can't recall the exact time on it.

9        Q.     All right.  And then the next bullet down

10   from there is "Order of Interest Evaluation Versus

11   Suspicious Order Investigation."

12            That -- what does that language mean?

13       A.     As I mentioned yesterday, we -- we looked

14   at three phases.  Once -- one, the pended order, so it

15   pended and we reviewed it.  If -- when it pended and

16   reviewed, if we didn't have enough information or even

17   if we did get justification, if it wasn't something

18   that substantiated the review of -- the release of the

19   order, we considered it an order of interest, and all

20   orders of interest were escalated over to DEA

21   compliance.  That's considered in -- in our

22   explanation an order of interest.

23            If DEA compliance received those and they

24   reviewed them and did not feel that there was

1    legitimate justification or information or legitimate

2    reporting or data to back it up, they considered it a

3    suspicious order.

4         Q.    Okay.  So, and on the next page, 674, it

5    says in quotations:

6              "'Order of Interest'" and then closed

7    quotations, "Investigation:  Re" -- "Red Flags," and

8    there are various advertisements there.

9              What does that mean?

10        A.    This would have been, as part of the due

11   diligence review, things that would have been

12   investigated, review of websites, so when we

13   investigated 867 data, we would have potentially seen

14   that there was multiple wholesalers selling to

15   somebody that we then thought looked like a red flag.

16   It would have been a product of ours that we saw being

17   sold by -- to a pharmacy by multiple wholesalers, we

18   would have looked that pharmacy up.

19              In this case I believe it was Palm Beach

20   Pain and Rejuvenation, we would have looked them up

21   and we would have said, Oh, good -- goodness, look at

22   these ads.  This is a red flag.  So where it says

23   "Investigation:  Red flags" and this is the ads that

24   would have been identified.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    All right.  And moving on into the next
 2   page, it states:
 3              "'Orders of Interest'" -- "'Order of
 4   Interest' Disposition."
 5              And can you tell me what this language
 6   means?
 7        A.    Let me just read through this a second.
 8        Q.    Sure, yeah, yeah.
 9        A.    So that's just an explanation of the
10   process of the investigation and the steps after the
11   investigation.
12        Q.    All right.  So then the last one there
13   says:
14              "All suspicious orders are reported to the
15   DEA Chicago field office."  And below that it says:
16   "To date, Watson has reported a few suspicious orders
17   to the Chicago field office."
18              And when you wrote that:  "To date Watson
19   has repute" -- "reported a few suspicious orders" --
20   "a few suspicious order to the Chicago field office,"
21   what did that mean?
22        A.    Well, I -- I can't guarantee that I'm the
23   person that wrote that.
24        Q.    Okay.
```

1    A.    My understanding of that was at that point

2    in time we did have some suspicious orders and they

3    were reported to the Chicago field office.

4    Q.    So does that mean in that year 2012 or

5    over a number of years or something else?

6    A.    I can't recall if this was only speaking

7    about what was going on that year, so I don't want to

8    just make a general statement.

9    Q.    Okay.  And then on the notes on the next

10   page, 676, it states:

11        "Please do not promise your customer

12   controlled product with the impression that marketing

13   is the only approval process.  Typically the large

14   wholesalers are not an issue.  However, smaller

15   wholesaler and distributors, and some chains, and

16   mail-order will be held and required to provide

17   documentation.  All responses are auditable."

18        Do you see that there?

19   A.    I do.

20   Q.    Do you remember that note being part of a

21   presentation that you gave in 2012?

22   A.    I don't remember the note being part of

23   the presentation.

24   Q.    Okay.  And do you remember ever saying to

1    someone, "Please do not promise your customer

2    controlled product with the impression that marketing

3    is the only approval process"?

4        A.    I remember that we strongly stressed that

5    marketing is not part of the approval process and not

6    to -- and that they are not allowed to approve any

7    controlled substance order.

8        Q.    Does that sentence there:  "Please do not

9    promise your customer controlled product with the

10   impression that marketing is the only approval

11   process," help you understand to whom this Exhibit 35

12   presentation was made?

13       A.    This may have been just to our internal

14   customer service team.  I don't know.

15       Q.    Okay.  Could it have been to the marketing

16   group?

17       MS. LEVY:  Objection to form.

18   BY THE WITNESS:

19       A.    I don't know.

20       MS. LEVY:  You can answer.

21   BY THE WITNESS:

22       A.    I don't know.

23   BY MR. EGLER:

24       Q.    And then the 676 page continues:

1          "Typically the large wholesalers are not

2   an issue, however, smaller wholesaler and

3   distributors, and some chains, and mail-order will be

4   held and required to provide documentation."

5          So do you remember writing that language?

6   A.    I don't.

7   Q.    Do you remember ever having the impression

8   that typically large wholesalers are not an issue with

9   regard to the SOMS system at Watson around this time?

10  A.    I don't think that that's the context of

11  what that comment made, because they were in

12  partnership calls with us constantly.  So I can't

13  speak to exactly what the comment was referencing.

14  Q.    All right.  And then the next statement

15  is:  "All responses are auditable."

16          Do you see that there?

17  A.    I do.

18  Q.    What does that mean in the context of this

19  document?

20  A.    I don't know what it means in the context

21  of this document.  I know what "all responses are

22  auditable" mean.

23  Q.    What does that mean to you?

24  A.    That when we receive justif --

1    justification from customers and we were forwarding

2    them over to DEA affairs, that we wanted to ensure

3    that customer responses on their justification are

4    auditable as part of our suspicious order monitoring.

5        Q.    So the word you used, "auditable," what

6    does that mean in the context of what you are saying?

7        A.    Well, everything that we, obviously, did

8    on suspicious order monitoring and -- or any

9    transaction is -- is auditable, right.  I mean,

10   it's -- every transaction is auditable.

11       Q.    And who would be doing the auditing that

12   you are thinking of when you say "all responses are

13   auditable"?

14       A.    Well, we had -- as you know, we talked

15   about it yesterday.  We had an internal audit team, we

16   had a -- we had financial auditing teams, we had

17   compliance auditing teams.

18       Q.    Okay.  So is this like a statement that

19   whatever is said to justify the clearing of a

20   suspicious order may be subject to an audit?

21       A.    Subject to any type of audit.

22       Q.    Okay.

23       A.    I wanted to make sure it was accurate.

24       Q.    All right.  And then the next page, 7 --

1  or 677 and 678 -- well, 677, can you tell me what this

2  page is discussing?

3      A.    This discusses the partnerships -- calls

4  that we discussed earlier.

5      Q.    All right.  And then the next page is

6  another series of notes.  And then moving on into

7  the -- the following page is "Progressive Results."

8            Do you see that there, Page 679?  It

9  states, "Progressive Results."  And it says:

10           "Results of partnership conference call.

11  Customers are able to grow their business, but we need

12  documentation/visibility to be justifiable.  Customers

13  willing to provide 852 and 867 data, data

14  comprehensive" -- I'm sorry -- "data comprehension,

15  order justification, customers willing to implement

16  more stringent and rigorous requirements for SOMS

17  evaluation process, partnering with our DEA affairs

18  department, thorough customer questionnaires, thorough

19  vetting process/site visits, periodic site visits, and

20  mix of products on contracts and orders."

21           Do you see that there?

22      A.    I do.

23      Q.    What does that -- those various sentence,

24  what do those mean all together?

 1      A.     And so you'll remember we had a

 2  conversation yesterday that we did not sell only

 3  controlled substances to people.

 4      Q.     Uh-huh.

 5      A.     The mix of this means that in order to --

 6  do you -- do you have one particular one you want me

 7  to start with?

 8      Q.     No.  I was thinking just in general as

 9  it's referred to as "progressive results"?

10      A.     Progressive results means that as --

11  progressive results means that the partnership calls

12  that we were having with people on controlled

13  substance, on controlled substances in general allowed

14  us to learn more about the customers, their policies,

15  their systems, how things were controlled, how they

16  controlled their controlled substances, their vetting

17  processes, allowed us to get more data from them if

18  they were going to purchase controlled substances with

19  us.  So we felt that we got progressive results by

20  having these partnership meetings.

21      Q.     All right.  And then can you move onto the

22  next page, it's a Page 681.  It states:  "Watson 'New'

23  Accounts."

24             And can you tell me what that shows?

 1      A.     So this talks about a new account process.

 2      Q.     And what do the -- what is the form that

 3  is there and the text that appears to the right of the

 4  form mean?

 5      A.     Well, it appears that this is part of the

 6  new account process.

 7      Q.     Okay.  Do you remember presenting about

 8  the new account system at Watson in 2012?

 9      A.     I could have.  I don't remember, but I

10  could have.

11      Q.     Okay.  Do you know why the new account

12  system would have been part of your presentation?

13      A.     I mean, it -- it could have been a lot of

14  presentations that we would have done this on because

15  this is part of our responsibility.

16      Q.     All right.  So then the next two pages,

17  682 and 683 are about carisoprodol?

18      A.     Correct.

19      Q.     And is that -- is carisoprodol an opioid?

20      A.     Carisoprodol is a C-IV.

21      Q.     Carisoprodol, sorry.  That's

22  c-a-r-i-s-o-p-r-d-o-l, and is it an opioid, though?

23      A.     I do -- I don't know if it's a -- I do not

24  believe so.

