Page 1

                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF OHIO
                            EASTERN DIVISION


_____

IN RE:  NATIONAL PRESCRIPTION          MDL No. 2804
OPIATE LITIGATION                      Case No. 17-md-2804

This document relates to:              Judge Dan
                                       Aaron Polster


The County of Cuyahoga v. Purdue
Pharma, L.P., et al.
Case No. 17-OP-45005

City of Cleveland, Ohio vs. Purdue
Pharma, L.P., et al.
Case No. 18-OP-45132

The County of Summit, Ohio,
et al. v. Purdue Pharma, L.P.,
et al.
Case No. 18-OP-45090

_____


                           VOLUME I
              Videotaped Deposition of Kyle J. Wright
                         Washington, D.C.
                        February 28, 2019
                           9:33 a.m.



Reported by:  Bonnie L. Russo
Job No. 3244302

Page 2

1   Deposition of Kyle J. Wright held at:
2
3
4
5
6        Williams & Connolly, LLP
7        725 12th Street, N.W.
8        Washington, D.C.
9
10
11
12
13
14
15
16   Pursuant to Notice, when were present on behalf
17   of the respective parties:
18
19
20
21
22
23
24
25

Page 3

1   APPEARANCES:
2
3   On behalf of the Witness:
4     DAVID LEE TAYMAN, ESQ.
      TAYMAN LANE CHAVERRI, LLP
      1875 Eye Street, N.W.
5     Fifth Floor
      Washington, D.C. 20006
6     202-695-8147
      dtayman@tlclawfirm.com
7
      On behalf of the U.S. Department of Justice:
8     JAMES R. BENNETT, II, ESQ.
      UNITED STATES ATTORNEY'S OFFICE
9     801 West Superior Avenue
      Suite 400
10    Cleveland, Ohio 44113
      216-622-3988
11    james.bennett4@usdoj.gov
12
      On behalf of Cuyahoga County:
13    HUNTER J. SHKOLNIK, ESQ.
      NAPOLI SHKOLNIK, PLLC
14    360 Lexington Avenue, 11th Floor
      New York, New York 10017
15    212-397-1000
      sshkolnik@napolilaw.com
16
17    On behalf of Summit County:
      DONALD A. MIGLIORI, ESQ.
18    KAITLYN EEKHOFF, ESQ.
      MOTLEY RICE, LLC
19    28 Bridgeside Boulevard
      Mt. Pleasant, South Carolina 29464
20    843-216-9241
      dmigliori@motleyrice.com
21    keekhoff@motleyrice.com
22
23
24
25

Page 4

1   APPEARANCES (CONTINUED):
2
    On behalf of Plaintiffs:
3     PAUL FARRELL, JR., ESQ.
      (Via Teleconference)
4     GREENE KETCHUM BAILEY FARRELL & TWEEL, LLP
      419 11th Street
5     Huntington, West Virginia 25701
      304-525-9115
6
7   On behalf of Purdue Pharma, L.P.
      DEBRA D. O'GORMAN, ESQ.
8     DECHERT, LLP
      Three Bryant Park
9     1095 Avenue of the Americas
      New York, New York 10036
10    212-698-3593
      debra.ogorman@dechert.com
11
12  On behalf of Johnson & Johnson and Janssen
    Pharmaceuticals, Inc.
13    JEFFREY A. BARKER, ESQ.
      O'MELVENY & MYERS, LLP
14    610 Newport Center Drive, 17th Floor
      Newport Beach, California 92660
15    949-823-7963
      jbarker@omm.com
16       -and-
      RAYMOND KRNCEVIC, ESQ.
17    (Via Teleconference)
      TUCKER ELLIS, LLP
18    950 Main Avenue
      Suite 1100
19    Cleveland, Ohio 44113
      216-592-5000
20    raymond.krncevic@tuckerellis.com
21
22
23
24
25

Page 5

1   APPEARANCES (CONTINUED):
2
    On behalf of Walmart, Inc.
3     NEAL J. STEPHENS, ESQ.
      JONES DAY
4     1755 Embarcadero Road
      Palo Alto, California 94303
5     650-739-3939
      nstephens@jonesday.com
6        -and-
      PATRICK J. BEISELL, ESQ.
7     (By Teleconference)
      JONES DAY
8     77 West Wacker
      Chicago, Illinois 60601
9     312-269-4066
      pbeisell@jonesday.com
10
11    On behalf of Par Pharmaceuticals:
      AMY M. VANNI, ESQ.
12    McCARTER & ENGLISH
      1600 Market Street, Suite 3900
13    Philadelphia, Pennsylvania 19103
      215-979-3848
14    avanni@mccarter.com
15
      On behalf of Endo Pharmaceuticals, Inc., Endo
16    Health Solutions, Inc.:
      JOSHUA M. DAVIS, ESQ.
17    ARNOLD & PORTER
      601 Massachusetts Avenue, N.W.
18    Washington, D.C. 20001
      202-942-5000
19    joshua.davis@arnoldporter.com
20
      On behalf of Rite Aid of Maryland:
21    JOHN P. LAVELLE, JR.
      (Via Teleconference)
22    MORGAN, LEWIS & BOCKIUS, LLP
      1701 Market Street
23    Philadelphia, Pennsylvania 19103
      215-963-4824
24    john.lavelle@morganlewis.com
25

2 (Pages 2 - 5)

Page 6

```
 1   APPEARANCES (CONTINUED):
 2   On behalf of Cardinal Health, Inc.:
     ENU MAINIGI, ESQ.
 3   COLLEEN McNAMARA, ESQ.
     JENNIFER WICHT, ESQ.
 4   BRAD MASTERS, ESQ.
     WILLIAMS & CONNOLLY, LLP
 5   725 12th Street, N.W.
     Washington, D.C. 20005
 6   202-434-5000
     emainigi@wc.com
 7   cmcnamara@wc.com
     jwicht@wc.com
 8   bmasters@wc.com
 9
     On behalf of CVS Indiana, LLC and CVS Rx
10   Services, Inc.:
     ANTHONY M. RUIZ, ESQ.
11   ZUCKERMAN SPAEDER, LLP
     1800 M Street, N.W.
12   Suite 1000
     Washington D.C. 20036
13   202-778-1800
     aruiz@zuckerman.com
14
15   On behalf of AmerisourceBergen Drug
     Corporation:
16   SHANNON McCLURE, ESQ.
     REED SMITH, LLP
17   Three Logan Square, Suite 3100
     1717 Arch Street
18   Philadelphia, Pennsylvania 19103
     215-241-7910
19   smclure@reedsmith.com
20   On behalf of Henry Schein, Inc.:
     MADELEINE BRUNNER, ESQ.
21   (By Teleconference)
     LOCKE LORD, LLP
22   2200 Ross Avenue
     Suite 2800
23   Dallas, Texas 75201
     214-740-8554
24   maddie.brunner@lockelord.com
25
```

Page 8

```
 1   APPEARANCES (CONTINUED):
 2   On behalf of H.D. SMITH:
     WILLIAM E. PADGETT, ESQ.
 3   BARNES & THORNBURG, LLP
     11 South Meridian Street
 4   Indianapolis, Indiana 46204
     317-236-1313
 5   william.padgett@btlaw.com
         -and-
 6   WILLIAM J. LEEDER, III, ESQ.
     BARNES & THORNBURG, LLP
 7   171 Monroe Avenue, N.W.
     Suite 1000
 8   Grand Rapids, Michigan 49503
     616-742-3930
 9   william.leeder@btlaw.com
10   On behalf of Anda, Inc.
     JAMES W. MATTHEWS, ESQ.
11   KATY E. KOSKI, ESQ.
     (Veritext Streaming)
12   FOLEY & LARDNER, LLP
     111 Huntington Avenue
13   Boston, Massachusetts 02199
     617-342-4000
14   jmatthews@foley.com
     kkoski@foley.com
15
     On behalf of HBC:
16   ROBERT M. BARNES, ESQ.
     SCOTT LIVINGSTON, ESQ.
17   (Via Teleconference)
     MARCUS & SHAPIRA, LLP
18   One Oxford Centre, 35th Floor
     301 Grant Street
19   Pittsburgh, Pennsylvania 15219
     412-338-5224
20   rbarnes@marcus-shapira.com
     livingston@marcus-shapira.com
21
     On behalf of Walgreen Co. and Walgreen Eastern
22   Co., Inc.:
     ALEX HARRIS, ESQ.
23   BARTLIT BECK, LLP
     1801 Wewatta Street
24   Suite 1200
     Denver, Colorado 80202
25   303-592-3197
     alex.harris@bartlitbeck.com
```

Page 7

```
 1   APPEARANCES (CONTINUED):
 2
     On behalf of McKesson Corporation:
 3   GEOFFREY E. HOBART, ESQ.
     EMILY L. KVESELIS, ESQ.
 4   ANDREW STANNER, ESQ.
     COVINGTON & BURLING, LLP
 5   One CityCenter
     850 Tenth Street, N.W.
 6   Washington, D.C. 20001
     202-662-6000
 7   ghobart@cov.com
     ekveselis@cov.com
 8   astanner@cov.com
         -and-
 9   CHRISTOPHER K. EPPICH, ESQ.
     COVINGTON & BURLING, LLP
10   1999 Avenue of the Stars
     Los Angeles, California 90067
11   424-332-4764
     ceppich@cov.com
12
13   On behalf of Allergan Finance, LLC:
     JENNIFER LEVY, ESQ.
14   CATIE VENTURA, ESQ.
     KIRKLAND & ELLIS, LLP
15   655 Fifteenth Street, N.W.
     Washington, D.C. 20005
16   202-879-5907
     jennifer.levy@kirkland.com
17   catie.ventura@kirkland.com
18
     On behalf of Mallinckrodt and SpecGx, LLC:
19   ANDREW O'CONNOR, ESQ.
     WILLIAM DAVISON, ESQ.
20   ROPES & GRAY, LLP
     Prudential Tower
21   800 Boylston Street
     Boston, Massachusetts 02199
22   617-951-7000
     andrew.o'connor@ropesgray.com
23   william.davison@ropesgray.com
24
25
```

Page 9

```
 1   APPEARANCES (CONTINUED):
 2   On behalf of Prescription Supply, Inc.
     ZACHARY MARTIN, ESQ.
 3   (Via Teleconference)
     FOX ROTHSCHILD, LLP
 4   Stone Manor Corporate Center
     2700 Kelly Road, Suite 300
 5   Warrington, Pennsylvania 18976
     215-918-3680
 6   zmartin@foxrothschild.com
 7
     ALSO PRESENT:
 8   David Cohen, Special Master
     Renee A. Bacchus, Esq., United States
 9   Department of Justice, United States Attorney's
     Office
10   Robert E. Chandler, Esq., United States
     Department of Justice, Civil Division
11   David M. Finkelstein, Esq., United States
     Department of Justice, Civil Fraud Section
12   Mariama C. Spears, Esq., United States
     Department of Justice, Drug Enforcement
13   Administration
     Daniel Russo, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
```

3 (Pages 6 - 9)

Page 10

C O N T E N T S

EXAMINATION OF KYLE J. WRIGHT          PAGE

BY MS. MAINIGI                                              24

BY MR. O'CONNOR                                        178

BY MR. STEPHENS                                        222

EXHIBITS

Exhibit 1  Notice of Videotaped          25
           Deposition of Kyle J. Wright

Exhibit 2  Letter dated 12-10-18         25

Exhibit 3  (SKIPPED)

Exhibit 4  Kyle J. Wright                63
           USA vs. $463,497.72 in
           US Currency from Best Bank
           7-7-11
           HDS_MDL_00002462-2514

Exhibit 5  Excerpt of Bench Trial        64
           8-11-11
           HDS_MDL_00005689-5799

Exhibit 6  (SKIPPED)

Exhibit 7  (SKIPPED)

Exhibit 8  (SKIPPED)

Exhibit 9  Regulatory Agency             81
           Contact Form
           CAH 024642

Exhibit 10  E-Mail Chain                 92
            dated 8-12-05
            Attachment
            US-DEA-00003880-3881
Exhibit 11  Memorandum stamp             92
            dated 10-20-05
            MCKMDL00496859-6875

Page 11

Exhibit 12  Memorandum stamp             94
            dated 8-23-05
            US-DEA-00000352-366
Exhibit 14  Drug Enforcement             156
            Administration
            Pharmaceutical Industry
            Conference
            9-11-07
            ABDC001819-1839

Exhibit 17  McKesson Pharmaceutical      150
            Controlled Substance
            Monitoring Program
            7-31-08
            MCKMDL00543715-3733

Exhibit 20  E-Mail dated 5-13-16         159
            US-DEA-00007628-7629
Exhibit 26  Compliance Group             78
            Ingredient Limit Report
            ECAH_001_000113672-930
Exhibit 27  Draft Memorandum             152
            8-12-08
            MCK_WVA_000064-68
Exhibit 28  E-Mail Chain                 202
            dated 4-21-11
            MAL-MI 000170902
Exhibit 29  E-Mail Chain                 209
            dated 1-31-17
            US-DEA-00007691


(Exhibits included with transcript.)

Page 12

P R O C E E D I N G S

THE VIDEOGRAPHER:  Good morning. We are going on the record at 9:33 a.m. on February 28, 2019.

Please note that the microphones are sensitive and may pick up whispering, private conversations and cellular interference. Please turn off all cell phones or place them away from the microphones as they can interfere with the deposition audio.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video recorded deposition of Kyle Wright, taken by counsel for the defendant in the matter of In Re National Prescription Opioid Litigation, filed in the United States District Court for the Northeastern District of Ohio, Eastern Division, Case No. MDL, No. 2804, 17-MD-2804.

This deposition is being held at Williams & Connolly, located at 725 12th Street, Northwest, Washington, D.C.

My name is Daniel Russo from the firm Veritext Legal Solutions, and I'm your

Page 13

videographer today.  The court reporter is Bonnie Russo from the firm Veritext Legal Solutions.

Counsel and all present in the room and everyone attending remotely will now state their appearances and affiliations for the record, please.

MS. MAINIGI:  Enu Mainigi for defendant Cardinal.

MS. McNAMARA:  Colleen McNamara for Cardinal Health.

MS. WICHT:  Jennifer Wicht for Cardinal Health.

MS. McCLURE:  Shannon McClure, Reed Smith, for AmerisourceBergen Drug Corporation.

MR. EPPICH:  Chris Eppich of Covington & Burling for McKesson.

MR. MATTHEWS:  James Matthews for Anda, Inc.

MS. LEVY:  Jennifer Levy for the Allergan defendants.

MR. O'CONNOR:  Andrew O'Connor for Mallinckrodt, LLC, and SpecGX.

MR. DAVISON:  William Davison for Mallinckrodt, LLC, and SpecGX, LLC.

4 (Pages 10 - 13)

Page 14

1    MR. STEPHENS:  Neal Stephens from
2  Jones Day for Walmart.
3    MR. PADGETT:  Bill Padgett, Barnes &
4  Thornburg, for Defendant H.D. Smith.
5    MR. BARKER:  Jeff Barker for Janssen
6  Pharmaceuticals and Johnson & Johnson.
7    MR. DAVIS:  Josh Davis for the Endo
8  defendants.
9    MS. VANNI:  Amy Vanni for the Endo
10  defendants.
11    MS. VENTURA:  Catie Ventura for the
12  Allergan defendants.
13    MR. RUIZ:  Anthony Ruiz for CVS
14  Indiana, LLC, and CVS Rx Services, Inc.
15    MR. BARNES:  Robert Barnes, HBC
16  Service Company.
17    MR. HARRIS:  Alex Harris, Walgreens
18  Company and Walgreens Eastern Company, Inc.
19    MR. MASTERS:  Brad Masters, Cardinal
20  Health.
21    MS. O'GORMAN:  Debra O'Gorman for
22  the Purdue defendants.
23    MS. KVESELIS:  Emily Kveselis for
24  McKesson.
25    MR. STANNER:  Andrew Stanner,

Page 15

1  McKesson.
2    MR. HOBART:  Geoff Hobart, McKesson.
3    MS. MAINIGI:  Defendants on the
4  phone?
5    MR. BEISELL:  Patrick Beisell for
6  Walmart.
7    MS. MAINIGI:  Any other defendants
8  on the phone?
9    MR. LIVINGSTON:  Scott Livingston
10  for Defendant HBC.
11    MS. BRUNNER:  Madeleine Brunner,
12  Locke Lord, for Henry Schein.
13    MR. KRNCEVIC:  Ray Krncevic for
14  Janssen.
15    MR. MARTIN:  Zach Martin for
16  Prescription Supply.
17    MR. LEEDER:  Bill Leeder for H.D.
18  Smith.
19    MS. MAINIGI:  Plaintiffs?
20    MR. MIGLIORI:  Don Migliori for the
21  Summit County plaintiffs.
22    MR. SHKOLNIK:  Hunter Shkolnik for
23  Cuyahoga County plaintiffs.
24    MS. MAINIGI:  Plaintiffs on the
25  phone?

Page 16

1    MR. FARRELL:  Paul Farrell, Jr., on
2  behalf of plaintiffs.
3    THE VIDEOGRAPHER:  Will the court --
4  oh.
5    MS. MAINIGI:  Let's let the
6  government attorneys introduce themselves.
7    MR. BENNETT:  For the United States
8  and the Department of Justice, James Bennett
9  from the U.S. Attorney's Office in Cleveland.
10    MR. CHANDLER:  Robert Chandler,
11  United States -- or -- United States Department
12  of Justice.
13    MR. FINKLESTEIN:  David Finklestein
14  from the United States Department of Justice.
15    MS. BACCHUS:  Renee Bacchus with the
16  Department of Justice from the Northern
17  District of Ohio U.S. Attorney's Office.
18    MS. SPEARS:  Mariama Spears, Drug
19  Enforcement Administration.
20    MR. TAYMAN:  David Tayman for Kyle
21  Wright in his individual capacity.
22    MS. MAINIGI:  Special Master Cohen,
23  do you -- you're on the phone as well, correct?
24    SPECIAL MASTER COHEN:  I am.  Good
25  morning everybody.

Page 17

1    THE VIDEOGRAPHER:  Will the court
2  reporter please swear in the witness.
3    MS. MAINIGI:  Actually, before --
4  before we swear in the witness, David Cohen,
5  before we came back into the room and went on
6  the record, we had an opportunity, primarily
7  plaintiff's counsel and defense counsel, to
8  speak to you about a few outstanding issues.
9    May we ask --
10    SPECIAL MASTER COHEN:  Right.  So
11  I'd like to -- I'd like to go ahead and put a
12  couple of things on the record before you swear
13  the witness, which are essentially ground rules
14  on how this will be forward.
15    So the -- the court reporter should
16  go ahead and go on the record.
17    First of all, good morning, Mr.
18  Wright.
19    You're the star of the show this
20  morning.  And so we all appreciate you making
21  yourself available.
22    Just so that I understand how this
23  is going to go forward, because I'm not in the
24  room, I assume that there is going to be one
25  counsel for each group of defendants who is

Page 18

1  doing questioning.
2      Enu, I assume that that's you on
3  behalf of distributors.
4      Am I right so far?
5      MS. MAINIGI: Correct. Correct.
6      SPECIAL MASTER COHEN: Hello?
7      MS. MAINIGI: Yes.
8      Can you hear me?
9      SPECIAL MASTER COHEN: Okay.
10     MS. MAINIGI: Yes.
11     SPECIAL MASTER COHEN: Yeah.
12     Actually, depending on how far
13  people are sitting from one of those
14  microphones, it's either very easy or very
15  difficult to hear counsel.
16     And then just for my own
17  understanding, and I guess for Mr. Wright's
18  understanding of how things will go forward,
19  who besides you, Enu, will be questioning Mr.
20  Wright for the defendant?
21     MS. MAINIGI: Who --
22     SPECIAL MASTER COHEN: I'm sorry. I
23  didn't hear.
24     MS. MAINIGI: Oh, who besides. Yes.
25     So Andrew O'Connor will question for

Page 19

1  the -- for pharma. And Neal Stephens will
2  question for the pharmacies.
3      SPECIAL MASTER COHEN: Okay.
4      And then on behalf of plaintiffs, it
5  will be Mr. Migliori?
6      MR. MIGLIORI: Yes. It'll be. But
7  it also will be -- and -- and this is hopefully
8  acceptable going forward for all witnesses.
9  Given the two counties, we'd like to be able to
10  have the option to have both -- a lawyer from
11  each county question.
12     So Hunter Shkolnik is also here.
13  And we were going to split the time, not to --
14     SPECIAL MASTER COHEN: That's fine.
15     MR. MIGLIORI: Okay.
16     SPECIAL MASTER COHEN: Okay. And
17  then I heard a number of government counsel. I
18  -- I caught James Bennett's name and I think a
19  Mr. Chandler and also an attorney who said he
20  was there individually on behalf of Mr. Wright.
21     And so I just want to understand who
22  will be the -- maybe, for example, interposing
23  objections on behalf of Mr. Wright?
24     MR. BENNETT: So, Special Master
25  Cohen, this is James Bennett. I will be

Page 20

1  interjecting objections on behalf of the United
2  States.
3      I anticipate that Mr. Wright's
4  private attorney, whose name is David Tayman,
5  may also have objections on behalf of Mr.
6  Wright in his individual capacity.
7      So I expect that two of us will be
8  the ones who will be making objections on
9  behalf of the government and Mr. Wright.
10     MR. TAYMAN: Mr. Cohen, this is
11  David Tayman. To -- to the extent that there
12  are objections to impose on Mr. Wright's behalf
13  as an individual, I will be making those.
14     SPECIAL MASTER COHEN: Okay. So a
15  few ground rules.
16     First of all, I understand that
17  counsel for the government or Mr. Wright may
18  interpose objection. Those objections should
19  be as brief as possible. Often you merely need
20  to say the word "objection" and sometimes three
21  or four words in explanation as to what the
22  basis for that objection is. But there should
23  not be speaking objections as a general matter.
24     Mr. Wright, when one of your
25  attorneys seeks to interpose an objection, you

Page 21

1  should let him. You should allow time for
2  counsel to object. But once that objection is
3  made, you normally, almost always, will go
4  ahead and answer the question that you were
5  asked unless you're directed not to respond by
6  your attorney. And that's a fairly unusual
7  circumstance, usually because the question asks
8  for you to reveal communications you had with
9  counsel. That's the main reason that you
10  wouldn't answer a question. But normally you
11  will answer the question even though an
12  objection is interposed.
13     So a couple of things that we talked
14  about before we -- before we went on the record
15  was kind of the splitting the time and also the
16  extent to which leading questions could be
17  asked.
18     Regarding the splitting of time, the
19  way this is going to go forward is that
20  defendants will be questioning first, and then
21  plaintiffs. And then defendant are going to
22  reserve some time to ask kind of a second round
23  of questions. And plaintiffs are going to
24  reserve time to ask a second round of
25  questions. Let's call that defendants' one and

1   plaintiffs' one and then defendants' two,
2   plaintiffs' two.
3      As a general matter, the parties
4   should -- are allowed to reserve time for
5   defendants' two and plaintiffs' two.  And as a
6   general matter, that should be in the range of
7   20 to 30 percent, at most, of the time that's
8   been allotted.
9      So defendants have eight hours.
10  They can reserve, you know, up to two and a
11  half hour.  But really it should be as little
12  as possible, closer to one and a half hours.
13     And in the same way, the plaintiffs
14  have three and a half hours.  If they were to
15  reserve 20 to 30 percent of that, then that's,
16  off the top of my head, an hour and 15
17  minutes-ish.
18     And -- and that reserved amount of
19  time will only be used to the extent necessary.
20  So, for example, if defendants' two questioning
21  takes place, it would be limited to the
22  cross-examination essentially of -- of -- of
23  plaintiffs' one questioning.  It's not going to
24  go beyond the scope.  And similarly,
25  plaintiffs' two wouldn't go beyond the scope of

1   defendants' two -- call it recross.
2      So that's way it's going go forward.
3   Everybody can reserve time but should use as
4   little of it as possible and as little of it as
5   necessary.
6      The other rule that I'm laying down
7   here is that, given that this is a third-party
8   witness, given the nature of the -- the
9   parties' positions and extent to they've had
10  conversations already with the deponent, both
11  sides may ask leading questions but should do
12  so as little as possible.
13     If -- if adversity is established,
14  that opens it up a bit more.  But I just think
15  it's going to lead to a quicker deposition,
16  less time for Mr. Wright in total, and an
17  easier process if I say now that leading
18  questions as a general matter may be asked but
19  should only be asked if necessary.
20     So the better approach is to ask a
21  question without leading.  But if it becomes
22  necessary, both sides are allowed to do that.
23     I think that's all I have.
24     Are there any questions of counsel
25  for me before we begin?

1      Okay.
2     MS. MAINIGI:  I see none.
3     SPECIAL MASTER COHEN:  I'll be
4   putting myself on mute.  So if you do need me,
5   it may take me a second to come back online.
6   But I will be listening in.  And I'll let you
7   go to it.
8     THE VIDEOGRAPHER:  Will the court
9   reporter please swear in the witness.
10
11        KYLE J. WRIGHT,
12  being first duly sworn, to tell the truth, the
13    whole truth and nothing but the truth,
14     testified as follows:
15   EXAMINATION BY COUNSEL FOR DEFENDANT
16     CARDINAL HEALTH, INC.
17  BY MS. MAINIGI:
18  Q.  Good morning, Mr. Wright.
19    If you could put your full name on
20  the record, please.
21  A.  Kyle James Wright.
22  Q.  Are you currently employed?
23  A.  No.
24  Q.  Are you retired?
25  A.  Yes.

1  Q.  Who is your prior employer?
2  A.  Department of Justice Drug
3  Enforcement Administration.
4    Q.  And how long approximately did you
5  work for the Drug Enforcement Administration?
6  A.  22 years.
7    Q.  Do you understand, Mr. Wright, that
8  the Drug Enforcement Administration or DEA, as
9  I will call it, has authorized you to testify
10  on certain topics related to your employment at
11  the agency?
12  A.  Shame on them.  Yes.
13    MS. MAINIGI:  I'll go ahead and mark
14  for the record as Exhibit 1, Wright Exhibit 1.
15    And we've prepared a binder for you
16  that has some of these, Mr. Wright.
17    Exhibit 1 is your notice of
18  deposition.
19    (Deposition Exhibit 1 was marked for
20  identification.)
21  BY MS. MAINIGI:
22  Q.  Have you seen that document before?
23  A.  I -- I -- I don't recall.
24    (Deposition Exhibit 2 was marked for
25  identification.)

7 (Pages 22 - 25)

Page 26

1        BY MS. MAINIGI:
2     Q.   Exhibit 2, Mr. Wright, which is also
3  in your binder --
4        MS. MAINIGI:  Counsel.  Counsel?
5        BY MS. MAINIGI:
6     Q.   Exhibit 2 is the authorization
7  letter sent by the DEA.
8        Have you seen this letter before?
9     A.   Yes.
10     Q.   Did you review this prior to the
11  deposition?
12     A.   Yes.
13     Q.   Mr. Wright, you are here represented
14  by individual counsel; is that right?
15     A.   Yes.
16     Q.   Are you also being represented by
17  DOJ and DEA attorneys here today?
18        MR. BENNETT:  Objection.
19        THE WITNESS:  No.
20        BY MS. MAINIGI:
21     Q.   Did you meet with DOJ and DEA
22  attorneys in preparation for your deposition?
23     A.   Yes.
24     Q.   Was your individual counsel also
25  present?

Page 27

1     A.   Yes.
2     Q.   As part of your preparation for this
3  deposition, either on your own or in
4  conjunction with your prep with the DOJ
5  attorneys, did you have occasion to review any
6  prior testimony you have provided?
7     A.   Yes.
8     Q.   What prior testimony did you review?
9     A.   The deposition with -- pertaining to
10  H.D. Smith.
11     Q.   H.D. Smith is a distributor?
12     A.   Yes, ma'am.
13     Q.   And you pro -- you provided
14  testimony in -- on behalf of the DEA against
15  H.D. Smith?
16     A.   Yes, ma'am.
17     Q.   As I recall it, Mr. Wright, that was
18  approximately in the 2011 time period?
19     A.   Yes, ma'am.
20     Q.   Did you review the entirety of your
21  deposition transcript?
22     A.   No, ma'am.
23     Q.   How much did you review?
24     A.   About three quarters of it.  Then I
25  went to sleep.

Page 28

1     Q.   It wasn't riveting enough to keep
2  you awake?
3     A.   No.  It had just been a very long
4  day.
5     Q.   Did you have occasion -- let me back
6  up.
7        Do you recall in that H.D. Smith
8  case that you also provided trial testimony?
9     A.   Yes, ma'am.
10     Q.   Did you have occasion to review that
11  trial testimony?
12     A.   No, ma'am.
13     Q.   Any other testimony that you had
14  previously provided that you reviewed for
15  today's purposes?
16     A.   I think we went -- I went over the
17  Masters administrative hearing.
18     Q.   The Masters administrative hearing,
19  were you testifying in that matter on behalf of
20  the DEA?
21     A.   Yes, ma'am.
22     Q.   And that was against Masters
23  Pharmaceutical; is --
24     A.   Yes, ma'am.
25     Q.   -- that correct?

Page 29

1        And do you remember approximately
2  when that testimony was, what year?
3     A.   No, I don't.
4     Q.   Did you review that testimony in its
5  entirety prior to today?
6     A.   No, ma'am.
7     Q.   Also partial?
8     A.   Yes, ma'am.
9     Q.   Any other prior testimony that you
10  provided that --
11     A.   No, ma'am.
12     Q.   -- you reviewed?  Okay.
13        THE REPORTER:  Let her finish her
14  question, please.
15        BY MS. MAINIGI:
16     Q.   When you provided that testimony,
17  you realized you were testifying under oath,
18  Mr. Wright?
19     A.   Yes.
20     Q.   And you realize that today your
21  testifying under oath?
22     A.   Yes.
23     Q.   Mr. Wright, before today, is it fair
24  to say you and I have never met before?
25     A.   Oh, that -- yes.

8 (Pages 26 - 29)

Page 30

1    Q.  Have you met plaintiff's counsel
2 before, Mr. Migliori, in particular, from
3 Motley Rice?
4    A.  Yes.
5    Q.  And how have you -- in what capacity
6 have you met Mr. Migliori from Motley Rice?
7        MR. TAYMAN:  Objection.
8        I'm going to direct you not to
9 answer.  It's privileged and confidential.
10       MS. MAINIGI:  We are aware that Mr.
11 Wright serves as a consultant for Motley Rice.
12 I don't think the manner in which he serves as
13 a consultant -- or the fact that he serves as a
14 consultant or specif -- generally what he does
15 as a consultant or the terms of that are
16 privileged.
17       I'll ask the question again.
18       BY MS. MAINIGI:
19    Q.  Mr. Wright, in what capacity do you
20 know Mr. Migliori from the Motley Rice law
21 firm?
22       MR. TAYMAN:  I'm going to object
23 again and direct him not to answer.
24       We take the position that it's
25 privileged and confidential and that we don't

Page 31

1 control that privilege.
2        MS. MAINIGI:  Mr. Migliori, are you
3 endorsing the assertion of that privilege?
4        MR. MIGLIORI:  I think that the --
5 the objection is an appropriate objection.
6        MS. MAINIGI:  Special Master Cohen,
7 I -- I think we may need your services earlier
8 than we anticipated.  I don't know if you can
9 hear us.
10       SPECIAL MASTER COHEN:  I didn't -- I
11 didn't hear what Don said just a second ago.
12       MR. MIGLIORI:  I'm not close to the
13 phone.  Sorry.
14       I said that I -- I think the
15 objection by the witness's counsel is an
16 appropriate objection, that whether a person is
17 a consultant expert is a matter of privilege
18 until or unless it becomes a testifying expert.
19       SPECIAL MASTER COHEN:  All right.
20 So -- so what I heard in that question was not
21 a solicitation of any communication between
22 counsel and the witness.  It was simply a -- a
23 question about the nature of the relationship.
24       And so I think that the
25 attorney-client privilege assertion is not well

Page 32

1 taken.  And the witness needs to answer that
2 question.
3        THE WITNESS:  As a private
4 consultant.
5        BY MS. MAINIGI:
6    Q.  How long, approximately, have you
7 served as a private consultant for Motley Rice?
8        MR. TAYMAN:  Objection.
9        I'm going to direct you not to
10 answer.
11       Our position is that it's privileged
12 and confidential and that we don't control that
13 privilege.
14       MS. MAINIGI:  Special Master Cohen?
15       SPECIAL MASTER COHEN:  Objection is
16 overruled.
17       BY MS. MAINIGI:
18    Q.  You may answer.
19       SPECIAL MASTER COHEN:  You can go
20 ahead and answer, Mr. Wright.
21       THE WITNESS:  I'm trying to
22 calculate the months.  Six, eight months maybe.
23 It's less than a year.
24       BY MS. MAINIGI:
25    Q.  From the Motley Rice firm, who are

Page 33

1 the individuals that you have dealings with?
2        MR. TAYMAN:  Objection.  I'm going
3 to assert the same privilege.  We don't control
4 the privilege.
5        MR. MIGLIORI:  If I may, Your Honor.
6 At this point there are courts that say that --
7 that even the identity of nontestifying
8 witnesses is a privilege.
9        Now, getting into who he may have
10 spoken with is getting deep into the actual
11 relationship.  And we think it's privileged at
12 this point.
13       SPECIAL MASTER COHEN:  I'll sustain
14 the objection.
15       MS. MAINIGI:  And the scope of what
16 you are sustaining, Special Master Cohen, is?
17       SPECIAL MASTER COHEN:  I'm ruling on
18 the specific question you asked.
19       BY MS. MAINIGI:
20    Q.  How much are you paid by the hour by
21 Motley Rice?
22       MR. MIGLIORI:  It's the same
23 objection.
24       MR. TAYMAN:  Same objection.
25       MS. MAINIGI:  I -- I don't see

9 (Pages 30 - 33)

Page 34

1  why --
2      SPECIAL MASTER COHEN: Overruled.
3      MS. MAINIGI: -- what his
4  compensation --
5      SPECIAL MASTER COHEN: It's
6  overruled.
7      I don't need argument.
8      MS. MAINIGI: Thank you.
9      THE WITNESS: $300 an hour.
10     BY MS. MAINIGI:
11     Q.   Approximately how much have you been
12  paid to date?
13     MR. MIGLIORI: Same objection.
14     MR. TAYMAN: Same objection.
15     SPECIAL MASTER COHEN: Overruled.
16     And just to be clear, I believe the
17  question is how much were you paid, not are you
18  being paid.
19     Am I correct about that, sir?
20     MS. MAINIGI: The question was how
21  much have you been --
22     SPECIAL MASTER COHEN: I just
23  need --
24     MS. MAINIGI: -- paid to date.
25     SPECIAL MASTER COHEN: No.  But the

Page 35

1  question before that was not the hourly rate.
2  And I think that I understood that he's not
3  currently being paid.  He was paid, and he's
4  not being paid now.
5      BY MS. MAINIGI:
6      Q.   Let -- let me just go ahead and
7  clarify that with you, Mr. Wright.
8      Are you currently serving as a
9  consultant to the Motley Rice law firm?
10     A.   At the present time, I have no
11  assignments, and I am not performing any work
12  for Motley Rice.
13     Q.   Do you have a retention agreement
14  with Motley Rice?
15     MR. TAYMAN: Objection.  Asserting
16  the privilege.
17     We don't control the privilege.
18     MR. MIGLIORI: Same basis.
19     SPECIAL MASTER COHEN: Overruled.
20     THE WITNESS: Yes.
21     BY MS. MAINIGI:
22     Q.   Does the retention agreement have an
23  end date for the consultation?
24     MR. TAYMAN: Objection.
25     MR. MIGLIORI: Same.

Page 36

1      SPECIAL MASTER COHEN: Overruled.
2      THE WITNESS: No.
3      BY MS. MAINIGI:
4      Q.   When was the last time,
5  approximately, that you interacted with anyone
6  at Motley Rice?
7      MR. TAYMAN: Objection.  We're going
8  to assert the privilege.  It's privilege and
9  confidential.  We don't control that privilege.
10     MR. SHKOLNIK: And --
11     MR. TAYMAN: I'm going to direct you
12  not to answer.
13     MR. SHKOLNIK: Sorry.
14     This is objection on behalf of
15  Cuyahoga County under Rule --
16     SPECIAL MASTER COHEN: I'll sustain
17  that.
18     MR. SHKOLNIK: -- 26.
19     SPECIAL MASTER COHEN: I'll sustain
20  the objection.
21     BY MS. MAINIGI:
22     Q.   How much have you been paid to date
23  by the Motley Rice law firm, approximately?
24     MR. MIGLIORI: Objection.
25     MR. TAYMAN: Objection.  It's

Page 37

1  privileged.
2      SPECIAL MASTER COHEN: Overruled.
3      THE WITNESS: You know, I --
4  honestly, this is -- off the top of my head, I
5  would say --
6      MR. TAYMAN: If you don't know, you
7  don't know, Kyle.
8      MS. MAINIGI: Please don't coach the
9  witness.
10     BY MS. MAINIGI:
11     Q.   Give us your --
12     A.   My guess --
13     Q.   -- best estimate.
14     A.   -- best est -- my best estimate is
15  about $3,000.
16     Q.   Have you prepped for this deposition
17  with Motley Rice?
18     A.   No.
19     Q.   And I'll ask again:  When was the
20  last time you had interaction with Motley Rice?
21     MR. TAYMAN: Objection.  Privileged
22  and confidential.  We don't control the
23  privilege.
24     MR. MIGLIORI: I think that was
25  sustained.

10 (Pages 34 - 37)

Page 38

1        MR. TAYMAN:  Yeah.  I thought --
2        SPECIAL MASTER COHEN:  I already --
3  I already sustained that.
4        BY MS. MAINIGI:
5     Q.   Mr. Wright, do you recall that you
6  received last July a letter from my law firm,
7  Williams & Connolly, about potentially
8  testifying in this action?
9     A.   Yes.
10    Q.   Okay.  And do you recall, after you
11  received that letter, you called me?
12    A.   Yes.
13    Q.   Do you recall whether, at the time
14  you called me, that you had been retained at
15  that point by Motley Rice?
16        In other words, were you retained in
17  that time period, or did it come after?
18    A.   I have -- I don't know.
19    Q.   Okay.  Now, do you recall in August
20  receiving a letter from DOJ instructing you to
21  not provide testimony in this action?
22    A.   Yes, ma'am.
23    Q.   Did you speak to anyone at DOJ
24  around the time you received that letter?
25        I don't need to know the substance

Page 39

1  of the conversation.  I'm just asking for
2  identification.
3     A.   I'm sorry.  Would you please repeat
4  the question.
5     Q.   Sure.
6        Did you speak to anyone at DOJ
7  around the time that you received that letter
8  from DOJ?
9     A.   Yes, ma'am.
10    Q.   Who did you speak with?
11    A.   All I know is her name starts with
12  an S.
13        How's that?
14    Q.   And it was someone from DOJ?
15    A.   DEA, D -- chief counsel's office.
16    Q.   From -- someone from the chief
17  counsel's office at the DEA?
18    A.   Yes, ma'am.
19    Q.   Okay.  When were you -- now, were
20  you first approached by Motley Rice before or
21  after receiving that letter from DOJ?
22        MR. MIGLIORI:  Objection.
23        MR. TAYMAN:  Objection.  Privileged
24  and confidential.  We don't control the
25  privilege.

Page 40

1        Directing you not to answer.
2        MS. MAINIGI:  I -- I don't think
3  that the timing of when he was approached
4  has been --
5        SPECIAL MASTER COHEN:  Overruled.
6        You -- you don't need -- you don't
7  need to converse with opposing counsel.  I'll
8  rule on the objection when I hear it.
9        It's overruled.
10        MS. MAINIGI:  Thank you.
11        BY MS. MAINIGI:
12    Q.   Do you need the question read back?
13    A.   I -- I don't recall.
14    Q.   Okay.  Who from Motley Rice first
15  approached you?
16        MR. TAYMAN:  Objection.  Privileged
17  and confidential.
18        MR. MIGLIORI:  Same objection.
19        SPECIAL MASTER COHEN:  Sustained.
20        BY MS. MAINIGI:
21    Q.   In your consultancy for Motley Rice,
22  are you retained as a paid consultant for all
23  of the plaintiffs that Motley Rice
24  represents --
25        MR. TAYMAN:  Objection.

Page 41

1        BY MS. MAINIGI:
2     Q.   -- or particular -- excuse me -- or
3  particular plaintiffs?
4        MR. TAYMAN:  Objection.  Privileged
5  and confidential.  We don't control the
6  privilege.
7        I'm directing you not to answer.
8        SPECIAL MASTER COHEN:  Overruled.
9        THE WITNESS:  Please repeat the
10  question.
11        BY MS. MAINIGI:
12    Q.   In your retention by Motley Rice as
13  a consultant, are you retained as a paid
14  consultant for all of the plaintiffs they
15  represent or particular plaintiffs they
16  represent?
17    A.   Particular.
18    Q.   Which particular plaintiffs?
19        MR. TAYMAN:  Objection.  Privileged
20  and confidential.
21        I'm directing you not to answer.
22        MR. MIGLIORI:  Objection.  On the
23  substantive information.
24        SPECIAL MASTER COHEN:  Over --
25  overruled.

11 (Pages 38 - 41)

Page 42

1      THE WITNESS:  Right now the only
2  thing that I have done is Summit County, Ohio.
3      BY MS. MAINIGI:
4      Q.   Is it fair to say that Summit
5  County, Ohio, is the only plaintiff for whom
6  you have provided consultancy work then?
7      A.   Yes.
8      MR. TAYMAN:  Objection.
9      MR. MIGLIORI:  Same objection.
10     MR. TAYMAN:  Privileged and
11  confidential.
12     Slow down.  Give us a chance to
13  object, please, Mr. Wright.
14     SPECIAL MASTER COHEN:  Overruled.
15     THE WITNESS:  Yes.
16     BY MS. MAINIGI:
17     Q.   Have you been asked by Motley Rice
18  to testify as an expert?
19     MR. TAYMAN:  Objection.
20     MR. MIGLIORI:  Objection.
21     MR. TAYMAN:  Privileged and
22  confidential.
23     MR. MIGLIORI:  Directly on point.
24     SPECIAL MASTER COHEN:  I'm sorry.
25  Can you tell me -- repeat the question again.

Page 43

1      MS. MAINIGI:  Sure.
2      BY MS. MAINIGI:
3      Q.   Have you been asked by Motley Rice
4  to testify as an expert?
5      SPECIAL MASTER COHEN:  You can
6  answer that yes-or-no question.
7      MR. SHKOLNIK:  Can we -- this is
8  Hunter Shkolnik.  Can we just make a record on
9  this just so -- so we're clear.
10     The -- the issue here is the
11  limitations under Rule 26 where it's a
12  consulting expert and discovery is only allowed
13  under exceptional circumstances.  And there's
14  been no showing of any exceptional
15  circumstances here.
16     And -- and it -- you -- it's even
17  rare to allow the -- if you know about it, you
18  know, that you're allowed to ask who -- if you
19  did it or not.  Here they asked mainly because
20  I think they stumbled upon it.  Now to question
21  at deposition is a clear violation of Rule 26
22  unless they can show exceptional circumstances.
23     SPECIAL MASTER COHEN:  Well, I
24  understand it.  And I'm trying to draw lines to
25  allow no inquiry into the nature of the

Page 44

1  relationship between -- or -- or the substance
2  of the relationship between the witness and
3  counsel.
4      But this all -- the questions that
5  I'm allowing -- I'm trying to draw the line --
6  go to the extent to which this witness has
7  reason to answer, motivation to answer
8  questions in a different way, which is always
9  at issue for any witness.  And so those are the
10  lines I'm drawing.
11     I understand your objection.  And
12  I'm adhering to the rulings I've made so far.
13  So if -- if you want to try and understand what
14  I'm doing, I'm allowing inquiring only to the
15  extent that it provides a basis for an argument
16  that this witness has -- I'm trying to think of
17  the right word, and it's not coming to me,
18  but -- an affiliation or a reason to answer a
19  question a certain way.
20     MR. SHKOLNIK:  Right.
21     MR. MIGLIORI:  So note our objection
22  under Rule 26, beyond identifying who he
23  consults with.
24     BY MS. MAINIGI:
25     Q.   Mr. Wright -- well, so do you need

Page 45

1  the question read back?
2      A.   Yes, ma'am.
3      MS. MAINIGI:  I think I need the
4  question read back as well.
5      So if I may ask the court reporter
6  to do so.
7      (The record was read as requested.)
8      THE WITNESS:  No.
9      BY MS. MAINIGI:
10     Q.   You are represented here today by
11  Mr. Tayman?
12     A.   Yes.
13     Q.   When did you retain Mr. Tayman?
14     A.   Approximately three weeks ago.
15     Q.   And did anyone from the Motley Rice
16  firm introduce you to Mr. Tayman?
17     A.   No.
18     Q.   How did you obtain Mr. Tayman's
19  name?
20     A.   Through my consulting work, he was
21  recommended to me.
22     Q.   Could you explain that, please, what
23  you mean by that, through your consulting work?
24     A.   Another attorney that I work for.
25     Q.   And who is that attorney?

12 (Pages 42 - 45)

1    A.    Fields & Company or Fields, LLC.
2    Q.    And that would be Rick Fields?
3    A.    Yes, ma'am.
4    Q.    Are you aware that Mr. Fields is a
5  plaintiff s attorney involved in --
6         MR. TAYMAN:  Objection.
7         BY MS. MAINIGI:
8    Q.    -- opioid litigation?
9         MR. TAYMAN:  The extent of his
10  relationship with Mr. Fields is privileged and
11  confidential.
12        MS. MAINIGI:  If you --
13        MR. TAYMAN:  We don't control the
14  privilege.
15        MS. MAINIGI:  If you could let me
16  finish asking my question first before you
17  object.
18        Let me restate my question since you
19  interrupted me.
20        BY MS. MAINIGI:
21    Q.    Are you aware that Mr. Fields is a
22  plaintiffs attorney involved in the opioid
23  litigation, Mr. Wright?
24        MR. TAYMAN:  You can answer the
25  question.

1         THE WITNESS:  Yes.
2         BY MS. MAINIGI:
3    Q.    Are you doing consulting work for
4  Mr. Fields in the context of opioids?
5         MR. TAYMAN:  Objection.  Privileged,
6  confidential.  We don't control the privilege.
7         Mr. Fields is not here to argue the
8  privilege, which he may or may not control on
9  his own.
10        MS. MAINIGI:  I just need a "yes" or
11  "no" to that, Mr. --
12        SPECIAL MASTER COHEN:  I think that
13  was a yes-or-no question.
14        Overruled.
15        THE WITNESS:  The question again,
16  please?
17        SPECIAL MASTER COHEN:  You can
18  answer.
19        MS. MAINIGI:  I'll ask the court
20  reporter to read it back, please.
21        (The record was read as requested.)
22        THE WITNESS:  Yes.
23        BY MS. MAINIGI:
24    Q.    Are Mr. Tayman's fees being paid by
25  you or by one of the attorneys for whom you do

1  consulting work?
2         MR. TAYMAN:  Objection.  Privileged
3  and confidential.  We don't control the
4  privilege.
5         I'm directing you not to answer.
6         SPECIAL MASTER COHEN:  Overruled.
7         MS. MAINIGI:  Special Master Cohen,
8  given the prior testimony and in particular the
9  testimony that Mr. Wright has and is and may
10  continue to operate as a consultant for Summit
11  County in this very litigation, we ask that we
12  be allowed to treat him as an adverse witness
13  and therefore ask him leading questions.
14        MR. BENNETT:  For the record, this
15  is James Bennett from the Department of
16  Justice.  We would object to this witness in
17  the scope of this deposition being designated
18  as a hostile witness.  He is here to answer
19  questions in his role as a Department of
20  Justice employee within the scope of the letter
21  that he was given.
22        And therefore, we do not believe,
23  for purposes of this deposition, that his
24  testimony related to official Department of
25  Justice information should be treated as a

1  hostile witness.
2         MR. MIGLIORI:  Your Honor, this is
3  Don Migliori.  This is Don Migliori.
4         I would just simply add that we
5  vetted this issue extensively beforehand.  And
6  the issue of the prior consultancy was
7  discussed.  So I think we are best governed by
8  what you put on the record before we got
9  started, which is simply the parties can ask
10  but should avoid, to the best that they can,
11  ask -- asking leading questions.
12        There's nothing hostile about this
13  witness.  I have no more control of this
14  witness than -- than other counsel.
15        SPECIAL MASTER COHEN:  So a couple
16  of things.
17        First of all, to clarify what I said
18  earlier, the credibility of the witness is
19  always at issue for every witness.  The exhibit
20  to which a witness has relationships with
21  parties or is being paid by parties always goes
22  to credibility.  And so those questions were
23  allowed.
24        Nothing, I think, that I allowed
25  lent into the nature of the substance of the

13 (Pages 46 - 49)

Page 50

1   conversations between the witness and -- and
2   counsel.  I don't think we need to go into it
3   any further because it's already been now
4   established that those relationships exist.
5          Turning to the question at hand, of
6   course a hostile witness and an adverse are not
7   exactly the same.  But in any event, I'm going
8   to suggest that the ruling that I made earlier
9   is sufficient, and it's stays in place.  And
10  that is that, to the extent that it is
11  necessary, leading questions can be asked, but
12  they shouldn't be asked unless necessary and
13  unless shown necessary.
14         So, you know, you can ask leading
15  questions when it becomes necessary but not
16  until then.
17         MS. MAINIGI:  Thank you.
18         It's been brought to my attention
19  that the last question that was objected to and
20  the objection was overruled, you did not answer
21  that question.  Let me restate it for the
22  record.
23         BY MS. MAINIGI:
24     Q.   Mr. Wright, who is paying Mr.
25  Tayman's fees?

Page 51

1          MR. TAYMAN:  Answer the question
2   that's...
3          THE WITNESS:  Answer?
4          MR. TAYMAN:  Yes.
5          THE WITNESS:  Fields, LLC.
6          BY MS. MAINIGI:
7      Q.   And Fields, LLC, for the purpose of
8   the record, again, is Rick Fields; is that
9   right?
10     A.   Yes, ma'am.
11     Q.   Rick Fields being previously
12  identified as a plaintiffs attorney involved
13  with the opioid litigation; is that right?
14     A.   Yes, ma'am.
15         MR. MIGLIORI:  For the record, I'd
16  like it to be clear that Rick Fields is not an
17  attorney in CT 1, that is for Summit County or
18  Cuyahoga County.
19         BY MS. MAINIGI:
20     Q.   Do you have knowledge as to how much
21  per hour Mr. Tayman charges?
22     A.   Yes, ma'am.
23     Q.   And what is that amount?
24     A.   440.
25     Q.   Do you know approximately how much

Page 52

1   Mr. Fields has paid already to Mr. Tayman?
2      A.   No, ma'am.
3      Q.   Do you have an approximate estimate
4   of how many hours you spent with Mr. Tayman
5   prior to coming here today?
6      A.   Eight to ten.
7      Q.   And was that in preparation for the
8   deposition here today?
9      A.   Partially.
10     Q.   How many hours were for preparation
11  for the deposition with Mr. Tayman?
12     A.   I would say six.
13     Q.   And at a high level, how would you
14  describe the remainder of the eight to ten
15  hours?
16         MR. TAYMAN:  Objection.  Privileged
17  and confidential.
18         Don't answer the question.
19         SPECIAL MASTER COHEN:  Sustained.
20         BY MS. MAINIGI:
21     Q.   What is your hourly rate for expert
22  work in opioids for Mr. Fields?
23     A.   275 an hour.
24     Q.   Let me go ahead and turn to your
25  time at the DEA.

Page 53

1          What year, approximately, did you
2   join the DEA?
3      A.   I think I was officially hired in
4   late 1994, attended the academy in 1995.
5      Q.   What was your first role at the DEA?
6      A.   I was a diversion investigator.
7      Q.   Were you at headquarters or a field
8   office?
9      A.   I was at a field office.
10     Q.   Which field office?
11     A.   The Dallas field division.
12     Q.   At some point did you have occasion
13  to move to headquarters in the Washington, D.C.
14  area?
15     A.   Yes.
16     Q.   When was that?
17     A.   April Fool's Day 2005.
18     Q.   Memorable.
19         When you moved to headquarters in
20  2005, did you assume a new role at DEA?
21     A.   Yes.
22     Q.   What was that role?
23     A.   I was the unit chief for the
24  E-commerce section.
25     Q.   What responsibility, just at a high

14 (Pages 50 - 53)

Page 54

1   level, did the E-commerce section have?
2      A.   There were three primary
3   assignments, I -- I guess you could say.  The
4   first one was CSOS, consolidated ordering
5   system.  The other was to look at data that we
6   had contracted from a private data aggregate
7   company pertaining to prescriptions.  And the
8   third was to look at ARCOS data, automated
9   reports consolidated ordering system.
10     Q.   So in your role in the E-commerce
11  department, you had occasion to utilize ARCOS
12  data, correct?
13     A.   Yes, ma'am.
14     Q.   Did you also have occasion to
15  utilize data from SearchPoint?
16     A.   Yes, ma'am.
17     Q.   Could you describe the type of data
18  you utilized from SearchPoint?
19         MR. BENNETT:  Can we hold one
20  second.
21         Can we go off the record and speak
22  to the witness briefly.  Neither myself nor DEA
23  counsel are familiar with the database you just
24  asked.  And we don't know whether it's a law
25  enforcement sensitive database or not.

Page 55

1         MS. MAINIGI:  It --
2         MR. BENNETT:  So I need to ask Mr.
3   Wright what it is.
4         MS. MAINIGI:  I believe he testified
5   to it in some of his prior depositions.
6         MR. BENNETT:  Okay.  But I -- if I
7   could just ask him real quick what it is --
8         MS. MAINIGI:  Fine.
9         MR. BENNETT:  -- so we can make a
10  determination.
11         Go off the record?
12         MS. MAINIGI:  Just -- just --
13         MR. BENNETT:  Will that be okay?
14         MS. MAINIGI:  Just a couple minutes,
15  please.
16         MR. BENNETT:  It'll be very brief.
17         MS. MAINIGI:  Fine.
18         MR. BENNETT:  Thank you.
19         THE VIDEOGRAPHER:  We are going off
20  the record.
21         The time is 10:16.
22         (A short recess was taken.)
23         THE VIDEOGRAPHER:  We are going back
24  on the record.
25         The time is 10:19.

Page 56

1         You may proceed, Counsel.
2         MR. BENNETT:  He can answer the
3   question.
4         Thank you for the break.
5         MS. MAINIGI:  Sure.  Thank you.
6         May I ask the court reporter to
7   please repeat the question, the pending
8   question.
9         (The record was read as requested.)
10         THE WITNESS:  Can I describe the
11  data that I obtained?
12         MS. MAINIGI:  Let me -- let me
13  rephrase the question.
14         BY MS. MAINIGI:
15     Q.   Can you describe what SearchPoint
16  is?
17     A.   SearchPoint was data provided by a
18  private firm, private organization, company.
19  And it was pharmaceutical-based from pharmacies
20  that they were a data -- the company was a data
21  aggregate company.  They had access to this
22  data, and we wanted to see if it had any
23  potential use for the DEA.
24     Q.   In your role in the E-commerce unit,
25  did you end up using SearchPoint data for

Page 57

1   diversion control or anything else?
2      A.   Yes, ma'am.
3      Q.   Can you explain at a high level how
4   you utilized that data?
5      A.   This is pharmacy -- these are
6   prescriptions that were filled.  They were
7   processed.  They were filled.  They told us
8   basically what the drugs were and who was
9   prescribing those drugs.
10     Q.   Did you use the SearchPoint data in
11  conjunction with the ARCOS data?
12     A.   Yes, ma'am.
13     Q.   And can you explain that?
14     A.   ARCOS is compelled by law, and there
15  are certain entities that report.  In this
16  particular case, you would get the distributors
17  reporting on who they sold everything to.
18  Example, pharmacies.  My spectrum or look
19  terminates right there.  Don't know what
20  happens to it.
21         SearchPoint supplemented that.  Now
22  I see what's happening at the pharmacy level as
23  far as they acquired a certain amount, now how
24  do they -- question of medical necessity or
25  appropriate prescribing, however you want to

15 (Pages 54 - 57)

Page 58

1  look at it, you know, what -- what is the
2  activity occurring there.
3      Q.   And so what type -- what does
4  SearchPoint allow you to do further beyond
5  ARCOS?  Identify particular pharmacies?
6      A.   Not necessarily, but yes.
7      Q.   And how did that benefit your
8  efforts at diversion control?
9      A.   Because I could see certain
10  prescriptions, we could see if there were
11  prescriptions that were very questionable in
12  both the quantity that was being prescribed, in
13  other words, the amount; if there were
14  inordinate amount of prescriptions coming in
15  for the same product; if there were particular
16  doctors, practitioners who were continuously
17  prescribing.
18      We were looking for anomalies.  And
19  that is it.
20      Q.   And were you successful in use of
21  the SearchPoint database in looking for
22  anomalies?
23      A.   Yes, ma'am.
24      Q.   Were there any other databases or
25  types of data, besides ARCOS or SearchPoint,

Page 59

1  that you, on a regular basis, utilized in the
2  E-commerce unit?
3      A.   You know, we were always looking for
4  any source.  I can tell you this.  The Google
5  maps, contrary -- especially in those days.
6  But yeah, Google maps was a -- a -- a resource.
7      And I couldn't tell you all the
8  other little things that we tried in places.
9  But it was just anything that might be
10  beneficial, prudent to us to use.
11      Q.   Okay.  Now, while you were in the
12  E-commerce unit, did you report to Michael
13  Mapes?
14      A.   Yes, ma'am.
15      Q.   And do you recall what Mr. Mapes's
16  role was while you were reporting to him in
17  E-commerce?
18      A.   Yes, ma'am.
19      Q.   What was that?
20      A.   He was my direct supervisor.
21      Q.   Do you remember his title or his
22  area of responsibility?
23      A.   He was the section chief.  He
24  operated that whole arena.  I was his unit
25  chief or I guess you could say his next in --

Page 60

1  in line.
2      Q.   At some point did you have occasion
3  to work with Mr. Mapes on distributor --
4  distributor briefings or a distributor
5  initiative?
6      A.   Yes, ma'am.
7      Q.   And that was starting towards the
8  end of 2005; is that right?
9      A.   Yes, ma'am.
10      Q.   Now, at some point -- just to close
11  the loop on -- on your role, at some point you
12  moved from the E-commerce unit to the
13  regulatory unit; is that right?
14      A.   In a long about way, yes, ma'am.
15      Q.   What year, approximately, did you
16  move?
17      A.   About 2007.
18      Q.   Mr. Mapes stayed where he was
19  though?
20      A.   No, ma'am.
21      Q.   Where did Mr. Mapes go?
22      A.   He went to the regulatory.
23      Q.   So you followed Mr. Mapes?
24      A.   No, ma'am.  When I got there, he had
25  already retired.

Page 61

1      Q.   Now, your -- could you describe at a
2  high level what your role was in the regulatory
3  unit?
4      A.   Oh, boy.  I was primarily charged
5  with a -- a -- a couple of things, I guess.
6  You know, I'm trying to dig off the cobwebs
7  here.
8      I was to continue the work on the
9  distributor briefing.  And then at the same
10  time I was charged to start coordinating within
11  DEA a rewrite and revision of the DI manual --
12      Q.   And --
13      A.   -- the diversion investigator's
14  manual.
15      Q.   And did you complete the rewrite of
16  the diversion investigator's manual?
17      A.   No, ma'am.
18      Q.   Did that get passed on to somebody
19  else?
20      A.   Yes, ma'am.
21      Q.   And who is that?
22      A.   I have no idea.
23      Q.   And is that because -- did you not
24  complete the diversion investigator manual
25  because you moved on to a different role?

16 (Pages 58 - 61)

Page 62

1      A.   I like that excuse.  Yes, ma'am.
2      Q.   And the role that you moved on to
3  was what, Mr. Wright?
4      A.   I became the unit chief of the
5  targeting and analysis section.
6      Q.   And at a high level, what were your
7  responsibilities in that unit?
8      A.   I became the ARCOS person.  This is
9  the output side of ARCOS.  It was my
10  responsibility to bring the ARCOS program up to
11  date, more interactive with field offices,
12  conduct training of the ARCOS to field offices
13  and new recruits, to work with the field
14  offices in their investigations and support
15  them to the best of my ability in what ARCOS
16  data could provide, and then be on -- to
17  consult with the chief counsel's office or U.S.
18  Attorney's Offices where necessary and they
19  need that -- that information.
20      MS. MAINIGI:  If there's anyone on
21  the phone -- I think there was someone on the
22  phone that was just coughing.  If you could put
23  yourself on mute right now, that would be --
24  that would be helpful.
25      BY MS. MAINIGI:

Page 63

1      Q.   We talked earlier about your prior
2  testimony against H.D. Smith.
3      Do you recall that?
4      A.   Yes, ma'am.
5      MS. MAINIGI:  Okay.  I'm going to
6  just put -- well, actually, I've already put in
7  front of you, I think -- we're going to mark as
8  Exhibit 4 the deposition transcript that I
9  believe you indicated you read three quarters
10  of yesterday?
11      THE WITNESS:  Yes.
12      MR. MIGLIORI:  Is there an Exhibit
13  3, or you haven't gotten to it yet?
14      MS. MAINIGI:  Excellent question.
15  We have skipped Exhibit 3 for now.
16      (Deposition Exhibit 4 was marked for
17  identification.)
18      MS. MAINIGI:  Thank you for staying
19  on top of that.  I'm not good at that.
20      MR. MIGLIORI:  I have the best uses.
21      BY MS. MAINIGI:
22      Q.   And for the record, this is a
23  deposition transcript from 2011 in U.S. versus
24  $463,000 and some change, correct?
25      A.   Yes, ma'am.

Page 64

1      MS. MAINIGI:  And I'm going to mark
2  as Exhibit 5 -- it's already in front of you,
3  Mr. Wright -- the trial transcript from that
4  same matter.
5      (Deposition Exhibit 5 was marked for
6  identification.)
7      MS. MAINIGI:  For the purpose of the
8  record, Wright 4 is HDS_MDL 00002462.
9      And for the purpose of the record,
10  Wright 5 is HDS MDL 00005372.
11      MR. SHKOLNIK:  So I'm clear, 3 has
12  not been used, right?
13      MS. MAINIGI:  Correct.
14      BY MS. MAINIGI:
15      Q.   And you have not had occasion to
16  review your trial testimony; is that right?
17      A.   No, ma'am.
18      Q.   Was there any particular reason you
19  reviewed the deposition testimony but not the
20  trial testimony?
21      A.   It was not a good experience.  I was
22  uncomfortable.
23      Q.   At the trial?
24      A.   No, ma'am.  At the deposition.
25      Q.   And so you wanted to review that

Page 65

1  again?
2      A.   Yes, ma'am.
3      Q.   Okay.  But you were more comfortable
4  at trial?
5      A.   Yes, ma'am.
6      Q.   With the testimony you provided at
7  trial?
8      MR. MIGLIORI:  Objection.  Form.
9      MR. SHKOLNIK:  Objection.  Form.
10      THE WITNESS:  The best of my
11  recollection, I was just -- it was okay.
12      BY MS. MAINIGI:
13      Q.   Do you know what I mean by the
14  phrase "closed system of distribution"?
15      A.   Yes, ma'am.
16      Q.   What is that?  Can you define it?
17      A.   Where to start.
18      Q.   Well, let -- let me try to help you.
19      If we're talking in the context of
20  controlled substances, would I be correct in
21  saying that a closed system would mean that
22  every entity in the production or sale of
23  controlled substances has certain
24  responsibilities and privileges?
25      A.   Yes, ma'am.

17 (Pages 62 - 65)

Page 66

1    Q.    And the controlled system involved
2  in the production or sale of controlled
3  substances, would that system include
4  manufacturers?
5    A.    Yes, ma'am.
6    Q.    Would it include wholesale
7  distributors?
8    A.    Yes, ma'am.
9    Q.    Would it include wholesale
10  distributors?
11    A.    Yes, ma'am.
12    Q.    Would it include pharmacies?
13    A.    Yes, ma'am.
14    Q.    And would it include prescribers?
15    A.    Yes, ma'am.
16    Q.    Is it fair to say that, to a certain
17  extent, each one of those participants doesn't
18  have complete visibility into what the other
19  participants in the process are doing?
20        MR. MIGLIORI:  Objection to form.
21        THE WITNESS:  I'm a little -- I'm
22  holding back on what your answer -- answering.
23  Because I don't understand your concept of
24  "complete."
25        BY MS. MAINIGI:

Page 67

1    Q.    Okay.  Well, "complete" means total.
2  So let me ask the question a slightly different
3  way.
4        Is it fair to say that, in -- in
5  this closed system, each participant in the
6  process -- so you identified manufacturers,
7  wholesalers, pharmacies and prescribers -- each
8  one of those categories of participants does
9  not have complete or total visibility into what
10  the other participants in the process are
11  doing?
12        MR. MIGLIORI:  Objection.  Form.
13        MR. TAYMAN:  Objection.
14        THE WITNESS:  Yes.
15        BY MS. MAINIGI:
16    Q.    So a manufacturer wouldn't have
17  visibility into what happens at the
18  doctor-patient level, for example?
19        MR. MIGLIORI:  Objection.  Form.
20        MR. SHKOLNIK:  Objection.
21        THE WITNESS:  Would not?
22        BY MS. MAINIGI:
23    Q.    Would not.
24    A.    Yes, they would.
25    Q.    Your testimony is that a

Page 68

1  manufacturer would have visibility at the
2  doctor-patient level?
3    A.    Under certain circumstances.
4  Because the manufacturers could be ordering
5  particular products and obtain them directly
6  from a manufacturer.
7        There were also programs where they
8  got rebates and other things like this.  And so
9  they also knew.  There were certain limited
10  circumstances in which manufacturer community
11  could -- community could see downstream.  It's
12  limited.
13    Q.    Limited circumstances?
14    A.    Yes, ma'am.
15    Q.    Okay.  And would distributors have
16  visibility or know about the doctor-patient
17  relationships?
18        MR. SHKOLNIK:  Objection to form.
19        MR. MIGLIORI:  Objection to form.
20        THE WITNESS:  Not in totality.
21        BY MS. MAINIGI:
22    Q.    So to be clear, a distributor would
23  not know anything about the doctor-patient
24  relationship, correct?
25        MR. MIGLIORI:  Objection.

Page 69

1        THE WITNESS:  On a specific
2  doctor-patient relationship, no.
3        MS. McCLURE:  Can we go off the
4  record for a minute.  The live feed stopped
5  working a few questions ago.
6        THE VIDEOGRAPHER:  We are going off
7  the record.
8        This is the end of Media Unit No. 1.
9        The time is 10:37.
10        (A short recess was taken.)
11        THE VIDEOGRAPHER:  We are going back
12  on the record.
13        This is the beginning of Media Unit
14  2.
15        The time is 10:48.
16        You may proceed, Counsel.
17        BY MS. MAINIGI:
18    Q.    Mr. Wright, you recall mentioning
19  earlier that you were transferred to DEA
20  headquarters around 2005, I think April Fool's
21  Day 2005, right?
22    A.    Yes.
23    Q.    Now, at the time that you moved over
24  to DEA headquarters, was there a system in
25  place called the Excessive Purchase Program?

18 (Pages 66 - 69)

Page 70

1    A.  Yes.
2    Q.  And under the -- well, can you
3  describe the Excessive Purchase Program to me?
4    A.  They were reports submitted by
5  distributors, mostly, would -- in which they
6  reported -- they set their own benchmark, and
7  they reported what they -- excessive sales.
8    Q.  So is it -- is it -- fair to say --
9  now, when I use the word "registrant,"
10  distributors are one type of registrant; is
11  that right?
12    A.  Yes, ma'am.
13    Q.  Okay.  So I may end up using that
14  term once in a while interchangeably.
15      Is that okay with you?
16    A.  Yes, ma'am.
17    Q.  Okay.  So if I'm understanding you
18  correctly, is it fair to say that a distributor
19  or a registrant would submit paper computer
20  printouts listing controlled substance orders
21  that the distributor or registrant had
22  identified as excessive?
23      MR. MIGLIORI:  Object to form.
24      THE WITNESS:  Yes, ma'am.
25      BY MS. MAINIGI:

Page 71

1    Q.  And as I think you alluded to, is it
2  fair to say that each individual registrant or
3  distributor set their own threshold defining
4  what was excessive?
5    A.  Yes, ma'am.
6    Q.  DEA did not dictate the criteria,
7  did they, for identifying excessive purchases?
8    A.  In my experience, no.
9    Q.  Now, to your knowledge, this
10  Excessive Purchase Program, was that in place
11  since the time you arrived at DEA in 1995
12  through at least 2005?
13    A.  Yes, ma'am.
14    Q.  Okay.  And when you got to -- now,
15  let -- let me back up.
16      When you were at the Dallas field
17  office of the DEA prior to your arrival in --
18  at headquarters in 2005, did you sometimes
19  receive these Excessive Purchase Reports from
20  registrants?
21    A.  Yes, ma'am.
22    Q.  When you were at headquarters, did
23  you also receive these Excessive Purchase
24  Reports from registrants?
25    A.  No, ma'am.

Page 72

1    Q.  They were primarily sent to the
2  various field offices?
3    A.  Yes, ma'am.
4    Q.  Okay.  And prior -- through 2005,
5  did you understand that it was the standard
6  practice in the industry to submit Excessive
7  Purchase Reports while continuing to ship
8  product?
9      MR. MIGLIORI:  Objection to form.
10      THE WITNESS:  Yes, ma'am.
11      BY MS. MAINIGI:
12    Q.  Now, the Excessive Purchase System
13  had been blessed by various DEA offices; is
14  that right?
15      MR. BENNETT:  Objection.  Form.
16      THE WITNESS:  Yes, ma'am.
17      BY MS. MAINIGI:
18    Q.  And is it fair to say that even
19  headquarters blessed some of the Excessive
20  Purchase Programs that various registrants had
21  in place?
22    A.  I do --
23      MR. BENNETT:  Objection --
24      THE WITNESS:  -- not know.
25      MR. BENNETT:  Objection.  Form.

Page 73

1      THE WITNESS:  I do not know.
2      BY MS. MAINIGI:
3    Q.  Let -- let me refresh your
4  recollection, if -- if I could.
5      Can I ask you to turn to your
6  deposition transcript.  So that is Exhibit 4.
7  And if you could turn to Page 42, lines 21
8  through 24.
9      MR. SHKOLNIK:  Objection to form.
10  Refreshing his recollection.
11      THE REPORTER:  I'm sorry.  I didn't
12  hear you.
13      MR. SHKOLNIK:  Objection to form.
14  Refreshing his recollection.
15      BY MS. MAINIGI:
16    Q.  Now, you testified earlier that you
17  recall giving the testimony in this H.D. Smith
18  case, correct?
19      Is that right, Mr. Wright?
20    A.  Okay.  I have two questions -- I
21  don't have questions.  I've two questions from
22  you.  So let's kind of start -- you told me to
23  look at Page --
24    Q.  Well --
25    A.  -- 42.

19 (Pages 70 - 73)

Page 74

1    Q.  Yes.  Take a look at Page -- why
2  don't -- let's take this one at a time.
3         Why don't you take a look at Page
4  42, lines 21 through 24.
5    A.  21 through -- where does 42
6  continue?  Oh, okay.  Thank you.  Okay.
7    BY MS. MAINIGI:
8    Q.  So in your prior testimony -- we'll
9  -- we'll just go a little faster through this.
10        In your prior testimony, you
11  testified that:  "The DEA, some offices blessed
12  these systems.  I mean they entered into
13  agreements and headquarters unfortunately
14  blessed some of these systems."
15        Did I read that exactly?
16    MR. MIGLIORI:  Objection for
17  completeness.  You didn't read the whole answer
18  nor the question.  Improper.
19    THE WITNESS:  Yes.  That is what I
20  testified.
21    BY MS. MAINIGI:
22    Q.  Was that testimony accurate at the
23  time?
24    A.  Yes, ma'am.
25    MR. SHKOLNIK:  Objection.

Page 75

1    BY MS. MAINIGI:
2    Q.  And it's fair to say that the
3  Excessive Purchase Reports were the accepted
4  practice by DEA for many years; is that right?
5    MR. BENNETT:  Objection.  Form.
6        Go ahead.
7    THE WITNESS:  As far as my
8  experience of dealing with them from when I
9  came on, yes, ma'am.
10    BY MS. MAINIGI:
11    Q.  I think, as you have testified
12  previously, the Excessive Purchase System, was
13  that an attempt to make the Suspicious Order
14  Reporting System or suspicious orders
15  manageable by everybody?
16    MR. BENNETT:  Objection.  Form.
17    THE WITNESS:  I don't know.
18    BY MS. MAINIGI:
19    Q.  Take a look at your deposition at
20  41 -- Page 41, please.
21    A.  Yes, ma'am.
22    Q.  In your deposition, did you say --
23  the -- the question was asked of you:  "Is it
24  fair to say though that that's what the
25  regulation required it?  Put the burden on -- "

Page 76

1         Your answer was:  "No, sir.  Well,
2  the burden, yes.  It was an attempt to make the
3  Suspicious Order Reporting System or suspicious
4  orders manageable by everybody."
5    Is that accurate?
6    A.  It's a record of what I said, yes.
7    Q.  Okay.  So is it fair to say that you
8  did testify in 2011 that the Excessive Purchase
9  System was an attempt to make the Suspicious
10  Order Reporting System or suspicious orders
11  managed by everybody?
12    MR. SHKOLNIK:  Objection.
13    MR. BENNETT:  Objection.
14    THE WITNESS:  It's what I said, yes.
15    BY MS. MAINIGI:
16    Q.  Now, you were also aware, were you
17  not, Mr. Wright, that some registrants or
18  distributors manually reviewed the Excessive
19  Order Reports to determine whether any activity
20  during that month was suspicious; is that
21  right?
22    A.  They could have.  I -- specifically
23  I don't know.  I -- I wouldn't know every
24  registrant's practices.
25    Q.  You were generally aware though some

Page 77

1  registrants did do that though; is that right?
2    A.  Yes.
3    Q.  And there was not anything improper
4  about that practice, was there?
5    MR. BENNETT:  Objection.  Form.
6    THE WITNESS:  No.
7    BY MS. MAINIGI:
8    Q.  Now, not everyone called their
9  Excessive Purchase Reports by the name
10  "Excessive Purchase Reports"; is that right?
11    A.  I don't know.
12    Q.  Okay.  Did you get reports from
13  different registrants; they might have called
14  those reports different things?
15    A.  All I know is I got a stack of
16  paperwork.  And I was assigned to go through it
17  periodically.
18    Q.  Was there a certain way that
19  registrants or distributors had to send
20  Excessive Purchase Reports to the field
21  offices?
22    A.  Only in paper.
23    Q.  They had to send them in paper.
24        And did they send them usually on a
25  monthly basis?

20 (Pages 74 - 77)

1     MR. SHKOLNIK:  Objection.  Form.
2     THE WITNESS:  Yes.
3     BY MS. MAINIGI:
4     Q.   Was it a set time of month that
5   everybody had to send their reports in by?
6     A.   I don't believe so.
7     Q.   So different registrants may send in
8   their reports on a monthly basis, but they
9   might be spread throughout the month; is that
10  fair?
11    A.   Yes.
12       MS. MAINIGI:  I'm going to mark
13  Wright Exhibit 26.
14       I'll put this in front of you.
15       I -- we didn't print out that many
16  copies.  It's just one example James.
17       (Deposition Exhibit 26 was marked
18  for identification.)
19       MS. MAINIGI:  I'm not going to ask
20  any questions of detail on it.
21       MR. BENNETT:  And this isn't
22  something that you sent previously as an
23  exhibit, right?
24       MS. MAINIGI:  I don't know.
25       MR. BENNETT:  Okay.

1     BY MS. MAINIGI:
2     Q.   Mr. Wright, I -- I'm not going to
3   ask you any detailed questions about this.  I
4   just wanted to show you an example of an
5   Excessive -- one of the Excessive Order Reports
6   and just confirm that this is the form that
7   these Excessive Order Reports would take.
8       MR. SHKOLNIK:  Objection.  Form.
9   Objection to form.
10       And you're referring to it as
11  "Excessive Purchase" --
12       MS. MAINIGI:  Hunter, we don't --
13  Hunter, we don't need your --
14       MR. SHKOLNIK:  No, no.  You can't --
15       MS. MAINIGI:  Speaking objections.
16       MR. SHKOLNIK:  You're -- you're
17  calling it something that it's not.  And so the
18  record's clear, it says it's a ILR --
19       MS. MAINIGI:  Okay.
20       MR. SHKOLNIK:  -- so the record's
21  clear.
22       MS. MAINIGI:  Thank you.
23       BY MS. MAINIGI:
24    Q.   Mr. Wright, does it look like --
25    A.   After that, can I have the question

1   repeated, please.
2     Q.   Sure.  Let me just restate the
3   question.
4       Is it -- does what I put in front of
5   you as Exhibit 26 look like an example of one
6   of the Excessive Purchase Reports that we were
7   just speaking of?
8     A.   It's been so long since I saw one of
9   those, I don't know.
10    Q.   Okay.  All right.  You can set that
11  aside.
12       Now, were there particular diversion
13  investigators that were assigned to particular
14  registrants to receive their Excessive Order
15  Reports?
16    A.   No, ma'am.
17    Q.   Were you aware that, in addition to
18  submitting Excessive Purchase Reports, some
19  registrants -- distribution center employees
20  called their local DEA offices to seek guidance
21  from time to time on certain particular orders
22  before the orders were shipped?
23       MR. BENNETT:  Objection.  Form.
24       THE WITNESS:  Yes.
25       BY MS. MAINIGI:

1     Q.   Did you get called from time to time
2   when you were a DEA investigator seeking advice
3   on whether to ship an order or not?
4     A.   Yes.
5     Q.   And would you try to work through
6   the question collaboratively with the
7   registrant's employee who was calling you?
8     A.   Under the guidance of my supervisor,
9   yes.
10       MS. MAINIGI:  I'm going to put in
11  front of you Wright Exhibit 9.
12       (Deposition Exhibit 9 was marked for
13  identification.)
14       MR. BENNETT:  You know, again, I
15  don't think this was a document that you guys
16  provided to us in advance of the deposition.
17  So if I might please have a minute.
18       MS. MAINIGI:  Sure.
19       Can you let him look at his copy,
20  and you can look at the one you have so that we
21  can keep things moving?
22       BY MS. MAINIGI:
23    Q.   Mr. Wright, Exhibit 9 is a
24  regulatory agency contact form of Cardinal
25  Health.  And it reflects contact with a

21 (Pages 78 - 81)

Page 82

1  diversion investigator named Donna Dombarian.
2      Do you know this diversion
3  investigator?
4      Are you familiar with the name?
5      A.  I have no recollection.
6      Q.  Take a look, if you would, at what's
7  described in No. 6, please.
8      MR. SHKOLNIK:  Note my objection for
9  the record.  This is outside the scope of the
10  topics.  It's not his -- something he did.
11      BY MS. MAINIGI:
12      Q.  Having read No. 6, does that look
13  like an example of the types of contacts that a
14  diversion investigator might have with an
15  employee of a distributor seeking guidance on
16  particular orders before orders were shipped?
17      MR. BENNETT:  Object to the form.
18      MR. SHKOLNIK:  Objection.
19      THE WITNESS:  Yes.
20      BY MS. MAINIGI:
21      Q.  Now, sometime after 2005, is it fair
22  to say that the DEA started wanting to move
23  away from the Excessive Purchase System?
24      MR. MIGLIORI:  Objection.  Form.
25  And I think to the scope of talking about

Page 83

1  "wanting."
2      THE WITNESS:  No.
3      BY MS. MAINIGI:
4      Q.  No.  Okay.
5      Is it fair to say that sometime
6  after 2005 DEA wanted registrants to start
7  moving toward a system other than the Excessive
8  Purchase System?
9      MR. BENNETT:  Objection to the form.
10      MR. MIGLIORI:  Scope.
11      THE WITNESS:  May I please have that
12  read back.
13      (The record was read as requested.)
14      THE WITNESS:  Yes.
15      BY MS. MAINIGI:
16      Q.  The volume of paper that was being
17  submitted through the Excessive Purchase System
18  became a -- a -- a very huge burden; is that
19  right?
20      MR. BENNETT:  Objection.  Form.
21  You can answer.
22      THE WITNESS:  I know what hit my
23  desk, and it was a -- a lot.
24      BY MS. MAINIGI:
25      Q.  It was a huge burden?

Page 84

1      MR. MIGLIORI:  Objection.
2      THE WITNESS:  There was a lot of
3  paper.  It took a lot of time to go through it.
4      BY MS. MAINIGI:
5      Q.  And I would imagine that it was
6  sometimes difficult to keep up with review of
7  all of the paper; is that fair?
8      A.  Yes.
9      Q.  And I believe you testified before,
10  in your personal experience reviewing these
11  Excessive Sales Reports, that half to
12  three-quarters of them sometimes went into the
13  trash can; is that right?
14      MR. BENNETT:  Do you have a page and
15  line in the testimony you're talking about,
16  please?
17      MS. MAINIGI:  I can give you one.
18  But I'm just asking if he remembers that.
19      MR. BENNETT:  Well, you're -- you
20  can answer her question if you can.
21      THE WITNESS:  Yes.
22      BY MS. MAINIGI:
23      Q.  Is it fair to say then that the
24  Excessive Purchase Reports were not very useful
25  to DEA because it was difficult to distinguish

Page 85

1  between orders that were just high in number,
2  exceeded a threshold, versus orders that were
3  intended for diversion or illegal or the
4  illicit market?
5      MR. BENNETT:  Objection.  Form.
6      THE WITNESS:  I don't know if I can
7  do this.
8      Can you qualify your question?
9      MS. MAINIGI:  Sure.  That was a
10  poorly-stated question.  Let me -- let me back
11  up.
12      BY MS. MAINIGI:
13      Q.  The Excessive Order Reports, usually
14  on a distributor-by-distributor basis, set a
15  particular threshold; is that fair?
16      A.  Okay.
17      Q.  Is that right?
18      A.  Yes.
19      Q.  Okay.  And every -- every
20  distributor or registrant had the ability to
21  set their own threshold, correct?
22      A.  Yes.
23      Q.  So the materials you got were
24  sometimes over-inclusive; is that right?
25      MR. BENNETT:  Objection to form.

22 (Pages 82 - 85)

Page 86

1     THE WITNESS: "Over-inclusive."
2     BY MS. MAINIGI:
3     Q.   The materials you got were basically
4  evening above a certain threshold; is that
5  their?
6     MR. MIGLIORI:  Objection.
7     THE WITNESS:  Yes.
8     BY MS. MAINIGI:
9     Q.   And that didn't allow you sometimes,
10  as a diversion investigator, to necessarily
11  distinguish out quickly the orders that might
12  have been placed for diversion reasons; is that
13  fair?
14     A.   No, ma'am.
15     Q.   Okay.  After you got to
16  headquarters -- I think we alluded to this
17  earlier -- you began working on distributor
18  briefings; is that right?
19     A.   Yes, ma'am.
20     Q.   And when I use the term "distributor
21  briefing," do you understand it to be
22  essentially the same as the distributor
23  initiative?
24     A.   Yes, ma'am.
25     Q.   Did your supervisor, Mr. Mapes, come

Page 87

1  up with the idea for the distributor briefings?
2     A.   I would say he initiated it, yes.
3     Q.   Now, when you transferred back to
4  headquarters -- or to headquarters in 2005, the
5  DEA was dealing with the continuing problem of
6  illicit Internet trafficking of controlled
7  substances; is that right?
8     A.   Yes.
9     Q.   And do you understand that to mean,
10  in shorthand, the problem of Internet
11  pharmacies?
12     MR. MIGLIORI:  Objection.
13     THE WITNESS:  Yes.
14     BY MS. MAINIGI:
15     Q.   Can you give us a brief explanation
16  of how controlled substances were being
17  illicitly trafficked through Internet
18  pharmacies in that time period, meaning around
19  2005?
20     A.   The simplest explanation is a
21  patient would get on the Internet, place an
22  order; a doctor would fill it; it would be
23  assigned to a pharmacy; the pharmacy would fill
24  it and mail it, FedEx it, UPS it to the
25  patient.

Page 88

1     Q.   Okay.  And where was the
2  prescription coming from?
3     A.   Generated online.
4     Q.   Was there a -- to your knowledge,
5  generally, with these Internet pharmacies was
6  there any sort of doctor-patient interaction or
7  evaluation of medical need?
8     MR. SHKOLNIK:  Objection to form.
9     THE WITNESS:  At the beginning,
10  nonexistent.  Assimilating -- eventually
11  attempting to assimilate or take the appearance
12  of a doctor-patient relationship.
13     BY MS. MAINIGI:
14     Q.   Was there an evolution at some
15  point?
16     A.   Evolution, no.  Morphing, chameleon.
17  "Chameleon" meaning changing only to.
18     Q.   And -- and what did it change to,
19  the Internet pharmacies, or the method you
20  described?
21     A.   Well, eventually that led up to the
22  Ryan -- Ryan Haight Act, which made it illegal,
23  which we had fought for.
24     Q.   And approximately what year was the
25  Ryan Haight Act; do you recall?

Page 89

1     A.   No, ma'am.
2     Q.   Now, when you arrived -- or shortly
3  after you arrived at the DEA, would it be fair
4  to say that Internet pharmacies were
5  overwhelming the DEA and exhausting field
6  resources?
7     A.   They were taking up a great deal of
8  our time.
9     Q.   And is one of the reasons for that,
10  that every time the DEA was successful in
11  taking out an Internet pharmacy, within a few
12  weeks it was replaced by another Internet
13  pharmacy?
14     MR. SHKOLNIK:  Objection to form.
15     THE WITNESS:  Yes.
16     BY MS. MAINIGI:
17     Q.   And by 2005, in your mind, as I
18  think you previously testified, the biggest
19  problem facing the DEA was, in fact, Internet
20  pharmacies.
21     A.   Yes.
22     Q.   Recognizing the problem of Internet
23  pharmacies, did you and Mr. Mapes develop a
24  PowerPoint presentation for the distributor
25  briefings that addressed the problem of

23 (Pages 86 - 89)

Page 90

1  Internet pharmacies?
2      A.   Yes.
3      Q.    And did you get approval for your
4  PowerPoint presentation from the office of
5  chief counsel at the DEA?
6          MR. BENNETT:  Objection.
7          Do not disclose any confidential
8  attorney-client communications that you are
9  aware of between chief counsel and the office
10  of diversion.
11          MS. MAINIGI:  I'm just looking for
12  --
13          MR. BENNETT:  You may answer the
14  question.
15          MS. MAINIGI:  -- a "yes" or "no."
16          BY MS. MAINIGI:
17      Q.   Just "yes" or "no."
18      A.   Yes.
19      Q.    Okay.  Did you get approval from Mr.
20  Rannazzisi?
21      A.   I specifically, no.  But yes.
22      Q.    You understood Mr. Rannazzisi had
23  given his approval?
24      A.   Yes.
25      Q.    Now, I imagine the development

Page 91

1  process for the PowerPoint took a few months to
2  put together; is that fair?
3      A.   Yes.
4      Q.    And then, after the presentation was
5  put together and approved, you and Mr. Mapes
6  began giving briefings to individual
7  distributors; is that right?
8      A.   Yes.
9      Q.    And as I recall you testifying, you
10  began the briefings in the latter part of 2005
11  with the big three distributors, with McKesson,
12  AmerisourceBergen and Cardinal Health; is that
13  right?
14      A.   We chose the largest distributors
15  because we -- they had the biggest market
16  share, wanted to get to the issue quickly.
17          MS. MAINIGI:  I'm just going to show
18  you, mark for the record, some of the
19  distributor briefings that I believe you
20  presented in that time period.
21          Wright Exhibit 10 is the briefing --
22          MR. BENNETT:  Hang on one second,
23  Counsel, please.
24          MS. MAINIGI:  Sure.
25          Yeah.  That's not in his binder,

Page 92

1  James.  So you just -- for the new exhibits,
2  you just need to let him have a copy.
3          MR. BENNETT:  I understand.
4          (Deposition Exhibit 10 was marked
5  for identification.)
6          BY MS. MAINIGI:
7      Q.    Does Exhibit 10 appear to be a copy
8  of the presentation that was provided to ABDC?
9      A.   To who?
10      Q.   To AmerisourceBergen.
11      A.   Yes.
12      Q.    Did you -- do you recall personally
13  attending this briefing?
14      A.   Yes.
15      Q.    And the title of the PowerPoint
16  presentation is what, Mr. Wright?
17      A.   "Internet Pharmacy Data."
18      Q.    And did you present essentially the
19  same presentation to all the distributors other
20  than the distributor-specific data?
21      A.   Yes.
22          MS. MAINIGI:  I'm going to put
23  Wright Exhibit 11 in front of you.
24          (Deposition Exhibit 11 was marked
25  for identification.)

Page 93

1          BY MS. MAINIGI:
2      Q.    And the question I'm going to ask
3  you, after you've had a chance to take a look,
4  is whether that is the distributor briefing
5  that you provided to McKesson.
6      A.   Yes.
7      Q.    And just to confirm, that is --
8  Exhibit 11 is -- appears to be the presentation
9  that you provided to McKesson?
10      A.   Yes.
11      Q.    And did you attend that particular
12  briefing?
13      A.   I believe I did, yes.
14      Q.    And both of these briefings, the
15  ABDC briefing and the McKesson briefing, were
16  those also attend by Mr. Mapes?
17      A.   The very first two briefings were
18  done completely by Mr. Mapes.  I was only an
19  attendee and a sense -- to get the flow and the
20  continuity, understanding.  After that, we
21  started sharing.  And then finally I did all of
22  it.
23      Q.    I see.  That's helpful.  Thank you.
24          So the ABDC briefing that is Exhibit
25  10, do you think Mr. Mapes provided that

24 (Pages 90 - 93)

Page 94

1    briefing to ABDC and you attended?
2        A.    Ma'am, I -- I really would not know
3    who gave the first one.  My recollection -- I
4    know that I attend every one.  I attended.
5    Whether I presented or not or Mr. Mapes
6    presented, unless I could see it in writing, I
7    don't know, especially in the very beginning.
8        Q.    Understood.  Okay.
9            So you attended, along with
10   Mr. Mapes, most of the early ones; is that
11   fair?
12       A.    Yes, ma'am.
13       Q.    And which one of you two actually
14   provided the briefing, between the two of you,
15   you don't recall.
16       A.    Yes, ma'am.
17           MS. MAINIGI:  Okay.  I'm going to
18   put in front of you Wright Exhibit 12.
19           (Deposition Exhibit 12 was marked
20   for identification.)
21           BY MS. MAINIGI:
22       Q.    Now, Wright Exhibit 12, is that the
23   -- does that appear to you to be the
24   presentation that was provided to Cardinal
25   Health?

Page 95

1        A.    It appears so.
2        Q.    Okay.  Now, if you take a look at
3    the cover memo, the -- there was a memo written
4    by Mr. Mapes to Mr. Rannazzisi.
5            Do you see that?
6        A.    On 12?
7        Q.    Yes.
8        A.    Yes, ma'am.
9        Q.    If you'd take a look at -- read to
10   yourself the first paragraph, please.
11           My question to you is going to be --
12   or is:  Does it appear that you did not attend
13   this particular distributor briefing to
14   Cardinal Health?
15       A.    It appears so.
16       Q.    Who does it appear attended this
17   particular briefing to Cardinal Health?
18       A.    Michael -- Michael Mapes, Vickie
19   Seeger from Office of Diversion, Mr. Trant from
20   chief counsel, and then two people from --
21   Steve Reardon and Robert Giacalone from
22   Cardinal.
23       Q.    Now, for each one of these
24   briefings, you would -- would you go through
25   the PowerPoint presentation?

Page 96

1        A.    I most certainly did.
2        Q.    Okay.  And you saw Mr. Mapes doing
3    the same thing when he did the briefing?
4        A.    Yes.
5        Q.    And then some -- time after the
6    PowerPoint presentation, would you present to
7    the distributor data that you had analyzed?
8        A.    Could you clarify data that I had
9    analyzed.
10       Q.    Sure.
11           The registrants own data, either
12   through ARCOS or some other source, that you
13   had analyzed for the purpose of the briefing.
14           Did you do that?
15       A.    Yes, ma'am.
16       Q.    Okay.  And can you describe the
17   process you went through to do that, at a high
18   level, Mr. Wright?
19       A.    I was basically looking for, you
20   know, outliers, anomalies -- and I will put
21   these two adjectives on this thing:  very
22   apparent, obviously out of the norm.
23       Q.    And you looked for these outliers
24   and the anomalies in the registrants' ARCOS
25   data?

Page 97

1        A.    Yes.
2        Q.    Did you use any other resource to
3    find these outliers and anomalies?
4        A.    Not to my recollection.
5        Q.    And I think you said earlier that
6    you continued to give these distributor
7    initiative briefings to registrants until you
8    switched over to the regulatory group?
9        A.    Yes.
10       Q.    Did you continue giving briefings of
11   this type to registrants after you switched
12   over to the regulatory group?
13       A.    Repeat, please.
14       Q.    Sure.
15           After you moved over to the
16   regulatory group in 2007 or 2008, did you
17   continue to give distributor initiative
18   briefings to registrants?
19       A.    Yes.
20       Q.    And so you continued providing these
21   distributor initiative briefings until
22   approximately what time period?
23       A.    Approximately '10 or -- '11 or --
24   probably about '11, 2011.
25       Q.    Now, the briefings that you

Page 98

1  provided -- the distributor initiative
2  briefings that you provided in the earlier
3  years -- so, for example, some of the exhibits
4  I have in front of you, such as 10, 11 and
5  12 -- there was not a discussion in the
6  presentation about other types of pharmacies,
7  such as pain clinics, was there?
8      A.   You'll have to give me a moment.
9      Q.   Sure.
10         MR. SHKOLNIK:  Object to form.
11         THE WITNESS:  Only to the extent of
12  the three exhibits you gave me, yes.
13         BY MS. MAINIGI:
14      Q.   So just so the record is clear, at
15  least as far as your review of the distributor
16  initiative presentations to McKesson,
17  AmerisourceBergen and Cardinal are concerned,
18  you did not discuss in those presentations pain
19  clinics, correct?
20         MR. MIGLIORI:  Objection.  Asked and
21  answered.  Object to form.
22         THE WITNESS:  Based upon the content
23  that is contained in those presentations, no.
24         BY MS. MAINIGI:
25      Q.   The focus was on Internet

Page 99

1  pharmacies, to the extent there was a focus on
2  pharmacies --
3         MR. MIGLIORI:  Objection to form.
4         BY MS. MAINIGI:
5      Q.   Is that right?
6      A.   Yes.
7      Q.   Now, is -- would it be fair to say
8  that the distributor briefings were also the
9  beginning of a change in DEA's guidance in
10  transitioning from the Excessive Purchase
11  System into the Suspicious Ordering System?
12         MR. BENNETT:  Objection to form.
13         MR. MIGLIORI:  Objection.
14         THE WITNESS:  I don't understand
15  what you mean by "transitioning."
16         BY MS. MAINIGI:
17      Q.   Okay.  Can you define for me -- or
18  do you understand the meaning of the Suspicious
19  Order System?
20      A.   As in these documents, Exhibits
21  11 -- 10, 11 and 12 -- use the color one.  It's
22  easier to read.
23      Q.   Let me withdraw the question.
24         And let me ask you this:  Did you
25  and Mr. Mapes, through the distributor

Page 100

1  briefings, begin to advise distributors to move
2  away from the Excessive Purchase System and
3  towards a different type of system for the
4  reporting suspicious orders?
5      A.   No.
6      Q.   Okay.  Can I ask you to take a look
7  at your deposition at Page 43, please.
8         MR. SHKOLNIK:  For the record, he's
9  looking at Exhibit 4.
10         MS. MAINIGI:  Yes.  I'm sorry.
11  Thank you, Hunter.  Exhibit 4.
12         Exhibit 4, Page 43.
13         MR. BENNETT:  Do you have a line,
14  counsel?
15         MS. MAINIGI:  Let me see.  Yes.
16  Lines 3 to 14, please.
17         BY MS. MAINIGI:
18      Q.   Let me know after you've had a
19  chance to review it, and then I'll ask you a
20  follow-up question Mr. Wright.
21      A.   43, ending?
22      Q.   At Line 14.
23      A.   14?
24         Yes, ma'am.
25      Q.   Exhibit 4 is the testimony you

Page 101

1  provided under oath in the H.D. Smith matter
2  that we discussed in approximately 2011,
3  correct?
4      A.   Yes, ma'am.
5      Q.   And you were employed at the DEA at
6  the time?
7      A.   Yes, ma'am.
8      Q.   And you obviously told the truth
9  when you provided this testimony, correct?
10      A.   Yes, ma'am.
11      Q.   So I think in this testimony you
12  were asked this question, and you provided this
13  answer -- this series of questions and these
14  series of answers.
15         "Question:  So you mentioned that
16  there was a change that started in 2005.  Do
17  you --
18         "Answer:  Yes, sir.
19         "Question:"  Picking up "-- do you
20  remember when?  Around the same time of the
21  distributor briefings?
22         "Answer:  Well, it became -- it was
23  a matter of very intense discussion in
24  developing what was called the distributor
25  briefing.  Because that's when the change

26 (Pages 98 - 101)

Page 102

1  occurred.  And that's when the introduction
2  from and transition from the Excessive Purchase
3  System into the Suspicious Ordering System
4  occurred."
5      That was the testimony you gave
6  under oath, correct?
7      MR. BENNETT: Objection.  Improper
8  impeachment.
9      MR. SHKOLNIK: Objection.
10     THE WITNESS:  Yes, ma'am.
11  BY MS. MAINIGI:
12   Q.  Okay.  With respect to the
13  Suspicious Ordering System, is it fair to say
14  that DEA did not advise registrants what it
15  wanted in the components of the Suspicious
16  Ordering System?
17     MR. BENNETT: Objection.  Form.
18     THE WITNESS:  We quoted the
19  regulation.  We identified and tried to give
20  examples, best guidance that could be -- that
21  could be given.
22  BY MS. MAINIGI:
23   Q.  Did you issue some sort of guidance
24  document to provide this guidance?
25   A.  I didn't, no.

Page 103

1   Q.  Were you aware of some sort of
2  guidance that issued from DEA about the
3  Suspicious Ordering System?
4   A.  Not to my recollection.
5   Q.  The expectation was that registrants
6  would look at orders as they were occurring and
7  apply criteria designed to identify suspicious
8  orders; is that right?
9   A.  I'm sorry.
10     MS. MAINIGI:  Why don't we read that
11  back.
12     (The record was read as requested.)
13     THE WITNESS:  Yes.
14  BY MS. MAINIGI:
15   Q.  Is it fair to say that, with the
16  suspicious -- or the transition to the
17  Suspicious Ordering System, that the DEA
18  preferred a system where somebody was making
19  the assessment as to whether there was a
20  foundation for reporting an order as suspicious
21  as opposed to some automatic trigger that led
22  to miles of reports?
23     MR. MIGLIORI:  Object to form.
24     MR. BENNETT:  Objection to form.
25     MR. MIGLIORI:  Scope.

Page 104

1      THE WITNESS:  You know what?  To me
2  there's like two questions in that.  I'm trying
3  to --
4      BY MS. MAINIGI:
5   Q.  Let me try to break it up.
6      The Excessive Ordering System led to
7  reams and reams of paper being provided to DEA
8  offices, right?
9      MR. MIGLIORI:  Objection.
10     THE WITNESS:  Yes.
11  BY MS. MAINIGI:
12   Q.  And the DEA wanted to --
13     MR. MIGLIORI:  I -- I objected to
14  that.  It's not showing up on the transcript.
15  I'm just noticing it now.  I don't know which
16  of my objections.  If I need to talk louder, I
17  will.
18     THE REPORTER:  I think I put it
19  under his name, not yours.  So it's there.  And
20  I'll change the person.
21     MR. MIGLIORI:  Nothing showed up.
22  But I'll be sure to be louder.
23     THE REPORTER:  Okay.
24     MR. MIGLIORI:  Thank you.
25     BY MS. MAINIGI:

Page 105

1   Q.  The DEA wanted to reduce the volume
2  of reported orders; is that correct?
3      MR. BENNETT:  Objection.  Form.
4      MR. MIGLIORI:  Objection.  Scope.
5      THE WITNESS:  Okay.
6      BY MS. MAINIGI:
7   Q.  Is that correct or not?
8   A.  No.
9   Q.  Okay.
10   A.  You're putting -- I'm hearing that
11  you're saying DEA was tired of a bunch of
12  paper.  It wasn't the volume of paper.  It's
13  not volume of paper.  That's what I'm hearing
14  you.
15   Q.  Is it fair to say that registrants
16  were expected to review orders that hit the
17  criteria in the regulation and make a
18  determination that there was truly suspicious
19  activity going on here?
20     MR. MIGLIORI:  Object to form.
21     THE WITNESS:  Under the Excessive or
22  Suspicious?
23     BY MS. MAINIGI:
24   Q.  Suspicious.
25   A.  They were being asked to comply with

27 (Pages 102 - 105)

Page 106

1    some of the -- with the criteria of the
2    definition of the law -- or the regulation by
3    volume, by size and quantity and things like
4    this.  And that was it.
5        BY MS. MAINIGI:
6    Q.  The DEA didn't provide guidance on
7    how to apply the criteria in the regulation; is
8    that right?
9        MR. BENNETT:  Object.  Objection.
10   Form.
11       THE WITNESS:  It couldn't provide
12   that.  Because it is fluid, and there are too
13   many variables, too many anomalies, too many
14   situations.  And what is the drug tomorrow?
15   What is the problem tomorrow?
16       Right now we started this Internet
17   with Hydrocodone.  You tell me what the problem
18   is today.
19       BY MS. MAINIGI:
20   Q.  It shifted, right?
21   A.  Well, it's certainly not
22   Hydrocodone.
23   Q.  Now, under the new Suspicious Order
24   Guidance, once a registrant deemed an order to
25   be suspicious, DEA did not want that order

Page 107

1    shipped; is that right?
2        MR. BENNETT:  Object to form.
3        MR. SHKOLNIK:  Objection to form.
4        MR. BENNETT:  Scope.
5        THE WITNESS:  DEA would ask the
6    question:  "If you deem it suspicious, why are
7    you shipping it continuing to ship?  If you
8    deem it suspicious, what does 'suspicious'
9    mean?"
10       And in the context of all the other
11   regulations, the fact that you even have to be
12   registered and that you're dealing with
13   narcotic substances that can be highly
14   addictive and abused, what does "suspicious"
15   mean?
16       MR. BENNETT:  Counsel, we've been
17   going for a little over an hour since our last
18   break.
19       Do you plan to break at noon for
20   lunch, or what's your plan on breaks?
21       MS. MAINIGI:  Let's go for a little
22   while longer, and then maybe we'll take our
23   lunch break.
24       MR. BENNETT:  Okay.  I don't want to
25   go --

Page 108

1        MS. MAINIGI:  But let's keep going.
2        MR. BENNETT:  Much more -- we've
3    gone an hour.  So I don't want to go much
4    more --
5        MS. MAINIGI:  I think --
6        MR. BENNETT:  -- than an hour.
7        MS. MAINIGI:  -- we'll hit up on
8    lunch soon if you can stick with me for another
9    ten minutes.
10       THE WITNESS:  Ten minutes.
11       MS. MAINIGI:  Okay.  Deal.
12       THE WITNESS:  And then I will start
13   squirming.
14       MS. MAINIGI:  Okay.  Deal.
15       BY MS. MAINIGI:
16   Q.  Mr. Wright, the Suspicious Order
17   System represented a significant change in DEA
18   policy guidance and interpretation regarding
19   Suspicious Order Monitoring, correct?
20       MR. BENNETT:  Objection.  Form.
21       THE WITNESS:  I agree with the
22   significant change.  But interpretation, no.
23       BY MS. MAINIGI:
24   Q.  And you agree it was a change as to
25   whether a registrant could ship an order it

Page 109

1    reported to DEA, correct?
2        MR. SHKOLNIK:  Objection to form.
3        MR. BENNETT:  Objection.  Form.
4        THE WITNESS:  It lied in their
5    responsibility to make the appropriate
6    decision.
7        BY MS. MAINIGI:
8    Q.  I don't believe I got an answer to
9    my question.
10       Do you agree that it was a change as
11   to whether a registrant could ship an order it
12   reported to DEA?
13       MR. BENNETT:  Objection again to the
14   form.
15       MR. MIGLIORI:  Objection.  Asked and
16   answered.
17       THE WITNESS:  Could you rephrase
18   that question?  Because -- I'm -- I'm sorry.
19   I -- it's vague to me.  And I answered it the
20   best that I could.
21       BY MS. MAINIGI:
22   Q.  Okay.  Do you agree that there was a
23   change in DEA policy guidance or interpretation
24   as to whether a registrant could ship an order
25   it reported to DEA?

28 (Pages 106 - 109)

1     MR. MIGLIORI:  Objection.  Form.
2     MR. BENNETT:  Objection.  Form.
3     THE WITNESS:  DEA could not provide
4  guidance as to whether to ship or not ship,
5  if -- in the context of your question to being
6  suspicious.
7     BY MS. MAINIGI:
8     Q.   There was a significant change in
9  whether a registrant could ship an order it
10  reported to DEA in that time period; is that
11  correct?
12     MR. BENNETT:  Objection to form.
13     MR. MIGLIORI:  Object to form.
14  Asked and answered.
15     THE WITNESS:  Repeat, please.
16     MS. MAINIGI:  Can you read that
17  back, please.
18     (The record was read as requested.)
19     THE WITNESS:  Yes.
20     MR. MIGLIORI:  Object to form of the
21  question.
22     MS. MAINIGI:  Why don't we go ahead
23  and take our lunch break right now.
24     MR. BENNETT:  Great.  Thanks.
25     MS. MAINIGI:  I got you in early,

1  Mr. Wright.  So I get some --
2     THE WITNESS:  Well, I appreciate
3  that.
4     MS. MAINIGI:  -- extra credit for
5  that, right.
6     THE WITNESS:  Yes, ma'am.
7     THE VIDEOGRAPHER:  We are going off
8  the record.
9     This is the end of Media Unit No. 2.
10     The time is 11.51.
11     (A short recess was taken.)
12     THE VIDEOGRAPHER:  We are back on
13  the record.
14     This is the beginning of Media Unit
15  No. 3.
16     The time is 1:15.
17     You may proceed, Counsel.
18     BY MS. MAINIGI:
19     Q.   Mr. Wright, could I ask you to turn
20  back to the trial testimony from the H.D. Smith
21  trial.  It's Exhibit 5 in front of you.  And
22  I'm going to ask you to turn to Page 382,
23  please, sir.
24     Okay.  So just for ease of asking
25  you some questions, I'm going to -- since you

1  didn't have a chance to review this trial
2  testimony prior to coming in here today, I'm
3  going to ask you to just take a moment and read
4  from about Page 382, line 19, through the
5  middle of Page 387 to yourself.  And let me
6  know when you are done.
7     MR. MIGLIORI:  While he's doing
8  that, I just object to using the record like --
9  this way.
10     BY MS. MAINIGI:
11     Q.   Ready?  Okay.
12     So this morning we were talking
13  about distributor briefings that you and
14  Mr. Mapes provided to distributors beginning in
15  2005.
16     Do you recall that?
17     A.   Yes, ma'am.
18     Q.   And I -- I think that you have
19  testified before that one of the critical
20  issues of discussion before you did these
21  distributor briefings was whether you all were
22  going to tell distributors about the issue of
23  whether to ship or not to ship, correct?
24     A.   Yes, ma'am.
25     Q.   Okay.  And the issue of whether to

1  ship or not to ship was a critical issue,
2  right?
3     MR. BENNETT:  Objection to form.
4     THE WITNESS:  I don't understand
5  "critical."  Because we -- we're obligated to
6  tell -- we were obligated to inform them of the
7  law and then the regulation.
8     BY MS. MAINIGI:
9     Q.   You were obligated to inform them of
10  the regulation.
11     A.   Yes, ma'am.
12     Q.   Okay.  And you understood, at the
13  time the distributor briefings were going on,
14  that it was standard practice in this industry
15  to file Suspicious Activity Reports while
16  continuing to ship products; yes?
17     A.   No, ma'am.  Excessive purchases.
18     Q.   Okay.  Let's take a look at your
19  testimony at 386.
20     A.   386?
21     Q.   Uh-huh.
22     A.   Yes, ma'am.
23     Q.   Okay.  Let -- let me just back up.
24     It's -- as you said earlier this
25  morning, you understood that, while Excessive

29 (Pages 110 - 113)

Page 114

1  Order Reports were being filed by distributors,
2  or registrants for that matter, that they
3  continued to ship product, correct?
4      A.  Yes, ma'am.
5      Q.  Okay.  And that was widely
6  understood at the DEA, correct?
7          MR. BENNETT:  Objection to form.
8          MR. MIGLIORI:  Objection to scope.
9          THE WITNESS:  I -- I -- I really
10  cannot speak to the other offices practices and
11  things like this through, you know, conferences
12  and things like this.
13          But absolutely across the board this
14  was the edict, I can't say.
15          BY MS. MAINIGI:
16      Q.  Okay.  But you certainly understood
17  it to be the practice, correct?
18      A.  Yes, ma'am.
19      Q.  Okay.  And in the 30 years that the
20  regulations -- 30-plus years that the
21  Suspicious Order Regulations have been on the
22  books, until 2005 forward, the DEA never once
23  said that the practice of continuing to ship
24  was illegal or a violation of DEA rules or
25  anything of that sort, correct?

Page 115

1          MR. BENNETT:  Objection.  Form.
2          THE WITNESS:  The -- read, please,
3  back.
4          (The record was read as requested.)
5          THE WITNESS:  Honestly, I do not
6  know.
7          BY MS. MAINIGI:
8      Q.  Okay.  Let's take a look at your
9  trial testimony at the bottom of Page 386.
10      A.  Yes, ma'am.
11      Q.  Lines 22 to 25.
12          Now, again, this is your trial
13  testimony from the H.D. Smith trial, correct?
14      A.  Yes, ma'am.
15      Q.  Given under oath, correct?
16      A.  Yes, ma'am.
17      Q.  And you were asked -- I will
18  actually ask you to back up to -- I
19  apologize -- just for completeness, lines 17
20  through 25.
21          You were asked these set of
22  questions, and you provided these sets of
23  answers.
24          "Question:  And you understood, at
25  the time that you were making these decisions,

Page 116

1  that it was standard practice in this industry
2  to file Suspicious Activity Reports while
3  continuing to ship products.
4          "Answer:  Yes, sir.
5          "Question:  And in the 30 years that
6  this rule has been on the books, the DEA never
7  once said that that was illegal, a violation of
8  DEA rules or regulations, or anything, did it?
9          "Answer:  No, sir."
10          That was the testimony you gave
11  under oath in 2011, correct?
12      A.  Yes, ma'am.
13      Q.  Okay.  Now, some of the discussions
14  that you had at the time of the distributor
15  briefings related to the changes with the
16  do-not-ship revolved around whether the
17  industry would be confused by changes, correct?
18          MR. BENNETT:  Objection to form.
19          MR. MIGLIORI:  Objection to form.
20          THE WITNESS:  It's not so much
21  around based upon confusion.  It's -- I -- I
22  guess you could say, to back it off a little
23  bit, our guidance would be limited.  It's their
24  responsibility to make that determination.
25          BY MS. MAINIGI:

Page 117

1      Q.  Well, you put the -- DEA chose, in
2  this time period, as it was doing distributor
3  briefings, to put greater responsibility on the
4  industry to interpret the regulation, correct?
5          MR. MIGLIORI:  Objection.  Form.
6          MR. BENNETT:  Objection to form.
7          THE WITNESS:  That responsibility
8  already -- always existed.  The regulations and
9  the rules always existed.  It has always been
10  to a greater -- great extent a self-policing
11  closed system in distribution.
12          BY MS. MAINIGI:
13      Q.  But an affirmative decision was
14  made, around the time of the distributor
15  briefings, to not provide the industry with
16  guidance and to not bless systems that the
17  industry came up with, correct?
18          MR. BENNETT:  Object to form.
19          THE WITNESS:  Because of what had
20  happened under the excessive purchases that had
21  been blessed by offices however.  Therefore,
22  they clung to that, didn't adapt, didn't --
23  wasn't addressing a problem that was killing
24  the country.
25          So, therefore, we had to -- I tried

30 (Pages 114 - 117)

Page 118

1 to stay out of as -- we could not give
2 something industry could cling to and said,
3 "You said you could do -- you have to do this
4 or do that or" -- because, again, I -- I stated
5 it earlier, Hydrocodone was the drug before.
6 We're two and a half grades up higher now.
7     BY MS. MAINIGI:
8   Q.   What's the drug today?
9   A.   Fentanyl.
10   Q.   Fentanyl?
11   A.   Fentanyl.  We went from Hydrocodone
12 to oxycodone, twice as potent, to fentanyl that
13 is now dealing with micrograms.  It is just so
14 in -- small, extremely, extremely potent.
15     Their system -- what was in
16 Excessive was rigid.  This is all you do.
17 Under Suspicious this is the -- there's too
18 many variables.  What is it?
19     What is happening in Alaska?  What's
20 the drug of choice?  Why?  Compared to West
21 Virginia, compared to Florida, compared to all
22 the other -- you have to look at all of this.
23     And I can't.  And DEA can't sit
24 there and say, "Oh, yeah.  That works."
25     And then people migrate, economies

Page 119

1 change, so many factors coming.  And if you're
2 not ready to adapt to that, then you don't have
3 a system.
4     MR. BENNETT:  Mr. Wright --
5     BY MS. MAINIGI:
6   Q.   And so the --
7     MR. BENNETT:  -- there is no
8 question pending.  So --
9     MS. MAINIGI:  There was --
10     MR. BENNETT:  -- maybe you should
11 wait for her to ask you --
12     MS. MAINIGI:  -- a question pending.
13     MR. BENNETT:  You -- your last
14 question was:  "Fentanyl?"
15     And so he went on a diatribe that
16 was nonresponsive.
17     MS. MAINIGI:  Well, I -- I --
18     MR. BENNETT:  And so he needs to
19 wait for you to ask a question.
20     MS. MAINIGI:  I think he was
21 answering my prior question still.
22     BY MS. MAINIGI:
23   Q.   But in any case, Mr. -- Mr. Wright,
24 I -- I think I understand what you're saying.
25 You're -- you're -- you're suggesting that the

Page 120

1 DEA had an expectation under Suspicious Order
2 Monitoring that the industry would respond to
3 whatever the threat was that -- in that time
4 period, because the threat was always changing,
5 and adopt and upgrade and change systems
6 accordingly; is that fair?
7   A.   That's --
8     MR. BENNETT:  Objection.  Form.
9     Go ahead.
10     THE WITNESS:  That is fair.
11     BY MS. MAINIGI:
12   Q.   But you did recognize -- and I think
13 your testimony at trial supports this
14 concept -- you recognized that this change from
15 the Excessive Order System to the Suspicious
16 Order System, which was more fluid, would cause
17 confusion in the industry, correct?
18   A.   Yes.
19   Q.   And that was part of the reason you
20 wanted to do these distributor briefings and go
21 one on one with distributors, right?
22   A.   Yes.
23   Q.   And there was also concern, as I saw
24 from your prior testimony, that your own DEA
25 agents might be confused by the -- the changes

Page 121

1 going on within the industry, correct?
2     MR. BENNETT:  Objection.  Form.
3     THE WITNESS:  Yes.
4     BY MS. MAINIGI:
5   Q.   And why would that be?
6     MR. BENNETT:  Objection.  Form.
7     THE WITNESS:  They, too, had to
8 think of the same things a lot of times, in the
9 same respect as the -- the distributors or the
10 registrants were being asked to.  And some of
11 the people had been -- this has been the only
12 system they know.
13     BY MS. MAINIGI:
14   Q.   The Excessive Order Program had been
15 the only system they had known?
16   A.   Yes, ma'am.
17   Q.   Okay.  And did -- did the
18 responsibilities of the DEA agents also change
19 to some extent under the Suspicious Order
20 Program?
21   A.   No, ma'am.
22   Q.   So what would cause -- I'm just
23 trying to pinpoint what would cause confusion
24 in their minds as to what to do.
25     MR. BENNETT:  Objection.  Form.

31 (Pages 118 - 121)

Page 122

1    THE WITNESS:  We were asking them to
2  look at other source documents and dig deeper
3  into it.  Prior -- more so than they had
4  previously.  We also had more resources
5  available for them to look at.
6    BY MS. MAINIGI:
7    Q.   And what were some of those
8  resources?
9    A.   Well, for one, ARCOS was more
10  readily available to them than it ever had been
11  before.
12    Q.   So as part of the -- the switch-over
13  to Suspicious Order Monitoring, ARCOS data
14  became more available to the diversion agents?
15    A.   Yes, ma'am.
16    Q.   In the field offices.
17    A.   Yes, ma'am.
18    Q.   And previously it had only been
19  available at headquarters; is that right?
20    A.   Yes, ma'am.
21    Q.   And so there was discussion among
22  your group at headquarters as to, "How are we
23  going to communicate this expectation on our
24  part to the distributors and to the other
25  registrants," correct?

Page 123

1    A.   Yes, ma'am.
2    Q.   And there was -- did you find -- was
3  it your experience that there was confusion
4  among the distributors -- honest confusion
5  among the distributors about the do-not-ship
6  requirement?
7    MR. SHKOLNIK:  Objection to form.
8    MR. BENNETT:  Objection to form.
9    THE WITNESS:  I wouldn't necessarily
10  call it confusion.  It was truly a -- a
11  different way of looking at it.  Everybody was
12  hard and fast on the past.  Going past that was
13  a hard reach.  They -- my experience, they
14  seemed to grasp it, but implementing it was --
15    Q.   Harder.
16    A.   Yes.
17    Q.   And the implementation of the --
18  well, the industry implementation of the
19  Suspicious Order Monitoring System didn't occur
20  over night, correct?
21    A.   No, ma'am.
22    Q.   And the DEA understood that it would
23  be a gradual shift over, correct?
24    MR. BENNETT:  Objection.  Form.
25    THE WITNESS:  Yes, ma'am.

Page 124

1    BY MS. MAINIGI:
2    Q.   And is it fair to say that after
3  2005 DEA continued to accept Excessive Order
4  Reports for some period of time until
5  distributors could change over to a new system?
6    MR. SHKOLNIK:  Objection to form.
7    THE WITNESS:  Yes, ma'am.
8    BY MS. MAINIGI:
9    Q.   Part of -- one of -- one of the
10  changes that was occurring in the industry as
11  part of the change over to Suspicious Order
12  Monitoring was that more and more companies
13  were going automated, correct?
14    A.   I had heard discussion to that
15  effect.  But as to actually knowing, no, I
16  don't know.
17    Q.   The types of changes that would be
18  required by a switch to the automated -- to a
19  more automated system, those changes might take
20  some time; they couldn't happen overnight,
21  fair?
22    MR. BENNETT:  Objection to form.
23    MR. MIGLIORI:  Objection.
24    THE WITNESS:  I -- I do not know the
25  implementation processes of -- of those types

Page 125

1  of businesses, how they would do it and -- and
2  all of that.  I -- I wouldn't be able to really
3  speak to it.
4    BY MS. MAINIGI:
5    Q.   Did DEA set any deadlines by which
6  there had to be a switch away from the
7  Excessive Order Reporting?
8    A.   Not to my recollection.
9    Q.   DEA just strongly encouraged
10  distributors to move toward Suspicious Order
11  Reporting, correct?
12    MR. BENNETT:  Objection to form.
13    MR. MIGLIORI:  Objection.
14    THE WITNESS:  DEA laid out the
15  responsibilities and requirements and made them
16  well known, enlightened.
17    BY MS. MAINIGI:
18    Q.   Through the distributor briefings?
19    A.   Yes, ma'am.
20    Q.   Now, as this evolution occurred from
21  the Excessive Order Reporting system to the
22  Suspicious Order Monitoring System, there was
23  no statute change, was there, sir?
24    MR. MIGLIORI:  Objection to form.
25    THE WITNESS:  No, ma'am.

32 (Pages 122 - 125)

Page 126

1      BY MS. MAINIGI:
2      Q.   The DEA didn't go to congress to
3   seek any sort of change to the statute of the
4   regulation?
5      A.   Not to my knowledge.
6      Q.   And there was not published a notice
7   of rule making, was there?
8      A.   Not to my knowledge.
9      Q.   Was anything put into the Federal
10  Register, to your knowledge?
11     A.   Not to my knowledge.
12     Q.   There was, however, internal
13  discussions that occurred at the DEA as to how
14  to communicate these changes to the industry
15  and to its own employees, correct?
16     A.   Yes, ma'am.
17     Q.   Who was involved with those
18  discussions, to your recollection?
19     A.   Most heavily the front office and
20  chief counsel.
21     Q.   Some of the names involved would be
22  which ones?
23     A.   There were so many names to be --
24  too many names.  There are too many -- put it
25  this way: I'm a little here; all these people

Page 127

1   up here were doing the talking.
2          And it involved liaison and policy
3   and involved all sorts of elements.  And I
4   wasn't always -- I was very little privy to any
5   of it.
6      Q.   And what was -- what were some of
7   the concerns that you heard as to
8   implementation of the changes?
9          MR. BENNETT:  And I'll object and
10  instruct the witness that he's not authorized
11  to talk about internal deliberations of the
12  agency.  But if he's aware of concerns, I will
13  let him answer that question.
14         MR. MIGLIORI:  Object to scope.
15         THE WITNESS:  The only concern is
16  not to allow anything like happened at the
17  Excessive Purchase System.  Industry was
18  looking for something that they could, "This is
19  it.  We got it.  We go."  And then therefore it
20  was going to be -- never grown, never moved,
21  never do anything.
22         So we couldn't go back to the
23  Excessive system, the excessive granting, the
24  all those things that occurred there.
25         BY MS. MAINIGI:

Page 128

1      Q.   I think I heard -- I remember you
2   describing the Excessive Order Program as very
3   black-and-white; fair?
4      A.   Fair.
5      Q.   And with the Suspicious Order
6   Monitoring program, the desire was to move to
7   something that was more fluid, fair?
8          MR. SHKOLNIK:  Object to form.
9          MR. MIGLIORI:  Object to form.
10         THE WITNESS:  Instead of fluid, I'd
11  say more encompassing.  Yeah.  More
12  encompassing.
13         BY MS. MAINIGI:
14     Q.   And it was understood, with the move
15  toward the Suspicious Order Monitoring Program,
16  that not every company would necessarily have
17  the exact same type of program; fair?
18         MR. BENNETT:  Objection to form.
19         THE WITNESS:  Yes, ma'am.
20         BY MS. MAINIGI:
21     Q.   And, in fact, DEA wanted companies
22  to be able to adopt their particular programs
23  to whatever the particular clients were that
24  they might service, correct?
25         MR. BENNETT:  Objection to form.

Page 129

1          THE WITNESS:  Yes, ma'am.
2          BY MS. MAINIGI:
3      Q.   And so that is one of the reasons
4   there were no set criteria or guidance put out
5   by the DEA as to what should go into companies'
6   Suspicious Order Monitoring programs, correct?
7          MR. BENNETT:  Objection.
8          You can answer.
9          THE WITNESS:  I apologize.  I -- I
10  really do.  I apologize.  Okay?  I blanked out.
11  I don't know --
12         MS. MAINIGI:  That's okay.  That's
13  okay.
14         THE WITNESS:  Okay?
15         MS. MAINIGI:  It's always the
16  after-lunch kind of drop-off that occurs at
17  some point.
18         THE WITNESS:  I -- I heard you.
19         MS. MAINIGI:  Let's -- let's read
20  the -- the question back.
21         (The record was read as requested.)
22         THE WITNESS:  Correct.
23         BY MS. MAINIGI:
24     Q.   I assume that a lot of companies
25  were trying to call their contacts at the DEA

33 (Pages 126 - 129)

Page 130

1 trying to get information about what the
2 expectations were.
3      Do you recall that?
4      MR. BENNETT: Object to form.
5      MR. MIGLIORI: Scope.
6      THE WITNESS: I know we got a lot --
7 we got a lot of phone calls in the field, did
8 also get phone calls because they were referred
9 up to us sometimes.
10      BY MS. MAINIGI:
11      Q.   And is it fair to say that these
12 were -- these were calls where companies and
13 individuals from companies were honestly just
14 trying to figure out what they should be doing?
15      MR. BENNETT: Objection.
16      MR. MIGLIORI: Objection. Form.
17      MR. SHKOLNIK: Objection. The
18 intent.
19      THE WITNESS: I can answer this only
20 one way: Yes and no.
21      BY MS. MAINIGI:
22      Q.   But there were a lot of companies
23 out there that were trying to figure out, get
24 any advice in terms of figuring out how to
25 comply with the changes, correct?

Page 131

1      MR. SHKOLNIK: Objection. The
2 company.
3      MR. BENNETT: Objection. Form.
4      THE WITNESS: Yes, ma'am.
5      BY MS. MAINIGI:
6      Q.   In fact, let me draw your attention
7 to your testimony at Page 59 of your
8 deposition. So we're going to switch over to
9 your deposition, sir.
10      MR. BENNETT: I'm sorry. Page and
11 line?
12      MS. MAINIGI: Just really all of 59
13 and the top of 60.
14      If you want to just read that to
15 yourself for a moment.
16      MR. SHKOLNIK: Objection to using
17 it. There's no question to refresh his
18 recollection at all. It's improper use of a --
19 of a transcript. Note my objection.
20      BY MS. MAINIGI:
21      Q.   And really all the way through 60,
22 sir. And then I have some follow-up questions
23 for you.
24      MR. MIGLIORI: Same objection.
25      BY MS. MAINIGI:

Page 132

1      Q.   Let me know when you're ready.
2      A.   Let's go.
3      Q.   So at the bottom of Page 59, you
4 say -- you have a statement to the -- that says
5 as follows: "I would say H.D. Smith was in the
6 same quandary and the same issues that the rest
7 of the industry -- the AmerisourceBergens, the
8 Cardinals, and everybody else was trying to
9 figure out."
10      You see that?
11      A.   Yes, ma'am.
12      Q.   Can you explain what you mean by
13 that?
14      MR. SHKOLNIK: Objection to form.
15 And objection. Improper use of a transcript:
16      THE WITNESS: The industry was
17 looking for a hard, fast system. DEA wasn't
18 blessing anything.
19      BY MS. MAINIGI:
20      Q.   Did that put distributors in a
21 difficult or awkward position?
22      MR. SHKOLNIK: Objection to form.
23      MR. BENNETT: Objection to form.
24      THE WITNESS: As I said here, yes,
25 it did.

Page 133

1      BY MS. MAINIGI:
2      Q.   Why?
3      MR. BENNETT: Objection to form.
4      THE WITNESS: I'm looking for a
5 word. I'm sorry. I'm looking for a word.
6      You just earlier stated 30 years.
7 That's the way it'd been. Made clear wasn't
8 working. This is what you got to do. How do
9 we do it? They're your customers.
10      That's all I can say. That's my
11 answer.
12      BY MS. MAINIGI:
13      Q.   And that's why it was awkward,
14 because you couldn't tell them how to get
15 there?
16      MR. MIGLIORI: Objection. Misstates
17 his testimony.
18      MR. BENNETT: Objection. Form.
19      THE WITNESS: I used "awkward." It
20 was an adaptation. There was no doubt about
21 it. I won't argue that. I -- I can't. It
22 was.
23      But there were things that we tried
24 to point out. And in pointing that out, I know
25 what I did. I know what I said. And what's

34 (Pages 130 - 133)

Page 134

1  going on today isn't necessarily going to be
2  what's happening tomorrow.  That was trying to
3  grasp what tomorrow was going to be a little
4  hard.
5       BY MS. MAINIGI:
6       Q.   So the system a company might have
7  put into place in 2007 to comply with its
8  Suspicious Order Monitoring obligations might
9  have been a good system in 2007 or 2008, but it
10  might need to evolve and change by 2009 or
11  2010; is that fair?
12       MR. BENNETT:  Objection to form.
13       THE WITNESS:  I wouldn't say it
14  would change that fast.  But yes, it always had
15  to -- had to be adaptive.  It had to be adapted
16  to the present circumstances.
17       I'll say it for the fourth time.
18  Hydrocodone, Oxycodone, fentanyl.  We went
19  through the Internet.  We went through a whole
20  bunch of other things.  Okay.  I don't know
21  what tomorrow is going to bring.  Are we going
22  to be one day able to ship Star Treky,
23  dematerialized and rematerial -- how do we
24  safeguard that product?  How do we know it's
25  going to the right people?

Page 135

1       I don't know what's going to happen
2  tomorrow and what the -- the -- the things are.
3  So it had to be completely adaptive.  And
4  people are looking for that what can I hang it
5  on?  And I can't tell you.  I don't know.
6       BY MS. MAINIGI:
7       Q.   So the Suspicious Order Monitoring
8  Systems had to be able to react to new trends
9  in diversion; fair?
10       A.   Yes, ma'am.
11       Q.   And they should have been able to
12  utilize technological advances; fair?
13       MR. BENNETT:  Objection.  Form.
14       MR. MIGLIORI:  Objection to form.
15       THE WITNESS:  Yes, ma'am.
16       BY MS. MAINIGI:
17       Q.   And incorporate new data sources
18  when available?
19       A.   Incorporate whatever it is to be
20  able to -- you know, I kept emphasizing the
21  good reputation and name of your company is
22  what you're trying to salvage and keep alive.
23  I don't know how many times I said that.
24       Q.   Now, during this time period, 2007,
25  I think in particular, you were actually asked

Page 136

1  to evaluate one distributor's new Suspicious
2  Ordering Monitoring Program, correct, ABDC's?
3       A.   Yes.
4       Q.   And you were involved in the review
5  of ABDC's Suspicious Order Monitoring program
6  to some degree, to a large degree, fair?
7       A.   To some degree.
8       Q.   Okay.  And your involvement, as I
9  understand it, was in the context of perhaps
10  doing an on-site inspection and test of the new
11  system?
12       A.   No, ma'am.  It was to go and receive
13  a briefing, to see what they were implementing,
14  what they were developing.  Again, I could tell
15  you this right now.
16       Before we went there, because we had
17  a discussion, we couldn't prove anything.
18  Okay?  We could is it there and say, you know
19  -- you know -- we are asked because the -- the
20  industry was constantly looking for that Good
21  Housekeeping Seal of Approval.
22       Q.   Uh-huh.
23       A.   I don't have them.  I don't issue
24  them.  I can't give you one.  But you are
25  always asking me.  Now, I'll repeat that.  I

Page 137

1  don't have one.  I don't keep them.  And I
2  don't issue them.  But you keep asking.
3       I went -- I went -- we observed it.
4  They had taken good measures.  We may have told
5  them those measures, but those -- we also would
6  have caveated it that this is not, you know,
7  the end-all.
8       MR. BENNETT:  And, Counsel, I will
9  remind the witness that they are not authorized
10  under Paragraph A of the -- of the authorize
11  letter to disclose information regards to any
12  specific DEA investigation or activities that's
13  nonpublic.  I don't know whether this is public
14  or nonpublic.  But if it's nonpublic, he's not
15  authorized at this time to answer about a
16  specific DEA investigation.
17       MS. MAINIGI:  So let me address the
18  nonpublic, public concern.
19       BY MS. MAINIGI:
20       Q.   Mr. Wright, let's turn to Page 106
21  of your depo transcript.  And actually, it
22  starts at the bottom of Page 105, goes on to
23  106.
24       If you want to just read that to
25  yourself for a moment, I think that may

35 (Pages 134 - 137)

Page 138

1 alleviate any concerns about public, nonpublic
2 as it relates to these particular questions.
3      MR. BENNETT:  Counsel, I just don't
4 know --
5      MR. SHKOLNIK:  Object to form.
6 Inappropriate use of a transcript.
7      MS. MAINIGI:  And then I'll have
8 some follow-up questions for you.
9      MR. SHKOLNIK:  Objection.
10      MR. BENNETT:  Counsel, was this
11 deposition filed in the case?
12      MS. MAINIGI:  In this case or in
13 the --
14      MR. BENNETT:  No.  In the H.D. --
15      MS. MAINIGI:  -- H.D. Smith case?
16      MR. BENNETT:  It's on the record.
17      MS. MAINIGI:  It was taken in the
18 H.D. Smith case.
19      MR. BENNETT:  I know it was taken,
20 but was it filed on the record?
21      MS. MAINIGI:  I don't know.  We can
22 check.
23      MR. BENNETT:  I think we should.
24 Because that may change --
25      MS. MAINIGI:  Sure.

Page 139

1      MR. BENNETT:  -- whether or not it's
2 public or nonpublic --
3      MS. MAINIGI:  I -- I --
4      MR. BENNETT:  -- information.
5      MS. MAINIGI:  -- I cannot imagine it
6 wasn't filed in support of summary judgment or
7 the like.
8      MR. BENNETT:  I just don't remember.
9      MS. MAINIGI:  But --
10      MR. MIGLIORI:  Hold on.  I -- I
11 can't imagine that it was.  Because right now
12 the cover of the document says it's
13 confidential subject to a protective order.
14 Until I see something different, it's a
15 document that is not a public document.  Unless
16 it was used in trial in a public court, it's
17 not a court proceeding.
18      MR. SHKOLNIK:  Only certain lines
19 were used in the trial.
20      MR. MIGLIORI:  My position is that
21 this is not a public investigation or recording
22 of a public investigation.
23      BY MS. MAINIGI:
24   Q.   Are you done reading?
25      I -- I just have one follow-up

Page 140

1 question right now to what you were saying.
2      On 106 you indicated that you did an
3 on-site inspection.
4      Do you recall that?
5   A.   Yes.
6   Q.   Okay.  Tell me what you --
7   A.   The --
8   Q.   -- what you recall doing?
9      MR. MIGLIORI:  Objection.
10      BY MS. MAINIGI:
11   Q.   I'm sorry.  Go ahead.
12   A.   We went down there to see what they
13 had implemented.  They should us what steps
14 they had -- measures they had taken.  They had
15 actually added a -- I guess you could say a
16 department -- I -- I -- I don't -- I just know
17 that they added these -- an area that this is
18 where suspicious orders came to.  They would
19 make a decision or determination, and they kind
20 of explained the process.
21   Q.   Do you recall that the system that
22 they put into place met the requirements of
23 their memorandum of agreement?
24   A.   I would not know.
25      MR. BENNETT:  Objection.

Page 141

1      BY MS. MAINIGI:
2   Q.   Let's take a look at the same page,
3 106, pages 11 through -- lines 11 through 14.
4   A.   Okay.
5   Q.   Does that refresh your recollection?
6      Do you think that the system that
7 you saw of ABDC's complied with their
8 obligations under their memorandum of
9 agreement?
10      MR. BENNETT:  Object to form.
11      MR. MIGLIORI:  Objection to the use
12 of this.  Objection to the scope.  Assumes this
13 is opening up investigations.
14      THE WITNESS:  I know.  And you've
15 got this document.  It says what I said.
16      Do you wanted to really know?  I
17 don't have a recollection of it, no.
18      BY MS. MAINIGI:
19   Q.   Do you have any reason to disagree
20 with your recollection in 2011 in which you
21 said -- in response to the question "Did you
22 believe it met those requirements?" you
23 responded, "Did the best without it.  It met
24 the requirements of the memorandum of
25 agreement, yes."

36 (Pages 138 - 141)

Page 142

1     MR. MIGLIORI:  Objection to form.
2     THE WITNESS:  I do not object to
3  this.
4     BY MS. MAINIGI:
5     Q.   So based on your recollection and
6  your review sitting here today, you agree --
7  you have no reason to disagree with the
8  testimony you provided in 2011?
9     A.   Yes, ma'am.
10     MR. SHKOLNIK:  Objection.  Improper
11  use of the document.
12     BY MS. MAINIGI:
13     Q.   Let me ask you -- let me the switch
14  for one moment while we seem to be looking for
15  other things.
16     When there is a suspicious order --
17  or let's say a registrant identifies a possible
18  suspicious order.
19     It's quite possible that, upon
20  further investigation, the registrant could
21  resolve the question of whether the order is
22  suspicious and make the decision to go ahead
23  and ship, correct?
24     MR. BENNETT:  Objection.  Form.
25     THE WITNESS:  Correct.

Page 143

1     BY MS. MAINIGI:
2     Q.   Okay.  And the exercise that the
3  registrant goes through to do some due
4  diligence to really bear out whether the order
5  is, in fact, truly a suspicious order or not,
6  that due diligence exercise, is there a
7  regulatory requirement to document that due
8  diligence?
9     A.   I apologize for being such a worm.
10  Can you repeat, please.
11     (The record was read as requested.)
12     THE WITNESS:  No.
13     MS. MAINIGI:  Can you get out
14  Exhibit 17.
15     BY MS. MAINIGI:
16     Q.   While -- while we're just getting
17  that exhibit together, one question for you,
18  Mr. Wright, in a different area.
19     Did you -- for a while you had a
20  practice of notifying registrants when a
21  distributor terminated a customer based on
22  concerns about diversion, correct?
23     A.   Yes.
24     Q.   And so you would group -- you would
25  send out an e-mail or something and BCC

Page 144

1  individuals from various companies, your
2  contacts at various companies, in an effort to
3  keep folks apprised about customers that were
4  terminated, correct?
5     A.   Yes.
6     Q.   And you would send those e-mails to
7  both distributors and manufacturers, correct?
8     A.   Yes.
9     Q.   And you understood that the
10  recipients of these e-mails found them helpful
11  in carrying out their due diligence
12  obligations, correct?
13     MR. BENNETT:  Objection.  Form.
14     THE WITNESS:  Yes.
15     BY MS. MAINIGI:
16     Q.   And at the end of your e-mails, you
17  would say to distributors or manufacturers
18  something to the effect of, "If your company
19  deems it appropriate to terminate or restrict a
20  customer, as a courtesy to the distributor
21  community, please notify this office," correct?
22     A.   Correct.
23     Q.   And do you recall that, in fact,
24  distributors did do that, correct?
25     A.   Correct.

Page 145

1     Q.   And DEA -- and now, each of the
2  pharmacies that were reported, those
3  distributors -- excuse me.  Let me start over.
4     Each of the pharmacies reported by
5  these distributors, they themselves were also
6  DEA registrants, right?
7     A.   I -- I'm sorry.  I got lost in
8  translation.
9     Q.   I -- I did too.  I apologize.
10     Each of the pharmacies that might
11  have been reported through this process to you
12  by a distributor, for example, the pharmacy
13  itself was also a DEA registrant, correct?
14     A.   Yes, ma'am.
15     Q.   Okay.  And DEA had the power to also
16  investigate those pharmacies to make sure they
17  were not diverting control substances, correct?
18     A.   It could.
19     Q.   Do you recall DEA revoking the
20  registrations of any of the pharmacies that
21  they thought were, in fact, diverting?
22     MR. SHKOLNIK:  Objection to form.
23     THE WITNESS:  Yeah, I moved.  I'm
24  sorry.
25     I know that referrals were made, to

Page 146

1  that extent.  As to what -- headquarters never
2  directed and said, "You have to start an
3  investigation.  You have to do -- go do this,"
4  or whatever.  Because they may have other
5  priorities or other things going on.
6      But we -- we tried to keep -- I
7  guess you could say a similar closed system of
8  distribution, in other words, tried to keep
9  everybody informed.  And everything could take
10  the actions that's they wanted to that they
11  deemed appropriate.
12      BY MS. MAINIGI:
13  Q.  So when you say referrals were made,
14  who were the referrals made to?
15  A.  To the office.  Wrights Pharmacy is
16  in Bangor -- Bangor, Maine.  Whoever's got
17  Maine.
18  Q.  To the particular field office?
19  A.  Yes, ma'am.
20  Q.  Okay.  And so you know referrals
21  might have been made out of headquarters; you
22  don't know what the field offices did with
23  those referrals.
24  A.  No, ma'am.
25  Q.  Okay.  Now, the e-mails that you had

Page 147

1  been sending, which were well received by the
2  distributors, at some point you stopped sending
3  those e-mails, right?
4      MR. MIGLIORI:  Objection.  Form.
5      THE WITNESS:  Yes, ma'am.
6      BY MS. MAINIGI:
7  Q.  And the reason you stopped sending
8  those e-mails was because the DEA got sued by
9  several of the pharmacies over the e-mails,
10  correct?
11      MR. BENNETT:  Objection to form.
12      To the extent you received any
13  instructions from counsel, you're not to answer
14  based on those instructions.
15      THE WITNESS:  The downstream
16  customers were -- I -- I -- I specifically do
17  not know of a specific lawsuit.  But there was
18  a threat of legal action.
19      BY MS. MAINIGI:
20  Q.  You recounted in your deposition, if
21  you recall, that you had to go to court and got
22  scolded by a judge about this.
23      Do you recall that?
24      MR. MIGLIORI:  Objection.
25      MR. BENNETT:  Objection.

Page 148

1  Do you have a page and line?
2      MS. MAINIGI:  I do.  142 to 143,
3  lines 19 through 6.
4      MR. SHKOLNIK:  Objection.  Improper
5  use of a transcript.
6      THE WITNESS:  142?
7      BY MS. MAINIGI:
8  Q.  Yes.  142 to 143.
9      What do you recall, Mr. Wright, as
10  to the reasons why you stopped sending the
11  e-mails to distributors that we were just
12  discussing?
13      MR. BENNETT:  Objection.  Same
14  instruction.
15      THE WITNESS:  Because we were being
16  threatened with potential lawsuits because
17  pharmacies were claiming it was undue
18  burdening.  If they couldn't get their supply,
19  how could they -- they were being disparaged
20  without given due process.
21      BY MS. MAINIGI:
22  Q.  And to your knowledge, was that the
23  only -- well, let -- let me rephrase.
24      Those e-mails were one way a
25  distributor was able to learn about a bad

Page 149

1  customer that had been reported by another
2  distributor to the DEA, correct?
3      MR. MIGLIORI:  Objection.
4      MR. BENNETT:  Objection.  Form.
5      THE WITNESS:  It was a basis of good
6  communication.
7      BY MS. MAINIGI:
8  Q.  That was one way for one distributor
9  to have visibility into a bad customer
10  terminated by another distributor, correct?
11      MR. BENNETT:  Objection.
12      THE WITNESS:  Correct.
13      MR. BENNETT:  Form.
14      Go ahead.
15      THE WITNESS:  Correct.
16      BY MS. MAINIGI:
17  Q.  To your knowledge, was there another
18  way for -- that existed at the time for a
19  distributor to know that another distributor
20  had terminated a customer?
21  A.  Yes, ma'am.
22  Q.  What is that?
23  A.  For the distributor community to
24  quit being so proprietary and protective of
25  their own customers and everything else and set

38 (Pages 146 - 149)

Page 150

1  up their own system.  They could have
2  implemented what we were doing and share it any
3  way they wanted to.
4      Q.   And were you aware whether there
5  were antitrust or other legal obligation -- or
6  legal impediments to that?
7          MR. MIGLIORI:  Objection.
8          THE WITNESS:  I wouldn't know.
9          MS. MAINIGI:  I'm going to put
10  Exhibit 17 in front of you, Mr. Wright.
11      (Deposition Exhibit 17 was marked
12  for identification.)
13          BY MS. MAINIGI:
14      Q.   Now, Exhibit 17 is a McKesson
15  presentation made to DEA regarding their
16  controlled substance monitoring program.
17          Do you recall attending this
18  presentation, Mr. Wright?
19      A.   No, ma'am.
20      Q.   Okay.  Did you, from time to time,
21  go to presentations like this as new -- as
22  distributors came up with their new systems or
23  improved systems in respond [sic] to the DEA's
24  changes, did you get invited to presentations?
25          MR. MIGLIORI:  Object to form.

Page 151

1          THE WITNESS:  Very rarely.
2          BY MS. MAINIGI:
3      Q.   When you did get invited, as with
4  this McKesson system, I imagine you had the
5  opportunity to ask questions about the program
6  if you chose.
7          MR. MIGLIORI:  Objection.
8          THE WITNESS:  Yes, ma'am.
9          BY MS. MAINIGI:
10      Q.   And would you provide feedback on
11  the systems?
12          MR. MIGLIORI:  Can I ask -- the real
13  time doesn't give a --
14          THE REPORTER:  I can't hear you.
15  I'm sorry.
16          MR. MIGLIORI:  The real time doesn't
17  give an answer to the question of what he
18  remembers being there.  It has a series of
19  numbers instead.
20          Can we establish was there, or did
21  we not have one?
22      (The record was read as requested.)
23          MS. MAINIGI:  I'm going to -- while
24  you're still looking at this, I'm going to put
25  Exhibit 27 in front of you, Mr. Wright.

Page 152

1      (Deposition Exhibit 27 was marked
2  for identification.)
3          BY MS. MAINIGI:
4      Q.   Take a look, when you get a chance,
5  at Exhibit 27, in particular the second
6  paragraph on the first page, which might help
7  refresh your recollection as to whether you
8  were present or not.
9          MR. MIGLIORI:  Are there any the
10  copies?
11          MS. MAINIGI:  Can you pass that down
12  to the plaintiffs, please.
13          MR. BENNETT:  We only have one.  You
14  only have one.  I have one.  He has one.
15          MS. MAINIGI:  Right.  Can you give
16  that to the plaintiffs.  I -- I think I have --
17  oh, I have one more.  I'm sorry.  Didn't see
18  that.
19          MR. BENNETT:  This is 27?
20          MS. MAINIGI:  Yes.
21          MR. BENNETT:  We went from 17 to 27,
22  yes?
23          MS. MAINIGI:  We have some others in
24  between.  Yes.
25          THE WITNESS:  Okay.

Page 153

1          BY MS. MAINIGI:
2      Q.   Is it -- does this refresh your
3  recollect that you attended the -- the meeting
4  with McKesson where they reviewed with DEA
5  their new suspicious monitoring system in 2008?
6      A.   It says I was there.  Do I recall
7  being there?  No.
8      Q.   It does appear, if you take a look
9  at the next few pages, that you asked some
10  questions of the McKesson folks about their
11  system; fair?
12          MR. BENNETT:  Object to form.  He
13  already testified he doesn't remember if he was
14  there.  And the document speaks for itself.
15          THE WITNESS:  And after that pause,
16  please.
17      (The record was read as requested.)
18          MR. BENNETT:  Objection.  Form.
19          THE WITNESS:  Yes.
20          BY MS. MAINIGI:
21      Q.   Do you recall approving or
22  disapproving of McKesson's system in any way?
23          MR. MIGLIORI:  Objection.
24          THE WITNESS:  No.
25          BY MS. MAINIGI:

39 (Pages 150 - 153)

Page 154

1    Q.   Do you recall providing feedback
2  that any part of McKesson's system was
3  inadequate?
4    A.   No.
5    Q.   That was not something DEA was in a
6  position to do, correct?
7        MR. BENNETT:  Objection to form.
8        THE WITNESS:  I honestly don't
9  recall.
10       BY MS. MAINIGI:
11   Q.   If there was something that you
12  thought was problematic in McKesson's system,
13  is it fair to say you certainly would have
14  shared your views at a meeting like this?
15       MR. SHKOLNIK:  Objection.
16  Speculation.
17       MR. BENNETT:  Objection.  Form.
18       THE WITNESS:  I probably would have
19  made comment, yes.
20       BY MS. MAINIGI:
21   Q.   Let me ask you to turn to Page 4 of
22  this document, and the second-to-last paragraph
23  on Page 4.
24   A.   Second to last?
25   Q.   Yes.

Page 155

1        Let me read this paragraph into the
2  record:  "Mr. Wright also asked whether
3  McKesson could determine how much its customers
4  were buying from other suppliers.  We responded
5  that this was very difficult and often involved
6  confidential business information.  McKesson
7  may be able to ask if a customer used other
8  suppliers, but the details of such purchases
9  would not be something McKesson could require.
10  DEA understood that this may be an area where
11  the agency would be in a better position to
12  find out" -- "find out this information."
13       Do you see that?
14   A.   I do.
15   Q.   Okay.  Do you know whether DEA ever
16  made any effort, just as a general matter, to
17  share with the supplier or distributor
18  community the total amounts one particular
19  pharmacy was purchasing of controlled
20  substances from multiple distributors?
21   A.   No.
22   Q.   Can you clarify?
23       MR. SHKOLNIK:  Objection to form.
24       BY MS. MAINIGI:
25   Q.   Does "no" mean there was no effort

Page 156

1  made by DEA to do that?
2        MR. SHKOLNIK:  Objection to form.
3        MR. BENNETT:  Objection.
4        THE WITNESS:  No.  Because it was --
5  automatically led to proprietary information.
6  If they are not going to talk to each other,
7  why should we be the emissary.
8        MS. MAINIGI:  Okay.  Why don't we go
9  ahead and take a break.
10       THE WITNESS:  Thank you.
11       THE VIDEOGRAPHER:  We are going off
12  the record.
13       This is the end of Media Unit No. 3.
14       The time is 2:21.
15       (A short recess was taken.)
16       THE VIDEOGRAPHER:  We are going back
17  on the record.
18       This is the start of Media Unit No.
19  4.
20       The time is 2:40.
21       You may proceed, Counsel.
22       (Deposition Exhibit 14 was marked
23  for identification.)
24       BY MS. MAINIGI:
25   Q.   Mr. Wright, I've put in front of you

Page 157

1  Wright Exhibit 14.  It is a PowerPoint from a
2  presentation given by the DEA at a
3  pharmaceutical industry conference, which
4  appears to have taken place on September 11,
5  2007.
6        MS. MAINIGI:  Could we ask whoever
7  is typing to go on mute, please.  Excuse me.
8  Whoever is typing, could you go on mute.
9        MR. MIGLIORI:  I think you said this
10  was --
11       SPECIAL MASTER COHEN:  That was me.
12  I'm sorry.  I am sorry.  I wasn't on mute.
13  Sorry.
14       MS. MAINIGI:  All right.  David,
15  that's not some angry order you were typing up
16  right now, is it?  Or if it is, just make sure
17  Hunter's name is on it.
18       SPECIAL MASTER COHEN:  I'll read it
19  to you.  It says that if you ordered a sandwich
20  it is not a problem.
21       MR. BENNETT:  Special Master Cohen,
22  that's the order you've issued in this case.
23  Thank you.
24       SPECIAL MASTER COHEN:  Sorry about
25  that.  I'm going on mute.

40 (Pages 154 - 157)

Page 158

1     MR. MIGLIORI:  You said a DEA
2 presentation?
3     MS. MAINIGI:  Is a DEA conference.
4 I'm going to start all over.
5     BY MS. MAINIGI:
6   Q.   Wright Exhibit 14, Mr. Wright,
7 appears to be a PowerPoint authored by
8 AmerisourceBergen for a DEA conference that
9 took place on September 11th, 2007.
10     Do you see that?
11     MR. BENNETT:  Objection to form.
12     THE WITNESS:  Yes, I do.
13     BY MS. MAINIGI:
14   Q.   Have you seen this document before?
15   A.   I really do not have any specific
16 recollection.
17   Q.   The Drug Enforcement Administration
18 -- the Drug Enforcement Administration
19 pharmaceutical industry conference, are you
20 just generally aware of that conference?
21     Was it an annual conference, for
22 example?
23   A.   It is held periodically.
24   Q.   Not annually?
25   A.   I -- I don't believe so, because of

Page 159

1 funding and other things that are going on.
2   Q.   Okay.  Now, do you think you would
3 have attended this conference?
4   A.   There is possibility.
5   Q.   Okay.  And do you think Mr. Mapes
6 would have attended this conference?
7   A.   I would not know.  I would not know.
8   Q.   Do you recall hearing of a
9 conference where AmerisourceBergen reviewed its
10 Suspicious Order Monitoring program?
11   A.   No, ma'am.
12     MS. MAINIGI:  Okay.  I'm going to
13 put Wright 20 in front of you, Mr. Wright.  If
14 you could take -- it's front and back.  If you
15 could take a moment and review it.
16     (Deposition Exhibit 20 was marked
17 for identification.)
18     BY MS. MAINIGI:
19   Q.   Ready, Mr. Wright?
20   A.   Yes.
21   Q.   Can you identify this document,
22 Wright 20?
23   A.   This is apparently a -- a e-mail --
24 and the backside is the attachment --
25 pertaining to a FOIA request.

Page 160

1   Q.   And the backside, the -- the
2 paragraphs which are Bates number US DEA
3 00007629, do you believe you authored that
4 paragraph -- or that page, rather?
5   A.   Yes.
6   Q.   And who is Ms. McMurren, Torri
7 McMurren?
8   A.   I do not recollect.  The only reason
9 -- I -- I don't recollect.
10   Q.   If you look at the very last
11 paragraph on the page that you authored, you
12 note in the first sentence:  "Resolution of
13 suspicious orders is under the purview of the
14 DEA."
15     Do you see that?
16   A.   Yes.
17   Q.   Do you agree with that statement?
18     MR. BENNETT:  I'm going to object to
19 the form.
20     But You can answer.
21     THE WITNESS:  Okay.  I have a little
22 problem because this is and after.  I don't
23 know the before.  I don't know what the FOIA
24 was pertaining to.  I don't know what the
25 question was.  And -- and the -- the last part

Page 161

1 is this would not -- my statement literally
2 would not go beyond.  FOIA has to produce the
3 answer, not me.  I give her background.  That's
4 all.
5     BY MS. MAINIGI:
6   Q.   And I think that's what this is,
7 right?
8     This -- this e-mail that you wrote
9 to her is you giving her background, correct?
10   A.   Yes, ma'am.
11   Q.   Okay.  So -- and -- and I don't care
12 about the FOIA request, frankly.  I just have
13 questions about some of the stuff that you
14 wrote as background.
15     So with that, as -- as a general
16 matter, do you agree with the sentence you
17 wrote here that the resolution -- the
18 resolution of suspicious orders is under the
19 purview of the DEA?
20     MR. BENNETT:  Objection to form.
21 Asked and answered.
22     THE WITNESS:  I'm -- I can't answer
23 because I don't know -- I don't know what
24 predicated me to put this statement without
25 seeing the other material.  I don't know if the

41 (Pages 158 - 161)

Page 162

1  context of that document was asking for
2  something about suspicious orders that would
3  cause me to make this statement.
4      BY MS. MAINIGI:
5      Q.  Once a suspicious order is reported
6  to the DEA, is it fair to say that the
7  resolution of the suspicious order is under the
8  purview of the DEA?
9      MR. BENNETT:  Object to form.
10     MR. MIGLIORI:  Objection.
11     THE WITNESS:  No.
12     BY MS. MAINIGI:
13     Q.  Why is that?
14     A.  Because what's resolution?  Means I
15  have to resolve it.
16     Q.  Well, you used the word
17  "resolution," right?
18     A.  I -- I did in response to a FOIA,
19  which I have no idea what it was.
20     Q.  Well, let -- let's -- let's go in a
21  different -- let's go to the paragraph before
22  it.
23         In that paragraph you say:  "Just
24  because a customer has been identified as
25  having transacted one or more purchases which

Page 163

1  the manufacturer or the distributor deems
2  suspicious, does not mean that activity was
3  illicit in any manner."
4         Is that a statement with which you
5  agree?
6      MR. BENNETT:  Objection to form.
7      THE WITNESS:  Yes.
8      BY MS. MAINIGI:
9      Q.  Do you also agree with the statement
10  that comes right after:  "It is an issue for
11  DEA to resolve through appropriate
12  investigation"?
13     MR. BENNETT:  Objection.  Form.
14     THE WITNESS:  It is -- in that
15  context it's leading me to -- again I -- I can
16  only go back to what the FOIA was -- was asking
17  or referring to to make it in this connote --
18  to respond in this way.
19         It -- it- - I'm reading this is that
20  I'm responding to something in a FOIA that was
21  quite specific, whatever.  This could have been
22  a registrant asking about activity -- a
23  downstream registrant.  I have no idea.  And so
24  I -- I -- I don't know why --
25     BY MS. MAINIGI:

Page 164

1      Q.  So let me -- let me keep going.
2  We're going to come back to that statement.
3         After a distributor notifies DEA of
4  a suspicious order, DEA has no obligation to
5  investigate, correct?
6      MR. BENNETT:  Objection.  Form.
7      THE WITNESS:  No.
8      BY MS. MAINIGI:
9      Q.  Can you -- are you agreeing with me?
10         Maybe I asked the question poorly?
11         Does DEA have an obligation to
12  investigate a suspicious order after it is
13  reported by a distributor?
14     MR. BENNETT:  Objection.  Form.
15     THE WITNESS:  No.
16     BY MS. MAINIGI:
17     Q.  DEA can take the reported suspicious
18  order and compound it with other intelligence
19  that the DEA has and make an assessment about
20  what to do with a suspicious order, correct?
21     MR. BENNETT:  Object to form.
22     THE WITNESS:  That's one thing they
23  could potentially do.
24     BY MS. MAINIGI:
25     Q.  And then there are a myriad of other

Page 165

1  things they could potentially decide to do in
2  response to a suspicious order report, correct?
3      MR. BENNETT:  Object to form.
4      THE WITNESS:  Correct.
5      BY MS. MAINIGI:
6      Q.  They could conduct a full-blown
7  investigation, correct?
8      A.  Correct.
9      Q.  Or they could conclude that, for
10  other reasons, further investigation is not
11  warranted, correct?
12     A.  Correct.
13     Q.  High distribution volume standing
14  alone is not indicative by itself of illegal
15  activity, correct?
16     MR. BENNETT:  Objection to form.
17     THE WITNESS:  A singular issue by
18  itself, one item, and I won't ask other
19  questions, but don't base your decision on just
20  one item.
21     BY MS. MAINIGI:
22     Q.  So just to confirm, if all you have
23  is high distribution volume standing alone, no
24  other items, that in and of itself is not
25  indicative of illegal activity, correct?

42 (Pages 162 - 165)

Page 166

1     MR. BENNETT:  Objection to form.
2     THE WITNESS:  You could have six
3  items, and it doesn't mean it's illicit.  It
4  means that everything has to be followed
5  through.  You have to alleviate the anomalies,
6  explain the anomalies, justify the anomalies.
7     These are anomalies.  They do not
8  implicate.
9     I will clarify this even further.
10  We had problems with administrative subpoenas.
11  These people would cut the customers off
12  because I sent an information request.  We
13  specifically started telling them, "Don't do
14  that."  Because it's not an inference that
15  there's an investigation going on.  I may be
16  requiring information just to compare it to
17  other information.
18     So nothing is indicative or implicit
19  that there is an illicit activity.  They are
20  anomalies.  Resolve the anomaly.
21     BY MS. MAINIGI:
22     Q.    So let me come back to this
23  statement that you have in this memo that you
24  wrote then.
25     Once the suspicious order is

Page 167

1  reported to the DEA, the DEA certainly has
2  control over the resolution of that suspicious
3  order, correct?
4     MR. BENNETT:  Objection to form.
5     THE WITNESS:  To whom?  I'm -- I'm
6  -- I'm sorry.  I'm understanding that we report
7  back to the person that made the suspicious
8  order and tell them, "Oh, no.  This isn't
9  suspicious"?
10     That's the context I hear of your
11  question.
12     BY MS. MAINIGI:
13     Q.    Well, what do you think the DEA's
14  obligation is when it gets a suspicious
15  order --
16     MR. BENNETT:  Objection.
17     BY MS. MAINIGI:
18     Q.    -- reported it to?
19     MR. BENNETT:  Oh, I'm sorry.
20     Objection.  Form.
21     THE WITNESS:  A lot of it is up to
22  the discretion of the field office, their
23  manning capability, their workload and all this
24  other kind of stuff.  Its priority and its
25  importance, where it ranks.

Page 168

1     Is -- the examples you ave were very
2  good.  I mean it -- it may be delving into
3  something else.  Something might come out of it
4  and -- and all this.
5     But "resolution" is the word I'm
6  having trouble with.  I know I said it.  And
7  again, I go back to I don't know what the FOIA
8  was asking and how -- how I was addressing this
9  so explicitly.  But there was something in that
10  FOIA that caused me to say this.
11     BY MS. MAINIGI:
12     Q.    Would you substitute another word
13  for "resolution" that would make it more clear
14  to you or more agreeable?
15     MR. SHKOLNIK:  Objection to form.
16     MR. BENNETT:  Objection.
17     THE WITNESS:  "Review."
18     BY MS. MAINIGI:
19     Q.    Review of suspicious orders is under
20  the purview of the DEA; agree?
21     A.    Agree.  If I have to replace it.
22     Q.    ARCOS data.  A few questions,
23  Mr. Wright.
24     Did distributors only have access to
25  their own ARCOS data, to your knowledge?

Page 169

1     A.    The only other information that they
2  would have would be the public reports that we
3  publish 1 through 7.
4     Q.    I'm sorry.  I missed the -- what --
5  what are the public reports?
6     A.    Public reports are very gran -- not
7  very granular.  They're very, very broad.
8  Okay?  Hydrocodone sales by state to hospitals,
9  to doctors, to pharmacies, by population.
10     They are not specific.  And we
11  definitely worked very hard -- we -- we kept it
12  at three-digit ZIP code.  Because if we went
13  down to a five-digit ZIP code, there may be one
14  pharmacy in that five digit ZIP code.  Then
15  everybody would know it.  Or there may be one
16  hospital or whatever.
17     So it was very broad, very general.
18  But it was also very good at seeing trends
19  comparing one state to another or a ZIP -- a
20  group of ZIP codes within another.  And it also
21  had population.  In other words, population
22  consumption.  Okay?
23     So otherwise, the answer to your
24  real question that predicated this is no.  Did
25  not share or give Distributor Y Distributor's L

43 (Pages 166 - 169)

Page 170

1  data.
2      Q.   Just to make sure the record is
3  clear, each distributor provided their own
4  ARCOS data to the DEA, correct?
5      A.   Correct.
6      Q.   And the DEA did not take
7  distributor -- one distributor's ARCOS data and
8  share it with another distributor, correct?
9      A.   Not to my knowledge.
10     Q.   And did the same apply for
11  pharmacies?
12     A.   It applied to all registrants.
13     Q.   And manufacturers as well?
14     A.   All registrants.
15     Q.   Now, the ARCOS system included
16  reporting tools, correct?
17          Were -- were there different reports
18  that could be run from the ARCOS data?
19     A.   You can extrapolate data any way you
20  want.
21     Q.   So you were -- and maybe not you
22  personally.
23          But the DEA was able to slice and
24  dice ARCOS data in a number of different ways
25  through various reports?

Page 171

1          MR. BENNETT:  Objection to form.  I
2  also will remind the witness that the witness
3  is not authorized to disclose investigative
4  techniques, the effect of -- effectiveness of
5  which would be impaired by his answer.
6          THE WITNESS:  Data is data.
7  Extrapolate.  Extrapolate the data.
8          BY MS. MAINIGI:
9      Q.   Okay.  So the ARCOS data could be
10  utilized in different ways through different
11  reports, correct?
12     A.   At the a very beginning of this
13  deposition, you talked about this.  And you
14  even said and commented that, at the end of it,
15  was data specific.
16     Q.   Yes.
17     A.   That is what we did.
18     Q.   Okay.  So for different purposes you
19  extracted ARCOS data in different ways?
20     A.   Yes.
21     Q.   And I think what you told me at the
22  beginning of this deposition was that for
23  particular distributors, for example, you were
24  able to identified outliers and aberrations,
25  correct?

Page 172

1      A.   Correct.
2      Q.   And on a routine basis, did DEA do
3  that?
4          MR. BENNETT:  Objection.  Form.
5          THE WITNESS:  Routine basis of what?
6          BY MS. MAINIGI:
7      Q.   Well, the distributor initiatives
8  were somewhat unique and part of an ongoing
9  process.
10          On some sort of regular or
11  semiregular basis, did DEA endeavor to identify
12  outliers and aberrations in the ARCOS data?
13          MR. MIGLIORI:  Objection to form.
14          MR. BENNETT:  Objection to form.
15          BY MS. MAINIGI:
16     Q.   I'm sorry.  Did you answer the
17  question?
18     A.   No.  And now I forgot your question.
19          MS. MAINIGI:  Sorry.  My fault.
20          Can we read that back, please.
21          (The record was read as requested.)
22          MR. MIGLIORI:  Objection.
23          THE WITNESS:  Yes.
24          BY MS. MAINIGI:
25     Q.   At a high level, can you explain

Page 173

1  how?
2      A.   It's really hard for me to do high
3  level.  I just go --
4      Q.   Whatever level you can summarize
5  briefly.
6          MR. BENNETT:  With the restrictions
7  as you understand in the letter.
8          MR. SHKOLNIK:  Objection.  Outside
9  the scope of the subpoena.
10          THE WITNESS:  We would look for
11  anomalies.  We used different techniques.  But
12  basically it was to recognize anomalies that
13  were confirmable, either with other data sorts.
14  And then we would do as much to resolve the
15  anomaly.  And if we couldn't resolve the
16  anomaly, then we'd send it out to the field for
17  investigative leave.
18          BY MS. MAINIGI:
19     Q.   How do you define "anomaly" in the
20  way that you're using it?
21     A.   Well, the volume is too high.  You
22  brought this one up in -- in -- in this.  And
23  it's not a indicator all by itself.  But in --
24  let's say there's two factors that -- the
25  frequency of ordering has been increasing, and

44 (Pages 170 - 173)

Page 174

1 the volume has been going up. Okay?
2     We've looked at it. We can't really
3 explain it. You know what? The field goes out
4 there and says, "You know what? They just
5 opened a new oncology unit over here at this
6 hospital."
7     And -- okay. Now I've resolution.
8 And it's been -- it's been looked at. Okay? I
9 can understand that.
10     But if they drive out there, and
11 this is Pickle Town, and there's only five
12 people that live here, and they are comparing
13 with a population of 200,000, something is
14 wrong.
15    Q.   So the circumstances and the due
16 diligence would determine the resolution,
17 ultimately.
18     MR. SHKOLNIK: Objection to form.
19     THE WITNESS: One of the factors,
20 yes.
21    BY MS. MAINIGI:
22    Q.   Other factors?
23     MR. SHKOLNIK: Objection. Form.
24     THE WITNESS: A good investigator
25 isn't going to take everything on its -- on

Page 175

1 face value. You resolve it. You dig into it.
2 That's what you get paid for. That's why
3 you're called an investigator.
4    BY MS. MAINIGI:
5    Q.   And every circumstance could be a
6 little different. It's not one size fits all.
7    A.   There is -- I -- listen. I did so
8 many investigations. There are a lot of
9 patterns and similarities. But no two
10 investigations were ever the same.
11    Q.   Mr. -- Mr. Wright, what were the
12 circumstances of your departure from the DEA?
13    A.   I retired.
14    Q.   Did you ever release ARCOS data to
15 the West Virginia attorney general?
16     MR. MIGLIORI: Objection. Outside
17 the scope of the subpoena.
18     I imagine that's why the government
19 is talking as well.
20     MS. MAINIGI: I don't feel like
21 their time should count against me.
22     MR. BENNETT: You know, I'm going to
23 object to the question. I believe it's outside
24 the scope of the information that you have
25 requested from this witness and has not been

Page 176

1 vetted whether he can talk about that case or
2 not.
3     He also has a specific instruction
4 not to talk about specific investigations. And
5 I believe what happened in West Virginia would
6 fall under that particular restriction.
7     I know part of that is now publicly
8 known. But I don't believe that that controls
9 his authorization.
10     So at this point I'm going to
11 instruct the witness that he's not authorized
12 to answer any questions about specific
13 information he may or may not have given
14 another law enforcement agency.
15     MS. MAINIGI: Okay. Well, so I
16 don't necessarily agree with what --
17     MR. BENNETT: I understand.
18     MS. MAINIGI: -- you said James.
19     But rather than hold all of us up,
20 here's what I suggest: I think, other than
21 that question, that issue, and obviously the
22 desire to reserve time for later, I'm done.
23 I'm ready to pass the baton over to my
24 colleague.
25     I suggest we go ahead off the

Page 177

1 record, let Mr. Wright take his break that he
2 was seeking. And then I can see if during the
3 break I have a document or something that I --
4     MR. BENNETT: Before we go off the
5 record, I just -- I want to make sure the
6 record's clear.
7     Is the only question you want to ask
8 whether he provided information to West
9 Virginia attorney general's office? Or do you
10 want to get into the details and substance of
11 that?
12     MS. MAINIGI: Well, depending on
13 what the answer is, I'd probably want to ask
14 some follow-ups.
15     MR. BENNETT: Okay. That's what I
16 want to know.
17     Are you ready for your break?
18     I know we haven't been going the
19 full hour.
20     Do you want to take a break?
21     THE WITNESS: I would very much
22 appreciate it.
23     MR. BENNETT: Then we'll take our
24 break.
25     MS. MAINIGI: Let's take a break.

45 (Pages 174 - 177)

Page 178

1     MR. TAYMAN:  It will be at least 30
2  minutes so he can go out and smoke?
3     MS. MAINIGI:  Yes.
4     MR. BENNETT:  Okay.  Great.
5     THE VIDEOGRAPHER:  We are going off
6  the record.
7     The time is 3:12.
8     (A short recess was taken.)
9     THE VIDEOGRAPHER:  We are going back
10  on the record.
11     The time is 3:43.
12     You may proceed, Counsel.
13
14     EXAMINATION BY COUNSEL FOR DEFENDANT
15     MALLINCKRODT, PLC and SPECGX, LLC
16  BY MR. O'CONNOR:
17     Q.   Mr. Wright, good afternoon.
18     I'm Andrew O'Connor.  We met just a
19  minute ago.  I represent --
20     MR. O'CONNOR:  We have the phone on
21  the line.
22  BY MR. O'CONNOR:
23     Q.   Mr. Wright, I'm Andrew O'Connor.  I
24  represent one of the manufacturers in the case.
25  And I appreciate you taking the time to be

Page 179

1  here.  I'm sure you're -- there are many other
2  places you'd rather be.
3     MS. McCLURE:  Andrew, can you speak
4  up a little bit.
5     MR. O'CONNOR:  Sure.
6     MS. McCLURE:  Thank you.
7  BY MR. O'CONNOR:
8     Q.   So, Mr. Wright, we've heard the term
9  "registrant" used a number of times today.
10     What's your understanding of the
11  word "registrant" in this context?
12     A.   Anyone that is registered by the
13  Drug Enforcement Administration to handle
14  controlled substances.
15     Q.   Is it fair to say there's different
16  categories of registrants under the DEA
17  regulations?
18     A.   Yes.
19     Q.   Okay.  What are some of those
20  categories?
21     A.   Manufacturers, distributors,
22  hospitals, practitioners, pharmacies, reverse
23  distributors, repackagers, relabelers.
24     Q.   That's a pretty good list.
25     Fair to say that each of those

Page 180

1  categories plays a different role in the supply
2  chain?
3     A.   In the distribution chain, yes.
4     Q.   Sure.
5     And is it also fair to say that each
6  of those categories has different
7  responsibilities within the distribution chain?
8     A.   Yes.
9     Q.   So the responsibilities that a
10  manufacturer has might be different in some
11  cases from what a distributor has, correct?
12     A.   Yes.
13     Q.   Okay.  And the responsibilities that
14  a distributor has might be different from the
15  responsibilities a pharmacy has.
16     A.   Yes.
17     Q.   Okay.  What is your understanding of
18  who a manufacturer's customers are?
19     Who do they sell to?
20     MR. MIGLIORI:  Objection to form.
21     THE WITNESS:  A general manufacturer
22  sells directly to distributors.
23     MR. O'CONNOR:  Okay.
24     THE WITNESS:  There are exceptions.
25  There's nothing prohibiting them to be a direct

Page 181

1  supplier to say a hospital or if there's a
2  special product they sell directly to a clinic
3  or a practitioner.
4     BY MR. O'CONNOR:
5     Q.   Is it true that they also might sell
6  to chain pharmacies that have their own
7  distribution centers?
8     A.   Yes.
9     Q.   Okay.  Are you familiar with the
10  term "independent pharmacy"?
11     MR. SHKOLNIK:  It is possible to
12  speak up just a little bit louder.  It's really
13  --
14     MR. O'CONNOR:  Sure.
15     MR. SHKOLNIK:  Hard to hear you down
16  here.  Sorry.
17     BY MR. O'CONNOR:
18     Q.   Are you familiar with the term
19  "independent pharmacy"?
20     A.   Yes.
21     Q.   What does that term mean to you?
22     A.   Not owned by a corporation.  It's
23  usually a -- you know, like -- I own a
24  pharmacy.
25     Q.   Uh-huh.

46 (Pages 178 - 181)

Page 182

1      A.   I do not work for CVS or -- this is
2  my pharmacy.
3      Q.   Okay.  Generally speaking, do
4  manufacturers sell to independent pharmacies,
5  in your experience?
6      A.   Repeat the question, please.
7      Q.   Generally speaking, do manufacturers
8  sell to independent pharmacies, in your
9  experience?
10      A.   No.
11      Q.   Okay.  Turning back to the question
12  of the responsibilities of registrants at
13  different levels in the distribution chain, is
14  it fair to say that each type of registrant has
15  certain responsibilities with respect to the
16  interactions it has with the next level in the
17  supply chain?
18          MR. BENNETT: Objection.  Form.
19          THE WITNESS:  Yes.
20          BY MR. O'CONNOR:
21      Q.   So, for example, a manufacturer must
22  check a distributor's registration before it
23  ships that distributor a product, correct?
24      A.   Correct.
25      Q.   At the same time, a manufacturer

Page 183

1  would not be required to check a pharmacy's
2  registration before it shipped product to a
3  distributor; is that fair?
4          MR. SHKOLNIK: Objection to form.
5          THE WITNESS:  Correct.
6          BY MR. O'CONNOR:
7      Q.   Okay.  And the manufacturers don't
8  have a responsibility to do that because they
9  don't sell product to that pharmacy, correct?
10      A.   There was no direct contact.
11      Q.   Okay.  And so they don't have that
12  responsibility, correct?
13      A.   Correct.
14      Q.   Do manufacturer registrants have any
15  obligation to examine individual prescriptions
16  written by doctors?
17      A.   No.
18      Q.   Is it fair to say then that a
19  manufacturer wouldn't know whether a particular
20  prescription was medically necessary or not?
21          MR. SHKOLNIK: Objection to form.
22          MR. MIGLIORI:  Objection.  Scope.
23  Foundation.
24          BY MR. O'CONNOR:
25      Q.   You can answer.

Page 184

1      A.   And the question was?
2          MR. O'CONNOR:  Do you mind reading
3  it back.
4          (The record was read as requested.)
5          MR. MIGLIORI:  Objection.
6          THE WITNESS:  No.
7          BY MR. O'CONNOR:
8      Q.   Why is that not fair to say?
9      A.   They wouldn't have direct contact
10  that they would need.
11      Q.   Okay.  So just so the record is --
12  is clear, do you agree that a manufacturer
13  would not know whether a particular
14  prescription was medically necessary?
15          MR. MIGLIORI:  Objection.
16          MR. BENNETT: Objection to form.
17          THE WITNESS:  If it was not a direct
18  sale --
19          MR. O'CONNOR:  Uh-huh.
20          THE WITNESS:  -- no.
21          BY MR. O'CONNOR:
22      Q.   Okay.  Earlier you mentioned in your
23  testimony that there might be limited
24  circumstances in which a manufacturer had
25  visibility into the doctor-patient

Page 185

1  relationship.
2          Do you recall that testimony?
3      A.   Yes.
4      Q.   What are those limited
5  circumstances?
6      A.   Special studies.
7      Q.   Special studies?  Okay.
8          Are there any circumstances outside
9  of special studies in which a manufacturer
10  would have visibility into a doctor-patient
11  relationship?
12          MR. SHKOLNIK: Objection to form.
13          MR. MIGLIORI:  Scope.
14          THE WITNESS:  Specifically, off the
15  top of my head, I do not know.  There is a
16  possibility.  And again, because of studies or
17  whatever that occur.
18          BY MR. O'CONNOR:
19      Q.   Okay.  But as you sit here today, no
20  other possibilities come to mind?
21          MR. SHKOLNIK: Objection.
22          MR. BENNETT: Objection to form.
23          THE WITNESS:  No.
24          BY MR. O'CONNOR:
25      Q.   Okay.  Generally speaking,

47 (Pages 182 - 185)

Page 186

1    Mr. Wright, is it fair to say that manufacturer
2    registrants don't have knowledge of where
3    individual distributors are selling the
4    manufacturer's products?
5         MR. BENNETT:  Object to form.
6         THE WITNESS:  Generally speaking?
7         MR. O'CONNOR:  Generally speaking.
8         THE WITNESS:  No.
9         BY MR. O'CONNOR:
10    Q.   Are there any exceptions to that
11    that you can think of as we sit here today?
12    A.   I -- no.
13    Q.   Earlier today you testified, I
14    believe, that you had some positions at the DEA
15    headquarters here in Washington; is that
16    correct?
17    A.   I was in positions here?
18    Q.   Yes.
19    A.   Yes.
20    Q.   Yes.
21         And in those positions, did your
22    responsibilities include issues related to
23    manufacturer registrants?
24    A.   Yes.
25    Q.   And in addition to personnel like

Page 187

1    yourself at DEA headquarters, there are DEA
2    personnel stationed in field offices, correct?
3    A.   Yes.
4    Q.   Do individual manufacturer
5    registrants have a reporting relationship to
6    their local field offices?
7         MR. BENNETT:  Objection.  Form.
8         THE WITNESS:  Reporting obligation?
9         BY MR. O'CONNOR:
10    Q.   Reporting obligation or reporting
11    relationship.
12         Do manufacturers communicate --
13    let's -- let's -- let's start -- start again.
14         Do manufacturer registrants
15    communicate with their local field office from
16    time to time?
17         MR. SHKOLNIK:  Objection to form.
18         Was there a referral?  The prior two
19    questions -- I just want to make it clear for
20    the record.
21         MR. O'CONNOR:  Yes.  Strike the
22    prior two questions.  And we can just answer
23    the pending one.
24         MR. SHKOLNIK:  Thank you.
25         THE WITNESS:  Yes.

Page 188

1         BY MR. O'CONNOR:
2    Q.   Okay.  Based on your experience, do
3    you have any sense of how often a manufacturer
4    might communicate with its local field office?
5    A.   No.
6    Q.   When a field office -- or if a field
7    office were to provide direction of some kind
8    to a manufacturer registrant, would you expect
9    the manufacturer registrant to follow that
10    direction?
11         MR. BENNETT:  Objection.  Form.
12         MR. MIGLIORI:  Objection.
13         THE WITNESS:  What the registrant
14    chooses to do or not to do is their discretion.
15         BY MR. O'CONNOR:
16    Q.   From time to time, are you aware of
17    DEA personnel in field offices or at
18    headquarters providing direction to
19    registrants?
20    A.   Could you be -- rephrase that or be
21    more specific, please.
22    Q.   Sure.
23         I'm wondering if you're aware of any
24    instances in which a DEA employee might have
25    provided direction to a registrant.

Page 189

1    A.   There are -- there is an official
2    system, depending upon -- your question is very
3    broad.  So I'm going to speak generally.
4         But -- if -- if -- if the field
5    office couldn't point to a specific reg --
6    regulation or citation and could say, "Follow
7    this," then they would refer it up to liaison
8    policy, who would then review it.  And if it
9    needed to be stipulated in writing, it would
10    be, or something like that.
11    Q.   Are you aware of any questions from
12    a registrant that worked their way through that
13    system that related to Suspicious Order
14    Monitoring?
15    A.   No.  No, I wouldn't.
16    Q.   Okay.  Earlier today you testified
17    about the distributor initiative.
18         Do you generally recall discussing
19    that subject?
20    A.   Yes, I do.
21    Q.   Okay.  And to be clear, the
22    distributor initiative involved a series of
23    meetings with distributors regarding Suspicious
24    Order Monitoring; is that fair?
25    A.   Yes.

48 (Pages 186 - 189)

Page 190

1     Q.    Okay.  When did those meetings take
2  place?
3     A.    Beginning in late 2005.
4     Q.    Okay.  And when was the last
5  distributor initiative meeting that you recall?
6     A.    They were still being continued when
7  I got transferred to targeting and analysis.
8  And I have no idea after that.
9     Q.    Okay.  When was that?
10    A.    2011, 2012, I think.
11    Q.    Okay.  The distributor initiative
12  meetings were with DEA registered distributors,
13  correct?
14    A.    Exclusively?
15    Q.    Were they with anyone besides --
16    A.    There were --
17    Q.    -- DEA registered --
18    A.    -- a couple of manufacturers that
19  were --
20    Q.    Okay.
21    A.    -- briefed.
22    Q.    Which manufacturers?
23    A.    I do not recall their names.
24    Q.    Okay.  Do you recall when they were
25  briefed?

Page 191

1     A.    Excuse me?
2     Q.    Do you recall when they were
3  briefed?
4     A.    Periodically, depending upon a need
5  to brief them because of activity that we were
6  seeing.
7     Q.    Were those briefings part of the
8  distributor initiative?  Were they something
9  else?
10    A.    They were a modified --
11    Q.    Okay.
12    A.    -- distributor meet -- or briefing.
13    Q.    Is it fair to say that the
14  distributor initiative was focused on
15  distributors?
16    A.    Yes.
17    Q.    Okay.  In fact, it was totally
18  focused on distributors, correct?
19         MR. BENNETT:  Objection to form.
20         THE WITNESS:  Yes.
21         BY MR. O'CONNOR:
22    Q.    Was there any separate manufacturer
23  initiative that you or others undertook while
24  at DEA?
25    A.    No.

Page 192

1     Q.    During the time period that you were
2  involved in the distributor initiatives, are
3  you aware of any guidance the DEA provided to
4  manufacturer registrants regarding Suspicious
5  Order Monitoring?
6     A.    Specifically, no.
7     Q.    Generally do you recall any?
8     A.    Generally I know there was
9  discussion.  And I know that -- I don't know
10  what it result -- resulted in.
11    Q.    Are you familiar at all with the
12  content of those discussions?
13    A.    I do not recall, no.
14    Q.    Do you have any recollection of who
15  was involved in the discussions you're
16  referring to?
17    A.    It would be my superiors up to the
18  front office.
19    Q.    Who would those individuals include?
20    A.    My direct, immediate supervisors.
21    Q.    And who was that?
22    A.    Well, I had multiple.
23    Q.    Who were they?
24    A.    Oh, boy.  I can't list them all.
25    Q.    Can you list some of them?

Page 193

1     A.    Barbara Boockholdt; Robert Hill;
2  who, of course, Mike Mapes has been mentioned.
3  But there's probably about three or four more
4  that I have left off.
5     Q.    Okay.  As you sit here today, can
6  you remember any guidance whatsoever that the
7  DEA provided to manufacturer registrants
8  regarding their obligations under the
9  Suspicious Order Monitoring regulation?
10    A.    No.
11    Q.    With respect to manufacturer
12  registrants, what does a suspicious order look
13  like?
14         MR. BENNETT:  Objection to form.
15         THE WITNESS:  You can apply the same
16  principles in at least two categories that I'm
17  thinking of off the top of my head.
18         If the volume of a particular --
19  volume starts to increase dramatically, the
20  frequency of orders start to increase, those
21  are two -- especially in the context of the
22  volume would be -- you're -- you're --
23  pharmacies are already ordering -- or
24  distributors are already ordering a substantial
25  amount.  And you start to see a frequency

49 (Pages 190 - 193)

Page 194

1  change.  Why is that?  So yes.
2       BY MR. O'CONNOR:
3    Q.   So just so I understand, are -- is
4  your testimony that, for a manufacturer,
5  suspicious orders are those orders for which
6  there's a dramatic increase in volume --
7       MR. BENNETT:  Objection.
8       BY MR. O'CONNOR:
9    Q.   -- or a dramatic increase in
10  frequency?
11      MR. BENNETT:  Sorry.
12  Objection.
13      THE WITNESS:  One or both.
14      BY MR. O'CONNOR:
15   Q.   Okay.  Besides volume and frequency,
16  are there any other factors that are relevant
17  to determining whether an order is suspicious
18  to a manufacturer?
19   A.   I'm overanalyzing.
20      Repeat the question, please.
21      MR. O'CONNOR:  Would you mind
22  reading it back.
23      (The record was read as requested.)
24      THE WITNESS:  I -- I -- I can't
25  recall -- I do not know at this time, no.  I

Page 195

1  don't know.
2       BY MR. O'CONNOR:
3    Q.   Okay.  I want to ask a few more
4  questions about what you meant when you talked
5  about a significant increase in volume.
6       For a manufacturer, how do you tell
7  if an increase in volume is significant enough
8  to be suspicious?
9       MR. BENNETT:  Objection.  Form.
10      THE WITNESS:  I think, when you're
11  dealing with a narcotic product that is a
12  potential for abuse, that you should sign on
13  the -- sign on as much caution as you possibly
14  can.  Because it's going out there, and it
15  could -- the -- the -- you could potentially --
16  it could be potentially causing harm.
17      And if that product is traced back,
18  the -- the company needs to be thinking about
19  the -- the total ramifications of its potential
20  good name.
21      BY MR. O'CONNOR:
22   Q.   Okay.  But when an order comes into
23  to a manufacturer, how does that manufacturer
24  decide if a volume increase is enough to make
25  it suspicious?

Page 196

1       MR. BENNETT:  Objection.  Form.
2       MR. MIGLIORI:  Objection.
3       THE WITNESS:  There is -- if -- you
4  look at your previous sales.  You look at those
5  and see if there's -- and it's usually a fairly
6  steady line.  There might be some peaks,
7  valances.  But there's nothing dramatic.
8       But if that starts climbing up, or
9  if it goes up significantly, you look at your
10  own data.  You look at your own sales
11  information to make that information.
12   Q.   What do you mean when you say it
13  goes up significantly?
14      MR. BENNETT:  Objection.  Form.
15      THE WITNESS:  You're the one that
16  has to be able to establish -- I can't -- that
17  is a judgment call by the manufacturer based
18  upon their data.
19      BY MR. O'CONNOR:
20   Q.   And that's not a judgment call you
21  can make?
22      MR. BENNETT:  Objection.  Form.
23      THE WITNESS:  As I stated in the
24  previous testimony, that's an anomaly that
25  needs to be resolved.

Page 197

1       Again, you're dealing with a
2  narcotic product that can cause harm or danger,
3  death.  Side on the -- resolve the anomaly.
4  Discovery what it is.
5       BY MR. O'CONNOR:
6    Q.   "Anomaly" is a word you've used a
7  few times.
8       When you just used it there, what do
9  you mean by "anomaly"?
10   A.   Out of the ordinary.
11   Q.   And what does "out of the ordinary"
12  mean in this context?
13   A.   Again, if I were in your shoes and I
14  was working -- I was making a decision at the
15  company level, I'd be looking at previous
16  sales; I'd be looking at distribution patterns,
17  has it changed; are there seasonal variations.
18  Looking at the data in totality.  Is this
19  rising to a -- a level?
20      The company has to make that
21  decision based upon their history and
22  relationship.
23   Q.   Earlier you mentioned that the
24  frequency of orders is another factor to be
25  considered when deciding an order is

50 (Pages 194 - 197)

Page 198

1  suspicious; is that fair?
2      A.  Yes.
3      Q.  How do you tell if an order is too
4  frequent?
5          MR. BENNETT:  Objection to form.
6          THE WITNESS:  If there is an
7  established pattern of ordering a couple of
8  times a month, and all of a sudden there's
9  ordering picking up a third little one, and
10  that starts to repeat itself, why?
11          BY MR. O'CONNOR:
12      Q.  So is your testimony that, if a
13  distributor ordered twice a month and then
14  ordered a third type -- time in the month,
15  that's suspicious?
16          MR. BENNETT:  Objection.  Form.
17          THE WITNESS:  If there are -- what
18  it amounts to, truly, to answer your question,
19  is you have to look at the variances that are
20  occurring, either in frequency or in volume and
21  resolve those.
22          Are the variances, to you, worth
23  looking into?
24          BY MR. O'CONNOR:
25      Q.  In your judgment, how significant

Page 199

1  does a variance need to be for it to be worth
2  looking into?
3      A.  There's too many --
4          MR. BENNETT:  Objection to form.
5          THE WITNESS:  Too many variables.
6  Knowing the customer, knowing the customer,
7  region, the specific narcotic or the drug that
8  you're talking about.
9          You have to look at all these things
10  together in a scope.
11          BY MR. O'CONNOR:
12      Q.  And in your position, do you ever
13  advise a manufacturer registrant regarding any
14  of those things that you just mentioned that
15  should be factors when considering whether an
16  order is suspicious?
17      A.  I don't specifically recall.
18      Q.  Did you feel that you were able to
19  know whether an individual order a manufacturer
20  received was suspicious?
21          MR. SHKOLNIK:  Objection.  Form.
22          THE WITNESS:  Yes.
23          BY MR. O'CONNOR:
24      Q.  And how would you know?
25      A.  By the things that we just

Page 200

1  discussed:  Significant increase in the volume
2  of sales; when a product was already out there
3  and it was already known on a national level,
4  that this was a drug of abuse.
5      Q.  Well, explain that to me.
6          Does the fact that a product was
7  known at a national level to be a drug of abuse
8  mean an order for it is suspicious?
9      A.  There were a lot of local news
10  articles.  And it got down to the national
11  level and finally up to the testimony
12  proceeding, the enactment of the Ryan Haight
13  Act, the narcotics, the other drugs associated
14  with those narcotics that were being abused and
15  were actually killing people.
16      Q.  So I'm going to ask you to answer my
17  question.
18          Does the fact that a product was
19  known at a national level to be a drug of abuse
20  mean the order for it is suspicious?
21          MR. SHKOLNIK:  Objection to form.
22  That's not what he said.
23          MR. MIGLIORI:  Objection.
24          MR. BENNETT:  Objection.
25          MR. O'CONNOR:  Strike that question.

Page 201

1          Could the court reporter please read
2  back my original question.
3          (The record was read as requested.)
4          MR. TAYMAN:  Objection.  Asked and
5  answered.
6          MR. SHKOLNIK:  Object to form.
7          MR. O'CONNOR:  I also don't think
8  that was an accurate retelling of my question.
9          BY MR. O'CONNOR:
10      Q.  Let me ask this question very
11  clearly:  Does the fact that a drug, in your
12  words, is known as a -- at a national level to
13  be a drug that's abused mean that an order for
14  it is suspicious?
15      A.  No.
16      Q.  Okay.  Other than the factors we've
17  just discussed here, are there any other
18  factors that you can think of that would make
19  an order placed to a manufacturer suspicious?
20          MR. MIGLIORI:  Object to form.
21          THE WITNESS:  There probably are,
22  but I don't recall them off the top of my head.
23          BY MR. O'CONNOR:
24      Q.  Okay.  Are you familiar with the
25  phrase "know your customer's customer"?

51 (Pages 198 - 201)

Page 202

1  A.  No.
2     Q.   Okay.  Do you recall any discussions
3  that you had with any individuals at
4  Mallinckrodt?
5        MR. BENNETT:  Objection.
6        Remind the witness that he's not
7  authorized to talk about any specific
8  investigations.
9        THE WITNESS:  I do not recall.
10       MR. O'CONNOR:  Okay.  I'm going to
11  mark Exhibit 28.
12       (Deposition Exhibit 28 was marked
13  for identification.)
14       MR. TAYMAN:  You said 28?
15       MR. O'CONNOR:  28.
16       BY MR. O'CONNOR:
17    Q.   This is an e-mail between you and
18  Karen Harper.
19       Do you know who Karen Harper is?
20    A.   I do not recall.
21    Q.   Do you recall this e-mail exchange?
22    A.   Very vague.
23    Q.   What do you remember about the
24  exchange of Mallinckrodt?
25    A.   I -- really not much.  I -- I'm

Page 203

1  sorry.
2     Q.   Okay.  It references -- the e-mail
3  references a discussion between yourself and
4  Don Lohman and Karen Harper during a DEA
5  pharmaceutical training conference.
6        Do you --
7     A.   Okay.
8     Q.   -- see that?
9        Do you recall that DEA
10  pharmaceutical training conference?
11    A.   No, sir.
12    Q.   And do you recall any discussion
13  with a Don Lohman at that conference?
14       MR. SHKOLNIK:  Objection to form.
15       THE WITNESS:  No.  No, sir.
16       BY MR. O'CONNOR:
17    Q.   Do you recall any discussions with
18  Don Lohman at any time?
19    A.   No, sir.
20    Q.   Do you recall any discussions with
21  Karen Harper at any time?
22    A.   No, sir.
23    Q.   As you sit here today, can you think
24  of any document or other material that would
25  refresh your recollection on any discussion

Page 204

1  with Don Lohman or Karen harper.
2        MR. MIGLIORI:  Objection.
3        THE WITNESS:  No, sir.
4        BY MR. O'CONNOR:
5     Q.   Do you recall any other discussions
6  with manufacturer registrants regarding
7  Suspicious Order Monitoring?
8     A.   No, sir.
9     Q.   Mr. Wright, did you have a practice
10  of taking notes when you had conversations with
11  registrants?
12    A.   I -- I was not a very good note
13  taker.
14    Q.   Do you recall ever taking notes when
15  having discussions with registrants?
16    A.   No.
17    Q.   Earlier today you talked a little
18  bit about Excessive Order Reports.
19       Do you remember that subject matter
20  generally?
21    A.   Yes, sir.
22    Q.   Is it fair to say that not all
23  orders on those Excessive Order Reports were
24  truly suspicious?
25    A.   You're interchanging words,

Page 205

1  "excessive" and "suspicious."  So I -- I don't
2  understand the context now.
3     Q.   So in -- in your view, were all of
4  the orders on Excessive Order Reports truly
5  suspicious?
6        MR. SHKOLNIK:  Objection.
7        MR. BENNETT:  Object -- objection to
8  form.
9        THE WITNESS:  No.
10       BY MR. O'CONNOR:
11    Q.   So in that case, it's fair to say
12  that not all orders on Excessive Order Reports
13  were truly suspicious, correct?
14       MR. MIGLIORI:  Objection.  Asked and
15  answered.
16       MR. BENNETT:  Objection.
17       THE WITNESS:  You know, I really
18  can't answer that.
19       BY MR. O'CONNOR:
20    Q.   So are you changing your testimony
21  from just a moment ago?
22       MR. BENNETT:  Objection to the form
23  of the question.
24       MR. O'CONNOR:  I just want -- want a
25  clear answer on this.

52 (Pages 202 - 205)

Page 206

1    MR. TAYMAN:  Why don't we have the
2  question read back and let him answer it again.
3    MR. O'CONNOR:  Would you mind
4  reading the last question back.
5    (The record was read as requested.)
6    THE WITNESS:  I'm having a lot of
7  difficulty answering your question.  Because
8  you're transposing "excessive" and
9  "suspicious."
10    MR. O'CONNOR:  Uh-huh.
11    THE WITNESS:  Excessive did not
12  report suspicious.  And it reported excessive.
13  And that was the limit of its foundation.
14    BY MR. O'CONNOR:
15    Q.  So excessive orders are different
16  from suspicious orders?
17    MR. MIGLIORI:  Objection.
18    THE WITNESS:  If they reached
19  arbitrary benchmark that whoever decided to do
20  the report set.  Once it reached it, that's all
21  there was to it.
22    BY MR. O'CONNOR:
23    Q.  But to be clear, do you believe that
24  excessive orders are different from suspicious?
25    MR. MIGLIORI:  Objection.

Page 207

1    THE WITNESS:  Earlier today we
2  talked about the distributor briefing.  And
3  inside that debriefing is the context or a
4  repeat of the federal regulation.  Those are
5  the criteria for suspicious orders.
6    A suspicious order does not mean
7  that -- there's nowhere in that definition of
8  the -- under CFR of a suspicious order of
9  saying it reached a bench -- arbitrary
10  benchmark.  That's the difference between
11  excessive and suspicious.
12    BY MR. O'CONNOR:
13    Q.  Okay.  Is it fair to say that not
14  all orders reported as suspicious are likely to
15  be diverted?
16    MR. BENNETT:  Objection.
17    THE WITNESS:  I'm going to
18  regurgitate your question to you.
19    That you're saying that a suspicious
20  order does not necessarily mean that there's an
21  illicit act.
22    MR. O'CONNOR:  Okay.
23    MR. SHKOLNIK:  Object to the form of
24  the reforming of the question.
25    MR. O'CONNOR:  Your -- your

Page 208

1  objection was to his question?
2    MR. SHKOLNIK:  Yes.
3    MR. O'CONNOR:  All right.
4    BY MR. O'CONNOR:
5    Q.  With respect to the suspicious
6  orders that were reported to DEA, is it fair to
7  say that there were a large number of false
8  positives?
9    MR. BENNETT:  Objection to form.
10    THE WITNESS:  Because a suspicious,
11  there could be a false positive.  As to the
12  quantity, I cannot stipulate.
13    BY MR. O'CONNOR:
14    Q.  Isn't it true that there were a
15  large number of suspicious orders that were
16  reported to DEA that were not, in fact, likely
17  to be diverted?
18    MR. BENNETT:  Objection to the form.
19    THE WITNESS:  I know --
20    BY MR. O'CONNOR:
21    Q.  You can answer the question.
22    A.  I know that there was a quantity.
23  As to the extent of that quantity being large
24  or not large, I don't know.
25    MR. O'CONNOR:  All right.  I'm going

Page 209

1  mark Exhibit No. 29.
2    (Deposition Exhibit 29 was marked
3  for identification.)
4    MR. O'CONNOR:  Counsel, could the
5  witness read his copy?
6    MR. BENNETT:  Give me one second.
7    MR. MIGLIORI:  You said 29, right?
8    MR. O'CONNOR:  Yeah.  Exhibit 29.
9  And for the record, it's US DEA 00007691.
10    MR. BENNETT:  Don't answer anything
11  yet.
12    BY MR. O'CONNOR:
13    Q.  This is an e-mail exchange between
14  you and Ruth Carter, correct?
15    MR. BENNETT:  Counsel, hang on one
16  second.  We're having it reviewed by DEA
17  counsel to see if there's any basis for any
18  objections or any concerns with this document.
19    Can we hold off on the question for
20  a moment, please.
21    MR. O'CONNOR:  Sure.
22    MR. BENNETT:  Thank you.
23    To the extent that this may refer to
24  a specific investigation, the witness is not
25  authorized to answer any questions about that

53 (Pages 206 - 209)

1    specific investigation.
2         Otherwise, you can answer his
3    questions.
4         Thank you for the time, Mr.
5    O'Connor.
6         MR. MIGLIORI: Can I ask the
7    government just a -- is it the investigation or
8    the methodology of the investigation that's the
9    limitation?
10        MR. BENNETT: So It's both.  If it's
11   a confidential law enforcement technique, the
12   effectiveness of which would be impaired by
13   disclosing it, then it would also include that
14   as well, which Mr. Wright's aware of.
15        MR. MIGLIORI: Okay.  Thank you.
16        MR. O'CONNOR: So I'm going to guess
17   you want that question read back, right?
18        (The record was read as requested.)
19        THE WITNESS: Yes.
20        BY MR. O'CONNOR:
21    Q.   Who is Ms. Carter?
22    A.   She was my supervisor.
23    Q.   Okay.  Another one of those names.
24        Is -- strike that.
25        Do you recognize this e-mail

1    exchange?
2     A.   I have recollection not of all the
3    context, but yes.
4     Q.   Okay.  And do you see halfway down
5    an e-mail from you dated January 31st, 2017, at
6    5:32 p.m.?
7     A.   Where do we see 5:32 p.m.?
8         Yes.
9     Q.   Okay.  And would you mind just
10   reading that e-mail for the record.
11        MR. MIGLIORI: Objection.
12        THE WITNESS: "The WDO, on a monthly
13   basis, downloads all SORS reports from the
14   previous month, conducts the analysis of those
15   SORS to eliminate large number of false
16   positives, and then assigns out the
17   miscellaneous assignments, those that have
18   investigative potential.  I previously passed
19   this link to the GSs within the division to
20   include newly assigned GS Kellum for their
21   information."
22        BY MR. O'CONNOR:
23    Q.   Okay.  Any reason to think that
24   e-mail -- it wasn't accurate at the time you
25   wrote it?

1     A.   No.
2     Q.   Okay.  Curiosity:  What is the WDO?
3     A.   Washington district office.
4     Q.   Okay.  Okay.  When you said in this
5    e-mail that there were a large number of false
6    positives, that referred to orders that were
7    reported to suspicious but were not likely to
8    be diverted, correct?
9         MR. BENNETT: Objection.  Form of
10   the question.
11        THE WITNESS: The word "diverted"
12   means an act that it -- my understanding of the
13   word "diverted" means an act that has already
14   been fulfilled.  It's -- it's -- it's been
15   taken out -- taken out of this closed system of
16   distribution.
17        MR. O'CONNOR: Okay.
18        THE WITNESS: It doesn't
19   necessarily -- source does not mean -- or
20   suspicious order does not imply that.  It
21   implies that there are suspicions that need to
22   be resolved.  Anomalies exist.
23        BY MR. O'CONNOR:
24    Q.   Okay.  But being reported as
25   suspicious does not imply necessarily that it

1    will be diverted, correct?
2     A.   It does not imply that, no.
3     Q.   Earlier today we talked a little bit
4    about -- or about ARCOS data.
5         At one point you were the unit chief
6    for targeting and analysis, correct?
7     A.   Correct.
8     Q.   And that unit is responsible for
9    ARCOS data; is that fair?
10    A.   It is responsible for the output
11   side of -- and making the information available
12   as needed for analytical studies,
13   investigations.  But it is not responsible for
14   the input side.
15    Q.   Okay.  What do you mean by "the
16   output side"?
17    A.   Output the product has been
18   finalized.
19    Q.   Okay.  Would that refer to reports
20   that are generated from ARCOS or something
21   else?
22    A.   The information has gone through the
23   input side, which does several checks to make
24   sure that the data could be used and received
25   properly; it's been reported properly.

Page 214

1    Then once it goes through the form
2  that they report, it then has to go -- an NDC
3  number is what they report with no description.
4  When it comes to me, it's the NDC and then the
5  full description.
6    It is the registrant's DEA number.
7  That's it.  Mine is the cross-reference to the
8  CSA, which gives me -- tells me that it's a
9  pharmacy or -- or -- or whatever.
10    Once it comes to me, then the data
11  is available for our use.
12    Q.   And what was the purpose of your use
13  of the data?
14    A.   To support investigations and to
15  determine if I saw any outliers, anomalies that
16  I -- my group, my unit felt were egregious
17  enough to warrant further investigation.
18    Q.   And how would your group going about
19  -- go about determining whether they're
20  egregious enough to warrant further
21  investigation?
22    MR. BENNETT:  Object.  The witness
23  is instructed that you may not talk about
24  confidential law enforcement techniques that
25  you used.

Page 215

1    If you can answer in generalities,
2  you can answer the question.
3    I assume you're asking at a high
4  level?
5    MR. O'CONNOR:  Yes.
6    THE WITNESS:  Applying the
7  principles of Suspicious Order under the CFR.
8    BY MR. O'CONNOR:
9    Q.   Okay.  Did the employees you had
10  working for you receive any kind of training on
11  how to determine whether an order warranted
12  further investigation?
13    A.   Yes.
14    Q.   In your view, were they qualified to
15  determine whether particular orders warranted
16  further investigation?
17    MR. BENNETT:  Objection to the form.
18    THE WITNESS:  Yes.
19    BY MR. O'CONNOR:
20    Q.   Okay.  Let me talk for a minute
21  about registrants reporting obligations with
22  respect to ARCOS.
23    What were manufacturer registrants,
24  in your understanding, required to report
25  through ARCOS?

Page 216

1    A.   All activity.
2    Q.   And what do you mean by "all
3  activity"?
4    A.   Primarily what they acquired, what
5  they sold.  But also, for manufacturers, there
6  was a lot of things that occur in the
7  manufacturing process.  And those also had to
8  be reported.
9    Q.   Okay.  What about distributors; what
10  did they have to report through ARCOS?
11    MR. MIGLIORI:  Object to form.
12    THE WITNESS:  All activity.
13    BY MR. O'CONNOR:
14    Q.   And by "all activity," what do you
15  mean?
16    A.   Sales, purchases, losses, sales to
17  returns, sending it back to the manufacturer,
18  recalls.  Anything that happened with that
19  product, a -- a controlled substance, is
20  required to be reported under ARCOS, all
21  activity.
22    BY MR. O'CONNOR:
23    Q.   Okay.  So with respect to opioids in
24  particular, would the ARCOS -- would the ARCOS
25  data reflect how much bulk opioid product a

Page 217

1  manufacturer registrant purchased?
2    A.   Manufacturer bulk purchase?
3    Q.   Strike that.  Let me ask it a
4  different way.
5    With respect to opioids, would ARCOS
6  data reflect the volume of opioid product
7  purchased by a manufacturer?
8    A.   Yes.
9    Q.   Okay.  And would ARCOS data reflect
10  how many opioid tablets were sold by that
11  manufacturer?
12    A.   Yes.
13    Q.   Would ARCOS data reflect who those
14  manufacturer registrants sold the tablets to?
15    A.   Yes.
16    Q.   Would ARCOS data reflect how many
17  tablets a distributor or wholesaler purchased?
18    A.   Yes.
19    Q.   And would that ARCOS data reflect
20  which manufacturer registrant the distributor
21  or wholesaler purchased them from?
22    A.   Yes.
23    Q.   In your understanding, is there any
24  other party besides DEA that receives all of
25  that information we just discussed?

55 (Pages 214 - 217)

1      MR. MIGLIORI:  Objection.
2      MR. BENNETT:  Objection.  Form.
3      THE WITNESS:  Received my
4   information?
5      BY MR. O'CONNOR:
6    Q.    To your understanding, is there any
7   other party besides DEA that receives
8   information regarding every transaction with
9   respect to controlled substances between
10   manufacturers and distributors and distributors
11   and pharmacies?
12    A.    I would have no idea --
13      MR. MIGLIORI:  Objection.
14      MR. BENNETT:  Objection.  Form.
15      THE WITNESS:  I would have no idea.
16      BY MR. O'CONNOR:
17    Q.    Besides the DEA and other law
18   enforcement entities, do any private parties
19   have access to ARCOS data?
20      MR. BENNETT:  Objection.  Form.
21      THE WITNESS:  No.
22      BY MR. O'CONNOR:
23    Q.    Are you familiar with the term
24   "charge-back"?
25    A.    I'm familiar, yes.

1    Q.    What does the term "charge-back"
2   mean to you?
3      MR. BENNETT:  Objection.  This is
4   beyond the scope of what was requested of this
5   particular witness.  I will let him answer
6   based on his personal knowledge.
7      I understand this wasn't one of the
8   topic that anybody wanted to discuss with this
9   witness.  There's other witnesses that that's
10   been requested from.
11      THE WITNESS:  My understanding is
12   very limited.  I didn't deal with it.  It was a
13   field issue.
14      But it was giving credit through a
15   distributor.  The pharmacy would buy; the
16   distributor would confirm; and a re -- monetary
17   would go back to the pharmacy.
18      BY MR. O'CONNOR:
19    Q.    Do you have an understanding of
20   whether any information regarding the
21   distributor sale to the pharmacy was provided
22   back to a manufacturer in connection with the
23   charge-back?
24    A.    I would not know.
25      MR. O'CONNOR:  Okay.  Okay.  We've

1   been going about an hour.
2      Can we take maybe just a five- or
3   ten-minute break?
4      MR. BENNETT:  Ten minutes.
5      THE VIDEOGRAPHER:  We are going off
6   the record.
7      This is the end of Media Unit No. 4.
8      The time is 4:43.
9      (A short recess was taken.)
10      THE VIDEOGRAPHER:  We are going back
11   on the record.
12      This is the start of Media Unit No.
13   5.
14      The time is 4:59.
15      You may proceed, Counsel.
16      BY MR. O'CONNOR:
17    Q.    Thank you, Mr. Wright.  We're almost
18   done, I promise, at least with my portion of
19   the -- the event.
20      Before we took a break, we talked a
21   little bit about charge-backs.
22      And I wanted to ask, in your
23   understanding, what role, if any, do
24   charge-backs play in Suspicious Order
25   Monitoring?

1    A.    None.
2    Q.    Okay.
3    A.    None.
4    Q.    All right.  Just a couple other
5   questions.
6      Are you being compensated in any way
7   for your time here today?
8    A.    Absolutely not.
9    Q.    Okay.  Is anyone covering your
10   out-of-pocket expenses, anything like that?
11    A.    No.
12    Q.    Okay.  During your time at DEA,
13   Mr. Wright, was there ever a time when you were
14   subject to any sort of discipline?
15    A.    No.
16    Q.    And when you retired from DEA, was
17   that retirement of your own choosing?
18    A.    Absolutely.
19    Q.    Was there ever any request made by
20   anyone that -- that you leave the agency?
21    A.    None.
22      MR. O'CONNOR:  Okay.  Okay.  Thank
23   you very much.  That's actually all I have.
24      Can we just go off the record for a
25   few minutes.

56 (Pages 218 - 221)

Page 222

1    THE VIDEOGRAPHER:  We are going off
2  the record.
3    The time is 5:01.
4    (Discussion off the record.)
5    THE VIDEOGRAPHER:  We are going back
6  on the record.
7    The time is 5:03.
8    You may proceed, Counsel.
9
10   EXAMINATION BY COUNSEL FOR DEFENDANT
11   WALMART, INC.
12   BY MR. STEPHENS:
13   Q.   Mr. Wright, good afternoon.
14     My name is Neal Stephens.  I'm from
15  the Jones Day law firm.  And I represent
16  Walmart in this matter.
17   A.   Okay.
18   Q.   Good after -- so I'm also going to
19  ask you a series of questions on behalf of
20  retail pharmacies today.  Okay?
21   A.   Okay.
22   Q.   The other retail pharmacies in this
23  case are CVS, Rite Aid and Walgreens.
24   A.   Okay.
25   Q.   So if I mention retail pharmacies,

Page 223

1  those are the pharmacies I'm talking about; is
2  that fair?
3    A.   I understand.
4    Q.   Okay.  You testified earlier today
5  about the challenge that certain Internet
6  pharmacies were presenting to DEA, right?
7    A.   Correct.
8    Q.   And I just want to go through and
9  kind of define some terms.
10     You had mentioned that DEA knew that
11  certain Internet pharmacies were diverting
12  opioids, correct?
13   A.   Correct.
14   Q.   And you described a bit what the
15  Internet pharmacies' business model was like.
16  And I just want to repeat that to make sure
17  that we understand each other.
18     Internet pharmacies would obtain
19  their opioids from distributors, and then their
20  model or sales model out was to deal directly
21  with consumers or customers, fill the
22  prescriptions, and then send the opioids direct
23  to the consumers, correct?
24     MR. MIGLIORI:  Objection.
25     THE WITNESS:  That was one of the

Page 224

1  models out there.
2    BY MR. STEPHENS:
3    Q.   Okay.  And some of those Internet
4  pharmacies were located overseas?
5    A.   Yes.
6    Q.   China, for example.
7    A.   Possibly.  I don't know.
8    Q.   Okay.  You also testified about
9  certain pain clinics.
10     Do you remember that testimony from
11  earlier today?
12   A.   I remember just questions pertaining
13  to pain clinics.
14   Q.   Okay.  And there were certain
15  investigations that DEA was doing on certain
16  pain clinics; fair?
17   A.   Fair.
18   Q.   Okay.  And one of the models that
19  was a problem for diversion was where pain
20  clinics would receive opioids and then both
21  handled the prescriptions there at the pain
22  clinic and also do the dispensing at the pain
23  clinic, correct?
24     MR. BENNETT:  Objection.  Form.
25     THE WITNESS:  Correct.

Page 225

1    BY MR. STEPHENS:
2    Q.   And that business model of
3  self-dispensing at the pain clinic increased
4  the risk of diversion, true?
5    A.   Increased the risk of diversion?  If
6  it wasn't out of medical necessity, it was
7  diversion.
8    Q.   Okay.  My point is more their --
9  their model of delivering the method case
10  through to the customer.
11     So in a situation where a pain
12  clinic is both writing the prescription and
13  dispensing the medication and not sending the
14  patient to a different pharmacist, in your
15  view, based on your experience, does that
16  increase the risk of diversion?
17     MR. BENNETT:  Objection to the form.
18     THE WITNESS:  It puts a -- all the
19  responsibility on the prescriber.
20     BY MR. STEPHENS:
21   Q.   At -- and in -- in my sample, the
22  prescriber's at the pain clinic, correct?
23   A.   Correct.
24   Q.   Okay.  Now, Walmart did not
25  distribute controlled substances to Internet

57 (Pages 222 - 225)

1  pharmacies, true?
2      MR. BENNETT: Objection.
3      THE WITNESS: Not to my direct
4  knowledge.
5      BY MR. STEPHENS:
6   Q.  And CVS, Rite Aid and Walgreens also
7  did not distribute controlled substances to
8  Internet pharmacies, true?
9      MR. BENNETT: Objection.
10     MR. MIGLIORI: Objection.
11     THE WITNESS: I don't have any
12  direct knowledge, no.
13     BY MR. STEPHENS:
14  Q.  Okay. In -- in response to some of
15  the questions from my colleague who was
16  representing the manufacturers, you answered a
17  series of questions as to whether or not the
18  manufacturer had an obligation to check on
19  someone who they were not supplying to.
20     Do you recall that line of
21  testimony?
22  A.  Yes.
23  Q.  Okay. Would you agree that Walmart
24  and CVS and Rite Aid and Walgreens would have
25  no obligation to check on Internet pharmacies

1  who they did not distribute to?
2      MR. MIGLIORI: Objection.
3      THE WITNESS: All right. I lost --
4  I got lost. I'm sorry.
5      BY MR. STEPHENS:
6   Q.  That's fine. It's late in the day.
7  Let me ask the question again. Well, let me --
8  we'll just start over. I'll ask the question
9  again. Okay?
10  A.  Okay.
11  Q.  So my question is Walmart, CVS, Rite
12  Aid, Walgreens would have no obligation to
13  check on Internet pharmacies that they are not
14  selling to.
15  A.  Pharmacy to pharmacy or Walmart
16  distributor --
17  Q.  As a distributor.
18  A.  Ah, there's where I was -- I'm
19  sorry. Now I understand.
20  Q.  Do you want me to restate the
21  question?
22  A.  No. I understand now.
23     No.
24  Q.  Okay. Would you agree that Walmart
25  also did not distribute controlled substances

1  to pain clinics who dispensed their own
2  medications?
3      MR. BENNETT: Objection.
4      MR. SHKOLNIK: Objection.
5  Foundation.
6      THE WITNESS: Walmart -- repeat,
7  please.
8      BY MR. STEPHENS:
9   Q.  To your knowledge, did Walmart
10  distribute controlled substances to pain
11  clinics who dispensed their own medications?
12  A.  Not to my knowledge.
13  Q.  Okay. To your knowledge, did CVS,
14  Rite Aid or Walgreens distribute controlled
15  substances to pain clinics who prescribed and
16  dispensed their own controlled substances?
17     MR. MIGLIORI: Objection.
18     THE WITNESS: I don't have any
19  recollection of that, no.
20     BY MR. STEPHENS:
21  Q.  Okay. Would you agree that Walmart,
22  CVS, Rite Aid and Walgreens would have no
23  obligation to check on pain clinics that they
24  did not distribute to?
25     MR. SHKOLNIK: Objection to form.

1      THE WITNESS: In the context of your
2  question, no.
3      BY MR. STEPHENS:
4   Q.  Do you also agree that, to your
5  knowledge, Walmart did not distribute
6  controlled substances to any pharmacy other
7  than a Walmart pharmacy?
8      MR. MIGLIORI: Objection to form.
9  Foundation.
10     THE WITNESS: That was my
11  understanding of their operation, yes.
12     BY MR. STEPHENS:
13  Q.  Okay. Would you also agree that
14  CVS, Rite Aid and Walgreens also only
15  distributed -- well, let me restate that.
16     I'm going to take it one at a time.
17  Okay?
18  A.  Yes, sir.
19  Q.  Would you also agree that CVS did
20  not distribute controlled substances to any
21  pharmacy other than a CVS pharmacy?
22     MR. MIGLIORI: Objection. Form.
23  Foundation.
24     MR. BENNETT: Objection.
25     THE WITNESS: I -- I do not have any

58 (Pages 226 - 229)

Page 230

1  direct knowledge of that happening.
2       BY MR. STEPHENS:
3       Q.   Okay.  To your knowledge, would you
4  also agree that Rite Aid did not distribute
5  controlled substances to any pharmacy other
6  than a Rite Aid pharmacy?
7       MR. MIGLIORI:  Objection.
8       MR. BENNETT:  Objection.
9       THE WITNESS:  Not to my direct
10  knowledge.
11       BY MR. STEPHENS:
12       Q.   And finally, would you also agree
13  that, to your knowledge, Walgreens did not
14  distribute controlled substances to any
15  pharmacy other than a Walgreens pharmacy?
16       MR. MIGLIORI:  Objection.
17       MR. SHKOLNIK:  Objection.
18       THE WITNESS:  I can't say with
19  absolute certainty, but that wasn't their --
20  their structure.
21       BY MR. STEPHENS:
22       Q.   Earlier today you testified about
23  interactions between field division agents and
24  distributors.
25       Do you recall that testimony?

Page 231

1       A.   Yes, sir.
2       Q.   And at one point in your career --
3  earlier in your career you worked out in the
4  field.
5       You worked in Dallas, correct?
6       A.   Correct.
7       Q.   And you would have interactions and
8  conversations with registrants?
9       A.   Correct.
10       Q.   And some of those discussions would
11  relate to the monitoring system that
12  registrants had in place, fair?
13       A.   It would only deal with excessive
14  purchases.
15       Q.   Okay.  So -- but you would have
16  conversations with them about their excessive
17  purchasing monitoring, fair?
18       Or reporting.
19       MR. SHKOLNIK:  Objection to form.
20       THE WITNESS:  Yes.
21       BY MR. STEPHENS:
22       Q.   And based on your experience, you
23  think it would be fair for a registrant to rely
24  on guidance that the registrant received from
25  DEA agents out in the field?

Page 232

1       MR. BENNETT:  Objection to the form
2  of the question.
3       THE WITNESS:  If you make the phone
4  call, you expect to receive a -- an answer.
5  And if you're making that phone call, I think
6  you would rely on the information an then put
7  it together with ever -- other factors that are
8  known to you to make that decision.
9       BY MR. STEPHENS:
10       Q.   Okay.  And that's the registrant
11  receiving information from DEA, relying on
12  that, and then acting?
13       A.   Yes, sir.
14       Q.   Correct?  Okay.  Fair enough.
15       All right.  So let me transition to
16  another topic and ask you some questions about
17  ISOs and order to show causes.  Okay?
18       A.   Okay.
19       Q.   You -- you know that an ISO is an
20  immediate suspension order, true?
21       A.   Correct, sir.
22       Q.   And DEA has the power via an
23  immediate suspension order to suspend the DEA
24  registration of a registrant?
25       A.   Correct, sir.

Page 233

1       Q.   And -- and that is based on DEA's
2  determination that the registrant presents an
3  imminent danger to the public health and
4  safety.
5       A.   Correct.
6       Q.   When D -- DEA issues an immediate
7  suspension order, the registrant is immediately
8  banned from continuing to supply or prescribe
9  controlled substances pending the final outcome
10  of the administrative proceeding, true?
11       MR. BENNETT:  Objection.  I'm not
12  sure this witness has been requested or
13  authorized to talk about this.  So he can talk
14  about his personal knowledge regarding this but
15  not specific DOJ information or specific cases.
16       THE WITNESS:  And the question was?
17       BY MR. STEPHENS:
18       Q.   Sure.
19       Based on your knowledge and
20  experience, when DEA issues an immediate
21  suspension order, the registrant is immediately
22  banned from continuing to supply or prescribe
23  controlled substances pending the final outcome
24  of the administrative proceeding on that
25  matter.

59 (Pages 230 - 233)

Page 234

1    A.   It would be my understanding.
2    Q.   And your understanding, based on
3  your experience, is that DEA and only DEA has
4  the power to seek an immediate suspension
5  order, true?
6    A.   True.
7    Q.   A retail pharmacy cannot seek an
8  immediate suspension order against another
9  registrant, true?
10      MR. BENNETT: Objection. Form.
11      THE WITNESS: True.
12      BY MR. STEPHENS:
13   Q.   Okay.  So as far as orders to show
14  cause, in addition to immediate suspension
15  orders, DEA also has the ability to issue an
16  order to show cause to a customer who DEA
17  believes is diverting controlled substances,
18  true?
19      MR. BENNETT: Objection. Scope.
20      THE WITNESS: True.
21      BY MR. STEPHENS:
22   Q.   And then, based on your experience,
23  an order to show cause notifies the registrant
24  that the DEA is initiating an administrative
25  action to revoke or suspend the registrant's

Page 235

1  ability to distribute or prescribe controlled
2  substances, true?
3    A.   True.
4    Q.   If the registrant contests the order
5  to show cause, the matter goes to
6  administrative litigation to determine if the
7  registrant will lose its registration, true?
8    A.   I believe that's my understanding of
9  the process.
10   Q.   Okay.  And then like the immediate
11  suspension order, DEA and only DEA has the
12  power to issue an order to show cause in these
13  administrative proceedings.
14      MR. MIGLIORI: Objection.
15      THE WITNESS: I believe that is
16  correct.
17      BY MR. STEPHENS:
18   Q.   A retail pharmacy like Walmart or
19  Rite Aid or CVS or Walgreens has no power to
20  issue an order to show cause.
21   A.   No, sir.
22   Q.   I think we have a double negative
23  there.  So I'm going to re-ask the question --
24   A.   Okay.
25   Q.   -- so a year from now we know what

Page 236

1  your answer was.
2       Does a retail pharmacy have the
3  ability to issue an order to show cause to a
4  registrant?
5    A.   No.
6    Q.   Thank you.
7       So let me talk a little bit about
8  your career in diversion and dealing with
9  opioids.
10      Would you agree that DEA presumes
11  that most physicians prescribe appropriate
12  amount of pain medication.
13      MR. BENNETT: Objection.  Form.
14      MR. MIGLIORI: Objection.
15  Foundation.
16      THE WITNESS: I'm having a little
17  trouble with that question.  So would you
18  repeat it again, please.
19      BY MR. STEPHENS:
20   Q.   Sure.
21      Would you agree that most physicians
22  prescribe appropriate amounts of pain
23  medication?
24      MR. BENNETT: Objection.  Form.
25      THE WITNESS: I have no idea.

Page 237

1       BY MR. STEPHENS:
2    Q.   Okay.  Based on your experience at
3  DEA, are you aware of whether DEA has ever
4  taken a position on that?
5       MR. MIGLIORI: Objection.
6       THE WITNESS: I don't believe so.
7  Because that gets -- I don't believe so.
8       BY MR. STEPHENS:
9    Q.   Would you agree that opioids have a
10  legitimate medical use?
11   A.   Yes.
12      MR. BENNETT: Objection to the form
13  of the question.
14      BY MR. STEPHENS:
15   Q.   And would you agree that some access
16  to opioids is necessary to maintain the health
17  and general welfare of the American people?
18      MR. BENNETT: Objection.
19      MR. MIGLIORI: Objection.
20      THE WITNESS: In the context of
21  medical necessity.
22      BY MR. STEPHENS:
23   Q.   Yes, then.
24   A.   In the context of medical necessary.
25   Q.   Yes.  Okay.

60 (Pages 234 - 237)

Page 238

1      And many individuals would suffer if
2   they were unable to receive opioids their
3   doctors had prescribed for them?
4        MR. MIGLIORI:  Objection.
5        MR. BENNETT:  Object to the form --
6   sorry.  Objection to the form of the question.
7        I would remind the witness that he
8   is not authorized to give personal opinions
9   regarding nonpublic facts or information
10  acquired as part of your performance of your
11  official duties.
12       So to the extent you're giving
13  personal opinions, they cannot be based on
14  nonpublic facts or information that you
15  acquired in the performance of your official
16  duties.
17       MR. MIGLIORI:  Objection.
18  Foundation.
19       THE WITNESS:  And would you repeat
20  the question.
21       BY MR. STEPHENS:
22   Q.   Sure, Mr. Wright.  Absolutely.
23       Many individuals would suffer if
24  they were unable to receive the opioid
25  medication that their doctors prescribed for

Page 239

1   them?
2        MR. SHKOLNIK:  Objection.
3        THE WITNESS:  As long as it's being
4   prescribed in medical necessity.  That's the
5   only way I can answer that.
6        BY MR. STEPHENS:
7    Q.   Okay.  And would you also agree that
8   chronic pain is a serious problem for many
9   Americans?
10       MR. MIGLIORI:  Objection.
11       THE WITNESS:  I can't answer that.
12       BY MR. STEPHENS:
13   Q.   Would you agree that DEA has a duty
14  to ensure that there's no interference with the
15  distribution of controlled substances to the
16  American public in accordance with the sound
17  judgment of their physicians?
18       MR. MIGLIORI:  Objection.
19       MR. SHKOLNIK:  Objection.  Outside
20  the scope of what he's here to testify.
21       MR. BENNETT:  I will also object to
22  form and remind the witness of the limits of
23  his authorization.
24       THE WITNESS:  Would you repeat the
25  question, please.

Page 240

1       BY MR. STEPHENS:
2    Q.   Sure.
3        The question was DEA has a duty to
4   ensure that there's no interference with the
5   distribution of controlled substances to the
6   American public in accordance with the sound
7   judgment of their physicians?
8    A.   The DEA is responsible to make sure
9   that the -- there's a legitimate supply and
10  that supply is protected.
11   Q.   Right.
12       And that's actually a statutory
13  obligation, correct?
14   A.   Correct.
15   Q.   In Title 21.
16   A.   Correct.
17   Q.   Okay.  All right.  So, Mr. Wright,
18  you've testified at length today about the
19  distributor initiative.  And I'm certainly not
20  going to cover all the ground that's been
21  covered.
22   A.   Thank you.
23   Q.   But -- but there -- there are a
24  couple of things that I still want to go
25  through with you.  Okay.

Page 241

1    A.   All right.
2    Q.   All right.  You had mentioned that
3   you started doing meeting with distributors in
4   about 2005; is that right?
5    A.   That's correct.
6    Q.   And -- and you continued to do them
7   until about 2011 or 2012?
8    A.   That is correct.
9    Q.   Okay.  I just want to get the time
10  right.
11       All right.  How many one-on-one
12  meetings did you do with distributors in that
13  six-, seven-, eight-year time period?
14   A.   I have no recollection.
15   Q.   Okay.  Is it more than 10?
16   A.   Correct.
17   Q.   Is it more than 20?
18   A.   Correct.
19   Q.   Would it be more than 50?
20   A.   Correct.
21   Q.   Would it be more than 75?
22   A.   Correct.
23   Q.   Would it be more than a hundred?
24   A.   Correct.
25   Q.   Would it be more than 150?

61 (Pages 238 - 241)

Page 242

1     A.   Do not know.
2     Q.   Okay.  All right.  There were other
3   people that were your peers that worked on your
4   unit as well, correct?
5     A.   Correct.
6     Q.   At -- during this time period?
7     A.   Correct.
8     Q.   And would other people also do these
9   meetings with distributors where you weren't
10   present?
11     A.   In the beginning, no.  Later on,
12   yes.  I trained them.  They attended my
13   briefing.  Then I would monitor them.  And
14   then -- because we had mandate to do more
15   briefings.
16     Q.   How many people did you train to do
17   these briefings?
18     A.   Three or four.
19     Q.   Okay.  And so we've got this window
20   of 2005 to about 2012.
21         Can you tell me when you started
22   training them, approximately?
23     A.   '9 other '10.
24     Q.   2009, 2010.  Okay.
25         And do you have an understanding as

Page 243

1   to approximately how many meetings those three
2   or four people would have had after 2009 with
3   distributors?
4     A.   I would have no idea.
5     Q.   Did you sit at meetings and say, you
6   know, "I'm going to St. Louis to meet with this
7   company.  Why don't you go to Minnesota and
8   meet with that company"?
9         Was there any kind of internal
10   reporting where they would come back to you and
11   say, "I had met with XYZ distributor"?
12         MR. BENNETT:  Objection to the form
13   of the question.
14         THE WITNESS:  That would have been
15   reported to my supervisor.
16         BY MR. STEPHENS:
17     Q.   And your supervisor at the time was?
18     A.   At that time was Barbara Boockholdt.
19     Q.   Okay.  Was Mike Mapes ever your
20   supervisor during this time period?
21     A.   No, sir.
22     Q.   Okay.  Would he have information
23   about how many of the these other distributor
24   briefings happened?
25     A.   No --

Page 244

1         MR. BENNETT:  Objection.  Form.
2         THE WITNESS:  No, sir.
3         BY MR. STEPHENS:
4     Q.   Okay.  Did you ever sit down with
5   Walmart to -- to discuss the distributor
6   initiatives?
7     A.   I may have.
8     Q.   Do you recall doing so?
9     A.   I don't recall.
10     Q.   Do you recall whether you ever met
11   with either CVS, Rite Aid or Walgreens to
12   discuss the distributor initiative?
13     A.   I do not recall.
14     Q.   Earlier on there was a line of
15   questioning in the first round with Ms. Mainigi
16   where she had asked some questions about you
17   reporting out to certain distributors that a
18   particular customer had been terminated.
19         Do you recall that?
20     A.   I do.
21     Q.   Okay.  And as I recall it, there was
22   some litigation that happened after that.
23     A.   Yes.
24     Q.   And --
25     A.   A threat of litigation.

Page 245

1     Q.   Okay.  And approximately when was
2   that time period?
3     A.   You know, I don't know.  But I can
4   tell you, in the -- for your context of your
5   question, as soon as we started this, it didn't
6   last a year because of the pushback.
7         So I -- wherever this started, it
8   ended in the same year or within a year.
9     Q.   Okay, Mr. Wright.  I just want to
10   make sure I understand your response.
11         Is what you're saying at some point
12   there was a threat of litigation, and over the
13   course of a year, DEA stopped giving
14   information out along the lines of what you had
15   given out that led to the threat of litigation?
16     A.   Correct.
17     Q.   Okay.  And can you place in time,
18   your best estimate, as to when DEA stopped
19   providing information to registrants about
20   customers who had been terminated by another
21   registrant?
22     A.   Sir, I'm sorry.  I really cannot
23   recall.  I -- I know about it.  I understand
24   what you're asking.  But the time frame I
25   cannot -- I'm sorry.  I cannot put down.

62 (Pages 242 - 245)

Page 246

1    Q.   Okay.  So in -- you go to work as
2 unit chief of ARCOS in 2010?
3    A.   2011, yes.
4    Q.   2011.  All right.
5        Did it happen before then?
6    A.   Oh, yes, sir.
7    Q.   Okay.  So we know it's before 2011,
8 right?
9    A.   Yes, sir.
10    Q.   Okay.  And then you left DEA when?
11    A.   Oh, in 2017.
12    Q.   2017.  All right.
13        So from the time that you went to
14 ARCOS in 2011 until 2017, are you aware of
15 anyone at DEA providing any information to
16 registrants about a registrant who had gotten
17 terminated by a distributor?
18    A.   No.
19    Q.   Okay.  And DEA, in the course of
20 that year, determined that they didn't want to
21 provide that type of information out because it
22 could lead to threats of lawsuit; is that fair?
23        MR. BENNETT:  Objection regarding
24 internal deliberations of DEA.
25        MR. MIGLIORI:  Retail pharmacist or

Page 247

1 rehashing?
2        MR. STEPHENS:  No.  I'm just trying
3 to get the time frame and then what the policy
4 was.
5        THE WITNESS:  Okay.  Ask the
6 question again, please.  I'm sorry.  I really
7 --
8        BY MR. STEPHENS:
9    Q.   No.  That's fine.
10        I'm just trying to establish certain
11 time frames.
12        You had mentioned that you -- you
13 thought this event occurred, the threat of
14 litigation, that led you to no longer send out
15 notices to other registrants about particular a
16 customer getting terminated, right?
17        That's what we are talking about.
18    A.   Yes, sir.
19    Q.   Okay.  So my question was, between
20 2011 and the time you retired in 2017, are you
21 aware of anyone at DEA ever giving a notice out
22 like the one that led to the threat of
23 litigation?
24    A.   No, sir.
25    Q.   Okay.  Did you -- after that -- that

Page 248

1 one that led to the threat of litigation,
2 before you joined the ARCOS team, did you ever
3 do it again?
4    A.   No, not that I -- well, to the best
5 of my recollection, no.
6    Q.   Okay.  I have a -- a series of
7 questions for you about ARCOS.  While we're
8 here, we'll talk about ARCOS.
9        So I -- I had you -- and if I've got
10 this wrong, I apologize.
11        But I had you in about 2010 becoming
12 the unit chief for ARCOS; is that accurate?
13    A.   10 -- it's -- I think it's closer to
14 '11, yes.
15    Q.   Okay.  Were you using ARCOS as a
16 tool in your prior slot when you were with
17 E-commerce?
18    A.   I had to.  Because I had to do the
19 background specific to that program.
20    Q.   So ARCOS, as a tool for DEA, came
21 online when?
22    A.   ARCOS was in existence to some
23 extent -- I do not -- when I came on in '95, it
24 was a two-year report that we used to get.  It
25 was paper.  That's all we used to get.

Page 249

1        When I came to D -- headquarters, we
2 had moved up to a static display, which is more
3 timely.  And when I moved into the E-commerce,
4 we were then getting raw -- not raw data but
5 actualized data.
6    Q.   And is that ARCOS data?
7    A.   Yes.
8    Q.   Okay.  So just as an approximate
9 time frame, your recollection when you first
10 started to use it would have been in about
11 2005?
12    A.   2 -- well, I was using it out in the
13 field by this.  So I'd say about 2004.
14    Q.   Okay.  When you were unit chief for
15 ARCOS, how many people did you have on your
16 team?
17    A.   Eight.
18    Q.   And were there ARCOS specialists in
19 the field -- in field divisions, or were they
20 just the eight at headquarters with you?
21    A.   Specialists?
22    Q.   Yeah.
23    A.   Just my --
24    Q.   Okay.
25    A.   Just my unit.

63 (Pages 246 - 249)

Page 250

1    Q.   So the -- for our purposes, the
2  ARCOS team is centered at DEA headquarters;
3  it's you and your eight direct reports.
4    A.   Yes.
5    Q.   Okay.  And how long did you lead the
6  ARCOS team, till about 2015?
7    A.   Let's see.  Yeah.  It'd be about
8  2015.
9    Q.   How many people did you have on your
10  team in 2015?
11    A.   About the same amount.
12    Q.   Okay.
13    A.   Maybe an additional one more.
14    Q.   All right.  So aside from people
15  kind of coming and going, there wasn't like
16  additions to the FTE staff on your squad that
17  you can recall in the five years you were
18  there?
19    A.   No, sir.
20    Q.   Okay.  What would -- what's the GS
21  level of the people that would be ARCOS
22  employees?
23    A.   What's -- what was my rate?
24    Q.   Not yours.
25       The eight that worked for you, what

Page 251

1  was their GS rating, their grade?
2    A.   I would say 9 through 12s.
3    Q.   So in that time period, that's --
4  they're -- they're making under $100,000 a
5  year?
6    A.   I would not know.
7    Q.   Okay.  You testified earlier today
8  about some of the capabilities that ARCOS had
9  and that it had the ability -- your team had
10  the ability to crunch the data, look at it,
11  study it, and determine leads that the field
12  could go out and investigate.
13    A.   Correct.
14    Q.   Fair?
15       When did that process start?
16       When did the ARCOS team start
17  feeding investigative leads out to the field?
18    A.   2000 -- 2006.
19    Q.   Okay.  How many leads would you
20  generate for the field in a month --
21    MR. BENNETT:  Objection.
22    BY MR. STEPHENS:
23    Q.   -- average month?
24    MR. BENNETT:  I think we need to
25  talk about high level.  I'm not sure we want to

Page 252

1  go into specific numbers of leads and how often
2  they used it.
3    MR. MIGLIORI:  Yeah.  It's overly
4  broad too.  Objection.
5    BY MR. STEPHENS:
6    Q.   Well, let me ask you this:  Do you
7  know?
8    A.   No.
9    Q.   Okay.  Is that -- is that
10  information stored anywhere at DEA?
11    A.   I don't ever recall having to report
12  that type of information out.
13    Q.   Okay.  Does DEA have -- during your
14  tenure when you ran the ARCOS unit, did DEA
15  have a process and procedure for reporting
16  ARCOS leads out to the field and then following
17  up on what happened with them?
18    A.   No, sir.
19    Q.   Okay.  Was there -- once the field
20  received a lead during your time as unit chief
21  running ARCOS, was there a policy or practice
22  or process in place for the field division to
23  report back to headquarters about what they did
24  with those leads?
25    A.   Not specifically to me.

Page 253

1    Q.   Okay.  Are you aware of any
2  reporting from the DEA field divisions to
3  anyone else at headquarters about what they had
4  done with the leads that your unit had
5  generated for them?
6    A.   I -- I am -- I don't recall.
7    Q.   Okay.  And your prior testimony was
8  along the lines of a lead would go out to the
9  field division, and then a SAC or an ASAC or a
10  RAC could make a determination as to where that
11  lead fit within that field division's
12  priorities; is that accurate?
13    A.   That is accurate.
14    Q.   Okay.  And would you agree that some
15  field divisions were more receptive to
16  receiving this information than others?
17    MR. BENNETT:  Objection to the form.
18    THE WITNESS:  Yes.
19    BY MR. STEPHENS:
20    Q.   There was a -- a series of questions
21  that were asked in the -- in the first session
22  about -- and we've gone through this a little
23  bit.  And I'll try and -- I'll try and to
24  streamline this as best I can.  It's late --
25  where DEA had stopped providing information to

64 (Pages 250 - 253)

Page 254

1  the industry regarding Suspicious Order
2  Monitoring.
3      A.  I'm sorry?
4      Q.  Let me restate that.
5      A.  Please.
6      Q.  I'll strike it and restate it.
7          There -- there were questions
8  about -- during the time frame early on a
9  distributor initiative time frame --
10     A.  Yes, sir.
11     Q.  -- 2005, 2006, 2007, DEA, yourself
12 were receiving questions from distributors
13 about how to set up their Suspicious Order
14 Monitoring programs, correct?
15     A.  Correct.
16     Q.  And you had mentioned, as I
17 understand your testimony, that you weren't in
18 position to provide them that type of
19 information; is that fair?
20     A.  Yes.
21     Q.  Okay.  And you -- you had talked
22 about people migrate, the economy changes,
23 things changed from hydro to oxy to fentanyl.
24     Do you recall that?
25     A.  Correct.

Page 255

1      Q.  And so the industry needed to design
2  their own systems, right?
3      A.  Correct.
4      Q.  At that time when the industry was
5  designing its own systems, the industry did not
6  have all the ARCOS data that your unit did at
7  DEA, correct?
8          MR. MIGLIORI:  Objection.
9          THE WITNESS:  They had what they
10 reported to me.
11         BY MR. STEPHENS:
12     Q.  Right.
13         That's one registrant had what that
14 registrant reported to you, correct?
15     A.  Correct.
16     Q.  But that registrant would not have
17 the ARCOS-related data from all the -- the
18 registrants that were reporting into DEA
19 separately, true?
20         MR. MIGLIORI:  Objection.
21         THE WITNESS:  Only the public
22 reports.
23         BY MR. STEPHENS:
24     Q.  Right.
25         And then after the time period in

Page 256

1  which there was this threat to -- for DEA to be
2  sued after you had provided some information to
3  distributors about a -- a customer who had been
4  terminated by another distributor, after that
5  period of time DEA, was not providing
6  information about terminated customers out to
7  registrants, correct?
8      A.  That practice stopped, yes.
9      Q.  So DEA had that information, but the
10 registrants did not, true?
11         MR. MIGLIORI:  Objection.  This is
12 rehashing.
13         THE WITNESS:  We weren't receiving
14 it any more.
15         BY MR. STEPHENS:
16     Q.  Okay.  At the time, and still today,
17 DEA has thousands of enforcement agents and --
18 and diversion agents, true?
19         MR. MIGLIORI:  Objection.  He's not
20 prepared for that.
21         MR. BENNETT:  Objection.  To the
22 form.
23         MR. STEPHENS:  That's a good point.
24         BY MR. STEPHENS:
25     Q.  When you -- when you retired -- let

Page 257

1  me -- I'll strike it and restate it.
2          When you retired in 2017, you would
3  agree that DEA had thousands of enforcement
4  agents and divergent -- diversion agents
5  working across the country?
6      A.  Yes.
7      Q.  Those agents had access to DEA 6
8  reporting, true?
9      A.  Yes.
10     Q.  And those agents had access to
11 NADDIS and information on NADDIS, true?
12     A.  Yes.
13     Q.  And that was true for your entire
14 career at DEA, true?
15     A.  True.
16     Q.  The DEA also receives briefings by
17 OCDETF units around the country, true?
18         MR. BENNETT:  Objection.  Goes
19 beyond the scope.  Gets into specific
20 techniques.
21         THE WITNESS:  I am not aware of the
22 OCDETF briefings or didn't participate in them.
23         BY MR. STEPHENS:
24     Q.  Okay.  You would agree that
25 registrants don't have access to DEA 6

65 (Pages 254 - 257)

Page 258

1  reporting or to information that's on NADDIS,
2  true?
3      A.   God help -- I hope not.
4          MR. STEPHENS:  Okay.  All right.  If
5  I could take a quick break, I think I may be
6  done.
7          THE VIDEOGRAPHER:  We are going off
8  the record.
9          The time is 5:37.
10         (A short recess was taken.)
11         THE VIDEOGRAPHER:  We are going back
12  on the record.
13         The time is 5:45.
14         You may proceed, Counsel.
15     BY MR. STEPHENS:
16     Q.   All right.  Mr. Wright, it's final
17  stretch.  Okay?
18     A.   Okay.
19     Q.   At least for me.
20     A.   Okay.
21     Q.   I want to go back, and I want to --
22  I think we had a double negative on two
23  questions that I asked you kind of early on.
24     A.   All right.
25     Q.   And I just want to make sure the

Page 259

1  record's clear on those.  So I'm going to
2  re-ask them and try to get them in a way that
3  -- I -- I think we understood each other, but
4  when Bonnie finishes the transcript, it's not
5  going to read the way I think it should.
6      A.   All right.
7      Q.   Okay?
8          And I was asking about the
9  obligations that retail pharmacies had.  Okay?
10     A.   Okay.
11     Q.   So let me re-ask the question.
12         You would agree, wouldn't you, that
13  the retail pharmacies, CVS, Rite Aid, Walgreens
14  and Walmart, had no obligation to check on
15  Internet pharmacies that they did not sell to,
16  correct?
17     A.   Correct.
18         MR. MIGLIORI:  Objection.
19         BY MR. STEPHENS:
20     Q.   And you would also agree that the
21  retail pharmacies, Walmart, CVS, Rite Aid,
22  Walgreens, had no -- had no obligation to check
23  on pain clinics that they did not distribute
24  to, correct?
25     A.   Correct.

Page 260

1      Q.   Okay.  All right.
2          So just a couple more topics, and
3  then we're done.
4          I want to go back to conversations
5  that you would have had with distributors and
6  relating to ratios of controlled versus
7  noncontrolled substances.
8      A.   Okay.
9      Q.   Okay?
10         Do you remember having those
11  conversations with distributors?
12     A.   Yes.
13     Q.   Okay.  And is it -- is it accurate
14  to say that you knew that it was common for
15  legitimate pharmacies to have a ratio of
16  approximately 20 percent of controlled to 80
17  percent noncontrolled?
18     A.   In that area, yes.
19     Q.   Okay.  And higher percentages of
20  controlled drugs could be reasonable at times,
21  right?
22     A.   Yes.
23     Q.   For example, pharmacies located
24  right next to a cancer clinic or something like
25  that.

Page 261

1      A.   Correct.
2      Q.   Okay.  You had also testify earlier
3  about manual systems to identify suspicious
4  orders.
5          Do you remember that?
6      A.   A manual system.
7      Q.   As opposed to automated.
8          MR. MIGLIORI:  Objection to form.
9          THE WITNESS:  Okay.
10         BY MR. STEPHENS:
11     Q.   Do you recall testimony earlier
12  today about manual versus automated systems?
13     A.   Well, that would be in the early
14  days.
15     Q.   Right.
16         So we can go back to that, right?
17     A.   Okay.
18     Q.   Okay.  So back when people were
19  reporting --
20     A.   Paper.
21     Q.   -- excess reports in -- into DEA,
22  right?
23     A.   All right, sir.
24     Q.   Okay.  And manual would -- would --
25  a manual system would include people on the

66 (Pages 258 - 261)

Page 262

1  ground in a distribution center that are
2  analyzing stuff as it -- as it comes into to
3  the distribution center; fair?
4      A.   Fair.
5      Q.   Kind of people and pickers kind of
6  thing, right.
7          MR. BENNETT:  Objection.  Form.
8          MR. STEPHENS:  All right.  I'll
9  strike it.
10         I think the rest of these you've
11 answered, so I'm going to not ask.
12         So I have no further questions.  I
13 apologize for taking a break right before we're
14 done.  But now we are done.
15         THE WITNESS:  Okay.
16         THE VIDEOGRAPHER:  We are off the
17 record at 5:59 p.m.
18         And This concludes today's testimony
19 given by Kyle Wright.
20         The total number of media units used
21 were five and will be retained by Veritext
22 Legal Solutions.
23         (Whereupon, the proceeding was
24 concluded at 5:59 p.m.)
25

Page 264

1          Veritext Legal Solutions
              1100 Superior Ave
2                Suite 1820
            Cleveland, Ohio 44114
3            Phone: 216-523-1313

4  March 5, 2019

5  To: David Lee Tayman

6  Case Name: In Re: National Prescription Opiate Litigation v.

7  Veritext Reference Number: 3244302

8  Witness: Kyle J. Wright      Deposition Date:  2/28/2019

9
10 Dear Sir/Madam:
11    Enclosed please find a deposition transcript.  Please have the witness
12 review the transcript and note any changes or corrections on the
13 included errata sheet, indicating the page, line number, change, and
14 the reason for the change.  Have the witness' signature notarized and
15 forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext.com.
18
   If the errata is not returned within thirty days of your receipt of
19 this letter, the reading and signing will be deemed waived.
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA

Page 263

1          CERTIFICATE OF NOTARY PUBLIC
2       I, Bonnie L. Russo, the officer before
3  whom the foregoing deposition was taken, do
4  hereby certify that the witness whose testimony
5  appears in the foregoing deposition was duly
6  sworn by me; that the testimony of said witness
7  was taken by me in shorthand and thereafter
8  reduced to computerized transcription under my
9  direction; that said deposition is a true
10 record of the testimony given by said witness;
11 that I am neither counsel for, related to, nor
12 employed by any of the parties to the action in
13 which this deposition was taken; and further,
14 that I am not a relative or employee of any
15 attorney or counsel employed by the parties
16 hereto, nor financially or otherwise interested
17 in the outcome of the action.
18
19         _Bonnie L. Russo_
20         Notary Public in and for
21         the District of Columbia
22
23 My Commission expires:  June 30, 2020
24
25

Page 265

1          DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 3244302
3  CASE NAME: In Re: National Prescription Opiate Litigation v.
   DATE OF DEPOSITION: 2/28/2019
4  WITNESS' NAME: Kyle J. Wright
5      In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7      I have made no changes to the testimony
   as transcribed by the court reporter.
8
                                    _____
9  Date              Kyle J. Wright
10     Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
       They have read the transcript;
13     They signed the foregoing Sworn
       Statement; and
14     Their execution of this Statement is of
       their free act and deed.
15
       I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
18     Notary Public
19     Commission Expiration Date
20
21
22
23
24
25

67 (Pages 262 - 265)

Page 266

```
 1        DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
 2
     ASSIGNMENT REFERENCE NO: 3244302
 3  CASE NAME: In Re: National Prescription Opiate Litigation v.
     DATE OF DEPOSITION: 2/28/2019
 4  WITNESS' NAME: Kyle J. Wright
 5       In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7       I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
 8  well as the reason(s) for the change(s).
 9       I request that these changes be entered
     as part of the record of my testimony.
10
         I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
     that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____
     Date              Kyle J. Wright
14
         Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
     the referenced witness did personally appear
16  and acknowledge that:
17      They have read the transcript;
        They have listed all of their corrections
18      in the appended Errata Sheet;
        They signed the foregoing Sworn
19      Statement; and
        Their execution of this Statement is of
20      their free act and deed.
21      I have affixed my name and official seal
22  this _____ day of _____, 20____.
23  _____
        Notary Public
24
25  _____
        Commission Expiration Date
```

Page 267

```
 1        ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS MIDWEST
 2        ASSIGNMENT NO: 2/28/2019
 3  PAGE/LINE(S) /      CHANGE     /REASON
 4  _____
 5  _____
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
    _____       _____
20  Date              Kyle J. Wright
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
        Notary Public
24
25  _____
        Commission Expiration Date
```

68 (Pages 266 - 267)

**[& - 2019]** Page 1

| **&** |
|---|
| **&** 2:6 4:4,12,13 |
| 5:12,17,22 6:4 7:4 |
| 7:9,14,20 8:3,6,12 |
| 8:17 12:22 13:17 |
| 14:3,6 38:7 46:1 |

| **0** |
|---|
| **00000352-366** |
| 11:2 |
| **00002462** 64:8 |
| **00002462-2514** |
| 10:13 |
| **00003880-3881** |
| 10:23 |
| **00005372** 64:10 |
| **00005689-5799** |
| 10:15 |
| **000064-68** 11:14 |
| **00007628-7629** |
| 11:10 |
| **00007629** 160:3 |
| **00007691** 11:18 |
| 209:9 |
| **000113672-930** |
| 11:12 |
| **000170902** 11:16 |
| **001** 11:12 |
| **02199** 7:21 8:13 |
| **024642** 10:20 |

| **1** |
|---|
| **1** 10:8 12:14 25:14 |
| 25:14,17,19 51:17 |
| 69:8 169:3 |
| **1-31-17** 11:17 |
| **10** 10:21 91:21 |
| 92:4,7 93:25 |
| 97:23 98:4 99:21 |
| 241:15 242:23 |
| 248:13 |

**10-20-05** 10:24
**100,000** 251:4
**1000** 6:12 8:7
**10017** 3:14
**10036** 4:9
**105** 137:22
**106** 137:20,23
140:2 141:3
**1095** 4:9
**10:16** 55:21
**10:19** 55:25
**10:37** 69:9
**10:48** 69:15
**11** 8:3 10:24 92:23
92:24 93:8 97:23
97:24 98:4 99:21
99:21 141:3,3
157:4 248:14
**11.51.** 111:10
**1100** 4:18 264:1
**111** 8:12
**11937** 263:19
**11th** 3:14 4:4
158:9
**12** 11:1 94:18,19
94:22 95:6 98:5
99:21
**12-10-18** 10:9
**1200** 8:24
**12s** 251:2
**12th** 2:7 6:5 12:22
**14** 11:3 100:16,22
100:23 141:3
156:22 157:1
158:6
**142** 148:2,6,8
**143** 148:2,8
**15** 22:16
**150** 11:6 241:25
**152** 11:13

**15219** 8:19
**156** 11:3
**159** 11:9
**1600** 5:12
**17** 1:5,9 11:6
12:20 115:19
143:14 150:10,11
150:14 152:21
**1701** 5:22
**171** 8:7
**1717** 6:17
**1755** 5:4
**178** 10:4
**17th** 4:14
**18** 1:11,14
**1800** 6:11
**1801** 8:23
**1820** 264:2
**1875** 3:4
**18976** 9:5
**19** 112:4 148:3
**19103** 5:13,23 6:18
**1994** 53:4
**1995** 53:4 71:11
**1999** 7:10
**1:15** 111:16

| **2** |
|---|
| **2** 10:9 25:24 26:2 |
| 26:6 69:14 111:9 |
| 249:12 |
| **2/28/2019** 264:8 |
| 265:3 266:3 267:2 |
| **20** 11:9 22:7,15 |
| 159:13,16,22 |
| 241:17 260:16 |
| 265:16 266:22 |
| 267:22 |
| **200,000** 174:13 |
| **2000** 251:18 |
| **20001** 5:18 7:6 |

**20005** 6:5 7:15
**20006** 3:5
**20036** 6:12
**2004** 249:13
**2005** 53:17,20 60:8
69:20,21 71:12,18
72:4 82:21 83:6
87:4,19 89:17
91:10 101:16
112:15 114:22
124:3 190:3 241:4
242:20 249:11
254:11
**2006** 251:18
254:11
**2007** 60:17 97:16
134:7,9 135:24
157:5 158:9
254:11
**2008** 97:16 134:9
153:5
**2009** 134:10
242:24 243:2
**2010** 134:11
242:24 246:2
248:11
**2011** 27:18 63:23
76:8 97:24 101:2
116:11 141:20
142:8 190:10
241:7 246:3,4,7,14
247:20
**2012** 190:10 241:7
242:20
**2015** 250:6,8,10
**2017** 211:5 246:11
246:12,14 247:20
257:2
**2019** 1:20 12:5
264:4

[202 - 92660]

**202** 11:15
**202-434-5000** 6:6
**202-662-6000** 7:6
**202-695-8147** 3:6
**202-778-1800** 6:13
**202-879-5907** 7:16
**202-942-5000** 5:18
**2020** 263:23
**209** 11:17
**21** 73:7 74:4,5
 240:15
**212-397-1000** 3:15
**212-698-3593** 4:10
**214-740-8554** 6:23
**215-241-7910** 6:18
**215-918-3680** 9:5
**215-963-4824** 5:23
**215-979-3848** 5:13
**216-523-1313**
 264:3
**216-592-5000** 4:19
**216-622-3988** 3:10
**22** 25:6 115:11
**2200** 6:22
**222** 10:5
**24** 10:3 73:8 74:4
**25** 10:8,9 115:11
 115:20
**25701** 4:5
**26** 11:11 36:18
 43:11,21 44:22
 78:13,17 80:5
**27** 11:13 151:25
 152:1,5,19,21
**2700** 9:4
**275** 52:23
**28** 1:20 3:19 11:15
 12:5 202:11,12,14
 202:15
**2800** 6:22

**2804** 1:5,5 12:20
 12:20
**29** 11:17 209:1,2,7
 209:8
**29464** 3:19
**2:21** 156:14
**2:40** 156:20

**3**

**3** 10:10 63:13,15
 64:11 100:16
 111:15 156:13
**3,000** 37:15
**30** 22:7,15 114:19
 114:20 116:5
 133:6 178:1
 263:23
**300** 9:4 34:9
**301** 8:18
**303-592-3197** 8:25
**304-525-9115** 4:5
**3100** 6:17
**312-269-4066** 5:9
**317-236-1313** 8:4
**31st** 211:5
**3244302** 1:25
 264:7 265:2 266:2
**35th** 8:18
**360** 3:14
**382** 111:22 112:4
**386** 113:19,20
 115:9
**387** 112:5
**3900** 5:12
**3:12** 178:7
**3:43** 178:11

**4**

**4** 10:11 63:8,16
 64:8 73:6 100:9
 100:11,12,25
 154:21,23 156:19

220:7
**4-21-11** 11:15
**400** 3:9
**41** 75:20,20
**412-338-5224** 8:19
**419** 4:4
**42** 73:7,25 74:4,5
**424-332-4764** 7:11
**43** 100:7,12,21
**440** 51:24
**44113** 3:10 4:19
**44114** 264:2
**45005** 1:9
**45090** 1:14
**45132** 1:11
**46204** 8:4
**463,000** 63:24
**463,497.72** 10:12
**49503** 8:8
**4:43** 220:8
**4:59** 220:14

**5**

**5** 10:14 64:2,5,10
 111:21 220:13
 264:4
**5-13-16** 11:9
**50** 241:19
**59** 131:7,12 132:3
**5:01** 222:3
**5:03** 222:7
**5:32** 211:6,7
**5:37** 258:9
**5:45** 258:13
**5:59** 262:17,24

**6**

**6** 10:16 82:7,12
 148:3 257:7,25
**60** 131:13,21
**601** 5:17

**60601** 5:8
**610** 4:14
**616-742-3930** 8:8
**617-342-4000** 8:13
**617-951-7000** 7:22
**63** 10:11
**64** 10:14
**650-739-3939** 5:5
**655** 7:15

**7**

**7** 10:17 169:3
**7-31-08** 11:8
**7-7-11** 10:13
**725** 2:7 6:5 12:22
**75** 241:21
**75201** 6:23
**77** 5:8
**78** 11:11

**8**

**8** 10:18
**8-11-11** 10:15
**8-12-05** 10:22
**8-12-08** 11:13
**8-23-05** 11:1
**80** 260:16
**800** 7:21
**801** 3:9
**80202** 8:24
**81** 10:19
**843-216-9241** 3:20
**850** 7:5

**9**

**9** 10:19 81:11,12
 81:23 242:23
 251:2
**9-11-07** 11:5
**90067** 7:10
**92** 10:21,24
**92660** 4:14

**94** 11:1
**94303** 5:4
**949-823-7963** 4:15
**95** 248:23
**950** 4:18

**a**

**a.m.** 1:21 12:5
**aaron** 1:7
**abdc** 92:8 93:15
93:24 94:1
**abdc's** 136:2,5
141:7
**abdc001819-1839**
11:5
**aberrations**
171:24 172:12
**ability** 62:15 85:20
234:15 235:1
236:3 251:9,10
**able** 19:9 125:2
128:22 134:22
135:8,11,20
148:25 155:7
170:23 171:24
196:16 199:18
**absolute** 230:19
**absolutely** 114:13
221:8,18 238:22
**abuse** 195:12
200:4,7,19
**abused** 107:14
200:14 201:13
**academy** 53:4
**accept** 124:3
**acceptable** 19:8
**accepted** 75:3
**access** 56:21
168:24 218:19
237:15 257:7,10
257:25

**accurate** 74:22
76:5 201:8 211:24
248:12 253:12,13
260:13
**acknowledge**
265:11 266:16
**acquired** 57:23
216:4 238:10,15
**act** 88:22,25
200:13 207:21
212:12,13 265:14
266:20
**acting** 232:12
**action** 38:8,21
147:18 234:25
263:12,17
**actions** 146:10
**activities** 137:12
**activity** 58:2 76:19
105:19 113:15
116:2 163:2,22
165:15,25 166:19
191:5 216:1,3,12
216:14,21
**actual** 33:10
**actualized** 249:5
**adapt** 117:22
119:2
**adaptation** 133:20
**adapted** 134:15
**adaptive** 134:15
135:3
**add** 49:4
**added** 140:15,17
**addictive** 107:14
**addition** 80:17
186:25 234:14
**additional** 250:13
**additions** 250:16
**address** 137:17
264:15

**addressed** 89:25
**addressing** 117:23
168:8
**adhering** 44:12
**adjectives** 96:21
**administration**
9:13 11:3 16:19
25:3,5,8 158:17,18
179:13
**administrative**
28:17,18 166:10
233:10,24 234:24
235:6,13
**adopt** 120:5
128:22
**advance** 81:16
**advances** 135:12
**adverse** 48:12
50:6
**adversity** 23:13
**advice** 81:2 130:24
**advise** 100:1
102:14 199:13
**affiliation** 44:18
**affiliations** 13:6
**affirmative** 117:13
**affixed** 265:15
266:21
**afternoon** 178:17
222:13
**agency** 10:19
25:11 81:24
127:12 155:11
176:14 221:20
**agents** 120:25
121:18 122:14
230:23 231:25
256:17,18 257:4,4
257:7,10
**aggregate** 54:6
56:21

**ago** 31:11 45:14
69:5 178:19
205:21
**agree** 12:13
108:21,24 109:10
109:22 142:6
160:17 161:16
163:5,9 168:20,21
176:16 184:12
226:23 227:24
228:21 229:4,13
229:19 230:4,12
236:10,21 237:9
237:15 239:7,13
253:14 257:3,24
259:12,20
**agreeable** 168:14
**agreeing** 164:9
**agreement** 35:13
35:22 140:23
141:9,25
**agreements** 74:13
**ah** 227:18
**ahead** 17:11,16
21:4 25:13 32:20
35:6 52:24 75:6
110:22 120:9
140:11 142:22
149:14 156:9
176:25
**aid** 5:20 222:23
226:6,24 227:12
228:14,22 229:14
230:4,6 235:19
244:11 259:13,21
**al** 1:9,11,13,13
**alaska** 118:19
**alex** 8:22 14:17
**alex.harris** 8:25
**alive** 135:22

allergan 7:13
  13:21 14:12
alleviate 138:1
  166:5
allotted 22:8
allow 21:1 43:17
  43:25 58:4 86:9
  127:16
allowed 22:4
  23:22 43:12,18
  48:12 49:23,24
allowing 44:5,14
alluded 71:1 86:16
alto 5:4
american 237:17
  239:16 240:6
americans 239:9
americas 4:9
amerisourceberg...
  6:15 13:15 91:12
  92:10 98:17 158:8
  159:9
amerisourceberg...
  132:7
amount 22:18
  51:23 57:23 58:13
  58:14 193:25
  236:12 250:11
amounts 155:18
  198:18 236:22
amy 5:11 14:9
analysis 62:5
  190:7 211:14
  213:6
analytical 213:12
analyzed 96:7,9
  96:13
analyzing 262:2
anda 8:10 13:19
andrew 7:4,19
  13:22 14:25 18:25

178:18,23 179:3
andrew.o'connor
  7:22
angeles 7:10
angry 157:15
annual 158:21
annually 158:24
anomalies 58:18
  58:22 96:20,24
  97:3 106:13 166:5
  166:6,6,7,20
  173:11,12 212:22
  214:15
anomaly 166:20
  173:15,16,19
  196:24 197:3,6,9
answer 21:4,10,11
  30:9,23 32:1,10,18
  32:20 36:12 40:1
  41:7,21 43:6 44:7
  44:7,18 46:24
  47:18 48:5,18
  50:20 51:1,3
  52:18 56:2 66:22
  74:17 76:1 83:21
  84:20 90:13
  101:13,18,22
  109:8 116:4,9
  127:13 129:8
  130:19 133:11
  137:15 147:13
  151:17 160:20
  161:3,22 169:23
  171:5 172:16
  176:12 177:13
  183:25 187:22
  198:18 200:16
  205:18,25 206:2
  208:21 209:10,25
  210:2 215:1,2
  219:5 232:4 236:1

239:5,11
answered 98:21
  109:16,19 110:14
  161:21 201:5
  205:15 226:16
  262:11
answering 66:22
  119:21 206:7
answers 101:14
  115:23
anthony 6:10
  14:13
anticipate 20:3
anticipated 31:8
antitrust 150:5
anybody 219:8
apologize 115:19
  129:9,10 143:9
  145:9 248:10
  262:13
apparent 96:22
apparently 159:23
appear 92:7 94:23
  95:12,16 153:8
  265:11 266:15
appearance 88:11
appearances 3:1
  4:1 5:1 6:1 7:1 8:1
  9:1 13:6
appears 93:8 95:1
  95:15 157:4 158:7
  263:5
appended 266:11
  266:18
applied 170:12
apply 103:7 106:7
  170:10 193:15
applying 215:6
appreciate 17:20
  111:2 177:22
  178:25

apprised 144:3
approach 23:20
approached 39:20
  40:3,15
appropriate 31:5
  31:16 57:25 109:5
  144:19 146:11
  163:11 236:11,22
approval 90:3,19
  90:23 136:21
approved 91:5
approving 153:21
approximate 52:3
  249:8
approximately
  25:4 27:18 29:1
  32:6 34:11 36:5
  36:23 45:14 51:25
  53:1 60:15 88:24
  97:22,23 101:2
  242:22 243:1
  245:1 260:16
april 53:17 69:20
arbitrary 206:19
  207:9
arch 6:17
arcos 54:8,11
  57:11,14 58:5,25
  62:8,9,10,12,15
  96:12,24 122:9,13
  168:22,25 170:4,7
  170:15,18,24
  171:9,19 172:12
  175:14 213:4,9,20
  215:22,25 216:10
  216:20,24,24
  217:5,9,13,16,19
  218:19 246:2,14
  248:2,7,8,12,15,20
  248:22 249:6,15
  249:18 250:2,6,21

**[arcos - backs]**

251:8,16 252:14
252:16,21 255:6
255:17
**area** 53:14 59:22
140:17 143:18
155:10 260:18
**arena** 59:24
**argue** 47:7 133:21
**argument** 34:7
44:15
**arnold** 5:17
**arnoldporter.com**
5:19
**arrival** 71:17
**arrived** 71:11 89:2
89:3
**articles** 200:10
**aruiz** 6:13
**asac** 253:9
**aside** 80:11 250:14
**asked** 21:5,17
23:18,19 33:18
42:17 43:3,19
50:11,12 54:24
75:23 98:20
101:12 105:25
109:15 110:14
115:17,21 121:10
135:25 136:19
153:9 155:2
161:21 164:10
201:4 205:14
244:16 253:21
258:23
**asking** 39:1 46:16
49:11 84:18
111:24 122:1
136:25 137:2
162:1 163:16,22
168:8 215:3
245:24 259:8

**asks** 21:7
**assert** 33:3 36:8
**asserting** 35:15
**assertion** 31:3,25
**assessment** 103:19
164:19
**assigned** 77:16
80:13 87:23
211:20
**assignment** 265:2
266:2 267:2
**assignments** 35:11
54:3 211:17
**assigns** 211:16
**assimilate** 88:11
**assimilating** 88:10
**associated** 200:13
**assume** 17:24 18:2
53:20 129:24
215:3
**assumes** 141:12
**astanner** 7:8
**attached** 266:7
**attachment** 10:22
159:24
**attempt** 75:13
76:2,9
**attempting** 88:11
**attend** 93:11,16
94:4 95:12
**attended** 53:4 94:1
94:4,9 95:16
153:3 159:3,6
242:12
**attendee** 93:19
**attending** 13:5
92:13 150:17
**attention** 50:18
131:6
**attorney** 19:19
20:4 21:6 31:25

45:24,25 46:5,22
51:12,17 90:8
175:15 177:9
263:15
**attorney's** 3:8 9:9
16:9,17 62:18
**attorneys** 16:6
20:25 26:17,22
27:5 47:25
**audio** 12:11,11
**august** 38:19
**authored** 158:7
160:3,11
**authorization** 26:6
176:9 239:23
**authorize** 137:10
266:11
**authorized** 25:9
127:10 137:9,15
171:3 176:11
202:7 209:25
233:13 238:8
**automated** 54:8
124:13,18,19
261:7,12
**automatic** 103:21
**automatically**
156:5
**available** 17:21
122:5,10,14,19
135:18 213:11
214:11
**avanni** 5:14
**ave** 168:1 264:1
**avenue** 3:9,14 4:9
4:18 5:17 6:22
7:10 8:7,12
**average** 251:23
**avoid** 49:10
**awake** 28:2

**aware** 30:10 46:4
46:21 76:16,25
80:17 90:9 103:1
127:12 150:4
158:20 188:16,23
189:11 192:3
210:14 237:3
246:14 247:21
253:1 257:21
**awkward** 132:21
133:13,19

**b**

**bacchus** 9:8 16:15
16:15
**back** 17:5 24:5
28:5 40:12 45:1,4
47:20 55:23 66:22
69:11 71:15 83:12
85:10 87:3 103:11
110:17 111:12,20
113:23 115:3,18
116:22 127:22
129:20 156:16
159:14 163:16
164:2 166:22
167:7 168:7
172:20 178:9
182:11 184:3
194:22 195:17
201:2 206:2,4
210:17 216:17
218:24 219:1,17
219:22,23 220:10
222:5 243:10
252:23 258:11,21
260:4 261:16,18
264:15
**background** 161:3
161:9,14 248:19
**backs** 220:21,24

backside 159:24
160:1
bad 148:25 149:9
bailey 4:4
bangor 146:16,16
bank 10:12
banned 233:8,22
barbara 193:1
243:18
barker 4:13 14:5,5
barnes 8:3,6,16
14:3,15,15
bartlit 8:23
bartlitbeck.com
8:25
base 165:19
based 56:19 98:22
116:21 142:5
143:21 147:14
188:2 196:17
197:21 219:6
225:15 231:22
233:1,19 234:2,22
237:2 238:13
basically 57:8 86:3
96:19 173:12
basis 20:22 35:18
44:15 59:1 77:25
78:8 85:14 149:5
172:2,5,11 209:17
211:13
bates 160:2
baton 176:23
bcc 143:25
beach 4:14
bear 143:4
beck 8:23
becoming 248:11
began 86:17 91:6
91:10

beginning 69:13
88:9 94:7 99:9
111:14 112:14
171:12,22 190:3
242:11
behalf 2:16 3:3,7
3:12,17 4:2,7,12
5:2,11,15,20 6:2,9
6:15,20 7:2,13,18
8:2,10,15,21 9:2
16:2 18:3 19:4,20
19:23 20:1,5,9,12
27:14 28:19 36:14
222:19
beisell 5:6 15:5,5
believe 34:16
48:22 55:4 63:9
78:6 84:9 91:19
93:13 109:8
141:22 158:25
160:3 175:23
176:5,8 186:14
206:23 235:8,15
237:6,7
believes 234:17
bench 10:14 207:9
benchmark 70:6
206:19 207:10
beneficial 59:10
benefit 58:7
bennett 3:8 16:7,8
19:24,25 26:18
48:14,15 54:19
55:2,6,9,13,16,18
56:2 72:15,23,25
75:5,16 76:13
77:5 78:21,25
80:23 81:14 82:17
83:9,20 84:14,19
85:5,25 90:6,13
91:22 92:3 99:12

100:13 102:7,17
103:24 105:3
106:9 107:2,4,16
107:24 108:2,6,20
109:3,13 110:2,12
110:24 113:3
114:7 115:1
116:18 117:6,18
119:4,7,10,13,18
120:8 121:2,6,25
123:8,24 124:22
125:12 127:9
128:18,25 129:7
130:4,15 131:3,10
132:23 133:3,18
134:12 135:13
137:8 138:3,10,14
138:16,19,23
139:1,4,8 140:25
141:10 142:24
144:13 147:11,25
148:13 149:4,11
149:13 152:13,19
152:21 153:12,18
154:7,17 156:3
157:21 158:11
160:18 161:20
162:9 163:6,13
164:6,14,21 165:3
165:16 166:1
167:4,16,19
168:16 171:1
172:4,14 173:6
175:22 176:17
177:4,15,23 178:4
182:18 184:16
185:22 186:5
187:7 188:11
191:19 193:14
194:7,11 195:9
196:1,14,22 198:5

198:16 199:4
200:24 202:5
205:7,16,22
207:16 208:9,18
209:6,10,15,22
210:10 212:9
214:22 215:17
218:2,14,20 219:3
220:4 224:24
225:17 226:2,9
228:3 229:24
230:8 232:1
233:11 234:10,19
236:13,24 237:12
237:18 238:5
239:21 243:16
244:1 246:23
251:21,24 253:17
256:21 257:18
262:7
bennett's 19:18
best 10:12 37:13
37:14,14 49:7,10
62:15 63:20 65:10
102:20 109:20
141:23 245:18
248:4 253:24
better 23:20
155:11
beyond 22:24,25
44:22 58:4 161:2
219:4 257:19
big 91:11
biggest 89:18
91:15
bill 14:3 15:17
binder 25:15 26:3
91:25
bit 23:14 116:23
179:4 181:12
204:18 213:3

220:21 223:14 236:7 253:23
**black** 128:3
**blanked** 129:10
**bless** 117:16
**blessed** 72:13,19 74:11,14 117:21
**blessing** 132:18
**blown** 165:6
**bmasters** 6:8
**board** 114:13
**bockius** 5:22
**bonnie** 1:24 13:2 259:4 263:2
**boockholdt** 193:1 243:18
**books** 114:22 116:6
**boston** 7:21 8:13
**bottom** 115:9 132:3 137:22
**boulevard** 3:19
**boy** 61:4 192:24
**boylston** 7:21
**brad** 6:4 14:19
**break** 56:4 104:5 107:18,19,23 110:23 156:9 177:1,3,17,20,24 177:25 220:3,20 258:5 262:13
**breaks** 107:20
**bridgeside** 3:19
**brief** 20:19 55:16 87:15 191:5
**briefed** 190:21,25 191:3
**briefing** 61:9 86:21 91:21 92:13 93:4,12,15,15,24 94:1,14 95:13,17

96:3,13 101:25 136:13 191:12 207:2 242:13
**briefings** 60:4 86:18 87:1 89:25 91:6,10,19 93:14 93:17 95:24 97:7 97:10,18,21,25 98:2 99:8 100:1 101:21 112:13,21 113:13 116:15 117:3,15 120:20 125:18 191:7 242:15,17 243:24 257:16,22
**briefly** 54:22 173:5
**bring** 62:10 134:21
**broad** 169:7,17 189:3 252:4
**brought** 50:18 173:22
**brunner** 6:20 15:11,11
**bryant** 4:8
**btlaw.com** 8:5,9
**bulk** 216:25 217:2
**bunch** 105:11 134:20
**burden** 75:25 76:2 83:18,25
**burdening** 148:18
**burling** 7:4,9 13:17
**business** 155:6 223:15 225:2
**businesses** 125:1
**buy** 219:15
**buying** 155:4

**c**

**c** 9:12 10:1 12:1
**ca** 264:25
**cah** 10:20
**calculate** 32:22
**california** 4:14 5:4 7:10
**call** 21:25 23:1 25:9 123:10 129:25 196:17,20 232:4,5
**called** 38:11,14 69:25 77:8,13 80:20 81:1 101:24 175:3
**calling** 79:17 81:7
**calls** 130:7,8,12
**cancer** 260:24
**capabilities** 251:8
**capability** 167:23
**capacity** 16:21 20:6 30:5,19
**cardinal** 6:2 13:9 13:11,13 14:19 24:16 81:24 91:12 94:24 95:14,17,22 98:17
**cardinals** 132:8
**care** 161:11
**career** 231:2,3 236:8 257:14
**carolina** 3:19
**carrying** 144:11
**carter** 209:14 210:21
**case** 1:5,9,11,14 12:20 28:8 57:16 73:18 119:23 138:11,12,15,18 157:22 176:1 178:24 205:11

222:23 225:9 264:6 265:3 266:3
**cases** 180:11 233:15
**categories** 67:8 179:16,20 180:1,6 193:16
**catie** 7:14 14:11
**catie.ventura** 7:17
**caught** 19:18
**cause** 120:16 121:22,23 162:3 197:2 234:14,16 234:23 235:5,12 235:20 236:3
**caused** 168:10
**causes** 232:17
**causing** 195:16
**caution** 195:13
**caveated** 137:6
**cell** 12:9
**cellular** 12:8
**center** 4:14 9:4 80:19 262:1,3
**centered** 250:2
**centers** 181:7
**centre** 8:18
**ceppich** 7:11
**certain** 25:10 44:19 57:15,23 58:9 65:23 66:16 68:3,9 77:18 80:21 86:4 139:18 182:15 223:5,11 224:9,14,15 244:17 247:10
**certainly** 96:1 106:21 114:16 154:13 167:1 240:19

certainty 230:19
certificate 263:1
   266:11
certification 265:1
   266:1
certify 263:4
cfr 207:8 215:7
chain 10:21 11:15
   11:17 180:2,3,7
   181:6 182:13,17
challenge 223:5
chameleon 88:16
   88:17
chance 42:12 93:3
   100:19 112:1
   152:4
chandler 9:10
   16:10,10 19:19
change 63:24
   88:18 99:9 101:16
   101:25 104:20
   108:17,22,24
   109:10,23 110:8
   119:1 120:5,14
   121:18 124:5,11
   125:23 126:3
   134:10,14 138:24
   194:1 264:13,14
   266:8 267:3
changed 197:17
   254:23
changes 116:15,17
   120:25 124:10,17
   124:19 126:14
   127:8 130:25
   150:24 254:22
   264:12 265:7
   266:7,9
changing 88:17
   120:4 205:20

charge 218:24
   219:1,23 220:21
   220:24
charged 61:4,10
charges 51:21
chaverri 3:4
check 138:22
   182:22 183:1
   226:18,25 227:13
   228:23 259:14,22
checks 213:23
chicago 5:8
chief 39:15,16
   53:23 59:23,25
   62:4,17 90:5,9
   95:20 126:20
   213:5 246:2
   248:12 249:14
   252:20
china 224:6
choice 118:20
chooses 188:14
choosing 221:17
chose 91:14 117:1
   151:6
chris 13:16
christopher 7:9
chronic 239:8
circumstance 21:7
   175:5
circumstances
   43:13,15,22 68:3
   68:10,13 134:16
   174:15 175:12
   184:24 185:5,8
citation 189:6
city 1:10
citycenter 7:5
civil 9:10,11 265:5
   266:5

claiming 148:17
clarify 35:7 49:17
   96:8 155:22 166:9
clear 34:16 43:9
   43:21 51:16 64:11
   68:22 79:18,21
   98:14 133:7
   168:13 170:3
   177:6 184:12
   187:19 189:21
   205:25 206:23
   259:1
clearly 201:11
cleveland 1:10
   3:10 4:19 16:9
   264:2
client 31:25 90:8
clients 128:23
climbing 196:8
cling 118:2
clinic 181:2
   224:22,23 225:3
   225:12,22 260:24
clinics 98:7,19
   224:9,13,16,20
   228:1,11,15,23
   259:23
close 31:12 60:10
closed 65:14,21
   67:5 117:11 146:7
   212:15
closer 22:12
   248:13
clung 117:22
cmcnamara 6:7
coach 37:8
cobwebs 61:6
code 169:12,13,14
codes 169:20
cohen 9:8 16:22,24
   17:4,10 18:6,9,11

18:22 19:3,14,16
   19:25 20:10,14
   24:3 31:6,10,19
   32:14,15,19 33:13
   33:16,17 34:2,5,15
   34:22,25 35:19
   36:1,16,19 37:2
   38:2 40:5,19 41:8
   41:24 42:14,24
   43:5,23 47:12,17
   48:6,7 49:15
   52:19 157:11,18
   157:21,24
collaboratively
   81:6
colleague 176:24
   226:15
colleen 6:3 13:10
color 99:21
colorado 8:24
columbia 263:21
come 24:5 38:17
   86:25 164:2
   166:22 168:3
   185:20 243:10
comes 163:10
   195:22 214:4,10
   262:2
comfortable 65:3
coming 44:17 52:5
   58:14 88:2 112:2
   119:1 250:15
comment 154:19
commented
   171:14
commerce 53:24
   54:1,10 56:24
   59:2,12,17 60:12
   248:17 249:3
commission
   263:23 265:19

[commission - controlled]                                                                 Page 9

266:25 267:25
common 260:14
communicate
122:23 126:14
187:12,15 188:4
communication
31:21 149:6
communications
21:8 90:8
community 68:10
68:11 144:21
149:23 155:18
companies 124:12
128:21 129:5,24
130:12,13,22
144:1,2
company 14:16,18
14:18 46:1 54:7
56:18,20,21
128:16 131:2
134:6 135:21
144:18 195:18
197:15,20 243:7,8
compare 166:16
compared 118:20
118:21,21
comparing 169:19
174:12
compelled 57:14
compensated
221:6
compensation
34:4
complete 61:15,24
66:18,24 67:1,9
completed 264:15
completely 93:18
135:3
completeness
74:17 115:19

compliance 11:11
complied 141:7
comply 105:25
130:25 134:7
components
102:15
compound 164:18
computer 70:19
computerized
263:8
concept 66:23
120:14
concern 120:23
127:15 137:18
concerned 98:17
concerns 127:7,12
138:1 143:22
209:18
conclude 165:9
concluded 262:24
concludes 262:18
conduct 62:12
165:6
conducts 211:14
conference 11:4
157:3 158:3,8,19
158:20,21 159:3,6
159:9 203:5,10,13
conferences
114:11
confidential 30:9
30:25 32:12 36:9
37:22 39:24 40:17
41:5,20 42:11,22
46:11 47:6 48:3
52:17 90:7 139:13
155:6 210:11
214:24
confirm 79:6 93:7
165:22 219:16

confirmable
173:13
confused 116:17
120:25
confusion 116:21
120:17 121:23
123:3,4,10
congress 126:2
conjunction 27:4
57:11
connection 219:22
connolly 2:6 6:4
12:22 38:7
connote 163:17
considered 197:25
considering
199:15
consolidated 54:4
54:9
constantly 136:20
consult 62:17
consultancy 40:21
42:6 49:6
consultant 30:11
30:13,14,15 31:17
32:4,7 35:9 40:22
41:13,14 48:10
consultation 35:23
consulting 43:12
45:20,23 47:3
48:1
consults 44:23
consumers 223:21
223:23
consumption
169:22
contact 10:20
81:24,25 183:10
184:9
contacts 82:13
129:25 144:2

contained 98:23
content 98:22
192:12
contests 235:4
context 47:4 65:19
107:10 110:5
136:9 162:1
163:15 167:10
179:11 193:21
197:12 205:2
207:3 211:3 229:1
237:20,24 245:4
continue 12:12
48:10 61:8 74:6
97:10,17
continued 4:1 5:1
6:1 7:1 8:1 9:1
97:6,20 114:3
124:3 190:6 241:6
continuing 72:7
87:5 107:7 113:16
114:23 116:3
233:8,22
continuity 93:20
continuously
58:16
contracted 54:6
contrary 59:5
control 31:1 32:12
33:3 35:17 36:9
37:22 39:24 41:5
46:13 47:6,8 48:3
49:13 57:1 58:8
145:17 167:2
controlled 11:7
65:20,23 66:1,2
70:20 87:6,16
150:16 155:19
179:14 216:19
218:9 225:25
226:7 227:25

228:10,14,16
229:6,20 230:5,14
233:9,23 234:17
235:1 239:15
240:5 260:6,16,20
**controls** 176:8
**conversation** 39:1
**conversations**
12:8 23:10 50:1
204:10 231:8,16
260:4,11
**converse** 40:7
**coordinating**
61:10
**copies** 78:16
152:10
**copy** 81:19 92:2,7
209:5
**corporate** 9:4
**corporation** 6:15
7:2 13:15 181:22
**correct** 16:23 18:5
18:5 28:25 34:19
54:12 63:24 64:13
65:20 68:24 73:18
85:21 98:19 101:3
101:9 102:6 105:2
105:7 108:19
109:1 110:11
112:23 114:3,6,17
114:25 115:13,15
116:11,17 117:4
117:17 120:17
121:1 122:25
123:20,23 124:13
125:11 126:15
128:24 129:6,22
130:25 136:2
142:23,25 143:22
144:4,7,12,21,22
144:24,25 145:13

145:17 147:10
149:2,10,12,15
154:6 161:9 164:5
164:20 165:2,4,7,8
165:11,12,15,25
167:3 170:4,5,8,16
171:11,25 172:1
180:11 182:23,24
183:5,9,12,13
186:16 187:2
190:13 191:18
205:13 209:14
212:8 213:1,6,7
223:7,12,13,23
224:23,25 225:22
225:23 231:5,6,9
232:14,21,25
233:5 235:16
240:13,14,16
241:5,8,16,18,20
241:22,24 242:4,5
242:7 245:16
251:13 254:14,15
254:25 255:3,7,14
255:15 256:7
259:16,17,24,25
261:1
**corrections** 264:12
266:17
**correctly** 70:18
**coughing** 62:22
**counsel** 12:16 13:4
17:7,7,25 18:15
19:17 20:17 21:2
21:9 23:24 24:15
26:4,4,14,24 30:1
31:15,22 40:7
44:3 49:14 50:2
54:23 56:1 69:16
90:5,9 91:23
95:20 100:14

107:16 111:17
126:20 137:8
138:3,10 147:13
156:21 178:12,14
209:4,15,17
220:15 222:8,10
258:14 263:11,15
**counsel's** 39:15,17
62:17
**count** 175:21
**counties** 19:9
**country** 117:24
257:5,17
**county** 1:8,12 3:12
3:17 15:21,23
19:11 36:15 42:2
42:5 48:11 51:17
51:18 265:10
266:15
**couple** 17:12
21:13 49:15 55:14
61:5 190:18 198:7
221:4 240:24
260:2
**course** 50:6 193:2
245:13 246:19
**court** 1:1 12:18
13:1 16:3 17:1,15
24:8 45:5 47:19
56:6 139:16,17
147:21 201:1
265:7
**courtesy** 144:20
**courts** 33:6
**cov.com** 7:7,7,8,11
**cover** 95:3 139:12
240:20
**covered** 240:21
**covering** 221:9
**covington** 7:4,9
13:17

**credibility** 49:18
49:22
**credit** 111:4
219:14
**criteria** 71:6 103:7
105:17 106:1,7
129:4 207:5
**critical** 112:19
113:1,5
**cross** 22:22 214:7
**crunch** 251:10
**csa** 214:8
**csos** 54:4
**ct** 51:17
**curiosity** 212:2
**currency** 10:12
**currently** 24:22
35:3,8
**customer** 143:21
144:20 149:1,9,20
155:7 162:24
199:6,6 201:25
225:10 234:16
244:18 247:16
256:3
**customer's** 201:25
**customers** 133:9
144:3 147:16
149:25 155:3
166:11 180:18
223:21 245:20
256:6
**cut** 166:11
**cuyahoga** 1:8 3:12
15:23 36:15 51:18
**cvs** 6:9,9 14:13,14
182:1 222:23
226:6,24 227:11
228:13,22 229:14
229:19,21 235:19
244:11 259:13,21

| **d** | | | |
| --- | --- | --- | --- |
| **d** 4:7 12:1 39:15 | 20:4,11 157:14 | 156:1 157:2 158:1 | **dealings** 33:1 |
| 233:6 249:1 | 264:5 | 158:3,8 160:2,14 | **dear** 264:10 |
| **d.c.** 1:19 2:8 3:5 | **davis** 5:16 14:7,7 | 161:19 162:6,8 | **death** 197:3 |
| 5:18 6:5,12 7:6,15 | **davison** 7:19 | 163:11 164:3,4,11 | **debra** 4:7 14:21 |
| 12:23 53:13 | 13:24,24 | 164:17,19 167:1,1 | **debra.ogorman** |
| **dallas** 6:23 53:11 | **day** 5:3,7 14:2 | 168:20 170:4,6,23 | 4:10 |
| 71:16 231:5 | 28:4 53:17 69:21 | 172:2,11 175:12 | **debriefing** 207:3 |
| **dan** 1:7 | 134:22 222:15 | 179:16 186:14 | **dechert** 4:8 |
| **danger** 197:2 | 227:6 265:16 | 187:1,1 188:17,24 | **dechert.com** 4:10 |
| 233:3 | 266:22 267:22 | 190:12,17 191:24 | **decide** 165:1 |
| **daniel** 9:13 12:24 | **days** 59:5 261:14 | 192:3 193:7 203:4 | 195:24 |
| **data** 54:5,6,8,12 | 264:18 | 203:9 208:6,16 | **decided** 206:19 |
| 54:15,17 56:11,17 | **dea** 10:23 11:2,10 | 209:9,16 214:6 | **deciding** 197:25 |
| 56:20,20,22,25 | 11:18 25:8 26:7 | 217:24 218:7,17 | **decision** 109:6 |
| 57:4,10,11 58:25 | 26:17,21 27:14 | 221:12,16 223:6 | 117:13 140:19 |
| 62:16 92:17,20 | 28:20 39:15,17 | 223:10 224:15 | 142:22 165:19 |
| 96:7,8,11,25 | 52:25 53:2,5,20 | 231:25 232:11,22 | 197:14,21 232:8 |
| 122:13 135:17 | 54:22 56:23 61:11 | 232:23 233:6,20 | **decisions** 115:25 |
| 168:22,25 170:1,4 | 69:19,24 71:6,11 | 234:3,3,15,16,24 | **deed** 265:14 |
| 170:7,18,19,24 | 71:17 72:13 74:11 | 235:11,11 236:10 | 266:20 |
| 171:6,6,7,9,15,19 | 75:4 80:20 81:2 | 237:3,3 239:13 | **deem** 107:6,8 |
| 172:12 173:13 | 82:22 83:6 84:25 | 240:3,8 245:13,18 | **deemed** 106:24 |
| 175:14 196:10,18 | 87:5 89:3,5,10,19 | 246:10,15,19,24 | 146:11 264:19 |
| 197:18 213:4,9,24 | 90:5 101:5 102:14 | 247:21 248:20 | **deems** 144:19 |
| 214:10,13 216:25 | 103:2,17 104:7,12 | 250:2 252:10,13 | 163:1 |
| 217:6,9,13,16,19 | 105:1,11 106:6,25 | 252:14 253:2,25 | **deep** 33:10 |
| 218:19 249:4,5,6 | 107:5 108:17 | 254:11 255:7,18 | **deeper** 122:2 |
| 251:10 255:6,17 | 109:1,12,23,25 | 256:1,5,9,17 257:3 | **defendant** 12:16 |
| **database** 54:23,25 | 110:3,10 114:6,22 | 257:7,14,16,25 | 13:9 14:4 15:10 |
| 58:21 | 114:24 116:6,8 | 261:21 | 18:20 21:21 24:15 |
| **databases** 58:24 | 117:1 118:23 | **dea's** 99:9 150:23 | 178:14 222:10 |
| **date** 34:12,24 | 120:1,24 121:18 | 167:13 233:1 | **defendants** 13:21 |
| 35:23 36:22 62:11 | 123:22 124:3 | **deadlines** 125:5 | 14:8,10,12,22 15:3 |
| 264:8 265:3,9,19 | 125:5,9,14 126:2 | **deal** 89:7 108:11 | 15:7 17:25 21:20 |
| 266:3,13,25 | 126:13 128:21 | 108:14 219:12 | 21:25 22:1,5,9,20 |
| 267:20,25 | 129:5,25 132:17 | 223:20 231:13 | 23:1 |
| **dated** 10:9,22,24 | 137:12,16 145:1,6 | **dealing** 75:8 87:5 | **defense** 17:7 |
| 11:1,9,15,17 211:5 | 145:13,15,19 | 107:12 118:13 | **define** 65:16 99:17 |
| **david** 3:3 9:8,11 | 147:8 149:2 | 195:11 197:1 | 173:19 223:9 |
| 16:13,20 17:4 | 150:15 153:4 | 236:8 | **defining** 71:3 |
| | 154:5 155:10,15 | | |

definitely 169:11
definition 106:2
207:7
degree 136:6,6,7
deliberations
127:11 246:24
delivering 225:9
delving 168:2
dematerialized
134:23
denver 8:24
department 3:7
9:9,10,11,12 16:8
16:11,14,16 25:2
48:15,19,24 54:11
140:16 264:22
departure 175:12
depending 18:12
177:12 189:2
191:4
depo 137:21
deponent 23:10
deposition 1:18
2:1 10:8 12:11,15
12:21 23:15 25:18
25:19,24 26:11,22
27:3,9,21 37:16
43:21 48:17,23
52:8,11 63:8,16,23
64:5,19,24 73:6
75:19,22 78:17
81:12,16 92:4,24
94:19 100:7 131:8
131:9 138:11
147:20 150:11
152:1 156:22
159:16 171:13,22
202:12 209:2
263:3,5,9,13 264:8
264:11 265:1,3
266:1,3

depositions 55:5
describe 52:14
54:17 56:10,15
61:1 70:3 96:16
described 82:7
88:20 223:14
describing 128:2
description 214:3
214:5
design 255:1
designated 48:17
designed 103:7
designing 255:5
desire 128:6
176:22
desk 83:23
detail 78:20
detailed 79:3
details 155:8
177:10
determination
55:10 105:18
116:24 140:19
233:2 253:10
determine 76:19
155:3 174:16
214:15 215:11,15
235:6 251:11
determined
246:20
determining
194:17 214:19
develop 89:23
developing 101:24
136:14
development
90:25
di 61:11
diatribe 119:15
dice 170:24

dictate 71:6
difference 207:10
different 44:8
61:25 67:2 77:13
77:14 78:7 100:3
123:11 139:14
143:18 162:21
170:17,24 171:10
171:10,18,19
173:11 175:6
179:15 180:1,6,10
180:14 182:13
206:15,24 217:4
225:14
difficult 18:15
84:6,25 132:21
155:5
difficulty 206:7
dig 61:6 122:2
175:1
digit 169:12,13,14
diligence 143:4,6,8
144:11 174:16
direct 30:8,23 32:9
36:11 59:20
180:25 183:10
184:9,17 192:20
223:22 226:3,12
230:1,9 250:3
directed 21:5
146:2
directing 40:1
41:7,21 48:5
direction 188:7,10
188:18,25 263:9
directly 42:23
68:5 180:22 181:2
223:20
disagree 141:19
142:7

disapproving
153:22
discipline 221:14
disclose 90:7
137:11 171:3
disclosing 210:13
discovery 43:12
197:4
discretion 167:22
188:14
discuss 98:18
219:8 244:5,12
discussed 49:7
101:2 200:1
201:17 217:25
discussing 148:12
189:18
discussion 98:5
101:23 112:20
122:21 124:14
136:17 192:9
203:3,12,25 222:4
discussions 116:13
126:13,18 192:12
192:15 202:2
203:17,20 204:5
204:15 231:10
disparaged 148:19
dispensed 228:1
228:11,16
dispensing 224:22
225:3,13
display 249:2
distinguish 84:25
86:11
distribute 225:25
226:7 227:1,25
228:10,14,24
229:5,20 230:4,14
235:1 259:23

distributed   229:15
distribution   65:14
   80:19 117:11
   146:8 165:13,23
   180:3,7 181:7
   182:13 197:16
   212:16 239:15
   240:5 262:1,3
distributor   27:11
   60:3,4,4 61:9
   68:22 70:18,21
   71:3 82:15 85:14
   85:14,20 86:17,20
   86:22 87:1 89:24
   91:19 92:20 93:4
   95:13 96:7 97:6
   97:17,21 98:1,15
   99:8,25 101:21,24
   112:13,21 113:13
   116:14 117:2,14
   120:20 125:18
   143:21 144:20
   145:12 148:25
   149:2,8,10,19,19
   149:23 155:17
   163:1 164:3,13
   169:25 170:3,7,8
   172:7 180:11,14
   182:23 183:3
   189:17,22 190:5
   190:11 191:8,12
   191:14 192:2
   198:13 207:2
   217:17,20 219:15
   219:16,21 227:16
   227:17 240:19
   243:11,23 244:5
   244:12 246:17
   254:9 256:4
distributor's
   136:1 169:25

170:7 182:22
distributors   18:3
   57:16 66:7,10
   68:15 70:5,10
   76:18 77:19 91:7
   91:11,14 92:19
   100:1 112:14,22
   114:1 120:21
   121:9 122:24
   123:4,5 124:5
   125:10 132:20
   144:7,17,24 145:3
   145:5 147:2
   148:11 150:22
   155:20 168:24
   171:23 179:21,23
   180:22 186:3
   189:23 190:12
   191:15,18 193:24
   216:9 218:10,10
   223:19 230:24
   241:3,12 242:9
   243:3 244:17
   254:12 256:3
   260:5,11
district   1:1,2
   12:18,19 16:17
   212:3 263:21
divergent   257:4
diversion   53:6
   57:1 58:8 61:13
   61:16,24 80:12
   82:1,2,14 85:3
   86:10,12 90:10
   95:19 122:14
   135:9 143:22
   224:19 225:4,5,7
   225:16 236:8
   256:18 257:4
diverted   207:15
   208:17 212:8,11

212:13 213:1
diverting   145:17
   145:21 223:11
   234:17
division   1:2 9:10
   12:20 53:11
   211:19 230:23
   252:22 253:9
division's   253:11
divisions   249:19
   253:2,15
dmigliori   3:20
doctor   67:18 68:2
   68:16,23 69:2
   87:22 88:6,12
   184:25 185:10
doctors   58:16
   169:9 183:16
   238:3,25
document   1:7
   25:22 81:15
   102:24 139:12,15
   139:15 141:15
   142:11 143:7
   153:14 154:22
   158:14 159:21
   162:1 177:3
   203:24 209:18
documents   99:20
   122:2
doing   18:1 44:14
   47:3 66:19 67:11
   96:2 112:7 117:2
   127:1 130:14
   136:10 140:8
   150:2 224:15
   241:3 244:8
doj   26:17,21 27:4
   38:20,23 39:6,8,14
   39:21 233:15

dombarian   82:1
don   15:20 31:11
   49:3,3 203:4,13,18
   204:1
donald   3:17
donna   82:1
double   235:22
   258:22
doubt   133:20
downloads   211:13
downstream
   68:11 147:15
   163:23
draft   11:13
dramatic   194:6,9
   196:7
dramatically
   193:19
draw   43:24 44:5
   131:6
drawing   44:10
drive   4:14 174:10
drop   129:16
drug   6:15 9:12
   11:3 13:15 16:18
   25:2,5,8 106:14
   118:5,8,20 158:17
   158:18 179:13
   199:7 200:4,7,19
   201:11,13
drugs   57:8,9
   200:13 260:20
dtayman   3:6
due   143:3,6,7
   144:11 148:20
   174:15
duly   24:12 263:5
duties   238:11,16
duty   239:13 240:3

[e - examples]                                                      Page 14

**e**

**e**  7:3 8:2,11 9:10
10:1,21 11:9,15,17
12:1,1 53:24 54:1
54:10 56:24 59:2
59:12,17 60:12
143:25 144:6,10
144:16 146:25
147:3,8,9 148:11
148:24 159:23
161:8 202:17,21
203:2 209:13
210:25 211:5,10
211:24 212:5
248:17 249:3
**earlier**  31:7 49:18
50:8 63:1 69:19
73:16 86:17 97:5
98:2 113:24 118:5
133:6 184:22
186:13 189:16
197:23 204:17
207:1 213:3 223:4
224:11 230:22
231:3 244:14
251:7 261:2,11
**early**  94:10 110:25
254:8 258:23
261:13
**ease**  111:24
**easier**  23:17 99:22
**eastern**  1:2 8:21
12:19 14:18
**easy**  18:14
**ecah**  11:12
**economies**  118:25
**economy**  254:22
**edict**  114:14
**eekhoff**  3:18
**effect**  124:15
144:18 171:4

**effectiveness**
171:4 210:12
**effort**  144:2
155:16,25
**efforts**  58:8
**egregious**  214:16
214:20
**eight**  22:9 32:22
52:6,14 241:13
249:17,20 250:3
250:25
**either**  18:14 27:3
96:11 173:13
198:20 244:11
**ekveselis**  7:7
**elements**  127:3
**eliminate**  211:15
**ellis**  4:17 7:14
**email**  264:17
**emainigi**  6:6
**embarcadero**  5:4
**emily**  7:3 14:23
**emissary**  156:7
**emphasizing**
135:20
**employed**  24:22
101:5 263:12,15
**employee**  48:20
81:7 82:15 188:24
263:14
**employees**  80:19
126:15 215:9
250:22
**employer**  25:1
**employment**  25:10
**enactment**  200:12
**enclosed**  264:11
**encompassing**
128:11,12
**encouraged**  125:9

**endeavor**  172:11
**ended**  245:8
**endo**  5:15,15 14:7
14:9
**endorsing**  31:3
**enforcement**  9:12
11:3 16:19 25:3,5
25:8 54:25 158:17
158:18 176:14
179:13 210:11
214:24 218:18
256:17 257:3
**english**  5:12
**enlightened**
125:16
**ensure**  239:14
240:4
**entered**  74:12
266:9
**entire**  257:13
265:5 266:5
**entirety**  27:20
29:5
**entities**  57:15
218:18
**entity**  65:22
**enu**  6:2 13:8 18:2
18:19
**eppich**  7:9 13:16
13:16
**errata**  264:13,18
266:7,10,18 267:1
**especially**  59:5
94:7 193:21
**esq**  3:3,8,13,17,18
4:3,7,13,16 5:3,6
5:11,16 6:2,3,3,4
6:10,16,20 7:3,3,4
7:9,13,14,19,19
8:2,6,10,11,16,16
8:22 9:2,8,10,11

9:12
**essentially**  17:13
22:22 86:22 92:18
**est**  37:14
**establish**  151:20
196:16 247:10
**established**  23:13
50:4 198:7
**estimate**  37:13,14
52:3 245:18
**et**  1:9,11,13,13
**evaluate**  136:1
**evaluation**  88:7
**evening**  86:4
**event**  50:7 220:19
247:13
**eventually**  88:10
88:21
**everybody**  16:25
23:3 75:15 76:4
76:11 78:5 123:11
132:8 146:9
169:15
**evolution**  88:14,16
125:20
**evolve**  134:10
**exact**  128:17
**exactly**  50:7 74:15
**examination**  10:2
22:22 24:15
178:14 222:10
**examine**  183:15
**example**  19:22
22:20 57:18 67:18
78:16 79:4 80:5
82:13 98:3 145:12
158:22 171:23
182:21 224:6
260:23
**examples**  102:20
168:1

[exceeded - fast]

exceeded 85:2
excellent 63:14
exceptional 43:13
43:14,22
exceptions 180:24
186:10
excerpt 10:14
excess 261:21
excessive 69:25
70:3,7,22 71:4,7
71:10,19,23 72:6
72:12,19 75:3,12
76:8,18 77:9,10,20
79:5,5,7,11 80:6
80:14,18 82:23
83:7,17 84:11,24
85:13 99:10 100:2
102:2 104:6
105:21 113:17,25
117:20 118:16
120:15 121:14
124:3 125:7,21
127:17,23,23
128:2 204:18,23
205:1,4,12 206:8
206:11,12,15,24
207:11 231:13,16
exchange 202:21
202:24 209:13
211:1
exclusively 190:14
excuse 41:2 62:1
145:3 157:7 191:1
executed 266:10
execution 265:14
266:19
exercise 143:2,6
exhausting 89:5
exhibit 10:8,9,10
10:11,14,16,17,18
10:19,21,24 11:1,3

11:6,9,11,13,15,17
25:14,14,17,19,24
26:2,6 49:19 63:8
63:12,15,16 64:2,5
73:6 78:13,17,23
80:5 81:11,12,23
91:21 92:4,7,23,24
93:8,24 94:18,19
94:22 100:9,11,12
100:25 111:21
143:14,17 150:10
150:11,14 151:25
152:1,5 156:22
157:1 158:6
159:16 202:11,12
209:1,2,8
exhibits 10:7
11:21 92:1 98:3
98:12 99:20
exist 50:4 212:22
existed 117:8,9
149:18
existence 248:22
expect 20:7 188:8
232:4
expectation 103:5
120:1 122:23
expectations
130:2
expected 105:16
expenses 221:10
experience 64:21
71:8 75:8 84:10
123:3,13 182:5,9
188:2 225:15
231:22 233:20
234:3,22 237:2
expert 31:17,18
42:18 43:4,12
52:21

expiration 265:19
266:25 267:25
expires 263:23
explain 45:22 57:3
57:13 132:12
166:6 172:25
174:3 200:5
explained 140:20
explanation 20:21
87:15,20
explicitly 168:9
extensively 49:5
extent 20:11 21:16
22:19 23:9 44:6
44:15 46:9 50:10
66:17 98:11 99:1
117:10 121:19
146:1 147:12
208:23 209:23
238:12 248:23
extra 111:4
extracted 171:19
extrapolate
170:19 171:7,7
extremely 118:14
118:14
eye 3:4

**f**

face 175:1
facing 89:19
fact 30:13 89:19
107:11 128:21
131:6 143:5
144:23 145:21
191:17 200:6,18
201:11 208:16
factor 197:24
factors 119:1
173:24 174:19,22
194:16 199:15
201:16,18 232:7

facts 238:9,14
fair 29:23 42:4
66:16 67:4 70:8
70:18 71:2 72:18
75:2,24 76:7
78:10 82:21 83:5
84:7,23 85:15
86:13 89:3 91:2
94:11 99:7 102:13
103:15 105:15
120:6,10 124:2,21
128:3,4,7,17
130:11 134:11
135:9,12 136:6
153:11 154:13
162:6 179:15,25
180:5 182:14
183:3,18 184:8
186:1 189:24
191:13 198:1
204:22 205:11
207:13 208:6
213:9 223:2
224:16,17 231:12
231:17,23 232:14
246:22 251:14
254:19 262:3,4
fairly 21:6 196:5
fall 176:6
false 208:7,11
211:15 212:5
familiar 54:23
82:4 181:9,18
192:11 201:24
218:23,25
far 18:4,12 44:12
57:23 75:7 98:15
234:13
farrell 4:3,4 16:1,1
fast 123:12 132:17
134:14

**faster** 74:9
**fault** 172:19
**february** 1:20
12:5
**federal** 126:9
207:4
**fedex** 87:24
**feed** 69:4
**feedback** 151:10
154:1
**feeding** 251:17
**feel** 175:20 199:18
**fees** 47:24 50:25
**felt** 214:16
**fentanyl** 118:9,10
118:11,12 119:14
134:18 254:23
**field** 53:7,9,10,11
62:11,12,13 71:16
72:2 77:20 89:5
122:16 130:7
146:18,22 167:22
173:16 174:3
187:2,6,15 188:4,6
188:6,17 189:4
219:13 230:23
231:4,25 249:13
249:19,19 251:11
251:17,20 252:16
252:19,22 253:2,9
253:11,15
**fields** 46:1,1,2,4,10
46:21 47:4,7 51:5
51:7,8,11,16 52:1
52:22
**fifteenth** 7:15
**fifth** 3:5
**figure** 130:14,23
132:9
**figuring** 130:24

**file** 113:15 116:2
**filed** 12:18 114:1
138:11,20 139:6
**fill** 87:22,23
223:21
**filled** 57:6,7
**final** 233:9,23
258:16
**finalized** 213:18
**finally** 93:21
200:11 230:12
**finance** 7:13
**financially** 263:16
**find** 97:3 123:2
155:12,12 264:11
**fine** 19:14 55:8,17
227:6 247:9
**finish** 29:13 46:16
**finishes** 259:4
**finkelstein** 9:11
**finklestein** 16:13
16:13
**firm** 12:25 13:2
30:21 32:25 35:9
36:23 38:6 45:16
56:18 222:15
**first** 17:17 20:16
21:20 24:12 39:20
40:14 46:16 49:17
53:5 54:4 93:17
94:3 95:10 152:6
160:12 244:15
249:9 253:21
**fit** 253:11
**fits** 175:6
**five** 169:13,14
174:11 220:2
250:17 262:21
**floor** 3:5,14 4:14
8:18

**florida** 118:21
**flow** 93:19
**fluid** 106:12
120:16 128:7,10
**focus** 98:25 99:1
**focused** 191:14,18
**foia** 159:25 160:23
161:2,12 162:18
163:16,20 168:7
168:10
**foley** 8:12
**foley.com** 8:14,14
**folks** 144:3 153:10
**follow** 100:20
131:22 138:8
139:25 177:14
188:9 189:6
**followed** 60:23
166:4
**following** 252:16
**follows** 24:14
132:5
**fool's** 53:17 69:20
**foregoing** 263:3,5
265:13 266:18
**forgot** 172:18
**form** 10:20 65:8,9
66:20 67:12,19
68:18,19 70:23
72:9,15,25 73:9,13
75:5,16 77:5 78:1
79:6,8,9 80:23
81:24 82:17,24
83:9,20 85:5,25
88:8 89:14 98:10
98:21 99:3,12
102:17 103:23,24
105:3,20 106:10
107:2,3 108:20
109:2,3,14 110:1,2
110:12,13,20

113:3 114:7 115:1
116:18,19 117:5,6
117:18 120:8
121:2,6,25 123:7,8
123:24 124:6,22
125:12,24 128:8,9
128:18,25 130:4
130:16 131:3
132:14,22,23
133:3,18 134:12
135:13,14 138:5
141:10 142:1,24
144:13 145:22
147:4,11 149:4,13
150:25 153:12,18
154:7,17 155:23
156:2 158:11
160:19 161:20
162:9 163:6,13
164:6,14,21 165:3
165:16 166:1
167:4,20 168:15
171:1 172:4,13,14
174:18,23 180:20
182:18 183:4,21
184:16 185:12,22
186:5 187:7,17
188:11 191:19
193:14 195:9
196:1,14,22 198:5
198:16 199:4,21
200:21 201:6,20
203:14 205:8,22
207:23 208:9,18
212:9 214:1
215:17 216:11
218:2,14,20
224:24 225:17
228:25 229:8,22
231:19 232:1
234:10 236:13,24

**[form - going]**

237:12 238:5,6
239:22 243:12
244:1 253:17
256:22 261:8
262:7
**forward** 17:14,23
18:18 19:8 21:19
23:2 114:22
264:15
**fought** 88:23
**found** 144:10
**foundation** 103:20
183:23 206:13
228:5 229:9,23
236:15 238:18
**four** 20:21 193:3
242:18 243:2
**fourth** 134:17
**fox** 9:3
**foxrothschild.com**
9:6
**frame** 245:24
247:3 249:9 254:8
254:9
**frames** 247:11
**frankly** 161:12
**fraud** 9:11
**free** 265:14 266:20
**frequency** 173:25
193:20,25 194:10
194:15 197:24
198:20
**frequent** 198:4
**front** 63:7 64:2
78:14 80:4 81:11
92:23 94:18 98:4
111:21 126:19
150:10 151:25
156:25 159:13,14
192:18

**fte** 250:16
**fulfilled** 212:14
**full** 24:19 165:6
177:19 214:5
**funding** 159:1
**further** 50:3 58:4
142:20 165:10
166:9 214:17,20
215:12,16 262:12
263:13

**g**

**g** 12:1
**general** 20:23 22:3
22:6 23:18 155:16
161:15 169:17
175:15 180:21
237:17
**general's** 177:9
**generalities** 215:1
**generally** 30:14
76:25 88:5 158:20
182:3,7 185:25
186:6,7 189:3,18
192:7,8 204:20
**generate** 251:20
**generated** 88:3
213:20 253:5
**geoff** 15:2
**geoffrey** 7:3
**getting** 33:9,10
143:16 247:16
249:4
**ghobart** 7:7
**giacalone** 95:21
**give** 37:11 42:12
84:17 87:15 97:6
97:17 98:8 102:19
118:1 136:24
151:13,17 152:15
161:3 169:25
209:6 238:8

**given** 19:9 23:7,8
48:8,21 90:23
102:21 115:15
148:20 157:2
176:13 245:15
262:19 263:10
**gives** 214:8
**giving** 73:17 91:6
97:10 161:9
219:14 238:12
245:13 247:21
**go** 12:13 17:11,16
17:16,23 18:18
21:3,19 22:24,25
23:2 24:7 25:13
32:19 35:6 44:6
50:2 52:24 54:21
55:11 60:21 69:3
74:9 75:6 77:16
84:3 95:24 107:21
107:25 108:3
110:22 120:9,20
126:2 127:19,22
129:5 132:2
136:12 140:11
142:22 146:3
147:21 149:14
150:21 156:8
157:7,8 161:2
162:20,21 163:16
168:7 173:3
176:25 177:4
178:2 214:2,19
219:17 221:24
223:8 240:24
243:7 246:1
251:12 252:1
253:8 258:21
260:4 261:16
**god** 258:3

**goes** 49:21 137:22
143:3 174:3 196:9
196:13 214:1
235:5 257:18
**going** 12:4 17:23
17:24 19:8,13
21:19,21,23 22:23
23:2,15 30:8,22
32:9 33:2 36:7,11
50:7 55:19,23
63:5,7 64:1 69:6
69:11 78:12,19
79:2 81:10 91:17
92:22 93:2 94:17
95:11 105:19
107:17 108:1
111:7,22,25 112:3
112:22 113:13
121:1 122:23
123:12 124:13
127:20 131:8
134:1,1,3,21,21,25
135:1 146:5 150:9
151:23,24 156:6
156:11,16 157:25
158:4 159:1,12
160:18 164:1,2
166:15 174:1,25
175:22 176:10
177:18 178:5,9
189:3 195:14
200:16 202:10
207:17 208:25
210:16 214:18
220:1,5,10 222:1,5
222:18 229:16
235:23 240:20
243:6 250:15
258:7,11 259:1,5
262:11

**good** 12:3 16:24
17:17 24:18 63:19
64:21 134:9
135:21 136:20
137:4 149:5 168:2
169:18 174:24
178:17 179:24
195:20 204:12
222:13,18 256:23
**google** 59:4,6
**gotten** 63:13
246:16
**governed** 49:7
**government** 16:6
19:17 20:9,17
175:18 210:7
**grade** 251:1
**grades** 118:6
**gradual** 123:23
**gran** 169:6
**grand** 8:8
**grant** 8:18
**granting** 127:23
**granular** 169:7
**grasp** 123:14
134:3
**gray** 7:20
**great** 89:7 110:24
117:10 178:4
**greater** 117:3,10
**greene** 4:4
**ground** 17:13
20:15 240:20
262:1
**group** 11:11 17:25
97:8,12,16 122:22
143:24 169:20
214:16,18
**grown** 127:20
**gs** 211:20 250:20
251:1

**gss** 211:19
**guess** 18:17 37:12
54:3 59:25 61:5
116:22 140:15
146:7 210:16
**guidance** 80:20
81:8 82:15 99:9
102:20,23,24
103:2 106:6,24
108:18 109:23
110:4 116:23
117:16 129:4
192:3 193:6
231:24
**guys** 81:15

**h**

**h.d.** 8:2 14:4 15:17
27:10,11,15 28:7
63:2 73:17 101:1
111:20 115:13
132:5 138:14,15
138:18
**haight** 88:22,25
200:12
**half** 22:11,12,14
84:11 118:6
**halfway** 211:4
**hand** 50:5
**handle** 179:13
**handled** 224:21
**hang** 91:22 135:4
209:15
**happen** 124:20
135:1 246:5
**happened** 117:20
127:16 176:5
216:18 243:24
244:22 252:17
**happening** 57:22
118:19 134:2
230:1

**happens** 57:20
67:17
**hard** 123:12,13
132:17 134:4
169:11 173:2
181:15
**harder** 123:15
**harm** 195:16
197:2
**harper** 202:18,19
203:4,21 204:1
**harris** 8:22 14:17
14:17
**hbc** 8:15 14:15
15:10
**hds** 10:13,15 64:8
64:10
**head** 22:16 37:4
185:15 193:17
201:22
**headquarters** 53:7
53:13,19 69:20,24
71:18,22 72:19
74:13 86:16 87:4
87:4 122:19,22
146:1,21 186:15
187:1 188:18
249:1,20 250:2
252:23 253:3
**health** 5:16 6:2
13:11,13 14:20
24:16 81:25 91:12
94:25 95:14,17
233:3 237:16
**hear** 18:8,15,23
31:9,11 40:8
73:12 151:14
167:10 181:15
**heard** 19:17 31:20
124:14 127:7
128:1 129:18

179:8
**hearing** 28:17,18
105:10,13 159:8
**heavily** 126:19
**held** 2:1 12:21
158:23
**hello** 18:6
**help** 65:18 152:6
258:3
**helpful** 62:24
93:23 144:10
**henry** 6:20 15:12
**hereto** 263:16
**high** 52:13 53:25
57:3 61:2 62:6
85:1 96:17 165:13
165:23 172:25
173:2,21 215:3
251:25
**higher** 118:6
260:19
**highly** 107:13
**hill** 193:1
**hired** 53:3
**history** 197:21
**hit** 83:22 105:16
108:7
**hobart** 7:3 15:2,2
**hold** 54:19 139:10
176:19 209:19
**holding** 66:22
**honest** 123:4
**honestly** 37:4
115:5 130:13
154:8
**honor** 33:5 49:2
**hope** 258:3
**hopefully** 19:7
**hospital** 169:16
174:6 181:1

hospitals   169:8
179:22
hostile   48:18 49:1
49:12 50:6
hour   22:16 33:20
34:9 51:21 52:23
107:17 108:3,6
177:19 220:1
hourly   35:1 52:21
hours   22:9,11,12
22:14 52:4,10,15
housekeeping
136:21
how's   39:13
huge   83:18,25
huh   113:21 136:22
181:25 184:19
206:10
hundred   241:23
hunter   3:13 15:22
19:12 43:8 79:12
79:13 100:11
hunter's   157:17
huntington   4:5
8:12
hydro   254:23
hydrocodone
106:17,22 118:5
118:11 134:18
169:8

**i**

idea   61:22 87:1
162:19 163:23
190:8 218:12,15
236:25 243:4
identification
25:20,25 39:2
63:17 64:6 78:18
81:13 92:5,25
94:20 150:12
152:2 156:23

159:17 202:13
209:3
identified   51:12
67:6 70:22 102:19
162:24 171:24
identifies   142:17
identify   58:5
103:7 159:21
172:11 261:3
identifying   44:22
71:7
identity   33:7
ii   3:8
iii   8:6
illegal   85:3 88:22
114:24 116:7
165:14,25
illicit   85:4 87:6
163:3 166:3,19
207:21
illicitly   87:17
illinois   5:8
ilr   79:18
imagine   84:5
90:25 139:5,11
151:4 175:18
immediate   192:20
232:20,23 233:6
233:20 234:4,8,14
235:10
immediately   233:7
233:21
imminent   233:3
impaired   171:5
210:12
impeachment
102:8
impediments
150:6
implementation
123:17,18 124:25

127:8
implemented
140:13 150:2
implementing
123:14 136:13
implicate   166:8
implicit   166:18
implies   212:21
imply   212:20,25
213:2
importance
167:25
impose   20:12
improper   74:18
77:3 102:7 131:11
132:15 142:10
148:4
improved   150:23
inadequate   154:3
inappropriate
138:6
include   66:3,6,9
66:12,14 186:22
192:19 210:13
211:20 261:25
included   11:21
170:15 264:13
inclusive   85:24
86:1
incorporate
135:17,19
incorporated
266:12
increase   193:19,20
194:6,9 195:5,7,24
200:1 225:16
increased   225:3,5
increasing   173:25
independent
181:10,19 182:4,8

indiana   6:9 8:4
14:14
indianapolis   8:4
indicated   63:9
140:2
indicating   264:13
indicative   165:14
165:25 166:18
indicator   173:23
individual   16:21
20:6,13 26:14,24
71:2 91:6 183:15
186:3 187:4
199:19
individually   19:20
individuals   33:1
130:13 144:1
192:19 202:3
238:1,23
industry   11:4 72:6
113:14 116:1,17
117:4,15,17 118:2
120:2,17 121:1
123:18 124:10
126:14 127:17
132:7,16 136:20
157:3 158:19
254:1 255:1,4,5
inference   166:14
inform   113:6,9
information   41:23
48:25 62:19 130:1
137:11 139:4
155:6,12 156:5
166:12,16,17
169:1 175:24
176:13 177:8
196:11,11 211:21
213:11,22 217:25
218:4,8 219:20
232:6,11 233:15

238:9,14 243:22
245:14,19 246:15
246:21 252:10,12
253:16,25 254:19
256:2,6,9 257:11
258:1
**informed** 146:9
**ingredient** 11:11
**initiated** 87:2
**initiating** 234:24
**initiative** 60:5
86:23 97:7,17,21
98:1,16 189:17,22
190:5,11 191:8,14
191:23 240:19
244:12 254:9
**initiatives** 172:7
192:2 244:6
**inordinate** 58:14
**input** 213:14,23
**inquiring** 44:14
**inquiry** 43:25
**inside** 207:3
**inspection** 136:10
140:3
**instances** 188:24
**instruct** 127:10
176:11
**instructed** 214:23
**instructing** 38:20
**instruction** 148:14
176:3
**instructions**
147:13,14
**intelligence**
164:18
**intended** 85:3
**intense** 101:23
**intent** 130:18
**interacted** 36:5

**interaction** 37:20
88:6
**interactions**
182:16 230:23
231:7
**interactive** 62:11
**interchangeably**
70:14
**interchanging**
204:25
**interested** 263:16
**interfere** 12:10
**interference** 12:8
239:14 240:4
**interjecting** 20:1
**internal** 126:12
127:11 243:9
246:24
**internet** 87:6,10
87:17,21 88:5,19
89:4,11,12,19,22
90:1 92:17 98:25
106:16 134:19
223:5,11,15,18
224:3 225:25
226:8,25 227:13
259:15
**interpose** 20:18,25
**interposed** 21:12
**interposing** 19:22
**interpret** 117:4
**interpretation**
108:18,22 109:23
**interrupted** 46:19
**introduce** 16:6
45:16
**introduction**
102:1
**investigate** 145:16
164:5,12 251:12

**investigation**
137:12,16 139:21
139:22 142:20
146:3 163:12
165:7,10 166:15
209:24 210:1,7,8
214:17,21 215:12
215:16
**investigations**
62:14 141:13
175:8,10 176:4
202:8 213:13
214:14 224:15
**investigative**
171:3 173:17
211:18 251:17
**investigator** 53:6
61:24 81:2 82:1,3
82:14 86:10
174:24 175:3
**investigator's**
61:13,16
**investigators**
80:13
**invited** 150:24
151:3
**involved** 46:5,22
51:12 66:1 126:17
126:21 127:2,3
136:4 155:5
189:22 192:2,15
**involvement** 136:8
**ish** 22:17
**iso** 232:19
**isos** 232:17
**issue** 43:10 44:9
49:5,6,19 91:16
102:23 112:22,25
113:1 136:23
137:2 163:10
165:17 176:21

219:13 234:15
235:12,20 236:3
**issued** 103:2
157:22
**issues** 17:8 112:20
132:6 186:22
233:6,20
**it'd** 133:7 250:7
**it'll** 19:6 55:16
**item** 165:18,20
**items** 165:24
166:3

**j**

**j** 1:18 2:1 3:13 5:3
5:6 8:6 10:2,8,11
24:11 264:8 265:4
265:9 266:4,13
267:20
**james** 3:8 8:10
13:18 16:8 19:18
19:25 24:21 48:15
78:16 92:1 176:18
**james.bennett4**
3:11
**janssen** 4:12 14:5
15:14
**january** 211:5
**jbarker** 4:15
**jeff** 14:5
**jeffrey** 4:13
**jennifer** 6:3 7:13
13:12,20
**jennifer.levy** 7:16
**jmatthews** 8:14
**job** 1:25
**john** 5:21
**john.lavelle** 5:24
**johnson** 4:12,12
14:6,6
**join** 53:2

**joined** 248:2
**jones** 5:3,7 14:2
  222:15
**jonesday** 5:5
**jonesday.com** 5:9
**josh** 14:7
**joshua** 5:16
**joshua.davis** 5:19
**jr** 4:3 5:21 16:1
**judge** 1:7 147:22
**judgment** 139:6
  196:17,20 198:25
  239:17 240:7
**july** 38:6
**june** 263:23
**justice** 3:7 9:9,10
  9:11,12 16:8,12,14
  16:16 25:2 48:16
  48:20,25
**justify** 166:6
**jwicht** 6:7

**k**

**k** 7:9
**kaitlyn** 3:18
**karen** 202:18,19
  203:4,21 204:1
**katy** 8:11
**keekhoff** 3:21
**keep** 28:1 81:21
  84:6 108:1 135:22
  137:1,2 144:3
  146:6,8 164:1
**kellum** 211:20
**kelly** 9:4
**kept** 135:20
  169:11
**ketchum** 4:4
**killing** 117:23
  200:15
**kind** 21:15,22
  73:22 129:16

140:19 167:24
188:7 215:10
223:9 243:9
250:15 258:23
262:5,5
**kirkland** 7:14
**kirkland.com** 7:16
  7:17
**kkoski** 8:14
**knew** 68:9 223:10
  260:14
**know** 22:10 30:20
  31:8 37:3,6,7
  38:18,25 39:11
  43:17,18 50:14
  51:25 54:24 57:19
  58:1 59:3 61:6
  65:13 68:16,23
  72:24 73:1 75:17
  76:23,23 77:11,15
  78:24 80:9 81:14
  82:2 83:22 85:6
  94:2,4,7 96:20
  100:18 104:1,15
  112:6 114:11
  115:6 121:12
  124:16,24 129:11
  130:6 132:1
  133:24,25 134:20
  134:24 135:1,5,20
  135:23 136:18,19
  137:6,13 138:4,19
  138:21 140:16,24
  141:14,16 145:25
  146:20,22 147:17
  149:19 150:8
  155:15 159:7,7
  160:23,23,24
  161:23,23,25
  163:24 168:6,7
  169:15 174:3,4

175:22 176:7
177:16,18 181:23
183:19 184:13
185:15 192:8,9,9
194:25 195:1
199:19,24 201:25
202:19 205:17
208:19,22,24
219:24 224:7
232:19 235:25
242:1 243:6 245:3
245:3,23 246:7
251:6 252:7
**knowing** 124:15
  199:6,6
**knowledge** 51:20
  71:9 88:4 126:5,8
  126:10,11 148:22
  149:17 168:25
  170:9 186:2 219:6
  226:4,12 228:9,12
  228:13 229:5
  230:1,3,10,13
  233:14,19
**known** 121:15
  125:16 176:8
  200:3,7,19 201:12
  232:8
**koski** 8:11
**krncevic** 4:16
  15:13,13
**kveselis** 7:3 14:23
  14:23
**kyle** 1:18 2:1 10:2
  10:8,11 12:15
  16:20 24:11,21
  37:7 262:19 264:8
  265:4,9 266:4,13
  267:20

**l**

**l** 1:24 7:3 169:25
  263:2
**l.p.** 1:9,11,13 4:7
**laid** 125:14
**lane** 3:4
**lardner** 8:12
**large** 136:6 208:7
  208:15,23,24
  211:15 212:5
**largest** 91:14
**late** 53:4 190:3
  227:6 253:24
**lavelle** 5:21
**law** 30:20 35:9
  36:23 38:6 54:24
  57:14 106:2 113:7
  176:14 210:11
  214:24 218:17
  222:15
**lawsuit** 147:17
  246:22
**lawsuits** 148:16
**lawyer** 19:10
**laying** 23:6
**lead** 23:15 246:22
  250:5 252:20
  253:8,11
**leading** 21:16
  23:11,17,21 48:13
  49:11 50:11,14
  163:15
**leads** 251:11,17,19
  252:1,16,24 253:4
**learn** 148:25
**leave** 173:17
  221:20
**led** 88:21 103:21
  104:6 156:5
  245:15 247:14,22
  248:1

lee 3:3 264:5
leeder 8:6 15:17
  15:17
left 193:4 246:10
legal 12:25 13:2
  147:18 150:5,6
  262:22 264:1
  267:1
legitimate 237:10
  240:9 260:15
length 240:18
lent 49:25
letter 10:9 26:7,8
  38:6,11,20,24 39:7
  39:21 48:20
  137:11 173:7
  264:19
level 52:13 54:1
  57:3,22 61:2 62:6
  67:18 68:2 96:18
  172:25 173:3,4
  182:16 197:15,19
  200:3,7,11,19
  201:12 215:4
  250:21 251:25
levels 182:13
levy 7:13 13:20,20
lewis 5:22
lexington 3:14
liaison 127:2
  189:7
lied 109:4
limit 11:11 206:13
limitation 210:9
limitations 43:11
limited 22:21 68:9
  68:12,13 116:23
  184:23 185:4
  219:12
limits 239:22

line 44:5 60:1
  84:15 100:13,22
  112:4 131:11
  148:1 178:21
  196:6 226:20
  244:14 264:13
  266:7 267:3
lines 43:24 44:10
  73:7 74:4 100:16
  115:11,19 139:18
  141:3 148:3
  245:14 253:8
link 211:19
list 179:24 192:24
  192:25
listed 266:7,17
listen 175:7
listening 24:6
listing 70:20 266:7
literally 161:1
litigation 1:5
  12:17 46:8,23
  48:11 51:13 235:6
  244:22,25 245:12
  245:15 247:14,23
  248:1 264:6 265:3
  266:3
little 22:11 23:4,4
  23:12 59:8 66:21
  74:9 107:17,21
  116:22 126:25
  127:4 134:3
  160:21 175:6
  179:4 181:12
  198:9 204:17
  213:3 220:21
  236:7,16 253:22
live 69:4 174:12
livingston 8:16,20
  15:9,9

llc 3:18 6:9 7:13
  7:18 13:23,25,25
  14:14 46:1 51:5,7
  178:15
llp 2:6 3:4 4:4,8,13
  4:17 5:22 6:4,11
  6:16,21 7:4,9,14
  7:20 8:3,6,12,17
  8:23 9:3
local 80:20 187:6
  187:15 188:4
  200:9
located 12:22
  224:4 260:23
locke 6:21 15:12
lockelord.com
  6:24
logan 6:17
lohman 203:4,13
  203:18 204:1
long 25:4 28:3
  32:6 60:14 80:8
  239:3 250:5
longer 107:22
  247:14
look 54:5,8 57:18
  58:1 73:23 74:1,3
  75:19 79:24 80:5
  81:19,20 82:6,12
  93:3 95:2,9 100:6
  103:6 113:18
  115:8 118:22
  122:2,5 141:2
  152:4 153:8
  160:10 173:10
  193:12 196:4,4,9
  196:10 198:19
  199:9 251:10
looked 96:23
  174:2,8

looking 58:18,21
  59:3 90:11 96:19
  100:9 123:11
  127:18 132:17
  133:4,5 135:4
  136:20 142:14
  151:24 197:15,16
  197:18 198:23
  199:2
loop 60:11
lord 6:21 15:12
los 7:10
lose 235:7
losses 216:16
lost 145:7 227:3,4
lot 83:23 84:2,3
  121:8 129:24
  130:6,7,22 167:21
  175:8 200:9 206:6
  216:6
louder 104:16,22
  181:12
louis 243:6
lunch 107:20,23
  108:8 110:23
  129:16

m

m 5:11,16 6:10,11
  8:16 9:11
ma'am 27:12,16
  27:19,22 28:9,12
  28:21,24 29:6,8,11
  38:22 39:9,18
  45:2 46:3 51:10
  51:14,22 52:2
  54:13,16 57:2,12
  58:23 59:14,18
  60:6,9,14,20,24
  61:17,20 62:1
  63:4,25 64:17,24
  65:2,5,15,25 66:5

66:8,11,13,15
68:14 70:12,16,24
71:5,13,21,25 72:3
72:10,16 74:24
75:9,21 80:16
86:14,19,24 89:1
94:2,12,16 95:8
96:15 100:24
101:4,7,10 102:10
111:6 112:17,24
113:11,17,22
114:4,18 115:10
115:14,16 116:12
121:16,21 122:15
122:17,20 123:1
123:21,25 124:7
125:19,25 126:16
128:19 129:1
131:4 132:11
135:10,15 136:12
142:9 145:14
146:19,24 147:5
149:21 150:19
151:8 159:11
161:10
**madam** 264:10
**maddie.brunner**
6:24
**madeleine** 6:20
15:11
**mail** 10:21 11:9,15
11:17 87:24
143:25 159:23
161:8 202:17,21
203:2 209:13
210:25 211:5,10
211:24 212:5
**mails** 144:6,10,16
146:25 147:3,8,9
148:11,24

**main** 4:18 21:9
**maine** 146:16,17
**mainigi** 6:2 10:3
13:8,8 15:3,7,19
15:24 16:5,22
17:3 18:5,7,10,21
18:24 24:2,17
25:13,21 26:1,4,5
26:20 29:15 30:10
30:18 31:2,6 32:5
32:14,17,24 33:15
33:19,25 34:3,8,10
34:20,24 35:5,21
36:3,21 37:8,10
38:4 40:2,10,11,20
41:1,11 42:3,16
43:1,2 44:24 45:3
45:9 46:7,12,15,20
47:2,10,19,23 48:7
50:17,23 51:6,19
52:20 55:1,4,8,12
55:14,17 56:5,12
56:14 62:20,25
63:5,14,18,21 64:1
64:7,13,14 65:12
66:25 67:15,22
68:21 69:17 70:25
72:11,17 73:2,15
74:7,21 75:1,10,18
76:15 77:7 78:3
78:12,19,24 79:1
79:12,15,19,22,23
80:25 81:10,18,22
82:11,20 83:3,15
83:24 84:4,17,22
85:9,12 86:2,8
87:14 88:13 89:16
90:11,15,16 91:17
91:24 92:6,22
93:1 94:17,21
98:13,24 99:4,16

100:10,15,17
102:11,22 103:10
103:14 104:4,11
104:25 105:6,23
106:5,19 107:21
108:1,5,7,11,14,15
108:23 109:7,21
110:7,16,22,25
111:4,18 112:10
113:8 114:15
115:7 116:25
117:12 118:7
119:5,9,12,17,20
119:22 120:11
121:4,13 122:6
124:1,8 125:4,17
126:1 127:25
128:13,20 129:2
129:12,15,19,23
130:10,21 131:5
131:12,20,25
132:19 133:1,12
134:5 135:6,16
137:17,19 138:7
138:12,15,17,21
138:25 139:3,5,9
139:23 140:10
141:1,18 142:4,12
143:1,13,15
144:15 146:12
147:6,19 148:2,7
148:21 149:7,16
150:9,13 151:2,9
151:23 152:3,11
152:15,20,23
153:1,20,25
154:10,20 155:24
156:8,24 157:6,14
158:3,5,13 159:12
159:18 161:5
162:4,12 163:8,25

164:8,16,24 165:5
165:21 166:21
167:12,17 168:11
168:18 171:8
172:6,15,19,24
173:18 174:21
175:4,20 176:15
176:18 177:12,25
178:3 244:15
**maintain** 237:16
**making** 17:20 20:8
20:13 103:18
115:25 126:7
197:14 213:11
232:5 251:4
**mal** 11:16
**mallinckrodt** 7:18
13:23,25 178:15
202:4,24
**manageable** 75:15
76:4
**managed** 76:11
**mandate** 242:14
**manner** 30:12
163:3
**manning** 167:23
**manor** 9:4
**manual** 61:11,14
61:16,24 261:3,6
261:12,24,25
**manually** 76:18
**manufacturer**
67:16 68:1,6,10
163:1 180:10,21
182:21,25 183:14
183:19 184:12,24
185:9 186:1,23
187:4,14 188:3,8,9
191:22 192:4
193:7,11 194:4,18
195:6,23,23

196:17 199:13,19 201:19 204:6 215:23 216:17 217:1,2,7,11,14,20 219:22 226:18

**manufacturer's** 180:18 186:4

**manufacturers** 66:4 67:6 68:4 144:7,17 170:13 178:24 179:21 182:4,7 183:7 187:12 190:18,22 216:5 218:10 226:16

**manufacturing** 216:7

**mapes** 59:13 60:3 60:18,21,23 86:25 89:23 91:5 93:16 93:18,25 94:5,10 95:4,18 96:2 99:25 112:14 159:5 193:2 243:19

**mapes's** 59:15

**maps** 59:5,6

**march** 264:4

**marcus** 8:17,20,20

**mariama** 9:12 16:18

**mark** 25:13 63:7 64:1 78:12 91:18 202:11 209:1

**marked** 25:19,24 63:16 64:5 78:17 81:12 92:4,24 94:19 150:11 152:1 156:22 159:16 202:12 209:2

**market** 5:12,22 85:4 91:15

**martin** 9:2 15:15 15:15

**maryland** 5:20

**massachusetts** 5:17 7:21 8:13

**master** 9:8 16:22 16:24 17:10 18:6 18:9,11,22 19:3,14 19:16,24 20:14 24:3 31:6,10,19 32:14,15,19 33:13 33:16,17 34:2,5,15 34:22,25 35:19 36:1,16,19 37:2 38:2 40:5,19 41:8 41:24 42:14,24 43:5,23 47:12,17 48:6,7 49:15 52:19 157:11,18 157:21,24

**masters** 6:4 14:19 14:19 28:17,18,22

**material** 161:25 203:24

**materials** 85:23 86:3

**matter** 12:16 20:23 22:3,6 23:18 28:19 31:17 64:4 101:1,23 114:2 155:16 161:16 204:19 222:16 233:25 235:5

**matthews** 8:10 13:18,18

**mccarter** 5:12

**mccarter.com** 5:14

**mcclure** 6:16 13:14,14 69:3 179:3,6

**mck** 11:14

**mckesson** 7:2 11:6 13:17 14:24 15:1 15:2 91:11 93:5,9 93:15 98:16 150:14 151:4 153:4,10 155:3,6,9

**mckesson's** 153:22 154:2,12

**mckmdl004968...** 10:25

**mckmdl005437...** 11:8

**mcmurren** 160:6 160:7

**mcnamara** 6:3 13:10,10

**md** 1:5 12:20

**mdl** 1:5 10:13,15 12:20 64:8,10

**mean** 45:23 65:13 65:21 74:12 87:9 99:15 107:9,15 132:12 155:25 163:2 166:3 168:2 181:21 196:12 197:9,12 200:8,20 201:13 207:6,20 212:19 213:15 216:2,15 219:2

**meaning** 87:18 88:17 99:18

**means** 67:1 162:14 166:4 212:12,13

**meant** 195:4

**measures** 137:4,5 140:14

**media** 12:14 69:8 69:13 111:9,14 156:13,18 220:7 220:12 262:20

**medical** 57:24 88:7 225:6 237:10 237:21,24 239:4

**medically** 183:20 184:14

**medication** 225:13 236:12,23 238:25

**medications** 228:2 228:11

**meet** 26:21 191:12 243:6,8

**meeting** 153:3 154:14 190:5 241:3

**meetings** 189:23 190:1,12 241:12 242:9 243:1,5

**memo** 95:3,3 166:23

**memorable** 53:18

**memorandum** 10:24 11:1,13 140:23 141:8,24

**mention** 222:25

**mentioned** 101:15 184:22 193:2 197:23 199:14 223:10 241:2 247:12 254:16

**mentioning** 69:18

**merely** 20:19

**meridian** 8:3

**met** 29:24 30:1,6 140:22 141:22,23 178:18 243:11 244:10

method  88:19
225:9
methodology
210:8
mi  11:16
michael  59:12
95:18,18
michigan  8:8
micrograms
118:13
microphones  12:6
12:10 18:14
middle  112:5
midwest  264:17
267:1
migliori  3:17
15:20,20 19:5,6,15
30:2,6,20 31:2,4
31:12 33:5,22
34:13 35:18,25
36:24 37:24 39:22
40:18 41:22 42:9
42:20,23 44:21
49:2,3,3 51:15
63:12,20 65:8
66:20 67:12,19
68:19,25 70:23
72:9 74:16 82:24
83:10 84:1 86:6
87:12 98:20 99:3
99:13 103:23,25
104:9,13,21,24
105:4,20 109:15
110:1,13,20 112:7
114:8 116:19
117:5 124:23
125:13,24 127:14
128:9 130:5,16
131:24 133:16
135:14 139:10,20
140:9 141:11

142:1 147:4,24
149:3 150:7,25
151:7,12,16 152:9
153:23 157:9
158:1 162:10
172:13,22 175:16
180:20 183:22
184:5,15 185:13
188:12 196:2
200:23 201:20
204:2 205:14
206:17,25 209:7
210:6,15 211:11
216:11 218:1,13
223:24 226:10
227:2 228:17
229:8,22 230:7,16
235:14 236:14
237:5,19 238:4,17
239:10,18 246:25
252:3 255:8,20
256:11,19 259:18
261:8
migrate  118:25
254:22
mike  193:2 243:19
miles  103:22
mind  89:17 184:2
185:20 194:21
206:3 211:9
minds  121:24
mine  214:7
minnesota  243:7
minute  69:4 81:17
178:19 215:20
220:3
minutes  22:17
55:14 108:9,10
178:2 220:4
221:25

miscellaneous
211:17
missed  169:4
misstates  133:16
model  223:15,20
223:20 225:2,9
models  224:1,18
modified  191:10
moment  98:8
112:3 131:15
137:25 142:14
159:15 205:21
209:20
monetary  219:16
monitor  242:13
monitoring  11:7
108:19 120:2
122:13 123:19
124:12 125:22
128:6,15 129:6
134:8 135:7 136:2
136:5 150:16
153:5 159:10
189:14,24 192:5
193:9 204:7
220:25 231:11,17
254:2,14
monroe  8:7
month  76:20 78:4
78:9 198:8,13,14
211:14 251:20,23
monthly  77:25
78:8 211:12
months  32:22,22
91:1
morgan  5:22
morganlewis.com
5:24
morning  12:3
16:25 17:17,20
24:18 112:12

113:25
morphing  88:16
motivation  44:7
motley  3:18 30:3,6
30:11,20 32:7,25
33:21 35:9,12,14
36:6,23 37:17,20
38:15 39:20 40:14
40:21,23 41:12
42:17 43:3 45:15
motleyrice.com
3:20,21
move  53:13 60:16
82:22 100:1
125:10 128:6,14
moved  53:19
60:12 61:25 62:2
69:23 97:15
127:20 145:23
249:2,3
moving  81:21 83:7
mt  3:19
multiple  155:20
192:22
mute  24:4 62:23
157:7,8,12,25
myers  4:13
myriad  164:25

n

n  10:1,1 12:1
n.w.  2:7 3:4 5:17
6:5,11 7:5,15 8:7
naddis  257:11,11
258:1
name  12:24 19:18
20:4 24:19 39:11
45:19 77:9 82:4
104:19 135:21
157:17 195:20
222:14 264:6
265:3,4,15 266:3,4

266:21
**named**  82:1
**names**  126:21,23
  126:24 190:23
  210:23
**napoli**  3:13
**napolilaw.com**
  3:15
**narcotic**  107:13
  195:11 197:2
  199:7
**narcotics**  200:13
  200:14
**national**  1:5 12:17
  200:3,7,10,19
  201:12 264:6
  265:3 266:3
**nature**  23:8 31:23
  43:25 49:25
**ndc**  214:2,4
**neal**  5:3 14:1 19:1
  222:14
**necessarily**  58:6
  86:10 123:9
  128:16 134:1
  176:16 207:20
  212:19,25
**necessary**  22:19
  23:5,19,22 50:11
  50:12,13,15 62:18
  183:20 184:14
  237:16,24
**necessity**  57:24
  225:6 237:21
  239:4
**need**  20:19 24:4
  31:7 34:7,23
  38:25 40:6,7,12
  44:25 45:3 47:10
  50:2 55:2 62:19
  79:13 88:7 92:2

104:16 134:10
  184:10 191:4
  199:1 212:21
  251:24
**needed**  189:9
  213:12 255:1
**needs**  32:1 119:18
  195:18 196:25
**negative**  235:22
  258:22
**neither**  54:22
  263:11
**never**  29:24
  114:22 116:6
  127:20,20,21
  146:1
**new**  3:14,14 4:9,9
  53:20 62:13 92:1
  106:23 124:5
  135:8,17 136:1,10
  150:21,22 153:5
  174:5
**newly**  211:20
**newport**  4:14,14
**news**  200:9
**night**  123:20
**noncontrolled**
  260:7,17
**nonexistent**  88:10
**nonpublic**  137:13
  137:14,14,18
  138:1 139:2 238:9
  238:14
**nonresponsive**
  119:16
**nontestifying**  33:7
**noon**  107:19
**norm**  96:22
**normally**  21:3,10
**northeastern**
  12:19

**northern**  1:2
  16:16
**northwest**  12:23
**notarized**  264:14
**notary**  263:1,20
  264:25 265:10,18
  266:15,23 267:23
**note**  12:6 44:21
  82:8 131:19
  160:12 204:12
  264:12
**notes**  204:10,14
**notice**  2:16 10:8
  25:17 126:6
  247:21
**notices**  247:15
**noticing**  104:15
**notifies**  164:3
  234:23
**notify**  144:21
**notifying**  143:20
**nstephens**  5:5
**number**  19:17
  85:1 160:2 170:24
  179:9 208:7,15
  211:15 212:5
  214:3,6 262:20
  264:7,13
**numbers**  151:19
  252:1 266:7

**o**

**o**  10:1 12:1
**o'connor**  7:19
  10:4 13:22,22
  18:25 178:16,18
  178:20,22,23
  179:5,7 180:23
  181:4,14,17
  182:20 183:6,24
  184:2,7,19,21
  185:18,24 186:7,9

187:9,21 188:1,15
  191:21 194:2,8,14
  194:21 195:2,21
  196:19 197:5
  198:11,24 199:11
  199:23 200:25
  201:7,9,23 202:10
  202:15,16 203:16
  204:4 205:10,19
  205:24 206:3,10
  206:14,22 207:12
  207:22,25 208:3,4
  208:13,20,25
  209:4,8,12,21
  210:5,16,20
  211:22 212:17,23
  215:5,8,19 216:13
  216:22 218:5,16
  218:22 219:18,25
  220:16 221:22
**o'gorman**  4:7
  14:21,21
**o'melveny**  4:13
**oath**  29:17,21
  101:1 102:6
  115:15 116:11
**object**  21:2 30:22
  42:13 46:17 48:16
  70:23 82:17 98:10
  98:21 103:23
  105:20 106:9
  107:2 110:13,20
  112:8 117:18
  127:9,14 128:8,9
  130:4 138:5
  141:10 142:2
  150:25 153:12
  160:18 162:9
  164:21 165:3
  175:23 186:5
  201:6,20 205:7

207:23 214:22
216:11 238:5
239:21
**objected** 50:19
104:13
**objection** 20:18,20
20:22,25 21:2,12
26:18 30:7 31:5,5
31:15,16 32:8,15
33:2,14,23,24
34:13,14 35:15,24
36:7,14,20,24,25
37:21 39:22,23
40:8,16,18,25 41:4
41:19,22 42:8,9,19
42:20 44:11,21
46:6 47:5 48:2
50:20 52:16 65:8
65:9 66:20 67:12
67:13,19,20 68:18
68:19,25 72:9,15
72:23,25 73:9,13
74:16,25 75:5,16
76:12,13 77:5
78:1 79:8,9 80:23
82:8,18,24 83:9,20
84:1 85:5,25 86:6
87:12 88:8 89:14
90:6 98:20 99:3
99:12,13 102:7,9
102:17 103:24
104:9 105:3,4
106:9 107:3
108:20 109:2,3,13
109:15 110:1,2,12
113:3 114:7,8
115:1 116:18,19
117:5,6 120:8
121:2,6,25 123:7,8
123:24 124:6,22
124:23 125:12,13

125:24 128:18,25
129:7 130:15,16
130:17 131:1,3,16
131:19,24 132:14
132:15,22,23
133:3,16,18
134:12 135:13,14
138:9 140:9,25
141:11,12 142:1
142:10,24 144:13
145:22 147:4,11
147:24,25 148:4
148:13 149:3,4,11
150:7 151:7
153:18,23 154:7
154:15,17 155:23
156:2,3 158:11
161:20 162:10
163:6,13 164:6,14
165:16 166:1
167:4,16,20
168:15,16 171:1
172:4,13,14,22
173:8 174:18,23
175:16 180:20
182:18 183:4,21
183:22 184:5,15
184:16 185:12,21
185:22 187:7,17
188:11,12 191:19
193:14 194:7,12
195:9 196:1,2,14
196:22 198:5,16
199:4,21 200:21
200:23,24 201:4
202:5 203:14
204:2 205:6,7,14
205:16,22 206:17
206:25 207:16
208:1,9,18 211:11
212:9 215:17

218:1,2,13,14,20
219:3 223:24
224:24 225:17
226:2,9,10 227:2
228:3,4,17,25
229:8,22,24 230:7
230:8,16,17
231:19 232:1
233:11 234:10,19
235:14 236:13,14
236:24 237:5,12
237:18,19 238:4,6
238:17 239:2,10
239:18,19 243:12
244:1 246:23
251:21 252:4
253:17 255:8,20
256:11,19,21
257:18 259:18
261:8 262:7
**objections** 19:23
20:1,5,8,12,18,23
79:15 104:16
209:18
**obligated** 113:5,6
113:9
**obligation** 150:5
164:4,11 167:14
183:15 187:8,10
226:18,25 227:12
228:23 240:13
259:14,22
**obligations** 134:8
141:8 144:12
193:8 215:21
259:9
**observed** 137:3
**obtain** 45:18 68:5
223:18
**obtained** 56:11

**obviously** 96:22
101:8 176:21
**occasion** 27:5 28:5
28:10 53:12 54:11
54:14 60:2 64:15
**occur** 123:19
185:17 216:6
**occurred** 102:1,4
125:20 126:13
127:24 247:13
**occurring** 58:2
103:6 124:10
198:20
**occurs** 129:16
**ocdetf** 257:17,22
**office** 3:8 9:9 16:9
16:17 39:15,17
53:8,9,10 62:17
71:17 90:4,9
95:19 126:19
144:21 146:15,18
167:22 177:9
187:15 188:4,6,7
189:5 192:18
212:3
**officer** 263:2
**offices** 62:11,12,14
62:18 72:2,13
74:11 77:21 80:20
104:8 114:10
117:21 122:16
146:22 187:2,6
188:17
**official** 48:24
189:1 238:11,15
265:15 266:21
**officially** 53:3
**oh** 16:4 18:24
29:25 61:4 74:6
118:24 152:17
167:8,19 192:24

246:6,11
**ohio** 1:2,10,12
3:10 4:19 12:19
16:17 42:2,5
264:2
**okay** 18:9 19:3,15
19:16 20:14 24:1
29:12 38:10,19
39:19 40:14 55:6
55:13 59:11 63:5
65:3,11 67:1
68:15 70:13,15,17
71:14 72:4 73:20
74:6,6 76:7 77:12
78:25 79:19 80:10
83:4 85:16,19
86:15 88:1 90:19
94:8,17 95:2 96:2
96:16 99:17 100:6
102:12 104:23
105:5,9 107:24
108:11,14 109:22
111:24 112:11,25
113:12,18,23
114:5,16,19 115:8
116:13 121:17
129:10,12,13,14
134:20 136:8,18
140:6 141:4 143:2
145:15 146:20,25
150:20 152:25
155:15 156:8
159:2,5,12 160:21
161:11 169:8,22
171:9,18 174:1,7,8
176:15 177:15
178:4 179:19
180:13,17,23
181:9 182:3,11
183:7,11 184:11
184:22 185:7,19

185:25 188:2
189:16,21 190:1,4
190:9,11,20,24
191:11,17 193:5
194:15 195:3,22
201:16,24 202:2
202:10 203:2,7
207:13,22 210:15
210:23 211:4,9,23
212:2,4,4,17,24
213:15,19 215:9
215:20 216:9,23
217:9 219:25,25
221:2,9,12,22,22
222:17,20,21,24
223:4 224:3,8,14
224:18 225:8,24
226:14,23 227:9
227:10,24 228:13
228:21 229:13,17
230:3 231:15
232:10,14,17,18
234:13 235:10,24
237:2,25 239:7
240:17,25 241:9
241:15 242:2,19
242:24 243:19,22
244:4,21 245:1,9
245:17 246:1,7,10
246:19 247:5,19
247:25 248:6,15
249:8,14,24 250:5
250:12,20 251:7
251:19 252:9,13
252:19 253:1,7,14
254:21 256:16
257:24 258:4,17
258:18,20 259:7,9
259:10 260:1,8,9
260:13,19 261:2,9
261:17,18,24

262:15
**omm.com** 4:15
**once** 21:2 70:14
106:24 114:22
116:7 162:5
166:25 206:20
214:1,10 252:19
**oncology** 174:5
**ones** 20:8 94:10
126:22
**ongoing** 172:8
**online** 24:5 88:3
248:21
**op** 1:9,11,14
**opened** 174:5
**opening** 141:13
**opens** 23:14
**operate** 48:10
**operated** 59:24
**operation** 229:11
**opiate** 1:5 264:6
265:3 266:3
**opinions** 238:8,13
**opioid** 12:17 46:8
46:22 51:13
216:25 217:6,10
238:24
**opioids** 47:4 52:22
216:23 217:5
223:12,19,22
224:20 236:9
237:9,16 238:2
**opportunity** 17:6
151:5
**opposed** 103:21
261:7
**opposing** 40:7
**option** 19:10
**order** 75:13 76:3
76:10,19 79:5,7
80:14 81:3 85:13

87:22 99:19
103:20 106:23,24
106:25 108:16,19
108:25 109:11,24
110:9 114:1,21
120:1,15,16
121:14,19 122:13
123:19 124:3,11
125:7,10,21,22
128:2,5,15 129:6
134:8 135:7 136:5
139:13 142:16,18
142:21 143:4,5
157:15,22 159:10
162:5,7 164:4,12
164:18,20 165:2
166:25 167:3,8,15
189:13,24 192:5
193:9,12 194:17
195:22 197:25
198:3 199:16,19
200:8,20 201:13
201:19 204:7,18
204:23 205:4,12
207:6,8,20 212:20
215:7,11 220:24
232:17,20,23
233:7,21 234:5,8
234:16,23 235:4
235:11,12,20
236:3 254:1,13
**ordered** 157:19
198:13,14
**ordering** 54:4,9
68:4 99:11 102:3
102:13,16 103:3
103:17 104:6
136:2 173:25
193:23,24 198:7,9
**orders** 70:20
75:14 76:4,10

[orders - performance]

80:21,22 82:16,16
85:1,2 86:11
100:4 103:6,8
105:2,16 140:18
160:13 161:18
162:2 168:19
193:20 194:5,5
197:24 204:23
205:4,12 206:15
206:16,24 207:5
207:14 208:6,15
212:6 215:15
234:13,15 261:4
**ordinary** 197:10
197:11
**organization**
56:18
**original** 201:2
**outcome** 233:9,23
263:17
**outliers** 96:20,23
97:3 171:24
172:12 214:15
**output** 62:9
213:10,16,17
**outside** 82:9 173:8
175:16,23 185:8
239:19
**outstanding** 17:8
**overanalyzing**
194:19
**overly** 252:3
**overnight** 124:20
**overruled** 32:16
34:2,6,15 35:19
36:1 37:2 40:5,9
41:8,25 42:14
47:14 48:6 50:20
**overseas** 224:4
**overwhelming**
89:5

**owned** 181:22
**oxford** 8:18
**oxy** 254:23
**oxycodone** 118:12
134:18

**p**

**p** 5:21 12:1
**p.m.** 211:6,7
262:17,24
**padgett** 8:2 14:3,3
**page** 10:2 73:7,23
74:1,3 75:20
84:14 100:7,12
111:22 112:4,5
115:9 131:7,10
132:3 137:20,22
141:2 148:1 152:6
154:21,23 160:4
160:11 264:13,15
266:7 267:3
**pages** 141:3 153:9
**paid** 33:20 34:12
34:17,18,24 35:3,3
35:4 36:22 40:22
41:13 47:24 49:21
52:1 175:2
**pain** 98:7,18 224:9
224:13,16,19,21
224:22 225:3,11
225:22 228:1,10
228:15,23 236:12
236:22 239:8
259:23
**palo** 5:4
**paper** 70:19 77:22
77:23 83:16 84:3
84:7 104:7 105:12
105:12,13 248:25
261:20
**paperwork** 77:16

**par** 5:11
**paragraph** 95:10
137:10 152:6
154:22 155:1
160:4,11 162:21
162:23
**paragraphs** 160:2
**park** 4:8
**part** 27:2 91:10
120:19 122:12,24
124:9,11 154:2
160:25 172:8
176:7 191:7
238:10 266:9
**partial** 29:7
**partially** 52:9
**participant** 67:5
**participants** 66:17
66:19 67:8,10
**participate** 257:22
**particular** 30:2
41:2,3,15,17,18
48:8 57:16 58:5
58:15 64:18 68:5
80:12,13,21 82:16
85:15 93:11 95:13
95:17 128:22,23
135:25 138:2
146:18 152:5
155:18 171:23
176:6 183:19
184:13 193:18
215:15 216:24
219:5 244:18
247:15
**parties** 2:17 12:13
22:3 23:9 49:9,21
49:21 218:18
263:12,15
**party** 23:7 217:24
218:7

**pass** 152:11
176:23
**passed** 61:18
211:18
**patient** 67:18 68:2
68:16,23 69:2
87:21,25 88:6,12
184:25 185:10
225:14
**patrick** 5:6 15:5
**pattern** 198:7
**patterns** 175:9
197:16
**paul** 4:3 16:1
**pause** 153:15
**paying** 50:24
**pbeisell** 5:9
**peaks** 196:6
**peers** 242:3
**pending** 56:7
119:8,12 187:23
233:9,23
**pennsylvania** 5:13
5:23 6:18 8:19 9:5
**people** 18:13
95:20 118:25
121:11 126:25
134:25 135:4
166:11 174:12
200:15 237:17
242:3,8,16 243:2
249:15 250:9,14
250:21 254:22
261:18,25 262:5
**percent** 22:7,15
260:16,17
**percentages**
260:19
**performance**
238:10,15

**performing** 35:11
**period** 27:18
  38:17 87:18 91:20
  97:22 110:10
  117:2 120:4 124:4
  135:24 192:1
  241:13 242:6
  243:20 245:2
  251:3 255:25
  256:5
**periodically** 77:17
  158:23 191:4
**person** 31:16 62:8
  104:20 167:7
**personal** 84:10
  219:6 233:14
  238:8,13
**personally** 92:12
  170:22 265:11
  266:15
**personnel** 186:25
  187:2 188:17
**pertaining** 27:9
  54:7 159:25
  160:24 224:12
**pharma** 1:9,11,13
  4:7 19:1
**pharmaceutical**
  11:4,6 28:23
  56:19 157:3
  158:19 203:5,10
**pharmaceuticals**
  4:12 5:11,15 14:6
**pharmacies** 19:2
  56:19 57:18 58:5
  66:12 67:7 87:11
  87:18 88:5,19
  89:4,20,23 90:1
  98:6 99:1,2 145:2
  145:4,10,16,20
  147:9 148:17

169:9 170:11
  179:22 181:6
  182:4,8 193:23
  218:11 222:20,22
  222:25 223:1,6,11
  223:15,18 224:4
  226:1,8,25 227:13
  259:9,13,15,21
  260:15,23
**pharmacist**
  225:14 246:25
**pharmacy** 57:5,22
  87:23,23 89:11,13
  92:17 145:12
  146:15 155:19
  169:14 180:15
  181:10,19,24
  182:2 183:9 214:9
  219:15,17,21
  227:15,15 229:6,7
  229:21,21 230:5,6
  230:15,15 234:7
  235:18 236:2
**pharmacy's** 183:1
**philadelphia** 5:13
  5:23 6:18
**phone** 15:4,8,25
  16:23 31:13 62:21
  62:22 130:7,8
  178:20 232:3,5
  264:3
**phones** 12:9
**phrase** 65:14
  201:25
**physicians** 236:11
  236:21 239:17
  240:7
**pick** 12:7
**pickers** 262:5
**picking** 101:19
  198:9

**pickle** 174:11
**pinpoint** 121:23
**pittsburgh** 8:19
**place** 12:9,12
  22:21 50:9 69:25
  71:10 72:21 87:21
  134:7 140:22
  157:4 158:9 190:2
  231:12 245:17
  252:22
**placed** 86:12
  201:19
**places** 59:8 179:2
**plaintiff** 42:5 46:5
**plaintiff's** 17:7
  30:1
**plaintiffs** 4:2
  15:19,21,23,24
  16:2 19:4 21:21
  21:23 22:1,2,5,13
  22:23,25 40:23
  41:3,14,15,18
  46:22 51:12
  152:12,16
**plan** 107:19,20
**play** 220:24
**plays** 180:1
**plc** 178:15
**pleasant** 3:19
**please** 12:6,9 13:7
  17:2 24:9,20
  29:14 37:8 39:3
  41:9 42:13 45:22
  47:16,20 55:15
  56:7 75:20 80:1
  81:17 82:7 83:11
  84:16 91:23 95:10
  97:13 100:7,16
  110:15,17 111:23
  115:2 143:10
  144:21 152:12

153:16 157:7
  172:20 182:6
  188:21 194:20
  201:1 209:20
  228:7 236:18
  239:25 247:6
  254:5 264:11,11
**pllc** 3:13
**plus** 114:20
**pocket** 221:10
**point** 33:6,12
  38:15 42:23 53:12
  60:2,10,11 88:15
  129:17 133:24
  147:2 176:10
  189:5 213:5 225:8
  231:2 245:11
  256:23
**pointing** 133:24
**policing** 117:10
**policy** 108:18
  109:23 127:2
  189:8 247:3
  252:21
**polster** 1:7
**poorly** 85:10
  164:10
**population** 169:9
  169:21,21 174:13
**porter** 5:17
**portion** 220:18
**position** 30:24
  32:11 132:21
  139:20 154:6
  155:11 199:12
  237:4 254:18
**positions** 23:9
  186:14,17,21
**positive** 208:11
**positives** 208:8
  211:16 212:6

**possibilities**
185:20
**possibility** 159:4
185:16
**possible** 20:19
22:12 23:4,12
142:17,19 181:11
**possibly** 195:13
224:7
**potent** 118:12,14
**potential** 56:23
148:16 195:12,19
211:18
**potentially** 38:7
164:23 165:1
195:15,16
**power** 145:15
232:22 234:4
235:12,19
**powerpoint** 89:24
90:4 91:1 92:15
95:25 96:6 157:1
158:7
**practice** 72:6 75:4
77:4 113:14
114:17,23 116:1
143:20 204:9
252:21 256:8
**practices** 76:24
114:10
**practitioner** 181:3
**practitioners**
58:16 179:22
**predicated** 161:24
169:24
**preferred** 103:18
**prep** 27:4
**preparation** 26:22
27:2 52:7,10
**prepared** 25:15
256:20

**prepped** 37:16
**prescribe** 233:8,22
235:1 236:11,22
**prescribed** 58:12
228:15 238:3,25
239:4
**prescriber** 225:19
**prescriber's**
225:22
**prescribers** 66:14
67:7
**prescribing** 57:9
57:25 58:17
**prescription** 1:5
9:2 12:17 15:16
88:2 183:20
184:14 225:12
264:6 265:3 266:3
**prescriptions** 54:7
57:6 58:10,11,14
183:15 223:22
224:21
**present** 2:16 9:7
13:4 26:25 35:10
92:18 96:6 134:16
152:8 242:10
**presentation**
89:24 90:4 91:4
92:8,16,19 93:8
94:24 95:25 96:6
98:6 150:15,18
157:2 158:2
**presentations**
98:16,18,23
150:21,24
**presented** 91:20
94:5,6
**presenting** 223:6
**presents** 233:2
**presumes** 236:10

**pretty** 179:24
**previous** 196:4,24
197:15 211:14
**previously** 28:14
51:11 75:12 78:22
89:18 122:4,18
211:18
**primarily** 17:6
61:4 72:1 216:4
**primary** 54:2
**principles** 193:16
215:7
**print** 78:15
**printouts** 70:20
**prior** 25:1 26:10
27:6,8 29:5,9 48:8
49:6 52:5 55:5
63:1 71:17 72:4
74:8,10 112:2
119:21 120:24
122:3 187:18,22
248:16 253:7
**priorities** 146:5
253:12
**priority** 167:24
**private** 12:7 20:4
32:3,7 54:6 56:18
56:18 218:18
**privilege** 31:1,3,17
31:25 32:13 33:3
33:4,8 35:16,17
36:8,8,9 37:23
39:25 41:6 46:14
47:6,8 48:4
**privileged** 30:9,16
30:25 32:11 33:11
37:1,21 39:23
40:16 41:4,19
42:10,21 46:10
47:5 48:2 52:16

**privileges** 65:24
**privy** 127:4
**pro** 27:13
**probably** 97:24
154:18 177:13
193:3 201:21
**problem** 87:5,10
89:19,22,25
106:15,17 117:23
157:20 160:22
224:19 239:8
**problematic**
154:12
**problems** 166:10
**procedure** 252:15
265:5 266:5
**proceed** 56:1
69:16 111:17
156:21 178:12
220:15 222:8
258:14
**proceeding** 139:17
200:12 233:10,24
262:23
**proceedings**
235:13
**process** 23:17
66:19 67:6,10
91:1 96:17 140:20
145:11 148:20
172:9 216:7 235:9
251:15 252:15,22
**processed** 57:7
**processes** 124:25
**produce** 161:2
**product** 58:15
72:8 114:3 134:24
181:2 182:23
183:2,9 195:11,17
197:2 200:2,6,18
213:17 216:19,25

217:6

**production** 65:22
66:2 264:15,17,22

**products** 68:5
113:16 116:3
186:4

**program** 11:7
62:10 69:25 70:3
71:10 121:14,20
128:2,6,15,17
136:2,5 150:16
151:5 159:10
248:19

**programs** 68:7
72:20 128:22
129:6 254:14

**prohibiting**
180:25

**promise** 220:18

**properly** 213:25
213:25

**proprietary**
149:24 156:5

**protected** 240:10

**protective** 139:13
149:24

**prove** 136:17

**provide** 38:21
62:16 102:24
106:6,11 110:3
117:15 151:10
188:7 246:21
254:18

**provided** 27:6,13
28:8,14 29:10,16
42:6 56:17 65:6
81:16 92:8 93:5,9
93:25 94:14,24
98:1,2 101:1,9,12
104:7 112:14
115:22 142:8

170:3 177:8
188:25 192:3
193:7 219:21
256:2

**provides** 44:15

**providing** 97:20
154:1 188:18
245:19 246:15
253:25 256:5

**prudent** 59:10

**prudential** 7:20

**public** 137:13,18
138:1 139:2,15,16
139:21,22 169:2,5
169:6 233:3
239:16 240:6
255:21 263:1,20
265:10,18 266:15
266:23 267:23

**publicly** 176:7

**publish** 169:3

**published** 126:6

**purchase** 69:25
70:3 71:10,19,23
72:7,12,20 75:3,12
76:8 77:9,10,20
79:11 80:6,18
82:23 83:8,17
84:24 99:10 100:2
102:2 127:17
217:2

**purchased** 217:1,7
217:17,21

**purchases** 71:7
113:17 117:20
155:8 162:25
216:16 231:14

**purchasing** 155:19
231:17

**purdue** 1:8,10,13
4:7 14:22

**purpose** 51:7 64:7
64:9 96:13 214:12

**purposes** 28:15
48:23 171:18
250:1

**pursuant** 2:16

**purview** 160:13
161:19 162:8
168:20

**pushback** 245:6

**put** 17:11 24:19
49:8 62:22 63:6,6
75:25 78:14 80:4
81:10 91:2,5
92:22 94:18 96:20
104:18 117:1,3
126:9,24 129:4
132:20 134:7
140:22 150:9
151:24 156:25
159:13 161:24
232:6 245:25

**puts** 225:18

**putting** 24:4
105:10

**q**

**qualified** 215:14

**qualify** 85:8

**quandary** 132:6

**quantity** 58:12
106:3 208:12,22
208:23

**quarters** 27:24
63:9 84:12

**question** 18:25
19:2,11 21:4,7,10
21:11 23:21 29:14
30:17 31:20,23
32:2 33:18 34:17
34:20 35:1 39:4
40:12 41:10 42:25

43:6,20 44:19
45:1,4 46:16,18,25
47:13,15 50:5,19
50:21 51:1 52:18
56:3,7,8,13 57:24
63:14 67:2 74:18
75:23 79:25 80:3
81:6 84:20 85:8
85:10 90:14 93:2
95:11 99:23
100:20 101:12,15
101:19 107:6
109:9,18 110:5,21
115:24 116:5
119:8,12,14,19,21
127:13 129:20
131:17 140:1
141:21 142:21
143:17 151:17
160:25 164:10
167:11 169:24
172:17,18 175:23
176:21 177:7
182:6,11 184:1
189:2 194:20
198:18 200:17,25
201:2,8,10 205:23
206:2,4,7 207:18
207:24 208:1,21
209:19 210:17
212:10 215:2
227:7,8,11,21
229:2 232:2
233:16 235:23
236:17 237:13
238:6,20 239:25
240:3 243:13
245:5 247:6,19
259:11

**questionable**
58:11

questioning 18:1
18:19 21:20 22:20
22:23 244:15
questions 21:16,23
21:25 23:11,18,24
44:4,8 48:13,19
49:11,22 50:11,15
69:5 73:20,21,21
78:20 79:3 101:13
104:2 111:25
115:22 131:22
138:2,8 151:5
153:10 161:13
165:19 168:22
176:12 187:19,22
189:11 195:4
209:25 210:3
221:5 222:19
224:12 226:15,17
232:16 244:16
248:7 253:20
254:7,12 258:23
262:12
quick 55:7 258:5
quicker 23:15
quickly 86:11
91:16
quit 149:24
quite 142:19
163:21
quoted 102:18

**r**

r 3:8 12:1
rac 253:10
ramifications
195:19
ran 252:14
range 22:6
ranks 167:25
rannazzisi 90:20
90:22 95:4

rapids 8:8
rare 43:17
rarely 151:1
rate 35:1 52:21
250:23
rating 251:1
ratio 260:15
ratios 260:6
raw 249:4,4
ray 15:13
raymond 4:16
raymond.krncevic
4:20
rbarnes 8:20
reach 123:13
reached 206:18,20
207:9
react 135:8
read 40:12 45:1,4
45:7 47:20,21
56:9 63:9 74:15
74:17 82:12 83:12
83:13 95:9 99:22
103:10,12 110:16
110:18 112:3
115:2,4 129:19,21
131:14 137:24
143:11 151:22
153:17 155:1
157:18 172:20,21
184:4 194:23
201:1,3 206:2,5
209:5 210:17,18
259:5 265:5,6,12
266:5,6,17
readily 122:10
reading 139:24
163:19 184:2
194:22 206:4
211:10 264:19

ready 112:11
119:2 132:1
159:19 176:23
177:17
real 55:7 151:12
151:16 169:24
realize 29:20
realized 29:17
really 22:11 94:2
114:9 125:2
129:10 131:12,21
141:16 143:4
158:15 173:2
174:2 181:12
202:25 205:17
245:22 247:6
reams 104:7,7
reardon 95:21
reason 21:9 44:7
44:18 64:18
120:19 141:19
142:7 147:7 160:8
211:23 264:14
266:8 267:3
reasonable 260:20
reasons 86:12 89:9
129:3 148:10
165:10
rebates 68:8
recall 25:23 27:17
28:7 38:5,10,13,19
40:13 59:15 63:3
69:18 73:17 88:25
91:9 92:12 94:15
112:16 130:3
140:4,8,21 144:23
145:19 147:21,23
148:9 150:17
153:6,21 154:1,9
159:8 185:2
189:18 190:5,23

190:24 191:2
192:7,13 194:25
199:17 201:22
202:2,9,20,21
203:9,12,17,20
204:5,14 226:20
230:25 244:8,9,10
244:13,19,21
245:23 250:17
252:11 253:6
254:24 261:11
recalls 216:18
receipt 264:18
receive 71:19,23
80:14 136:12
215:10 224:20
232:4 238:2,24
received 38:6,11
38:24 39:7 147:1
147:12 199:20
213:24 218:3
231:24 252:20
receives 217:24
218:7 257:16
receiving 38:20
39:21 232:11
253:16 254:12
256:13
receptive 253:15
recess 55:22 69:10
111:11 156:15
178:8 220:9
258:10
recipients 144:10
recognize 120:12
173:12 210:25
recognized 120:14
recognizing 89:22
recollect 153:3
160:8,9

**recollection**  65:11
73:4,10,14 82:5
94:3 97:4 103:4
125:8 126:18
131:18 141:5,17
141:20 142:5
152:7 158:16
192:14 203:25
211:2 228:19
241:14 248:5
249:9
**recommended**
45:21
**record**  12:4,13
13:7 17:6,12,16
21:14 24:20 25:14
43:8 45:7 47:21
48:14 49:8 50:22
51:8,15 54:21
55:11,20,24 56:9
63:22 64:8,9 69:4
69:7,12 76:6 82:9
83:13 91:18 98:14
100:8 103:12
110:18 111:8,13
112:8 115:4
129:21 138:16,20
143:11 151:22
153:17 155:2
156:12,17 170:2
172:21 177:1,5
178:6,10 184:4,11
187:20 194:23
201:3 206:5 209:9
210:18 211:10
220:6,11 221:24
222:2,4,6 258:8,12
262:17 263:10
266:9
**record's**  79:18,20
177:6 259:1

**recorded**  12:15
**recording**  12:12
139:21
**recounted**  147:20
**recross**  23:1
**recruits**  62:13
**reduce**  105:1
**reduced**  263:8
**reed**  6:16 13:14
**reedsmith.com**
6:19
**refer**  189:7 209:23
213:19
**reference**  214:7
264:7 265:2 266:2
**referenced**  265:11
266:15
**references**  203:2,3
**referral**  187:18
**referrals**  145:25
146:13,14,20,23
**referred**  130:8
212:6
**referring**  79:10
163:17 192:16
**reflect**  216:25
217:6,9,13,16,19
**reflects**  81:25
**reforming**  207:24
**refresh**  73:3
131:17 141:5
152:7 153:2
203:25
**refreshing**  73:10
73:14
**reg**  189:5
**regarding**  21:18
108:18 150:15
189:23 192:4
193:8 199:13
204:6 218:8

219:20 233:14
238:9 246:23
254:1
**regards**  137:11
**region**  199:7
**register**  126:10
**registered**  107:12
179:12 190:12,17
**registrant**  70:9,10
70:19,21 71:2
85:20 106:24
108:25 109:11,24
110:9 142:17,20
143:3 145:13
163:22,23 179:9
179:11 182:14
188:8,9,13,25
189:12 199:13
217:1,20 231:23
231:24 232:10,24
233:2,7,21 234:9
234:23 235:4,7
236:4 245:21
246:16 255:13,14
255:16
**registrant's**  76:24
81:7 214:6 234:25
**registrants**  71:20
71:24 72:20 76:17
77:1,13,19 78:7
80:14,19 83:6
96:11,24 97:7,11
97:18 102:14
103:5 105:15
114:2 121:10
122:25 143:20
145:6 170:12,14
179:16 182:12
183:14 186:2,23
187:5,14 188:19
192:4 193:7,12

204:6,11,15
215:21,23 217:14
231:8,12 245:19
246:16 247:15
255:18 256:7,10
257:25
**registration**
182:22 183:2
232:24 235:7
**registrations**
145:20
**regular**  59:1
172:10
**regulation**  75:25
102:19 105:17
106:2,7 113:7,10
117:4 126:4 189:6
193:9 207:4
**regulations**  107:11
114:20,21 116:8
117:8 179:17
**regulatory**  10:19
60:13,22 61:2
81:24 97:8,12,16
143:7
**regurgitate**  207:18
**rehashing**  247:1
256:12
**relabelers**  179:23
**relate**  231:11
**related**  25:10
48:24 116:15
186:22 189:13
255:17 263:11
**relates**  1:7 138:2
**relating**  260:6
**relationship**  31:23
33:11 44:1,2
46:10 68:24 69:2
88:12 185:1,11
187:5,11 197:22

**relationships**
49:20 50:4 68:17
**relative**  263:14
**release**  175:14
**relevant**  194:16
**rely**  231:23 232:6
**relying**  232:11
**remainder**  52:14
**rematerial**  134:23
**remember**  29:1
59:21 101:20
128:1 139:8
153:13 193:6
202:23 204:19
224:10,12 260:10
261:5
**remembers**  84:18
151:18
**remind**  137:9
171:2 202:6 238:7
239:22
**remotely**  13:5
**renee**  9:8 16:15
**repackagers**
179:23
**repeat**  39:3 41:9
42:25 56:7 97:13
110:15 136:25
143:10 182:6
194:20 198:10
207:4 223:16
228:6 236:18
238:19 239:24
**repeated**  80:1
**rephrase**  56:13
109:17 148:23
188:20
**replace**  168:21
**replaced**  89:12
**report**  11:11 57:15
59:12 165:2 167:6

206:12,20 214:2,3
215:24 216:10
248:24 252:11,23
**reported**  1:24 70:6
70:7 105:2 109:1
109:12,25 110:10
145:2,4,11 149:1
162:5 164:13,17
167:1,18 206:12
207:14 208:6,16
212:7,24 213:25
216:8,20 243:15
255:10,14
**reporter**  13:1 17:2
17:15 24:9 29:13
45:5 47:20 56:6
73:11 104:18,23
151:14 201:1
265:7
**reporting**  57:17
59:16 75:14 76:3
76:10 100:4
103:20 125:7,11
125:21 170:16
187:5,8,10,10
215:21 231:18
243:10 244:17
252:15 253:2
255:18 257:8
258:1 261:19
**reports**  54:9 70:4
71:19,24 72:7
75:3 76:19 77:9
77:10,12,14,20
78:5,8 79:5,7 80:6
80:15,18 84:11,24
85:13 103:22
113:15 114:1
116:2 124:4 169:2
169:5,6 170:17,25
171:11 204:18,23

205:4,12 211:13
213:19 250:3
255:22 261:21
**represent**  41:15
41:16 178:19,24
222:15
**represented**  26:13
26:16 45:10
108:17
**representing**
226:16
**represents**  40:24
**reputation**  135:21
**request**  159:25
161:12 166:12
221:19 266:9,11
**requested**  45:7
47:21 56:9 83:13
103:12 110:18
115:4 129:21
143:11 151:22
153:17 172:21
175:25 184:4
194:23 201:3
206:5 210:18
219:4,10 233:12
**require**  155:9
**required**  75:25
124:18 183:1
215:24 216:20
264:25
**requirement**
123:6 143:7
**requirements**
125:15 140:22
141:22,24
**requiring**  166:16
**reserve**  21:22,24
22:4,10,15 23:3
176:22

**reserved**  22:18
**resolution**  160:12
161:17,18 162:7
162:14,17 167:2
168:5,13 174:7,16
**resolve**  142:21
162:15 163:11
166:20 173:14,15
175:1 197:3
198:21
**resolved**  196:25
212:22
**resource**  59:6 97:2
**resources**  89:6
122:4,8
**respect**  102:12
121:9 182:15
193:11 208:5
215:22 216:23
217:5 218:9
**respective**  2:17
**respond**  21:5
120:2 150:23
163:18
**responded**  141:23
155:4
**responding**  163:20
**response**  141:21
162:18 165:2
226:14 245:10
**responsibilities**
62:7 65:24 121:18
125:15 180:7,9,13
180:15 182:12,15
186:22
**responsibility**
53:25 59:22 62:10
109:5 116:24
117:3,7 183:8,12
225:19

**responsible** 213:8
213:10,13 240:8
**rest** 132:6 262:10
**restate** 46:18
50:21 80:2 227:20
229:15 254:4,6
257:1
**restrict** 144:19
**restriction** 176:6
**restrictions** 173:6
**result** 192:10
**resulted** 192:10
**retail** 222:20,22,25
234:7 235:18
236:2 246:25
259:9,13,21
**retain** 45:13
**retained** 38:14,16
40:22 41:13
262:21
**retelling** 201:8
**retention** 35:13,22
41:12
**retired** 24:24
60:25 175:13
221:16 247:20
256:25 257:2
**retirement** 221:17
**returned** 264:18
**returns** 216:17
**reveal** 21:8
**reverse** 179:22
**review** 26:10 27:5
27:8,20,23 28:10
29:4 64:16,25
84:6 98:15 100:19
105:16 112:1
136:4 142:6
159:15 168:17,19
189:8 264:12
265:1 266:1

**reviewed** 28:14
29:12 64:19 76:18
153:4 159:9
209:16
**reviewing** 84:10
**revision** 61:11
**revoke** 234:25
**revoking** 145:19
**revolved** 116:16
**rewrite** 61:11,15
**rice** 3:18 30:3,6,11
30:20 32:7,25
33:21 35:9,12,14
36:6,23 37:17,20
38:15 39:20 40:14
40:21,23 41:12
42:17 43:3 45:15
**rick** 46:2 51:8,11
51:16
**right** 17:10 18:4
26:14 31:19 42:1
44:17,20 51:9,13
57:19 60:8,13
62:23 64:12,16
69:21 70:11 72:14
73:19 75:4 76:21
77:1,10 78:23
80:10 83:19 84:13
85:17,24 86:18
87:7 91:7,13 99:5
103:8 104:8 106:8
106:16,20 107:1
110:23 111:5
113:2 120:21
122:19 134:25
136:15 139:11
140:1 145:6 147:3
152:15 157:14,16
161:7 162:17
163:10 208:3,25
209:7 210:17

221:4 223:6 227:3
232:15 240:11,17
241:1,2,4,10,11
242:2 246:4,8,12
247:16 250:14
255:2,12,24 258:4
258:16,24 259:6
260:1,21,24
261:15,16,22,23
262:6,8,13
**rigid** 118:16
**rising** 197:19
**risk** 225:4,5,16
**rite** 5:20 222:23
226:6,24 227:11
228:14,22 229:14
230:4,6 235:19
244:11 259:13,21
**riveting** 28:1
**road** 5:4 9:4
**robert** 8:16 9:10
14:15 16:10 95:21
193:1
**role** 48:19 53:5,20
53:22 54:10 56:24
59:16 60:11 61:2
61:25 62:2 180:1
220:23
**room** 13:4 17:5,24
**ropes** 7:20
**ropesgray.com**
7:22,23
**ross** 6:22
**rothschild** 9:3
**round** 21:22,24
244:15
**routine** 172:2,5
**ruiz** 6:10 14:13,13
**rule** 23:6 36:15
40:8 43:11,21
44:22 116:6 126:7

**rules** 17:13 20:15
114:24 116:8
117:9 265:5 266:5
**ruling** 33:17 50:8
**rulings** 44:12
**run** 170:18
**running** 252:21
**russo** 1:24 9:13
12:24 13:2 263:2
**ruth** 209:14
**rx** 6:9 14:14
**ryan** 88:22,22,25
200:12

**s**

**s** 10:1 12:1 39:12
46:5 264:15 266:8
266:8 267:3
**sac** 253:9
**safeguard** 134:24
**safety** 233:4
**sale** 65:22 66:2
184:18 219:21
**sales** 70:7 84:11
169:8 196:4,10
197:16 200:2
216:16,16 223:20
**salvage** 135:22
**sample** 225:21
**sandwich** 157:19
**saw** 80:8 96:2
120:23 141:7
214:15
**saying** 65:21
105:11 119:24
140:1 207:9,19
245:11
**says** 79:18 132:4
139:12 141:15
153:6 157:19
174:4

schein  6:20 15:12
scolded  147:22
scope  22:24,25
  33:15 48:17,20
  82:9,25 83:10
  103:25 105:4
  107:4 114:8
  127:14 130:5
  141:12 173:9
  175:17,24 183:22
  185:13 199:10
  219:4 234:19
  239:20 257:19
scott  8:16 15:9
seal  136:21 265:15
  266:21
searchpoint  54:15
  54:18 56:15,17,25
  57:10,21 58:4,21
  58:25
seasonal  197:17
second  21:22,24
  24:5 31:11 54:20
  91:22 152:5
  154:22,24 209:6
  209:16
section  9:11 53:24
  54:1 59:23 62:5
see  24:2 33:25
  56:22 57:22 58:9
  58:10 68:11 93:23
  94:6 95:5 100:15
  132:10 136:13
  139:14 140:12
  152:17 155:13
  158:10 160:15
  177:2 193:25
  196:5 203:8
  209:17 211:4,7
  250:7

seeger  95:19
seeing  161:25
  169:18 191:6
seek  80:20 126:3
  234:4,7
seeking  81:2 82:15
  177:2
seeks  20:25
seen  25:22 26:8
  158:14
self  117:10 225:3
sell  180:19 181:2,5
  182:4,8 183:9
  259:15
selling  186:3
  227:14
sells  180:22
semiregular
  172:11
send  77:19,23,24
  78:5,7 143:25
  144:6 173:16
  223:22 247:14
sending  147:1,2,7
  148:10 216:17
  225:13
sense  93:19 188:3
sensitive  12:7
  54:25
sent  26:7 72:1
  78:22 166:12
sentence  160:12
  161:16
separate  191:22
separately  255:19
september  157:4
  158:9
series  101:13,14
  151:18 189:22
  222:19 226:17
  248:6 253:20

serious  239:8
served  32:7
serves  30:11,12,13
service  14:16
  128:24
services  6:10
  14:14 31:7
serving  35:8
session  253:21
set  70:6 71:3 78:4
  80:10 85:14,21
  115:21 125:5
  129:4 149:25
  206:20 254:13
sets  115:22
seven  241:13
shame  25:12
shannon  6:16
  13:14
shapira  8:17
shapira.com  8:20
  8:20
share  91:16 150:2
  155:17 169:25
  170:8
shared  154:14
sharing  93:21
sheet  264:13 266:7
  266:10,18 267:1
shift  123:23
shifted  106:20
ship  72:7 81:3
  107:7 108:25
  109:11,24 110:4,4
  110:9 112:23,23
  113:1,1,16 114:3
  114:23 116:3,16
  123:5 134:22
  142:23
shipped  80:22
  82:16 107:1 183:2

shipping  107:7
ships  182:23
shkolnik  3:13,13
  15:22,22 19:12
  36:10,13,18 43:7,8
  44:20 64:11 65:9
  67:20 68:18 73:9
  73:13 74:25 76:12
  78:1 79:8,14,16,20
  82:8,18 88:8
  89:14 98:10 100:8
  102:9 107:3 109:2
  123:7 124:6 128:8
  130:17 131:1,16
  132:14,22 138:5,9
  139:18 142:10
  145:22 148:4
  154:15 155:23
  156:2 168:15
  173:8 174:18,23
  181:11,15 183:4
  183:21 185:12,21
  187:17,24 199:21
  200:21 201:6
  203:14 205:6
  207:23 208:2
  228:4,25 230:17
  231:19 239:2,19
shoes  197:13
short  55:22 69:10
  111:11 156:15
  178:8 220:9
  258:10
shorthand  87:10
  263:7
shortly  89:2
show  17:19 43:22
  79:4 91:17 232:17
  234:13,16,23
  235:5,12,20 236:3

showed  104:21
showing  43:14
  104:14
shown  50:13
  264:16
sic  150:23
side  62:9 197:3
  213:11,14,16,23
sides  23:11,22
sign  195:12,13
signature  263:19
  264:14
signed  265:13
  266:18
significant  108:17
  108:22 110:8
  195:5,7 198:25
  200:1
significantly  196:9
  196:13
signing  264:19
similar  146:7
similarities  175:9
similarly  22:24
simplest  87:20
simply  31:22 49:4
  49:9
sincerely  264:21
singular  165:17
sir  34:19 76:1
  101:18 111:23
  116:4,9 125:23
  131:9,22 203:11
  203:15,19,22
  204:3,8,21 229:18
  231:1 232:13,21
  232:25 235:21
  243:21 244:2
  245:22 246:6,9
  247:18,24 250:19
  252:18 254:10

261:23 264:10
sit  118:23 185:19
  186:11 193:5
  203:23 243:5
  244:4
site  136:10 140:3
sitting  18:13 142:6
situation  225:11
situations  106:14
six  32:22 52:12
  166:2 241:13
size  106:3 175:6
skipped  10:10,16
  10:17,18 63:15
sleep  27:25
slice  170:23
slightly  67:2
slot  248:16
slow  42:12
small  118:14
smclure  6:19
smith  6:16 8:2
  13:15 14:4 15:18
  27:10,11,15 28:7
  63:2 73:17 101:1
  111:20 115:13
  132:5 138:15,18
smoke  178:2
sold  57:17 216:5
  217:10,14
solicitation  31:21
solutions  5:16
  12:25 13:3 262:22
  264:1 267:1
somebody  61:18
  103:18
somewhat  172:8
soon  108:8 245:5
sorry  18:22 31:13
  36:13 39:3 42:24
  73:11 100:10

103:9 109:18
131:10 133:5
140:11 145:7,24
151:15 152:17
157:12,12,13,24
167:6,19 169:4
172:16,19 181:16
194:11 203:1
227:4,19 238:6
245:22,25 247:6
254:3
sors  211:13,15
sort  88:6 102:23
  103:1 114:25
  126:3 172:10
  221:14
sorts  127:3 173:13
sound  239:16
  240:6
source  59:4 96:12
  122:2 212:19
sources  135:17
south  3:19 8:3
spaeder  6:11
speak  17:8 38:23
  39:6,10 54:21
  114:10 125:3
  179:3 181:12
  189:3
speaking  20:23
  79:15 80:7 182:3
  182:7 185:25
  186:6,7
speaks  153:14
spears  9:12 16:18
  16:18
specgx  7:18 13:23
  13:25 178:15
special  9:8 16:22
  16:24 17:10 18:6
  18:9,11,22 19:3,14

19:16,24 20:14
24:3 31:6,10,19
32:14,15,19 33:13
33:16,17 34:2,5,15
34:22,25 35:19
36:1,16,19 37:2
38:2 40:5,19 41:8
41:24 42:14,24
43:5,23 47:12,17
48:6,7 49:15
52:19 157:11,18
157:21,24 181:2
185:6,7,9
specialists  249:18
  249:21
specif  30:14
specific  33:18 69:1
  92:20 137:12,16
  147:17 158:15
  163:21 169:10
  171:15 176:3,4,12
  188:21 189:5
  199:7 202:7
  209:24 210:1
  233:15,15 248:19
  252:1 257:19
specifically  76:22
  90:21 147:16
  166:13 185:14
  192:6 199:17
  252:25
spectrum  57:18
speculation
  154:16
spent  52:4
split  19:13
splitting  21:15,18
spoken  33:10
spread  78:9
squad  250:16

**square**  6:17
**squirming**  108:13
**sshkolnik**  3:15
**st**  243:6
**stack**  77:15
**staff**  250:16
**stamp**  10:24 11:1
**standard**  72:5
  113:14 116:1
**standing**  165:13
  165:23
**stanner**  7:4 14:25
  14:25
**star**  17:19 134:22
**stars**  7:10
**start**  61:10 65:17
  73:22 83:6 108:12
  145:3 146:2
  156:18 158:4
  187:13,13 193:20
  193:25 220:12
  227:8 251:15,16
**started**  49:9 82:22
  93:21 101:16
  106:16 166:13
  241:3 242:21
  245:5,7 249:10
**starting**  60:7
**starts**  39:11
  137:22 193:19
  196:8 198:10
**state**  13:5 169:8,19
  265:10 266:15
**stated**  85:10 118:4
  133:6 196:23
**statement**  132:4
  160:17 161:1,24
  162:3 163:4,9
  164:2 166:23
  265:13,14 266:19
  266:19

**states**  1:1 3:8 9:8,9
  9:10,11,12 12:18
  16:7,11,11,14 20:2
**static**  249:2
**stationed**  187:2
**statute**  125:23
  126:3
**statutory**  240:12
**stay**  118:1
**stayed**  60:18
**staying**  63:18
**stays**  50:9
**steady**  196:6
**stephens**  5:3 10:5
  14:1,1 19:1
  222:12,14 224:2
  225:1,20 226:5,13
  227:5 228:8,20
  229:3,12 230:2,11
  230:21 231:21
  232:9 233:17
  234:12,21 235:17
  236:19 237:1,8,14
  237:22 238:21
  239:6,12 240:1
  243:16 244:3
  247:2,8 251:22
  252:5 253:19
  255:11,23 256:15
  256:23,24 257:23
  258:4,15 259:19
  261:10 262:8
**steps**  140:13
**steve**  95:21
**stick**  108:8
**stipulate**  208:12
**stipulated**  189:9
**stone**  9:4
**stopped**  69:4
  147:2,7 148:10
  245:13,18 253:25

**256**:8
**stored**  252:10
**streaming**  8:11
**streamline**  253:24
**street**  2:7 3:4 4:4
  5:12,22 6:5,11,17
  7:5,15,21 8:3,18
  8:23 12:23
**stretch**  258:17
**strike**  187:21
  200:25 210:24
  217:3 254:6 257:1
  262:9
**strongly**  125:9
**structure**  230:20
**studies**  185:6,7,9
  185:16 213:12
**study**  251:11
**stuff**  161:13
  167:24 262:2
**stumbled**  43:20
**subject**  139:13
  189:19 204:19
  221:14
**submit**  70:19 72:6
**submitted**  70:4
  83:17
**submitting**  80:18
**subpoena**  173:9
  175:17
**subpoenas**  166:10
**subscribed**  265:10
  266:14 267:21
**substance**  11:7
  38:25 44:1 49:25
  70:20 150:16
  177:10 216:19
**substances**  65:20
  65:23 66:3 87:7
  87:16 107:13
  145:17 155:20

**179**:14 218:9
  225:25 226:7
  227:25 228:10,15
  228:16 229:6,20
  230:5,14 233:9,23
  234:17 235:2
  239:15 240:5
  260:7
**substantial**  193:24
**substantive**  41:23
**substitute**  168:12
**successful**  58:20
  89:10
**sudden**  198:8
**sued**  147:8 256:2
**suffer**  238:1,23
**sufficient**  50:9
**suggest**  50:8
  176:20,25
**suggesting**  119:25
**suite**  3:9 4:18 5:12
  6:12,17,22 8:7,24
  9:4 264:2
**summarize**  173:4
**summary**  139:6
**summit**  1:12 3:17
  15:21 42:2,4
  48:10 51:17
**superior**  3:9 264:1
**superiors**  192:17
**supervisor**  59:20
  81:8 86:25 210:22
  243:15,17,20
**supervisors**
  192:20
**supplemented**
  57:21
**supplier**  155:17
  181:1
**suppliers**  155:4,8

**supply**  9:2 15:16
148:18 180:1
182:17 233:8,22
240:9,10
**supplying**  226:19
**support**  62:14
139:6 214:14
**supports**  120:13
**sure**  39:5 43:1
56:5 80:2 81:18
85:9 91:24 96:10
97:14 98:9 104:22
138:25 145:16
157:16 170:2
177:5 179:1,5
180:4 181:14
188:22 209:21
213:24 223:16
233:12,18 236:20
238:22 240:2,8
245:10 251:25
258:25
**suspend**  232:23
234:25
**suspension**  232:20
232:23 233:7,21
234:4,8,14 235:11
**suspicions**  212:21
**suspicious**  75:13
75:14 76:3,3,9,10
76:20 99:11,18
100:4 102:3,13,15
103:3,7,16,17,20
105:18,22,24
106:23,25 107:6,8
107:8,14 108:16
108:19 110:6
113:15 114:21
116:2 118:17
120:1,15 121:19
122:13 123:19

124:11 125:10,22
128:5,15 129:6
134:8 135:7 136:1
136:5 140:18
142:16,18,22
143:5 153:5
159:10 160:13
161:18 162:2,5,7
163:2 164:4,12,17
164:20 165:2
166:25 167:2,7,9
167:14 168:19
189:13,23 192:4
193:9,12 194:5,17
195:8,25 198:1,15
199:16,20 200:8
200:20 201:14,19
204:7,24 205:1,5
205:13 206:9,12
206:16,24 207:5,6
207:8,11,14,19
208:5,10,15 212:7
212:20,25 215:7
220:24 254:1,13
261:3
**sustain**  33:13
36:16,19
**sustained**  37:25
38:3 40:19 52:19
**sustaining**  33:16
**swear**  17:2,4,12
24:9
**switch**  122:12
124:18 125:6
131:8 142:13
**switched**  97:8,11
**sworn**  24:12 263:6
265:10,13 266:14
266:18 267:21
**system**  54:5,9
65:14,21 66:1,3

67:5 69:24 72:12
75:12,14 76:3,9,10
82:23 83:7,8,17
99:11,11,19 100:2
100:3 102:3,3,13
102:16 103:3,17
103:18 104:6
108:17 117:11
118:15 119:3
120:15,16 121:12
121:15 123:19
124:5,19 125:21
125:22 127:17,23
132:17 134:6,9
136:11 140:21
141:6 146:7 150:1
151:4 153:5,11,22
154:2,12 170:15
189:2,13 212:15
231:11 261:6,25
**systems**  74:12,14
117:16 120:5
135:8 150:22,23
151:11 255:2,5
261:3,12

| t |

**t**  10:1,1
**tablets**  217:10,14
217:17
**take**  12:12 24:5
30:24 74:1,2,3
75:19 79:7 82:6
88:11 93:3 95:2,9
100:6 107:22
110:23 112:3
113:18 115:8
124:19 141:2
146:9 152:4 153:8
156:9 159:14,15
164:17 170:6
174:25 177:1,20

177:23,25 190:1
220:2 229:16
258:5
**taken**  12:15 32:1
55:22 69:10
111:11 137:4
138:17,19 140:14
156:15 157:4
178:8 212:15,15
220:9 237:4
258:10 263:3,7,13
**taker**  204:13
**takes**  22:21
**talk**  104:16 127:11
156:6 176:1,4
202:7 214:23
215:20 233:13,13
236:7 248:8
251:25
**talked**  21:13 63:1
171:13 195:4
204:17 207:2
213:3 220:20
254:21
**talking**  65:19
82:25 84:15
112:12 127:1
175:19 199:8
223:1 247:17
**targeting**  62:5
190:7 213:6
**tayman**  3:3,4
16:20,20 20:4,10
20:11 30:7,22
32:8 33:2,24
34:14 35:15,24
36:7,11,25 37:6,21
38:1 39:23 40:16
40:25 41:4,19
42:8,10,19,21
45:11,13,16 46:6,9

46:13,24 47:5
48:2 51:1,4,21
52:1,4,11,16 67:13
178:1 201:4
202:14 206:1
264:5
**tayman's** 45:18
47:24 50:25
**team** 248:2 249:16
250:2,6,10 251:9
251:16
**technique** 210:11
**techniques** 171:4
173:11 214:24
257:20
**technological**
135:12
**teleconference** 4:3
4:17 5:7,21 6:21
8:17 9:3
**tell** 24:12 42:25
59:4,7 106:17
112:22 113:6
133:14 135:5
136:14 140:6
167:8 195:6 198:3
242:21 245:4
**telling** 166:13
**tells** 214:8
**ten** 52:6,14 108:9
108:10 220:3,4
**tenth** 7:5
**tenure** 252:14
**term** 70:14 86:20
179:8 181:10,18
181:21 218:23
219:1
**terminate** 144:19
**terminated** 143:21
144:4 149:10,20
244:18 245:20

246:17 247:16
256:4,6
**terminates** 57:19
**terms** 30:15
130:24 223:9
**test** 136:10
**testified** 24:14
55:4 73:16 74:11
74:20 75:11 84:9
89:18 112:19
153:13 186:13
189:16 223:4
224:8 230:22
240:18 251:7
**testify** 25:9 42:18
43:4 76:8 239:20
261:2
**testifying** 28:19
29:17,21 31:18
38:8 91:9
**testimony** 27:6,8
27:14 28:8,11,13
29:2,4,9,16 38:21
48:8,9,24 63:2
64:16,19,20 65:6
67:25 73:17 74:8
74:10,22 84:15
100:25 101:9,11
102:5 111:20
112:2 113:19
115:9,13 116:10
120:13,24 131:7
133:17 142:8
184:23 185:2
194:4 196:24
198:12 200:11
205:20 224:10
226:21 230:25
253:7 254:17
261:11 262:18
263:4,6,10 265:6,7

266:6,9,12
**texas** 6:23
**thank** 34:8 40:10
50:17 55:18 56:4
56:5 63:18 74:6
79:22 93:23
100:11 104:24
156:10 157:23
179:6 187:24
209:22 210:4,15
220:17 221:22
236:6 240:22
**thanks** 110:24
**thing** 42:2 96:3,21
164:22 262:6
**things** 17:12 18:18
21:13 49:16 59:8
61:5 68:8 77:14
81:21 106:3
114:11,12 121:8
127:24 133:23
134:20 135:2
142:15 146:5
159:1 165:1 199:9
199:14,25 216:6
240:24 254:23
**think** 19:18 23:14
23:23 28:16 30:12
31:4,7,14,24 33:11
35:2 37:24 40:2
43:20 44:16 45:3
47:12 49:7,24
50:2 53:3 62:21
63:7 69:20 71:1
75:11 81:15 82:25
86:16 89:18 93:25
97:5 101:11
104:18 108:5
112:18 119:20,24
120:12 121:8
128:1 135:25

137:25 138:23
141:6 152:16
157:9 159:2,5
161:6 167:13
171:21 176:20
186:11 190:10
195:10 201:7,18
203:23 211:23
231:23 232:5
235:22 248:13
251:24 258:5,22
259:3,5 262:10
**thinking** 193:17
195:18
**third** 23:7 54:8
198:9,14
**thirty** 264:18
**thornburg** 8:3,6
14:4
**thought** 38:1
145:21 154:12
247:13
**thousands** 256:17
257:3
**threat** 120:3,4
147:18 244:25
245:12,15 247:13
247:22 248:1
256:1
**threatened** 148:16
**threats** 246:22
**three** 4:8 6:17
20:20 22:14 27:24
45:14 54:2 63:9
84:12 91:11 98:12
169:12 193:3
242:18 243:1
**threshold** 71:3
85:2,15,21 86:4
**till** 250:6

**time** 19:13 21:1,15
21:18,22,24 22:4,7
22:19 23:3,16
27:18 35:10 36:4
37:20 38:13,17,24
39:7 52:25 55:21
55:25 61:10 69:9
69:15,23 71:11
74:2,23 78:4
80:21,21 81:1,1
84:3 87:18 89:8
89:10 91:20 96:5
97:22 101:6,20
110:10 111:10,16
113:13 115:25
116:14 117:2,14
120:3 124:4,20
134:17 135:24
137:15 149:18
150:20,20 151:13
151:16 156:14,20
175:21 176:22
178:7,11,25
182:25 187:16,16
188:16,16 192:1
194:25 198:14
203:18,21 210:4
211:24 220:8,14
221:7,12,13 222:3
222:7 229:16
241:9,13 242:6
243:17,18,20
245:2,17,24
246:13 247:3,11
247:20 249:9
251:3 252:20
254:8,9 255:4,25
256:5,16 258:9,13
**timely** 249:3
**times** 121:8
135:23 179:9

197:7 198:8
260:20
**timing** 40:3
**tired** 105:11
**title** 59:21 92:15
240:15
**tlclawfirm.com**
3:6
**today** 13:1 26:17
29:5,20,23 45:10
52:5,8 106:18
112:2 118:8 134:1
142:6 179:9
185:19 186:11,13
189:16 193:5
201:17 203:23
204:17 207:1
213:3 221:7
222:20 223:4
224:11 230:22
240:18 251:7
256:16 261:12
**today's** 28:15
262:18
**told** 57:7 73:22
101:8 137:4
171:21
**tomorrow** 106:14
106:15 134:2,3,21
135:2
**tool** 248:16,20
**tools** 170:16
**top** 22:16 37:4
63:19 131:13
185:15 193:17
201:22
**topic** 219:8 232:16
**topics** 25:10 82:10
260:2
**torri** 160:6

**total** 23:16 67:1,9
155:18 195:19
262:20
**totality** 68:20
197:18
**totally** 191:17
**tower** 7:20
**town** 174:11
**traced** 195:17
**trafficked** 87:17
**trafficking** 87:6
**train** 242:16
**trained** 242:12
**training** 62:12
203:5,10 215:10
242:22
**transacted** 162:25
**transaction** 218:8
**transcribed** 265:7
**transcript** 11:21
27:21 63:8,23
64:3 73:6 104:14
131:19 132:15
137:21 138:6
148:5 259:4
264:11,12 265:5
265:12 266:5,11
266:17
**transcription**
263:8
**transferred** 69:19
87:3 190:7
**transition** 102:2
103:16 232:15
**transitioning**
99:10,15
**translation** 145:8
**transposing** 206:8
**trant** 95:19
**trash** 84:13

**treat** 48:12
**treated** 48:25
**treky** 134:22
**trends** 135:8
169:18
**trial** 10:14 28:8,11
64:3,16,20,23 65:4
65:7 111:20,21
112:1 115:9,12,13
120:13 139:16,19
**tried** 59:8 102:19
117:25 133:23
146:6,8
**trigger** 103:21
**trouble** 168:6
236:17
**true** 181:5 208:14
225:4 226:1,8
232:20 233:10
234:5,6,9,11,18,20
235:2,3,7 255:19
256:10,18 257:8
257:11,13,14,15
257:17 258:2
263:9
**truly** 105:18
123:10 143:5
198:18 204:24
205:4,13
**truth** 24:12,13,13
101:8
**try** 44:13 65:18
81:5 104:5 253:23
253:23 259:2
**trying** 32:21 43:24
44:5,16 61:6
104:2 121:23
129:25 130:1,14
130:23 132:8
134:2 135:22
247:2,10

**tucker**  4:17
**tuckerellis.com**
  4:20
**turn**  12:9 52:24
  73:5,7 111:19,22
  137:20 154:21
**turning**  50:5
  182:11
**tweel**  4:4
**twice**  118:12
  198:13
**two**  19:9 20:7 22:1
  22:2,5,5,10,20,25
  23:1 73:20,21
  93:17 94:13,14
  95:20 96:21 104:2
  118:6 173:24
  175:9 187:18,22
  193:16,21 248:24
  258:22
**type**  54:17 58:3
  70:10 97:11 100:3
  128:17 182:14
  198:14 246:21
  252:12 254:18
**types**  58:25 82:13
  98:6 124:17,25
**typing**  157:7,8,15

**u**

**u.s.**  3:7 16:9,17
  62:17 63:23
**uh**  113:21 136:22
  181:25 184:19
  206:10
**ultimately**  174:17
**unable**  238:2,24
**uncomfortable**
  64:22
**understand**  17:22
  19:21 20:16 25:7
  43:24 44:11,13

66:23 72:5 86:21
  87:9 92:3 99:14
  99:18 113:4
  119:24 136:9
  173:7 174:9
  176:17 194:3
  205:2 219:7 223:3
  223:17 227:19,22
  245:10,23 254:17
**understanding**
  18:17,18 70:17
  93:20 167:6
  179:10 180:17
  212:12 215:24
  217:23 218:6
  219:11,19 220:23
  229:11 234:1,2
  235:8 242:25
**understood**  35:2
  90:22 94:8 113:12
  113:25 114:6,16
  115:24 123:22
  128:14 144:9
  155:10 259:3
**undertook**  191:23
**undue**  148:17
**unfortunately**
  74:13
**unique**  172:8
**unit**  12:14 53:23
  56:24 59:2,12,24
  60:12,13 61:3
  62:4,7 69:8,13
  111:9,14 156:13
  156:18 174:5
  213:5,8 214:16
  220:7,12 242:4
  246:2 248:12
  249:14,25 252:14
  252:20 253:4
  255:6

**united**  1:1 3:8 9:8
  9:9,10,11,12 12:18
  16:7,11,11,14 20:1
**units**  257:17
  262:20
**unusual**  21:6
**upgrade**  120:5
**ups**  87:24 177:14
**usa**  10:12
**usdoj.gov**  3:11
**use**  23:3 56:23
  57:10 58:20 59:10
  70:9 86:20 97:2
  99:21 131:18
  132:15 138:6
  141:11 142:11
  148:5 214:11,12
  237:10 249:10
**useful**  84:24
**uses**  63:20
**usually**  21:7 77:24
  85:13 181:23
  196:5
**utilize**  54:11,15
  135:12
**utilized**  54:18 57:4
  59:1 171:10

**v**

**v**  1:8,13 264:6
  265:3 266:3
**vague**  109:19
  202:22
**valances**  196:7
**value**  175:1
**vanni**  5:11 14:9,9
**variables**  106:13
  118:18 199:5
**variance**  199:1
**variances**  198:19
  198:22

**variations**  197:17
**various**  72:2,13,20
  144:1,2 170:25
**ventura**  7:14
  14:11,11
**veritext**  8:11
  12:25 13:2 262:21
  264:1,7 267:1
**veritext.com.**
  264:17
**versus**  63:23 85:2
  260:6 261:12
**vetted**  49:5 176:1
**vickie**  95:18
**video**  12:11,14
**videographer**  9:13
  12:3 13:1 16:3
  17:1 24:8 55:19
  55:23 69:6,11
  111:7,12 156:11
  156:16 178:5,9
  220:5,10 222:1,5
  258:7,11 262:16
**videotaped**  1:18
  10:8
**view**  205:3 215:14
  225:15
**views**  154:14
**violation**  43:21
  114:24 116:7
**virginia**  4:5
  118:21 175:15
  176:5 177:9
**visibility**  66:18
  67:9,17 68:1,16
  149:9 184:25
  185:10
**volume**  1:17 83:16
  105:1,12,13 106:3
  165:13,23 173:21
  174:1 193:18,19

193:22 194:6,15
195:5,7,24 198:20
200:1 217:6
**vs** 1:10 10:12

**w**

**w** 8:10
**wacker** 5:8
**wait** 119:11,19
**waived** 264:19
**walgreen** 8:21,21
**walgreens** 14:17
14:18 222:23
226:6,24 227:12
228:14,22 229:14
230:13,15 235:19
244:11 259:13,22
**walmart** 5:2 14:2
15:6 222:11,16
225:24 226:23
227:11,15,24
228:6,9,21 229:5,7
235:18 244:5
259:14,21
**want** 19:21 44:13
57:25 106:25
107:24 108:3
131:14 137:24
170:20 177:5,7,10
177:13,16,20
187:19 195:3
205:24,24 210:17
223:8,16 227:20
240:24 241:9
245:9 246:20
251:25 258:21,21
258:25 260:4
**wanted** 56:22
64:25 79:4 83:6
91:16 102:15
104:12 105:1
120:20 128:21

141:16 146:10
150:3 219:8
220:22
**wanting** 82:22
83:1
**warrant** 214:17,20
**warranted** 165:11
215:11,15
**warrington** 9:5
**washington** 1:19
2:8 3:5 5:18 6:5
6:12 7:6,15 12:23
53:13 186:15
212:3
**way** 21:19 22:13
23:2 44:8,19
60:14 67:3 77:18
112:9 123:11
126:25 130:20
131:21 133:7
148:24 149:8,18
150:3 153:22
163:18 170:19
173:20 189:12
217:4 221:6 239:5
259:2,5
**ways** 170:24
171:10,19
**wc.com** 6:6,7,7,8
**wdo** 211:12 212:2
**we've** 25:15
107:16 108:2
174:2 179:8
201:16 219:25
242:19 253:22
**weeks** 45:14 89:12
**welfare** 237:17
**went** 17:5 21:14
27:25 28:16,16
60:22 84:12 96:17
118:11 119:15

134:18,19 136:16
137:3,3 140:12
152:21 169:12
246:13
**west** 3:9 4:5 5:8
118:20 175:15
176:5 177:8
**wewatta** 8:23
**whatsoever** 193:6
**whispering** 12:7
**white** 128:3
**whoever's** 146:16
**wholesale** 66:6,9
**wholesaler** 217:17
217:21
**wholesalers** 67:7
**wicht** 6:3 13:12,12
**widely** 114:5
**william** 7:19 8:2,6
13:24
**william.davison**
7:23
**william.leeder** 8:9
**william.padgett**
8:5
**williams** 2:6 6:4
12:22 38:7
**window** 242:19
**withdraw** 99:23
**witness** 3:3 17:2,4
17:13 23:8 24:9
26:19 31:22 32:1
32:3,21 34:9
35:20 36:2 37:3,9
41:9 42:1,15 44:2
44:6,9,16 45:8
47:1,15,22 48:12
48:16,18 49:1,13
49:14,18,19,20
50:1,6 51:3,5
54:22 56:10 63:11

65:10 66:21 67:14
67:21 68:20 69:1
70:24 72:10,16,24
73:1 74:19 75:7
75:17 76:14 77:6
78:2 80:24 82:19
83:2,11,14,22 84:2
84:21 85:6 86:1,7
87:13 88:9 89:15
98:11,22 99:14
102:10,18 103:13
104:1,10 105:5,21
106:11 107:5
108:10,12,21
109:4,17 110:3,15
110:19 111:2,6
113:4 114:9 115:2
115:5 116:20
117:7,19 120:10
121:3,7 122:1
123:9,25 124:7,24
125:14,25 127:10
127:15 128:10,19
129:1,9,14,18,22
130:6,19 131:4
132:16,24 133:4
133:19 134:13
135:15 137:9
141:14 142:2,25
143:12 144:14
145:23 147:5,15
148:6,15 149:5,12
149:15 150:8
151:1,8 152:25
153:15,19,24
154:8,18 156:4,10
158:12 160:21
161:22 162:11
163:7,14 164:7,15
164:22 165:4,17
166:2 167:5,21

**[witness - zuckerman.com]**                                                     Page 45

168:17 171:2,2,6
172:5,23 173:10
174:19,24 175:25
176:11 177:21
180:21,24 182:19
183:5 184:6,17,20
185:14,23 186:6,8
187:8,25 188:13
191:20 193:15
194:13,24 195:10
196:3,15,23 198:6
198:17 199:5,22
201:21 202:6,9
203:15 204:3
205:9,17 206:6,11
206:18 207:1,17
208:10,19 209:5
209:24 210:19
211:12 212:11,18
214:22 215:6,18
216:12 218:3,15
218:21 219:5,9,11
223:25 224:25
225:18 226:3,11
227:3 228:6,18
229:1,10,25 230:9
230:18 231:20
232:3 233:12,16
234:11,20 235:15
236:16,25 237:6
237:20 238:7,19
239:3,11,22,24
243:14 244:2
247:5 253:18
255:9,21 256:13
257:21 261:9
262:15 263:4,6,10
264:8,11 265:1,4
265:11 266:1,4,15
**witness's**  31:15

**witnesses**  19:8
33:8 219:9
**witness'**  264:14
**wondering**  188:23
**word**  20:20 44:17
70:9 133:5,5
162:16 168:5,12
179:11 197:6
212:11,13
**words**  20:21 38:16
58:13 146:8
169:21 201:12
204:25
**work**  25:5 35:11
42:6 45:20,23,24
47:3 48:1 52:22
60:3 61:8 62:13
81:5 182:1 246:1
**worked**  169:11
189:12 231:3,5
242:3 250:25
**working**  69:5
86:17 133:8
197:14 215:10
257:5
**workload**  167:23
**works**  118:24
**worm**  143:9
**worth**  198:22
199:1
**wright**  1:18 2:1
10:2,8,11 12:15
16:21 17:18 18:20
19:20,23 20:6,9,17
20:24 23:16 24:11
24:18,21 25:7,14
25:16 26:2,13
27:17 29:18,23
30:11,19 32:20
35:7 38:5 42:13
44:25 46:23 48:9

50:24 55:3 62:3
64:3,8,10 69:18
73:19 76:17 78:13
79:2,24 81:11,23
91:21 92:16,23
94:18,22 96:18
100:20 108:16
111:1,19 119:4,23
137:20 143:18
148:9 150:10,18
151:25 155:2
156:25 157:1
158:6,6 159:13,13
159:19,22 168:23
175:11 177:1
178:17,23 179:8
186:1 204:9
220:17 221:13
222:13 238:22
240:17 245:9
258:16 262:19
264:8 265:4,9
266:4,13 267:20
**wright's**  18:17
20:3,12 210:14
**wrights**  146:15
**writing**  94:6 189:9
225:12
**written**  95:3
183:16
**wrong**  174:14
248:10
**wrote**  161:8,14,17
166:24 211:25
**wva**  11:14

**x**

**xyz**  243:11

**y**

**y**  169:25

**yeah**  18:11 38:1
59:6 91:25 118:24
128:11 145:23
209:8 249:22
250:7 252:3
**year**  29:2 32:23
53:1 60:15 88:24
235:25 241:13
245:6,8,8,13
246:20 248:24
251:5
**years**  25:6 75:4
98:3 114:19,20
116:5 133:6
250:17
**yesterday**  63:10
**york**  3:14,14 4:9,9

**z**

**zach**  15:15
**zachary**  9:2
**zip**  169:12,13,14
169:19,20
**zmartin**  9:6
**zuckerman**  6:11
**zuckerman.com**
6:13

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.