Page 268

1

2                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF OHIO
3                          EASTERN DIVISION

4

_____

5

IN RE:  NATIONAL PRESCRIPTION      MDL No. 2804
6    OPIATE LITIGATION                  Case No. 17-md-2804

7

This document relates to:        Judge Dan
8                                     Aaron Polster
9    The County of Cuyahoga v. Purdue
     Pharma, L.P., et al.
10   Case No. 17-OP-45005
11   City of Cleveland, Ohio vs. Purdue
     Pharma, L.P., et al.
12   Case No. 18-OP-45132
13   The County of Summit, Ohio,
     et al. v. Purdue Pharma, L.P.,
14   et al.
     Case No. 18-OP-45090
15   _____
16

17

18                          VOLUME II
19        Videotaped Deposition of Kyle J. Wright
20                     Washington, D.C.
21                      March 4, 2019
22                        9:09 a.m.
23

24   Reported by:  Bonnie L. Russo
25   Job No. 3249543

Page 269

```
 1    Videotaped Deposition of Kyle J. Wright held
 2    at:
 3
 4
 5
 6
 7              Williams & Connolly, LLP
 8              725 12th Street, N.W.
 9              Washington, D.C.
10
11
12    Pursuant to Notice, when were present on behalf
13    of the respective parties:
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 271

```
 1    APPEARANCES (CONTINUED):
 2    On behalf of Purdue Pharma, L.P.
      DEBRA D. O'GORMAN, ESQ.
 3    DECHERT, LLP
      Three Bryant Park
 4    1095 Avenue of the Americas
      New York, New York 10036
 5    212-698-3593
      debra.ogorman@dechert.com
 6
 7    On behalf of Johnson & Johnson and Janssen
      Pharmaceuticals, Inc.
 8    JEFFREY A. BARKER, ESQ.
      O'MELVENY & MYERS, LLP
 9    610 Newport Center Drive, 17th Floor
      Newport Beach, California 92660
10    949-823-7963
      jbarker@omm.com
11       -and-
      RAYMOND KRNCEVIC, ESQ.
12    (Via Teleconference)
      TUCKER ELLIS, LLP
13    950 Main Avenue
      Suite 1100
14    Cleveland, Ohio 44113
      216-592-5000
15    raymond.krncevic@tuckerellis.com
16
      On behalf of Walmart, Inc.
17    NEAL J. STEPHENS, ESQ.
      JONES DAY
18    1755 Embarcadero Road
      Palo Alto, California 94303
19    650-739-3939
      nstephens@jonesday
20       -and-
      PATRICK J. BEISELL, ESQ.
21    (By Teleconference)
      JONES DAY
22    77 West Wacker
      Chicago, Illinois 60601
23    312-269-4066
      pbeisell@jonesday.com
24
25
```

Page 270

```
 1    APPEARANCES:
 2
      On behalf of the Witness:
 3    DAVID LEE TAYMAN, ESQ.
      TAYMAN LANE CHAVERRI, LLP
 4    1875 Eye Street, N.W.
      Fifth Floor
 5    Washington, D.C. 20006
      202-695-8147
 6    dtayman@tlclawfirm.com
 7    On behalf of the U.S. Department of Justice:
      JAMES R. BENNETT, II, ESQ.
 8    UNITED STATES ATTORNEY'S OFFICE
      801 West Superior Avenue
 9    Suite 400
      Cleveland, Ohio 44113
10    216-622-3988
      james.bennett4@usdoj.gov
11
12    On behalf of Cuyahoga County:
      HUNTER J. SHKOLNIK, ESQ.
13    NAPOLI SHKOLNIK, PLLC
      360 Lexington Avenue, 11th Floor
14    New York, New York 10017
      212-397-1000
15    sshkolnik@napolilaw.com
16    On behalf of Summit County:
      DONALD A. MIGLIORI, ESQ.
17    KAITLYN EEKHOFF, ESQ.
      MOTLEY RICE, LLC
18    28 Bridgeside Boulevard
      Mt. Pleasant, South Carolina 29464
19    843-216-9241
      dmigliori@motleyrice.com
20    keekhoff@motleyrice.com
21    On behalf of Plaintiffs:
      PAUL FARRELL, JR., ESQ.
22    (Via Teleconference)
      GREENE KETCHUM BAILEY FARRELL & TWEEL, LLP
23    419 11th Street
      Huntington, West Virginia 25701
24    304-525-9115
25
```

Page 272

```
 1    APPEARANCES (CONTINUED):
 2    On behalf of Par Pharmaceuticals:
      AMY M. VANNI, ESQ.
 3    McCARTER & ENGLISH
      1600 Market Street, Suite 3900
 4    Philadelphia, Pennsylvania 19103
      215-979-3848
 5    avanni@mccarter.com
 6
      On behalf of Cardinal Health, Inc.:
 7    ENU MAINIGI, ESQ.
      COLLEEN McNAMARA, ESQ.
 8    JENNIFER WICHT, ESQ.
      BRAD MASTERS, ESQ.
 9    WILLIAMS & CONNOLLY, LLP
      725 12th Street, N.W.
10    Washington, D.C. 20005
      202-434-5000
11    emainigi@wc.com
      cmcnamara@wc.com
12    jwicht@wc.com
      bmasters@wc.com
13
14    On behalf of CVS Indiana, LLC and CVS Rx
      Services, Inc.:
15    ANTHONY M. RUIZ, ESQ.
      ZUCKERMAN SPAEDER, LLP
16    1800 M Street, N.W.
      Suite 1000
17    Washington D.C. 20036
      202-778-1800
18    aruiz@zuckerman.com
19
      On behalf of AmerisourceBergen Drug
20    Corporation:
      SHANNON McCLURE, ESQ.
21    REED SMITH, LLP
      Three Logan Square, Suite 3100
22    1717 Arch Street
      Philadelphia, Pennsylvania 19103
23    215-241-7910
      smclure@reedsmith.com
24
25
```

2 (Pages 269 - 272)

Page 273

```
1   APPEARANCES (CONTINUED):
2   On behalf of Henry Schein, Inc.:
    BRANDAN MONTMINY, ESQ.
3   (By Teleconference)
    LOCKE LORD, LLP
4   2200 Ross Avenue
    Suite 2800
5   Dallas, Texas 75201
    214-740-8554
6   brandan.montminy@lockelord.com
7
    On behalf of McKesson Corporation:
8   GEOFFREY E. HOBART, ESQ.
    ANDREW STANNER, ESQ.
9   MEGHAN MONAGHAN, ESQ.
    COVINGTON & BURLING, LLP
10  One CityCenter
    850 Tenth Street, N.W.
11  Washington, D.C. 20001
    202-662-6000
12  ghobart@cov.com
    astanner@cov.com
13  mmonaghan@cov.com
        -and-
14  CHRISTOPHER K. EPPICH, ESQ.
    COVINGTON & BURLING, LLP
15  1999 Avenue of the Stars
    Los Angeles, California 90067
16  424-332-4764
    ceppich@cov.com
17
18  On behalf of Allergan Finance, LLC:
    JENNIFER LEVY, ESQ.
19  CATIE VENTURA, ESQ.
    KIRKLAND & ELLIS, LLP
20  655 Fifteenth Street, N.W.
    Washington, D.C. 20005
21  202-879-5907
    jennifer.levy@kirkland.com
22  catie.ventura@kirkland.com
23
24
25
```

Page 275

```
1   ALSO PRESENT:
    David Cohen, Special Master
2   Renee A. Bacchus, Esq., United States
    Department of Justice, United States Attorney's
3   Office
    Robert E. Chandler, Esq., United States
4   Department of Justice, Civil Division
    David M. Finkelstein, Esq., United States
5   Department of Justice, Civil Fraud Section
    Mariama C. Spears, Esq., United States
6   Department of Justice, Drug Enforcement
    Administration
7   Natalie A. Waites, United States Department of
    Justice, Civil Fraud Section
8   Chelsea Thompson, Napoli Shkolnik, PLLC
    Jodie Klockenga, Napoli Shkolnik, PLLC (Via
9   Teleconference)
    Mike Fuller, Motley Rice
10  Daniel Russo, Videographer
    Solomon Francis, IT Specialist
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 274

```
1   APPEARANCES (CONTINUED):
2   On behalf of Mallinckrodt and Spec Gx, LLC:
    ANDREW O'CONNOR, ESQ.
3   WILLIAM DAVISON, ESQ.
    ROPES & GRAY, LLP
4   Prudential Tower
    800 Boylston Street
5   Boston, Massachusetts 02199
    617-951-7000
6   andrew.o'connor@ropesgray.com
    william.davison@ropesgray.com
7
    On behalf of H.D. SMITH:
8   WILLIAM E. PADGETT, ESQ.
    BARNES & THORNBURG, LLP
9   11 South Meridian Street
    Indianapolis, Indiana 46204
10  317-236-1313
    william.padgett@btlaw.com
11
    On behalf of HBC:
12  ROBERT M. BARNES, ESQ.
    (Via Teleconference)
13  MARCUS & SHAPIRA, LLP
    One Oxford Centre, 35th Floor
14  301 Grant Street
    Pittsburgh, Pennsylvania 15219
15  412-338-5224
    rbarnes@marcus-shapira.com
16
    On behalf of Walgreen Co. and Walgreen Eastern
17  Co., Inc.:
    LESTER C. HOUTZ, ESQ.
18  BARTLIT BECK, LLP
    1801 Wewatta Street
19  Suite 1200
    Denver, Colorado 80202
20  303-592-3197
    lester.houtz@bartlitbeck.com
21
    On behalf of Prescription Supply, Inc.
22  ZACHARY MARTIN, ESQ.
    (Via Teleconference)
23  FOX ROTHSCHILD, LLP
    Stone Manor Corporate Center
24  2700 Kelly Road, Suite 300
    Warrington, Pennsylvania 18976
25  215-918-3680
    zmartin@foxrothschild.com
```

Page 276

```
1              C O N T E N T S
2   EXAMINATION OF KYLE J. SMITH           PAGE
3   BY MR. MIGLIORI                  278
4   BY MR. SHKOLNIK                  383
5   BY MS. MAINIGI                   478
6   BY MR. EPPICH                    535
7
8           EXHIBITS
9   Exhibit 30  Letter dated 9-27-06     322
    CAH_MDL_PRIORPROD_DEA07_00837645-648
10
    Exhibit 31  Letter dated 12-27-07    343
11  CAH_MDL_PRIORPROD_DEA07_01053067-068
12  Exhibit 32  Draft Summary of the     356
    HDMA DEA Meeting
13  October 16 and 17, 2007
    HDS-MDL-00622468-472
14
    Exhibit 33  Effective Controls Against  362
15  Diversion of Controlled
    Substances
16  10-16-07
    ECAH_001_000454261-320
17
    Exhibit 34  Industry Compliance     370
18  Guidelines
    CAH_MDL2804_00988458-472
19
    Exhibit 35  Drug Enforcement        386
20  Administration's Office of
    Diversion Control
21  CAH 019076-120
22  Exhibit 36  Claimant's Request for   401
    Production of Documents to
23  Plaintiff
    HDS_MDL_00002032-2045
24
    Exhibit 37  NWDA Suspicious Order    415
25  Monitoring System
    CAH_MDL2804_01465723-734
```

3 (Pages 273 - 276)

Page 277

1  EXHIBITS (CONTINUED):
2  Exhibit 38  Request Number 03-1134-F      429
        CAH_MDL2804_02203353-357
3
   Exhibit 39  Chemical Handler's Manual    437
4        January 2004
        WAGMDL00395965-033
5
   Exhibit 40  Letter date stamped 9-4-08   442
6        US-DEA-00005987-6045
7  Exhibit 41  Inventory Data               459
        License Agreement
8        TEVA_MDL_A_03448408-418
9  Exhibit 42  Inventory Data               467
        License Agreement
10       PPLPC004000320062-072
11 Exhibit 43  First Amendment              472
        Inventory Data License
12       Agreement
        PPLPC034001042114-115
13
   Exhibit 44  IMS Health Data              473
14       Sharing Agreement
        PPLPC031001277089-092
15
   Exhibit 45  (SKIPPED)
16
   Exhibit 46  21 U.S.C.A. Section 823      495
17
   Exhibit 47  21 C.F.R. Section 1301.74    495
18
   Exhibit 48  United States vs.            527
19       $463,497.72
        Opinion
20
   Exhibit 49  ARCOS                        539
21       Automation of Reports and
        Consolidated Orders System
22
   Exhibit 50  (SKIPPED)
23
   Exhibit 51  E-Mail Chain                 551
24       dated 8-14-08
        MCK_WVA_000088-89
25
   (Exhibits included with transcript.)

Page 278

1           P R O C E E D I N G S
2
3          THE VIDEOGRAPHER:  Good morning.
4      We going on the record at 9:09 a.m.
5  on March 4th, 2019.
6          This begins Media Unit No. 1, Volume
7  II, of the continued recorded video deposition
8  of Kyle Wright.
9          We are now on the record.
10         You may proceed, Counsel.
11         MR. MIGLIORI:  Thank you.
12     EXAMINATION BY COUNSEL FOR SUMMIT COUNTY
13             PLAINTIFFS
14     BY MR. MIGLIORI:
15 Q.   Good morning.
16 A.   Good morning.
17 Q.   My name is Don Migliori.  I'm here
18 on behalf of Summit County and -- and the
19 plaintiffs generally in the multidistrict
20 litigation.
21     With me is Hunter Shkolnik.
22 A.   Morning.
23 Q.   This morning we'll be asking you
24 some questions as a follow-up to our day
25 together on Thursday.  Okay?

Page 279

1  A.   Okay.
2  Q.   Before we get started, do you have
3  any questions or concerns, anything we need to
4  know about?
5  A.   No.
6  Q.   Okay.  Sir, could you tell us again
7  what you were doing from 1995 to 2005 at DEA.
8  A.   I was a diversion investigator
9  assigned to the Dallas field division.  I
10 covered a myriad of assignments and
11 investigations, basically culminating in -- in
12 two facets:  the methamphetamine problem along
13 the Texas-Oklahoma border, and actually I was
14 engaged in an Internet investigation just prior
15 to being transferred to D.C.
16 Q.   Okay.  And that Internet
17 investigation what -- what type of
18 investigation was that?
19 A.   It was a -- a Internet Hydrocodone
20 investigation.
21 Q.   Was it specific to the field where
22 you were located in Dallas, or was it outside
23 of the Dallas area?
24 A.   The actual pharmacies were located
25 within the jurisdictional or operational area

Page 280

1  of the Dallas field division with ties to other
2  areas of the country.
3  Q.   So fair to say that, from 1995 when
4  you first started at the DEA through 2005, you
5  had no responsibilities with respect to the
6  drug enforcement agency headquarter operations?
7  A.   That would be correct.
8  Q.   And while you were in the Dallas
9  field office, primarily your responsibilities
10 involved investigations relative to
11 methamphetamines and pseudoephedrine, correct?
12         MS. McCLURE:  Objection.  Misstates
13 the witness's testimony.
14         BY MR. MIGLIORI:
15 Q.   Go ahead.  You an answer.
16 A.   That would be correct.
17 Q.   Okay.  So as you know, counsel
18 showed you the notice of deposition for today
19 and then also showed you Exhibit No. 2.
20         Do you have the exhibit book in
21 front of you?
22 A.   Yes, sir.
23 Q.   So I'm going to project on the
24 screen what we're talking about.  But you have
25 it in front of you.  And if you have any

4 (Pages 277 - 280)

Page 281

1  questions or if not sure where I'm referring
2  to, please -- please just let me know.
3      Exhibit 2, as was explained to you,
4  is the authorization for you to testify here
5  today.
6      Do you understand that?
7      A.  Yes, sir.
8      Q.  And that authorization was provided
9  by the United States Department of Justice.
10  And the purpose of that authorization is to
11  identify five areas where you are, in fact,
12  authorized to give testimony for this case.
13      Do you see that?
14      A.  Yes, sir.
15      Q.  And we'll go through those in a
16  minute.
17      But on the second page is a list of
18  the areas that you are not authorized to speak
19  on, and it's letter A through M.
20      Do you see that?
21      A.  Yes, sir.
22      Q.  Okay.  So just for context, I want
23  to make sure that we're clear of why you're
24  here and what you're allowed to speak on based
25  on your authorization from the Department of

Page 282

1  Justice.  Okay?
2      MS. MAINIGI:  Objection.
3      THE WITNESS:  Yes, sir.
4      BY MR. MIGLIORI:
5      Q.  The first area that you're
6  authorized to speak about is your general
7  employment history with the DEA.
8      You have already given us a pretty
9  complete description of your general employment
10  history with the DEA, correct?
11      A.  Yes, sir.
12      Q.  And that started in 1995, and you
13  retired in 2017; is that correct?
14      A.  Yes, sir.
15      Q.  And you're currently retired and
16  have been for approximately two years, correct?
17      A.  Yes, sir.
18      Q.  All right.  The second area you're
19  authorized to speak on is your general duties
20  in your various positions held in the DEA.
21      Do you feel like you've given us a
22  general -- I think the word was used several
23  times -- high-level description of your various
24  positions held at the DEA?
25      MS. MAINIGI:  Objection.  Form.

Page 283

1      THE WITNESS:  Yes, sir.
2      BY MR. MIGLIORI:
3      Q.  Okay.  The third is your personal
4  recollection of practices and procedures
5  relating to ARCOS data and suspicious order
6  reports.
7      MR. BENNETT:  Objection.  I think
8  you missed a word.  You said "your."  You -- I
9  think you didn't tell him "your practices and
10  procedures."
11      MR. MIGLIORI:  Okay.  There are two
12  yours in there.  I'll repeat it.
13      MR. BENNETT:  Correct.
14      BY MR. MIGLIORI:
15      Q.  Your personal recollection of your
16  practices and procedures relating to ARCOS data
17  and suspicious order reports.
18      Do you understand that that's and
19  that has been your authorization to speak here
20  today and -- last week?
21      MS. MAINIGI:  Objection.  Form.
22      THE WITNESS:  Yes, sir.
23      BY MR. MIGLIORI:
24      Q.  And -- and the reason I'm asking is,
25  when you are giving your testimony in this

Page 284

1  case, you understand that you're here giving us
2  your factual background and experience with the
3  DEA based on this position.
4      Did you understand that?
5      MS. MAINIGI:  Objection.
6      MS. McCLURE:  Objection.
7      THE WITNESS:  Yes, sir.
8      BY MR. MIGLIORI:
9      Q.  And that you weren't here speaking
10  for the G -- the DEA across the board as an
11  official representative of the DEA today.
12      You understood that, correct?
13      MS. MAINIGI:  Objection.
14      THE WITNESS:  Yes, sir.
15      BY MR. MIGLIORI:
16      Q.  And you weren't authorized to speak
17  on behalf of the DEA for the years that you
18  were employed at the DEA; that is you were
19  limited to your personal recollection of your
20  practices.
21      Did you understand that?
22      MS. MAINIGI:  Objection.
23      THE WITNESS:  Yes, sir.
24      BY MR. MIGLIORI:
25      Q.  The fourth area where you've been

5 (Pages 281 - 284)

Page 285

1  authorized to speak is your personal
2  recollection of your interaction with
3  registrants when a distributor terminated its
4  relationship with a customer due to the risk of
5  division -- diversion.
6      When speaking about that topic, that
7  is the termination of a distributor in
8  relationship to a customer, you understood that
9  any testimony that you provided last week or
10  will provide today is your personal your
11  personal relect -- interact -- strike -- your
12  personal recollection of your interactions.
13      Do you understand and appreciate
14  that limitation?
15      MS. MAINIGI:  Objection.
16      THE WITNESS:  Yes, sir.
17      BY MR. MIGLIORI:
18      Q.   And the final area that the
19  Department of Justice has authorized you to
20  give testimony in this case is your personal
21  recollection regarding DEA's interpretation of
22  enforcement of and practices relating to 21 USC
23  823 and 21 CFR 1301.74 to the extent covered by
24  the foregoing authorized specific topics.
25      Did you understand that, whenever

Page 286

1  you spoke about the DEA's interpretation of the
2  obligations under the Controlled Substances
3  Act, that you were giving your personal
4  recollection of the DEA's interpretation?
5      MS. MAINIGI:  Objection.
6      THE WITNESS:  Yes, sir.
7      BY MR. MIGLIORI:
8      Q.   The defendants in this case have
9  noticed the depositions of Mr. Rannazzisi.
10      Just for purposes of -- of clarity,
11  what was Mr. Rannazzisi's role in relationship
12  to you in the years you were in the DEA?
13      A.   Mr. Rannazzisi was the deputy
14  assistant administrator.  And he was about
15  three to four tiers above myself and
16  supervisor.
17      Q.   Okay.  So you reported directly to
18  him, or did you report to him through
19  Mr. Mapes?
20      MS. McCLURE:  Objection.  Form.
21      THE WITNESS:  I would have reported
22  to him through Mr. Mapes.
23      BY MR. MIGLIORI:
24      Q.   Okay.  And so, to the extent that
25  Mr. Rannazzisi has testimony that's related to

Page 287

1  these topics that we've -- we've identified
2  here, he would have a position, at least
3  relative these -- to these topics, as you said,
4  three or four tears higher than you in the flow
5  chart within DEA headquarters, correct?
6      MS. MAINIGI:  Objection.
7      THE WITNESS:  That would be correct.
8      BY MR. MIGLIORI:
9      Q.   The same for Mr. Mapes; Mr. Mapes
10  was your direct supervisor, correct?
11      A.   Yes, sir.
12      Q.   And to the extent that Mr. Mapes may
13  testify in this case, he would have his own
14  authority under this process to testify, and he
15  would be above you in terms of role and
16  responsibility in the area of distributor
17  initiative and briefing, correct?
18      MS. MAINIGI:  Objection.
19      THE WITNESS:  I apologize.  I got a
20  little lost in that question.
21      MR. MIGLIORI:  I may have too.  I'll
22  start over.
23      BY MR. MIGLIORI:
24      Q.   Mr. Mapes was your direct
25  supervisor, correct?

Page 288

1      A.   Yes, sir.
2      Q.   All right.  And to the extent that
3  he is speaking on these topics that we've
4  enumerated, he would be the person above you,
5  that is a decision maker above you, on these
6  topics, correct --
7      MS. MAINIGI:  Objection.
8      BY MR. MIGLIORI:
9      Q.   -- during the relevant years?
10      MS. MAINIGI:  Excuse me.
11      Objection.
12      THE WITNESS:  Yes, sir.
13      BY MR. MIGLIORI:
14      Q.   Okay.  Now, the Justice Department
15  in Exhibit 2 specifically said there is some
16  thing that you are not authorized to talk
17  about.  That's on Page 2 of -- of Exhibit 2
18  introduced by defense counsel Thursday.  And
19  I'll just go through some of them.
20      You are not authorized and have not
21  testified here about information regarding any
22  specific DEA investigation or activity,
23  correct?
24      MS. MAINIGI:  Objection.
25      MS. McCLURE:  Objection.

6 (Pages 285 - 288)

Page 289

1        THE WITNESS:  Correct.
2        BY MR. MIGLIORI:
3    Q.    And you are not authorized and you
4    weren't giving any testimony in this case
5    relative to classified and classifiable
6    information that you may have encountered while
7    at the DEA, correct?
8        MS. MAINIGI:  Objection.
9        THE WITNESS:  Correct.
10        BY MR. MIGLIORI:
11    Q.    You are not authorized and you are
12    not speaking in this deposition as to
13    information that would reveal the internal
14    deliberative process within the United States
15    Department of Justice, including the DEA, the
16    United States Attorney's Off -- U.S. Attorney's
17    Office and/or any federal departments or
18    agencies, correct?
19        MS. MAINIGI:  Objection.
20        THE WITNESS:  Correct.
21        BY MR. MIGLIORI:
22    Q.    You are not authorized and you did
23    not testify on Thursday and will not testify
24    today about any information that could reveal
25    investigative or intelligence gathering and

Page 290

1    dissemination techniques whose effectiveness
2    would thereby be impaired, correct?
3        MS. MAINIGI:  Objection.
4        MR. MIGLIORI:  Letter H.
5        THE WITNESS:  Correct.
6        BY MR. MIGLIORI:
7    Q.    You are not authorized and you are
8    not giving any expert testimony related to the
9    nonpublic facts or information acquired as part
10    of your performance of your official duties at
11    the DEA, correct?
12        MS. MAINIGI:  Objection.
13        THE WITNESS:  Correct.
14        BY MR. MIGLIORI:
15    Q.    You are not authorized and you are
16    not going to offer any personal opinions
17    regarding nonpublic facts or information
18    acquired as part of your performance of your
19    official duties, correct?
20        MS. MAINIGI:  Objection.
21        THE WITNESS:  Correct.
22        BY MR. MIGLIORI:
23    Q.    And finally, you are not authorized
24    you did not speak and you will not speak on any
25    nonpublic recommendations you made or you are

Page 291

1    aware of concerning any proposed agency action,
2    correct?
3        MS. MAINIGI:  Objection.
4        THE WITNESS:  Correct.
5        BY MR. MIGLIORI:
6    Q.    I know it may seem a little tedious,
7    but counsel showed this to you without going
8    through those elements.  And so I just want to
9    make sure we understand.
10        You're here to tell us your
11    experience at the DEA, correct?
12        MS. MAINIGI:  Objection.
13        MR. STEPHENS:  Object to form.
14        (Reporter clarification.)
15        MR. MIGLIORI:  I'll repeat the --
16    what we said off the record last time.  We're
17    -- I'll accept one objection as for everybody,
18    unless there's some other reason to make the
19    court reporter crazy.
20        THE WITNESS:  Yes, sir.
21        BY MR. MIGLIORI:
22    Q.    All right.  So when counsel last
23    week asked you questions about your impressions
24    of what was right or what was wrong or what was
25    blessed or not blessed, those were your

Page 292

1    recollections of your interpretations of what
2    happened in the past, correct?
3        MS. MAINIGI:  Objection.
4        THE WITNESS:  Yes, sir.
5        BY MR. MIGLIORI:
6    Q.    And so the defendants have noticed
7    what's called a 30(b)(6) witness.  That is
8    they've actually sent out a notice asking the
9    government to produce the person to speak on
10    behalf of the Drug Enforcement Agency in this
11    litigation.
12        To date have you been asked to serve
13    as that person that will speak on behalf of the
14    DEA in a 30(b)(6) deposition?
15        MS. MAINIGI:  Objection to form.
16        MR. BENNETT:  And objection to the
17    extent that it calls for any communications
18    with counsel, either the general counsel's
19    office at DEA or the Department of Justice.
20        But otherwise you can answer.
21        THE WITNESS:  God, I hope not.
22        BY MR. MIGLIORI:
23    Q.    Okay.  And, in fact, we believe that
24    there is somebody else designated to speak on
25    behalf of the Drug Enforcement Agency in that

7 (Pages 289 - 292)

Page 293

1  capacity.
2      But as you sit here today, you have
3  not -- you don't have any understanding that
4  that is a role that you're supposed to be
5  playing, correct?
6      MS. MAINIGI: Objection.
7      Don, I don't know if you need to
8  have a running commentary about what's
9  happening as part of your questioning.
10     MR. MIGLIORI: Okay. That's -- I
11 got your objection. You can -- you can note
12 that.
13     THE WITNESS: Yes, sir.
14     MR. MIGLIORI: All right.
15     BY MR. MIGLIORI:
16 Q.  So we're here about the role that
17 you did play and your recollection of the role
18 that you played primarily with respect to the
19 period of time from 2005 on at the DEA.
20     In 2000 --
21     MS. McCLURE: Objection to the
22 commentary for the record.
23     MS. MAINIGI: Is -- is that -- was
24 that a question? And are you starting another
25 question?

Page 294

1      MR. MIGLIORI: No. I'm about to go
2  into the question.
3      Are we going to do this the whole
4  thing?
5      You can -- you can put it --
6  anything you want on the record, and we can
7  argue about it later.
8      MS. MAINIGI: Well, we may have to
9  call the special master and argue about it now.
10     But go ahead.
11     MR. MIGLIORI: That's -- that's not
12 how this works.
13     MS. MAINIGI: Well, I think it is.
14     BY MR. MIGLIORI:
15 Q.  In 2005 you started in Washington,
16 D.C., correct?
17 A.  Correct.
18 Q.  Everything that you've testified to
19 prior to 2005 is based on information that you
20 would have learned from others about the
21 history of the diversion program in Washington,
22 D.C., correct?
23     MS. MAINIGI: Objection. Form.
24 Misstates his testimony. His testimony speaks
25 for itself.

Page 295

1      MR. MIGLIORI: Go ahead.
2      THE WITNESS: Yes, sir.
3      BY MR. MIGLIORI:
4  Q.  All right. So counsel showed you
5  some PowerPoints.
6      And in 2005 -- this is Exhibit No.
7  10 -- you testified to having participated --
8      MR. BENNETT: Counsel, can we let
9  him find it --
10     MR. MIGLIORI: Sure.
11     MR. BENNETT: -- find it. It's not
12 in the book.
13     MR. MIGLIORI: Oh, I apologize.
14     MR. BENNETT: Did you find it?
15     BY MR. MIGLIORI:
16 Q.  Do you have it?
17 A.  Exhibit No. 10.
18 Q.  Okay. Counsel showed you Exhibit
19 No. 10, which on the cover of the PowerPoint
20 attachment says the Internet Pharmacy Data
21 Meeting with the Amerisource --
22 AmerisourceBergen DEA headquarters, August
23 10th, 2005.
24     Are we on the same page?
25 A.  Same as displayed?

Page 296

1  Q.  Yes.
2  A.  Okay. Yes, sir.
3  Q.  All right. Now, this is a
4  PowerPoint that you helped put together for
5  purposes of distributor briefings, correct?
6      Was that your testimony?
7      MS. McCLURE: Objection. Asked and
8  answered.
9      THE WITNESS: Correct.
10     BY MR. MIGLIORI:
11 Q.  Counsel didn't go through with you
12 all of the pages. So I want to take some time
13 to do that now. Okay?
14     There was testimony that these were
15 -- that there were concerns at this time in
16 2005 about Internet pharmacies, correct?
17 A.  Correct.
18     MS. MAINIGI: Correct.
19     BY MR. MIGLIORI:
20 Q.  But Internet pharmacies were not the
21 only concern you had in 2005, was it?
22     MS. MAINIGI: Objection. Misstates
23 his testimony.
24     THE WITNESS: No.
25     BY MR. MIGLIORI:

8 (Pages 293 - 296)

Page 297

1     Q.   What other concerns in 2005 did you
2 have relative to the Controlled Substances Act
3 and the registrants when you were doing these
4 briefings?
5       MS. MAINIGI: Objection.
6       THE WITNESS: I'll try to say it in
7 a nutshell: to maintain, oversee and protect
8 the closed system of distribution at all
9 levels.
10       BY MR. MIGLIORI:
11     Q.   Was that the role of the Drug
12 Enforcement Agency, as you understood it in
13 your experience?
14     A.   Yes, sir.
15       MS. MAINIGI: Objection.
16       BY MR. MIGLIORI:
17     Q.   And, in fact, this PowerPoint
18 presentation has some general slides that
19 relates to that mission, correct?
20       MS. MAINIGI: Objection. The
21 document speaks for itself.
22       THE WITNESS: Correct.
23       BY MR. MIGLIORI:
24     Q.   I want to show you the slide that
25 says "Issues to Consider."

Page 298

1       Did you help prepare this slide?
2     A.   Correct.
3     Q.   What does this slide represent?
4     A.   From past cases, experiences,
5 issues. This -- these -- these are items that
6 could be encountered, not inclusive, not every
7 one of them. But they are some items to look
8 at conducting your business from distributor to
9 pharmacy or practitioner. There could be tails
10 that there might be some amiss or awry.
11     Q.   Does this only apply to Internet
12 sales?
13       MS. MAINIGI: Objection.
14       THE WITNESS: Absolutely not.
15       BY MR. MIGLIORI:
16     Q.   So when you have issues to consider,
17 like the frequency of order or size of order or
18 range of products purchased, were those applied
19 to the more traditional relationship of
20 distributor to pharmacy?
21       MS. MAINIGI: Objection.
22       THE WITNESS: They absolutely could.
23       BY MR. MIGLIORI:
24     Q.   Do they apply to the relationship
25 between a distributor and a chain retail

Page 299

1 pharmacy?
2       MS. MAINIGI: Objection.
3       THE WITNESS: They could.
4       BY MR. MIGLIORI:
5     Q.   Do they apply to all registrants in
6 the closed system of distribution for
7 controlled substances?
8       MS. MAINIGI: Objection.
9       THE WITNESS: Yes, sir, they could.
10       BY MR. MIGLIORI:
11     Q.   What's the importance of looking at
12 things like the payment method?
13       Why is that important?
14       MS. McCLURE: Objection.
15       THE WITNESS: I'm sorry. I didn't
16 hear the --
17       BY MR. MIGLIORI:
18     Q.   Why would looking at the payment
19 method be an important issue to consider as an
20 example?
21       MS. MAINIGI: Objection.
22       THE WITNESS: Most people at this
23 time were covered by insurance. And when
24 insurance -- insurances, in our experience,
25 felt that if they were paying too frequently,

Page 300

1 they wouldn't authorize payment. A reflection
2 of addiction is to pay cash.
3       BY MR. MIGLIORI:
4     Q.   Is there a term for that kind of
5 issue?
6       MS. MAINIGI: Objection.
7       BY MR. MIGLIORI:
8     Q.   In the DEA is that referred to as
9 a -- a red flag?
10       MS. MAINIGI: Objection.
11       MS. McCLURE: Objection.
12       THE WITNESS: I said "tails." You
13 could say red flag, yes.
14       BY MR. MIGLIORI:
15     Q.   Okay. What about percentage of
16 controlled to noncontrolled substances; why is
17 that important?
18       MS. McCLURE: Objection.
19       THE WITNESS: We had some
20 benchmarks. And I -- truly a benchmark, there
21 are variables in those -- in those benchmarks.
22 But the amount of controlled versus
23 noncontrolled, noncontrolled products would be
24 like your geriatric product, your diabetes,
25 your heart medications. All those things

9 (Pages 297 - 300)

Page 301

1 constituted a greater bulk of business, in our
2 experience and observations, as compared to
3 controlled substances.
4 　　　If there was a outside of that
5 pattern, look at it, see if it -- there's some
6 justification to it.  There potentially could
7 be.  But it's a tail or a red flag.
8 　　　BY MR. MIGLIORI:
9 　　Q.　Were these tails or red flags
10 understood and appreciated at the time of this
11 presentation?
12 　　　That is, in your experience, was
13 this something that was appreciated in the
14 industry?
15 　　　MR. STEPHENS:  Objection.
16 　　　MS. MAINIGI:  Objection to form.  No
17 foundation.
18 　　　THE WITNESS:  In my interchange with
19 them doing these briefings, yes.
20 　　　BY MR. MIGLIORI:
21 　　Q.　Were these red flags or tails
22 appreciated when you started in 1995 in dealing
23 with field investigations for pseudoephedrine
24 and methamphetamines?
25 　　　MS. MAINIGI:  Objection to form.

Page 302

1 　　　MR. STEPHENS:  Objection.
2 　　　THE WITNESS:  Yes, sir.
3 　　　BY MR. MIGLIORI:
4 　　Q.　These weren't new issues in 2005
5 when you're giving these briefings, were they?
6 　　　MS. MAINIGI:  Objection.
7 　　　THE WITNESS:  No, sir.
8 　　　BY MR. MIGLIORI:
9 　　Q.　And these weren't limited to
10 Internet sales, were they?
11 　　　MS. MAINIGI:  Objection.
12 　　　THE WITNESS:  Yes, sir -- no.  I'm
13 sorry.  No, they were not limited to just
14 Internet.
15 　　　BY MR. MIGLIORI:
16 　　Q.　The next page -- I don't think you
17 saw this last week either.  It says "DEA
18 Distributor Registrations" and gives the
19 citation.
20 　　　And then it says:  "Is a
21 registration in the public interest?
22 Maintenance of effective controls against
23 diversion of particular controlled substances
24 into other than legitimate medical channels."
25 　　　Is that part of the purpose for the

Page 303

1 Controlled Substances Act, as you understood it
2 in your experience?
3 　　　MS. MAINIGI:  Objection.
4 　　　THE WITNESS:  Absolutely.
5 　　　BY MR. MIGLIORI:
6 　　Q.　And was that true when the Act was
7 enacted in the early 1970s?
8 　　　MS. MAINIGI:  Objection.
9 　　　THE WITNESS:  Yes, sir.
10 　　　BY MR. MIGLIORI:
11 　　Q.　Was it certainly true as of the time
12 that you started at the DEA in 1995?
13 　　　MS. MAINIGI:  Objection.
14 　　　THE WITNESS:  Yes, sir.
15 　　　BY MR. MIGLIORI:
16 　　Q.　You give some examples of cases,
17 supreme court cases and others, that relate to
18 Internet pharmacies.  And then you have a
19 section in your PowerPoint presentation.  This
20 is your August -- again, your August 2005
21 distributor briefing.  And here you have a
22 slide that says "Suspicious Orders."
23 　　　Can you read that?
24 　　　MS. MAINIGI:  Objection.
25 　　　MR. MIGLIORI:  I'm sorry.  They're

Page 304

1 not numbered.
2 　　　THE WITNESS:  You want me to read
3 this?
4 　　　MR. MIGLIORI:  If you don't mind.
5 　　　THE WITNESS:  Reporting a suspicious
6 order to DEA does not, emphasis on not, relieve
7 the distributor of the responsibility to
8 maintain effective controls against diversion.
9 　　　BY MR. MIGLIORI:
10 　　Q.　What's the importance of that?
11 　　　MS. MAINIGI:  Objection.
12 　　　THE WITNESS:  There's
13 accountability.  There's a responsibility not
14 to let -- if you go back to what you said at
15 823, maintain effective controls, medical
16 channels.  Don't let it out there.
17 　　　BY MR. MIGLIORI:
18 　　Q.　Does that only relate to Internet
19 sales?
20 　　　MS. MAINIGI:  Objection.
21 　　　THE WITNESS:  No, sir.
22 　　　BY MR. MIGLIORI:
23 　　Q.　Does that apply to the sale of all
24 controlled substances within the closed system?
25 　　　MS. MAINIGI:  Objection.

10 (Pages 301 - 304)

1     THE WITNESS:  It the covers all
2  controls.
3     BY MR. MIGLIORI:
4     Q.  I'm going to just flash it on the
5  screen now.  We'll get back to it later.  But
6  Exhibit 26, if you remember, counsel gave you
7  what's called an ingredient limit report.
8     Do you remember seeing that
9  document?
10    A.  Yes, sir.
11    Q.  Does submitting that report on a
12  monthly basis satisfy the requirement in this
13  PowerPoint slide that we just read?
14    MS. MAINIGI:  Objection.  Outside of
15  the scope.
16    BY MR. MIGLIORI:
17    Q.  In your experience?
18    MS. MAINIGI:  Objection.  Form.
19  Objection.  Outside of the scope.
20    THE WITNESS:  No, sir.
21    BY MR. MIGLIORI:
22    Q.  Why not?
23    A.  It doesn't tell me what you've done,
24  why you drew this conclusion.  It's just they
25  exceeded a limit.  What does -- what is your

1  limit?  Why did you set that limit?  What is
2  your experience behind that limit?
3     Q.  Is everything in Exhibit 26, the
4  ingredient limit report, in excess of
5  benchmarks?
6     MS. MAINIGI:  Objection.
7     THE WITNESS:  Now that I found the
8  document, could you please repeat the question.
9     BY MR. MIGLIORI:
10    Q.  Sure.  I'm sorry.
11    Is everything that's in this
12  ingredient limit report, Exhibit No. 26, in
13  excess of the set benchmarks?
14    MS. MAINIGI:  Objection.
15    BY MR. MIGLIORI:
16    Q.  Is this an excessive purchase
17  report?
18    MS. MAINIGI:  Objection.
19    THE WITNESS:  This would be an
20  example of what we called Excessive Purchase
21  Reports.
22    BY MR. MIGLIORI:
23    Q.  So the ARCOS data that you got
24  monthly was data of all transactions for the
25  month, correct?

1     MS. MAINIGI:  Objection.
2     THE WITNESS:  Correct.
3     BY MR. MIGLIORI:
4     Q.  This report, Exhibit 26, was just
5  that -- those sales or purchases that were made
6  that were in excess of the benchmarks, correct?
7     MS. MAINIGI:  Object to form.  Lacks
8  foundation.  He said he'd never even seen the
9  report before.
10    THE WITNESS:  I'm sorry, sir.  Could
11  you --
12    MR. MIGLIORI:  Sure.
13    THE WITNESS:  -- restate that
14  question.
15    BY MR. MIGLIORI:
16    Q.  Is Exhibit 26 a subset of the
17  transactions submitted to ARCOS?
18    MS. MAINIGI:  Objection.
19    THE WITNESS:  Yes, sir.
20    BY MR. MIGLIORI:
21    Q.  And by its description, it's the
22  excess purchases over benchmark for the month,
23  correct?
24    MS. MAINIGI:  Objection.
25    MS. McCLURE:  Objection.

1     THE WITNESS:  Correct.
2     BY MR. MIGLIORI:
3     Q.  Are these reported, as you
4  understood it in your experience, at the time
5  that they're discovered?
6     MS. McCLURE:  Objection.
7     MS. MAINIGI:  Objection.  Outside
8  the scope.  And objection to form.
9     BY MR. MIGLIORI:
10    Q.  In your experience.
11    A.  No, sir.
12    MS. McCLURE:  Same objections.
13    MS. MAINIGI:  Same objections.
14    BY MR. MIGLIORI:
15    Q.  For Suspicious Order Reporting, in
16  your experience was it compliant to submit a
17  report on a monthly basis?
18    MS. MAINIGI:  Objection.  Form.
19  Objection foundation.
20    THE WITNESS:  I don't understand the
21  question.  I'm sorry.
22    BY MR. MIGLIORI:
23    Q.  Sure.  I'll -- we'll go to the --
24  I'll show you through the slide.
25    I'll -- I'll strike the question.

11 (Pages 305 - 308)

1       The next slide on the PowerPoint
2   from exhibit -- I think this was 10 -- states:
3   "The basic obligation of the Controlled
4   Substances Act," right, "that a registrant is
5   required to design and operate a system to
6   identify suspicious orders," correct?
7           MS. MAINIGI:  Objection.
8           THE WITNESS:  Correct.
9           BY MR. MIGLIORI:
10    Q.    And the next point on your slide
11  from August of 2005 says:  The -- "Report
12  suspicious orders to DEA when discovered."
13      In your experience, in your history,
14  "when discovered" means what to you?
15          MS. MAINIGI:  Objection.  Form.
16  Objection.  Calls for a legal conclusion.
17          MS. McCLURE:  Objection.  Outside
18  the scope.
19          MR. MIGLIORI:  Go ahead.
20          THE WITNESS:  If you're going --
21  when you just determine that it's suspicious.
22          BY MR. MIGLIORI:
23    Q.    Does that mean gather them
24  and report them on a monthly basis?
25          MS. MAINIGI:  Objection.

1           THE WITNESS:  No, sir.  It says
2   "when discovered."
3           BY MR. MIGLIORI:
4     Q.    On Exhibit 26, counsel referred to
5   this as Excessive Purchase Reports.
6           Are purchases the same as orders?
7           MS. MAINIGI:  Objection.
8           THE WITNESS:  These are consummated
9   or completed sales.  They're gone.  They're
10  done.
11          BY MR. MIGLIORI:
12    Q.    And what's a suspicious order?
13          MS. McCLURE:  Objection.
14          THE WITNESS:  Order is I have
15  submitted a request to you; it's in your hands;
16  you determine to sell it or not, fulfill it or
17  not.  It's an order.
18          BY MR. MIGLIORI:
19    Q.    If an order is determined to be --
20  or suspected to be suspicious, is it to be
21  consummated, to use your term; is the sale to
22  be consummated and sent out the door?
23          MS. MAINIGI:  Objection.
24          BY MR. MIGLIORI:
25    Q.    In your experience?

1           MS. MAINIGI:  Objection.
2           THE WITNESS:  If it is deemed
3   suspicious, you should resolve that suspicion
4   before fulfilling that order.  Because
5   otherwise now you're letting the product go out
6   to do its damage.
7           BY MR. MIGLIORI:
8     Q.    The next slide talks about the DEA
9   cannot tell a distributor if an order is
10  legitimate or not.
11      Do you recall that in your
12  presentation in the distributor briefings?
13    A.    Repeatedly.
14    Q.    Was that true when you first got to
15  the DEA, in your experience, in 1995?
16          MS. MAINIGI:  Objection.
17          THE WITNESS:  Yes, sir.
18          BY MR. MIGLIORI:
19    Q.    Did it remain true through to your
20  retirement in 2017?
21          MS. MAINIGI:  Objection.
22          THE WITNESS:  Yes, sir.
23          BY MR. MIGLIORI:
24    Q.    In your experience, did you express
25  that ever to registrants when asked?

1           MS. MAINIGI:  Objection.
2           THE WITNESS:  Yes, sir.
3           BY MR. MIGLIORI:
4     Q.    Why is that true?
5           MS. MAINIGI:  Objection.
6           THE WITNESS:  They had the
7   registration.  They understand control
8   substances.  They've more fact that than I do
9   in making that decision to fulfill or not
10  fulfill an order.
11      I cannot draw the conclusions that
12  they can.  And I can't bless or run your
13  business.
14          BY MR. MIGLIORI:
15    Q.    What is your understanding, in your
16  experience, of who or in whom the Controlled
17  Substances Act puts that obligation?
18          MS. MAINIGI:  Objection.
19          THE WITNESS:  In these particular
20  areas, the onus of responsibility is upon the
21  industry.
22          BY MR. MIGLIORI:
23    Q.    And the language of the act that's
24  the registrant?
25    A.    Yes, sir.

12 (Pages 309 - 312)

Page 313

1    Q.   And registrants include
2  distributors, correct?
3    A.   Correct.
4    Q.   A registrant includes pharmacies,
5  correct?
6    A.   Correct.
7    Q.   Including chain pharmacies, correct?
8    A.   Correct.
9    Q.   And pharmaceutical manufacturers are
10  also DEA registrants, correct?
11    A.   Correct.
12    Q.   And so these provisions would apply
13  to all of those groups, correct, in your
14  experience and your -- to your understanding?
15        MS. MAINIGI:  Objection.
16        THE WITNESS:  It would apply to all
17  DEA registrants.
18        BY MR. MIGLIORI:
19    Q.   You give some examples of
20  pharmacies, and then you give a summary.  And I
21  want to ask you whether this applies only to
22  Internet sales or to the industry as a whole.
23  Okay?  I'll go through each one.
24        MS. MAINIGI:  Objection.
25        BY MR. MIGLIORI:

Page 314

1    Q.   "Prescriptions not written in the
2  usual course of professional practice are not
3  valid."
4        Does that only apply to Internet
5  sales, or does that apply to all sales within
6  the system?
7        MS. MAINIGI:  Objection.
8        THE WITNESS:  To all sales.
9        BY MR. MIGLIORI:
10    Q.   "Drugs dispensed pursuant to invalid
11  prescriptions are not for legitimate medical
12  purpose.  The drugs are diverted."
13        Is that limited only to Internet
14  sales, or is that industrywide?
15        MS. MAINIGI:  Objection.
16        THE WITNESS:  Across the scope.
17        BY MR. MIGLIORI:
18    Q.   The last bullet says:  "Not limited
19  to Internet pharmacies."
20        Is that -- is that something that --
21  is that a message that you had throughout these
22  distributor briefings?
23        MS. MAINIGI:  Objection.
24        THE WITNESS:  Correct.
25        BY MR. MIGLIORI:

Page 315

1    Q.   The next page of the summary says:
2  "A pattern of drugs being distributed to
3  pharmacies who are diverting controlled
4  substances demonstrates the lack of effective
5  controls against diversion by the distributor."
6        Does that apply only to Internet
7  pharmacies, or was that industrywide?
8        MS. MAINIGI:  Objection.
9        THE WITNESS:  Industrywide.
10        BY MR. MIGLIORI:
11    Q.   "The DEA registration of the
12  distributor could be revoked under public
13  interest grounds."
14        Does that apply only to Internet
15  pharmacies, or does that apply industrywide?
16        MS. MAINIGI:  Objection.
17        THE WITNESS:  Across the board.
18        BY MR. MIGLIORI:
19    Q.   Did you make that clear during these
20  briefings, that it applied across the board?
21        MS. MAINIGI:  Objection.
22        THE WITNESS:  To the best of my
23  recollection, yes.
24        BY MR. MIGLIORI:
25    Q.   Summary says:  "Any distributor

Page 316

1  who's selling controlled substances that are
2  being dispensed outside the course of
3  professional practice must stop immediately."
4        Does that apply to industry or to
5  Internet sales only?
6        MS. MAINIGI:  Objection.
7        THE WITNESS:  To industry.
8        BY MR. MIGLIORI:
9    Q.   "And the DEA cannot guarantee that
10  past failure to maintain effective controls
11  against diversion will not result in action
12  against a distributor."
13        First off, what does that mean?
14    A.   If your practice has had a potential
15  investigation or potential problems of
16  diversion, attending this briefing, becoming
17  knowledgeable, didn't make that go away.
18    Q.   So when you were at these briefings,
19  I think you testified to presenting some
20  information from data in -- from the ARCOS
21  database.
22        Do you recall saying that last week?
23        MS. MAINIGI:  Objection.
24        THE WITNESS:  Yes, sir.
25        BY MR. MIGLIORI:

13 (Pages 313 - 316)

Page 317

1    Q.   And the data that you would look at,
2  was that data provided by that company that was
3  at the briefing?
4        MS. MAINIGI:  Objection.
5        THE WITNESS:  Absolutely.
6        BY MR. MIGLIORI:
7    Q.   So the data you were looking at was
8  whatever that that company was providing to
9  you, that is to the ARCOS database, the origin
10  of it was the -- the registrant, correct?
11        MS. MAINIGI:  Objection.
12        THE WITNESS:  Absolutely.
13        BY MR. MIGLIORI:
14    Q.   And at these briefings, you used
15  some of that data to point out to some of these
16  companies anomalies or tails that suggested
17  concerns that you might have about potential
18  suspicious orders, correct?
19        MS. MAINIGI:  Objection.
20        THE WITNESS:  Correct.
21        BY MR. MIGLIORI:
22    Q.   That wasn't based on, in your
23  experience, reviewing other people's data, was
24  it?
25        MS. MAINIGI:  Objection.

Page 318

1        THE WITNESS:  No, sir.
2        BY MR. MIGLIORI:
3    Q.   And then at -- at least at the end
4  of these slides, it has you and your direct
5  supervisor, Michael Mapes, listed.
6        There were times when Mr. Mapes
7  presented this briefing to registrants or
8  distributors without you, correct?
9    A.   There may have been occasion.  Yes,
10  sir.
11    Q.   And, in fact, I think in Exhibit 12
12  the Cardinal presentation of this information,
13  which counsel showed you, it was Michael Mapes
14  and Vickie Seeger from OD presenting, correct?
15        This was in August 22nd of 2005?
16        That's in the first paragraph here.
17  I'm sorry.  It's right in the middle of the
18  first paragraph.
19    A.   Yes, sir.
20    Q.   Who is Vickie Seeger?
21    A.   She was a -- she was a staff
22  coordinator.  And my recollection is that she
23  worked in liaison and policy.  But I'm not
24  definitive on that.
25    Q.   So what was verbally communicated at

Page 319

1  the meeting, if you were not there, there's no
2  other record of, to your knowledge, correct?
3        MS. MAINIGI:  Objection.
4        THE WITNESS:  No, sir.
5        BY MR. MIGLIORI:
6    Q.   No, that's not correct; or no,
7  you -- you -- you didn't...
8        MS. MAINIGI:  Objection.
9        THE WITNESS:  There would be no
10  other communication.
11        BY MR. MIGLIORI:
12    Q.   All right.  But I think you
13  testified -- well, let me just ask you.
14        To your knowledge, were all of the
15  major distributors provided a briefing in 2005
16  or 2006?
17        MS. MAINIGI:  Objection.
18        MR. STEPHENS:  Object to form.
19        THE WITNESS:  That would have been
20  our priority, yes.
21        BY MR. MIGLIORI:
22    Q.   Did you also send letters to the
23  registrants around this period of time?
24        MS. MAINIGI:  Objection.
25        THE WITNESS:  I don't recall.

Page 320

1        BY MR. MIGLIORI:
2    Q.   Are you familiar with letters that
3  are referred to as dear-registrant letters --
4        MS. MAINIGI:  Objection.
5        BY MR. MIGLIORI:
6    Q.   -- from your supervisor, Joe
7  Rannazzisi?
8        MS. McCLURE:  Objection.  Misstates
9  the record.
10        THE WITNESS:  Not particularly.
11        MR. MIGLIORI:  All right.  Let me --
12        (Deposition Exhibit 30 was marked
13  for identification.)
14        MR. MIGLIORI:  Let me show you
15  Exhibit No. 30.
16        MS. MAINIGI:  Counsel, do you have a
17  copy?
18        MR. MIGLIORI:  Yes.
19        This one is September 27th.
20        MR. BENNETT:  Counsel, do you happen
21  to have one more copy?
22        MR. MIGLIORI:  I have literally one
23  more copy.
24        MR. BENNETT:  Thank you.
25        MR. MIGLIORI:  It's Exhibit 30.

14 (Pages 317 - 320)

Page 321

1      MR. BENNETT:  Thank you.
2      BY MR. MIGLIORI:
3   Q.   Take a moment to look at this.
4   Have you reviewed it?
5   A.   I have reviewed it.
6   Q.   Have you seen that before?
7   A.   Yes.
8   Q.   Okay.  And did you play any role --
9   first of all, in September of 2006 were you
10  still then in the headquarters in Washington,
11  D.C. of the Drug Enforcement Administration?
12  A.   Yes, sir.
13  Q.   And did you play a role in -- in
14  forming this letter of Mr. Joe Rannazzisi?
15      I'll show you the signature on the
16  last page.
17      MS. McCLURE:  Objection.
18      THE WITNESS:  None whatsoever.
19      BY MR. MIGLIORI:
20  Q.   H okay.  Ad you seen it though when
21  it went out or roughly around the time that it
22  had gone out?
23      MS. MAINIGI:  Objection.
24      THE WITNESS:  I only saw it after it
25  was published and sent out and only in passing.

Page 322

1      BY MR. MIGLIORI:
2   Q.   And in your experience and to your
3   knowledge, was this part of the effort within
4   your department to make sure that registrants
5   understood and appreciated what their
6   obligations were under the Controlled
7   Substances Act?
8      MS. MAINIGI:  Objection.  Absolutely
9   no foundation.  He said he never saw it before
10  it went out and saw it in passing after.
11      BY MR. MIGLIORI:
12  Q.   Go ahead.
13  A.   It supports the efforts that were
14  trying to be done cross the board in the
15  agency.
16  Q.   Did it support, in your experience,
17  the efforts that you were trying to accomplish
18  with the distributor initiative?
19      MS. MAINIGI:  Objection.
20      THE WITNESS:  It did.
21      BY MR. MIGLIORI:
22  Q.   If you look in the first paragraph,
23  it says: "The purpose of the letter is to
24  reiterate the responsibilities of controlled
25  substance distributors in view of the

Page 323

1   prescription drug abuse problem our nation
2   currently faces."
3      Did you understand that this was not
4   a new program but a summary of -- or
5   reiteration of what the obligations are under
6   the Controlled Substances Act?
7      MS. MAINIGI:  Objection.
8      THE WITNESS:  Yes, sir.
9      BY MR. MIGLIORI:
10  Q.   In giving background, your
11  supervisor wrote: "As each of you is
12  undoubtedly aware, the abuse, nonmedical use of
13  controlled prescription drugs, is a serious and
14  growing health problem in this country."
15      Was that consistent with and
16  supportive of your efforts in the distributor
17  initiative?
18      MS. MAINIGI:  Objection.
19      THE WITNESS:  Yes, sir.
20      BY MR. MIGLIORI:
21  Q.   "DEA has an obligation to combat
22  this problem as one of the agency's core
23  functions is to prevent the diversion of
24  controlled substances into illicit channels.
25  Congress assigned DEA to carry out this

Page 324

1   function through enforcement of the Controlled
2   Substances Act and DEA regulations to implement
3   the Act."
4      Is that consistent with the message
5   that you were trying to deliver in your
6   experience in the distributor briefings?
7      MS. MAINIGI:  Objection.
8      THE WITNESS:  Yes, sir.
9      BY MR. MIGLIORI:
10  Q.   That is your role was enforcement of
11  the provisions of the Controlled Substances
12  Act, correct?
13      MS. MAINIGI:  Objection.
14      THE WITNESS:  Correct.
15      BY MR. MIGLIORI:
16  Q.   The obligations of a registrant were
17  the focus of what you, as a distributor
18  initiative, were trying to monitor and enforce,
19  correct?
20      MS. MAINIGI:  Objection.
21      THE WITNESS:  Correct.
22      BY MR. MIGLIORI:
23  Q.   "The Controlled Substances Act was
24  designed by congress to combat diversion by
25  providing for a closed system of drug

15 (Pages 321 - 324)

Page 325

1  distribution in which all legitimate handlers
2  of controlled substances must obtain a DEA
3  registration and, as a condition of maintaining
4  such registration, must take reasonable steps
5  to ensure that their registration is not being
6  utilized as a source of diversion."
7      Was that consistent with the
8  message, in your experience, that you were
9  trying to get across through the distributor
10  initiative?
11      MS. MAINIGI:  Objection.
12      THE WITNESS:  Yes, sir.
13      BY MR. MIGLIORI:
14  Q.    That is, if a company wanted the
15  benefits of having a DEA registration for the
16  distribution and sale of controlled substance,
17  there were certain obligations that came with
18  that privilege, correct?
19      MS. MAINIGI:  Objection.
20      THE WITNESS:  Yes, sir.
21      BY MR. MIGLIORI:
22  Q.    It says here that: "Distributors
23  are, of course, one of the key components of
24  the distribution chain.  If the closed system
25  is to function properly, as congress

Page 326

1  envisioned, distributors must be vigilant in
2  deciding whether prospective customer can be
3  trusted to deliver the controlled substance
4  only for lawful purposes."
5      Is that consistent with the message
6  you tried to deliver in the distributor
7  initiative?
8      MS. MAINIGI:  Objection.
9      THE WITNESS:  Yes, sir.
10      BY MR. MIGLIORI:
11  Q.    The Controlled Substances Act puts
12  the obligation on who to make sure that the
13  customer that receives controlled substances is
14  the intend and appropriate customer?
15      MS. MAINIGI:  Objection.
16      THE WITNESS:  The onus of
17  responsibility is upon the registrant.
18      BY MR. MIGLIORI:
19  Q.    Is it upon the DEA?
20      MR. STEPHENS:  Objection.
21      THE WITNESS:  No, sir.
22      BY MR. MIGLIORI:
23  Q.    "This responsibility is critical as
24  congress has expressly declared that the
25  illegal distribution of controlled substances

Page 327

1  has a substantial and detrimental effect on the
2  health and general welfare of the American
3  people."
4      Is that consistent with the message
5  that you delivered, in your experience, in the
6  distributor initiative?
7      MS. MAINIGI:  Objection.
8      THE WITNESS:  Yes, sir.
9      BY MR. MIGLIORI:
10  Q.    Mr. Rannazzisi talks about the
11  statutory scheme and legal duties of
12  distributors as DEA registrants.  And he says:
13  "Although most distributors are already well
14  aware of the following legal principles, they
15  are reiterated here as additional background
16  for this discussion.
17      In your presentation of the
18  distributor initiative, did you reiterate legal
19  principles that most distributors were already
20  well aware of?
21      MS. MAINIGI:  Objection.
22      THE WITNESS:  Yes, sir.
23      BY MR. MIGLIORI:
24  Q.    "The CSA uses a concept of
25  registration as a primary means by which

Page 328

1  manufacturers, distributors and practitioners
2  are given legal authority to handle controlled
3  substance.  Registration also serves as the
4  primary incentive for compliance with the
5  regulatory requirements of the CSA and" DS --
6  "DEA regulations as congress gave DEA the
7  authority under the ACT to revoke and suspend
8  registrations for failure to comply with these
9  requirements."
10      Was one of the enforcement
11  mechanisms of the DEA, in your experience, the
12  revocation and suspension of registrations when
13  companies, in fact, did not comply with the
14  provisions of the Controlled Substances Act?
15      MS. MAINIGI:  Objection.
16      THE WITNESS:  Yes, sir.
17      BY MR. MIGLIORI:
18  Q.    And did you make that known in your
19  distributor initiative briefings that one of
20  the consequences of failing to comply with the
21  CSA was a potential suspension or revocation of
22  registration?
23      MS. MAINIGI:  Objection.
24      THE WITNESS:  Yes, sir.
25      BY MR. MIGLIORI:

16 (Pages 325 - 328)

Page 329

1    Q.    All right. I'm not going to go
2  through the whole rest of it. But in the --
3  right in the middle of this page, there is the
4  operative language I think in two days nobody
5  has actually asked you about. It's this box
6  here -- here.
7        It says:  "The registrant shall
8  design and operate a system to disclose to the
9  registrant suspicious orders of controlled
10  substances.  The registrant shall inform the
11  field division of the administration in his
12  area of suspicious orders when discovered by
13  the registrant.  Suspicious orders include
14  orders of unusual size, orders deviating
15  substantially from a normal pattern, and orders
16  of unusual frequency."
17        Is that the operative language, in
18  your experience, of the Controlled Substances
19  Act when you were giving the distributor
20  initiative briefings?
21        MS. MAINIGI:  Objection.
22        THE WITNESS:  Yes, sir.
23        BY MR. MIGLIORI:
24    Q.    And that was in existence when you
25  got to the DEA in 1995, correct?

Page 330

1        MS. MAINIGI:  Objection.
2        THE WITNESS:  Yes, sir.
3    Q.    And that was in existence as the
4  operative language when you retired in 2017,
5  correct?
6        MS. MAINIGI:  Objection.
7        THE WITNESS:  Yes, sir.
8        BY MR. MIGLIORI:
9    Q.    Was it enough simply to be compliant
10  with the Controlled Substances Act, in your
11  experience, in your understanding, to just
12  monitor whether or not an order was suspicious
13  or deviated in size, frequency or pattern from
14  prior orders?
15        MS. MAINIGI:  Objection.
16        THE WITNESS:  No, sir.
17        BY MR. MIGLIORI:
18    Q.    What else was required?
19        MS. MAINIGI:  Objection.
20        THE WITNESS:  If you deemed an order
21  suspicious, resolve that conflict. In that
22  resolution of resolving the conflict, if it did
23  not meet the criteria of a legitimate order,
24  take the appropriate action.
25        BY MR. MIGLIORI:

Page 331

1    Q.    Independent of that obligation, was
2  there an -- was there also a concurrent
3  obligation for registrants to know their
4  customer?
5        MS. MAINIGI:  Objection.
6        THE WITNESS:  Yes, sir.
7        BY MR. MIGLIORI:
8    Q.    This letter says:  "Thus, in
9  addition to reporting all suspicious orders, a
10  distributor has a statutory responsibility to
11  exercise due diligence to avoid filling
12  suspicious orders that might be diverted into
13  other than legitimate medical, scientific and
14  industrial channels.  Failure to exercise such
15  due diligence could, as circumstances warrant,
16  provide a statutory basis for revocation of
17  suspension of a distributor's registration.
18        What is due diligence?
19        MS. MAINIGI:  Objection.
20        MS. McCLURE:  Objection to the
21  commentary in the record prior to asking the
22  question.
23        BY MR. MIGLIORI:
24    Q.    In your understanding, what does
25  "due diligence" mean in this context?

Page 332

1        MS. MAINIGI:  Objection.
2        THE WITNESS:  Meeting your
3  requirements, obligations, responsibilities as
4  stipulated by both the CSA and the CFR.
5        BY MR. MIGLIORI:
6    Q.    Did those responsibilities to
7  conduct due diligence exist when you got to the
8  DEA in 1995?
9        MS. MAINIGI:  Objection.
10        THE WITNESS:  Yes, sir.
11        BY MR. MIGLIORI:
12    Q.    Again, Mr. Rannazzisi goes on to say
13  in the next paragraph:  "A distributor may not
14  simply rely on the fact that the person placing
15  the suspicious order is a DEA registrant and
16  turn a blind eye to the suspicious
17  circumstances.  Again, to maintain effective
18  controls against diversion, as Section 823(e)
19  requires, the distributor should exercise due
20  care in confirming the legitimacy of all orders
21  prior to filling."
22        MS. McCLURE:  Objection to the
23  extent that that portion that you've read is
24  not up on the record.  So to the extent that
25  misstates the document from which you are

17 (Pages 329 - 332)

Page 333

1    reading, the document speaks for itself.
2          MR. MIGLIORI:  I have no idea what
3    you just said.
4          You're saying because it's not on
5    the screen.
6          MS. MAINIGI:  She's saying you
7    didn't read it right.
8          MR. MIGLIORI:  I didn't read it
9    right or --
10          MS. McCLURE:  To the extent -- to
11    the extent you didn't, objection.
12          MR. MIGLIORI:  Let me ask the
13    question.
14          Is it the way I read it or the fact
15    that it wasn't on the screen?
16          I couldn't make heads or tails.
17          MS. McCLURE:  We couldn't determine
18    where you were reading from on the screen.  It
19    was not visible to us.
20          MR. MIGLIORI:  Fair enough.  I'll
21    fix it.
22          MS. McCLURE:  So to the extent you
23    didn't read it correctly --
24          MR. MIGLIORI:  Thank you.
25          MS. McCLURE:  -- I object.

Page 334

1          MR. MIGLIORI:  I'll fix it.
2          I have to do this again.
3          BY MR. MIGLIORI:
4    Q.    Mr. Rannazzisi says:  "In a similar
5    vein, given the requirement under Section
6    823(e) that a distributor maintain effective
7    controls against diversion, a distributor may
8    not simply rely on the fact that the person
9    placing a suspicious order is a DEA registrant
10    and turn a blind eye to the suspicious
11    circumstances.  Again, to maintain effective
12    controls against diversion, as Section 823(e)
13    requires, the distributor should exercise due
14    care in confirming the legitimacy of all orders
15    prior to filling."
16          Was that consistent with the
17    messages that you were giving in the
18    distributor initiative briefings?
19          MS. MAINIGI:  Objection.
20          THE WITNESS:  Yes, sir.
21          BY MR. MIGLIORI:
22    Q.    And would failure -- in your
23    experience, would failure to exercise the due
24    care in confirming the legitimacy of all orders
25    prior to filling be a violation of the

Page 335

1    registrant's obligations under the Controlled
2    Substances Act?
3          MS. MAINIGI:  Objection.
4          THE WITNESS:  Yes, sir.
5          BY MR. MIGLIORI:
6    Q.    There was some questions last week
7    about testimony you gave in the past concerning
8    whether the CSA requires documentation.
9          Do you remember that questioning?
10          MS. MAINIGI:  Objection.
11          THE WITNESS:  Yes, sir.
12          BY MR. MIGLIORI:
13    Q.    Now, counsel -- strike that.
14          Your answer, as I recall, was that
15    the CSA does not specifically require
16    documentation in its provisions; is that true?
17          MS. MAINIGI:  Objection.  His answer
18    under oath last week speaks for itself.
19          BY MR. MIGLIORI:
20    Q.    Go ahead.
21    A.    Yes, sir.
22    Q.    But in prior testimony, you spoke
23    about best practices relative to documentation,
24    correct?
25          MS. MAINIGI:  Objection.

Page 336

1          What prior testimony?
2          BY MR. MIGLIORI:
3    Q.    Do you believe that documentation is
4    necessary for good best practices in complying
5    with the Controlled Substances Act?
6          MS. MAINIGI:  Objection.  Misstates
7    his prior testimony.  Vague.  Ambiguous.
8          BY MR. MIGLIORI:
9    Q.    Go ahead.
10    A.    Yes, sir.
11    Q.    Why?
12    A.    If you can't show me what you've
13    done, explained or give -- besides -- you've
14    got to document everything that you do.  It
15    shows what you did.
16          When I do an investigation, I have
17    to document what I did.  It shows what I did.
18    When the IRS audited me about 12 years ago, I
19    was about -- I had to come up with paper I
20    didn't know I had.
21          Everything is critical.  Best
22    practices -- business operated in our system --
23    everybody should -- best practices.  This is
24    why I did what I did, as a company, as a
25    decision.

18 (Pages 333 - 336)

Page 337

1    Q.   Is that a message that you gave
2    during your distributor initiative briefings?
3         MS. MAINIGI:  Objection.
4         THE WITNESS:  Absolutely.
5         BY MR. MIGLIORI:
6    Q.   In Mr. Rannazzisi's letter on the
7    last paragraph of this page, it says:
8    "Depending on the circumstances, the failure to
9    keep or furnish required records might also be
10   the basis for civil fines or criminal penalties
11   under the CSA as provided in 21 USC 842."
12        Was that consistent with the
13   messages that you gave during the distributor
14   initiative briefings?
15        MS. MAINIGI:  Objection.
16        THE WITNESS:  Yes, sir.
17        BY MR. MIGLIORI:
18   Q.   Page 3 of Mr. Rannazzisi's letter
19   goes into circumstances that might be
20   indicative of diversion.  And the first one is
21   "Ordering excessive quantities of limited
22   variety of controlled substances.  Example,
23   ordering only phentermine, Hydrocodone or
24   alprazolam while ordering few, if any, other
25   drugs."

Page 338

1         Is that a message that you were
2    delivering during the distributor initiative
3    meetings?
4         MS. MAINIGI:  Objection.
5         THE WITNESS:  Yes, sir.  It was.
6         BY MR. MIGLIORI:
7    Q.   "Ordering a limited variety of
8    controlled substances and quantities
9    disproportionate to the quantity of
10   noncontrolled medications ordered," was that a
11   message you were delivering in your distributor
12   initiatives?
13        MS. MAINIGI:  Objection.
14        THE WITNESS:  Yes, sir.
15        BY MR. MIGLIORI:
16   Q.   Are these concepts that are
17   consistent with the obligation to know your
18   customer under the Controlled Substances Act?
19        MS. MAINIGI:  Objection.
20        THE WITNESS:  Yes, sir.
21        BY MR. MIGLIORI:
22   Q.   Are the obligations to know your
23   customer on the Controlled Substances Act also
24   applicable when a new client is brought on
25   board for a registrant?

Page 339

1         MS. MAINIGI:  Objection.
2         THE WITNESS:  Yes, sir.
3         BY MR. MIGLIORI:
4    Q.   Can you explain that?
5         How does that work, in your
6    experience?
7         MS. MAINIGI:  Objection.
8         THE WITNESS:  What is their purpose.
9    Who is their clientele.  Is there any
10   speciality that they're going to be involved
11   in.  What's their business model land role.
12   Who do they want to reach out to as a customer
13   base themselves.  What products are they going
14   to be needing.  Project to them quantities they
15   potentially may be ordering.
16        BY MR. MIGLIORI:
17   Q.   Does the obligation for a registrant
18   to know the customer exist outside of actually
19   placing orders?
20        MS. MAINIGI:  Objection.
21        THE WITNESS:  How can you understand
22   what the customers needs if you don't know
23   their potential needs?
24        BY MR. MIGLIORI:
25   Q.   So is it fair --

Page 340

1    A.   Especially in the context of control
2    substances.  If it's labeled "controlled," it's
3    a dangerous product.  Has potential to cause
4    harm.  If that's the case, you're not trying
5    to -- know your customer.  Know what they want
6    to do.
7    Q.   Is that a requirement of the
8    Controlled Substances Act?
9         MS. MAINIGI:  Objection.
10        THE WITNESS:  Protect the legitimate
11   medical need.  It's the obligation that you are
12   required to fulfill.
13        BY MR. MIGLIORI:
14   Q.   And was that consistent with the
15   message that you delivered during the
16   distributor initiative briefings that you were
17   involved in, in your experience, in 2005 and
18   2006?
19        MS. MAINIGI:  Objection.
20        THE WITNESS:  Yes, sir.
21        BY MR. MIGLIORI:
22   Q.   And was that a new concept in 2005,
23   or did that exist when you got to DEA in 1995?
24        MS. MAINIGI:  Objection.
25        THE WITNESS:  It existed in 1995

19 (Pages 337 - 340)

Page 341

1  when I came on board.
2      MR. MIGLIORI:  All right.  Why don't
3  we take a break.
4      THE VIDEOGRAPHER:  We are going off
5  the record.
6      This is the end of Media Unit No. 1.
7      The time is 10:23.
8      (A short recess was taken.)
9      THE VIDEOGRAPHER:  We are going back
10  on the record.
11      This is the start of Media Unit No.
12  2.
13      The time is 10:42.
14      You may proceed, Counsel.
15      MR. MIGLIORI:  Thank you.
16      (Deposition Exhibit 31 was marked
17  for identification.)
18      MR. MIGLIORI:  I want to show you
19  what I've marked as Exhibit 31.
20      BY MR. MIGLIORI:
21   Q.   Mr. Wright, I'm showing you what's
22  been marked as Exhibit 31.  This is a two-page
23  letter, if you look on the second page, it's
24  again signed by Joseph T. Rannazzisi.
25      In December of 2007, was he still

Page 342

1  your -- your boss?
2      MS. McCLURE:  Object to form.
3      THE WITNESS:  He was still the
4  deputy assistant administrator of diversion
5  control.
6      BY MR. MIGLIORI:
7   Q.   This is another letter.
8      Have you ever -- did you have a
9  chance to review it?
10      MS. MAINIGI:  Objection.
11      THE WITNESS:  Yes, sir.
12      BY MR. MIGLIORI:
13   Q.   Are you familiar with this letter?
14      MS. MAINIGI:  Objection.
15      THE WITNESS:  Only in the context
16  that it was sent out.
17      BY MR. MIGLIORI:
18   Q.   Do you know to whom this was sent?
19      MS. MAINIGI:  Objection.
20      THE WITNESS:  This exhibit
21  specifically to Cardinal Health.  But this went
22  out to -- industrywide.
23      BY MR. MIGLIORI:
24   Q.   And did it go out to all
25  registrants, to your knowledge?

Page 343

1      MS. MAINIGI:  Objection.
2      THE WITNESS:  I do not know.
3      BY MR. MIGLIORI:
4   Q.   Okay.  You'll notice that the same
5  language is in this December 27th, 2007 letter.
6      It says:  "The purpose of this
7  letter is to reiterate the responsibilities of
8  the controlled substance manufacturers and
9  distributors to inform DEA of suspicious orders
10  in accordance with 21 CFR 1301.74(b)."
11      Based on your recollection of this
12  letter, did you understand that to be the
13  purpose of sending this out to registrants like
14  Cardinal Health?
15      MS. MAINIGI:  Objection.  He's
16  testified he didn't have a recollection of
17  the -- of the letter.  And there's been no
18  foundation.
19      MR. MIGLIORI:  All right.  You can
20  just -- you don't have to give that much
21  information.  I got it with --
22      MS. MAINIGI:  I am actually just
23  allowing you --
24      MR. MIGLIORI:  Three or four words.
25      MS. MAINIGI:  -- to correct your

Page 344

1  question, Counsel.
2      MR. MIGLIORI:  I appreciate that.
3      THE WITNESS:  Yes, sir.
4      BY MR. MIGLIORI:
5   Q.   Here in the second paragraph, it
6  says:  "In addition to and not in lieu of the
7  general requirement under 21 USC 823 that
8  manufacturers and distributors maintain
9  effective controls against diversion, DEA
10  regulations require all manufacturers and
11  distributors to report suspicious orders of
12  controlled substances.  The title 21 CFR
13  1301.74(b) specifically requires that the
14  registrant design and operate a system to
15  disclose to the registrant suspicious orders of
16  controlled substances."
17      That's the same language we've seen
18  throughout your presentation.
19      It's about the general obligations
20  under Controlled Substances Act, correct?
21      MS. MAINIGI:  Objection.
22      THE WITNESS:  Correct, sir.
23      BY MR. MIGLIORI:
24   Q.   "The regulation clearly indicates
25  that it is the sole responsibility of the

20 (Pages 341 - 344)

1  registrant to design and operate such a
2  system."
3       Was that message consistent with the
4  message that you delivered to the distributors
5  in your briefings with them in 2005, 2006
6  and -- and on?
7      MS. MAINIGI:  Objection.
8      THE WITNESS:  Yes, sir.  It was.
9      BY MR. MIGLIORI:
10    Q.   And it says:  "Accordingly, DEA does
11  not approve or otherwise endorse any specific
12  system for reporting suspicious orders."
13      Is that consistent with the
14  messaging that you had in your distributor
15  initiative briefings?
16      MS. MAINIGI:  Objection.
17      THE WITNESS:  Yes, sir.  It was.
18      BY MR. MIGLIORI:
19    Q.   In your experience, do you recall
20  actually talking to registrants and telling
21  them that the DEA does not approve or otherwise
22  endorse a specific system for reporting
23  suspicious orders?
24      MS. MAINIGI:  Objection.
25      THE WITNESS:  Repeatedly.

1      BY MR. MIGLIORI:
2    Q.   And in doing that, was that
3  something that was true in 1995 when you first
4  began with the DEA in the Dallas field office?
5      MS. MAINIGI:  Objection.
6      THE WITNESS:  Yes, sir.
7      BY MR. MIGLIORI:
8    Q.   "Past communications with DEA,
9  whether implicit or explicit, that could be
10  construed as approval of a particular system
11  for reporting suspicious orders should no
12  longer be taken to mean that the DEA approves a
13  specific system."
14      Do you remember delivering that
15  message in your own experience during the
16  distributor initiative meetings?
17      MS. MAINIGI:  Objection.
18      THE WITNESS:  Yes, sir.
19      BY MR. MIGLIORI:
20    Q.   Would that have applied to the
21  Excessive Purchase Reports, Exhibit 26, that
22  counsel for Cardinal showed you last week?
23      MS. MAINIGI:  Objection.
24      THE WITNESS:  Yes, sir.
25      BY MR. MIGLIORI:

1    Q.   If the industry or registrant
2  standard was to ship a suspicious order without
3  performing due diligence, would that standard
4  have been compliant with federal law, in your
5  experience and your understanding?
6      MS. MAINIGI:  Objection.
7      THE WITNESS:  No, sir.
8      BY MR. MIGLIORI:
9    Q.   Would it have been compliant to
10  report suspicious orders after sale on a
11  monthly basis?
12      MS. MAINIGI:  Objection.
13      THE WITNESS:  No, sir.
14      BY MR. MIGLIORI:
15    Q.   Mr. Rannazzisi says:  "The
16  registration also requires that the registrant
17  inform the local DEA division office of
18  suspicious orders when discovered by the
19  registrant."
20      Is that a message that you delivered
21  in your distributor initiative briefings?
22      MS. MAINIGI:  Objection.
23      THE WITNESS:  Yes, sir.
24      BY MR. MIGLIORI:
25    Q.   Was that true in 1995, in your

1  experience, when you got to the DEA?
2      MS. MAINIGI:  Objection.
3      THE WITNESS:  Yes, sir.
4      BY MR. MIGLIORI:
5    Q.   That is reporting suspicious orders
6  when discovered by the registrant, is actually
7  part of the language of the Controlled
8  Substances Act, correct, in your -- to your
9  understanding?
10      MS. MAINIGI:  Objection.
11      THE WITNESS:  Yes, sir.
12      BY MR. MIGLIORI:
13    Q.   So that goes back to the enactment,
14  in your understanding, of the Controlled
15  Substances Act and did not start in 2005 when
16  you did these briefings, correct?
17      MS. MAINIGI:  Objection.
18      THE WITNESS:  Yes, sir.
19      BY MR. MIGLIORI:
20    Q.   Filling a month --
21      MS. MAINIGI:  Can I ask a question
22  of the government:  Is this all of fair game
23  for questioning so we and ask similar
24  questions?
25      MR. BENNETT:  When it's about his

Page 349

1  personal knowledge on the suspicious orders and
2  ARCOS data, practices and procedures, which is
3  No. 3.
4      MS. MAINIGI:  Back to 1970?
5      MR. BENNETT:  Huh?
6      MS. MAINIGI:  Back to 1970, James?
7      MR. MIGLIORI:  It's based on his --
8      MR. BENNETT:  If he has -- if he has
9  any personal knowledge, yes.
10     MS. MAINIGI:  I see.  You think he
11 has personal knowledge back then?
12     MR. MIGLIORI:  Oh, you can save the
13 argument.
14     MR. BENNETT:  I don't have a
15 position on that.
16     MR. MIGLIORI:  Save the argument.
17 That's my time you're using for that.
18     MS. MAINIGI:  I'll give you a
19 minute.
20     MR. MIGLIORI:  Thank you.  You're
21 sweet.
22     BY MR. MIGLIORI:
23  Q.   "Registrants are reminded that their
24 responsibility does not end merely with the
25 filling of a suspicious orders report."

Page 350

1      Was that a message that you
2  delivered in your distributor briefings?
3      MS. MAINIGI:  Objection.
4      THE WITNESS:  Yes, sir.
5      BY MR. MIGLIORI:
6  Q.   Was that true in 1995 when you got
7  to the DEA?
8      MS. MAINIGI:  Objection.
9      THE WITNESS:  Yes, sir.
10     BY MR. MIGLIORI:
11  Q.  Mr. Rannazzisi says:  Registrants
12 must conduct an independent analysis of
13 suspicious orders prior to completing a sale to
14 determine whether the controlled substances are
15 likely to be diverted from legitimate channels.
16 Reporting an order as suspicious will not
17 absolve the registrant of responsibility if the
18 registrant knew or should have known that the
19 controlled substances were being diverted."
20     Was that a message that you
21 delivered in your distributor initiative
22 briefings?
23     MS. MAINIGI:  Objection.
24     THE WITNESS:  Yes, sir.
25     BY MR. MIGLIORI:

Page 351

1  Q.   And did that independent analysis of
2  suspicious orders requirement exist in '95, in
3  your experience, when you got to DEA?
4      MS. MAINIGI:  Objection.
5      THE WITNESS:  The requirement of
6  this statute existed.
7      BY MR. MIGLIORI:
8  Q.   So the -- it existed in 1995 when
9  you got to the DEA, in your experience,
10 correct?
11     MS. MAINIGI:  Objection.
12     THE WITNESS:  Yes, sir.
13     BY MR. MIGLIORI:
14  Q.   All right.  Mr. Rannazzisi then goes
15 into the concepts of -- well, orders of unusual
16 size, orders deviating substantially from a
17 normal pattern, and orders of unusual
18 frequency.
19     Those are also in the statute,
20 correct?
21     MS. MAINIGI:  Objection.
22     THE WITNESS:  Yes, sir.
23     BY MR. MIGLIORI:
24  Q.   If orders deviate in size, are they,
25 on the face of the statute, potentially

Page 352

1  suspicious orders?
2      MS. MAINIGI:  Objection.
3      THE WITNESS:  Yes, sir.
4      BY MR. MIGLIORI:
5  Q.   "These criteria are disjunctive and
6  are not all-inclusive."
7      First of all, is that a message that
8  you delivered in the distributor -- distributor
9  initiative briefings?
10     MS. MAINIGI:  Objection.
11     THE WITNESS:  Yes, sir.
12     BY MR. MIGLIORI:
13  Q.   And what does that mean, that
14 they're disjunctive?
15  A.   It isn't limited to just this.  It
16 isn't -- these are the primary things to start
17 looking at.  Think.  Why?
18  Q.   So an order may be suspicious if it
19 only deviates substantially from a normal
20 pattern, in your understanding of the
21 obligations under the Controlled Substances
22 Act, correct?
23     MS. MAINIGI:  Objection.
24     THE WITNESS:  Yes, sir.
25     BY MR. MIGLIORI:

22 (Pages 349 - 352)

Page 353

1    Q.   It doesn't require that it also be
2  of unusual frequency or unusual size; any one
3  or any three or all three could -- could exist
4  for it to be potentially a suspicious order,
5  correct?
6         MS. MAINIGI:  Objection.
7         THE WITNESS:  Correct.
8         BY MR. MIGLIORI:
9    Q.   The language says "that suspicious
10  orders include orders of unusual size."
11         Is an order of unusual size, on its
12  face, suspicious?
13         MS. MAINIGI:  Objection.
14         THE WITNESS:  It could certainly be.
15         BY MR. MIGLIORI:
16    Q.   And to determine whether it's
17  suspicious, what is required, in your
18  understanding?
19         MS. MAINIGI:  Objection.
20         THE WITNESS:  Legitimate medical
21  necessity.  Why is there a certain particular
22  reason for a substantial increase in size?
23         BY MR. MIGLIORI:
24    Q.   Who determines that?
25         MS. MAINIGI:  Objection.

Page 354

1         THE WITNESS:  It'd have to be the
2  registrant who has received the order.
3         BY MR. MIGLIORI:
4    Q.   Is that a message you delivered in
5  the distributor briefings?
6         MS. MAINIGI:  Object to form.
7         James, I -- I hope that -- well,
8  I'll save it.
9         THE WITNESS:  Yes, sir.
10         BY MR. MIGLIORI:
11    Q.   And was that true in 1995 when you
12  got to DEA?
13         MS. MAINIGI:  Objection.
14         THE WITNESS:  Yes, sir.
15         BY MR. MIGLIORI:
16    Q.   On the second page of his letter,
17  Mr. Rannazzisi writes:  "When reporting an
18  order as suspicious, registrants must be clear
19  in their communications with DEA that the"
20  registrate -- "registrant is actually
21  characterizing an order as suspicious.  Daily,
22  weekly or monthly reports submitted by a
23  registrant indicating excessive purchases do
24  not comply with the requirement to report
25  suspicious orders even if the registrant calls

Page 355

1  such reports suspicious order reports."
2         Is that consistent with the message
3  that you delivered in the distributor
4  initiative briefings?
5         MS. MAINIGI:  Objection.
6         BY MR. MIGLIORI:
7    Q.   What's your answer?
8    A.   Yes, sir.
9    Q.   And was that true in 1995 when you
10  got to the DEA?
11         MS. MAINIGI:  Objection.
12         THE WITNESS:  The statute this the
13  requirement, yes.
14         MS. MAINIGI:  Objection.
15         BY MR. MIGLIORI:
16    Q.   So Exhibit 26, this excessive
17  purchase report or this ingredient limit report
18  that counsel showed you last week, as you
19  understand it, would not be a suspicious order
20  report even if it were labeled as such, based
21  on your understanding, correct?
22         MS. MAINIGI:  Objection.
23         THE WITNESS:  Correct.
24         BY MR. MIGLIORI:
25    Q.   Did you deliver this message to the

Page 356

1  HDA or the HDMA as well?
2         MS. MAINIGI:  Objection.
3         BY MR. MIGLIORI:
4    Q.   And by "you" I mean in the
5  distributor initiative briefings.
6         Did you ever speak to the HDMA?
7    A.   I don't recall specifically.  I
8  probably did.  We reached out to many
9  organizations every chance we had to get this
10  message out.
11         MR. MIGLIORI:  Let me show you
12  Exhibit 32.
13         (Deposition Exhibit 32 was marked
14  for identification.)
15         BY MR. MIGLIORI:
16    Q.   Exhibit 32 is a document produced
17  I'll show you the Bates number:  HSI-MDL
18  00622468.  I'll present to you that it's a
19  Henry Schein document produced in this
20  litigation.
21         And what I have highlighted on the
22  screen -- well, the -- title of it is
23  "Draft Summary of the HDMA DEA meeting,"
24  October 16th and 17th, 2007, "Not For External
25  Distribution.

23 (Pages 353 - 356)

Page 357

1    And then under the subparagraph
2  "Suspicious Orders," your name appears.
3    Why don't you take a look at it, and
4  then I'll ask you about it.
5    Does reviewing this document refresh
6  your recollection at all as to whether or not
7  you may have been present at a presentation to
8  the HDMA?
9    A.   It does.
10    Q.   This document says, under
11  "Suspicious Orders": "Kyle Wright joined the
12  meeting and provided DEA's presentation on
13  suspicious orders.  Mr. Wright highlighted
14  DEA's position that whole distributors should
15  conduct a more aggressive form of customer due
16  diligence in addition to reporting."
17    Do you recall giving that message?
18    MS. MAINIGI:  Objection.
19    THE WITNESS:  Yes, sir.
20    BY MR. MIGLIORI:
21    Q.   And it says: "DEA also wants
22  distributors to assess orders and stop them
23  before they are filled if there" -- if there's
24  a reason to be suspicious and expects wholesale
25  distributors to thoroughly evaluate orders, the

Page 358

1  dispensers themselves, and the dispensers'
2  customers."
3    Was that the message that you were
4  delivering at the HDMA conference with the DEA
5  in October of 2007?
6    MS. MAINIGI:  Objection.
7    THE WITNESS:  Yes, sir.
8    BY MR. MIGLIORI:
9    Q.   And was that consistent with the
10  messages that you delivered in the distributor
11  initiative briefings?
12    MS. MAINIGI:  Objection.
13    THE WITNESS:  Yes, sir.
14    BY MR. MIGLIORI:
15    Q.   Kyle went so far as to discuss
16  having a distributor's employee take a look at
17  the dispensing site's physical location and
18  watch for suspicious activity.  Kyle also noted
19  that the DEA wants to expand the drug subject
20  to ARCOS reporting to include all controlled
21  substances."
22    Do you recall delivering that
23  message to the HDMA?
24    MS. MAINIGI:  Objection.
25    THE WITNESS:  Yes, sir.

Page 359

1    BY MR. MIGLIORI:
2    Q.   And why was it important to
3  encourage distributor employees going to the
4  dispensing sites to actually look at the
5  physical locations?
6    MS. MAINIGI:  Objection.
7    THE WITNESS:  It would help them
8  resolve the business model of that customer.
9    BY MR. MIGLIORI:
10    Q.   Help me understand how that relates
11  to obligations under Controlled Substances Act,
12  if at all.
13    MS. MAINIGI:  Objection.
14    THE WITNESS:  If a customer is in a
15  sparsely populated area and is ordering,
16  conduct business the same as a
17  well-established, suburban area, what's the
18  draw?  Why?
19    If the -- if the potential customer
20  is in a impoverished or blighted area of town
21  and is doing business commensurate with a
22  well-established area, how can that be?
23    These are tails, again, that is
24  drawing it.
25    BY MR. MIGLIORI:

Page 360

1    Q.   Do you recall how that message was
2  received at the HDMA conference?
3    MS. MAINIGI:  Objection.
4  Foundation.
5    THE WITNESS:  I think they
6  understood that -- what we were trying to
7  convey to them.
8    BY MR. MIGLIORI:
9    Q.   Were you -- do you recall being
10  asked about DEA's role with respect to this
11  higher level of due diligence?
12    MS. MAINIGI:  Objection.
13    THE WITNESS:  Yes.
14    BY MR. MIGLIORI:
15    Q.   What do you recall?
16    A.   We were not trying to lead or get
17  industry involved in enforcement.  There were
18  limits to their capabilities.  We understood
19  that.  We weren't trying to drive them in that
20  direction.
21    But on the basis of understanding
22  who their customer was, there were certain
23  obligations that they could do and perform.
24    Q.   Did that include on-site
25  inspections?

24 (Pages 357 - 360)

Page 361

1     MS. MAINIGI:  Objection to form.
2     THE WITNESS:  It wasn't a compulsory
3   requirement.  It was a suggested requirement to
4   help resolve the legitimacy of the orders in
5   the business.
6     BY MR. MIGLIORI:
7     Q.   The minutes go on to say: "When
8   asked, if these customers weren't DEA
9   registrants, what steps did the DEA take to
10   evaluate them before registration, Kyle made it
11   clear that the DEA didn't have the resources to
12   inspect or otherwise follow up on all
13   registrants.  A copy of Kyle's presentation is
14   attached.  Kyle also offered to act as an
15   information conduit in the event that any
16   distributor terminated a pharmacy or clinic
17   customer based on suspicious orders."
18     Do you recall having that
19   interaction about DEA resources?
20     A.   Yes, sir.
21     MS. MAINIGI:  Objection.
22     BY MR. MIGLIORI:
23     Q.   And did D -- DEA, in your
24   experience, have the resources to do the
25   policing of all individual orders that may be

Page 362

1   suspicious?
2     MS. MAINIGI:  Objection.
3     THE WITNESS:  That would be
4   relatively impossible for us to do.
5     BY MR. MIGLIORI:
6     Q.   And under the CSA, in your -- to
7   your understanding, who had the sole
8   responsibility to do that?
9     MS. MAINIGI:  Objection.
10     THE WITNESS:  The industry, the
11   registrant.
12     MR. MIGLIORI:  Let me show you
13   Exhibit 33.
14     MR. EPPICH:  Don, before we move to
15   Exhibit 33, what's the Bates on Exhibit 32?
16     MR. MIGLIORI:  On 32?  HSI-MDL
17   00622468.
18     Exhibit 33.
19     (Deposition Exhibit 33 was marked
20   for identification.)
21     BY MR. MIGLIORI:
22     Q.   Does this appear to be the
23   presentation that was made at the HDMA
24   conference?
25     A.   Yes, sir.

Page 363

1     Q.   And does it appear to be, as you
2   flip through it, the same as we discussed in
3   Exhibit 10, the AmerisourceBergen?
4     A.   It contains the -- most, if not all,
5   the material.
6     Q.   It has the same section on
7   suspicious orders that we talked about earlier,
8   correct?
9     This is a page that ends with Bates
10   No. 1 -- ending in 8158.  You can look on the
11   screen too.
12     We discussed this in the
13   AmerisourceBergen presentation, correct?
14     MS. MAINIGI:  Objection.
15     THE WITNESS:  Correct, sir.
16     BY MR. MIGLIORI:
17     Q.   My -- my question is simply it
18   appears to be the same one even with the
19   examples of the pharmacies and the summary
20   on -- on the last page?
21     A.   Yes, sir.
22     MS. MAINIGI:  Objection.
23     BY MR. MIGLIORI:
24     Q.   And again, I'm not sure if I asked
25   you this, but relative to the summary of this

Page 364

1   presentation, these points, these principals,
2   existed in 1995 when you got to the DEA,
3   correct?
4     MS. MAINIGI:  Objection.
5     THE WITNESS:  Yes, sir.
6     BY MR. MIGLIORI:
7     Q.   I do want to bring your attention --
8   attached to it seems to be a PowerPoint
9   presentation with notes underneath them, like
10   speaking notes.  We haven't seen anything like
11   this yet.
12     Are you familiar with these speaking
13   notes?
14     Would they have been notes that you
15   put together?
16     MS. McCLURE:  Object to form.
17   Compound.
18     BY MR. MIGLIORI:
19     Q.   Just so we can illustrate what I'm
20   talking about, if you turn to Page 16 of the
21   PowerPoint presentation, it seems to be a
22   duplicate of the larger presentation in front
23   of it, but underneath there are notes
24   underneath the PowerPoint slides.  I'm on Page
25   16, "Suspicious Orders."

25 (Pages 361 - 364)

Page 365

1     MS. MAINIGI: Objection.
2     MS. McCLURE: Don, for the record,
3  who applied the highlighting that we now see on
4  this?
5     MR. MIGLIORI: I did.
6     MS. McCLURE: It's not on the
7  original?
8     MR. MIGLIORI: That's correct.
9     MS. McCLURE: Thank you.
10     MR. MIGLIORI: But I did not do the
11  all caps.
12     THE WITNESS: Yes, sir.
13     BY MR. MIGLIORI:
14  Q.  Okay. So do you recall working off
15  of notes like that when you gave these
16  briefings?
17  A.  For recall.
18     MS. MAINIGI: Objection.
19     BY MR. MIGLIORI:
20  Q.  Go ahead. Repeat your answer.
21  A.  For recall.
22  Q.  And so under this particular slide
23  on Page 16 of the suspicious orders where it
24  talks about reporting a suspicious order, "The
25  DEA does not relieve the distributor of the

Page 366

1  responsibility to maintain effective controls
2  against diversion," underneath it says, in all
3  caps, "VERY" and then in lower case "Important
4  Concept."
5     Is that your note?
6     MS. MAINIGI: Objection.
7     THE WITNESS: I don't recall.
8     BY MR. MIGLIORI:
9  Q.  Is it a note that you would have
10  taken an instruction from for recall as you
11  were giving the presentation?
12     MS. MAINIGI: Objection.
13     THE WITNESS: Yes, sir.
14     BY MR. MIGLIORI:
15  Q.  Is it a concept that you would have
16  emphasized as a very important concept?
17     MS. MAINIGI: Objection.
18     THE WITNESS: Yes, sir.
19     BY MR. MIGLIORI:
20  Q.  If you turn to the next page -- it's
21  the last one I'll ask you about -- there's a
22  note underneath the side on "Suspicious Orders"
23  that discuss the requirement to design and
24  operate a system to identify suspicious orders.
25     Could you read the note under the

Page 367

1  slide on the -- that?
2  A.  "Suspicious orders versus excessive
3  purchases. Orders are before sales."
4  Q.  Is that a message that you were
5  delivering in your distributor briefings?
6     MS. MAINIGI: Objection.
7     THE WITNESS: Yes, sir.
8     BY MR. MIGLIORI:
9  Q.  And why did you make a note, or was
10  there a note there for you to recall making
11  that point?
12     MS. MAINIGI: Objection.
13  Foundation. He's already said he doesn't even
14  recall whether he made these notes.
15     MR. MIGLIORI: All right. That's
16  about ten word. But you can get it down to
17  four, and we'll be in good shape.
18     MS. MAINIGI: I don't think I need
19  to. Because you're trying to put words in his
20  mouth for this entire bit of testimony.
21     MR. MIGLIORI: Who asked for
22  leading?
23     MS. MAINIGI: I --
24     BY MR. MIGLIORI:
25  Q.  Can you answer that question, or do

Page 368

1  you want me to repeat it?
2  A.  Order --
3  Q.  I'm happy to repeat it.
4  A.  Order before. Was the sale is
5  completed. It's a sale. Order is I'm
6  requesting it. The distinction had to be made
7  clear.
8  Q.  Is there a distinction being made
9  between suspicious order reporting and
10  excessive purchase reporting?
11     MS. MAINIGI: Objection. No
12  foundation this witness wrote this note.
13     THE WITNESS: As previously stated,
14  the excessive purchase -- it was already done.
15  It was -- the sale was completed. Suspicious
16  order is before the order is completed.
17     BY MR. MIGLIORI:
18  Q.  Was this excessive purchase
19  reporting compliant, to your understanding,
20  with the Controlled Substances Act obligations
21  for a registrant at the time of this
22  presentation in 2007?
23     MS. MAINIGI: Objection.
24     THE WITNESS: No, sir. It was not.
25     BY MR. MIGLIORI:

26 (Pages 365 - 368)

Page 369

1    Q.   Was excessive purchase reporting, to
2   your understanding of the DEA obligations,
3   compliant with the -- with the -- strike that.
4        Was excessive purchase reporting
5   compliant with the obligations under the
6   Controlled Substances Act, to your
7   understanding, when you got to the DEA in 1995?
8        MS. MAINIGI:  Objection.
9        THE WITNESS:  No, sir.
10       BY MR. MIGLIORI:
11   Q.   And when you gave your briefings in
12  2007, did you make a point to distinguish
13  orders from sales relative to the obligations
14  to report suspicious orders?
15       MS. MAINIGI:  Objection.
16       THE WITNESS:  Yes, sir.
17       BY MR. MIGLIORI:
18   Q.   The issue came up when counsel was
19  talking to you last week about documentation of
20  due diligence.
21       Do you recall that?
22   A.   Yes, sir.
23   Q.   Now, we've been talking a little bit
24  about the HDMA.
25       Do you know who the members of the

Page 370

1   HDMA are?
2        MS. MAINIGI:  Objection.
3        THE WITNESS:  (No response.)
4        MR. MIGLIORI:  This is Exhibit No.
5   34.
6        (Deposition Exhibit 34 was marked
7   for identification.)
8        MS. McCLURE:  Can you read the Bates
9   number into the record for the --
10       MR. MIGLIORI:  Happy to.
11       MS. MAINIGI:  -- attorneys and
12  people on the phone.
13       MR. MIGLIORI:  This is Cardinal
14  Health document CAH_MDL 280400988458.  It's
15  called the "Industry Compliance Guidelines,
16  Healthcare Distribution Management Association,
17  HDMA."
18       THE WITNESS:  It was an association
19  of distributors, to my understanding, mostly,
20  in which they would get together, either
21  independently on their own and with the
22  department of -- or drug enforcement to discuss
23  matters, litigation, proposed rule making, a
24  variety of things that would affect their
25  business or had an interest in their business.

Page 371

1        BY MR. MIGLIORI:
2    Q.   Were retail chain pharmacies part of
3   the HDMA, to your knowledge?
4        MS. MAINIGI:  Objection.
5        THE WITNESS:  I don't recall.
6        BY MR. MIGLIORI:
7    Q.   Okay.  Were manufacturers of
8   controlled substances members of the HDMA, to
9   your knowledge?
10       MS. MAINIGI:  Objection.
11       THE WITNESS:  I don't recall.  I
12  don't believe so.
13       BY MR. MIGLIORI:
14   Q.   On the covering page of this
15  document, in talking about -- oh, I'll --
16  I'll -- let me give the full title.  It's
17  called "The Industry Compliance Guidelines:
18  Reporting Suspicious Orders and Preventing
19  Diversion of Controlled Substances."
20       Were you aware that the HDMA, in
21  November of 2008, published a guidance for
22  distributors relative to suspicious orders and
23  preventing diversion?
24       MS. MAINIGI:  Objection.
25       THE WITNESS:  No, sir.

Page 372

1        BY MR. MIGLIORI:
2    Q.   I'm going to read from this cover
3   introduction.  It says:  "At the center of a
4   sophisticated supply chain, distributors are
5   uniquely situated to perform the due diligence
6   in order to help support the security of the
7   controlled substances they deliver to their
8   customers."
9        Do you agree with that statement?
10       MS. MAINIGI:  Objection.
11       BY MR. MIGLIORI:
12   Q.   That distributors are uniquely
13  situated to perform the due diligence?
14       MS. MAINIGI:  Objection.
15       THE WITNESS:  Yes, sir.
16       BY MR. MIGLIORI:
17   Q.   The HDMA wrote:  "Due diligence can
18  provide a greater level of assurance that those
19  who purchase controlled substance from
20  distributors intend to dispense them for
21  legally acceptable purposes."
22       Do you agree with that statement of
23  the HDMA?
24       MS. MAINIGI:  Objection.
25       THE WITNESS:  Yes, sir.

27 (Pages 369 - 372)

Page 373

1    BY MR. MIGLIORI:
2    Q.   And it says: "Such due diligence
3  can reduce the possibility that controlled
4  substances within the supply chain will reach
5  locations they are not intended to reach."
6        Do you agree with that statement of
7  the HDMA?
8        MS. MAINIGI:  Objection.
9        THE WITNESS:  Yes, sir.
10       BY MR. MIGLIORI:
11   Q.   I want to have you turn to Page 415,
12  if you look at the top-right corner.  There's a
13  discussion in the guidance about the "Know Your
14  Customer Due Diligence."
15       And it says: "Before opening an
16  account for a new customer, the distributor
17  should obtain background information on the
18  customer and the customer's business, review
19  that information carefully and, where
20  appropriate, verify the information and
21  independently investigate the potential
22  customer."
23       Do you agree with that statement of
24  the Healthcare -- of the HDMA?
25       MS. MAINIGI:  Objection.

Page 374

1        THE WITNESS:  I do, sir.
2        BY MR. MIGLIORI:
3    Q.   Was that a good due diligence
4  practice in 2008?
5        MR. BENNETT:  Objection.
6        MS. MAINIGI:  Objection.
7        THE WITNESS:  It's a good start.
8        BY MR. MIGLIORI:
9    Q.   And --
10       MS. McCLURE:  Don, for the purposes
11  of the record, I'm just going to confirm that
12  the highlighting that you're displaying in this
13  document is again your own and not contained in
14  the original, correct?
15       MR. MIGLIORI:  Correct.  That's true
16  for every document that you'll see from me
17  today.
18       BY MR. MIGLIORI:
19   Q.   Due diligence for a new customer was
20  also required in 1995 when you got to the DEA,
21  correct?
22       MS. MAINIGI:  Objection.
23       THE WITNESS:  Yes, sir.
24       BY MR. MIGLIORI:
25   Q.   On Page 9 of 15, under "Suspend/Stop

Page 375

1  an Order of Interest Shipment," the HDMA wrote:
2  "If an order meets or exceeds a distributor's
3  threshold, as defined in the distributor's
4  monitoring system, or as otherwise
5  characterized by the distributor as an order of
6  interest, the distributor should not ship to
7  the customer in fulfillment of that order any
8  units of the specific drug code product as to
9  which the order met or exceed a threshold or as
10  to which the order was otherwise characterized
11  as an order of interest."
12       Do you agree with that guidance?
13       MS. MAINIGI:  Objection.
14       BY MR. MIGLIORI:
15   Q.   Was that consistent with your then
16  understanding of the requirements under the
17  CSA?
18       MS. MAINIGI:  Objection.
19       THE WITNESS:  An order of interest
20  would be a suspicious order.  Anything that
21  drew attention, identified anomalies should be
22  looked at.
23       BY MR. MIGLIORI:
24   Q.   Once identified, what were the
25  obligations of that registrant, in your

Page 376

1  experience, or to your understanding?
2        MS. MAINIGI:  Objection.
3        THE WITNESS:  If you deem it
4  suspicious, you report.
5        BY MR. MIGLIORI:
6    Q.   When do you report it?
7    A.   When discovered.
8    Q.   If you turn to Page 11 of 15,
9  there's a reference here by the HDMA about
10  documentation.  In 2008, the HDMA guidance on
11  document says: "All investigations should be
12  fully documented, and all records of the
13  investigation should be retained in an
14  appropriate location within the firm, such as
15  with other records relating to the particular
16  customer."
17       Do you agree with that statement of
18  the HDMA in 2008?
19       MS. MAINIGI:  Objection.
20       THE WITNESS:  I do, sir.
21       BY MR. MIGLIORI:
22   Q.   Is that something that you told
23  registrants when you briefed them in your
24  distributor briefings?
25       MS. MAINIGI:  Objection.

28 (Pages 373 - 376)

Page 377

1    THE WITNESS:  Most certainly was.
2    BY MR. MIGLIORI:
3    Q.    And did you believe that to be the
4  appropriate procedure or policy in 1995 when
5  you got to the DEA and were in the field in
6  Dallas?
7    MS. MAINIGI:  Objection.
8    THE WITNESS:  Yes, sir.
9    BY MR. MIGLIORI:
10   Q.    The HDMA wrote:  "At a minimum,
11 documentation should include the names, titles
12 and other relevant identification of the
13 representative of the customer contacted,
14 example given:  pharmacist in charge, dates of
15 contact, full description of questions asked
16 and requests for information made by the
17 distributor and of information provided by the
18 customer."
19   Do you agree with that guidance from
20 the HDMA to its distributor members in 2008?
21   MS. MAINIGI:  Objection.
22   THE WITNESS:  I certainly do.
23   BY MR. MIGLIORI:
24   Q.    And would that have been what you
25 would expect in 1995 of registrant

Page 378

1  distributors?
2    MS. MAINIGI:  Objection.
3    THE WITNESS:  Yes, sir.
4    BY MR. MIGLIORI:
5    Q.    In fact, have you ever looked at the
6  standard operating procedures of any of the
7  registrant distributors in your experience at
8  the DEA?
9    MR. BENNETT:  Objection.
10   MS. MAINIGI:  Objection.
11   MR. BENNETT:  I don't want you to
12 talk about specific investigations.  You can
13 talk generally though.
14   THE WITNESS:  As I'm -- would you
15 please repeat the question.
16   BY MR. MIGLIORI:
17   Q.   Sure.
18   Are you familiar with any standard
19 operating procedures of any of the distributor
20 registrants?
21   First "yes" or "no."
22   MS. MAINIGI:  Objection.
23   THE WITNESS:  No.
24   MR. MIGLIORI:  Okay.  Made that
25 quick.

Page 379

1    BY MR. MIGLIORI:
2    Q.    It goes on to say:  "The
3  documentation should include a clear statement
4  of the final conclusion of the investigation,
5  including why the order investigated was or was
6  not determined to be suspicious."
7    Do you agree with that statement of
8  the HDMA?
9    MS. MAINIGI:  Objection.
10   THE WITNESS:  Yes, sir.
11   Q.    And would that have been appropriate
12 guidance in 1995 when you got to the DEA?
13   MS. MAINIGI:  Objection.
14   THE WITNESS:  Yes, sir.
15   BY MR. MIGLIORI:
16   Q.    Finally:  "That statement should be
17 signed and dated by the reviewer.  Copies of
18 any written information provided by the
19 customer should also be retained as part of the
20 documentation of the investigation."
21   Was that good guidance by the HDMA
22 in 2008?
23   MS. MAINIGI:  Objection.
24   MR. BENNETT:  Objection.
25   THE WITNESS:  Yes, sir.

Page 380

1    BY MR. MIGLIORI:
2    Q.    And would that have been appropriate
3  guidance in 1995 when you got to the DEA?
4    MS. MAINIGI:  Objection.
5    THE WITNESS:  Yes, sir.
6    BY MR. MIGLIORI:
7    Q.    Let me just bring you to the Page 14
8  of 15 under "Additional Recommendations."
9    The HDMA, on page 14 of 15, lists
10 under "Additional Recommendations" the third
11 bullet point.  Well, it says:  "It is
12 recommended that a distributor include in its
13 system provisions for," the third bullet point,
14 "periodic review of the distributor system for
15 monitoring for suspicious orders, including the
16 system design and the thresholds to determine
17 whether a revision should be developed.  For
18 example, if the FDA approves a new controlled
19 substance or a new indication for use for an
20 existing controlled substance, or if the DEA
21 makes new information available regarding a
22 drug or concern, provisions to the thresholds
23 may be needed."
24   Do you agree with the guidance of
25 the HDMA in 2008 that periodic review of the

29 (Pages 377 - 380)

Page 381

1 Suspicious Order Monitoring System is
2 appropriate?
3      MS. MAINIGI:  Objection.
4      THE WITNESS:  Yes, sir.
5      BY MR. MIGLIORI:
6   Q.    Would that have been appropriate in
7 1995 when you got to the DEA?
8      Would that have been appropriate
9 guidance?
10      MS. McCLURE:  Objection.
11      MS. MAINIGI:  Objection.
12      THE WITNESS:  Yes, sir.
13      BY MR. MIGLIORI:
14   Q.   Why?
15      MS. MAINIGI:  Objection.
16      THE WITNESS:  The means of criminal
17 activity was always changing; didn't stay
18 constant.  Means of -- of trying to obtain
19 these narcotic drugs illicitly was always
20 changing.  The drugs themselves, the
21 combinations of those drugs.
22      There's -- can't predict what the
23 drug is today is going to be the same drug of
24 abuse.  Opana was a regional drug through the
25 Midwest that stayed consistent for a little

Page 382

1 over a year and quickly died out because it
2 just didn't have the desired effect.
3      Things were going to come up and
4 arise and change.  The system had to be adapted
5 to detect these changes.
6      BY MR. MIGLIORI:
7   Q.    What was your understanding of whose
8 responsibility it was to periodically review
9 and make those changes?
10      MS. MAINIGI:  Objection.
11      THE WITNESS:  The registrants'.
12      BY MR. MIGLIORI:
13   Q.    Did that responsibility, in your
14 experience, go back to 1995 when you got to the
15 DEA?
16      MS. MAINIGI:  Objection.
17      THE WITNESS:  Yes, sir.
18      MR. MIGLIORI:  Want to take a break?
19 Let's take a break.
20      THE VIDEOGRAPHER:  We are going off
21 the record.
22      This is the end of Media Unit No. 2.
23      The time is 11:31.
24      (A short recess was taken.)
25      THE VIDEOGRAPHER:  We are going back

Page 383

1 on the record.
2      This is the start of Media Unit No.
3 3.
4      The time is 11:54.
5      You may proceed, Counsel.
6 EXAMINATION BY COUNSEL FOR CUYAHOGA COUNTY
7      PLAINTIFFS
8      BY MR. SHKOLNIK:
9   Q.   Good morning, Mr. Wright.
10      My name's Hunter Shkolnik.  I
11 introduced myself last Thursday when your first
12 day of your deposition began.
13      You and I have never met before that
14 Thursday occasion; am I correct?
15   A.   No, sir.  Not to the best of my
16 recollection.
17   Q.   And let me reintroduce myself and
18 why I'm here.  I represent Cuyahoga County as
19 well as -- as -- as various plaintiffs in this
20 litigation.  And Cuyahoga County is one of the
21 cases going to trial this coming October in the
22 opioid litigation.
23      You, sir, during your years at DEA,
24 did you ever -- or were you ever assigned to
25 the region that would encompass Ohio, Cuyahoga

Page 384

1 County, when you were working in the field?
2      MS. MAINIGI:  Objection.
3      THE WITNESS:  No, sir.
4      BY MR. SHKOLNIK:
5   Q.    Did you ever have occasion to work
6 any investigations in Ohio, specifically
7 Cuyahoga County or, for that matter, Summit
8 County, which is adjoining it?
9      MS. MAINIGI:  Objection.
10      MR. BENNETT:  Objection.  Don't
11 speak about specific investigation.
12      But you can answer generally.
13      THE WITNESS:  Not to my
14 recollection.
15      BY MR. SHKOLNIK:
16   Q.    Now, you -- you've been asked
17 questions on Thursday and again this morning
18 about attending and -- and present -- and
19 presentations at a pharmaceutical industry
20 conference in Houston September 11th and 12th,
21 2007.
22      Do you actually have recollection of
23 attending that conference with Mr. Mapes and
24 doing any presentations?
25      MS. MAINIGI:  Objection.

30 (Pages 381 - 384)

Page 385

1      MR. STEPHENS:  Objection.
2      THE WITNESS:  The dates?  Repeat
3  those --
4      BY MR. SHKOLNIK:
5   Q.   September 11th and 12th of 2007 in
6  Houston, Texas?
7      MS. McCLURE:  Objection.  Asked and
8  answered.
9      MR. SHKOLNIK:  Not by me.
10      THE WITNESS:  Vaguely, yes.
11      BY MR. SHKOLNIK:
12   Q.   And -- and would I be correct in
13  stating that that was not just attend by
14  distributors, that conference in Houston in
15  2007, correct?
16      MS. MAINIGI:  Objection.
17      THE WITNESS:  Correct.
18      BY MR. SHKOLNIK:
19   Q.   And that was what we would call a
20  pharmaceutical industry conference, meaning you
21  would have various levels of the pharmaceutical
22  industry, and registrants in particular,
23  pharmacy, pharmacy chains, manufacturers and
24  distributors that were in attendance, correct?
25      MS. MAINIGI:  Objection.

Page 386

1      THE WITNESS:  Correct.
2      MR. SHKOLNIK:  And I'd like to hand
3  you what I've marked as Exhibit No. -- I
4  believe it's 35.
5      I can give you this.
6      (Deposition Exhibit 35 was marked
7  for identification.)
8      MR. SHKOLNIK:  Unlike my colleagues,
9  I only have limited numbers of copies.  So I
10  apologize.
11      MS. MAINIGI:  Could you read the
12  Bates number for the record.
13      MR. SHKOLNIK:  I will.
14  Cardinal Health 019076.
15      BY MR. SHKOLNIK:
16   Q.   And sir, I've just handed you what
17  I've marked as Exhibit No. 35.  And it appears
18  to -- and -- and if -- if I understand it
19  correctly, it is a list of attendees at the
20  13th pharmaceutical industry conference in
21  Houston, Texas, September 11th, 2000 --
22  September 12, 2007.
23      Do you have that in front of you,
24  sir?
25   A.   I do, sir.

Page 387

1   Q.   And also attached to it is a portion
2  of a -- one of the PowerPoints presented at
3  that conference.  We can go into details in a
4  little bit.
5      But it is a -- a PowerPoint
6  presentation, correct?
7   A.   It is, sir.
8   Q.   And that is not -- withdraw that.
9      If we could just briefly go through
10  35.
11      On -- on the first page at the
12  bottom it says "1 of 24."  We -- we see that
13  there are a list of attendees.
14      MR. SHKOLNIK:  How I do zoom this
15  out.  Here we go.
16      BY MR. SHKOLNIK:
17   Q.   Okay.  We have a list of attendees
18  that were here.  I want to just go through this
19  and see if this helps refresh your recollect as
20  to who some of the attendees are.
21      We have here Actavis --
22      MS. MAINIGI:  Is that a question, or
23  what -- what is it?
24      MR. SHKOLNIK:  It's all -- it's all
25  of the above.  I hope you like it.

Page 388

1      MS. MAINIGI:  Objection.
2      BY MR. SHKOLNIK:
3   Q.   Actavis was there; am I correct,
4  sir?
5      MS. MAINIGI:  Objection.
6      MR. BENNETT:  Objection.
7      THE WITNESS:  Yes, sir.
8      BY MR. SHKOLNIK:
9   Q.   Actavis Mid-Atlantic, LLC, also had
10  a -- had a person there; am I correct?
11      MS. MAINIGI:  Objection.
12      MS. McCLURE:  Objection.
13      MR. BENNETT:  Object to the form.
14      MR. SHKOLNIK:  I don't think --
15      MR. BENNETT:  Counsel, I just --
16  just so the record's clear, are you asking him
17  whether the document says that or whether he --
18      MR. SHKOLNIK:  Okay.  I'll --
19      MR. BENNETT:  -- remembers?
20      MR. SHKOLNIK:  I'll rephrase it.
21  That's a --
22      MR. BENNETT:  Thank you, sir.
23      BY MR. SHKOLNIK:
24   Q.   According to the document, the --
25  the attendee list, it suggests that Actavis and

1    Actavis Mid-Atlantic was in attendance, if you
2    see Page 2.
3         A.   Yes, sir.
4              MS. MAINIGI:  Objection.
5              BY MR. SHKOLNIK:
6         Q.   It -- it also suggests that, whether
7    they were actually physically there or -- and
8    attending, they were registered, also
9    AmerisourceBergen had a group of registered
10   participants at that conference, correct?
11             MS. McCLURE:  Objection.
12             THE WITNESS:  Yes, sir.
13             BY MR. SHKOLNIK:
14        Q.   And if we turn to Page No. 4, we
15   have more AmerisourceBergen as well as
16   AmerisourceBergen Specialty Group represent --
17   representatives who were registered at that
18   pharmaceutical conference in -- in Houston,
19   correct?
20             MS. McCLURE:  Objection.
21             THE WITNESS:  Yes, sir.
22             BY MR. SHKOLNIK:
23        Q.   And when you go to these type of
24   conferences, is it common to get a list of the
25   attendees so you know who was registered and

1    who'd be participating?
2              MS. MAINIGI:  Objection.
3              THE WITNESS:  It was a very common
4    practice.
5              BY MR. SHKOLNIK:
6         Q.   And if we go to Page 6, it looks
7    like we have Cardinal Health represented in the
8    house that day as well, correct?
9              MS. MAINIGI:  Objection.
10             BY MR. SHKOLNIK:
11        Q.   Or at least registered.
12        A.   Correct, sir.
13        Q.   And if we go to Page 7, we have
14   Cephalon registered and potentially in the
15   house for the presentation by at least three
16   people, correct?
17             MR. O'CONNOR:  Objection.
18             THE WITNESS:  Correct, sir.
19             BY MR. SHKOLNIK:
20        Q.   And if we go to the next page, Page
21   8, we have, again, Cephalon and Cephalon doing
22   business as Anesta Corp., also registered
23   attendee at the Houston pharmaceutical
24   conference where the presentation was made,
25   correct?

1              MR. O'CONNOR:  Objection.
2              THE WITNESS:  Correct, sir.
3              BY MR. SHKOLNIK:
4         Q.   And if we go to the next page, which
5    I'm looking at is Page 10, we -- we -- we also
6    have FedEx Custom Critical and FedEx Freight as
7    a registered attendee at the conference in
8    Houston.
9              Does it say that?
10        A.   Yes, sir.
11        Q.   Now, FedEx was one of the -- was an
12   entity that actually participated in the
13   distribution process of controlled substances,
14   was it not?
15             MS. MAINIGI:  Objection.
16   Foundation.
17             MR. EPPICH:  Objection.
18             THE WITNESS:  Yes, sir.
19             BY MR. SHKOLNIK:
20        Q.   And they were -- they actually had a
21   registration where they could distribute for
22   manufacturers, couldn't they?
23             MS. MAINIGI:  Objection.
24             THE WITNESS:  Yes, sir.
25             BY MR. SHKOLNIK:

1         Q.   And then if we go to the next page,
2    we have H.D. Smith as a registrant on Page 11,
3    correct?
4              MS. MAINIGI:  Objection.
5              MR. EPPICH:  Object.
6              BY MR. SHKOLNIK:
7         Q.   When I say "registered," I mean
8    registered attendee at the conference.
9              Correct?
10        A.   Yes, sir.
11             MS. MAINIGI:  Objection.
12             BY MR. SHKOLNIK:
13        Q.   If we go to the next page, we have
14   Henry Schein also registered by a couple of
15   people, both regulatory affairs people, for --
16   as attendees at the conference, correct?
17             MS. MAINIGI:  Objection.
18             THE WITNESS:  Yes, sir.
19             BY MR. SHKOLNIK:
20        Q.   And if we could go now to Page 15,
21   we have Mallinckrodt Davidian, and we have
22   McKesson as registered attendees at the
23   pharmaceutical conference in Houston, correct.
24             MR. EPPICH:  Objection.
25             THE WITNESS:  Yes, sir.

32 (Pages 389 - 392)

1      BY MR. SHKOLNIK:
2      Q.   If we go to the next page, we
3   actually have McKesson's Medical Surgical,
4   Incorporated, as a registered attendee for the
5   conference, correct?
6          MR. EPPICH:  Objection.
7          MR. SHKOLNIK:  Sorry.  Go back to
8   that.  I apologize.
9          THE WITNESS:  Yes, sir.
10         BY MR. SHKOLNIK:
11     Q.   And if we go to the next page, 17,
12  we have Mylan Laboratories also as a registered
13  attendee for the conference, correct?
14         MR. EPPICH:  Objection.
15         THE WITNESS:  Yes, sir.
16         MR. SHKOLNIK:  Going to skip ahead.
17         BY MR. SHKOLNIK:
18     Q.   If we could go to Page 20, we have
19  Purdue and Qualitest Pharmaceuticals both as
20  registered attendees at this conference,
21  correct?
22         MR. O'CONNOR:  Objection.
23         MS. MAINIGI:  Objection.
24         MS. McCLURE:  Objection.
25         THE WITNESS:  (No response.)

1      BY MR. SHKOLNIK:
2      Q.   And if we could go to Page 23, we
3   even have Walgreens here --
4          MR. STEPHENS:  Objection.
5          BY MR. SHKOLNIK:
6      Q.   -- as a attendee registrant at this
7   conference, correct?
8          MR. STEPHENS:  Objection.
9          MR. SHKOLNIK:  I knew that was
10  coming.
11         BY MR. SHKOLNIK:
12     Q.   Am I correct, sir?
13     A.   Yes, sir.
14     Q.   So would -- would I be -- oh, and I
15  think I've got one more here.  Oh, I do.
16         If we could just go to the last
17  page.  We've Walgreen Company again.  And
18  actually, they even had their lawyer there
19  attending the -- as a registrant --
20         MR. STEPHENS:  Same objection.
21         BY MR. SHKOLNIK:
22     Q.   -- for the conference, Mr. Pinon,
23  correct?
24         MR. STEPHENS:  Objection.
25         THE WITNESS:  Yes, sir.

1      BY MR. SHKOLNIK:
2      Q.   And we have Watson Laboratories also
3   attending as a -- or a registered attendee at
4   the conference, correct?
5          MR. O'CONNOR:  Objection.
6          THE WITNESS:  Yes, sir.
7          BY MR. SHKOLNIK:
8      Q.   Now, would it be fair to say that,
9   when these pharmaceutical companies, chain
10  pharmacies, manufacturers and distributors were
11  attending this conference and -- and you and/or
12  Mr. Mapes presenting there or Mr. Mapes
13  presenting there, was the goal to try to get
14  out your information to as many people as you
15  possibly could at a forum such as this where so
16  many people were -- or so many registrants were
17  attending?
18         MS. MAINIGI:  Objection.
19         THE WITNESS:  Absolutely.
20         BY MR. SHKOLNIK:
21     Q.   I mean, if you want to get the word
22  out from the DEA perspective, you want to go to
23  where the registrants are so that you could
24  really hit as many or get as many to hear the
25  word that you're -- that you're -- you're --

1   you're sort of preaching.
2          You want them to get it, and this
3   was a good places to do it, correct?
4          MS. MAINIGI:  Objection.
5          MR. BENNETT:  Objection.  Form.
6          THE WITNESS:  Yes, sir.
7          BY MR. SHKOLNIK:
8      Q.   I mean I'm not -- I'm not using the
9   word "preaching" in a derogatory way.
10         You were trying to get the word out
11  to the industry that you had a problem with
12  respect to sales and distribution of controlled
13  substances, and these companies had to do
14  something, and they had to act, correct?
15         MS. MAINIGI:  Objection.
16         Mr. Shkolnik, if you could -- I
17  don't know what foundation you have that you
18  are trying to put all these words in this
19  witness's mouth.
20         MR. SHKOLNIK:  Please, you know, do
21  you have an objection to form?
22         MS. MAINIGI:  He's not even said
23  that --
24         MR. SHKOLNIK:  Do you have an
25  objection to form?  Say it.

33 (Pages 393 - 396)

Page 397

1    MS. MAINIGI:  I've an objection to
2  form.  And I --
3    MR. SHKOLNIK:  Okay.  Could we go
4  off the record.  We're going to call Special
5  Master Cohen.
6    MS. MAINIGI:  I'm fine with that.
7    MR SHKOLNIK:  On.  That -- that --
8  that's good.
9    THE VIDEOGRAPHER:  We -- we are
10  going off the record.  The time is 12:06.
11    (A short recess was taken.)
12    (Whereupon, Special Master Cohen was
13  called.)
14    (Discussion off the record.)
15    SPECIAL MASTER COHEN:  Who right now
16  is doing the questioning, and who is stating
17  objections?
18    MS. MAINIGI:  Hunter is doing the
19  questioning.  And I'm stating the objection.
20    And the problem that we are having
21  -- and I'm happy to read the question -- is
22  this witness has indicated he actually has no
23  idea whether he was at this meeting, number
24  one.  Number two, he's actually previously
25  testified under oath that he was not at the

Page 398

1  meeting.
2    I think he's trying to be as helpful
3  as he can to the plaintiffs' counsel, which we
4  all understood why.
5    And so, despite all of that, Mr.
6  Shkolnik is building into his questioning all
7  of these assumptions.  He's not asking a
8  straight question.  He's basically taking a
9  page and then asking a question at the end of
10  his self-serving statements.
11    MR. SHKOLNIK:  I'm cross-examining
12  the witness.  I think we're allowed to do that.
13    MS. MAINIGI:  And so I think -- so I
14  put in an objection.  It has been object to
15  form the entire morning when Mr. Migliori was
16  questioning.
17    And Mr. Shkolnik has just now
18  started questioning and is loading up all of
19  his questions with just is garbage.
20    MR. SHKOLNIK:  David, could we just
21  read the question and then --
22    SPECIAL MASTER COHEN:  Yeah.  Go
23  ahead.
24    MR. SHKOLNIK:  -- and then the
25  speech that came at the end of it.

Page 399

1    If we could go back to that.
2    MS. MAINIGI:  I -- I'm looking for
3  it.  I -- I think we keep talking, so it goes
4  further and further back.
5    MR. SHKOLNIK:  Maybe the court
6  reporter -- could you pull that up?
7    (Discussion held off the record.)
8    (The record was read as requested.)
9    SPECIAL MASTER COHEN:  All right.
10  So look, this is how this needs to go forward.
11  I said it before that an objection needs to be
12  one word with an explanation, and the
13  explanation can be about ten words or less.  So
14  an appropriate objection would be, "Objection.
15  Form."
16    When it's time to decide whether
17  that colloquy is allowed in as evidence, and if
18  -- if it ever comes up that counsel designates
19  that colloquy, then the court will look at the
20  objection and may well decide that the form was
21  shitty and that the question was inappropriate
22  and that the response isn't allowed in.  But
23  the only thing that needs to happen is that
24  somebody needs to register an objection.
25    I always think that, when counsel is

Page 400

1  inside of a deposition like this, that they are
2  at odds, but sometimes it actually does some
3  good for questioning counsel to think about
4  what the objection is and think to themselves,
5  "Hmm, you know what?  That really wasn't such a
6  good-formed question.  Maybe I'll reask it."
7    But that isn't relevant to what you
8  were calling me for.  The point is that an
9  objection has to be extremely succinct, in the
10  form of a word and a very brief explanation so
11  that a reviewing court knows what the basis for
12  the objection is.  And that's it.
13    MR. SHKOLNIK:  Thank you.
14    MS. MAINIGI:  David, that's fine.
15    SPECIAL MASTER COHEN:  And you can
16  have an opportunity for whatever you want to
17  call it, redirect, to clean things up or ask
18  additional questions.  And that's how that is
19  addressed.
20    MS. MAINIGI:  David, that's fine.
21  And we'll follow that.  But it doesn't work
22  perfectly, your solution, in the case of a
23  witness who can be easily influenced and who is
24  a consultant for the plaintiffs.
25    SPECIAL MASTER COHEN:  You can make

34 (Pages 397 - 400)

Page 401

1  that argument later.
2      MS. MAINIGI:  Okay.  I will.
3      MR. SHKOLNIK:  Thank you very much.
4      SPECIAL MASTER COHEN:  Anything
5  else?
6      MR. SHKOLNIK:  No.  Thank you.
7      SPECIAL MASTER COHEN:  Okay.
8      THE VIDEOGRAPHER:  We are going back
9  on the record.
10      The 12 -- the time is 12:12.
11      You may proceed, Counsel.
12      BY MR. SHKOLNIK:
13  Q.   So, Mr. Wright, was I correct in
14  stating that one of the reasons to go to a -- a
15  industry conference is to try to get the word
16  out to as many registrants as possible in one
17  location?
18      MS. MAINIGI:  Objection.
19      THE WITNESS:  Yes, sir.
20      MR. SHKOLNIK:  I'm going to hand you
21  a document which I marked as Exhibit 36.
22      (Deposition Exhibit 36 was marked
23  for identification.)
24      BY MR. SHKOLNIK:
25  Q.   And it is, again, a document from

Page 402

1  the Houston conference September 11, 12, 2007.
2  This is HDS_MDL Bates No. 2033.  So it's a
3  document produced by I believe H.D. Smith in
4  this case.
5      And -- and attached to this document
6  is a PowerPoint which I don't think we've
7  looked at yet in your deposition as well as
8  a -- a printout from the Office of Diversion
9  Control outlining the pharmaceutical industry
10  conference attendees by DEA; am I correct?
11      MS. MAINIGI:  Objection.
12      THE WITNESS:  Yes, sir.
13      BY MR. SHKOLNIK:
14  Q.   And if we could turn now to what would
15  be Bates numbered at the bottom 2035.  This
16  type of notice -- it -- at the top it says --
17      MR. BENNETT:  Hang on a second,
18  Counsel.  He's going to try to find it.
19      MR. SHKOLNIK:  Yeah.  I'm going to
20  try to -- it says "Office of Diversion
21  Control," to help you find it.
22      Thank you.
23      BY MR. SHKOLNIK:
24  Q.   This type of notice is -- is common
25  for DEA that, if you -- if you attend

Page 403

1  something, there's an official recognition that
2  there was attendance by DEA, if you know?
3      MR. BENNETT:  Objection to form.
4      MS. MAINIGI:  Objection.
5      MR. SHKOLNIK:  I'll rephrase it.
6      BY MR. SHKOLNIK:
7  Q.   Are you familiar with this type of
8  notice being given out by DEA?
9  A.   Yes, sir.
10  Q.   And is -- is this something that's
11  utilized when DEA attends such -- something
12  such as a conference or has a meeting that it
13  wants to give notice of?
14      MS. MAINIGI:  Objection.
15      MS. McCLURE:  Form.
16      BY MR. SHKOLNIK:
17  Q.   You can answer.
18  A.   Yes, sir.
19  Q.   And here it -- it -- it says that
20  there are a number of people in attendance, and
21  Mr. Mapes was one of the people, and it was --
22  the topic was -- and it says a PowerPoint slide
23  presentation.
24      And it says Mr. Mapes, Michael
25  Mapes, "Suspicious Orders"; am I correct?

Page 404

1      MS. MAINIGI:  Objection.
2      THE WITNESS:  Yes, sir.
3      BY MR. SHKOLNIK:
4  Q.   And if we could turn now to the next
5  page that's Bates No. 2036, if we could zoom in
6  on that.
7      This actually -- this DEA notice
8  also gives a -- a synopsis of what Mr. Mapes
9  presented to the conference in Houston, this
10  pharmaceutical conference that was attended by
11  the individuals we -- I'm sorry -- the --
12  withdraw that.
13      This notice give a synopsis of Mr.
14  Mapes's presentation; am I correct?
15      MS. MAINIGI:  Objection.
16      THE WITNESS:  Yes, sir.
17      BY MR. SHKOLNIK:
18  Q.   And if I'm reading it correctly --
19      MR. SHKOLNIK:  And that's my
20  highlight on the document, just in case anyone
21  questions it.
22      BY MR. SHKOLNIK:
23  Q.   Toward the bottom middle section it
24  says: In 21 CFR Section 1301.74.  Other
25  security controls include making a good faith

35 (Pages 401 - 404)

Page 405

1  inquiry, report suspicious orders, report
2  significant losses."
3      He also quoted 21 CFR 1301.74(b):
4  "Registrant shall design and operate a system
5  to disclose to the registrant suspicious orders
6  of controlled substances.  The registrant shall
7  inform the field diversion office of the
8  administration in his area of suspicious orders
9  when discovered by the registrant."
10      That was your understanding of what
11  the rule was while you were working in
12  Washington from 2005 to your retirement,
13  correct?
14      MS. MAINIGI:  Objection.
15      THE WITNESS:  Yes, sir.
16      BY MR. SHKOLNIK:
17   Q.   And -- and just so -- so I -- I
18  understand it, was that also your understanding
19  from before getting to Washington in 2005 when
20  you were working out in the field?
21      MS. MAINIGI:  Objection.
22      THE WITNESS:  Yes, sir.
23      BY MR. SHKOLNIK:
24   Q.   This doesn't represent any -- from
25  your perspective, this did not represent any

Page 406

1  change in any law or regulation at DEA.
2      Fair statement?
3      MS. MAINIGI:  Objection.
4      THE WITNESS:  Yes, sir.
5      BY MR. SHKOLNIK:
6   Q.   Now, by the way, it also has another
7  paragraph that talks about that a Mr.
8  Zimmerman, who I think is referred to as -- as
9  vice president corporate security regulatory
10  affairs at AmerisourceBergen, also spoke at
11  this conference.  And if I'm reading it
12  correctly -- please tell me if I'm not reading
13  it correctly.
14      "Mr. Zimmerman stressed the
15  importance of knowing your customer and
16  providing due diligence investigations on all
17  new retail and wholesale accounts with the
18  exception of retail chain pharmacies included
19  in new account setup processes and new account
20  questionnaire."
21      I mean was it common that industry
22  people would speak alongside DEA people, from
23  your experience, when you attended conferences
24  like this?
25      MS. McCLURE:  Object to form.

Page 407

1      MS. MAINIGI:  Objection.
2      THE WITNESS:  It wasn't uncommon but
3  not necessarily done all the time.
4      BY MR. SHKOLNIK:
5   Q.   Now, if we can now go to what's
6  Bates numbered 252 in this PowerPoint -- I'm
7  sorry -- in this exhibit numbered -- I think
8  it's 36.
9      And here we have -- I think we may
10  have seen a version of this earlier, but I'm
11  not sure.  But I just want to ask you a few
12  questions.
13      If I read this correctly:
14  "Suspicious orders."  Once again, Title 21 CFR
15  1301.74(b).  "Requires registrant to design and
16  operate a system to disclose suspicious orders
17  of controlled substances to DEA."
18      That was your understanding in 2005,
19  correct, sir?
20      MS. MAINIGI:  Objection.
21      THE WITNESS:  Yes, sir.
22      BY MR. SHKOLNIK:
23   Q.   That was your understanding straight
24  through your retirement in 2017, correct, sir?
25      MS. MAINIGI:  Objection.

Page 408

1      THE WITNESS:  Yes, sir.
2      BY MR. SHKOLNIK:
3   Q.   Now, if we go to the second
4  paragraph of Mr. Mapes's PowerPoint slide, it
5  says:  "The requirement is to report suspicious
6  orders, not suspicious sales after the fact."
7      Did I read that correctly, sir?
8      MS. MAINIGI:  Objection.
9      THE WITNESS:  Yes, sir.
10      BY MR. SHKOLNIK:
11   Q.   Now, what is the difference between
12  a suspicious order versus a suspicious sales
13  after the fact, if you could -- your
14  understanding?
15      MS. MAINIGI:  Objection.
16      THE WITNESS:  A suspicious order is
17  the order placed.  I send you a request.  I
18  want to order 1,500 widgets.  You get this, and
19  you say that it -- that's excess -- or it's
20  suspicious, it's whatever --
21   Q.   Uh-huh.
22   A.   -- and you can't fulfill it.  Maybe
23  you don't even have it in stock.  But if you
24  deem it's suspicious, you report it.
25      A sale --

36 (Pages 405 - 408)

Page 409

1    Q.   Thank you.
2    A.   A sale says this is completed.  It's
3  already out.  It has been fulfilled.  It has
4  been delivered.  And the potential harm or
5  damage is now there.
6    Q.   So you really can't pull it back at
7  that point once it's out into the market, is
8  what you're saying?
9        MS. MAINIGI:  Objection.
10        THE WITNESS:  No.
11        BY MR. SHKOLNIK:
12    Q.   So when Mr. Mapes is -- is -- is
13  telling this group of attendees at the
14  pharmaceutical conference "The requirement is
15  to report suspicious orders, not suspicious
16  sales after the fact," from your understanding,
17  what was he telling those industry
18  representatives that were in attendance in
19  Houston in 2007?
20        MS. McCLURE:  Objection.
21  Foundation.
22        MS. MAINIGI:  Objection.
23  Foundation.
24        THE WITNESS:  Don't let the drugs
25  get on the street.

Page 410

1        BY MR. SHKOLNIK:
2    Q.   Was that the -- was that the word
3  that DEA was trying to get out to man --
4  withdraw that.
5        From your recollection and
6  understanding, was that the word that your
7  group at DEA and DEA at the time was trying to
8  get out to industry?
9        MS. MAINIGI:  Objection.
10        MR. SHKOLNIK:  You knew the
11  objection was coming.
12        THE WITNESS:  This was the
13  difference between the old system of Excessive
14  and the new system Suspicious.  Excessive it
15  was reporting after the sale.  Suspicious was
16  to catch them before it went out.
17        BY MR. SHKOLNIK:
18    Q.   And -- and if we could turn, if you
19  would, to Bates No. 254.
20    A.   Okay.
21    Q.   In this slide that -- in Mr. Mapes's
22  presentation, "The responsibility for making
23  the decision ship" -- "ship rests with the
24  supplier."
25        What was your understanding of -- of

Page 411

1  -- of that when you were working with Mr. Mapes
2  during that time frame?
3        MS. MAINIGI:  Objection.
4        THE WITNESS:  This was incorporated
5  in other presentations, this very statement.
6        BY MR. SHKOLNIK:
7    Q.   And what was the significance of
8  that statement?
9        MS. MAINIGI:  Objection.
10        THE WITNESS:  The onus of
11  responsibility lies with the registrant.
12        BY MR. SHKOLNIK:
13    Q.   So that would be either the
14  manufacturer selling to a distributor,
15  distributor selling to a pharmacy, whichever in
16  line you're -- is -- is occurring?
17        MS. MAINIGI:  Objection.
18        BY MR. SHKOLNIK:
19    Q.   Is that a fair statement?
20        MS. MAINIGI:  Objection.
21        THE WITNESS:  That's correct, sir.
22        BY MR. SHKOLNIK:
23    Q.   And -- and you were asked some
24  questions the other day by counsel about
25  visibility.  And I think the questions focused

Page 412

1  on who would have visibility of what, would it
2  be manufacturer to distributor, distributor to
3  pharmacy.
4        Do you recall those questions the
5  other day?
6        MS. MAINIGI:  Objection.
7        THE WITNESS:  I do, sir.
8        BY MR. SHKOLNIK:
9    Q.   And one of the -- the -- sort of the
10  gist of what you were being asked is, "Well,
11  does a manufacturer see what's at the
12  pharmacist?  Does a distributor see what's --
13  do they see everything?  Who sees what?"
14        Is that a fair statement from the
15  questions you were asked?
16        MS. MAINIGI:  Objection.
17        THE WITNESS:  Yes, sir.
18        BY MR. SHKOLNIK:
19    Q.   And is it your understanding that,
20  generally speaking, there may not be situations
21  -- there may be situations where a manufacturer
22  doesn't know what a pharmacy is doing, correct?
23        MS. MAINIGI:  Objection.
24        THE WITNESS:  That'd be correct.
25        BY MR. SHKOLNIK:

37 (Pages 409 - 412)

Page 413

1     Q.    And there are situations where only
2  a distributor may have certain information
3  about a pharmacy, correct?
4           MS. MAINIGI: Objection.
5           THE WITNESS: Yes, sir.
6           BY MR. SHKOLNIK:
7     Q.    But there are also situations --
8  withdraw that.
9           Were you aware of situations back
10 when you were -- at the agency that
11 manufacturers, distributors and pharmacies
12 actually shared the data up and down the stream
13 through sharing agreements?
14          Were you aware of that?
15    A.    No, sir.
16          MS. MAINIGI: Objection.
17          BY MR. SHKOLNIK:
18    Q.    And just -- the other day you were
19 asked questions about the issue of -- of
20 shipping and -- and not -- when this idea of do
21 not ship comes into -- comes into play.
22          Do you recall that?
23    A.    Yes, sir.
24          MS. MAINIGI: Objection.
25          BY MR. SHKOLNIK:

Page 414

1     Q.    And -- and would I be correct in
2  stating that there -- from all the years that
3  you were at DEA, there were regulations in
4  place that dealt with the obligations of a
5  registrant not to ship if there was a
6  suspicious order that they could identify,
7  correct?
8           MS. MAINIGI: Objection.
9           THE WITNESS: Yes, sir.
10          BY MR. SHKOLNIK:
11    Q.    I mean that was not a new phenomenon
12 in 2005, '6, '7, was it, sir?
13          MS. MAINIGI: Objection.
14          THE WITNESS: No, sir.
15          BY MR. SHKOLNIK:
16    Q.    And that obligation was on -- was in
17 place for whether it was a pharmacy, whether it
18 was a chain pharmacy, whether it was a
19 distributor, whether it was a manufacturer; if
20 they identified a suspicious order, the
21 obligation was on them to decide if they should
22 ship it or not, correct?
23          MS. MAINIGI: Objection.
24          THE WITNESS: Yes, sir.
25          BY MR. SHKOLNIK:

Page 415

1     Q.    And there was no sea change in 2000
2  time frame, mid 2000s, in terms of changing of
3  the regulations in that regard, correct?
4           MS. MAINIGI: Objection.
5           THE WITNESS: Yes, sir.
6           MR. SHKOLNIK: In fact, I'm going to
7  mark as Exhibit No. 30 -- was the last one 37?
8           MR. BENNETT: 37.
9           THE REPORTER: We were up to 37.
10          MR. SHKOLNIK: Okay. The next
11 exhibit's going to be 38. I'm going to hand
12 you --
13          (Discussion held off the
14 stenographic record.)
15          MR. SHKOLNIK: Going to hand you a
16 document marked as Exhibit No. 37.
17          (Deposition Exhibit 37 was marked
18 for identification.)
19          MR. SHKOLNIK: It is Bates numbered
20 Cardinal 2804_01465723, dated June 21, 1993.
21 And it's entitled "NWDA Suspicious Order
22 Monitoring System."
23          BY MR. SHKOLNIK:
24    Q.    When you were at DEA, was it part of
25 your job to try to determine what was -- what

Page 416

1  was the regulatory requirements that -- that --
2  that you were working under in terms of the
3  controlled substance monitoring?
4           MS. MAINIGI: Objection.
5           MR. SHKOLNIK: I'll rephrase that.
6           BY MR. SHKOLNIK:
7     Q.    When you were working another DEA at
8  the field office and again in -- in D.C., did
9  -- did -- did; you try to become aware of what
10 the regulations were?
11          MS. MAINIGI: Objection.
12          THE WITNESS: Absolutely.
13          BY MR. SHKOLNIK:
14    Q.    I mean that was part of your job to
15 know what you were trying to enforce, correct?
16          MS. MAINIGI: Objection.
17          THE WITNESS: Yes, sir.
18          BY MR. SHKOLNIK:
19    Q.    And if -- if we could turn -- have
20 you ever heard of the National Wholesale
21 Druggists Association?
22    A.    Vaguely.
23    Q.    And -- and what was your
24 understanding of it?
25          MS. MAINIGI: Objection.

38 (Pages 413 - 416)

Page 417

1     THE WITNESS:  Another industry
2  organization sharing their issues specifically
3  dealing with government proposed legislation
4  and other issues.
5     BY MR. SHKOLNIK:
6     Q.   And if we could just look at Page 1
7  of Exhibit No. 37.  This -- this is entitled
8  "The NWDA Suspicious Order Monitoring System."
9     Were you aware that -- that the
10  National Wholesale Druggists Association had
11  promulgated its own policy for its members
12  regarding the Suspicious Order Monitoring
13  System -- Systems?
14     MS. MAINIGI:  Objection.
15     THE WITNESS:  No, sir.
16     BY MR. SHKOLNIK:
17     Q.   Were you aware that in 1993 that
18  industry with -- that -- that -- that the
19  industry group for chain pharmacies and
20  pharmacies was promulgating any rules for their
21  organization members regarding monitoring for
22  suspicious orders?
23     MS. MAINIGI:  Objection.
24     THE WITNESS:  No, sir.
25     BY MR. SHKOLNIK:

Page 418

1     Q.   If we could turn to Page 7, Bates
2  number ending in 730, it says "Single
3  Suspicious Orders."
4     "Single orders of unusual size or
5  deviations must be reported immediately."
6     Were you aware that members of the
7  National Wholesale -- I'm sorry -- the National
8  -- got to make sure I get it right -- Wholesale
9  Druggist Association were aware in 1993 that
10  they were being guided that they should report
11  orders of unusual size or deviation
12  immediately?
13     Were you aware of that?
14     A.   No, sir.
15     MS. MAINIGI:  Objection.
16     BY MR. SHKOLNIK:
17     Q.   Was that consistent with your
18  understanding of what was being -- of what the
19  regulations were when you were in DEA, 95
20  through your retirement?
21     MS. MAINIGI:  Objection.
22     THE WITNESS:  Yes, sir.
23     BY MR. SHKOLNIK:
24     Q.   Does it -- would it be surprising to
25  you that -- that a recommendation such as this,

Page 419

1  that they should report immediately if they
2  identify a order of unusual size or deviation,
3  that that was a recommendation to the industry,
4  the -- the wholesale druggist industry, back in
5  the '90s?
6     Would that surprise you?
7     MS. MAINIGI:  Objection.
8     THE WITNESS:  Yes, sir.
9     BY MR. SHKOLNIK:
10     Q.   Okay.  Why is -- why would it
11  surprise you, sir?
12     MS. MAINIGI:  Objection.
13     THE WITNESS:  Because, in my field
14  experience, I did not see this in practice.
15     BY MR. SHKOLNIK:
16     Q.   Would -- would you have -- from --
17  from your experience, would you have -- would
18  you have liked to have seen this in practice in
19  the industry, this recommendation?
20     MS. MAINIGI:  Objection.
21     THE WITNESS:  Yes, sir.  I would
22  have welcomed it.
23     BY MR. SHKOLNIK:
24     Q.   And then it goes on to say:  "The
25  submission of a monthly printout of

Page 420

1  after-the-fact sales will not relieve a
2  registrant from the responsibility of reporting
3  these single excessive or suspicious orders."
4     Were you aware that was a
5  recommendation being made to industry before
6  you even started at DEA in '95?
7     MS. MAINIGI:  Objection.
8     THE WITNESS:  No, sir.
9     BY MR. SHKOLNIK:
10     Q.   Did you see any of these wholesale
11  chain pharmacies or wholesale pharmacy members
12  implementing this type of responsibility
13  regarding suspicious orders in -- withdraw
14  that.
15     Did you observe pharmacies, chain
16  pharmacies, following this recommendation while
17  you were at DEA out in the field and again in
18  D.C.?
19     MS. MAINIGI:  Objection.
20     THE WITNESS:  No, sir.
21     BY MR. SHKOLNIK:
22     Q.   Would you have liked to have seen
23  them comply with this recommendation by the --
24  the Wholesale Druggists Association while you
25  were working at DEA?

39 (Pages 417 - 420)

Page 421

1      Would you have like that, sir?
2      MS. MAINIGI:  Objection.
3      THE WITNESS:  Very much.
4      BY MR. SHKOLNIK:
5   Q.   Why?
6      MS. MAINIGI:  Objection.
7      THE WITNESS:  This is reiterating
8   what we were emphasizing at the time.
9      BY MR. SHKOLNIK:
10  Q.   When --
11  A.   This would have -- if it had come on
12  and been utilized, we may not have been steeped
13  in the endemic problem that we were
14  experiencing at the time.  It could have
15  effectively kept it down to a lower level and
16  potentially fewer problems, addictions and
17  deaths.
18     And -- and by the way, the last
19  sentence, the DEA interpreted orders to mean
20  prior to shipment.
21     Wasn't that something that you were
22  telling everybody from 2005 until your
23  retirement in 2017, that that's what -- that
24  was your recommendation?
25     MS. MAINIGI:  Objection.

Page 422

1      THE WITNESS:  Yes, sir.
2      BY MR. SHKOLNIK:
3   Q.   Did you know that they were being
4   told that by the their agents -- by their own
5   lobbying group, trade association, that that
6   was the definition back in 1993?
7      MS. MAINIGI:  Objection.
8      THE WITNESS:  No, sir.  I did not.
9      BY MR. SHKOLNIK:
10  Q.   Did any of the registrants that you
11  met with, sir, ever tell you that they had a
12  trade organization that recommended that orders
13  should be reported immediately and orders meant
14  before shipment?
15     Did anyone ever -- any of these
16  people you met with ever say, "We knew about
17  this back in 1993"?
18     MS. MAINIGI:  Objection.
19     THE WITNESS:  No, sir.
20     BY MR. SHKOLNIK:
21  Q.   In fact, they were telling you, sir,
22  "This is new to us.  We didn't even know about
23  this."
24     Isn't that what they were really
25  saying?  "This is a sea change to us."

Page 423

1      Fair statement?
2      MS. MAINIGI:  Objection.
3      THE WITNESS:  Yes, sir.
4      BY MR. SHKOLNIK:
5   Q.   Looking at that document, sir, were
6   they being honest with you where -- any
7   registrant that was a member of that
8   organization, if they said to you, sir, "This
9   is new, we didn't know about it before," would
10  they have been honest with you --
11     MR. BENNETT:  Objection.
12     MS. MAINIGI:  Objection.
13     BY MR. SHKOLNIK:
14  Q.   -- based on what we just read?
15  A.   No, sir.
16     MR. SHKOLNIK:  Okay.  I'm going to
17  mark for Exhibit -- Exhibit No. 38 a document
18  from 1984.
19     Did I tell you '34?  '84.  Sorry.
20  '84.  It's in your copy?  Okay.  I'm sorry.
21     We're not changing the markings on
22  this one then.  Good thing I had someone else
23  here.
24     BY MR. SHKOLNIK:
25  Q.   If we can go to Bates numbered 5732

Page 424

1   in that last exhibit.
2   A.   Excuse me.  What page?
3   Q.   Bates number is 5732 at the bottom.
4      I'll show you a document -- a letter
5   that was sent to nation -- the vice
6   president --
7      MR. BENNETT:  Counsel, can you give
8   me one second.
9      MR. SHKOLNIK:  Sure.
10     MR. BENNETT:  Thank you, Counsel.
11  We're good.
12     BY MR. SHKOLNIK:
13  Q.   I'm going to show -- just read from
14  this letter that was sent in 1984 from DEA.
15  And it's diversion operation section chief, Mr.
16  Tom Gitchel.
17     Do you know that name at all?
18     MS. MAINIGI:  Objection.
19     BY MR. SHKOLNIK:
20  Q.   May have been before your time.
21  A.   Oh, I heard his name many a time.
22  Q.   Okay.  This is a letter he wrote to
23  the Wholesale Druggist Association where he
24  said in his letter:  "As previously discussed,
25  an after-the-fact computer printout of sales

40 (Pages 421 - 424)

Page 425

1   data does not relieve a registrant of its
2   responsibility to report excessive or
3   suspicious orders when discovered.  I'm
4   enclosing a copy of your draft with my pen and
5   ink changes."
6           Were you aware that the members of
7   the National Wholesale Druggists Association,
8   as far back as '84, was advised by the DEA that
9   these monthly after-the-fact reports did not
10  relieve them of their responsibility to report
11  excessive or suspicious orders when discovered?
12          MS. MAINIGI:  Objection.
13          BY MR. SHKOLNIK:
14      Q.  Were you aware of that when -- when
15  you were at DEA?
16          MS. MAINIGI:  Objection.
17          THE WITNESS:  No, sir.
18          BY MR. SHKOLNIK:
19      Q.   In all the times that you had
20  meetings with registrants, pharmacy chains, at
21  any time did anyone ever say to you, "By the
22  way, we already knew about this requirement to
23  report way back in '84.  And there's nothing
24  new about what you're telling us in 2005 and
25  2006 and 2007"?

Page 426

1           Did they ever say that?
2           MS. MAINIGI:  Objection.
3           THE WITNESS:  No, sir.
4           BY MR. SHKOLNIK:
5       Q.   Would you have liked to have known
6   that they knew about it for decades by the time
7   you told them this in 2005, '6, '7 and so on?
8           MS. MAINIGI:  Objection.
9           THE WITNESS:  Yes, sir.
10          BY MR. SHKOLNIK:
11      Q.   Why?
12          Why would you have liked to have
13  known that?
14          MS. MAINIGI:  Objection.
15          THE WITNESS:  Because it would have
16  shown institutional knowledge of the
17  requirements, the regulation, that we weren't
18  throwing something new or startling at them;
19  that we were simply trying to enforce the
20  regulations that had existed already.
21          BY MR. SHKOLNIK:
22      Q.   And would it be fair to say you
23  repeatedly were met with the response that,
24  "This is new.  You're changing the rules on
25  us"?

Page 427

1           Isn't that you -- what you were
2   hearing from industry in 2005 on when you told
3   them that their obligation was to investigate,
4   report and don't ship?
5           Isn't -- wasn't that their response
6   to you?
7           MS. MAINIGI:  Objection.
8           THE WITNESS:  Yes, sir.
9           BY MR. SHKOLNIK:
10      Q.   And -- and you were asked to -- to
11  read your testimony from a -- a trial by
12  counsel the other day where -- where your
13  testimony was that there -- there was a change
14  in -- in -- in circumstances.
15          Did anyone before you testified in
16  that trial ever show you the 1984 document,
17  this 1993 document?
18          Did anyone ever show those to you
19  before you testified in preparation for your
20  testimony?
21          MS. MAINIGI:  Objection.
22          THE WITNESS:  No, sir.
23          BY MR. SHKOLNIK:
24      Q.   Would you have liked to have had
25  that as preparation for your testimony to know

Page 428

1   what DEA had told the people in industry going
2   back to '84?
3           Wouldn't that have helped you, sir?
4           MS. MAINIGI:  Objection.
5           THE WITNESS:  It certainly would
6   have.
7           BY MR. SHKOLNIK:
8       Q.   Would you have liked to have had
9   counsel show that to you when you were being
10  confronted with your testimony from 2011 the
11  other day?
12          MR. BENNETT:  Objection to form.
13          MS. MAINIGI:  Objection.
14          MR. BENNETT:  I'm sorry.  Were you
15  talk defense counsel?
16          MR. SHKOLNIK:  Oh, yeah.
17          MR. BENNETT:  I withdraw my
18  objection.  I thought you were talking about
19  me.
20          MR. SHKOLNIK:  That was good.
21          MS. MAINIGI:  I think he was talking
22  about defense counsel too.
23          MR. SHKOLNIK:  Yes, I was.
24          BY MR. SHKOLNIK:
25      Q.   Would you have liked to have had

41 (Pages 425 - 428)

Page 429

1  that -- those documents presented to you at the
2  same time?
3      A.   Yes, sir.
4          MS. MAINIGI:  Objection.
5          MR. SHKOLNIK:  I'm going to give you
6  a document I'm marking as Exhibit 36.
7          MR. BENNETT:  I'm sorry.  Would this
8  be 38?
9          MR. SHKOLNIK:  38.  I'm sorry.  I'm
10  horrible with exhibits.  That's why I need
11  other people doing this.
12          (Deposition Exhibit 38 was marked
13  for identification.)
14  BY MR. SHKOLNIK:
15      Q.   I'm going to show you a document
16  from -- let me see -- 1996 so this is after you
17  were at DEA.  If you could take a look at it.
18      It's from Department of Justice to
19  Cardinal Health, Bates number is 2203353.
20          MR. STEPHENS:  Counsel, is this 38
21  or 39?
22          MR. SHKOLNIK:  This is 38, am I
23  correct?  38.
24          MR. BENNETT:  Counsel, may I've one
25  second?

Page 430

1          MR. SHKOLNIK:  Sure.
2          MR. BENNETT:  Thank you, counsel.
3  We're okay.
4  BY MR. SHKOLNIK:
5      Q.   If you could just take a look at
6  Bates No. 3355.  It's a -- it's a cover of a
7  manual that says "Diversion Investigator
8  Manual."
9          Were you familiar with this manual
10  at all, sir?
11      A.   Yes, sir.
12      Q.   And -- and I'm going to -- let's
13  turn to Bates numbered 3356, if we -- if we
14  could.
15          And it's -- the top of the page it
16  says "DEA Sensitive."  And then when we go down
17  the page, there's a section that says:
18  "Requirement to report suspicious orders."
19          So was it your understanding that
20  this manual was in effect when -- when you went
21  out in the field for DEA?
22          MS. MAINIGI:  Objection.
23          THE WITNESS:  Yes, sir.
24  BY MR. SHKOLNIK:
25      Q.   And -- and here this -- apparently

Page 431

1  this copy of the manual was -- according to
2  what we have here, was sent to Cardinal Health.
3  And it says:  "The" registrant -- "registrants
4  are required to inform DEA of suspicious orders
5  in accordance with 21 CFR 1301.74(b).  DEA
6  field offices are not to approve or disapprove
7  supplier shipments of controlled substance."
8          That was your understanding of the
9  rules that you worked under back when you were
10  at DEA, correct?
11          MS. McCLURE:  Objection.  Misstates
12  prior testimony.
13          MS. MAINIGI:  Objection.
14          THE WITNESS:  Yes, sir.
15  BY MR. SHKOLNIK:
16      Q.   And -- and a manual like this is
17  something you had to -- you had to act in
18  accordance with; am I correct?
19          MS. MAINIGI:  Objection.
20          THE WITNESS:  Or receive special --
21  BY MR. SHKOLNIK:
22      Q.   Dispensation?
23      A.   Yes, sir.
24      Q.   Okay.  And then it says:  "The
25  responsibility for making the decision to ship

Page 432

1  substance" -- I'm sorry.  I'm sorry.
2          "DEA field offices are not to
3  approve or disapprove supplier shipments of
4  controlled substances.  The responsibility for
5  making the decision to ship rests with the
6  supplier."
7          That's what you at DEA, from your
8  recollection, is what you were telling people
9  back in 1996 and forward, correct?
10          MS. MAINIGI:  Objection.
11          THE WITNESS:  Yes, sir.
12  BY MR. SHKOLNIK:
13      Q.   And down at the bottom it says:
14  "Registrants who routinely report suspicious
15  orders yet fill these orders with reason to
16  believe they are destined for illicit market
17  are expressing an attitude of
18  irresponsibility."
19          Did you recall that being the --
20  the -- the position of DEA while you were with
21  them from '96 right through to your retirement?
22          MS. MAINIGI:  Objection.
23  BY MR. SHKOLNIK:
24      Q.   Basically your understanding?
25      A.   Yes, sir.

42 (Pages 429 - 432)

Page 433

1    Q.   If we could just turn to the next
2    page.
3        MR. SHKOLNIK:  And by the way, just
4    so the record's clear, this is my highlighting.
5    This didn't come from DEA like this or
6    Cardinal.
7        BY MR. SHKOLNIK:
8    Q.   "The supplier can determine whether
9    the order is excessive by checking their own
10   sales and establishing the average amount of
11   controlled substances shipped to the
12   registrants of the same apparent size in a
13   particular geographic area.
14       Was that your -- your understanding
15   while you were at DEA?
16       MS. MAINIGI:  Objection.
17       THE WITNESS:  Yes, sir.
18       BY MR. SHKOLNIK:
19   Q.   And it goes on to say:  "If the
20   customer exceeds the threshold, the request
21   should be viewed as suspicious.  This activity
22   over extended periods of time would lead a
23   reasonable person to believe the controlled
24   substance are possibly being diverted."
25       Was that your understanding when you

Page 434

1    were at DEA?
2        MS. MAINIGI:  Objection.
3        THE WITNESS:  Yes, sir.
4        BY MR. SHKOLNIK:
5    Q.   And was that something that, when
6    you were going out and having these
7    presentations, you were impressing upon the
8    registrants that's you presented to?
9        MS. MAINIGI:  Objection.
10       BY MR. SHKOLNIK:
11   Q.   Correct?
12   A.   Yes, sir.
13   Q.   And this was not something new in
14   2005 forward; this is -- this was clearly in
15   place back in 1996, correct, sir?
16       MS. MAINIGI:  Objection.
17       THE WITNESS:  Correct.
18       BY MR. SHKOLNIK:
19   Q.   And from what we saw from other
20   documents, even earlier, correct?
21       MS. MAINIGI:  Objection.
22       THE WITNESS:  Yes, sir.
23       BY MR. SHKOLNIK:
24   Q.   And the 1984 letter from DEA says
25   that, does it not?

Page 435

1        MS. MAINIGI:  Objection.
2        BY MR. SHKOLNIK:
3    Q.   That we just looked at, sir?
4    A.   It does, sir.
5    Q.   And are you familiar with something
6    called the "Chemical Handlers Manual"?
7    A.   Yes, sir.
8    Q.   You say that with a sigh.
9        How do you know about that document?
10   A.   Many long hours enforcing it.
11   Q.   Okay.  And -- and is your
12   understanding that the Chemical Handlers Manual
13   was -- was utilized by some of the registrants
14   or many registrants as a manner in which they
15   thought they would be in compliance with the
16   regulations?
17       MS. MAINIGI:  Objection.
18       THE WITNESS:  Yes, sir.
19       BY MR. SHKOLNIK:
20   Q.   And if -- if -- if I'm not mistaken,
21   you were shown what we -- was referred to as
22   a -- I think it's a -- an ingredient list
23   report.  I don't remember the exact exhibit
24   number.  The thick compilation that you have
25   there.

Page 436

1        MR. BENNETT:  26.
2        BY MR. SHKOLNIK:
3    Q.   Number -- Exhibit 26.
4        Were -- were -- were you under the
5    impression that documents like that were being
6    generated based upon an interpretation of the
7    Chemical Handlers Manual?
8        MS. MAINIGI:  Objection.
9        THE WITNESS:  No, I did not.
10       BY MR. SHKOLNIK:
11   Q.   Did -- none of the manufacturers, to
12   your knowledge, ever told -- I'm sorry --
13   manufacturers, distributors or pharmacies ever
14   suggested that they were basing their analyses
15   on the Chemical Handlers Manual?
16       MS. MAINIGI:  Objection.
17       THE WITNESS:  No, sir.
18       BY MR. SHKOLNIK:
19   Q.   To your knowledge, sir -- withdraw
20   that.
21       Mr. Wright, was the Chemical
22   Handlers Manual the -- the -- the criteria set
23   forth in the manual, in terms of the
24   determining suspicious orders or not, did that
25   apply to opioids?

43 (Pages 433 - 436)

Page 437

1    MS. MAINIGI:  Objection.
2    MR. SHKOLNIK:  I'm sorry.  I put the
3  sticker on the wrong one.  Let me give you a
4  copy.
5    I'm going to withdraw the question.
6  Let me just withdraw that.
7    MS. MAINIGI:  What was the answer?
8  Did we have an answer?
9    MR. SHKOLNIK:  I withdrew the
10  question.  There was no answer.
11    MS. MAINIGI:  Oh, he didn't answer
12  the question.
13    MR. SHKOLNIK:  No.  I can't withdraw
14  it if he answered it.
15    (Deposition Exhibit 39 was marked
16  for identification.)
17    BY MR. SHKOLNIK:
18    Q.   I've handed you a copy of the 2004
19  Chemical Handlers Manual.
20    Do you recall ever seeing that
21  actual manual before?
22    MS. McCLURE:  Counsel, for the
23  record, can you please read the Bates number.
24    MR. SHKOLNIK:  Yes.  This copy is
25  from Walgreens 395965 dated January 2004.

Page 438

1    MR. STEPHENS:  What's the exhibit
2  number?
3    MR. SHKOLNIK:  39.
4    BY MR. SHKOLNIK:
5    Q.   Have you ever seen this before?
6    A.   Yes, sir.
7    Q.   Okay.  If we could turn to Page 10
8  of the Chemical Handlers Manual, Exhibit 39.
9  I'm going to read one paragraph from the --
10  from the 2000 -- I'm sorry -- from the 2004
11  version of it.
12    "When a regulated person suspects an
13  order may be intended for illicit purposes,
14  good practice requires that every reasonable
15  effort made to resolve those" suspicious --
16  "those suspicions."
17    Was -- was that your understanding
18  of a requirement of registrants when -- when
19  you were at DEA?
20    MR. TAYMAN:  What page are you at?
21    MS. MAINIGI:  Yeah.  You said 10.
22    MR. SHKOLNIK:  Oh, 19.  I'm sorry.
23  19.
24    THE WITNESS:  19?
25    MR. SHKOLNIK:  Yeah.  19.

Page 439

1    THE WITNESS:  Okay.
2    BY MR. SHKOLNIK:
3    Q.   Let's try that again.  I'll read it
4  slow.
5    "When a regulated person suspects
6  that an order may be intended for illicit
7  purposes, good practice requires that every
8  reasonable effort be made to resolve those
9  suspicions."
10    Was that your understanding of the
11  requirement of registrants?
12    MS. MAINIGI:  Objection.
13    THE WITNESS:  No, sir.
14    MR. SHKOLNIK:  Oh, okay.
15    THE WITNESS:  Regulated was not a
16  registrant.
17    BY MR. SHKOLNIK:
18    Q.   Ah.
19    What's a regulated?
20    A.   Regulated meant that they were
21  downstream.  We could not regulate every
22  7-Eleven in town.  We -- our system couldn't
23  accommodate that because this was the only
24  product that they were selling.  So they were
25  not registrants.  They were regulated.  The

Page 440

1  registrants above them would be the suppliers.
2    Q.   So in -- when it says "In addition
3  to making required reports, transactions should
4  not be completed until the customer is able to
5  eliminate the suspicions," what does that mean?
6    MS. MAINIGI:  Objection.
7    MR. BENNETT:  Objection.
8    THE WITNESS:  The --
9    BY MR. SHKOLNIK:
10    Q.   I'm sorry.
11    Do you understand what that means?
12    A.   Yes, sir.
13    Q.   Okay.  What does that mean?
14    MS. MAINIGI:  Objection.
15    MR. BENNETT:  Objection.
16    Counsel, are you asking his
17  understanding of what this --
18    MR. SHKOLNIK:  Yeah.  His
19  understanding, not DEA's.
20    MR. BENNETT:  Then I withdraw the
21  objection.
22    THE WITNESS:  Don't let the product
23  get into illicit markets or systems.
24    BY MR. SHKOLNIK:
25    Q.   "The distributor may have to forgo

44 (Pages 437 - 440)

1 some transactions."
2 Did you -- did you have an
3 understanding as to what that meant?
4 MS. MAINIGI: Objection.
5 MS. McCLURE: Objection.
6 THE WITNESS: Yes.
7 BY MR. SHKOLNIK:
8 Q. What did that mean to you, sir?
9 A. Don't let it get into the system.
10 Q. That was something known long before
11 even 2004 while you were at DEA, correct?
12 MS. MAINIGI: Objection.
13 THE WITNESS: Yes, sir.
14 BY MR. SHKOLNIK:
15 Q. Are you familiar with an action
16 brought by DEA against Novelty Distributors,
17 Inc.?
18 MS. McCLURE: Objection.
19 BY MR. SHKOLNIK:
20 Q. I'm not going to ask about any
21 specific investigation but the case in -- in
22 particular.
23 A. I do recall that litigation.
24 Q. I don't want to know any details,
25 but were you involved in that or just aware of?

1 A. I was only aware.
2 Q. Okay. Did -- did you ever become
3 aware of the fact that Novelty Drugs -- the
4 decision not -- with -- withdraw that.
5 (Deposition Exhibit 40 was marked
6 for identification.)
7 BY MR. SHKOLNIK:
8 Q. I'm going to hand you a document I
9 marked as Exhibit 40, a copy of it. December
10 -- I'm sorry. September 2008 letter from
11 Department of Justice. And attached to it is
12 the decision in Novelty Distributors, Inc.,
13 revocation of registration.
14 Were -- were you --
15 MR. BENNETT: Give me one second,
16 Counsel.
17 MR. SHKOLNIK: Yeah.
18 BY MR. SHKOLNIK:
19 Q. If we could turn to Page No. 39. I
20 think I actually got that one right too.
21 In the Novelty Distributors, Inc.,
22 case there is a -- I'm going to read a section
23 of it.
24 MR. SHKOLNIK: Yeah. Good idea. I
25 think I said it was 2008.

1 Date of the opinion on the order is
2 September 3, 2008.
3 BY MR. SHKOLNIK:
4 Q. Says: "Fundamental to its
5 obligation to maintain effective controls
6 against diversion, a distributor must review
7 every order and identify suspicious"
8 transaction -- "transactions. Further, it must
9 do so prior to shipping the products. Indeed,
10 a distributor has an affirmative duty to forgo
11 a transaction if, upon investigation, it is
12 unable to determine that the proposed
13 transaction is for legitimate purposes."
14 And it's referencing the Chemical
15 Handlers Manual for 2002.
16 Is this -- in this opinion, is this
17 consistent with what we just looked at in the
18 2004 Chemical Handlers Manual?
19 MS. MAINIGI: Objection.
20 THE WITNESS: Yes, sir.
21 BY MR. SHKOLNIK:
22 Q. "Respondents procedure of
23 post-transaction review is incompatible with
24 its obligation to identify and forgo suspicious
25 transactions."

1 Was that your understanding of what
2 -- of -- of -- of the state of the regulations
3 while you were at DEA?
4 MS. MAINIGI: Objection.
5 THE WITNESS: Yes, sir.
6 BY MR. SHKOLNIK:
7 Q. You're aware -- sir, are you aware
8 that AmerisourceBergen had a DEA-issued order
9 to show cause and immediate suspension order
10 issued against it in 2007 for -- for shipping
11 suspicious orders?
12 Were you aware of that?
13 MS. McCLURE: Objection. Same
14 objection.
15 MS. MAINIGI: Objection.
16 THE WITNESS: Yes, sir.
17 BY MR. SHKOLNIK:
18 Q. If -- if AmerisourceBergen in 2007
19 was shipping suspicious orders without doing a
20 due diligence investigation before shipping, if
21 that was the case, was that after you started
22 doing those presentations telling the -- the
23 registrants that they shouldn't be shipping
24 without doing due diligence?
25 MS. McCLURE: Objection.

45 (Pages 441 - 444)

Page 445

1      MS. MAINIGI:  And, Mr. Bennett, are
2  you allowing questions on specific --
3      MR. BENNETT:  If 2007 is after 2005?
4      MR. SHKOLNIK:  Yeah.
5      MS. MAINIGI:  Well, he's referencing
6  the ABDC investigation.  So I was --
7      MR. BENNETT:  I thought he said
8  "immediate suspension order."
9      MS. MAINIGI:  Well, it sounds like
10  he's asking him to draw upon --
11      MR. SHKOLNIK:  Well --
12      MS. MAINIGI:  -- something from the
13  investigation --
14      MR. BENNETT:  I don't --
15      MS. MAINIGI:  -- order to answer
16  that question.
17      MR. BENNETT:  Sure.  And if -- if --
18      MS. MAINIGI:  If he -- if he needs
19  to know if 2008 is before 2007, that's fine.
20  But I would like --
21      MR. SHKOLNIK:  Okay.  You know
22  something?  No.  Let's go off the record if
23  you're going to have a conversation.  All
24  right?
25      MS. MAINIGI:  I --

Page 446

1      MR. SHKOLNIK:  I thought we had
2  this -- I thought we had this ruling already
3  once.
4      MS. MAINIGI:  No, we didn't.
5      MR. SHKOLNIK:  We did.  Let's go off
6  the record, please.
7      If you want to have a discussion,
8  we'll do it off the record, not on my time.
9      MS. MAINIGI:  Fine.  Let's go back
10  on the record, and DOJ can make their --
11      MR. SHKOLNIK:  Off -- off video.
12      MS. MAINIGI:  No.  We're -- we're on
13  the record.
14      MR. SHKOLNIK:  No, no.  I'm not --
15      MS. MAINIGI:  We're going to let DOJ
16  answer the question.
17      MR. SHKOLNIK:  You're not going to
18  have a discussion.
19      MS. MAINIGI:  I'm not having a
20  discussion.  You're right.
21      So let's go back on the record,
22  please.
23      MR. BENNETT:  So the answer is that
24  the witness is not --
25      MS. MAINIGI:  Well, hang on.  Let's

Page 447

1  go on the record first.
2      THE VIDEOGRAPHER:  We are on the
3  record.
4      MS. MAINIGI:  Okay.  Thank you.
5      MR. BENNETT:  The answer is that the
6  witness is not authorized to talk about any
7  specific investigations.
8      To the extent that the question
9  called for information about a specific
10  investigation, Mr. Wright's not authorized to
11  answer that question.
12      I did not understand the question to
13  have called for information about a specific
14  investigation.
15      MR. SHKOLNIK:  And it wasn't.
16      MR. BENNETT:  But if it -- if it
17  does, Mr. Wright, you are instructed that you
18  cannot talk about any specifics of the
19  AmerisourceBergen investigation.  However, if
20  there is a publicly-filed document that you're
21  aware of, you may talk about the contents of
22  that but not the investigation.
23      Do you understand?
24      THE WITNESS:  I understand.
25      MR. SHKOLNIK:  Just so the record is

Page 448

1  clear, this was brought up by counsel on --
2  this issue was brought up by counsel on direct.
3      BY MR. SHKOLNIK:
4      Q.   So my question -- just to help
5  refresh your recollection very clear -- if
6  AmerisourceBergen suspension order was issued
7  in 2007 for violating the Controlled Substances
8  Act and allowing diversion in 2007, would that
9  have been after you had already told industry
10  that they were not to ship if they had
11  suspicious orders?
12      MS. McCLURE:  Objection.  Form.
13  Foundation misstates prior testimony.
14  Speculative.
15      MS. MAINIGI:  Objection.
16      BY MR. SHKOLNIK:
17      Q.   It's a simple -- simple date.
18      A.   Yes, sir.
19      Q.   And if there was a immediate
20  suspension order against Cardinal Health Auburn
21  facility in November of 2007 for violating the
22  Controlled Substances Act related to shipping
23  without completing due diligence, would that
24  have been after you had already told them that
25  they were not allowed to do that?

46 (Pages 445 - 448)

Page 449

1      MS. MAINIGI:  Objection.
2      BY MR. SHKOLNIK:
3      Q.   When I say "you," I mean you at part
4   of the presentations.
5      MS. MAINIGI:  Objection.
6      THE WITNESS:  Yes, sir.
7      BY MR. SHKOLNIK:
8      Q.   And -- and that -- that was from
9   your experience, correct, sir?
10      MS. MAINIGI:  Objection.
11      THE WITNESS:  Yes, sir.
12      BY MR. SHKOLNIK:
13      Q.   And if, on December 7, 2007, an
14   order to show cause and immediate suspension
15   order was issued to Cardinal Health Lakeland
16   facility for failure to -- to main [sic]
17   effective controls against diversion of
18   hydrocodone, that was after you had already
19   told them, meaning you -- you and Mr. Mapes as
20   part of the presentations to the big
21   distributors, that -- that they shouldn't be
22   shipping absent the due diligence, correct,
23   sir?
24      MS. MAINIGI:  Objection.
25      THE WITNESS:  Yes, sir.

Page 450

1      BY MR. SHKOLNIK:
2      Q.   Even if it was a sea change in the
3   field of distributors and manufacturers, this
4   do-not-ship requirement, even assume that that
5   was correct, they still did it after you told
6   them, correct?
7      MS. MAINIGI:  Objection.
8      THE WITNESS:  Yes, sir.
9      BY MR. SHKOLNIK:
10      Q.   They apparently weren't taking the
11   advice you were giving.
12      Fair statement?
13      MS. MAINIGI:  Objection.
14      THE WITNESS:  Yes, sir.
15      BY MR. SHKOLNIK:
16      Q.   If the DEA issued an order to show
17   cause and an immediate suspension order against
18   Cardinal Health's Swedesboro, New Jersey,
19   distribution center for failure to maintain
20   effective controls against diversion of
21   Hydrocodone, December 7, 2007, that was after
22   you had already told them, "You're not supposed
23   to ship without doing due diligence," correct?
24      MS. MAINIGI:  Objection.
25      THE WITNESS:  Yes, sir.

Page 451

1      BY MR. SHKOLNIK:
2      Q.   That would have meant they rejected
3   the recommendations and the guidance given by
4   DEA, correct?
5      MS. MAINIGI:  Objection.
6      THE WITNESS:  They weren't adhering
7   to the recommendations.
8      BY MR. SHKOLNIK:
9      Q.   If a DEA issued an order to show
10   cause against Cardinal Health's Stafford, Texas
11   distribution center on January 30th, 2008, for
12   failure to maintain effective controls against
13   diversion of hydrocodone, that was now three
14   years after you already started telling the big
15   three distributors, "You can't ship without due
16   diligence," correct?
17      MS. MAINIGI:  Objection.
18      THE WITNESS:  Yes, sir.
19      BY MR. SHKOLNIK:
20      Q.   And that would have meant they
21   didn't follow the recommendations you and
22   Mr. Mapes and the rest of the team were giving
23   at these presentations.
24      Fair statement?
25      MS. MAINIGI:  Objection.

Page 452

1      MR. BENNETT:  And I am going to
2   object to the extent that he's asking you about
3   any specific investigation and interpretation
4   of what they were or were not doing after your
5   presentation.
6      But to the extent it's in a public
7   document or it's asking about timing, you may
8   answer.
9      BY MR. SHKOLNIK:
10      Q.   Just as to timing.
11      A.   Yes, sir.
12      Q.   And if -- if May 2008 McKesson
13   agreed to a $13 million civil penalty and
14   entered into an administrative MOA with DEA for
15   failure to maintain compliance program designed
16   to detect and prevent diversion of controlled
17   substances, inform DEA of suspicious orders in
18   violation -- I'm sorry -- as required by 21 CFR
19   1301.74, that was more than three years after
20   you started telling the big three, "Do due
21   diligence.  Don't ship," correct?
22      MR. EPPICH:  Object to the form.
23      BY MR. SHKOLNIK:
24      Q.   Just for the timing standpoint.
25      MR. EPPICH:  Object to the form.

47 (Pages 449 - 452)

Page 453

1  Foundation.
2       THE WITNESS: Yes, sir.
3       BY MR. SHKOLNIK:
4    Q.   If in December 2016 Cardinal Health
5  agreed to pay $34 million as a civil penalty
6  for failure to report suspicious orders and
7  meet its obligations under CSA as it relates to
8  shipping without doing due diligence, that was
9  11 years after you first brought in the big
10  three and told them what the rules are,
11  correct?
12       MS. MAINIGI:  Objection.
13       THE WITNESS: Yes, sir.
14       BY MR. SHKOLNIK:
15    Q.   In 2017, January 5th of 2017,
16  McKesson entered into an administrative MOA
17  with DEA pay -- to pay 150 million civil
18  penalty for failure to identify and report
19  suspicious orders in its facilities in
20  Colorado, Illinois, New Jersey, Wisconsin,
21  Florida, Maryland, Nebraska, Michigan,
22  Massachusetts, California, Ohio and Cal --
23  and -- and West Sacramento, California.
24       That was now 12 years after you
25  first sat them down and said, "You can't ship

Page 454

1  without doing due diligence."
2       Fair statement?
3       MR. EPPICH:  Object to the form.
4       THE WITNESS: Yes, sir.
5       BY MR. SHKOLNIK:
6    Q.   And Walgreens, the chains pharmacy,
7  they had had an immediate suspension order
8  issued to them in 2011 and 2012 and agreed to
9  an MOA and paid $80 million in 2013.
10       MR. STEPHENS:  Object to form.
11       BY MR. SHKOLNIK:
12    Q.   That would have been almost seven
13  years after you first started telling industry,
14  "You can't ship without doing due diligence,"
15  correct?
16       MR. STEPHENS:  Object to form.
17       THE WITNESS: Yes, sir.
18       MR. SHKOLNIK: All right. I'm going
19  to change topics.
20       Can we just take a -- just a
21  couple-minute break?
22       THE VIDEOGRAPHER: We are going off
23  the record.
24       This is the end of Media Unit No. 3.
25       The time is 1:08.

Page 455

1       (A lunch recess was taken.)
2       THE VIDEOGRAPHER:  We are going back
3  on the record.
4       This is the start of Media Unit No.
5  4.
6       The time is 2:31.
7       You may proceed, Counsel.
8       MR. BENNETT:  For the record, while
9  we took our lunch break, it's my understanding
10  that there was an ex parte communication with
11  the Special Master to discuss how long the
12  lunch break was.
13       That's the second time that this has
14  happened during the deposition that there was a
15  communication about the deposition without the
16  government being present.
17       I would object to that. And I would
18  respectfully request that, any time the special
19  master is contacted regarding a deposition
20  involving the government witnesses, that the
21  government be included in that conversation.
22       MS. MAINIGI:  I understand your
23  position. Let me state for the record what
24  happened.
25       I reached out to David Cohen, who is

Page 456

1  actually in D.C. here somewhere, for the
2  purpose of setting up such a conference.
3  Because it was clear that everyone was choosing
4  to act unilaterally perhaps as to how much time
5  the lunch break was actually going to be and
6  that for whatever reason we would not reach
7  agreement on that.
8       I called him to set up a time
9  quickly for us to speak.
10       He said "What is the dispute about
11  so that I know."
12       I told him. I told him the
13  government position. I told him the
14  plaintiffs' position that it was 45 minutes,
15  government position that there was a hard stop
16  for the witness at 5:00; that it was -- and
17  they only wanted 45 minutes.
18       And I said, "Do you want me to
19  gather the parties?"
20       And he basically said, "I -- I don't
21  have time for this. Hour and 15 minutes."
22       So I understand your position
23  that -- but it -- it was not intended to be
24  some sort of ex parte conversation. I think he
25  was trying to go ahead to whatever his other

48 (Pages 453 - 456)

Page 457

1  issue was or -- I think he's here for AG
2  meetings, if what I saw from his e-mail trails
3  to the larger community last night, while at
4  the same time be responsive to us while this
5  deposition is going.
6      MR. BENNETT:  And again, whether
7  it's a call to schedule a call or a call to
8  talk substantively, we believe we should be
9  involved in that conversation.  Maybe it would
10  be better to send an e-mail and copy all of us,
11  if you're trying to set up a call.
12      But either way about it, we want to
13  be involved in any conversations with the
14  special master regarding our witness
15  depositions.
16      MS. MAINIGI:  Noted.
17      MR. SHKOLNIK:  And just so the
18  record's clear, we were not involved as well.
19  We were in the other room and were not
20  contacted.
21      Ready to start?
22      MS. MAINIGI:  Yes.
23      MR. TAYMAN:  Okay.  Hunter, can I
24  just say on the record -- I just want to put on
25  record what we talked about before we went on

Page 458

1  the record, that we have a hard stop at 5:00.
2  And we're not able to continue to tomorrow.
3      And once the plaintiff -- the
4  plaintiffs and the defendants coordinate an
5  figure out what they need, once we see where we
6  are today, Mr. Wright will reasonably
7  participate in -- in -- in rescheduling
8  whatever time remains at that point.
9      MS. MAINIGI:  And thank you for
10  that.
11      I'll just note for the record that,
12  until we came back from lunch, it was not known
13  to us that Mr. Wright did, in fact, have a hard
14  stop at 5:00.  We heard different things
15  communicated over the lunch break.
16      But I do wish, in retrospect, we had
17  been aware at the morning time or last week
18  that Mr. Wright had a hard top at 5:00 so we
19  could have began the day -- begun the day at
20  8:00, for example, instead of 9:00 or
21  something.
22      But we understand.  And -- and we
23  will collectively figure out how to work around
24  that.
25      MR. SHKOLNIK:  Okay.  My time is

Page 459

1  starting now.
2      (Deposition Exhibit 41 was marked
3  for identification.)
4      BY MR. SHKOLNIK:
5      Q.  Mr. Wright, I'm going to hand you a
6  document I've marked as Exhibit 41.  The
7  document is TEVA_MDL 034408.  And it's -- the
8  title is "Inventory Data License Agreement."
9      Mr. Wright, I'm going to hand you
10  a -- a -- a -- this document, and I'm going to
11  ask you a few questions about it.
12      This is a document that was produced
13  us to by Teva.  And it's entitled "Inventory
14  Data License Made Between and entered on July
15  1, 2001, by and between Walgreen on behalf of
16  itself" as -- "and Cephalon, Inc."
17      Are you -- you're aware, are you
18  not, that Walgreen and Cephalon are both
19  registrants, are you not?
20      A.  Yes, sir.
21      Q.  Were you ever aware, while you were
22  at DEA, that there were written agreements
23  between Cephalon and Walgreens to provide
24  inventory data electronically from Walgreens to
25  the manufacturer Cephalon regarding its

Page 460

1  products?
2      MR. BENNETT:  I remind the witness
3  not to discuss any specific investigations.  So
4  if this -- if you're aware unrelated to a
5  specific investigation, you can answer.
6      THE WITNESS:  No, sir.
7      BY MR. SHKOLNIK:
8      Q.  If we read under the first
9  paragraph -- I'm sorry -- the second paragraph,
10  it says "Whereas, Cephalon desires a license
11  from Walgreen, certain inventory data, as
12  further described herein, the data relating to
13  Cephalon products and Walgreens' desire to
14  license such data to Cephalon on terms and
15  conditions herein."
16      And I'm going to jump down to
17  Paragraph 1.2, where it says a description of
18  the data:  "All data supplied to Cephalon shall
19  be in electronic format and contain the
20  elements described in Exhibit B attached hereto
21  or made a part hereof.  Walgreen shall supply
22  data as frequently as set forth in Exhibit B,
23  and in any event, Walgreen shall supply the
24  data no later than five business days following
25  the end of the applicable period, provided that

49 (Pages 457 - 460)

Page 461

1  Walgreen has received the license fee from
2  Cephalon as provided herein."
3      Were you aware of inventory data
4  being exchanged within five days between
5  Walgreens Distribution and Pharmacies and
6  Cephalon?
7      MS. MAINIGI:  Objection.
8      MR. STEPHENS:  Objection.
9      THE WITNESS:  No, sir.
10     BY MR. SHKOLNIK:
11     Q.   During -- at any point in time
12  during the -- those years that you were in
13  Washington, D.C., and doing those presentations
14  regarding Suspicious Order, Monitoring did
15  anyone ever tell you that Cephalon was
16  providing -- I'm sorry -- Walgreens was
17  providing store- and distributor-level data
18  directly up to Cephalon regarding its opioid
19  products?
20     A.   I've --
21     MS. MAINIGI:  Objection.
22     THE WITNESS:  I have no
23  recollection.
24     BY MR. SHKOLNIK:
25     Q.   Would you -- from -- from your

Page 462

1  understanding, would -- would it have been
2  helpful to -- would it have been helpful to you
3  doing your job if you had been provided
4  information that a manufacturer such as
5  Cephalon was actually getting the -- the sales
6  data from the pharmacy through the distributor
7  up to the -- I'm sorry.  Withdraw that.
8      Would it have been helpful to you,
9  back when you were working at DEA, to have the
10  information that the manufacturers were
11  actually purchasing the sales data from the
12  pharmacies directly?
13     MS. MAINIGI:  Objection.
14     THE WITNESS:  It would have been
15  insightful.
16     BY MR. SHKOLNIK:
17     Q.   Early -- on Thursday you were asked
18  by counsel for the manufacturers questions
19  about visibility.
20      And -- and I think you gave your
21  answers as best as you could from your
22  recollection about either your knowledge or
23  lack of knowledge of visibility between
24  manufacturers and pharmacies, correct?
25     MS. MAINIGI:  Objection.

Page 463

1      MS. McCLURE:  Objection.
2      THE WITNESS:  Yes, sir.
3      BY MR. SHKOLNIK:
4      Q.   And -- and you didn't know that they
5  were -- that there was actually sales agree --
6  I mean there were agreements where the pharmacy
7  would sell that data right up to the
8  manufacturer so they could have it in their
9  possession.
10      Fair statement?
11     MS. MAINIGI:  Objection.
12     THE WITNESS:  Yes, sir.
13     BY MR. SHKOLNIK:
14     Q.   And -- and, in fact, we've such
15  information as EDI 852 transactions.
16      Do you know what EDI 852s are?
17     A.   It's -- EDI is the format --
18  electronic format that it is transmitted under.
19  And it's the character strings take -- you
20  know, certain elements go in a certain block.
21     Q.   And -- and were you aware that --
22  that, in this industry, that EDI data was
23  available?
24     MS. MAINIGI:  Objection.
25     THE WITNESS:  No, sir.

Page 464

1      BY MR. SHKOLNIK:
2      Q.   Here we -- we -- we show that
3  "Walgreens shall provide" the vendor --
4  "Walgreens shall provide vendor with EDI 852
5  transactions for all products with summary
6  transmitted to vendor on a weekly basis in a
7  manner mutually agreed upon.  Each transmission
8  will include information set forth below."
9      And it says:  "on hand," "on order,"
10  "quantity withdrawn," "lost billing," and
11  "receipts."
12      You weren't aware that Walgreens was
13  actually selling that up to the manufacturer
14  Cephalon, correct?
15     MS. MAINIGI:  Objection.
16     THE WITNESS:  No, sir.
17     BY MR. SHKOLNIK:
18     Q.   Would that be an example of -- using
19  the terminology that was used on Thursday --
20  visibility?
21     MS. MAINIGI:  Objection.
22     MR. EPPICH:  Objection.
23     THE WITNESS:  Yes, sir.
24     BY MR. SHKOLNIK:
25     Q.   And then it goes and says:

50 (Pages 461 - 464)

Page 465

1  "Walgreens was providing the vendor EDI 867
2  transactions for all products which included
3  the information set forth below transmitted on
4  a weekly basis and its distributor stock sales
5  and who it was shipped to."
6      And it says: "Each data point
7  included will provide at the level of each
8  Walgreens distribution center and by product
9  NDC."
10     So if I'm reading that correctly,
11  Walgreens is selling the data of its sales to
12  its stores right up to the manufacturers here,
13  according to this agreement, correct?
14     MR. STEPHENS:  Object to form.
15     MS. MAINIGI:  Objection.
16     THE WITNESS:  It appears so.
17  BY MR. SHKOLNIK:
18     Q.   "Provide vendor store direct" --
19  "vendor store direct purchase data from
20  wholesale on a weekly basis."
21     It's also suggesting that it's
22  providing on a weekly basis its wholesale
23  numbers directly to the manufacturer, correct?
24     MS. MAINIGI:  Objection.
25     THE WITNESS:  Yes, sir.

Page 466

1  BY MR. SHKOLNIK:
2     Q.   Once again, that's an example of
3  visibility between a manufacturer and a -- a
4  wholesale chain distributor and pharmacy, is it
5  not, sir?
6     MS. MAINIGI:  Objection.
7     THE WITNESS:  Yes, sir.
8  BY MR. SHKOLNIK:
9     Q.   If we can go back one page, they
10  give an example of the products that they were
11  reporting on from Walgreens up to the
12  manufacturer.  It says "Actiq."
13     That's a -- an opioid, is it not,
14  sir?
15     MS. MAINIGI:  Objection.
16     THE WITNESS:  Yes, sir.
17  BY MR. SHKOLNIK:
18     Q.   Fentora?
19     Are -- are any of these other -- are
20  -- are these controlled substances, to your
21  knowledge, that we have a list of here?
22     MS. MAINIGI:  Objection.
23     THE WITNESS:  I'm not familiar with
24  the -- the rest of these, no.
25  BY MR. SHKOLNIK:

Page 467

1     Q.   But Actiq was one of the C2s, was it
2  not?
3     A.   I --
4     MS. MAINIGI:  Objection.
5     THE WITNESS:  -- don't recall, sir.
6     MR. SHKOLNIK:  Now, I'm going to --
7  I'm going to mark as Exhibit 42 another
8  inventory license.
9     (Deposition Exhibit 42 was marked
10  for identification.)
11     BY MR. SHKOLNIK:
12     Q.   This is an inventory license.  It --
13  unfortunately, we weren't provided the signed
14  ones.  But just want to ask some questions
15  about this document.
16     It's from 2012.  "Walgreen and
17  Purdue Pharma Inventory Data License."
18     And again, this is a document, if
19  we're reading at 1. -- 1.2: "All data supplied
20  to vendors shall be in electronic format and
21  contain the elements described in Exhibit B
22  attached hereto and made part hereof.
23  Walgreens shall use commercially reasonable
24  efforts to supply the data no" longer -- "no
25  later than five days following the end of each

Page 468

1  calendar week."
2     And then I'm going to jump to the
3  attachment.
4     MS. McCLURE:  Is that a question?
5     MR. SHKOLNIK:  No.  I'll get there.
6  And I'm going to keep reading.
7     MS. McCLURE:  Object to the
8  commentary on the record with a -- not a
9  question.
10     MR. SHKOLNIK:  Thank you.
11     Can I finish my question?
12     MS. McCLURE:  If there is one.
13     MR. SHKOLNIK:  I'll get to it, if
14  you -- if you don't mind.
15     BY MR. SHKOLNIK:
16     Q.   And this is the list of products
17  that's referred to in the Exhibit B in the
18  paragraph I was just reading before I was
19  interrupted.
20     Dilaudid and OxyContin, those are
21  Schedule II products, are they not?
22     MS. MAINIGI:  Objection.
23     MS. McCLURE:  Objection.
24     MR. SHKOLNIK:  Let me restate the
25  question.  I'm sorry.

51 (Pages 465 - 468)

1     BY MR. SHKOLNIK:
2     Q.   Those are controlled substances, are
3 they not?
4          MS. MAINIGI:  Objection.
5          MS. McCLURE:  Objection.
6          THE WITNESS:  Yes, sir.
7     BY MR. SHKOLNIK:
8     Q.   And OxyContin is a product that is
9 manufactured by Purdue, is it not?
10         MS. MAINIGI:  Objection.
11         THE WITNESS:  Yes, sir.
12    BY MR. SHKOLNIK:
13    Q.   If this was a contract that was
14 entered into between Walgreens and Purdue, this
15 would be an example of Purdue getting data
16 directly from the pharmacy right up to the
17 company for visibility purposes, would it not?
18         MS. MAINIGI:  Objection.
19         MS. McCLURE:  Same objection.
20         MR. STEPHENS:  Object to form.
21         THE WITNESS:  Yes, sir.
22    BY MR. SHKOLNIK:
23    Q.   And under Exhibit B format, it
24 suggests that datasets are inventory available,
25 demand quantity, quantity on order, quantity

1 sold.
2          If that type of information was
3 provided by Walgreen up to the manufacturer,
4 Purdue on those Schedule II products,
5 OxyContin, that would be a way of having
6 visibility down to the store level by
7 Walgreens, would it not?
8          MS. MAINIGI:  Objection.
9          MS. McCLURE:  Objection.
10         THE WITNESS:  It appears so.  Yes,
11 sir.
12         BY MR. SHKOLNIK:
13    Q.   And then on Dataset 2, it would also
14 include retail sales quantity.
15         So that would be evidence of data at
16 the store level going all the way up to the
17 manufacturer on the movement of OxyContin,
18 correct?
19         MS. MAINIGI:  Objection.
20         MS. McCLURE:  Objection.
21         THE WITNESS:  Yes, sir.
22         BY MR. SHKOLNIK:
23    Q.   That would be what would one -- one
24 might call visibility of the sales of OxyContin
25 at the store level right up to the

1 manufacturer, Purdue, pursuant to a license
2 with the pharmacy Walgreens, correct?
3          MS. MAINIGI:  Objection.
4          MS. McCLURE:  Objection.
5          THE WITNESS:  Yes, sir.
6          MR. SHKOLNIK:  I'm going to show you
7 Exhibit No. 43.
8          I apologize again.  This is another
9 unsigned contract that neither Walgreen or
10 Purdue provided us.  But it appears to be the
11 amendment of the last contract.
12         (Deposition Exhibit 43 was marked
13 for identification.)
14         BY MR. SHKOLNIK:
15    Q.   This document, if I'm reading it
16 correctly, says: "First Amendment Inventory
17 Data License Agreement."  And the data of this
18 is March 2015 between Walgreen and Purdue.  And
19 it's now including a new product that they
20 would be providing data on.  And it says
21 Hysingla.
22         Are you familiar with Hysingla?
23         MS. MAINIGI:  Objection.
24         THE WITNESS:  No, sir.  I'm not.
25         BY MR. SHKOLNIK:

1     Q.   Are you familiar with something -- a
2 data source called IMS or IMS Health?
3     A.   Yes, sir.
4     Q.   What's your understanding of IMS
5 Health or IMS?
6          MS. MAINIGI:  Objection.
7          BY MR. SHKOLNIK:
8     Q.   In terms of data.
9          MS. MAINIGI:  Objection.
10         THE WITNESS:  It's a data aggregate
11 company that provides high-level and low-level
12 or granular transaction information.
13         And we had -- DEA had high-level
14 data output, in other words, how much a certain
15 product was moving, but nothing specific as to
16 who or what.
17         BY MR. SHKOLNIK:
18    Q.   Did you know that the pharma -- that
19 -- that the pharmacy chains and the
20 distributors could purchase the -- the -- the
21 data regarding the movement of prescriptions
22 right down to the store level --
23         MS. MAINIGI:  Objection.
24         BY MR. SHKOLNIK:
25    Q.   -- from IMS?

Page 473

1       MS. MAINIGI:  Objection.
2       MS. McCLURE:  Objection.
3       THE WITNESS:  I don't know if they
4   could or not, no.
5       MR. SHKOLNIK:  I'm going to hand you
6   what I'm marking as Exhibit No. 44, was that, I
7   think.
8       (Deposition Exhibit 44 was marked
9   for identification.)
10      MR. SHKOLNIK:  Once again, this is
11  another unsigned contract provided to us by
12  Purdue.  And this -- this is an unsigned
13  agreement between Purdue and Walgreen for
14  access to IMF -- IMS Health data sharing.
15      BY MR. SHKOLNIK:
16  Q.   And I would like to turn your
17  attention to the Bates No. 791.  And if we
18  could go to the section entitled "AMA/AOA
19  Third-Party Data" where -- where it says:  "The
20  AMA/AOA data, any fields of information
21  specific to identifiable physician, where
22  identified by name or other identifier,
23  collectively, shall be treated by IMS and
24  Walgreens as derived from American Medical
25  Association, physician professional data."

Page 474

1       Were you aware that -- that the
2   manufacturer Purdue was purchasing directly
3   from chain pharmacies the actual information
4   regarding the prescriptions of the individual
5   physicians --
6       MR. EPPICH:  Object to form.
7       BY MR. SHKOLNIK:
8   Q.   -- at the store level?
9       MS. McCLURE:  Same objection.
10      MR. EPPICH:  And object to the
11  characterization of the document.
12      THE WITNESS:  No, sir.
13      BY MR. SHKOLNIK:
14  Q.   Did you know that IMS could provide
15  physician-level data flowing through the
16  pharmacies?
17      MS. MAINIGI:  Objection.
18      BY MR. SHKOLNIK:
19  Q.   Through IMS?
20      Did you know that?
21      MS. MAINIGI:  Objection.
22      THE WITNESS:  I got lost in the
23  question.
24      BY MR. SHKOLNIK:
25  Q.   Sure.

Page 475

1       Were you aware that IMS could
2   provide the physician prescribing level data as
3   it flowed through the pharmacies by way of the
4   IMS database?
5       Were you aware of that?
6   A.   Yes, sir.
7       MS. MAINIGI:  Objection.
8       MS. McCLURE:  Objection.
9       BY MR. SHKOLNIK:
10  Q.   Did you know that the manufacturers
11  were purchasing that data and having that?
12      MS. MAINIGI:  Objection.
13      MS. McCLURE:  Objection.
14      THE WITNESS:  No, sir.
15      BY MR. SHKOLNIK:
16  Q.   Would that be an -- if they had that
17  data, would that be another example of
18  visibility between manufacturer through
19  distribution right down to the store level and,
20  in fact, down to the prescription level?
21      MS. MAINIGI:  Objection.
22      MS. McCLURE:  Objection.
23      THE WITNESS:  Yes, sir.
24      BY MR. SHKOLNIK:
25  Q.   Would that help, sir -- based on

Page 476

1   your understanding of the way things were,
2   would that help in getting the manufacturers,
3   the distributors, as well as the pharmacies to
4   do adequate due diligence regarding suspicious
5   orders if they had all that data available to
6   them?
7       MS. MAINIGI:  Objection.
8       MR. EPPICH:  Object to form.
9       THE WITNESS:  Yes, sir.
10      BY MR. SHKOLNIK:
11  Q.   If they had used that data for that
12  purpose, correct, sir?
13      MR. EPPICH:  Object to form.
14      MS. MAINIGI:  Objection.
15      THE WITNESS:  Yes, sir.
16      BY MR. SHKOLNIK:
17  Q.   To your knowledge, when you were
18  doing your -- your work at DEA, did any -- any
19  of the registrants you work with ever tell you
20  they were using all that data together to help
21  comply with their Suspicious Order Monitoring
22  obligations under the Act?
23      MR. EPPICH:  Object to form.
24      MS. MAINIGI:  Objection.
25      MR. BENNETT:  Objection.

53 (Pages 473 - 476)

1  You may not talk about any specific
2  investigations or interviews that you had.
3       But you can answer it generally if
4  it's outside of a specific investigation.
5       THE WITNESS:  And the question was?
6       MR. SHKOLNIK:  Could you read that
7  question back, please.  I'll never get it --
8  get it a second time.
9       (The record was read as requested.)
10       THE WITNESS:  No, sir.
11       MS. MAINIGI:  May I ask the
12  videographer how much time is left before we
13  reach 3:30?
14       THE VIDEOGRAPHER:  You've got run
15  time of 3:32:30 so far.
16       MS. MAINIGI:  Okay.  I think we're
17  done.
18       Go off the record, please.
19       MR. SHKOLNIK:  No.  Wait -- wait a
20  second.  We had -- wasn't there -- there was a.
21       THE VIDEOGRAPHER:  Well, that -- you
22  -- I mean you guys have to work that out --
23       MR. SHKOLNIK:  You -- you -- you
24  guys were having a discussion.
25       MS. MAINIGI:  We're at 3:32.  I

1  don't think our discussion was longer than two
2  minutes.
3       MR. SHKOLNIK:  Oh, actually timed it
4  over here.
5       MS. MAINIGI:  Let's go off the
6  record, please.
7       THE VIDEOGRAPHER:  We are going off
8  the record.
9       The time is 2:53.
10       (A short recess was taken.)
11       THE VIDEOGRAPHER:  We are going back
12  on the record.
13       The time is 3:07.
14       You may proceed, Counsel.
15  FURTHER EXAMINATION BY COUNSEL FOR
16       CARDINAL HEALTH, INC.
17  BY MS. MAINIGI:
18  Q.  Good afternoon, Mr. Wright.
19       You just were questioned by Mr.
20  Hunter Shkolnik.
21       Do you remember that?
22  A.  Yes, ma'am.
23  Q.  And one of the questions Mr.
24  Shkolnik asked you at the beginning of his
25  testimony -- or his questioning of you was

1  whether you two had ever met.
2       Do you recall him asking you that
3  question?
4  A.  Yes.
5  Q.  Okay.  And you told him you have
6  never met him before, correct?
7  A.  Maybe I'll no recollection.
8  Q.  Okay.  Now, Mr. Migliori, have you
9  met Mr. Migliori before?
10  A.  Yes, ma'am.
11  Q.  And on how many occasions have you
12  met Mr. Migliori?
13       MR. MIGLIORI:  I'm going to object
14  on the scope.  On this question I will not tell
15  him not to answer.  But I'm going to -- I'm
16  warning that this is getting into the ruling
17  that was already issued.
18       MS. MAINIGI:  I think the door was
19  opened so -- by Mr. Shkolnik.
20       BY MS. MAINIGI:
21  Q.  How many times have you met with
22  Mr. Migliori?
23  A.  One time, to the best of my
24  recollection.
25  Q.  You've only met Mr. Migliori one

1  time.
2       That's your testimony under oath?
3  A.  Except for the days here.
4  Q.  Okay.  And other individuals from
5  Motley Rice, have you met with them?
6  A.  No, ma'am.
7  Q.  The only --
8  A.  Now --
9  Q.  I'm sorry.  Go ahead.  Go ahead.
10  A.  I've had a couple of telephone --
11  I've had some telephone conferences.  But I've
12  not physically met with anyone from Motley Rice
13  except for him.
14  Q.  Okay.  Thank you for completing
15  that.
16       In terms of -- well, the meeting
17  with Mr. Migliori, when was that
18  approximately, what month; do you remember?
19  A.  It was late last year.
20  Q.  Was he the first person from Motley
21  Rice that you spoke with?
22       MR. TAYMAN:  Objection.
23       MR. BENNETT:  Objection.
24       MR. TAYMAN:  Privileged and
25  confidential.

54 (Pages 477 - 480)

1     I'm going to direct you not the
2  answer.
3     We don't control the privilege.
4     MS. MAINIGI: I know that. I don't
5  know why that would be privileged and
6  confidential. But I can't -- I can't change
7  how you're directing him not to answer the
8  question.
9     BY MS. MAINIGI:
10    Q.   Who else from -- you mentioned
11  telephone calls with Motley Rice.
12    Were those with Mr. Migliori?
13    A.   He had occasion to be in -- in some
14  of those but not all.
15    Q.   How many phone calls, approximately,
16  have you had with Motley Rice?
17    A.   Four.
18    Q.   And approximately how long did each
19  last?
20    A.   None of them lasted more than an
21  hour.
22    Q.   And those --
23    A.   The last two were only half an hour.
24    Q.   Were all of those calls -- and I
25  don't know -- want to know the details, but

1  were all of those calls related to your
2  consulting arrangement with Motley Rice?
3     MR. TAYMAN: Objection to the extent
4  it calls for the content of the call.
5     But otherwise You can answer.
6     THE WITNESS: Yes.
7     BY MS. MAINIGI:
8     Q.   Who else from Motley Rice was on
9  those telephone calls?
10    MR. MIGLIORI: Objection.
11    MR. TAYMAN: Objection.
12    MR. MIGLIORI: Don't answer.
13    MR. TAYMAN: Direct you not to
14  answer.
15    MS. MAINIGI: Why is that
16  privileged?
17    MR. MIGLIORI: It's the privilege
18  under the rule for --
19    MS. MAINIGI: But --
20    MR. MIGLIORI: -- for consultancy
21  experts. You happened to learn by happenstance
22  of the existence of it. I gave you latitude
23  about how little it was. But content on the
24  and who he spoke with a far beyond the rule.
25    MS. MAINIGI: So he's able to

1  identify you from Motley Rice as someone he has
2  met with for the purpose of consulting, but he
3  can't -- I'd -- you're -- you're --
4     MR. MIGLIORI: Yes. You're right.
5     MS. MAINIGI: -- forbidding him,
6  Mr. Migliori, from identifying anyone else from
7  Motley Rice?
8     MR. MIGLIORI: That's correct.
9     MS. MAINIGI: Okay. Well, I guess
10  we'll take that up with the Special Master
11  Cohen.
12    BY MS. MAINIGI:
13    Q.   Did you meet with Ms. Singer from
14  Motley Rice?
15    MR. MIGLIORI: Do not answer.
16    MR. TAYMAN: Objection. Privileged.
17  Confidential.
18    Direct you not to answer.
19    BY MS. MAINIGI:
20    Q.   Did you meet to Ms. Singer by
21  telephone?
22    MR. MIGLIORI: Same objection.
23    MR. TAYMAN: Objection.
24    BY MS. MAINIGI:
25    Q.   Your in-person meeting with

1  Mr. Migliori that took place late last year,
2  how long did that meeting last?
3     MR. MIGLIORI: Objection.
4     Do not answer.
5     We're -- we're done with that.
6  That's going to be my running objection.
7     MS. MAINIGI: Okay. We'll -- we'll
8  figure out if on the next break we go ahead and
9  stop and call David Cohen.
10    BY MS. MAINIGI:
11    Q.   So you were retained, as you
12  testified before, by Mr. Migliori and Motley
13  Rice to represent or consult for Summit County,
14  correct?
15    MR. MIGLIORI: Objection.
16    Don't answer.
17    MR. TAYMAN: Objection.
18    MS. MAINIGI: He's already answered
19  that.
20    MR. MIGLIORI: No. First of all,
21  it's been asked and answered. It's beyond the
22  spoke. I don't know how Hunter opened the door
23  for it. But it's beyond the scope of this type
24  of questioning.
25    MS. MAINIGI: Well, actually.

55 (Pages 481 - 484)

Page 485

1      MR. MIGLIORI:  And we can have David
2   resolve the issue.  But David's already let you
3   go as far as you can go.
4      MS. MAINIGI:  I don't think so.
5   Because Mr. Shkolnik opened the door to this.
6      MR. SHKOLNIK:  I didn't open any
7   door.
8      MR. MIGLIORI:  He can't open a door
9   for my relationship.
10      MS. MAINIGI:  Okay.  Well, the -- I
11   disagree.  But we'll keep on going, and then
12   we'll come back.
13      MR. MIGLIORI:  And you can use all
14   of your time doing that, but --
15   BY MS. MAINIGI:
16   Q.  Did you meet with -- between last
17   week's testimony that you provided under oath
18   and today's testimony that you are providing
19   under oath, did you meet with your attorney?
20      MR. TAYMAN:  Objection to the extent
21   that -- don't --
22   BY MS. MAINIGI:
23   Q.  "Yes" or "no"?
24      MR. TAYMAN:  You can't tell her the
25   content of any meeting.  But you can tell her

Page 486

1   about the existence of a meeting.
2      THE WITNESS:  I'm sorry.  Could you
3   repeat your question for me, please.
4   BY MS. MAINIGI:
5   Q.  Sure.
6      Do you remember testifying last
7   Thursday here in this room?
8   A.  Okay.  Thank you.
9      Yes, ma'am.
10   Q.  Okay.  And then your back, of
11   course, today.
12      Between then and now, did you meet
13   with your attorney?
14      I don't need to know what you talk
15   about; I just -- "yes" or "no," did you meet
16   with your attorney?
17   A.  No, ma'am.
18   Q.  Okay.  Did you speak to your
19   attorney by telephone between last Thursday and
20   today?
21   A.  Yes, ma'am.
22   Q.  Okay.  How long did you speak to
23   your attorney for, sir?
24   A.  Five minutes.
25   Q.  Five minutes between last Thursday

Page 487

1   and today?
2   A.  Yes, ma'am.
3   Q.  Okay.  Did you speak to anyone else
4   about this matter between last Thursday and
5   today?
6   A.  No, ma'am.
7   Q.  Okay.  You testified that the
8   Excessive Purchase System had been in place
9   since at least 1995 when you joined the DEA,
10   correct?
11   A.  Excessive?
12   Q.  Yes.
13   A.  Yes, ma'am.
14   Q.  Okay.  And the Excessive Purchase
15   Reports were the accepted practice for many
16   years, correct?
17   A.  Yes, ma'am.
18   Q.  And these reports were blessed by
19   DEA headquarters and field offices, correct?
20      MR. BENNETT:  Objection.
21      You can answer.
22      THE WITNESS:  To my understanding.
23   Because that's all I was provided, ma'am.
24   BY MS. MAINIGI:
25   Q.  Well, you understood, when you were

Page 488

1   at the DEA field office, that it was the
2   practice for registrants to send in Excessive
3   Purchase Reports, correct?
4   A.  That's all I ever saw.  That's all I
5   ever got on my desk.  I saw no other variation
6   of that.
7   Q.  Did you ever ask anybody, when you
8   were in the field office, whether there were
9   other variations?
10   A.  No, ma'am.
11   Q.  Okay.  And when you got to
12   headquarters, you were aware that the practice
13   was to -- for registrants to send in Excessive
14   Purchase Reports, correct?
15   A.  Yes, ma'am.
16   Q.  And, in fact, the DEA told
17   registrants during inspections that your system
18   is working, correct?
19      MR. BENNETT:  Objection.
20      THE WITNESS:  I do not know what
21   other investigators were -- were telling or
22   whatever, approving.
23      I know that these were accepted
24   reports.  They were received by many field
25   office nationwide.  Got that through training.

56 (Pages 485 - 488)

Page 489

1 When we got together, we'd talk about work and
2 things like this, so --
3        BY MS. MAINIGI:
4     Q.   And prior for 2005, you personally,
5 in your experience, never told any registrant
6 that there was anything improper or illegal
7 about the practice of submitting excesses --
8 Excessive Purchase Reports, correct?
9     A.   Yes, ma'am.
10    Q.   And to the best of your knowledge,
11 in your experience, nobody at DEA told any
12 registrant there was anything improper or
13 illegal about the practice of submitting
14 Excessive Purchase Reports, correct?
15    A.   Yes, ma'am.
16    Q.   A colleague pointed out to me that
17 your very polite response may -- it may not be
18 totally clear.
19        When you say "yes, ma'am" -- when
20 you say "yes, ma'am" --
21    A.   You don't want me to be polite?
22    Q.   I do want you to be polite.
23        When you say "yes, ma'am," that
24 means you're agreeing with my statement; is
25 that right?

Page 490

1        MR. MIGLIORI:  Objection.
2        BY MS. MAINIGI:
3     Q.   So let's -- let's -- let's make sure
4 the record is clear.  I -- let me do -- I
5 apologize.  Let -- let -- let me try to make
6 sure that the record is clear.
7        To the best of your knowledge,
8 Mr. Wright, in your experience, do you agree
9 that no one at DEA told a registrant that there
10 was anything improper or illegal about the
11 practice of submitting Excessive Purchase
12 Reports prior to 2005?
13    A.   To the best of my knowledge, no.
14    Q.   DEA would not have blessed a
15 practice that did not comply with the
16 regulation, correct?
17        MR. MIGLIORI:  Objection.  Scope.
18        MR. BENNETT:  Objection.
19        MR. MIGLIORI:  Authority.
20        THE WITNESS:  I was never at that
21 level to say what DEA would approve or not
22 approve.  Never.  Everything I did got stamped,
23 spended and folded and mutilated 20 different
24 ways.
25        BY MS. MAINIGI:

Page 491

1     Q.   So you weren't person making
2 decisions about what did or did not comply with
3 regulations and statutes?
4        MR. MIGLIORI:  Objection.
5        THE WITNESS:  No, ma'am.
6        BY MS. MAINIGI:
7     Q.   That would have been the office of
8 legal counsel at DEA, correct?
9     A.   Among one of many.
10    Q.   Now, if you, as one of the employees
11 of DEA, knew facts that indicated that
12 registrants were failing to maintain effective
13 controls against diversion, you would have
14 tried to take some sort of action, correct?
15        MR. MIGLIORI:  Objection.  Form.
16 Foundation.
17        THE WITNESS:  I would have tried --
18 I would have begun looking into it to -- to
19 explore it.  I -- "action" is a very broad
20 word.
21        BY MS. MAINIGI:
22    Q.   To your knowledge, no one from DEA
23 told registrants to submit anything other than
24 Excessive Purchase Reports until the 2005, 2007
25 time frame we've been talking about, correct?

Page 492

1     A.   To the best of my knowledge.
2     Q.   To the best of your knowledge, that
3 is a correct statement?
4     A.   Yes, ma'am.
5     Q.   Okay.  And I believe you testified
6 to this before, but the DEA continued to accept
7 those Excessive Purchase Reports even after the
8 distributor initiative briefings that you
9 discussed with Mr. Migliori began, correct?
10        MR. MIGLIORI:  Objection.  Beyond
11 the scope.
12        MR. BENNETT:  Objection.
13        MS. MAINIGI:  Let me -- let me
14 withdraw the question.  And I'll -- I'll -- let
15 me break it up a little bit for you.  Okay?
16        THE WITNESS:  Thank you.
17        BY MS. MAINIGI:
18    Q.   You testified that the distributor
19 briefings began towards the end of 2005 and
20 actually continued for several more years
21 thereafter, correct?
22    A.   Yes, ma'am.
23    Q.   And, in fact, I recall you
24 discussing with Mr. Migliori the concept of
25 doing one of the distributor briefings with --

57 (Pages 489 - 492)

Page 493

1  with the trade association HDMA. I think it
2  was at the end of 2007.
3      Do you remember that?
4      A. Yes, ma'am.
5      Q. And I believe you testified last
6  week that there were some distributor briefings
7  that took place even after 2007, correct?
8      A. Yes, ma'am.
9      Q. So there was a period of time where
10  a number of the one-on-one distributor
11  briefings were happening, correct?
12      A. Yes, ma'am.
13      Q. Okay. And I believe you told me
14  last week that, even after the distributor
15  briefings began at the end of 2005, to your
16  knowledge the DEA continued to accept Excessive
17  Order Reports from registrants for some period
18  of time after the briefings began.
19      A. Only for those that have not been
20  briefed, not accepting or maybe more from those
21  that have been -- the -- the -- the distributor
22  briefing or whatever had been given to.
23      There's -- there had to be a
24  transition time. We couldn't just fall on top
25  of everybody all at once.

Page 494

1      Q. That's right.
2      Because it would have been -- it --
3  it took a while for the registrants to build
4  out essentially a new system, correct?
5      A. I don't know if "build out." But
6  they had to employ and -- and start it. But it
7  wasn't fair for brief -- Company A and Company
8  B hadn't been briefed, and make them -- Company
9  B change.
10      Q. Do you recall saying to any company
11  after a briefing that you would no longer
12  accept Excessive Order Reports from that
13  company starting from some date certain?
14      A. I never recall giving anybody a
15  hard, fast date of transition.
16      Q. Okay. Do you recall ever sending
17  out a letter to a company telling them you were
18  no longer going to accept Excessive Order
19  Reports from that company?
20      A. I don't have any recollection of
21  ever doing that.
22      Q. Now, there was some discussion about
23  the due diligence that a company may perform in
24  determining whether an order is suspicious or
25  not.

Page 495

1      Do you remember that discussion?
2      A. Yes, ma'am.
3      Q. And you're familiar with the statute
4  and the regulations that are at issue here,
5  correct?
6      A. Yes, ma'am.
7      Q. Would you like me to put them in
8  front of you, or do you feel like you're
9  sufficiently aware of them?
10      A. Oh, I would rather have them in
11  front of me.
12      MS. MAINIGI: Okay.
13      THE WITNESS: I -
14      MS. MAINIGI: Let's do that.
15      THE WITNESS: After a few years --
16      MS. MAINIGI: Understood.
17      46 is the statute, sir.
18      (Deposition Exhibit 46 was marked
19  for identification.)
20      MS. MAINIGI: And 47 is the
21  regulation, sir.
22      (Deposition Exhibit 47 was marked
23  for identification.)
24      BY MS. MAINIGI:
25      Q. Now, the -- this is just a reference

Page 496

1  for you if -- if you need the statute or the
2  regulation.
3      I believe, when you spoke of best
4  practice -- when you spoke of the due diligence
5  that may be performed, you spoke of it in terms
6  of best practices, correct?
7      A. Yes, ma'am.
8      Q. So the due diligence that got
9  referenced in your discussion this morning,
10  that is not required by the statute or the
11  regulation, correct?
12      MR. BENNETT: Objection.
13      THE WITNESS: It is not mentioned
14  specifically.
15      BY MS. MAINIGI:
16      Q. It is, in your mind, a best
17  practice, correct?
18      A. I don't see how it can be -- it's a
19  little more than best practice. I know it's
20  not stipulated. But I don't see how you can do
21  the assessments without going through some of
22  those -- those processes.
23      Q. And it is the documentation of --
24  whatever due diligence is done by a company,
25  that may be a best practice, but it is not

58 (Pages 493 - 496)

Page 497

1  required by statute or regulation, correct?
2      MR. BENNETT: Objection.
3      MR. SHKOLNIK: Objection to form.
4      THE WITNESS: Yes, ma'am.
5      BY MS. MAINIGI:
6      Q.  When you did your distributor
7  briefings, you did not note in your distributor
8  briefings the documentation of due diligence,
9  did you?
10     A.  No, ma'am.
11     MR. BENNETT: Mr. Wright, do you
12  need to supplement your answer?
13     THE WITNESS: I'm not changing my
14  answer.
15     MR. BENNETT: Okay.
16     BY MS. MAINIGI:
17     Q.  There was testimony this morning
18  about a September 11th, 2007 DEA conference.
19     Do you recall that?
20     A.  In Houston.
21     Q.  That's correct.
22     Do you recall that discussion back
23  and forth with you and Mr. Migliori?
24     A.  Yes, ma'am.
25     Q.  It might have even been

Page 498

1  Mr. Shkolnik. I -- I may have gotten that
2  wrong.
3      But in any case, with the plaintiffs
4  you discussed the concept of whether you
5  attended the DEA conference on September 11th,
6  2007, correct?
7      A.  Yes, ma'am.
8      Q.  And I believe your testimony was
9  that you couldn't remember, but you thought
10  maybe you had.
11     Do you remember that?
12     A.  I've been to Houston several times.
13  And I just can't recall if it was in connection
14  with this or not.
15     Q.  Okay.  And Mr. Migliori or
16  Mr. Shkolnik plaintiffs' counsel walked you
17  through the deck or PowerPoint associated with
18  that DEA conference, correct?
19     A.  Yes, ma'am.
20     Q.  Now, I think in front of you you've
21  your trial testimony in the binder.
22     A.  Okay.  Thank you.
23     Q.  And you recall testifying at the
24  H.D. Smith trial, correct?
25     A.  Unfortunately, yes, ma'am.

Page 499

1      Q.  And that was not necessarily a
2  pleasant experience for you, correct?
3      A.  No, ma'am.
4      Q.  That -- the date of your testimony
5  was in the year 2011, correct?
6      A.  Yes, ma'am.
7      Q.  And 2011 is certainly closer in time
8  to 2007 than 2019 is, correct?
9      A.  Yes, ma'am.
10     Q.  So in 2011 your memory about whether
11  you attended that conference might be a bit
12  better; don't you agree?
13     A.  Yes, ma'am.
14     Q.  Okay.  Let's take a look at your
15  testimony at Page 368, lines 10 through 14.
16     MR. SHKOLNIK: Can we have the date
17  of the transcript so we know which one you're
18  talking about.
19     MS. MAINIGI: Page 368, pages --
20  lines 10 to 14.  And the trial testimony date
21  is August 12th, 2011.
22     THE WITNESS: Okay.
23     BY MS. MAINIGI:
24     Q.  At Page 368, lines 10 through 14,
25  have you had a chance to review your testimony?

Page 500

1      A.  Yes, ma'am.
2      Q.  Okay.  Does it appear to you,
3  Mr. Wright, upon reflection, that you did not
4  attend the September 11, 2007, DEA conference?
5      A.  According to this statement that I
6  made, no, I did not.
7      Q.  And when did you make the statement?
8      A.  This was 2011.
9      Q.  What was the statement you made
10  Mr. Wright?
11     A.  Oh, you want me to read it verbatim?
12     Q.  Or you can -- you can paraphrase it.
13  Whatever you wish.
14     MR. MIGLIORI: Objection. Form.
15     THE WITNESS: "Question: Did you
16  attend the DEA distributor conference in
17  Houston September 11th or 12th of 2007?
18     "Answer: To the best of my
19  recollection, no, I did not."
20     BY MS. MAINIGI:
21     Q.  So sitting here today, just to be
22  clear, Mr. Wright, to the best of your
23  recollection sitting here today, did you attend
24  the September 11th, 2007, DEA conference?
25     A.  In Houston, Texas.

59 (Pages 497 - 500)

Page 501

1    Q.   Yes.
2    A.   Apparently to previous testimony, I
3  did not.
4    Q.   Okay.  Based on prior documents that
5  you reviewed, is it clear that Mr. Mapes
6  attended that conference?
7        MR. BENNETT:  Objection.  Form.
8        THE WITNESS:  It appears so.
9        BY MS. MAINIGI:
10   Q.   And sitting here today, you don't
11  recall having a discussion with Mr. Mapes about
12  what he specifically said or discussed at that
13  conference, do you?
14   A.   I -- I only snicker because I - how
15  many thousands of things did I talk to him
16  about.  I -- I do not know.  I would not know.
17       BY MS. MAINIGI:
18   Q.   And so, when you were asked a series
19  of questions by plaintiffs' counsel about what
20  might have been said at the conference or what
21  got said at the conference, the September 11th,
22  2007 conference, that was speculation on your
23  part, correct?
24       MR. SHKOLNIK:  Objection to form.
25       THE WITNESS:  I don't think it would

Page 502

1  be speculation.  I was only answering the
2  question as it was directed to me.
3        BY MS. MAINIGI:
4    Q.   Well, you were asked -- do you
5  recall being asked questions, Mr. Wright, about
6  what may have been discussed with the
7  registrants at the conference?
8    A.   Based upon the slides that -- that
9  he showed.
10   Q.   Do you know if those slides got
11  delivered at the conference?
12   A.   No, ma'am.  Not specifically.
13   Q.   So you indicating -- you -- you
14  reading the slides and telling the plaintiffs'
15  counsel what you thought might have been said
16  as a result of review of the slide deck, you
17  have no idea whether that got communicated to
18  the registrants, correct?
19   A.   Yes, ma'am.  That's correct.
20   Q.   Okay.  Now, the person that might
21  know and might have some recollection of what
22  got said by the DEA to the registrants at that
23  September 11th, 2007 conference is Mr. Mapes,
24  correct?
25   A.   Yes, ma'am.

Page 503

1    Q.   Okay.  Now, you also got asked a
2  number of questions -- well, let's back up.
3        You were shown also copies of
4  various letters to registrants from Joe
5  Rannazzisi in the 2006 and 2007 time period,
6  correct?
7    A.   Yes, ma'am.
8    Q.   And you've testified that you didn't
9  see Mr. Rannazzisi's letters before they went
10  out, correct?
11   A.   Yes, ma'am.
12   Q.   You did not see them, right?
13   A.   No, ma'am.  I did not.
14   Q.   Okay.  And I believe you said this
15  morning that you saw Mr. Rannazzisi's letter
16  after the fact in passing, correct?
17       MR. MIGLIORI:  Objection.  Misstates
18  testimony.
19   A.   I believe that is exactly what I
20  said.
21       BY MS. MAINIGI:
22   Q.   Plaintiffs' counsel reviewed various
23  passages from the Rannazzisi letters with you
24  in detail, correct?
25   A.   Yes, ma'am.  They did.

Page 504

1    Q.   And they asked you if you agreed
2  that you would have, in fact, said those things
3  specifically to distributors in distributor
4  briefings.
5        Do you recall that?
6        MR. MIGLIORI:  Objection.  Misstates
7  the question and answer.
8        THE WITNESS:  Yes, ma'am.
9        BY MS. MAINIGI:
10   Q.   But sitting here today, Mr. Wright,
11  you can't possibly know whether you
12  specifically said anything that was in
13  Mr. Rannazzisi's letter, which you saw in
14  passing after the fact, in the distributor
15  briefings that you did for several years, could
16  you?
17       MR. BENNETT:  Objection to form.
18       BY MS. MAINIGI:
19   Q.   "Yes" or "no"?
20   A.   Then I need the question repeated,
21  please.
22   Q.   Let me start over.
23   A.   Yes, ma'am.
24   Q.   Because I probably confused us both.
25  I'm sorry.

60 (Pages 501 - 504)

Page 505

1    You did the distributor briefings
2  for a number of years, right?
3     A.  Yes, ma'am.
4     Q.  And you had a very fulsome
5  PowerPoint deck that you utilized as the basis
6  for your briefing, correct?
7     A.  Yes, ma'am.
8     Q.  And then you also said things out
9  loud at the various briefings, I'm sure,
10  correct, that were not in your PowerPoint?
11     A.  Yes, ma'am.
12     Q.  Okay.  But sitting here today, can
13  you tell me under oath and specifically what
14  you might have said out loud at those briefings
15  that was not necessarily contained in your
16  PowerPoint deck?
17     MR. MIGLIORI:  Objection to form.
18     THE WITNESS:  To some extent, yes.
19  Because I repeated them quite often.  I -- I
20  made sure that they were conveyed to every
21  distributor or to everybody that -- that -- it
22  had to be emphasized.
23     BY MS. MAINIGI:
24     Q.  When --
25     A.  I --

Page 506

1     Q.  Go ahead.  Finish.
2     A.  To be a PowerPoint is just to convey
3  the -- the major concept.  Anybody -- I don't
4  like using a PowerPoint to do my job for me.
5     Q.  You certainly put into the
6  PowerPoint the stuff you thought was very
7  important, correct?
8     A.  Critical.  Yes, ma'am.
9     Q.  Sitting here today, you can't
10  possibly tell me that you knew for sure that
11  some of the things that were in the Rannazzisi
12  letters were things that you specifically said
13  to all the distributors, can you?
14     MR. BENNETT:  Objection.  Form.
15     MR. MIGLIORI:  Objection.  Form.
16     THE WITNESS:  Based upon this --
17  this morning, what you're referring to, I
18  answered those questions when I was asked in
19  the context of this is what I saw in the
20  PowerPoint.  That is how I answered those.
21     MR. SHKOLNIK:  I'm sorry.  Could
22  I've the question and answer read back.
23     MS. MAINIGI:  You can do that on
24  your own time.
25     MR. SHKOLNIK:  I just couldn't hear

Page 507

1  it.
2     MS. MAINIGI:  There's -- there's the
3  machine right there.
4     MR. SHKOLNIK:  I don't -- I don't
5  have one.  I'm sorry.
6     MS. McCLURE:  I'm sure he'll pass it
7  over.  You guys are friends.  You're sharing.
8  Just pass it over.
9     BY MS. MAINIGI:
10     Q.  Sitting here today, many, many years
11  later, Mr. Wright, unless it is specifically
12  reflected in your PowerPoint, you were at best
13  making an educated guess about what you
14  specifically said to distributors at the
15  distributor briefings, correct?
16     MR. MIGLIORI:  Objection.  Form.
17     MR. BENNETT:  Objection.  Form.
18     THE WITNESS:  Yes.
19     BY MS. MAINIGI:
20     Q.  And maybe after the next break we'll
21  come back and pull out some of the very
22  specific points from the letter you were asked
23  to -- to agree with.
24     MR. MIGLIORI:  Is that a question?
25  Form.

Page 508

1     BY MS. MAINIGI:
2     Q.  Let's take a look at your
3  distributor briefing slides.  I believe that
4  they're in your binder.  Exhibit 10 -- oh, I'm
5  -- I apologize, Mr. Wright.  They're Exhibit
6  10.
7     MR. SHKOLNIK:  Can you make sure the
8  exhibits that have been marked are in front of
9  the witness for the last two days.
10     MS. MAINIGI:  We -- we can do that.
11     THE WITNESS:  Okay.  Exhibit which
12  one?
13     MS. MAINIGI:  It's Exhibit 10, sir.
14     THE WITNESS:  Okay.
15     MS. MAINIGI:  It's the -- it's --
16  it's the -- one of the examples --
17     THE WITNESS:  Got it.
18     MS. MAINIGI:  -- of the distributor
19  briefing.
20     BY MS. MAINIGI:
21     Q.  By the way, do you recall -- you got
22  asked some questions about -- about Cardinal
23  this morning.
24     Do you recall testifying last week
25  that you did not actually attend the Cardinal

61 (Pages 505 - 508)

1   distributor briefing?

2       A.   To the best of my recollection, no.

3       Q.   And do you recall testifying last

4   week that it was actually Mr. Mapes and Ms.

5   Seeger that attended the Cardinal briefing?

6       A.   Yes, ma'am.

7       Q.   And so sitting here today, you do

8   not know yourself what specifically got said

9   outside of the PowerPoint by Mr. Mapes or Ms.

10  Seeger at the Cardinal distributor briefing,

11  correct?

12      A.   Correct.

13      Q.   Okay.  Now, taking -- feel free to

14  refer to the Internet pharmacy data PowerPoint

15  that, as I understand it, you used for your

16  distributor briefers.

17          By the way, you also mentioned last

18  week that the early distributor briefings Mr.

19  Mapes took the lead on those, and you were an

20  attendee.

21          Do you recall that?

22      A.   I do.

23          MR. SHKOLNIK:  Objection to form.

24          BY MS. MAINIGI:

25      Q.   Was it Mr. Mapes or you or both of

1   you that actually created the distributor

2   briefing, the PowerPoint?

3           MR. BENNETT:  Objection to the

4   extent it goes into internal deliberations.

5           But you can answer if you know.

6           THE WITNESS:  The question again?

7           BY MS. MAINIGI:

8       Q.   Do you recall, Mr. Wright, whether

9   the Internet pharmacy data briefing that we

10  have been referring to as the distributor

11  briefing, whether you actually created this

12  PowerPoint or whether Mr. Mapes created it or

13  whether you did it jointly?

14      A.   Jointly.

15      Q.   Do you remember which pages you

16  wrote versus Mr. Mapes?

17      A.   I remember a lot of red ink.  No,

18  ma'am.

19      Q.   Okay.  Do you remember whether you

20  specifically concentrated on the data examples

21  and he concentrated on some of the DEA

22  requirements?

23          MR. BENNETT:  Objection.

24          To the extent that would require you

25  to disclose internal deliberations, you're not

1   to answer.  Otherwise, you can answer.

2           THE WITNESS:  Both.

3           BY MS. MAINIGI:

4       Q.   You worked on both, and he worked on

5   both?

6       A.   On the regulations and that

7   discussion, we -- that was both.  The -- yes,

8   ma'am.  Yes, ma'am.  Because it -- the whole

9   concept of the data -- what we were trying to

10  get across.  So yes.

11      Q.   Now, you mentioned something about

12  red ink.

13          That -- Do you mean that was the

14  editing back and forth that naturally occurs?

15      A.   Yes, ma'am.

16      Q.   Okay.

17          MR. BENNETT:  Objection.

18          You can answer.

19          THE WITNESS:  Yes, ma'am.

20          MR. BENNETT:  I don't want to get

21  into the specifics of who was doing red ink or

22  where they got advice or -- or the internal

23  deliberative process as far as creating this.

24          BY MS. MAINIGI:

25      Q.   Well, let me ask you this,

1   Mr. Wright.

2           I don't want to get into those

3   details either, but answer this question for me

4   "yes" or "no":  Do you even recall at this

5   point any of the specifics about who edited

6   what or what edits you might have made versus

7   what edits Mr. Mapes may have been -- may have

8   made, or is it just too long ago?

9       A.   No, ma'am.  It's too long ago.

10      Q.   Okay.  Now, I think you testified at

11  the H.D. Smith trial that, for whatever reason,

12  you deleted your e-mails prior to sometime in

13  2010.

14          Do you remember testifying to that

15  effect?

16      A.   Yes, ma'am.

17      Q.   And your e-mails that were deleted

18  prior to 2010 would have contained some of the

19  back-and-forth red ink that we're talking

20  about, right?

21          MR. BENNETT:  Objection.  Form.

22          MR. MIGLIORI:  Objection.  It's

23  beyond the scope of prior examination.

24          THE WITNESS:  I doubt that those

25  discussions would have been in those e-mails.

62 (Pages 509 - 512)

Page 513

1    But yes, it would have deleted that.
2         BY MS. MAINIGI:
3    Q.   Well, they were written discussions
4    or e-mails, right?
5         Red ink would be edits in writing?
6    A.   No, ma'am.  That would be us sitting
7    across from each other and slamming each other
8    and objecting and doing this.  That was most of
9    my discussion with Mr. Mapes.
10   Q.   Was just sitting across from him?
11   A.   Yes, ma'am.
12   Q.   Okay.  And was there -- I think you
13   testified at the trial that there was some back
14   and forth about internal discussions in
15   particular about the do-not-ship requirement
16   that were in an e-mail that ultimately got
17   deleted.
18        Do you remember that?
19   A.   Yes, ma'am.
20   Q.   Okay.  And those were internal
21   discussions about whether to -- how to
22   essentially approach the do-not-ship
23   requirement in conversations with distributors,
24   correct.
25        MR. BENNETT:  Objection to the

Page 514

1    extent you're asking about prior testimony, he
2    can answer.  To the extent you're asking about
3    the contents of internal deliberations, the
4    witness is not authorized to answer that
5    question.
6         THE WITNESS:  Yes.
7         BY MS. MAINIGI:
8    Q.   And were those discussions just with
9    Mr. Mapes, or did they perhaps include
10   discussions with other folks at DEA?
11        MR. BENNETT:  Objection.  Same
12   instructions.
13        MR. SHKOLNIK:  Just note my
14   objection here.  Special Master Cohen was very
15   clear.  Reserving time --
16        MS. MAINIGI:  I'm sorry.  There --
17   there is -- this --
18        MR. SHKOLNIK:  No.  Reserving time
19   was not meant to do a second deposition.  And I
20   think maybe we should go to the special master
21   at the beginning -- when we take the break.
22        MS. MAINIGI:  Okay.
23        THE WITNESS:  And I apologize again.
24   Would you please repeat the question to me.
25        MS. MAINIGI:  I'm not sure there's a

Page 515

1    question pending.  Let's go back and look.
2         The question -- I'll ask the court
3    reporter to read back the question, please.
4         (The record was read as requested.)
5         MR. BENNETT:  So I'm going to object
6    to the extent that this question calls for
7    disclosure of internal deliberations and would
8    object to him disclosing any other individuals
9    beyond himself or Mr. Mapes who was involved.
10   But I believe he can say if there were others
11   involved.
12        Do you understand the instruction?
13        THE WITNESS:  I understand the
14   instruction.
15        And I'm rethinking the answer.  I'm
16   trying to satisfy everybody.
17        Yes.
18        BY MS. MAINIGI:
19   Q.   Can you identify those other
20   individuals besides Mr. Mapes?
21        MR. BENNETT:  Objection.  Internal
22   deliberative process, the individuals who were
23   involved.
24        I'm instructing you not to answer
25   that.  I don't believe you are authorized to

Page 516

1    disclose that.
2         BY MS. MAINIGI:
3    Q.   You were asked -- Mr. Migliori this
4    morning went through the Internet pharmacy data
5    deck with you page by page, practically,
6    correct?
7    A.   He did cover quite a bit of the
8    content.
9    Q.   And I -- I think he made note of the
10   fact, in fact, that he felt you and I had not
11   the spent enough time on the deck last week.
12        Do you remember that?
13   A.   Yes, ma'am.
14   Q.   Now, feel free to refer to the deck,
15   but do you recall anything from this deck about
16   the due diligence?
17   A.   No, ma'am.
18   Q.   Okay.
19   A.   It's not mentioned.  And it's in
20   that --
21   Q.   Do you recall anything about --
22   A.   -- terminology.
23   Q.   Do you recall anything from this
24   deck about know your customer?
25   A.   No, ma'am.

63 (Pages 513 - 516)

Page 517

1    Q.   But Mr. Migliori asked you a litany
2   of questions about what might have been in
3   these distributor briefings, very specific
4   questions.
5        Do you remember that?
6    A.   Yes, ma'am.
7    Q.   And you seemed to readily agree with
8   each one of the questions he asked without even
9   looking at the deck that, yes, that was
10  contained in the distributor briefing.
11       Do you remember that?
12   A.   Yes, ma'am.
13   Q.   Did you go back and look to see if
14  those were actually in the distributor
15  briefing?
16   A.   No, ma'am.
17   Q.   And now, sitting here today, you
18  can't recall specifically what you said even in
19  the briefings that you actually did do, right?
20   A.   I've some recollection of what I
21  said to -- let -- let me answer it this way:
22  The letters was -- and the questions I was
23  asked was consistent with the message that the
24  DEA was putting out at the time.
25   Q.   So your testimony is the general

Page 518

1   gist of what was in the Rannazzisi letters that
2   came after the distributor briefings would have
3   likely been contained in presentations to
4   distributors, right?
5    A.   Yes, ma'am.
6    Q.   Okay.  But sitting here today, you
7   cannot recall for me specifically what you said
8   to distributors even in the briefings you
9   attended, correct?
10       MR. BENNETT:  Objection.
11       MR. MIGLIORI:  Objection.  It's been
12  asked and answered four times.
13       THE WITNESS:  I'm -- I'm not
14  annoying you.
15       May I've the question again.  I -- I
16  -- I do apologize.
17       (The record was read as requested.)
18       MR. SHKOLNIK:  Objection.  Form.
19       MR. MIGLIORI:  Asked and answered.
20       THE WITNESS:  Can I have a short
21  recess?
22       MS. MAINIGI:  Not while the
23  question's pending.
24       THE WITNESS:  Ah, that's right.
25       BY MS. MAINIGI:

Page 519

1    Q.   You don't remember what you
2   specifically said, do you?
3    A.   Yes, ma'am.
4        MR. SHKOLNIK:  Objection.
5        THE WITNESS:  To a certain --
6        MR. SHKOLNIK:  Was the prior
7   question withdrawn?
8        THE WITNESS:  Yes, ma'am.  I have
9   some recollection.
10       BY MS. MAINIGI:
11   Q.   Okay.  What did you specifically
12  say?
13       MR. MIGLIORI:  Objection to form.
14       THE WITNESS:  Okay.
15       BY MS. MAINIGI:
16   Q.   That was not in the Internet
17  briefing.
18   A.   Okay.  "You must know your customer
19  on an inmate basis because that customer could
20  get you in trouble."
21       And I can certainly guarantee that I
22  probably said that at every briefing.
23   Q.   The briefing that --
24   A.   And I know --
25   Q.   -- you did.

Page 520

1    A.   Yes, ma'am.
2        MR. MIGLIORI:  Don't interrupt.
3        THE WITNESS:  And I know it's also
4   in the H.D. Smith testimony.  And I've stated
5   it in there.
6        But I -- the reason I know it is
7   because some people thought that I was -- they
8   didn't like the word "intimacy."  I thought it
9   conveyed the extent of what you should do with
10  your -- with your customers.
11       So in those things that I've
12  repeated, I have recollection of those.
13       BY MS. MAINIGI:
14   Q.   Anything else --
15       MR. BENNETT:  Can --
16       BY MS. MAINIGI:
17   Q.   -- that --
18       MR. BENNETT:  Counsel --
19       MS. MAINIGI:  Hang on.
20       MR. BENNETT:  Can we take a break?
21       MS. MAINIGI:  No.  Not -- I'd like
22  to finish this line of questioning and then --
23       MR. BENNETT:  The witness has asked
24  for a break.
25       MS. MAINIGI:  I understand.  But I

64 (Pages 517 - 520)

Page 521

1    think it's very important that we finish this
2    line of questioning.
3          BY MS. MAINIGI:
4      Q.   Mr. Wright, I will not keep you much
5    longer, and then I will let you take a break.
6          But do you recall anything else
7    specifically that you would have said at your
8    distributor briefing that's not in the deck?
9      A.   The only other thing I can
10   specifically recall is that "Your customer can
11   ruin your business.  Get to know them."
12     Q.   Anything else?
13     A.   That -- not specifically right now.
14         MS. MAINIGI:  Okay.  Thank you.  We
15   can take a break.
16         MR. BENNETT:  Thank you, Counsel.
17         THE VIDEOGRAPHER:  We are going off
18   the record.
19         This is the end of Media Unit No. 4.
20         The time is 3:58.
21         (A short recess was taken.)
22         THE VIDEOGRAPHER:  We are going back
23   on the record.
24         This is the start of Media Unit No.
25   5.

Page 522

1          The time is 4:21.
2          You may proceed, Counsel.
3          BY MS. MAINIGI:
4      Q.   Mr. Wright, you recall the trial
5    testimony you provided in 2011 relating to
6    H.D. Smith, correct?
7      A.   I do.
8      Q.   And you recall this morning
9    testifying about the do-not-ship requirement,
10   correct?
11     A.   Yes, ma'am.
12     Q.   And I think the questions that you
13   got asked by plaintiffs' counsel were very
14   specifically tied to the do-not-ship
15   requirement and any changes in statute or
16   regulation.
17         Do you remember that?
18         MR. MIGLIORI:  Object.
19         THE WITNESS:  Yes, ma'am.
20         BY MS. MAINIGI:
21     Q.   Okay.  But do you remember being
22   asked a question related to do-not-ship at
23   trial and you provided that testimony at trial
24   with a judge sitting right there in front of
25   you, right?

Page 523

1          MR. SHKOLNIK:  Object to the form.
2          MR. BENNETT:  Objection.
3          THE WITNESS:  I -- I'd have to
4    refresh.
5          BY MS. MAINIGI:
6      Q.   Well, when you provided your trial
7    testimony in the H.D. Smith trial in 2011,
8    there was a judge right there, right?
9      A.   Yes, ma'am.
10     Q.   And he was listening to everything
11   you were saying, correct?
12         MR. BENNETT:  Objection.
13         MR. MIGLIORI:  Objection.
14         THE WITNESS:  I hope so.
15         MR. SHKOLNIK:  Don't assume.
16         BY MS. MAINIGI:
17     Q.   And you never told the judge that
18   you wanted to change the any of your testimony
19   at that trial, did you?
20         MR. MIGLIORI:  Objection.
21         MR. SHKOLNIK:  Objection.  Form.
22         THE WITNESS:  No, ma'am.
23         BY MS. MAINIGI:
24     Q.   And you understood that, as an
25   official of the DEA, the judge may rely on what

Page 524

1    you testified to under oath at that trial,
2    correct?
3      A.   Yes, ma'am.
4      Q.   Okay.  You testified at that
5    trial --
6          MR. BENNETT:  Counsel, do you have a
7    page and line?
8          BY MS. MAINIGI:
9      Q.   -- Mr. Wright, that in 2006 and 2007
10   there was a significant change in DEA policy,
11   DEA guidance, and interpretation of the very
12   issues that are at stake in this litigation,
13   correct.
14         MR. SHKOLNIK:  Objection to form.
15   And objection to use of the transcript in this
16   matter.
17         MR. BENNETT:  And Counsel, can you
18   give me a page and line where you're reading,
19   please.
20         MS. MAINIGI:  382, 24.
21         BY MS. MAINIGI:
22     Q.   Do you recall testifying about the
23   do-not-ship requirement?
24         MR. MIGLIORI:  Same Objection.
25         THE WITNESS:  Are you asking me did

65 (Pages 521 - 524)

Page 525

1  I make that statement?
2      BY MS. MAINIGI:
3      Q.  Yes.
4      A.  Oh, yes.
5      Q.  Okay.  And you testified, at both
6  your deposition and at your trial and last
7  week, that there was, in fact, a change in DEA
8  policy guidance and interpretation as it
9  related to the do-not-ship requirement,
10  correct?
11      MR. SHKOLNIK:  Objection.  Asked and
12  answered by counsel.
13      MR. BENNETT:  Objection.  Form.
14      THE WITNESS:  Only in the sense
15  of -- from it changing from excessive to
16  suspicious.  Excessive, it went out;
17  Suspicious, it did not.
18      BY MS. MAINIGI:
19      Q.  Okay.  And to clarify for the jury
20  what that means, what I think you are saying is
21  that, when the Excessive Order Program existed,
22  which was known by DEA, it was also known by
23  DEA that registrants would ship orders out even
24  if they were on the excessive order report,
25  correct?

Page 526

1      MR. SHKOLNIK:  Objection to the
2  form.
3      MR. BENNETT:  Objection to form.
4      THE WITNESS:  Yes, ma'am.
5      BY MS. MAINIGI:
6      Q.  When the Suspicious Order Program
7  came into existence during a several-year time
8  period, what DEA said was "We no longer want
9  you to ship out any orders that you don't
10  resolve and that remain suspicious," correct?
11      MR. SHKOLNIK:  Objection to form.
12      MR. BENNETT:  Objection to form.
13      BY MS. MAINIGI:
14      Q.  Is that correct?
15      A.  No, ma'am.  We had -- we told them
16  or stipulated what the suspicious order
17  guideline was.  And to make that decision based
18  upon that.  There was --
19      Q.  With the Suspicious Order Program,
20  distributors were told to suspend shipments to
21  customers if they identified orders as
22  suspicious, correct?
23      A.  Yes, ma'am.
24      Q.  It was understood by you, as you've
25  testified several times under oath, that that

Page 527

1  was enough of a change in policy that confusion
2  was created among both distributors and DEA
3  investigators, correct?
4      MR. SHKOLNIK:  Objection to form.
5  And asked multiple times.
6      THE WITNESS:  Yes.
7      BY MS. MAINIGI:
8      Q.  And, in fact, it is because of this
9  change in apology that DEA personnel, such as
10  yourself, began to conduct distributor
11  briefings so that they could familiarize
12  distributors with the new policy, right?
13      A.  Yes, ma'am.
14      MS. MAINIGI:  Let me give you
15  Exhibit 48, Mr. Wright.
16      (Deposition Exhibit 48 was marked
17  for identification.)
18      BY MS. MAINIGI:
19      Q.  Exhibit 48 is the opinion written by
20  the judge in United States versus $463,497.72
21  in U.S. Currency from Best Bank Account dated
22  March 30, 2012.
23      Do you see that?
24      A.  Yes, ma'am.
25      Q.  You could -- have you ever reviewed

Page 528

1  this document before?
2      A.  Never seen it before.
3      Q.  Has anyone ever explained to you
4  that the judge who took your testimony, who was
5  sitting right up there where judges sit,
6  absorbed your testimony and ultimately -- and
7  absorbed other people's testimony and
8  ultimately produced an opinion?
9      MR. SHKOLNIK:  Objection to form.
10      THE WITNESS:  Yes, ma'am.  I mean
11  nobody told me that.  But I understand that's
12  the process.
13      BY MS. MAINIGI:
14      Q.  Do you remember -- did anyone ever
15  tell you about what the outcome was in the
16  H.D. Smith case?
17      MR. BENNETT:  Object to the extent
18  that it's conversations with counsel.
19      THE WITNESS:  Quite frankly, no.
20      BY MS. MAINIGI:
21      Q.  Did you ever wonder or ask anybody
22  what happened?
23      A.  No.  It was the worst day of my
24  life.
25      Q.  The actual trial testimony was the

66 (Pages 525 - 528)

Page 529

1 worst day of your life?
2    A.   The deposition.
3    Q.   How was the trial testimony?  That
4 was okay?
5    A.   It was better.  But --
6    Q.   So you never asked what happened?
7        MR. SHKOLNIK:  Objection.  Asked and
8 answered.
9        THE WITNESS:  Most of the time I --
10 I moved from one case to the -- to the next.
11 This one was done, this is where I have to pick
12 up.  My workload was --
13       BY MS. MAINIGI:
14    Q.   You --
15    A.   -- very contiguous.
16    Q.   If you take a look at page -- it's
17 -- it's No. 6 at the bottom right.
18    A.   6?
19    Q.   Yeah.  At the -- it's perhaps not
20 the 6th page, but 6 at the bottom right.
21       And let me know when you're there.
22 And I'm going to ask you to read to yourself
23 the fourth paragraph down.
24       And then when you're done with the
25 fourth, please read the fifth paragraph, sir.

Page 530

1    A.   (Witness complied.)
2    Q.   Let me know when you're ready.
3    A.   I think I am.
4    Q.   So you see in this opinion that the
5 judge who -- who wrote it, Judge Lawson,
6 mentions your testimony, correct?
7    A.   Yes, ma'am.
8    Q.   And with respect to your test --
9 now, he -- he -- he certainly covered the whole
10 issue with your e-mails, right?
11    A.   He did.
12       MR. SHKOLNIK:  Objection.
13       MR. BENNETT:  Objection.
14       You can answer.
15       MR. SHKOLNIK:  Form.
16       BY MS. MAINIGI:
17    Q.   And then at the beginning of the
18 fifth paragraph, could you read out loud what
19 Judge Lawson said you testified to?
20    A.   The fifth paragraph.
21    Q.   Correct.
22       MR. BENNETT:  Objection.
23       You can answer.
24       THE WITNESS:  "In all events Wright
25 testified that the DEA was aware that it was a

Page 531

1 standard practice in the industry to file
2 suspicious order reports while continuing to
3 ship products and that practices had been
4 approved by the DEA.  Derrick testified that he
5 knew that it was H.D. Smith's practice to
6 routinely ship products after filing suspicious
7 orders reports."
8        BY MS. MAINIGI:
9    Q.   You never told the judge,
10 Mr. Wright, did you, that what you testified to
11 with respect to what the standard practice was
12 that had been approved by the DEA -- you didn't
13 agree with that testimony in any way, correct?
14       MR. SHKOLNIK:  Objection to form.
15       MR. BENNETT:  Objection.
16       THE WITNESS:  No, ma'am.
17       BY MS. MAINIGI:
18    Q.   You never went back to the judge of
19 your attorney in that case and say, "Oh, what I
20 testified to in court I don't agree with any
21 more," right?
22       MR. SHKOLNIK:  Objection to form.
23       MR. BENNETT:  Objection to any
24 conversations he had with counsel.
25       To the extent you went back to the

Page 532

1 judge, you can answer.
2        BY MS. MAINIGI:
3    Q.   Did you ever go back to the judge,
4 change your hem?
5        MR. SHKOLNIK:  Objection.
6        THE WITNESS:  No, ma'am.
7        BY MS. MAINIGI:
8    Q.   Now, before your testimony in this
9 matter -- in this, matter, Mr. Wright, you
10 received from Mr. Migliori's firm about $3,000?
11    A.   I'm sorry.  I'm lost in this
12 question.
13    Q.   Well, you're a consultant to -- to
14 Summit County, right?
15    A.   Yes, ma'am.
16    Q.   And you're a consultant retained
17 through the Motley Rice firm, right?
18    A.   Yes, ma'am.
19    Q.   And so, prior to your testimony in
20 this matter, as a fact witness you have
21 received $3,000 or so from the Motley Rice
22 firm, correct?
23       MR. BENNETT:  Objection.
24       MR. MIGLIORI:  Asked and answered.
25       MR. BENNETT:  And also you said "as

67 (Pages 529 - 532)

Page 533

1  a fact witness" or as a consultant?
2        MS. MAINIGI:  He's testifying here
3  as a fact witness.
4        MR. BENNETT:  Correct.
5        But I guess -- objection to form.
6        THE WITNESS:  Yes, ma'am.
7        MR. MIGLIORI:  As a fact --
8        MS. MAINIGI:  I'm going to go ahead
9  and pass the baton on to one of my colleagues.
10       Shall we go off the record?
11       THE VIDEOGRAPHER:  We are going off
12  the record.
13       The time is 4:35.
14       (A short recess was taken.)
15       THE VIDEOGRAPHER:  We are going back
16  on the record.
17       The time is 4:36.
18       You may proceed, Counsel.
19       MR. MIGLIORI:  Just for a second.
20       Counsel, on the last question you
21  tried to leave it in -- with a question pending
22  that this witness is being paid a fact
23  witness and knowing that's absolutely not the
24  case and completely inappropriate.
25       I want it to be very clear on this

Page 534

1  record that my objection is it totally
2  misstates the record.  And it is not true, nor
3  is it consistent with his prior testimony.
4        After all the objections, this
5  record may reflect to the contrary.  And I want
6  it to be very clear.  He's not be paid as a
7  fact witness by my firm or by any firm.
8        MS. MAINIGI:  I believe the
9  questioning reflected, Mr. Migliori, that he
10  was paid for consulting services --
11       MR. MIGLIORI:  That's not what the
12  question says on the realtime.
13       MS. MAINIGI:  -- prior to being a
14  fact witness in --
15       MR. MIGLIORI:  I'll -- I'll read --
16       MS. MAINIGI:  Well, we'll go --
17  we'll -- you know what?
18       MR. MIGLIORI:  No, no.  I'll read
19  it.
20       MS. MAINIGI:  We'll go back and
21  look.
22       MR. MIGLIORI:  Because it's very
23  important.
24       MS. MAINIGI:  Well, I -- I don't --
25       MR. MIGLIORI:  It says -- it says:

Page 535

1  "Prior to your testimony in this matter as a
2  fact witness, you have received $3,000 or so
3  from the Motley Rice firm, correct?"
4        And the impropriety of that is not
5  going to be left without me making a note that
6  that is not the -- however it's interpreted,
7  he's not being paid as a fact witness.  He may
8  be a fact witness here.  But he's not being
9  paid as a fact witness.
10       Thank you.
11       MR. EPPICH:  Thank you.
12  EXAMINATION BY COUNSEL FOR McKESSON CORPORATION
13       BY MR. EPPICH:
14       Q.  Mr. Wright, my name is Chris Eppich.
15  I represent the McKesson defendants in this --
16  in this litigation.
17       And I would like to return to some
18  testimony you provided about ARCOS.
19       Do you remember testifying about
20  ARCOS earlier today?
21       Do you remember testifying about
22  that?
23       A.  No, but --
24       Q.  Not today?  There's been a lot of
25  testimony today.

Page 536

1        You testified earlier that you first
2  started to analyze ARCOS data beginning around
3  2005; isn't that correct?
4        MR. BENNETT:  Objection.
5        THE WITNESS:  Yes, sir.
6        BY MR. EPPICH:
7        Q.  And that -- that's when you began
8  working on the distributor initiative?
9        A.  Yes, sir.
10       Q.  And I guess in 2010 you became
11  what's known as a unit chief of the targeting
12  and analytics unit?
13       A.  Analysis.
14       Q.  Analysis unit.
15       And in that position you were
16  responsible for the analysis of ARCOS data,
17  correct?
18       A.  Correct.
19       Q.  And that means you're -- you're
20  actually in charge -- you're in charge of that
21  unit that was responsible for analyzing ARCOS
22  data; is that right?
23       A.  Correct.
24       Q.  So you and your team or the unit at
25  DEA that -- were tasked with taking all the

68 (Pages 533 - 536)

Page 537

1  data provided by distributors, by
2  manufacturers, and -- and you were using it
3  to -- to combat diversion.
4      Do I have that right?
5      MR. MIGLIORI: Objection. Misstates
6  testimony.
7      THE WITNESS: Yes, sir.
8      BY MR. EPPICH:
9      Q. Now, you -- you've testified that
10  manufacturers and distributors, they report all
11  of their acquisitions, their dispositions, the
12  inventories of controlled substances into
13  ARCOS; is that right?
14      A. Who?
15      Q. Manufacturers and distributors?
16      A. Yes, sir.
17      Q. And manufacturers and distributors
18  have been submitting this data into ARCOS since
19  you joined with DEA in 1995; isn't that right?
20      A. Correct, sir.
21      Q. And the controlled substances, they
22  were reported in this ARCOS data, and those
23  controlled substances included data on
24  Hydrocodone, oxycodone, fentanyl, other
25  opioids.

Page 538

1      Do I have that right?
2      A. You have it right.
3      Q. So this -- this ARCOS system, it's a
4  -- it's a robust system, isn't it?
5      MR. BENNETT: Objection to form.
6      BY MR. EPPICH:
7      Q. It has a lot of data in it, doesn't
8  it?
9      MR. SHKOLNIK: Objection to form.
10      THE WITNESS: Yes, sir.
11      BY MR. EPPICH:
12      Q. ARCOS tells you how many pills a
13  manufacturer makes, right?
14      A. How many they sell, yes.
15      Q. How many they sell.
16      ARCOS tells you how many pills have
17  been distributed by a distributor to a
18  pharmacy, doesn't it?
19      A. Correct.
20      Q. And using ARCOS, DEA can generate
21  statistical reports showing drug distributions
22  in grams and in dosage units.
23      They can do that, right?
24      MR. BENNETT: You can answer that
25  question.

Page 539

1      THE WITNESS: Okay. And after that,
2  can you tell me what you asked?
3      BY MR. EPPICH:
4      Q. I can.
5      Using ARCOS, DEA can generate
6  statistical reports showing drug distribution
7  in grams and dosage units.
8      A. Correct.
9      Q. Now, you've -- you've provided
10  trainings on these statistical reports in the
11  past, haven't you?
12      A. Correct.
13      MR. EPPICH: I'd like to mark as
14  Exhibit No. 49 presentation titled "ARCOS
15  Automation of Reports and Consolidated Order
16  Systems."
17      (Deposition Exhibit 49 was marked
18  for identification.)
19      MR. MIGLIORI: I'm going to object
20  to the question as outside the scope of the
21  direct.
22      BY MR. EPPICH:
23      Q. Now, Mr. Wright, you've seen Exhibit
24  49 before, haven't you?
25      A. I'm looking at it.

Page 540

1      Q. Do you see your name on the second
2  page of the document?
3      A. It does.
4      Q. And do you recall presenting this --
5      A. Can I have a moment -- you --
6      Q. Absolutely.
7      A. Thank you.
8      MR. MIGLIORI: I'm going to repeat
9  my objections. This is beyond the scope.
10      MR. EPPICH: Mr. Bennett, I'll
11  represent to you that this presentation's found
12  on the DEA diversion web site.
13      MR. BENNETT: That's very helpful.
14  Thank you.
15      MR. SHKOLNIK: It was not covered or
16  this topic covered at all on either mine or --
17      MR. EPPICH: I think you'll see,
18  sir, that the topic was covered. We'll get
19  into that.
20      BY MR. EPPICH:
21      Q. Mr. Wright why don't we go ahead
22  and --
23      MR. BENNETT: He's still looking,
24  Counsel. Give him a moment, please.
25      MR. EPPICH: I've only got 14.

69 (Pages 537 - 540)

Page 541

1  THE WITNESS: Okay.
2  BY MR. EPPICH:
3  Q. Now, Mr. Wright, do you remember
4  giving this presentation in June of 2011 at a
5  conference in Fort Worth, Texas?
6  Why don't we go ahead and turn to
7  page 20. I'll help you out.
8  A. Thank you.
9  Q. The page is in the bottom-right
10  corner.
11  And I just want to quickly point out
12  to the -- point you to this page.
13  Slide 24 is a chart showing the
14  purchases of hydrocodone by one pharmacy in
15  Texas, isn't it -- excuse me. Yes. On
16  slide --
17  A. Are you on Page 20?
18  Q. I'm going to be on page -- I'm on
19  slide -- I'm sorry. You'll have to forgive
20  me -- Slide 20.
21  A. Okay.
22  Q. And slide 20 is a chart showing the
23  purchases of Hydrocodone, looks like Arkansas,
24  by ZIP code in 2008, isn't it?
25  MR. BENNETT: Objection.

Page 542

1  THE WITNESS: I don't know if it's
2  Arkansas. But it looks like a state because --
3  BY MR. EPPICH:
4  Q. The -- the -- but the point is is
5  ARCOS reports -- ARCOS reports can be generated
6  to show counties having an above-average
7  distribution of controlled substances as
8  compared to other counties in the state and the
9  national average; isn't that true?
10  A. Counties --
11  MR. SHKOLNIK: Objection. Outside
12  the scope.
13  THE WITNESS: You -- your question
14  is counties in comparison to other counties
15  within a state?
16  MR. EPPICH: Yes, sir.
17  THE WITNESS: Yes.
18  BY MR. EPPICH:
19  Q. And ARCOS reports can be generated
20  to show the number of dosage units dispensed by
21  a single pharmacy and compared that -- compare
22  that to average pharmacy purchases in the state
23  and across the United States; isn't that true?
24  A. Yes, it can.
25  Q. And ARCOS reports can be generated

Page 543

1  to show the number of dosage units supplied by
2  each distributor to a single pharmacy; isn't
3  that true?
4  MR. SHKOLNIK: Objection to form.
5  And outside the scope.
6  THE WITNESS: Yes, sir.
7  BY MR. EPPICH:
8  Q. Now, you've been able to generate
9  these types of reports using ARCOS since at
10  least 2005, correct?
11  A. Yes, sir.
12  Q. And in -- in 2005, when you were
13  preparing for distributors briefings, you were
14  using these ARCOS reporting tools to identify
15  pharmacies having extraordinarily large
16  prescriptions of narcotics, weren't you?
17  MR. SHKOLNIK: Objection to form.
18  THE WITNESS: I'm sorry. I lost
19  the -- the last part of your question. Can you
20  repeat that, please.
21  Q. Let me -- let me try it again.
22  A. Thank you, sir.
23  Q. In -- when you were preparing for
24  the distributor briefings --
25  A. Yes, sir.

Page 544

1  Q. -- you were using these ARCOS
2  reporting tools to identify pharmacies having
3  extraordinarily large prescriptions in
4  narcotics, and you present that data to the
5  distributors, correct?
6  A. Yes, sir.
7  Q. You didn't -- you didn't need
8  distributors' suspicious order reports to do
9  that analysis, did you?
10  MR. MIGLIORI: Objection. Scope.
11  THE WITNESS: No, sir.
12  BY MR. EPPICH:
13  Q. Now, while you were in the targeting
14  and analysis group, one of your
15  responsibilities was to analyze the trends of
16  controlled substances -- excuse me --
17  controlled substance distributions on national,
18  state and local levels, correct?
19  A. It was one of our functions. I
20  don't know if it was a defined responsibility.
21  Q. It was one of your functions.
22  How were you and your staff using
23  ARCOS to conduct and analyze trends of
24  controlled substance distributions on a
25  national, state and local level, just -- just

70 (Pages 541 - 544)

Page 545

1  generally?
2        MR. SHKOLNIK:  Outside the scope.
3        MR. MIGLIORI:  Objection to form.
4        THE WITNESS:  I'd say that the
5  easiest answer to that is public reports 1
6  through 7.
7        BY MR. EPPICH:
8    Q.   And other than your public reports,
9  how were you using ARCOS data to analyze trends
10  of controlled substance distributions?
11        MR. BENNETT:  Objection.
12        So you're not --
13        MR. MIGLIORI:  Same objection.
14        MR. BENNETT:  You're not authorized
15  to --
16        MR. SHKOLNIK:  Objection.  Scope.
17        MR. BENNETT:  -- discuss specific
18  cases on how you used it or confidential law
19  enforcement technique.  But to the extent you
20  can answer generally, you may answer.
21        THE WITNESS:  My responsibility was
22  to provide information to either division --
23  first off, the front office and anything that
24  they needed, and then to division or regional
25  offices or specific offices.  They'd send me a

Page 546

1  request, and we'd -- depending on whether it
2  was an actual case or whether it was just
3  background information, we would provide it.
4        BY MR. EPPICH:
5    Q.   Were you ever trying to identify
6  pharmacies with order volumes or patterns
7  suggesting diversion activity?
8        MR. BENNETT:  Objection.  You're not
9  authorized to discuss specific efforts or
10  specific techniques.
11        THE WITNESS:  Yes.
12        BY MR. EPPICH:
13    Q.   Were you using ARCOS to try to
14  identify red flags?
15        MR. BENNETT:  Objection.
16        Same instruction.
17        THE WITNESS:  No.
18        BY MR. EPPICH:
19    Q.   Were you able to identify any
20  suspicious pharmacies from your work?
21        MR. BENNETT:  Objection.
22        BY MR. EPPICH:
23    Q.   Just generally.
24        MR. MIGLIORI:  Objection.  Scope.
25  Just generally.

Page 547

1        MR. BENNETT:  You can answer
2  generally.
3        THE WITNESS:  Yes.  Yes.  We were
4  seeing if -- if there was something, you know,
5  grievously outrageous that required further
6  attention.  Not that we did anything
7  specifically with it except for send it out to
8  the field office of responsibility.
9        BY MR. EPPICH:
10    Q.   So your testimony is that, when you
11  found a suspicious pharmacy or the
12  identification of a suspicious pharmacy, you
13  would identify that pharmacy to the field
14  office; is that correct?
15        MR. BENNETT:  Objection.  Regarding
16  what the specific internal practice is with
17  individual pharmacies, I'm going to instruct
18  the witness he's not authorized at this time to
19  answer that.  Goes beyond the scope of his
20  authorization.
21        BY MR. EPPICH:
22    Q.   In general, when you identified a
23  suspicious pharmacy, did you identify that
24  pharmacy to the relevant DEA field office?
25        MR. BENNETT:  Objection.

Page 548

1        Same instruction.  He's not to
2  answer that as far as what they did with
3  individual pharmacies.
4        BY MR. EPPICH:
5    Q.   In general, what did you do when
6  you -- when you learned about a suspicious
7  pharmacy?
8        MR. BENNETT:  Objection.
9        BY MR. EPPICH:
10    Q.   -- from -- from review of the data?
11        MR. BENNETT:  Objection.  He's not
12  authorized to answer what the DEA did
13  individually in cases internally.
14        BY MR. EPPICH:
15    Q.   Did the DEA shut down the pharmacies
16  that you identified?
17        MR. BENNETT:  Objection.
18        MR. SHKOLNIK:  Objection.  Outside
19  the scope.
20        MR. BENNETT:  And objection.  He's
21  not authorized to talk about specific cases.
22        BY MR. EPPICH:
23    Q.   Was it your general practice to
24  refer the suspicious pharmacies you identified
25  through ARCOS to a field office so the field

71 (Pages 545 - 548)

Page 549

1 office could shut down that pharmacy?
2    MR. BENNETT: Objection. Beyond the
3 scope of his authorization. He can't answer
4 that.
5    MR. SHKOLNIK: And outside the scope
6 of examination.
7    BY MR. EPPICH:
8    Q.   What did you do with the
9 identification of the suspicious pharmacy after
10 you identified it through the ARCOS data?
11    MR. BENNETT: Objection. He can't
12 answer that. It's outside the scope of his
13 authorization.
14    BY MR. EPPICH:
15    Q.   Would you ever follow up with a
16 field office to determine whether or not they
17 had taken action in response to any
18 instructions or guidance or information that
19 you'd provide them?
20    MR. BENNETT: Objection. He -- he's
21 not authorized to answer about specific
22 enforcement actions that he took.
23    MR. SHKOLNIK: And -- and for the
24 record, these were all nice areas to go into on
25 the main part of your deposition, not as

Page 550

1 reserved for a second deposition. Outside the
2 scope.
3    MR. EPPICH: Thank you.
4    MR. STEPHENS: And for
5 clarification, are you instructing him not to
6 answer those questions?
7    MR. BENNETT: I am indicating that
8 he's not authorized to disclose DEA information
9 in response to those questions. So he doesn't
10 have authorization to answer them.
11    BY MR. EPPICH:
12    Q.   After identifying a suspicious
13 pharmacy is in the ARCOS data, did you ever
14 inform distributors of the identification of
15 that pharmacy?
16    MR. SHKOLNIK: Objection. Outside
17 the scope of direct.
18    MR. BENNETT: Objection to the
19 extent that that talks about specific cases.
20    However, you can otherwise answer
21 that question about information you may have
22 provided to distributors about suspicious
23 pharmacies as long as it wasn't any specific
24 case that was worked.
25    THE WITNESS: No.

Page 551

1    MR. BENNETT: Counsel, we have about
2 five minutes until 5:00.
3    MR. EPPICH: Thank you.
4    I'd like to mark Exhibit 51.
5    This is an e-mail that you received
6 from Don Walker on August 14, 2008.
7 Notification of suspicious customer, and your
8 response on top.
9    (Deposition Exhibit 51 was marked
10 for identification.)
11    BY MR. EPPICH:
12    Q.   Now, Mr. Wright, in 2008 you're
13 familiar with the practice of distributors of
14 identifying the names of what they've
15 determined to be a suspicious customer after
16 they've performed due diligence.
17    You're aware of that practice,
18 aren't you?
19    A.   Yes, sir.
20    Q.   In this e-mail from Mr. Don Walker
21 on August 14, 2008, he's identification a
22 suspicious customer to you, isn't he?
23    A.   Yes, sir.
24    MR. SHKOLNIK: Objection. Outside
25 the scope.

Page 552

1    BY MR. EPPICH:
2    Q.   He's identifying the registrant
3 Advanced Doctors Prescription Pharmacy in San
4 Antonio, Texas.
5    Do you see that?
6    A.   Yes, sir.
7    Q.   And you respond: "This is to
8 acknowledge receipt of your e-mail. It is
9 appreciated if you would continue to provide
10 any and all information you have or discover to
11 the local DEA office in San Antonio."
12    Do you see that?
13    A.   Yes, sir.
14    Q.   Now, do you know -- do you know,
15 just generally, what the DEA would do with the
16 identification of suspicious customers as
17 received from distributors during this time?
18    MR. BENNETT: Objection. He's not
19 authorized to respond to what he's done in
20 specific cases internally within the DEA.
21    MR. SHKOLNIK: And outside the
22 scope.
23    BY MR. EPPICH:
24    Q.   You may answer.
25    MR. BENNETT: No. He may not answer

72 (Pages 549 - 552)

Page 553

1  what DEA would do with the suspicious order --
2  this suspicious order.
3      BY MR. EPPICH:
4      Q.  Do you recall passing along these
5  suspicious orders to the relevant field
6  offices?
7      MR. BENNETT:  Objection.  He's not
8  authorized to answer about specific actions
9  taken internally by the DEA in response to this
10  suspicious order report.
11      BY MR. EPPICH:
12      Q.  Are you aware that last month the
13  DEA launched a new tool in ARCOS online
14  reporting systems that would allow distributors
15  to view and download the number of distributors
16  and the amount each distributor sold to
17  perspective customers in the last six months?
18      Are you aware of that?
19      MR. SHKOLNIK:  Objection.  Outside
20  the scope.
21      You asked for an extra two and a
22  half hours of deposition time, and you're just
23  doing a new deposition and not addressing
24  anything we covered.
25      MR. TAYMAN:  And you have less than

Page 554

1  two minutes.
2      MR. BENNETT:  And I would join the
3  objection of it being outside the scope of the
4  plaintiffs' cross-examination.
5      THE WITNESS:  You -- you said in the
6  last six months?
7      MR. EPPICH:  Yes, sir.
8      THE WITNESS:  I haven't worked in
9  two years.  So I have no idea.
10      BY MR. EPPICH:
11      Q.  But DEA, up until 2018, did not
12  permit other distributors to see the ARCOS data
13  so that they could determine how much of a
14  single -- of -- of a -- of a controlled
15  substance was being shipped into a pharmacy by
16  another distributor; isn't that correct?
17      MR. SHKOLNIK:  Objection.  Outside
18  the scope.  A waste of your two and a half
19  hours.
20      MR. BENNETT:  Objection.
21      MR. EPPICH:  I've heard your
22  objection.  Thank you.
23      MR. BENNETT:  Object to form and
24  also being outside the scope.
25      THE WITNESS:  Yes, sir.

Page 555

1      MR. EPPICH:  Let's go off the
2  record.
3      THE VIDEOGRAPHER:  We are going off
4  the record.
5      The time is 4:58.
6      (A short recess was taken.)
7      THE VIDEOGRAPHER:  We are off the
8  record at 5:01 p.m.
9      And This concludes today's testimony
10  given by Kyle Wright.
11      The total number of media units used
12  was five and will be retained by Veritext Legal
13  Solutions.
14      (Whereupon, the proceeding was
15  adjourned at 5:01 p.m.)
16
17
18
19
20
21
22
23
24
25

Page 556

1      CERTIFICATE OF NOTARY PUBLIC
2      I, Bonnie L. Russo, the officer before
3  whom the foregoing deposition was taken, do
4  here by certify that the witness whose
5  testimony appears in the foregoing deposition
6  was duly sworn by me; that the testimony of
7  said witness was taken by me in shorthand and
8  thereafter reduced to computerized
9  transcription under my direction; that said
10  deposition is a true record of the testimony
11  given by said witness; that I am neither
12  counsel for, related to, nor employed by any of
13  the parties to the action in which this
14  deposition was taken; and further, that I am
15  not a relative or employee of any attorney or
16  counsel employed by the parties hereto, nor
17  financially or otherwise interested in the
18  outcome of the action.
19
20      _____
21      Notary Public in and for
22      the District of Columbia
23
24  My Commission expires:  June 30, 2020
25

73 (Pages 553 - 556)

Page 557

```
1              Veritext Legal Solutions
                   1100 Superior Ave
2                     Suite 1820
                  Cleveland, Ohio 44114
3                 Phone: 216-523-1313
4
     March 7, 2019
5
     To: David Lee Tayman
6
     Case Name: In Re: National Prescription Opiate Litigation v.
7
     Veritext Reference Number: 3249543
8
     Witness: Kyle Wright, Vol II     Deposition Date: 3/4/2019
9
10   Dear Sir/Madam:
11
         Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
         If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA
```

Page 558

```
1              DEPOSITION REVIEW
                CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 3249543
3    CASE NAME: In Re: National Prescription Opiate Litigation v.
     DATE OF DEPOSITION: 3/4/2019
4    WITNESS' NAME: Kyle Wright, Vol II
5        In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7        I have made no changes to the testimony
     as transcribed by the court reporter.
8
     _____
9    Date             Kyle Wright, Vol II
10       Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
     They have read the transcript;
13   They signed the foregoing Sworn
     Statement; and
14   Their execution of this Statement is of
     their free act and deed.
15
     I have affixed my name and official seal
16   this _____ day of_____, 20____.
17
18        _____
          Notary Public
19
          _____
          Commission Expiration Date
20
21
22
23
24
25
```

Page 559

```
1              DEPOSITION REVIEW
                CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 3249543
3    CASE NAME: In Re: National Prescription Opiate Litigation v.
     DATE OF DEPOSITION: 3/4/2019
4    WITNESS' NAME: Kyle Wright, Vol II
5        In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7        I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
8    well as the reason(s) for the change(s).
9        I request that these changes be entered
     as part of the record of my testimony.
10
         I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____
     Date             Kyle Wright, Vol II
14
     Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17   They have read the transcript;
     They have listed all of their corrections
18   in the appended Errata Sheet;
     They signed the foregoing Sworn
19   Statement; and
     Their execution of this Statement is of
20   their free act and deed.
21   I have affixed my name and official seal
22   this _____ day of_____, 20____.
23        _____
          Notary Public
24
          _____
25        Commission Expiration Date
```

Page 560

```
1        ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS MIDWEST
2         ASSIGNMENT NO: 3/4/2019
3    PAGE/LINE(S) /     CHANGE     /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   Date             Kyle Wright, Vol II
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23        _____
          Notary Public
24
          _____
25        Commission Expiration Date
```

74 (Pages 557 - 560)

**[& - 2004]**  Page 1

| & |
|---|
| **&**  269:7 270:22 271:7,8 272:3,9 273:9,14,19 274:3 274:8,13 |

| 0 |
|---|
| **00002032-2045**  276:23 |
| **00005987-6045**  277:6 |
| **000088-89**  277:24 |
| **000454261-320**  276:16 |
| **001**  276:16 |
| **00622468**  356:18 362:17 |
| **00622468-472**  276:13 |
| **00837645-648**  276:9 |
| **00988458-472**  276:18 |
| **01053067-068**  276:11 |
| **01465723**  415:20 |
| **01465723-734**  276:25 |
| **019076**  386:14 |
| **019076-120**  276:21 |
| **02199**  274:5 |
| **02203353-357**  277:2 |
| **03-1134**  277:2 |
| **034408**  459:7 |
| **03448408-418**  277:8 |

| 1 |
|---|
| **1**  278:6 341:6 363:10 387:12 417:6 459:15 467:19 545:5 |
| **1,500**  408:18 |
| **1.2**  460:17 467:19 |
| **10**  295:7,17,19 309:2 363:3 391:5 438:7,21 499:15 499:20,24 508:4,6 508:13 |
| **10-16-07**  276:16 |
| **1000**  272:16 |
| **10017**  270:14 |
| **10036**  271:4 |
| **1095**  271:4 |
| **10:23**  341:7 |
| **10:42**  341:13 |
| **10th**  295:23 |
| **11**  274:9 376:8 392:2 402:1 453:9 500:4 |
| **1100**  271:13 557:1 |
| **11937**  556:20 |
| **11:31**  382:23 |
| **11:54**  383:4 |
| **11th**  270:13,23 384:20 385:5 386:21 497:18 498:5 500:17,24 501:21 502:23 |
| **12**  318:11 336:18 386:22 401:10 402:1 453:24 |
| **12-27-07**  276:10 |
| **1200**  274:19 |
| **12:06**  397:10 |
| **12:12**  401:10 |
| **12th**  269:8 272:9 384:20 385:5 |

**499:21 500:17**
| **13**  452:13 |
|---|
| **1301.74**  277:17 285:23 343:10 344:13 405:3 407:15 431:5 452:19 |
| **1301.74.**  404:24 |
| **13th**  386:20 |
| **14**  380:7,9 499:15 499:20,24 540:25 551:6,21 |
| **15**  374:25 376:8 380:8,9 392:20 456:21 |
| **150**  453:17 |
| **15219**  274:14 |
| **16**  276:13 364:20 364:25 365:23 |
| **1600**  272:3 |
| **16th**  356:24 |
| **17**  268:6,10 276:13 393:11 |
| **1717**  272:22 |
| **1755**  271:18 |
| **17th**  271:9 356:24 |
| **18**  268:12,14 |
| **1800**  272:16 |
| **1801**  274:18 |
| **1820**  557:2 |
| **1875**  270:4 |
| **18976**  274:24 |
| **19**  438:22,23,24,25 |
| **19103**  272:4,22 |
| **1970**  349:4,6 |
| **1970s**  303:7 |
| **1984**  423:18 424:14 427:16 434:24 |
| **1993**  415:20 417:17 418:9 |

**422:6,17 427:17**
| **1995**  279:7 280:3 282:12 301:22 303:12 311:15 329:25 332:8 340:23,25 346:3 347:25 350:6 351:8 354:11 355:9 364:2 369:7 374:20 377:4,25 379:12 380:3 381:7 382:14 487:9 537:19 |
|---|
| **1996**  429:16 432:9 434:15 |
| **1999**  273:15 |
| **1:08**  454:25 |

| 2 |
|---|
| **2**  280:19 281:3 288:15,17,17 341:12 382:22 389:2 470:13 |
| **20**  393:18 490:23 541:7,17,20,22 558:16 559:22 560:22 |
| **2000**  293:20 386:21 415:1 438:10 |
| **20001**  273:11 |
| **20005**  272:10 273:20 |
| **20006**  270:5 |
| **2000s**  415:2 |
| **2001**  459:15 |
| **2002**  443:15 |
| **20036**  272:17 |
| **2004**  277:4 437:18 437:25 438:10 441:11 443:18 |

[2005 - 343]

**2005** 279:7 280:4
293:19 294:15,19
295:6,23 296:16
296:21 297:1
302:4 303:20
309:11 318:15
319:15 340:17,22
345:5 348:15
405:12,19 407:18
414:12 421:22
425:24 426:7
427:2 434:14
445:3 489:4
490:12 491:24
492:19 493:15
536:3 543:10,12
**2006** 319:16 321:9
340:18 345:5
425:25 503:5
524:9
**2007** 276:13
341:25 343:5
356:24 358:5
368:22 369:12
384:21 385:5,15
386:22 402:1
409:19 425:25
444:10,18 445:3
445:19 448:7,8,21
449:13 450:21
491:24 493:2,7
497:18 498:6
499:8 500:4,17,24
501:22 502:23
503:5 524:9
**2008** 371:21 374:4
376:10,18 377:20
379:22 380:25
442:10,25 443:2
445:19 451:11
452:12 541:24

551:6,12,21
**2010** 512:13,18
536:10
**2011** 428:10 454:8
499:5,7,10,21
500:8 522:5 523:7
541:4
**2012** 454:8 467:16
527:22
**2013** 454:9
**2015** 471:18
**2016** 453:4
**2017** 282:13
311:20 330:4
407:24 421:23
453:15,15
**2018** 554:11
**2019** 268:21 278:5
499:8 557:4
**202-434-5000**
272:10
**202-662-6000**
273:11
**202-695-8147**
270:5
**202-778-1800**
272:17
**202-879-5907**
273:21
**2020** 556:24
**2033** 402:2
**2035** 402:15
**2036** 404:5
**21** 277:16,17
285:22,23 337:11
343:10 344:7,12
404:24 405:3
407:14 415:20
431:5 452:18
**212-397-1000**
270:14

**212-698-3593**
271:5
**214-740-8554**
273:5
**215-241-7910**
272:23
**215-918-3680**
274:25
**215-979-3848**
272:4
**216-523-1313**
557:3
**216-592-5000**
271:14
**216-622-3988**
270:10
**2200** 273:4
**2203353** 429:19
**22nd** 318:15
**23** 394:2
**24** 387:12 524:20
541:13
**252** 407:6
**254** 410:19
**25701** 270:23
**26** 305:6 306:3,12
307:4,16 310:4
346:21 355:16
436:1,3
**2700** 274:24
**278** 276:3
**27th** 320:19 343:5
**28** 270:18
**2800** 273:4
**2804** 268:5,6
415:20
**280400988458**
370:14
**29464** 270:18
**2:31** 455:6

**2:53** 478:9

**3**

**3** 337:18 349:3
383:3 443:2
454:24
**3,000** 532:10,21
535:2
**3/4/2019** 557:8
558:3 559:3 560:2
**30** 276:9 292:7,14
320:12,15,25
415:7 527:22
556:24
**300** 274:24
**301** 274:14
**303-592-3197**
274:20
**304-525-9115**
270:24
**30th** 451:11
**31** 276:10 341:16
341:19,22
**3100** 272:21
**312-269-4066**
271:23
**317-236-1313**
274:10
**32** 276:12 356:12
356:13,16 362:15
362:16
**322** 276:9
**3249543** 268:25
557:7 558:2 559:2
**33** 276:14 362:13
362:15,18,19
**3355** 430:6
**3356** 430:13
**34** 276:17 370:5,6
423:19 453:5
**343** 276:10

**[35 - able]**

**35** 276:19 386:4,6 386:17 387:10
**356** 276:12
**35th** 274:13
**36** 276:22 401:21 401:22 407:8 429:6
**360** 270:13
**362** 276:14
**368** 499:15,19,24
**37** 276:24 415:7,8 415:9,16,17 417:7
**370** 276:17
**38** 277:2 415:11 423:17 429:8,9,12 429:20,22,23
**382** 524:20
**383** 276:4
**386** 276:19
**39** 277:3 429:21 437:15 438:3,8 442:19
**3900** 272:3
**395965** 437:25
**3:07** 478:13
**3:30** 477:13
**3:32** 477:25
**3:32:30** 477:15
**3:58** 521:20

**4**

**4** 268:21 389:14 455:5 521:19
**40** 277:5 442:5,9
**400** 270:9
**401** 276:22
**41** 277:7 459:2,6
**412-338-5224** 274:15
**415** 276:24 373:11
**419** 270:23

**42** 277:9 467:7,9
**424-332-4764** 273:16
**429** 277:2
**43** 277:11 471:7,12
**437** 277:3
**44** 277:13 473:6,8
**44113** 270:9 271:14
**44114** 557:2
**442** 277:5
**45** 277:15 456:14 456:17
**45005** 268:10
**45090** 268:14
**45132** 268:12
**459** 277:7
**46** 277:16 495:17 495:18
**46204** 274:9
**463,407.72** 277:19
**463,497.72** 527:20
**467** 277:9
**47** 277:17 495:20 495:22
**472** 277:11
**473** 277:13
**478** 276:5
**48** 277:18 527:15 527:16,19
**49** 277:20 539:14 539:17,24
**495** 277:16,17
**4:21** 522:1
**4:35** 533:13
**4:36** 533:17
**4:58** 555:5
**4th** 278:5

**5**

**5** 521:25
**50** 277:22
**51** 277:23 551:4,9
**527** 277:18
**535** 276:6
**539** 277:20
**551** 277:23
**5732** 423:25 424:3
**5:00** 456:16 458:1 458:14,18 551:2
**5:01** 555:8,15
**5th** 453:15

**6**

**6** 292:7,14 390:6 414:12 426:7 529:17,18,20
**60601** 271:22
**610** 271:9
**617-951-7000** 274:5
**650-739-3939** 271:19
**655** 273:20
**6th** 529:20

**7**

**7** 390:13 414:12 418:1 426:7 439:22 449:13 450:21 545:6 557:4
**725** 269:8 272:9
**730** 418:2
**75201** 273:5
**77** 271:22
**791** 473:17

**8**

**8** 390:21
**8-14-08** 277:24

**80** 454:9
**800** 274:4
**801** 270:8
**80202** 274:19
**8158** 363:10
**823** 277:16 285:23 304:15 332:18 334:6,12 344:7
**84** 423:19,20 425:8 425:23 428:2
**842** 337:11
**843-216-9241** 270:19
**850** 273:10
**852** 463:15 464:4
**852s** 463:16
**867** 465:1
**8:00** 458:20

**9**

**9** 374:25
**9-27-06** 276:9
**9-4-08** 277:5
**90067** 273:15
**90s** 419:5
**92660** 271:9
**94303** 271:18
**949-823-7963** 271:10
**95** 351:2 418:19 420:6
**950** 271:13
**96** 432:21
**9:00** 458:20
**9:09** 268:22 278:4

**a**

**a.m.** 268:22 278:4
**aaron** 268:8
**abdc** 445:6
**able** 440:4 458:2 482:25 543:8

546:19
absent 449:22
absolutely 298:14
  298:22 303:4
  317:5,12 322:8
  337:4 395:19
  416:12 533:23
  540:6
absolve 350:17
absorbed 528:6,7
abuse 323:1,12
  381:24
accept 291:17
  492:6 493:16
  494:12,18
acceptable 372:21
accepted 487:15
  488:23
accepting 493:20
access 473:14
accommodate
  439:23
accomplish 322:17
account 373:16
  406:19,19 527:21
accountability
  304:13
accounts 406:17
acknowledge
  552:8 558:11
  559:16
acquired 290:9,18
acquisitions
  537:11
act 286:3 297:2
  303:1,6 309:4
  312:17,23 322:7
  323:6 324:2,3,12
  324:23 326:11
  328:7,14 329:19
  330:10 335:2

336:5 338:18,23
  340:8 344:20
  348:8,15 352:22
  359:11 361:14
  368:20 369:6
  396:14 431:17
  448:8,22 456:4
  476:22 558:14
  559:20
actavis 387:21
  388:3,9,25 389:1
action 291:1
  316:11 330:24
  441:15 491:14,19
  549:17 556:13,18
actions 549:22
  553:8
actiq 466:12 467:1
activity 288:22
  358:18 381:17
  433:21 546:7
actual 279:24
  437:21 474:3
  528:25 546:2
ad 321:20
adapted 382:4
addiction 300:2
addictions 421:16
addition 331:9
  344:6 357:16
  440:2
additional 327:15
  380:8,10 400:18
address 557:15
addressed 400:19
addressing 553:23
adequate 476:4
adhering 451:6
adjoining 384:8
adjourned 555:15

administration
  275:6 321:11
  329:11 405:8
administration's
  276:20
administrative
  452:14 453:16
administrator
  286:14 342:4
advanced 552:3
advice 450:11
  511:22
advised 425:8
affairs 392:15
  406:10
affect 370:24
affirmative 443:10
affixed 558:15
  559:21
afternoon 478:18
ag 457:1
agencies 289:18
agency 280:6
  291:1 292:10,25
  297:12 322:15
  413:10
agency's 323:22
agents 422:4
aggregate 472:10
aggressive 357:15
ago 336:18 512:8,9
agree 372:9,22
  373:6,23 375:12
  376:17 377:19
  379:7 380:24
  463:5 490:8
  499:12 507:23
  517:7 531:13,20
agreed 452:13
  453:5 454:8 464:7
  504:1

agreeing 489:24
agreement 277:7,9
  277:12,14 456:7
  459:8 465:13
  471:17 473:13
agreements
  413:13 459:22
  463:6
ah 439:18 518:24
ahead 280:15
  294:10 295:1
  309:19 322:12
  335:20 336:9
  365:20 393:16
  398:23 456:25
  480:9,9 484:8
  506:1 533:8
  540:21 541:6
al 268:9,11,13,14
allergan 273:18
allow 553:14
allowed 281:24
  398:12 399:17,22
  448:25
allowing 343:23
  445:2 448:8
alongside 406:22
alprazolam
  337:24
alto 271:18
ama 473:18,20
ambiguous 336:7
amendment
  277:11 471:11,16
american 327:2
  473:24
americas 271:4
amerisource
  295:21
amerisourceberg...
  272:19 295:22

363:3,13 389:9,15
389:16 406:10
444:8,18 447:19
448:6
**amiss** 298:10
**amount** 300:22
433:10 553:16
**amy** 272:2
**analyses** 436:14
**analysis** 350:12
351:1 536:13,14
536:16 544:9,14
**analytics** 536:12
**analyze** 536:2
544:15,23 545:9
**analyzing** 536:21
**andrew** 273:8
274:2
**andrew.o'connor**
274:6
**anesta** 390:22
**angeles** 273:15
**annoying** 518:14
**anomalies** 317:16
375:21
**answer** 280:15
292:20 335:14,17
355:7 365:20
367:25 384:12
403:17 437:7,8,10
437:11 445:15
446:16,23 447:5
447:11 452:8
460:5 477:3
479:15 481:2,7
482:5,12,14
483:15,18 484:4
484:16 487:21
497:12,14 500:18
504:7 506:22
510:5 511:1,1,18

512:3 514:2,4
515:15,24 517:21
530:14,23 532:1
538:24 545:5,20
545:20 547:1,19
548:2,12 549:3,12
549:21 550:6,10
550:20 552:24,25
553:8
**answered** 296:8
385:8 437:14
484:18,21 506:18
506:20 518:12,19
525:12 529:8
532:24
**answering** 502:1
**answers** 462:21
**anthony** 272:15
**antonio** 552:4,11
**anybody** 488:7
494:14 506:3
528:21
**aoa** 473:18,20
**apologize** 287:19
295:13 386:10
393:8 471:8 490:5
508:5 514:23
518:16
**apology** 527:9
**apparent** 433:12
**apparently** 430:25
450:10 501:2
**appear** 362:22
363:1 500:2
558:11 559:15
**appearances**
270:1 271:1 272:1
273:1 274:1
**appears** 357:2
363:18 386:17
465:16 470:10

471:10 501:8
556:5
**appended** 559:11
559:18
**applicable** 338:24
460:25
**applied** 298:18
315:20 346:20
365:3
**applies** 313:21
**apply** 298:11,24
299:5 304:23
313:12,16 314:4,5
315:6,14,15 316:4
436:25
**appreciate** 285:13
344:2
**appreciated**
301:10,13,22
322:5 552:9
**approach** 513:22
**appropriate**
326:14 330:24
373:20 376:14
377:4 379:11
380:2 381:2,6,8
399:14
**approval** 346:10
**approve** 345:11,21
431:6 432:3
490:21,22
**approved** 531:4
531:12
**approves** 346:12
380:18
**approving** 488:22
**approximately**
282:16 480:18
481:15,18
**arch** 272:22

**arcos** 277:20
283:5,16 306:23
307:17 316:20
317:9 349:2
358:20 535:18,20
536:2,16,21
537:13,18,22
538:3,12,16,20
539:5,14 542:5,5
542:19,25 543:9
543:14 544:1,23
545:9 546:13
548:25 549:10
550:13 553:13
554:12
**area** 279:23,25
282:5,18 284:25
285:18 287:16
329:12 359:15,17
359:20 405:8
433:13
**areas** 280:2
281:11,18 312:20
549:24
**argue** 294:7,9
**argument** 349:13
349:16 401:1
**arkansas** 541:23
542:2
**arrangement**
482:2
**aruiz** 272:18
**asked** 291:23
292:12 296:7
311:25 329:5
360:10 361:8
363:24 367:21
377:15 384:16
385:7 411:23
412:10,15 413:19
427:10 462:17

478:24 484:21
501:18 502:4,5
503:1 504:1
506:18 507:22
508:22 516:3
517:1,8,23 518:12
518:19 520:23
522:13,22 525:11
527:5 529:6,7
532:24 539:2
553:21
**asking**  278:23
283:24 292:8
331:21 388:16
398:7,9 440:16
445:10 452:2,7
479:2 514:1,2
524:25
**assess**  357:22
**assessments**
496:21
**assigned**  279:9
323:25 383:24
**assignment**  558:2
559:2 560:2
**assignments**
279:10
**assistant**  286:14
342:4
**associated**  498:17
**association**  370:16
370:18 416:21
417:10 418:9
420:24 422:5
424:23 425:7
473:25 493:1
**assume**  450:4
523:15
**assumptions**  398:7
**assurance**  372:18

**astanner**  273:12
**atlantic**  388:9
389:1
**attached**  361:14
364:8 387:1 402:5
442:11 460:20
467:22 559:7
**attachment**
295:20 468:3
**attend**  385:13
402:25 500:4,16
500:23 508:25
**attendance**  385:24
389:1 403:2,20
409:18
**attended**  404:10
406:23 498:5
499:11 501:6
509:5 518:9
**attendee**  388:25
390:23 391:7
392:8 393:4,13
394:6 395:3
509:20
**attendees**  386:19
387:13,17,20
389:25 392:16,22
393:20 402:10
409:13
**attending**  316:16
384:18,23 389:8
394:19 395:3,11
395:17
**attends**  403:11
**attention**  364:7
375:21 473:17
547:6
**attitude**  432:17
**attorney**  485:19
486:13,16,19,23
531:19 556:15

**attorney's**  270:8
275:2 289:16,16
**attorneys**  370:11
**auburn**  448:20
**audited**  336:18
**august**  295:22
303:20,20 309:11
318:15 499:21
551:6,21
**authority**  284:3
287:14 328:2,7
490:19
**authorization**
281:4,8,10,25
283:19 547:20
549:3,13 550:10
**authorize**  300:1
559:11
**authorized**  281:12
281:18 282:6,19
284:16 285:1,19
285:24 288:16,20
289:3,11,22 290:7
290:15,23 447:6
447:10 514:4
515:25 545:14
546:9 547:18
548:12,21 549:21
550:8 552:19
553:8
**automation**
277:21 539:15
**available**  380:21
463:23 469:24
476:5
**avanni**  272:5
**ave**  557:1
**avenue**  270:8,13
271:4,13 273:4,15
**average**  433:10
542:6,9,22

**avoid**  331:11
**aware**  291:1
323:12 327:14,20
371:20 413:9,14
416:9 417:9,17
418:6,9,13 420:4
425:6,14 441:25
442:1,3 444:7,7,12
447:21 458:17
459:17,21 460:4
461:3 463:21
464:12 474:1
475:1,5 488:12
495:9 530:25
551:17 553:12,18
**awry**  298:10

**b**

**b**  292:7,14 343:10
344:13 405:3
407:15 431:5
460:20,22 467:21
468:17 469:23
494:8,9
**bacchus**  275:2
**back**  304:14 305:5
341:9 348:13
349:4,6,11 382:14
382:25 393:7
399:1,4 401:8
409:6 413:9 419:4
422:6,17 425:8,23
428:2 431:9 432:9
434:15 446:9,21
455:2 458:12
462:9 466:9 477:7
478:11 485:12
486:10 497:22
503:2 506:22
507:21 511:14
512:19 513:13
515:1,3 517:13

521:22 531:18,25
532:3 533:15
534:20 557:15
**background** 284:2
323:10 327:15
373:17 546:3
**bailey** 270:22
**bank** 527:21
**barker** 271:8
**barnes** 274:8,12
**bartlit** 274:18
**bartlitbeck.com**
274:20
**base** 339:13
**based** 281:24
284:3 294:19
317:22 343:11
349:7 355:20
361:17 423:14
436:6 475:25
501:4 502:8
506:16 526:17
**basic** 309:3
**basically** 279:11
398:8 432:24
456:20
**basing** 436:14
**basis** 305:12
308:17 309:24
331:16 337:10
347:11 360:21
400:11 464:6
465:4,20,22 505:5
519:19
**bates** 356:17
362:15 363:9
370:8 386:12
402:2,15 404:5
407:6 410:19
415:19 418:1
423:25 424:3

429:19 430:6,13
437:23 473:17
**baton** 533:9
**beach** 271:9
**beck** 274:18
**becoming** 316:16
**began** 346:4
383:12 458:19
492:9,19 493:15
493:18 527:10
536:7
**beginning** 478:24
514:21 530:17
536:2
**begins** 278:6
**begun** 458:19
491:18
**behalf** 269:12
270:2,7,12,16,21
271:2,7,16 272:2,6
272:14,19 273:2,7
273:18 274:2,7,11
274:16,21 278:18
284:17 292:10,13
292:25 459:15
**beisell** 271:20
**believe** 292:23
336:3 371:12
377:3 386:4 402:3
432:16 433:23
457:8 492:5 493:5
493:13 496:3
498:8 503:14,19
508:3 515:10,25
534:8
**benchmark**
300:20 307:22
**benchmarks**
300:20,21 306:5
306:13 307:6

**benefits** 325:15
**bennett** 270:7
283:7,13 292:16
295:8,11,14
320:20,24 321:1
348:25 349:5,8,14
374:5 378:9,11
379:24 384:10
388:6,13,15,19,22
396:5 402:17
403:3 415:8
423:11 424:7,10
428:12,14,17
429:7,24 430:2
436:1 440:7,15,20
442:15 445:1,3,7
445:14,17 446:23
447:5,16 452:1
455:8 457:6 460:2
476:25 480:23
487:20 488:19
490:18 492:12
496:12 497:2,11
497:15 501:7
504:17 506:14
507:17 510:3,23
511:17,20 512:21
513:25 514:11
515:5,21 518:10
520:15,18,20,23
521:16 523:2,12
524:6,17 525:13
526:3,12 528:17
530:13,22 531:15
531:23 532:23,25
533:4 536:4 538:5
538:24 540:10,13
540:23 541:25
545:11,14,17
546:8,15,21 547:1
547:15,25 548:8

548:11,17,20
549:2,11,20 550:7
550:18 551:1
552:18,25 553:7
554:2,20,23
**best** 315:22 335:23
336:4,21,23
383:15 462:21
479:23 489:10
490:7,13 492:1,2
496:3,6,16,19,25
500:18,22 507:12
509:2 527:21
**better** 457:10
499:12 529:5
**beyond** 482:24
484:21,23 492:10
512:23 515:9
540:9 547:19
549:2
**big** 449:20 451:14
452:20 453:9
**billing** 464:10
**binder** 498:21
508:4
**bit** 367:20 369:23
387:4 492:15
499:11 516:7
**bless** 312:12
**blessed** 291:25,25
487:18 490:14
**blighted** 359:20
**blind** 332:16
334:10
**block** 463:20
**bmasters** 272:12
**board** 284:10
315:17,20 322:14
338:25 341:1
**bonnie** 268:24
556:2

**book** 280:20
295:12
**border** 279:13
**boss** 342:1
**boston** 274:5
**bottom** 387:12
402:15 404:23
424:3 432:13
529:17,20 541:9
**boulevard** 270:18
**box** 329:5
**boylston** 274:4
**brad** 272:8
**brandan** 273:2
**brandan.montmi...**
273:6
**break** 341:3
382:18,19 454:21
455:9,12 456:5
458:15 484:8
492:15 507:20
514:21 520:20,24
521:5,15
**bridgeside** 270:18
**brief** 400:10 494:7
**briefed** 376:23
493:20 494:8
**briefers** 509:16
**briefing** 287:17
303:21 316:16
317:3 318:7
319:15 493:22
494:11 505:6
508:3,19 509:1,5
509:10 510:2,9,11
517:10,15 519:17
519:22,23 521:8
**briefings** 296:5
297:4 301:19
302:5 311:12
314:22 315:20

316:18 317:14
324:6 328:19
329:20 334:18
337:2,14 340:16
345:5,15 347:21
348:16 350:2,22
352:9 354:5 355:4
356:5 358:11
365:16 367:5
369:11 376:24
492:8,19,25 493:6
493:11,15,18
497:7,8 504:4,15
505:1,9,14 507:15
509:18 517:3,19
518:2,8 527:11
543:13,24
**briefly** 387:9
**bring** 364:7 380:7
**broad** 491:19
**brought** 338:24
441:16 448:1,2
453:9
**bryant** 271:3
**btlaw.com** 274:10
**build** 494:3,5
**building** 398:6
**bulk** 301:1
**bullet** 314:18
380:11,13
**burling** 273:9,14
**business** 298:8
301:1 312:13
336:22 339:11
359:8,16,21 361:5
370:25,25 373:18
390:22 460:24
521:11

**c**

**c** 274:17 275:5
276:1 278:1
**c.f.r.** 277:17
**c2s** 467:1
**ca** 557:25
**cah** 276:9,11,18,21
276:25 277:2
370:14
**cal** 453:22
**calendar** 468:1
**california** 271:9
271:18 273:15
453:22,23
**call** 294:9 385:19
397:4 400:17
457:7,7,7,11
470:24 482:4
484:9
**called** 292:7 305:7
306:20 370:15
371:17 397:13
435:6 447:9,13
456:8 472:2
**calling** 400:8
**calls** 292:17
309:16 354:25
481:11,15,24
482:1,4,9 515:6
**capabilities**
360:18
**capacity** 293:1
**caps** 365:11 366:3
**cardinal** 272:6
318:12 342:21
343:14 346:22
370:13 386:14
390:7 415:20
429:19 431:2
433:6 448:20
449:15 450:18

451:10 453:4
478:16 508:22,25
509:5,10
**care** 332:20
334:14,24
**carefully** 373:19
**carolina** 270:18
**carry** 323:25
**case** 268:6,10,12
268:14 281:12
284:1 285:20
286:8 287:13
289:4 340:4 366:3
400:22 402:4
404:20 441:21
442:22 444:21
498:3 528:16
529:10 531:19
533:24 546:2
550:24 557:6
558:3 559:3
**cases** 298:4 303:16
303:17 383:21
545:18 548:13,21
550:19 552:20
**cash** 300:2
**catch** 410:16
**catie** 273:19
**catie.ventura**
273:22
**cause** 340:3 444:9
449:14 450:17
451:10
**center** 271:9
274:23 372:3
450:19 451:11
465:8
**centre** 274:13
**cephalon** 390:14
390:21,21 459:16
459:18,23,25

460:10,13,14,18
461:2,6,15,18
462:5 464:14
**ceppich** 273:16
**certain** 325:17
353:21 360:22
413:2 460:11
463:20,20 472:14
494:13 519:5
**certainly** 303:11
353:14 377:1,22
428:5 499:7 506:5
519:21 530:9
**certificate** 556:1
559:11
**certification** 558:1
559:1
**certify** 556:4
**cfr** 285:23 332:4
343:10 344:12
404:24 405:3
407:14 431:5
452:18
**chain** 277:23
298:25 313:7
325:24 371:2
372:4 373:4 395:9
406:18 414:18
417:19 420:11,15
466:4 474:3
**chains** 385:23
425:20 454:6
472:19
**chance** 342:9
356:9 499:25
**chandler** 275:3
**change** 382:4
406:1 415:1
422:25 427:13
450:2 454:19
481:6 494:9

523:18 524:10
525:7 527:1,9
532:4 557:13,14
559:8 560:3
**changes** 382:5,9
425:5 522:15
557:12 558:7
559:7,9
**changing** 381:17
381:20 415:2
423:21 426:24
497:13 525:15
**channels** 302:24
304:16 323:24
331:14 350:15
**character** 463:19
**characterization**
474:11
**characterized**
375:5,10
**characterizing**
354:21
**charge** 377:14
536:20,20
**chart** 287:5
541:13,22
**chaverri** 270:3
**checking** 433:9
**chelsea** 275:8
**chemical** 277:3
435:6,12 436:7,15
436:21 437:19
438:8 443:14,18
**chicago** 271:22
**chief** 424:15
536:11
**choosing** 456:3
**chris** 535:14
**christopher**
273:14

**circumstances**
331:15 332:17
334:11 337:8,19
427:14
**citation** 302:19
**city** 268:11
**citycenter** 273:10
**civil** 275:4,5,7
337:10 452:13
453:5,17 558:5
559:5
**claimant's** 276:22
**clarification**
291:14 550:5
**clarify** 525:19
**clarity** 286:10
**classifiable** 289:5
**classified** 289:5
**clean** 400:17
**clear** 281:23
315:19 354:18
361:11 368:7
379:3 388:16
433:4 448:1,5
456:3 457:18
489:18 490:4,6
500:22 501:5
514:15 533:25
534:6
**clearly** 344:24
434:14
**cleveland** 268:11
270:9 271:14
557:2
**client** 338:24
**clientele** 339:9
**clinic** 361:16
**closed** 297:8 299:6
304:24 324:25
325:24

**closer** 499:7
**cmcnamara**
272:11
**code** 375:8 541:24
**cohen** 275:1 397:5
397:12,15 398:22
399:9 400:15,25
401:4,7 455:25
483:11 484:9
514:14
**colleague** 489:16
**colleagues** 386:8
533:9
**collectively** 458:23
473:23
**colleen** 272:7
**colloquy** 399:17
399:19
**colorado** 274:19
453:20
**columbia** 556:22
**combat** 323:21
324:24 537:3
**combinations**
381:21
**come** 336:19 382:3
421:11 433:5
485:12 507:21
**comes** 399:18
413:21,21
**coming** 383:21
394:10 410:11
**commensurate**
359:21
**commentary**
293:8,22 331:21
468:8
**commercially**
467:23
**commission**
556:24 558:19

559:25 560:25
common 389:24
390:3 402:24
406:21
communicated
318:25 458:15
502:17
communication
319:10 455:10,15
communications
292:17 346:8
354:19
community 457:3
companies 317:16
328:13 395:9
396:13
company 317:2,8
325:14 336:24
394:17 469:17
472:11 494:7,7,8
494:10,13,17,19
494:23 496:24
compare 542:21
compared 301:2
542:8,21
comparison
542:14
compilation
435:24
complete 282:9
completed 310:9
368:5,15,16 409:2
440:4 557:15
completely 533:24
completing 350:13
448:23 480:14
compliance
276:17 328:4
370:15 371:17
435:15 452:15

compliant 308:16
330:9 347:4,9
368:19 369:3,5
complied 530:1
comply 328:8,13
328:20 354:24
420:23 476:21
490:15 491:2
complying 336:4
components
325:23
compound 364:17
compulsory 361:2
computer 424:25
computerized
556:8
concentrated
510:20,21
concept 327:24
340:22 366:4,15
366:16 492:24
498:4 506:3 511:9
concepts 338:16
351:15
concern 296:21
380:22
concerning 291:1
335:7
concerns 279:3
296:15 297:1
317:17
concludes 555:9
conclusion 305:24
309:16 379:4
conclusions
312:11
concurrent 331:2
condition 325:3
conditions 460:15
conduct 332:7
350:12 357:15

359:16 527:10
544:23
conducting 298:8
conduit 361:15
conference 358:4
360:2 362:24
384:20,23 385:14
385:20 386:20
387:3 389:10,18
390:24 391:7
392:8,16,23 393:5
393:13,20 394:7
394:22 395:4,11
401:15 402:1,10
403:12 404:9,10
406:11 409:14
456:2 497:18
498:5,18 499:11
500:4,16,24 501:6
501:13,20,21,22
502:7,11,23 541:5
conferences
389:24 406:23
480:11
confidential
480:25 481:6
483:17 545:18
confirm 374:11
confirming 332:20
334:14,24
conflict 330:21,22
confronted 428:10
confused 504:24
confusion 527:1
congress 323:25
324:24 325:25
326:24 328:6
connection 498:13
connolly 269:7
272:9

consequences
328:20
consider 297:25
298:16 299:19
consistent 323:15
324:4 325:7 326:5
327:4 334:16
337:12 338:17
340:14 345:3,13
355:2 358:9
375:15 381:25
418:17 443:17
517:23 534:3
consolidated
277:21 539:15
constant 381:18
constituted 301:1
construed 346:10
consult 484:13
consultancy
482:20
consultant 400:24
532:13,16 533:1
consulting 482:2
483:2 534:10
consummated
310:8,21,22
contact 377:15
contacted 377:13
455:19 457:20
contain 460:19
467:21
contained 374:13
505:15 512:18
517:10 518:3
contains 363:4
content 482:4,23
485:25 516:8
contents 447:21
514:3

[context - correct]

**context** 281:22
331:25 340:1
342:15 506:19
**contiguous** 529:15
**continue** 458:2
552:9
**continued** 271:1
272:1 273:1 274:1
277:1 278:7 492:6
492:20 493:16
**continuing** 531:2
**contract** 469:13
471:9,11 473:11
**contrary** 534:5
**control** 276:20
312:7 340:1 342:5
402:9,21 481:3
**controlled** 276:15
286:2 297:2 299:7
300:16,22 301:3
302:23 303:1
304:24 309:3
312:16 315:3
316:1 322:6,24
323:6,13,24 324:1
324:11,23 325:2
325:16 326:3,11
326:13,25 328:2
328:14 329:9,18
330:10 335:1
336:5 337:22
338:8,18,23 340:2
340:8 343:8
344:12,16,20
348:7,14 350:14
350:19 352:21
358:20 359:11
368:20 369:6
371:8,19 372:7,19
373:3 380:18,20
391:13 396:12

405:6 407:17
416:3 431:7 432:4
433:11,23 448:7
448:22 452:16
466:20 469:2
537:12,21,23
542:7 544:16,17
544:24 545:10
554:14
**controls** 276:14
302:22 304:8,15
305:2 315:5
316:10 332:18
334:7,12 344:9
366:1 404:25
443:5 449:17
450:20 451:12
491:13
**conversation**
445:23 455:21
456:24 457:9
**conversations**
457:13 513:23
528:18 531:24
**convey** 360:7
506:2
**conveyed** 505:20
520:9
**coordinate** 458:4
**coordinator**
318:22
**copies** 379:17
386:9 503:3
**copy** 320:17,21,23
361:13 423:20
425:4 431:1 437:4
437:18,24 442:9
457:10
**core** 323:22
**corner** 373:12
541:10

**corp** 390:22
**corporate** 274:23
406:9
**corporation**
272:20 273:7
535:12
**correct** 280:7,11
280:16 282:10,13
282:16 283:13
284:12 287:5,7,10
287:17,25 288:6
288:23 289:1,7,9
289:18,20 290:2,5
290:11,13,19,21
291:2,4,11 292:2
293:5 294:16,17
294:22 296:5,9,16
296:17,18 297:19
297:22 298:2
306:25 307:2,6,23
308:1 309:6,8
313:2,3,5,6,7,8,10
313:11,13 314:24
317:10,18,20
318:8,14 319:2,6
324:12,14,19,21
325:18 329:25
330:5 335:24
343:25 344:20,22
348:8,16 351:10
351:20 352:22
353:5,7 355:21,23
363:8,13,15 364:3
365:8 374:14,15
374:21 383:14
385:12,15,17,24
386:1 387:6 388:3
388:10 389:10,19
390:8,12,16,18,25
391:2 392:3,9,16
392:23 393:5,13

393:21 394:7,12
394:23 395:4
396:3,14 401:13
402:10 403:25
404:14 405:13
407:19,24 411:21
412:22,24 413:3
414:1,7,22 415:3
416:15 429:23
431:10,18 432:9
434:11,15,17,20
441:11 449:9,22
450:5,6,23 451:4
451:16 452:21
453:11 454:15
462:24 464:14
465:13,23 470:18
471:2 476:12
479:6 483:8
484:14 487:10,16
487:19 488:3,14
488:18 489:8,14
490:16 491:8,14
491:25 492:3,9,21
493:7,11 494:4
495:5 496:6,11,17
497:1,21 498:6,18
498:24 499:2,5,8
501:23 502:18,19
502:24 503:6,10
503:16,24 505:6
505:10 506:7
507:15 509:11,12
513:24 516:6
518:9 522:6,10
523:11 524:2,13
525:10,25 526:10
526:14,22 527:3
530:6,21 531:13
532:22 533:4
535:3 536:3,17,18

[correct - data]

Page 12

536:23 537:20
538:19 539:8,12
543:10 544:5,18
547:14 554:16
**corrections** 557:12
559:17
**correctly** 333:23
386:19 404:18
406:12,13 407:13
408:7 465:10
471:16
**counsel** 278:10,12
280:17 288:18
291:7,22 292:18
295:4,8,18 296:11
305:6 310:4
318:13 320:16,20
335:13 341:14
344:1 346:22
355:18 369:18
383:5,6 388:15
398:3 399:18,25
400:3 401:11
402:18 411:24
424:7,10 427:12
428:9,15,22
429:20,24 430:2
437:22 440:16
442:16 448:1,2
455:7 462:18
478:14,15 491:8
498:16 501:19
502:15 503:22
520:18 521:16
522:2,13 524:6,17
525:12 528:18
531:24 533:18,20
535:12 540:24
551:1 556:12,16
**counsel's** 292:18

**counties** 542:6,8
542:10,14,14
**country** 280:2
323:14
**county** 268:9,13
270:12,16 278:12
278:18 383:6,18
383:20 384:1,7,8
484:13 532:14
558:10 559:15
**couple** 392:14
454:21 480:10
**course** 314:2
316:2 325:23
486:11
**court** 268:2
291:19 303:17
399:5,19 400:11
515:2 531:20
558:7
**cov.com** 273:12,12
273:13,16
**cover** 295:19
372:2 430:6 516:7
**covered** 279:10
285:23 299:23
530:9 540:15,16
540:18 553:24
**covering** 371:14
**covers** 305:1
**covington** 273:9
273:14
**crazy** 291:19
**created** 510:1,11
510:12 527:2
**creating** 511:23
**criminal** 337:10
381:16
**criteria** 330:23
352:5 436:22

**critical** 326:23
336:21 391:6
506:8
**cross** 322:14
398:11 554:4
**csa** 327:24 328:5
328:21 332:4
335:8,15 337:11
362:6 375:17
453:7
**culminating**
279:11
**currency** 527:21
**currently** 282:15
323:2
**custom** 391:6
**customer** 285:4,8
326:2,13,14 331:4
338:18,23 339:12
339:18 340:5
357:15 359:8,14
359:19 360:22
361:17 373:14,16
373:18,22 374:19
375:7 376:16
377:13,18 379:19
406:15 433:20
440:4 516:24
519:18,19 521:10
551:7,15,22
**customer's** 373:18
**customers** 339:22
358:2 361:8 372:8
520:10 526:21
552:16 553:17
**cuyahoga** 268:9
270:12 383:6,18
383:20,25 384:7
**cvs** 272:14,14

**d**

**d** 271:2 278:1
361:23
**d.c.** 268:20 269:9
270:5 272:10,17
273:11,20 279:15
294:16,22 321:11
416:8 420:18
456:1 461:13
**daily** 354:21
**dallas** 273:5 279:9
279:22,23 280:1,8
346:4 377:6
**damage** 311:6
409:5
**dan** 268:7
**dangerous** 340:3
**daniel** 275:10
**data** 277:7,9,11,13
283:5,16 295:20
306:23,24 316:20
317:1,2,7,15,23
349:2 413:12
425:1 459:8,14,24
460:11,12,14,18
460:18,22,24
461:3,17 462:6,11
463:7,22 465:6,11
465:19 467:17,19
467:24 469:15
470:15 471:17,17
471:20 472:2,8,10
472:14,21 473:14
473:19,20,25
474:15 475:2,11
475:17 476:5,11
476:20 509:14
510:9,20 511:9
516:4 536:2,16,22
537:1,18,22,23
538:7 544:4 545:9

[data - deliver]

548:10 549:10
550:13 554:12
**database** 316:21
317:9 475:4
**dataset** 470:13
**datasets** 469:24
**date** 277:5 292:12
443:1 448:17
494:13,15 499:4
499:16,20 557:8
558:3,9,19 559:3
559:13,25 560:20
560:25
**dated** 276:9,10
277:24 379:17
415:20 437:25
527:21
**dates** 377:14 385:2
**david** 270:3 275:1
275:4 398:20
400:14,20 455:25
484:9 485:1 557:5
**david's** 485:2
**davidian** 392:21
**davison** 274:3
**day** 271:17,21
278:24 383:12
390:8 411:24
412:5 413:18
427:12 428:11
458:19,19 528:23
529:1 558:16
559:22 560:22
**days** 329:4 460:24
461:4 467:25
480:3 508:9
557:18
**dea** 276:12 277:6
279:7 280:4 282:7
282:10,20,24
284:3,10,11,17,18

286:12 287:5
288:22 289:7,15
290:11 291:11
292:14,19 293:19
295:22 300:8
302:17 303:12
304:6 309:12
311:8,15 313:10
313:17 315:11
316:9 323:21,25
324:2 325:2,15
326:19 327:12
328:6,6,11 329:25
332:8,15 334:9
340:23 343:9
344:9 345:10,21
346:4,8,12 347:17
348:1 350:7 351:3
351:9 354:12,19
355:10 356:23
357:21 358:4,19
361:8,9,11,19,23
364:2 365:25
369:2,7 374:20
377:5 378:8
379:12 380:3,20
381:7 382:15
383:23 395:22
402:10,25 403:2,8
403:11 404:7
406:1,22 407:17
410:3,7,7 414:3
415:24 416:7
418:19 420:6,17
420:25 421:19
424:14 425:8,15
428:1 429:17
430:16,21 431:4,5
431:10 432:2,7,20
433:5,15 434:1,24
438:19 441:11,16

444:3,8 450:16
451:4,9 452:14,17
453:17 459:22
462:9 472:13
476:18 487:9,19
488:1,16 489:11
490:9,14,21 491:8
491:11,22 492:6
493:16 497:18
498:5,18 500:4,16
500:24 502:22
510:21 514:10
517:24 523:25
524:10,11 525:7
525:22,23 526:8
527:2,9 530:25
531:4,12 536:25
537:19 538:20
539:5 540:12
547:24 548:12,15
550:8 552:11,15
552:20 553:1,9,13
554:11
**dea's** 285:21 286:1
286:4 357:12,14
360:10 440:19
**dea07** 276:9,11
**dealing** 301:22
417:3
**dealt** 414:4
**dear** 320:3 557:10
**deaths** 421:17
**debra** 271:2
**debra.ogorman**
271:5
**decades** 426:6
**december** 341:25
343:5 442:9
449:13 450:21
453:4

**dechert** 271:3
**dechert.com** 271:5
**decide** 399:16,20
414:21
**deciding** 326:2
**decision** 288:5
312:9 336:25
410:23 431:25
432:5 442:4,12
526:17
**decisions** 491:2
**deck** 498:17
502:16 505:5,16
516:5,11,14,15,24
517:9 521:8
**declared** 326:24
**deed** 558:14
559:20
**deem** 376:3
408:24
**deemed** 311:2
330:20 557:19
**defendants** 286:8
292:6 458:4
535:15
**defense** 288:18
428:15,22
**defined** 375:3
544:20
**definition** 422:6
**definitive** 318:24
**deleted** 512:12,17
513:1,17
**deliberations**
510:4,25 514:3
515:7
**deliberative**
289:14 511:23
515:22
**deliver** 324:5
326:3,6 355:25

372:7
**delivered**  327:5
340:15 345:4
347:20 350:2,21
352:8 354:4 355:3
358:10 409:4
502:11
**delivering**  338:2
338:11 346:14
358:4,22 367:5
**demand**  469:25
**demonstrates**
315:4
**denver**  274:19
**department**  270:7
275:2,4,5,6,7
281:9,25 285:19
288:14 289:15
292:19 322:4
370:22 429:18
442:11 557:22
**departments**
289:17
**depending**  337:8
546:1
**deposition**  268:19
269:1 278:7
280:18 289:12
292:14 320:12
341:16 356:13
362:19 370:6
383:12 386:6
400:1 401:22
402:7 415:17
429:12 437:15
442:5 455:14,15
455:19 457:5
459:2 467:9
471:12 473:8
495:18,22 514:19
525:6 527:16

529:2 539:17
549:25 550:1
551:9 553:22,23
556:3,5,10,14
557:8,11 558:1,3
559:1,3
**depositions**  286:9
457:15
**deputy**  286:13
342:4
**derived**  473:24
**derogatory**  396:9
**derrick**  531:4
**described**  460:12
460:20 467:21
**description**  282:9
282:23 307:21
377:15 460:17
**design**  309:5 329:8
344:14 345:1
366:23 380:16
405:4 407:15
**designated**  292:24
**designates**  399:18
**designed**  324:24
452:15
**desire**  460:13
**desired**  382:2
**desires**  460:10
**desk**  488:5
**despite**  398:5
**destined**  432:16
**detail**  503:24
**details**  387:3
441:24 481:25
512:3
**detect**  382:5
452:16
**determine**  309:21
310:16 333:17
350:14 353:16

380:16 415:25
433:8 443:12
549:16 554:13
**determined**
310:19 379:6
551:15
**determines**  353:24
**determining**
436:24 494:24
**detrimental**  327:1
**developed**  380:17
**deviate**  351:24
**deviated**  330:13
**deviates**  352:19
**deviating**  329:14
351:16
**deviation**  418:11
419:2
**deviations**  418:5
**diabetes**  300:24
**died**  382:1
**difference**  408:11
410:13
**different**  458:14
490:23
**dilaudid**  468:20
**diligence**  331:11
331:15,18,25
332:7 347:3
357:16 360:11
369:20 372:5,13
372:17 373:2,14
374:3,19 406:16
444:20,24 448:23
449:22 450:23
451:16 452:21
453:8 454:1,14
476:4 494:23
496:4,8,24 497:8
516:16 551:16

**direct**  287:10,24
318:4 448:2
465:18,19 481:1
482:13 483:18
539:21 550:17
**directed**  502:2
**directing**  481:7
**direction**  360:20
556:9
**directly**  286:17
461:18 462:12
465:23 469:16
474:2
**disagree**  485:11
**disapprove**  431:6
432:3
**disclose**  329:8
344:15 405:5
407:16 510:25
516:1 550:8
**disclosing**  515:8
**disclosure**  515:7
**discover**  552:10
**discovered**  308:5
309:12,14 310:2
329:12 347:18
348:6 376:7 405:9
425:3,11
**discuss**  358:15
366:23 370:22
455:11 460:3
545:17 546:9
**discussed**  363:2,12
424:24 492:9
498:4 501:12
502:6
**discussing**  492:24
**discussion**  327:16
373:13 397:14
399:7 415:13
446:7,18,20

[discussion - documentation]                                    Page 15

477:24 478:1
494:22 495:1
496:9 497:22
501:11 511:7
513:9
**discussions**  512:25
513:3,14,21 514:8
514:10
**disjunctive**  352:5
352:14
**dispensation**
431:22
**dispense**  372:20
**dispensed**  314:10
316:2 542:20
**dispensers**  358:1,1
**dispensing**  358:17
359:4
**displayed**  295:25
**displaying**  374:12
**dispositions**
537:11
**disproportionate**
338:9
**dispute**  456:10
**dissemination**
290:1
**distinction**  368:6,8
**distinguish**  369:12
**distribute**  391:21
**distributed**  315:2
538:17
**distribution**  297:8
299:6 325:1,16,24
326:25 356:25
370:16 391:13
396:12 450:19
451:11 461:5
465:8 475:19
539:6 542:7

**distributions**
538:21 544:17,24
545:10
**distributor**  285:3
285:7 287:16
296:5 298:8,20,25
302:18 303:21
304:7 311:9,12
314:22 315:5,12
315:25 316:12
322:18 323:16
324:6,17 325:9
326:6 327:6,18
328:19 329:19
331:10 332:13,19
334:6,7,13,18
337:2,13 338:2,11
340:16 345:14
346:16 347:21
350:2,21 352:8,8
354:5 355:3 356:5
358:10 359:3
361:16 365:25
367:5 373:16
375:5,6 376:24
377:17,20 378:19
380:12,14 411:14
411:15 412:2,2,12
413:2 414:19
440:25 443:6,10
461:17 462:6
465:4 466:4 492:8
492:18,25 493:6
493:10,14,21
497:6,7 500:16
504:3,14 505:1,21
507:15 508:3,18
509:1,10,16,18
510:1,10 517:3,10
517:14 518:2
521:8 527:10

536:8 538:17
543:2,24 553:16
554:16
**distributor's**
331:17 358:16
375:2,3
**distributors**  313:2
318:8 319:15
322:25 325:22
326:1 327:12,13
327:19 328:1
343:9 344:8,11
345:4 357:14,22
357:25 370:19
371:22 372:4,12
372:20 378:1,7
385:14,24 395:10
413:11 436:13
441:16 442:12,21
449:21 450:3
451:15 472:20
476:3 504:3
506:13 507:14
513:23 518:4,8
526:20 527:2,12
537:1,10,15,17
543:13 544:5,8
550:14,22 551:13
552:17 553:14,15
554:12
**district**  268:2,2
556:22
**diversion**  276:15
276:20 279:8
285:5 294:21
302:23 304:8
315:5 316:11,16
323:23 324:24
325:6 332:18
334:7,12 337:20
342:4 344:9 366:2

371:19,23 402:8
402:20 405:7
424:15 430:7
443:6 448:8
449:17 450:20
451:13 452:16
491:13 537:3
540:12 546:7
**diverted**  314:12
331:12 350:15,19
433:24
**diverting**  315:3
**division**  268:3
275:4 279:9 280:1
285:5 329:11
347:17 545:22,24
**dmigliori**  270:19
**doctors**  552:3
**document**  268:7
297:21 305:9
306:8 332:25
333:1 336:14,17
356:16,19 357:5
357:10 370:14
371:15 374:13,16
376:11 388:17,24
401:21,25 402:3,5
404:20 415:16
423:5,17 424:4
427:16,17 429:6
429:15 435:9
442:8 447:20
452:7 459:6,7,10
459:12 467:15,18
471:15 474:11
528:1 540:2
**documentation**
335:8,16,23 336:3
369:19 376:10
377:11 379:3,20
496:23 497:8

**documented**
376:12
**documents** 276:22
429:1 434:20
436:5 501:4
**doing** 279:7 297:3
301:19 346:2
359:21 384:24
390:21 397:16,18
412:22 429:11
444:19,22,24
450:23 452:4
453:8 454:1,14
461:13 462:3
476:18 485:14
492:25 494:21
511:21 513:8
553:23
**doj** 446:10,15
**don** 278:17 293:7
362:14 365:2
374:10 551:6,20
**donald** 270:16
**door** 310:22
479:18 484:22
485:5,7,8
**dosage** 538:22
539:7 542:20
543:1
**doubt** 512:24
**download** 553:15
**downstream**
439:21
**draft** 276:12
356:23 425:4
**draw** 312:11
359:18 445:10
**drawing** 359:24
**drew** 305:24
375:21

**drive** 271:9 360:19
**drug** 272:19 275:6
276:19 280:6
292:10,25 297:11
321:11 323:1
324:25 358:19
370:22 375:8
380:22 381:23,23
381:24 538:21
539:6
**druggist** 418:9
419:4 424:23
**druggists** 416:21
417:10 420:24
425:7
**drugs** 314:10,12
315:2 323:13
337:25 381:19,20
381:21 409:24
442:3
**ds** 328:5
**dtayman** 270:6
**due** 285:4 331:11
331:15,18,25
332:7,19 334:13
334:23 347:3
357:15 360:11
369:20 372:5,13
372:17 373:2,14
374:3,19 406:16
444:20,24 448:23
449:22 450:23
451:15 452:20
453:8 454:1,14
476:4 494:23
496:4,8,24 497:8
516:16 551:16
**duly** 556:6
**duplicate** 364:22
**duties** 282:19
290:10,19 327:11

**duty** 443:10

**e**

**e** 273:8 274:8
275:3 276:1
277:23 278:1,1
332:18 334:6,12
457:2,10 512:12
512:17,25 513:4
513:16 530:10
551:5,20 552:8
**earlier** 363:7
407:10 434:20
535:20 536:1
**early** 303:7 462:17
509:18
**easiest** 545:5
**easily** 400:23
**eastern** 268:3
274:16
**ecah** 276:16
**edi** 463:15,16,17
463:22 464:4
465:1
**edited** 512:5
**editing** 511:14
**edits** 512:6,7 513:5
**educated** 507:13
**eekhoff** 270:17
**effect** 327:1 382:2
430:20 512:15
**effective** 276:14
302:22 304:8,15
315:4 316:10
332:17 334:6,11
344:9 366:1 443:5
449:17 450:20
451:12 491:12
**effectively** 421:15
**effectiveness**
290:1

**effort** 322:3
438:15 439:8
**efforts** 322:13,17
323:16 467:24
546:9
**either** 292:18
302:17 370:20
411:13 457:12
462:22 512:3
540:16 545:22
**electronic** 460:19
463:18 467:20
**electronically**
459:24
**elements** 291:8
460:20 463:20
467:21
**eleven** 439:22
**eliminate** 440:5
**ellis** 271:12 273:19
**email** 557:17
**emainigi** 272:11
**embarcadero**
271:18
**emphasis** 304:6
**emphasized**
366:16 505:22
**emphasizing**
421:8
**employ** 494:6
**employed** 284:18
556:12,16
**employee** 358:16
556:15
**employees** 359:3
491:10
**employment** 282:7
282:9
**enacted** 303:7
**enactment** 348:13

enclosed 557:11
enclosing 425:4
encompass 383:25
encountered 289:6
  298:6
encourage 359:3
endemic 421:13
endorse 345:11,22
ends 363:9
enforce 324:18
  416:15 426:19
enforcement
  275:6 276:19
  280:6 285:22
  292:10,25 297:12
  321:11 324:1,10
  328:10 360:17
  370:22 545:19
  549:22
enforcing 435:10
engaged 279:14
english 272:3
ensure 325:5
entered 452:14
  453:16 459:14
  469:14 559:9
entire 367:20
  398:15 558:5
  559:5
entitled 415:21
  417:7 459:13
  473:18
entity 391:12
enu 272:7
enumerated 288:4
envisioned 326:1
eppich 273:14
  276:6 362:14
  391:17 392:5,24
  393:6,14 452:22
  452:25 454:3

464:22 474:6,10
476:8,13,23
535:11,13,14
536:6 537:8 538:6
538:11 539:3,13
539:22 540:10,17
540:20,25 541:2
542:3,16,18 543:7
544:12 545:7
546:4,12,18,22
547:9,21 548:4,9
548:14,22 549:7
549:14 550:3,11
551:3,11 552:1,23
553:3,11 554:7,10
554:21 555:1
errata 557:13,18
  559:7,10,18 560:1
especially 340:1
esq 270:3,7,12,16
  270:17,21 271:2,8
  271:11,17,20
  272:2,7,7,8,8,15
  272:20 273:2,8,8,9
  273:14,18,19
  274:2,3,8,12,17,22
  275:2,3,4,5
essentially 494:4
  513:22
established 359:17
  359:22
establishing
  433:10
et 268:9,11,13,14
evaluate 357:25
  361:10
event 361:15
  460:23
events 530:24
everybody 291:17
  336:23 421:22

493:25 505:21
  515:16
evidence 399:17
  470:15
ex 455:10 456:24
exact 435:23
exactly 503:19
examination 276:2
  278:12 383:6
  478:15 512:23
  535:12 549:6
  554:4
examining 398:11
example 299:20
  306:20 337:22
  377:14 380:18
  458:20 464:18
  466:2,10 469:15
  475:17
examples 303:16
  313:19 363:19
  508:16 510:20
exceed 375:9
exceeded 305:25
exceeds 375:2
  433:20
exception 406:18
excess 306:4,13
  307:6,22 408:19
excesses 489:7
excessive 306:16
  306:20 310:5
  337:21 346:21
  354:23 355:16
  367:2 368:10,14
  368:18 369:1,4
  410:13,14 420:3
  425:2,11 433:9
  487:8,11,14 488:2
  488:13 489:8,14
  490:11 491:24

492:7 493:16
494:12,18 525:15
525:16,21,24
exchanged 461:4
excuse 288:10
  424:2 541:15
  544:16
executed 559:10
execution 558:14
  559:19
exercise 331:11,14
  332:19 334:13,23
exhibit 276:9,10
  276:12,14,17,19
  276:22,24 277:2,3
  277:5,7,9,11,13,15
  277:16,17,18,20
  277:22,23 280:19
  280:20 281:3
  288:15,17 295:6
  295:17,18 305:6
  306:3,12 307:4,16
  309:2 310:4
  318:11 320:12,15
  320:25 341:16,19
  341:22 342:20
  346:21 355:16
  356:12,13,16
  362:13,15,15,18
  362:19 363:3
  370:4,6 386:3,6,17
  401:21,22 407:7
  415:7,16,17 417:7
  423:17,17 424:1
  429:6,12 435:23
  436:3 437:15
  438:1,8 442:5,9
  459:2,6 460:20,22
  467:7,9,21 468:17
  469:23 471:7,12
  473:6,8 495:18,22

508:4,5,11,13
527:15,16,19
539:14,17,23
551:4,9
**exhibit's** 415:11
**exhibits** 276:8
277:1,25 429:10
508:8
**exist** 332:7 339:18
340:23 351:2
353:3
**existed** 340:25
351:6,8 364:2
426:20 525:21
**existence** 329:24
330:3 482:22
486:1 526:7
**existing** 380:20
**expand** 358:19
**expect** 377:25
**expects** 357:24
**experience** 284:2
291:11 297:13
299:24 301:2,12
303:2 305:17
306:2 308:4,10,16
309:13 310:25
311:15,24 312:16
313:14 317:23
322:2,16 324:6
325:8 327:5
328:11 329:18
330:11 334:23
339:6 340:17
345:19 346:15
347:5 348:1 351:3
351:9 361:24
376:1 378:7
382:14 406:23
419:14,17 449:9
489:5,11 490:8

499:2
**experiences** 298:4
**experiencing**
421:14
**expert** 290:8
**experts** 482:21
**expiration** 558:19
559:25 560:25
**expires** 556:24
**explain** 339:4
**explained** 281:3
336:13 528:3
**explanation**
399:12,13 400:10
**explicit** 346:9
**explore** 491:19
**express** 311:24
**expressing** 432:17
**expressly** 326:24
**extended** 433:22
**extent** 285:23
286:24 287:12
288:2 292:17
332:23,24 333:10
333:11,22 447:8
452:2,6 482:3
485:20 505:18
510:4,24 514:1,2
515:6 520:9
528:17 531:25
545:19 550:19
**external** 356:24
**extra** 553:21
**extraordinarily**
543:15 544:3
**extremely** 400:9
**eye** 270:4 332:16
334:10

**f**

**f** 277:2
**face** 351:25 353:12
**faces** 323:2
**facets** 279:12
**facilities** 453:19
**facility** 448:21
449:16
**fact** 281:11 292:23
297:17 312:8
318:11 328:13
332:14 333:14
334:8 378:5 408:6
408:13 409:16
415:6 420:1
422:21 424:25
425:9 442:3
458:13 463:14
475:20 488:16
492:23 503:16
504:2,14 516:10
516:10 525:7
527:8 532:20
533:1,3,7,22 534:7
534:14 535:2,7,8,9
**facts** 290:9,17
491:11
**factual** 284:2
**failing** 328:20
491:12
**failure** 316:10
328:8 331:14
334:22,23 337:8
449:16 450:19
451:12 452:15
453:6,18
**fair** 280:3 333:20
339:25 348:22
395:8 406:2
411:19 412:14
423:1 426:22

450:12 451:24
454:2 463:10
494:7
**faith** 404:25
**fall** 493:24
**familiar** 320:2
342:13 364:12
378:18 403:7
430:9 435:5
441:15 466:23
471:22 472:1
495:3 551:13
**familiarize** 527:11
**far** 358:15 425:8
477:15 482:24
485:3 511:23
548:2
**farrell** 270:21,22
**fast** 494:15
**fda** 380:18
**federal** 289:17
347:4
**fedex** 391:6,6,11
**fee** 461:1
**feel** 282:21 495:8
509:13 516:14
**felt** 299:25 516:10
**fentanyl** 537:24
**fentora** 466:18
**fewer** 421:16
**field** 279:9,21
280:1,9 301:23
329:11 346:4
377:5 384:1 405:7
405:20 416:8
419:13 420:17
430:21 431:6
432:2 450:3
487:19 488:1,8,24
547:8,13,24
548:25,25 549:16

[field - front]                                                                 Page 19

553:5
**fields** 473:20
**fifteenth** 273:20
**fifth** 270:4 529:25
530:18,20
**figure** 458:5,23
484:8
**file** 531:1
**filed** 447:20
**filing** 531:6
**fill** 432:15
**filled** 357:23
**filling** 331:11
332:21 334:15,25
348:20 349:25
**final** 285:18 379:4
**finally** 290:23
379:16
**finance** 273:18
**financially** 556:17
**find** 295:9,11,14
402:18,21 557:11
**fine** 397:6 400:14
400:20 445:19
446:9
**fines** 337:10
**finish** 468:11
506:1 520:22
521:1
**finkelstein** 275:4
**firm** 376:14
532:10,17,22
534:7,7 535:3
**first** 277:11 280:4
282:5 311:14
316:13 318:16,18
321:9 322:22
337:20 346:3
352:7 378:21
383:11 387:11
447:1 453:9,25

454:13 460:8
471:16 480:20
484:20 536:1
545:23
**five** 281:11 460:24
461:4 467:25
486:24,25 551:2
555:12
**fix** 333:21 334:1
**flag** 300:9,13
301:7
**flags** 301:9,21
546:14
**flash** 305:4
**flip** 363:2
**floor** 270:4,13
271:9 274:13
**florida** 453:21
**flow** 287:4
**flowed** 475:3
**flowing** 474:15
**focus** 324:17
**focused** 411:25
**folded** 490:23
**folks** 514:10
**follow** 278:24
361:12 400:21
451:21 549:15
**following** 327:14
420:16 460:24
467:25
**forbidding** 483:5
**foregoing** 285:24
556:3,5 558:13
559:18
**forgive** 541:19
**forgo** 440:25
443:10,24
**form** 282:25
283:21 286:20
291:13 292:15

294:23 301:16,25
305:18 307:7
308:8,18 309:15
319:18 342:2
354:6 357:15
361:1 364:16
388:13 396:5,21
396:25 397:2
398:15 399:15,20
400:10 403:3,15
406:25 428:12
448:12 452:22,25
454:3,10,16
465:14 469:20
474:6 476:8,13,23
491:15 497:3
500:14 501:7,24
504:17 505:17
506:14,15 507:16
507:17,25 509:23
512:21 518:18
519:13 523:1,21
524:14 525:13
526:2,3,11,12
527:4 528:9
530:15 531:14,22
533:5 538:5,9
543:4,17 545:3
554:23
**format** 460:19
463:17,18 467:20
469:23
**formed** 400:6
**forming** 321:14
**fort** 541:5
**forth** 436:23
460:22 464:8
465:3 497:23
511:14 512:19
513:14

**forum** 395:15
**forward** 399:10
432:9 434:14
557:15
**found** 306:7
540:11 547:11
**foundation** 301:17
307:8 308:19
322:9 343:18
360:4 367:13
368:12 391:16
396:17 409:21,23
448:13 453:1
491:16
**four** 286:15 287:4
343:24 367:17
481:17 518:12
**fourth** 284:25
529:23,25
**fox** 274:23
**foxrothschild.com**
274:25
**frame** 411:2 415:2
491:25
**francis** 275:10
**frankly** 528:19
**fraud** 275:5,7
**free** 509:13 516:14
558:14 559:20
**freight** 391:6
**frequency** 298:17
329:16 330:13
351:18 353:2
**frequently** 299:25
460:22
**friends** 507:7
**front** 280:21,25
364:22 386:23
495:8,11 498:20
508:8 522:24
545:23

**fulfill** 310:16
312:9,10 340:12
408:22
**fulfilled** 409:3
**fulfilling** 311:4
**fulfillment** 375:7
**full** 371:16 377:15
**fuller** 275:9
**fully** 376:12
**fulsome** 505:4
**function** 324:1
325:25
**functions** 323:23
544:19,21
**fundamental**
443:4
**furnish** 337:9
**further** 399:4,4
443:8 460:12
478:15 547:5
556:14

**g**

**g** 278:1 284:10
**game** 348:22
**garbage** 398:19
**gather** 309:23
456:19
**gathering** 289:25
**general** 282:6,9,19
282:22 292:18
297:18 327:2
344:7,19 517:25
547:22 548:5,23
**generally** 278:19
378:13 384:12
412:20 477:3
545:1,20 546:23
546:25 547:2
552:15
**generate** 538:20
539:5 543:8

**generated** 436:6
542:5,19,25
**geoffrey** 273:8
**geographic** 433:13
**geriatric** 300:24
**getting** 405:19
462:5 469:15
476:2 479:16
**ghobart** 273:12
**gist** 412:10 518:1
**gitchel** 424:16
**give** 281:12 285:20
303:16 313:19,20
336:13 343:20
349:18 371:16
386:5 403:13
404:13 424:7
429:5 437:3
442:15 466:10
524:18 527:14
540:24
**given** 282:8,21
328:2 334:5
377:14 403:8
451:3 493:22
555:10 556:11
**gives** 302:18 404:8
**giving** 283:25
284:1 286:3 289:4
290:8 302:5
323:10 329:19
334:17 357:17
366:11 450:11
451:22 494:14
541:4
**go** 280:15 281:15
288:19 294:1,10
295:1 296:11
304:14 308:23
309:19 311:5
313:23 316:17

322:12 329:1
335:20 336:9
342:24 361:7
365:20 382:14
387:3,9,15,18
389:23 390:6,13
390:20 391:4
392:1,13,20 393:2
393:7,11,18 394:2
394:16 395:22
397:3 398:22
399:1,10 401:14
407:5 408:3
423:25 430:16
445:22 446:5,9,21
447:1 456:25
463:20 466:9
473:18 477:18
478:5 480:9,9
484:8 485:3,3
506:1 514:20
515:1 517:13
532:3 533:8,10
534:16,20 540:21
541:6 549:24
555:1
**goal** 395:13
**god** 292:21
**goes** 332:12
337:19 348:13
351:14 379:2
399:3 419:24
433:19 464:25
510:4 547:19
**going** 278:4
280:23 290:16
291:7 294:3 305:4
309:20 329:1
339:10,13 341:4,9
359:3 372:2
374:11 381:23

382:3,20,25
383:21 393:16
397:4,10 401:8,20
402:18,19 415:6
415:11,11,15
423:16 424:13
428:1 429:5,15
430:12 434:6
437:5 438:9
441:20 442:8,22
445:23 446:15,17
452:1 454:18,22
455:2 456:5 457:5
459:5,9,10 460:16
467:6,7 468:2,6
470:16 471:6
473:5 478:7,11
479:13,15 481:1
484:6 485:11
494:18 496:21
515:5 521:17,22
529:22 533:8,11
533:15 535:5
539:19 540:8
541:18 547:17
555:3
**good** 278:3,15,16
336:4 367:17
374:3,7 379:21
383:9 396:3 397:8
400:3,6 404:25
423:22 424:11
428:20 438:14
439:7 442:24
478:18
**gotten** 498:1
**government** 292:9
348:22 417:3
455:16,20,21
456:13,15

grams  538:22
  539:7
grant  274:14
granular  472:12
gray  274:3
greater  301:1
  372:18
greene  270:22
grievously  547:5
grounds  315:13
group  389:9,16
  409:13 410:7
  417:19 422:5
  544:14
groups  313:13
growing  323:14
guarantee  316:9
  519:21
guess  483:9
  507:13 533:5
  536:10
guidance  371:21
  373:13 375:12
  376:10 377:19
  379:12,21 380:3
  380:24 381:9
  451:3 524:11
  525:8 549:18
guided  418:10
guideline  526:17
guidelines  276:18
  370:15 371:17
guys  477:22,24
  507:7
gx  274:2

**h**

h  290:4 321:20
h.d.  274:7 392:2
  402:3 498:24
  512:11 520:4
  522:6 523:7

528:16 531:5
half  481:23 553:22
  554:18
hand  386:2 401:20
  415:11,15 442:8
  459:5,9 464:9
  473:5
handed  386:16
  437:18
handle  328:2
handler's  277:3
handlers  325:1
  435:6,12 436:7,15
  436:22 437:19
  438:8 443:15,18
hands  310:15
hang  402:17
  446:25 520:19
happen  320:20
  399:23
happened  292:2
  455:14,24 482:21
  528:22 529:6
happening  293:9
  493:11
happenstance
  482:21
happy  368:3
  370:10 397:21
hard  456:15 458:1
  458:13,18 494:15
harm  340:4 409:4
hbc  274:11
hda  356:1
hdma  276:12
  356:1,6,23 357:8
  358:4,23 360:2
  362:23 369:24
  370:1,17 371:3,8
  371:20 372:17,23
  373:7,24 375:1

376:9,10,18
377:10,20 379:8
379:21 380:9,25
493:1
hds  276:13,23
  402:2
he'll  507:6
headquarter
  280:6
headquarters
  287:5 295:22
  321:10 487:19
  488:12
heads  333:16
health  272:6
  277:13 323:14
  327:2 342:21
  343:14 370:14
  386:14 390:7
  429:19 431:2
  448:20 449:15
  453:4 472:2,5
  473:14 478:16
health's  450:18
  451:10
healthcare  370:16
  373:24
hear  299:16
  395:24 506:25
heard  416:20
  424:21 458:14
  554:21
hearing  427:2
heart  300:25
held  269:1 282:20
  282:24 399:7
  415:13
help  298:1 359:7
  359:10 361:4
  372:6 402:21
  448:4 475:25

476:2,20 541:7
helped  296:4
  428:3
helpful  398:2
  462:2,2,8 540:13
helps  387:19
hem  532:4
henry  273:2
  356:19 392:14
hereof  460:21
  467:22
hereto  460:20
  467:22 556:16
high  282:23
  472:11,13
higher  287:4
  360:11
highlight  404:20
highlighted
  356:21 357:13
highlighting  365:3
  374:12 433:4
history  282:7,10
  294:21 309:13
hit  395:24
hmm  400:5
hobart  273:8
honest  423:6,10
hope  292:21 354:7
  387:25 523:14
horrible  429:10
hour  456:21
  481:21,23
hours  435:10
  553:22 554:19
house  390:8,15
houston  384:20
  385:6,14 386:21
  389:18 390:23
  391:8 392:23
  402:1 404:9

409:19 497:20
498:12 500:17,25
**houtz** 274:17
**hsi** 356:17 362:16
**huh** 349:5 408:21
**hunter** 270:12
278:21 383:10
397:18 457:23
478:20 484:22
**huntington** 270:23
**hydrocodone**
279:19 337:23
449:18 450:21
451:13 537:24
541:14,23
**hysingla** 471:21
471:22

**i**

**idea** 333:2 397:23
413:20 442:24
502:17 554:9
**identifiable**
473:21
**identification**
320:13 341:17
356:14 362:20
370:7 377:12
386:7 401:23
415:18 429:13
437:16 442:6
459:3 467:10
471:13 473:9
495:19,23 527:17
539:18 547:12
549:9 550:14
551:10,21 552:16
**identified** 287:1
375:21,24 414:20
473:22 526:21
547:22 548:16,24
549:10

**identifier** 473:22
**identify** 281:11
309:6 366:24
414:6 419:2 443:7
443:24 453:18
483:1 515:19
543:14 544:2
546:5,14,19
547:13,23
**identifying** 483:6
550:12 551:14
552:2
**ii** 268:18 270:7
278:7 468:21
470:4 557:8 558:4
558:9 559:4,13
560:20
**illegal** 326:25
489:6,13 490:10
**illicit** 323:24
432:16 438:13
439:6 440:23
**illicitly** 381:19
**illinois** 271:22
453:20
**illustrate** 364:19
**imf** 473:14
**immediate** 444:9
445:8 448:19
449:14 450:17
454:7
**immediately** 316:3
418:5,12 419:1
422:13
**impaired** 290:2
**implement** 324:2
**implementing**
420:12
**implicit** 346:9
**importance**
299:11 304:10

406:15
**important** 299:13
299:19 300:17
359:2 366:3,16
506:7 521:1
534:23
**impossible** 362:4
**impoverished**
359:20
**impressing** 434:7
**impression** 436:5
**impressions**
291:23
**improper** 489:6
489:12 490:10
**impropriety** 535:4
**ims** 277:13 472:2,2
472:4,5,25 473:14
473:23 474:14,19
475:1,4
**inappropriate**
399:21 533:24
**incentive** 328:4
**include** 313:1
329:13 353:10
358:20 360:24
377:11 379:3
380:12 404:25
464:8 470:14
514:9
**included** 277:25
406:18 455:21
465:2,7 537:23
557:13
**includes** 313:2
**including** 289:15
313:7 379:5
380:15 471:19
**inclusive** 298:6
352:6

**incompatible**
443:23
**incorporated**
393:4 411:4
559:12
**increase** 353:22
**independent** 331:1
350:12 351:1
**independently**
370:21 373:21
**indiana** 272:14
274:9
**indianapolis** 274:9
**indicated** 397:22
491:11
**indicates** 344:24
**indicating** 354:23
502:13 550:7
557:13
**indication** 380:19
**indicative** 337:20
**individual** 361:25
474:4 547:17
548:3
**individually**
548:13
**individuals** 404:11
480:4 515:8,20,22
**industrial** 331:14
**industry** 276:17
301:14 312:21
313:22 316:4,7
347:1 360:17
362:10 370:15
371:17 384:19
385:20,22 386:20
396:11 401:15
402:9 406:21
409:17 410:8
417:1,18,19 419:3
419:4,19 420:5

427:2 428:1 448:9
454:13 463:22
531:1
**industrywide**
314:14 315:7,9,15
342:22
**influenced** 400:23
**inform** 329:10
343:9 347:17
405:7 431:4
452:17 550:14
**information**
288:21 289:6,13
289:24 290:9,17
294:19 316:20
318:12 343:21
361:15 373:17,19
373:20 377:16,17
379:18 380:21
395:14 413:2
447:9,13 462:4,10
463:15 464:8
465:3 470:2
472:12 473:20
474:3 545:22
546:3 549:18
550:8,21 552:10
**ingredient** 305:7
306:4,12 355:17
435:22
**initiative** 287:17
322:18 323:17
324:18 325:10
326:7 327:6,18
328:19 329:20
334:18 337:2,14
338:2 340:16
345:15 346:16
347:21 350:21
352:9 355:4 356:5
358:11 492:8

536:8
**initiatives** 338:12
**ink** 425:5 510:17
511:12,21 512:19
513:5
**inmate** 519:19
**inquiry** 405:1
**inside** 400:1
**insightful** 462:15
**inspect** 361:12
**inspections** 360:25
488:17
**institutional**
426:16
**instruct** 547:17
**instructed** 447:17
**instructing** 515:24
550:5
**instruction** 366:10
515:12,14 546:16
548:1
**instructions**
514:12 549:18
**insurance** 299:23
299:24
**insurances** 299:24
**intelligence**
289:25
**intend** 326:14
372:20
**intended** 373:5
438:13 439:6
456:23
**interact** 285:11
**interaction** 285:2
361:19
**interactions**
285:12
**interchange**
301:18

**interest** 302:21
315:13 370:25
375:1,6,11,19
**interested** 556:17
**internal** 289:13
510:4,25 511:22
513:14,20 514:3
515:7,21 547:16
**internally** 548:13
552:20 553:9
**internet** 279:14,16
279:19 295:20
296:16,20 298:11
302:10,14 303:18
304:18 313:22
314:4,13,19 315:6
315:14 316:5
509:14 510:9
516:4 519:16
**interpretation**
285:21 286:1,4
436:6 452:3
524:11 525:8
**interpretations**
292:1
**interpreted**
421:19 535:6
**interrupt** 520:2
**interrupted**
468:19
**interviews** 477:2
**intimacy** 520:8
**introduced** 288:18
383:11
**introduction**
372:3
**invalid** 314:10
**inventories** 537:12
**inventory** 277:7,9
277:11 459:8,13
459:24 460:11

461:3 467:8,12,17
469:24 471:16
**investigate** 373:21
427:3
**investigated** 379:5
**investigation**
279:14,17,18,20
288:22 316:15
336:16 376:13
379:4,20 384:11
441:21 443:11
444:20 445:6,13
447:10,14,19,22
452:3 460:5 477:4
**investigations**
279:11 280:1
301:23 376:11
378:12 384:6
406:16 447:7
460:3 477:2
**investigative**
289:25
**investigator** 279:8
430:7
**investigators**
488:21 527:3
**involved** 280:10
339:10 340:17
360:17 441:25
457:9,13,18 515:9
515:11,23
**involving** 455:20
**irresponsibility**
432:18
**irs** 336:18
**issue** 299:19 300:5
369:18 413:19
448:2 457:1 485:2
495:4 530:10
**issued** 444:8,10
448:6 449:15

450:16 451:9
454:8 479:17
**issues** 297:25
298:5,16 302:4
417:2,4 524:12
**it'd** 354:1
**items** 298:5,7

**j**

**j** 268:19 269:1
270:12 271:17,20
276:2
**james** 270:7 349:6
354:7
**james.bennett4**
270:10
**janssen** 271:7
**january** 277:4
437:25 451:11
453:15
**jbarker** 271:10
**jeffrey** 271:8
**jennifer** 272:8
273:18
**jennifer.levy**
273:21
**jersey** 450:18
453:20
**job** 268:25 415:25
416:14 462:3
506:4
**jodie** 275:8
**joe** 320:6 321:14
503:4
**johnson** 271:7,7
**join** 554:2
**joined** 357:11
487:9 537:19
**jointly** 510:13,14
**jones** 271:17,21
**jonesday** 271:19

**jonesday.com**
271:23
**joseph** 341:24
**jr** 270:21
**judge** 268:7
522:24 523:8,17
523:25 527:20
528:4 530:5,5,19
531:9,18 532:1,3
**judges** 528:5
**july** 459:14
**jump** 460:16
468:2
**june** 415:20 541:4
556:24
**jurisdictional**
279:25
**jury** 525:19
**justice** 270:7
275:2,4,5,6,7
281:9 282:1
285:19 288:14
289:15 292:19
429:18 442:11
**justification** 301:6
**jwicht** 272:12

**k**

**k** 273:14
**kaitlyn** 270:17
**keekhoff** 270:20
**keep** 337:9 399:3
468:6 485:11
521:4
**kelly** 274:24
**kept** 421:15
**ketchum** 270:22
**key** 325:23
**kind** 300:4
**kirkland** 273:19
**kirkland.com**
273:21,22

**klockenga** 275:8
**knew** 350:18
394:9 410:10
422:16 425:22
426:6 491:11
506:10 531:5
**know** 279:4
280:17 281:2
291:6 293:7 331:3
336:20 338:17,22
339:18,22 340:5,5
342:18 343:2
369:25 373:13
389:25 396:17,20
400:5 403:2
412:22 416:15
422:3,22 423:9
424:17 427:25
435:9 441:24
445:19,21 456:11
463:4,16,20
472:18 473:3
474:14,20 475:10
481:4,5,25,25
484:22 486:14
488:20,23 494:5
496:19 499:17
501:16,16 502:10
502:21 504:11
509:8 510:5
516:24 519:18,24
520:3,6 521:11
529:21 530:2
534:17 542:1
544:20 547:4
552:14,14
**knowing** 406:15
533:23
**knowledge** 319:2
319:14 322:3
342:25 349:1,9,11

371:3,9 426:16
436:12,19 462:22
462:23 466:21
476:17 489:10
490:7,13 491:22
492:1,2 493:16
**knowledgeable**
316:17
**known** 328:18
350:18 426:5,13
441:10 458:12
525:22,22 536:11
**knows** 400:11
**krncevic** 271:11
**kyle** 268:19 269:1
276:2 278:8
357:11 358:15,18
361:10,14 555:10
557:8 558:4,9
559:4,13 560:20
**kyle's** 361:13

**l**

**l** 268:24 556:2
**l.p.** 268:9,11,13
271:2
**labeled** 340:2
355:20
**laboratories**
393:12 395:2
**lack** 315:4 462:23
**lacks** 307:7
**lakeland** 449:15
**land** 339:11
**lane** 270:3
**language** 312:23
329:4,17 330:4
343:5 344:17
348:7 353:9
**large** 543:15 544:3
**larger** 364:22
457:3

**lasted** 481:20
**late** 480:19 484:1
**latitude** 482:22
**launched** 553:13
**law** 347:4 406:1
545:18
**lawful** 326:4
**lawson** 530:5,19
**lawyer** 394:18
**lead** 360:16
433:22 509:19
**leading** 367:22
**learn** 482:21
**learned** 294:20
548:6
**leave** 533:21
**lee** 270:3 557:5
**left** 477:12 535:5
**legal** 309:16
327:11,14,18
328:2 491:8
555:12 557:1
560:1
**legally** 372:21
**legislation** 417:3
**legitimacy** 332:20
334:14,24 361:4
**legitimate** 302:24
311:10 314:11
325:1 330:23
331:13 340:10
350:15 353:20
443:13
**lester** 274:17
**lester.houtz**
274:20
**letter** 276:9,10
277:5 281:19
290:4 321:14
322:23 331:8
337:6,18 341:23

342:7,13 343:5,7
343:12,17 354:16
424:4,14,22,24
434:24 442:10
494:17 503:15
504:13 507:22
557:19
**letters** 319:22
320:2,3 503:4,9,23
506:12 517:22
518:1
**letting** 311:5
**level** 282:23
360:11 372:18
421:15 461:17
465:7 470:6,16,25
472:11,11,13,22
474:8,15 475:2,19
475:20 490:21
544:25
**levels** 297:9
385:21 544:18
**levy** 273:18
**lexington** 270:13
**liaison** 318:23
**license** 277:7,9,11
459:8,14 460:10
460:14 461:1
467:8,12,17 471:1
471:17
**lies** 411:11
**lieu** 344:6
**life** 528:24 529:1
**liked** 419:18
420:22 426:5,12
427:24 428:8,25
**limit** 305:7,25
306:1,1,2,4,12
355:17
**limitation** 285:14

**limited** 284:19
302:9,13 314:13
314:18 337:21
338:7 352:15
386:9
**limits** 360:18
**line** 411:16 520:22
521:2 524:7,18
557:13 559:7
560:3
**lines** 499:15,20,24
**list** 281:17 386:19
387:13,17 388:25
389:24 435:22
466:21 468:16
**listed** 318:5 559:7
559:17
**listening** 523:10
**listing** 559:7
**lists** 380:9
**litany** 517:1
**literally** 320:22
**litigation** 268:6
278:20 292:11
356:20 370:23
383:20,22 441:23
524:12 535:16
557:6 558:3 559:3
**little** 287:20 291:6
369:23 381:25
387:4 482:23
492:15 496:19
**llc** 270:17 272:14
273:18 274:2
388:9
**llp** 269:7 270:3,22
271:3,8,12 272:9
272:15,21 273:3,9
273:14,19 274:3,8
274:13,18,23

**loading** 398:18
**lobbying** 422:5
**local** 347:17
544:18,25 552:11
**located** 279:22,24
**location** 358:17
376:14 401:17
**locations** 359:5
373:5
**locke** 273:3
**lockelord.com**
273:6
**logan** 272:21
**long** 435:10
441:10 455:11
481:18 484:2
486:22 512:8,9
550:23
**longer** 346:12
467:24 478:1
494:11,18 521:5
526:8
**look** 298:7 301:5
317:1 321:3
322:22 341:23
357:3 358:16
359:4 363:10
373:12 399:10,19
417:6 429:17
430:5 499:14
508:2 515:1
517:13 529:16
534:21
**looked** 375:22
378:5 402:7 435:3
443:17
**looking** 299:11,18
317:7 352:17
391:5 399:2 423:5
491:18 517:9
539:25 540:23

**looks** 390:6 541:23
542:2
**lord** 273:3
**los** 273:15
**losses** 405:2
**lost** 287:20 464:10
474:22 532:11
543:18
**lot** 510:17 535:24
538:7
**loud** 505:9,14
530:18
**low** 472:11
**lower** 366:3
421:15
**lunch** 455:1,9,12
456:5 458:12,15

**m**

**m** 272:2,15,16
274:12 275:4
281:19
**ma'am** 478:22
479:10 480:6
486:9,17,21 487:2
487:6,13,17,23
488:10,15 489:9
489:15,19,20,23
491:5 492:4,22
493:4,8,12 495:2,6
496:7 497:4,10,24
498:7,19,25 499:3
499:6,9,13 500:1
502:12,19,25
503:7,11,13,25
504:8,23 505:3,7
505:11 506:8
509:6 510:18
511:8,8,15,19
512:9,16 513:6,11
513:19 516:13,17
516:25 517:6,12

517:16 518:5
519:3,8 520:1
522:11,19 523:9
523:22 524:3
526:4,15,23
527:13,24 528:10
530:7 531:16
532:6,15,18 533:6
**machine** 507:3
**madam** 557:10
**mail** 277:23 457:2
457:10 513:16
551:5,20 552:8
**mails** 512:12,17,25
513:4 530:10
**main** 271:13
449:16 549:25
**mainigi** 272:7
276:5 282:2,25
283:21 284:5,13
284:22 285:15
286:5 287:6,18
288:7,10,24 289:8
289:19 290:3,12
290:20 291:3,12
292:3,15 293:6,23
294:8,13,23
296:18,22 297:5
297:15,20 298:13
298:21 299:2,8,21
300:6,10 301:16
301:25 302:6,11
303:3,8,13,24
304:11,20,25
305:14,18 306:6
306:14,18 307:1,7
307:18,24 308:7
308:13,18 309:7
309:15,25 310:7
310:23 311:1,16
311:21 312:1,5,18

313:15,24 314:7
314:15,23 315:8
315:16,21 316:6
316:23 317:4,11
317:19,25 319:3,8
319:17,24 320:4
320:16 321:23
322:8,19 323:7,18
324:7,13,20
325:11,19 326:8
326:15 327:7,21
328:15,23 329:21
330:1,6,15,19
331:5,19 332:1,9
333:6 334:19
335:3,10,17,25
336:6 337:3,15
338:4,13,19 339:1
339:7,20 340:9,19
340:24 342:10,14
342:19 343:1,15
343:22,25 344:21
345:7,16,24 346:5
346:17,23 347:6
347:12,22 348:2
348:10,17,21
349:4,6,10,18
350:3,8,23 351:4
351:11,21 352:2
352:10,23 353:6
353:13,19,25
354:6,13 355:5,11
355:14,22 356:2
357:18 358:6,12
358:24 359:6,13
360:3,12 361:1,21
362:2,9 363:14,22
364:4 365:1,18
366:6,12,17 367:6
367:12,18,23
368:11,23 369:8

369:15 370:2,11
371:4,10,24
372:10,14,24
373:8,25 374:6,22
375:13,18 376:2
376:19,25 377:7
377:21 378:2,10
378:22 379:9,13
379:23 380:4
381:3,11,15
382:10,16 384:2,9
384:25 385:16,25
386:11 387:22
388:1,5,11 389:4
390:2,9 391:15,23
392:4,11,17
393:23 395:18
396:4,15,22 397:1
397:6,18 398:13
399:2 400:14,20
401:2,18 402:11
403:4,14 404:1,15
405:14,21 406:3
407:1,20,25 408:8
408:15 409:9,22
410:9 411:3,9,17
411:20 412:6,16
412:23 413:4,16
413:24 414:8,13
414:23 415:4
416:4,11,16,25
417:14,23 418:15
418:21 419:7,12
419:20 420:7,19
421:2,6,25 422:7
422:18 423:2,12
424:18 425:12,16
426:2,8,14 427:7
427:21 428:4,13
428:21 429:4
430:22 431:13,19

432:10,22 433:16
434:2,9,16,21
435:1,17 436:8,16
437:1,7,11 438:21
439:12 440:6,14
441:4,12 443:19
444:4,15 445:1,5,9
445:12,15,18,25
446:4,9,12,15,19
446:25 447:4
448:15 449:1,5,10
449:24 450:7,13
450:24 451:5,17
451:25 453:12
455:22 457:16,22
458:9 461:7,21
462:13,25 463:11
463:24 464:15,21
465:15,24 466:6
466:15,22 467:4
468:22 469:4,10
469:18 470:8,19
471:3,23 472:6,9
472:23 473:1
474:17,21 475:7
475:12,21 476:7
476:14,24 477:11
477:16,25 478:5
478:17 479:18,20
481:4,9 482:7,15
482:19,25 483:5,9
483:12,19,24
484:7,10,18,25
485:4,10,15,22
486:4 487:24
489:3 490:2,25
491:6,21 492:13
492:17 495:12,14
495:16,20,24
496:15 497:5,16
499:19,23 500:20

501:9,17 502:3
503:21 504:9,18
505:23 506:23
507:2,9,19 508:1
508:10,13,15,18
508:20 509:24
510:7 511:3,24
513:2 514:7,16,22
514:25 515:18
516:2 518:22,25
519:10,15 520:13
520:16,19,21,25
521:3,14 522:3,20
523:5,16,23 524:8
524:20,21 525:2
525:18 526:5,13
527:7,14,18
528:13,20 529:13
530:16 531:8,17
532:2,7 533:2,8
534:8,13,16,20,24
**maintain** 297:7
304:8,15 316:10
332:17 334:6,11
344:8 366:1 443:5
450:19 451:12
452:15 491:12
**maintaining** 325:3
**maintenance**
302:22
**major** 319:15
506:3
**maker** 288:5
**making** 312:9
367:10 370:23
404:25 410:22
431:25 432:5
440:3 491:1
507:13 535:5
**mallinckrodt**
274:2 392:21

**man** 410:3
**management**
370:16
**manner** 435:14
464:7
**manor** 274:23
**manual** 277:3
430:7,8,9,20 431:1
431:16 435:6,12
436:7,15,22,23
437:19,21 438:8
443:15,18
**manufactured**
469:9
**manufacturer**
411:14 412:2,11
412:21 414:19
459:25 462:4
463:8 464:13
465:23 466:3,12
470:3,17 471:1
474:2 475:18
538:13
**manufacturers**
313:9 328:1 343:8
344:8,10 371:7
385:23 391:22
395:10 413:11
436:11,13 450:3
462:10,18,24
465:12 475:10
476:2 537:2,10,15
537:17
**mapes** 286:19,22
287:9,9,12,24
318:5,6,13 384:23
395:12,12 403:21
403:24,25 404:8
409:12 411:1
449:19 451:22
501:5,11 502:23

509:4,9,19,25
510:12,16 512:7
513:9 514:9 515:9
515:20
**mapes's** 404:14
408:4 410:21
**march** 268:21
278:5 471:18
527:22 557:4
**marcus** 274:13,15
**mariama** 275:5
**mark** 415:7
423:17 467:7
539:13 551:4
**marked** 320:12
341:16,19,22
356:13 362:19
370:6 386:3,6,17
401:21,22 415:16
415:17 429:12
437:15 442:5,9
459:2,6 467:9
471:12 473:8
495:18,22 508:8
527:16 539:17
551:9
**market** 272:3
409:7 432:16
**markets** 440:23
**marking** 429:6
473:6
**markings** 423:21
**martin** 274:22
**maryland** 453:21
**massachusetts**
274:5 453:22
**master** 275:1
294:9 397:5,12,15
398:22 399:9
400:15,25 401:4,7
455:11,19 457:14

483:10 514:14,20
**masters** 272:8
**material** 363:5
**matter** 384:7
487:4 524:16
532:9,9,20 535:1
**matters** 370:23
**mccarter** 272:3
**mccarter.com**
272:5
**mcclure** 272:20
280:12 284:6
286:20 288:25
293:21 296:7
299:14 300:11,18
307:25 308:6,12
309:17 310:13
320:8 321:17
331:20 332:22
333:10,17,22,25
342:2 364:16
365:2,6,9 370:8
374:10 381:10
385:7 388:12
389:11,20 393:24
403:15 406:25
409:20 431:11
437:22 441:5,18
444:13,25 448:12
463:1 468:4,7,12
468:23 469:5,19
470:9,20 471:4
473:2 474:9 475:8
475:13,22 507:6
**mck** 277:24
**mckesson** 273:7
392:22 452:12
453:16 535:12,15
**mckesson's** 393:3
**mcnamara** 272:7

**md** 268:6
**mdl** 268:5 276:9
276:11,13,23
277:8 356:17
362:16 370:14
402:2 459:7
**mdl2804** 276:18
276:25 277:2
**mean** 309:23
316:13 331:25
346:12 352:13
356:4 392:7
395:21 396:8
406:21 414:11
416:14 421:19
440:5,13 441:8
449:3 463:6
477:22 511:13
528:10
**meaning** 385:20
449:19
**means** 309:14
327:25 381:16,18
440:11 489:24
525:20 536:19
**meant** 422:13
439:20 441:3
451:2,20 514:19
**mechanisms**
328:11
**media** 278:6 341:6
341:11 382:22
383:2 454:24
455:4 521:19,24
555:11
**medical** 302:24
304:15 314:11
331:13 340:11
353:20 393:3
473:24

**medications**
300:25 338:10
**meet** 330:23 453:7
483:13,20 485:16
485:19 486:12,15
**meeting** 276:12
295:21 319:1
332:2 356:23
357:12 397:23
398:1 403:12
480:16 483:25
484:2 485:25
486:1
**meetings** 338:3
346:16 425:20
457:2
**meets** 375:2
**meghan** 273:9
**member** 423:7
**members** 369:25
371:8 377:20
417:11,21 418:6
420:11 425:6
**memory** 499:10
**mentioned** 481:10
496:13 509:17
511:11 516:19
**mentions** 530:6
**merely** 349:24
**meridian** 274:9
**message** 314:21
324:4 325:8 326:5
327:4 337:1 338:1
338:11 340:15
345:3,4 346:15
347:20 350:1,20
352:7 354:4 355:2
355:25 356:10
357:17 358:3,23
360:1 367:4
517:23

**messages** 334:17
337:13 358:10
**messaging** 345:14
**met** 375:9 383:13
422:11,16 426:23
479:1,6,9,12,21,25
480:5,12 483:2
**methamphetamine**
279:12
**methamphetami...**
280:11 301:24
**method** 299:12,19
**michael** 318:5,13
403:24
**michigan** 453:21
**mid** 388:9 389:1
415:2
**middle** 318:17
329:3 404:23
**midwest** 381:25
557:17 560:1
**migliori** 270:16
276:3 278:11,14
278:17 280:14
282:4 283:2,11,14
283:23 284:8,15
284:24 285:17
286:7,23 287:8,21
287:23 288:8,13
289:2,10,21 290:4
290:6,14,22 291:5
291:15,21 292:5
292:22 293:10,14
293:15 294:1,11
294:14 295:1,3,10
295:13,15 296:10
296:19,25 297:10
297:16,23 298:15
298:23 299:4,10
299:17 300:3,7,14
301:8,20 302:3,8

| | | | |
|---|---|---|---|
| 302:15 303:5,10 | 351:13,23 352:4 | 518:11,19 519:13 | monaghan 273:9 |
| 303:15,25 304:4,9 | 352:12,25 353:8 | 520:2 522:18 | monitor 324:18 |
| 304:17,22 305:3 | 353:15,23 354:3 | 523:13,20 524:24 | 330:12 |
| 305:16,21 306:9 | 354:10,15 355:6 | 532:24 533:7,19 | monitoring 276:25 |
| 306:15,22 307:3 | 355:15,24 356:3 | 534:9,11,15,18,22 | 375:4 380:15 |
| 307:12,15,20 | 356:11,15 357:20 | 534:25 537:5 | 381:1 415:22 |
| 308:2,9,14,22 | 358:8,14 359:1,9 | 539:19 540:8 | 416:3 417:8,12,21 |
| 309:9,19,22 310:3 | 359:25 360:8,14 | 544:10 545:3,13 | 461:14 476:21 |
| 310:11,18,24 | 361:6,22 362:5,12 | 546:24 | month 306:25 |
| 311:7,18,23 312:3 | 362:16,21 363:16 | migliori's 532:10 | 307:22 348:20 |
| 312:14,22 313:18 | 363:23 364:6,18 | mike 275:9 | 480:18 553:12 |
| 313:25 314:9,17 | 365:5,8,10,13,19 | million 452:13 | monthly 305:12 |
| 314:25 315:10,18 | 366:8,14,19 367:8 | 453:5,17 454:9 | 306:24 308:17 |
| 315:24 316:8,25 | 367:15,21,24 | mind 304:4 468:14 | 309:24 347:11 |
| 317:6,13,21 318:2 | 368:17,25 369:10 | 496:16 | 354:22 419:25 |
| 319:5,11,21 320:1 | 369:17 370:4,10 | mine 540:16 | 425:9 |
| 320:5,11,14,18,22 | 370:13 371:1,6,13 | minimum 377:10 | months 553:17 |
| 320:25 321:2,19 | 372:1,11,16 373:1 | minute 281:16 | 554:6 |
| 322:1,11,21 323:9 | 373:10 374:2,8,15 | 349:19 454:21 | montminy 273:2 |
| 323:20 324:9,15 | 374:18,24 375:14 | minutes 361:7 | morning 278:3,15 |
| 324:22 325:13,21 | 375:23 376:5,21 | 456:14,17,21 | 278:16,22,23 |
| 326:10,18,22 | 377:2,9,23 378:4 | 478:2 486:24,25 | 383:9 384:17 |
| 327:9,23 328:17 | 378:16,24 379:1 | 551:2 554:1 | 398:15 458:17 |
| 328:25 329:23 | 379:15 380:1,6 | missed 283:8 | 496:9 497:17 |
| 330:8,17,25 331:7 | 381:5,13 382:6,12 | mission 297:19 | 503:15 506:17 |
| 331:23 332:5,11 | 382:18 398:15 | misstates 280:12 | 508:23 516:4 |
| 333:2,8,12,20,24 | 479:8,9,12,13,22 | 294:24 296:22 | 522:8 |
| 334:1,3,21 335:5 | 479:25 480:17 | 320:8 332:25 | motley 270:17 |
| 335:12,19 336:2,8 | 481:12 482:10,12 | 336:6 431:11 | 275:9 480:5,12,20 |
| 337:5,17 338:6,15 | 482:17,20 483:4,6 | 448:13 503:17 | 481:11,16 482:2,8 |
| 338:21 339:3,16 | 483:8,15,22 484:1 | 504:6 534:2 537:5 | 483:1,7,14 484:12 |
| 339:24 340:13,21 | 484:3,12,15,20 | mistaken 435:20 | 532:17,21 535:3 |
| 341:2,15,18,20 | 485:1,8,13 490:1 | mmonaghan | motleyrice.com |
| 342:6,12,17,23 | 490:17,19 491:4 | 273:13 | 270:19,20 |
| 343:3,19,24 344:2 | 491:15 492:9,10 | moa 452:14 | mouth 367:20 |
| 344:4,23 345:9,18 | 492:24 497:23 | 453:16 454:9 | 396:19 |
| 346:1,7,19,25 | 498:15 500:14 | model 339:11 | move 362:14 |
| 347:8,14,24 348:4 | 503:17 504:6 | 359:8 | moved 529:10 |
| 348:12,19 349:7 | 505:17 506:15 | moment 321:3 | movement 470:17 |
| 349:12,16,20,22 | 507:16,24 512:22 | 540:5,24 | 472:21 |
| 350:5,10,25 351:7 | 516:3 517:1 | | |

moving  472:15
mt  270:18
multidistrict
   278:19
multiple  527:5
mutilated  490:23
mutually  464:7
myers  271:8
mylan  393:12
myriad  279:10

**n**

n  276:1,1 278:1
n.w.  269:8 270:4
   272:9,16 273:10
   273:20
name  278:17
   357:2 424:17,21
   473:22 535:14
   540:1 557:6 558:3
   558:4,15 559:3,4
   559:21
name's  383:10
names  377:11
   551:14
napoli  270:13
   275:8,8
napolilaw.com
   270:15
narcotic  381:19
narcotics  543:16
   544:4
natalie  275:7
nation  323:1 424:5
national  268:5
   416:20 417:10
   418:7,7 425:7
   542:9 544:17,25
   557:6 558:3 559:3
nationwide  488:25
naturally  511:14

ndc  465:9
neal  271:17
nebraska  453:21
necessarily  407:3
   499:1 505:15
necessary  336:4
necessity  353:21
need  279:3 293:7
   340:11 367:18
   429:10 458:5
   486:14 496:1
   497:12 504:20
   544:7
needed  380:23
   545:24
needing  339:14
needs  339:22,23
   399:10,11,23,24
   445:18
neither  471:9
   556:11
never  307:8 322:9
   383:13 477:7
   479:6 489:5
   490:20,22 494:14
   523:17 528:2
   529:6 531:9,18
new  270:14,14
   271:4,4 302:4
   323:4 338:24
   340:22 373:16
   374:19 380:18,19
   380:21 406:17,19
   406:19 410:14
   414:11 422:22
   423:9 425:24
   426:18,24 434:13
   450:18 453:20
   471:19 494:4
   527:12 553:13,23

newport  271:9,9
nice  549:24
night  457:3
noncontrolled
   300:16,23,23
   338:10
nonmedical
   323:12
nonpublic  290:9
   290:17,25
normal  329:15
   351:17 352:19
northern  268:2
notarized  557:14
notary  556:1,21
   557:25 558:10,18
   559:15,23 560:23
note  293:11 366:5
   366:9,22,25 367:9
   367:10 368:12
   458:11 497:7
   514:13 516:9
   535:5 557:12
noted  358:18
   457:16
notes  364:9,10,13
   364:14,23 365:15
   367:14
notice  269:12
   280:18 292:8
   343:4 402:16,24
   403:8,13 404:7,13
noticed  286:9
   292:6
notification  551:7
novelty  441:16
   442:3,12,21
november  371:21
   448:21
nstephens  271:19

number  277:2
   356:17 370:9
   386:12 397:23,24
   403:20 418:2
   424:3 429:19
   435:24 436:3
   437:23 438:2
   493:10 503:2
   505:2 542:20
   543:1 553:15
   555:11 557:7,13
numbered  304:1
   402:15 407:6,7
   415:19 423:25
   430:13
numbers  386:9
   465:23 559:7
nutshell  297:7
nwda  276:24
   415:21 417:8

**o**

o  276:1 278:1
o'connor  274:2
   390:17 391:1
   393:22 395:5
o'gorman  271:2
o'melveny  271:8
oath  335:18
   397:25 480:2
   485:17,19 505:13
   524:1 526:25
object  291:13
   307:7 319:18
   333:25 342:2
   354:6 364:16
   388:13 392:5
   398:14 406:25
   452:2,22,25 454:3
   454:10,16 455:17
   465:14 468:7
   469:20 474:6,10

**[object - objection]**

| | | | |
|---|---|---|---|
| 476:8,13,23 | 325:11,19 326:8 | 384:10,25 385:1,7 | 441:4,5,12,18 |
| 479:13 515:5,8 | 326:15,20 327:7 | 385:16,25 388:1,5 | 443:19 444:4,13 |
| 522:18 523:1 | 327:21 328:15,23 | 388:6,11,12 389:4 | 444:14,15,25 |
| 528:17 539:19 | 329:21 330:1,6,15 | 389:11,20 390:2,9 | 448:12,15 449:1,5 |
| 554:23 | 330:19 331:5,19 | 390:17 391:1,15 | 449:10,24 450:7 |
| **objecting**   513:8 | 331:20 332:1,9,22 | 391:17,23 392:4 | 450:13,24 451:5 |
| **objection**   280:12 | 333:11 334:19 | 392:11,17,24 | 451:17,25 453:12 |
| 282:2,25 283:7,21 | 335:3,10,17,25 | 393:6,14,22,23,24 | 461:7,8,21 462:13 |
| 284:5,6,13,22 | 336:6 337:3,15 | 394:4,8,20,24 | 462:25 463:1,11 |
| 285:15 286:5,20 | 338:4,13,19 339:1 | 395:5,18 396:4,5 | 463:24 464:15,21 |
| 287:6,18 288:7,11 | 339:7,20 340:9,19 | 396:15,21,25 | 464:22 465:15,24 |
| 288:24,25 289:8 | 340:24 342:10,14 | 397:1,19 398:14 | 466:6,15,22 467:4 |
| 289:19 290:3,12 | 342:19 343:1,15 | 399:11,14,14,20 | 468:22,23 469:4,5 |
| 290:20 291:3,12 | 344:21 345:7,16 | 399:24 400:4,9,12 | 469:10,18,19 |
| 291:17 292:3,15 | 345:24 346:5,17 | 401:18 402:11 | 470:8,9,19,20 |
| 292:16 293:6,11 | 346:23 347:6,12 | 403:3,4,14 404:1 | 471:3,4,23 472:6,9 |
| 293:21 294:23 | 347:22 348:2,10 | 404:15 405:14,21 | 472:23 473:1,2 |
| 296:7,22 297:5,15 | 348:17 350:3,8,23 | 406:3 407:1,20,25 | 474:9,17,21 475:7 |
| 297:20 298:13,21 | 351:4,11,21 352:2 | 408:8,15 409:9,20 | 475:8,12,13,21,22 |
| 299:2,8,14,21 | 352:10,23 353:6 | 409:22 410:9,11 | 476:7,14,24,25 |
| 300:6,10,11,18 | 353:13,19,25 | 411:3,9,17,20 | 480:22,23 482:3 |
| 301:15,16,25 | 354:13 355:5,11 | 412:6,16,23 413:4 | 482:10,11 483:16 |
| 302:1,6,11 303:3,8 | 355:14,22 356:2 | 413:16,24 414:8 | 483:22,23 484:3,6 |
| 303:13,24 304:11 | 357:18 358:6,12 | 414:13,23 415:4 | 484:15,17 485:20 |
| 304:20,25 305:14 | 358:24 359:6,13 | 416:4,11,16,25 | 487:20 488:19 |
| 305:18,19 306:6 | 360:3,12 361:1,21 | 417:14,23 418:15 | 490:1,17,18 491:4 |
| 306:14,18 307:1 | 362:2,9 363:14,22 | 418:21 419:7,12 | 491:15 492:10,12 |
| 307:18,24,25 | 364:4 365:1,18 | 419:20 420:7,19 | 496:12 497:2,3 |
| 308:6,7,8,18,19 | 366:6,12,17 367:6 | 421:2,6,25 422:7 | 500:14 501:7,24 |
| 309:7,15,16,17,25 | 367:12 368:11,23 | 422:18 423:2,11 | 503:17 504:6,17 |
| 310:7,13,23 311:1 | 369:8,15 370:2 | 423:12 424:18 | 505:17 506:14,15 |
| 311:16,21 312:1,5 | 371:4,10,24 | 425:12,16 426:2,8 | 507:16,17 509:23 |
| 312:18 313:15,24 | 372:10,14,24 | 426:14 427:7,21 | 510:3,23 511:17 |
| 314:7,15,23 315:8 | 373:8,25 374:5,6 | 428:4,12,13,18 | 512:21,22 513:25 |
| 315:16,21 316:6 | 374:22 375:13,18 | 429:4 430:22 | 514:11,14 515:21 |
| 316:23 317:4,11 | 376:2,19,25 377:7 | 431:11,13,19 | 518:10,11,18 |
| 317:19,25 319:3,8 | 377:21 378:2,9,10 | 432:10,22 433:16 | 519:4,13 523:2,12 |
| 319:17,24 320:4,8 | 378:22 379:9,13 | 434:2,9,16,21 | 523:13,20,21 |
| 321:17,23 322:8 | 379:23,24 380:4 | 435:1,17 436:8,16 | 524:14,15,24 |
| 322:19 323:7,18 | 381:3,10,11,15 | 437:1 439:12 | 525:11,13 526:1,3 |
| 324:7,13,20 | 382:10,16 384:2,9 | 440:6,7,14,15,21 | 526:11,12 527:4 |

528:9 529:7
530:12,13,22
531:14,15,22,23
532:5,23 533:5
534:1 536:4 537:5
538:5,9 541:25
542:11 543:4,17
544:10 545:3,11
545:13,16 546:8
546:15,21,24
547:15,25 548:8
548:11,17,18,20
549:2,11,20
550:16,18 551:24
552:18 553:7,19
554:3,17,20,22
**objections** 308:12
308:13 397:17
534:4 540:9
**obligation** 309:3
312:17 323:21
326:12 331:1,3
338:17 339:17
340:11 414:16,21
427:3 443:5,24
**obligations** 286:2
322:6 323:5
324:16 325:17
332:3 335:1
338:22 344:19
352:21 359:11
360:23 368:20
369:2,5,13 375:25
414:4 453:7
476:22
**observations**
301:2
**observe** 420:15
**obtain** 325:2
373:17 381:18

**occasion** 318:9
383:14 384:5
481:13
**occasions** 479:11
**occurring** 411:16
**occurs** 511:14
**october** 276:13
356:24 358:5
383:21
**od** 318:14
**odds** 400:2
**offer** 290:16
**offered** 361:14
**office** 270:8 275:3
276:20 280:9
289:17 292:19
346:4 347:17
402:8,20 405:7
416:8 488:1,8,25
491:7 545:23
547:8,14,24
548:25 549:1,16
552:11
**officer** 556:2
**offices** 431:6 432:2
487:19 545:25,25
553:6
**official** 284:11
290:10,19 403:1
523:25 558:15
559:21
**oh** 295:13 349:12
371:15 394:14,15
424:21 428:16
437:11 438:22
439:14 478:3
495:10 500:11
508:4 525:4
531:19
**ohio** 268:2,11,13
270:9 271:14

383:25 384:6
453:22 557:2
**okay** 278:25 279:1
279:6,16 280:17
281:22 282:1
283:3,11 286:17
286:24 288:14
292:23 293:10
295:18 296:2,13
300:15 313:23
321:8,20 343:4
365:14 371:7
378:24 387:17
388:18 397:3
401:2,7 410:20
415:10 419:10
423:16,20 424:22
430:3 431:24
435:11 438:7
439:1,14 440:13
442:2 445:21
447:4 457:23
458:25 477:16
479:5,8 480:4,14
483:9 484:7
485:10 486:8,10
486:18,22 487:3,7
487:14 488:11
492:5,15 493:13
494:16 495:12
497:15 498:15,22
499:14,22 500:2
501:4 502:20
503:1,14 505:12
508:11,14 509:13
510:19 511:16
512:10 513:12,20
514:22 516:18
518:6 519:11,14
519:18 521:14
522:21 524:4

525:5,19 529:4
539:1 541:1,21
**oklahoma** 279:13
**old** 410:13
**omm.com** 271:10
**once** 375:24
407:14 409:7
446:3 458:3,5
466:2 473:10
493:25
**ones** 467:14
**online** 553:13
**onus** 312:20
326:16 411:10
**op** 268:10,12,14
**opana** 381:24
**open** 485:6,8
**opened** 479:19
484:22 485:5
**opening** 373:15
**operate** 309:5
329:8 344:14
345:1 366:24
405:4 407:16
**operated** 336:22
**operating** 378:6
378:19
**operation** 424:15
**operational**
279:25
**operations** 280:6
**operative** 329:4,17
330:4
**opiate** 268:6 557:6
558:3 559:3
**opinion** 277:19
443:1,16 527:19
528:8 530:4
**opinions** 290:16
**opioid** 383:22
461:18 466:13

**opioids** 436:25
537:25
**opportunity**
400:16
**order** 276:24
283:5,17 298:17
298:17 304:6
308:15 310:12,14
310:17,19 311:4,9
312:10 330:12,20
330:23 332:15
334:9 347:2
350:16 352:18
353:4,11 354:2,18
354:21 355:1,19
365:24 368:2,4,5,9
368:16,16 372:6
375:1,2,5,7,9,10
375:11,19,20
379:5 381:1
408:12,16,17,18
414:6,20 415:21
417:8,12 419:2
433:9 438:13
439:6 443:1,7
444:8,9 445:8,15
448:6,20 449:14
449:15 450:16,17
451:9 454:7
461:14 464:9
469:25 476:21
493:17 494:12,18
494:24 525:21,24
526:6,16,19 531:2
539:15 544:8
546:6 553:1,2,10
**ordered** 338:10
**ordering** 337:21
337:23,24 338:7
339:15 359:15

**orders** 277:21
303:22 309:6,12
310:6 317:18
329:9,12,13,14,14
329:15 330:14
331:9,12 332:20
334:14,24 339:19
343:9 344:11,15
345:12,23 346:11
347:10,18 348:5
349:1,25 350:13
351:2,15,16,17,24
352:1 353:10,10
354:25 357:2,11
357:13,22,25
361:4,17,25 363:7
364:25 365:23
366:22,24 367:2,3
369:13,14 371:18
371:22 380:15
403:25 405:1,5,8
407:14,16 408:6
409:15 417:22
418:3,4,11 420:3
420:13 421:19
422:12,13 425:3
425:11 430:18
431:4 432:15,15
436:24 444:11,19
448:11 452:17
453:6,19 476:5
525:23 526:9,21
531:7 553:5
**organization**
417:2,21 422:12
423:8
**organizations**
356:9
**origin** 317:9
**original** 365:7
374:14

**outcome** 528:15
556:18
**outlining** 402:9
**output** 472:14
**outrageous** 547:5
**outside** 279:22
301:4 305:14,19
308:7 309:17
316:2 339:18
477:4 509:9
539:20 542:11
543:5 545:2
548:18 549:5,12
550:1,16 551:24
552:21 553:19
554:3,17,24
**oversee** 297:7
**oxford** 274:13
**oxycodone** 537:24
**oxycontin** 468:20
469:8 470:5,17,24

**p**

**p** 278:1
**p.m.** 555:8,15
**padgett** 274:8
**page** 276:2 281:17
288:17 295:24
302:16 315:1
321:16 329:3
337:7,18 341:22
341:23 354:16
363:9,20 364:20
364:24 365:23
366:20 371:14
373:11 374:25
376:8 380:7,9
387:11 389:2,14
390:6,13,20,20
391:4,5 392:1,2,13
392:20 393:2,11
393:18 394:2,17

398:9 404:5 417:6
418:1 424:2
430:15,17 433:2
438:7,20 442:19
466:9 499:15,19
499:24 516:5,5
524:7,18 529:16
529:20 540:2
541:7,9,12,17,18
557:13,15 559:7
560:3
**pages** 296:12
499:19 510:15
**paid** 454:9 533:22
534:6,10 535:7,9
**palo** 271:18
**paper** 336:19
**par** 272:2
**paragraph** 318:16
318:18 322:22
332:13 337:7
344:5 406:7 408:4
438:9 460:9,9,17
468:18 529:23,25
530:18,20
**paraphrase**
500:12
**park** 271:3
**part** 290:9,18
293:9 302:25
322:3 348:7 371:2
379:19 415:24
416:14 449:3,20
460:21 467:22
501:23 543:19
549:25 559:9
**parte** 455:10
456:24
**participants**
389:10

participate 458:7
participated 295:7
391:12
participating
390:1
particular 302:23
312:19 346:10
353:21 365:22
376:15 385:22
433:13 441:22
513:15
particularly
320:10
parties 269:13
456:19 556:13,16
party 473:19
pass 507:6,8 533:9
passages 503:23
passing 321:25
322:10 503:16
504:14 553:4
patrick 271:20
pattern 301:5
315:2 329:15
330:13 351:17
352:20
patterns 546:6
paul 270:21
pay 300:2 453:5
453:17,17
paying 299:25
payment 299:12
299:18 300:1
pbeisell 271:23
pen 425:4
penalties 337:10
penalty 452:13
453:5,18
pending 515:1
518:23 533:21

pennsylvania
272:4,22 274:14
274:24
people 299:22
327:3 370:12
390:16 392:15,15
395:14,16 403:20
403:21 406:22,22
422:16 428:1
429:11 432:8
520:7
people's 317:23
528:7
percentage 300:15
perfectly 400:22
perform 360:23
372:5,13 494:23
performance
290:10,18
performed 496:5
551:16
performing 347:3
period 293:19
319:23 460:25
493:9,17 503:5
526:8
periodic 380:14,25
periodically 382:8
periods 433:22
permit 554:12
person 288:4
292:9,13 332:14
334:8 388:10
433:23 438:12
439:5 480:20
483:25 491:1
502:20
personal 283:3,15
284:19 285:1,10
285:11,12,20
286:3 290:16

349:1,9,11
personally 489:4
558:11 559:15
personnel 527:9
perspective
395:22 405:25
553:17
pharma 268:9,13
268:13 271:2
467:17 472:18
pharmaceutical
313:9 384:19
385:20,21 386:20
389:18 390:23
392:23 395:9
402:9 404:10
409:14
pharmaceuticals
271:7 272:2
393:19
pharmacies
279:24 296:16,20
303:18 313:4,7,20
314:19 315:3,7,15
363:19 371:2
395:10 406:18
413:11 417:19,20
420:11,15,16
436:13 461:5
462:12,24 474:3
474:16 475:3
476:3 543:15
544:2 546:6,20
547:17 548:3,15
548:24 550:23
pharmacist
377:14 412:12
pharmacy 295:20
298:9,20 299:1
361:16 385:23,23
411:15 412:3,22

413:3 414:17,18
420:11 425:20
454:6 462:6 463:6
466:4 469:16
471:2 472:19
509:14 510:9
516:4 538:18
541:14 542:21,22
543:2 547:11,12
547:13,23,24
548:7 549:1,9
550:13,15 552:3
554:15
phenomenon
414:11
phentermine
337:23
philadelphia
272:4,22
phone 370:12
481:15 557:3
physical 358:17
359:5
physically 389:7
480:12
physician 473:21
473:25 474:15
475:2
physicians 474:5
pick 529:11
pills 538:12,16
pinon 394:22
pittsburgh 274:14
place 414:4,17
434:15 484:1
487:8 493:7
placed 408:17
places 396:3
placing 332:14
334:9 339:19

**plaintiff** 276:23
458:3
**plaintiffs** 270:21
278:13,19 383:7
383:19 398:3
400:24 456:14
458:4 498:3,16
501:19 502:14
503:22 522:13
554:4
**play** 293:17 321:8
321:13 413:21
**played** 293:18
**playing** 293:5
**pleasant** 270:18
499:2
**please** 281:2,2
306:8 378:15
396:20 406:12
437:23 446:6,22
477:7,18 478:6
486:3 504:21
514:24 515:3
524:19 529:25
540:24 543:20
557:11,11
**pllc** 270:13 275:8
275:8
**point** 309:10
317:15 367:11
369:12 380:11,13
400:8 409:7 458:8
461:11 465:6
512:5 541:11,12
542:4
**pointed** 489:16
**points** 364:1
507:22
**policing** 361:25
**policy** 318:23
377:4 417:11

524:10 525:8
527:1,12
**polite** 489:17,21
489:22
**polster** 268:8
**populated** 359:15
**portion** 332:23
387:1
**position** 287:2
349:15 357:14
432:20 455:23
456:13,14,15,22
536:15
**positions** 282:20
282:24
**possession** 463:9
**possibility** 373:3
**possible** 401:16
**possibly** 395:15
433:24 504:11
506:10
**post** 443:23
**potential** 316:14
316:15 317:17
328:21 339:23
340:3 359:19
373:21 409:4
**potentially** 301:6
339:15 351:25
353:4 390:14
421:16
**powerpoint**
295:19 296:4
297:17 303:19
305:13 309:1
364:8,21,24 387:5
402:6 403:22
407:6 408:4
498:17 505:5,10
505:16 506:2,4,6
506:20 507:12

509:9,14 510:2,12
**powerpoints**
295:5 387:2
**pplpc00400032...**
277:10
**pplpc03100127...**
277:14
**pplpc03400104...**
277:12
**practically** 516:5
**practice** 314:2
316:3,14 374:4
390:4 419:14,18
438:14 439:7
487:15 488:2,12
489:7,13 490:11
490:15 496:4,17
496:19,25 531:1,5
531:11 547:16
548:23 551:13,17
**practices** 283:4,9
283:16 284:20
285:22 335:23
336:4,22,23 349:2
496:6 531:3
**practitioner** 298:9
**practitioners**
328:1
**preaching** 396:1,9
**predict** 381:22
**preparation**
427:19,25
**prepare** 298:1
**preparing** 543:13
543:23
**prescribing** 475:2
**prescription** 268:5
274:21 323:1,13
475:20 552:3
557:6 558:3 559:3

**prescriptions**
314:1,11 472:21
474:4 543:16
544:3
**present** 269:12
275:1 356:18
357:7 384:18
455:16 544:4
**presentation**
297:18 301:11
303:19 311:12
318:12 327:17
344:18 357:7,12
361:13 362:23
363:13 364:1,9,21
364:22 366:11
368:22 387:6
390:15,24 403:23
404:14 410:22
452:5 539:14
541:4
**presentation's**
540:11
**presentations**
384:19,24 411:5
434:7 444:22
449:4,20 451:23
461:13 518:3
**presented** 318:7
387:2 404:9 429:1
434:8
**presenting** 316:19
318:14 395:12,13
540:4
**president** 406:9
424:6
**pretty** 282:8
**prevent** 323:23
452:16
**preventing** 371:18
371:23

**previous**  501:2
**previously**  368:13
    397:24 424:24
**primarily**  280:9
    293:18
**primary**  327:25
    328:4 352:16
**principals**  364:1
**principles**  327:14
    327:19
**printout**  402:8
    419:25 424:25
**prior**  279:14
    294:19 330:14
    331:21 332:21
    334:15,25 335:22
    336:1,7 350:13
    421:20 431:12
    443:9 448:13
    489:4 490:12
    501:4 512:12,18
    512:23 514:1
    519:6 532:19
    534:3,13 535:1
**priority**  319:20
**priorprod**  276:9
    276:11
**privilege**  325:18
    481:3 482:17
**privileged**  480:24
    481:5 482:16
    483:16
**probably**  356:8
    504:24 519:22
**problem**  279:12
    323:1,14,22
    396:11 397:20
    421:13
**problems**  316:15
    421:16

**procedure**  377:4
    443:22 558:5
    559:5
**procedures**  283:4
    283:10,16 349:2
    378:6,19
**proceed**  278:10
    341:14 383:5
    401:11 455:7
    478:14 522:2
    533:18
**proceeding**  555:14
**process**  287:14
    289:14 391:13
    511:23 515:22
    528:12
**processes**  406:19
    496:22
**produce**  292:9
**produced**  356:16
    356:19 402:3
    459:12 528:8
**product**  300:24
    311:5 340:3 375:8
    439:24 440:22
    465:8 469:8
    471:19 472:15
**production**  276:22
    557:15,17,22
**products**  298:18
    300:23 339:13
    443:9 460:1,13
    461:19 464:5
    465:2 466:10
    468:16,21 470:4
    531:3,6
**professional**  314:2
    316:3 473:25
**program**  294:21
    323:4 452:15
    525:21 526:6,19

**project**  280:23
    339:14
**promulgated**
    417:11
**promulgating**
    417:20
**properly**  325:25
**proposed**  291:1
    370:23 417:3
    443:12
**prospective**  326:2
**protect**  297:7
    340:10
**provide**  285:10
    331:16 372:18
    459:23 464:3,4
    465:7,18 474:14
    475:2 545:22
    546:3 549:19
    552:9
**provided**  281:8
    285:9 317:2
    319:15 337:11
    357:12 377:17
    379:18 460:25
    461:2 462:3
    467:13 470:3
    471:10 473:11
    485:17 487:23
    522:5,23 523:6
    535:18 537:1
    539:9 550:22
**provides**  472:11
**providing**  317:8
    324:25 406:16
    461:16,17 465:1
    465:22 471:20
    485:18
**provisions**  313:12
    324:11 328:14
    335:16 380:13,22

**prudential**  274:4
**pseudoephedrine**
    280:11 301:23
**public**  302:21
    315:12 452:6
    545:5,8 556:1,21
    558:10,18 559:15
    559:23 560:23
**publicly**  447:20
**published**  321:25
    371:21
**pull**  399:6 409:6
    507:21
**purchase**  306:16
    306:20 310:5
    346:21 355:17
    368:10,14,18
    369:1,4 372:19
    465:19 472:20
    487:8,14 488:3,14
    489:8,14 490:11
    491:24 492:7
**purchased**  298:18
**purchases**  307:5
    307:22 310:6
    354:23 367:3
    541:14,23 542:22
**purchasing**  462:11
    474:2 475:11
**purdue**  268:9,11
    268:13 271:2
    393:19 467:17
    469:9,14,15 470:4
    471:1,10,18
    473:12,13 474:2
**purpose**  281:10
    302:25 314:12
    322:23 339:8
    343:6,13 456:2
    476:12 483:2

**purposes** 286:10
296:5 326:4
372:21 374:10
438:13 439:7
443:13 469:17
**pursuant** 269:12
314:10 471:1
**put** 294:5 296:4
364:15 367:19
396:18 398:14
437:2 457:24
495:7 506:5
**puts** 312:17
326:11
**putting** 517:24

**q**

**qualitest** 393:19
**quantities** 337:21
338:8 339:14
**quantity** 338:9
464:10 469:25,25
469:25 470:14
**question** 287:20
293:24,25 294:2
306:8 307:14
308:21,25 331:22
333:13 344:1
348:21 363:17
367:25 378:15
387:22 397:21
398:8,9,21 399:21
400:6 437:5,10,12
445:16 446:16
447:8,11,12 448:4
468:4,9,11,25
474:23 477:5,7
479:3,14 481:8
486:3 492:14
500:15 502:2
504:7,20 506:22
507:24 510:6

512:3 514:5,24
515:1,2,3,6 518:15
519:7 522:22
532:12 533:20,21
534:12 538:25
539:20 542:13
543:19 550:21
**question's** 518:23
**questioned** 478:19
**questioning** 293:9
335:9 348:23
397:16,19 398:6
398:16,18 400:3
478:25 484:24
520:22 521:2
534:9
**questionnaire**
406:20
**questions** 278:24
279:3 281:1
291:23 335:6
348:24 377:15
384:17 398:19
400:18 404:21
407:12 411:24,25
412:4,15 413:19
445:2 459:11
462:18 467:14
478:23 501:19
502:5 503:2
506:18 508:22
517:2,4,8,22
522:12 550:6,9
**quick** 378:25
**quickly** 382:1
456:9 541:11
**quite** 505:19 516:7
528:19
**quoted** 405:3

**r**

**r** 270:7 278:1
**range** 298:18
**rannazzisi** 286:9
286:13,25 320:7
321:14 327:10
332:12 334:4
341:24 347:15
350:11 351:14
354:17 503:5,23
506:11 518:1
**rannazzisi's**
286:11 337:6,18
503:9,15 504:13
**raymond** 271:11
**raymond.krncevic**
271:15
**rbarnes** 274:15
**reach** 339:12
373:4,5 456:6
477:13
**reached** 356:8
455:25
**read** 303:23 304:2
305:13 332:23
333:7,8,14,23
366:25 370:8
372:2 386:11
397:21 398:21
399:8 407:13
408:7 423:14
424:13 427:11
437:23 438:9
439:3 442:22
460:8 477:6,9
500:11 506:22
515:3,4 518:17
529:22,25 530:18
534:15,18 558:5,6
558:12 559:5,6,17

**readily** 517:7
**reading** 333:1,18
404:18 406:11,12
465:10 467:19
468:6,18 471:15
502:14 524:18
557:19
**ready** 457:21
530:2
**really** 395:24
400:5 409:6
422:24
**realtime** 534:12
**reask** 400:6
**reason** 283:24
291:18 353:22
357:24 432:15
456:6 512:11
520:6 557:14
559:8 560:3
**reasonable** 325:4
433:23 438:14
439:8 467:23
**reasonably** 458:6
**reasons** 401:14
**recall** 311:11
316:22 319:25
335:14 345:19
356:7 357:17
358:22 360:1,9,15
361:18 365:14,17
365:21 366:7,10
367:10,14 369:21
371:5,11 412:4
413:22 432:19
437:20 441:23
467:5 479:2
492:23 494:10,14
494:16 497:19,22
498:13,23 501:11
502:5 504:5

508:21,24 509:3
509:21 510:8
512:4 516:15,21
516:23 517:18
518:7 521:6,10
522:4,8 524:22
540:4 553:4
**receipt** 552:8
557:18
**receipts** 464:11
**receive** 431:20
**received** 354:2
360:2 461:1
488:24 532:10,21
535:2 551:5
552:17
**receives** 326:13
**recess** 341:8
382:24 397:11
455:1 478:10
518:21 521:21
533:14 555:6
**recognition** 403:1
**recollect** 387:19
**recollection** 283:4
283:15 284:19
285:2,12,21 286:4
293:17 315:23
318:22 343:11,16
357:6 383:16
384:14,22 410:5
432:8 448:5
461:23 462:22
479:7,24 494:20
500:19,23 502:21
509:2 517:20
519:9 520:12
**recollections**
292:1
**recommendation**
418:25 419:3,19

420:5,16,23
421:24
**recommendations**
290:25 380:8,10
451:3,7,21
**recommended**
380:12 422:12
**record** 278:4,9
291:16 293:22
294:6 319:2 320:9
331:21 332:24
341:5,10 365:2
370:9 374:11
382:21 383:1
386:12 397:4,10
397:14 399:7,8
401:9 415:14
437:23 445:22
446:6,8,10,13,21
447:1,3,25 454:23
455:3,8,23 457:24
457:25 458:1,11
468:8 477:9,18
478:6,8,12 490:4,6
515:4 518:17
521:18,23 533:10
533:12,16 534:1,2
534:5 549:24
555:2,4,8 556:10
559:9
**record's** 388:16
433:4 457:18
**recorded** 278:7
**records** 337:9
376:12,15
**red** 300:9,13 301:7
301:9,21 510:17
511:12,21 512:19
513:5 546:14
**redirect** 400:17

**reduce** 373:3
**reduced** 556:8
**reed** 272:21
**reedsmith.com**
272:23
**refer** 509:14
516:14 548:24
**reference** 376:9
495:25 557:7
558:2 559:2
**referenced** 496:9
558:11 559:15
**referencing**
443:14 445:5
**referred** 300:8
310:4 320:3 406:8
435:21 468:17
**referring** 281:1
506:17 510:10
**reflect** 534:5
**reflected** 507:12
534:9
**reflection** 300:1
500:3
**refresh** 357:5
387:19 448:5
523:4
**regard** 415:3
**regarding** 285:21
288:21 290:17
380:21 417:12,21
420:13 455:19
457:14 459:25
461:14,18 472:21
474:4 476:4
547:15
**region** 383:25
**regional** 381:24
545:24
**register** 399:24

**registered** 389:8,9
389:17,25 390:11
390:14,22 391:7
392:7,8,14,22
393:4,12,20 395:3
**registrant** 309:4
312:24 313:4
317:10 320:3
324:16 326:17
329:7,9,10,13
332:15 334:9
338:25 339:17
344:14,15 345:1
347:1,16,19 348:6
350:17,18 354:2
354:20,23,25
362:11 368:21
375:25 377:25
378:7 392:2 394:6
394:19 405:4,5,6,9
407:15 411:11
414:5 420:2 423:7
425:1 431:3
439:16 489:5,12
490:9 552:2
**registrant's** 335:1
**registrants** 285:3
297:3 299:5
311:25 313:1,10
313:17 318:7
319:23 322:4
327:12 331:3
342:25 343:13
345:20 349:23
350:11 354:18
361:9,13 376:23
378:20 382:11
385:22 395:16,23
401:16 422:10
425:20 431:3
432:14 433:12

434:8 435:13,14
438:18 439:11,25
440:1 444:23
459:19 476:19
488:2,13,17
491:12,23 493:17
494:3 502:7,18,22
503:4 525:23
**registrate** 354:20
**registration**
302:21 312:7
315:11 325:3,4,5
325:15 327:25
328:3,22 331:17
347:16 361:10
391:21 442:13
**registrations**
302:18 328:8,12
**regulate** 439:21
**regulated** 438:12
439:5,15,19,20,25
**regulation** 344:24
406:1 426:17
490:16 495:21
496:2,11 497:1
522:16
**regulations** 324:2
328:6 344:10
414:3 415:3
416:10 418:19
426:20 435:16
444:2 491:3 495:4
511:6
**regulatory** 328:5
392:15 406:9
416:1
**reintroduce**
383:17
**reiterate** 322:24
327:18 343:7

**reiterated** 327:15
**reiterating** 421:7
**reiteration** 323:5
**rejected** 451:2
**relate** 303:17
304:18
**related** 286:25
290:8 448:22
482:1 522:22
525:9 556:12
**relates** 268:7
297:19 359:10
453:7
**relating** 283:5,16
285:22 376:15
460:12 522:5
**relationship** 285:4
285:8 286:11
298:19,24 485:9
**relative** 280:10
287:3 289:5 297:2
335:23 363:25
369:13 371:22
556:15
**relatively** 362:4
**relect** 285:11
**relevant** 288:9
377:12 400:7
547:24 553:5
**relieve** 304:6
365:25 420:1
425:1,10
**rely** 332:14 334:8
523:25
**remain** 311:19
526:10
**remains** 458:8
**remember** 305:6,8
335:9 346:14
435:23 478:21
480:18 486:6

493:3 495:1 498:9
498:11 510:15,17
510:19 512:14
513:18 516:12
517:5,11 519:1
522:17,21 528:14
535:19,21 541:3
**remembers**
388:19
**remind** 460:2
**reminded** 349:23
**renee** 275:2
**repeat** 283:12
291:15 306:8
365:20 368:1,3
378:15 385:2
486:3 514:24
540:8 543:20
**repeated** 504:20
505:19 520:12
**repeatedly** 311:13
345:25 426:23
**rephrase** 388:20
403:5 416:5
**report** 286:18
305:7,11 306:4,12
306:17 307:4,9
308:17 309:11,24
344:11 347:10
349:25 354:24
355:17,17,20
369:14 376:4,6
405:1,1 408:5,24
409:15 418:10
419:1 425:2,10,23
427:4 430:18
432:14 435:23
453:6,18 525:24
537:10 553:10
**reported** 268:24
286:17,21 308:3

418:5 422:13
537:22
**reporter** 291:14
291:19 399:6
415:9 515:3 558:7
**reporting** 304:5
308:15 331:9
345:12,22 346:11
348:5 350:16
354:17 357:16
358:20 365:24
368:9,10,19 369:1
369:4 371:18
410:15 420:2
466:11 543:14
544:2 553:14
**reports** 277:21
283:6,17 306:21
310:5 346:21
354:22 355:1,1
425:9 440:3
487:15,18 488:3
488:14,24 489:8
489:14 490:12
491:24 492:7
493:17 494:12,19
531:2,7 538:21
539:6,10,15 542:5
542:5,19,25 543:9
544:8 545:5,8
**represent** 298:3
383:18 389:16
405:24,25 484:13
535:15 540:11
**representative**
284:11 377:13
**representatives**
389:17 409:14
**represented** 390:7
**request** 276:22
277:2 310:15

408:17 433:20
455:18 546:1
559:9,11
**requested** 399:8
477:9 515:4
518:17
**requesting** 368:6
**requests** 377:16
**require** 335:15
344:10 353:1
510:24
**required** 309:5
330:18 337:9
340:12 353:17
374:20 431:4
440:3 452:18
496:10 497:1
547:5 557:25
**requirement**
305:12 334:5
340:7 344:7 351:2
351:5 354:24
355:13 361:3,3
366:23 408:5
409:14 425:22
430:18 438:18
439:11 450:4
513:15,23 522:9
522:15 524:23
525:9
**requirements**
328:5,9 332:3
375:16 416:1
426:17 510:22
**requires** 332:19
334:13 335:8
344:13 347:16
407:15 438:14
439:7
**rescheduling**
458:7

**reserved** 550:1
**reserving** 514:15
514:18
**resolution** 330:22
**resolve** 311:3
330:21 359:8
361:4 438:15
439:8 485:2
526:10
**resolving** 330:22
**resources** 361:11
361:19,24
**respect** 280:5
293:18 360:10
396:12 530:8
531:11
**respectfully**
455:18
**respective** 269:13
**respond** 552:7,19
**respondents**
443:22
**response** 370:3
393:25 399:22
426:23 427:5
489:17 549:17
550:9 551:8 553:9
**responsibilities**
280:5,9 322:24
332:3,6 343:7
544:15
**responsibility**
287:16 304:7,13
312:20 326:17,23
331:10 344:25
349:24 350:17
362:8 366:1 382:8
382:13 410:22
411:11 420:2,12
425:2,10 431:25
432:4 544:20

545:21 547:8
**responsible**
536:16,21
**responsive** 457:4
**rest** 329:2 451:22
466:24
**restate** 307:13
468:24
**rests** 410:23 432:5
**result** 316:11
502:16
**retail** 298:25
371:2 406:17,18
470:14
**retained** 376:13
379:19 484:11
532:16 555:12
**rethinking** 515:15
**retired** 282:13,15
330:4
**retirement** 311:20
405:12 407:24
418:20 421:23
432:21
**retrospect** 458:16
**return** 535:17
**returned** 557:18
**reveal** 289:13,24
**review** 342:9
373:18 380:14,25
382:8 443:6,23
499:25 502:16
548:10 557:12
558:1 559:1
**reviewed** 321:4,5
501:5 503:22
527:25
**reviewer** 379:17
**reviewing** 317:23
357:5 400:11

**revision** 380:17
**revocation** 328:12
328:21 331:16
442:13
**revoke** 328:7
**revoked** 315:12
**rice** 270:17 275:9
480:5,12,21
481:11,16 482:2,8
483:1,7,14 484:13
532:17,21 535:3
**right** 282:18 288:2
291:22,24 293:14
295:4 296:3 309:4
318:17 319:12
320:11 329:1,3
333:7,9 341:2
343:19 351:14
367:15 373:12
397:15 399:9
418:8 432:21
442:20 445:24
446:20 454:18
463:7 465:12
469:16 470:25
472:22 475:19
483:4 489:25
494:1 503:12
505:2 507:3
512:20 513:4
517:19 518:4,24
521:13 522:24,25
523:8,8 527:12
528:5 529:17,20
530:10 531:21
532:14,17 536:22
537:4,13,19 538:1
538:2,13,23 541:9
**risk** 285:4
**road** 271:18
274:24

**robert** 274:12
  275:3
**robust** 538:4
**role** 286:11 287:15
  293:4,16,17
  297:11 321:8,13
  324:10 339:11
  360:10
**room** 457:19
  486:7
**ropes** 274:3
**ropesgray.com**
  274:6,6
**ross** 273:4
**rothschild** 274:23
**roughly** 321:21
**routinely** 432:14
  531:6
**ruin** 521:11
**ruiz** 272:15
**rule** 370:23 405:11
  482:18,24
**rules** 417:20
  426:24 431:9
  453:10 558:5
  559:5
**ruling** 446:2
  479:16
**run** 312:12 477:14
**running** 293:8
  484:6
**russo** 268:24
  275:10 556:2
**rx** 272:14

**s**

**s** 276:1 278:1
  557:15 559:8,8
  560:3
**sacramento**
  453:23

**sale** 304:23 310:21
  325:16 347:10
  350:13 368:4,5,15
  408:25 409:2
  410:15
**sales** 298:12
  302:10 304:19
  307:5 310:9
  313:22 314:5,5,8
  314:14 316:5
  367:3 369:13
  396:12 408:6,12
  409:16 420:1
  424:25 433:10
  462:5,11 463:5
  465:4,11 470:14
  470:24
**san** 552:3,11
**sat** 453:25
**satisfy** 305:12
  515:16
**save** 349:12,16
  354:8
**saw** 302:17 321:24
  322:9,10 434:19
  457:2 488:4,5
  503:15 504:13
  506:19
**saying** 316:22
  333:4,6 409:8
  422:25 494:10
  523:11 525:20
**says** 295:20
  297:25 302:17,20
  303:22 309:11
  310:1 314:18
  315:1,25 322:23
  325:22 327:12
  329:7 331:8 334:4
  337:7 343:6 344:6
  345:10 347:15

350:11 353:9
357:10,21 366:2
372:3 373:2,15
376:11 380:11
387:12 388:17
402:16,20 403:19
403:22,24 404:24
408:5 409:2 418:2
430:7,16,17 431:3
431:24 432:13
434:24 440:2
443:4 460:10,17
464:9,25 465:6
466:12 471:16,20
473:19 534:12,25
534:25
**schedule** 457:7
468:21 470:4
**schein** 273:2
356:19 392:14
**scheme** 327:11
**scientific** 331:13
**scope** 305:15,19
308:8 309:18
314:16 479:14
484:23 490:17
492:11 512:23
539:20 540:9
542:12 543:5
544:10 545:2,16
546:24 547:19
548:19 549:3,5,12
550:2,17 551:25
552:22 553:20
554:3,18,24
**screen** 280:24
305:5 333:5,15,18
356:22 363:11
**sea** 415:1 422:25
450:2

**seal** 558:15 559:21
**second** 281:17
  282:18 341:23
  344:5 354:16
  402:17 408:3
  424:8 429:25
  442:15 455:13
  460:9 477:8,20
  514:19 533:19
  540:1 550:1
**section** 275:5,7
  277:16,17 303:19
  332:18 334:5,12
  363:6 404:23,24
  424:15 430:17
  442:22 473:18
**security** 372:6
  404:25 406:9
**see** 281:13,20
  301:5 349:10
  365:3 374:16
  387:12,19 389:2
  412:11,12,13
  419:14 420:10
  429:16 458:5
  496:18,20 503:9
  503:12 517:13
  527:23 530:4
  540:1,17 552:5,12
  554:12
**seeger** 318:14,20
  509:5,10
**seeing** 305:8
  437:20 547:4
**seen** 307:8 321:6
  321:20 344:17
  364:10 407:10
  419:18 420:22
  438:5 528:2
  539:23

**[sees - shkolnik]**

| | | | |
|---|---|---|---|
| **sees** 412:13 | **shannon** 272:20 | 388:23 389:5,13 | 435:2,19 436:2,10 |
| **self** 398:10 | **shape** 367:17 | 389:22 390:5,10 | 436:18 437:2,9,13 |
| **sell** 310:16 463:7 | **shapira** 274:13 | 390:19 391:3,19 | 437:17,24 438:3,4 |
| 538:14,15 | **shapira.com** | 391:25 392:6,12 | 438:22,25 439:2 |
| **selling** 316:1 | 274:15 | 392:19 393:1,7,10 | 439:14,17 440:9 |
| 411:14,15 439:24 | **shared** 413:12 | 393:16,17 394:1,5 | 440:18,24 441:7 |
| 464:13 465:11 | **sharing** 277:14 | 394:9,11,21 395:1 | 441:14,19 442:7 |
| **send** 319:22 | 413:13 417:2 | 395:7,20 396:7,16 | 442:17,18,24 |
| 408:17 457:10 | 473:14 507:7 | 396:20,24 397:3,7 | 443:3,21 444:6,17 |
| 488:2,13 545:25 | **sheet** 557:13 559:7 | 398:6,11,17,20,24 | 445:4,11,21 446:1 |
| 547:7 | 559:10,18 560:1 | 399:5 400:13 | 446:5,11,14,17 |
| **sending** 343:13 | **ship** 347:2 375:6 | 401:3,6,12,20,24 | 447:15,25 448:3 |
| 494:16 | 410:23,23 413:21 | 402:13,19,23 | 448:16 449:2,7,12 |
| **sense** 525:14 | 414:5,22 427:4 | 403:5,6,16 404:3 | 450:1,9,15 451:1,8 |
| **sensitive** 430:16 | 431:25 432:5 | 404:17,19,22 | 451:19 452:9,23 |
| **sent** 292:8 310:22 | 448:10 450:4,23 | 405:16,23 406:5 | 453:3,14 454:5,11 |
| 321:25 342:16,18 | 451:15 452:21 | 407:4,22 408:2,10 | 454:18 457:17 |
| 424:5,14 431:2 | 453:25 454:14 | 409:11 410:1,10 | 458:25 459:4 |
| **sentence** 421:19 | 513:15,22 522:9 | 410:17 411:6,12 | 460:7 461:10,24 |
| **september** 320:19 | 522:14,22 524:23 | 411:18,22 412:8 | 462:16 463:3,13 |
| 321:9 384:20 | 525:9,23 526:9 | 412:18,25 413:6 | 464:1,17,24 |
| 385:5 386:21,22 | 531:3,6 | 413:17,25 414:10 | 465:17 466:1,8,17 |
| 402:1 442:10 | **shipment** 375:1 | 414:15,25 415:6 | 466:25 467:6,11 |
| 443:2 497:18 | 421:20 422:14 | 415:10,15,19,23 | 468:5,10,13,15,24 |
| 498:5 500:4,17,24 | **shipments** 431:7 | 416:5,6,13,18 | 469:1,7,12,22 |
| 501:21 502:23 | 432:3 526:20 | 417:5,16,25 | 470:12,22 471:6 |
| **series** 501:18 | **shipped** 433:11 | 418:16,23 419:9 | 471:14,25 472:7 |
| **serious** 323:13 | 465:5 554:15 | 419:15,23 420:9 | 472:17,24 473:5 |
| **serve** 292:12 | **shipping** 413:20 | 420:21 421:4,9 | 473:10,15 474:7 |
| **serves** 328:3 | 443:9 444:10,19 | 422:2,9,20 423:4 | 474:13,18,24 |
| **services** 272:14 | 444:20,23 448:22 | 423:13,16,24 | 475:9,15,24 |
| 534:10 | 449:22 453:8 | 424:9,12,19 | 476:10,16 477:6 |
| **serving** 398:10 | **shitty** 399:21 | 425:13,18 426:4 | 477:19,23 478:3 |
| **set** 306:1,13 | **shkolnik** 270:12 | 426:10,21 427:9 | 478:20,24 479:19 |
| 436:22 456:8 | 270:13 275:8,8 | 427:23 428:7,16 | 485:5,6 497:3 |
| 457:11 460:22 | 276:4 278:21 | 428:20,23,24 | 498:1,16 499:16 |
| 464:8 465:3 | 383:8,10 384:4,15 | 429:5,9,14,22 | 501:24 506:21,25 |
| **setting** 456:2 | 385:4,9,11,18 | 430:1,4,24 431:15 | 507:4 508:7 |
| **setup** 406:19 | 386:2,8,13,15 | 431:21 432:12,23 | 509:23 514:13,18 |
| **seven** 454:12 | 387:14,16,24 | 433:3,7,18 434:4 | 518:18 519:4,6 |
| | 388:2,8,14,18,20 | 434:10,18,23 | 523:1,15,21 |

**[shkolnik - sir]**

524:14 525:11
526:1,11 527:4
528:9 529:7
530:12,15 531:14
531:22 532:5
538:9 540:15
542:11 543:4,17
545:2,16 548:18
549:5,23 550:16
551:24 552:21
553:19 554:17
**short** 341:8 382:24
397:11 478:10
518:20 521:21
533:14 555:6
**shorthand** 556:7
**show** 297:24
308:24 320:14
321:15 336:12
341:18 356:11,17
362:12 424:4,13
427:16,18 428:9
429:15 444:9
449:14 450:16
451:9 464:2 471:6
542:6,20 543:1
**showed** 280:18,19
291:7 295:4,18
318:13 346:22
355:18 502:9
**showing** 341:21
538:21 539:6
541:13,22
**shown** 426:16
435:21 503:3
557:16
**shows** 336:15,17
**shut** 548:15 549:1
**sic** 449:16
**side** 366:22

**sigh** 435:8
**signature** 321:15
556:20 557:14
**signed** 341:24
379:17 467:13
558:13 559:18
**significance** 411:7
**significant** 405:2
524:10
**signing** 557:19
**similar** 334:4
348:23
**simple** 448:17,17
**simply** 330:9
332:14 334:8
363:17 426:19
**sincerely** 557:21
**singer** 483:13,20
**single** 418:2,4
420:3 542:21
543:2 554:14
**sir** 279:6 280:22
281:7,14,21 282:3
282:11,14,17
283:1,22 284:7,14
284:23 285:16
286:6 287:11
288:1,12 291:20
292:4 293:13
295:2 296:2
297:14 299:9
302:2,7,12 303:9
303:14 304:21
305:10,20 307:10
307:19 308:11
310:1 311:17,22
312:2,25 316:24
318:1,10,19 319:4
321:12 323:8,19
324:8 325:12,20
326:9,21 327:8,22

328:16,24 329:22
330:2,7,16 331:6
332:10 334:20
335:4,11,21
336:10 337:16
338:5,14,20 339:2
340:20 342:11
344:3,22 345:8,17
346:6,18,24 347:7
347:13,23 348:3
348:11,18 350:4,9
350:24 351:12,22
352:3,11,24 354:9
354:14 355:8
357:19 358:7,13
358:25 361:20
362:25 363:15,21
364:5 365:12
366:13,18 367:7
368:24 369:9,16
369:22 371:25
372:15,25 373:9
374:1,23 376:20
377:8 378:3
379:10,14,25
380:5 381:4,12
382:17 383:15,23
384:3 386:16,24
386:25 387:7
388:4,7,22 389:3
389:12,21 390:12
390:18 391:2,10
391:18,24 392:10
392:18,25 393:9
393:15 394:12,13
394:25 395:6
396:6 401:19
402:12 403:9,18
404:2,16 405:15
405:22 406:4
407:19,21,24

408:1,7,9 411:21
412:7,17 413:5,15
413:23 414:9,12
414:14,24 415:5
416:17 417:15,24
418:14,22 419:8
419:11,21 420:8
420:20 421:1
422:1,8,11,19,21
423:3,5,8,15
425:17 426:3,9
427:8,22 428:3
429:3 430:10,11
430:23 431:14,23
432:11,25 433:17
434:3,12,15,22
435:3,4,7,18
436:17,19 438:6
439:13 440:12
441:8,13 443:20
444:5,7,16 448:18
449:6,9,11,23,25
450:8,14,25
451:18 452:11
453:2,13 454:4,17
459:20 460:6
461:9 463:2,12,25
464:16,23 465:25
466:5,7,14,16
467:5 469:6,11,21
470:11,21 471:5
471:24 472:3
474:12 475:6,14
475:23,25 476:9
476:12,15 477:10
486:23 495:17,21
508:13 529:25
536:5,9 537:7,16
537:20 538:10
540:18 542:16
543:6,11,22,25

544:6,11 551:19
551:23 552:6,13
554:7,25 557:10
**sit** 293:2 528:5
**site** 360:24 540:12
**site's** 358:17
**sites** 359:4
**sitting** 500:21,23
501:10 504:10
505:12 506:9
507:10 509:7
513:6,10 517:17
518:6 522:24
528:5
**situated** 372:5,13
**situations** 412:20
412:21 413:1,7,9
**six** 553:17 554:6
**size** 298:17 329:14
330:13 351:16,24
353:2,10,11,22
418:4,11 419:2
433:12
**skip** 393:16
**skipped** 277:15,22
**slamming** 513:7
**slide** 297:24 298:1
298:3 303:22
305:13 308:24
309:1,10 311:8
365:22 367:1
403:22 408:4
410:21 502:16
541:13,16,19,20
541:22
**slides** 297:18
318:4 364:24
502:8,10,14 508:3
**slow** 439:4
**smclure** 272:23

**smith** 272:21
274:7 276:2 392:2
402:3 498:24
512:11 520:4
522:6 523:7
528:16
**smith's** 531:5
**snicker** 501:14
**sold** 470:1 553:16
**sole** 344:25 362:7
**solomon** 275:10
**solution** 400:22
**solutions** 555:13
557:1 560:1
**somebody** 292:24
399:24
**sophisticated**
372:4
**sorry** 299:15
302:13 303:25
306:10 307:10
308:21 318:17
393:7 404:11
407:7 418:7
423:19,20 428:14
429:7,9 432:1,1
436:12 437:2
438:10,22 440:10
442:10 452:18
460:9 461:16
462:7 468:25
480:9 486:2
504:25 506:21
507:5 514:16
532:11 541:19
543:18
**sort** 396:1 412:9
456:24 491:14
**sounds** 445:9
**source** 325:6
472:2

**south** 270:18
274:9
**spaeder** 272:15
**sparsely** 359:15
**speak** 281:18,24
282:6,19 283:19
284:16 285:1
290:24,24 292:9
292:13,24 356:6
384:11 406:22
456:9 486:18,22
487:3
**speaking** 284:9
285:6 288:3
289:12 364:10,12
412:20
**speaks** 294:24
297:21 333:1
335:18
**spears** 275:5
**spec** 274:2
**special** 275:1
294:9 397:4,12,15
398:22 399:9
400:15,25 401:4,7
431:20 455:11,18
457:14 483:10
514:14,20
**specialist** 275:10
**speciality** 339:10
**specialty** 389:16
**specific** 279:21
285:24 288:22
345:11,22 346:13
375:8 378:12
384:11 441:21
445:2 447:7,9,13
452:3 460:3,5
472:15 473:21
477:1,4 507:22
517:3 545:17,25

546:9,10 547:16
548:21 549:21
550:19,23 552:20
553:8
**specifically** 288:15
335:15 342:21
344:13 356:7
384:6 417:2
496:14 501:12
502:12 504:3,12
505:13 506:12
507:11,14 509:8
510:20 517:18
518:7 519:2,11
521:7,10,13
522:14 547:7
**specifics** 447:18
511:21 512:5
**speculation**
501:22 502:1
**speculative** 448:14
**speech** 398:25
**spended** 490:23
**spent** 516:11
**spoke** 286:1
335:22 406:10
480:21 482:24
484:22 496:3,4,5
**square** 272:21
**sshkolnik** 270:15
**staff** 318:21
544:22
**stafford** 451:10
**stake** 524:12
**stamped** 277:5
490:22
**standard** 347:2,3
378:6,18 531:1,11
**standpoint** 452:24
**stanner** 273:8

**stars** 273:15
**start** 287:22
　341:11 348:15
　352:16 374:7
　383:2 455:4
　457:21 494:6
　504:22 521:24
**started** 279:2
　280:4 282:12
　294:15 301:22
　303:12 398:18
　420:6 444:21
　451:14 452:20
　454:13 536:2
**starting** 293:24
　459:1 494:13
**startling** 426:18
**state** 444:2 455:23
　542:2,8,15,22
　544:18,25 558:10
　559:15
**stated** 368:13
　520:4
**statement** 372:9
　372:22 373:6,23
　376:17 379:3,7,16
　406:2 411:5,8,19
　412:14 423:1
　450:12 451:24
　454:2 463:10
　489:24 492:3
　500:5,7,9 525:1
　558:13,14 559:19
　559:19
**statements** 398:10
**states** 268:2 270:8
　275:2,2,3,4,5,7
　277:18 281:9
　289:14,16 309:2
　527:20 542:23

**stating** 385:13
　397:16,19 401:14
　414:2
**statistical** 538:21
　539:6,10
**statute** 351:6,19
　351:25 355:12
　495:3,17 496:1,10
　497:1 522:15
**statutes** 491:3
**statutory** 327:11
　331:10,16
**stay** 381:17
**stayed** 381:25
**steeped** 421:12
**stenographic**
　415:14
**stephens** 271:17
　291:13 301:15
　302:1 319:18
　326:20 385:1
　394:4,8,20,24
　429:20 438:1
　454:10,16 461:8
　465:14 469:20
　550:4
**steps** 325:4 361:9
**sticker** 437:3
**stipulated** 332:4
　496:20 526:16
**stock** 408:23 465:4
**stone** 274:23
**stop** 316:3 357:22
　374:25 456:15
　458:1,14 484:9
**store** 461:17
　465:18,19 470:6
　470:16,25 472:22
　474:8 475:19
**stores** 465:12

**straight** 398:8
　407:23
**stream** 413:12
**street** 269:8 270:4
　270:23 272:3,9,16
　272:22 273:10,20
　274:4,9,14,18
　409:25
**stressed** 406:14
**strike** 285:11
　308:25 335:13
　369:3
**strings** 463:19
**stuff** 506:6
**subject** 358:19
**submission** 419:25
**submit** 308:16
　491:23
**submitted** 307:17
　310:15 354:22
**submitting** 305:11
　489:7,13 490:11
　537:18
**subparagraph**
　357:1
**subscribed** 558:10
　559:14 560:21
**subset** 307:16
**substance** 322:25
　325:16 326:3
　328:3 343:8
　372:19 380:19,20
　416:3 431:7 432:1
　433:24 544:17,24
　545:10 554:15
**substances** 276:15
　286:2 297:2 299:7
　300:16 301:3
　302:23 303:1
　304:24 309:4
　312:8,17 315:4

316:1 322:7 323:6
　323:24 324:2,11
　324:23 325:2
　326:11,13,25
　328:14 329:10,18
　330:10 335:2
　336:5 337:22
　338:8,18,23 340:2
　340:8 344:12,16
　344:20 348:8,15
　350:14,19 352:21
　358:21 359:11
　368:20 369:6
　371:8,19 372:7
　373:4 391:13
　396:13 405:6
　407:17 432:4
　433:11 448:7,22
　452:17 466:20
　469:2 537:12,21
　537:23 542:7
　544:16
**substantial** 327:1
　353:22
**substantially**
　329:15 351:16
　352:19
**substantively**
　457:8
**suburban** 359:17
**succinct** 400:9
**sufficiently** 495:9
**suggested** 317:16
　361:3 436:14
**suggesting** 465:21
　546:7
**suggests** 388:25
　389:6 469:24
**suite** 270:9 271:13
　272:3,16,21 273:4
　274:19,24 557:2

summary 276:12
313:20 315:1,25
323:4 356:23
363:19,25 464:5
summit 268:13
270:16 278:12,18
384:7 484:13
532:14
superior 270:8
557:1
supervisor 286:16
287:10,25 318:5
320:6 323:11
supplement
497:12
supplied 460:18
467:19 543:1
supplier 410:24
431:7 432:3,6
433:8
suppliers 440:1
supply 274:21
372:4 373:4
460:21,23 467:24
support 322:16
372:6
supportive 323:16
supports 322:13
supposed 293:4
450:22
supreme 303:17
sure 281:1,23
291:9 295:10
306:10 307:12
308:23 322:4
326:12 363:24
378:17 407:11
418:8 424:9 430:1
445:17 474:25
486:5 490:3,6
505:9,20 506:10

507:6 508:7
514:25
surgical 393:3
surprise 419:6,11
surprising 418:24
suspected 310:20
suspects 438:12
439:5
suspend 328:7
374:25 526:20
suspension 328:12
328:21 331:17
444:9 445:8 448:6
448:20 449:14
450:17 454:7
suspicion 311:3
suspicions 438:16
439:9 440:5
suspicious 276:24
283:5,17 303:22
304:5 308:15
309:6,12,21
310:12,20 311:3
317:18 329:9,12
329:13 330:12,21
331:9,12 332:15
332:16 334:9,10
343:9 344:11,15
345:12,23 346:11
347:2,10,18 348:5
349:1,25 350:13
350:16 351:2
352:1,18 353:4,9
353:12,17 354:18
354:21,25 355:1
355:19 357:2,11
357:13,24 358:18
361:17 362:1
363:7 364:25
365:23,24 366:22
366:24 367:2

368:9,15 369:14
371:18,22 375:20
376:4 379:6
380:15 381:1
403:25 405:1,5,8
407:14,16 408:5,6
408:12,12,16,20
408:24 409:15,15
410:14,15 414:6
414:20 415:21
417:8,12,22 418:3
420:3,13 425:3,11
430:18 431:4
432:14 433:21
436:24 438:15
443:7,24 444:11
444:19 448:11
452:17 453:6,19
461:14 476:4,21
494:24 525:16,17
526:6,10,16,19,22
531:2,6 544:8
546:20 547:11,12
547:23 548:6,24
549:9 550:12,22
551:7,15,22
552:16 553:1,2,5
553:10
swedesboro
450:18
sweet 349:21
sworn 556:6
558:10,13 559:14
559:18 560:21
synopsis 404:8,13
system 276:25
277:21 297:8
299:6 304:24
309:5 314:6
324:25 325:24
329:8 336:22

344:14 345:2,12
345:22 346:10,13
366:24 375:4
380:13,14,16
381:1 382:4 405:4
407:16 410:13,14
415:22 417:8,13
439:22 441:9
487:8 488:17
494:4 538:3,4
systems 417:13
440:23 539:16
553:14

**t**

t 276:1,1 341:24
tail 301:7
tails 298:9 300:12
301:9,21 317:16
333:16 359:23
take 296:12 321:3
325:4 330:24
341:3 357:3
358:16 361:9
382:18,19 429:17
430:5 454:20
463:19 483:10
491:14 499:14
508:2 514:21
520:20 521:5,15
529:16
taken 341:8
346:12 366:10
382:24 397:11
455:1 478:10
521:21 533:14
549:17 553:9
555:6 556:3,7,14
talk 288:16 378:12
378:13 428:15
447:6,18,21 457:8
477:1 486:14

489:1 501:15 548:21

**talked** 363:7
457:25

**talking** 280:24
345:20 364:20
369:19,23 371:15
399:3 428:18,21
491:25 499:18
512:19

**talks** 311:8 327:10
365:24 406:7
550:19

**targeting** 536:11
544:13

**tasked** 536:25

**tayman** 270:3,3
438:20 457:23
480:22,24 482:3
482:11,13 483:16
483:23 484:17
485:20,24 553:25
557:5

**team** 451:22
536:24

**tears** 287:4

**technique** 545:19

**techniques** 290:1
546:10

**tedious** 291:6

**teleconference**
270:22 271:12,21
273:3 274:12,22
275:9

**telephone** 480:10
480:11 481:11
482:9 483:21
486:19

**tell** 279:6 283:9
291:10 305:23
311:9 406:12

422:11 423:19
461:15 476:19
479:14 485:24,25
505:13 506:10
528:15 539:2

**telling** 345:20
409:13,17 421:22
422:21 425:24
432:8 444:22
451:14 452:20
454:13 488:21
494:17 502:14

**tells** 538:12,16

**ten** 367:16 399:13

**tenth** 273:10

**term** 300:4 310:21

**terminated** 285:3
361:16

**termination** 285:7

**terminology**
464:19 516:22

**terms** 287:15
415:2 416:2
436:23 460:14
472:8 480:16
496:5

**test** 530:8

**testified** 288:21
294:18 295:7
316:19 319:13
343:16 397:25
427:15,19 484:12
487:7 492:5,18
493:5 503:8
512:10 513:13
524:1,4 525:5
526:25 530:19,25
531:4,10,20 536:1
537:9

**testify** 281:4
287:13,14 289:23

289:23

**testifying** 486:6
498:23 508:24
509:3 512:14
522:9 524:22
533:2 535:19,21

**testimony** 280:13
281:12 283:25
285:9,20 286:25
289:4 290:8
294:24,24 296:6
296:14,23 335:7
335:22 336:1,7
367:20 427:11,13
427:20,25 428:10
431:12 448:13
478:25 480:2
485:17,18 497:17
498:8,21 499:4,15
499:20,25 501:2
503:18 514:1
517:25 520:4
522:5,23 523:7,18
528:4,6,7,25 529:3
530:6 531:13
532:8,19 534:3
535:1,18,25 537:6
547:10 555:9
556:5,6,10 558:6,7
559:6,9,12

**teva** 277:8 459:7
459:13

**texas** 273:5 279:13
385:6 386:21
451:10 500:25
541:5,15 552:4

**thank** 278:11
320:24 321:1
333:24 341:15
349:20 365:9
388:22 400:13

401:3,6 402:22
409:1 424:10
430:2 447:4 458:9
468:10 480:14
486:8 492:16
498:22 521:14,16
535:10,11 540:7
540:14 541:8
543:22 550:3
551:3 554:22

**that'd** 412:24

**thick** 435:24

**thing** 288:16 294:4
399:23 423:22
521:9

**things** 299:12
300:25 352:16
370:24 382:3
400:17 458:14
476:1 489:2
501:15 504:2
505:8 506:11,12
520:11

**think** 282:22
283:7,9 294:13
302:16 309:2
316:19 318:11
319:12 329:4
349:10 352:17
360:5 367:18
388:14 394:15
398:2,12,13 399:3
399:25 400:3,4
402:6 406:8 407:7
407:9 411:25
428:21 435:22
442:20,25 456:24
457:1 462:20
473:7 477:16
478:1 479:18
485:4 493:1

498:20 501:25
512:10 513:12
514:20 516:9
521:1 522:12
525:20 530:3
540:17
**third** 283:3 380:10
380:13 473:19
**thirty** 557:18
**thompson** 275:8
**thornburg** 274:8
**thoroughly** 357:25
**thought** 428:18
435:15 445:7
446:1,2 498:9
502:15 506:6
520:7,8
**thousands** 501:15
**three** 271:3 272:21
286:15 287:4
343:24 353:3,3
390:15 451:13,15
452:19,20 453:10
**threshold** 375:3,9
433:20
**thresholds** 380:16
380:22
**throwing** 426:18
**thursday** 278:25
288:18 289:23
383:11,14 384:17
462:17 464:19
486:7,19,25 487:4
**tied** 522:14
**tiers** 286:15
**ties** 280:1
**time** 291:16
293:19 296:12,15
299:23 301:10
303:11 308:4
319:23 321:21

341:7,13 349:17
368:21 382:23
383:4 397:10
399:16 401:10
407:3 410:7 411:2
415:2 421:8,14
424:20,21 425:21
426:6 429:2
433:22 446:8
454:25 455:6,13
455:18 456:4,8,21
457:4 458:8,17,25
461:11 477:8,12
477:15 478:9,13
479:23 480:1
485:14 491:25
493:9,18,24 499:7
503:5 506:24
514:15,18 516:11
517:24 521:20
522:1 526:7 529:9
533:13,17 547:18
552:17 553:22
555:5
**timed** 478:3
**times** 282:23
318:6 425:19
479:21 498:12
518:12 526:25
527:5
**timing** 452:7,10,24
**title** 344:12 356:22
371:16 407:14
459:8
**titled** 539:14
**titles** 377:11
**tlclawfirm.com**
270:6
**today** 280:18
281:5 283:20
284:11 285:10

289:24 293:2
374:17 381:23
458:6 486:11,20
487:1,5 500:21,23
501:10 504:10
505:12 506:9
507:10 509:7
517:17 518:6
535:20,24,25
**today's** 485:18
555:9
**told** 376:22 422:4
426:7 427:2 428:1
436:12 448:9,24
449:19 450:5,22
453:10 456:12,12
456:13 479:5
488:16 489:5,11
490:9 491:23
493:13 523:17
526:15,20 528:11
531:9
**tom** 424:16
**tomorrow** 458:2
**tool** 553:13
**tools** 543:14 544:2
**top** 373:12 402:16
430:15 458:18
493:24 551:8
**topic** 285:6 403:22
540:16,18
**topics** 285:24
287:1,3 288:3,6
454:19
**total** 555:11
**totally** 489:18
534:1
**tower** 274:4
**town** 359:20
439:22

**trade** 422:5,12
493:1
**traditional** 298:19
**trails** 457:2
**training** 488:25
**trainings** 539:10
**transaction** 443:8
443:11,13,23
472:12
**transactions**
306:24 307:17
440:3 441:1 443:8
443:25 463:15
464:5 465:2
**transcribed** 558:7
**transcript** 277:25
499:17 524:15
557:11,12 558:5
558:12 559:5,11
559:17
**transcription**
556:9
**transferred**
279:15
**transition** 493:24
494:15
**transmission**
464:7
**transmitted**
463:18 464:6
465:3
**treated** 473:23
**trends** 544:15,23
545:9
**trial** 383:21
427:11,16 498:21
498:24 499:20
512:11 513:13
522:4,23,23 523:6
523:7,19 524:1,5
525:6 528:25

[trial - vendor]

Page 49

529:3
tried 326:6 491:14
491:17 533:21
trouble 519:20
true 303:6,11
311:14,19 312:4
335:16 346:3
347:25 350:6
354:11 355:9
374:15 534:2
542:9,23 543:3
556:10
truly 300:20
trusted 326:3
try 297:6 395:13
401:15 402:18,20
415:25 416:9
439:3 490:5
543:21 546:13
trying 322:14,17
324:5,18 325:9
340:4 360:6,16,19
367:19 381:18
396:10,18 398:2
410:3,7 416:15
426:19 456:25
457:11 511:9
515:16 546:5
tucker 271:12
tuckerellis.com
271:15
turn 332:16
334:10 364:20
366:20 373:11
376:8 389:14
402:14 404:4
410:18 416:19
418:1 430:13
433:1 438:7
442:19 473:16
541:6

tweel 270:22
two 279:12 282:16
283:11 329:4
341:22 397:24
478:1 479:1
481:23 508:9
553:21 554:1,9,18
type 279:17
389:23 402:16,24
403:7 420:12
470:2 484:23
types 543:9

**u**

u.s. 270:7 289:16
527:21
u.s.c.a. 277:16
uh 408:21
ultimately 513:16
528:6,8
unable 443:12
uncommon 407:2
underneath 364:9
364:23,24 366:2
366:22
understand 281:6
283:18 284:1,4,21
285:13,25 291:9
308:20 312:7
323:3 339:21
343:12 355:19
359:10 386:18
405:18 440:11
447:12,23,24
455:22 456:22
458:22 509:15
515:12,13 520:25
528:11
understanding
293:3 312:15
313:14 330:11
331:24 347:5

348:9,14 352:20
353:18 355:21
360:21 362:7
368:19 369:2,7
370:19 375:16
376:1 382:7
405:10,18 407:18
407:23 408:14
409:16 410:6,25
412:19 416:24
418:18 430:19
431:8 432:24
433:14,25 435:12
438:17 439:10
440:17,19 441:3
444:1 455:9 462:1
472:4 476:1
487:22
understood
284:12 285:8
297:12 301:10
303:1 308:4 322:5
360:6,18 398:4
487:25 495:16
523:24 526:24
undoubtedly
323:12
unfortunately
467:13 498:25
unilaterally 456:4
uniquely 372:5,12
unit 278:6 341:6
341:11 382:22
383:2 454:24
455:4 521:19,24
536:11,12,14,21
536:24
united 268:2 270:8
275:2,2,3,4,5,7
277:18 281:9
289:14,16 527:20

542:23
units 375:8 538:22
539:7 542:20
543:1 555:11
unrelated 460:4
unsigned 471:9
473:11,12
unusual 329:14,16
351:15,17 353:2,2
353:10,11 418:4
418:11 419:2
usc 285:22 337:11
344:7
usdoj.gov 270:10
use 310:21 323:12
380:19 467:23
485:13 524:15
uses 327:24
usual 314:2
utilized 325:6
403:11 421:12
435:13 505:5

**v**

v 268:9,13 557:6
558:3 559:3
vague 336:7
vaguely 385:10
416:22
valid 314:3
vanni 272:2
variables 300:21
variation 488:5
variations 488:9
variety 337:22
338:7 370:24
various 282:20,23
383:19 385:21
503:4,22 505:9
vein 334:5
vendor 464:3,4,6
465:1,18,19

**vendors** 467:20
**ventura** 273:19
**verbally** 318:25
**verbatim** 500:11
**verify** 373:20
**veritext** 555:12
557:1,7 560:1
**veritext.com.**
557:17
**version** 407:10
438:11
**versus** 300:22
367:2 408:12
510:16 512:6
527:20
**vice** 406:9 424:5
**vickie** 318:14,20
**video** 278:7
446:11
**videographer**
275:10 278:3
341:4,9 382:20,25
397:9 401:8 447:2
454:22 455:2
477:12,14,21
478:7,11 521:17
521:22 533:11,15
555:3,7
**videotaped** 268:19
269:1
**view** 322:25
553:15
**viewed** 433:21
**vigilant** 326:1
**violating** 448:7,21
**violation** 334:25
452:18
**virginia** 270:23
**visibility** 411:25
412:1 462:19,23
464:20 466:3

469:17 470:6,24
475:18
**visible** 333:19
**vol** 557:8 558:4,9
559:4,13 560:20
**volume** 268:18
278:6
**volumes** 546:6
**vs** 268:11 277:18

**w**

**wacker** 271:22
**wagmdl003959...**
277:4
**wait** 477:19,19
**waites** 275:7
**waived** 557:19
**walgreen** 274:16
274:16 394:17
459:15,18 460:11
460:21,23 461:1
467:16 470:3
471:9,18 473:13
**walgreens** 394:3
437:25 454:6
459:23,24 460:13
461:5,16 464:3,4
464:12 465:1,8,11
466:11 467:23
469:14 470:7
471:2 473:24
**walked** 498:16
**walker** 551:6,20
**walmart** 271:16
**want** 281:22 291:8
294:6 296:12
297:24 304:2
313:21 339:12
340:5 341:18
364:7 368:1
373:11 378:11
382:18 387:18

395:21,22 396:2
400:16 407:11
408:18 441:24
446:7 456:18
457:12,24 467:14
481:25 489:21,22
500:11 511:20
512:2 526:8
533:25 534:5
541:11
**wanted** 325:14
456:17 523:18
**wants** 357:21
358:19 403:13
**warning** 479:16
**warrant** 331:15
**warrington**
274:24
**washington**
268:20 269:9
270:5 272:10,17
273:11,20 294:15
294:21 321:10
405:12,19 461:13
**waste** 554:18
**watch** 358:18
**watson** 395:2
**way** 333:14 396:9
406:6 421:18
425:22,23 433:3
457:12 470:5,16
475:3 476:1
508:21 509:17
517:21 531:13
**ways** 490:24
**wc.com** 272:11,11
272:12,12
**we've** 287:1,1
288:3 344:17
369:23 394:17
402:6 463:14

491:25
**web** 540:12
**week** 283:20 285:9
291:23 302:17
316:22 335:6,18
346:22 355:18
369:19 458:17
468:1 493:6,14
508:24 509:4,18
516:11 525:7
**week's** 485:17
**weekly** 354:22
464:6 465:4,20,22
**welcomed** 419:22
**welfare** 327:2
**went** 321:21
322:10 342:21
358:15 410:16
430:20 457:25
503:9 516:4
525:16 531:18,25
**west** 270:8,23
271:22 453:23
**wewatta** 274:18
**whatsoever**
321:18
**whichever** 411:15
**wholesale** 357:24
406:17 416:20
417:10 418:7,8
419:4 420:10,11
420:24 424:23
425:7 465:20,22
466:4
**wicht** 272:8
**widgets** 408:18
**william** 274:3,8
**william.davison**
274:6
**william.padgett**
274:10

| | | | |
|---|---|---|---|
| **williams** 269:7 | 319:4,9,19,25 | 382:11,17 384:3 | 463:25 464:16,23 |
| 272:9 | 320:10 321:18,24 | 384:13 385:2,10 | 465:16,25 466:7 |
| **wisconsin** 453:20 | 322:20 323:8,19 | 385:17 386:1 | 466:16,23 467:5 |
| **wish** 458:16 | 324:8,14,21 | 388:7 389:12,21 | 469:6,11,21 |
| 500:13 | 325:12,20 326:9 | 390:3,18 391:2,18 | 470:10,21 471:5 |
| **withdraw** 387:8 | 326:16,21 327:8 | 391:24 392:18,25 | 471:24 472:10 |
| 404:12 410:4 | 327:22 328:16,24 | 393:9,15,25 | 473:3 474:12,22 |
| 413:8 420:13 | 329:22 330:2,7,16 | 394:25 395:6,19 | 475:14,23 476:9 |
| 428:17 436:19 | 330:20 331:6 | 396:6 397:22 | 476:15 477:5,10 |
| 437:5,6,13 440:20 | 332:2,10 334:20 | 398:12 400:23 | 482:6 486:2 |
| 442:4 462:7 | 335:4,11 337:4,16 | 401:19 402:12 | 487:22 488:20 |
| 492:14 | 338:5,14,20 339:2 | 404:2,16 405:15 | 490:20 491:5,17 |
| **withdrawn** 464:10 | 339:8,21 340:10 | 405:22 406:4 | 492:16 495:13,15 |
| 519:7 | 340:20,25 342:3 | 407:2,21 408:1,9 | 496:13 497:4,13 |
| **withdrew** 437:9 | 342:11,15,20 | 408:16 409:10,24 | 499:22 500:15 |
| **witness** 270:2 | 343:2 344:3,22 | 410:12 411:4,10 | 501:8,25 504:8 |
| 282:3 283:1,22 | 345:8,17,25 346:6 | 411:21 412:7,17 | 505:18 506:16 |
| 284:7,14,23 | 346:18,24 347:7 | 412:24 413:5 | 507:18 508:9,11 |
| 285:16 286:6,21 | 347:13,23 348:3 | 414:9,14,24 415:5 | 508:14,17 510:6 |
| 287:7,19 288:12 | 348:11,18 350:4,9 | 416:12,17 417:1 | 511:2,19 512:24 |
| 289:1,9,20 290:5 | 350:24 351:5,12 | 417:15,24 418:22 | 514:4,6,23 515:13 |
| 290:13,21 291:4 | 351:22 352:3,11 | 419:8,13,21 420:8 | 518:13,20,24 |
| 291:20 292:4,7,21 | 352:24 353:7,14 | 420:20 421:3,7 | 519:5,8,14 520:3 |
| 293:13 295:2 | 353:20 354:1,9,14 | 422:1,8,19 423:3 | 520:23 522:19 |
| 296:9,24 297:6,22 | 355:12,23 357:19 | 425:17 426:3,9,15 | 523:3,14,22 |
| 298:14,22 299:3,9 | 358:7,13,25 359:7 | 427:8,22 428:5 | 524:25 525:14 |
| 299:15,22 300:12 | 359:14 360:5,13 | 430:23 431:14,20 | 526:4 527:6 |
| 300:19 301:18 | 361:2 362:3,10 | 432:11 433:17 | 528:10,19 529:9 |
| 302:2,7,12 303:4,9 | 363:15 364:5 | 434:3,17,22 | 530:1,24 531:16 |
| 303:14 304:2,5,12 | 365:12 366:7,13 | 435:18 436:9,17 | 532:6,20 533:1,3,6 |
| 304:21 305:1,20 | 366:18 367:7 | 438:24 439:1,13 | 533:22,23 534:7 |
| 306:7,19 307:2,10 | 368:12,13,24 | 439:15 440:8,22 | 534:14 535:2,7,8,9 |
| 307:13,19 308:1 | 369:9,16 370:3,18 | 441:6,13 443:20 | 536:5 537:7 |
| 308:20 309:8,20 | 371:5,11,25 | 444:5,16 446:24 | 538:10 539:1 |
| 310:1,8,14 311:2 | 372:15,25 373:9 | 447:6,24 449:6,11 | 541:1 542:1,13,17 |
| 311:17,22 312:2,6 | 374:1,7,23 375:19 | 449:25 450:8,14 | 543:6,18 544:11 |
| 312:19 313:16 | 376:3,20 377:1,8 | 450:25 451:6,18 | 545:4,21 546:11 |
| 314:8,16,24 315:9 | 377:22 378:3,14 | 453:2,13 454:4,17 | 546:17 547:3,18 |
| 315:17,22 316:7 | 378:23 379:10,14 | 456:16 457:14 | 550:25 554:5,8,25 |
| 316:24 317:5,12 | 379:25 380:5 | 460:2,6 461:9,22 | 556:4,7,11 557:8 |
| 317:20 318:1 | 381:4,12,16 | 462:14 463:2,12 | 557:11 558:1,4,11 |

**[witness - zuckerman.com]**                                      Page 52

559:1,4,15
**witness's**  280:13
  396:19
**witnesses**  455:20
**witness'**  557:14
**wonder**  528:21
**word**  282:22 283:8
  367:16 395:21,25
  396:9,10 399:12
  400:10 401:15
  410:2,6 491:20
  520:8
**words**  343:24
  367:16 396:18
  399:13 472:14
**work**  339:5 384:5
  400:21 458:23
  476:18,19 477:22
  489:1 546:20
**worked**  318:23
  431:9 511:4,4
  550:24 554:8
**working**  365:14
  384:1 405:11,20
  411:1 416:2,7
  420:25 462:9
  488:18 536:8
**workload**  529:12
**works**  294:12
**worst**  528:23
  529:1
**worth**  541:5
**wright**  268:19
  269:1 278:8
  341:21 357:11,13
  383:9 401:13
  436:21 447:17
  458:6,13,18 459:5
  459:9 478:18
  490:8 497:11
  500:3,10,22 502:5

504:10 507:11
508:5 510:8 512:1
521:4 522:4 524:9
527:15 530:24
531:10 532:9
535:14 539:23
540:21 541:3
551:12 555:10
557:8 558:4,9
559:4,13 560:20
**wright's**  447:10
**writes**  354:17
**writing**  513:5
**written**  314:1
  379:18 459:22
  513:3 527:19
**wrong**  291:24
  437:3 498:2
**wrote**  323:11
  368:12 372:17
  375:1 377:10
  424:22 510:16
  530:5
**wva**  277:24

**y**

**yeah**  398:22
  402:19 428:16
  438:21,25 440:18
  442:17,24 445:4
  529:19
**year**  382:1 480:19
  484:1 499:5 526:7
**years**  282:16
  284:17 286:12
  288:9 336:18
  383:23 414:2
  451:14 452:19
  453:9,24 454:13
  461:12 487:16
  492:20 495:15
  504:15 505:2

507:10 554:9
**york**  270:14,14
  271:4,4

**z**

**zachary**  274:22
**zimmerman**  406:8
  406:14
**zip**  541:24
**zmartin**  274:25
**zoom**  387:14
  404:5
**zuckerman**  272:15
**zuckerman.com**
  272:18

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.