Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3   IN RE: NATIONAL          )   MDL No. 2804
     PRESCRIPTION OPIATE      )
 4   LITIGATION               )   Case No.
                              )   1:17-MD-2804
 5                            )
     THIS DOCUMENT RELATES TO )   Hon. Dan A.
 6   ALL CASES                )   Polster
                              )
 7
 8
 9                      __ __ __
10             Tuesday, May 14, 2019
                        __ __ __
11
      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12              CONFIDENTIALITY REVIEW
                        __ __ __
13
14
15
16        Videotaped Deposition of NANCY K.
     YOUNG, Ph.D., held at Robinson Calcagnie,
17   Inc., 19 Corporate Plaza Drive, Newport
     Beach, California, commencing at 9:10 a.m.,
18   on the above date, before Debra A. Dibble,
     Registered Diplomate Reporter, Certified
19   Realtime Reporter, Certified Realtime
     Captioner, and Notary Public.
20
21
22                      __ __ __
23        GOLKOW LITIGATION SERVICES
        877.370.3377 ph | fax 917.591.5672
24              deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     A P P E A R A N C E S:
 2         MOTLEY RICE LLC
           BY:  JODI WESTBROOK FLOWERS, ESQUIRE
 3              jflowers@motleyrice.com
                MICHAEL J. PENDELL, ESQUIRE
 4              mpendell@motleyrice.com
                ANNIE E. KOUBA, ESQUIRE
 5              akouba@motleyrice.com
           28 Bridgeside Boulevard
 6         Mt. Pleasant, South Carolina 29464
           (843) 216-9163
 7         Counsel for MDL Plaintiffs
 8
           ROBINSON CALCAGNIE, INC.
 9         BY:  PAUL DAGOSTINO, ESQUIRE
                pdagostino@robinsonfirm.com
10              LILA RAZMARA, ESQUIRE
                lrazmara@robinsonfirm.com
11         19 Corporate Plaza Drive
           Newport Beach, California 92660
12         (949) 720-1288
           Counsel for MDL Plaintiffs
13
14         BRANSTETTER STRANCH & JENNINGS PLLC
           BY:  MICHAEL G. STEWART, ESQUIRE
15              michaels@bsjfirm.com
           223 Rosa L. Parks Boulevard
16         Suite 200
           Nashville, Tennessee 37203
17         (615) 254-8801
           Counsel for Tennessee Plaintiffs
18
19         REED SMITH LLP
           BY:  ERIC L. ALEXANDER, ESQUIRE
20              ealexander@reedsmith.com
           1301 K Street N.W.
21         Suite 1000 - East Tower
           Washington, D.C. 20005
22         (202) 414-9403
           Counsel for AmerisourceBergen Drug
23         Corporation
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          KIRKLAND & ELLIS LLP
            BY:  KARL STAMPFL, ESQUIRE
 2               karl.stampfl@kirkland.com
            300 North LaSalle
 3          Chicago, Illinois 60654
            (312) 862-2595
 4          Counsel for Allergan Finance LLC
 5
 6          BARTLIT BECK LLP
            BY:  ALEX J. HARRIS, ESQUIRE
 7               Alex.Harris@BartlitBeck.com
            1801 Wewatta Street
 8          Suite 1200
            Denver, Colorado 80202
 9          (303) 592-3197
            Counsel for Walgreens Company
10
11          MARCUS & SHAPIRA LLP
            BY:  ELLY HELLER-TOIG, ESQUIRE
12               ehtoig@marcus-shapira.com
                 (appearing telephonically)
13          One Oxford Centre
            35th Floor
14          Pittsburgh, Pennsylvania 15219
            (412) 471-3490
15          Counsel for HBC Services
16
            MORGAN LEWIS & BOCKIUS LLP
17          BY:  VALERIE M. TOTH, ESQUIRE
                 valerie.toth@morganlewis.com
18          200 South Biscayne Boulevard
            Suite 5300
19          Miami, Florida 33131-2339
            (305) 415-3413
20          Counsel for Teva Pharmaceuticals USA
            Inc., Cephalon Inc., Watson
21          Laboratories Inc., Actavis LLC, and
            Actavis Pharma Inc. F/k/a Watson
22          Pharma Inc.
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          ZUCKERMAN SPAEDER LLP
            BY:  STEVEN HERMAN, ESQUIRE
 2               sherman@zuckerman.com
            1800 M Street, N.W.
 3          Suite 1000
            Washington, D.C. 20036-5807
 4          (202) 778-1800
            Counsel for CVS Indiana LLC and CVS
 5          Rx Services Inc.
 6
            LOCKE LORD LLP
 7          BY:  ANNA K. FINGER, ESQUIRE
                 anna.k.finger@lockelord.com
 8               (appearing telephonically)
            2200 Ross Avenue
 9          Suite 2800
            Dallas, Texas 75201
10          (214) 740-8000
            Counsel for Henry Schein, Inc. and
11          Henry Schein Medical Systems, Inc.
12
            ARNOLD & PORTER KAYE SCHOLER LLP
13          BY:  ANGEL TANG NAKAMURA, ESQUIRE
                 Angel.Nakamura@arnoldporter.com
14          777 South Figueroa Street
            44th Floor
15          Los Angeles, California 90017-5844
            (213) 243-4094
16          Counsel for Endo Health Solutions
            Inc., Endo Pharmaceuticals Inc., Par
17          Pharmaceutical, Inc. and Par
            Pharmaceutical Companies, Inc.
18
19          SHOOK, HARDY & BACON, L.L.P.
            BY:  MICHELLE M. FUJIMOTO, ESQUIRE
20               mfujimoto@shb.com
            5 Park Plaza
21          Suite 1600
            Irvine, California 92614-8502
22          (949) 475-1500
            Counsel for McKesson
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          JONES DAY
            BY:  LAURA JANE DURFEE, ESQUIRE
 2               ldurfee@jonesday.com
            2727 North Harwood Street
 3          Suite 500
            Dallas, Texas 75201-1515
 4          (214) 969-5150
            Counsel for Walmart Corporation
 5
 6          O'MELVENY & MYERS LLP
            BY:  HOUMAN EHSAN, M.D., ESQUIRE
 7               hehsan@omm.com
            400 South Hope Street
 8          18th Floor
            Los Angeles, California 90071
 9          (213) 430-6000
            Counsel for Janssen Pharmaceuticals
10          Inc. and Johnson & Johnson
11
            ROPES & GRAY LLP
12          BY:  JESSICA F. SORICELLI, ESQUIRE
                 jessica.soricelli@ropesgray.com
13          1211 Avenue of the Americas
            New York, New York 10036
14          (212) 256-9000
            Counsel for Mallinckrodt
15          Pharmaceuticals
16
            LYNN PINKER COX & HURST, LLP
17          BY:  JOHN VOLNEY, ESQUIRE
                 jvolney@lynnllp.com
18          2100 Ross Avenue
            Suite 2700
19          Dallas, Texas 75201
            (214) 981-3800
20          Counsel for Purdue Pharma
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          MORGAN LEWIS & BOCKIUS LLP

            BY:  JAMES ALPHONSE NORTEY, ESQUIRE

 2               james.nortey@morganlewis.com

                 (appearing telephonically)

 3          1000 Louisiana Street

            Suite 4000

 4          Houston, Texas 77002

            (713) 890-5000

 5          Counsel for Rite Aid

 6

            THE VIDEOGRAPHER:

 7

                 David Kim,

 8               Golkow Litigation Services

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1

                     I N D E X

2

     NANCY K. YOUNG, Ph.D.                          Page

3

        DIRECT EXAMINATION BY MR. ALEXANDER          9

4

5                      E X H I B I T S

     No.                  Description           Page

7   Young-1    Nancy K. Young, Ph.D. report    128

8   Young-2    Nancy K. Young, Ph.D.           130
               report/reformatted

9

    Young-3    Materials considered by Nancy   133
10             Young

11  Young-4    March 7, 2018, Substance Use,   309
               the Opioid Epidemic, and the
12             Child Welfare System: Key
               Findings from a mixed Methods
13             Study

14  Young-5    2-23-16 written testimony of    365
               Nancy K. Young, Ph.D.,
15             Examining the Opioid
               Epidemic: Challenges and
16             Opportunities

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     PROCEEDINGS
 2              (May 14, 2019 at 9:10 a.m.)
 3              THE VIDEOGRAPHER:  We are now
 4       on the record.  My name is David Kim.
 5       I'm a videographer for Golkow
 6       Litigation Services.  Today's date is
 7       May 14, 2019, and the time is
 8       9:10 a.m.  This videotaped deposition
 9       is being held in Newport Beach,
10       California, in the matter of National
11       Prescription Opioid Litigation MDL
12       No. 2804 for the U.S. District Court,
13       Northern District of Ohio, Eastern
14       Division.
15              The deponent is Nancy K. Young.
16       Counsel will be noted on the
17       stenographic record.
18              The court reporter is Debbie
19       Dibble, and will now swear in the
20       witness.
21              NANCY K. YOUNG,
22  having first been duly sworn, was examined
23  and testified as follows:
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    DIRECT EXAMINATION

2    BY MR. ALEXANDER:

3         Q.     State your full name for the

4    record, please.

5         A.     Nancy Kathryn, K-A-T-H-R-Y-N,

6    Young.

7         Q.     And you go by Dr. Young

8    professionally?

9         A.     Yes, I do.

10        Q.     Okay.  Dr. Young, do you

11   understand you're here to be deposed as an

12   expert witness for the plaintiffs in the

13   first federal MDL trial involving Cuyahoga

14   and Summit Counties?

15        A.     Yes, I do understand.

16        Q.     Have you ever been deposed

17   before in connection with a lawsuit?

18        A.     No, I have not.

19        Q.     Have you ever served as an

20   expert witness in connection with a lawsuit?

21        A.     No, I have not.

22        Q.     Before we get into much of the

23   substance and I go over a couple of the

24   rules, I'll state two or three things that
```

Highly Confidential - Subject to Further Confidentiality Review

1    happened off the record so we're clear.

2              First is that there is somebody

3    calling in by phone and perhaps later

4    attending live, who is not in any of these --

5    in this case for any party in this case but

6    is trying to participate on behalf of a state

7    court plaintiff in Tennessee.  I would say on

8    behalf of the defendants that we object to

9    anybody participating who isn't in this case,

10   and hasn't followed on appropriate cross

11   notice proceedings, although we don't plan to

12   do anything to stop participation based on

13   the representation that the participation

14   wouldn't involve any questioning or

15   objecting.

16             The other is that we've been

17   informed by the two lawyers -- I'm sorry, two

18   of the three lawyers here from Motley Rice

19   who represent Summit County that they both

20   intend to object, simultaneously or

21   overlapping nature, on behalf of the same

22   party, and on behalf of the defendants.  We

23   do object to that as well.  Unless it gets to

24   be a particular problem or issue, I think we

Highly Confidential - Subject to Further Confidentiality Review

```
 1    will just go forward with that.

 2                I would also state that we were

 3    given a copy of the expert report of

 4    Dr. Young just before we got started, with

 5    the representation that it is simply

 6    reformatted, but that no words or substance

 7    has changed to any portion of the report.

 8                MS. FLOWERS:  And for the

 9         record, plaintiffs would state they

10         have no objection to the participation

11         of the state counsel, as defendants

12         regularly take the position that they

13         should go to the MDL for the

14         depositions.

15                We don't -- we do not object to

16         their appearance today, and with

17         respect to counsel being able to

18         object, we disagree with the statement

19         that was made on the record.

20                MR. ALEXANDER:  I'm sorry,

21         somebody from the phone was saying

22         something?

23                MR. STEWART:  Yeah.  This is

24         Mike Stewart, representing the
```

Highly Confidential - Subject to Further Confidentiality Review

1          Tennessee plaintiff.  We don't agree

2          with the objection, but that said,

3          your characterization of what we plan

4          to do is accurate.

5          Q.     (BY MR. ALEXANDER)  So,

6    Dr. Young, you have testified in connection

7    with legislative proceedings before.

8               Correct?

9          A.     Yes, I have testified at the

10   Senate and at the House of Representatives,

11   yes.  And at a few different state capitals.

12         Q.     And when you've given that sort

13   of testimony, have you been under oath?

14         A.     Yes, I have.

15         Q.     Do you have any questions about

16   what it means to be under oath here today?

17         A.     No, I do not.

18         Q.     Some basic rules of deposition.

19   This is a question-and-answer format.  I'm

20   over here asking the questions.  If you need

21   to take a break at any time, let us know; we

22   can take a break.  If you don't understand my

23   questions, I can try to fix them.

24               If there is an objection from

Highly Confidential - Subject to Further Confidentiality Review

1    plaintiffs' counsel to the form of the

2    question, and you understand it, you should

3    try to answer it anyway.

4              If somebody here instructs you

5    not to answer, then that's kind of between

6    you and them.  Although I'm not sure there

7    will be any basis to instruct you not to

8    answer based upon what your role is in this

9    case.

10             If you have some personal

11   emergency, health-related, whatever,

12   discomfort -- I know there's been talk about

13   you bringing a fan and having issues with the

14   light in here and all of that -- let us know.

15   We'll try to fix it so that you can sit and

16   answer questions.  In general I think we'll

17   go until somebody asks for a break.  I'm not

18   sure that I'm going to be watching the clock,

19   but like I said, if you feel the need to take

20   a break because of whatever reason, let us

21   know and we'll do that.

22             Other basic rules, the court

23   reporter to your right, my left, is typing

24   down everything everybody says.  Even though

1    this is being videotaped, you do need to give

2    answers with actual words out loud, not head

3    nods or shakes or kind of nonverbal responses

4    like mm-hmm or uh-huh.  Because that would

5    require the court reporter to make a judgment

6    about what you mean and put that down.

7              So -- any questions about the

8    proceedings or the procedures for this

9    proceeding before we get going?

10         A.    No, I do not have any

11   questions.

12         Q.    Do you know when you were

13   retained as an expert witness in this matter?

14         A.    In January of 2019.

15         Q.    Do you know who approached you?

16         A.    A colleague of Jodi Flowers.

17         Q.    Who is that?

18         A.    Her name is Erin Dickinson.

19         Q.    Before January of 2019, had you

20   had any connection with any of the plaintiff

21   lawyers or any of the plaintiff groups in

22   connection with anything about opioid or

23   opiate litigation?

24         A.    No.  I had not.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     The work that you'd done in

2   this case, as I understand it based upon your

3   report, you do rely on some prior

4   presentations and prior work that you do in

5   connection with your work outside of

6   litigation; is that a fair statement?

7              MS. FLOWERS:  Objection to

8         form.

9              THE WITNESS:  Yes.  I've been

10        working on these related policy issues

11        for 25 years.

12     Q.     (BY MR. ALEXANDER)  Okay.

13   Ma'am, can you hear me okay?  You're looking

14   away from where I'm asking questions.

15     A.     Yes, I can hear you fine.

16     Q.     Okay.  So do you have an idea

17   as to how many hours you or your staff have

18   put in on this matter prior to signing your

19   expert report around March 25th?

20     A.     Yes.  About 150 hours.

21     Q.     And how many of those were

22   yours versus your staff's?

23     A.     Probably 10 to 15 hours were my

24   staff.

1    Q.    And who from your staff

2    participated?

3    A.    Statistician named Dr. Yueqi

4    Yan, from the research assistant program

5    associates on finding literature.

6    Q.    Dr. Yan, is that Y-A-N?

7    A.    Yes, it is.

8    Q.    And can you give me the names

9    of any other staff that participated other

10   than Dr. Yan?

11   A.    I asked a staff member to run

12   information about all of the technical

13   assistance that we've delivered in Ohio, and

14   that would have been the person who has that

15   data.  Someh Lewis.

16         There's also a staff member who

17   I have been working with in Ohio, who works

18   in our Children and Family Futures.  Her name

19   is Alexis Balkey.

20   Q.    Can you spell the last name?

21   A.    B-A-L-K-E-Y.

22   Q.    Is she actually part of your

23   company or your entity?

24   A.    Yes.  There's 60 employees at

Highly Confidential - Subject to Further Confidentiality Review

1    Children and Family Futures.

2         Q.     Dr. Yan, Someh Lewis,

3    Ms. Balkey.  Anybody else?

4         A.     There may have been one or two

5    people that I asked for specific information,

6    but those are the primary ones.

7         Q.     There's a description of some

8    work and analyses related to three particular

9    data sets described in your report.  Was that

10   all done by Dr. Yan?

11        A.     Yes, that's right.

12             MS. FLOWERS:  Object to the

13        form.  Lack of foundation.

14        Q.     (BY MR. ALEXANDER)  And did

15   you, yourself, do anything with those data

16   sets in terms of looking at the data or

17   checking the analysis or the algorithms that

18   were used to do any kind of analysis?

19             MR. PENDELL:  Object to the

20        form.

21             THE WITNESS:  All of the

22        output, I reviewed.  First, I asked

23        for the specific cross tabs to be run.

24        And then looked at all of the output.

1    And then created the graphs from the

2    output.

3         Q.    (BY MR. ALEXANDER)  So going

4    back to when you were retained by

5    Ms. Dickinson, were you retained right in

6    connection with the first contact or did you

7    have a series of, you know, kind of exchanges

8    back and forth reviewing materials before you

9    agreed to sign up with the plaintiffs?

10        A.    I did not review materials in

11   between the first phone call and having an

12   agreement with them.  I didn't review

13   materials during that time.

14        Q.    Do you know when you first

15   reviewed any materials, either data or

16   materials provided to you by plaintiffs or

17   medical literature that was obtained

18   specifically for purposes of doing your

19   report for this case?

20             MS. FLOWERS:  Object to the

21        form.

22             THE WITNESS:  As I began to

23        pull together the information for the

24        report, I read the depositions from

Highly Confidential - Subject to Further Confidentiality Review

1      the child welfare administrator in

2      Cuyahoga County and in Summit County.

3      So I've read those depositions.

4      Q.     (BY MR. ALEXANDER)  So my

5  question was when.  Do you know when it was

6  that you first started looking at any

7  materials that were outside of whatever you

8  might have already had in your head before

9  you were retained?

10     A.     I believe that was the end of

11 February.

12     Q.     So whatever -- one rule that I

13 didn't go over that I think is potentially

14 pertinent is that because the court reporter

15 takes down everything everybody says, it is

16 important that people don't speak over one

17 another.

18         I will try to make sure that I

19 don't start my next question until you're

20 done with your answer.  If you could try to

21 do the same thing with my questions, that

22 will make for a cleaner record, so that at

23 the end of the day the written record

24 reflects what you actually know and think.

Highly Confidential - Subject to Further Confidentiality Review

 1                    Does that make sense?

 2          A.     Yes.  It does make sense.  I

 3    understand.

 4          Q.     And if there is an objection

 5    from one or more of the various plaintiffs'

 6    lawyers here, obviously try not to talk over

 7    them too, but the whole idea is doing what we

 8    can to make sure only one person is talking

 9    at a time.  Does that make sense?

10          A.     Yes, it makes sense.

11          Q.     Okay.  So you mentioned

12    reviewing certain depositions, starting in

13    late February.

14                    Was that the first sort of

15    information that you reviewed for your work

16    on this case between the time you were

17    retained and the time that you signed your

18    expert report in late March?

19                    MS. FLOWERS:  Object to the

20          form.

21                    THE WITNESS:  Well, I review

22          research and I look at materials on a

23          daily basis.

24                    So specific to writing this

Highly Confidential - Subject to Further Confidentiality Review

1    report, it was late February.

2          Q.     (BY MR. ALEXANDER)  Do you

3    recall whose depositions they were that you

4    reviewed?

5          A.     The two administrators, the

6    administrator from Cuyahoga County and the

7    administrator from Summit County.  And then,

8    in the process, I also read the deposition of

9    the -- I believe he's a program manager in

10   Summit -- no, I'm sorry, from Cuyahoga

11   County, about the START program.

12         Q.     Is that Dr. -- was that David

13   Merriman, the third one you mentioned?

14         A.     No, it was not.

15         Q.     Who was that?

16         A.     I may not have the name right.

17   I believe it's Christopher Cabot.

18         Q.     Do you remember the names of

19   the first two you mentioned, when you said

20   that they were essentially the heads of the

21   Cuyahoga and Summit County children's

22   services groups?

23         A.     Yes, I do.  Julie Barnes in

24   Summit County, and -- I probably don't have

Highly Confidential - Subject to Further Confidentiality Review

1    the name correct.  Wieselstadt.  I'm not sure

2    of her name.

3            Q.    Weiskittel?

4            A.    Yes, that's correct.

5            Q.    So those were the current

6    directors of the Cuyahoga and Summit County

7    children's services or children and family

8    services departments, depending on how they

9    named them in each county.  Is that what

10   you're talking about?

11           A.    Yes, that's right.

12           Q.    And there were prior directors

13   or executive directors of each department and

14   some of the subdivisions who were also

15   deposed.  Did you ever review those?

16                 MS. FLOWERS:  Object to the

17          form, foundation.

18                 THE WITNESS:  I don't remember

19          reading those, no.

20           Q.    (BY MR. ALEXANDER)  You only

21   remember reading those three depositions,

22   Cabot, Weiskittel, and Barnes?

23                 MS. FLOWERS:  Object to the

24          form.  Misstates the testimony.

```
 1               THE WITNESS:  Yes.  Those are
 2        the depositions that I recall.
 3        Q.    (BY MR. ALEXANDER)  And did you
 4   actually look at the exhibits that went along
 5   with the deposition?
 6        A.    I don't remember the
 7   deposition.  I mean, I don't -- excuse me, I
 8   don't remember the exhibits specifically.
 9        Q.    And I'm not trying to be, you
10   know, overly simplistic, but for a
11   deposition, there may be pieces of paper that
12   are attached, kind of numbered 1, 2, 3, 4, 5,
13   that will be documents that may have been
14   used and referenced in the deposition.  Like
15   here, we may mark your expert report, or
16   there may be a notice, or for those fact
17   depositions there may have been documents
18   that had their name on them, budget requests,
19   e-mails, that sort of thing.
20               Do you think with your
21   description of a deposition exhibit that you
22   reviewed any deposition exhibits for any
23   employee of Cuyahoga or Summit County who was
24   deposed in connection with this case?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              MS. FLOWERS:  Object to the
2         form.
3              THE WITNESS:  I recall in the
4         deposition the description of those
5         exhibits, but I don't recall the
6         exhibits themselves.
7    Q.    (BY MR. ALEXANDER)  When you
8  say you don't recall, you don't recall that
9  you actually read them?
10   A.    That I --
11             MS. FLOWERS:  Object to the
12        form.
13             THE WITNESS:  I don't recall
14        that I actually saw the exhibits.
15   Q.    (BY MR. ALEXANDER)  Okay.  And
16 so trying to unpack a little bit, sitting
17 here today, you think you actually didn't
18 read the exhibits that went along with those
19 three depositions or any others; correct?
20             MS. FLOWERS:  Object to the
21        form.  Lack of foundation.
22             THE WITNESS:  I don't recall
23        reading the exhibits; that is correct.
24   Q.    (BY MR. ALEXANDER)  Did you
```

1   keep copies of correspondence from the

2   plaintiffs' counsel that showed what they

3   sent you, when?

4           MS. FLOWERS:  I'm going to

5       object on the grounds that it might

6       call for work product privilege and

7       caution the witness to answer the

8       questions if you can without revealing

9       the contents of anything that we

10      discussed during your preparation.

11          MR. ALEXANDER:  I was just

12      asking, did you keep copies of the

13      correspondence that showed what

14      particular materials were provided to

15      you, when?

16          I didn't ask about the

17      substance of any communications.

18          THE WITNESS:  If they were sent

19      in an e-mail, I still have them in an

20      e-mail.

21      Q.    (BY MR. ALEXANDER)  Were there

22  materials that you ever requested from the

23  plaintiff lawyers, please send me these

24  documents, by describing a category of

Highly Confidential - Subject to Further Confidentiality Review

1    documents or asking for specific documents

2    based upon any of the review you had done to

3    that point?

4         A.    No, I don't believe so.

5         Q.    Okay.  So like Weiskittel,

6    Cabot, and Barnes, those depositions were

7    picked through as ones you should receive and

8    review?

9              MS. FLOWERS:  Object to the

10             form.

11             THE WITNESS:  Yes, that's

12             correct.

13        Q.    (BY MR. ALEXANDER)  And when

14   you reviewed those three depositions, did you

15   ask to see anything else, like, hey, they

16   mentioned so and so.  If that person's been

17   deposed can I get their deposition too?

18        A.    Yes.  There's actually a

19   physician in the Cincinnati area who I am

20   aware of.  I haven't worked with him, but I

21   was interested because of the work he's doing

22   related to infants with prenatal exposure,

23   and I have a -- I scanned his deposition, but

24   I didn't finish reading it.

1       Q.      Dr. Wexelblatt?

2       A.      Yes.  That's correct.

3       Q.      So I want to make sure we're

4    clear, because I was asking about current or

5    former employees of Cuyahoga or Summit County

6    that were deposed, and you answered in terms

7    of an expert witness retained by the

8    plaintiffs.

9            So I'm not being critical.  I'm

10   just trying to make sure that we get answers

11   to my specific questions.  And we'll talk

12   about Mr. Wexelblatt and potentially some of

13   the other experts.  But for the various

14   employees who work in children and family

15   services, or related fields, or health and

16   human services, or any other area that kind

17   of intersects with your area of expertise,

18   when you read the three depositions that

19   you've identified, Cabot, Weiskittel, and

20   Barnes, did you ask the plaintiffs' lawyers

21   to provide you any additional deposition

22   transcripts or documents?

23            MR. PENDELL:  Objection to

24        form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  Thank you for the

2      reminder on the difference between the

3      employees in the two counties and the

4      expert.  And no, I did not ask for any

5      other county employee depositions.

6          Q.    (BY MR. ALEXANDER)  Do you know

7   any of the people whose depositions you read

8   or whose names were referenced in the

9   depositions or any documents you may have

10  seen?

11         MR. PENDELL:  Objection, form.

12         Q.    (BY MR. ALEXANDER)  And I'm

13  focusing specifically on people who work or

14  have worked at Cuyahoga or Summit County in

15  areas related to children's services or

16  social services.

17         A.     Of the people that I read the

18  depositions, I believe I have met and talked

19  to Julie Barnes before.  I don't believe that

20  I have met the Cuyahoga commissioner or

21  director before.

22              I have met past individuals in

23  Cuyahoga and other employees in Summit.

24         Q.     Okay.  So let me break that up.

Highly Confidential - Subject to Further Confidentiality Review

1    I believe there were three logical parts of

2    that.  In terms of your work for this case,

3    the work that you've done since you were

4    retained in January to do your expert report

5    and offer the opinions that you intend to

6    offer at trial, did you have any kind of

7    interviews or discussions or meetings with

8    anybody who works for Cuyahoga or Summit

9    County or has worked for Cuyahoga or Summit

10   County?

11               MR. PENDELL:  Object to the

12        form.

13               THE WITNESS:  Who?  In terms of

14        who has worked for Cuyahoga County,

15        yes.

16               The former supervisor of the

17        START program is now a program

18        director in my organization.

19               So I speak to her on a weekly

20        basis.

21               I also wrote a case study for

22        the federal government about the START

23        program previously, so I interviewed

24        many people about the START program

1        previously.

2        Q.      (BY MR. ALEXANDER)  So again, I

3    was asking about the former work that you're

4    doing --

5        A.      During this time period.

6        Q.      -- to get ready for this case.

7        A.      Right.

8        Q.      Your colleague who used to work

9    on START in Cuyahoga County, who is that?

10       A.      Her name is Tina Willauer.

11       Q.      And did you have discussions

12   with her about START or anything else in

13   connection with preparing your expert

14   reports -- your expert report or getting

15   ready to testify as an expert in this case?

16       A.      Yes.  I had a conversation

17   because she runs -- ran the START program in

18   Kentucky.  So she was aware of the START data

19   in Kentucky.

20       Q.      And did she ever work --

21   Ms. Wig our -- is it Ms. or doctor?

22       A.      It's Ms., and it is

23   W-I-L-L-A-U-E-R.

24       Q.      And did Ms. Willauer ever work,

Highly Confidential - Subject to Further Confidentiality Review

1    as far as you know, for Summit or Cuyahoga

2    County?

3         A.    But now that you've put the

4    frame of this time period, which I neglected

5    to pay attention to, not during this time

6    period.  She previously worked for Cuyahoga

7    County.  She left Cuyahoga in about 2007.

8         Q.    Okay.  There are two time

9    periods at issue here.  So one is whenever

10   anybody worked for Cuyahoga or Summit County

11   at some point before today, and the other is

12   the time period relating to when you've been

13   preparing to be an expert witness and offer

14   opinions at trial, if called.

15        A.    Mm-hmm.

16        Q.    So focusing on the latter, were

17   any of your discussions with Ms. Willauer

18   this year intended to provide the information

19   so that you can testify about any issue as an

20   expert witness in this matter?

21        A.    Not directly.  Just context.

22        Q.    And what sort of information

23   did you get from Ms. Willauer that provides

24   context for any of your opinions?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Not anything that I didn't

2   already know.  Confirmation of when she left

3   Cuyahoga and went to Kentucky was really

4   about it.

5    Q.    What about any aspect of how

6   Cuyahoga County did anything relating to

7   children and family services through 2007

8   when she worked there?  Would you talk to her

9   about that?

10        MS. FLOWERS:  Object to the

11        form.

12        THE WITNESS:  I don't believe

13        there was any new information.  I had

14        done and already written a case study

15        about the START program, so it was a

16        general conversation about the START

17        program when she was there.

18    Q.    (BY MR. ALEXANDER)  Sitting

19   here today, do you rely on anything from

20   Ms. Willauer that tells you how Cuyahoga

21   County has run its START program or any

22   aspect of children and family services, or

23   how they should going forward?

24    A.    No, I didn't rely on my

Highly Confidential - Subject to Further Confidentiality Review

1  conversation with Ms. Willauer for that.

2       Q.    So let's go back to Ms. Barnes.

3             Did you meet her outside of the

4  context of litigation?  Just at some

5  professional meeting or some sort of other

6  way in which you meet -- might meet somebody

7  who works in Ohio?

8       A.    Yes.  Summit County received a

9  regional partnership grant in 2012, and they

10 operated that grant to 2017.  And our

11 organization provided the programmatic

12 technical assistance to that set of grantees,

13 and there were at least annual meetings with

14 those grantees.  So we would have been at

15 that same meeting, and our staff had a person

16 assigned to Summit County providing technical

17 assistance to them.

18             And then subsequent to that, we

19 have been providing assistance through an

20 Office of Juvenile Justice and Delinquency

21 prevention grant, or contract, to the State

22 of Ohio, and Summit County is one of those

23 counties.

24             So I've had weekly -- or excuse

Highly Confidential - Subject to Further Confidentiality Review

1    me, monthly conversations with the counties

2    that were participating in that, and Summit

3    is one of those.

4         Q.    Have those calls or meetings

5    extended into 2019?

6         A.    Yes.

7         Q.    Do you rely on any interaction

8    with Ms. Barnes for any of the opinions you

9    intend to offer in this case?

10        A.    I couldn't say directly with

11   Ms. Barnes.  With the staff in Summit County,

12   it's specific to the family treatment court,

13   and the initiatives that they've put forward

14   in Summit County.

15            So I am aware of the work that

16   they're doing in connection with their family

17   treatment court.

18        Q.    Do you have some opinions that

19   you intend to offer in whole or in part based

20   upon information that you've gained from your

21   interaction with Summit County on their

22   family treatment courts?

23        A.    I think it would be impossible

24   to separate out that particular conversation

Highly Confidential - Subject to Further Confidentiality Review

1   from the conversations with the other

2   counties, and with the entirety of all of the

3   conversations I have with counties across the

4   country.

5            Because there are similar

6   patterns.  There -- I couldn't say there was

7   anything specific in the conversations with

8   Summit that would have led to any of the

9   recommendations about the kinds of

10  remediations that are needed.

11       Q.    Are there any documents that

12  you're aware of that you have access to, like

13  maintained at your company, that memorialize

14  in any way the interaction with Summit County

15  relating to their drug treatment courts or

16  family treatment courts, whatever you call

17  them?

18       A.    That memorialize.  Let me think

19  about that.

20            Because we are a contractor to

21  the Office of Juvenile Justice and

22  Delinquency Prevention, the acronym OJJDP, we

23  report periodically, twice a year, about the

24  work that we're doing through that contract.

Highly Confidential - Subject to Further Confidentiality Review

1          So there could be something

2     that says broadly what's going on in Ohio,

3     but it would not necessarily say anything

4     specific about Summit County.  It would be

5     broad about all 11 of those counties.

6          Q.    Is there a name for that

7     document that might have that sort of

8     information about Summit County?

9               MS. FLOWERS:  Object to the

10         form.

11              THE WITNESS:  The semiannual

12         progress report filed to the federal

13         government about our work.

14              MR. ALEXANDER:  Okay.

15         Q.    (BY MR. ALEXANDER)  And you

16     keep copies of that; correct?

17         A.    Yes.

18         Q.    In connection with your work to

19     be an expert in this case, did you reach out

20     to Ms. Barnes or any of the other contacts

21     that you had at Summit County to try to get

22     any additional information about what has

23     gone on there, what their hurdles or

24     challenges have been in providing children

1    and family services or any other issue

2    pertinent to your expert report?

3                    MR. PENDELL:  Object to the

4         form.

5                    THE WITNESS:  No, I did not.

6         Q.     (BY MR. ALEXANDER)  Did you ask

7    to do that?

8         A.     No, I didn't.

9         Q.     Same question for Cuyahoga

10   County.  Did you make any attempt to try to

11   have contact with anybody who actually works

12   for any of the Cuyahoga County Children and

13   Family Services entities to try to figure out

14   what's been going on there, what their

15   hurdles or challenges are, or any other issue

16   related to the subject matter of your expert

17   report?

18                   MR. PENDELL:  Object to the

19        form.

20                   THE WITNESS:  No, I did not.

21        Q.     (BY MR. ALEXANDER)  And did you

22   ask the plaintiffs' lawyers if that happened?

23        A.     No, I did not.

24        Q.     Have you had any contact,

1    directly or indirectly, that tells you what

2    the perspectives have been of the people in

3    the trenches, so to speak, from those two

4    counties in terms of their issues related to

5    any sort of substance abuse and how it

6    affects children and family services?

7                   MS. FLOWERS:  Object to the

8          form.

9                   THE WITNESS:  As part of my

10         responsibilities as the project

11         director for the OJJDP contract, and

12         working specifically in Ohio on the

13         State System Improvement Program, the

14         acronym SSIP, I meet at least twice a

15         year with the heads of the departments

16         at the state and the specialty docket

17         staff of the Supreme Court.  So I am

18         meeting with the heads of the

19         departments, who are overseeing all of

20         the counties.  So much of that

21         information is flowing up to those

22         commissioners.  I have had

23         conversations with PCSAO, Public -- C,

24         Child -- Services Association of

```
 1          Ohio -- staff.  So I'm familiar with,

 2          very much so, about the whole picture

 3          of Ohio, and how that is playing out

 4          in Summit and in Cuyahoga.

 5          Q.    (BY MR. ALEXANDER)

 6   Specifically with regard to Cuyahoga and

 7   Summit counties, have you had any interaction

 8   with the people who work there, where you

 9   attempted to find out how substance abuse

10   affects their challenges in providing

11   children and family services?

12          A.    The last time before, just

13   being in Cleveland a few weeks ago, that I

14   was in Cuyahoga, I was there at the

15   invitation of Senator Portman and Senator

16   Brown, to speak directly about the opioid

17   issues in Ohio.  We were in Cleveland, and

18   several of the individuals from Cleveland

19   were also there to testify and to discuss the

20   issues.  There were individuals from the

21   substance abuse treatment agency that were

22   there, and there were individuals from the

23   child welfare agency that were there.  I'm

24   sorry, I don't remember their names.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.      Do you remember the date when

 2    that happened?

 3           A.      It was in April of 2016, I

 4    believe.

 5           Q.      You just said it was a couple

 6    of weeks ago.

 7           A.      No, subs -- I said prior to the

 8    time a few weeks ago when I was in Cleveland.

 9    The time before that that I was actually in

10    Cleveland was at the meeting with the

11    senators.

12           Q.      Okay.  Let's break it up.

13                   For purposes of this case.

14           A.      Mm-hmm.

15           Q.      The work that you did between

16    when you were retained in January and when

17    you signed your expert report in March, did

18    you have any contact with anybody who works

19    for or used to work for children and family

20    services entities in Cuyahoga or Summit

21    County to give you their perspective on how

22    substance abuse of any kind affects the

23    delivery of services?

24           A.      I did not ask specific
```

Highly Confidential - Subject to Further Confidentiality Review

1    questions of the person -- of current

2    employees in those two counties.

3         Q.    Okay.  So let's break it up

4    from your two meetings that you've described.

5         A.    Mm-hmm.

6         Q.    And then let's just go back for

7    a second, actually, first, for the SSIP

8    program.

9         A.    Mm-hmm.

10        Q.    And are there Cuyahoga and

11   Summit County sites set up in connection with

12   SSIP yet?

13        A.    I'm sorry, I don't understand

14   the question.  Are there site?

15        Q.    Let me ask you this way.  The

16   work that you do for SSIP is through the

17   state; correct?

18        A.    It's funded through the federal

19   government to the Supreme Court; correct.

20   And Summit is one of the counties that is

21   participating.  Cuyahoga is not one of the

22   pilot counties.

23        Q.    Okay.  So the SSIP program work

24   that you're doing doesn't give you any

1   information about what's going on in Cuyahoga

2   County; correct?

3          MS. FLOWERS:  Object to the

4       form.

5          THE WITNESS:  Not directly.

6       Only in the oversight committee that

7       is made up of all of the directors and

8       commissioners.  Yes.

9       Q.    (BY MR. ALEXANDER)  And the

10  Summit County and any information you get

11  would be within the last how long?  What time

12  period?

13      A.    Well, I believe the last

14  demonstration phone call was in the first

15  quarter of 2019.  But I wouldn't be able to

16  tell you exactly what month that was in.

17      Q.    And when did that start?  When

18  did the SSIP program start such that you ever

19  got information that had to do with Summit

20  County in part?

21      A.    About four and a half years

22  ago.

23      Q.    So then let's go back to the

24  Cleveland visit.  There was a visit in

Highly Confidential - Subject to Further Confidentiality Review

1    Cleveland that you had within the last couple

2    of weeks?

3         A.     Yes.  That was to meet with

4    Jodi and her team.

5         Q.     Okay.  Do you know the date of

6    that meeting?

7         A.     Not off the top of my head.  I

8    was in Columbus to meet with this executive

9    committee again, and then we added on a

10   meeting in Columbus.  I'm sorry, excuse me,

11   in Cleveland.

12        Q.     So if we used the date of your

13   report of March 25th as a guidepost, was this

14   meeting with the plaintiff lawyers before or

15   after that?

16        A.     It was after that.

17        Q.     Okay.  Who was present at the

18   meeting after you did your report, the

19   meeting that you mentioned with the plaintiff

20   lawyers in Cleveland?

21        A.     Jodi and a few of her

22   colleagues.

23        Q.     Was there anybody present who

24   wasn't a lawyer or like a paralegal?

1    Somebody working with lawyers or the law

2    firm?

3           A.     Not that I recall.

4           Q.     Were there any people who

5    worked for Cuyahoga or Summit County there?

6           A.     There were lawyers there, and

7    as I recall there were lawyers for the

8    counties.

9           Q.     Did you get any new information

10   at that meeting that gave you any additional

11   facts or assumptions to make that would

12   influence any of your expert opinions?

13          A.     No, I did not.

14          Q.     I'm not asking you about the

15   specifics of conversations you had with the

16   lawyers, but in general, did anything about

17   that affect any of the opinions you're going

18   to give?

19                 MS. FLOWERS:  Objection, asked

20        and answered.

21                 THE VIDEOGRAPHER:  I'm sorry, I

22        can hear her playing with the cord.

23                 MS. FLOWERS:  Better now?

24                 MR. ALEXANDER:  Do you need the

Highly Confidential - Subject to Further Confidentiality Review

1          question read back, ma'am?

2                    THE WITNESS:  Yes, would you

3          ask the question again, please?

4                    MR. ALEXANDER:  Sure.

5          Q.    (BY MR. ALEXANDER)  Without

6     asking you about the specifics of

7     conversations you had with any of the

8     plaintiff lawyers, did anything about that

9     meeting after you signed your report affect

10    any of the substance of your report?

11                   MS. FLOWERS:  Asked and

12         answered.

13                   THE WITNESS:  No, it did not.

14         Q.    (BY MR. ALEXANDER)  You said

15    that there was a meeting back in Cleveland in

16    roughly the spring of 2016?  The last time

17    you were there?

18         A.    That's correct.

19         Q.    And do you recall what that was

20    about?

21         A.    Yes.  It was at the invitation

22    of the senators to have a discussion about

23    the impact of opioids in Ohio and it was

24    specifically in Cuyahoga and there were

Highly Confidential - Subject to Further Confidentiality Review

1    several people that had discussion with them

2    about what was going on in Cuyahoga and more

3    broadly in the state about opioids.

4         Q.    Did you get any information

5    about Summit County in particular at that

6    time or just Cuyahoga County?

7         A.    Mostly Cuyahoga.

8         Q.    Was there anybody presenting

9    relating specifically to Summit?

10        A.    I don't recall specifically to

11   Summit.  The person who stood out for me was

12   the father of a young man who had his wisdom

13   teeth pulled and got a prescription for

14   OxyContin, became a heroin addict and he

15   died.

16             And this father has started a

17   support group for other parents who have lost

18   their children and was speaking about his

19   effort to try and educate other parents about

20   what they can do when they first get signs

21   that their children are in trouble.

22        Q.    Do you know the name of that

23   support group or the gentleman who founded

24   it?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     His son's name was Robby, and

 2   he was talking about Robby's voice.  That he

 3   wanted Robby's voice to go on.

 4          Q.     Is that the name of the

 5   organization?

 6          A.     I believe that was what he was

 7   trying to -- had either started an

 8   organization called Robby's Voice or was

 9   starting an organization Robby's Voice.

10          The other person who I was

11   distinct, because I knew her previously, was

12   Tracy Plouck.  She, at the time, was the

13   director of OMAS, Ohio Mental Health and

14   Addiction Services.  And she was speaking

15   about the data and the impact of prescription

16   opioids and what was going on in the

17   treatment world related to trying to solve

18   the opioid problem in Ohio.

19          She's no longer the director in

20   the change of administration.  There's a new

21   director of Ohio OMAS.

22          Q.     Okay.  Let's go back to what I

23   was asking.  That was in response to the

24   question about the name of the organization.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              The -- you said there were --

2     during the time that you were in Cleveland,

3     in 2016, for a presentation what you remember

4     or something that a gentleman said about an

5     organization he was intending to found to

6     educate parents, and then you said something

7     about something from Tracy Plouck about

8     analysis that was going on at OMAS.

9          A.    Mm-hmm.

10         Q.    Am I right so far?

11         A.    That's correct.

12         Q.    Okay.

13              So at the meeting in the spring

14    of 2016 in Cleveland, was there anybody there

15    who presented from Summit County on behalf of

16    any of the entities there that interact with

17    children and family services?

18         A.    I don't recall -- as I said, I

19    don't recall anyone specifically from Summit.

20    I made a presentation about opioids and child

21    welfare at that meeting.

22         Q.    So I'm asking first about the

23    presentations that were given other than

24    yours.  We'll get to yours.
```

1          Do you remember the name of

2     anybody who presented from Cuyahoga County

3     relating to children and family services?

4          A.    I don't remember the name of

5     anyone from Cuyahoga County.

6          Those are the two people who

7     really stood out.  There was a presentation

8     from a NICU nurse, as I recall.  That's the

9     other -- as I sit here right now, that's

10    another presentation that I recall.

11         Q.    With that as a background, did

12    you ask to see any documents in connection

13    with your evaluation of materials to form

14    your expert opinions in this case from OMAS

15    or from anything else related to what you

16    actually heard presented back in 2016?

17              MS. FLOWERS:  Object to the

18         form.

19              THE WITNESS:  I didn't ask for

20         new documents from OMAS.  I am aware

21         of the documents that are available on

22         their website and am familiar with the

23         data in Ohio.

24         Q.    (BY MR. ALEXANDER)  Did you

Highly Confidential - Subject to Further Confidentiality Review

1    consider any OMAS data or documents for

2    purposes of forming your opinions in this

3    case?

4         A.    Just in general.  I may have

5    looked at the updated data from OMAS, not

6    that in specific that I cited in the report.

7    If I had cited it in the report, you would

8    have that reference.  But they do have data

9    in -- on their website, and I am very

10   familiar with their maps that were originally

11   created when Orman Hall was the director of

12   OMAS.  And you may have seen the maps that

13   turned red across the state as they look at

14   the concentration of individuals being

15   admitted to substance abuse treatment for

16   opioid use disorders.

17        Q.    So if your expert report in

18   this case doesn't cite any data from OMAS or

19   analyses by OMAS, then you didn't look at

20   them in connection with forming your opinions

21   in this case; correct?

22             MS. FLOWERS:  Object to the

23        form.  Lack of foundation.

24             THE WITNESS:  I think

Highly Confidential - Subject to Further Confidentiality Review

1          they're -- for me, they are in my mind

2          because I am very aware of those data

3          in this field.  Anyone who's working

4          in this field would be aware of those

5          data.

6          Q.     (BY MR. ALEXANDER)  Are you

7     aware --

8          A.     I did not cite them

9     specifically in this report.  You probably

10    have other experts that have.

11         Q.     Did you talk to anybody,

12    Ms. Plouck or anybody else from OMAS, in

13    connection with forming any of your opinions?

14         A.     I haven't talked to Ms. Plouck

15    since she was at the last meeting of this

16    executive committee.

17                She's no longer the director.

18         Q.     And what year was that?

19         A.     I'm not sure when the last time

20    was that I spoke to her.  Probably 2017.

21    Maybe 2018.

22         Q.     So the question was, in

23    connection with forming your opinions for

24    this case, did you talk to Ms. Plouck or

 1    anybody else from OMAS?

 2         A.    I believe I've answered that

 3    no.  I'm aware of their data and how I would

 4    access their data.

 5         Q.    Are you aware of any issues you

 6    have with their data where you think their

 7    data or their analysis as it's been published

 8    or appeared on their website is inaccurate or

 9    misleading in some form?

10         A.    From --

11               MS. FLOWERS:  Object to the

12    form.

13               THE WITNESS:  From OMAS?

14         Q.    (BY MR. ALEXANDER)  Yes.

15    That's the question.

16         A.    I'm aware of OMAS data and

17    Medicaid data, and some minutia about

18    Medicaid claims data.  I'm aware of that.

19    Those are not data that I relied on.  Those

20    are not data that I have access to.  And

21    they're not data that are represented in my

22    report.  They're not data that I relied on.

23         Q.    Okay.  So going back to that

24    meeting in the spring of 2016 where you

Highly Confidential - Subject to Further Confidentiality Review

1  presented, did you present with like a

2  PowerPoint presentation?  A slide deck?

3      A.    No.  As I recall, it was a

4  written report that there was not PowerPoint

5  available.  We spoke more like this.  That

6  there was a report, and it was much more of a

7  dialogue with the senators.

8      Q.    Was there a name of that

9  report?

10      A.    They are both on senate

11  finance, and they are both on another

12  committee, something to the effect of

13  Homeland Security and government oversight.

14          And for technical reasons,

15  because it was a field hearing, they had to

16  call the hearing for Homeland Security and

17  government oversight.  So it was a field

18  hearing for them to have discussion with

19  people from Ohio.

20          So there was a report that I

21  wrote specific to that hearing.

22      Q.    We have a written testimony

23  that you gave before the United States Senate

24  Committee on Finance called Examining the

Highly Confidential - Subject to Further Confidentiality Review

```
1    Opioid Epidemic: Challenges and Opportunities
2    from February 23rd, 2016.  Is this the same
3    presentation that you're talking about that
4    you gave in Cleveland?
5         A.    No, it's not exactly the same.
6    But it was after the February senate finance
7    that Senator Portman and Senator Brown held
8    this field hearing and asked me to go to
9    Cleveland to also have a conversation with
10   them in Cuyahoga County.
11        Q.    Do you know the name of
12   whatever the report would have been from
13   this, what you called field hearing?
14        A.    Again, I may not have the
15   committee right.  It was a field hearing of
16   the senate government, Homeland Security and
17   government oversight committee.
18        Q.    I'm asking about the report
19   that you or your entity generated.
20        A.    It would have been similar name
21   of opioids and child welfare.  Similar name.
22        Q.    Did you keep a copy of that?
23        A.    In my records, I would have a
24   copy.  But it's available publicly because it
```

Highly Confidential - Subject to Further Confidentiality Review

1    was a senate hearing, a field hearing.

2        Q.    Did you get any feedback after

3    your presentation from anybody at Cuyahoga or

4    Summit County talking about the challenges

5    they faced and whether any of the stuff that

6    you were saying either was accurate in terms

7    of their local experience or did not reflect

8    their local experience?

9        A.    I did not get feedback from

10   anyone specific in Cuyahoga or Summit County

11   that I recall.

12       Q.    Have we exhausted the

13   interaction that you've had with anybody at

14   Cuyahoga County current or past in children

15   or family services?

16       A.    I believe that's right, yes.

17       Q.    Same question goes for Summit

18   County.  I know that you said that in

19   connection with this project through the Ohio

20   Supreme Court that there have been periodic

21   meetings and there had been someone from

22   Summit present.  Is there any additional

23   contact that you've had with anybody current

24   or past from Summit County Children's

1    Services that you were going to consider in

2    connection with any of the opinions you

3    intend to give in this case?

4         A.     I believe that's right.

5              Now, my organization has 60

6    employees, and other employees may have

7    contact with those two counties.  As I said,

8    we keep track of all of the technical

9    assistance that we provide, so -- but me

10   personally, those are the contacts that I

11   would routinely have with Summit County

12   because of the SSIP.

13        Q.     I want to make sure we're clear

14   because I'm not asking about routine contact.

15   I'm asking about any contact you've had with

16   Summit County that related to children's

17   services that you intend to rely on in any

18   way for any opinions that you would give in

19   the trial of this case.  Have we covered it

20   all?

21              MS. FLOWERS:  Object to the

22         form.

23              THE WITNESS:  I believe we've

24         covered it all.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. ALEXANDER:  Okay.

 2         Q.    (BY MR. ALEXANDER)  And in

 3    terms of your staff, whatever your 60-person

 4    staff may know from their interaction of

 5    Summit County, you would only be relying on

 6    what you've actually been made aware of from

 7    those interactions; correct?

 8                    MS. FLOWERS:  Object to the

 9         form.  Lack of foundation.

10                    THE WITNESS:  Yes, that's

11         correct.

12         Q.    (BY MR. ALEXANDER)  And are you

13    aware of anything that your staff has told

14    you about interaction with Cuyahoga or Summit

15    County that you're relying on?

16         A.    Only what I've told you.

17                    I think it's a good time for a

18    break.

19                    MR. ALEXANDER:  Can I just

20         ask -- actually, that's fine.  We can

21         take a break.  It's getting warm.

22                    THE VIDEOGRAPHER:  We are now

23         going off the record.  And the time is

24         9:58 a.m.  Don't forget to take off
```

Highly Confidential - Subject to Further Confidentiality Review

1       your microphone.

2               (Recess taken, 10:00 a.m. to

3       10:18 a.m.)

4               THE VIDEOGRAPHER:  I rebooted.

5       If there is no sound I'll have to fix

6       at lunch.  I don't know what the

7       problem is.  We are now going back on

8       the record and the time is 10:17 a.m.

9       Q.      (BY MR. ALEXANDER)  Dr. Young,

10   is there any of your testimony thus far you

11   need to change or supplement in any way?

12      A.      No, there is not.

13      Q.      Have you understood the process

14   so far as a first timer?

15      A.      Yes.  I do.

16      Q.      And what about the situation

17   here?  Is there anything about the physical

18   environment that's affecting your ability to

19   testify fully and accurately?

20      A.      No, there is not.

21      Q.      Let's go back to some of the

22   things we were talking about before the

23   break.

24               We were talking about the

1    spring 2016 meeting in Cuyahoga County, where

2    you presented some additional presentations.

3              Do you know any of the details

4    of the actual individual who you described as

5    having overdosed in connection with a

6    discussion you heard from his father?

7         A.    The only detail I know is what

8    his father talked about at that hearing.

9         Q.    Do you know what the actual

10   like medical facts are, the actual

11   prescription history, history of addiction

12   before or after what his father mentioned,

13   any of those sorts of facts?

14             MS. FLOWERS:  Object to the

15        form.

16             THE WITNESS:  His father told

17        the story of his son having his wisdom

18        teeth pulled, and being given a

19        prescription for opioids, and his son

20        overdosing.

21             Because I do remember that his

22        son was in the military, because he

23        was going to be deployed to the Middle

24        East, and he overdosed.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     (BY MR. ALEXANDER)  So you only

2   know what the father said at that meeting?

3      A.     Yes.  That's correct.

4      Q.     Do you intend to offer any

5   testimony based upon what you heard the

6   father say about his son at that meeting?

7              MR. PENDELL:  Objection, form.

8              THE WITNESS:  No, I do not.

9      Q.     (BY MR. ALEXANDER)  Do you hold

10  yourself out as an expert on addiction?

11     A.     I am an expert on the public

12  policy issues related to addiction, and

13  particularly as it affects children of

14  parents with substance use disorders, yes.

15     Q.     So in connection with the

16  report that you have in front of you, that

17  we've -- the reformatted version of the one

18  we got at the end of March, did you attempt

19  to set forward all of the opinions that you

20  would express at trial?

21     A.     Did I attempt to do that, yes.

22     Q.     And even though it was your

23  first time doing it, do you think you

24  succeeded in setting forth all of the

Highly Confidential - Subject to Further Confidentiality Review

1    opinions you would offer at trial?

2        A.    I believe I did, yes.

3        Q.    Are you aware of any additional

4    opinions that you have as you sit here today

5    that you would offer at trial if called but

6    are not included in your expert report?

7        A.    I'm not aware of anything.  Of

8    course there's always new data that becomes

9    available.

10       Q.    Sure.

11             So I asked you about addiction.

12   Let me ask it this way.

13             Do you hold yourself out as an

14   expert in addiction medicine?

15       A.    I am not an addiction medicine

16   certified physician.  No, I am not.

17       Q.    You're not a physician at all;

18   correct?

19       A.    I am not a physician.  My Ph.D.

20   is in social policy.

21       Q.    And you hold -- do not hold

22   yourself out as an expert in any medical

23   specialty or subspecialty; correct?

24       A.    No.  As I said, I'm not a

1    physician.  I'm a Ph.D. in social policy.

2         Q.    So, ma'am, I'm not sure if

3    there's a disconnect here.  I asked if that

4    was correct and you said no.  It is correct

5    that you do not hold yourself out as an

6    expert in any medical specialty or

7    subspecialty.

8         A.    It is correct that I am not a

9    physician.

10        Q.    So do you intend to offer the

11   opinion at trial that there is some sort of

12   progression explained by something about

13   neuropharmacology or other aspects of

14   addiction medicine that would lead somebody

15   to progress from short-term use of a

16   prescription pain medication to being

17   addicted to heroin or another illicit opioid

18   or opiate?

19             MS. FLOWERS:  Object to the

20        form, lack of foundation.

21             MR. PENDELL:  Also compound.

22             THE WITNESS:  That's outside of

23        the scope of my report and what I was

24        asked to do.

Highly Confidential - Subject to Further Confidentiality Review

1           Of course I do understand that.

2       Q.      (BY MR. ALEXANDER)  Well, I'm

3   asking about the expert opinions you intend

4   to offer at trial.  When you say it's outside

5   of the scope of your report and what you were

6   asked to do, when something is outside of the

7   scope of what you were asked to do and what

8   you've set forth in your report, it would

9   mean that's not an opinion you would offer at

10  trial; correct?

11          MS. FLOWERS:  Object to the

12      form.

13          THE WITNESS:  I believe that

14      those are the ways that these things

15      work.

16      Q.      (BY MR. ALEXANDER)  So I think

17  in a little bit we'll go over what you're not

18  doing which will help to shorten up things.

19  Does that make sense?  The expert opinions

20  that you will not offer.

21      A.      If you'd like to go at it that

22  way, I can go at it that way.

23      Q.      Great.  So have you heard of

24  something described as the gateway concept of

Highly Confidential - Subject to Further Confidentiality Review

1    addiction.  That somebody might progress from

2    one drug or one substance of abuse to another

3    substance of abuse?

4        A.    Yes, a longstanding theory,

5    yes.

6        Q.    And even though you may have

7    read literature describing that, that is not

8    an area where you yourself are offering any

9    expert opinions; correct?

10       A.    It is outside of the scope of

11    what I was asked to do.

12       Q.    And what briefly were you asked

13    to do from the plaintiffs' lawyer,

14    Ms. Dickinson, who retained you originally?

15            MS. FLOWERS:  Object to the

16        form, lack of foundation.

17            THE WITNESS:  I was asked to

18        offer my opinions on the impact of the

19        opioid epidemic on child welfare and

20        to provide my opinion on reasonable

21        remedies to that situation in Cuyahoga

22        and Summit Counties.

23       Q.    (BY MR. ALEXANDER)  And in

24    connection with doing the second part of

1    that, you didn't actually talk to anybody who

2    works at Cuyahoga and Summit County to form

3    any of the opinions about what would be

4    reasonable to do; correct?

5              MS. FLOWERS:  Object to the

6         form, asked and answered.

7              THE WITNESS:  No, I relied on

8         my 25-year experience as well as all

9         of the other things that are embedded

10        in my report.

11        Q.    (BY MR. ALEXANDER)  Has the

12   scope of your engagement, what you were asked

13   to do, changed at all since you were

14   initially retained?

15        A.    No, it hasn't.

16        Q.    In any of the meetings or

17   conversations you've had with the plaintiffs'

18   lawyers, prior to finalizing your report on

19   or about March 25th of 2019, were there

20   additional subjects that you were asked to

21   cover?

22              And I'm not asking about the

23   specifics of your conversations, I'm asking

24   about the scope of your engagement.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            MS. FLOWERS:  I just have to
 2       give the witness the same counsel that
 3       I did before.  You can answer the
 4       question to the extent that you don't
 5       divulge any subject that we talked
 6       about substantively with respect to
 7       your prep.
 8            THE WITNESS:  I was not asked
 9       to expand the scope of my report.
10       Q.    (BY MR. ALEXANDER)  Were there
11  any documents or data sources you asked to
12  review that you didn't get from the
13  plaintiffs' lawyers?
14       A.    No, there were not.
15       Q.    Were there any documents or
16  data sources you or your staff attempted to
17  get, not through the plaintiffs' lawyers, but
18  were unable to get?
19            MS. FLOWERS:  Object to the
20       form.
21            THE WITNESS:  No, there were
22       not.
23       Q.    (BY MR. ALEXANDER)  Were there
24  any subjects or areas of analysis that you
```

Highly Confidential - Subject to Further Confidentiality Review

1    weren't able to complete by March 25th, but

2    plan to address between now and the time of

3    trial?

4         A.    No, there were not.

5         Q.    How many times have you met

6    with the plaintiffs' lawyers since you were

7    initially approached?

8         A.    In person or on the phone?

9         Q.    Both.

10        A.    In person, I have met with

11   Jodi, I believe three times, and on the phone

12   for periodic conversations, I believe twice

13   related to prep.

14        Q.    And are those part of the 100

15   or so hours you described that went into your

16   work prior to signing your report?

17        A.    Yes, that's correct.

18        Q.    And is there some additional

19   amount of time that you've spent since you

20   signed your report, leading up to the

21   deposition?

22        A.    Oh, I'm sorry.  I may have

23   misunderstood your question.  Could you ask

24   your question again, the previous one, about

1    the time period?

2         Q.     Sure.  The total that you gave

3    before, about how much time you and your

4    staff collectively and then how much of that

5    was you, was spent before doing your report.

6    Do you remember that testimony?

7         A.     Yes.

8         Q.     Okay.  Did that include any

9    meetings that you had with the plaintiff

10   lawyers?

11        A.     No.  Only phone calls and

12   e-mails.  Primarily e-mail.

13        Q.     So all of your in-person

14   meetings with the plaintiffs' lawyers have

15   been since March 25th?

16        A.     Yes.  That's correct.

17        Q.     How much time have you spent

18   since March 25th, including the meetings with

19   the plaintiffs' lawyers and anything else you

20   did to get ready for the deposition?

21        A.     Those are the days that I just

22   mentioned.  Those were after the report.

23        Q.     The question was how much time

24   total, ma'am.

Highly Confidential - Subject to Further Confidentiality Review

 1          A.     I believe I just answered that.

 2          Q.     How much time total have you

 3   spent since March 25th to get ready for your

 4   deposition?

 5          A.     Could we read back what I just

 6   said, please?

 7          Q.     Mine doesn't work.  So I can't

 8   read it back.  Are you asking the court

 9   reporter?

10              Go ahead, please.

11   (Whereupon, the following testimony

12    was read by the court reporter.)

13       "Answer:  Those are the days that I

14   just mentioned.  Those were after the report.

15   (End of readback.)

16              THE WITNESS:  And the number of

17        days?

18              MS. FLOWERS:  It says, "In

19        person, I met with Jodi, I believe

20        three times, and on the phone for

21        periodic conversations, I believe

22        twice related to prep."

23          Q.     (BY MR. ALEXANDER)  My question

24   was how much total time have you spent in

1    meetings or other preparation since

2    March 25th?

3        A.    Let's see.  The phone calls,

4    the first one was, I believe, an hour and a

5    half.

6              The second one was two hours.

7    And there was a half day that I mentioned

8    just recently that was in Cleveland.  And

9    then two days here.  So I don't know exactly

10   those hours, but they weren't full workdays,

11   but pretty much full workdays.  So would you

12   like me to add up those hours?

13       Q.    No.

14       A.    Okay.

15       Q.    I already did it.

16       A.    Thank you.  So...

17       Q.    So other than the calls and

18   in-person meetings with the lawyers since

19   March 25th, have you done anything else to

20   prepare for the deposition?

21       A.    Yes, in fact, I did.

22             I reread my report.  I believe

23   twice.  I went to the methodology section and

24   reread the methodology section of the ASPE

Highly Confidential - Subject to Further Confidentiality Review

```
 1    report.  And that's the Assistant Secretary

 2    for Planning and Evaluation report.

 3         Q.    That's the one where the lead

 4    author is Radel, R-A-D-E-L?

 5         A.    Yes.  That's Radel.

 6               Yes, I read the methodology

 7    section of that report.  And I pulled the

 8    summaries of the regional partnership grants

 9    from those six regional partnership grants,

10    and scanned those so that I would have a

11    general sense of what their programs were.

12         Q.    So the additional preparation

13    that was involved with meetings or calls with

14    the plaintiffs' lawyers, how much time has

15    that been since March 25th?

16         A.    Well, let's see.  I started

17    last Thursday, so that would probably have

18    been not full days, but Thursday, Friday, and

19    part day Saturday.

20               Excuse me.

21         Q.    Do you have water, ma'am?

22         A.    I do.  I do have water, yes.

23    Thank you.

24         Q.    Okay.  So another, what,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    15 hours or so in addition to whatever you

 2    spent on the meetings and calls?

 3         A.    Yes, I believe that's right.

 4         Q.    And what about your staff?  Has

 5    your staff done any additional work to help

 6    you get ready for your deposition?  Dr. Yan,

 7    Ms. Balkey, anybody else?

 8         A.    No.

 9         Q.    And even though Ms. Balkey

10    works in Ohio, she hasn't provided you

11    information specific to interaction with

12    Cuyahoga or Summit County children or family

13    services groups; correct?

14              MS. FLOWERS:  Object to the

15         form.

16              THE WITNESS:  Actually, I did

17         text Alexis on Saturday, and asked her

18         if she knew what the current capacity

19         in Summit County was of the family

20         treatment court, and she said that she

21         wasn't current and she didn't know.

22         Q.    (BY MR. ALEXANDER)  Okay.  So

23    sitting here today, you don't know the answer

24    to the current capacity of the Family
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Treatment Court in Cuyahoga County; correct?
 2                   MS. FLOWERS:  Object to the
 3            form.  Lack of foundation.
 4                   THE WITNESS:  To be 100 percent
 5            certain I would have to ask what the
 6            current count is.  It is generally
 7            around 30 parents.
 8         Q.    (BY MR. ALEXANDER)  What about
 9    Summit County?  Do you know what the current
10    capacity is in Summit County as you sit here
11    today?
12         A.    Similarly, it is about 30
13    parents.
14         Q.    The meetings that you've had
15    with the plaintiffs' lawyers, has there been
16    anybody present at any of those meetings
17    other than a lawyer?
18                   MS. FLOWERS:  Objection, asked
19            and answered.
20         Q.    (BY MR. ALEXANDER)  Any of the
21    meetings you've had, not just the one you've
22    talked about.
23                   MS. FLOWERS:  Same objection.
24                   THE WITNESS:  It's been with
```

Highly Confidential - Subject to Further Confidentiality Review

1          Jodi's team.

2          Q.     (BY MR. ALEXANDER)  Has there

3     been a non-lawyer present?

4               MS. FLOWERS:  Objection, asked

5          and answered.

6               THE WITNESS:  To be honest, I

7          don't know if they're lawyers.

8          Q.     (BY MR. ALEXANDER)  Okay.  So

9     you mentioned or we mentioned Dr. Wexelblatt

10    earlier, that you reviewed, I guess, skimmed

11    his deposition that he gave a couple of weeks

12    ago?  Correct?

13         A.     Yes, that's correct.  I skimmed

14    his deposition.

15         Q.     And you asked for that by name

16    because you were aware of his work in

17    neonatal abstinence syndrome?

18         A.     Yes, I was aware that they and

19    one other community in the country are doing

20    universal screening.  That was why I didn't

21    rely on his deposition for my report.  That

22    was subsequent to the report.

23         Q.     Right.  For your report, did

24    you consider any of the reports of any of the

Highly Confidential - Subject to Further Confidentiality Review

1    plaintiffs' experts?

2         A.    No, I did not.

3         Q.    Since you did your report, have

4    you reviewed any of the expert reports of any

5    of the plaintiffs' experts?

6         A.    No, I have not.

7         Q.    Have you had any communications

8    or other interaction with any of the

9    plaintiffs' experts?

10        A.    No, I have not.

11        Q.    Do you understand if

12   Dr. Wexelblatt is an expert in the field of

13   neonatal abstinence syndrome?

14        A.    I do understand that he's an

15   expert in that field, but I know several

16   others also, yes.

17        Q.    Are you yourself an expert in

18   neonatal abstinence syndrome in terms of how

19   to treat it, how to mitigate its effects,

20   anything like that?

21             MR. PENDELL:  Objection, form.

22             THE WITNESS:  I know the public

23        policy issues related to NAS and I

24        know the ways in which NAS is treated.

1           I am not a clinician to prescribe to

2           treat any one individual infant who is

3           going through withdrawal.

4      Q.      (BY MR. ALEXANDER)  Do you hold

5  yourself out as an expert in some aspect of

6  neonatal abstinence syndrome, other than the

7  public policy aspects of it?

8      A.      There are specifics related to

9  the policy that I am an expert in.

10     Q.      So it's some of the public

11 policy aspects, but not all?

12     A.      No, I'm pretty much an expert

13 in all the policy about NAS and infants with

14 prenatal exposure.

15     Q.      Are there any areas in which

16 you would defer to Dr. Wexelblatt as an

17 expert in something related to NAS?

18           MS. FLOWERS:  Object to the

19           form.

20           THE WITNESS:  In -- in this

21           case, I believe that the attorneys

22           would be deferring to Dr. Wexelblatt.

23           There are other experts in my practice

24           or in my work that I would also be

1    deferring to.

2        Q.      (BY MR. ALEXANDER)  Okay.  I

3    didn't ask anything about attorneys.  I'm

4    asking about you.  Are there areas where you

5    would defer to Dr. Wexelblatt on something

6    relating to NAS?

7        A.      Certainly.  The clinical

8    treatment of an individual infant.

9        Q.      Is that the extent of it?

10       A.      I think that's a hypothetical

11   that I don't really know what you're trying

12   to ask me.  There are aspects of how to

13   treat, if you will, an infant, about what

14   happens at the hospital and after the

15   hospital that I am an expert on that I

16   wouldn't rely on Dr. Wexelblatt for.

17       Q.      What about what the best

18   practices are in terms of screening for and

19   treating NAS?  Would you defer to

20   Mr. Wexelblatt on that?

21       A.      Yes, but I also am very current

22   on the ways in which Yale is piloting and

23   there are a group in several different

24   locations in the country that are doing

1    revised Finnegan scales and working on eat,

2    sleep, console types of measures that I also

3    am very familiar with.

4            I am not putting those kinds of

5    practices in place in hospitals, but I am

6    certainly monitoring those groups and what

7    they're doing, and am in communication with

8    those physicians.

9        Q.    So what about Dr. Wexelblatt's

10   testimony on factors that have driven the

11   rise of NAS in certain parts of the country?

12           Or the difficulties of

13   assessing the true incidence of NAS?  Would

14   you defer to him on subjects like that?

15           MR. PENDELL:  Object to the

16       form.

17           THE WITNESS:  Certainly he

18       knows the issues in Ohio better than

19       anyone else.

20       Q.    (BY MR. ALEXANDER)  Okay.  Are

21   there any other areas about NAS that you

22   would defer to Dr. Wexelblatt about?

23       A.    Certainly the issues about how

24   he is setting up the attempts to address NAS

Highly Confidential - Subject to Further Confidentiality Review

1    in other communities.  He's certainly the

2    expert.

3              (Whereupon, Mr. Stewart joined

4    the deposition.)

5         Q.    (BY MR. ALEXANDER)  Are there

6    any other medical doctors who specialize in

7    NAS anywhere in the country who you defer to

8    on any subject other than the individual

9    clinical care of an individual patient?

10             MS. FLOWERS:  Object to the

11        form.

12             THE WITNESS:  Are you asking me

13        who the other experts are in the

14        country on NAS who I have

15        conversations with about these issues?

16        Q.    (BY MR. ALEXANDER)  No, that

17   wasn't my question.

18        A.    Could you repeat your question,

19   then?

20        Q.    I've been asking you about

21   whether you defer to Mr. Wexelblatt on any

22   specific subjects that are addressed in his

23   testimony that you've now received, which is

24   largely related to neonatal abstinence

1    syndrome.

2                    I said are there any

3    specialists in the neonatal abstinence

4    syndrome who you would defer to on anything

5    about neonatal abstinence syndrome other than

6    how to care for individual patients?

7                    MS. FLOWERS:  Object to the

8            form.

9                    THE WITNESS:  I think there are

10           two parts to your question.  Let me

11           try it this way.

12                   The clinical treatment of NAS,

13           I would absolutely defer to a medical

14           doctor, which Dr. Wexelblatt is.

15                   The post-hospital treatment,

16           not the clinical treatment, the

17           connection to child welfare and the

18           services that are needed in the

19           community, I would defer to myself.

20           Q.    (BY MR. ALEXANDER)  Okay.  So

21    between clinical treatment of the patient in

22    the hospital and the social services area

23    where you say you are an expert, is there any

24    other area relating to NAS, including its

1    causes, its prevalence, anything like that,

2    where you would defer to Dr. Wexelblatt or

3    some other specialist who happened to be a

4    medical doctor?

5              MS. FLOWERS:  Object to the

6         form.

7              THE WITNESS:  Yes, there are

8         other physicians, including

9         Mr. Wexelblatt about the specific

10        prevalence, that are doing research on

11        prevalence that I would defer to.

12        Q.    (BY MR. ALEXANDER)  So you

13   haven't yet reviewed Mr. Wexelblatt's

14   testimony; correct?

15        A.    I have skimmed the first part.

16   I did not finish it.

17        Q.    Do you know sitting here today

18   if you disagree with any of the testimony

19   that he gave on any issue?

20        A.    No, I do not.

21        Q.    So are you -- have you asked

22   for or received any testimony from any of the

23   other plaintiffs' experts?

24        A.    No, I have not.

1    Q.    What about their reports?  Have

2  you asked to see anybody's report?

3         MS. FLOWERS:  Objection, asked

4    and answered.

5         THE WITNESS:  No, I have not.

6    Q.    (BY MR. ALEXANDER)  What about

7  the defense experts?  Do you know the names

8  of any of the defense experts who have been

9  named?

10   A.    No, I do not.

11   Q.    And have you --

12   A.    Oh, let me back up.  Because we

13  had to make available the data sets, there

14  was an e-mail who we put on a Dropbox, and

15  that was -- I don't remember the name, but I

16  assume that is who the expert is that was

17  going to analyze the data sets.  So -- but I

18  don't know who that is.

19   Q.    It's somebody from an entity

20  called Alvarez & Marsal.  Is that what you're

21  talking about?

22   A.    I believe that's right.

23   Q.    And we'll talk about the data

24  in a little bit.  So let's go back to where

Highly Confidential - Subject to Further Confidentiality Review

1    we were.  In terms of the expert reports that

2    have been written by defense experts and

3    served on the plaintiffs, have you been made

4    aware of anything about them, their content,

5    who the people are, what subjects they cover,

6    what expertise might be present among the

7    defense experts, that's maybe not present

8    among the plaintiffs' experts, anything like

9    that?

10              MS. FLOWERS:  Objection.

11              MR. PENDELL:  Objection.

12              THE WITNESS:  Not that I

13       recall.

14       Q.    (BY MR. ALEXANDER)  Is that

15    something you intend to do, review any of the

16    defense experts' reports or testimony?

17       A.    I may, if I'm asked to.

18       Q.    I just meant you.  Do you,

19    Dr. Young, intend to review any additional

20    reports or deposition testimony at all from

21    any expert or any fact witness on either

22    side?

23              MS. FLOWERS:  Objection, asked

24       and answered.

Highly Confidential - Subject to Further Confidentiality Review

```
1                 THE WITNESS:  I don't intend
2       to.
3          Q.    (BY MR. ALEXANDER)  Do you have
4       any additional analyses that you intend to
5       have Dr. Yan or any of your staff perform?
6          A.    No, I do not.
7                 Well, let me go back one
8       second.  It depends on how long this takes.
9       The new AFCARS data set generally comes out
10      in January of each year.  So if this goes
11      through January, we would want to add the
12      2018 data to any of those reports.
13         Q.    And did you obtain the AFCARS
14      data through NDACAN directly?  Or did the
15      plaintiffs' lawyers have anything to do with
16      that?
17         A.    Oh, no.  We are -- we get that
18      every year.
19         Q.    And the RPG data, that's also
20      something that you and your staff already had
21      anyway?
22         A.    The RPG 1 data is data that we
23      collected.  We already had.
24         Q.    Did you ask for any data sets
```

1  to be obtained through plaintiffs, including

2  data that might be maintained by Cuyahoga or

3  Summit County or Ohio?

4       A.    No, we did not.

5       Q.    The recommendations at the

6  latter part of your report.

7       A.    Yes.

8       Q.    Is there anywhere where you've

9  set out in more detail actual plans of what

10  you think Cuyahoga and/or Summit County

11  should be doing different than what they're

12  already doing?

13       A.    No.  Not at this point.

14       Q.    Is that something that's in the

15  works?

16       A.    Not that I'm aware of.

17       Q.    Do you know the details of

18  what's already going on in Cuyahoga County in

19  terms of any of the subjects addressed in

20  your report?

21       A.    No, I do not.

22       Q.    Do you know in detail what's

23  already going on in Summit County in terms of

24  any of the details addressed in your report?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      No, I do not.

 2              Q.      Do you know, as you sit here

 3      today, the history of what's been done in

 4      terms of children and family services or any

 5      adjustments to budgeting, staffing, policies,

 6      procedures, because of anything relating to

 7      substance abuse?

 8                   MS. FLOWERS:  Object to the

 9              form.

10                   THE WITNESS:  I think I need

11              you to break that into separate parts.

12                   MR. ALEXANDER:  I'm happy to do

13              so.

14              Q.      (BY MR. ALEXANDER)  I will tell

15      you the key word there is history.  The

16      history.  So if we look at Cuyahoga County,

17      let's say, did you know that for children and

18      family services that there was a major

19      slashing of the budget and staffing in the

20      late 2008, early 2009 period and that

21      staffing levels in Cuyahoga County Children

22      and Family Services through the end of 2018

23      were still below 2008 levels?  Did you know

24      that?
```

Highly Confidential - Subject to Further Confidentiality Review

1          MS. FLOWERS:  Object to the

2      form, lack of foundation.

3          THE WITNESS:  The only part of

4      that -- well, let me -- I'm sorry,

5      could you restate, was that specific

6      to staff or to budget?

7      Q.    (BY MR. ALEXANDER)  I was

8  talking about staffing levels.

9      A.    Okay.  The part that I know of

10  that was specific to the START program.  And

11  I know that the START program decreased their

12  number of family advocates in about five --

13  2008.

14          And I knew that because I keep

15  up on what's going on in the field.

16      Q.    Okay.  So when you say a family

17  advocate, part of the START concept is that

18  there are people who personally have a

19  history of an addiction who are retained and

20  can act as a liaison with families going

21  through substance abuse issues in connection

22  with whatever social services they're

23  consuming; correct?

24          MS. FLOWERS:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2                    THE WITNESS:  They're a person

3          who is either a person in recovery or

4          they have a family member who is a

5          person in recovery who acts as a

6          family advocate who is paired with a

7          social worker, that's correct.

8          Q.    (BY MR. ALEXANDER)  And is your

9    general understanding that there used to be

10   about 25 of those in Cuyahoga County and it

11   was dropped to about three for most of the

12   period that we're talking about since 2008?

13         A.    My understanding is that the --

14   there were four, and that more recently they

15   have hired back the family advocates.

16         Q.    But not to prior levels that

17   they were in 2008?

18                   MS. FLOWERS:  Object to the

19         form, lack of foundation.

20                   THE WITNESS:  I don't know that

21         number.

22         Q.    (BY MR. ALEXANDER)  So when you

23   received the three depositions we talked

24   about, Barnes, Weiskittel and Cabot, did you

1   pay attention to all aspects of their

2   testimony even if it wasn't helpful for

3   plaintiffs' case?

4          MS. FLOWERS:  Object to the

5      form.

6          THE WITNESS:  It was the first

7      time for me to read depositions, and

8      they're rather challenging to get

9      through.  So, yes, I paid attention

10      best I could.

11    Q.    (BY MR. ALEXANDER)  Did you

12   like -- who was asking the questions, like

13   that level of detail?

14    A.    I'm sorry, could you repeat

15   that.

16    Q.    When you read them, did you

17   look at like who was asking the question,

18   which side the questioner was on, who they

19   were.  Did you pay attention to that?

20    A.    I didn't pay attention to who

21   the name was of the questioner, no, I didn't.

22    Q.    So let me ask you this in

23   general about being an expert.  As an expert

24   witness, even though it's your first time, do

Highly Confidential - Subject to Further Confidentiality Review

1    you understand that your role is not to

2    advocate for the party that represented -- or

3    retained you, but to provide an accurate and

4    fair representation of your own expertise as

5    it pertains to the issues in the case?

6                 MS. FLOWERS:  Object to the

7            form.

8                 THE WITNESS:  I understand that

9            as my -- a researcher in the field,

10           that is what I understand, yes.  And

11           as an expert in this case, yes.

12           Q.    (BY MR. ALEXANDER)  So like

13   when you did your expert report, you would

14   want to include statements that were helpful

15   to plaintiffs' case and statements that were

16   not helpful to plaintiffs' case if you

17   thought that they were accurate; correct?

18                 MS. FLOWERS:  Object to the

19           form.  Lack of foundation.

20                 THE WITNESS:  I -- yes.  I can

21           say yes, I would want to include

22           statements both ways.  I don't believe

23           I found any statements that were

24           endorsing the proliferation of drugs

1          in communities.

2          Q.     (BY MR. ALEXANDER)  When you

3     say endorsing the proliferation of

4     prescription drugs in communities?

5          A.     Yes.

6          Q.     Do you intend to offer any

7     opinions at trial as to why there have been

8     increases in any metric of abuse at any point

9     in time in Cuyahoga and Summit County?

10               MS. FLOWERS:  Object to the

11          form.

12               THE WITNESS:  That's outside of

13          the scope of my report.  And I think

14          that's my experience and knowledge

15          about what has gone on in many

16          communities around our country.

17          Q.     (BY MR. ALEXANDER)  So no, you

18     don't intend to offer any opinions at trial

19     about the reasons for the increase in any

20     type of substance abuse in Cuyahoga or Summit

21     County to any point of time; correct?

22               MS. FLOWERS:  Object to the

23          form.

24               THE WITNESS:  That's outside of

1          the scope of what I was asked to do.

2          Q.     (BY MR. ALEXANDER)  So you're

3     not going to do it?

4               MS. FLOWERS:  Object to the

5          form.

6               THE WITNESS:  That's correct.

7          Q.     (BY MR. ALEXANDER)  And you're

8     not offering any opinions about the conduct

9     of any of the defendants in the case;

10    correct?

11         A.     No.  That wouldn't be my area

12    of expertise.

13         Q.     So correct, you're not going to

14    do it?

15              MS. FLOWERS:  Object to the

16         form.

17              THE WITNESS:  So correct.

18         Q.     (BY MR. ALEXANDER)  Do you know

19    the names of any of the defendants?

20         A.     I know some of the names of the

21    defendants, yes.

22         Q.     I saw that one of the things

23    that you reviewed was one of the versions of

24    one of the complaints for either Cuyahoga or

Highly Confidential - Subject to Further Confidentiality Review

```
1    Summit County.  In connection with reviewing

2    the complaint, did you see various

3    allegations in there about what specific

4    defendants were alleged to have done wrong to

5    have -- what they did or what they failed to

6    do that the plaintiffs had some issue with?

7          A.    Yes, did I see that.

8          Q.    And you're not the person who

9    will testify at trial about whether any of

10   those allegations are correct or incorrect as

11   they relate to the conduct of any defendant?

12         A.    That is correct.

13         Q.    And in terms of what standards

14   apply to the conduct of any of the

15   defendants, whether they be FDA standards,

16   DEA standards, or any other standard that

17   might govern their conduct, you're not the

18   one to say what the standards of conduct are;

19   correct?

20         A.    That is correct.

21         Q.    And in terms of whether

22   anything the defendants did or didn't do

23   caused or contributed to anything about the

24   opioid epidemic or opiate crisis, however you
```

1    may term it, that's also not anything you're

2    going to address; correct?

3         A.    That is correct.

4         Q.    In terms of whether anything

5    the defendants did or didn't do essentially

6    increased the cost of Cuyahoga or Summit

7    County in regards to anything relating to

8    substance abuse, that is also not an area

9    where you'll be offering expert opinions;

10   correct?

11        A.    I am not an expert on the cost

12   to the County broadly.  I do understand the

13   cost in children's services, although I

14   haven't been asked, nor would I offer

15   expertise on the cost of specific cases or

16   increased cases in children's services

17   related to the -- to opioids in the

18   community.

19        Q.    Your expert report doesn't

20   address costs at all.

21        A.    That is correct.

22        Q.    Therefore you're not going to

23   be offering any opinions that talk about past

24   costs or future costs associated with any

Highly Confidential - Subject to Further Confidentiality Review

```
 1    social services or aspect of remediating any

 2    problem with substance abuse; correct?

 3                 MS. FLOWERS:  Object to the

 4         form.  Asked and answered.

 5                 THE WITNESS:  That is correct.

 6         Q.    (BY MR. ALEXANDER)  And you're

 7    not offering any kind of opinions about how

 8    costs or damages should be allocated among

 9    the defendants or any group of defendants

10    based upon any analysis or opinions you hold.

11                 MS. FLOWERS:  Same objection.

12                 THE WITNESS:  That is correct.

13         Q.    (BY MR. ALEXANDER)  You're not

14    actually -- do you call it the opioid crisis?

15    The opiate epidemic?  What words do you use

16    to describe the issue of the problems in

17    society that have been related to increasing

18    abuse of drugs like heroin and fentanyl?

19                 MS. FLOWERS:  Object to the

20         form.  Lack of foundation.

21                 THE WITNESS:  The opioid

22         epidemic.

23         Q.    (BY MR. ALEXANDER)  Okay.  So

24    using that term as you use it, do you intend
```

1    to offer any testimony about the causes of

2    the opioid epidemic?

3          A.    No, I wouldn't be testifying to

4    the causes of the opioid epidemic.

5          Q.    Are you going to testify to the

6    causes of what drives substance abuse of any

7    substance in the United States or

8    specifically Cuyahoga and Summit County?

9                MS. FLOWERS:  Object to the

10          form.

11               THE WITNESS:  No.  That is

12          outside of the scope of what I was

13          asked to report on.

14          Q.    (BY MR. ALEXANDER)  Is that

15    also beyond your expertise, ma'am?

16          A.    I have a great deal of

17    knowledge about that, but that is not what I

18    was asked to report on, nor do I believe I

19    would be the expert that would be asked to

20    testify about that.  There are other experts,

21    I believe, that the plaintiffs would call for

22    that.

23          Q.    So we've talked about neonatal

24    abstinence syndrome.  You've also used the

Highly Confidential - Subject to Further Confidentiality Review

1    term neonatal opiate withdrawal, NOW?  That's

2    in one of your footnotes.  You say a lot of

3    clinicians get those wrong, but you really

4    think NOW is the right word?  Or acronym?  Is

5    that right?

6              MS. FLOWERS:  Object to the

7         form.  Misstates the report.

8              THE WITNESS:  Would you like me

9         to explain that?

10        Q.    (BY MR. ALEXANDER)  I want to

11   make sure I'm using the right acronyms when I

12   ask you substantive questions.  Do you prefer

13   NAS or NOW?

14        A.    We can use the term NAS.

15   That's sort of the generic term.  I do a fair

16   amount of writing for the federal government,

17   and when I'm writing for the federal

18   government, the federal government would like

19   me to be precise when I'm speaking or

20   writing, rather, specific to opioid

21   withdrawal, versus the broader category of

22   any abstinence syndrome, which would include

23   any kind of substance that the infant was

24   exposed to.  But it is generally referred to

Highly Confidential - Subject to Further Confidentiality Review

1    as neonatal abstinence syndrome.

2         Q.    Focusing on neonatal abstinence

3    syndrome for Cuyahoga and Summit County

4    individually or collectively, do you intend

5    to offer any opinions about the prevalence of

6    that condition in those counties over time?

7         A.    No, I do not.

8         Q.    Do you intend to offer any

9    opinions about the various factors that have

10   driven any changes over time in the

11   prevalence of NAS in Cuyahoga and/or Summit

12   County?

13        A.    No, I do not.

14        Q.    Do you intend to offer any

15   opinions about the costs associated with any

16   changes in neonatal abstinence syndrome in

17   those counties over time?

18             MS. FLOWERS:  Objection, asked

19        and answered.

20             THE WITNESS:  No, I do not.

21        Q.    (BY MR. ALEXANDER)  Do you know

22   when data is included in your report that

23   talks about NAS, the portion of NAS cases

24   that are related to the use of prescription

1    opioids by a mother who is obtaining the

2    prescription opioids pursuant to a

3    prescription written for her?

4                    MS. FLOWERS:  Object to the

5          form.

6                    THE WITNESS:  No, I do not.

7          Q.     (BY MR. ALEXANDER)  I can

8    expand more generally.  For any of the

9    measures of substance abuse or opioid use

10   syndrome, any of these metrics of basically

11   abuse of opioids, can you break it up by the

12   percentage of that that actually involved

13   people abusing opioids where they've obtained

14   them legally pursuant to a prescription

15   written for them at the time?

16                   MS. FLOWERS:  Object to the

17         form, lack of foundation.

18                   THE WITNESS:  At this point in

19         time, those data are not available.

20                   I believe going forward those

21         data would be available, and I believe

22         that there are certain hospitals and

23         centers that are trying to

24         differentiate that, particularly the

1           prescriptions for methadone

2           apomorphine, versus heroin.

3                   But I don't have those data.

4           Q.      So sitting here today, none of

5    the opinions you're going to offer are

6    specific to the percentage of harm or

7    problems in general related to the abuse of

8    prescription opioids by somebody who actually

9    has a prescription for them at the time

10   they're abusing them?

11                  MS. FLOWERS:  Object to the

12          form.

13                  MR. PENDELL:  Object.

14                  THE WITNESS:  That's not how I

15          understand the problem.

16          Q.      (BY MR. ALEXANDER)  I'm asking

17   is it an opinion you intend to offer today

18   that you're actually going to say there are

19   people abusing prescription opioids who

20   actually have a prescription for them at the

21   time they're abusing them?

22          A.      I'm sorry, could you repeat

23   that?

24          Q.      Sure.

1      So an individual who is abusing

2  drugs, under some of the data that you have

3  where it talks about drug abuse, it's

4  basically tallying all types of drug abuse of

5  all sorts, different drugs combined in a

6  single number; correct?

7      A.    Yes.  But it's not really

8  abuse.  It's persons with substance use

9  disorders.  And I think you would need to

10  point to which number you're talking about if

11  those categories are collapsed, or if they're

12  separated.

13      So can you tell me which number

14  you're actually referring to?

15      Q.    I'm not referring to a specific

16  one now, I'm talking about the concept of how

17  when you talk about people with a substance

18  use disorder, sometimes it's all drugs, plus

19  alcohol, that's one of the kind of datasets

20  or ways that the data might be grouped that

21  you've looked at and described in your

22  report; correct?

23      A.    You would have to show me where

24  in the report for me to agree with that

Highly Confidential - Subject to Further Confidentiality Review

1    statement, because when possible, I pulled

2    out which substance.  So I don't want to

3    agree with that statement, because sometimes

4    the substances are differentiated and

5    sometimes they're not.  So I can't agree with

6    that statement, blanket statement.

7            Q.     Sometimes in the data you have

8    you have drug level data, where you can say

9    specifically what drug is noted as the drug

10   of abuse, and in some of the data that you

11   have, or are describing, you can't get that

12   low, you just say that people are -- have

13   substance abuse disorder associated with some

14   variety or combination of substances; right?

15              MS. FLOWERS:  Object to the

16           form.  Lack of foundation.

17              THE WITNESS:  Again, I think

18           you need to tell me which data you're

19           pointing to for me to agree with that

20           statement.  It's a -- kind of a

21           compound thing that you're asking me,

22           and I don't want to agree with it

23           unless you can point to which one

24           you're talking about that the data had

Highly Confidential - Subject to Further Confidentiality Review

```
 1          been collapsed or the data are

 2          differentiated.

 3          Q.    (BY MR. ALEXANDER)  In none of

 4  the data that you've analyzed for your

 5  present report do you have the ability to say

 6  what portion of substance abuse disorders are

 7  related to people who are abusing

 8  prescription opioids that they obtained

 9  solely through legal means from a

10  prescription written for them.

11               MS. FLOWERS:  Object to the

12          form.  Lack of foundation.

13          Q.    (BY MR. ALEXANDER)  Correct?

14               MS. FLOWERS:  Asked and

15          answered.

16               THE WITNESS:  So it's substance

17          use disorders, rather than substance

18          abuse disorders is the term.

19               And typically in the way in

20          which those clinical data are

21          collected, they would then be rolled

22          up into the data set that would

23          collapse those data.  So in this

24          report, prescription drug use is
```

Highly Confidential - Subject to Further Confidentiality Review

1    collapsed into Opioid Use Disorders.

2         Q.    So you have no data where you

3    were actually looking solely at somebody who

4    has a substance use disorder, and the only

5    drug they're abusing is a drug that they have

6    obtained pursuant to a legal prescription;

7    correct?

8              MR. PENDELL:  Objection.

9              THE WITNESS:  In the child

10        welfare system specifically, which is

11        what we're talking about, at this

12        point those data are not available.

13             I believe that they may be

14        available in the future.

15        Q.    (BY MR. ALEXANDER)  Same thing

16   goes for the issue of medical versus

17   nonmedical use.  None of your analyses focus

18   solely on any kind of substance use disorder

19   or impact on child services related solely

20   from medical use of prescription opioids;

21   correct?

22             MS. FLOWERS:  Object to the

23        form.

24             MR. ALEXANDER:  Or like I say,

Highly Confidential - Subject to Further Confidentiality Review

1       medically necessary use.

2              MS. FLOWERS:  Object to the

3       form.

4              THE WITNESS:  Medically

5       necessary use.  I believe I've already

6       answered that, that the data that are

7       available collapse typically opioids

8       into one category.

9       Q.     (BY MR. ALEXANDER)  You also

10  can't break out any kind of part of opioid --

11  I'm sorry, substance use disorder or impact

12  on child services in either or both counties

13  that's related to medically unnecessary use

14  of prescription opioids; correct?

15             MS. FLOWERS:  Object to the

16      form.  Asked and answered.

17             THE WITNESS:  Unnecessary.  The

18      data are not broken out in that way;

19      that is correct.

20      Q.     (BY MR. ALEXANDER)  And you

21  also don't have an amount of substance use

22  disorder or the impact on children and family

23  services in Cuyahoga and/or Summit County

24  that is attributable to the use of illicit

Highly Confidential - Subject to Further Confidentiality Review

 1    drugs, not prescription drugs but purely

 2    illicit drugs like heroin, methamphetamine,

 3    fentanyl analog obtained illegally, that sort

 4    of thing?

 5              MS. FLOWERS:  Objection, form.

 6         Foundation.

 7              THE WITNESS:  Those data are

 8         not in my report.

 9         Q.    (BY MR. ALEXANDER)  Do you know

10    the percentage of children and family

11    services cases in Cuyahoga County that are

12    attributable in whole or in part to abuse of

13    alcohol?

14         A.    I specifically excluded the

15    alcohol from that indicator in this report.

16         Q.    I know that you did.  That's

17    why I'm asking the question.

18              Do you know what percentage of

19    their cases have abuse of alcohol as one of

20    the causes for there being a need for social

21    services, whether it be investigation or some

22    other social services need?

23         A.    Off the top of my head, I don't

24    know.  It's a small percentage are recorded

Highly Confidential - Subject to Further Confidentiality Review

```
 1    as alcohol only.  It's a small percentage

 2    across the country.  Five -- five percent or

 3    less.

 4         Q.     What about Summit County?  Do

 5    you know the percentage of their cases, let's

 6    say investigation for maltreatment that

 7    related to alcohol abuse?

 8               According to data maintained by

 9    the counties themselves.

10         A.     Similarly, it's a low

11    percentage.

12         Q.     What about where alcohol abuse

13    is concomitant with abuse of some other

14    substance, including an opioid?  Do you know

15    what percentage that is?

16         A.     No, sitting here today, I don't

17    know.  I would have to look.

18         Q.     In the data that your staff

19    had, did you look at or ask that they look at

20    the overlap of alcohol abuse and abuse of

21    some sort of other substance like an opioid

22    to see how often those are going hand in

23    hand?

24               MS. FLOWERS:  Object to the
```

1          form, misstates testimony.

2                   THE WITNESS:  We do that

3          analysis.  It doesn't change the data

4          very much, so I excluded the alcohol

5          in this report.

6          Q.     (BY MR. ALEXANDER)  I

7     understand you excluded the alcohol in that

8     report.  I asked if you looked at or have

9     your staff look at the issue of the overlay

10    of alcohol abuse with other substances of

11    abuse in the same sort of data that you did

12    actually look at.

13         A.     Mm-hmm.  In the national data

14    that are presented on parent substance use,

15    the alcohol is in those -- it is in that --

16    those data.

17         Q.     Like AFCARS?

18         A.     In the AFCARS, yes.

19                We first ran the data with

20    both.  I don't recall what that percentage

21    was.  I presented it for drug only because I

22    thought this group would be more interested

23    in the drug only.  I wasn't presenting it

24    without the alcohol to hide the alcohol, but

Highly Confidential - Subject to Further Confidentiality Review

1    rather that this group was more interested in

2    the drug only.  And that the alcohol would

3    raise those percentages some and that you

4    would want to have just the drug.  That was

5    the rationale behind raising -- behind

6    reporting just the drug.

7         Q.    What do you mean by this group

8    would be more interested in the drug only?

9    What group?

10        A.    The group of attorneys that are

11   in the room.

12        Q.    Okay.  Kind of goes back to

13   where we were before.  But are there actually

14   calculations or some sort of data output

15   that -- of what you got when you included

16   alcohol?

17        A.    Yes.

18        Q.    Where is that?

19        A.    In my office.

20        Q.    Did you produce it to the

21   plaintiffs' lawyers so they could give it to

22   us?

23        A.    No.

24        Q.    Did you present it to the

Highly Confidential - Subject to Further Confidentiality Review

1    plaintiffs' lawyers before it was excluded

2    from the report?

3         A.    No.

4         Q.    Would it surprise you if in

5    some of the years that we're talking about,

6    for let's say Cuyahoga County, that the

7    overlap of alcohol abuse and drug abuse was

8    such that almost half of the drug abuse cases

9    also had a notation of alcohol abuse at the

10   same time?

11             MS. FLOWERS:  Object to the

12        form.  Lack of foundation.

13             THE WITNESS:  No.  That

14        wouldn't surprise me.

15        Q.    (BY MR. ALEXANDER)  So in your

16   years in the field of participating in

17   children and family services or more

18   appropriately, I guess, doing research on

19   children and family services and things like

20   best practices, is it your understanding that

21   alcohol abuse is always one of the main

22   drivers of the need for children and family

23   services across the country?

24             MS. FLOWERS:  Objection.

```
 1              THE WITNESS:  No.  It is one of

 2         the factors that are associated with

 3         the case, but typically it is not the

 4         main driver.

 5         Q.    (BY MR. ALEXANDER)  I'm saying

 6    one of the most common drivers.  Is it your

 7    understanding that alcohol abuse is one of

 8    the most commonly noted drivers of the need

 9    for children and family services over the

10    last 30, 40 years?

11         A.    Could you restate that?

12         Q.    Sure.  So you understand that

13    Cuyahoga and Summit County track information

14    on the cases where there's an investigation

15    of maltreatment and that there might be some

16    other involvement of children's services

17    essentially have case files for all of their

18    cases; right?

19         A.    Yes, I understand that.

20         Q.    And you understand that they

21    have a state database system where they put

22    certain information in as required by their

23    local obligations so that it can ultimately

24    flow into something like AFCARS; correct?
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Yes, I understand that.

2        Q.      Have you asked for any

3    information about the database or case file

4    practices of Cuyahoga or Summit County?

5        A.      I understand those practices

6    broadly, because of working in Ohio.

7        Q.      Did you get any information

8    about the SACWIS database?

9        A.      I understand the SACWIS

10   database.

11       Q.      For this case, did you ask for

12   and receive any specific information about

13   SACWIS database or any practices relating to

14   how those counties do their case files or

15   what sort of information they put into SACWIS

16   over time?

17              MR. PENDELL:  Objection to

18         form.

19              THE WITNESS:  Not specific for

20         this report, just from my knowledge of

21         working with those data over time.

22         And working through the SSIP project.

23       Q.      (BY MR. ALEXANDER)  Did you

24   look at any output for SACWIS for your work

Highly Confidential - Subject to Further Confidentiality Review

1    on this case?

2         A.    Well, SACWIS is the same -- is

3    the data behind the AFCARS data, and AFCARS

4    data are the data set that I used for

5    reporting these in this report.

6         Q.    Do you know if the fields in

7    the data you have from AFCARS meet up with

8    the fields in SACWIS as maintained by the

9    state of Ohio?

10        A.    Unless the state of Ohio

11   submitted AFCARS data that are somehow

12   different than the underlying database, they

13   would match.

14        Q.    If they don't, that would be an

15   issue for your data analysis; right?

16             MS. FLOWERS:  Object to the

17        form.  Lack of foundation.

18             THE WITNESS:  Well, you also

19        have to know that the AFCARS data are

20        updated pretty much on an ongoing

21        basis.  So if you get the AFCARS data

22        set and then you get the data set six

23        months later, the corrections or

24        updates that have been made

1          previously, the data are updated.  So

2          whenever the state updates it, the

3          data are not the same as the previous

4          upload.

5          Q.    (BY MR. ALEXANDER)  My question

6     was, if the data in SACWIS, like produced in

7     connection with this litigation, is different

8     for the essential same group of cases as the

9     data that your staff reviewed from AFCARS,

10    that would present a problem for the analyses

11    that your staff did; right?

12              MR. PENDELL:  Objection to

13         form.  Calls for speculation.

14              THE WITNESS:  If they were

15         different, if -- I would be surprised.

16         I wouldn't understand how the data in

17         the underlying database would be

18         reported to the federal government

19         that would be different.

20         Q.    (BY MR. ALEXANDER)  And you

21    haven't done any investigation here to figure

22    out how the data was generated for SACWIS and

23    how that might have eventually flowed into

24    what you ultimately looked at or your staff

Highly Confidential - Subject to Further Confidentiality Review

1    looked at from NDACAN?

2              MS. FLOWERS:  Objection, asked

3         and answered.

4              THE WITNESS:  We looked at the

5         AFCARS data set that is reported to

6         the federal government and stored it,

7         the Cornell archive.  That's correct.

8         Q.    (BY MR. ALEXANDER)  Did you

9    look at any data output, reports, anything

10   like that, that came directly from SACWIS,

11   "yes" or "no"?

12        A.    No, I did not.

13        Q.    Did you look at any case files

14   or compilation or summary of cases filed from

15   Cuyahoga or Summit County in connection with

16   your work in this case?

17        A.    No, I did not.

18        Q.    If there's data that's been

19   generated in course -- in the course of doing

20   regular children and family services

21   functions for those counties, or for the

22   litigation from the counties that's contrary

23   to your own analyses, would you expect to

24   have seen it?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. FLOWERS:  Object to the

 2         form, lack of foundation.

 3              THE WITNESS:  I think you're

 4         creating a hypothetical that I don't

 5         know where you're going, so if there

 6         were data that were in conflict to the

 7         AFCARS data, yes, I would think I

 8         would have seen that.

 9         Q.    (BY MR. ALEXANDER)  Okay.

10    And --

11         A.    Perhaps.  I -- I don't know.

12         Q.    And for your own work here to

13    try to make sure that you're thorough and

14    looking at all of the -- both sides of the

15    issues, have you attempted in your mind to

16    get the data and analyses that already exist,

17    that have been done by the counties or done

18    by the state as part of evaluation of the

19    data that came from the counties that pertain

20    to the same subject matters you're

21    addressing?

22              MS. FLOWERS:  Object to the

23         form.

24              THE WITNESS:  Yes, I'm familiar
```

Highly Confidential - Subject to Further Confidentiality Review

 1          with the data that are available on

 2          the subject matter that I was asked to

 3          report on.

 4                  I think we've been going an

 5          hour.  Let's take a break.

 6          Q.     (BY MR. ALEXANDER)  Can I ask

 7    just one question?

 8          A.     Let's take a break.

 9                  THE VIDEOGRAPHER:  Your

10          microphone.

11                  Are we going off?

12                  MR. ALEXANDER:  Yeah.  I mean,

13    I --

14                  THE WITNESS:  A quick one.

15                  MR. ALEXANDER:  I normally

16          would ask a follow-up question, but

17          she's already taken her mic off.

18                  THE VIDEOGRAPHER:  We are going

19          off the record.  The time is 11:17.

20                  (Recess taken, 11:18 a.m. to

21          11:37 a.m.)

22                  THE VIDEOGRAPHER:  We are now

23          going back on the record.  And the

24          time is 11:36 a.m.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.       (BY MR. ALEXANDER)  Dr. Young,

2    is there any of your testimony thus far you

3    need to change or supplement in any way?

4        A.       Yes.  I would like to clarify.

5    You asked a question about how -- or what I

6    call the opioid epidemic, and I believe you

7    did not include in the substances you asked

8    me about, prescription drugs, and yes, I

9    include prescription drugs in the definition

10   of the opioid epidemic.  I just want to make

11   sure that's clear.

12       Q.       What drugs?

13       A.       Prescription opioids, fentanyl,

14   carfentanil, opioids, all of the drugs that

15   fit into the opioid class would be what I

16   would include in my definition of the opioid

17   epidemic.

18       Q.       Can you name for me some of the

19   prescription drugs?

20       A.       Some.  OxyContin, hydrocodone,

21   oxycodone.  Those are the ones that come to

22   mind off the top of my head.

23       Q.       Anything else?

24       A.       Percodan, Percocet.  Those are

Highly Confidential - Subject to Further Confidentiality Review

1    the ones that I can think of right here

2    today.

3         Q.    Okay.  Do you include fentanyl

4    as a prescription drug?

5         A.    No, I do not.  Oh, yes, I'm

6    sorry, yes, it is a prescription drug.  It

7    can, yes.

8         Q.    So you -- what benzodiazepines?

9    Do you include them at all?

10        A.    I don't believe they're the

11   opioid class.

12        Q.    Well, is there some role as far

13   as you know of abuse of benzodiazepines in

14   connection -- abuse or medically unnecessary

15   use of benzodiazepines in connection with

16   what's been described as the opioid epidemic?

17             MS. FLOWERS:  Object to the

18        form.

19             THE WITNESS:  They're not in

20        the class of opioids.  So I am -- I

21        don't know.

22        Q.    (BY MR. ALEXANDER)  What about

23   methamphetamine?  Does that play any role in

24   either being like overlapping use or part of

Highly Confidential - Subject to Further Confidentiality Review

1    the different drugs of abuse that an

2    individual person with a substance abuse

3    disorder might cycle through?

4              MR. PENDELL:  Objection to

5         form.

6              THE WITNESS:  In any one

7         individual, I believe that that could

8         be a substance that an individual

9         might use.  But they're not an opioid

10        class.

11        Q.    (BY MR. ALEXANDER)  Let me ask

12   this more generally.  In your analyses, did

13   you pay attention to the role of

14   methamphetamine in terms of the burden on

15   social services?

16        A.     Not specifically in this time

17   period.

18        Q.     What about for Cuyahoga and

19   Summit County?  Did you pay attention to

20   historic trends of methamphetamine abuse in

21   Cuyahoga or Summit County as they relate to

22   the burden on social services?

23        A.      Well, as you know, the AFCARS

24   data on the total number of children that

Highly Confidential - Subject to Further Confidentiality Review

1    have been both entering and the static

2    population of children in out-of-home care,

3    have -- were continuing to go down from 2000

4    until 2012.  And, in fact, that was during

5    the time that the country was experiencing an

6    increase in the number of individuals

7    including parents that were using

8    methamphetamine.  So while the

9    methamphetamine use rate was going down, it

10   was not contributing to the increase of

11   children going into out-of-home care or the

12   static population of children in care.

13                Not until 2012 did workers

14   begin to say this is opioids that are driving

15   the out-of-home care population.

16                So, as you asked about, did I

17   look at that historically, yes.

18   Historically, methamphetamine did not have

19   the same impact that prescription drugs and

20   opioids have had on the child welfare

21   population.

22        Q.    So you've mentioned a couple of

23   times something about the time frame

24   applicable to this case?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      I'm sorry, I didn't hear you.

2          Q.      You've mentioned -- I'm over

3     here.

4          A.      Yes, I know.

5          Q.      I don't know if you can hear

6     me.

7                  You've mentioned a couple of

8     times the time frame or the time period of

9     this case.  What do you understand that to

10    be?

11         A.      The -- this case, I don't know.

12    What I know is that in 2012, the longstanding

13    trend in out-of-home care began to reverse

14    itself.

15                 I know that OxyContin was

16    introduced, I believe, in the mid '90s, and I

17    could be wrong on that.  I don't know that

18    for sure.

19                 And I know that about 2014 or

20    so is when Summit and Cuyahoga began to

21    experience increases in their out of home

22    care, I believe.

23                 I would have to look at my

24    report.  Would you like me to check that?

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      No.  Focusing on the time since

2   2012, have there been times when

3   methamphetamine abuse in either county

4   outpaced the use of opioids, including

5   illicit opioids?

6      A.      Not in some of the measures

7   that I am familiar with.  In the treatment

8   data in terms of treatment admission, opioids

9   outpaced methamphetamine in Ohio.  From the

10  data that I'm aware of.

11     Q.      So my question was of the

12  counties.

13     A.      Mm-hmm.

14     Q.      So I'm asking about

15  county-specific data, not statewide data.

16     A.      Mm-hmm.

17     Q.      Has there been a time period

18  since 2012 when methamphetamine abuse

19  outpaced opioid abuse?

20     A.      I don't know.

21     Q.      What about in terms of a reason

22  for involvement of children's services or

23  children and family services in either

24  county?  Has there been a time when

Highly Confidential - Subject to Further Confidentiality Review

1  methamphetamine was, you know, more often the

2  drug of abuse than a prescription or illicit

3  opioid?

4       A.    I'm sorry, what was the time

5  frame you were giving me?

6       Q.    Since 2012, ma'am.

7       A.    Those data, as far as I know,

8  are not available.

9             The difference between

10 methamphetamine and opioids.

11      Q.    Okay.  So in your analyses, did

12 you attempt to separate out the role of

13 methamphetamine as a driver of the need for

14 children and family services in Cuyahoga or

15 Summit County?

16      A.    Yes, I did the best I could

17 with the data sources that I could look at.

18      Q.    What about marijuana?  So

19 marijuana, in -- over this time period has

20 generally increased among those who are

21 consumers of children and family services.

22 Right?

23            MS. FLOWERS:  Object to the

24       form.  Lack of foundation.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  I don't know
 2        those data on marijuana.  And those --
 3        marijuana alone is typically not a
 4        reason that children's services would
 5        make a removal.  It might be
 6        associated with the case.
 7              MR. ALEXANDER:  Hey, can
 8        whoever is on the phone mute their
 9        line?  We don't care about your
10        airline thing to be on the record.  No
11        offense.
12        Q.    (BY MR. ALEXANDER)  Do you need
13   to have the question read back, ma'am?
14        A.    Yes, please.
15        Q.    I'm not sure you fully answered
16   it.  I was asking about marijuana, and I
17   think you gave your answer about that
18   marijuana might be associated with the case.
19   Was that a complete answer before we had the
20   little interruption?
21        A.    Why don't you ask your question
22   again.
23        Q.    So marijuana, as one of the
24   drugs of abuse or one of the substances of
```

Highly Confidential - Subject to Further Confidentiality Review

1  abuse, do you know if the data exists for

2  Cuyahoga and Summit County to indicate that

3  that frequency has been going up over time?

4            MS. FLOWERS:  Object to the

5       form, lack of foundation.

6            THE WITNESS:  I don't know that

7       those data exist.

8       Q.    (BY MR. ALEXANDER)  Did you

9  consider at all marijuana as a driver of the

10  need for children and family services or the

11  complexity of cases involved in children and

12  family services in Cuyahoga or Summit County?

13      A.    It's my general knowledge that

14  marijuana does not drive children being

15  placed in out-of-home care.  It's my --

16      Q.    Is that just a gestalt from

17  having worked in the field or do you have

18  some specific data or documents you base that

19  on?

20            MS. FLOWERS:  Object to the

21       form.

22            THE WITNESS:  That's my general

23       knowledge of working in the field.

24      Q.    (BY MR. ALEXANDER)  Have you

Highly Confidential - Subject to Further Confidentiality Review

```
 1    looked to see if there are differences in

 2    terms of marijuana use patterns in Cuyahoga

 3    or Summit County where marijuana actually is

 4    a driver of the need for children's services

 5    or the complexity of children's services

 6    cases?

 7            MS. FLOWERS:  Objection, asked

 8       and answered.

 9            THE WITNESS:  No, I have not.

10    Q.    (BY MR. ALEXANDER)  The

11    analyses that Dr. Yan did when you said you

12    checked his work, can you describe what it --

13    what was involved in checking the work that

14    he did or the output that he gave you?

15    A.    So initially we discussed the

16    variables and what I was looking for, and we

17    talked about how we would get those

18    variables.  And he created the syntax and we

19    looked at the output together and then I used

20    the output to create the graphs.

21    Q.    And what about the output that

22    isn't included in the report, other than all

23    of the output that included alcohol before it

24    was excluded?  Was there other output that
```

Highly Confidential - Subject to Further Confidentiality Review

1    you didn't include in the report?

2              MS. FLOWERS:  Object to the

3         form.  Foundation.  Misstates

4         testimony.

5              THE WITNESS:  Not that I

6         recall.

7         Q.    (BY MR. ALEXANDER)  How many

8    charts have been run with alcohol in it

9    before alcohol was excluded?

10        A.    Only the two charts of the --

11   well, I need to check and make sure in my

12   report.  Would you like for me to look?

13        Q.    Here's what we're going to do.

14   I've marked as Exhibit 1 --

15             MR. ALEXANDER:  Counsel, do you

16        need a copy of the case report?

17             MS. FLOWERS:  No.

18             MR. ALEXANDER:  More paper for

19        me.  Awesome.

20             (Whereupon, Deposition Exhibit

21        Young-1 was marked for

22        identification.)

23        Q.    (BY MR. ALEXANDER)  Exhibit 1

24   is a copy of the report that we got from you.

1    I'm sorry, from the plaintiffs's lawyers, on

2    your behalf.  It has your name at the top and

3    then describes you throughout in the third

4    person.  And then on the 37th page there is a

5    signature that says Nancy K. Young Ph.D.,

6    over the typed date March 25th, 2019.  Do you

7    see that?

8         A.    Yes, I do.

9               MS. FLOWERS:  Objection,

10        misstates the record.  The document

11        does not refer to her in the third

12        person throughout.

13        Q.    (BY MR. ALEXANDER)  Is that

14   your signature?

15              On page 37 of Exhibit 1?

16        A.    Yes, it is.

17        Q.    And when do you think you

18   finalized this report?

19        A.    March 25th.

20        Q.    And do you see that there's a

21   list of references on the last four pages?

22              Do you see that?

23        A.    Yes, I do.

24        Q.    And those are references that

Highly Confidential - Subject to Further Confidentiality Review

1    are included in the preceding 37 pages;

2    correct?

3         A.     Yes.

4         Q.     Then we were provided with --

5    let me just ask this first.

6              In Exhibit 1, when we've been

7    referring to your report and what is an

8    opinion disclosed in your report or something

9    that's beyond the scope of your report,

10   that's Exhibit 1?  That's the report you were

11   referring to?

12        A.     Yes.  If all the pages are

13   here, yes.

14        Q.     And we got before the

15   deposition started what we were told was the

16   reformatted version of your report.

17              I've marked that as Exhibit 2.

18   I'll hand you a copy.

19              (Whereupon, Deposition Exhibit

20        Young-2 was marked for

21        identification.)

22        Q.     (BY MR. ALEXANDER)  Exhibit 2

23   seems to be identical to what you have in

24   front of you.  Is that what you have, like

Highly Confidential - Subject to Further Confidentiality Review

1    kind of the reformatted version, is what you

2    brought with you?

3         A.    Yes.

4         Q.    Take a look at it.  Exhibit 2

5    is what plaintiffs' counsel handed me right

6    before we started that I just slapped the

7    sticker on.

8         A.    All right.

9         Q.    So the signature again is on

10   page 37.  And then again, after that, there

11   are these four pages of references.

12             Do you see that?

13        A.    Yes.

14        Q.    So the reformatting relates to

15   just the position of the tables with regard

16   to where -- or the graphs with regard to the

17   title of them?

18        A.    Yes.

19        Q.    When did you make these changes

20   in terms of reformat?

21        A.    Oh, I don't recall.  In the

22   week after, I believe.

23        Q.    Back in March?

24        A.    Yes.  I believe that's right.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.      Did you re-sign it or you

2    didn't see it pointing to that?

3        A.      No.

4        Q.      Because it's the same signature

5    and the same date on Exhibit 1 as on

6    Exhibit 2.

7        A.      That page was just put in the

8    same.

9        Q.      So the copy that we got,

10   starting on page 10, you'll see that there --

11   actually before that, I'm sorry.

12              Most of the pages after the

13   first couple, I guess starting on page 5,

14   there's a vertical line on Exhibit 2 running

15   up them.

16              MS. FLOWERS:  Sorry, Counselor,

17         are you referring to Exhibit 1 or

18         Exhibit 2?

19              MR. ALEXANDER:  I said

20         Exhibit 2, Counsel.

21       Q.      (BY MR. ALEXANDER)  Do you see

22   that in your copy that you're flipping

23   through?

24       A.      Yes, I do.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you know what the vertical

2 black line is about?

3    A.    It looks like a bad copy

4 machine.

5    Q.    But as far as you understand,

6 whether we look at Exhibit 1 or Exhibit 2,

7 the reformatted version, either of those

8 would contain all of the opinions you intend

9 to offer at a trial of this case, if called;

10 correct?

11    A.    That's correct.

12    Q.    And I have marked as Exhibit 3,

13 it's a two-sided color copy -- here's one,

14 plaintiffs' counsel -- of something that we

15 got with the report, that is not the same

16 thing as this couple of pages of references,

17 but is a two-page list of materials

18 referenced in the expert report, and it says

19 on the left, and on the top right it says

20 materials considered by Nancy Young.  Do you

21 see that?

22    A.    Yes, I see this.

23            (Whereupon, Deposition Exhibit

24    Young-3 was marked for

Highly Confidential - Subject to Further Confidentiality Review

1          identification.)

2          Q.     (BY MR. ALEXANDER)  Did you

3    have any role in putting together Exhibit 3?

4          A.     No, I didn't.

5          Q.     So other than the overlap of

6    some of these things that were actually in

7    the report, like National Survey on Drug Use

8    and Health, do you know what any of these

9    documents are?

10              Let me break it up for you.

11    Why don't we go through this.

12              If you start on the second

13    page, there's a list of published literature

14    or governmental publications.  Do you see

15    that?

16              Starting on the second page

17    with Compton on down.

18          A.     Yes.

19          Q.     So the Compton article, from

20    New England Journal of Medicine 2016, is that

21    something you considered in arriving at your

22    opinions in this case?

23          A.     Yes.

24          Q.     You just didn't have a specific

1   citation for it in the report.  Is that

2   right?

3          A.     Oh, I didn't realize that I

4   didn't cite that.  I do know that article.

5          Q.     Okay.  Is that one that you

6   specifically looked at for the case or is it

7   just something you have kind of in your data

8   bank, as it were?

9          A.     It's in my mind.  I know that

10  article.

11         Q.     Okay.  And I'm not doing a

12  direct comparison to see which of these might

13  be cited among the things that are listed

14  here.  But so the National Survey on Drug Use

15  and Health, we do know that that's discussed

16  in your report; correct?

17         A.     That's correct.

18         Q.     Then drug overdose deaths in

19  the United States from the National Center

20  For Health Statistics.  That is also

21  something that is at least a citation in some

22  of your charts, either directly or

23  indirectly, like that was what was cited in

24  some publication or presentation that you

Highly Confidential - Subject to Further Confidentiality Review

1    recited; correct?

2        A.    I believe that's right.

3        Q.    The next one says description

4    of the State of Kansas Regional Partnership

5    Grant and evaluation findings.  Do you know

6    what that is?

7        A.    I do know that regional

8    partnership grant, but I don't believe that's

9    in my report.

10       Q.    That's not something you

11   actually considered in forming your opinions

12   for this case; correct?

13            MS. FLOWERS:  Object to the

14        form.  Misstates the testimony and

15        you're asking her about a document she

16        didn't prepare.

17       Q.    (BY MR. ALEXANDER)  Did you

18   answer the question?

19       A.    What was the question?

20       Q.    This Kansas Regional

21   Partnership Grant, that's not something that

22   you actually considered in forming your

23   opinions for this case?

24       A.    Not that I recall.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      This U.S. News article from

 2   2015 about heroin use skyrockets in the U.S.,

 3   that's not something that you considered in

 4   forming your opinions in this case?

 5                  MS. FLOWERS:  Object to the

 6          form.

 7                  THE WITNESS:  Yeah, I don't

 8          recall that article.

 9          Q.      (BY MR. ALEXANDER)  Treatment

10   of Opioid Use Disorder in Pregnancy and

11   Infants Affected By Neonatal Abstinence

12   Syndrome.  A Webinar presented for the SAMHSA

13   Women's Health Week.

14                  Do you see that?

15          A.      I do see that.

16          Q.      Are you familiar with that

17   webinar?

18          A.      I -- it's been quite a while

19   ago, but I do remember that webinar.

20          Q.      Do you recall how long ago that

21   was?  A couple years?

22          A.      I believe it was a couple of

23   years ago.

24          Q.      Is that something you
```

Highly Confidential - Subject to Further Confidentiality Review

1    considered in forming your opinions for this

2    case?

3         A.     It's in --

4         Q.     After you were retained in

5    January?

6         A.     It's in my general knowledge

7    base.  It's not something that I went back

8    and referred to.

9         Q.     After that, something from a

10   Reuters investigation?  Called helped --

11              I'm sorry, Helpless and Hooked.

12   Do you see that?

13        A.     Yes.

14        Q.     Have you ever seen that before?

15        A.     Yes, I have.

16        Q.     And was that something you

17   considered in forming your opinions for the

18   case?

19        A.     Again, it's something that I

20   know well, and it's something in my knowledge

21   base.  It's not something I went back to or

22   referred to for this report.

23        Q.     Are you relying on news reports

24   from Reuters or U.S. News for any of your

1    opinions?

2         A.     This is a particular series

3    that ran for four or seven days that was

4    quite important in the field, and I'm not

5    relying on that report for my opinions.

6         Q.     Okay.  The next article,

7    Alambyan?  Do you see that?  Neurology -- a

8    JAMA, Neurology article from last year?

9              Do you see the citation?

10        A.     Yes, I do.

11        Q.     Is that something that you ever

12   reviewed in connection with forming your

13   opinions on this case?

14        A.     No.  I'm familiar with that

15   article but I did not rely on that article

16   for forming my opinions in this case.

17        Q.     Hoffmann, N.G., Retrieved from,

18   and then there's a citation to

19   evinceassessment.com?

20        A.     Mm-hmm.

21        Q.     Any idea what that is?

22        A.     Yes, I do.  I know Norm

23   Hoffmann well.  I've used his research.

24              I know the UNCOPE well, and it

Highly Confidential - Subject to Further Confidentiality Review

1   is not something that I --

2            Oh, wait.  I do believe it is

3   cited in this report because -- I don't

4   recall if Summit is using the UNCOPE or if

5   they are using the GAIN Short Screen.

6            It is a short screening tool

7   that some Ohio counties are using to screen

8   for substance use at the front end of the

9   child welfare system.  Many places are using

10  the UNCOPE, so I'm very familiar with that.

11       Q.    Do you know what Summit or

12  Cuyahoga County are doing in terms of

13  screening for substance use disorder

14  currently?

15       A.    That's what I said.  I'm not

16  sure which tool Summit is using.  It's kind

17  of sticking in my head that they use the GAIN

18  Short Screen, but I'm not positive on that.

19            And I am -- don't know which

20  tool Cuyahoga uses.

21       Q.    You also don't know what

22  changes there might have been over time for

23  Cuyahoga or Summit County in terms of how

24  they screen for substance abuse disorder?

1        MS. FLOWERS:  Objection, lack

2      of foundation.

3        THE WITNESS:  Off the top of my

4      head, I don't.  I'm not able to recall

5      which tool they're using.

6      Q.    (BY MR. ALEXANDER)  The one

7   after that is another webinar.  This one is

8   from 2015, from Jones.  Are you familiar with

9   this webinar?

10     A.    Yes.  Yes, that's Hendrée

11  Jones.  Yes, I'm familiar with that webinar.

12  No, I did not use that to form my opinions.

13     Q.    And if you'd go to the top of

14  this page and the bottom of the prior page,

15  there are a number of documents that are

16  referenced with what we call in the legal

17  world a Bates number.  They're -- most of

18  these say Summit at the beginning of them and

19  then it's a series of numbers.  And then the

20  last two say CUYAH, which is short for

21  Cuyahoga.  Do you see those?

22     A.    The last -- I don't see CUYAH.

23  I only see Summit.

24     Q.    The last two, which are listed

1    right above where we started with the Compton

2    article?  Cc -- say CUYAH and the rest say

3    Summit.  Do you see those?

4         A.    Yes, I do.

5         Q.    Did you review any of those

6    documents?

7         A.    I do not know.

8         Q.    Did you recall reviewing any

9    documents produced by Summit or Cuyahoga

10   County in connection with the litigation?

11        A.    I don't remember.

12        Q.    If you did, you didn't have any

13   role in picking them, did you?

14             MS. FLOWERS:  Object to the

15        form.

16             THE WITNESS:  No, I do not.

17        No.

18        Q.    (BY MR. ALEXANDER)  Sitting

19   here today, you can't say you rely on

20   anything from Cuyahoga or Summit County's

21   production in the litigation for any of your

22   opinions; correct?

23             MS. FLOWERS:  Object to the

24        form, lack of foundation.

Highly Confidential - Subject to Further Confidentiality Review

```
1              THE WITNESS:  I can't say that
2       today, no.
3              Q.    (BY MR. ALEXANDER)  And so like
4       there have been task forces in place in
5       Cuyahoga and Summit County.  And there have
6       been various kind of cross-functional efforts
7       looking at issues relating to substance
8       abuse, impact on governmental and social
9       services.  Are you familiar with those in
10      general?
11             A.    Yes, I am.
12             Q.    Did you review any of the
13      outputs, white papers, reports, anything like
14      that from any of those kind of governmental
15      and quasi-governmental efforts in the
16      counties over the last decade?
17             A.    I have seen reports from
18      counties in Ohio as well as from the state
19      governor's task force and other documents
20      that have been created related to the opioid
21      epidemic.
22                  I wouldn't be able, right here
23      today, to name the specific documents that I
24      have seen, but I am aware of the -- of
```

Highly Confidential - Subject to Further Confidentiality Review

1    several various task forces and ways in which

2    Ohio has tried to deal with the prescription

3    drug epidemic, yes.

4        Q.    So my question is specific to

5    Cuyahoga and Summit County, not the state of

6    Ohio, so let's break that up.  The stuff that

7    you are aware of that came out of the

8    governor's task force, did you rely on any of

9    that for any your opinions in this case?

10       A.    No.  That was outside of the

11   scope of what I was asked to do.

12       Q.    Did you notice, though, just

13   from the time frame, that the governor's task

14   force and some of the statewide efforts to

15   look at the issue of what was the opioid

16   epidemic or the developing opioid epidemic,

17   started in the -- at the end of the prior

18   decade, essentially by or around 2010;

19   correct?

20            MS. FLOWERS:  Object to the

21       form.  Lack of foundation.  Assumes

22       facts not in evidence.

23            THE WITNESS:  I don't remember

24       that, when that started.

```
1              Q.      (BY MR. ALEXANDER)  From your
2      work generally.  Obviously in your work that
3      you do at your company where you are now, you
4      pay attention to trends around the country
5      that affect children and family services;
6      correct?
7              A.      Yes, I do.
8              Q.      Including trends in substance
9      abuse and substance use; correct?
10             A.      Yes, I do.
11             Q.      And at national conferences and
12     in academic settings, the discussion of
13     rising heroin use and other aspects of the
14     opioid epidemic impacting on children and
15     family services has been discussed for at
16     least a decade; correct?
17             A.      Which part has been -- could
18     you repeat that, please?
19             Q.      The fact that there's been
20     increasing, let's say use of heroin,
21     including in mothers of small children or
22     pregnant women, and that that affects
23     children and family services, those sorts of
24     general topics have been discussed for about
```

```
 1    a decade nationally; correct?

 2               MR. PENDELL:  Object to the

 3          form.

 4               MS. FLOWERS:  Objection to

 5          form.  Lack of foundation.  Assumes

 6          facts not in evidence.

 7               THE WITNESS:  I don't remember

 8          that for a decade.

 9          Q.    (BY MR. ALEXANDER)  When is the

10    first time you remember those sorts of

11    discussions as national conferences or

12    meetings or academic settings with experts

13    from around the country?

14          A.    In 2011, I was told by my

15    federal project officer for the National

16    Center on Substance Abuse and Child Welfare

17    that I was again to pull together resources

18    on opioids and child welfare because she had

19    been briefed on the prescription drug problem

20    in the country from her standpoint in the

21    substance abuse and mental health services

22    administration.  She said, in effect, we need

23    to be prepared and we need to begin to pull

24    together resources.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Our contract changed in 2012 --
 2     in other words, we had to rebid and it was a
 3     new contract here in 2012, and one of the
 4     tasks that we were given was to convene a
 5     work group made up of healthcare
 6     professionals that treat infants with NAS,
 7     child welfare workers, substance abuse
 8     treatment professionals, and home visiting
 9     professionals, a whole host of individuals or
10     about over 40 people in these various work
11     groups that we convened for about a year and
12     a half in order to provide guidance to states
13     and communities about the opioid crisis and
14     the rise of opioid use, so that child welfare
15     would have this guidance.  And that
16     publication took some time to get cleared by
17     the federal government, but it was released
18     by the federal government in 2016.
19              So my first direction from the
20     federal government, as a contractor to them,
21     first heads-up, we need to work on this was
22     2011.  My first direct task to work on this
23     was 2012.
24          Q.     Who was the federal project
```

1    officer you had a discussion with in 2011?

2        A.    She's no longer at SAMHSA.  Her

3    name is Sharon Amatetti, A-M-A-T-E-T-T-I.

4        Q.    And do you recall when this

5    discussion was in 2011 with Ms. Amatetti?

6        A.    Not specifically.  I only

7    remember that it was in 2011 because of the

8    change in the contract in 2012, and that we

9    were tasked in the new contract with their

10   effort to begin this document and pulling

11   together this -- a major piece of work, to

12   have this ongoing work group with various

13   professionals meeting separately, meeting

14   together, pulling together all of the

15   guidance from these professionals and then

16   synthesizing it into a document that was

17   reviewed by every agency within the

18   Department of Health and Human Services

19   before it was released.

20       Q.    So the conversation you recall

21   was sometime in 2011, roughly eight years

22   ago, with a federal project officer from

23   SAMHSA; correct?

24       A.    That's correct.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      And you don't know how long in

2   advance of that there had been discussions

3   with other people nationally to try to

4   initiate this sort of project?  Essentially

5   how long it had been on somebody's radar

6   screen before they started being willing to

7   spend money for a contract on it?

8               MS. FLOWERS:  Object to the

9          form, calls for speculation.

10              THE WITNESS:  No, I don't know.

11     Q.      (BY MR. ALEXANDER)  And I mean,

12   you've been a government contractor for a

13   long time; right?

14     A.      Yes, I have.

15     Q.      And in general, when there's a

16   request for a contract and the government's

17   willing to spend some money on something,

18   that can be a relatively slow process from

19   when they first realize there might be some

20   need to address something.  Does that make

21   sense?

22              MS. FLOWERS:  Object to the

23          form.

24              THE WITNESS:  It can be, but

Highly Confidential - Subject to Further Confidentiality Review

1    this moved fast.

2    Q.    (BY MR. ALEXANDER)  So you said

3    that over the period of time from this

4    initial conversation until the contract was

5    awarded and a report was generated was about

6    18 months; is that correct?

7    A.    No.  The time period for us to

8    do our work was about 18 months.  And then

9    the review process took some time because it

10   was a topic that the Department of Health and

11   Human Services wanted every agency in the

12   department to clear.  So that clearance

13   process took quite a while.

14   Q.    Were there other experts or

15   people from around the country involved in

16   providing input?

17   A.    The experts that we relied on

18   to give us input to provide the guidance to

19   each of those disciplines.

20   Q.    Was the guidance document

21   issued in 2013 or '14?

22   A.    It actually did not come out

23   until, I believe, 2016, was actually when it

24   was released.  But it was pretty much

Highly Confidential - Subject to Further Confidentiality Review

1    completed into the review process in 2014.

2         Q.    And like state stakeholders,

3    let's say people from Ohio which already have

4    their governor's task force in place, do you

5    know when they got any of your output or your

6    draft report?

7         A.    We were allowed to release

8    parts of that in draft, and we were allowed

9    to present parts of that in presentations and

10   in webinars.  We were allowed to use pieces

11   of that in technical assistance tools while

12   it was undergoing review.

13        Q.    So in this time period, 2012,

14   '13, '14, roughly, were you already giving

15   presentations and doing webinars and

16   teachings that raised the issue of how the

17   opioid epidemic, the increasing abuse of

18   heroin by pregnant women, that sort of thing,

19   was putting a strain on children and family

20   services around the country?

21             MS. FLOWERS:  Object to the

22        form.

23             THE WITNESS:  Could I refer

24        back to this document?

1          MR. ALEXANDER:  Sure.

2      Q.     (BY MR. ALEXANDER)  You're

3  referring to Exhibit 3?

4          The little sticker is actually

5  on the other side you flipped over.

6      A.     I was looking for the Hendrée

7  Jones --

8      Q.     It says 2015, ma'am.

9      A.     Yeah.  2015 is when Hendrée,

10  she's a Ph.D. in North Carolina, she did a

11  webinar, was during that time period.  So

12  2015, 2016, perhaps '14, some of that

13  information was coming out, yes.

14      Q.     Let me just ask in general,

15  because during this time period, the first

16  half of this decade, you did participate in

17  national seminars and presentations and talks

18  among other people interested in issues

19  relating to children and family services;

20  correct?

21      A.     Yes.  I give speeches about 15,

22  20 times a year.

23      Q.     Are any of those recorded on

24  camera?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Not that I am aware of.
 2          Q.      So is it your impression that
 3     there was national attention by people who
 4     pay attention to children and family
 5     services, kind of like the same people who
 6     might be members of that PCSAO in Ohio, are
 7     aware of this idea that increasing trends in
 8     substance abuse related to substances like
 9     heroin were affecting the provision of
10     children and family services, this was a
11     topic and an awareness by the mid 2000s at
12     the latest?  The mid part of this decade, by
13     the latest.  I'm sorry.
14               MS. FLOWERS:  Object to the
15          form.
16               THE WITNESS:  I began going to
17          Ohio in, I believe, 2014, 2015.  And
18          what the stakeholders in 2014 and 2015
19          were telling me was about prescription
20          opioids driving the child welfare
21          cases and the prescription opioid
22          crisis in their communities.
23               So, yes, they were aware, they
24          were talking about that at national
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          meetings that was going on.
2          Q.    (BY MR. ALEXANDER)  Okay.  The
3     people you were dealing with in Ohio by 2014
4     were aware that abuse of prescription opioids
5     and non-prescription opioids was driving
6     child welfare cases?  That's your testimony?
7               MS. FLOWERS:  Object to the
8          form.
9               THE WITNESS:  As I recall, I
10         wasn't hearing at that point about
11         other opioids.  Or opiates.
12              I was hearing about
13         prescription drugs.
14         Q.    (BY MR. ALEXANDER)  Okay.  And
15    but I'm talking about the time frame.  The
16    first time you recall hearing from it, about
17    this subject from somebody in Ohio, was
18    roughly 2014.
19         A.    Correct.  '14, '15, in that
20    time period.
21         Q.    And you don't know how long the
22    governor's task force had been in place or
23    any state-wide legislative or governmental
24    efforts had been in place to address this?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. FLOWERS:  Asked and

 2         answered.

 3              MR. ALEXANDER:  Dynamic that

 4         you've been discussing?

 5              THE WITNESS:  I don't recall.

 6         Q.   (BY MR. ALEXANDER)  Because

 7    like in your review for this case, you didn't

 8    go through the documents from Summit and

 9    Cuyahoga County to look at kind of the timing

10    of their involvement with this issue and when

11    they first started looking for additional

12    funding or staffing or changes in policies

13    and practice to try to address the additional

14    burden from changes in drug usage and other

15    societal issues; correct?

16              MS. FLOWERS:  Object to the

17         form.

18              THE WITNESS:  If your question

19         is did I look specifically at those

20         materials, no, I didn't look

21         specifically at those materials.

22              I am aware of some of those

23         efforts, yes, that they -- that they

24         took.
```

1        Q.      (BY MR. ALEXANDER)   Okay.   But

2    in general, your view is that the awareness

3    of these problems, these changes in terms of

4    drug usage patterns, the burden on social

5    services, did require reasonable county

6    personnel and officers to take additional

7    measures in terms of funding, staffing,

8    policies and procedures, coordination with

9    other stakeholders, et cetera, to try to

10   lessen the burden that you were seeing;

11   correct?

12       A.      Could you simplify that

13   question?  I think there's a lot in there.

14   There was a question at the beginning, and

15   there's a question at the end.  Could you

16   simplify that question?

17       Q.      I can try.  It actually was a

18   single, very direct question, but I'll do my

19   shot.

20               Okay.  So you've described that

21   you are aware in general that there were

22   efforts to try to address the additional

23   social services burden of what you've

24   described in general as the opioid epidemic,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    and that was including not just Ohio but

 2    Cuyahoga and Summit County efforts in

 3    general; correct?

 4         A.      Yes.

 5         Q.      Okay.  And you said that you

 6    first became aware of efforts in Ohio

 7    somewhere around 2014; correct?

 8         A.      Specifically in Ohio would have

 9    been in 2014, when I started working on the

10    SSIP project, correct.

11         Q.      And I know you haven't put

12    yourself in the head of somebody who was on

13    the ground like whoever the executive

14    director was of the Cuyahoga County Children

15    and Family Services division within Health

16    and Human Services from, let's say, 2011

17    through 2014, but whoever it was, they and

18    their staff should have been paying attention

19    to the need to make changes and get

20    additional staffing and funding to address

21    the opioid epidemic; correct?

22              MS. FLOWERS:  Object to the

23         form, lack of foundation.

24              THE WITNESS:  My experience is
```

Highly Confidential - Subject to Further Confidentiality Review

1          that individuals who are at the head

2          of those agencies are always trying to

3          garner resources to deal with the

4          issues of child abuse and neglect and

5          the parents' and families' needs.

6          That's an ongoing issue, not -- not an

7          unusual issue.

8          Q.     (BY MR. ALEXANDER)  Right.  And

9    one of the things that is always a driver of

10   children and family services is substance

11   abuse of various kinds; correct?

12         A.     What is unique at that time

13   period is the flooding of communities with

14   opioids that they could not keep up with.

15              And that information came from

16   senior officials in the departments at the

17   state level and conversations that I had with

18   many people in Ohio about what was going on

19   in Ohio.

20              MR. ALEXANDER:  So move to

21         strike as nonresponsive.

22         Q.     (BY MR. ALEXANDER)  Let me ask

23   my question because I don't think you

24   answered it?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. FLOWERS:  Objection.  She
 2         did answer it.  You might not like it,
 3         but she answered it.
 4              MR. ALEXANDER:  Not even close.
 5         Q.    (BY MR. ALEXANDER)  One of the
 6    things that is always a driver of children
 7    and family services is substance abuse of
 8    various kinds; correct?
 9              MS. FLOWERS:  Asked and
10         answered.
11              THE WITNESS:  There are always
12         parents who have needs of -- for
13         substance abuse treatment in the child
14         abuse -- I mean in the child welfare
15         caseload.  What is unique in this
16         situation is that we have never had
17         orphans, since the orphan trains of
18         the industrial revolution.  That's
19         unique.  That's new.
20              We've never had social workers
21         say this is the worst that they've
22         seen.  That's new.
23              This is a new era in which the
24         people on the front lines are saying
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          they have run out of foster care

 2          homes.  That's new.

 3               MR. ALEXANDER:  So move to

 4          strike as nonresponsive everything

 5          after what is unique.

 6               MR. PENDELL:  Objection.

 7               MS. FLOWERS:  Objection.  She

 8          answered your question fully.  You

 9          just don't like it.

10     Q.    (BY MR. ALEXANDER)  Let's go

11  back to the question.

12               A good administrator of a

13  children and family services department

14  should be paying attention to changes in

15  socioeconomic factors including substance

16  abuse trends to figure out if they need to

17  change their budgeting, their staffing, or

18  their policies and procedures; right?

19               MR. PENDELL:  Objection, form.

20               THE WITNESS:  I've never met a

21          child welfare administrator or a child

22          welfare director who has not paid

23          attention to these conditions and has

24          not tried to garner resources to make
```

Highly Confidential - Subject to Further Confidentiality Review

1          sure that families have what they

2          need.  So if that means that they are

3          good administrators, that means all

4          child welfare administrators are good,

5          at least all the ones that I know.

6          Q.    (BY MR. ALEXANDER)  The

7   question was should.  In your expert opinion,

8   a child services or children and family

9   services or children's welfare services

10  administrator should pay attention to these

11  sorts of changes, including substance abuse

12  trends, to do their job; right?

13             MS. FLOWERS:  Objection, asked

14         and answered three times now.

15             THE WITNESS:  Not only should,

16         in your word, they do.

17         Q.    (BY MR. ALEXANDER)  Okay.  And

18  for Cuyahoga and Summit County, whoever was

19  running those departments in the early part

20  of this decade should have been paying

21  attention to those trends as well; correct?

22             MS. FLOWERS:  Objection, asked

23         and answered.

24             THE WITNESS:  And in my report,

Highly Confidential - Subject to Further Confidentiality Review

1              I detail the kinds of programs that

2              they put in place in order to try and

3              ameliorate the problems that were in

4              their caseloads.

5         Q.     (BY MR. ALEXANDER)  And in

6    general, you think that it is reasonable and

7    appropriate to initiate programs as soon as

8    possible to try to ameliorate these problems;

9    correct?

10        A.     I understand the restrictions

11   on being able to do that, when the caseloads

12   are such that the resources are not available

13   to you to be able to do that.

14             When you are having babies

15   dropped off at your door and you have to find

16   a place for them, and children that you don't

17   have a place to put them, then that's your

18   immediate need.  So I understand the reasons

19   why some of these things can't be immediately

20   dealt with, because the child safety has to

21   come first.

22        Q.     Do you think that it's

23   reasonable and appropriate to try to initiate

24   programs as soon as possible to try to

Highly Confidential - Subject to Further Confidentiality Review

1    ameliorate these problems; correct?

2        A.    I do think it is appropriate

3    and reasonable when you can to put these

4    programs in place in order to help families

5    recover and care for their children.

6        Q.    And based upon the analysis

7    that you've done thus far in the case, the

8    information available to you that we've gone

9    over what you've seen and haven't seen, you

10   are not in a position to talk about whether

11   all of the measures that have been initiated

12   in Cuyahoga County were both reasonable and

13   appropriate in terms of their scope and their

14   timeliness; correct?

15            MR. PENDELL:  Objection to

16       form.

17            MS. FLOWERS:  Lack of

18       foundation.

19            THE WITNESS:  I disagree with

20       you.

21       Q.    (BY MR. ALEXANDER)  Have you

22   disclosed in your expert report somewhere

23   where you say all of what Cuyahoga County has

24   done has been reasonable and timely to

Highly Confidential - Subject to Further Confidentiality Review

 1    address the social services burden created by

 2    the opioid epidemic?

 3               MR. PENDELL:  Objection.

 4               THE WITNESS:  I do not say that

 5          in my report, and I know that what is

 6          on the ground is not yet sufficient.

 7          It has not yet remediated the problem

 8          that they have.

 9          Q.    (BY MR. ALEXANDER)  So let me

10    use your words, then.  The issue of whether

11    everything Cuyahoga County has done has been

12    timely and appropriate was beyond the scope

13    of your work in this case; correct?

14               MR. PENDELL:  Objection, form.

15               THE WITNESS:  Could you repeat

16          that?

17          Q.    (BY MR. ALEXANDER)  Sure.

18               The issue of whether everything

19    Cuyahoga County has done has been -- let me

20    start over.  The issue of whether everything

21    Cuyahoga County has done has been timely and

22    appropriate was beyond the scope of your work

23    in this case?

24               MS. FLOWERS:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

1           form.  Lack of foundation.

2                   THE WITNESS:  Yes, that was not

3           what I was asked to do.

4           Q.    (BY MR. ALEXANDER)  Same thing

5     for Summit County.  The issue of whether what

6     Summit County has done in terms of changes in

7     family services, children's services, was

8     reasonable and timely, that was beyond the

9     scope of your work in this case?

10                  MS. FLOWERS:  Same objection.

11                  THE WITNESS:  Yes, that is

12          beyond what I was asked to do.

13          Q.    (BY MR. ALEXANDER)  In other

14    words, you're not coming into court and

15    vouching for Cuyahoga County Children and

16    Family Services or Summit County Children's

17    Services, if you say that everything that

18    they did was reasonable and appropriate as a

19    response to the opioid epidemic after it

20    became known to them or should have become

21    known to them that there was a problem that

22    required additional efforts; correct?

23                  MS. FLOWERS:  Object to the

24          form.  Asked and answered.

```
1                    THE WITNESS:  That is correct.
2           I've listed in my report what I know
3           of the efforts that were put forward.
4           Q.    (BY MR. ALEXANDER)  And
5    therefore, your recommendations in your
6    report, the latter part of your report where
7    you go over some general recommendations of
8    what should be done and some general
9    description of what has been done or maybe is
10   going to be done in the future in the
11   counties, none of that is intended to take
12   account for how things would be if the
13   counties had behaved reasonably and
14   appropriately in terms of what they did and
15   when they did it; correct?
16                   MS. FLOWERS:  Object to the
17          form.  Calls for speculation.
18                   THE WITNESS:  That is correct.
19          It was not intended for those purposes
20          that you state.
21          Q.    (BY MR. ALEXANDER)  And I want
22   to make sure we're on the same page, and I'm
23   pretty sure we are.  But essentially -- I
24   mean, some of what you describe are like best
```

Highly Confidential - Subject to Further Confidentiality Review

1    practices and those may emerge over time.

2    But you have things that you think are

3    appropriate to be done to address the impact

4    of increasing substance abuse and the

5    specifics relating to the opioid epidemic as

6    you understand it.  Correct, in general

7    terms?

8         A.    Yes.  Things that we have --

9    that have been demonstrated in other

10   communities that have helped remedy the

11   crisis, if you will.

12        Q.    Right.  So like you wouldn't

13   suggest something as a recommendation if you

14   thought that it wasn't likely to help;

15   correct?

16        A.    That's correct.

17        Q.    I mean, we know that you didn't

18   do any kind of legal feasibility analysis or

19   consider budget or cost in any of this;

20   correct?

21        A.    That is correct.

22        Q.    But in general, when you

23   recommend something, you recommend the things

24   you think will help; correct?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      That is correct.

2          Q.      And the things that you think

3    should be done now, if they'd been done

4    before, they may have improved things so that

5    things would be better now than they are;

6    correct?

7                  MS. FLOWERS:  Object to the

8          form and lack of foundation.

9                  THE WITNESS:  Yes.  That is

10         correct.

11         Q.      (BY MR. ALEXANDER)  I mean,

12    that's the way it works, is if you had, for

13    instance, think that MAT -- do you know what

14    MAT means in this context?

15         A.      Yes, I do.

16         Q.      What does it mean?

17         A.      Medication-assisted treatment.

18         Q.      And you think that there are

19    some barriers, kind of in terms of local law

20    and coordination between various

21    stakeholders, that can affect or impair the

22    efficacy of MAT in treating opioid use

23    disorder; correct?

24                 MS. FLOWERS:  Object to the

1    form and the characterization of the

2    report.

3             THE WITNESS:  I disagree with

4    your statement.  You said that the

5    barriers of access would interfere

6    with the efficacy of MAT.  And that's

7    not true.

8         Q.    (BY MR. ALEXANDER)  So I

9    actually didn't say access.  That maybe was

10   an add-on.

11        A.    No, you -- you said something

12   about the barriers of local control.

13        Q.    So --

14        A.    Would interfere with efficacy.

15        Q.    Let me put it this way.

16        A.    Okay.

17        Q.    When it comes to something like

18   MAT, this is just an example.  You have

19   general best practices recommendations for

20   the ways that essentially MAT being available

21   and being implemented can be at its maximal

22   efficacy; correct?

23        A.    Let me look.  I don't actually

24   remember what I said about availability of

1    MAT.

2         Q.    Okay.  I mean, I can ask you

3    about NAS, it doesn't really matter.  I'm

4    just saying that when you've recommended

5    various things that can be done, you

6    recommend them in ways that we would say,

7    this isn't just some general category of you

8    should have MAT and you should have, you

9    know, policies that address, you know,

10   placement of children.  You have

11   recommendations that you think are the better

12   ways to go.  That's why they're called best

13   practices; correct?

14             MS. FLOWERS:  Object to the

15        form.

16             THE WITNESS:  It's not what I

17        think, it's what is borne out in

18        evaluations.  So timely access to

19        treatment is one of those key

20        variables for parents in substance --

21        in child welfare services, yes.

22        Q.    (BY MR. ALEXANDER)  And if

23   Cuyahoga and/or Summit County had taken

24   timely and appropriate steps to address the

1    impact of the opioid epidemic on children and

2    family services, starting years ago when it

3    was first known to them that they might need

4    to take additional steps, your view, as an

5    expert in this area, is that they're the --

6    in some ways less to remediate, less to abate

7    going forward; correct?

8                MS. FLOWERS:  Object to the

9          form of the question.  Misstates the

10         testimony and calls for speculation.

11               THE WITNESS:  You're asking a

12         question out of context of what was

13         going on in the child welfare system

14         during the last half decade, that if

15         resources had been available if they

16         had not been overrun with children

17         coming into their system, all things

18         being available to them, that would

19         have been ideal.

20               Unfortunately, they weren't in

21         that situation.

22         Q.    (BY MR. ALEXANDER)  Have you

23    done an analysis of available money for

24    Cuyahoga and Summit County to initiate any

Highly Confidential - Subject to Further Confidentiality Review

1    programs based upon state funding, local

2    funding, including levies, federal funding,

3    anything like that?

4         A.     Not specifically.

5         Q.     Do you know anything about

6    where Ohio ranks nationally in terms of the

7    state's contribution to children and family

8    services costs that are borne by counties?

9         A.     Not specifically.

10        Q.     I mean, you've heard Ohio is

11   last in the nation; right?

12              MS. FLOWERS:  Object to the

13         form.

14              THE WITNESS:  I hear that in a

15         lot of states.

16        Q.     (BY MR. ALEXANDER)  I mean, if

17   you went to any of these meetings with PCSAO,

18   or you saw any of their documents, you would

19   have seen that the state contribution to

20   children and welfare budgets, essentially, is

21   the lowest in the nation, and that it could

22   be twice as high as it has been and Ohio

23   would still rank dead last.  You've heard

24   that; right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. FLOWERS:  Object to the
 2           form.
 3                    THE WITNESS:  I have heard
 4           that, but I frankly also hear that in
 5           California.  Because California's
 6           counties contribute a very large
 7           portion of the child welfare budget.
 8           So I don't know the accuracy of that,
 9           but I have heard that.
10           Q.    (BY MR. ALEXANDER)  So let's
11    focus on Ohio, and Cuyahoga and Summit
12    County.
13           A.    Mm-hmm.
14           Q.    Do you know essentially whether
15    Cuyahoga and Summit County were hamstrung in
16    their ability to combat the opioid epidemic
17    in terms of making changes to how they
18    provided services and the staffing that would
19    go along with providing the services by their
20    low state contribution to budgets?
21                    MS. FLOWERS:  Object to the
22           form.
23                    THE WITNESS:  I don't know
24           those data specifically.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.      (BY MR. ALEXANDER)  You do know
2     that in general, that as we said, the
3     staffing levels were lagging for years after
4     budget cuts in the 2008, 2009 time frame;
5     correct?
6               MS. FLOWERS:  Object to the
7          form, lack of foundation.
8               THE WITNESS:  I don't know that
9          specifically.
10         Q.      (BY MR. ALEXANDER)  Do you know
11    anything about whether anybody who was like
12    an executive director or some officer of
13    Cuyahoga or Summit County children, family
14    services or children's services, made efforts
15    to get additional funding and hire additional
16    staff, at least in part because of what they
17    observed with the opioid epidemic, and they
18    failed because their higher-ups or the local
19    governments or other funding sources
20    essentially said no during this exact time
21    period we're talking about?
22              MS. FLOWERS:  Object to the
23         form.
24              THE WITNESS:  I don't know that
```

1      specifically.

2           Q.     (BY MR. ALEXANDER)  That would

3      have been something you could have found out

4      if you asked anybody who worked in those

5      counties; right?

6                MS. FLOWERS:  Object to the

7                form, argumentative.

8                THE WITNESS:  I do know that

9                there isn't a child welfare

10               administrator that I've ever talked to

11               who isn't advocating for additional

12               resources.

13          Q.     (BY MR. ALEXANDER)  Okay.  So

14     let's go back to my question.  If you had

15     asked somebody who worked at those counties

16     in this time period in appropriate positions

17     what their history has been of trying to get

18     money to hire more people, hire more START

19     advocates, or do anything else because of

20     their rising caseloads, the increased burden

21     of NAS babies, any of the things that you

22     actually talk about in your report as impacts

23     of what you've described as the opioid

24     epidemic, you would have information on this

Highly Confidential - Subject to Further Confidentiality Review

 1    that you currently don't have today; right?

 2                   MS. FLOWERS:  Object to the

 3            form.

 4                   THE WITNESS:  That's -- that's

 5            possible.

 6            Q.    (BY MR. ALEXANDER)  Okay.  And

 7    if funding wasn't provided to make things

 8    better, to mitigate the harms as you think

 9    would have been reasonable and appropriate,

10    that's certainly not something you blame on

11    any of the defendants in this case, is it?

12            A.    I specifically don't think that

13    it's appropriate for the taxpayers of

14    Cuyahoga and Summit to clean up the mess of

15    the prescription opioid crisis in their

16    counties for child welfare.

17            Q.    Is that a personal opinion or

18    is that an expert opinion --

19            A.    That's my --

20                  Both.

21            Q.    How is that an expert opinion

22    about whether it's fair for taxpayers to do

23    something or not do something?

24            A.    You're right, that's my

Highly Confidential - Subject to Further Confidentiality Review

1    personal opinion.  But as an expert, as I see

2    changes in caseloads, it often takes several

3    years for budgets to catch up with that.

4    That's a -- that is what happens.

5    Legislatures don't meet soon enough for data

6    to be able to get to them to be able to say

7    this is what is going on.  It often takes

8    some time for the data to even be available

9    that the caseloads are going up.  So by the

10   time that the information is available that

11   we have a crisis and for the legislature to

12   be back in session for the governor to make a

13   request, there often can be a lag between

14   those time periods.

15       Q.    And that general subject that

16   you've just been describing, you didn't

17   specifically look at that for Cuyahoga or

18   Summit County, did you?

19       A.    No, but I do know that that is

20   how the budget cycle in state governments

21   work.

22       Q.    Cuyahoga and Summit County in

23   terms of their children's services

24   departments, they track caseloads, don't

Highly Confidential - Subject to Further Confidentiality Review

1    they?

2         A.     Yes, they track caseloads.

3         Q.     And you didn't look at any data

4    relating to what their caseloads were over

5    time; correct?

6              MS. FLOWERS:  Object to the

7              form, lack of foundation.

8              THE WITNESS:  That is what the

9              report shows in Cuyahoga and Summit,

10             is their caseload over time.

11             Oh -- yes.

12        Q.     (BY MR. ALEXANDER)  I'm sorry,

13   did you hear my question?

14             Did you look at any data on

15   what the caseloads were over time, like per

16   worker caseloads as they calculated them?

17        A.     No, I didn't look per worker

18   caseload.

19        Q.     And did you look at what the

20   testimony was of the various officials on the

21   issue of their caseload over time per worker

22   or what factors might have driven changes

23   over time in caseloads?

24        A.     Yes.  That information was in

1    the depositions.

2         Q.    So if you go to the first page

3    of Exhibit 3?  It's the blue thing.  Yeah.

4              So at the top, right above

5    where we stopped, there are three categories

6    of documents.

7              It's the one where the sticker

8    is, ma'am.  That page.  That has the titles

9    on it.

10             So the first one says,

11   Corrected Second Amended Complaint and Jury

12   Demand, et cetera.  County of Summit.  Do you

13   see that?

14        A.    Yes.

15        Q.    Did you actually read that

16   whole complaint?

17        A.    I read the first portion of the

18   complaint.

19        Q.    I mean, it's like several

20   hundred pages; right?

21        A.    Yes.

22        Q.    So when you say first portion,

23   what do you mean?

24        A.    I believe I stopped about page

Highly Confidential - Subject to Further Confidentiality Review

1    38 or 40.

2          Q.     What about the complaint from

3    Cuyahoga County?  Did you look at that ever?

4          A.     I'm sorry, I don't recall which

5    of those complaints I read.  If it was

6    Cuyahoga or Summit.

7          Q.     The only one listed here is

8    Summit, ma'am.  That's the first entry on

9    Exhibit 3.  It says Summit County right

10   there.

11              So the question is, did you

12   ever review any allegations made by Cuyahoga

13   County?

14         A.     I'm sorry, I don't recall.

15         Q.     Did you rely on anything in

16   that complaint for any of your opinions?

17         A.     No.

18         Q.     Second thing says Summit County

19   and City of Akron, Ohio amended responses and

20   objections to National Retail Pharmacy

21   Defendants First Set of Interrogatories and

22   Distributor Defendants Fourth Set of

23   Interrogatories.

24              Do you even know what an

Highly Confidential - Subject to Further Confidentiality Review

```
 1    interrogatory is?

 2         A.     No, I do not.

 3         Q.     Did you rely on that document

 4    for any opinions at all?

 5         A.     No, I did not.

 6         Q.     Did you actually read that one?

 7                MS. FLOWERS:  Object to the

 8         form.

 9                THE WITNESS:  I don't recall.

10         Q.     (BY MR. ALEXANDER)  Did you

11    help the plaintiffs put that one together?

12                MS. FLOWERS:  Object to the

13         form.  To the extent that would call

14         for --

15                THE WITNESS:  I don't know what

16         an interrogatory is.

17         Q.     (BY MR. ALEXANDER)  What about

18    the City of Akron?  Do you know what their

19    role is in the first trial at all?  Are they

20    part of it?  Are they not part of it?

21         A.     I don't know.

22         Q.     So then, after that are listed

23    several deposition transcripts.  And it

24    has -- it all says that they have exhibits
```

Highly Confidential - Subject to Further Confidentiality Review

1    with them.

2                    1, 2, 3, 4, 5, 6, 7, 8, 9, 10,

3    11, 12, 13.

4                    You didn't review all 13 of

5    those deposition transcripts, with or without

6    exhibits; correct?

7                    MS. FLOWERS:  Object to the

8            form.  Misstates the testimony.

9                    THE WITNESS:  No.  I mentioned

10           the ones that I read.

11           Q.    (BY MR. ALEXANDER)  Okay.  And

12   seeing this list of the other ten, it doesn't

13   make you think you reviewed more than

14   Weiskittel, Barnes, and Cabot?

15           A.    No.

16           Q.    So Cynthia Weiskittel, do you

17   know what her position was?  Like which

18   county she was with?  What her title was?

19           A.    Cuyahoga.

20           Q.    And just in general.  I don't

21   need her exact title.

22           A.    The director of children's

23   services.

24           Q.    And what about Ms. Barnes?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.      The director of children's

2   services.

3          Q.      For which county?

4          A.      For Summit.

5          Q.      And Mr. Cabot, what do you

6   think his title was?

7          A.      Some senior manager type

8   position for Cuyahoga, and he had previously

9   been the manager of the START program.

10          Q.      So like before Ms. Weiskittel

11   there were other directors of the Cuyahoga

12   County department; right?

13          A.      Correct.

14          Q.      Did you review any of those?

15   Like let's say Patricia Rideout, who was the

16   former executive director of children and

17   family services for Cuyahoga County.

18               Did you review that one?

19          A.      No.  I know Pat Rideout.

20          Q.      Have you talked with her about

21   any of this?

22          A.      Not for -- I haven't seen Pat

23   in a few years.

24          Q.      You knew her through the
```

Highly Confidential - Subject to Further Confidentiality Review

1   foundation where she has worked at different

2   times in her career?  The --

3        A.    No, I knew her when she was in

4   Cuyahoga and I have run into her

5   professionally periodically.

6             I don't recall the last time I

7   saw her in person, but -- and --

8        Q.    Is she somebody you respect in

9   this field?

10       A.    Oh, yes.

11       Q.    And I think you said you don't

12  know Weiskittel, Barnes, or Cabot personally?

13       A.    I'm fairly certain I have met

14  Julie Barnes, but I -- I couldn't tell you

15  100 percent for sure.

16       Q.    Do you know enough to know

17  whether she is somebody who you respect as a

18  person in this field?

19       A.    I don't know any reason why I

20  would not respect her in this field.

21       Q.    What about any of the others,

22  Debra Forkas, for example?  Do you know

23  anything about her?

24       A.    I know that she served as a

Highly Confidential - Subject to Further Confidentiality Review

1    director in the department.

2            Q.      In which county?

3            A.      Cuyahoga.

4            Q.      And did you know she also used

5    to be an official in Summit County in this

6    area?

7            A.      No, I didn't know that.

8            Q.      And do you know if there is

9    relevant testimony from any of these

10   depositions that you haven't read that are

11   listed here as having been considered by you

12   that actually pertain to the very subjects

13   we've been discussing?

14                   MS. FLOWERS:  Object to the

15           form.

16                   THE WITNESS:  I haven't read

17           their depositions.

18           Q.      (BY MR. ALEXANDER)  So you

19   don't know if they actually have very

20   pertinent information that's directly related

21   to what we've been talking about, do you?

22           A.      No, I do not.

23           Q.      And when you looked at

24   Weiskittel, Barnes, and Cabot, did you try to

Highly Confidential - Subject to Further Confidentiality Review

1    pay attention to if they said things that

2    were, you know, contrary to plaintiffs'

3    general theory of the case as spelled out in

4    the complaint that you reviewed in part?

5         A.    I paid attention to their

6    depositions, yes.

7         Q.    Was there anything you recall

8    seeing in either of those three depositions

9    that you actually reviewed where you said,

10   you know, this person doesn't know what

11   they're talking about?  They're clueless?

12   Anything like that?

13        A.    No, I did not.

14        Q.    Did you see any information in

15   there that you thought was useful to you in

16   offering your opinions in this case?

17        A.    There was nothing in the

18   depositions that surprised me.

19        Q.    Did you -- so looking at this

20   list, you see that there are these 13 listed

21   with all these exhibits, where it says

22   transcript and exhibits?  Do you see that?

23        A.    I didn't count them.  Did you

24   count them correctly?

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Yeah.

2      A.      Okay.  If you counted

3  correctly, 13, then there are 13 there.

4      Q.      But you see each one says and

5  exhibits.  Do you see that?

6      A.      Yes.

7      Q.      And so when you read the

8  transcript, at the -- like the second page,

9  there's a list of all the exhibits that are

10  attached to the transcript, and then as you

11  go through the transcript, there will be

12  questioning by like, I don't know, me, in

13  these depositions, where it says, here, let's

14  look at this exhibit and talk through the

15  content of this document that's been marked

16  as an exhibit.  Do you remember reading that

17  sort of thing?

18      A.      Yes, I do.

19      Q.      And did that lead you to ask

20  the plaintiffs if you could actually see the

21  exhibits that were being referenced and

22  discussed?

23      A.      No, it did not.

24              MR. ALEXANDER:  Is now a good

1        time for a lunch break, ma'am?

2             I think we've actually been

3        going more than an hour this time, but

4        I don't really care.  I can keep going

5        if you guys want or we can break.

6             THE WITNESS:  Is lunch here?

7             MS. FLOWERS:  Lunch is coming

8        at 12:30, so yes, it is.

9             Let's go off the record.

10            THE VIDEOGRAPHER:  We are now

11       going off the record.  And the time is

12       12:45 p.m.

13            (Recess taken, 12:46 p.m. to

14             1:34 p.m.)

15            THE VIDEOGRAPHER:  We are now

16       going back to the record, and the time

17       is 1:34 p.m.

18       Q.    (BY MR. ALEXANDER)  Dr. Young,

19  is there any of your testimony that you gave

20  before the lunch break that you need to amend

21  or supplement in any way?

22       A.    No, there is not.

23       Q.    In your own words, what are the

24  areas where you claim to have expertise that

1   is relevant to the testimony you intend to

2   offer at trial?

3          A.     I am an expert in the social

4   policy issues related to children of parents

5   with substance use disorders and specifically

6   how they relate to the child welfare system.

7          Q.     Anything else?

8          A.     No.  Those -- those are the

9   areas of my expertise, how the treatment

10  system, the court system, and the child

11  welfare system work together in different

12  models that address those issues for children

13  and parents that cross between those systems.

14  So family treatment courts, and various

15  models to put in place to assist families and

16  children.

17         Q.     I asked you earlier about

18  medical expertise.  Do you have any claimed

19  expertise in terms of epidemiology,

20  biostatistics, or economics?

21             MR. PENDELL:  Objection to

22         form.

23             THE WITNESS:  No.  I have taken

24         graduate school courses in those

Highly Confidential - Subject to Further Confidentiality Review

1          courses, but I am not an expert in

2          those areas.

3          Q.     (BY MR. ALEXANDER)  And so

4     included in economics, health care economics

5     or pharmacoeconomics, do you have expertise

6     in those areas?

7               MR. PENDELL:  Objection, form.

8               THE WITNESS:  No.  I took

9          general economics in Ph.D. program.

10         Q.     (BY MR. ALEXANDER)  What about

11    the regulation of drawings, either from FDA

12    or the Drug Enforcement Agency, do you claim

13    any expertise in those areas?

14         A.     I have knowledge of those areas

15    because of my area of knowledge around

16    substance abuse treatment, but I am not an

17    expert in the FDA or DEA.

18         Q.     Do you intend to offer any

19    opinions related to anything relating to the

20    diversion of controlled substances?

21         A.     No, I do not.

22         Q.     Do you have any expertise in

23    neuropsychology or neuropharmacology?

24               MR. PENDELL:  Objection, form.

```
 1              THE WITNESS:  No.  I am aware
 2         of neuropharmacology and particularly
 3         as it relates to substance use
 4         disorders, and I have given
 5         presentations many times on the reward
 6         pathway and the way in which different
 7         substances react or act on the reward
 8         pathway.  But I am not an expert that
 9         I would be offering testimony on those
10         issues.  I believe you have other
11         experts that would be called on to do
12         that.
13         Q.    (BY MR. ALEXANDER)  Do you
14    claim any expertise in pain medicine or
15    addiction medicine?
16         A.    No.  I am very familiar with
17    addiction medicine.  I have written papers
18    with addiction medicine physicians, but I am
19    not an expert in addiction medicine and I
20    would not be offering testimony about
21    specific addiction medicine.
22         Q.    What's the subject of your
23    Ph.D.?
24         A.    Broadly, social policy.
```

1       Q.      What was your thesis?

2       A.      I was awarded a predoctoral

3    fellowship with the National Institute on

4    Drug Abuse to look specifically at a

5    population of children that had been

6    prenatally exposed to substances, and I

7    looked at how they were doing after an early

8    intervention program that they participated

9    in in LA Unified School District.  And I

10   looked at their assessments while they were

11   in the primary grades compared to their

12   classmates.  That was my dissertation topic.

13      Q.      Was that prenatal exposure to

14   cocaine?

15      A.      Primarily cocaine, yes.

16   Those -- that population was primarily

17   cocaine.

18      Q.      I don't see that in any of the

19   materials that you disclosed to us that you

20   reviewed in connection with this case, that

21   you looked specifically at the body of

22   medical literature or scientific literature

23   on the essentially lingering effects, if any,

24   of prenatal exposure to cocaine in terms of

Highly Confidential - Subject to Further Confidentiality Review

1    the need for additional social or educational

2    interventions or services.  Did you look at

3    any of that for this case?

4              MS. FLOWERS:  Objection, form.

5              THE WITNESS:  Not specifically.

6         That's in the body of my knowledge.

7         Q.    (BY MR. ALEXANDER)  And in

8    general, within a certain period of time

9    prenatally exposed -- I'm sorry, or children

10   who are prenatally exposed to cocaine don't

11   have additional needs for educational or

12   social services compared to similar peers

13   once you account for all socioeconomic

14   factors; correct?

15             MS. FLOWERS:  Objection, form.

16             THE WITNESS:  That -- I don't

17        know that I could agree with you on

18        that.

19        Q.    (BY MR. ALEXANDER)  After how

20   long?  About 18, is it, months where you stop

21   being able to see that there's any need for

22   additional interventions based upon the

23   prenatal exposure as opposed to all of the

24   other socioeconomic factors?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. FLOWERS:  Objection, form.
 2        Lack of foundation.
 3              THE WITNESS:  That's not what I
 4        found in my dissertation, and I don't
 5        believe that that's what the
 6        literature bears out over time.
 7        Q.    (BY MR. ALEXANDER)  What do you
 8   think the consensus view is about how long it
 9   is that there is a discernable need after you
10   control for all appropriate other causes for
11   additional educational and social services
12   needs?
13        A.    I would want to refresh my
14   memory on the American Academy of Pediatrics
15   review of 40 years of literature that came
16   out in 2013, or it might have been 2016.
17   That they looked at each of the substances to
18   look at the short-term and the long-term
19   effects of the literature on each substance.
20   So I wouldn't want to state it off the top of
21   my memory.
22        Q.    So whatever is in the most
23   recent review from the American Academy of
24   Pediatrics on this topic is what you think is
```

Highly Confidential - Subject to Further Confidentiality Review

1       the consensus view?

2              A.      At that time, yes.

3              Q.      Has it changed since then?

4              A.      Well, literature is coming out

5       all the time on new studies and new research

6       that comes out.

7              Q.      My question was about the

8       consensus view.  Has the consensus view on

9       this issue changed since the last publication

10      from the American Academy of Pediatrics?

11                     MS. FLOWERS:  Objection, form.

12             Can you just tell her what view?

13                     MR. ALEXANDER:  Go ahead.

14                     THE WITNESS:  Not that I'm

15             aware of.

16             Q.      (BY MR. ALEXANDER)  Do you

17      think as you sit here today there is a

18      consensus view on whether and for how long

19      there will be a need for additional medical

20      or social services needs or services to be

21      rendered to the children who are born with

22      prenatal exposure to opioids or heroin?

23                     MR. PENDELL:  Objection, form.

24                     THE WITNESS:  There is not a

Highly Confidential - Subject to Further Confidentiality Review

1          consensus view, and what the American

2          Academy of Pediatrics said in that

3          review was that there was not enough

4          research on the long-term consequences

5          of opioid exposure prenatally.

6          Q.    (BY MR. ALEXANDER)  Is that

7  your view as you sit here today?  Or your

8  expert opinion?

9          A.    That is the consensus statement

10  from the AAP.

11         Q.    And do you agree with it?

12         A.    Yes.

13         Q.    Let me ask you in general, we

14  talked about how your report does cite a

15  number of sources you've described as

16  references.  Each of these references

17  included in your expert report, whether the

18  version that's Exhibit 1 or Exhibit 2, were

19  things that you thought were appropriate to

20  cite; correct?

21         A.    Yes, that's correct.

22         Q.    And you only cited references

23  that you thought were reliable sources?

24         A.    Yes, that's correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.     So there are a couple of them
 2      that are cited in a number of places.  The
 3      Seay article, the Radel.  Is that how you say
 4      it?
 5              A.     Radel, yes.
 6              Q.     The Radel article.
 7                     The Hall article; correct?
 8              A.     Yes.
 9              Q.     Is there anything in any of
10      those publications that you thought was
11      incorrect and you cited it anyway?
12              A.     No.
13              Q.     What about the various
14      governmental publications that you've cited
15      from SAMHSA or Health and Human Services or
16      any of the other governmental publications
17      that you've cited as references, is there
18      anything in those that you think is incorrect
19      in terms of the data or analysis they present
20      or the recommendations or conclusions they
21      present?
22              A.     Not to my knowledge.
23              Q.     Did you pay attention to that?
24              A.     Yes, I did.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     And in terms of just overall,
 2    when you've cited something as a reference,
 3    you intend that the entirety of it is
 4    something that is appropriate, scientific
 5    information that you can consider reliable
 6    and relevant to what you've cited it for;
 7    right?
 8               MS. FLOWERS:  Objection, form.
 9          Asked and answered.
10               THE WITNESS:  That would be the
11          scientific standard; that's correct.
12          Q.     (BY MR. ALEXANDER)  And your
13    own articles, the things that you have cited
14    with your summary of qualifications, the
15    things that have appeared under your name in
16    the published medical literature, do you
17    stand by all of those?
18          A.     Well, there are certainly
19    things that were published a while ago that
20    we have more information on now that, you
21    know, obviously new findings come out that
22    have changed over time.
23          Q.     Are there specific things in
24    mind that you'd say are in publications where
```

Highly Confidential - Subject to Further Confidentiality Review

1   you know that they're now outdated or

2   inapplicable?

3        A.    Not that I can think of off the

4   top of my head.

5        Q.    Other than that, that some of

6   the things are essentially time limited, are

7   there any specific errors or issues with your

8   own publications that you're aware of as you

9   sit here today?

10       A.    Not that I know of.

11       Q.    What about your presentations?

12  We've talked about some of them, but

13  obviously, like you presented in Bethesda,

14  Maryland last May, at a national conference,

15  and you've presented orally and in writing

16  before a senate subcommittee in 2016.  Right

17  so far?

18       A.    Yes.  I make many public

19  presentations, yes.

20       Q.    Are there -- I mean, I won't

21  make it unfair, hopefully, but if we just go

22  back to like the last ten years of them, are

23  there any of your public presentations where

24  you used slides and you presented data or

Highly Confidential - Subject to Further Confidentiality Review

1    conclusions that you are aware there are

2    issues with the data or conclusions that you

3    presented in professional or public fora?

4              MS. FLOWERS:  Objection, form.

5              THE WITNESS:  No.  And I can

6         also tell you that if I am ever making

7         a presentation that is on behalf of

8         the National Center on Substance Abuse

9         and Child Welfare, that it is reviewed

10        by the project officers that have

11        oversight of that contract.  So it is,

12        in fact, not just my information, but

13        it is reviewed by the federal

14        government before I make a

15        presentation.

16        Q.    (BY MR. ALEXANDER)  So in other

17   words, when we have your slides, that you've

18   presented in some professional setting over

19   this last ten-year time period and you were

20   presenting on behalf of the National Center

21   on Substance Abuse and Child Welfare, we can

22   be sure that you stand by that what you

23   presented was accurate and complete?

24        A.    And you can be assured that a

Highly Confidential - Subject to Further Confidentiality Review

 1    project officer for the federal government

 2    has reviewed those, because it says that the

 3    presentation was sponsored by the federal

 4    government.

 5         Q.    So with your addition, what I

 6    said was correct?

 7         A.    That's correct.

 8         Q.    And are there any of these

 9    publications that have your name on them,

10    Dr. Young, where you presented or you put

11    your name on some public presentation or

12    something was generated as a report that came

13    out of your work, where you know as you sit

14    here today there are issues with it and parts

15    of it that you would say, I really can't

16    stand by some parts of it?

17         A.    Not that I remember at this

18    point.

19         Q.    So one of the things I

20    understand from your report is that your

21    staff prepares a quarterly bibliography or

22    summary of relevant literature?

23         A.    Yes.

24         Q.    And is that a single document

1    or are these subject-specific summaries or

2    bibliographies?

3          A.    It has different topics in that

4    by topic.

5          Q.    Did you look at any of those

6    bibliographies or summaries for your work

7    here?

8          A.    I review them periodically, so

9    it wouldn't have been something that I would

10   have done specifically.  It's something that

11   I do on an ongoing basis to keep up on the

12   literature.

13         Q.    Specifically for the work here,

14   is there some summary or bibliography

15   generated in 2019 or updated in 2019 that

16   relates to the topics of your expert report?

17         A.    No, there is not.

18         Q.    So like the general subject of

19   the expert report relates to the issue of the

20   impact of substance abuse by pregnant women

21   and parents in connection with the delivery

22   of children and family services; correct?

23              MS. FLOWERS:  Objection, form.

24              THE WITNESS:  I'm sorry, you're

Highly Confidential - Subject to Further Confidentiality Review

1        going to have to break that out.  It

2        relates generally to -- I think you

3        threw a couple of things in there.

4             MR. ALEXANDER:  I'll do it this

5        way.

6        Q.    (BY MR. ALEXANDER)  From your

7   perspective, if you were to give a

8   one-sentence answer, what's the general

9   subject of the expert testimony you plan to

10  give at trial?

11       A.    The implications of the opioid

12  epidemic on child welfare practice.

13       Q.    Have you, Dr. Young, or your

14  staff compiled or updated in 2019 what you

15  believe is the best and most accurate

16  compilation of medical literature on that

17  subject?

18       A.    It wouldn't be just

19  specifically medical literature.  We keep up

20  on the medical and social science literature

21  on that topic.

22       Q.    Okay.  So is there an updated

23  compilation, a bibliography or a summary from

24  this year, of medical and scientific

Highly Confidential - Subject to Further Confidentiality Review

1    literature on the topic of the implications

2    of the opioid epidemic on child welfare

3    practice?

4           A.    It wouldn't be collected in

5    that way.  It would be what are the new

6    articles that have come out this year that we

7    would track.  And it would include things

8    like I received yesterday a report from the

9    Supreme Court in Vermont that states that

10   half of the cases in Vermont in their child

11   welfare system are affected by opiates.

12              So we would -- we would monitor

13   that.  We would keep track of that.

14          Q.    So are there any additional

15   sources, including published medical or

16   scientific literature or governmental sources

17   like you've just described, that you intend

18   to rely on for your opinions in this case but

19   are neither cited in your report nor the

20   attachment, the Exhibit 3 that we've already

21   marked?

22          A.    I don't know that I would need

23   to cite that or rely on that for my

24   testimony, but I know that there are a few

Highly Confidential - Subject to Further Confidentiality Review

```
 1     articles that I haven't been able to get to
 2     in the last six weeks, is a compilation that
 3     came out of a group at the University of
 4     Minnesota.  I wasn't able to attend; I sent a
 5     staff member.  And it's a compilation of some
 6     articles that I actually gave the person who
 7     was putting it together referrals to various
 8     researchers.  She had the topics and I gave
 9     her referrals to various researchers that
10     would be good people to write those articles.
11     That compilation has been -- has come out,
12     and I just haven't had a chance to get back
13     to it to read that.  So I'm anxious to be
14     able to read that.  I know that's waiting for
15     me.  But I don't believe that there will be
16     anything in there that I'm not already aware
17     of, since I'm the one who sent that person to
18     those researchers.  So that is out there for
19     me to read.
20          Q.     The Minnesota document you just
21     described that you haven't read yet but have
22     on your plate, so to speak?
23          A.     Yes.
24          Q.     Does that relate to anything
```

1    about opioids?

2         A.    Oh, I'm sure it will, because

3    there's many people that are, you know,

4    trying to tease out what's happening about

5    opioids.  But I don't know specifically what

6    the researchers put into that compilation.

7         Q.    So other than the possible

8    inclusion of that document that you haven't

9    read yet, are there pieces of medical or

10   scientific literature or governmental

11   publications that you rely on as you sit here

12   today but have not cited or identified for

13   us, from the attachments to Exhibits 1 or 2,

14   or to the listing of materials in Exhibit 3?

15        A.    I mean, there -- I don't know

16   how to answer that question exactly, because

17   there's stuff that comes out all the time.  I

18   interacted with Stephen Patrick the week

19   before last on an op ed that he wrote, and

20   gave him some feedback on that.  So I know

21   that's coming out.  It's an op ed; it's not a

22   scientific piece.  But he publishes

23   frequently.  He's at Vanderbilt and he's a

24   very well known pediatrician, neonatologist,

1    that works on NAS issues, and he's somebody

2    who I keep up with.

3             There's lots of literature

4    that's coming out specific to these issues.

5    So I can't say that there would be nothing

6    that wouldn't inform my expertise between now

7    and trial.  Is there anything that I would

8    rely on?  To be honest, I don't know what the

9    rules are on that.  There will be more

10   information that comes out between now and

11   trial.

12        Q.     So I wasn't asking about things

13   that don't exist yet.

14        A.     Okay.

15        Q.     Okay?  And we understand you

16   have cited some articles from Dr. Patrick on

17   neonatal abstinence syndrome.  There are

18   specific citations to him included in your

19   disclosed materials.

20             I'm asking about things you

21   haven't cited that already exist.  Are there

22   pieces of medical literature, scientific

23   literature, or government publications that

24   you rely on as you sit here today but have

```
1    not disclosed?

2         A.    No.

3         Q.    In connection with the sort of

4    tracking of changes in the medical or

5    scientific literature that your staff does

6    outside of litigation, do they also pay

7    attention to if there are slides included in

8    some of your standard and recurring

9    presentations that would need to be updated

10   or changed because the literature has changed

11   or data has changed?

12        A.    Yes.  And would you like to

13   know the process?

14        Q.    No.  I'll ask the specific

15   question.

16        A.    All right.

17        Q.    So I think what we can see is

18   that included in your report, I think we

19   alluded to this earlier, and in some of your

20   presentations, there's some slides and

21   charts, graphics, whatever, that basically

22   recur.

23            You use them in multiple

24   presentations.  They're part of your standard
```

```
 1    set.  Do you understand what I'm saying?

 2         A.     Yes.

 3         Q.     And that's true for your

 4    report, that some of what's included in your

 5    report, these are things that you presented

 6    before in slides, or kind of portions of

 7    published literature that you've cited

 8    before?  Correct?

 9              MS. FLOWERS:  Objection, form.

10         Lack of foundation.

11              THE WITNESS:  With updated

12         data, that is correct.

13         Q.     (BY MR. ALEXANDER)  Right?

14              And I'm not saying that, you

15    know, it's plagiarized or you plagiarized

16    yourself, that's not the nature of my

17    questions.  It's that basically the way it

18    works because you do present so frequently,

19    often on similar subjects, is you essentially

20    pay attention to the need to replace outdated

21    slides and tables and graphs, if they've been

22    superseded or otherwise shown to be

23    unreliable or inapplicable going forward;

24    correct?
```

1          MS. FLOWERS:  Objection, form.

2          THE WITNESS:  Yes, I do try and

3     stay current.

4          Q.     (BY MR. ALEXANDER)  So in your

5     report, there's a reference to asking

6     Dr. Hall to generate some data and share it

7     with you coming out of the work that Dr. Hall

8     did on the START program down in Kentucky.

9     Do you remember that?

10         A.     Yes, I do.

11         Q.     Other than that -- and we'll

12    talk about it.  Other than that, are there

13    any other researchers or databases where you

14    have obtained information that is not

15    otherwise publicly available for purposes of

16    the opinions you intend to offer in this

17    case?

18         A.     No, there is not.

19         Q.     Are there private

20    conversations, conversations you've had with

21    specific workers in this area or authors or

22    researchers or government officials, that you

23    intend to rely on for any of your opinions?

24         MS. FLOWERS:  Object to the

```
 1          form.

 2                 THE WITNESS:  I have

 3          conversations with workers, officials,

 4          stakeholders, commissioner of

 5          children's bureau, directors, elected

 6          officials, frequently.

 7                 Not a single person who I have

 8          interacted with in the child welfare

 9          field has told me that it is anything

10          other than opioids that is driving the

11          child welfare caseload increase.

12          Q.    (BY MR. ALEXANDER)  Have you

13   completed your answer?

14          A.    I have completed my answer.

15   Those -- so --

16          Q.    Can you name the people you

17   were just referencing in that prior answer,

18   all of them?

19          A.    They would be very numerous.

20                 I don't know if I can name all

21   of them.  I can give positions of who I have

22   talked to.

23          Q.    If you could give the actual

24   name with the position, and maybe do it in
```

Highly Confidential - Subject to Further Confidentiality Review

1    groups of ten and then we'll figure out how

2    far to go before we stop the process. Can

3    you give me the first ten people you've had

4    that conversation with by their title and

5    their name?

6              MS. FLOWERS: Objection, form.

7              THE WITNESS: Let's see. I

8       would start with the findings from

9       Laura Radel.

10      Q.    (BY MR. ALEXANDER) So just to

11   orient, again, my question was about

12   conversations.

13      A.    Yes.

14      Q.    So I'm not asking about that

15   you read a paper or you saw a published

16   presentation or -- I'm talking about private

17   conversations.

18          So like remember we said that

19   you, I guess, called or e-mailed or

20   something, Dr. Hall and said, hey, can you

21   generate some data for us that we're going to

22   use in my litigation expert report based upon

23   data that you've been gathering on START in

24   Kentucky. Do you remember that?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Yes, I do remember that.

2        Q.      And so I asked you about if

3   you're relying on any conversations with

4   researchers, children's services

5   professionals, or government officials, for

6   any opinions that you have.  And so I'm

7   talking about conversations, not published

8   literature, not government reports, not

9   something somebody said to -- from a stage to

10  an audience of, you know, 600 professionals.

11  Are you with me so far?

12       A.      Yes.

13       Q.      Are there any private

14  conversations like that where you can

15  identify who -- that you've had with -- who

16  you've had them with?

17       A.      So Laura Radel is somebody who

18  I've known since 1989.  We've had that

19  conversation about drug use patterns on

20  multiple occasions.

21       Q.      Anyone else?

22       A.      I'm not really -- I can't

23  really remember details of other people.

24       Q.      So when you said in response to

Highly Confidential - Subject to Further Confidentiality Review

1    a prior question that you had conversations

2    with workers, officials, stakeholders,

3    commissioners of children's bureaus,

4    directors, elected officials, not a single

5    person I've interacted with in child welfare

6    has told me, and then you gave a continuation

7    of an answer.  The only person you're talking

8    about there is Laura Radel?

9              MS. FLOWERS:  Objection, form.

10              MR. PENDELL:  Objection, form.

11              THE WITNESS:  Probably that I

12        could remember specific names of.

13        Q.    (BY MR. ALEXANDER)  How about

14    titles and states or governmental entity?

15    Can you give us any detail?

16        A.    It's a general sense of these

17    conversations.  No, I don't think I can.

18        Q.    Okay.  So if we wanted to kind

19    of follow up and check on this as opposed to

20    just taking your ipse dixit, your Word for

21    it, the only one we could contact would be

22    Laura Radel; is that correct?

23              MR. PENDELL:  Objection to the

24        use of the Word "ipse dixit."

```
 1                 THE WITNESS:  I missed the Word

 2          that you used.

 3                 MR. ALEXANDER:  Take your Word

 4          for it.

 5                 THE WITNESS:  No, before that.

 6          Q.     (BY MR. ALEXANDER)  I used a

 7    Latin phrase, ipse dixit, the thing speaks

 8    for itself.

 9                 I say a thing, it's -- I don't

10    know if you speak Latin at all.  It's --

11    could be any gender, or neutral.

12                 Do you need me to repeat the

13    question?

14          A.     Yeah, I couldn't come up with

15    other specific names.

16          Q.     Okay.  Remember I also asked

17    you if you can identify anybody by their

18    position or the governmental entity that they

19    might hold a position with.  Can you do that?

20          A.     Well, when you put the caveat

21    on not having it be a public statement, I had

22    to rethink that a bit.  And that's where I

23    think I'm not as clear on who I would refer

24    to.
```

1        Q.     You said Laura Radel is --

2        A.     So --

3        Q.     I'm sorry, I thought you were

4   done.

5        A.     And Laura obviously would have

6   knowledge because she worked on the ASPE

7   study specifically.

8        Q.     Is she a Dr. Radel?

9        A.     No. She has a Masters degree.

10       Q.     Okay.  All right.  So she's the

11  only one you can name specifically or

12  generally for anything you're relying on

13  that's in the nature of a private

14  conversation for any topic you intend to

15  opine on in your report; correct?

16       A.     Well, and now as I'm thinking

17  about it, I'm trying to remember if there

18  were -- if that was exactly a private

19  conversation or if that was more at a

20  meeting.  When we were talking about her data

21  and her report.

22       Q.     Do you intend to rely on any

23  private conversations you've had with any

24  researcher, government official, or

1    children's services professional for any

2    opinions you intend to give at trial in this

3    case?

4            MS. FLOWERS:  Objection, form.

5        Asked and answered.

6            THE WITNESS:  It's probably

7        more just my ongoing work and

8        conversations with people that I have

9        in general, you know, in my everyday

10       work.

11       Q.    (BY MR. ALEXANDER)  Can you

12   name anybody who's been part of any of those

13   conversations?

14           MS. FLOWERS:  Objection.  Asked

15       and answered.

16           THE WITNESS:  As I said, I have

17       conversations with lots of people --

18       e-mail conversations, lots of people,

19       frequently.  But not that it would be

20       that conversation that I relied on for

21       this work, nor that it was specific to

22       this report.

23           It is more of the overall

24       knowledge base that I carry.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.      (BY MR. ALEXANDER)   Can you

 2    name anybody who you would say has provided

 3    you information through one of these

 4    conversations that you're going to rely on

 5    for opinions in this case?  Regardless of

 6    whether the conversation was specifically for

 7    the case.

 8            A.      No.  As a matter of fact, not

 9    that that would be a person that would not

10    have also already published also.

11            Q.      Okay.  So you rely on the

12    published information, not the private

13    conversations; correct?

14            A.      Yes.  I'm sorry, that was a

15    long way around to that.

16            Q.      Okay.  So I understand that

17    your company also tracks "solutions" to see

18    how they're doing in this area?

19                    Do you have a database of that?

20    Or is it just anecdotal sort of tracking?

21                    MS. FLOWERS:  Object to the

22            form.

23                    THE WITNESS:  We don't have a

24            database of that.  We are trying to
```

Highly Confidential - Subject to Further Confidentiality Review

1         have a database of that.  We don't

2         have.

3         Q.     (BY MR. ALEXANDER)  Okay.  So

4    in your report it says, I have also tracked

5    the solutions that states and communities

6    have implemented.  That tracking has been

7    conducted how?

8         A.     We have various reports that we

9    are required to file.  Some of -- most of

10   them are on our website.  I refer to some of

11   them in my report.  So our reports that are

12   submitted on our various contracts.

13        Q.     So the reports on your website,

14   the website for national -- I'm sorry, for

15   Children and Family Futures.  Sorry, is that

16   the entity you're talking about or a

17   different entity?

18        A.     Yes.  Children and Family

19   Futures, or if it was specifically under the

20   National Center on Substance Abuse and Child

21   Welfare, then their reports would be --

22   eventually make their way to the national

23   center website.

24        Q.     Okay.  So let's make sure we

Highly Confidential - Subject to Further Confidentiality Review

1    cover both of these.

2          A.      Mm-hmm.

3          Q.      Anything that your group did

4    that appears on the website for Children and

5    Family Futures or the National Center on

6    Substance Abuse and Child Welfare, you stand

7    by those and they should be current and

8    up-to-date?

9          A.      Well, some are out of date,

10   because you know how things are on websites.

11   They get old fast.  But we do keep

12   information on our websites so that the

13   public can Access the information of things

14   that we've reported on, yes.

15         Q.      The information currently on

16   the website for either of these entities

17   should have been accurate when originally

18   published; correct?  Or posted.

19         A.      That's correct.

20         Q.      And you make efforts to keep

21   them up-to-date so they should be reasonably

22   complete, but you're not saying that they're

23   up to the minute; fair?

24         A.      Yes, that's correct.

1    Q.    Okay.  And are you aware of

2    anything that's tracking solutions that

3    appears on either of these websites that you

4    know is incorrect, out of date, unreliable,

5    wrong?

6    A.    No.  I don't know of anything

7    that is wrong on our website.

8    Q.    So like if I were to pull

9    something off your website that you were

10    involved in creating and has your name on it

11    and it talks about your description of what's

12    going on in this area in 2006, '7, '8, '9 --

13    I'm sorry, 2016, '17, '18, or '19, you would

14    expect that it's something you can stand by;

15    correct?

16    A.    That's right.  I would hope so.

17    Q.    Let me go back to some of the

18    stuff you said before the lunch break, before

19    we move on to the next subject.

20          You said that you were aware of

21    the names of two of the defendants you, I

22    guess, ran across when you reviewed the

23    38 pages of the one complaint that you were

24    provided?  Who are those two defendants?

1    A.    I don't recall saying two

2    defendants, but I do know the name Purdue.  I

3    do know the name Bergen Amerisource.

4              I do know that there are

5    distributors that are included in the

6    complaint, distributors, CVS, other

7    manufacturers and other distributors.

8    Q.    Do you intend to offer any

9    testimony at trial that's specific to any of

10   the entities you identified specifically or

11   by category?

12   A.    No.  That's outside of the

13   scope of what I was asked to do.

14   Q.    The one you mentioned where you

15   said Bergen Amerisource?  What kind of

16   company are they?

17   A.    I believe they're a

18   manufacturer of one of the opioids.  I'm not

19   sure.

20   Q.    And what about Purdue?  Is that

21   a manufacturer or distributor?

22   A.    It's a manufacturer.  But I

23   think they also distribute, they distribute

24   their product.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     When you said CVS was a
 2   distributor, do you know if they're being
 3   sued for anything they did at the retail
 4   level or for any other actions?
 5          A.     I believe they are both a
 6   distributor because they distribute to their
 7   own pharmacies.
 8          Q.     Okay.  My question is, do you
 9   know why they're being sued?
10                 MS. FLOWERS:  Objection, form.
11                 THE WITNESS:  My understanding
12          is that the distributors had an
13          obligation to notify the DEA on the
14          quantities of certain opioids that
15          were being shipped to certain outlets,
16          and that that notification didn't
17          happen.  And so quantities of opioids
18          were being distributed into
19          neighborhoods and cities and counties
20          at unusual high rates.  That's my
21          understanding.
22          Q.     (BY MR. ALEXANDER)  Is that
23   understanding based on anything other than
24   what you read in the complaint?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    My knowledge from just reading

2    the newspaper.

3    Q.    Other than regurgitating

4    something you saw in the newspaper, do you

5    intend to talk about this at all at trial in

6    terms of your understanding of what any

7    distributor did or didn't do or was supposed

8    to do?

9         MS. FLOWERS:  Objection, form.

10        THE WITNESS:  No.  That is not

11        my area.  My area is about the opioids

12        and the impact on the child welfare

13        system.

14    Q.    (BY MR. ALEXANDER)  And I think

15    I know the answer to this one, but when it

16    comes to the specific drugs, I know earlier I

17    asked you to list some of the prescription

18    drugs that you are aware of in the opioid

19    class, and that we went over some of the

20    illicit drugs in the opioid or opiate class.

21    You're not offering any opinions that breaks

22    up any kind of metric of harm or social

23    service burden by the specific drug, whether

24    it be a prescription drug or an illicit drug;

Highly Confidential - Subject to Further Confidentiality Review

1    correct?

2              MS. FLOWERS:  Object to the

3         form.

4              THE WITNESS:  Well, what --

5         what I know is that as you said, there

6         have been parents with substance use

7         disorders in the child welfare system

8         for a long time, but what is new, and

9         in particular in these two counties,

10        is the rapid increase of opioids that

11        act and mimic the same action of

12        heroin in those communities that child

13        welfare had to react to as people

14        became -- developed tolerance and

15        dependence on those opioids.

16             So that's what I understand.

17             So metric of any kind of

18        quantity, no, I don't have knowledge

19        about that.  What I know is that that

20        was the new piece that happened in

21        child welfare.

22        Q.    (BY MR. ALEXANDER)  What you

23   just described in terms of the rapid increase

24   of opioids and whether they mimic heroin,

Highly Confidential - Subject to Further Confidentiality Review

1   those are not expert opinions you intend to

2   offer at trial; correct?

3          A.      I don't know exactly what you

4   mean by expert.  I do know how opioids work

5   in the brain, not from a neuroscience

6   standpoint but from the basic action of the

7   reward pathway.  So if someone asked me do

8   you understand the reward pathway of

9   addiction, I would say yes, I understand

10  that.  I understand the uptake and

11  neurotransmitters and dopamine, but I am not

12  a neuroscience-ist.  So I'm not sure what

13  you're asking for, if I would testify to

14  that.

15         Q.      The specifics of how

16  prescription opioids mimic or don't mimic or

17  relate to anything about illicit drugs that

18  people might have already been abusing or

19  might in the future abuse, that was beyond

20  the scope of your engagement for this case;

21  correct?

22                 MS. FLOWERS:  Object to the

23         form.

24                 THE WITNESS:  That was beyond

Highly Confidential - Subject to Further Confidentiality Review

```
1            the scope of my engagement for this

2            case.

3            Q.    (BY MR. ALEXANDER)  Okay.  So

4     was it also beyond the scope of your

5     engagement for this case to pay attention to

6     the trends relating to the prescriptions

7     written for opioids and the amounts of

8     opioids distributed into Cuyahoga and Summit

9     County over time?

10           A.    That was beyond the scope of

11    what I was asked to look at.  I am aware of

12    that knowledge, yes.

13           Q.    So do you -- do you know when

14    it was in time that the total prescriptions

15    and distribution of opioids to -- of -- legal

16    prescription opioids to Cuyahoga and Summit

17    County were increasing versus decreasing?

18                 MS. FLOWERS:  Object to the

19           form.

20                 THE WITNESS:  With specificity

21           as to months and years, probably not.

22                 I have a general sense of the

23           time period.

24           Q.    (BY MR. ALEXANDER)  So is it
```

Highly Confidential - Subject to Further Confidentiality Review

1    your understanding that the total

2    prescriptions into and distribution into

3    Cuyahoga and Summit County of prescription

4    opioids from within the closed distribution

5    system started declining in late 2011, early

6    2012?

7               MS. FLOWERS:  Object to the

8          form, lack of foundation.

9               THE WITNESS:  I'm not sure.

10          And, as you've been saying, that's

11          outside the scope of what I was asked

12          to look at.

13          Q.    (BY MR. ALEXANDER)  Okay.  So

14    you did give some answers earlier where you

15    talked about flooding the communities and

16    talking about the amount of drugs that were

17    in these communities through the legitimate

18    chain, at least until they were diverted

19    through one or more illegal acts.  Do you

20    remember that sort of testimony?

21          A.    Yes.

22               MS. FLOWERS:  Object to the

23          form.  Mischaracterization of the

24          testimony.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.      (BY MR. ALEXANDER)  Was it

 2    within the scope of your engagement to talk

 3    about flooding of the communities or anything

 4    about how the volume of prescription drugs in

 5    Cuyahoga or Summit County, or even Ohio more

 6    broadly, played any role in any of what you

 7    understand to be the opioid epidemic?

 8                 MR. PENDELL:  Objection to

 9            form.

10                 THE WITNESS:  That was not in

11            the scope of my engagement, but you

12            would have to be living under a rock

13            if you didn't know about it.

14            Q.      (BY MR. ALEXANDER)  Well, under

15    a rock or not, do you know if the time period

16    when the prescriptions started going down in

17    2012, '13, '14, '15, '16, '17, '18, '19, was

18    also a time when at least for some of the

19    time, there was an increase in things like

20    hospitalization for overdose or deaths

21    attributed to overdose of opioids, whether

22    illicit or prescription?

23                 MS. FLOWERS:  Objection, lack

24            of foundation.
```

Highly Confidential - Subject to Further Confidentiality Review

 1              THE WITNESS:  As you said,

 2         that's outside my scope.  I do

 3         understand the time period of the

 4         transition for persons that could no

 5         longer Access prescription opioids,

 6         being in that 2012, 2013, 2014, 2015,

 7         I believe.

 8         Q.    (BY MR. ALEXANDER)  Did you

 9    look at --

10         A.    But I don't -- I don't have

11    that exact information.  So I may be

12    answering erroneously, because that's not my

13    area of expertise.

14         Q.    Sure.  You haven't paid

15    attention to the specifics when you've given

16    these sort of general answers about flooding

17    and what drugs people were taking at

18    different points in time.  You haven't paid

19    attention to the actual specifics about the

20    distribution of prescription drugs versus

21    information about illegal drugs coming into

22    these communities; correct?

23              MS. FLOWERS:  Object to the

24         form.

```
1                THE WITNESS:  Well, paid

2        attention?  Yes, I've paid attention.

3        Obviously I've paid attention.

4        Q.    (BY MR. ALEXANDER)  What about

5   like the HIDTA reports, the High Intensity

6   Drug Trafficking reports that are available

7   that include information about heroin and

8   methamphetamine and fentanyl analogs and when

9   they came in to these communities versus when

10  there were spikes seen in overdoses and, you

11  know, hospitalizations and that sort of

12  thing.

13       A.    Yes, I've seen the HIDTA

14  reports.

15       Q.    Did you look at them for this

16  case?

17       A.    I did not look at them between

18  January and March specifically.

19       Q.    What about since March?  Since

20  you signed your report on or about

21  March 25th, 2019, have you looked at the

22  HIDTA reports in connection with any of the

23  issues in this case?

24       A.    Not since March 25th, no, I
```

Highly Confidential - Subject to Further Confidentiality Review

1   have not.

2        Q.      Is it your general

3   understanding that the increase in opioid

4   deaths, as it sometimes is ascribed, is

5   related to the use of heroin and fentanyl

6   analogs as opposed to actually prescription

7   drugs being taken without those other

8   substances?

9             MS. FLOWERS:  Objection, lack

10        of foundation.

11            THE WITNESS:  I think general

12        knowledge, for people who, as I said,

13        are paying attention, recognize that,

14        that those are -- can be deadly

15        combinations.

16        Q.      (BY MR. ALEXANDER)  Okay.  So

17   I'm not sure that answered my question.  Is

18   it your understanding that the -- the

19   ascribed increase in sometimes-called opioid

20   overdose deaths, or more specifically

21   unintentional overdose deaths, are not the

22   prescription drugs but are heroin, fentanyl

23   analogs, and various combinations of drugs

24   including cocaine, methamphetamine, PCP, and

Highly Confidential - Subject to Further Confidentiality Review

1    alcohol?

2                   MS. FLOWERS:  Objection to form

3            and lack of foundation.

4                   THE WITNESS:  My understanding

5            is that people die from all of those.

6            Q.    (BY MR. ALEXANDER)  Do you know

7    about the methodology used by the medical

8    examiner's or coroner's offices in Cuyahoga

9    County or Summit County to look at opioid

10   overdose deaths or to make that sort of

11   attribution?

12           A.    No, I don't know about the

13   specifics of how they make that attribution.

14           Q.    So when you talked about the

15   numbers of orphans and that these were

16   numbers not seen since the orphan trains of

17   many decades ago, do you know what drugs or

18   combination of drugs were responsible for any

19   deaths of parents leaving behind an orphan?

20           A.    It probably doesn't matter to

21   that orphan which combination when they

22   started with prescription drugs, and most

23   individuals who end up using heroin, doesn't

24   the data show that 83 percent of them started

1   with prescription drugs?  And I believe the

2   Compton article says that people that use

3   heroin or became heroin -- have heroin use

4   disorders are 12 times more likely to have

5   started with a prescription drug.

6            So I'm not sure of what

7   combination mattered to that child who lost

8   their parent.

9            MR. ALEXANDER:  So move to

10       strike as non-responsive.

11            Let me read my question back

12       again.

13            MS. FLOWERS:  Objection, it was

14       responsive.

15       Q.    (BY MR. ALEXANDER)  When you

16   were talking about the numbers of orphans and

17   it's not a -- at levels not seen since the

18   orphan trains of many decades ago, do you as

19   you sit here today know the drugs or

20   combination of drugs that were responsible

21   for any of those deaths of parents, "yes" or

22   "no"?

23            MR. PENDELL:  Objection to

24       form.

```
 1              THE WITNESS:  Could you ask me
 2         again, please?  I got a little hung up
 3         on thinking about the kids.
 4         Q.    (BY MR. ALEXANDER)  When you
 5    said that there are orphans at levels not
 6    seen for many decades, do you know what drugs
 7    or combinations of drugs were responsible for
 8    the deaths of any parents, "yes" or "no"?
 9              MR. PENDELL:  Objection to
10         form.
11              THE WITNESS:  As I said, in the
12         Compton article, if that parent became
13         a parent with a heroin use disorder,
14         they were 12 times more likely to have
15         started with a prescription drug.
16         Parsing out which of those
17         heroin-related deaths started with a
18         prescription drug, I cannot tell you
19         which individual child lost their
20         parent and they were in the 83 percent
21         versus the 17 percent.
22              No, I cannot.
23              MR. ALEXANDER:  Move to strike
24         as non-responsive.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              MS. FLOWERS:  Objection.

2              MR. PENDELL:  Objection.

3              MS. FLOWERS:  It was

4         responsive.  You just don't like the

5         answer.

6         Q.    (BY MR. ALEXANDER)  Dr. Young,

7    did you ask to look at the data that's

8    available, that's maybe been produced in

9    discovery in the case, that gives information

10   about overdose deaths in these communities

11   that are attributed to opioids as a class to

12   look to see what actual substances or

13   combinations of substances are ascribed as

14   being the reason for the actual deaths?

15             MS. FLOWERS:  Objection --

16             MR. ALEXANDER:  "Yes" or "no."

17             MR. PENDELL:  Object to form.

18             MS. FLOWERS:  Asked and

19        answered.

20             THE WITNESS:  No, I didn't ask

21        to look specifically at that.  I can

22        tell you that I happen to have been in

23        Senator Brown's office in Washington,

24        DC when his office took the call from
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            the field office in Ohio from the
 2            coroners, asking about the revenues
 3            that they needed in order to get
 4            enough coroners for the bodies that
 5            they were trying to process.
 6                 I don't believe that was in
 7            Cuyahoga.  I believe that was in
 8            Cincinnati.  But I don't know that
 9            that makes a difference.
10                 So I was pretty aware of the
11            overdose deaths.  And no, I didn't ask
12            for how the coroners parse out was it
13            heroin or prescription drugs.
14       Q.    (BY MR. ALEXANDER)  The
15  anecdote that you just referenced, of
16  overhearing some phone conversation from
17  Hamilton County, Ohio that went to Senator
18  Brown, is that something you intend to
19  testify about at trial?
20       A.    Only if I'm asked about it.
21       Q.    Do you offer any opinions based
22  upon that conversation that you overheard?
23       A.    No.  It's in my general body of
24  knowledge.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.      What was the date of that call?

 2           A.      I don't remember.

 3           Q.      Were you -- was it like on a

 4      speakerphone and you could hear every Word

 5      that was said?

 6           A.      No.  It was going on in another

 7      room, and it was being relayed that this is a

 8      big issue in Ohio.  We weren't there to talk

 9      about the coroners.

10           Q.      So you didn't actually hear

11      some coroners talking; you heard somebody

12      else referring to what they heard a coroner

13      said.  Is that what it is?

14           A.      Yes.  Yes, that is true.

15           Q.      Do you know of the name of

16      anybody who was on the phone with the

17      coroner, either at the coroner's side in

18      Hamilton County, Ohio, or at Senator Brown's

19      office?

20           A.      No, I do not.

21           Q.      The medical literature you

22      referenced about this idea that people who

23      become heroin addicts have some point -- at

24      some point in their past history of their
```

Highly Confidential - Subject to Further Confidentiality Review

1    entire lives received a prescription opioid,

2    and what percentage those are, as I

3    understand from your prior testimony, this is

4    not within the scope of the opinions you

5    intend to offer at trial.  Has that changed?

6              MS. FLOWERS:  Object to the

7         form.

8              THE WITNESS:  No, that hasn't

9         changed.  That's not what I was asked

10        specifically to report on.  But you

11        asked me about my knowledge about

12        that, so I told you about my knowledge

13        about that.  That's in my general body

14        of knowledge, because I'm informed in

15        this area.  So I have knowledge about

16        it.  It's not what I was asked to

17        write about, and unless you ask me

18        about it, I won't be telling you about

19        it.

20        Q.    (BY MR. ALEXANDER)  Well, this

21   is my opportunity to find out what opinions

22   you would offer at trial and what you would

23   base them on, so I'm not intending to play

24   games about asking you about something and

Highly Confidential - Subject to Further Confidentiality Review

1  hiding the ball.  I would like to know, are

2  there opinions that you intend to offer at

3  trial relating to this concept of why it is

4  that some people become addicts for heroin

5  and may overdose on heroin or a fentanyl

6  analog versus other people.  Is this a

7  subject that you intend to offer expert

8  testimony about?

9      A.     No, it is not.

10      Q.     Okay.  And you don't know as

11  you sit here today, in terms of that

12  particular article that you referenced, how

13  many of those folks started abusing any

14  substance while they are actually receiving

15  an opioid prescription; correct?

16          MS. FLOWERS:  Object to the

17      form.

18          THE WITNESS:  No.  I'm not -- I

19      would have to refresh my memory on

20      that article, but I thought you were

21      going to go back to what my report

22      says.  So I'm not -- we just

23      established that I wasn't going to

24      testify about those kinds of issues,

Highly Confidential - Subject to Further Confidentiality Review

```
1              and then you went back to those

2              issues.  So let me be clear.  Do you

3              want me to talk more about the

4              connection between prescription drugs

5              and heroin, or are we going to move

6              off of that?

7         Q.    (BY MR. ALEXANDER)  I want to

8    make sure that I understand what you would

9    offer expert opinions about at trial based

10   upon the current scope of your disclosure.

11   This issue of why it is that some people

12   become addicts and other people don't, and

13   what people's particular pathway is that may

14   result in them being -- having some substance

15   use disorder, and maybe overdosing, all of

16   those specifics are to be left for other

17   experts in other fields; is that correct?

18        A.    That is my understanding.

19        Q.    Okay.  Good.  And so you also

20   then don't know, and don't intend to offer

21   expert opinions on why it is that 96, 97%,

22   according to the estimates, of people who do

23   use a prescription drug do not end up with a

24   substance use disorder?
```

1          MR. PENDELL:  Objection to

2      form.

3          MS. FLOWERS:  Objection, lack

4      of foundation.

5          THE WITNESS:  I don't intend to

6      offer testimony on that component.

7      Q.    (BY MR. ALEXANDER)  The report

8  that you generated that was released, in I

9  think you said 2015, that came way -- much

10  later from that original 2011 discussion with

11  a project manager from -- I don't have -- is

12  that from NIDA or SAMHSA?

13          MS. FLOWERS:  Objection.  She

14      said 2016.

15          THE WITNESS:  Right.  It was

16      released in 2016, and that is a SAMHSA

17      publication.

18      Q.    (BY MR. ALEXANDER)  Okay.  Did

19  you get any response from that or the version

20  of that that you presented during any of

21  these meetings in Ohio or at national

22  conferences from anybody from Cuyahoga County

23  or Summit County that suggested they agreed

24  with anything you said, disagreed with it, or

Highly Confidential - Subject to Further Confidentiality Review

```
 1    were going to make any kind of changes to

 2    what they were doing because of anything you

 3    said?

 4              MR. PENDELL:  Objection to

 5         form.

 6              THE WITNESS:  I don't know.

 7         Q.    (BY MR. ALEXANDER)  Have you

 8    ever heard from anybody from Cuyahoga or

 9    Summit County in response to any of your

10    publications or professional presentations

11    that commented on the substance of what you

12    had said or that they intended to change any

13    of their behaviors based upon your

14    recommendations?

15              MR. PENDELL:  Objection to

16         form.

17              THE WITNESS:  Ever?  Do you

18         want ever?

19         So I've been working in the

20         field 25 years, and I spent a lot of

21         time in Summit in the -- I mean,

22         excuse me, in Cuyahoga in the late

23         '90s and early 2000s.  So...

24              MR. ALEXANDER:  And, ma'am,
```

Highly Confidential - Subject to Further Confidentiality Review

1      Dr. Young --

2              THE WITNESS:  I'm not sure what

3      you want me to answer to.

4      Q.     (BY MR. ALEXANDER)  Dr. Young,

5  I'm just asking about this current body of

6  work that started -- well, actually maybe I'm

7  wrong.

8              Were you doing anything

9  specifically on kind of the opioid epidemic's

10  impact on social services and what to do

11  about it before 2011?

12      A.     Well, all of our technical

13  assistance didn't necessarily exclude

14  opioids.  And so if somebody called or

15  e-mailed us from Ohio or from anyone else and

16  asked us for assistance about screening tools

17  or communication protocols or family

18  treatment courts, any of those areas of our

19  scope of practice, it would not have mattered

20  to us if it was opioids or methamphetamine or

21  cocaine or alcohol or marijuana; we would

22  have responded with a response about what the

23  specific question was that they had.

24      Q.     Sitting here today, can you

1    recall any interaction with anybody from

2    Cuyahoga or Summit County about the issues

3    that have now been identified as the opioid

4    epidemic or opioid crisis before 2011?

5         A.    Well, Summit County became an

6    RPG grantee in 2012, and in 2010, we started

7    the contract on family treatment court,

8    technical assistance, and I'm not sure when

9    Summit County's family treatment court began.

10   I believe it was before they had their

11   regional partnership grant.  So some of our

12   staff would have been providing technical

13   assistance in Summit County prior to 2012.

14   Perhaps during the time that they were

15   writing their application.  But certainly

16   from 2012 on we were involved with providing

17   technical assistance in Summit.

18        Q.    So in terms of specific

19   interaction about something that you now

20   describe as the opioid epidemic, the first

21   time that you can think of was 2012 with

22   Summit County; correct?

23        A.    The time that I know for sure

24   that we would have been interacting with

Highly Confidential - Subject to Further Confidentiality Review

1  Summit County would have been 2012.  Because

2  of their grantee status.

3      Q.    And have you had any feedback

4  from anybody from Cuyahoga or Summit County

5  since then about any of your published

6  recommendations or analyses about anything

7  relating to the impact of the opioid epidemic

8  on children and family services?

9      A.    We typically get very high

10  ratings for our technical assistance.  Is

11  that what you mean?  Or do you mean things

12  that they were going to put in place?

13      Q.    My question was specific to

14  Cuyahoga and Summit County.

15          So, sitting here today, can you

16  tell me if you've ever gotten any feedback of

17  any sort from Cuyahoga or Summit County about

18  any of your recommendations or analyses about

19  the opioid epidemic and its impact on

20  children and family services?

21      A.    Well, as you saw in the report,

22  we listed the actions that they put in place.

23  And most of those were in reaction to the

24  opioid problems that they were trying to deal

Highly Confidential - Subject to Further Confidentiality Review

1    with.

2         Q.    Do you need to have my question

3    read back, ma'am?

4              MS. FLOWERS:  Object to the

5         form.

6         Q.    (BY MR. ALEXANDER)  Because

7    I -- I didn't ask you about their response to

8    the opioid epidemic; I asked you about their

9    response to presentations and publications

10   you've given.

11             So we said that you've been

12   giving a lot of presentations and you've

13   published various things with your name on it

14   over the last several years that talk about

15   the same issues of your expert report;

16   correct?

17             MS. FLOWERS:  Object to the

18        form.  Argumentative.

19             THE WITNESS:  Yes.

20        Q.    (BY MR. ALEXANDER)  Can you

21   tell us that any official with Cuyahoga or

22   Summit County has responded to you,

23   positively, negatively, any way, about any of

24   those presentations or publications?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. FLOWERS:  Object to the

 2         form, asked and answered.

 3              THE WITNESS:  Yes, I had

 4         conversations a couple of different

 5         times with Kevin Brown.

 6         Q.    (BY MR. ALEXANDER)  And who is

 7    Kevin Brown?

 8         A.    Kevin Brown was the evaluator

 9    of the Summit County regional partnership

10    grant.

11         Q.    And where does he work?

12         A.    Unfortunately he is deceased.

13         Q.    Where did he work?

14         A.    In Summit County.

15         Q.    What was his position there?

16         A.    He was the evaluator for their

17    regional partnership grant.  I'm not entirely

18    sure what his position title was.

19              I knew him as the regional

20    partnership grant evaluator.  And he passed

21    away, I believe, about a year and a half or

22    two years ago.

23         Q.    Somewhere in 2017?

24         A.    I believe that's right.  He
```

Highly Confidential - Subject to Further Confidentiality Review

1    worked in children's services.

2         Q.    Other than the deceased

3    Mr. Brown?

4         A.    Dr. Brown.

5         Q.    I'm sorry, other than the

6    deceased Dr. Brown -- I'm sorry, you just

7    called him Kevin.  You didn't call him

8    doctor, so I wasn't slighting him.

9              Other than the deceased

10   Dr. Brown, is there anybody from Summit or

11   Cuyahoga County that's given you any kind of

12   feedback on any of your presentations or

13   publications in this area?

14        A.    Well, as I said, we've had

15   frequent contact with Summit County because

16   of their participation in the State System

17   Improvement Program.

18              So I -- feedback.  We've talked

19   to them once a month for several years, and

20   different officials would have been on that

21   phone call, either, you know, someone from

22   the court, typically the project officer, the

23   coordinator from the family treatment court;

24   sometimes that would also include someone

Highly Confidential - Subject to Further Confidentiality Review

1    from children's services.  We would give

2    recommendations.  They would give feedback.

3    They were testing out screening tools.  We

4    would be listening for challenges that

5    crossed over between the counties and

6    providing feedback.

7         Q.    So let's take this in small

8    bites, if we can.

9         A.    Mm-hmm.  Sure.

10        Q.    Nobody from Cuyahoga County, as

11   far as you know, has given you feedback on

12   any of your publications or presentations in

13   this area; correct?

14             MS. FLOWERS:  Object to the

15        form, asked and answered.

16             THE WITNESS:  I haven't had

17        conversations directly with Cuyahoga

18        County related to my presentations.

19        Q.    (BY MR. ALEXANDER)  So correct?

20   The answer is correct?

21             MS. FLOWERS:  Objection.

22             THE WITNESS:  I hate --

23             I'm sorry, Jodi.

24        Q.    (BY MR. ALEXANDER)  Because

Highly Confidential - Subject to Further Confidentiality Review

```
 1     it's as far as you know.

 2          A.     I hate to say that because I've

 3     been at many meetings in Ohio, and I meet a

 4     lot of people.  And I hate to forget somebody

 5     that may have been from Cuyahoga that I had a

 6     conversation with that I don't remember who

 7     they were or their positions.

 8               So I cannot say with

 9     100 percent confidence that I have not had

10     conversations with individuals from Cuyahoga

11     County.

12          Q.     (BY MR. ALEXANDER)  Can you

13     name one person?

14          A.     No.

15               MS. FLOWERS:  Objection.

16               THE WITNESS:  It would have --

17               It would have been in a

18          conference setting that I spoke to

19          many different people.

20          Q.     (BY MR. ALEXANDER)  Other than

21     the deceased Dr. Brown, can you name one

22     person from Summit County?

23               MS. FLOWERS:  Object to the

24          form, asked and answered.
```

Highly Confidential - Subject to Further Confidentiality Review

1              THE WITNESS:  I would have to

2         look at records to know the names of

3         the individuals from the counties that

4         are on those phone calls.

5         Q.    (BY MR. ALEXANDER)  Focusing

6    specifically on the various recommendations

7    that you've made under these best practices

8    recommendations which we've seen in your

9    publications and are mimicked in a portion of

10   your expert report in this case, have you had

11   any feedback from Summit County where they

12   say, we like your recommendations, we don't

13   like your recommendations, we plan to do some

14   of these, we're already doing some of these,

15   anything like that?

16        A.    Yes.

17        Q.    From whom?

18        A.    The family treatment court

19   coordinator in Summit County was also very

20   involved in the regional partnership grant.

21   And I am not remembering her name, but we had

22   a lot of conversation about what, when that

23   grant program was coming to an end.  In the

24   last year we spent quite a bit of time

Highly Confidential - Subject to Further Confidentiality Review

1    talking about sustainability and what does

2    sustainability mean and how will the grant be

3    sustained and there was a lot of technical

4    assistance that we did both in webinars to

5    all of the grantees and specifically to

6    specific grantees, and she did indicate in

7    one of these SSIP conversations unrelated to

8    RPG that they were very happy with having

9    those strategies and that they believed they

10   were going to be able to sustain most of the

11   components of the STARS program.

12              So that was in Summit County.

13   Q.     From either this unnamed family

14   treatment court coordinator or the deceased

15   Dr. Brown, can you say that Summit County is

16   currently implementing any of your

17   recommendations in response to you making

18   them?

19              MS. FLOWERS:  Object to the

20         form.

21              THE WITNESS:  Summit County has

22         many things in place.  The universal

23         screening at the front end.  That was

24         part of the SSIP program.  They are

Highly Confidential - Subject to Further Confidentiality Review

1     part of the START initiative that is

2     also run out of our -- out of Children

3     and Family Futures.  The family

4     treatment court has a docket of about

5     30 parents, I believe, several

6     initiatives that they have tried, and

7     there is a list in my report of the

8     various initiatives that they've put

9     in place.

10     Q.     (BY MR. ALEXANDER)  Dr. Young,

11 my question was specific.  Not that they're

12 implementing things, but they're implementing

13 any of your recommendations in response to

14 your making them.

15     A.     Yes.

16     Q.     Those are all recommendations

17 they're following because Dr. Young made them

18 and they read them from you?

19     A.     Well, the trick of technical

20 assistance is to suggest them and have them

21 believe that they are their own.

22     Q.     Ahh.

23     A.     That's what we do.  So if they

24 were to believe that they came up with the

1   idea about wouldn't it be a great idea to put

2   a screening tool up front and they said, gee,

3   let's do that, that would be a true success

4   on our end.

5        Q.    So like a Jedi mind trick, you

6   get them to think it's their idea?

7              MS. FLOWERS:  Objection to the

8        form.

9              THE WITNESS:  I've actually --

10       I believe that's Star Wars.  Jedi?  Is

11       that right?

12       Q.    (BY MR. ALEXANDER)  So let me

13   ask you a specific question.

14             MS. FLOWERS:  We can stipulate

15       to that.

16       Q.    (BY MR. ALEXANDER)  The START

17   program, do you know where that started?

18       A.    Yes, I do.

19       Q.    And what part of the country

20   did START start in?

21       A.    It actually -- Pat Rideout was

22   in Toledo, I believe, and then she went to

23   work in Cuyahoga.  And it migrated to

24   Cuyahoga, and started in Cuyahoga with

1    funding from the Annie E. Casey Foundation.

2         Q.     Uh-huh.  And do you know when

3    that actually migrated all the way from

4    Cuyahoga County to Summit County?

5              MS. FLOWERS:  Object to the

6         form.

7              THE WITNESS:  START in Summit

8         County was in the second cohort, which

9         would have been, I believe, about --

10        you know, you recognize there's a

11        difference when we're talking about

12        STARS and START, in Summit; right?

13        Q.     (BY MR. ALEXANDER)  I asked a

14   specific question using the specific words

15   that I meant to use.  Thanks.

16        A.     Good.  So START, I believe, is

17   about a year and a half ago in Summit County.

18   STARS was in Summit starting in 2012.

19        Q.     Okay.  So like if the people

20   who actually have worked in Summit County who

21   have been deposed in this litigation give

22   different dates for when they started

23   initiating START and that it had nothing to

24   do with you, are they right or are they

1    wrong?

2              MR. PENDELL:  Objection to

3         form.

4              MS. FLOWERS:  Objection to

5         form.

6              MR. PENDELL:  Misstates the

7         record.

8              THE WITNESS:  Well, I can tell

9         you what I know.  Now Governor DeWine

10        started a new START initiative about

11        three years ago through PCSAO, is the

12        contracting agency.  And it began in

13        the counties below I-70.  And it could

14        very well be that Summit began with

15        hiring family advocates and began some

16        of the START initiatives before the

17        second wave or the second cohort of

18        START.  I could be wrong on that.

19        Q.    (BY MR. ALEXANDER)  Do you

20   know --

21        A.    I --

22        Q.    I'm sorry.  Were you done?

23        A.    Pretty much.

24        Q.    Have you looked at any

Highly Confidential - Subject to Further Confidentiality Review

1    documents relating to any of the involvement

2    of PCSAO with any data initiatives across the

3    state?

4          A.    Yes.  I'm aware of some of the

5    PCSAO documents related to the data, yes.

6          Q.    So they did like a SACWIS data

7    blitz several years ago, right?

8          A.    Yes, they did.

9          Q.    And the idea of that was

10   increasing the amount of drug-specific

11   information in SACWIS?

12               MS. FLOWERS:  Object to the

13         form, lack of foundation.

14               THE WITNESS:  That wasn't my

15         understanding of the purpose.

16         Q.    (BY MR. ALEXANDER)  If one of

17   the purposes of the data blitz was to

18   increase the amount of drug and drug of abuse

19   information in SACWIS, what would that tell

20   you about making comparisons on trends before

21   and after the database -- the data blitz?

22               MS. FLOWERS:  Object to the

23         form.

24               THE WITNESS:  Again, that's not

Highly Confidential - Subject to Further Confidentiality Review

1      my understanding of the purpose of

2      their asking the counties to submit

3      data on the parents' substance use and

4      their caseload.  That's my

5      understanding of what they asked for.

6      That wasn't what you've characterized

7      that as.

8      Q.    (BY MR. ALEXANDER)  And what's

9  that understanding based on?  Because it's

10 obviously not based on deposition testimony

11 or previous documents in the litigation.

12 What's it based on?

13           MR. PENDELL:  Object to the

14      form.  Lack of foundation.  Misstates

15      the testimony.

16           THE WITNESS:  General knowledge

17      of being in Ohio and understanding

18      some of the policy issues in Ohio.

19 Q.    (BY MR. ALEXANDER)  If the data

20 blitz had the effect of increasing the number

21 of files that had a specified substance of

22 abuse in an individual case and how often it

23 was that a substance use disorder was

24 identified as a cause of the need for

Highly Confidential - Subject to Further Confidentiality Review

1    children and family services being involved,

2    what sort of effect would that have had on

3    making comparisons to the data that existed

4    before the blitz?

5           A.     That is such a long question, I

6    can't understand what you're asking.

7                  What's the specific question

8    you're asking?

9           Q.     If the information changed with

10   the data blitz, where there was a lot more

11   information in there about the drug of abuse

12   and how often it was that there was substance

13   abuse involved in a case that related to

14   children and family services, would that make

15   it difficult to make comparisons over time?

16                 MS. FLOWERS:  Object to the

17          form.  Vague.

18                 THE WITNESS:  Yeah, I still am

19          not able to follow your question about

20          what you're trying to ask.

21          Q.     (BY MR. ALEXANDER)  Why don't

22   we take a break, then.  I think we've been

23   going over an hour anyway.  It's probably

24   time when brains get fried.

1

2          THE VIDEOGRAPHER:  We are now

3     going off the record and the time is

4     2:51 p.m.

5          (Recess taken, 2:51 p.m. to

6     3:17 p.m.)

7

8          THE VIDEOGRAPHER:  We are now

9     going back on the record and the time

10    is 3:17 p.m.

11    Q.    (BY MR. ALEXANDER)  Dr. Young,

12 is there any of your testimony thus far you

13 need to change or supplement in any way?

14    A.    I would just like to clarify.

15 You asked what I was going to be testifying

16 about, and in -- I believe you asked me to do

17 it in one sentence.  And I would like to

18 supplement that to be sure you understand

19 that my testimony will include my opinion on

20 necessary and appropriate remedies in

21 response to the opioid epidemic for child

22 welfare.

23    Q.    And all of those specific

24 opinions on necessary and appropriate

Highly Confidential - Subject to Further Confidentiality Review

1    remedies are set forth in your report;

2    correct?

3         A.    Yes, that's correct.

4         Q.    So if you go to your expert

5    report.  I know you brought your copy but

6    obviously we've marked the original version

7    as Exhibit 1, and the reformatted version of

8    Exhibit 2.  At the bottom of page one, it

9    says -- after this description of Nancy K.

10   Young's background.  Do you see that?

11        A.    Yes.

12        Q.    It says, Dr. Young was asked to

13   give her opinions regarding the impact of the

14   opioid crisis on child welfare systems and

15   related agencies including recovery courts,

16   and to offer her opinions on necessary and

17   appropriate remedies in response to the

18   opioid epidemic.  Do you see that one

19   sentence?

20        A.    Yes, I do.

21        Q.    And you see that the first part

22   of that is essentially what you gave when I

23   asked for one sentence, and the second part

24   of that is what you've now added, again,

Highly Confidential - Subject to Further Confidentiality Review

1    as --

2         A.    Yes.

3         Q.    -- the second part of that same

4    sentence?

5         A.    Yes.

6         Q.    Is that an accurate one

7    sentence summary of what you're here to do?

8         A.    Yes, that's correct.

9         Q.    The next part says, The

10   non-profit organization that she is executive

11   director of, Children and Family Futures, is

12   being compensated at $300 per hour for her

13   testimony in the case.

14            Is that the rate for your staff

15   as well as you?

16        A.    No, that's not.  My staff have

17   different rates.

18        Q.    And what's the rate for the

19   three staff members you identified as working

20   on this?

21        A.    I don't know that off the top

22   of my head.  They're all less than me.

23        Q.    Have you billed for all 115 or

24   so hours through the time of the report?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes, I have.

2    Q.    And the additional time since

3  the report, have you billed for that yet?

4    A.    I actually don't do that

5  invoicing, and we invoice once a month.  So

6  I'm not sure if that second invoice has gone

7  out yet or not.

8    Q.    And so the total amount, at

9  least from the first part of it, was around

10  $35,000?

11    A.    In that range, yes, I believe

12  that's right.

13    Q.    And how are you compensated as

14  executive director?  Does the money that you

15  bring in through a consulting project for

16  litigation like this affect your compensation

17  in any way?

18    A.    No, it doesn't.  I'm paid a

19  salary.

20    Q.    And that doesn't change when

21  you do something like this?

22    A.    No, it does not.

23    Q.    If you go to the bottom of --

24  well, let's actually just walk through this

Highly Confidential - Subject to Further Confidentiality Review

```
 1      in general terms so we can orient.

 2                  At the top of page 2, it lists

 3      three data sources that were considered in

 4      connection with the work on the report;

 5      correct?

 6          A.      Yes, that's right.

 7          Q.      And we've actually already

 8      identified these three data sources so far,

 9      although not necessarily the specific

10      analyses that were done for them; correct?

11          A.      That's right.

12          Q.      These are all obtained through

13      the NDACAN that's kept at Cornell University;

14      correct?

15          A.      Yes, that's right.

16          Q.      Any other data sources

17      consulted other than the specific START data

18      maintained for Kentucky by Dr. Hall that you

19      asked him to look at for you?

20          A.      Just Dr. Hall's data, plus

21      these, as I recall.

22          Q.      Okay.  At the bottom of --

23      actually, let's do this.

24                  When was the last time that you
```

1    actually worked for any county or city's

2    child services department, whatever the name

3    of it would have been?

4        A.    I've had a contract with

5    Sacramento County continuously since about

6    1996.

7        Q.    But as an employee, when was

8    the last time you actually worked as like a

9    caseworker or a supervisor or somebody who

10   actually would be directly involved in

11   interacting with a consumer of children or

12   family services?

13       A.    I have not worked as a

14   caseworker in children's services.

15       Q.    Ever?

16       A.    No.  I have been a consumer of

17   children's services.

18       Q.    And is that the right term that

19   you would use, consumer?

20       A.    Yes.

21       Q.    And have you ever been a

22   consumer of children's services in Cuyahoga

23   or Summit County?

24       A.    No, in Orange County,

Highly Confidential - Subject to Further Confidentiality Review

1    California.

2         Q.    Do you intend to offer any

3    opinions based upon your personal experience

4    as a consumer of children's services?  And

5    I'll just tell you, this is an area where we

6    would tread lightly.  I mean, I'm not trying

7    to find out about you or your children or

8    your personal circumstances unless you intend

9    to talk about it at trial.

10         A.    If you'd like to know about it

11    I can tell you about it, but it is part of my

12    experience and it would be very hard to, just

13    as any part of life, when you have a part of

14    your experience, it's pretty hard to separate

15    your life into compartments that don't have

16    something to do with all of your experience,

17    so...

18         Q.    Do you intend to testify at

19    trial where you will reveal these sorts of

20    personal experiences from your own

21    involvement as a consumer of children's

22    services in Orange County, California?

23         A.    Not unless I'm asked about it.

24         Q.    If asked by the plaintiffs,

Highly Confidential - Subject to Further Confidentiality Review

```
1      will you talk about that?

2            A.     If I'm asked about it, I will

3      be honest.  Yes.

4                  MR. ALEXANDER:  Plaintiffs'

5            counsel, do you intend to ask her?

6            Because I'm not trying to get into her

7            personal life, but if it's going to be

8            injected in trial, just as with most

9            of these fact witnesses, you know, we

10           need to get our discovery, but I'm not

11           trying to impose some personal burden

12           on her if it's not going to come up.

13                 MS. FLOWERS:  We did not intend

14           to ask her about her personal

15           experiences at trial.

16                 MR. PENDELL:  And think as you

17           know, counsel, an expert's testimony

18           is limited to what they say in their

19           report or what they say at a

20           deposition.  So I don't think this is

21           actually an issue.

22                 MR. ALEXANDER:  Based upon the

23           representation of Ms. Flowers, I will

24           move on.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    (BY MR. ALEXANDER)  Going back

2    to where we were.  In terms of your work in

3    your career, have you ever directly

4    interacted with a consumer of children's

5    services in a professional capacity?

6    A.    With a consumer of child

7    welfare services in my professional capacity?

8    Q.    Right.  I don't mean like that

9    you were there when your neighbor also

10   consumed children's services or your cousin

11   or anything like that.  We've already

12   established that you've never been a

13   caseworker or a supervisor who was an

14   employee of a county.

15   A.    Mm-hmm.

16   Q.    Or other provider of children

17   family services.  So the question is, have

18   you ever, in some capacity, physically been

19   present and interacted with the consumer, the

20   family, the mother or the child, any of those

21   real-world people?

22   A.    Yes.  Actually, about two weeks

23   ago I was at a site visit to Coshocton County

24   and had the opportunity to speak with a

Highly Confidential - Subject to Further Confidentiality Review

1   graduate of the Coshocton family treatment

2   court and spent about 45 minutes with her as

3   she had the opportunity to tell me about her

4   experience and her husband's experience with

5   their addiction that started with

6   prescription opioids and moved on to heroin.

7   And she was a participant in the family

8   treatment court.  And luckily she is in

9   recovery.  She has all four of her children

10  with her.  She has moved on.  That she is

11  beginning to start a recovery support group

12  with other parents that are graduates of the

13  family treatment court.  Unfortunately her

14  husband, ex-husband now, has not done well.

15  He's struggling on methadone, living in his

16  parents' basement, not doing well.  And she

17  had been doing very well going to community

18  college.  But just after the first of the

19  year her sister overdosed and did not die but

20  has not recovered fully.  And that really

21  threw her for a loop, so she's dropped out of

22  community college and just trying to keep her

23  life together now as she cares for her four

24  children.

1          So that was my most recent

2     conversation with a consumer in the child

3     welfare system.

4          Q.     (BY MR. ALEXANDER)  Were you

5     referencing Coshocton County, Ohio?

6          A.     I was in Coshocton County, Ohio

7     two weeks ago, yes.

8          Q.     Okay.  Do you intend to testify

9     at trial about this anecdotal experience with

10    this one particular couple with addiction

11    issues in another part of Ohio?

12         A.     You asked me if I had any

13    interaction with consumers in the child

14    welfare system, so I gave you that example.

15         I have many such examples of

16    having conversations with parents in those

17    kinds of anecdotal examples, in observing

18    family treatment courts, in doing focus

19    groups with consumers and social workers over

20    the years.  I've had lots of conversations

21    with social workers, parents, foster parents,

22    adoptive parents, lots of different

23    consumers, yes.

24         Q.     My question was whether you

1    intend to testify at trial about this one

2    particular couple and their particular

3    experiences with addiction in another part of

4    Ohio.

5              MS. FLOWERS:  Object to the

6         form.

7              THE WITNESS:  If I'm asked

8         about it, I will be honest.

9         Q.    (BY MR. ALEXANDER)  Do you rely

10   on that experience for any particular opinion

11   you intend to offer?

12        A.    That particular experience is

13   not unusual from other experiences.  It

14   becomes part, again, of my body of knowledge.

15   So it's difficult to separate out that body

16   of knowledge from other similar experiences

17   and conversations that I have with, again,

18   parents, foster parents, adoptive parents,

19   consumers.

20        Q.    Most of what you have done in

21   your career is work on studies and try to use

22   systematic analysis of data to come up with

23   best practices recommendations; right?

24        A.    Yes.  That is what policy

1    research is.  And that is what I do, yes.

2           Q.    Okay.  So as a researcher who

3    tries to follow the scientific method, do you

4    intend to testify at trial in reliance on

5    specific instances of interaction with people

6    who have varying experiences with addiction

7    related to various substances?

8                 MS. FLOWERS:  Object to the

9           form.

10                THE WITNESS:  Well, whenever

11          you're looking at the data, it's

12          always great when you have interviews

13          and the qualitative information to go

14          along with those -- with those data.

15          So do I rely on them?  Of course.

16          Just as the ASPE study told us that

17          overdose deaths are related to the

18          increase of child welfare cases and

19          they interviewed caseworkers and

20          stakeholders to get qualitative data

21          also.  That's very appropriate kind of

22          methods to use.  So we would rely on

23          both of those, yes.

24          Q.    (BY MR. ALEXANDER)  So examples

Highly Confidential - Subject to Further Confidentiality Review

1    like this, this couple in Coshocton County,

2    what opinions do you intend to offer at trial

3    based on specific experience like this?

4          A.    What I intend to offer at trial

5    is what is in my report.  That particular

6    situation is already embedded in the

7    information about what kinds of remedies.

8                She was a successful family

9    treatment court graduate.  She's going on to

10   school.  She is -- was looking at ideas, and

11   I connected her with our staff member who has

12   helped other graduates start recovery alumni

13   groups.

14               So that isn't unusual.

15         Q.    Can you disclose her name?

16         A.    No.

17         Q.    What about her spouse's or her

18   ex-husband's name?

19         A.    No, I would not do that.

20         Q.    Can you disclose any personal

21   information about them in terms of what their

22   particular medical history was, history of

23   addiction treatment, what they were addicted

24   to, how that started, any personal

Highly Confidential - Subject to Further Confidentiality Review

1    information like that?

2         A.    I can tell you that she told me

3    her husband originally got OxyContin as a

4    result of a work injury, that he had a severe

5    cut to his leg.  Almost lost his leg.

6    Shortly after that is when she became

7    pregnant with her first son.  She had a

8    C-section and came home with a large supply

9    of opioid pills.  I didn't ask her what kind.

10              I did not probe.

11              Because of -- I had already

12   turned in my report, and it was a little odd

13   for me because I was there under a different

14   purpose completely, and I was not expecting

15   to get this woman telling me a story in an,

16   as you say, an anecdote of something that I

17   had just turned a report in in the aggregate

18   about this kind of a situation.  I wasn't

19   even expecting to sit down with this young

20   woman.  She's 31.  She has four children.

21              It ended up that she was asked

22   to come in and talk to these project officers

23   and federal people that were there to visit

24   this -- the family treatment court, and

Highly Confidential - Subject to Further Confidentiality Review

```
 1    everyone else wanted to sit through the
 2    docket, and I've sat through many dockets,
 3    and I felt like when she was there, I needed
 4    to -- everyone else wanted to stay so I said
 5    I'll go talk to her.  It wasn't set up.  It
 6    wasn't planned.
 7                    I went into a separate room and
 8    I said, what happened to you?  And she
 9    said -- she started to tell me the story
10    about her husband having this work accident.
11    And he came home with OxyContin.  And I was
12    surprised because this is what I'd been
13    working on.  And here was this young woman
14    who her life was nearly destroyed and her
15    husband's life was destroyed, and I -- here
16    it was in life.  And I wasn't expecting that.
17    So I didn't probe; I didn't ask her
18    questions.  And then, when she said she was
19    trying to -- well, actually, the drug court
20    coordinator had told me that they were so
21    proud of her and she wanted to -- brought to
22    develop this alumni group, that would I spend
23    time with her.  So then I told her that I
24    would -- I gave her my card, and I told her
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    that I would make sure that she got the

2    resources that we have about starting alumni

3    groups.  And that I would make sure that she

4    got those.

5             So I was happy to be able to do

6    that.

7       Q.    Do you remember what my

8    question was before you started that answer?

9       A.    No.  Did I offer -- no, I

10   don't, but that was just so amazing to me to

11   be in a small town in Ohio, and have that

12   happen and to have that experience.  And it

13   does enrich my career, it enriches -- makes

14   this live, it makes it real people.

15      Q.    The question was whether you

16   can reveal any personal information that

17   would allow us to identify this family or

18   look at the truth of any of what you

19   apparently were told.

20             You're not willing to do that;

21   correct?

22             MR. PENDELL:  Objection to

23        form.

24             THE WITNESS:  I would be -- I
```

Highly Confidential - Subject to Further Confidentiality Review

1          would be comfortable with asking the

2          drug court coordinator about that.

3          But he wouldn't even know I was doing

4          this.  So that makes me uncomfortable.

5          So do -- you understand why that would

6          be like an overstepping of that

7          boundary that she revealed those

8          things to me?

9               And I can understand your view

10          of how do you even know I'm not making

11          that up.  And that's my experience.

12          That's what happened to me.  That's

13          the last time I spoke to a consumer of

14          child welfare, and it was two weeks

15          ago in Coshocton County.

16          Q.    (BY MR. ALEXANDER)  Did you

17     take notes or are there otherwise records

18     available relating to this encounter with

19     this particular woman in Coshocton County?

20          A.    No.  The person who would know

21     about that is the court coordinator in

22     Coshocton County.  Because he's the one who

23     had asked her to come in and meet with the

24     federal officials that had come in.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.     Okay.  So I'm not sure we got

2    an answer to my question.

3              Are you personally willing to

4    take steps that would allow it to determine

5    whether this woman, or the government

6    employees working with her, would reveal her

7    identity so that anybody could do any kind of

8    checking of like, did she or her husband

9    actually ever get legal prescriptions for the

10   medications they said or any of the other

11   facts relating to them that might be

12   available through public records searches or

13   database searches or that sort of thing?  Are

14   you or are you not?

15             MR. PENDELL:  Objection to

16        form.

17             MS. FLOWERS:  Objection to

18        form.

19             THE WITNESS:  I think I would

20        rely on Jodi's advice on that before I

21        would answer that on the

22        appropriateness of that.

23        Q.     (BY MR. ALEXANDER)  Are there

24   other specific anecdotes that you might

Highly Confidential - Subject to Further Confidentiality Review

1    testify about at trial relating to your

2    interaction with specific patients or

3    consumers of social services who have some

4    current or past history of substance abuse?

5          A.    Not that I can think of right

6    now.

7          Q.    Okay.

8                MR. ALEXANDER:  Counsel,

9          Ms. Flowers, do you intend to elicit

10         from this witness any testimony at

11         trial that would reveal the individual

12         facts or circumstances of this woman

13         in Coshocton County or any other case

14         that she might talk about as an

15         example?

16               MS. FLOWERS:  That was pretty

17         broad.

18               MR. ALEXANDER:  Yeah, but...

19               And obviously you do know the

20         order.

21               MS. FLOWERS:  Can we talk about

22         it on a break?

23               MR. ALEXANDER:  We can, but

24         here's the issue.  And I will say that

Highly Confidential - Subject to Further Confidentiality Review

1    we went through this in a number of

2    depositions where people will say I

3    have a cousin who had this problem or

4    a neighbor or this or that.  And

5    obviously we only ask questions if

6    it's going to be revealed or it's a

7    basis directly or indirectly.  And

8    there is an order about non-public

9    information as a basis of opinions,

10   and there was a requirement to

11   disclose that.  Obviously she has said

12   that this happened since the report,

13   which hasn't been supplemented or

14   amended in any ways, and the list of

15   materials considered has likewise not

16   been supplemented or amended.  We've

17   gotten no additional data beyond what

18   we've requested based upon what was in

19   the report.

20        So given all of that, either

21   you're going to or you're not try to

22   have her inject individual people's

23   cases.  But if you are, obviously our

24   position would be we're entitled to

Highly Confidential - Subject to Further Confidentiality Review

```
1        discovery, the same way would be if

2        some fact witness under your control

3        says, I want to talk about personal

4        experience but I won't allow discovery

5        underlying the facts.  So I think it's

6        really for you and we can talk about

7        it off the record during a break,

8        whatever.

9             But I think that this is

10       frankly not the first time this sort

11       of thing has come up, and when we've

12       done it before, we have had

13       plaintiffs' counsel in the various

14       child and family services depositions

15       we've had take a position that

16       basically they wouldn't inject

17       anecdotes like that because it would

18       lead to a specific discovery.  But you

19       can think about it and talk about it

20       with co-counsel.  I don't really care

21       when exactly we deal with it as long

22       as we deal with it before we're done

23       today.

24            MS. FLOWERS:  I'm fine with
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        that.  I would just like to think

 2        about it, because the way that you

 3        stated it was so broad with respect to

 4        her experience.  But I hear you on the

 5        specific example.  We're learning

 6        about it the same time you are.

 7              MR. ALEXANDER:  I got it.  And

 8        I'm not critical of you for not

 9        revealing it, and I'm just trying to

10        obviously avoid issues.

11              And just so it's clear, I'm not

12        just talking about the Coshocton

13        County couple.

14              MS. FLOWERS:  Right.  That's

15        why I think --

16              MR. ALEXANDER:  If she's going

17        to say, listen, I know this person and

18        that person and I saw a person ten

19        years ago who had a crack addiction

20        and 20 years ago who had a meth

21        addiction or whatever and I'm going to

22        talk about them at trial, and compare

23        and contrast them to somebody I met in

24        Kentucky with a heroin addiction, we
```

Highly Confidential - Subject to Further Confidentiality Review

1    obviously can't have there be

2    specifics like that without the

3    possibility of some discovery.  It's

4    quite different than saying I'm

5    relying on published literature or

6    data that we'd have Access to, so...

7         I didn't want to think that I

8    was only talking about this particular

9    couple.

10   Q.    (BY MR. ALEXANDER)  All right.

11   Let's go back to the questioning, with all of

12   that done.

13        The only specific example that

14   you think you might talk about at trial,

15   depending on what Ms. Flowers and her

16   colleagues decide, is the one that you've

17   talked about of interaction over the last

18   couple of weeks; correct?

19   A.    Yes, I think that's right.

20   Q.    And going back to what you said

21   before about your involvement with individual

22   cases, have you ever had direct personal

23   involvement with any child, family services

24   case in Cuyahoga or Summit County?

```
 1            A.      No, I don't believe so.

 2            Q.      The focus groups that you've

 3   been part of, where you have heard

 4   experiences from consumers of children and

 5   family services, have any of those been in

 6   Cuyahoga or Summit County?

 7            A.      No.  We haven't done focus

 8   groups in those two counties.

 9            Q.      The research that you have

10   done, has any of that involved you personally

11   interviewing consumers of children and family

12   services?

13            A.      Yes, we have done consumer that

14   I have done the focus group, yes.

15            Q.      Has any of that related to

16   Cuyahoga or Summit County?

17            A.      No, not specifically.

18            Q.      Has any of that related to the

19   issues of opioid use or substance use

20   disorder?

21            A.      I am trying to remember the

22   fathers focus group.  It certainly wasn't

23   specific to opioids, so I would say my answer

24   is no.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.      Why don't you look at the

2    second full paragraph on page 3 of your

3    report, Dr. Young.

4              It says, in these project

5    director roles, I have had the experience on

6    several occasions to convene expert

7    multidisciplinary working groups to forge

8    consensus on best practices on emerging

9    practice and policy challenges in the field.

10             Examples of these consultative

11   and professional consensus efforts include,

12   one, a collaborative approach to the

13   treatment of pregnant women with opioid use

14   disorder, SAMHSA 2016.

15             We've actually referenced that

16   report, haven't we?

17         A.      Yes, that's right.

18         Q.      And it continues: Guidance to

19   states, recommendations for developing family

20   drug court guidance, Children and Family

21   Futures 2013.

22         A.      Yes.

23         Q.      And three, screening and

24   assessment for family engagement retention

Highly Confidential - Subject to Further Confidentiality Review

1    and recovery.  Young, et al, 2006.

2             The instances where you

3    participated in these sorts of working groups

4    that resulted in some sort of professional

5    consensus emerging, are there any of these

6    that are not publicly available because

7    they've been published under your name or

8    otherwise available through like your

9    entity's websites or the professional -- I'm

10   sorry, or governmental entities that

11   reference you by name?

12        A.    No.  These are available on

13   government websites.

14        Q.    Okay.

15             So, in other words, whatever

16   consensus efforts you've been involved in,

17   they're all essentially public now.  You're

18   not relying on any kind of private consensus

19   efforts that you think exist; correct?

20        A.    That's correct.

21        Q.    And the one that's really most

22   relevant to the issues here is this first one

23   about treatment of pregnant women with opioid

24   use disorders; correct?

1      A.      Yes, that's correct.

2      Q.      And then, at the bottom of

3   page 3 under summary of opinions, it gives

4   three opinions.  And those continue to be the

5   three opinions that you intend to offer at

6   trial; correct?

7      A.      Yes, that's correct.

8      Q.      And in terms of the third one,

9   this is the one I think we've grouped

10  generally as your recommendations.  Is there

11  anywhere where these recommendations are

12  summarized besides the report and essentially

13  the SAMHSA report to the extent that it

14  overlaps with those?

15     A.      Not that they're summarized.

16  They're in various reports and publications,

17  for example, the family treatment court

18  guidance, the screening and assessment

19  guidance, other monographs.  They're all

20  publicly available.

21     Q.      Did you consider for your

22  opinions in this case any data about the

23  incidence of fetal alcohol syndrome in

24  Cuyahoga or Summit County?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      The incidence of FASD in those

2    two counties, I did not look at specifically.

3    I am knowledgeable about the rates of FASD

4    and FAS in the nation, and often there are

5    not county-level data available on those two

6    indicators.

7          Q.      Let's turn to page 6 for a

8    second, please.  We may go backwards, but I

9    want to just kind of orient us on some of the

10   things that you've been talking about here.

11                 Graphic two, number of children

12   in out-of-home care at end of fiscal year in

13   2000 -- in the United states, 2000 to 2017.

14                 Correct?

15         A.      Yes.

16         Q.      And out-of-home care basically

17   means foster care or some sort of placement

18   other than with, what, a parent?

19         A.      Yes.  It means that the court

20   has placed the child in an alternative

21   placement, not with the parents.  So group

22   home, foster home, kinship placement under

23   court order.

24         Q.      So the decrease in absolute

Highly Confidential - Subject to Further Confidentiality Review

1    numbers in the United States from 2000 to

2    2012, while the population in the

3    United States was increasing, that was a good

4    thing, right?

5                    MS. FLOWERS:  Object to the

6           form.

7                    THE WITNESS:  Yes.

8           Q.    (BY MR. ALEXANDER)  Is there

9    some number that you think is an ideal number

10   or a percentage of the population of what you

11   think kind of the right or ideal number of

12   out-of-home placements would be?

13                    MS. FLOWERS:  Object to the

14          form.

15                    THE WITNESS:  Zero.

16          Q.    (BY MR. ALEXANDER)  So the

17   lower you can drive it, the better; right?

18          A.    The lower you can drive it, the

19   better would mean that fewer children had

20   been abused or neglected and needed to be

21   placed in protective custody.

22          Q.    And --

23          A.    That is correct.

24          Q.    And this may be longer than it

1    would take up for all of the remaining time,

2    but could you come up with a complete list of

3    the known factors or causative reasons for

4    child abuse or maltreatment that leads to

5    out-of-home care placement in the various

6    ways that you've described?

7                    MS. FLOWERS:  Object to the

8           form.

9                    THE WITNESS:  Do you mean off

10          the top of my head now?

11          Q.    (BY MR. ALEXANDER)  Yeah.

12   Like, I mean, it's a really long list, isn't

13   it?  There's substance abuse, single parent

14   home, poverty, mental illness among parents.

15   There's a really, really big list of all of

16   the known reasons that drive this sort of

17   child maltreatment and the investigations for

18   child maltreatment that lead to out of

19   care -- out-of-home placement; correct?

20          A.    Well, actually kids are not

21   removed for those reasons.  I know sometimes

22   in the data system it says reasons for

23   removal, but the state statutes are pretty

24   clear that reasons for removal are various

Highly Confidential - Subject to Further Confidentiality Review

1    categories of abuse or neglect.  So abuse can

2    be physical abuse, emotional abuse, sexual

3    abuse.  Neglect can be emotional neglect,

4    failure to provide, different forms of

5    medical neglect.  Neglect has some categories

6    of how the child was neglected.  You didn't

7    feed; you can't provide a safe environment.

8    Those are different ways that children are

9    neglected.

10                    These other things that you're

11   mentioning are things that contribute to the

12   abuse or the neglect.  So a parent's

13   substance use is contributing to the neglect.

14   The children are not removed for substance

15   abuse alone.  They're removed for categories

16   of neglect or categories of abuse.

17         Q.     What does dependency mean as a

18   reason for removal?

19         A.     Dependency?  I don't know what

20   context you're using that in.

21         Q.     The way the term appears in

22   SACWIS and the databases that draw data from

23   SACWIS.

24                    MS. FLOWERS:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2                    THE WITNESS:  That means that

3          the child has been made -- my

4          understanding.  Now, you also have to

5          recognize that every state system has

6          its own state system.  So if you know

7          SACWIS in one state, you know SACWIS

8          in one state.

9                    So there are categories of

10         variables that are reported to the

11         federal government, and every state

12         has their own state system.

13                   So there are not -- there's not

14         one SACWIS.  So, for example, we're

15         sitting in California.  California

16         doesn't have a federally approved

17         SACWIS system, although they operate a

18         data system.  So you -- if you know

19         dependency and what that means in

20         Ohio, you don't necessarily know what

21         that category or what that variable

22         means in California.

23                   So I may be guessing on what

24         that actually means in that -- that

Highly Confidential - Subject to Further Confidentiality Review

1        category in Ohio.

2                  MR. ALEXANDER:  Okay.

3        Q.    (BY MR. ALEXANDER)  I would

4    make an assumption that dependency means that

5    that child has been through the court process

6    and been named as a dependent of the court.

7    But I'm not sure.

8        Q.    (BY MR. ALEXANDER)  Did you do

9    any investigation, "yes" or "no," on how

10   SACWIS uses any of the terms that are

11   contained in SACWIS for Ohio?

12                  MS. FLOWERS:  Object to the

13            form.

14                  THE WITNESS:  I looked at the

15            categories of the way that parent

16            substance use is recorded but not with

17            any depth because I understand how

18            seriously undercounted parent

19            substance use is in the AFCARS data

20            and in the SACWIS data, and I

21            understand the reasons why it's

22            undercounted.

23        Q.    (BY MR. ALEXANDER)  So my

24   question was specific to SACWIS for Ohio.

1    Did you do any investigations for this case

2    on how any terms are used in SACWIS?

3              MS. FLOWERS:  Object to the

4         form.  Asked and answered.

5              THE WITNESS:  Between January

6         and March, I did not ask for any

7         specific data runs of SACWIS in Ohio.

8         I already knew information from SACWIS

9         in Ohio from work that I had

10        previously done related to the SSIP

11        project.

12        Q.    (BY MR. ALEXANDER)  So let's go

13   back to graphic two.

14              So given that there are all of

15   these factors, all these broad societal

16   factors that drive physical abuse of

17   children, sexual abuse of children, neglect

18   of children, all the things that frankly we

19   all wish there was less of, do you know why

20   it was for these 12 years, despite the

21   population of the U.S. growing, that we had

22   this good trend on children in out-of-home

23   care?

24              MS. FLOWERS:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

```
 1          form.
 2                  THE WITNESS:  Most child
 3          welfare practitioners, stakeholders,
 4          policymakers, attribute that decrease
 5          in kids in care to primarily the
 6          Adoption and Safe Families Act that
 7          was passed in 1997, which did several
 8          things:  It put a great emphasis on
 9          reducing the number of kids in care.
10          It provided incentives to states to
11          get kids adopted and to find adoptive
12          homes.  So this static number of kids
13          in care is made up of two primary
14          factors, the number of children that
15          come into care and the number of kids
16          that are staying.
17                  So there were efforts that were
18          made on both ends of the system, if
19          you will.  Don't take as many kids
20          into the system and get the kids that
21          are in the system out into permanency.
22                  So the Adoption and Safe
23          Families Act put restrictions on the
24          number of months that a child could
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              stay in out-of-home care.  They had to

 2              have a permanent plan in their

 3              permanent record in the court record

 4              within 12 months.  If there -- if the

 5              child was in out-of-home care for

 6              15 months out of 22, there had to be a

 7              motion by the State or by the County

 8              to move to terminate parental rights

 9              unless it was not in the best interest

10              of the child.  So there was a lot of

11              effort on permanency for the child.

12                   So that moved a lot of kids

13              that had been in the system for a long

14              time into permanent placement,

15              adoption, guardianship, other forms of

16              being in permanent placements, not in

17              foster care.  There were also a lot of

18              alternatives put into practice, so

19              alternative placements meaning put

20              kids into kinship placements, or you

21              may have heard of alternative

22              response, so that the initial response

23              was not placement but let's see if we

24              can put services in place in the
```

Highly Confidential - Subject to Further Confidentiality Review

1    community to keep the child at in-home

2    services, so that the child wasn't

3    removed.

4         So during that time period,

5    there were a lot of things that were

6    going on in the child welfare system.

7    And you may note that during that time

8    period, there was also the

9    methamphetamine epidemic.

10        So child welfare, by and large,

11   was doing pretty well until 2012,

12   2013, and, as I said, most everyone

13   that I know, that has commented on

14   what's the rise, attributes the rise

15   to the prescription drug and then

16   ongoing opioid crisis epidemic in our

17   country.

18   Q.    (BY MR. ALEXANDER)  Are you

19   done with your answer?

20   A.    I am.

21   Q.    So there were legislative

22   reasons that led to the drop that was seen

23   for 12 years as depicted on the data here;

24   correct?

1          A.      Legislative and programmatic

2     reasons.

3          Q.      And then if I go to pages --

4     flip forward for a second to pages 18 and 19.

5     I don't know if your reformatting changed any

6     of this.  They're essentially similar --

7     there's a similar chart for Cuyahoga and

8     Summit County that does the same sort of

9     thing, children in out-of-home care in

10    Cuyahoga and Summit.  This just has 2004

11    through 2017, and there's a -- blue is

12    Cuyahoga and orange is Summit, according to

13    this graph.  Do you see that?

14         A.      Yes, I do.

15         Q.      And so if we look at this for

16    Cuyahoga, other than -- well, let's just

17    break it up.

18              Summit has continuously --

19    well, continuously dropped from 2004 through

20    2011, and from 2011 through 2017 has had a

21    very slight gain but essentially remains

22    stable.  A little bit up and down.  Do you

23    see that?

24         A.      Well, I count that as going up.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Well, it dropped between '16

2   and '17; right?

3      A.      Well, in my report, I actually

4   believe that that's a data correction,

5   because if you look at the numbers between

6   2015, 588, and then all the way up to 675 in

7   2016, and then down to 648, I believe you

8   need to average that '16 and '17.  It

9   probably was a timing of data entry that

10  there could be such variation between those

11  two years.

12              So it's probably a continuing

13  upward trend.

14      Q.      Okay.  But it was dropping for

15  the first seven years of this chart.  Do you

16  agree with that?

17      A.      Similar to the overall -- yes,

18  in almost the same pattern as the overall

19  federal trend of going down until 20 -- until

20  2012.

21      Q.      And if you look at Cuyahoga, it

22  dropped for the first five years, then went

23  up for two years, then down for two years,

24  and has had a slight increase over the last

1    four years of this chart; is that the

2    description --

3            A.      Yes.

4            Q.      Is that an accurate

5    description?

6            A.      Mm-hmm.  (Witness nods.)

7            Q.      During the time period for like

8    Summit and Cuyahoga where overall there's a

9    significant drop in children in out-of-home

10   placement at the end of the year, at the same

11   time period through 2012, this is the time

12   period during which, as you understand it,

13   there was a rise in total prescriptions being

14   written and dispensed in these counties for

15   opioids; correct?

16           A.      I believe that's the time

17   period, yes.

18           Q.      And the time period of heroin

19   and illegal drugs making a rise followed this

20   2012 time period when we tend to see a rise

21   in the numbers here; correct?

22           A.      Right.  Those people that

23   moved -- my understanding, those people that

24   became opioid dependent and then moved to

Highly Confidential - Subject to Further Confidentiality Review

1    heroin, yes, that's my understanding.

2         Q.    So let's go backwards, then.

3               If we go backwards to 2000 --

4    I'm sorry, to page 12 of your report, where

5    you're talking about national analyses

6    related to the factors associated with child

7    placement.  Do you see that?

8         A.    Yes.

9         Q.    There's a graph on page 11.

10   And that is not the absolute percentage of

11   factors related to child placement.  That's

12   looking at -- it's kind of on a wacky scale,

13   but it's done to show changes in this

14   ten-year time period of whether a reason

15   became more or less common according to the

16   way that this was tracked in this particular

17   database; correct?

18        A.    That's correct.

19        Q.    So if we looked at overall,

20   like what were the most common factors as the

21   reasons for child placement, it would be a

22   different list.  There would be a number --

23   which one was number one, number two, number

24   three, those didn't necessarily change from

Highly Confidential - Subject to Further Confidentiality Review

1    year to year over this ten-year time period;

2    right?

3              MS. FLOWERS:  Objection, lack

4         of foundation.

5              THE WITNESS:  I'm sorry, I

6         don't understand your question.

7         Q.    (BY MR. ALEXANDER)  Like, for

8    instance, neglect.  That -- that is a common,

9    most frequent reason that's associated with

10   a -- as a factor for child placement

11   throughout this time period; right?

12        A.    That is a -- yes, a category

13   for removal, right.

14        Q.    Sexual abuse unfortunately,

15   physical abuse unfortunately, these are also

16   all going to be among the most common reasons

17   for child placement, each of these years for

18   this 11-year -- these 11 years at issue here?

19             MS. FLOWERS:  Object to the

20        form.

21             THE WITNESS:  Well, what this

22        is showing is the percentage change

23        over that decade of what went up and

24        what went down.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     (BY MR. ALEXANDER)  I

 2    understand.  I'm saying if you presented this

 3    graphic instead of percentage change, and you

 4    just looked at the most common ones from year

 5    to year, these three that I've identified,

 6    neglect, physical abuse and sexual abuse, are

 7    going to be among the top reasons for child

 8    placement each year; right?

 9               MS. FLOWERS:  Object to the

10          form, lack of foundation.

11               THE WITNESS:  I don't know

12          that.  I don't know.

13          Q.     (BY MR. ALEXANDER)  Did you

14    look at the most common reasons for this time

15    period?

16          A.     I didn't look at the data that

17    way.

18          Q.     In the discussion that follows,

19    it said, this discrepancy in data led the

20    office of the Assistant Secretary For

21    Planning and Education, ASPE, in the

22    Department of Health and Human Services to

23    conduct a mixed method study of quantitative

24    indicators of the opioid impact on foster
```

Highly Confidential - Subject to Further Confidentiality Review

1    care in a series of qualitative interviews.

2              Do you see that?

3         A.    Yes.  I would just correct that

4    it's the Assistant Secretary For Planning and

5    Evaluation, ASPE.

6         Q.    This ASPE paper, the research

7    and the paper that followed, we've talked

8    about in -- or we've referred to a couple of

9    times so far; correct?

10        A.    Yes, we have.

11        Q.    And --

12        A.    There's actually a series of

13   four papers.

14        Q.    And the one that you reference

15   is the Radel paper from 2018, which is on the

16   next page as the cite at the end of the third

17   bullet; right?

18        A.    That's correct.  Radel.

19        Q.    And so continuing on 11.  I

20   think -- I want to make sure we're on the

21   same page, because there is a description

22   here.  It says:  Their study was to determine

23   the strength of the relationship at the

24   county level of government, and they

1    conducted interviews with 188 professionals

2    to understand the impact of opioids on child

3    welfare systems.

4               Did I read that right?

5    A.      You did read that right.

6    Q.      Specifically they evaluated the

7    impact rates of drug overdose deaths,

8    drug-related hospital stays and emergency

9    room visits on foster care reports of

10   maltreatment, substantiated reports in which

11   child protective -- protection investors have

12   confirmed that maltreatment occurred and

13   foster care entries.

14              Do you see that?

15   A.      Yes, I do see that.

16   Q.      And do you have that sort of

17   data analysis specific to Cuyahoga and Summit

18   County?

19   A.      Only in their findings that

20   Summit and Cuyahoga appear on their map that

21   they show that Summit and Cuyahoga are

22   counties with rates of drug overdose deaths

23   and foster care entries both above the

24   national median in 2016.

1          Those are the only data that

2     they made available specific to that.

3          Q.     And do you know anything about

4     how Cuyahoga and Summit Counties calculate

5     their tallying of drug overdose deaths that

6     would be used in that sort of color chart

7     like graphic nine?

8          A.     They, meaning ASPE, obtained

9     the National Vital Statistics System

10    mortality data and used that at the county

11    level, and then calculated those rates with

12    the foster care, those three data points,

13    reports, entries, and -- I'm sorry, reports,

14    substantiated reports and entries.

15         Q.     The overdose death statistics

16    and National Vital Statistics come from the

17    Cuyahoga County and Summit County officials;

18    correct?

19         A.     Yes, that's correct.

20         Q.     So then back to my question.

21    Do you know how overdose deaths like would be

22    ultimately counted here through Vital

23    Statistics are tallied or determined in these

24    counties?

```
1              A.      No, I do not.

2              Q.      Like do you know if -- how they

3      treat intentional versus unintentional

4      death -- overdose death?

5              A.      No, I do not.  I read the

6      methods section again, just in the last few

7      days, on this analysis, and I'm sorry I do

8      not remember that specific.

9              Q.      In these three bullets on page

10     12, are you intending to summarize this Radel

11     paper correctly?

12             A.      These bullets are taken from

13     the Radel paper.

14             Q.      And it continues on page 13.

15     Again you have extensive, essentially

16     quotation or summarization of the Radel

17     paper; correct?

18             A.      Yes.  This graphic is from the

19     Radel paper.

20             Q.      And that continues on to

21     page 14, a chunk of what you present on

22     page 14 is basically straight out of the

23     Radel paper, at least the parts of it that

24     you presented; correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         A.    Yes.  That's correct.  These
2    are the -- 13 and 14 are from their
3    interviews.
4         Q.    Okay.
5               (Whereupon, Deposition Exhibit
6         Young-4 was marked for
7         identification.)
8         Q.    (BY MR. ALEXANDER)  I've marked
9    as Exhibit 4 -- here's a copy for you,
10   Counsel -- a copy of the Radel paper that I
11   believe you've been referencing over the
12   sections of your report that we've discussed.
13               Can you confirm that that's the
14   case for Exhibit 4?
15        A.    If this is the report with the
16   same date, March 7th of '18 -- is that the
17   same date that I reference?
18        Q.    Yep.
19        A.    Then it is the same report.
20        Q.    And in fact you can see that
21   you've used some of these figures as is from
22   the Radel paper or the small kind of color
23   changes.  Graphic nine in your report is
24   figure two from the Radel paper?
```

1       A.      Yes.

2       Q.      Correct?

3       A.      Mm-hmm.

4       Q.      Yours is orange, theirs is red.

5               Right?

6       A.      They look the same color to me.

7       Q.      Okay.  Well, maybe it's just

8    the way we've printed it.  But you intended

9    to copy this as is?

10      A.      I lifted it.

11      Q.      And what about, then, from the

12   Radel paper, figure three, versus your

13   graphic ten on page 13 of your report?  Is

14   that supposed to be lifted as is?

15      A.      We reproduced that, I believe.

16      Q.      Do you see how the numbers

17   don't match up?

18      A.      4.4, 2.6 and 2.4 and 2.3 and

19   2.2.  Drug overdose deaths.

20              (Sotto voce document review by

21      the witness.)

22              I do see that.

23      Q.      (BY MR. ALEXANDER)  Any

24   explanation for why your graphic ten from

Highly Confidential - Subject to Further Confidentiality Review

1    your report doesn't match Figure 3 from the

2    published Radel report?

3           A.    No, I don't have --

4                 MS. FLOWERS:  Object to form.

5           Q.    (BY MR. ALEXANDER)  And

6    Figure 3 from the Radel report has, just for

7    colors, I'm not suggesting there's anything

8    with it in the placement of the little box,

9    there is a black arrow and then three red

10   arrows, and the little box is on an angle

11   covering the first black arrow where it says

12   ten percent increase in overdose death rates?

13   And yours are all blue arrows, with a blue

14   vertical box?  Do you see the difference?

15          A.    Yes.

16          Q.    Do you know how those

17   differences came to be?

18          A.    No, I do not.

19          Q.    Yours adds the words

20   "corresponds with," and then dot, dot, dot.

21   Do you see that?

22          A.    Yes.  I do see that.

23          Q.    And the way it works in this

24   graphic, or figure, and in the paper, the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    ten percent increase is over the national

 2    median; correct?

 3         A.    Yes.

 4         Q.    It's not a ten percent compared

 5    to some historic number, like it's increased

 6    from year to year.  It's how the numbers in

 7    the particular county relate to the national

 8    average; correct?

 9         A.    Yes, that is correct.

10         Q.    And that's true for any of your

11    discussions of this ten percent increase.

12    You're not talking about an increase over

13    time; you're talking about being essentially

14    above the national median on a county basis;

15    correct?

16         A.    Yes, that's correct.

17               I am thinking about these

18    differences in the percentages, and obviously

19    they're not material.  They're 2.3 versus

20    2.2, and 2.4 versus 2.6.  But I am thinking

21    that there was a prior version of this report

22    that had these figures.  I'm remembering that

23    there was an adjustment in the report, and

24    that this was rereleased.  And obviously when
```

Highly Confidential - Subject to Further Confidentiality Review

1    you put it back on the website, you can't

2    actually tell that.  So I actually reviewed

3    this report when it was in draft, and then it

4    was released.  And I'm remembering something

5    about that.  So obviously the percentages are

6    not material, but I -- something's like

7    triggering that that was what happened.

8         Q.    Why don't you go to then, for

9    your report, the bottom of page 39.  This is

10   the second page of your references.  And

11   there's a citation to this paper.  It says

12   Radel L, Baldwin M, Crouse G, and then it

13   gives the title, and it gives the citation.

14   Do you see that that matches up with the

15   piece of paper in front of you?

16        A.    Uh-huh.

17        Q.    And it says retrieved March 9,

18   2019, from ASPE.HHS.gov, and then it gives a

19   specific file extension relating to this.  Do

20   you see that?

21        A.    Mm-hmm.  (Witness nods.)

22        Q.    So it says you're relying on

23   the version that existed as of March 9, 2019

24   on the ASPE system.  Do you see that?

```
 1          A.    Yes.

 2                MS. FLOWERS:  Just for the

 3          record, the document is dated

 4          March 7th.

 5                MR. ALEXANDER:  Of the prior

 6          year when it was published.  That's

 7          not the actual date, Counsel.

 8                MS. FLOWERS:  Okay.

 9                THE WITNESS:  So, I, again, we

10          reproduced this graph, and have been

11          using it for quite some time.  So I

12          can explain, if you're interested,

13          that this is a PowerPoint that we

14          would have been using for some time.

15          And again, the differences in

16          percentages are not material.

17          Q.    (BY MR. ALEXANDER)  I didn't

18    say one way or the other whether they were

19    and we talked about this in general, that

20    essentially part of your report is cuts and

21    pastes from prior presentations you've given?

22                MS. FLOWERS:  Object to the

23          form and the misstatement of counsel.

24          Q.    (BY MR. ALEXANDER)  Right?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Yes.

2             MS. FLOWERS:  Objection to

3         form.

4             THE WITNESS:  There's a body of

5         knowledge and literature that has been

6         there for some time, yes.

7             MR. ALEXANDER:  Okay.

8      Q.    (BY MR. ALEXANDER)  So the

9  three bullets that are in the box on the

10  first page of Exhibit 4, these would be the

11  way it works for a publication like this.

12  These are done by the authors, giving like

13  their own little summary of what they think

14  the take-home messages are.  Is that the way

15  it works?

16      A.     Yes.  Typically, yes.

17      Q.     And so other than Ms. Radel, do

18  you know any of these other authors?

19  Dr. Waters, Dr. Crouse, Dr. Baldwin, or

20  Ms. Ghertner?

21      A.     The only one that I haven't --

22  that I don't remember meeting is Dr. Crouse.

23      Q.     And do you know where all these

24  folks work?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.     They -- I don't know where

2    Melinda is presently.  The others are at

3    Assistant Secretary For Planning and

4    Evaluation.

5                 Dr. Baldwin was at the -- at

6    ACYF, I believe.  Or may have been at ACF.

7    I'm not sure.

8          Q.     And there's a reference in this

9    paper in a couple of places of data

10   collection done by Mathematica Policy

11   Research.  Do you know that entity?

12         A.     Yes, I do.

13         Q.     And have you ever worked with

14   them?

15         A.     Yes, I have.

16         Q.     Are they competent and

17   qualified as far as you know?

18         A.     Oh, yes.

19                MS. FLOWERS:  Object to form.

20         Q.     (BY MR. ALEXANDER)  Do you know

21   if any of these authors work at that entity?

22         A.     No, I don't know that.  I don't

23   believe so.

24         Q.     Let's go to the introduction.
```

1   It says, "After more than a decade of

2   sustained declines in national foster care

3   caseload, the number of children entering

4   foster care began to rise in 2012."

5          Did I read that right?

6     A.     Yes, you did.

7     Q.     Do you agree with those

8   statements?

9     A.     Yes, we've already said that.

10    Q.     "Between 2012 and 2016, the

11  number of children in foster care nationally

12  rose by ten percent from 397,600 to 437,500.

13         "Although the experience of

14  individual states varied, more than

15  two-thirds, 36 states, experienced caseload

16  increases.

17         "Hardest hit have been six

18  states whose foster care populations rose by

19  more than 50 percent over this 4-year

20  period."

21         Did I read the rest of that

22  paragraph correctly?

23    A.     Yes, you did.

24    Q.     And the footnote identifies

Highly Confidential - Subject to Further Confidentiality Review

1    those six states, and Ohio is not one of

2    them; correct?

3         A.    Yes, that's correct.

4         Q.    And then essentially what it

5    says is because of this experience, this is

6    why this research effort was initiated,

7    including with the assistance of Mathematica

8    Policy Research.

9              Do you see that?

10        A.    Yes.

11        Q.    If you go to the second page,

12   there's a discussion of how we conducted the

13   study.

14             Do you see that?

15        A.    Yes, I do.

16        Q.    So I'm going to read all of it

17   so that there's no -- nothing incomplete.

18             "This study combines

19   statistical modeling and qualitative data

20   collection to answer the broad question, how

21   does parental substance use currently affect

22   child welfare systems.  We conducted

23   statistical modeling to examine how two

24   indicators of substance use prevalence relate

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to child welfare caseload rates."

 2              Have I read it right so far?

 3        A.    Yes, you have.

 4        Q.    "Child welfare caseloads

 5    include reports of maltreatment,

 6    substantiated reports in which child

 7    protection investigators have confirmed that

 8    maltreatment occurred, and foster care entry

 9    rates."

10              Did I read that right?

11        A.    Yes, you did.

12        Q.    And that's actually verbatim in

13    your report; correct?

14        A.    I don't know that for sure.

15        Q.    I mean, you have parts of this

16    paper that are verbatim in your report with

17    or without quotes; right?

18              MS. FLOWERS:  Object to the

19         form.

20              THE WITNESS:  I don't know that

21         for sure.

22        Q.    (BY MR. ALEXANDER)  It says,

23    "We used two measures of substance use, rates

24    of drug overdose deaths and rates of hospital
```

Highly Confidential - Subject to Further Confidentiality Review

1    stays and emergency department visits related

2    to substances (referred to as drug

3    hospitalizations.)

4              "Both measures include all

5    substances except alcohol and tobacco."

6              Do you see that?

7         A.    I do see that.

8         Q.    Do you have any idea why they

9    decided to exclude alcohol and tobacco?

10        A.    They were looking specifically

11   for opioids.

12        Q.    Okay.  "We used multiple years

13   of data for most counties in the U.S. and

14   accounted for a variety of demographic,

15   economic, and other factors that confound the

16   relationship between substance abuse and

17   child welfare caseloads."

18             Do you see that?

19        A.    Yes, I do.

20        Q.    Do you know what the

21   demographic, economic, and other factors are

22   that confound the relationship between

23   substance use and child welfare caseloads?

24        A.    Off the top of my head, I

Highly Confidential - Subject to Further Confidentiality Review

1    wouldn't want to try and remember those, but

2    they are detailed in the methods section of

3    their reports.

4         Q.    Can you name one that you think

5    would be a known confounder?

6         A.    They -- I'm trying to remember

7    the things that they controlled for.  And I'm

8    sorry, I don't remember.

9         Q.    I didn't ask you what they

10   controlled for.

11        A.    Right.

12        Q.    I'm asking you what are the

13   known confounders in this area that would

14   confound the relationship between substance

15   use and child welfare caseloads.

16             MS. FLOWERS:  Object to the

17        form.

18        Q.    (BY MR. ALEXANDER)  I just

19   asked you, can you name one of them?

20             MS. FLOWERS:  Object to the

21        form.

22             THE WITNESS:  Actually, I would

23        like to take a break, because my brain

24        is not working and -- right at the

Highly Confidential - Subject to Further Confidentiality Review

1          moment, to be able to think it

2          through.

3                    MR. ALEXANDER:  So actually --

4                    THE WITNESS:  We'll come back

5          to this.

6                    MS. FLOWERS:  You have to

7          answer the question.

8                    MR. ALEXANDER:  The rule is,

9          while there's a question pending, you

10         do have to answer it.

11                   THE WITNESS:  Okay.

12                   The thing that's throwing me is

13         that "confound the relationship

14         between the two."

15                   So let me think about that for

16         just a minute.

17                   I'm sorry, I don't -- I can't

18         think of one right now.  I'd like to

19         come back to that.  So my answer is,

20         I'm sorry, no, I can't think of one

21         right now.

22             Q.    (BY MR. ALEXANDER)  Do you need

23     a break or do you -- can you answer like

24     another question before we come to a logical

Highly Confidential - Subject to Further Confidentiality Review

```
 1    stopping point on this?

 2                MS. FLOWERS:  She's asked for a

 3         break.  I think we should take one.

 4                THE WITNESS:  Let's take a

 5         break.

 6                MR. ALEXANDER:  Okay.  That's

 7         fine.  We can go off the record.

 8

 9                THE VIDEOGRAPHER:  Okay.  We

10         are now going off the record, and the

11         time is 4:22 p.m.

12                (Recess taken, 4:22 p.m. to

13         4:45 p.m.)

14

15                THE VIDEOGRAPHER:  We are now

16         going back on the record, and the time

17         is 4:45 p.m.

18         Q.    (BY MR. ALEXANDER)  Dr. Young,

19    did you review any documents during the

20    break?

21         A.    No, I did not.

22         Q.    Do you have any of your

23    testimony thus far you need to change or

24    supplement in any way?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.     No, I do not.

2                 MR. ALEXANDER:  And plaintiffs'

3          counsel, do you have a response on the

4          issue that we discussed during the

5          last segment in terms of whether

6          certain anecdotal information would be

7          presented at trial through this

8          witness?

9                 MS. FLOWERS:  Yeah.  I think,

10         with respect to this witness and her

11         experience, it's a whole different

12         issue than her personal experience, so

13         I can't give you the same

14         representation that I was able to give

15         you with respect to her personal.

16                MR. ALEXANDER:  Okay.  So do

17         you have a problem, Counsel, with

18         making sure that we get discovery on

19         the bases of her opinion in terms of

20         any particular individual case that

21         she might want to talk about at trial,

22         the couple in Coshocton County or

23         whoever else might come up?

24                MS. FLOWERS:  Well, you're the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            one asking the questions.  It came

2            out.  So do what you want.

3                 MR. ALEXANDER:  No, no.  She

4            said she would follow your advice on

5            whether you would allow us to obtain

6            that sort of information.  That's

7            where it was going to --

8                 MS. FLOWERS:  I'm not going to

9            agree to that right now.

10                MR. ALEXANDER:  Okay.  Well,

11           we'll have to just reserve our rights

12           and follow up after the deposition.  I

13           think that's as much as we can do,

14           given what her answers have been.

15           Maybe looking at the transcript will

16           show you where we are.

17                MR. PENDELL:  Maybe it will

18           show you where we are.

19                MR. ALEXANDER:  That was really

20           helpful.  Really, really good.  Glad

21           you guys have two people objecting at

22           once.  Awesome.

23                MS. FLOWERS:  I do think that

24           it goes to experience.  And we don't
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              intend to elicit any individual

2              stories, but you just did, so I can't

3              make a promise.

4                   MR. ALEXANDER:  I understand

5              your position, Counsel.  I don't think

6              that we're arguing or being difficult

7              about any of this, but it's clearly a

8              matter of knowing what she's going to

9              say in terms of specifics.  Again,

10             we've litigated a bunch of times.

11        Q.    (BY MR. ALEXANDER)  So, Doctor,

12   going back to Exhibit 4, I think where we

13   were was we were on page 2.  And the next

14   section talks about the qualitative analysis

15   that they did in addition to the quantitative

16   analysis.  Are you with me?

17                  MS. FLOWERS:  No. 4?

18                  THE WITNESS:  Yes.

19        Q.    (BY MR. ALEXANDER)  And there's

20   a list of the sites for the interviews, the

21   188 interviews that are referenced in a

22   number of places in your report.

23                  And if you look at the sites,

24   you'll see that no interviews included
```

Highly Confidential - Subject to Further Confidentiality Review

1    Cuyahoga or Summit County, Ohio.  Do you see

2    that?

3           A.    Yes, that's correct.

4           Q.    And, in fact, no Ohio sites

5    were included at all; correct?

6           A.    Correct.  The closest sites

7    were in Indiana.

8           Q.    Well, some West Virginia

9    counties as well, to be fair --

10          A.    Yes.  That's true.

11          Q.    -- right?

12          A.    Yes.

13          Q.    So just a couple hundred miles

14   away from Cuyahoga or Summit County.  Is that

15   your point about the closest?

16          A.    I believe that's right.

17          Q.    So if you go to page 3, that's

18   the third page of -- the number doesn't

19   actually appear on the third page, but the

20   third page, the right column, it says, "Many

21   factors that differ across counties

22   influenced child welfare practices, child

23   maltreatment and substance use."

24                Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.      Yes, I do.

2          Q.      "These factors make it

3   difficult to identify the extent to which

4   substance use and child welfare are related

5   in the average county."

6                  Do you see that?

7          A.      Yes.

8          Q.      Do you agree with that so far?

9          A.      I agree that that's what the

10  page says, yes.

11         Q.      No, I'm asking do you agree

12  with what has been stated in substance?  Many

13  factors differ across and they make it

14  difficult to identify the extent to which

15  substance use and child welfare are related

16  in the average county?

17         A.      Yes.  I take that to mean the

18  way in which substance use is undercounted in

19  child welfare practice.  That is my

20  interpretation of that.

21         Q.      Let's continue with the rest of

22  the paragraph.

23                 "For example, poverty is a

24  strong predictor of both child welfare
```

Highly Confidential - Subject to Further Confidentiality Review

 1    involvement and substance use.  Since not

 2    every county has the same poverty rate, not

 3    taking poverty into account may mask the true

 4    relationship between child welfare and

 5    substance use prevalence."

 6              Do you see that?

 7         A.    Yes, I see that.

 8         Q.    Did I read that one right?

 9         A.    Yes, you did.

10         Q.    Does that help inform you that

11    what was talked about in the prior sentences

12    isn't at all what you said, but it actually

13    relates to this issue of confounding factors?

14              MS. FLOWERS:  Object to the

15         form of the question.

16              THE WITNESS:  Well, I

17         understand what you're saying, but I

18         also understand that the mini factors

19         that differ include the making it

20         difficult to identify the extent to

21         which substance use and child welfare

22         are related in the average county is

23         also a mini factor is the fact that it

24         is seriously undercounted in the

1          information system.  So that is a

2          factor also.

3          Q.    (BY MR. ALEXANDER)  So this

4    issue of, let's say, poverty, do you know

5    anything about the Medicaid rate or other

6    measure of poverty in Cuyahoga or Summit

7    County, particularly the parts of those

8    counties that consume the most children's

9    services?

10         A.    I have seen maps of those ZIP

11   codes, but I couldn't pull that up off of the

12   top of my head.

13         Q.    Well, your report doesn't

14   include any analysis that you or your staff

15   did that look at any of these sorts of

16   socioeconomic factors, demographic or other

17   factors, that would be specific to Cuyahoga

18   or Summit County; correct?

19               MS. FLOWERS:  Object to the

20         form.

21               THE WITNESS:  No, it does not.

22         Q.    (BY MR. ALEXANDER)  And to

23   really get down to the relationship between

24   child services consumption and what's going

1    on with anything relating to substance use in

2    Cuyahoga or Summit County, you would need to

3    have this sort of information to control for

4    these factors; correct?

5              MS. FLOWERS:  Object to the

6         form.

7              MR. PENDELL:  Object.

8              THE WITNESS:  No, I disagree.

9         Q.    (BY MR. ALEXANDER)  Well, the

10   authors say that they attempted to use

11   physical models to account for a range of

12   factors to more precisely estimate this

13   relationship, didn't they?

14        A.    They were doing a statistical

15   model which was not what I was attempting to

16   do.  So that is the reason why they were

17   using that kind of a model.

18        Q.    For increased precision;

19   correct?

20        A.    Yes, and they were looking at

21   the entire country.  So different type of

22   analysis completely.

23        Q.    Do you know where Cuyahoga and

24   Summit County are on any of these

Highly Confidential - Subject to Further Confidentiality Review

1    socioeconomic factors compared to the average

2    county in the country?

3         A.     No, I do not.

4         Q.     Did you do anything before you

5    started testifying today to figure out any of

6    those sorts of local considerations?

7              MS. FLOWERS:  Object to the

8         form.

9              THE WITNESS:  I have looked at

10        those indicators previously, yes.

11        Q.     (BY MR. ALEXANDER)  For forming

12   your opinions that you intend to offer

13   pursuant to your report, when called as an

14   expert witness at trial if that happens, have

15   you looked at any specific socioeconomic or

16   demographic factors for Cuyahoga or Summit

17   County that might be recognized as

18   confounding the relationship between

19   substance use and child welfare caseloads?

20             MS. FLOWERS:  Object to the

21        form.

22             THE WITNESS:  No, I don't

23        intend to offer opinions related to

24        that.

1        Q.      (BY MR. ALEXANDER)  Okay.  Why

2    don't you go to page 4 of Exhibit 4.

3              Some of this is included in

4    your report.  It says, "The higher rate of

5    placement into foster care suggests that

6    cases in areas with higher indicators of

7    substance use may have distinctive

8    characteristics.

9              "Experienced caseworkers,

10   judges, and others noted several factors that

11   we perceived as contributing to higher

12   caseloads and greater difficulty in

13   reunifying families relative to previous

14   eras, including the methamphetamine crisis of

15   the mid to late 1990s, and the crack epidemic

16   of the 1980s."

17             Did I read that right so far?

18        A.    Yes, you did.

19        Q.    And you see the time frame that

20   they're giving for the methamphetamine

21   crisis; correct?

22        A.    Yes.  I do.

23        Q.    All before the time when the

24   foster care placement data that we were going

Highly Confidential - Subject to Further Confidentiality Review

1    over started declining; correct?

2         A.    Yes.  However, I don't know

3    that that is accurate.

4         Q.    Have you told Dr. Radel that

5    you think that some of her paper is

6    inaccurate?

7              MS. FLOWERS:  Object to the

8         form.

9              THE WITNESS:  No, I have not.

10        Q.    (BY MR. ALEXANDER)  The prior

11   paragraph we were going over about, you know,

12   why they did statistical modeling to account

13   for confounders like poverty and you had this

14   interpretation that that really was about

15   underreporting, did you ever ask her about

16   what she meant or what she and her coauthors

17   meant with that paragraph?

18        A.    I didn't have that specific

19   conversation with her about that paragraph,

20   but we've had several conversations about the

21   underreporting of parental substance use in

22   the AFCARS data.

23        Q.    Did you ever talk to Dr. Radel

24   about their interpretation of the importance

1    of accounting for confounding factors in

2    doing their analysis?

3         A.    We had a few conversations

4    while they were in the process of putting

5    this paper together.  I don't recall that it

6    was specific about the way they were trying

7    to account for the other variables that they

8    were putting into their model.

9         Q.    Okay.  So let's continue on

10   page 4.  I think that's where you are.

11            Where it picks up, it says, "In

12   past drug epidemics, family members and

13   community institutions shielded many children

14   from some of the consequences of parental

15   substance use."

16            Do you see that?

17        A.    Yes, I do.

18        Q.    And do you know what the

19   changes have been since the 1980s and 1990s

20   that relate to the disintegration or the

21   weakening of these sorts of community

22   institutions?

23        A.    Well, let me back up just one

24   minute, if you would.  Because related to the

Highly Confidential - Subject to Further Confidentiality Review

1    date of the methamphetamine in the mid to

2    late 1990s, recall that we spoke about the

3    regional partnership grants.  Those -- the

4    first regional partnership grants were made

5    in 2007.  And those grants came out from

6    Congress specifically targeting

7    methamphetamine in child welfare.

8              So that's part of my basis for

9    saying that I don't believe that this date of

10   the mid to late 1990s is accurate.  Either

11   that or the tardiness of Congress should be

12   noted.

13             So the mid-2000s is really more

14   the time period that most people would

15   attribute to the methamphetamine crisis.

16             So while you're talking about

17   the time periods, then, for this second

18   piece, I think we need to set that context.

19   So maybe you could repeat your question now.

20        Q.    (BY MR. ALEXANDER)  I can do

21   that.

22             It says: In past drug

23   epidemics, which you understand to be

24   referring to the crack epidemic and the

1    methamphetamine crisis; correct?

2         A.    Yes.

3         Q.    "Family members and community

4    institutions shielded many children from some

5    of the consequences of parental substance

6    use."

7              Do you see that?

8         A.    Yes.

9         Q.    The question is, do you know

10   what led to a disintegration or a weakening

11   of those sorts of community institutions or

12   the role of families?

13             MS. FLOWERS:  Object to form.

14             THE WITNESS:  Well, what I -- I

15        believe the ASPE study goes on to

16        report that social workers are

17        reporting in the qualitative aspect of

18        this study, is that there are multiple

19        generations that are using opioids,

20        and the kinship placements that were

21        really being fostered after the

22        Adoption and Safe Families Act.

23        You'll recall we talked about the ways

24        in which that law really tried to

Highly Confidential - Subject to Further Confidentiality Review

1         divert children from, if you will,

2         stranger foster care and really trying

3         to build the kinship network.  There

4         have been several laws that have been

5         passed and grant programs that have

6         been passed to build kinship

7         placements.  And that kinship

8         placements have not been able to be

9         used in this more modern, if you will,

10        time period, that they haven't been

11        available.

12             So I believe this qualitative

13        data goes on to speak to some of those

14        issues.

15        Q.    (BY MR. ALEXANDER)  So what

16   you've answered is about part of it.  That's

17   actually the very next sentence.

18        A.    Mm-hmm.

19        Q.    In talking about

20   multigenerational drug use and how that

21   affects kinship placements.

22             The other part of it, the

23   community institutions, have you analyzed why

24   it is that community institutions have

1   weakened compared to the time period of prior

2   drug crises?

3                    MS. FLOWERS:  Object to the

4             form.

5                    THE WITNESS:  Have I analyzed

6             that?  Not specifically.  I'm aware of

7             that in the context of communities

8             that have had, if you will, the

9             phenomenon of the pill mills, and the

10            loss of jobs from manufacturing, and

11            the pill mills, and the accidents, and

12            those kinds of things that have

13            happened in some communities.  I'm

14            aware of that.

15            Q.    (BY MR. ALEXANDER)  So the way

16   that it's set up, if you actually just look

17   at the page, I'm not trying to hide it from

18   you, but your report basically includes this

19   sort of language about multiple generations

20   and caregivers.  You basically quote or

21   paraphrase this part.  But you don't talk

22   about the next part here, which is where it

23   says, "Community institutions are perceived

24   as weaker and less able to support children

```
 1    when families cannot.  Respondents reported

 2    that families were less likely than in the

 3    past to be engaged with churches or other

 4    social institutions, often hospitals and

 5    schools have closed, diminishing the presence

 6    of institutions that had bound communities

 7    together.  The institutions that remained

 8    were more strained in their ability to take

 9    on new roles."

10              Do you see where I just read

11    that paragraph?

12         A.    Yes, I do see you read that

13    paragraph.

14         Q.    And that's referring to the

15    other part of the sentence we were just

16    discussing where it talks about community

17    institutions that had previously shielded

18    children from some of the consequences of

19    parental substance use.  Do you see that?

20         A.    Yes, I see that.

21         Q.    So why is your -- does your

22    report not talk at all about this issue of

23    this change in community institutions,

24    whether it be churches, hospitals, schools,
```

Highly Confidential - Subject to Further Confidentiality Review

1    social institutions, just general community

2    institutions?  Why is that not in your

3    report?

4              MS. FLOWERS:  Object to the

5         form.

6              THE WITNESS:  I don't know.

7         Q.    (BY MR. ALEXANDER)  Was that in

8    like presentations you've given but it just

9    didn't make its way into your report?

10             MS. FLOWERS:  Object to the

11        form.

12             THE WITNESS:  I don't know if

13        it's in presentations I've given.

14        Q.    (BY MR. ALEXANDER)  Do you know

15   why it is that community institutions have

16   weakened in these various ways that the

17   authors detail in this Radel study that you

18   cite a bunch?

19        A.    I don't know why community

20   institutions, what directly has led to that

21   in some of these communities.

22        Q.    Did you look at this issue

23   specifically for Cuyahoga and Summit County

24   to see the changes in their community

Highly Confidential - Subject to Further Confidentiality Review

```
1    institutions compared to prior decades?

2         A.     No, I did not.

3         Q.     Why don't you go to the right

4    column of the same page 4.  There's a heading

5    that says:  Hospitalization rates varied by

6    substance but different substances had

7    similar relationships with foster care entry

8    rates.  Do you see that?

9         A.     I do see that.

10        Q.     And by substances here, it

11   means substances of abuse like different

12   drugs or categories of drugs and alcohol;

13   right?

14             MS. FLOWERS:  Object to form.

15             THE WITNESS:  I believe earlier

16        we found that they had eliminated

17        alcohol, didn't they?

18        Q.     (BY MR. ALEXANDER)  Well, we'll

19   read on and see what they say about that.

20   But when they say substances, different

21   substances, at a minimum, they mean different

22   categories of drugs; right?

23        A.     Yes.  I believe that's so.

24        Q.     So the first sentence says,
```

1    "Use of any substance can put children at

2    risk, and statistical analysis found that

3    hospitalization due to different categories

4    of substances have comparable relationship

5    with foster care entry rates."

6                    Do you see that?

7         A.     Yes.

8         Q.     Do you agree with that?

9         A.     This is what their study found,

10   yes.

11        Q.     But you agree that use of any

12   substance can put children at risk?

13        A.     Yes, I do agree with that.

14        Q.     It says -- I think you quote

15   this part in your report.

16                    "Opioids, stimulants, including

17   cocaine and methamphetamine, and

18   hallucinogens had dramatically different

19   hospitalization rates, with the rate of

20   opioid-related stays being the largest."

21                    Do you see that?

22        A.     Yes, I do see that.

23        Q.     And it says, "Despite the

24   differing prevalence across substance types,

Highly Confidential - Subject to Further Confidentiality Review

1    their relationships with foster care entry

2    rates were practically identical."

3                    Do you see that?

4         A.      Yes, I do see that.

5         Q.      Do you agree with that as a

6    read on the data from this study?

7         A.       In this study, yes.

8         Q.       Have you seen contrary data

9    from other studies?

10        A.       This is the only study that's

11   looked at this particular -- in this way.

12        Q.       Do you know why this didn't

13   make its way into your report?

14                 MS. FLOWERS:  Object to the

15        form.

16        Q.     (BY MR. ALEXANDER)   That

17   despite differing prevalence across substance

18   types, their relationships with foster care

19   entry rates were practically identical?

20                 MS. FLOWERS:  Same objection.

21                 THE WITNESS:  I thought it was

22        more important the part about the more

23        severe -- it goes on.  Actually, I

24        didn't spend a lot of time on the

Highly Confidential - Subject to Further Confidentiality Review

 1          hospitalization component of it.

 2          There's another section that moves

 3          into the relationship with the more

 4          severe foster care entry rates.

 5          Q.    (BY MR. ALEXANDER)  So go to

 6   the top of page 5, please, Dr. Young.

 7          The continuing paragraph says:

 8   Alcohol-related hospitalizations, over four

 9   times more prevalent than opioid

10   hospitalizations, had a slightly stronger

11   relationship with foster care entry.

12          Do you see that?

13          A.    Yes, I do.

14          Q.    Apparently they did pay

15   attention to alcohol-related hospitalizations

16   and analyzed that in this study; correct?

17          A.    Yes.

18          Q.    So a ten percent increase in

19   alcohol-related hospitalizations compared to

20   the mean predicted a 2.7 percent increase in

21   foster care entry rates.  Do you see that?

22          A.    I do.

23          Q.    And that is in fact higher?

24   Than with opioid related to hospitalizations;

1    correct?

2         A.    I believe that is right.  Oh,

3    the other was not in the graph.  Yes.

4         Q.    So what about this one?  Why

5    did this discussion about the stronger

6    relationship between alcohol-related

7    hospitalizations and foster care entry also

8    not make its way into your report?

9         A.    Because we were asked to look

10   at opioids.

11        Q.    Asked by whom?

12        A.    My request by the plaintiffs

13   was to look at my opinions regarding the

14   opioid crisis and child welfare, not the

15   alcohol-related indicators and child welfare.

16        Q.    And it's in the same paper, it

17   wouldn't have been hard for you to mention,

18   by the way, alcohol is a relevant thing to

19   consider in all of this; right?

20             MS. FLOWERS:  Object to the

21        form.

22             MR. PENDELL:  Object to the

23        form.

24             MS. FLOWERS:  Lack of

```
 1            foundation.
 2                 THE WITNESS:  Is the question
 3            would it have been hard to have
 4            included that?  It would not have been
 5            hard to have included that, but it was
 6            not what I was asked to do.
 7            Q.    (BY MR. ALEXANDER)  And you, as
 8   an expert witness, in attempting to present a
 9   fair and accurate portrayal of the issues,
10   elected not to include any information in
11   your report about alcohol and its role in
12   social services needs; correct?
13                 MR. PENDELL:  Object to the
14            form.
15                 MS. FLOWERS:  Object to the
16            form and lack of foundation.
17                 THE WITNESS:  That's correct.
18            I was specifically asked to look at
19            opioids.
20            Q.    (BY MR. ALEXANDER)  What about
21   Cuyahoga and Summit County?  Do you know
22   where they are in terms of alcohol-related
23   hospitalizations in relation to the national
24   median?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         A.      No, I do not know.

2         Q.      Do you know anything about

3  trends over time with alcoholism, alcohol

4  abuse or alcohol-related hospitalizations in

5  those counties?

6                 MR. PENDELL:  Objection, form.

7                 THE WITNESS:  No, I do not.

8         Q.      (BY MR. ALEXANDER)  Let's go to

9  the next section.  This is part of a longer

10 kind of discussion.

11                The first paragraph, it says,

12 "Although substance use is a serious

13 problem" -- we're on page 5 still.

14                "In all the sites studied, in

15 some sites the problem was not primarily an

16 opioid crisis."

17                Did I read that right?

18        A.      Mm-hmm.

19        Q.      "The current drug epidemic

20 involves a range of substances.  Drugs other

21 than opioids, e.g., methamphetamine, are the

22 primary concern in many places.

23 Polysubstance use -- use of multiple

24 substances by the same individual -- is a
```

Highly Confidential - Subject to Further Confidentiality Review

1    significant issue and the norm in most places

2    studied.  Polysubstance use complicates

3    treatment and recovery."

4              Do you agree with all of those

5    statements?

6              MS. FLOWERS:  Object to the

7         form.

8              THE WITNESS:  In many places

9         that is true.  It is not my

10        understanding of necessarily what's

11        going on in places that have been

12        heavily hit by opioids.

13        Q.    (BY MR. ALEXANDER)  So let's

14   break that down.

15             First of all, this whole

16   discussion about the current drug epidemic

17   involves a range of substances.  It's --

18   methamphetamine is a bigger issue than in --

19   opioids in some places and polysubstance use

20   is common and complicates treatment and

21   recovery.

22             None of that made its way into

23   your report; right?

24             MS. FLOWERS:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

```
1              form.  Lack of foundation.
2                   THE WITNESS:  That's right,
3              because I was asked to speak -- asked
4              to write about opioids.
5         Q.    (BY MR. ALEXANDER)  But, I
6    mean, you know about polysubstance use being
7    a complicating factor.  You could have
8    analyzed that, or discussed that in some form
9    or fashion in your report; right?
10                  MS. FLOWERS:  Object to the
11             form, asked and answered.
12                  MR. PENDELL:  Object to the
13             form.
14                  THE WITNESS:  Yes, I could
15             have, but I was asked to speak to
16             opioids and child welfare.
17        Q.    (BY MR. ALEXANDER)  If we look
18   at some of your public presentations outside
19   of litigation, you do talk about
20   polysubstance use; right?
21        A.    I do speak about polysubstance
22   use, yes.
23        Q.    So let me just ask, for
24   Cuyahoga and Summit County, the role of
```

Highly Confidential - Subject to Further Confidentiality Review

 1    methamphetamine, have you looked at the data

 2    available on that over time?

 3          A.    No, I have not.

 4          Q.    So like do you know if there

 5    was a time in the last couple of years when

 6    methamphetamine has far outpaced opioid use

 7    including illicit substances?

 8                MS. FLOWERS:  Objection, lack

 9          of foundation.

10                THE WITNESS:  I do not know

11          that.

12          Q.    (BY MR. ALEXANDER)  Do you know

13    what the more recent data is for these

14    counties in terms of whether they're

15    essentially having a methamphetamine problem

16    now, and not even really a heroin problem

17    anymore, except that sometimes what is

18    supposed to be heroin is actually a bunch of

19    other substances?

20                MR. PENDELL:  Objection to

21          form.

22                THE WITNESS:  I do not know

23          that.  People I have heard discussing

24          methamphetamine all over the country.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     (BY MR. ALEXANDER)  Next

 2   section.  Actually, let me make sure we're

 3   clear.  You haven't analyzed the specifics of

 4   what drugs are being used in these counties

 5   in terms of illegal drugs, whether they be

 6   methamphetamine, heroin, fentanyl analogs,

 7   cocaine, or various kind of combinations of

 8   those; correct?

 9               MS. FLOWERS:  Object to the

10        form.

11               THE WITNESS:  No, I have not.

12          Q.     (BY MR. ALEXANDER)  The next

13   section says, "Parents using substances have

14   multiple issues."  It continues, "Families

15   come with a range of interrelated issues and

16   needs.  The predominant issues include

17   domestic violence, mental illness and long

18   histories of traumatic experiences."

19               You agree with that so far,

20   don't you?

21          A.     I do agree with that.

22          Q.     Not in your report at all, is

23   it?

24               MS. FLOWERS:  Object to the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            form.

 2                 THE WITNESS:  I think that's

 3            well understood and doesn't even need

 4            to be pointed out, because it's well

 5            understood.

 6            Q.    (BY MR. ALEXANDER)  Okay.  And

 7       so that's why you didn't include it is

 8       because you assumed the reader would just

 9       know that the main drivers of social services

10       need are going to be domestic violence,

11       mental illness, and long histories of

12       traumatic experiences particularly in certain

13       communities?

14            A.    No, I didn't say the main

15       drivers.  I have -- the agreement that

16       parents using substances often have

17       interrelated issues is what I'm agreeing

18       with.

19            Q.    What about the next sentence?

20       "Addressing substance use alone is unlikely

21       to be effective in producing the desired

22       child welfare outcomes."

23                 Do you agree with that one?

24            A.    Yes, it does take more than
```

Highly Confidential - Subject to Further Confidentiality Review

1     just substance abuse treatment to ameliorate

2     the issues.

3          Q.    So even though you didn't

4     discuss at all in the body of your report the

5     predominant issues that affect families and

6     their social services needs, in your

7     recommendations, you actually did include a

8     number of recommendations for ways to improve

9     child welfare outcomes other than just

10    treating substance use; correct?

11              MS. FLOWERS:  Object to the

12         form of the question.

13              THE WITNESS:  Yes, I believe

14         that's correct.

15         Q.    (BY MR. ALEXANDER)  If you go

16    to the last sentence of that paragraph, it

17    says, "In addition, many community leaders

18    and service providers view substance use and

19    the opioid epidemic in particular as being

20    rooted in diminished economic opportunities,

21    unresolved emotional pain resulting from

22    adverse experiences, and pervasive feelings

23    of hopelessness from which substance use,

24    parenthesis, at least initially, provides an

1    escape."

2              Did I read that one right?

3        A.     You did read that one right.

4    And obviously these are things that have been

5    constants in communities, and what's

6    different is the introduction of opioids at

7    higher rates into communities.

8              These are longstanding issues

9    in communities.

10       Q.     The statement that substance

11   use and the opioid epidemic in particular are

12   rooted in diminished economic opportunities,

13   unresolved emotional pain resulting from

14   adverse experiences, and pervasive feelings

15   of hopelessness from which substance use at

16   least initially provides an escape, are those

17   statements with which you agree, Dr. Young?

18              MS. FLOWERS:  Objection, asked

19        and answered.

20              THE WITNESS:  Not in their

21        entirety, no.

22              This is saying that many

23        community leaders view that.  So I

24        would agree that they're saying

Highly Confidential - Subject to Further Confidentiality Review

```
1           community leaders said that.  That's

2           not my view.

3           Q.    (BY MR. ALEXANDER)  And which

4    part of this do you think they're wrong

5    about?

6           A.    The initial use of a substance

7    does, in fact, provide that initial escape,

8    but -- and many of those conditions in a

9    person's life gives them that escape.  But

10   when there is a ready supply of a substance,

11   then that is what leads to that triggering of

12   the reward pathway, and those ongoing poor

13   outcomes.

14          Q.    Do you know anything about

15   diminished economic opportunities in Cuyahoga

16   and Summit County during this general time

17   period?

18          A.    Not directly, no.

19          Q.    Not something you've analyzed

20   for this case; correct?

21                MS. FLOWERS:  Objection, asked

22          and answered.

23                THE WITNESS:  That's correct.

24          Q.    (BY MR. ALEXANDER)  The next
```

Highly Confidential - Subject to Further Confidentiality Review

1    section here is Challenges of Treatment.  It

2    gives a number, and then after that is a

3    section called Child Welfare Response,

4    Practice and Resource Issues; correct?

5         A.    Yes, that's correct.

6         Q.    And these actually mimic a

7    number of your -- or mirror, in broad terms,

8    a number of your recommendations; correct?

9              MS. FLOWERS:  Object to the

10             form.

11             THE WITNESS:  Yes, these are

12             recommendations that have been

13             longstanding in the field.

14        Q.    (BY MR. ALEXANDER)  So on page

15   seven, the right-hand column, there's one

16   that says, "Child welfare agencies face

17   increasing shortages of foster homes?"

18             Do you see that?

19        A.    Where --

20        Q.    Page 7?  Page 7.

21        A.    In the middle?  Yes.

22        Q.    And do you know all of what

23   drives the increasing shortage of foster

24   homes in Cuyahoga and Summit County?

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.      I believe that -- I'm not sure
2    which administrator spoke to this, if it was
3    Julie Barnes or the director in Cuyahoga
4    County spoke directly about the need to
5    recruit foster families.  But it may have
6    been both of them, but that the difficulty in
7    recruiting foster families was mentioned in
8    both of them.
9            So, yes, I am familiar with
10   what that means when foster families are not
11   available in the child's own community.
12           Q.      Dr. Young, that actually wasn't
13   my question.  I asked, do you know what
14   drives the increasing shortage of foster
15   homes in Cuyahoga and Summit County, "yes" or
16   "no."  Do you know?
17               MS. FLOWERS:  Objection, asked
18           and answered.
19               THE WITNESS:  I would have to
20           look back at their depositions to give
21           you those exam -- those specifics.  I
22           don't remember.
23           Q.      (BY MR. ALEXANDER)  So for the
24   three depositions you read, if they give an
```

1    explanation for what's going on in their

2    community, you don't have a basis to dispute

3    it; correct?

4                    MS. FLOWERS:  Object to the

5          form.

6                    THE WITNESS:  That's correct.

7          Q.    (BY MR. ALEXANDER)  And that's

8    not just about foster homes, it's really

9    about anything within their purview; correct?

10                   MS. FLOWERS:  Same objection.

11                   THE WITNESS:  The shortage of

12         foster homes is something that's

13         raised in many places.

14         Q.    (BY MR. ALEXANDER)  I'm sorry,

15    that wasn't my question.

16                   For the three depositions you

17    read of officials within Summit or Cuyahoga

18    County in children and family services,

19    Ms. Weiskittel, Ms. Barnes, and Mr. Cabot,

20    you defer to them on whatever their

21    observations are about what's going on in

22    their communities as it relates to their

23    professional responsibilities; correct?

24                   MS. FLOWERS:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

```
 1            form.

 2                 THE WITNESS:  Yes.

 3            Q.    (BY MR. ALEXANDER)  Go to

 4      page eight, please, of Exhibit 4.

 5                 After some more of this

 6      discussion, there is a section called

 7      Difficulty of Collaboration.  And then there

 8      is a Conclusion section.

 9                 Do you see that?

10            A.    Yes, I do.

11            Q.    In the first paragraph under

12      conclusion, the third sentence says: In --

13      well, I'll start actually with -- I'll read

14      the whole thing so there's no confusion.

15                 "Increased levels of substance

16      use, including but not limited to opioids,

17      have devastated many American families and

18      the child welfare system has felt the

19      effects."

20                 Do you agree with that so far?

21            A.    Yes.

22            Q.    "Child welfare caseloads

23      nationally increased by 10% between fiscal

24      years 2012 and 2016, parenthesis, the most
```

1    recent years for which data are available.

2            "The situation is not uniform,

3    however.  While many states saw considerable

4    increases, in some states the number of

5    children in foster care actually decreased

6    during this period.

7            "The sites included in this

8    study were particularly hard hit.  9 of the

9    25 counties had seen caseload increases of

10   more than 50 percent between 2012 and 2015."

11           Did I read that right?

12   A.      Yes, you did.

13   Q.      And so these 9 counties with

14   greater than 50 percent increase, obviously

15   those are all outside of Ohio and certainly

16   not Cuyahoga and Summit County; correct?

17           MS. FLOWERS:  Object to the

18           form.

19           THE WITNESS:  If -- yes, if

20           they're referring back to the places

21           that they chose to do the qualitative

22           interviews, yes.

23   Q.      (BY MR. ALEXANDER)  Did you

24   agree with the first statement, that

Highly Confidential - Subject to Further Confidentiality Review

1    increased levels of substance use, including

2    but not limited to opioids, have devastated

3    many American families and the child welfare

4    system has felt the effects?

5        A.    Yes.

6        Q.    And in none of your testimony

7    in this case do you intend to offer an

8    opinion with some sort of differentiation or

9    breakdown between the effects of substance

10   use that involves opioids versus substance

11   use that does not involve opioids?

12           MS. FLOWERS:  Object to the

13       form, and lack of foundation.

14           THE WITNESS:  No, I do not.

15       Q.    (BY MR. ALEXANDER)  The

16   statement in the middle, "The situation is

17   not uniform.  While many states saw

18   considerable increases, in some states the

19   number of children in foster care actually

20   decreased during this period."

21           You think that's accurate data;

22   correct?

23           MS. FLOWERS:  Object to the

24       form.

1          THE WITNESS:  Yes, I believe it

2     is.

3          Q.    (BY MR. ALEXANDER)  Given your

4     general discussion about what's been going on

5     nationally, do you have an explanation for

6     why it is that there are some states that had

7     a decrease in the number of children in

8     foster care during this time period when

9     there was, nationally, an increase in opioid

10    prescriptions according to your testimony and

11    understanding?

12         A.    I believe you've misstated my

13    report and my testimony about nationally the

14    increase of opioids.

15         Q.    Let me ask it this way: Do you

16    have an explanation for why there would be

17    some states where during this same time

18    period the number of cases in foster care

19    continue to go down as they had been for the

20    prior ten-plus years nationally?

21         A.    There are some discussions

22    about some of the states that made those

23    policy changes and practice changes that we

24    spoke about earlier.  That they were -- that

```
 1    they didn't put those practice changes in

 2    place until later.  There are also some

 3    states that had some specific policy changes

 4    particularly related to adolescents and

 5    moving kids out of group homes.  So more

 6    recently another law change has happened that

 7    sort of mimics those changes in moving kids

 8    out of residential placements.  So there are

 9    some states that had already moved into some

10    of that practice.  So there's some variation

11    by states that had already either lagged in

12    some of those policy changes or had moved

13    forward with some of those changes for

14    adolescents in group homes --

15         Q.     Dr. Young --

16         A.     -- so it varies from state to

17    state.

18         Q.     I'm sorry, I thought you were

19    done.

20                Dr. Young, have you analyzed

21    what it is about anything relating to drug

22    usage or distribution patterns in the states

23    that continue to have a decrease in foster

24    care numbers that might explain that?
```

```
 1              MS. FLOWERS:  Object to the
 2         form.  Asked and answered.
 3              THE WITNESS:  I have begun to
 4         look at some of that and some of the
 5         states that have high numbers of
 6         babies going into out-of-home care,
 7         but I'm not ready to make any
 8         statements related to that.
 9         Q.    (BY MR. ALEXANDER)  You're not
10    going to rely on pending analyses that you're
11    trying to publish or present in connection
12    with anything you're doing in this case?
13         A.    No, I'm not.
14              (Whereupon, Deposition Exhibit
15         Young-5 was marked for
16         identification.)
17         Q.    (BY MR. ALEXANDER)  Handing you
18    what I've marked as Deposition Exhibit 5.
19              There's a copy for counsel.
20              This is identified as being a
21    docket from Children and Family Futures,
22    which is your written testimony before the
23    United States Senate Committee on Finance,
24    examining the opioid epidemic challenges and
```

1    opportunities, and it gives a date of

2    February 23rd, 2016, at a Senate office

3    building in DC; right?

4          A.    Yes, that's correct.

5          Q.    And that's actually when you

6    showed up and you gave oral testimony that

7    was kind of an abbreviated version of this;

8    correct?

9          A.    Yes, that's correct.

10         Q.    And we have the much larger

11   testimony from that day.  You were one of

12   many speakers including, I think

13   Senator Hatch probably spoke first, and then

14   you maybe were second or third up.  Does that

15   sound about right?

16         A.    Yes, that's right.

17         Q.    Okay.  But this document is

18   something, Exhibit 5, that was prepared by

19   you and your staff to be accurate and

20   essentially be sworn testimony; correct?

21         A.    Yes, that's right.

22         Q.    I mean, I'm not trying to make

23   you into a lawyer here or anything, but you

24   understand you're like submitting this to a

Highly Confidential - Subject to Further Confidentiality Review

1    governmental entity essentially under oath

2    and you need to make sure it's accurate;

3    right?

4        A.    Yes.

5        Q.    I mean, as a former government

6    contractor, you're familiar with those sorts

7    of requirements; correct?

8        A.    Yes, I am.

9        Q.    And I won't belabor this, but

10   let's go through this quickly.

11           The first page with testimony

12   on it is actually labeled as page 3.  Do you

13   see that?

14       A.    Yes.

15       Q.    It starts where it says,

16   Chairman Hatch, and then kind of an

17   introduction that you would give when you

18   spoke orally.  Do you see that?

19       A.    Yes.

20       Q.    And then there are three

21   numbered summaries that you would like to

22   emphasize.  The first two are almost verbatim

23   to what you've included in your expert

24   report; correct?

```
 1              A.      To be honest, I hadn't noticed

 2      that.

 3              MS. FLOWERS:  Objection.

 4              Q.      (BY MR. ALEXANDER)  Well, they

 5      are.  I mean, number one in Exhibit 5 is, "In

 6      the past three decades, our country has

 7      experienced at least three major shifts in

 8      the substances -- in substance of abuse that

 9      have had dramatic effects on children and

10      families; however, the increase of opioid

11      misuse has been described by long-time child

12      welfare professionals as having the worst

13      effects on child welfare systems they have

14      seen?"

15              That's number one in Exhibit 5.

16              And number one as a summary of

17      opinions on page 3 of your expert report

18      says, "In the past four decades, our country

19      has experienced at least three major shifts,"

20      and then it continues.

21              Do you see that?

22              A.      Yes.

23              Q.      Okay.  And number two in the

24      Senate testimony says, "The current
```

Highly Confidential - Subject to Further Confidentiality Review

1    environment has at least two major

2    differences from prior experiences.  First,

3    that young people are dying at astonishing

4    rates and many states report that infants are

5    coming into protective custody at alarming

6    rates."

7              And number two from your

8    summary from page 4 of your expert report

9    says, "The current environment exhibits at

10   least two major differences from our prior

11   experiences:  First, young people are dying

12   at astonishing rates, and second, most states

13   have infants being placed into protective

14   custody at increasingly high rates."

15             So there's an increasingly high

16   rates in one versus alarming rates in the

17   other.  Do you see that?

18        A.    Yes, I do.

19        Q.    Okay.  So obviously you agree

20   with these two statements from your senate?

21        A.    I agree with myself.

22        Q.    And number three from the

23   Senate testimony, Exhibit 5:  Federal

24   investments over the past decade's testing

```
 1    strategies to improve outcomes for families

 2    in child welfare affected by substance use

 3    disorders have generated a knowledge base

 4    that allows us to clearly state that we can

 5    no longer say we don't know what to do.

 6              Do you see that?

 7        A.    Yes, I do.

 8              MS. FLOWERS:  Object to form.

 9        Q.    (BY MR. ALEXANDER)  And that is

10    not included in your expert report; correct?

11              MS. FLOWERS:  Objection to

12         form.  It misstates what's in her

13         report and her testimony.

14        Q.    (BY MR. ALEXANDER)  I didn't

15    get your answer, Doctor.

16        A.    Oh, I'm sorry.  I didn't know

17    there was a question.

18        Q.    That statement, No. 3, is not

19    included anywhere in your expert report;

20    correct?

21              MS. FLOWERS:  Misstates the

22         report and the witness's testimony.

23         Objection.

24              THE WITNESS:  I would have to
```

Highly Confidential - Subject to Further Confidentiality Review

1       look again.

2           Q.      (BY MR. ALEXANDER)  Why don't

3   we go to page 4 of Exhibit 5.  And there's a

4   discussion of some of the data from the

5   Compton study, SAMHSA, other -- and others

6   about information relating to drugs of abuse

7   and patterns of abuse.  Do you see that?

8           A.      Yes, I do.

9           Q.      And is there any of this that

10  you think is incorrect?  That needs to be

11  changed?

12              MS. FLOWERS:  Object to the

13          form.

14          Q.      (BY MR. ALEXANDER)  Let me ask

15  it differently.  Is there any of this

16  information on page 4 of Exhibit 5 that you,

17  Dr. Young, do not stand by today?

18              MS. FLOWERS:  Same objection.

19              THE WITNESS:  Well, as I stated

20          earlier, there's always new data that

21          comes out.  And since I haven't looked

22          at this for three years, I probably

23          want to reread that before I would say

24          that there isn't anything that may

1          have changed in the research

2          literature or that there's new data

3          that I would want to change any of

4          these.

5          Q.     (BY MR. ALEXANDER)  Are there

6     any characterizations of the actual studies

7     or sources that you cite, Compton or

8     otherwise, that you think is incorrect here?

9          A.     As I said, there's new data

10    always coming out, so I would want to make

11    sure and check that before I would agree and

12    say that there aren't new data to include or

13    to correct.

14         Q.     Why don't you go to the

15    carryover paragraph at the bottom of page 4

16    to the top of page 5.  And this is now

17    talking about neonatal abstinence syndrome;

18    correct?

19         A.     Yes.

20         Q.     And we had some general

21    questioning about that before.  Do you

22    remember that?

23         A.     Yes.

24         Q.     It says, if you follow it, the

1    first full sentence on page 5: But there were

2    data suggesting that experiencing NAS was

3    related to mothers who also smoked during

4    pregnancy, and it cites a Jonas study

5    published in 2015.

6              Do you see that?

7       A.    Yes.

8       Q.    And I don't think there's any

9    mention of anything about smoking during

10   pregnancy or issues of smoking in connection

11   with anything in your expert report.  Is that

12   something you think is relevant to consider?

13      A.    In this context, I'm not, in my

14   report, talking about the clinical treatment

15   of NAS.  This particular section of this

16   testimony report was talking about prevalence

17   of how often it occurs.  And I believe

18   there's another expert in this case that's

19   talking about prevalence of NAS, and that

20   would be appropriate there.

21              This Jonas study is from the

22   mothers study, and I believe that probably is

23   covered in that other expert report.

24      Q.    Which you haven't seen?

1        A.      No, I don't believe I've seen

2    that.

3        Q.      But you -- are you talking

4    about Dr. Wexelblatt here or somebody else?

5        A.      I don't remember if -- I don't

6    recall if there's another -- I don't know if

7    there's another expert on NAS.

8        Q.      So you're just assuming there

9    is another expert who would address these

10   particular studies even though you haven't

11   seen the report and don't know the name?

12              MS. FLOWERS:  Object to the

13         form.

14              THE WITNESS:  I -- yes, I -- I

15         would assume there's somebody talking

16         about the prevalence of NAS.

17       Q.      (BY MR. ALEXANDER)  So the next

18   paragraph on page 5 of Exhibit 5, it says

19   Dr. Steven Patrick and colleagues,

20   parenthesis, 2016.  You've mentioned

21   Dr. Patrick from Vanderbilt; correct?

22       A.      That's correct.

23       Q.      And he's somebody you think is

24   kind of a leader in this area nationally;

1    correct?

2          A.     That's correct.

3          Q.     So Dr. Patrick and his

4    colleagues have analyzed Medicaid claims data

5    to monitor the trend of infants who are

6    diagnosed with neonatal abstinence syndrome.

7                 So just so we're clear,

8    Medicaid data?  Do you know what sort of

9    patients would be involved in Medicaid data?

10   Or be receiving Medicaid?

11         A.     Well, actually, Medicaid

12   pays -- varies from state to state, but

13   Medicaid pays for over half of the births in

14   the country, and I believe it's more than

15   half the births in Ohio.

16                So a lot of births are covered

17   by Medicaid.

18         Q.     So --

19         A.     So it's not just low-income

20   women that are covered by Medicaid.

21         Q.     Do you know that Medicaid

22   covering a birth is one of the strongest

23   indicators of the risk of NAS?

24         A.     Yes, and I also know that if

Highly Confidential - Subject to Further Confidentiality Review

```
 1    you're on Medicaid, you were -- I don't

 2    remember the number.  I don't know, eight or

 3    nine, ten times more likely to have been

 4    prescribed an opioid.

 5         Q.    And yet when we talked about

 6    your analysis in the last paper, you made no

 7    attempt to account for poverty or any

 8    socioeconomic factors in any of your

 9    analysis; correct?

10              MS. FLOWERS:  Objection to

11         form.  Misstates the testimony.

12              THE WITNESS:  Well, you're

13         mixing up a few different things in

14         that.

15              So this is specific -- first of

16         all, these data from Dr. Patrick are a

17         bit out of date.  I believe there have

18         been studies since then.

19              But this is various different

20         questions than what I was asked to

21         cover in my report.  So asking me

22         about these seems outside of the scope

23         of what I was asked to do.

24         Q.    Do you intend to talk about any
```

1   factors that drive the incidence or are risk

2   factors for NAS babies being born in Cuyahoga

3   or Summit County?

4         A.    No.  I intend to talk about

5   what I was asked to report on in my report.

6         Q.    Okay.  So what it says here, if

7   you look at the chart, is that there's

8   variation across regions in the rates of NAS;

9   correct?

10        A.    Yes.

11        Q.    And Ohio is in the lower end of

12   those ranges?

13          MS. FLOWERS:  Object to the

14       form, lack of foundation.

15        Q.    (BY MR. ALEXANDER)  According

16   to the data from Dr. Patrick published in

17   2015; correct?

18        A.    Let me restate what I just

19   agreed to.

20         Your statement was varying

21   rates of NAS.  These are varying rates of

22   diagnosed NAS in Medicaid claims data.  That

23   is very different than prevalence rates of

24   NAS.  The data source makes a difference on

1    rates of NAS.  So you can't use this as rates

2    of NAS.  You can use this as a rate of

3    diagnosed and recorded in Medicaid claims

4    data NAS.

5         Q.    So in Ohio, about 86 to 87% of

6    NAS cases are in Medicaid recipients, whereas

7    about 45 to 46% of births in Ohio are covered

8    by Medicaid.

9              Does that sound about right to

10   you?

11             MS. FLOWERS:  Object to the

12        form.  Foundation.  Lack of

13        foundation.

14             THE WITNESS:  I'm sorry, it's

15        late and I wasn't even able to track

16        what percentages you were throwing at

17        me.

18        Q.    (BY MR. ALEXANDER)  So do you

19   understand that in Ohio, the vast majority of

20   NAS births are among -- or within the group

21   of mothers who are on Medicaid as opposed to

22   private insurance or self-pay?

23        A.    I understand the data source

24   makes a very big difference in that

1    availability of data, and who you're looking

2    at and the availability of what you can find.

3              I also understand that women on

4    Medicaid were much more likely to be

5    prescribed an opioid than other women.  But I

6    also understand that low-income women are not

7    necessarily more likely to become dependent

8    on a substance than any other woman.

9        Q.    Okay.  So the information here

10   presented the chart and the description of

11   the results from Dr. Patrick's study on

12   page 5 of Exhibit 5.  You think that's

13   accurately described; correct?

14       A.    At that time, with the data

15   that were available to him, which are dated

16   at this point, yes.

17       Q.    And you thought you knew enough

18   about what literature was out there at this

19   time that you gave this sworn written

20   testimony to the Senate in February of 2016;

21   correct?

22             MS. FLOWERS:  Object to the

23        form.

24             THE WITNESS:  Yes.

```
 1              Q.      (BY MR. ALEXANDER)  The next

 2    paragraph says, "While there is not a clear

 3    relationship of rates of NAS and the dramatic

 4    increase of infants being placed in

 5    protective custody, the trend of younger

 6    children in care and particularly the number

 7    of infants is alarming."

 8              Do you see that?

 9         A.      Yes, I do.

10         Q.      Okay.  And do you agree there

11    isn't a clear relationship of the rates of

12    NAS and the rates of children being placed

13    in -- or infants being placed in protective

14    custody?

15         A.      Could you restate that?

16         Q.      Do you agree that there is not

17    a clear relationship of rates of NAS and the

18    increase of infants being placed in

19    protective custody?

20         A.      It's -- again, you're looking

21    at old data, and asking me to comment on

22    relatively old data that have been updated

23    since then.

24              So in -- at this point, you
```

1    have old data that is difficult to make that

2    relationship.  So at this point you can't get

3    the clear relationship between Medicaid

4    claims data with a diagnosis, and the same

5    places in the country in which infants were

6    going into out-of-home care.

7         Q.    So no data is cited here.  It

8    just has the statement.  So I'm asking you,

9    currently, in May of 2019, as you sit here

10   under oath, do you agree that there is still

11   not a clear relationship of the rates of NAS

12   and the increase of infants being placed into

13   protective custody?

14             MS. FLOWERS:  Objection, you

15        don't need to remind the witness that

16        she's under oath, and she's asked and

17        answered it.

18             THE WITNESS:  I don't know

19        that.

20             MR. ALEXANDER:  If you go to --

21             THE WITNESS:  Excuse me.  How

22        long have we been going after that

23        last break?

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE VIDEOGRAPHER:    54 minutes.

 2              THE WITNESS:  So it's probably

 3      about time for a break.

 4              MR. ALEXANDER:  Would you like

 5      a break?

 6              THE WITNESS:  Yes, I would.

 7              MR. ALEXANDER:  That's fine.

 8

 9              THE VIDEOGRAPHER:    We are

10      going off the record.  The time is

11      5:39 p.m.

12              (Recess taken, 5:40 p.m. to

13      5:48 p.m.)

14

15              THE VIDEOGRAPHER:   We are now

16      going back on the record and the time

17      is 5:49 p.m.

18      Q.    (BY MR. ALEXANDER)  Dr. Young,

19   we're still with Exhibit 5.  Do you have

20   page 6 in front of you?

21      A.    Yes, I do.

22      Q.    And this graphic on the page is

23   also included in your report, is it not?

24      A.    With updated data, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And after discussion of that

2    data, the last paragraph on this page starts

3    off with "Unfortunately, I cannot report

4    reliable data that would indicate to what

5    extent parental opioid or other substance use

6    disorders are associated with the number of

7    children in out-of-home care."

8         Did I read that right?

9    A.    Yes, you did.

10   Q.    Is that still the case?

11   A.    Yes.  There are a variety of

12   reasons why opioids and other substances are

13   undercounted in the AFCARS data system.

14        I outlined some of those in my

15   report, and there are various reasons why

16   parents are not either able to give the

17   answers about their substance use in the way

18   that they are asked, and there are various

19   reasons for that.  Stigma.  Depends on who's

20   asking the question.  We know when it's not

21   the person who has care and control of their

22   child, when they are asking the questions

23   about their substance use, it's more likely

24   to be a valid response.

```
 1              And then of course there's the
 2     three important groups of parents who are not
 3     available to give answers to those questions.
 4     So there are serious undercounts of substance
 5     use among parents in the AFCARS data.
 6              The three important populations
 7     that are not available for those data and why
 8     you find consistently that they're
 9     undercounted are parents who are
10     incarcerated, parents who, out of grief and
11     loss, leave their children at the hospital,
12     and of course the parents who have overdosed
13     and died.
14              MR. ALEXANDER:  Move to strike
15          everything after "yes" as
16          non-responsive.
17              MS. FLOWERS:  Objection, it was
18          responsive.
19          Q.    (BY MR. ALEXANDER)  Go to
20     page eight, please, Dr. Young.  There's a
21     state-by-state breakdown of parental alcohol
22     or drug use as a reason for child removal in
23     2013.  Do you see that?
24          A.    Yes.  This is just the
```

Highly Confidential - Subject to Further Confidentiality Review

1    information that I was giving you about why

2    these are undercounts and why there is such

3    variation from state to state.

4         Q.    Okay.  So in 2013, at least,

5    AFCARS had data that talked about parental

6    alcohol use as a reason for child removal;

7    correct?

8         A.    It is -- yes.  It's not exactly

9    a reason for child removal.  It's a factor

10   that's associated with the case.

11              As I said earlier, the reasons

12   for child removal are the various categories

13   of abuse, various categories of neglect.

14   These are sometimes referred to as reasons,

15   but they're actually factors that are

16   associated with the case.

17              So a parent's alcohol or drug

18   use could be the factor that leads to the

19   neglect, or leads --

20              And most substance use is

21   associated with neglect.  Very rarely you'll

22   find that box checked, and it's some form of

23   physical abuse.  But that does -- obviously

24   does happen.

Highly Confidential - Subject to Further Confidentiality Review

1           MR. ALEXANDER:  Move to strike

2      everything after "yes" as

3      non-responsive.

4           MS. FLOWERS:  Again, it is

5      responsive; you just don't like the

6      answer.  Objection.

7      Q.     (BY MR. ALEXANDER)  With your

8  caveat about differences in how data is

9  gathered in different places, according to

10 this chart Ohio is kind of middle of the

11 pack; right?  About average nationally?

12     A.     Well --

13          MS. FLOWERS:  Objection,

14     foundation.

15          THE WITNESS:  -- I believe the

16     average in 2013 was probably somewhere

17     around 33, something like that,

18     percent.  It's now about 37%.

19     Q.     (BY MR. ALEXANDER)  So Ohio is

20 about 25% here, so below average?

21     A.     Yes, they were.

22     Q.     And we've seen other kind of

23 state-by-state breakdowns in some of the data

24 and the cites that you have that -- for

1   statewide, for a lot of these metrics, Ohio

2   is average or below average in terms of

3   metrics of drug abuse and alcohol abuse;

4   correct?

5            MS. FLOWERS:  Objection,

6       compound.

7            THE WITNESS:  Yes.  And I

8       believe you're aware that they have

9       made recent changes to try and improve

10       their data collection.

11       Q.    (BY MR. ALEXANDER)  Why don't

12   you go to page 13, please.  There is the

13   section where you talk about children

14   affected by methamphetamine grants.  Do you

15   see that?

16       A.    Yes, I do.

17       Q.    And you've talked about these

18   methamphetamine grants which are the same --

19   are those the same thing as the RPG?

20       A.    No, they're not.

21       Q.    Okay.  So -- like the box above

22   it is in -- shaded in.  It says the RPG in

23   the state of Kansas.  That was right above

24   the methamphetamine grants.  You're talking

Highly Confidential - Subject to Further Confidentiality Review

1    about a separate set of grants; correct?

2         A.    That's correct.

3         Q.    So on page 13, the last full

4    paragraph says, "The other good news about

5    these projects is that they saved money.  Not

6    only in reducing -- in reduced foster care

7    costs but in keeping parents in treatment

8    long enough for treatment to have a lasting

9    effect.  And in the long term, these programs

10   are keeping children out of higher-end,

11   higher-cost mental health, special education,

12   and juvenile justice programs when they get

13   older.  These programs proved that they could

14   save millions of dollars, justifying the

15   increase in enhanced services for children

16   and their parents."

17             Did I read that right?

18        A.    You did read that right.

19        Q.    Is the gist of this that some

20   of the things that you think are best

21   practices involving treating substance abuse

22   and having early interventions have long-term

23   cost savings in terms of social services and

24   governmental services?

1        A.      Yes, that's correct.

2        Q.      And is that your hope for the

3    various recommendations you have in your

4    expert report?

5        A.      Yes.  Those have been shown in

6    various -- the two grant programs that I'm

7    mentioning, yes.

8        Q.      And that would go with what we

9    talked about earlier, that if Cuyahoga and

10   Summit County had instituted reasonable

11   practices in the past, that the total amount

12   that would need to be spent in the future in

13   terms of governmental and social services to

14   address any of these issues hopefully would

15   be less?

16              MS. FLOWERS:  Object to the

17        form.

18              THE WITNESS:  I believe that is

19        the hope, that they would be able to

20        have less investments in the future,

21        yes.

22        Q.      (BY MR. ALEXANDER)  Why don't

23   you go to paragraph 15 of your expert report,

24   please.

1          Again, you can look at your

2     copy, or Exhibit 2, or 3.

3          I'm sorry, 1 or 2, whichever

4     you're more comfortable with.

5          In the middle of the page, at

6     least the copy I have, it talks about

7     analysis done on the RPG data.

8          Do you see that?

9          MS. FLOWERS:  Which page are

10         you on?

11         MR. ALEXANDER:  15.

12         THE WITNESS:  Yes, I do.

13    Q.    (BY MR. ALEXANDER)  And there's

14    a statement here, it says, "The following

15    table shows the parents' demographic data on

16    opioid use for adults in the data sets from

17    grantees located in Ohio, Kentucky, and

18    Tennessee."

19         Do you see that?

20    A.    Yes, I do.

21    Q.    And then those states are

22    listed a couple of times thereafter.

23         This is not statewide data from

24    Ohio, is it?

1          A.      No, it is not.

2          Q.      It's not county-specific data

3    that includes Cuyahoga or Summit County, is

4    it?

5          A.      No.  As it says on the page,

6    it's the County of Lucas and it's Butler

7    County in Ohio.

8          Q.      Do you know where those

9    counties are in relation to Cuyahoga and

10   Summit County?

11         A.      Yes, I do.

12         Q.      Are they adjoining counties?

13   Different part of the state?

14         A.      They're not adjoining counties.

15         Q.      Okay.  So the RPG dataset is

16   dataset 191.  Do you know that?

17         A.      Dataset 191 from the archive?

18         Q.      In terms of what was produced,

19   the data that your colleague Dr. Yan

20   analyzed, we got dataset 191 as the RPG

21   dataset that was supposed to represent this

22   analysis.

23         A.      That's correct.

24         Q.      And of the datasets that you

Highly Confidential - Subject to Further Confidentiality Review

```
1    have that are set forth in this report, this

2    is the only dataset that has drug level data,

3    where you actually could say what the

4    specific drugs at issue are as opposed to a

5    general category, I think you call it

6    collapsed, of all drug use or drugs of abuse;

7    correct?

8            A.     That's correct.

9                   MS. FLOWERS:  Object to the

10           form.  Misstates the testimony.

11           Q.     (BY MR. ALEXANDER)  So of your

12   three datasets, the only one that has drug

13   level data has no data on Cuyahoga or Summit

14   County at all; correct?

15                  MS. FLOWERS:  Objection, form.

16           Lack of foundation.

17                  THE WITNESS:  Let me back up

18           just a second, because the other

19           datasets have substance use data in

20           them.  The AFCARS dataset has the data

21           that we just looked at by state of the

22           parent substance use indicator.  Those

23           are in the AFCARS dataset, and we

24           looked at those already.  So there is
```

Highly Confidential - Subject to Further Confidentiality Review

1          substance use data from Cuyahoga and

2          from Summit in my report.

3          Q.    (BY MR. ALEXANDER)  The

4     question was drug level data.  Where you said

5     it was collapsed from dataset 225 and dataset

6     220 that you produced coming out of AFCARS

7     and NDACAN, it was all collapsed.  You didn't

8     include in those data analyses any drug level

9     data; correct?

10              MS. FLOWERS:  Objection to the

11         form.  I don't think "collapsed" was

12         her Word.

13              THE WITNESS:  Yeah.  Those data

14         are not collected in that way.  Drug

15         level is what is not -- it's not the

16         way I would term those data.

17              So the variable is actually

18         parents' substance use.  Or parents'

19         drug use, rather, or parents' alcohol

20         use.

21              MR. ALEXANDER:  I want to make

22         sure we're talking about the same

23         thing.

24              THE WITNESS:  Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      (BY MR. ALEXANDER)  Of your

2    three datasets, the only one where you can

3    say the drug that was supposed to be being

4    used by the parent was a particular drug,

5    whether it was heroin, or a branded

6    prescription opioid, or some other specific

7    drug, is this RPG dataset 191; correct?

8      A.      Yes, that's correct.

9      Q.      And that doesn't have any data

10   that comes from Cuyahoga or Summit County at

11   all; correct?

12     A.      Yes, that's correct.

13     Q.      And even when you had

14   information in this dataset that talks about

15   which particular drug somebody was indicating

16   that they were using or abusing, there's no

17   information in this dataset or in the way

18   that you and your colleagues have analyzed it

19   that would cross-reference to see if that

20   individual actually had a prescription for

21   the drug that was being used; correct?

22            MS. FLOWERS:  Object to the

23       form.  Lack of foundation.

24            THE WITNESS:  These data come

1           from the treatment admission data.

2           They're not referenced to

3           prescriptions.  They are from the

4           treatment episode dataset that are

5           collected by providers at the provider

6           level when they come into treatment.

7           Q.    (BY MR. ALEXANDER)  I'm not

8   sure you heard my question.

9           Do you know if there are

10  databases available in Ohio and produced in

11  the litigation that would indicate like who

12  got a prescription for an opioid in Ohio?

13          A.    I do not know that.

14          Q.    So there's no analysis where

15  there was an attempt to cross-reference or

16  figure out if anybody who was taking a

17  prescription opioid actually had a

18  prescription for the opioid they were taking;

19  correct?

20          MS. FLOWERS:  Object to the

21          form.  Lack of foundation.  Misstates

22          testimony.

23          THE WITNESS:  I'm sorry, I

24          think I misspoke when I said that I

1     don't know that there are databases of

2     prescriptions.  I believe there are

3     databases of prescriptions.  I don't

4     have any idea to what extent they have

5     identifying information.  The data

6     that we're talking about in the

7     treatment episode dataset do not have

8     identifying information.  So there

9     would not be a way to connect any kind

10    of identifying information from the

11    treatment data to prescriptions.  The

12    treatment episode dataset does not

13    have identifiers.

14         Q.    (BY MR. ALEXANDER)  So in your

15    report where you present any analyses from

16    this RPG dataset, there is no information

17    that allows anybody to see if any of these

18    individuals who were purporting that they

19    were taking a prescription opioid actually

20    had a prescription for the opioid they were

21    taking; correct?

22              MS. FLOWERS:  Objection, lack

23         of foundation and form.

24              THE WITNESS:  There isn't a way

Highly Confidential - Subject to Further Confidentiality Review

```
 1           and I don't see that that's the point.

 2           The point is these were parents in the

 3           child welfare system who were referred

 4           to specialized programs because their

 5           children were placed in protective

 6           custody.  And being placed in

 7           protective custody, the parents needed

 8           treatment, and half of them were using

 9           opioids.

10           Q.    (BY MR. ALEXANDER)  And you

11  don't know how many of the ones using opioids

12  actually had a prescription for the

13  prescription opioids they were using?

14                The portion of them that were

15  using prescription opioids?

16           A.    No, I do not.

17           Q.    And you didn't include any data

18  or analysis on the alcohol use in this group;

19  correct?

20                MS. FLOWERS:  Asked and

21           answered.

22                THE WITNESS:  No.  That was not

23           what I was asked to do.

24           Q.    (BY MR. ALEXANDER)  I mean,
```

1    it's in the RPG data.  Alcohol abuse is noted

2    in this data and could have been pulled out

3    and cross-referenced or analyzed; correct?

4         A.    Alcohol use is in the RPG data,

5    yes.

6         Q.    Why don't we go to the second

7    dataset that was looked at in your -- at

8    least in the terms of the way it's presented

9    in the report.  On page 17, very bottom at

10   least for mine, page 16 carries over to the

11   top of page 17, it talks about the NCANDS

12   data analysis submitted from the -- to the

13   state of -- by the state of Ohio, 2004 to

14   2016.  And specific graphics are included

15   here.

16              Do you see that?

17        A.    Yes.

18        Q.    And so this is dataset 220;

19   correct?

20        A.    Yes.  I believe that's correct.

21        Q.    And do you know why the numbers

22   for the individual cases in this dataset

23   don't match what's actually in SACWIS?

24              MS. FLOWERS:  Object to the

1          form, lack of foundation.

2                    THE WITNESS:  I don't know what

3          you're talking about.

4          Q.     (BY MR. ALEXANDER)  So in the

5     actual SACWIS database, they have a certain

6     number in the system where cases are assigned

7     a number.  And it doesn't relate at all to

8     what was produced from your dataset.  Do you

9     know why that would be?

10                   MS. FLOWERS:  Object to the

11         form, lack of foundation.

12                   THE WITNESS:  I assume,

13         although I do not know for sure, that

14         all of those data get a different

15         number assigned when they go into the

16         archives so that they are made --

17         protected.

18         Q.     (BY MR. ALEXANDER)  And do you

19    have the key to that to do cross-referencing?

20         A.     No, I do not.

21         Q.     Do you know who does?

22         A.     No, I do not.

23         Q.     Do you know in your dataset

24    that was produced from 220 why caretaker

Highly Confidential - Subject to Further Confidentiality Review

```
 1    alcohol abuse is missing?

 2          A.     Because I was asked to look at

 3    opioids.

 4          Q.     So did you ask Dr. Yan to omit

 5    that from the data?

 6          A.     Yes, I did.

 7          Q.     But that was actually in the

 8    data that was available to you; right?

 9                 MS. FLOWERS:  Objection, asked

10          and answered.

11                 THE WITNESS:  In which data are

12          you talking about?  In the NCANDS

13          data.

14          Q.     (BY MR. ALEXANDER)  Dataset 220

15    that's discussed on page 17?

16          A.     I need to go back and look at

17    dataset 220.

18          Q.     You said that you asked Mr. Yan

19    to omit the alcohol -- caretaker alcohol

20    abuse data.

21                 Is that true or not true?

22                 MS. FLOWERS:  Objection.

23                 THE WITNESS:  NCANDS does not

24          have substance use in the NCANDS
```

1        dataset.

2            I think it's late in the day,

3        and I'm sorry, but I think I've gotten

4        a bit tripped up between the datasets.

5        So I normally wouldn't refer to a

6        dataset by a number.

7            So NCANDS.  NCANDS is about the

8        front end of the system.  Reports and

9        investigations.  It's a separate

10       dataset.  In some states it's in one

11       data system.

12           It's interesting that in Ohio

13       they call their dataset SACWIS.  That

14       is the requirement in the -- at the

15       federal government.  Most other states

16       have a different name for it.

17       Q.    (BY MR. ALEXANDER)  So SACWIS

18   covers both maltreatment investigations and

19   removals; correct?

20           MS. FLOWERS:  Objection to the

21       form, lack of foundation.

22           THE WITNESS:  No.

23       Q.    (BY MR. ALEXANDER)  In Ohio,

24   where Cuyahoga and Summit County are, the

1    SACWIS database has information in it on both

2    removals and maltreatment investigations;

3    correct?

4         A.    Yes, I believe that's correct.

5         Q.    Okay.

6         A.    But AFCARS are the items that

7    go to the federal government related to the

8    parents' substance use.

9              So at the federal level, report

10   220, the dataset 220, which is NCANDS, would

11   not have the substance use variables in

12   NCANDS at -- in the archive.  AFCARS has the

13   parents' substance use at the federal level.

14   Not NCANDS.

15        Q.    (BY MR. ALEXANDER)  Do you know

16   if you could have gone back to SACWIS to pull

17   out caretaker alcohol abuse or other

18   variables that weren't included?

19        A.    I would not be given

20   permission, nor would I ask a state for

21   Access to SACWIS.  The way that researchers

22   get Access to data is through the data

23   archive.  It's never -- I wouldn't even ask

24   to get somebody's -- a SACWIS system.  It's

Highly Confidential - Subject to Further Confidentiality Review

1    not permissible.

2             It's the reason why the federal

3    government set up the data archive for

4    researchers to have Access to child welfare

5    data.  You do it through the archive.

6        Q.    So you didn't ask for that;

7    correct?

8             MS. FLOWERS:  Objection to the

9        form.

10             THE WITNESS:  No.

11        Q.    (BY MR. ALEXANDER)  Graphic 12

12    is number of substantiated maltreatment

13    reports and child victims in Cuyahoga County

14    2004 to 2016.  Do you see that?

15        A.    Yes, I do.

16        Q.    Blue is child victims and green

17    is maltreatment reports.

18        A.    That's correct.

19        Q.    And a single report can have

20    more than one child; correct?

21             A child can be the subject of

22    more than one report?

23        A.    That's right.  There can be

24    more than one allegation for a particular

Highly Confidential - Subject to Further Confidentiality Review

```
 1    child.
 2         Q.    So for the first five years,
 3    presented here, from 2004 to 2009, there was
 4    a significant drop of both of these metrics;
 5    correct?
 6              MS. FLOWERS:  Object to form.
 7              THE WITNESS:  Yes.
 8              Another factor that plays into
 9         the --
10              MR. ALEXANDER:  I'm sorry,
11         Doctor, we're light on time and I
12         didn't ask you anything about factors.
13         I just asked about the numbers.
14         During those five years, did they
15         drop.
16              MR. PENDELL:  Objection.
17              MS. FLOWERS:  Objection, you've
18         got to let her finish the answer.
19              MR. ALEXANDER:  Actually, not
20         according to what Special Master Cohen
21         said during the Egilman deposition.
22         Given the time limit, we are allowed
23         to cut off non-responsive answers.
24         I've been very generous.
```

```
 1              Q.      (BY MR. ALEXANDER)  So I just
 2     asked you about these numbers between 2004
 3     and 2005 -- 2009, in graphic 12, on Cuyahoga
 4     County.  This significant drop, is that a
 5     good thing?
 6                   MS. FLOWERS:  Objection.
 7                   THE WITNESS:  Yes.
 8                   MR. PENDELL:  Doctor, answer
 9              how you need to.
10                   THE WITNESS:  There is a drop.
11                   You should also know that in
12              2006 is when Ohio changed their SACWIS
13              system and got a new system.  So I
14              can't really verify that those are
15              actual drops, or if those are related
16              to the change in the state data
17              system.
18              Q.      (BY MR. ALEXANDER)  Okay.  So
19     just looking from 2006 to 2009, there are
20     still substantial drops for the number of
21     maltreatment reports.  It's about 640.  And
22     for the number of children, it's just short
23     of 600.  That's good, right?
24              A.      Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. FLOWERS:  Objection, asked
 2         and answered.
 3              THE WITNESS:  Yes.  And any
 4         researcher would say that 2009 is some
 5         sort of an anomaly.  That you don't
 6         get that big of a drop in any one year
 7         without there being some strange thing
 8         that happened in the data.
 9         Q.    (BY MR. ALEXANDER)  And so is
10    there a right number, you think, of the
11    number of substantiated maltreatment reports
12    or child victims that you should see in a
13    county as big as Cuyahoga County?
14         A.    I would not venture to say what
15    the right number of child abuse is in a
16    county.
17         Q.    You'd like it to be zero,
18    right?
19         A.    Wouldn't we all want it to be
20    zero?
21         Q.    And so do you know all of the
22    factors that drive it up or down in any given
23    year?
24         A.    Do I know all of the factors
```

```
 1    that drive it up and down in any given year?

 2    No, I can't say that I know all of the

 3    factors.

 4         Q.    You'd need to look at a number

 5    of socioeconomic and demographic factors that

 6    might have an impact on changes from year to

 7    year, in addition to anything about data

 8    collection or policies and practices of the

 9    department; correct?

10              MR. PENDELL:  Objection.

11              MS. FLOWERS:  Objection, form

12         and foundation.

13              THE WITNESS:  I don't believe

14         that what you're --

15              Well, I'm not sure, but I think

16         you're leading to socioeconomic

17         factors are what drive child abuse and

18         neglect.  I don't believe that that is

19         borne out in the literature.

20         Q.    (BY MR. ALEXANDER)  There are a

21    number of factors that drive child

22    maltreatment reports and the number of child

23    victims; correct?

24         A.    There are factors that are
```

Highly Confidential - Subject to Further Confidentiality Review

1    associated with cases that are in child abuse

2    and neglect.

3         Q.    Let's look at graphic 13.  And

4    we can cut off the first two years if you

5    want because you told us that SACWIS was

6    adopted statewide in 2006; correct?

7         A.    I'm not positive on that year.

8    It could be in that time frame of 2006, 2007.

9    Something like that.

10        Q.    So if SACWIS was adopted in

11   2006, do you know why the numbers went up

12   between '04 and '06 in Summit County?  Is

13   that related to methamphetamine?  Something

14   else?  Any other changes?

15        A.    No, I don't know.

16             MS. FLOWERS:  Objection to

17        form.

18        Q.    (BY MR. ALEXANDER)  So the

19   changes from 2006, all the way down to 2014,

20   those first eight years, there's a fairly

21   steady decline on both of these numbers;

22   correct?

23        A.    Yes, there are declines.

24        Q.    That's good, right?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yes, it is.

2          Q.     Do you know what drove that

3     decline of child maltreatment reports and

4     child victims in Summit County from 2006

5     through 2014?

6              MS. FLOWERS:  Objection, asked

7          and answered.

8              THE WITNESS:  No, I don't know

9          specifically.

10         Q.     (BY MR. ALEXANDER)  Do you know

11    what drove the increases from 2014 to 2016?

12         A.     I know what workers told us in

13    conversations, and what the family treatment

14    court individuals ask us to come help them

15    with.

16         Q.     But remember, you got requests

17    and you knew something was going on with

18    opioids and abuse in Summit County before

19    they ever saw these increases between 2014

20    and 2015; right?

21             MS. FLOWERS:  Objection.

22             THE WITNESS:  I think we're

23         confusing the 2011 request that I got

24         from my federal project officer and

1        recall that Summit got their regional

2        partnership grant in 2012.  And in, I

3        believe it's 2016 is when they

4        actually asked for some of our staff

5        to do a site visit related to their

6        increasing number of cases.

7        Q.     (BY MR. ALEXANDER)  If we

8   overlay on these, either of these charts

9   about maltreatment reports, the prescription

10  drug distribution and number of prescriptions

11  written and dispensed in these counties, we

12  would see that the prescription drug use was

13  going up while these numbers were going down

14  and that it was going down before any of

15  these numbers came up; correct?

16        MS. FLOWERS:  Object to the

17        form, foundation, outside of the

18        scope.

19        THE WITNESS:  Yeah, that is

20        something that is outside my scope.  I

21        don't know.

22        Q.     (BY MR. ALEXANDER)  If that's

23  the case, you'd have no explanation for that,

24  would you?

Highly Confidential - Subject to Further Confidentiality Review

```
1                    MS. FLOWERS:  Object to the

2           form.

3                    THE WITNESS:  Again, it's

4           outside my scope.

5           Q.     (BY MR. ALEXANDER)  So on

6    page 18 you present some data on your third

7    dataset that was analyzed; correct?

8                    This is the AFCARS data from

9    Ohio Department of Job and Family Services,

10   dataset 225; correct?

11          A.     Yes, this is the AFCARS

12   dataset.

13          Q.     And so I'm going to ask a

14   couple of pretty simple questions about this.

15                  Do you know why it is that the

16   numbers in SACWIS don't match what's included

17   in AFCARS, that is supposed to have come from

18   ODJFS, presumably forwarding SACWIS data?

19          A.     Again, there are corrections

20   that are made each time that reports are

21   filed with the federal government.

22          Q.     Do you think they've been

23   deidentified in some way?

24          A.     Pardon?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  I didn't catch that.

 2          Q.      Do you think the case number

 3    format has changed in some way and you don't

 4    have the information that would allow you to

 5    cross-reference them; correct?

 6                  MS. FLOWERS:  Objection.

 7                  THE WITNESS:  I'm sorry.  I

 8          thought you meant the totals --

 9                  MR. ALEXANDER:  No.

10                  THE WITNESS:  -- are different.

11                  MR. ALEXANDER:  No.  I asked

12          about the case numbering system.

13          Q.      (BY MR. ALEXANDER)  So each

14    case -- we went over this already.  Each case

15    that's established in one of these counties

16    required by law it's maintained, and

17    ultimately there is a case number associated

18    with it.  There are various ways that's

19    described, and that is used in SACWIS so that

20    you could like go to the actual case file if

21    you wanted to look up what happened and look

22    at the full file.  Right?  Do you understand

23    how case file numbers work?

24                  MS. FLOWERS:  Objection to the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              form, lack of foundation.  Move to
 2              strike.
 3                   MR. PENDELL:  Objection.
 4                   THE WITNESS:  I didn't hear you
 5              say "file."  I heard you say why the
 6              numbers would be different.
 7                   So I thought you were saying
 8              the totals were different.  And I was
 9              trying to put that together.
10         Q.   (BY MR. ALEXANDER)  Well --
11         A.     The case file numbers, I
12    believe it's the same situation.  That the
13    numbers, that the case numbers are
14    deidentified when -- and changed before they
15    go to the archives so that they are
16    deidentified.
17         Q.     (BY MR. ALEXANDER)  So the
18    numbers are also different.  The total
19    numbers, there are more removals in this
20    dataset from Cuyahoga and Summit County from
21    dataset 225 than are in the SACWIS dataset
22    that was produced by plaintiffs directly from
23    Summit and Cuyahoga County.  Do you have an
24    explanation for that?
```

1           MS. FLOWERS:  Objection, lack

2      of foundation.

3           THE WITNESS:  I wouldn't be

4      able to speak to that, since I haven't

5      seen the other dataset.

6      Q.    (BY MR. ALEXANDER)  So this

7  dataset, 225, lists multiple reasons why

8  there could be a removal, whereas the data

9  that was produced by plaintiffs directly from

10 SACWIS does not include multiple reasons,

11 only one reason per case.  Do you know why

12 that would be different?

13          MS. FLOWERS:  Objection, asked

14     and answered.  Lack of foundation.

15          THE WITNESS:  Again, I don't

16     know what I'm comparing to, so I do

17     not know.

18     Q.    (BY MR. ALEXANDER)  If there

19 are multiple reasons available in the data,

20 you'd need to have them to be able to conduct

21 a meaningful analysis of the data; right?

22          MS. FLOWERS:  Objection, lack

23     of form -- form, foundation, calls for

24     speculation.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  I'm looking at

 2         the data that are submitted to the

 3         federal government.

 4         Q.    (BY MR. ALEXANDER)  So you have

 5    no idea what would be in SACWIS?

 6              MS. FLOWERS:  Objection.

 7              THE WITNESS:  I don't know what

 8         the difference is between what Ohio

 9         submitted in their dataset and what is

10         in the AFCARS dataset with these

11         county numbers.

12         Q.    (BY MR. ALEXANDER)  So the data

13    here as we talked about in connection with

14    the other ones, you don't get the ability to

15    pull out a specific drug of abuse from this

16    dataset 225; correct?

17         A.    No.  You only have those four

18    variables that I mentioned already.

19         Q.    So correct, you can't pull out

20    the specific drug of abuse?

21              MS. FLOWERS:  Objection, asked

22         and answered.

23              THE WITNESS:  That's correct.

24         Q.    (BY MR. ALEXANDER)  So the
```

Highly Confidential - Subject to Further Confidentiality Review

1    dataset 225, among possible reasons that are

2    tracked for removal, has 15 options.  The

3    SACWIS data as maintained by the state of

4    Ohio has 27 reasons.  Any understanding of

5    why there would be a difference there?

6          A.    As I mentioned, each state runs

7    their own data system.  And the variables

8    that are required to be submitted to AFCARS

9    are the standard variables that are -- that

10   are required by the federal government.  But

11   each state's data system varies.  They can

12   have many different things in their data

13   system that don't roll up to the federal

14   government.

15         Q.    Okay.  So if the analysis is

16   done on the 15 possible reasons, not the 27

17   that are actually in the SACWIS data, you may

18   get different results; correct?

19               MS. FLOWERS:  Objection, lack

20         of foundation.

21               THE WITNESS:  Well, the 15

22         variables would be consistent unless

23         the state was rolling those 27 and

24         collapsing into those 15 for some

Highly Confidential - Subject to Further Confidentiality Review

```
 1          reason.  I don't know the mechanism in
 2          Ohio.  If they just cut off the extra
 3          12, or if they recategorize the 12
 4          into the 15.  I don't know.
 5          Q.    (BY MR. ALEXANDER)  But the
 6    purpose of the analysis that you've done
 7    here, these couple of pages of charts, is
 8    this is the place where you're able to
 9    actually present some Cuyahoga and Summit
10    County specific data; right?
11          A.    That's correct.
12          Q.    Okay.
13          So in doing this -- I'm not
14    talking about Ohio, and what Ohio does more
15    generally, I'm talking about the reasons that
16    are in the files maintained by Cuyahoga and
17    Summit County, according to their own laws
18    and requirements, if they had additional
19    fields of reasons for removal, your analysis
20    didn't account for them; correct?
21          MS. FLOWERS:  Objection.  She's
22          already testified she didn't look at
23          SACWIS.
24          THE WITNESS:  As I said, what's
```

1      available to researchers are the data

2      that are stored at the national

3      archive.

4      Q.      (BY MR. ALEXANDER)  I didn't

5  ask about researchers, I asked about you in

6  terms of preparing to be an expert witness in

7  this case on behalf of Cuyahoga and Summit

8  County who have Access to this data and have

9  produced it in the litigation.

10         So did you account for the

11 additional 12 fields that are in SACWIS for

12 Cuyahoga and Summit County for reasons for

13 removal, "yes" or "no"?

14         MS. FLOWERS:  Object to the

15      form, lack of foundation, and it's

16      unclear as to what "this data" is.

17         THE WITNESS:  Yeah, no, I did

18      not.

19      Q.      (BY MR. ALEXANDER)  If you go

20 to the last section of this report, basically

21 the County initiatives and then solutions and

22 recommendations, I'm going to kind of lump

23 them all together.  Does that make sense?

24 I'm not asking you about every section and

1     every part.

2               But because as we've seen, a

3     lot of these are actually included in other

4     publications that you've had; right?

5               MS. FLOWERS:  Objection, move

6          to strike.

7               THE WITNESS:  The

8          recommendations are tested in other

9          grant programs.

10         Q.    (BY MR. ALEXANDER)  So in

11    general, these various recommendations that

12    you offer here, they require actions or

13    changes in policy or law or funding, not just

14    from Cuyahoga or Summit County, but in some

15    instances from the State of Ohio, in some

16    instances it's from healthcare providers or

17    hospital chains, and in some instances from

18    complete third parties beyond what I've

19    already mentioned; right?

20               MS. FLOWERS:  Object to the

21          form.

22               THE WITNESS:  I wouldn't agree

23          to that until I looked at each one

24          that you're talking about.

1    Q.    (BY MR. ALEXANDER)  So you've

2    used the Word "stakeholders" before, both in

3    your testimony and in some of your

4    publications.  What's a stakeholder?

5    A.    The various entities that boil

6    down to the taxpayers who are paying for

7    this.  But the representatives that represent

8    the taxpayers.  So they are both the elected

9    officials and their appointees that govern or

10   oversee the policies and procedures for how

11   the agencies run, and the various interested

12   commissions and agency heads that run these

13   different programs.

14   Q.    So they're not just government

15   officials, though?  Stakeholders would

16   include like healthcare provider chains,

17   hospitals, medical associations, third-party

18   treatment centers in some instances; correct?

19   A.    Yes, that's correct.

20         MS. FLOWERS:  Object to the

21         form.

22         THE WITNESS:  Yes, that's

23         right.

24         MR. ALEXANDER:  Like you talk

Highly Confidential - Subject to Further Confidentiality Review

1    about family-centered treatment

2    services and treatment service Access,

3    and you talk about monitoring and

4    testing in connection with birth.  You

5    talk about a range of things that

6    aren't just government, they would

7    require various behavioral changes or

8    funding and policy changes by various

9    third parties, not just these

10    counties; correct?

11         MS. FLOWERS:  Objection.

12         THE WITNESS:  Yes.  It takes

13    more than just the specific government

14    agencies.  It takes those that are

15    contracted to work on behalf of the

16    government agency.  For example, the

17    treatment providers, the hospitals

18    that are receiving the insurance

19    payments and the Medicaid payments,

20    the physicians, yes.

21         Q.    (BY MR. ALEXANDER)  And so you

22    don't have a list of the recommendations you

23    have that could just be done by the counties

24    themselves; correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            MS. FLOWERS:  Lack of

 2        foundation, objection.

 3            THE WITNESS:  The counties are

 4        very much involved with what these

 5        need to happen, but they -- can't do

 6        it by themselves.  It takes all of

 7        these entities pulling together.

 8    Q.    (BY MR. ALEXANDER)  Do you

 9  understand that this lawsuit involves certain

10  parties that the court may be able to order

11  to do something, but only the ones who are

12  parties, like not the state, not third-party

13  hospital chains, not individual doctors out

14  in the community, not people running

15  treatment centers.  Do you understand that?

16            MS. FLOWERS:  Objection, calls

17        for a legal conclusion.

18            THE WITNESS:  I understand

19        that.  I also understand that that is

20        much of what this work entails is

21        bringing together community groups and

22        other interested parties.  It's in the

23        hospital's best interest to also

24        participate to reduce the number of
```

Highly Confidential - Subject to Further Confidentiality Review

1           babies born with NAS, and that is the

2           way in which that comes together to

3           ensure that they're getting something

4           from this collaborative as well as the

5           county is getting something from this

6           collaborative.

7           Q.     (BY MR. ALEXANDER)  When you

8     say this work entails, are you talking about

9     the litigation?  Or are you talking about the

10    general practice in the field?

11          A.     I'm talking about the solutions

12    of putting together the collaborative work

13    that needs to happen to create these

14    solutions.

15          Q.     Okay.  So going back to my

16    question, did you include, or can you

17    identify the specific recommendations you

18    have that would just be things that would

19    need to be done by the counties themselves,

20    as opposed to involving the state or various

21    third parties?

22               MS. FLOWERS:  Object to the

23          form.

24               THE WITNESS:  I didn't do that.

Highly Confidential - Subject to Further Confidentiality Review

1          I could take a look at that, but I

2          think that most of these

3          recommendations would take the County

4          and other entities working together.

5          Q.    (BY MR. ALEXANDER)  So sitting

6     here today, having gone through your first

7     deposition, do you have anything that you've

8     testified to thus far you need to change or

9     supplement that we haven't already gone over?

10          A.    Not that I know of right now.

11          Q.    Do you have any additional

12     analysis or review or preparation that you

13     need to do before you testify at trial in

14     this matter?

15          A.    Not that I know of right now.

16          Q.    And obviously there can be

17     additional medical literature that comes out

18     or additional dataset or additional requests

19     from plaintiffs for you to look at stuff.  If

20     you get that sort of information and it

21     changes your opinions or your bases therefor,

22     you will let us know through plaintiffs'

23     counsel; right?

24          A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. ALEXANDER:  So subject to

 2         our reservations that we went over

 3         before on the record, I won't repeat

 4         all of that, and I think there may be

 5         some need for some additional

 6         follow-ups on specific data and issues

 7         identified relating to data during the

 8         course of the deposition.  Subject to

 9         those reservations, those are the

10         questions that I have on behalf of

11         the -- my client and the distributor

12         defendants, and I would pass the

13         witness to anybody else who may ask

14         questions.

15              MS. FLOWERS:  We have 7 minutes

16         and 38 seconds.

17              MR. ALEXANDER:  Does anybody

18         else on the defense side have any

19         questions?

20              MS. FLOWERS:  No questions.

21         Let's go off the record for just a

22         minute.

23              MR. ALEXANDER:  Okay.

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              THE VIDEOGRAPHER:   We are now

2         going off the record, and the time is

3         6:28 p.m.

4              (Recess taken, 6:28 p.m. to

5         6:36 p.m.)

6

7              THE VIDEOGRAPHER:   We are now

8         going back on the record, and the time

9         is 6:36 p.m.

10             MS. FLOWERS:  This is Jodi

11        Flowers on behalf of the plaintiffs.

12        The witness reserves her right to read

13        and sign and we have no questions.

14             MR. ALEXANDER:  Thank you.

15

16             THE VIDEOGRAPHER:   Okay.  This

17        concludes the video deposition of

18        Nancy K. Young.  We are now going off

19        the record and the time is 6:36 p.m.

20             (Proceedings recessed at

21        6:36 p.m.)

22                  --o0o--

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      CERTIFICATE
 2              I, DEBRA A. DIBBLE, Registered
      Diplomate Reporter, Certified Realtime
 3    Reporter, Certified Realtime Captioner,
      Certified Court Reporter and Notary Public,
 4    do hereby certify that prior to the
      commencement of the examination, NANCY K.
 5    YOUNG, Ph.D. was duly sworn by me to testify
      to the truth, the whole truth and nothing but
 6    the truth.
 7              I DO FURTHER CERTIFY that the
      foregoing is a verbatim transcript of the
 8    testimony as taken stenographically by and
      before me at the time, place and on the date
 9    hereinbefore set forth, to the best of my
      ability.
10
                I DO FURTHER CERTIFY that pursuant
11    to FRCP Rule 30, signature of the witness was
      not requested by the witness or other party
12    before the conclusion of the deposition.
13              I DO FURTHER CERTIFY that I am
      neither a relative nor employee nor attorney
14    nor counsel of any of the parties to this
      action, and that I am neither a relative nor
15    employee of such attorney or counsel, and
      that I am not financially interested in the
16    action.
17
18
19    _____
      DEBRA A. DIBBLE, RDR, CRR, CRC
20    NCRA Registered Diplomate Reporter
      NCRA Certified Realtime Reporter
21    Certified Court Reporter
22
      Dated: 5/17/19
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the

 6    appropriate space on the errata sheet for any

 7    corrections that are made.

 8              After doing so, please sign the

 9    errata sheet and date it.

10              You are signing same subject to

11    the changes you have noted on the errata

12    sheet, which will be attached to your

13    deposition.

14              It is imperative that you return

15    the original errata sheet to the deposing

16    attorney within thirty (30) days of receipt

17    of the deposition transcript by you.  If you

18    fail to do so, the deposition transcript may

19    be deemed to be accurate and may be used in

20    court.

21

22

23

24
```

```
 1                        ERRATA

 2     Page   LINE   CHANGE

 3     _____  _____  _____

 4            REASON: _____

 5     _____  _____  _____

 6            REASON: _____

 7     _____  _____  _____

 8            REASON: _____

 9     _____  _____  _____

10            REASON: _____

11     _____  _____  _____

12            REASON: _____

13     _____  _____  _____

14            REASON: _____

15     _____  _____  _____

16            REASON: _____

17     _____  _____  _____

18            REASON: _____

19     _____  _____  _____

20            REASON: _____

21     _____  _____  _____

22            REASON: _____

23     _____  _____  _____

24            REASON: _____
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4           I, NANCY K. YOUNG, Ph.D., do
       hereby certify that I have read the foregoing
 5     pages and that the same is a correct
       transcription of the answers given by me to
 6     the questions therein propounded, except for
       the corrections or changes in form or
 7     substance, if any, noted in the attached
       Errata Sheet.

 8

 9

10

11

12     _____
        NANCY K. YOUNG, Ph.D.              DATE
13

14

15     Subscribed and sworn to before me this

16     _____ day of _____, 20 _____.

17     My commission expires: _____

18

19     _____
20     Notary Public

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    LAWYER'S NOTES

 2

 3    page      LINE

 4    _____     _____      _____

 5    _____     _____      _____

 6    _____     _____      _____

 7    _____     _____      _____

 8    _____     _____      _____

 9    _____     _____      _____

10    _____     _____      _____

11    _____     _____      _____

12    _____     _____      _____

13    _____     _____      _____

14    _____     _____      _____

15    _____     _____      _____

16    _____     _____      _____

17    _____     _____      _____

18    _____     _____      _____

19    _____     _____      _____

20    _____     _____      _____

21    _____     _____      _____

22    _____     _____      _____

23    _____     _____      _____

24    _____     _____      _____
```