Highly Confidential - Subject to Further Confidentiality Review

```
 1            IN THE UNITED STATES DISTRICT COURT
 2             FOR THE NORTHERN DISTRICT OF OHIO
 3                      EASTERN DIVISION
 4                        -   -   -
 5

     IN RE:  NATIONAL           :   MDL NO. 2804
 6   PRESCRIPTION OPIATE        :
     LITIGATION                 :
 7                              :
     ------------------------------------------------
 8   THIS DOCUMENT RELATES TO   :  CASE NO.
     ALL CASES                  :  1:17-MD-2804
 9                              :
                                :  Hon. Dan A.
10                              :  Polster
11                        -   -   -
12                    February 8, 2019
13                        -   -   -
           HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
14                 CONFIDENTIALITY REVIEW
15
16               Continued videotaped deposition
     of CHRISTOPHER ZIMMERMAN taken pursuant to notice,
17   was held at the law offices of Reed Smith LLP, Three
     Logan Square, 1717 Arch Street, Suite 3100,
18   Philadelphia, Pennsylvania, beginning at 1:44
     p.m., on the above date, before Ann Marie
19   Mitchell, a Federally Approved Certified Realtime
     Reporter, Registered Diplomate Reporter,
20   Registered Merit Reporter and Notary Public.
21
                          -   -   -
22
               GOLKOW LITIGATION SERVICES
23        877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

## Page 2

APPEARANCES:

BARON & BUDD, P.C.
BY: MARK PIFKO, ESQUIRE
15910 Ventura Boulevard
Suite 1600
Encino, California 91436
(818) 839-2333
mpifko@baronbudd.com
Representing the Plaintiffs

BARON & BUDD, P.C.
BY: WILLIAM POWERS, ESQUIRE
600 New Hampshire Avenue NW
The Watergate, Suite 10-A
Washington, DC 20037
(202) 333-4562
wpowers@baronbudd.com
Representing the Plaintiffs

REED SMITH LLP
BY: ROBERT A. NICHOLAS, ESQUIRE
BY: JOSEPH J. MAHADY, ESQUIRE
BY: SAMANTHA L. ROCCHINO, ESQUIRE
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
(215) 851-8100
rnicholas@reedsmith.com
jmahady@reedsmith.com
srocchino@reedsmith.com
Representing AmerisourceBergen Drug
Corporation

## Page 3

APPEARANCES (cont.'d):

JONES DAY
BY: ADAM HOLLINGSWORTH, ESQUIRE
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
(216) 586-3939
ahollingsworth@jonesday.com
Representing Walmart

COVINGTON & BURLING, LLP
BY: MEGHAN E. MONAGHAN, ESQUIRE
One City Center, 850 Tenth Street, NW
Washington, DC 20001
(202) 662-5272
mmonaghan@cov.com
Representing McKesson Corporation

WILLIAMS & CONNOLLY LLP
BY: KATELYN ADAMS, ESQUIRE
725 Twelfth Street, N.W.
Washington, DC 20005
kadams@wc.com
(202) 434-5000
Representing Cardinal Health

## Page 4

APPEARANCES VIA TELEPHONE/STREAM:

BARON & BUDD, P.C.
BY: W. SCOTT SIMMER, ESQUIRE
BY: GRETCHEN KEARNEY, ESQUIRE
600 New Hampshire Avenue NW
The Watergate, Suite 10-A
Washington, DC 20037
(202) 333-4562
ssimmer@baronbudd.com
gkearney@baronbudd.com
Representing the Plaintiffs

BARON & BUDD, P.C.
BY: STERLING CLUFF, ESQUIRE
BY: JAY LICHTER, ESQUIRE
15910 Ventura Blvd
Suite 1600
Encino, California 91436
(818) 839-2333
cluff@baronbudd.com
jlichter@baronbudd.com
Representing the Plaintiffs

GREENE KETCHUM FARRELL BAILEY & TWEEL LLP
BY: PAUL THOMAS FARRELL JR., ESQUIRE
419 Eleventh Street
Huntington, West Virginia 25701
(304) 525-9115
Representing the Plaintiffs

THE LANIER LAW FIRM
BY: EVAN M. JANUSH, ESQUIRE
Tower 56
126 East 56th Street, 6th Floor
New York, New York 10022
(212) 421-2800
evan.janush@lanierlawfirm.com
Representing the Plaintiffs

## Page 5

APPEARANCES VIA TELEPHONE/STREAM (cont.'d):

BLASINGAME, BURCH, GARRARD & ASHLEY, P.C.
BY: ALEXANDRA K. HUGHES, ESQUIRE
440 College Avenue
Suite 320
Athens, Georgia 30601
(706) 744-4135
ahughes@bbga.com
Representing the Plaintiffs

BAILEY & WYANT, PLLC
BY: HARRISON M. CYRUS, ESQUIRE
500 Virginia Street East
Suite 600
Charleston, West Virginia 25301
(304) 345-4222
hcyrus@baileywyant.com
Representing the West Virginia Board of Pharmacy

REED SMITH LLP
BY: ANNE E. ROLLINS, ESQUIRE
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
(215) 851-8100
arollins@reedsmith.com
Representing AmerisourceBergen Drug
Corporation

ARNOLD & PORTER KAYE SCHOLER LLP
BY: SEAN A. McCORMICK, ESQUIRE
777 South Figueroa Street
44th Floor
Los Angeles, California 90017
(213) 243-4000
sean.mccormick@arnoldporter.com
Representing Endo Health Solutions; Endo
Pharmaceuticals, Inc.; Par Pharmaceutical
Companies, Inc. f/k/a Par Pharmaceutical
Holdings, Inc.

| | Page 6 |
|---|---|
| 1 | APPEARANCES VIA TELEPHONE/STREAM (cont.'d): |
| 2 | |
| 3 | ROPES & GRAY LLP |
| | BY: LUKE D. RILEY, ESQUIRE |
| 4 | Prudential Tower |
| | 800 Boylston Street |
| 5 | Boston, Massachusetts 02199 |
| | (617) 951-7000 |
| 6 | luke.riley@ropesgray.com |
| | Representing Mallinckrodt |
| 7 | |
| 8 | |
| 9 | BARNES & THORNBURG LLP |
| | BY: MONIQUE HANNAM, ESQUIRE |
| 10 | 11 South Meridian Street |
| | Indianapolis, Indiana 46204 |
| 11 | (317) 236-1313 |
| | monique.hannam@btlaw.com |
| 12 | Representing HD Smith |
| 13 | |
| 14 | VIDEOGRAPHER: |
| | DAVID LANE |
| 15 | |
| | TRIAL TECHNICIAN: |
| 16 | ZACH HONE |
| 17 | |
| | ALSO PRESENT: |
| 18 | |
| | ELIZABETH CAMPBELL, ESQUIRE |
| 19 | AmerisourceBergen Drug Corporation |
| 20 | |
| 21 | ALSO PRESENT VIA TELEPHONE/STREAM: |
| | JUSTIN L. MANN, Law Clerk |
| 22 | Ropes & Gray LLP |
| 23 | |
| 24 | |

| | Page 8 |
|---|---|
| 1 | - - - |
| 2 | I N D E X |
| 3 | - - - |
| 4 | |
| 5 | Testimony of: CHRISTOPHER ZIMMERMAN |
| 6 | By Mr. Pifko                11 |
| 7 | |
| | - - - |
| 8 | |
| | E X H I B I T S |
| 9 | |
| | - - - |
| 10 | |
| 11 | NO.            DESCRIPTION            PAGE |
| 12 | Zimmerman   PowerPoint entitled      44 |
| | V2-1      "Regulatory Compliance |
| 13 |        Update Meeting of the |
| |        Board of Directors August |
| 14 |        10, 2017," Bates stamped |
| |        ABDCMDL00273425 |
| 15 | |
| | Zimmerman   Email chain, top one dated   52 |
| 16 | V2-2      16 Sep 2014, Bates stamped |
| |        ABDCMDL00277299 through |
| 17 |        ABDCMDL00277301 |
| 18 | Zimmerman   FY14 Performance        59 |
| | V2-3      Evaluation Form for Chris |
| 19 |        Zimmerman, Bates stamped |
| |        ABDCMDL00383869 through |
| 20 |        ABDCMDL00383874 |
| 21 | Zimmerman   Email chain, top one dated   80 |
| | V2-4      30 Mar 2011, Bates stamped |
| 22 |        ABDCMDL00267230 through |
| |        ABDCMDL00267232 |
| 23 | |
| 24 | |

| | Page 7 |
|---|---|
| 1 | TIFFANY ELLIS |
| | Weitz & Luxenberg P.C. |
| 2 | |
| 3 | JOSH GAY |
| | Levin Papantonio Thomas Mitchell |
| 4 | Rafferty Proctor P.A. |
| 5 | |
| | EMMA KABOLI |
| 6 | Baron & Budd, P.C. |
| 7 | |
| | ALEX SHERMAN |
| 8 | |
| 9 |      - - - |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

| | Page 9 |
|---|---|
| 1 | Zimmerman   Email dated 17 Oct 2017,     89 |
| | V2-5      Bates stamped |
| 2 |        ABDCMDL00272819 |
| 3 | Zimmerman   Pay Change History, Bates     103 |
| | V2-6      stamped ABDCMDL00383878 |
| 4 | |
| | Zimmerman   Map Chart, Bates stamped x    104 |
| 5 | V2-7      through x |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

Page 10

```
1          - - -
2    DEPOSITION SUPPORT INDEX
3          - - -
4
   Direction to Witness Not to Answer
5
        Page Line
6
7
8
9  Request for Production of Documents
10       Page Line
11
12
13
      Stipulations
14
        Page Line
15
16
17
18
      Question Marked
19
        Page Line
20
21
22
23
24
```

Page 11

```
1        THE VIDEOGRAPHER:  We're now on
2   the record.  My name is David Lane,
3   videographer for Golkow Litigation
4   Services.  Today's date is February 8,
5   2019.  Our time is 1:44 p.m.
6        This deposition is taking place
7   in Philadelphia, Pennsylvania in the
8   matter of the National Prescription
9   Opiate Litigation, MDL.
10       Our deponent today is Chris
11  Zimmerman.  Counsel will be noted on the
12  stenographic record.
13       Our court reporter today is Ann
14  Marie Mitchell and will now swear in our
15  witness.
16        - - -
17       CHRISTOPHER ZIMMERMAN, after
18  having been duly sworn, was examined and
19  testified as follows:
20        - - -
21      EXAMINATION
22        - - -
23  BY MR. PIFKO:
24    Q.   Good afternoon, Mr. Zimmerman.
```

Page 12

```
1   My name is Mark Pifko.  We met some months ago
2   when I deposed you before.
3        Do you recall?
4     A.   Yes, I do.
5     Q.   Okay.  So the court reporter has
6   just placed you under oath.  It's the same oath
7   you took when you were deposed before.
8        Understood?
9     A.   Yes.
10    Q.   Okay.  And that means that if
11  you're untruthful or intentionally misleading or
12  dishonest in some way, you could be subject to
13  penalties from the court.
14       Do you understand that?
15    A.   Yes.
16    Q.   Do you intend to provide truthful
17  and accurate testimony today?
18    A.   I do.
19    Q.   Are you undergoing any medical
20  treatment or suffering from any condition that
21  would inhibit your ability to provide truthful
22  and accurate testimony today?
