Highly Confidential - Subject to Further Confidentiality Review

1            IN THE UNITED STATES DISTRICT COURT

          FOR THE NORTHERN DISTRICT OF OHIO

2                    EASTERN DIVISION

3

    IN RE:  NATIONAL PRESCRIPTION     ) No. 17-md-2804

4    OPIATE LITIGATION NO. 2804        )

                                       )

5    APPLIES TO ALL CASES              ) Hon. Dan A. Polster

                                       )

6

7                    HIGHLY CONFIDENTIAL

8         SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

9

          VIDEO DEPOSITION OF TIFFANY KILPER

10

                    February 9, 2019

11                    9:05 a.m.

12

13

14

15

          Reporter:  John Arndt, CSR, CCR, RDR, CRR

16                    CSR No. 084-004605

                      CCR No. 1186

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1            DEPOSITION OF TIFFANY KILPER
     produced, sworn, and examined on February 9, 2019, at
 2   Bryan Cave Leighton Paisner LLP, 211 North Broadway,
     Suite 3600, in the City of St. Louis, State of
 3   Missouri, before John Arndt, a Certified Shorthand
     Reporter and Certified Court Reporter.

 4

 5               APPEARANCES OF COUNSEL

 6

     On Behalf of Plaintiffs:
 7        Keller Rohrback LLP
          1201 Third Avenue, Suite 3200
 8        Seattle, WA  98101
          (206) 623-1900
 9        BY:  MS. ALISON S. GAFFNEY
               agaffney@kellerrohrback.com
10        MR. DEAN KAWAMOTO
               dkawamoto@kellerrohrback.com
11

     On Behalf of Tennessee Action:
12        Branstetter, Stranch & Jennings, PLLC
          223 Rosa L. Parks Avenue, Suite 200
13        Nashville, TN  37203
          (615) 254-8801
14        BY:  MS. TRICIA HERZFELD
               triciah@bsjfirm.com
15             (present via speakerphone)
16   On Behalf of AmerisourceBergen:
          Reed Smith LLP
17        1717 Arch Street, Suite 3100
          Philadelphia, PA  19103
18        (215) 241-5489
          BY:  MR. RYAN K. BLAKE
19             rblake@reedsmith.com
               (present via speakerphone)
20

     On Behalf of Walmart:
21        Jones Day
          325 John H. McConnell Boulevard, Suite 600
22        Columbus, OH  43215
          (614) 469-3939
23        BY:  MS. BRANDY H. RANJAN
               branjan@jonesday.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              APPEARANCES OF COUNSEL (CONTINUED)
 2
    On Behalf of Cardinal Health:
 3          Armstrong Teasdale, LLP
            7700 Forsyth Boulevard, Suite 1800
 4          St. Louis, MO  63105
            (314) 552-6672
 5          BY:  MS. JULIE F. MEYER
                 jmeyer@armstrongteasdale.com
 6
 7  On Behalf of Mallinckrodt, SpecGX LLC:
            Ropes & Gray LLP
 8          800 Boylston Street
            Boston, MA  02199
 9          (617) 951-7000
            BY:  MR. WILLIAM T. DAVISON
10               william.davison@ropesgray.com
11          Ropes & Gray LLP
            1211 6th Avenue
12          New York, NY  10036
            (212) 596-9000
13          BY:  MS. FEIFEI REN
                 andrea.ren@ropesgray.com
14
    On Behalf of Endo Pharmaceuticals and Par
15  Pharmaceuticals:
            Arnold & Porter Kaye Scholer, LLP
16          70 West Madison Street, Suite 4200
            Chicago, IL  60602
17          (312) 583-2434
            BY:  MS. CAITLIN M. MIKA
18               caitlin.mika@arnoldporter.com
                 (present via speakerphone)
19
20  Also present:  James Arndt, videographer
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   INDEX OF INTERROGATION
 2   Examination by Ms. Gaffney              Page 8
 3
                     INDEX OF EXHIBITS
 4
 5   Exhibit Mallinckrodt-Rowley-Kilper-001     Page 10
     (Notice of deposition)
 6
     Exhibit Mallinckrodt-Rowley-Kilper-002     Page 13
 7   (R?sum?)
     (MNK-T1_0008005925 - MNK-T1_0008005927)
 8
     Exhibit Mallinckrodt-Rowley-Kilper-003     Page 16
 9   (Performance Management Document)
     (MNK-T1_0008005956 - MNK-T1_0008005963)
10
     Exhibit Mallinckrodt-Rowley-Kilper-004     Page 18
11   (Covidien HR letter)
     (MNK-T1_0008005909)
12
     Exhibit Mallinckrodt-Rowley-Kilper-005     Page 25
13   (E-mail message with attachment)
     (MNK-T1_0008001446)
14
     Exhibit Mallinckrodt-Rowley-Kilper-006     Page 32
15   (Chargebacks & Tracings presentation)
     (MNK-T1_0007127583)
16
     Exhibit Mallinckrodt-Rowley-Kilper-007     Page 39
17   (Chargebacks & Tracings presentation)
     (MNK-T1_0001009775)
18
     Exhibit Mallinckrodt-Rowley-Kilper-008     Page 46
19   (E-mail chain)
     (MNK-T1_0000457681)
20
     Exhibit Mallinckrodt-Rowley-Kilper-009     Page 47
21   (E-mail chain)
     (MNK-T1_0000457681 - MNK-T1_0000457687)
22
     Exhibit Mallinckrodt-Rowley-Kilper-010     Page 52
23   (E-mail message with attachment)
     (MNK-T1_0000387970)
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 INDEX OF EXHIBITS (CONTINUED)
 2
    Exhibit Mallinckrodt-Rowley-Kilper-011      Page 54
 3  (E-mail chain with attachment)
    (MNK-T1_0000274486 - MNK-T1_0000274519)
 4
    Exhibit Mallinckrodt-Rowley-Kilper-012      Page 64
 5  (E-mail chain)
    (MNK-T1_0000457251 - MNK-T1_0000457256)
 6
    Exhibit Mallinckrodt-Rowley-Kilper-013      Page 69
 7  (E-mail chain)
    (MNK-T1_0000563507 - MNK-T1_0000563508)
 8
    Exhibit Mallinckrodt-Rowley-Kilper-014      Page 73
 9  (E-mail chain with attachment)
    (MNK-T1_0006331001 - MNK-T1_0006331005)
10
    Exhibit Mallinckrodt-Rowley-Kilper-015      Page 80
11  (E-mail message with attachment)
    (MNK-T1_0000457174 - MNK-T1_0000457178)
12
    Exhibit Mallinckrodt-Rowley-Kilper-016      Page 84
13  (E-mail chain)
    (MNK-T1_0000290095 - MNK-T1_0000290097)
14
    Exhibit Mallinckrodt-Rowley-Kilper-017      Page 89
15  (E-mail chain with attachment)
    (MNK-T1_0000289983 - MNK-T1_0000289987)
16
    Exhibit Mallinckrodt-Rowley-Kilper-018      Page 97
17  (E-mail chain)
    (MNK-T1_0000421620 - MNK-T1_0000421621)
18
    Exhibit Mallinckrodt-Rowley-Kilper-019      Page 101
19  (E-mail chain)
    (MNK-T1_0000474370 - MNK-T1_0000474372)
20
    Exhibit Mallinckrodt-Rowley-Kilper-020      Page 103
21  (E-mail chain)
    (MNK-T1_0000421736 - MNK-T1_0000421739)
22
    Exhibit Mallinckrodt-Rowley-Kilper-021      Page 104
23  (E-mail chain)
    (MNK-T1_0000286532 - MNK-T1_0000286534)
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  INDEX OF EXHIBITS (CONTINUED)
 2
     Exhibit Mallinckrodt-Rowley-Kilper-022      Page 109
 3   (E-mail chain)
     (MNK-T1_0000289889)
 4
     Exhibit Mallinckrodt-Rowley-Kilper-023      Page 113
 5   (E-mail chain)
     (MNK-T1_0000561207 - MNK-T1_0000561209)
 6
     Exhibit Mallinckrodt-Rowley-Kilper-024      Page 116
 7   (E-mail message)
     (MNK-T1_0000286194)
 8
     Exhibit Mallinckrodt-Rowley-Kilper-025      Page 129
 9   (E-mail message with attachment)
     (MNK-T1_0000281241 - MNK-T1_0000281248)
10
     Exhibit Mallinckrodt-Rowley-Kilper-026      Page 143
11   (E-mail chain)
     (MNK-T1_0000465411 - MNK-T1_0000465413)
12
13                  (Exhibits are attached.)
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE VIDEOGRAPHER:  We are now on the

 2  record.  My name is James Arndt.  I'm a videographer

 3  for Golkow Litigation Services.  Today's date is

 4  February 9th, 2019, and the time is 9:05 AM.

 5              This video deposition is being held in St.

 6  Louis, Missouri, in the matter of the National

 7  Prescription Opiate Litigation, for the United States

 8  District Court for the Northern District of Ohio,

 9  Eastern Division.  The deponent is Tiffany

10  Rowley-Kilper.

11              Will counsel please identify themselves?

12              MS. GAFFNEY:  Alison Gaffney from Keller

13  Rohrback, for the plaintiffs.

14              MR. KAWAMOTO:  Dean Kawamoto, Keller

15  Rohrback, for the plaintiffs.

16              MS. MEYER:  Julie Fix Meyer, Armstrong

17  Teasdale, for Cardinal Health.

18              MS. RANJAN:  Brandy Ranjan from Jones Day

19  for Walmart.

20              MS. REN:  Feifei Andrea Ren from Ropes &

21  Gray for Mallinckrodt LLC, SpecGX LLC, and Tiffany.

22              MR. DAVISON:  William Davison of Ropes &

23  Gray for Mallinckrodt LLC, SpecGX LLC, and the witness.

24              THE VIDEOGRAPHER:  Will counsel on the
```

Highly Confidential - Subject to Further Confidentiality Review

1   phone please identify themselves?

2            MS. MIKA:  Caitlin Mika --

3            MS. HERZFELD:  Tricia Herzfeld from

4   Branstetter, Stranch & Jennings for the Tennessee

5   plaintiffs.

6            MS. MIKA:  Caitlin Mika, Arnold & Porter,

7   for the Endo and Par entities.

8            MR. BLAKE:  Ryan Blake with Reed Smith on

9   behalf of AmerisourceBergen.

10           THE VIDEOGRAPHER:  The court reporter is

11  John Arndt, and he will now swear in the witness.

12

13       The witness, TIFFANY KILPER, first having

14  been duly sworn, testified as follows:

15                    EXAMINATION

16  BY MS. GAFFNEY:

17       Q.   Good morning, Ms. Rowley-Kilper.  Could

18  you please state and spell your full name for the

19  record?

20       A.   Sure.  Tiffany Kilper.  T-I-F-F-A-N-Y,

21  K-I-L-P-E-R.

22       Q.   Okay, great.  And Ms. Kilper, you

23  understand you're under oath today?

24       A.   I do.

1        Q.      Are you taking any medication or is there

2    any reason that would prevent you from answering every

3    question truthfully today?

4        A.      No.

5        Q.      Have you ever been deposed before?

6        A.      I have not.

7        Q.      So just a few ground rules, mostly so we

8    can help the court reporter.  We don't want to talk

9    over each other.  He'll be recording every word that we

10   say, so for the sake of having a clear record we don't

11   want to speak at the same time.  So if you wait for me

12   to finish asking a question before answering, I will

13   wait for you to finish answering before asking another

14   question.

15       A.      Okay.

16       Q.      And then when you answer a question, you

17   need to answer it verbally rather than uh-huh or

18   nodding, shaking head.

19       A.      Okay.

20       Q.      If I ask a question that you don't

21   understand, please let me know.  I'll try to rephrase

22   it.  Okay.

23               Are you represented by counsel today?

24       A.      Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And who are they?

 2        A.    Bill Davison and Andrea Ren.

 3        Q.    Okay.  Great.  And are you paying them for

 4   representing you here today?

 5        A.    No.

 6        Q.    And to your knowledge, is Mallinckrodt

 7   paying them for representing you here today?

 8        A.    I would assume so.

 9        Q.    So the first exhibit is the deposition

10   notice.  Here you go.  It's been marked as Exhibit 1.

11              [Exhibit Mallinckrodt-Rowley-Kilper-001

12              marked for identification.]

13        Q.    Have you seen this before?

14        A.    Yes.

15        Q.    When did you first see it?

16        A.    When I opened it last night.

17        Q.    Got it.  If you just flip through,

18   Schedule A defines the documents that you need to

19   bring, and then after the definitions -- the documents

20   to be produced, and the last page, Request For

21   Production Number 2, asks for all documents, including

22   electronic data and e-mail, in your possession related

23   in any way to any defendants, manufacturer, marketing,

24   sale, distribution, suspicious order monitoring, and
```

Highly Confidential - Subject to Further Confidentiality Review

1    lobbying efforts in connection with its opioid

2    business.

3              Have you searched through your personal

4    documents and provided them to counsel?

5         A.   Yes.

6         Q.   And were there any documents in your own

7    possession that were responsive?

8         A.   No.

9         Q.   Okay.  Great.  When you were at

10   Mallinckrodt, did you use your personal e-mail for

11   Mallinckrodt business ever?

12        A.   No.

13        Q.   How about text messages?  Did you ever

14   text for Mallinckrodt business?

15        A.   No.

16        Q.   What did you do to prepare for your

17   deposition today?

18        A.   I met with my attorneys.

19        Q.   How many times?

20        A.   Just once.

21        Q.   And did you review any documents?

22        A.   Yes.

23        Q.   What categories of documents did you

24   review?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. DAVISON:  I'm just going to -- you can

 2     tell what categories.  I don't want you to get into any

 3     specific documents that we reviewed.  So you can say at

 4     a high level, but nothing into any specific documents.

 5          A.    Okay.  We looked at e-mails that were

 6     exchanged.  We looked at spreadsheets that -- I have

 7     some spreadsheet friends my time there.  That's all I

 8     remember, really.

 9     BY MS. GAFFNEY:

10          Q.    And other with your -- other than with

11     your attorneys, did you speak to anyone else about your

12     deposition today?

13          A.    No.

14          Q.    No former colleagues, friends?

15          A.    No.

16          Q.    Are you related to Jeff Kilper, who was

17     deposed earlier this week?

18          A.    Yes.

19          Q.    Did you speak to him about your

20     deposition?

21          A.    Not about details of it.

22          Q.    What did you talk to him about?

23          A.    Just that we were -- that it -- when it

24     was happening and the process of being here, yeah.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Let's see.  Are you being reimbursed at

 2   all for your time here today?

 3          A.    Nope.

 4          Q.    All right.  Thank you for being here.

 5   When did you start working at Mallinckrodt?

 6          A.    I took a temporary job there in 1999 and

 7   then I was hired in 2000 as a full-time employee.

 8          Q.    And what were your responsibilities when

 9   you started in 1999?

10          A.    It's a test of memory.

11          Q.    Yes.

12          A.    But I was a temp for a time being a

13   deduction analyst, is what they called it, I believe,

14   and essentially I was matching debits and credits, and

15   it was just a financial position.  Low-level financial

16   position.

17          Q.    I'll hand you what's been marked as

18   Exhibit 2.  And this will help a little bit with the

19   memory test.

20                [Exhibit Mallinckrodt-Rowley-Kilper-002

21                marked for identification.]

22          Q.    An early r?sum?, and for the record this

23   is Bates number ending in 8005925.  So you mentioned

24   your responsibilities when you first started in a
```

1    temporary position.

2         Can you walk me through how your

3    responsibilities evolved over your time at

4    Mallinckrodt?

5         A.    Sure.  So I was hired then -- after doing

6    deductions for a time, I was hired permanently in that

7    position and -- under the finance team, and then I, it

8    looks like in 2001, took a position as a senior

9    contract administrator.  Did you want me to go into the

10   roles in --

11        Q.    Yeah, so how is that -- a senior contract

12   administrator different from the distributor deduction

13   analyst position?

14        A.    Sure.  So the contract administrators

15   basically worked on drafting the contracts with our

16   customers.  We worked with legal, and we would put the

17   contract together and send it out to the customer, and

18   then we would enter the pricing into the system.

19        So it was a totally different position

20   than the deductions analyst.  That was just really an

21   accounting role to match debits and credits and try to

22   analyze the remaining difference if there was one.

23        Q.    Got it.  Okay.  Thank you.

24        A.    And then I was promoted to, I believe,

```
 1    lead -- yeah, lead senior contract administrator.  Just

 2    more of a supervisory role, taking the lead on process

 3    improvement, things like that, and then eventually

 4    promoted to supervisor in 2004, which just was

 5    officially hiring and leading the team that did that.

 6          Q.    And after that 2004-2005 time period, did

 7    you stay in contract administration?

 8          A.    I did not.

 9          Q.    Where did you go to after that within

10    Mallinckrodt?

11          A.    So they created a role that they called

12    trade compliance, and it was an effort to kind of

13    utilize my background in contracts to help resolve

14    issues with our distributors and work on -- they called

15    DSA, distribution services agreements, and implement

16    some process improvement.

17                It was kind of a catch-all role that had a

18    lot of different functions to it, but that was kind of

19    the trade-compliance piece, and then from there they

20    just promoted the position to what they called trade

21    relations manager, which was just a change in title but

22    essentially the same job, just a little bit higher

23    level, getting to see some of the distributors

24    face-to-face.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Just -- yeah, really just an effort to

 2   promote me, I think, and make it a higher-level

 3   position.  That's all.

 4         Q.    Okay.  Great.  This is what's been marked

 5   Exhibit 3.

 6               [Exhibit Mallinckrodt-Rowley-Kilper-003

 7               marked for identification.]

 8         Q.    For the record, this is Bates-numbered

 9   ending in 8005956.  This is a performance evaluation

10   from October 2002.  I have a question about just one

11   part of it.

12               On Page 4, in the box that says expected

13   result, it says become more exposed to the chargeback

14   group and their importance and functions in the

15   department.  Can you explain that to me, please?

16               MR. DAVISON:  Objection.  Form.

17         A.    I'm sorry.  Which expected result?  I see

18   four on this page.

