CONFIDENTIAL

**Report of Professor Thomas McGuire**

**Regarding Public Nuisance**

**March 25, 2019**

CONFIDENTIAL

**TABLE OF CONTENTS**

I.  **Introduction** ................................................................................ 1

    A.  Qualifications ...................................................................... 1
    B.  Assignment......................................................................... 3
    C.  Overview of Structure and Organization of the Report ......................... 6
    D.  Summary of Opinions .......................................................... 7

II.  **The Economic Analysis of Public Nuisances** ................................................... 9

    A.  Public Nuisance and Negative Externalities........................................ 9
    B.  Prescription Opioids are Not a Typical Consumer Good ..................................... 11
    C.  Benefits from Shipments and Positive Externalities............................................. 14
    D.  Widespread Negative Externalities to Public Health are Often Addressed by Public Policy ................................................. 15

III.  **Shipments of Prescriptions Constituted a Public Nuisance to the Bellwether Communities**.............................................................. 21

    A.  Introduction ....................................................................... 21
    B.  Shipments Interfered with Public Health, Safety, Peace and Comfort of Members of the Bellwether Communities with Continuing and Long-Lasting Effects ................................................. 23
    C.  The Interference from Shipments was Unreasonable.......................................... 37
    D.  Defendants Were or Should Have Been Aware of the Interference .................. 50
    E.  Conclusion ......................................................................... 53

IV.  **Quantification of the Magnitude of the Economic Costs Imposed on Bellwether Communities by Prescription Opioid Shipments**....................................... 53

    A.  Review of Some Earlier Studies of Economic Burden of the Opioid Crisis ........... 54
    B.  Economic Framework for Valuing Harms in Dollar Terms................................... 58
    C.  Overview of Categories of Harms and Methods of Valuation............................. 60
    D.  Valuation in Dollar Terms:  Mortality ................................................... 61
    E.  Valuation in Dollar Terms:  Morbidity .................................................. 63
    F.  Valuation in Dollar Terms:  Children Born with NAS ........................................ 67
    G.  Valuation in Dollar Terms:  Crime ......................................................... 70
    H.  Valuation in Dollar Terms:  Child Maltreatment.................................................. 73
    I.  Bellwether Government Costs Due to Shipments ................................................ 76
    J.  Sum of Economic Costs Imposed on Bellwether Communities Due to Shipments ............................................... 77

CONFIDENTIAL

## I. Introduction

### A. Qualifications

1.      My name is Thomas McGuire and I am a Professor of Health Economics in the

Department of Health Care Policy at Harvard Medical School, where I teach health economics in

Harvard University's Ph.D. Program in Health Policy.  In 2008, I received the Everett

Mendelsohn Excellence in Mentoring Award from Harvard's Graduate School of Arts and

Sciences.  I received an A.B. degree from Princeton University in 1971 and a Ph.D. degree in

economics from Yale University in 1976.

2.      I am a member of the National Academy of Medicine – formally, the Institute of

Medicine (IOM) – and a Research Associate at the National Bureau of Economic Research.  I

served for ten years as an editor of the leading journal in the field of health economics, the

*Journal of Health Economics* and co-edited the *Handbook of Health Economics*, Volume II.

3.      For more than 40 years I have conducted research on the economics of managed care,

health insurance, health care payment systems, drug pricing and procurement, the economics

of health care disparities by race and ethnicity, and the economics of behavioral healthcare.  I

have recently authored a series of published papers on the economics of drug prices,

competition between branded and generic drug products, and insurance coverage for drugs.[1]  I

---

[1] T.G. McGuire and S. Bauhoff, "Adoption of a Cost-Saving Innovation: Germany, UK and Simvastatin," in N. Klusen, F. Verheyen, and C. Wagner, eds., *England and Germany in Europe – What Lessons Can We Learn from Each Other?* Baden-Baden, Germany: Nomos, 2011, pp. 11-26; E.R. Berndt, T.G. McGuire, and J.P. Newhouse, "A Primer on the Economics of Prescription Pharmaceutical Pricing in Health Insurance Markets," *Forum for Health Economics & Policy*, 14(2), 2011, Article 10; J. Glazer and T.G. McGuire, "A Welfare Measure of 'Offset Effects' in Health Insurance," *Journal of Public Economics,* 96, 2012, pp. 520-523; J. Glazer, H. Huskamp, and T.G. McGuire, "A Prescription for Drug Formulary Evaluation: An Application of Price Indexes," *Forum for Health Economics and Policy*, 15(2), 2012, Article 3; K. Drake, M. Starr, and T. McGuire, "Do 'Reverse Payment' Settlements Constitute an

CONFIDENTIAL

co-chaired three conferences on the Industrial Organization of Health Care and edited special

sections of economic journals in which the conference papers were published.[2]  My research

has been recognized by a number of awards, including the Victor Fuchs Lifetime Achievement

Award for 2018, awarded by the American Society of Health Economics.[3]  In 2015, a jointly

authored paper on reverse payment settlements in the drug industry received the Article of the

Year Award from the *International Journal of the Economics of Business*.[4]

4.      I have conducted research and contributed to public policy regarding behavioral health

(mental and addictive illnesses) for 40 years.  I was the co-chair of four conferences on

economics and mental health sponsored by the National Institute of Mental Health (NIMH).  I

have been the recipient of investigator-initiated research projects (R01's) from the NIMH and

the National Institute on Drug Abuse (NIDA).  My research in behavioral health has earned a

number of awards, including the Elizur Wright Award from the American Association of Risk and

---

Anticompetitive Pay-for-Delay?" *International Journal of the Economics of Business,* 22(2), 2015, pp. 173-200; T. McGuire, K. Drake, E. Elhauge, R. Hartman, and M. Starr, "Resolving Reverse-Payment Settlements with the Smoking Gun of Stock Price Movements," *Iowa Law Review*, 101(4), 2016, pp. 1581-1599; and K. Drake and T. McGuire, "Stock-Price Evidence for Anticompetitive Effects in the Nexium 'Reverse-Payment' Settlement," *Journal of Competition Law & Economics*, 12(4), 2016, pp. 735-747.

[2] T.G. McGuire and M.H. Riordan (guest editors), "The Industrial Organization of Health Care," *Journal of Economics & Management Strategy*, 3(1), March 1994; A. Ma, T.G. McGuire, and M.H. Riordan (guest editors), "The Industrial Organization of Health Care, II," *Journal of Economics & Management Strategy*, 6(1), Spring 1997; and A. Ma and T.G. McGuire (guest editors), "The Industrial Organization of Health Care, III," *Journal of Economics & Management Strategy*, 8(3), Fall 1999.

[3] Two of my jointly authored papers received "Best Paper of the Year" awards in 2008, one from Academy Health for research on physician-patient interaction and one from the National Institute for Health Care Management for work on incentives in managed care plans.  My paper on designing payment systems for private health insurance markets received the best paper of the year award in 2014 from the National Institute for Health Care Management.

[4] K. Drake, M. Starr, and T. McGuire, "Do 'Reverse Payment' Settlements Constitute an Anticompetitive Pay-for-Delay?" *International Journal of the Economics of Business,* 22(2), 2015, pp. 173-200.

---

CONFIDENTIAL

Insurance recognizing "an outstanding contribution to the literature on risk and insurance" for my *Financing Psychotherapy* (1981), and the Carl Taube Award from the American Public Health Association for "outstanding contributions to public health" (1991).  I have supervised numerous Ph.D. dissertations on the economics of behavioral health at Boston University, Brandeis University and Harvard University.  I was the director of two NIMH-funded pre- and post-doctoral training programs in the economics of mental health and the economics of mental health policy.  My research has directly contributed to the design of health insurance and provider payment in behavioral health care.

5.      My litigation experience includes recent testimony at two drug industry antitrust trials.[5] Appendix A contains my CV and a list of my recent testimony.  My rate of compensation in this matter is $900 per hour.  My compensation does not depend upon the outcome of this litigation.

    **B. Assignment**

6.      In connection with the public nuisance claims raised by Cuyahoga County and Summit County (Bellwether Plaintiffs), I have been asked the following three questions:[6]

---

[5] *In re: Nexium (esomeprazole) Antitrust Litigation*, United States District Court for the District of Massachusetts, MDL No. 2409, Civil Action No. 112-cv-11711, November 7 and 20, 2014, and *In re: Solodyn (Minocycline Hydrocholoride) Antitrust Litigation*, United States District Court, District of Massachusetts, MDL No. 14-md-2503-DJC, March 26-27, 2018.

[6] I have not been asked to offer an opinion on the scope or cost of programs needed to abate this nuisance, but such a report could be submitted at such time as the Court deems appropriate.

---

CONFIDENTIAL

- First, is there a framework within the area of applied microeconomics by which economists determine the existence of, and measure the extent of, what is known under the law as a "public nuisance?"

- Second (and if the answer above is "yes"), do you have an opinion to a reasonable degree of certainty in the area of applied microeconomics as to whether there is a public nuisance that resulted from the shipment of prescription opioid products into the Bellwether communities over the period 2006 to the present that has impacted those communities?

- Third (and if the answer above is "yes"), do you have an opinion of the magnitude of the economic costs imposed on the Bellwether communities over the period 2006 to 2016, the most recent period for which data are fully available, taking into account any potential economic benefits with respect to the shipments?

7.       Because these questions are framed in the context of the legal term "public nuisance," I have been instructed by counsel to be guided by the following general definition of a public nuisance:

> "The definition of 'public nuisance' . . . is couched in broad language. According to the Restatement [(Second) of Torts], a 'public nuisance' is 'an unreasonable interference with a right common to the general public.' . . . 'Unreasonable interference' includes those acts that significantly interfere with public health, safety, peace, comfort, or convenience, conduct that is contrary to a statute, ordinance, or regulation, or conduct that is of a continuing nature or one which has produced a permanent or long-lasting effect upon the public right, an effect of which the actor is aware or should be aware."[7]

---

[7] *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1142 (Ohio 2002).  In that case, involving a public nuisance claim against the gun industry, the Court held that "the city should be permitted to bring suit against the manufacturer of a product under a public nuisance theory, when, as here, the product has allegedly resulted in widespread harm and widespread costs to the city as a whole and to its citizens individually (at 1142)."(internal

CONFIDENTIAL

8.      Coupled with this general definition of public nuisance, I have further been instructed by counsel to be guided by the Bellwether Plaintiffs' allegations regarding their public nuisance claims.  I understand that this Court has already recognized that the Bellwether Plaintiffs' public nuisance claims "allege that Defendants created and maintained a public nuisance in the marketing and distribution of prescription opioids."[8]  Furthermore, I understand the Bellwether Plaintiffs have specifically alleged that the "Defendants have created and maintained a public nuisance by marketing, distributing, and selling opioids in ways that unreasonably interfere with the public health, welfare, and safety in Plaintiff's Community, and Plaintiff and the residents of Plaintiff's Community have a common right to be free from such conduct and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property."[9]

9.      I further understand that the Bellwether Plaintiffs allege that "Defendants have created and maintained an absolute public nuisance through their ongoing conduct of marketing, distributing, and selling opioids, which are dangerously addictive drugs, in a manner which caused prescriptions and sales of opioids to skyrocket in Plaintiffs' communities, flooded Plaintiffs' communities with opioids, and facilitated and encouraged the flow and diversion of

---

quotations omitted).  Also see *City of Cincinnati v. Deutsche Bank Nat'l Trust Co.*, 863 F.3d 474, 477 (6th Circuit 2017) ("Under Ohio law, a common law public nuisance is an unreasonable interference with a right common to the general public.") (internal quotations omitted).

[8] *See* Magistrate Judge David Ruiz's Report and Recommendation, October 5, 2018 at p. 60.

[9] Cuyahoga County, Second Amended Complaint, ¶ 1024. Similarly, see Second Amended Complaint (Summit County), ¶ 1000.

CONFIDENTIAL

opioids into an illegal, secondary market, resulting in devastating consequences to Plaintiffs and the residents of Plaintiffs' communities."[10]

10.     I will use the term "Defendants' shipments of prescription opioids," or sometimes just "shipments," as a shorthand for the activity the Bellwether Plaintiffs claim constitutes a public nuisance regarding both the marketing and distribution of prescription opioids by Defendants.

### C.  Overview of Structure and Organization of the Report

11.     In Section II, I discuss the economic analysis of a public nuisance and its relationship to an analysis of externalities.  Included in this section is a discussion of the nature of negative externalities associated with shipments of prescription opioids, the role of the presence of positive effects of opioid use, and examples of public response to negative externalities.  In Section III, I identify a series of harms caused by opioid shipments and quantify them for the Bellwether communities.   Note that these harms are due directly to the use of prescription opioids and, indirectly, by use of non-prescription opioids (*e.g.*, heroin, fentanyl) caused by the shipments.   I limit my discussion to five groups of harms:  mortality, morbidity, neonatal abstinence syndrome, crime, and child maltreatment.  In Section IV of this Report, I monetize these harms to the Bellwether communities.  In this monetization, I also include damages incurred by the Cuyahoga and Summit County governments as calculated in my Report on damages.

---

[10] Corrected Second Amended Complaint (Summit County), ECF No. 514, ¶ 1002.  Similarly, see Cuyahoga County, Second Amended Complaint, ¶1026.

CONFIDENTIAL

12.     Attached to this Report are a series of appendices which detail my analysis and are

identified throughout this Report.  In addition, throughout the Report, I reference and rely

upon the work of other experts who are submitting testimony contemporaneously with this

Report.[11]

#### D.  Summary of Opinions

13.     First, I am of the opinion that there is a framework within the area of applied

microeconomics by which economists can determine the existence of, and measure the extent

of, what is known under the law as a "public nuisance."  Within economics there is a long

tradition of analyzing the social consequences of private behaviors imposing harms on others.

This economic framework provides a natural parallel with the legal notion of public nuisance.

And such economic analyses are commonly used by decision makers to design policies to

contend with private behavior imposing harms.

14.     Second, I am of the opinion to a reasonable degree of certainty in the area of applied

microeconomics that a public nuisance has resulted from the shipment of prescription opioid

products into the Bellwether communities, and that this public nuisance has had a widespread,

devastating, and long-lasting impact on both the individual residents of the Bellwether

communities and on the Bellwether Plaintiffs themselves.  This opinion is entirely consistent

---

[11] Expert Report of Professor David Cutler (hereafter Cutler Report); Expert Report of Dr. David Egilman; Expert Report of Professor Jonathan Gruber (hereafter Gruber Report); Expert Report of Dr. David Kessler (hereafter Kessler Report);  Expert Report of Thomas McGuire regarding Damages (hereafter McGuire Damages Report); Expert Report of Dr. Matthew Perri (hereafter Perri Report); Expert Report of Professor Meredith Rosenthal (hereafter Rosenthal Report); Expert Report of Dr. Schumacher; and Expert Report of Dr. Nancy Young (hereafter Young Report).

CONFIDENTIAL

with similar analyses sponsored by numerous public and private agencies throughout the

United States (albeit typically applicable to broader geographic communities).

15.      Third, I am of the opinion, again to a reasonable degree of certainty in the area of

applied microeconomics, that the estimated magnitude of the net economic burden imposed

on the Bellwether communities over the period 2006-2016 is approximately $20 billion. The

major components of this harm, as measured in economic terms, are shown in Table 1.  These

dollar values of harms are net of any benefits provided by prescription opioid shipments.

**Table 1**
**Summary of Monetary Value of Harms Due to Prescription Opioid Shipments**
**2006-2016**
**($millions)**

| Harms Due to Defendants' Shipments | Cuyahoga | Summit | Total |
|---|---|---|---|
| Excess deaths | $11,279 | $5,377 | $16,656 |
| Excess morbidity | $1,376 | $587 | $1,963 |
| Excess neonatal abstinence syndrome | $9 | $7 | $16 |
| Excess crimes | $327 | $126 | $453 |
| Excess child maltreatment | $401 | $297 | $698 |
| Excess costs to Bellwether governments | $172 | $99 | $271 |
| *Totals* | *$13,564* | *$6,492* | *$20,056* |

Sources:  Tables  5a, 5b, 7a, 7b, 8a, 8b, 9a, 9b, 10a, 10b and 11 of this Report.

CONFIDENTIAL

## II. The Economic Analysis of Public Nuisances

### A. Public Nuisance and Negative Externalities

16.     I rely on the long tradition within economics of analyzing the social consequences of private behaviors imposing costs on others.  A public nuisance, in economic terms, is generally observed when an action (or set of actions) undertaken by a party (or group of parties) gives rise to overwhelming "negative externalities."  An externality "occurs whenever the actions of one party make another party worse or better off, yet the first party neither bears the costs nor receives the benefits of doing so."[12]

17.     A negative externality imposes costs on others.  An example of a negative externality is pollution of a river.[13]  If a household or firm deposits waste in the river, other members of the community are harmed (*e.g.*, bear health risks, enjoy less recreational use of the river) but they are not compensated for the costs imposed on them.  In economics, harms, such as health risks or loss of recreational opportunities, are regarded as a "cost" imposed on others and can sometimes be valued in dollar terms.

18.     The legal concept of a public nuisance parallels the concept of a negative externality in economics.  An externality is created when a private actor harms others and does not compensate others for those effects.  If the negative externality satisfies the other components of the definition mentioned earlier, it qualifies as a public nuisance.  "Nuisance may also be

---

[12] J. Gruber, *Public Finance and Public Policy*, 5th edition, 2016. p. 124.

[13] An externality can be positive as well, that is, confer benefits on others.  A neighborhood association might maintain a local park that is open to the public, benefiting those outside the immediate neighborhood as well as residents of the neighborhood.

CONFIDENTIAL

viewed as a form of externality that interferes with the enjoyment or use of another's

property."[14]  The economic framework of an externality provides a natural parallel with the

legal notion of a public nuisance.[15]

19.     In a related approach, scholarship in law and economics has sometimes referred to a

public nuisance as a "public bad": "The common law of public nuisance has evolved for dealing

with public bads.  When an agent imposes a cost, similar in amount and kind, on a group of

individuals, then the harmed group can call upon a public defender to bring a public nuisance

action against the agent."[16]  "Public bads are . . . said to emerge when a large number of parties

are affected negatively and simultaneously, at the margin, by an action undertaken by an

individual or group. The nature of the phenomenon is such that there is no low-cost way to

insulate and partition the affected individuals in the group from the negative effect.  What one

group member receives, all receive."[17]  Public bads are a form of negative externality, and I will

---

[14] T. Swanson and A. Kontoleon, "Nuisance (Section 2100)," in B. Bouckaert and G. de Geest (eds.), *Encyclopedia of Law and Economics*, 2000, pp. 380-402.  See also, R. Cooter and T.S. Ulen (2016), *Law and Economics*, *6*th *Edition*, Berkeley Law Books, 2, p. 183.

[15] I have been instructed by counsel that unlike a private nuisance, a public nuisance does not necessarily involve interference with the use and enjoyment of land because a common law nuisance is the doing of or the failure to do something that injuriously affects the safety, health or morals of the public, or works some substantial annoyance, inconvenience or injury to the public. See Restatement (Second) of Torts (1977) § 821B (at common law, a public nuisance is defined as an unreasonable interference with rights held by the public in general, not merely with the rights or interests of a few individuals).  I also understand that a public nuisance suit may be brought either by the state through its attorney general or through another public official or public agency representing the state or one of its political subdivisions through a statutory public nuisance claim, and that Cuyahoga and Summit counties both have such claims against Defendants here.

[16] K. Boudreaux and B. Yandle, "Public Bads and Public Nuisance-Common Law Remedies for Environmental Decline," *Fordham Environmental Law Review*, 14(1) Article 2, 2002, pp. 55-88.

[17] *Ibid.*, p. 59-60.

---

CONFIDENTIAL

use the more general term "negative externality" to characterize a public nuisance in economic terms.[18]

### B.  Prescription Opioids are Not a Typical Consumer Good

20.     Patients do not choose prescription drugs for themselves.  Generally, physicians decide the drug, dosage, and duration to prescribe to patients.  Since the dawn of modern health economics associated with the classic article from Nobel Prize-winner Kenneth Arrow, economic analysis  has recognized the special role of the physician in formulating patient demand for health care.[19]  The role of the physician remains a central and widely studied issue in health economics.[20]  While generally regarded as making medical decisions on the basis of patient health outcomes, physicians are recognized, however, to be "imperfect agents" for

---

[18] The relationship between public bad and negative externality is the same as between public good and positive externality.  A public good involves positive externalities, but all externalities are not public goods.  Pure public goods must be consumed in equal quantity by all and are completely non-rivalrous, *i.e.*, the consumption by one person does not affect the consumption by others. The classic papers are: P.A. Samuelson, "The Pure Theory of Public Expenditure," *Review of Economics and Statistics,* 36, 1954, pp. 386-389, and P.A. Samuelson, "Diagrammatic Exposition of a Theory of Public Expenditure," *Review of Economics and Statistics,* 37,1955, pp. 350-356.  Not all externalities possess these two characteristics in pure form so I use the more general term, "externality."

[19] K. Arrow, "Uncertainty and the Welfare Economics of Medical Care," *American Economic Review*, 53(5), December 1963, pp. 941-73.

[20] For example, see T.G. McGuire, "Physician Agency," *in* A.J.Culyer and J.P. Newhouse (eds), *Handbook of Health Economics*, 2000, chapter 9; G. Mooney and M. Ryan, "Agency in Health Care: Getting Beyond First Principles," *Journal of Health Economics*, 12(2), July 1993, pp. 125-135; S. Vick and A. Scott, "Agency in Health Care:  Examining Patients' Preferences for Attributes of the Doctor-Patient Relationship," *Journal of Health Economics*, 17(5), October 1998, pp. 587-605; and K.R. Brekke, R. Nuscheler, and O.R. Straume, "Gatekeeping in Health Care," *Journal of Health Economics*, 26(1), 2007, pp. 149-170.

CONFIDENTIAL

patients, partly for reasons related to information[21] and partly for reasons related to

incentives.[22]

21.      In practice, to decide about prescription drugs, physicians are influenced by "detailing"

visits by representatives of brand drug companies and other promotional activities by drug

companies.[23]  Brand-name drug companies spend mightily on these visits,[24] and undertake

---

[21] To take just one aspect of this, physicians must make decisions about drug treatment based on symptom reports and clinical tests, both of which can be unreliable.  Physicians make decisions based on population-wide prevalence of disorders, decisions that may not be best for the particular patient.  See A. Balsa, T. McGuire and L. Meredith, "Testing for Statistical Discrimination in Health Care," *Health Services Research*, 40(1), 2005, pp. 227-252.

[22] For a general discussion, see J. Newhouse, *Pricing the Priceless: A Health Care Conundrum*, Cambridge, MA: MIT Press, 2002.  One special form "incentives" in the pharmaceutical area are financial rewards manufacturers confer on physicians who liberally prescribe their product.  For example, Hadland *et al.* find that there was greater opioid prescribing under Medicare Part D by physicians who received non-research-based payments related to opioid products (S.E. Hadland, *et al.*, "Association of Pharmaceutical Industry Marketing of Opioid Products to Physicians with Subsequent Opioid Prescribing," published online at jamainternmed.2018.1999, May 14, 2018).  For another example, the New York State Health Foundation found that "Physicians who received payments from opioid manufacturers prescribed more opioids to Medicare patients than physicians who did not receive any opioid-related payments."  They also found that "a higher number of opioid prescriptions was associated with more opioid-related payments to physicians" (New York State Health Foundation, "Follow the Money: Pharmaceutical Manufacturer Payments and Opioid Prescribing Patterns in New York State," June 2018).

[23] For example, see P. Manchanda and P. Chintagunta, "Responsiveness of Physician Prescription Behavior to Salesforce Effort:  An Individual Level Analysis," *Marketing Letters*, 15(2-3), 2004, pp. 129-145; F. Gönül, *et al.*, "Promotion of Prescription Drugs and Its Impact on Physicians' Choice Behavior," *Journal of Marketing*, 65(3), July 2001, pp. 79-90; A. Wazana, "Physicians and the Pharmaceutical Industry: Is a Gift Ever Just a Gift?" *Journal of the American Medical Association*, 283(3), January 19, 2000, pp. 373-80; A. Fugh-Berman, "The Corporate Coauthor," *Journal of General Internal Medicine*, 20(6), June 2005, pp. 546-48; Editorial Staff, "Pharmaceutical Marketing to Physicians: Free Gifts Carry a High Price," *American Medical News*, June 10, 2002; P. Azoulay, "Do Pharmaceutical Sales Respond to Scientific Evidence?" *Journal of Economic & Management Strategy*, 11(4), Winter 2002, pp. 551-594; J. Avorn, M. Chen, and R. Hartley, "Scientific Versus Commercial Sources of Influence on the Prescribing Behavior of Physicians," *American Journal of Medicine*, 73(1), July 1982, pp. 4-8; C. DeJong, *et al.*, "Pharmaceutical Industry-Sponsored Meals and Physician Prescribing Patterns for Medicare Beneficiaries," *JAMA Internal Medicine,* 2016, 176(8), pp. 1114-22; I. Larkin, *et al.*, "Association Between Academic Medical Center Pharmaceutical Detailing Policies and Physician Prescribing," *JAMA*, 2017, 317(17), pp. 1785-95; A. Datta and D. Dave, "Effects of Physician-Directed Pharmaceutical Promotion on Prescription Behaviors: Longitudinal Evidence," *Health Economics*, 26, 2017, pp. 450-68; and G. Spurling, *et al.*, "Information from Pharmaceutical Companies and the Quality, Quantity, and Cost of Physicians' Prescribing: A Systematic Review," *PLOS Medicine*, 7(10), October 2010.

[24] For example, see Congressional Budget Office (CBO), "Promotional Spending for Prescription Drugs," December 2, 2009; Families USA, "Off the Charts: Pay, Profits and Spending by Drug Companies," Families USA Publication No. 01-104, July 2001, pp. 1-31 at 1; and M. Hurwitz and R. Caves, "Persuasion or Information? Promotion and the

---

CONFIDENTIAL

huge numbers of detailing visits.[25] Drug company promotional efforts can go too far, and have been put in check by national reporting requirements and ethical guidelines imposed by private organizations that limit payments and even contacts with pharmaceutical representatives.[26] In the context of prescription opioids, manufacturers were purveying biased information. As explained in the expert report of Dr. Matthew Perri, the information doctors were being given about the dangers of prescription opioids was in most cases false, and systematically and intentionally misleading.[27] Dr. Perri's report establishes, among other things, that (i) manufacturers of prescription opioids are sophisticated marketers who are skilled in applying marketing strategies and tactics to successfully target and reach their desired customers, (ii) these Defendants target multiple audiences, including patients, prescribers, insurers, formulary decision makers, wholesalers, and pharmacies, (iii) this marketing of prescription opioids expanded demand for these drugs, with increases in the volume of doses sold and the numbers of patients treated with opioids, (iv) the addictive properties of opioids make marketing of such products especially problematic because of the likelihood that market demand may be driven by tolerance, dependence, abuse or addiction, and (v) in the context of addictive substances,

---

Shares of Brand Name and Generic Pharmaceuticals," *Journal of Law and Economics*, 31(2), October 1988, pp. 299-320 at 302.

[25] From 1993 to May 2018, opioid drug manufacturers made over 10 million detailing visits (see Rosenthal Report, Attachment C).

[26] See National Conference of State Legislatures, "Marketing and Advertising of Pharmaceuticals," November 5, 2018, available at http://www.ncsl.org/research/health/marketing-and-advertising-of-pharmaceuticals.aspx. Also see Centers for Medicare & Medicaid Services (CMS), Open Payments page, available at https://www.cms.gov/openpayments/ ("Open Payments is a national disclosure program … making the financial relationships between applicable manufacturers and group purchasing organizations (GPOs) and health care providers (physicians and teaching hospitals) available to the public.").

[27] Perri Report, Section III.C.

CONFIDENTIAL

as these prescriptions of opioids are, expansion of demand is not an appropriate use of marketing.[28]

22.     As a result, the ultimate "consumers" of prescription opioids (patients) were not properly informed about the risk of harms associated with prescription opioids because their doctors were systematically misled by manufacturers.  Without full knowledge of harms, a consumer cannot take them into account, nor can the consumer weigh the harms and costs relative to any purported benefits.  Consumers could not accurately anticipate prescription opioids' addictive properties because their agents, *i.e.*, physicians, were misled by Defendants.

### C.  Benefits from Shipments and Positive Externalities

23.     A product (like prescription opioids) even while harming users through inappropriate use and harming others by imposing negative externalities, might at the same time confer positive benefits on particular individuals when used in accordance with scientifically acceptable clinical criteria, and furthermore might, in those circumstances, generate positive externalities to others.

24.     A comprehensive evaluation of a public nuisance from an economic perspective considers both the positive and negative effects of the potential public nuisance.  The empirical framework I apply in this Report recognizes and quantifies not only costs in economic terms, but also the ostensible benefits to both to the user, and to the wider economy, from the use of prescription opioids based on scientifically acceptable clinical criteria.  Consideration of both benefits and costs allows for a net accounting in which benefits can be weighed against costs.

---

[28] Perri Report, Section III.

CONFIDENTIAL

### D. Widespread Negative Externalities to Public Health are Often Addressed by Public Policy

25.    The economic characteristics of widespread negative externalities (or public bads) generally mean that to contend with the negative externality, public action is needed.  No single individual has the incentives or is in a position to respond forcefully and efficiently to a problem affecting large shares of the population.  Collective action, led by government, is needed to effectively address the crisis.  In economic terms, collective action is generally necessary when the social harm takes the form of a large-scale negative externality.[29]

26.    There are many examples, within public health, of collective action, led by government, to contend with widespread negative externalities.  Outside of the context of the opioid crisis, this includes taxation of goods such as cigarettes and alcohol, bans on use of alcohol and other goods by vulnerable age groups, and bans on consumption in certain locations (*e.g.*, smoking in restaurants or consumption of alcohol in public).

27.    I note that not all activities that might lead to a significant imbalance, in economic terms, between overwhelming costs versus benefits are treated under the law as a public nuisance requiring sweeping government intervention to abate its existence.  For example, while I have not conducted the analysis, one might surmise that an economic weighing of the benefits versus costs of the prevalence of alcohol use yields an overwhelming net cost to society; yet for myriad reasons, society condones the prevalence of alcohol and, subject to its regulation and appropriate use, selling, buying and consuming alcohol are legal activities.

---

[29] M. Olson, The Logic of Collective Action: Public Goods and the Theory of Groups, Harvard University Press, 1965.

CONFIDENTIAL

28.     For this Report, I have been advised by counsel that the Bellwether Plaintiffs intend to prove that the public nuisance regarding the shipment of prescription opioids arose in substantial part from *the unlawful conduct* by the Defendants.  As a result, I understand from counsel that the public nuisance described here does not fall within some area of condoned societal harm.  Indeed, even in areas where society tolerates some significant harm from an activity, if the prevalence of that activity is expanded through illegal means, it might give rise to a public nuisance.

29.     The opioid crisis itself yields numerous examples of governmental actions required by its existence.  I review a few of these examples here from federal activity, but also note that collective action has been led by government at the state and local level as well.[30]  My examples do not constitute a comprehensive list of government policy responses.

30.     The executive branch of the federal government has taken action, under both the current and the previous administration, to address the opioid crisis.  In March 2015, the now former Secretary of HHS (U.S. Department of Health and Human Services), Sylvia Burwell,

---

[30] According to the National Center for State Courts (NCSC), "State legislatures have been active in developing and enacting a broad range of statutory responses to the opioid crisis," (https://www.ncsc.org/Topics/Court-Management/Leadership-and-Change-Management/Opioids-and-the-Courts.aspx).  For example, according to the Centers for Disease Control and Prevention (CDC), "In 2011 and 2012 respectively, Ohio and Kentucky mandated clinicians to review prescription drug monitoring program (PDMP) data and implemented pain clinic regulation. In these states, MME [morphine milligram equivalent] per capita decreased in 85% and 62% of counties, respectively, from 2010 to 2015," available at CDC, Opioid Overdose (available at https://www.cdc.gov/drugoverdose/ policy/successes.html).  For another example, in Ohio, Summit County and the City of Akron have implemented community outreach programs directed as suspected opioid addicts (see G. Mace, "Cuyahoga Falls police, fire join with drug counselors to visit homes of addicts to offer help," *Akron Beacon Journal*, January 14, 2017; P. Schleis, "Stow is the Latest Community to Form Quick Response Team to Get Help to Opiate Addicts," *Akron Beacon Journal*, February 15, 2017 and D. Livingston, "Akron adopts quick response team to curb future drug overdoses," *Akron Beacon Journal*, February 28, 2017).  In Cuyahoga County the Drug Court Program was started in 2009 to divert convicted drug addicts from jail to treatment (see Cuyahoga County Opiate Task Force Report, 2014, available at http://opiatecollaborative. cuyahogacounty.us/pdf_OpiateCollaborative/en-US/CC_OpiateTaskForceReport.pdf).

CONFIDENTIAL

launched the HHS Opioid Initiative.[31]  The initiative focused on "three priority areas:"

improving opioid prescribing practices, expanding the use of naloxone to prevent opioid

overdoses, and expanding access to medication-assisted treatment (MAT) to treat opioid use

disorders.[32]  As part of the Opioid Initiative, the Centers for Disease Control and Prevention

(CDC) expanded its new Prescription Drug Overdose Prevention for States program.  This

program's primary goal was to provide funding to states to enhance their Prescription Drug

Monitoring Programs (PDMPs), statewide electronic databases for tracking prescriptions of

opioids and other controlled substances.[33]

31.     In support of improving prescription practices, the CDC published new opioid

prescribing guidelines for primary care clinicians in 2016.[34]  In support of expanding the use of

naloxone, the initiative promoted states' use of block grants from the Substance Abuse and

Mental Health Services Administration (SAMHSA) for purchasing naloxone.[35]  In support of

expanding access to MAT, the Health Resources and Services Administration granted nearly

$100 million to Community Health Centers to expand substance use disorder treatment

---

[31] U.S. Department of Health and Human Services (HHS), "HHS takes strong steps to address opioid-drug related overdose, death and dependence, March 26, 2015," available at http://wayback.archive-it.org/3926/20170128023910/https://www.hhs.gov/about/news/2015/03/26/hhs-takes-strong-steps-to-address-opioid-drug-related-overdose-death-and-dependence.html.

[32] HHS; Office of the Assistant Secretary for Planning and Evaluation (ASPE), "Opioid Abuse in the U.S. and HHS Actions to Address Opioid-Drug Related Overdoses and Deaths," March 26, 2015, available at https://aspe.hhs.gov/system/files/pdf/107956/ib_OpioidInitiative.pdf.

[33] CDC, Prescription Drug Overdose: Prevention for States, CDC-RFA-CE15-1501, May 27, 2015, available at https://www.grants.gov/view-opportunity.html?oppId=274995 and CDC, Prevention for States, October 23, 2017, available at https://www.cdc.gov/drugoverdose/states/state_prevention.html.  See also HHS, March 26, 2015, *op. cit.*

[34] D. Dowell, T.M. Haegerich and R. Chou, "CDC Guideline for Prescribing Opioids for Chronic Pain – United States," *JAMA,* 2016, 315(15), pp.1624-1645.

[35] HHS, March 26, 2015, *op. cit.*

---

CONFIDENTIAL

services, including MAT, and SAMHSA awarded grant funding to states to expand MAT services.[36]

32.     HHS also took action under the Trump administration to combat the opioid epidemic, introducing its Five-Point Opioid Strategy in April 2017.[37]  The primary goals of this strategy included: 1) improving access to prevention, treatment, and recovery services; 2) improving public health data reporting; 3) improving treatment practices for pain management; 4) better targeting naloxone and other overdose reversing drugs availability; and 5) new research on pain and addiction.  As part of this strategy, the National Institutes of Health (NIH) launched the Helping to End Addiction Long-Term (HEAL) Initiative in 2018 to speed development of non-addictive pain treatments and improve prevention and treatment for opioid addiction.[38]

33.     In October 2017, Eric Hargan, the Acting Secretary of HHS, declared a public health emergency in response to the opioid crisis.[39]  The public health emergency, more limited than a national state of emergency, grants the federal government some additional flexibility in

---

[36] Office of the Press Secretary, The White House, "Fact Sheet: Obama Administration Announces Additional Actions to Address the Prescription Opioid Abuse and Heroin Epidemic," March 29, 2016, available at https://obamawhitehouse.archives.gov/the-press-office/2016/03/29/fact-sheet-obama-administration-announces-additional-actions-address.  Also see HHS, 2015, *op. cit.*

[37] HHS, "Acting Secretary Declares Public Health Emergency to Address National Opioid Crisis," October 26, 2017, available at https://www.hhs.gov/about/news/2017/10/26/hhs-acting-secretary-declares-public-health-emergency-address-national-opioid-crisis.html and HHS, "5-Point Strategy to Combat the Opioid Crisis," August 7, 2018, available at https://www.hhs.gov/opioids/about-the-epidemic/hhs-response/index.html.

[38] National Institutes of Health (NIH), "NIH HEAL Initiative: Enhance Pain Management," December 28,2018, available at https://www.nih.gov/research-training/medical-research-initiatives/heal-initiative/enhance-pain-management.

[39] HHS, October 26, 2017, *op. cit.* Also see J. Johnson and J. Wagner, "Trump declares the opioid crisis a public health emergency," *The Washington Post*, October 26, 2017, available at https://www.washingtonpost.com/news/post-politics/wp/2017/10/26/trump-plans-to-declare-the-opioid-crisis-a-public-health-emergency/?utm_term=.9097d816a96b.

CONFIDENTIAL

responding to the crisis, including waiving some regulations and allowing states to use federal grant funds to combat opioid abuse.

34.    The legislative branch of the federal government has also initiated action in response to the opioid crisis.  In addition to including $1 billion in funding to combat the opioid epidemic as part of the 21st Century Cures Act in 2016,[40] Congress has passed two pieces of legislation:  the Comprehensive Addiction and Recovery Act of 2016 and the Substance Use Disorder Prevention that Promotes Opioid Recovery and Treatment (SUPPORT) for Patients and Communities Act of 2018.[41]

35.    The Comprehensive Addiction and Recovery Act, signed into law by President Obama in 2016, addressed the opioid epidemic in several ways.  Among a host of other measures, it created grant programs to improve naloxone availability; expanded access to evidence-based treatment, including MAT; and reauthorized grant programs for states to implement and expand prescription drug monitoring.[42]

36.    The SUPPORT for Patients and Communities Act passed in 2018 with broad bipartisan support. Some key provisions of the legislation included promoting more rapid development of

---

[40] See SAMHSA, "HHS, SAMHSA to maintain funding formula for $1B opioid grant program," October 30, 2017, available at https://www.samhsa.gov/newsroom/press-announcements/201710300530.

[41] C. Reilly, "President Obama Signs Bipartisan Bill to Combat Opioid Epidemic," *Pew Charitable Trusts,* July 22, 2016, available at https://www.pewtrusts.org/en/research-and-analysis/articles/2016/07/22/president-obama-signs-bipartisan-bill-to-combat-opioid-epidemic.  Also see M. Vazquez, "Trump signs opioids law at White House event," *CNN*, October 24, 2018, available at https://www.cnn.com/2018/10/24/politics/donald-trump-opioid-crisis-one-year-later-event/index.html; C.Thompson, "Trump Signs Legislation to Combat Opioid Crisis", *ASHP*, October 25, 2018, available at https://www.ashp.org/news/2018/10/24/trump-signs-legislation-to-combat-opioid-crisis.

[42] C. Reilly, *op. cit.*  Also see G. Lopez, "Congress just passed a big bill to fight the opioid epidemic. But there's a catch," *Vox*, July 14, 2016, available at https://www.vox.com/2016/7/6/12101476/obama-congress-opioids-heroin.

CONFIDENTIAL

non-addictive drugs for pain management, improving PDMPs, and improving coordination across federal agencies to prevent illicit substances like fentanyl from entering the United States.[43]  The legislation also had broad implications for Medicaid; in particular, it amended the "long-standing prohibition against the use of federal Medicaid funds for services in Institutions for Mental Diseases (IMDs) for nonelderly adults," allowing Medicaid programs to cover these services for up to 30 days per year for individuals with substance use disorder until September 2023.[44]

37.     In addition, as referenced in the expert report of Professor Jonathan Gruber, as early as 2007, law enforcement officials brought actions claiming that manufacturers misrepresented the addictive properties of opioids and that distributors failed to meet their obligations to monitor and report suspicious patterns of shipments.[45]  These actions led to substantial settlements, including payments made by (i) Purdue related to criminal and civil charges for misbranding OxyContin with the intent to defraud and mislead the public about its addictive qualities[46] (which also led to three executives at Purdue pleading guilty to misbranding[47]); (ii)

---

[43] M. Vazquez, *op. cit.*  Also see, U.S. Senate Committee on Health, Education, Labor and Pensions, "Chairman Alexander: This Congress, HELP Committee Produced 18 Laws Including 'Landmark' Opioid Legislation to Combat Nation's Most Pressing Public Health Crisis." December 20, 2018, available at https://www.help.senate.gov/chair/newsroom/press/chairman-alexander-this-congress-help-committee-produced-18-laws-including-landmark-opioid-legislation-to-combat-nations-most-pressing-public-health-crisis-.

[44] M. Musumeci and J. Tolbert, "Federal Legislation to Address the Opioid Crisis: Medicaid Provisions in the SUPPORT Act," Kaiser Family Foundation; October 5, 2018, available at https://www.kff.org/medicaid/issue-brief/federal-legislation-to-address-the-opioid-crisis-medicaid-provisions-in-the-support-act/.

[45] Gruber Report, ¶ 44.

[46] B. Meier, "In Guilty Plea, OxyContin Maker to Pay $600 Million," *The New York Times*, May 10, 2007.

[47] H. Won Tesoriero, "OxyContin Maker Pleads Guilty – Purdue Frederick to Pay $634.5 Million Settlement for Hiding Addiction Risk," *The Wall Street Journal*, May 11, 2007.

CONFIDENTIAL

McKesson related to allegations that it violated federal reporting provisions for its handling of certain prescription medications regulated by the Drug Enforcement Administration (DEA), and for failing to report excessive sales of their products to pharmacies filling illegal online prescriptions[48]; and (iii) Cardinal Health related to its failures to report suspicious sales and orders of controlled substances to the DEA.[49]  More recently, Mallinckrodt also paid a substantial settlement to the Department of Justice for, among other things, its failure to report suspicious sales and orders of controlled substances to the DEA.[50]

## III.  Shipments of Prescriptions Constituted a Public Nuisance to the Bellwether Communities

### A.  Introduction

38.  To address this portion of my assignment, I consider elements of the definition of a public nuisance contained above (¶¶ 7-8), and establish three conclusions:

1. Shipments significantly interfered with public health, safety, peace and comfort of members of the Bellwether communities with continuing and long-lasting effects;
2. The interference from shipments was unreasonable; and
3. Defendants were or should have been aware of the interference.

---

[48] Department of Justice (DOJ), Press Release, "McKesson Corporation Agrees to Pay More than $13 Million to Settle Claims that it Failed to Report Suspicious Sales of Prescription Medications," May 2, 2008, available at https://www.justice.gov/archive/opa/pr/2008/May/08-opa-374.html.

[49] The United States Attorney's Office, Colorado, "Cardinal Health Inc., Agrees to Pay $34 Million to Settle Claims That it Failed to Report Suspicious Sales of Widely-Abused Controlled Substances," October 2, 2008, available at https://www.justice.gov/archive/usao/co/news/2008/October08/10_2_08.html.

[50] DOJ, Press Release, "Mallinckrodt Agrees to Pay Record $35 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs and for Recordkeeping Violations,: July 11, 2017, available at https://www.justice.gov/opa/pr/mallinckrodt-agrees-pay-record-35-million-settlement-failure-report-suspicious-orders

CONFIDENTIAL

39.      Before proceeding, it will be useful to briefly identify the Defendants' drugs at issue in this matter.  The drugs in the case are Schedule 2 opioids, excluding injectables and all buprenorphine drugs except Butrans, [51] manufactured and distributed by the Defendants.  The Defendants account for the vast majority of these Schedule 2 drugs as illustrated in Figure 1 below.[52]  I understand from counsel that a showing that the majority of these drugs are at issue in this litigation is important because it is evidence relevant to the fact-finder's determination that the Defendants' conduct was a substantial contributing factor in creating the nuisance.  As a reminder, the harms I attribute to shipments of prescription opioids includes harms due to the subsequent use of other opioids (*e.g.*, heroin, fentanyl) caused by the shipments.

---

[51] Butrans is a Schedule 3 drug.

[52] Figure 1 is reproduced from Rosenthal Report, Attachment C.  These data are based on IQVIA National Prescription Audit (NPA) retail sales of extended units (*e.g.*, number of pills) of Schedule 2 drugs (plus Butrans) by manufacturers by month.  The MME for a pill of each drug is computed based on an MME conversion factor obtained from the CDC times the milligram strength of the pill.  I understand that Information on the Defendant status for each manufacturer was provided by counsel.

CONFIDENTIAL

**Figure 1**



**B.  Shipments Interfered with Public Health, Safety, Peace and Comfort of Members of the Bellwether Communities with Continuing and Long-Lasting Effects**

40.      The most obvious and consequential negative impact of opioid shipments is death.  As discussed by Professor Gruber, more than 47,000 Americans died from an opioid overdose in 2017, a death toll greater than deaths due to guns or to H.I.V. at the peak of its epidemic.[53]  The opioid crisis has hit the Bellwether counties particularly hard.  Professor Gruber notes that between 2010 and 2016, the opioid mortality rate in Cuyahoga County increased by 280 percent and in Summit County increased by 362 percent, compared to the overall U.S. large

---

[53] Gruber Report ¶ 7.

CONFIDENTIAL

county opioid mortality rate of 88 percent.[54]  Both Summit and Cuyahoga counties were among
the top 7 percent of U.S. counties in terms of opioid mortality rates in 2016.[55]

41.     Figure 2 (Figure I.10 from the Gruber Report) shows the rates of shipments of
prescription opioids (measured in MMEs per capita per day) in the Bellwether counties.  The
magnitude and shape of the curves for the Bellwethers showing rates over 2006-2016 are
similar to the national trends, all peaking in 2010/11.  Figure 3 (Figure I.11 from the Gruber
Report) graphs opioid mortality rates for the Bellwether counties and the national average for
large counties.[56]  Up until the turning point of 2010/11 in the rate of shipments, the death rates
nationally for large counties and in the Bellwethers were similar and growing only slowly.  After
2010, however, death rates escalated dramatically in both Cuyahoga and Summit counties,
vastly outpacing national increases for large counties.

---

[54] Gruber Report, ¶ 65.

[55] Gruber Report, ¶ 65.

[56] The Gruber Report indicates at ¶ 36 that large counties are those with a population greater than 100,000.  He
notes at his footnote 48 that "The simple correlation between the national opioid-related mortality rate and the
total rate in the large county sample is 0.996."

CONFIDENTIAL

**Figure 2**



Source: ARCOS and Census Data

CONFIDENTIAL

**Figure 3**
**Opioid Mortality Rates: Bellwether Counties v. U.S. Large Counties**
**[Source: Gruber Report, Figure I.11]**



Note: Due to confidentiality restrictions, for any years in which the number of deaths is fewer than 10, rates are adjusted to assume 10 deaths. These years are indicated with a dashed line.
Source: NCHS Mortality Data

42.     Death is not the only negative impact.  Professor Cutler empirically assesses the impact

of shipments of prescription opioids on three forms of harms: on the rates of mortality, on the

rates of crime, and on the number of children needing foster care placement in the Bellwether

communities.  In this Report, I broaden the scope of harms to children by quantifying child

maltreatment (only some of which results in foster care).  I also add tallies of the rates of

morbidity and of neonatal abstinence syndrome (NAS).  I then use the magnitude of these five

harms (mortality, morbidity, crime, child maltreatment and NAS) to establish the existence of

CONFIDENTIAL

significant long-term negative effects of shipments on the public health, safety and peace of members of the Bellwether communities.[57]  Later, in Section IV of this Report, I value these harms in dollars.[58]  These five are not the only forms of harm associated with shipments; these five are, however, sufficient in my view to establish the existence of widespread and ongoing interference to public health and welfare from the Defendants' opioid shipments.  In the remainder of this section, I discuss my methods for quantifying the five harms on which I focus in this Report.

### *Mortality*

43.     Professor Cutler applied two empirical approaches to estimate the opioid-related mortality attributable to opioid shipments.  His Approach 1 uses the results of a "direct" regression model that estimates the relationship between changes in opioid-related mortality and shipments of prescription opioids between 1995-2010, while controlling for other key variables likely to explain the growth in mortality over that time period.  He uses this regression model to estimate the share of mortality attributable to shipments for all opioids through 2010 and the share of mortality attributable to prescription opioids only for 2011-2016.  This is combined with an "indirect" regression model that estimates the illicit opioid mortality that is

---

[57] Professor Cutler estimated the share of studied harms due to Defendants' misconduct by multiplying Professor Rosenthal's estimated share of shipments due to misconduct by his own estimate of the share of harms due to shipments.  In this Report, I assess the external costs associated with prescription shipments without regard as to whether they were due to Defendants' misconduct.  I thus use the share of harms due to shipments without multiplying by Professor Rosenthal's estimate of the share of shipments due to misconduct.

[58] Professor Cutler was concerned with the impact of prescription opioid shipments on Bellwether governments, so therefore did not address some harmful effects of these shipments, such as mortality costs not falling on Bellwether governments, the cost of crime to victims, lost productivity, and other categories of harm that will be considered here.

---

CONFIDENTIAL

attributable to shipments from 2011 through 2016.  This second regression model estimates the relationship between illicit opioid mortality and the economic and demographic characteristics of counties over the 2008-2010 period, yielding an estimate of illicit opioid mortality rates for 2011-2016 that would have been expected to prevail in the absence of the reformulation of OxyContin and the reduction in opioid shipments.  Combining these two regression models gives Professor Cutler the full effect of shipments on mortality due to licit and illicit opioids over the full time period, 1995 through 2016.[59]

44.     His Approach 2 calculates the share of opioid mortality due to shipments based on an indirect regression model that estimates the relationship between opioid mortality and the economic and demographic characteristics of counties similar to Cuyahoga and Summit over the 1993 to 1995 period.  This analysis is based on the period before the launch of OxyContin and the subsequent acceleration in the growth of prescription opioid shipments, and thus yields estimates of opioid mortality rates that would have been expected to prevail in the absence of these events.  Professor Cutler uses this method to calculate a second estimate of the percent of opioid mortality that is attributable to shipments for 2006 through 2016.[60]

45.     Professor Cutler's Approach 1 and Approach 2 lead to broadly similar quantitative estimates of the effect of shipments on mortality.  In the text of this Report, I focus on Professor Cutler's results from his Approach 1 which yields more conservative calculations as inputs for my analysis.  This choice is not meant as a comment on the appropriateness of

---

[59] For more details on Professor Cutler's Approach 1, see Cutler Report, Section VI.A.

[60] For more details on Professor Cutler's Approach 2 see Cutler Report, Section VI.B.  Also see Cutler Report, Appendix III.I, Tables I.4 and I.5 for Professor Cutler's estimates of harms attributable to all shipments.

CONFIDENTIAL

Approach 1 over Approach 2 but is simply done for ease of discussion in the text of this Report. Although the dollar amounts attributable to my conclusions of the public nuisance calculations undertaken here change depending on which of the approaches I use, my other conclusions do not change based on the approach chosen.  For completeness, I repeat my analysis presented in the body of this Report, in Appendix I, using Approach 2.

46.      I apply Professor Cutler's estimates of the share of opioid-related mortality due to shipments to the death rate in each county in each year to determine the absolute numbers of deaths each year attributable to shipments in Cuyahoga and Summit counties.[61]  Over the entire 11-year period from 2006-2016, 2,158 deaths in the Bellwether counties can be attributed to opioid shipments.[62]  I emphasize that these are not just opioid-related deaths; these are, based on Professor Cutler's findings, opioid-related deaths *attributable to Defendants' shipments* of prescription opioids.

47.      These shipment-related deaths can be put in perspective by comparing them to the number of deaths from firearms in each year in each county.[63]  In broad terms, the number of

---

[61] Mortality data are based on the Multiple Cause of Death (MCOD) files published by the National Center for Health Statistics (NCHS), part of the Centers for Disease Control and Prevention (CDC).  See https://www.cdc.gov/nchs/index.htm. These data are generated from death certificates and report mortality by cause of death and by county of residence.  A single death may have multiple causes.  Opioid overdose deaths have an underlying cause of death code related to drug poisoning and one or more additional codes related to opioids.  Because some overdose fatalities fail to identify the underlying drug associated with the death, these numbers are conservative.  Note that in the Cutler Report, these numbers are adjusted by following the procedures outlined in Ruhm (2018) to allocate these unidentified drug overdoses as either opioid-related or non-opioid related (See C.J. Ruhm, "Corrected US Opioid-Involved Drug Poisoning Deaths and Mortality Rates, 1999–2015," *Addiction*, 113, 2018, pp. 1339-1344).

[62] See Tables 5a and 5b in Section IV of this Report for a summary by year of deaths due to prescription opioid shipments.  See Appendix C for a discussion of the data sources and calculation methods.

[63] Firearm-related deaths are downloaded from CDC's Wonder data tool and are based on the same underlying MCOD data as opioid mortality. Cause of death codes to identify firearm-related deaths are based on Xu *et al.* (2018) (J. Xu, *et al.*, "Deaths: Final Data for 2016," *National Vital Statistics Reports*, 67(5), July 26, 2018).

---

CONFIDENTIAL

people killed by opioid shipments over this period was roughly the same as those killed by guns.[64]  By 2016, however, shipments were killing over twice as many people as guns in Cuyahoga County and more than three times as many people as guns in Summit County.[65]

*Morbidity*

48.    In addition to the public harms from deaths due to opioid shipments, harms result from opioid-related morbidity.  Morbidity simply means to have a disease or be in ill health.  Opioid use disorder (OUD) is a substance use disorder that is diagnosed by health care providers using specific assessment criteria from the Diagnostic and Statistical Manual of Mental Health Disorders.[66]  Individuals with OUD are at a high risk of death.  OUD is a chronic disease, meaning once ill with OUD, a person may remain ill for years.[67]  According to the CDC, there were 2.1 million Americans with OUD as of 2016.[68]  The disorder is defined as a "problematic pattern of opioid use leading to clinically significant impairment or distress,"[69] and is diagnosed

---

[64] There were 1,772 deaths due to firearms in Cuyahoga County from 2006 through 2016 and 2,114 deaths due to opioid shipments.  In Summit County, there were 604 deaths due to firearms and 804 deaths due to opioid shipments.  See Centers for Disease Control and Prevention (CDC), Wonder data for data on deaths by firearms by County (available at https://wonder.cdc.gov/controller/datarequest/D77).

[65] *Ibid.*, In 2016 there were 235 firearm deaths in Cuyahoga County and 68 in Summit County compared to 504 deaths due to opioid shipments in Cuyahoga County and 269 in Summit County.

[66] Substance-Related and Addictive Disorders in: American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders,* 5th edition, DSM Library. Arlington, VA, 2013.

[67] National Institute on Drug Abuse, Addiction is a Chronic Disease, available at https://archives.drugabuse.gov/publications/drug-abuse-addiction-one-americas-most-challenging-public-health-problems/addiction-chronic-disease.

[68] CDC, Module 5:  Assessing and Addressing Opioid Use Disorder (OUD), available at https://www.cdc.gov/drugoverdose/training/oud/accessible/index.html.

[69] Substance-Related and Addictive Disorders, *op. cit.*

CONFIDENTIAL

by evaluating patients for at least two of 11 clinical symptoms within a 12-month period.[70]

"OUD exists on a continuum of severity … based upon the number of criteria that have been met."[71]

49.  Determining the morbidity in the Bellwether counties due to shipments of prescription opioids proceeds in two steps.  I first estimate the overall prevalence of OUD in the Bellwether counties for 2006 through 2016, and second, I estimate the share of this morbidity attributable to shipments.  The product of these two yields the number of OUD cases in each county for each year attributable to shipments.

50.  For the first of these two steps, I begin with data from the National Survey on Drug Use and Health (NSDUH).  I summarize how these data are used and adjusted, and provide a detailed description of data and methods to estimate morbidity rates in Appendix D.  Based on the adjusted prevalence rates, I estimate number of persons in each year with OUD based on each of the Bellwether county populations. Tables 7a and 7b in Section IV below report the prevalence of disease in each year.

*51.*  In the second step needed to estimate disease prevalence due to shipments, I rely on Professor Cutler's finding about the share of opioid-related *mortality* attributable to shipments

---

[70] Examples of these symptoms include taking opioids in larger amounts or over a longer time period than was intended, being unsuccessful in efforts to reduce or control opioid use and having cravings or strong urges to use opioids.  For all twelve symptoms, see CDC, Module 5: Assessing and Addressing Opioid Use Disorder (OUD), available at https://www.cdc.gov/drugoverdose/training/oud/accessible/index.html.

[71] *Ibid*..  The previous edition of the Diagnostic and Statistical Manual from 1994 did not include opioid use disorder as a diagnosis; rather, it contained two separate diagnoses, opioid dependence and opioid abuse. *Diagnostic and Statistical Manual of Mental Disorders,* 4th ed. Washington, DC: American Psychiatric Association; 1994.  These were combined into a single disorder in 2013.  D.S. Hasin, *et al.*, DSM-5 criteria for substance use disorders: recommendations and rationale, *American Journal of Psychiatry,* 2013, 170(8), pp. 834-851.

CONFIDENTIAL

and assume that the same share applies to *morbidity*.[72]  These shares are shown in Tables 7a

and 7b (and are the same as the shares I use in the mortality analysis).  Multiplying the number

of persons with OUD in each year by the share attributable to shipments provides the absolute

number of people in each county with disease attributable to shipments in each year.  As

identified in Tables 7a and 7b below in Section IV, over the 11-year period from 2006-2016,

there were approximately 109 thousand person-years of opioid-related morbidity due to

shipments in Cuyahoga County and approximately 46 thousand person-years of opioid-related

morbidity due to shipments in Summit County.

### *Babies born with neonatal abstinence syndrome*

52.     Neonatal abstinence syndrome (NAS), also termed neonatal withdrawal,[73] is a

constellation of conditions associated with *in utero* exposure to opioids.[74]  It can occur due to

any regular antenatal opioid use, including both illicit and prescribed.[75]  The syndrome is a

rapidly growing public health problem, with the incidence of NAS increasing nearly fivefold

between 2000-2012, corresponding with a rise in opioid use and abuse.[76]  Babies born with NAS

---

[72] Professor Cutler states in his report that "opioid-related mortality is used as a proxy for opioid-related harms" (¶ 27).  He explains why mortality is a good proxy for harms in his ¶48.

[73] K. McQueen and J. Murphy-Oikonen, "Neonatal abstinence syndrome," *New England Journal of Medicine,* 2016, 375(25), pp. 2468-2479.

[74] H. Uebel, *et al.*, "Reasons for Rehospitalization in Children who had Neonatal Abstinence Syndrome," *Pediatrics, 2015,* 136(4), e811-e820.

[75] S. Wong, *et al.*, "Substance use in pregnancy," *Journal of Obstetrics and Gynaecology Canada*, 2011, 33(4), pp. 367-384.

[76] S.W. Patrick, *et al.*, "Neonatal abstinence syndrome and associated health care expenditures: United States, 2000-2009," *JAMA,* 2012, 307(18), pp. 1934-1940; S.W. Patrick, *et al.*, "Increasing incidence and geographic distribution of neonatal abstinence syndrome: United States 2009 to 2012," *Journal of Perinatology*, August 2015, 35(8), pp. 650-655.

CONFIDENTIAL

may exhibit a host of symptoms, including respiratory distress; central nervous-system symptoms, like tremors and seizure; and gastrointestinal problems, such as poor feeding and vomiting.[77]  The onset of symptoms typically occurs within the first few days following birth, but timing may vary due to a variety of factors, including the half-life of the specific opiate used.[78] In this section, I describe the methodology for estimating the number of NAS cases in the Bellwether counties attributable to opioid shipments.

53.     According to the Ohio Department of Health, virtually all cases of NAS are due to opioids.[79]  I use publicly available on the number of NAS cases by county of residence within Ohio over the period from 2006-2016 (see Appendix E for details).  Tables 8a and 8b in Section IV below report the number of NAS cases for each year between 2006-2016.  I then multiply these estimates by Professor Cutler's estimates of the share of harm attributable to shipments to arrive at a number of opioid-related NAS cases *attributable to the shipments*.  As reported in Tables 8a and 8b, between 2006-2016, I estimate that there were 609 cases of opioid-related NAS attributable to shipments in Cuyahoga County, and 430 cases attributable to shipments in

---

[77] Wong et al., op. cit.

[78] Wong et al., op. cit.

[79] See Ohio Department of Health, "Neonatal Abstinence Syndrome (NAS) Hospital Reporting in Ohio, July 2, 2018, available at https://odh.ohio.gov/wps/portal/gov/odh/know-our-programs/violence-injury-prevention-program/resources/nas_hospital_reporting_in_ohio.  Also see "2017 Ohio Neonatal Abstinence Syndrome County Report," available at https://odh.ohio.gov/wps/wcm/connect/gov/4cad708c-ba99-4b8b-b425-01cfef119c5d/2017+NAS+County+Table+12.3.2018.pdf?MOD=AJPERES&CONVERT_TO=url&CACHEID=ROOTWORKSPACE.Z18_M1HGGIK0N0JO00QO9DDDDM3000-4cad708c-ba99-4b8b-b425-01cfef119c5d-muueFzr.

CONFIDENTIAL

Summit County.

*Crime*

54.     The opioid crisis could increase the number of crimes committed in the Bellwether communities in several ways.  For example, the sale of illegal opioids (*e.g.*, heroin) for any use or prescription opioids (*e.g.*, OxyContin) for illicit use is a crime.  Additionally, people misusing opioids may commit crimes, such as property theft, to obtain money to buy opioids or their drug use may lead to other crimes, such as assault.

55.     Appendix F contains the details on how I estimate the number of crimes due to opioid shipments and the economic costs of those crimes.  In sum, I start with a count of the total number of crimes in different categories, (*e.g.*, motor vehicle theft, prostitution, vandalism) committed within the Bellwether communities.  Counts of incidents within each Bellwether community come from the National Incident-Based Reporting System (NIBRS) maintained by the FBI.  NIBRS data are a standard source used to measure criminal offenses by criminal category for all law enforcement agencies (LEAs) that report into NIBRS.  Not all LEAs report their data to the NIBRS.[80]  I then apply methods from Professor Cutler's report to determine the share of these crimes attributable to shipments.  As described in his Section IV.A and summarized in my Appendix F, Professor Cutler uses data from a number of sources to make this attribution.

---

[80] The Bureau of Justice Statistics reported that, "In 2012 NIBRS-contributing agencies served approximately 30 percent of the U.S. population and accounted for 28 percent of all crime reported to the UCR [Uniform Crime Reporting] Program."  See Bureau of Justice Statistics, Data Collection: National Incident-Based Reporting System (NIBRS), available at https://www.bjs.gov/index.cfm?ty=dcdetail&iid=301.

CONFIDENTIAL

56.     Tables 9a and 9b in Section IV below summarize results for the two counties, showing

the impact in terms of incidents of crime on each community for each year, 2006 – 2016.  Over

the time period from 2006-2016, there were over almost 44 thousand crimes in Cuyahoga

County and almost 21 thousand in Summit County due to shipments.  These numbers are

conservative given the reporting limitations in the NIBRS identified above.

### *Child maltreatment*

57.     Substance abuse, including opioid abuse, is a major cause of child maltreatment.[81]

According to the U.S. Department of Health and Human Services (2019), nearly 700,000

children are subject to maltreatment (includes abuse and neglect) each year in the U.S., with

the majority of cases involving neglect (74.9%).[82]  In Ohio in 2017, 24,897 cases of

maltreatment were substantiated or indicated; of these, more than half involved a caregiver

with a substance use risk factor.[83]

58.     I rely on Dr. Young for the number of unique children subject to maltreatment in the

Bellwether counties.[84]  I use data from the Cutler Report to estimate the share of maltreated

---

[81] See U.S. Department of Health & Human Services, Administration for Children and Families, Administration on Children, Youth and Families, Children's Bureau, "Child Maltreatment 2017,"; 2019, available at https://www.acf.hhs.gov/sites/default/files/cb/cm2017.pdf; O. Mowbray, *et al.*, "Longitudinal Trends in Substance Use and Mental Health Service Needs in Child Welfare," *Children and Youth Services Review,* 73, 2017, pp. 1-8..

[82] *Ibid.*, p. ii; J.J. Doyle and A. Aizer, "Economics of Child Protection:  Maltreatment, Foster Care, and Intimate Partner Violence," *Annual Review of Economics*, 2018, 10, pp. 87-108.

[83] Broken down by type of maltreatment (categories not mutually exclusive): neglect: 11,212; medical neglect: 493; physical abuse: 11,892; psychological maltreatment: 914; sexual abuse: 4,339.  See U.S. Dep. Health Hum. Serv. 2019.  This is likely to be an underestimate, since it relies on reports to Child Protective Services agencies. Victimization surveys and other sources report higher rates of maltreatment.  See F. Wulczyn, "Epidemiological Perspectives on Maltreatment Prevention," *The Future of Children*, Fall 2009, 19(2), pp. 39-66; and Doyle & Aizer *op. cit.*

[84] See Young Report, Graphics 12 and 13.

CONFIDENTIAL

children due to opioids.  I then apply Professor Cutler's estimate of the share of opioid-related

harms due to shipments to obtain estimates of the number of children maltreated due to

shipments.  These results are reported in Tables 10a and 10b in Section IV for Cuyahoga and

Summit Counties, respectively.  Over the period 2006-2016, shipments of prescription opioids

caused 1,391 cases of maltreatment in Cuyahoga County and 1,031 cases of maltreatment in

Summit County.  Appendix G contains details of the calculations.

### *Summary*

59.     Harms *caused by shipments of prescription opioids* to the Bellwether communities over

2006 - 2016 quantified in this section are summarized in Table 2.[85]

**Table 2**
**Summary of Harms Due to Opioid Shipments**
**2006-2016**

| Harm | Cuyahoga | Summit |
|---|---|---|
| Excess deaths | 1,535 | 623 |
| Excess morbidity | 108,515 | 46,183 |
| Excess neonatal abstinence syndrome | 609 | 430 |
| Excess crimes | 43,957 | 20,779 |
| Excess child maltreatment | 1,391 | 1,031 |

Sources:  Tables  5a, 5b, 7a, 7b, 8a, 8b, 9a, 9b, 10a and 10b of this Report.

---

[85] Note that this is not an exhaustive list of harms.

60.     I conclude that shipments of prescription opioids significantly interfered with public

health, safety, peace and comfort of the members of the Bellwether communities with

continuing and long-lasting effects.

### C.  The Interference from Shipments was Unreasonable

61.     I consider the question of whether the shipments of prescription opioids were

reasonable or unreasonable from two perspectives.  The first perspective considers whether

the shipments were reasonable from the standpoint of being used for clinically justified

treatment.  The second perspective considers whether the shipments were reasonable from

the standpoint of economic costs and benefits.

### *Share of shipments for scientifically acceptable treatment*

62.     I have been instructed by counsel to assume that the Court will conclude that, under

applicable public nuisance law and in the context of a prescription medication, the meaning of

"unreasonable" is, in substance, "not justified by clinical need."  In other words, a "reasonable"

shipment of opioids would be to treat a patient in accordance with scientifically acceptable

medical criteria.  Shipments not for such a purpose are not reasonable.

63.     Using epidemiological data and medical opinions about scientifically acceptable uses,

treatments and dosages for opioids, Professor Rosenthal has calculated a theoretical maximum

for quantities of prescription opioids (measured in MMEs) for three patient groups needing

treatment for pain.[86]  She cites professional academic articles as well as relying upon Dr.

Schumacher and Dr. Parran in her selection of end-of-life cancer patients, trauma patients and

---

[86] Rosenthal Report, Section X.

CONFIDENTIAL

surgery patients as those patient groups appropriately treated by opioids.  Professor Rosenthal

also relies on some of the same sources to identify the average dosage level and treatment

durations that are appropriate for these patient groups.

64.     I have been advised by counsel that Dr. Schumacher will testify that at most, opioids are

properly indicated for the short-term treatment of severe acute pain (e.g., trauma or post-

surgical pain); end-of-life pain/hospice care; and cancer pain from active malignant disease.

Chronic opioid therapy is not recommended for most common chronic pain conditions,

including low back pain, centralized pain such as fibromyalgia, and headache pain.  In less

common chronic pain conditions (such as pain from advanced multiple sclerosis, sickle cell

disease, pain following spinal cord injury and paraplegia, or post-herpetic neuralgia), which

comprise a small percentage of chronic pain patients, opioids may be considered a third-line

therapy (taken if other therapies are ineffective or contraindicated) for moderate and severe

pain.  However, in other neurologic conditions such as polyneuropathy, no functional status

markers were improved by long-term use of opioids, adverse outcomes were more common

among patients with polyneuropathy receiving long-term opioids, including depression opioid

dependence and opioid overdose.  In addition to diagnosis, clinicians should consider risk, and

some patients may not be suitable candidates on the basis of that risk.  Given the narrow

categories that may indicate opioids for chronic use, opioids' position as third-line therapy, and

the significant risks associated with its use, long-term opioid therapy for persons with chronic

pain conditions is, at most, indicated in fewer than 5% of patients with chronic pain and likely

significantly fewer.  For all proper indications other than terminal cancer, palliative care and

CONFIDENTIAL

hospice care, if prescribed, opioids should be prescribed with the lowest effective dose of immediate-release opioids taken only when needed.

65.     These clinical positions are consistent with criteria employed by Professor Rosenthal in addressing scientifically acceptable use of prescription oral opioids.[87]  See also the Report of Dr. Parran.

66.     Professor Rosenthal produces national estimates for the theoretical maximum, scientifically acceptable use over the period 1993 to the present and finds the maximum justifiable share to be no more than 10% in every year from 2006-2016 of the actual observed MMEs of opioid prescriptions.[88]  In addition to her national analysis, Professor Rosenthal conducts a similar analysis for the Bellwether communities.[89]  The number of cancer deaths in the Bellwether communities are estimated from state-wide mortality rates available from US Cancer Statistics, Centers for Disease Control (CDC).  State-wide incident rates are multiplied by county population to estimate Bellwether cancer mortality by year.  The number of inpatient and outpatient surgeries are obtained from the American Hospital Resource File (AHRF).  The number of Bellwether trauma cases are estimated based on Health Care Utilization Project (HCUP) data from the Agency on Healthcare Research and Quality (AHRQ) by multiplying the national-wide emergency room visits by Bellwether population.  The theoretical maximum clinically justified usage for each of the patient groups is found by multiplying the number of cases by the appropriate average daily MME and treatment duration.

---

[87] Rosenthal Report, ¶ 92-94.

[88]  See Rosenthal Report, Table 6, last column.

[89]  The details supporting the following calculations are provided in Rosenthal Report, ¶ 100 and Table 7.

CONFIDENTIAL

67.      The estimates of total appropriate use of opioids for the Bellwether communities for

2006-2016 are contained in Table 7 of the Rosenthal Report.  The Table also shows the total

actual shipments into the Bellwether communities.  As shown in Rosenthal Table 7 the share of

opioid shipments which were clinically justified ranges from ███████████ of actual shipments

in Cuyahoga from 2006 through 2016 and from ███████████ in Summit.

68.      As Professor Rosenthal explains, because every patient in these appropriate treatment

groups would not have been treated with opioids, the shares of potentially appropriate

shipments are overestimates of the shares of shipments that were actually directed to

appropriate treatment.[90]

69.      The low share of shipments being appropriate is confirmed by an analysis conducted by

Professor Gruber, where he found that demographic factors like age, that are correlated with

disease prevalence, explain little of the cross-sectional variation in shipments.[91]  He observes

"The extreme variation in per capita shipments across areas suggest that prescription activity,

which drives shipments to an area, bears little relationship to medical need."[92]

70.      Using the criterion that a reasonable shipment is one for an appropriate medical need

and an unreasonable shipment was one for some other purpose, results in Rosenthal Table 7

indicate that the vast majority – at least ████ in Cuyahoga and at least ████ in Summit – of

---

[90] Rosenthal Report, ¶ 94-101.

[91] Gruber Report, Section IV A.

[92] Gruber Report, ¶ 74.

CONFIDENTIAL

shipments to the Bellwether communities over this period were not jutified by clinical need and were therefore unreasonable.[93]

### Benefits and costs

71.     When used according to scientific criteria, prescription opioids reduce pain for some users and may increase the user's ability to work.  As I show here, however, the magnitude of these beneficial effects is dwarfed by the harmful effects.  Thus, I also find that shipments of prescription opioids are also unreasonable from the standpoint of benefits and costs.

72.     In this analysis I ignore costs of production, distribution, marketing, product development and any other cost of production of shipments.  The costs I assess here are only the harmful effects on users of prescription opioids.  Including consideration of conventional costs of production by manufacturers and distributors would increase the extent to which costs exceed benefits of shipments.

73.     _Workforce participation and productivity._  Pain interferes with an individual's ability to work,[94] and appropriate treatment of pain enables some to work who would have otherwise been prevented from working due to pain.[95]  A study of the effects of Cox-2 inhibitors (non-

---

[93] Professor Rosenthal conducts sensitivity analyses to allow for the possibility that some other patients would also be appropriately treated with opioids.  She discusses this in her ¶101 and concludes that potential modifications of the clinical groups are captured in her sensitivity analyses.

[94] D.J. Gaskin and P. Richard, "The Economic Cost of Pain in the United States," _The Journal of Pain_, 13(8), 2012, pp. 715-724.

[95] Participation in the labor force benefits the individual and the wider society.  The individual benefits to the degree that added income adds to their consumption opportunities.  Others benefit to the degree that the added income of the worker increases public tax revenue or offsets costs others would have paid to support consumption of the individual had they been out of the labor force.  For example, if someone out of the labor force is paid unemployment or disability benefits, avoiding these transfer payments benefits the public.  Support for an individual out of the labor force may come from other family members, and this support is not needed if an

---

CONFIDENTIAL

opioid pain medications) finds that treatment increases workplace attendance.[96]  Likewise, prescription opioids, when used appropriately for treatment of pain, may increase labor force participation and employment for pain-afflicted individuals.  According to one study, the introduction of state Prescription Drug Monitoring Programs (PDMPs), intended to address prescription drug diversion and abuse, led to decreases in opioid prescriptions and increases in absence rates for short-term disabled and injured workers.[97]

74.      Prescription opioids, when used inappropriately, however, can lead to death, morbidity, crime, incarceration, and child maltreatment, all of which decrease labor force participation of the user and/or of others in the immediate and longer term.  A paper from the Workers Compensation Research Institute studied the effect of opioid prescriptions on workers out on temporary disability with low-back pain.  Long-term treatment with opioids increased the length of time workers missed work.[98]

75.      Some recent papers in the economics literature study the effect of opioid prescriptions on a geographic basis (rather than for populations who might benefit from appropriate treatment), and thus capture empirically both the short-term positive effects (from appropriate

---

individual is working and supporting themselves.  In other words, how much of the benefits of labor force participation flow directly to the worker or are external to others depends on the individual circumstances.

[96] Cox-2 inhibitors are not generally used for recreational purposes.  See C. Garthwaite, "The economic benefits of pharmaceutical innovations: The case of cox-2 inhibitors," *American Economic Journal: Applied Economics*, 2012, 4(3), pp. 116–137.  A. Butikofer and M. M. Skira, "Missing Work is a Pain: The Effect of Cox-2 Inhibitors on Sickness Absence and Disability Pension Receipt," *Journal of Human Resources*, 2018, 53(1), pp. 71-122.

[97] A.E. Kilby, "Opioids for the masses: Welfare tradeoffs in the regulation of narcotic pain medications," 2015, Working Paper, Northeastern University.  Decreases in prescriptions may have moved users to dangerous illicit drugs, explaining the increase in absentee rates.

[98] B. Savych, D. Neumark and R. Lea, (2018), "The Impact of Opioid Prescriptions on the Duration of Temporary Disability," Workers Compensation Research Institute, Cambridge, MA, March.

CONFIDENTIAL

pain treatment) and some negative effects (from inappropriate treatment) of opioid prescriptions on work.  As one of pair of authors put it, "Because it is impossible to distinguish between legitimate and illegitimate uses of prescription opioids, we interpret these [geographic-level] results as a net effect of both types of use."[99]  These authors found that the net effect at the state level was negative.[100]  One paper using county data on prescription rates and employment by age and gender finds that a higher rate of prescriptions has a small positive effect on employment for women, but no effect on men.[101]  Another paper found that areas with higher opioid prescription rates have lower rates of labor force participation overall.[102]  Finally, a very recent paper finds that increasing shipments of prescription opioids decreases the prime-age employment rate for both men and women.[103]

76.     Overall, on the basis of the available evidence I am of the opinion that the short-term effect of shipments on work results in a negative relationship:  more shipments means less

---

[99]  M.C. Harris, L.M. Kessley, M.N. Murray and M. E. Glenn (2019). "Prescription opioids and labor market pains," forthcoming, *Journal of Human Resources*, pages 3-4 in web version.

[100] Harris *et al.* (2019) *op. cit.* study ten states using data from Prescription Drug Monitoring Programs and find that a 10% increase in prescriptions leads to a .56% decrease in labor force participation.

[101] J. Currie, J. Jin and M. Schnell, "U.S. Employment and Opioids, Is there a Connection?" NBER Working Paper 24440, March 2018.

[102] A. Krueger, "Where Have All the Workers Gone? An Inquiry into the Decline of the U.S. Labor Force Participation Rate," Brookings Papers on Economic Activity, 2017.

[103] D. Aliprantis, K. Fee and M.E. Schweitzer (2019), "Opioids and the Labor Market," Federal Reserve Bank of Cleveland, Working Paper no. 18-07.

CONFIDENTIAL

work.  Furthermore, these studies, focusing on the contemporaneous and short-term effect of prescriptions underestimate the negative effects which play out over time.

77.     These short-term effects are not alone.  As Professor Cutler shows and as I agree, the harmful effects of prescriptions today continue for years.  These longer-term harmful effects likely apply to work-related disabilities as well.  And finally, other channels by which opioid shipments have negative effects on productivity over time – deaths after transition to street drugs, crime and incarceration, maltreatment that affects a child's income as an adult -- are not captured in the contemporaneous correlation of shipments and productivity.[104]  Deaths are a clear example of the delayed negative impact of shipments.  As Professor Cutler shows, deaths today are caused by shipments years ago.[105]  I have not undertaken a quantification of the longer-term effects on productivity from shipments (apart from death, criminality, and child maltreatment).  But given the dynamics of opioid use and OUD, measurement of these longer-term effects on productivity from shipments would result in a much greater imbalance where the costs far exceed the benefits to productivity.

78.     The overall purpose of my analysis here is to determine whether overall costs from shipments exceed ostensible benefits.  As a result, if a particular quantification is not needed to make that determination, I can simplify the analysis by making conservative assumptions.

---

[104] Empirical research shows that the effects through these other channels swamp any possible small net positive from appropriate pain treatment (after subtracting short-term negative effects from higher rates of morbidity).  For example, Florence *et al*. (2016) estimate the value of lost productivity from disease ("non-fatal costs") to be $16.3 billion.  These are the negative effects possibly offset by positive effects of pain relief.  The value of lost productivity from deaths ("fatality costs") and incarceration were estimated at $21.4 and $4.2 billion, respectively.  C. Florence, *et al.*, "The Economic Burden of Prescription Opioid Overdose, Abuse and Dependence in the United States, 2013," *Medical Care*, October 2016; 54 (10), pp. 901-906.  This analysis attributes disease rates to prescriptions based on specific questions in the NSDUH.

[105] Cutler Report, ¶ 68 where he notes shipments may have "long-term" effects.

CONFIDENTIAL

Therefore, when counting and valuing the effects of shipments on productivity, I will very conservatively treat the positive and negative short-term effects of shipments approximately cancel out, leaving the long-term negative effects as the net productivity effect of shipments. Specifically, any arguable short-term positive effects on productivity from pain relief are more than offset by losses due to the contemporaneous presence of disease.  When tallying the net effect of shipments on productivity, I will not count lost productivity from morbidity (present in the short term), but I will count lost productivity to effects occurring over a longer term, due to death,[106] criminal careers, and child maltreatment.[107]

79.    _Quality of life._  Shipments of prescription opioids can affect a user's quality of life. Opioids are clinically justified analgesics for some categories of patients.  Reducing pain improves a patient's quality of life.  On the other hand, shipments of prescription opioids put users and others at risk for OUD and its _sequelae_.  These diseases reduce affected individuals' quality of life.

80.    Data on the prevalence of patients who are candidates for treatment with opioids and on the prevalence of OUD (and its relation to shipments) permits a comparison of positive and negative effects of opioid shipments on quality of life.  I use the same sources as Professor Rosenthal to count the number of cancer deaths, surgeries and trauma cases in the Bellwether

---

[106] As I explain below in Section IV.D., lost productivity is included within the "value of a statistical life" used to figure the economic cost of a death.  Therefore, I make no separate accounting here for productivity lost associated with mortality.

[107] In the short-term effects, more work due to pain treatment is likely to come from clinically appropriate use whereas the short-term interference with work due to higher rates of OUD is likely to come from clinically inappropriate use.  Allowing the short-term positive effects to balance out the short-term negative effects does not change the fact that by causing disease, shipments have elevated rates of OUD and interfered with work.

CONFIDENTIAL

communities for 2014, the most recent year for which data are available.[108]  Professor

Rosenthal also reports estimates of the appropriate duration of pain treatment for these

individuals, of 64 days (on average) for people dying of cancer and 7 days on average for cases

of surgery or trauma.[109]  Combining the number of cases with the average duration of

treatment yields a maximum theoretical number of days that shipments of opioids might

alleviate pain.  In both Cuyahoga and Summit counties, the number of days residents of the

counties suffer from the presence of OUD (ignoring for this calculation *sequelae* such as HIV

and Hepatitis C) vastly outweighs the maximum potential days of clinically justified pain relief.

Specifically, for 2014 in Cuyahoga, days living with disease outweigh days with pain relief by a

ratio of 1.8 to 1; in Summit, the ratio is 2.8 to 1.[110]

81.      These ratios significantly underestimate the ratio of harms to benefits.  Regarding the

numerator of the ratio (harms), NSDUH, the source of estimates of the prevalence of OUD,

undercounts the number of individuals suffering from OUD.[111]  Regarding the denominator

---

[108] These are listed above in ¶66.  See Rosenthal Report, Section X. and Table 7.

[109] For average duration of treatment for cancer palliative care, Dr. Rosenthal uses a number below the average number of days patients spend in hospice (see Rosenthal Report, ¶ 96 and footnote 134).  For trauma and post surgery, Dr. Rosenthal uses seven days. (see Rosenthal Report, ¶¶ 98 and 99 and footnotes 137, 138 and 141).

[110] The number of days with OUD for 2014 come from Appendix D Tables D.3a and D.3b (also see Tables 7a and 7b below) reporting estimates of OUD due to shipment based on Professor Cutler's Approach 1 (Approach 2 yields higher estimates).  The number of people with OUD is 13,400 for Cuyahoga and 5,800 for Summit, corresponding to days 365*13,400 and 365*5,800 for the counties, respectively.  The maximum number of days of potential pain relief is found by multiplying the number of cases for each of the three conditions times the average duration of treatment, 64 days for cancer and 7 days for the other two conditions.  For Cuyahoga the number of cases are cancer deaths 2,998, trauma cases 285,338 and surgeries 84,318.  For Summit the number of cases are cancer deaths 1,269, trauma cases 58,246 and surgeries 36,271.  The ratio in the text for Cuyahoga is calculated by evaluating [13,400*365/(2,998*64 + 285,338*7 + 84,318*7)] = 1.8.  A similar operation is conducted for Summit to yield the ratio of 2.8.  See Rosenthal Report for numbers of cases of cancer deaths, trauma and surgeries by county (Rosenthal Report, Attachment D, table titled Epidemiological Data Used for Appropriate Use Analysis).

[111] See Appendix D for more discussion of the NSHUH estimates.

CONFIDENTIAL

(benefits), the theoretical maximum of the number of patients appropriately treated is likely

much higher than those who were actually appropriately treated.  Not all patients who could

benefit from pain treatment receive it.  Of those who would benefit from treatment, opioids

are often not the best choice.  To illustrate the effect of taking into account of these factors on

the ratios presented above, if 20% of patients who may benefit from appropriate treatment do

not receive any treatment, and of those who receive treatment, 50% use opioids, the ratio of

harms to benefits measured in days affected rise to 4.5 to 1 for Cuyahoga and 7.0 to 1 for

Summit.[112]  These more realistic ratios emerge correcting only the denominator for its

overcount of days of benefit, and not the numerator for its undercount of the days of harm.

Correcting the numerator (to account for its underestimation of the prevalence of OUD) would

add harm-days and increase the ratio further.

82.    As previously mentioned, the scientifically acceptable uses of prescription opioids are, at

most, short-term treatment of severe acute pain, end-of-life pain/hospice care, cancer pain

from active malignant disease, and a small percentage of the less common chronic pain

conditions (such as pain from advanced multiple sclerosis, sickle cell disease, pain following

spinal cord injury and paraplegia, or post-herpetic neuralgia) where opioids may be considered

a third-line therapy (taken if other therapies are ineffective or contraindicated) for moderate

and severe pain.  Including these less common chronic pain patients for whom opioids are

considered a third-line treatment would not materially change the magnitude of the ratios of

---

[112] The effect of assumptions that 20% are untreated and 50% of those treated are treated by opioids reduces the number of days with benefits from opioids to 40% of the previous amount (100%-20%)*(50%).  Thus, both ratios go up by a factor of 1/.4 = 2.5.  1.8*2.5 = 4.5 and 2.8*2.5 = 7.0.

CONFIDENTIAL

harms to benefits.  These chronic-pain patients are also subject to risk of addiction.  In such

cases, the harms of opioid treatment may exceed the benefits.

83.    The days-of-harm-to-days-of-benefit ratio could be modified by weighting days

according to the relative importance of the harms from OUD and the potential benefits from

pain relief.  Quality-Adjusted Life Years (QALYs) are one candidate for weighting.  QALYs assign

a utility weight between 0 (death) and 1 (perfect health) to each year of life living in a certain

state of health or illness.[113]  QALYs standardize utility into a single index that can be "added up"

across people.[114]

84.    Nothing is to be gained by a QALY-weighting exercise in this context, however, because

the estimates from the literature on the QALY gain from pain treatment[115] are in overlapping

ranges as the QALYs lost from living with OUD.[116]  Weighting the top and bottom of a ratio by

---

[113] There are several ways to derive utility valuations of each health state. One example is the Time-Trade-Off approach, in which survey respondents are asked to select the number of years in perfect health they would choose over a given number of years in their current health state. See P. Dolan, *et al.* "The Time Trade-off Method: Results from a General Population Study," *Health Economics*, 5(2), 1996, pp. 141-154.

[114] See M.C. Weinstein, G. Torrance, and A. McGuire, "QALYs:  The Basics," *Value in Health,* 12, 2009, pp. S5-S9.

[115] For estimates of the QALY loss from pain, see S. Wetherington *et al.,* (2014), "Pain Quality of Life as Measured by Utilities," *Pain Medicine* (15):865-870, Table 2.  Researchers also use alternative scales for measuring utility of disease states, such as the EQ-5D used by Wetherington et al.  Utility weights can be considered relative to a life lived in usual health, which is not 1.0. See N. Luo, *et al.*, "Self-Reported Health Status of the General Adult U.S. Population as Assessed by the EQ-5D and Health Utilities Index," *Medical Care*, 43(11), 2005, pp. 1076-1086. This study uses the EQ-5D method to assign utility weights.  Utility weights for conditions for which opioid use would be considered appropriate (i.e., conditions other than chronic pain) tend to be higher than utility weights for chronic pain, representing *less* potential for QALY gains from opioid treatment. See J. Diels *et al.,* "Mapping FACT-P to EQ-5D in a large cross-sectional study of metastatic castration-resistant prostate cancer patients," *Qual Lif Res*, 24, 2015, pp. 591-598; M. Lidgren, *et al.*, "Health related quality of life in different states of breast cancer," *Qual Lif Res*, 16, 2007, pp. 1073-1081.

[116] The literature contains a range of estimates for the disease burden associated with OUD.  See, for example, J.W. Bray, *et al.*, "Quality of Life as an Outcome of Opioid Use Disorder Treatment: A Systematic Review," *Journal of Substance Abuse Treatment*, 76, 2017, pp. 88-93; M. Chetty, *et al.*, "A Systematic Review of Health Economic Models of Opioid Agonist Therapies in Maintenance Treatment of Non-Prescription Opioid Dependence," *Addiction Science & Clinical Practice*, 12(6), 2017; H. Cranmer, *et al.*, "Health-Related Quality of Life in Opioid Use Disorder Measured by Utilities: A Systematic Literature Review," *Value in Health*, 19(7), 2016 A387; J. De Maeyer, ,

---

CONFIDENTIAL

similar numbers does not materially change the value of the ratio.  There is also considerable

variation in the estimates for each condition reducing the reliability of any weighting.

85.     Furthermore, analgesics could not be expected to fully restore quality of life for affected

patients – in part because the analgesics are unlikely to fully eliminate pain,[117] in part due to

side effects (such as constipation) from opioid treatment,[118] and in part because these patients

are affected by other symptoms aside from pain – so the actual QALY benefits from treatment

would be lower than studies of the utility loss from pain would suggest.

86.     In sum, I take a similar approach to the quality-of-life impact of opioids as I did with

productivity effects.  As in the case of assessing productivity effects, the purpose of my analysis

is to determine whether overall costs from shipments exceed ostensible benefits.  I can again

simplify the analysis by making conservative assumptions.  In terms of quality-of-life impacts, I

am of the opinion that any quality of life gains from pain relief are more than offset by

increased disease burden association with OUD In the face of ratios of costs to benefits of 4.5 to

1 or 7 to 1, to be conservative, when it comes to tallying the economic impact of opioid

shipments on quality of life, I will assume the ratio is just one-to-one leading the costs to just

---

W. Vanderplasschen and E. Broekaert, "Quality of Life Among Opiate-Dependent Individuals: A Review of the Literature," *International Journal of Drug Policy*, 21(5), 2010, pp. 364-380; and J. P. Feelemyer, *et al.*, "Changes in Quality of Life (WHOQOL-BREF) and Addiction Severity Index (ASI) Among Participants in Opioid Substitution Treatment (OST) in *Low and Middle Income Countries: An International Systematic Review," Drug and Alcohol Dependence*, 134, 2014, pp. 251-258.

[117] A study by Dillie *et al.* (2008) finds very low health-related quality of life of chronic pain patients who are treated with opioids relative to US population norms; see K.S. Dillie *et al.*, "Quality of Life Associated with Daily Opioid Therapy in a Primary Care Chronic Pain Sample," *J Am Board Fam Med*, 21(2), 2008, pp. 108-117. See also M.R. Kosinski, *et al.*, "An observational study of health-related quality of life and pain outcomes in chronic low back pain patients treated with fentanyl transdermal system," *Current Medical Research and Opinion*, 21(6), 2005, pp. 849-862.

[118] F. Hjalte, *et al.*, "Treatment of Severe Pain and Opioid-induced Constipation: An Observational Study of Quality of Life, Resource Use, and Costs in Sweden," *Pain Ther*, 5, 2016, pp. 227-236.

CONFIDENTIAL

balance out the benefits.  This is conservative because the evidence implies that the costs more than outweigh the benefits.

87.     I implement this conservative assumption in my valuing of the net costs of opioid shipments in Section IV by not counting cost associated with quality-of-life reductions due to OUD and its *sequelae*.  Not counting this cost certainly offsets any benefits of opioid shipments on pain relief and quality of life.

88.     Summary of reasonableness/unreasonableness of shipments.  From two perspectives, shipments of prescription opioids are unreasonable.  First, nationally, less than 10% of shipments over the period 2006-2016 could have been devoted to clinically appropriate use.

89.     Second, from the economic standpoint of costs and benefits, shipments were also unreasonable.  Positive productivity and quality-of-life effects of scientifically acceptable pain treatment are vastly outweighed by the negative effects on productivity and quality of life.  The net social contribution of shipments of prescription opioids is negative and large.

### D.  Defendants Were or Should Have Been Aware of the Interference

90.     As explained in the expert reports of Dr. Perri referenced above, as well as the expert reports of Dr. David Kessler and Dr. David Egilman, the Manufacturing Defendants knew or should have known that they were making misleading statements about the safety and efficacy of the prescription opioids they manufactured.  For instance, marketing by the Defendants was consistent in conveying the message that the risk of addiction in patients taking opioids for pain was minimal; that tolerance, dependence, and addiction were not serious concerns; and that opioids were the safest and most effective treatment for chronic/long-term pain.  These reports

CONFIDENTIAL

further establish that there was no basis, however, for Defendants to make these misleading statements.

91.     In addition, based on my own examination of publicly available documents and discovery produced in this litigation, Defendants had clear knowledge that the shipments had negative impacts on the public health and safety of communities across the nation, including in the Bellwether communities.

92.     For example, in connection with Purdue's 2007 settlement with the United States Government mentioned above, Purdue entered into an "Agreed Statement of Facts" in which Purdue admitted that from December 12, 1995 to June 30, 2001, "certain Purdue supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications …"[119]  Furthermore, Purdue acknowledged that it "manufactured, marketed, and sold quantities of OxyContin in interstate commerce from various locations …"[120]

93.     Additionally, in connection with Mallinckrodt's 2017 settlement with the Department of Justice mentioned above, Mallinckrodt entered into an "Administrative Memorandum of Agreement" which indicates that "[f]rom January 1, 2008, through September 30, 2011, there was an epidemic increase in diversion of the controlled substance oxycodone" and that "[t]he

---

[119] Agreed Statement of Facts, United States of America v. The Purdue Frederick Company, Inc., United States District Court for the Western District of Virginia, Arlington Division, (available at http://i.bnet.com/blogs/purdue-agreed-facts.pdf), ¶ 20.

[120] Ibid., ¶ 44.

CONFIDENTIAL

United States alleges that Mallinckrodt, a manufacturer and distributor of oxycodone, knew about the diversion and sold excessive amounts of the most highly abused forms of oxycodone, 30 mg and 15 mg tablets, placing them into a stream of commerce that would result in diversion."[121]  Furthermore, the "Acceptance of Responsibility" section of the agreement indicates that "Mallinckrodt agrees that at certain times during the Covered Time Period prior to January 1, 2012, certain aspects of Mallinckrodt's system to monitor and detect suspicious orders did not meet the standards outlined in letters from the DEA …"[122]

94.     As set forth above, both Cardinal and McKesson also entered into settlement agreements with the Department of Justice arising out of their failures to adhere to DEA regulations regarding the effective control over the controlled substances they distributed.[123] In particular, I understand both of these settlements were reached after the government alleged that these distributors' conduct allowed the diversion of millions of prescription opioids from legitimate to non-legitimate channels, thereby placing these entities on notice that they knew or should have known their conduct was causing a substantial interference to the public health and safety of the Bellwether communities.

95.     I understand from counsel that the distributors' knowledge about the diversion, abuse, and misuse potential of the prescription opioids they distributed across the country, including

---

[121] Administrative Memorandum of Agreement between the United States Department of Justice, Drug Enforcement Administration and Mallinckrodt, plc, p. 1, available at https://www.justice.gov/usao-edmi/press-release/file/986026/download.

[122] *Ibid.*, pp. 3-4.

[123] https://www.justice.gov/archive/opa/pr/2008/May/08-opa-374.html; https://www.justice.gov/archive/usao/co/news/2008/October08/10_2_08.html

CONFIDENTIAL

in Ohio and in the Bellwether communities will be further spelled out in other evidence and

expert testimony.

### E. Conclusion

96.     Section III establishes that first, shipments of prescription opioids significantly interfered

with the public health, safety and peace in the Bellwether communities.  Second, shipments

were unreasonable from the standpoint of being primarily directed to use without clinical

justification and from the standpoint of the costs vastly outweighing the benefits.  By my

calculations, explained in detail in Section IV, the net economic cost of prescription opioid

shipments to the two Bellwether counties over the 11-year period 2006-2016 approximately

$20 billion.  Third, Defendants were aware of the addictive and other harmful effects of

prescription opioids.

97.     Defendants' shipments of prescription opioids meet the criteria for a public nuisance

contained in ¶¶ 7-8 above.  I conclude that Defendants' shipment and distribution of

prescription opioids constituted a public nuisance.


## IV. Quantification of the Magnitude of the Economic Costs Imposed on Bellwether Communities by Prescription Opioid Shipments

98.     In this section, I address the third part of my assignment, quantifying, in dollar terms,

the net economic costs imposed on the Bellwether communities by shipments of prescription

opioids.  To put my analysis in context, I begin with a review of some published studies

quantifying some elements of the economic burden of opioids.  Then, after discussion of the

general economic framework for assessing the harms in dollar terms, I conduct a series of

CONFIDENTIAL

analyses to quantify the net economic harm in the Bellwether communities.  Throughout this

Section, valued harms are *due to Defendants' shipments of prescription opioids,* as described in

Section III.B.

### A.  Review of Some Earlier Studies of Economic Burden of the Opioid Crisis

99.      A variety of published studies estimate the cost of the opioid crisis in the United States.

These studies review the economic cost of the opioid epidemic in terms of health care costs,

criminal justice costs, lost productivity, and the cost of premature death.

100.     In 2016, Curtis S. Florence and colleagues from the National Center for Injury Prevention

and Control, Centers for Disease Control and Prevention (CDC) set out "[t]o estimate the

economic burden of prescription opioid overdose, abuse, and dependence from a societal

perspective" across the United States for the year 2013.[124]  To that end, Florence *et al.* (2016)

analyzed three areas of impact: 1) health care costs, 2) criminal justice costs, and 3) lost

productivity costs.  For health care costs, the authors utilized de-identified medical claims data

from Truven Health MarketScan® for commercial, Medicaid and Medicare health plan

enrollees, while also accounting for SUD treatment costs not paid by health insurance (and

therefore not in the MarketScan data), such as public programs like SAMHSA grants and private

funding.  Criminal justice costs included police protection, legal and adjudication, correctional

facilities, and property loss due to crime.  Lost productivity costs included costs from premature

death due to opioid abuse, reduced productive hours due to abuse/dependence, and

incarceration.

---

[124] Florence *et al.*, op. cit.

CONFIDENTIAL

101.    This analysis resulted in an estimated total economic burden of prescription opioid abuse, dependence, and overdose of $78.5 billion nationwide in 2013.  More than one third of that estimated $78.5 billion, the authors concluded, was "due to increased health care and substance abuse treatment costs," with one quarter of the overall nationwide cost borne by public sector health care, substance abuse treatment, and criminal justice costs.[125]

102.    In November 2017, as a part of the Trump Administration's investigation into the impact of the opioid crisis, the Council of Economic Advisers ("CEA") issued a report entitled "The Underestimated Cost of the Opioid Crisis."[126]  The CEA study focused not just on prescription opioid abuse, dependence, and overdose, as previous studies – including the CDC's – had, but also on illicit opioid abuse, including heroin.  However, the study noted that of individuals presenting with an OUD in 2015, just 14% presented with heroin use disorder with no prescription opioid involvement.[127]  The study also quantified "the costs of opioid-related overdose deaths based on economic valuations of fatality risk reduction," known as "value of statistical life" (in line with what I do here and discussed in more below), which is commonly used to measure fatality risk-reduction benefits used by federal agencies.[128]

103.    Taking into account the 33,091 opioid-related deaths, as well as the reported 2.4 million individuals suffering with OUD in 2015, the CEA estimated economic costs of $431.7 billion

---

[125] Florence, *et al.*, *op. cit.*

[126] The Council of Economic Advisers (CEA), Executive Office of the President of the United States, "The Underestimated Cost of the Opioid Crisis," November 2017, available at: https://www.whitehouse.gov/sites/whitehouse.gov/files/images/The%20Underestimated%20Cost%20of%20the%20Opioid%20Crisis.pdf.

[127] *Ibid.*, p. 7.

[128] *Ibid.*, p. 3.

CONFIDENTIAL

resulting from fatalities (more than 85% of total costs), and $72.3 billion for non-fatal disease. In total, the CEA estimated the cost of the opioid crisis at more than half a trillion dollars ($504 billion) for 2015 – more than six times greater than that estimated by Florence *et al.* (2016) for 2013 – signaling the quantitative importance of valuing a death in assessing the cost of opioids.

104.     Results from the Florence *et al.* (2016) and CEA studies are listed in Table 3, along with a summary of other national studies.

CONFIDENTIAL

**Table 3**
**Summary of National Studies of the Societal Costs Attributable to Opioids**

| Study | Year[7] | Opioids[8] | Cost Categories Included | Total Cost (billions) |
|---|---|---|---|---|
| Birnbaum et al. (2006) [1] | 2001 | Prescription | Healthcare (treatment, excess medical costs), Workplace Costs (premature death, reduced wages/employment, incarceration), Criminal Justice (police, legal, corrections) | $8.6 |
| Hansen et al. (2011)[2] | 2006 | Prescription | Healthcare (treatment, medical complications), Productivity Loss (premature death, unemployment/ subemployment, incarceration), Criminal Justice (police, legal, incarceration, costs to crime victims) | $53.4 |
| Birnbaum et al. (2011)[3] | 2009 | Prescription | Healthcare (treatment, excess medical costs, prevention, research), Workplace Costs (premature death, lost wages/employment, incarceration, excess absenteeism, excess disability, presenteeism), Criminal Justice (police, legal, corrections, lost property) | $55.7 |
| Florence et al. (2016)[4] | 2013 | Prescription | Healthcare (treatment, excess medical costs), Lost Productivity (reduced productive time/increased disability, incarceration), Criminal Justice (police, legal, corrections, lost property), Fatal costs (lost productivity, healthcare) | $78.5 |
| The Council of Economic Advisors (2017)[5] | 2015 | Prescription, Illicit | Healthcare (treatment, excess medical costs), Lost Productivity (reduced productive time/increased disability, incarceration), Criminal Justice (police, legal, corrections, lost property), Fatality costs | $504.0 |
| Rhyan (2017)[6] | 2016 | Prescripton, Illicit | Healthcare (overdoses, indirect), Productivity (fatal, nonfatal), Criminal Justice, Child and Family Assistance, Education | $95 3 |

Sources:

[1] Birnbaum, Howard G., et al., "Estimated Costs of Prescription Opioid Analgesic Abuse in the United States in 2001," *Clin J Pain* , Volume 22, Number 8, October 2006.

[2] Hansen, Ryan N, et al., "Economic Costs of Nonmedical Use of Prescription Opioids," Clin J Pain, Volume 27, Number 3, March/April 2011.

[3] Birnbaum, Howard G., et al., "Societal Costs of Prescription Opioid Abuse, Dependence, and Misuse in the United States," Pain Medicine, 2011, 12:657-667.

[4] Florence, Curtis S., et al., "The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependance in the United States, 2013," Medical Care, Volume 54, Number 10, October 2016.

[5] The Council of Economic Advisers, "The Underestimated Cost of the Opioid Crisis," November 2017.

[6] Rhyan, Corwin N., "The Potential Societal Benefit of Eliminating Opioid Overdoses, Deaths, and Substance Use Disorders Exceeds $95 Billion Per Year," Altarum, November 16, 2017.

[7] The year listed reflects the year in which dollar cost estimates are measured, not necessarily the year from which the data originate.

[8] The Birnbaum et al., (2006), Birnbaum et al., (2011) and Florence et al. (2016) articles estimate costs for prescription opioids, however, their estimates of excess healthcare costs cannot distinguish between individuals who abuse prescription and illicit opioids.

105.     Studies of costs of the opioid crisis have been conducted at the state and local level

within Ohio.  In October 2017, the Ohio-based C. William Swank Program in Rural-Urban Policy

CONFIDENTIAL

published "Taking Measure of Ohio's Opioid Crisis."[129]  The Swank Report studied costs in four categories: (1) health care and treatment costs, (2) criminal justice costs, (3) lost productivity among current users, and (4) lost productivity of overdose deaths.  Depending on the assumptions made about the rate of non-fatal opioid addiction and abuse, the authors estimated the costs to Ohio in 2015 to range from $6.6 to $8.8 billion.[130]

106.    A community assessment of the impact of the opioid crisis undertaken in Lorain County, just to the west of Cuyahoga County, concluded that "annual economic burden of the opioid crisis in Lorain County reached nearly $200 million in 2016."[131]  Categories of economic burden studied include lost earnings and productivity and increased costs for health care, criminal justice, children and family services, treatment and prevention.[132]

## B. Economic Framework for Valuing Harms in Dollar Terms

107.    In Section III, I report some of the harms due to shipments of prescription opioids in "natural units" – *i.e.*, number of deaths, cases of disease, babies born with NAS, number of

---

[129] Swank Program in Rural-Urban Policy, "Taking Measure of Ohio's Opioid Crisis," October 2017, available at https://cpb-us-w2.wpmucdn.com/u.osu.edu/dist/2/14548/files/2017/10/SWANK-Taking-Measure-of-Ohios-Opioid-Crisis-1vtx548.pdf.

[130] The lower-bound estimate is derived from the survey response data from the NSDUH, which, as noted earlier, likely underestimates the true rates of disease in Ohio.  The Report factors up the Ohio rate to reflect this likely undercount to get the upper-bound estimate.  See Swank Report, page 1.

[131] "Community Assessment of the Opioid Crisis in Lorain County, Ohio:  Executive Summary," Prepared for The Nord Family Foundation, December 20, 2017, available at https://altarum.org/sites/default/files/uploaded-publication-files/Lorain-County-Community-Assessment_Executive-Summary.pdf.

[132] Brill and Ganz estimated state and county level per-capita costs of the opioid crisis by allocating CEA's national estimates to states and counties using variations local costs, such as wages and health care as well as local variations in opioid-related factors such as mortality and morbidity.  They estimated the total cost per-capita for Ohio to be $3,385, which ranks fourth in the United States.  A. Brill and S.Ganz, "The Geographic Variation in the Cost of the Opioid Crisis," American Enterprise Institute, AEI Economics Working Paper 2018-03, March 2018.

CONFIDENTIAL

crimes, and a count of children needing foster care placement.  Economic analysis often,

however, requires a summing of effects in common units, and economists use dollars to do so.

108.    Valuing effects or inputs in dollar terms is sometimes straightforward.  For example,

labor and other inputs are used to prevent crime.  To find the total cost of such activities to

prevent crime, one could add the public sector spending (*e.g.*, some community policing costs,

some public education costs) to what individuals and groups buy privately (*e.g.*, guards,

equipment).  In an application of the economist's concept of "opportunity costs," these labor

and other inputs are traded on markets, and market prices are available to measure the value

of inputs in dollar terms.[133]

109.    In other circumstances, market prices are not available to value inputs or effects in

dollars.  No market price directly values death, crime victimization, suffering with illness, or the

cost of a maltreated child.  In these circumstances, economists have developed methods to

substitute for market prices.  For example, economists use tradeoffs workers make of wages for

risk of death to infer the value they put on risk of death.[134]  Economists use jury awards for pain

and suffering to put a dollar value on the subjective cost of crime to a victim.[135]

110.    As needed in this section, when markets are absent, I will describe and employ

conventional economic methods to value effects in dollars.  The overarching goal is to "add up"

---

[133] Opportunity cost refers to value in the best alternative use.  Prices set on competitive markets equal opportunity cost.

[134] See, for example, U.S. Department of Health and Human Services. 2016. "Guidelines for Regulatory Impact Analysis," available at https://aspe.hhs.gov/system/files/pdf/242926/HHS_RIAGuidance.pdf.

[135] T.R. Miller, M.A. Cohen and S.B. Rossman. "Victim costs of violent crime and resulting injuries," *Health Affairs*, 1993,12(4), pp. 186-197.  M.A. Cohen, "Pain, Suffering, and Jury Awards: A Study of the Cost of Crime to Victims," *Law & Society Review*, 1988, 22(3), pp. 537-556.

CONFIDENTIAL

in dollar terms the economic cost of the many forms of harmful effects due to by shipments of prescription opioids into the Bellwether communities.

### C.  Overview of Categories of Harms and Methods of Valuation

111.    Table 4 summarizes the categories of harms valued in this section.  I put dollar values on the deaths, cases of OUD, babies born with NAS, crimes,[136] and child maltreatment attributable to shipments.  Bellwether government costs, the final category in the table and a form of harm measured in dollars, were discussed and estimated in my Damages Report.[137]

112.    OUD creates harms in multiple ways, including reducing productivity and reducing quality of life, as well as increasing health care costs.  As explained above, I do not count productivity losses from OUD in Table 4 because I use these costs to more than offset any productivity gains associated with opioid treatment.  I also do not count any quality-of-life losses associated with OUD because I use these costs to more than offset any quality of life gains from pain reduction.  Table 4 is thus a net and conservative accounting of the economic cost of the harms caused by shipments of prescription opioids.

---

[136] Criminal justice and police costs are accounted for in the analysis of Bellwether government costs.  The source of these is the damages analyses above.

[137] See McGuire Damages Report, Section V.

CONFIDENTIAL

**Table 4**
**Categories of Harms Due to Shipments and Method of Valuation**

| Form of Harm | Method Used for Valuation | Primary Sources for Valuation |
|---|---|---|
| Mortality: Deaths | Value of statistical life (VSL) | U.S. Health and Human Services guidance |
| Morbidity: OUD Cases | Elevated health care costs | Review of relevant literature |
| Babies with NAS | Elevated health care costs | Review of relevant literature |
| Crimes | Valuation | Review of relevant literature |
| Child Maltreatment | Elevated costs | Review of relevant literature |
| Bellwether Government Costs | Elevated costs | McGuire Report on Damages |

### D.  Valuation in Dollar Terms:  Mortality

113.    An accounting of the economic cost of a death can be made with the economic concept of the value of a "statistical life," used by researchers and government agencies to assign a dollar value to the economic cost of a death.[138]  I rely on guidance from the Assistant Secretary for Planning and Evaluation (ASPE) of the U.S. Department of Health and Human Services (HHS) and choose $9.3 million as the national value of a statistical life (VSL) in 2014.  Appendix C explains some of the methodology and sources behind this estimate.[139]

---

[138] The Value of a Statistical Life (VSL) is figured as the ratio of the maximum willingness to pay for a given reduction in the probability risk of death within a specified time period.  This yields a monetary amount per statistical life saved.  For example, if I were willing to pay $10,000 to avoid a 1/100 risk of death, the VSL would be measured as $10,000*100 = $10m.  See L. Robinson and J. Hammitt "Valuing Reductions in Fatal Illness Risks: Implications of Recent Research," *Health Economics*, 2016, 25, pp 1039-1052.  The methodology for measuring the VSL is discussed in more detail in Appendix C.

[139] The VSL incorporates lost productivity from death so no separate accounting of lost productivity is necessary when VSL is applied to value the costs of mortality.  "VSL is expected to be larger than expected productivity loss, because it includes the utility gains from living in addition to productivity and market consumption."  Robinson and Hammitt, *op. cit.*, p. 1041.

CONFIDENTIAL

114.     The national value of $9.3 million in 2014 can be adjusted to different years and different geographic areas.  Since the VSL derives from consumer preferences, factors affecting willingness to pay affect the estimate of the VSL for particular local areas in particular years. Appendix C explains how differences in income and price levels are used to estimate VSL for different years for Cuyahoga and Summit counties.

115.     The first rows of Tables 5a and 5b show for each county the number of deaths due to shipments in each year for each county applying the results from Professor Cutler's analysis explained above.  The last two rows of the tables show, for each year and Bellwether, the VSL and the product of the VSL and the number of deaths due to shipments.  This product is the economic harm from deaths.  Over this 11-year time period, this measure of the economic value of lost lives is $16.7 billion for the two counties.  As in the CEA Report discussed above,[140] the value of lives lost comprises the largest component of the economic harm from opioid shipments.

### Table 5a
### Mortality and Valuation of Mortality Due to Opioid Shipments
### Cuyahoga County, 2006-2016

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opioid Overdose Deaths | 104 | 87 | 111 | 92 | 138 | 185 | 191 | 223 | 234 | 245 | 504 | 2,114 |
| Share of Harm Due to Shipments | 49.2% | 50.4% | 51.1% | 52.4% | 54.6% | 57.6% | 66.5% | ■ | ■ | ■ | ■ | |
| Opioid Deaths Due to Shipments | 51 | 44 | 57 | 48 | 75 | 107 | 127 | ■ | ■ | ■ | ■ | 1,535 |
| VSL ($mil) | $5.9 | $6.6 | $6.8 | $6.0 | $6.3 | $6.6 | $6.8 | $7.2 | $7.5 | $7.7 | $8.1 | |
| Valuation ($mil) | $302 | $289 | $387 | $289 | $478 | $702 | $864 | $1,199 | $1,413 | $1,655 | $3,702 | $11,279 |

See Appendix C for sources and calculation notes.

---

[140] CEA, op. cit.

CONFIDENTIAL

**Table 5b**
**Mortality and Valuation of Mortality Due to Opioid Shipments**
**Summit County, 2006-2016**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opioid Overdose Deaths | 25 | 31 | 21 | 23 | 45 | 34 | 60 | 56 | 105 | 135 | 269 | 804 |
| Share of Harm Due to Shipments | 49.2% | 50.4% | 51.1% | 52.4% | 54.6% | 57.6% | 66.5% | ██ | ██ | ██ | ██ | |
| Opioid Deaths Due to Shipments | 12 | 16 | 11 | 12 | 25 | 20 | 40 | ██ | ██ | ██ | ██ | 623 |
| VSL ($mil) | $6.5 | $7.1 | $7.8 | $7.3 | $7.2 | $7.6 | $8.2 | $8.4 | $8.7 | $8.9 | $9.1 | |
| Valuation ($mil) | $80 | $111 | $83 | $88 | $176 | $148 | $326 | $348 | $740 | $1,048 | $2,229 | $5,377 |

See Appendix C for sources and calculation notes.

### E.  Valuation in Dollar Terms:  Morbidity

116.    I conservatively value the net economic effects of shipment-caused morbidity in terms of higher health care costs only.  The opioid epidemic has increased health care utilization. Individuals with OUD consume more health care both to treat their OUD (*e.g.*, addiction services, MAT, etc.) and to treat comorbidities, such as hepatitis C and HIV, which occur in greater frequencies among patients with OUD.[141]  In this section, I estimate the additional health care costs attributable to opioid shipments.

117.    Researchers examining the additional health care costs resulting from OUD have measured the magnitude of excess health care costs due to OUD using a "cost-of-illness" methodology.  The basic approach is to compare the health care costs of individuals with OUD to a comparison group of individuals with similar insurance, sociodemographic and other characteristics.  The goal of the comparison is to estimate the costs for all health care, not just

---

[141] J. S. Morrison and L. Dattilo, "America's Dangerous Syndemic:  Opioid Addiction, HIV, and Hepatitis C," *Center for Strategic & International Studies*, December 2017;  P.J. Peters, *et al.*, "HIV Infection Linked to Injection Use of Oxymorphone in Indiana, 2014-2015," *The New England Journal of Medicine*, July 21, 2016, pp. 229-239;  Nilsen, E., "America's opioid crisis has become and 'epidemic of epidemics,'" *Vox*, March 6, 2018, available at https://www.vox.com/2018/3/6/16453530america-opioid-crisis-epidemic-bacterial-endocarditis-hepatitis-c.

CONFIDENTIAL

OUD treatment, resulting from OUD after controlling for other health factors.  So, for example, suppose there are two 40-year-old men with private insurance.  One man suffers from OUD and the second man does not.  These analyses compare the health care spending over 12 months for these two men, starting at the time of the first OUD diagnosis for the individual with OUD.  The difference in their health care spending is the excess health care cost attributable to OUD.

CONFIDENTIAL

**Table 6**
**Literature Documenting the Elevated Health Care Costs of OUD**

| Study | Year[7] | Patient Population Studied | Additional Annual Cost for OUD Individuals |
|---|---|---|---|
| Birnbaum et al., (2006)[1] | 2001 | Commercial | $9,449 |
| | | Publicly Insured | $12,394 |
| | | Uninsured | $4,566 |
| McAdam-Marx et al., (2010)[2] | 2002-2003 | Medicaid | $5,874 |
| White et al., (2005)[3] | 2003 | Commerical | $14,054 |
| Rice et al., (2014)[4] | 2012 | Commercial | $11,376 |
| Florence et al., (2016)[5] | 2013 | Commerical | $15,500 |
| | | Medicare | $17,052 |
| | | Medicaid | $13,743 |
| Kirson et al., (2017)[6] | 2015 | Commercial | $14,810 |

[1] Birnbuam, Howard G., Alan G. White, Jennifer L. Reynolds, Paul E. Greenberg, Mingliang Zhang, Sue Vallow, Jeff R. Schein, Nathanial P. Katz, "Estimated Costs of Prescription Opioid Analgesic Abuse in the United States in 2001," *Clin J Pain*, Volume 22, Number 8, October 2006.

[2] McAdam-Marx, Carrie, Carl L. Roland, Jody Cleveland, Gary M. Oderda, "Costs of Opioid Abuse and Misuse Determined From a Medicaid Database," *Journal of Pain & Palliative Care Pharmacotherapy*, 24:1, 5-18.

[3] White, Alan G., Howard G. Birnbaum, Milena N. Mareva, Maham Daher, Susan Vallow, Jeff Schein, Nathaniel Katz, "Direct Costs of Opioid Abuse in an Insured Population in the United States," *J Manag Care Pharm*, 2005:11(6):469-79.

[4] Rice, J. Bradford, Noam Y. Kirson, Amie Shei, Caroline J. Enloe, Alice Kate G. Cummings, Howard G. Birnbaum, Pamela Holly, and Rami Ben-Joseph. "The Economic Burden of Diagnosed Opioid Abuse Among Commercially Insured Individuals, *Postgraduate Medicine*, Volume 126, Issue 4, July/August 2014.

[5] Florence, Curtis S., Chao Zhou, Feijun Luo, and Likang Xu, "The Economic Burden of Prescription Opioid Overdose, Abuse and Dependence in the United States, 2013." *Medical Care*, Vol 54, No. 10, 2016.

[6]Kirson, Noam Y., Lauren M. Scarpati, Caroline J. Enloe, Aliya P. Dincer, Howard G. Birnbaum, and Tracy J. Mayne. "The Economic Burden of Opioid Abuse: Updated Findings." *J Manag Care Spec Pharm*. 2017;23(4):427-45.

[7] The year listed reflects the year in which dollar cost estimates are measured, not necessarily the year from which the data originate.

118.  Despite some differences in population covered, form of health insurance, definition of

OUD, and the chosen comparison group, there is a rough consensus from the research

literature that the additional health care costs for an individual with OUD in the 2006 through

CONFIDENTIAL

2016 period range from approximately $11,000 to $17,000 per patient per year.[142]  (See Table

6). Florence *et al.* (2016) use the same "cost of illness" methodology to estimate the excess

health care costs attributable to OUD for patients with Medicare, Medicaid and private

insurance in 2013.[143]  They find that health care costs were $15,500 higher for commercially

insured patients, $17,052 higher for Medicare patients, and $13,743 higher for Medicaid

patients.

119.    I use the Florence *et al.* (2016) findings, along with the number of person-years with

OUD estimated in Tables 7a and 7b to estimate excess health care costs attributable to OUD in

the Bellwether counties.  As explained in detail in Appendix H, I estimate the number of OUD

individuals covered by Medicare, Medicaid and private insurance plans from national surveys.  I

multiply the number of OUD person-years in each insurance category by the excess health care

costs attributable to OUD in each year, adjusted for health care inflation.  Excess health care

costs were $1.4 billion for individuals with OUD in Cuyahoga County and $587 million for

individuals with OUD in Summit County.  See Tables 7a and 7b.

---

[142] Conceptually, these studies all use this matching methodology to compare health care costs, however, there are small differences between the studies.  For example, studies may use different slightly different measurement periods or may use different numbers of control patients.

[143] Florence *et al.* (2016) use Truven Health MarketScan Research Databases for commercial, Medicaid and Medicare enrollees.  They identify OUD individuals using ICD-9-CM codes for opioid abuse, dependence or overdose, which include costs due to prescription opioid or heroin dependence.  All individuals included in the study had 18 months of continuous insurance coverage in the data.  The first six months of data were used for matching OUD to non-OUD individuals and the final 12 months were used for cost comparison. Florence *et al.* (2016), p. 902.

CONFIDENTIAL

**Table 7a**
**Morbidity and Valuation of Morbidity Due to Shipments**
**Cuyahoga County, 2006-2016**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Prevalence of OUD | 1.18% | 1.15% | 1.19% | 1.36% | 1.38% | 1.42% | 1.55% | 1.48% | 1.53% | 1.44% | 1.40% | |
| County Population 12 + (000s) | 1,117.2 | 1,109.9 | 1,103.5 | 1,099.4 | 1,094.7 | 1,089.4 | 1,087.5 | 1,087.9 | 1,086.8 | 1,083.7 | 1,080.9 | 12,040.8 |
| Persons with OUD (000s) | 13.2 | 12.7 | 13.2 | 14.9 | 15.1 | 15.4 | 16.8 | 16.1 | 16.6 | 15.6 | 15.1 | 164.8 |
| Share of Harm Due to Shipments | 49.2% | 50.4% | 51.1% | 52.4% | 54.6% | 57.6% | 66.5% | ▮ | ▮ | ▮ | ▮ | |
| Persons with OUD Due to Opioid Shipments (000s) | 6.5 | 6.4 | 6.7 | 7.8 | 8.2 | 8.9 | 11.2 | ▮ | ▮ | ▮ | ▮ | 108.5 |
| Elevated Health Costs ($mil) | $65 | $67 | $72 | $87 | $95 | $107 | $142 | $158 | $185 | $194 | $205 | $1,376 |

See Appendix D for sources and calculation notes.

**Table 7b**
**Morbidity and Valuation of Morbidity Due to Shipments**
**Summit County, 2006-2016**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Prevalence of OUD | 1.18% | 1.15% | 1.19% | 1.36% | 1.38% | 1.42% | 1.55% | 1.48% | 1.53% | 1.44% | 1.40% | |
| County Population 12 + (000s) | 461.9 | 462.5 | 462.6 | 462.5 | 463.0 | 463.8 | 464.4 | 465.7 | 466.5 | 466.4 | 466.1 | 5,105.5 |
| Persons with OUD (000s) | 5.5 | 5.3 | 5.5 | 6.3 | 6.4 | 6.6 | 7.2 | 6.9 | 7.1 | 6.7 | 6.5 | 70.0 |
| Share of Harm Due to Shipments | 49.2% | 50.4% | 51.1% | 52.4% | 54.6% | 57.6% | 66.5% | ▮ | ▮ | ▮ | ▮ | |
| Persons with OUD Due to Opioid Shipments (000s) | 2.7 | 2.7 | 2.8 | 3.3 | 3.5 | 3.8 | 4.8 | ▮ | ▮ | ▮ | ▮ | 46.2 |
| Elevated Health Costs ($mil) | $27 | $28 | $30 | $37 | $40 | $46 | $60 | $68 | $79 | $84 | $88 | $587 |

See Appendix D for sources and calculation notes.

## F.   Valuation in Dollar Terms:  Children Born with NAS

120.    Due to data limitations, valuing the harms due to NAS in this section is confined to excess hospital costs associated with birth.  While the dollar amount of harms due to neonatal abstinence syndrome described in this Report is small relative to other costs attributable to opioid shipments, these adverse effects are likely to be vastly underestimated relative to the full costs over the course of a child's lifetime.  Firstly, in addition to health care costs, cases of NAS may also require monitoring and follow-up by child welfare services, which results in

CONFIDENTIAL

increased labor costs.[144]  Additionally, there may be longer-term adverse outcomes associated

with NAS.  While the effects of NAS on long-term outcomes are more difficult to study due to

confounding factors associated with opioid use and abuse,  there is compelling evidence that

NAS is associated with several adverse outcomes in infancy and childhood, including

neurodevelopmental and neurobehavioral impairment,[145] maltreatment,[146] mental and

behavioral disorders,[147] and visual impairment.[148]  Children with NAS have also been found to

have impaired school performance,[149] and to be at increased risk for educational disability and

needing special education services,[150] relative to comparison children.  All of these harms

---

[144] U.L. França, S. Mustafa and M.L. McManus, "The Growing Burden of Neonatal Opiate Exposure on Children and Family Services in Massachusetts," *Child Maltreatment*, 2011 21(1), pp. 80-84.

[145] R.W. Hunt, *et al.*, "Adverse neurodevelopmental outcome of infants exposed to opiate in-utero," *Early Human Development*, 2008, 84(1), pp. 29-35; L. McGlone and H. Mactier, "Infants of opioid-dependent mothers: neurodevelopment at six months," *Early Human Development*, 2015, 91(1), pp. 19-21; E. Nygaard, *et al.*, "Longitudinal cognitive development of children born to mothers with opioid and polysubstance use," *Pediatric Research*, 2015, 78(3), pp. 330-335; A. Baldacchino *et al.*, "Erratum: neurobehavioral consequences of chronic intrauterine opioid exposure in infants and preschool children: a systematic review and meta-analysis," *BMC Psychiatry*, 2015, 15(1), p. 134; T.S. Rosen and H.L. Johnson, "Children of methadone-maintained mothers: follow-up to 18 months of age," *The Journal of Pediatrics*, 101(2), 1982, pp. 192-196; R. Bunikowski, *et al.,* "Neurodevelopmental outcome after prenatal exposure to opiates," *European Journal of Pediatrics*, 1998, 157(9), pp. 724-730.

[146] Uebel et al., op. cit.

[147] Uebel et al., op. cit.

[148] L. McGlone *et al.*, "Visual outcome in infants born to drug-misusing mothers prescribed methadone in pregnancy," *British Journal of Ophthalmology*, 2014, 98(2), pp. 238-245; R. Hamilton, *et al.*, "Ophthalmic, clinical and visual electrophysiological findings in children born to mothers prescribed substitute methadone in pregnancy," *British Journal of Ophthalmology*, 2010, 94(6), pp. 696-700; K.S. Cornish, *et al.*, "The short-and long-term effects on the visual system of children following exposure to maternal substance misuse in pregnancy," *American Journal of Ophthalmology*, 2013, 156(1), pp. 190-194; Uebel *et al., op. cit*.

[149] J.L. Oei, *et al.*, "Neonatal abstinence syndrome and high school performance," *Pediatrics*, 2017, 139(2), e20162651, pp. 1-10.

[150] M.A. Fill, *et al.*, "Educational disabilities among children born with neonatal abstinence syndrome," *Pediatrics*, 2018, 142(3), e20180562.

---

CONFIDENTIAL

represent additional social costs of opioid use that have not, due to data limitations, been quantified in this Report.

121.　A NAS birth is associated with more intensive hospital utilization than other births, including, for example, increased length of stay and increased risk of admission to the neonatal intensive care unit, resulting in excess costs.[151]

122.　To quantify the excess hospital charges due to NAS, I use the difference between the average hospital charge for an NAS case in Ohio and the average hospital charge for all births in Ohio in each year, as reported in Ohio Department of Health statewide data.[152]  These excess hospital charges are reported in Tables 8a and 8b below.  I then use these excess hospital charges to estimate excess hospital costs by multiplying charges by net revenue-to-charge ratios from the American Hospital Association.  Tables 8a and 8b report the total estimated hospital costs of NAS attributable to opioid shipments; these costs were $9.4 million in Cuyahoga County and $6.7 million in Summit county between 2006-2016.

### Table 8a
### Neonatal Abstinence Syndrome (NAS) and Valuation
### Cuyahoga County, 2006-2016

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opioid-Related NAS Cases | 19 | 23 | 30 | 45 | 60 | 74 | 94 | 117 | 117 | 117 | 141 | 837 |
| Share of Harm Due to Shipments | 49.2% | 50.4% | 51.1% | 52.4% | 54.6% | 57.6% | 66.5% | ■ | ■ | ■ | ■ | |
| NAS Cases Due to Shipments | 9 | 12 | 15 | 24 | 33 | 43 | 62 | ■ | ■ | ■ | ■ | 609 |
| Excess Hospital Costs Due to NAS | $12,885 | $19,525 | $18,795 | $22,276 | $18,587 | $15,731 | $14,671 | $15,153 | $16,823 | $14,011 | $13,397 | |
| Valuation of NAS Health Costs Due to Shipments ($ mil) | $0.12 | $0.23 | $0.29 | $0.53 | $0.61 | $0.67 | $0.91 | $1.32 | $1.59 | $1.43 | $1.71 | $9.41 |

See Appendix E for sources and calculation notes.

---

[151] Wong *et al.*, *op. cit.* See also: T.E. Corr and C.S. Hollenbeak, "The Economic Burden of Neonatal Abstinence Syndrome in the United States," *Addiction*, 2017, 112, pp. 1590-1599.

[152] See Appendix E.

CONFIDENTIAL

**Table 8b**
**Neonatal Abstinence Syndrome (NAS) and Valuation**
**Summit County, 2006-2016**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opioid-Related NAS Cases | 13 | 16 | 20 | 31 | 41 | 50 | 63 | 89 | 89 | 89 | 89 | 589 |
| Share of Harm Due to Shipments | 49.2% | 50.4% | 51.1% | 52.4% | 54.6% | 57.6% | 66.5% | ■ | ■ | ■ | ■ | |
| NAS Cases Due to Shipments | 6 | 8 | 10 | 16 | 22 | 29 | 42 | ■ | ■ | ■ | ■ | 430 |
| Excess Hospital Costs Due to NAS | $12,885 | $19,525 | $18,795 | $22,276 | $18,587 | $15,731 | $14,671 | $15,153 | $16,823 | $14,011 | $13,397 | |
| Valuation of NAS Health Costs Due to Shipments ($ mil) | $0.08 | $0.16 | $0.20 | $0.36 | $0.41 | $0.45 | $0.62 | $1.00 | $1.21 | $1.08 | $1.08 | $6.65 |

See Appendix E for sources and calculation notes.

### G.  Valuation in Dollar Terms:  Crime

123.	Appendix F describes the methods I use for counting the number of crimes in the Bellwether communities due to shipments of prescription opioids, and for valuing the cost of crimes in dollars.  In terms of counting crimes, I begin with a standard database reporting number of crimes by category of crime; specifically, I calculate the total criminal activity reported for all reporting Law Enforcement Agencies in the National Incident-Based Reporting System (NIBRS) data in which the 'primary county' listed is Cuyahoga/Summit.  I then apply methods from Professor Cutler's report to attribute a share of those crimes to shipments of opioids.

124.	A useful framework used in the economic literature on crime classifies costs into direct, indirect, and intangible costs.[153]  Direct costs include the costs of private crime deterrents (alarms, security), public expenditures on police, and the value of property lost due to criminal activity.  Indirect costs of crime include the productivity loss for victims of violent crime and the

---

[153] Two literature reviews are N. Wickramasekera, *et al.,* "Cost of crime: A systematic review," *Journal of Criminal Justice*, 2015, 43(3), pp. 218-228 and K.E. McCollister, M.T. French and H. Fang, "The cost of crime to society: New crime-specific estimates for policy and program evaluation," 2010, 108(1-2), pp. 98-109.

CONFIDENTIAL

loss in productivity due to addiction and incarceration for the perpetrator.  Finally, intangible costs consist of pain, suffering, and psychological consequences borne by crime victims and the public.  Details on the dollar valuation are also contained in Appendix F.

125.     Direct costs of crime, such as property loss, medical care expenses, and public or private expenditures on crime deterrents, are often estimated by combining several sources of data, including government data on criminal justice system costs, surveys on medical expenses, and property loss associated with crime.[154]  The main component of the indirect costs of crime is productivity loss of both the victims and the perpetrators.  Crimes that result in injury or hospitalization lead to a reduction in victim productivity. The opportunity cost to criminals of engaging in productive activities by criminals is also included in the indirect cost of crime.[155] Finally, intangible costs include the pain, emotional and psychological consequences of criminal activity imposed on victims and the public.  The "jury-compensation approach" uses monetary amounts awarded by juries in injury cases, net of medical costs and lost wages, to estimate intangible costs to victims.[156]  A second method for estimating intangible costs, the contingent valuation approach, uses surveys to estimate respondents' willingness-to-pay for reductions in hypothetical risk of pain, suffering or various types of crimes.

---

[154] See D.A. Anderson, "The cost of crime," Foundations and Trends® in Microeconomics 7.3 (2012): 209-265, chapter 4, for a discussion and a representative example of the data-aggregation methods used in crime costing studies.

[155] These costs are often calculated by multiplying the minimum wage or other unskilled labor wage by the amount of time spent by criminals in incarceration. Note this assumes incarcerated individuals would work full time if not incarcerated. While this is a crude measure, is its likely an underestimation of this form of crime cost, because there it does not include the opportunity cost of crime that does not result in incarceration. See S. Aos, *et al.* "The Comparative Costs and Benefits of Programs to Reduce Crime. Version 4.0," (2001) for a discussion of this point.

[156] This methodology was developed in M.A. Cohen(1988), *op cit.*

CONFIDENTIAL

126.     To avoid any double counting of costs of crime already accounted for in the budget impacts on the Bellwether governments, I deduct from costs the direct costs to the criminal justice system.  This is conservative because crime in a county imposes direct costs not just on the county government but also on other governments with criminal jurisdiction within the county, such as, in this case, the city governments of Akron and Cleveland.  Criminal justice costs of crime for the Bellwether county governments are included in the costs reported in Table 11 below.

127.     Tables 9a and 9b present dollar estimates of the costs of crime, across all types of offenses, per Bellwether county and year due to shipments.  These figures include direct, indirect and intangible costs as described above.  In total, I estimate that shipments from 2006-2016 led to $327 million in Cuyahoga county, and $126 million in Summit county.

### Table 9a
### Crime and Valuation of Crime Due to Shipments
### Cuyahoga County, 2006-2016

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Crimes | 2,636 | 2,531 | 3,082 | 3,155 | 3,498 | 3,728 | 4,648 | 4,641 | 4,932 | 5,441 | 5,665 | 43,957 |
| Valuation of Crimes ($mil) | $19 | $19 | $22 | $23 | $25 | $25 | $32 | $33 | $35 | $43 | $50 | $327 |

See Appendix F for sources and calculation notes.

### Table 9b
### Crime and Valuation of Crime Due to Shipments
### Summit County, 2006-2016

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Crimes | 934 | 903 | 1,275 | 1,350 | 1,556 | 1,616 | 1,918 | 2,324 | 2,600 | 3,021 | 3,281 | 20,779 |
| Valuation of Crimes ($mil) | $6 | $6 | $8 | $8 | $9 | $10 | $12 | $13 | $16 | $18 | $20 | $126 |

See Appendix F for sources and calculation notes.

CONFIDENTIAL

### H. Valuation in Dollar Terms: Child Maltreatment

128.    Appendix G describes the methods I use for counting the number of victims of child maltreatment in the Bellwether communities due to shipments of prescription opioids, and for valuing the excess costs incurred. In terms of counting victims, I rely on Dr. Young's reporting of the number of victims of substantiated maltreatment in the two counties. I then apply methods from Professor Cutler's report to attribute a share of these victims to shipments of opioids.

129.    The research literature establishes that child maltreatment (abuse or neglect) devastates a child, lowering educational attainment;[157] reducing cognitive development;[158] increasing the need for special education services;[159] lowering employment and earnings;[160]

---

[157] R. Gilbert, *et al*, "Burden and consequences of child maltreatment in high-income countries," *The Lancet,* 373, 2009, 68-81; J. Currie and C.S. Widom, "Long-term consequences of child abuse and neglect on adult economic well-being," *Child Maltreatment*, 15(2), 2010, pp. 111-120; J.P. Mersky and J. Topitzes, "Comparing early adult outcomes of maltreated and non-maltreated children: A prospective longitudinal investigation," *Children and Youth Services Review*, 32(8), 2010, pp. 1086-1096; Doyle & Aizer, 2018, *op. cit.;* A. Bald, E. Chyn, J.S. Hastings, and M. Machelett, "The Causal Impact of Removing Children from Abusive and Neglectful Homes," NBER Working Paper 25419, January 2019.

[158] K.L. Hildyard and D.A. Wolfe, "Child neglect: developmental issues and outcomes," *Child Abuse & Neglect,* 26, 2002, pp. 679-695; C.M. Perez and C.S. Widom, "Childhood victimization and long-term intellectual and academic outcomes," *Child Abuse & Neglect,* 18(8), 1994, pp. 617-633; J. Currie & C.S. Widom, 2010, *op. cit.*

[159] M. Jonson-Reid, *et al.*, "A prospective analysis of the relationship between reported child maltreatment and special education eligibility among poor children," *Child Maltreatment,* 9(4), 2004, pp. 382-394; R.J. Gelles and S. Perlman, "Estimated Annual Cost of Child Abuse and Neglect," Prevent Child Abuse America; April 2012, available at https://preventchildabuse.org/wp-content/uploads/2016/02/PCA_COM2012-1.pdf; R. Gilbert *et al.,* 2009, *op. cit.*

[160] R.J. Gelles & S. Perlman, 2012, *op. cit.;* R. Gilbert *et al.,* 2009, *op. cit.;* J. Currie & C.S. Widom, 2010, *op. cit.;* J.P. Mersky and J. Topitzes, 2010, *op. cit.*

CONFIDENTIAL

and causing higher rates of preventable deaths,[161] obesity,[162] depression,[163] substance abuse,[164] and PTSD.[165]  Furthermore maltreatment elevates rates of juvenile delinquency[166] and crime.[167] These negative effects of maltreatment are costly.

130.    I focus on the research studies of lost earnings and special education costs, as these are the outcomes for which there is strong evidence of adverse effects due to childhood maltreatment.  Again, to avoid double counting with the costs reported in Table 11 below, I do not include excess crime-related costs for the victims of maltreatment.

131.    For each outcome of interest, I first determine the estimated incremental effect of maltreatment on the outcome.  For example, maltreated children are 8.6 percentage points

[161] A. Hjern, B. Vinnerljung, and F. Lindblad, "Avoidable mortality among child welfare recipients and intercountry adoptees: a national cohort study," *Journal of Epidemiology & Community Health,* 58(5), 2004, pp. 412-417; Doyle & Aizer, 2018, *op. cit.*

[162] L.M. Berger and J. Waldfogel, "Economic Determinants and Consequences of Child Maltreatment," OECD Social, Employment and Migration Working Paper No. 111, April 2011, OECD Publishing, Paris, available at http://dx.doi.org/10.1787/5kgf09zj7h9t-en; R. Gilbert *et al.,* 2009, *op. cit.*

[163] L.M. Berger and J. Waldfogel, 2011, *op. cit.;* R. Gilbert *et al.,* 2009, *op. cit.;* A. Bald, E. Chyn, J.S. Hastings, and M. Machelett, 2019, *op. cit.;* F. Wulczyn, 2009, *op. cit.;* J.P. Mersky and J. Topitzes, 2010, *op. cit.;* C.S. Widom, K. DuMont, and S.J. Czaja, "A prospective investigation of major depressive disorder and comorbidity in abused and neglected children grown up," *Archives of General Psychiatry,* 64(1), 2007, pp. 49-56.

[164] L.M. Berger and J. Waldfogel, 2011, *op. cit.;* R. Gilbert *et al.,* 2009, *op. cit.;* F. Wulczyn, 2009, *op. cit.;* J.P. Mersky and J. Topitzes, 2010, *op. cit.;* C.S. Widom, K. DuMont, and S.J. Czaja, 2007, *op. cit.*

[165] L.M. Berger and J. Waldfogel, 2011, *op. cit.;* R. Gilbert *et al.,* 2009, *op. cit.;* C.S. Widom, K. DuMont, and S.J. Czaja, 2007, *op. cit.;* C.S. Widom, "Posttraumatic stress disorder in abused and neglected children grown up," *American Journal of Psychiatry,* 156(8), 1999, pp. 1223-1229.

[166] C.S. Widom, "The Cycle of Violence," *Science,* 244(4901), 1989, pp. 160-166; R.J. Gelles & S. Perlman, 2012, *op. cit.;* R. Gilbert *et al.,* 2009, *op. cit.;* M.G. Maxfield and C.S. Widom, "The cycle of violence: Revisited 6 years later," *Archives of Pediatrics & Adolescent Medicine*, 150(4), 1996, pp. 390-395; C.S. Widom and M.G. Maxfield, "An Update on the 'Cycle of Violence.' Research in Brief," Department of Justice, Washington, DC, National Institute of Justice; February 2001, available at https://files.eric.ed.gov/fulltext/ED451313.pdf.

[167] J. Currie and E. Tekin, "Does child abuse cause crime?" NBER Working Paper 12171, April 2006; Doyle & Aizer, 2018, *op. cit.;* R.J. Gelles & S. Perlman, 2012, *op. cit.;* R. Gilbert *et al.,* 2009, *op. cit.;* Widom, 1989, *op. cit.;* J. Currie and E. Tekin, "Understanding the cycle childhood maltreatment and future crime," *Journal of Human Resources,* 47(2), 2012, pp. 509-549; J.P. Mersky and J. Topitzes, 2010, *op. cit.;* M.G. Maxfield and C.S. Widom, 1996, *op cit;* C.S. Widom and M.G. Maxfield, 2001, *op. cit.*

CONFIDENTIAL

more likely to need special education services compared with control children (22.3% vs. 13.7%).[168]  Following methodology by Fang *et al.* (2012),[169] I multiply the total estimated cost of special education services by 0.086 to arrive at an estimate of the excess special education costs for each case of childhood maltreatment.  See Appendix G for additional details on these and other components of the estimates and the literature on the social costs of childhood maltreatment.

132.    Tables 10a and 10b report the dollar estimates of the cost of child maltreatment for the two Bellwether communities, using the counts of maltreatment from Section III.  I estimate that the social costs of cases of maltreatment attributable to opioid shipments between 2006-2016 is $401 million for Cuyahoga and $297 million for Summit counties.[170]  Lost earnings (*i.e.*, productivity losses) are the largest component of costs.

### Table 10a
### Child Maltreatment Cases and Valuation Due to Shipments
### Cuyahoga County, 2006-2016

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Cases of Maltreatment | 2,043 | 1,924 | 2,073 | 1,452 | 1,738 | 2,092 | 2,156 | 2,502 | 2,281 | 2,316 | 2,513 | 23,090 |
| Share Harms Due to Opioid Shipments | 2.2% | 2.7% | 3.2% | 3.7% | 4.0% | 4.2% | 4.8% | ■ | ■ | ■ | ■ | |
| Maltreatment Cases Due to Opioid Shipments | 45 | 52 | 65 | 53 | 70 | 88 | 104 | ■ | ■ | ■ | ■ | 1,391 |
| | | | | | | | | | | | | |
| Social Cost of Maltreatment by Category | | | | | | | | | | | | |
| Productivity Losses ($000s) | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | |
| Special Education Costs ($000s) | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | |
| Total Social Costs ($000s) | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | |
| | | | | | | | | | | | | |
| Valuation of Child Maltreatment ($mil) | $13.1 | $14.9 | $18.9 | $15.4 | $20.1 | $25.4 | $29.9 | $47.3 | $53.7 | $64.0 | $97.9 | $400.6 |

See Appendix G for sources and calculation notes.

---

[168] M. Jonson-Reid, *et al.*, 2004, *op. cit.*

[169] X. Fang, *et al.*, "The economic burden of child maltreatment in the United States and implications for prevention," *Child Abuse & Neglect*, 2012, 36, pp. 156-165.

[170] See Appendix G for further details on these calculations.

CONFIDENTIAL

**Table 10b**
**Child Maltreatment and Valuation Due to Shipments**
**Summit County, 2006-2016**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Cases of Maltreatment | 1,319 | 1,117 | 901 | 944 | 715 | 643 | 674 | 601 | 579 | 757 | 886 | 9,136 |
| Share Harms Due to Opioid Shipments | 2.1% | 2.6% | 3.3% | 4.6% | 12.0% | 12.2% | 15.5% | ■ | ■ | ■ | ■ | |
| Maltreatment Cases Due to Opioid Shipments | 28 | 29 | 30 | 44 | 86 | 79 | 105 | ■ | ■ | ■ | ■ | 1,031 |
| | | | | | | | | | | | | |
| Social Cost of Maltreatment by Category | | | | | | | | | | | | |
| Productivity Losses ($000s) | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | |
| Special Education Costs ($000s) | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | |
| Total Social Costs ($000s) | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | |
| | | | | | | | | | | | | |
| Valuation of Child Maltreatment ($mil) | $8.1 | $8.2 | $8.6 | $12.6 | $24.7 | $22.6 | $30.1 | $31.7 | $32.5 | $47.6 | $70.1 | $296.9 |

See Appendix G for sources and calculation notes.

### I.  Bellwether Government Costs Due to Shipments

133.    My Damages Report estimates the costs incurred by the Bellwether governments as a result of opioid shipments due to misconduct.  As detailed in that report, I identified government divisions impacted by the opioid crisis and the costs within those divisions that were potentially affected by the opioid crisis.[171]  To those estimates of potentially affected costs, I applied shares of harm due to Defendants' misconduct estimated by Professor Cutler and report my estimates of costs incurred by the Bellwether governments as a result of Defendants' misconduct.[172]

134.    As discussed above, in this Report, I focus on all opioid shipments when assessing costs (not just the share of shipments Professor Rosenthal attributed to misconduct).  Appendix E to my Damages Report included these estimates,[173] and they are reproduced here as Table 11.

---

[171] See, McGuire Damages Report, Sections III and IV.

[172] See McGuire Damages Report, Section V.

[173] See McGuire Damages Report, Appendix IV.E. Tables E.3 and E4.

CONFIDENTIAL

Bellwether county costs attributable to shipments totaled $172.4 million for Cuyahoga and

$98.7 million for Summit over the period 2006-2016.

**Table 11**
**Government Costs Attributable to Opioid Shipments**
**2006-2016 (millions)**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cuyahoga County ($mil) | $6.4 | $7.4 | $9.5 | $10.4 | $11.7 | $12.7 | $14.7 | $18.9 | $22.1 | $25.7 | $32 9 | $172.4 |
| Summit County ($mil) | $2.0 | $2.2 | $2.9 | $4.1 | $8 0 | $7.9 | $9.5 | $12.4 | $14.0 | $15 9 | $19 8 | $98.7 |
| Total ($mil) | $8.4 | $9.6 | $12.4 | $14 5 | $19 8 | $20.5 | $24.3 | $31.3 | $36.1 | $41.6 | $52.7 | $271.1 |

Sources:  McGuire Cost Report, Tables E 3 and E.4.

### J.    Sum of Economic Costs Imposed on Bellwether Communities Due to Shipments

135.    Table 12 summarizes the costs to the Bellwether communities from the five categories

of harm assess here, excess mortality, morbidity, babies born with NAS, crime, and cases of

child maltreatment.  In addition, Table 12 includes the costs to the county governments in

Cuyahoga and Summit tallied in my Damages Report.  In total, over the 11-year period,

shipments of prescription opioids imposed net economic costs on the Bellwether communities

of approximately $13.6 billion in Cuyahoga and approximately $6.5 billion for Summit.  Harms

include those associated with heroin, fentanyl and other drugs to the degree that harms from

these drugs can be attributed to shipments of prescription opioids.

136.    These results are conservative for two reasons (in addition to the reasons discussed

above that apply to component estimates.)  First, the accounting stops in 2016 because of data

limitations.  Some categories of costs could be estimated for later years, but to keep the results

consistent across cost categories, I only included costs through 2016 in the tables.  The harms

due to opioid shipments are ongoing and are much higher in the later years, after the crisis

CONFIDENTIAL

accelerated, compared to the earlier years.  Costs to Cuyahoga in 2016 alone were almost $4.1 billion and to Summit were approximately $2.4 billion.  Costs for 2016 represent reasonable estimates of costs for 2017 and 2018 and could be added to the total if required.

137.    The second reason is that not all categories of costs are included in the five categories assessed here.  Costs not counted here include costs to other governments in the counties, such as the City of Cleveland, the City of Akron, school districts and other public agencies.  Also not counted, among other categories, are losses in property values and property taxes due to opioid-related crime, and losses in sales taxes.

CONFIDENTIAL

**Table 12**
**Summary of Harms Due to Shipments Valued in Dollars, 2006-2016**
**(millions)**

| Form of Harm | Method of Valuation | Cuyahoga | Summit | Total |
|---|---|---|---|---|
| Mortality: Deaths | Value of statistical life (VSL) | $11,279 | $5,377 | $16,656 |
| Morbidity: OUD Cases | Elevated health care costs | $1,376 | $587 | $1,963 |
| Babies with NAS | Elevated health care costs | $9 | $7 | $16 |
| Crimes | Valuation | $327 | $126 | $453 |
| Child Maltreatment | Elevated costs | $401 | $297 | $698 |
| Bellwether Government Costs | Elevated costs | $172 | $99 | $271 |
| *Totals* | | *$13,564* | *$6,492* | *$20,056* |

Sources:  Tables  5a, 5b, 7a, 7b, 8a, 8b, 9a, 9b, 10a, 10b and 11 of this Report.

138.    As noted above in ¶ 45, I only report results using Dr. Cutler's Approach 1 in this Report.

Appendix I includes all the tables resulting from my analysis using Dr. Cutler's Approach 2.

Table 13 below summarizes the results from reliance on Approach 2.

CONFIDENTIAL

**Table 13**
**Summary of Monetary Value of Harms Due to Prescription Opioid Shipments**
**Based on Dr. Cutler's Approach 2**
**2006-2016 (millions)**

| Form of Harm | Method of Valuation | Cuyahoga | Summit | Total |
|---|---|---|---|---|
| Mortality: Deaths | Value of statistical life (VSL) | $13,306 | $6,059 | $19,366 |
| Morbidity: OUD Cases | Elevated health care costs | $1,738 | $739 | $2,477 |
| Babies with NAS | Elevated health care costs | $11 | $8 | $19 |
| Crimes | Valuation | $420 | $159 | $579 |
| Child Maltreatment | Elevated costs | $485 | $360 | $845 |
| Bellwether Government Costs | Elevated costs | $215 | $119 | $334 |
| *Totals* | | *$16,176* | *$7,445* | *$23,621* |

Sources:  Tables I.5a, I.5b, I.7a, I.7b, I.8a, I.8b, I.9a, I.9b, I.10a, I.10b and I.11 of Appendix I.

CONFIDENTIAL

March 25, 2019

Prof. Thomas McGuire

CONFIDENTIAL

**Appendix A**
**Professor McGuire CV and Listing of Testimony**

**February 26, 2019**

Thomas G. McGuire

Department of Health Care Policy
Harvard Medical School
180 Longwood Ave.
Boston, MA 02115-5899

**TEL:** (617) 432-3536

mcguire@hcp.med.harvard.edu

http://www.hcp.med.harvard.edu/people/hcp_core_faculty/thomas_mcguire

**Education**:

| Year | Degree | Institution | Field |
|---|---|---|---|
| 1971 | B.A.  Summa Cum Laude | Princeton University | Economics |
| 1976 | Ph.D. | Yale University | Economics |

**Academic Appointments:**

| Year | Academic Title | Institution |
|---|---|---|
| 2001-present | Professor | Harvard Medical School |
| 1987-2001 | Professor | Boston University |
| 1981-1996 | Visiting Professor | Brandeis University |
| 1983-1987 | Associate Professor | Boston University |
| 1980-81 | Postdoctoral Fellow | Yale University |
| 1976-1983 | Assistant Professor | Boston University |

**Other Professional Positions:**

| Year | Position/Title | Institution |
|---|---|---|
| 2012-present | Research Associate | National Bureau of Economic Research |

**Major Committee and Association Memberships:**

| Year | Position/Title | Institution |
|---|---|---|
| 2003-2007 | Member | NIH/ National Center for Research Resources, Council |
| 1994-1998 | Member | National Institute of Mental Health Services Research Review Committee |
| 1980-84 | Member | National Institute of Mental Health Epidemiologic and Services Research Review Committee |
| 2000-present | Member | National Academies of Science, Education and Medicine/Institute of Medicine |
| 2003-2009 | Board of Directors | International Health Economics Association |

**Major Editorial Positions**:

| | | |
|---|---|---|
| 2001-2011 | Editor | *Journal of Health Economics* |

**Awards and Honors:**

| Year | Name of Award |
|---|---|
| 2018 | Victor Fuchs Award from the American Society of Health Economics for Lifetime Contributions to the Field of Health Economics |
| 2016 | Article of the Year, *International Journal of the Economics of Business* |
| 2014 | National Institute for Health Care Management Paper of the Year |
| 2008 | National Institute for Health Care Management Paper of the Year |
| 2008 | AcademyHealth Article of the Year Award |
| 2008 | Everett Mendelsohn Excellence in Mentoring Award |
| 2006 | Emily Mumford Medal for Distinguished Contributions to Social Science In Medicine |
| 1997 | Kenneth J. Arrow Award for Best Paper published in Health Economics |
| 1994-1996 | Investigator Award in Health Policy, Robert Wood Johnson Foundation |
| 1991 | Carl A. Taube Award for outstanding contributions to mental health services research, American Public Health Association |
| 1989-1994, 1994-1999 | Research Scientist Award, National Institute for Mental Health |
| 1983 | Elizur Wright Award for an outstanding contribution to the literature on risk and insurance (*Financing Psychotherapy*), American Risk and Insurance Association |
| 1979 | Abt Prize for Research on National Policy Issues |

## BOOKS AND MONOGRAPHS:

Thomas G. McGuire.  *Financing Psychotherapy: Costs, Effects and Public Policy*, Cambridge: Ballinger, 1981.

Thomas G. McGuire and Burton Weisbrod (Eds.).  *Economics and Mental Health*, National Institute of Mental Health, Series EN No. 1, DHHS Publication No. (ADM) 81-114, Superintendent of Documents, USGPO, Washington, D.C., 1981.

Thomas G. McGuire and Richard Scheffler (Eds.).  *Research Issues in Economics and Mental Health*, JAI Press, Vol. 8, 1987.

Thomas G. McGuire (guest editor).  "Economics and Mental Health," special issue of *Administration and Policy in Mental Health*, 1990.

Thomas G. McGuire and Michael H. Riordan (guest editors).  "The Industrial Organization of Health Care," *Journal of Economics & Management Strategy*, 3(1), 1994.

Albert Ma, Thomas G. McGuire, and Michael H. Riordan (guest editors)  "The Industrial Organization of Health Care, II" *Journal of Economics & Management Strategy*, 1997.

Frank, Richard G. and McGuire, T.G. (guest editors) "Mental Health Economics," *Administration and Policy in Mental Health*, 24(4) (March 1997).

Albert Ma and Thomas G. McGuire (guest editors) "The Industrial Organization of Health Care, III," *Journal of Economics & Management Strategy*, 8(3), Fall 1999.

Mark V. Pauly, Thomas G. McGuire. and Pedro Pitta Barros. (eds) (2012) *Handbook of Health Economics*, Vol.2, Elsevier.

Jacob Glazer and Thomas G. McGuire, (2017) *Models of Health Plan Payment and Quality Reporting*, World Scientific Press.

Thomas G. McGuire and Richard van Kleef, (eds.) "Health Plan Payment in Regulated Competition," Special Section of the *Journal of Health Economics*, Volume 56, December, 2017.

Thomas G. McGuire and Richard van Kleef, (eds.) *Risk Adjustment, Risk Sharing and Premium Regulation in Health Insurance Markets: Theory and Practice*, Elsevier, 2018.

**PAPERS:**

**Thomas G. McGuire**. A Note on Lindahl's Voluntary Exchange Theory. *Public Finance*, 28(1):94-97, (1973).

Geoffrey Brennan and **Thomas G. McGuire**. Optimal Policy Choice under Uncertainty. *Journal of Public Economics*, 4(2):204-209, 1975.

Richard Nelson, **Thomas G. McGuire** and Thomas Spavins. Comment on Sam Peltzman's 'An Evaluation of Consumer Protection Legislation: The 1962 Drug Amendments'. *Journal of Political Economy*, 83(3), 1975.

**Thomas G. McGuire**, Michael Coiner and Larry Spancake. Budget-Maximizing Agencies and Efficiency in Government. *Public Choice*, 34:333-357, 1979.

**Thomas G. McGuire**. Some Simple Projections of the Cost of National Health Insurance for the Private Practice of Psychiatry. Egdahl, Walsh and Goldbeck (Eds.) *Mental Wellness Programs for Employees*, Springer-Verlag, 1980.

**Thomas G. McGuire**. Markets for Psychotherapy in G. VandenBos (Ed.) *Psychotherapy: From Theory to Research to Policy*, Sage Publishing, 1980.

Wayne Dorris and **Thomas G. McGuire**. Community Mental Health Centers and Competition in Mental Health Services. Altman and Sapolsky (Eds.) *Federal Health Programs: Improving the Health Care Systems*, Lexington Books, 1980.

**Thomas G. McGuire** and Burton Weisbrod. Perspectives on the Economics of Mental Health. *Journal of Human Resources*, 16(4):494-500, 1981.

**Thomas G. McGuire**. Compulsory Insurance for Psychotherapy? *The Clinical Psychologist* 34(4):13-14, 1981.

**Thomas G. McGuire**. Financing and Demand for Mental Health Services. *Journal of Human Resources*, 16(4):501-522, 1981.

**Thomas G. McGuire**. National Health Insurance for Private Psychiatric Care: A Study in the Distribution of Income. *Public Finance Quarterly*, 9(2):183-196, 1981.

**Thomas G. McGuire**. Price and Demand for Membership in a Prepaid Group Medical Practice. *Medical Care*, 19(2):172-183, 1981.

**Thomas G. McGuire**. Budget-Maximizing Governmental Agencies: An Empirical Test. *Public Choice*, 36:313-322, (1981).

**Thomas G. McGuire** and John Montgomery. Mandated Mental Health Benefits in Private Health Insurance Policies. *Journal of Health Politics, Policy and Law*, 7(2):380-406, 1982.

**Thomas G. McGuire** and Sylvia Moore. Private Regulation in Mental Health: The JCAH and Psychologists in Hospitals. *Journal of Law and Human Behavior*, 7(2/3):235-249, 1983.

**Thomas G. McGuire** and Linda K. Frisman. Reimbursement Policy and Cost-Effective Mental Health Care. *American Psychologist*, 38(8):935-940, August, 1983.

Charles A. Kiesler, **Thomas G. McGuire** (and others). Federal Mental Health Policy Making: An Assessment of Deinstitutionalization. *American Psychologist*, 38(12):1292-1293, 1983.

**Thomas G. McGuire** and Kyle Grazier. Markets and Bureaucracies in Mental Health Services: Implications for Management Information Systems. Bennett and Trute (Eds.) *Mental Health Information Systems: Problems and Prospects*, Edwin Mellon Press, 1983, pp. 283-302.

**Thomas G. McGuire**. Patients' Trust and the Quality of Physicians. *Economic Inquiry*, 21(2):203-222, 1983.

**Thomas G. McGuire**.  Economic Assessment of Treatment Programs for the Chronically Mentally Ill.  Cronholm and VonKnorring (Eds.) *Evaluation of Mental Health Services Programs*, Swedish Medical Research Council, pp. 148-160, 1984.

**Thomas G. McGuire**, Arnold Gurin, Linda K. Frisman, Victor L. Kane and Barbara F. Shatkin. Vendorship and Social Work in Massachusetts. *Social Service Review*, 373-383, 1984.

Randall P. Ellis and **Thomas G. McGuire**.  Cost Sharing and the Demand for Ambulatory Mental Health Services: A Comment on the Rand Health Insurance Study.  *American Psychologist*, 39:1195-1197, 1984.

**Thomas G. McGuire**.  Economics of Mental Health.  Cavenar (Ed.) *Psychiatry, Vol. 3*, Lippicott and Co., 1985.

Nancy Cannon, **Thomas G. McGuire** and Barbara Dickey.  Capital Costs in Economic Program Evaluation: The Case of Mental Health Services.  J. S. Catterall (Ed.) *Economic Evaluation of Public Programs*, San Francisco: Jossey-Bass, 1985.

**Thomas G. McGuire** and Barbara Dickey.  Payment for Mental Health Care: Economic Issues. S. Sharfstein and A. Beigel (Eds.) *The New Economics and Psychiatric Care*, American Psychiatric Association Press, 1985.

Steve Jencks, Howard Goldman, and **Thomas G. McGuire**.  Challenges in Bringing Exempt Psychiatric Services Under a Prospective Payment System. *Hospital and Community Psychiatry*, 36(7):764-769, 1985.

Linda K. Frisman, **Thomas G. McGuire** and Margo L. Rosenbach.  Costs of Mandates for Outpatient Mental Health Care in Private Health Insurance.  *Archives of General Psychiatry*, 42:558-561, 1985.

**Thomas G. McGuire**.  Prospective, Cost-Based and Mixed Reimbursement Systems:  An Economic Evaluation.  DiBlasi, Kline and Strickney (Eds.) *Pursuing Excellence in a Time of Declining Resources: The Role of Automated Information Systems*, Nathan Kline Institute, 1985.

Randall P. Ellis and **Thomas G. McGuire**.  Provider Behavior Under Prospective Reimbursement: Cost Sharing and Supply. *Journal of Health Economics*, 129-151, 1986.

Richard G. Frank and **Thomas G. McGuire**.  A Review of Studies of Demand and Utilization of Specialty Mental Health Services.  *Health Services Research*, 21(2) (Part II):241-265, 1986.

**Thomas G. McGuire**.  Financing Psychotherapy. *The Journal of Risk and Insurance*, 53(3):484-491, 1986.

Barbara Dickey, Nancy L. Cannon, **Thomas G. McGuire**, and Jon Gudeman.  The Quarterway House:  A Two-Year Cost Study of an Experimental Residential Program.  *Hospital and Community Psychiatry*, 37(11):136-143, 1986.

Barbara Dickey, Nancy Cannon, and **Thomas G. McGuire**.  Mental Health Cost Models: Refinements and Applications, *Medical Care*, 24(9):857-867, 1986.

Barbara Dickey, Nancy Cannon, and **Thomas G. McGuire**.  Mental Health Cost Studies: Some Observations on Methodology. *Administration in Mental Health*, 13(3):189-201, 1986.

**Thomas G. McGuire** and Richard Scheffler.  Summary of Issues in Research in Economics and Mental Health.  *Journal of Human Resources*, 21(3):289-292, 1986.

Barbara F. Shatkin, Linda K. Frisman and **Thomas G. McGuire**.  The Effect of Vendorship on the Distribution of Clinical Social Work Services.  *Social Services Review*, 60(3):437-448, 1986.

Randall P. Ellis and **Thomas G. McGuire**.  Cost Sharing and Patterns of Mental Health Care Utilization.  *Journal of Human Resources*, 21(3):359-380, 1986.

Alvin K. Klevorick and **Thomas G. McGuire**.  Monopolistic Competition and Pricing in Psychologists' Services. In McGuire and Scheffler (Eds.) *Research Issues in Economics and Mental Health*, JAI Press, 1987.

4

Sarah Hall and **Thomas G. McGuire**.  Ownership and Performance: The Case of Outpatient Mental Health Clinics.  *Medical Care*, 25(11):179-1183, 1987.

Kyle L. Grazier and **Thomas G. McGuire**.  Payment Systems and Hospital Resource Use:  A Comparative Analysis of Psychiatric, Medical and Obstetric Services.  McGuire and Scheffler (Eds.) *Research Issues in Economics and Mental Health*, JAI Press, 1987.

**Thomas G. McGuire**, Barbara Dickey, Gerald Shively, and Ira Strumwasser.  DRGs and Private Health Insurance: Implications for Design of Prospective Payment Systems.  *American Journal of Psychiatry*, 144(5):616-620, 1987.

Randall P. Ellis and **Thomas G. McGuire**.  Setting Capitation Payments in Markets for Health Services. *Health Care Financing Review*, 8(4):55-64, 1987.

Randall P. Ellis and **Thomas G. McGuire**.  Insurance Principles and Design of Prospective Payment Systems.  *Journal of Health Economics*, 7:215-237, 1988.

**Thomas G. McGuire** and Alan Fairbank. Patterns of Mental Health: Utilization over Time: Evidence from the Fee-For-Service Sector.  *American Journal of Public Health*, 78(2):134-136, 1988.

Alice Liberman, Barbara Shatkin, and **Thomas G. McGuire**. Assessing the Effect of Vendorship: A One-State Case Study.  *Journal of Independent Social Work Practice*, 2(4):59-74, 1988.

Lois Camberg and **Thomas G. McGuire**. Inpatient Psychiatric Units in General Hospitals: Response to Mental Health Policy or Hospital Economics?  *Medical Care*, 27(2): 130-139, 1989.

**Thomas G. McGuire**.  Financing and Reimbursement of Mental Health Services. Taube and Mechanic (Eds.) *The Future of Mental Health Services Research, National Institute of Mental Health*, 1989.

**Thomas G. McGuire**. Outpatient Benefits for Mental Health Services in Medicare: Alignment with the Private Sector? *American Psychologist*, 44(5):818-824, 1989.

Marc Friedman, Randall P. Ellis, and **Thomas G. McGuire**.  Provider response to Medicare's PPS: Reductions in Length of Stay for Psychiatric Patients Treated in Scatter Beds. *Inquiry*, 26 (2): 192-201, 1989.

**Thomas G. McGuire.** Combining Demand and Supply Side Cost Sharing: the Case of Inpatient Mental Health Care.  *Inquiry*, 26(2) 192-201, 1989.

Sara Bachman, **Thomas G. McGuire,** et al. Preferred Provider Organizations: Options for Medicare. *Inquiry*, 26(1):24-34, 1989.

Linda K. Frisman and **Thomas G. McGuire**.  The Economics of Long-Term Care for the Mentally Ill. *The Journal of Social Issues*, 45(3):119-130, 1989.

Randall P. Ellis, Cynthia Gallup, and **Thomas G. McGuire**.  Should Medical Professional Liability Insurance be Experience Rated? *Journal of Risk and Insurance*, 57(1):66-78, 1990.

Randall P. Ellis and Thomas G McGuire.  Optimal Payment Systems for Health Services. *Journal of Health Economics*, 9:375-936, 1990.

David A. Lambert and **Thomas G. McGuire**.  Political and Economic Determinants of Insurance Regulation in Mental Health.  *Journal of Health Politics, Policy, and Law*, 15(1): 169-190, 1990.

**Thomas G. McGuire**. Growth of a Field of Policy Research: The Economics of Mental Health. *Journal of Administration and Policy in Mental Health.*

Richard G. Frank and **Thomas G. McGuire**.  Mandating Employer Coverage of Mental Health Care.  *Health Affairs*, 9(1):32-42, 1990.

**Thomas G. McGuire**, William S. Mosakowski, and Linda S. Radigan.  Designing a State-Level Prospective Payment System for Inpatient Psychiatric Services in Medicaid: New Hampshire's Peer Group Approach.  *Administration and Policy in Mental Health*, 19(1):43-54, 1990.

**Thomas G. McGuire** and Barbara Shatkin. Forecasting the Cost of Drug Abuse Treatment Coverage in Private Health Insurance.  In Cartwright and Kaple (Eds.) *Economic Costs, Cost Effectiveness, Financing and Community-Based Drug Treatment*, National Institute on Drug Abuse Research Monograph #113, 1991.

Richard G. Frank, **Thomas G. McGuire**, and David Salkever Benefit Flexibility, Cost Shifting, and Mandated Mental Health Coverage.  *Journal of Mental Health Administration*, 18(3): 264-271, 1991.

**Thomas G. McGuire**. Measuring the Economic Cost of Schizophrenia. *Schizophrenia Bulletin*, 17(3):375-388, 1991.

Jerry Cromwell, Brooke Harrow, **Thomas G. McGuire**, and Randall P. Ellis.  Medicare Payment to Psychiatric Facilities: Unfair and Insufficient?  *Health Affairs*, 10(2): 124-134, 1991.

Diana C. Walsh, Ralph W. Hingston, and **Thomas G. McGuire**.  A Randomized Trial of Treatment Options for Alcohol-Abusing Workers.  *New England Journal of Medicine*, 325:775-782, 1991.

David A. Lambert and **Thomas G. McGuire**.  Determinants of Stringency of Psychologist Licensure. *International Journal of Law and Psychiatry*, 14:315-329, 1991.

**Thomas G. McGuire**. Paralyzing Medicare's Demand-Side Policies.  In H.E. Frech III (Eds.) Setting Physicians' Fees, *American Institute Enterprise*, 1991.

**Thomas G. McGuire** and Mark V. Pauly.  Physician Response to Fee Schedules with Multiple Payers.  *Journal of Health Economics*, 10:385-410, 1991.

Marc Cohen, Nanda Kumar, **Thomas G. McGuire**, and Stanley S. Wallack.  Response to Weiner et al.  *Journal of Health Politics, Policy, and Law*, 17(3):435-438, 1992.

Marc Cohen, Nanda Kumar, **Thomas G. McGuire**, and Stanley S. Wallack.  Financing Long-Term Care: A Practical Mix of Public and Private. *Journal of Health Politics, Policy, and Law*, 17(3):403-424, 1992.

**Thomas G. McGuire**, Christopher Ruhm, and Barbara Shatkin.  Defining the Public Interest in Workplace Drug Abuse Policy.  *National Institute on Drug Abuse Research Monograph*, 1992.

**Thomas G. McGuire**.  Research on Economics in Mental Health: The Past and Future Prospects. In Frank and Manning (Eds.) *Economics and Mental Health*, Johns Hopkins University Press, 1992.

**Thomas G. McGuire**. Estimating Cost of a Mental Health Benefit: A Small-Employer Mandate in Connecticut.  In Frank and Manning (Eds.) *Economics and Mental Health*, Johns Hopkins University Press, 1992.

Jerry Cromwell, Randall P. Ellis, Brooke Harrow, and **Thomas G. McGuire**.  A Modified TEFRA System for Medicare Discharges from Psychiatric Facilities.  In Frank and Manning (Eds.) *Economics and Mental Health*, Johns Hopkins University Press, 1992.

Constance Horgan and **Thomas G. McGuire**.  Financing Child and Adolescent Inpatient Mental Health Care Through Private Insurance.  In the *Financing of Mental Health Services for Children and Adolescents*, National Center for Education in Maternal and Child Health: Washington, DC, 1992.

**Thomas G. McGuire**, Richard G. Frank, and Howard H. Goldman.  Designing a Benefit Plan for Child and Adolescent Mental Health Services.  *Administration and Policy in Mental Health*, 1(3):151-157, 1992.

Richard G. Frank, Howard H. Goldman, and **Thomas G. McGuire**.  A Model Mental Health Bbenefit in Private Insurance.  *Health Affairs*, 11(3):98-117, 1992.

**Thomas G. McGuire** and Christopher Ruhm.  Workplace Drug Abuse Policy. *Journal of Health Economics,* 12:19-38, 1993.

**Thomas G. McGuire**.  Outcomes, Costs, and Design of Health Insurance for Depression.  In B. Jonsson and J. Rosembaum (Eds.) *Health Economics of Depression*, John Wiley & Sons, 1993.

John Schneider, Jerry Cromwell, and **Thomas G. McGuire**.  Excluded Facility Financial Status and Options for Payment System Modification. *Health Care Financing Review*, 15(2)7-30, 1993.

**Thomas G. McGuire** and Michael H. Riordan.  Contracting for Community-Based Public Mental Health Services. In Hu and Rupp (Eds.), *Economics and Mental Health*, Advances in Health Economics and Health Services Research, 14:55-69, 1993.

Randall P. Ellis and **Thomas G. McGuire**.  Supply-Side and Demand-Side Cost Sharing in Health Care. *Journal of Economic Perspectives*, 7(4):135-151, 1993.

Jacob Glazer and **Thomas G. McGuire**.  Should Physicians be Permitted to "Balance Bill" Patients? *Journal of Health Economics*, 12(3):239-258, 1993.

Albert Ma and **Thomas G. McGuire**.  Paying for Joint Costs in Health Care. *Journal of Economics and Management Strategy*, 2(1):71-95, 1993.

Randall P. Ellis and **Thomas G. McGuire**. Reparto de costs en atencion sanitaria por el lado de la oferta y por ewl lado de la demanda. Pere Ibern (Ed.), Springer-Vaerlag Iberica, 1999, 127-146 translated from Supply-Side Demand and Demand-Side Cost Sharing in Health Care. *Journal of Economic Perspectives*, Fall 1993).

Dominic Hodgkin and **Thomas G. McGuire**.  Hospital response to Prospective Payment. *Journal of Health Economics*, 13:1-29, 1994.

Jacob Glazer and **Thomas G. McGuire**.  Payer Competition and Cost Shifting in Health Care. *Journal of Economics and Management Strategy*, 3(1):71-92, 1994.

**Thomas G. McGuire**.  Predicting the Costs of Mental Health Benefits.  Milbank Memorial Fund Quarterly: *Health and Society*, 72(1):3-23, 1994.

Richard G. Frank, **Thomas G. McGuire**, Darrel A Regier, Ronald Manderscheid, and Albert Woodward.  Paying for Mental Health and Substance Abuse Care. *Health Affairs*, 13(1):337-342, 1994.

Bernard S. Arons, Richard G. Frank, Howard H. Goldman, **Thomas G. McGuire**, and Sharman Stephens.  Mental Health and Substance Abuse Coverage Under Health Reform.  *Health Affairs*, 13(1):337-342, 1994.

Margaret Commons, Dominic Hodgkin, **Thomas G. McGuire**, and Michael Riordan. Summaries of State Programs. In G. Denmead and B. Rouse (Eds.) *Financing Drug Treatment Through State Programs*, Services Research Monograph No. 1, National Institute on Drug Abuse, 1994.

Margaret Commons, Dominic Hodgkin, **Thomas G. McGuire**, and Michael Riordan.  Paying For Drug Abuse Services in the Six New England States.  In G. Denmead and B. Rouse (Eds.) *Financing Drug Treatment Through State Programs*, Services Research Monograph No. 1, National Institute on Drug Abuse, 1994.

Howard H. Goldman, Richard G. Frank, and **Thomas G. McGuire**.  Mental Health Care.  In E. Ginzburg (Eds.) *Critical Issues in U.S. Health Reform*, 1994.

Richard G. Frank and **Thomas G. McGuire**.  Health Care Reform and Financing of Mental Health Services: Distributional Consequences.  In R. Manderscheid (Eds.) *Mental Health*, 1994.

Richard G. Frank and **Thomas G. McGuire**.  Establishing a Capitation Policy for Mental health and Substance Abuse Services in Health Care Reform.  *Behavioral Healthcare Tomorrow*, 3(4):36-39, 1994.

Richard G. Frank, Howard H. Goldman, and **Thomas G. McGuire**.  Who Will Pay For Health Reform?  Consequences of Redistribution of Funding for Mental Health Care. *Hospital and Community Psychiatry*, 45(9):906-910, 1994.

**Thomas G. McGuire** and Michael H. Riordan.  Incomplete Information and Optimal Market Structure: Public Purchases from Private Providers. *Journal of Public Economics*, 56:125-141, 1995.

**Thomas G. McGuire**, Dominic Hodgkin, and Donald Shumway.  Managing Medicaid Mental Health Costs: The Case of New Hampshire.  *Administration and Policy in Mental Health*, 23(2)98-117, 1992.

**Thomas G. McGuire** and Beverly Porter. State Mental Health Agency Spending, 1986-1990.  *Journal of Mental Health Administration*, 22(3):301-319, 1995.

**Thomas G. McGuire**.  Effectiveness, Patient Matching, and Insurance Coverage for Depression.  *Social Psychiatry and Psychiatric Epidemiology*, 30:240-243, 1995.

Richard G. Frank and **Thomas G. McGuire**.  Estimating the Costs of Mental Health and Substance Abuse Coverage for Public Policy.  *Health Affairs*, 14(3):102-115, 1995.

Richard G. Frank, **Thomas G. McGuire**, and Joseph P. Newhouse.  Risk Contacts in Managed Mental Health Care. *Health Affairs*, 14(3):102-115, 1995.

Karen Jacobsen, **Thomas G. McGuire**, and Elizabeth Notman.  Organizational Structure and State Mental Health Expenditures.  *Administration and Policy in Mental Health,* 23(6):475-492, 1996.

Richard G. Frank and **Thomas G. McGuire**.  Health Care Financing Reform and State Mental Health Systems. In Rich White (Eds.) *Health Policy*, Federalism and the American States, 1996.

Richard G. Frank, Howard Goldman, and **Thomas G. McGuire**.  Insuring Severe Mental Disorders: A Comparison of Approaches.  Massimo Moscarelli, Agnes Rupp, and Norman Sartorius (Eds.) *Vol 1 Schizophrenia of Handbook of Mental Health Economics and Policy*, 411-422, 1996.

Karen Jacobsen and **Thomas G. McGuire**. Federal Block Grants and State Spending: The ADM Block Grant and State Agency Behavior.  *Journal of Health Politics, Policy, and Law*, 21(4):753-770, 1996.

Richard G. Frank, Haiden Huskamp, **Thomas G. McGuire**, and Joseph P. Newhouse.  Some Economics of a Mental Health Carve Out.  *Archives of General Psychiatry*, 53:933-957, 1996.

Richard G. Frank and **Thomas G. McGuire**.  Managed Care for People with Disabilities: Individuals with Severe Mental Illnesses.  In S. Altman and U. Reinhardt (Eds.) *Strategic Choices for a Changing Health Care System*, 1996.

Richard G. Frank and **Thomas G. McGuire**.  Introduction to the Economics of Mental Health.  In Levin and Petrila (Eds.) *Mental Health Services: A Public Health Perspective*, 1996.

Christine Spencer, Richard G. Frank, and **Thomas G. McGuire**.  How Should the Profit Motive be Used in Managed Care? In Lazarus (Eds.) *Controversies in Managed Care*, 1996.

Randall P. Ellis and **Thomas G. McGuire**.  Hospital Responses to Prospective Payment: Moral Hazard, Selection, and Practice-Style Effects.  *Journal of Health Economics*, 15:257-277, 1996.

**Thomas G. McGuire**.  Commentary on Rizzo and Blumenthal. Is the Target Income Hypothesis an Economic Heresy? *Medical Care Research and Review,* 53(3):267-277, 1996.

Ching-To Albert Ma and **Thomas G. McGuire**.  Optimal Health Insurance and Provider Payment.  *American Economic Review,* 87(4): 685-704, 1997.

Ernst R. Berndt, Richard G. Frank, and **Thomas G. McGuire**.  Alternative Insurance Arrangements and the Treatment of Depression: What Are the Facts?  The American *Journal of Managed Care*, 3(2): 243-250, 1997.

Richard G. Frank, Chris Koyangi, and **Thomas G. McGuire**.  The Politics and Economics of Mental Health Parity Laws.  *Health Affairs*, 16(4): 108-119, 1997.

Margaret Commons, Thomas G. McGuire and Michael H. Riordan.  Performance Contracting for Substance Abuse Treatment, *Health Services Research,* 32(5): 631-650. 1997.

Margaret Commons and **Thomas G. McGuire**.  Some Economics of Performance-Based Contracting for Substance-Abuse Services.  In Egertson, Fox, and Leshner (Eds.) *Treating Drug Abusers*, 223-249, 1997.

Richard G. Frank, **Thomas G. McGuire**, Jay Bae, and Agnes Rupp. Carve-Outs, Risk Adjustment, and Risk Sharing as Solutions for Adverse Selection in Behavioral Health Care. *Health Care Financing Review*, 18(3): 109-122, 1997.

Richard G. Frank and **Thomas G. McGuire**. Savings From a Medicaid Carve-Out for Mental Health and Substance Abuse Services in Massachusetts. *Psychiatric Services*, 48(9): 1147-1152, 1997.

Robin E. Clark, Gregory B. Teague, **Thomas G. McGuire**, et al. Cost-Effectiveness of Assertive Community Treatment versus Standard Care Management for Persons with Co-Occurring Severe Mental Illness and Substance Use Disorders. *Health Services Research*, 33(5): 1285-1308, 1998.

Ching-To Albert Ma and **Thomas G. McGuire**. Cost and Incentives in a Behavioral Health Carve Out. *Health Affairs*, 17(2):53-69, 1998.

Richard G. Frank and **Thomas G. McGuire**. The Economic Function of Carve Outs in Managed Care. *American Journal of Managed Care*, 6(4): Sp31-Sp39, 1998.

Susan L. Ettner, Richard G. Frank, **Thomas G. McGuire**, Joseph P. Newhouse, and Elizabeth Nutman. Risk Adjustment of Mental Health and Substance Abuse Payments. *Inquiry*, 35: 223-239, 1998.

Richard G. Frank and **Thomas G. McGuire**. Parity for Mental Health and Substance Abuse Care Under Managed Care. *The Journal of Mental Health Policy and Economics*, 1: 153-159, 1998.

Richard G. Frank, **Thomas G. McGuire**, Sharon-Lise T. Normand, and Howard H. Goldman. The Value of Mental Health Services at the System Level: The Case of Treatment for Depression. *Health Affairs*, 18(5): 71-86, 1999.

Elaine Fleming, Ching-To Albert Ma, and **Thomas G. McGuire**. Behavioral Health Expenditures and State Organizational Structure. *Administration and Policy in Mental Health*, 27(3): 91-111, 2000.

Richard G. Frank and **Thomas G. McGuire**. Economics of Mental Health. In Culyer and Newhouse (Eds.) *Handbook of Health Economics*, 2000.

**Thomas G. McGuire**. Physician Agency. In Culyer and Newhouse (Eds.) *Handbook of Health Economics*, 2000.

Jacob Glazer and **Thomas G. McGuire**. Optimal Risk Adjustment of Health Insurance Premiums: An Application to Managed Care. *American Economic Review*, 90(4): 1055-1071, 2000.

**Thomas G. McGuire** and Richard G. Frank. The Mental Health Economy and Mental Health Economics. *Mental Health*, 2001.

Richard G. Frank, Jacob Glazer, and **Thomas G. McGuire**. Adverse Selection in Managed Health Care. *Journal of Health Economics*, 19(6): 829-854, 2001.

Jacob Glazer and **Thomas G. McGuire**. Why Don't Private Employers Use Formal Risk Adjustment? Conference Overview. *Inquiry*, 38(3): 242—244, 2001.

Jacob Glazer and **Thomas G. McGuire**. Private Employers Don't Need Formal Risk Adjustment. *Inquiry*, 38(3): 260-69, 2001.

Patricia S. Keenan, Melinda J. Beeuwkes Buntin, **Thomas G. McGuire**, and Joseph P. Newhouse. The Prevalence of Formal Risk Adjustment. *Inquiry*, 38(3): 245-259, 2001.

Susan L Ettner, Richard G. Frank, **Thomas G. McGuire**, and Richard C. Hermann. Risk Adjustment Alternatives in Paying for Behavioral Health Care Under Medicaid. *Health Services Research*, 36(4): 793-811, 2001.

Margarita Alegria, **Thomas G. McGuire**, Mildred Vera, Glorisa Canino, Daniel Freeman, Leida Matias, Carmen Albizu, Heriberto Marin, and Jose Calderon. The Impact of Managed Care on the Use of Outpatient Mental Health and Substance Abuse Services in Puerto Rico. *Inquiry*, 38(4): 381-965, 2001.

Margarita Alegria, **Thomas G. McGuire**, Mildred Vera, Glorisa Canino, Carmen Albizu, Heriberto Marin, and Leida Matias.  Does Managed Mental Health Care Reallocate Resources to Those with Greater Need for Services?  *The Journal of Behavioral Health Services and Research*, 28(4): 439-455, 2001.

Margarita Alegria, **Thomas G. McGuire**, Mildred Vera, Glorisa Canino, Leida Matias, Carmen Albizu, and Jose Calderon.  Changes in Access to Mental Health Care for the Poor and the Non-Poor with Managed Care: Results from the Health Care Reform in Puerto Rico.  *American Journal of Public Health,* 91(9):1431-1434, 2001.

Richard G. Frank, Howard H. Goldman, and **Thomas G. McGuire**.  Will Parity Coverage Result in Better Mental Health Care? *New England Journal of Medicine*, 345(23): 1701-1704, 2001.

Ann Balsa and **Thomas G. McGuire**.  Statistical Discrimination in Health Care. *Journal of Health Economics,* 20:881-907, 2001.

Mingshan Lu and **Thomas G. McGuire**.  The Productivity of Outpatient Treatment for Substance Abuse.  *Journal of Human Resources*, 38(2): 309-335, 2002.

Sharon-Lise T. Normand, Richard G. Frank, and **Thomas G. McGuire**.  Using Elicitation Techniques to Estimate the Value of Ambulatory Treatments for Major Depression.  *Medical Decision Making*, 22(3): 245-260, 2002.

**Thomas G. McGuire**, Kenneth B. Wells, Martha L. Bruce, Jeanne Miranda, Richard Scheffler, Mary Durham, Dan Ford, and Lydia Lewis.  Burden of Illness.  *Mental Health Services Research*, 4(4): 179-185, 2002.

Kenneth B. Wells, Jeanne Miranda, Mark S. Bauer, Martha L. Bruce, Mary Durham, Javier Escobar, Daniel Ford, Junius Gonzalez, Kimberly Hoagwood, Sarah M. Horowitz, William Lawson, Lydia Lewis, **Thomas G. McGuire**, Harold Pincus, Richard Scheffer, William A. Smith, and Jurgen Unutzer.  Overcoming Barriers to Reducing the Burden of Affective Disorders.  *Biological Psychiatry*, 52: 655-675, 2002.

Jacob Glazer and **Thomas G. McGuire**.  Setting Health Plan Premiums to Ensure Efficient Quality in Health Care: Minimum Variance Optimal Risk Adjustment.  *Journal of Public Economics.*  84(2): 153-173, 2002.

Ching-To Albert Ma and **Thomas G. McGuire**.  Network Incentives for Managed Health Care.  *Journal of Economics and Management Strategy.* 11(1): 1-35, 2002.

Jacob Glazer and **Thomas G. McGuire**.  Multiple Payers, Commonality, and Free-Riding in Health Care Medicare and Private Payers.  *Journal of Health Economics*, 21: 1049-1069, 2002.

Ching-To Albert Ma, **Thomas G. McGuire**, and Yong Weng. Monitoring and Enforcement in Federal Alcohol and Drug Abuse Block Grants.  The Economics of Health Care in Asia-Pacific Countries, *Institute of Economics*, 2002.

**Thomas G. McGuire**.  Setting prices for New Vaccines (in Advance).  *International Journal of Health Care Finance and Economics*, 3: 207-224, 2003.

Zhun Cao and **Thomas G. McGuire**.  Service-Level Selection by HMOs in Medicare.  *Journal of Health Economics*, 22: 915-931, 2003.

Richard G. Frank and **Thomas G. McGuire**.  Setting Payments in the Ticket to Work Program: Applying Experience from Capitation Payments in Health Insurance.  Paying for Results in Vocational Rehabilitation: Will Provider Incentives Work for Ticket to Work? *The Urban Institute,* 155-176, 2003.

Elaine Fleming, Hsien-Ming Lien, Ching-To Albert Ma, and **Thomas G. McGuire**.  Managed Care and Trends in Hospital Care for Mental health and Substance Abuse Treatment in Massachusetts: 1994-1997.  *The Journal of Mental Health Policy and Economics*, 6: 3-12, 2003.

Susan M. Essock, Robert E. Drake, Richard G. Frank, and **Thomas G. McGuire**.  Randomized Controlled Trials in Evidence-Based Mental Health Care: Getting the Right Answer to the Right Question.  *Schizophrenia Bulletin*, 29(1):  115-123, 2003.

Margarita Alegria and **Thomas G. McGuire**.  Rethinking a Universal Framework in Psychiatric Symptom-Disease Relationship.  *Journal of Health and Social Behavior*, 44: 257-274, 2003.

Ana I. Balsa and **Thomas G. McGuire**.  Prejudice, Clinical Uncertainty, and Stereotypes as Sources of Health Disparities.  *Journal of Health Economics*, 22(1) 89-116, 2003.

Jose J. Escarce and **Thomas G. McGuire**. Methods for Using Medicare Data to Compare Procedure Rates Among Asians, Blacks, Hispanics, Native Americans, and Whites.  *Health Services Research*, 38(5):1303-1319, 2003.

Ana I. Balsa, Naomi Seiler, **Thomas G. McGuire**, and Gregg Bloche.  Clinical Uncertainty and Healthcare Disparities.  *American Journal of Law and Medicine*, 29: 203-219, 2003.

Jose J. Escarce and **Thomas G. McGuire**.  Changes in Racial Differences in Use of Medical procedures and Diagnostic Test Among Elder Persons: 1986-1997.  *American Journal of Public Health*, 94(10): 1795-1799, 2004.

Rena Conti, Richard G. Frank, and **Thomas G. McGuire**.  Insuring Mental Health Care in the Age of Managed Care.  In Levin Petrila and Hennessy (Eds), *Mental Health Services*, 15-41, 2004.

Hsien-Ming Lien, Ching-To Albert Ma, and **Thomas G. McGuire**. Provider-Client Interactions and Quantity of Health Care Use.  *Journal of Health Economics,* 23(6): 1261-1283, 2004.

**Thomas G. McGuire**.  DRG-Based Payment for Hospital Care: Observations from the US Experience.  *Activity Based Funding for Hospitals: English Policy International Experience*, 2004.

Tracy Lieu, **Thomas G. McGuire**, and Alan R. Hinman.  Overcoming Economic Barriers to the Optimal Use of Vaccines.  *Health Affairs,* 24(3): 666-679. 2005.

Margarita Alegria, Richard G. Frank, and **Thomas G. McGuire**.  Managed Care and Systems Cost-Effectiveness: Treatment for Depression.  *Medical Care*, 43(12): 1225-1233, 2005.

Richard G. Frank and **Thomas G. McGuire**. Integrating People with Mental Illness into Health Insurance and Social Services.  In Mechanic, Rogut, Colby, and Knickman (Eds.), *Policy Challenges in Modern Health Care*. 223-237, 2005.

Ana I. Balsa, **Thomas G. McGuire**, and Lisa S. Meredith.  Testing for Statistical Discrimination in Health Care.  *Health Services Research*, 40(1):  227-252, 2005.

Margarita Alegria, Zhun Cao, **Thomas G. McGuire**, Victoria Ojeda, Bill Sribney, Megan Woo, and David Takeuchi.  Health Insurance Coverage for Vulnerable Populations: Contrasting Asian Americans and Latinos in the United States. *Inquiry*, 43(3): 231-254, 2006.

**Thomas G. McGuire**, Margarita Alegria, Benjamin L. Cook, Kenneth B. Wells, and Alan Zaslavsky.  Implementing the IOM Definition of Disparities: An Application to Mental Health Care.  *Health Services Research,* 41(5): 1979-2005, 2006.

Victoria Ojeda and **Thomas G. McGuire**.  Gender and Racial/Ethnic Differences in Use of Outpatient Mental Health and Substance Use Services by Depressed Adults.  *Psychiatric Q*, 77(3): 211-222, 2006.

Anna D. Sinaiko and **Thomas G. McGuire**.  Patient Inducement, Provider Priorities, and Resource Allocation in Public Mental Health Systems.  *Journal of Health Politics, Policy, and Law*, 31(6): 1075-1106, 2006.

Carla Gomes, **Thomas G. McGuire**, Jameson Foster, Sheila A. Donahue, Chip J. Felton, and Susan M. Essock. Supply of Mental Health Services in the Aftermath of 9/11: Did Project Liberty Displace Community Based Medicaid Services in New York? *Psychiatric Services*, 57(9): 1309-1312, 2006.

Colleen Barry, Richard G. Frank, and **Thomas G. McGuire**.  The Cost of Mental Health Parity: Still an Impediment?  *Health Affairs*, 25(3): 623-634, 2006.

Jacob Glazer and **Thomas G. McGuire**. Optimal Risk Adjustment. In Jones (Eds.) *The Elgar Companion to Health Economics*, 279-285, 2006.

Jacob Glazer and **Thomas G. McGuire**.  Optimal Quality Reporting in Markets for Health Plans. *Journal of Health Economics*, 25(2): 295-310, 2006.

Jacob Glazer and **Thomas G. McGuire**.  Contending with Risk Selection in Health Insurance Markets in Germany. *Perspektiven der Wirtscgaftspolitik*, 7: 75-91, 2006.

**Thomas G. McGuire**.  Paying Doctors to Improve Quality of Care.  In Rosen, Saltman, Shani (Eds.) *Health Systems*, 383-389.  The Israel National Institute for Health Policy and Health Services Research: Jerusalem Conference on Health Policy, 2006.

Randall P. Ellis and **Thomas G. McGuire**.  Predictability and Predictiveness in Health Care Spending. *Journal of Health Economics*, 26(1): 25-48, 2007.

**Thomas G. McGuire**.  Risk Adjustment Systems in Competitive Health Insurance Markets: Lessons from the United States.  In Wille, Ulrich, and Schneider (Eds.) *Wettnewerb und Riskikostrukturausgleich im internartonalen vergleich,* 2007.

**Thomas G. McGuire** and Sebastian Bauhoff.  A Decade of Choice: Tracking the German National Experience with Consumer Choice of Sickness Fund. In P. Oberender and C. Strauss (Eds) *Auf der Suche nach der besseren Losung*, 145-160, 2007.

Ming Tai-Seale, **Thomas G. McGuire**, Christopher Colenda, David Rosen, and Mary Ann Cook. Two-Minute Mental Health Care for Elderly Patients: Inside Primary Care Visits. *Journal of the American Geriatrics Society,* 55(12): 1903-1911, 2007.

Ming Tai Seale, **Thomas G. McGuire**, and Weimin Zhang.  Time Allocation in Primary Care Office Visits. *Health Research Services,* 42(5): 1871-1894, 2007.

Ana Balsa, Zhun Cao and **Thomas G. McGuire**.  Does Managed Care Reduce Health Care Disparities Between Minorities and Whites? *Journal of Health Economics* 26: 101-121, 2007.

Jacob Glazer, **Thomas G. McGuire**, and Joseph P. Newhouse.  Using Performance Measures to Motivate Report Averse and Report Loving Agents.  *Journal of Health Economics*, 26(6): 1170-1189, 2007.

Naihua Duan, Margarita Alegria, Glorisa Canino, **Thomas G. McGuire**, and David Takeuchi. Survey Conditioning in Self-Reported Mental Health Service Use: Randomized Comparison of Alternative Instrument Formats.  *Health Services Research,* 42(2): 890-907, 2007.

Benjamin L. Cook, **Thomas G. McGuire**, and Jeanne Miranda.  Measuring Trends in Mental Health Care Disparities, 2000-2004.  *Psychiatric Services,* 58(12): 1533-1540, 2007.

**Thomas G. McGuire** and Jeanne Miranda.  Racial and Ethnic Disparities in Mental Health Care: Evidence and Policy Implications.  *Health Affairs*, 27(2):393-403, 2008.

**Thomas G. McGuire**, John Z. Ayanian, Daniel, E. Ford, Rachel E.M. Henke, Kathryn M. Rost, and Alan M. Zaslavsky.  Testing for Statistical Discrimination by Race/Ethnicity in Panel Data for Depression Treatment in Primary Care.  *Health Services Research,* 43(2): 531-551, 2008.

Jeanne Miranda, **Thomas G. McGuire**, David R. Williams, and Phillip Wang.  Mental Health in the Context of Health Disparities.  *The American Journal of Psychiatry*, 165(9): 1102-1108, 2008.

Chunlung Lu, Richard G. Frank, and **Thomas G. McGuire**.  Demand Response of Mental Health Services to Cost Sharing under Managed Care. *The Journal of Mental Health Policy and Economics,* 11(3): 113-126, 2008.

Rachel E.M. Henke, **Thomas G. McGuire**, Alan M. Zaslavsky, Daniel E. Ford, and Jose Arbelaez.  Clinician and Organizational Level Factors in the Adoption of Evidence-Based

Care for Depression in Primary Care. *Health Care Management Review,* 33(4): 289-299, 2008.

**Thomas G. McGuire** and Jeanne Miranda.  New Evidence Regarding Racial and Ethnic Disparities in Mental Health: Policy Implications.  *Health Affairs,* 27(2): 393-403, 2008.

Jacob Glazer and **Thomas G. McGuire**.  Inducing Quality from Health Care Providers in the Presence of Adverse Selection.  In Lu, Mingshan, and Jonsson (Eds.) *Financing Health Care: New Ideas for a Changing Society*, 9:223-244, 2008.

Jacob Glazer, **Thomas G. McGuire**, and Sharon-Lise T. Normand.  Mitigating the Problem of Unmeasured Outcomes in Quality Reports.  *The B.E. Journal of Economic Analysis and Policy*, 8(2): 7, 2008.

Jacob Glazer, **Thomas G. McGuire**, Zhun Cao, and Alan M. Zaslavsky.  Using Global Ratings of Health Plans to Improve the Quality of Health Care.  *Journal of Health Economics*, 27(5): 1182-1195, 2008.

**Thomas G. McGuire**.  Physician Fees and Behavior: Implications for Structuring a Fee Schedule. In Sloan and Kasper (Eds.) *Incentives and Choice in Health Care,* 263-288, 2008.

Chunling Lu, Richard G. Frank, and **Thomas G. McGuire**.  Demand Response Under Managed Health Care.  *Contemporary Economic Policy*, 27(1): 1-15, 2009.

Benjamin L. Cook, **Thomas G. McGuire**, and Samuel H. Zuvekas.  Measuring Trends in Racial/Ethnic Health Care Disparities.  *Medical Care Research and Review*, 66: 23-48, 2009.

Victoria Ojeda, Richard G. Frank, and **Thomas G. McGuire**.  Mental illness, Nativity, Gender and Labor Supply.  *Health Economics*, 19(4): 396-421, 2009.

Jeffrey Swanson, Marvin Swartz, Richard A. Van Dorn, John Monahan, **Thomas G. McGuire**, Henry J. Steadman, and Pamela Clark Robbins.  Racial Disparities in Involuntary Outpatient Commitment: Are They Real? *Health Affairs*, 28(3): 816-826, 2009.

Benjamin L. Cook, **Thomas G. McGuire**, Ellen Meara, and Alan M. Zaslavsky.  Adjusting for Health Status in Non-Linear Models of Health Care Disparities.  *Health Services and Outcomes Research Methodology*, 9(1): 1-21, 2009.

Marcela V. Horovitz-Lennon, Richard G. Frank, **Thomas G. McGuire**, and Margarita Alegria.  Racial and Ethnic Disparities in the Treatment of a Medicaid Population with Schizophrenia. *Health Services Research*, 44(6): 2106-2122.

David C. Grabowski and **Thomas G. McGuire**.  Black-White Disparities in Care in Nursing Homes.  *Atlantic Economic Journal*, 37(3): 299-314, 2009.

Alisa B. Busch, Haiden A. Huskamp, Brian Neelon, Tim Manning, Sharon-Lise T. Nomrand, and **Thomas G. McGuire**.  Longitudinal Racial/Ethnic Disparities in Antimanic Medication Use in Bipolar-I Disorder.  *Medical Care*, 47(12): 1217-1228, 2009.

Richard G. Frank, **Thomas G. McGuire**, and Howard H. Goldman.  Trends in Mental Health Cost Growth: An Expanded Role for Management?  *Health Affairs*, 28(3): 649-659, 2009.

Catherine Fullerton, David C. Grabowski, **Thomas G. McGuire**, and Vincent Mor.  Trends in Mental Health Admissions to Nursing Homes: 1999-2005.  *Psychiatric Services*, 60(7): 965-71, 2009.

Rachel Henke and **Thomas G. McGuire**. Clinical Inertia in Depression Treatment. *Medical Care*. 47(9): 959-967, 2009.

Elizabeth L. Merrick, **Thomas G. McGuire**, et al.  Integrated Employee Assistance Program/Managed Behavioral Healthcare Benefits: Relationship with Access and Client Characteristics.  *Administration and Policy in Mental Health and Mental Health Services Research*, 36(6): 416-423, 2009.

13

Hsien-Ming Lien, Mingshan Lu, Ching-To Albert Ma, and **Thomas G. McGuire**.  Progress and Compliance in Alcohol Abuse Treatment.  *Journal of Health Economics*, 29 (2): 213-225, 2009.

Elizabeth L. Merrick, Dominic Hodgkin, Deidre Hiatt, Constance M. Horgan, Vanessa Azzone, Bernard McCann, Grant Ritter, Galima Zolotusky, **Thomas G. McGuire**, and Sharon Reif.  Patterns of Service Use in Two Types of Managed Behavioral Health Care Plans.  *Psychiatric Services*, 61(1): 86-90, 2010.

**Thomas G. McGuire** and Anna Sinaiko.  Regulating a Health Insurance Exchange: Implications for Individuals with Mental Illness.  *Psychiatric Services*, 61(11): 1074-1080, 2010.

**Thomas G. McGuire**.  Introduction to Special Section on Health Reform and Mental Illness.  *Psychiatric Services*, 61(11): 1073, 2010.

Richard G. Frank and **Thomas G. McGuire**.  Mental Health Treatment and Criminal Justice Outcomes.  In Cook, Ludwig, McCrary (Eds*.) Controlling Crime: Strategies and Tradeoffs*, 2010.

Jeffrey W. Swanson, Richard A. Van Dorn, Marvin S. Swartz, Andrew M. Cislo, Christine M. Wilder, Lorna L. Moser, Allison R. Guilbert, and **Thomas G. McGuire**.  Robbing Peter to Pay Paul: Did New York State's Outpatient Commitment Program Crowd Out Voluntary Service Recipients?  *Psychiatric Services*, 61(10): 888-995, 2010.

Dominic Hodgkin, Elizabeth L. Merrick, Deidre Hiatt, Constance M. Horgan, and **Thomas G. McGuire**.  The Effect of Employee Assistance Plan Benefit on the Use of Outpatient Behavioral Health Care.  *Journal of Mental Health Policy and Economics,* 13(4): 167-174, 2010.

Benjamin L. Cook, **Thomas G. McGuire**, Kari Lock, and Alan M. Zaslavsky.  Comparing Methods of Racial and Ethnic Disparities Measurement across Different Settings of Mental Health Care.  *Health Services Research* 45(2): 825-847, 2010.

**Thomas G. McGuire**.  Payment Reform to Finance a Medical Home.  Comment on Achieving Cost Control, Care Coordination, and Quality Improvement Through Incremental Payment System Reform.  *Journal of Ambulatory Care Management*, 33(1): 35-37, 2010.

**Thomas G. McGuire** and Sebastian Bauhoff.  Adoption of a Cost-Saving Innovation: Germany, UK, and Simvastatin.  In Klusen, Verheyen, and Wagner (Eds.) *England and Germany in Europe – What Lessons Can We Learn From Each Other?*  11-26, 2011.

**Thomas G. McGuire**, Anna D. Sinaiko, and Joseph P. Newhouse.  An Economics History of Medicare Part C.  *The Millbank Quarterly*, 2(89), 2011.

David C. Grabowski, Christopher C. Afendulis, and **Thomas G. McGuire**.  Medicare Prospective Payment and the Volume and Intensity of Skilled Nursing Facility Services.  *Journal of Health Economics*, 30(4): 675-684, 2011.

Jacob Glazer and **Thomas G. McGuire**.  Gold and Silver Health Plans:  Accommodating Demand Heterogeneity in Managed Competition.  *Journal of Health Economics*, 30(5):1011, 2011.

John M. McWilliams, Christopher C. Afendulis, and **Thomas G. McGuire**.  Complex Medicare Advantage Choices May Overwhelm Seniors – Especially Those With Impaired Decision Making.  *Health Affairs*, 30(9): 1786-1794, 2011.

Ernst R. Berndt, **Thomas G. McGuire**, and Joseph P. Newhouse.  A Primer on the Economics of Prescription Pharmaceutical Pricing in Health Insurance Markets.  *Forum for Health Economics and Policy*, 14(2), 2011.

Benjamin L. Cook, **Thomas G. McGuire**, Margarita Alegria, and Sharon-Lise T. Normand.  Crowd-out and Exposure Effects of Physical Comorbidities on Mental Health Care Use:  Implications for Racial-Ethnic Disparities in Access.  *Health Services Research*, 46(4): 1259-1280, 2011.

14

Catherine Fullerton, Alisa B. Busch,  Sharon-Lise T. Normand, **Thomas G. McGuire**, and Arnold M. Epstein.  Ten-Year Trends in Quality of Care and Spending for Depression: 1996-2005.  *Archive of General Psychiatry*, 68(12): 1218-1226, 2012.

Catherine Fullerton, Arnold M. Epstein, Richard G. Frank, Sharon-Lise T. Normand, Christina X. Fu, and **Thomas G. McGuire**. Medication Use and Spending Trends Among Children with ADHD in Florida's Medicaid Program. *Psychiatric Services*, 63(2): 115-121, 2012.

Benjamin L. Cook, **Thomas G. McGuire**, and Alan M. Zaslavsky.  Measuring Racial/Ethnic Disparities in Health Care:  Methods and Practical Issues.  *Health Services Research*, 2011, 45(4): 1259-1280, 2012.

Jacob Glazer and **Thomas G. McGuire**.  A Welfare Measure of Offset Effects in Health Insurance.  *Journal of Public Economics*, 96: 520-523, 2012.

Ming Tai-Seale and **Thomas G. McGuire**. Time is Up: The Increasing Shadow Price of Time in Primary Care Office Visits.  *Health Economics*, 21: 457-476, 2012.

Jacob Glazer, Haiden Huskamp, and **Thomas G. McGuire**.  A Prescription for Drug Formulary Evaluation: An Application of Price Indices.  *Forum for Health Economics and Policy*, 15(2): 1558, 2012.

**Thomas G. McGuire**.  Demand for Health Insurance.  In Pauly, McGuire, and Barros (Eds.) *Handbook of Health Economics*, Volume 2, 2012.

Jacob Glazer and **Thomas G. McGuire**.  Making MA a Middle Class Program.  *Journal of Health Economics,* 32(2): 463-473, 2013.

**Thomas G. McGuire**, Jacob Glazer, Joseph P. Newhouse, Sharon-Lise T. Normand, Julie Shi, Anna D. Sinaiko, and Samuel Zuvekas.  Integrating Risk Adjustment and Enrollee Premiums in Health Plan Payment.  *Journal of Health Economics*, 32(6): 1263-1277, 2013.

Jane M. Zhu, Timothy J. Layton, Anna D. Sinaiko, and **Thomas G. McGuire**.  The Power of Reinsurance in Health Insurance Exchanges to Improve the Fit of the Payment System and Reduce Incentives for Adverse Selection.  *Inquiry*, 50(4): 255-274, 2013.

Jeffery Swanson, Richard Van Dorn, Marvin Swartz, Pam Robbins, Henry Steadman, **Thomas G. McGuire**, and John Monahan.  The Cost of Assisted Outpatient Treatment: Can it Save States Money?  *American Journal of Psychiatry*, 170: 1423-1432, 2014.

Joseph P. Newhouse and **Thomas G. McGuire**.  How Successful is Medicare Advantage?  *Millbank Quarterly*, 92(2): 351-394, 2014.

**Thomas G. McGuire**.  A Note on Income Effects and Health Care Cost Growth in Medicare.  *Forum for Health Economics and Policy*.  17(1): 1, 2014.

**Thomas G. McGuire**, Joseph P. Newhouse, Sharon-Lise T. Normand, Julie Shi, and Samuel Zuvekas.  Assessing Incentives for Service-Level Selection in Private Health Insurance Marketplaces.  *Journal of Health Economics*, 35(1): 47-63, 2014.

Jacob Glazer and **Thomas G. McGuire**.  Risk Adjustment as Mechanism to Design.  In Culyer (Eds.) *Encyclopedia of Health Economics*, 3: 267-271, 2014.

Benjamin L. Cook, Samuel H. Zuvekas, Nicholas Carson, Geoffrey Ferris Wayne, Andrew Vesper and **Thomas G. McGuire**.  Assessing Disparities in Treatment Among Racial/Ethnic Groups During Episodes of Mental Health Care.  *Health Services Research*, 49(1): 206-229, 2014.

Henry J. Steadman, Lisa Callahan, Pamela Clark Robbins, Roumen Vesselinov, **Thomas G. McGuire**, and Joseph P. Morrissey.  Criminal Justice and Behavioral Health Care Costs of Mental Health Court Participants: A Six year Study.  *Psychiatric Services*, 1:65(9): 1100-1104, 2014.

Richard G. Frank Sherry A. Glied, **Thomas G. McGuire**.  Paying for Early Interventions in Psychoses: A Three-Part Model.  *Psychiatric Services*, 66(7): 677-679, 2014.

Rudy Douven, **Thomas G. McGuire**, and J. Michael McWilliams.  Avoiding Unintended Incentives in ACO Payment Models.  *Health Affairs*, 34(1): 143-149, 2015.

Sherri Rose, Julie Shi, **Thomas G. McGuire**, and Sharon-Lise T. Normand.  Matching and Imputation Methods for Risk Adjustment in the Health Insurance Marketplaces. *Statistics in Biosciences,* 2015 (special issue on big data) Advance online publication. doi:10.1007/s12561-015-9135-7.

Keith M. Drake, Martha A. Starr, and **Thomas G. McGuire**.  Do Reverse Payment Settlements Constitute an Anticompetitive Pay-for-Delay? *International Journal of the Economics of Business*, 22(2): 173-200, 2015.

Benjamin L. Cook, Zimin Liu, Anna Sophia Lessios, Stephen Loder, and **Thomas G. McGuire**.  The Costs and Benefits of Reducing Racial – Ethnic Disparities in Mental Health. *Psychiatric Services*, 66(4): 389-396, 2015.

Alisa B. Busch, Arnold M. Epstein, **Thomas G. McGuire**, Sharon-Lise T. Normand, and Richard G. Frank.  Thirty Day Hospital Readmission for Medicaid Enrollees with Schizophrenia: The Role of Local health Care Systems.  *The Journal of Mental Health Policy and Economics*, 18(3): 115-124, 2015.

Ezra Golberstein, Taeho Greg Rhee, and **Thomas G. McGuire**.  Geographic Variations in use of Medicaid Mental Health Services. *Psychiatric Services*, 1:66(5): 452-454, 2015.

Joseph P. Newhouse, Mary Price, J. Michael McWilliams, John Hsu, and **Thomas G. McGuire**.  How Much Favorable Selection is Left in Medicare Advantage? *American Journal of Health Economics,* 1(1): 1-26, 2015.

Sherry A. Glied, Bradley D. Stein, **Thomas G. McGuire**, Rhonda Robinson Beale, Farifteh Firoozmand Duffy, Samantha Shugarman, and Howard H. Goldman.  Measuring Performance in Psychiatry: A Call to Action.  *Psychiatric Services*, 1:66(8): 872-878, 2015.

**Thomas G. McGuire**, Keith M. Drake, Einer Elhauge, Raymond Hartman, and Martha A. Starr.  Resolving Reverse-Payment Settlements with the Smoking Gun of Stock Price Movements.  *Iowa Law Review*, 101(4): 1581-1599, 2016.

Dominic Hodgkin, Elizabeth L. Merrick, Peggy L. O'Brien, **Thomas G. McGuire**, Sue Lee, Thilo Desckersbach, and Andrew A. Nierenberg.  Testing for Clinical Inertia in Medication Treatment of Bipolar Disorder. *Journal of Affective Disorders*, 205: 13-19, 2016

Timothy J. Layton, **Thomas G. McGuire**, and Anna D. Sinaiko.  Risk Corridors and Reinsurance in Health Insurance Marketplaces: Insurances for Insurers.  *American Journal of Health Economics*, 2(1): 66-95, 2016.

Ellen J. Montz, Timothy J. Layton, Alisa B. Busch, Randall P. Ellis, Sherri R. Rose, and **Thomas G. McGuire**.  Risk Adjustment Simulation:  Health Plans May Have Incentives to Distort Mental Health and Substance Abuse Coverage.  *Health Affairs*, 35(6): 1022-1028, 2016.

**Thomas G. McGuire.**  Achieving Mental Health Care Parity Might Require Changes in Payments and Competition.  *Health Affairs*, 35(6): 1029-1035, 2016.

Michael Geruso and **Thomas G. McGuire**.  Tradeoffs in the Design of health plan payment Systems: Fit, Power, and Balance. *Journal of Health Economics*, 47: 1-19, 2016.

Yuhua Bao, **Thomas G. McGuire**, Ya-Fen Chan, Ashley A. Eggman, Andrew M. Ryan, Martha L. Bruce, Harold Alan Pincus, Erin Hafer, and Jurgen Unutzer, Value-Based Payment in Implementing Evidence- Based Care: The Mental Health Integration Program in Washington State. *American Journal of Managed Care*, 23(1):48-53, 2017.

Jacob Glazer, **Thomas G. McGuire**, and Julie Shi.  Risk Adjustment of Health Plan Payments to Correct Inefficiencies from Adverse Selection. Ana Aizcorbe, Colin Baker, Ernst Berndt and David Cutler, editors, Measuring and Modeling Health Care Costs, Chicago: University of Chicago Press for the National Bureau of Economic Research, 2017.

Keith M. Drake and **Thomas G. McGuire**, Stock-Price Evidence for Anticompetitive Effects in the Nexium "Reverse-Payment" Settlement," *Journal of Competition Law & Economics*, 12(4): 735-747, 2016.

16

Foo, Patricia, Ming Tai-Seale, **Thomas G. McGuire**, Alan Zaslavsky, Richard Frankel, Jennifer Lafata, "Patient and Physician Race and the Allocation of Time and Patient Engagement Efforts to Mental Health Discussions in Primary Care: An Observational Study of Audiorecorded Periodic Health Exams," *Journal of Ambulatory Care Management*, 40(3): 246-256, 2017..

Timothy J. Layton and **Thomas G. McGuire**, "Options for Dealing with High-Cost Cases in Health Insurance Marketplaces," *American Journal of Health Economics,*3(2): 1-27, 2017.

David C. Grabowski, Nina R. Joyce, **Thomas G. McGuire** and Richard G. Frank, "Passive Enrollment of Dual Eligible Beneficiaries into Medicare and Medicaid Managed Care has not met Expectations," *Health Affairs* 36(5): 846-854, 2017.

Ming Tai-Seale, Laura Hatfield, **Thomas G. McGuire**, Caroline Wilson, Cheryl Stults, Ashley Stone, Lisa Diamond, Richard Frankel, Jennifer Lafata, "Periodic Health Exams and Missed Opportunities Among Patients Likely Needing Mental Health Care," *American Journal of Managed Care,*22(10): e350-e357, 2017.

**Thomas G. McGuire** and Richard C. van Kleef, "Introduction to the Special Section on Regulated Competition," *Journal of Health Economics*, (56): 234-236, December, 2017.

Richard van Kleef, **Thomas G. McGuire**, Rene van Vliet and Wynand P. van de Ven, "Improving Risk Equalization with Constrained Regression," *The European Journal of Health Economics*, 18(9): 1137-1156, 2017.

Jacob Glazer and **Thomas G. McGuire**, "Paying Medicare Advantage Plans:  To Level or Tilt the Playing Field," *Journal of Health Economics*, (56): 281-291, December, 2017.

Anna Sinaiko, Timothy J. Layton, Sherri Rose and **Thomas G. McGuire**, "Implications of Family Risk Pooling for Individual Health Insurance Markets," *Health Services Research and Methodology*, 17(3-4), pp 219-236, December, 2017.

Timothy Layton, Randall Ellis, **Thomas G. McGuire** and Richard van Kleef, "Measuring Efficiency of Health Plan Payment Systems in Managed Competition Health Insurance Markets," *Journal of Health Economics*, (56): 237-255, December, 2017.

Laura A. Hatfield, Melissa M. Fauvreault, **Thomas G. McGuire** and Michael E. Chernew, "Modelling Health Care Spending Growth of Older Adults," *Health Services Research*, 53): 238-255, February 2018.

Nina R. Joyce, **Thomas G. McGuire**, Stephen J. Bartels,  Susan L. Mitchell and David G. Grabowski, "The Impact of Dementia Special Care Units on Quality of Care:  an Instrumental Variables Analysis," *Health Services Research*, 55(5) Part I (October) 3657-3679, 2018.

**Thomas G. McGuire** and Richard C. van Kleef, "Regulated Competition in Health Insurance Markets:  Paradigms and Ongoing Issues," in McGuire and Van Kleef (eds), *Risk Adjustment, Risk Sharing and Premium Regulation in Health Insurance Markets:  Theory and Practice*, Elsevier, 2018.

**Thomas G. McGuire** and Richard C. van Kleef, "Risk Sharing" in McGuire and Van Kleef (eds), *Risk Adjustment, Risk Sharing and Premium Regulation in Health Insurance Markets:  Theory and Practice*, Elsevier, 2018.

Timothy J. Layton, Randall P. Ellis, **Thomas G. McGuire** and Richard C. van Kleef, "Evaluating the Performance of Health Plan Payment Systems," in McGuire and Van Kleef (eds), *Risk Adjustment, Risk Sharing and Premium Regulation in Health Insurance Markets: Theory and Practice*, Elsevier, 2018.

**Thomas G. McGuire** and Joseph P. Newhouse, "Medicare Advantage:  Regulated Competition in the Shadow of a Public Option," in McGuire and Van Kleef (eds), *Risk Adjustment, Risk Sharing and Premium Regulation in Health Insurance Markets:  Theory and Practice*, Elsevier, 2018.

Sherri Rose and **Thomas G. McGuire**, "Limitations of p-values and R-squared for Stepwise Regression Building:  A Fairness Demonstration in Health Policy and Risk Adjustment," *The American Statistician*, forthcoming.

Savanah Bergquist, Timothy J. Layton, **Thomas G. McGuire** and Sherri Rose, "Medicare Risk Adjustment with Systematically Missing Data," *Health Services Research*, forthcoming.

Timothy J. Layton, **Thomas G. McGuire** and Richard C. van Kleef, "Deriving Risk Adjustment Payment Weights to Maximize Efficiency of Health Insurance Markets," *Journal of Health Economics,* forthcoming.

Richard van Kleef, **Thomas G. McGuire**, Frederick T. Schut and Wynand P. van de Ven, "Strategies to Counteract Risk Selection in Social Health Insurance Markets," *Oxford Encyclopedia of Health and Economics*, forthcoming.

**Thomas G. McGuire**, "New Models of Financing in Behavioral Health:  Recipe for Efficiency or Under-Provision," in Howard H. Goldman, Richard G. Frank and Joseph P. Morrissey (eds), *Handbook of American Mental Health Policy*, Palgrave, forthcoming.

Rudy Douven, Ron van der Heijden, **Thomas McGuire** and Erik Schut, "Premium levels and demand response in health insurance: relative thinking and zero-price effects," *Journal of Economic Behavior & Organization*, forthcoming.

Joseph P. Newhouse, Mary Beth Landrum, Mary Price, J. Michael McWilliams, John Hsu, and **Thomas G. McGuire,** "The Comparative Advantage of Medicare Advantage," *American Journal of Health Economics* (forthcoming).

Christine Baugh, William Meehan, Emily Kroshus, **Thomas McGuire** and Laura Hatfield, "College Football Players Less Likely to Report Concussions and other Injuries with Increased InjuryAccumulation," *Journal of Neurotrauma*, forthcoming.

18

**Thomas McGuire:  Litigation Experience, 2014-Present**

*In re: Nexium (esomeprazole) Antitrust Litigation*, United States District Court for the District of Massachusetts, MDL No. 2409, Civil Action No. 112-cv-11711 and *In re: Nexium (esomeprazole) Antitrust Litigation*, United States District Court for the District of Massachusetts, MDL No. 2409

> Expert reports, August 2013, October 2013, January 2014, September 2014, October 2014, and November 2014
>
> Depositions, November 2013 and February 2014
>
> Testimony, November 2014

*United States of America, ex rel. Saldivar v. Fresenius Medical Care Holdings, Inc.;* United States District Court for the Northern District of Georgia, Atlanta Division, Civil Action No. 1:10-cv-01614-AT

> Expert report, November 2014
>
> Deposition, February 2015

*Monica Barba and Jonathan Reisman, on behalf of themselves and all others similarly situated v. SHIRE U.S., INC., et al.,* United States Southern District Court of Florida, Miami-Dade Division, Civil Action No. 1:13-cv-21158-JAL

> Expert report, June 2015
>
> Deposition, August 2015

*United States of America, ex rel., Tracey George and Dawn Simmons v. Fresenius Medical Care Holdings, Inc.;* United States District Court for the Northern District of Alabama, Southern Division, Civil Action No. 2:12-cv-877-AKK

> Expert report, October 2015
>
> Deposition, December 2015

*In re: Cipro Cases I & II*, In the Supreme Court of California, Case No. S198616

> Expert disclosure, April 2016
>
> Deposition, April 2016

*In re: Solodyn (Minocycline Hydrochloride) Antitrust Litigation*, United States District Court, District of Massachusetts, MDL No. 14-md-2503-DJC

> Expert reports, May 2017, August 2017, and February 2018

> Deposition, September 2017

> Testimony, March 2018

*In re: Asacol Antitrust Litigation*, United States District Court, District of Massachusetts, Civil Action No. 1:15-cv-12730-DJC

> Expert reports, June 2017 and August 2017

> Deposition, August 2017

*United States of America ex rel., Stephen A. Krahling and Joan Wlochowski v. Merck & Co., Inc.*, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 10-4374 (CDJ) and *In re Merck Mumps Vaccine Antitrust Litigation*, United States District Court for the Eastern District of Pennsylvania, Master File No. 2:12-cv-03555 (CDJ)

> Expert reports, March 2018

> Deposition, July 2018

*In re: Niaspan Antitrust Litigation*, United States District Court, District of Pennsylvania, MDL 2460

> Expert reports, May 2018 and October 2018

*In re Loestrin 24 FE Antitrust Litigation*, United States District Court for the District of Rhode Island, MDL No. 2472

> Expert report, January 2019

> Deposition, March 2019

CONFIDENTIAL

**Appendix B**
**Materials Relied Upon**

CONFIDENTIAL

**Attachment B**
**Materials Relied Upon**


<u>Legal</u>

*City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1142 (Ohio 2002).

*City of Cincinnati v. Deutsche Bank Nat'l Trust Co.*, 863 F.3d 474, 477 (6th Circuit 2017).

Corrected Second Amended Complaint (Summit County), in this matter.

Cuyahoga County, Second Amended Complaint, in this matter.

Expert Report of Dr. David Egilman, in this matter.

Expert Report of Dr. David Kessler, in this matter.

Expert Report of Dr. Matthew Perri, in this matter.

Expert Report of Dr. Nancy Young, in this matter.

Expert Report of Professor David Cutler, in this matter.

Expert Report of Professor Jonathan Gruber, in this matter.

Expert Report of Professor Meredith Rosenthal, in this matter.

Expert Report of Dr. Schumacher, in this matter.

Expert Report of Thomas McGuire regarding Damages, in this matter.

Magistrate Judge David Ruiz's Report and Recommendation, in this matter, October 5, 2018.

Restatement (Second) of Torts (1977) § 821B.


<u>Data</u>

Federal Bureau of Investigation, Crime Data Explorer, National Incident-Based Reporting System data, available at https://crime-data-explorer.fr.cloud.gov/downloads-and-docs.

Substance Abuse and Mental Health Data Archive, National Survey on Drug Use and Health 2002-2014, pooled 2002-2014 NSDUH data (ages 12 and over), available at https://www.samhsa.gov/data/sites/default/files/cbhsq-reports/Supplemental%20NSDUH%20Opioid%20Tables/heroin%20pain%20halluc%20use%20and%20disorder%20by%20state.xlsx.

Substance Abuse and Mental Health Data Archive, National Survey on Drug Use and Health, 2006-2014 summary, available at https://pdas.samhsa.gov/#/survey/NSDUH-2015-DS0001?column=UDPYOPI&results_received=true&row=CATAG6&weight=ANALWT_C.

CONFIDENTIAL

Substance Abuse and Mental Health Data Archive, National Survey on Drug Use and Health, 2015-2017 summary, available at https://pdas.samhsa.gov/#/survey/NSDUH-2016-DS0001?column=UDPYOPI&results_received=true&row=CATAG6&weight=ANALWT_C.

United States Census Bureau, Population Division, "Annual Estimates of the Resident Population by Single Year of Age and Sex for the United States, States, and Puerto Rico Commonwealth," April 1, 2010 to July 1, 2017, available at https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk.

United States Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics, Multiple Cause of Death files, available at https://www.cdc.gov/nchs/index.htm.

United States Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics, Bridged-Race Population Estimates, United States July 1st resident population by state, county, age, sex, bridged-race, and Hispanic origin. Compiled from 1990-1999 bridged-race intercensal population estimates (released by NCHS on 7/26/2004), revised bridged-race 2000-2009 intercensal population estimates (released by NCHS on 10/26/2012), and bridged-race Vintage 2017 (2010-2017) postcensal population estimates (released by NCHS on 6/27/2018), available on CDC WONDER Online Database, at http://wonder.cdc.gov/bridged-race-v2017.html.

United States Department of Labor, Bureau of Labor Statistics, CPI-All Urban Consumers, Midwest, Medical Care, Series CUUR0200SAM and CUUS0200SAM, available at https://data.bls.gov/PDQWeb/cu.

United States Department of Labor, Bureau of Labor Statistics, CPI- All Urban Consumers, Series CUSR0000SA0, available at https://www.bls.gov/cpi/data.htm.

United States Drug Enforcement Administration, National Forensic Laboratory Information System, Diversion Control Division, 2007-2017, Table 2, available at https://www.nflis.deadiversion.usdoj.gov/Resources/NFLISPublicResourceLibrary.aspx.

Other Documents

Administrative Memorandum of Agreement between the United States Department of Justice, Drug Enforcement Administration and Mallinckrodt, plc, p. 1, available at https://www.justice.gov/usao-edmi/press-release/file/986026/download.

Agreed Statement of Facts, United States of America v. The Purdue Frederick Company, Inc., United States District Court for the Western District of Virginia, Arlington Division, available at http://i.bnet.com/blogs/purdue-agreed-facts.pdf.

AHA Hospital Statistics, 2009, 2013, 2016, 2019 Editions, Ohio Table 6, p. 121, 2009 Edition pp. 206-208.

CONFIDENTIAL

Aliprantis, D., K. Fee and M.E. Schweitzer, "Opioids and the Labor Market," Federal Reserve Bank of Cleveland, 2019, Working Paper no. 18-07.

Amednews.com, "Average hospice length of stay is falling," February 1, 2012, available at https://amednews.com/article/20120201/profession/302019996/8/.

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders,* 5th edition, DSM Library. Arlington, VA, 2013.

Anderson, D.A., "The cost of crime," Foundations and Trends® in Microeconomics 7.3 (2012): 209-265, Chapter 4.

Aos, S., *et al.* "The Comparative Costs and Benefits of Programs to Reduce Crime. Version 4.0," (2001).

Arrow, K.,"Uncertainty and the Welfare Economics of Medical Care," *American Economic Review*, 53(5), December 1963, pp. 941-73.

Avorn, J., M. Chen, and R. Hartley, "Scientific Versus Commercial Sources of Influence on the Prescribing Behavior of Physicians," *American Journal of Medicine*, 73(1), July 1982, pp. 4-8.

Azoulay, P., "Do Pharmaceutical Sales Respond to Scientific Evidence?" *Journal of Economic & Management Strategy*, 11(4), Winter 2002, pp. 551-594.

Bald, A., E. Chyn, J.S. Hastings, and M. Machelett, "The Causal Impact of Removing Children from Abusive and Neglectful Homes," NBER Working Paper 25419, January 2019.

Baldacchino, A., *et al.*, "Erratum: neurobehavioral consequences of chronic intrauterine opioid exposure in infants and preschool children: a systematic review and meta-analysis," *BMC Psychiatry*, 2015, 15(1).

Balsa, A., T. McGuire and L. Meredith, "Testing for Statistical Discrimination in Health Care," *Health Services Research*, 40(1), 2005, pp. 227-252.

Barocas, J.A., *et al.*, "Estimated Prevalence of Opioid Use Disorder in Massachusetts, 2011–2015: A Capture–Recapture Analysis," *American Journal of Public Health* (*AJPH*)*,* Open Themed Research, 108(12), December 2018, pp. 1675-181.

Berger, L.M., and J. Waldfogel, "Economic Determinants and Consequences of Child Maltreatment," OECD Social, Employment and Migration Working Paper No. 111, April 2011, OECD Publishing, Paris, available at http://dx.doi.org/10.1787/5kgf09zj7h9t-en.

Berndt, E.R., T.G. McGuire, and J.P. Newhouse, "A Primer on the Economics of Prescription Pharmaceutical Pricing in Health Insurance Markets," *Forum for Health Economics & Policy*, 14(2), 2011, Article 10.

Birnbaum, Howard G., et al., "Estimated Costs of Prescription Opioid Analgesic Abuse in the United States in 2001," *Clin J Pain*, Volume 22, Number 8, October 2006.

Birnbaum, Howard G., et al., "Societal Costs of Prescription Opioid Abuse, Dependence, and Misuse in the United States," *Pain Medicine*, 2011, 12:657-667.

CONFIDENTIAL

Boudreaux, K., and B. Yandle, "Public Bads and Public Nuisance-Common Law Remedies for Environmental Decline," *Fordham Environmental Law Review*, 14(1) Article 2, 2002, pp. 55-88.

Bray, J.W., *et al.*, "Quality of Life as an Outcome of Opioid Use Disorder Treatment: A Systematic Review," *Journal of Substance Abuse Treatment*, 76, 2017, pp. 88-93.

Brekke, K.R., R. Nuscheler, and O.R. Straume, "Gatekeeping in Health Care," *Journal of Health Economics*, 26(1), 2007, pp. 149-170.

Brill, A., and S.Ganz, "The Geographic Variation in the Cost of the Opioid Crisis," American Enterprise Institute, AEI Economics Working Paper 2018-03, March 2018.

Bunikowski, R., *et al., "*Neurodevelopmental outcome after prenatal exposure to opiates," *European Journal of Pediatrics*, 1998, 157(9), pp. 724-730.

Bureau of Justice Statistics, Data Collection: National Incident-Based Reporting System (NIBRS), available at https://www.bjs.gov/index.cfm?ty=dcdetail&iid=301.

Butikofer, A., and M. M. Skira, "Missing Work is a Pain: The Effect of Cox-2 Inhibitors on Sickness Absence and Disability Pension Receipt," *Journal of Human Resources*, 2018, 53(1), pp. 71-122.

Cameron, T.A., and J.R. DeShazo, "Demand for Health Risk Reduction," *Journal Environmental Economics and Management*, 65, 2013, pp. 87-109.

Centers for Disease Control and Prevention, Module 5:  Assessing and Addressing Opioid Use Disorder (OUD), available at https://www.cdc.gov/drugoverdose/training/oud/accessible/index.html.

Centers for Disease Control and Prevention, Prescription Drug Overdose: Prevention for States, CDC-RFA-CE15-1501, May 27, 2015, available at https://www.grants.gov/view-opportunity.html?oppId=274995 and CDC, Prevention for States, October 23, 2017, available at https://www.cdc.gov/drugoverdose/states/state_prevention.html.

Centers for Disease Control and Prevention, Opioid Overdose, available at https://www.cdc.gov/drugoverdose/policy/successes.html.

Centers for Medicare & Medicaid Services, Open Payments page, available at https://www.cms.gov/openpayments/.

Chambers, J.G., J. Shkolnik and M. Perez, "Total expenditures for students with disabilities, 1999–2000: Spending variation by disability. Report 5, Special Education Expenditure Project (SEEP)," 2003, Washington, DC: United States Department of Education, Office of Special Education Programs, American Institutes for Research available at https://eric.ed.gov/?id=ED481398.

Chetty, M., *et al.*, "A Systematic Review of Health Economic Models of Opioid Agonist Therapies in Maintenance Treatment of Non-Prescription Opioid Dependence," *Addiction Science & Clinical Practice*, 12(6), 2017.

CONFIDENTIAL

Children's Bureau, Office of the Administration for Children & Families, U.S. Department of Health and Human Services, "Child Maltreatment," January 28, 2019, available at https://www.acf.hhs.gov/cb/research-data-technology/statistics-research/child-maltreatment.

Cohen, M.A., "Pain, Suffering, and Jury Awards: A Study of the Cost of Crime to Victims," *Law & Society Review*, 1988, 22(3), pp. 537-556.

Community Assessment of the Opioid Crisis in Lorain County, Ohio:  Executive Summary," Prepared for The Nord Family Foundation, December 20, 2017, available at https://altarum.org/sites/default/files/uploaded-publication-files/Lorain-County-Community-Assessment_Executive-Summary.pdf.

Congressional Budget Office (CBO), "Promotional Spending for Prescription Drugs," December 2, 2009.

Cooter, R., and T.S. Ulen (2016), *Law and Economics*, 6th *Edition*, Berkeley Law Books, 2.

Cornish, K.S., *et al.*, "The short-and long-term effects on the visual system of children following exposure to maternal substance misuse in pregnancy," *American Journal of Ophthalmology*, 2013, 156(1), pp. 190-194.

Corr, T.E., and C.S. Hollenbeak, "The Economic Burden of Neonatal Abstinence Syndrome in the United States," *Addiction*, 2017, 112, pp. 1590-1599.

Council of Economic Advisors, The Underestimated Cost of the Opioid Crisis, November 2017.

Cranmer, H., *et al.*, "Health-Related Quality of Life in Opioid Use Disorder Measured by Utilities: A Systematic Literature Review," *Value in Health*, 19(7), 2016 A387.

Currie, J., J. Jin and M. Schnell, "U.S. Employment and Opioids, Is there a Connection?" NBER Working Paper 24440, March 2018.

Currie, J., and E. Tekin, "Does child abuse cause crime?" NBER Working Paper 12171, April 2006.

Currie, J., and E. Tekin, "Understanding the cycle childhood maltreatment and future crime," *Journal of Human Resources,* 47(2), 2012, pp. 509-549.

Currie, J., and C.S. Widom, "Long-term consequences of child abuse and neglect on adult economic well-being," *Child Maltreatment*, 15(2), 2010, pp. 111-120.

Cuyahoga County Opiate Task Force Report, 2014, available at http://opiatecollaborative. cuyahogacounty.us/pdf_OpiateCollaborative/en-US/CC_OpiateTaskForceReport.pdf.

Datta, A., and D. Dave, "Effects of Physician-Directed Pharmaceutical Promotion on Prescription Behaviors: Longitudinal Evidence," *Health Economics*, 26, 2017, pp. 450-68.

De Maeyer, J., W. Vanderplasschen and E. Broekaert, "Quality of Life Among Opiate-Dependent Individuals: A Review of the Literature," *International Journal of Drug Policy*, 21(5), 2010, pp. 364-380.

DeJong, C., *et al.*, "Pharmaceutical Industry-Sponsored Meals and Physician Prescribing Patterns for Medicare Beneficiaries," *JAMA Internal Medicine,* 2016, 176(8), pp. 1114-22.

CONFIDENTIAL

Department of Justice, Press Release, "McKesson Corporation Agrees to Pay More than $13 Million to Settle Claims that it Failed to Report Suspicious Sales of Prescription Medications," May 2, 2008, available at https://www.justice.gov/archive/opa/pr/2008/May/08-opa-374.html.

*Diagnostic and Statistical Manual of Mental Disorders,* 4th ed. Washington, DC: American Psychiatric Association, 1994.

Diels, J., *et al.,* "Mapping FACT-P to EQ-5D in a large cross-sectional study of metastatic castration-resistant prostate cancer patients,"*Qual Lif Res*, 24, 2015, pp. 591-598.

Dillie, K.S., *et al*., "Quality of Life Associated with Daily Opioid Therapy in a Primary Care Chronic Pain Sample," *J Am Board Fam Med*, 21(2), 2008, pp. 108-117.

"DOJ, Press Release, "Mallinckrodt Agrees to Pay Record $35 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs and for Recordkeeping Violations, July 11, 2017, available at https://www.justice.gov/opa/pr/mallinckrodt-agrees-pay-record-35-million-settlement-failure-report-suspicious-orders.

Dolan, P.  *et al.* "The Time Trade-off Method: Results from a General Population Study," *Health Economics*, 5(2), 1996, pp. 141-154.

Dowell, D., T.M. Haegerich and R. Chou, "CDC Guideline for Prescribing Opioids for Chronic Pain – United States," *JAMA,* 2016, 315(15), pp.1624-1645.

Doyle, J.J., and A. Aizer, "Economics of Child Protection:  Maltreatment, Foster Care, and Intimate Partner Violence," *Annual Review of Economics*, 2018, 10, pp. 87-108.

Drake, K., and T. McGuire, "Stock-Price Evidence for Anticompetitive Effects in the Nexium 'Reverse-Payment' Settlement," *Journal of Competition Law & Economics*, 12(4), 2016, pp. 735-747.

Drake, K., M. Starr, and T. McGuire, "Do 'Reverse Payment' Settlements Constitute an Anticompetitive Pay-for-Delay?" *International Journal of the Economics of Business,* 22(2), 2015, pp. 173-200.

Families USA, "Off the Charts: Pay, Profits and Spending by Drug Companies," Families USA Publication No. 01-104, July 2001, pp. 1-31.

Fang, X., *et al.*, "The economic burden of child maltreatment in the United States and implications for prevention," *Child Abuse & Neglect*, 2012, 36, pp. 156-165.

Feelemyer, J. P., *et al.*, "Changes in Quality of Life (WHOQOL-BREF) and Addiction Severity Index (ASI) Among Participants in Opioid Substitution Treatment (OST) in *Low and Middle Income Countries: An International Systematic Review," Drug and Alcohol Dependence*, 134, 2014, pp. 251-258.

Fill, M.A., *et al.*, "Educational disabilities among children born with neonatal abstinence syndrome," *Pediatrics*, 2018, 142(3), e20180562.

Florence, C.S., *et al.*, "The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States, 2013" *Medical Care*, October 2016, 54(10), pp. 901-906.

CONFIDENTIAL

França, U.L., S. Mustafa and M.L. McManus, "The Growing Burden of Neonatal Opiate Exposure on Children and Family Services in Massachusetts," *Child Maltreatment*, 2011 21(1), pp. 80-84.

Fugh-Berman, A., "The Corporate Coauthor," *Journal of General Internal Medicine*, 20(6), June 2005, pp. 546-48

Editorial Staff, "Pharmaceutical Marketing to Physicians: Free Gifts Carry a High Price," *American Medical News*, June 10, 2002.

Garthwaite, C., "The economic benefits of pharmaceutical innovations: The case of cox-2 inhibitors," *American Economic Journal: Applied Economics*, 2012, 4(3), pp. 116–137.

Gaskin, D.J., and P. Richard, "The Economic Cost of Pain in the United States," *The Journal of Pain*, 13(8), 2012, pp. 715-724.

Gelles, R.J., and S. Perlman, "Estimated Annual Cost of Child Abuse and Neglect," Prevent Child Abuse America, April 2012, available at https://preventchildabuse.org/wp-content/uploads/2016/02/PCA_COM2012-1.pdf.

Gilbert, R., *et al*, "Burden and consequences of child maltreatment in high-income countries," *The Lancet,* 373, 2009, 68-81.

Glazer, J., and T.G. McGuire, "A Welfare Measure of 'Offset Effects' in Health Insurance," *Journal of Public Economics,* 96, 2012, pp. 520-523.

Glazer, J., H. Huskamp, and T.G. McGuire, "A Prescription for Drug Formulary Evaluation: An Application of Price Indexes," *Forum for Health Economics and Policy*, 15(2), 2012, Article 3.

Gönül, F., *et al.*, "Promotion of Prescription Drugs and Its Impact on Physicians' Choice Behavior," *Journal of Marketing*, 65(3), July 2001, pp. 79-90.

Gruber, J., *Public Finance and Public Policy*, 5th edition, 2016.

Hadland, S.E., *et al.*, "Association of Pharmaceutical Industry Marketing of Opioid Products to Physicians with Subsequent Opioid Prescribing," published online at jamainternmed.2018.1999, May 14, 2018.

Hamilton, R., *et al.*, "Ophthalmic, clinical and visual electrophysiological findings in children born to mothers prescribed substitute methadone in pregnancy," *British Journal of Ophthalmology*, 2010, 94(6), pp. 696-700.

Hammit, J.K., "Valuing Changes in Mortality Risk: Lives Saved versus Life Years Saved," *Review of Environmental Economics and Policy*, 1(2), 2007, pp. 228-240.

Hansen, Ryan N, et al., "Economic Costs of Nonmedical Use of Prescription Opioids," Clin J Pain, Volume 27, Number 3, March/April 2011.

Harris, M.C., L.M. Kesslery, M.N. Murray and M. E. Glenn (2019). "Prescription opioids and labor market pains," forthcoming, *Journal of Human Resources*, pages 3-4.

Hasin, D.S., *et al.*, DSM-5 criteria for substance use disorders: recommendations and rationale, *American Journal of Psychiatry,* 2013, 170(8), pp. 834-851.

Hildyard, K.L., and D.A. Wolfe, "Child neglect: developmental issues and outcomes," *Child Abuse & Neglect,* 26, 2002, pp. 679-695.

Hjalte, F., *et al.*, "Treatment of Severe Pain and Opioid-induced Constipation: An Observational Study of Quality of Life, Resource Use, and Costs in Sweden," *Pain Ther*, 5, 2016, pp. 227-236.

Hjern, A., B. Vinnerljung, and F. Lindblad, "Avoidable mortality among child welfare recipients and intercountry adoptees: a national cohort study," *Journal of Epidemiology & Community Health,* 58(5), 2004, pp. 412-417.

Holt, E.W., D.J. McGrath, W.L. Herring, "Timing and Duration of Student Participation in Special Education in the Primary Grades, NCES, 2007-043, Washington DC, National Center for Education Statistics, 2007.

Hunt, R.W., *et al.*, "Adverse neurodevelopmental outcome of infants exposed to opiate in-utero," *Early Human Development*, 2008, 84(1), pp. 29-35.

Hurwitz, M., and R. Caves, "Persuasion or Information? Promotion and the Shares of Brand Name and Generic Pharmaceuticals," *Journal of Law and Economics*, 31(2), October 1988, pp. 299-320.

Johnson, J., and J. Wagner, "Trump declares the opioid crisis a public health emergency," *The Washington Post*, October 26, 2017, available at https://www.washingtonpost.com/news/post-politics/wp/2017/10/26/trump-plans-to-declare-the-opioid-crisis-a-public-health-emergency/?utm_term=.9097d816a96b.

Jonson-Reid, M., *et al.*, "A prospective analysis of the relationship between reported child maltreatment and special education eligibility among poor children," *Child Maltreatment,* 9(4), 2004, pp. 382-394.

Kilby, A.E., "Opioids for the masses: Welfare tradeoffs in the regulation of narcotic pain medications," 2015, Working Paper, Northeastern University.

Kirson, N.Y., *et al.*, "The Economic Burden of Opioid Abuse: Updated Findings," *Journal of Managed Care & Specialty Pharmacy*, 23(4), 2017, pp. 427-445.

Kosinski, M.R., *et al.*, "An observational study of health-related quality of life and pain outcomes in chronic low back pain patients treated with fentanyl transdermal system," *Current Medical Research and Opinion*, 21(6), 2005, pp. 849-862.

Krueger, A., "Where Have All the Workers Gone?  An Inquiry into the Decline of the U.S. Labor Force Participation Rate," Brookings Papers on Economic Activity, 2017.

Larkin, I., *et al.*, "Association Between Academic Medical Center Pharmaceutical Detailing Policies and Physician Prescribing," *JAMA*, 2017, 317(17), pp. 1785-95.

Lidgren, M., *et al.*, "Health related quality of life in different states of breast cancer," *Qual Lif Res*, 16, 2007, pp. 1073-1081.

Livingston, D., "Akron adopts quick response team to curb future drug overdoses," *Akron Beacon Journal*, February 28, 2017.

CONFIDENTIAL

Lopez, G., "Congress just passed a big bill to fight the opioid epidemic. But there's a catch," *Vox*, July 14, 2016, available at https://www.vox.com/2016/7/6/12101476/obama-congress-opioids-heroin.

Luo, N., *et al.*, "Self-Reported Health Status of the General Adult U.S. Population as Assessed by the EQ-5D and Health Utilities Index," *Medical Care*, 43(11), 2005, pp. 1076-1086.

Ma, A., and T.G. McGuire (guest editors), "The Industrial Organization of Health Care, III," *Journal of Economics & Management Strategy*, 8(3), Fall 1999.

Ma, A., T.G. McGuire, and M.H. Riordan (guest editors), "The Industrial Organization of Health Care, II," *Journal of Economics & Management Strategy*, 6(1), Spring 1997.

Mace, G., "Cuyahoga Falls police, fire join with drug counselors to visit homes of addicts to offer help," *Akron Beacon Journal*, January 14, 2017.

Manchanda, P., and P. Chintagunta, "Responsiveness of Physician Prescription Behavior to Salesforce Effort:  An Individual Level Analysis," *Marketing Letters*, 15(2-3), 2004, pp. 129-145.

Maxfield, M.G., and C.S. Widom, "The cycle of violence: Revisited 6 years later," *Archives of Pediatrics & Adolescent Medicine*, 150(4), 1996, pp. 390-395.

McAdam-Marx, Carrie, Carl L. Roland, Jody Cleveland, Gary M. Oderda, "Costs of Opioid Abuse and Misuse Determined From a Medicaid Database," *Journal of Pain & Palliative Care Pharmacotherapy*, 24:1, 5-18.

McCollister, K.E., M.T. French and H. Fang, "The Cost of Crime to Society:  New Crime-Specific Estimates for Policy and Program Evaluation," Drug and Alcohol Dependence, 108(1), 2010, pp. 98-109

McGlone, L., and H. Mactier, "Infants of opioid-dependent mothers: neurodevelopment at six months," *Early Human Development*, 2015, 91(1), pp. 19-21.

McGlone, L., *et al.*, "Visual outcome in infants born to drug-misusing mothers prescribed methadone in pregnancy," *British Journal of Ophthalmology*, 2014, 98(2), pp. 238-245.

McGuire, T.**,** K. Drake, E. Elhauge, R. Hartman, and M. Starr, "Resolving Reverse-Payment Settlements with the Smoking Gun of Stock Price Movements," *Iowa Law Review*, 101(4), 2016, pp. 1581-1599.

McGuire, T.G., "Physician Agency," *in* A.J.Culyer and J.P. Newhouse (eds), *Handbook of Health Economics*, 2000, Chapter 9.

McGuire, T.G., and M.H. Riordan (guest editors), "The Industrial Organization of Health Care," *Journal of Economics & Management Strategy*, 3(1), March 1994.

McGuire, T.G., and S. Bauhoff, "Adoption of a Cost-Saving Innovation: Germany, UK and Simvastatin," in N. Klusen, F. Verheyen, and C. Wagner, eds., *England and Germany in Europe – What Lessons Can We Learn from Each Other?* Baden-Baden, Germany: Nomos, 2011, pp. 11-26.

CONFIDENTIAL

McQueen, K., and J. Murphy-Oikonen, "Neonatal abstinence syndrome," *New England Journal of Medicine,* 2016, 375(25), pp. 2468-2479.

Meier, B., "In Guilty Plea, OxyContin Maker to Pay $600 Million," *The New York Times*, May 10, 2007.

Mersky, P., and J. Topitzes, "Comparing Early Adult Outcomes of Maltreated and Non-Maltreated Children:  A Prospective Longitudinal Investigation," *Children and Youth Services Review*, 32, 2010, pp. 1086-1096.

Miller, T., and S. Bhattacharya, "Incidence and Cost of Carbon Monoxide Poisoning for All Ages, Pool and Spa Submersions for Ages 0– 14, and Lead Poisoning for Ages 0-4," 2013, Table 20, available at https://www.cpsc.gov/Global/Researchnd-tatistics/Injury-tatistics/Carbon-onoxide-osioning/IncidenceandCostofCarbonMonoxidePoisoningPoolandSpaSubmersion andLeadPosioning.pdf.

Miller, T.R., M.A. Cohen and D. Hendrie, "Non-Economic Damages Due to Physical and Sexual Assault: Estimates from Civil Jury Awards," *Forensic Science and Criminology*, 2(1), 2017, pp. 1-10.

Miller, T.R., M.A. Cohen and S.B. Rossman. "Victim costs of violent crime and resulting injuries," *Health Affairs*, 1993,12(4), pp. 186-197.

Mooney, G., and M. Ryan, "Agency in Health Care: Getting Beyond First Principles," *Journal of Health Economics*, 12(2), July 1993, pp. 125-135.

Morrison, J. S., and L. Dattilo, "America's Dangerous Syndemic:  Opioid Addiction, HIV, and Hepatitis C," *Center for Strategic & International Studies*, December 2017.

Mowbray, O., *et al.*, "Longitudinal Trends in Substance Use and Mental Health Service Needs in Child Welfare," *Children and Youth Services Review,* 73, 2017, pp. 1-8.

Musumeci, M., and J. Tolbert, "Federal Legislation to Address the Opioid Crisis: Medicaid Provisions in the SUPPORT Act," Kaiser Family Foundation, October 5, 2018, available at https://www.kff.org/medicaid/issue-brief/federal-legislation-to-address-the-opioid-crisis-medicaid-provisions-in-the-support-act/.

National Center for Education Statistics, Table 204.30, available at https://nces.ed.gov/programs/digest/d17/tables/dt17_204.30.asp.

National Center for Education Statistics, Table 236.15, available at https://nces.ed.gov/programs/digest/d17/tables/dt17_236.15.asp.

National Center for State Courts (NCSC), "State legislatures have been active in developing and enacting a broad range of statutory responses to the opioid crisis," https://www.ncsc.org/Topics/Court-Management/Leadership-and-Change-Management/Opioids-and-the-Courts.aspx.

CONFIDENTIAL

National Conference of State Legislatures, "Marketing and Advertising of Pharmaceuticals," November 5, 2018, available at http://www.ncsl.org/research/health/marketing-and-advertising-of-pharmaceuticals.aspx.

National Institute on Drug Abuse, Addiction is a Chronic Disease, available at https://archives.drugabuse.gov/publications/drug-abuse-addiction-one-americas-most-challenging-public-health-problems/addiction-chronic-disease.

National Institutes of Health (NIH), "NIH HEAL Initiative: Enhance Pain Management," December 28,2018, available at https://www.nih.gov/research-training/medical-research-initiatives/heal-initiative/enhance-pain-management.

New York State Health Foundation, "Follow the Money: Pharmaceutical Manufacturer Payments and Opioid Prescribing Patterns in New York State," June 2018.

Newhouse, J., *Pricing the Priceless: A Health Care Conundrum*, Cambridge, MA: MIT Press, 2002.

Nilsen, E., "America's opioid crisis has become and 'epidemic of epidemics,'" *Vox*, March 6, 2018, available at https://www.vox.com/2018/3/6/16453530america-opioid-crisis-epidemic-bacterial-endocarditis-hepatitis-c.

NSDUH, "National Survey on Drug Use and Health: 2-Year RDAS (2012 to 2013)," available at https://rdas.samhsa.gov/#/survey/NSDUH-2012-2013-RD02YR.

NSDUH, "2015 National Survey on Drug Use and Health - Summary of the Effects of the 2015 NSDUH Questionnaire Redesign: Implications for Data Users", June 2016.

Nygaard, E., *et al.*, "Longitudinal cognitive development of children born to mothers with opioid and polysubstance use," *Pediatric Research*, 2015, 78(3), pp. 330-335.

Oei, J.L., *et al.*, "Neonatal abstinence syndrome and high school performance," *Pediatrics*, 2017, 139(2), e20162651, pp. 1-10.

Office of the Assistant Secretary for Planning and Evaluation (ASPE), U.S. Department of Health and Human Services (HHS), "Guidelines for Regulatory Impact Analysis," 2016, available at https://aspe.hhs.gov/system/files/pdf/242926/HHS_RIAGuidance.pdf.

Office of the Assistant Secretary for Planning and Evaluation (ASPE), U.S. Department of Health and Human Services (HHS), "Opioid Abuse in the U.S. and HHS Actions to Address Opioid-Drug Related Overdoses and Deaths," March 26, 2015, available at https://aspe.hhs.gov/system/files/pdf/107956/ib_OpioidInitiative.pdf.

Office of the Press Secretary, The White House, "Fact Sheet: Obama Administration Announces Additional Actions to Address the Prescription Opioid Abuse and Heroin Epidemic," March 29, 2016, available at https://obamawhitehouse.archives.gov/the-press-office/2016/03/29/fact-sheet-obama-administration-announces-additional-actions-address.

Ohio Department of Health, "2017 Ohio Neonatal Abstinence Syndrome County Report," available at https://odh.ohio.gov/wps/wcm/connect/gov/4cad708c-ba99-4b8b-b425-01cfef119c5d/2017+NAS+County+Table+12.3.2018.pdf?MOD=AJPERES&CONVERT_TO=url&CA

CONFIDENTIAL

CHEID=ROOTWORKSPACE.Z18_M1HGGIK0N0JO00QO9DDDDM3000-4cad708c-ba99-4b8b-b425-01cfef119c5d-muueFzr.

Ohio Department of Health, "Neonatal Abstinence Syndrome (NAS) Hospital Reporting in Ohio, July 2, 2018, available at https://odh.ohio.gov/wps/portal/gov/odh/know-our-programs/violence-injury-prevention-program/resources/nas_hospital_reporting_in_ohio.

Ohio Department of Health, "Neonatal Abstinence Syndrome (NAS) in Ohio, 2006-2015 Report," Tables 1A and 1D, available at https://odh.ohio.gov/wps/portal/gov/odh/know-our-programs/violence-injury-prevention-program/media/Ohio_NAS_Report_2006-2015.

Ohio Department of Health, "2017 Ohio Neonatal Abstinence Syndrome Report" available at https://odh.ohio.gov/wps/wcm/connect/gov/73b5602a-eb7a-4967-92ba-113de136371d/2017%2BNAS%2BData%2BTable%2B10.25.2018.pdf?MOD=AJPERES&CONVERT_TO=url&CACHEID=ROOTWORKSPACE.Z18_M1HGGIK0N0JO00QO9DDDDM3000-73b5602a-eb7a-4967-92ba-113de136371d-muuj4xU.

Ohio forensic laboratories reporting to the National Forensic Laboratory Information System (NFLIS), U.S. Drug Enforcement Administration, Diversion Control Division, 2007-2017, Table 2.

Olson, M., The Logic of Collective Action: Public Goods and the Theory of Groups, Harvard University Press, 1965.

Patrick, S.W., *et al.*, "Increasing incidence and geographic distribution of neonatal abstinence syndrome: United States 2009 to 2012," *Journal of Perinatology*, August 2015, 35(8), pp. 650-655.

Patrick, S.W., *et al.*, "Neonatal abstinence syndrome and associated health care expenditures: United States, 2000-2009," *JAMA,* 2012, 307(18), pp. 1934-1940.

Perez, C.M., and C.S. Widom, "Childhood victimization and long-term intellectual and academic outcomes," *Child Abuse & Neglect,* 18(8), 1994, pp. 617-633.

Peters, P.J., *et al.*, "HIV Infection Linked to Injection Use of Oxymorphone in Indiana, 2014-2015," *The New England Journal of Medicine*, July 21, 2016, pp. 229-239.

Pitt, A.L., K. Humphreys and M.L. Brandeau, "Modeling Health Benefits and Harms of Public Policy Responses to the US Opioid Epidemic," *American Journal of Public Health* (*AJPH*), Open Themed Research, 108(10), October 2018, pp. 1394-1400.

RAND Corporation, "What America's Users Spend on Illegal Drugs:  2000-2010," prepared for U.S. Office of National Drug Control Policy, February 2014.

Reilly, C., "President Obama Signs Bipartisan Bill to Combat Opioid Epidemic," *Pew Charitable Trusts,* July 22, 2016, available at https://www.pewtrusts.org/en/research-and-analysis/articles/2016/07/22/president-obama-signs-bipartisan-bill-to-combat-opioid-epidemic.

Rhyan, Corwin N., "The Potential Societal Benefit of Eliminating Opioid Overdoses, Deaths, and Substance Use Disorders Exceeds $95 Billion Per Year," Altarum, November 16, 2017.

CONFIDENTIAL

Rice, J. Bradford, Noam Y. Kirson, Amie Shei, Caroline J. Enloe, Alice Kate G. Cummings, Howard G. Birnbaum, Pamela Holly, and Rami Ben-Joseph. "The Economic Burden of Diagnosed Opioid Abuse Among Commercially Insured Individuals, *Postgraduate Medicine*, Volume 126, Issue 4, July/August 2014.

Robinson, L., and J. Hammitt "Valuing Reductions in Fatal Illness Risks: Implications of Recent Research," *Health Economics*, 2016, 25, pp 1039-1052.

Rosen, T.S., and H.L. Johnson, "Children of methadone-maintained mothers: follow-up to 18 months of age," *The Journal of Pediatrics*, 101(2), 1982, pp. 192-196.

Ruhm, C.J., "Corrected US Opioid-Involved Drug Poisoning Deaths and Mortality Rates, 1999–2015," *Addiction*, 113, 2018, pp. 1339-1344.

SAMHSA, "HHS, SAMHSA to maintain funding formula for $1B opioid grant program," October 30, 2017, available at https://www.samhsa.gov/newsroom/press-announcements/201710300530.

Samuelson, P.A., "The Pure Theory of Public Expenditure," *Review of Economics and Statistics,* 36, 1954, pp. 386-389.

Samuelson, P.A.,"Diagrammatic Exposition of a Theory of Public Expenditure," *Review of Economics and Statistics,* 37,1955, pp. 350-356.

Savych, B., D. Neumark and R. Lea, (2018), "The Impact of Opioid Prescriptions on the Duration of Temporary Disability," Workers Compensation Research Institute, Cambridge, MA, March.

Scarborough, A.A., J.S. McCrae, "Reported Eligibility for Part C and Later School-Age Special Education Services," *Topics in Early Childhood Special Education*, 28(2), 2008, pp. 75-89.

Schleis, P., "Stow is the Latest Community to Form Quick Response Team to Get Help to Opiate Addicts," *Akron Beacon Journal*, February 15, 2017.

Scotton, C.R., "New risk rates, inter-industry differentials and the magnitude of VSL estimates," *Journal of Benefit-Cost Analysis*, 4(1), 2013, pp. 39-80.

Spurling, G., *et al.*, "Information from Pharmaceutical Companies and the Quality, Quantity, and Cost of Physicians' Prescribing: A Systematic Review," *PLOS Medicine*, 7(10), October 2010.

Swank Program in Rural-Urban Policy, "Taking Measure of Ohio's Opioid Crisis," October 2017, available at https://cpb-us-w2.wpmucdn.com/u.osu.edu/dist/2/14548/files/2017/10/SWANK-Taking-Measure-of-Ohios-Opioid-Crisis-1vtx548.pdf.

Swanson, T., and A. Kontoleon, "Nuisance (Section 2100)," in B. Bouckaert and G. de Geest (eds.), *Encyclopedia of Law and Economics*, 2000, pp. 380-402.

The Council of Economic Advisers (CEA), Executive Office of the President of the United States, "The Underestimated Cost of the Opioid Crisis," November 2017, available at: https://www.whitehouse.gov/sites/whitehouse.gov/files/images/The%20Underestimated%20Cost%20of%20the%20Opioid%20Crisis.pdf.

CONFIDENTIAL

The Henry J. Kaiser Family Foundation (KFF), "The Opioid Epidemic and Medicaid's Role in Facilitating Access to Treatment," April 11, 2018, available at https://www.kff.org/medicaid/ issue-brief/the-opioid-epidemic-and-medicaids-role-in-facilitating-access-to-treatment/.

The Henry J. Kaiser Family Foundation, "The Opioid Epidemic and Medicaid's Role in Treatment: A Look at Changes Over Time," June 29, 2017, available at https://www.kff.org/slideshow/the-opioid-epidemic-and-medicaids-role-in-treatment-a-look-at-changes-over-time/.

The United States Attorney's Office, Colorado, "Cardinal Health Inc., Agrees to Pay $34 Million to Settle Claims That it Failed to Report Suspicious Sales of Widely-Abused Controlled Substances," October 2, 2008, available at https://www.justice.gov/archive/usao /co/news/2008/October08/10_2_08.html.

Thompson, C, "Trump Signs Legislation to Combat Opioid Crisis", *ASHP*, October 25, 2018, available at https://www.ashp.org/news/2018/10/24/trump-signs-legislation-to-combat-opioid-crisis.

U.S. Census Bureau, *2006-2016 American Community Survey 1-Year Estimates (Subject Table S1901)*. Available from https://factfinder.census.gov/.

U.S. Department of Health and Human Services (HHS), "5-Point Strategy to Combat the Opioid Crisis," August 7, 2018, available at https://www.hhs.gov/opioids/about-the-epidemic/hhs-response/index.html.

U.S. Department of Health and Human Services (HHS), "Acting Secretary Declares Public Health Emergency to Address National Opioid Crisis," October 26, 2017, available at https://www.hhs.gov/about/news/2017/10/26/hhs-acting-secretary-declares-public-health-emergency-address-national-opioid-crisis.html.

U.S. Department of Health & Human Services, Administration for Children and Families, Administration on Children, Youth and Families, Children's Bureau, "Child Maltreatment 2017," 2019, available at https://www.acf.hhs.gov/sites/default/files/cb/cm2017.pdf.

U.S. Department of Health and Human Services (HHS), "HHS takes strong steps to address opioid-drug related overdose, death and dependence, March 26, 2015," available at http://wayback.archive-it.org/3926/20170128023910/https://www.hhs.gov/about/news /2015/03/26/hhs-takes-strong-steps-to-address-opioid-drug-related-overdose-death-and-dependence.html.

U.S. Department of Health and Human Services, "Guidelines for Regulatory Impact Analysis," 2016, available at https://aspe.hhs.gov/system/files/pdf/242926/HHS_RIAGuidance.pdf.

U.S. Department of Transportation (DOT), "Revised Departmental Guidance 2016: Treatment of the Value of Preventing Fatalities and Injuries in Preparing Economic Analyses," 2016.

U.S. Environmental Protection Agency, "Valuing Fatality Risk Reductions for Policy: A Meta-Analytic Approach," 2016.

U.S. Senate Committee on Health, Education, Labor and Pensions, "Chairman Alexander: This Congress, HELP Committee Produced 18 Laws Including 'Landmark' Opioid Legislation to

CONFIDENTIAL

Combat Nation's Most Pressing Public Health Crisis." December 20, 2018, available at https://www.help.senate.gov/chair/newsroom/press/chairman-alexander-this-congress-help-committee-produced-18-laws-including-landmark-opioid-legislation-to-combat-nations-most-pressing-public-health-crisis-.

Uebel, H., *et al.*, "Reasons for Rehospitalization in Children who had Neonatal Abstinence Syndrome," *Pediatrics, 2015,* 136(4), e811-e820.

United States Department of Justice, National Drug Intelligence Center, "The Economic Impact of Illicit Drug Use on American Society," 2011, Table 1.7.

Vazquez, M., "Trump signs opioids law at White House event," *CNN*, October 24, 2018, available at https://www.cnn.com/2018/10/24/politics/donald-trump-opioid-crisis-one-year-later-event/index.html.

Vick, S., and A. Scott, "Agency in Health Care:  Examining Patients' Preferences for Attributes of the Doctor-Patient Relationship," *Journal of Health Economics*, 17(5), October 1998, pp. 587-605.

Wazana, A., "Physicians and the Pharmaceutical Industry: Is a Gift Ever Just a Gift?" *Journal of the American Medical Association*, 283(3), January 19, 2000, pp. 373-80.

Weinstein, M.C., G. Torrance, and A. McGuire, "QALYs:  The Basics," *Value in Health,*12, 2009, pp. S5-S9.

Wetherington, S., *et al.,* (2014), "Pain Quality of Life as Measured by Utilities," *Pain Medicine* (15):865-870.

White, Alan G., Howard G. Birnbaum, Milena N. Mareva, Maham Daher, Susan Vallow, Jeff Schein, Nathaniel Katz, "Direct Costs of Opioid Abuse in an Insured Population in the United States," *J Manag Care Pharm*, 2005:11(6):469-79.

Wickramasekera, N., *et al.*, "Cost of crime: A systematic review," *Journal of Criminal Justice*, 2015, 43(3), pp. 218-228 and K.E. McCollister, M.T. French.

Widom, C.S., "Posttraumatic stress disorder in abused and neglected children grown up," *American Journal of Psychiatry,* 156(8), 1999, pp. 1223-1229.

Widom, C.S., "The Cycle of Violence," *Science*, 244(4901), 1989, pp. 160-166.

Widom, C.S., and M.G. Maxfield, "An Update on the 'Cycle of Violence.' Research in Brief," Department of Justice, Washington, DC, National Institute of Justice, February 2001, available at https://files.eric.ed.gov/fulltext/ED451313.pdf.

Widom, C.S., K. Dumont and S.J. Czaja, "A Prospective Investigation of Major Depressive Disorder and Comorbidity in Abused and Neglected Children Grown Up," *Archives of General Psychiatry*, 2007, 64, 2007, pp. 49-56.

Won Tesoriero, H., "OxyContin Maker Pleads Guilty – Purdue Frederick to Pay $634.5 Million Settlement for Hiding Addiction Risk," *The Wall Street Journal*, May 11, 2007.

CONFIDENTIAL

Wong, S., *et al.*, "Substance use in pregnancy," *Journal of Obstetrics and Gynaecology Canada*, 2011, 33(4), pp. 367-384.

Wulczyn, F., "Epidemiological Perspectives on Maltreatment Prevention," *The Future of Children*, Fall 2009, 19(2), pp. 39-66.

Xu, J., *et al.*, "Deaths: Final Data for 2016," *National Vital Statistics Reports*, 67(5), July 26, 2018.

CONFIDENTIAL

**Appendix C**
**Technical Memo re Mortality**

Prof. Thomas McGuire

CONFIDENTIAL

**Appendix C**
**Technical Memo re Mortality**

In this appendix, I describe in Section I the basis for the quantification of deaths due to shipments.  In Section II, I describe the methodology used to quantify the valuation of deaths.

## I.      Count of Number of Deaths

For the number of deaths due to shipments, I first begin with a raw count of opioid overdose deaths.  This data is obtained directly from the CDC.[1]  I then take these numbers and multiply by the share of harm due to shipments from the Cutler Report.[2]

## II.      Valuation of Deaths

I use the value of a statistical life to quantify the valuation of deaths.

### Value of a Statistical Life (VSL)

The VSL is derived from an individual's willingness to pay (WTP) for a reduction in the risk of injury or death.[3]  WTP is estimated via revealed-preference studies using labor market data that measure the wage-risk tradeoff.[4]  WTP can also be directly measured using surveys that require respondents to express their risk-reduction preferences.[5]  An individual's risk-reduction WTP may vary based on factors such as risk-tolerance, preferences, age, health status, and other

---

[1] Centers for Disease Control and Prevention (CDC), WONDER data, Multiple Cause of Death data, available at https://wonder.cdc.gov/controller/datarequest/D77.

[2] See Cutler Report, Appendix III.I, Table I.4 for Approach 1 and Table I.5 for Approach 2.

[3] For a recent review on the VSL literature, see L.A. Robinson and J.K. Hammit, "Valuing Reductions in Fatal Illness Risks: Implications of Recent Research," *Health Economics*, 25, 2016, pp. 1039-1052.

[4] Examples of this approach include C.R. Scotton, "New risk rates, inter-industry differentials and the magnitude of VSL estimates," *Journal of Benefit-Cost Analysis*, 4(1), 2013, pp. 39-80.

[5] A recent example of this approach is:  T.A. Cameron and J.R. DeShazo, "Demand for Health Risk Reduction," *Journal Environmental Economics and Management*, 65, 2013, pp. 87-109.

CONFIDENTIAL

factors.  For example, some studies find that the age-distribution of VSL takes the form of an inverted-U, implying that the VSL is highest for individuals in the 25-55 age range.[6]

The methodology I use for deriving a VSL is based on guidance from the Assistant Secretary for Planning and Evaluation (ASPE) of the U.S. Department of Human and Health Services (HHS), the federal agency responsible for evaluating health-related policies in the U.S.[7]  HHS recommends a VSL of $9.3 million in 2014 dollars (without an age adjustment) as its main national estimate.[8]  For purposes of my report, I will use the central $9.3 million estimate for 2014.

The Council of Economic Advisor's (CEA) recent report entitled "The Underestimated Cost of the Opioid Crisis," uses VSL-based estimates of the economic cost of death very similar to those used in my Report.[9]   The CEA selects $9.6m in 2015 as its "middle" estimate, while showing results for higher and lower values of VSL as well.[10]

---

[6] See J.K. Hammit, "Valuing Changes in Mortality Risk: Lives Saved versus Life Years Saved," *Review of Environmental Economics and Policy*, 1(2), 2007, pp. 228-240.

[7] Office of the Assistant Secretary for Planning and Evaluation (ASPE), U.S. Department of Health and Human Services (HHS), "Guidelines for Regulatory Impact Analysis," 2016, available at https://aspe.hhs.gov/system /files/pdf/242926/HHS_RIAGuidance.pdf (hereafter HHS 2016 Guidelines). ASPE does not recommend adjusting the VSL for the age of the individual.

[8] See HHS 2016 Guidelines, at p. 15.  HHS also recommends sensitivity analyses and recommends sensitivity analyses using low and high VSL estimates of $4.4 million and $14.2 million, respectively.  For simplicity I apply the central estimate in the text of my report.  It is straightforward, if required, to inflate or deflate the estimates in the report up or down.

Other federal agencies also use VSL estimates to evaluate policy interventions.  The methods proposed are broadly similar, but sometimes differ in the specific assumptions used. For example, the Department of Transportation recommends using a different deflator specification, but assumes income elasticity of VSL is 1.0, and base VSL is $9.1 million in 2013 dollars.  With their methodology, the VSL recommended for 2015 is $9.4 million.  See U.S. Department of Transportation (DOT), "Revised Departmental Guidance 2016: Treatment of the Value of Preventing Fatalities and Injuries in Preparing Economic Analyses," 2016 (hereafter DOT 2016 Guidance).

The Environmental Protection Agency (EPA) guidelines are based on a review of the VSL literature.  In particular, they aggregate 88 VSL estimates and derive a series of summary statistics of these numeric estimates using a variety of statistical approaches, settling on a central estimate of $10.3 million for 2013 dollars.  See U.S. Environmental Protection Agency, "Valuing Fatality Risk Reductions for Policy: A Meta-Analytic Approach," 2016 (hereafter EPA 2016).

[9] Council of Economic Advisors, The Underestimated Cost of the Opioid Crisis, November 2017.

[10] CEA, op cit., pages 6-7.

CONFIDENTIAL

The national estimate for 2014 can be used as a basis for estimating the VSL for different years by applying a price-level adjustment and adapted to different geographic areas by applying an income adjustment.  Specifically, the VSL for county c (Cuyahoga, Summit counties) and year t (2006, 2007, …, 2016), $VSL_{ct}$, is estimated based on the HHS-recommended methodology, by applying equation (1):

$$VSL_{ct} = VSL_{2014} * \frac{CPI_t}{CPI_{2014}} * \left( 1 + \left[ \in * \frac{(Y_{ct} - Y_{2014})}{(Y_{ct} + Y_{2014})/2} \right] \right) \tag{1}$$

Where

$VSL_{2014}$  = National Value of Statistical Life in 2014

$CPI_t$  = National Consumer Price Index for the year t

$CPI_{2014}$  = National Consumer Price Index for 2014

$\in$  = Income elasticity of Value of Statistical Life

$Y_{2014}$  = National median income in 2014

$Y_{ct}$  = Median income in county c at time t

The $VSL_{2014}$ = \$9.3m is from the HHS recommendations as indicated above.  The CPI for the years 2006 through 2016 is the Consumer Price Index for All Urban Consumers Current Series (CPI) from the Bureau of Labor Statistics.[11]  The parameter $\in$ for the income elasticity is assumed to be 1.0 following HHS recommendations, recommendations in line also with those of the Department of Transportation.[12]  Assuming a relatively high value of the income elasticity in this context is conservative because the median income in the Bellwether communities is lower than the national average.[13]  The source of national and county median income is the Census Bureau's American Community Survey 1-year estimates.[14]

---

[11] CPI data is available from https://www.bls.gov/cpi/data.htm.  I utilized the All Urban Consumer Current Series CUSR0000SA0.  HHS recommends using the CPI to adjust for inflation.  See page 38 of the HHS 2016 Guidelines.

[12] DOT 2016 Guidance, p. 9.  Note that the EPA recommends a value of 0.7, with a range of 0.1 to 1.7 (EPA 2016, p. 10.

[13] A smaller income elasticity of demand would result in a higher estimated VSL in the Bellwether communities.

[14] U.S. Census Bureau, *2006-2016 American Community Survey 1-Year Estimates (Subject Table S1901)*. Available from https://factfinder.census.gov/.

CONFIDENTIAL

The interpretation of the VSL for a county in a year from (1) is the median valuation a member of the county would put on the loss of life, measured in current dollars.  Expression (1) adjusts the national figure for VSL in 2014 for changes in price levels between years and differences in income between counties.  The ratio of the CPIs adjusts for prices.  In years prior to 2014, for example, this ratio will be less than one, tending to factor down the VSL.  The product of the elasticity ∈ and the percentage difference in the county-year specific income and the national base year for 2014 adjusts the VSL for changes in valuation that would accompany higher incomes.  The assumption of ∈ = 1.0 means that the increase in valuation of the VSL moves in proportion to income.  A one percent increase in income leads to a one percent increase in the VSL.

The resulting VSL for each Bellwether county for each year is in Tables C.1a and C.1b.  Values from these tables are multiplied by the deaths due to shipments as determined by Professor Cutler.  Tables C.2a and C.2b show the results of this calculation for Approach 1 and Tables C.3a and C.3b for Approach 2.  Tables C.2a and C.2b are replicated in the body of my Report as Tables 5a and 5b.

**Table C.1a**
**Value of Statistical Life for Cuyahoga County**
**Using National 2014 VSL of $9.3m, National Median Income of $53,657**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CPI/CPI(2014) | 0.85 | 0.88 | 0.91 | 0.91 | 0.92 | 0.95 | 0.97 | 0.98 | 1.00 | 1.00 | 1.01 |
| Adjusted VSL ($m) | $7.92 | $8.15 | $8.46 | $8.43 | $8.57 | $8.84 | $9.02 | $9.15 | $9.30 | $9.31 | $9.43 |
| Median Income | 41,522 | 44,358 | 44,199 | 40,101 | 41,347 | 41,530 | 41,880 | 43,501 | 44,016 | 45,297 | 46,601 |
| VSL ($m) | $5.90 | $6.60 | $6.82 | $5.99 | $6.35 | $6.58 | $6.80 | $7.24 | $7.46 | $7.74 | $8.10 |

**Table C.1b**
**Value of Statistical Life for Summit County**
**Using National 2014 VSL of $9.3m, National Median Income of $53,657**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CPI/CPI(2014) | 0.85 | 0.88 | 0.91 | 0.91 | 0.92 | 0.95 | 0.97 | 0.98 | 1.00 | 1.00 | 1.01 |
| Adjusted VSL | $7.92 | $8.15 | $8.46 | $8.43 | $8.57 | $8.84 | $9.02 | $9.15 | $9.30 | $9.31 | $9.43 |
| Median Income | 44,747 | 47,333 | 49,411 | 46,974 | 45,593 | 46,429 | 48,798 | 49,232 | 50,365 | 51,309 | 52,036 |
| VSL ($m) | $6.49 | $7.13 | $7.76 | $7.31 | $7.17 | $7.56 | $8.16 | $8.36 | $8.71 | $8.89 | $9.14 |

CONFIDENTIAL

### Table C.2a
### Value of Statistical Life for Cuyahoga County
### Using National 2014 VSL of $9.3m, National Median Income of $53,657
### Approach 1

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opioid Overdose Deaths | 104 | 87 | 111 | 92 | 138 | 185 | 191 | 223 | 234 | 245 | 504 | 2,114 |
| Share of Harm Due to Shipments | 49.2% | 50.4% | 51.1% | 52.4% | 54.6% | 57.6% | 66 5% | ■ | ■ | ■ | ■ | |
| Opioid Deaths Due to Shipments | 51 | 44 | 57 | 48 | 75 | 107 | 127 | ■ | ■ | ■ | ■ | 1,535 |
| VSL ($mil) | $5 9 | $6.6 | $6.8 | $6.0 | $6.3 | $6.6 | $6 8 | $7 2 | $7 5 | $7.7 | $8.1 | |
| Valuation ($mil) | $302 | $289 | $387 | $289 | $478 | $702 | $864 | $1,199 | $1,413 | $1,655 | $3,702 | $11,279 |

### Table C.2b
### Value of Statistical Life for Summit County
### Using National 2014 VSL of $9.3m, National Median Income of $53,657
### Approach 1

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opioid Overdose Deaths | 25 | 31 | 21 | 23 | 45 | 34 | 60 | 56 | 105 | 135 | 269 | 804 |
| Share of Harm Due to Shipments | 49.2% | 50.4% | 51.1% | 52.4% | 54.6% | 57.6% | 66 5% | ■ | ■ | ■ | ■ | |
| Opioid Deaths Due to Shipments | 12 | 16 | 11 | 12 | 25 | 20 | 40 | ■ | ■ | ■ | ■ | 623 |
| VSL ($mil) | $6 5 | $7.1 | $7.8 | $7.3 | $7.2 | $7.6 | $8 2 | $8.4 | $8.7 | $8 9 | $9.1 | |
| Valuation ($mil) | $80 | $111 | $83 | $88 | $176 | $148 | $326 | $348 | $740 | $1,048 | $2,229 | $5,377 |

### Table C.3a
### Value of Statistical Life for Cuyahoga County
### Using National 2014 VSL of $9.3m, National Median Income of $53,657
### Approach 2

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opioid Overdose Deaths | 104 | 87 | 111 | 92 | 138 | 185 | 191 | 223 | 234 | 245 | 504 | 2,114 |
| Share of Harm Due to Shipments | 83.7% | 85.6% | 85.2% | 77.1% | 77 8% | 82 2% | 84.1% | ■ | ■ | ■ | ■ | |
| Opioid Deaths Due to Shipments | 87 | 75 | 95 | 71 | 107 | 152 | 161 | ■ | ■ | ■ | ■ | 1,838 |
| VSL ($mil) | $5 9 | $6.6 | $6.8 | $6.0 | $6.3 | $6.6 | $6 8 | $7 2 | $7 5 | $7.7 | $8.1 | |
| Valuation ($mil) | $514 | $492 | $645 | $425 | $681 | $1,001 | $1,091 | $1,387 | $1,554 | $1,726 | $3,790 | $13,306 |

CONFIDENTIAL

**Table C.3b**
**Value of Statistical Life for Summit County**
**Using National 2014 VSL of $9.3m, National Median Income of $53,657**
**Approach 2**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opioid Overdose Deaths | 25 | 31 | 21 | 23 | 45 | 34 | 60 | 56 | 105 | 135 | 269 | 804 |
| Share of Harm Due to Shipments | 83.7% | 85.6% | 85.2% | 77.1% | 77 8% | 82 2% | 84.1% | ■ | ■ | ■ | ■ | |
| Opioid Deaths Due to Shipments | 21 | 27 | 18 | 18 | 35 | 28 | 50 | ■ | ■ | ■ | ■ | 711 |
| VSL ($mil) | $6 5 | $7.1 | $7.8 | $7.3 | $7.2 | $7.6 | $8 2 | $8.4 | $8.7 | $8 9 | $9.1 | |
| Valuation ($mil) | $136 | $189 | $139 | $130 | $251 | $211 | $412 | $402 | $814 | $1,093 | $2,282 | $6,059 |

CONFIDENTIAL

**Appendix D**
**Technical Memo re Prevalence of OUD and the Share Attributable to Shipments**

Prof. Thomas McGuire

CONFIDENTIAL

**Appendix D**
**Technical Memo re Prevalence of OUD and the Share Attributable to Shipments**

In this appendix, I describe the basis for the estimates of the prevalence of OUD and the quantification of individuals with OUD due to shipments.  In Appendix H, I describe the methodology to value the excess health costs for individuals with OUD.

### Count of Number of Individuals with OUD

The morbidity analysis calls for time series data on OUD rates.  There are two problems in applying OUD rates published by National Survey on Drug Use and Health (NSDUH).  First, it is generally recognized that NSDUH rates understate OUD; second, NSDUH changed its Rx drug question sequence and show-cards in 2015, leaving Rx OUD data for 2015-17 not fully comparable to data from earlier years.  This appendix outlines an approach to constructing estimates of OUD rates between 2006-16.  The approach follows the methodology used by Pitt *et al.* (2018) [1] for adjusting for the downward bias in NSDUH HUD and Rx OUD rates in 2016 and then uses trends in these NSDUH rates to create the time series.  To adjust for the changes in NSDUH OUD definitions in 2015, I infer the 2014/2015 change based on changes in surrounding years.

### Description of Pitt *et al.* Correction to OUD rate

The Pitt *et al.* (2018) supplement identifies two national measurements of 2016 OUD as inputs into the model – severe prescription opioid use disorder (SOUD, 0.77%) and severe heroin use disorder (SHUD, 0.51%).[2]  Adding the two together yields a combined 2016 national OUD rate of 1.28%.[3]  The derivations of these rates are described below and the Pitt *et al.* discussion of this derivation is available in Attachment D.A at the end of this appendix.

---

[1] A.L. Pitt, K. Humphreys and M.L. Brandeau, "Modeling Health Benefits and Harms of Public Policy Responses to the US Opioid Epidemic," *American Journal of Public Health* (*AJPH*), Open Themed Research, 108(10), October 2018, pp. 1394-1400.

[2] *Ibid.*, Supplement, Table A.  The SHUD rate excludes individuals with SHUD that did not first have SOUD.

[3] Pitt *et al.*, *op. cit.*, calculation of SOUD does not include individuals who also have SHUD (these individuals would fall into the SHUD bucket), therefore the two numbers can be added together to get an overall OUD rate.

CONFIDENTIAL

- The 2016 SOUD rate of 0.77% rate is estimated based on reported prescription overdose deaths and the likelihood of overdose death.  This estimation requires the following inputs, some of which Pitt *et al.* calculate from available data and some of which are assumed: (1) reported prescription overdose deaths; (2) proportion of SOUD enrolled in Medication-Assisted Treatment (MAT); (3) overdose mortality risk when not enrolled in MAT; and (4) relative overdose mortality risk reduction when enrolled in MAT.[4]

- The 2016 SHUD rate of 0.51% is calculated as follows:

  o Uses RAND estimate of 1 million people with SHUD in 2010.[5]

  o Brought forward to 2016 using the growth in the NSDUH HUD rate between 2010 and 2016 (64%).[6]

  o Pitt *et al.* SHUD rate is calculated as the number of people with SHUD expressed as a share of the U.S. population ages 12 and above.

---

[4] Pitt *et al.*, *op. cit.*, Supplement, pp. S4-S5 and Table A.

[5] RAND Corporation, "What America's Users Spend on Illegal Drugs:  2000-2010," prepared for U.S. Office of National Drug Control Policy, February 2014, p. 23.

[6] Pitt *et al., op. cit.*, note that they use the growth rate between 2010 and 2015 but based on the NSDUH data it appears they use the growth rate between 2010 and 2016.  Pitt *et al., op. cit.* incorporate other adjustments that are specific to their model but unrelated to constructing an OUD time series for my purposes.

Table D.1 below replicates the Pitt *et al.* calculation of SHUD.

**Table D.1**
**Replication of Pitt *et al.* Calculation of 2016 National SHUD Rate**

| | | |
|---|---|---|
| [A] | 2010 Daily or Near-Daily Users of Heroin (millions) | 1.0 |
| [B] | 2010 US Population 12+ (millions) | 259.9 |
| [C] | 2010 SHUD Rate Based on Pitt et al. | 0.38% |
| [D] | Growth in NSDUH rate of HUD 2010-2016 | 63.95% |
| [E] | 2016 SHUD Rate Based on Pitt et al. | 0.63% |

Sources and Notes:

[A]  Rand (2014), p. 23.  Daily or near-daily users of heroin 12+ years of age are those who use 21+ days / month.

[B]  Census Bureau Annual Estimates of the Resident Population by Single Year of Age and Sex for the United States, States, and Puerto Rico Commonwealth: April 1, 2010 to July 1, 2017 (pepsyasex).

[C]=[A]/[B].  2010 Severe Heroin Use Disorder (SHUD) rate, based on Pitt et al. methodology.  Pitt et al. (2018) Supplement, pp. S2-S3.

[D] NSDUH.

[E]=[C]*(1+[D]).  Calculation of 2016 SHUD rate based on Pitt et al. methodology.  Pitt et al. (2018) Supplement, pp. S2-S3.

## Calculation of National OUD Time Series (2006-2016)

The national OUD time series for 2006-16 uses the Pitt *et al.* estimates of SOUD and SHUD for 2016 as the starting point and then brings these rates backwards and forwards using trends in NSDUH rates of heroin use disorder and prescription opioid use disorder.  That is, the calculation reflects the assumption that the trends in the adjusted rate (as estimated by Pitt *et al.*) follows trends in published SHUD rates.  These calculations are summarized in Table D.2 and are described in more detail below.

### *Calculation of HUD Time Series (2006-2016)*

The national SHUD rate in 2010 (0.38%) reflects the Pitt *et al.* estimate of 1 million daily or near-daily users of heroin expressed as a share of the 12+ population.  I then multiply it by the

CONFIDENTIAL

rate of growth in the NSDUH HUD rate between 2010 and each of the other years in 2006-16 to estimate a national rate for this period. See rows [A]-[C] in Table D.2, below.

### *Calculation of Prescription Opioid Use Disorder Time Series (2006-2016)*

A times series estimate of adjusted rates of SOUD starts with Pitt *et al.*'s estimate of a 2016 rate of 0.77%. This can be extrapolated backward and forward using the NSDUH published rate for prescription Opioid Use Disorder. However, the NSDUH survey methodology for Prescription Opioid Use Disorder changed in 2015 and NSDUH did not publish an adjustment factor that identifies the impact of the definitional change. (There was no change to NSDUH's definition of HUD.) Attachment D.B to this appendix explains the changes to NSDUH's definitions. To adjust for this change, I assume that the change from 2014-15 is the average of the changes between 2013-14 and 2015-16. Using estimates of changes in annual rates calculated in this way, I construct estimates for 2006-16 using Pitt's 2016 estimates of SOUD as a starting point.

### *Calculation of OUD Time Series (2006-2016)*

The estimates of SHUD and SOUD are reported in Table D.2. The OUD time series can be calculated as the sum of these series.

### Table D.2
### Calculation of Adjusted OUD Rate Based on Pitt *et al.* Methodology

| Source | Series | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|--------|--------|------|------|------|------|------|------|------|------|------|------|------|
| [A] | NSDUH HUD Rate | 0.12% | 0.09% | 0.12% | 0.16% | 0.14% | 0.18% | 0.19% | 0.20% | 0.23% | 0.22% | 0.24% |
| [B] | *% Change from 2010* | *-16.9%* | *-40.1%* | *-19.1%* | *13.2%* | *0.0%* | *25.8%* | *28.6%* | *36.1%* | *57.0%* | *51.5%* | *64.0%* |
| [C] | **Adjusted HUD Rate** | 0.32% | 0.23% | 0.31% | 0.44% | 0.38% | 0.48% | 0.49% | 0.52% | 0.60% | 0.58% | 0.63% |
| | | | | | | | | | | | | |
| [D] | NSDUH Pain Reliever Use Disorder Rate | 0.66% | 0.70% | 0.68% | 0.71% | 0.76% | 0.72% | 0.81% | 0.74% | 0.71% | 0.77% | 0.69% |
| [E] | *Change from previous year (2015 imputed)* | | *6.3%* | *-3.5%* | *4.3%* | *7.7%* | *-6.0%* | *12.9%* | *-8.7%* | *-3.9%* | *-7.1%* | *-10.2%* |
| [F] | **Adjusted Pain Reliever Use Disorder Rate** | 0.86% | 0.92% | 0.88% | 0.92% | 0.99% | 0.93% | 1.05% | 0.96% | 0.92% | 0.86% | 0.77% |
| | | | | | | | | | | | | |
| [G] | **Adjusted OUD Rate** | 1.18% | 1.15% | 1.19% | 1.36% | 1.38% | 1.42% | 1.55% | 1.48% | 1.53% | 1.44% | 1.40% |

Sources and Notes:
Bolded and boxed values are inputs from Pitt et al. (2018). For derivation of [C] 2010, see Table 1.

[A] NSDUH.
[B] Percentage difference in [A] from 2010 rate.
[C] Based on Pitt et al. (2018) methodology. Adjusted HUD rate in 2010 of 0.38% based on Rand (2014) study. See Table 1. Other years calculated from 2010 rate based on trend in NSDUH HUD rate.
[D] NSDUH.
[E] Percentage change in [D] from previous year. Percentage change from 2014 to 2015 calculate as the simple average of the 2013/2014 and 2015/2016 percentage changes.
[F] 2016 value from Pitt et al. (2018). Other years calculated based on trend in NSDUH rates of pain reliever use disorder, with 2015 imputation. (Row [E]).
[G]=[C]+[F].

CONFIDENTIAL

Benchmarking Against Recent Publications

A recent study from Barocas *et al.* (2018) estimates the prevalence of OUD in Massachusetts using an epidemiological "capture-recapture" analysis using data from six administrative databases of public health data.[7]  This study estimates prevalence of OUD in Massachusetts of 2.72% to 4.60% between 2011 and 2015.  Over this same period, based on the Pitt *et al.* methodology, I calculated adjusted national OUD rates of 1.42% to 1.55%.  See Table D.2 above.  Available data indicate that Ohio had slightly higher rates of OUD and opioid-related mortality than did Massachusetts during this period.[8]  Based on Barocas *et al*., the results reported in Table D.2 are conservative.

**Number of Individuals with OUD Attributable to Opioid Shipments**

Based on the above prevalence rates, I calculate the number of individuals with OUD attributable to opioid shipments in each year from 2006 through 2016.[9]  The calculation of persons with OUD due to shipments for each of the counties is shown below in Tables D.3a and D.3b for Approach 1 which also appears in Tables 7a and 7b of the Report.  Tables D.4a and D.4b below show the results for Approach 2.

---

[7] J.A. Barocas, *et al.*, "Estimated Prevalence of Opioid Use Disorder in Massachusetts, 2011–2015: A Capture–Recapture Analysis," *American Journal of Public Health* (*AJPH*)*,* Open Themed Research, 108(12), December 2018, pp. 1675-181.

[8] In 2012-13, the NSDUH OUD rate for Ohio was 1.10% and for Massachusetts was 1.07% (https://rdas.samhsa.gov/).  In 2011-2015 the age-adjusted opioid-related mortality rate per 100,000 in Ohio was 16.4 and in Massachusetts was 14.8.  Source: CDC Multiple Causes of Death data, accessed on CDC Wonder.

[9] Prevalence of OUD from above.  County Population from U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics (NCHS), Bridged Race Population Estimates.  Share of Harm Due to Shipments from Cutler Report, Appendix III.I, Tables I.4 and I.5.

CONFIDENTIAL

### Table D.3a
### Persons with OUD Due to Opioid Shipments, Cuyahoga County, Approach 1

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Prevalence of OUD[1] | 1.2% | 1.1% | 1.2% | 1.4% | 1.4% | 1.4% | 1.5% | 1.5% | 1.5% | 1.4% | 1.4% | |
| County Population 12 Years and Older(000s)[2] | 1,117.2 | 1,109.9 | 1,103.5 | 1,099.4 | 1,094.7 | 1,089.4 | 1,087.5 | 1,087.9 | 1,086.8 | 1,083.7 | 1,080.9 | 12,040.8 |
| Person-years with OUD (000s) | 13.2 | 12.7 | 13.2 | 14.9 | 15.1 | 15.4 | 16.8 | 16.1 | 16.6 | 15.6 | 15.1 | |
| Share of Harm Due to Shipments[3] | 49.2% | 50.4% | 51.1% | 52.4% | 54.6% | 57.6% | 66.5% | | | | | |
| Person-years with OUD Due to Opioid Shipments (000s) | 6.49 | 6.40 | 6.73 | 7.82 | 8.22 | 8.89 | 11.19 | ■ | ■ | ■ | ■ | 108.52 |

[1] See OUD backup.

[2] CDC Bridged-Race Population Estimates, 2006-2016.

[3] Expert Report of Professor David Cutler, March 25, 2019, Appendix III.J, Table I.4

### Table D.3b
### Persons with OUD Due to Opioid Shipments, Summit County, Approach 1

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Prevalence of OUD[1] | 1.2% | 1.1% | 1.2% | 1.4% | 1.4% | 1.4% | 1.5% | 1.5% | 1.5% | 1.4% | 1.4% | |
| County Population 12 Years and Older(000s)[2] | 461.9 | 462.5 | 462.6 | 462.5 | 463.0 | 463.8 | 464.4 | 465.7 | 466.5 | 466.4 | 466.1 | 5,105.5 |
| Person-years with OUD (000s) | 5.5 | 5.3 | 5.5 | 6.3 | 6.4 | 6.6 | 7.2 | 6.9 | 7.1 | 6.7 | 6.5 | |
| Share of Harm Due to Shipments[3] | 49.2% | 50.4% | 51.1% | 52.4% | 54.6% | 57.6% | 66.5% | | | | | |
| Person-years with OUD Due to Opioid Shipments (000s) | 2.68 | 2.67 | 2.82 | 3.29 | 3.48 | 3.79 | 4.78 | ■ | ■ | ■ | ■ | 46.18 |

[1] See OUD backup.

[2] CDC Bridged-Race Population Estimates, 2006-2016.

[3] Expert Report of Professor David Cutler, March 25, 2019, Appendix III.J, Table I.4

### Table D.4a
### Persons with OUD Due to Opioid Shipments, Cuyahoga County, Approach 2

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Prevalence of OUD[1] | 1.2% | 1.1% | 1.2% | 1.4% | 1.4% | 1.4% | 1.5% | 1.5% | 1.5% | 1.4% | 1.4% | |
| County Population 12 Years and Older(000s)[2] | 1,117.2 | 1,109.9 | 1,103.5 | 1,099.4 | 1,094.7 | 1,089.4 | 1,087.5 | 1,087.9 | 1,086.8 | 1,083.7 | 1,080.9 | 12,040.8 |
| Person-years with OUD (000s) | 13.2 | 12.7 | 13.2 | 14.9 | 15.1 | 15.4 | 16.8 | 16.1 | 16.6 | 15.6 | 15.1 | |
| Share of Harm Due to Shipments[3] | 83.7% | 85.6% | 85.2% | 77.1% | 77.8% | 82.2% | 84.1% | | | | | |
| Person-years with OUD Due to Opioid Shipments (000s) | 11.04 | 10.89 | 11.23 | 11.51 | 11.72 | 12.68 | 14.14 | ■ | ■ | ■ | ■ | 140.12 |

[1] See OUD backup.

[2] CDC Bridged-Race Population Estimates, 2006-2016.

[3] Expert Report of Professor David Cutler, March 25, 2019, Appendix III.J, Table I.5

### Table D.4b
### Persons with OUD Due to Opioid Shipments, Summit County, Approach 2

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Prevalence of OUD[1] | 1.2% | 1.1% | 1.2% | 1.4% | 1.4% | 1.4% | 1.5% | 1.5% | 1.5% | 1.4% | 1.4% | |
| County Population 12 Years and Older(000s)[2] | 461.9 | 462.5 | 462.6 | 462.5 | 463.0 | 463.8 | 464.4 | 465.7 | 466.5 | 466.4 | 466.1 | 5,105.5 |
| Person-years with OUD (000s) | 5.5 | 5.3 | 5.5 | 6.3 | 6.4 | 6.6 | 7.2 | 6.9 | 7.1 | 6.7 | 6.5 | |
| Share of Harm Due to Shipments[3] | 83.7% | 85.6% | 85.2% | 77.1% | 77.8% | 82.2% | 84.1% | | | | | |
| Person-years with OUD Due to Opioid Shipments (000s) | 4.57 | 4.54 | 4.71 | 4.84 | 4.96 | 5.40 | 6.04 | ■ | ■ | ■ | ■ | 59.50 |

[1] See OUD backup.

[2] CDC Bridged-Race Population Estimates, 2006-2016.

[3] Expert Report of Professor David Cutler, March 25, 2019, Appendix III.J, Table I.5

CONFIDENTIAL

### Attachment D.A
### Pitt Discussion of Derivation of Rate of SOUD and SHUD for 2016

Parameter values (Pitt Supplement, Table A)

| | | |
|---|---|---|
| Severe opioid use disorder prevalence | 0.77% | Assumed [22,23] |
| Severe heroin use disorder prevalence | 0.51% | Calculated [14-17] |

Discussion of derivation of SOUD and SHUD rates (Pitt Supplement, pp. S3-S4)

The National Survey on Drug Use and Health (NSDUH)[14] tends to underreport opioid use disorder due to omission of some key populations (e.g., homeless, incarcerated) that are known to have high rates of illicit drug use, so we used estimates from RAND Corporation[15] to estimate SHUD prevalence. Based on the RAND data, we estimated that 1 million people had SHUD in 2010 (this is the number of individuals with 21+ days of use per month). Because the RAND data ends with 2010, we projected to 2016 prevalence using the 64% growth in heroin use disorder reported by NSDUH from 2010 to 2015.[14] This yielded an estimate of 1.7 million people with SHUD in 2016. We adjusted this total to have the model reflect only the ~80% of individuals with SHUD who first had SOUD,[16,17] Though the monthly prevalence of MAT among individuals with SHUD is not reported, studies indicate that rates of MAT are low relative to the population with abuse and/or dependence.[18-20] We approximated the percentage of individuals with SHUD who are enrolled in MAT ("SHUD in MAT") based on expert opinion (K. Humphreys).

NSDUH and the National Epidemiologic Survey on Alcohol and Related Conditions-III (NESARC-III)[21] report rates of prescription opioid dependence and use trends; however, prevalence of severe opioid use disorder is not reported. Additionally, these surveys suffer from underreporting in key populations of relevance to the epidemic. We therefore estimated SOUD prevalence based on reported prescription opioid overdose deaths, adjusted for underreporting, and the estimated likelihood of overdose death. We performed the adjustment for underreporting by assuming that the actual number of prescription opioid-related deaths was 24% greater[22] than the total opioid deaths minus deaths from illicit opioids (heroin and synthetic opioids other than methadone) reported by the Centers for Disease Control and Prevention.[23] Because there is no

CONFIDENTIAL

reliable data on the risk of overdose death from SOUD, we estimated it assuming a 0.5 relative risk of overdose mortality for SOUD relative to SHUD. (We describe calculation of the SHUD overdose mortality rate in the Mortality subsection of S1.4). For individuals with SOUD in MAT, mortality risk is reduced by half.[24] We solved the equation below to obtain an estimate of the size of the total SOUD population ("Chronic pain SOUD with Rx", "Pain-free SOUD with Rx", "SOUD without Rx", "SOUD in MAT"). Based on expert opinion, we assumed that a lower percentage of individuals with SOUD than with SHUD enroll in MAT (K. Humphreys).

$$\frac{SOUD\ overdose\ deaths}{SOUD\ population\ size}$$

$$= SOUD\ overdose\ mortality\ risk\ not\ in\ MAT$$
$$* (1 - proportion\ SOUD\ enrolled\ in\ MAT)$$
$$+ SOUD\ overdose\ mortality\ risk\ not\ in\ MAT * risk\ reduction\ in\ MAT$$
$$* proportion\ SOUD\ enrolled\ in\ MAT$$

where

$$SOUD\ overdose\ mortality\ risk\ not\ in\ MAT$$
$$= SHUD\ overdose\ mortality\ risk\ not\ in\ MAT$$
$$* relative\ risk\ of\ mortality\ in\ SOUD\ vs. SHUD$$

Given the total SOUD population, the percent in MAT, and the number of individuals in the "Chronic pain SOUD with Rx" and "Pain-free SOUD with Rx" compartments, we determined the size of the "SOUD in MAT" and "SOUD without Rx" populations.

CONFIDENTIAL

**Attachment D.B**
**Change in NSDUH Methodology for Measuring Prescription Opioid Use Disorder in 2015**

Starting with the 2015 NSDUH survey, a number of changes were made to the NSDUH questionnaire and data collection process with the intent of improving the quality of the data collected.[10]  These changes affected the questions and data collection process for prescription drugs, among other topics, but not heroin.[11]  NSDUH notes that where estimates are no longer comparable, such as with prescription drugs, they "are assumed to have 'broken' trends and to begin new baselines in 2015."[12]

Below is a summary of the changes for prescription drugs (which includes prescription opioids).[13]

## 2.6   Prescription Drugs

The prescription drug questions were redesigned for the 2015 NSDUH. Prior to 2015, NSDUH focused on estimates of prescription drug misuse (previously called "nonmedical use") at the category level (pain relievers, sedatives, tranquilizers, and sedatives), but did not collect many details regarding the use or misuse of many specific prescription drugs in the past year. Questions about lifetime misuse of most specific prescription drugs were asked only for the lifetime period. Questions about any use of prescription drugs (as opposed to just misuse) also were not asked. Collecting more detailed and complete information on use, misuse, and recent initiation of a comprehensive set of specific prescription drugs was determined to be more useful for policy and research purposes, partly due to public health concerns about recent increases in addiction, overdose, and death involving prescription drugs, particularly prescription pain relievers. To address these priorities, the following changes were implemented in 2015:

- The focus of the prescription drug questions in 2015 was changed to a 12-month reference period instead of the lifetime reference period that was used in prior NSDUH questionnaires. Detailed information was collected regarding past year use and misuse of several specific prescription drugs and overall drug categories (pain relievers,

---

[10] NSDUH, "2015 National Survey on Drug Use and Health - Summary of the Effects of the 2015 NSDUH Questionnaire Redesign: Implications for Data Users", June 2016, p. 1.
[11] NSDUH, "2015 National Survey on Drug Use and Health - Summary of the Effects of the 2015 NSDUH Questionnaire Redesign: Implications for Data Users", June 2016, p. 2.
[12] NSDUH, "2015 National Survey on Drug Use and Health - Summary of the Effects of the 2015 NSDUH Questionnaire Redesign: Implications for Data Users", June 2016, p. 1.
[13] NSDUH, "2015 National Survey on Drug Use and Health - Summary of the Effects of the 2015 NSDUH Questionnaire Redesign: Implications for Data Users", June 2016, pp. 4-5.

CONFIDENTIAL

tranquilizers, stimulants, and sedatives), but detailed questions on lifetime misuse of specific prescription drugs were not included.

- Questions about any use of prescription drugs (instead of just misuse) during the past year were added.

- The definition of misuse was revised to use of a drug "in any way a doctor did not direct you to use it [or them]" in order to focus on the behavioral components of misuse. Prior to 2015, respondents were asked about the use of prescription drugs that were not prescribed for respondents (i.e., a behavior) or that respondents took only for the experience or feeling that the drugs caused (i.e., a motivation). Examples of behaviors of misuse that were presented to respondents in 2015 included (a) use without a prescription of the respondent's own; (b) use in greater amounts, more often, or longer than told to take a drug; or (c) use in any other way a doctor did not tell respondents to take a drug.

- Electronic images of prescription drugs replaced the hard-copy "pill cards" that were shown to respondents, and examples other than pills were shown (e.g., a picture of morphine in liquid form for injection and pictures of patches for delivering certain drugs through the skin).

- Prescription drugs that previously were included elsewhere in the questionnaire (i.e., Adderall® and Ambien®) were moved to the appropriate prescription drug module. As noted earlier, methamphetamine was also moved to its own section that was separate from prescription stimulants.

- New information was collected on the specific ways in which respondents misused prescription drugs (e.g., without a prescription of the respondent's own, use in greater amounts than prescribed).

- New detailed information was collected on the motivations for misuse.

These changes will result in new baselines for 2015 for all prescription drug measures, including measures for any prescription psychotherapeutic drug and categories of psychotherapeutic drugs (pain relievers, tranquilizers, stimulants, and sedatives). Specifically, new baselines will begin in 2015 for measures of use and misuse, past year initiation of prescription drug misuse, and prescription drug use disorders. Additionally, due to the differences in the way lifetime prescription drug misuse was measured in 2015, it appears that lifetime misuse measures are underreported compared with prior years. Therefore, lifetime prescription drug misuse measures will not be reported, including the reporting of trends.

CONFIDENTIAL

**Appendix E**
**Technical Memo re Neonatal Abstinence Syndrome (NAS)**

CONFIDENTIAL

**Appendix E**
**Technical Memo re Neonatal Abstinence Syndrome (NAS)**

In Section I, I describe a methodology for estimating the number of cases of neonatal abstinence syndrome (NAS) in the Bellwether counties attributable to opioid shipments.  In Section II, I estimate the excess hospital costs associated with those cases.

**I.      Estimating the Number of Neonatal Abstinence Syndrome Cases**

The data used in this analysis are publicly available, and collected and summarized by the Ohio Department of Health (ODH) on the incidence and cost of all births and of NAS births in Ohio.[1] Reports from 2006-2015 and 2017 provide 1) the number of NAS hospitalizations in Ohio and 2) the average hospital charges for all births and NAS births.[2]  These data are all statewide.  An additional report for 2017 provides the number of NAS cases by county of residence within Ohio for 2016 and 2017, separately, and for 2013-2017 in total.[3]

The number of NAS discharges in the state of Ohio between 2006 and 2017 is reported in row 1 of Table E.1 below.

The far-right columns of rows 4 and 5 report county-level NAS incidences for 2016, 2017 and 2013-2017.  The Cuyahoga and Summit shares of the total Ohio cases of NAS for 2016, 2017 and 2013-2017 are calculated in rows 2 and 3. The number of county-level NAS cases in 2013-2015 are estimated by subtracting the 2016-2017 cases from the 2013-2017 case total and distributing these cases equally across the three years.  For NAS case estimates in 2006-2012, I

---

[1] https://odh.ohio.gov/wps/portal/gov/odh/know-our-programs/violence-injury-prevention-program/resources/nas_hospital_reporting_in_ohio.

[2] See Ohio Department of Health, "Neonatal Abstinence Syndrome (NAS) in Ohio, 2006-2015 Report," Tables 1A and 1D; "2017 Ohio Neonatal Abstinence Syndrome Report" available at https://odh.ohio.gov/wps/wcm/connect/gov/73b5602a-eb7a-4967-92ba-113de136371d/2017%2BNAS%2BData%2BTable%2B10.25.2018.pdf?MOD=AJPERES&CONVERT_TO=url&CACHEID=ROOTWORKSPACE.Z18_M1HGGIK0N0JO00QO9DDDDM3000-73b5602a-eb7a-4967-92ba-113de136371d-muuj4xU.

[3] Ohio Department of Health, "2017 Ohio Neonatal Abstinence Syndrome County Report," available at https://odh.ohio.gov/wps/wcm/connect/gov/4cad708c-ba99-4b8b-b425-01cfef119c5d/2017+NAS+County+Table+12.3.2018.pdf?MOD=AJPERES&CONVERT_TO=url&CACHEID=ROOTWORKSPACE.Z18_M1HGGIK0N0JO00QO9DDDDM3000-4cad708c-ba99-4b8b-b425-01cfef119c5d-muueFzr.

CONFIDENTIAL

use the 2013-2017 Cuyahoga (Summit) share of total Ohio cases to approximate the number of cases in Cuyahoga (Summit).  The results of these estimations are in rows 2 and 3.

To estimate the share of opioid-related NAS cases attributable to opioid-shipments, I multiply the number of opioid-related NAS cases in rows 2 and 3 by the share of harm attributable to all shipments estimated by Professor Cutler.[4]  Based on Approach 1, this analysis estimates that there are 609 cases of opioid-related NAS attributable to shipments in Cuyahoga County from 2006-2016 and 430 cases in Summit County during the same period.  The same analysis using Approach 2 is presented Table E.2.

**Table E.1**
**Estimates of NAS Cases in Bellwether Counties Attributable to Opioid Shipments**
**Approach 1**

| | | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2013-2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Ohio NAS and Drug Abuse/Dependence Statistics** | | | | | | | | | | | | | | |
| [1] | NAS Discharges[A,C] | 305 | 369 | 477 | 715 | 953 | 1,172 | 1,482 | 1,717 | 1,919 | 2,174 | 2,223 | 1,935 | 9,968 |
| **County-level NAS Statistics** | | | | | | | | | | | | | | |
| [2] | NAS - Cuyahoga[B] | 19 | 23 | 30 | 45 | 60 | 74 | 94 | 117 | 117 | 117 | 141 | 137 | 629 |
| [3] | NAS - Summit[B] | 13 | 16 | 20 | 31 | 41 | 50 | 63 | 89 | 89 | 89 | 89 | 71 | 426 |
| [4]=[2]/[1] | Cuyahoga Share of Ohio NAS | | | | | | | | | | | 6 3% | 7 1% | 6 3% |
| [5]=[3]/[1] | Summit Share of Ohio NAS | | | | | | | | | | | 4 0% | 3 7% | 4 3% |
| [6] | Share of Harm Due to Shipments[D] | 49 2% | 50 4% | 51 1% | 52 4% | 54 6% | 57 6% | 66 5% | ■ | ■ | ■ | ■ | | |
| | | | | | | | | | | | | | | **2006-2016** |
| [7]=[2]*[6] | NAS Cases Due to Opioid Shipments - Cuyahoga | 9 | 12 | 15 | 24 | 33 | 43 | 62 | ■ | ■ | ■ | ■ | | 609 |
| [8]=[3]*[6] | NAS Cases Due to Opioid Shipments - Summit | 6 | 8 | 10 | 16 | 22 | 29 | 42 | ■ | ■ | ■ | ■ | | 430 |

Sources:
[A]     2017 Ohio Neonatal Abstinence Syndrome Report, https://odh ohio gov/wps/wcm/connect/gov/73b5602a-eb7a-4967-92ba-113de136371d/2017%2BNAS%2BData%2BTable%2B10 25 2018 pdf?MOD=AJPERES&CONVERT_TO=url&CACHEID=ROOTWORKSPACE Z18_M1HGGIK0N0JO00QO9DDDDM3000-73b5602a-eb7a-4967-92ba-113de136371d-muuj4xU

[B]     2017 Ohio Neonatal Abstinence Syndrome County Report, https://odh ohio gov/wps/wcm/connect/gov/4cad708c-ba99-4b8b-b425-01cfef119c5d/2017+NAS+County+Table+12 3 2018 pdf?MOD=AJPERES&CONVERT_TO=url&CACHEID=ROOTWORKSPACE Z18_M1HGGIK0N0JO00QO9DDDDM3000-4cad708c-ba99-4b8b-b425-01cfef119c5d-muueFzr

[C]     Neonatal Abstinence Syndrome (NAS) in Ohio, 2006-2015 Report, Ohio Department of Health
[D]     Expert Report of Professor David Cutler, March 25, 2019, Appendix III I, Table I 4

Notes:     The NAS cases reported by ODH reflect ICD-9 CM code 779 5 for 2006 through September 30, 2015 and ICD-10-CM code P96 1 for October 1, 2016 through 2017  The ICD-9 or ICD-10 codes could appear in the primary or secondary diagnosis fields
The number of NAS cases in Cuyahoga and Summit counties in 2006-2012 estimated using 2013-2017 county share of NAS in Ohio (6 3% for Cuyahoga and 4 3% for Summit) and the total number of NAS cases in Ohio (row [1])  The number of NAS cases in 2013-2015 are set equal to the number of 2013-2017 cases, by county, minus the county totals in 2016-2017, split evenly across years

---

[4] See Cutler Report, Appendix III.I, Tables I.4 and I.5.

**Table E.2**
**Estimates of NAS Cases in Bellwether Counties Attributable to Opioid Shipments**
**Approach 2**

| | | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2013-2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Ohio NAS and Drug Abuse/Dependence Statistics** | | | | | | | | | | | | | | |
| [1] | NAS Discharges[A,C] | 305 | 369 | 477 | 715 | 953 | 1,172 | 1,482 | 1,717 | 1,919 | 2,174 | 2,223 | 1,935 | 9,968 |
| | | | | | | | | | | | | | | |
| **County-level NAS Statistics** | | | | | | | | | | | | | | |
| [2] | NAS - Cuyahoga[B] | 19 | 23 | 30 | 45 | 60 | 74 | 94 | 117 | 117 | 117 | 141 | 137 | 629 |
| [3] | NAS - Summit[B] | 13 | 16 | 20 | 31 | 41 | 50 | 63 | 89 | 89 | 89 | 89 | 71 | 426 |
| | | | | | | | | | | | | | | |
| [4]=[2]/[1] | Cuyahoga Share of Ohio NAS | | | | | | | | | | | 6 3% | 7 1% | 6 3% |
| [5]=[3]/[1] | Summit Share of Ohio NAS | | | | | | | | | | | 4 0% | 3 7% | 4 3% |
| | | | | | | | | | | | | | | |
| [6] | Share of Harm Due to Shipments [D] | 83 7% | 85 6% | 85 2% | 77 1% | 77 8% | 82 2% | 84 1% | ■ | ■ | ■ | ■ | | |
| | | | | | | | | | | | | | | **2006-2016** |
| [7]=[2]*[6] | NAS Cases Due to Opioid Shipments - Cuyahoga | 16 | 20 | 26 | 35 | 47 | 61 | 79 | ■ | ■ | ■ | ■ | | 725 |
| [8]=[3]*[6] | NAS Cases Due to Opioid Shipments - Summit | 11 | 14 | 17 | 24 | 32 | 41 | 53 | ■ | ■ | ■ | ■ | | 510 |

Sources:
[A]     2017 Ohio Neonatal Abstinence Syndrome Report, https://odh ohio gov/wps/wcm/connect/gov/73b5602a-eb7a-4967-92ba-
113de136371d/2017%2BNAS%2BData%2BTable%2B10 25 2018 pdf?MOD=AJPERES&CONVERT_TO=url&CACHEID=ROOTWORKSPACE Z18_M1HGGIK0N0JO
00QO9DDDDM3000-73b5602a-eb7a-4967-92ba-113de136371d-muuj4xU

[B]     2017 Ohio Neonatal Abstinence Syndrome County Report, https://odh ohio gov/wps/wcm/connect/gov/4cad708c-ba99-4b8b-b425-
01efef119c5d/2017+NAS+County+Table+12 3 2018 pdf?MOD=AJPERES&CONVERT_TO=url&CACHEID=ROOTWORKSPACE Z18_M1HGGIK0N0JO00QO9DDDD
M3000-4cad708c-ba99-4b8b-b425-01efef119c5d-muueFzr

[C]     Neonatal Abstinence Syndrome (NAS) in Ohio, 2006-2015 Report, Ohio Department of Health

[D]     Expert Report of Professor David Cutler, March 25, 2019, Appendix III I, Table I 5

Notes:     The NAS cases reported by ODH reflect ICD-9 CM code 779 5 for 2006 through September 30, 2015 and ICD-10-CM code P96 1 for October 1, 2016 through 2017   The
ICD-9 or ICD-10 codes could appear in the primary or secondary diagnosis fields
The number of NAS cases in Cuyahoga and Summit counties in 2006-2012 estimated using 2013-2017 county share of NAS in Ohio (6 3% for Cuyahoga and 4 3% for
Summit) and the total number of NAS cases in Ohio (row [1])   The number of NAS cases in 2013-2015 are set equal to the number of 2013-2017 cases, by county, minus the
county totals in 2016-2017, split evenly across years

## II.     Valuation of Excess Health Costs for NAS

The next step in this analysis is to estimate the cost for the NAS cases attributable to shipments.
Row 3 of Table E.3 provides the average hospital charges for an NAS case in Ohio from 2006-
2016.  Row 4 provides the average hospital charges for a birth in Ohio, using all births to Ohio
residents from 2006-2016.[5]  Both estimates are based on ODH statewide data.  The difference
between these two charge amounts is the excess hospital charge resulting from NAS. [6]

Because the ODH reports hospital charges, I use net revenue-to-charge ratios from the
American Hospital Association to approximate hospital costs.  The American Hospital

---

[5] This data for the average charges for all births will include charges for NAS births and therefore is a conservative
comparison.

[6] The average charges reflect charges billed by the hospital ("2017 Ohio Neonatal Abstinence Syndrome Report"
Ohio Department of Health).

Association publishes aggregate data on gross hospital charges and net patient revenues by state.  I use that data for the state of Ohio, reproduced in rows 6 and 7 of Table E.3, to estimate the revenue to charge ratio for Ohio hospitals and I use this ratio to estimate the excess costs required to treat NAS patients.[7]  The average excess cost for a case of NAS is reported in row 9 of Table E.3.  Average excess costs for NAS are multiplied by the number of cases in Cuyahoga and Summit counties to estimate total excess hospital costs due to NAS resulting from opioid shipments (rows 10 and 11).  Table E.3 below reports the total estimated cost of NAS attributable to shipments, under Approach 1.  These costs were $9.4 million in Cuyahoga County and $6.6 million in Summit County.[8]  The same analysis using Approach 2 is presented in Table E.4.

### Table E.3
### Hospital Cost Estimates for NAS Attributable to Opioid Shipments
### Approach 1

| | | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [1] | Opioid-related NAS Cases - Cuyahoga | 9 | 12 | 15 | 24 | 33 | 43 | 62 | 87 | 95 | 102 | 128 | 609 |
| [2] | Opioid-related NAS Cases - Summit | 6 | 8 | 10 | 16 | 22 | 29 | 42 | 66 | 72 | 77 | 81 | 430 |
| | | | | | | | | | | | | | |
| [3] | Average Charge for NAS in Ohio Hospitals[A] | 39,561 | 59,033 | 59,580 | 72,158 | 64,911 | 59,847 | 57,813 | 61,469 | 68,666 | 61,241 | | |
| [4] | Average Charge for a Birth in Ohio Hospitals[A] | 6,838 | 7,870 | 8,660 | 9,680 | 10,336 | 11,452 | 12,977 | 13,604 | 14,570 | 15,494 | | |
| [5] [3]-[4] | Excess Charges for NAS Births | 32,723 | 51,163 | 50,920 | 62,478 | 54,575 | 48,395 | 44,836 | 47,865 | 54,096 | 45,747 | 44,903 | |
| | | | | | | | | | | | | | |
| [6] | Ohio Hospital Gross Patient Revenues (millions)[B] | 64,339 | 69,105 | 77,003 | 85,584 | 93,353 | 99,617 | 108,810 | 117,265 | 125,847 | 134,927 | | |
| [7] | Ohio Hospital Net Patient Revenues (millions)[B] | 25,333 | 26,372 | 28,423 | 30,514 | 31,793 | 32,381 | 35,605 | 37,124 | 39,137 | 41,324 | | |
| [8] [7]/[6] | Net Revenue to Gross Charge Ratio | 39.4% | 38.2% | 36.9% | 35.7% | 34.1% | 32.5% | 32.7% | 31.7% | 31.1% | 30.6% | 29.8% | |
| | | | | | | | | | | | | | |
| [9] [5]*[8] | Excess Hospital Costs Due to NAS | 12,885 | 19,525 | 18,795 | 22,276 | 18,587 | 15,731 | 14,671 | 15,153 | 16,823 | 14,011 | 13,397 | |
| | | | | | | | | | | | | | |
| [10] [1]*[9] | Total Cost of NAS Due to Shipments - Cuyahoga | 122,019 | 228,920 | 288,999 | 526,513 | 609,856 | 670,388 | 912,893 | ▇ | ▇ | ▇ | ▇ | 9,412,195 |
| [11] [2]*[9] | Total Cost of NAS Due to Shipments - Summit | 82,639 | 155,040 | 195,729 | 356,589 | 413,034 | 454,031 | 618,271 | ▇ | ▇ | ▇ | ▇ | 6,645,313 |

Sources

[A]     2017 Ohio Neonatal Abstinence Syndrome Report, https://odh.ohio.gov/wps/wcm/connect/gov/73b5602a-eb7a-4967-92ba-
113de136371d/2017%2BNAS%28Data%2BTable%2B10.25.2018.pdf?MOD  AJPERES&CONVERT_TO  url&CACHEID  ROOTWORKSPACE.Z18_M1HGGIK0N0JO00QO9DDDDM3000-73b5602a-eb7a-4967-92ba-
113de136371d-muuj4xU

[8]

Notes

        Net patient revenue is defined as, "[t]he estimated net realizable amounts from patients, third-party payers, and others for services rendered."  (AHA Hospital Statistics, 2009 Edition, p.208.)  This measure is used to
        approximate hospital cost.

---

[7] The AHA's measure of gross patient revenue is the sum of gross inpatient revenue and gross outpatient revenue. Both measures also reflect charges billed by the hospital.  (AHA Hospital Statistics, 2009 Edition, pp. 206.)  Net patient revenue is defined as, "[t]he estimated net realizable amounts from patients, third-party payers, and others for services rendered."  (AHA Hospital Statistics, 2009 Edition, p. 208.)

[8] Results using Professor Cutler's Approach 2 are found in Table E.4 below.

CONFIDENTIAL

**Table E.4**
**Hospital Cost Estimates for NAS Attributable to Opioid Shipments**
**Approach 2**

| | | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [1] | Opioid-related NAS Cases - Cuyahoga | 16 | 20 | 26 | 35 | 47 | 61 | 79 | 101 | 104 | 107 | 131 | 725 |
| [2] | Opioid-related NAS Cases - Summit | 11 | 14 | 17 | 24 | 32 | 41 | 53 | 76 | 79 | 81 | 83 | 510 |
| | | | | | | | | | | | | | |
| [3] | Average Charge for NAS in Ohio Hospitals[A] | 39,561 | 59,033 | 59,580 | 72,158 | 64,911 | 59,847 | 57,813 | 61,469 | 68,666 | 61,241 | | |
| [4] | Average Charge for a Birth in Ohio Hospitals[A] | 6,838 | 7,870 | 8,660 | 9,680 | 10,336 | 11,452 | 12,977 | 13,604 | 14,570 | 15,494 | | |
| [5] [3]-[4] | Excess Charges for NAS Births | 32,723 | 51,163 | 50,920 | 62,478 | 54,575 | 48,395 | 44,836 | 47,865 | 54,096 | 45,747 | 44,903 | |
| | | | | | | | | | | | | | |
| [6] | Ohio Hospital Gross Patient Revenues (millions)[B] | 64,339 | 69,105 | 77,003 | 85,584 | 93,353 | 99,617 | 108,810 | 117,265 | 125,847 | 134,927 | | |
| [7] | Ohio Hospital Net Patient Revenues (millions)[B] | 25,333 | 26,372 | 28,423 | 30,514 | 31,793 | 32,381 | 35,605 | 37,124 | 39,137 | 41,324 | | |
| [8] [7]/[6] | Net Revenue to Gross Charge Ratio | 39.4% | 38.2% | 36.9% | 35.7% | 34.1% | 32.5% | 32.7% | 31.7% | 31.1% | 30.6% | 29.8% | |
| | | | | | | | | | | | | | |
| [9] [5]*[8] | Excess Hospital Costs Due to NAS | 12,885 | 19,525 | 18,795 | 22,276 | 18,587 | 15,731 | 14,671 | 15,153 | 16,823 | 14,011 | 13,397 | |
| | | | | | | | | | | | | | |
| [10] [1]*[9] | Total Cost of NAS Due to Shipments - Cuyahoga | 207,564 | 389,339 | 482,161 | 775,046 | 869,337 | 956,065 | 1,153,313 | ▮ | ▮ | ▮ | ▮ | 11,353,726 |
| [11] [1]*[9] | Total Cost of NAS Due to Shipments - Summit | 140,576 | 263,686 | 326,551 | 524,912 | 588,772 | 647,510 | 781,099 | ▮ | ▮ | ▮ | ▮ | 7,992,844 |

Sources
[A]  2017 Ohio Neonatal Abstinence Syndrome Report, https://odh.ohio.gov/wps/wcm/connect/gov/73b5602a-eb7a-4967-92ba-113de136371d/2017%2BNAS%2BData%2BTable%2B10.25.2018.pdf?MOD AJPERES&CONVERT_TO url&CACHEID ROOTWORKSPACE.Z18_M1HGGIK0N0JO00QO9DDDDM3000-73b5602a-eb7a-4967-92ba-113de136371d-muuj4xU

[B]  AHA Hospital Statistics, 2009, 2013, 2016, 2019 Editions, Ohio Table 6, p. 121.

Notes  Charges in [3] and [4], "reflect charges billed by the hospital." (2017 Ohio Neonatal Abstinence Syndrome Report).
Gross patient revenues in [6] reflect revenue from services rendered to inpatients at full established rates, or "charges." (AHA Hospital Statistics, 2009 Edition, p.206.)
Net patient revenue is defined as, "[t]he estimated net realizable amounts from patients, third-party payers, and others for services rendered." (AHA Hospital Statistics, 2009 Edition, p.208.) This measure is used to approximate hospital cost.

The incremental costs I estimate are of the same magnitude as those estimated in an academic publication by Corr and Hollenbeak (2017).[9] The authors use three different methods to compare NAS births to other births, and estimate incremental costs ranging from approximately $9,000 to $13,000.

---

[9] T.E. Corr and C.S. Hollenbeak, "The Economic Burden of Neonatal Abstinence Syndrome in the United States," *Addiction*, 112, 2017, pp. 1590-1599.

CONFIDENTIAL

**Appendix F**
**Technical Memo re Crime**

CONFIDENTIAL

**Appendix F**
**Technical Memo re Crime**

In Section I, this appendix summarizes the method I used to estimate the number of crimes that are due to prescription opioid shipments that I used in my Report.  This method follows the analysis used in the Cutler Report to estimate the percent of costs incurred by crime-related Bellwether divisions that are due to prescription opioid shipments.  In Section II, I describe my method for assigning a dollar value to the costs associated with crime.

**I.      Estimating Number of Crimes**

<u>Overview of Methodology</u>

The estimation method used in the Cutler Report to calculate crime due to opioid shipments is executed using the following inputs:

| | | |
|---|---|---|
| Crime due to shipments = | Crime × | (a) |
| | % of Crime that is Drug-Related × | (b) |
| | % of Drug-Related Crime that is Opioid-Related × | (c) |
| | % of Opioid-Related Harm that is Due to Shipments | (d) |

Professor Cutler's analysis focuses on crime prevention efforts (and hence crimes) that are overseen by specific law enforcement divisions within the Bellwethers.  Therefore, the data used to estimate the number of crime offenses (input (a) above) in these analyses are specific to the crime-related division in each Bellwether.  For the analysis in my Report, I calculate the number of crimes in all law enforcement divisions for which data are available in each Bellwether county.  Once the crime counts in each county have been calculated, the remaining inputs ((b) through (d)) can be used from the same sources and applied in the same manner as is done in the Cutler Report.[1]

---

[1] Cutler Report, Appendix III.C.3 and Appendix III.1, Tables 1.4 and 1.5.

CONFIDENTIAL

<u>Crime Counts</u>

For the purpose of measuring the total amount of criminal activity that occurred within Cuyahoga and Summit's geographic area, I calculate the total amount of criminal activity reported for all reporting Law Enforcement Agencies in the National Incident-Based Reporting System (NIBRS) data in which the 'primary county' listed is Cuyahoga/Summit. The NIBRS data is a standard source used to measure criminal offenses by criminal category for all law enforcement agencies (LEAs) that report into NIBRS (note that not every LEA reports into NIBRS currently).  Due to underreporting of criminal activity in Cleveland in 2015, I use the average of 2014 and 2016 to approximate criminal activity in Cuyahoga in 2015.[2]  The Cuyahoga Sheriff's office does not report to the NIBRS, so incidents investigated by that office are not included in the totals.

<u>Estimates of Criminal Offenses Due to Prescription Opioids</u>

The NIBRS data described above is used to generate estimates of criminal activity within the two counties.  The remaining steps in the estimation follow the method described in the Cutler Report and use the same data inputs as described in that report.

- Input (b), the percent of these crime categories that can be attributable to drugs, is taken from US DOJ National Drug Intelligence Center.[3]  These estimates are applied to each year of the analysis.

- Input (c), the percent of drug-related crimes that are opioid-related, is estimated in two parts.  This two-part method follows the literature, such as Florence et al (2016).[4]  The percent of drug crimes that are drug-related is estimated using information on the

---

[2] The NIBRS data for the Cleveland Police (which accounts for approximately 80% of Cuyahoga criminal activity) appear to contain errors as the numbers are significantly lower than those of 2014 or 2016.

[3] See United States Department of Justice, National Drug Intelligence Center, "The Economic Impact of Illicit Drug Use on American Society," 2011, Table 1.7.

[4] C. Florence, *et al.*, "The Economic Burden of Prescription Opioid Overdose, Abuse and Dependence in the United States, 2013," *Medical Care*, 54(10), 2016, pp. 901-906.

percent of drug seizures in Ohio that contained opioids.[5]  The percent of drug-related crimes (e.g. burglaries that are motivated by drugs) that are opioid-related is estimated using the relative value of opioid use disorder (OUD) to substance use disorder (SUD) in Ohio as measured by NSDUH.[6]

- Input (d), the percent of opioid-related crimes that are due to shipments is approximated using mortality regressions using two different approaches.  Approach 1 and Approach 2 are described in more detail in the Cutler Report.

Combining the above inputs yields two estimates (one using Approach 1 and one using Approach 2) of the number of crimes occurring in each of the counties that are due to prescription opioid shipments.  Tables F.1a and F.1b present these estimates for Cuyahoga and Summit counties, respectively, for Approach 1.  Tables F.2a and F.2b do so for Approach 2.  The last lines in Tables F.1a and F.1b appear in Tables 9a and 9b in my Report.

---

[5] Ohio forensic laboratories reporting to the National Forensic Laboratory Information System (NFLIS), U.S. Drug Enforcement Administration, Diversion Control Division, 2007-2017, Table 2.

[6] Note that state-specific estimates are not available for 2014 and NSDUH's definition of OUD changed in 2015.  As a result, the Cutler Report holds this value constant after 2013.

CONFIDENTIAL

**Table F.1a**
**Estimates of Crimes Due to Shipments**
**Cuyahoga County**
**Approach 1**

| Category of Offense | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aggravated Assault | 11 | 11 | 13 | 14 | 15 | 15 | 18 | 20 | 20 | 28 | 36 | 199 |
| All Other Offenses | 7 | 6 | 8 | 9 | 10 | 10 | 12 | 14 | 14 | 17 | 19 | 126 |
| Arson | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 12 |
| Burglary | 460 | 449 | 582 | 595 | 685 | 747 | 873 | 839 | 779 | 812 | 813 | 7,633 |
| Curfew/Loitering/Vagrancy | | | | | | | | | | | | |
| Disorderly Conduct | | | | | | | | | | | | |
| Driving Under the Influence | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Drug Crimes | 584 | 534 | 628 | 747 | 943 | 931 | 1,164 | 1,087 | 1,291 | 1,538 | 1,637 | 11,084 |
| Drunkenness | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Embezzlement | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Family and Children | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Forcible Rape | 4 | 3 | 4 | 4 | 4 | 4 | 6 | 6 | 8 | 9 | 10 | 63 |
| Forgery and Fraud | 128 | 122 | 144 | 144 | 143 | 154 | 230 | 214 | 246 | 258 | 260 | 2,045 |
| Gambling Offenses | | | | | | | | | | | | |
| Human Trafficking | | | | | | | | | | | | |
| Larceny-theft | 872 | 829 | 1,041 | 1,050 | 1,112 | 1,239 | 1,557 | 1,559 | 1,666 | 1,777 | 1,826 | 14,527 |
| Liquor Laws | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Motor Vehicle Theft | 218 | 231 | 235 | 177 | 168 | 211 | 246 | 294 | 298 | 348 | 389 | 2,815 |
| Murder | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 8 |
| Other Assaults | 100 | 99 | 123 | 134 | 147 | 139 | 181 | 203 | 217 | 239 | 254 | 1,836 |
| Prostitution | 20 | 19 | 27 | 30 | 31 | 31 | 38 | 37 | 33 | 23 | 11 | 301 |
| Robbery | 166 | 159 | 199 | 191 | 183 | 188 | 246 | 293 | 275 | 283 | 279 | 2,462 |
| Sex Offenses | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 10 |
| Stolen Property | 25 | 27 | 27 | 9 | 8 | 9 | 12 | 10 | 14 | 17 | 19 | 178 |
| Vandalism | 40 | 39 | 48 | 49 | 47 | 48 | 61 | 62 | 69 | 89 | 107 | 658 |
| Weapons | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | **2 636** | **2 531** | **3 082** | **3 155** | **3 498** | **3 728** | **4 648** | **4 641** | **4 932** | **5 441** | **5 665** | **43 957** |

CONFIDENTIAL

**Table F.1b**
**Estimates of Crimes Due to Shipments**
**Summit County**
**Approach 1**

| Category of Offense | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aggravated Assault | 2 | 3 | 6 | 6 | 6 | 6 | 9 | 9 | 9 | 8 | 8 | 74 |
| All Other Offenses | 1 | 2 | 2 | 2 | 2 | 2 | 3 | 3 | 3 | 4 | 4 | 27 |
| Arson | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Burglary | 155 | 157 | 236 | 238 | 291 | 308 | 314 | 341 | 337 | 344 | 336 | 3,057 |
| Curfew/Loitering/Vagrancy | | | | | | | | | | | | |
| Disorderly Conduct | | | | | | | | | | | | |
| Driving Under the Influence | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Drug Crimes | 285 | 251 | 353 | 435 | 547 | 556 | 693 | 891 | 1,123 | 1,383 | 1,593 | 8,110 |
| Drunkenness | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Embezzlement | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Family and Children | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Forcible Rape | 1 | 1 | 2 | 2 | 2 | 2 | 3 | 3 | 3 | 4 | 5 | 27 |
| Forgery and Fraud | 45 | 53 | 77 | 85 | 80 | 83 | 99 | 128 | 141 | 194 | 187 | 1,172 |
| Gambling Offenses | | | | | | | | | | | | |
| Human Trafficking | | | | | | | | | | | | |
| Larceny-theft | 292 | 283 | 400 | 397 | 447 | 469 | 582 | 722 | 755 | 821 | 858 | 6,026 |
| Liquor Laws | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Motor Vehicle Theft | 45 | 40 | 44 | 45 | 39 | 45 | 51 | 50 | 51 | 63 | 72 | 544 |
| Murder | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Other Assaults | 41 | 40 | 54 | 53 | 57 | 57 | 72 | 80 | 85 | 98 | 106 | 743 |
| Prostitution | 8 | 17 | 24 | 15 | 14 | 8 | 7 | 4 | 3 | 3 | 6 | 110 |
| Robbery | 27 | 28 | 42 | 38 | 34 | 43 | 44 | 47 | 42 | 44 | 45 | 435 |
| Sex Offenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 5 |
| Stolen Property | 6 | 4 | 6 | 6 | 6 | 8 | 9 | 11 | 10 | 13 | 16 | 95 |
| Vandalism | 21 | 20 | 25 | 25 | 27 | 26 | 30 | 32 | 32 | 38 | 40 | 315 |
| Weapons | 2 | 2 | 2 | 2 | 2 | 3 | 3 | 4 | 3 | 4 | 5 | 32 |
| **Total** | **934** | **903** | **1 275** | **1 350** | **1 556** | **1 616** | **1 918** | **2 324** | **2 600** | **3 021** | **3 281** | **20 779** |

CONFIDENTIAL

**Table F.2a**
**Estimates of Crimes Due to Shipments**
**Cuyahoga County**
**Approach 2**

| Category of Offense | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aggravated Assault | 19 | 18 | 21 | 21 | 21 | 21 | 23 | 23 | 22 | 29 | 36 | 254 |
| All Other Offenses | 11 | 10 | 14 | 13 | 14 | 14 | 16 | 16 | 16 | 18 | 19 | 161 |
| Arson | 2 | 2 | 2 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 16 |
| Burglary | 782 | 763 | 971 | 876 | 976 | 1,066 | 1,103 | 971 | 857 | 847 | 833 | 10,043 |
| Curfew/Loitering/Vagrancy | | | | | | | | | | | | |
| Disorderly Conduct | | | | | | | | | | | | |
| Driving Under the Influence | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Drug Crimes | 993 | 908 | 1,047 | 1,100 | 1,345 | 1,327 | 1,471 | 1,257 | 1,420 | 1,605 | 1,676 | 14,150 |
| Drunkenness | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Embezzlement | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Family and Children | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Forcible Rape | 6 | 6 | 7 | 7 | 6 | 6 | 7 | 8 | 9 | 9 | 10 | 80 |
| Forgery and Fraud | 218 | 208 | 241 | 212 | 204 | 220 | 291 | 248 | 271 | 269 | 266 | 2,647 |
| Gambling Offenses | | | | | | | | | | | | |
| Human Trafficking | | | | | | | | | | | | |
| Larceny-theft | 1,484 | 1,410 | 1,737 | 1,546 | 1,586 | 1,766 | 1,966 | 1,803 | 1,832 | 1,854 | 1,869 | 18,854 |
| Liquor Laws | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Motor Vehicle Theft | 371 | 393 | 392 | 260 | 239 | 301 | 311 | 340 | 328 | 363 | 399 | 3,697 |
| Murder | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 10 |
| Other Assaults | 170 | 168 | 205 | 197 | 210 | 199 | 229 | 235 | 238 | 249 | 260 | 2,360 |
| Prostitution | 34 | 33 | 45 | 45 | 44 | 44 | 48 | 42 | 37 | 24 | 12 | 407 |
| Robbery | 282 | 271 | 332 | 281 | 261 | 269 | 311 | 339 | 302 | 295 | 286 | 3,229 |
| Sex Offenses | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 13 |
| Stolen Property | 43 | 46 | 46 | 13 | 11 | 12 | 15 | 12 | 16 | 18 | 20 | 251 |
| Vandalism | 68 | 67 | 81 | 72 | 66 | 68 | 77 | 71 | 76 | 93 | 110 | 848 |
| Weapons | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | **4 484** | **4 304** | **5 142** | **4 645** | **4 986** | **5 316** | **5 872** | **5 369** | **5 426** | **5 677** | **5 799** | **57 019** |

CONFIDENTIAL

**Table F.2b**
**Estimates of Crimes Due to Shipments**
**Summit County**
**Approach 2**

| Category of Offense | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aggravated Assault | 4 | 5 | 10 | 9 | 9 | 9 | 11 | 11 | 10 | 9 | 9 | 95 |
| All Other Offenses | 2 | 3 | 3 | 3 | 3 | 3 | 3 | 4 | 3 | 4 | 4 | 35 |
| Arson | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 4 |
| Burglary | 263 | 267 | 394 | 351 | 415 | 439 | 396 | 394 | 371 | 358 | 344 | 3,994 |
| Curfew/Loitering/Vagrancy | | | | | | | | | | | | |
| Disorderly Conduct | | | | | | | | | | | | |
| Driving Under the Influence | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Drug Crimes | 485 | 428 | 589 | 640 | 779 | 793 | 875 | 1,031 | 1,235 | 1,442 | 1,630 | 9,929 |
| Drunkenness | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Embezzlement | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| Family and Children | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Forcible Rape | 2 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 5 | 35 |
| Forgery and Fraud | 76 | 89 | 129 | 125 | 115 | 118 | 126 | 148 | 155 | 202 | 192 | 1,474 |
| Gambling Offenses | | | | | | | | | | | | |
| Human Trafficking | | | | | | | | | | | | |
| Larceny-theft | 497 | 482 | 668 | 584 | 637 | 668 | 735 | 835 | 831 | 857 | 878 | 7,672 |
| Liquor Laws | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Motor Vehicle Theft | 76 | 68 | 74 | 66 | 56 | 64 | 64 | 57 | 56 | 66 | 73 | 720 |
| Murder | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Other Assaults | 70 | 69 | 90 | 77 | 82 | 81 | 90 | 92 | 94 | 103 | 108 | 956 |
| Prostitution | 14 | 29 | 41 | 23 | 20 | 12 | 9 | 4 | 3 | 3 | 6 | 163 |
| Robbery | 46 | 48 | 70 | 57 | 49 | 61 | 55 | 55 | 47 | 45 | 46 | 579 |
| Sex Offenses | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 6 |
| Stolen Property | 10 | 8 | 10 | 9 | 9 | 11 | 11 | 12 | 11 | 14 | 16 | 121 |
| Vandalism | 35 | 34 | 41 | 36 | 39 | 37 | 38 | 37 | 36 | 39 | 41 | 412 |
| Weapons | 3 | 3 | 4 | 3 | 3 | 4 | 4 | 4 | 4 | 4 | 6 | 41 |
| **Total** | **1 590** | **1 536** | **2 127** | **1 987** | **2 219** | **2 304** | **2 423** | **2 689** | **2 860** | **3 152** | **3 359** | **26 245** |

CONFIDENTIAL

## II.     Valuation of Criminal Offenses Due to Shipments of Prescription Opioids

The main source of monetary estimates is McCollister *et al.*[7]  The authors estimate the cost of crime by offense category using two methods:  cost-of-illness and jury compensation.  The cost-of-illness approach identifies a comprehensive list of costs imposed by crime on society, including property loss, medical costs, lost productivity, crime prevention expenses, pain and suffering.  These costs are then attributed to different crime categories (theft, arson, etc.) to estimate a "per-offense" unit cost by type of criminal activity.  The jury-compensation approach is an estimation method for the intangible costs of crime, such as pain and suffering, derived from data on jury awards received by crime victims.[8]  These two methodologies allow for the disaggregation of the unit cost of a given crime into direct, indirect and intangible costs and are widely used in the crime cost literature.[9]

I then match the offense categories in our data on criminal activity due to shipments to the per-offense cost estimates available in the literature.[10]   I rely on other research papers to value crimes not covered in McCollister *et al.*[11]  Cost estimates per offense are not available for all crimes (such as disorderly conduct).  In these cases, no costs are assigned.

---

[7]  K.E. McCollister, M.T. French and H. Fang, "The Cost of Crime to Society:  New Crime-Specific Estimates for Policy and Program Evaluation," Drug and Alcohol Dependence, 108(1), 2010, pp. 98-109

[8] M.A. Cohen, "Pain, Suffering, and Jury Awards: A Study of the Cost of Crime to Victims," *Law & Society Review*, 22(3), 1988, 537.

[9] Examples of these approaches are: D.A. Anderson, "The Cost of Crime," *Foundations and Trends® in Microeconomics*, 7(3), 2012, pp. 209-265. and T.R. Miller, M.A. Cohen and D. Hendrie, "Non-Economic Damages Due to Physical and Sexual Assault: Estimates from Civil Jury Awards," *Forensic Science and Criminology*, 2(1), 2017, pp. 1-10.

[10] Some of these categories do not match 1-1, or there are difficulties in finding per-offense costs for some crimes. I specify the sources for each crime category in the notes for Table F.3.  In particular, I do not have the adjusted risk-of-homicide crime costs for crimes not available in McCollister *et al.*, *op. cit.*  Other assumptions include the use of the sexual assault per-offense cost to crimes in the data categorized as forcible rape.

[11] I supplement my unit-cost crimes using the estimates available in T. Miller and S. Bhattacharya, "Incidence and Cost of Carbon Monoxide Poisoning for All Ages, Pool and Spa Submersions for Ages 0– 14, and Lead Poisoning for Ages 0-4," 2013, Table 20, available at https://www.cpsc.gov/Global/Researchnd-tatistics/Injury-tatistics/Carbon-onoxide-osioning/IncidenceandCostofCarbonMonoxidePoisoningPoolandSpaSubmersion andLeadPosioning.pdf.

CONFIDENTIAL

Finally, I multiply the counts in each crime category by the corresponding per-offense cost estimate, which yields the total crime costs broken into direct, indirect and intangible costs.

Table F.3 identifies the category of offense and the costs I use to value direct, implicit and intangible costs.  The table identifies the sources for those numbers.  Total costs appear in Tables F4a and F4b for Approach 1 and F5a and F5b for Approach 2.  The sum of these costs by year for each of the counties (*i.e.*, the last lines of Tables F.4a and F.4b), appear in Tables 9a and 9b in my Report.

**Table F.3**
**Summary of Costs by Offense**

| Category of Offense | Direct Cost/Offense | Implicit Cost/Offense | Intangible Costs/Offense | | Total All Costs | Note |
|---|---|---|---|---|---|---|
| | Crime Victim Cost | Crime Career Cost | Pain and Suffering | Adjusted Risk of Homicide | | |
| Aggravated Assault | $8,700 | $2,126 | $13,435 | $81,588 | $105,849 | [1]  Aggravated Assault |
| All Other Offenses | $70 | $92 | N/A | N/A | $162 | [13] All Other Nontraffic Offenses |
| Arson | $11,452 | $584 | $0 | $5,133 | $17,169 | [2] Arson |
| Burglary | $1,362 | $681 | $0 | $321 | $2,364 | [3] Burglary |
| Curfew/Loitering/Vagrancy | | | | | $0 | |
| Disorderly Conduct | | | | | $0 | |
| Driving Under the Influence | | | | | $0 | |
| Drug Crimes | $4,490 | $1,118 | $0 | N/A | $5,608 | [14] Drug Posession/Sales |
| Drunkenness | | | | | $0 | |
| Embezzlement | $0 | $660 | N/A | N/A | $660 | [4] Embezzlement |
| Family and Children | | | | | $0 | |
| Forcible Rape | $5,556 | $9,212 | $198,212 | $1,430 | $214,410 | [5] Sexual Assault |
| Forgery and Fraud | $0 | $660 | N/A | N/A | $660 | [6] Forgery/counterfeiting and Fraud |
| Gambling Offenses | | | | | $0 | |
| Human Trafficking | | | | | $0 | |
| Larceny-theft | $480 | $163 | $0 | $10 | $653 | [7] Larceny |
| Liquor Laws | | | | | $0 | |
| Motor Vehicle Theft | $6,114 | $553 | $0 | $262 | $6,929 | [8] Motor Vehicle Theft |
| Murder | $737,517 | $148,555 | $8,442,000 | $0 | $9,328,072 | [9] Murder |
| Other Assaults | $3,425 | $1,878 | $13,069 | N/A | $18,372 | [15]  Assault |
| Prostitution | $70 | $80 | $0 | N/A | $150 | [16] Prostitution/Pandering |
| Robbery | $3,299 | $4,272 | $4,976 | $17,599 | $30,146 | [10] Robbery |
| Sex Offenses | $5,686 | $9,517 | $89,784 | N/A | $104,987 | [17] Other Sexual Assault |
| Stolen Property | $0 | $1,132 | N/A | N/A | $1,132 | [11] Stolen Property |
| Vandalism | $0 | $701 | N/A | N/A | $701 | [12] Vandalism |
| Weapons | $70 | $799 | $0 | N/A | $869 | [18] Weapons Carrying |

Notes:     [1] - [12] are in 2008 dollars. Costs are from McCollister *et al.* (2010) Tables 3 & 4.

[13] - [18] are in 2010 dollars. Costs are from Miller and Bhattacharya (2013) Table 2. I treat medical costs, lost wages, property damage and public services as Direct Costs. Implicit Costs are Perpetrator Work Loss. Intangible costs, under Pain and Suffering come from Mental Health Costs and Quality of Life costs.

CONFIDENTIAL

## Table F.4a
## Valuation of Crimes Due to Shipments
## Cuyahoga County
## Approach 1

| Category of Offense | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aggravated Assault | $1,175,326 | $1,126,006 | $1,323,285 | $1,477,418 | $1,534,927 | $1,573,591 | $1,939,814 | $2,100,607 | $2,123,465 | $2,961,293 | $3,773,138 | $21,108,869 |
| All Other Offenses | $1,074 | $997 | $1,376 | $1,453 | $1,572 | $1,556 | $2,001 | $2,215 | $2,349 | $2,738 | $3,057 | $20,386 |
| Arson | $15,377 | $16,289 | $20,889 | $16,406 | $16,262 | $14,513 | $17,880 | $20,446 | $22,070 | $24,382 | $25,926 | $210,441 |
| Burglary | $1,086,617 | $1,060,288 | $1,375,926 | $1,406,024 | $1,618,606 | $1,766,371 | $2,063,788 | $1,984,490 | $1,841,356 | $1,918,526 | $1,922,588 | $18,044,581 |
| Curfew/Loitering/Vagrancy | | | | | | | | | | | | $0 |
| Disorderly Conduct | | | | | | | | | | | | $0 |
| Driving Under the Influence | | | | | | | | | | | | $0 |
| Drug Crimes | $3,275,095 | $2,993,569 | $3,519,067 | $4,191,475 | $5,291,023 | $5,219,149 | $6,530,401 | $6,093,566 | $7,237,527 | $8,627,237 | $9,182,061 | $62,160,169 |
| Drunkenness | | | | | | | | | | | | $0 |
| Embezzlement | | | | | | | | | | | | $0 |
| Family and Children | | | | | | | | | | | | $0 |
| Forcible Rape | $754,472 | $698,671 | $956,457 | $948,837 | $882,547 | $881,934 | $1,209,379 | $1,391,968 | $1,709,603 | $1,929,779 | $2,093,647 | $13,457,294 |
| Forgery and Fraud | $84,439 | $80,845 | $95,334 | $94,939 | $94,510 | $101,850 | $152,117 | $141,396 | $162,435 | $170,119 | $171,423 | $1,349,407 |
| Gambling Offenses | | | | | | | | | | | | $0 |
| Human Trafficking | | | | | | | | | | | | $0 |
| Larceny-theft | $569,684 | $541,411 | $679,722 | $685,684 | $726,421 | $808,839 | $1,016,421 | $1,017,851 | $1,087,691 | $1,160,436 | $1,192,111 | $9,486,271 |
| Liquor Laws | | | | | | | | | | | | $0 |
| Motor Vehicle Theft | $1,511,073 | $1,599,281 | $1,628,688 | $1,225,769 | $1,161,918 | $1,461,724 | $1,705,025 | $2,039,328 | $2,063,139 | $2,411,550 | $2,698,449 | $19,505,942 |
| Murder | $3,214,554 | $4,280,851 | $3,595,515 | $4,916,359 | $5,034,640 | $5,037,306 | $6,839,391 | $5,552,396 | $6,695,626 | $11,126,550 | $15,614,896 | $71,908,083 |
| Other Assaults | $1,834,443 | $1,814,502 | $2,252,667 | $2,464,496 | $2,705,109 | $2,561,601 | $3,328,275 | $3,725,435 | $3,978,454 | $4,392,211 | $4,667,251 | $33,724,443 |
| Prostitution | $2,980 | $2,879 | $4,043 | $4,547 | $4,637 | $4,617 | $5,732 | $5,502 | $4,994 | $3,514 | $1,705 | $45,149 |
| Robbery | $4,998,756 | $4,806,007 | $5,994,559 | $5,755,648 | $5,515,863 | $5,680,642 | $7,417,422 | $8,834,820 | $8,284,976 | $8,522,744 | $8,423,045 | $74,234,482 |
| Sex Offenses | $65,853 | $65,306 | $74,138 | $83,215 | $92,043 | $76,663 | $111,580 | $114,038 | $110,409 | $119,431 | $124,411 | $1,037,086 |
| Stolen Property | $28,753 | $30,630 | $30,923 | $9,898 | $8,871 | $9,817 | $13,436 | $11,818 | $16,091 | $19,095 | $21,643 | $200,975 |
| Vandalism | $27,919 | $27,553 | $33,933 | $34,153 | $32,687 | $33,580 | $42,498 | $43,273 | $48,204 | $62,202 | $75,219 | $461,220 |
| Weapons | | | | | | | | | | | | $0 |
| **Total** | **$18,646,413** | **$19,145,083** | **$21,586,522** | **$23,316,320** | **$24,721,636** | **$25,233,754** | **$32,395,157** | **$33,079,149** | **$35,388,388** | **$43,451,808** | **$49,990,569** | **$326,954,800** |

## Table F.4b
## Valuation of Crimes Due to Shipments
## Summit County
## Approach 1

| Category of Offense | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aggravated Assault | $240,702 | $329,957 | $610,629 | $677,347 | $650,436 | $674,396 | $950,577 | $972,245 | $966,342 | $873,995 | $889,438 | $7,836,064 |
| All Other Offenses | $234 | $246 | $318 | $311 | $319 | $352 | $422 | $498 | $611 | $611 | $582 | $4,374 |
| Arson | $2,378 | $3,844 | $4,781 | $4,450 | $5,001 | $4,766 | $6,378 | $6,268 | $5,368 | $7,150 | $8,469 | $58,853 |
| Burglary | $365,921 | $371,530 | $558,645 | $563,387 | $687,828 | $727,742 | $741,633 | $805,454 | $797,545 | $812,162 | $794,410 | $7,226,257 |
| Curfew/Loitering/Vagrancy | | | | | | | | | | | | $0 |
| Disorderly Conduct | | | | | | | | | | | | $0 |
| Driving Under the Influence | | | | | | | | | | | | $0 |
| Drug Crimes | $1,597,949 | $1,410,362 | $1,981,090 | $2,438,916 | $3,066,541 | $3,120,133 | $3,884,068 | $4,997,350 | $6,297,010 | $7,753,293 | $8,932,315 | $45,479,127 |
| Drunkenness | | | | | | | | | | | | $0 |
| Embezzlement | $1,566 | $244 | $10 | $20 | $21 | $0 | $0 | | | | | $1,879 |
| Family and Children | | | | | | | | | | | | $0 |
| Forcible Rape | $286,871 | $321,448 | $386,487 | $434,383 | $429,405 | $412,481 | $561,291 | $568,414 | $717,611 | $751,418 | $1,021,195 | $5,891,004 |
| Forgery and Fraud | $29,463 | $34,689 | $50,947 | $55,933 | $53,118 | $54,551 | $65,585 | $84,410 | $93,260 | $127,954 | $123,633 | $773,543 |
| Gambling Offenses | | | | | | | | | | | | $0 |
| Human Trafficking | | | | | | | | | | | | $0 |
| Larceny-theft | $190,960 | $185,046 | $261,349 | $259,100 | $291,844 | $306,060 | $379,747 | $471,347 | $493,107 | $536,181 | $560,052 | $3,934,791 |
| Liquor Laws | | | | | | | | | | | | $0 |
| Motor Vehicle Theft | $311,441 | $275,617 | $306,767 | $311,503 | $270,629 | $309,180 | $350,270 | $343,366 | $354,231 | $439,190 | $495,611 | $3,767,805 |
| Murder | $1,232,979 | $991,355 | $1,078,654 | $1,229,090 | $1,589,886 | $1,888,990 | $2,398,228 | $2,181,298 | $2,915,837 | $3,844,776 | $3,873,463 | $23,224,557 |
| Other Assaults | $754,854 | $741,838 | $993,233 | $966,054 | $1,051,963 | $1,043,990 | $1,315,698 | $1,464,317 | $1,561,798 | $1,808,768 | $1,943,406 | $13,645,918 |
| Prostitution | $1,222 | $2,567 | $3,653 | $2,312 | $2,089 | $1,265 | $1,083 | $542 | $409 | $441 | $865 | $16,446 |
| Robbery | $820,979 | $853,280 | $1,258,712 | $1,157,711 | $1,039,968 | $1,292,448 | $1,318,749 | $1,423,803 | $1,280,071 | $1,312,936 | $1,355,229 | $13,113,887 |
| Sex Offenses | $21,193 | $29,161 | $30,307 | $33,754 | $46,832 | $41,090 | $52,409 | $60,928 | $52,562 | $53,538 | $57,927 | $479,699 |
| Stolen Property | $6,611 | $5,065 | $7,075 | $6,978 | $6,922 | $8,894 | $9,783 | $12,118 | $11,528 | $14,723 | $17,579 | $107,275 |
| Vandalism | $14,440 | $13,873 | $17,320 | $17,199 | $18,975 | $18,013 | $20,984 | $22,569 | $22,668 | $26,088 | $28,133 | $220,561 |
| Weapons | $1,620 | $1,467 | $1,997 | $1,884 | $1,928 | $2,189 | $2,942 | $3,053 | $2,846 | $3,325 | $4,768 | $28,017 |
| **Total** | **$5,881,382** | **$5,571,590** | **$7,552,072** | **$8,160,331** | **$9,213,704** | **$9,906,539** | **$12,059,844** | **$13,417,978** | **$15,572,676** | **$18,366,868** | **$20,107,073** | **$125,810,057** |

CONFIDENTIAL

**Table F.5a**
**Valuation of Crimes Due to Shipments**
**Cuyahoga County**
**Approach 2**

| Category of Offense | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aggravated Assault | $1,999,321 | $1,915,069 | $2,207,744 | $2,174,812 | $2,188,008 | $2,244,157 | $2,450,687 | $2,430,066 | $2,335,864 | $3,089,583 | $3,862,392 | $26,897,702 |
| All Other Offenses | $1,827 | $1,695 | $2,295 | $2,139 | $2,241 | $2,219 | $2,527 | $2,562 | $2,584 | $2,857 | $3,129 | $26,075 |
| Arson | $26,158 | $27,703 | $34,851 | $24,151 | $23,182 | $20,697 | $22,589 | $23,652 | $24,278 | $25,439 | $26,540 | $279,239 |
| Burglary | $1,848,420 | $1,803,299 | $2,295,570 | $2,069,717 | $2,307,291 | $2,519,087 | $2,607,311 | $2,295,737 | $2,025,538 | $2,001,641 | $1,968,067 | $23,741,679 |
| Curfew/Loitering/Vagrancy | | | | | | | | | | | | $0 |
| Disorderly Conduct | | | | | | | | | | | | $0 |
| Driving Under the Influence | | | | | | | | | | | | $0 |
| Drug Crimes | $5,571,192 | $5,091,351 | $5,871,148 | $6,169,998 | $7,542,249 | $7,443,222 | $8,250,258 | $7,049,280 | $7,961,461 | $9,000,990 | $9,399,263 | $79,350,412 |
| Drunkenness | | | | | | | | | | | | $0 |
| Embezzlement | | | | | | | | | | | | $0 |
| Family and Children | | | | | | | | | | | | $0 |
| Forcible Rape | $1,283,416 | $1,188,275 | $1,595,736 | $1,396,721 | $1,258,053 | $1,257,759 | $1,527,883 | $1,610,284 | $1,880,606 | $2,013,382 | $2,143,172 | $17,155,286 |
| Forgery and Fraud | $143,638 | $137,498 | $159,053 | $139,754 | $134,722 | $145,252 | $192,179 | $163,572 | $178,683 | $177,489 | $175,478 | $1,747,318 |
| Gambling Offenses | | | | | | | | | | | | $0 |
| Human Trafficking | | | | | | | | | | | | $0 |
| Larceny-theft | $969,077 | $920,812 | $1,134,037 | $1,009,350 | $1,035,499 | $1,153,516 | $1,284,107 | $1,177,491 | $1,196,487 | $1,210,709 | $1,220,311 | $12,311,395 |
| Liquor Laws | | | | | | | | | | | | $0 |
| Motor Vehicle Theft | $2,570,453 | $2,719,998 | $2,717,273 | $1,804,375 | $1,656,291 | $2,084,618 | $2,154,063 | $2,359,176 | $2,269,504 | $2,516,023 | $2,762,281 | $25,614,056 |
| Murder | $5,468,207 | $7,280,714 | $5,998,692 | $7,237,053 | $7,176,780 | $7,183,889 | $8,640,625 | $6,423,233 | $7,365,356 | $11,608,578 | $15,984,268 | $90,367,394 |
| Other Assaults | $3,120,531 | $3,086,038 | $3,758,310 | $3,627,824 | $3,856,079 | $3,653,194 | $4,204,815 | $4,309,732 | $4,376,399 | $4,582,492 | $4,777,655 | $43,353,069 |
| Prostitution | $5,070 | $4,897 | $6,746 | $6,693 | $6,609 | $6,585 | $7,241 | $6,365 | $5,493 | $3,666 | $1,745 | $61,110 |
| Robbery | $8,503,274 | $8,173,881 | $10,001,214 | $8,472,516 | $7,862,754 | $8,101,375 | $9,370,887 | $10,220,472 | $9,113,681 | $8,891,969 | $8,622,293 | $97,334,315 |
| Sex Offenses | $112,022 | $111,069 | $123,690 | $122,495 | $131,206 | $109,332 | $140,966 | $131,924 | $121,453 | $124,605 | $127,354 | $1,356,114 |
| Stolen Property | $48,910 | $52,094 | $51,591 | $14,571 | $12,645 | $14,001 | $16,974 | $13,672 | $17,700 | $19,923 | $22,155 | $284,236 |
| Vandalism | $47,492 | $46,860 | $56,613 | $50,275 | $46,595 | $47,889 | $53,690 | $50,060 | $53,025 | $64,896 | $76,998 | $594,395 |
| Weapons | | | | | | | | | | | | $0 |
| Total | $31,719,006 | $32,561,254 | $36,014,562 | $34,322,442 | $35,240,206 | $35,986,794 | $40,926,801 | $38,267,280 | $38,928,112 | $45,334,242 | $51,173,100 | $420,473,796 |

**Table F.5b**
**Valuation of Crimes Due to Shipments**
**Summit County**
**Approach 2**

| Category of Offense | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aggravated Assault | $409,453 | $561,178 | $1,018,762 | $997,078 | $927,184 | $961,782 | $1,200,923 | $1,124,731 | $1,063,001 | $911,859 | $910,478 | $10,086,428 |
| All Other Offenses | $397 | $418 | $530 | $457 | $454 | $501 | $533 | $576 | $531 | $637 | $596 | $5,632 |
| Arson | $4,045 | $6,538 | $7,977 | $6,551 | $7,128 | $6,797 | $8,058 | $7,251 | $5,905 | $7,460 | $8,669 | $76,379 |
| Burglary | $622,461 | $631,884 | $932,033 | $829,325 | $980,485 | $1,037,860 | $936,951 | $931,781 | $877,319 | $847,347 | $813,202 | $9,440,648 |
| Curfew/Loitering/Vagrancy | | | | | | | | | | | | $0 |
| Disorderly Conduct | | | | | | | | | | | | $0 |
| Driving Under the Influence | | | | | | | | | | | | $0 |
| Drug Crimes | $2,718,236 | $2,398,692 | $3,305,382 | $3,590,170 | $4,371,294 | $4,449,738 | $4,906,983 | $5,781,134 | $6,926,869 | $8,089,183 | $9,143,609 | $55,681,290 |
| Drunkenness | | | | | | | | | | | | $0 |
| Embezzlement | $2,663 | $415 | $16 | $29 | $30 | $0 | $0 | $0 | $0 | $19 | $0 | $3,173 |
| Family and Children | | | | | | | | | | | | $0 |
| Forcible Rape | $487,991 | $546,706 | $644,807 | $639,427 | $612,109 | $588,254 | $709,113 | $657,564 | $789,390 | $783,972 | $1,045,351 | $7,504,685 |
| Forgery and Fraud | $50,118 | $58,998 | $84,999 | $82,335 | $75,719 | $77,797 | $82,857 | $97,649 | $102,589 | $133,497 | $126,558 | $973,117 |
| Gambling Offenses | | | | | | | | | | | | $0 |
| Human Trafficking | | | | | | | | | | | | $0 |
| Larceny-theft | $324,837 | $314,720 | $436,029 | $381,404 | $416,017 | $436,484 | $479,757 | $545,274 | $542,429 | $559,409 | $573,300 | $5,009,661 |
| Liquor Laws | | | | | | | | | | | | $0 |
| Motor Vehicle Theft | $529,785 | $468,760 | $511,804 | $458,543 | $385,777 | $440,933 | $442,517 | $397,219 | $389,663 | $458,217 | $507,335 | $4,990,553 |
| Murder | $2,097,394 | $1,686,060 | $1,799,608 | $1,809,263 | $2,266,352 | $2,693,958 | $3,029,829 | $2,523,413 | $3,207,494 | $4,011,341 | $3,965,090 | $29,089,802 |
| Other Assaults | $1,284,065 | $1,261,691 | $1,657,092 | $1,422,066 | $1,499,552 | $1,488,873 | $1,662,203 | $1,693,980 | $1,718,016 | $1,887,128 | $1,989,377 | $17,564,043 |
| Prostitution | $2,078 | $4,365 | $6,094 | $3,404 | $2,977 | $1,804 | $1,368 | $627 | $449 | $460 | $885 | $24,512 |
| Robbery | $1,396,550 | $1,451,228 | $2,100,012 | $1,704,191 | $1,482,454 | $1,843,208 | $1,666,057 | $1,647,112 | $1,408,110 | $1,369,816 | $1,387,287 | $17,456,025 |
| Sex Offenses | $36,051 | $49,596 | $50,563 | $49,687 | $66,758 | $58,600 | $66,211 | $70,484 | $57,819 | $55,857 | $59,297 | $620,923 |
| Stolen Property | $11,246 | $8,615 | $11,804 | $10,271 | $9,867 | $12,684 | $12,360 | $14,018 | $12,682 | $15,360 | $17,995 | $136,901 |
| Vandalism | $24,563 | $23,595 | $28,896 | $25,318 | $27,049 | $25,688 | $26,510 | $26,108 | $24,935 | $27,531 | $28,798 | $288,992 |
| Weapons | $2,755 | $2,495 | $3,332 | $2,773 | $2,748 | $3,122 | $3,716 | $3,532 | $3,131 | $3,469 | $4,881 | $35,952 |
| Total | $10,004,690 | $9,475,955 | $12,599,740 | $12,012,293 | $13,133,954 | $14,128,083 | $15,235,946 | $15,522,453 | $17,130,332 | $19,162,564 | $20,582,707 | $158,988,717 |

CONFIDENTIAL

**Appendix G**
**Technical Memo re Child Maltreatment**

Prof. Thomas McGuire

CONFIDENTIAL

**Appendix G**
**Technical Memo re Child Maltreatment**

In Section I, I describe the source for the calculation of maltreated children over time in the Bellwether counties.  In Section II, I discuss the method for valuing the social costs of this maltreatment imposed on the children and wider society.

**I.        Maltreatment Data for Cuyahoga and Summit Counties.**

The number of children maltreated due to opioid shipments is obtained in two steps.  First, Dr. Nancy Young's Report filed in this matter identifies a unique count of victims of substantiated maltreatment in Cuyahoga and Summit counties from 2002 through 2016 in her Graphics 12 and 13.

Tables G.1a and G.1b is a replication of the numbers Dr. Young reports for 2006-2016.  These numbers appear in my Tables 10a and 10b in my Report.

**Table G.1a**
**Number of Substantiated Maltreatment Child Victims, 2006-2016**
**Cuyahoga County**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Cases of Maltreatment | 2,043 | 1,924 | 2,073 | 1,452 | 1,738 | 2,092 | 2,156 | 2,502 | 2,281 | 2,316 | 2,513 | 23,090 |

Source: Young Report, Graphic 12.

**Table G.1b**
**Number of Substantiated Maltreatment Child Victims, 2006-2016**
**Summit County**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Cases of Maltreatment | 1,319 | 1,117 | 901 | 944 | 715 | 643 | 674 | 601 | 579 | 757 | 886 | 9,136 |

Source: Young Report, Graphic 13.

Secondly, I apply Professor Cutler's share of harms due to opioid shipments to obtain the number of children maltreated due to opioid shipments.  The shares of harms are from the Cutler Report, Appendix III.I, Tables I.6 and I.7.  Note that these shares also adjust for the share of maltreatment due to opioids.  These numbers are reported below in Tables G.2a and G.2b

CONFIDENTIAL

for Approach 1 and Tables G.3a and G.3b for Approach 2. The Approach 1 numbers also appear in my Tables 10a and 10b in my Report.

## II.   Calculation of Costs of Child Maltreatment in the Bellwethers

Fang *et al.*, (2012) estimates an average lifetime cost per victim of nonfatal child maltreatment of $210,012 in 2010 dollars.[1] This lifetime cost includes costs of childhood health care, adult medical costs, productivity losses, child welfare costs, criminal justice costs and special education costs. The method for counting maltreated children outlined above is consistent with Fang *et al.*'s methodology in that it uses the same source for the incidence of maltreatment, the US Department of Health and Human Services' (HHS) Annual Report on Child Maltreatment – counts of victims of maltreatment.[2]

As this suggests, the Fang *et al.* cost estimate includes elements that are already covered in estimates of the costs faced by Bellwether counties from the McGuire Damages Report. In order to avoid double counting, I exclude the following cost categories from my analysis here (*i.e.*, from the Fang *et al.* estimates):

- Child Welfare Costs – the cost report measures expenditures by the Bellwether counties' divisions of children and family services and
- Criminal Justice Costs – the cost report measures expenditures by the Bellwether counties' juvenile courts, sheriff's offices and county jails

Excluding these costs is conservative, since some of the child welfare and criminal justice costs will not fall on the Bellwether county governments. Furthermore, costs of children maltreated today will fall on Bellwether jurisdictions many years in the future.

I estimate the social costs associated with child maltreatment in two categories: productivity and special education.

---

[1] X. Fang, *et al.*, "The Economic Burden of Child Maltreatment in the United States and Implications for Prevention," *Child Abuse & Neglect*, 36, 2012, pp. 156-165.

[2] See Children's Bureau, Office of the Administration for Children & Families, U.S. Department of Health and Human Services, "Child Maltreatment," January 28, 2019, available at https://www.acf.hhs.gov/cb/research-data-technology/statistics-research/child-maltreatment.

CONFIDENTIAL

Productivity Losses

Childhood maltreatment has adverse effects on economic outcomes in adulthood.  Currie & Widom (2010)[3] tracks matched cohorts from an earlier study of childhood maltreatment into adulthood.[4]  The authors find that adults who experienced validated and substantiated maltreatment as children earn approximately $6,500 less annually (2003 dollars) and are 14 percentage points less likely to be employed at middle age (mean age 41).

To keep the calculations simple, I sum the total earnings lost per maltreated child with no discounting and no adjustments for inflation or productivity growth.  If on average a person works 44 years (from age 21 through 64) and loses $6,500 per year, the total lost earnings over a lifetime is $286,000.

Tables G.2a and G.2b combine data on counts with estimates of lost earnings to estimate total lost earnings due to shipments under Approach 1.  Tables G.3a and G.3b do the same for Approach 2.  The total value of productivity losses from maltreatment cases due to opioid shipments is $693 million for Approach 1 and $840 million for Approach 2.

In addition to earnings differences, maltreated children are less likely to own assets (*e.g.*, stock, a vehicle, a home) in adulthood than children who did not experience maltreatment.[5]  I do not attribute dollar values to these adverse events or include these differences in the cost of maltreatment.

Special Education

A study by Jonson-Reid *et al.* (2004)[6] finds that maltreated children are 10.5 percentage points more likely to need special education services (*i.e.*, receive services for an educational

---

[3] J. Currie and C.S. Widom, "Long-Term Consequences of Child Abuse and Neglect on Adult Economic Well-Being," Child Maltreatment, 15(2), 2010, pp. 111-120.

[4] See C.S. Widom, "The Cycle of Violence," Science, April 14, 1989, pp. 160-166.

[5] Currie & Widom, *op cit.*

[6] M. Jonson-Reid, *et al.*, "A Prospective Analysis of the Relationship Between Reported Child Maltreatment and Special Education Eligibility Among Poor Children," Child Maltreatment, 9(4), November 2004, pp. 381-394.

disability) than children who are impoverished but not maltreated (24.2% vs. 13.7%).  This effect remains consistent after controlling for potential confounders (hazard ratio = 1.9).

Research shows that students needing special education services cost $9,298 more annually than regular students. [7]  Students remain in special education on average approximately two years,[8] leading to a total incremental average cost per maltreated child of $1,952.58 (.105*$9,298*2).  This value is used for all years 2006-2016.  The total value of the increase in special education costs from maltreatment cases due to opioid shipments is $4.7 million for Approach 1 and $5.7 million for Approach 2.  See Tables G.2a and G.2b for Approach 1 and Tables G.3a and G.3b for Approach 2.

Note on Additional Costs

The categories above are not an exhaustive list of the social costs of childhood maltreatment.  As an example of the effects of maltreatment on educational and developmental outcomes, children who are maltreated complete fewer years of schooling,[9] have lower IQ scores in young

---

[7] Chambers *et al.* report that "Per pupil education expenditures for students who receive special education services (excluding homebound students) are 1.91 times greater than expenditures for students who receive no special education services."  The National Center for Education Statistics, Digest of Education Statistics report that in 2014-2015, cost per pupil averaged $11,445 with 13.2% of children receiving school-based special education services in 2015-16.  Using these inputs, I determine that the average cost over all students is $10,218 and that the cost for special education students is $19,516 ($10,218*1.91).  I use the difference between these two numbers ($9,298) as the additional special education cost incurred per school year.  See J.G. Chambers., J. Shkolnik and M. Perez, "Total expenditures for students with disabilities, 1999–2000: Spending variation by disability. Report 5, Special Education Expenditure Project (SEEP)," 2003, Washington, DC: United States Department of Education, Office of Special Education Programs, American Institutes for Research (available at https://eric.ed.gov/?id =ED481398), see p. v for quote.  See National Center for Education Statistics, Table 236.15 for cost per pupil (available at https://nces.ed.gov/programs/digest/d17/tables/dt17_236.15.asp) and Table 204.30 for percent of total enrollment for children with disabilities (available at https://nces.ed.gov/programs/ digest/d17/tables/dt17_204.30.asp).

[8] E.W. Holt, D.J. McGrath, W.L. Herring, "Timing and Duration of Student Participation in Special Education in the Primary Grades, NCES, 2007-043, Washington DC, National Center for Education Statistics, 2007;  A.A. Scarborough, J.S. McCrae, "Reported Eligibility for Part C and Later School-Age Special Education Services," *Topics in Early Childhood Special Education*, 28(2), 2008, pp. 75-89.

[9] Currie & Widom 2010, *op cit.*

adulthood,[10] and are significantly less likely to attend 4-year college,[11] than other children.
Additionally, children who experience maltreatment have higher rates of substance misuse and
depression in adulthood than other children.[12]  Finally, there are direct costs associated with
child welfare.[13]  None of these costs are reflected in the estimates presented here.

**Table G.2a**
**Cases and Valuation of Maltreatment due to Opioid Shipments, 2006-2016**
**Cuyahoga County**
**Approach 1**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Child Victims of Maltreatment [1] | 2,043 | 1,924 | 2,073 | 1,452 | 1,738 | 2,092 | 2,156 | 2,502 | 2,281 | 2,316 | 2,513 | 23,090 |
| Share Harms Due to Opioid Shipments [2] | 2.2% | 2.7% | 3.2% | 3.7% | 4.0% | 4.2% | 4.8% | ■ | ■ | ■ | ■ | |
| Maltreatment Victims Due to Opioid Shipments | 45 | 52 | 65 | 53 | 70 | 88 | 104 | ■ | ■ | ■ | ■ | 1,391 |
| | | | | | | | | | | | | |
| **Social Cost of Maltreatment by Category** | | | | | | | | | | | | |
| Productivity Losses ($000s) | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | |
| Special Education Costs ($000s) | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | |
| Total Social Costs ($000s) | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | |
| **Valuation of Child Maltreatment Due to Opioid Shipments** | | | | | | | | | | | | |
| Productivity Losses ($mil) | $13.0 | $14.8 | $18.7 | $15.3 | $20.0 | $25.2 | $29.7 | $47.0 | $53.3 | $63.6 | $97.3 | $397.9 |
| Special Education Costs ($mil) | $0.1 | $0.1 | $0.1 | $0.1 | $0.1 | $0.2 | $0.2 | $0.3 | $0.4 | $0.4 | $0.7 | $2.7 |
| **Total valuation ($mil)** | $13.1 | $14.9 | $18.9 | $15.4 | $20.1 | $25.4 | $29.9 | $47.3 | $53.7 | $64.0 | $97.9 | $400.6 |

[1] Young Report, Graphic 12.
[2] Cutler Report, Appendix III.I, Table I.6.
Estimates rounded to the nearest whole number.

---

[10] Currie & Widom 2010, *op cit.*

[11] .P. Mersky and J. Topitzes, "Comparing Early Adult Outcomes of Maltreated and Non-Maltreated Children:  A Prospective Longitudinal Investigation," *Children and Youth Services Review*, 32, 2010, pp. 1086-1096.

[12] J Mersky and Topitzes, *op cit.*; and C.S. Widom, K. Dumont and S.J. Czaja, "A Prospective Investigation of Major Depressive Disorder and Comorbidity in Abused and Neglected Children Grown Up," *Archives of General Psychiatry*, 2007, 64, 2007, pp. 49-56.

[13] Fang *et al.* 2012, *op cit.*

CONFIDENTIAL

**Table G.2b**
**Cases and Valuation of Maltreatment due to Opioid Shipments, 2006-2016**
**Summit County**
**Approach 1**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Child Victims of Maltreatment [1] | 1,319 | 1,117 | 901 | 944 | 715 | 643 | 674 | 601 | 579 | 757 | 886 | 9,136 |
| Share Harms Due to Opioid Shipments [2] | 2.1% | 2.6% | 3.3% | 4.6% | 12.0% | 12.2% | 15.5% | ■ | ■ | ■ | ■ | |
| Maltreatment Victims Due to Opioid Shipments | 28 | 29 | 30 | 44 | 86 | 79 | 105 | ■ | ■ | ■ | ■ | 1,031 |
| | | | | | | | | | | | | |
| **Social Cost of Maltreatment by Category** | | | | | | | | | | | | |
| Productivity Losses ($000s) | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | |
| Special Education Costs ($000s) | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | |
| Total Social Costs ($000s) | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | |
| **Valuation of Child Maltreatment Due to Opioid Shipments** | | | | | | | | | | | | |
| Productivity Losses ($mil) | $8.1 | $8.2 | $8.6 | $12.5 | $24.5 | $22.5 | $29.9 | $31.5 | $32.3 | $47.2 | $69.7 | $294.9 |
| Special Education Costs ($mil) | $0.1 | $0.1 | $0.1 | $0.1 | $0.2 | $0.2 | $0.2 | $0.2 | $0.2 | $0.3 | $0.5 | $2.0 |
| **Total valuation ($mil)** | $8.1 | $8.2 | $8.6 | $12.6 | $24.7 | $22.6 | $30.1 | $31.7 | $32.5 | $47.6 | $70.1 | $296.9 |

[1] Young Report, Graphic 13.
[2] Cutler Report, Appendix III.I, Table I.7.
Estimates rounded to the nearest whole number.

CONFIDENTIAL

**Table G.3a**
**Cases and Valuation of Maltreatment due to Opioid Shipments, 2006-2016**
**Cuyahoga County**
**Approach 2**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Child Victims of Maltreatment [1] | 2,043 | 1,924 | 2,073 | 1,452 | 1,738 | 2,092 | 2,156 | 2,502 | 2,281 | 2,316 | 2,513 | 23,090 |
| Share Harms Due to Opioid Shipments [2] | 3.8% | 4.6% | 5.3% | 5.4% | 5.7% | 6.0% | 6.1% | ■ | ■ | ■ | ■ | |
| Maltreatment Cases Due to Opioid Shipments | 77 | 88 | 109 | 79 | 100 | 126 | 131 | ■ | ■ | ■ | ■ | 1,685 |
| **Social Cost of Neglect by Category** | | | | | | | | | | | | |
| Productivity Losses ($000s) | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | |
| Special Education Costs ($000s) | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | |
| Total Social Costs ($000s) | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | |
| **Valuation of Child Maltreatment Due to Opioid Shipments** | | | | | | | | | | | | |
| Productivity Losses ($mil) | $22.1 | $25.2 | $31.3 | $22.5 | $28.5 | $35.9 | $37.6 | $54.4 | $58.7 | $66.3 | $99.6 | $482.0 |
| Special Education Costs ($mil) | $0.2 | $0.2 | $0.2 | $0.2 | $0.2 | $0.2 | $0.3 | $0.4 | $0.4 | $0.5 | $0.7 | $3.3 |
| **Total valuation ($mil)** | $22.3 | $25.4 | $31.5 | $22.6 | $28.7 | $36.2 | $37.8 | $54.8 | $59.1 | $66.8 | $100.2 | $485.3 |

[1] Young Report, Graphic 12.
[2] Cutler Report, Appendix III.I, Table I.6.
Estimates rounded to the nearest whole number.

**Table G.3b**
**Cases and Valuation of Maltreatment due to Opioid Shipments, 2006-2016**
**Summit County**
**Approach 2**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Child Victims of Maltreatment [1] | 1,319 | 1,117 | 901 | 944 | 715 | 643 | 674 | 601 | 579 | 757 | 886 | 9,136 |
| Share Harms Due to Opioid Shipments [2] | 3.6% | 4.4% | 5.5% | 6.8% | 17.1% | 17.4% | 19.6% | ■ | ■ | ■ | ■ | |
| Maltreatment Cases Due to Opioid Shipments | 48 | 49 | 50 | 64 | 122 | 112 | 132 | ■ | ■ | ■ | ■ | 1,251 |
| **Social Cost of Neglect by Category** | | | | | | | | | | | | |
| Productivity Losses ($000s) | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | |
| Special Education Costs ($000s) | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | |
| Total Social Costs ($000s) | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | |
| **Valuation of Child Maltreatment Due to Opioid Shipments** | | | | | | | | | | | | |
| Productivity Losses ($mil) | $13.7 | $13.9 | $14.3 | $18.4 | $35.0 | $32.1 | $37.8 | $36.4 | $35.5 | $49.3 | $71.3 | $357.7 |
| Special Education Costs ($mil) | $0.1 | $0.1 | $0.1 | $0.1 | $0.2 | $0.2 | $0.3 | $0.2 | $0.2 | $0.3 | $0.5 | $2.4 |
| **Total valuation ($mil)** | $13.8 | $14.0 | $14.4 | $18.5 | $35.2 | $32.3 | $38.0 | $36.7 | $35.8 | $49.6 | $71.8 | $360.2 |

[1] Young Report, Graphic 13.
[2] Cutler Report, Appendix III.I, Table I.7.
Estimates rounded to the nearest whole number.

CONFIDENTIAL

**Appendix H**
**Technical Memo re Health Care Costs**

CONFIDENTIAL

**Appendix H**
**Technical Memo re Health Care Costs**

This appendix summarizes my approach to estimating excess healthcare costs resulting from opioid use disorder (OUD) attributable to opioid shipments in the Bellwether communities.  To summarize, I estimate the excess healthcare costs by insurer type from the academic literature and apply those per-person estimates to the number of people in the Bellwether communities with OUD attributable to opioid shipments.

There are three primary inputs into this analysis:  1) the number of individuals with OUD attributable to opioid shipments in the Bellwether communities; 2) the distribution of individuals with OUD with respect to the type of insurance coverage; and 3) published estimates of excess healthcare costs incurred by individuals with OUD.

### Number of Individuals with OUD Attributable to Opioid Shipments:

The first input to the analysis is the number of individuals with OUD attributable to opioid shipments in each year from 2006 through 2016.  See Appendix D for a discussion of the prevalence rates of OUD.  The calculation of persons with OUD due to shipments for each of the counties is shown below in Tables H.1a and H.1b for Approach 1 and Tables H.2a and H.2b for Approach 2.[1]

---

[1] Prevalence of OUD from Appendix D of this Report.  County Population from U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics (NCHS), Bridged Race Population Estimates.  Share of Harm Due to Shipments are from Cutler Report, Appendix III.I, Tables I.4 and I.5.

CONFIDENTIAL

### Table H.1a
### Persons with OUD Due to Opioid Shipments, Cuyahoga County, Approach 1

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Prevalence of OUD[1] | 1.2% | 1.1% | 1.2% | 1.4% | 1.4% | 1.4% | 1.5% | 1.5% | 1.5% | 1.4% | 1.4% | |
| County Population 12 Years and Older(000s)[2] | 1,117.2 | 1,109.9 | 1,103.5 | 1,099.4 | 1,094.7 | 1,089.4 | 1,087.5 | 1,087.9 | 1,086.8 | 1,083.7 | 1,080.9 | 12,040.8 |
| Person-years with OUD (000s) | 13.2 | 12.7 | 13.2 | 14.9 | 15.1 | 15.4 | 16.8 | 16.1 | 16.6 | 15.6 | 15.1 | |
| Share of Harm Due to Shipments[3] | 49.2% | 50.4% | 51.1% | 52.4% | 54.6% | 57.6% | 66.5% | | | | | |
| Person-years with OUD Due to Opioid Shipments (000s) | 6.49 | 6.40 | 6.73 | 7.82 | 8.22 | 8.89 | 11.19 | █ | █ | █ | █ | 108.52 |

[1] See OUD backup.
[2] CDC Bridged-Race Population Estimates, 2006-2016.
[3] Expert Report of Professor David Cutler, March 25, 2019, Appendix III.J, Table I.4

### Table H.1b
### Persons with OUD Due to Opioid Shipments, Summit County, Approach 1

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Prevalence of OUD[1] | 1.2% | 1.1% | 1.2% | 1.4% | 1.4% | 1.4% | 1.5% | 1.5% | 1.5% | 1.4% | 1.4% | |
| County Population 12 Years and Older(000s)[2] | 461.9 | 462.5 | 462.6 | 462.5 | 463.0 | 463.8 | 464.4 | 465.7 | 466.5 | 466.4 | 466.1 | 5,105.5 |
| Person-years with OUD (000s) | 5.5 | 5.3 | 5.5 | 6.3 | 6.4 | 6.6 | 7.2 | 6.9 | 7.1 | 6.7 | 6.5 | |
| Share of Harm Due to Shipments[3] | 49.2% | 50.4% | 51.1% | 52.4% | 54.6% | 57.6% | 66.5% | | | | | |
| Person-years with OUD Due to Opioid Shipments (000s) | 2.68 | 2.67 | 2.82 | 3.29 | 3.48 | 3.79 | 4.78 | █ | █ | █ | █ | 46.18 |

[1] See OUD backup.
[2] CDC Bridged-Race Population Estimates, 2006-2016.
[3] Expert Report of Professor David Cutler, March 25, 2019, Appendix III.J, Table I.4

### Table H.2a
### Persons with OUD Due to Opioid Shipments, Cuyahoga County, Approach 2

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Prevalence of OUD | 1.2% | 1.1% | 1.2% | 1.4% | 1.4% | 1.4% | 1.5% | 1.5% | 1.5% | 1.4% | 1.4% | |
| County Population 12 +(000s) | 1,117.2 | 1,109.9 | 1,103.5 | 1,099.4 | 1,094.7 | 1,089.4 | 1,087.5 | 1,087.9 | 1,086.8 | 1,083.7 | 1,080.9 | |
| Persons with OUD (000s) | 13.2 | 12.7 | 13.2 | 14.9 | 15.1 | 15.4 | 16.8 | 16.1 | 16.6 | 15.6 | 15.1 | |
| Share of Harm Due to Shipments | 83.7% | 85.6% | 85.2% | 77.1% | 77.8% | 82.2% | 84.1% | █ | █ | █ | █ | |
| Persons with OUD Due to Opioid Shipments (000s) | 11.0 | 10.9 | 11.2 | 11.5 | 11.7 | 12.7 | 14.1 | | | | | 140.1 |

### Table H.2b
### Persons with OUD Due to Opioid Shipments, Summit County, Approach 2

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Prevalence of OUD[1] | 1.2% | 1.1% | 1.2% | 1.4% | 1.4% | 1.4% | 1.5% | 1.5% | 1.5% | 1.4% | 1.4% | |
| County Population 12 Years and Older(000s)[2] | 461.9 | 462.5 | 462.6 | 462.5 | 463.0 | 463.8 | 464.4 | 465.7 | 466.5 | 466.4 | 466.1 | 5,105.5 |
| Person-years with OUD (000s) | 5.5 | 5.3 | 5.5 | 6.3 | 6.4 | 6.6 | 7.2 | 6.9 | 7.1 | 6.7 | 6.5 | |
| Share of Harm Due to Shipments[3] | 83.7% | 85.6% | 85.2% | 77.1% | 77.8% | 82.2% | 84.1% | █ | █ | █ | █ | |
| Person-years with OUD Due to Opioid Shipments (000s) | 4.57 | 4.54 | 4.71 | 4.84 | 4.96 | 5.40 | 6.04 | | | | | 59.50 |

[1] See OUD backup.
[2] CDC Bridged-Race Population Estimates, 2006-2016.
[3] Expert Report of Professor David Cutler, March 25, 2019, Appendix III.J, Table I.5

CONFIDENTIAL

**Insurance Distribution for OUD Individuals:**

The second input to the analysis is the distribution of the type of insurance coverage for individuals with OUD.  Excess healthcare costs used in the third step of this analysis, vary by type of insurance coverage.

The distribution of type of insurance is constructed from two sources of data.  First, the Henry J. Kaiser Family Foundation (KFF) reports the type of insurance coverage for adults under age 65 in the United States with opioid addiction (OUD) in 2005, 2010, 2015 and 2016.[2]  I use linear interpolation to estimate the insurance shares for the nonelderly population for years not surveyed (interpolated values are shaded in gray).  See Table H.3.

**Table H.3**
**Insurance Status of Nonelderly Adults with Opioid Addiction**

|  | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Uninsured | 33% | 32.8% | 32.6% | 32.4% | 32.2% | 32% | 29.6% | 27.2% | 24.8% | 22.4% | 20% | 17% |
| Other | 8% | 8.0% | 8.0% | 8.0% | 8.0% | 8% | 8.4% | 8.8% | 9.2% | 9.6% | 10% | 8% |
| Private | 42% | 41% | 40.0% | 39.0% | 38.0% | 37% | 37.6% | 38.2% | 38.8% | 39.4% | 40% | 37% |
| Medicaid | 17% | 18.2% | 19.4% | 20.6% | 21.8% | 23% | 24.4% | 25.8% | 27.2% | 28.6% | 30% | 38% |

Sources:  The Henry J. Kaiser Family Foundation, "The Opioid Epidemic and Medicaid's Role in Treatment:  A Look at Changes Over Time (https://www.kff.org/slideshow/the-opioid-epidemic-and-medicaids-role-in-treatment-a-look-at-changes-over-time/); Zur, Julia and Jennifer Tolbert, "The Opioid Epidemic and Medicaid's Role in Facilitating Access to Treatment," The Henry J. Kaiser Family Foundation, April 11, 2018, (https://www.kff.org/medicaid/issue-brief/the-opioid-epidemic-and-medicaids-role-in-facilitating-access-to-treatment/)

Notes:  Shaded cells estimated using linear interpolation

Estimates of the share of individuals with OUD that are covered by Medicare are based on demographic data from the National Survey on Drug Use and Health (NSDUH).[3]  I assume that all persons with OUD who are 65 years and older are covered by Medicare.  These surveys collect demographic information on the share of OUD individuals in the United States who are

---

[2] The Henry J. Kaiser Family Foundation (KFF), "The Opioid Epidemic and Medicaid's Role in Facilitating Access to Treatment," April 11, 2018, available at https://www.kff.org/medicaid/issue-brief/the-opioid-epidemic-and-medicaids-role-in-facilitating-access-to-treatment/; and The Henry J. Kaiser Family Foundation, "The Opioid Epidemic and Medicaid's Role in Treatment:  A Look at Changes Over Time," June 29, 2017, available at https://www.kff.org/slideshow/the-opioid-epidemic-and-medicaids-role-in-treatment-a-look-at-changes-over-time/.

I refer to "opioid addiction" as referred to in the KFF reports as OUD throughout this appendix and in my analysis.

[3] Substance Abuse and Mental Health Services, National Survey on Drug Use and Health (https://nsduhweb.rti.org/respweb/homepage.cfm).

---

CONFIDENTIAL

65 years and older.  Because sample sizes for each year are small, I use a population-weighted average share calculated using data pooled from 2006-2014 and 2015-2017, respectively.[4]  See Table H.4.

**Table H.4**
**Share of OUD Population 65 and Over**

| Share of OUD Population 65 and over | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** |
| **Share 65+** | 2.3% | 2.3% | 2.3% | 2.3% | 2.3% | 2.3% | 2.3% | 2.3% | 2.3% | 2.2% | 2.2% |

Source:  NSDUH (https://pdas.samhsa.gov/#/survey/NSDUH-2015-DS0001?column=UDPYOPI&results_received=true&row=CATAG6&weight=ANALWT_C); (https://pdas.samhsa.gov/#/survey/NSDUH-2016-DS0001?column=UDPYOPI&results_received=true&row=CATAG6&weight=ANALWT_C).

Note: The share used for 2006-2014 is the population-weighted share of the OUD population that is 65 years and over during the same, 2006-2014, period.  Similarly, the 2015-2016 share is the population-weighted share during the 2015-2016 period.

I combine the Medicare estimates and insurance estimates for the nonelderly population to obtain estimates for the insurance status of all adults with OUD in 2006-2016.  For example, in 2006, 1.5 percent of the OUD population was 65 years and older.[5]  I use this Medicare share to recalculate the KFF nonelderly shares for the total population.  In 2006, 41 percent of the nonelderly population had private insurance and 97.7 percent of the population was nonelderly.  Therefore, 40 percent (41% x 97.7%) of the total population with OUD had private insurance.  See Table H.5 for the insurance distribution of all adults with opioid addiction.

**Table H.5**
**Insurance Status for US Population with Opioid Addiction**

| Insurance Status for US Population with Opioid Addiction | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** |
| **Private** | 40% | 39% | 38% | 37% | 36% | 37% | 37% | 38% | 39% | 39% | 36% |
| **Medicare** | 2.3% | 2.3% | 2.3% | 2.3% | 2.3% | 2.3% | 2.3% | 2.3% | 2.3% | 2.2% | 2.2% |
| **Medicaid** | 18% | 19% | 20% | 21% | 22% | 24% | 25% | 27% | 28% | 29% | 37% |
| **Uninsured** | 32% | 32% | 32% | 31% | 31% | 29% | 27% | 24% | 22% | 20% | 17% |
| **Other** | 8% | 8% | 8% | 8% | 8% | 8% | 9% | 9% | 9% | 10% | 8% |
| **Total** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

[4] The NSDUH survey changed in 2015 making it more appropriate to pool samples separately before and after the survey change.

[5] See raw data from NSDUH for population references in this paragraph.

CONFIDENTIAL

<u>Excess Healthcare Costs Resulting from OUD</u>

The final input in this analysis is the estimated excess healthcare costs, which come from Florence *et al.* (2016).[6]  Florence *et al.* use a "matched case-control design" to estimate excess healthcare costs incurred by individuals with a diagnosis for opioid abuse and/or dependence. Using Truven Health MarketScan Research Databases for commercial, Medicare and Medicaid enrollees, they identify individuals with an opioid abuse/dependence diagnosis and match them to individuals with similar age and health characteristics who did not have an opioid abuse/dependence diagnosis.[7]  For the opioid abuse patient, they track healthcare utilization and costs for a 12-month period starting on the "index date," which is the first occurrence of an opioid abuse/dependence diagnosis in the data.  For the control patient, they measure healthcare utilization and costs for a 12-month period starting with an "index date" based on the selection of a random medical claim in the data.  By comparing the costs for the matched pairs, they estimate an excess annual per person healthcare cost for individuals with opioid abuse/dependence.

This analysis yields estimates of annual excess healthcare costs for 2013 of $17,052 for a patient covered by Medicare; $15,500 for a patient covered by private insurance and $13,743 for a patient covered by Medicaid.  All costs are in 2013 dollars.  When using these estimates to create aggregate costs, Florence *et al.* assign private insurance costs to CHAMPUS/VA and other insurance categories and they assign 50 percent of the private insurance cost to the uninsured.[8] These 2013 estimates are adjusted to other years using the Medical Care CPI for the Midwest

---

[6] C.S. Florence, *et al.*, "The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States, 2013" *Medical Care*, October 2016, 54(10), pp. 901-906.

[7] The Florence *et al. op cit.* paper estimates the economic burden of prescription opioids, however, they acknowledge that the medical claims data do not allow them to distinguish between individuals with prescription and illicit opioid abuse/dependence so the excess healthcare costs they estimate applies to both types of opioid abuse.

[8] Florence *et al.*, *op cit.,* p. 903.

CONFIDENTIAL

Census Region.[9]  See Table H.6 for excess healthcare costs expressed in nominal dollars for each year 2006-2016.  The 2013 values from Florence *et al.* are shaded gray.

**Table H.6**
**Per Person Excess Costs by Type of Insurer**

| | | | | | | | Per Person Excess Costs by Type of Insurer | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | | 2009 | 2010 | | 2011 | | 2012 | | 2013 | | 2014 | | 2015 | | 2016 | | | |
| Private | $ 12,171 | $ 12,725 | $ 13,111 | $ | 13,573 | $ 14,032 | $ | 14,471 | $ | 15,046 | $ | 15,500 | $ | 15,966 | $ | 16,357 | $ | 17,007 | | | |
| Medicare | $ 13,390 | $ 13,999 | $ 14,423 | $ | 14,932 | $ 15,437 | $ | 15,920 | $ | 16,553 | $ | 17,052 | $ | 17,565 | $ | 17,995 | $ | 18,709 | | | |
| Medicaid | $ 10,791 | $ 11,283 | $ 11,624 | $ | 12,035 | $ 12,442 | $ | 12,830 | $ | 13,341 | $ | 13,743 | $ | 14,156 | $ | 14,503 | $ | 15,079 | | | |
| Uninsured | $ 6,085 | $ 6,363 | $ 6,555 | $ | 6,787 | $ 7,016 | $ | 7,235 | $ | 7,523 | $ | 7,750 | $ | 7,983 | $ | 8,178 | $ | 8,503 | | | |
| Other | $ 12,171 | $ 12,725 | $ 13,111 | $ | 13,573 | $ 14,032 | $ | 14,471 | $ | 15,046 | $ | 15,500 | $ | 15,966 | $ | 16,357 | $ | 17,007 | | | |

## Estimating Excess Healthcare Costs

These three inputs are multiplied together to obtain annual estimates of the excess healthcare costs resulting from opioid shipments in 2006 through 2016.  Table H.7a contains these calculations for Cuyahoga County using Professor Cutler's Approach 1.

For example, there were 6,491 people in Cuyahoga County in 2006 with OUD attributable to opioid shipments.  Forty percent of those individuals (6,491 x 40% = 2,596) are covered by private insurance.  The estimated healthcare costs for those 2,596 people in 2006 dollars is $31.6 million ($12,171 x 2,596).  This calculation is repeated for all insurance categories in 2006 and the total excess cost of healthcare in 2006 is $64.9 million.

Similar analysis was conducted for Summit County, results reported in Table H.7b.

Similar analysis was conducted for Cuyahoga and Summit counties for Dr. Cutlers Approach 2 and the results appear in Tables H.8a and H.8b.

Tables 7a and 7b in my Report include these calculations as part of my valuation for excess costs attributed to morbidity.

---

[9] Bureau of Labor Statistics, CPI-U Midwest: Medical Care.  The monthly cost indices are averaged to create annual estimates for 2006-2016.

CONFIDENTIAL

**Table H.7a**
**Excess Healthcare Costs**
**Cuyahoga County**
**Approach 1**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Person-years with OUD Due to Opioid Shipments (000s) | 6.49 | 6.40 | 6.73 | 7.82 | 8 22 | 8.89 | 11.19 | 11.99 | 13.42 | 13.62 | 13.73 | 108 52 |
| **Distribution of Population by Type of Insurance[1]** | | | | | | | | | | | | |
| Private Insurance | 40% | 39% | 38% | 37% | 36% | 37% | 37% | 38% | 39% | 39% | 36% | |
| Medicare | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | |
| Medicaid | 18% | 19% | 20% | 21% | 22% | 24% | 25% | 27% | 28% | 29% | 37% | |
| Uninsured | 32% | 32% | 32% | 31% | 31% | 29% | 27% | 24% | 22% | 20% | 17% | |
| Other | 8% | 8% | 8% | 8% | 8% | 8% | 9% | 9% | 9% | 10% | 8% | |
| **Per Person Excess Costs by Type of Insurer[2]** | | | | | | | | | | | | |
| Private Insurance | $12,171 | $12,725 | $13,111 | $13,573 | $14,032 | $14,471 | $15,046 | $15,500 | $15,966 | $16,357 | $17,007 | |
| Medicare | $13,390 | $13,999 | $14,423 | $14,932 | $15,437 | $15,920 | $16,553 | $17,052 | $17,565 | $17,995 | $18,709 | |
| Medicaid | $10,791 | $11,283 | $11,624 | $12,035 | $12,442 | $12,830 | $13,341 | $13,743 | $14,156 | $14,503 | $15,079 | |
| Uninsured[3] | $6,085 | $6,363 | $6,555 | $6,787 | $7,016 | $7,235 | $7,523 | $7,750 | $7,983 | $8,178 | $8,503 | |
| Other[4] | $12,171 | $12,725 | $13,111 | $13,573 | $14,032 | $14,471 | $15,046 | $15,500 | $15,966 | $16,357 | $17,007 | |
| **Excess Healthcare Costs (000s)** | $ 64,929 | $ 66,922 | $ 72,470 | $ 87,083 | $ 94,678 | $106,887 | $141,602 | $158,154 | $184,536 | $194,115 | $204,720 | $1,376,145 |

Sources:  Morbidity Estimates; Kaiser Family Foundation; NSDUH; Florence et al. (2016), Bureau of Labor Statistics, Midwest Medical Care CPI.

Notes:  [1] Medicare share based on NSDUH OUD population demographics (65 yrs and over).  Other insurance shares based on Kaiser estimates for of insurance status for nonelderly adults with opioid addiction.

[2] Florence et al. (2016) excess cost estimates from 2013 are scaled to each year using the Midwest Medical Care CPI.

[3] Uninsured are assigned costs equal to 50% of private insurance rate.  Florence et al. (2016), p. 903.

[4] OUD individuals with "other" insurance are assigned costs for private insurance. Florence et al. (2016), p. 903.

CONFIDENTIAL

**Table H.7b**
**Excess Healthcare Costs**
**Summit County**
**Approach 1**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Person-years with OUD Due to Opioid Shipments (000s) | 2.68 | 2.67 | 2.82 | 3.29 | 3.48 | 3.79 | 4.78 | 5.13 | 5.76 | 5.86 | 5.92 | 46.18 |
| Distribution of Population by Type of Insurance[1] | | | | | | | | | | | | |
| Private Insurance | 40% | 39% | 38% | 37% | 36% | 37% | 37% | 38% | 39% | 39% | 36% | |
| Medicare | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | |
| Medicaid | 18% | 19% | 20% | 21% | 22% | 24% | 25% | 27% | 28% | 29% | 37% | |
| Uninsured | 32% | 32% | 32% | 31% | 31% | 29% | 27% | 24% | 22% | 20% | 17% | |
| Other | 8% | 8% | 8% | 8% | 8% | 8% | 9% | 9% | 9% | 10% | 8% | |
| Per Person Excess Costs by Type of Insurer[2] | | | | | | | | | | | | |
| Private Insurance | $12,171 | $12,725 | $13,111 | $13,573 | $14,032 | $14,471 | $15,046 | $15,500 | $15,966 | $16,357 | $17,007 | |
| Medicare | $13,390 | $13,999 | $14,423 | $14,932 | $15,437 | $15,920 | $16,553 | $17,052 | $17,565 | $17,995 | $18,709 | |
| Medicaid | $10,791 | $11,283 | $11,624 | $12,035 | $12,442 | $12,830 | $13,341 | $13,743 | $14,156 | $14,503 | $15,079 | |
| Uninsured[3] | $6,085 | $6,363 | $6,555 | $6,787 | $7,016 | $7,235 | $7,523 | $7,750 | $7,983 | $8,178 | $8,503 | |
| Other[4] | $12,171 | $12,725 | $13,111 | $13,573 | $14,032 | $14,471 | $15,046 | $15,500 | $15,966 | $16,357 | $17,007 | |
| Total Excess Healthcare Costs | $ 26,845 | $ 27,889 | $ 30,379 | $ 36,638 | $ 40,043 | $ 45,509 | $ 60,465 | $ 67,707 | $ 79,208 | $ 83,548 | $ 88,293 | $ 586,524 |

Source:   Morbidity Estimates; Kaiser Family Foundation; NSDUH; Florence et al. (2016), Bureau of Labor Statistics, Midwest Medical Care CPI.

Notes:    [1] Medicare share based on NSDUH OUD population demographics (65 yrs and over).  Other insurance shares based on Kaiser estimates for of insurance status for nonelderly adults with opioid addiction.

[2] Florence et al. (2016) excess cost estimates from 2013 are scaled to each year using the Midwest Medical Care CPI.

[3] Uninsured are assigned costs equal to 50% of private insurance rate.  Florence et al. (2016), p. 903.

[4] OUD individuals with "other" insurance are assigned costs for private insurance. Florence et al. (2016), p. 903.

CONFIDENTIAL

**Table H.8a**
**Excess Healthcare Costs**
**Cuyahoga County**
**Approach 2**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Person-years with OUD Due to Opioid Shipments (000s) | 11 04 | 10.89 | 11.23 | 11.51 | 11.72 | 12.68 | 14.14 | 13.87 | 14.76 | 14.21 | 14.05 | 140.12 |
| **Distribution of Population by Type of Insurance[1]** | | | | | | | | | | | | |
| Private Insurance | 40% | 39% | 38% | 37% | 36% | 37% | 37% | 38% | 39% | 39% | 36% | |
| Medicare | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | |
| Medicaid | 18% | 19% | 20% | 21% | 22% | 24% | 25% | 27% | 28% | 29% | 37% | |
| Uninsured | 32% | 32% | 32% | 31% | 31% | 29% | 27% | 24% | 22% | 20% | 17% | |
| Other | 8% | 8% | 8% | 8% | 8% | 8% | 9% | 9% | 9% | 10% | 8% | |
| **Per Person Excess Costs by Type of Insurer[2]** | | | | | | | | | | | | |
| Private Insurance | $12,171 | $12,725 | $13,111 | $13,573 | $14,032 | $14,471 | $15,046 | $15,500 | $15,966 | $16,357 | $17,007 | |
| Medicare | $13,390 | $13,999 | $14,423 | $14,932 | $15,437 | $15,920 | $16,553 | $17,052 | $17,565 | $17,995 | $18,709 | |
| Medicaid | $10,791 | $11,283 | $11,624 | $12,035 | $12,442 | $12,830 | $13,341 | $13,743 | $14,156 | $14,503 | $15,079 | |
| Uninsured[3] | $6,085 | $6,363 | $6,555 | $6,787 | $7,016 | $7,235 | $7,523 | $7,750 | $7,983 | $8,178 | $8,503 | |
| Other[4] | $12,171 | $12,725 | $13,111 | $13,573 | $14,032 | $14,471 | $15,046 | $15,500 | $15,966 | $16,357 | $17,007 | |
| **Excess Healthcare Costs (000s)** | $110,449 | $113,818 | $120,907 | $128,189 | $134,962 | $152,435 | $178,895 | $182,959 | $202,994 | $202,525 | $209,613 | $1,737,746 |

Sources:  Morbidity Estimates; Kaiser Family Foundation; NSDUH; Florence et al. (2016), Bureau of Labor Statistics, Midwest Medical Care CPI.

Notes:  [1] Medicare share based on NSDUH OUD population demographics (65 yrs and over).  Other insurance shares based on Kaiser estimates for of insurance status for nonelderly adults with opioid addiction.
  [2] Florence et al. (2016) excess cost estimates from 2013 are scaled to each year using the Midwest Medical Care CPI.
  [3] Uninsured are assigned costs equal to 50% of private insurance rate.  Florence et al. (2016), p. 903.
  [4] OUD individuals with "other" insurance are assigned costs for private insurance. Florence et al. (2016), p. 903.

CONFIDENTIAL

**Table H.8b**
**Excess Healthcare Costs**
**Summit County**
**Approach 2**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Person-years with OUD Due to Opioid Shipments (000s) | 4 57 | 4.54 | 4.71 | 4.84 | 4 96 | 5.40 | 6.04 | 5.94 | 6 34 | 6.12 | 6.06 | 59 50 |
| **Distribution of Population by Type of Insurance[1]** | | | | | | | | | | | | |
| Private Insurance | 40% | 39% | 38% | 37% | 36% | 37% | 37% | 38% | 39% | 39% | 36% | |
| Medicare | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | |
| Medicaid | 18% | 19% | 20% | 21% | 22% | 24% | 25% | 27% | 28% | 29% | 37% | |
| Uninsured | 32% | 32% | 32% | 31% | 31% | 29% | 27% | 24% | 22% | 20% | 17% | |
| Other | 8% | 8% | 8% | 8% | 8% | 8% | 9% | 9% | 9% | 10% | 8% | |
| **Per Person Excess Costs by Type of Insurer[2]** | | | | | | | | | | | | |
| Private Insurance | $12,171 | $12,725 | $13,111 | $13,573 | $14,032 | $14,471 | $15,046 | $15,500 | $15,966 | $16,357 | $17,007 | |
| Medicare | $13,390 | $13,999 | $14,423 | $14,932 | $15,437 | $15,920 | $16,553 | $17,052 | $17,565 | $17,995 | $18,709 | |
| Medicaid | $10,791 | $11,283 | $11,624 | $12,035 | $12,442 | $12,830 | $13,341 | $13,743 | $14,156 | $14,503 | $15,079 | |
| Uninsured[3] | $6,085 | $6,363 | $6,555 | $6,787 | $7,016 | $7,235 | $7,523 | $7,750 | $7,983 | $8,178 | $8,503 | |
| Other[4] | $12,171 | $12,725 | $13,111 | $13,573 | $14,032 | $14,471 | $15,046 | $15,500 | $15,966 | $16,357 | $17,007 | |
| Total Excess Healthcare Costs | $ 45,666 | $ 47,433 | $ 50,683 | $ 53,933 | $ 57,081 | $ 64,902 | $ 76,389 | $ 78,326 | $ 87,130 | $ 87,167 | $ 90,382 | $ 739,092 |

Source: Morbidity Estimates; Kaiser Family Foundation; NSDUH; Florence et al. (2016), Bureau of Labor Statistics, Midwest Medical Care CPI.

Notes: [1] Medicare share based on NSDUH OUD population demographics (65 yrs and over). Other insurance shares based on Kaiser estimates for of insurance status for nonelderly adults with opioid addiction.

[2] Florence et al. (2016) excess cost estimates from 2013 are scaled to each year using the Midwest Medical Care CPI.

[3] Uninsured are assigned costs equal to 50% of private insurance rate. Florence et al. (2016), p. 903.

[4] OUD individuals with "other" insurance are assigned costs for private insurance. Florence et al. (2016), p. 903.

## Model Assumptions

The insurance distribution estimates used in this analysis are based on national data, which are assumed to approximate the distribution for the Bellwether communities. Pooled 2002-2014 NSDUH data by state show that the US and Ohio insurance distributions are similar.[10]

The OUD estimates from the morbidity analysis are person-years, meaning that the same person may have OUD in multiple years. The Florence *et al.* analysis measures excess healthcare costs in the 12-month period following the first appearance of an opioid abuse/dependency diagnosis in the data. My estimates assume that excess healthcare costs are the same in each year a person has OUD. This will tend to overstate healthcare costs

---

[10] See SAMHDA, National Survey on Drug Use and Health 2002-2014, pooled 2002-2014 NSDUH data (ages 12 and over), available at https://www.samhsa.gov/data/sites/default/files/cbhsq-reports/Supplemental%20NSDUH %20Opioid%20Tables/heroin%20pain%20halluc%20use%20and%20disorder%20by%20state.xlsx.

CONFIDENTIAL

associated with OUD to the degree costs in the first year exceed costs in subsequent years, for the reason that some of the individuals counted each year will be "continuing" and therefore have lower healthcare costs in comparison to the new cases.  On the other hand, these estimates tend to understate health care costs because individuals who are diagnosed with OUD are more expensive than others in the time leading up to their diagnosis on the index date.  Kirson *et al.* (2017)[11] shows elevated costs pre and post index diagnosis on a monthly basis.  Costs appear to be elevated more in the first month or two after diagnosis, but these elevations are roughly balanced by the higher health care costs in the run up to diagnosis.  In light of these countervailing effects, it is reasonable to use the elevated cost per person year as an estimate of the excess costs associated with OUD.

---

[11] N.Y. Kirson, *et al.*, "The Economic Burden of Opioid Abuse: Updated Findings," *Journal of Managed Care & Specialty Pharmacy*, 23(4), 2017, pp. 427-445.

CONFIDENTIAL

**Appendix I**
**Analysis Using Dr. Cutler's Approach 2**

CONFIDENTIAL

**Appendix I**
**Analysis Using Dr. Cutler's Approach 2**

Tables 1, 2, 5a, 5b, 7a, 7b, 8a, 8b, 9a, 9b, 10a, 10b and 11 included in my Report are based on Dr. Cutler's Approach 1.  In this appendix, I produce those same tables but using Dr. Cutler's Approach 2.  The methodologies are the same as those presented in my Appendices C through H.  Table 13 in my Report and Table I.1 below summarize the results of applying Dr. Cutler's Approach 2.

**Table I.1**
**Summary of Monetary Value of Harms Due to Prescription Opioid Shipments**
**2006-2016**
**($millions)**
**Approach 2**

| Harms Due to Defendants' Shipments | Cuyahoga | Summit | Total |
|---|---|---|---|
| Excess deaths ($mil) | $13,306 | $6,059 | $19,366 |
| Excess morbidity ($mil) | $1,738 | $739 | $2,477 |
| Excess neonatal abstinence syndrome ($mil) | $11 | $8 | $19 |
| Excess crimes ($mil) | $420 | $159 | $579 |
| Excess child maltreatment ($mil) | $485 | $360 | $845 |
| Excess costs to Bellwether governments ($mil) | $215 | $119 | $334 |
| *Totals ($mil)* | *$16,176* | *$7,445* | *$23,621* |

Sources:  Tables  I.5a, I.5b, I.7a, I.7b, I.8a, I.8b, I.9a, I.9b, I.10a, I.10b and I.11 of Attachment

CONFIDENTIAL

**Table I.2**
**Summary of Harms Due to Opioid Shipments**
**2006-2016**
**Approach 2**

| Harm | Cuyahoga | Summit |
|------|----------|--------|
| Excess deaths | 1,838 | 711 |
| Excess morbidity | 140 | 60 |
| Excess neonatal abstinence syndrome | 725 | 510 |
| Excess crimes | 57,019 | 26,245 |
| Excess child maltreatment | 1,685 | 1,251 |

Sources:  Tables  I.5a, I.5b, I.7a, I.7b, I.8a, I.8b, I.9a, I.9b, I.10a, and I.10b of Attachment I.

**Table I.5a**
**Mortality and Valuation of Mortality Due to Opioid Shipments**
**Cuyahoga County, 2006-2016**
**Approach 2**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opioid Overdose Deaths | 104 | 87 | 111 | 92 | 138 | 185 | 191 | 223 | 234 | 245 | 504 | 2,114 |
| Share of Harm Due to Shipments | 83.7% | 85.6% | 85.2% | 77.1% | 77 8% | 82 2% | 84.1% | ▮ | ▮ | ▮ | ▮ | |
| Opioid Deaths Due to Shipments | 87 | 75 | 95 | 71 | 107 | 152 | 161 | ▮ | ▮ | ▮ | ▮ | 1,838 |
| VSL ($mil) | $5 9 | $6.6 | $6.8 | $6.0 | $6.3 | $6.6 | $6 8 | $7 2 | $7 5 | $7.7 | $8.1 | |
| Valuation ($mil) | $514 | $492 | $645 | $425 | $681 | $1,001 | $1,091 | $1,387 | $1,554 | $1,726 | $3,790 | $13,306 |

See Appendix C for sources and calculation notes.

CONFIDENTIAL

**Table I.5b**
**Mortality and Valuation of Mortality Due to Opioid Shipments**
**Summit County, 2006-2016**
**Approach 2**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opioid Overdose Deaths | 25 | 31 | 21 | 23 | 45 | 34 | 60 | 56 | 105 | 135 | 269 | 804 |
| Share of Harm Due to Shipments | 83.7% | 85.6% | 85.2% | 77.1% | 77 8% | 82 2% | 84.1% | ■ | ■ | ■ | ■ | |
| Opioid Deaths Due to Shipments | 21 | 27 | 18 | 18 | 35 | 28 | 50 | ■ | ■ | ■ | ■ | 711 |
| VSL ($mil) | $6 5 | $7.1 | $7.8 | $7.3 | $7.2 | $7.6 | $8 2 | $8.4 | $8.7 | $8 9 | $9.1 | |
| Valuation ($mil) | $136 | $189 | $139 | $130 | $251 | $211 | $412 | $402 | $814 | $1,093 | $2,282 | $6,059 |

See Appendix C for sources and calculation notes.

**Table I.7a**
**Morbidity and Valuation of Morbidity Due to Shipments**
**Cuyahoga County, 2006-2016**
**Approach 2**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Prevalence of OUD | 1.2% | 1.1% | 1.2% | 1.4% | 1.4% | 1.4% | 1.5% | 1.5% | 1.5% | 1.4% | 1.4% | |
| County Population 12 +(000s) | 1,117.2 | 1,109.9 | 1,103.5 | 1,099.4 | 1,089.4 | 1,089.4 | 1,087.5 | 1,087.9 | 1,086.8 | 1,083.7 | 1,080.9 | 12,040.8 |
| Persons with OUD (000s) | 13.2 | 12.7 | 13.2 | 14.9 | 15.1 | 15.4 | 16.8 | 16.1 | 16.6 | 15.6 | 15.1 | |
| Share of Harm Due to Shipments | 83.7% | 85.6% | 85.2% | 77.1% | 77.8% | 82.2% | 84.1% | ■ | ■ | ■ | ■ | |
| Persons with OUD Due to Opioid Shipments (000s) | 11.0 | 10.9 | 11.2 | 11.5 | 11.7 | 12.7 | 14.1 | ■ | ■ | ■ | ■ | 140.1 |
| Elevated Health Costs ($mil) | $110 | $114 | $121 | $128 | $135 | $152 | $179 | $183 | $203 | $203 | $210 | $1,738 |

See Appendix D for sources and calculation notes.

**Table I.7b**
**Morbidity and Valuation of Morbidity Due to Shipments**
**Summit County, 2006-2016**
**Approach 2**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Prevalence of OUD | 1.2% | 1.1% | 1.2% | 1.4% | 1.4% | 1.4% | 1.5% | 1.5% | 1.4% | 1.4% | 1.4% | |
| County Population 12 +(000s) | 461.9 | 462.5 | 462.6 | 462.5 | 463.0 | 463.8 | 464.4 | 465.7 | 466.5 | 466.4 | 466.1 | 5,105.5 |
| Persons with OUD (000s) | 5.5 | 5.3 | 5.5 | 6.3 | 6.4 | 6.6 | 7.2 | 6.9 | 7.1 | 6.7 | 6.5 | |
| Share of Harm Due to Shipments | 83.7% | 85.6% | 85.2% | 77.1% | 77.8% | 82.2% | 84.1% | ■ | ■ | ■ | ■ | |
| Persons with OUD Due to Opioid Shipments (000s) | 4.6 | 4.5 | 4.7 | 4.8 | 5.0 | 5.4 | 6.0 | ■ | ■ | ■ | ■ | 59.5 |
| Elevated Health Costs ($mil) | $46 | $47 | $51 | $54 | $57 | $65 | $76 | $78 | $87 | $87 | $90 | $739 |

See Appendix D for sources and calculation notes.

CONFIDENTIAL

**Table I.8a**
**Neonatal Abstinence Syndrome (NAS) and Valuation**
**Cuyahoga County, 2006-2016**
**Approach 2**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opioid-Related NAS Cases | 19 | 23 | 30 | 45 | 60 | 74 | 94 | 117 | 117 | 117 | 141 | 837 |
| Share of Harm Due to Shipments | 83.7% | 85.6% | 85.2% | 77.1% | 77.8% | 82.2% | 84.1% | ■ | ■ | ■ | ■ | |
| NAS Cases Due to Shipments | 16 | 20 | 26 | 35 | 47 | 61 | 79 | ■ | ■ | ■ | ■ | 725 |
| Excess Hospital Costs Due to NAS | $12,885 | $19,525 | $18,795 | $22,276 | $18,587 | $15,731 | $14,671 | $15,153 | $16,823 | $14,011 | $13,397 | |
| Valuation of NAS Health Costs Due to Shipments ($ mil) | $0.21 | $0.39 | $0.48 | $0.78 | $0.87 | $0.96 | $1.15 | $1.52 | $1.75 | $1.49 | $1.75 | $11.35 |

See Appendix E for sources and calculation notes.

**Table I.8b**
**Neonatal Abstinence Syndrome (NAS) and Valuation**
**Summit County, 2006-2016**
**Approach 2**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opioid-Related NAS Cases | 13 | 16 | 20 | 31 | 41 | 50 | 63 | 89 | 89 | 89 | 89 | 589 |
| Share of Harm Due to Shipments | 83.7% | 85.6% | 85.2% | 77.1% | 77.8% | 82.2% | 84.1% | ■ | ■ | ■ | ■ | |
| NAS Cases Due to Shipments | 11 | 14 | 17 | 24 | 32 | 41 | 53 | ■ | ■ | ■ | ■ | 510 |
| Excess Hospital Costs Due to NAS | $12,885 | $19,525 | $18,795 | $22,276 | $18,587 | $15,731 | $14,671 | $15,153 | $16,823 | $14,011 | $13,397 | |
| Valuation of NAS Health Costs Due to Shipments ($ mil) | $0.14 | $0.26 | $0.33 | $0.52 | $0.59 | $0.65 | $0.78 | $1.15 | $1.33 | $1.13 | $1.11 | $7.99 |

See Appendix E for sources and calculation notes.

**Table I.9a**
**Crime and Valuation of Crime Due to Shipments**
**Cuyahoga County, 2006-2016**
**Approach 2**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Crimes | 4,484 | 4,304 | 5,142 | 4,645 | 4,986 | 5,316 | 5,872 | 5,369 | 5,426 | 5,677 | 5,799 | 57,019 |
| Valuation of Crimes ($mil) | $32 | $33 | $36 | $34 | $35 | $36 | $41 | $38 | $39 | $45 | $51 | $420 |

See Appendix F for sources and calculation notes.

CONFIDENTIAL

**Table I.9b**
**Crime and Valuation of Crime Due to Shipments**
**Summit County, 2006-2016**
**Approach 2**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Crimes | 1,590 | 1,536 | 2,127 | 1,987 | 2,219 | 2,304 | 2,423 | 2,689 | 2,860 | 3,152 | 3,359 | 26,245 |
| Valuation of Crimes ($mil) | $10 | $9 | $13 | $12 | $13 | $14 | $15 | $16 | $17 | $19 | $21 | $159 |

See Appendix F for sources and calculation notes.

**Table I.10a**
**Child Maltreatment Cases and Valuation Due to Shipments**
**Cuyahoga County, 2006-2016**
**Approach 2**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Child Victims of Maltreatment | 2,043 | 1,924 | 2,073 | 1,452 | 1,738 | 2,092 | 2,156 | 2,502 | 2,281 | 2,316 | 2,513 | 23,090 |
| Share Harms Due to Opioid Shipments | 3.8% | 4.6% | 5.3% | 5.4% | 5.7% | 6.0% | 6.1% | ▉ | ▉ | ▉ | ▉ |  |
| Maltreatment Victims Due to Opioid Shipments | 77 | 88 | 109 | 79 | 100 | 126 | 131 | ▉ | ▉ | ▉ | ▉ | 1,685 |
| Social Cost of Neglect by Category |  |  |  |  |  |  |  |  |  |  |  |  |
| Productivity Losses ($000s) | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 |  |
| Special Education Costs ($000s) | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 |  |
| Total Social Costs ($000s) | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 |  |
| Valuation of Child Maltreatment ($mil) | $22.3 | $25.4 | $31.5 | $22.6 | $28.7 | $36.2 | $37.8 | $54.8 | $59.1 | $66.8 | $100.2 | $485.3 |

See Appendix G for sources and calculation notes.

**Table I.10b**
**Child Maltreatment and Valuation Due to Shipments**
**Summit County, 2006-2016**
**Approach 2**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Child Victims of Maltreatment | 1,319 | 1,117 | 901 | 944 | 715 | 643 | 674 | 601 | 579 | 757 | 886 | 9,136 |
| Share Harms Due to Opioid Shipments | 3.6% | 4.4% | 5.5% | 6.8% | 17.1% | 17.4% | 19.6% | ▉ | ▉ | ▉ | ▉ |  |
| Maltreatment Victims Due to Opioid Shipments | 48 | 49 | 50 | 64 | 122 | 112 | 132 | ▉ | ▉ | ▉ | ▉ | 1,251 |
| Social Cost of Neglect by Category |  |  |  |  |  |  |  |  |  |  |  |  |
| Productivity Losses ($000s) | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 | $286.0 |  |
| Special Education Costs ($000s) | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 | $1.95 |  |
| Total Social Costs ($000s) | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 | $288.0 |  |
| Valuation of Child Maltreatment ($mil) | $13.8 | $14.0 | $14.4 | $18.5 | $35.2 | 32.3 | $38.0 | $36.7 | $35.8 | $49.6 | $71.8 | $360.2 |

See Appendix G for sources and calculation notes.

CONFIDENTIAL

### Table I.11
### Government Costs Attributable to Opioid Shipments
### 2006-2016 (millions)
### Approach 2

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cuyahoga County ($mil) | $11.0 | $12.6 | $15.8 | $15 3 | $16.7 | $18.1 | $18.6 | $21.9 | $24.3 | $26 8 | $33.7 | $214.7 |
| Summit County ($mil) | $3.4 | $3.7 | $4.9 | $6 0 | $11 5 | $11.2 | $12.0 | $14.3 | $15.4 | $16.6 | $20 3 | $119.3 |
| | | | | | | | | | | | | |
| Total ($mil) | $14.3 | $16.3 | $20.6 | $21.4 | $28 2 | $29.3 | $30.7 | $36.2 | $39.7 | $43.4 | $54 0 | $334.0 |

Sources:  McGuire Cost Report, Tables E 3 and E.4.

Note:

The estimates include damages incurred by the Summit and Cuyahoga governments.  Damages incurred by the governments of the cities of Cleveland and Akron are not included, nor are damages incurred by other jurisdictions within the counties.

This document exceeds the maximum permitted file size for upload onto the Electronic Court Filing system. Consequently, the balance of this document will be manually filed with the Court.

1807338.1