UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION | MDL 2804 |
| OPIATE LITIGATION | Case No.: 1:17-md-2804 |
| THIS DOCUMENT RELATES: | Judge Dan Aaron Polster |
| *ALL CASES* | Hearing Date: August 6, 2019 |
| | Time: 10:00 a.m. |

**PLAINTIFFS' REPLY BRIEF IN FURTHER SUPPORT OF RENEWED
AND AMENDED MOTION FOR CERTIFICATION OF RULE 23(b)(3)
CITIES/COUNTIES NEGOTIATION CLASS**

# TABLE OF CONTENTS

**Page**

I.    Introduction ........................................................................................................... 1

II.   Every Issue Raised in Distributor and Pharmacy Defendants' Opposition Is
      Addressed in Plaintiffs' Memorandum and Is Meritless ...................................... 4

      A.    The Fact that Rule 23 Does Not Mention Negotiation Classes Does Not
            Render Them Improper ................................................................................ 4

      B.    The Purpose of the Negotiation Class Is to Negotiate with National Opioid
            Defendants Who Wish to Negotiate ............................................................ 6

      C.    The Amended Motion Meets All Requirements of Rule 23 ........................ 6

            1.    Plaintiffs Do Not Seek a Relaxed Rule 23 Standard.................................. 6

            2.    Neither Proposed Class Counsel nor Class Representatives Have
                  Conflicts ........................................................................................... 7

            3.    The Claims of the Representative Plaintiffs are Typical of Class
                  Members, and Common Questions of Law and Fact Predominate ........ 10

            4.    Defendants Do Not Suggest a Superior Method of Resolving the
                  Proposed Class's Claims ................................................................. 12

III.  The Proposed Negotiation Class Respects the Roles of the States and Does Not
      Usurp State Sovereignty ...................................................................................... 13

IV.   City of Fargo is a Member of the Proposed Class .............................................. 16

V.    The Sole Opposition from Within the Class Underscores the Propriety of the
      Negotiation Class. ............................................................................................... 16

VI.   A Second Opt-Out Right is Discretionary, Not Required, and Both the Notice and
      Proposed Order Are Sufficient ........................................................................... 18

VII.  The Negotiation Class Does Not Toll Statutes of Limitations ........................... 19

VIII. Conclusion .......................................................................................................... 19

1815019.9

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997).................................................................................. 5, 7, 10, 12

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013).................................................................................. 11

*Bell v. Brockett*,
922 F.3d 502 (4th Cir. 2019) .................................................................... 9

*Bell v. Disner*,
3:14cv91, 2018 WL 296035 (W.D.N.C. Jan. 4, 2018) ............................ 9

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013) .............................................................................. 10

*Eggleston v. Chi. Journeymen Plumbers' Local Union No. 130*,
657 F.2d 890 (7th Cir. 1981) .................................................................... 9

*Gelboim v. Bank of America Corp.*,
135 S. Ct. 897 (2015) ................................................................................ 6

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010*,
910 F. Supp. 2d 891 (E.D. La. 2012) ....................................................... 10

*In re Refrigerant Compressors Antitrust Litig.*,
731 F.3d 588 (6th Cir. 2013) .................................................................... 6

*Klay v. Humana, Inc.*,
382 F.3d 1241 (11th Cir. 2004) ................................................................ 12

*Leyva v. Medline Indus. Inc.*,
716 F.3d 510 (9th Cir. 2012) .................................................................... 10

*Low v. Trump Univ. LLC*,
881 F.3d 1111 (9th Cir. 2018) .................................................................. 18

*Martin v. Behr Dayton Thermal Prods., LLC*,
896 F.3d 405 (6th Cir. 2018) .................................................................... 10

*Mehl v. Canadian Pac. Ry. Ltd.*,
227 F.R.D. 505 (D.N.D. 2005) ................................................................. 9

*Neale v. Volvo Cars of N. Am., LLC*,
794 F.3d 353 (3d Cir. 2015) ..................................................................... 10

*Nguyen v. Nissan Motor Corp.*,
No. 18-16344, 2019 WL 3368918 (9th Cir. July 26, 2019)..................... 10

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999)................................................................................... 17

*Pulaski. & Middleman, LLC v. Google, Inc.*,
802 F.3d 979 (9th Cir. 2015) .................................................................... 10

*Sandoval v. M1 Auto Collisions Ctrs.*,
309 F.R.D. 549 (N.D. Cal. 2015)............................................................. 9

*Sears, Roebuck & Co. v. Butler*,
727 F.3d 796 (7th Cir. 2013) .................................................................... 10

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S. Ct. 1036 (2016) .............................................................................. 10

1815019.9

*Wal-Mart Stores, Inc. v. Dukes,*
 564 U.S. 338 (2011)........................................................................................ 4, 11

**Statutes**
11 U.S.C. § 524(g) ......................................................................................... 17, 18
21 U.S.C. § 801.................................................................................................... 12
28 U.S.C. § 1407 ................................................................................................. 14

**Rules**
Fed. R. Civ. P. 23 ........................................................................................... passim

**Other Authorities**
1 *Newberg On Class Actions*
 § 3:75 (5th ed. 2019).......................................................................................... 9
2 *Newberg on Class Actions*
 § 4:50 ................................................................................................................ 10
3 *Newberg on Class Actions*
 § 9:34 ................................................................................................................ 18
Francis E. McGovern & William B. Rubenstein,
 *The Negotiation Class: A Cooperative Approach to Large Claim Class Actions Involving
 Large Stakeholders*, Duke Law School Public Law & Legal Theory Series No. 2019-41,
 (June 13, 2019)................................................................................................... 5

1815019.9

## I.     Introduction

Before this Court is a motion to allow tens of thousands of public entities to express their views, collectively and pro-actively, on a to-be-proposed Class settlement.  It is hard to imagine any mechanism that better protects the interests of these cities and counties than the same, time-honored mechanism that brought their authorized representatives to public office: the vote. Perhaps not surprisingly, no member of this proposed Class has raised any opposition to the core concept before this Court.  A handful (of Ohio cities) raise odd and irrelevant issues (such as "future Classes"), and request a second opt-out mechanism, a matter that can be addressed by this Court down the road under Fed. R. Civ. P. 23(e)(4).  And one North Dakota city, anticipating certification, is already engaging how it will be classified under the voting mechanisms proposed for the Class.  But, *that is it.*

