**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE NATIONAL PRESCRIPTION** **OPIATE LITIGATION** | **MDL No. 2804** **Case No. 17-md-2804** **Judge Dan Aaron Polster** |

**This document relates to:**
*The County of Cuyahoga v. Purdue*
*Pharma L.P., et al.,* Case No. 17-OP-45004

*The County of Summit, Ohio, et al. v.*
*Purdue Pharma L.P. et al.*,
Case No. 18-OP-45090

---

**REPLY IN SUPPORT OF SPECIALLY APPEARING DEFENDANT ALLERGAN PLC**
**MOTION TO DISMISS PURSUANT TO RULE 12(B)(2)**
**FOR LACK OF PERSONAL JURISDICTION**

Plaintiffs ask this Court to exercise personal jurisdiction over Ireland-based Allergan plc based on mischaracterizations of Allergan plc's corporate structure and operations.  Indeed, in their Opposition, they simply describe the activities of Allergan plc's direct or indirect subsidiaries—three of which are Defendants in these cases and actually subject to personal jurisdiction—but they provide no basis to characterize them as the activities of the parent holding company.

*First*, Allergan plc cannot be subject to personal jurisdiction in this Court as the implied successor-in-interest to Allergan Finance, LLC, formerly known as Actavis, Inc., based on two undisputed facts: (1) Allergan Finance, LLC is a going concern with over $90 billion in reported assets and is a Defendant in these cases, and (2) Allergan plc never acquired *any*, let alone substantially all, of Allergan Finance, LLC's assets.  *See In re Welding Fume Prod. Liab. Litig.*, No. 1:03-cv-17000, 2010 WL 2403355, at *7 (N.D. Ohio June 11, 2010) (where, as here, "the original entity still exists, there is no successor—and no successor liability."); *Transp. Ins. Co. v.*

*Busy Beaver Bldg. Ctrs., Inc.*, 969 F. Supp. 2d 875, 886 (S.D. Ohio 2013) ("For a purchaser to even have the potential to be a successor, there must be a sale or transfer of all the assets of the selling company.").

**Second**, Plaintiffs' assertion that Allergan plc conducted business in Ohio is contrary to the undisputed facts.  For example, Plaintiffs' assertion that "'Allergan plc . . . maintains a production and packaging facility' in Ohio" (Dkt. 1823, Plaintiffs' Memo. of Law in Opp'n (hereinafter "Opp'n Br." at 2)) is false.  That facility in fact has never been owned or operated by Allergan plc; it is and has been owned and operated by Allergan Sales, LLC, one of the Defendants in this case.  (Ex. 1, 7/25/19 D'Arecca Aff. at ¶ 4.)  Plaintiffs tell the Court that Allergan plc owns and operates this Ohio facility based on (1) a statement from the University of Cincinnati[1] and (2) a statement in Allergan plc's consolidated financial statements that "we" have manufacturing sites in various locations across the world.  Of course, a third party's incorrect characterization of Allergan's operations cannot subject Allergan plc to jurisdiction.  *See Hanson v. Denckla*, 357 U.S. 235, 253 (1958) ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.").  Nor can Allergan plc's use of personal plural pronouns in its consolidated financial statements, as such pronouns are consistent with SEC guidance for public filings and simply describe the facilities owned by subsidiaries whose operations Allergan plc is required to report on a consolidated basis in its SEC filings.[2]  *See Landis v. Jarden Corp.*, No. 2:11-cv-101, 2012 WL 12892209, at *3

---

[1]  Plaintiffs cite a University of Cincinnati study that stated, "Allergan plc . . . maintains a production and packaging facility" in Ohio.  *See* Opp'n Br. at 2; Pl. Ex. 3.  As noted above and discussed further below, the University of Cincinnati's incorrect attribution of this facility to Allergan plc cannot warrant the exercise of personal jurisdiction.

[2]  Plaintiffs also claim  that Allergan plc maintains its administrative headquarters in New Jersey.  They do not explain how that fact would subject Allergan plc to jurisdiction in this Court.  Regardless, the New Jersey "headquarters" is actually leased from a third party by Defendant Allergan Sales, LLC.  (Ex. 1, 7/25/19 D'Arecca Decl. at ¶ 3.)

(N.D.W. Va. Mar. 9, 2012) ("[A] holding corporation is obligated to present SEC reports on a consolidated basis…").

**Third**, Plaintiffs' alter-ego arguments also fail as a matter of law because they fail to address, let alone satisfy, the second two prongs required for that rare exception: (1) that Allergan plc exercised control over unidentified subsidiaries by committing fraud or illegal acts and (2) that such fraud injured Plaintiffs.  Moreover, Plaintiffs' allegations of "control" are based on further mischaracterizations.  For example, Plaintiffs tell the Court that Allergan plc's sworn assertion that it does not finance or control the daily affairs of its subsidiaries is false because an accounting policy (Opp'n Br. Ex. 5) allegedly states "that 'any new loan and/or cash movement.' among subsidiaries 'must be approved by **[the PLC]** prior to cash movement.'"  (Opp'n Br. at 2)  Setting aside that this would not establish the level of control to justify an alter-ego finding, the actual quote from Plaintiffs' Exhibit 5 is, "any new loan and/or cash movement must be approved by **treasury** via email prior to cash movement." (emphasis added).  Allergan's 30(b)(6) witness explicitly testified that "people who report to me as part of the treasury function, they would also be employees of Allergan Sales, LLC."  (Ex. 2, Kaufhold Dep. Tr. at 139.)  Plaintiffs' bracketed replacement of "PLC" to replace "treasury" is disingenuous in light of the record.

Stripped of rhetoric and misstatements, the record is clear that Allergan plc is a holding company based in Dublin, Ireland, which does not conduct business in the United States.  Because the appropriate well-financed Allergan entities are already Defendants in this case, this Court should not accept Plaintiffs' invitation to erroneously exercise jurisdiction over this Irish holding company in contravention of the United States Constitution and settled Ohio law.

I.     **PLAINTIFFS' EVIDENCE FALLS FAR SHORT OF THE PREPONDERANCE OF THE EVIDENCE STANDARD.**

As a threshold matter, Plaintiffs misstate their burden, arguing that to survive Allergan plc's motion they "need only make a prima facie showing" of personal jurisdiction.  (Opp'n Br. at 4.)   At Plaintiffs' insistence and over Allergan plc's objection, Allergan plc participated in discovery for over a year, including (1) participating in a 30(b)(6) deposition, (2) producing documents and responding to interrogatories during fact discovery, and (3) producing documents and responding to interrogatories during extensive jurisdictional discovery pursuant to Court order.  (Ex. 3, Dkt. 1512, Jurisdictional Discovery Order.)  Plaintiffs cannot have it both ways:  "When, as here, the district court allows discovery on the motion, the court should consider the facts offered by both parties and rule according to the preponderance of the evidence."  *SFS Check, LLC v. First Bank of Del.*, 774 F.3d 351, 356 (6th Cir. 2014); *see also One Media IP Ltd. v. S.A.A.R. SrL*, 122 F. Supp. 3d 705, 715 (M.D. Tenn. 2015) (same); *Williams v. MD Helicopters, Inc.*, No. 14-13787, 2015 WL 4546770, at *2 (E.D. Mich. July 28, 2015) (same); *Lyman Steel Corp. v. Ferrostaal Metals Corp.*, 747 F. Supp. 389, 392 (N.D. Ohio 1990) ("While the opportunity for discovery and depositions is critical, Plaintiffs have only to meet a prima facie burden at this stage. Following discovery, they will have to meet the burden of a preponderance of the evidence.").[3]

Plaintiffs argue the lower "prima facie" standard should nonetheless apply because "Allergan plc has not produced all of the jurisdictional discovery it was ordered to produce."

