# Exhibit 10

## POST MARKETING RESEARCH PROJECT MANAGEMENT AGREEMENT

This **POST MARKETING RESEARCH (PMR) PROJECT MANAGEMENT AGREEMENT** (the "Agreement") is made and entered into as of Febryuary 11, 2014 (the "Effective Date") by and between the ER/LA NDA Holder Participants (each entity individually, a "Participant" and together, the "Client") and Campbell Alliance, Ltd. ("Campbell").

1. Definitions.

   a. **"Program"** or **"PMR Program"** shall be defined as the planning, design, or conduct of post marketing studies to address FDA requirements

   b. **"Participant"** shall be defined as an entity that is an ER/LA NDA holder with post marketing requirements (PMR)..

2. Engagement. Campbell is engaged by Client to serve as the Project Management Office, or "PMO", to provide PMR project management services (the "Services"), as described in one or more statements of work ("SOWs") executed by the parties pursuant to this Agreement. Each SOW shall be provided in substantially the form as the SOW attached hereto as Attachment A. The specific terms and conditions associated with each engagement will be delineated in the applicable SOW, which shall be sequentially numbered (e.g. SOW1,-2, etc...) and incorporated herein by reference. Campbell agrees and acknowledges, without the Client's approval, that neither it nor any related or affiliated entity shall provide any additional third party vendor services to Participants under this Agreement in connection with the Program while this Agreement remains in full force and effect. Except as otherwise provided herein, the Subcommittee Representative for each subcommittee (observational and clinical) will be the sole point of contact responsible for interactions with Campbell as described below. Within ten (10) days of the Effective Date, each Subcommittee shall constitute and appoint and provide written notice of the same to Campbell, one Participant as the sole, exclusive, true and lawful agent and representative of all Participants (the "Subcommittee Representative") with respect to any and all matters relating to, arising out of, or in connection with, this Agreement. The Subcommittee may replace the Subcommittee Representative, effective upon five (5) days written notice to Campbell. Except as otherwise expressly set forth herein, all actions, notices, communications and determinations by Client and the Subcommittee relating to this Agreement shall be given or made by a Subcommittee Representative, and Campbell shall be entitled to rely on any such action, notice, communication or determination. It is agreed that additional Participants may become parties to this Agreement from time to time, contingent on prior approval of the Participants and execution of a New Participant Confirmation in the form attached hereto as **Exhibit A**, by each additional Participant. If a Participant ceases to be a party by notice of Termination,, its obligations under this Agreement shall continue until such time as its obligations have been fulfilled. When the Client confirms to Campbell in writing that a Participant is no longer a member and that its obligations under this Agreement have been fulfilled, such Participant shall cease to be a party to this Agreement. The addition or departure of Participants to this Agreement will not increase or decrease the total compensation due to Campbell hereunder. In the event of a conflict between the provisions of this Agreement and the provisions of the Statement of Work, the provisions of this Agreement shall prevail.

   Each Participant shall reasonably cooperate with Campbell in connection with its performance of the Services. Such cooperation shall include, without limitation, providing to Campbell all information reasonably requested by it. Campbell shall not be responsible or liable for errors, delays, or other consequences caused by the failure of a Participant to provide any such required information or cooperative efforts. Without limiting the generality of the foregoing, in the event any action under

this Agreement requires Client's approval and such approval is not received in a reasonably timely manner, Campbell shall not be deemed in breach of its obligations hereunder.

3. Term, Suspension and Termination.

3.1. The term of this Agreement will begin on the Effective Date of the first Statement of Work and continue for a period of three (3) calendar years, or as otherwise agreed upon in writing by Campbell and the Client (the "Initial Agreement Term"), unless extended or terminated earlier in accordance with the terms of this Agreement.

3.2. Campbell may terminate this Agreement in the event of a material breach by Client which breach remains uncured for a period of thirty (30) days after receipt of written notice specifying the details of the breach. Notwithstanding the foregoing, failure of a Participant to make any payment under this Agreement when due shall constitute a material breach by the Participant of this Agreement and Campbell may terminate such Participant from this Agreement if such breach remains uncured for a period of sixty (60) days after Participant's receipt of written notice specifying the details of such breach. Upon the termination of a Participant, (i) such Participant's rights under this Agreement shall terminate and (ii) such Participant shall no longer be entitled to any of the benefits of this Agreement. Client may terminate this Agreement in the event of a material breach by Campbell which breach remains uncured for a period of thirty (30) days after receipt of written notice specifying the details of the breach.

3.3. In the event of any termination or suspension by Client, Campbell shall provide Client with a wind-down plan as soon as possible. Campbell shall continue to be compensated the fees then in effect as set forth in Section 6; provided, however, that in the event that the nature of the wind-down services materially differs from the Services contemplated by the Statement of Work, the parties agree to discuss alternative compensation. Upon receipt of notice of termination or suspension, Campbell shall immediately cease incurring any additional costs in connection with this Agreement or Statement of Work, and Client's sole obligation to Campbell shall be limited to payment for Services provided to the date of termination or suspension and payment of those costs and expenses already incurred or committed by Campbell up to the date of suspension or termination, which are not cancelable or recoverable by the terms of the applicable agreements. Any costs or expenses not actually recovered by Campbell will be reimbursed by Client or a Participant, as applicable.

