# EXHIBIT 1



SKIKOS
CRAWFORD
SKIKOS
& JOSEPH

One Sansome Street, Suite 2830, San Francisco, CA 94104   877 475-4567    fax 415 546-7301

March 18, 2019

**Via Electronic Mail**
Special Master David Cohen
Email: David@SpecialMaster.Law

Re: *In re National Prescription Opiate Litigation*, MDL No. 2804
   Personal Jurisdiction Discovery re Defendant Teva Pharmaceutical Industries, Ltd.

Dear Special Master Cohen:

We write on behalf of Plaintiffs in response to your March 16 request for a report as to the extent the parties reached agreement on the timing and scope of personal jurisdiction discovery as to the foreign defendants, and the parties' positions if they did not reach agreement on such discovery. Plaintiffs here provide a report on the parties' positions as to Defendant Teva Pharmaceutical Industries Ltd. ("Teva Ltd.").

The parties are at an impasse regarding the scope of jurisdictional discovery. Plaintiffs have offered to narrow substantially their discovery requests to encompass many fewer topics and requests than originally proposed, but Teva Ltd. (a) refuses to produce documents or provide written discovery at all; and (b) insists the only discovery it will offer is a single 30(b)(6) deposition by a tax employee, to be taken in Israel, limited to the question of "corporate formalities." As explained below, these limitations are unreasonable and simply ignore nearly all the factors that are relevant to the assertion of jurisdiction. Plaintiffs' proposals are reasonable and we ask that you order Teva Ltd. to provide discovery in accordance with our most recent proposal, described below.

**Summary of Positions**

Plaintiffs' position is that at a minimum they should be allowed to conduct the following personal jurisdiction discovery:

- Rule 30(b)(6) Deposition: Plaintiffs have reduced their topics to 15 from the original 29 requested. *See* Att. 1, and below.

- Deposition of One Teva Ltd. Fact Witness: Plaintiffs seek the deposition of Brendan O'Grady, Teva Ltd.'s Executive VP of North American Commercial Operations. Plaintiffs believe Mr. O'Grady works in the United States, and Plaintiffs agree to take the deposition at a U.S. location of his choice.

- Requests for Documents: Plaintiffs have reduced the categories to 18 from the original 36 requested. Plaintiffs at this time agree to defer on their special interrogatories they served. *See* Att. 2, and below.

S K I K O S ,  C R A W F O R D ,  S K I K O S  &  J O S E P H  LLP

Special Master Cohen
March 18, 2019
Page 2

- <u>Timing</u>: Plaintiffs propose production of documents within 30 days, and to conduct the depositions approximately 30 days thereafter depending on the size of the production and witness/attorney availability.

Teva Ltd.'s position is as follows:

- <u>Rule 30(b)(6) Deposition</u>: Teva Ltd.'s position is to produce its Sr. VP and Head of Tax, Doron Herman, for certain unspecified categories related to "corporate formalities."

- <u>No Written Discovery</u>: Teva will not provide answers to discovery or documents related to personal jurisdiction.

There is a dispute as to whether the Rule 30(b)(6) deposition must be taken in the United States or in Israel. Plaintiffs have agreed to defer this dispute until there is resolution of the topics and witnesses who will be deposed, at which time the matter may be easily resolved.

## **Background**

Teva Ltd. is the largest manufacturer, seller and distributor of generic pharmaceutical drugs in the world and in the United States, and currently is one of the largest (if not the largest) manufacturers and distributors of opioid products in the United States. Teva Ltd. is a globally integrated corporate organization headquartered in Israel that sells and distributes its generic and name-brand opioid products in the United States through its indirect U.S. subsidiaries, including defendants Teva Pharmaceutical USA, Inc.; Cephalon, Inc. (which it acquired in 2009); and certain Actavis/Watson defendant entities (which it acquired from Allergan in 2016).

Plaintiffs first served written discovery on Teva Ltd. in the MDL in April 2018. Teva Ltd. refused to respond, claiming it had not been properly served in the cases and that CMO-1 suspended service on foreign defendants. Teva Ltd. also asserted the Court had no personal jurisdiction in the matter. On November 9, 2019 Plaintiffs obtained Judge Polster's directive that the foreign entities (including Teva Ltd.) acknowledge service, and on December 11, 2018 Teva Ltd. acknowledged service in the case.

On December 25, 2018, Plaintiffs served Teva Ltd. a Rule 30(b)(6) deposition notice, special interrogatories and written discovery on the personal jurisdiction issues. In January, Teva Ltd. responded by refusing to answer the discovery, to produce documents or to provide a witness for deposition. Teva Ltd. in January 2019 also filed a motion to dismiss claiming the Court had no personal jurisdiction over it in the matter.

Plaintiffs filed a motion with Judge Polster seeking an extension of time to respond to the motion to dismiss until after jurisdictional discovery could be taken. On February 15, 2019, Judge Polster in connection with granting an extension referred to you the issue of whether, and to what extent, Plaintiffs are entitled to jurisdictional discovery. The parties subsequently briefed the issue, with Plaintiffs taking the position that the jurisdictional discovery they served was warranted prior to deciding the motion to dismiss, and Teva taking the position that no jurisdictional discovery was warranted. A copy of Plaintiffs' March 7 letter brief to you is attached hereto. Att. 3.

S K I K O S ,  C R A W F O R D ,  S K I K O S  &  J O S E P H  LLP

Special Master Cohen
March 18, 2019
Page 3

The matter was addressed on several occasions before you, including the March 13, 2019 discovery teleconference at which you directed the parties to meet and confer as to the scope of personal jurisdiction discovery should such discovery be allowed. On March 16, 2019, you emailed the parties requesting a report today on the status of the meet and confer and the parties' positions, which Plaintiffs provide here.

### The Parties' Meet and Confer on Personal Jurisdiction Discovery

Plaintiffs in the meet and confer asserted Teva should respond to Plaintiffs' December 2018 written discovery and Rule 30(b)(6) deposition notice on personal jurisdiction issues. Plaintiffs' discovery primarily is focused on Teva' Ltd.'s operation of its business through its U.S. subsidiaries on an alter ego or agency basis as part of its global operations.

Teva's position was that Plaintiffs should be limited to a Rule 30(b)(6) deposition as to "corporate formalities" such as whether the Teva U.S. defendants were sufficiently capitalized. Teva stated it would designate its Senior VP and Head of Global Tax, Doron Herman, as its witness for deposition in Israel. Teva maintained it should not be required to answer written discovery or produce documents related to the personal jurisdiction issue.

Plaintiffs asserted written discovery is warranted, and that they should be permitted to question Teva's designee in areas beyond "corporate formalities." Plaintiffs also maintained since most of the information sought concerned Teva Ltd.'s global business enterprise, operations and control over its subsidiaries with regard to the manufacture, sale and distribution of its pharmaceutical products, Mr. Doron did not appear to have much if any personal knowledge in those areas. Plaintiffs asserted if Teva insisted on designating Mr. Doron as its Rule 30(b)(6) witness, Plaintiffs would seek the deposition of a Teva witness who appeared to have such personal knowledge. Plaintiffs also stated they would review the requests to determine whether they could be narrowed. Teva responded that it was not in a position to agree to any specific topics in the Rule 30(b)(6) notice before this submission.

### Parties' Positions on Personal Jurisdiction Discovery

Plaintiffs' position on personal jurisdiction discovery that should be allowed is as follows, without prejudice to seeking further discovery if warranted:

- Rule 30(b)(6) Deposition: Plaintiffs agree to narrow their December 2018 Rule 30(b)(6) notice to the following 15 personal jurisdiction topics (out of 29 originally specified): Nos. 1-9, 15, 17, 19-21, and, for 29, to opioids only. *See* Att. 1 (highlighted requests).

- Deposition of One Teva Ltd. Fact Witness: Plaintiffs seek to depose Brendan O'Grady, Teva Ltd.'s Executive VP and Head of its North America Commercial Operations. In that capacity, Mr. O'Grady appears to have personal knowledge as to the manner in which Teva conducts its global pharmaceutical drug business, including in the United States. Plaintiffs believe Mr. O'Grady resides in the United States, and agree to take the deposition at a location of his choosing in the U.S.

  As Mr. O'Grady appears to be personally knowledgeable about each of the topics in Plaintiffs' Rule 30(b)(6) notice, Teva might consider naming Mr. O'Grady instead of

SKIKOS, CRAWFORD, SKIKOS & JOSEPH LLP

Special Master Cohen
March 18, 2019
Page 4

Mr. Herman as its designee for that deposition as well. That should obviate the issue as to the location of the Rule 30(b)(6) deposition.

- Requests for Documents: Plaintiffs agree to narrow their December 2018 personal jurisdiction document requests to the following 18 requests (out of 36 originally served): Nos. 34-41, 49-51, 53-55, 65-66, and 68. *See* Att. 2 (highlighted requests).

- Special Interrogatories: Plaintiffs at this time agree to defer responses to its 25 personal jurisdiction interrogatories.

As set forth above, Plaintiffs understand Teva's position is that no written personal jurisdiction discovery or document production should be allowed, and that Teva should only be required to produce Mr. Herman from its tax department on topics limited to "corporate formalities." Teva states it is not able at this time to identify any particular topics in Plaintiffs' Rule 30(b)(6) notice to which he would testify. Plaintiffs note Teva also offered to provide testimony on Teva Ltd.'s direct contacts with the State of Ohio, but at the same time denies any direct contacts with the State of Ohio, so Plaintiffs are not sure this offer has any meaning.

**Brief Discussion**

Plaintiffs assert they are entitled to discovery on personal jurisdiction issues primarily with regard to its relationship with its U.S. subsidiaries as an alter ego and an agent. Plaintiffs submit they have presented a prima facie case in their March 7, 2019 brief (Att. 3) entitling them to discovery on the personal jurisdiction issues, and Plaintiffs incorporate their discussion of those issues by reference herein.

Teva Ltd. asserts it does not manufacture, promote or sell opioid products in Ohio or anywhere in the United States, and has submitted a declaration to that effect. While Plaintiffs seek to confirm through discovery Teva's assertions it does not directly operate in the United States, Plaintiffs also should be permitted personal discovery on the basis of alter ego and agency and their discovery should not be restricted in this regard.

