## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

IN RE:  NATIONAL        : HON. DAN A. POLSTER
PRESCRIPTION OPIATE    :
LITIGATION             :
                       :
APPLIES TO ALL CASES   :NO.
            :1:17-MD-2804
- HIGHLY CONFIDENTIAL -
SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

- - -

December 13, 2018

- - -

Videotaped sworn deposition of
DAVID A. MYERS, JR., taken pursuant to
notice, was held at LIEFF CABRASER
HEIMANN & BERNSTEIN, LLP, 250 Hudson
Street, 8th Floor, New York, New York,
beginning at 9:15 a.m., on the above
date, before Margaret M. Reihl, a
Registered Professional Reporter,
Certified Shorthand Reporter, Certified
Realtime Reporter, and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

## Page 2

1     A P P E A R A N C E S :
2
3     ROBBINS GELLER RUDMAN & DOWD LLP
      BY:  MATTHEW S. MELAMED, ESQUIRE
           KELLI BLACK, ESQUIRE
4     Post-Montgomery Center
      One Montgomery Street, Suite 1800
5     San Francisco, California  94104
      (415) 288-4545
6     mmelamed@rgrdlaw.com
      kblack@rgrdlaw.com
7     Representing the Plaintiffs
8
9     WAGSTAFF & CARTMELL LLP
      BY:  JONATHAN P. KIEFFER, ESQUIRE
           SARAH RUANE, ESQUIRE
10    4740 Grand Avenue, Suite 300
      Kansas City, Missouri  64112
11    (816) 701-1100
      jpkieffer@wcllp.com
12    Representing the Plaintiffs
13
      MORGAN LEWIS & BOCKIUS, LLP
14    BY:  STACEY ANNE MAHONEY, ESQUIRE
      101 Park Avenue
15    New York, New York  10178-0060
      (212) 309-6930
16    stacey.mahoney@morganlewis.com
            - AND -
17    BY:  LIZA B. FLEMING, ESQUIRE
      1701 Market St.
18    Philadelphia, Pennsylvania 19103-2921
      (215) 963-4610
19    liza.fleming@morganlewis.com
      Representing the Defendant Teva
20
      KIRKLAND & ELLIS LLP
21    BY:  ERICA B. ZOLNER, ESQUIRE
           PRATIK GHOSH, ESQUIRE
22    300 North LaSalle Street
      Chicago, Illinois  60654
23    (312) 862-3247
      erica.zolner@kirkland.com
24    Representing the Defendant Allergan

## Page 3

1     A P P E A R A N C E S :  (cont'd)
2
      WILLIAMS & CONNOLLY LLP
3     BY:  JOEL S. JOHNSON, ESQUIRE
      725 Twelfth Street, N.W.
4     Washington, D.C.  20005
      (202) 434-5091
5     jjohnson@wc.com
      Representing the Defendant,
6     Cardinal Health
7
      JONES DAY
8     BY:  CHRISTOPHER J. LOVRIEN, ESQUIRE
      555 South Flower Street
9     Fiftieth Floor
      Los Angeles, California  90071-2452
10    (213) 489-3939
      cjlovrien@jonesday.com
11    Representing the Defendant, Walmart
12
13
14    ALSO PRESENT:  HENRY MARTE, VIDEOGRAPHER
15
16                  – – –
17
18
19
20
21
22
23
24

## Page 4

1     TELEPHONIC APPEARANCES:
2
      ARNOLD & PORTER KAYE SCHOLER LLP
3     BY:  DAVID FAUVRE, ESQUIRE
      601 Massachusetts Ave, NW
4     Washington, DC  20001-3743
      (202) 942-5041
5     david.fauvre@arnoldporter.com
      Representing the Defendants, Endo
6     Health Solutions; Endo
      Pharmaceuticals, Inc.; Par
7     Pharmaceutical Companies, Inc. f/k/a
      Par Pharmaceutical Holdings, Inc.
8
9
      REED SMITH LLP
10    BY:  CHRISTIAN W. SAUCEDO, ESQUIRE
      Three Logan Square
11    1717 Arch Street
      Philadelphia, Pennsylvania  19103
12    (215) 851-8262
      csaucedo@reedsmith.com
13    Representing the Defendant,
      AmerisourceBergen Drug Corp.
14
15    COVINGTON & BURLING LLP
      BY:  CLAYTON BAILEY, ESQUIRE
16    The New York Times Building
      620 Eighth Avenue
17    New York, New York 10018-1405
      (212) 841-1285
18    cbailey@cov.com
      Representing the Defendant,
19    McKesson Corporation
20
      BARON BUDD, P.C.
21    BY:  GRETCHEN KEARNEY, Paralegal
      600 New Hampshire Avenue, NW
22    Suite 10A
      Washington, D.C.  20037
23    (202) 333-4562
      gkearney@baronbudd.com
24    Representing the Plaintiffs

Page 5

I N D E X

WITNESS                                PAGE
DAVID A. MYERS, Jr.
    By Mr. Melamed              9
    By Mr. Kieffer              356

E X H I B I T S
Allergan-Myers    DESCRIPTION    PAGE

Myers-1  Plaintiffs' Amended Notice
    of Oral Videotaped Fact
    Deposition of David Myers    15

Myers-2  Personnel file of David Myers
    ALLERGAN_MDL_SUPP_0000810    26
Myers-3  E-mail dated 9/13/12, with
    attached Resume of David Myers
    Acquired_Actavis_00626098    33
Myers-4  Chart, "Special Recognition
    Recipients"
    Acquired_Actavis_00661681    88
Myers-5  E-mails dated 6/16/09
    Subject, FW: Kadian - New
    Option for Marketing
    ALLERGAN MDL 01192443    107

Myers-6  E-mails dated 3/17/10
    Subject, FW: CDER New
    March 16, 2010
    ALLERGAN_MDL_02463212    116
Myers-7  FDA Warning Letter dated
    2/18/10
    ACT AVIS0799203    118

Page 6

E X H I B I T S (cont'd)
Allergan-Myers    DESCRIPTION    PAGE
Myers-8  E-mail string, top one
    dated 12/14/09
    Subject, RE: Actavis Brand
    Project update
    ALLERGAN_MDL_01234649    120
Myers-9  E-mail string, top one
    dated 7/14/10
    Subject, FW: June CY 2010
    Acquired_Actavis_01373039    124

Myers-10  E-mail string, top one
    dated 7/27/10
    Subject, RE: Fentanyl VA
    Mailer and 7/26/10 Weekly
    Status
    ALLERGAN_MDL_01235205    128
Myers-11  E-mail string, top one
    dated 7/29/10
    Subject, Re: Fentanyl
    Advertising - DSN PI
    Info Needed
    Acquired_Actavis 00954338    147

Myers-12  E-mail dated 9/13/10
    Subject, Re: Buprenorphine
    advertisement
    Acquired_Actavis_01373136    154
Myers-13  2011 Budget Launches
    ALLERGAN_MDL_01211800    187

Myers-14  E-mail dated 6/20/11
    Subject, Oxymorphone
    Launch Preparation
    ALLERGAN_MDL_03684488    203
Myers-15  E-mail string dated
    7/7/2011
    Subject, PDQ Quote For
    Your Review
    ACTAVIS1130369    226

Page 7

E X H I B I T S (cont'd)
Allergan-Myers    DESCRIPTION    PAGE
Myers-16  E-mails dated 7/19/2011
    Subject, Recap of
    Sales/Marketing/Contracts
    Meeting - MONDAY, JULY 18TH
    ALLERGAN_MDL_ 00505041    253
Myers-17  E-mail dated 7/22/2011
    Subject, Oxymorphone
    training to KADIAN sales
    team, with slide deck
    ALLERGAN_MDL_00504974    279
Myers-18  E-mail dated 8/2/2011
    Subject, Marketing SIOP
    August 3 2011.ppt attached
    ALLERGAN_MDL_ 00504 796    282

Myers-19  E-mail 8/18/2011
    Subject, FW: Opioid Article
    May PPM 2011, with attachment
    ALLERGAN_MDL_00504574    285
Myers-20  E-mail dated 8/26/2011
    Subject, Oxymorphone Promotion
    and chargeback results to date
    ALLERGAN_MDL_00508576    297

Myers-21  E-mail dated 9/27/2011
    Subject, Oxymorphone
    Promotion at McKesson
    ACT AVIS0622089    318
Myers-22  E-mail string, top one
    dated 10/5/2011
    Subject, FW: Fentanyl Ad
    ACT AVIS0343310    322

Myers-23  E-mail string, top one
    dated 1/18/2012
    Subject, RE: Oxymorphone
    mailings
    ACTAVIS0618579    325

Page 8

E X H I B I T S (cont'd)
Allergan-Myers    DESCRIPTION    PAGE

Myers-24  E-mail dated 3/26/2012
    Subject, Oxymorphone
    Prescription/Sales Trend
    ALLERGAN MDL 00291742    330
Myers-25  E-mail dated 6/13/2012
    Subject, FW: Diana Award
    and attachments
    ALLERGAN MDL 00507938    345

Myers-26  E-mail dated 2/25/2013
    Subject, Buprenorphine
    Naloxone Pre-launch Documents
    Acquired_Actavis_02048142    347
Myers-27  LinkedIn printout for
    David A. Myers, Jr.    361

Myers-28  File Provided Natively
    slide deck,
    "Marketing Department
    Overview"
    Acquired_Actavis_01367234    388

Myers-29  E-mail dated 7/19/2011
    Subject, RE: Recap of
    Sales/Marketing/Contracts
    Meeting - MONDAY, JULY 18TH
    ACTAVIS0819308    419

- - -

## Page 9

1    THE VIDEOGRAPHER:  We are now on
2  the record.  My name is Daniel
3  Holmstock, I am the videographer for
4  Golkow Litigation Services.  Today's
5  date is December 3th, 2018, and the time
6  on the video screen is 9:15 a.m.  This
7  video deposition is being held at 250
8  Hudson Street, the eighth floor, New
9  York, New York in the matter of In Re:
10  National Prescription Opiate Litigation.
11  It's pending before the United States
12  District Court for the Northern District
13  of Ohio, Eastern Division.
14    The deponent today is Mr. David
15  Myers.  Counsel will be noted on the
16  stenographic record for appearances.
17    The court reporter is Peg Reihl,
18  who will now administer the oath.
19    ... DAVID A. MYERS, JR., having been
20  duly sworn as a witness, was examined and
21  testified as follows:
22  BY MR. MELAMED:
23    Q.    Good morning.
24    A.    Good morning.

## Page 10

1    Q.    My name is Matt Melamed from the
2  law firm Robbins Geller Rudman & Dowd, and I
3  represent plaintiffs in this matter.
4    Can you state your full name and
5  your address for the record, please.
6    A.    My name is David Allen Myers,
7
8                                              .
9    Q.    And what is your current
10  occupation?
11    A.    I am associate director of
12  marketing.
13    Q.    At what company?
14    A.    Teva Pharmaceuticals.
15    Q.    And where is your business
16  address?
17    A.    400 Interpace Parkway, Building
18  A, Parsippany, New Jersey.
19    Q.    You understand you're under oath,
20  correct?
21    A.    Yes, I do.
22    Q.    Are you taking any medication, or
23  is there any other reason that would interfere
24  with your ability to answer fully and truthfully

## Page 11

1  today?
2    A.    No.
3    Q.    If I ask you a question during
4  the course of today's deposition that you don't
5  understand, please ask me to clarify.  It's my
6  job to ask clear questions, okay?
7    A.    Understood.
8    Q.    Have you ever testified at a --
9  in a deposition before?
10    A.    Once before.
11    Q.    About how long ago was that?
12    A.    Within the year.
13    Q.    And what was the substance of --
14  what did the substance of the deposition
15  concern?
16    MS. MAHONEY:  Objection.
17    THE WITNESS:  I was a witness in
18  a separate litigation.
19  BY MR. MELAMED:
20    Q.    Did it involve Teva?
21    A.    Teva was not the target of the --
22  of the deposition.
23    Q.    Did you provide testimony because
24  of your experience at Teva?

## Page 12

1    A.    Yes.
2    Q.    Did it have anything to do with
3  opioids?
4    A.    Yes.
5    Q.    Can you tell me the name of the
6  litigation, please?
7    A.    I don't remember the name of the
8  litigation.
9    Q.    Was Teva a plaintiff in the
10  litigation, if you know?
11    A.    No.
12    Q.    Was it a defendant in the
13  litigation, if you know?
14    A.    No.
15    Q.    It was a third party?
16    A.    It was a third party.
17    MS. MAHONEY:  Objection.
18    THE WITNESS:  Yes.
19  BY MR. MELAMED:
20    Q.    And you understand that while
21  your counsel -- you've done so and you've
22  demonstrated this understanding, but while
23  counsel may make objections, you're still
24  required to answer the question after she

Page 13

1    objects, unless she instructs you not to answer
2    and you decide to follow that instruction.
3         A.    Understood.
4         Q.    Okay.  You've also done a very
5    good job of waiting for me to finish my
6    question, even when I pause, I appreciate that.
7    I know it's unnatural.  I will try and do you
8    the same -- the same courtesy, and I apologize
9    in advance if I have to remind you or remind
10   myself to allow each other to finish, okay?
11        A.    Understood.  The day is young.
12        Q.    You mentioned that that
13   deposition in which you appeared concerned
14   opioids, correct?
15        A.    Yes.
16        Q.    Did it concern specific opioids?
17        MS. MAHONEY:  Objection.
18        THE WITNESS:  Yes.
19   BY MR. MELAMED:
20        Q.    What opioids did it concern?
21        A.    Generic Opana ER, oxymorphone
22   extended release.
23        Q.    Do you know the -- do you have
24   any understanding of the nature of the lawsuit

Page 14

1    in which you were deposed?  Was it a personal
2    injury matter, for instance, or a patent matter,
3    et cetera?
4         MS. MAHONEY:  Objection.
5         MS. ZOLNER:  Object to the form.
6         THE WITNESS:  As I understand it,
7    it was two other groups that were making
8    a charge against the brand company Endo
9    and their actions they took to prevent
10   generic Opana from coming to the market.
11   BY MR. MELAMED:
12        Q.    Do you know the -- you mentioned
13   two other groups.  Do you know the identity of
14   those two other groups?
15        A.    I know essentially what they did.
16   I don't know their formal names.  One was -- one
17   I believe was a consumer advocacy group, and the
18   other represented wholesalers and distributors.
19   That's what I believe.
20        Q.    And you testified truthfully in
21   that deposition, correct?
22        A.    Of course.
23        Q.    Have you ever testified in any
24   other trial or legal proceeding?

Page 15

1         MS. MAHONEY:  Objection.
2         THE WITNESS:  No.
3    BY MR. MELAMED:
4         Q.    Who are the people seated with
5    you today?
6         A.    Counsel for Teva and counsel for
7    Allergan.
8         Q.    Are they your attorneys here
9    representing you today?
10        A.    They're representing my company.
11        Q.    Are you personally represented by
12   any attorneys here today?
13        A.    No.
14        (Document marked for
15        identification as Myers Deposition
16        Exhibit No. 1.)
17   BY MR. MELAMED:
18        Q.    I'm going to hand you what's been
19   marked as Exhibit Number 1.
20        A.    Okay.
21        Q.    Exhibit Number 1 is titled
22   Plaintiffs' Amended Notice of Oral Videotaped
23   Fact Deposition of David Myers.
24        Have you seen this document

Page 16

1    before?
2         A.    Yes.
3         Q.    And when do you recall first
4    seeing this?
5         A.    Yesterday.
6         Q.    And you understand that you're
7    here today to testify as a result of this -- the
8    notice reflected in Exhibit 1, correct?
9         A.    Yes.
10        Q.    Did you bring any documents with
11   you today?
12        A.    No.  I -- let me clarify, I
13   brought my briefcase over at the other side of
14   the room, but there are no documents pertaining
15   to this litigation, other than where to show up
16   and what time.
17        Q.    And is that a handwritten note
18   that's where to show up and what time?
19        A.    A note that I wrote, yes.
20        Q.    And there's nothing else on that
21   note, other than the time and location?
22        A.    The time and location and contact
23   names for counsel.
24        Q.    Did you provide any documents to

1    counsel in advance of this litiga -- in advance
2    of this deposition?
3         A.    No.
4         Q.    So what did you do to prepare to
5    be deposed today?
6         MS. MAHONEY:  Objection.
7         THE WITNESS:  I met with the
8    counsels for both Teva and Allergan, who
9    took me through some of the documents.
10        MS. MAHONEY:  I want to caution
11   you not to share any of the discussion
12   or content.  You can tell him that we
13   met and for how long.
14        THE WITNESS:  Okay.  We met
15   yesterday from 9:30 till approximately
16   5:00, 5:30.
17   BY MR. MELAMED:
18        Q.    And that meeting yesterday from
19   9:30 to 5:30 approximately was with counsel from
20   both Teva and Allergan?
21        A.    Yes, sir.
22        Q.    Did you have any phone
23   conversations with anyone pertaining to this
24   deposition prior to yesterday?

1         A.    No.
2         Q.    You mentioned that you reviewed
3    documents during that -- yesterday's preparation
4    for today's deposition, correct?
5         A.    Yes.
6         Q.    Did you review any depositions
7    given in this matter during your preparation
8    yesterday?
9         A.    No.
10        Q.    Did you review any reports or
11   memoranda issued by experts pertaining to this,
12   this litigation when you were -- during your
13   preparation yesterday?
14        MS. ZOLNER:  Object to the form.
15        MS. MAHONEY:  Object.
16        THE WITNESS:  No, not that I
17   remember.
18   BY MR. MELAMED:
19        Q.    Did you review any court
20   documents during your preparation yesterday?
21        A.    Could you define a court
22   document?
23        Q.    Sure.  I'll ask it more
24   specifically.

1         Did you review anything that you
2    know to have been filed in this court -- let me
3    withdraw that.
4         Did you review anything that you
5    know to have been filed in court in this case
6    during your preparation yesterday?
7         A.    No.  The only thing I'm aware of
8    that is a court document is this one you handed
9    me previously, which is my summons, I believe.
10        Q.    Fair enough.
11        Did you review any electronic
12   records yesterday, and by that I mean things on
13   a computer that weren't necessarily printed out
14   as documents for you to review?
15        A.    No.
16        Q.    Did you review any databases
17   yesterday in your preparation?
18        MS. MAHONEY:  Objection.
19        THE WITNESS:  No.
20   BY MR. MELAMED:
21        Q.    Have you looked in your own
22   personal paper or electronic files to identify
23   documents that might be relevant to the opioid
24   litigation for which -- pursuant to which you're

1    being deposed today?
2         MS. MAHONEY:  Objection.
3         THE WITNESS:  Yes.
4    BY MR. MELAMED:
5         Q.    What types of documents did you
6    look for?
7         A.    This was quite some time ago when
8    the collection of documents was going on and I
9    was requested to pull anything that I had
10   pertaining and hand it over to counsel.
11        Q.    Who made that request?
12        A.    I don't remember.  Probably the
13   legal team at Teva.  I was asked --
14        MS. MAHONEY:  We don't need to
15   get into attorney-client communication.
16        THE WITNESS:  Okay.  Thank you.
17   BY MR. MELAMED:
18        Q.    Just to be clear, I'm not -- I'm
19   not asking for the substance of your
20   communications with your attorneys.
21        A.    Okay, understood, thank you.
22   Thank you.
23        Q.    When you conducted that search,
24   you provided all of the documents that you found

## Page 21

1 in your search to counsel; is that correct?
2     A.   Yes.
3     Q.   Do you know whether those
4 documents have been produced during discovery in
5 this litigation?
6     MS. MAHONEY:  Objection.
7     THE WITNESS:  I'm not sure.
8 BY MR. MELAMED:
9     Q.   When did you first learn you were
10 going to be deposed in this litigation?
11     A.   I don't remember the exact date.
12 I know that investigation had been going on for
13 some time.
14     Q.   Approximately when, was it
15 this -- within the last month, prior to the last
16 month, et cetera?
17     MS. MAHONEY:  Objection.
18     THE WITNESS:  Probably within the
19     last three to four months, I believe.  I
20     can't be sure of the date again.
21 BY MR. MELAMED:
22     Q.   Fair enough.
23     Do you recall how you learned?
24     A.   No.

## Page 22

1     Q.   Have you spoken to anybody, aside
2 from your lawyers with whom you met yesterday,
3 about this deposition?
4     A.   I spoke to my boss, not about the
5 deposition, but to tell him that I was being
6 deposed and the dates that I would be out of the
7 office and to make sure that I was okay to make
8 travel arrangements.
9     Q.   Did you speak to any family
10 members about today's deposition?
11     A.   Yes.
12     Q.   With whom did you speak?
13     A.   I spoke to my partner, not about
14 the substance, but about that I would be
15 deposed.
16     Q.   Anyone else?
17     A.   Not that I recall.
18     Q.   Was anyone aside from your --
19 from lawyers for Teva and Allergan present
20 during yesterday's meeting?
21     A.   No.
22     Q.   There was no one from either
23 the -- from either Teva or Allergan themselves
24 at the meeting?

## Page 23

1     A.   No.
2     Q.   Other than you?
3     A.   Other than me.
4     Q.   Are you being reimbursed by
5 anyone for your expenses in connection with this
6 deposition?
7     A.   Yes.
8     Q.   What expenses are you being
9 reimbursed for?
10     A.   Teva will pay for my hotel and
11 for specific meals up to a certain amount within
12 a limit.
13     Q.   And how many nights of hotel will
14 Teva pay for?
15     A.   Two.
16     Q.   And loosely equivalent number of
17 meals the day -- the meals for approximately two
18 days?
19     MS. MAHONEY:  Objection.
20     THE WITNESS:  Breakfast, lunch
21     and dinner would be appropriate.
22 BY MR. MELAMED:
23     Q.   For each of the days you're --
24     A.   Yes.

## Page 24

1     Q.   -- you've had to travel for the
2 deposition?
3     A.   Yes.
4     Q.   Were you compensated by anyone
5 for your time in connection for review --
6 searching your documents to provide your
7 attorneys that you referred to earlier?
8     A.   No.  Well, I earned my salary,
9 and it was done on work time, so to be specific.
10     Q.   No compensation other than your
11 salary?
12     A.   No, my salary.
13     Q.   Yes, thank you for the
14 clarification.
15     Have you ever received any
16 compensation from any opioid manufacturer to be
17 a speaker at a conference?
18     MS. MAHONEY:  Objection.
19     THE WITNESS:  No.
20 BY MR. MELAMED:
21     Q.   Have you ever received any
22 compensation from any opioid distributor to be a
23 speaker at a conference?
24     MS. MAHONEY:  Objection.

1      THE WITNESS:  No.
2    BY MR. MELAMED:
3      Q.    Have you ever received
4    compensation from any pharmacy to be a speaker
5    at a conference?
6      A.    No.
7      Q.    Have you ever received any
8    compensation from any opioid manufacturer other
9    than Actavis and its associated companies or
10    Teva and its associated companies?
11      MS. MAHONEY:  Objection.
12      THE WITNESS:  No.
13    BY MR. MELAMED:
14      Q.    Have you ever received dinners
15    from any opioid manufacturer, other than the one
16    that was presently employing you?
17      A.    No.
18      Q.    Have you ever received any
19    dinners from any distributor of opioids?
20      A.    No.
21      Q.    Same question for pharmacy, have
22    you ever received any dinners from any
23    pharmacies?
24      MS. MAHONEY:  Objection.

1      THE WITNESS:  No.
2    BY MR. MELAMED:
3      Q.    What about trips, have you ever
4    received any compensation or been provided a
5    trip by any opioid manufacturer, other than the
6    one that you -- that you are presently employed
7    by?
8      MS. MAHONEY:  Objection.
9      THE WITNESS:  No.
10    BY MR. MELAMED:
11      Q.    Have you ever attended any
12    training sessions specific to opioids in any
13    way?
14      A.    No.
15      (Document marked for
16      identification as Myers Deposition
17      Exhibit No. 2.)
18    BY MR. MELAMED:
19      Q.    I'm going to hand you what's been
20    marked as Myers Exhibit 2.
21      For the record, Myers Exhibit 2
22    is a -- it appears to be several hundred pages
23    of documents beginning at
24    ALLERGAN_MDL_SUPP_00000810.

1      I'll represent to you that these
2    are your personnel file that was produced in
3    litigation.
4      Just an initial question, if you
5    flip through, you'll notice that a substantial
6    number of pages are stamped redacted.
7      Do you see that?
8      A.    Yes.
9      MS. MAHONEY:  Objection.
10      THE WITNESS:  Yes.
11    BY MR. MELAMED:
12      Q.    Do you have any understanding,
13    without telling me what the information is, do
14    you have any understanding of what information
15    has been redacted on these pages?
16      A.    No.  I do not know the full
17    contents of my personnel file.
18      Q.    Can you think of any experiences
19    during your employment at Actavis and at Teva
20    that could have resulted in pages in your
21    personnel file that would be redacted for
22    privileged attorney-client communications?
23      MS. MAHONEY:  Objection.
24      THE WITNESS:  I have no

1    knowledge.  I wouldn't know.
2      MR. MELAMED:  Counsel, I'll
3    represent to you that our search of the
4    privilege log didn't reflect the reason
5    that these pages were redacted, so if
6    you could get that information to us,
7    we'd appreciate it.
8      MS. ZOLNER:  So a couple of
9    things.  First of all, the information
10    from Mr. Myers' personnel files were
11    produced to you by both Allergan and by
12    Teva.  The version that you got from
13    Teva did not include the same
14    redactions.  The information that was
15    redacted was personal information that
16    had nothing to do with any of the
17    information that was requested in the
18    personnel files, but you do have the
19    information in an unredacted version
20    that was provided by Teva.
21      MR. MELAMED:  Okay.  And is
22    the -- are you representing that the
23    unredacted version provided by Teva is
24    the same documents -- it contains the

Page 29

1     same precise documents as the version
2     that's been marked as Exhibit 2?
3         MS. ZOLNER: That's my
4     understanding, yes.
5     BY MR. MELAMED:
6         Q.   All right. If you could turn to
7     the page -- I'm going to refer to Bates numbers
8     during the liti -- during the deposition. Those
9     are the numbers that are stamped at the bottom
10    of -- bottom right corner of these pages.
11        A.   Yeah.
12        Q.   If you turn to the page with the
13    Bates number ending 830.
14        MS. MAHONEY: And, for the
15        record, counsel, because I can't flip
16        through all these pages, are you
17        representing that this is a complete
18        compilation of the document from Bates
19        number ending 810 through 1121, and that
20        no pages are missing?
21        MR. MELAMED: Yes.
22    BY MR. MELAMED:
23        Q.   So this appears to -- let me ask
24    this as a question: Is this your resume that

Page 30

1     you prepared on or about June 1993?
2         A.   No.
3         Q.   Do you know who prepared this
4     resume?
5         A.   I prepared this resume, but it
6     wasn't prepared on June 1993.
7         Q.   Do you know when it was prepared?
8         A.   Oh, I'm sorry. I'm sorry. Yes,
9     yes, on or about June 1993. I'm sorry.
10    Carefully read the document.
11        Q.   Yeah, and I'll rep -- I'll
12    represent to you, so counsel is comfortable with
13    this and you're comfortable, my intent with
14    this document, this voluminous document is just
15    to look at these few pages for -- at this point
16    in time. So, hopefully, you don't need to flip
17    through the rest of it.
18        MS. MAHONEY: We'll proceed until
19        we do need to flip through the rest of
20        it.
21        MR. MELAMED: Fair enough.
22    BY MR. MELAMED:
23        Q.   So if you turn to 831, the second
24    page of the resume. It states that you received

Page 31

1     your education at Edinboro University in
2     Pennsylvania; is that correct?
3         A.   Yes.
4         Q.   And you majored in computer
5     science and minored in math, correct?
6         A.   Yes.
7         Q.   And then you attended Cleveland
8     State University from 1997 to 19 -- I'm sorry --
9     1987 to 1988 as a part-time student, correct?
10        A.   Yes.
11        Q.   Did you receive your -- a degree
12    from either institution?
13        A.   No.
14        Q.   And then working up your -- what
15    appears to be your professional experience
16    section, which is referred to on 830 and work
17    up, you worked as an order entry supervisor --
18    I'm sorry. Let me withdraw that.
19        You worked from 1985 to 1987 at
20    Leichtung, Incorporated in Warrensville, Ohio;
21    is that correct?
22        A.   Yes.
23        Q.   And before that you worked as a
24    teller at Central National Bank during college,

Page 32

1     as summer employment, correct?
2         A.   Yes.
3         Q.   If you turn to 830, the remainder
4     of your professional experience up to 1993 was
5     at a company called Ecocenters Corporation in
6     Beachwood, Ohio; is that correct?
7         A.   Yes.
8         Q.   What did Echocenters Corporation
9     do at that time?
10        A.   They were a computer services
11    firm which specialized in electronic printing,
12    typesetting and advertising, mailing
13    advertising.
14        Q.   And by the time you left, you had
15    worked your way up to be an account manager,
16    correct?
17        A.   Yes.
18        Q.   And as an account manager, you
19    were the primary customer contact for certain
20    customers of Ecocenters Corporation?
21        A.   Yes, after the salesperson had
22    received a signed contract, they were turned
23    over to me to manage their business.
24        Q.   You can put this document aside.

Page 33

1    (Document marked for
2    identification as Myers Deposition
3    Exhibit No. 3.)
4    BY MR. MELAMED:
5        Q.    I'm handing you what's been
6    marked as Exhibit 3, which is -- the first page
7    is an e-mail from David Myers to an e-mail
8    address esthilaire@lupinusa.com?
9        A.    Yes.
10       Q.    Sent September 13, 2012, starts
11   at Bates number Acquired_Actavis_00626098, and
12   then there's an attachment thereto that starts
13   the next Bates number is 099 and continues
14   through 0100.
15            Do you recognize this document?
16       A.    Yes.
17       Q.    You sent this to somebody because
18   you were interested in potentially securing
19   employment at that person's company, correct?
20           MS. MAHONEY:  Objection.
21           THE WITNESS:  Yes.
22   BY MR. MELAMED:
23       Q.    And the second and third pages of
24   this exhibit, which are 099 and 100 reflect a --

Page 34

1    reflect your -- did you prepare those pages?
2    Let me start here.  Did you prepare the pages
3    at 099 and 100?
4        A.    I believe so.
5        Q.    And this is your resume, correct?
6        A.    A former resume.
7        Q.    A resume up through
8    September 13th, 2012; is that accurate?
9        A.    Yes.
10       Q.    And so after leaving Ecocenters,
11   you were hired by a company called Alpharma,
12   correct?
13       A.    Yes.  It was more commonly known
14   as Barre-NMC at the time, I believe.
15       Q.    Can you spell that for me?
16       A.    Barre is spelled B-a-r-r-e-N, as
17   in Nancy, M as in Mary, C as in cream.
18       Q.    Is there a point at which
19   Barre-NMC became more commonly known as
20   Alpharma?
21       A.    Yes.
22       Q.    About when did that happen?
23       A.    I think in 1996.
24       Q.    Do you rem -- do you recall the

Page 35

1    reason that that happened?
2            MS. ZOLNER:  Objection,
3            foundation.
4            THE WITNESS:  It wasn't a change
5            in company ownership.  I believe it was
6            just a uniting the company under one
7            name.
8    BY MR. MELAMED:
9        Q.    So you were, starting again from
10   the first in time item on your professional
11   experience listed on this resume, so we're on
12   page ending Bates Number 100.
13       A.    Yes.
14       Q.    It says sales associate,
15   Alpharma, Baltimore, Maryland?
16       A.    Mm-hmm.
17       Q.    Do you recall who you reported to
18   as a sales associate at that point?
19       A.    Yes, I do.
20       Q.    Who was that person?
21       A.    Susan Barret.
22       Q.    Is Susan Barret -- do you know
23   where Susan Barret is presently employed?
24       A.    Susan Barret --

Page 36

1            MS. ZOLNER:  Objection.
2            THE WITNESS:  Susan Barret is now
3            Susan Cameen, and she owns her own
4            business.
5    BY MR. MELAMED:
6        Q.    Do you know when she left
7    Alpharma?
8        A.    I don't recall.
9        Q.    Your description of your job
10   during this time period is that you "provided
11   superior customer service to assigned
12   pharmaceutical wholesalers."  We'll start there.
13       A.    Yes.
14       Q.    Do you recall who the assigned
15   pharmaceutical wholesalers were?
16       A.    No, I do not.
17       Q.    And what -- what customer service
18   did you provide those wholesalers?
19       A.    Essentially managing their
20   orders, order entry, communicating back orders,
21   order fulfillment, those types of daily
22   processes.
23       Q.    And the second sentence says,
24   "supported marketing and sales efforts of West

Page 37

1    Coast sales manager"?
2        A.    Yes.
3        Q.    Was the West Coast sales manager
4    the person you just identified as Susan --
5    formerly Susan Barret?
6        A.    No.
7        Q.    Who is the West Coast sales
8    manager, if you recall?
9        A.    I believe his name was Dwight
10   Nix.
11       Q.    Do you know if Dwight Nix -- do
12   you know what Dwight Nix's current employment
13   is?
14             MS. MAHONEY:  Objection.
15             THE WITNESS:  I do not know.
16   BY MR. MELAMED:
17       Q.    Do you recall how you supported
18   his marketing and sales efforts?
19       A.    Yes.
20       Q.    What did you do?
21       A.    Essentially, I reported to Susan
22   Barret, but I was teamed with a salesperson,
23   Dwight Nix, and every account that he was
24   assigned to, I was assigned to, so we would work

Page 38

1    in tandem for any issues he had with his
2    customers.  I was almost like what you might
3    refer to as an assistant.
4        Q.    And then you were in that
5    position from 1993 to '94?
6        A.    Mm-hmm.
7        Q.    And then proceeded to become a
8    sales specialist from 1994 to '99, correct?
9        A.    Yes.
10       Q.    Was that a promotion?
11       A.    Yes.
12       Q.    Do you recall who you reported to
13   at that time?
14       A.    No.
15       Q.    The description states that you
16   "provided all aspects of customer service to
17   assigned accounts as well as sales of OTC
18   private label products," correct?
19       A.    Yes.
20       Q.    What do you mean by "all aspects
21   of customer service"?
22       A.    It would include all of the
23   aspects that were in the previous position, so
24   order availability, product availability,

Page 39

1    shipping status, tracing, things like that, any
2    issues that the customer might bring about their
3    orders in, orders out.  That would be the aspect
4    of the sales or of the customer service portion.
5        Q.    Do you recall the assigned
6    accounts to whom you provided that service?
7        A.    No.
8        Q.    Was there a geographical
9    designation for those accounts?
10       A.    I don't believe so.
11       Q.    Do you recall whether they were
12   national accounts?
13       A.    Yes, some were.
14       Q.    Do you recall the identity of
15   those some accounts that were national or some
16   of the accounts that were national?
17       A.    Yes.
18       Q.    Who were they?
19       A.    I believe Walgreens, Rite Aid
20   were two of them.
21       Q.    And what are OTC private label
22   products?
23       A.    Over-the-counter is OTC.
24   Pharmaceuticals do not -- that do not require a

Page 40

1    prescription.
2             Frequently, national retailers
3    like Walgreens or Rite Aid will offer products
4    with their label on it or their -- you know,
5    their branding, and we would manufacture those
6    for them.
7        Q.    The second sentence of your
8    description states that you "communicated new
9    products information and pricing changes to
10   pharmaceutical buyers"?
11       A.    Yes.
12       Q.    How would you do that?
13       A.    I believe through e-mail and
14   letters, written type notices.
15       Q.    Was there a regularly scheduled
16   written notice, do you recall, during that time
17   period?
18             MS. MAHONEY:  Objection.
19             THE WITNESS:  No, I don't really
20       recall anything of that nature.
21   BY MR. MELAMED:
22       Q.    After working as a sales
23   specialist, you became a senior sales associate
24   from 1999 to 2001, correct?

Page 41

1   A.   Yes.
2   Q.   Was that position a promotion?
3   A.   Yes.
4   Q.   Do you recall who you reported
5   to?
6   A.   I don't recall his name.
7   Q.   Did you have any reports in this
8   position?  Did anybody report to you?
9         MS. MAHONEY:  Objection.
10        THE WITNESS:  No.
11  BY MR. MELAMED:
12   Q.   And in this position it states
13  that you managed daily activities on all
14  consumer products over-the-counter, private
15  label and business development accounts,
16  correct?
17   A.   Yes.
18   Q.   Does that mean you were the
19  manager primarily responsible for all of the
20  described account relationships, and by "the
21  described account relationships," I'm just --
22  I'll use the words that I was trying to say to
23  make it clear, the consumer products, OTC,
24  private label and business development accounts?

Page 42

1         MS. MAHONEY:  Objection.
2         THE WITNESS:  I think that --
3   that your question is vague in a way.  I
4   was a senior sales associate who had
5   responsibility for all accounts, but I
6   wasn't the only person managing those
7   accounts.  So I wanted to clarify that.
8   BY MR. MELAMED:
9    Q.   I appreciate that.  Thank you.
10        Now, was this all of the customer
11  accounts that existed at Alpharma at the time?
12   A.   It could be --
13        MS. MAHONEY:  Objection.
14        THE WITNESS:  It could be any
15   account that existed for consumer
16   products, OTC, private label customers.
17   At this time not prescription, but they
18   could overlap.
19  BY MR. MELAMED:
20   Q.   So there were other types of
21  accounts for which you did not necessarily have
22  responsibility as the senior sales associate;
23  you mentioned pharmaceutical, for instance?
24        MS. MAHONEY:  Objection.

Page 43

1         THE WITNESS:  I'm not sure I
2    understand the question.  Can you --
3   BY MR. MELAMED:
4    Q.   Did you have -- did you manage
5   daily activities on all pharmaceutical accounts
6   at this point in time in this position?
7         MS. MAHONEY:  Objection,
8    foundation.
9         THE WITNESS:  No.
10  BY MR. MELAMED:
11   Q.   Next sentence says you "created
12  demand forecasts for business development
13  division customers by utilizing demand solutions
14  software."
15        Can you walk me through how you
16  created those demand forecasts at this point in
17  time?
18   A.   From what I remember, the
19  business development division would come with
20  new business, I would interface with them and
21  potentially have conversations with the
22  customers about their demands and needs.  I
23  would then build a forecast for them, enter it
24  into our software so that the plant could begin

Page 44

1   to manufacture the product to their needs.
2    Q.   The third bullet point, it states
3   that you served as a member of corporate Core
4   Values/Basic Principles Committee.
5         Do you see that?
6    A.   I do.
7    Q.   What was the purpose of that
8   committee?
9    A.   The purpose of the committee was
10  to promote awareness of the company's values,
11  the basic principles by which we do business and
12  to ensure that they were promoted and followed
13  by employees.
14   Q.   How were those core values and
15  basic principles communicated to employees?
16   A.   Through various means.  Corporate
17  posters, corporate meetings, town hall meetings,
18  where they were presented, the meetings
19  discussed and examples of what that -- of living
20  that core value and working in that core value
21  would -- how it would be represented.
22   Q.   Do you recall why you were
23  selected to be a member of that committee?
24   A.   Look at me.  I'm sorry.  Because

Page 45

1    I was well known and regarded in amongst my
2    peers in my department, and I believe that that
3    was why I was selected as a person that could
4    communicate and build coalition with my peers.
5        Q.    Were you selected to represent
6    the department?
7        A.    There were numerous members of
8    the Core Values/Basic Principles Committee.  I
9    was one person in one area.  I don't recall that
10   it was assigned to a specific department
11   necessarily.
12       Q.    Do you recall how many members
13   the committee had, approximately?
14       A.    I don't know.
15       Q.    Were there any executive members
16   of Alpharma who were part of the committee?
17           MS. MAHONEY:  Objection.
18           THE WITNESS:  I believe so, but I
19       don't remember.
20   BY MR. MELAMED:
21       Q.    Is it that you remember certain
22   individuals but don't remember whether they were
23   executives at the time?
24       A.    This is something that is -- the

Page 46

1    core values/basic principles is something that
2    comes from the top down of the organization, and
3    so it would only be likely that executives
4    amongst our group would be part of this.
5        Q.    Okay.  So you have no specific
6    recollection?
7        A.    I don't have a specific
8    recollection or a name.
9        Q.    After serving as senior sales
10   associate at Alpharma, you became the marketing
11   communications specialist from 2001 to 2002,
12   correct?
13       A.    Yes.
14       Q.    Do you recall who you reported to
15   in that position?
16       A.    Yes.
17       Q.    Who was that person?
18       A.    Nancy Buckingham.
19       Q.    Do you know where Nancy
20   Buckingham currently works?
21           MS. MAHONEY:  Objection.
22           THE WITNESS:  No.
23   BY MR. MELAMED:
24       Q.    Do you know if Nancy Buckingham's

Page 47

1    last name ever changed due to marriage or
2    divorce or anything like that?
3           MS. MAHONEY:  Objection.
4           THE WITNESS:  Yes.
5    BY MR. MELAMED:
6        Q.    What did her last name become?
7        A.    Yes, I know.  Her name did not
8    change.  Sorry.
9        Q.    That's an unclear question, so
10   that was a clear answer.  Thank you.
11           Did you have anyone who reported
12   to you in this position?
13       A.    No.
14       Q.    And your job as marketing
15   communications specialist was to develop
16   advertising and product launch communication
17   campaigns for major products?
18       A.    That was one portion of my
19   position, yes.
20       Q.    What types -- do you recall the
21   major products or any of the major products that
22   you helped develop advertising and product
23   launch communications campaigns for?
24       A.    For the time period specified,

Page 48

1    2001 to 2002?
2        Q.    Correct.
3        A.    I do not.
4        Q.    Would that have -- would your job
5    have encompassed developing advertising and
6    product launch communication campaigns for all
7    major products at Alpharma during this time
8    period?
9        A.    It could, but being a generic
10   company, we don't do major advertising for all
11   products.
12       Q.    You advertised for some of your
13   generic products; is that correct?
14       A.    For some, when it made sense to
15   do so, because of a market condition.
16       Q.    And you worked -- the next
17   sentence says you "directed advertising agency
18   through all phases of materials production,"
19   correct?
20       A.    Yes.
21       Q.    So did you work with a single
22   advertising agency during this time period?
23       A.    I do not believe so.
24       Q.    You were the primary contact at

Page 49

1     Alpharma for the advertising agencies with whom
2     you worked, correct?
3        A.    Yes.
4        Q.    And by "you" in that last phrase,
5     I meant Alpharma.
6        A.    Yeah.
7        Q.    Okay.  I want to go back to the
8     end of the first sentence here.  It says, you
9     developed supporting marketing and sales
10    management plans.
11            Do you see that?
12       A.    Yes.
13       Q.    What are marketing plans, and
14    what are sales management plans?
15            MS. MAHONEY:  Objection.
16            THE WITNESS:  Marketing and sales
17            management plans would be -- an example
18            would be looking at new product
19            launches, determining if there was a
20            reason that we should build awareness of
21            the product's launch or availability.
22    BY MR. MELAMED:
23       Q.    So the phrase here "marketing and
24    sales management plans" refers to a single type

Page 50

1     of plan; is that correct?
2        A.    Yes, it's not separate from
3     marketing or sales management, marketing and
4     sales.
5        Q.    And then after being a marketing
6     communications specialist at Alpharma, you
7     became the manager of products and
8     communications from 2002 to 2010, correct?
9        A.    Yes, sir.
10       Q.    Okay.  And for part of that time
11    you worked at Alpharma, and then you worked for
12    another part of that time at Actavis; is that
13    correct?
14       A.    Yes.
15       Q.    Do you recall why you worked for
16    Alpharma for part and Actavis for part?
17       A.    Yes.
18       Q.    And what was the reason for that?
19       A.    Actavis purchased Alpharma
20    generics division, USP, the US pharmaceutical
21    division, as well as, I believe, other generic
22    portions of Alpharma around the globe.
23       Q.    And subsequent to that purchase,
24    you became employed by Actavis?

Page 51

1        A.    Yes.
2        Q.    Did your role as manager of
3     products and communications change when you
4     transitioned from working for Alpharma to
5     working for Actavis?
6        A.    I don't think it changed in any
7     major way.
8        Q.    Do you recall who you reported to
9     as manager of products and communications
10    between 2002 and 2010?
11       A.    It was a couple of people.
12       Q.    Can you tell me the couple people
13    and the approximate time periods for each?
14       A.    At first I worked for Nancy
15    Buckingham, and then I worked for Terry Fullem,
16    I believe, then Joe Corsetti, and then Jinping
17    McCormick.  I believe that list to be complete
18    but...
19       Q.    If you recall differently later,
20    please come back and let me know that you can
21    correct.  I understand that you don't have a
22    perfect recollection of --
23       A.    Certainly.
24       Q.    -- who you reported to 15, 20

Page 52

1     years ago.
2             Was this a promotion from being a
3     marketing communications specialist?
4        A.    Yes, it was.
5             MR. MELAMED:  Apologies for those
6             of you who are relying on the elmo.
7     BY MR. MELAMED:
8        Q.    So during this time you managed
9     the generic pharmaceutical product line at
10    Alpharma and then at Actavis, correct?
11       A.    I managed a portion of the
12    pharmaceutical line.
13       Q.    What was the portion you managed?
14       A.    I don't remember.
15       Q.    So "portion" meaning you managed
16    certain generic pharmaceuticals and not other
17    generic pharmaceuticals?
18       A.    Yes.
19       Q.    Do you recall any of the generic
20    pharmaceuticals products that you managed?
21       A.    Yes.
22       Q.    Can you list those, if you can?
23       A.    It is a long list.  I can clarify
24    by at the beginning of this position, I managed

Page 53

1    all of the products -- prescription products
2    that came out of our Lincolnton, North Carolina
3    plant. It was mostly semi-solids and liquids,
4    creams, ointments, suppositories, things of that
5    nature.
6        Q.    And that responsibility changed
7    over time; you managed different pharmaceutical
8    products over time?
9        A.    Yes.
10       Q.    Did that management ever include
11   generic opioids?
12           MS. MAHONEY:  Objection.
13           THE WITNESS:  I believe possibly
14   one or two.
15   BY MR. MELAMED:
16       Q.    You don't recall specifically at
17   this point?
18       A.    There is one that I believe I
19   managed.
20       Q.    Which one is that?
21       A.    Promethazine with codeine.
22       Q.    The second sentence of the -- of
23   your job description states you "oversaw unit
24   demand forecasting, financial projection and

Page 54

1    corporate communications"?
2        A.    Yes.
3        Q.    What was unit demand forecasting?
4        A.    Looking at the run rate of
5    customer demand and anticipating the future
6    based on the past and any other changes that
7    were communicated by the customer.  This would
8    drive production in our plants to meet customer
9    needs.
10       Q.    In that -- withdraw that.
11           As part of that forecasting -- as
12   part of your forecasting, did you include market
13   data from other manufacturers?
14       A.    No.  Let me clarify.  I did look
15   at trends based on IMS data for whether the
16   molecule was growing or declining, and I would
17   take that into account over the long period of
18   forecasting.
19       Q.    What is IMS data?
20       A.    IMS data is a third party service
21   that is commonly used in the pharmaceutical
22   industry, and it collects sales data of nearly
23   any pharmaceutical product.
24       Q.    And so you would look at IMS data

Page 55

1    for particular molecules that were the same
2    molecule as the generic pharmaceutical product
3    for which you were overseeing unit demand
4    forecasting?
5            MS. MAHONEY:  Objection.
6            THE WITNESS:  I could use IMS
7    data to review all of my assigned
8    products.
9    BY MR. MELAMED:
10       Q.    What kind of data was available
11   through IMS?
12       A.    I would see total market, how
13   many units were sold for the past several years.
14   I could see which company's product was sold, so
15   what percentage of that share they had.
16           I could see the overall decline
17   or growth of the demand for the molecule in the
18   market, the market being the United States.
19           And I could see the segment in
20   which the demand was driven, whether it be
21   retailers, wholesalers, hospitals, who was
22   needing this product.
23       Q.    The geographic region this data
24   reflect was the United States; is that correct?

Page 56

1        A.    Yes.
2        Q.    Were you able to be more specific
3    than the United States at large with this data?
4            MS. MAHONEY:  Objection.
5            THE WITNESS:  You mean regions?
6    BY MR. MELAMED:
7        Q.    Could you look at a specific
8    United States region with the IMS data you had
9    access to?
10       A.    The IMS data I had access to, no.
11       Q.    Do you know if IMS provided
12   regional United States data?
13           MS. MAHONEY:  Objection.
14           THE WITNESS:  I don't know.
15   BY MR. MELAMED:
16       Q.    So the smallest geographical unit
17   you were able to review was the United States?
18       A.    Yes.
19       Q.    And you don't know whether IMS
20   provided data on any smaller geographical
21   regions?
22       A.    I believe that they do, but I
23   don't believe that they provided it to us.
24       Q.    Is your belief that they would

Page 57

1    have had the contract that Alpharma or Actavis
2    had at that point with IMS been at a different
3    level?
4            MS. MAHONEY:  Objection.
5            THE WITNESS:  I don't know what
6        the levels of subscription Alpharma
7        would have had or Actavis.
8    BY MR. MELAMED:
9        Q.    I guess my -- I'm trying to ask
10   something I think simpler than my question came
11   out.
12       A.    Okay.
13       Q.    You believe that the data was
14   available on geographical bases smaller than the
15   United States, correct?
16       A.    I believe, but my basis for that
17   belief is I am aware that in brand
18   pharmaceuticals, they do cut it down to regions
19   and specific regions, so I know that IMS as a
20   company does that, and I know that they do that
21   because of their work with brands.
22           We're a generic company.  I never
23   had access to that, and I don't believe that we
24   bought that specific on a regular basis, not

Page 58

1    that it wouldn't have been available to us had
2    we had a different subscription.
3        Q.    You don't know either way whether
4    that level of detail was available for generics
5    through IMS?
6        A.    I don't know.
7        Q.    And how do you know that IMS
8    provided that level of detail?  And that level
9    of detail being a smaller geographical
10   refinements for brand pharmaceuticals?
11       A.    I know that they do because at
12   one point -- at one point, I had heard about
13   being able -- well, two ways I know this.
14           I have friends in the industry
15   that work in brands, and much of their bonuses
16   and salaries are based on, if they are in sales,
17   on their sales to their doctors.  So this is
18   just my being in the industry and knowing
19   people.
20           Also, I am aware that my company
21   has at times had brand sales force, and I
22   believe that it's used in that regard.  I don't
23   think it was at this time.  I don't remember
24   us -- we didn't have much to do with brand, the

Page 59

1    brands sales force.  Brands were very divided.
2        Q.    Meaning within Alpharma and
3    Actavis during this time period, the brand
4    operations were divi -- were separate --
5        A.    Yes.
6        Q.    -- from the generic operations?
7            MS. MAHONEY:  Objection.
8            THE WITNESS:  Yes.
9    BY MR. MELAMED:
10       Q.    How do you know that?
11       A.    I know that because I worked for
12   the company.
13       Q.    That was -- I'm sorry, go ahead.
14       A.    We rarely had anything,
15   interactions with the brand side from where I
16   sat.
17       Q.    The job description also states
18   that you oversaw financial projection.
19           Do you see that?
20       A.    Yes.
21       Q.    Was that financial projection for
22   the generic pharmaceutical product lines for
23   which you had responsibility?
24       A.    Yes.

Page 60

1        Q.    How did you do that financial
2    projection?
3        A.    Financial projection was done
4    based on current unit run rate demand, monthly
5    demand, projecting out the future, what our
6    current average selling price was and projecting
7    a budget for the next year.
8        Q.    Did that also consider trends
9    with the molecule from other manufacturers?
10           MS. MAHONEY:  Objection.
11           THE WITNESS:  From other
12       manufacturers?
13   BY MR. MELAMED:
14       Q.    Yes.
15       A.    No.
16       Q.    And you mentioned that you also
17   had the responsibility for corporate
18   communications.
19           What do you mean by corporate
20   communications?
21       A.    Essentially, all of the work that
22   was done in the marketing communications
23   specialist remained with me.  I was still the
24   main contact for our agency or agencies of

Page 61

1    record, and I would interface with them and
2    other product managers and marketing management
3    to build corporate awareness programs and
4    advertisements for specific products that were
5    deemed worthy of having an advertising campaign.
6        Q.   After being a manager from 2002
7    to 2010, you became a senior manager, products
8    and communications from 2010 to present as of
9    September 2012, correct?
10       A.   Yes.
11       Q.   That was a promotion, correct?
12       A.   Yes, sir.
13       Q.   At that point you -- it states
14   "manage generic pharmaceutical product line
15   representing $140 million in annual revenues."
16       Do you see that?
17       A.   I do.
18       Q.   Was that the entirety of Actavis'
19   generic product -- pharmaceutical product line
20   during that time period?
21       A.   No, far from it.
22       Q.   Further down in the paragraph
23   there's a line that says, "conduct market
24   research using IMS Health, Wolters Kluwer and

Page 62

1    other data sources."
2        Do you see that?
3        MS. MAHONEY:  Objection.
4        THE WITNESS:  Yes.
5    BY MR. MELAMED:
6        Q.   IMS -- is IMS health the data
7    source we were just discussing?
8        A.   Yes.
9        Q.   Did you use that any differently
10   in your position as senior manager than you did
11   as manager?
12       A.   No.
13       Q.   Was there any different data
14   available to you when you were acting as senior
15   manager than when you were acting as manager
16   from IMS Health?
17       A.   No.
18       Q.   What is Wolters Kluwer?
19       A.   Wolters Kluwer is similar to IMS
20   in that they measure sales of products.  I don't
21   know their full line of business, but at the
22   time I know that we used them to tell us or give
23   us metrics on prescription sales -- or
24   prescriptions filled, I should say.

Page 63

1        Q.   Was the metric of prescriptions
2    filled not available through IMS Health?
3        A.   I don't recall if they offered
4    that at the time.
5        Q.   And can you describe what you
6    mean by they gave us metrics on prescriptions
7    filled?
8        A.   Similar to IMS, IMS would tell us
9    the full market of sales, their data was based
10   on sales out from wholesalers, distributors to
11   pharmacies.
12       Wolters Kluwer would tell us how
13   many prescriptions were filled for the entire
14   United States on every drug.
15       Q.   Was the Wolters Kluwer data able
16   to be refined by a particular pharmacy?
17       MS. ZOLNER:  Object to the form.
18   BY MR. MELAMED:
19       Q.   The prescriptions filled by a
20   particular pharmacy?
21       A.   I don't know.
22       Q.   Did you -- you did not use it
23   that way?
24       A.   No.

Page 64

1        Q.   Do you know if it was able to
2    provide data on prescription filled by a
3    pharmacy group?  So my former question I was
4    referring to the Duane Reed down the block.  For
5    this question I'm referring to Walgreens
6    pharmacies nationwide.
7        MS. MAHONEY:  Objection.
8        THE WITNESS:  I don't know.
9    BY MR. MELAMED:
10       Q.   Do you know if it was able to be
11   filtered by geographical region within the
12   United States?
13       A.   I don't know.
14       Q.   You did not use it in that way?
15       A.   I did not.
16       Q.   You mentioned other data sources
17   at the end of that sentence on your resume?
18       A.   Yes.
19       Q.   What other data sources are you
20   referring to there?
21       A.   I don't remember specifically.
22       Q.   You just remember that there were
23   other data sources?
24       A.   Other data sources could be

Page 65

1    internal data sources, our own sales, our own
2    sale trends and analyzing those, doesn't
3    necessarily mean an outside service that would
4    mean anything in regards to my resume.
5         Q.    In the second bullet point, the
6    end of it you write that you were awarded the
7    2012 HDMA Diana Award for Best New Product
8    Introduction (Generic).
9         Do you see that?
10        A.    Yes.
11        Q.    What is the HDMA?
12        A.    I'm not sure exactly what the --
13   I believe it's Healthcare Distributors
14   Management Association was what that means.
15   It's an organization.
16        Q.    Industry group?
17        A.    Industry organization, yes.
18        Q.    Do you know if Actavis was a
19   member of that organization?
20        A.    Yes.
21        Q.    Do you know if you -- do you
22   recall whether you were a member of that
23   organization?
24        A.    Yes.

Page 66

1         Q.    And were you?
2         A.    No.
3         Q.    Do you know who at Actavis was?
4         A.    No.
5         Q.    Do you know any of the other
6    members of HDMA at that -- go ahead.  If you
7    want to clarify, please do.
8         A.    Let me clarify.
9         The company was a member, but I
10   believe there were people within the company
11   that were on the roster, the contact list, and I
12   do believe that I was one of them.  I did not
13   have a separate membership.
14        Q.    Do you recall approximately how
15   many people at the company were on the roster
16   list?
17        A.    I do not.
18        Q.    Do you -- there were other
19   members of HDMA presumably as well, correct?
20        MS. MAHONEY:  Objection.
21        THE WITNESS:  Can you --
22   BY MR. MELAMED:
23        Q.    Actavis wasn't HDMA's sole
24   member?

Page 67

1         A.    No.
2         Q.    Do you recall interacting with
3    any of the other members through the HDMA?
4         MS. MAHONEY:  Objection.
5         THE WITNESS:  No.
6    BY MR. MELAMED:
7         Q.    Do you recall the identity of any
8    of the other member companies of the HDMA?
9         THE WITNESS:  The other member
10        companies could be everyone in the
11        industry.
12   BY MR. MELAMED:
13        Q.    Do you recall specifically
14   whether Mallinckrodt was a member organization?
15        A.    I do not know.
16        Q.    Or Teva?
17        MS. MAHONEY:  Objection.
18        THE WITNESS:  I do not remember.
19   BY MR. MELAMED:
20        Q.    Do you recall whether Purdue was
21   a member?
22        A.    I do not, no.
23        Q.    Do you recall whether Endo was a
24   member?

Page 68

1         A.    I do not.
2         Q.    Do you recall whether any
3    specific company other than Actavis was a
4    member?
5         A.    I do not know.
6         Q.    You know that there were other
7    members, you just don't recall who they were?
8         A.    I can't concretely say that
9    anyone was a member.  I know that it's open to
10   the entire pharmaceutical landscape, and I know
11   that most companies -- I perceive that most
12   companies at the time were part of this
13   organization.  I do not have any specific
14   knowledge or cannot confirm concretely of their
15   membership.  I worried about our membership or I
16   took care of our membership anyway.
17        Q.    What was the purpose, as best you
18   understand, of the HDMA?
19        MS. ZOLNER:  Objection to form.
20        THE WITNESS:  From what I
21        understand, the HDMA -- and it still
22        exists as the HDA, I believe, is to --
23        is a group of -- how do I state this?
24        MS. MAHONEY:  If you know.

Page 69

1    THE WITNESS: I understand what
2  their purpose for being is. I don't
3  know that it's all encompassing. They
4  are a group of businesses that are
5  wholesalers and distributors, and they
6  deal with issues that could relate to
7  wholesaling and distributing of
8  products.
9  BY MR. MELAMED:
10   Q.   And that knowledge comes from
11 your experience?
12   A.   I've never attended an HDMA
13 meeting. I was a member and I was part of
14 Actavis and Alpharma's membership in that I
15 processed the payment for our membership. You
16 pay dues to belong.
17   Q.   You stated what I understood to
18 be a general understanding of what HDMA was, and
19 you just said it was a group of businesses that
20 are wholesalers and distributors, and they deal
21 with issues that could relate to wholesaling and
22 distributing of products, correct?
23   A.   Yes.
24   Q.   How did you come to that

Page 70

1  understanding?
2    A.   I come to that understanding
3  based on the type of work that they do. Based
4  on that I submitted the paper for the Diana
5  award, and the topic of that paper was how we
6  int -- how we interacted with wholesalers and
7  distributors and partnered with them in the
8  launch of that product to make it smooth for
9  their business processes, to make sure that
10 product was adequately distributed but not
11 overstocked. So that's how I come to that.
12   Q.   I know you said you did not
13 personally attend any HDMA conferences, correct?
14   A.   Yes.
15   Q.   Do you know whether the HDMA held
16 conferences?
17   A.   Yes.
18   Q.   Do you know approximately how
19 often those conferences were held?
20    MS. MAHONEY: Objection.
21    THE WITNESS: I know that they
22 may have -- we have attended some
23 conferences, probably once a year, but
24 we did not attend all of their

Page 71

1  conferences.
2  BY MR. MELAMED:
3    Q.   Is it your recollection that
4  they -- HDMA during this time period, 2010 to
5  2013 -- I'm sorry -- 2010 to 2012 held annual
6  conferences?
7    A.   I believe -- I believe so.
8    Q.   Do you recall whether they held
9  any other meetings between the annual -- in
10 addition to the annual conferences during that
11 time period?
12   A.   I believe so. I would get the
13 schedule but our company didn't attend.
14   Q.   Do you know who from your company
15 did attend the conferences from 2010 to 2012?
16   A.   It could change from year to
17 year.
18   Q.   Do you know any of the people who
19 did attend in any particular year?
20   A.   I couldn't be sure.
21   Q.   Where would that information be
22 reflected? If I wanted to find that out, would
23 there be a document that said it?
24    MS. MAHONEY: Objection.

Page 72

1    THE WITNESS: Probably a trade
2  show -- probably a trade show schedule.
3  BY MR. MELAMED:
4    Q.   And would Actavis have received
5  that trade show schedule?
6    A.   The trade show schedule for
7  certain years would be partially produced by me,
8  so it's not something we would -- when I refer
9  to a trade show schedule, I'm talking about the
10 trade shows that our company is going to attend.
11   Q.   And you maintain -- you were the
12 person responsible at Actavis for maintaining
13 those schedules?
14   A.   I was one of the people.
15   Q.   Who else was responsible for
16 that?
17   A.   There could be other people
18 within marketing. There could be the marketing
19 director that would have input to that.
20   Q.   When you kept those schedules,
21 where did you keep them? Is there a specific
22 directory you kept them in, shared files, et
23 cetera?
24    MS. MAHONEY: Objection.

Page 73

```
 1          THE WITNESS:  I don't remember
 2   specifically, but they were kept online.
 3   BY MR. MELAMED:
 4      Q.    Were they --
 5      A.    On our network.
 6      Q.    And did you update them on the
 7   network, or did you update them through a
 8   network site?
 9      A.    Yes.
10          MS. MAHONEY:  Objection.
11   BY MR. MELAMED:
12      Q.    Would you know what the name of
13   that network system was at the time?
14      A.    I don't recall.
15      Q.    Did the HDMA -- let me -- I'd
16   like to broaden the time period of these
17   questions now, so I'd like to refer to both the
18   HDMA and HDA; is that okay?
19      A.    That's fine.
20      Q.    And is it okay if I call it the
21   HDA?
22      A.    Yes.
23      Q.    So does the HDA continue to hold
24   conferences, to the best of your knowledge?
```

Page 74

```
 1      A.    I believe so.
 2      Q.    And that belief is based on what?
 3      A.    Assuming that their business
 4   would continue as usual and random e-mails I
 5   receive, marketing e-mails from them.
 6      Q.    When did your responsibility for
 7   managing Actavis' membership in the HDA end?
 8      A.    I believe it ended when Watson
 9   bought Actavis, and those type of memberships
10   went -- moved to someone else.  That
11   responsibility came off my plate.
12      Q.    And that was approximately 2013;
13   is that accurate?  This isn't intended to be a
14   test.  I just want to have --
15      A.    I think about that time.  There's
16   been many mergers and acquisitions over the
17   course of my tenure, and it's hard to remember
18   what your last name is.
19      Q.    Did the HDA, in your experience,
20   produce any periodicals?
21          MS. MAHONEY:  Objection.
22          THE WITNESS:  I don't remember
23      that.
24   BY MR. MELAMED:
```

Page 75

```
 1      Q.    Do you know whether it sponsored
 2   any articles?
 3      A.    I don't remember that.
 4      Q.    Do you know whether it sponsored
 5   any medical research?
 6      A.    I don't recall that at all.
 7      Q.    Do you know whether it lobbied,
 8   political -- engaged in political lobbying?
 9          MS. MAHONEY:  Objection.
10          THE WITNESS:  I don't know.
11   BY MR. MELAMED:
12      Q.    Do you know whether it made any
13   campaign donations to politicians?
14      A.    I don't know.
15      Q.    Do you know whether Actavis was a
16   member of any working groups at the HDA or HDMA?
17          MS. MAHONEY:  Objection.
18          THE WITNESS:  Could you define
19      "working groups"?
20   BY MR. MELAMED:
21      Q.    Sure.  Was it a member of any
22   subcommittees of the organization, if you know?
23          MS. MAHONEY:  Objection.
24          THE WITNESS:  I don't know.
```

Page 76

```
 1   BY MR. MELAMED:
 2      Q.    Were there individuals most
 3   active in Actavis' membership in the HDA during
 4   the time period that you were responsible for
 5   paying the bills?
 6          MS. ZOLNER:  Objection to form.
 7          THE WITNESS:  I don't recall that
 8      anybody was very active in their
 9      membership with the HDA, other than
10      attending the conference once a year.
11   BY MR. MELAMED:
12      Q.    Do you recall whether opioids
13   were discussed at HDA conferences?
14      A.    I wouldn't recall, because I had
15   never been to a conference.
16      Q.    Do you recall anybody you work
17   with speaking about opioids having been
18   discussed in an HDA conference?
19      A.    No.
20      Q.    Returning to the award, you won
21   what's called a Diana award.
22          Do you know why it's called the
23   Diana award?
24      A.    I do not.
```

Page 77

1    Q.    And you won that for best new
2  product introduction (generic), correct?
3    A.    Yes.
4    Q.    And that was for the introduction
5  of oxymorphone, correct?
6    A.    Yes, it was.
7    Q.    What were the criteria for that
8  award, as best you understand?
9    A.    To apply for the award -- to
10  apply for the award, you -- it has to be a
11  product awarded in that previous year -- or
12  launched in that previous year.
13        You have to write a paper that
14  includes many different criteria.  Criteria
15  being -- and I don't -- may not recall all of
16  them, but it helps to show why the product is
17  unique or necessary for society and what you did
18  specifically and how you managed the business
19  differently in pertains to wholesalers,
20  distributors.  Because they are a wholesaler,
21  distributor organization, how did you work with
22  them, what was different about this product
23  launch than any other product launch.
24        That paper, amongst all of the

Page 78

1  other submissions, is then read by members of
2  the HDMA, and they vote on it, decide who wins
3  the award.
4    Q.    In the final bullet point under
5  this section of your professional experience it
6  states, "Analyze markets of existing products
7  for growth opportunities and conduct analysis to
8  identify high potential new products," right?
9    A.    Yes.
10    Q.    What analysis did you do to
11  identify high potential new products?
12    A.    Typically, once our R&D
13  organization and our pipeline organization had
14  gotten to within a year or two of projected
15  launch, they have forecasts -- forecasts that
16  they have created to start the project.  It is
17  then co-authored with commercial, so someone
18  like me, to then look, take another look at the
19  market, the trends, is it growing, is it
20  declining, how many competitors do we feel -- do
21  we project there might be based on public
22  information, to determine what our market share
23  would be.  That would then be used to drive
24  manufacturing to prepare for launch and also

Page 79

1  could be used for financials, understanding how
2  many units we would sell at an estimated price
3  for whatever -- wherever the market lands.
4    Q.    As a general matter, the idea --
5  withdraw that.
6        As a general matter, the company
7  wanted to launch generic drugs that would be
8  profitable, correct?
9        MS. ZOLNER:  Objection to form.
10        MS. MAHONEY:  Objection.
11        THE WITNESS:  Yes.
12  BY MR. MELAMED:
13    Q.    It did not want to lose money
14  when it introduced a product, correct?
15        MS. ZOLNER:  Objection to form.
16        THE WITNESS:  Yes.  That doesn't
17    mean that we didn't.
18  BY MR. MELAMED:
19    Q.    Fair enough.
20        Are you aware of any product that
21  was introduced by Actavis or its successors for
22  whom you worked, so Watson or Teva when you were
23  transferred, that was launched and at the time
24  of launch the company anticipated it would lose

Page 80

1  money?
2        MS. ZOLNER:  Objection, form.
3        THE WITNESS:  I don't recall a
4    specific product.  I recall products
5    where at the end where we were about to
6    launch we decided not to because the
7    market had changed, and the value had
8    not been supportive of moving forward.
9  BY MR. MELAMED:
10    Q.    In your experience, if that
11  determination had been made, that the market had
12  changed and the value wouldn't be supported
13  going forward, the company then decided not to
14  launch that generic product; is that correct?
15        MS. MAHONEY:  Objection.
16        THE WITNESS:  It would be
17    dependent on the particulars of that
18    specific product, not necessarily that
19    it wouldn't be profitable, but what are
20    all the other market factors that go
21    into it.
22  BY MR. MELAMED:
23    Q.    Do you recall specifically any
24  pharmaceutical products for which that happened?

Page 81

1   And by that I mean that you got close to launch
2   and that it was withdrawn?
3        A.   I don't recall any specific
4   products.  I just know that it's happened.
5        Q.   This resume takes us up to 2012.
6   Can you tell me what positions you've held since
7   being senior manager at Actavis?
8        A.   Senior manager at Actavis for
9   products and communications then morphed into
10  just senior managers -- senior managers of
11  product operations.  The communications portion,
12  as the company grew, went to a specific group of
13  marketing communications professionals that
14  dealt with that portion.
15       And since then I was promoted
16  once more to associate director of marketing.
17       Q.   What was the name of the company
18  at the time you were promoted to associate
19  director of marketing?
20       A.   Teva.
21       Q.   When did that promotion happen,
22  approximately?
23       A.   Within the last month.
24       Q.   Congratulations.

Page 82

1        A.   Thank you.
2        Q.   Do you remem -- you recall about
3   when you were promoted to senior manager of
4   product operations?
5        A.   Well, it wasn't a promotion, it
6   was just a title change.  The job just morphed
7   into something else.  You know, different
8   companies will call you something different.
9   And, again, the communications portion came off,
10  so the communications portion came off of my
11  title.
12       Q.   Did that happen in conjunction
13  with the Watson acquisition?
14            MS. MAHONEY:  Objection.
15            THE WITNESS:  It became more in
16       conjunction with Teva acquisition.
17  BY MR. MELAMED:
18       Q.   So it is accurate to say you were
19  senior manager of products and communications up
20  until the Teva acquisition?
21       A.   Yes.
22       Q.   And at that point you became
23  senior manager of product operations at Teva,
24  right?

Page 83

1        A.   Yes, but at Watson, we -- when it
2   was Watson Actavis, because Watson bought
3   Actavis and then changed their name to Actavis,
4   so it's a little confusing.
5        Q.   It is.
6        A.   Watson did not believe in really
7   advertising generic pharmaceuticals.  So
8   although random things would come up for me,
9   rarely did I get involved in communications,
10  even though the title didn't change, just so you
11  know.
12       Q.   When you were senior manager of
13  products and communications at Actavis from,
14  let's say -- do you recall who you reported to
15  when you were in that position?
16       A.   As senior manager?
17       Q.   Yes.
18       A.   I was promoted by Jinping
19  McCormick, and then when Watson bought Actavis,
20  Jinping did not go on with the company, and then
21  I reported to Napoleon Clark.
22       Q.   Did you report to Jinping
23  McCormick prior to the Watson acquisition?
24       A.   Yes.

Page 84

1        Q.   When did you start reporting to
2   Jinping McCormick?
3        A.   I don't remember the specific
4   date.
5        Q.   Is it -- was that -- did you
6   start reporting to Jinping McCormick in or
7   around 2010 when you were promoted to senior
8   manager?
9        A.   Yes, she promoted me.
10       Q.   Okay.  Prior to being promoted to
11  senior manager, do you recall to whom you
12  reported in 2009 as the manager of products and
13  communications?
14       A.   That may have been Jinping then
15  too.  In 2009, I think so.
16       Q.   Do you recall in 2008?
17            MS. MAHONEY:  Objection.
18            THE WITNESS:  I'm not exactly
19       sure.  I don't know when Jinping became
20       director of marketing.
21  BY MR. MELAMED:
22       Q.   Prior to Jinping McCormick
23  becoming -- let me withdraw that.
24            Upon Jinping McCormick becoming

Page 85

1    director of marketing, did you report to her
2    until the Watson acquisition?
3         A.   Can you repeat?
4         Q.   From the point at which Jinping
5    McCormick was promoted to director of marketing,
6    did you report to her up until the point of the
7    Watson acquisition?
8         A.   Yes.
9         Q.   Do you remember immediately prior
10   to Jinping McCormick becoming the director of
11   marketing who you reported to?
12        A.   Yes.
13        Q.   And who was that?
14        A.   Joseph Corsetti.
15        Q.   Do you know where Joseph Corsetti
16   is currently employed?
17             MS. MAHONEY:  Objection.
18             THE WITNESS:  No.
19   BY MR. MELAMED:
20        Q.   And since you joined -- I'm
21   sorry, let me withdraw that.
22             You began reporting to Napoleon
23   Clark after the Watson acquisition, correct?
24        A.   Yes.

Page 86

1         Q.   Have you continued to report to
2    Napoleon Clark to present?
3         A.   Indirectly.
4         Q.   When did your direct reporting
5    relationship to Napoleon Clark change?
6         A.   When Teva acquired Actavis.
7         Q.   And who did you begin to directly
8    report to after the Teva acquisition?
9         A.   Bryan Bart.
10        Q.   And then does Bryan Bart report
11   to Napoleon Clark?
12        A.   Yes.
13        Q.   And is that the reporting
14   relationship that remains today?
15             MS. ZOLNER:  Objection, form.
16   BY MR. MELAMED:
17        Q.   Is that your -- do you still
18   report to Bryan Bart?  As on a -- let me
19   withdraw that.
20        A.   Okay.
21        Q.   Up until a month ago, did you
22   report to Bryan Bart?
23        A.   Yes.
24        Q.   And up until a month ago, your

Page 87

1    understanding is Bryan Bart still reported to
2    Napoleon Clark?
3         A.   Yes.
4         Q.   And in the last month, those
5    reporting relationships are shifting?
6             MS. ZOLNER:  Objection to form.
7             THE WITNESS:  Yes, Bryan Bart is
8        taking a different position within the
9        company.
10   BY MR. MELAMED:
11        Q.   Is it not clear who you will be
12   reporting to at this point in time?
13        A.   Currently, I have a dotted line
14   to Bryan Bart as he makes the transition, and I
15   report to Napoleon Clark, and Bryan Bart's old
16   position, senior director of marketing -- or
17   senior director of product operations, I believe
18   it may be, is open and is being recruited for.
19        Q.   Is it your understanding that
20   once a person is hired for that position, you
21   will report directly to that person?
22        A.   I believe that is the way that
23   will go.
24             MS. MAHONEY:  I don't want to

Page 88

1    interrupt you, but we've been going for
2    a while, if now is a good time for a
3    break.
4             MR. MELAMED:  If it's okay with
5        you -- with everybody in the room, if we
6        do one more document, pretty quick set
7        of documents.  Is that okay?
8             THE WITNESS:  I'm okay.
9             MS. MAHONEY:  Is that good with
10       you?
11             THE WITNESS:  Okay.
12             MR. MELAMED:  Then we'll take a
13       break.
14             MS. MAHONEY:  Thank you.
15             (Document marked for
16       identification as Myers Deposition
17       Exhibit No. 4.)
18   BY MR. MELAMED:
19        Q.   Handing you what's been marked as
20   Exhibit 4.  Exhibit 4 is a spreadsheet, several
21   pages printed, it's all at the same Bates number
22   which is Acquired_Actavis_00661681.  And the
23   title of the document has been recorded on the
24   bottom of the printed spreadsheet which is

1    "Special Recognition Recipients."
2            Do you recognize this document?
3    A.    No.
4    Q.    Okay.  I just want to draw your
5    attention to page 2, and the page numbers on
6    this is in the center of the bottom of the page,
7    still the same Bates number, 1681.
8            And the top line it says in 2011
9    in the month of August, there's a column for
10   Recipient #2 and you are listed.
11           Do you see your name under
12   Recipient #2?
13   A.    I do.
14   Q.    And you see that there's an award
15   summary, and it refers to you and others.  It
16   says, "For their effort in support of NACDS"?
17   A.    Yes.
18   Q.    And NACDS stands for National
19   Association of Chain Drug Stores, correct?
20   A.    Yes.
21   Q.    Can you explain this -- do you
22   recall why you received this award?
23           MS. MAHONEY:  Objection.
24           THE WITNESS:  Yes.

1    BY MR. MELAMED:
2    Q.    You do recall receiving the
3    award, correct?
4    A.    Not specifically.
5    Q.    Do you understand the reason this
6    -- that you received this award?
7    A.    Based on the summary, yes, I
8    would understand.
9    Q.    Okay.  And what is your
10   understanding of the reason you received this
11   award?
12   A.    Once a year we would -- National
13   Association of Chain Drug Stores is another
14   national organization that the company
15   participated and belonged to, and we would go to
16   a -- they call it a trade show, but it's really
17   a meeting driven trade show, where participants,
18   like, for instance, Actavis or Teva would have a
19   trade show booth and you would have appointments
20   with most of your largest customers just to
21   review business.
22   Q.    More generally, do you understand
23   the reason for the National Association of Chain
24   Drug Stores existence?

1            MS. MAHONEY:  Objection.
2            THE WITNESS:  I don't know what
3        their mission statement is, but I assume
4        that they are same thing to -- an
5        organization to deal with, you know,
6        business things that might impact
7        national chain drug stores.
8    BY MR. MELAMED:
9    Q.    Do you have an understanding of
10   why Actavis was a member of -- and I'll refer to
11   it as the document does, as the NACDS, is that
12   okay?  Do you have any understanding of why
13   Actavis was a member of the NACDS?
14           MS. MAHONEY:  Objection.
15           THE WITNESS:  Not specifically to
16       NACDS, but we supported the industry.
17       It was customary for all drug companies
18       to support their customers.
19   BY MR. MELAMED:
20   Q.    And so the NACDS was made up, at
21   least in part of -- let me withdraw that.
22           The membership of NACDS was made
23   up, at least in part, of Actavis' customers,
24   correct?

1            MS. MAHONEY:  Objection.
2            THE WITNESS:  I believe so.
3    BY MR. MELAMED:
4    Q.    And those customers were the --
5    were some of the pharmacies who filled
6    prescriptions using Actavis products?
7    A.    Were they members?
8    Q.    Yes.
9            MS. MAHONEY:  Objection.
10           THE WITNESS:  I have no
11       knowledge.
12   BY MR. MELAMED:
13   Q.    Okay.  Do you know if there were
14   any pharmaceutical distributors who were members
15   of the NACDS?
16   A.    I don't know.
17   Q.    Do you know whether there were
18   any other pharmaceutical manufacturers who were
19   members of the NACDS?
20   A.    I believe so.
21   Q.    Do you have any specific
22   knowledge as to any other manufacturers who were
23   members of the NACDS?
24   A.    Yes.

Page 93

1      Q.    About how many do you recall off
2  the top of your head?
3      A.    I don't have a list of their
4  members.  I am aware that both Actavis and Teva
5  had been members of the NACDS.
6      Q.    Is Teva still a member of the
7  NACDS?
8      A.    I don't know.
9      Q.    Do you know if the NACDS still
10  exists?
11      A.    Yes, it does.
12      Q.    And you said that the NACDS held
13  annual trade shows, but you referred to those as
14  meeting based?
15      A.    Yes.
16      Q.    What do you mean by "meeting
17  based"?
18      A.    The difference between what I
19  would consider, from my personal experience, a
20  trade show is a trade show you show up, people
21  can ask you questions about your products and
22  your company.
23          With a meeting trade show, such
24  as one of the NACDS' -- the NACDS has many trade

Page 94

1  shows.  The one in this particular regard,
2  essentially you have meeting -- you have a booth
3  that has meeting rooms, and your business
4  partners make appointments with you to discuss
5  business.
6      Q.    Do you know if the NACDS
7  published any periodicals, any pamphlets,
8  magazines?
9          MS. MAHONEY:  Objection.
10          THE WITNESS:  I don't know.
11  BY MR. MELAMED:
12      Q.    Do you know whether they
13  sponsored any medical studies?
14          MS. MAHONEY:  Objection.
15          THE WITNESS:  I don't know.
16  BY MR. MELAMED:
17      Q.    Do you know whether the NACDS
18  engages in any political lobbying?  Apologies
19  for tripping over my tongue.
20      A.    I don't know.
21      Q.    Do you know whether the NACDS
22  provides political candidates any campaign
23  donations?
24      A.    I don't know.

Page 95

1      Q.    Do you know who was responsible
2  at Actavis -- withdraw that.
3          Who was primarily responsible at
4  Actavis for the relationship -- let me withdraw
5  that and start again.
6          Do you know who was primarily
7  responsible at Actavis for managing Actavis'
8  membership in the NACDS?
9          MS. MAHONEY:  Objection.
10          THE WITNESS:  Can you define
11  "managing"?
12  BY MR. MELAMED:
13      Q.    Who is the primary point person
14  between Actavis and the NACDS?
15          MS. ZOLNER:  Objection to form.
16          MS. MAHONEY:  Objection.
17          THE WITNESS:  I know there were
18  some years for which I paid our
19  membership dues, not me personally, but
20  I submitted payment to pay our dues to
21  belong to the thing.  I don't know who
22  was the main contact outside of that.
23  There were many people that could have
24  been.

Page 96

1  BY MR. MELAMED:
2      Q.    Did you attend any of the NACDS
3  meetings?
4      A.    Yes.
5      Q.    You attended the one for which
6  you received this award, correct?  And by "this
7  award" I'm referring to the award on Exhibit 4
8  that we're looking at?
9      A.    I don't remember if I attended
10  this one or not.
11      Q.    Approximately how many NACDS
12  meetings have you attended in your career to
13  present?
14      A.    Four or five, I think.
15      Q.    And have you engaged in any other
16  communications -- withdraw that.
17          Have you ever participated in any
18  committees of the NACDS?
19      A.    No.
20      Q.    Do you know if anybody at Actavis
21  has or did?
22      A.    No.
23      Q.    Do you know if anybody at Teva
24  currently does?

Page 97

1    A.   No.
2    Q.   Do you know if anybody at Teva
3  formerly did?
4    A.   No.
5        MR. MELAMED:  All right.  Let's
6  go off the record.
7        THE VIDEOGRAPHER:  The time is
8  10:42 a.m.  We're going off the record.
9        (Brief recess.)
10       THE VIDEOGRAPHER:  The time is
11 10:57 a.m., and we're back on the
12 record.
13 BY MR. MELAMED:
14    Q.   Before we took a break, we were
15 talking about two industry groups, the NACDS and
16 HDA, correct?
17    A.   Yes.
18    Q.   For the NACDS you mentioned that
19 there were annual meetings, right?
20    A.   Yes.
21    Q.   You called them trade shows, but
22 they were actually more organized to facilitate
23 meetings?
24       MS. MAHONEY:  Objection.

Page 98

1        THE WITNESS:  The meeting in
2  question was that way.
3  BY MR. MELAMED:
4    Q.   The meeting -- and you're
5  referring to the meeting in question in Exhibit
6  4?
7    A.   Yes.
8    Q.   Do you know whether other NACDS
9  trade shows were similarly meeting based?
10       MS. ZOLNER:  Objection to the
11 form.
12       MS. MAHONEY:  Objection.
13       THE WITNESS:  I don't know.
14 BY MR. MELAMED:
15    Q.   Do you recall any meetings that
16 occurred during the NACDS that concerned
17 opioids?
18    A.   No.
19    Q.   At the NACDS were any of the
20 meetings between Actavis and another drug
21 manufacturer?
22    A.   Not that I recall.
23    Q.   Were there any meetings at the
24 NACDS between Actavis and distributors of

Page 99

1  pharmaceutical products?
2    A.   Yes.
3    Q.   Do you recall specifically with
4  whom any of those meetings occurred?
5    A.   Not specifically.  It could be
6  with any of our customers.
7    Q.   So you can't -- well, I'll ask
8  you a few specific ones, and if that triggers
9  your recollection great, and if not, fair
10 enough.
11       Do you know whether Actavis met
12 at the NACDS with Cardinal Health?
13    A.   I don't recall.
14    Q.   It's possible, but you don't
15 recall either way?
16    A.   Yes.
17       MS. MAHONEY:  Objection.
18       THE WITNESS:  Yes.
19 BY MR. MELAMED:
20    Q.   Okay.  Do you recall whether at
21 the NACDS whether Actavis met with McKesson?
22    A.   It's possible, but I don't
23 recall.
24    Q.   Do you recall at the NACDS

Page 100

1  whether Actavis met with AmerisourceBergen?
2    A.   Again, it's possible, but I don't
3  recall specifically.
4    Q.   Do you recall at the NACDS
5  whether Actavis met with Walgreens?
6    A.   Yes.
7    Q.   And is your recollection that
8  Actavis did meet with Walgreens?
9    A.   I believe so.
10    Q.   Were you at that meeting?
11    A.   No.
12    Q.   Do you know who was at that
13 meeting?
14    A.   No.
15    Q.   How do you recall that Actavis
16 met with Walgreens at the NACDS?
17    A.   Walgreens is one of our largest
18 chain drug store companies or customers.  This
19 is a chain drug store meeting.
20    Q.   Do you know who from Actavis
21 would have participated in that meeting?
22       MS. MAHONEY:  Objection.
23       THE WITNESS:  Not specifically.
24 BY MR. MELAMED:

Page 101

1    Q.    Do you have any idea who it was
2  most likely to be that participated in that
3  meeting from Actavis?
4         MS. MAHONEY:  Objection.
5         THE WITNESS:  Yes.
6  BY MR. MELAMED:
7    Q.    Who was it -- who was it most
8  likely to be?
9         MS. ZOLNER:  Objection to form.
10        THE WITNESS:  Most likely, it
11        would be the salesperson who represented
12        or who was assigned to Walgreens.  It
13        could be other members of our
14        management.  It could be the vice
15        president of sales.  It could be other
16        people in the commercial team.
17  BY MR. MELAMED:
18    Q.    Do you recall who the vice
19  president of sales at Actavis was at the time
20  you attend -- you received your award for your
21  effort in support of NACDS?
22    A.    I believe it was Michael
23  Perfetto.
24    Q.    And at the NACDS did you meet

Page 102

1  with -- do you recall whether Actavis met with
2  Publix?
3    A.    I do not.
4    Q.    Do you recall at the NACDS
5  whether Actavis met with Rite Aid?
6    A.    It's possible, but I don't
7  recall.
8    Q.    Do you recall at the NACDS
9  whether Actavis met with Walmart?
10    A.    It's possible, but I don't
11  recall.
12    Q.    Do you recall at the NACDS
13  whether Actavis met with Target?
14    A.    It's possible, but I don't recall
15  specifically.
16    Q.    Do you recall at the NACDS
17  whether Actavis met with Kroger?
18    A.    It's quite possible, but I don't
19  recall.
20    Q.    Is there a reason you said quite
21  possible for Kroger, but only possible for the
22  others?
23    A.    Just a difference in statement.
24  It's quite possible that we met with any or all

Page 103

1  of those.  I don't have specific recollection.
2    Q.    Was Anda also a distributor of
3  Actavis Pharmaceuticals when you were at
4  Actavis?
5    A.    Yes.
6    Q.    Was Anda a part of the -- let me
7  withdraw that.
8         Was Anda also owned by Actavis,
9  if you know?
10    A.    Define Actavis.
11    Q.    Why don't you explain the reason
12  for your hesitation and describe the
13  relationships.
14        MS. MAHONEY:  Objection.
15        THE WITNESS:  The name Actavis
16        has lived on in a couple different
17        corporate cultures.  Actavis was once a
18        company owned by Actavis Iceland that
19        bought Alpharma.  Watson then bought
20        Actavis, and Watson changed its name to
21        Actavis.  At the time that Actavis was
22        an entity prior to their being bought by
23        Watson, we did not own Anda.  Watson
24        owned Anda.

Page 104

1  BY MR. MELAMED:
2    Q.    And so Anda became part of the
3  Actavis company once Watson acquired Actavis and
4  renamed the combined company Actavis?
5    A.    Yes.
6    Q.    And Anda remained part of Actavis
7  and its successors until Anda was sold to Teva;
8  is that correct?
9         MS. MAHONEY:  Objection.
10        THE WITNESS:  No.
11  BY MR. MELAMED:
12    Q.    Was Anda sold at any point by
13  post merger Actavis and its successors?
14        MS. ZOLNER:  Objection,
15        foundation.
16        MS. MAHONEY:  Objection.
17        THE WITNESS:  Could you repeat
18        the question.
19  BY MR. MELAMED:
20    Q.    Sure.  Do you know -- do you know
21  if another company owns -- do you know if any
22  company owns Anda at this point?
23    A.    Yes.
24    Q.    Do you know who owns Anda?

## Page 105

1           MS. MAHONEY:  Objection.
2           THE WITNESS:  Teva.
3     BY MR. MELAMED:
4        Q.    Do you know when Teva acquired
5     Anda?
6        A.    Sometime after Teva acquiring
7     Actavis.
8        Q.    Do you know prior to Anda's
9     acquisition of the Actavis generic portfolio
10    whether Anda was owned by Actavis?
11          MS. MAHONEY:  Objection.
12    BY MR. MELAMED:
13       Q.    Who owned Actavis -- let me
14    restate the question.
15          Who owned Anda prior to Teva's
16    acquisition of Anda?
17       A.    I believe it was part of
18    Allergan.
19       Q.    At the HDA conferences, are you
20    aware whether Actavis met with any other drug
21    manufacturers?
22       A.    No.
23       Q.    You're not aware?
24       A.    I'm not aware.

## Page 106

1           MS. MAHONEY:  Objection.
2     BY MR. MELAMED:
3        Q.    Thank you.  I just wanted
4     clarification whether you were saying they
5     didn't or you were not aware.  Thank you.
6           Do you know whether Actavis met
7     with any drug distributors at the HDA?
8           MS. ZOLNER:  Objection, form.
9           THE WITNESS:  At what meeting?
10    BY MR. MELAMED:
11       Q.    At any HDA meeting.
12       A.    I'm sorry.  Restate the question
13    for me, please.
14       Q.    Sure.  So Actavis attended some
15    HDA meetings, correct?
16       A.    Yes.
17       Q.    Do you know during its attendance
18    at any of those meetings whether it, Actavis,
19    met with any of its drug distributor clients?
20          MS. ZOLNER:  Objection, form.
21          THE WITNESS:  I don't know.
22    BY MR. MELAMED:
23       Q.    It's possible?  I just want to
24    understand whether -- you don't know either way;

## Page 107

1     is that correct?
2           MS. MAHONEY:  Objection.
3           THE WITNESS:  I wasn't there.
4     BY MR. MELAMED:
5        Q.    Is it correct you didn't hear
6     anything subsequently --
7        A.    No.
8        Q.    -- that indicated that they had
9     or had not met with them?
10          MS. MAHONEY:  Objection.
11          THE WITNESS:  No.  Thank you.
12          MS. MAHONEY:  Since I'm not
13    allowed to interrupt him, I can't object
14    before you start answering.  So when you
15    interrupt him, I don't have anything to
16    do.
17          THE WITNESS:  Okay.  And we want
18    to give you plenty to do.
19          (Document marked for
20    identification as Myers Deposition
21    Exhibit No. 5.)
22    BY MR. MELAMED:
23       Q.    I'm handing you what's been
24    marked Exhibit 5.

## Page 108

1        A.    Thank you.
2        Q.    Exhibit 5 is an e-mail string,
3     the last in time being from David Myers to
4     Nathalie Leitch on June 16, 2009.  The Bates
5     range of the e-mail exchange -- e-mail string is
6     ALLERGAN_MDA_01192443 through 444.
7           Do you recognize this e-mail
8     string?
9        A.    No.
10       Q.    Do you have any reason to doubt
11    that the e-mail at the top of the string is from
12    you?
13       A.    No, I see that it is from me.
14       Q.    And it concerned the subject
15    matter of your employment at Actavis, correct?
16          MS. MAHONEY:  Objection.
17          THE WITNESS:  I'm not sure I
18    understand the question.
19    BY MR. MELAMED:
20       Q.    This wasn't a personal e-mail to
21    Nathalie Leitch, correct?
22       A.    No.
23       Q.    It had to do with work?
24       A.    Yes.

1      Q.     How do you properly pronounce
2   Ms. Leitch's first name?
3      A.     Nathalie.
4      Q.     Nathalie.
5      A.     With the T-H is -- yes.  She's
6   Canadian, it's unusual, Nathalie.
7      Q.     Do you see the e-mail from
8   Kristine Fidler that starts at the bottom of the
9   first page and continues on to the second that's
10   subject line "Kadian - New Option For
11   Marketing"?
12      A.     Let me read it for a second.
13          (Witness reviews document.)
14          Yes.
15      Q.     Okay.  Do you recall reviewing
16   this e-mail?
17      A.     I don't recall reviewing it.
18      Q.     Kadian was a brand name opioid at
19   this point in time, correct?
20      A.     Yes.
21      Q.     And Ms. Fidler, according to the
22   e-mail, worked at Cardinal Health.
23          Do you see that?
24      A.     Yes.

1      Q.     Do you have any reason to doubt
2   that she worked at Cardinal Health at that time?
3      A.     No.
4      Q.     Now, she writes to Denise, and
5   this is the e-mail that's eventually forwarded
6   on to you, it says "I wanted to provide you with
7   this option to consider for your product Kadian.
8   We have a publication called RxNotes which is a
9   16-20 page publication that is received by over
10   7,000 retail chain and independent pharmacies
11   (Cardinal customers)."
12          It talks it's a quarterly
13   publication.  "The next publication includes
14   pain awareness as a topic of interest."  Then it
15   continues and says, "As Kadian is a pain
16   management product I thought this would be a
17   good opportunity to place an ad in this
18   publication for product awareness.  A full page
19   ad is 2 DSP points - you have a total of 5 DSP
20   points to use this year."
21          Do you know whether Actavis
22   placed the ad that is being discussed in this
23   e-mail?
24      A.     I do not.

1      Q.     Do you know whether Actavis ever
2   placed ads through RxNotes?
3      A.     I don't know.
4      Q.     Do you know what DSP points are,
5   as she references those in the e-mail?
6      A.     I'm not sure.
7      Q.     Who would be the best person to
8   ask those questions to which you just answered
9   you don't know?
10          MS. ZOLNER:  Objection, calls for
11   speculation.
12          MS. MAHONEY:  Objection.
13          THE WITNESS:  I don't know.
14   BY MR. MELAMED:
15      Q.     Was there a person who
16   customarily at Actavis around this point in time
17   dealt with Cardinal Health concerning ads?
18          MS. ZOLNER:  Objection.
19   BY MR. MELAMED:
20      Q.     Offers of ads?
21          MS. MAHONEY:  Objection.
22          MS. ZOLNER:  Objection,
23   foundation.
24          THE WITNESS:  From Cardinal

1   Health, I do not know who specifically
2   would have received these.
3   BY MR. MELAMED:
4      Q.     Do you recall other offers from
5   Cardinal Health to Actavis to promote Kadian?
6          MS. MAHONEY:  Objection.
7          MS. ZOLNER:  Objection,
8   foundation.
9          THE WITNESS:  No.
10   BY MR. MELAMED:
11      Q.     Do you recall other offers from
12   Cardinal Health to Actavis to assist in the
13   promotion of any of Actavis' drugs?
14          MS. MAHONEY:  Objection.
15          MS. ZOLNER:  Objection,
16   foundation.
17          THE WITNESS:  Not specifically
18   from Cardinal.
19   BY MR. MELAMED:
20      Q.     Do you recall distributors making
21   offers to promote Actavis drugs?
22      A.     None specifically.
23      Q.     So you don't recall whether
24   McKesson provided offers to place advertisements

Page 113

1    in its materials distributed to pharmacies?
2          MS. MAHONEY: Objection.
3          THE WITNESS: It's possible that
4       they did, but I don't remember specific
5       instances.
6    BY MR. MELAMED:
7      Q.   Do you recall who -- do you have
8    any idea who would be the best person to ask
9    that question, if not yourself?
10      A.   Me.
11      Q.   And you don't recall?
12      A.   I don't recall. It was a long
13    time ago.
14      Q.   Okay. Do you recall whether
15    AmerisourceBergen made similar offers of placing
16    advertisements for Actavis Pharmaceutical
17    products in its communications to its customers?
18          MS. MAHONEY: Objection.
19          THE WITNESS: It's possible, but
20       I don't recall.
21    BY MR. MELAMED:
22      Q.   And would you have been the best
23    person to -- are you the best person to ask that
24    question?

Page 114

1      A.   At the time in question, yes.
2      Q.   And the time in question here is
3    June 2009.
4          Do you see that?
5      A.   Yeah. Yes.
6      Q.   Is there a time in question where
7    you would no longer be the best person to ask
8    those questions?
9          MS. MAHONEY: Objection.
10          THE WITNESS: At some point
11       during the Watson ownership of Actavis
12       through the Teva, I had nothing to do
13       with advertising.
14    BY MR. MELAMED:
15      Q.   Okay. Is it fair to say that
16    from at least June 2009 through the Watson
17    acquisition, you were the primary person at
18    Actavis concerning advertising?
19          MS. ZOLNER: Objection to form.
20          MS. MAHONEY: Objection.
21          THE WITNESS: I was for generics.
22    BY MR. MELAMED:
23      Q.   What about for Kadian?
24      A.   No.

Page 115

1      Q.   Who was the primary person for
2    Kadian during that time period?
3          MS. ZOLNER: Objection,
4       foundation.
5          MS. MAHONEY: Objection.
6          THE WITNESS: I don't know.
7    BY MR. MELAMED:
8      Q.   Was it in a different --
9    different department at Actavis? Was Kadian
10    promoted by a different department at Actavis?
11          MS. ZOLNER: Objection,
12       foundation.
13          MS. MAHONEY: Objection.
14          THE WITNESS: Kadian was a brand,
15       and, as I previously stated, brands
16       operated separately, almost like a
17       separate business unit from generics, so
18       I would have very little to do with
19       advertising Kadian.
20    BY MR. MELAMED:
21      Q.   Which unit would have been
22    primarily involved in discussions concerning the
23    advertising of Kadian?
24          MS. ZOLNER: Objection,

Page 116

1    foundation.
2          MS. MAHONEY: Objection.
3          THE WITNESS: I believe brand
4       management.
5    BY MR. MELAMED:
6      Q.   Do you know who headed that unit
7    in 2009?
8      A.   I'm sorry, I do not.
9      Q.   Do you know at any point in time
10    who was in charge of that unit?
11      A.   No, I don't.
12          (Document marked for
13       identification as Myers Deposition
14       Exhibit No. 6.)
15    BY MR. MELAMED:
16      Q.   I'm handing you what's been
17    marked Exhibit 6. Exhibit 6 is an e-mail
18    string, most recent in time being from David
19    Myers to Jinping McCormick, Michael Perfetto and
20    Gerard Farrell on March 17th, 2010. Bates range
21    of the document is ALLERGAN_MDL_02463212 through
22    215.
23          Do you recognize this e-mail?
24      A.   No.

Page 117

```
1        Q.   Do you have any reason to doubt
2   you wrote it?
3        A.   No.
4        Q.   At the top, and by "it" I mean
5   the top one in the string.
6        A.   No, I see that it is from me.
7        Q.   And this wasn't a personal
8   e-mail, was it?
9        MS. MAHONEY: Objection.
10       THE WITNESS: No.
11  BY MR. MELAMED:
12       Q.   This concerned your -- this
13  related to your employment at Actavis, your job
14  duties, correct?
15       A.   Yes.
16       Q.   And your brief e-mail concerns a
17  warning letter for Kadian, which has appeared on
18  the FDA's e-mail announcement, correct?
19       A.   Yes.
20       Q.   Do you recall the warning letter
21  for Kadian?
22       A.   No.
23       Q.   Do you recall any discussions
24  about the contents of the warning letter for
```

Page 118

```
1   Kadian?
2        A.   No, sir.
3        Q.   Do you recall why you forwarded
4   the warning letter for Kadian as it appeared on
5   the FDA's e-mails announcement?
6        A.   Because I noticed it, as this is
7   an e-mail announcement that goes out to the
8   industry, I noticed something that referred --
9   that impacted our company or that referred to
10  our company, so I passed it on so that it could
11  be forwarded to whomever the appropriate person
12  was.
13       (Document marked for
14       identification as Myers Deposition
15       Exhibit No. 7.)
16  BY MR. MELAMED:
17       Q.   I'm going to hand you another
18  document that's been previously marked in
19  another deposition -- it's been marked as -- it
20  has been previously marked, but it is not here,
21  so I'm going to remark it.
22       MS. MAHONEY:  I don't know how
23       we're doing that anyway, so I think it's
24       easier to remark it.
```

Page 119

```
1        MR. MELAMED:  Fair enough.
2   BY MR. MELAMED:
3        Q.   It's been marked as Exhibit 7.
4   Exhibit 7 is a letter from the Department of
5   Health & Human Services, says transmitted by
6   facsimile to Doug Boothe, chief executive
7   officer of Actavis, and it's titled Warning
8   Letter.  It starts at ACTAVIS0799203 and it
9   continues to 0799214.
10       Have you seen this warning letter
11  before?
12       A.   I don't believe so.
13       Q.   Do you recall whether this is the
14  warning letter to which the prior exhibit, your
15  e-mail in the prior exhibit, which was Exhibit
16  Number 6, referred?
17       A.   I don't know.
18       Q.   Okay.  Do you have any
19  familiarity with the content of the warning
20  letter?
21       A.   No.
22       Q.   Do you recall it being discussed
23  with you when you were at Actavis?
24       A.   No.
```

Page 120

```
1        Q.   Do you recall discussions by
2   anybody else at Actavis about this letter?
3        A.   Not specific discussions.
4        Q.   Do you recall that it was
5   discussed at Actavis?
6        A.   I was aware that it existed.  I'm
7   not privy to any discussions.
8        Q.   Okay.  You can put that aside.
9        (Document marked for
10       identification as Myers Deposition
11       Exhibit No. 8.)
12  BY MR. MELAMED:
13       Q.   I'm handing you what's been
14  marked as Exhibit 8.  Exhibit 8 starts with an
15  e-mail, most recent in time being from David
16  Myers to Elisabet Hjaltadottir dated
17  December 14th, 2009, subject, Actavis brand
18  project update.  It starts at Bates number
19  ALLERGAN_MDL_1234649 and then includes an
20  attachment that starts at ALLERGAN_MDL_1234652
21  and concludes on 661.
22       Do you recognize this document?
23       A.   No.
24       Q.   Do you have any reason to doubt
```

Page 121

1    that you sent the e-mail to -- and I'm going to
2    refer to her by her first name -- to Elisabet --
3        A.    Yes.
4        Q.    -- on this -- on December 4th --
5    14th, 2009?
6        A.    No, I believe I did.
7        Q.    And this was not a personal
8    e-mail, correct?
9        A.    No.
10       Q.    It was something that concerned
11   your employed at Act -- your job duties at
12   Actavis, correct?
13       MS. MAHONEY:  Objection.
14       THE WITNESS:  Yes.
15   BY MR. MELAMED:
16       Q.    And you mention in your e-mail to
17   Elisabet that you've attached a booklet that our
18   Kadian sales team uses to promote Kadian to
19   doctors.
20       Do you see that?
21       A.    Can I read that?
22       Q.    Yes, of course.
23       A.    (Witness reviews document.)
24       Q.    So you see at the beginning of

Page 122

1    the e-mail, you write to Elizabeth, you say, "I
2    have attached a booklet that our Kadian sales
3    team uses to promote Kadian to doctors,"
4    correct?
5        A.    Yes.
6        Q.    And that's the attachment that
7    starts at the Bates number ending 4652, correct?
8        A.    I believe so.
9        Q.    You have no reason to doubt?
10       A.    I have no reason to doubt.
11       Q.    Okay.  Do you know when the date
12   range that the Kadian sales team used this
13   booklet to promote Kadian to doctors?
14       MS. MAHONEY:  Objection.
15       THE WITNESS:  No, I don't.  No, I
16   don't.
17   BY MR. MELAMED:
18       Q.    Do you know if the sales team
19   ceased using this booklet to promote Kadian to
20   doctors at any point after the date you sent
21   this e-mail?
22       MS. MAHONEY:  Objection.
23       THE WITNESS:  No, I don't.
24   BY MR. MELAMED:

Page 123

1        Q.    Do you know who were the members
2    of the Kadian sales team that used this booklet?
3        A.    I don't know.
4        Q.    Do you know organizationally
5    where in the organization, what group those
6    individuals worked in?
7        MS. ZOLNER:  Objection, form.
8        THE WITNESS:  The brand team
9        operated separately, and Kadian had a
10       separate sales force.  I don't know who
11       the members of that team were, and I
12       don't know who managed them.
13   BY MR. MELAMED:
14       Q.    Do you have any familiarity with
15   the booklet used to promote Kadian that is
16   attached to this e-mail starting at 652?
17       MS. ZOLNER:  Object to form.
18       MS. MAHONEY:  Objection.
19       THE WITNESS:  No.
20   BY MR. MELAMED:
21       Q.    Have you seen it before?
22       A.    I may have, since I attached it,
23   but I did not have anything to do with its
24   development.

Page 124

1        Q.    Do you recall any discussions
2    about the content of the booklet used to promote
3    Kadian that is attached to Exhibit 8?
4        MS. MAHONEY:  Objection.
5        THE WITNESS:  No, sir.
6        MR. MELAMED:  All right.  You can
7        put that aside.
8        (Document marked for
9        identification as Myers Deposition
10       Exhibit No. 9.)
11   BY MR. MELAMED:
12       Q.    I'm handing you a document that's
13   been marked Exhibit 9.  Exhibit 9 is an e-mail
14   string, most recent in time from Rachelle Galant
15   to David Myers, July 14th, 2010.  The Bates
16   range is Acquired_Actavis_01373039 to 3041.
17       Do you recognize this document?
18       A.    No.
19       Q.    Do you have any reason to believe
20   that you did not receive this, the e-mail and
21   the forwarded e-mail that Rachelle Galant sends
22   to you?
23       A.    No.
24       Q.    I'd like you to turn to the

Page 125

1    second page of the e-mail string, which ends
2    3040, and it references a sell more at higher
3    prices faster June CY 2010 award.
4            Do you see that?
5        A.   Yes, I do.
6        Q.   Does CY stand for calendar year?
7        A.   Yes, or current year.
8        Q.   Current year.
9            And you see that you are
10   referenced as somebody under that header,
11   correct?
12       A.   Yes.
13       Q.   And it's for the development of
14   the acetic acid and F-patch ad slicks that will
15   be utilized by the sales team to increase sales?
16       A.   Yes.
17       Q.   Is F-patch fentanyl patch?
18       A.   Yes.
19       Q.   Can you describe what an "ad
20   slick" is?
21       A.   An ad slick is a marketing
22   collateral piece that can be used by the sales
23   team.  It can be provided to our direct
24   customers, and, occasionally, it can be used for

Page 126

1    journal advertising, industry journal
2    advertising.
3        Q.   And do you have any understand --
4    let me withdraw that, because I tripped over my
5    tongue.
6            Do you have any understanding
7    about how ad slicks, as a general matter, were
8    utilized by the sales team to increase sales?
9            MS. MAHONEY:  Objection.
10           THE WITNESS:  I believe they were
11       just used for awareness and discussions
12       with their direct customers.
13   BY MR. MELAMED:
14       Q.   Did you conduct any analysis of
15   the efficacy of ad slicks to drive sales of
16   particular drugs?
17       A.   No.
18       Q.   Do you know if anybody at Actavis
19   did at or around this time period?
20       A.   No.
21       Q.   So you do not know -- let me
22   withdraw that.
23           Do you know whether sales of
24   fentanyl patches did increase from mid-2010 in

Page 127

1    the next six-month time period, through the end
2    of the year?
3            MS. MAHONEY:  Objection.
4            THE WITNESS:  I don't recall.
5    BY MR. MELAMED:
6        Q.   Do you recall who tasked you with
7    creating an ad slick for a fentanyl patch at
8    Actavis?
9            MS. ZOLNER:  Objection to form.
10           THE WITNESS:  It could have been
11       my direct supervisor, Jinping McCormick,
12       or it could have been Michael Perfetto.
13   BY MR. MELAMED:
14       Q.   Was Michael Perfetto Jinping
15   McCormick's supervisor?
16       A.   Yes.
17       Q.   Do you know to whom Michael
18   Perfetto reported?
19       A.   I believe he reported to the CEO
20   at that time, who was -- his name escapes me.
21       Q.   Was the CEO's name Doug Boothe at
22   that time?
23       A.   Yes, Doug Boothe.  Thank you.
24       Q.   You can put that aside.

Page 128

1            (Document marked for
2            identification as Myers Deposition
3            Exhibit No. 10.)
4    BY MR. MELAMED:
5        Q.   I'm handing you what's been
6    marked as Exhibit 10.  Exhibit 10 is a
7    multi-page e-mail string, the most recent in
8    time being from David Myers to Dorothy McEntee
9    dated July 27th, 2010 regarding fentanyl VA
10   mailer and 7/26/10 weekly status.  It starts at
11   Bates number ALLERGAN_MDL_01235205 and concludes
12   at 5209.
13           Do you recognize this document?
14       A.   No.
15       Q.   Do you have any reason to believe
16   that you did not send the e-mail dated Tuesday,
17   July 27, 2010 to Dorothy McEntee?
18       A.   No.
19       Q.   The contents of this e-mail were
20   not personal; is that correct?
21           MS. MAHONEY:  Objection.
22           THE WITNESS:  Yes, that's
23       correct.
24   BY MR. MELAMED:

Page 129

1     Q.    They concerned matters within
2   your employment at Actavis, correct?
3            MS. MAHONEY:  Objection.
4            THE WITNESS:  Yes, sir.
5   BY MR. MELAMED:
6     Q.    In the subject line it says
7   "Fentanyl VA Mailer."
8            Does VA there stand for Veterans'
9   Administration?
10            MS. ZOLNER:  Objection,
11   foundation.
12            THE WITNESS:  I don't recall.
13   BY MR. MELAMED:
14     Q.    Who was Dorothy McEntee?
15     A.    Dorothy McEntee was the account
16   executive at catalyst agency, which was our
17   agency of record at that time, our ad agency.
18     Q.    And what do you mean by "agency
19   of record"?
20     A.    They were our main agency to do
21   advertising work that we required.
22     Q.    So the substance of your
23   July 27th e-mail concerns a -- revisions to an
24   advertisement for fentanyl to be sent by mail;

Page 130

1   is that correct?
2            MS. ZOLNER:  Objection to form.
3            MS. MAHONEY:  Objection.
4            THE WITNESS:  Let me read the
5   e-mail, so I can understand.
6   BY MR. MELAMED:
7     Q.    Sure.
8     A.    (Witness reviews document.)
9            Can you repeat your question?
10     Q.    I'll phrase it slightly
11   differently.
12     A.    Okay.
13     Q.    The first sentence says "Thanks
14   for the revised Fentanyl mailer."
15            Do you see that?
16     A.    Yes.
17     Q.    Can you tell me what that
18   references?
19     A.    Collateral piece for fentanyl.
20     Q.    And used to promote fentanyl,
21   correct?
22     A.    Yes.
23     Q.    To whom?
24     A.    I'm not entirely sure.

Page 131

1     Q.    And then the second paragraph
2   talks about an additional project.
3            Do you see that?
4     A.    Yes.
5     Q.    It says, "we want to move forward
6   immediately with the insertion of the Fentanyl
7   ad in Drug Store News."
8            Do you see that?
9     A.    Yes.
10     Q.    So that additional project
11   concerned the placement of an advertisement for
12   Actavis' generic version of fentanyl?
13            MS. MAHONEY:  Objection.
14            THE WITNESS:  Yes.
15   BY MR. MELAMED:
16     Q.    In a periodical called Drug Store
17   News; is that accurate?
18            MS. ZOLNER:  Objection.
19            MS. MAHONEY:  Objection.
20            THE WITNESS:  Yes, I believe so.
21   BY MR. MELAMED:
22     Q.    Do you know whether that ad ever
23   ran in Drug Store News?
24     A.    I don't recall.

Page 132

1     Q.    We talked before, you said you
2   don't know -- you don't recall to whom the
3   revised fentanyl mailer would be sent, correct?
4            MS. MAHONEY:  Objection.
5            THE WITNESS:  Not at this moment.
6   BY MR. MELAMED:
7     Q.    Okay.  Who are the groups who
8   would likely have -- let me withdraw that.
9            Did you oversee the creation of
10   mailers at this time period for Actavis
11   concerning its generic opioid products?
12            MS. ZOLNER:  Objection, form.
13            THE WITNESS:  Could you repeat
14   the question, please.
15   BY MR. MELAMED:
16     Q.    Sure.  Did you oversee the
17   creation of mailers from Actavis concerning its
18   generic opioid products in July 2010?
19            MS. MAHONEY:  Objection.
20            THE WITNESS:  I believe so.
21   BY MR. MELAMED:
22     Q.    Who were -- as a general matter,
23   not specific to this fentanyl mailer, who were
24   the possible targets -- who were the possible

Page 133

1    recipients of such mailers in terms of groups,
2    groups of individuals?
3        MS. MAHONEY:  Objection.
4        THE WITNESS:  Generally, mailers
5    could -- a mailer may not be entirely
6    accurate for all the ways in which this
7    can be used.  As you see, we're doing
8    insertions in Drug Store News and US
9    Pharmacist.  These are publications to
10   the industry, not to patients.  So it
11   could be read by people at drug
12   wholesalers, drug chains and
13   pharmacists.
14       The fentanyl mailer, I don't
15   specifically recall who it went to.  I
16   believe it possibly went to pharmacists.
17   BY MR. MELAMED:
18       Q.   Do you recall whether any mailers
19   you oversaw concerning Actavis' generic opioids
20   were sent directly to physicians?
21       A.   Yes.
22       Q.   And were any such mailers sent
23   directly to physicians?
24       A.   Yes.

Page 134

1        Q.   Do you remember for which
2    products specifically?
3        A.   I believe oxymorphone ER.
4        Q.   Do you recall whether mailers
5    concerning any other of Actavis' generic opioids
6    were sent directly to physicians under your --
7    you know, during the period of time in which you
8    were in charge of this project?
9        A.   I don't --
10       MS. MAHONEY:  Objection.
11       THE WITNESS:  I don't believe so,
12   but I'm not entirely sure.
13   BY MR. MELAMED:
14       Q.   You said that mailer may not be
15   the right term to use with this specific
16   fentanyl advertisement being discussed; is that
17   correct?
18       A.   It may not encompass all the ways
19   it's used.
20       Q.   Can you talk about all the ways
21   that an advertisement such as the one being
22   discussed here could be used?
23       MS. MAHONEY:  Objection.
24       THE WITNESS:  In this regard,

Page 135

1        with fentanyl, I believe if memory
2        serves correctly, that we did mail it to
3        pharmacists, I believe, but we also used
4        the same content, the same design and
5        used it for industry publications.
6    BY MR. MELAMED:
7        Q.   Do you recall any other uses for
8    mailers such as the fentanyl mailer being
9    discussed here?
10       MS. MAHONEY:  Objection.
11       THE WITNESS:  No.
12   BY MR. MELAMED:
13       Q.   Was the goal of this mailer to
14   drive sales of fentanyl?
15       A.   The goal of the mailer was to
16   increase awareness of our type of -- our
17   delivery system of fentanyl.
18       Q.   Why did you want to increase
19   awareness of Actavis' delivery system of
20   fentanyl?
21       A.   To increase sales.
22       Q.   Now, your July 27th e-mail is in
23   response to a July 26th e-mail from Dorothy
24   McEntee to you.

Page 136

1        Do you see that?
2        A.   Yes.
3        Q.   And if you turn to page 2 of the
4    document, which ends with the Bates number 5206,
5    you see that there's an e-mail addressed to you
6    from Dorothy McEntee, correct?
7        A.   Yes, sir.
8        Q.   Do you recall this e-mail?
9        A.   Only as it's shown to me now.
10       Q.   Do you have any reason to believe
11   that you did not receive this e-mail?
12       A.   No.
13       Q.   In fact, you responded to it, so
14   presumably you received it, correct?
15       A.   Yes, yes.
16       Q.   Thanks.
17       In Ms. McEntee's e-mail she
18   references the fentanyl VA mailer we were just
19   discussing at the top, correct?
20       A.   Yes.
21       Q.   She also provides a -- what
22   appears to be a status update concerning
23   catalyst projects for Actavis; is that correct?
24       A.   Yes.

Page 137

1    Q.    Okay.  And the first item
2    discussed under "Creative" has two headers, it
3    says "Fentanyl ad - done."
4          Do you see that?
5    A.    Yes.
6    Q.    And then it says "Fentanyl
7    Front/Back VA Mailer (Sell Sheet and Ad
8    combined)."
9          Do you understand that to be
10   referring to two separate projects?
11   A.    Probably two separate portions of
12   the same or a similar project.
13   Q.    What is a sell sheet?
14   A.    A sell sheet would be a handout
15   that a salesman could provide to a buyer when
16   they visit or could be provided to a trade show.
17   Q.    And what is the purpose of
18   providing a sell sheet?
19   A.    To promote awareness of the
20   availability of the product.
21   Q.    And you wanted -- the purpose of
22   promoting awareness of the availability of a
23   product was ultimately to drive sales of that
24   product; is that right?

Page 138

1    A.    Yes.
2    Q.    If you skip down there's another
3    header for "Oxycodone."  Do you see that in the
4    status update?
5    A.    Yes.
6    Q.    Did Catalyst work on advertising
7    for Actavis' generic oxycodone on or around this
8    time period?
9    A.    I don't know if the project ever
10   got off the ground.  I don't recall.
11   Q.    Do you recall, as you sit here
12   right now, whether Actavis ever advertised its
13   oxycodone?
14         MS. ZOLNER: Objection, form.
15         THE WITNESS: I don't
16   specifically recall.
17   BY MR. MELAMED:
18   Q.    If you look at page 3 in the
19   lighter text, the first header that says "On
20   Hold."  This is the page Bates number ending
21   5207.  It says, "Agency will develop a Morphine
22   Sulfate ad."
23         Do you recall -- well, what do
24   you understand "On Hold" to mean?

Page 139

1    A.    Could I read through it just a
2    second.
3    Q.    Sure.
4    A.    (Witness reviews document.)
5          In answer to your question, I'm
6    not sure exactly the specifics.  What I perceive
7    it to be is that we had discussed a possible
8    project and maybe even started a project with
9    the agency and then decided to stop production.
10   Q.    And you personally had had a
11   longstanding relationship with Catalyst by this
12   point in time; is that accurate?
13   A.    Yes.
14         MS. MAHONEY: Objection.
15         THE WITNESS: Yes.
16   BY MR. MELAMED:
17   Q.    So your understanding is based on
18   that relationship?
19   A.    Yes, how we would manage the
20   relationship.
21   Q.    Do you recall whether Actavis
22   ever advertised generic Morphine Sulfate?
23   A.    I do not recall.
24         MS. ZOLNER: Objection to form.

Page 140

1          THE WITNESS: I do not recall.
2    BY MR. MELAMED:
3    Q.    The next On Hold message concerns
4    a Morphine Sulfate sell sheet.
5          Do you see that?
6    A.    Yes.
7    Q.    Do you know whether that
8    project -- withdraw that.
9          Do you know whether the project
10   being described there ever came off of the on
11   hold status?
12         MS. MAHONEY: Objection.
13         THE WITNESS: Let me just read
14   it.  It will help familiarize me.
15   BY MR. MELAMED:
16   Q.    Please.
17   A.    (Witness reviews document.)
18         I don't remember if we ever
19   completed work on this.
20   Q.    Do you recall whether Actavis
21   ever advertised generic Morphine Sulfate?
22   A.    I do not.
23   Q.    Below the section we were just
24   discussing is a header that says "Event."

Page 141

1      Do you see that?
2      A.   Yes.
3      Q.   And then it says "3 panels
4  released to Westerly - done."
5      Do you know what event that
6  refers to?
7      A.   I do not recall.
8      Q.   Do you recall what drugs, if any,
9  were referenced by the three panels that are
10  referenced in the e-mail?
11      A.   I do not.
12      Q.   If you turn to page 4 of the
13  e-mail ends on 5208, and it says -- there's --
14  under the header "WEB" there's another "On Hold"
15  prep -- preface to a sentence.
16      Do you see that?
17      A.   Yes.
18      MS. MAHONEY:  Objection.
19  BY MR. MELAMED:
20      Q.   It says, "(On Hold) banner ads
21  currently running on NACDS Guide can change at
22  any time until May 11th, 2011."
23      Do you understand that to mean
24  that banner ads were actually running -- banner

Page 142

1  ads promoting Actavis products were actually
2  running on the NACDS Guide at this point in
3  time?
4      MS. ZOLNER:  Objection.
5  Objection, foundation.
6      MS. MAHONEY:  Objection.
7      THE WITNESS:  Sorry.  Ask me the
8  question again.
9  BY MR. MELAMED:
10      Q.   Sure.
11      Do you have -- do you understand
12  this sentence to mean that banner ads for
13  Actavis products were at the time this was
14  written running on the NACDS guide?
15      A.   I don't know if they were running
16  or if they were related to products.
17      Q.   What do you mean "if they were
18  related to products"?
19      A.   We could possibly run a banner ad
20  to promote just the company Actavis.
21      Q.   Understood.  Is it accurate to
22  say that Actavis did run banner ads on the NACDS
23  Guide?
24      A.   At one point or another.

Page 143

1      Q.   What is the NACDS guide?
2      A.   I believe that that is their
3  online website.
4      Q.   Do you recall any specific
5  products Actavis advertised through banner ads
6  on the NACDS guide?
7      MS. MAHONEY:  Objection.
8      MS. ZOLNER:  Objection.
9      THE WITNESS:  I don't recall.
10  BY MR. MELAMED:
11      Q.   Do you recall whether Actavis ran
12  banner ads on the NACDS guide that were specific
13  to any of its products?
14      MS. ZOLNER:  Objection,
15  foundation.
16      THE WITNESS:  It's possible, but
17  I don't remember specifically.
18  BY MR. MELAMED:
19      Q.   At the bottom of this same page
20  ending in 5208, there's a "Media Plan."
21      Do you see that?
22      A.   Yes.
23      Q.   And it references approved
24  insertions for August and September, correct?

Page 144

1      A.   Yes.
2      Q.   What are -- what is meant by
3  "insertions" in those sentences.  Let me
4  withdraw that.
5      Do you have an understanding of
6  what is meant by "insertions" in that sentence?
7      A.   Yes.
8      Q.   What is meant by insertions?
9      A.   That would be an advertisement
10  that's taken out in the publication.
11      Q.   And so there were approved
12  advertisements in August for Drug Store News; is
13  that correct?
14      A.   Yes.
15      Q.   And for US Pharmacist, correct?
16      A.   Yes.
17      Q.   And MRP, correct?
18      A.   I believe so, because it's here.
19  I don't remember what MRP is.
20      Q.   Okay.  And then in September
21  there were approved insertions for Drug Store
22  News again?
23      A.   Mm-hmm.
24      Q.   Correct?

Page 145

1      A.    Yes.
2      Q.    And Chain Drug Review, correct?
3      A.    Yes.
4      Q.    And American Health and Drug
5    Benefits, correct?
6      A.    Yes.
7      Q.    Do you recall the content of any
8    of those advertisements?
9      A.    I do not.
10      Q.    Do you recall whether they
11    related to Actavis generally?
12          MS. ZOLNER:  Objection, form.
13          THE WITNESS:  I don't remember
14      the content of these specific ads for
15      that -- those months.
16    BY MR. MELAMED:
17      Q.    So is it accurate that they could
18    have been specific to individual Actavis
19    products?
20          MS. MAHONEY:  Objection.
21          THE WITNESS:  It's not
22      impossible.
23    BY MR. MELAMED:
24      Q.    Did Actavis, to the best of your

Page 146

1    knowledge, ever advertise individual specific
2    products through media insertions in
3    periodicals?
4      A.    Yes, I believe so.
5      Q.    Do you recall whether it ever
6    advertised any specific opioid products through
7    media insertions in periodicals?
8      A.    It is possible.
9      Q.    You don't recall either way?
10      A.    No.
11      Q.    If you look at the bottom, very
12    bottom of 4, it says, "Insertion Orders" and
13    then continues on to 5 to say "Ideally, 50% of
14    placement should be product advertising."
15          Do you see that?
16      A.    Yes.
17      Q.    Does that refresh your
18    recollection whether the ads concerned specific
19    Actavis products?
20      A.    It refreshes my recollection that
21    that was a target that we would like to meet.
22    Whether we met it, I don't know.  And the
23    specific products, I don't have -- I don't
24    recollect an entire list of what we advertised.

Page 147

1      Q.    You can put that aside.
2          (Document marked for
3      identification as Myers Deposition
4      Exhibit No. 11.)
5    BY MR. MELAMED:
6      Q.    I'm handing you what's been
7    marked as Exhibit 11.
8          Exhibit 11 is an e-mail string,
9    most recent in time being from Dorothy McEntee
10    to David Myers, cc'ing others on July 29th,
11    2010, subject re: "Fentanyl Advertisingm - DSN
12    PI info needed."  Bates range is from
13    Acquired_Actavis_00954338 through 340.
14          Do you recognize this e-mail
15    string?
16      A.    No.
17      Q.    Do you have any reason to think
18    that you did not -- this is not you who -- let
19    me withdraw that.
20          Do you have any reason to believe
21    that you did not receive the most recent e-mail
22    in time from Dorothy McEntee?
23      A.    No.
24      Q.    And do you have any reason to

Page 148

1    believe that you did not send the e-mail
2    reflected on the middle of the first page of
3    this 4338 that's addressed Dorothy, et al.?
4      A.    No, I believe I sent it.
5      Q.    Okay.  And is that the same
6    for -- if you look on page 2, I just want to see
7    if you have any reason to believe -- let me --
8    on the second page, 4339, there's an e-mail from
9    Cristina Garcia to you, cc'ing Jinping McCormick
10    and Terri Nataline.
11          Do you have any reason to believe
12    you did not receive that e-mail from Cristina
13    Garcia?
14      A.    No.
15      Q.    And below that is an e-mail that
16    commences the string from you to Cristina
17    Garcia, cc'ing Jinping McCormick and Terri
18    Nataline.
19      A.    It appears to be that way.
20      Q.    And do you believe that you -- do
21    you have any reason to believe you did not send
22    that first e-mail in time on July 27th, 2010?
23      A.    No.
24      Q.    These e-mails are not personal

Page 149

```
 1    e-mails, correct?
 2          MS. MAHONEY:  Objection.
 3          THE WITNESS:  No.
 4    BY MR. MELAMED:
 5       Q.    And by that I mean, they are, to
 6    the contrary, e-mails concerning your employment
 7    at Actavis, correct?
 8          MS. MAHONEY:  Objection.
 9          THE WITNESS:  Yes.
10    BY MR. MELAMED:
11       Q.    And they concern a -- if you go
12    back to the first page of the e-mail string, in
13    your e-mail, second in time -- second most
14    recent, the one that starts Dorothy, et al., it
15    says, "Attached are the Word files for use in
16    creating the full PI attachment for Drug Store
17    News.  I believe the order of the text should
18    be, insert, med guide, instructions for
19    applying.  Please proceed with formatting these
20    into an appropriate form for insertion in Drug
21    Store News."
22          Do you see that?
23       A.    Yes.
24       Q.    So this concerned an
```

Page 150

```
 1    advertisement that Catalyst was working on for
 2    Actavis for insertion in a periodical called
 3    Drug Store News; is that correct?
 4          MS. MAHONEY:  Objection.
 5          THE WITNESS:  I believe so.
 6    BY MR. MELAMED:
 7       Q.    And the advertisement concerned
 8    fentanyl; is that correct?
 9       A.    Yes.
10       Q.    And if you look at your e-mail on
11    the next page, so going back in time, on the
12    Bates -- the page ending with Bates number 4339,
13    the second paragraph you talk about -- or you
14    wrote, "Now we are looking to use the Fentanyl
15    'binoculars' ad creative in an actual trade
16    journal advertisement, and I need some guidance
17    from you."
18          Do you see that?
19       A.    Yes.
20       Q.    Is it your understanding that the
21    advertisement that this e-mail string continues
22    to address as it moves forward in time concerns
23    that -- formatting of that fentanyl binoculars
24    ad for placement in the Drug Store News?
```

Page 151

```
 1          MS. ZOLNER:  Objection, form.
 2          THE WITNESS:  Let me take a
 3    moment to read the --
 4    BY MR. MELAMED:
 5       Q.    Yes.
 6       A.    (Witness reviews document.)
 7          Okay. I'm sorry.  Can you repeat
 8    your question.
 9       Q.    Sure.
10          Is it your understanding that the
11    e-mail string, as it moves forward in time, so
12    back to -- towards page 1 of the exhibit,
13    concerns formatting of an ad for fentanyl using
14    the binoculars, in quotes, for Drug Store News?
15          MS. MAHONEY:  Objection.
16          THE WITNESS:  I believe so.
17    BY MR. MELAMED:
18       Q.    Do you know whether that
19    advertisement was ever placed in Drug Store
20    News?
21       A.    I don't recall.
22       Q.    As you sit here today, do you
23    have any reason to believe that it was not
24    placed in Drug Store News?
```

Page 152

```
 1          MS. MAHONEY:  Objection.
 2          THE WITNESS:  I have no reason to
 3    believe that it was not, but, as you've
 4    seen in the other documents, sometimes
 5    we put projects on hold.
 6    BY MR. MELAMED:
 7       Q.    Understood.
 8          You can put that document aside.
 9          Actavis also marketed and sold
10    generic buprenorphine; is that correct?
11          MS. MAHONEY:  Objection.
12          THE WITNESS:  Yes.
13    BY MR. MELAMED:
14       Q.    And how do you know that?
15       A.    I believe that I was either the
16    product manager or involved in perhaps the
17    advertising of that product.
18       Q.    Are you aware of any market
19    research Actavis conducted regarding
20    buprenorphine before Actavis launched its
21    generic version of the drug?
22          MS. ZOLNER:  Objection.
23          MS. MAHONEY:  Objection.
24          THE WITNESS:  Can you define
```

Page 153

1    "market research"? That's a broad term.
2  BY MR. MELAMED:
3      Q.    Sure.  Do you know whether
4  Actavis conducted any analysis to consider the
5  potential revenues to be gained from selling
6  generic version of buprenorphine before
7  launching the drug?
8      A.    Yes.
9      Q.    Do you know who performed that?
10         MS. MAHONEY: Objection.
11         THE WITNESS: I do not.
12  BY MR. MELAMED:
13     Q.    You know that buprenorphine is a
14  drug used to treat opioid addiction, correct?
15     A.    I believe so.
16     Q.    So it is true that at the time
17  Actavis was marketing and selling opioids,
18  including Kadian, fentanyl patch we've
19  discussed, oxycodone, it was also marketing and
20  selling a drug used to treat opioid addiction,
21  correct?
22         MS. MAHONEY:  Objection.
23         THE WITNESS:  I believe so.
24         (Document marked for

Page 154

1      identification as Myers Deposition
2      Exhibit No. 12.)
3  BY MR. MELAMED:
4      Q.    I'm handing you what's been
5  marked Myers Exhibit 12.  Myers Exhibit 12
6  starts with an e-mail from Steve Kane to David
7  Myers and Dorothy -- cc'ing Dorothy McEntee on
8  September 13th, 2010, subject is Re:
9  "buprenorphine advertisement."  It contains a
10  series of attachments, and then within the
11  document on page Bates number ending 3147
12  contains another e-mail from David Myers to --
13  addressed to Dorothy and a series of
14  attachments.  The entire Bates range of the
15  document is Acquired_Actavis_01373136 through
16  3160.
17         Do you recall this document?
18     A.    No.
19     Q.    If you turn to -- I want to start
20  with your e-mail, which is on the page with the
21  Bates number ending 3147.
22     A.    Okay.
23     Q.    And you write that "we'd like to
24  begin development on a new drug we expect to be

Page 155

1  approved in October", and then you provide
2  details.
3         Do you see that?
4      A.    Yes, sir.
5      Q.    And the drug was buprenorphine
6  hydrochloride sublingual tablets, correct?
7      A.    Yes.
8      Q.    Do you recall whether you
9  received approval on or around October 2010 to
10  sell that drug?
11     A.    I know we received approval.  I
12  don't recall the date.
13     Q.    Okay.  And you provide other
14  specific information about the drug in the
15  bullets?
16     A.    Mm-hmm.
17     Q.    And then if you turn to the next
18  page, the paragraph that begins, as usual,
19  provides some guidance about the type of
20  advertisement you would like to see, correct?
21     A.    Yes.
22         MS. MAHONEY:  Objection.
23         THE WITNESS:  Yes.
24  BY MR. MELAMED:

Page 156

1      Q.    In the last sentence you say it,
2  referring to the ad or the imagery -- what does
3  "it" refer to in the last sentence?
4      A.    Let me read.  (Witness reviews
5  document.)
6         What does "it" refer to is your
7  question?
8      Q.    Yes.
9      A.    "It" is the advertising concept.
10     Q.    Okay.  So you write that the
11  concept, the advertising concepts can be
12  indication adjacent and reference the use of the
13  moon in the Zolpidem ad.
14     A.    Yes.
15         MS. MAHONEY:  Objection.
16  BY MR. MELAMED:
17     Q.    Correct?
18     A.    Yes.
19     Q.    Zolpidem is a sleeping aid; is
20  that correct?
21     A.    Yes.
22     Q.    And so you note that that ad for
23  zolpidem did not say anything about making you
24  sleep, correct?

Page 157

1    MS. MAHONEY:  Objection.
2    THE WITNESS:  I believe it did
3 not.
4 BY MR. MELAMED:
5    Q.    According to what you write, you
6 use the moon to be indication adjacent as
7 suggestive of sleep, without saying anything of
8 sleep; is that an accurate summary?
9    MS. ZOLNER:  Objection to form.
10    MS. MAHONEY:  Objection.
11    THE WITNESS:  I think that's an
12 assumption.
13 BY MR. MELAMED:
14    Q.    Does that reflect accurately the
15 assumption you think is expressed in your
16 sentence that starts with can be indication
17 adjacent?
18    MS. ZOLNER:  Objection, form.
19    THE WITNESS:  Possibly, yes.
20 BY MR. MELAMED:
21    Q.    Is there any reason for the
22 hesitation, the possibly in that response?
23    A.    Only because I know that we've
24 used images and imagery that had nothing to do

Page 158

1 with what the drug did.
2    Q.    But in zolpidem --
3    A.    In zolpidem it does say it was
4 indication adjacent.
5    Q.    And the moon was used as adjacent
6 to sleep --
7    A.    Yes.
8    Q.    -- is that correct?
9    A.    Yes.
10    MS. MAHONEY:  Objection.  Please
11 give me an opportunity to object, David.
12    THE WITNESS:  Thank you.  I'm
13 sorry.
14 BY MR. MELAMED:
15    Q.    So the guidance that you were
16 providing to Dorothy was that you could -- she
17 could use an analogy similar to the moon for a
18 sleeping aid for a drug used to treat opioid
19 addiction.
20    Is that your understanding of
21 what you wrote?
22    MS. ZOLNER:  Objection to form.
23    MS. MAHONEY:  Objection.
24    THE WITNESS:  That was my opinion

Page 159

1    at the time, not a legal or regulatory
2    approved guidance.
3 BY MR. MELAMED:
4    Q.    Fair enough.  I'm not asking you
5 to speak for legal or regulatory approved,
6 unless I specifically ask you that question.
7    A.    Okay.
8    Q.    All right.  If you could turn
9 back to the second page now.  I just want to
10 look at some of these concepts, so the page
11 ending in 3137.
12    The text says "leave the past
13 behind."
14    Do you see that?
15    A.    Yes, sir.
16    Q.    Do you understand what is meant
17 by "the past" in this sentence?
18    A.    I can infer what it means.
19    Q.    What is your inference?
20    A.    Since this is a drug to help
21 people get off of drug dependence, it's starting
22 anew.
23    Q.    Getting off the drug?
24    A.    That's what they're proposing,

Page 160

1 what this ad agency is proposing.
2    Q.    Right.
3    And so the proposal is the past
4 is leaving that drug dependence behind?
5    A.    That's inferred, yes.
6    Q.    Okay.  And the sketch appears to
7 be bars of a jail cell, correct?
8    A.    Mm-hmm.
9    Q.    And those bars have been bent so
10 that somebody has -- the implication being that
11 somebody has escaped; is that right?
12    A.    Yes.
13    Q.    So the jail cell represented
14 opioid addiction in this drawing; is that
15 correct?
16    MS. ZOLNER:  Objection form.
17    MS. MAHONEY:  Objection.
18 BY MR. MELAMED:
19    Q.    Let me restate that.
20    How do you understand what the
21 jail cell represents in this drawing?
22    MS. ZOLNER:  Objection,
23 foundation.
24    THE WITNESS:  I believe it could

Page 161

1        be interpreted that had way, but I did
2   not create the creative.
3   BY MR. MELAMED:
4        Q.   I'm asking you for -- to be
5   clear, and your answer was clear on this, I'm
6   asking for your interpretation.
7            So your interpretation is that
8   this drawing, the drawing of the bars represents
9   the addiction and that the fact that the bars
10  are broken and bent in the middle represents an
11  escape from addiction?
12           MS. ZOLNER:  Objection to form.
13           MS. MAHONEY:  Objection, asked
14       and answered, mischaracterizes the
15       testimony.
16  BY MR. MELAMED:
17       Q.   Is that accurate?  And if it's
18  not, please tell me.
19       A.   That would be my personal
20  impression.
21       Q.   If you turn to the next page,
22  3138.  It says "Independence day".
23           Do you agree that that appears to
24  be a firework?

Page 162

1        A.   Yes, sir.
2        Q.   Okay.  And to what do you
3   understand the word independence to be referring
4   to?
5            MS. ZOLNER:  Objection,
6   foundation.
7            THE WITNESS:  The word
8        independence or Independence day?
9   BY MR. MELAMED:
10       Q.   The word independence.
11       A.   As it relates to this ad?
12       Q.   Yes.
13           MS. MAHONEY:  Objection.
14  BY MR. MELAMED:
15       Q.   Let me put that differently.
16  Independence from what?
17           MS. MAHONEY:  Objection.
18           THE WITNESS:  Independence from
19       habits that the user would have, in this
20       case possibly drug addiction.
21  BY MR. MELAMED:
22       Q.   This drug was approved for --
23  to -- as a treatment for opioid addiction,
24  correct?

Page 163

1        A.   Yes.
2        Q.   So independence from opioid
3   addiction?
4        A.   Yes.
5            MS. ZOLNER:  Objection to form.
6            MS. MAHONEY:  Objection.  You
7        really have to give us an opportunity to
8        object, please, David.
9            THE WITNESS:  Could you restate
10       your question, please.
11  BY MR. MELAMED:
12       Q.   Sure.  So your understanding is
13  that independence here meant independence from
14  opioid addiction; is that correct?
15           MS. ZOLNER:  Objection,
16       foundation.
17           MS. MAHONEY:  Objection.
18           THE WITNESS:  I'm assuming so.
19  BY MR. MELAMED:
20       Q.   Do you recall discussing any of
21  these ad concepts after they were sent to you?
22       A.   No.
23       Q.   Turn to the next page, which ends
24  3139.

Page 164

1            You see the header says "A new
2   start"?
3        A.   Yes.
4        Q.   Do you have any understanding of
5   what is -- let me withdraw that.
6            Do you have an understanding of
7   what is meant by "A new start"?
8        A.   I believe in conjunction with the
9   imagery of a butterfly that it means a rebirth.
10       Q.   And does it follow that that
11  rebirth is after leaving opioid addiction
12  behind?
13           MS. ZOLNER:  Objection, form.
14           MS. MAHONEY:  Objection.
15           THE WITNESS:  It's possible,
16       since that was the subject of this ad.
17  BY MR. MELAMED:
18       Q.   Is that your interpretation of
19  the drawing?
20           MS. MAHONEY:  Objection.
21           THE WITNESS:  My personal
22       interpretation.
23  BY MR. MELAMED:
24       Q.   Turn to the next page, which ends

Page 165

1    3140. And it says "Break the ties that bind."
2        And do you agree with me that
3    that appears to be a drawing of a broken chain?
4        A.   Yes, sir.
5        Q.   Okay. What is your understanding
6    of what "the ties that bind" refer to?
7        MS. MAHONEY: Objection.
8        THE WITNESS: My personal opinion
9    in relationship to this topic is
10       breaking drug addiction.
11   BY MR. MELAMED:
12       Q.   And because of this specific
13   product we're talking about, would it be fair to
14   say that it was breaking opioid addiction?
15       MS. ZOLNER: Objection to form.
16       MS. MAHONEY: Objection.
17       THE WITNESS: I believe so.
18   BY MR. MELAMED:
19       Q.   And do you understand the
20   drawing, the chain in the drawing to represent
21   opioid addiction?
22       MS. ZOLNER: Objection to form.
23       THE WITNESS: I believe not based
24       on the drawing of the chain, I believe

Page 166

1        based on the indication for the drug
2    that's being proposed here.
3    BY MR. MELAMED:
4        Q.   So based on the indication of the
5    drug, combined with the drawing, your
6    understanding is that the -- that chain
7    represents opioid addiction?
8        MS. ZOLNER: Objection.
9    BY MR. MELAMED:
10       Q.   Is that accurate?
11       MS. ZOLNER: Objection, form.
12       MS. MAHONEY: Objection.
13       THE WITNESS: Yes, I believe so.
14   BY MR. MELAMED:
15       Q.   And that the drug being
16   advertised will help break that chain of
17   addiction?
18       MS. ZOLNER: Objection, form.
19       THE WITNESS: I believe that is
20       what the artist is proposing.
21   BY MR. MELAMED:
22       Q.   If you turn the page to the
23   drawing on 3141. This says "A bright new path."
24       And it appears to be either a

Page 167

1    sunrise or a sunset in front of a road and
2    rolling hills.
3        Does that reflect what you see as
4    well?
5        MS. ZOLNER: Objection to form.
6        MS. MAHONEY: Objection.
7        THE WITNESS: Yes.
8    BY MR. MELAMED:
9        Q.   How would you describe that
10   drawing?
11       MS. MAHONEY: Objection.
12       THE WITNESS: It looks like a
13       sunrise or sunset towards the horizon.
14   BY MR. MELAMED:
15       Q.   And the header says "A bright new
16   path."
17       You see that, correct?
18       A.   Yes.
19       Q.   Is your understanding of that
20   bright new path that it leaves a dark, old path
21   behind?
22       MS. ZOLNER: Objection, form.
23       MS. MAHONEY: Objection.
24       THE WITNESS: I believe it means

Page 168

1        a new direction in your life.
2    BY MR. MELAMED:
3        Q.   And you mean -- your
4    understanding that it means a new direction in
5    one's life, what is the -- do you have any
6    understanding of the reason that a new direction
7    was being promoted here?
8        MS. MAHONEY: Objection.
9        THE WITNESS: You can assume,
10       based on -- that this is a proposed
11       advertisement for buprenorphine that it
12       might be to change your life if you
13       happen to be a person who has become
14       addicted.
15   BY MR. MELAMED:
16       Q.   And, again, addicted to opioids,
17   correct?
18       MS. MAHONEY: Objection.
19       MS. ZOLNER: Objection.
20       THE WITNESS: I believe that's
21       what the drug is indicated for. I'm not
22       entirely sure.
23   BY MR. MELAMED:
24       Q.   Let's skip ahead to the one --

Page 169

1  the drawing on 3143.  You see it says "Finding
2  the way home"?
3      A.   Yes.
4      Q.    And how would you describe the
5  scene being depicted in that drawing?
6      A.   It looks as --
7          MS. MAHONEY:  Objection.
8          THE WITNESS:  It looks as if a
9      bird has been released from a cage.
10  BY MR. MELAMED:
11     Q.    And how would you interpret,
12  given the indication of the drug being
13  advertised, how would you interpret the phrase
14  "finding the way home"?  What is meant by that?
15         MS. ZOLNER:  Objection, form.
16         THE WITNESS:  Being set free from
17     possibly drug addiction, since this is a
18     drug -- a drug that is indicated to help
19     you with addiction.
20  BY MR. MELAMED:
21     Q.    And in the drawing, is it your
22  understanding that the bird represents the
23  person being set free from that addiction?
24         MS. MAHONEY:  Objection.

Page 170

1          MS. ZOLNER:  Objection.
2          THE WITNESS:  Potentially.
3  BY MR. MELAMED:
4      Q.    And do you have any understanding
5  of what the cage represents in this -- how would
6  you interpret what the cage represents in this
7  drawing?
8      A.   Well, that's my personal opinion.
9  The cage in this might be the cage of addiction,
10  being trapped in addiction.
11     Q.   Can you think of any other
12  interpretations, as you sit here?
13         MS. MAHONEY:  Objection.
14         MS. ZOLNER:  Objection.
15         THE WITNESS:  Not necessarily.
16  BY MR. MELAMED:
17     Q.   If you turn to the next page,
18  ends 3144, it's the same drawing that we were
19  just looking at, correct?
20     A.   Yes.
21     Q.   The only difference is the tag
22  line at the top, correct?
23     A.   Yes.
24     Q.    And it says "Free at last."

Page 171

1      A.   Yes.
2      Q.    Do you have any understanding of
3  what was meant by "Free at last"?
4          MS. ZOLNER:  Objection.
5          MS. MAHONEY:  Objection.
6          THE WITNESS:  Similar to the
7      other ads, I would think it would denote
8      a new beginning or a different path.
9  BY MR. MELAMED:
10     Q.    Do you understand -- let me
11  withdraw that.
12         Free from what?
13         MS. ZOLNER:  Objection.
14         MS. MAHONEY:  Objection.
15         MS. ZOLNER:  Foundation.
16         THE WITNESS:  The inference might
17     be free from drug addiction.
18  BY MR. MELAMED:
19     Q.   And you're developing that
20  inference based on the indication of the drug
21  being advertised?
22     A.   And the image.
23         MS. ZOLNER:  Objection to form.
24         MS. MAHONEY:  Objection.

Page 172

1          THE WITNESS:  And the image.
2  BY MR. MELAMED:
3      Q.    To just be clear, I know there
4  were objections, I'm not trying to get over
5  those.
6          The -- it was the -- I'll reask
7  my question and I'll state what I think your
8  answer is, and then you guys can object, I'll
9  give you time.
10         The question was you were
11  developing that inference based on the
12  indication of the drug being advertised, and
13  there were objections.
14         And you said "and the image."
15         So your answer was you developed
16  that inference based on the indication of the
17  drug being advertised and the image being
18  represented on this page?
19     A.   Yes.
20         MS. MAHONEY:  Objection.
21         MS. ZOLNER:  Objection to form.
22         THE WITNESS:  Yes.
23  BY MR. MELAMED:
24     Q.    Turn the page to 3145, and,

Page 173

1    again, we've seen this drawing before, correct?
2       A.   Yes.
3       Q.   Okay.  The difference is the tag
4    line, which says "Toward a brighter tomorrow,"
5    correct?
6       A.   Yes.
7       Q.   Given your understanding of the
8    indication for which the drug being
9    advertised -- withdrawn.
10       Given your understanding of the
11    indication of the drug being advertised, how do
12    you interpret "Toward a brighter tomorrow"?
13       MS. ZOLNER:  Objection.
14       MS. MAHONEY:  Objection.
15       THE WITNESS:  A new path away
16       from drug addiction.
17    BY MR. MELAMED:
18       Q.   If you turn the page to 3146.
19    Again, we see the same drawing, correct?
20       A.   Yes.
21       Q.   Okay.  And this time it says "A
22    road to freedom."
23       Do you see that?
24       A.   Yes.

Page 174

1       Q.   Based on your understanding of
2    the indication of the drug being advertised and
3    the drawing, do you understand "A road to
4    freedom" to mean freedom from opioid addiction?
5       MS. MAHONEY:  Objection.
6       THE WITNESS:  That is my personal
7       opinion.
8    BY MR. MELAMED:
9       Q.   Do you understand buprenorphine
10    to be the road as reflected in this drawing?
11       MS. ZOLNER:  Objection.
12       MS. MAHONEY:  Objection.
13       THE WITNESS:  I don't know that I
14       necessarily see it that way.
15    BY MR. MELAMED:
16       Q.   So you don't agree with that one,
17    in contrast to many of the others we've talked
18    about?
19       MS. ZOLNER:  Objection to form.
20       MS. MAHONEY:  Objection.
21       THE WITNESS:  I agree that
22       artwork is subject to the person who is
23       looking at it --
24

Page 175

1    BY MR. MELAMED:
2       Q.   What about in the --
3       A.   -- and interpreting it.
4       Q.   What about in the text?  The text
5    says "A road to freedom."  Do you have any
6    understanding of what is meant by the word
7    "road" in that given the context of
8    advertisement -- this potential advertisement?
9       MS. ZOLNER:  Objection.
10       MS. MAHONEY:  Objection.
11       THE WITNESS:  I believe they mean
12       it to be -- to imply that the drug could
13       help you do freedom from -- from drug
14       addiction.
15    BY MR. MELAMED:
16       Q.   And then there's I believe one
17    more drawing on 3147.  And you see the tag line
18    says "Breaking free"?
19       A.   Yes, sir.
20       Q.   And then you see that it's
21    accompanied by a drawing, correct?
22       A.   Yes.
23       Q.   What do you understand that
24    drawing to be depicting?

Page 176

1       A.   It looks as if someone has broken
2    out of a jail and is heading towards a new
3    horizon.
4       Q.   Given the context of this
5    advertisement, do you agree that the jail cell
6    represents addiction?
7       MS. ZOLNER:  Objection.
8       MS. MAHONEY:  Objection.
9       THE WITNESS:  I interpret the
10       artist representation to mean it that
11       way, yes.
12    BY MR. MELAMED:
13       Q.   And concerning the tag line,
14    "Breaking free," do you understand that to imply
15    that this buprenorphine would help an opioid
16    addicted person break free from their addiction?
17       MS. MAHONEY:  Objection.
18       THE WITNESS:  Could you please
19       repeat that again.
20    BY MR. MELAMED:
21       Q.   Sure.
22       Do you understand the tag line
23    "Breaking free" to imply that buprenorphine
24    would help an opioid addicted person break free

Page 177

1  from their addiction?
2         MS. ZOLNER:  Objection to form.
3         MS. MAHONEY:  Objection.
4         THE WITNESS:  I believe that is
5     what the artist creative person was
6     trying to make that association.
7  BY MR. MELAMED:
8      Q.    And I asked this before, I don't
9  recall your answer, so I apologize for asking
10  again, do you know if any -- if any of these
11  ads -- let me withdraw that.
12         Do you know in any ads based on
13  the concepts reflected in this exhibit, Exhibit
14  12, were ever used in any advertisements put out
15  by Actavis?
16         MS. ZOLNER:  Objection, form.
17         THE WITNESS:  I believe -- I
18     believe that one of the concepts was
19     used, probably not as is.
20  BY MR. MELAMED:
21      Q.    Do you recall which concept was
22  used?
23      A.    I don't remember the tag line or
24  the headline.  I remember the sun, the horizon

Page 178

1  --
2      Q.    So something like --
3      A.    -- being developed.
4      Q.    -- the horizon on 3145?
5      A.    Yes.
6      Q.    Do you recall whether the tag
7  lines were similar to any of the tag lines we
8  just reviewed?
9         MS. MAHONEY:  Objection.
10         MS. ZOLNER:  Objection, form.
11         THE WITNESS:  I don't recall what
12     the tag line was.
13  BY MR. MELAMED:
14      Q.    Do you recall where
15  advertisements that used the picture of the sun,
16  horizon were placed?
17         MS. ZOLNER:  Objection, form.
18         THE WITNESS:  I don't remember a
19     full, comprehensive list.
20  BY MR. MELAMED:
21      Q.    Do you recall whether they were
22  targeted towards pharmacies?
23         MS. MAHONEY:  Objection.
24         THE WITNESS:  Possibly, but I

Page 179

1     don't recall.
2  BY MR. MELAMED:
3      Q.    Do you recall whether they were
4  targeted towards distributors?
5         MS. MAHONEY:  Objection.
6         MS. ZOLNER:  Objection.
7         THE WITNESS:  Possibly.
8  BY MR. MELAMED:
9      Q.    By "they" in those questions, you
10  understand I'm talking about ads, correct?
11      A.    Yeah.
12      Q.    Okay.  Do you recall whether they
13  were targeted towards doctors?
14         MS. ZOLNER:  Objection.
15         MS. MAHONEY:  Objection.
16         THE WITNESS:  I don't remember
17     them going to doctors.  It is possible.
18  BY MR. MELAMED:
19      Q.    Do you recall whether they were
20  placed in publications likely to be read by
21  patients?
22         MS. ZOLNER:  Objection.
23         THE WITNESS:  That's highly
24     unlikely.

Page 180

1         MR. MELAMED:  Let's go off the
2     record.
3         THE VIDEOGRAPHER:  The time is
4     12:19 p.m.  We're going off the record.
5         (Luncheon recess.)
6         THE VIDEOGRAPHER:  The time is
7     1:07 p.m., and we're back on the record.
8  BY MR. MELAMED:
9      Q.    Welcome back.  Just looking to
10  see if the doors were closed.
11      A.    Thank you.
12      Q.    Can you pull back out Exhibit 9,
13  should be in your pile.  It starts with an
14  e-mail from Rachelle Galant to you.
15         And we talked about this earlier.
16  Do you recall you testifying that you had
17  received an award for June CY, which was current
18  year or calendar year, 2010?
19      A.    Yes.
20      Q.    Was there a monetary award
21  associated with that?
22      A.    I don't recall.
23      Q.    Do you recall whether you ever
24  received monetary rewards -- let me withdraw

Page 181

```
 1    that.
 2           Was the sell more at higher
 3    prices faster award given other than the
 4    instance noted in Exhibit 9, to your knowledge?
 5           MS. MAHONEY:  Objection.
 6           THE WITNESS:  The sell more at
 7        higher prices faster moniker could apply
 8        to anything, anybody that management
 9        wanted to acknowledge publicly for
10        completing a project successfully or,
11        you know, going an extra mile.
12    BY MR. MELAMED:
13        Q.    And so they did -- management --
14    withdraw that.
15           Is it true that management did
16    recognize other individuals, aside from
17    Ms. Pehlke and yourself at other times for their
18    work under the moniker sell more at higher
19    prices faster?
20           MS. MAHONEY:  Objection.
21           THE WITNESS:  Yes.
22    BY MR. MELAMED:
23        Q.    About how frequently did they
24    acknowledge individuals -- withdraw it.
```

Page 182

```
 1           About how frequently were
 2    individuals acknowledged --
 3           MS. ZOLNER:  Objection.
 4    BY MR. MELAMED:
 5        Q.    -- under the course -- the
 6    moniker sell more at higher prices faster?
 7           MS. ZOLNER:  Objection.
 8    BY MR. MELAMED:
 9        Q.    To your recollection?
10           MS. ZOLNER:  Objection,
11        foundation, and I apologize, I kept
12        thinking the time was right.
13           THE WITNESS:  So the question was
14        how often were people recognized under
15        this?  I don't recall the frequency.
16    BY MR. MELAMED:
17        Q.    Do you recall whether it was
18    approximately monthly?
19        A.    It could be, yes.
20        Q.    Did you ever -- do you recall
21    ever being acknowledged under the sell more at
22    higher prices faster moniker at any other time
23    during your employment at Actavis?
24           MS. MAHONEY:  Objection.
```

Page 183

```
 1           THE WITNESS:  Yes.
 2    BY MR. MELAMED:
 3        Q.    Do you recall whether -- how many
 4    other times in your -- if you can remember?
 5        A.    I don't remember specifically.
 6        Q.    Approximately how many times?
 7        A.    Four or five times over the
 8    years.
 9        Q.    Were any of those times prior to
10    the instance on July 13th, 2010?
11        A.    Were any of them prior?  I
12    couldn't say for sure.
13        Q.    And do you remember whether any
14    of them were after July 13th, 2010?
15        A.    I couldn't be sure.
16        Q.    Do you recall what any other
17    projects you were recognized for under the sell
18    more at higher prices faster moniker?
19           MS. MAHONEY:  Objection.
20           THE WITNESS:  Yes.
21    BY MR. MELAMED:
22        Q.    What other projects were they?
23        A.    The one that you referred to
24    earlier about the NACDS, that would have been
```

Page 184

```
 1    the similar program or the same program.
 2        Q.    Okay.  Any others?
 3           MS. MAHONEY:  Objection.
 4           THE WITNESS:  I don't recall
 5        specifically.
 6    BY MR. MELAMED:
 7        Q.    All right.  Did your compensation
 8    include incentive awards?
 9        A.    There is a once annual bonus
10    program that I participate in.
11        Q.    And did that bonus -- did the --
12    withdraw that.
13           Did that bonus program change
14    over time from the period starting approximately
15    2008 to present?
16        A.    The company offers an incentive
17    bonus, and it reserves the right to change it
18    constantly, and so there have been tweaks to the
19    measurements and things like that over the
20    years.
21        Q.    Is the -- does the incentive --
22    withdraw that.
23           What did your incentive
24    compensation incentivize?
```

Page 185

```
 1           MS. ZOLNER: Objection, form.
 2           MS. MAHONEY: Objection.
 3           THE WITNESS: It incentivized me
 4      to meet the goals within my annual
 5      performance review.
 6   BY MR. MELAMED:
 7      Q.   Did any of your goals have to do
 8   with product sales?
 9      A.   I don't --
10           MS. MAHONEY: Objection.
11           THE WITNESS: I don't recall any
12      specific links to sales.
13   BY MR. MELAMED:
14      Q.   Do you recall specific links to
15   any metric?
16      A.   Yes.
17      Q.   What metrices?
18      A.   One metric is for forecasting
19   accuracy.  I believe another was for preparing
20   advertising as required, and there could be many
21   other subcategories that all make up part of my
22   entire performance that's reviewed annually.
23      Q.   You said you don't recall any of
24   it having to do -- any of your incentive
```

Page 186

```
 1   compensation having to do with sales, correct?
 2           MS. MAHONEY: Objection.
 3           THE WITNESS: Yes, I believe
 4      that's what I said.
 5   BY MR. MELAMED:
 6      Q.   Do you recall any having to do
 7   with revenues generated by the company or any
 8   subset of the company?
 9           MS. ZOLNER: Objection, form.
10           THE WITNESS: Not directly to me.
11   BY MR. MELAMED:
12      Q.   Was your incentive compensation
13   indirectly affected by the company's revenues?
14      A.   Yes.
15      Q.   How so?
16      A.   In order for the company to pay a
17   bonus, the company had to meet a certain
18   threshold of its annual sales and other metrics
19   that they could imply, such as cash flow.
20      Q.   And if I recall correctly, you
21   testified earlier that there were other
22   employees at Actavis who were incentivized based
23   on product sales; is that correct?
24           MS. ZOLNER: Objection to form.
```

Page 187

```
 1           MS. MAHONEY: Objection.
 2           THE WITNESS: I'm not
 3      specifically aware of other people's
 4      compensation.  I'm aware that the bonus
 5      program is in place for most employees
 6      of the company.
 7           (Document marked for
 8      identification as Myers Deposition
 9      Exhibit No. 13.)
10   BY MR. MELAMED:
11      Q.   I'm handing you what's been
12   marked as Exhibit 13.
13           Exhibit 13 is a spreadsheet, it's
14   all at one Bates number, the printout is two
15   pages.  The Bates number is
16   Allergan_MDL_01211800.  And the title of the
17   spreadsheet is "2011 Budget Launches."
18           Do you see that?
19      A.   Yes.
20      Q.   Do you recognize this document?
21      A.   Yes.
22      Q.   What is this document?  What is
23   it describing?
24           MS. MAHONEY: Objection.
```

Page 188

```
 1           THE WITNESS: This is a
 2      spreadsheet for products that we've
 3      anticipated to launch in the year of
 4      2011, potential launches.
 5   BY MR. MELAMED:
 6      Q.   And I just want to go through a
 7   couple of these to make sure I understand what
 8   the -- what each column stands for, okay?
 9      A.   Okay.
10      Q.   So if you could look, do you see
11   under the "Product" about -- or not about,
12   exactly five rows down it says "Oxymorphone."
13           Do you see that?
14      A.   Yes.
15      Q.   So using that as an example, the
16   label states Actavis -- under the column titled
17   "Label" it states "Actavis Elizabeth," correct?
18      A.   Yes.
19      Q.   What does "label" mean in this
20   context?
21      A.   I believe Actavis was a
22   conglomeration of many different LLCs, and I
23   believe that it refers back to the division that
24   had the original development of the drug, so
```

Page 189

1  maybe the division that filed the ANDA.
2      Q.    Okay.  And then the next column
3  is labeled "Product," and for this same row
4  we're talking about, it says "Oxymorphone,"
5  correct?
6      A.    Yes, sir.
7      Q.    And that's the name of the
8  molecule?
9      A.    Yes, the molecule.
10     Q.    The "Dosage" column here says "ER
11  tabs."
12         Do you see that?
13     A.    Yes.
14     Q.    Is that -- does that stand for
15  extended-relief tablets?
16     A.    Extended-release tablets, yes.
17     Q.    Extended-release tablets.  Thank
18  you for correcting me.
19         And so dosage refers to the
20  manner by which the molecule is ingested?
21         MS. MAHONEY:  Objection.
22         THE WITNESS:  Yes.
23  BY MR. MELAMED:
24     Q.    Brand -- the column "Brand

Page 190

1  (Company)" here for oxymorphone states "Opana ER
2  (Endo)," correct?
3      A.    Yes.
4      Q.    So Opana ER is the name of the
5  brand opioid -- I'm sorry -- the brand
6  oxymorphone on the market, correct?
7      A.    Yes.
8      Q.    And Endo is the company that
9  sells Opana ER at this point in time, correct?
10     A.    I believe so, yes.
11     Q.    And, in general, that applies to
12  each of these -- each of the branded companies
13  listed in this column.  The idea is that it
14  identifies the company and the brand name of the
15  molecule that Actavis anticipates launching in
16  2011; is that correct?
17     A.    Yes.
18     Q.    The "Strengths" for the
19  oxymorphone row indicate 7.5 milligrams and
20  15 milligrams, correct?
21     A.    Yes.
22     Q.    And that's the strengths at which
23  Actavis anticipates introducing the molecule in
24  2011; is that right?

Page 191

1      A.    Yes.
2      Q.    The next column is titled "MAT
3  June 2010 IMS sales US ($MM)."
4         Can you tell me what MAT stands
5  for?
6      A.    Moving annual total.
7      Q.    So moving annual total as of
8  June 2010, and what does "IMS sales US" refer
9  to?
10     A.    That means sales -- estimated
11  sales in the United States based on IMS data.
12     Q.    And can you explain what the
13  moving annual total --
14     A.    Yes.
15     Q.    -- refers to here?
16     A.    Yes.  So moving annual total in
17  this regard being June 2010 would mean the sales
18  figures from July 2019 through June 2010.
19     Q.    Okay.  And so here for the
20  oxymorphone molecule it's listed as "$15," and
21  that means $15 million, correct?
22     A.    Yes.
23     Q.    Where did -- and withdraw that.
24         The information in the column

Page 192

1  we're discussing, "MAT June 2010 IMS Sales US"
2  comes from IMS; is that right?
3      A.    Yes.
4      Q.    The next column is "2011 Budget
5  Approval."
6         Do you see that?
7      A.    Yes.
8      Q.    And then for oxymorphone it says
9  "July-11."
10     A.    Mm-hmm.
11     Q.    Can you explain what that means,
12  please?
13     A.    I believe it means that's when
14  we're expected to launch or that's where our
15  expected launch is in the 2011 budget.
16     Q.    Okay.  So in the 2011 budget it
17  reflects an anticipated launch of the generic
18  oxymorphone pursuant to the other specifics in
19  this row in July; is that right?
20     A.    Yes.
21     Q.    "Target Approval (Best Case),"
22  can you tell me what target approval means?
23     A.    The date that we assume that the
24  product will be able to launch from legal

Page 193

1  standpoint and approval standpoint in the best
2  case of that scenario, the earliest it would
3  launch.
4       Q.    And from whom is the approval
5  being targeted for that date?
6            MS. MAHONEY:  Objection.
7            THE WITNESS:  Can you explain
8       that a little bit further.
9  BY MR. MELAMED:
10      Q.    Sure.  Target approval by who?
11 Who is the approving entity referenced in this
12 column, if you know?
13           MS. MAHONEY:  Objection.
14           MS. ZOLNER:  Objection.
15           THE WITNESS:  It could be a
16      number of different factors.  It could
17      be based on anticipated FDA approval or
18      other legal hurdles that need to be
19      cleared.
20 BY MR. MELAMED:
21      Q.    What other kinds of legal hurdles
22 are you aware of?
23           MS. MAHONEY:  Objection.
24           THE WITNESS:  Exclusivity, patent

Page 194

1       rights, there could be a number of
2       things involved.
3  BY MR. MELAMED:
4       Q.    The next column is MFG Country
5  and Site.
6            Does MFG stand for manufacturing?
7            THE WITNESS:  Yes.
8            MS. MAHONEY:  Objection.
9  BY MR. MELAMED:
10      Q.    And so here in oxymorphone the
11 manufacturing country is United States, correct?
12      A.    Yes.
13      Q.    And "ELZ" is listed as the site
14 for oxymorphone, correct?
15      A.    Yes.
16      Q.    And that stands for Elizabeth?
17      A.    Yes.
18      Q.    "Competitors" in the oxymorphone
19 row states "approval received on 7.5 mg and
20 15 mg.  TA on other strengths.  Brand is," and
21 then appears to be fragment.
22           Can you describe -- do you
23 understand who received approval on 7.5 and
24 15-milligram strengths?

Page 195

1       A.    From the way it's written, I
2  believe that the company, Actavis, received
3  approval on those two strengths.
4       Q.    Do you know what TA stands for in
5  the next clause?
6       A.    Yes.
7       Q.    What is TA?
8       A.    Tentative approval.
9       Q.    Okay.  And then there's a
10 "Comments" column.  In oxymorphone it says "PIV,
11 filed June-07, May-08."
12           Do you know what PIV stands for
13 in that row?
14      A.    I believe so.
15      Q.    What is that?
16      A.    Paragraph IV.
17      Q.    And what does paragraph IV refer
18 to, if you know?
19      A.    I believe it is a type of filing
20 with the FDA.  I'm not entirely sure exactly all
21 of the things that go into it.
22      Q.    And then there is a "Market Share
23 Target (2011 budget)" column.
24           Do you see that?

Page 196

1       A.    Yes.
2       Q.    Can you explain what that column
3  is referencing, market -- what is the market?
4       A.    The market is all of the units
5  that are currently being sold by the brand
6  and/or any generics on the market for that -- at
7  that time and what share of business we predict
8  we can get, based on the number of competitors
9  and things like that.
10      Q.    Now, is that market limited to
11 the United States?
12      A.    Yes, in this instance.
13      Q.    Excuse me.  Thank you.
14           And so for oxymorphone the target
15 market share for the 7.5 and 15-milligram
16 generic oxymorphone is 60% of the US market for
17 those strengths of that molecule, correct?
18      A.    Yes.
19      Q.    Thank you.
20           Turn to the second page, couple
21 more details I wanted to ask you about.
22           You see the row where the product
23 listed is buprenorphine?
24      A.    I do.

Page 197

1    Q.    I realize I forgot to ask you
2  about one of the columns on the prior page.  I'm
3  going to ask you about it in context of
4  buprenorphine.
5    A.    Okay.
6    Q.    There's a "2011 Budget Sales" and
7  then "($000)."
8        Do you see that column?
9    A.    Yes.
10    Q.    And for buprenorphine it is --
11  the number written in the cell is $6,879,
12  correct?
13    A.    Yes.
14    Q.    That reflects, first of all, the
15  number because of the $000 indicates that that
16  number reflects $6,879,000, correct?
17    A.    Yes.
18    Q.    Okay.  What does that number
19  refer to?  It says "2011 Budget Sales."
20        What does 2011 budget sales mean?
21    A.    I believe that means that is the
22  number we predicted we would sell in that
23  calendar year.
24    Q.    And is that -- that is a January

Page 198

1  to December calendar year?
2    A.    It's based on our fiscal year,
3  which I believe at that time was January through
4  December.
5    Q.    And in the "Comments" for
6  buprenorphine, it says -- the first comment is
7  "filed September of 2008."
8        Do you see that?
9    A.    Yes.
10    Q.    Do you understand what was filed
11  in September of 2008?
12    A.    I would infer that to mean when
13  we filed our ANDA for approval with the FDA.
14    Q.    And then the next comment is
15  "Awaiting RiskMap/REMS approval."
16        Do you see that?
17    A.    Yes.
18    Q.    Do you understand what is
19  referred to by "RiskMap/REMS"?
20    A.    Essentially, yes.
21    Q.    What is that or those -- first of
22  all, is it one thing or two things?
23    A.    I'm not sure.
24    Q.    Okay.  Can you describe to me

Page 199

1  what you understand that reference to mean?
2    A.    My understanding is specific
3  drugs have a REMS program associated with them.
4  A REMS program is -- I don't remember the exact
5  initials, it has something to do with risk
6  mitigation strategies.
7        Oftentimes it's educating doctors
8  on how this product is used.  It could include
9  them to take special courses.  It could include
10  them to sign up for awareness of the product.
11  It's a safety measure -- an extra safety measure
12  that's added to the approval of the drug.
13  Participation is not optional.  It is mandated.
14    Q.    And do you know from whom Actavis
15  was awaiting approval for its RiskMap/REMS on
16  buprenorphine?
17    A.    I'm not exactly sure of who the
18  approving body is.  I'm sure it has something to
19  do with the FDA or in conjunction with the FDA.
20    Q.    So your understanding is it's
21  being subject to approval by an external body
22  from Actavis?
23    A.    From Actavis, yes.
24    Q.    The next line concerns the

Page 200

1  molecule Morphine ER.
2        Do you see that?
3    A.    I do.
4    Q.    And that was a generic of the
5  brand name Kadian that Actavis also sold,
6  correct?
7    A.    Yes.
8    Q.    Under "Target Approval" it states
9  "ready."
10        Do you see that?
11    A.    Yes.
12    Q.    Does that mean that the generic
13  was already approved for sale and distribution
14  by the FDA?
15    A.    Not necessarily.
16    Q.    What do you understand it to
17  mean?
18    A.    I understand this to mean that we
19  owned the ANDA for Kadian; therefore, we do not
20  need a special approval for generic.
21    Q.    In the "Comments" field, under
22  the -- in the row affiliated with Morphine ER,
23  comments say "product ready at UPS."
24        Do you see that?

Page 201

1      A.    Yes.
2      Q.    What do you understand that to
3   mean?
4          MS. MAHONEY:  Objection.
5          THE WITNESS:  I believe that
6      product had been produced in a generic
7      label and was ready at our warehouse
8      partner at that time was UPS.  They were
9      managing our logistics.
10  BY MR. MELAMED:
11      Q.    If you look at the oxycodone APAP
12   row, do you see that?
13      A.    Yes.
14      Q.    And that was the generic version
15   of Percocet, correct?
16      A.    I believe so.
17      Q.    That's what it indicates on the
18   chart, right?
19      A.    Yes.
20      Q.    If you look at the comments after
21   the filed date, it says not launching
22   5 milligrams/325 milligrams?
23      A.    Yes.
24      Q.    Do you underst -- do you have any

Page 202

1   understanding why it was not launching
2   5 milligrams/325 milligrams?
3          MS. MAHONEY:  Objection.
4          THE WITNESS:  No.
5   BY MR. MELAMED:
6      Q.    Do you understand what is meant
7   by the next clause, which says not getting
8   approval on 7.5/500 and 10/625 mg per FDA?
9      A.    I understand what it means by
10   that reading.  I don't understand the background
11   on why it was not approved.
12      Q.    What does 7.5/500 mean to you?
13      A.    The strength of the product in
14   both molecules.
15      Q.    So 7.5 milligrams of oxycodone?
16      A.    I believe that may be the case.
17      Q.    And 500 milligrams of APAP?
18      A.    Yes.
19      Q.    And what does APAP stand for?
20      A.    Acetaminophen.
21      Q.    All right.  You can put that
22   aside.
23          (Document marked for
24      identification as Myers Deposition

Page 203

1      Exhibit No. 14.)
2   BY MR. MELAMED:
3      Q.    I'm handing you what's been
4   marked Exhibit 14.
5          Exhibit 14 is an e-mail and
6   several attachments thereto.  The e-mail is from
7   Dave Myers to a group of recipients on
8   June 20th, 2011.  The subject is Oxymorphone
9   Launch Preparation.  Bates range of the document
10   is ALLERGAN_MDL_03684488 to 4492, and then there
11   is an addended document that does not currently
12   have a Bates number on it.  It's actually
13   interspersed throughout.  There's HDMA documents
14   that are in the production that do not appear to
15   have Bates numbers.
16          MR. MELAMED:  I'll represent to
17      counsel that this is produced as a
18      unitary doc.  I'm not sure why the Bates
19      numbers are not on here.
20          MS. MAHONEY:  I believe it's
21      because they were produced natively.  I
22      see a reference to that, but I -- here's
23      the 92.
24          MR. MELAMED:  So there -- so it

Page 204

1      appears that the Bates range does
2      encompass the documents, it's just
3      not -- the Bates number is not reflected
4      on several of the individual attachments
5      that are here.  I'm happy to talk to you
6      about that after if there's any
7      confusion.
8          MS. MAHONEY:  Again, I think it's
9      because they were produced natively, so
10      I think we're on the same physical page,
11      not even metaphorically.
12  BY MR. MELAMED:
13      Q.    All right.  Do you recognize this
14   document?
15      A.    No.
16      Q.    Do you have any reason to believe
17   that you did not send the e-mail and the
18   attachments?
19      A.    No, I believe I did -- was the
20   author.
21      Q.    And this concerned preparation
22   for launching generic oxymorphone, correct?
23          MS. MAHONEY:  Objection.
24          THE WITNESS:  Yes.

Page 205

1  BY MR. MELAMED:
2      Q.   And that's referenced in the
3  subject line, right?
4      A.   Yes.
5      Q.   And in your e-mail you say, "I
6  have attached the launch preparation documents
7  that we will be discussing at this morning's
8  meeting."
9          Do you see that?
10     A.   Yes, sir.
11     Q.   Do you recall that discussion
12  that you reference in the e-mail?
13     A.   I don't recall the meeting.
14     Q.   Was it customary to have a
15  meeting to launch a generic drug at Actavis?
16         MS. MAHONEY:  Objection.
17         THE WITNESS:  Yes.
18  BY MR. MELAMED:
19     Q.   Was it customary for you to be
20  involved in product launch meetings at Actavis?
21         MS. ZOLNER:  Objection.
22         MS. MAHONEY:  Objection.
23         THE WITNESS:  In some cases.
24  BY MR. MELAMED:

Page 206

1      Q.   Do you recall the general
2  discussion that occurred during such meetings?
3          MS. MAHONEY:  Objection.
4          THE WITNESS:  Typically, during a
5  launch meeting we would provide certain
6  members of the commercial team with a
7  background on the product and any other
8  pertinent information.  There are
9  documents attached which give background
10  on the product.
11  BY MR. MELAMED:
12     Q.   Okay.  I want to talk primarily
13  about the first attached document, which runs
14  from the Bates number 4489 to 4490.  It says
15  "New Product Fact Sheet: Oxymorphone HCl
16  Extended-Release Tablets 7.5 & 15 mg."
17         Do you recognize this document?
18     A.   I do.
19     Q.   Did you prepare this document?
20     A.   I believe I did.
21     Q.   And it's labeled "For Actavis
22  Internal Use Only."
23         Do you see that?
24     A.   Yes.

Page 207

1      Q.   And the intent was that it not be
2  shared outside of Actavis, correct?
3      A.   Yes.
4      Q.   So I want to talk -- do you see
5  the section labeled "Overall Market (all
6  strengths)"?
7      A.   Yes, sir.
8      Q.   The first line says "Actual 12
9  Months Ending March 2011 Total Market Units
10  (tablets)," and then to the right of that it
11  says "49.8 MM."
12         Do you see that?
13     A.   Yes.
14     Q.   MM stands for million, correct?
15     A.   Yes.
16     Q.   So that's 49.8 million Opana
17  tablets --
18     A.   Yes.
19     Q.   Actually, let me pull back.
20         What does that 49.8 million
21  describe?
22     A.   I believe it describes the total
23  market of Opana units being sold.
24     Q.   And it describes that market in

Page 208

1  terms of the number of individual tablets of
2  Opana?
3      A.   Yes.
4      Q.   And the next line says,
5  "Projected 2011 Total Market Extended Units
6  (tablet)."
7          Do you see that?
8      A.   Yes.
9      Q.   Do you know what's meant by
10  extended units?
11     A.   This is confusing.
12     Q.   What is confusing?
13     A.   I believe there's an error in the
14  document.
15     Q.   Okay.  Can you explain what you
16  believe the error to be, please.
17     A.   In the first bullet that we just
18  discussed, it says "Total Market Units (tablets)
19  49.8 million."  In the second it says Total
20  Market Extended Units (tablets) -- let me
21  collect my thoughts.
22     Q.   Mm-hmm.
23     A.   I'm unsure how to interpret this.
24     Q.   Okay.  Is your confusion caused

Page 209

1  by the jump in number between 49.8 million in
2  the first line and 310 million in the second
3  line?
4       A.  Yes.
5       Q.  Because that seems like a rather
6  large jump if you're comparing the number of
7  tablets sold in actual 12 months ended
8  March 2011 for the projected 2011 calendar year
9  sales; is that right?
10           MS. ZOLNER:  Objection, form.
11           MS. MAHONEY:  Objection.
12           THE WITNESS:  What I'm thinking
13      may be the issue is in the first line
14      where it says total market units and
15      then tablets is in parentheses at
16      49.8 million, and then it clearly states
17      that extended units tablets -- in the
18      industry a unit would be a sales unit,
19      so a bottle of a specific number of --
20      that's commonly sold.  An extended unit
21      would be a tablet, down to the lowest
22      form.  In this case it would be tablets.
23  BY MR. MELAMED:
24       Q.  So is it -- given that

Page 210

1  explanation, is it your understanding that the
2  first line refers to -- when it talks about
3  total market units, it's referring to the number
4  of bottles sold?
5           MS. MAHONEY:  Objection.
6           THE WITNESS:  I can't be sure.
7      I'd have to look at the data from that
8      time.
9  BY MR. MELAMED:
10       Q.  The next line says, "Actual 12
11  Months Ending December 2010 Total Market Sales
12  (IMS)."
13       A.  Yes.
14       Q.  And then the number that's given
15  is $318 million, correct?
16       A.  Yes.
17       Q.  Can you explain what that
18  $318 million reflects?
19       A.  Let me read the whole statement
20  here.
21           (Witness reviews document.)
22           Yes, the 318 million refers to
23  the estimated amount of Opana sales for the 12
24  months up to December 2010.

Page 211

1       Q.  And the reference to IMS is a
2  reference to where that information came from?
3       A.  Yes.
4       Q.  And then there's an italicized
5  line at the bottom of this section that says 7.5
6  and 15-milligram strengths had sales of
7  $22 million, but brand discontinued these
8  strengths in 03/2011.
9           Do you see that?
10       A.  Yes.
11       Q.  Do you recall why Opana was
12  discontinued in the 7.5 and 15-milligram
13  strengths in March of 2011?
14           MS. MAHONEY:  Objection.
15           THE WITNESS:  I was not privy to
16      Opana's strategy, Endo's strategy with
17      Opana, I should say.
18  BY MR. MELAMED:
19       Q.  So you don't understand one --
20  you don't have -- do you have any understanding
21  of why they were withdrawing?
22       A.  No.
23       Q.  Okay.  The next section you have
24  "Product."  In the second bullet point says

Page 212

1  "Market volume has increased by 28%; dollar
2  volume increased by 41% (year-over-year)."
3           What do you mean by market volume
4  has increased by 28%?
5       A.  The number of extended units has
6  increased.
7       Q.  And remind me, by extended units
8  you mean the number of individual Opana pills?
9       A.  Yes.
10       Q.  Okay.  And is that a comparison
11  between two years when it says year-over-year?
12       A.  Yes.
13       Q.  Do you know which two years you
14  are comparing at this point?
15       A.  I believe that it would be -- in
16  year-over-year it would be to the data that I am
17  saying -- hold on just one second.  Let me be
18  sure.
19           (Witness reviews document.)
20           The latest data I probably would
21  have had at that point would have been
22  March 2011, and so it was probably
23  year-over-year that rolling annual total 2010
24  through 2011.

Page 213

```
1        Q.    So it would -- the 28% market
2    volume increase you're talking about would
3    compare April 2010 to March 2011 versus
4    April 2010 -- I'm sorry -- April 2009 to
5    March 2010; is that correct?
6        A.    Yes, I believe so.
7        Q.    Okay.  And then you say dollar
8    volume increased by 41% year-over-year, do you
9    believe that comparison is for the same two time
10   periods we just discussed?
11       A.    Yes.
12       Q.    And what do you mean by dollar
13   volume?
14       A.    It would imply that Opana had --
15   Endo had increased the price of Opana.
16       Q.    By 41%?
17           MS. MAHONEY:  Objection.
18           THE WITNESS:  No.
19   BY MR. MELAMED:
20       Q.    How did you determine that Endo
21   had increased the price of Opana?
22           MS. ZOLNER:  Objection, form.
23           THE WITNESS:  We used IMS dollar
24       volume, compared to it IMS unit sales
```

Page 214

```
1        volume.  If the dollar volume increased
2        to 41%, by 41% and units only increased
3        by 28%, that would mean the only
4        difference could be an increase in
5        price.  That's how we were deducing
6        that.
7    BY MR. MELAMED:
8        Q.    And by -- just a simple question,
9    by dollar volume, are you referring to the
10   dollar sales?
11       A.    Yes, but it's -- it's IMS's
12   predicted sales.  IMS does not really know
13   contract prices, and there may be rebates
14   involved that are not taken into account.
15   Actual performance may be less.
16       Q.    Sorry to cut you off.
17           This is IMS's estimate --
18       A.    Yes.
19       Q.    -- of the sales compared over the
20   two years we talked about earlier?
21       A.    Yes.
22       Q.    Okay.  In the next bullet
23   point it says, "trade channel," and it states
24   that 49% of the volume is via drug chains, 34%
```

Page 215

```
1    via independents, 11% via food stores.  LTC and
2    mail order comprise less than 5%.
3           Do you see that?
4        A.    Yes.
5        Q.    Do you know where you got that
6    data?
7        A.    That would also be from IMS.
8        Q.    And then the final bullet point
9    in that section states that "Endo discontinued
10   the 7.5 mg and 15 mg strengths in March 2011.
11   This will present marketing challenges to
12   Actavis."
13           Do you see that?
14       A.    Yes.
15       Q.    What is the nature of the
16   marketing challenges that Endo's discontinuation
17   of those two strengths will present to Actavis?
18       A.    Doctors may have stopped writing
19   prescriptions for those strengths because they
20   were no longer available on the market.
21       Q.    If you look at the next page
22   ending 490, the top section says Actavis Market
23   Target Share:  50%.
24           MS. MAHONEY:  Objection, misread.
```

Page 216

```
1    BY MR. MELAMED:
2        Q.    I'll reread it, just so the
3    record is clear.  The document actually says
4    "Actavis Market Share Target:  50%."
5           Do you see that?
6        A.    Yes.
7        Q.    I was not trying to confuse you.
8    I misread the document.
9           Is it correct to say that Actavis
10   was targeting a 50% market share for each of the
11   two strengths of oxymorphone it was introducing?
12           MS. MAHONEY:  Objection.
13           THE WITNESS:  I believe that to
14   possibly be true, yes.
15   BY MR. MELAMED:
16       Q.    Is there another explanation that
17   you have for the 50% market share target?
18           MS. MAHONEY:  Objection.
19           THE WITNESS:  No.
20   BY MR. MELAMED:
21       Q.    And, again, that market is the
22   total United States market; is that true?
23       A.    Yes.
24       Q.    On the bottom section of page 2
```

Page 217

1  of this document, which again at 4490, it talks
2  about Marketing Promotional Plans, and you start
3  by writing, "Because Endo discontinued the 7.5
4  and 15 mg strengths in March 2011 Actavis will
5  be implementing a more aggressive promotional
6  campaign for this launch."
7  　　　　Do you see that?
8  　　A.　Yes, sir.
9  　　Q.　Does that reflect your -- let me
10  withdraw that.
11  　　　　Does the reason for the more
12  aggressive promotional campaign for this launch
13  relate to the answer you provided before, that
14  doctors may have stopped writing prescriptions
15  at this strength because the drug had no longer
16  been available?
17  　　　　MS. MAHONEY:  Objection.
18  　　　　THE WITNESS:  Yes.
19  BY MR. MELAMED:
20  　　Q.　And is the goal of the
21  promotional campaign -- let me withdraw that.
22  　　　　What was the goal of the
23  marketing promotional plan for oxymorphone in
24  7.5 and 15-milligram strengths --

Page 218

1  　　　　MS. ZOLNER:  Objection.
2  BY MR. MELAMED:
3  　　Q.　 -- to be introduced by Actavis?
4  　　　　MS. ZOLNER:  Objection,
5  　　foundation.
6  　　　　THE WITNESS:  The goal of the
7  　　marketing plan was to make pharmacists
8  　　and doctors aware that these two
9  　　strengths were once again available for
10  　　those patients they felt they were most
11  　　appropriate for.
12  BY MR. MELAMED:
13  　　Q.　And how do you know that that was
14  the goal of the marketing plan?
15  　　A.　Because I was part of creating
16  the marketing plan.
17  　　Q.　And so the four bullet points
18  list different aspects of the marketing
19  promotional plan that Actavis plans to
20  implement; is that true?
21  　　　　MS. MAHONEY:  Objection.
22  　　　　THE WITNESS:  They were proposed
23  　　action plans, yes.
24  BY MR. MELAMED:

Page 219

1  　　Q.　Did you propose them?
2  　　A.　I wrote them on this document.  I
3  don't remember who conceived of each individual
4  component.
5  　　Q.　Okay.  The first bullet is "A two
6  wave direct-mail campaign to the top 10,000
7  prescribing doctors."
8  　　　　What were those doctors, the top
9  10,000 -- sorry, let me withdraw that.
10  　　　　Was there a particular drug that
11  these doctors were the top 10,000 prescribing
12  doctors of?
13  　　　　MS. MAHONEY:  Objection.
14  　　　　MS. ZOLNER:  Objection.
15  　　　　THE WITNESS:  Yes.
16  BY MR. MELAMED:
17  　　Q.　What was that drug?
18  　　A.　Opana ER.
19  　　Q.　Was that list of the top 10,000
20  doctors limited by any particular strength of
21  Opana ER?
22  　　A.　Not that I recall.
23  　　Q.　From where did you get the
24  information about who were the top 10,000

Page 220

1  prescribing doctors of Opana ER?
2  　　A.　I believe we purchased a mailing
3  list from IMS data.
4  　　Q.　Is your belief that IMS data
5  provided you the list of the top 10,000
6  prescribing doctors of Opana ER?
7  　　A.　I believe so.
8  　　Q.　Do you know whether IMS data
9  maintained records of other drugs that doctors
10  prescribed?
11  　　A.　I imagine that they do based on
12  the nature of their business, but I have no
13  direct knowledge of how they run their business.
14  　　Q.　Were you involved in the decision
15  to purchase that information from IMS?
16  　　　　MS. MAHONEY:  Objection.
17  　　　　MS. ZOLNER:  Objection, form.
18  　　　　THE WITNESS:  I was involved in
19  　　the decision and development of the
20  　　campaign.  I don't remember who decided
21  　　to buy the data from IMS.
22  BY MR. MELAMED:
23  　　Q.　Actavis did buy the data
24  eventually from IMS concerning the top 10,000

Page 221

```
 1     prescribing doctors of Opana, correct?
 2         A.    I believe so.
 3         Q.    Do you recall how much that cost
 4     Actavis?
 5         A.    No, I'm sorry, I don't.
 6         Q.    Do you have any ballpark figure?
 7             MS. MAHONEY:  Objection.
 8             THE WITNESS:  No, I don't.
 9     BY MR. MELAMED:
10         Q.    The second bullet point talks
11     about "Direct Contact."
12             Do you see that?
13         A.    Yes.
14         Q.    And the plan was to utilize the
15     Kadian sales force to deliver sell sheets to
16     known pain doctors they visit in their
17     day-to-day promotion of Kadian.
18             Do you see that?
19             MS. MAHONEY:  Objection.
20             THE WITNESS:  I do.
21     BY MR. MELAMED:
22         Q.    Why was oxymorphone -- let me
23     withdraw that.
24             Why was the plan to use the
```

Page 222

```
 1     Kadian sales force to deliver sell sheets to
 2     known pain doctors they visited in their
 3     day-to-day promotion of Kadian?
 4             MS. MAHONEY:  Objection.
 5             MS. ZOLNER:  Objection to form,
 6     objection, foundation.
 7             THE WITNESS:  We thought that
 8     would be another way to bring awareness
 9     of availability of oxymorphone 7.5 mg
10     and 15 mg strengths to doctors who
11     specialized in pain management.
12     BY MR. MELAMED:
13         Q.    Is the reason that doctors -- if
14     you know, is the reason that doctors who
15     specialized in pain management were targeted for
16     providing this information because they were the
17     most likely to prescribe the drug being
18     promoted?
19             MS. ZOLNER:  Objection to form.
20             MS. MAHONEY:  Objection.
21             THE WITNESS:  They could be among
22     the people that would be likely to
23     prescribe, but additional people --
24     additional doctors in specialties like
```

Page 223

```
 1         oncology and such might also prescribe,
 2         so they were not the only ones who would
 3         be likely.
 4     BY MR. MELAMED:
 5         Q.    They were among the group that
 6     was likely to prescribe Opana; is that correct?
 7             MS. MAHONEY:  Objection.
 8             THE WITNESS:  I believe so.
 9     BY MR. MELAMED:
10         Q.    Similar, why was the decision
11     made to target the direct mail campaign to the
12     top ten prescribing doctors of Opana ER?
13             MS. MAHONEY:  Objection.
14     BY MR. MELAMED:
15         Q.    I'm sorry, I said top ten.  Order
16     of magnitude a few or two off.  I'll restate the
17     question.
18             Do you know why the decision was
19     made to target the direct mail campaign to the
20     top 10,000 prescribing doctors of Opana ER?
21         A.    We -- I believe that many, many,
22     many multitudes of doctors prescribed Opana ER,
23     and we wanted to reach the people who were most
24     likely to have history with the drug and have
```

Page 224

```
 1     patients who have had success that it had been
 2     beneficial for in managing their pain.
 3         Q.    Next bullet point mentions
 4     "Journal advertising to two segments of the
 5     industry."
 6             Do you see that?
 7         A.    I do.
 8         Q.    The first one is "Practical Pain
 9     Management - focused on pain specialists."
10             Do you know why journal
11     advertising in Practical Pain Management was
12     contemplated for the promotional materials for
13     Opana -- for oxymorphone?
14         A.    I believe based on the indication
15     of oxymorphone, that this would help support our
16     awareness campaign to let people who would read
17     that journal know that it was available.
18         Q.    And then the second sub-bullet
19     point is "Pharmacy Times - focused on
20     pharmacists/pharmacy buyers."
21             Do you know why the decision to
22     advertise introduction of generic oxymorphone in
23     Pharmacy Times was made?
24             MS. MAHONEY:  Objection.
```

Page 225

1           THE WITNESS:  Yes.
2   BY MR. MELAMED:
3       Q.    Why was that?
4       A.    To bring awareness also to
5   pharmacists that the product was available and
6   to pharmaceutical buyers that they could
7   purchase this for their pharmacy.
8       Q.    Do you know whether you followed
9   up on each of these four bullet points in the
10  marketing promotional plans?
11      A.    I think --
12      Q.    Go ahead.  I'm sorry.
13          MS. ZOLNER:  Objection, form.
14          THE WITNESS:  I believe that we
15      did.
16  BY MR. MELAMED:
17      Q.    And by follow up I mean did you
18  implement each of the plans discussed in these
19  four bullet points?
20          MS. ZOLNER:  Objection, form.
21          THE WITNESS:  I believe that we
22      did.  There may be some variance in the
23      journals that we used.
24          MR. MELAMED:  You can put that

Page 226

1   aside.
2           (Document marked for
3       identification as Myers Deposition
4       Exhibit No. 15.)
5   BY MR. MELAMED:
6       Q.    I'm going to hand you what's been
7   marked Myers Exhibit 15.
8           It's a voluminous document.  I'll
9   represent to you that most of the volume is a
10  single spreadsheet, and we're not going to go
11  through it row by row.  Obviously, you should
12  flip through it and familiarize yourself, but
13  I'm hopeful that you will not need to read the
14  entirety of the document before we discuss it.
15      A.    I can see why you would be
16  hopeful.
17      Q.    Exhibit 15 is an e-mail, starting
18  at ACTAVIS1130369 from David Myers to Joanne
19  Terzides, cc'ing several individuals, July 7th,
20  2011, e-mail continues through ACTAVIS1130374.
21  There are several pages of what appear to be
22  signature gifs and then an extensive spreadsheet
23  starting -- which all shares the same Bates
24  number ACTAVIS1130377.  And then at the end of

Page 227

1   the spreadsheet, a communication from PDQ
2   Communications to David Myers, two
3   communications, both dated July 1st, 2011.
4           Are you -- do you recall this
5   document?
6       A.    No.
7       Q.    Do you have any reason to believe
8   that you did not send the e-mail and the
9   attachments thereto as reflected in this
10  document?
11      A.    No, I see that I was the author.
12      Q.    And this was sent pursuant to
13  your professional duties at Actavis; is that
14  correct?
15          MS. MAHONEY:  Objection.
16          THE WITNESS:  Yes, sir.
17  BY MR. MELAMED:
18      Q.    It wasn't a personal e-mail to
19  Ms. Terzides?
20      A.    No.
21      Q.    You see the first paragraph that
22  this refers to a two wave oxycodone direct
23  e-mail and e-mail program, correct?
24      A.    Yes.

Page 228

1       Q.    And next line says, "I have
2   attached a spreadsheet that provides the name
3   and addresses of the top 10,000 prescribing
4   doctors of Opana ER."
5           Do you see that?
6       A.    I do.
7       Q.    Do you believe the spreadsheet,
8   which makes up the vast majority of this
9   exhibit, reflects what you described as the
10  spreadsheet providing the names and addresses of
11  the top 10,000 prescribing doctors of Opana ER?
12          MS. ZOLNER:  Objection, form.
13          THE WITNESS:  I believe it does.
14  BY MR. MELAMED:
15      Q.    And the end of the first
16  paragraph you say, "This is the list we would
17  like to use for our direct mail campaign,"
18  correct?
19      A.    Yes.
20      Q.    Do you recall the content of the
21  direct mail campaign that you were discussing
22  here?
23          MS. MAHONEY:  Objection.
24          THE WITNESS:  I believe I do.

Page 229

1    BY MR. MELAMED:
2        Q.    What was included in that direct
3    mail campaign?
4        A.    There was an advertising printed
5    piece created that included information about
6    the drug being available, the strengths and the
7    sizes, as well as a full list of required
8    warnings, PI, black box warnings, things like
9    that all would have been included.
10       Q.    And it references a two wave
11   oxycodone direct mail program?
12       A.    Yes.
13       Q.    Does that mean there were two sep
14   -- the plan was for there to be two separate --
15   withdraw that.
16            Does that indicate that there was
17   a plan to mail information to these top 10,000
18   prescribing doctors at two separate points in
19   time?
20            MS. MAHONEY:  Objection.
21            THE WITNESS:  Yes.
22   BY MR. MELAMED:
23       Q.    Was there a difference in the
24   content of the information that was going to be

Page 230

1    provided to doctors at time one from time two?
2            MS. ZOLNER:  Objection, form.
3            THE WITNESS:  No, I don't believe
4    so.
5    BY MR. MELAMED:
6        Q.    You believe it was the same,
7    precisely the same information that was mailed
8    twice to each recipient?
9            MS. MAHONEY:  Objection.
10           THE WITNESS:  Yes.
11   BY MR. MELAMED:
12       Q.    If you can turn to the first page
13   of the spreadsheet at ACTAVIS1130377.  I
14   apologize for the size of the information on
15   this, but, hopefully, you can make it out.
16       A.    Yes.
17       Q.    And, again, I don't want to go
18   through line by line.  I'd like to go through
19   the first line to see if I can understand -- if
20   you understand and tell me what the information
21   in that first line reflects.
22            So, first, if you see at the top
23   before we get to the individual line, it says
24   "Data: March 2011."

Page 231

1            Do you see that in very small
2    print right under the header "Opana ER, Full
3    List of Prescribers"?
4        A.    Yes.
5        Q.    Do you understand what "Data:
6    March 2011" means?
7        A.    I assume it to mean that's the
8    date when the information was pulled.
9        Q.    And then over to the left, again,
10   before we get into the rows and information,
11   there's one asterisk that says 2010 is
12   Jan-December 2010.
13       A.    Okay.
14       Q.    Do you have any understanding of
15   what that means?
16       A.    No.
17       Q.    And then two asterisks, it says
18   YTD is Jan - March -- I'm sorry, Jan-Mar 2011.
19            Do you see that?
20       A.    Yes.
21       Q.    Do you have any understanding of
22   what that means?
23       A.    I assume it means for a partial
24   year.

Page 232

1        Q.    Where the header says YTD, it's
2    indicating information --
3        A.    Year-to-date.
4        Q.    And that the year-to-date
5    indicates information from January to March
6    of 2011?
7        A.    Yes.  I don't see how that's
8    relevant to the document though.  I don't...
9        Q.    Okay.  If you look over at the
10   column headers on the right side, you'll see
11   that there are a series of headers that start
12   with -- we'll start from the first.  It says
13   Opana 2010, and then the next immediately
14   adjacent column is Opana year-to-date.
15       A.    I see.
16       Q.    So is your understanding that
17   those definitions we were just going through at
18   the top of the document refer to what is meant
19   by 2010 and what is meant by YTD?
20           MS. MAHONEY:  Objection.
21           THE WITNESS:  I believe that
22   based on this conversation.  I don't
23   remember recognizing that in the past.
24   BY MR. MELAMED:

Page 233

1      Q.    Did you make -- this data came
2  from IMS, correct?
3      A.    I believe so.
4      Q.    Did you make the request to IMS
5  for this data?
6      A.    I don't know.
7      Q.    Did you ever request data from
8  IMS, you being you, David Myers?
9      A.    I don't know.
10     Q.    Okay.  Do you know who you would
11 have talked to at IMS would you have wanted to
12 request information?
13          MS. MAHONEY:  Objection.
14          THE WITNESS:  No, I didn't
15      have -- I don't remember having contacts
16      directly with -- at IMS.
17 BY MR. MELAMED:
18     Q.    All right.  Now I'd like to go
19 through some of the information and just use the
20 first row primarily.
21          The first column says "Product
22 Group."
23          Do you see that?
24     A.    Yes.

Page 234

1      Q.    And the product group is Opana
2  ER.
3          Do you see that?
4      A.    Yes.
5      Q.    And I'll represent to you that
6  each of the rows in this document says "Opana
7  ER."
8          Do you have any understanding of
9  what that product group being defined as Opana
10 ER means?
11     A.    I believe it to be people who
12 prescribed Opana ER.
13     Q.    So is it your understanding that
14 that was a restriction set on the information
15 given to you?
16     A.    Yes.
17     Q.    You somehow -- sorry.
18     A.    Sorry.  I didn't let you finish.
19     Q.    That's okay.  I think you said
20 yes, and I'll follow up just to make sure I
21 understand, that somebody at Actavis had
22 requested information about the top 10,000
23 prescribing doctors of Opana ER, and the product
24 group was used to limit the information to

Page 235

1  doctors who prescribed Opana ER; is that
2  correct?
3      A.    I believe that to be true.
4      Q.    Okay.  The next column says
5  "Target Flag."
6          Do you know what that means?
7      A.    No.
8      Q.    Do you know why some have a --
9  for instance, the first row is blank under
10 Target Flag, yet the second row and others has a
11 Y under Target Flag?
12          MS. MAHONEY:  Objection.
13          THE WITNESS:  No, I don't know.
14 BY MR. MELAMED:
15     Q.    The next column says "TMS
16 Target."
17          Do you know what TMS stands for?
18     A.    No, I do not.
19     Q.    Do you know what TMS target
20 means?
21     A.    No, I do not.
22     Q.    And so you have no understanding
23 of why again there are some who are marked --
24 rows where Y is marked under TMS target and

Page 236

1  others where it is blank?
2          MS. MAHONEY:  Objection.
3          THE WITNESS:  No, I don't know
4      why.
5  BY MR. MELAMED:
6      Q.    The next column says "PDRP Flag."
7      A.    Yes.
8      Q.    Do you know what PDRP stands for?
9      A.    No, sir.
10     Q.    Do you know what the function of
11 the PDRP flag column is?
12          MS. MAHONEY:  Objection.
13          THE WITNESS:  No, I do not.
14 BY MR. MELAMED:
15     Q.    Do you know whether these columns
16 were provided by IMS when they gave Actavis the
17 data?
18          MS. ZOLNER:  Objection, form.
19          THE WITNESS:  I assume so, as
20      this appears to be the database we
21      received.
22 BY MR. MELAMED:
23     Q.    When you received this
24 information, do you recall the format in which

Page 237

1  you received it?
2      A.  No.
3      Q.  Do you recall using it as an
4  electronic document?
5      A.  I believe it would have been
6  delivered to us as an electronic document
7  because of its volume.
8      Q.  And you believe that -- do you
9  have any understanding of the file format it
10  would have been delivered to you in?
11          MS. MAHONEY:  Objection.
12          THE WITNESS:  No.
13  BY MR. MELAMED:
14      Q.  The next column, we had just
15  discussed PDRP flag, we're moving on.  The next
16  one says "ME," and each individual reflected in
17  a row in this chart has an ME number associated.
18      A.  Mm-hmm.
19      Q.  Do you know what ME means?
20      A.  No.
21      Q.  The next columns says "Last
22  Name."
23          Do you have any understanding
24  what's indicated by last name, so in the first

Page 238

1  row it's Guank(ph)?
2      A.  Yes.
3      Q.  And what is that?
4      A.  I assume that is that doctor's
5  last name.
6      Q.  Is it your assumption that the
7  first name refers to that doctor's first name?
8      A.  Yes.
9      Q.  And the title reflects that
10  doctor's professional title?
11      A.  I believe so.
12      Q.  So, for instance, in the first
13  row it is MD, so that represents what to you?
14      A.  Medical doctor.
15      Q.  And just skipping down to the
16  fourth row, it says NP, do you understand what
17  that means?
18      A.  I do not.
19      Q.  Is it possible that that means
20  nurse practitioner?
21          MS. MAHONEY:  Objection.
22          THE WITNESS:  It could be
23  possible.
24  BY MR. MELAMED:

Page 239

1      Q.  Do you know whether nurse
2  practitioners prescribed Opana?
3      A.  I have no personal knowledge of
4  that.
5      Q.  Do you know whether Actavis'
6  sales force ever marketed any opioids to nurse
7  practitioners?
8      A.  I don't know.
9      Q.  If you look down just a few more
10  rows, there's a DO.
11          Do you see that?
12      A.  Mm-hmm.
13      Q.  Do you know what DO stands for?
14      A.  I believe it's doctor of -- it's
15  a type of doctor.  I don't remember exactly the
16  word that it is.
17      Q.  Returning to the columns, you see
18  there's address, city, state and zip code?
19      A.  Yes.
20      Q.  Do you understand -- do you
21  believe you understand what each of those stand
22  for?
23      A.  Yes.
24      Q.  And those are the address, city,

Page 240

1  state and zip code for each individual physician
2  listed?
3      A.  Yes.
4      Q.  And I said "physician," I realize
5  they may not all be physicians.
6          For each individual listed,
7  correct?
8      A.  Yes.
9      Q.  You see where it says
10  "Specialty"?
11      A.  Yes.
12      Q.  The first one says "PM."
13          Do you know if that stands for
14  pain management?
15      A.  I wouldn't know.  I'd be
16  guessing.
17      Q.  You have no idea anyway?
18      A.  No.
19      Q.  Do you know in the second row
20  what "IM" stands for?
21      A.  No.
22      Q.  Is it fair to say, I don't want
23  to have you read through this entire document,
24  but if you glance through the first, you know,

Page 241

1   15 or so, do you have any understanding of what
2   any of those abbreviations stand for?
3        A.   No.
4        Q.   The next column is "Phone," and
5   for some individuals it appears to list a
6   ten-digit number.
7            Do you see that?
8        A.   Yes.
9        Q.   Do you have any understanding of
10  what that information is?
11       A.   In the column that says phone,
12  I'd assume it means it's their phone number if
13  they provided one.
14       Q.   The next column says target list
15  category.
16           Do you see that?
17           MS. MAHONEY:  Objection.
18           MR. MELAMED:  I'm sorry.  Thank
19  you.
20           THE WITNESS:  I don't see --
21  BY MR. MELAMED:
22       Q.   Yes.  You won't see that because
23  I read it wrong, again, not trying to trick you.
24           The next column says "Target List

Page 242

1   Territory."
2            Do you see that?
3        A.   Yes.
4        Q.   Do you know what that refers to?
5        A.   I'm assuming it's a territory
6   that the doctor is located in or practices in.
7        Q.   And do you see how, if you look
8   at row two, and this is consistent with several
9   others, there's an alphanumeric indicator before
10  a geographic location?
11       A.   Mm-hmm.
12       Q.   And so in row 2 it's
13  A207-Indianapolis, IN.
14           Do you know what the A207 stands
15  for in that?
16       A.   No, I don't.
17       Q.   And then the next column says
18  "Zip Terr Territory."
19           Do you see that?
20       A.   Yes.
21       Q.   Do you have any understanding of
22  what's indicated by that column?
23       A.   I assume that it's the doctor's
24  territory based upon their zip code.

Page 243

1        Q.   Okay.  Now, moving over to the
2   right side, the first column says "Opana 210,"
3   and for the first row says 2,088.
4            Do you understand what that 2,088
5   indicates?
6        A.   I'm not sure how to interpret the
7   data.
8        Q.   What are -- are there different
9   interpretations that one could have of that
10  number, reasonably?
11       A.   I don't --
12           MS. MAHONEY:  Objection.
13           THE WITNESS:  I don't know if
14       that would be based on the number of
15       prescriptions they've written or the
16       number of units that were filled for
17       that doctor.
18  BY MR. MELAMED:
19       Q.   So do you agree that the 2,088
20  refers to something having to do with Opana in
21  the year 2010 as it relates to that, your
22  doctor, Dr. Yang?
23           MS. MAHONEY:  Objection.
24           THE WITNESS:  I believe so, from

Page 244

1   the way it's represented.
2   BY MR. MELAMED:
3        Q.   The next column has Opana
4   year-to-date, correct?
5        A.   Yes, sir.
6        Q.   And that here is 700.
7            Do you see that?
8        A.   Yes.
9        Q.   Do you have any reason to believe
10  that the 700 reflects a different unit of
11  measure than the 2,088 in the Opana 2010
12  category?
13       A.   I have no reason to believe that,
14  but I don't understand how the data is
15  presented.
16       Q.   Okay.  Do you have any
17  understanding of how the data is presented in
18  the 5-milligram 2010 column?
19       A.   The same confusion extends to
20  this.  Directionally I understand the breakdown,
21  but I don't understand what makes up the number.
22       Q.   So you're unsure what unit is
23  being represented by the number?
24       A.   Yes.

Page 245

1      Q.    And so it could be, for instance,
2  bottles of Opana, correct?
3          MS. MAHONEY:  Objection.
4          THE WITNESS:  It's nonspecific.
5      It could be bottles.  It could be --
6      these could be extended units, pills, by
7      some hundreds or thousands.  It could be
8      any number.
9          Directionally I understand the
10     breakdown between the strengths.
11 BY MR. MELAMED:
12     Q.    And is that the same -- do you
13 have the same answer concerning the units listed
14 under the 7.5-milligram column?
15     A.    Yes, sir.
16     Q.    And same answer for the
17 10-milligram column, columns, there's two?
18     A.    Yes.
19     Q.    And the same answer for the
20 15-milligram columns?
21     A.    Yes, sir.
22     Q.    And same answer for the
23 20-milligram columns?
24     A.    Yes.

Page 246

1      Q.    And the same answer for the
2  30-milligram columns?
3      A.    Yes.
4      Q.    And the same answer for the
5  40-milligram columns?
6      A.    Yes.
7      Q.    Do you know whether the direct
8  mailing campaign utilized the information from
9  this spreadsheet to get its 10,000 prescribing
10 doctors?
11         MS. MAHONEY:  Objection.
12         THE WITNESS:  It appears that
13     they are listed in descending order by
14     highest prescribing to lowest
15     prescribing, and that's what we would
16     have used the names based on that.
17 BY MR. MELAMED:
18     Q.    So is it your belief that this is
19 the information that was used to -- I'm sorry,
20 let me withdraw that.
21         Is it your belief that the
22 individuals listed on this spreadsheet were the
23 individuals targeted for the direct mailing
24 campaign that is discussed in the cover e-mail?

Page 247

1          MS. MAHONEY:  Objection.
2          THE WITNESS:  I believe so.
3  BY MR. MELAMED:
4      Q.    Okay.  Did you ever undertake any
5  analysis to determine whether any of the orders
6  from these individual doctors were suspicious?
7          MS. MAHONEY:  Objection.
8          THE WITNESS:  Could you repeat.
9  BY MR. MELAMED:
10     Q.    Did you ever -- did you ever
11 undertake any analysis to determine -- I'll
12 start that again.  Tripping over my tongue
13 again.
14         Did you ever undertake any
15 analysis to determine whether any of the orders
16 from these individual doctors were suspicious?
17         MS. MAHONEY:  Objection.
18         MS. ZOLNER:  Objection to form.
19         THE WITNESS:  I did not.
20 BY MR. MELAMED:
21     Q.    Do you understand the meaning of
22 the word suspicious as I'm using it in that
23 question?
24         MS. MAHONEY:  Objection.

Page 248

1          THE WITNESS:  I believe that you
2      are inferring to orders that would be of
3      overprescribing.
4  BY MR. MELAMED:
5      Q.    Do you know if anybody at Actavis
6  undertook any analysis to determine whether any
7  of the orders from these individual doctors were
8  suspicious, using the definition you just used?
9          MS. MAHONEY:  Objection.
10         THE WITNESS:  Actavis does not
11     see prescriptions directly from doctors.
12 BY MR. MELAMED:
13     Q.    So is the answer then that
14 Actavis didn't -- not do any follow-up to
15 determine whether any of the subscriptions
16 listed in the spreadsheet that we're discussing
17 were suspicious?
18         MS. MAHONEY:  Objection.
19         THE WITNESS:  Not that I'm aware
20     of.
21 BY MR. MELAMED:
22     Q.    Are you aware that -- let me
23 withdraw that.
24         Are you aware that Opana was

Page 249

1    resold illegally on the streets after it had
2    been prescribed, as a general matter?
3            MS. MAHONEY: Objection.
4            THE WITNESS: I am not aware of
5        that.
6    BY MR. MELAMED:
7        Q.    You are not currently aware of
8    that?
9            MS. MAHONEY: Objection, asked
10        and answered.
11            THE WITNESS: I am not aware of
12        that.
13    BY MR. MELAMED:
14        Q.    And is that -- I'm just trying to
15    flesh out and make sure I understand, does that
16    mean you were never at any time prior to today
17    aware of that?
18            MS. MAHONEY: Objection.
19            THE WITNESS: No.
20    BY MR. MELAMED:
21        Q.    I don't want to belabor the
22    point. When you say "no," does it mean you are
23    not aware, or does it mean that you were
24    answering my question that you were, in fact,

Page 250

1    aware?
2            MS. ZOLNER: Object to form.
3            MS. MAHONEY: Objection.
4            THE WITNESS: I am not aware of
5        instances where Opana, generic Opana has
6        been sold illegally on the street.
7    BY MR. MELAMED:
8        Q.    Are you aware of any instances
9    where branded Opana has been sold illegally on
10    the street?
11            MS. MAHONEY: Objection.
12            THE WITNESS: No, I am not.
13    BY MR. MELAMED:
14        Q.    Are you aware of any instances
15    where -- let me withdraw this.
16            Do you understand what is meant
17    by the term pill mill?
18        A.    I believe I have a colloquial
19    understanding of that phrase.
20        Q.    What is your colloquial
21    understanding of that phrase?
22        A.    I believe it to be clinics or
23    doctors who are inappropriately dispensing or
24    prescribing a product.

Page 251

1        Q.    Are you aware of any pill mills
2    that were inappropriately dispensing
3    oxymorphone?
4        A.    No, I am not.
5        Q.    And that is for all time, you
6    have -- at no time have you become aware of
7    that; is that correct?
8            MS. MAHONEY: Objection.
9            THE WITNESS: No. I may have
10        read a news article at some point, but I
11        don't recall anything.
12    BY MR. MELAMED:
13        Q.    Just to be clear, you may at one
14    point have read an article talking about the
15    prescription of oxymorphone by pill mills, but
16    you don't recall whether or not you did?
17            MS. MAHONEY: Objection.
18            THE WITNESS: I understand the
19        term pill mill because I may have in the
20        past read an article that deals with
21        that. It's not specific to oxymorphone.
22    BY MR. MELAMED:
23        Q.    So is it correct to say that you
24    don't recall having read any articles specific

Page 252

1    to oxymorphone concerning pill mills?
2            MS. ZOLNER: Objection, form.
3            MS. MAHONEY: Objection.
4            THE WITNESS: Yes, I have not
5        read any articles specific.
6            MS. MAHONEY: We're happy to take
7        a break when you think it's appropriate,
8        Matt.
9            MR. MELAMED: Would you like to
10        take a break, or do you want to keep
11        going a little bit longer first?
12            THE WITNESS: What do you want
13        me --
14            MS. MAHONEY: We're fine. This
15        is your call.
16            THE WITNESS: You're human beings
17        too.
18            MR. MELAMED: If anybody would
19        like to take a break, they can let me
20        know.
21            THE WITNESS: I'm fine to go a
22        short time more, but I will need take a
23        break.
24            MR. MELAMED: Fair enough.

Page 253

1      THE WITNESS:  Thank you.
2      MR. MELAMED:  We'll do another
3  document --
4      THE WITNESS:  Water.
5      MR. MELAMED:  -- and I'll check
6  in and take a break.  That makes sense.
7      MS. MAHONEY:  Thank you, Matt.
8      MR. MELAMED:  We are all human
9  beings.
10      (Document marked for
11  identification as Myers Deposition
12  Exhibit No. 16.)
13  BY MR. MELAMED:
14      Q.   Exhibit 16.  Exhibit 16 is an
15  e-mail exchange, the most recent in time being
16  from David Myers to Karen Stoedter on July 19th,
17  2011.  It starts ALLERGAN_MDL_00505041 and
18  concludes on 5044.
19      Do you recognize this document,
20  this e-mail exchange?
21      A.   No.
22      Q.   Do you have any reason to believe
23  you did not send the e-mails that are -- that
24  indicate they are from David Myers?

Page 254

1      A.   No.
2      Q.   Do you have any reason to believe
3  that you did not receive the e-mails that were
4  sent to David Myers on this exhibit?
5      A.   No.
6      Q.   These e-mails concern your work
7  at Actavis, correct?
8      MS. MAHONEY:  Objection.
9      THE WITNESS:  I believe so.
10  BY MR. MELAMED:
11      Q.   Again, they're not personal,
12  right?
13      MS. MAHONEY:  Objection.
14      THE WITNESS:  No.  Some of the
15  language is personal between a close
16  colleague.
17  BY MR. MELAMED:
18      Q.   But even the -- and I assume
19  you're referring to the first paragraph --
20      A.   Yes.
21      Q.   -- in the entire e-mail, correct?
22      A.   Yes.
23      Q.   Even the personal language
24  between you and Ms. Stoedter concerns

Page 255

1  circumstances at work, right?
2      MS. MAHONEY:  Objection.
3      THE WITNESS:  Yes.
4  BY MR. MELAMED:
5      Q.   I'd like you to turn to the first
6  e-mail in this chain, which actually starts on
7  the second page of it at 5042.  It's from Karen
8  Stoedter to a large number of recipients.  The
9  subject is "Recap of Sales/Marketing/Contracts
10  meeting - Monday, July 18th."
11      Do you recall reading this e-mail
12  prior to today?
13      A.   From the conversation in the
14  e-mail, it's obvious that I reviewed it, yes.
15      Q.   Do you have any specific
16  recollection of reviewing it before it's been
17  placed before you right now?
18      A.   No.
19      Q.   Do you recall
20  sales/marketing/contracts meetings in which you
21  are -- you were a participant?
22      MS. ZOLNER:  Object to the form.
23      THE WITNESS:  Yes.
24  BY MR. MELAMED:

Page 256

1      Q.   Can you describe the purpose of
2  those meetings?
3      MS. MAHONEY:  Objection.
4      THE WITNESS:  Yes.
5  BY MR. MELAMED:
6      Q.   And what is the purpose of --
7  what was the purpose of those meetings?
8      A.   The purpose of the meeting is
9  typically every Monday morning, the commercial
10  team, which would be members of the sales team,
11  the marketing group and our contracts pricing
12  people would get on a conference call, and we
13  would talk orders of business for the week,
14  production concerns, launches, anything that
15  might -- we might need to make everybody aware
16  of.  It was a forum for us to discuss our
17  business concerns.
18      Q.   And was this commercial team
19  specifically comprised of individuals -- let me
20  withdraw that.  That's really awkward.
21      Did these meetings concern
22  generic opioids, specifically?
23      MS. MAHONEY:  Objection.
24      THE WITNESS:  These meetings were

Page 257

1    not specific to opioids at all.
2  BY MR. MELAMED:
3       Q.    Were these meetings specific to
4  generic drugs?
5       A.    Yes.
6       Q.    Were brand name drugs discussed
7  at these meetings?
8       A.    Rarely, if at all.
9       Q.    So the first paragraph is titled
10  "Oxymorphone."
11           Do you see that in Karen's
12  e-mail?
13       A.    Yes.
14       Q.    And in the middle of the
15  paragraph it says, "We have a two-way direct
16  mail campaign to the top 10 prescribing
17  physicians."
18           Do you see that?
19       A.    Can I read the paragraph?
20       Q.    Yes.
21       A.    Thank you.
22           (Witness reviews document.)
23           Okay.  Can you repeat your
24  question --

Page 258

1       Q.    Sure?
2       A.    -- now that I've read it.  Thank
3  you.
4       Q.    Yes.  I'm going to start from the
5  beginning of the paragraph instead of jumping to
6  the middle.
7       A.    Okay.
8       Q.    Beginning of the paragraph Karen
9  wrote, "We successfully launched oxymorphone on
10  Friday, July 15th with over 75% market share."
11           Do you know what time period that
12  75% market share reflected?
13           MS. MAHONEY:  Objection.
14           THE WITNESS:  I do not.
15  BY MR. MELAMED:
16       Q.    How do you understand the
17  sentence that she wrote, that first sentence?
18           MS. MAHONEY:  Objection.
19           THE WITNESS:  I believe it's a
20       misinterpretation of market share.  We
21       did not obtain 75% market share on day
22       one of launch.  I believe it may have
23       been an estimate based on the number of
24       orders we shipped and what that

Page 259

1       represented in market share, but that
2       really wasn't our market share.
3  BY MR. MELAMED:
4       Q.    Okay.  Am I correct that you're
5  saying that it was a projection of potential
6  market share based on first day sales?
7           MS. ZOLNER:  Objection, form.
8           MS. MAHONEY:  Objection.
9           THE WITNESS:  No.
10  BY MR. MELAMED:
11       Q.    Do you have any understanding of
12  what the estimate of 75% market share was based
13  on?
14           MS. ZOLNER:  Objection, form.
15           MS. MAHONEY:  Objection.
16           THE WITNESS:  I believe that
17       Karen, the author of this document, was
18       taking notes quickly, obviously, there's
19       a lot of information contained here
20       about a conversation.  I'm assuming that
21       she does not have court reporter skills,
22       so I believe she may have misinterpreted
23       some of this.
24           But the 75% market share I

Page 260

1       believe may have been the units that we
2       shipped on day one to fill the pipeline
3       at our -- at wholesalers and
4       distributors may have been equal to one
5       month's sales back at the time when
6       Opana was being sold for these
7       strengths, 75% of one month's sales.
8       That's how I'm interpreting it.
9  BY MR. MELAMED:
10       Q.    Second sentence says, "The
11  product released earlier in the day and dropped
12  $1.4 million in orders to UPS before lunchtime."
13       A.    Yes.
14       Q.    Can you explain what is meant --
15  what you understood dropped 1.4 million in
16  orders to UPS before lunchtime mean?
17       A.    I believe that she was talking
18  about the success of our supply chain in
19  shipping orders for orders that we had.
20       Q.    So that before lunchtime on the
21  first day that Actavis had oxymorphone
22  available, it had made -- is it accurate to say
23  that it had made $1.4 million in -- worth of
24  sales in that time period?

Page 261

```
 1            MS. MAHONEY:  Objection.
 2            THE WITNESS:  Could you ask the
 3      question again.  I'm sorry.
 4    BY MR. MELAMED:
 5        Q.   I'm trying to figure out what the
 6    $1.4 million refers to.  It says in orders to
 7    UPS.
 8            Are those sales?
 9        A.   Yes.
10        Q.   Are those drugs that Actavis had
11    sold in that time period?
12        A.   Those are Acta -- those are
13    orders, the value of orders that had been
14    shipped to drug wholesalers and to distributors,
15    retailers, our whole -- whoever was buying from
16    us.  It's not to patients or dispensing.
17        Q.   Fair enough.  So, again, correct
18    me if I'm wrong, my understanding of what you're
19    saying is that before lunchtime on the first day
20    of sales, Actavis had -- orders of oxymorphone
21    from Actavis had equaled $1.4 million?
22        A.   Yes.
23            MS. MAHONEY:  Objection.
24    BY MR. MELAMED:
```

Page 262

```
 1        Q.   If we skip a sentence, the fourth
 2    sentence, I believe, says, "The Kadian team will
 3    be training with Ara next Monday so they will be
 4    able to bring the doctors they normally visit up
 5    to speed on generic option and also deliver the
 6    direct mailing materials that you all receive at
 7    the trade show."
 8            Do you understood the -- do you
 9    understand the reference to the generic option
10    in that sentence?
11        A.   Yes.
12        Q.   Is that to the availability of
13    generic oxymorphone?
14        A.   Yes.
15        Q.   And does this sentence reflect --
16    if you recall earlier that we looked at a
17    document about the promotional plan for
18    oxymorphone on its launch?
19        A.   Yes.
20        Q.   And one of the elements was using
21    the Kadian sales team, correct?
22            MS. ZOLNER:  Objection, form.
23            THE WITNESS:  Yes.
24    BY MR. MELAMED:
```

Page 263

```
 1        Q.   Does this sentence reflect that
 2    effort?
 3            MS. MAHONEY:  Objection.
 4            MS. ZOLNER:  Objection, form.
 5      Objection, foundation.
 6            THE WITNESS:  I believe it
 7      reflects a preparation of the Kadian
 8      team to potentially deliver that.
 9    BY MR. MELAMED:
10        Q.   Okay.  So is the Kadian team also
11    tasked -- did you -- let me withdraw that.
12            Did you understand that the
13    Kadian sales team would also be tasked with
14    delivering the direct mailing materials that
15    everyone will receive at the trade show?
16            MS. MAHONEY:  Objection.
17            THE WITNESS:  Yes.
18    BY MR. MELAMED:
19        Q.   Are those the direct mailing
20    materials that were sent to the top 10,000
21    prescribing doctors of Opana ER?
22            MS. ZOLNER:  Objection, form.
23            THE WITNESS:  Yes.
24    BY MR. MELAMED:
```

Page 264

```
 1        Q.   And do you understand the
 2    reference to the receipt of those direct mailing
 3    materials at the trade show?
 4        A.   Yes, I believe I do.
 5        Q.   Do you know what trade show she
 6    was talking about?
 7        A.   That's the piece I don't
 8    understand.
 9        Q.   Okay.  Do you recall there being
10    a trade show where Actavis introduced
11    oxymorphone?
12            MS. MAHONEY:  Objection.
13            THE WITNESS:  No.
14    BY MR. MELAMED:
15        Q.   The next sentence states, "We are
16    focusing on creating awareness and want to
17    target physicians to continue to write and
18    increase their scripts."
19            Do you see that?
20        A.   Yes.
21        Q.   That describes the motivation for
22    the advertising campaign for oxymorphone; is
23    that right?
24            MS. MAHONEY:  Objection.
```

Page 265

1      THE WITNESS:  This sentence is
2  vague and was written by a person who is
3  not a product manager.
4  BY MR. MELAMED:
5      Q.    How do you understand that
6  sentence?
7      A.    I understand the objective behind
8  the sentence.
9      Q.    What is your understanding of the
10  objective behind the sentence?
11      A.    That physicians were targeted to
12  receive the information to let them know that
13  the 7.5 mg and 15 mg was approved and available
14  for patients that they felt were appropriate to
15  receive those strengths.
16      Q.    You said that Karen is not a
17  product manager, correct?
18      A.    Yes.
19      Q.    What was her role?
20      A.    Karen's main role was manager of
21  forecasting, but she was part of the commercial
22  team in that role.
23      Q.    The next couple sentences
24  describe a two-way direct mail campaign to the

Page 266

1  top 10 prescribing physicians.
2      Do you see that?
3      A.    Yes.
4      Q.    Do you believe that number 10 to
5  be an error?
6      A.    I believe there are a couple
7  errors in this sentence.
8      Q.    Can you identify the errors for
9  me?
10      A.    To the top 10 prescribing
11  physicians would be a very minimal marketing
12  campaign, and, also, I think it represents that
13  how she does not understand the marketing aspect
14  and was a note taker from this meeting.  She
15  says two way and not two wave.
16      Q.    Okay.  Do you understand this
17  sentence to be referring to a discussion of the
18  direct mail campaign we discussed earlier?
19      A.    Yes.
20      Q.    And so it was 10,000 physicians
21  who were targeted?
22      MS. MAHONEY:  Objection.
23      THE WITNESS:  Yes.
24  BY MR. MELAMED:

Page 267

1      Q.    And it was a -- they would be
2  targeted in two separate communications over
3  time, correct?
4      A.    I believe it to be two waves of
5  the same communication.
6      Q.    Two waves of the same
7  communication to each of the 10,000; is that
8  correct?
9      A.    Yes.
10      Q.    If you skip a sentence, it says,
11  "We have booked Pharmacy Times (Aug)."
12      A.    Mm-hmm.
13      Q.    Is that a reference to having
14  booked an advertis -- advertising space in a
15  periodical called Pharmacy Times for their
16  August issue?
17      A.    I believe that represents that,
18  yes.
19      Q.    The next sentence, acknowledging
20  these are notes --
21      A.    Right.
22      Q.    -- it says, "and will work with
23  major wholesalers and chains to target doctors
24  and patients to get the word out to utilize the

Page 268

1  generic."
2      Do you see that?
3      MS. MAHONEY:  Objection.
4      THE WITNESS:  I do.
5  BY MR. MELAMED:
6      Q.    Do you see that -- to utilize the
7  generic, do you understand that to mean to
8  utilize generic oxymorphone being sold by
9  Actavis?
10      A.    I do.
11      Q.    Do you understand what is meant
12  by work with major wholesalers and chains to
13  target doctors and patients?
14      A.    I believe that to be an error.
15      Q.    What do you believe to be the
16  error in that sentence?
17      A.    I don't believe that wholesalers
18  and chains have direct contacts to doctors or
19  patients.
20      Q.    Do you recall working with
21  wholesalers or chains to promote oxymorphone?
22      A.    I don't remember specific
23  campaigns, but it is possible we did something.
24      Q.    Do you recall working with

Page 269

1  wholesalers and chains to promote other drugs at
2  Actavis?
3      A.    From time to time.
4      Q.    Can you describe how, as a
5  general matter, you worked with wholesalers and
6  chains to promote generic drugs?
7          MS. ZOLNER:  Objection, form.
8          MS. MAHONEY:  Objection.
9          THE WITNESS:  Wholesalers and
10         chains could have fliers or leaflets
11         that they send out to their member
12         customers, customers being pharmacies.
13         Chains may have newsletters out from
14         their corporate office down to their
15         pharmacies, and we may have, you know,
16         made product availability announcements
17         in those.
18  BY MR. MELAMED:
19      Q.    Do you know if wholesalers
20  communicated anything more to their customers
21  than your product availability concerning any of
22  Actavis' drugs at any time?
23         MS. ZOLNER:  Objection to form.
24         MS. MAHONEY:  Objection.

Page 270

1          MR. JOHNSON:  Objection to form.
2          THE WITNESS:  No.
3  BY MR. MELAMED:
4      Q.    Do you know whether -- well, what
5  is meant -- what is referred to by chains here?
6  Do you understand what is referred to by chains
7  in this sentence?
8      A.    National or regional drug chains.
9      Q.    Do you know if national or
10  regional drug chains at any point provided any
11  information about Actavis' drugs to their
12  customers other than mere availability?
13         MS. MAHONEY:  Objection.
14         THE WITNESS:  No.
15  BY MR. MELAMED:
16      Q.    When you're saying "no," it's you
17  don't know; is that correct?
18      A.    I don't know.
19      Q.    Okay.  Do you see the next
20  sentence says, "The sales team can be helpful in
21  driving this to get reasonable feedback from
22  customers over several weeks to see if the
23  demand has increased or maintained," I'll stop
24  there, the sentence continues.

Page 271

1      A.    Let me read just a little back.
2      Q.    Sure.
3      A.    (Witness reviews document.)
4          Yes.
5      Q.    Do you recall whether the sales
6  team ever did get feedback from customers over
7  the next several weeks to see if demand for
8  oxymorphone had increased or maintained?
9      A.    I don't recall specifically, but
10  it's quite possible.
11      Q.    Do you know who would have led
12  the effort on the sales team to compile that
13  feedback?
14         MS. MAHONEY:  Objection.
15         MS. ZOLNER:  Objection to form.
16         THE WITNESS:  No.  If there was
17         feedback, it would have been the
18         individual salesperson that represents
19         or had contact with that assigned
20         account.
21  BY MR. MELAMED:
22      Q.    And you don't know whether there
23  was any effort to bring together any
24  communications with accounts pursuant to the

Page 272

1  effort to get reasonable feedback from customers
2  regarding oxymorphone's launch?
3          MS. MAHONEY:  Objection.
4          THE WITNESS:  I don't believe
5          there was a formalized system for doing
6          that.
7  BY MR. MELAMED:
8      Q.    The end of that sentence talks
9  about evaluating -- doing what we've just talked
10  about and "evaluating the effectiveness of our
11  marketing campaign."
12         Do you see that?
13      A.    Yes.
14      Q.    Do you recall any work done to
15  measure the effectiveness of Actavis' marketing
16  campaign around the launch of generic
17  oxymorphone?
18      A.    I remember personally putting
19  reports together that stated sales, our sales
20  out and comparing that to prescriptions and
21  monitoring different aspects of the -- of the
22  launch.
23      Q.    Were those reports something that
24  you compiled on a regular basis?

Page 273

1      MS. MAHONEY:  Objection.
2      THE WITNESS:  Yes.
3  BY MR. MELAMED:
4      Q.    About how frequently did you
5  compile them?
6      MS. ZOLNER:  Objection, form.
7      THE WITNESS:  I'm not sure, but I
8      think about once a month.
9  BY MR. MELAMED:
10     Q.    Did anybody request that you
11  provide those reports?
12     A.    I believe the -- I believe they
13  were requested by one of two people, either the
14  vice president of sales, Michael Perfetto or the
15  director of marketing, Jinping McCormick.
16     Q.    Do you recall whether you
17  provided those evaluations to Ms. McCormick when
18  they were complete?
19     MS. MAHONEY:  Objection.
20     MS. ZOLNER:  Objection, form.
21     THE WITNESS:  I don't
22      specifically remember sending them to
23      her, but it would be likely that I did,
24      as she was my supervisor.

Page 274

1  BY MR. MELAMED:
2      Q.    Do you recall whether you
3  provided those reports to Mr. Perfetto?
4      A.    I don't specifically recall, but
5  it would be likely that I would, as he was the
6  head of sales.
7      Q.    Is there anybody else you can
8  think of who you would likely have provided
9  those reports to?
10     MS. ZOLNER:  Objection, form.
11     THE WITNESS:  It's possible I
12      could have provided them to other
13      members of our sales team, although just
14      for informational purposes for them.
15      They weren't really in a capacity to
16      impact sales at that point.
17  BY MR. MELAMED:
18     Q.    Go to the next section.  It says
19  "Our Focus," and the first sentence says "Sales
20  for the month - $20.3 vs. $46.4."
21      Do you see that?
22     A.    Yes.
23     Q.    Are those figures -- do those
24  figures reflect $20.3 million versus

Page 275

1  $46.4 million?
2      A.    I believe so.
3      Q.    The third sentence states, "We
4  need to get additional traction on fentanyl."
5      Do you see that?
6      A.    Yes.
7      Q.    Do you recall an effort to get
8  additional traction on fentanyl around
9  July 2011?
10     MS. MAHONEY:  Objection.
11     THE WITNESS:  I recall marketing
12      campaigns.  I don't recall if they -- if
13      the time corresponds to this time of
14      this document.
15  BY MR. MELAMED:
16     Q.    Were there other instances -- do
17  you recall other instances at Actavis where you
18  needed to get additional traction on the sales
19  of a particular generic drug?
20     A.    Yes.
21     Q.    Was there a standard set of
22  actions that were then undertaken, undertaken in
23  the effort to get additional traction on those
24  generic drugs?

Page 276

1      A.    Repeat, please.
2      Q.    Was there a standard set of
3  actions that were then undertaken in the effort
4  to get additional traction on those generic
5  drugs?
6      A.    It wasn't a standard set of
7  actions.  It was basically a guideline for
8  understanding your business and taking actions,
9  and those actions could be different based on
10  the particular situation for that product.
11     Q.    About two-thirds of the way down
12  the -- part of the paragraph reflected on this
13  page, on 505 -- I'm sorry -- 5042, there's a
14  sentence that says, "There may be opportunity to
15  pick up additional oxycodone since there
16  continues to be shortages in the marketplace."
17      Do you see that?
18     A.    Yes.
19     Q.    Do you have any recollection of
20  why there were shortages in the marketplace?
21     MS. MAHONEY:  Objection.
22     THE WITNESS:  No.
23  BY MR. MELAMED:
24     Q.    If you turn back to the first

Page 277

1  page of this exhibit, you and Karen exchange
2  e-mails about the process of taking notes at
3  these meetings, correct?
4      A.    Yes.
5      Q.    And your final e-mail talks about
6  how individuals who take notes may compete to
7  one up each other; is that right?
8      A.    Yes.
9      Q.    And you talk about -- I assume
10 humorously talk about --
11     A.    Yes.
12     Q.    -- playing music when someone
13 opens your summary e-mail, correct?
14     MS. MAHONEY:  Objection.
15     THE WITNESS:  Yes.
16 BY MR. MELAMED:
17     Q.    And then you say something
18 pharmaceutical in quotes?
19     A.    I see that that's written there,
20 yes.
21     Q.    And you reference the song White
22 Rabbit.
23     Do you see that?
24     A.    I do.

Page 278

1      Q.    Do you have any understanding of
2  why you used the song White Rabbit as an
3  example?
4      A.    I can give you the background on
5  the conversation.
6      Q.    Sure.
7      A.    Jinping is a brilliant woman, and
8  it was known that when Jinping would -- with two
9  people or three people did something, Jinping
10 would also -- would always be a little bit
11 above, a little bit greater.  She was a little
12 extra, and so others would strive to bring their
13 game up to the level of her expertise.  It was
14 was a joke on that unspoken competition, so to
15 speak.  She was the person to whose performance
16 to aspire to.  So that's what the competition
17 that I'm discussing is.
18     So the White Rabbit was not a
19 joke pertaining to opioids, although I can see
20 how you would think that here, but we are in the
21 pharmaceutical industry, and this was a joke
22 internally between two colleagues who share a
23 warm friendship.
24     Q.    Was there anything about the

Page 279

1  lyric to White Rabbit that had anything to do --
2  that you quote that had anything to do with any
3  of Actavis' products?
4      A.    No, it had to do with my
5  knowledge of contemporary music.
6      MS. MAHONEY:  Only some of us in
7  the room think that's contemporary
8  music.
9      THE WITNESS:  Well, at my age
10 it's contemporary.  At one time it was
11 contemporary.
12     MR. MELAMED:  It is true that at
13 one time that's what was contemporary.
14 Why don't we go off the record.
15     THE VIDEOGRAPHER:  The time is
16 2:47 p.m.  We're going off the record.
17     (Brief recess.)
18     (Document marked for
19 identification as Myers Deposition
20 Exhibit No. 17.)
21     THE VIDEOGRAPHER:  The time is
22 3:03 p.m., and we're back on the record.
23 BY MR. MELAMED:
24     Q.    I've just handed you what's been

Page 280

1  marked Exhibit 17, which is an e-mail and an
2  attachment.  The e-mail is from David Myers to
3  Ara Aprahamian on July 22nd, 2011.  Subject is
4  "Oxymorphone training to Kadian sales team," and
5  then there's an attachment.  There are two.  The
6  Bates range is ALLERGAN_MDL_00504974 through
7  4994.
8      Do you recognize this document?
9      A.    No.
10     Q.    Do you have any reason to believe
11 that you did not send this e-mail and the
12 attachment to it?
13     A.    No, sir.
14     Q.    And sending this e-mail and this
15 attachment was part of your duties at Actavis?
16     A.    Yes.
17     Q.    You referenced -- we've discussed
18 before earlier today that Actavis would use its
19 Kadian sales team to inform doctors about the
20 availability of generic oxymorphone, correct?
21     MS. MAHONEY:  Objection.
22     THE WITNESS:  Yes.
23 BY MR. MELAMED:
24     Q.    If you look at the email, you

Page 281

1  write that the attached slide deck is approved
2  for Monday's presentation to the Kadian sales
3  team.
4       Do you see that?
5       A.   Yes.
6       Q.   And if you turn to the first page
7  of the presentation, which is at Bates number
8  ending 4976, it states "Introduction of
9  Oxymorphone Hydrochloride Extended-Release
10 Tablets, CII Sales Training Class."
11      Do you see that?
12      A.   Yes, I do.
13      Q.   Is this the training that was
14 provided to the Kadian sales team about
15 introducing oxymorphone to doctors?
16      MS. MAHONEY:  Objection.
17      THE WITNESS:  I believe so.
18 BY MR. MELAMED:
19      Q.   Is that the purpose for which
20 this was approved?
21      A.   I believe so.
22      Q.   Do you know whether this was
23 actually -- this presentation was ever given to
24 the Kadian sales team?

Page 282

1       A.   I do not know.  I wasn't at this
2  training.
3       Q.   Do you know, referring back to
4  the e-mail, the first line says, "The attached
5  slide deck is approved for use in Monday's
6  presentation," do you know who approved it?
7       A.   I believe it would have been
8  the -- routed for full approval like all
9  advertising and training documents.  I don't
10 remember specific people.
11      Q.   Okay.  You can put that exhibit
12 aside.
13      (Document marked for
14      identification as Myers Deposition
15      Exhibit No. 18.)
16 BY MR. MELAMED:
17      Q.   I'm handing you what's been
18 marked as Exhibit 18.
19      Exhibit 18 is an e-mail from
20 Rachelle Galant to Mike Diblasi and cc'ing
21 Mr. Myers and others, sent August 2nd, 2011.
22 Subject is Marketing SIOP August 3, 2011
23 PowerPoint, and it attaches a PowerPoint
24 document called "Quarterly SIOP - Marketing

Page 283

1  August 3rd, 2011."  The Bates range for this
2  document is ALLERGAN_MDL_00504796 through 4815.
3       Do you recognize this e-mail and
4  the attached PowerPoint presentation?
5       A.   No, I do not.
6       Q.   Do you have any reason to believe
7  that you did not receive these from Rachelle
8  Galant on or around August 2nd, 2011?
9       A.   No.
10      Q.   Do you know what SIOP stands for?
11      A.   I don't remember.
12      Q.   Do you recall the purpose of the
13 quarterly SIOP meetings?
14      A.   It appears to be a strategy
15 meeting for our overall business.
16      Q.   Did you participate in those
17 meetings?
18      A.   I believe so.
19      Q.   Do you know who prepared the
20 PowerPoint presentation?
21      A.   I do not.
22      Q.   Do you recall attending a
23 quarterly SIOP marketing meeting on or around
24 August 3rd, 2011?

Page 284

1       A.   Not specifically.
2       Q.   Do you recall generally attending
3  quarterly SIOP marketing meetings?
4       A.   Yes.
5       Q.   Where were they?
6       A.   In our offices in New Jersey.
7       Q.   In Parsippany?
8       A.   I think at the time we were in
9  Morristown.
10      Q.   Okay.  Do you recall who
11 participated in those meetings?
12      A.   I don't remember all of the
13 attendees.
14      Q.   Would -- do you recall whether
15 the individuals listed as recipients in the to
16 and CC line of the e-mail at 796 would have --
17 were regular attendees of the quarterly SIOP
18 marketing meetings?
19      MS. MAHONEY:  Objection.
20      THE WITNESS:  I do not know.
21 BY MR. MELAMED:
22      Q.   Is there anybody you recall being
23 at a quarterly SIOP meeting who is not reflected
24 amongst the recipients of the August 2nd e-mail

Page 285

1  in Exhibit 18?
2      A.   I don't remember all of the
3  participants.
4      Q.   Does anybody stick out as not --
5  for their absence from this e-mail?
6      MS. ZOLNER:  Objection, form.
7      MS. MAHONEY:  Objection.
8      THE WITNESS:  No.
9      MR. MELAMED:  Okay.  You can put
10     that aside.
11         (Document marked for
12         identification as Myers Deposition
13         Exhibit No. 19.)
14 BY MR. MELAMED:
15     Q.   I'm handing you what's been
16 marked Exhibit 19.
17     Exhibit 19 is -- most recent in
18 time is an e-mail from Jinping McCormick to Ara
19 Aprahamian and Michael Perfetto and David Myers,
20 August 18th, 2011.  Subject, forward, Opioid
21 Article May PPM 2011, which forwards an e-mail
22 from Sean Cunningham, and then there is an
23 attachment thereto.  The document starts at
24 Bates number ALLERGAN_MDL_050 -- I'm sorry --

Page 286

1  00504574 and ends on 4584.  I'm going to draw
2  your attention to the first -- to the cover page
3  first, the e-mails.
4      Do you know who Sean Cunningham
5  was?
6      MS. MAHONEY:  Objection.
7      THE WITNESS:  Yes.
8  BY MR. MELAMED:
9      Q.   Who was Sean Cunningham?
10     MS. MAHONEY:  Objection.
11     THE WITNESS:  He was a
12     representative of a -- I believe a trade
13     journal.
14 BY MR. MELAMED:
15     Q.   Is Vertical Health the name of
16 that trade journal?
17     A.   No.
18     Q.   Do you recall receiving this
19 e-mail and article?
20     A.   No.
21     Q.   Do you recognize the e-mail or
22 the article?
23     A.   No.
24     Q.   Do you have any reason to believe

Page 287

1  you did not receive the e-mail and article when
2  they were forwarded to David Myers on or around
3  August 18th, 2011?
4      A.   No.
5      Q.   And this e-mail and article do
6  not concern personal communications, correct?
7      A.   No.
8      Q.   They concern your work at
9  Actavis?
10     A.   Yes.
11     MS. MAHONEY:  Objection.
12 BY MR. MELAMED:
13     Q.   If you look at the e-mail from
14 Sean Cunningham, he states that he wanted to
15 share this article "as it is relevant to your
16 brand and could be a tool that your brand and
17 have your reps use as a detail piece or
18 leave-behind."
19     Turning to the front page of the
20 attached article at 575, it's the title of the
21 article is "Medications for Chronic Pain -
22 Opioid Analgesics."
23     Do you see that?
24     A.   Yes.

Page 288

1      Q.   Do you know whether this article
2  was used as a detail piece or leave-behind by
3  Actavis at any time?
4      MS. ZOLNER:  Objection, form.
5      THE WITNESS:  No.
6  BY MR. MELAMED:
7      Q.   Just I asked a compound question,
8  I just want to make sure I understand your no.
9      Do you know whether Actavis ever
10 used this article as a detail piece?
11     A.   I do not believe so, no.
12     Q.   Do you know whether Actavis ever
13 used this article as a leave-behind?
14     A.   I do not believe they did, no.
15     Q.   Do you have any understanding why
16 Jinping McCormick forwarded this article to you?
17     A.   Because I was responsible for
18 advertising and collateral marketing pieces.
19 She may have sent it to me for my review.
20     Q.   Did you -- do you recall
21 discussing this with Jinping McCormick?
22     A.   No, I don't.
23     Q.   Do you recall discussing this
24 with anybody else?

Page 289

1      A.   No.
2           MS. MAHONEY: Objection.
3           THE WITNESS: No.
4    BY MR. MELAMED:
5      Q.   If you turn to page -- the
6    pagination on the article is 112.  It's at Bates
7    number ending 4577.  I want to just draw your
8    attention to a couple of sentences.  There's a
9    paragraph in the middle column that starts
10   towards -- two-thirds of the way down the page
11   that starts "chronic use of opioids."
12          Do you see that paragraph?
13     A.   Yes.
14     Q.   It's the first paragraph says,
15   "chronic use of opioids for non-cancer pain may
16   be associated with a risk for opioid abuse."
17          Do you see that?
18     A.   I do.
19     Q.   Do you know if the marketing
20   materials you oversaw the creation of for
21   Actavis concerning any of its opioids contained
22   a warning that chronic use of opioids for
23   non-cancer pain may be associated with a risk
24   for opioid abuse?

Page 290

1           MS. MAHONEY: Objection.
2           THE WITNESS: I don't know if
3    that exact quote was used in our
4    materials.
5    BY MR. MELAMED:
6      Q.   The next sentence says, "With
7    chronic opioid use, rates of abuse have been
8    reported to range from 18% to 41%."
9           Do you see that?
10     A.   Yes, I see it.
11     Q.   Do you know if there was a
12   reference in any of the advertising materials
13   you oversaw for Actavis opioids to rates of
14   abuse reported for chronic opioid use reported
15   to range from 18% to 41%?
16          MS. ZOLNER: Objection to form.
17          MS. MAHONEY: Objection.
18          THE WITNESS: Not that I recall.
19   BY MR. MELAMED:
20     Q.   Further down the paragraph it
21   states, several factors or characteristics
22   associated with an increased risk for opioid
23   abuse have been identified, including younger
24   age, multiple healthcare visits (greater than 20

Page 291

1    per year), a history of nonopioid substance
2    abuse, a mental health diagnosis receiving --
3    I'm sorry, comma, receiving more than 200 days
4    -- 210 days supply of opioids, marital status
5    (separated, divorced, or single), and
6    African-American race.
7           Do you see that?
8      A.   Yes.
9      Q.   Do you know whether any of the
10   advertising materials you oversaw the creation
11   of for Actavis concerning its opioids warned of
12   increased risk of opioid abuse due to younger
13   age?
14          MS. MAHONEY: Objection.
15          MS. ZOLNER: Objection, form.
16          THE WITNESS: I do not know.
17   BY MR. MELAMED:
18     Q.   Do you know whether any of the
19   advertising materials you oversaw the creation
20   of for Actavis concerning Actavis opioids warned
21   of increased risk of -- for opioid abuse
22   resulting from multiple healthcare visits
23   greater than 20 per year?
24          MS. MAHONEY: Objection.

Page 292

1           THE WITNESS: I do not know.
2    BY MR. MELAMED:
3      Q.   Do you know whether any of the
4    advertising materials you oversaw the creation
5    of for Actavis concerning Actavis opioids warned
6    of increased risk for opioid abuse resulting
7    from a history of nonopioid substance abuse?
8           MS. MAHONEY: Objection.
9           THE WITNESS: I do not know.
10   BY MR. MELAMED:
11     Q.   Do you know whether any of the
12   advertising materials you oversaw the creation
13   of for Actavis concerning its opioids warned of
14   increased risk for opioid abuse where patients
15   had a mental health diagnosis?
16          MS. ZOLNER: Objection to form.
17          MS. MAHONEY: Objection.
18          THE WITNESS: I do not know.
19   BY MR. MELAMED:
20     Q.   Do you know whether any of the
21   advertising materials you oversaw the creation
22   of for Actavis concerning its opioids warned of
23   increased risk of opioid abuse due to receiving
24   more than 210 days supply of opioids?

Page 293

1        MS. ZOLNER: Objection to form.
2        MS. MAHONEY: Objection.
3        THE WITNESS: I do not know.
4    BY MR. MELAMED:
5        Q.    Do you know whether any of the
6    advertising materials you oversaw the creation
7    of for Actavis concerning its opioids warned of
8    increased risk of opioids -- opioid abuse due to
9    marital status being separated, divorced or
10   single?
11       MS. MAHONEY: Objection.
12       THE WITNESS: I do not know.
13   BY MR. MELAMED:
14       Q.    Do you know whether any of the
15   advertising materials you oversaw the creation
16   of for Actavis concerning its opioids warned of
17   increased risk of opioid abuse for patients who
18   are African-American?
19       MS. MAHONEY: Objection.
20       MS. ZOLNER: Objection to form.
21       THE WITNESS: I do not know.
22   BY MR. MELAMED:
23       Q.    For each of those when you say
24   you don't know, you don't recall one way or the

Page 294

1    other whether the advertising you oversaw
2    concerning Actavis opioids included warnings as
3    to any of those factors; is that correct?
4        MS. MAHONEY: Objection.
5        THE WITNESS: I do not recall if
6    it included those warnings for those
7    exact.
8    BY MR. MELAMED:
9        Q.    In your opinion, should such
10   warnings have been included in Actavis
11   advertising for its opioids?
12       MS. MAHONEY: Objection.
13       MS. ZOLNER: Objection, form,
14   foundation.
15       THE WITNESS: That's outside of
16   my scope of expertise.
17   BY MR. MELAMED:
18       Q.    So you have no opinion either way
19   whether such warnings should have been included?
20       MS. MAHONEY: Objection.
21       MS. ZOLNER: Objection, form.
22       THE WITNESS: I have no opinion
23   on that.  It's not -- I'm not the
24   subject matter expert on that.

Page 295

1    BY MR. MELAMED:
2        Q.    Are you aware of a current opioid
3    addiction crisis in the United States?
4        MS. ZOLNER: Objection, form.
5        MS. MAHONEY: Objection.
6        THE WITNESS: I'm not sure about
7    the word crisis.  I understand from
8    reading the news that there are -- is a
9    segment of the population, smaller
10   segment that it is a possibility that
11   they can become addicted.
12   BY MR. MELAMED:
13       Q.    Do you have any understanding
14   about estimates of the number of opioid addicts
15   currently in the United States?
16       MS. ZOLNER: Objection to form.
17       MS. MAHONEY: Objection.
18       THE WITNESS: No, I do not.
19   BY MR. MELAMED:
20       Q.    Has the opioid -- has opioid
21   addiction affected anyone in your family?
22       MS. ZOLNER: Objection, form.
23       THE WITNESS: Remotely.
24   BY MR. MELAMED:

Page 296

1        Q.    Do you know the opioid to which
2    that family member is addicted?
3        MS. MAHONEY: Objection.
4        MS. ZOLNER: Objection to form.
5        THE WITNESS: No, I do not.
6    BY MR. MELAMED:
7        Q.    You mentioned before where you
8    live.  I'm sorry, I've forgotten.  Can you name
9    the town you live in?
10       A.    Maplewood, New Jersey.
11       Q.    Has opioid addiction affected --
12   to your knowledge, affected Maplewood, New
13   Jersey and its residents?
14       MS. MAHONEY: Objection.
15       THE WITNESS: I don't know.
16   BY MR. MELAMED:
17       Q.    Do you know if anyone you worked
18   with at Actavis became addicted to opioids?
19       A.    Not that I'm aware of.
20       MS. ZOLNER: Objection, form.
21       THE WITNESS: Not that I'm aware
22   of.
23   BY MR. MELAMED:
24       Q.    What about at Teva?

Page 297

1          MS. MAHONEY:  Objection.
2          MS. ZOLNER:  Objection, form.
3          THE WITNESS:  Not that I'm aware
4     of.
5          (Document marked for
6     identification as Myers Deposition
7     Exhibit No. 20.)
8     BY MR. MELAMED:
9          Q.    I'm going to hand you what's been
10    marked as Exhibit 20.
11          Exhibit 20 is an e-mail and
12    attachments.  The e-mail is from David Myers to
13    Michael Perfetto, cc'ing Jinping McCormick,
14    August 26, 2011.  The subject is "Oxymorphone
15    Promotion and chargeback results to date."
16          And then it contains what appear
17    to be two separate attachments.  The Bates range
18    is ALLERGAN_MDL_00508576 to 8579.
19          Do you recognize this e-mail and
20    the attached documents?
21          MS. MAHONEY:  8579?
22          MR. MELAMED:  I'm sorry, 8580.
23    8580 is a blank page.  Thank you for the
24    correction.

Page 298

1          THE WITNESS:  No, I do not
2     recognize the e-mail.
3     BY MR. MELAMED:
4          Q.    Do you have any reason to doubt
5     that you sent the e-mail and the documents
6     attached to it to Mr. Perfetto and Ms. McCormick
7     on or around August 26th, 2011?
8          MS. ZOLNER:  Objection, form.
9          THE WITNESS:  No.
10    BY MR. MELAMED:
11          Q.    And this e-mail and the
12    attachments concerned your work at Actavis,
13    correct?
14          MS. MAHONEY:  Objection.
15          THE WITNESS:  Yes.
16    BY MR. MELAMED:
17          Q.    They were not personal, correct?
18          MS. MAHONEY:  Objection.
19          THE WITNESS:  No.
20    BY MR. MELAMED:
21          Q.    Your e-mail states that you've
22    "attached Word document which outlines
23    promotional activities in relation to
24    oxymorphone."

Page 299

1          Do you see that?
2          A.    Yes.
3          Q.    So if you could flip to the
4     document labeled -- with the Bates number ending
5     8579.
6          Does this appear to be the Word
7     document to which you were referring?
8          A.    I believe so.
9          Q.    So we've -- this document appears
10    to mention several promotional activities that
11    we've already discussed today, such as the two
12    wave direct mail campaign, correct?
13          A.    Yes.
14          Q.    And it indicates now that that
15    two wave campaign, the first wave had been
16    completed as of August 9th, 2011.
17          Do you see that?
18          A.    Yes.
19          Q.    And the second wave was planned
20    for the week of September 6th, 2011?
21          A.    Yes.
22          Q.    And then we've also discussed
23    advertising.  Here you discuss two
24    advertisements, one that had been placed on

Page 300

1     pharmacy -- in Pharmacy Times in the August 2011
2     issue.
3          Do you see that?
4          A.    Yes.
5          Q.    And then one ad that had been
6     placed in Practical Pain Management in the
7     August 2011 issue and presumably the forthcoming
8     October 2011 issue?
9          MS. ZOLNER:  Objection, form.
10    BY MR. MELAMED:
11          Q.    Do you see that?
12          A.    Yes.
13          Q.    Do you know whether that
14    October 2011 ad was placed?
15          A.    I don't recall if it was.
16          Q.    Okay.  The next item you mention
17    is an e-mail campaign reaching a pharmacy
18    audience of 87,000 addresses.
19          Do you see that?
20          A.    Yes.
21          Q.    Where did you get those e-mail
22    addresses?
23          MS. MAHONEY:  Objection.
24          THE WITNESS:  I don't recall.

Page 301

1  BY MR. MELAMED:
2      Q.   Do you recall whether you were
3  the person responsible for acquiring those
4  e-mail addresses?
5          MS. MAHONEY:  Objection.
6          THE WITNESS:  I don't recall.
7  BY MR. MELAMED:
8      Q.   Then you include a category it
9  says "Customer Campaigns."
10         Do you see that?
11     A.   Yes.
12     Q.   Okay.  First says NC Mutual -
13  sell sheet will be distributed to their of their
14  approximately 500 pharmacy customers.
15         Do you see that?
16     A.   Yes.
17     Q.   How did that customer campaign
18  come about, if you know?
19         MS. MAHONEY:  Objection.
20         THE WITNESS:  I don't remember.
21  BY MR. MELAMED:
22     Q.   The next one is "Premier -
23  electronic sell sheet sent to each of their
24  facilities."

Page 302

1          Do you know what is meant by
2  "electronic sell sheet sent to each of their
3  facilities"?
4          MS. ZOLNER:  Objection, form.
5          THE WITNESS:  I believe it was an
6      electronic version of our approved sell
7      sheet that we sent to them and they sent
8      out to their member pharmacies.
9  BY MR. MELAMED:
10     Q.   And what is Premier?
11     A.   Premier is a group purchasing
12  organization, pharmaceutical.
13     Q.   Was it -- do you know how much --
14  let me withdraw that.
15         Do you know the approximate value
16  of their purchases from Actavis on the -- for
17  the year 2011?
18         MS. MAHONEY:  Objection.
19         THE WITNESS:  No.
20  BY MR. MELAMED:
21     Q.   What is NC Mutual?
22     A.   NC Mutual is another drug
23  distributor.
24     Q.   NC stand for North Carolina?

Page 303

1      A.   Yes.
2      Q.   The third bullet mentions
3  MedAssets?
4      A.   Yes.
5      Q.   And you describe the same
6  distribution of an electronic sell sheet to each
7  of its facility, correct?
8      A.   Yes.
9      Q.   And so the answer you provided
10  for what was meant by that in response to the
11  bullet point starting Premier also applies to
12  MedAssets; is that right?
13         MS. MAHONEY:  Objection.
14         THE WITNESS:  Yes.
15  BY MR. MELAMED:
16     Q.   The fourth bullet point mentions
17  Anda.  At this point in time Anda was owned by
18  Actavis, correct?
19     A.   I believe so.
20     Q.   And you mention telemarketing
21  promotion through Anda's call center.
22         Do you know if the telemarketing
23  promotion included a script?
24         MS. MAHONEY:  Objection.

Page 304

1          MS. ZOLNER:  Objection.
2  BY MR. MELAMED:
3      Q.   And by "script" I don't mean a
4  prescription, I mean a written script for what
5  telemarketers would say.
6          MS. ZOLNER:  Objection, form.
7          MS. MAHONEY:  Objection.
8          THE WITNESS:  I don't remember.
9  BY MR. MELAMED:
10     Q.   Do you know who oversaw that
11  telemarketing promotion through Anda's call
12  center?
13         MS. MAHONEY:  Objection.
14         THE WITNESS:  I do not, no.
15  BY MR. MELAMED:
16     Q.   It says that "Telemarketers are
17  financially incentivized to promote
18  oxymorphone."
19         Do you recall the nature of that
20  financial incentive?
21         MS. ZOLNER:  Objection.
22         MS. MAHONEY:  Objection.
23         THE WITNESS:  I do not.
24  BY MR. MELAMED:

Page 305

```
 1        Q.   Do you know who would?
 2             MS. MAHONEY:  Objection.
 3             THE WITNESS:  I do not.
 4   BY MR. MELAMED:
 5        Q.   The next bullet point concerns
 6   K-Mart.  That's -- is that a reference to the
 7   retail chain K-Mart that also has pharmacies?
 8        A.   Pharmacies, yes.
 9        Q.   The next one is to Safeway,
10   similarly, that is the grocery store that also
11   has pharmacies, correct?
12             MS. MAHONEY:  Objection.
13             THE WITNESS:  Yes.
14   BY MR. MELAMED:
15        Q.   The next bullet point is to
16   Costco, that is the big box retailer that also
17   has pharmacies; is that right?
18             MS. ZOLNER:  Object to the form.
19             THE WITNESS:  Yes.
20   BY MR. MELAMED:
21        Q.   Do you understand what I mean by
22   big box retailer?
23        A.   Yes.
24        Q.   The next bullet point mentions
```

Page 306

```
 1   Hi-School Pharmacy.
 2             Do you know what Hi-School
 3   Pharmacy is?
 4        A.   I believe that they were also a
 5   pharmaceutical distributor.
 6        Q.   Do you know did they have a
 7   geographic location?
 8             MS. MAHONEY:  Objection.
 9             THE WITNESS:  I don't remember.
10   BY MR. MELAMED:
11        Q.   HD -- what is HD Smith?
12        A.   They were a pharmaceutical
13   distributor.
14        Q.   And here it mentions for HD Smith
15   that a blast fax was sent to each account
16   announcing launch of oxymorphone.
17             Do you know who -- what team
18   was -- let me withdraw that.
19             Do you know whether that blast
20   fax was sent by HD Smith to its accounts?
21             MS. MAHONEY:  Objection.
22             THE WITNESS:  Could you -- could
23        you clarify the question.
24   BY MR. MELAMED:
```

Page 307

```
 1        Q.   Sure.  I'm trying to figure out
 2   whether Actavis sent a blast fax to each HD
 3   Smith account or whether HD Smith sent a blast
 4   fax to each of its accounts, if you know?
 5             MS. MAHONEY:  Objection.
 6             THE WITNESS:  That would not have
 7        been something that Actavis took part
 8        in.  That would be something that HD
 9        Smith would have executed.
10   BY MR. MELAMED:
11        Q.   So it's your understanding that
12   HD Smith itself sent the blast fax that's
13   referred to here?
14             MS. MAHONEY:  Objection.
15             THE WITNESS:  If it indeed
16        happened, yes.
17   BY MR. MELAMED:
18        Q.   Okay.  Do you know who provided
19   the content for it to send the blast fax?
20             MS. MAHONEY:  Objection.
21             THE WITNESS:  I don't recall.
22   BY MR. MELAMED:
23        Q.   And then there's a sub-bullet
24   point for that one says "Telemarketing team
```

Page 308

```
 1   targeting accounts that have previously ordered
 2   Opana ER."
 3             Do you know for whom that
 4   telemarketing team referenced in that sub-bullet
 5   point marked?
 6             MS. ZOLNER:  Objection.
 7             MS. MAHONEY:  Objection.
 8             THE WITNESS:  I believe it was HD
 9        Smith.
10   BY MR. MELAMED:
11        Q.   The next bullet point is
12   McKesson, says "will use telemarketer to call
13   500 independent pharmacies with highest script
14   history and provide incentives," and it
15   describes the incentives, "to pharmacies on
16   first order."
17             Do you see that?
18             MS. MAHONEY:  Objection.
19             THE WITNESS:  I do.
20             MR. LOVRIEN:  Counsel, can I just
21        ask you to move up your exhibit.
22             MR. MELAMED:  Yes.
23             MR. LOVRIEN:  Thank you.
24             MR. MELAMED:  Good?
```

Page 309

```
 1            MR. LOVRIEN:  Yeah, thank you.
 2   BY MR. MELAMED:
 3       Q.    Did Actavis incentivize McKesson
 4   to undertake the action described here?
 5            MS. MAHONEY:  Objection.
 6            THE WITNESS:  I don't know.
 7   BY MR. MELAMED:
 8       Q.    Do you know if Actavis was
 9   providing the financial incentives or -- let me
10   withdraw that.
11            Do you know if Actavis was
12   required to reimburse McKesson for the
13   incentives that are described in this bullet
14   point?
15            MS. MAHONEY:  Objection.
16            MS. ZOLNER:  Objection to form.
17            THE WITNESS:  I don't know.
18   BY MR. MELAMED:
19       Q.    The next bullet point is Rite
20   Aid, said "provided store level incentive to top
21   volume stores ($30 off first order)."
22            Do you see that?
23       A.    I do.
24       Q.    Do you know whether Actavis was
```

Page 310

```
 1   required to pay Rite Aid back for any portion of
 2   the incentives Rite Aid provided its top volume
 3   stores?
 4            MS. MAHONEY:  Objection.
 5            THE WITNESS:  I don't know.
 6   BY MR. MELAMED:
 7       Q.    The final bullet point says
 8   "Walgreens - met Walgreens marketing team,
 9   currently analyzing promotional campaign
10   options."
11            Do you see that?
12       A.    Yes.
13       Q.    Do you recall that meeting?
14            MS. MAHONEY:  Objection.
15            THE WITNESS:  Vaguely.
16   BY MR. MELAMED:
17       Q.    Do you recall that any
18   promotional campaign options as being
19   contemplated in that meeting were taken
20   regarding oxymorphone?
21       A.    I don't recall if that meeting
22   resulted in any campaigns being run through
23   Walgreens.
24       Q.    Do you know if Walgreens ever ran
```

Page 311

```
 1   any campaigns related to Actavis and
 2   oxymorphone?
 3       A.    I don't know.
 4       Q.    If you return to the e-mail at
 5   the front of the exhibit, the last sentence
 6   states, "Additionally, I have attached the
 7   chargeback results to date."
 8            Do you see that?
 9       A.    Yes.
10       Q.    What are chargebacks?
11       A.    A chargeback is a way that we
12   have of measuring sales out to -- it's
13   complicated.  Let me think about my phrasing.
14            Oftentimes when we sell a product
15   out, we sell it at wholesale acquisition cost,
16   which is a standard cost that's published.  When
17   we have subcontracts for other companies, like
18   say Walmart and Walmart went to a wholesaler and
19   bought a bottle, they would pay the contract
20   price, and we would reimburse the wholesaler the
21   difference.  They're acting mainly as an
22   intermediary between us.
23       Q.    Who would -- sorry, go ahead.
24       A.    A chargeback shows a sales out to
```

Page 312

```
 1   a subaccount.
 2       Q.    You said they acted mainly as an
 3   intermediary between us.  In that scenario that
 4   you described, who was acting as the
 5   intermediary between whom?
 6       A.    It could --
 7            MS. MAHONEY:  Objection.
 8            THE WITNESS:  It could be any
 9   wholesaler/distributor.
10   BY MR. MELAMED:
11       Q.    Any wholesaler/distributor would
12   be the intermediary?
13       A.    Possibly, yes.
14       Q.    I'm just trying to understand how
15   chargeback works -- how chargebacks work.
16            It appears you're looking at the
17   page that contains the spreadsheet titled Charge
18   Back Details since launch July 15th, 2011; is
19   that correct?
20       A.    Yes.
21       Q.    And that's -- this is in Exhibit
22   20.
23            Can you -- do you understand the
24   meaning of the information reflected on this
```

Page 313

```
 1   spreadsheet?
 2       A.   Yes, vaguely.
 3       Q.   You put the spreadsheet together;
 4   is that right?
 5           MS. MAHONEY:  Objection.
 6           THE WITNESS:  I believe so.
 7   BY MR. MELAMED:
 8       Q.   You sent it on?
 9           MS. MAHONEY:  Objection.
10           THE WITNESS:  Yes.
11   BY MR. MELAMED:
12       Q.   So looking at the spreadsheet,
13   can you describe what you mean by "CARS Prod
14   Group Dimension" in the top left?
15       A.   CARS was a system that managed
16   our contracts and chargebacks, so that's an
17   internal system.  I don't know if it's a third
18   party software.
19       Q.   And so all of the chargebacks
20   were recorded in CARS?
21       A.   I believe so.
22       Q.   And do you know how long you used
23   CARS?
24       A.   I do not.
```

Page 314

```
 1       Q.   Does Teva still use CARS?
 2           MS. ZOLNER:  Objection, form.
 3   Objection, foundation.
 4           THE WITNESS:  I don't believe so.
 5   BY MR. MELAMED:
 6       Q.   Was there a point in time at
 7   which Actavis stopped using CARS to record
 8   charge backs?
 9           MS. ZOLNER:  Objection, form.
10           THE WITNESS:  I don't recall.
11   BY MR. MELAMED:
12       Q.   So it says CARS -- below the
13   header "CARS Prod Group Dimension," it says
14   "Cars Item (2/2)."
15           Do you see that?
16       A.   Yes.
17       Q.   Do you know what that refers to?
18       A.   Yes.
19       Q.   And what is that?
20       A.   I have selected two products for
21   review.
22       Q.   So the items being referenced
23   there are the oxymorphone 15-milligram tablets
24   and the oxymorphone 7.5-milligram tablets,
```

Page 315

```
 1   correct?
 2       A.   Yes.
 3       Q.   And then the oxymorphone line
 4   below, if you go to the right, reflects the
 5   total number of chargeback units for those two
 6   items for the time period defined; is that
 7   correct?
 8       A.   Yes.
 9       Q.   And then the subsequent part of
10   the spreadsheet breaks down the chargebacks on
11   a -- what appears to be a distributor by
12   distributor basis; is that correct?
13           MS. MAHONEY:  Objection.
14           MS. ZOLNER:  Objection, form.
15           THE WITNESS:  It appears that
16   way.
17   BY MR. MELAMED:
18       Q.   So Walmart here is listed as
19   having 284 chargeback units; is that correct?
20       A.   Yes.
21       Q.   And so -- and this is for the
22   period July 15th to August 19th, 2011, right?
23       A.   Yes.
24       Q.   What is the effective Walmart --
```

Page 316

```
 1   let me withdraw that.
 2           Does that mean Actavis is making
 3   a payment to Walmart for 284 different sales
 4   that Walmart made of Actavis oxymorphone?
 5       A.   Could you repeat that.
 6       Q.   Sure.  Does that mean that
 7   Actavis is paying Walmart to make up the
 8   difference between the wholesale price and a
 9   different price for 284 transactions in which
10   Walmart took part?
11           MS. MAHONEY:  Objection.
12           THE WITNESS:  No.
13   BY MR. MELAMED:
14       Q.   Can you explain to me what that
15   means, what does the 284 next to Walmart mean?
16       A.   Yes.  The 284 units mean that
17   Walmart had purchased 284 units from one of the
18   four wholesalers listed below, at the bottom of
19   the form where it says CARS wholesale group.
20       Q.   And what was the effect on
21   Actavis of Walmart having purchased 284 units
22   from one of the four wholesalers listed in the
23   CARS wholesaler group?
24           MS. MAHONEY:  Objection.
```

Page 317

1     THE WITNESS:  We would reimburse
2  whoever they purchased those units from
3  for the difference between their
4  contract price and the price that they
5  paid.
6  BY MR. MELAMED:
7     Q.   That's helpful.  I just want to
8  understand a few words you used in that
9  sentence.  You said we would reimburse whoever
10  they purchased those units from, that "they" is
11  referencing Walmart in this example, correct?
12     A.   Yes.
13     Q.   Okay.  So we would reimburse
14  whoever Walmart purchased those 284 units from
15  for the difference between their contract price
16  and the price that they paid.
17        Whose contract price?
18     A.   Walmart's.
19     Q.   And the price that who paid?
20     A.   The wholesaler that they
21  purchased it from.
22     Q.   Okay.  So just to make sure I
23  have this clear, and please correct me if it's
24  wrong, Actavis would reimburse whoever Walmart

Page 318

1  purchased the 284 units from for the difference
2  between Walmart's contract price and the price
3  that the wholesaler paid for those drugs?
4     MS. MAHONEY:  Objection.
5     THE WITNESS:  Yes.
6  BY MR. MELAMED:
7     Q.   And in order to receive these
8  reimbursement payments, were the wholesalers
9  required to provide Actavis the specific
10  information about who purchased the units for
11  which the wholesalers were seeking chargeback
12  payments?
13     A.   I believe so.
14        (Document marked for
15        identification as Myers Deposition
16        Exhibit No. 21.)
17  BY MR. MELAMED:
18     Q.   Handing you what's been marked
19  Exhibit 21.
20        Exhibit 21 is an e-mail from
21  David Myers to a group of recipients on
22  September 27th, 2011, subject, "Oxymorphone
23  Promotion at McKesson."
24        Do you recognize this document?

Page 319

1     A.   No, I do not.
2     Q.   Do you have any reason to
3  believe -- let me rephrase that.
4        Do you have any reason to doubt
5  that you sent this document?
6     A.   No, I do not.
7     Q.   This document related to your
8  work at Actavis, correct?
9     A.   Yes.
10     Q.   Do you recall what is referred --
11  what you referred to here as "a two-part
12  oxymorphone marketing program with McKesson Drug
13  Company"?
14     A.   Let me read the document, so I
15  can understand the context.
16     Q.   Sure.
17     A.   (Witness reviews document.)
18        MR. LOVRIEN:  While he's doing
19  that, maybe I missed it, but can we get
20  a Bates number for the record.
21        MR. MELAMED:  Sure.  I may not
22  have said it.  For the record, the Bates
23  number for Exhibit 21 is
24  ACTAVIS06220892090.

Page 320

1  BY MR. MELAMED:
2     Q.   Do you recall the two-part
3  oxymorphone marketing program with McKesson that
4  is referenced in this e-mail?
5     MS. MAHONEY:  Objection.
6     THE WITNESS:  I do not.
7  BY MR. MELAMED:
8     Q.   Do you understand what's meant in
9  the online bullet point by "a two-week
10  advertising campaign on McKesson Connect"?
11     A.   I believe so.
12     Q.   And what's your understanding of
13  that?
14     A.   I believe that McKesson has an
15  ordering portal for their customers, their
16  pharmacy customers, and you can put banner ads
17  on that to highlight your product.
18     Q.   Do you recall whether Actavis
19  paid to place those banner ads on McKesson's
20  ordering portal?
21     A.   I do not recall.
22     Q.   There's a second bullet point
23  that says "Phone Awareness Campaign."  It says
24  "McKesson's team of dedicated generics

Page 321

1    specialists, GenericsConnect, will be contacting
2    a targeted pool of 200 retail independent
3    pharmacies with significant Opana ER brand sales
4    beginning the week of September 26th."
5        And it continues, "each
6    GenericsConnect specialist has a regular series
7    of ongoing conversations with the same customer
8    base, and promotional awareness of Actavis'
9    oxymorphone is being incorporated into their
10   outbound messaging during this campaign period."
11       Do you see that?
12       A.   Yes.
13       Q.   Do you recall whether Actavis
14   compensated McKesson for the phone awareness
15   campaign described in the second bullet point?
16       MS. MAHONEY:  Objection.
17       MS. ZOLNER:  Objection to form.
18       THE WITNESS:  I do not know.
19   BY MR. MELAMED:
20       Q.   You don't know whether they paid
21   either way?
22       MS. MAHONEY:  Objection.
23       THE WITNESS:  I do not know.
24   BY MR. MELAMED:

Page 322

1        Q.   Do you recall having discussions
2    with anyone from McKesson about either of these
3    marketing programs?
4        MS. MAHONEY:  Objection.
5        MS. ZOLNER:  Objection, form.
6        THE WITNESS:  I do not recall.
7    BY MR. MELAMED:
8        Q.   Did you regularly have
9    discussions with McKesson about marketing
10   Actavis' generic drugs?
11       A.   No.
12       Q.   Other than this instance, do you
13   recall any other instance where McKesson ran a
14   marketing program on behalf of an Actavis drug?
15       MS. MAHONEY:  Objection.
16       MS. ZOLNER:  Objection, form.
17       THE WITNESS:  It's possible.
18   BY MR. MELAMED:
19       Q.   Do you recall any, as you sit
20   here today?
21       A.   Not specifically.
22       (Document marked for
23   identification as Myers Deposition
24   Exhibit No. 22.)

Page 323

1    BY MR. MELAMED:
2        Q.   Handing you what's been marked
3    Exhibit 22.
4        Exhibit 22 is an e-mail and
5    attachment thereto from David Myers to Dorothy
6    McEntee and several others cc'd, October 5th,
7    2011, subject, forward, "Fentanyl Ad."  It
8    starts at Bates number ACTAVIS0343310 and
9    continues to 3321.
10       Do you recall this document?
11       A.   I do not.
12       Q.   Do you have any reason to believe
13   that you did not send the e-mail and attachments
14   thereto?
15       MS. ZOLNER:  Objection, form.
16       MS. MAHONEY:  Objection.
17       THE WITNESS:  No.
18   BY MR. MELAMED:
19       Q.   Do you have any reason to believe
20   you didn't send this e-mail?
21       MS. MAHONEY:  Objection.
22       THE WITNESS:  No.
23   BY MR. MELAMED:
24       Q.   Do you have any reason to believe

Page 324

1    you didn't circulate these attachments?
2        A.   No.
3        Q.   These communications concern your
4    work, your job responsibilities at Actavis,
5    correct?
6        MS. ZOLNER:  Objection, form.
7        MS. MAHONEY:  Objection.
8        THE WITNESS:  Yes.
9    BY MR. MELAMED:
10       Q.   And what I mean when I say that
11   is they were undertaken as part of your job
12   responsibilities; do you understand that?
13       A.   Yes.
14       Q.   Okay.  The e-mail concerns or
15   mentions that Actavis is planning to once again
16   advertise fentanyl in 2012.
17       Do you see that?
18       MS. MAHONEY:  Objection.
19       MS. ZOLNER:  Object to form.
20       THE WITNESS:  I do see it.
21   BY MR. MELAMED:
22       Q.   And there are a series of
23   asterisks following a sentence that says, "Can
24   you please make the following changes to the

Page 325

1    advertisement."
2          Do you see that?
3       A.    Yes.
4       Q.    The final change says, change
5    more than 8 million patches sold long to be more
6    than 20 million patches -- more than 20 million.
7          Do you see that?
8       A.    I do.
9       Q.    Is that because by October 5th,
10   2011, Actavis had sold more than 20 million
11   fentanyl patches?
12      A.    I believe that would be the case.
13         (Document marked for
14         identification as Myers Deposition
15         Exhibit No. 23.)
16   BY MR. MELAMED:
17      Q.    Handing you what's been marked
18   Exhibit 23.
19         Exhibit 23 is e-mail string and
20   attachment, e-mail most recent in time is from
21   Heather Alonso to David Myers, cc'ing Joanne
22   Terzides sent January 18th, 2012, begins at
23   ACTAVIS0618579 and continues through 8584.
24         Do you recognize this document?

Page 326

1       A.    No, I do not.
2       Q.    Do you have any reason to believe
3    you did not send the e-mails that say they are
4    from David Myers in the string of e-mails
5    reflected here?
6       A.    I do not.
7       Q.    Do you have any reason to believe
8    you did not receive the e-mails that were sent
9    to David Myers reflected in this string?
10      A.    I do not.
11      Q.    And these -- the content of these
12   e-mails concerned your responsibility as an
13   employee of Actavis; is that correct?
14         MS. MAHONEY:  Objection.
15         THE WITNESS:  Yes, yes.
16   BY MR. MELAMED:
17      Q.    I want to turn your attention to
18   an e-mail you sent to Heather Alonso on
19   January 17th, which is on the second page, Bates
20   number ending 8580.  And the subject here is
21   "RE: Oxymorphone mailings."  And you write, "In
22   discussing this production with my director, we
23   were thinking of going in a somewhat different
24   direction.  We were thinking of shortening the

Page 327

1    mailing list to the top 6,000 doctors (we
2    provide the list), but doing three waves instead
3    of two.  Can you please provide another quote
4    for a 3-wave mailing program with 6,000 names in
5    each wave?"
6          Do you see that?
7       A.    I do.
8       Q.    Do you recall discussing this
9    three-wave mailing to the top 6,000 doctors?
10      A.    No.
11      Q.    Based on earlier document --
12   earlier documents we looked at or discussions,
13   we talked about a two-wave mailing campaign to
14   the top 10,000 prescribers of Opana ER.
15         Do you recall that?
16      A.    Yes.
17      Q.    This e-mail is dated subsequent
18   to the completion of that two-wave campaign to
19   the top 10,000 Opana prescribers; is that
20   correct?
21      A.    Forgetting the date of launch was
22   July 2011?
23      Q.    If you look back at Exhibit --
24   I'm sorry I don't have the number -- 20 and the

Page 328

1    page with the Bates stamp ending 8579, and the
2    first section with "Direct Mail" says "Two wave
3    direct mail campaign to the top 10,000
4    prescribing doctors."  The first wave was mailed
5    August 9th, 2011.  The second wave will be
6    mailed week of September 6, 2011.
7          Do you see that?
8       A.    Yes.
9       Q.    Now, returning to Exhibit 23,
10   this is now a January 17th, 2012 conversation
11   about a three-wave mailing to the top 6,000
12   doctors concerning oxymorphone; is that correct?
13         MS. MAHONEY:  Objection.
14         THE WITNESS:  This confuses me,
15   so I need to read the whole document.
16   BY MR. MELAMED:
17      Q.    The entirety of the --
18      A.    I need to understand the context
19   of the conversation at the time.
20      Q.    Okay.
21      A.    (Witness reviews document.)
22         Okay.
23      Q.    So returning to the January 17th,
24   2012 e-mail from you to Heather Alonso, cc'ing

Page 329

1 Joanne Terzides at the bottom of the page with
2 the Bates stamped -- with the Bates stamp ending
3 8580, subject "RE: Oxymorphone mailings." This
4 is discussing a mailing campaign separate from
5 the two-wave mailing campaign to the top 10,000
6 prescribers of Opana, correct?
7     A.   Yes.
8     Q.   That e-mailing campaign, the
9 two-wave campaign to the top 10,000 Opana
10 prescribers had already been completed by the
11 date -- by January 17th, 2012, right?
12     A.   I believe so.
13     Q.   And so this was -- you were
14 asking for a quote for a three-wave campaign to
15 the top 6,000 doctors, again concerning
16 oxymorphone; is that correct?
17     A.   Yes, that appears what I'm
18 asking.
19     Q.   Do you know what the top -- the
20 top 6,000 doctors refers to, meaning top 6,000
21 doctors at what?
22         MS. MAHONEY:  Objection.
23         THE WITNESS:  I believe it to
24 mean the top 6,000 doctors off of the

Page 330

1 previous list that was entered into
2 evidence.
3 BY MR. MELAMED:
4     Q.   Do you know whether this mailing
5 campaign being discussed on January 17th, 2012
6 ever took place?
7     A.   I don't believe that it did.
8     Q.   Do you understand why -- or why
9 don't you believe that it did?
10     A.   Because I would probably remember
11 it and I don't.
12     Q.   Okay.  You can put that aside.
13         (Document marked for
14 identification as Myers Deposition
15 Exhibit No. 24.)
16 BY MR. MELAMED:
17     Q.   Handing you what's been marked
18 Myers Exhibit 24, which is an e-mail and an
19 attachment.  The e-mail is from David Myers to a
20 list of recipients.  Subject is "Oxymorphone
21 Prescription/Sales Trend" starts at
22 ALLERGAN_MDL_00291742 and ends on 1744.  There
23 are subsequent documents to that which appear to
24 be the natives referenced on 1744.

Page 331

1         Do you recognize this document?
2     A.   No, I do not.
3         MS. MAHONEY:  One second.  I just
4 want to clarify for the record how many
5 pages there --
6         Ten pages of --
7         MR. MELAMED:  Non-Bates numbered
8 spreadsheets; is that correct?
9         MS. MAHONEY:  Yes, that were
10 produced as native.  Thank you.
11 Confirmed.
12 BY MR. MELAMED:
13     Q.   Do you have any reason to believe
14 you did not send this e-mail?
15     A.   I do not.
16     Q.   Do you have any reason to believe
17 that you did not circulate the documents that
18 appear to be the spreadsheets produced as
19 natives?
20     A.   I do not.
21     Q.   And the content of the e-mail --
22 I'm sorry, the content of these communications
23 concerned your responsibilities you held at
24 Actavis, correct?

Page 332

1         MS. ZOLNER:  Objection, form.
2         MS. MAHONEY:  Objection.
3         THE WITNESS:  Yes.
4 BY MR. MELAMED:
5     Q.   These were not personal e-mails
6 or communications?
7     A.   No.
8     Q.   You referenced earlier that you
9 remember doing some reports on the success of
10 the introduction of oxymorphone.
11         Do you recall testifying about
12 that?
13     A.   Yes.
14     Q.   And by success on the
15 introduction by Actavis of oxymorphone, correct?
16     A.   Yes.
17     Q.   Is this the type of document to
18 which you were referring when you testified to
19 that effect earlier?
20         MS. MAHONEY:  Objection.
21         THE WITNESS:  Yes.
22 BY MR. MELAMED:
23     Q.   And the highlights on the e-mail
24 reference that prescriptions have reached 50% of

Page 333

1  where they were prior to the discontinuation of
2  Opana ER 7.5-milligram and 15-milligram.
3        Do you see that?
4        A.    Yes.
5        Q.    And that there was also a 37.2%
6  jump in prescriptions in February, correct?
7        A.    Yes.
8        Q.    And you say, "this is most likely
9  due to a couple of factors," and the first
10  factor you list is "Continued promotion by
11  Actavis (direct e-mail/e-mail programs); and the
12  help of the Kadian sales team promoting
13  awareness among physicians."
14        Do you see that?
15        A.    I do.
16        Q.    Did you believe that to be true
17  when you wrote -- when you wrote this statement?
18        A.    I believe it was a contributing
19  factor.
20        Q.    Have you come to believe that
21  that is not true for any reason since?
22        A.    No.
23        Q.    If you could turn to the
24  spreadsheets, and I'll put the spreadsheets up

Page 334

1  on the screen and try to describe them for the
2  record.  The first one contains a bar chart at
3  the top.  The header says Oxymorphone
4  Prescription Sales Through February -- Feb 2012,
5  and the chart says "Oxymorphone Sales Trend."
6  There are red bars that state total sum of TRx
7  quantify.
8        Can you tell me what TRx quantity
9  stands for?
10        A.    Total prescriptions.
11        Q.    So that is number of
12  prescriptions written for these drugs; is that
13  correct?
14        A.    Yes.
15        Q.    Okay.  The orange says "CARS Prod
16  - chargeback units."
17        A.    Yes.
18        Q.    Can you tell me what that stands
19  for?
20        A.    That has to do with units
21  actually being sold out to pharmacies and stores
22  that have pharmacies.
23        Q.    And Actavis had access to
24  information about which specific pharmacies

Page 335

1  those units were sold out to; is that correct?
2        MS. MAHONEY:  Objection.
3        THE WITNESS:  I don't believe so.
4  BY MR. MELAMED:
5        Q.    We discussed earlier when we were
6  looking at the document concerning chargebacks,
7  and if I understood incorrectly, let me know,
8  but my understanding was that you testified you
9  believed Actavis -- in order to make a
10  chargeback payment to a wholesaler, Actavis had
11  to know who that wholesaler had sold Actavis'
12  drugs to?  Can you clarify that testimony to the
13  extent I've misstated it?
14        MS. MAHONEY:  Objection.
15        THE WITNESS:  Yes, sir.  You
16  asked -- you stated the question that
17  due to the chargebacks, Actavis would
18  know which pharmacy it was sold out to,
19  and that's not exactly how that works.
20        We know the pharmacy system.  We
21  know that we sold a unit to Walmart.  We
22  don't know that we sold a unit to
23  Walmart on Lakeshore Boulevard in
24  Euclid, Ohio.

Page 336

1  BY MR. MELAMED:
2        Q.    Understood.
3        A.    So it was --
4        Q.    So you understand one level up
5  from the individual pharmacy; is that correct?
6        A.    Yes.
7        MS. ZOLNER:  Objection, form.
8        THE WITNESS:  From what I
9  understand.  This is not my area of
10  expertise.
11  BY MR. MELAMED:
12        Q.    Whose area of expertise was this
13  at this time?
14        MS. ZOLNER:  Objection,
15  foundation.
16        MS. MAHONEY:  Objection.
17        THE WITNESS:  I don't know.
18  BY MR. MELAMED:
19        Q.    If you were looking to ask
20  somebody about chargebacks, details about
21  chargebacks at Actavis concerning oxymorphone in
22  or around the beginning of 2012, who would you
23  ask?
24        MS. MAHONEY:  Objection.

Page 337

1        MS. ZOLNER: Objection,
2    foundation.
3        THE WITNESS: I don't remember.
4    BY MR. MELAMED:
5        Q.    If you look at the next page,
6    which has a small chart, top left of which has
7    "Strength" and then "Manufacturer," then "Data"
8    and then there's a "Month" row at the top.  Do
9    you see where Endo Pharm, Inc. is listed as a
10   manufacturer?
11       A.    I do.
12       Q.    And do you see that there is a
13   row for Endo Pharm, Inc. that says in the
14   15-milligram section "Sum of TRx Count"?
15       A.    Yes.
16       Q.    And that there's another row that
17   says Sum of TRx quantity?
18       A.    Yes.
19       Q.    So does sum of TRx quantity mean
20   the same thing on this page that it did on the
21   chart, on the prior page?
22       A.    Yes, I believe so.
23       Q.    Okay.  That's the total number of
24   prescriptions written for Endo Pharmaceutical,

Page 338

1    Incorporated's 15-milligram oxymorphone in
2    the -- over time; is that correct?
3        MS. MAHONEY:  Objection.
4        THE WITNESS:  One moment, please.
5    I'm a little confused by how I pulled
6    this, but, I'm sorry, could you please
7    restate your question.
8    BY MR. MELAMED:
9        Q.    What do you understand sum of TRx
10   quantity for Endo Pharmaceuticals, Inc.,
11   15 milligrams to mean on the chart we were
12   looking at?
13       A.    On the chart we're looking at
14   currently --
15       Q.    Yes.
16       A.    -- I believe it to mean this was
17   the amount of prescriptions that they were
18   selling when they were activity selling this
19   strength.
20       Q.    Okay.  And what do you understand
21   sum of TRx count to mean for Endo Pharm, Inc.,
22   15-milligram strength?
23       A.    I'm not sure of the difference
24   between count and quantity.  I believe it may

Page 339

1    mean the difference between -- quantity may mean
2    extended units and count may be a bottle, but
3    I'm not sure.
4        Q.    Do you believe the meanings of
5    those terms, TRx quantity and TRx count are
6    consistent as used on this chart alone?
7        MS. MAHONEY:  Objection.
8        MS. ZOLNER:  Objection, form.
9    Objection, foundation.
10       THE WITNESS:  Can you explain.
11   BY MR. MELAMED:
12       Q.    Sure.
13       Does sum of TRx count next to
14   Actavis Elizabeth under 15-milligram strength
15   mean the same thing as sum of TRx count next to
16   Endo Pharm, Inc. for 15 milligrams?
17       MS. ZOLNER:  Objection, form.
18   Objection, foundation.
19       THE WITNESS:  I believe so.  I
20   was comparing what they had been selling
21   to what we were selling.
22   BY MR. MELAMED:
23       Q.    And to use a colloquialism,
24   that's an apple-to-apples comparison, correct?

Page 340

1        MS. MAHONEY:  Objection.
2        THE WITNESS:  Yes.
3    BY MR. MELAMED:
4        Q.    You're comparing the same type of
5    information?
6        MS. ZOLNER:  Objection.
7        MS. MAHONEY:  Objection.
8        THE WITNESS:  Like speaks to
9    like.
10   BY MR. MELAMED:
11       Q.    Where did you get the information
12   about Endo Pharmaceuticals that is in this
13   chart?
14       A.    At the time I would assume that
15   it was Wolters Kluwer.
16       Q.    What information was available to
17   you about other company's products through
18   Wolters Kluwer?
19       A.    I don't remember the entire range
20   of the data that was available to me.
21       Q.    But one of the types of data you
22   do recall being available was information about
23   prescriptions of Endo's Opana at 15 milligrams
24   and 7.5 milligrams; is that correct?

Page 341

1    A.   Yes, yes.
2    Q.   Turn the page, I just want to
3  look at the first page of the remainder of the
4  spreadsheet, and just so -- for the record, so
5  it's clear, it says "Oxycodone IR" at the top,
6  Form, Product, Strength, Manufacturer, Month,
7  Metrics, NRx count, NRx quantity, TRx count, TRx
8  quantity, TRx dollars.  The remaining pages have
9  the same columns but do not have the same
10 headers as a manner of identifying.
11   A.   Yeah.
12   Q.   Do you understand where this
13 information came from?
14   A.   I don't recall.
15   Q.   Okay.  Do you understand what
16 "Form" means?
17   A.   I assume that to be dosage form.
18   Q.   And so there are dosage forms in
19 this spreadsheet that are tablet and then dosage
20 forms that are sustained-release tablet; is that
21 correct?
22   A.   Yes.
23   Q.   Okay.  "Product," what do you
24 understand Product to mean?

Page 342

1    A.   Either the brand product name or
2  the molecule, if it's generic.
3    Q.   Is it your understanding that the
4  generic molecule rows here which appear at the
5  beginning of this spreadsheet are Actavis
6  oxymorphone hydrochloride tablets?
7    A.   Could you repeat.
8         MS. MAHONEY:  Objection.
9  BY MR. MELAMED:
10   Q.   Is it your understanding that
11 the -- where it says "Product" and it lists
12 "oxymorphone HCL" --
13   A.   Yes.
14   Q.   -- is it your understanding that
15 that -- those rows reflect oxymorphone
16 manufactured and sold by Actavis?
17        MS. MAHONEY:  Objection.
18        THE WITNESS:  No.
19 BY MR. MELAMED:
20   Q.   What is your understanding of
21 what that reflects?
22   A.   My understanding by looking at
23 this chart is that is oxymorphone that is sold
24 by Qualitest, Roxane or Qualitest and Roxane in

Page 343

1  different strengths, and those are tablets, not
2  sustained-release tablets.
3    Q.   So you were referring to the
4  manufacturer --
5    A.   Yes.
6    Q.   -- column, correct?
7    A.   Yes.
8    Q.   And so Qualitest is a
9  manufacturer separate from Actavis, correct?
10   A.   Yes.
11   Q.   And Roxane is a manufacturer
12 separate from Actavis; is that correct?
13   A.   Yes.
14   Q.   And if you turn to the next page,
15 there is a manufacturer called Repacker MFG.
16        Do you see the references to
17 Repacker?
18   A.   Yes.
19   Q.   Repacker MFG is a company
20 separate from Actavis; is that right?
21        MS. ZOLNER:  Objection to form.
22        THE WITNESS:  They're an entity
23 or entities separate from Actavis.
24 BY MR. MELAMED:

Page 344

1    Q.   That's not -- that doesn't
2  reflect Actavis oxymorphone; is that right?
3        MS. ZOLNER:  Objection to form.
4        THE WITNESS:  Yes.
5  BY MR. MELAMED:
6    Q.   If you turn to the last page of
7  the spreadsheet, you'll see there is reference
8  in the bottom approximately ten rows to the
9  manufacturer being Actavis Elizabeth?
10   A.   Yes.
11   Q.   Do you understand that to be
12 short for Actavis Elizabeth?
13   A.   Yes.
14   Q.   Do you understand those to be --
15 reflect oxymorphone sold by Actavis?
16   A.   Yes.
17   Q.   And you don't recall where you
18 got this information?
19   A.   It appears that it might be from
20 Wolters Kluwer, but I don't recall the layout.
21   Q.   Can you think of any other source
22 from which you would have gotten this
23 information, other than Wolters Kluwer?
24        MS. MAHONEY:  Objection.

Page 345

1      THE WITNESS:  No, that's why I'm
2  basing my previous comment that it
3  appears to be Wolters Kluwer, because I
4  don't have any other place where I could
5  have gotten this.  No other place comes
6  to mind.
7      (Document marked for
8  identification as Myers Deposition
9  Exhibit No. 25.)
10      MR. MELAMED:  Sorry for the
11  placement of the sticker, handing you
12  Exhibit 25, just didn't want to block
13  off anything on the document.
14      MS. MAHONEY:  Seems appropriate
15  to me.
16  BY MR. MELAMED:
17      Q.    Exhibit 25 is an e-mail from
18  David Myers to Gerard Farrell and Brenda Vesey
19  dated June 13th, 2012, subject, forward, "Diana
20  Award" and it has attachments.  The document has
21  Bates numbers or the Bates range
22  ACTAVIS_MDL_00507938 to 944.
23      Do you recognize this document?
24      A.    No.

Page 346

1      Q.    Do you have any reason to doubt
2  that you sent the e-mails -- there are two
3  e-mails, I'll represent to you on this page,
4  that say they came from you to Gerard Farrell
5  and Brenda Vesey?
6      A.    Yes.
7      Q.    I'm sorry.
8      A.    I'm sorry.
9      Q.    Do you have any reason to doubt
10  that you sent these e-mails?
11      A.    Sorry, no.
12      Q.    Do you have any reason to doubt
13  that you sent the attachments to these e-mails
14  to those two individuals?
15      A.    No.
16      Q.    We talked at the very beginning
17  of your deposition about a Diana award you won
18  from the HGMA, correct?
19      A.    Yes.
20      Q.    If you turn to the page ending in
21  940, was this a submission -- let me rephrase
22  that.
23      Was this part of the submission
24  that you provided in support of your candidacy

Page 347

1  for the Diana award?
2      A.    I believe it is.
3      Q.    Did you win any money for winning
4  the Diana award?
5      A.    No, we did not.
6      Q.    Neither you individually, nor the
7  company, correct?
8      MS. MAHONEY:  Objection.
9      THE WITNESS:  Yes, neither me
10  individually, nor the company.
11      MR. MELAMED:  You can put that
12  aside.
13      (Document marked for
14  identification as Myers Deposition
15  Exhibit No. 26.)
16  BY MR. MELAMED:
17      Q.    I'm going to hand you what's been
18  marked Myers Exhibit 26.
19      Myers Exhibit 26 is an e-mail and
20  a number of attachments.  E-mail is from David
21  Myers to a number of recipients, sent
22  February 25th, 2013, subject, "Buprenorphine
23  Naloxone Pre-launch Documents."  The Bates range
24  is Acquired_Actavis_02048142.  And, again, this

Page 348

1  include what appear to be native documents, so
2  the end Bates number is 193.  The not Bates
3  stamped documents at the end are HDMA Standard
4  Pharmaceutical Product Information and the form
5  and the instructions thereto.
6      Do you recall efforts to launch
7  generic version of buprenorphine Naloxone when
8  you were employed at Watson?
9      A.    Vaguely.
10      Q.    Do you recall whether this drug
11  ever did launch?
12      A.    Yes, it did launch.
13      Q.    And does this -- to the best of
14  your recollection, does this document reflect
15  the pre-launch documents you provided the team
16  in advance of the launch?
17      MS. MAHONEY:  Objection.
18      THE WITNESS:  I believe so.
19  BY MR. MELAMED:
20      Q.    Do you know the indication for
21  buprenorphine Naloxone?
22      MS. ZOLNER:  Objection, form.
23      THE WITNESS:  I believe that it
24  is treatment of opioid dependence.

Page 349

BY MR. MELAMED:
Q.   If you look at page ending 146.
MS. MAHONEY:  Need to pause for a minute.  Do we know whether there is anybody on the telephone that is a representative from one of the companies as opposed to one of the outside lawyers?  This is a document marked highly confidential.
MR. MELAMED:  Fair enough.  Is there anybody on the phone who is -- who is employed by one of the companies and not their outside counsel?
MS. MAHONEY:  Okay.  Hearing silence, we'll proceed.  I understand that somebody is maintaining attendance lists for people who attend these on the phone.  We will reserve our rights to address this issue if it turns out that somebody is improperly attending this part of the deposition.
MR. MELAMED:  Fair enough.  And just to make clear, it is not my intent to throw down a highly confidential

Page 350

document without doing that.  Thank you for asking.
BY MR. MELAMED:
Q.   Do you see the promotional -- on the page ending 146, there's a Promotional Plan?
A.   Yes.
Q.   Did you put together this promotional plan?
A.   I believe I typed up the document.
Q.   Okay.  And when you're talking about achieving market share of 50%, can you describe what you mean?
A.   Prior to a generic drug's launch, we would look at the total market for brand sales.  We would make an assumption of the number of participants, competitors in the market, and we would assume -- we would set a target for share based on the number of competitors and other market factors.
Q.   Okay.  And the target share, market share of 50% there is targeting 50% of the total US market for these specific strengths outlined on this page of the combination

Page 351

buprenorphine Naloxone; is that correct?
MS. MAHONEY:  Objection.
THE WITNESS:  No.
BY MR. MELAMED:
Q.   Please explain what it is.
MS. MAHONEY:  Objection.
THE WITNESS:  It is to achieve 50% of whatever the total market share for the United States goes generic.  It would be 50% of generic products filled, not 50% of generic plus brand.
BY MR. MELAMED:
Q.   Understood.  Do you recall whether you undertook any marketing, and by "you" here I mean anyone at Watson; do you recall?
MS. ZOLNER:  Objection.
BY MR. MELAMED:
Q.   Whether Watson undertook any marketing of the combination buprenorphine Naloxone?
MS. ZOLNER:  Objection, foundation.
THE WITNESS:  Could you define

Page 352

marketing?
BY MR. MELAMED:
Q.   Do you recall whether Watson placed any advertisements in periodicals for buprenorphine Naloxone?
A.   I don't recall.
Q.   Do you recall whether there was a direct mailing campaign by Watson to any doctors concerning the launch of buprenorphine Naloxone?
A.   I don't recall.
Q.   Do you recall whether there were any promotional activities undertaken by distributors of Actavis' -- availability of Actavis' buprenorphine Naloxone?
MS. MAHONEY:  Objection.
THE WITNESS:  I don't recall.
BY MR. MELAMED:
Q.   If you look at the bullets point on page 4 of this page at 8146 it says "Initial Target market to include" and then it lists an initial target market.
Do you see that?
A.   Yes.
MS. MAHONEY:  Objection.

Page 353

1    THE WITNESS:  Yes.
2  BY MR. MELAMED:
3    Q.   Do you recall whether Watson did
4  anything to reach out to any of the entities
5  listed in the initial target market?
6    MS. MAHONEY:  Objection.
7    MS. ZOLNER:  Objection, form.
8    Objection, foundation.
9    THE WITNESS:  We would have
10   reached out to our salesmen to contact
11   their customers and announce the
12   availability of the product and gather
13   whether they would be interested in
14   purchasing from us.
15  BY MR. MELAMED:
16   Q.   Would you -- would Watson have
17  undertaken the same activities with respect to
18  what are referred to in the second bullet point
19  as "other targets"?
20   MS. ZOLNER:  Objection, form.
21   MS. MAHONEY:  Objection.
22   MS. ZOLNER:  Objection,
23   foundation.
24   THE WITNESS:  They may.

Page 354

1  BY MR. MELAMED:
2    Q.   And just to be clear, my
3  questions and your answers here concern
4  buprenorphine Naloxone, correct?
5    A.   Yes.
6    Q.   I'm sorry if I left that off.
7  And the third bullet point says, "Offer letters
8  for the initial target customers will be sent by
9  marketing/pricing."
10   Do you see that?
11   A.   Yes.
12   Q.   Do you recall whether such offer
13  letters were sent?
14   A.   I believe they were.
15   Q.   Do you know who sent them?
16   A.   I believe it was me.
17   Q.   Do you know how many of them you
18  sent?
19   A.   I don't recall.
20   Q.   Do you recall how many --
21  approximately how many initial target customers
22  were included in that fourth bullet point?
23   A.   I don't recall.
24   Q.   Do you recall whether it was

Page 355

1  fewer than 100?
2    A.   It was most definitely fewer than
3  100.
4    Q.   So the target customers there
5  we're talking about national chains, small
6  chains, nonwarehousing chains, large
7  wholesalers, regional wholesalers, distributors,
8  GPOs, for instance?
9    MS. ZOLNER:  Objection to form.
10   MS. MAHONEY:  Objection.
11   THE WITNESS:  Yes, possibly.
12  BY MR. MELAMED:
13   Q.   Okay.  Do you recall what the --
14  whether there was an incentive in the offer
15  letter provided by Watson to the initial target
16  customers?
17   A.   Could you define "incentive"?
18   Q.   Sure, any discounts.
19   MS. MAHONEY:  Objection.
20   THE WITNESS:  No, I don't believe
21   that was standard form for our price --
22   our offer letters.  We made an offer and
23   proposed a price.
24  BY MR. MELAMED:

Page 356

1    Q.   Do you recall any negotiations
2  about pricing with any -- concerning
3  buprenorphine Naloxone?
4    A.   Negotiations happen as a course
5  of business, but I am not part of those
6  negotiations.
7    MR. MELAMED:  Let's go off the
8    record, please.
9    THE VIDEOGRAPHER:  The time is
10   4:23 p.m.  We're going off the record.
11   (Brief recess.)
12   THE VIDEOGRAPHER:  The time is
13   4:43 p.m., and we're back on the record.
14  BY MR. KIEFFER:
15   Q.   Good afternoon, Mr. Myers.
16   A.   Good afternoon.
17   Q.   My name is John Kieffer.  I'm
18  going to ask you a few questions.  I'm going to
19  go as quickly as I can to try to get you out of
20  here.  If I talk too fast, you stop me and let
21  me know, and I'll try to slow down, okay?
22   A.   Understood, thank you.
23   Q.   You understand you're still under
24  oath?

Page 357

1      A.    I do.
2      Q.    You understand that is the same
3  oath that you will take if you end up testifying
4  as a witness at the trial of this case?
5      A.    I do.
6      Q.    I assume you're here today
7  voluntarily, meaning nobody served you with a
8  subpoena compelling your attendance?
9      A.    No, I don't --
10          MS. MAHONEY:  Objection.
11          THE WITNESS:  I don't believe so.
12  BY MR. KIEFFER:
13      Q.    I'm assuming your employer or
14  somebody, their attorneys told you your
15  deposition had been requested and asked that you
16  come today?
17      A.    Yes, I believe so.
18      Q.    And you complied?
19      A.    Yes.
20      Q.    That's why we're all here, right?
21      A.    Yes.
22      Q.    Okay.  The trial of this case is
23  set in Cleveland, Ohio.  Can I assume that if
24  your employer or somebody on their behalf, like

Page 358

1  their attorneys asks you to appear live to
2  testify before the jury at trial, that you will
3  comply with that request, just as you've
4  complied with the request to come and testify
5  today?
6          MS. ZOLNER:  Objection.
7          MS. MAHONEY:  Objection.
8          THE WITNESS:  I believe so, yes.
9  BY MR. KIEFFER:
10      Q.    Okay.  And the reason I ask that
11  you're aware your testimony is being videotaped
12  today?
13      A.    Yes.
14      Q.    Okay.  If a jury has to watch a
15  videotape of your testimony, instead of having
16  the benefit of seeing and hearing from you live,
17  I want them to understand it's not because of
18  anything the plaintiffs have done and that you
19  certainly are willing to come and appear live if
20  asked; fair enough?
21          MS. ZOLNER:  Objection.
22          MS. MAHONEY:  Objection.
23          THE WITNESS:  Yes.
24  BY MR. KIEFFER:

Page 359

1      Q.    Okay.  Just to make sure I'm
2  clear, you're represented here today by two
3  attorneys?
4          MS. MAHONEY:  Well, objection.
5          MS. ZOLNER:  Objection.
6          THE WITNESS:  I'm represented by
7          two teams of them, two attorney -- two
8          companies that are representing Acta --
9          excuse me, Teva and Allergan, I'm sorry.
10  BY MR. KIEFFER:
11      Q.    Two teams --
12      A.    Two teams.
13      Q.    You're represented by two teams
14  of attorneys today?
15      A.    There are four attorneys here
16  today.
17      Q.    All right.  And I think you said
18  earlier that you met with the attorneys all day
19  yesterday from 9:00 till 5:00 or 5:30
20  thereabouts?
21      A.    Yes.
22      Q.    Okay.  And that was to prepare
23  for your testimony today?
24      A.    Yes.

Page 360

1      Q.    Okay.  And you also reviewed some
2  documents to prepare for your testimony today;
3  is that correct?
4      A.    Yes.
5      Q.    All right.  I'm not going to ask
6  you, given the lateness of the hour, to try to
7  recall every document you may have seen
8  yesterday, but some of the documents you've been
9  shown in your testimony today, were those among
10  some of them you reviewed yesterday?
11          MS. MAHONEY:  Objection.
12          THE WITNESS:  Yes.
13  BY MR. KIEFFER:
14      Q.    The White Rabbit e-mail, for
15  example, is that one you reviewed yesterday?
16      A.    I didn't -- I saw that e-mail.  I
17  did not see the White Rabbit portion of it.
18      Q.    Okay.  But you saw the part that
19  preceded it that talked about the weekly meeting
20  and the plan for the oxymorphone launch, that
21  part of the e-mail?
22      A.    Yes, I did see that.
23      Q.    Okay.  I thought that one might
24  make the list.  I'm going to have a few

Page 361

1    follow-ups for you on that in a minute, but we
2    won't jump ahead to that until we cover a couple
3    of other topics, okay?
4        A.    Okay.
5        Q.    I want to ask you a couple of
6    brief questions about your background.  I'm not
7    going to go back through your resume or your CV.
8            (Document marked for
9            identification as Myers Deposition
10           Exhibit No. 27.)
11   BY MR. KIEFFER:
12       Q.    But let me hand you what we have
13   marked as Exhibit 27.  That's just something we
14   printed off the internet, which I think is your
15   LinkedIn profile.
16           Does that look like what it is to
17   you?
18       A.    Yes, it appears to be.
19       Q.    Okay.  That is, I assume --
20           MR. RUANE:  I'm sorry, I need to
21       ask for one back.  I didn't have an
22       extra copy.  I apologize.
23           MS. ZOLNER:  Sure.
24   BY MR. KIEFFER:

Page 362

1        Q.    Okay.  I assume you drafted the
2    information in terms of your job title, the
3    positions you've held and, in particular, this
4    material marked "Summary"; is that correct?
5            MS. MAHONEY:  Objection.
6            THE WITNESS:  Yes.
7    BY MR. KIEFFER:
8        Q.    Okay.  Under the Summary I want
9    to ask you just a few things there.  You
10   indicate that you're an energetic senior project
11   manager skilled in all facets of generic
12   pharmaceutical product management including
13   product lifecycle management, new product
14   launch, marketing research, revenue projection
15   and demand forecasting.
16           Did I read that all correctly?
17       A.    Yes, well, except for you called
18   me a project manager, and I am a product
19   manager.
20       Q.    Thank you.  I meant to say
21   product, but in my haste, I misspoke.  So thanks
22   for clarifying the record.
23           You go on to state there,
24   "recognized for developing unique corporate and

Page 363

1    product advertising/promotional materials,"
2    correct?
3        A.    Yes.
4        Q.    What sorts of things are those?
5    Are they things like, for example, PowerPoints?
6            MS. MAHONEY:  Objection.
7            THE WITNESS:  It could be nearly
8        anything that's used for marketing the
9        company or marketing a product.  It
10       could range as simple as a product ad, a
11       corporate awareness ad, websites and
12       trade show materials, including booth
13       design.
14   BY MR. KIEFFER:
15       Q.    Things that go by the name sell
16   sheets would be included among those?
17       A.    Those might be, yes.
18       Q.    Those are what are sometimes
19   referred to as like a salesman's leave-behind
20   device that a drug representative might leave
21   behind with a doctor or prescriber they're
22   calling on?
23           MS. MAHONEY:  Objection.
24           THE WITNESS:  Could you repeat

Page 364

1        that question.
2    BY MR. KIEFFER:
3        Q.    Yeah, I don't want to get us
4    bogged down, but a sell sheet, for example, I
5    think you said in your earlier testimony, those
6    typically, in your experience, at least at
7    Actavis and later Teva, those are things that
8    very often advertise or provide information on a
9    specific product, and they are materials that
10   either a member of the sales force might leave
11   behind after calling on a doctor or perhaps
12   would be handed out at a trade show, things like
13   that?
14           MS. MAHONEY:  Objection,
15       mischaracterizes the testimony.
16           MS. ZOLNER:  Objection, form.
17           THE WITNESS:  Sell sheets are
18       used to promote a product.  It's the --
19       I have -- I take issue with your
20       characterization that it's left at
21       doctors' offices.  As generics, as a
22       rule, we do not contact doctors
23       directly, primarily, as a rule for our
24       products.

Page 365

1   BY MR. KIEFFER:
2       Q.   As a rule with certain very
3   notable exceptions, for example, the oxymorphone
4   launch that was talked about earlier today and
5   perhaps others, right?
6           MS. ZOLNER:  Objection to form.
7           MS. MAHONEY:  Objection.
8           THE WITNESS:  That was an
9       exception to a standard course of
10      business.
11  BY MR. KIEFFER:
12      Q.   Okay.  And certainly in that
13  instance, I think, and we can look at the e-mail
14  here in a moment, so I don't misquote it, but in
15  that instance, I think there was -- there were
16  specific pieces mailed to the physicians --
17          MS. ZOLNER:  Objection, form.
18  BY MR. KIEFFER:
19      Q.   -- in a two-wave mailing.
20          MS. ZOLNER:  Objection, form.
21          THE WITNESS:  I believe so.
22  BY MR. KIEFFER:
23      Q.   Okay.  And then the Kadian sales
24  force also brought materials with them to go

Page 366

1   over with the physicians when they were talking
2   about the oxymorphone product, correct?
3           MS. MAHONEY:  Objection,
4       mischaracterizes the testimony.
5           THE WITNESS:  Yes.
6   BY MR. KIEFFER:
7       Q.   Okay.  Electronic advertising
8   materials would also be the kind of thing that
9   you have created to build awareness of a
10  particular product?
11          MS. ZOLNER:  Objection, form.
12          THE WITNESS:  Yes.
13  BY MR. KIEFFER:
14      Q.   Okay.  Let me -- let me continue
15  on here.  You indicate 20 years experience in
16  the genetic -- I'm sorry -- in the generic
17  pharmaceuticals industry with 15-year
18  concentration on product management and
19  communications, correct?
20      A.   Yes.
21      Q.   Is it true that really your
22  entire career in the pharmaceutical business has
23  been spent with respect to -- focusing on
24  generic products versus brand products?

Page 367

1       A.   Yes.
2       Q.   Okay.  So whatever marketing and
3   advertising and promotional type activities you
4   may be engaged in and marketing and advertising
5   and promotional type materials you may have a
6   hand in developing would typically all relate to
7   the generic side of the business as opposed to
8   the branded side, correct?
9           MS. ZOLNER:  Objection, form.
10          MS. MAHONEY:  Objection.
11          THE WITNESS:  I'd agree.
12  BY MR. KIEFFER:
13      Q.   Okay.  And then further down here
14  you list under specialties, again, on the fourth
15  one, "Development of Sales Presentations and
16  Advertising/Communications Materials," correct?
17      A.   Yes.
18      Q.   All right.  The sales
19  presentations that you are -- that you are
20  referencing here that you've developed, who
21  typically utilizes those?  Who is actually
22  making the presentations?
23          MS. ZOLNER:  Objection to form.
24          MS. MAHONEY:  Objection.

Page 368

1           THE WITNESS:  Our salesmen would
2       use this.
3   BY MR. KIEFFER:
4       Q.   So, as an example, one example at
5   least, the oxymorphone product that we talked
6   about, the launch of that product and the
7   follow-up marketing of that product?
8           MS. MAHONEY:  Objection.
9           THE WITNESS:  Yes.
10  BY MR. KIEFFER:
11      Q.   Yes?
12      A.   Yes, it would be used for that.
13      Q.   Okay, all right, fair enough.
14          You gave quite a bit of testimony
15  earlier about the various facets of your job.
16  One significant facet is you're kind of an ad
17  guy, right, on the creative side?
18          MS. ZOLNER:  Object.
19  BY MR. KIEFFER:
20      Q.   You help develop content and
21  graphics and materials designed to deliver a
22  marketing and sales message?
23          MS. ZOLNER:  Objection to form.
24          MS. MAHONEY:  Objection.

Page 369

1    THE WITNESS:  It appears to be
2  that way from this deposition, the
3  content in it, but at the time that I
4  was doing advertising, it was only a
5  portion of my responsibilities.  I also
6  managed a product line.
7  BY MR. KIEFFER:
8    Q.    No, no, understood.  And I don't
9  mean to give short shrift to that, but,
10  certainly, it's a portion of your
11  responsibility?
12    MS. MAHONEY:  Objection.
13    THE WITNESS:  It was.
14  BY MR. KIEFFER:
15    Q.    It's an important portion, true?
16    MS. ZOLNER:  Objection, form.
17    MS. MAHONEY:  Objection.
18    THE WITNESS:  It was a portion of
19  my responsibilities.
20  BY MR. KIEFFER:
21    Q.    Okay.  You have been at Teva for
22  a little over two years?
23    A.    Yes.
24    Q.    When did you become a Teva

Page 370

1  employee?
2    A.    When Teva purchased Actavis.
3    Q.    Okay.  And that date, just for
4  our record, was when?
5    A.    I don't remember exactly.  It's
6  been about two years.  I think I have on here
7  August 2016, that sounds about right, without
8  having an exact date.
9    Q.    And prior to that for about 17
10  years, at least according to your LinkedIn, you
11  worked for Actavis?
12    A.    Yes, I think it was longer than
13  that, actually.  I've been with the company that
14  has become Teva through many mergers and
15  acquisitions for 25 years as of last October.
16    Q.    Okay, thank you.  I think you
17  testified earlier that when Teva acquired
18  Actavis, you had a bit of a title change; is
19  that fair?
20    A.    Yes.
21    Q.    Your LinkedIn profile, assuming
22  that it's accurate, forgive me, I'm going to
23  move the cords here a little bit, indicates
24  that -- let's see here -- well, why don't you

Page 371

1  just tell me versus me trying to piece it
2  together, what was your last title while you
3  were an Actavis employee and your first title
4  after you became a Teva employee?
5    MS. ZOLNER:  Objection, form.
6    THE WITNESS:  My last title at
7  Actavis was senior manager of products
8  and communications.
9    My title at Teva Pharmaceuticals
10  became senior -- or product manager 4 of
11  product operations.
12  BY MR. KIEFFER:
13    Q.    Okay.  So a bit of a title
14  change, maybe not a radical title change; is
15  that fair?
16    MS. ZOLNER:  Objection, form.
17    MS. MAHONEY:  Objection.
18    THE WITNESS:  A bit of a title
19  change to align with internal titles
20  that they had at Teva.
21  BY MR. KIEFFER:
22    Q.    Totally understood.
23    When you transitioned from being
24  an Actavis employee to a Teva employee, I'm

Page 372

1  assuming the fundamental nature of your work and
2  the skill sets you would deploy on a daily basis
3  really didn't change very much, if at all, fair?
4    MS. MAHONEY:  Objection.
5    MS. ZOLNER:  Objection, form.
6    THE WITNESS:  Essentially, no,
7  that did not -- my skill set did not
8  change that much.
9  BY MR. KIEFFER:
10    Q.    Okay.  You still did a lot of the
11  same sorts of things the day you became a Teva
12  employee that you had done for some period of
13  time as an Actavis employee?
14    MS. ZOLNER:  Objection to form.
15    MS. MAHONEY:  Objection.
16    THE WITNESS:  Not completely.
17  BY MR. KIEFFER:
18    Q.    Okay.  What changed, if anything?
19    A.    I no longer handled advertising
20  in any way.
21    Q.    At Teva?
22    A.    At Teva.
23    Q.    Okay.  And who handles
24  advertising at Teva?

Page 373

```
 1          MS. MAHONEY:  Objection.
 2          THE WITNESS:  There is an entire
 3     product market -- not product marketing,
 4     but marketing communications team at
 5     Teva.
 6   BY MR. KIEFFER:
 7      Q.   Okay.  And who heads up that
 8   team?
 9      A.   I'm forgetting her name.
10      Q.   Who is on the team?
11      A.   There are several people that do
12   various things.  Ashley Maul(ph.) is one.
13   Patrick Mullaney is another, and there's another
14   woman that they report to, Suzanne someone or
15   other.  I don't remember her name.
16      Q.   Is there a reason that you don't
17   do advertising at Teva?
18          MS. MAHONEY:  Objection.
19          THE WITNESS:  I don't do
20     advertising because I chose not to go in
21     that vein, and I chose to focus on
22     product management.  It would have
23     required a major job change for me to do
24     that, and I chose not to do that.
```

Page 374

```
 1   BY MR. KIEFFER:
 2      Q.   A major job change in terms of
 3   what, reporting structure?
 4      A.   Well, reporting structure,
 5   location --
 6      Q.   Okay.
 7      A.   -- direction I wanted my career
 8   to go in, many things.
 9      Q.   What's the -- what would be --
10   what would the location change have been?
11      A.   I work in Parsippany, New Jersey,
12   and the current marketing communications people
13   are in Horsham, Pennsylvania.
14      Q.   Okay.  So that was one of the
15   reasons; you liked where you were?
16      A.   Well, let me clarify something.
17   I never considered it, nor was anything offered
18   for me to go into communications.  My job
19   changed, and I accepted that and was happy with
20   the change.
21      Q.   Okay.  You're in product
22   management at Teva.  What products do you
23   manage?
24      A.   I manage a plethora of products,
```

Page 375

```
 1   all prescription generics.
 2      Q.   Okay.  Some of them opioid
 3   medications?
 4      A.   Some.
 5      Q.   What opioid medications?
 6          MS. MAHONEY:  Objection.
 7          THE WITNESS:  I believe
 8     buprenorphine Naloxone is one of them.
 9     I can't remember any others.  It's not
10     broken out specifically.
11   BY MR. KIEFFER:
12      Q.   Teva advertises itself at least
13   on its company website as the world's leading
14   provider of generic drugs.
15          Are you aware that it makes that
16   claim?
17      A.   I'm aware that we are the largest
18   generic pharmaceutical company in the world,
19   yes.
20      Q.   Okay.  Your question maybe was a
21   little -- your answer was a little bit better
22   than my question.
23          As far as you're concerned, Teva
24   is the largest generic pharmaceutical maker in
```

Page 376

```
 1   the world?
 2          MS. MAHONEY:  Objection.
 3          THE WITNESS:  Based on providing
 4     patients with product, not based on --
 5     based on volume, not based on dollars.
 6   BY MR. KIEFFER:
 7      Q.   Okay.  So in terms of patients
 8   taking generic pharmaceuticals, more patients
 9   who take generic pharmaceuticals around the
10   world take Teva's than anybody else's?
11          MS. ZOLNER:  Objection to form.
12          MS. MAHONEY:  Objection.
13          THE WITNESS:  Yes.
14   BY MR. KIEFFER:
15      Q.   Okay.  How about in the United
16   States?
17          MS. MAHONEY:  Objection.
18          THE WITNESS:  I believe that to
19     be true.
20   BY MR. KIEFFER:
21      Q.   Same?
22      A.   Yes.
23          MS. MAHONEY:  Objection.
24
```

Page 377

1    BY MR. KIEFFER:
2      Q.    Okay.  Teva indicates on its
3    website that one-in-seven of the 3.86 billion
4    generic prescriptions written in the United
5    States is filled with a Teva product.
6           Is that consistent with your
7    understanding?
8           MS. MAHONEY:  Objection.
9           THE WITNESS:  I have no basis for
10     the actual number.
11   BY MR. KIEFFER:
12     Q.    Okay.  Sound out of line to you?
13          MS. MAHONEY:  Objection.
14          THE WITNESS:  I have no basis for
15     the actual number.
16   BY MR. KIEFFER:
17     Q.    Okay.  I mean, if we were -- if
18   we were to do -- calculate a percentage as to
19   what one-in-seven is, does that sound right to
20   you, or do you know?
21          MS. MAHONEY:  Objection.
22          THE WITNESS:  I don't know.  I
23     have no basis for that number.
24   BY MR. KIEFFER:

Page 378

1      Q.    Okay.  When you were at Actavis,
2    just prior to its acquisition by Teva, were
3    you -- do you know what Actavis' share of the US
4    generic market was?
5      A.    I don't --
6           MS. MAHONEY:  Objection.
7           THE WITNESS:  I don't recall.
8    BY MR. KIEFFER:
9      Q.    Do you recall when Teva acquired
10   Actavis what its share of the US generic market
11   became?
12          MS. MAHONEY:  Objection.
13          THE WITNESS:  I don't recall.
14   BY MR. KIEFFER:
15     Q.    Or the US opioid market?
16          MS. MAHONEY:  Objection.
17          MS. ZOLNER:  Objection, form.
18          THE WITNESS:  I don't recall.
19   BY MR. KIEFFER:
20     Q.    If you were asked whether Teva
21   has 20% or more of the US opioid market, do you
22   have any idea whether that's correct or not?
23          MS. MAHONEY:  Objection.
24          THE WITNESS:  I would have no

Page 379

1      idea.
2    BY MR. KIEFFER:
3      Q.    You're aware of the fact, I
4    assume, that generic opioids make up the
5    substantial majority of the US market versus
6    branded?
7           MS. MAHONEY:  Objection.
8           THE WITNESS:  Could you repeat
9      the question, please.
10   BY MR. KIEFFER:
11     Q.    Yeah.  You're aware of the fact,
12   I assume, that generic opioids make up a
13   substantial majority of the US market versus
14   branded opioids?
15          MS. MAHONEY:  Objection stands.
16          THE WITNESS:  I'm not aware of
17     that.
18   BY MR. KIEFFER:
19     Q.    You've never heard that before?
20     A.    No.
21     Q.    You have a belief to the
22   contrary?
23     A.    I've never given it thought.
24     Q.    In all the time that you were at

Page 380

1    Actavis doing marketing communications work,
2    some of which focused on generic opioids, you
3    never gave a thought to how much of the US
4    opioid market was for a generic product such as
5    Actavis made versus branded products?
6           MS. MAHONEY:  Objection.
7           THE WITNESS:  I provided
8      advertising and collateral materials for
9      our full product line.  Opioids were a
10     very -- from a product volume of work
11     that I had to do, opiates were a very
12     small part, so that's why I did not
13     bother to quantify that.
14   BY MR. KIEFFER:
15     Q.    As a part of your workload is
16   what you're saying, how you spent your time?
17          MS. MAHONEY:  Objection.
18          THE WITNESS:  I handled for a
19     time all advertising projects, and
20     product advertising related to opioids
21     was very small compared to the entire --
22     excuse me -- entire workload.
23   BY MR. KIEFFER:
24     Q.    Your workload you're referencing?

Page 381

1      A.    Yes, my workload.
2      Q.    You're not referencing, for
3   example, the amount that generic opioids
4   contributed to Actavis' gross revenues or gross
5   sales each year, correct?
6      A.    That was not a concern for me in
7   my capacity.
8      Q.    Okay.  In your capacity when you
9   were at Actavis, did it ever come to your
10   attention that generic opioid sales were a
11   substantial contributor to Actavis' annual
12   sales?
13         MS. ZOLNER:  Objection to form.
14         MS. MAHONEY:  Objection.
15         THE WITNESS:  I don't know that
16      to be true.
17   BY MR. KIEFFER:
18      Q.    Do you know anything about it one
19   way or the other?
20         MS. ZOLNER:  Objection, form.
21         THE WITNESS:  No.
22   BY MR. KIEFFER:
23      Q.    Was it ever a part of your job or
24   your thinking when you were working on

Page 382

1   advertising and promotional materials at Actavis
2   to try to get a sense of whether a particular
3   product or products that you were promoting was
4   a 1% contributor to sales or a 30% contributor
5   to sales?
6         MS. ZOLNER:  Objection to form.
7         MS. MAHONEY:  Objection.
8         THE WITNESS:  As a product
9      manager, I would certainly be aware of
10      the largest products in my line.  I
11      might not be aware of the major products
12      for the company overall.
13   BY MR. KIEFFER:
14      Q.    Okay.  And specifically with
15   respect to generic opioids in your time at
16   Actavis, is it your testimony you have no idea
17   whether generic opioids were a significant,
18   average or tiny contributor to annual sales?
19         MS. ZOLNER:  Objection to form.
20         MS. MAHONEY:  Objection.
21         THE WITNESS:  I would have no
22      idea of their contribution towards the
23      total, overall revenue of the company.
24   BY MR. KIEFFER:

Page 383

1      Q.    None at all?
2      A.    Not that I --
3         MS. MAHONEY:  Objection.
4         THE WITNESS:  Not that I recall.
5   BY MR. KIEFFER:
6      Q.    Even though you were a product
7   manager who managed certain generic opioid
8   products at Actavis?
9         MS. MAHONEY:  Objection.
10         MS. ZOLNER:  Objection.
11         THE WITNESS:  I did not manage
12      all opioid products; therefore, I don't
13      know how they contribute to the total
14      overall income of the company.
15   BY MR. KIEFFER:
16      Q.    Okay.  With respect to the
17   products that you managed, do you have any idea
18   how they contributed to the overall income of
19   the company?
20         MS. ZOLNER:  Objection to form.
21         THE WITNESS:  I might have known
22      at one point, but I don't recall.
23   BY MR. KIEFFER:
24      Q.    I don't mean to be argumentative

Page 384

1   with you.  It's a point of curiosity for me.  It
2   seems like as a product manager, one of the
3   things you would get evaluated on is how well
4   are you managing your product, right, sounds
5   kind of axiomatic?
6      A.    Yes.
7      Q.    And one of the things, a
8   significant thing that goes into how well you're
9   managing your product is how well is the product
10   selling and how much of the product is selling
11   and what's it doing for the company, right?
12         MS. MAHONEY:  Objection.
13         MS. ZOLNER:  Objection to form.
14         THE WITNESS:  My responsibilities
15      and how I'm viewed at doing my job are
16      not based entirely on profitable
17      high-ranking products, nor is it
18      increasing sales of those products.
19         Product management at Teva is
20      greatly an operational position.  It's
21      forecasting demand, ensuring that the
22      company's factories make enough to
23      support our clients and our customers
24      without supply disruption and not making

Page 385

1      so much that we end up throwing product
2      away.  That is a major portion.
3          Forecast accuracy is 25% of my
4      annual review.  It continues to be so
5      every year for -- for years and years.
6          So to say that we are focused
7      more like a brand, where a brand team
8      would have one product and they work on
9      it, I think that I probably manage over
10     100 product families, and I do not know
11     the specific budget for nearly any of
12     them.
13  BY MR. KIEFFER:
14     Q.    Okay.  Well, thank you.  You
15  covered a lot there, a lot of which in the
16  interest of time is respectfully not of interest
17  to me, but I appreciate the information.
18          You said, though, at the
19  beginning of that that my responsibilities at
20  Actavis and how I'm viewed at doing my job are
21  not based entirely on profitable high-ranking
22  products, okay.  A part of how you were
23  evaluated had to do with the success and the
24  profitability of the products you managed, fair?

Page 386

1          MS. MAHONEY:  Objection.
2          MS. ZOLNER:  Objection, form.
3          MS. MAHONEY:  Foundation.
4          THE WITNESS:  It's the successful
5      management of my entire product line,
6      not just specific products within that
7      product line.  It is not pulled -- those
8      products are not pulled out separately
9      in my performance review.
10  BY MR. KIEFFER:
11     Q.    But you won awards, for example,
12  the award that went by the name of sell more
13  products faster at higher prices, you won a
14  specific award for your work on the oxymorphone
15  launch with respect to that; did you not?
16          MS. MAHONEY:  Objection.
17          MS. ZOLNER:  Objection, form.
18          THE WITNESS:  I believe that was
19      in an e-mail that we reviewed earlier.
20  BY MR. KIEFFER:
21     Q.    Right.  I mean, that's a -- that
22  looks to me like kind of a big feather in your
23  cap.
24          Is that how you viewed it?

Page 387

1          MS. ZOLNER:  Objection, form.
2          MS. MAHONEY:  Objection.
3          THE WITNESS:  I viewed it as -- I
4      wouldn't say it was necessarily a
5      feather in my cap, but it certainly was
6      an acknowledgment of my hard work on
7      that project.
8  BY MR. KIEFFER:
9      Q.    Okay.  And it looks like, and I'm
10  not going to take the time to go back through
11  all the different documents you were shown, but
12  we will get to a few here in a moment, but it
13  looks like to me that oxymorphone launch was a
14  significant success for Actavis; was it not?
15          MS. MAHONEY:  Objection.
16          THE WITNESS:  I'm not aware that
17      it was a significant financial success.
18      That was not the goal that was placed in
19      front of us.  Certainly, that's a
20      byproduct.
21  BY MR. KIEFFER:
22     Q.    It's the -- let me make sure I
23  understand what you just told us.
24          Are you saying that when Actavis,

Page 388

1  for example, launches a new product or engages
2  in marketing related activities that sales and
3  profits are not a goal, they're merely a
4  byproduct?
5          MS. MAHONEY:  Objection.
6          MS. ZOLNER:  Objection to form.
7          MS. MAHONEY:  Mischaracterizes
8      the testimony.
9          THE WITNESS:  They're a goal for
10      the company.  They're not entirely
11      within our control.
12          (Document marked for
13      identification as Myers Deposition
14      Exhibit No. 28.)
15  BY MR. KIEFFER:
16     Q.    Mr. Myers, let me hand you what
17  we've marked as Exhibit 28.  This is a document
18  that came from Actavis' internal files, actually
19  files that were provided to us from what's
20  referred to as your custodial file, your
21  electronic files.
22     A.    Okay.
23     Q.    This particular document was
24  produced natively as Acquired_Actavis_01367234.

Page 389

```
 1          MS. MAHONEY:  I need to make the
 2     same point I made previously.  If
 3     there's anybody on the phone that is not
 4     outside counsel for a party to this
 5     case, can you please identify yourself.
 6     This is a highly confidential document,
 7     and I need to have you not attend this
 8     portion of the deposition.  I don't know
 9     how we alert you when we finish with
10     this, but can anybody affirmatively
11     assert that they are not outside counsel
12     for one of the parties?
13          Again, I'll reserve rights to
14     challenge if it turns out it's the case.
15          MR. KIEFFER:  All right, fair
16     enough.
17 BY MR. KIEFFER:
18     Q.    Okay.  Mr. Myers, this is a --
19 I'm going to call it a PowerPoint or a slide
20 deck that was produced to us from your
21 electronic files at Actavis.  It is entitled
22 "Marketing Department Overview."
23          Let me first begin by asking you,
24 did you create this?
```

Page 390

```
 1     A.    I don't recall that.
 2     Q.    Is it possible that you created
 3 it?
 4          MS. MAHONEY:  Objection.
 5          MS. ZOLNER:  Calls for
 6     speculation.
 7          THE WITNESS:  It's possible with
 8     input from others.
 9 BY MR. KIEFFER:
10     Q.    Okay.  I take it during your time
11 at Actavis, you would from time to time create
12 things like PowerPoint presentations or slide
13 decks?
14          MS. MAHONEY:  Objection.
15          THE WITNESS:  Yes, sometimes I
16     would.
17 BY MR. KIEFFER:
18     Q.    Okay.  So you may have created
19 this.  If you did, likely you think you received
20 input from others, right?
21     A.    Yes.
22     Q.    Okay.  You in your time at
23 Actavis saw documents like this from time to
24 time, correct?
```

Page 391

```
 1          MS. MAHONEY:  Objection.
 2          THE WITNESS:  Yes.
 3 BY MR. KIEFFER:
 4     Q.    All right.  If you turn to the
 5 first -- and we have placed -- these were not
 6 individually page numbered as they were produced
 7 to us.  So we have supplied page numbering in
 8 the upper right-hand corner, okay?  I'm just
 9 going to refer you to a few of those pages,
10 okay?
11     A.    Okay.
12     Q.    All right.  Page 2, which is
13 really the first substantive page after the
14 cover is on the screen in front of you, the
15 heading of that slide is "Marketing Goal -
16 Maximizing Profit," correct?
17     A.    Yes.
18     Q.    And, in fact, that was the goal
19 of the marketing department at the time you were
20 at Actavis, true?
21          MS. MAHONEY:  Objection.  You can
22     also take as much time as you need to
23     review the document to get context.
24          MR. KIEFFER:  Yeah, I just -- we
```

Page 392

```
 1     can go through -- the only context you
 2     need for this question, sir, is the page
 3     that's in front of you.
 4          MS. MAHONEY:  That's your
 5     impression.  He can take the time he
 6     needs to get context.
 7 BY MR. KIEFFER:
 8     Q.    Well, and, respectfully, my
 9 question, sir, wasn't the document in context.
10 My question was in your time at Actavis, the
11 goal of the marketing department was, in fact,
12 maximizing profit, as stated here on page 2 of
13 this exhibit?
14          MS. MAHONEY:  Objection.
15          MS. ZOLNER:  Objection, form.
16          THE WITNESS:  The goal of the
17     company is to maximize profit.  The goal
18     as me of product manager would have
19     contribution to that, but I would not be
20     the only person that has or the only
21     department that has input into launching
22     products and having a profitable
23     outcome.
24 BY MR. KIEFFER:
```

Page 393

1      Q.   Fair enough.  And I actually -- I
2  don't think we disagree on that.
3           You testified the goal of the
4  company was to maximize profit, true?
5           MS. ZOLNER:  Objection.
6           THE WITNESS:  The goal of any
7      company is to be profitable.
8  BY MR. KIEFFER:
9      Q.   There's a difference, I think,
10  between being profitable and having your central
11  goal as maximizing profit.  Appreciate that
12  distinction?
13          MS. MAHONEY:  Objection.
14          THE WITNESS:  I think that's a
15      mischaracterization of what's here.
16  BY MR. KIEFFER:
17      Q.   Okay.  Let me stick then with
18  what's here.
19          This states "Marketing Goal -
20  Maximizing Profit."  Do you understand what take
21  phrase means?
22      A.   I have an interpretation of it,
23  yes.
24      Q.   My interpretation, and tell me if

Page 394

1  you think I'm at all in the ballpark, is that it
2  is either the goal of the marketing department
3  at Actavis, the goal of all marketing activities
4  at Actavis or both to maximize profit?
5           MS. MAHONEY:  Objection.
6           THE WITNESS:  I think our
7      activities contribute to profit.
8  BY MR. KIEFFER:
9      Q.   Okay.  And without meaning to
10  spend unnecessary time on this or to argue with
11  you, because I don't mean to do either, this
12  doesn't say marketing goal contribute to profit,
13  it says maximizing profit; does it not?
14          MS. MAHONEY:  The document speaks
15      for itself.
16          THE WITNESS:  The document says
17      what the document says.
18  BY MR. KIEFFER:
19      Q.   Okay.  And, again, this is a
20  document that you may have created; you're not
21  certain whether you did or not?
22          MS. ZOLNER:  Objection.
23          MS. MAHONEY:  Objection.
24          MS. ZOLNER:  Asked and answered.

Page 395

1           THE WITNESS:  I'm not certain if
2      I had input or not.
3  BY MR. KIEFFER:
4      Q.   Possible you did?
5           MS. MAHONEY:  Objection.
6           MS. ZOLNER:  Objection, asked and
7      answered.
8           THE WITNESS:  Many things are
9      possible.
10  BY MR. KIEFFER:
11      Q.   Fair enough.  Well, and I'm not
12  really trying to get you to speculate, sir.  If
13  you look at a document like this and you say
14  there is no way that I ever created that or
15  helped pull some of those slides together, I
16  want you to tell me that, okay?
17      A.   Mm-hmm.
18      Q.   And you haven't told me that with
19  respect to this document yet, so I'm assuming
20  you agree it's possible you either created this
21  or had a hand in creating it?
22          MS. MAHONEY:  Objection, asked
23      and answered.
24          MS. ZOLNER:  Objection, form.

Page 396

1           THE WITNESS:  I may have had a
2      piece in creating it.  My piece may have
3      been just taking somebody else's work
4      and putting it into PowerPoint without
5      editing content.  That's a possibility.
6  BY MR. KIEFFER:
7      Q.   Okay.  It's one of many
8  possibilities?
9      A.   Yes.
10      Q.   Okay.  Spectrum of possibilities,
11  right?
12      A.   Yes.
13      Q.   One of which is you were the
14  principal architect of this?
15          MS. MAHONEY:  Objection.  Now
16      you're badgering the witness.
17          MS. ZOLNER:  Objection.
18          MR. KIEFFER:  I'm not badgering.
19          MS. MAHONEY:  You've asked this
20      question in multiple different ways.
21      You've gotten the same answer every
22      time.  You don't like the answer.  I
23      appreciate that you don't like the
24      answer, but that's the answer, so we

Page 397

1      should move on.
2  BY MR. KIEFFER:
3      Q.    All right.  You are not ruling
4  out the possibility that you were the one that
5  pulled these materials together that we have
6  here as -- what's the exhibit, Exhibit 28?
7          MS. MAHONEY:  Objection.
8          MS. ZOLNER:  Asked and answered.
9  Objection, form.
10         THE WITNESS:  I find it doubtful
11         that I would have on my own prepared
12         this document.
13  BY MR. KIEFFER:
14     Q.    You mean entirely and
15  independently --
16     A.    Yes.
17     Q.    -- on your own?
18         MS. ZOLNER:  Objection, form.
19         THE WITNESS:  Yes.
20  BY MR. KIEFFER:
21     Q.    All right.  Without input from
22  others?
23         MS. ZOLNER:  Objection, form.
24         THE WITNESS:  Yes.

Page 398

1  BY MR. KIEFFER:
2      Q.    Okay.  Do me a favor, if you
3  would, turn to page 4 of that document.  Page 4
4  is entitled "Demand Forecast."
5          Do you see that?
6      A.    Yes.
7      Q.    Okay.  I want to ask you about
8  the second bullet here.  It says "done by sku by
9  customer monthly by Marketing."
10         Do you see what I'm referring to
11  there?
12     A.    Yes, sir.
13     Q.    SKU is an individual product
14  number.  I believe it stands for stock keeping
15  unit.
16         Is that what you understand it to
17  be?
18     A.    Yes.
19     Q.    So, just as an example,
20  hypothetical example, oxymorphone
21  extended-release, 7.5 milligrams, that would
22  have a discrete SKU assigned to it; would it
23  not?
24         MS. MAHONEY:  Objection.

Page 399

1          THE WITNESS:  It might have more
2          than one.
3  BY MR. KIEFFER:
4      Q.    Okay.  Might have more than one
5  based on what, like how many tablets in a given
6  package or something like that?
7          MS. MAHONEY:  Objection.
8          THE WITNESS:  Yes.
9  BY MR. KIEFFER:
10     Q.    Okay.  So as I understand --
11  strike that.
12         That -- this -- this projection
13  of future sales units by month was done by SKU
14  by customer, it was done monthly, and it was
15  done by the marketing department.
16         Am I interpreting all that
17  correctly?
18     A.    I believe so.
19     Q.    So am I correct that the
20  marketing department at Actavis was able to tell
21  by customer, by month, exactly how much of a
22  particular size and strength opioid was being
23  purchased by customer?
24         MS. ZOLNER:  Objection to form.

Page 400

1          MS. MAHONEY:  Objection.
2  BY MR. KIEFFER:
3      Q.    Marketing had all that
4  information and, in fact, it sounds like
5  actually pulled it together each month?
6          MS. MAHONEY:  Objection.
7          THE WITNESS:  I would take issue
8          with your word we had exactly -- knew
9          exactly how much a customer would buy
10         each month.  We would base our forecast
11         on run rate, on history.
12  BY MR. KIEFFER:
13     Q.    Yeah, historical data?
14     A.    Yes.
15     Q.    Okay.  Well, and maybe we're not
16  communicating and maybe it's my fault.  I guess
17  I didn't necessarily mean that prospectively you
18  would know precisely what each customer was
19  buying in terms of a particular type, size and
20  strength of opioid.
21         My question was intended to ask
22  if you looked retrospectively, you had that
23  data?
24         MS. ZOLNER:  Objection to form.

Page 401

```
 1          MS. MAHONEY:  Objection.
 2          MS. ZOLNER:  Objection, vague.
 3          THE WITNESS:  Yes.
 4   BY MR. KIEFFER:
 5      Q.   So, for example, if there was a
 6   particular customer of Actavis' and you wanted
 7   to see what their purchase history was three
 8   months ago versus six months ago of a particular
 9   opioid in a particular size and strength, you
10   could do that?
11          MS. MAHONEY:  Objection.
12          THE WITNESS:  I would have access
13   to unit sales.
14   BY MR. KIEFFER:
15      Q.   And you said you would have
16   access to unit sales, did you from time to time
17   access unit sales information?
18          MS. ZOLNER:  Objection, form.
19          THE WITNESS:  Yes.
20   BY MR. KIEFFER:
21      Q.   Okay.  And for what purposes did
22   you access unit sales information?
23      A.   For demand forecasting.
24      Q.   Okay.  And did part of the -- did
```

Page 402

```
 1   part of your efforts at looking at unit sales
 2   information, did part of those involve looking
 3   at past trends in some of Actavis' customers?
 4          MS. MAHONEY:  Objection.
 5          THE WITNESS:  That could be a
 6   consideration.
 7   BY MR. KIEFFER:
 8      Q.   For example, are certain
 9   customers showing an increasing purchase history
10   with respect to certain products?
11      A.   That could have been taken into
12   account to -- to project the future.
13      Q.   Did you ever chart those things,
14   to your recollection?
15          MS. MAHONEY:  Objection.
16          THE WITNESS:  I don't recall.
17   BY MR. KIEFFER:
18      Q.   If you would, sir, turn to page 8
19   of the exhibit in front of you.
20          Page 8 at the top is entitled
21   "Product Launches," correct?
22      A.   Yes, sir.
23      Q.   Okay.  And you were involved with
24   certain product launches in your time at
```

Page 403

```
 1   Actavis?
 2      A.   Yes, with some of them.
 3      Q.   Multiple?
 4      A.   Over the years, yes.
 5      Q.   Okay.  Any idea how many?
 6      A.   No.
 7      Q.   Okay.  Let me back up and ask you
 8   a question.
 9          You were in the marketing
10   department at Actavis, correct?
11      A.   Yes.
12      Q.   And there were obviously others
13   in that department, right?
14      A.   Yes.
15      Q.   Jinping McCormick?
16      A.   Yes.
17      Q.   Okay.  She was your boss for a
18   time?
19      A.   For a time, yes.
20      Q.   And who did she report to?
21      A.   I believe she reported at that
22   time to Michael Perfetto.
23      Q.   Okay.  The marketing department
24   that you were in at Actavis, was that entire
```

Page 404

```
 1   department confined to generic products, or did
 2   they support branded products as well?
 3      A.   Yes, no generics.
 4      Q.   Only generics?
 5      A.   Only generics.
 6      Q.   Okay.
 7      A.   Let me qualify that, quantify
 8   that.
 9          Only generics but that doesn't
10   mean that an e-mail didn't come in or something
11   like that that I had to forward.
12      Q.   Once in a while --
13      A.   A question would come in, right.
14      Q.   Got it, okay, I understand.
15          Okay.  Let me use -- let me use
16   the word generic in a totally different way,
17   okay?
18      A.   Okay.
19      Q.   This slide, and you take a minute
20   to look at it, but it's entitled "Product
21   Launches," it looks to me, my eye, that this is
22   talking about kind of big points related to
23   product launches generically, in other words,
24   not specific to any particular product launch.
```

Page 405

1        Am I interpreting that correctly?
2            MS. MAHONEY:  Objection.
3            MS. ZOLNER:  Objection, form.
4    BY MR. KIEFFER:
5        Q.    It doesn't mention specific
6    products there and things like that?
7        A.    Yes, this --
8            MS. MAHONEY:  Objection.
9            THE WITNESS:  Yes, this is just
10       an overview.
11   BY MR. KIEFFER:
12       Q.    An overview of what the generic
13   -- I'm going to call it the generic marketing
14   department at Actavis, some of the things it
15   does in relation to product launches, true?
16           MS. MAHONEY:  Objection.
17           THE WITNESS:  Let me read the
18       full page.
19   BY MR. KIEFFER:
20       Q.    Sure.
21       A.    (Witness reviews document.)
22           I'm sorry.  Could you repeat your
23   question now that I've had a chance to review.
24       Q.    Yeah, let me try.  Page 8 of the

Page 406

1    exhibit that's in front of you entitled "Product
2    Launches" --
3        A.    Yes.
4        Q.    -- is it true that the
5    information on that page just describes, in
6    general terms, some of the things that the
7    generic marketing department at Actavis did as
8    it relates to product launches; it is not
9    focused on any particular product launch?
10           MS. MAHONEY:  Objection.
11           THE WITNESS:  I agree with that
12       statement, yes.
13   BY MR. KIEFFER:
14       Q.    Okay, fair enough.  If you look
15   at the bottom portion of the page, this third
16   bullet, one of the things that the marketing
17   department has identified as doing in connection
18   with product launches generally is working with
19   sales and contract on launch strategy and
20   execution, correct?
21       A.    Yes.
22       Q.    This would be the sales function
23   of Actavis, true?
24           MS. MAHONEY:  Objection.

Page 407

1            THE WITNESS:  Yes.
2    BY MR. KIEFFER:
3        Q.    That would include, but
4    presumably it would not be limited to, sale
5    representatives who, for example, would go call
6    on customers, physicians, others?
7            MS. MAHONEY:  Objection.
8            MS. ZOLNER:  Objection, form.
9            THE WITNESS:  Our generic sales
10       managers, sales directors do not call on
11       physicians.
12   BY MR. KIEFFER:
13       Q.    Okay.  They call on wholesalers,
14   distributors, others?
15           MS. MAHONEY:  Objection.
16           MS. ZOLNER:  Objection, form.
17           THE WITNESS:  Wholesalers,
18       distributors for their assigned
19       accounts.
20   BY MR. KIEFFER:
21       Q.    Okay.  That's your generic sales
22   representatives?
23       A.    Yes.
24       Q.    But there are other sales

Page 408

1    representatives that do call on physicians
2    undisputed, right?
3            MS. ZOLNER:  Objection to form.
4    BY MR. KIEFFER:
5        Q.    The Kadian sales team, for
6    example?
7            MS. MAHONEY:  Objection.
8            THE WITNESS:  Yes, I believe so.
9        That was a different division than I was
10       in.
11   BY MR. KIEFFER:
12       Q.    Okay.  Turn to the next page, if
13   you would, page 9.  There's a box at the bottom
14   of page 9 that says "New products are the driver
15   of growth; product launch success is central to
16   our future."
17           Do you agree with that statement?
18       A.    Yes.
19       Q.    If you turn, and I'll go through
20   these fairly quickly, turn to page 11.
21   Actually, turn back to page 10.  Sorry about
22   that.
23           Page 10 is captioned "Marketing
24   Communications."

Page 409

1        Do you see that?
2        A.   Yes.
3        Q.    And then for several pages behind
4   page 10 there's some examples of different types
5   of marketing communications, right?
6        MS. MAHONEY: Objection.
7        THE WITNESS:  That appears to be
8   so.
9   BY MR. KIEFFER:
10       Q.    Okay.  So if you look at page 11,
11  for example, that identifies marketing
12  communications in the form of corporate ads?
13       A.   Yes.
14       Q.    Okay.  The one on the left that
15  has flowers in a pot says a number of things, a
16  couple of the pieces of information communicated
17  there are that there's "650 generics to market,
18  350 on the way."
19       Do you see that?
20       A.   I do.
21       Q.    "A pipeline that's always in
22  bloom," right?
23       A.   Yes.
24       Q.    A pipeline of generics?

Page 410

1        A.   Yes.
2        MS. MAHONEY: Objection.
3   BY MR. KIEFFER:
4        Q.    Did you have a hand in developing
5   this kind of a corporate ad as what we see here?
6        MS. MAHONEY: Objection.
7        THE WITNESS:  I believe so, yes.
8   BY MR. KIEFFER:
9        Q.    Okay.  I realize some things in
10  our professional lives are easier to remember
11  than others.  I would think probably a lot of
12  time and effort and thought goes into these
13  sorts of things, and you probably have some
14  memory of at least some of them that you had a
15  hand in creating; is that fair?
16       MS. MAHONEY: Objection.
17       MS. ZOLNER: Objection, form.
18       THE WITNESS:  Possibly, yes.
19  BY MR. KIEFFER:
20       Q.    Okay.  And this one here that
21  we're looking at on page 11 with the -- the one
22  that says "All the right ingredients," your
23  recollection is you had a hand in creating that?
24       MS. MAHONEY: Objection.

Page 411

1        THE WITNESS:  I believe I was the
2        contact for the ad agency that created
3        that.
4   BY MR. KIEFFER:
5        Q.    Okay.  You would be kind of the
6   supervisory person at Actavis for this ad?
7        MS. MAHONEY: Objection.
8        THE WITNESS:  I would have been
9        the person who directed them to make --
10       create an ad.
11  BY MR. KIEFFER:
12       Q.    Got it, okay.  All right.
13       How about the one on the right
14  here, that's captioned "The building blocks of
15  all we do," did you have a hand in creating
16  that?
17       MS. MAHONEY: Objection.
18       THE WITNESS:  I believe that I
19       was the contract for the ad agency that
20       created it.
21  BY MR. KIEFFER:
22       Q.    Okay.  And, again, this is
23  focused on generics with the same line, the
24  third one down here referencing "650 generics to

Page 412

1   market, 350 on the way," right?
2        A.   Yes.
3        Q.    Okay.  This is -- this is all,
4   and I don't mean to belabor it, but there is a
5   distinction obviously between brand and generic?
6        A.   Yes.
7        Q.    This is all exclusively generic
8   advertising, marketing, promotion, all those
9   sorts of things, not focused at all on the
10  branded business, true?
11       MS. MAHONEY: Objection.
12       THE WITNESS:  It was a corporate
13       awareness ad.  I believe that the
14       contents are -- and the information
15       provided is about generics, but it was
16       to let people know that Actavis was in
17       the United States.
18  BY MR. KIEFFER:
19       Q.    Okay.  If you turn the page over
20  to page 12, here on the right there's an ad,
21  another corporate ad it says "Simply
22  illuminating."
23       Did you have a hand in creating
24  that one?

1          MS. MAHONEY:  Objection.
2          THE WITNESS:  I believe I was the
3    contact person for the ad agency who
4    created this.
5    BY MR. KIEFFER:
6          Q.   Okay.  And, again, this is
7    focused solely on the generic side of the
8    business, right?
9          MS. MAHONEY:  Objection,
10   mischaracterizes the testimony.
11         THE WITNESS:  I believe it's a
12   corporate -- it's a corporate ad that
13   focuses on generics, but it's to raise
14   corporate awareness.
15   BY MR. KIEFFER:
16         Q.   Okay.  All right.  If you turn to
17   page 13, there's some examples, it says
18   "Marketing Communications:  Lyrical Sellsheets."
19         A.   Yes.
20         Q.   And lyrical sell sheet is this
21   example we have here that is a graphic that's
22   sort of made up of words; is that right?
23         A.   Yes.
24         Q.   Okay.  Did you have a hand in the

1    creation of these?
2          MS. MAHONEY:  Objection.
3          THE WITNESS:  No.
4    BY MR. KIEFFER:
5          Q.   Page 15, if you would.  This one
6    says "Marketing Communications:  Advertorial."
7    What's an advertorial?
8          MS. ZOLNER:  Objection,
9    foundation.
10         THE WITNESS:  It's -- an
11   advertorial can be used in many
12   different ways.  In this way, I believe
13   it was used to talk more extensively
14   about the company.
15   BY MR. KIEFFER:
16         Q.   Okay.  You had a hand in creating
17   this, I assume, because it's the same type of
18   thing we saw a few minutes ago?
19         MS. MAHONEY:  Objection.
20         THE WITNESS:  I was the contact
21   for the advertising agency that created
22   this ad, yes.
23   BY MR. KIEFFER:
24         Q.   Okay.  Turn to the next page, if

1    you would, page 16 that's captioned "Marketing
2    Communications:  Electronic."
3          You see that?
4          A.   Yes.
5          Q.   All right.  And it looks like
6    this over here on the right-hand side, there is
7    an Actavis ad, correct?
8          A.   Mm-hmm.
9          Q.   And it looks like that came from
10   Drug Store News, a trade publication, to you,
11   also correct?
12         A.   I believe that's what it appears
13   to be from this screen capture.
14         Q.   Okay.  And this particular ad is
15   for oxycodone hydrochloride in 15-milligram and
16   30-milligram tablets, correct?
17         A.   Yes.
18         Q.   And it says "Demand, meet
19   supply," also correct?
20         A.   That's what the headline says.
21         Q.   Okay.  And this is the kind of
22   message whereby Actavis is telling anybody who
23   is reading Drug Store -- well, strike that.
24         People that read Drug Store News

1    or receive these e-mails include people like
2    drug stores, distributors, retailers, those
3    sorts of folks?
4          MS. MAHONEY:  Objection.
5          MS. ZOLNER:  Objection,
6    foundation.
7          THE WITNESS:  I don't
8    understand -- I don't have any knowledge
9    of who Drug Store News' entire
10   readership includes.
11   BY MR. KIEFFER:
12         Q.   Would you be the one typically
13   who would be making the decision to place this
14   kind of electronic ad in Drug Store News?
15         MS. ZOLNER:  Objection, form.
16         MS. MAHONEY:  Objection.
17         THE WITNESS:  I could propose
18   where to put things, but the final
19   decision was not necessarily mine, and
20   this is not the full ad.
21   BY MR. KIEFFER:
22         Q.   But, presumably, if you were --
23   did you ever recommend that any ads be placed in
24   Drug Store News?

Page 417

1    A.   Yes.
2    Q.   Okay.  So, presumably, you had
3  some understanding of who they were?
4    A.   Yes.
5         MS. MAHONEY:  Objection.
6         MS. ZOLNER:  Objection to form.
7  BY MR. KIEFFER:
8    Q.   I mean, they kind of advertise
9  themselves as the number one source of news,
10  knowledge and networking for professionals in
11  the multibillion dollar retail pharmacy
12  marketplace.
13       Is that generally consistent with
14  your understanding of who they are?
15       MS. MAHONEY:  Objection,
16  foundation.
17       MS. ZOLNER:  Objection, form.
18       THE WITNESS:  I don't know how
19  they characterize themselves.
20  BY MR. KIEFFER:
21    Q.   They're a big trade publication,
22  though.  That's why you recommended Actavis
23  spend its money to advertise with them, right?
24       MS. ZOLNER:  Objection.

Page 418

1         MS. MAHONEY:  Objection.
2         MS. ZOLNER:  Form, foundation.
3         THE WITNESS:  I recommended that
4    Actavis spend their money with many
5    different trade publications.
6  BY MR. KIEFFER:
7    Q.   Okay.  And this particular ad,
8  before we leave it, for oxycodone hydrochloride
9  tablets, this is Actavis telling the readership
10  of Drug Store News that it has the ability to
11  supply the demand for those particular opioids,
12  correct?
13       MS. MAHONEY:  Objection.
14       THE WITNESS:  That's the
15    implication.
16  BY MR. KIEFFER:
17    Q.   Okay.  There -- I've seen a
18  number of documents and communications in this
19  case where -- in preparation for your deposition
20  where Actavis is emphasizing as a marketing
21  message its ability to supply the relevant
22  demand.  That was a consistent theme in a lot of
23  marketing communications; was it not?
24       MS. MAHONEY:  Objection.

Page 419

1         THE WITNESS:  That could have
2    been placed -- that could have been
3    highlighted as a reaction to outside
4    influences that were going on in the
5    market at the time.
6  BY MR. KIEFFER:
7    Q.   Do you know?
8         MS. MAHONEY:  Objection.
9  BY MR. KIEFFER:
10    Q.   Do you recall that specifically?
11    A.   Not specifically.
12       (Document marked for
13    identification as Myers Deposition
14    Exhibit No. 29.)
15  BY MR. KIEFFER:
16    Q.   Sir, I've just handed Exhibit 29
17  to you.  This is a slightly different version of
18  an e-mail you looked at earlier.  It's the one
19  with the White Rabbit reference.  I think this
20  is maybe a little further on in the string
21  perhaps than what was shown to you.
22    A.   Okay.
23    Q.   But let me -- let me ask you to
24  turn to the second page -- now wait a minute.

Page 420

1  Turn to the third page of that exhibit, which
2  has a number in the lower right-hand corner
3  ACTAVIS0819310.
4         All right.  You were asked a
5  number of questions about this section
6  pertaining to oxymorphone earlier.
7         Do you recall those, generally?
8    A.   Yes, sir.
9         MS. ZOLNER:  Objection, form.
10  BY MR. KIEFFER:
11    Q.   Okay.  I have just a few
12  follow-ups on that, okay.  The first sentence
13  here states, "We successfully launched
14  oxymorphone on Friday, July 15th with over 75%
15  market share."
16       It states that, correct?
17    A.   It does state that.
18    Q.   Now, did I understand you to say
19  earlier that you think the term "market share"
20  there is being used imprecisely or is a bit of a
21  misnomer to what's intended to be communicated?
22       MS. MAHONEY:  Objection.
23       THE WITNESS:  Yes, I believe that
24    to be the case.

Page 421

1    BY MR. KIEFFER:
2        Q.    And I thought I understood you to
3    say earlier, but I want to make sure that I
4    understood your answer, I thought I understood
5    you to say that what's referenced here, the 75%,
6    was in reference to the previous -- in reference
7    to what the monthly sales for the branded
8    product Opana ER had been; is that what you
9    said?
10       A.    I believe something similar to
11   that.  That's what I'm -- there's no way we had
12   a 75% market share, so I'm assuming how that was
13   interpreted by the person who took the notes.
14       Q.    Okay.  This oxymorphone product
15   was a generic equivalent of Opana ER made by
16   Endo Labs, correct?
17       A.    Yes.
18       Q.    And a very specific goal of the
19   product launch of oxymorphone was to try to
20   acquire share that or sales that had previously
21   gone to the Opana branded product, correct?
22            MS. MAHONEY:  Objection.
23            THE WITNESS:  Our goal with the
24       launch was to build awareness that the

Page 422

1    strengths were available once again so
2    that doctors would know that these
3    strengths were available for their
4    patients that they felt they were most
5    appropriate for.
6    BY MR. KIEFFER:
7        Q.    Understood.  But the goal of
8    building awareness is to increase sales?
9            MS. MAHONEY:  Objection.
10           MS. ZOLNER:  Objection, form.
11           THE WITNESS:  The goal of running
12       a business is to sell product.
13   BY MR. KIEFFER:
14       Q.    Right.  I mean, what's referenced
15   here in the first sentence is this 75% market
16   share phrase, correct?
17           MS. MAHONEY:  Objection.
18           THE WITNESS:  Yes, but I've
19       stated before that I -- that that is
20       wrong.
21   BY MR. KIEFFER:
22       Q.    Right, you interpret that as on
23   July 15th, the product launch by Actavis of
24   oxymorphone resulted in Actavis acquiring over

Page 423

1    75% of what the comparable Opana product would
2    have sold in a given month?
3            MS. MAHONEY:  Objection.
4            THE WITNESS:  Clarify that.  I
5        believe that the 75% that she is saying
6        here is -- it could be the units that
7        Opana used to sell.  Let my characterize
8        that as shipping a unit is not a sale to
9        a patient.
10   BY MR. KIEFFER:
11       Q.    Well, not when the unit ships,
12   right?
13       A.    It may not ever turn into a -- to
14   a sale to a patient.
15       Q.    Typically, they do.  I mean,
16   typically, wholesalers and distributors and
17   retailers don't just buy this stuff to let it
18   sit on their shelves and go bad, true?
19           MS. MAHONEY:  Objection.
20           THE WITNESS:  All of those
21       companies that you mentioned also can
22       return that product for a full refund
23       from my company if it does not sell.
24   BY MR. KIEFFER:

Page 424

1        Q.    Understood.  But in your
2    experience, these products typically sold?
3            MS. ZOLNER:  Object to form.
4            MS. MAHONEY:  Objection.
5            THE WITNESS:  I have no idea what
6        the return rate was on the initial
7        shipments of Opana ER.
8    BY MR. KIEFFER:
9        Q.    Okay.  Well, fair enough.
10   Regardless I don't want to get us bogged down.
11           This 75% market share, you
12   interpret that as related to prior -- 75% in
13   relation to what Opana ER would have done in a
14   given month perhaps tablets or product, perhaps
15   dollar sales; you're not sure which?
16           MS. ZOLNER:  Object to form.
17           MS. MAHONEY:  Objection, asked
18       and answered.
19           THE WITNESS:  It would not have
20       been dollar sales.
21   BY MR. KIEFFER:
22       Q.    Okay.  So you think it's product,
23   product volume?
24           MS. MAHONEY:  Objection.

Page 425

1      MS. ZOLNER: Object to form.
2          THE WITNESS: I believe the
3  spirit of what she is reporting here is
4  the successful launch and shipment of
5  product on time on a specific date.
6  BY MR. KIEFFER:
7      Q.    Was 75% -- actually, she says
8  over 75% of -- in your interpretation what Opana
9  had been doing?
10         MS. MAHONEY: Objection, asked
11  and answered.
12         THE WITNESS: I don't know where
13  she came up with the 75%.
14  BY MR. KIEFFER:
15     Q.    Okay, fair enough. Okay. Let me
16  skip down here a little bit.
17         She states, "We are focusing on
18  creating awareness and want to target physicians
19  to continue to write and increase their
20  scripts."
21         Do you see that?
22     A.    Let me see. (Witness reviews
23  document.)
24         What does the sentence start

Page 426

1  with?  Oh, okay, I see.
2      Q.    "We are focusing on creating
3  awareness and want to target physicians to
4  continue to write and increase their scripts,"
5  correct?
6      A.    Yes.
7      Q.    Okay. That kind of speaks for
8  itself, doesn't it?
9          MS. MAHONEY: Objection.
10         THE WITNESS: I don't know how
11  you are interpreting that.
12  BY MR. KIEFFER:
13     Q.    Well, increase in scripts would
14  certainly appear to be increasing the
15  prescriptions of this particular product,
16  oxymorphone?
17     A.    It's not increasing the
18  prescriptions of oxymorphone. It's not to get
19  more patients on oxymorphone. It's to build
20  awareness of the two strengths that we had
21  launched. To build -- to increase sales from
22  zero, because the brand had discontinued the
23  product, to back to whatever it was deemed by
24  the doctors felt those strengths were

Page 427

1  appropriate for their patients.
2      Q.    Okay. Now, you didn't write this
3  material we have here in front of us on page
4  19310, right?
5      A.    No, sir.
6      Q.    Okay. And do you have a specific
7  recollection of this meeting?
8      A.    No, I don't.
9      Q.    Okay. And I take it -- how do
10  you pronounce Karen's last name?
11     A.    Stoedter.
12     Q.    I take it you haven't talked to
13  her recently and asked her to interpret for you
14  what she meant here?
15     A.    No.
16         MS. MAHONEY: Objection.
17  BY MR. KIEFFER:
18     Q.    Okay. So you're kind of giving
19  this your own interpretation, particularly as
20  she references the reference to increasing these
21  scripts, right?
22         MS. MAHONEY: Objection. That's
23  actually what you're asking him to do.
24         THE WITNESS: Ask the question

Page 428

1  again.
2  BY MR. KIEFFER:
3      Q.    Yeah. You're just giving us your
4  own interpretation of what Ms. Stoedter has
5  written here about physicians increasing
6  scripts, correct?
7          MS. MAHONEY: Objection.
8          THE WITNESS: Yes.
9  BY MR. KIEFFER:
10     Q.    Okay. All right. She goes on to
11  state here, we have booked Pharmacy Times,
12  August, and will work with major wholesalers and
13  chains to target doctors and patients to get the
14  word out to utilize the generic.
15         Do you see that?
16     A.    Yes, I do.
17     Q.    Okay. You took issue earlier
18  with the reference to targeting doctors and
19  patients, did I understand, yes?
20     A.    Yes.
21     Q.    Okay. Certainly, major chains,
22  retail chains, they interface with patients,
23  right?
24         MS. ZOLNER: Objection to form.

Page 429

1        MS. MAHONEY:  Objection.
2    BY MR. KIEFFER:
3        Q.    Target has a pharmacy, Publix has
4    a pharmacy, right?
5        MS. MAHONEY:  Objection.
6        THE WITNESS:  They all have
7        pharmacies, and they do interact with
8        patients, but they don't actively sell
9        or promote drugs to patients.
10   BY MR. KIEFFER:
11       Q.    Would it be a problem, in your
12   view, if Actavis was working with major
13   wholesalers and chains to target doctors and
14   patients --
15       MS. MAHONEY:  Objection.
16   BY MR. KIEFFER:
17       Q.    -- about its oxymorphone product?
18       MS. MAHONEY:  Objection.
19       MS. ZOLNER:  Object to form,
20   foundation.
21       THE WITNESS:  That is an
22       erroneous statement.  Karen Stoedter is
23       not a marketing professional.  She is
24       merely the scribe, and she is

Page 430

1        interpreting a fast-paced conversation.
2    BY MR. KIEFFER:
3        Q.    No, I'm asking you if -- assume
4    with me for a moment that Actavis was
5    undertaking activities whereby it was working
6    with major wholesalers and chains to target
7    doctors and patients for this particular generic
8    opioid oxymorphone, would that be a problem, in
9    your view?
10       MS. MAHONEY:  Objection, calls
11       for speculation.
12       MS. ZOLNER:  Objection,
13       foundation.
14       THE WITNESS:  I would find that
15       very surprising and unlikely.
16   BY MR. KIEFFER:
17       Q.    Okay.  Whether it's surprising
18   and unlikely or not, if it took place, would it
19   be a problem, in your view?
20       MS. MAHONEY:  Objection.
21       MS. ZOLNER:  Objection, calls for
22   speculation.
23       THE WITNESS:  You are asking for
24       my personal opinion?

Page 431

1    BY MR. KIEFFER:
2        Q.    Sure.
3        MS. MAHONEY:  Objection.
4    BY MR. KIEFFER:
5        Q.    As a 25-year professional in the
6    generic pharmaceuticals field, if the company
7    you worked for was working with major
8    wholesalers and chains to target doctors and
9    patients to get the word -- to target doctors
10   and patients to get the word out to utilize the
11   generic, namely this opioid oxymorphone, would
12   that be a problem in your view?
13       MS. MAHONEY:  Objection.
14       MS. ZOLNER:  Objection, form.
15   Objection, calls for speculation.
16       THE WITNESS:  It would depend on
17       the nature of the contact.
18   BY MR. KIEFFER:
19       Q.    Might be okay?
20       MS. MAHONEY:  Objection.
21       THE WITNESS:  I don't have an
22       opinion on it.
23   BY MR. KIEFFER:
24       Q.    Okay.  Read for us if you would,

Page 432

1    sir, what you've written in the e-mail here on
2    the first page of this particular exhibit?
3        A.    From me to Karen Stoedter, how
4    much do you wanna bet this becomes a --
5        MS. MAHONEY:  This is not a
6        reading exercise.  You can read it to
7        yourself.
8        THE WITNESS:  Oh, okay.  I
9        thought he was asking --
10       MR. KIEFFER:  I actually did want
11       you to read it, since it's your words.
12       MS. MAHONEY:  It's on the Elmo,
13       so if you want to read it into the
14       record, you can feel free.
15       MR. KIEFFER:  Well, the witness
16       wrote it.  I think if I'm going to ask
17       him --
18       MS. MAHONEY:  If you want to read
19       it into the record, you can feel free.
20       The witness will read it to himself.
21       MR. KIEFFER:  Okay.  You don't
22       want him to read the words that he
23       wrote.
24       MS. MAHONEY:  The witness will

Page 433

1      read it to himself, and you can read it
2      into the record.
3   BY MR. KIEFFER:
4      Q.   All right. "How much you wanna
5   bet this becomes a competition? First Jinping
6   will include charts and a graph.  Then, because
7   the gauntlet had been thrown, I'll add custom
8   photos and graphics... maybe music will play
9   when you open the mail.  Something
10  'pharmaceutical.'  Like the song 'White
11  Rabbit'... one pill makes you bigger, and one
12  pill makes you small... and the ones that mother
13  gives you, don't do anything at all!"
14      Did I read that correctly?
15      A.   I believe that you did.
16      Q.   Okay.  You made a refer -- you
17  know that song; you're familiar with the lyrics,
18  right?
19      A.   Vaguely familiar with it, yes.
20      Q.   Looks like a little more than
21  vague here.  I looked it up and it looks like
22  you had it pretty much perfect?
23      MS. MAHONEY:  Objection.
24      THE WITNESS:  I've sung along to

Page 434

1      the radio.
2   BY MR. KIEFFER:
3      Q.   As have I.  Jefferson Airplane
4   song, right?
5      A.   I believe so.
6      Q.   It's about drug abuse; is it not?
7      MS. MAHONEY:  Objection.
8      THE WITNESS:  I don't know what
9      it's about.
10  BY MR. KIEFFER:
11      Q.   Honestly?
12      MS. ZOLNER:  Objection.
13      MS. MAHONEY:  Objection.
14      THE WITNESS:  It's artistic and
15      subject to the person who hears it.  I
16      believe they're talking about Alice in
17      Wonderland.  How you interpret it -- I
18      mean, isn't that a portion of that song?
19      It was 30 years ago, 40 years ago.
20  BY MR. KIEFFER:
21      Q.   You reference to subject to the
22  person who hears it, earlier when you were being
23  asked questions about this, you volunteered, you
24  said, well, that wasn't a reference to opioids,

Page 435

1   but I could see how it could be viewed that way.
2      Do you recall that testimony?
3      MS. MAHONEY:  Objection.
4      THE WITNESS:  I don't recall what
5      I was looking at when I made that
6      assertion.
7   BY MR. KIEFFER:
8      Q.   Okay.  Certainly this -- in
9   context, this could certainly be viewed as a
10  reference to opioids; could it not?
11      MS. ZOLNER:  Objection.
12      MS. MAHONEY:  Objection.
13  BY MR. KIEFFER:
14      Q.   It's not an unreasonable
15  interpretation of what you've written here, is
16  it?
17      MS. MAHONEY:  Objection.
18      THE WITNESS:  You are
19      mischaracterizing the conversation.
20  BY MR. KIEFFER:
21      Q.   I'm not asking about the
22  conversation.  I'm asking about the words you
23  wrote on this page.
24      MS. MAHONEY:  Is there a question

Page 436

1      pending?
2   BY MR. KIEFFER:
3      Q.   There is.
4      In the context of a marketing
5   campaign to launch a new generic opioid, your
6   reference here to this particular song and these
7   pills, one could look at that and certainly take
8   that as a reference to opioid pain medications;
9   that's not an unreasonable interpretation of
10  what you've written.
11      MS. MAHONEY:  Objection.
12      MS. ZOLNER:  Objection, form.
13      THE WITNESS:  It is unreasonable
14      in the context of the conversation.  If
15      you look at the previous dialogue back
16      and forth between me and Karen Stoedter,
17      you'll notice that I complimented her on
18      her quick note taking, that it was quite
19      complimentary, and then we went back and
20      forth on how she has set the bar high,
21      and then everybody has to take a turn
22      doing it, which means that everybody
23      will try to do a better job than the
24      person before.  And we were taking a

Page 437

1   facetious, humorous look at how could
2   you increase this to make the meeting
3   notes more interesting, humorous,
4   whatever, how could you embellish those
5   in a farce.
6        This meeting note is not about
7   the launch of just opioids.  This weekly
8   meeting is part of a entire business
9   review of all products could be on here.
10  So that conversation was not related to
11  the launch of any specific product,
12  including oxymorphone.
13  BY MR. KIEFFER:
14     Q.   Do you recall how that song ends?
15     A.   No, I don't.
16     Q.   Feed your head, feed your head;
17  is that familiar to you at all?
18       MS. MAHONEY:  Objection.
19       THE WITNESS:  No.
20  BY MR. KIEFFER:
21     Q.   Okay.  In the time that you were
22  -- I've got like two more questions.
23       In the time you were at Actavis,
24  did you ever participate in any kind of

Page 438

1   conversation with anybody in the marketing
2   department, even just around the proverbial
3   water cooler where you or anybody else said
4   maybe we're adding fuel to the fire of this
5   opioid epidemic?
6        MS. MAHONEY:  Objection.
7        THE WITNESS:  I don't remember
8   ever discussing the opioid epidemic, so
9   to speak, if it is one, with anyone at
10  work.
11  BY MR. KIEFFER:
12     Q.   Not ever, never came up?
13     A.   I don't have --
14       MS. MAHONEY:  Objection.
15       THE WITNESS:  I don't have any
16  recollection.
17  BY MR. KIEFFER:
18     Q.   Okay.  What you all were focused
19  on were efforts aimed at marketing and
20  increasing sales and maximizing profit, true?
21       MS. ZOLNER:  Objection.
22       MS. MAHONEY:  Objection.
23       MS. ZOLNER:  Mischaracterizes
24  testimony.  Objection, form.

Page 439

1        THE WITNESS:  We were focused on
2   our individual goals as employees.
3   BY MR. KIEFFER:
4      Q.   Which certainly included
5   increasing sales and maximizing profit?
6        MS. MAHONEY:  Objection,
7   mischaracterizes the testimony, asked
8   and answered.
9        THE WITNESS:  Not necessarily
10  only those things or that specifically
11  in the way it's being characterized.
12  BY MR. KIEFFER:
13     Q.   And I'm not implying, sir, it's
14  only that, but that is certainly a part of it?
15       MS. MAHONEY:  Objection.  There's
16  no question pending.
17       MS. ZOLNER:  Are we out of time?
18       MS. MAHONEY:  Thank you.
19       MR. KIEFFER:  Are we done?
20  That's all I've got.  Thank you for your
21  time, sir.
22       THE WITNESS:  Thank you.  Have a
23  good day.
24       THE VIDEOGRAPHER:  The time is

Page 440

1   5:54 p.m. December 13th, 2018, going off
2   the record.  This is the end of the
3   videotape deposition.
4        (Witness excused.)
5            ---
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 441

C E R T I F I C A T I O N

1
2    I, MARGARET M. REIHL, a
3    Registered Professional Reporter,
4    Certified Realtime Reporter, Certified
5    Shorthand Reporter, Certified LiveNote
6    Reporter and Notary Public, do hereby
7    certify that the foregoing is a true and
8    accurate transcript of the testimony as
9    taken stenographically by and before me
10   at the time, place, and on the date
11   hereinbefore set forth.
12                I DO FURTHER CERTIFY that I
13   am neither a relative nor employee nor
14   attorney nor counsel of any of the
15   parties to this action, and that I am
16   neither a relative nor employee of such
17   attorney or counsel, and that I am not
18   financially interested in the action.
19
20
21   -------------------------------
     Margaret M. Reihl, RPR, CRR, CLR
22   CSR #XI01497  Notary Public
23
24

Page 442

1          - - - - - -
2          E R R A T A
3          - - - - - -
4    PAGE  LINE  CHANGE
5    ___  ___  _____
6    REASON: _____
7    ___  ___  _____
8    REASON: _____
9    ___  ___  _____
10   REASON: _____
11   ___  ___  _____
12   REASON: _____
13   ___  ___  _____
14   REASON: _____
15   ___  ___  _____
16   REASON: _____
17   ___  ___  _____
18   REASON: _____
19   ___  ___  _____
20   REASON: _____
21   ___  ___  _____
22   REASON: _____
23   ___  ___  _____
24   REASON: _____

Page 443

1    ACKNOWLEDGMENT OF DEPONENT
2
3          I, DAVID A. MYERS, JR., do hereby
4    certify that I have read the foregoing
5    pages, and that the same is a correct
6    transcription of the answers given by me
7    to the questions therein propounded,
8    except for the corrections or changes in
9    form or substance, if any, noted in the
10   attached Errata Sheet.
11
12
13
     _____
14   DAVID A. MYERS, JR.          DATE
15
     Subscribed and sworn to before me this
16
     _____ day of _____, 2018.
17
     My commission expires:_____
18
19   _____
     Notary Public
20
21
22
23
24