IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: NATIONAL           )
PRESCRIPTION              )
OPIATE LITIGATION,        )        Judge Polster
                          )        Cleveland, Ohio
          Plaintiff,      )
                          )        Civil Action
     APPLIES TO ALL CASES )        Number 1:17MD02804
                          )
                          )

- - - - -

TRANSCRIPT OF PROCEEDINGS HAD BEFORE

THE HONORABLE DAN AARON POLSTER

JUDGE OF SAID COURT,

ON TUESDAY, AUGUST 6, 2019

- - - - -

Official Court Reporter:        Shirle M. Perkins, RDR, CRR
                                U.S. District Court
                                801 West Superior, #7-189
                                Cleveland, OH 44113-1829
                                (216) 357-7106

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

```
 1    APPEARANCES:

 2      For the Plaintiffs:              PETER WEINBERGER, ESQ.,
                                         Spangenberg, Shibley &
 3                                       Liber
                                         Suite 1700
 4                                       1001 Lakeside Avenue, E
                                         Cleveland, OH 44114
 5                                       (216) 696-3232

 6      Also Present:

 7      Jenny Lee Anderson, Esq.,
        Jonathan Blanton, Esq.,
 8      Mark Cheffo, Esq.,
        Jayne Conroy, Esq.,
 9      Sam Issacharoff, Professor
        Robert Klonoff, Esq.,
10      Mark Lynch, Esq.,
        Christopher Seeger, Esq.,
11      Paul Singer, Esq.,
        Sonya Winner, Esq.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        TUESDAY SESSION, AUGUST 6, 2019, AT 9:38 A.M.

2              THE COURT:  All right.

3        This is obviously Case 1:17MD2804, the National Opioid

4   MDL.

10:03:03  5        This is a hearing on Plaintiff's Renewed and Amended

6   Notice of Motion, the Motion for Class Certification of Rule

7   23(b)(3), Cities/Counties Negotiation Class.  So shorthand,

8   this is motion for certification of the negotiation.  It was

9   filed July 9th.

10:03:28 10        There's been a number of objections filed.  There were

11   responses.  The Court has reviewed them all carefully.  I

12   set today for hearing.  I will listen to anyone who wants to

13   address the Court.  My plan is then to take the matter under

14   advisement.  I certainly will listen carefully to what was

10:03:53 15   said and to issue a decision shortly.

16        My request in oral arguments is for the lawyers to

17   address what they feel the best arguments that have been

18   made by those fine lawyers on the other side.  That would be

19   most helpful to the Court.

10:04:11 20        I want to say at the outset that a whole lot of work

21   has gone into this.  I believe the initial idea was

22   Professor, Special Master McGovern, Francis McGovern, and

23   then a number of other very fine, knowledgeable, experienced

24   people have weighed in to create and develop this.  I know

10:04:43 25   Professor Issacharoff and Rubenstein had a lot to do with

1    it, a lot of fine lawyers did, people who know a lot more

2    than I do about class action litigation.

3         I have already determined that no lawyer who is also

4    representing a state, state or states, in this MDL will be

5    permitted to argue on behalf of the motion to conditionally

6    certify nor file any pleadings relative to that.  I think

7    those lawyers have a conflict at the moment because all or

8    most of the State Attorneys General are opposing this

9    motion.  So we'll have only lawyers arguing for the

10   proponents who are not representing states.

11        I also want to say that if I grant the motion for

12   certification, my plan is to appoint a neutral to represent

13   the non-litigating cities and counties.  I think that's a

14   good idea.  They're not formally -- obviously, they're not

15   parties to any litigation because they haven't filed but

16   they are potential beneficiaries and class members.  So I

17   think it'll be appropriate to appoint a neutral to represent

18   them, and that's what I'll do.

19        Also I want everyone to know that if I do grant the

20   motion and class certification, I'm going to limit -- limit

21   the claims and the parties based on the short form complaint

22   in the Summit County case.  So it will encompass a small

23   number of federal claims, not state claims.  I think it will

24   be unruly and unworkable to have, you know, state claims

25   from 50 states.  And I will limit it to 13 nationwide

1    defendant families.  I think that's the appropriate thing to

2    do.

3         So I have a number of other -- other comments,

4    observations, but I think I'll reserve those to the end

10:07:05  5    after I hear from the parties.

6         So I think it makes sense to have the counsel for the

7    moving parties start.  So who -- who's planning on

8    addressing the Court?

9              MR. WEINBERGER:  Your Honor, on behalf of the

10:07:18 10    Plaintiffs Executive Committee, this is Peter Weinberger,

11    and I'm simply going to introduce our proposed co-lead class

12    counsel, who will address the Court; Chris Seeger and Jayne

13    Conroy, and I know that there -- there are others who

14    have -- with whom we have consulted and who have worked on

10:07:39 15    this, who may be called upon to answer questions or make

16    presentations.

17         Thank you, your Honor.

18              THE COURT:  Okay.

19         So Mr. Seeger or Ms. Conroy.

10:07:49 20              MR. SEEGER:  Good morning, your Honor.

21              THE COURT:  Yes.  And it's important to stay

22    seated.  I know it's customary to stand, but the microphones

23    won't work as well.  So everyone can stay seated.

24              MR. SEEGER:  You anticipated the first

10:08:02 25    question I was going to ask.  Well, thank you for that, your

1   Honor.

2        Also I want to make sure you know Sam Issacharoff is

3   here at counsel table, Bob Klonoff, who has also assisted

4   the PEC, the Professor from Portland, Oregon, is here

10:08:14 5   assisting and can also answer questions.  And I intend to

6   draw upon their help today if that's okay with you.

7        I'd also like to quickly mention, you had mentioned

8   the people that put a lot of work into this.  There are two

9   lawyers in particular I'd like to call out who put a

10:08:29 10   tremendous amount of work into this; Elizabeth Cabraser and

11   Paul Geller, who were there from the very beginning in terms

12   of the concepts, drafting the briefs and research, and I

13   want to thank them for their help today.

14        I thought I would start, your Honor, with just sort of

10:08:44 15   a brief overview of what we're seeking and what we're not

16   seeking.

17        I didn't intend at this point to run through Rule

18   23(a) and (b)(3) factors unless --

19             THE COURT:  No.  All counsel should expect

10:08:55 20   that I have carefully read all the papers, the objections.

21   I'm not expert in class action, but I understand enough to

22   decide this.  And what I really want you to really focus on

23   is what you think are the strongest arguments that -- that

24   those who have filed opposition have made, Mr. Seeger.  That

10:09:17 25   will help me crystallize my decision.

1          MR. SEEGER:  So, your Honor, to answer that,

2     and I'll go into sort of where -- I think that duck tails

3     nicely into where I was heading.

4          Frankly, I don't think any strong arguments have been

10:09:29  5     made.  The arguments regarding commonality and typicality

6     and predominance, I say it as respectfully as I can, border

7     on frivolous simply because there really can be no question

8     that those factors, those important factors of Rule 23 have

9     been met.  The claims are the same, many of the facts are

10:09:48 10     the same.

11          And I guess the best example that highlights this is

12     that there's probably nobody in this courtroom that can

13     dispute this, and that is if you took the two Bellwether

14     plaintiffs out of the trial that you have upcoming, your

10:10:00 15     Honor, and you substitute them with any two other plaintiffs

16     that have a case in front of you, you're going to try the

17     exact same case.  It will be the same evidence, it'll be the

18     same experts, and it's all -- so I really -- when you say to

19     highlight, what I thought I would do is highlight some

10:10:16 20     things I think are important and then let the objectors go

21     because maybe we misunderstand their objections because they

22     seem pretty weak.  And there's no basis that's been provided

23     for not certifying a Negotiation Class on behalf of the

24     30,000 political subdivisions in the U.S.

10:10:32 25          So just to get to -- I'm only going to take a minute

1    or two -- what this is and what it isn't, this is simply a

2    tool to assist in the global resolution of some, most, or

3    maybe all of this litigation.  Like Rule 23 has been out

4    there, nonclass aggregate settlements are out there.  What

5    have been pejoratively, I think, referred to as inventory

6    settlements.  Plaintiffs lawyers on both sides know how to

7    settle cases but this will put one more tool in the tool

8    shed.

9         Now what it isn't is it isn't forcing any Defendant to

10   participate in it.  If a Defendant in this courtroom has no

11   interest in a class action settlement, so be it.  They can

12   go the route of a Vioxx settlement, non-class aggregate

13   settlement.  They can do that.  I have never heard your

14   Honor express a preference one way or another and so that is

15   still available to them.

16        And as we all know from people who do this kind of

17   work, there is no one-size-fits-all solution to every MDL.

18   Every single MDL presents its own problems.  So, your Honor,

19   as you know, I'm involved with Joe Rice and others and have

20   some input on the negotiating committee, and two big

21   questions and problems continue to come up over and over

22   again.  The that question gets asked by the Defendants, "Are

23   you unified?  Do you speak on behalf of all the political

24   subdivisions out there," and "if we settle with you, can we

25   get closure?"  Well this, what we propose to you today,

1    answers those two questions if they want it.

2        Now the other thing I'd like point out about this is

3    that this is a major improvement over the typical Rule 23(e)

4    settlement that probably your Honor has seen and most people

5    in this courtroom.

6        If you take a typical consumer case, your Honor, the

7    lawyers negotiate a settlement agreement, it's presented

8    through notice, and they're asked whether they accept it or

9    they don't accept it.  What we're doing here, which is very

10   different, is very smart people got together, led by Joe

11   Rice and his firm, and put together an allocation model

12   which distributes money potentially to the areas of the

13   country hardest hit.

14       Now more than that, there's a calculator that's

15   available on a website.  So every political subdivision in

16   the country -- and they're all watching this case.  They're

17   all aware of it -- can go to that calculator and determine

18   exactly what they would get from a hypothetical number.

19   Plug in any number you want, one billion, two billion, $100

20   billion, and they can figure out what they get now.  And

21   maybe the most important feature is it really turns this

22   case, if you want this tool, into a participatory class

23   action in the sense that the Class gets to vote yes or no

24   for the deal by 75 percent super majority.

25       So when -- I start out with that introduction because

1    when you look at it in that light, and it is voluntary,

2    there is no decent basis for objecting to this or denying

3    it, your Honor, respectfully.

4        Sam, I don't know whether you want to add anything to

10:13:24  5    that.

6        MR. ISSACHAROFF:  Your Honor, I just want to

7    focus on one feature of this, which is the role of the Court

8    at this point in the proceedings, as your Honor well knows,

9    is the protection of absent class members, is to make sure

10:13:37 10    that if a class is certified, there is adequacy of the

11    representation and the various due process considerations

12    identified by the Supreme Court in cases like Amchem and

13    Ortiz are satisfied.

14        Here, we have something quite extraordinary because

10:13:55 15    the -- as Mr. Seeger just mentioned, one of the features of

16    this is that there is a table that distributes or allocates

17    the funds if they come in, so that every class member is

18    aware right now, today, of what it will get if there is a

19    settlement.  And we have examples in the brief.  A $1

10:14:17 20    billion settlement, Cuyahoga County will get so much, Summit

21    County will get so much.  And the important and critical

22    issue is that that is known ahead of time what the

23    distribution is, how each class member will be treated

24    relative to each other class member, the obligation that the

10:14:37 25    similarly-situated is treated in similar fashion.  And there

1    have been effectively no objections from the Class as to the

2    distribution, the allocation formula we have.  This is

3    unheard of because the amounts are known, how one does

4    relative to another is known, and no objection.