```
1        Q.    All right.

2        A.    It wasn't even a control until

3   December 12th, 2011.

4        Q.    All right.  And then the next page is 684

5   after those two.  It states, "CSOS."

6              Do you have an understanding of what CSOS

7   is?

8        A.    Yes, I do.

9        Q.    What is CSOS?

10       A.    Controlled substance ordering system.

11       Q.    Okay.  What is a controlled substance

12  ordering system?

13       A.    It is an electronic method to submit

14  orders for C-IIs.

15       Q.    Okay.  And how did the CSOS at Watson

16  differ from prior ordering systems at Watson?

17       A.    It's only for C-II controlled substances.

18  Prior to controlled substance ordering system being

19  able to electronic -- before customers were able --

20  before the existence of CSOS, before the existence of

21  customers being able to electronically submit a C-II

22  order, every order was manual.  Customers write --

23  would write out manually a 222 form.  Part of it would

24  get submitted to the DEA and then part of it would be
```

1    mailed to a company.  This allowed them to

2    electronically submit a C-II order which would go

3    through the DEA and then come to our company.

4         Q.    All right.  And does this chart show that

5    in 2009, 5 percent of the Schedule II controlled

6    substances orders were submitted or received via CSOS

7    and by 2011 the number was 74 percent?

8         A.    That -- yes, that appears to be what this

9    shows.

10        Q.    All right.  All right.  That's all I have

11   for -- oh, the very last page of this document, and we

12   had talked about this before, the "CRA Alignment," do

13   you see that there?

14        A.    Yes.

15        Q.    And yesterday as we were talking, I think

16   you had said that as you think about it today there

17   are about ten customers for controlled substances at

18   Allergan, is that right?

19        A.    Yeah.  It's -- it's a -- I don't know that

20   that's the exact number, but it is a very small

21   amount.

22        Q.    Right.  And you had said previously there

23   were more customers for controlled substances at

24   Watson, and that difference between ten and the number

Highly Confidential - Subject to Further Confidentiality Review

```
 1   that is shown here, is that the difference you were

 2   thinking of, on the very last page of the document?

 3        A.    This alignment does not represent that all

 4   of these customers were controlled substance --

 5        Q.    Okay.

 6        A.    -- customers.  At all.

 7        Q.    Oh, okay.

 8        A.    That's just the alignment of customers to

 9   the na -- to the director of national accounts.

10        Q.    Got it.  All right.  Thank you.

11        A.    You're welcome.

12        MR. EGLER:  So let's take a break for lunch.

13        THE VIDEOGRAPHER:  The time is approximately

14   12:19 p.m.  And we are going off the record.

15                  (WHEREUPON, a recess was had

16                   from 12:19 to 1:15 p.m.)

17        THE VIDEOGRAPHER:  We are back on the record.

18   The time is approximately 1:15 p.m.

19   BY MR. EGLER:

20        Q.    Ms. Woods, thanks for coming back.

21              I'm going to hand you what we'll mark as

22   Exhibit 36.

23                  (WHEREUPON, a certain document was

24                   marked Allergan - Woods Deposition
```

1              Exhibit No. 36, for identification,

2              as of 01/10/2019.)

3    BY MR. EGLER:

4        Q.    And can you look generally through

5    Exhibit 36.  And as you are looking through it, and

6    you don't have to read all of that text because I'll

7    ask you some questions about it, but I'll read on the

8    record it's Bates numbered Allergan_MDL_03776365

9    through 6387.

10            And we had been talking earlier today

11   about your use of the program known as Microsoft

12   One Note and that we had looked at a document that had

13   a similar format to this.  And we -- think we

14   established that it came from a One Note file.  And

15   I'll tell you that based on the information we've been

16   presented in this case, this document also came from

17   your files or you were the custodian of this document.

18            I'm not going to ask you about the entire

19   document, but based on that understanding from the

20   previous document and looking at it today, does this

21   appear to you to be similar to that prior document and

22   the -- what a Microsoft One Note file would look like

23   if it were printed out?

24       A.    Yes, that appears to be a Microsoft

1    One Note document.

2         Q.    All right.

3              So with regard to this particular

4    document, can you turn to page -- what's marked as

5    Native File Download Page 7, and it's a Bates

6    No. 6371.  And then at the top of the page, there is a

7    notation that says "SOMS June 24th, NJ."

8              Do you see that there?

9         A.    I do.

10        Q.    Okay.  Could you read from that page to

11   the next, I think three pages, that's where the next

12   seeming header comes in.  Just look at it generally.

13   You don't have to read the whole thing, but tell me if

14   these appear to be your writing as far as you

15   understand?

16        A.    I don't know if it is notes I typed or

17   notes I interfaced, but they are notes from the 24th.

18        Q.    When you say -- I'm sorry.

19             When you say notes you interfaced, what

20   does that mean?

21        A.    Such as receiving an e-mail and copying it

22   into my One Note or all meeting notes that I took and

23   put into my One Note.

24        Q.    As you look at these notes, do you have a

1   feeling of who, other than you, they could have been

2   written by?

3        A.    They could have been written by somebody

4   in attendance in a meeting and sent in an e-mail that

5   I would have copied into an e-mail, but I don't

6   know -- if -- without the header of the e-mail, I

7   wouldn't know.  It looked -- they would be copied and

8   pasted.

9        Q.    All right.  So as you sit here today, one

10  way or another, you can't tell whether this is your

11  writing or somebody else's?

12       A.    Yeah, that took meeting notes and sent

13  them.

14       Q.    All right.

15            As you worked in a -- at Watson, was there

16  someone that you can recognize whose job it was to

17  take notes at meetings around this time, June to

18  September 2012?

19       A.    Typically it would have -- it could have

20  been anybody that attended the meeting that set the

21  meeting up would have typically sent the meeting notes

22  out.

23       Q.    As you think about around this time, 2012,

24  during the, excuse me, Watson acquisition of Actavis,

```
 1    do you remember taking your own computer to meetings

 2    with people from Actavis?

 3         A.    Yes, I would have.

 4         Q.    Okay.  Do you remember whether you made it

 5    a practice at meetings to type notes into a One Note

 6    file?

 7         A.    Yes, I did.

 8         Q.    All right.  Do you remember whether as a

 9    practice you delegated that task to anyone else at any

10    time?

11         A.    No.  I -- I mean, if I attended the

12    meeting, I would have taken the notes.  If I didn't

13    set the meeting up, somebody else could have taken the

14    notes and sent them to me.

15         Q.    Okay.  So, is it fair to say your practice

16    around this time, May 2012, was to take notes at

17    meetings?

18         A.    It could have been my practice any time.

19         Q.    All right.  Was it your practice at this

20    time to take notes at meetings with people from

21    Actavis?

22         A.    I'm not -- I'm not sure I understand what

23    you mean.