23    A.   No.
24    Q.   Is there any reason that you can
```

Page 13

```
1   state as far as why this deposition should not go
2   forward?
3     A.   No.
4     Q.   All right.  The -- 2007
5   AmerisourceBergen entered into a settlement
6   agreement with the DEA.  Correct?
7     A.   Yes.
8     Q.   And prior to that, there was an
9   order to show cause that was sent to
10  AmerisourceBergen.  Correct?
11    A.   Correct.
12    Q.   And you're familiar with the
13  order to show cause?
14    A.   I know we got an order to show
15  cause, yes.
16    Q.   Okay.  You were the top person
17  with respect to diversion control at the time.
18  Correct?
19    A.   I was in charge of regulatory --
20  corporate security and regulatory affairs is the
21  department I was responsible for.
22    Q.   But diversion control was under
23  your authority.  Correct?
24    A.   That aspect would be one of the
```

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1 aspects under my control, yes.
2      Q.   And to this day, it's still --
3 diversion control is something that's underneath
4 your purview.  Correct?
5      A.   Correct.
6      Q.   And you're the top person with
7 respect to diversion control issues.  Correct?
8      A.   I'm the top person in charge of
9 that department that diversion control reports up
10 to, yes.
11      Q.   I understand you have other
12 responsibilities as well.  Correct?
13      A.   Yes.  I have dedicated people
14 underneath me responsible for diversion control
15 as well.
16      Q.   So you are familiar with the
17 order to show cause that was sent to
18 AmerisourceBergen at that time.  Correct?
19      A.   At that time, we had an order to
20 show cause, yes.
21      Q.   Do you have an understanding
22 about what specifically it was that led the DEA
23 to suspend the registration of the Orlando
24 facility?

Page 15

1         MR. NICHOLAS:  Object to the
2      form.
3         THE WITNESS:  The -- my
4      recollection, it had to do -- the order
5      to show cause had to do with distribution
6      of controlled substances and I believe
7      possibly to an internet pharmacy.  I'm
8      not -- I don't recall specifically.
9 BY MR. PIFKO:
10      Q.   Okay.  What I'm trying to get at,
11 though, is I understand you're -- well, I
12 shouldn't assume that.
13         What I'm trying to get at is,
14 what specifically did the DEA contend that
15 AmerisourceBergen did wrong that led it to
16 suspend the registration of the Orlando facility?
17         MR. NICHOLAS:  Object to the
18      form.
19         THE WITNESS:  I would need to --
20      I don't recall exactly what was written
21      in the order to show cause from 11 years
22      ago.  If I saw the document, I could
23      refresh my memory.
24 BY MR. PIFKO:

Page 16

1      Q.   One of the things that -- after
2 the suspension order, AmerisourceBergen as part
3 of the settlement agreement with the DEA
4 undertook some changes to its diversion control
5 policies and procedures.  Correct?
6      A.   We made some enhancements and
7 changes to the program.  Correct.
8      Q.   Okay.
9      A.   At the request of DEA.
10      Q.   One of those changes was the
11 initiation of a process by which
12 AmerisourceBergen would not ship an order that it
13 had deemed to be suspicious.  Correct?
14      A.   That was part of the settlement
15 agreement, yes.
16      Q.   Okay.  That was not something the
17 company was doing prior to that settlement
18 agreement.  Correct?
19      A.   Correct.
20      Q.   Are you aware that -- do you know
21 who David May is?
22      A.   Yes.
23      Q.   He's someone who works for you.
24 Correct?

Page 17

1      A.   Correct.
2      Q.   He had a lengthy history with the
3 DEA.  Correct?  Prior to joining
4 AmerisourceBergen?
5      A.   Correct.
6      Q.   Are you aware that he was deposed
7 in this case as well?
8      A.   Yes.
9      Q.   The day after your first
10 deposition?
11      A.   Yes.
12      Q.   And he served as a 30(b)(6) for
13 the company.  Correct?
14      A.   I believe so.  For a certain time
15 period.
16      Q.   Okay, right.  So you served as a
17 30(b)(6) for certain issues, and he did as well.
18 Correct?
19      A.   Correct.
20      Q.   And the distinction between you
21 was that he provided testimony from a time period
22 more recently than you did.  Correct?
23      A.   Correct.
24      Q.   Do you remember the time period

Page 18

1 of which you were designated?
2      A.   I don't know when it started.  I
3 mean, I have been with the company a long time.
4 But I think it was up till 2014 was my time
5 period.
6      Q.   So Mr. May covered those same
7 topics but with respect to the time period 2015
8 going forward.  Correct?
9      A.   That's my understanding.
10          MR. NICHOLAS:  Object to the
11      form.
12          And just I will remind everyone
13      for the record that today Mr. Zimmerman
14      is testifying as a fact witness, not as a
15      30(b)(6) witness, pursuant to Special
16      Master Cohen's order.
17 BY MR. PIFKO:
18      Q.   Are you aware that Mr. May
19 testified that under the Controlled Substances
20 Act there is a, what we call the shipping
21 requirement, which is a requirement that if you
22 identify an order as suspicious, you cannot ship
23 it --
24          MR. NICHOLAS:  Object to the

Page 19

1      form.
2 BY MR. PIFKO:
3      Q.   -- unless you've performed the
4 requisite due diligence to clear the order?
5          MR. NICHOLAS:  Object to the
6      form, mischaracterizes the testimony.
7          Go ahead.
8          THE WITNESS:  I don't know what
9      Mr. May attested to.
10 BY MR. PIFKO:
11      Q.   Okay.  Well, I'll represent to
12 you that he testified that there is a shipping
13 requirement under the Controlled Substances Act.
14 I'd like to know if you believe
15 that there is a controlled -- a shipping
16 requirement under the Controlled Substances Act.
17          MR. NICHOLAS:  Object to the
18      form, mischaracterizes the testimony.
19          Go ahead.
20          THE WITNESS:  My understanding of
21      the regulation is that we have a
22      responsibility to report suspicious
23      orders.  I have not seen any inference or
24      reference to a shipping requirement

Page 20

1      within the regulations.
2 BY MR. PIFKO:
3      Q.   Do you have any way to explain
4 why Mr. May would say there is a shipping
5 requirement and you would say there's not?
6          MR. NICHOLAS:  Object to the
7      form, mischaracterizes the testimony.
8          Go ahead.
9          THE WITNESS:  I don't know.  I
10      can't speak for Mr. May.
11 BY MR. PIFKO:
12      Q.   So if Mr. May said that, would
13 you believe he's just wrong?
14          MR. NICHOLAS:  Object to the
15      form.
16          THE WITNESS:  I don't know the
17      context or -- of his statement.  And
18      when he referred -- I don't -- I can't
19      answer that question.
20 BY MR. PIFKO:
21      Q.   I believe one of the things we
22 talked about when you were deposed before was the
23 Masters Pharmaceutical decision from the DC
24 Circuit.

Page 21

1          Do you recall discussing that?
2          MR. NICHOLAS:  Object to the
3      form.
4          Go ahead.
5          THE WITNESS:  Yeah.  I remember
6      it being mentioned, yes.  Not
7      specifically, but yes.
8 BY MR. PIFKO:
9      Q.   And you have some familiarity
10 with that decision.  Correct?
11      A.   A little, yes.
12      Q.   You understand, as we discussed
13 in your deposition, that the case says that
14 there's something called a shipping requirement.
15 Correct?
16          MR. NICHOLAS:  Object to the
17      form, mischaracterizes his testimony,
18      calls for a legal analysis.  He's a fact
19      witness.
20          THE WITNESS:  I don't know that.
21 BY MR. PIFKO:
22      Q.   Okay.  So sitting here today, you
23 have no explanation for why Mr. May would say
24 there was a shipping requirement, but you don't

Page 22

1 contend that there is?

2      MR. NICHOLAS: Object to the

3      form, mischaracterizes the testimony,

4      asked and answered, bickering.

5      THE WITNESS: I don't know what

6      the context of the discussion that you

7      and Mr. May had and with him to --

8      whatever comment he made, if he did. But

9      my answer is, I'm not aware of the

10      shipping requirement as stipulated in the

11      federal regulations.

12 BY MR. PIFKO:

13    Q. If there is no requirement that

14 you not ship an order that's deemed to be

15 suspicious, why would the company have agreed to

16 undertake such a requirement?

17    A. Because that was part of our

18 negotiations in order to get our registration

19 reinstated, was to implement a program that

20 halted orders that we deemed to be suspicious.

21    Q. Why would you have to agree to

22 something that's not in the regulations?

23      MR. NICHOLAS: Object to the

24      form.

Page 23

1      THE WITNESS: It was the

2      negotiation. That's what we agreed upon.

3 BY MR. PIFKO:

4    Q. It was something that the DEA

5 asked you to agree to?

6    A. Yes.

7    Q. Did you tell the DEA they were

8 wrong?

9      MR. NICHOLAS: Object to the

10      form.

11      THE WITNESS: It was a part of

12      the negotiation process of the areas that

13      we would implement that would enhance our

14      program. That was one of the items that

15      we had discussed, in addition to others,

16      was that we would not ship an order that

17      we deemed to be suspicious.

18 BY MR. PIFKO:

19    Q. Were you one of the people who

20 was negotiating the settlement agreement with the

21 DEA?

22    A. Yes.

23    Q. And did you ever tell the DEA

24 that you felt that wasn't a requirement under the

Page 24

1 law that they were asking you to do, to halt the

2 shipment of orders that you had identified as

3 suspicious?

4      MR. NICHOLAS: Object to the

5      form.

6      THE WITNESS: Yes.

7 BY MR. PIFKO:

8    Q. You did tell them that you

9 thought that was wrong?

10    A. During the negotiations, yes.

11    Q. Okay. What specifically did you

12 tell them?

13    A. I told them that our requirement

14 is to report suspicious orders, and the way we've

15 been doing it for the previous 17 years was to

16 report after the fact. And that has been the way

17 we've been doing it for 17 years. We negotiated

18 with DEA with the program in '98, which they were

19 well aware that we were shipping the products --

20 we were reporting them after we ship the

21 products, and that was approved by DEA.

22      So my previous negotiations with

23 DEA, what the regulations state, there's no --

24 nowhere that I could find that says you can't

Page 25

1 ship an order that has been reported as

2 suspicious. In fact, it's the way it's been

3 done.

4      This was a change in the

5 industry. No one else was stopping orders. We

6 had never done it in the past. So again, that

7 was my understanding.

8      So in the negotiation process, I

9 said, this is the way we've been doing it. This

10 has been approved by DEA in the past. It's been

11 inspected by DEA. Our -- DEA audits our

12 distribution centers. And in all of our audits,

13 they've never once said that you're not supposed

14 to ship an order that you deem to be suspicious.

15 So my -- that was my response into the

16 negotiation, I don't agree with that.

17    Q. And what was their response when

18 you said that?

19      MR. NICHOLAS: Object to the

20      form.

21      THE WITNESS: I mean, do you want

22      to go back and forth through the

23      negotiations or -- I mean...

24 BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1  Q.  Well, I want you to tell me what
2  they said in response to you saying that to them.
3      MR. NICHOLAS:  Same objection.
4      THE WITNESS:  They disagreed at
5  that time.