19   BY MS. GAFFNEY:

20         Q.    The top one?

21         A.    Become more exposed to the chargeback

22   group?  Yeah, so it was an effort to sit with the folks

23   that actually processed the chargebacks and kind of

24   understand -- the contracts team entered the pricing,
```

Highly Confidential - Subject to Further Confidentiality Review

1    and the chargebacks team processed the chargeback, so

2    it was an effort to kind of understand how those two

3    things correlated together.

4         Q.    And how do they correlate together?

5         A.    Well, the pricing that I would enter into

6    the system would be the basis for that reimbursement

7    back to the distributor in a chargeback.  So if I were

8    to make a mistake on the pricing system, it would cause

9    significant effects in chargebacks being inaccurately

10   paid, so that was kind of an effort for us to do a

11   better job, I think.

12        Q.    And then the result here -- during a

13   special project given to the entire contract

14   administration department, Tiffany was responsible for

15   sitting with each member of the chargeback department

16   to better understand that side of the business.

17             So when it says that you were responsible

18   for sitting with each member of the chargeback

19   department -- and I know this is going back to 2002,

20   but do you remember doing that?

21        A.    No.

22        Q.    Just generally speaking, in terms of how

23   the departments were organized, this refers to the

24   chargeback department and the contract administration

Highly Confidential - Subject to Further Confidentiality Review

1   department.

2           Were those connected within the same

3   business unit, or were they -- how was it organized at

4   Mallinckrodt?

5           MR. DAVISON:  Objection to form.

6       A.   At the time I believe that the

7   contracts -- they switched around a lot, but I think

8   during this time the chargeback group was under

9   shared -- what they considered shared service finance,

10  and the contracts were under the business unit.

11          So -- they were in different buildings,

12  too, which made discrepancies difficult to resolve.  So

13  that I think this was all an effort to streamline and

14  try to understand what -- when there's discrepancies,

15  how they're caused, and how we can do a better job of

16  understanding how the two functions could come together

17  and help each other a little bit.  Makes sense.

18      Q.   Okay.  Thank you.  Here's what's been

19  marked as Exhibit 4.

20          [Exhibit Mallinckrodt-Rowley-Kilper-004

21          marked for identification.]

22      Q.   Bates number ending in 8005909, and this

23  appears to be a letter from the HR department stating

24  that you were an employee of Covidien, formerly known

1    as Tyco Health Care, from March 21st, 2001, to February

2    5th, 2011.

3              Do those dates seem accurate to you?

4         A.   Yes.

5         Q.   And just to clarify for the record,

6    because there are documents that refer to Covidien as

7    well as Mallinckrodt, understanding that legally those

8    are separate entities, but when I refer to Mallinckrodt

9    today, for purposes of today's deposition, can we have

10   an understanding that Covidien and Mallinckrodt are the

11   same?

12        A.   Yes.

13        Q.   Why did you leave Mallinckrodt in 2011?

14        A.   To stay home.  We were in the process of

15   adopting, and I wanted to stay home with my son.

16        Q.   And are you currently working?

17        A.   I am.

18        Q.   Where do you work now?

19        A.   The Salvation Army.

20        Q.   So I have some general questions.  What is

21   a chargeback?

22             MR. DAVISON:  Objection to form.

23        A.   Let's see.  A chargeback was -- or is a

24   payment to a distributor to reimburse them for the

Highly Confidential - Subject to Further Confidentiality Review

1  difference between the wholesaler acquisition cost that

2  they purchased it from the manufacturer at and the

3  distributor's customers price or contract price with

4  their customer.

5  BY MS. GAFFNEY:

6      Q.    Is this a practice that's widespread

7  throughout the pharmaceutical industry to your

8  knowledge?

9          MR. DAVISON:  Objection --

10     A.    To my knowledge, yes.

11  BY MS. GAFFNEY:

12     Q.    And to your knowledge, is it applied to

13  both brand-name pharmaceutical products as well as

14  generics?

15          MR. DAVISON:  Objection to form.

16     A.    I -- my time was only in generics, so I'm

17  not really sure.

18  BY MS. GAFFNEY:

19     Q.    And when we talk about chargeback data,

20  what does that data consist of?

21          MR. DAVISON:  Objection.  Form.

22     A.    Chargeback data should consist of the

23  distributor that -- so when you speak of that, are you

24  talking about like Mallinckrodt's chargeback data, what

Highly Confidential - Subject to Further Confidentiality Review

1   that would contain?  Because that's really only --

2   BY MS. GAFFNEY:

3        Q.    Right.  In your experience working at

4   Mallinckrodt.

5        A.    Okay.  So I can't say exhaustively.  I

6   don't really remember the -- every detail, but I know

7   it would contain at least the distributor or the

8   manufacturer that -- us --and then the distributor that

9   is submitting it, and then the DEA registrant that the

10  product was shipped to from the distributor and their

11  DEA number that's in the product.  Obviously, quantity,

12  price.  So that's kind of all I remember.

13       Q.    And when you say the DEA registrant that

14  the product was shipped to, would that also be referred

15  to as the downstream customer or the indirect customer?

16       A.    Yes.

17       Q.    Either of those two?

18       A.    I've never used the term downstream

19  customer, but yeah, we commonly refer to them as

20  indirect customers, yeah.

21       Q.    What's your understanding of how

22  Mallinckrodt uses chargeback data?

23            MR. DAVISON:  Objection to form.

24       A.    I mean, the chargeback data was used to

Highly Confidential - Subject to Further Confidentiality Review

1  reimburse the distributor, so that's really -- that was

2  the purpose of a chargeback.  I don't -- the data can

3  be used for any number of things to look at your

4  indirect sales.

5  BY MS. GAFFNEY:

6      Q.    So with respect to pharmaceutical

7  products, do you know what diversion refers to?

8          MR. DAVISON:  Objection to form.

9      A.    I have an educated guess.

10 BY MS. GAFFNEY:

11     Q.    What is that guess?

12         MR. DAVISON:  Objection.

13     A.    That diversion would be Mallinckrodt

14 product going somewhere other than -- I mean, than it

15 should, I guess, or than -- yeah, I can't even really

16 say that I can define it.

17 BY MS. GAFFNEY:

18     Q.    That's fine.  How about the term

19 suspicious order?  Are you familiar with that term?

20     A.    Yes.

21     Q.    What is a suspicious order?

22         MR. DAVISON:  Objection to form.

23     A.    I can't remember what was determined to be

24 a suspicious order.  I know that the compliance team

Highly Confidential - Subject to Further Confidentiality Review

1    had owned a system for reporting for suspicious orders,

2    but I was only -- I only looked at those for a brief

3    time, so I can't really speak to like what was

4    considered a suspicious order, if that makes sense.

5    BY MS. GAFFNEY:

6         Q.    That's fair.

7         A.    Okay.

8         Q.    How about the term peculiar order?  Are

9    you familiar with that term?

10        A.    My understanding is that that's the same

11   thing as a suspicious order.

12        Q.    And is it your understanding that

13   chargeback data can be used in connection with

14   suspicious order monitoring?

15             MR. DAVISON:  Objection to form.

16        A.    That it can be, or that it was, or -- I'm

17   not sure I understand the question.

18   BY MS. GAFFNEY:

19        Q.    Start with that it can be?

20        A.    I wasn't -- I don't remember anything

21   about the indirect sales being considered on the

22   suspicious orders at all.  I recall those two things

23   being separate.

24        Q.    So in your recollection, did Mallinckrodt

Highly Confidential - Subject to Further Confidentiality Review

1    ever use chargeback data in connection with suspicious

2    order monitoring?

3              MR. DAVISON:  Objection.

4         A.    Not that I remember.

5    BY MS. GAFFNEY:

6         Q.    Another general question.  Are you

7    familiar with the term pill mill?

8         A.    I've heard it.

9         Q.    What's your understanding of what that

10   means?

11        A.    My educated guess would be that it's a

12   pharmacy that is distributing a lot -- prescribing a

13   lot of opioids from that specific location or that

14   specific pharmacy.

15        Q.    And in your opinion, is it important for

16   Mallinckrodt to try to prevent its product from going

17   to pill mills?

18              MR. DAVISON:  Objection to form.

19        A.    I think that's a reasonable

20   responsibility, yeah.

21   BY MS. GAFFNEY:

22        Q.    Do you have any understanding of how

23   Mallinckrodt would try to do that if it would try to do

24   that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. DAVISON:  Objection to form.

 2       A.    I really have no recollection of the

 3   details of how or how they would go about it now.

 4   Yeah.

 5   BY MS. GAFFNEY:

 6       Q.    I'm going to hand you what's been marked

 7   as Exhibit 5.

 8              [Exhibit Mallinckrodt-Rowley-Kilper-005

 9              marked for identification.]

10              MS. GAFFNEY:  Oh, I'm sorry.  Did I

11   miscount, I think?

12              MR. DAVISON:  No.  This is 5.  Correct.

13              MS. GAFFNEY:  That's 5?  Okay.  Okay.  For

14   the record, this is Bates-numbered ending in 8001446,

15   and then there's an attachment ending in 800 -- or

16   1451.

17   BY MS. GAFFNEY:

18       Q.    So this is an e-mail forward from Sue

19   Werder dated November 6th, 2006, with the subject

20   October monthly report.  And I just have a few

21   questions about the attachment, but first, what was Sue

22   Werder's position at Mallinckrodt at the time of this

23   e-mail, if you remember?

24       A.    I mean, she was -- well, I'm sorry.  What
```

```
 1   was the date of that e-mail?

 2        Q.    2006.

 3        A.    So she was my boss at the time.  I'm not

 4   sure what her title was, actually, but she was a

 5   director.

 6        Q.    And if you look at this e-mail, it looks

 7   like she has forwarded an e-mail that she first sent to

 8   Vince Kaiman at Mallinckrodt.  Do you remember what his

 9   role was at Mallinckrodt at that time?

10        A.    Vince was the -- oh, you're testing my

11   memory today.  I think he was the VP of the business, I

12   think.

13             MR. DAVISON:  And sorry.  Just to be clear

14   on the PowerPoint behind it, I see it jumps a Bates

15   number by five.  Is this one of -- are you representing

16   that this is one of the -- I see there's more than one

17   attachment.

18             MS. GAFFNEY:  Uh-huh.

19             MR. DAVISON:  So are you representing that

20   this is one of the attachments to the e-mail?

21             MS. GAFFNEY:  Yes, it's the second

22   attachment.

23             MR. DAVISON:  Okay.

24             MS. GAFFNEY:  Gross margin initiatives --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    PowerPoint.

 2              MR. DAVISON:  Okay.  I just wanted to make

 3    sure because I saw it jumps.

 4              MS. GAFFNEY:  Yeah.

 5              MR. DAVISON:  Thanks.

 6    BY MS. GAFFNEY:

 7         Q.   One more question on this e-mail.  She

 8    forwards it to a group that includes you.  If you can

 9    take a minute to look over the other names in that

10    group.

11              Can you tell me if those people were from

12    primarily one department at Mallinckrodt, or from --

13    were they from different departments?

14         A.   This is the first one, Number 8.

15         Q.   Oh, I'm sorry.  Back at the cover e-mail.

16         A.   Oh, okay.  Lots of different departments.

17         Q.   Okay.  So now going on the PowerPoint, GM

18    Initiative Number 8.  This PowerPoint that -- the title

19    of the file is gross margin initiatives.  Can you tell

20    me what gross margin initiatives refers to?

21              MR. DAVISON:  Objection to form.

22         A.   I'm assuming -- I really can't speak to

23    what she meant by that.  Just -- yeah, I really have no

24    idea.
```

1    BY MS. GAFFNEY:

2         Q.    Okay.  And then this -- on the Number 8

3    page, the initiative is reduce financial risks

4    associated with gray market activity.  What does gray

5    market activity refer to?

6              MR. DAVISON:  Objection to form.

7         A.    My recollection is that that's the

8    diversion that you're talking about, that the product

9    was showing up in places that we -- that it wasn't

10   supposed to.

11   BY MS. GAFFNEY:

12        Q.    And then next to that under description,

13   it says refine business process and controls relating

14   to chargebacks.  How does that description relate to

15   the initiative of reducing financial risks associated

16   with gray market activity?

17             MR. DAVISON:  Objection to form.

18        A.    Honestly, I have no idea what this slide

19   was referring to.  It's just been so long.  I am not --

20   I don't remember any specific business process or

21   controls that I was a part of that was associated with

22   gray market activity, so I'm not really sure what the

23   details of this slide are.

24   BY MS. GAFFNEY:

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Okay.  That's fair.  I know it has been a

 2   long time.  And according to this slide, you were the

 3   business lead for this subcommittee.  Is that correct?

 4               MR. DAVISON:  Objection to form.

 5          A.    That's what it appears.  It appears that

 6   way.

 7   BY MS. GAFFNEY:

 8          Q.    If you read through the objective and the

 9   tactical plan items listed on this slide, does that

10   refresh your recollection of what this project

11   involved?

12          A.    I have some recollection of the

13   overreporting analysis vaguely, that we looked at the

14   outbound sales versus the inbound sales in an effort to

15   try to determine if we thought the reporting was

16   accurate from a big picture percentage-wise, if that

17   makes sense.

18               But beyond that, I really can't -- they

19   were all efforts to attempt to do the best job we could

20   to monitor the indirect activity to see if -- to make

21   sure that our product was getting where it needed to go

22   and not diverted, so --

23          Q.    On the third box under tactical plan, it

24   says completion of customer segmentation project to
```

Highly Confidential - Subject to Further Confidentiality Review

1    ensure 100 percent validation of legitimate end

2    customers for chargeback processing.

3           Were there customers in Mallinckrodt's

4    supply chain that were not legitimate end customers, to

5    your knowledge?

6           MR. DAVISON:  Objection to form.

7       A.    I'm sorry.  Can you repeat the question?

8    BY MS. GAFFNEY:

9       Q.    Sure.  Were there customers in

10   Mallinckrodt's supply chain that were not legitimate

11   end customers to your knowledge?

12          MR. DAVISON:  Objection to form.

13      A.    I think that the term legitimate -- that

14   had to do with a segmentation project that ensured that

15   our system would automatically kick out any chargeback

16   that was, let's say, a distributor selling to a

17   distributor.  If they had that segmentation,

18   distributor would automatically kick out.

19          So it wasn't -- I don't know of any

20   illegitimate end customers.  This was just really an

21   effort to try to have the system do some of the grunt

22   work for making sure that these chargebacks were denied

23   if they were sold to a segmentation that shouldn't be

24   receiving a chargeback.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. GAFFNEY:

 2         Q.    That makes sense.  Thank you.  You

 3    mentioned the segmentation of

 4    distributor-to-distributor sales?

 5         A.    Right.

 6         Q.    So that type of transaction would not

 7    receive a chargeback?

 8         A.    Right.

 9         Q.    And why is that?

10         A.    I mean, it's just because then you have

11    no -- I mean, my understanding is that would have been

12    because then you can't account for where the product is

13    going.  I don't know.

14               I mean, the wholesaler that bought it from

15    us should want their reimbursement, and that's what the

16    chargeback is to get them to, and so for them to take

17    the product and sell it to another distributor, we

18    would lose sight of that, and so that was something

19    that we ensured that that business process didn't

20    happen, if that makes sense.

21         Q.    Uh-huh.  Okay.  And you said the system

22    would automatically kick out those types of

23    transactions; is that correct?

24         A.    Correct.  Yeah.
```

Highly Confidential - Subject to Further Confidentiality Review

 1          Q.    Were there other segmentations that the

 2    chargeback system would also exclude?

 3          A.    Yes.

 4                MR. DAVISON:  Objection to form.

 5          A.    I have no idea which ones.

 6    BY MS. GAFFNEY:

 7          Q.    This is what's been marked as Exhibit 6,

 8    and Bates number 7127583.

 9                [Exhibit Mallinckrodt-Rowley-Kilper-006

10                marked for identification.]

11          Q.    Exhibit 6 is from a PowerPoint

12    presentation.  The title of this presentation is sales

13    and marketing operations, new hire orientation.  It was

14    quite a long PowerPoint deck, so I didn't print the

15    whole thing.  Just one section of it on chargebacks and

16    tracings.

17                Are you familiar with the term tracing?

18                MR. DAVISON:  Objection.

19          A.    Vaguely.

20    BY MS. GAFFNEY:

21          Q.    Can you tell me what you recall what that

22    means in the context of your work at Mallinckrodt?

23                MR. DAVISON:  Objection.

24          A.    I could not be accurate here, but my

Highly Confidential - Subject to Further Confidentiality Review

1    recollection is that maybe a tracing was a transaction

2    indicating where the product was sold even when there

3    wasn't a chargeback to be paid, but that could be

4    wrong.  That's my recollection of it.

5    BY MS. GAFFNEY:

6         Q.    Okay.  And this looks like an organization

7    chart for the chargeback department, and you're not in

8    here; correct?

9         A.    Right.

10        Q.    So as you were explaining before, the

11   chargeback department was separate from your contract

12   administration department; correct?

13        A.    Correct.

14        Q.    Were both of those departments within the

15   sales and marketing operations diversion?

16             MR. DAVISON:  Objection.

17        A.    They for a time were both under sales

18   marketing ops, and then -- during my 11 years there

19   they changed back and forth quite a bit.  The

20   chargebacks teams was always under the shared service

21   organization -- or sales marketing ops, I guess --

22   operations -- but the contracts team went back and

23   forth.

24   BY MS. GAFFNEY:

Highly Confidential - Subject to Further Confidentiality Review

1       Q.    So just going through these slides,

2    there's one called chargebacks and tracings interaction

3    chart.  So under distributors, there's three --

4              MR. DAVISON:  Give her a second to review

5    the chart.

6              MS. GAFFNEY:  Oh, sorry.

7              MR. DAVISON:  It's a big chart, so --

8              MS. GAFFNEY:  Yeah.  Please take your

9    time.

10       A.    Okay.

11   BY MS. GAFFNEY:

12       Q.    Okay.  So under distributors in the third

13   bullet point, it says communicate discrepancies between

14   what the distributor reported and what is in Partner.

15              Do you remember what Partner refers to

16   here?

17       A.    The pricing system.

18       Q.    And does that mean that it's a database?

19   What does it mean -- the pricing system?

20       A.    It was just our software platform that we

21   entered pricing into, so it was what the chargeback was

22   processed in -- the system that it was processed in.

23       Q.    And then how about under information

24   services it says EDI 844, 849, and 867.  Can you

Highly Confidential - Subject to Further Confidentiality Review

1    explain what that refers to?

2        A.    I know that they're the transactions from

3    the wholesaler, and I know one of them's inventory but

4    I can't remember -- I cannot remember the specifics on

5    each of these transactions.  No, I'm sorry.

6        Q.    No problem.  And it says partner support

7    there as well.  Do you know what that would refer to?

8        A.    I think that this slide's indicating that

9    our IT group was -- they were the ones that handled

10   those EDI transactions coming into our system and they

11   provided support for when we'd have -- if we

12   encountered an issue with our pricing system.

13       Q.    Got it.  And CDIG.  I think I saw in

14   another document that that's the customer data

15   integrity group.  Correct?

16       A.    That's correct.

17       Q.    It says set up new indirect customers.

18   Would Mallinckrodt set up an account for its indirect

19   customers?

20            MR. DAVISON:  Objection.

21       A.    My understanding is that for the

22   chargeback to pay, we would have needed to have that

23   DEA number to ensure that it's a legitimate DEA

24   registrant so that we could pay that transaction.  So

Highly Confidential - Subject to Further Confidentiality Review

1    that's -- that would be my understanding of that.

2    BY MS. GAFFNEY:

3        Q.    Okay.   And CDIG would be the group that

4    would enter that information into the system?

5        A.    Correct.

6        Q.    And do you know which system the indirect

7    customer information is entered into?   Would that have

8    been Partner as well?

9              MR. DAVISON:   Objection to form.

10       A.    I'm not sure.   I never had responsibility

11   for that, so I'm not sure where she set -- where CDIG

12   set those up at.

13

14   BY MS. GAFFNEY:

15       Q.    I'm sorry.   I've got one more question

16   about the slideshow.

17       A.    Oh.

18       Q.    There's a slide -- I know they're not

19   numbered, but it says chargebacks and tracing services.

20   Got it?

21       A.    Okay.   Got it.

22       Q.    So under distributor reporting

23   administrators process chargebacks, it says ensure the

24   data is accurate by validating with help of Partner,

Highly Confidential - Subject to Further Confidentiality Review

1   and it lists unit of measure, item codes, pricing,

2   customer names, addresses, and DEA numbers.

3           Does this refer to what we were talking

4   about earlier as chargeback data?

5           MR. DAVISON:  Objection to form.

6       A.   That would be my understanding.

7           THE VIDEOGRAPHER:  Ms. Gaffney, I've been

8   getting some rustling from your hair.

9           [Discussion off the record.]

10  BY MS. GAFFNEY:

11      Q.   So the chargeback data is contained in

12  Partner?

13          MR. DAVISON:  Objection to form.

14      A.   As far as the chargeback data being

15  contained, my understanding was that the chargeback was

16  processed in Partner, so I'm not an IT expert at all,

17  so I don't know exactly where it was like housed or

18  stored or any of that, but I think Partner system is

19  where the pricing was, so I know that Partner was at

20  least utilized in processing of the chargebacks, if

21  that makes sense.