Of the thousands of public entities in the proposed Class, none has taken issue with the basic idea that any proposed settlement should be put before all the cities and counties, should be resolved by basic democratic procedures, and should have a transparent distribution system for settlement proceeds.  Given the diversity of the cities and counties across the nation—just starting with red and blue electoral preferences does not even scratch the surface—this uniformity of response is nothing short of stunning.  Some Class members may opt out, some may be passive, but none of these thousands of Class members has asked this Court to reject their collective right to determine their own fate by the simple act of saying yea or nay to any proposed settlement.  And they are certainly aware of the Negotiation Class as proposed:  it has been extensively covered by the media, has been publicly posted online, and has been discussed by hundreds of lawyers with their cities/counties clients.

Instead, the opposition is generated from the sidelines.  First are the Attorneys General of forty states who are, of course, not only not part of the Class, but not even parties to this MDL.

- 1 -

In their *amicus* filings, the AGs basically urge that they, and they alone, can speak for the citizens of their states in any settlement of any litigation. Perfunctory recitation of stock Rule 23 objections aside, the crux of the AG position is that certifying a Negotiation Class of cities and counties across state lines would violate their States' sovereign authority. There are three basic answers to this:

      a) Thousands of local entities have already sued, and those claims are before this Court. The proposed Negotiation Class is a vehicle to resolve those cases through the MDL. Nothing in the proposed Class deprives the Attorneys General from prosecuting, negotiating, or settling any cases they may have for example, through consent decrees;

      b) The proposed Negotiation Class does not seek to disrupt the authority of the Attorney General of any State, to the extent such authority exists, to command the litigation fate of subordinate cities and counties. This is purely a matter of state law and, assertions in *amicus* filings to the contrary notwithstanding, movants suspect wide variations in state law on this issue. Any AG who decides to settle or prosecute claims may seek an order from the competent state court directing the conduct of the cities and counties in that jurisdiction. Nothing in the proposed Class alters any authority that exists as a matter of state law;

      c) There are many defendants before the MDL, some of whom may need to settle with cities and counties to obtain a categorically comprehensive and binding release, regardless of what the AGs may do. The proposed Negotiation Class is to be implemented, if at all, on a defendant-by-defendant basis. It is not clear that there is or could be any similarly comprehensive mechanism outside this MDL. For example, only a minority of AGs has sued the Distributor Defendants and fewer still have sued the Pharmacy Defendants. If the Court's

- 2 -

objective of a global resolution is to be realized, a mechanism to include all the MDL litigants' claims against distributors and pharmacies still needs to be created.  No parties to any opioids litigation have proposed or achieved a global settlement under any other approach.

Of secondary importance is the opposition filed by the Distributor and Pharmacy Defendants, which claims that the proposed Class violates essentially every requirement of Rule 23.  Quite frankly, most of their arguments are frivolous (*e.g*. New York, Chicago and San Francisco are not typical of American cities?  What about Atlanta, Georgia; Baton Rouge, Louisiana; Franklin County, Ohio; Manchester, New Hampshire; Smith, Texas; Palm Beach, Florida; Saint Paul, Minnesota; or any of the more than 40 other proposed Class representatives?).  But the main point is the simplest one: what possible interest do these defendants have?  Clearly, their concern for the quality of representation of the proposed Class is insincere.  And if they do not like the very concept of a Negotiation Class, fine.  Don't negotiate with it.  Don't settle with it.  These Defendants are sophisticated parties who can well protect their own interests.  The Negotiation Class only comes into action if triggered by a defendant's decision to use it; and by no means have all defendants rejected its potential use.  Meanwhile, any defendant that prefers trial or another settlement vehicle is unimpaired by the existence of a Negotiation Class.

Finally, the Manufacturer Defendants seek confirmation that the Negotiation Class is not an invitation to toll the statute of limitations for Class members beyond whatever might already be the case.  We agree.

1815019.9

II.    **Every Issue Raised in Distributor and Pharmacy Defendants' Opposition Is Addressed in Plaintiffs' Memorandum and Is Meritless**

      A.    **The Fact that Rule 23 Does Not Mention Negotiation Classes Does Not Render Them Improper**

Rule 23 does not explicitly authorize a negotiation Class, but it does not explicitly prohibit one either.  As this Court noted at the June 25, 2019 hearing on Plaintiffs' Motion, the fact that a negotiation Class has never been tried before "doesn't make it wrong or illegal or incorrect."  June 25, 2019 12:02 p.m. Hr'g Tr. 7:11-13.  Neither Rule 23 nor any cases Defendants cite foreclose this use of the Class action device.  *Wal-Mart Stores, Inc. v. Dukes* has no relevance because the Negotiation Class complies with the strictures of Rule 23.  In *Wal-Mart*, the Supreme Court explained that a Rule 23(b)(2) settlement Class combining individual damages claims with Class claims for injunctive relief would be "inconsistent with the structure of Rule 23(b)," 564 U.S. 338, 361 (2011), because the use of Rule 23(b)(2) denied Class members due process and the procedural protections afforded under Rule 23(b)(3).  *Id.* at 363-64.  The Negotiation Class, by contrast, strictly heeds all of the procedural safeguards and ***adds*** an active voting feature, while affording all Rule 23(b)(3) due process protections to Class members.