---

[3]  Plaintiffs fault Allergan plc for not updating its motion to dismiss after Plaintiffs filed their Third Amended Complaint, claiming Allergan plc "ignores" the allegations in that Complaint.  (Opp'n Br. at 4.)  But Plaintiffs ignore that the Court granted leave to file the Third Amended Complaint only to add new parties, not to add or change substantive allegations against existing parties like Allergan plc.  (Dkt. 1106, Order Modifying CMO-1)  In any event, Plaintiffs do not identify a single substantive allegation in the Third Amended Complaint that is different from the Second Amended Complaint.  Like much of their brief, this argument lacks any substance or import to the jurisdictional question actually before the Court.

(Opp'n Br. at 5.)  That is incorrect as both a matter of law and fact.  Plaintiffs cite no authority suggesting that, in the event of a discovery dispute, the remedy would be to lower the standard of proof in the Sixth Circuit.  If Plaintiffs thought there was discovery missing, their remedy was to file a motion to compel, not to ask for a lower burden in response to a substantive motion.  *See Reyes v. Wilson Mem'l Hosp.*, 102 F. Supp. 2d 798, 826 (S.D. Ohio 1998) (denying motion for extension of time based on allegedly missing discovery because "[t]he remedy for a party that has not complied with requests for discovery is a motion to compel").  Here, Plaintiffs never filed such a motion.  The reason is obvious: Plaintiffs do not identify any missing discovery, nor could they.

As Allergan plc reported to Special Master Cohen on June 16, 2019, Allergan turned over the final "two outstanding pieces of jurisdictional discovery" shortly after June 16.  (Ex. 4, 6/16/19 Knapp email to Cohen.)  Indeed, Plaintiffs cite one of those pieces of evidence, the 2013-2015 general ledger, in their brief.  (Opp'n Br. at 24.)  Plaintiffs instead conjure up supposedly "missing" documents—like undefined accounting policies above and beyond the hundreds of pages of policies already produced and that Plaintiffs rely on in their brief—that Allergan plc repeatedly told Plaintiffs "simply do not exist."  (Ex. 5, 6/14/2019 Welch email to Cohen.) Plaintiffs got the full benefit of wide-ranging jurisdictional discovery and voluntarily chose not to pursue such a motion.  There is no basis to lower the standard on this motion.[4]

## II.    ALLERGAN PLC IS NOT THE SUCCESSOR IN INTEREST TO ACTAVIS, INC. (NOW ALLERGAN FINANCE, LLC).

Plaintiffs' primary argument in support of personal jurisdiction is that Allergan plc is the successor in interest to Actavis, Inc., which changed its name to Allergan Finance, LLC in 2016.

---

[4] In any event, Plaintiffs do not satisfy the "prima facie" standard because their successor-in-interest arguments fail as a matter of law and they have not addressed two of the three prongs of the alter-ego analysis.  Nevertheless, if the Court disagrees, Allergan respectfully requests an evidentiary hearing on these issues.  Holding such a hearing would be far more efficient than waiting to resolve these jurisdictional issues in an already-too-crowded trial.

But Plaintiffs overlook two undisputed facts that render the successor-in-interest analysis wholly inapplicable here: (1) Allergan Finance, LLC still exists as an ongoing concern, and (2) Allergan Finance, LLC and Allergan plc did not engage in an asset sale.  Because these two unchallenged facts render successor liability inapplicable as a matter of law, there is no need to proceed with Plaintiffs' arguments regarding the exceptions to the successor nonliability rule.  Indeed, unlike in the two cases where courts found that the plaintiffs had made a prima facie showing that Allergan plc was Allergan Finance, LLC's successor, this Court now has a fully-developed factual record and need not accept Plaintiffs' factually and legally flawed characterization of the relationship between Allergan plc and Allergan Finance, LLC as fact.

The Northern District of Illinois found that the plaintiffs there had satisfied the prima facie standard because Allergan plc's 10-K's "suggest[ed] that Actavis plc simply continued the business of Actavis, Inc."  *See City of Chicago v. Purdue Pharma L.P.*, No. 14 C 4361, 2015 WL 2208423, at *7 (N.D. Ill. May 8, 2015).   However, the court expressly acknowledged: "[T]his evidence does not definitively establish that Actavis plc [now Allergan plc] is Actavis, Inc.'s successor."  *Id.* at *7.  If the Chicago case proceeded to jurisdictional discovery (as these cases have), Allergan plc would have presented the evidence and legal arguments outlined in this reply, which, based on the case cited by the Chicago court, would defeat Plaintiffs' personal jurisdiction argument.  *See Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 785 (7th Cir. 2003) ("We do not believe that the record before us permits the conclusion that SSBO France is a 'mere continuation' of Sterling.  It did not merge with Sterling, **nor did it purchase all (or substantially all) of Sterling's assets**." (emphasis added)); *see also BASF Corp. v. POSM II Properties P'ship, L.P.*, No. 3608-VCS, 2009 WL 522721, at *8 (Del. Ch. Mar. 3, 2009) ("A holding corporation like LyondellBasell must present reports of their affairs on a consolidated

6

basis.  The fact that holdings corporations do so does not render all their subsidiaries inutile, deprived of all their separate legal dignity." (internal quotation omitted)).  The decision in the Ohio Attorney General lawsuit likewise is distinguishable because the court there adopted the reasoning of the *City of Chicago* decision on a similarly incomplete pre-discovery record.  *See State of Ohio ex rel. Dewine v. Purdue Pharma L.P., et al.*, No. 17 CI 261, 2018 WL 4080052, at *7 (Ohio Ct. of Common Pleas Aug. 22, 2018) ("This Court also adopts the reasoning of the court in *City of Chicago v. Purdue Pharma L.P.* N.D. Ill. No. 14C4361, 215 WL 2208423, finding the evidence sufficient at the stage of a motion to dismiss that Actavis PLC is the successor to Actavis, Inc.").  These courts did not address the evidence this Court has before it that shows (1) there is no successor to Allergan Finance, LLC because it is an ongoing concern with $90.8 billion in assets (*see* Ex. 6, Allergan plc 2018 10-K at F-91), and (2) the transaction that created Allergan plc was not an asset sale that would even present the possibility of successor liability.  Under Ohio law, this evidence defeats any jurisdictional argument based on successor liability.

### A. Successor-in-Interest Jurisdiction Cannot Apply Because Allergan Finance, LLC Still Exists, Still Operates, and Has Billions of Dollars of Assets.