4. Transition Services. Upon any termination or expiration of the Agreement, Campbell shall provide services reasonably requested by Client to transition the performance of the Services under the Agreement back to Client or to a third party (the "Transition Services"). Campbell shall, at Client's request, continue to provide the Services for a period not to exceed six (6) months from the termination or expiration of the Agreement (the "Transition Period") for the fees then in effect upon the termination or expiration date; provided, however, that in the event that the nature of the Transition Services materially differs from the Services contemplated by the Statement of Work, the parties agree to discuss alternative compensation. Campbell shall cooperate with and assist Client or Client's designee in providing the Transition Services. The Transition Services shall include: 1) preparation of a transition project plan by Campbell; 2) access to Campbell personnel for knowledge transfer; and 3) existing documentation/data and the schedules of tasks and due dates and statuses, provided to Client in comma deliminated files. Client shall pay Campbell for all Transition Services in accordance with the provisions of Section 7 below. During the Transition Period, all applicable terms and conditions of the Agreement shall remain in full force and effect.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER 

5. Compensation.

5.1. Campbell's fees for Services shall be as described in Section 6 below. Each Participant will be responsible for an equal percentage of fees and expenses. Each Participant shall provide Campbell with a purchase order number within ten days of execution of a Statement of Work in an amount sufficient to support payment of all Campbell invoices hereunder as and when due. Failure of one Participant to pay its share will not constitute a breach of this Agreement by the remaining Participants.

5.2. Unless otherwise stated in a SOW, Client will provide Campbell with a security deposit equal to three (3) months of the total budget over the following twelve (12) months plus, to the extent not previously invoiced, any months for which services have been provided by Campbell and/or Vendors to the date of calculation of the initial annual security deposit ("Annual Security Deposit"), divided equally among the Participants. Campbell shall recalculate the Annual Security Deposit and reallocate the amount of each Participant Security Deposit on an annual basis in accordance with the preceding sentence. The percentage of fees and expenses and the amount of each Participant Security Deposit shall be immediately prospectively reallocated among the remaining Participants by Campbell upon the addition or termination of a Participant, or upon Campbell's termination of a Participant in accordance with Section 3.3. Campbell may draw on a Participant Security Deposit in the event that such Participant does not pay Campbell within the required timeframes as provided in Section 7 below, or is insolvent and unable to meet its payment obligations. In the event of any such nonpayment by a Participant, the Participant must immediately pay all outstanding amounts owed to Campbell and replenish its Participant Security Deposit if funds were withdrawn by Campbell. In the event of any nonpayment by a Participant, Campbell shall not have the right to terminate this Agreement or to withhold the provision of Services except to a Participant who has been terminated from this Agreement by Campbell pursuant to Section 3.3 above. Campbell shall notify Client of any nonpayment by a Participant, including any amounts that Campbell withdrew from the relevant Participant Security Deposit. In the event of any nonpayment by a Participant, the remaining Participants shall use commercially reasonable efforts to enforce the provisions that apply when a Participant fails to meet its payment obligations. Each SOW will affirm if the provisions of this Section 5.2 is applicable to such SOW.

6. Fees and Expenses. Campbell's fees will be billed as a fixed fee and will delinieated in the applicable Statemet of Work.

In addition to the Fixed Fees, Client shall reimburse Campbell for administrative costs, and approved and reasonable travel, lodging and other out-of-pocket project-related expenses. Unless otherwise stated in a SOW, expenses are estimated to be approximately 10% of Fixed Fees. Campbell will charge only for the actual expense amount on a "pass-through" basis. Campbell will obtain approval from Client prior to incurring any expenses associated with the performance of Services hereunder to the extent such expenses are not contemplated within the terms of the SOW. Campbell will provide receipts and any other back-up documentation in accordance with applicable IRS regulations and as may otherwise be reasonably requested by Client ("Expense Documentation") for any expenses for which it seeks reimbursement hereunder and Campbell acknowledges and agrees Client will have no obligation to reimburse for expenses for which no Expense Documentation is provided. Further, in addition to project-related expenses, service provider or vendor fees will be billed as expenses on a "pass-through" basis. The estimate of the fees for service providers or vendors will be determined following the vendor selection process. All expenses will be reimbursed monthly in arrears.

Campbell will bill each Participant for its applicable share in fees upon execution of this Agreement and will thereafter bill each such Participant for its applicable share of fees on the first day of the month.

Campbell shall accurately document spend per retained health careprofessional and timely provide such spend to Client in an approved format that Client will provide to Campbell by Client prior to retention of the health care professionals so that Client is able to report the information as required by state and federal transparency laws. Campbell will liaise with a designated compliance representative of Client to ensure all compliance requirements are fulfilled in a manner acceptable to each Participant.

7. Payment Terms.

7.1. Each Participant will pay its applicable share of Campbell's fees for Services and will reimburse Campbell for its applicable share of authorized expenses (other than reasonably disputed amounts) by ACH credit within forty-five (45) days of receipt by each Participant of a correct invoice from Campbell, provided, however that, if applicable, each Participant agrees to use its best efforts to pay to Campbell such Participant's initial Participant Security Deposit and applicable share the initial Fixed Fee Amount by ACH credit as soon as practicable upon receipt of invoices therefor. Invoices will be issued to each Participant in accordance with the allocation of costs determined by Campbell as described in Section 5 above. Each invoice will include a description of the deliverables and amounts due. Invoices for allowable expenses incurred by Campbell will be itemized. All invoices submitted by Campbell will state amounts due in U.S. dollars and all payments made by each Participant will be in U.S. dollars and will be delivered electronically to the bank account as provided by Campbell, or to such other address as Campbell may subsequently designate by notice. If any Participant fails to pay for Services rendered and collection efforts become necessary pursuant to Section 5 above, in addition to any other remedy available to Campbell, such Participant shall be responsible for all collection costs incurred by Campbell.