Teva Ltd. asserts Plaintiffs are only entitled to personal jurisdiction discovery on what it terms "corporate formalities." But in order to determine if there is sufficient unity of interest and ownership that goes beyond mere ownership and shared management personnel to subject a parent company to jurisdiction, the Sixth Circuit looks at seven factors: (1) sharing the same employees and corporate officers; (2) engaging in the same business enterprise; (3) having the same address and phone lines; (4) using the same assets; (5) completing the same jobs; (6) not maintaining separate books, tax returns and financial statements; and (7) exerting control over the daily affairs of another corporation. *Anwar v. Dow Chem. Co.,* 876 F.3d 841, 849 (6th Cir. 2017). Plaintiff should be entitled to take discovery with respect to each of these elements, as each will be relevant to the Court's ultimate determination. And indeed, Plaintiffs' personal jurisdiction discovery seeks information as to each of these elements, with particular emphasis on Nos. 2, 5 and 7, elements that the evidence we previously submitted suggest may point strongly towards the assertion of jurisdiction. By insisting on discovery limited to "corporate formalities" and by naming their tax employee as their Rule 30(b)(6) designee, Teva Ltd. seeks to limit discovery to only the sixth element of the seven-part test.

S KIKOS , C RAWFORD , S KIKOS & J OSEPH LLP

Special Master Cohen
March 18, 2019
Page 5

For the foregoing reasons, Plaintiffs respectfully request that you allow them to conduct personal jurisdiction discovery, and that Teva respond at this time to Plaintiffs' limited personal jurisdiction discovery specified herein.

Respectfully submitted,

**SKIKOS, CRAWFORD, SKIKOS,**
**& JOSEPH LLP**

Mark G. Crawford, Esq.

cc:    Steve Reed, Esq.
       Rebecca Hillyer, Esq.
       Sagiv Edelman, Esq.
       xALLDEFENDANTS-MDL2804-Service@arnoldporter.com
       MDL2804Discovery@motleyrice.com

# ATTACHMENT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br><br>*All Cases* | MDL No. 2804<br><br>Case No. 17-md-2804<br><br>Judge Dan Aaron Polster |

**NOTICE OF DEPOSITION PURSUANT TO RULE 30(B)(6) TO DEFENDANT TEVA PHARMACEUTICAL INDUSTRIES, LTD.**

TO:    ALL PARTIES AND THEIR ATTORNEYS OF RECORD

PLEASE TAKE NOTICE that, pursuant to Rules 26 and 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiffs will take the deposition of TEVA PHARMACEUTICAL INDUSTRIES, LTD. ("TEVA LTD.") on January 24, 2019 commencing at 9:30 a.m. local time, at Golkow Technologies, One Liberty Place, 1650 Market Street, Suite 5150, Philadelphia, PA 19103, (856.208.4809). The deposition will be recorded stenographically, by video, and through instant visual display of testimony by means of LiveNote or other similar technology, before a notary public or other person authorized to administer oaths pursuant to Fed. R. Civ. P. 28(a). The deposition will continue from day to day and/or at further later date(s) until completed, weekends and Court-recognized holidays excepted.

Pursuant to Fed. R. Civ. P. 30(b)(6), TEVA LTD. shall designate and produce a representative or representatives, as may be required, who are knowledgeable and prepared to testify fully on behalf of TEVA LTD. concerning the topics identified in **Schedule A** below.

1

**Duty to Designate**

By designating a representative, TEVA LTD. indicate its representative(s) has/have authority to speak on its behalf on the matters listed in this notice – not only to facts, but also to subject beliefs and opinions.

**Duty to Substitute**

If it becomes clear that a chosen representative is unable to respond to questions on the matters for which he or she has been designated, TEVA LTD. must immediately provide a substitute knowledgeable witness.  This is required even if the initial designation was made in good faith.

**Duty to Prepare**

The testimony elicited in the deposition represents TEVA LTD.'s knowledge, not the individual deponent's knowledge.  TEVA LTD. must conduct a thorough investigation in response to the deposition notice and must prepare a witness to testify to all matters "known or reasonably available to the organization."  Therefore, if TEVA LTD.'s designee is not knowledgeable about the matters specified in the deposition notice, it must nonetheless prepare such designee to give knowledgeable, binding answers.

"Reasonably available" information includes all documents that the organization has the authority, legal right, or practical ability to obtain.  An inadequately prepared designated witness will amount to an impermissible refusal to answer and a sanctionable failure to appear.

**SCHEDULE A**
**(TEVA LTD.)**

**I.      DEFINITIONS**

This section sets forth specific definitions applicable to certain words and terms used herein. Unless words or terms have been given a specific definition in this section or in a specific request, each word or term shall be given its usual and customary dictionary definition, except where a word or term has a specific customary and usage definition in your trade and industry. In that case, the word or term shall be interpreted in accordance with the specific customary and usage definition.

1.      "Action" refers to *In re National Prescription Opiate Litigation*, No. 18-OP-45332-DAP (N.D. Ohio).

2.      "Branded Marketing" refers to Marketing (defined below) that identifies and promotes a specific drug.

3.      "Complaint" means the most recently filed complaint in this Action.

4.      "Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) and, with respect to oral communications, includes any document evidencing such oral communications.  It includes the transmittal of information by any means, including email, SMS, MMS or other "text" messages, messages on "social networking" sites (including but not limited to, Facebook, Google+, MySpace, and Twitter), shared applications from cell phones, or by any other means. "Communication" also shall include, without limitation, all originals and copies that are provided by You or to You by others.

5.      "Concerning," "Concerns," "Relating To" and "Referring To" and derivations thereof each mean reflecting, concerning, relating to, referring to, describing, discussing, evidencing, addressing or constituting in any way.

1

6.      "Controlled Substance(s)" has the definition provided by the CSA (defined below), 21 U.S.C. §802(6).

7.      "CSA" means Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §801, *et seq.*, inclusive of all regulations adopted thereunder.

8.      "DEA" means Drug Enforcement Administration.

9.      "Defendant(s)" means the named Defendants in the above-captioned Action.

10.     "Diversion" means the unlawful channeling of a licit Controlled Substance for an illicit purpose or use.

11.     "Document" is defined to be synonymous in meaning and equal in scope to the usage of the phrase "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A). A draft or non-identical copy is a separate Document within the meaning of this term. In all events, the definition of "Document" shall include "Communications" as defined below.

12.     "ESI" has the same meaning as in Rules 26 and 34 of the Federal Rules of Civil Procedure and includes electronic documents or data and computer-generated information or data stored in or on any storage media located on computers, file servers, disks, tape, USB drives or other real or virtualized devices or media.

13.     "Identity" or "Identify" when referring to a corporate entity means the full formal name of the company, its location and place of incorporation and principal place of business, and parent or subsidiary relationship or affiliation to any of Your related entities. "identity" or "Identify" when referring to a natural person means the person's name, business location, employer(s) and position(s) held and years employed in those positions.

14. "Lobbying" means seeking to influence the actions, policies or decisions of politicians or other public officials on an issue, whether or not it involves monetary payment. "Lobbyists" are Persons who participate in an organized effort to influence the actions, policies or decisions of politicians or other public officials on an issue, whether or not it involves monetary payment.

15. "Marketing" refers to the action or business of promoting, selling or providing information about Opioids or Opioid Products (both defined below). "Marketing" includes both branded and unbranded Communications; branded and unbranded informational or educational programs; detailing by sales representatives (including electronic detailing); continuing medical education; publication of scientific medical or Marketing articles; dissemination or publication of information about opioids, either directly or indirectly, through third-party individuals or entities; Scientific Research (defined below), studies or reports; websites (whether branded or unbranded); video or other visual media; sales blasts, messages or other means used to sell or promote Opioids or Opioid Products for sale or distribution.

16. "Opioid" refers to that class of drugs, legal or illegal, natural or synthetic, used to control pain, including, but not limited to, the drugs referenced in Plaintiffs' Complaints in the above-referenced matter.

17. "Opioid Products" refers to the Opioids that You sold, promoted, marketed, manufactured, or distributed. This includes coatings, capsule configurations, delivery systems or mechanisms that include but are not limited to anti-abuse, tamper resistance and crush-proof mechanisms and mechanisms to deter immediate release. Opioid Products is also intended to include rescue medication for breakthrough pain. Opioid Products include both name-brand and generic products.

18.     "Person" is defined as any natural person or any legal entity, including, but not limited to, any business or governmental entity or association.

19.     "Scientific Research" includes studies, investigations, trials, articles, comparisons, case histories, reviews, reports or analyses that are conducted by doctors, researchers or other investigators.

20.      "Suspicious Order" shall be as defined by the DEA and shall include, but not be limited to, orders for Opioids or Opioid Products of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.

21.     "Unbranded Marketing" refers to Marketing that does not refer to a specific drug, but more generally to a disease state or treatment.

22.     "You" or "Your" means Defendant Teva Pharmaceutical Industries Ltd. and its officers, directors, employees, partners, representatives, agents, corporate parent, subsidiaries, affiliates, divisions, predecessors or successors-in-interest, and other Persons or entities acting on its behalf or controlled by them.

23.     Any capitalized terms used but not defined herein shall have the same meaning assigned to them in the Complaint if any such meaning was provided therein.

24.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the 30(b)(6) topic all subject matters that might otherwise be construed to be outside of its scope.

25.     The terms "all," any" and "each" shall be construed as encompassing "any and all."

## II.     RELEVANT TIME PERIOD

Except as otherwise specified, the Relevant Time Period applicable to the Subject Matters for Testimony is one year prior to the launch of each relevant Opioid Product

through the date of Your response, unless otherwise specified, or, if longer, as specified in rulings by the Court or Special Master.

## III.    SUBJECT MATTERS FOR TESTIMONY

In accordance with Fed. R. Civ. P. 30(b)(6), the following designated matters identify topics upon which examination is requested and the minimum to which a witness must be prepared to testify. If an examining party asks questions outside the scope of the matters described in the notice, general deposition rules govern.