10:14:58  5          We have a voting process that is novel in some sense

6    in its use in the Class action.  As the Court is well aware,

7    we've taken it from other places, from 524(g) of the

8    Bankruptcy Code, which has a similar type of voting

9    structure, from an American Law Institute proposal, which

10:15:17  10   expanded that into other kinds of aggregate litigation.

11          And here, we give the voting distributions so that

12   it's a very simple process.  Every class member just says

13   yes or no.  There's no complication to it but it's tabulated

14   in six different ways to make sure that there is no

10:15:37  15   crammed-down mechanism.  75 percent cut-offs at each of the

16   six different voting groups has to be satisfied in order for

17   this to go forward.

18          Again, no objection from within the Class.  I know

19   that there's six counties -- six cities in Ohio, now seven,

10:15:56  20   that have some objections that they want to raise, but

21   effectively, out of 33,000, there have been effectively no

22   objections, as we said in the brief.  It's over 99.98

23   percent.  We're in the Ivory Soap category of purity on

24   class representation here.

10:16:17  25          And so at this point, what are the objections, or who

1    is objecting?  There are Defendants who are claiming that

2    this is poor representation.  There's add -- it's not

3    adequacy, not typicality.  There's a certain crocodile-tear

4    quality to Defendants trying to stop the Class from getting

5    what it wants in the name of the sanctity of the Class'

6    interests.  That's always a bizarre situation in court.  But

7    putting that aside, this is a group of Class members who

8    have lawyers.  We have the lawyers here for several of the

9    Class members who are serving as -- have been offered a

10   subclass counsel.  These are political entities who are

11   accustomed to making decisions based on the information

12   available to them.  They got into office through the

13   elective process.

14       So the idea of voting and being part of a political

15   constituency is by no means alien to them.  We are not

16   taking a class of minors.  We are not taking a class of

17   consumers who bought a $20 toaster or something and have no

18   knowledge that they are a member of a punitive class.  Here,

19   we have self-conscious political leadership of every

20   City/County in the United States, and what's critical for, I

21   think for the Court's purposes, is there's no objection.

22   There's no objection meaningfully from within the Class.

23   And that is the first and most critical threshold that the

24   Court has to pay attention to, in my view.

25       The only other point we can get to is the relationship

1    with the states and that's, as the Court has already

2    indicated in its ruling on who can speak today and who

3    cannot, that is a source of concern.  And we would just say

4    the following:

10:18:12  5        There is no proposal here to alter relations between

6    states and counties, states and cities.  There is no

7    proposed change of state law.  We are not asking the Court

8    to issue any orders that change the relationship between a

9    state and its political subdivisions.

10:18:30 10        If a state has authority to step into the shoes of the

11   cities and counties in its state and say this is what we

12   want, X or Y in litigation or non-litigation, so be it.

13   There's nothing here that alters that.  If they do not have

14   that authority, which is true, which we know to be true in

10:18:48 15  some states, or if they do not wish to exercise that

16   authority and wish the cities and counties to pursue, as

17   aggressively as possible, the claims that they may have,

18   then this is a vehicle that helps achieve that.

19        Finally, with regard to the claim by the Defendants

10:19:06 20  that -- and the claims are curious because the same

21   distributor and pharmacy Defendants both say this is too

22   empowering of the Class, and this is a terrible idea, and it

23   can never be realized because 75 percent is too high a

24   threshold.  There's some ambiguity in which way they want to

10:19:29 25  go on that, but in regards to their claim they are

1    prejudiced, which is ultimately the issue they have to

2    answer, how were they harmed legally, the answer is quite

3    simple.  If they don't like this, ignore us.  The moment, if

4    this court certifies, the moment the certification takes

5    place, every single Defendant is as free as it was before to

6    simply ignore us.  Don't pay any attention to us.  You want

7    to go to trial, go to trial.  Good luck.  Have at it.  You

8    want to settle some other mechanism, fine.  You want to --

9    you want to attempt an aggregate settlement, a bankruptcy

10   solution, what have you, it doesn't matter.  You are as free

11   as before.

12        What is being proposed to the Court, as Mr. Seeger

13   said, is a tool, it's a novel one we admit, but it's in

14   keeping with the idea of Rule 23 as a mechanism for complete

15   resolution of common legal problems, and we believe that

16   this advances that.

17             THE COURT:  Okay.  Thank you, Professor

18   Issacharoff and Mr. Seeger.

19        Anyone else want to say anything from the moving

20   proponent side at this point?  All right.  Thank you.

21        Then is there anyone who'd like to speak from the

22   opponent or objector's side and --

23             MR. FERRARO:  Yes, your Honor.

24        I'm Jim Ferraro from Kelly and Ferraro, and we filed

25   an objection on the Plaintiff's side on behalf of the

1      handful of Ohio cities.  Okay.

2           The prior brief made reference to our objections as

3      odd and relevant, but by way of background, I tell you where

4      we've been.  Okay.  I was an objector in the <u>Amchem</u> case

10:21:27  5      from the very beginning all the way through the Supreme

6      Court over 20 plus years ago.  I've been involved with over

7      20, 524(g) asbestos trusts, and they have no relationship to

8      this particular matter.

9           We represent proposed members of this negotiating

10:21:44  10      Class.  We also represent third-party claims that are not

11      part of negotiating class.  We represent a rather large case

12      that's not part of the negotiating class and recovery for

13      the state of Florida, which is here in the Northern District

14      of Ohio now and in recovery services --

10:22:01  15                THE COURT:  Slow down.  Who exactly are you

16      representing, sir?

17                MR. FERRARO:  We're objecting on behalf of a

18      handful of Ohio cities.

19                THE COURT:  All right.  Which cities are

10:22:12  20      you -- are the litigating cities or non-litigating cities?

21                MR. FERRARO:  Litigating cities.

22                THE COURT:  Which cities?

23                MR. FERRARO:  One is East Cleveland.

24                THE COURT:  And what other cities do you

10:22:23  25      represent?

1          MR. FERRARO:  I know I don't have the list in

2     front of me but it's six.

3          THE COURT:  All right.

4          MR. FERRARO:  And --

10:22:29  5          THE COURT:  You mentioned Florida and I didn't

6     -- wasn't following you.  I thought you were representing

7     Ohio -- you're objecting on behalf of six -- seven Ohio

8     cities?

9          MR. FERRARO:  I have the list, by the way.

10:22:39 10          It's the City of North Royalton, Ohio.  I mentioned

11     the City of East Cleveland, the City of Mayfield Heights,

12     City of Lyndhurst, City of Huron, the City of Wick -- life.

13          THE COURT:  Wickliffe.

14          MR. FERRARO:  Wickliffe.  Thank you, your

10:22:54 15     Honor.

16          And the other Class is talking about the Florida class

17     was moved up here, is MSP Recovery.  They're the -- they're

18     the assignees of MSP Recovery for Medicaid.  There was also

19     a national class action that was filed right here.  Same

10:23:09 20     type of case, it's on behalf of Medicaid Recovery Benefits.

21     They're the assignee from a number of insurance carriers in

22     the United States.  It's a rather substantial case.  It may

23     be bigger than any city/municipality in this litigation.

24          THE COURT:  I don't see how that -- how that

10:23:27 25     even applies.  I mean they're not part of this potential

1    Class.

2              MR. FERRARO:  I agree with that, and I made

3    reference, your Honor, to the fact I represent them.

4              THE COURT:  All right.

10:23:36  5              MR. FERRARO:  We're here on behalf of the City

6    Classes.

7              THE COURT:  Tell me specifically what -- what

8    is the objection for these seven Ohio cities; East

9    Cleveland, et al.

10:23:45 10              MR. FERRARO:  Here's the objection.  It's

11   based on the facts, okay, that there's 1200 lawsuits

12   pending, the proposed negotiating class is 33,000 class

13   members.

14       Over 30,000 have filed nothing in this litigation.

10:23:59 15   Zero.

16              THE COURT:  All right.

17              MR. FERRARO:  In the papers, your Honor, it

18   states at Page 8 in the motion, no uncertain terms, that the

19   voting process is straight forward.  Each Class member will

10:24:10 20   vote only once.  The vote is simply yes or no in favor of or

21   against the proposed settlement.  That's not true.  That's

22   not the way the rule works that each Class member will vote

23   only once.  The reality is the overwhelming may never vote.

24   There may be zero votes.  And if you don't vote, you're in.

10:24:28 25   And where does that leave you if you're in?  Okay.

1    THE COURT:  Well, I'm not following you at

2    all, sir.

3        Everyone can -- everyone will be given an opportunity

4    to vote.  If someone chooses not to vote, they choose not to

10:24:40  5    vote like in the election.  You have the opportunity to

6    vote.

7        MR. FERRARO:  Here's the problem.  If you

8    don't opt out, if you don't opt out based on the data we

9    have now, okay, there is absolutely no monetary component to

10:24:53 10    this as it stands.

11        We have the three factors.  How many people died in

12    your city, how many opiate -- how many milligrams of opiates

13    went to the County, so forth.  No monetary component.  Sure,

14    you go to the website, you could be some county from

10:25:07 15    wherever city, municipality, look it up and say my

16    percentage is .0021 percent of what?  Right now it's zero.

17    Zero is zero or it could be a big county, maybe a .001

18    percent, or 01 percent of zero is zero.  The problem that I

19    have is three fold.

10:25:28 20        THE COURT:  Well, that's not an objection.  I

21    mean, of course, it's zero.  It only goes into effect if

22    there is a settlement, which will be not zero but some

23    amount of money.

24        MR. FERRARO:  That's correct, but it's a blind

10:25:41 25    settlement, your Honor.

1        For instance, say East Cleveland does not opt out,

2    okay, and supposed to be, I guess, within 60 days, now

3    you're in.  You're in.

4            THE COURT:  Right.

10:25:51  5            MR. FERRARO:  You don't know what the numbers

6    are.  Say negotiate for the next six months and come up with

7    a number, and if you -- if the 75 percent vote occurs,

8    you're in.  You don't have a choice.  You can't get out at

9    that point.  There's no way out.  There's no way out.  You

10:26:07 10   don't know if it's a zero or $100 billion.  You don't know

11   that.  That is a glaring deficiency.

12           THE COURT:  No.  There would still be a vote

13   on the settlement itself.  What you're accepting is the

14   allocation model.

10:26:20 15           MR. FERRARO:  You're right, 75 percent vote,

16   but if you didn't opt out, you were bound by that vote.

17           THE COURT:  Right.

18           MR. FERRARO:  I know but --

19           THE COURT:  You can opt out if East Cleveland

10:26:30 20   looks at this and says, "Hey, I don't like this.  I don't

21   like this even this very thoughtful way of allocation" --

22           MR. FERRARO:  They can opt out.  They can opt

23   out, you know.  They can opt out blindly right now.  Why not

24   let them opt out without the blinders?  Why don't we do it

10:26:46 25   like most single opt-out cases?

1          THE COURT:  All right.  Okay.  I -- your

2     objection -- I understand the objection.

3          MR. FERRARO:  So that's Part 1.  You don't opt

4     out, you're in.  Okay.  If the 75 percent, you can vote

10:27:01 5     against the 75 percent vote, but still be bound by it if it

6     passes.  So that's something that is a very problem -- but

7     at a minimum, at a minimum, the way this should work, it

8     should be at best an opt-in class.  There's no problem

9     notifying the 33,000 municipalities, townships, and the like

10:27:22 10    of a --

11         THE COURT:  Have all seven of these cities

12    filed lawsuits?