24         Q.    So, the notes in question say:
```

1          "SOMS June 24th, New Jersey," and then

2    below there it says:  "June 24th Rose B, Lisa S, Mary

3    W, Frank C, Tom N, Nancy, Sandy S, Laura P."

4          So in the context of this, do you know who

5    Rose B would be?

6          A.    Yes.

7          Q.    Who?

8          A.    Rose Bentravato.  She was a Watson

9    employee.

10         Q.    Okay.  And then Lisa S, do you know who

11   that is?

12         A.    Lisa Scott was from compliance at Watson.

13         Q.    All right.

14         A.    And then myself and --

15         Q.    And Frank C, do you know who Frank C could

16   be?

17         A.    Oh, yes.  Frank Chen would have been

18   our -- in our IT team.

19         Q.    Okay.

20         A.    And then Tom Napoli would have been

21   compliance.  And the Nancy would have probably been

22   Nancy Baran, Sandra Simmons, and Laura Pinti, they

23   would have all been Watson people.  And obviously I am

24   the Mary W.

```
1        Q.     Was Nancy Baran a Watson person?

2        A.     Nancy was an Actavis person.

3        Q.     All right.

4        A.     She is the only Actavis person I see on

5   here.

6        Q.     Okay.  So there is a statement there:

7               "Third-party distributor - UPS, UPS used a

8   'homegrown' SOMS system, local DEA office reviewed.

9   UPS has three resources for Actavis."

10              Do you remember having a conversation

11  along those lines in, say, June 24th at a meeting with

12  the people who are listed there?

13       A.     Information -- that would have had to have

14  been provided by Actavis.  I would not -- we wouldn't

15  have known that information.

16       Q.     All right.  So, and then moving down into

17  this document, it states:  "Direct Sales."

18              Do you see that there?

19       A.     I do.

20       Q.     It says:  "Implemented statistical model

21  that is 'defensible.'"

22              Do you remember having that discussion

23  that an Actavis model regarding direct sales was

24  defensible?
```

1      A.     I would have not remembered any particular

2   conversation in it.

3      Q.     Okay.  And, again, do you remember any of

4   those other people who are listed there taking notes

5   at a meeting around mid-June and sending them to you?

6      A.     I couldn't remember back to June of 2012

7   if they --

8      Q.     Okay.

9      A.     -- would not -- would have or would not

10  have.

11     Q.     As you think about the work --

12  relationship with the people who are there, would any

13  of those people have the responsibility for taking

14  notes for you at a meeting like this?

15     A.     I would imagine everybody would have taken

16  their own notes or Nancy would have provided us notes

17  based on the Actavis system.

18     Q.     As you think about it, would any of the

19  people here make a habit of sending you their notes

20  from a meeting that you attended?

21     A.     Yes, we would have commonly sent notes to

22  each other from meetings that we attended.

23     Q.     So would you have received all of the

24  notes from, say, Tom Napoli?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    I can't recall if he would have sent me

2   notes from this meeting back in 2012.

3        Q.    Would he have sent you notes from other

4   meetings, all of his notes from other meetings?

5        MS. LEVY:   Object to form.

6   BY THE WITNESS:

7        A.    From all of his other meetings?

8   BY MR. EGLER:

9        Q.    No, I'm sorry.   I -- I -- I said that a

10  little -- in a cumbersome manner.

11             Do you remember a time when Tom Napoli

12  sent you all of the notes that he had from a

13  particular meeting that you attended?

14       A.    He may have.

15       Q.    Do you -- do you remember any particular

16  time when that occurred?

17       A.    Not off the top of my head, but he -- he

18  may have.

19       Q.    How about the other people that are listed

20  up there on June 24th, do you remember any particular

21  time when you and they attended a meeting and they

22  sent you all of the notes that they took at a meeting?

23       A.    Yes.

24       Q.    Okay.   Let's go through.

1          Rose B, do you remember a time when she

2  sent you --

3          A.    Yes.

4          Q.    Okay.  When would she have sent you her

5  notes?

6          A.    Well, she was the head of order management

7  and she would have sent me notes from meetings,

8  forecast meetings or things with customers.

9          Q.    Okay.  Do you remember where -- whether

10  she sent you these notes?

11          A.    I don't remember in particular.

12          Q.    Okay.  How about --

13          A.    And just to be clear, I didn't say these

14  weren't my notes.  I said I just couldn't remember if

15  they were my notes.

16          Q.    Okay.  How about Lisa S, do you remember

17  her sending you notes on anything?

18          A.    Yes.

19          Q.    Okay.

20          A.    I do.

21          Q.    And what would the circumstances of her be

22  to send you notes?

23          A.    Well, Lisa was from the compliance team,

24  so you've already seen some notes that she sent me.

Highly Confidential — Subject to Further Confidentiality Review

```
1        Q.    All right.

2              And how about Frank C.?

3        A.    Frank Chen was in IT and he would have

4    sent me notes on different projects and meetings that

5    we attended.

6        Q.    Okay.  Do you think he sent you these

7    notes here?

8        A.    Well, this isn't a I -- necessarily an IT

9    thing, so I don't know if he would have or would not

10   have.

11       Q.    All right.  And how about Nancy Baran?

12       A.    Yes, Nancy frequently sent meetings notes.

13       Q.    Okay.  Do you remember her sending you

14   these notes?

15       A.    I can't recall who sent me these notes.

16   I've established that.

17       Q.    Okay.  If -- if anybody did, right?

18       A.    If anybody did, that's correct.

19       Q.    And then the next one is Sandy S.  Would

20   Sandy S have sent you notes on a regular occasion?

21       A.    She would have sent notes on occasion if

22   she was in a meeting and I needed the notes, correct.

23       Q.    Okay.  Do you remember whether she sent

24   you these notes?
```

1          A.     I do not.

2          Q.     Okay.  And then Laura P?

3          A.     Laura Pinti sent meetings notes if she

4    attended as well, but I cannot recall if she sent

5    meetings notes from this.

6          Q.     So, and just so we're clear, you don't

7    remember one way or another whether she sent you these

8    notes that appear on Page 371 of this exhibit?

9          A.     That -- that's correct, or part of them.

10         Q.     All right.  So going down into this

11   document, it states:  "Know your customer."

12                Do you see that there?

13         A.     I do.

14         Q.     It says, "Actavis" -- two lines down it

15   says -- or one line down it says:  "Customer profiles

16   pertain to 'survey' Cegedim provided."

17                Do you see there?

18         A.     I do.

19         Q.     Do you remember having a discussion about

20   customer profiles in a survey that was part of

21   Actavis's suspicious order monitoring system around

22   this time, 2012?

23         A.     The notes that I read here are what we

24   would -- what I would have known.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    All right.  And then the next line down,

 2   it says:

 3              "Actavis - approx 30 customers of controls

 4   plus Optisource, Premier."

 5              In the context of your work, do you

 6   recognize the term "Optisource"?

 7        A.    I do.

 8        Q.    What is Optisource?

 9        A.    A buying group.

10        Q.    And when you say "a bry" -- "a buying

11   group," what do you mean?

12        A.    A buying group means that there's multiple

13   members and they belong to Optisource and Optisource

14   creates a contract to give them better buying power.

15        Q.    All right.  And how about the word

16   "Premier," what does that mean to you in the context

17   of your work?

18        A.    They are a different buying group.

19        Q.    And then it says the:

20              "Current system does not block orders,

21   however they have the data."

22              Do you see that there?

23        A.    I do.

24        Q.    Do you remember writing that?
```

```
 1      A.    I -- I don't.

 2      Q.    Okay.  Do you remember having an

 3  understanding that in the middle of 2012 the then

 4  current system at Actavis did not block orders but had

 5  the data?

 6      A.    I understand how the system works today,

 7  but I don't know if at that time I would have

 8  understood that comment.

 9      Q.    All right.  And:  "May need to pull back

10  orders in question."

11            Do you remember writing that down?

12      A.    I don't.

13      Q.    All right.  And it says:  "Actavis will

14  report to DEA those that are in question."

15            And then further down into this document,

16  it states:

17            "EDI and manual 13,299 order lines passed

18  through model 2017 manual, 11,282 EDI."

19            In the context of your work, do you have

20  an understanding of what that line means?

21      A.    I mean, I know what EDI is.  I'm a little

22  skeptical to make an assumption here.

23      Q.    Okay.

24      A.    So I would probably prefer not to do that.
```

1        Q.     Okay.  But with the understanding that you

2    don't absolutely know, as you piece those pieces of

3    the sentence together, what does it mean to you?