6  BY MR. PIFKO:
7  Q.  What did they say was the basis
8  for their disagreement?
9      MR. NICHOLAS:  Object to the
10  form.
11      THE WITNESS:  They wanted that
12  order not to be shipped if it's deemed to
13  be suspicious.  I mean, that's what they
14  said.
15  BY MR. PIFKO:
16  Q.  They didn't tell you why?
17  A.  No.
18  Q.  And you just ended up agreeing to
19  it?
20      MR. NICHOLAS:  Object to the
21  form.
22      THE WITNESS:  In order to -- as
23  part of the negotiation, that was an area
24  that we agreed upon in order to get our

Page 27

1  license reinstated in Orlando, yes.
2  BY MR. PIFKO:
3  Q.  Did you agree to anything
4  specific related to internet pharmacies in the
5  settlement agreement in order to get your license
6  back or lift -- the suspension lifted at the
7  Orlando facility?
8  A.  I don't recall.
9  Q.  You don't believe there was
10  anything specific to internet pharmacies in the
11  settlement agreement?
12  A.  I don't -- I don't recall.
13  Q.  Okay.  The changes that you made
14  in response to the settlement agreement with --
15  that were made as a result of the suspension of
16  the Orlando facility, those were systemic
17  companywide changes.  Correct?
18      MR. NICHOLAS:  Object to the
19  form.
20      Go ahead.
21      THE WITNESS:  Yes.  Part of the
22  negotiation was that, even though it was
23  the Orlando distribution center's license
24  that was suspended, that they wanted us

Page 28

1  to implement a program for all of our
2  drug company distribution centers.
3  BY MR. PIFKO:
4  Q.  They wanted you to make changes
5  companywide.  Correct?
6  A.  They wanted us to implement the
7  program companywide, correct.
8  Q.  And that's what you did.
9  Correct?
10  A.  Yes.
11  Q.  And the programs that you
12  implemented, those weren't specific to internet
13  pharmacies.  Correct?
14  A.  The program was -- regardless of
15  an internet pharmacy or not, I mean, if we
16  identified an order that we deemed to be
17  suspicious, we would not ship it and report it to
18  DEA.  So it was an internet pharmacy, that would
19  apply.
20      And then we have an additional
21  due diligence process that was also negotiated --
22  negotiated on the front end as well.
23  Q.  But that was for a broad array of
24  customer types.  Correct?

Page 29

1  A.  Yeah, all retail pharmacies.  All
2  pharmacies licensed as retail pharmacies.
3  Q.  And the due diligence requirement
4  you're saying that you -- didn't apply, however,
5  to chain pharmacies.  Correct?
6      MR. NICHOLAS:  Object to the
7  form.
8      THE WITNESS:  Part of our
9  negotiations was identifying the program
10  and what was -- what aspects it would
11  cover, would it include hospitals,
12  Department of Defense.  Chains were
13  discussed.  And part of the negotiation
14  was that it was determined that a chain
15  of ten or more stores would not be
16  included in the due diligence process,
17  still in the order monitoring process.
18  BY MR. PIFKO:
19  Q.  This implementation of a shipping
20  requirement or an agreement not to ship an order
21  that had been identified as suspicious, that
22  applied regardless of the customer type.
23  Correct?
24  A.  Correct.

Page 30

1  Q.  For all customers of
2  AmerisourceBergen.  Correct?
3  A.  Correct.
4  Q.  I'm handing you what was -- you
5  said something -- before I get to that.
6  You said something earlier that
7  this shipping requirement wasn't anything anyone
8  else was doing.
9  Do you recall saying that a few
10  minutes ago?
11  A.  I wasn't aware of any of the
12  other companies that were stopping orders that
13  they deemed to be suspicious.
14  Q.  Okay.  And how do you know that
15  no one else was doing that?
16  MR. NICHOLAS:  Object to the
17  form.
18  THE WITNESS:  Because after
19  the -- once we -- once we implemented our
20  new program, we were the only ones that
21  were halting orders that we deemed to be
22  suspicious.
23  BY MR. PIFKO:
24  Q.  Did you review the diversion

Page 31

1  control policies and practices of every other
2  distributor?
3  A.  No, I did not.
4  Q.  So you don't really know if
5  that's true or not?
6  A.  I -- only from -- through
7  discussions.
8  Q.  Discussions with whom?
9  A.  My counterparts.
10  Q.  Which counterparts?
11  A.  The other distribution companies.
12  Q.  Which companies?
13  A.  Cardinal, McKesson, some of the
14  smaller ones -- you know, it was at a HDA meeting
15  where I did a presentation.  There was
16  discussions at that meeting.
17  Q.  When was that?
18  A.  2007, I think.  2007, I believe.
19  The end of 2007.
20  Q.  So at the end of 2007, you
21  participated in an HDA meeting with other
22  distributors, and you discussed who was -- had a
23  shipping requirement and who didn't?
24  MR. NICHOLAS:  Object to the

Page 32

1  form.
2  THE WITNESS:  Let me clarify.
3  It was a DEA conference in 2007.
4  It wasn't a HDA conference.  It was a DEA
5  conference.  Sorry about that.
6  BY MR. PIFKO:
7  Q.  So regardless of the type of
8  conference, you had a discussion with other
9  distributors at the end of 2007 about diversion
10  control issues, which included whether they were
11  implementing a shipping requirement?
12  A.  I did a presentation on our
13  program that had a requirement to not ship orders
14  that we deemed to be suspicious, and they were
15  present at the meeting.
16  Q.  And they told you that that
17  wasn't a requirement that any of them had?
18  A.  I don't recall that being a
19  specific statement.  I don't remember the
20  word-for-word conversation, but there was
21  conversations about that process and whether it's
22  legal and what the regulations imply, you know.
23  Just general conversation.
24  Q.  As part of this conference or on

Page 33

1  the side after the conference?
2  MR. NICHOLAS:  Object to the
3  form.
4  THE WITNESS:  I don't recall if
5  there was a question and answer, if it
6  came up during the question and answer or
7  if it was immediately after or in between
8  sessions.  I don't recall.
9  BY MR. PIFKO:
10  Q.  Do you recall any specific people
11  with whom you had that discussion?
12  A.  No.
13  Q.  Do you recall any specific
14  companies with whom you may have had that
15  discussion?
16  A.  It wasn't like a point of
17  discussion.  It was common discussions about the
18  requirement of -- you know, the regulations did
19  not indicate that you have to stop orders
20  before -- if you deemed them suspicious.  And
21  then, you know, our program had that and what was
22  the basis upon our decision to do that.
23  Q.  And what did you tell them?
24  A.  It was in our negotiation with

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1  DEA.
2      Q.   What did they tell you about
3  whether that wasn't required?
4          MR. NICHOLAS:  I'm going to
5  object to the form.
6          THE WITNESS:  I think -- I mean,
7  their -- again, that was the discussion.
8  It wasn't a long, lengthy debate.  I
9  mean, we had our program in place, and
10  that was our program.  I was explaining
11  what our program was.
12  BY MR. PIFKO:
13      Q.   Other than that discussion, did
14  you have any other discussions with anyone about
15  whether other companies had a shipping
16  requirement?
17      A.   I don't recall.
18      Q.   So sitting here today, that's the
19  only such discussion that you recall as to
20  whether other companies had a shipping
21  requirement?
22      A.   No.  There was a lot of
23  discussions.  I mean, through our organization,
24  HDA, we would meet and discuss regulatory

Page 35

1  requirements and processes.
2      Q.   You participated regularly in HDA
3  meetings regarding DEA regulatory requirements
4  and diversion issues?
5          MR. NICHOLAS:  Object to the
6  form.
7          THE WITNESS:  I had -- and I'm
8  not sure what time frame you're talking
9  about, but I've been -- worked with HDA,
10  NWD and HDMA, all the different names
11  prior to that, throughout my career,
12  which consists of meetings, meetings with
13  DEA, meetings with HDA, joint meetings.
14  And discussions are about regulatory
15  requirements.
16  BY MR. PIFKO:
17      Q.   Through meetings with the HDA,
18  you had discussions with other distributors about
19  regulatory requirements?
20          MR. NICHOLAS:  Object to the
21  form.
22          THE WITNESS:  We would have
23  discussions about general -- well, either
24  new regulatory requirements that were

Page 36

1  being proposed, whether it's in the state
2  or the government, existing
3  interpretation of the requirements, but
4  that would be something that we would
5  talk about.
6  BY MR. PIFKO:
7      Q.   And one of the things you
8  discussed was the shipping requirement?
9          MR. NICHOLAS:  Object to the
10  form.
11          THE WITNESS:  Again, it depends
12  on what time frame.  If it was after 2007
13  and our program had -- and again, we
14  never called it the shipping requirement.
15  Our requirement was that we did not ship
16  an order that we deemed to be suspicious.
17  And I would have probably had that
18  discussion after we implemented the
19  program.
20  BY MR. PIFKO:
21      Q.   Before you implemented the
22  program, did you ever have a discussion with
23  other distributors about whether there was a
24  shipping requirement?

Page 37

1      A.   No, not that I can recall.
2      Q.   And so after you implemented that
3  under the settlement agreement, you believe that
4  you discussed the shipping requirement with other
5  distributors at the HDA meetings.  Correct?
6          MR. NICHOLAS:  Object to the
7  form, asked and answered.
8          THE WITNESS:  I had a
9  presentation at the DEA conference where
10  I explained our program, which included
11  not shipping orders that we deemed to be
12  suspicious.  And we've had -- we had
13  discussions at HDA meetings.  I, you
14  know, can't point to how many times or
15  the specific conversation, but we would
16  have discussed that.
17  BY MR. PIFKO:
18      Q.   What was the nature of the
19  discussions about the shipping requirement at HDA
20  meetings that you recall?
21          MR. NICHOLAS:  Object to the
22  form.
23          THE WITNESS:  I mean, that's
24  pretty much -- there's not much

Page 38

1 discussion. Either you ship it or you
2 don't. We don't ship orders that we deem
3 to be suspicious. That's the extent of
4 the discussion.
5 BY MR. PIFKO:
6 Q. And other companies told you that
7 they did?
8 MR. NICHOLAS: Object to the
9 form.
10 THE WITNESS: I don't know if
11 they ever said they did. I just know
12 what we did. And my conversation was
13 what ABC was doing and that was our
14 program.
15 BY MR. PIFKO:
16 Q. And did they ever say, why you're
17 doing that, we don't agree that's a requirement?
18 MR. NICHOLAS: Asked and
19 answered.
20 THE WITNESS: I don't know
21 exactly if that's how the conversation
22 went, but I'm sure there was questions of
23 people of why you're changing your
24 practices that you've been -- had in

Page 39

1 place for the past 17 years.
2 BY MR. PIFKO:
3 Q. Did anyone ever say you should
4 fight that, it's not a requirement under the law?
5 A. I don't recall that discussion.
6 Q. So to your knowledge, no one ever
7 said that?
8 MR. NICHOLAS: Object to the
9 form.
10 THE WITNESS: I -- again, not
11 that I recall.
12 BY MR. PIFKO:
13 Q. Any other way that you believe
14 you would know whether all -- other distributors
15 didn't have that requirement?
16 MR. NICHOLAS: Object to the
17 form.
18 THE WITNESS: No, not that I can
19 think of.
20 BY MR. PIFKO:
21 Q. So this DEA meeting and
22 discussions you had at the HDA are the only such
23 discussions?