22  BY MS. GAFFNEY:

23      Q.   That does make sense.

24      A.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.      And I'm not an IT person either --

2        A.      Okay.

3        Q.      -- so I'm going to be asking lots of

4    questions trying to figure out the database without

5    really knowing the right terminology.  So let me ask it

6    this way.  I've seen in the documents -- and let me

7    know if this is accurate -- that you would at times run

8    chargeback reports; is that correct?

9              MR. DAVISON:  Objection to form.

10       A.      Yeah.  Yes.

11   BY MS. GAFFNEY:

12       Q.      When you would run a chargeback report,

13   would you run it through Partner?

14       A.      No.  Yeah.  There was a tool called Cognos

15   that, again, I don't really understand it, but it was

16   what our system or what our company used to sort of --

17   I know that it like rolled up the data so you could

18   look at it at a level and you could -- it was like a

19   program or a report-writer type of functionality.

20       Q.      So if I understand correctly, Cognos would

21   be able to import the pricing data from Partner?

22              MR. DAVISON:  Objection to form.

23   BY MS. GAFFNEY:

24       Q.      Is that correct?

```
 1          A.    Somehow -- I don't know if it was

 2    imported, but yeah, somehow it did get our indirect

 3    sales so you could run reports out of Cognos to get at

 4    that information.  So yeah, anytime I were to run like

 5    a chargeback report or anything about chargebacks,

 6    that's the system that I had to use.

 7          Q.    All right.  All done with that.  Thank

 8    you.

 9          A.    Okay.

10          Q.    Okay.  What's been marked as Exhibit 7 has

11    a PowerPoint Bates number ending in 1009775.

12                [Exhibit Mallinckrodt-Rowley-Kilper-007

13                marked for identification.]

14          Q.    I'll give you a moment to flip through

15    this slideshow.  There's some overlap with what we were

16    just looking at.

17          A.    Okay.

18          Q.    And then a few slides that are different

19    that I wanted to ask about.

20          A.    Are there specific slides you want me to

21    read?  You want me to read this entire thing?

22          Q.    Yeah.  No, you don't need to read the

23    entire thing.

24          A.    Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

 1      Q.    There are some slides that appear to be

 2   screenshots from a database.  So the first one, I

 3   think, is setting up customer cross-ref in Partner.

 4   And then from there a few slides later is one that says

 5   chargeback transaction in Partner.

 6      A.    Okay.

 7      Q.    Okay.  So just to try to understand how

 8   the databases worked -- this is -- is this what the --

 9   essentially what the screen looked like when you worked

10   in Partner?

11              MR. DAVISON:  Objection to form.

12      A.    It looked familiar with, but yeah, I have

13   no recollection of the details of it, but --

14   BY MS. GAFFNEY:

15      Q.    And you used Partner to enter the pricing

16   data.  Let me back up.  Strike that.  Can you just walk

17   me through how you would use the Partner system?

18              MR. DAVISON:  Objection.

19      A.    So in my roles I would enter the pricing

20   and so I would never have seen this screen ever --

21   yeah -- except for that time I must have sat with the

22   chargeback analyst.  This would have been their

23   screen -- something that they would have seen, but not

24   me.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                I'm sure some of the prices on here came

 2      from the screens that I entered.  I can't even tell you

 3      exactly which prices are the ones that I entered

 4      because there's so many -- all the prices are on here

 5      so they've got the wholesaler acquisition cost.

 6                There's just -- I'm not even sure what --

 7      because I've never used this screen so I'm not even

 8      sure which are the pricers that are the contract prices

 9      that I entered.

10      BY MS. GAFFNEY:

11           Q.    Okay.  So Partner was the pricing system;

12      is that correct?

13           A.    Correct.

14           Q.    Was there an additional customer database

15      that Mallinckrodt used?

16                MR. DAVISON:  Objection to form.

17           A.    I don't remember in the customers were

18      housed in Partner or -- no, no.  I do remember -- I'm

19      sorry.  I do remember that.  The customers -- I think

20      the customer information was housed in what they call

21      J.D. Edwards system, and there was interaction

22      obviously between the two, but I couldn't tell you the

23      details of that either.

24      BY MS. GAFFNEY:
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And which department would primarily work

2    with the J.D. Edwards system?

3            MR. DAVISON:  Objection.

4    A.    My recollection of the J.D. Edwards was

5    that it was -- all of the outbound sales to the

6    wholesalers were JDE transactions.  That's what I

7    remember.  Partner -- I don't know that -- I don't

8    remember if direct sales got put in Partner at all.  I

9    don't think they did.

10           I think it was -- Partner was sort of the

11   pricing system for the indirect piece of the business,

12   so I think J.D. Edwards was their -- the director --

13   outbound sales to the wholesalers.

14   BY MS. GAFFNEY:

15   Q.    And then Cognos was not so much of a

16   database but rather a report-generating tool; is that

17   correct?

18   A.    That's what -- that was my understanding

19   of it.  That's the way that I used it.

20   Q.    Okay.  Okay.  So just in terms of the way

21   that you used these systems -- I'll give you an

22   example.  If you were sent an article saying that a

23   pharmacy had been raided by the DEA and asked to find

24   out how much Mallinckrodt product went to that

Highly Confidential - Subject to Further Confidentiality Review

1    pharmacy, how would you go about doing that?

2                MR. DAVISON:  Objection to form.

3          A.   I couldn't -- I really don't remember

4    exactly how I would or if I would have been able to do

5    that.  We only had the transactions that we had gotten

6    in chargebacks, so you could look at indirect sales to

7    a pharmacy but it may not have been -- it's not going

8    to be the entirety of the product that may be there

9    because there was also noncontract sales, so we only

10   had what the distributor submitted to us in the

11   chargeback.

12   BY MS. GAFFNEY:

13         Q.   Okay.  And understanding that that is all

14   the data that you had access to, if you wanted to

15   generate a report of that data, how would you do that?

16               MR. DAVISON:  Objection to form.

17         A.   I don't remember the details.  I mean, I

18   know that I could run a report and look at a specific

19   end pharmacy and look at chargebacks that had come in

20   for that pharmacy.  I know that I could do that, but I

21   can't really recall.  I think it was from Cognos.  My

22   only recollection was doing reports from Cognos.  I

23   don't know if that answers your question or --

24   BY MS. GAFFNEY:

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.     It does.

 2           A.     Okay.

 3           Q.     Thank you.  Are you aware of how

 4   Mallinckrodt kept track of suspicious or peculiar

 5   orders?

 6                  MR. DAVISON:  Objection to form.

 7           A.     I'm aware that there was a process in

 8   place.  I couldn't tell you the details of that

 9   process.

10   BY MS. GAFFNEY:

11           Q.     Just another example.  If you were asked

12   to create a report showing all of the pharmacies for

13   which one distributor had requested chargeback

14   payments, how would you go about doing that?

15                  MR. DAVISON:  Objection to form.

16           A.     One pharmacy?

17   BY MS. GAFFNEY:

18           Q.     One distributor -- all of its pharmacy

19   customers for which it had requested chargeback

20   payments?

21                  MR. DAVISON:  Same -- sorry.  Same

22   objection.

23           A.     Yeah, I mean, the same -- I mean, I would

24   have used Cognos to look at, yeah, the end user.  It
```

Highly Confidential - Subject to Further Confidentiality Review

1   would -- my recollection is that the data getting down

2   to the distributor's customer was massive, but -- so we

3   didn't really look at it that way because there was

4   hundreds of thousands of transactions and -- but we

5   could -- I would use Cognos to look at any of the data

6   that I was asked to look at.

7   BY MS. GAFFNEY:

8          Q.     When you say the data getting down to the

9   distributor's customer was massive, what do you mean by

10  massive?

11         A.     Well, just like a chargeback could be so

12  small, and so if you -- the chargeback might be a

13  couple dollars, and so you've got a lot of data, right,

14  to -- when you're down to that level in the sort of --

15  just the -- that's just all I meant.  This was just a

16  lot of transactions that go into one distributor.

17         Q.     Understanding that there's a lot of data

18  there, would you still be able to use those programs to

19  generate a report showing all of the indirect customer

20  transactions for which a certain distributor had

21  requested chargeback payments?

22                MR. DAVISON:  Objection to form.

23         A.     The -- yeah, the data was there and you

24  could run reports to get it.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MS. GAFFNEY:

 2        Q.    Okay.  Here's what's been marked as

 3   Exhibit 8.

 4              [Exhibit Mallinckrodt-Rowley-Kilper-008

 5              marked for identification.]

 6        Q.    For the record, the Bates number ends in

 7   457681.  It is an e-mail dated February 6th, 2008, to

 8   you from Victor Borelli with an attachment.

 9              Do you remember working with Victor

10   Borelli?

11        A.    I do.

12        Q.    And it appears that he is forwarding you

13   an e-mail from Chrissy Madden of Master's

14   Pharmaceuticals that attaches a letter from Master's

15   and a due diligence report regarding Sunrise Wholesale.

16   I'll give you a minute to -- oh, wait.  I didn't give

17   you an attachment.  Hold on.

18              [Discussion off the record.]

19              MS. GAFFNEY:  Okay.  Can we go off the

20   record for a second?

21              THE VIDEOGRAPHER:  We are going off the

22   record at 9:58 AM.

23              [A brief recess was taken.]

24              THE VIDEOGRAPHER:  We are back at 10:12
```

Highly Confidential - Subject to Further Confidentiality Review

1    AM.

2    BY MS. GAFFNEY:

3        Q.    Okay, Ms. Kilper.  Welcome back from the

4    break.  We've fixed the exhibit issue.  So now you have

5    what's been marked Exhibit 9, which is the same e-mail

6    we were just talking about but this time with the

7    attachment.  So I'll give you a moment just to look at

8    the attachment.

9              [Exhibit Mallinckrodt-Rowley-Kilper-009

10             marked for identification.]

11       Q.    Okay.  And you said before the break that

12   you did recall working with Mr. Borelli.  He was a

13   national account manager; correct?

14       A.    Correct.

15       Q.    How would you interact with him in your

16   role in the contract administration department?

17       A.    So we supported the national account

18   managers when they would need contracts drafted for

19   their customers, so we just -- they would submit what

20   they needed a like proposal for, and we would draft it

21   up and send it out, so that's how I supported him.

22       Q.    Looking over this e-mail and the

23   attachment, do you remember why Victor Borelli would

24   have been sending you the due diligence report that

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Master's did with respect to Sunrise?
 2              MR. DAVISON:  Objection to form.
 3         A.   I really -- I don't recall ever seeing
 4    this, and I trust that it did come to me because I
 5    could see that, but I don't remember seeing this at
 6    all, so I have no idea why he sent it to me, actually.
 7    BY MS. GAFFNEY:
 8         Q.   So this is in February 2008, and he says
 9    here's the due diligence report that Master's did a few
10    months ago.  Let's talk when you get a chance.  I just
11    left you a voicemail on this.  You don't remember --
12    well, you just said you don't remember receiving this.
13    You don't remember discussing this with Mr. Borelli
14    either?
15         A.   No.
16         Q.   Would you -- would the national account
17    managers typically send you due diligence reports on
18    indirect customers in your interactions with them?
19         A.   No.
20         Q.   Can you think of any reason that this
21    related to your work at this time in 2008?
22              MR. DAVISON:  Objection to form.
23         A.   I really can't think of any reason why he
24    would have sent this to me, no.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. GAFFNEY:

 2          Q.    Ms. Kilper, were you ever involved in

 3    suspicious order monitoring efforts at Mallinckrodt?

 4          A.    Yes, for like a three-month period, I

 5    believe.

 6          Q.    Okay.  So a three-month period.

 7    Approximately when did that start?

 8          A.    I'm not sure of the exact date.  Actually,

 9    it was a few months before I resigned.

10          Q.    So it would have been end of 2010,

11    beginning of 2011?

12          A.    I think so.

13          Q.    And what was your role at Mallinckrodt at

14    that time right before you resigned from the company?

15          A.    I was in the role of trade relations,

16    but -- is that what you're asking?

17          Q.    Uh-huh.

18          A.    What role was I in?

19          Q.    Uh-huh.

20          A.    Yeah, I was the trade relations manager at

21    the time.

22          Q.    And how were you involved in suspicious

23    order monitoring for those few months in your role as

24    trade relations manager?
```

1          A.    I remember that Jim Rausch transitioned

2     the report to me that was suspicious order monitoring,

3     and I remember being trained to look over that report

4     and -- but beyond that, I can't really remember the

5     details of what I did.  It was such a short time.

6          Q.    Do you know who took your place after you

7     left Mallinckrodt in 2011?

8          MR. DAVISON:  Objection to form.

9          A.    I know they didn't replace my role in the

10    same capacity, so they restructured, and so no, I don't

11    know.

12          THE VIDEOGRAPHER:  Ms. Gaffney, I've got

13    some noise --

14          MS. GAFFNEY:  Sorry.

15          THE VIDEOGRAPHER:  That's okay.

16    BY MS. GAFFNEY:

17          Q.    You said you remember that Jim Rausch

18    transitioned the peculiar order or suspicious order

19    report to you just a few months before you left.  Do

20    you remember why Mallinckrodt -- or Jim Rausch

21    transitioned that report to you?

22          MR. DAVISON:  Objection to form.

23          A.    I don't know why they chose me, no.

24    BY MS. GAFFNEY:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    I want to go back to something you were

2    saying earlier.  You said that a sales tracing, to the

3    best of your recollection, is a transaction indicating

4    where the product was sold even when there wasn't a

5    chargeback to be paid; is that correct?

6              MR. DAVISON:  Objection to form.

7    A.    Since it was a guess, I probably misspoke.

8    I really can't be sure what it was.  So --

9    BY MS. GAFFNEY:

10    Q.    Okay.  But to the best of your

11    recollection here today, a tracing would provide a way

12    to identify an indirect customer even in the absence of

13    a chargeback payment request?

14              MR. DAVISON:  Objection to form.

15    A.    Since I'm not 100 percent sure that that's

16    what a tracing is, I feel like I should just say I'm

17    not sure.

18    BY MS. GAFFNEY:

19    Q.    That's fine.

20    A.    Yeah.

21    Q.    Do you know who at Mallinckrodt would have

22    been responsible for sales tracings?

23              MR. DAVISON:  Objection to form.

24    A.    I have no idea.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MS. GAFFNEY:

2         Q.    Do you know which department or group that

3    would have fallen under?

4              MR. DAVISON:   Objection.

5         A.    No.

6    BY MS. GAFFNEY:

7         Q.    Were you involved in consideration of a

8    pilot project by an entity called IntegriChain?

9         A.    I don't remember anything regarding that,

10   no.

11        Q.    Let me give you a couple documents that

12   may help refresh your recollection on that.  So this is

13   what's been marked Exhibit 10.

14             [Exhibit Mallinckrodt-Rowley-Kilper-010

15             marked for identification.]

16        Q.    And for the record, it's Bates number

17   ending in 387970, and this is an e-mail from Kimberly

18   France to Karen Harper dated April 9th, 2008, and I've

19   just included one of the attachments, which is

20   IntegriChain project history.  Your name starts to show

21   up in the column of meeting invitees in December of

22   2007.

23             Does this document refresh your

24   recollection of IntegriChain at all?

```
 1          A.    Not really.  I remember sitting in a

 2    meeting.  That's about -- that's the extent of what I

 3    remember about IntegriChain.

 4    BY MS. GAFFNEY:

 5          Q.    Do you remember who Kimberly France was in

 6    terms of what her role was at Mallinckrodt?

 7          A.    I don't remember her role, no.

 8          Q.    How about Karen Harper?

 9          A.    Yeah, Karen Harper.  Yeah.

10          Q.    What was her role at Mallinckrodt?

11          A.    I know she -- she's who I would go to on

12    the compliance side of things.

13          Q.    And when you say you would go -- who you

14    would go to on the compliance side of things, what sort

15    of interactions would you have with the compliance side

16    of things?

17          A.    Limited interaction, but when Jim Rausch

18    transitioned that report I remember interacting with

19    Karen, but I can't really remember any detail about it.

20    But that was my only interaction with Karen.

21          Q.    So to your recollection, your primary

22    interactions with the compliance department were

23    surrounding the peculiar order report after Jim Rausch

24    transitioned it to you?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. DAVISON:  Objection to form.

 2          A.    That's what I remember, yeah.

 3   BY MS. GAFFNEY:

 4          Q.    And what was Jim Rausch's role at

 5   Mallinckrodt?

 6          A.    I know he was in customer service.  I

 7   don't know if he was manager or director or -- but

 8   he -- I just know he was in customer service.

 9          Q.    To your knowledge, after you left

10   Mallinckrodt, did Mallinckrodt continue to generate

11   those peculiar order reports?

12          A.    I have no --

13                    MR. DAVISON:  Objection to form.

14          A.    Got no idea.

15   BY MS. GAFFNEY:

16          Q.    You mentioned that they restructured after

17   you left.  Do you know how they restructured?

18                    MR. DAVISON:  Object --

19          A.    No, I don't know.

20   BY MS. GAFFNEY:

21          Q.    This has been marked as Exhibit 11.

22                    [Exhibit Mallinckrodt-Rowley-Kilper-011

23                    marked for identification.]

24          Q.    It's also about IntegriChain.  It's an
```

```
 1    e-mail with an attached PowerPoint, so I'll give you a

 2    moment to flip through it.  And for the record, the

 3    Bates number on this Exhibit 11 ends in 274486.

 4         A.    You want me to look through it all?

 5         Q.    No, I don't think you need to look through

 6    it all.  I can ask you just a few targeted questions

 7    about it.  So the slideshow appears to be a

 8    presentation prepared by IntegriChain.  Is that fair to

 9    say?

10              MR. DAVISON:  Objection to form.

11         A.    That's what it looks like.

12    BY MS. GAFFNEY:

13         Q.    That's what it looks like?  It's very hard

14    to read the title of this slideshow from how it

15    printed, but it is titled IntegriChain-Covidien proof

16    of concept channel integrity reporting, Phase 1.

17              And I'm just going back to the cover to

18    place this in time.  The subject of this e-mail is July

19    15th IntegriChain meeting, and it's from July 15th,

20    2008.  You said you remembered sitting in a meeting.

21              Do you think it might have been this July

22    15th meeting?

23              MR. DAVISON:  Objection.

24         A.    I have no recollection.
```

```
 1   BY MS. GAFFNEY:

 2        Q.    And going back to the previous exhibit,

 3   the IntegriChain project history, it looked like there

 4   were multiple meetings starting in -- excuse me --

 5   starting in 2007 and going into 2008.

 6              Does that seem accurate according to your

 7   recollection?

 8              MR. DAVISON:  Objection to form.

 9        A.    That's what it looks like in the document.

10   BY MS. GAFFNEY:

11        Q.    Okay.  Okay, so going through the slides

12   in the -- from the IntegriChain July 15th meeting, in

13   the background it says Covidien has engaged

14   IntegriChain in a proof-of-concept program that

15   leverages Covidien's channel data to proactively

16   monitor channel integrity.

17              What's your understanding of what that

18   means?

19              MR. DAVISON:  Objection to form.

20        A.    I really have no idea.  Sorry.

21   BY MS. GAFFNEY:

22        Q.    That's fine.  Is it your understanding

23   that when IntegriChain is proposing to leverage

24   Covidien's channel data, it means it's proposing to use
```

Highly Confidential - Subject to Further Confidentiality Review

 1    Mallinckrodt's own data?

 2                MR. DAVISON:  Objection to form.

 3          A.    I'm not sure.

 4    BY MS. GAFFNEY:

 5          Q.    So just -- you can go ahead and skip past

 6    the slides that are the retail inventory analysis

 7    slides to the slide titled wholesale inventory analysis

 8    overview.  And here it reads most wholesalers have

 9    committed to exclusively source pharmaceuticals

10    directly from the manufacturer and to maintain

11    inventory levels within prespecified parameters.