Courts have routinely certified Classes for uses not explicitly defined in Rule 23. Settlement Classes were not mentioned until a December 2018 amendment, but that did not prohibit courts in the Sixth Circuit and throughout the country from recognizing and designing specific procedures for certifying, and affirming them.  As Defendants themselves point out,  the term "settlement Class" was added to Rule 23 by amendment as of December 1, 2018. Mem. of Certain Defs. in Opp. to Pls.' Renewed and Am. Mot. for Certification of Rule 23(b)(3) Cities/Counties Negotiation Class' ("Opp.") at 8 n.8.  But courts, including this one, and defense firms, including those that filed the opposition, used settlement Classes for many years before the

- 4 -

amendment.  Clearly, then, a practice can develop under Rule 23 and be perfectly proper, even before it is codified.  Under Defendants' argument, settlement Classes violated Rule 23 prior to December 1, 2018, which of course is not accurate.[1]  Courts considering settlement Classes faced and rejected the same "no authorization" argument that Defendants present here. Francis E. McGovern & William B. Rubenstein, *The Negotiation Class: A Cooperative Approach to Large Claim Class Actions Involving Large Stakeholders*, Duke Law School Public Law & Legal Theory Series No. 2019-41,43-44 (June 13, 2019), https://ssrn.com/abstract= 3403834 ("*A Cooperative Approach*").  Settlement Classes became so commonplace that by the time the Supreme Court addressed their use in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), it was not to question their validity but to clarify the degree to which normal Class certification requirements applied.  *Id.* at 44.  Not a single Justice on the Court questioned the legitimacy of settlement Classes; rather the "dominant concern" to the Supreme Court in *Amchem* was that a Class have "sufficient unity so that absentees can fairly be bound."  *Id.* at 593.  The proposed Class here quells those concerns: the active Class members—litigating entities—have coordinated the prosecution of their federal and state cases on a daily basis, and the "absent" Class members have Rule 23(c) opt-out rights, plus additional rights, as active, voting participants.

Still, Defendants assert that the proposed Class differs from the pre-2018 settlement Classes, arguing that Rule 23 allows certification only for pursuing "standard judicial activity," a term they invent and nowhere define, and that, while settlement Classes fall into that category, negotiation Classes do not.  Opp. at 7.  Defendants are wrong.  The proposed Class is not an

---

[1] Indeed, these Defendants seem to mistake the Federal Rules of Civil Procedure for a code, ignoring that the Rule-making process frequently functions iteratively (as the recent 2018 amendments illustrate), to adopt practices that have already been developed through judicial innovation and established in case law before they are incorporated in the Rules.

1815019.9

attempted end run around Rule 23.  Like a settlement Class, the purpose of the negotiation Class is to achieve a judicially approved and binding settlement.  While a settlement Class is certified *ex post*, after the negotiation, the difference here is that the certification would be *ex ante*, so that a willing and voluntary defendant would know precisely the membership of the Class with whom it might negotiate.

> **B.** **The Purpose of the Negotiation Class Is to Negotiate with National Opioid Defendants Who Wish to Negotiate**

The Distributor and Pharmacy Defendants argue that the proposed Class cannot proceed without a defined defendant, Opp. at 9, but Plaintiffs clearly state that the Class is directed at negotiation with the identified "national Opioid defendants" named in Class Members' complaints filed throughout the country.  Pls.' Mem. in Supp. of Renewed and Am. Mot. for Certification of Rule 23(b)(3) Cities/Counties Negotiation Class (Dkt. No. 1820-1) ("Mem.") at 11.  Those named defendants, Mem. at 82, include many national Manufacturers who, tellingly, do not  oppose the Amended Motion.  This argument fundamentally misapprehends the very purpose of the Negotiation Class:  to certify a known group, with known claims, with whom any national Opioid defendant may, or may not, then choose to negotiate.[2]

> **C.** **The Amended Motion Meets All Requirements of Rule 23**

> **1.** **Plaintiffs Do Not Seek a Relaxed Rule 23 Standard**

The Distributor and Pharmacy Defendants concede a settlement Class might be appropriate at some point, Opp. at 2, but attack the negotiation Class as if it were a Rule 23(e) settlement Class.  It is not.  And Plaintiffs' proposal contemplates a full Rule 23(e) process if and

---

[2] Defendants also suggest that even at this stage, a Class would need to be tied to a specific case, not generally to the MDL.  If a settlement is reached that achieves supermajority support, a formal Rule 23(e) motion will indeed be filed in a specific MDL case; or in a specific-purpose master or consolidated complaint, as the Court, in the exercise of its case management authority, may direct.  *See Gelboim v. Bank of America Corp.*, 135 S. Ct. 897 (2015); *In re Refrigerant Compressors Antitrust Litig.*, 731 F.3d 588, 590 (6th Cir. 2013.

when the Negotiation Class reaches a settlement with any defendant.  That said, Plaintiffs never

claimed that "a more relaxed" standard should apply to a negotiation Class.  *See* Opp. at 15.

Despite the Defendants' straw person, Plaintiffs nowhere argue that the prospect of settlement, or

the common benefits to the Class, establish predominance, as did the plaintiffs in *Amchem,* 521

U.S. at 622-23.  *See* Opp. at 14.  Rather, Plaintiffs demonstrate through rigorous analyses that the

Negotiation Class meets the requirements of Rule 23(a) and (b)(3) by reference to the claims the

Class representatives and Class members have actually asserted in their filed complaints.

Unmentioned in the opposition briefs is the fact that the common question/predominance

inquiries for this Class certification – unlike in virtually every other Class certification

proceeding – turn not on a hypothetical set of arguments about what the proposed representatives

and others think might be claimed by the Class, but on a pre-existing, revealed set of claims

made by thousands of Class members in their individually filed suits.  To the best of Movants'

knowledge, this is a new and important protection— a reality-based guarantor of predominance

in aid of the Class certification decision.

## 2.  Neither Proposed Class Counsel nor Class Representatives Have Conflicts

Loyalty is as loyalty does.  The proposed Class representatives and counsel have earned

the loyalty of, and they have demonstrated their loyalty to, their cities/counties Class with deeds,

not merely words.  The City of Chicago is an early, active pioneer in opioids litigation.  Its case

pre-dates the MDL, as well as the vast majority of AG actions.  New York City and the City and

County of San Francisco are likewise active and innovative in addressing the opioid crisis.  None

has any interest other than in abating the epidemic by maximizing relief to cities and counties.