Successor jurisdiction, as Plaintiffs label it, stems from the rule regarding successor-in-interest liability.  *Opportunity Fund, LLC v. Epitome Sys., Inc.*, 912 F. Supp. 2d 531, 541 (S.D. Ohio 2012) ("To apply the successor theory of personal jurisdiction in a diversity action, courts look to the forum state's rules of successor liability.").  "The purpose of successor liability is to ensure that claimants are not left without recourse against an entity simply because the entity sells all of its assets or changes its corporate form."  *See In re Welding Fume Prod. Liab. Litig.*, 2010 WL 2403355, at *7.  The two defining aspects of implied successor-in-interest liability are (1) a

7

transfer of assets and (2) the dissolution of the predecessor.[5]  *See* Restatement (Third) of Torts: Prod. Liab. § 12 (1998) ("Almost all of the reported decisions applying the bases of successor liability stated in this Section involve predecessors that transfer all of their assets to successors and then dissolve or otherwise cease operations.").  Neither element is present here.

Plaintiffs' successor-in-interest argument fails as a matter of black-letter law because there is no dispute that Allergan Finance, LLC still exists, still operates, and still has tens of billions of dollars of assets.  When, as here, "the original entity still exists, there is no successor—and no successor liability." *In re Welding Fume Prod. Liab. Litig.*, 2010 WL 2403355, at *7 (citing cases); *Darwish v. Tempglass Grp., Inc.*, 26 F. App'x 477, 480 (6th Cir. 2002) ("Tempglass Group cannot be considered a successor corporation to a corporation, Tempglass, Inc., which still exists as a going concern (albeit under a different name)").  Not only is there no dispute that Allergan Finance, LLC still exists, it is party to this lawsuit.  For example, paragraph 49 of Summit's Third Amended Complaint states: "Actavis plc (n/k/a Allergan plc) was established to facilitate the business combination between ***Actavis, Inc. (n/k/a Allergan Finance, LLC)*** and Warner Chilcott plc. Following the consummation of the October 1, 2013 acquisition, ***Actavis, Inc. (n/k/a Allergan Finance, LLC Inc.)*** and Warner Chilcott plc became wholly-owned subsidiaries of Actavis plc (n/k/a Allergan plc)."  (Emphasis added).   In other words, Plaintiffs agree and concede that Actavis, Inc. still exists: it is just called Allergan Finance, LLC today.  And there is no dispute that Allergan Finance, LLC continues to operate today.  Indeed, in its 2018 Form 10-K, Allergan plc

---

[5]  Plaintiffs do not argue that Allergan plc expressly assumed the potential liabilities at issue in this litigation, another exception to the rule of successor nonliability.  Plaintiffs allege only that Allergan plc guaranteed certain notes issued by Allergan Finance, LLC (Opp'n Br. at 13–15), which they do not allege have any relationship to the liabilities in this litigation.  Such a guarantee is not remotely the same as an express assumption of the liabilities at issue in this litigation in connection with an asset sale.  And such guarantees are not material to Plaintiffs' implied successor theories either.  *See*, *e.g.*, *Gallenberg Equip., Inc. v. Agromac Int'l Inc.*, 191 F.3d 456 (7th Cir. 1999) ("The presence of the [debt] guarantee does not materially change the required [successor liability] analysis.").

reported that Allergan Finance, LLC had total assets of $90.8 billion.  (Ex. 6, Allergan plc 2018 10-K at F-91.)   On this basis alone, this Court must reject Plaintiffs' successor-jurisdiction argument.

> **B.     Successor-in-Interest Jurisdiction Cannot Apply Because Allergan plc Did Not Acquire Allergan Finance, LLC in an Asset Sale.**

Plaintiffs' successor-jurisdiction argument fails as a matter of law for the independent reason that successor-in-interest liability applies only in asset sales, not stock transactions like the one that created Allergan plc.  *See Transp. Ins. Co.,* 969 F. Supp. 2d at 886 ("For a purchaser to even have the potential to be a successor, ***there must be a sale or transfer of all the assets*** of the selling company." (emphasis added)).  This is a basic proposition supported by Ohio case law, which governs here.  *See Flaugher v. Cone Automatic Mach. Co.,* 507 N.E.2d 331, 334 (Ohio 1987) ("Where there is ***merely a sale of a corporation's assets***, the buyer corporation is not liable for the seller corporation's tortious conduct unless one of the following four exceptions applies…" (citation omitted)(emphasis added)); *Middletown Tube Works, Inc. v. Creative Storage Sys.*, No. 1:15CV355, 2016 WL 3406025, at *2 (S.D. Ohio June 21, 2016) ("The Supreme Court of Ohio has explained that 'a corporation that ***purchases the assets*** of another corporation is not liable for the contractual liabilities of its predecessor corporation unless'…") (emphasis added); *see also C.T. Charlton & Assocs., Inc. v. Thule, Inc.*, 541 F. App'x 549, 554 (6th Cir. 2013) (applying Michigan law and requiring "a transfer of substantially all assets"); *Stramaglia v. United States*, 377 F. App'x 472, 475 (6th Cir. 2010) (same, requiring "a transfer of substantially all assets.").

Indeed, Plaintiffs repeatedly acknowledge that an asset sale is part and parcel of successor-in-interest liability:

- Section IV(A)(2)(c) is titled, "Continuity of Shareholders Resulting from a ***Sale of Assets*** in Exchange for Stock." (Opp'n Br. at 13) (emphasis added).

- "The Ohio Supreme Court has recognized that a continuity of shareholders resulting ***from a sale of assets*** in exchange for stock is 'arguably the *sine qua non* of a de facto merger.'" (Opp'n Br. at 13) (emphasis added).

- "A second, independently sufficient ground for jurisdiction is where 'one corporation ***sells its assets*** to another corporation with the same people owning both corporations,' rendering the acquiring corporation 'just a new hat for, or reincarnation of, the acquired corporation.'" (Opp'n Br. at 15) (emphasis added).

Despite this black-letter requirement, Plaintiffs do not even attempt to argue that there was a sale of any assets from Allergan Finance, LLC to Allergan plc.  And it is undisputed that the 2013 transaction that created Allergan plc did not involve an asset purchase: it was a stock transaction that ***did not involve the transfer of any assets from Allergan Finance, LLC***. Specifically, Allergan plc "was established for the purpose of facilitating the business combination between Allergan Finance, LLC (formerly known as Actavis, Inc.) and Warner Chilcott plc[.]" (Ex. 7, Allergan plc 2017 10-K at 3.)  As part of the transaction, Warner Chilcott shareholders received shares in the newly-created Allergan plc at a ratio of 0.16 share of Allergan plc for every one share of Warner Chilcott.  (Ex. 14, Actavis, Inc. 2013 8-K at 10.)  Simultaneously, a subsidiary of Allergan plc, Actavis W.C. Holding 2 Inc., merged with and into Allergan Finance, LLC. Allergan Finance, LLC was the surviving corporation and retained all of the assets it had prior to the transaction.  (*Id.* at 2.)  All shares of Allergan Finance, LLC were cancelled and converted into the right to receive shares in Allergan plc on a one-to-one basis. (*Id.* at 14.) As shown in the graphical description of the Warner Chilcott/Allergan merger used in the Stockholder's Announcement,[6] Allergan Finance, LLC merged with an indirect-subsidiary of Allergan plc, and

---

[6]https://www.sec.gov/Archives/edgar/data/1578845/000119312513312887/d549812d424b3. htm#rom549812_5

in return, Allergan Finance, LLC and Warner Chilcott plc shareholders each received shares in Allergan plc:



Courts in Ohio and throughout the country recognize that these types of stock acquisitions do not result in successor-in-interest liability for the parent company (Allergan plc) acquiring stock in a subsidiary (Allergan Finance, LLC). *See In re Welding Fume Prod. Liab. Litig.*, 2010 WL 2403355, at *7 ("ITW simply purchased their issued and outstanding capital stock, while each retained its liabilities. Moreover, courts have recognized that the 'reverse triangular merger,' by which ITW obtained Hobart, does not result in the parent company (ITW) assuming the liabilities of the acquired company (Hobart)."); *Orzeck v. Englehart*, 41 Del. Ch. 361, 365, 195 A.2d 375, 377 (1963) ("In other words, the purchasing corporation is not the owner of the assets of the other corporation, but is merely a stockholder with all the incidents of such. Nor do the corporate identities merge by reason solely of the purchase by one of all of the other's stock."); *see also Orzeck*, 41 Del. Ch. at 366, 195 A.2d at 378 ("[O]wnership of stock in one corporation by another does not create an identity of interest between the two corporations and make one the owner of the property of the other."). Thus, the mere fact that Allergan plc became the "successor registrant" for SEC reporting purposes does not expose Allergan plc to successor liability for the prior

11

registrant that still exists, Allergan Finance, LLC, and retained the assets it had prior to the transaction.

Put simply, because Allergan Finance, LLC f/k/a Actavis, Inc. did not sell *any* assets to Allergan plc (or anyone else), there can be no successor liability, and thus no successor jurisdiction. *See Transp. Ins. Co.,* 969 F. Supp. 2d at 886 ("For a purchaser to even have the potential to be a successor, ***there must be a sale or transfer of all the assets*** of the selling company.") (emphasis added). That Allergan Finance, LLC continues to report tens of billions of dollars in assets itself proves there was no "sale or transfer of all" of its assets. These undisputed facts defeat Plaintiffs' successor-jurisdiction argument.

### C.   Plaintiffs' De Facto Merger and "Mere Continuation" Arguments Are Similarly Meritless.

Plaintiffs' argument that the 2013 Warner Chilcott transaction amounts to a de facto merger between Allergan plc and Allergan Finance, LLC also fails because Allergan Finance, LLC still exists. (Opp'n Br. at 8.) Plaintiffs admit that a de facto merger requires the "the dissolution of the predecessor corporation." *Id.*; *see also Welco Indus., Inc. v. Applied Cos.*, 617 N.E.2d 1129, 1134 (Ohio 1933) ("Nor did the selling corporation dissolve immediately. In fact, it still exists under the name Wesche Electric . . . Thus, this transaction fails to satisfy the elements of a de facto merger.") (cited by Plaintiffs); *CRS Site RD/RA Grp. v. Acme-Cleveland Corp.*, No. 1: 13 CV 01516, 2014 WL 12591695, at *12 (N.D. Ohio Dec. 1, 2014) ("However, despite the seller corporation having been stripped of its operating assets and its status as a shell, the court still found that no de facto merger occurred because the seller corporation did not dissolve immediately after the asset sale."). It is self-evident that did not happen here as Allergan Finance, LLC not only still exists but also is a defendant in these lawsuits. Plaintiffs simply ignore this factor, which they themselves recognize as one of the "hallmarks" of a de facto merger. (Opp'n Br. at 8.)

12

Plaintiffs' "mere continuation" argument fails for the same reason.  *See Flaugher v. Cone Automatic Mach. Co.*, 507 N.E.2d 331, 336 (Ohio 1987) ("[Mere continuation] cases have required that the predecessor be dissolved or liquidated soon after the transfer of assets.").  Each of the cases Plaintiffs cite in their brief—many of which rejected mere continuation arguments, *see e.g., Welco Indus.,* 617 N.E.2d at 1134—involved asset sales that are entirely distinguishable from the stock transaction at issue here.[7]

Plaintiffs' remaining evidence shows nothing more than the normal relationship between a parent and subsidiary.  Principally, Plaintiffs allege that Allergan plc's corporate disclosures support the proposition that Allergan plc is the successor to still-existing Allergan Finance, LLC.  For example, Plaintiffs claim that Allergan plc's:

- Disclosure of its subsidiaries' litigation means that Allergan plc assumed responsibility for those lawsuits[8] (Opp'n Br. at 14);

- General description of the business of its consolidated subsidiaries means Allergan plc is not a holding company (Opp'n Br. at 9, 16);

---

[7]  *See Cytec Indus., Inc. v. B.F. Goodrich Co.*, 196 F. Supp. 2d 644, 654 (S.D. Ohio 2002) ("purchased the assets"); *Welco Indus.,* 617 N.E.2d at 1132 ("purchased the assets"); *Opportunity Fund,* 912 F. Supp. 2d at 536 ("sold Epitome, or some part of its assets"); *State ex rel. Health Care Facilities, Inc. v. Ohio Bureau of Workers' Comp.*, 687 N.E.2d 763, 764 (Ohio 1998) ("purchased the following assets"); *WRK Rarities, LLC v. United States*, 165 F. Supp. 3d 631, 638 (N.D. Ohio 2016) ("transfers of assets"); *Senco Brands, Inc. v. Ohio Dep't of Job & Family Servs.*, 70 N.E.3d 117, 120 (Ohio Ct. Appeals 2016) ("executed an asset purchase agreement"); *Trs. of Serv. Emps. Int'l Union Local 3 v. Glengary Grp.*, LLC., No. 5:07CV2429, 2008 WL 11383259, at *1 (N.D. Ohio July 31, 2008) ("transferred its Western Reserve account").

[8]  To support its argument that Allergan plc "assumed the liabilities and obligations" of Allergan Finance, LLC, (Opp'n Br. at 13), Plaintiffs identify five sets of Allergan Finance, LLC notes that Allergan plc guaranteed, (*id.* at 13-14). That certainly does not support the argument that Allergan plc assumed "all liabilities" of Allergan Finance, LLC, as Plaintiffs claim.  And Plaintiffs cite no case law holding that a parent corporation guaranteeing the debt of a subsidiary justifies successor liability.  Plaintiffs also present evidence that Allergan Finance, LLC has guaranteed certain notes that are not guaranteed by Allergan plc.  (Opp'n Br. at 14.)  Plaintiffs do not even try to explain how that supports their successor-liability argument.  Likewise, Plaintiffs' allegation that Allergan plc has undertaken responsibility for all of its subsidiaries' lawsuits because Allergan plc lists them in its Form 10-K hardly warrants a response.  (Opp'n Br. at 14.)  As shown below, Allergan plc presents its financial results on a consolidated basis and thus is required to identify lawsuits filed against its subsidiaries.

13

- Status as the SEC reporting entity means it became Actavis, Inc. (and Warner Chilcott at the same time), because Actavis, Inc. was the former reporting entity (Opp'n Br. at 13); and

- Disclosure of revenue earned by subsidiaries in the U.S. means Allergan plc has "great interests in the United States" (Opp'n Br. at 18).