8. Confidentiality.

8.1. During the term of this Agreement, Campbell and Participants may each receive, learn or have access to confidential information of Campbell or one or more Participants, or third parties to whom Campbell or one or more Participants has an obligation of confidentiality, including but not limited to a Participant's products or business plans. Each party may also receive, learn or have access to additional confidential information of Campbell or one or more Participants that is generated during the course of or as a result of performance of Services hereunder. All such information will be deemed "Confidential Information". Such Confidential Information will not be subject to obligations of non-disclosure and non-use if it:

8.1.1. was already known to the receiving party at the time of disclosure by or on behalf of the disclosing party as shown by prior written records; or

8.1.2. is already available or becomes available in print or other tangible form, to the public through no fault of the receiving party; or

8.1.3. was received by the receiving party from a third party who has the right to disclose it and who did not receive it, directly or indirectly, from or on behalf of the disclosing party; or

8.1.4. is independently developed by the receiving party without use of or reference to the disclosing party's Confidential Information.

8.2. For a period of ten (10) years from the date of disclosure, Campbell and each Participant will keep all Confidential Information in confidence, and will not disclose it to anyone (including through lecture, presentation, manuscript, abstract, poster or any other publication) except as



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER 

otherwise expressly provided in this Agreement or unless authorized in writing by the disclosing party.

8.3. Further, each party will use the other party's Confidential Information solely for the purpose of performing its obligations under this Agreement.

8.4. Campbell and each Participant agree to not make copies of another party's Confidential Information, aside from those copies required for performing its obligations under this Agreement. At any time upon a party's demand or upon termination of this Agreement, parties receiving the Confidential Information of other parties will return to such disclosing parties all such Confidential Information, including any copies; provided, however, that the receiving party may retain one copy for archival purposes.

8.5. In the event that any Confidential Information is required to be disclosed pursuant to any judicial or government request, requirement or order, the party required to make such disclosure shall take reasonable steps to provide the other party with sufficient prior notice in order to allow such party to contest such request, requirement or order. In such event, the party required to make disclosure shall cooperate reasonably with such other party, at such other party's cost and expense, in seeking confidential treatment of such requested or compelled disclosure. Thereafter, the party required to make disclosure shall only disclose Confidential Information to the extent required in order to comply with such request, requirement or order.

8.6. Each party will receive and transmit Confidential Information in a secure manner and store in a secure manner and not on servers accessible to an entity or person not bound by confidentiality under this Agreement.

8.7. Campbell will comply with all applicable federal, state, and local laws and regulations applicable to Campbell hereunder. Each Participant will comply with all applicable federal, state, and local laws and regulations applicable to it hereunder.

The obligations and restrictions set forth in this Section will survive the termination or expiration of this Agreement.

9. <u>Protection of Personal Information</u>. Campbell acknowledges that in connection with this Agreement, Client will not provide to Campbell or require Campbell to process, receive, use or disclose protected health information ("PHI"), as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). In the event that Campbell inadvertently receives PHI, Campbell agrees to maintain such PHI in strict confidence and not to further use or further disclose the PHI to any third party.

10. <u>Rights, Ownership and License</u>.

10.1. Notwithstanding Section 10.2, as between each Participant and Campbell, Campbell shall retain all intellectual property rights in the following items independently or as they may be incorporated in the deliverables (the "Campbell Property"):

10.1.1. Any content, applications, formula, data, know-how, techniques, tools, templates, models, graphics, images, or other materials, whether in print, online, or other electronic format (collectively, the "Materials"), provided to Client by Campbell as part of the Services, whether created/provided by Campbell or Vendors (defined in Section 18), but in the case of vendor-created/provided materials, to the extent provided in any Third Party Agreement (as defined below). Campbell Property may not be copied, reproduced, licensed, or sold by Client.

10.1.2. All Materials which are conceived, produced, used or updated in the course of providing Services, whether by Campbell or Vendors, to the extent such Materials: a) were not created exclusively for Client by Campbell in performing the Services; b) do not contain a Participant's Confidential Information; c) are not uniquely applicable to Client; and/or d) have general applicability to Campbell's business practices.

Except as otherwise expressly set forth in the Statement of Work, Campbell hereby grants each Participant a perpetual, royalty-free, nontransferable, nonexclusive license to access and use the Campbell Property as embodied in the deliverables and solely for use of such Campbell Property as incorporated into the deliverables. In the event a Participant is terminated under this Agreement, its rights under the foregoing license shall terminate.

10.2. Except to the extent set forth in Section 10.1 above, upon payment in full for Services performed to date, Client shall own all intellectual property rights in all deliverables which arise from or are created as a result of the Services ("Client Property"), whether created by Campbell or by Vendors. Any and all such Client Property which constitutes copyrightable material created by Campbell as part of the deliverables shall be considered "Works Made for Hire" (as that term is defined under U.S. copyright laws) for the benefit of Client and all rights therein shall reside in Client as author and copyright owner without reservations of any kind.

10.3. Participants hereby grant to Campbell and its affiliates a limited, non-exclusive, worldwide, royalty-free, fully paid-up, sublicenseable (to Third Party Vendors only, as necessary and required), non-transferable, license during the term of this Agreement to use any Participant intellectual property (including all trademarks relating exclusively to the Program) necessary for, and for the sole purpose of providing the Services hereunder, and each Participant represents and warrants that it has the rights necessary to grant such license.

11. Liability Insurance. Campbell will, at Campbell's sole cost and expense, procure and maintain during the term of this Agreement and for a period of two (2) years following the termination or expiration of this Agreement the following minimum insurance coverage, written by insurance companies authorized to do business in the applicable jurisdiction(s) with a minimum financial rating of at least an "A-" or higher by the latest edition of A.M. Best or its equivalent, the policies for which will be primary and non-contributory:

a. Commercial General Liability including liability coverage for Premises Operations, Blanket Contractual, Personal Injury and Advertising Injury and Products/Completed Operations in amounts not less than $2,000,000 per occurrence and $10,000,000 annual aggregate; and

b. Employers Liability and Workers' Compensation Insurance:
   1. Employers Liability: in amounts not less than $1,000,000 per occurrence and $1,000,000 annual aggregate; and
   2. Workers' Compensation: coverage as mandated by applicable state statutes.

c. Automobile Liability in amounts not less than $1,000,000 per occurrence and $1,000,000 annual aggregate covering all owned, hired and non-owned automobile equipment; and

d. Excess/Umbrella Liability Insurance in amounts not less than $10,000,000 per occurrence and $25,000,000 annual aggregate; and

e. Professional Liability Insurance in amounts not less than $2,000,000 per occurrence and $2,000,000 annual aggregate.