1.      Your corporate organizational structure and governance, and how You are structured to oversee and manage Your global operations with regard to the development, testing, regulatory approval and other regulatory matters, manufacture, branding, marketing, sale, promotion, distribution suspicious order monitoring and pharmacovigilance relating to Your generic and name-brand pharmaceutical drug products, including Opioid Products.

2.      Your global corporate branding and marketing plans and efforts to market Your pharmaceutical drug products under the "Teva" name, and the Identity of the Persons and departments responsible for corporate branding.

3.      The Identity, roles and operations of Your subsidiaries (including direct and indirect subsidiaries) involved in the development, testing, regulatory approval and other regulatory matters, manufacture, branding, marketing, sale, promotion, distribution, suspicious order monitoring or pharmacovigilance relating to Your generic and name-brand pharmaceutical drug products, including Opioid Products, and Your corporate relationship to those subsidiaries.

4.      The manner in which You monitor, oversee, direct and control Your subsidiaries (including direct and indirect subsidiaries) with regard to in the development, testing, approval, manufacture, marketing, sale, promotion, distribution, suspicious order

5

monitoring or pharmacovigilance relating to Your generic and name-brand pharmaceutical drug products, including Opioid Products. This includes any meetings, reports, audits, directives, recommendations and other communications between You and your subsidiaries.

5.  The Identity of Your employees in the United States who are involved in the development, testing, approval and regulatory matters, manufacture, marketing, sale, promotion, distribution, suspicious order monitoring or pharmacovigilance relating to Your generic and name-brand pharmaceutical drug products, including Opioid Products.

6.  The identity including the location, description and ownership of Your plant, property and equipment in the United States.

7.  The manner in which decisions have been and continue to be made to hire or terminate Your employees in the United States, including but not limited to the employees of Your direct and indirect subsidiaries. This includes You publicly announced decision in 2017 to lay off thousands of employees worldwide, and the manner in which that decision was or will be executed.

8.  The manner in which decisions have been and continue to be made as to how Your direct and indirect subsidiaries are to work together with regard to the development, testing, regulatory approval and other regulatory matters, manufacture, branding, marketing, sale, promotion, distribution, regulation or compliance, suspicious order monitoring or pharmacovigilance relating to Your generic and name-brand pharmaceutical drug products, including Opioid Products, and how those decisions are implemented. This topic includes whether the subsidiary has any choice to reject decisions to work with Your other direct or indirect subsidiaries, and the identity of any contracts or similar documents that govern relationships between those entities.

9.　　The manner in which budgets are created for You and your direct and indirect subsidiaries, and how those subsidiaries are financed, the manner in which their funds are held, the extent to which their funds are commingled, what entity controls their financial accounting, how financial books and records are kept, and the identity of any and all financial accountants or accounting firms retained with regard to accounting for those funds.

10.　　The Identity of all entities you acquired with the Actavis generic business in 2016 that had any role or involvement in the development, testing, regulatory approval, manufacture, marketing, sale, promotion, distribution, regulation or compliance, or pharmacovigilance relating to Your generic and name-brand pharmaceutical drug products, including Opioid Products, and the corporate relationships amongst those entities and the role of each entity acquired with regard to Opioids.

11.　　The manner in which You conducted any due diligence with regard to Your acquisition of the Actavis generic business in 2016, and the Identity of all entities, Your departments or divisions, and Persons, including third parties or vendors, that conducted or assisted in conducting the due diligence.

12.　　The identity of all findings, reports and conclusions concerning the due diligence You conducted with regard to Your acquisition of the Actavis generic business in 2016, including expected sales, revenue and profits and other benefits from the sale of Opioid Products in the United States after the acquisition, and the identity of all agreements reached with Allergan regarding the acquisition

13.　　The manner in which you conducted any due diligence with regard to Your acquisition of Cephalon in 2011, and the Identity of all entities, Your departments or

7

divisions, and Persons, including third parties or vendors, that conducted or assisted in conducting the due diligence.

14.     The identity of all findings, reports and conclusions concerning the due diligence You conducted with regard to Your acquisition of Cephalon in 2011, including expected sales, revenue and profits and other benefits from the sale of Opioid Products in the United States after the acquisition.

15.     The identity of Your Board of Directors and the composition and responsibilities of any Board committees, task forces, or working groups comprised of Board members related Your generic and name-brand pharmaceutical drug products, including Opioid Products.

16.     The matters set forth in Your Annual Reports filed with US or Israeli regulators.

17.     The structure of Your marketing and sales departments for Your generic and name-brand pharmaceutical drug products (including Opioid Products), including divisions within each department (i.e. regional/segment/area divisions for sales and marketing)

18.     The job responsibilities for each position in Your sales and marketing departments, and whether the position's compensation is based in whole or in part on levels of sales of Your generic and name-brand pharmaceutical drug products, including Opioid Products.

19.     The manner in which You market, price and sell Your generic and name-brand pharmaceutical drug products, including Opioid Products, globally including in the United States. Include how you develop and implement global brand, marketing and pricing plans for the sale of Your products, the persons and departments involved in

8

developing those plans, and implementation and reporting structure for these plans between TEVA, LTD. and its direct and indirect subsidiaries.

20.    The structure of Your regulatory, manufacturing, distribution and compliance departments for Your generic and name-brand pharmaceutical drug products (including Opioid Products), including divisions within each department (i.e. regional/segment/area divisions for sales and marketing).

21.    The manner in which you develop, manufacture and distribute Your generic and name-brand pharmaceutical drug products, including Opioid Products, globally including in the United States. Include how you develop and implement global development, manufacturing and distribution plans for Your products, the Persons and departments involved in developing those plans, and the reporting structure for these plans.

22.    Identification of Your policies and procedures for the branding, marketing, sale, promotion, distribution of Your generic and name-brand pharmaceutical drug products, including Opioid Products.

23.    Identification of Your policies and procedures for regulatory, pharmacovigilance and drug safety, and compliance with regulations and conditions concerning the sale, marketing and distribution of Your generic and name-brand pharmaceutical drug products, including Opioid Products.

24.    The surveys, focus groups, market research or other similar research or investigation that You performed, had performed on Your behalf, or that you received or reviewed, regarding physician or public perceptions of the safety, efficacy and/or addictive nature of Your Opioid Products, other Opioid products, or Opioids and Your use of focus

groups, research or investigations in developing a sales and marketing strategy and/or a strategy on how to effect, change or influence those perceptions.

25.     The role of wholesalers, distributors, pharmacies, hospitals, formularies, and government entities, agencies and departments (including any other Defendants) in the supply chain for Your Opioid Products and the responsibilities of each with respect to Marketing, sales, supply, Suspicious Order monitoring and potential diversion.

26.     Identification of all reports or the like that were given to the Board of Directors regarding Your generic or name-brand pharmaceutical drug products, including Opioid Products, for the United States, including but not limited to reports regarding:

     a.  Sales;

     b.  Lobbying efforts;

     c.  Safety and efficacy of Opioids or Your Opioid Products;

     d.  Submissions to the FDA or DEA;

     e.  Documents, studies, reports, data or other information that You did not submit to FDA or DEA;

     f.  Abuse potential for Opioids or Your Opioid Products;

     g.  Reports of abuse, misuse, diversion, addiction or dependence regarding Opioids or Your Opioid Products;

     h.  Government investigations regarding Opioids or Your Opioid Products;

     i.  Sales and marketing of Opioids or Your Opioid Products.

27.     Your annual sales, revenue, profits and market share for and the identity of each Opioid Product sold in the United States.

28.     The nature and scope of any meetings, correspondence, communications, documents, contracts or agreements, between You and Purdue, Janssen, Endo, and

Mallinckrodt (and any of their predecessor or successor companies, subsidiaries or affiliates), concerning the manufacture, development, formulation, marketing, advertising, sale and distribution of generic and name-brand pharmaceutical drug products, including Opioid Products.

29.    All financial and business arrangements with any of the Defendants in this matter including any contractual relationships between You and any of the Defendants in this matter.

Dated:  December 25, 2018          *s/ Mark G. Crawford*
                                   Steven J. Skikos (Cal. Bar No. 148110)
                                   Mark G. Crawford (Cal. Bar No. 136501)
                                   **SKIKOS, CRAWFORD, SKIKOS & JOSEPH**
                                   One Sansome Street, Suite 2830
                                   San Francisco, CA 94104
                                   (415) 546-7300
                                   (415) 546-7301 (Fax)
                                   *mcrawford@skikos.com*
                                   Plaintiffs' Co-Liaison Counsel

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of December 2018, the foregoing has been served via email only to the following defense liaison counsel:

Mark Cheffo, Esq.
Dechert LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY  10036
mark.cheffo@dechert.com

Carol Rendon, Esq.
Baker Hostetler
Key Tower, 127 Public Square
Cleveland, OH  44114
crendon@bakerlaw.com

Enu Mainigi, Esq.
Williams & Connolly
725 Twelfth Street, NW.
Washington, DC  20005
emainigi@wc.com

Shannon McClure, Esq.
ReedSmith
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA  19103
smcclure@reedsmith.com

Geoffrey E. Hobart, Esq.
Covington & Burling
One CityCenter
850 Tenth Street, NW.
Washington, DC  20001
ghobart@cov.com

Kaspar Stoffelmayr, Esq.
Bartlit Beck
54 West Hubbard Street, Ste 300
Chicago, IL  60654
Kaspar.stoffelmayr@bartlit-beck.com

Tina Tabacchi, Esq.
Jones Day
77 West Wacker Drive
Chicago, IL  60601

tmtabacchi@jonesday.com

Tyler Tarney, Esq.
Gordon & Rees
41 S. High Street, Suite 2495
Columbus, OH 43215
ttarney@grsm.com

Steven Reed, Esq.
Rebecca Hillyer, Esq.
Jonathan Maier, Esq.
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
steven.reed@morganlewis.com
rebecca.hillyer@morganlewis.com
jonathan.maier@morganlewis.com

xALLDEFENDANTS-MDL2804-Service@arnoldporter.com

mdl2804discovery@motleyrice.com

opioids@golkow.com

s/Mark G. Crawford
Mark G. Crawford
Counsel for Plaintiffs

# ATTACHMENT 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL No. 2804 |
| This document relates to: | Case No. 17-md-2804 |
| *All Cases* | Judge Dan Aaron Polster |

## **PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO TEVA PHARMACEUTICAL INDUSTRIES LTD.**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure as well as the Case Management Order in In re National Prescription Opiate Litigation (Dkt. No. 232 in No.:17-cv- 2804), Plaintiffs hereby requests that Defendant Teva Pharmaceutical Industries, Ltd. (herein "TEVA LTD.") respond to the following Requests for Production (the "Requests") in accordance with their obligations under the Federal Rules of Civil Procedure. Responses to the Requests shall be provided in the manner required by Rule 34(b)(2), the Local Rules of the Northern District of Ohio, the Court's Case Management Order One, filed April 11, 2018, Doc. No. 232, and any other applicable law or rules, within thirty (30) days of the service of these Requests.