13         MR. FERRARO:  I'm sorry?

14         THE COURT:  Have all seven of the Ohio cities

10:27:30 15    you represent --

16         MR. FERRARO:  Yes.

17         THE COURT:  So you need to understand that

18    you've got, you know, seven that oppose this and the other

19    2000 seem to think it's fine.  So we're in a very tiny

10:27:44 20    minority, but maybe you're right.  So you need to recognize

21    that.

22         MR. FERRARO:  Another problem with that, your

23    Honor, I will tell you that.  And it's in the reply brief.

24    They say we represent, these seven cities or six cities that

10:27:53 25    I mentioned, represent .02 percent.  I get that.  And they

1    say of the thousands of public entities in the proposed

2    class, none has taken issue.  Of course, they haven't taken

3    issue because they didn't get notified of this.  They don't

4    know of this, know about this.  The last time I looked at

10:28:10  5    the certificate of services case, I didn't see 33,000 --

6                 THE COURT:  I referred not to the 33.  I

7    referred to the -- let's do the sub group.  You're in a

8    litigating, represent seven litigating cities.  Out of 2000

9    litigating cities, I certainly know all this because the

10:28:27 10    lawyers help negotiate it and they're in the case and they

11    got notice.  So I'm just pointing out that there are roughly

12    2000 litigating cities that appear to have no objection to

13    this.  There's seven who do.  All right.  But, those are the

14    facts.

10:28:41 15                 MR. FERRARO:  You look at the fraction, which

16    is it's less than 2000 but a small fraction of the 33,000

17    that may go into this blind settlement or be bound by --

18                 THE COURT:  You don't represent any of those,

19    do you?

10:28:54 20                 MR. FERRARO:  Other than my seven, no, I am

21    not.

22                 THE COURT:  Okay.  So I don't think you have

23    standing to raise an objection on behalf of the other 30,000

24    cities and counties.

10:29:04 25                 MR. FERRARO:  All right.  I mean we're going

1    to object and we'll take it to wherever it goes from here.

2    If we get -- if that's the way it goes, that's the way it

3    goes.  I mean that we're basically voting right now.

4                  THE COURT:  I'm just making an observation

10:29:18   5    that you appear to be raising an objection on behalf of

6    cities and counties you don't represent.  So I don't -- I

7    just made that observation.

8                  MR. FERRARO:  As an objector, we -- and as a

9    lawyer, I think it's wise to put out there that for parties,

10:29:37  10    municipalities that aren't here and didn't get notice of

11    today's hearing, we don't know what they would say.  We're

12    speculating.  Now, of course, the small group --

13                  THE COURT:  Well, they will be notified if

14    I -- if I send out this -- if I certify this class, they

10:29:50  15    will be notified --

16                  MR. FERRARO:  Right.

17                  THE COURT:  -- next 60 days, and they will

18    have an opportunity to vote.  Absolutely.  They will be

19    notified, those elected officials representing them will

10:30:00  20    know, and they can -- they will have the opportunity to

21    weigh in, one way or another.

22                  MR. FERRARO:  I agree.  But it's still a blind

23    vote because there's no monetary component.  That's the

24    systemic problem with what we're doing here.  It should be

10:30:14  25    an opt-in Class, or at best or at worse --

1           THE COURT:  Okay.  I understand.  I read your

2     papers, sir.  I understand your objection.

3           MR. FERRARO:  Okay.

4        That would be the substance of the objection, is that

10:30:28  5     this is three-fold.

6        By the way, there's a third factor that we may be

7     bringing parties into this litigation through the opt-out

8     Class that may be blind and may be wasting funds that could

9     go to the real parties and interests, the ones that have

10:30:43 10    filed cases that do have damages, and the model may be

11    correct or may not be correct.  That's -- is that -- is that

12    a --

13           THE COURT:  Wait a minute.  Are you -- are you

14    saying that that 30,000 cities and counties who have not

10:31:00 15    filed lawsuits should be ignored?

16           MR. FERRARO:  No.  I think that they should be

17    noticed.  First of all, they should have been noticed about

18    today, Number 1, and Number 2, before they go into a final

19    settlement, second opt-out where you get presented -- like

10:31:16 20    literally, every single case I looked at where there's a

21    single opt-out, no second opt-out, they have the monetary

22    component.  It's a full settlement.  It's like the 524(g),

23    you have everything in front of you.  You know the number,

24    you know what you're voting on, you know what you're going

10:31:30 25    to get.

1          THE COURT:  All right.

2          MR. FERRARO:  We don't know that here.  We

3    don't -- simply don't know that.

4          So my suggestion is that the Court, at a minimum, have

5    a second opt-out after the financial component is out there.

6    And the best scenario should be an opt-in Class.  It's easy

7    to notify the 33,000 of an opt-in Class and get a full vote

8    and see how fair it is.

9          And the other objection is these adopted from 524(g),

10   where it's the 75 percent of who votes.  Okay.  So depends

11   on how many of these entities vote.  Maybe ten will vote,

12   maybe 30,000 will vote, maybe four will vote, maybe three

13   out of four wins.  Who knows?

14         THE COURT:  Well, sir, that's always an issue.

15   In any election I know, it's very often determined by who

16   chooses to vote and who doesn't.

17         MR. FERRARO:  Right.  I understand that but

18   that's --

19         THE COURT:  That's always the case in an

20   election.  No one has a gun to anyone's head in this

21   country.  That's the point of free election.

22         MR. FERRARO:  Right, but again --

23         THE COURT:  Or you cannot vote.

24         MR. FERRARO:  Again, the blindness of the

25   settlement is the biggest issue.

1    And the other is I'm not here on behalf of Attorneys

2    General.  I don't represent them.  But if you want to get to

3    the 33,000, maybe that's a better way through 15 Attorneys

4    General who control the counties and cities, municipalities

10:32:47  5    in their respective states.

6                THE COURT:  I'm not following that.  I

7    understand your objection, sir.

8                MR. FERRARO:  Okay.  Okay.

9                THE COURT:  Thank you.

10:32:56 10                MR. FERRARO:  You're welcome.

11                THE COURT:  Okay.

12        Is there anyone else who wants to speak for any of the

13    opponents to the motion?

14                MR. LYNCH:  Your Honor, Mark Lynch for

10:33:10 15    McKesson.  I'd like to introduce my partner, Sonya Winner,

16    who will address the objections of the distributors.

17                THE COURT:  I should indicate the distributors

18    filed collective objections.

19        Okay.  Ms. Winters.

10:33:21 20                MS. WINNER:  It's Winner, your Honor.

21                THE COURT:  Sorry.

22                MS. WINNER:  Thank you, your Honor.

23        Your Honor, this is a very unusual kind of opposition.

24    It's not like the usual situation where Defendants are

10:33:34 25    opposing class certification.  I am not here today because

1    Defendants are unalterably opposed to pursuing anything that

2    would offer a legitimate mechanism for pursuing global

3    resolution of this litigation.

4        I'm here because the Defendants who oppose this motion

10:33:56  5    believe that the opportunity for global resolution that this

6    motion purports to offer is a mirage.

7        For any class to be a reliable counterparty the

8    Defendants can negotiate with for settlement, the Defendants

9    would need comfort that any settlement that they reached

10:34:19 10    with that class would survive, would survive objections,

11    would survive any subsequent appeals.

12        So when we look at this, we don't just look at how we

13    would object to this class.  We must also look at how absent

14    Class members would object to this Class and would pursue

10:34:43 15    appeals of approval of any settlement with this Class.  That

16    is -- that is the framework that we have to focus on.

17             THE COURT:  There wouldn't be any absent class

18    members.

19             MS. WINNER:  There are absent Class members.

10:34:56 20    Anybody -- absent Class members are the members of the

21    Class, whether you use the word absent or not.  Anybody who

22    doesn't opt out is going to be bound by the settlement.  If

23    it's --

24             THE COURT:  They're not -- they're not absent

10:35:12 25    they're in.

1        MS. WINNER:  They're in.  I'm sorry.  Absent

2   class members is a term sometimes used to refer to the Class

3   members who aren't named plaintiffs.  That's all I meant by

4   that term.  I'm sorry if I was confusing.

10:35:23  5        The problem is that this proposal does not provide the

6   assurances of a valid viable settlement that the Defendants

7   would need.  And Defendants are concerned --

8        THE COURT:  Well, you may be right, Ms.

9   Winner, but no Defendant has to -- Number 1, no Defendant

10:35:50 10  has to settle, period, under any model.  Okay?

11        MS. WINNER:  Of course.

12        THE COURT:  You can go to trial, win or lose.

13   If you lose, you can appeal and you can try 2000 cases, plus

14   the several hundred in State Court, so-called 2500 trials.

10:36:07 15  Any Defendant can choose the 2500 trials.

16        Second, any Defendant that doesn't like this model and

17   wants to pursue settlement can develop any other model.

18        MS. WINNER:  I understand.

19        THE COURT:  And use it -- and use it.  And if

10:36:23 20  you think this model isn't -- doesn't -- if your client

21   wishes to pursue resolution and doesn't think this is a good

22   model, then more power to you.  You can come up with another

23   model.

24        And I understand other models have been proposed in

10:36:41 25  settlement discussions.  I'm not going to discuss them

1    because they're private.  But I understand other models have

2    been discussed, floated, and that's fine.  No one has a

3    monopoly on good ideas.  I think the more good ideas

4    floated, all the better.

10:36:59 5         And so I just want to point that out that if your

6    client doesn't like this model and doesn't think it provides

7    certainty and wouldn't -- and would not be upheld on appeal

8    if there are objectors, then you come up with a better model

9    or -- or take this model and say this is not a bad model how

10:37:27 10   it goes, but I want to change this, this, and this to make

11   it better and use that.

12              MS. WINNER:  Well, your Honor, I fully

13   appreciate what you've said, and you're, of course, right.

14   But Defendants are concerned that certification of this

10:37:43 15  Class, nonetheless, creates real -- would create real

16   problems here.

17              THE COURT:  That's what I'd like -- what

18   problem?

19              MS. WINNER:  The problems it would create

10:37:55 20  would include for, one thing, it would take up the resources

21   of this Court and of the Special Masters on a process that

22   we believe at the end of the day would not be viable.

23   Second --

24              THE COURT:  All right.

10:38:08 25        But, it wouldn't be your resources, okay, your

1   client's resources.  I appreciate that you're mindful of

2   mine and I'm glad that you are, and I -- but if -- if a

3   defendant who you're not representing disagrees with you and

4   thinks this is a pretty good model and wants to pursue it,

10:38:32   5   why shouldn't they be allowed to pursue it?

6                MS. WINNER:  Your Honor, I would point out

7   although not all Defendants have affirmatively opposed this,

8   there's no Defendant that has come out affirmatively in

9   support of it.

10:38:45  10                THE COURT:  I didn't ask for that.  I mean,

11   you know, that's -- they don't -- I didn't -- I didn't

12   require Defendants to say, "I think this is great.  I

13   approve it."  I certainly wanted and expected anyone who

14   opposed it to file something.

10:39:04  15        So I'm just -- I'm trying to get at what -- if your

16   objection is that your client doesn't think this model, if

17   you pursued it, would provide what your client wants and

18   would ultimately be that a settlement would be approved by

19   the Court of Appeals, all right, but no one's making you do

10:39:22  20   it.