4        MS. LEVY:  Objection; calls for speculation.

5    BY MR. EGLER:

6        Q.     You can speculate.  I've just asked you

7    to.  I've called for you to speculate.

8        MS. LEVY:  Okay.

9    BY THE WITNESS:

10       A.     It --

11       MS. LEVY:  If -- if you don't know, you can also

12   say that.

13       MR. EGLER:  No, stop.

14   BY MR. EGLER:

15       Q.     I've asked you for a speculation on this,

16   please.

17       A.     I am speculating that it states that EDI

18   and manual orders created 13,299 order lines that

19   passed through the SOMS model in 2017, that the manual

20   lines were 11,282 of those lines and that the EDI were

21   746, but the why I am confused is because the word

22   "orders" appears after 746 when the other ones refer

23   to lines, so that's why I'm not clear.

24       Q.     All right.  So let's move down into this

Highly Confidential - Subject to Further Confidentiality Review

1    piece of text here where it says "McKesson."

2              Do you see that there?

3    A.    I do.

4    Q.    It says:

5              "McKesson is very high" and then in -- it

6    has the dollar sign and then an S comma, "lower in

7    percentage.  95 percent of revenue on hold."

8              In the context of your work, do you have

9    an understanding of what those two sentences mean?

10   A.    Again, this is going to be speculation

11   because --

12   Q.    Uh-huh.

13   A.    -- this is Actavis information and I'm not

14   familiar from 2012.

15   Q.    Okay.

16   A.    So I would prefer not to speculate.

17   Q.    Okay.  And I'm going to ask you to

18   speculate as you --

19   MS. LEVY:  You do not have to guess or

20   speculate --

21   MR. EGLER:  Actually --

22   MS. LEVY:  -- as an answer if you don't know.

23   MR. EGLER:  I'm going to --

24   MS. LEVY:  That is your -- my instruction to

1   you.

2       MR. EGLER:  I --

3       MS. LEVY:  If you know, you can, but you do not

4   have to guess about answers that you don't know.

5   BY THE WITNESS:

6       A.   I don't because it is not my information.

7   And this is not my system, so I don't know.

8   BY MR. EGLER:

9       Q.   So if it said McKesson is very high in

10  dollars but lower in percentage, what would that mean

11  to you in the context of your work?

12      MS. LEVY:  Same objection.

13  BY THE WITNESS:

14      A.   I -- I don't know -- I don't understand

15  what the context of this comment is, so I -- I really

16  don't know.

17  BY MR. EGLER:

18      Q.   Okay.  Have you ever heard the term

19  "revenue on hold" in the context of your work at

20  Act- -- at Watson and Allergan?

21      A.   Revenue on hold would be -- I -- I don't

22  know in the context of -- of this.

23      Q.   Okay.

24      A.   I mean, I don't -- I can't understand

1  these notes because they are very brief, so it is very

2  difficult for me to know.

3       Q.    Separate from these notes, have you ever

4  heard of the term "revenue on hold"?

5       A.    In what -- in what context?

6       Q.    In the context of any of your work.

7       A.    In the context of any of my work, revenue

8  on hold means that it is not processed.

9       Q.    All right.

10      A.    The order is not processed.

11      Q.    So next two lines down states:

12            "Actavis system can release even though

13  under investigation."

14            Do you have an understanding of around the

15  middle of June 2012 you attended a meeting where there

16  is a discussion or a conclusion that the Actavis SOM

17  system could release orders even though they were

18  under investigation?

19      A.    I'm not familiar enough with the Actavis

20  system.  That's why I don't --

21      Q.    Okay.

22      A.    -- want to comment.  I don't know their

23  system.

24      Q.    And what I'm asking you is do you

1    remember, do you have an independent memory of being

2    at a meeting where that issue was discussed?

3         A.    Probably not from 2012.

4         Q.    Okay.  Do you remember attending a later

5    or earlier meeting where that issue was discussed?

6         A.    That really is -- no, they had a

7    different -- they had a parallel system running at the

8    time, which was the Cegedim system, so I am not -- I

9    am not familiar with this.

10        Q.    And then the next sentence says:  "If

11   order passes SOM, Actavis cancel line and order will

12   be" -- "not go to SOMS again."

13             Do you remember attending a meeting in

14   mid-2012 where that issue was discussed?

15        A.    I -- I can't recall from that far back.

16        Q.    Okay.  All right.  So can you turn to the

17   next page.  And about halfway down this page, there is

18   a statement "Know your Customer" and it says "DEA has

19   ARCOS" and then "- visibility of all supplies to

20   indirect account."

21             And then the next line is:  "Data is based

22   on chargeback data, Actavis will only provide contract

23   for some controls under chargeback terms."

24             Do you see that there?

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.    I do.

 2       Q.    Do you remember that issue being discussed

 3   at a mid-2012 meeting discussing Actavis's SOM

 4   processes?

 5       A.    Not in particular.

 6       Q.    Okay.  And then the next two statements

 7   underneath there, it says, "Indirect."

 8             Do you see that there?

 9       A.    I do.

10       Q.    And there is an "Indirect" and it says:

11   "- ValueCentric 867 downstream data."

12             Do you see that there?

13       A.    I do.

14       Q.    And we had talked about that term

15   "ValueCentric" --

16       A.    Uh-huh.

17       Q.    -- before, right?

18       A.    That is correct.

19       Q.    Okay.  And what does ValueCentric 867

20   downstream data mean?

21       A.    So we've discussed this several times.  So

22   ValueCentric 867 data, as I've explained before, is

23   when the wholesalers send in their downstream data,

24   meaning who they are selling to, that's their
```

Highly Confidential - Subject to Further Confidentiality Review

1    downstream data, that's 867.

2        Q.    And that 867 downstream data only includes

3    the data regarding the NDC codes of the -- the entity

4    that is buying the data, is that right?

5        A.    That is correct.

6        Q.    All right.

7        A.    Exactly as we discussed before.

8        Q.    So, and then the two lines down from

9    there, it states:  "Multiple source purchasing."

10           Do you remember being in a meeting in

11   mid-2012 where people dis -- were discussing multiple

12   source purchasing in the context of ValueCentric 867

13   downstream data?

14       A.    Not really.

15       Q.    Okay.  All right.  Can you move three

16   pages ahead in this document to Page 6375 and look at

17   this page and tell me what it appears to you to be?

18       A.    One Note, meeting from August 16th of

19   2012.

20       Q.    Okay.  And when you say a One Note

21   meeting, what does that mean?

22       A.    Well, it is a One Note and the meeting

23   date is 8/16 of 2012.

24       Q.    All right.  And then it says:

```
 1              "SOMS: - Actavis Meeting 8/16/2012."

 2         Do you remember having a meeting to

 3   discuss Actavis's SOM system around August 2012?

 4      A.    I do.

 5      Q.    All right.  Now, as you look at these --

 6   the language that appears down here, do you recognize

 7   these as your notes?

 8      A.    I remember a meeting with Nancy, Umish,

 9   Scott and myself.

10      Q.    Do you remember whether you took notes at

11   the meeting?

12      A.    I probably did.

13      Q.    All right.  Do you have any reason to

14   believe you didn't take notes at the meeting?

15      A.    Nope.

16      Q.    Okay.  The first bullet point down there

17   says -- well, let's go through.

18         Who is Nancy in the context of these

19   notes?