24 A. Can you ask me that question?

Page 40

1 Because I want to make sure I understand the
2 question on the table.
3 Q. Yeah. I'm just trying to --
4 that's what we do at depositions.
5 A. Yeah.
6 Q. You said that no one else had a
7 requirement of -- that they would not ship an
8 order that they deemed to be suspicious. And I'm
9 trying to understand the basis for your saying
10 that.
11 MR. NICHOLAS: Object to the
12 form. I think you're mischaracterizing
13 the testimony.
14 THE WITNESS: As I explained,
15 that prior to our implementing the
16 program that stopped orders to be
17 suspicious, the practice had always been
18 that you report suspicious orders -- you
19 have to have a system to report
20 suspicious orders. That reporting was
21 always after the order was shipped.
22 You know, you're asking me, did I
23 have discussions in 1990, in '91, '92. I
24 don't -- I'm sure I probably did. '95,

Page 41

1 2000, 2004, possibly. So that was the
2 general knowledge of the program when I
3 started with the company in 1990 until
4 2007 when they said that we wanted you to
5 implement a new process to where you
6 don't ship it.
7 Prior to that, my negotiations
8 with DEA, working on a suspicious order
9 program, it never even came up in the
10 conversation. DEA never mentioned a
11 shipping requirement or stopping the
12 order. We tested it for two years with
13 multiple DEA offices in the field, went
14 to Washington, DC, and Washington, DC
15 said, we approve your program. There was
16 no mention of shipping requirements, no
17 mention of stopping orders.
18 So that was my belief, my
19 understanding. If DEA -- if there was --
20 if DEA thought that there should be a
21 shipping requirement, I thought they
22 would have brought that in the
23 negotiations in the '90s when we're
24 devising the program. They would have

Page 42

1 said, hey, Cardinal, McKesson, they're
2 stopping the orders, why don't you guys
3 enter that into your system. Never came
4 into the discussion.
5 And again, this was a two-year
6 process. This isn't, you know, hey, can
7 we do this.
8 And so never a shipping
9 requirement was mentioned. We get to
10 2007. We have an immediate suspension.
11 We come down there, and they put on the
12 table, we want you to stop orders that we
13 deem to be suspicious. And my first
14 response is, where is that in the
15 regulations and why wasn't that ever
16 brought up in 1998 through our
17 negotiation, why hasn't it ever been
18 mentioned in the DEA audit, why isn't
19 it -- we've never had discussions about
20 that. So --
21 BY MR. PIFKO:
22 Q. What did they say in response to
23 that question?
24 MR. NICHOLAS: Let him finish.

Page 43

1 THE WITNESS: We want to
2 implement -- we want industry to stop
3 shipping orders that they deem to be
4 suspicious. And in order for you to get
5 your license back, we want you to
6 implement in your program.
7 Now, you know, that was the
8 agreement we went in the negotiations,
9 and that was what we implemented after
10 that. We did, ABC.
11 BY MR. PIFKO:
12 Q. When you said this was never
13 brought up before, what did they say about that?
14 A. This is what we want to do now.
15 They didn't say anything about that.
16 Q. When you said this wasn't a
17 requirement in the regulations, what did they say
18 in response to that?
19 A. They didn't say anything.
20 Q. When you say that you got a
21 system approved in Washington, when was that?
22 A. 1998, I believe.
23 Q. And who specifically approved
24 that?

Page 44

1 A. The chief of the diversion unit
2 at DEA.
3 Q. Do you have a name?
4 A. Pat Good.
5 Q. Was --
6 A. I believe Pat Good was the chief
7 at the time.
8 Q. That was something that was in
9 writing?
10 A. Yes.
11 Q. I'm going to hand you what was
12 marked in your deposition before, but I think
13 there might have been some redactions, so I'm
14 going to remark it.
15 - - -
16 (Deposition Exhibit No. Zimmerman
17 V2-1, PowerPoint entitled "Regulatory
18 Compliance Update Meeting of the Board of
19 Directors August 10, 2017," Bates stamped
20 ABDCMDL00273425, was marked for
21 identification.)
22 - - -
23 BY MR. PIFKO:
24 Q. As Zimmerman Volume 2, Number 1.

Page 45

1 A. Thank you.
2 Q. For the record, this is a
3 document Bates labeled ABDCMDL00273425. And it
4 was produced natively, so it's the same Bates
5 number on every page.
6 MR. MAHADY: Can we go off the
7 record for one second?
8 Can I talk to you outside real
9 quick?
10 MR. PIFKO: Sure.
11 THE VIDEOGRAPHER: Going off the
12 record, 2:12 p.m.
13 - - -
14 (A discussion off the record
15 occurred.)
16 - - -
17 THE VIDEOGRAPHER: Back on record
18 at 2:13 p.m.
19 BY MR. PIFKO:
20 Q. Okay. So I just want to ask you
21 about a specific page on this document that we
22 had to get a court order to be able to ask you
23 about this after your deposition, or to have
24 access to this part of the document.

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1    So if you want to turn to page 16
2 of the PowerPoint, there's numbers on the left
3 corner.
4        MR. NICHOLAS:  I'll object to the
5    commentary, but I will ask -- I'm not
6    going to say he has to read the whole
7    thing again, but let him at least flip
8    through it to refamiliarize himself with
9    the document.
10 BY MR. PIFKO:
11   Q.    Take your time.  I just want to
12 ask you about something in the comments on the
13 page that has slide 16 on it.
14   A.    (Reviewing document.)
15        Okay.
16   Q.    There's a part here that's in
17 color in red on the document.
18        Are you on page 16 there?
19   A.    I am.
20   Q.    Okay.  So it says here, "We are
21 trying to make the best decisions we can to
22 protect the public while assuring legit customers
23 get their meds -- that is all the diversion
24 control function is concerned with."

Page 47

1        Do you see that?
2    A.    I see that.
3    Q.    Do you agree with that statement?
4        MR. NICHOLAS:  Object to the
5    form.
6        THE WITNESS:  I don't know who
7    wrote this or what the inference is to,
8    but the general -- the general assumption
9    that we want to make sure we have
10    medications available for those that need
11    them, I agree with.  And we have
12    processes in place to, you know, secure
13    the supply chain, I agree with that.  But
14    I don't know who wrote it.  I'm not sure
15    what the context is.
16 BY MR. PIFKO:
17   Q.    Okay.  But what about the part
18 about part of the diversion control function
19 being that you -- while you want to protect the
20 public while also assuring that customers get
21 their medicines, do you agree about that part of
22 it?
23        MR. NICHOLAS:  Object to the
24    form.

Page 48

1        Go ahead.
2        THE WITNESS:  Again, our
3    diversion control program is just one
4    facet of our regulatory program and our
5    CS array of security to protect the
6    company in making sure that the
7    medications that we buy are legitimate,
8    are stored and distributed appropriately,
9    and are available to the pharmacies when
10    they place an order.  And that is how our
11    process works.
12        I don't know the person who
13    stated that and what they meant by that,
14    but that's how we ensure the integrity of
15    the supply chain, ensuring that patients
16    have medicines that's available to them
17    that are written by doctors and that
18    those medications have been stored and
19    distributed safely to a licensed
20    pharmacy.
21 BY MR. PIFKO:
22   Q.    Okay.  All I'm trying to ask you,
23 though, is in part of carrying out those duties,
24 if you believe that part of the idea of

Page 49

1 preventing diversion is to help protect the
2 public from the consequences of a controlled
3 substance that gets diverted.
4        MR. NICHOLAS:  Object to the
5    form.
6        Go ahead.
7        THE WITNESS:  And I know we spoke
8    this -- about this last time.  It depends
9    how that drug is diverted.  And again,
10    our role in the supply chain that adds
11    protections to the public is to ensure
12    that the medications are available and
13    they have been stored and safely
14    distributed to a licensed dispenser.
15    That is our obligation, and that is how
16    our program is built.
17 BY MR. PIFKO:
18   Q.    Okay.  When you say safely
19 distributed --
20        MR. NICHOLAS:  Let him finish.
21        THE WITNESS:  Safely distributed
22    to a dispenser, a licensed location.
23 BY MR. PIFKO:
24   Q.    Right.  So when you say safely

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1 distributed, what do you mean, safely
2 distributed?
3      A.    Make sure that the transportation
4 companies that we use have been background
5 checked and that the product has been stored
6 appropriately and is delivered to the pharmacy
7 where the pharmacist signs for the product.
8      Q.    Right.  Because you don't want a
9 substance to be diverted from legitimate medical
10 channels.  Correct?
11      A.    Not while it's under our
12 distribution license.  Right?  So when we -- as
13 soon as we receive the product, it's under our
14 control.  And the way the federal regulations are
15 written, we're responsible to make sure we have
16 the adequate recordkeeping, storage requirements,
17 select drivers, ensure that the pharmacies are
18 appropriately licensed.  And so in that -- from
19 the time we sign for it till the time the
20 pharmacy signs for it, we want to make sure that
21 product is not diverted.  Correct.
22      Q.    And you understand that these are
23 substances that have a high potential for abuse
24 that you're distributing.  Correct?

Page 51

1      MR. NICHOLAS:  Object to the
2 form.
3      THE WITNESS:  We distribute
4 all -- all medications, over the counter.
5 A small subset of the product that we
6 sell and distribute are controlled
7 substances, and a smaller subset are
8 Schedule II, which have a higher
9 potential for abuse.  Correct.
10 BY MR. PIFKO:
11      Q.    Okay.  Well, Schedule II
12 substances have a high potential for abuse.
13 Agree?
14      A.    Correct.
15      Q.    And when you distribute those,
16 you want to make sure they don't get into the
17 wrong hands so that they're abused.  Correct?
18      A.    We want to make sure all of our
19 product that we sell doesn't get in the wrong
20 hands.
21      Q.    But that includes Schedule II
22 controlled substances?
23      A.    We want to make sure we sell to
24 licensed pharmacies.  Correct.  We have an

Page 52

1 obligation to make sure we only sell to licensed
2 entities.
3           - - -
4      (Deposition Exhibit No. Zimmerman
5      V2-2, Email chain, top one dated 16 Sep
6      2014, Bates stamped ABDCMDL00277299
7      through ABDCMDL00277301, was marked for
8      identification.)
9           - - -
10 BY MR. PIFKO:
11      Q.    I'm handing you what's marked as
12 Zimmerman Volume 2, Exhibit 2.
13      A.    Thank you.
14      Q.    For the record, it's a
15 couple-page email, Bates labeled ABDCMDL00277299
16 through 301.
17           Take a moment to review that.
18 Let me know when you're done.
19      A.    (Reviewing document.)
20           Okay.
21      Q.    Okay.  I want to turn your
22 attention to -- well, have you seen this before?
23      A.    My name is on it.  I don't
24 specifically recall.

Page 53

1      Q.    This is an email that -- a
2 portion of which you wrote.  Correct?
3      A.    Yes.
4      Q.    It says in the middle of the
5 first page, there's an email from you dated
6 September 16, 2014 to Rita Norton, Anne Oswalt,
7 copying Steve Mays and David May.  The subject is
8 "Update."
9           Do you see that?
10      A.    Uh-huh.
11      Q.    Do you agree this is an email you
12 wrote?
13      A.    It appears to be, yes.
14      Q.    I want to direct your attention
15 to language that starts on the bottom of the
16 first page and continues onto the second page.
17           You say, "Doesn't the dispensing
18 of any controlled substance come with the
19 foreseeable risk of adverse health consequences
20 or misuse of the controlled substances?"