12                Is that statement consistent with your

13    experience dealing with wholesale customers?

14                MR. DAVISON:  Objection to form.

15          A.    I really can't speak to whether or not

16    it's accurate or not.  I mean, it's just not my slide

17    deck and I don't really know what it means.

18    BY MS. GAFFNEY:

19          Q.    Sure.

20          A.    Sorry.

21          Q.    Okay.  You can go -- let's see -- past the

22    wholesale inventory analysis to the slide titled orders

23    from high-risk channels.  Here it reads wholesaler

24    sales to certain channels pose a higher risk of product

Highly Confidential - Subject to Further Confidentiality Review

1    diversion than others and lists two examples, sales to

2    internet pharmacies and distributor sales to other

3    wholesalers.

4              Do you agree that those categories of

5    sales pose a higher risk of product diversion?

6              MR. DAVISON:  Objection to form.

7         A.    I really don't know enough to say.  This

8    isn't my area of expertise at all, so --

9    BY MS. GAFFNEY:

10        Q.    And earlier we talked about how the

11   chargeback system will not process chargebacks for

12   wholesaler-to-wholesaler transactions.  You mentioned

13   that with wholesaler-to-wholesaler transactions, it's

14   difficult for Mallinckrodt to know where that product

15   goes eventually; is that accurate?

16             MR. DAVISON:  Objection to form.

17        A.    Yeah, that's, I think, a true statement.

18   Yeah.  I mean, I really only dealt with the data of

19   those transactions, so to speak at a high level of

20   whether or not it's a higher risk of product diversion,

21   I just can't really speak to that.

22             Our system had a way to identify those

23   distributors-to-distributor sales and deny them, is

24   what I was referring to, I guess.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MS. GAFFNEY:

 2        Q.   Understood.  Okay.  So if you keep going

 3   through the slide deck, it looks like IntegriChain

 4   included examples of mail-order pharmacies, internet

 5   pharmacies, examples of wholesaler-to-wholesaler

 6   purchases, and then examples of wholesalers with

 7   counterfeiting/diversion ties purchasing Covidien

 8   products.

 9             To your knowledge, did Mallinckrodt do

10   anything with the information flagged by IntegriChain

11   in this presentation?

12             MR. DAVISON:  Objection to form.

13        A.   I don't know.

14   BY MS. GAFFNEY:

15        Q.   Okay.  If you can keep flipping through to

16   the slide titled order diversion risk analysis.  It has

17   oxycodone customers with the largest relative growth,

18   so it appears that IntegriChain analyzed relative

19   growth, and then the text back here -- box here

20   explains that most of these were new customers with

21   minimal orders in the first three months of the

22   analysis.

23             But if you flip to the next slide, there

24   are a few examples of oxycodone customers with
```

Highly Confidential - Subject to Further Confidentiality Review

1    established order history and high growth.  Do you see

2    that?

3                    MR. DAVISON:  Objection to form.

4    BY MS. GAFFNEY:

5         Q.    Oops.  There you go.

6         A.    Okay.

7         Q.    And the text box reads a smaller number of

8    facilities flagged for high relative growth did not

9    appear to be new customers and still demonstrated

10   significant order growth.  So if you can take a look at

11   the graph that's included here, there's a line for the

12   three pharmacy examples -- for each of the three

13   pharmacy examples.

14                   What's your interpretation of this graph

15   as you look at it today?

16                   MR. DAVISON:  Objection.  Form.

17        A.    I really can't comment on it because I

18   don't remember this presentation.  I don't remember

19   this data at all, so I don't feel like I can speak to

20   it.

21   BY MS. GAFFNEY:

22        Q.    How about just looking at the graph?

23   What's your understanding of the information that's

24   represented there?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   MR. DAVISON:  Objection to form.

 2           A.    I mean, I can tell that there's sales data

 3    for this pharmacy -- for these three different

 4    pharmacies, and they're trying to convey something, but

 5    I really can't speak to it.  I just have no idea.

 6    BY MS. GAFFNEY:

 7           Q.    Would you agree that this graph shows a

 8    significant increase in oxycodone sales by Gompers

 9    Pharmacy in a one-month time period?

10                   MR. DAVISON:  Objection to form.

11           A.    That's what it looks like it's conveying,

12    yeah.

13    BY MS. GAFFNEY:

14           Q.    Gompers Pharmacy is in West Virginia.

15    I'll represent to you that it is in Wheeling, West

16    Virginia, which borders Ohio.  It's right on the Ohio

17    River in Appalachia.

18                   Is it your understanding that there is an

19    opioid crisis in this country?

20                   MR. DAVISON:  Objection to form.

21           A.    I'm aware of that, yeah.

22    BY MS. GAFFNEY:

23           Q.    How did you become aware of that?

24           A.    Just the media.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Is it your understanding that the opioid

2  crisis has particularly affected Appalachia and West

3  Virginia?

4              MR. DAVISON:  Objection.

5      A.    I didn't know that, no.

6  BY MS. GAFFNEY:

7      Q.    This slideshow is from 2008.  If someone

8  had asked you in 2008 to look back at sales of

9  Mallinckrodt oxycodone to these three pharmacies listed

10  here as indirect customers, would you have been able to

11  access that information?

12              MR. DAVISON:  Objection to form.

13      A.    For the data that was submitted to us from

14  the distributor, yeah.

15  BY MS. GAFFNEY:

16      Q.    And would the data submitted to you from

17  the distributor have shown an increase in sales from

18  month to month, if that's what the transaction --

19  scratch that.

20              What would the data from the distributor

21  have shown?

22              MR. DAVISON:  Objection to form.

23      A.    I can't be sure what it would have shown.

24  BY MS. GAFFNEY:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Would you have been able to see the amount

2 of product ordered each month or purchased each month

3 by the indirect customer?

4         MR. DAVISON:  Objection to form.

5    A.    Only what the distributors submitted to us

6 on a chargeback, yeah.

7 BY MS. GAFFNEY:

8    Q.    Would the sales tracing have covered sales

9 to indirect customers that wouldn't have been submitted

10 through the chargeback system?

11        MR. DAVISON:  Objection to form.

12   A.    Again, just not being sure about the full

13 meaning of a tracing, I can't really comment if that

14 would be comprehensive or not.  I'm not sure.

15 BY MS. GAFFNEY:

16   Q.    Do you remember if anyone at Mallinckrodt

17 following this presentation asked you to pull data on

18 the three pharmacies listed here?

19        MR. DAVISON:  Objection.

20   A.    I don't recall, no.

21        [Discussion off the record.]

22 BY MS. GAFFNEY:

23   Q.    Do you remember what happened after this

24 July 15th meeting in terms of Mallinckrodt working with

Highly Confidential - Subject to Further Confidentiality Review

```
 1    IntegriChain?

 2              MR. DAVISON:  Objection to form.

 3         A.    No idea.

 4    BY MS. GAFFNEY:

 5         Q.    Okay.  I'm going to hand you what's marked

 6    as Exhibit 12.

 7              [Exhibit Mallinckrodt-Rowley-Kilper-012

 8              marked for identification.]

 9         Q.    Bates number ends in 457251, and it's an

10    e-mail chain from July 2008.  The most recent e-mail in

11    this chain is you forwarding it to Victor Borelli on

12    July 29th, 2008, but if you go back to the first e-mail

13    in the chain, it is an e-mail from Kimberly France to

14    the IntegriChain representatives on July 17th, so just

15    after this meeting from the presentation we were just

16    looking at.

17              And it appears that she's forwarded an

18    article about Cardinal Health being fined by the Ohio

19    Pharmacy Board for allegedly neglecting suspicious

20    orders, and then read through the e-mail chain.

21    Someone from IntegriChain replies with thanks for the

22    meeting on Tuesday, and then some follow-up items.

23    Kimberly France replies and adds Sue Werder to the

24    e-mail.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              And you said earlier that you worked with

 2    Sue Werder; is that correct?

 3         A.    Correct.

 4              MR. DAVISON:  Objection.

 5    BY MS. GAFFNEY:

 6         Q.    She was in the contract administration

 7    department with you?  Or no?

 8         A.    No, she was who I went to work for when I

 9    got promoted out of contract administration into trade

10    compliance.

11         Q.    So if you keep following this e-mail

12    chain, Sue Werder on July 23rd e-mails Gordon Cummins,

13    who's one of the IntegriChain representatives.  She

14    asks him for more information about NuCare.  It is a

15    pharmacy highlighted as questionable in the

16    IntegriChain presentation.

17              Do you see that e-mail?

18         A.    I do, yeah.

19         Q.    And then following the e-mail chain,

20    there's some back and forth, and IntegriChain sends her

21    briefing on the company, on NuCare, which she then

22    forwards to you.

23              Do you remember if you discussed the

24    NuCare Pharmacy with Ms. Werder at this time?
```

Highly Confidential - Subject to Further Confidentiality Review

1                    MR. DAVISON:  Objection to form.

2          A.    I don't remember discussing it.

3    BY MS. GAFFNEY:

4          Q.    So that brings us up to the top of the

5    document, and you write to Victor Borelli we are fine

6    opening up NuCare and paying chargebacks for sales to

7    them.  As you read, it was the CEO back in 2002 that

8    engaged in illegal practices.  You can let Master's

9    know they are fine.

10                   Do you remember sending this e-mail to Mr.

11   Borelli?

12         A.    No.

13         Q.    Is it accurate to say that this is an

14   example of Mallinckrodt researching a downstream

15   customer to approve it for chargeback requests?

16                   MR. DAVISON:  Objection to form.

17         A.    I -- that's what it appears.

18   BY MS. GAFFNEY:

19         Q.    And is it your understanding that

20   NuCare -- is it your understanding from this e-mail

21   that NuCare was one of Master's customers?

22                   MR. DAVISON:  Objection to form.

23         A.    That's what it appears.

24   BY MS. GAFFNEY:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     Would you agree that the IntegriChain

2  presentation prompted Mallinckrodt to research NuCare

3  Pharmacy?

4           MR. DAVISON:  Objection to form.

5      A.     Since I don't remember the IntegriChain

6  presentation, I can't really speak to whether or not

7  they're related.  I'm not -- I mean, it appears from

8  the chain that they're involved, so -- but other than

9  reading this e-mail, I really don't know.

10  BY MS. GAFFNEY:

11      Q.     And is it your recollection that

12  Mallinckrodt did not follow up on the information

13  highlighted about Gompers Pharmacy in the IntegriChain

14  presentation?

15           MR. DAVISON:  Objection to form.

16      A.     I have no idea if they followed up or not.

17  BY MS. GAFFNEY:

18      Q.     Do you remember anyone asking you to run

19  reports on Gompers Pharmacy?

20           MR. DAVISON:  Objection to form.

21      A.     No.

22  BY MS. GAFFNEY:

23      Q.     In your opinion, if that data was accurate

24  and there was a big jump in sales of oxycodone from one

Highly Confidential - Subject to Further Confidentiality Review

1   month to another, would Mallinckrodt have a

2   responsibility to look into that?

3             MR. DAVISON:  Objection to form.

4      A.   I don't know.  I feel like Mallinckrodt

5   always took a very diligent responsibility in our sales

6   and where the product went, so I know that I felt

7   comfortable that they were doing what they needed to

8   do.

9   BY MS. GAFFNEY:

10      Q.   And if Mallinckrodt had wanted to research

11   Gompers Pharmacy in 2008 and look into those sales of

12   its oxycodone product to that indirect customer, would

13   it have been able to do that from the data it had?

14             MR. DAVISON:  Objection to form.

15      A.   I'm not sure if the data had Gompers

16   Pharmacy even in it.  I never recall running anything

17   with them, so I have no idea what the data would show.

18   BY MS. GAFFNEY:

19      Q.   If they were an indirect customer of

20   Mallinckrodt purchasing Mallinckrodt product, would

21   Mallinckrodt have data showing those purchases?

22      A.   Yeah, if we received --

23             MR. DAVISON:  Objection to form.  Asked

24   and answered.

Highly Confidential - Subject to Further Confidentiality Review

1        A.      If we received chargebacks for them, then

2    yeah, the data would be there.

3    BY MS. GAFFNEY:

4        Q.      A moment ago you said that you felt

5    Mallinckrodt always took diligent responsibility in its

6    sales and knowing where its product went.  What do you

7    base that on?

8        A.      Just my working there, and I just know

9    based on my time there that we always were trying to

10   improve the process and work to do whatever we could to

11   ensure that we had done our responsibility in that.

12           So -- I mean, it wasn't something that I

13   was particularly involved with other than those three

14   months, but I felt comfortable that we had a compliance

15   team that was doing their job in that.

16       Q.      Okay.  This is Exhibit 13.

17           [Exhibit Mallinckrodt-Rowley-Kilper-013

18           marked for identification.]

19       Q.      And for the record, the Bates number ends

20   in 563507.  It's an e-mail from you to Victor Borelli

21   and Kate Muhlenkamp, July 11th, 2008.  I'll give you a

22   moment to look it over.

23       A.      Okay.

24       Q.      Can you explain to me what happened here,

Highly Confidential - Subject to Further Confidentiality Review

1    what this e-mail chain is describing?

2              MR. DAVISON:  Objection to form.

3         A.    Other than just reading it today, I really

4    don't remember it at all.  But my responsibility was

5    promotional.  I helped -- or -- let me think how to say

6    it.  For some time I played a role in stocking

7    allowances and promotional incentives, but I really

8    can't remember exactly what that role was, but that's

9    why I was involved here with the stocking allowance.

10   BY MS. GAFFNEY:

11        Q.    It appears that Victor Borelli was asking

12   for this stocking allowance because of an unusual

13   circumstance.  Is that accurate?

14             MR. DAVISON:  Objection to form.

15        A.    That's what it looks like, yeah.

16   BY MS. GAFFNEY:

17        Q.    Is it your understanding that what is

18   described here is a customer of Mallinckrodt's,

19   Master's Pharmaceutical, wanting a chargeback that was

20   not processed because it turned out to be a

21   wholesaler-to-wholesaler transaction?

22             MR. DAVISON:  Objection to form.

23        A.    That's what it looks like in the e-mail.

24   BY MS. GAFFNEY:

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     And then Mallinckrodt was able to do a

2    one-time stocking allowance to get them that payment

3    even though it wasn't a chargeback; is that accurate?

4                MR. DAVISON:  Objection to form.

5          A.     That's what it looks like, yeah.

6    BY MS. GAFFNEY:

7          Q.     In this particular transaction, according

8    to this e-mail, the indirect customer, Medical Arts,

9    sold all of the Mallinckrodt product to a single

10   customer, South Florida Pain Management, and that

11   product was all oxycodone.

12               Does that raise any concerns for you with

13   respect to diversion?

14               MR. DAVISON:  Objection to form.

15         A.     It did not, no.

16   BY MS. GAFFNEY:

17         Q.     You said earlier that your

18   responsibilities with compliance were limited to a

19   few-month period reviewing the peculiar order reports;

20   is that correct?

21               MR. DAVISON:  Objection.

22         A.     Correct.

23   BY MS. GAFFNEY:

24         Q.     When you would review those peculiar order

1    reports for those few months, what were you looking

2    for?

3         A.    I have no recollection the details of the

4    report, other than I know that I was trained and I

5    followed through on the procedure that I was taught,

6    but I really can't remember any of the details on what

7    I did.  It was such a brief time, and I was getting

8    ready to leave, honestly.

9         Q.    Would you agree, based on this e-mail

10   about this transaction, that Mallinckrodt had very

11   detailed information about where its product went, down

12   to the name of the pain clinic?

13              MR. DAVISON:  Objection to form.

14        A.    As I mentioned, the data that Mallinckrodt

15   had was from the chargebacks, so anything we had was

16   from the chargebacks that were submitted from the

17   wholesaler.

18   BY MS. GAFFNEY:

19        Q.    Okay.  And in this case, the wholesaler

20   submitted a chargeback request that the system then

21   denied; is that accurate?

22              MR. DAVISON:  Objection.

23        A.    That's what it appears.

24   BY MS. GAFFNEY:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Are you familiar with what eventually

2   happened to Master's, Medical Arts, and South Florida

3   pain Management?

4      A.   I am not --

5           MR. DAVISON:  Objection to form.

6      A.   I'm not, no.

7   BY MS. GAFFNEY:

8      Q.   I'll represent to you here today that they

9   were all busted by federal investigators.  Does that

10  cause you any concern that Mallinckrodt product went to

11  these entities that were later investigated for

12  diversion?

13          MR. DAVISON:  Objection to form.

14     A.   Does it cause me concern?

15  BY MS. GAFFNEY:

16     Q.   (Nodding "yes.")

17     A.   I don't feel like -- I'm not sure I

18  understand.  I mean, it's concerning that we have an

19  opioid crisis, but I don't believe that Mallinckrodt

20  did anything wrong.

21     Q.   Exhibit 13.  Or no.  I'm sorry.  14.

22          MS. GAFFNEY:  Right?  Yeah.

23          MR. KAWAMOTO:  Yeah.

24          [Exhibit Mallinckrodt-Rowley-Kilper-014

Highly Confidential - Subject to Further Confidentiality Review

 1                  marked for identification.]

 2                  MR. DAVISON:  Do you have your glasses?

 3        A.    Yeah.

 4   BY MS. GAFFNEY:

 5        Q.    I'll --

 6        A.    I brought some cheaters.

 7        Q.    I'll put this on -- this is also a

 8   printing failure -- for the record, Exhibit 14 ends in

 9   Bates number ending 6331001.  It's an e-mail and an

10   attachment.  Before we get to the attachment -- if you

11   turn to the end of the e-mail chain, the earliest

12   e-mail is from Cathie Gergen to you on October 14th,

13   2008.

14                  Do you remember working with Cathie

15   Gergen?

16        A.    I do not.

17        Q.    So this is a data question.  Could you

18   take a moment just to read through your reply to her

19   question?  I'm hoping that then you can explain to me

20   what that means in layman's terms.

21        A.    So mine wasn't -- mine doesn't appear to

22   be a reply.  Mine is an e-mail to Kathy Weiss.  Is that

23   what you want me to read?

24        Q.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1       A.    Oh.

2       Q.    I'm sorry.  Yes.  That's exactly what I

3   meant.

4       A.    It appears that I'm wanting to get the

5   OptiSource members set up to receive the 867 and 852,

6   which I can't remember what those transactions are.

7   What else do you --

8       Q.    Okay.  My questions are about the 857 --

9   852 and 867.  Is there anything that you can recall

10  sitting here today about those reports?

11          MR. DAVISON:  Objection to form.

12      A.    I mean, the 850 two is -- it says in the

13  e-mail that it's the inventory activity code, so other

14  than recalling that the 852 is the inventory data

15  that's submitted to us.  That's all I can ascertain

16  from this e-mail.

17  BY MS. GAFFNEY:

18      Q.    So Kathy Weiss says that she will work on

19  the Partner testing.  Do you know what that refers to?

20         MR. DAVISON:  Objection.

21      A.    I really don't.

22  BY MS. GAFFNEY:

23      Q.    She asks about sending Excel spreadsheets

24  to the pharma folks, and then if you flip to the first

Highly Confidential - Subject to Further Confidentiality Review

1    page of this document, you ask her to send them to Kate

2    Muhlenkamp in generic marketing as well as Sara

3    Heideman.

4              Do you remember why you asked her to send

5    it to Kate in generic marketing?

6              MR. DAVISON:  Objection.

7         A.   No idea.  Sorry.

8    BY MS. GAFFNEY:

9         Q.   Okay.  And then at the top it explains

10   what the attachment is -- the one attachment that's

11   included here is the Miami-Luken test 867.  I don't

12   know if it will be legible.

13             MS. GAFFNEY:  Can we zoom?

14             [Discussion off the record.]

15   BY MS. GAFFNEY:

16        Q.   So this is the 867 data from Miami-Luken.

17   Thank you.  It's actually legible.  Okay.  So it's got

18   dealer customer number, dealer customer name.  It looks

19   like it's listing mainly pharmacies here.

20             Is it your understanding that the dealer

21   customer is the indirect customer?

22             MR. DAVISON:  Objection to form.

23        A.   I'm not familiar with the fields or this

24   report.  Yeah, sorry.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. GAFFNEY:

 2          Q.    Which department would have handled the

 3    867 data?

 4          A.    I'm not sure.

 5          Q.    Most of these pharmacies are in Ohio.  Is

 6    it your understanding that this shows sales of

 7    Mallinckrodt product to these pharmacies in Ohio?

 8                MR. DAVISON:  Objection to form.

 9    BY MS. GAFFNEY:

10          Q.    I apologize for the printing.

11          A.    I don't even see like our name --

12    Mallinckrodt's name on this, so I really have never

13    seen this data so I don't know if that's accurate or

14    not.

15          Q.    Are you saying you think that this 867

16    data is not connected to Mallinckrodt?

17                MR. DAVISON:  Objection to form.

18          A.    I just never -- I can't recognize anything

19    from it that I don't -- yeah, I'm just saying I don't

20    recognize -- I recognize the NDC code, so yeah, I

21    guess, but, I'm just -- I've never seen this before so

22    I really can't speak to what it says.

23    BY MS. GAFFNEY:

24          Q.    What's the NDC code?
```

Highly Confidential - Subject to Further Confidentiality Review

 1          A.    It was our item number for the products,

 2     and the field entitled Tyco item number -- some of them

 3     have the full NDC and some of them have the partial,

 4     and that's the only way that I recognized the -- oh, I

 5     see.  Dealer item number has our full NDC, so those

 6     numbers look familiar to me, is all I'm saying.