Section IV of the Memorandum describes the direct impact of the opioids epidemic on, and the

work done by, these entities and the other 48 cities/counties of every size, from every region of

- 7 -

the country, who have come forward as Class representatives to combat this crisis.  They are litigants in the MDL, which is the center battleground for discovery, which is where cities and counties fought to obtain, analyze, and provide ARCOS data to all plaintiffs (including AGs), and which is where the first trial against all categories of defendants is set.

These efforts, by those who represent the Class, have cost many millions of dollars and many thousands of hours of time.  All of it has been spent willingly, as a priority, at high risk, and on a contingent basis, by the proposed Class Counsel—and by many other firms, on the PEC and in state courts—who made the commitment to prosecute and to seek fair and effective resolution of opioids litigation in response to this Court's call for immediate action in the face of a daunting emergency.  They do so, on an ongoing (and, judicially-supervised) basis in their MDL and state court actions, so that not only the cities and counties directly, but all plaintiffs, (including AGs) may benefit.[3]  This is no conflict.  Their loyalty cannot be questioned, certainly not by adverse parties.

Should there be fewer, more, or different Class representatives or Class counsel?  That is a Goldilocks question, but "just right" is determined by the Court, not by those adverse to the Class.[4]  Most centrally, these Defendants confuse the great diversity of cities and counties across

---

[3] As is well known, the proposed Class counsel do not represent any government entities except cities and counties. The PEC itself includes counsel who represent an array of government entities and other sophisticated clients; including Tribes, AGs, third party payors, and/or hospitals.  These were disclosed to and accepted by Class members, AGs, and other sophisticated clients in the competitive application and retention process that most of them used. This integrated representation is a feature that has enabled a greater degree of cooperation and coordination in the prosecution for all plaintiffs than would a more fragmentary representation. It also affords a greater prospect for comprehensive resolution.  What it is not is a weakness that undermines Class representation.  Indeed, it is not Class members or AGs that claim a conflict, but rather certain Defendants.  The PEC has welcomed the Court's invitation to the AGs that they voluntarily participate in Court-mediated settlement discussions, and the PEC has funded, at substantial cost, that mediation process, supervised by the Court-appointed Special Masters, at significant benefit to the AGs.  In addition, the AGs have requested and received the PEC's work product generated in the MDL discovery process.

[4] The oppositions' musings over appropriate representation for the Class brings to mind the Seventh Circuit's famous rebuff:  "…it is often the defendant, preferring not to be successfully sued by anyone, who supposedly undertakes to assist the court in determining whether to certify a putative Class.  When it comes, for instance, to determining whether the representative parties will fairly and adequately protect the interests of the Class, … it is a

*Footnote continued on next page*

- 8 -

the country with conflict.  There is no division among the proposed Class members vis-à-vis the defendants, nor even any conflict between the proposed Class and the States represented by the Attorneys' General.  As such, the fact that there are many parties suing the defendants, and that some may have selected the same lawyers does not mean there is a disabling conflict in trying to obtain the primary objectives of every Class member and every entity suing the defendants: abating the epidemic and maximizing the recovery obtained from those responsible for the Opioid calamity.  Difference is not conflict.

It is hornbook law that the simultaneous representation of multiple parties, even different Classes, against a common defendant does not, in and of itself, create a conflict. "The few courts that have denied a finding of adequacy due to simultaneous representation of multiple sets of litigants, or simultaneous actions in multiple forums, have done so only when the recovery of one group or in one forum inherently conflicts with the recovery of the other." 1 *Newberg On Class Actions* § 3:75 (5th ed. 2019). "For instance, courts have found that Class counsel cannot adequately represent two sets of claimants if, in limited fund situations, the recovery of one set will cut directly into those of another, if the substantive law will permit recovery only by one or the other set of litigants, or if one client is litigating an appeal to a Class action settlement in which another claimed recovery." *Id.* (footnotes omitted).  None of the circumstances in which courts have found conflicts are present here.[5]  That is because, while there will be allocation

---

*Footnote continued from previous page*

bit like permitting a fox, although with a pious countenance, to take charge of the chicken house."  *Eggleston v. Chi. Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890, 895 (7th Cir. 1981).

[5] *See Bell v. Disner*, 3:14cv91, 2018 WL 296035, at *3 (W.D.N.C. Jan. 4, 2018) ("Courts have generally held that the mere existence of parallel representation does not create an insurmountable conflict of interest.") (collecting cases), aff'd sub nom. *Bell v. Brockett*, 922 F.3d 502 (4th Cir. 2019); *Sandoval v. M1 Auto Collisions Ctrs.*, 309 F.R.D. 549, 570 (N.D. Cal. 2015) (rejecting "[d]efendants' suggestion that the mere fact that Plaintiffs' counsel are maintaining a second Class action against them renders counsel inadequate"); *Mehl v. Canadian Pac. Ry. Ltd.*, 227 F.R.D. 505, 515 (D.N.D. 2005) ("Most courts have held that Class counsel may represent more than one Class against the same set of defendants . . . .").

negotiations no matter who represents whom, all plaintiffs here are aligned in seeking to hold Defendants accountable for the same common course of conduct.

### 3. The Claims of the Representative Plaintiffs are Typical of Class Members, and Common Questions of Law and Fact Predominate

By fixating on a contrived laundry list of purportedly non-common issues to argue an absence of typicality, commonality, and predominance, Defendants miss the mark. Individual issues often, if not always, exist; that fact is the bedrock of a Rule 23(b)(3) Class. *Amchem*, 521 U.S. at 615.[6]

Here, more so than in most certified Classes, the fact that claims are typical and based on common facts can be shown—and has been shown—by a survey of the actual, filed factual allegations and claims asserted by members of the Class and their proposed representatives. And, when a proper predominance analysis is conducted, it is clear that common issues predominate.