These are the normal activities of a parent holding corporation and merely reflect the fact that parent corporations are, by definition, the major investors in their subsidiaries.  (*See* Ex. 8, Macey Report at 36 ("Similarly, parent companies generally are required to produce consolidated financial statements and tax returns that reflect the results of their subsidiaries.").)  That Allergan plc reports its financial statements on a consolidated basis, including the results of Allergan Finance, LLC and other subsidiaries, cannot support a conclusion that Allergan plc is liable as a successor to Allergan Finance, LLC.  *See Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1274 (6th Cir. 1998) ("a company does not purposefully avail itself merely by owning all or some of a corporation subject to jurisdiction"); *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 336, 45 S. Ct. 250, 251, 69 L. Ed. 634 (1925) ("Congress has not provided that a corporation of one state shall be amenable to suit in the federal court for another state in which the plaintiff resides, whenever it employees a subsidiary corporation as the instrumentality for doing business therein.") If it did, then every parent company would be subject to personal jurisdiction in those states where their subsidiaries do business.  (*See* Ex. 8, Macey Report, at ¶ 48 (providing examples of companies reporting consolidated financial statements).)

Because Plaintiffs' successor-in-interest arguments fail as a matter of black-letter law, the remainder of Plaintiffs' successor-liability "evidence" is discussed in the context of the long-arm statute below.

14

III.   **NEITHER OHIO'S LONG-ARM STATUTE NOR THE FEDERAL DUE PROCESS CLAUSE PERMITS EXERCISING SPECIFIC JURISDICTION OVER ALLERGAN PLC.**

Plaintiffs next argue that Allergan plc is subject to personal jurisdiction in this Court under Ohio's long-arm statute and that exercising jurisdiction passes constitutional muster. "Under Ohio law, personal jurisdiction over non-resident defendants is available only if (1) the long-arm statute confers jurisdiction and (2) jurisdiction is proper under the Federal Due Process Clause." *Conn v. Zakharov*, 667 F.3d 705, 712 (6th Cir. 2012). Regarding Ohio's long-arm statute, Plaintiffs allege that jurisdiction is proper under R.C. § 2307.382(A)(1) because Allergan plc conducted business in Ohio directly and as the alter ego of unidentified subsidiaries and under R.C. § 2307.382(A)(7) because Allergan plc was complicit in criminal acts occurring in Ohio. (Opp'n Br. at 19–25.) Regarding the Due Process Clause, Plaintiffs maintain that Allergan plc's acts in Ohio establish a sufficient connection to make exercising jurisdiction reasonable. (*Id*. at 26.)

Plaintiffs have failed to satisfy either standard because they offer no evidence at all that Allergan plc engaged in any actions in Ohio. Further, they have not rebutted the evidence submitted in Allergan plc's motion that "Allergan plc is a holding company" that (1) "does not finance or control the daily affairs, including marketing or sales operations in Ohio" of any companies whose shares it holds and (2) does not "currently and has never manufactured, distributed, marketed, promoted, or sold any pharmaceutical products (including Kadian® or Norco®) in the United States." (Ex. 9, 9/7/17 D'Arecca Aff. at ¶ 6, 9.) Indeed, as explained below, Plaintiffs' evidence is entirely consistent with the fact that Allergan plc is a mere holding company that does not *itself* conduct business anywhere in the United States.

For example, Plaintiffs assert that, as a holding company, Allergan plc "is focused on" developing and commercializing pharmaceuticals (Opp'n Br. at 1), but they ignore that its only

actions in this regard are by *its subsidiaries*, which conduct the actual developing and commercializing.  Moreover, those subsidiaries' actions cannot be imputed to Allergan plc under Ohio's exacting alter-ego standard, which Plaintiffs do not even attempt to satisfy.

### A.  Allegan plc Does Not Conduct Business Anywhere in the United States.

Plaintiffs' assertion that Allergan plc itself transacts business in Ohio is based on a misunderstanding or misrepresentation of Allergan plc's corporate structure.

*First*, Plaintiffs assert that Allergan plc maintains a "major manufacturing" site in Cincinnati, Ohio.  (Opp'n Br. at 19.)  That is false.  In fact, "Allergan Sales, LLC—a subsidiary of Allergan plc—owns and operates that facility", not Allergan plc.  (Ex. 1, 7/25/19 D'Arecca Decl. at ¶ 4.)  Plaintiffs seek to convert routine, general disclosures that clearly relate to Allergan plc and all of its subsidiaries and affiliates into declarations of ownership.  This is entirely inconsistent with ordinary and customary business practice by corporate parents, who often use collective pronouns such as "we" and "us" to refer not only to themselves but also to their subsidiaries and affiliates.  Routine statements in Allergan plc's Form 10-K, including the statement that "we" have manufacturing sites in various locations across the world, do not prove that Allergan plc ever owned or operated any of those sites.[9]  *See Gruca v. Alpha Therapeutic*

---

[9]  To support its argument, Plaintiffs also cite an April 2019 study indicating that Allergan plc maintains that facility. (*See* Opp'n Br. at 2 (citing Pls.' Ex. 3).)  Plaintiffs' own evidence, however, shows that this study was prepared by the University of Cincinnati Economics Center.  (Pls.' Ex. 4 at 1.)  Plaintiffs cite no authority for the proposition that a public university's inaccurate statement of corporate ownership constitutes evidence sufficient to justify exercising jurisdiction over a nonresident defendant.  *See Hanson v. Denckla,* 357 U.S. 235, 253 (1958) ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State."); *Hughes v. Cabanas Del Caribe Hotel*, 947 F.2d 945 (6th Cir. 1991) ("The purposeful availment requirement guards against a defendant having to engage in litigation in a jurisdiction solely as a result of . . .the unilateral activity of another party or a third person.") (internal quotation marks omitted).

*Corp.*, 19 F. Supp. 2d 862, 867–68 (N.D. Ill. 1998) (ambiguous reference in parent corporation's annual report to "our marketing position," "our international marketing efforts," and "[o]ur key overseas operation" are consistent with subsidiary's existence as a separate entity); *BBA Aviation PLC v. Superior Court*, 190 Cal. App. 4th 421, 432, 117 Cal. Rptr. 3d 914, 923–24 (2010) ("The use of 'we' or 'the Company' or 'BBA' does not prove that BBA and Ontic were a single entity in practice and does not turn a holding company into an operating company.").[10]  Moreover, Plaintiffs cite no evidence suggesting that this facility *ever* produced any opioid medicines at issue in this litigation.  Thus, even if Allergan plc had ever owned or operated this facility (and it did not), that would not be sufficient to exercise personal jurisdiction over Allergan plc.  *See Bristol-Myers Squibb Co. v. Superior Ct. of Cal., S.F. Cnty.*, 137 S. Ct. 1773, 1780 (2017) ("In order for a state court to exercise specific jurisdiction, the *suit* must arise out of or relate to the defendant's contacts with the *forum*. … In other words, there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State that is therefore subject to the State's regulation.") (internal citations and quotation marks omitted).

---

[10]  *See also Francis v. Bridgestone Corp.*, No. 2010/30, 2011 WL 2650599, *9 (D.V.I. July 6, 2011) (rejecting the argument that statements in the corporate parent's annual report referring to itself and its subsidiaries as "we" and "our" supported an alter-ego theory of personal jurisdiction, and stating that "this sort of generic language is frequently used by corporations when describing the activities of their subsidiaries and does not demonstrate that Bridgestone actually controlled" its subsidiaries); *Wady v. Provident Life & Accident Ins. Co. of Am.*, 216 F. Supp. 2d 1060, 1062, 1068 (C.D. Cal. 2002) (rejecting contention that use of pronouns such as "we," "us," or "our" in claims forms and correspondence evidenced alter-ego relationship between insurance company and parent holding company); *Jazini v. Nissan Motor Co. Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998) (references in parent corporation's annual report did not show pervasive control over subsidiary); *Japan Petrol. (Nigeria) Ltd. v. Ashland Oil Co.*, 456 F. Supp. 831, 846 (D. Del. 1978) (subsidiary cannot be regarded as agent of parent based solely on representations made in annual reports, because "such representations may result from public relations motives or an attempt at simplification").