Any insurance policies which are written on a "claims-made" basis shall be kept in force for not less than two years following termination or expiration of the Agreement. Evidence of successive policy periods shall be made by the annual issuance of a certificate of insurance to Client. Alternatively, a copy of an "extended reporting period" endorsement, expiring no less than two years following completion of the work covered by this Agreement, shall be provided to Client.

Campbell waives, and will require all of its insurers to waive, all rights of recovery against Client and each Participant and their respective officers, directors, shareholders, employees, consultants, authorized agents and assigns, arising from any perils insured against in connection with this Agreement, whether in contract, tort (including negligence and strict liability) or otherwise. Before the commencement of the Services hereunder, and when otherwise reasonably requested by Client, Campbell agrees to submit to Client a certificate of insurance ACORD Form 25-S (1/95), or latest edition for each insurance policy obtained by Campbell as required under this Agreement. Client shall be provided with certified endorsements evidencing existence of the requirements contained above including an "extended reporting period" endorsement and primary and non-contributory endorsement. The certificate of insurance must be signed by a duly authorized officer or agent of the insurer. In addition, Campbell will provide Client with written notice at least thirty (30) days prior to cancellation, non-renewal or material adverse change in such insurance. The standard certificate of insurance cancellation language shall be modified to comply with this requirement.

The obligations set forth in this Section shall survive the termination or expiration of this Agreement.

12. Standard of Performance.

12.1. Campbell represents and warrants that it has the right to enter into and perform under this Agreement. Campbell represents and warrants that it will not take any actions on behalf of Client except as expressly authorized by Client in the Statement of Work, and that all Services will be performed in conformance with all applicable laws, regulations and legally enforceable rules governing the Services. Campbell will perform all Services in accordance with (i) the requirements set forth in this Agreement, (ii) a high degree of care, skill, diligence, professional knowledge, judgment and expertise according to generally accepted professional and industry standards, in a well-managed, organized, and efficient manner, and (iii) in material conformance with the description set forth in the Statement of Work.

12.2. Each employee, contractor, or agent assigned to perform the Services hereunder will have the proper skills and training so as to be able to perform in a competent and professional manner and will perform all work in material conformance with the description set forth in the Statement of Work. Furthermore, Campbell, Campbell's employees, contractors, and agents, will adhere to appropriate standards of professional behavior while performing services for Client.

12.3. Campbell may designate the personnel to perform services pursuant to this Agreement, and shall promptly notify Client of all such personnel when designated. In addition, Client may request that remedial action, including the removal of any of Campbell's personnel, be taken if the conduct or performance of Campbell's personnel is not in accordance with required standards. Promptly, upon Client's request, Campbell will use diligent efforts to replace such personnel with other personnel who possess the necessary skills, knowledge and training to perform the services contemplated. Campbell shall periodically review the project timelines and milestones and revise its staffing levels accordingly, subject to Client's prior approval, before making any significant reduction in staff.

12.4. Upon notice to Client of the affiliate(s) in question, Campbell may consult with employees of its affiliates who have expertise in the subject matter related to the Services and are subject to the same confidentiality obligations that Campbell is subject to; however, Client may at any time notify Campbell that no further consultations may take place. In that instance, Campbell shall ensure that all Confidential Information is retrieved from the possession of employees of its affiliates and create a firewall which will ensure that no further sharing of Confidential Information occurs with such affiliates.

12.5. Pursuant to this Agreement, Campbell may obtain and deliver to Client information that has been derived from a variety of sources, including but not limited to proprietary data services, government information, industry publications, Client press releases and other Client content, web sites, marketing materials and other generally available public sources. All information, statements, facts, analyses, interpretations and opinions contained in Campbell's deliverables and based on the foregoing are provided without representation or warranty by Campbell, its affiliates, officers, employees, contractors or business partners as to accuracy, completeness, usefulness or otherwise. Nothing herein is intended to negate Campbell's standard of performance obligations under this Section 12.

12.6. THE EXPRESS WARRANTIES SET FORTH IN THIS AGREEMENT ARE CAMPBELL'S SOLE AND EXCLUSIVE WARRANTIES PROVIDED CONCERNING THE SERVICES AND ANY DELIVERABLES, AND CAMPBELL DISCLAIMS ALL OTHER WARRANTIES AND REPRESENTATIONS, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, OR OTHERWISE.

12.7. Each Participant represents, warrants and covenants as follows: (a) all information provided to Campbell in connection with the Services shall be accurate and complete in all material respects, and not misleading whether by omission or otherwise; (b) all of its activities in connection with this Agreement will be conducted in accordance with all applicable laws, rules and regulations; (c) this Agreement is executed for it by its duly authorized representative and is binding on it in accordance with the terms of this Agreement; (d) it has the right to enter into and perform under this Agreement and (e) it has no obligations, contractual or otherwise, that would conflict with or prevent it from complying with the terms of this Agreement.