If TEVA LTD. finds any term or other aspect of the Requests vague, ambiguous or otherwise objectionable and intend to so object, counsel for the Plaintiffs offer to promptly meet with counsel for Teva Ltd. to resolve any issues.

## **DEFINITIONS**

"You" or "Your" means Defendant TEVA PHARMACEUTICAL INDUSTRIES LTD., and its officers, directors, employees, partners, representatives, agents, corporate parent, subsidiaries (includes direct and indirect subsidiaries), affiliates, divisions, predecessors or successors-in-interest, and other persons or entities acting on its behalf or controlled by it.

"Defendants" mean the named Defendants in the above-captioned matter.

"Plaintiffs" mean all the named Plaintiffs in the above-captioned matter.

"Document" is defined to be synonymous in meaning and equal in scope of the usage of this term in Fed. R. Civ. P. 34. A draft or non-identical copy is a separate document within the meaning of this term. In all events, the definition of "Document" shall include "Communications," as defined below.

"Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) and, with respect to oral communications, includes any document evidencing such oral communications. It includes the transmittal of information by any means, including email, SMS, MMS or other "text" messages, messages on "social networking" sites (including but not limited to, Facebook, Google+, MySpace, Instagram, Snapchat and Twitter), shared applications from cell phones, or by any other means. "Communication" also shall include, without limitation, all originals and copies that are provided by you or to you by others.

"Person" is defined as any natural person or any business, legal, or governmental entity, or association.

"Opioid" refers to that class of drugs, legal or illegal, natural or synthetic, used to control pain, including, but not limited to, the drugs referenced in Plaintiffs' Complaint in the above-referenced matter.

"Opioid Products" refers to the Opioids that You developed, manufactured, marketed, promoted, sold, or distributed.  This includes coatings, capsule configurations, delivery systems or mechanisms that include but are not limited to anti-abuse, tamper resistance and crush-proof mechanisms and mechanisms to deter immediate release.  Opioid Products is also intended to include rescue medication for breakthrough pain. Opioid Products include both name-brand and generic products.

 "Marketing" refers to the action or business of promoting, selling, or providing information about Opioids or Opioid Products. "Marketing" includes both branded and unbranded Communications; branded and unbranded informational or educational programs; detailing by sales representatives (including electronic detailing); continuing medical education; publication of scientific medical or marketing articles, Scientific Research, studies or reports; websites (whether branded or unbranded); video or other visual media; sales blasts, messages, or other means used to sell or promote Opioids or Opioid Products for sale or distribution.

"Branded Marketing" refers to Marketing which identifies and promotes a specific drug.

"Unbranded Marketing" is Marketing that does not refer to a specific drug, but more generally to a disease state or treatment.

"Adverse Event" shall be as defined by the FDA and shall mean and include any undesirable experience associated with the use of a drug in a patient.

3

"Suspicious Order" shall be as defined by the DEA and shall include, but not be limited to, orders for Opioids or Opioid Products of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.

"Scientific Research" includes studies, investigations, trials, articles, comparisons, case histories, reviews, reports, or analyses that are conducted by doctors, researchers, or other investigators.

"DEA Quotas" mean aggregate, manufacturing, and procurement quotas established pursuant to 21 U.S.C. § 826 in accordance with 21 CFR 1303.11.

## INSTRUCTIONS

The time period covered by these Interrogatories is one year prior to the launch of each relevant Opioid Product through the date of Your response, unless otherwise specified, or as specified in rulings by the Court or Special Master, whichever period is longer.

All ESI shall be produced in its original native form, including all metadata, and shall be subject to the provisions of the agreed-upon ESI protocol.

All video and audio files must be produced in the manner in which you store and retrieve them, *i.e.*, in their native formats and shall be subject to the provisions of the agreed upon ESI protocol.

## REQUESTS FOR PRODUCTION

34.    Documents that reflect your corporate organizational structure and governance, and how You are structured to oversee and manage Your global operations with regard to the development, testing, regulatory approval, manufacture, branding, marketing, sale, promotion, distribution suspicious order monitoring and

4

pharmacovigilance relating to Your generic and name-brand pharmaceutical drug products, including Opioid Products.

35.     Documents that reflect Your global corporate branding and marketing plans and efforts to market Your pharmaceutical drug products under the "Teva" name, and the Identity of the Persons and departments responsible for corporate branding.

36.     Documents that reflect the Identity, roles and operations of Your subsidiaries (including direct and indirect subsidiaries) involved in the development, testing, regulatory approval, manufacture, branding, marketing, sale, promotion, distribution, suspicious order monitoring or pharmacovigilance relating to Your generic and name-brand pharmaceutical drug products, including Opioid Products, and Your corporate relationship to those subsidiaries.

36.     Documents that reflect the manner in which You monitor, oversee, direct and control Your subsidiaries (including direct and indirect subsidiaries) with regard to in the development, testing, approval, manufacture, marketing, sale, promotion, distribution, suspicious order monitoring or pharmacovigilance relating to Your generic and name-brand pharmaceutical drug products, including Opioid Products. This includes Documents reflecting any meetings, reports, audits, directives, recommendations and other communications between You and your subsidiaries.

37.     Documents that reflect the Identity of Your employees in the United States who are involved in the development, testing, approval, manufacture, marketing, sale, promotion, distribution, suspicious order monitoring or pharmacovigilance relating to Your generic and name-brand pharmaceutical drug products, including Opioid Products.

5

38.    Documents that reflect the identity including the location, description and ownership of Your plant, property and equipment in the United States.

39.    Documents that reflect the manner in which decisions have been and continue to be made to hire or terminate Your employees in the United States, including but not limited to the employees of Your direct and indirect subsidiaries. This includes Documents that reflect Your decision in 2017 to lay off thousands of employees worldwide, and the manner in which that decision was or will be executed.

40.    Documents that reflect the manner in which decisions have been and continue to be made as to how Your direct and indirect subsidiaries are to work together with regard to the development, testing, regulatory approval, manufacture, branding, marketing, sale, promotion, distribution, regulation or compliance, suspicious order monitoring or pharmacovigilance relating to Your generic and name-brand pharmaceutical drug products, including Opioid Products, and how those decisions are implemented.

41.    Documents that reflect the manner in which budgets are created for You and your direct and indirect subsidiaries, and how those subsidiaries are financed, the manner in which their funds are held, the extent to which their funds are commingled, what entity controls their financial accounting, how financial books and records are kept, and the identity of any and all financial accountants or accounting firms retained with regard to accounting for those funds.

42.    Documents that reflect the Identity of all entities you acquired with the Actavis generic business in 2016 that had any role or involvement in the development, testing, regulatory approval, manufacture, marketing, sale, promotion, distribution,

6

regulation or compliance, or pharmacovigilance relating to Your generic and name-brand pharmaceutical drug products, including Opioid Products, and the corporate relationships amongst those entities and the role of each entity acquired with regard to Opioids.

43.     Documents that reflect the manner in which You conducted any due diligence with regard to Your acquisition of the Actavis generic business in 2016, and the Identity of all entities, Your departments or divisions, and Persons, including third parties or vendors, that conducted or assisted in conducting the due diligence.

44.     All Documents resulting from your due diligence investigation with regard to Your acquisition of the Actavis generic business in 2016 and that relate to or concern Opioid Products.

45.     All Documents that reflect findings, reports or conclusions concerning the due diligence You conducted with regard to Your acquisition of the Actavis generic business in 2016, including expected sales, revenue and profits and other benefits from the sale of Opioid Products in the United States after the acquisition, and the identity of all agreements reached with Allergan regarding the acquisition.

46.     Documents that reflect the manner in which you conducted any due diligence with regard to Your acquisition of Cephalon in 2011, and the Identity of all entities, Your departments or divisions, and Persons, including third parties or vendors, that conducted or assisted in conducting the due diligence.

47.     All Documents resulting from your due diligence investigation with regard to Your acquisition of Cephalon in 2011 and that relate to or concern Opioid Products.

48.     All Documents that reflect findings, reports or conclusions concerning the due diligence You conducted with regard to Your acquisition of Cephalon in 2011, including expected sales, revenue and profits and other benefits from the sale of Opioid Products in the United States after the acquisition.

49.     Documents that reflect the identity of Your Board of Directors and the composition and responsibilities of any Board committees, task forces, or working groups comprised of Board members related to Your generic and name-brand pharmaceutical drug products, including Opioid Products.

50.     All Annual Reports or similar reports filed with US or Israeli regulators.

51.     Documents that reflect the structure of Your marketing and sales departments for Your generic and name-brand pharmaceutical drug products (including Opioid Products), including divisions within each department (i.e. regional/segment/area divisions for sales and marketing)

52.     Documents that reflect the job responsibilities for each position in Your sales and marketing departments, and any compensation structure that is based in whole or in part on levels of sales of Your generic and name-brand pharmaceutical drug products, including Opioid Products.

53.     Documents that reflect the manner in which you market, price and sell Your generic and name-brand pharmaceutical drug products, including Opioid Products, globally including in the United States. Include how you develop and implement global brand, marketing and pricing plans for the sale of Your products, the persons and departments involved in developing those plans, and implementation and reporting structure for these plans between TEVA, LTD. and its direct and indirect subsidiaries.