21        Why are you opposing providing the opportunity for

22   some other Defendant who thinks it might be a pretty good

23   model from trying it?

24                MS. WINNER:  I think, your Honor, because

10:39:34  25   first of all, as I said, there are only so many resources to

1    go around, including resources of the Court and of the

2    Special Masters that are attempting to assist with the

3    settlement process.  Dedicating those resources to this

4    would divert them from other options.  That's Number 1.

10:39:51  5    Number 2, we're concerned that this -- I'm going to go

6    further into this in a few minutes.  We're concerned that

7    this proposal, as it has been put forward, is going to sow

8    considerable confusion among the proposed class, and in

9    fact, has already started to do that.  We've already seen

10:40:11 10    some indication of that.

11    And third of all, we are very concerned that

12    notwithstanding all of the protestations by the Plaintiffs

13    that they -- that this isn't solely for negotiation

14    purposes, there will be no implications of this for any

10:40:27 15    merited class issues, that could very readily be

16    misunderstood, even if your Honor were to adopt their

17    proposal on that, could very readily be misunderstood by

18    other courts.

19    Your Honor, in order to certify this Class, under

10:40:43 20    Supreme Court, very clear Supreme Court law, has to make

21    explicit findings under each of the Rule 23 factors.  Those

22    Rule 23 factors, for the reasons we've set out in our brief

23    -- and I'm only going to talk about one or two of them

24    today.  I'm not going to belabor it -- but those 23 fact --

10:41:01 25    Rule 23 factors are not satisfied here.

1          The Plaintiffs are asking your Honor to basically shut

2     your eyes and make those findings for purposes of

3     expediency.

4               THE COURT:  What -- first of all, you're

10:41:14  5     correct.  If there would be a settlement, I would still have

6     to have a fairness hearing and entertain objections and make

7     a decision.  And if I adopted it, I would have to go through

8     all those 23, Rule 23 factors and make findings.

9               MS. WINNER:  No, you have to make those

10:41:34 10     findings now if you're going to certify this Class.  Those

11     findings have to be made now.  That's the part.

12               THE COURT:  What findings -- what findings do

13     you think I cannot make in good faith now?

14               MS. WINNER:  You cannot make in good faith --

10:41:46 15     I mean I think the only findings you can make in good faith,

16     based on what has been presented to you, is numerosity.  I

17     think that's satisfied.  Everybody agrees on that.  But,

18     there are three other factors under Rule 23(a and there are

19     two factors under Rule 23(b) on which specific findings are

10:42:04 20     required.

21               THE COURT:  What findings do you think the

22     facts don't warrant?

23               MS. WINNER:  The facts do not warrant -- let

24     me give you a couple of examples.

10:42:15 25          One of the findings that is required under Rule 23(b)

1    is predominance.  The Amchem case from the Supreme Court

2    made very clear that you cannot find predominance merely

3    because a settlement would be good for everyone.  And so

4    that swamps everything.  You have to look at the underlying

10:42:37    5    claims and the proof that would be used to satisfy those

6    claims.

7         And the Supreme Court, by the way, has been very clear

8    in some of its recent decisions.  The Amgen case --

9    different from Amchem, the Amgen case, the Tyson Foods case

10:42:55  10    from the Supreme Court, the Supreme Court has said you have

11    to make a rigorous analysis that looks at evidence, that

12    determines will the claims be -- not whether the claims are

13    the same causes of action for everybody, but rather, whether

14    those claims can be proven in one fell swoop with common

10:43:18  15    evidence; whether you can prove the issues with common

16    evidence.

17              THE COURT:  Well, I think -- I think that's

18    fairly easy to say.  All right?  I've studied this, I've

19    studied these -- the complaints.  I've been reading a whole

10:43:33  20    lot of motions.  Okay?  I think Mr. Seeger is essentially

21    right in terms of liability.  In terms of liability, I could

22    probably substitute almost any other city or county for

23    Summit and Cuyahoga and the trial would be similar.  For

24    damages, there would be -- there would be differences.

10:43:53  25              MS. WINNER:  In fact, your Honor, the issues

1    would be quite different, and I was actually going to bring

2    up what he said about that.

3              THE COURT:  I think they're a lot more similar

4    than different.

10:44:01  5              MS. WINNER:  They're -- particularly if you

6    look at the distributors, if you -- the trial in this, in

7    October, that you have set for this October, is going to

8    look at what was shipped in to Summit and Cuyahoga County,

9    what impact those shipments had, whether those shipments

10:44:19 10   were diverted, what impact those shipments had on the

11   community, if any.  And you look at that -- by the way, on a

12   Defendant-by-Defendant basis, this is not a finding that you

13   can make just sort of globally and say well, if you look at

14   all the Defendants together, it sort of looks the same.

10:44:37 15  This finding has to be made individually for every

16   Defendant.  You cannot substitute Cumberland County, Maine

17   and prove the case from Cumberland County, Maine, or

18   Phoenix, Arizona, based on what the shipments were in Summit

19   County.

10:44:54 20       The shipments into Summit County, the impact of those

21   shipments on the residents or the community of Summit County

22   has nothing to do with the case of Cumberland County, Maine,

23   or Phoenix, Arizona.

24              THE COURT:  Would just be different

10:45:11 25  statistics.  All right?

34

1          MS. WINNER:  No, it's going to be more than

2     just statistics because it has to be statistics where they

3     were coming from.  They're different distributors in

4     different cases, in different jurisdictions.  Some of these

10:45:22  5     jurisdictions, my clients shipped very little into.  Some of

6     them they shipped more into.  That's true of all the

7     distributors.

8          THE COURT:  Let me ask you this.  I mean

9     what -- if this model, if you don't think this model passes

10:45:40 10     legal muster, what are you proposing?

11          MS. WINNER:  Well, your Honor, I can

12     understand your frustration --

13          THE COURT:  No, no.  What are you -- what are

14     you -- how do you think this model can be improved Ms.

10:45:55 15     Winner, or if it's so bad that it needs to be scrapped, what

16     are you proposing in its alternative as an alternative?

17          MS. WINNER:  Well first of all, your Honor, I

18     can't propose an alternative here today.  That's not, I

19     think, what we're here for --

10:46:11 20          THE COURT:  I disagree.  I disagree.

21          MS. WINNER:  -- because your Honor cannot

22     certify a class that does not satisfy Rule 23 merely because

23     there's not a better alternative out there.  I mean,

24     unfortunately, that's what the Supreme Court --

10:46:26 25          THE COURT:  We may differ on that, Ms. Winner.

1          MS. WINNER:  We may but that's what the

2    Supreme Court held in the Amchem case.

3          THE COURT:  Amchem, let's see what they do

4    with this if this gets that far.

10:46:37    5          MS. WINNER:  The Supreme Court confronting

6    Amchem was confronting similar situations where there was a

7    very --

8          THE COURT:  No court has ever confronted a

9    similar situation.  That I'm confident of.  So you have no

10:46:49   10    idea what -- if this gets to the Supreme Court, you have no

11    idea what they'll do.

12      I'm -- but I -- but I'm not worried about the Supreme

13    Court.  The issue is what I will do, and I am open to all

14    suggestions but I would simply say just to say that this

10:47:07   15    model isn't adequate isn't helpful to me and it isn't

16    helpful to the process.  What is helpful is if you say, "All

17    right, Judge, you should -- you should make these following

18    changes, A, B, C, or here's a much better model."

19          MS. WINNER:  Well, let me say, your Honor, our

10:47:26   20    brief does address several problems with this proposal that

21    are fixable.

22          THE COURT:  All right.  What do you think

23    needs to be fixed?

24          MS. WINNER:  One thing that is -- that would

10:47:37   25    be fixable but is not fixed -- I'm not saying it would cure

1       all the problems, but one is that this is not proposed as a

2       class action.  It's not a class proposed to be certified in

3       any particular lawsuit, involving distinct parties with

4       distinct plaintiffs and distinct plaintiffs.  That's --

10:47:55  5            THE COURT:  I've already said that's -- I've

6       already fixed that.  It's going to be a specific number of

7       specific federal claims, and it will be 13 national

8       Defendant families.

9            MS. WINNER:  But it has to be in a specific

10:48:09 10     case.  It can't just be -- MDL is not a case; it's an

11      administrative mechanism.  It's not a case.  It's not a

12      case --

13           THE COURT:  I got 2000 cases.  There has to be

14      a vehicle for resolving them as a group, so.

10:48:23 15           MS. WINNER:  But, your Honor, again, I'm not

16      saying that that's not fixable.  I'm saying we raised this

17      before and they chose not to fix this.

18           THE COURT:  I'm not understanding what you're

19      suggesting should be fixed.

10:48:34 20           MS. WINNER:  There is no case in which they

21      are seeking to have this case certified.  This motion is

22      filed just generally in the MDL.  It's -- they're not

23      seeking certification against specific Defendants.  And I

24      understand that your Honor does intend to address that.

10:48:49 25           THE COURT:  I'm fixing that.  There will be 13

1    Defendant families.

2               MS. WINNER:  But, your Honor, we'll need to

3    make the Rule 23 findings for each Defendant.  That is,

4    again --

10:48:59 5          THE COURT:  If I need to, if you think I

6    can -- I can make findings if I need to.

7               MS. WINNER:  But let me talk about another

8    area where there are some clear problems here.  And that is

9    the conflict of interest within this class.  And I go back

10:49:14 10   to -- and the real problems with the notice.

11        We might return here to the article from Professors

12   McGovern and Rubenstein that was sort of the foundation of

13   this proposal.  And that article, if you read it, it's very

14   interesting.  They did a lot of work to try to address the

10:49:37 15  adequacy of representation issues in light of Amchem and to

16   come up with a design, particular structure for a proposed

17   Negotiation Class.

18        Now we don't think even that would satisfy Rule 23,

19   but if you leave that issue aside, that -- they at least

10:49:56 20  made -- do make an effort to try to make -- get it as close

21   to Rule 23 as possible.  This proposal doesn't follow that

22   pattern.  It doesn't do what that -- what the original

23   concept envisioned because the original concept was -- it

24   has two critical parts that are not satisfied here.

10:50:20 25       One is that you get to get -- you identify all the

1   claimants who would need to participate in a settlement in

2   order to get a global settlement, and you make that your

3   class.

4            THE COURT:  I thought that's what happened.

10:50:36  5            MS. WINNER:  They don't -- well, they don't

6   really do that here because you leave out the states, and

7   that's pretty critical.  The states are not part of the

8   Class.

9            THE COURT:  Of course, not.  They're not -- no

10:50:47  10   state has a federal lawsuit, Ms. Winner.  So they can't

11   be -- I mean the State Attorneys General have each decided

12   to file one or more cases --

13            MS. WINNER:  I believe Montana has a

14   federal -- I believe Montana actually has a federal suit.

10:51:02  15            THE COURT:  I don't think so.  Alabama was the

16   only one who did.  I'm not aware of any counsel --

17            MR. LYNCH:  Your Honor, we just had it

18   stipulated that Montana has filed a federal lawsuit.

19            COUNSEL:  No, no, no.

10:51:13  20            THE COURT:  No.  There is no -- Alabama

21   voluntarily dismissed their federal lawsuit and refiled in

22   State Court.  It did not include any State Attorney General.

23            MR. LYNCH:  Excuse me for interjecting this.

24   It was Idaho, not Montana.

10:51:30  25            THE COURT:  I don't think this is going

1    anywhere.