20      A.    Nancy Baran.

21      Q.    And who's Uresh?

22      A.    I'm sorry.  His name is Umish, but I

23   didn't know --

24      Q.    Okay.
```

```
 1        A.     -- him at the time, so I'm sure I

 2   misspelled his name.

 3        Q.     Okay.  And was he from Actavis?

 4        A.     He was.

 5        Q.     All right.  And then who is Scott?

 6        A.     Scott Soltis, that was the head of our

 7   security and DEA compliance team.

 8        Q.     All right.  And the Mary is you, is that

 9   right?

10        A.     Myself.

11        Q.     All right.  And you write:

12               "Not nearly as compliant as we could be,

13   to the letter of the law prior.  Threshold-based

14   report system."

15               What does that mean?

16        A.     They had moved to a brand new system

17   called the Cegedim system that was running live and

18   they felt that they were much more compliant moving

19   into the Cegedim system based on the letter of the law

20   from 2007, which is why they moved to the Cegedim

21   system.

22        Q.     All right.

23        A.     And that system was running live at that

24   time.
```

1      Q.    And then you write down -- or further down

2  that page, two bullet points down:

3             "Ran for a couple of months in production,

4  does not put orders on hold, just got her first

5  resource from the brand side."

6             Do you remember what you meant by writing

7  that?

8      A.    I'm sure it was just abbreviation, so I

9  probably don't have -- I was taking notes about what

10  she was communicating.

11     Q.    All right.  So when you use that term

12  "resource" in the context of your work, is that like a

13  dedicated employee or something else?

14     A.    It would have been a resource that they

15  had with inside of their organization.

16     Q.    And a -- a resource in the context as you

17  use it here is a -- is a person as opposed to a

18  computer or something, is that right?

19     A.    To the best of my recollection.  I mean,

20  you are asking me to comment on notes from, you know,

21  six -- over six years ago.

22     Q.    All right.  And then two bullets down from

23  there you state:  "Did not have resources to support."

24             And do you know what that means in the

1    context of this document?

2        A.    Not off the top of my head.  I would have

3    to know what the discussion was at the time.

4        Q.    All right.

5             Do you remember having a -- making a

6    conclusion that the Actavis SOM system in August 2012

7    did not have adequate resources to support it?

8        A.    I think the conclusion was I was happy

9    that they were up on Cegedim.  I don't know if I had

10   any other conclusion.

11       Q.    Okay.  When you say that you were happy

12   that they were up on Cegedim, what do you mean?

13       A.    I thought Cegedim was a good system and

14   I -- and they communicated that they were up on

15   Cegedim, and I didn't really know much about their

16   company at the time.  It was August of 2012.

17       Q.    All right.  And then down two lines from

18   there, you state:  "31 - 33 percent are pending,

19   waiting to retune."

20             What did you mean by that?

21       A.    I can tell you it looks like 31 to

22   33 percent of the orders were pending and there is

23   a -- I can tell you what retuning means to Cegedim, I

24   can't tell you if it's -- so retuning to Cegedim is

Highly Confidential - Subject to Further Confidentiality Review

```
 1    they take all of your -- there is -- there is certain
 2    scope of data they take.
 3              Remember how we talked about the nine
 4    algorithms or algorithms and they have to do retuning.
 5    They retune using all of this data and algorithms.  I
 6    don't know the whole process, but I'm thinking that
 7    that's what that's reference to.
 8        Q.    All right.
 9              And then it states:  "Sees the data but
10    does not act on the recommendation of what the system
11    tells them to do."
12              Do you see that there?
13        A.    I do.
14        Q.    What -- what did you mean by that?
15        A.    I can't tell you based on 2012 notes
16    because I'm not familiar enough with what the
17    discussion was at that time.
18        Q.    All right.  And then two bullets down from
19    there, it states:
20              "They are running a parallel," and then --
21    that seems to be in bold, and then it states, "is not
22    managing the system, old system.  DEA would see the
23    old logic if they did an investigation.  Both systems
24    are in production environment."
```

```
 1              Do you have a -- a feeling for what that

 2   text means?

 3       A.    That they were running both systems in

 4   parallel.

 5       THE VIDEOGRAPHER:  Pardon me, Counsel, the phone

 6   call actually went out.  Can we go off the record to

 7   get that fixed?

 8       MR. EGLER:  Yeah, absolutely.

 9       THE VIDEOGRAPHER:  The time is approximately

10   1:44 p.m.  We are going off the record.

11              (WHEREUPON, a recess was had

12               from 1:44 to 1:50 p.m.)

13       THE VIDEOGRAPHER:  We are back on the record.

14   The time is approximately 1:50 p.m.

15   BY MR. EGLER:

16       Q.    All right.  Ms. Woods --

17       A.    We're back.

18       Q.    -- let's pick up where we left off.  We're

19   on Exhibit --

20       MS. LEVY:  Thank you for coming back.

21   BY MR. EGLER:

22       Q.    We are on Exhibit 36 and it's a -- we are

23   on what's marked as "Native File Download Page 11" and

24   it's Bates No. 6375 and we were talking about the
```

```
 1   bullet point that you wrote:

 2            "These are running at parallel" and

 3   then -- that's in bold, but then the rest of it is,

 4   it -- "is not managing the system, old system.  DEA

 5   would see the old logic if they did an investigation.

 6   Both systems are in production environment."

 7            So I think you had talked about what you

 8   meant by they are running in parallel.  When you wrote

 9   "DEA would see the old logic if they did an

10   investigation," what does that mean?

11       A.    Yeah, I real -- I think we should probably

12   ask the Actavis Inc. people because this data came

13   from them.

14       Q.    Okay.

15       A.    So it would probably be best to ask

16   somebody from that side.

17       Q.    All right.  And then the last one there

18   is:  "Both systems are in production environment."

19       A.    Uh-huh.

20       Q.    And the -- the term "production

21   environment" as you see that, does that have a meaning

22   in your work?

23       A.    In my work, production environment means

24   that they are functioning in -- in a production
```

```
 1   environment, not in a sand box environment, meaning

 2   the real-time environment.

 3        Q.   Okay.  So going down on this page, there

 4   is a thing that says "Action Items."

 5             Do you see that there, "Nancy and Uresh"?

 6        A.   Correct.

 7        Q.   And you had said before that the Uresh is

 8   actually Umish --

 9        A.   That's correct.

10        Q.   -- a person at Actavis?

11             And it says:

12             "What is your implementation strategy for

13   SOMS??? - Set up a separate meeting to:"  And then you

14   have various things written down there.

15             Do you remember having that discussion

16   with Nancy Baran and Umish around August 16th, 2012?

17        A.   I don't recall if there was follow-up

18   meetings after that.  If there is notes there, it must

19   have been something discussed in the meeting, that's

20   the best I could recall, if there is something there.

21        Q.   All right.  And so then down below there,

22   it says, "Day 100."