21           Do you see that?
22      MR. NICHOLAS:  I'm sorry, where
23 are you?
24      THE WITNESS:  Yeah, where are

Page 54

1    you?
2 BY MR. PIFKO:
3    Q.    You can look at the screen in
4 front of you to help you, too.
5    A.    Oh.
6         MR. NICHOLAS: I see. Yep.
7         THE WITNESS: Yes, I see that.
8 BY MR. PIFKO:
9    Q.    You said that. Correct?
10    A.    It appears I wrote that, yes.
11    Q.    And you say -- you then say,
12 "Dispensed" -- on the second page, "Dispensed
13 controlled substances have the 'foreseeable risk'
14 of: being given to a family member that they
15 were not originally prescribed for (husband,
16 wife, et cetera); removed from the medicine
17 cabinet by a family member or friend; the patient
18 can become addicted to the prescribed drug;
19 stolen; et cetera; all of which are foreseeable
20 and could have the adverse health consequences or
21 death due to the abuse or misuse of the
22 controlled substances."
23         Do you see that?
24    A.    Yes.

Page 55

1    Q.    You said that. Correct?
2    A.    That's what I wrote.
3    Q.    What was the basis for saying
4 that at the time?
5         MR. NICHOLAS: Object to the
6    form.
7         THE WITNESS: I think the basis
8    of the comment was that we have no
9    control -- all these things I indicate,
10    we have no control over that. We
11    distribute to the licensed individuals,
12    but there's -- the risk is -- you know,
13    how the doctor prescribes it, if they
14    don't describe it -- prescribe it
15    appropriately, if the pharmacy isn't
16    monitoring it, if the patient doesn't
17    monitor it appropriately, if somebody has
18    it in their medicine cabinet and somebody
19    steals it, there's inherent risk to that
20    product. That's why it's important that
21    everybody follows the regulatory
22    requirements.
23         We have our requirements that
24    have nothing to do -- I'm just pointing

Page 56

1    out a fact that these medications have
2    that has nothing to do with how we handle
3    our regulatory responsibilities within
4    the supply channel.
5 BY MR. PIFKO:
6    Q.    Okay. But you agree that these
7 are all foreseeable risks with the controlled
8 substance. Correct?
9         MR. NICHOLAS: Object to the
10    form.
11         THE WITNESS: I believe that's
12    probably -- again, I shouldn't say
13    probably, but that's why they're a
14    controlled substance.
15 BY MR. PIFKO:
16    Q.    Right. Because all these things
17 are potential consequences. I mean, you're
18 saying it's obviously foreseeable, is what you're
19 saying.
20         MR. NICHOLAS: Object to the
21    form.
22         THE WITNESS: Not obviously
23    foreseeable. I'm stating that there's a
24    reason why we store them in vaults and we

Page 57

1    have specific recordkeeping requirements,
2    because of their potential for abuse.
3 BY MR. PIFKO:
4    Q.    And all --
5    A.    Which implies that these
6 products, that if somebody dispenses a Schedule
7 II product, somebody is going to die because
8 they're going to misuse it or it's going to get
9 stolen, I don't agree with that.
10    Q.    Well, if there's a -- it's a
11 foreseeable risk, though, that all the these
12 things could happen. That's exactly what you
13 said.
14    A.    They could happen.
15    Q.    I want to ask you about the New
16 Jersey United States Attorney investigation.
17         Are you familiar with that?
18    A.    In what context?
19    Q.    You're aware that there was a
20 criminal investigation of the company being
21 conducted by the United States Attorney.
22 Correct?
23    A.    I'm under -- yes. I have that
24 understanding, that there was an investigation by



Page 58

1  the US Attorney's Office.  Correct.
2       Q.    That was a stressful situation
3  for you?
4       A.    It's a situation that I have to
5  deal with.  Correct.

Page 59

6  BY MR. PIFKO:
7       Q.    Specific -- I'm not saying that
8  you haven't had other stressful times in your
9  life and there's not -- many causes of stress.
10       All I'm asking is that dealing
11  with that United States Attorney's investigation
12  was a stressful situation for you.
13       Would you agree?
14       MR. NICHOLAS:  Same objection.
15  Same objection.
16       THE WITNESS:  I mean, it was --
17  there was some stress involved, but I
18  mean, it wasn't, you know -- again, it
19  wasn't anything -- anything different
20  than my regular course of work.
21            -  -  -

Page 60

Page 61

Highly Confidential - Subject to Further Confidentiality Review



Page 62

22    Q.    Okay.  Who is John?
23    A.    John Chou is my boss.
24    Q.    Okay.  It says -- what's his

Page 63

1    title?
2    A.    He's general counsel.

Page 64

Page 65

Page 66

Page 68

6    Q.    Did you ever see the subpoena
7  yourself?
8         A.    I don't recall.
9         Q.    You don't know either way?
10        A.    I don't know either way.  I don't
11  recall if I saw the subpoena or not.
12        Q.    Did you spend a lot of time
13  dealing with the subpoena?
14        A.    Again, my conversations and
15  actions were all done under the direction of
16  counsel.
17        Q.    Okay.  That's not my question,
18  though.  You got to answer my question.
19        I asked you if you spent a lot of
20  time dealing with the subpoena.
21        MR. NICHOLAS:  Object to the
22        form.
23        THE WITNESS:  So it was a long,
24        drawn-out process.  So, you know, I

Page 67

Page 69

1         don't -- I mean, it was years, years of
2         process.  So again, I'm not sure how to
3         gauge that, whether it's -- your question
4         is, did we produce a lot.  I don't know
5         if over five years, I would -- a lot,
6         yes, I assume we did.
7  BY MR. PIFKO:
8         Q.    Okay.
9         A.    I can't tell you exactly what all
10  was produced, but, you know, that would all be
11  through the legal department.
12        Q.    So it's your testimony that you
13  dealt with the nature of this investigation over
14  the course of five years?
15        A.    I don't --
16        MR. NICHOLAS:  Object to the
17        form.
18        Go ahead.
19        THE WITNESS:  I don't know the
20        course.  It initiated I believe in 2012,
21        and that's what I know.
22  BY MR. PIFKO:
23        Q.    And when -- is it closed, to your
24  knowledge?

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1    A.   I don't know.

2    Q.   Are you still dealing with it?

3        MR. NICHOLAS:  Object to the

4    form.

5        THE WITNESS:  In what -- in what

6    way?

7    BY MR. PIFKO:



22       THE WITNESS:  Yeah.  I wouldn't

23   feel comfortable answering that question.

24   BY MR. PIFKO:

Page 71

1    Q.   I am not asking you the substance

2    of the discussions.  I'm asking you the amount of

3    time you spent.  You need to answer that

4    question.

5        MR. NICHOLAS:  If you know.

6    Object to the form.

7        MR. PIFKO:  Stop "if you know,"

8    Bob.  Stop.

9        MR. NICHOLAS:  It's the first

10   time I've said it all day, Mark.

11       MR. PIFKO:  Stop.

12       MR. NICHOLAS:  Don't say --

13       MR. PIFKO:  You've got a problem

14   with coaching witnesses.  Okay?  You need

15   to stop.  I'm done with it.  You say that

16   one more time, we're going -- we're going

17   to be done.

18       MR. NICHOLAS:  Good.  Go ahead.

19       MR. PIFKO:  I'm going to bring

20   him back again.  Okay?

21       MR. NICHOLAS:  Just --

22       MR. PIFKO:  We're going to go

23   this over and over again.

24       MR. NICHOLAS:  Ask your -- you're

Page 72

1    badgering the witness.

2        MR. PIFKO:  No, I'm not.  You're

3    trying to -- you coached him into not

4    answering this question.  He knows all

5    about this thing.  He just testified that

6    he dealt with it for five years, and

7    you're trying to get him to avoid talking

8    about it.

9        MR. NICHOLAS:  Okay.  That's

10   offensive.  I object to that.  Don't talk

11   to me that way.

12       MR. PIFKO:  And we're not killing

13   this time.

14       MR. NICHOLAS:  Ask him your --

15       MR. PIFKO:  We're not killing

16   this time you're interrupting for the

17   record.  Okay?

18       MR. NICHOLAS:  I don't care if

19   you count this time or not.  I don't care

20   if you count these 30 seconds or not.  Go

21   ahead and ask your question.

22       MR. PIFKO:  Okay.

23   BY MR. PIFKO:

24   Q.   Sir, I'm trying to get an

Page 73

1    accurate answer from you.  Okay?

2        I understand that your counsel is

3    instructing you not to talk about the substance

4    of discussions you had with counsel.  I'm not

5    asking you about that.  Okay?

6        I just want to know how much time

7    in your day over the course of years that this

8    was going on that you were dealing with this.

9        MR. NICHOLAS:  Object to the

10   form.

11       THE WITNESS:  Some days it would

12   be an entire day.  It may go two months

13   without any time.  It may be three days

14   at a time, then it may go months

15   without -- again, you're asking me to

16   give you an answer over a five-year

17   period of how much time I worked on it.

18   I can't -- if -- I don't know.

19   BY MR. PIFKO:

20   Q.   That's all the kind of answer I'm

21   looking at.

22       So you believe it was roughly a

23   five-year period --

24   A.   I just --

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1     Q.   -- and that's about the rough
2 time periods in any particular day that you might
3 have dealt with it?
4         MR. NICHOLAS: Object to the
5 form.
6         THE WITNESS: I threw out five
7 years. I don't even -- I don't know the
8 investigation's closed. I don't know the
9 current status. It started in 2012. I
10 haven't done much in the last, you know,
11 bit. So I don't -- I don't know.
12 BY MR. PIFKO:
13     Q.   When was the last time you recall
14 having significant involvement with it?
15     A.   It's been a while. I don't -- I
16 wouldn't feel comfortable picking a date.
17     Q.   More than a year?
18     A.   I don't think it's been -- I
19 don't think it's that long. I don't know.
20     Q.   So sometime less than a year was
21 the last time you had significant involvement?
22         MR. NICHOLAS: Object to the
23 form.
24         THE WITNESS: It could have been

Page 75

1 a year, it could have been six months.
2 Again, my time -- I may -- I don't know.
3 I don't know. It wasn't last week or
4 last month, I know that.
5 BY MR. PIFKO:
6     Q.   Okay. But it's 2019 right now.
7     A.   It wasn't 2019.
8     Q.   So the last time you had
9 significant involvement was in 2019?
10     A.   No, no, no. It was not in 2019.
11     Q.   Okay. It was sometime in 2018?
12         MR. NICHOLAS: Object to the
13 form.
14         THE WITNESS: Again, I don't know
15 exactly.
16 BY MR. PIFKO:
17     Q.   Roughly, I'm just asking you.
18         MR. NICHOLAS: Object to the
19 form.
20         THE WITNESS: I can't answer that
21 question. I don't know what you're
22 considering considerable time. And I
23 can't -- is considerable time five hours,
24 five days, five months?

Page 76

1         And again, you're asking me to
2 say how much -- how long of -- what's a
3 significant amount of time? To some
4 people, a significant amount of time
5 might be an hour-and-a-half for this
6 deposition.