 7          Q.    Okay.  Okay.  Then is it your

 8     understanding that this 867 data in this chart is

 9     showing sales of Mallinckrodt product through

10     Miami-Luken to pharmacies in Ohio?

11               MR. DAVISON:  Objection to form.

12          A.    I can't be sure what the data is.

13     BY MS. GAFFNEY:

14          Q.    Do you have any understanding of how the

15     867 data was used?

16               MR. DAVISON:  Objection.

17          A.    No idea.

18     BY MS. GAFFNEY:

19          Q.    So this spreadsheet shows a Tug Valley

20     Pharmacy in Williamson, West Virginia.  If Tug Valley

21     Pharmacy submitted chargeback -- scratch that.  If Tug

22     Valley Pharmacy is the indirect customer and

23     Miami-Luken is the direct customer, then it would have

24     been Miami-Luken submitting the chargeback requests; is

1    that correct?

2              MR. DAVISON:  Objection to form.

3         A.    Yes.

4    BY MS. GAFFNEY:

5         Q.    So if Tug Valley Pharmacy was an indirect

6    customer of Mallinckrodt's customer at this time, which

7    was in 2008, that data reflecting that transaction to

8    Tug Valley Pharmacy would have been in the chargeback

9    system as well as in this 867 data; is that correct?

10             MR. DAVISON:  Objection to form.

11        A.    I'm not sure about that.

12   BY MS. GAFFNEY:

13        Q.    What part of that aren't you sure about?

14        A.    The 867 data.

15        Q.    Okay.  How about the chargeback system,

16   which you are familiar with?  If Tug Valley Pharmacy

17   were an indirect customer of Mallinckrodt's customer,

18   Miami-Luken, would the chargeback system show

19   chargebacks to Tug Valley Pharmacy?

20        A.    If Miam --

21             MR. DAVISON:  Objection to form.

22        A.    If Miami-Luken submitted them to us, yes.

23   BY MS. GAFFNEY:

24        Q.    You mentioned that you were aware of the

Highly Confidential - Subject to Further Confidentiality Review

1    opioid crisis from the media; is that correct?

2         A.    Yes.

3         Q.    Did you see any media reports about the

4    United States House Energy and Commerce Committee's

5    report on alleged pill dumping in West Virginia that

6    came out in December of last year?

7         A.    No.

8         Q.    Okay.  That was covered in the media, and

9    I can represent to you today that the committee's

10   investigation found that Miami-Luken sold 6.4 million

11   hydrocodone and oxycodone pills to Tug Valley Pharmacy

12   from 2008 to 2015.  That's in a town that has

13   approximately 2,700 people.

14             So if any of the hydrocodone and oxycodone

15   that Miami-Luken sold to Tug Valley Pharmacy were

16   Mallinckrodt products, would the record of those

17   transactions show up in Mallinckrodt's data?

18             MR. DAVISON:  Objection to form.

19        A.    If they were submitted in a chargeback for

20   Miami-Luken, yes.

21   BY MS. GAFFNEY:

22        Q.    This is what's marked as Exhibit 15.

23             [Exhibit Mallinckrodt-Rowley-Kilper-015

24             marked for identification.]

1      Q.    Bates number ending in 457174.  It's an

2   e-mail from John Adams to you, Victor Borelli, Laura

3   Maher, and Kathy Weiss from June 23rd, 2009 -- forward

4   of new account forms.

5           Is this something that you would typically

6   receive -- new account forms -- as part of your work at

7   Mallinckrodt?

8      A.    No.

9      Q.    I think we talked earlier about the

10  customer data integrity group setting up new accounts.

11  Is that right?

12     A.    Uh-huh.

13     Q.    So as a general matter, new account forms

14  would go to CDIG?

15     A.    Yes.

16           MR. DAVISON:  Objection.

17  BY MS. GAFFNEY:

18     Q.    Do you know why you received this?

19           MR. DAVISON:  Objection.  Form.

20     A.    A lot of times the national account

21  managers would just copy me to make sure that things

22  would get done with shared services.  I really -- it

23  was not necessary, but I noticed that a lot, so --

24  BY MS. GAFFNEY:

Highly Confidential - Subject to Further Confidentiality Review

1       Q.      Are some of the recipients of this e-mail

2    from CDIG?

3       A.      Laura Maher.

4       Q.      Just taking a look at the attachments, a

5    customer review checklist completed by Toby Bane.  Do

6    you remember who he was at Mallinckrodt?

7       A.      He was a national account manager.

8               [Discussion off the record.]

9       Q.      So is it your understanding that the

10   national account managers would complete this checklist

11   prior to submitting new -- a new account request?

12      A.      I'm not sure.

13      Q.      As part of the new account opening

14   process, did you have any involvement?

15      A.      None.

16      Q.      So this -- the summary of the review here,

17   it says that this appears to be a legitimate,

18   well-controlled pharmaceutical business which primarily

19   caters to dispensing physicians, and then on the other

20   page it has a percentage of the current customer base

21   and geographic regions.

22              Is it your understanding that Mallinckrodt

23   prior to opening a new account would have information

24   about the indirect customer base?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. DAVISON:  Objection to form.

 2          A.    I have no idea.

 3   BY MS. GAFFNEY:

 4          Q.    And it also says do you process

 5   chargebacks?  If so, EDI?  What's your understanding of

 6   what that means?

 7          A.    The chargebacks would come in

 8   electronically, and so I guess they were just asking if

 9   they can handle that or some of the smaller

10   distributors maybe did the paper submissions versus

11   electronic.

12          Q.    To understand the new account opening

13   process -- at what point would you have any involvement

14   in that process?

15          A.    None.

16          Q.    At what point would you enter pricing

17   information into the pricing system?

18          A.    After a contract was signed, and that was

19   with direct customers.  But setting them up or any of

20   that was -- they already had to be set up in order to

21   put pricing on the account, if that makes sense.  Yeah.

22                    MR. DAVISON:  We've been going for another

23   hour.  Is now a good time to take a quick break?

24                    MS. GAFFNEY:  Sure.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. DAVISON:  Okay.  Go off --

 2                  THE VIDEOGRAPHER:  We are going off the

 3     record at 11:12 AM.

 4                  [A brief recess was taken.]

 5                  THE VIDEOGRAPHER:  We are back on the

 6     record at 11:25 AM.

 7                  [Exhibit Mallinckrodt-Rowley-Kilper-016

 8                  marked for identification.]

 9     BY MS. GAFFNEY:

10          Q.    Okay.  So Exhibit 16, for the record, ends

11     in Bates number 290095.  It's an e-mail string with the

12     earliest e-mail dated August 10th, 2009.  I'll just

13     give you a second to look it over.

14          A.    Okay.

15          Q.    Okay.  So reading through these e-mails,

16     it appears that Karen Harper needed chargeback reports

17     pertaining to Sunrise Wholesale and was going to go

18     first to Kate Muhlenkamp for that.  Is that your

19     understanding?

20          A.    That's what it looks like.  I don't

21     remember this.

22          Q.    And then just going off of the document --

23     Kate Muhlenkamp was out of the office, so Karen Harper

24     and sent to Lisa Lundergan.
```

Highly Confidential - Subject to Further Confidentiality Review

1          And do you remember working with Lisa

2    Lundergan?

3          A.    Yes, she worked for me for a brief time.

4          Q.    Oh, okay.  In your same department?

5          A.    She was a contract administrator, yeah.

6          Q.    Would that --

7                THE VIDEOGRAPHER:  I'm sorry, Ms. Gaffney.

8                [Discussion off the record.]

9    BY MS. GAFFNEY:

10         Q.    Do you remember, Ms. Kilper, if the time

11   period in which Lisa Lundergan was in your department

12   was around the time of this e-mail in 2009?

13         A.    I don't remember.

14         Q.    And at that point in 2009, were you aware

15   that Kate Muhlenkamp was able to run chargeback

16   reports?

17               MR. DAVISON:  Objection to form.

18         A.    I know that Kate was very good with data

19   and would often be able to run reports, so I don't --

20   yes, I guess.

21   BY MS. GAFFNEY:

22         Q.    And it appears from this e-mail chain that

23   Lisa Lundergan could also run chargeback reports.  Is

24   that consistent with your understanding?

```
 1          A.     Yeah, Lisa moved over to marketing, and so

 2   she did -- after she left my department she probably

 3   learned how to run reports.  I can't -- I mean, I don't

 4   know for sure if she could run reports, but yeah, there

 5   was a handful of people.  There were plenty of people

 6   that were familiar with the data, yeah.

 7          Q.     And when you say plenty of people who were

 8   familiar with the data, you're talking about the

 9   chargeback data?

10          A.     All sales data, yeah.

11          Q.     And who were some of those other people

12   who were familiar with the sales data?

13          A.     I mean, I just knew Kate and Lisa.  There

14   were some folks in marketing that just were very good

15   at -- they ran a lot of access reports and just good

16   with data.  So yeah.

17                 But it was -- Cognos was a tool that

18   anybody could -- well, I shouldn't say anybody could

19   use, but Cognos was a tool that we had available if you

20   wanted to run reports, so it wasn't like specific to

21   certain people or I don't know the people that were

22   able to run them.  Does that make sense?

23          Q.     Uh-huh.

24          A.     Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    And is it fair to say that using the

2   Cognos tool was not specific to a certain department at

3   Mallinckrodt?

4        A.    It seems like it crossed departments --

5   the tool.  Yeah.

6        Q.    And which were the departments at

7   Mallinckrodt that would have used the Cognos tool most

8   often?

9        A.    I'm not --

10            MR. DAVISON:  Objection to form.

11        A.    I'm not sure, other than my own -- like I

12   know that I had access to the tool.  Beyond that, I

13   know Kate, so she was in marketing.  But I don't know

14   other departments that had it.

15   BY MS. GAFFNEY:

16        Q.    Just following this e-mail chain, it looks

17   like Cathy Stewart turns to Sara Heideman for help with

18   this task.  Do you remember which department she was in

19   at Mallinckrodt?

20        A.    I don't, no.

21        Q.    And then the top of the e-mail chain, Sara

22   is e-mailing Cathy.  She says I gave this a try, but

23   had no luck getting the data out of JDE.  I reached out

24   to Tiffany Rowley for help, and she said that she could
```

Highly Confidential - Subject to Further Confidentiality Review

1    provide this data to you, no problem.

2            Do you remember helping provide the

3    Sunrise data from JDE to Sara Heideman?

4        A.    I don't.

5        Q.    The data being requested here is

6    chargeback data; is that correct?

7            MR. DAVISON:  Objection to form.

8        A.    That's my understanding of the e-mail.

9    BY MS. GAFFNEY:

10       Q.    And would that data come out of JDE?

11           MR. DAVISON:  Objection to form.

12       A.    No.

13   BY MS. GAFFNEY:

14       Q.    Okay.  Well, that might have been why Sara

15   needed to turn to you for help, then.

16       A.    Right.

17       Q.    Okay.  JDE we spoke about earlier.  That

18   was J.D. Edwards; is that right?

19       A.    Right.

20       Q.    And can you remind me what JDE -- what

21   sort of information was stored in JDE again?

22       A.    I don't know comprehensively what was

23   stored in JDE.  I just know that our direct sales were

24   shipped out of JDE.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Okay.  Let's go to the next exhibit.

2   Okay.  Okay, you've been handed what's been marked

3   Exhibit 17.

4                [Exhibit Mallinckrodt-Rowley-Kilper-017

5                marked for identification.]

6        Q.    For the record, it's Bates ending in

7   289983.  This is an e-mail from John Adams dated

8   November 18th, 2009, with the subject East Main Street

9   Pharmacy sales, trailing 12 months.  It looks like it's

10  a spreadsheet file attached.

11               So you are copied on this e-mail, and Mr.

12  Adams is e-mailing Victor Borelli and Steve Becker to

13  say that the East Main Street Pharmacy was shut down by

14  the DEA last week.

15               And if you look at the bottom of the

16  e-mail, the attachment is coming from you to John

17  Adams.  You say you see attached sales data.  I've

18  indicated the distributor that sold them our product.

19               Can you look at the attached spreadsheet

20  and tell me which database that spreadsheet would have

21  been generated from?

22       A.    This is from Cognos.

23       Q.    Okay.  Okay.  And John Adams's e-mail to

24  Victor Borelli and Steven Becker says -- he says the

Highly Confidential - Subject to Further Confidentiality Review

```
 1   intent of the call is to make the above accounts aware,

 2   as I'm sure they are -- let them know that we have

 3   compiled an accurate list of purchases of our

 4   controlled substances over the past 12 months to this

 5   pharmacy and put it on file in the event of a review.

 6   As you can see, there was a disproportionate amount of

 7   oxy 15 and 30.

 8              So when he says compiled an aggregate list

 9   of purchases, is it your understanding he's referring

10   to this spreadsheet that was attached?

11              MR. DAVISON:  Objection to form.

12        A.    That's what it appears.

13   BY MS. GAFFNEY:

14        Q.    And what's involved in compiling this

15   aggregate list of purchases?

16              MR. DAVISON:  Objection to form.

17        A.    You're asking how I ran it?

18   BY MS. GAFFNEY:

19        Q.    Uh-huh.

20        A.    Yeah, I don't remember the details of how

21   I ran it.  I just remember that I had -- went out to

22   Cognos and pulled the data that -- I'm sure I used DEA

23   or -- I can't be sure, actually, what I used.  But I

24   just know that I used Cognos to pull it.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And on a very basic level, when you say

2  used Cognos to pull it, can you walk me through what

3  that might entail?  What steps would you take to pull

4  that report?

5    A.    I'm just not sure what I -- what steps I

6  took because I don't remember pulling it.  It's just

7  been so long.

8    Q.    Just as a general matter, what information

9  would you need to generate a report like this?

10         MR. DAVISON:  Objection to form.

11   A.    I'm not sure what data was provided to me.

12  I'm not sure if this was all that was provided to me

13  before I ran the report or not.

14  BY MS. GAFFNEY:

15   Q.    If one of your co-workers at Mallinckrodt

16  gave you the name of a pharmacy, would that be enough,

17  or would you need more information?

18         MR. DAVISON:  Objection to form.

19   A.    More information.

20  BY MS. GAFFNEY:

21   Q.    For example, what more information would

22  you need?

23         MR. DAVISON:  Objection to form.

24   A.    I mean, everything in our business was

Highly Confidential - Subject to Further Confidentiality Review

```
 1    done with a DEA number, so I mean, beyond that, beyond

 2    the DEA number, I'm not sure what else I would need,

 3    but yeah, we wouldn't typically go on just name.

 4    BY MS. GAFFNEY:

 5         Q.    If you had the name of the pharmacy and

 6    the DEA registration number, would you be able to

 7    generate a report of the sales data?

 8              MR. DAVISON:  Objection.

 9         A.    To look like this?  I'm not sure.  I'm not

10    sure what data I used to pull this.

11    BY MS. GAFFNEY:

12         Q.    Is it time-consuming to generate a report

13    like this?

14              MR. DAVISON:  Objection.

15         A.    I can't remember how long it would take to

16    do something like this, no.

17    BY MS. GAFFNEY:

18         Q.    Do you remember as a general matter

19    whether it would take multiple work days?

20              MR. DAVISON:  Objection.

21         A.    I'm not exactly sure how long it took.

22    BY MS. GAFFNEY:

23         Q.    Do you agree that this report shows sales

24    to a pharmacy in Columbus, Ohio?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    It appears --

 2                MR. DAVISON:  Objection.

 3          A.    It appears that way.

 4   BY MS. GAFFNEY:

 5          Q.    John Adams's e-mail says as you can see,

 6   there was a disproportionate amount of oxy 15 and 30.

 7                Would you agree that the reports generated

 8   with the Cognos tool can show the proportion of product

 9   purchased by Mallinckrodt's indirect customers?

10                MR. DAVISON:  Objection.

11          A.    I'm not sure whether or not the Cognos

12   data alone can say that.  I'm not sure.

13   BY MS. GAFFNEY:

14          Q.    If you wanted to provide information about

15   the about the proportion of products that an indirect

16   customer was purchasing, where would you look for that

17   data?

18                MR. DAVISON:  Objection.

19          A.    It wasn't my area of expertise to be

20   looking for a disproportionate amount of anything, so

21   I'm not sure where you would be able to find that

22   information.

23   BY MS. GAFFNEY:

24          Q.    Okay.  So just to break it down a little
```

1    bit, so when we're talking about the proportion of

2    products, we're just looking for the relative amounts

3    of Mallinckrodt product that an indirect customer

4    purchased; correct?

5            MR. DAVISON:  Objection to form.

6        A.    Is that what you're defining as

7    proportionate?

8    BY MS. GAFFNEY:

9        Q.    I'm just trying to make it as simple as

10   possible.

11       A.    Okay.

12       Q.    I don't think we're talking about

13   something super complicated, but if you have a

14   different understanding of what the proportionate

15   amount of products purchased means, I'd like to hear

16   that.

17       A.    I guess I'm just saying I don't know how

18   you would define proportionate or disproportionate, and

19   it certainly wasn't in my expertise to decide that,

20   so --

21       Q.    Understood.  But just to gather the

22   information that would show the proportionate products

23   purchased, so in order to see the proportion you'd just

24   need the total amount of Mallinckrodt products

1    purchased by an indirect customer; right?

2              MR. DAVISON:  Objection to form.

3         A.    I don't think that has anything to do with

4    proportionate or disproportionate amounts.  That's

5    just -- I'm sorry.  Maybe I'm misunderstanding what

6    you're asking.