In *Martin v. Behr Dayton Thermal Prods., LLC*, 896 F.3d 405 (6th Cir. 2018), the Sixth Circuit explained that "[t]o evaluate predominance, '[a] court must first *characterize* the issues in the case as common or individual and then *weigh* which predominate.'" *Id.* at 413 (citing  2 *Newberg on Class Actions* § 4:50) (emphasis in original). Defendants do not, and cannot, explain how the generalized issues identified in their Opposition, like an entity's demographics or funding scheme, should be accorded more weight than the central questions concerning national Defendants' course of conduct facing thousands of cities and counties across this country: what Defendants knew, when they knew it, and whether or not they contributed to opioid abuse,

---

[6] It is a mantra of the Supreme and Circuit Courts that individualized damages do not defeat predominance. *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016); *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353 (3d Cir. 2015; *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010*, 910 F. Supp. 2d 891 (E.D. La. 2012), *aff'd*, 739 F.3d 790, 817 (5th Cir. 2014); *Sears, Roebuck & Co. v. Butler*, 727 F.3d 796, 799 (7th Cir. 2013); *Pulaski. & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015), citing *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 544 (9th Cir. 2012); and *Nguyen v. Nissan Motor Corp.*, No. 18-16344, 2019 WL 3368918 (9th Cir., July 26, 2019)(same).

addiction, and diversion.  *See* Opp. at 28.  As Plaintiffs' analysis demonstrates, there is an

overwhelming degree of alignment between Class Members' claims and allegations.[7]  Regardless

of an entity's size and funding scheme, its case will live or die based on the answers to the

central questions.

Defendants claim the evidence needed to prove Class Members' claims varies widely,[8]

but their own argument highlights a single source of proof that can be used by all Class

Members.  *See* Opp. at 34-36.  Defendants argue for two pages that ARCOS data is needed to

establish causation and scope of harm in this MDL, but ARCOS data can be, and already has

been, analyzed and applied both nationwide and locally in one fell swoop in the MDL.  ARCOS

shows that all communities have been exposed and impacted.  In trying to avoid predominance

(and morph their nationwide suspicious order monitoring [SOM] policies in a way that fits *Wal-*

*Mart*), Defendants assert that their various facilities' SOM systems may have varied "by

defendant, over time, and by location."  Opp. at 36 n.35.  But there is no question that all of these

defendants had the same uniform, statutory, nationwide duties to prevent diversion by

monitoring, reporting and suspending suspicious orders; and substantial evidence has been

produced (and submitted to the court) demonstrating that these defendants all failed in their

duties, in Plaintiffs' summary judgment motions and numerous expert reports summarizing

---

[7] Defendants' attempt to invalidate Plaintiffs' statistics by focusing on claims outside of those specifically addressed in the Motion (*e.g.*, consumer protection claims) fails.  Opp. at 29-33.  Class representatives often seek to certify certain claims over others; the fact that Class Members may have brought other claims is inconsequential, especially here where answers to the aggregation-enabling questions will also drive resolution of those claims.  The Texas state MDL cases to which Defendants point is a prime example—these cases (for example, the recently-selected Texas bellwether cases) will stand or fall on the same liability questions regarding defendants' knowledge, conduct, and duty that drive the MDL complaints.

[8] The showing in the Memorandum, based on Plaintiffs' thorough analysis of the complaints, makes clear that common questions predominate.  By focusing on evidence, Defendants miss the point of *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013) that "Rule 23(b)(3) requires a showing that ***questions*** common to the Class predominate, not that those questions will be answered, on the merits, in favor of the Class."  (emphasis in original).

Defendants' SOMs failures.[9]  Regardless, the issue of what is required to demonstrate SOMs compliance is not only common to the Class, but also to Defendants.  That a distributor flooded counties with opioids in differing amounts does not make the flooding individualized; the fact of it and the conduct that caused it are the common and predominating questions.

      **4.**      **Defendants Do Not Suggest a Superior Method of Resolving the Proposed Class's Claims**

The Distributor and Pharmacy Defendants' challenge to superiority fails to meaningfully address the four superiority factors described in *Amchem*, 521 U.S. at 616, or to explain what, if any, "other means" and "available alternatives" exist.  Opp. at 45.  This Court is well aware that "[n]obody has . . . the capability to try all of these cases" and that "the cases cannot be settled piecemeal, one at a time."  June 25, 2019 12:02 p.m. Hr'g Tr. at 6:16-17, 6:24-25.  Plaintiffs' proposal is an attempt to address this reality.  There is a clear benefit to centralizing resolution efforts, and negotiating with a fully participatory, unified Class is far more manageable than thousands of piecemeal settlements – *or trials*.  Mem. at 87-92.  Plaintiffs' proposed Class is superior to one-by-one settlements, to trudging forward with litigating the thousands of individual cases currently clogging court dockets, and to the non-existent or previously-rejected alternatives.  *See Klay v. Humana, Inc.,* 382 F.3d 1241, 1270 (11th Cir. 2004) (noting that Class actions offer "substantial economies of time, effort, and expense," whereas one-by-one

---

[9] The Controlled Substances Act, 21 U.S.C. §§ 801, *et seq.* ("CSA") and DEA regulations categorically require Defendants to maintain effective controls against diversion, to design and operate systems to identify "suspicious orders", and to report them to the DEA when discovered. The CSA requires Defendants to refrain from shipping orders flagged as "suspicious" unless it has been determined that the order is not likely to be diverted.  As bellwether Plaintiffs/Proposed Class Representatives Summit and Cuyahoga Counties' recently filed summary judgment motions elucidate, Defendants did none of that. They failed to design serious suspicious order monitoring systems ("SOMs") that would identify suspicious orders (defined by the DEA to include orders unusual size, frequency, or pattern); they failed to report them; and they shipped these orders anyway.  *See* Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Adjudication that Defendants Did Not Comply With Their Duties Under the Federal Controlled Substances Act to Report Suspicious Opioid Orders and Not Ship Them (Second Corrected Brief) (Doc. #1910-1; Filed: 07/19/19).

- 12 -

adjudications are "costly, inefficient, and . . . a burden [on] the court system") (citations and internal quotations omitted).