**Second**, Plaintiffs rely on Allergan plc's 2018 Form 10-K, which states that 23 percent of revenue came from sales to Ohio-based Cardinal Health. (Opp'n Br. at 19.) Allergan plc's financial statements are reported on a consolidated basis, reflecting revenue generated by the operating entities that it directly or indirectly owns. (Ex. 1, 7/25/19 D'Arecca Decl. at ¶ 4.) As noted above, referring to this revenue as "our revenue" does not prove that Allergan plc actually operated in Ohio. The SEC actually directs public companies like Allergan plc to use personal pronouns in public filings, and the "pronouns to use are first-person plural (we, us, our/ours)." Office of Investor Education & Assistance, U.S. Sec. & Exch. Comm'n, *A Plain English Handbook: How to Create Clear SEC Disclosure Documents* at 22 (1998), http://www.sec.gov/pdf/handbook.pdf. Moreover, filing consolidated financial statements that include the results, operations, and assets of subsidiaries is a routine, generally accepted practice for corporate families and cannot serve as a basis for asserting personal jurisdiction. *See Case Fin., Inc. v. Alden*, No. 1184-VCP, 2009 WL 2581873, at *4–*5 (Del. Ch. Aug. 21, 2009) ("fil[ing] consolidated financial statements with the SEC, which include [the subsidiary's] results" is insufficient to pierce the corporate veil); *Best v. Mobile Streams, Inc.*, No. 1:12-cv-564, 2014 WL 4988220, at *2 (S.D. Ohio Oct. 7, 2014) ("Best's reliance on the SEC filings is misplaced, because nothing in the fact that AT & T Inc. files consolidated financial statements or tax returns … suggests that it does business in Ohio, provides services or goods in Ohio, or possesses any property in Ohio."). Indeed, under Irish law, Allergan plc is **required** to prepare and file consolidated financial statements. Companies Act of 2014, Part 6, Chapter 4, paragraph 293 ("Where at the end of its financial year a company is a holding company, the directors of the company … shall prepare group financial statements for the holding company and all its subsidiary undertakings for that financial year.") Thus, Plaintiffs' reliance on revenue derived from the

18

operations of Allergan plc's subsidiaries is legally insufficient to establish jurisdiction over holding company parent Allergan plc.

**Third**, Plaintiffs argue that, because a few employees of Allergan plc's indirect subsidiaries listed "Allergan plc" in their email signature blocks and letter correspondence, Allergan plc "reached into Ohio to sell opioids."  (Opp'n Br. at 20–22.)  Not so.  The inclusion of "Allergan plc" in these signature block and letters is not a legal statement about the Allergan entity that actually employed the individual.  Rather, the "Allergan plc" signature block is a function of corporate branding in which a corporate family uses a single face-to-market name when corresponding with the public.  (*See* Ex. 8, Macey Report, at ¶ 46 ("Parent companies, particularly large companies often engage in corporate branding across subsidiaries and other related companies as a marketing strategy.").)  That some Allergan employees used that face-to-market name (Allergan plc is the name of the public company) in correspondence cannot justify exercising jurisdiction over a nonresident defendant.  *See Associated Producers, LTD v. Vanderbilt Univ.*, 76 F. Supp. 3d 154, 166–67 (D.D.C. 2014) (holding that a nonresident defendant university's decision to allow a professor to use the university's name in her signature block was insufficient for establishing jurisdiction over the university); *Whiting-Turner Contracting Co. v. Capstone Dev. Corp.*, No. WDO-12-3730, 2013 WL 5423953, at *9 (D. Md. Sept. 26, 2013) (finding no jurisdiction over nonresident defendant when employees of the corporate family used the nonresident defendant's name in their signature blocks).  Allergan plc is a holding company with no employees.  (Ex. 9, 9/17/17 D'Arecca Decl. at ¶ 6, 8.)  Plaintiffs have presented no evidence to the contrary.

**Fourth**, Plaintiffs cite a handful of documents showing that employees of Allergan plc's indirect subsidiaries occasionally responded to opioid-related questions from Ohio residents and

sent letters to Cardinal Health on Allergan plc letterhead.  (Opp'n Br. at 20–21.)  Plaintiffs specifically note that these letters refer to "our Medical Information Department," "Allergan, plc. products," and "Allergan plc's sales terms."  (*Id*. at 20.)  These arguments fail for the same reasons the other signature-block arguments fail: they reflect corporate branding using the name of Allergan's public company, Allergan plc. (*See* Ex. 8, Macey Report, at ¶ 46 ("[I]t is not uncommon for parent companies and subsidiaries and affiliates to share logos, specific letterhead or stationary, common websites, domains/emails, and packaging.").)

Even assuming Plaintiffs showed something more, these arguments also fail because parent corporations often speak on behalf of their subsidiaries, and courts routinely hold that such conduct does not constitute a basis for asserting personal jurisdiction.  *ASEA/AFSCME Local Health 52 Health Benefits Trust v. Abbott Laboratories* shows as much.  No. 17-cv-6704, 2018 WL 3022670 (N.D. Ill. June 18, 2018).  There, the plaintiff sued Illinois-based Abbott and its Minnesota subsidiary St. Jude after a recall of allegedly defective pacemakers.  *Id*. at *1.  The plaintiff argued that the court had jurisdiction over the nonresident defendant St. Jude because "Abbott publically claimed responsibility for the recall of the defective devices, issued updates about the devices in its own name, and communicated with the FDA about the devices in its own name," and because St. Jude publicly advertised that "St. Jude Medical is now Abbott" after the companies' merger.  *Id*. at *3.  In declining to exercise jurisdiction, the court discounted the significance of this, finding that, "[a]t most, the allegations in the complaint suggest that Abbott sometimes spoke on behalf of St. Jude or sometimes represented that it had succeeded St. Jude."  *Id*.; *see also Citibank, N.A. v. Hicks*, No. 03-2283, 2004 WL 945142, at *1 (E.D. Pa. Apr. 29, 2004) ("A blurred line of distinction between two companies does not mean that the two companies are actually (legally) alter egos."); *In re Chi. Truck Ctr., Inc.*, 398 B.R. 266, 278 (Bankr. N.D. Ill. 2008) ("The

corporations are and were independent legal entities, which cannot be collapsed into one company just because an internal memo uses a '/' between GM and GMAC."; *LaSalle Nat. Bank v. Vitro, Sociedad Anonima*, 85 F. Supp. 2d 857, 865 (N.D. Ill. 2000) ("Personal jurisdiction is based on actual evidence of control . . . rather than on a corporation's general descriptions. Promotional statements made on a public website do not precisely convey the operative corporate structure."); *Martin ex rel. Estate of Martin v. S. Indiana Treatment Ctr., Inc.*, No. 3:03-CV-428, 2004 WL 2595946, at *1–*2 (W.D. Ky. May 27, 2004) (rejecting argument that parent company was the alter ego of its subsidiary because the parent corresponded with regulators and otherwise spoke on its subsidiary's behalf; in finding no jurisdiction over the parent, the court found that "[i]t seems only natural that a parent company would directly deal with the media on newsworthy issues occurring at its subsidiary … .").