13. Indemnification and Liability.

13.1. Campbell will indemnify, defend and hold harmless each Participant and their respective owners, officers, directors, agents, employees, representatives (collectively, "Client Indemnitees") against any third party liability, damage, loss or expense of any kind (including reasonable attorney's fees and expenses of litigation) incurred by or imposed upon Client Indemnitees to the extent arising from (a) an allegation that the Services or any Campbell Property infringes any right protected by any patent, copyright, trademark, trade secret, or other intellectual property right of any third party; (b) any willful misconduct or negligent act or omission of Campbell, its agents, directors, officers or employees; (c) any material breach of this Agreement by Campbell, its agents, directors, officers or employees; or (d) any failure of Campbell to comply with all relevant laws, regulations and legally enforceable rules governing the Services. For purposes of this Section 13.1, "third party" means any party other than Campbell and the Participants.

13.2. Each Participant will indemnify, defend and hold harmless Campbell, its owners, directors, agents, employees, representatives, and subcontractors (collectively "Campbell Indemnitees") against any third party liability, damage, loss or expenses of any kind (including reasonable attorney's fees and expenses of litigation) incurred by or imposed upon such Campbell Indemnitees to the extent arising from: (i) any willful misconduct or negligent act or omission of such Participant, its agents, directors, officers or employees, (ii) any material breach of this

Agreement by such Participant, its agents, directors, officers, or employees, and (iii) any product liability claims relating to such Participant's products, whether arising out of warranty, negligence, strict liability (including manufacturing, design, warning or instruction claims) or any content-based claim or other product-based statutory claim except to the extent any such claim arises as a result of the willful misconduct or grossly negligent act or omission of Campbell.

Each Participant will, to the extent of its respective applicable share (except as set forth below), indemnify, defend and hold harmless Campbell Indemnitees against any liability, damage, loss, fines, penalties or expenses (including, without limitation, reasonable attorney's fees and expenses of litigation incurred by or imposed upon such Campbell Indemnitees to the extent arising from any third party (including, without limitation, governmental agencies and lawmaking bodies) claims, suits, actions and/or demands arising out of this Agreement or Campbell's performance of the Services (collectively "Claims," and each, a "Claim") except to the extent any such Claim (i) is subject to Campbell's indemnification obligations set forth in Section 13.1 above, or (ii) arises as a result of the willful misconduct or negligent act or omission of Campbell. To the extent Campbell is aware that a Claim results from the actions of one or more specific Participants, then Campbell will seek indemnification solely from such Participant(s), This indemnity shall not apply to any expenses incurred by Campbell Indemnitees in connection with responding to subpoenas or other similar legal orders or requests for information not arising out of a Claim as defined herein.

13.3. If the Services or Campbell Property is held to infringe per subsection 13.1 (a) above, Campbell shall have the option, at its expense, to take one or more of the following remedial steps: (i) procure for Client the right to continue use of the service or deliverable at no additional cost to Client; (ii) replace the service or deliverable with a non-infringing service or deliverable; (iii) modify the service or deliverable so that it becomes non-infringing; or (iv) if it is not commercially reasonable to perform any of the foregoing options, refund to Client a pro-rated portion of the applicable fees paid by Client for the service or deliverable. Sections 13.1 and 13.3 state Campbell's entire liability and Client's exclusive remedy for any claim of infringement.

13.4. A party's agreement to defend and indemnify another party as set forth herein above ("Indemnified Party") is conditioned upon the Indemnified Party: (a) providing prompt written notice to the first party (the "Indemnifying Party") of any claim, demand or action arising out of the indemnified activities after the Indemnified Party has knowledge of such claim, demand or action; (b) permitting the Indemnifying Party to assume full responsibility and authority to investigate, prepare for and defend against any such claim or demand; (c) assisting the Indemnifying Party, at the Indemnifying Party's reasonable expense, in the investigation of, preparation for and defense of any such claim or demand; and (d) not compromising or settling such claim or demand without the Indemnifying Party's written consent, which consent shall not be unreasonably withheld. An Indemnified Party may, at its cost and expense, hire legal counsel of its choice to participate in an advisory capacity in discussions, negotiations, or proceedings of the claim.

13.5. **[Intentionally Omitted]**

13.6. Except for its indemnification obligations and its obligations of confidentiality under this Agreement, Campbell's aggregate and cumulative liability to each Participant and each such Participant's aggregate and cumulative liability to Campbell for damages of whatever nature arising hereunder shall not exceed three times the amount of Fixed Fees and approved and reasonable travel, lodging and other out-of-pocket project- related expenses paid or payable to Campbell by such Participant under this Agreement. For purposes of this Section 13.6 expenses shall not include any service provider or Vendor fees that will be billed as expenses

on a "pass-through" basis. In no event shall a party be liable for consequential, special, incidental or punitive loss, damage or expenses (including but not limited to lost profits, savings, data, or the cost of recreating lost data), even if it has been advised of their possible existence.

14. Publications. Campbell shall not use any Client Property for teaching, research, education, clinical or publication purposes without the prior written consent of Client. The obligations of this Section will survive the termination or expiration of this Agreement.

15. Adverse Event Reporting. During the term of this Agreement, Campbell agrees to report to each Participant within twenty-four (24) hours of receiving notice, any Adverse Event (any unintended medical or physical condition that is evidenced during the use of a Participant product) or any complaint about a Participant's product that comes to Campbell's attention.

16. Notices. All legal notices or demands provided for by this Agreement will be in writing and will be deemed to have been given when delivered by certified mail, return receipt requested, or by overnight courier. All such communications should be addressed to the address of the respective party stated under their signature and to the attention of such party's "General Counsel".

17. Assignment. Campbell may not assign this Agreement or its obligations hereunder in whole or in part without Client's prior written consent. No assignment will relieve a party of the performance of any accrued obligation that such party may have under this Agreement.