8

54.    Documents that reflect the structure of Your regulatory, manufacturing, distribution and compliance departments for Your generic and name-brand pharmaceutical drug products (including Opioid Products), including divisions within each department (i.e. regional/segment/area divisions for sales and marketing).

55.    Documents that reflect the manner in which you develop, manufacture and distribute Your generic and name-brand pharmaceutical drug products, including Opioid Products, globally including in the United States, including but not limited to how you develop and implement global development, manufacturing and distribution plans for Your products, the Persons and departments involved in developing those plans, and the reporting structure for these plans.

56.    Documents that reflect Your policies and procedures concerning the branding, marketing, sale, promotion, distribution of Your generic and name-brand pharmaceutical drug products, including Opioid Products.

57.    Documents that reflect Your policies and procedures concerning regulatory, pharmacovigilance and drug safety, and compliance with regulations and conditions concerning the sale, marketing and distribution of Your generic and name-brand pharmaceutical drug products, including Opioid Products.

58.    Documents that reflect your policies and procedures as to how You manage your global operations and that concern or affect your operations in the United States concerning internal accounting, internal and external audits, directives from TEVA LTD. to its subsidiaries, and reporting back by a subsidiary to TEVA LTD. on the subsidiary's operations.

59.     Documents that reflect your policies and procedures with regard to personnel management, including but not limited to hiring, promotion, termination and reviews.

60.     Documents that reflect surveys, focus groups, market research or other similar research or investigation that You performed, had performed on Your behalf, or that you received or reviewed, regarding physician or public perceptions of the safety, efficacy and/or addictive nature of Your Opioid Products, other Opioid products, or Opioids and Your use of focus groups, research or investigations in developing a sales and marketing strategy and/or a strategy on how to effect, change or influence those perceptions.

61.     Documents that reflect the role of wholesalers, distributors, pharmacies, hospitals, formularies, and government entities, agencies and departments (including any other defendants) in the supply chain for Your Opioid Products and the responsibilities of each with respect to Marketing, sales, supply, Suspicious Order monitoring and potential diversion.

62.     Documents that reflect reports or the like that were given to the Board of Directors regarding Your generic or name-brand pharmaceutical drug products, including Opioid Products, for the United States, including but not limited to reports regarding:

a.     Sales;

b.     Lobbying efforts;

c.     Safety and efficacy of Opioids or Your Opioid Products;

d.     Submissions to the FDA or DEA;

10

e.      Documents, studies, reports, data or other information that You did not submit to FDA or DEA;

f.      Abuse potential for Opioids or Your Opioid Products;

g.      Reports of abuse, misuse, diversion, addiction or dependence regarding Opioids or Your Opioid Products;

h.      Government investigations regarding Opioids or Your Opioid Products;

i.      Sales and marketing of Opioids or Your Opioid Products.

63.     Documents that reflect Your annual sales, revenue, profits and market share for and the identity of each Opioid Product sold in the United States.

64.     Documents that reflect any meetings, correspondence, communications, documents, contracts or agreements, between You and Purdue, Janssen, Endo, and Mallinckrodt (and any of their predecessor or successor companies, subsidiaries or affiliates), concerning the manufacture, development, formulation, marketing, advertising, sale and distribution of generic and name-brand pharmaceutical drug products, including Opioid Products.

65.     Documents that reflect financial and business arrangements with any of the Defendants in this matter including any contractual relationships between You and any of the Defendants in this matter.

66.     Documents that reflect Communications between You (TEVA LTD.) and any of your direct or indirect subsidiaries concerning the development, regulatory approval and regulatory matters, branding, marketing, sale, promotion, distribution and suspicious order monitoring concerning Opioid Products in the United States.

11

67.     Documents that reflect Communications by and between Your (TEVA LTD.'s) employees concerning the development, regulatory approval, marketing, sale, promotion, distribution and suspicious order monitoring concerning Opioid Products in the United States.

68.     Documents that reflect Your global brand, marketing and sales plans concerning Your generic and name-brand pharmaceutical drug products, including Opioid Products.

69.     Documents that reflect Your market research, analysis or projections concerning the generic pharmaceutical drug market, including for Opioid Products, in the United States.

70.     Documents that reflect performance reviews conducted by You (TEVA LTD.) of the officers, and of department heads for Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; and Anda, Inc. to the extent any of those departments were involved in the marketing, sale, promotion, distribution and suspicious order monitoring for Opioid Products.


Dated:  December 25, 2018             *s/ Mark G. Crawford*
                                     Steven J. Skikos (Cal. Bar No. 148110)
                                     Mark G. Crawford (Cal. Bar No. 136501)
                                     **SKIKOS, CRAWFORD, SKIKOS & JOSEPH**
                                     One Sansome Street, Suite 2830
                                     San Francisco, CA 94104
                                     (415) 546-7300
                                     (415) 546-7301 (Fax)
                                     *mcrawford@skikos.com*
                                     Plaintiffs' Co-Liaison Counsel

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of December 2018, the foregoing has been served via email only to the following defense and defense liaison counsel:

Steven Reed, Esq.
Rebecca Hillyer, Esq.
Jonathan Maier, Esq.
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
Email: rebecca.hillyer@morganlewis.com

*Counsel for Teva Defendants*

Mark Cheffo, Esq.
Dechert LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY  10036
mark.cheffo@dechert.com

Carol Rendon, Esq.
Baker Hostetler
Key Tower, 127 Public Square
Cleveland, OH  44114
crendon@bakerlaw.com

Enu Mainigi, Esq.
Williams & Connolly
725 Twelfth Street, NW.
Washington, DC  20005
emainigi@wc.com

Shannon McClure, Esq.
ReedSmith
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA  19103
smcclure@reedsmith.com

Geoffrey E. Hobart, Esq.
Covington & Burling
One CityCenter
850 Tenth Street, NW.
Washington, DC  20001

ghobart@cov.com

Kaspar Stoffelmayr, Esq.
Bartlit Beck
54 West Hubbard Street, Ste 300
Chicago, IL  60654
Kaspar.stoffelmayr@bartlit-beck.com

Tyler Tarney, Esq.
Gordon & Rees
41 S. High Street, Suite 2495
Columbus, OH  43215
ttarney@grsm.com

*Defendants' Liaison Counsel*

xALLDEFENDANTS-MDL2804-Service@arnoldporter.com

mdl2804discovery@motleyrice.com

*s/ Mark G. Crawford*
Mark G. Crawford
Attorneys for Plaintiffs

# ATTACHMENT 3

**SIMMONS HANLY CONROY**
A NATIONAL LAW FIRM

SIMMONSFIRM.COM
(800) 479-9533

**VIA EMAIL: david@specialmaster.law**

March 7, 2019

David R. Cohen
24400 Chagrin Blvd.
Suite 300
Cleveland, OH 44122

     Re: *In Re: National Prescription Opiate Litigation*, Case No.1:17-MD-2804

Dear Special Master Cohen:

     I write on behalf of CT1 Plaintiffs ("Plaintiffs") to respond to the letters from Steve Reed, Donna Welch, and Andrew O'Connor regarding jurisdictional discovery with respect to Teva Pharmaceuticals Industries, Ltd. ("Teva Ltd."), Allergan plc, and Mallinckrodt plc (the "Foreign Parents"). Jurisdictional discovery is proper as to all three entities because, as demonstrated below, Plaintiffs have more than sufficient evidence to meet the "clearly frivolous" standard required to justify such discovery. Indeed, Plaintiffs have made out a *prima facie* case to justify dismissal of the motions outright, should the Special Master or Court choose to dispose of these motions without such discovery.

**BACKGROUND**

     The background to this issue is set forth in Mr. Reed's letter and, in the interest of brevity will not be repeated here (although Plaintiffs do not concede that Mr. Reed's recitation is accurate in every particular). A few salient points should be emphasized, however. The Foreign Parents first moved to dismiss for lack of personal jurisdiction on January 15, 2019. Plaintiffs sought an extension of their time to respond to the motion until after jurisdictional discovery, which had already been propounded, could be taken, and no response was filed. In connection with granting that extension, on February 15, 2019, Judge Polster referred the issue of whether, and to what extent, Plaintiffs are entitled to jurisdictional discovery to you.[1] On March 1, 2019, you requested that the parties submit briefing to you on the issue. Thus, at no time until now have Plaintiffs been called upon to lay bare their proofs and make any sort of showing whatsoever in connection with the Court's

---

[1] The Foreign Parents have addressed only the question of whether jurisdictional discovery should take place. Plaintiffs respectfully suggest that if you agree that such discovery should proceed, issues of scope will be best addressed in the context of Plaintiffs' specific discovery requests and the Foreign Parents' responses and objections thereto.

*We stand for our clients.*

HEADQUARTERS
One Court Street
Alton, IL 62002
TEL: (618) 259-2222
FAX: (618) 259-2251

NEW YORK
112 Madison Avenue
New York, NY 10016
TEL: (212) 784-6400
FAX: (212) 213-5949

CHICAGO
230 W. Monroe
Suite 2221
Chicago, IL 60606
TEL: (312) 759-7500
FAX: (312) 759-7516

SAN FRANCISCO
455 Market
Suite 1150
San Francisco, CA 94105
TEL: (415) 536-3986
FAX: (415) 537-4120

LOS ANGELES
100 N. Sepulveda Blvd.
Suite 1350
El Segundo, CA 90245
TEL: (310) 322-3555
FAX: (310) 322-3655

ST. LOUIS
231 S. Bemiston
Suite 525
St. Louis, MO 63105
TEL: (800) 479-9533



David R. Cohen
March 7, 2019                                                           Page 2

assertion of personal jurisdiction over the Foreign Parents.    Now that the
opportunity is here, we make that showing.[2]

LEGAL STANDARDS

Plaintiffs take issue with the Foreign Parents recitation of the legal standard applicable to this motion in two respects.  First, the Foreign Parents mis-state the standard applicable here when they suggest that the Court (or the Special Master in this instance) is restricted to considering only what is alleged in the Complaint.  The issue is not what Plaintiffs have pleaded, but rather what they are able to *show* in response to Defendants' motion to dismiss.  *See Anwar v. Dow Chem. Co.*, 876 F.3d 841, 847 (6th Cir. 2017) (plaintiff need only make a "*prima facie showing*"); *MAG IAS Holdings, Inc. v. Schmückle*, 854 F.3d 894, 899 (6th Cir. 2017) (same); *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 149 (6th Cir. 1997) (plaintiff need only "present" a *prima facie* case; in assessing that case, court considers "the plaintiff's complaint and affidavits").  Indeed, where, as here, Defendants have supported their motion to dismiss with affidavits and material outside the complaint, the Sixth Circuit has held that "the plaintiff *may not stand on his pleadings* but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991) (emphasis added). Moreover, as discussed above, Plaintiffs have not previously been called upon to make any showing because they have not yet responded to the Foreign Parents' motion to dismiss.