2              MS. WINNER:  Your Honor, let me go to the

3    second piece, which I think is more critical, and I don't

4    think there's any basis for dispute here.

10:51:39  5         The second piece, the critical piece here is that

6    there will be an advance agreement that sets up, upfront

7    what each class member's share of any settlement will be.

8              THE COURT:  I think that's probably the best

9    part of the proposal.  Why do you think that's bad?

10:51:59 10            MS. WINNER:  Because it's not true.  They

11   haven't done that.  That's the problem.  If they'd done, you

12   know, we might be talking differently but that's not what

13   they've done here.  That's not what this proposal does.

14         This proposal only provides an allocation that goes to

10:52:14 15   the County level.  It provides no allocation between the

16   cities and between the counties and the cities and towns and

17   villages that are within each county.  That is left either

18   to later negotiation between each county and its

19   constituents or to the Special Master.  If they can't reach

10:52:39 20   agreement with the Special; Master, it will have to be

21   re-litigated.

22         So they have a partial allocation, not a complete

23   allocation.  This is kind of hidden in their -- in their

24   filing.  But if you read it closely, it becomes very

10:52:53 25   apparent.

1           THE COURT:  Well I mean that's --

2           MS. WINNER:  That's a very real problem.

3       Let me just give you an example.

4           THE COURT:  How is that a problem for you?

10:53:02  5   Again, you don't have to use it.  If you've got a better

6   way, I mean.

7           MS. WINNER:  It's a problem because it's being

8   held out there as the golden way to solve this.  It's being

9   held out there as a way the Court should invest its time and

10:53:21 10  its energy and its resources.  It's being held out as

11  something that the Court is being invited to make findings

12  that this record does not support.

13      It is a problem because we have a very, very

14  complicated litigation here.  Your Honor has stressed that

10:53:42 15  more than anyone.  This is -- this is as complicated a

16  litigation as there's ever been, and adding another layer of

17  complication through a class action that is not supportable,

18  that does not follow the Federal Rules, does not even do

19  what the Plaintiffs claim it does, is wasting everybody's

10:54:06 20  time, is wasting everybody's energy.

21      Let me just give you the example --

22          THE COURT:  Ms. Winner, if -- if every

23  Defendant feels the way you do, there will be no time wasted

24  because no one will ever use it.

10:54:23 25          MS. WINNER:  But your Honor will have gone on

1    record making findings that are not supported by the record.

2    Your Honor --

3              THE COURT:  That's on me but it's going to be

4    academic because no one's ever going to use it.

10:54:34  5              MS. WINNER:  It will not be academic if other

6    people copy those findings, your Honor.  That is --

7              THE COURT:  No one -- I mean copy the

8    finding -- no one can copy the findings in another case.

9    Any other Judge in another case will have to see what's

10:54:48 10    proposed in his or her case.

11              MS. WINNER:  We're also concerned that it

12    would create a considerable amount of confusion out there

13    about what the situation is, whether class members are, in

14    fact, entitled to negotiate separately with defendants.

10:55:03 15    That is something that's come up in the submissions that

16    have been presented to your Honor, the written submissions.

17         There's also confusion in the notice, and the -- let

18    me just give you an example from the notice of what the

19    problem is with the notice.

10:55:18 20         The idea is that allocation is made clear.  All you

21    have to do, if you're a small town in America, all you have

22    to do is just look up on this website and you'll find out

23    what your allocation is.

24         Well, let's just take the example of DuBois, Wyoming.

10:55:34 25    Very nice little town in Wyoming I visited once.  Dubois,

1    Wyoming looks up -- opens up their browser.  They look up

2    the website, they look up their county, Fremont County,

3    Wyoming, and see that Fremont County is going to get either

4    the billion-dollar settlement, Fremont County will get about

10:55:52  5    $68,000, and that DuBois will get $98 out of that.

6        Well that, in fact, isn't true.  If you read the fine

7    print, you find out -- and you actually have to sort through

8    the FAQ's and their brief in support of this motion.  You

9    find the fine print, it actually says they're proposing if

10:56:16 10    your allocation is less than $500, you actually get nothing.

11        So the proposal is actually that out of a

12    billion-dollar settlement, DuBois would get zero.  But, this

13    website says they get $98.  But, then there's more on the

14    fine print.  The fine print also says well by the way, this

10:56:36 15    is only sort of a default allocation that might be applied

16    because there's no actual agreed allocation for DuBois or

17    for Chicago or for Montgomery, Alabama, or any other city or

18    town in America.  There is no specific allocation agreed to

19    here.  There's just this default idea of what it might be,

10:56:59 20    but you still have to negotiate it afterwards.

21        That creates two very serious problems here.  One is

22    this notice is not adequate.  It is, I would argue,

23    affirmatively misleading.  I think, you know, DuBois looks

24    this up, they think they're getting $98.  They're not

10:57:19 25    getting $98.  They're not guaranteed --

```
 1              THE COURT:  Okay.  We'll have to look
 2    carefully at the notice --
 3              MS. WINNER:  There's another problem.
 4              THE COURT:  -- not that kind of confusion.  We
 5    can look at that.
 6              MS. WINNER:  There's another problem here, in
 7    that there's conflict of interest within this Class, a very
 8    fundamental conflict of interest.
 9              THE COURT:  What's that?
10              MS. WINNER:  Between the cities and the
11    counties.
12         All of these entities have got to be able to negotiate
13    with each other.
14              THE COURT:  Well --
15              MS. WINNER:  I did note at the beginning that
16    your Honor said --
17              THE COURT:  That happens all the time.
18              MS. WINNER:  No.
19         The whole idea of this structure, the reason why they
20    try to circumvent other aspects of Rule 23 and say this
21    Negotiation Class idea will work is because this is all set
22    upfront.  You don't have to negotiate it after the fact and
23    that would eliminate conflicts within the Class.  That's the
24    whole idea of --
25              THE COURT:  What are you -- what are you
```

1       proposing as an alternative, Ms. Winner?

2                 MS. WINNER:  Your Honor, I think -- I don't

3       have a specific alternative.  I think that the -- if you

4       look at the article, that what the article presents, it says

10:58:25  5       that the alternative is you actually have to have an

6       agreement that actually does allocate everything.  That --

7       that would be the fix.  That was the concept that the

8       Plaintiffs borrowed in coming up with this motion, is that

9       there had to be a full allocation formula for everybody.

10:58:44 10                 THE COURT:  All right.  So --

11                 MS. WINNER:  Now the other way the Amchem case

12       says that you can address this kind of conflict problem is

13       that you can have subclasses.  And the Plaintiffs make

14       their -- I think a very persuasive argument in their

10:59:00 15       motion -- I don't agree with all of their reasons for why

16       subclasses wouldn't work here.  It just wouldn't be

17       practical.  And frankly, I think the main reason it wouldn't

18       work here is you then have to have rather than one global

19       settlement which, is the whole idea here, you'd have to

10:59:15 20       negotiate a whole bunch of different settlements.

21                 THE COURT:  Right.  It defeats the purpose.

22                 MS. WINNER:  That defeats the purpose.  And

23       that is why the concept that is set out in the article from

24       Professors McGovern and Rubenstein is to have the allocation

10:59:31 25       completely established upfront so that you don't have to

1  worry about subclasses.

2      So, your Honor, I'm not going to go --

3          THE COURT:  That would put this off

4  indefinitely for every county to negotiate with every city

10:59:45  5  and township that has filed a lawsuit and everyone that

6  hasn't so -- before we do anything, but I hear what you're

7  saying.

8          MS. WINNER: Your Honor, there are several

9  other fundamental problems with this motion and we do set

11:00:01 10  them out in our brief.  I'm not going to recite them.  Your

11  Honor has said you've reviewed our brief.  And if you have

12  questions, obviously I'm happy to address them.  I

13  appreciate your patience with me today.

14      We do have very serious concerns here and we do think

11:00:17 15  that this motion, at least as it's currently framed, should

16  be denied.

17          THE COURT:  Okay.  Thank you, Ms. Winner.  All

18  right.

19      Anyone -- I guess anyone want to speak on behalf of

11:00:31 20  the States?

21          MR. SINGER:  Yes, your Honor.

22      Good morning.  I'm Paul Singer, the chief attorney of

23  the tax division of the Texas Attorney General's Office.

24      And first, I want to thank you for giving the States

11:00:48 25  another opportunity to address the Court.  Despite your

1    repeated recognition that we are not parties or bound by

2    your Honor or the rulings of this Court, obviously the

3    States play a critical role in this process and we are

4    active litigants in this case and also importantly, we are

5    active -- we have engaged in active investigations, using

6    our pre-investigative powers.

7        I just want to lay that out because I think the

8    States, like member of the Plaintiffs Committee, have been

9    very active participants and are very knowledgeable about

10   the facts that are here and before us that have led to this

11   hearing today.

12       And as to the matter at hand, the AG is also an

13   important player when it comes to class action.  We have a

14   role under the Class Action Fairness Act to review class

15   action settlement proposals, such as this novel approach,

16   and raise any concerns on behalf of our citizens with the

17   Court.

18       As your Honor knows, 38 AG's submitted a letter to the

19   Court, outlining many of our concerns that we have.  I think

20   it's somewhat unprecedented to see that many AGs united in

21   expressing their concerns, especially given the short time

22   that was available to review these motions.

23       But I want to address -- rather than go through the

24   letter, I do want to address a few things that your Honor

25   has raised today and a few points that have been made by the

1      Plaintiffs as well.

2          First, your Honor, I understand and recognize the

3      notion that if parties don't like this model, they just

4      don't have to use it.  Unfortunately, I don't think it's as

11:02:30 5      simple as that, and especially when it comes to the States.

6          The motion that's been put out there goes into great

7      detail about the role that it -- that this negotiation class

8      would play in determining allocation between the States and

9      the Counties, including purporting to allow out-of-state

11:02:50 10     representatives ultimately to vote on how that allocation

11     would work within a particular state, and then also

12     subjecting any final allocation that's reached between a

13     state and its counties to ultimate approval by this Court.

14         So that directly conflicts with your Honor's previous

11:03:08 15     orders that make it clear that this Court does not have

16     jurisdiction over the states and it infringes on state

17     sovereignty.  That's really the underlying sovereignty issue

18     that the States have raised.

19         I know Professor Issacharoff spoke earlier about

11:03:23 20     States stepping in the shoes of counties.  I agree.  It's

21     largely a very claim-by-claim issue --

22                THE COURT:  I understand your point, but I

23     don't, I don't think this proposal infringes one iota on

24     state sovereignty.

11:03:42 25         Everyone understands that no defendant or group of

1  defendants is going to settle with the States alone and not

2  with the cities and counties, or with the cities and

3  counties alone and not the states.  Okay?  That would be

4  lunacy, and no one would do it.

11:04:00  5  And so the challenge has been, all right, how to

6  create some -- some semblance of a team on the Plaintiffs'

7  side so any Defendant who wishes to pursue settlement could

8  do it.