23             And do you remember there being a day with

24   regard to the Watson/Actavis merger that was referred
```

1    to as Day 100?

2        A.    I -- I have to be honest, I don't remember

3    what Day 100 was --

4        Q.    Okay.

5        A.    -- reference to.

6        Q.    And you've -- you've been with Watson as

7    they've merged with various companies, is that right?

8        A.    That is correct.

9        Q.    As -- as you think of it, is there

10   typically, like, a countdown clock or some other thing

11   that the companies try to set up to count down to the

12   merger?

13       A.    There is a countdown clock, correct.

14       Q.    Would that have -- in the context of your

15   general work, would there have been in some of the

16   mergers a Day 100 before the merger is supposed to be

17   final?

18       A.    There -- there could be, but if they get

19   pushed out, then Day 100 doesn't mean the Day 100.

20       Q.    All right.  But would they -- in the

21   context of a plan date, would you be given various

22   tasks that were to be done by Day 100 before the

23   merger and things like that?

24       A.    Yes, there could be tasks --

1     Q.    Okay.

2     A.    -- that could be.  I don't see anything

3   next to the Day 100, but there could be tasks,

4   correct.

5     Q.    All right.  So going down from there,

6   there is another line that says, meeting August 21st,

7   2012.

8          Do you remember having a meeting on

9   August 21st, 2012, with the people who are listed

10   below there and onto the next page?

11     A.    I -- there's notes there, but, I mean, I

12   can't remember meetings from 2012, I have to be honest

13   with you.

14     Q.    Okay.  So as you look at the notes that

15   appear on the next page, are these your notes?

16     A.    I'm -- I would be pretty positive they

17   would be my notes.

18     Q.    All right.  So, with regard to this

19   meeting from August 21st, 2012, do you remember on

20   the -- on the top of the next page underneath your

21   name and two other people's names, it says "Meeting

22   Goals"?

23     A.    I see that.

24     Q.    And it states:

1           "Day 1 - compliance discussion; Day 1 -

2    critical deliverables; Day 1 - determine what the risk

3    is at Day 1;" and then "Day 1" -- "Day 100 - system

4    deliverables," right?

5        A.    I see that.

6        Q.    And then below there you write:

7           "Definite risk right now today, current

8    system is not acceptable to Watson."

9           Do you remember having that impression in

10   August 2012 that the Actavis SOM system was not

11   acceptable to Watson?

12       A.    I don't know if I could say what I thought

13   today in 2012.

14       Q.    Okay.  So if you would have written that

15   down in 2012, do you think it would have any meaning

16   other than that the current system was not acceptable

17   to Watson?

18       A.    What I'm reading, I mean, I'm looking at

19   what I wrote right then, so I must have had some

20   thoughts about it at the time I wrote it.

21       Q.    Okay.  And you wrote:  "Definite risk

22   right now today," is that right?

23       A.    I did write that.

24       Q.    And you had substantial experience with

1    regard to suspicious order monitoring systems in your

2    career even up to 2012, is that right?

3         A.    I did.

4         Q.    And so when you wrote down:  "Definite

5    risk right now today," you thought that there was a

6    definite risk right now today as to Actavis's system

7    at that point, is that right?

8         A.    Comparing it to what I felt was the Watson

9    system.

10        Q.    Okay.  And you wrote down:  "Current

11   system is not acceptable to Watson," right?

12              And that meant that the current Actavis

13   SOM system was not acceptable to Watson, is that

14   right?

15        A.    Or process.

16        Q.    All right.

17              So, and then below there you write:

18   "Current As-is Process."  And under (a) it says:

19   "There is no current SOP on the current process."

20              Do you see that there?

21        A.    I do.

22        Q.    Do you remember writing that down?

23        A.    I don't remember writing it.

24        Q.    Do you remember being surprised that there

1    was no current SOP on the current process for the

2    Actavis SOM system around August 2012?

3         A.    I don't know if I was surprised.  A lot of

4    companies don't have procedures and policies on

5    things.

6         Q.    Can you name another company that doesn't

7    have an SOP on its suspicious order monitoring system?

8         A.    I -- I don't go and investigate other

9    companies, but I don't think it's extremely uncommon

10   that companies, you know.

11        Q.    Do you think it would be a good practice

12   for a company not to have written standard operating

13   procedures on their suspicious order monitoring

14   processes?

15        A.    I'm a very organized person, so I think

16   everything should have a policy and a procedure.

17        Q.    All right.  Would you recommend that a

18   company have a written SOP set for its suspicious

19   order monitoring systems?

20        A.    Personally, I think so.

21        Q.    All right.

22              So, then you write down:  "Threshold

23   base."

24              In the context of your notes here, do you

1    remember what that means?

2         A.    I know what a threshold base system is.

3         Q.    What is a threshold base system?

4         A.    A threshold base system -- in my mind, a

5    threshold base system is based on benchmarks, that's

6    how I review it -- review it.

7         Q.    All right.  And how would a threshold base

8    system differ from the system that Watson had in place

9    around this time, August 2012, if at all?

10        A.    The Watson system had other algorithms in

11   it that allowed us to manage -- you know, we had class

12   trades, we me -- measured it up more than against

13   anything that was just a benchmark, so we felt that

14   that was -- removed a lot more risk.

15        Q.    So the threshold base that you are talking

16   about is the statistic or algorithm that would cause

17   an order to pend, is that correct?

18        A.    The logic, correct.

19        Q.    All right.  So the next one down:  "(c)

20   does not hold orders," do you remember what you meant

21   by that?

22        A.    Of course I did not at the time because I

23   wasn't aware of their system.

24        Q.    Okay.

```
1        A.    I wasn't an Actavis Inc. person.

2        Q.    Right.

3              Do you remember hearing that the Actavis

4    system did not hold orders when you met with them in

5    August 2012?

6        A.    I -- I don't know if I did or not.  I

7    don't recall because I --

8        Q.    And that term "hold orders," we had talked

9    about it yesterday with regard to Watson, that the

10   Watson system not only created a report when an order

11   pended, but it held any order from being shipped, is

12   that right?

13       A.    That is correct.

14       Q.    And do you remember whether the Actavis

15   system did not do that?

16       A.    Well, I can tell you I did learn that the

17   Actavis system held all orders whether they were SOMS

18   or not.  If you remember, we discussed that yesterday.