7 BY MR. PIFKO:
8     Q.   And you're --
9     A.   But I'm just saying, what's a
10 significant amount of time.
11     Q.   In your understanding of the word
12 "significant," when was the last time that you
13 had a meaningful day where you dealt with the New
14 Jersey US Attorney's investigation?
15         MR. NICHOLAS: Object to the
16 form.
17         THE WITNESS: It's been a while.
18 BY MR. PIFKO:
19     Q.   Okay.
20     A.   It's been a while, more than a
21 year.
22     Q.   But less than two years?
23         MR. NICHOLAS: Object to the
24 form.

Page 77

1         THE WITNESS: Now, I can't --
2 now -- you got me more than a year. I
3 don't know.
4 BY MR. PIFKO:
5     Q.   I'm just trying to get an
6 estimate. Okay?
7     A.   I'm being completely honest with
8 you.
9     Q.   Okay.
10     A.   I don't know --
11     Q.   Okay. Fair enough.
12     A.   -- if it was a year, 14 months,
13 16 months. I don't know.
14         MR. PIFKO: Okay. We're going to
15 take a short break.
16         THE VIDEOGRAPHER: Going off the
17 record, 2:42 p.m.
18         - - -
19         (A recess was taken from
20 2:42 p.m. to 2:57 p.m.)
21         - - -
22         THE VIDEOGRAPHER: Back on
23 record, 2:57 p.m.
24 BY MR. PIFKO:

Page 78

1  Q.  Welcome back.

2  A.  Yeah.

3  Q.  AmerisourceBergen for a lengthy

4  period of time had thresholds as a feature of its

5  order monitoring program. Correct?

6  A.  That was one component. Correct.

7  Q.  And those thresholds were set at

8  300 percent of the customer's ordering history?

9  A.  They were -- in what time frame?

10  Q.  Well, for a majority of the time

11  frame.

12  A.  So in the '90s, it was three for

13  I think ARCOS items and possibly a multiplier of

14  six for schedules -- nonreportables, so III, IVs

15  and Vs.

16  And then when we entered into our

17  program in '98, they were a lot more flexible.

18  But there was a baseline threshold trigger of

19  about three times the average of the pharmacy's

20  based upon what classification they were in.

21  Q.  And what was the basis for using

22  that 300 percent?

23  MR. NICHOLAS:  Object to the

24  form.

Page 79

1  THE WITNESS:  So when I came on

2  board in 1990, that was already the --

3  and I'm not sure where that came from,

4  but that was the number that we had used.

5  That was the number we used when we

6  started negotiating the new program with

7  DEA and worked with them for years.

8  Again, there was no discussion of

9  four or five or two. That was the

10  threshold that we were working with DEA

11  for two years with, and that was the one

12  that we had.

13  Now, offices had the ability to

14  change that triggering number. And then

15  in 2007 we devised our program. One

16  more -- once again, when we were

17  designing the program, negotiating with

18  DEA again, the trigger point for

19  identifying an order of interest was

20  three -- was three times based on the

21  average of the category they were in, the

22  customer.

23  - - -

24  (Deposition Exhibit No. Zimmerman

Page 80

1  V2-4, Email chain, top one dated 30 Mar

2  2011, Bates stamped ABDCMDL00267230

3  through ABDCMDL00267232, was marked for

4  identification.)

5  - - -

6  BY MR. PIFKO:

7  Q.  You remember when we talked

8  before, we were talking about the Chemical

9  Handlers Manual?

10  A.  Yes. We talked about that.

11  Q.  Do you remember discussing that?

12  A.  Yes.

13  Q.  Do you remember talking about how

14  the three times the multiplier was used because

15  of language in there?

16  A.  That was part of the discussion

17  when we were negotiating with DEA of the three

18  times. At the time, that was the -- on the DEA's

19  website, identifying a potential suspicious order

20  for listed chemicals was three times. And that

21  was just another element of the discussions.

22  Q.  I've handed you a three-page

23  email Bates labeled ABDCMDL00267230 through 32.

24  There's various discussion here, but I just

Page 81

1  wanted to, again, direct your attention to a

2  couple specific statements that you have in here

3  about the thresholds.

4  A.  (Reviewing document.)

5  Okay.

6  Q.  All right. So you comment here

7  on the first page. In bullet point 2, you say,

8  "Threshold levels are already 300% over average."

9  Do you see that?

10  A.  Yes.

11  Q.  What did you mean by that?

12  A.  The trigger for our program is

13  300 -- three times the average of the

14  classification of the pharmacy's -- so the

15  pharmacies are broken into categories. And that

16  category takes the average of all pharmacies, and

17  then the multiplier 3 is put on there to trigger

18  anywhere that hits that threshold.

19  Q.  But the point that you're making

20  is that it's already 300 percent over. There's

21  already a lot of buffer in there. Agree?

22  MR. NICHOLAS:  Object to the

23  form.

24  Go ahead.

Page 82

1　　　　THE WITNESS: Again, that was
2　the -- that was the agreed-upon trigger
3　that we picked. Because you're going
4　to -- of course, you know, through the
5　averages, you're get customers at the top
6　of that range that order more and
7　depending on the type of patients they
8　serve. There's a lot of different
9　variables that creates, even within the
10　category, different levels. So
11　300 percent was the triggering level.
12　And that's what it says there.
13　BY MR. PIFKO:
14　　　Q.　Well, let's look at a little
15　further down on the page. There's a section here
16　you say, "First: When an order is 'just 3% or
17　6%' over its threshold...it is actually 303...or
18　306% over...because we build a 300% float into
19　each threshold."
20　　　　Do you see that part of the
21　email?
22　　　A.　I see that, yes.
23　　　Q.　The point is -- you're trying to
24　make there is, there's a lot of extra room in the

Page 83

1　threshold. Agree?
2　　　　MR. NICHOLAS: Object to the
3　form.
4　　　　THE WITNESS: No.
5　BY MR. PIFKO:
6　　　Q.　When something is over, it's not
7　just over a little bit, you're actually a lot
8　over the average.
9　　　　MR. NICHOLAS: Object to the
10　form.
11　　　　THE WITNESS: They're over the
12　average. But again, it's customer
13　specific. That's just the triggering
14　event to then review the characteristics
15　of that order on top of that. But -- so
16　3 percent would be 303. Just as I state,
17　it's --
18　BY MR. PIFKO:
19　　　Q.　It's actually 306 and 318. Your
20　math there is incorrect.
21　　　　But the point you're trying to
22　make there is that when something is 1 percent
23　over or 2 percent over, it's not just 1 percent
24　over, it's actually 303 percent over. Agreed?

Page 84

1　　　　MR. NICHOLAS: Object. Object to
2　the predicate to the question and the
3　commentary on the math. And object to
4　the form.
5　　　　THE WITNESS: That's the
6　statement. That's the statement I have.
7　BY MR. PIFKO:
8　　　Q.　What are you trying to
9　communicate there when you say when an order is
10　just 3 or 6 percent over, it's actually 303 or
11　306 percent? What are you trying to communicate
12　by saying that?
13　　　　MR. NICHOLAS: Object to the
14　form.
15　　　　THE WITNESS: Exactly what I
16　state there. I mean, there's not much
17　commentary to expand on.
18　BY MR. PIFKO:
19　　　Q.　That it's not a little bit over,
20　it's 303 or 306 percent over. Correct?
21　　　　MR. NICHOLAS: Object to the
22　form.
23　　　　THE WITNESS: Yeah. It's
24　3 percent over the threshold, but --

Page 85

1　which is already established at three
2　times. Correct.
3　BY MR. PIFKO:
4　　　Q.　Part of the reason that you have
5　that threshold is so that you won't interrupt the
6　customer's business. Correct?
7　　　A.　It's the -- so the threshold has
8　been -- so the threshold was in place before we
9　blocked orders. So the threshold was always
10　3 percent, even when we weren't stopping orders.
11　So for the first 17 years, when the agreed-upon
12　practice with DEA was that you reported
13　suspicious after and we wanted you to report
14　anything over 300 -- three times the average of
15　that category, that was how it was done. There
16　was no impact to the customer, because it was
17　reported after the fact.
18　　　　So the threshold trigger has
19　nothing to do with the impact of the -- on the
20　customer. That's always been the trigger,
21　regardless of whether we stopped orders or
22　released orders.
23　　　Q.　So even in the time period when
24　you stopped the orders, it's your testimony that

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1  the threshold has no design on not interrupting
2  the supply chain?
3       A.    Well, again, the whole purpose of
4  the threshold was to provide some type of
5  triggering event, because we process the amount
6  of volume that goes through our system.  And this
7  was the agreed-upon mechanism that we negotiated
8  with DEA as the triggering event.  Of course,
9  patient care is -- we want to make sure that the
10  patients have product that they need when they
11  come in for their -- when they get a prescription
12  filled.  So part of that is so you don't just
13  have a million orders flagging that aren't
14  suspicious or potentially suspicious.
15      Q.    You agree that your customers are
16  valued business partners, is a statement that the
17  company makes from time to time?
18           MR. NICHOLAS:  Object to the
19      form.
20           THE WITNESS:  I mean, our
21      customers are business partners of ours,
22      yes.
23  BY MR. PIFKO:
24      Q.    Are you familiar with what's

Page 87

1  called sometimes chargeback data or fee for
2  services data?
3       A.    I mean, I have heard of that.
4  I'm not intricately knowledgeable about that.
5       Q.    Okay.
6       A.    We have a department that handles
7  that type of stuff.
8       Q.    Have you ever heard of 867 data
9  or 852 data?  Do you know that term?
10      A.    I know there's numbers to data,
11  but I don't -- I couldn't tell you if those were
12  the correct three numbers to -- I have heard
13  people reference data with -- accustomed to
14  numbers like that.
15      Q.    You agree that AmerisourceBergen
16  provides transactional data back to the
17  manufacturers from whom it purchases products.
18  Correct?
19           MR. NICHOLAS:  Object to the
20      form.
21           THE WITNESS:  That's not my area,
22      and I -- you know, I don't know for sure.
23  BY MR. PIFKO:
24      Q.    You've never discussed that with

Page 88

1  anyone?
2       A.    I can't recall having that
3  discussion with anyone.
4       Q.    Okay.  You have zero familiarity
5  with the use of chargeback data or 852 data or
6  867 data?
7       A.    No.
8       Q.    What about IQVA data or IMS data,
9  are you familiar with that type of data?
10      A.    I know IMS is a data company
11  that -- is a data company that different
12  departments within the company uses.
13      Q.    Have you ever used that data in
14  connection with your diversion control programs?
15      A.    I believe I piloted something
16  years back, but I don't know the specifics of
17  that.
18      Q.    What caused you to pilot that
19  data at some point in your history?
20      A.    I think they were -- they had
21  mentioned that they have certain data that -- and
22  then we -- I believe.  Again, I wasn't involved
23  with the pilot.  I don't know if they piloted it
24  or what, but at some time we had access to

Page 89

1  certain data the diversion control group piloted.
2  It was years back.  I'm not sure when exactly.
3       Q.    Who would have known about that?
4       A.    David May.
5       Q.    Do you have any understanding
6  about how that data was used in connection with
7  AmerisourceBergen's diversion control program?
8       A.    I don't know exactly how it
9  was -- you know, I'm -- not exactly, no.