7    BY MS. GAFFNEY:

8         Q.    I'm sure I did not ask it very clearly.

9    John Adams in his e-mail says as you can see, there was

10   a disproportionate amount of oxy 15 and 30.  So this

11   report -- it's split onto a few pages, but it lists

12   products -- Mallinckrodt products that went to East

13   Main Street Pharmacy in Columbus, Ohio; right?

14        A.    Uh-huh.

15        Q.    So in order to see the proportion, the

16   relative amounts of oxy 15 and 30, you were just

17   looking for the comparison of the amount of oxy 15

18   relative to other Mallinckrodt products purchased by

19   that indirect customer; is that fair to say?

20             MR. DAVISON:  Objection to form.

21        A.    So you're defining disproportionate as

22   relative to the other Mallinckrodt products on that --

23   BY MS. GAFFNEY:

24        Q.    I'm not talking about disproportionate

Highly Confidential - Subject to Further Confidentiality Review

1    yet.

2         A.    Oh, okay.

3         Q.    I'm just talking about identifying

4    information that would show you relative proportions of

5    product purchased.

6         A.    Among our portfolio products?

7         Q.    Uh-huh.

8         A.    Yes.  Okay.

9         Q.    So that --

10        A.    With you.

11        Q.    So trying to get to that information in

12   the data that Mallinckrodt has, where would you go to

13   pull a report that would show, for example, the

14   products -- the Mallinckrodt portfolio products that

15   went to an end customer like East Main Street Pharmacy?

16             MR. DAVISON:  Objection to form.

17        A.    Cognos.

18   BY MS. GAFFNEY:

19        Q.    Cognos?  Okay.  So is it fair to say that

20   those amounts were relatively easy to access in the

21   Cognos -- through the Cognos tool?

22        A.    I don't remember in the --

23             MR. DAVISON:  Objection to form.  Sorry.

24        A.    I don't remember if the report was easy to

Highly Confidential - Subject to Further Confidentiality Review

1  run.  I just don't remember.  It was obtainable, yeah.

2  BY MS. GAFFNEY:

3      Q.    And you and other people at Mallinckrodt

4  could generate those reports and provide them upon

5  request?

6      A.    Correct.

7      Q.    And then is it fair to say that whether or

8  not those amounts were proportionate or

9  disproportionate was not within your responsibilities

10  at Mallinckrodt to decide?

11      A.    Correct.

12      Q.    And fair to say that you would provide the

13  information to others at Mallinckrodt when requested?

14      A.    Correct.

15          MR. DAVISON:  Objection to form.

16  BY MS. GAFFNEY:

17      Q.    There's Exhibit 18.

18          [Exhibit Mallinckrodt-Rowley-Kilper-018

19          marked for identification.]

20      Q.    The Bates number ends in 421620.  And if

21  you look through the e-mail chain, you can see that

22  this is a continuation of the e-mail that we were just

23  discussing; is that right?

24      A.    It appears to be, yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So subsequent to the e-mail that we were

2    just discussing, Karen Harper e-mails you the next day,

3    on November 19th, 2009, asking you whether it's

4    feasible to run chargeback summary reports each time

5    her group receives information about DEA actions

6    against pharmacies or physicians.

7              And you reply sure, Karen.  I can always

8    provide that data.  I will set up a report and just

9    plug in the DEA number to see where the product went

10   from the distributor.

11             So is that what we were just talking about

12   in terms of using the Cognos tool?  When you say set up

13   a report, is that through Cognos?

14   A.    Yes.

15   Q.    And when you say set up a report, is that

16   a one-time action or would that be a report that the

17   tool would continue to generate once you've set it up?

18   A.    I can't remember the system well enough to

19   say whether or not you could save reports or -- like

20   save them or not.  It sounds like in the e-mail that

21   possibly you could save them, but I can't recall for

22   sure.

23   Q.    And you ask her would the previous 12

24   months make sense or would another time frame be more

 1    meaningful for your purpose?

 2              Is time frame a variable that you can use

 3    when setting these reports?

 4         A.    Yes.

 5         Q.    How far back could you go?

 6         A.    I don't know.

 7         Q.    And it appears from the e-mail where you

 8    say I will set up a report and just plug in the DEA

 9    number that the DEA number and the name of the pharmacy

10    would be sufficient to generate the report.  Does that

11    seem fair to say?

12              MR. DAVISON:  Objection to form.

13         A.    I don't -- I mean, I reference setting up

14    a report, so yeah, I would need more -- I'd have to

15    know more information, I think, than just a DEA number.

16    I -- based on what I said, I'm not sure how -- what

17    information I used to set up the report.  I just can't

18    remember.

19    BY MS. GAFFNEY:

20         Q.    Looking back at Karen's e-mail, she says

21    I'm trying to figure out how to tie chargeback

22    summaries into the program, realizing that chargeback

23    data is for our customers' customers.  The sentence

24    above that says I've been working with John Adams --

Highly Confidential - Subject to Further Confidentiality Review

```
 1    DEA-mandated suspicious --

 2                 [Interruption by the reporter.]

 3         Q.      -- order monitoring program and make it

 4    as robust as possible.  So Karen Harper is e-mailing

 5    you because she -- as she states, in November 2009

 6    she's trying to figure out how to tie chargeback

 7    summaries into the program.

 8                 Is it your understanding she's referring

 9    to the suspicious order monitoring program?

10                 MR. DAVISON:  Objection to form.

11         A.    Well, the e-mail states that she's

12    referring to it.

13    BY MS. GAFFNEY:

14         Q.    Great.  Do you recall whether after this

15    e-mail exchange in November 2009, Karen Harper ever

16    asked you to run chargeback reports as part of the

17    suspicious order monitoring program?

18         A.    I don't remember, no.

19         Q.    But you told her you could always provide

20    that and you just need to plug in the DEA number; is

21    that correct?

22                 MR. DAVISON:  Objection.

23         A.    Looks like what I told her, yeah.

24    BY MS. GAFFNEY:
```

1          Q.    Okay.  You've been handed what's been

2    marked as Exhibit 19, Bates number ending 474370.

3                [Exhibit Mallinckrodt-Rowley-Kilper-019

4                marked for identification.]

5          Q.    And this exhibit is another continuation

6    of the same e-mail string.  Or I should say that it is

7    a continuation of portions of the prior e-mail string

8    that we were just looking at.  I'll give you a sec to

9    read through.

10         A.    Okay.

11         Q.    Okay.  So we have Karen e-mailing you in

12   February 2010, apparently in response to the e-mail

13   that we were just looking at when you e-mailed her

14   November 2009 saying you can always provide that data.

15               She e-mails you in February saying we

16   exchanged e-mails several months ago about running

17   chargeback reports as a benefit to the business based

18   upon information we received regarding DEA actions

19   requesting registrants and industry news.

20               And she's asking whether it would be

21   feasible -- she says it is now apparent there will be

22   more than one to two requests per month and wants to

23   know if that's feasible.  And then your response is

24   to -- you respond the same day to Karen Harper and ask

1    for an estimate of how frequent or how many end user

2    inquiries per month so that you can run it by your

3    manager; correct?

4               MR. DAVISON:  Objection to form.

5         A.    That's what it looks like.

6    BY MS. GAFFNEY:

7         Q.    You also explain I just pulled the data

8    from Cognos.  It's nothing complicated at all.  I'd be

9    happy to train someone in your group to do this if that

10   makes more sense.

11              Did Karen Harper ever ask you to train

12   anyone in the compliance group on Cognos?

13        A.    I don't remember.

14        Q.    What's your understanding of how running

15   chargeback reports would support Karen Harper's group?

16              MR. DAVISON:  Objection.

17        A.    I'm not sure, really, because this was

18   about my interaction with Karen Harper.  Beyond that, I

19   don't remember anything, so I'm not sure how they would

20   correlate.

21   BY MS. GAFFNEY:

22        Q.    Do you have any understanding of why the

23   compliance department would ask you for chargeback

24   reports?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   MR. DAVISON:  Objection.

 2          A.    Just because they didn't know how to use

 3    the Cognos tool.

 4    BY MS. GAFFNEY:

 5          Q.    And as you explain, it's nothing

 6    complicated at all and you can train someone in their

 7    group to do that, but you don't recall ever training

 8    anyone in --

 9          A.    I don't --

10                   MR. DAVISON:  Objection.

11          A.    Yeah, I don't remember if I did or not.

12    BY MS. GAFFNEY:

13          Q.    Exhibit 20, for the record, ends in Bates

14    number 421736.

15                   [Exhibit Mallinckrodt-Rowley-Kilper-020

16                   marked for identification.]

17          Q.    This is another continuation of the same

18    e-mail conversation.

19          A.    Okay.

20          Q.    On the second page you can see the e-mail

21    that we were just discussing from February 22nd where

22    you offered to pull the data from Cognos or train

23    someone from their group.  And then it looks like the

24    next e-mail is from Carrie Johnson on March 8th, 2010.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Do you remember what Carrie's Johnson's

2    role at Mallinckrodt was?

3          A.    Nope.

4          Q.    So Carrie Johnson is asking on March 8th

5    if anything has been figured out on the chargeback

6    requests yet, and then you reply asking Karen whether

7    something was in your court with this and reminding her

8    that you never heard back from your prior e-mail; is

9    that right?

10          MR. DAVISON:  Objection.

11          A.    That's what it looks like.

12   BY MS. GAFFNEY:

13          Q.    To which Karen says the ball's in her

14   court -- speak to Carrie and get back in touch.  Do you

15   remember if Karen ever got back in touch with you

16   following this e-mail?

17          A.    I don't remember.

18          Q.    Exhibit 21, for the record, ends in Bates

19   286532.

20          [Exhibit Mallinckrodt-Rowley-Kilper-021

21          marked for identification.]

22          A.    Okay.

23          Q.    Okay.  So the last e-mail we looked at,

24   Karen Harper had said in March of 2010 that the ball

Highly Confidential - Subject to Further Confidentiality Review

1    was in her court, she'll speak to Carrie and follow up

2    with you, and then it looks like here in May 2010 she's

3    following up with you.  Is that fair to say?

4              MR. DAVISON:  Objection.

5         A.    That's what it looks like, yeah.

6    BY MS. GAFFNEY:

7         Q.    So she's directing Carrie to work with you

8    to determine if Carrie can access the programs

9    necessary to run chargeback reports associated with the

10   compliance -- C slash S -- controlled substance

11   compliance industry news for Mallinckrodt commercial

12   team initiative.

13             Do you remember working with Carrie

14   Johnson on this initiative?

15        A.    I don't even remember who Carrie Johnson

16   was.  Sorry.

17        Q.    So we'll just follow the e-mail.  Carrie

18   Johnson's asking what programs you use, and you answer

19   that you run queries in Cognos Report Studio, the new

20   Impromptu.  Can you tell me about Impromptu?

21             MR. DAVISON:  Objection to form.

22        A.    Other than it was a report writer.  That's

23   all I remember.

24   BY MS. GAFFNEY:

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    Do you remember at what time Mallinckrodt

2  switched from using Impromptu to using Cognos?

3     A.    No idea.  Sorry.

4     Q.    So Carrie's saying she doesn't know if she

5  has access; she doesn't know what it is, and then you

6  explained to her that if she's going to be doing

7  analysis on chargeback data, I don't know of any other

8  way to do that besides using the sales history tool,

9  Cognos.  And I know they offer training, and the

10 queries are pretty simple to learn.

11            When you say I know they offer training,

12 who's they?

13     A.    I'm not sure.

14     Q.    Do you remember if that would have been

15 the company that makes Cognos?

16            MR. DAVISON:  Objection.

17     A.    No, there was an outside company that came

18 and trained us, so it was internal, but I can't

19 remember who.

20 BY MS. GAFFNEY:

21     Q.    You said I would also be happy to help and

22 can show you some of the reports I built just checking

23 the data for Karen in the past.

24            Do you remember what sort of data you

Highly Confidential - Subject to Further Confidentiality Review

1    would check for Karen?

2         A.    I don't remember, but this -- the report

3    that was in one of these e-mails is what I remember

4    checking for her.

5         Q.    Are you referring to the report that John

6    Adams had attached in that e-mail that was -- he

7    referred to as aggregate purchase data?

8         A.    Wasn't that -- I thought one of the last

9    few attachments we just talked about was me providing a

10   report to Karen.  Was it in this chain here?  I don't

11   know.  I mean, other than just what we've been through

12   here, I have no recollection of running things for

13   Karen.  It would be the examples of what we've already

14   looked at.  Yeah.

15        Q.    It looks like from this e-mail that

16   Carolyn was working on getting set up to get access to

17   Cognos Report Studio.

18             Do you remember if she ever got access to

19   Cognos?

20        A.    I don't know.

21        Q.    Do you remember if during your time at

22   Mallinckrodt, other people ran chargeback data reports

23   for the compliance group besides you?

24        A.    I don't know.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    But it is your recollection that you would

2    on occasion run chargeback data reports for Karen?

3              MR. DAVISON:  Objection.

4        A.    On very sporadic occasion, yeah.

5    BY MS. GAFFNEY:

6        Q.    When you mention that the queries are

7    pretty simple to learn, can you give me an example of a

8    query that you would use?

9              MR. DAVISON:  Objection.  Form.

10       A.    My only recollection has been from this

11   time here today and the one report that I said that I

12   ran from Cognos.  That's what I'm thinking is the only

13   thing I remember about what they looked like.

14   BY MS. GAFFNEY:

15       Q.    Okay.  So an example of a query would be

16   plugging in the DEA number as we discussed previously?

17             MR. DAVISON:  Objection to form.

18       A.    I mean, I don't remember setting up a

19   report where I plugged in a DEA number.  I just

20   referred to in an e-mail that you can do that.  I don't

21   remember doing that.  But all I'm saying is I just

22   remember like what the reports look like.  They had

23   those types of fields that we saw on that last report.

24       Q.    And like I mentioned, I'm not a tech

Highly Confidential - Subject to Further Confidentiality Review

1    person, so I'm just trying to ask what an example of a

2    query is.

3         A.    Oh.

4         Q.    What does that refer to in this context?

5               MR. DAVISON:  Objection.

6         A.    A query is just what your -- the data

7    you're wanting to get back.  So all the fields in that

8    one attachment that we looked at that I said I ran from

9    Cognos -- it's got various fields, and in my

10   understanding of what I did, that was a query.

11   BY MS. GAFFNEY:

12        Q.    Okay.  Thank you.

13              [Exhibit Mallinckrodt-Rowley-Kilper-022

14              marked for identification.]

15        Q.    Exhibit 22 is Bates number 289889, and it

16   is an e-mail exchange between you and Karen Harper on

17   June 29th, 2010.

18        A.    Okay.

19        Q.    Okay.  And you wrote to Karen that you

20   spoke to your boss, Carol Svejkosky, briefly regarding

21   the reports you request, and she's fine with you

22   running them going forward, or she also mentioned Sandy

23   Ivancho supports the commercial business specifically

24   by providing sales reports and other data assistance.

Highly Confidential - Subject to Further Confidentiality Review

1          So earlier you mentioned that there were

2    various people at Mallinckrodt who were good with data

3    and worked with it regularly.  Would this be an example

4    of one of the people you were thinking of?

5          A.    Yes.

6          Q.    You mentioned not being sure whether all

7    of the JDE and Cognos training is necessary to get

8    Carrie up to speed.  Is the familiarity with the JDE

9    database also required to pull the Cognos -- or I'm

10   sorry -- to pull the chargeback reports?

11              MR. DAVISON:  Objection to form.

12         A.    I'm not sure if familiarity with JDE was

13   necessary or not, actually.

14   BY MS. GAFFNEY:

15         Q.    Okay.  And you wrote it seems like a lot

16   of training to obtain something very simple when you

17   know the system and the data well.  Is it fair to say

18   we've seen you in these e-mails describe it as simple

19   to pull the chargeback data?

20              MR. DAVISON:  Objection to form.

21         A.    I describe it as simple, so yeah, I felt

22   comfortable with the system.  I've been there a long

23   time.  So yeah.

24   BY MS. GAFFNEY:

Highly Confidential - Subject to Further Confidentiality Review

 1      Q.    So Karen Harper says I can't thank you

 2   enough for the collaborative report.  We will accept

 3   your offer and appreciate the availability of

 4   chargeback reports going forward.  This is in June

 5   2010.

 6            Do you recall whether you started

 7   providing chargeback reports to Karen Harper and her

 8   group regularly after this e-mail?

 9      A.    I don't remember.

10      Q.    Do you recall breathe you provided any to

11   Karen Harper and her group after this date?

12      A.    I don't know about the dates.  Yeah, I

13   know I've provided some to her.  I just don't know

14   exactly when they were and if they were after this.

15      Q.    And your recollection is that you provided

16   them intermittently; is that right?

17      A.    Correct.

18            MR. DAVISON:  Objection to form.

19   BY MS. GAFFNEY:

20      Q.    Earlier when I asked you about whether you

21   were involved in suspicious order monitoring efforts,

22   and you said only for those few months that you

23   reviewed the peculiar order reports.

24            Would you understand providing chargeback

Highly Confidential - Subject to Further Confidentiality Review

1    data reports to Karen Harper to be involved in

2    suspicious order monitoring?

3          A.    I didn't really see it that way, no.  I

4    was often running reports for people and just helping

5    in various functions, so I didn't really see it as a

6    compliance-related task.  I just was providing

7    something that they needed.

8          Q.    When you transitioned to reviewing the

9    peculiar order reports for those few months, did

10   Mallinckrodt provide training to you on the Controlled

11   Substance Act?

12                MR. DAVISON:  Objection to form.

13         A.    I don't remember training specifically on

14   the Controlled Substance Act.  I do remember being

15   trained and sitting with Jim Rausch.

16   BY MS. GAFFNEY:

17         Q.    What do you remember of that training?

18         A.    Other than just sitting with Jim Rausch at

19   his desk, nothing.  Yeah.

20         Q.    You were -- at the time when you

21   transitioned to reviewing the peculiar order reports,

22   you had said you were preparing to leave for family

23   reasons.

24                Did Mallinckrodt know that you were

1    planning to leave when they transitioned you to

2    reviewing the peculiar order reports?

3            MR. DAVISON:  Objection to form.

4        A.    No, I don't believe so.

5    BY MS. GAFFNEY:

6        Q.    Exhibit 23.

7            [Exhibit Mallinckrodt-Rowley-Kilper-023

8            marked for identification.]

9        Q.    For the record, Exhibit 23 ends in Bates

10    561207.  It's an e-mail chain with the most recent

11    e-mail dated July 8th, 2010.  Ms. Kilper, you are not

12    on this e-mail chain but you're mentioned in it.

13            Karen Harper is e-mailing Kate Muhlenkamp,

14    and she says Kate, also be advised that we are working

15    with Tiffany Rowley-Kilper to establish a system to run

16    chargeback reports related to suspicious order

17    monitoring as needed, and we will not be calling on you

18    for this in the future.

19            Do you remember working with Karen Harper

20    to establish a system to run chargeback reports?

21        A.    Other than what we've read through the

22    e-mails, I don't remember anything else, or -- yeah.

23        Q.    And is it fair to say that the e-mails

24    we've read through reflect Karen Harper asking you

Highly Confidential - Subject to Further Confidentiality Review

1    about the availability of you providing these reports

2    and you responding that you are able to provide those

3    reports when she needs them?

4              MR. DAVISON:  Objection to form.

5         A.    That's what the e-mails indicated, yeah.

6    BY MS. GAFFNEY:

7         Q.    So beyond her asking about the

8    availability of those reports and you confirming that

9    you could provide them, did you do anything with Karen

10   Harper to, as she says here, establish a system to run

11   chargeback reports related to suspicious order

12   monitoring?