The Distributor and Pharmacy Defendants also take issue with the supermajority voting requirement of 75% approval.  For them, this figure is so high as to be unattainable and should be grounds for rejecting the proposed Negotiation Class.  The source of their certainty is unclear, as this same 75% threshold has been used for years in asbestos trust formation, with no evidence of it being unattainable.  Perhaps these Defendants are objecting that a high approval threshold from the Class will make it difficult to cram down a bad deal.  If so, Movants embrace the difficulty as a superiority (and adequacy) plus-factor—evidence that the interests of the Class are well-protected.

## III.    The Proposed Negotiation Class Respects the Roles of the States and Does Not Usurp State Sovereignty

The AGs' federalism concern is an important one, but it misses the mark of what can be negotiated in the federal MDL. To date, most comprehensive and centralized litigation efforts have occurred in the MDL.  MDL plaintiffs have made extraordinary efforts and incurred substantial expense, for over 18 months, to document misconduct of all defendants and the localized impact.  To date, the only impact-based distribution system proposed for epidemic-combatting remedies has come from the MDL litigation leadership.  The simple reality is that the MDL process has been carrying the freight for all claimants against all defendants.

And yet, there is nothing in the negotiation Class proposal that would foreclose State consent decrees as essential features of any settlement – or indeed as the exclusive form for any settlement.  The Negotiation Class would *not* "strip state courts of the authority to settle cases properly before them."  Attorney General Amicus Letter (Dkt. No. 1951) at 4.  To be clear:  the Negotiation Class precludes no separate peace.  Agreement within a State, between a State, and

- 13 -

its subdivisions, is a highly desired approach to resolution, does not involve the Class, and would not require a Class vote.  Whether such a resolution can be realized is a matter between the States and the various defendants, including the many that the States have not sued.  If such a peace can be obtained, all the better.  If not, there must be other avenues to pursue.

Everyone recognizes that the States' own cases are theirs to prosecute or resolve.  But federalism works both ways.  The opioids MDL litigation exists, the need for proactive and centralized case management of its thousands of federal actions has been determined by the Judicial Panel on Multidistrict Litigation, and this Court has an express statutory obligation to manage the federal cases transferred to it in this MDL.  28 U.S.C. § 1407.  The cities and counties are MDL litigants with existing federal and state claims against manufacturers, distributors, and pharmacies[10] to recover their own damages and obtain necessary equitable relief for their communities.  The Case Track One cases have survived motions to dismiss, have completed fact and expert discovery (including 500+ depositions and 150+ million pages of data), are in the midst of intensive *Daubert* and summary judgment briefing, and are headed to federal trial.  The MDL litigation is every bit as real as the States' activities, and its management, adjudication, and resolution must be the concern of this Court.  The Negotiation Class simply provides it with a means to enfranchise actual MDL litigants in the existing settlement discussions the MDL is hosting.

Much of the AGs' concern is asserted on behalf of Class members, but the widespread Class member objections AGs predicted has not materialized.  The AGs raise secondary issues concerning, *inter alia*, the notice given to Class members, the quality of the FAQs, and the

---

[10] While national Distributors and Pharmacies are a major focus of the MDL and the cities' and counties' related state court litigation, in which trials involving these Defendants are set for 2019 and 2020, it appears that fewer than ⅓ of States have sued Distributors, and only a scant handful have sued Pharmacies.

1815019.9

protections afforded Class members to object or opt out.  But that is a matter for the Class members, and none seems to have any issue with the notice, the FAQs, or the opt-out process (save for a handful who raise the issue of a second opt out).  More fundamentally, it is incorrect and disingenuous to suggest the Class has a less active voice here than in an ordinary settlement. This proposal gives more authority to Class members than a typical litigated Class certification (with an opt-out deadline) that is followed by a settlement.  Here, crucial information is provided up front, before opt-out, and Class members will have a chance to object under Rule 23(e) to any settlement approved by a super-majority.[11]

The AGs play into the Balkanization problem by suggesting that there must be representatives from every state and from every size (largest to smallest) county and city.  No court has ever imposed such a requirement.  To the contrary, such arguments have been routinely dismissed.[12]  The AGs' superiority argument is likewise misplaced and untimely.[13]  How could it be superior for Class counsel representatives to negotiate a settlement on behalf of all cities and counties <u>without</u> the negotiation Class structure?  How would that process work?  How is it fairer to Class members than this one?  Given the AGs' worry that our proposal would take time, how is the alternative proposed approach (with a blow-up provision if there are too many opt outs) likely to be done more quickly?  The whole point of our novel approach is that the traditional way of negotiating a Class settlement hasn't worked here.

---

[11] The point that the ALI project is opt-in rather than opt-out is a distinction without a difference.  The ALI project did not address the use of a super-majority in a Class action; the whole point of the Negotiation Class is to *extend* the ALI concept to Class actions.  Opt-out Classes are routinely certified and approved under Rule 23(b)(3); it is difficult to understand how the opt-out nature of the proposal renders the ALI analogy inapt.

[12] Of course, this Court is free to direct that additional Class representatives and Class counsel be designated, just as it may direct that a master or model complaint incorporating the negotiation Class parties and claims be filed.

[13] The Negotiation Class proponents agreed to continue their motion, at the AGs' request, to give the AGs more time to reach agreement with certain defendants under alternative structures.  To date, these have not succeeded.

- 15 -

There is similarly no basis to contend that attorneys' fees would be excessive. There are no fees awarded at this point, as there is no settlement in place. And it is striking that no Class member objected on this ground. But the main point is that the Negotiation Class proposal keeps intact *all* of the Rule 23 protections on fee issues. The proposed structure places *all* fees under Special Master and MDL Court control, under a robust body of fees-regulating Rule 23 case law. The proposed fee committees build in a fair, inclusive and voluntary application process, neutral evaluation, and inescapable court scrutiny, designed to assure a system for the fair, proportional, and non-duplicative compensation of *all* counsel whose contributions of costs and work, in the MDL and the state courts, actually contribute to the recovery for the Class, and for their Class member clients.

## IV.  City of Fargo is a Member of the Proposed Class

City of Fargo seeks to be classified as litigating rather than non-litigating for purposes of the Negotiation Class. But other than changing respective voting pools, altering the "filed by" date has no practical purpose. Fargo is already a proposed Class member with full participatory rights. All Class Members, litigating or not, are treated identically. Fargo may opt out, and if not, it is subject to the same allocation criteria as other Class members; it is entitled to vote on any settlement presented to the Class, and it enjoys equal opportunity to apply to the Class Members' Special Needs Fund.