*Finally*, Plaintiffs have proffered evidence showing that inVentiv Health directed two invoices for "Opioid PMR Support" to Allergan plc—one dated February 7, 2017 (Invoice No. 009355) and the other dated February 9, 2017 (Invoice No. 009394).  (Opp'n Br. at 22; Pls.' Exs. 34 & 35.)  Both invoices concern postmarketing studies required under the opioid REMS.  (*See* Pls.' Exs. 34 & 35.)  For one thing, Plaintiffs present no evidence showing that Allergan plc actually entered into any contracts for these services or that Allergan plc paid those invoices.  To the contrary, the evidence shows that "Actavis, Inc."—a defendant in this case—contracted for these services through inVentiv Health's consulting group Campbell Alliance.  (*See* Ex. 10, ALLERGAN_MDL_02189110.)  Moreover, a March 31, 2017 email from inVentiv Health to the "Opioid PMR Consortium" attaches an excel spreadsheet listing "Actavis, Inc." as the responsible party for both the February 7, 2017 and February 9, 2017 invoices.  (*See* Ex. 11,

ALLERGAN_MDL_04348720; Ex. 12, ALLERGAN_MDL_04348759[11].)  For another thing, Plaintiffs cite no authority for the novel proposition that a third party could take some act to subject Allergan plc to jurisdiction in this Court.  *See Hanson v. Denckla*, 357 U.S. 235, 253 (1958) ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.").

### B.    Allergan plc Is Not the Alter Ego of Unidentified Subsidiaries.

Because Plaintiffs have not (and cannot) show that Allergan plc itself conducted business in Ohio, Plaintiffs attempt to impute Allergan plc's unidentified subsidiaries' conduct to Allergan plc under an alter-ego theory.[12]  The Court should decline Plaintiffs' invitation to employ this "rare exception, to be applied only in the case of fraud or certain other exceptional circumstances." *Dombroski v. WellPoint, Inc.*, 895 N.E.2d 538, 542–43 (Ohio 2008).

As Plaintiffs note in their brief, Ohio law permits a plaintiff to pierce the corporate veil for jurisdictional purposes only when

> (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit

---

[11] Exhibit 12 is an excel spreadsheet that has been excerpted for the parties' and Court's convenience.

[12]  Because Plaintiffs do not identify the subsidiaries they claim Allergan plc is the "alter ego" of, it is virtually impossible for the Court to conduct a true alter-ego analysis.  For example, Plaintiffs identify a Management Services Agreement between Allergan plc and two United States subsidiaries—Allergan, Inc. and Allergan Sales, LLC. (Opp'n Br. at 23; Pls.' Ex. 6.)  But Allergan plc is not the direct parent of either of those entities; indeed, there are six corporate entities separating Allergan plc from Allergan, Inc. (Warner Chilcott Holdings Company III, Ltd., Allergan Capital S.à r.l., Allergan Pharma Inc., Allergan Akarna LLC, Allergan W.C. Holding Inc., and Allergan Finance, LLC), and Allergan Sales, LLC is even further removed from Allergan plc (Allergan Sales, LLC is a direct subsidiary of Allergan Holdco US, Inc., which is a direct subsidiary of Allergan, Inc.). (*See* Ex. 13, ALLERGAN_MDL_00000034, 12/31/18 Allergan Organizational Chart at 2.)  To pierce the corporate veil, Plaintiffs would need to demonstrate that the veil should be pierced as to each entity between Allergan plc and those United States subsidiaries.  Plaintiffs have not even tried to do so.  *See Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 725–26 (6th Cir. 2007) (the plaintiffs failed the first prong of Ohio's veil-piercing test when the defendant parent company was separated from its relevant subsidiary by two other subsidiaries, "and the plaintiffs [had] not presented any evidence showing why the corporate form should be disregarded as to each of these levels of subsidiaries").

fraud or an illegal act against the person seeking to disregard the corporate entity, **and** (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

*Belvedere Condo. Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 617 N.E.2d 1075 (Ohio 1993) (emphasis added).  Here, Plaintiffs fail to establish the first element and have made no attempt to satisfy either of the second two elements, so their alter-ego argument must be rejected.  *See Dombroski*, 895 N.E.2d at 513 ("Limiting piercing to cases in which the shareholders used their complete control over the corporate form to commit ***specific egregious acts*** is key to maintaining this balance.") (emphasis added); *In re Sunstates Corp. S'holder Litig.*, 788 A.2d 530, 534 (Del. Ch. 2001) ("[T]o pierce the corporate veil based on an agency or "alter ego" theory, 'the corporation must be a sham and exist for no other purpose than as a vehicle for fraud.'").

With respect to the first element, the undisputed record shows that Allergan plc observes all corporate formalities in relation to its subsidiaries, including Allergan Finance, LLC.  (Ex. 9, 9/7/17 D'Arecca Decl. at ¶ 7 ("Allergan plc operates separately and is independent of each of the companies in which it holds shares.  For example, Allergan plc's corporate records, tax returns, and financial statements are kept separate from the companies in which it holds shares.").)

The evidence Plaintiffs cite proves as much.  For example, Plaintiffs cite to Allergan plc's general ledgers, which definitively show that Allergan plc ***in fact*** keeps books and records separate from its subsidiaries.  (*See* Pls.' Exs. 36–37.)  Regarding the 2016–2019 ledger, Plaintiffs claim there is no record showing how Allergan plc accounted for "$33.4 billion in cash the PLC received for selling its" generics businesses to an affiliate of Teva.  (Opp'n Br. at 24.)  This fact actually supports Allergan plc's position; Plaintiffs simply do not understand that transaction.  Allergan plc did not receive cash from the Teva transaction because it did not directly own the equity in the businesses that were sold: Allergan plc was their indirect parent.  Allergan plc's subsidiaries that actually owned the equity interests in those generics businesses received the cash and accounted

for it in their general ledgers".  (Ex. 1, 7/25/19 D'Arecca Decl. at ¶ 6.)  Thus, if anything, the fact that Allergan plc's general ledger does not reflect the receipt of billions of dollars from the sale of equity in entities owned by Allergan plc's indirect subsidiaries actually shows respect for the separate legal existence of those entities.

As for the 2013–2015 general ledger, Plaintiffs complain that "it shows merely 17 transactions for a three-year period." (Opp'n Br. at 24).  Plaintiffs cite no authority requiring a threshold amount of activity for a corporate entity, particularly a passive holding company, to be deemed a separate corporate entity.