18. Independent Contractor/Vendors. Campbell is and will be treated as an independent contractor and not an agent, employee, joint venturer or partner of Client. Campbell will not enter into any agreements with a Vendor (as defined below) or subcontract the Services or any part thereof without a Subcomittee Representative's prior written approval. If Campbell enters into an agreement ("Third Party Agreements") with a Vendor (as defined below) as part of the Services, then Client hereby authorizes Campbell to execute such Third Party Agreements for Client as its representative. Client shall have the right to approve all Third Party Agreements prior to execution as set forth in Section 18 hereof, such approval shall not be unreasonably withheld or delayed. Campbell shall have no liability for the acts or omissions of Vendors or for the performance by Vendors of Third Party Agreements (provided that any such Third Party Agreement expressly designates Client and/or each Participant as third-party beneficiaries under such agreement with a right of direct action against the relevant Vendor), except to the extent there is a failure of a Vendor to perform that is caused by Campbell's negligence or willful misconduct. For the purposes of this Agreement "Vendor" means a third party engaged by Campbell to perform a task contemplated under the Statement of Work to be performed by a third party. Client shall complete its initial review of any Third Party Agreement between Campbell and a Vendor within ten (10) business days after receiving such Third Party Agreement from Campbell and any subsequent reviews, if required, within five (5) business days after receipt. Any revisions to such Third Party Vendor Agreements made by Client which increase Third Party Vendor expenses and/or cause Campbell to incur extraordinary outside legal fees and expenses shall be negotiated in good faith between Campbell and Client as to the amount that will be reimbursable by Client. In the event that Client does not approve the selection of a Vendor or the terms of a Third Party Vendor Agreement in a reasonably timely manner, Campbell shall not be deemed in breach of its obligations hereunder. Campbell will pay, when due, salaries, wages and other forms of compensation or reimbursement and all applicable federal, state and local withholding taxes and unemployment taxes, as well as social security, state disability insurance and all other payroll charges payable to, or on behalf of, Campbell's personnel working under this Agreement. No federal, state or local income or withholding taxes, no social security, state disability insurance, unemployment taxes or workers' compensation, life, casualty, or disability insurance, or health, retirement or any other employment benefits will be paid by Client to or for the benefit of Campbell or Campbell's employees,



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER 

and Campbell waives any right to such benefits. Pass through costs for approved Vendors shall be paid by Client without any additional fees added to such costs by Campbell.

19. Applicable Law. This Agreement will in all respects be governed by, interpreted, construed and enforced in accordance with the laws of the State of New York applicable to contracts executed and to be fully performed therein. Except for actions seeking injunctive relief initiated by a party to protect its Confidential Information which may be brought in any court of competent jurisdiction in the continental U.S., the parties agree that any action or proceeding arising out of or in connection with this Agreement will be in a federal or state court of appropriate venue and subject matter jurisdiction located in the State of New York. Each party hereto irrevocably consents to the personal jurisdiction of the courts in the State of New York.

20. Entire Agreement. This Agreement, together with appendices, attachments and/or exhibits, constitutes the entire agreement between the parties with respect to the subject matter contained herein, and this Agreement supersedes all prior understandings and agreements between Campbell and all of the Participants with respect to the subject matter contained herein. This Agreement and the rights and obligations hereunder may not be modified, amended or waived, whether in whole or in part, except by a writing signed by both parties. The terms of this Agreement shall prevail, notwithstanding any variance with any purchase order or other written instrument submitted by any party, whether or not formally rejected by the receiving party.

21. Waiver. No waiver of any term, provision or condition of this Agreement whether by conduct or otherwise in any one or more instances will be deemed to be or construed as a further or continuing waiver of any such term, provision or condition, or of any other term, provision or condition of this Agreement.

22. Invalidity. The terms of this Agreement will be severable so that if any term, clause, or provision hereof is deemed invalid or unenforceable for any reason, such invalidity or unenforceability will not affect the remaining terms, clauses and provisions hereof, which will continue with full force and effect to the maximum allowable extent under applicable law.

23. Use of Name. Under no circumstances may any party use the name of another party for promotional literature or advertising without the prior written permission and approval of the other party. Notwithstanding the foregoing, in the event that a party is required to use the name of another party in submissions to regulatory authorities, no prior consent for such use will be necessary.

24. Debarment. Campbell represents that neither it, nor its officers, employees, agents or subcontractors are currently, or have ever been (i) debarred under Section 306(a) or 306(b) of the United States Federal Food, Drug and Cosmetic Act, as may be amended and supplemented from time to time; (ii) charged with, or convicted of, any felony or misdemeanor within the ambit of 42 U.S.C. §§ 1320a-7(a), 1320a-7(b)(l)-(3), or proposed for exclusion or (iii) excluded, suspended or debarred from participation, or otherwise ineligible to participate, in any U.S. Federal or State health care programs (including convicted of a criminal offense that falls within the scope of 42 U.S.C. §1320a-7 but not yet excluded, debarred, suspended, or otherwise declared ineligible), or excluded, suspended or debarred from participation, or otherwise ineligible to participate, in any U.S. Federal procurement or non procurement programs. Notwithstanding any provision in this Agreement to the contrary, Client may immediately terminate this Agreement if Campbell violates this Section. Campbell will notify Client immediately, but in no event later than five (5) business days, after knowledge of any such exclusion, debarment, suspension or otherwise ineligibility occurring during the term of this Agreement, or if any action or investigation is pending.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER 

25. Force Majeure. No party will be liable for any delay or failure to perform as required by this Agreement to the extent that such delay or failure to perform is caused by circumstances reasonably beyond such party's control, such as labor disputes, accidents, any act, law, order or requirement of any governmental agency or authority, civil disorders or commotions, acts of aggression, fire or other casualty, strikes, acts of God, explosions, or material shortages. Performance time will be considered extended for a period of time equivalent to the time lost because of any such delay or failure to perform; however, in any event, the extension of time will not exceed sixty (60) days (at which point either party may terminate the Agreement), unless the parties otherwise agree in writing.