Second, Plaintiffs disagree that the standard for obtaining jurisdictional discovery is whether Plaintiffs have made out a *prima facie* case for the assertion of jurisdiction.  The standard for whether jurisdictional discovery should proceed is best understood in the context of the standard that applies to the underlying motion to dismiss.  In ruling on a motion to dismiss for lack of personal jurisdiction, a court has "three procedural alternatives: it may decide the motion upon the affidavits alone; it may permit discovery in aid of deciding the motion; or it may conduct an evidentiary hearing to resolve any apparent factual questions." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991); *accord Anwar v. Dow Chem. Co.*, 876 F.3d 841, 847 (6th Cir. 2017); *see also Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1240 (6th Cir. 1981) ("discovery may be appropriate when a defendant moves to dismiss for lack of jurisdiction."). If a court chooses to resolve the question of

---

[2] The exhibits provided herewith are somewhat voluminous.  In order to prevent them being even more so, we provided excerpts, rather than full transcripts, of depositions, and similarly have excerpted long documents, such as SEC filings. The full documents are, of course, available if needed.



David R. Cohen
March 7, 2019                                                                                    Page 3

personal jurisdiction upon the affidavits alone without an evidentiary hearing, Plaintiffs' burden is slight: a plaintiff need only make a *prima facie* showing that jurisdiction exists in order to avoid dismissal. *MAG IAS Holdings*, 854 F.3d at 899; *accord Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430 (6th Cir. 2012); *Kerry Steel*, 106 F.3d at 149. "Dismissal in this procedural posture is proper only if all the specific facts which the plaintiff alleges collectively fail to state a *prima facie* case for jurisdiction." *Kerry Steel*, 106 F.3d at 149. In assessing a plaintiff's *prima facie* case, the court must "consider pleadings and affidavits in a light most favorable to the plaintiff, without weighing the controverting assertions of the party seeking dismissal." *Anwar*, 876 F.3d at 847; *accord Theunissen*, 935 F.2d at 1459.

Given that a *prima facie* case suffices to defeat a motion to dismiss for lack of jurisdiction, the threshold for jurisdictional discovery must be something less, else the Court could simply deny the motion outright. Thus, the Third Circuit has held that "jurisdictional discovery should be allowed unless the plaintiff's [jurisdictional] claim is *clearly frivolous*." *Massachusetts Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 107 F.3d 1026, 1042 (3d Cir. 1997) (emphasis added); *accord GCIU-Employer Ret. Fund v. Coleridge Fine Arts*, 700 F. App'x 865, 871 (10th Cir. 2017) ("When a defendant moves to dismiss for lack of jurisdiction, either party should be allowed discovery on the factual issues raised by that motion."); *Am. Civil Liberties Union of Fla., Inc. v. City of Sarasota*, 859 F.3d 1337, 1341 (11th Cir. 2017) ("when facts that go to the merits and the court's jurisdiction are intertwined and genuinely in dispute, parties have a qualified right to jurisdictional discovery"); *Williams v. Romarm, SA*, 756 F.3d 777, 786 (D.C. Cir. 2014) (in order to obtain jurisdictional discovery, "[a] plaintiff must have at least a good faith belief that such discovery will enable it to show that the court has personal jurisdiction over the defendant."); *see also Hohman v. Eadie*, 894 F.3d 776, 787 (6th Cir. 2018) ("a plaintiff should have access to information necessary to establish her claim. . . .").

The Foreign Parents cite *Kerry Steel* for the proposition that the *prima facie* case standard applies to the question of jurisdictional discovery, but *Kerry Steel* holds no such thing. Rather, in that case, the Sixth Circuit held that the district court was not required to *hold an evidentiary hearing* on the motion to dismiss, because Plaintiffs had failed to make out a *prima facie* case in their affidavits. 106 F.3d at 154. The Court noted, too, that plaintiff *had not requested additional time so that it could take discovery. Id.* For this reason, it is clear that the Sixth Circuit had no occasion, in *Kerry Steel*, to consider what the standard for jurisdictional discovery would have been had the plaintiff there asked for it. Having failed to request jurisdictional discovery, Plaintiffs were unable to defeat the motion to dismiss, or even obtain an evidentiary hearing on it, because they did not make a *prima facie* case. Indeed, *Kerry Steel* suggests that, had the plaintiff there made such a request, it might have



David R. Cohen
March 7, 2019                                                                                      Page 4

obtained such discovery *even though it was unable to make a* prima facie *case*.  Plaintiffs have been unable, to locate any precedent in which the Sixth Circuit has specifically addressed the issue, but note the logic and authority from other circuits (as well as the implication from *Kerry Steel*) demonstrating that the standard for jurisdictional discovery is something less than the *prima facie* case that would suffice for Plaintiffs to defeat Defendants' motion altogether in the current posture.  But the issue is of little moment here, because Plaintiffs' evidence is sufficient to meet either standard.

ARGUMENT

PLAINTIFFS ARE ENTITLED TO JURISDICTIONAL DISCOVERY WITH RESPECT TO EACH OF THE FOREIGN PARENTS

Plaintiffs do not contend that any of the Foreign Parents is subject to *general* jurisdiction in Ohio.  The question is solely that of specific jurisdiction, that is, jurisdiction arising from the conduct of the Foreign Parents in Ohio with respect to the sale of prescription opioids, including, particularly, generic opioids.

Plaintiffs have identified several bases for the assertion of such jurisdiction. *First*, the Foreign Defendants may be subject to jurisdiction under the Ohio long-arm statute, R.C. § 2307.382(A)(1), which provides for jurisdiction arising from a person's "transacting any business" in Ohio, if they themselves market opioids here. *Second*, they may be subject to jurisdiction under the same provision based on their activities of their subsidiaries here "if the parent company exerts so much control over the subsidiary that the two do not exist as separate entities but are one and the same for purposes of jurisdiction." *Anwar*, 876 F.3d at 848. The Sixth Circuit considers multiple factors to determine if there is sufficient "unity of interest and ownership that goes beyond mere ownership and shared management personnel," to subject the parent to jurisdiction: "(1) sharing the same employees and corporate officers; (2) engaging in the same business enterprise; (3) having the same address and phone lines; (4) using the same assets; (5) completing the same jobs; (6) not maintaining separate books, tax returns and financial statements; and (7) exerting control over the daily affairs of another corporation." *Id.* at 849. *Third,* the Foreign Parents may be subject to jurisdiction under § 2307.382(A)(1) as successors to other entities they have acquired.  Jurisdiction as a successor may attach if the successor corporation expressly or impliedly agreed to assume the relevant liability; if the transaction amounts to a *de facto* consolidation or merger; or if the buyer corporation is merely a continuation of the seller corporation.  *See Opportunity Fund, LLC v. Epitome Sys., Inc.*, 912 F. Supp. 2d 531, 541 (S.D. Ohio 2012), *citing Welco Indus., Inc. v. Applied Cos.*, 67 Ohio St.3d 344 (1993).  *Finally*, the Foreign Parents may be subject to jurisdiction in Ohio under § 2307.382(A)(7), which provides that a court may exercise jurisdiction "over a person who acts directly or by an agent, as to a cause



David R. Cohen
March 7, 2019                                                                Page 5

of action arising from the person's. . . [c]ausing tortious injury to any person by a criminal act, any element of which takes place in this state, which he commits or in the commission of which he is guilty of complicity."[3]

To the extent that Plaintiffs have a reasonable basis to assert any of these bases for jurisdiction, they are entitled to discover to develop the facts relevant to proving the elements for them.  As we now show, such basis exists for each of the Foreign Parents.

### A.       The Case for Jurisdictional Discovery with Respect to Teva Ltd.

Oddly absent from Teva Ltd.'s submission is any mention of the fact that the Ohio state court judge hearing the State of Ohio's opioid-related claims has already found that Teva Ltd. is subject to jurisdiction in Ohio in connection with these claims.  *See State ex rel. Dewine v. Purdue Pharma L.P.*, 2018 WL 4080052, **7-8 (Ohio Ct. C.P. Ross Cty. Aug. 22, 2018).  Ignoring this ruling, Teva Ltd.'s motion to dismiss is based on a single conclusory declaration from its "Head of Integration Management Office, stating that it Teva Ltd. "does not transact business in the United States."  *See* Teva Ex. B at ¶ 2.  But the evidence that Plaintiffs have been able to obtain without discovery from Teva Ltd. itself is consistent with the Ohio ruling and contradicts the declaration submitted by Teva Ltd.[4]  This evidence can be divided into several categories:

#### 1.       *Drug Launch Announcements*

Although Teva Ltd. claims that it does not transact business in the United States, for years, it has announced that *it* – that is, specifically Teva Ltd. – has launched new generic drugs *in the United States.*  Examples of this include a new drug launch announcement on February 6, 2019, in which "Teva Pharmaceutical

---

[3] Assertion of jurisdiction based on any of these theories comports with due process.  *See, e.g., Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008) (assertion of personal jurisdiction over the successor of a corporation that would be subject to jurisdiction comports with due process); *Newsome v. Gallacher*, 722 F.3d 1257, 1265 (10th Cir. 2013) (where one co-conspirator acts within the forum and conspiracy directed at the forum, minimum contacts sufficient to exercise jurisdiction over another co-conspirator); *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1069-70 (10th Cir. 2007) (acts of a co-conspirator within the forum may, in some cases, subject another co-conspirator to the forum's jurisdiction, where plaintiff alleges facts that would support a *prima facie* showing of conspiracy and where conspiracy was directed at the forum).