9  Now it's easy to set -- establish a team of 50AGs.

11:04:19  10  It's 50 men and women.  That kind of team has been put

11  together in lots of other lawsuits very effectively.  They

12  were here from the beginning.  It's not so easy with 2000

13  litigating cities and counties and potentially 20 or 30,000

14  others.  So that, to me, is purpose the of this proposed

11:04:42  15  class.  It's so that a Defendant who says I want to settle

16  with everyone now can say all right, I've got the AG's and

17  I've got this litigating subdivision, and I can figure out

18  -- I do one of two things.  I decide the allocation.  I'm

19  offering X to the states and X to the cities and counties,

11:05:07  20  or I'm offering Y to the two groups and you allocate it.

21  Okay?  And you figure it out.

22  So all this mechanism does is take care of the portion

23  that is allocated to the cities and counties.  It doesn't

24  say what that portion will be.  In fact, it explicitly says

11:05:33  25  it will be the product of negotiation between the states and

1    the cities and counties, which it would have to be.  Quite

2    frankly, if it didn't exist you would have to do it.  And it

3    doesn't say how you do it.  It just says you do it.  And it

4    doesn't say if you can't come to an agreement, the Court

11:05:47  5    decides.  I don't decide.  If you can't come to an

6    agreement, there's no settlement with that Defendant or

7    group of Defendants.

8         So I don't -- I wouldn't approve anything that I

9    thought infringed on state sovereignty.

11:06:02 10              MR. SINGER:  So, your Honor, I think the

11    motion, though, purports to do more than just focus on the

12    County allocation.

13         It does include reference to the fact that this

14    mechanism could be used to decide how that allocation occurs

11:06:16 15    between a state and its counties and how the relationship

16    between state and counties goes.

17              THE COURT:  I didn't read it.  I didn't read

18    it, and I don't think it could.  I don't -- I don't -- I

19    don't think that I have the power, directly or indirectly,

11:06:37 20    to make that decision.  All right?  Either a Defendant wants

21    to settle, either that will be explicit in the settlement

22    agreement, all right, which would be a three-way

23    negotiation, or it would have to be worked out afterward

24    between the states and the cities and counties and it would

11:06:57 25    be a product of negotiation, and no one could dictate it.

1    All right?  If I tried, it would be appealed in a minute and

2    reversed without even an argument.

3        So I don't -- I mean can you point to something in

4    this agreement which you think tells a one-state AG or 50 as

11:07:20  5    a group this is how you've got to -- how you've got to

6    allocate your money that's awarded in any settlement?  If

7    so, I'll fix it.

8            MR. SINGER:  I think in the motion, I mean I'm

9    just referencing on Page 10 of the motion, it does reference

11:07:38 10    that any agreed-to allocation gets treated as a settlement

11    and submitted to the Negotiation Class for consideration.

12        So if in Texas, the AG reaches a separate agreement

13    with its counties, what this motion is purporting to do is

14    then force that agreement to be taken to this Negotiation

11:07:56 15    Class for a vote.

16        And what unclear between the motion and the memorandum

17    is that whether or not this entire National Class gets to

18    then vote on how that allocation works within Texas, for

19    example.

11:08:08 20            THE COURT:  Well, it doesn't --

21            MR. SINGER:  And, your Honor, I appreciate

22    what you're saying because I mean some of this can be

23    remedied, and which I think is part of the offer that the

24    states have made is to continue to work as we have from day

11:08:22 25    one as this proposal was originally created, we are happy to

1    continue to work with the parties about how alternatives can

2    be approached.

3                    THE COURT:  And I would simply say,

4    Mr. Singer, you know, picking up on what I said to Ms.

5    Winner, there are other models.  No one, no defendant has to

6    use this model.  If someone proposes another model that says

7    hypothetically we're going to rely on each State AG to

8    figure out and work it out with the cities and counties in

9    his or her state, all right, but there's still going to have

10   to be a lot of negotiation.  And if you don't work it out,

11   there's nothing.

12        So this is a -- I think one of the strengths of this

13   model is the allocation system because it -- a lot of time

14   and effort and money was spent coming up with something that

15   looks fair.  It looks like it gets the money to where the

16   harm is, which is the idea, and it gets the money to where

17   the harm is even if a particular subdivision hadn't filed a

18   lawsuit because no one wants to encourage another 20 or

19   30,000 lawsuits.

20        I said from the start, if there's any settlement, the

21   money needs to go where the harm is and where the treatment

22   facilities are.  And I think -- I think this does this.  So

23   I think it would be -- it would be helpful toward those

24   discussions under some other model, but again, I welcome

25   your offer.

1          And this is a work in progress.  And quite frankly, if

2     it's approved and if a given Defendant wants to use it, I am

3     sure that during that process, there will be changes made

4     because people are going to say, "Geez, we didn't anticipate

11:10:17  5     this.  And we've got to fix this and we've got to fix that."

6     This is all theoretical.  There will be a whole lot -- a lot

7     legislation.  All right?  You pass it, you think -- you

8     think it works, and then you start trying to implement it

9     and you see there are things you've got to change and you

11:10:35 10     change it.  So I expect that to happen here.

11          But, I -- if you think that there's some language

12     which just -- which appears to say that this Court, in any

13     way, shape, or form is going to tell an Attorney General of

14     Texas or any other 49 states what they're to do with money

11:11:00 15     that they are -- they get in a settlement, I want to fix

16     that language because I -- that's -- it's not appropriate

17     for a Federal Court, directly or indirectly, to do that.

18               MR. SINGER:  Yes, your Honor.

19          And we can do that.  But it's also the issue of how

11:11:17 20     the states interact with their counties and how we are going

21     to go forward within each state and allocate funds to do

22     exactly as your Honor wants because I think we share in that

23     goal, which is getting the money to the appropriate

24     locations where the problem is.

11:11:32 25          And certain states have had advanced discussions with

1    all of their subdivisions and are working that out.  Our

2    concern is that by including the states in these motions,

3    which they do, I mean there is reference to the states and

4    how this will impact the state discussions with its

11:11:48   5    counties, it's infringing on that inherent sovereignty that

6    we have to have those -- that relationship with our

7    subdivisions.

8        There's no reason the states need to be at all

9    referenced or included in motions like this because, as your

11:12:01  10    Honor has noted, none of the states have filed cases or have

11    cases before the Court.

12        THE COURT:  Well, I think it had, quite

13    frankly, Mr. Singer, it's in there to make it clear that

14    they're not trying to infringe on state sovereignty.  If

11:12:16  15    they say nothing, someone's going to -- raise a whole lot of

16    question and say, "Well, what about the states and what

17    about the state cases?"  So I think they have to -- they

18    have to mention that or else --

19        MR. SINGER:  I want to address that, too, your

11:12:32  20    Honor, because as your Honor knows, the states are active

21    participants in ongoing settlement discussions that have

22    been very active.  And frankly, the states are really the

23    leaders in those discussions for good reason because of the

24    nature of our claims and the nature of our offices.

11:12:51  25        And to the question of is there a better alternative,

1    I think the short answer is yes.  You know, we are happy to

2    separately and behind closed doors further brief your Honor

3    on sort of the nature of those discussions and what varying

4    models have looked like.  But, inherent in just sort of the

11:13:14    5    underlying power that your Honor recognized just a moment

6    ago, the States have to do this time and time again.

7         We are quite familiar with settling multi-state

8    matters and resolving issues at a nationwide level, and I

9    think we should be looked to, to conduct that here.

11:13:28   10              THE COURT:  That I was going to raise at the

11    end, but I'll raise it -- I'll point that out now.

12         The problem is that in a number of states, any money

13    that is, that a State Attorney General obtains, either by

14    victory in court, litigated judgment, or settlement, goes

11:13:53   15    into the general fund.  And the men and women who control

16    what happens in the general fund are the elected state

17    representatives and senators.  That's what they do.

18         And that's what happened in the tobacco litigation.

19    Over $200 billion, far more than 90 percent of that was used

11:14:12   20    for public purposes totally unrelated to tobacco smoking,

21    lung cancer, whatever.  And I believe that's why we have all

22    these counties and cities that filed separate lawsuits, to

23    make sure that doesn't happen again.

24         And so, again, no Defendant has to use this model at

11:14:37   25    all.  I know that there, as I alluded to, there are other

1    models being discussed actively, and if a given Defendant or

2    Defendants think that' a better model, more power to them.

3    I'm all in favor of it if it works.  And -- but that model

4    has to address -- because the model is encompassing cities

11:15:03    5    and counties, it has to address the problem of putting money

6    into the state general funds or else it isn't going to fly.

7         And so again, this is -- this is a nonexclusive

8    proposal, and it doesn't cut off -- in fact, I think the

9    more models out there, the better.  Okay?  Because it may be

11:15:27 10    that that given Defendant may say, "Well, I'd like something

11    for Model A and Model B, and this is" -- so whatever.

12                 MR. SINGER:  Your Honor, to your initial

13    point, and that is a -- the key issue of the model that is

14    under development, ensuring exactly that point.  I think the

11:15:47 15    States completely agree with your Honor on -- in terms of

16    again, making sure the money goes to where the problem is in

17    addressing the problem.  And so, you know, as I said, I

18    think we're happy -- and it does --

19                 THE COURT:  As I said, if you -- I mean if you

11:16:03 20    can identify, Mr. Singer, you or your colleagues, language

21    which you feel, you know, expressly infringes on state

22    sovereignty and say somehow this Court, me, directly or

23    indirectly, is telling a state, State AG how to do his or

24    her job or how to -- how to settle a case or not settle a

11:16:31 25    case, or how to in any way, shape, or form allocate money

1    that goes to a state, tell me, I will -- I will -- I'll

2    change that language.  Certainly if it says that expressly,

3    it's out.  And if it's subject to that interpretation, I'll

4    revise it so it's not subjected to that.

11:16:51    5        MR. SINGER:  I appreciate that, your Honor,

6    and I think we're happy to provide some alternative

7    language.

8        THE COURT:  All right.

9        MR. SINGER:  I would like to raise, though,

11:16:57   10    the fact that yes, more models in general are a good thing,

11    but I do want to underscore the point that was made earlier,

12    that there is going to be a lot of confusion as this process

13    moves forward, especially if there are other models that are

14    far more progressed and more likely to result in settlement

11:17:16   15    than the one under consideration today.

16        When all of our subdivisions receive formal notice of

17    this, there is no doubt that we are going to be overwhelmed

18    with questions and confusion.

19        I strongly do not believe that the comment made

11:17:32   20    earlier, I think by Mr. Seeger, that everybody knows about

21    this and all of our subdivisions are well aware of what's

22    happening, I do not believe that's the case.  In Texas alone

23    we have such varied subdivisions.  We have counties that

24    have four and a half million people.  We have counties that

11:17:47   25    have 130 people.  And when you get down to the individual

1    cities and towns, you're talking about a very different

2    level of sophistication and political structure.  You have

3    wide variance in how they can even consider these kinds of

4    notices and even raise an objection.

11:18:05  5          And so there's just inherent concern that there's

6    insufficient time and insufficient notice for those

7    subdivisions to properly object.

8          And then as the points have been made earlier, then

9    they're stuck, then they're bound.  And while I understand

11:18:19 10   the subdivisions all get a vote later, just a straight

11   up/down vote, what's unclear from the FAQs that's going out

12   to these subdivisions is that it's 75 percent of those

13   voting.  That is not made clear in the FAQ.  It's not made

14   clear in the motion.  It's made clearer in the memo that

11:18:38 15   accompanies it, and that's --

16              THE COURT:  Well, that's -- I will look at

17   that because it's -- I think, quite frankly, I think most

18   people would understand that because if it's not, and people

19   don't vote, they're essentially voting no.  I mean it's, you

11:18:57 20   know, generally elections are determined by the people who

21   vote.  And if you choose not to vote, you can't complain

22   about it.