19   Their process was different.  They had to go in and

20   manually put a hold on the order, but it did hold the

21   orders whether they were Rx products or whether they

22   were controlled or not controlled orders.  So it was

23   just different.  They had to go and then continue to

24   block an order that they considered an order of
```

 1    interest.  So it was just different.

 2         Q.    And it wasn't automatic, is that right?

 3         A.    They had to manually go and put the blocks

 4    on, to my understanding, but you -- again, you would

 5    need to ask an Actavis Inc. person because they would

 6    have much more knowledge than I would.

 7         Q.    And this -- the Watson system that you

 8    were familiar with was automatic, is that right?

 9         A.    Yes.

10         Q.    Okay.  And then the next one, "(d)," it

11    says:  "Creates a report."

12               Do you know what you meant by that?

13         A.    Just as we discussed yesterday, their

14    orders created it -- their system created a report on

15    every order that exceeded.

16         Q.    All right.

17         A.    Just as we discussed yesterday.

18         Q.    And then the next one says:

19               "They do not investigate all, only some,

20    since there is no SOP, they don't investigate."

21         A.    They wouldn't investigate products that

22    weren't controlled substances.  So, remember,

23    yesterday I explained that the reports that printed

24    were for controls and non-controls.  They wouldn't

1    con -- they wouldn't investigate products that were

2    not controlled substances.

3        Q.    All right.

4              And then the next one down there, it says:

5    "Report runs every time an order load is run for EDI,

6    not for manual."

7              What did you mean by that?

8        A.    I'm not as familiar with how -- with that

9    report, if there was a separate report for manual or

10   EDI.  I think we'd have to clarify that with them.

11       Q.    All right.

12             And then the next one says:  "Looks at six

13   months of orders and compares the current orders with

14   the past six months."

15             And what did you mean by that?

16       A.    So we discussed this yesterday as well.

17   It looks at what the six-month order average was and

18   then compares it to the number of lines in that

19   six-month period, and that's how it came up with the

20   order and line average.  So that was part of our

21   discussion yesterday.

22       Q.    Okay.  Is that the threshold base that you

23   are referring to above there?

24       A.    Yes.

1      Q.    All right.  So --

2      A.    It is somewhat of an algorithm and

3    somewhat of a baseline.

4      Q.    All right.

5            So going down from there, it says:

6    "Meeting notes October" -- or "10/5/2012."

7            Do you remember having a meeting in

8    October 2012 regarding the Actavis SOM system?

9      A.    I don't remember any specific meetings,

10    but obviously that's why there is notes in here.

11      Q.    All right.  And it states there:

12    "Finalized 4" and then in parentheses "(5 including

13    Nancy) resources that will be on through January" --

14    or "through Jan until Watson cutover."

15            Do you see that there?

16      A.    I do.

17      Q.    Do you remember that there was a cutover

18    of the Watson SOM system to replace the Actavis SOM

19    system set for January 2013?

20      A.    I don't remember the exact date of the

21    cutover, but in every acquisition we did, there was

22    always cutovers for every single component.

23      Q.    All right.

24            And then going down into here, rather than

1    eving -- reading every one, there is one that says:

2    "SOP does not [sic] show the escalation process."

3            In the context of your work, what did you

4    mean by that?

5    A.    I couldn't be positive right now about

6    what that meant.

7    Q.    Okay.  When -- you -- have you heard the

8    term "escalation process" in your work at Watson and

9    Actavis and Allergan?

10    A.    Yes, because we have escalation process in

11    our SOP, so I'm familiar.

12    Q.    Okay.  So what does that mean to you,

13    Wat -- or escalation process?

14    A.    It means when you have -- you know, there

15    is an escalation process for everything.  When it --

16    when you have steps in a process, you go from one

17    step.  When you need approval, you have one -- you

18    have a first approval process, when you need a next

19    approval process, that's an escalation step.

20    Q.    And I think you had just said that the --

21    as you understand it, the Watson suspicious order

22    monitoring SOP did contain the escalation process, is

23    that right?

24    A.    That is correct.

1    Q.    Would you expect any suspicious order

2  monitoring system's SOPs to include an escalation

3  process?

4    A.    Well, I can't -- I can't speak to other

5  people's SOP or SOM system, so I'm not -- I'm not the

6  authority to determine whether they would or wouldn't.

7    Q.    If you were writing the SOPs for a

8  suspicious order monitoring process, would you ensure

9  that the escalation process was a written SOP?

10    A.    I would personally, because I -- like I

11  said before, I'm a very kind of methodical, organized

12  person, so I would put it in there because I would not

13  want to count on my memory to remember every step, so

14  personally, yes, I would.

15    Q.    And you have been in this industry for

16  more than 20 years, is that right?

17    A.    That is correct.

18    Q.    So, and then the bottom one, the bottom

19  note you write there:  "DEA meetings told them to

20  focus on customers/customer."

21         Do you see that there?

22    A.    I do.

23    Q.    And then below that, it says:  "DEA oxy

24  30, 15, hydro."

1          What did you mean by that?

2      A.    That would have come from them.  They

3   would have told me that, so --

4      Q.    What --

5      A.     -- that's where that note would have come

6   from.  I don't know at the time.  I mean, that --

7   that's something that they would have communicated to

8   us.

9      Q.    Okay.  And in the context of your work and

10  your note taking, what does that bullet point and the

11  sub bullet point mean when spoken out as sentences?

12     A.    Well, that just means exactly what it

13  says.  They had a meeting with the DEA, the DEA told

14  them to focus on customer/customer, and obviously

15  there was something that communicated to them

16  regarding their oxy 30, 15, and hydro, something along

17  those lines, but I don't know the exact content of,

18  you know, what happened at their meeting with the DEA.

19  I can't -- I can't pretend that I know that.

20     Q.    All right.  And Actavis didn't sell brand

21  name OxyContin, is that right, they sold generic

22  OxyContin?

23     A.    I -- I don't know the exact line of the

24  Actavis products to -- to tell you one way or another,

Highly Confidential - Subject to Further Confidentiality Review

1  so I don't want to --

2       Q.    All right.

3       A.    -- give you incorrect information.

4       Q.    So going down to the next entry there, it

5  says:  "Meeting Notes 10/25/2012 Actavis/Watson."

6            Do you see that there?

7       A.    I do.

8       Q.    And then beyond that there is screen shots

9  or something.  As you look down into the following

10 pages, I think it's -- it's eight pages to --

11      A.    Uh-huh.

12      Q.    -- Page 382.

13           Do you have an understanding of what those

14 are that appear on the following pages?

15      A.    This would have been a presentation

16 provided to us by Actavis Inc.

17      Q.    Okay.  And then there is writing in and

18 between the various screen shots or whatever they are.

19           Do you remember who wrote that text there?

20      A.    I don't know if that was me or -- this

21 might have been notes that I documented as Nancy Baran

22 was going through the presentation with us.

23      Q.    All right.  All right.  And then going to

24 the next page after those notes, the 383, at the

Highly Confidential - Subject to Further Confidentiality Review

1    beginning of the page, top of the page it states:

2    "Retention."

3            Do you see that there?

4        A.    I do.

5        Q.    Okay.  And the second entry there states:

6            "Milestone 1," and then parentheses

7    "(Nancy).  Execute current job responsibilities

8    including the management and support of your current

9    internal Watson customers meeting exceptional level of

10   service standards.  Ongoing through release date."

11           Do you have an understanding of what that

12   text means?

13       A.    I do not.

14       Q.    Okay.  And then -- all right.  That's all

15   I have for this document.  You can set it aside.

16           My documents have gotten all out of order.

17   All right.  Let's mark this as Exhibit 37.

18               (WHEREUPON, a certain document was

19               marked Allergan - Woods Deposition

20               Exhibit No. 37, for identification,

21               as of 01/10/2019.)

22   BY MR. EGLER:

23       Q.    And if you look generally at Exhibit 37,

24   and while you're looking at it, I'll read into the

1    record, it is Allergan_MDL_03755062 through 078.  And

2    when you are ready, okay, let me know and I'll ask you

3    some questions.

4         A.    Sure.

5         Q.    All right.

6               So, this document, Exhibit 37, again,

7    generally, was produced to us from your custodial

8    file.  And will you agree with me that it appears,

9    again, to be a printout of a Microsoft One Note file?

10        A.    Yes, it does appear to be --

11        Q.    All right.

12        A.    -- from a One Note file.

13        Q.    And then this is a five -- excuse me --

14   this is a family of documents, and for the first time

15   I think we have included the attachment from -- that

16   appeared in the family.

17               If you look at the second page of this

18   document, 063, it states that there is an -- or it

19   notes that there is an attachment to an e-mail or

20   whatever that is.

21               Do you see that there?

22        A.    I do.  I do see that.

23        Q.    All right.  And the -- the document, that

24   second page states:  "Buzzeo PDMA Project Kickoff

1    Meeting - Phase 1 Proof of Concept."

2            Do you remember hearing about or attending

3    a Buzzeo PDMA project kickoff meeting around May,

4    middle of May 2015?

5        A.    Yes, I kind of remember this.

6        Q.    Do you remember what Watson -- well, I

7    take that back, at this point it's Actavis and

8    Allergan -- what Actavis and Allergan had engaged the

9    Buzzeo PDMA to do in the mid-2015?

10       A.    Can I take a minute to look at the

11   document?

12       Q.    Yes, absolutely.