10           - - -
11           (Deposition Exhibit No. Zimmerman
12      V2-5, Email dated 17 Oct 2017, Bates
13      stamped ABDCMDL00272819, was marked for
14      identification.)
15           - - -
16  BY MR. PIFKO:
17      Q.    Handing you what's marked as
18  Zimmerman Volume 2, Exhibit 5.  For the record,
19  it's a single-page document Bates labeled
20  ABDCMDL00272819.
21           Let me know when you're done
22  looking at that.
23      A.    (Reviewing document.)
24           Okay.

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1 Q. Have you seen this before?

2 A. It has my name on it.

3 Q. Did you write this?

4 A. I would assume so.

5 Q. Do you remember writing this?

6 A. I don't remember writing it.

7 Q. This is about a 60 Minutes and

8 Washington Post article. Agree?

9 A. Yes.

10 Q. And you're writing some comments

11 to, as you say, address the article. Agree?

12 A. Yes.

13 Q. Why were you writing these

14 comments?

15 A. I don't know -- I don't recall

16 writing them, but -- I don't know. It looks like

17 notes to myself.

18 Q. Item 1 here you say, "DEA sets

19 quotas for the amount of opioids to be

20 manufactured each year and DEA raised quotas over

21 1000%" over "Joe R."

22 Do you see that?

23 A. Yes.

24 Q. Do you know who Joe R. referred

Page 91

1 to here?

2 A. Joe Rannazzisi.

3 Q. What's the point you're trying to

4 make in item 1?

5 MR. NICHOLAS: Object to the

6 form.

7 THE WITNESS: Yeah. I'm not

8 trying to make any points. I'm just

9 making a note that DEA raised quotas over

10 1,000 percent. Schedule II products have

11 to have quotas, and DEA controls how much

12 opioids are manufactured each year to be

13 distributed.

14 BY MR. PIFKO:

15 Q. Do you know that the DEA

16 considers the prior year's disposal as part of

17 calculating the quota?

18 MR. NICHOLAS: Object to the

19 form.

20 THE WITNESS: I don't.

21 BY MR. PIFKO:

22 Q. Have you ever been in a meeting

23 with HDA or anybody discussing the quotas?

24 A. I don't recall.

Page 92

1 Q. Have you ever discussed the

2 quotas with any of your manufacturer clients or

3 customers?

4 A. Not that I -- not that I know of.

5 We -- you know, as a distributor, we don't deal

6 with -- I mean, we're not involved in quotas.

7 Q. How about, have you ever heard of

8 getting an allocation of a manufacturer's quota

9 for distribution?

10 A. I'm not sure -- I know we get

11 allocated product on short supply items. I'm not

12 sure if that's what you're referencing.

13 Q. Have you ever like, for example,

14 applied to get a certain percentage of the

15 distribution of Schedule II controlled substances

16 manufactured by like Purdue?

17 A. I wouldn't know that.

18 Q. Who would know that?

19 A. If it's a purchasing or

20 procurement, then it would be that -- global

21 sourcing is the name of the department that does

22 all the buying for the company.

23 Q. Item number 2 here says, "DEA

24 issued registrations to pill mills that 'popped

Page 93

1 up' (Joe R's words) without due diligence

2 enabling them to receive opioids from

3 distributors under Joe R's oversight."

4 Do you see that?

5 A. Yes.

6 Q. What are you trying to convey

7 here?

8 A. Again, these are just notes I had

9 written down based upon the 60 Minutes interview

10 with Joe Rannazzisi. And that was the statement

11 that he made, that he was referencing pill mills,

12 but he didn't indicate that the pill mills were

13 all vetted and approved and licensed in good

14 standing with DEA and the Boards of Pharmacy.

15 Q. Was it --

16 A. Go ahead. I'm sorry.

17 Q. Continue.

18 A. No.

19 Q. Was this something you were

20 writing because you intended to draft something

21 in response to the article?

22 A. No.

23 Q. Were you upset by the article in

24 the 60 Minutes story?

Page 94

1    A.   Was I upset?  No, I wasn't upset.
2  I mean, I think the commentary -- you know,
3  mentioning pill mills, that there is -- that this
4  is a -- you know, these pills mills were popping
5  up.  They weren't popping up.  DEA was licensing
6  every one of these pill mills.
7         So here's the head of the DEA --
8  former DEA person blaming it on the pop up of the
9  pill mills that his department licensed that
10  enabled that to occur.  And so, yeah, I get
11  frustrated, because we do what we're supposed to
12  do in the supply chain, and we're not an
13  enforcement agency, and the enforcement agency is
14  trying to blame it on the regulated wholesalers
15  when they're the ones who license these
16  pharmacies, they license these doctors, they
17  review all the information, they know every pill
18  that's sold.  They have full enforcement
19  discretion.  They can go into pharmacies, they
20  can raid pharmacies, they can go into doctors.
21  But instead, they're focusing on distributors
22  that have no line of sight to that, and then make
23  it sound that we're just selling to people that
24  aren't licensed, which is completely out of line.

Page 95

1         We only sell to DEA licensed
2  pharmacies and hospitals.  And we take our
3  responsibilities very seriously.  So when I see a
4  guy on 60 Minutes who -- we negotiated our deal
5  with Joe Rannazzisi.  He negotiated our program
6  and existence from 2007 forward.  And here he is
7  making all these claims.  He was in the room
8  across the table from me.  He agreed on
9  everything that we put in place.  Everything.
10         And then to have a 60 Minutes
11  article come out and kind of lambast what he
12  worked with us and negotiate is, yes,
13  frustrating.  Yeah.
14    Q.   So you feel that the DEA had
15  responsibility for the opioid crisis?
16         MR. NICHOLAS:  Object to the
17  form.
18         THE WITNESS:  I'm not -- again,
19  the opioid crisis is a huge -- I mean,
20  there's a -- you know, there's a lot of
21  areas that assumes that opioid crisis.
22  Does DEA, they set the quotas.  They
23  license the doctors.  They license the
24  pharmacies.  They have all the data.

Page 96

1  They have all the distribution.  They
2  know how many pills are going to each
3  pharmacy.  They know how many pills are
4  going to what areas.  They have full --
5  they have all that information.
6         Part of our deal in 2007 was to
7  report every single controlled substance
8  sale every day to DEA, which we did.
9  Full transparency.  And that discussion
10  was in the event that we do find -- you
11  know, we know this is a new program and a
12  new area, so we want you to report every
13  order.  And if we see something
14  suspicious, we'll call you.  And then
15  we'll tweak it some more.
16         We never received a call.  We
17  never received any other issues.  And now
18  we have him on 60 Minutes saying that
19  we're servicing all these -- you know,
20  the distributors are servicing these pill
21  mills, it's just -- again, I think
22  there's a lot of blame to go around, but
23  I can tell you that if a doctor didn't
24  write the prescription, then we wouldn't

Page 97

1  sell it to the pharmacy and, you know, it
2  wouldn't get into -- into the public.
3  BY MR. PIFKO:
4    Q.   The fourth one here, you say, the
5  "opioid problem continuously got worse year over
6  year under Joe's...rule."
7         Do you see that?
8    A.   I see that.
9    Q.   Why did you think that was an
10  important note to make?
11         MR. NICHOLAS:  Object to the
12  form.
13         THE WITNESS:  Again, these are
14  just notes I was writing as he was --
15  as -- during the 60 Minutes.  And he's,
16  you know, discussing the problem with
17  opioids.  And he was in full control of
18  the DEA during that entire time.
19         Did he ever introduce legislation
20  or propose rules?  He was in charge.  Why
21  didn't he put proposed rules to further
22  regulate controlled substance
23  distribution?  Why didn't he create a
24  special license for pain management so we

Page 98

1  could focus on the issue and vet those,
2  more importantly, and then let DEA have
3  an idea for enforcement?  There was --
4  why didn't he share the data that he was
5  receiving so distributors could make more
6  cognizant decisions based upon a full
7  volume of information versus just what
8  we're selling?
9       He was in charge of all that.
10  And during that time, we were trying to
11  open up a dialogue to how can we help to
12  the crisis, and we weren't getting any
13  communication.  So that's -- that's, you
14  know, why I wrote that the problem
15  continued to occur while he was in
16  charge.
17  BY MR. PIFKO:
18      Q.    You presided over
19  AmerisourceBergen's diversion control problem the
20  entire time as well.  Correct?
21      A.    We -- excuse me, can you state
22  that again?
23      Q.    You presided over
24  AmerisourceBergen's diversion control program

Page 99

1  during the entire time as well.  Correct?
2      A.    Yes.
3      Q.    And the problem got worse under
4  your tenure as well.  Correct?
5          MR. NICHOLAS:  Object to the
6      form.
7          THE WITNESS:  Again, not based
8      upon -- we were meeting all of our
9      regulatory requirements.  We were going
10     to the Hill and proposing possible
11     solutions to open up and work with DEA.
12     We can't make new laws.  We can't make
13     new registrations.  We can't make
14     enforcement decisions.  We don't issue
15     DEA licenses.  DEA does all that.  But
16     for some reason --
17  BY MR. PIFKO:
18     Q.    You got your license --
19         MR. NICHOLAS:  Don't interrupt
20     him.
21         THE WITNESS:  But for some
22     reason, everyone expects the distributors
23     to be the enforcement agency, the
24     licensing agency.  It's ridiculous.  We

Page 100

1  have a --
2  BY MR. PIFKO:
3      Q.    You have your license
4  suspended --
5          MR. NICHOLAS:  Don't interrupt
6      him.
7          THE WITNESS:  We have a
8      distribution license, which the
9      regulations explain what our
10     responsibilities are.  We meet our
11     responsibilities.  I have been in charge
12     of it, yes, during that entire time, for
13     the last 30 years.  And I take it very
14     seriously.  And we do follow our
15     regulations, our responsibilities.
16         And when I think we can improve
17     it, I have done it in '98.  I did it in
18     2007.  I tried -- I have been trying
19     since 2007.  I've been on the Hill for
20     the last ten years hoping to try to
21     improve our relationships with DEA, open
22     up conversations, how can we solve the
23     crisis.
24         I have offered solutions,

Page 101

1  licensing requirements, clearinghouses,
2  everything.  Zero.  We've asked for
3  meetings.  Zero.  I can't force
4  regulations.  And then I can't imply
5  those requirements onto our pharmacy
6  customers, who are licensed by DEA, who
7  have patients coming in.  I can't say to
8  ABC, you know what, we're just going to
9  stop selling opioids.  I can't do that,
10  because opioids are a legitimate
11  medication for the treatment of pain, and
12  there's patients that need them.
13  BY MR. PIFKO:
14     Q.    You've been --
15     A.    And so you guys -- again, you
16  want us to do everybody's job in the supply
17  channel.  We are doing our job.  We're also
18  offering solutions that we can control.
19         I can't control a doctor writing
20  prescription.  I can't control a pharmacist who
21  fills the prescription.  I control who we sell
22  to, to make sure that they're licensed and that
23  we vet them properly.  And we could provide
24  training the best we can.  But that's all I can

Page 102

```
1   control.