13             MR. DAVISON:  Object --

14        A.    Not that I can remember.

15   BY MS. GAFFNEY:

16        Q.    Just taking a look at this e-mail chain,

17   it starts with Victor Borelli e-mailing Kate

18   Muhlenkamp.  From his e-mail, it appears that one of

19   his customers, KMI, KeySource Medical, is asking him

20   for a favor to determine whether the indirect customer

21   is getting Mallinckrodt product from anyone else.

22             Is it your understanding that this sort of

23   thing is typical, that an indirect customer would

24   request information from Mallinckrodt --

Highly Confidential - Subject to Further Confidentiality Review

1          MR. DAVISON:  Objection.

2   BY MS. GAFFNEY:

3          Q.    -- of this nature?

4          MR. DAVISON:  Objection.

5          A.    Not to my knowledge, no.

6   BY MS. GAFFNEY:

7          Q.    Karen had in this e-mail said to Kate

8   Muhlenkamp, now that she's working with you, she'll be

9   not calling on Kate Muhlenkamp for this in the future.

10          Did you train Kate Muhlenkamp on how to

11   run chargeback reports?

12          A.    No.

13          Q.    And do you remember what department Kate

14   Muhlenkamp was in?

15          A.    Marketing.

16          Q.    And is it your understanding that the

17   marketing department would work with Cognos regularly?

18          MR. DAVISON:  Objection.

19          A.    Not necessarily the marketing department

20   as a whole, but certainly individuals in it were pretty

21   data-savvy.

22   BY MS. GAFFNEY:

23          Q.    Do you recall ever having meetings with

24   people from the suspicious order monitoring team about

Highly Confidential - Subject to Further Confidentiality Review

```
 1    how to utilize chargeback data?

 2         A.    No.

 3         Q.    You've been handed Exhibit 24, Bates

 4    number ending in 268194.

 5              [Exhibit Mallinckrodt-Rowley-Kilper-024

 6              marked for identification.]

 7         Q.    This appears to be a calendar entry, and

 8    from what I can tell printed from your e-mail.  Does

 9    that seem accurate to you?

10              MR. DAVISON:  Objection.

11         A.    Yes.

12    BY MS. GAFFNEY:

13         Q.    And the calendar entry is for a meeting in

14    July 2010.  Is that your handwriting on this document?

15         A.    Yes.

16         Q.    Is it your recollection that you attended

17    this meeting?

18         A.    I don't recall.

19         Q.    The meeting purpose, according to this

20    document, is that recent DEA enforcement action taken

21    within industry, including two Mallinckrodt customers,

22    merits a review of our existing controlled substance

23    suspicious order monitoring program, and then one item

24    on the engine agenda is to review additional internal
```

Highly Confidential - Subject to Further Confidentiality Review

1    resources that exist for analyzing inputs, chargebacks,

2    sales trending.

3              Do you know what sales trending refers to

4    here?

5         A.    I do not.

6         Q.    Can you -- based on your experience

7    working for Mallinckrodt over -- for over a decade and

8    working with this data, with sales data, do you have

9    any idea what sales trending might refer to?

10             MR. DAVISON:  Objection to form.

11        A.    I don't -- I wouldn't want to guess, so

12   no.

13   BY MS. GAFFNEY:

14        Q.    And in your handwriting here it says 99

15   percent of orders legit so do not hold orders.  What's

16   that based on?

17             MR. DAVISON:  Objection to form.

18        A.    What is the statement based on?

19   BY MS. GAFFNEY:

20        Q.    (Nodding "yes.")

21        A.    I don't know.  I'm not sure if these are

22   notes from the meeting or not.  I'm not sure.

23        Q.    So with the agenda item to review

24   additional internal resources that exist for analyzing

Highly Confidential - Subject to Further Confidentiality Review

```
1    inputs, chargebacks, and sales trending, do you recall

2    providing information to this group about these

3    internal resources that exist for analyzing inputs?

4         A.    I don't remember, no.

5         Q.    Based on your experience working at

6    Mallinckrodt, what would be some of the internal

7    resources available for analyzing inputs that relate to

8    suspicious order monitoring?

9              MR. DAVISON:  Objection to form.

10        A.    Cognos is -- yeah.  I mean, I didn't write

11   that, so -- but they're referring to chargeback data,

12   so Cognos, I guess.

13             MS. GAFFNEY:  Okay.  You can put that

14   aside.

15             MR. DAVISON:  Should we go ahead and take

16   a lunch break?

17             MS. GAFFNEY:  I was just about to ask.

18             MR. DAVISON:  On the same page.  Going off

19   the record.

20             THE VIDEOGRAPHER:  We are going off the

21   record at 12:24 PM.

22             [A recess was taken.]

23             THE VIDEOGRAPHER:  We are back on the

24   record at 1:10 PM.
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MS. GAFFNEY:

2          Q.    Okay.  Welcome back from lunch, Ms.

3    Kilper.  Do you recall this morning reviewing e-mails

4    in which you said that pulling the reports from Cognos

5    was simple?

6          A.    I remember the e-mail, yeah.

7          Q.    And do you recall testifying earlier that

8    many people at Mallinckrodt were savvy with data and

9    had access to Cognos?

10         A.    Yeah, I don't know if I said many or --

11   but yeah, there were several.

12         Q.    Do you recall reviewing e-mails in which

13   you offered to train people on Cognos?

14         A.    Yeah.

15         Q.    And do you recall ever training anyone on

16   Cognos?

17         A.    Not that I recall.

18         Q.    Were there ever restrictions on whom you

19   could have trained on Cognos?

20               MR. DAVISON:  Objection to form.

21         A.    Not that I could recall.

22   BY MS. GAFFNEY:

23         Q.    So if anyone had wanted to take you up on

24   that offer to be trained on Cognos, you would have been

Highly Confidential - Subject to Further Confidentiality Review

1    able to train them on how to use the program?

2          A.    I would have checked --

3                MR. DAVISON:  No objection.

4          A.    I would have checked with my boss.

5    BY MS. GAFFNEY:

6          Q.    And would you have any reason to think

7    that you would be limited in who you could train on

8    using Cognos?

9                MR. DAVISON:  Objection to form.

10         A.    I'm not -- yeah, I'm not sure.  I would

11   assume that it would have to be relevant to their job,

12   but yeah, I just would have had to run it by my boss

13   and see if it was -- if it made sense.

14   BY MS. GAFFNEY:

15         Q.    Do you recall any efforts to incorporate

16   chargeback data into suspicious order monitoring?

17         A.    I don't --

18               MR. DAVISON:  Objection to form.

19         A.    I don't recall any efforts beyond what

20   we've already talked about here.

21   BY MS. GAFFNEY:

22         Q.    And how would you characterize the efforts

23   that we've talked about here?

24               MR. DAVISON:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Just the intermittent communication with

 2   Karen Harper on getting chargeback data.

 3   BY MS. GAFFNEY:

 4          Q.    Do you know whether the -- scratch that.

 5   Do you have any reason to believe that the compliance

 6   department placed a high priority on using chargeback

 7   data connected to suspicious order monitoring?

 8                MR. DAVISON:  Objection to form.

 9          A.    I'm sorry.  Can you repeat the question?

10   BY MS. GAFFNEY:

11          Q.    Uh-huh.  Do you have any reason to believe

12   that the compliance department placed a high priority

13   on using chargeback data in connection to suspicious

14   order monitoring?

15                MR. DAVISON:  Same objection.

16          A.    I don't feel like I can speak to if they

17   placed a high priority on it or not.

18   BY MS. GAFFNEY:

19          Q.    Do you recall anyone from the compliance

20   department ever discussing the need to use chargeback

21   data for suspicious order monitoring with you?

22                MR. DAVISON:  Objection to form.

23          A.    Other than the communication we've seen in

24   the e-mails today from Karen, no.
```

1    BY MS. GAFFNEY:

2         Q.    And you testified earlier that there were

3    several people who had -- who were savvy with data and

4    had access to Cognos; is that accurate?

5         A.    Correct.

6               MR. DAVISON:  Objection.

7    BY MS. GAFFNEY:

8         Q.    Were there any restrictions on people at

9    Mallinckrodt who had access to Cognos?

10              MR. DAVISON:  Objection.

11        A.    What type of restrictions?

12   BY MS. GAFFNEY:

13        Q.    I don't know whether there would be any;

14   that's why I'm asking you.  Could anybody -- you said

15   it had to be relevant to their job?

16        A.    No, you were asking if I would train

17   anyone.

18        Q.    Train them.  Right.  Okay.  So that was in

19   the context of training, but just in terms of having

20   access to Cognos, I believe you testified earlier that

21   people across various departments had access to it.

22        A.    Correct.

23        Q.    Were there any restrictions within

24   Mallinckrodt on employees having access to Cognos?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    I'm not --

2              MR. DAVISON:  Objection.

3        A.    I'm not aware of if there were

4    restrictions or not.

5    BY MS. GAFFNEY:

6        Q.    I believe we discussed that Cognos is the

7    report-generating tool and Partner is the system used

8    for actually processing chargebacks.  Is that correct?

9        A.    Correct.

10       Q.    Do you remember back -- we looked at a

11   document from 2002 that referenced you sitting with

12   each member of the compliance department early on.  Do

13   you remember at that time whether Mallinckrodt used

14   Cognos or whether it used Impromptu or another program?

15             MR. DAVISON:  Objection to form.

16       A.    I don't remember when the change happened

17   from Impromptu to Cognos.

18   BY MS. GAFFNEY:

19       Q.    When you started at Mallinckrodt, which

20   would have been in 1999, was Mallinckrodt using Cognos

21   at that time, or did the change happen at some point

22   during your employment there?

23             MR. DAVISON:  Objection.

24       A.    I'm actually not sure because at some

Highly Confidential - Subject to Further Confidentiality Review

1    point I was made aware of Cognos, but that doesn't mean

2    they didn't have it before I was made aware of it, so

3    yeah.

4    BY MS. GAFFNEY:

5         Q.    And as we discussed from that document

6    from 2002, you went and sat with everybody in the

7    chargeback department, so fair to say that in 2002

8    Mallinckrodt had a chargeback department?

9         A.    Correct.

10              MR. DAVISON:  Objection.

11   BY MS. GAFFNEY:

12        Q.    And Mallinckrodt was -- had a system in

13   place to honor chargeback requests at that time?

14        A.    Yes.

15        Q.    Do you have an understanding of how long

16   Mallinckrodt has had a system in place to honor

17   chargeback requests?

18        A.    No, I have no idea.

19        Q.    Was the chargeback system in place when

20   you started in 1999?

21        A.    Yes.

22        Q.    And in order to honor a chargeback

23   request, you need to have data specific to the indirect

24   customer; is that accurate?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. DAVISON:  Objection.

2      A.    Since I didn't process the chargebacks,

3   I'm not sure exactly what was necessary to process it.

4   BY MS. GAFFNEY:

5      Q.    But fair to say you would have needed to

6   have known -- need to have known who the indirect

7   customer was?  Is that fair?

8          MR. DAVISON:  Objection.

9      A.    The indirect customer would have had to

10   have been on the transaction to pay, yes.

11   BY MS. GAFFNEY:

12      Q.    To pay the chargeback?  Is it also

13   accurate to say you would have needed to known -- to

14   have known the details about the product that was

15   shipped to the indirect customer and the amount of that

16   product --

17          MR. DAVISON:  Objection.

18   BY MS. GAFFNEY:

19      Q.    -- in order to process a chargeback

20   request?

21      A.    Yes.

22          MR. DAVISON:  Objection.

23   BY MS. GAFFNEY:

24      Q.    So if Mallinckrodt was honoring chargeback

Highly Confidential - Subject to Further Confidentiality Review

1    requests in 1999, it must have had a way to track at

2    least those data points -- who the indirect customer

3    was, the amount -- what the product was and the amount

4    of product involved in the transaction; is that

5    accurate?

6              MR. DAVISON:  Objection.

7         A.    You said track.  I don't know about

8    tracking it, but to process it, to pay it, yes.

9    BY MS. GAFFNEY:

10        Q.    Do you recall ever being trained on the

11   characteristics of a suspicious order?

12        A.    I --

13             MR. DAVISON:  Objection.

14        A.    I remember that I sat with Jim and he

15   trained me, but I don't remember the details of that

16   training.

17   BY MS. GAFFNEY:

18        Q.    Do you recall whether that training

19   involved the requirements of regulations under the

20   Controlled Substances Act?

21             MR. DAVISON:  Objection.

22        A.    I really don't remember any of the details

23   of the training at all.

24   BY MS. GAFFNEY:

1        Q.    Are you aware that controlled substances

2    are classified by schedule -- for example, Schedule

3    III, Schedule II controlled substances?

4        A.    Yes.

5        Q.    Can you give examples of what some

6    controlled -- Schedule II controlled substances are?

7        A.    I really don't even remember the portfolio

8    of products and what would constitute Schedule II

9    versus Schedule III or -- it just wasn't my area of

10   expertise.

11       Q.    When you began reviewing peculiar orders,

12   did you feel that you were qualified to review those

13   peculiar order reports?

14            MR. DAVISON:  Objection.  Form.

15       A.    I was given the task, and I felt like I

16   could do what they asked me to do.  Whether or not I

17   was qualified is -- I can't really speak to that

18   necessarily.  It's just I felt capable of administering

19   what they were asking me to do with it.

20   BY MS. GAFFNEY:

21       Q.    And what is it that they were asking you

22   to do with it?

23       A.    I don't remember the details, but I just

24   don't remember thinking this isn't something I get or

Highly Confidential - Subject to Further Confidentiality Review

1   this isn't something I could do.  I take my job

2   seriously, and I would have taken that very seriously,

3   like I took everything that was asked of me there.

4           So I just know that I would have done the

5   job that was required, even though I can't remember the

6   details of it.  It's just such a short time so many

7   years ago.

8       Q.   Do you recall testifying earlier that you

9   didn't have a sense of what might make an order of oxy

10  15 and 30 disproportionate or proportionate?

11      A.   Yes.

12      Q.   Is whether an order of a controlled

13  substances like oxy 15 or 30 is disproportionate or

14  proportionate something that you would be looking for

15  in a peculiar order report?

16           MR. DAVISON:  Objection to form.

17      A.   I just, again, don't remember the details

18  of the suspicious order report, and it was something

19  that was generated from and created from a group of

20  people that did not include me, so that was already set

21  and what I was asked to do was look at it, and I don't

22  remember beyond that what I was doing -- the details of

23  it.  But whether or not it was proportionate or

24  disproportionate was decided outside of my

Highly Confidential - Subject to Further Confidentiality Review

1    responsibility.

2    BY MS. GAFFNEY:

3        Q.    Even when you were reviewing the peculiar

4    order reports?

5        A.    What kicked out in the form of a report.

6    So the algorithm that was set was something that was

7    done outside of me, and then I was asked to review it

8    and handle whatever I was supposed to handle, which I

9    just can't remember the details.

10            But yeah, what I'm saying is the orders

11   that were on that report came from a system that was

12   created that I didn't create.  Does that make sense?

13       Q.    Uh-huh.  Okay.  Here's what's marked as

14   Exhibit 25.

15            [Exhibit Mallinckrodt-Rowley-Kilper-025

16            marked for identification.]

17            MR. DAVISON:  Did you say 25?  25?

18            MS. GAFFNEY:  25.

19            MR. DAVISON:  Thanks.

20   BY MS. GAFFNEY:

21       Q.    For the record, the Bates number ends in

22   281241.

23       A.    Okay.

24       Q.    So this is an e-mail from you to Karen

Highly Confidential - Subject to Further Confidentiality Review

1    Harper, January 5th, 2011.  Could you please read your

2    e-mail into the record?

3          A.    Karen, attached is an example of the

4    current document --

5                [Interruption by the reporter.]

6          A.    Attached is an example of the current

7    documentation.  I'm working on an SOP which explains

8    all the reports involved in this process.  I would

9    recommend reconvening with the team you put together

10   for the direct side of the business.

11               This process has a lot to be improved

12   upon, is extremely time-consuming, and I'm not

13   convinced it is adding much value in its current state.

14   It might be worth considering reports from the Cognos

15   tool, which could look at trends by product and

16   customer.

17               Since orders are shipped out even if they

18   are included in the current report, you are really

19   looking at historical data either way.  Call me when

20   it's convenient to discuss the attached.  Tiffany.

21         Q.    Thank you.  You wrote I'm working on an

22   SOP.  What does that refer to?

23         A.    Standard operating procedures.

24         Q.    Got it.  Do you recall if you finished

1    putting together that SOP?

2         A.    Don't remember.

3         Q.    You wrote it might be worth considering

4    reports from the Cognos tool which could look at trends

5    by product and customer.  Why did you think it might be

6    worth considering reports from the Cognos tool?

7              MR. DAVISON:  Objection.

8         A.    I don't really know -- I mean, the

9    questions were around indirect sales activity, so I was

10   suggesting using the Cognos tool because outbound sales

11   activity isn't going to include chargeback data.

12   BY MS. GAFFNEY:

13        Q.    Okay.  When you say the questions were

14   around indirect sales activity, what do you mean by

15   that?

16        A.    I guess my -- again, my only interaction

17   with Karen Harper were those random requests for

18   chargeback data, so my involvement here was suggesting

19   that they might want to incorporate that when looking

20   at peculiar orders, which I knew very little about but

21   knew it was on the direct side of the business, on the

22   shipments out.

23              So -- and I was just kind of always

24   looking at process improvement.  That was kind of one

Highly Confidential - Subject to Further Confidentiality Review

1    of my things with different areas of the business, and

2    so I was suggesting that we possibly use the Cognos

3    tool as a way to better the system.

4          Q.    And when you say the system, are you

5    referring to peculiar order report system?

6          A.    Correct.  Yeah.

7          Q.    And how would using the Cognos tool better

8    the peculiar order report system?

9                MR. DAVISON:  Objection.

10         A.    I'm not sure how it would have, but I was

11   entertaining the idea that it might if you wanted to

12   look at indirect business.

13   BY MS. GAFFNEY:

14         Q.    How would looking at indirect business

15   help the peculiar order monitoring?

16               MR. DAVISON:  Objection.

17         A.    Again, I don't know that it would.  I just

18   was being asked for chargeback activity from Karen, and

19   then I was included in the peculiar order process, so

20   all I recall is that seemed like we might want to

21   incorporate the Cognos activity and that data into our

22   methodology for looking at things.  Just trying to make

23   a more robust program.

24   BY MS. GAFFNEY:

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    So at this point when you're sending this

 2    e-mail -- and then you said attached is an example of

 3    the current documentation.  So this attachment -- the

 4    current documentation -- is this -- is it fair to say

 5    this is an example of a peculiar order report?

 6          A.    Uh-huh.

 7          Q.    And at this time, that peculiar order

 8    report was only looking at the direct sales; is that

 9    correct?

10          A.    That was my understanding, yes.

11          Q.    And it is your opinion that incorporating

12    the indirect side of things would make it a more robust

13    report?

14          A.    It was just --

15                MR. DAVISON:  Objection to form.

16          A.    It was just a suggestion.  I'm not saying

17    that it would have or would not have.  Just it was a

18    suggestion that if we wanted to look at the indirect

19    side of the business, that using the Cognos tool would

20    help us to do that.