## V.  The Sole Opposition from Within the Class Underscores the Propriety of the Negotiation Class.

By their own admission, "Certain Plaintiffs" tie themselves to the arguments of the Distributors and Pharmacies.[14] As a result, the same arguments in reply will not be repeated here. The central point that Certain Plaintiffs seek to add concerns the status of future claimants,

---

[14] "Certain Plaintiffs" are six Ohio cities who filed a late opposition, since joined by a seventh. They are the only potential Class members to file an opposition.

which brings with it the concerns of *Ortiz*[15] and of the role of a future claims representative

under Section 524(g) of the Bankruptcy Code.  11 U.S.C. § 524(g). The comparison to asbestos

workouts is curious, to say the least.  In asbestos, the key issue is that all persons alive in the

United States through the period of asbestos use (and beyond) are potentially at risk, and have no

reason to think themselves part of an asbestos Class unless, and until, misfortune should strike.

Here, by contrast, the proposed Class is made up of all cities and counties in the United

States, each of whom will receive individual notice, and many of whom have already accessed

the Class website and allocation map.  There are no "future Class members":  any future cities

and counties will have to be carved from the territory of the United States that is already entirely

covered by the proposed Class.  As for any future shifts in the locus of addiction, that is a policy

decision best exercised by the cities and counties themselves on their own behalf.  The claim that

there are unknown futures here whose interest is compromised by the present Class members

who are currently battling a real and present public health crisis is just bizarre under the facts of

this case.

More fundamentally, Certain Plaintiffs misunderstand the role of the Class

representatives and Class counsel in this Class as opposed to the cases they identify.  *Ortiz* is an

example of a massive Class that encompassed much of the American population.  Most were

likely to be passive in the face of a settlement that they simply did not know applied to them, as

they were unaware of any asbestos exposure and had not manifested symptoms of asbestos-

implicated disease.  Their only protection was the "structural assurances" of fairness, as defined

by *Amchem*.  Here, cities and counties across the country are all too aware of the existence of the

opioids epidemic and its present and direct impact on their communities.  Here, the role of the

---

[15] *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).

Class representatives and subClass counsel is to present to the entire Class in any proposed settlement.  The only settlement authority lies with the Class as a whole, subject to the Court's approval, and decidedly not with the Class representatives.  The Class itself gets to vote; no one, including the Class representatives, decides for the Class.  (And, contrary to the assertion by Certain Plaintiffs, the voting model is exactly what is used in Section 524(g) concerning the supermajority of votes cast. Certain Pls.' Mem. in Opp. to Renewed and Am. Mot. for Certification of Rule 23(b)(3) Cities/Counties Negotiation Class (Dkt. No. 1958) at 14).  *See* 11 U.S.C. § 524(g)(2) (B)(ii)(IV) (bb) ("a separate Class or Classes of the claimants whose claims are to be addressed by a trust described in clause (i) is established and votes, by at least 75 percent of those voting, in favor of the plan").

The "Certain Plaintiffs" represent a grand total of .02% of the Class, that is, two hundredths of one percent of the Class.[16]  These cities are free to opt out and pursue any strategy without disrupting a proposal that has the participatory approval of 99.98% of the cities and counties already, and from whom there are no objections.

## VI.    A Second Opt-Out Right is Discretionary, Not Required, and Both the Notice and Proposed Order Are Sufficient

The sole objection directly tied to the operation of the Negotiation Class in relation to the "traditional" settlement Class by this handful of Class members, relates to opt-out provisions. Rule 23(e)(4) provides for a discretionary grant of a second opt out at the settlement stage.  *See* 3 *Newberg on Class Actions* § 9:34.  Of course, the Court retains that discretion here, to apply it and when appropriate, but courts have rarely done so, and it is not a due process requirement. *Low v. Trump Univ. LLC*, 881 F.3d 1111, 1121 (9th Cir. 2018).  The rationale for a second opt-

---

[16] Six Ohio entities are represented by the same counsel, who previously sought and was denied a leadership position representing all cities and counties and, who, curiously, is co-counsel with PEC members in representing other Class Members who do not oppose the Class.

1815019.9

out, as articulated by the Advisory Committee note to the 2003 Rule 23(e) amendment, is that a "decision to remain in the Class is likely to be more carefully considered and is better informed when the settlement terms are known."  Of course, here, each Class member already knows its share of any Class Settlement: the Allocation Map provides this information, and the FAQs describe the allocation methodology on which it is based, up front.  This is *more* information than is frequently available at the Rule 23(e) settlement stage, when the total settlement fund amount is known, but a Class member's share is not.

## VII.    The Negotiation Class Does Not Toll Statutes of Limitations

The Manufacturer Defendants correctly note that the proposed Class: (1) will not be utilized to litigate any claim, and (2) does not impact the claims of any party.  Accordingly, we agree, and the Court should hold, that certification of a Negotiation Class has no impact on applicable statutes of limitations or tolling thereof.

## VIII.   Conclusion

Movants respectfully urge this Court to exercise its discretion to certify the Negotiation Class under Rule 23(b)(3); designate the proposed Class Representatives, and appoint the proposed Class Counsel under Rule 23(g), to represent the Class; approve and direct Class Notice under Rule 23(c); and set an appropriate exclusion ("opt-out") deadline under Rule 23(c)(2)(B).