Plaintiffs also cite a Management Services Agreement between Allergan plc and two of its indirect subsidiaries—Allergan, Inc. and Allergan Sales, LLC. [13]  (Opp'n Br. at 23; Pls.' Ex. 6.) The agreement tasks the subsidiaries with providing various services to Allergan plc, including strategic direction, information technology, legal, and accounting services.  (*See* Pls.' Ex. 6 at Exhibit A.)  In performing these services, the subsidiaries are prohibited from entering into contracts on Allergan plc's behalf (*id*. at § 2.5); receive fees from Allergan plc "based on arm's length principles" (*id*. at § 3.1); are required to invoice Allergan plc each quarter and are paid within 30 days of Allergan plc's receipt of invoices (*id*. at §§ 4.1, 4.2); are obligated to "keep true and accurate books and records" regarding costs of services provided (*id*. at § 5); are tasked with protecting confidential information and are prohibited from using such information for any purposes other than providing the contracted-for services (*id*. at §§ 7.1, 7.2); are subject to liability for breaching the agreement (*id*. at § 8.2); and are required to return all records to Allergan plc at

---

[13]  Plaintiffs also cite this agreement in support of their claim that Allergan plc is the successor to Allergan Finance, LLC.  But given that Allergan Finance, LLC is not a party to this agreement, it is unclear why Plaintiffs think this agreement supports a finding of successor liability.

24

the agreement's conclusion (*id*. at § 10.5).  Far from suggesting a "mish-mash of responsibility, power, and ability to control financial processes" as Plaintiffs maintain (Opp'n at 24), this agreement demonstrates that Allergan plc and its subsidiaries respected corporate formalities and truly maintained separate corporate identities.  *Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 726 (6th Cir. 2007) ("[P]roof of some overlapping management between subsidiary and parent is an insufficient basis to pierce the corporate veil.").  Indeed, if Allergan plc truly was its subsidiaries' alter ego, no such agreement (let alone payment of fees) would have been necessary.

Finally, Plaintiffs assert that "seven of Allergan plc's eight executive officers also serve as the top officers of Allergan Finance, LLC – the top domestic subsidiary."  (Opp'n Br. at 24.) Sharing common officers plainly is not enough to confer jurisdiction over a nonresident defendant, particularly when corporate formalities are observed.  *Ohio Edison Co. v. Frontier N. Inc.*, No. 5:14cv321, 2014 WL 6389564, at *11 (N.D. Ohio Nov. 14, 2014).[14]

Put simply, there is no basis to pierce Allergan plc's corporate veil.  Nor would declining to do so work any injustice on Plaintiffs.  As stated in Allergan plc's opening brief, Allergan Finance, LLC—a named defendant not contesting this Court's jurisdiction—"is a solvent, going concern, having reported total assets at year end 2017 of ***$109 billion*** and comprehensive income for 2017 of ***$1.19 billion***".  (Dkt. 1258-1, Allergan's Opening BR., at 7 (citing 2017 Allergan plc

---

[14] S*ee also Microsys Computing, Inc. v. Dynamic Data Sys., LLC*, No. 4:05 CV 2205, 2006 WL 2225821, at *6–*7 (N.D. Ohio Aug. 2, 2006) (no jurisdiction even when parent and subsidiary shared common officers, same business enterprise, same phone line, and same address without evidence that corporate formalities had been disregarded); *Garlock v. Ohio Bell Tel. Co. Inc.*, No. 1:13CV02200, 2014 WL 2006781, at *6 (N.D. Ohio May 15, 2014) (no jurisdiction despite sharing of common management, officers, directors, board members, offices, corporate logo, and website with subsidiary); *Rucker v. Personal Fin. Co.,* 90 N.E.2d 428, (3d Dist. Franklin 1948) ("The fact that the stock of a subsidiary is held by a foreign corporation and that the foreign corporation exercises control over the subsidiary through the ownership of the stock, the corporate identity being formally preserved, is not sufficient to subject such foreign corporation to the jurisdiction of a court of this state."); *Levengood v. Levengood*, No. 1998AP100114, 2000 WL 874720, *8 (5th Dist. Tuscarawas June 7, 2000) (quoting same).

Form 10-K at F-109-10).)  Thus, exercising jurisdiction over Allergan plc under an alter-ego theory is not just improper under Ohio law; it is also unnecessary.

### C.  Allergan plc Was Not Complicit in Causing Tortious Injuries in Ohio.

Plaintiffs also argue that Allergan plc was complicit in the alleged illegal conduct of its subsidiaries.  (Opp'n Br. at 25.)  To support this charge, Plaintiffs rely exclusively on their RICO claim.  (*Id.*)  Nevertheless, Plaintiffs do not cite a shred of evidence suggesting that Allergan plc had anything to do with its subsidiaries' alleged illegal conduct.  Courts routinely reject such arguments.  *See, e.g.*, *Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris Inc.*, 23 F. Supp. 2d 796, 801 (N.D. Ohio 1998) (rejecting argument that nonresident parent's alleged participation in conspiracy justifies exercising jurisdiction when the parent "has never manufactured, packaged, marketed, advertised, sold, or distributed [the relevant] products, or any other goods or products, in the state of Ohio" and had no independent contacts with Ohio outside of an intercompany lending agreement); *Weller v. Cromwell Oil Co.*, 504 F.2d 927, 930 (6th Cir. 1974). ("[T]he non-moving party may not rest upon allegations or denials in his pleadings but his response by affidavit or otherwise must set forth specific facts showing that the court has jurisdiction.").  This Court should do the same.

### D.  Exercising Personal Jurisdiction Over Allergan plc Would Violate Constitutional Due Process Protections.

To exercise personal jurisdiction over Allergan plc, Plaintiffs also must show that doing so comports with the Due Process Clause of the Fourteenth Amendment.

A constitutional exercise of personal jurisdiction requires two things: "(1) the defendant must have established minimum contacts with the forum state, and (2) the assertion of jurisdiction cannot offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).  Minimum contacts may give rise to two

types of jurisdiction: general (when the defendant's "affiliations within the state are so continuous and systematic as to render it ***essentially at home*** in the forum state") and specific (when the defendant's activities in the state "give rise to the liabilities sued on").  *Id*. at 317.

Plaintiffs have made no attempt to prove general jurisdiction over Allergan plc, so any argument on that score has been waived.  *See Gibson v. Prof'l Account Mgmt., LLC*, No. 11-CV-12920, 2012 WL 7990304, at *6 (E.D. Mich. Nov. 15, 2012) ("Where a party fails to raise an issue in its responsive brief … courts have found that such an argument is waived.").

As for specific jurisdiction, Plaintiffs' argument depends entirely on the alleged connections Allergan plc has to Ohio, which Allergan plc has already shown do not exist, *infra* § 4.A.  The Constitution requires that a direct affiliation must exist "between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum state." *Bristol-Myers Squibb*, 137 S. Ct. at 1781.  Plaintiffs have failed to demonstrate any contacts between Allergan plc and Ohio, let alone that their claim arose from those contacts.  Accordingly, the Due Process Clause does not permit exercising jurisdiction over Allergan plc.


Dated: July 30, 2019                           Respectfully submitted,

                                               */s/ Donna Welch*
                                               Donna Welch, P.C.
                                               KIRKLAND & ELLIS LLP
                                               300 North LaSalle
                                               Chicago, IL 60654
                                               *Counsel for Allergan plc f/k/a Actavis plc*

<u>CERTIFICATE OF SERVICE</u>

I, Donna M. Welch, hereby certify that the foregoing document was served via the email

consistent with the Court's order to all counsel of record.

> <u>*/s/ Donna M. Welch*</u>
> Donna M. Welch
> KIRKLAND & ELLIS LLP
> 300 North LaSalle
> Chicago, IL  60654
> Tel: (312) 862-2000
> donna.welch@kirkland.com