26. Non-Exclusivity. Campbell maintains the right, during or after the term of this Agreement and at Campbell's sole discretion, to render similar services to other companies, so long as doing so does not create a conflict of interest with third parties and so long as Campbell does not breach its obligations under this Agreement, including without limitation those set forth in Section 8 on Confidentiality.

27. Headings/Counterparts. The headings contained in this Agreement are for convenience of reference only and are not intended to have any substantive significance in interpreting this Agreement. This Agreement may be executed in any number of counterparts, and each such counterpart hereof will be deemed to be an original and all such counterparts together will constitute one agreement.

28. Equal Employment Opportunity. Campbell represents that Campbell is in compliance with all applicable laws, regulations, and orders with respect to equal employment opportunity and either has provided or will provide to Client the legally required certifications and representations regarding equal employment opportunity that Client may require under such laws, regulations, and orders.

29. Behavior of Campbell's Employees and Independent Contractors. In performing Services under this Agreement, Campbell, Campbell's employees and independent contractors will: (i) not commit any act of sexual harassment nor discriminate on the basis of sex, race, religion, national origin, disability, marital status, Veteran's status and age and any other status protected by law; and (ii) conduct themselves ethically and professionally.

30. Requisites to Providing Service. At the request of Client, prior to and/or during the performance of any services, Campbell will: (i) provide Client with any required business or tax information related to services performed under the Statement of Work; and (ii) cause Campbell's personnel to comply with all reasonable requirements specified by Client, including without limitation: submitting to a drug screen in the event that Client has a reasonable belief of drug use, and a background check.

31. Compatibility with Software. All documentation generated by Campbell under this Agreement for Client's use will be in MS Office 2007 or as otherwise specified in the Statement of Work.

32. Non-Solicitation. Campbell and each Participant agree that each will not, during the term of the Agreement and for a period of twelve (12) months after the date of termination of this Agreement, without the prior written consent of the other party, knowingly solicit or induce any officer, employee, agent or contractor of such other party with whom it had dealings in the course of providing the Services, to terminate their employment or engagement with such other party or to otherwise hire such individual in any capacity. The solicitation prohibition of the preceding sentence shall not apply to or prohibit: (a) general newspaper or Internet advertisements and materials not directly targeted at such persons, or (b) solicitations of any employee who has been terminated by either party or its affiliates prior to commencement of employment discussions between the other party and such employee.

AGREED AND ACCEPTED as of the Effective Date set forth above.

**CAMPBELL ALLIANCE, LTD.**

**By:** Marilyn D. Williams/st

**Name:** Marilyn D. Williams

**Title:** Director, Contracts

**Address for notice:**

8045 Arco Corporate Drive, Suite 200
Raleigh, NC 27617
Attention: Contracts

**[Participants' signatures to follow]**

**ACTAVIS, INC.**

**By:** [signature]

**Name:** Charles D. Ebert, PhD

**Title:** Sr. Vice Pres, Brand R+D

**Date:** February 19, 2014

**Address for notice:**
400 Interpace Parkway
Parsippany, NJ 07054
Attn: Chief Legal Officer
USlegal@actavis.com
Fax: (862)261-7922

**ROXANE LABORATORIES, INC.**

**By:** ____________________

**Name:** ____________________

**Title:** ____________________

**Date:** ____________________

**Address for notice:**

**ENDO PHARMACEUTICALS INC.**

**By:** ____________________

**Name:** ____________________

**Title:** ____________________

**Date:** ____________________

**Address for notice:**
100 Endo Boulevard
Chadds Ford, Pennsylvania 19317

**JANSSEN PHARMACEUTICALS, INC.**

**By:** ____________________

**Name:** ____________________

**Title:** ____________________

**Date:** ____________________

**Address for notice:**

1125 Trenton-Harbourton Road
Titusville, NJ 08650
Attn: VP, Law

ACTAVIS, INC.

By: ______________________

Name: ______________________

Title: ______________________

Date: ______________________

Address for notice:
400 Interpace Parkway
Parsippany, NJ 07054
Attn: Chief Legal Officer
USlegal@actavis.com
Fax: (862)261-7922

ROXANE LABORATORIES, INC.

By: Randall S Wilson

Name: Randall S. Wilson

Title: GM

Date: 2/25/2014

Address for notice:
1809 Wilson Road
Columbus, OH 43228

ENDO PHARMACEUTICALS INC.

By: ______________________

Name: ______________________

Title: ______________________

Date: ______________________

Address for notice:
100 Endo Boulevard
Chadds Ford, Pennsylvania 19317

JANSSEN PHARMACEUTICALS, INC.

By: ______________________

Name: ______________________

Title: ______________________

Date: ______________________

Address for notice:

1125 Trenton-Harbourton Road
Titusville, NJ 08650
Attn: VP, Law

**ACTAVIS, INC.**

**By:** ______________________

**Name:** ______________________

**Title:** ______________________

**Date:** ______________________

**Address for notice:**
400 Interpace Parkway
Parsippany, NJ 07054
Attn: Chief Legal Officer
USlegal@actavis.com
Fax: (862)261-7922