[4] Teva Ltd. has consistently refused to respond to Plaintiffs' discovery requests.  The Teva U.S. defendant entities have expressly excluded Teva Ltd. from their responses and productions for those requests. Consequently, Plaintiffs have received little if any discovery regarding Teva Ltd. in the interrogatory responses and production of documents to date.



David R. Cohen
March 7, 2019                                                                                          Page 6

Industries Ltd., (NYSE and TASE: TEVA) today announced the launch of a generic version of Sabril®1 (vigabatrin) tablets, 500 mg in the US, the first generic version of Sabril® (vigabatrin) tablets to enter the US market." *See* Exhibit 1 (emphasis added). The press release quotes Brendan O'Grady, described as "EVP and Head of North America Commercial at Teva." *Id.* The release further brags:

> With over 550 generic medicines available, *Teva has the largest portfolio of FDA-approved generic products* on the market and holds the leading position in first-to-file opportunities, with over *100 pending first-to-files in the U.S.* Currently, *one in seven generic prescriptions dispensed in the U.S. is filled with a Teva generic product*.

*Id.* (emphasis added). The release includes a section entitled "About Teva," which explains that "Teva Pharmaceutical Industries Ltd. (NYSE and TASE: TEVA) is a global leader in generic medicines" and that it is "[h]eadquartered in Israel, with production and research facilities around the globe." *Id*. There is no mention whatsoever of a separate U.S. subsidiary. Teva Ltd. issued similar releases on numerous other occasions, including February 5, 2019, *see* Exhibit 2, December 10, 2014, *see* Exhibit 3, and August 17, 2012, *see* Exhibit 4. Thus, Teva Ltd has been announcing its business dealings in the United States for many years.[5]

> ### 2.    *Investor Materials*

A November 2018 presentation for Teva Ltd. investors treats Teva's business in the United States as the business of Teva Ltd. The presentation is aimed at investors in Teva, Ltd., the stock of which is traded on the New York and Tel Aviv exchanges. It tells investors that "U.S. Generics, U.S. Specialty, Canada and Anda [are] expected to collectively deliver $9B in revenue in 2018." Exhibit 5 at 9. The presentation further tells investors that Teva Ltd. has "14% Market share of U.S. Generics Market." *Id*. The presentation breaks out Teva Ltd.'s revenues into the portion derived by the "North American Segment," the "Europe Segment," and the "International Markets Segment." *Id.* at 19. Only by acknowledging that it has misled its investors about the extent to which it is in control of revenues from generic drugs in the United States can Teva Ltd. now contend it transacts no business in the United States.

---

[5] Plaintiffs recognize that their claims do not arise from Teva Ltd.'s sales of these particular (non-opioid) drugs in the United States. But the drug launch announcements suggest that Teva Ltd. does in fact sell drugs directly in the United States and provides sufficient basis for discovery into the question of Teva Ltd.'s role in selling opioids in the United States and, in particular, in Ohio.



David R. Cohen
March 7, 2019                                                                                    Page 7

3.    *Organizational Information*

Other evidence confirms that Teva Ltd. itself sells generic drugs in the United States.  Teva Ltd.'s President and CEO for its Global Generic Medicines Group ("GGM"), Dipankar Bhattacharjee, is based in the United States.  *See* Exhibit 6.  (In a December, 2016 press release, Teva Ltd. announced that it had appointed Mr. Bhattacharjee to his position with the Global Generic Medicines Group.)  According to an internal organization chart, Andy Boyer, head of generic medicines for North America, reports directly to Mr. Bhattacharjee, as does the head for generic medicines in Europe and the head of generic medicines for what Teva calls "Growth Markets." Exhibit 7.  At his deposition, Mr. Boyer was unable to say if he worked for Teva Ltd., Teva USA, or some other entity. Exhibit 8 at 20:7-22:20.

Teva USA's National Sales Director, Randy Spokane, testified that although he was in charge of sales with regard to Fentora and Actiq, he was not in involved in any way with regard to the sales of Teva's generic opioid products. Exhibit 9 at 282-283. With regard to those products, he testified that "*generics was run out of Israel.*"  *Id.*  (Emphasis added.) A Teva Powerpoint presentation for the Global Generics Medicines Group, entitled "GGM – Executive Summary," (which contains the organization chart showing Mr. Bhattacharjee and Mr. Boyer) states:  "We are organized as 3 regions (NA, EU, GM) . . . ."  Exhibit 7 at 4.  It further explains that its North American business (specified on the Powerpoint slide as "U.S., CAN") consists of generic and over-the-counter assets. *Id.*  The presentation notes that "Significant EU/GM presence moderates the volatility of U.S. revenues," *Id.*, showing that Teva Ltd. views its American, European, and other worldwide generic sales as components of a single revenue stream.  It further lists as one of the "Achievements" of 2017 its "New business in U.S. Gx secured through RFPs."  *Id.*  Among its "Main items going into 2018" is "[i]mplementaion of potential new strategies in U.S. Gx."  *Id.*  An entire section of the Powerpoint – 15 slides – is devoted to discussion of U.S. Generics.  No mention is made of a separate U.S. entity. *Id.*  Notably, the GGM Powerpoint does explain that its "business in Japan is a JV with Takeda . . ." *Id.* Thus, when Teva Ltd. works with or through a distinct corporate entity, it knows how to say so.

Teva Ltd.'s 2016 "Social Impact Report" (Exhibit 10) further confirms Teva Ltd.'s business transactions in the United States.[6]   In a report marked "Teva Pharmaceutical Industries, Ltd." on every page, Teva Ltd. reported that as of 2016,

---

[6] The 2016 Social Impact Report was one of the documents relied on by the Ross County Court of Common Pleas in denying Teva Ltd.'s motion to dismiss for lack of personal jurisdiction. *See Dewine v. Purdue Pharma L.P.*, 2018 WL 4080052, **7-8.



David R. Cohen
March 7, 2019                                                                                          Page 8

it had 10,855 employees in the U.S. and Canada.  Exhibit 10 at 12. A chart shows that this workforce represents 20% of Teva employees. *Id.* at 29.  (Another chart shows that only 4% of employees are "indirect employees," *id.*, suggesting that the remaining 96% are direct employees of Teva Ltd.)  A global map in that same report shows "Production sites – 2016."  The key shows color coding for "Pharmaceutical production facilities," "Raw materials production facilities," and "both."  The entirety of the United States is marked "Both."  The United States appears on a list of "key markets" on that same page.  *Id.* at 7.  The report also brags that, in 2016, Teva Ltd. "increased our work with diverse U.S. businesses, including small companies and minority-, women- and LGBT-owned enterprises." *Id.* at 11.   Yet the 2016 Social Impact Report notes that "Teva USA was among 55 companies from across the country to be recognized for outstanding employee wellness programs. . . ." *Id.* at 32. The differentiation of Teva USA here confirms that the other statements, which make no such distinction, refer to Teva Ltd., the company with its name on every page of the report.

>            *4.        Other Evidence that Teva USA Is Not Distinct from Teva Ltd.*

Evidence also shows that Teva Ltd. directed the corporate compliance function for Teva USA.  Teva Ltd.'s 2016 Social Impact Report states that "Teva's Compliance Audit department within our Global Internal Audit (GIA) program assesses our company's level of compliance around the world."  Exhibit 10 at 39.  The heading for this information is:  "Ensuring compliance at every level and every location."  *Id.*   The report also shows that Teva Ltd.'s Global Compliance Audit department performed "68 audits in 52 counties."   *Id.* Clearly, when it comes to compliance, the parent company is in control.  This is confirmed by evidence showing that Teva Ltd. was specifically involved in auditing Teva USA's DEA Compliance Department and suspicious order monitoring program. Exhibit 11; Exhibit 12; Exhibit 13; Exhibit 14; and Exhibit 15.

An audit of pharmacovigilance in the United States shows the extent to which Teva USA was or is treated as simply another office of the parent company. The audit report explains:

> Teva pharmacovigilance is headquartered at the main site in Israel. There are local safety offices in multiple countries around the world. Adverse events come from clinical trials, postmarketing reports, business partners, solicited cases etc. and are entered into the global database in Israel, the US and Germany. *The US office is responsible for entry and medical assessment of cases from North America.*

Exhibit 16 at 8.



David R. Cohen
March 7, 2019                                                                                             Page 9

       5.     *Successor Liability*

Teva Ltd. has, over time acquired multiple entities that sell or sold opioids in the United States, including Cephalon, the Actavis Generic Entities, and Anda, Inc. As already noted, Teva Ltd. agreed to indemnify Allergan plc for all liability arising out of the Actavis Generic Entities' marketing and sale of their generic opioid products, including for liability arising out of those entities' pre-sale activities. Teva Ltd.'s acquisitions – and its agreement to indemnify Allergan plc – provides sufficient basis to entitle Plaintiffs to discovery about the allocation of successor liability.

**B.      The Case for Jurisdictional Discovery with Respect to Allergan plc**

Although Allergan plc (f/k/a Actavis plc) is attempting to portray itself as a mere holding company for the purposes of its motion, it is an NYSE-listed company (NYSE: AGN) that holds itself out as a "bold, global pharmaceutical company"[7] with its executives and "administrative headquarters" based in Madison, New Jersey.[8] Indeed, all of Allergan plc's current executive officers work on the fourth floor of the company's New Jersey headquarters. Exhibit 17 at 117:10-121:13. For years, Allergan plc and its predecessors have filed SEC Forms 10-K informing investors that the company books revenue from the sale of opioids. *See id.* at 105:3-12 ("[a]s in past years," Allergan plc's Form 10-K for the year ended December 31, 2015 reported revenues and expenses reflecting the sales and the costs of sales, respectively, of brand and generic opioids).