23              MR. SINGER:  Sure.  And what's different here

24   is the unique --

11:19:08 25              THE COURT:  I'll make sure that the -- it's

1    made clear that it's 75 percent of those voters.

2              MR. SINGER:  And, your Honor, we're happy to

3    provide, you know, as we've outlined other concerns in our

4    letter, we're similarly, to what we were talking about,

5    happy to provide alternative language.

6              THE COURT:  All right.  I would encourage

7    you -- I would encourage you to do that because I don't

8    think any -- any of the drafters and any of the lawyers who

9    are proposing this are -- intended to infringe on state

10   sovereignty.  They understand that very well.  What the

11   heck, a bunch of them are representing states, so.

12             MR. SINGER:  I wasn't going to get into that,

13   your Honor.

14             THE COURT:  Well, I've alluded to it.  And

15   they were involved in this.  So the -- you know, I've said

16   enough on that.

17             MR. SINGER:  And I think, you know, as further

18   outlined in our letter, the States share a lot of the Rule

19   23 concerns that have already been raised, and I don't need

20   to readdress them for the Court, but obviously in our role

21   and overseeing the integrity of that process, that's the

22   nature of why we raise those concerns.  And really the

23   concerns, not just for this particular case, but the

24   precedent in the future that it sets, and so you know, I --

25   I'm happy to go into more of those, but I think your Honor

1    has reviewed them in our letter and all of the other

2    briefing and understands those concerns as well.

3              THE COURT:  All right.  Thank you very much,

4    Mr. Singer.

11:20:41  5              MR. SINGER:  Thank you.

6              THE COURT:  All right.

7         Was there anyone else who has any, I guess, objections

8    that haven't been articulated by the speakers so far?

9              MR. BLANTON:  Good morning, your Honor.

11:20:56 10   Jonathan Blanton, Deputy Attorney General for Major

11   Litigation at the Ohio Attorney General's Office.  I will do

12   my best to be brief, your Honor.

13        If this were -- we appreciate the work Professor

14   McGovern and Professor Rubenstein put into this.  This model

11:21:09 15   would be interesting if it were dealing with a consumer

16   protection matter, if it were dealing with a stockholder

17   matter or property damages.  But, this is different.  This

18   is a case of public interest and public harm.  And the model

19   that's been set forth impinges on the role of the Attorney

11:21:27 20   General.

21        The Attorney General has authority, puts them in a

22   unique position to represent the state as a whole, in the

23   interest of the state as a whole.

24        The Attorney General is best situated to work with the

11:21:39 25   legislature to make sure the money goes where the harm

1    really is.

2         Your Honor, the metrics that have been chosen in this

3    class voting concept clearly disfavor smaller jurisdictions,

4    less popular jurisdictions.  The fact that we're talking

5    about gross Morphine milligram equivalence rather than per

6    capita is troubling because in any large political

7    subdivision, as you would expect, there will be a larger

8    stream of legitimate opioids.  Same with overdose deaths.

9    Same with opioid dependence.

10        The voting itself, your Honor, by the fact that it is

11   population based and then doubles on that, your Honor, with

12   the fact that it is metric based also, so the higher the

13   metrics score, the greater vote you get, puts a great risk

14   to the rights and interests of the smaller political

15   subdivisions, and that expands globally.

16        Your Honor, the danger -- you're talking about the

17   danger to the Attorneys General and their sovereignty lies

18   in the interest of the individual states.  There's no

19   requirement in this plan that there's a threshold of Ohio

20   subdivisions that agree.  It's a threshold of harm to Ohio

21   subdivisions that agree.  Ohio can be bound by the votes of

22   folks who don't even live here, your Honor.  New York, Los

23   Angeles, the double counting of the counties and cities

24   could easily overwhelm our southern part of the state, which

25   has been absolutely drenched and almost irrecoverably

1    damaged by the opioid epidemic.

2         Also, your Honor --

3              THE COURT:  Mr. Blanton, what are you

4    proposing as an alternative?  All right?  I mean I

11:23:14  5    understand that, you know, you can say that, all right,

6    there shouldn't be any of these lawsuits in the first place.

7    It is -- I mean the corollary of what you're saying is the

8    Attorney General represents everyone in Ohio, which he does.

9    And so these cases should all be dismissed.

11:23:33  10    If that -- if that's what you're saying, you should

11    say it overtly that the Court should dismiss -- should have

12    filed, you know, say these cases are not just issuable;

13    cities and counties in Ohio don't have a right to bring

14    them, they should be dismissed.

11:23:46  15    I understand there are some litigation like that in

16    Tennessee.  I don't know what the result of that's been, but

17    I think the Attorney General took that position.

18              MR. BLANTON:  Your Honor, the danger of the

19    city/county cases and any resolution outside of the state is

11:24:01  20    that assuming there's settlement with just the city/county

21    class, not with an Attorney General, say the State of Ohio

22    doesn't join the settlement --

23              THE COURT:  There won't be.  No state --

24    sorry.  No Defendant in his, in its right mind would settle

11:24:18  25    the constellation of cases filed by the cities and counties

1    and not cases filed by Attorneys General.  The whole point

2    is that they need -- every Defendant has made clear that

3    before they'll seriously discuss settlement, they'll need

4    some vehicle to provide global peace.  All right?

11:24:37  5         It's easy to negotiate with the 50 AG's.  It's a model

6    that's done in countless other cases.

7                     MR. BLANTON:  It's somewhat monolithic, your

8    Honor.  But there are outliers --

9                     THE COURT:  I didn't say it's monolithic.  I

11:24:47 10   said if you've got 50 people, 50 men and women, you can

11   actually have them all there together if you want.

12                     MR. BLANTON:  If the Class gets out ahead,

13   your Honor.  The argument is that any recovery received by

14   the City and County, we offer as offset against the state

11:25:01 15   damages --

16                     THE COURT:  No one is going to settle

17   piecemeal, okay?  So it isn't going to happen.  Any

18   settlement is going to be with the Attorneys General and

19   with the cities and counties.  Okay?  So this -- this

11:25:17 20   vehicle is a way of getting a handle around this numerous

21   and somewhat fractious group so no one is going to -- no

22   one's going to settle with this group alone without the

23   AG's.

24                     MR. BLANTON:  We appreciate that commitment on

11:25:36 25   behalf of the Court, on behalf of the Special Masters, your

1    Honor.

2         As Mr. Singer hinted to, there are other potential

3    models being discussed and proposed that would not encompass

4    these types of challenges, that would not create the risk,

5    not create risk to our community, the risk of Ohio being

6    overwhelmed by other states' votes because of greater

7    populations, that would allow for greater cooperation and a

8    greater state-by-state consideration of the authorities, the

9    needs and the powers existing within that state at that

10   time.  We would be happy to talk to you about that.  Again,

11   this isn't quite the right forum because they are

12   confidential discussions.

13            THE COURT:  Right, but again, again, and I'll

14   say it again, I'm aware that there are other models under

15   discussion.  And if a Defendant or group of Defendants

16   believes there's another model that is more effective, and

17   the overall aggregate amount is acceptable, it's going to

18   fly, and it will work.  And the cities and counties will

19   join.  And if you have some other, you know, other vehicle,

20   again there's going to have to be a vehicle, a process of

21   allocating the money that's acceptable or they won't buy

22   into it.  But if you've got a better one, that's fine.

23   Nothing, nothing prevents that from happening.

24            MR. BLANTON:  I understand that, your Honor,

25   but once this model is created, once the pressure begins

1   from -- there's a large group of cities and counties who

2   have bonded together in a national class style, that would

3   result in -- essentially crams down these Defendants where

4   there will not be a settlement offered to them, does not

11:27:24  5   incorporate this class structure and, therefore, it gets

6   into the same issues with the states, your Honor.

7           THE COURT:  I assume -- nothing is being

8   crammed down -- this is a -- this is a model.  There's

9   another model under discussion.  No Defendant has to choose

11:27:38 10  any model.  It can go to trial in October and go to trial

11  for the next umpteen years in the 22,000 cases around the

12  country.

13          MR. BLANTON:  Your Honor, this model creates a

14  known for those who represents the cities and counties,

11:27:52 15  creates a known pot of dollars, a known percentage; 10

16  percent plus the 15 that's allocated.  I know there's a

17  waterfall provision.  But once that's established, what

18  interest would any of these plaintiffs have, especially when

19  you can roll in the unrepresented unvoting members of the

11:28:10 20  political subdivisions with negotiation of any of these

21  Defendants?  Why would they want to do that, your Honor?

22      It creates a system where this becomes the only

23  acceptable model to the subdivisions because it's their

24  benefit for it to be that way, whether it's the benefit of

11:28:23 25  each individual state, each individual community or not, it

1    stops being the question --

2                  THE COURT:  I disagree.  They're represented

3    by lawyers.  The lawyers are negotiating with any Defendant

4    who wants to negotiate.  They're never going to say no.

11:28:37  5    They're never going to say no, we won't consider another

6    model.  In fact, they're duty bound, they're ethically bound

7    representing their clients to consider any reasonable model.

8    All right?  They can't say we're not going to consider any

9    model other than this ethically.

11:28:53 10        And if they started to, I wouldn't let them.  I'd

11    throw them off the MDL in a heart beat.

12                  MR. BLANTON:  Thank you, your Honor.

13                  THE COURT:  So I -- and again, I would echo if

14    you feel, Mr. Blanton, that there is language in here that

11:29:15 15    that interferes with state sovereignty or says or suggests

16    that this Court in some way is going to tell an Attorney

17    General how to allocate money that is -- that is given to

18    the state, I want you to promptly tell me that, show me that

19    and I will look very hard, and if I think you're right, I'll

11:29:39 20    change it, I'll fix it because that's not -- I don't think

21    it's the intention of the movants, but maybe there's some

22    ambiguity.  But, get that to me, any suggestions as soon as

23    possible.

24                  MR. BLANTON:  Thank you, your Honor, for your

11:29:56 25    time.

1      MS. ANDERSON:  Good morning, your Honor.

2  Jenny Lee Anderson on behalf of the City of Fargo, North

3  Dakota.

4      As I mentioned in our papers, for a variety of

11:30:12  5  reasons, practical and logistical, the City of Fargo was

6  unable to get its complaint on file by June 14th.  That puts

7  it in a non-litigating class.

8      Now, on one hand, the City, therefore, became

9  concerned about being in a less concentrated group and

11:30:30 10  representation of that group.  On the other hand, the City

11  of Fargo generally supports the motion and understands

12  proposed class counsel needs to have a definite closure date

13  for litigating and non-litigating classes.  So we understand

14  those tensions.

11:30:46 15      Just this morning, I had an opportunity to discuss the

16  issue very briefly with Professor McGovern and also with

17  some members of leadership, Elizabeth Cabraser and others,

18  and it was suggested that perhaps we could explore

19  harnessing the City of Fargo's enthusiasm and desire to roll

11:31:04 20  up its sleeve in event of either litigation or global

21  settlement to act as a representative of some type for the

22  non-litigating class members under the currently proposed

23  settlement class structure if approved by your Honor.

24      Now as I mentioned, this was only discussed as an idea

11:31:21 25  this morning.  So the City of Fargo would like the

1    opportunity to explore the idea further with Plaintiffs

2    leadership and with Special Master McGovern and report back

3    to the Court promptly.