13       A.    Okay.  Thanks.

14       Q.    And I'll -- I'll tell you that what I'm

15   going to ask you about is on Page 5074 --

16       A.    Okay.

17       Q.    -- and that's because your name appears

18   there, but also generally about the meeting.

19       A.    They changed their name so often and I

20   only worked with them on one thing, so...

21       Q.    Okay.

22       A.    Okay.  I -- I think I'm ready.  I just

23   wanted to make sure I understood what this was about.

24       Q.    Okay.  What is this about?

1        A.    Are you on the page ending in --

2        Q.    You know, I'd -- I'd like to take the

3    entire --

4        A.    The whole concept?

5        Q.    Hold on.

6              I'd like to take the document starting at

7    Page 066 and --

8        A.    Okay.

9        Q.    -- going to the end, and if you recognize

10   that or have a feeling as to what it is, let me know

11   what it is and tell me about the context that you

12   understand it to be in.

13       A.    This was a meeting with Buzzeo which you

14   know as Cegedim.  This was -- if you remember

15   yesterday, I had explained to you that in around the

16   2012 period the algorithm was a logic that had to be

17   programmed into your ERP system.

18             Remember we had that discussion yesterday?

19       Q.    Yes.

20       A.    At this period of time in 2015, they had

21   actually turned it into an application that you could

22   purchase.

23       Q.    Okay.

24       A.    Okay?  This meeting was to meet with them

1    to see the application.

2        Q.    Okay.  So this is, is it fair to say,

3    prior to any engagement or other signed contract with

4    Buzzeo, is that right?

5        A.    I don't know the sequence of time, but I'm

6    going to make the assumption that that would be it.

7        Q.    Okay.  But you don't have a strong feeling

8    or a conclusion either way about whether Buzzeo was

9    engaged on the processes listed here or not?

10       A.    I -- I don't, but we wouldn't have engaged

11   with them until we met with them, so.  I don't know

12   the time -- timing and sequence.

13       Q.    All right.  All right.

14             So on Page 074 of this document, it says:

15   "Core Project Team - Actavis."

16             Do you see that there?

17       A.    I do.

18       Q.    And it lists various people including

19   you --

20       A.    Uh-huh.

21       Q.    -- and you are listed as a process owner?

22       A.    That's correct.

23       Q.    Around this time, May 2015, do you know

24   what that designation would have indicated, process

1    owner?

2        A.    Yes.

3        Q.    What does it mean?

4        A.    A process owner is somebody who has input

5    because of what you or your team does in the company,

6    and you have input as to what is required into the

7    system or process.

8        Q.    All right.

9              And do you remember whether the Buzzeo

10   entity was ever subsequently engaged to create or to

11   construct this system for Actavis or Allergan or

12   whatever entity you worked for?

13       A.    To the best of my knowledge, we did sign a

14   contract with them, but Tom Napoli would be the person

15   to confirm that.  I wouldn't be the person signing the

16   contract.

17       Q.    All right.  All right.

18       MR. EGLER:  Let's -- let's take a quick break.

19   All right.

20       THE VIDEOGRAPHER:  The time is approximately

21   2:15 p.m. and we are going off the record.

22              (WHEREUPON, a recess was had

23               from 2:15 to 2:33 p.m.)

24       THE VIDEOGRAPHER:  We are back on the record.

1    The time is approximately 2:33 p.m.

2        MR. EGLER:  Ms. Woods, I appreciate you coming

3    in yesterday and today.  I don't have any further

4    questions.

5        MS. LEVY:  I have -- I have just one question.

6                    EXAMINATION

7    BY MS. LEVY:

8        Q.    Ms. Woods, when we are talking about

9    Actavis pre 2012 suspicious order monitoring system,

10   who are the folks who would be in the best position to

11   understand the intricacies of how that system worked?

12       A.    For Actavis Inc., correct?

13       Q.    Correct.

14       A.    So that would really be Nancy Baran and

15   Rachelle Galant.

16       Q.    Would those two individuals know more than

17   you know about that system?

18       A.    Oh, significantly.  I mean, they were

19   hired -- they were at the company at the time.

20       MS. LEVY:  Okay.  I don't have anything further.

21       MR. EGLER:  Okay.  I'm going to have a question.

22                 FURTHER EXAMINATION

23   BY MR. EGLER:

24       Q.    Ms. Woods, when earlier today we were

1    talking about various meetings in May and August

2    of 2012, with people from Actavis, do you remember

3    that -- those discussions?

4         A.    The meetings that were in 2012 was

5    pre aq -- when we were going through the

6    acquisition --

7         Q.    Uh-huh.

8         A.    -- and we just had some preliminary

9    meetings before we completed the acquisition.

10        Q.    Right.

11        A.    So we had some preliminary meetings.  So

12   those were notes or meetings -- those were notes taken

13   from meetings we had with them.  So those notes would

14   have been information provided and information from

15   them.  So clarification would have to come from them

16   because we would not have been familiar with their

17   systems.

18        Q.    Do you think the people from Actavis who

19   were at the meetings in 2012 that we were talking

20   about earlier today lied to you?

21        A.    My point is I'm not sure we would have

22   understood the notes enough to correctly have taken

23   notes from them in the context in which they would

24   have communicated the system because we weren't

1    familiar the system.

2         Q.    Okay.  Do you think they lied to you

3    during the meetings?

4         A.    I wouldn't think they'd lie to us in the

5    meetings.  The way we might have interpreted the notes

6    might not have been how their system operated because

7    we weren't familiar with their system.

8         Q.    Do you think you would have asked

9    questions if you needed more information during the

10   meetings?

11        A.    It depended on what the meeting was.  If

12   it was, like, a fact finding meeting, an initial

13   meeting, we may have taken notes, gone back and talked

14   about them and had a subsequent meeting, but we may

15   not have had, like, an initial meeting because we

16   didn't own them at the time.

17        Q.    During the meetings if you asked a

18   question, do you remember anyone from Actavis not

19   volunteering the information that you asked for?

20        A.    After -- after the close --

21        Q.    No.

22        A.    -- of acquis- -- so I just want to make

23   sure I'm clear.

24        Q.    Uh-huh.

1      A.    We were only able to receive certain

2  information on any company we acquired --

3      Q.    Uh-huh.

4      A.    -- prior to the close of the company.  I'm

5  sure you're aware of that, right?

6      Q.    Yes.

7      A.    So we might not have been able to get

8  everything we needed prior to the close.

9      Q.    So at the meetings that we were talking

10  about earlier today, was there a point that you

11  remembered today where you asked for some information

12  from someone from Actavis and they didn't give it to

13  you?

14      A.    I can't recall from 2012 to now.

15      Q.    Do you think that would stick out in your

16  memory?

17      A.    I -- what I can't recall is if I asked for

18  anything or if our compliance team asked for anything.

19      Q.    If you had asked for something and they

20  refused to give it to you, do you think that would

21  have stuck out in your memory?

22      A.    If -- if we were allowed to ask for

23  something and they did not provide something --

24      Q.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.     -- we would have remembered.  I just don't
2   know if we did ask for anything and if we could have
3   asked for anything.
4        MR. EGLER:  Okay.  I don't have any further
5   questions.
6        MS. LEVY:  Nothing further from me.
7        MR. EGLER:  Thanks again.
8        THE WITNESS:  You're welcome.
9        THE VIDEOGRAPHER:  The time is approximately
10  2:37 p.m. and this concludes the deposition.
11             (Time Noted:  2:37 p.m.)
12             FURTHER DEPONENT SAITH NOT.
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    REPORTER'S CERTIFICATE

 2

 3              I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,

 4    a Certified Shorthand Reporter, do hereby certify:

 5              That previous to the commencement of the

 6    examination of the witness herein, the witness was

 7    duly sworn to testify the whole truth concerning the

 8    matters herein;

 9              That the foregoing deposition transcript

10    was reported stenographically by me, was thereafter

11    reduced to typewriting under my personal direction and

12    constitutes a true record of the testimony given and

13    the proceedings had;

14              That the said deposition was taken before

15    me at the time and place specified;

16              That I am not a relative or employee or

17    attorney or counsel, nor a relative or employee of

18    such attorney or counsel for any of the parties

19    hereto, nor interested directly or indirectly in the

20    outcome of this action.

21              IN WITNESS WHEREOF, I do hereunto set my

22    hand on this 14th day of January, 2019.

23

24              JULIANA F. ZAJICEK, Certified Reporter
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    DEPOSITION ERRATA SHEET

2

3

4    Case Caption:  In Re: National Prescription

5                    Opiate Litigation

6

7          DECLARATION UNDER PENALTY OF PERJURY

8

9          I declare under penalty of perjury that I

10   have read the entire transcript of my Deposition taken

11   in the captioned matter or the same has been read to

12   me, and the same is true and accurate, save and except

13   for changes and/or corrections, if any, as indicated

14   by me on the DEPOSITION ERRATA SHEET hereof, with the

15   understanding that I offer these changes as if still

16   under oath.

17

18                              MARY WOODS

19

20   SUBSCRIBED AND SWORN TO

21   before me this        day

22   of                , A.D. 20__.

23

24          Notary Public
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    _____

 4    Reason for change:_____

 5    Page No._____Line No._____Change to:_____

 6    _____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to:_____

 9    _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23    SIGNATURE:_____DATE:_____

24                        MARY WOODS
```

Highly Confidential - Subject to Further Confidentiality Review

1          DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24                    MARY WOODS