2           I can't control the pharmacy, I
3   can't control the doctor, and I can't control
4   DEA.
5       Q.   But you haven't been complying
6   with the law the entire time either.  You got an
7   order to show cause.  You got a consent agreement
8   with you.
9           MR. NICHOLAS:  Object to the
10          form.
11          THE WITNESS:  But what -- so we
12          received an order to show cause.
13  BY MR. PIFKO:
14      Q.   You're not complying with the
15  law.  You're saying you're doing everything you
16  can.  You could start by complying with the law.
17          Do you agree?
18          MR. NICHOLAS:  Object to the
19          form.
20          THE WITNESS:  I was -- we were
21          complying with the law.
22  BY MR. PIFKO:
23      Q.   Why did the DEA send you an order
24  to show cause?
```

Page 103

```
1       A.   I can't control the DEA.
2       Q.   Why was the US Attorney's Office
3   investigating you?
4           MR. NICHOLAS:  I object to the
5           form.
6           THE WITNESS:  I can't control
7           them either.  I don't know.  I know what
8           we do, and I know the rules and our
9           obligations under regulatory
10          requirements, and we uphold those.
11              - - -
12          (Deposition Exhibit No. Zimmerman
13          V2-6, Pay Change History, Bates stamped
14          ABDCMDL00383878, was marked for
15          identification.)
16              - - -
17  BY MR. PIFKO:
18      Q.   I'm handing you what's marked as
19  Exhibit Zimmerman Volume 2, Exhibit 6.
20  ABDCMDL00383878.
```



Page 104

```
10              - - -
11          (Deposition Exhibit No. Zimmerman
12          V2-7, Map Chart, Bates stamped x through
13          x, was marked for identification.)
14              - - -
15          MR. NICHOLAS:  Can we get a check
16  on the time while we're doing this?
17          THE VIDEOGRAPHER:  Five minutes
18  left.
19  BY MR. PIFKO:
20      Q.   I'm handing you what's marked as
21  Zimmerman Volume 2, Exhibit 7.
22          Is any part of your -- you're in
23  charge of diversion control.  Right?  You're the
24  top person at AmerisourceBergen responsible for
```

Page 105

```
1   preventing diversion.  Correct?
2           MR. NICHOLAS:  Object to the
3           form.
4           THE WITNESS:  I have a -- I
5           oversee the diversion control department.
6           Correct.
7   BY MR. PIFKO:
```

Highly Confidential - Subject to Further Confidentiality Review

Page 106



17  Q.   You have a component of your
18 salary that's --
19  A.   My job is preventing diversion.
20 That's the basis of my department.  If we were
21 selling to unlicensed locations that result in
22 diversion, then yes.  If we had product that we
23 were -- that was flying out the back doors
24 because we didn't have adequate security, yes,

Page 107

1 that would be my responsibility.
2        And we would -- and so we don't
3 have that happening.  We don't sell to unlicensed
4 locations.  We do report suspicious orders.  We
5 meet all of our regulatory responsibilities.  And
6 since we do, that's probably why I have gotten my
7 increases, because we haven't had those actions
8 taken against us in the 30 years I have been in
9 my role.
10       We take those seriously.  I know
11 to you we don't.  But I do.  I take it
12 personally.  I spent my entire career --
13       MR. NICHOLAS:  Don't interrupt.
14 BY MR. PIFKO:
15  Q.   You had an order to show cause --
16       MR. NICHOLAS:  Don't interrupt.
17       MR. PIFKO:  He's done.
18 BY MR. PIFKO:
19  Q.   You had an order to show cause
20 issued against you in 2007, and you had to
21 negotiate a settlement agreement.  In 2008, you
22 get a merit adjustment.  Agree?
23  A.   In 2007 we got an order to show
24 cause.  And the first question I asked him, I

Page 108

1 said, what is this about.  And they said,
2 suspicious orders.  And they said -- I said,
3 well, what about our approved system.  They said,
4 what approved system.  They weren't even aware
5 the DEA had approved our system.
6        So there was a big
7 miscommunication between DEA when that happened.
8 So we went to negotiate.  There was never a -- we
9 didn't pay any fine.  We negotiated to help with
10 a program that we felt might enhance what we had
11 existingly for the good of the -- for the good of
12 the distribution chain.  And then they asked me
13 to --
14  Q.   Let's look at --
15  A.   Then they asked me to present at
16 their DEA conference, to share our program with
17 the other distributors.  So if we're such bad
18 actors, why are they asking us to present at the
19 DEA conference about our programs?
20  Q.   Let's talk about what's happening
21 to the country with respect to drug overdoses
22 while you're get merit bonuses and running the
23 diversion control program.
24  A.   Right.

Page 109

1  Q.   Look at Exhibit 8.  Do you
2 understand --
3        MR. NICHOLAS:  How much time?
4 Two minutes?  Okay.
5 BY MR. PIFKO:
6  Q.   Do you understand how to read
7 this?
8  A.   Is there a page you want me to --
9  Q.   The blue.  The blue is lower
10 death rates.
11       You understand, as you scroll
12 forward from 1990 to 2000, the overdose death
13 rates are skyrocketing in the United States.
14       MR. NICHOLAS:  If you're going to
15 give him a document like this, you're
16 going to need to let him look at it.
17       THE WITNESS:  Okay.  I see it.
18 BY MR. PIFKO:
19  Q.   Do you agree that that's what's
20 happening in the country?
21  A.   That's what this map shows.
22  Q.   And while you're responsible for
23 preventing diversion, this is what's happening.
24  A.   I'm responsible --

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1  MR. NICHOLAS: Let him finish.
2  THE WITNESS: I'm responsible for
3  diversion from my -- from our company.
4  Correct. I'm not responsible for
5  diversion from the pharmacy, from the
6  doctor, from the patient who has the
7  pills that he's been prescribed that he's
8  selling. We don't -- we can't prevent
9  that. We -- our role in the supply chain
10 is defined by the Code of Federal
11 Regulations, and we meet all those
12 requirements.
13 And since it's -- you showed me
14 this year over year, where's the new
15 regulations every year from the
16 government imposing new requirements to
17 combat this? Where are those? Why isn't
18 DEA calling me and having conversations
19 about, hey, we've got a severe problem,
20 can you help us fix it? Where is that?
21 BY MR. PIFKO:
22 Q. What are your improvements doing
23 to resolve --
24 A. I can't license them. I can't

Page 111

1  create a new license. I've told them that's
2  what we need. These are things we can do to
3  help, that the distributor can do, that can
4  control. If you license a pain clinic for -- to
5  dispense higher levels of opioids, then you could
6  put additional requirements on them. It
7  identifies the manufacturer and the distributor
8  that they sell more. If I have a retail pharmacy
9  that wants more, I can tell them go get the pain
10 license, it's going to cost you better -- it's
11 going to cost you some money and it's going to
12 cost you better education and more oversight by
13 DEA.
14 I can't control that, but it
15 seems like a simple fix to at least crack down on
16 some of this. But nothing. Nothing. The
17 government's done nothing.
18 Q. It's your testimony that --
19 MR. NICHOLAS: We're at an
20 hour-and-a-half. We're over --
21 MR. PIFKO: No. One more
22 question.
23 MR. NICHOLAS: No. I'm sorry,
24 Mark.

Page 112

1  MR. PIFKO: I've got one more
2  question. I'm going to ask it.
3  MR. NICHOLAS: Mark --
4  MR. PIFKO: You've been talking.
5  Okay?
6  MR. NICHOLAS: Mark, I have not
7  been talking.
8  MR. PIFKO: I've got more
9  question. I'm going to ask it.
10 MR. NICHOLAS: You've been
11 badgering with him questions that are
12 unnecessary.
13 MR. PIFKO: I've got one more
14 question.
15 MR. NICHOLAS: Hold on.
16 MR. PIFKO: Let me ask my one
17 more question and we can be done.
18 BY MR. PIFKO:
19 Q. My question is, you think you've
20 done everything you can do to prevent diversion?
21 A. Yes. I think -- I think me and
22 my team have done everything we can to prevent
23 diversion, over and above going to congress,
24 meeting with people, trying to get additional

Page 113

1  requirements imposed, regulations. We're waiting
2  for proposed rules, we keep hearing they're
3  coming out.
4  We want to be part of the
5  solution. But we can't do it one sided. You
6  need the collaboration of all stakeholders, and
7  you can't have it without the regulators and the
8  enforcement agencies and the people who license
9  these doctors and these pharmacies. We can't do
10 that. Alls we can do is make sure we have
11 patient -- medication available for those
12 patients when they need it and that -- those
13 pharmacies are properly licensed. And that's --
14 again, I think we do that.
15 MR. NICHOLAS: Okay. We're done.
16 Thank you.
17 THE VIDEOGRAPHER: This ends
18 today's deposition. We're going off the
19 record at 3:32 p.m.
20 (Witness excused.)
21 (Deposition concluded at
22 approximately 3:32 p.m.)
23
24

Page 114

1
2      CERTIFICATE
3
4
5          I HEREBY CERTIFY that the witness
   was duly sworn by me and that the deposition is a
6  true record of the testimony given by the
   witness.
7
          It was requested before
8  completion of the deposition that the witness,
   CHRIS ZIMMERMAN, have the opportunity to read and
9  sign the deposition transcript.
10
11
12
13
   _____
14     ANN MARIE MITCHELL, a Federally
       Approved Certified Realtime
15     Reporter, Registered Diplomate
       Reporter, Registered Merit Reporter and
16     Notary Public
17
18
19        (The foregoing certification of
20  this transcript does not apply to any
21  reproduction of the same by any means, unless
22  under the direct control and/or supervision of
23  the certifying reporter.)
24

Page 115

1      INSTRUCTIONS TO WITNESS
2
3          Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the appropriate
6  space on the errata sheet for any corrections
7  that are made.
8          After doing so, please sign the
9  errata sheet and date it.
10         You are signing same subject to
11 the changes you have noted on the errata sheet,
12 which will be attached to your deposition.
13         It is imperative that you return
14 the original errata sheet to the deposing
15 attorney within thirty (30) days of receipt of
16 the deposition transcript by you.  If you fail to
17 do so, the deposition transcript may be deemed to
18 be accurate and may be used in court.
19
20
21
22
23
24

Page 116

1       - - - - - -
         E R R A T A
2       - - - - - -
3
4  PAGE  LINE  CHANGE
5  ____ ____ _____
6     REASON: _____
7  ____ ____ _____
8     REASON: _____
9  ____ ____ _____
10    REASON: _____
11 ____ ____ _____
12    REASON: _____
13 ____ ____ _____
14    REASON: _____
15 ____ ____ _____
16    REASON: _____
17 ____ ____ _____
18    REASON: _____
19 ____ ____ _____
20    REASON: _____
21 ____ ____ _____
22    REASON: _____
23 ____ ____ _____
24    REASON: _____

Page 117

1
2      ACKNOWLEDGMENT OF DEPONENT
3
4          I,_____, do
5  hereby certify that I have read the foregoing
6  pages, 1 - 117, and that the same is a correct
7  transcription of the answers given by me to the
8  questions therein propounded, except for the
9  corrections or changes in form or substance, if
10 any, noted in the attached Errata Sheet.
11
12
13 _____
14 CHRISTOPHER ZIMMERMAN            DATE
15
16
17 Subscribed and sworn
   to before me this
18 _____ day of _____, 20_____.
19 My commission expires:_____
20
   _____
21 Notary Public
22
23
24