21    BY MS. GAFFNEY:

22          Q.    Okay.  You said a moment ago that all I

23    recall is it seemed like we might want to incorporate

24    the Cognos activity and that data into our methodology
```

Highly Confidential - Subject to Further Confidentiality Review

1    for looking at things just trying to make a more robust

2    program.

3              So was it your opinion at that time that

4    incorporating the Cognos activity would make a more

5    robust program?

6              MR. DAVISON:  Objection to form.

7         A.   I suggested that possibly we use it,

8    without knowing if it would have helped make a more

9    robust tool or not.  Does that make sense?

10   BY MS. GAFFNEY:

11        Q.   (Nodding "yes.")

12        A.   Yeah.  So I don't remember beyond this

13   ever incorporating it, so I don't know that -- it was a

14   suggestion that obviously at the time I thought it

15   might be worth looking into.

16        Q.   Okay.  But you don't remember if anyone

17   ever followed up with you on that suggestion?

18        A.   I don't.

19        Q.   So you write here since orders are shipped

20   out even if they are included in the current report,

21   you are really looking at historical data either way.

22   Can you explain that to me, please?

23             MR. DAVISON:  Objection.

24        A.   They weren't holding the orders, so if it

Highly Confidential - Subject to Further Confidentiality Review

1    showed up on the report, they were still shipping it

2    out.  So my point was that both orders have occurred in

3    the past -- the chargeback and the shipment out to the

4    distributor both have occurred in the past, was what I

5    meant by that.

6    BY MS. GAFFNEY:

7         Q.    Okay.  So that looking at the current

8    documentation, peculiar orders, as well as the --

9    incorporating the Cognos tool, as you suggested here,

10   both would be looking at historical data?

11             MR. DAVISON:  Objection to form.

12        A.    Correct.

13   BY MS. GAFFNEY:

14        Q.    So just looking -- and this is another

15   document that's very hard to read.  Okay.  Okay.  Is

16   this your handwriting on this document?

17        A.    Yes.

18        Q.    Does looking at this document refresh your

19   recollection of what you were reviewing for when you

20   reviewed peculiar order reports?

21        A.    No.

22        Q.    But essentially you would receive a

23   document like this and be asked to approve it and you

24   would note that here?  Like it says okay with your

1    initials and the date?

2         A.    Correct.

3               MR. DAVISON:  Objection to the form.

4         A.    I know that I would have a task assigned

5    when I get the report before I approve it.  I'm not

6    sure that was clear, but I just want to make that

7    clear.  So it wasn't just like got the report and

8    approved it.

9    BY MS. GAFFNEY:

10        Q.    Right.

11        A.    Okay.  I did have something to do, but I

12   just don't remember the details of what it was that I

13   did.

14        Q.    Understood.

15        A.    Okay.

16        Q.    On the very last page of the document,

17   there's an e-mail.  So this is an e-mail from you to

18   Penny Myers, subject ABC, on January 5th, 2011.  Do you

19   recall Penny Myers's role at Mallinckrodt?

20        A.    Not really, no.  I know she was with our

21   addiction treatment business, but beyond that, no.

22        Q.    So in this e-mail you're asking her about

23   an average of 97 bottles an order and -- compared to an

24   order for 288 bottles.  Do you know any reason why they

Highly Confidential - Subject to Further Confidentiality Review

```
 1    would be placing higher-than-average orders?

 2              MR. DAVISON:  Objection to form.

 3              MS. GAFFNEY:  I was just reading the

 4    e-mail.  I'm sorry.

 5              MR. DAVISON:  Apologies.  That makes

 6    sense.  Apologies.  I got excited.

 7    BY MS. GAFFNEY:

 8         Q.   So just reading the e-mail into the

 9    record.  And then there's your note below that -- spoke

10    to Penny regarding ABC methadone orders.  All okay.  Do

11    you see that?

12         A.   Uh-huh.

13         Q.   Do you recall -- knowing that it was many

14    years ago, can you think of what you might have asked

15    Penny Myers about in connection with an explanation for

16    a higher-than-average order like this example?

17              MR. DAVISON:  Objection to form.

18         A.   I have no recollection of what the

19    situation was that I spoke to her about.

20    BY MS. GAFFNEY:

21         Q.   And it looks from this document that this

22    was a printout of an e-mail then with your handwritten

23    note.  Is that your understanding from just looking at

24    this document?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Uh-huh.

2          Q.     Do you recall whether it would have been

3     your practice to print out this e-mail, make the note,

4     and keep that as the record for your review for the

5     peculiar order report?

6          A.     I -- yes, I vaguely recall that -- keeping

7     these reports, yes.

8          Q.     And then this document here with the

9     e-mail and your note would have been the record of the

10    process that you went through to approve the order; is

11    that correct?

12               MR. DAVISON:  Objection.

13         A.     It looks like in this situation, but I

14    can't say that I remember the process, because it

15    doesn't seem consistent on all of these the same, so --

16    BY MS. GAFFNEY:

17         Q.     And in this case, your notes simply says

18    that you spoke to her and all okay.  Without providing

19    any more explanation for the increase -- the

20    higher-than-average order, would there have been a

21    place where you would have made a record of the reason

22    for the higher-than-average order?

23               MR. DAVISON:  Objection.

24         A.     No, it seems that the process was to just

Highly Confidential - Subject to Further Confidentiality Review

1    make sure that it was okay and to note that.

2    BY MS. GAFFNEY:

3         Q.    And making sure that it okay -- was okay

4    until contacting the person responsible for the account

5    with that distributor?

6              MR. DAVISON:  Objection.

7         A.    Yeah, I'm not sure who because I'm not

8    sure what Penny's responsibility was, so I'm not sure

9    exactly who I would contact on these orders.  In this

10   case, it's clear it was Penny Myers, but --

11   BY MS. GAFFNEY:

12        Q.    Uh-huh.

13        A.    Yeah.  Beyond that I'm not sure.

14        Q.    So this is an example of a peculiar order

15   report as we discussed.  Do you know what system was

16   used to generate this report?

17        A.    I do not.

18        Q.    If you wanted to find out how many of the

19   orders noted in a peculiar order report were ultimately

20   shipped by Mallinckrodt, how would you generate that

21   report?

22             MR. DAVISON:  Objection.

23        A.    Can you rephrase that?

24   BY MS. GAFFNEY:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     Uh-huh.  So if you wanted to find out how

2  many of the orders in a peculiar order report were

3  ultimately shipped by Mallinckrodt, where would you go

4  to find that information?

5             MR. DAVISON:  Same objection.

6      A.     Once the product ships, it would be -- the

7  data would be available in Cognos.

8  BY MS. GAFFNEY:

9      Q.     Okay.  So using the information that's in

10 this report, you could then run queries in Cognos to

11 see the actual sales transactions related to the orders

12 in these reports; is that correct?

13            MR. DAVISON:  Objection.

14     A.     I can't say for sure because I've never

15 done that.

16     Q.     We discussed earlier you running reports

17 from Cognos based on the name of a pharmacy and a DEA

18 registration number.  Do you remember discussing that

19 earlier?

20     A.     Was it --

21            MR. DAVISON:  Objection.

22     A.      -- in relation to indirect sales or

23 direct?

24 BY MS. GAFFNEY:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    My understanding is that would be indirect

2  sales because we were discussing specific pharmacies.

3    A.    Okay, okay.  Yeah, I remember that.

4    Q.    So you can generate those reports in

5  Cognos based on the name of the indirect customer and

6  the DEA registration number; is that correct?

7              MR. DAVISON:  Objection.

8    A.    I can get the data that is submitted in it

9  from a chargeback, yeah.

10  BY MS. GAFFNEY:

11    Q.    That would be sufficient to run a query in

12  Cognos; is that right?

13              MR. DAVISON:  Same objection.

14    A.    Yes, but this is direct transactions, so

15  they're not the same.  I just want to make sure I'm not

16  unclear about these reports were auto outbound sales

17  too, so they can't be correlated to an indirect

18  transaction with a DEA registrant.  Does that make

19  sense?

20  BY MS. GAFFNEY:

21    Q.    With an order number would they be able to

22  be correlated to an indirect transaction?

23    A.    No, because these are -- sales are going

24  to AmerisourceBergen, for instance, so beyond that I

Highly Confidential - Subject to Further Confidentiality Review

1    would not know where they're going beyond that until

2    they sent me a chargeback.  Does that make sense?

3        Q.    Until AmerisourceBergen sent you the

4    chargeback request?

5        A.    Correct.  So all this is going to give me

6    is like outbound orders to them.

7        Q.    Okay.  Understood.  Thank you.  So after

8    the transaction had taken place, the direct customer or

9    the distributor will submit a request for a chargeback

10   payment; is that correct?

11            MR. DAVISON:  Same objection.

12       A.    After their sale.

13   BY MS. GAFFNEY:

14       Q.    After their sale?

15       A.    Correct.

16       Q.    And if you wanted to create a list of all

17   of the pharmacies for which a distributor had requested

18   chargeback payments, how would you go about doing that?

19            MR. DAVISON:  Objection.

20       A.    The same as we talked about earlier --

21   just the Cognos tool -- and that's -- I could use their

22   DEA number, and it would pull any chargebacks that were

23   requested or paid from the distributor.

24            [Discussion off the record.]

```
 1   BY MS. GAFFNEY:

 2        Q.    Exhibit 26 ends in Bates number 465411.

 3              [Exhibit Mallinckrodt-Rowley-Kilper-026

 4              marked for identification.]

 5        A.    Okay.

 6        Q.    Okay.  So this document starts with an

 7   e-mail dated September 3rd, 2010, from Dave Hoffman at

 8   KeySource Medical to Victor Borelli, and he's asking

 9   Mr. Borelli specific questions about a customer of

10   KeySource's increasing their use of Mallinckrodt

11   oxycodone 30 milligram at a rapid pace.

12              So the e-mail describes a February 2010

13   report of 39,959 tablets of Mallinckrodt oxy 30, and

14   then the same report for the month of July is 119,587

15   tablets.  It appears that KeySource is asking Mr.

16   Borelli to check within Mallinckrodt's data to see if

17   Mallinckrodt's numbers are the same.

18              Is that an accurate characterization of

19   this e-mail?

20              MR. DAVISON:  Objection to form.

21        A.    That's what it seems like, yeah.

22   BY MS. GAFFNEY:

23        Q.    A few weeks later Mr. Borelli e-mails you

24   asking you if you ever got back to him, and you say ran
```

1   some reports.  We do show the oxy purchases shoot up in

2   June, July, and August for this facility.  Our numbers

3   are very close to his.  I would involve Karen Harper

4   and find out whether we have any responsibility with

5   this knowledge.

6           In your opinion, does Mallinckrodt have

7   responsibility with this knowledge?

8           MR. DAVISON:  Objection to form.

9       A.   It really wasn't my call as to who has

10  responsibility.  I passed it on and had full confidence

11  that our compliance team would address it and decide

12  what they needed to do about it.  That's why I made the

13  suggestion to involve Karen.

14  BY MS. GAFFNEY:

15      Q.   And what was this confidence in the

16  compliance e-mail addressing it based on?

17          MR. DAVISON:  Objection.

18      A.   What was my confidence in the compliance

19  team based on?

20  BY MS. GAFFNEY:

21      Q.   Uh-huh.

22      A.   I just believed that Mallinckrodt during

23  my time there was very responsible and trying to do the

24  right thing, and that's why we were taking information

Highly Confidential - Subject to Further Confidentiality Review

 1    like this and giving it to Karen Harper, because that

 2    was something that we took very seriously.

 3         Q.    So you said you believe that Mallinckrodt

 4    during your time there was very responsible and trying

 5    to do the right thing.  What was that belief based on?

 6              MR. DAVISON:  Objection to form.

 7         A.    I wouldn't have worked for a company that

 8    I thought was not being responsible with their product,

 9    and there were, as you can see, a lot of communication

10    during my time there about these pharmacies and making

11    sure that we were -- even though the data's in the past

12    and this is chargeback data that's already -- the sale

13    has already occurred -- but to do whatever we could

14    going forward with the pharmacies that we were hearing

15    were shut down, or whatever the information was that

16    would come in on these e-mails, that the people that I

17    worked for and the people that they worked for --

18    everybody was trying to do the right thing and make

19    sure that these pharmacies weren't distributing more

20    product than what they should be.

21              And so that's what I mean.  I just had a

22    very strong confidence in the leadership there and the

23    compliance team that was under Karen, and I wouldn't

24    have worked there if I had felt like they were doing

Highly Confidential - Subject to Further Confidentiality Review

1    anything irresponsible.

2    BY MS. GAFFNEY:

3        Q.    Can you think of any specific examples of

4    actions that you or others at Mallinckrodt took to

5    prevent the sort of volume of shipments of Mallinckrodt

6    products going to pharmacies as we've seen in some of

7    these documents today?

8            MR. DAVISON:   Objection.

9        A.    I remember vaguely chargebacks being

10   denied or discussion of the chargebacks being denied

11   for future, but I couldn't -- I wasn't the one that

12   would process the chargebacks, I wasn't one that would

13   change whatever they would change so that the

14   chargeback wouldn't pay, but I know that these

15   conversations led to chargebacks being denied for

16   entities that they believed were suspicious or whatever

17   the term.

18           So yeah, I mean, I think that shows that

19   they were serious about their responsibility in denying

20   chargebacks to the wholesaler.

21   BY MS. GAFFNEY:

22       Q.    At the point of denying chargebacks to the

23   wholesaler, Mallinckrodt has already been paid for its

24   product which it has shipped to the wholesaler and

Highly Confidential - Subject to Further Confidentiality Review

1    denying the chargeback is a financial benefit to

2    Mallinckrodt, is it not, because Mallinckrodt does not

3    have to then pay that amount to the wholesaler?

4              MR. DAVISON:  Objection.

5         A.    I mean, it's essentially -- I mean, I

6    wouldn't see it as a financial benefit.  I mean, it's a

7    disruption in your customer relationship with your

8    wholesaler so ultimately it's not going to be a --

9    there is a risk -- for us to deny chargebacks is to

10   upset our distributors, and that's not something that's

11   like seen as something light.

12              So it wasn't -- I would say that the

13   chargeback denial is a way for us to say -- it's the

14   only way for us to say that -- that I know of, that we

15   aren't agreeing to where you sold our product and --

16   because again, it's not -- this product went to the

17   wholesaler, and we don't know those outbound sales --

18   you don't know where it's going from there until the

19   chargeback comes in.

20              So I think -- I just felt strongly that

21   Mallinckrodt was doing what they could do to say they

22   were not in agreement with whatever that entity is --

23   the customer's -- our customer's customer.  I mean,

24   that's the way I saw it, and I felt like they were

1    always trying to better the process.  In the time that

2    I was there, that was something that people took very

3    seriously.

4    BY MS. GAFFNEY:

5         Q.    And do you know in any of these examples

6    where Mallinckrodt decided not to honor a chargeback

7    request to a certain indirect customer, whether that

8    indirect customer -- whether there were ever any

9    instances of that indirect customer continuing to

10   receive Mallinckrodt product through other

11   distributors?

12        A.    I --

13              MR. DAVISON:  Objection.

14        A.    No idea.

15   BY MS. GAFFNEY:

16        Q.    And given what you just explained about

17   the role of chargeback denial, would it concern you if

18   Mallinckrodt products still ended up going to those

19   pharmacies after Mallinckrodt had made the decision to

20   restrict the chargebacks?

21              MR. DAVISON:  Objection to form.

22        A.    Would it concern me personally, or like --

23   what is your question?

24   BY MS. GAFFNEY:

```
 1        Q.    Uh-huh.  Would it concern you personally?

 2              MR. DAVISON:  Same objection.

 3        A.    I mean, it personally concerns me that

 4   there's a problem and that our product ends up in the

 5   hands of people that abuse it.  Yes, it's personally

 6   concerning, but I feel like Mallinckrodt did what it

 7   could to ensure that it was shipping product in good

 8   conscience, in good responsibility, and I don't feel

 9   that they could have done more.

10   BY MS. GAFFNEY:

11        Q.    You explained it's your opinion that the

12   chargeback denial is the only way that you know of for

13   Mallinckrodt to say we aren't agreeing to where you

14   sold our product.  Is that right?  I'm not trying to

15   put words in your mouth.

16        A.    Yeah, I'm thinking --

17        Q.    I'm looking back at the transcript and

18   trying to be fair about how you phrased that.

19        A.    In my limited exposure to the business,

20   that is one way that we could say that we didn't --

21   we're not going to honor that chargeback, is to

22   communicate that we're not comfortable with -- based on

23   whatever knowledge that we've obtained from like these

24   types of things.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And could Mallinckrodt also have decided

2   to stop shipping to a particular distributor?

3             MR. DAVISON:  Objection.

4      A.    Could we have stopped shipping to a

5   particular distributor?

6   BY MS. GAFFNEY:

7      Q.    (Nodding "yes.")

8      A.    Yes.

9      Q.    To your knowledge, did Mallinckrodt ever

10  do that?

11     A.    I don't know.

12     Q.    Are you aware of whether Mallinckrodt has

13  a duty under the Controlled Substance Act to stop

14  suspicious orders before they're shipped?

15            MR. DAVISON:  Objection.

16            THE WITNESS:  I'm not aware of the details

17  of the Controlled Substance Act.

18            MS. GAFFNEY:  Counsel, why don't we take a

19  short break?

20            MR. DAVISON:  Okay.

21            THE VIDEOGRAPHER:  We are going off the

22  record at 2:05 PM.

23            [A brief recess was taken.]

24            THE VIDEOGRAPHER:  We are back on the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    record at 2:20 PM.

 2              MR. DAVISON:  So we did reach out -- I

 3    understand plaintiffs -- MDL plaintiffs have no more

 4    questions?

 5              MS. GAFFNEY:  That's correct.

 6              MR. DAVISON:  And we did reach out to

 7    Tennessee counsel, and we understand from that reach

 8    out that she has no questions at this time, so we are

 9    all finished.

10              THE VIDEOGRAPHER:  We are going off the

11    record at 2:21 PM.

12

13                   [SIGNATURE RESERVED.]

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1                  C E R T I F I C A T E

2

3          I, JOHN ARNDT, a Certified Shorthand

4    Reporter and Certified Court Reporter, do hereby

5    certify that prior to the commencement of the

6    examination, TIFFANY KILPER was sworn by me to

7    testify the truth, the whole truth and nothing but the

8    truth.

9          I DO FURTHER CERTIFY that the foregoing is a

10   true and accurate transcript of the proceedings as

11   taken stenographically by and before me at the time,

12   place and on the date hereinbefore set forth.

13         I DO FURTHER CERTIFY that I am neither a

14   relative nor employee nor attorney nor counsel of any

15   of the parties to this action, and that I am neither a

16   relative nor employee of such attorney or counsel, and

17   that I am not financially interested in this action.

18

19

20   _____

21         JOHN ARNDT, CSR, CCR, RDR, CRR

22         CSR No. 084-004605

23         CCR No. 1186

24

Highly Confidential - Subject to Further Confidentiality Review

1

2

3          I, TIFFANY KILPER, the witness

4    herein, having read the foregoing testimony of the

5    pages of this deposition, do hereby certify it to be a

6    true and correct transcript, subject to the

7    corrections, if any, shown on the attached page.

8

9

10

11                          _____

12                          TIFFANY KILPER

13

14

15   Sworn and subscribed to before me,

16   This _____ day of _____, 201_.

17

18

19   _____

20          Notary Public

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1

2                    DEPOSITION ERRATA SHEET

3

4    Page No._____Line No._____Change to:_____

5    _____

6    Reason for change:_____

7    Page No._____Line No._____Change to:_____

8    _____

9    Reason for change:_____

10   Page No._____Line No._____Change to:_____

11   _____

12   Reason for change:_____

13   Page No._____Line No._____Change to:_____

14   _____

15   Reason for change:_____

16   Page No._____Line No._____Change to:_____

17   _____

18   Reason for change:_____

19   Page No._____Line No._____Change to:_____

20   _____

21   Reason for change:_____

22

23   SIGNATURE:_____DATE:_____

24              TIFFANY KILPER