Dated:  July 30, 2019        *Proposed Co-Lead Class Counsel*

By:      /s/ Jayne Conroy
      Jayne Conroy

SIMMONS HANLY CONROY LLC
112 Madison Avenue
New York, NY 10016
Tel:    212-784-6401
Fax:    212-213-5949

By:      /s/ Christopher A. Seeger
      Christopher A. Seeger

SEEGER WEISS LLP
55 Challenger Road 6th Floor
Ridgefield Park, NJ 07660
Tel:    973-639-9100
Fax:    973-639-9393
Email:  cseeger@seegerweiss.com

*Proposed Class Counsel*

J. Gerard Stranch, IV
BRANSTETTER, STRANCH & JENNINGS, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
Tel:    615-254-8801
Fax:    615-255-5419
Email:  gerards@bsjfirm.com

Zachary Carter
NEW YORK CITY LAW DEPARTMENT
CORPORATION COUNSEL OF THE CITY OF NEW YORK
100 Church Street
New York, NY 1000
Tel:    (212) 345-1000
Email   zcarter@law.nyc.gov

Louise Renne
RENNE PUBLIC LAW GROUP
350 Sansome Street, Suite 300
San Francisco, CA  94104
Tel:    415-848-7200
Fax:    415-848-7230
Email: lrenne@publiclawgroup.com

Mark A. Flessner
CORPORATION COUNSEL
CITY OF CHICAGO
121 North LaSalle Street, Suite 600
Chicago, IL  60602
Tel:    (312) 744-0200
Email:

*Plaintiffs Co-Lead Counsel*


By:    /s/ Joseph F. Rice
         Joseph F. Rice

MOTLEY RICE LLC
28 Bridgeside Blvd. 17th Floor
Mount Pleasant, SC  29464
Tel:    843-216-9000
Fax:    843-216-9450
Email: jrice@motleyrice.com

Paul T. Farrell, Jr.
GREENE KETCHUM, FARRELL, BAILEY & TWEEL, LLP
419 Eleventh Street
Huntington, WV  25701
Tel:    304-525-9115
Fax:    304-529-3284
Email: paul@greeneketchum.com

Paul J. Hanley, Jr.
SIMMONS HANLY CONROY LLC
112 Madison Avenue
New York, NY 10016
Tel:    212-784-6401
Fax:    212-213-5949

*Plaintiffs' Liaison Counsel*

By:    /s/ Peter Weinberger
       Peter Weinberger

SPANGENBERG SHIBLEY & LIBER, LLP
1001 Lakeside Avenue, E, Suite 1700
Cleveland, OH 44114
Tel:    216-696-3232
Fax:    216-696-3924
Email: pweinberger@spanglaw.com

Steve Skikos
SKIKOS, CRAWFORD, SKIKOS AND JOSEPH
1 Sansome Street, Suite  2830
San Francisco, CA 94104
Tel:    415-546-7300
Fax:    415-546-7301
Email: sskikos@skikos.com

Troy Rafferty
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
 RAFFERTY AND PROCTOR
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Tel:    850-435-7163
Fax:    850-436-6163
Email: trafferty@levinlaw.com

*Plaintiffs' Executive Committee*

By:    /s/ Elizabeth J. Cabraser
       Elizabeth J. Cabraser

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Tel:    415-956-1000
Fax:    415-956-1008
Email: ecabraser@lchb.com

1815019.9

Don Barrett
BARRETT LAW GROUP,
404 Court Square, P.O Box 927
Lexington, MS 39095
Tel:     662-834-2488
Fax:     662-834-2628
Email: DonBarrettPA@gmail.com

James E. Cecchi
CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY &
  AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
Tel:     973-994-1700
Fax:     973-994-1744
Email: jcecchi@carellabyrne.com

Erin K. Dickinson
CRUEGER DICKINSON LLC
4532 North Oakland Avenue
Whitefish Bay, WI 53202
Tel:     414-210-3767
Email: ekd@cruegerdickinson.com

James R. Dugan, II
THE DUGAN LAW FIRM, APLC
365 Canal Street, Suite 1000
New Orleans, LA 70130
Tel:     504-648-0180
Fax:     504-648-0181
Email: jdugan@dugan-lawfirm.com

By:     /s/ Paul J. Geller
          Paul J. Geller

ROBBINS GELLER RUDMAN & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Tel:     561-750-3000
Fax:     561-750-3364
Email: pgeller@rgrdlaw.com

- 23 -

Michael J. Fuller
MCHUGH FULLER LAW GROUP
97 Elias Whiddon Road
Hattiesburg, MS 39402
Tel:     601-261-2220
Fax:     601-261-2481
Email:  mike@mchughfuller.com

R. Eric Kennedy
WEISMAN KENNEDY & BERRIS CO., LPA
1600 Midland Bldg.
101 Prospect Avenue, W
Cleveland, OH 44115
Tel:     216-781-1111
Fax:     216-781-6747
Email:  ekennedy@weismanlaw.com

W. Mark Lanier
LANIER LAW FIRM
6810 FM 1960 West
Houston, TX 77069
Tel:     713-659-5200

Peter J. Mougey
LEVIN, PAPANTONIO, THOMAS, MITCHELL, RAFFERTY &
  PROCTOR, PA
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Tel:     850-435-7068
Fax:     850-436-6068
Email:  pmougey@levinlaw.com

Ellen Relkin
WEITZ & LUXENBERG, P.C.
700 Broadway 5th Floor
New York, NY 10003
Tel:     212-558-5715
Fax:     212-344-5461
Email:  erelkin@weitzlux.com

- 24 -

Lynn Sarko
KELLER ROHRBACK
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel:     206-623-1900
Fax:     206-623-3384
Email: lsarko@kellerrohrback.com

Hunter J. Shkolnik
NAPOLI SHKOLNIK PLLC
400 Broadhollow Road, Suite 305
Melville, NY 11747
Tel:     212-397-1000
Fax:     646-843-7603
Email: hunter@napolilaw.com

Roland Tellis
BARON & BUDD, P.C.
15910 Ventura Blvd., Suite 1600
Los Angeles, CA 91436
Tel:     818-839-2333
Fax:     818-986-9698
Email: rtellis@baronbudd.com

James D. Young
MORGAN & MORGAN
76 South Laura Street, Suite 1100
Jacksonville, FL 32202
Tel:     904-361-0012
Fax:     904-366-7677
Email: jyoung@forthepeople.com

*On the Brief*:
Samuel Issacharoff
40 Washington Square South
New York, NY 10012
Tel:     (212) 998-6580
Email: si13@nyu.edu

1815019.9