**ROXANE LABORATORIES, INC.**

**By:** ______________________

**Name:** ______________________

**Title:** ______________________

**Date:** ______________________

**Address for notice:**

**ENDO PHARMACEUTICALS INC.**

**By:** ______________________

**Name:** Ivan Gergel, MD

**Title:** EVP, R&D and Chief Scientific Officer

**Date:** February 20, 2014

**Address for notice:**
1400 Atwater Drive
Malvern, Pennsylvania 19355

**JANSSEN PHARMACEUTICALS, INC.**

**By:** ______________________

**Name:** ______________________

**Title:** ______________________

**Date:** ______________________

**Address for notice:**

1125 Trenton-Harbourton Road
Titusville, NJ 08650
Attn: VP, Law

**ACTAVIS, INC.**

By: ______________________________

Name: ___________________________

Title: ___________________________

Date: ___________________________

**Address for notice:**
400 Interpace Parkway
Parsippany, NJ 07054
Attn: Chief Legal Officer
**USlegal@actavis.com**
Fax: (862)261-7922

**ROXANE LABORATORIES, INC.**

By: ______________________________

Name: ___________________________

Title: ___________________________

Date: ___________________________

**Address for notice:**

**ENDO PHARMACEUTICALS INC.**

By: ______________________________

Name: ___________________________

Title: ___________________________

Date: ___________________________

**Address for notice:**
100 Endo Boulevard
Chadds Ford, Pennsylvania 19317

**JANSSEN PHARMACEUTICALS, INC.**

By: ______________________________

Name: ___________________________

Title: ___________________________

Date: ___________________________

MILA ETROPOLSKI

Digitally signed by MILA ETROPOLSKI
DN: c=US, o=JNJ, ou=Employees, ou=340252, cn=MILA ETROPOLSKI, email=MEtropol@its.jnj.com
Reason: I agree to specified portions of this document.
Date: 2014.02.20 11:12:55 -05'00'

**Address for notice:**

1125 Trenton-Harbourton Road
Titusville, NJ 08650
Attn: VP, Law



 

Mallinckrodt Pharma
675 McDonnell Blvd (301-4-W)
Hazelwood, MO 63042

**MALLINCKRODT PHARMACEUTICALS**

By: ANTHONY LASSITER

Name: Anthony Lassiter, MD

Title: VP, Global PV and Med Info

Date: 28 FEB 14

**Address for notice:**
Mallinckrodt Inc.
675 McDonnell Blvd
Mail Stop 10-3-5
Hazelwood, MO 63042
Attention: Regulatory Counsel

Legal Approved

**PFIZER INC.**

By: ______________________

Name: ______________________

Title: ______________________

Date: ______________________

**Address for notice:**
235 East 42nd ST.
New York, NY 10017

**PURDUE PHARMA L.P.**

By: ______________________

Name: ______________________

Title: ______________________

Date: ______________________

**Address for notice:**

**RHODES PHARMACEUTICALS L.P**

By: ______________________

Name: ______________________

Title: ______________________

Date: ______________________

**Address for notice:**

**MALLINCKRODT PHARMACEUTICALS**

**By:** ______________________ **Address for notice:**

**Name:** ______________________

**Title:** ______________________

**Date:** ______________________

**PFIZER INC.**

**By:** [signature] **Address for notice:**
235 East 42nd ST.
New York, NY 10017

**Name:** ALAN H. LITWACK

**Title:** OPIOID PRODUCTS - GCTL

**Date:** 7/25/14

**PURDUE PHARMA L.P.**

**By:** ______________________ **Address for notice:**

**Name:** ______________________

**Title:** ______________________

**Date:** ______________________

**RHODES PHARMACEUTICALS L.P**

**By:** ______________________ **Address for notice:**

**Name:** ______________________

**Title:** ______________________

**Date:** ______________________

MALLINCKRODT PHARMACEUTICALS

By: ____________________ Address for notice:

Name: ____________________

Title: ____________________

Date: ____________________

PFIZER INC.

By: ____________________ Address for notice:
235 East 42nd ST.
New York, NY 10017

Name: ____________________

Title: ____________________

Date: ____________________

PURDUE PHARMA L.P.

By: Todd F. Baumgartner Address for notice:
201 TRESSER BLVD.
STAMFORD, CT 06901

Name: Todd F. Baumgartner, M.D., M.P.H.

Title: Vice President, Regulatory Affairs

Date: 21 FEB 2014

RHODES PHARMACEUTICALS L.P

By: ____________________ Address for notice:

Name: ____________________

Title: ____________________

Date: ____________________

**MALLINCKRODT PHARMACEUTICALS**

**By:** ______________________ **Address for notice:**

**Name:** ______________________

**Title:** ______________________

**Date:** ______________________

**PFIZER INC.**

**By:** ______________________ **Address for notice:**
235 East 42nd ST.
New York, NY 10017

**Name:** ______________________

**Title:** ______________________

**Date:** ______________________

**PURDUE PHARMA L.P.**

**By:** ______________________ **Address for notice:**

**Name:** ______________________

**Title:** ______________________

**Date:** ______________________

**RHODES PHARMACEUTICALS L.P**

**By:** Vincent Mancinelli II **Address for notice:**
498 Washington Street
Coventry, RI 02816

**Name:** Vincent Mancinelli II

**Title:** VP/GM

**Date:** 03/05/14



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**ZOGENIX, INC.**

**By:** [signature]

**Name:** Edward F. Smith III

**Title:** Vice President, Regulatory Affairs

**Date:** 21 Feb 2014

**Address for notice:**

Zogenix, Inc
5858 Horton St., Ste 455
Emeryville, CA 94608



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit A**
**NEW PARTICIPANT CONFIRMATION FORM**

We, the undersigned, hereby agree to abide by the terms of that certain PMR Project Management Agreement (the "Agreement"), entered into by and between Campbell Alliance Group, Inc. and the Participants (each individually, a "Participant"), thereby becoming a Participant to the Agreement for all intents and purposes, as of the ____ day of ________________, 20__.

[INSERT NAME OF NEW PARTICIPANT]

By: ______________________________

Name: ___________________________

Title: ____________________________