Allergan plc (f/k/a Actavis plc) is the culmination of a series of corporate mergers and consolidations.[9] The majority of the current executives of Allergan plc came from Forest Laboratories, Inc., another company acquired by Actavis plc that sold pharmaceuticals in the U.S., including an opioid called Combunox that has since been discontinued by the FDA. Exhibit 18. In its 2013, Allergan plc (then known as Actavis plc) noted in its 2013 10-K that the U.S. remained its largest commercial market.[10] In its 2015 Form 10-K, Allergan plc cited a "major manufacturing site" in Cincinnati, Ohio, among other U.S. locations. Through its

---

[7]  https://www.allergan.com/about/company-profile

[8]  https://www.allergan.com/about/executive-leadership

[9]  *See id;* Exhibit 18; Actavis, Inc. Form 10-K for the year ended December 31, 2012 at 3, *available at* https://www.sec.gov/Archives/edgar/data/884629/000119312513082059/d448020d10k.htm;

[10]  *See* Actavis, Inc. Form 10-K for the fiscal year ended December 31, 2012 at 3, *available at* https://www.sec.gov/Archives/edgar/data/884629/000119312513082059/d448020d10k.htm;



David R. Cohen
March 7, 2019                                                              Page 10

subsidiaries, which included Actavis Laboratories UT, Inc. (f/k/a Watson Laboratories, Inc.), Actavis Elizabeth LLC, and Allergan USA, Inc., Allergan plc continued manufacturing and distributing opioids in Ohio and throughout the U.S.[11]  On August 2, 2016, Allergan plc sold its generic businesses, which included entities involved with generic opioids, to Teva Pharmaceutical Industries Ltd., pursuant to a master purchase agreement dated July 26, 2015.[12] During his 30(b)(6) deposition, Mr. Kaufhold testified that Allergan plc received approximately $33 billion in cash pursuant to the transaction, which "went on [Allergan plc's] consolidated financial statements."  Exhibit 17 at 94:14-97:9.

Numerous documents confirm that, prior to that sale, employees with responsibility for opioids understood themselves to work for Allergan plc. *See* Exhibits 19-23. These documents include emails pertaining to various aspects of Allergan's U.S. business sent by numerous different employees whose email signatures include "Allergan plc" in explaining their titles.  *See id.*

Plaintiffs note, moreover, that two other courts have denied Allergan plc's motion to dismiss for lack of personal jurisdiction in related cases, finding that the plaintiffs in those actions had made a showing not just sufficient to justify jurisdictional discovery, but sufficient to justify the exercise of jurisdiction.  In the same decision that denied Teva Ltd.'s motion to dismiss for lack of personal jurisdiction, the Ohio Court of Common Pleas also held that the State had "established a prima facia case for jurisdiction over Allergan PLC under the long-arm statute, Section 2307.382(A) ORC" and that "Allergan PLC[] acted and caused consequences in the state of Ohio." *Dewine v. Purdue Pharma L.P.*, 2018 WL 4080052, **6-7.  Similarly, in *Chicago v. Purdue Pharma L.P., et al.*, the United States District Court for the Northern District of Illinois held that plaintiff had established a prima facie case of jurisdiction over Actavis plc, Allergan plc's predecessor, based on a successor-in-interest theory.  *Chicago v. Purdue Pharma L.P., et al.*, 2015 WL 2208423, at *7 (N.D. Il. May 8, 2015).  The court later reaffirmed this opinion.  *Chicago v. Purdue Pharma L.P., et al.*, 211 F. Supp. 3d 1058, 1068 (N.D. Il. 2016).

These rulings, and the evidence cited and submitted, are sufficient to warrant further jurisdictional discovery into the extent of Allergan plc's business in Ohio

---

[11]  *See* Exhibit 18.

[12]   *See* Allergan plc Form 10-K for the fiscal year ended December 31, 2016 at 4, available at https://www.sec.gov/Archives/edgar/data/1578845/000156459017002433/agn-10k_20161231.htm



David R. Cohen
March 7, 2019                                                                                    Page 11

with respect to the sale of opioids.

> **C.     The Case for Jurisdictional Discovery with Respect to Mallinckrodt plc**

Mallinckrodt plc ("MNK plc") has agreed to provide some jurisdictional discovery to Plaintiffs.[13]  Nonetheless, because MNK plc maintains that it is not required to do so, Plaintiffs here set forth the evidence sufficient to support jurisdictional discovery.

The evidence Plaintiffs have been able to obtain suggests that MNK plc either sells opioids in the United States, or has so disregarded the corporate form of its U.S. subsidiary, Mallinckrodt LLC, that the two companies should be treated as one for jurisdictional purposes.  Like the other Foreign Parents, MNK plc is publicly-traded on the New York Stock Exchange.  In its 2017 Annual Report (Form 10-K), filed with the SEC, MNK plc notes that it and its subsidiaries "are a global business that develops, manufactures, markets and distributes specialty pharmaceutical products and therapies." Exhibit 24 at 4. The Annual Report further notes that, in addition to MNK plc' principal executive offices in the U.K., "we have other locations in the United States ('U.S.'), most notably *our corporate shared services office* in Hazelwood, Missouri, *our* Specialty Brands commercial headquarters in Bedminster, New Jersey and *our* Specialty Generics headquarters and technical development center in Webster Groves, Missouri." *Id*. at 5 (emphasis added).

The 2017 Form 10-K for MNK plc further reported to the public and the SEC: "*We* manufacture controlled substances under DEA quota restrictions and in calendar 2017 we estimated that *we* received approximately 36% of the total DEA quota provided to the U.S. market for the controlled substances *we* manufacture." Exhibit 24 at 8 (emphasis added).  The 10-K also reports "significant products and product families in our Specialty Generics product portfolio," including hydrocodone and hydrocodone-containing tablets and oxycodone and oxycodone-containing tablets. *Id.* The Irish parent entity also reported at that time that "[a]t December 29, 2017, we had approximately 3,900 employees, approximately 3,400 of which are based in the U.S."  *Id.* at 20.

This evidence alone should be sufficient for Plaintiffs to obtain jurisdictional discovery, but other statements in MNK plc's public filings confirm that it does not distinguish between the Irish entity and its U.S. subsidiary.  MNK plc reports its net sales by business segment (not by subsidiary) *i.e.*, generics and branded opioid and

---

[13] Not having seen the discovery MNK plc has agreed to provide, Plaintiffs do not concede that what MNK plc has offered is sufficient.



David R. Cohen
March 7, 2019                                                                    Page 12

non-opioid (branded) medications. (This is consistent with the testimony of Jeff Kilper, Senior Director Finance, Specialty Generics, that he pays no attention to legal entities, but focuses on the particular businesses of Mallinckrodt. *See* Exhibit 25, at 46:10-20; *see also id.* at 8:13-24, 9:1-9, 12:19-23, 13:12-13.[14]) Moreover, although MNK plc is an Irish Company, it has reported that 90% of its sales and 93% of its manufacturing production costs are conducted in the United States. In 2013, in its Master Q&A for investors and media, MNK plc state: "We have a strong foundation - 146 years of experience - in managing controlled substances. *We* are the largest U.S. supplier of opioid pain medications and other highly controlled substances . . . ." Exhibit 26 at 4 (emphasis added).

Moreover, in 2014, it was MNK plc itself, and not any U.S. subsidiary, that announced FDA approval of Xartemis XR, a drug containing oxycodone and acetaminophen. *See* Exhibit 27. The "Contacts" listed in the Xartemis press release are labeled as "Mallinckrodt plc," but the phone numbers provided include the Missouri 314 area code. *Id.* One of those "Contacts," Mallinckrodt's manager of communications, Lynn Phillips, who worked for the company in the United States and has a law degree, was unable, at her deposition, to say which entity actually employed her. *See* Exhibit 28 at 17-18.

Finally, MNK plc has acted, and is acting, to dispose of the U.S. opioids business without regard the corporate formalities of the U.S. entity. In its December 30, 2016 quarterly report, MNK plc reported that the "goodwill" of its opioid business segment was impaired; MNK plc began attempts to sell the business. *See* Exhibit 29. Thereafter, on February 22, 2018, MNK plc, acting through its Board of Directors, to "further execute upon our strategic vision" authorized the disposition of its opioids business, and hired Credit Suisse Securities, LLC as the exclusive financial adviser to pursue the sale. MNK plc then caused the transfer of its opioid business operations and assets from Mallinckrodt, LLC to SpecGX, LLC. *See* Exhibit 24. Nine months later on December 6, 2018, MNK, plc announced a new plan to spin off the opioids business into a new publicly held entity that "will assume the Mallinckrodt name" through SpecGX, LLC. Exhibit 30. In other words, the Irish parent company authorized the sale of business in theory belonging to the American subsidiary, to separate its impaired opioids business from its unimpaired new

---

[14] Plaintiffs note that although Mr. Kilper (who could not say at his deposition which entity he worked for) signed a Sarbanes-Oxley compliance form for MNK plc in 2015, listing his own then-title as "Director, Finance - Hospital Therapies *of Mailinckrodt plc*" (emphasis added), he has always worked in St. Louis. *See* Exhibit 25 at 8; Exhibit 31; Exhibit 32.



David R. Cohen
March 7, 2019                                                                                  Page 13

branded products business.[15]

CONCLUSION

All of this evidence suffices to establish that Plaintiffs have a good faith basis to take jurisdictional discovery and that Plaintiffs' claims that the Foreign Parents are subject to jurisdiction here is not frivolous.  Even if Plaintiffs were required to make out a *prima facie* case for jurisdiction at this point, the evidence outlined above would suffice.  The Special Master should order Teva Ltd., Allergan plc, and MNK plc to respond to Plaintiffs' jurisdictional discovery demands and proceed to resolve any disputes among the parties about the scope of that discovery.

Sincerely,

Andrea Bierstein

cc:  All Counsel

---

[15] The upcoming spinoff of Mallinckrodt's opioids business raises the possibility of fraudulent transfers to an entity unable to meet the liabilities associated with the business, and makes jurisdictional discovery into the parent company all the more urgent.