4                    THE COURT:  Okay.  Thank you.

11:31:34 5        When did Fargo file its case?

6                    MS. ANDERSON:  On July 9th.

7                    THE COURT:  Okay.  All right.  There obviously

8    needs to be some cut off.  And any cut off is going to be

9    somewhat arbitrary, but if not, no one will know who -- who

11:31:53 10   is litigating and who's non-litigating.  Okay.

11        Thank you very much for that offer.

12                   MS. ANDERSON:  Thank you, your Honor.

13                   MR. CHEFFO:  Your Honor, Mark Cheffo.  I just

14   have one --

11:32:06 15                  THE COURT:  Yes, Mr. Cheffo.

16                   MR. CHEFFO:  -- thank you, your Honor.  One

17   very discreet point.

18        As you know, the Manufacture Defendants have not

19   opposed at all.  But, hearing a number of things that your

11:32:16 20   Honor has said today, I think we will digest.  One in

21   particular, you referenced both the 13 groups and also

22   referenced you don't plan to focus on certain claims, I

23   think you were focusing on federal claims, and I guess this

24   is really more of an observation in kind of your invitation

11:32:32 25   to invite, you know, discourse about it.

1          The only thing that came to my mind and I think a few

2     of the folks who are kind of sitting next to me here was how

3     that might have -- how, to the extent this was used, any

4     releases would work if --

11:32:50  5          THE COURT:  Well, releases would encompass any

6     and all claims.  I've -- I've raised that already.  I picked

7     that up in my reading of this.

8          The releases, I mean the releases can be broader.  And

9     any obviously any Defendant who settles or wants release of

11:33:06 10   any and all claims that were brought and candidly could be

11    brought, you always have language there, too, so that isn't

12    going to be a problem, but I felt it was -- that -- there

13    had to be some boundaries so that -- so the Class members

14    would know what exactly these cases are and there's -- there

11:33:32 15   needed to be some uniformity and you can have uniformity

16    with federal claims.

17         So any releases will encompass any and all claims that

18    were brought or could be brought.

19                   MR. CHEFFO:  Thank you, your Honor.

11:33:47 20                   THE COURT:  Thank you for highlighting that.

21    Okay.

22         Anyone else who wanted to weigh in?  All right.  Well,

23    I very much appreciate first the hard work of all the

24    lawyers, academicians who helped create this proposed

11:34:09 25   negotiation.

1     MR. ISSACHAROFF:  Your Honor, could we address

2 two short points that were raised that may help clarify

3 things for the Court?  You want to go first?

4     MR. SEEGER:  Your Honor, I had a couple of

11:34:22  5 quick observations which I think are important to bring out.

6   On the AG's point, and I think you made the point but

7 if you didn't, I'd like to just -- there are -- I don't

8 represent AG's, your Honor.  I represent cities and

9 counties, and I can tell you --

11:34:34 10     THE COURT:  If you didn't, you wouldn't be

11 arguing.

12     MR. SEEGER:  I wouldn't be at this table.

13   There are cities and counties in Ohio that strongly

14 disagree with the idea that the Ohio AG owns those claims.

11:34:45 15 I think the best evidence of the fact that there's a

16 disagreement is you've got a couple trials about to go and

17 nobody, as far as I know, has come into the courtroom and

18 said stop.  So that's just an observation I'd like to make

19 on behalf of the Class here.

11:34:58 20   And I just want to express gratitude to Ms. Winner for

21 looking after our Plaintiffs.  It kind of reminds me of the

22 phrase in the Eggleston case in the Seventh Circuit, "That's

23 kind of an issue of the fox expressing worry about the

24 safety of the henhouse."  But I wanted to thank her for

11:35:10 25 that.

1      Your Honor, I have nothing else.

2          MR. ISSACHAROFF:  Two quick points, your

3      Honor, just to clarify some statements that were made.  One

4      was on the voting, voting system.

11:35:18  5      The voting system needs a requirement of 75 percent of

6      each of the six voting trusts.  It's not three out of six,

7      four out of six.  It's six out of six.  And they're designed

8      to, in one instance, overrepresent the power of small

9      jurisdictions because it's by each entity gets one vote.  In

11:35:41 10      some instances, it gives more power to the larger

11      jurisdictions because it's by population.  And in one

12      instance, it's by impact because it's based upon the same

13      formula that's used in the -- in the allocation system.

14      And so we tried three different metrics before and

11:35:57 15      after the cut off date, and so there's no risk at all of a

16      cram down.  And the only system -- the only time this would

17      be called into question is if some Defendant wanted to

18      settle, and as part of the settlement, wanted to give X

19      amount, a billion dollars let's say, to the cities and

11:36:15 20      counties, this then is the voting mechanism for that part of

21      the settlement and it's the allocation for whatever portion

22      is designated to the cities and counties.  There is no

23      effort made whatsoever to get inside the State/County

24      relations.

11:36:31 25      The second point is on the allocation itself.  We are

1    -- Ms. Winner discovered through her diligence that how this

2    money is distributed to the cities is not present here.  Let

3    me read the first sentence where we introduce the allocation

4    model.

5        The allocation model uses three factors to determine

6    the share of the global settlement that each county will

7    receive.  We do not purport anywhere to take this down below

8    the county level because as Mr. Singer expressed from Texas,

9    there is a huge variety in the size of counties and in the

10   functions that counties play, vis-a-vis, the various

11   municipalities within them.

12       I used to live in Texas.  And there, the counties are

13   very big and incorporate many cities.  I now live in New

14   York.  We have five counties but one city.

15       So it is -- this cannot be a "one size fits all."  And

16   so we are distributing down to the county level.  And then

17   there are suggested ways because there's a different

18   distribution of resources and services provided between

19   cities and counties.

20       This is known, and this has been communicated to the

21   2000 plus that already has cases on file.  And in addition,

22   we have a website where this is active and has been down --

23   has been hit many, many times by Class members.

24       So yes, we have not given notice yet but this is no

25   secret to the most actively involved litigating entities.

1    And as I said very, very beginning, there is no opposition

2    from within the Class.  So the smaller towns of Wyoming will

3    have to get the money from their counties which is the way

4    they get things now.

11:38:19  5        Thank you very much, your Honor.

6             THE COURT:  All right.  Thank you, Professor

7    Issacharoff.

8        Anyone else?  I don't want to slight anyone.  All

9    right.

11:38:34 10       Well, I -- I again appreciate all the hard work of

11   those who helped develop and devise and refine this

12   proposal.  I appreciate the many people who weighed in with

13   comments or suggestions to improve the finding.  I

14   appreciate all the comments made today.  The Court will take

11:38:55 15  it under advisement and I'll make a decision in the near

16   future.

17       I just want to highlight some of the key factors that

18   I'm weighing, wrestling in my mind.

19       There needs to be some vehicle to provide resolution

11:39:23 20  of these cases.  Everyone knows that trying probably 2500

21   now between the federal ones and the ones in State Court, is

22   -- first, it would sink the state and federal judiciaries,

23   but also the amount of private resources would be

24   staggering.  And no one -- no one would want to do that.

11:39:53 25       So there has to be a vehicle to resolve them.  There

1    doesn't have to be one vehicle alone.  So I've -- I've

2    encouraged all settlement discussions, I've encouraged all

3    ideas, I'm continuing to do so.  And this is just one.  And

4    no one had to use it.  And no one has to use all of it.

11:40:15  5    Someone could use part of it or use it as a spring board.

6    And I think it's a product of the Defendants' justifiable

7    insistence that before they would engage in serious

8    settlement discussions, they needed to have a vehicle, a

9    mechanism to provide a reasonable chance of global

11:40:38 10    resolution and global peace.  That's -- that's always

11    expressed by virtually every Defendant I've encountered in

12    my years as a lawyer and now as a Judge.  It's a fair and

13    acceptable one.

14        It's a lot more complicated.  We've never had, I don't

11:40:54 15    believe in our country, a constellation of cases like we

16    have in this opioid MDL.  I believe it's a, you know, a

17    product of some things that have happened in the past, but

18    whether it is or not, we have it here and there has to be

19    some vehicle to resolve these lawsuits.

11:41:21 20        I think this vehicle has some merit.  Is it perfect?

21    No.  Does it have problems?  No.  Is it certain it would be

22    affirmed on appeal if challenged?  Of course not because

23    it's never been tried before.  And that's simply -- but that

24    isn't -- that isn't a reason to say no, because you've never

11:41:37 25    had a set of lawsuits like this.  So the vehicle isn't going

1    to be one that's been tried and tested.

2         I don't believe that the proposed Negotiation Class

3    interferes or infringes on state sovereignty but again I've

4    invited the Attorneys General promptly to point out to me

11:42:03  5    any language which says to the contrary, and I will -- I

6    will address it.

7         But again, there's nothing coercive about this

8    process.  No Defendant has to employ it.  There's nothing

9    exclusive.  It does not prohibit any Defendant or State

11:42:22 10   Attorney General from taking a lead in some other vehicle

11   and/or structure.  And of course, there's nothing intrusive.

12   No Defendant has to settle at all.

13        So those are the considerations.  But I will -- I will

14   weigh all the comments and all the objections that were

11:42:47 15   filed, and I will endeavor to come to a decision as quickly

16   as possible.

17        And again, I think this hearing highlights the

18   challenges and difficulties presented by this MDL.  I mean

19   if someone says why is the federal judiciary trying to

11:43:13 20   address a 20-year social epidemic, why is it in this branch

21   of government and not the other two, I might share that

22   question, but we didn't choose it.  These cases came to our

23   branch, and we're not shirking our responsibility.  And I

24   was asked to undertake it on behalf of our branch.  I'm

11:43:37 25   essentially the fiduciary.  These aren't my cases.  Only a

1    handful of these cases are actually my cases or my court's

2    cases in the Northern District, a fraction of the 2000.  I

3    haven't added it up but it's a tiny fraction.

4         I'm the fiduciary, the trustee for -- almost every one

11:43:56  5    of my colleagues in the Federal Court has at least one of

6    these.  I haven't looked, but certainly a majority has at

7    least one.  And I've been asked to be the steward.

8         I'm trying the case in my district.  But, again, the

9    fact is that there has to be some vehicle to address these.

11:44:22  10    And, of course, the cases are -- have highlighted this

11    social epidemic and the social problem.

12         And I've also tried, along with this, to focus on

13    changes in conduct and behavior to turn that curve down and

14    candidly, a number of things have already been put into

11:44:45  15    place.  And as part of the discussions that are ongoing,

16    there are a number of other ideas and suggestions.

17         So again, those can't be implemented.  Most of them

18    can't be implemented outside of a -- outside of a resolution

19    or a settlement.  And that's why it's paramount to have at

11:45:03  20    least one vehicle or two vehicles or three vehicles for

21    resolution.

22         So with that, I want to thank everyone for their

23    participation.  And this hearing is adjourned.

24                   COUNSEL:  Thank you.

11:45:14  25         (Proceedings adjourned at 11:45 a.m.)

1                    C E R T I F I C A T E

2              I certify that the foregoing is a correct

3    transcript from the record of proceedings in the

4    above-entitled matter.

5

6

7

8    s/Shirle Perkins_____
     Shirle M. Perkins, RDR, CRR
9    U.S. District Court - Room 7-189
     801 West Superior Avenue
10   Cleveland, Ohio 44113
     (216) 357-7106
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25