# EXHIBIT 1

Highly Confidential - Subject to Further Confidentiality Review

1                UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
2                     EASTERN DIVISION

3

     IN RE: NATIONAL          )
4    PRESCRIPTION             )    MDL No. 2804
     OPIATE LITIGATION        )
5    _____  )    Case No.
                              )    1:17-MD-2804
6                             )
     THIS DOCUMENT RELATES    )    Hon. Dan A.
7    TO ALL CASES             )    Polster

8

                  THURSDAY, JULY 11, 2019
9

        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10              CONFIDENTIALITY REVIEW
11                     - - -
12          Videotaped deposition of Michael
13   Mapes, held at the offices of The Mining
14   Exchange, A Wyndham Grand Hotel & Spa,
15   8 South Nevada Avenue, Colorado Springs,
16   Colorado, commencing at 9:41 a.m., on the
17   above date, before Carrie A. Campbell,
18   Registered Diplomate Reporter and Certified
19   Realtime Reporter.

20

21

22                     - - -

23

              GOLKOW LITIGATION SERVICES
24       877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A P P E A R A N C E S :
 2
        LANIER LAW FIRM, P.C.
 3      BY:  W. MARK LANIER
             wml@lanierlawfirm.com
 4           RACHEL LANIER
             rachel.lanier@lanierlawfirm.com
 5           ROBERT LEONE
             robert.leone@lanierlawfirm.com
 6      10940 W. Sam Houston Parkway N., Suite 100
        Houston, Texas 77064
 7      (713) 659-5200
 8
 9      GREENE, KETCHUM, FARRELL, BAILEY
        & TWEEL LLP
10      BY:  PAUL T. FARRELL, JR.
             paul@greeneketchum.com
11      419 Eleventh Street
        Huntington, West Virginia 25701
12      (314) 525-9115
13
14      MCHUGH FULLER LAW GROUP
        BY:  MICHAEL J. FULLER, JR.
15           mike@mchughfuller.com
             AJ ELKINS
16           aj@mchughfuller.com
             (VIA REALTIME STREAM)
17      97 Elias Whiddon Road
        Hattiesburg, Mississippi 39402
18      (601) 261-2220
19
20      SIMMONS HANLY CONROY LLC
        BY:  LAURA L. FITZPATRICK
21           lfitzpatrick@simmonsfirm.com
        112 Madison Avenue
22      New York, New York  10016-7416
        (212) 784-6400
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      BARON & BUDD, P.C.
        BY:  MARK PIFKO
 2           mpifko@baronbudd.com
             JAY LICHTER
 3           jlichter@baronbudd.com
             (VIA REALTIME STREAM)
 4           STERLING CLUFF
             scluff@baronbudd.com
 5           (VIA REALTIME STREAM)
        15910 Ventura Boulevard, Suite 1600
 6      Encino, California 91436
        (818) 839-2333
 7      Counsel for Plaintiffs
 8
 9      NAPOLI SHKOLNIK, PLLC
        BY:  HUNTER SHKOLNIK
10           hunter@napolilaw.com
             (VIA TELECONFERENCE)
11           SHAYNA SACKS
             ssacks@napolilaw.com
12           (VIA REALTIME STREAM)
        360 Lexington Avenue, 11th Floor
13      New York, New York 10017
        (212) 397-1000
14      Counsel for Cuyahoga County
15
16      US DEPARTMENT OF JUSTICE
        BY:  JAMES R. BENNETT, II
17           james.bennett4@usdoj.gov
             RENÉE BACCHUS
18           renee.bacchus@usdoj.gov
        United States Courthouse
19      801 West Superior Avenue, Suite 400
        Cleveland, Ohio 44113
20      (216) 622-3988
21      and
22      US DEPARTMENT OF JUSTICE
        BY:  MARIAMA C. SPEARS
23           mariama.c.spears@usdoj.gov
        8701 Morrisette Drive
24      Springfield, Virginia 22152
        (202) 598-6204
25      Representing the US DOJ and the Witness
```

```
 1    REED SMITH LLP
      BY:  SHANNON MCCLURE
 2         smcclure@reedsmith.com
           ABIGAIL PIERCE
 3         abigail.pierce@reedsmith.com
      1717 Arch Street, Suite 3100
 4    Philadelphia, Pennsylvania 19103
      (215) 851-8100
 5    Counsel for AmerisourceBergen
 6
 7    WILLIAMS & CONNOLLY LLP
      BY:  JENNIFER G. WICHT
 8         jwicht@wc.com
           BRAD MASTERS
 9         bmasters@wc.com
      725 Twelfth Street, N.W.
10    Washington, DC 20005
      (202) 434-5331
11    Counsel for Cardinal Health, Inc.
12
13    COVINGTON & BURLING LLP
      BY:  CHRISTOPHER K. EPPICH
14         ceppich@cov.com
      1999 Avenue of the Stars
15    Los Angeles, California 90067
      (424) 332-4764
16
      and
17
      BY:  MEGHAN E. MONAGHAN
18         mmonaghan@cov.com
      850 Tenth Street, NW
19    Washington, DC 20001-4956
      (202) 662-6000
20    Counsel for McKesson Corporation
21    JONES DAY
22    BY:  NEAL J. STEPHENS
           nstephens@jonesday.com
23         PATRICK BEISELL
      1755 Embarcadero Road
24    Palo Alto, California 94303
      (650) 739-3939
25    Counsel for Walmart
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        KIRKLAND & ELLIS, LLP
          BY:  JENNIFER LEVY
 2            jennifer.levy@kirkland.com
              CATIE VENTURA
 3            catie.ventura@kirkland.com
          1301 Pennsylvania Avenue, N.W.
 4        Washington, DC 20004
          (202) 879-5000
 5        Counsel for Allergan Finance, LLC
 6
 7
          BARTLIT BECK LLP
 8        BY:  KATHERINE SWIFT
              kswift@bartlit-beck.com
 9            (VIA REALTIME STREAM)
          54 West Hubbard Street, Suite 300
10        Chicago, Illinois 60654
          (312) 494-4400
11        Counsel for Walgreens
12
13        DECHERT LLP
          BY:  ERIK W. SNAPP
14            erik.snapp@dechert.com
          35 West Wacker Drive, Suite 3400
15        Chicago, Illinois  60601
          (312) 646-5800
16        Counsel for Purdue Pharma
17
18        ROPES & GRAY, LLP
          BY:  WILLIAM DAVISON
19            william.davison@ropesgray.com
          800 Boylston Street
20        Boston, Massachusetts 02199-3600
          (617) 951-7000
21        Counsel for Mallinckrodt & SpecGx
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      BARNES & THORNBURG LLP
        BY:   WILLIAM A. HAHN, II
 2            william.hahn@btlaw.com
        11 South Meridian Street
 3      Indianapolis, Indiana  46204-3535
        (317) 236-1313
 4      Counsel for HD Smith
 5
 6      MORGAN, LEWIS & BOCKIUS LLP
        BY:   JOHN P. LAVELLE, JR.
 7            john.lavelle@morganlewis.com
        1701 Market Street
 8      Philadelphia, Pennsylvania 19103-2921
        (215) 963-5000
 9      Counsel for Rite Aid
10
11      LOCKE LORD LLP
        BY:   BRANDAN MONTMINY
12            brandan.montminy@lockelord.com
        2200 Ross Avenue, Suite 2800
13      Dallas, Texas 75201
        (214) 740-8445
14      Counsel for Henry Schein, Inc., and
        Henry Schein Medical Systems, Inc.
15
16
        ZUCKERMAN SPAEDER LLP
17      BY:   ANTHONY M. RUIZ
              aruiz@zuckerman.com
18            (VIA TELECONFERENCE AND STREAM)
        1800 M Street NW, Suite 1000
19      Washington, DC  20036-5807
        (202) 778-1800
20      Counsel for CVS Indiana, LLC, and
        CVS RX Services, Inc.
21
22
23
24
25
```

```
 1        O'MELVENY & MYERS LLP
          BY:  RYAN SYNDER
 2             rsnyder@omm.com
               (VIA TELECONFERENCE AND STREAM)
 3             AMY LUCAS
               alucas@omm.com
 4             (VIA REALTIME STREAM)
               SETH BAGLIN
 5             sbaglin@omm.com
               (VIA REALTIME STREAM)
 6        1999 Avenue of the Stars, 8th Floor
          Los Angeles, California 90067
 7        (213) 430-6326
 8        and
 9        TUCKER ELLIS LLP
          BY:  JEFFREY C. SINDELAR, JR.
10             jeffrey.sindelar@tuckerellis.com
               (VIA TELECONFERENCE)
11        950 Main Avenue, Suite 1100
          Cleveland, Ohio  44113-7213
12        (216) 696-3697
          Counsel for Janssen and Johnson &
13        Johnson
14
15        MORGAN, LEWIS & BOCKIUS LLP
          BY:  MAUREEN K. BARBER
16             valerie.toth@morganlewis.com
               (VIA TELECONFERENCE AND STREAM)
17        One Oxford Centre, 32nd Floor
          Pittsburgh, Pennsylvania 15219-6401
18        (412) 560-3300
          Counsel for Teva Pharmaceuticals
19        USA, Inc., Cephalon, Inc., Watson
          Laboratories, Inc., Actavis LLC,
20        Actavis Pharma, Inc., f/k/a Watson
          Pharma, Inc.
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MARCUS & SHAPIRA LLP
          BY:  JOSHUA A. KOBRIN
 2             kobrin@Marcus-Shapira.com
               (VIA TELECONFERENCE AND STREAM)
 3        301 Grant Street, 35th Floor
          Pittsburgh, Pennsylvania 15219-6401
 4        (412) 338-4690
          Counsel for HBC
 5

 6

          FOX ROTHSCHILD LLP
 7        BY:  ZACHARY MARTIN
               Zmartin@foxrothschild.com
 8             (VIA TELECONFERENCE)
          2700 Kelly Road, Suite 300
 9        Warrington, Pennsylvania  18976-3624
          (215) 345-7500
10        Counsel for Prescription Supply, Inc.

11

12        CAVITCH FAMILO & DURKIN, CO., L.P.A.
          BY:  ERIC J. WEISS
13             eweiss@cavitch.com
               (VIA TELECONFERENCE)
14        1300 East 9th Street
          Cleveland, Ohio  44114
15        (216) 621-7860
          Counsel for Discount Drug Mart

16

17

          FLAHERTY SENSABAUGH BONASSO PLLC
18        BY:  JACK SMITH
               jsmith@flahertylegal.com
19             (VIA TELECONFERENCE AND STREAM)
          200 Capitol Street
20        Charleston, West Virginia  25338
          (304) 345-0200
21        Counsel for Masters Pharmaceutical

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        FOLEY & LARDNER LLP
          BY:  KATY E. KOSKI
 2             kkoski@foley.com
               (VIA REALTIME STREAM)
 3        111 Huntington Avenue, Suite 2500
          Boston, Massachusetts 02199-7610
 4        (617) 342-4000
          Counsel for Anda
 5
 6
          BAILEY WYANT PLLC
 7        BY:  JUSTIN TAYLOR
               jtaylor@baileywyant.com
 8             (VIA REALTIME STREAM)
          500 Virginia Street East, Suite 600
 9        Charleston, West Virginia 25301
          (304) 345-4222
10        Counsel for West Virginia Board of
          Pharmacy
11
12
     ALSO PRESENT:
13
               SPECIAL MASTER DAVID R. COHEN
14        david@specialmaster.law
          24400 Chagrin Boulevard, Suite 300
15        Cleveland, Ohio 44122
          (216) 831-0001
16
17        Juan Wilson, Lanier Law Firm
          Georgia Macy, Lanier Law Firm
18
19
     VIDEOGRAPHER:
20        DAN LAWLOR,
          Golkow Litigation Services
21
                    - - -
22
23
24
25
```

```
 1                       INDEX
 2                                      PAGE
 3   APPEARANCES................................   2
 4   EXAMINATIONS
 5     BY MS. MCCLURE...........................  17
 6     BY MS. WICHT............................. 191
 7     BY MR. EPPICH........................... 207
 8     BY MR. STEPHENS......................... 233
 9
10                     EXHIBITS
11     No.     Description                      Page
12   Mapes 1   May 3, 2019 letter from US        23
               Department of Justice to
13             Michael Mapes
14   Mapes 2   Mike Mapes LinkedIn profile       47
               printout
15
     Mapes 3   Code of Federal Regulation        79
16             1301.74 printout from Westlaw
17   Mapes 4   US Department of Justice DEA       99
               July 23, 1998 letter to Chris
18             Zimmerman,
               ABDCMDL00315783 -
19             ABDCMDL00315794
20   Mapes 5   US Department of Justice DEA      121
               July 23, 1998 letter to Bergen
21             Brunswig,
               US-DEA-00025671
22
     Mapes 6   US Department of Justice DEA      122
23             letter dated December 27, 2007
               to registrant,
24             US-DEA-00001771 -
               US-DEA-00001772
25
```

Highly Confidential - Subject to Further Confidentiality Review

| | | | |
|---|---|---|---|
| 1 | Mapes 7 | Memorandum dated August 16, 2005, subject Internet Presentation with AmerisourceBergen on August 10 2005, US-DEA-00000147 - US-DEA-00000164 | 133 |
| 5 | Mapes 8 | Memorandum dated October 20, 2005, subject Internet Presentation with McKesson Corp. On September 1, 2005, MCKMDL00496859 - MCKMDL00496875 | 141 |
| 8 | Mapes 9 | Memorandum dated August 23, 2005, subject Meeting with Cardinal Health, Inc., Concerning Internet Pharmacies, US-DEA-00000352 - US-DEA-00000366 | 142 |
| 11 | Mapes 10 | E-mail(s), CAH_MDL_PRIORPROD_DEA07_00857912-R | 145 |
| 13 | Mapes 11 | E-mail(s), CAH_MDL_PRIORPROD_DEA07_01106667-R | 146 |
| 15 | Mapes 12 | Order to Show Cause and Immediate Suspension of Registration, ABDCMDL00269383 - ABDCMDL00269387 | 154 |
| 18 | Mapes 13 | Order of Special Dispensation and Agreement Between The Drug Enforcement Administration and AmerisourceBergen Drug Corporation, ABDCMDL00398334 - ABDCMDL00279857 | 156 |
| 22 | Mapes 14 | Settlement and Release Agreement, ABDCMDL00279854 - ABDCMDL00279865 | 158 |

| 1  | Mapes 15 | E-mail(s),                          | 169 |
|    |          | ABDCMDL00316083 -                   |     |
| 2  |          | ABDCMDL00316110                     |     |
| 3  | Mapes 16 | US Department of Justice DEA        | 179 |
|    |          | Diversion Control Division          |     |
| 4  |          | Pharmaceutical Industry             |     |
|    |          | Conference printout                 |     |
| 5  |          |                                     |     |
|    | Mapes 17 | AmerisourceBergen Drug              | 180 |
| 6  |          | Enforcement Administration          |     |
|    |          | Pharmaceutical Industry             |     |
| 7  |          | Conference, Wholesale               |     |
|    |          | Distribution Diversion Control      |     |
| 8  |          | Program, September 11, 2017,        |     |
|    |          | US-DEA-00001777 -                   |     |
| 9  |          | US-DEA-00001799                     |     |
| 10 | Mapes 18 | Summary of the DEA-HDMA Meeting     | 200 |
|    |          | on Suspicious Orders Meeting        |     |
| 11 |          | Date:  Sept 7, 2007,                |     |
|    |          | HDS_MDL_00135664 -                  |     |
| 12 |          | HDS_MDL_00135665                    |     |
| 13 | Mapes 19 | Internet Pharmacies, Joseph         | 246 |
|    |          | Rannazzisi,                         |     |
| 14 |          | US-DEA-00002413                     |     |
| 15 |          | (Exhibits attached to the deposition.) |  |
| 16 |          |                                     |     |
| 17 |          |                                     |     |
| 18 |          |                                     |     |
| 19 |          |                                     |     |
| 20 |          |                                     |     |
| 21 |          |                                     |     |
| 22 |          |                                     |     |
| 23 |          |                                     |     |
| 24 |          |                                     |     |
| 25 |          |                                     |     |

Highly Confidential - Subject to Further Confidentiality Review

 1              VIDEOGRAPHER:  We are now on

 2      the record.

 3              My name is Dan Lawlor.  I'm the

 4      videographer with Golkow Litigation

 5      Services.

 6              Today's date is July 11, 2019,

 7      and the time is 9:41 a.m.

 8              This video deposition is being

 9      held in Colorado Springs, Colorado, in

10      the matter of National Prescription

11      Opiate Litigation, MDL Number 2804.

12              The deponent is Michael Mapes.

13              Counsel, please identify

14      yourselves, starting with the

15      plaintiffs.

16              MR. LANIER:  My name is Mark

17      Lanier.  I'm here on behalf of the

18      plaintiffs.

19              I've got with me from my firm

20      Bob Leone, Rachel Lanier, Georgia

21      Macy, Juan Wilson in the room.

22              And then I know that there are

23      other plaintiffs' attorneys present,

24      but I'll let them identify themselves.

25              MS. FITZPATRICK:  Laura

```
 1          Fitzpatrick, Simmons Hanly Conroy.

 2               MR. FARRELL:  Paul Farrell,

 3          Jr., co-lead for the plaintiffs.

 4               MR. PIFKO:  Mark Pifko, Baron &

 5          Budd, for plaintiffs.

 6               MR. FULLER:  Mike Fuller on

 7          behalf of plaintiffs.

 8               MS. MCCLURE:  And we'll just

 9          continue in the room and then we can

10          do the phone.

11               This is Shannon McClure, Reed

12          Smith, on behalf of AmerisourceBergen.

13               MS. PIERCE:  Abby Pierce from

14          Reed Smith on behalf of

15          AmerisourceBergen.

16               MR. EPPICH:  Chris Eppich of

17          Covington & Burling on behalf of

18          McKesson.

19               MS. MONAGHAN:  Meghan Monaghan

20          of Covington & Burling on behalf of

21          McKesson.

22               MS. SWIFT:  Kate Swift for

23          Walgreens.

24               MS. WICHT:  Jennifer Wicht from

25          Williams & Connolly for Cardinal
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Health.
 2               MR. MASTERS:  Brad Masters,
 3        Williams & Connolly, Cardinal Health.
 4               MR. LAVELLE:  John Lavelle from
 5        Morgan Lewis on behalf of Rite Aid of
 6        Maryland.
 7               MR. STEPHENS:  Neal Stephens
 8        from Jones Day for Walmart.
 9               MR. SNAPP:  Erik Snapp from
10        Dechert on behalf of the Purdue
11        defendants.
12               MS. VENTURA:  Catie Ventura of
13        Kirkland & Ellis on behalf of the
14        Allergan defendants.
15               MS. LEVY:  Jennifer Levy from
16        Kirkland & Ellis on behalf of the
17        Allergan defendants.
18               MR. DAVISON:  William Davison
19        of Ropes & Gray on behalf of the
20        Mallinckrodt defendants.
21               MR. MONTMINY:  Brandan
22        Montminy, Locke Lord, on behalf of the
23        Henry Schein defendants.
24               MR. HAHN:  Bill Hahn, Barnes &
25        Thornburg, on behalf of HD Smith.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. BACCHUS:  Renée Bacchus, US

 2         Attorney's Office, Northern District

 3         of Ohio, on behalf of the Department

 4         of Justice and DEA.

 5              MS. SPEARS:  Mariama Spears on

 6         behalf of the DEA.

 7              MR. BENNETT:  James Bennett

 8         from the US Attorney's Office in the

 9         Northern District of Ohio on behalf of

10         the Department of Justice and DEA.

11              SPECIAL MASTER COHEN:  David

12         Cohen, special master.

13              VIDEOGRAPHER:  And counsel on

14         the phone, please identify yourselves.

15              MR. SHKOLNIK:  Hunter Shkolnik,

16         plaintiffs.

17              MR. BEISELL:  Patrick Beisell

18         for Walmart.

19              COURT REPORTER:  I'm sorry, one

20         at a time, please.

21              MS. MCCLURE:  Zach?

22              MR. MARTIN:  This is Zach

23         Martin, Prescription Supply.

24              MR. SMITH:  Jack Smith,

25         Flaherty Sensabaugh Bonasso, for
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Masters Pharmaceutical.

2              MR. KOBRIN:  Josh Kobrin for HB

3          Service Company.

4              MR. SNYDER:  Ryan Snyder from

5          O'Melveny & Myers on behalf of Johnson

6          & Johnson and the Janssen defendants.

7              MR. SINDELAR:  Jeffrey Sindelar

8          from Tucker Ellis on behalf of Johnson

9          & Johnson and Janssen.

10             MS. BARBER:  Maureen Barber

11         from Morgan Lewis for the Teva

12         defendants.

13             MR. RUIZ:  Anthony Ruiz from

14         Zuckerman Spaeder for CVS.

15             MR. WEISS:  Eric Weiss with

16         Cavitch, Familo & Durkin on behalf of

17         Discount Drug Mart.

18             VIDEOGRAPHER:  All right.  The

19         court reporter today is Carrie

20         Campbell and will now swear in the

21         witness.

22                  EXAMINATION

23     QUESTIONS BY MS. MCCLURE:

24         Q.    Good morning, Mr. Mapes.

25         A.    Good morning.
```

1      Q.      That was a lengthy introduction

2  to a big room with a lot of people here.

3              So I am Shannon McClure.  I'm

4  from the law firm of Reed Smith.  I represent

5  AmerisourceBergen Drug Corporation.

6              Thank you for coming here today

7  and tomorrow.  We appreciate your appearance

8  here today.

9              We're just going to go through

10  some deposition ground rules so that you are

11  oriented to what we're going to be doing here

12  today.

13              Just to explain the timing to

14  you, which your counsel may have explained,

15  the defendants have been afforded eight hours

16  to question -- to question you, and the

17  plaintiffs have been afforded five hours.

18              Defendants and plaintiffs may

19  each elect to reserve some of their time to

20  go after, so the defendants may go and then

21  the plaintiffs and then a reservation of

22  time.

23              Do you understand that today?

24      A.      Yes, I do.

25      Q.      And so your deposition will

1    begin today and will continue and conclude

2    tomorrow.

3                This is a question and answer

4    format, so I'll be doing the questions for

5    the first part, and then there will be other

6    defendants who will take over questioning on

7    behalf of the defense, and then the

8    plaintiffs will as well.

9                If there's ever a time that I

10   ask you a question that you don't understand,

11   I would like you to please ask me to rephrase

12   the question and tell me that you don't

13   understand that.

14               Do you understand that

15   instruction?

16        A.     Yes, I do.

17        Q.     And similarly, if I insert

18   facts or assumptions into a question that are

19   inaccurate, then what I would like you to do

20   is to correct those.

21               Can we agree on that?

22        A.     Yes.

23        Q.     And similarly, when other

24   counsel question you in the room from either

25   side, will you agree that to the extent that

Highly Confidential - Subject to Further Confidentiality Review

1    there are factual inaccuracies or predicates

2    that are inserted into a question that you

3    don't agree with, you will not only respond

4    to the question but you would correct those

5    factual inaccuracies?

6          A.     Okay.

7          Q.     And if you answer my question,

8    then I'm going to assume that you understood

9    the question as I asked it.

10               Is that fair?

11         A.     Yes, it is.

12         Q.     And today your answers must be

13   verbal.  We do have a videocamera set up, but

14   nevertheless, in order for Carrie, the court

15   reporter, to take down what's been said in

16   the room, I do need you to -- instead of

17   nodding or shaking your head, I do need you

18   to provide verbal answers.

19               Can you agree to do that today?

20         A.     Yes.

21         Q.     It can be easy in the course of

22   normal conversation to nod or shake your

23   head, but she can't get that down.

24         A.     Right.

25         Q.     Similarly, often in human

1  conversation we know where the other person

2  is going or we start to finish the question

3  that they're asking or answer it before the

4  question has been completed.  That makes it

5  difficult later when we need to go back and

6  look at the transcript as to what was said.

7            So what I would ask is that you

8  allow me to finish my questions, and then,

9  similarly, I will allow you to completely

10 finish your answers before I ask another

11 question.

12            Is that fair?

13      A.    Yes.

14      Q.    And if I do inadvertently

15 interrupt you -- and I assure you it is

16 inadvertent, I don't mean to -- then please

17 just let me know that you're not finished

18 answering, and I will of course stop and let

19 you finish your answer.

20            Is that fair?

21      A.    Okay.

22      Q.    Okay.  There may be objections

23 from time to time interposed by any of the

24 counsel in the room, including Mr. Bennett.

25 For the most part, when objections are

Highly Confidential - Subject to Further Confidentiality Review

1    interposed, you are still required to answer

2    the question after an objection, say, to

3    form.

4              Do you understand that?

5        A.    Yes.

6        Q.    There may be occasions where

7    you may be instructed not to answer the

8    question, and in that instance then you would

9    have to determine whether you would follow

10   the instructions of counsel and not answer

11   the question, and there may be discussions

12   among counsel about those instructions.

13             But for the most part, an

14   objection is simply for the record and then

15   you would be required to answer the question.

16             Do you understand that?

17       A.    Yes.

18       Q.    And you and I have never met

19   before.  I introduced myself when I took the

20   government up to the breakout room; is that

21   correct?

22       A.    That's correct.

23       Q.    And we've never written or

24   exchanged any letters or e-mails?

25       A.    That's correct.

 1          Q.      And we've never spoken on the

 2    phone?

 3          A.      Not that I'm aware of.

 4          Q.      Or had any communication,

 5    right?

 6          A.      Yep.

 7          Q.      Okay.  And this is a question

 8    that often comes up in depositions and might

 9    seem strange to you, but it's a standard

10    question that we always ask witnesses.

11              Are you on any medications

12    today that would affect your ability to

13    recall information or testify truthfully here

14    today?

15          A.      No.

16          Q.      Okay.  And you understand that

17    DOJ and DEA have authorized you to testify

18    here today on behalf -- regarding certain

19    topics about your work at DEA, right?

20          A.      Yes.

21              (Mapes Exhibit 1 marked for

22          identification.)

23    QUESTIONS BY MS. MCCLURE:

24          Q.      I'm going to hand you a

25    document that has been marked Mapes 1.  And

Highly Confidential - Subject to Further Confidentiality Review

```
1   if you could take a look at that document and

2   let me know when you've had an opportunity to

3   review it.

4        A.     Okay.  I've reviewed it.

5        Q.     Now, given that this document

6   is addressed to you, is it fair for me to

7   assume that you have, in fact, seen this

8   document before?

9        A.     I have.

10       Q.     This is not the first time

11  you're seeing it?

12       A.     That's correct.

13       Q.     And to the best of your

14  recollection, did you receive it sometime

15  shortly after May 3, 2019, which is the date

16  on page 1?

17       A.     Yes.

18       Q.     Okay.  The letter references a,

19  quote, "previous denial of authorization" in

20  the first sentence.

21              Do you see that?

22       A.     Yes.

23       Q.     Had you previously received a

24  communication from DEA or DOJ that there had

25  been a request for your deposition received
```

Highly Confidential - Subject to Further Confidentiality Review

1    that had been denied?

2         A.    Yes, I had.

3         Q.    Okay.  Do you recall when you

4    received that communication?

5         A.    I don't really remember exactly

6    when it was.

7         Q.    And you may not remember

8    exactly when it was.  That's fair.

9               Today I'm asking you, right

10   now, about something that was several months

11   ago.  In this deposition I'll be asking you

12   about things that may be several years ago or

13   even many years ago.

14              What I would like is for you to

15   tell me in each of those instances where I'm

16   asking you about a time period and you don't

17   exactly remember, that's totally fair.  What

18   I would like you to do is tell me if you

19   think -- if you can approximate when it was.

20   Was it a couple of months before this, was it

21   a year before this, if you can recall.

22        A.    Probably three or four months

23   before this.

24        Q.    And I have not seen that

25   communication.  Is it fair to say that it

Highly Confidential - Subject to Further Confidentiality Review

1    would have been a shorter communication than

2    this one in the fact that you were not, in

3    fact, authorized and thus there were no

4    topics listed, or am I incorrect about that?

5         A.    Yes, it was shorter.

6         Q.    And in advance of today's

7    deposition, did you review the topics on

8    which you were authorized to provide

9    testimony?

10        A.    I did.

11        Q.    And that is Topics 1 through 8,

12   which are listed on pages 1 and 2, correct?

13        A.    Yes.

14        Q.    And then with regard to those

15   areas of testimony, there is a second list

16   which comprises A through M and lists out the

17   subsets of information that you would not be

18   permitted to testify about those topics.

19             Is that a fair reading of this

20   letter?

21        A.    Yes.

22        Q.    And so things that are

23   privileged information are things that you

24   would not be permitted to testify about

25   within those first eight topics on pages 1 to

Highly Confidential - Subject to Further Confidentiality Review

1    2, correct?

2         A.     Yes.

3         Q.     Okay.  You can set that

4    document aside for now.

5                Have you been contacted by any

6    party to act as an expert in this matter?

7         A.     Yes, I have.

8         Q.     And has that been in a

9    testifying expert capacity or in a consulting

10   expert capacity?

11        A.     Consulting.

12        Q.     Okay.  And who is that entity

13   who has retained you?

14        A.     The only one that's retained me

15   is Williams Connolly.

16        Q.     And have you met with attorneys

17   from Williams & Connolly?

18        A.     Yes.

19        Q.     And you are aware that they

20   represent Cardinal Health, correct?

21        A.     That's correct.

22        Q.     Okay.  With whom did you meet?

23        A.     I've forgotten the names.

24   Jennifer and a couple other attorneys.

25        Q.     And was that a single meeting?

1     A.     Yes.

2     Q.     How long was that meeting?

3     A.     Six or seven hours.

4     Q.     Do you recall approximately

5   when that meeting was?

6     A.     It was the Monday after Easter,

7   whatever that day was.

8     Q.     I don't know it either, but

9   thank you for -- that's helpful.

10          Did they provide any documents

11   for you to review, if you recall?

12    A.     No, I don't recall reviewing

13   documents.

14    Q.     Have you seen any of the

15   plaintiffs' expert reports in this case?

16    A.     No.

17    Q.     Did you review Cardinal's DEA

18   expert report authored by Brian Reise?

19    A.     No.

20    Q.     Since the time that you were

21   authorized by DEA on May 3, 2019, to testify

22   as a fact witness in this case, have you

23   spoken with anyone at Williams & Connolly or

24   anyone representing Cardinal Health about any

25   work for them?

```
1          A.      No.

2          Q.      Have you done any expert work

3     in this case since you were authorized to

4     testify pursuant to Exhibit 1, which is the

5     May 3rd letter?

6          A.      No.

7          Q.      Did you meet with anyone to

8     prepare for your deposition today?

9          A.      Yes, I did.

10         Q.      Okay.  And who did you meet

11    with?

12         A.      The three attorneys here.

13         Q.      And by "the three attorneys

14    here," you're talking about the three

15    attorneys to your left --

16         A.      Yes.

17         Q.      -- which is Mr. Bennett,

18    Ms. Spears and Ms. Bacchus?

19         A.      Yes.

20         Q.      Was there anyone else in those

21    meetings?

22         A.      No.

23         Q.      Were those meetings conducted

24    as a conference call?

25                 Was there anyone on a phone?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     No.

 2        Q.     Did you meet one time or more

 3   than one time with those three attorneys?

 4             MR. BENNETT:  Objection.  Form.

 5             Are you talking about for this

 6        deposition?

 7             MS. MCCLURE:  Let me rephrase.

 8   QUESTIONS BY MS. MCCLURE:

 9        Q.     The three attorneys to your

10   left that you identified, have you met with

11   them for multiple reasons, in other words,

12   for this deposition and for other reasons?

13        A.     Yes, I met with them twice.

14        Q.     Okay.  What was the nature

15   of -- I assume one of the meetings, at least,

16   was to prepare for this deposition; is that

17   correct?

18        A.     It is.

19        Q.     And what was the nature of the

20   other meeting?

21        A.     To discuss my background with

22   DEA, the things that I've done, what I've

23   been involved in, that kind of thing.

24        Q.     So is it fair to say that that

25   was an informational meeting that you had
```

Highly Confidential - Subject to Further Confidentiality Review

 1   with these three attorneys?

 2        A.     Yes.

 3        Q.     And then the second meeting was

 4   specifically to prepare for the deposition?

 5        A.     Yes.

 6        Q.     How long did the first

 7   meeting -- and by "the first meeting," I'm

 8   referring to the informational meeting --

 9   last?

10        A.     Three or four hours.

11        Q.     Where was that meeting?

12        A.     It was in the DEA office here

13   in Colorado Springs, and some people were on

14   the phone.

15        Q.     Okay.  So for the informational

16   meeting, who was physically present with you

17   in the room at the DEA office in Colorado

18   Springs?

19        A.     Mr. Bennett was, and I don't

20   recall if anyone else was physically present

21   in the room.

22        Q.     To the best of your

23   recollection, were Ms. Bacchus and Ms. Spears

24   on the phone for that meeting, that

25   informational meeting?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      I'm not sure who was on the

2    phone.  I don't remember.

3          Q.      So it's possible there are

4    other attorneys, other than the three you've

5    named here today, who were present on the

6    phone for that first informational meeting?

7          A.      It's possible, yes.

8          Q.      But as of right now, you just

9    don't remember who they were?

10         A.      That's correct.

11         Q.      For the second meeting to

12   prepare for this deposition, how long was

13   that meeting?

14         A.      Four hours.

15         Q.      Where was that meeting?

16         A.      At the DEA office here in

17   Colorado Springs.

18         Q.      And when was that meeting?

19         A.      Yesterday.

20         Q.      When was the informational

21   meeting that was the first meeting?

22         A.      Early this year.  I don't know

23   exactly when, but several months ago.

24         Q.      Do you recall whether that

25   first meeting was before or after you

 1    received that first communication that I

 2    don't have a copy of that did not authorize

 3    you to appear for a deposition?

 4          A.     I'm not certain.

 5          Q.     Have you met with anyone from

 6    plaintiffs' counsel in preparing for today's

 7    deposition or in the informational meeting

 8    that you discussed that was several months

 9    ago?

10                 MR. BENNETT:  Objection.

11    Compound.

12    QUESTIONS BY MS. MCCLURE:

13          Q.     Let me rephrase.

14                 Did you meet with anyone from

15    plaintiffs' counsel today before -- in

16    preparation for today's deposition?

17          A.     No.

18          Q.     Okay.  And so some names of

19    plaintiffs' attorneys would be Mark Lanier,

20    Don Migliori, Linda Singer, Jayne Conroy,

21    Ms. Finkelstein, Hunter Shkolnik, Pete

22    Weinberger, Mike Fuller, Mark Pifko, Paul

23    Farrell, none of those attorneys were

24    attorneys that you met with in preparation

25    for your deposition today?

```
 1              MR. BENNETT:  Objection.  Form.

 2              You can answer.

 3              THE WITNESS:  That's correct.

 4   QUESTIONS BY MS. MCCLURE:

 5         Q.    During your meeting yesterday

 6   to prepare for this deposition today, was

 7   there anyone on the phone?

 8         A.    No.

 9         Q.    And to the best of your

10   knowledge, that long list of plaintiffs'

11   attorneys that I've provided you were not on

12   the phone for your informational meeting, but

13   you can't be certain because you don't recall

14   exactly who was on the phone; is that fair?

15         A.    I believe anybody that was on

16   the phone was a government attorney, so they

17   wouldn't have been the plaintiffs' attorneys.

18         Q.    Great.  Thank you.

19              And have you retained private

20   counsel for this deposition here today?

21         A.    No, I have not.

22         Q.    So you didn't work with any

23   private counsel in preparation for your

24   testimony here today?

25         A.    That's correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.      And by "private counsel," I'm
 2   referring to nongovernmental attorneys.
 3        A.      Right.
 4        Q.      Okay.  Separately from the
 5   meetings we've discussed, which is the
 6   informational meeting several months ago and
 7   then the preparation for your deposition here
 8   today, have you met with plaintiffs' counsel
 9   regarding this case generally?
10        A.      I did meet with plaintiffs'
11   counsel a couple of times in Washington, DC.
12        Q.      And by "a couple of times,"
13   does that mean two times?
14        A.      Yes.
15        Q.      And was that two different
16   times or two consecutive days?
17        A.      Two different times.
18        Q.      When were those meetings,
19   approximately?
20        A.      Last late summer and fall.
21        Q.      So summer and fall of 2018?
22        A.      Yes.
23        Q.      How long were those meetings?
24        A.      Two or three hours each.
25        Q.      Where were they?
```

1    A.    In an office downtown in DC.

2    Q.    Do you recall whose office?

3    A.    No, I don't.

4    Q.    And who attended those?

5          Well, let me ask first this

6    question.  We'll call those the first and

7    second meetings in the spring and fall

8    of 2018 -- summer and fall of 2018.

9          For the summer of 2018 meeting,

10   who attended that meeting?

11   A.    Joseph Rannazzisi, who was also

12   with DEA, retired, myself, and there were

13   five or six attorneys from various law firms.

14   Q.    Do you recall their names?

15   A.    No, I don't.

16   Q.    Do you see any of those

17   attorneys in the room here today?

18   A.    No.

19   Q.    How did that meeting come

20   about, that summer of 2018 meeting?

21   A.    I was contacted by Joseph

22   Rannazzisi.  He told me that he was working

23   with this group and asked me to come to

24   Washington to meet with the group.

25   Q.    When you say he said "he was

Highly Confidential - Subject to Further Confidentiality Review

1    working with this group," what group did he

2    mean, to your understanding?

3            A.      This group of attorneys that

4    were plaintiffs' attorneys.

5            Q.      And so you understood that

6    these were plaintiffs' attorneys representing

7    city, county governments in opioid

8    litigation?

9            A.      Representing -- excuse me.

10   Representing states, Indian tribes, cities,

11   counties.

12           Q.      Okay.  Any other type of

13   entities you understood that this group of

14   plaintiffs' attorneys represented?

15           A.      No.

16           Q.      And was Joseph Rannazzisi

17   present for the entire first meeting in the

18   spring -- in the summer or fall of 2018?

19           A.      He was.

20           Q.      Were you retained as an expert

21   at the conclusion of either the first or the

22   second meeting in 2018 with plaintiffs'

23   counsel?

24           A.      No, I was not.

25           Q.      Tell me what you can remember

Highly Confidential - Subject to Further Confidentiality Review

1    from those meetings.

2         A.      Generally, discussions about

3    DEA policies, suspicious order monitoring,

4    that kind of issue.

5         Q.      The second meeting in summer or

6    fall of 2018, who was present?

7         A.      Joseph Rannazzisi was present

8    and some of the same group of attorneys.

9         Q.      But do you know whether it was

10   the exact same group or it might have shifted

11   to some degree?

12        A.      It could have been shifted

13   somewhat, but mostly the same.

14        Q.      Do you see any attorneys in

15   this room who attended that second meeting?

16        A.      No.

17        Q.      And why did the second meeting

18   happen, to your knowledge?

19        A.      They had more questions about

20   suspicious order monitoring, quotas, ARCOS,

21   those kind of issues.

22        Q.      Other than DEA policies,

23   quotas, ARCOS and suspicious order

24   monitoring, can you recall any other topic

25   from either of those two meetings that you

Highly Confidential - Subject to Further Confidentiality Review

1    discussed with plaintiffs' counsel?

2        A.      No.

3        Q.      Do you remember what you

4    discussed about quotas?

5        A.      Very little, because my

6    knowledge of quotas is very limited.

7        Q.      Of that very little that you

8    discussed about quotas, do you remember what

9    specifically you discussed about quotas given

10   your limited knowledge?

11       A.      That there are quotas set for

12   manufacturing of certain drugs, and the DEA

13   sets those quotas, and different

14   manufacturers have their share of the quota

15   for different drugs.  That's about it.

16       Q.      Do you recall what you

17   discussed in those two meetings about ARCOS?

18       A.      Just generally what ARCOS is

19   and where the information comes from and how

20   it's used.

21       Q.      And what is ARCOS?

22       A.      ARCOS is a system that collects

23   information from all sales of Schedule II

24   drugs and Schedule III narcotic drugs.

25       Q.      So it's transactional data?

```
 1          A.      Yes.

 2          Q.      Provided by whom?

 3          A.      By the registrants that are

 4   selling the drugs.

 5          Q.      And what did you tell

 6   plaintiffs' counsel about how ARCOS is used?

 7          A.      It's used to see which drugs

 8   are going to which pharmacies from which

 9   wholesalers.  It's used to look at pharmacies

10   to see if they're buying from several

11   wholesalers, that kind of thing.

12          Q.      ARCOS is accessible to DEA,

13   correct?

14          A.      Yes.

15          Q.      ARCOS is not accessible to

16   registrants in the industry, correct?

17          A.      I don't know if it is today.

18   It was not when I was there.

19          Q.      So registrants would generally

20   have access to their own transactional data,

21   correct?

22          A.      Yes.

23          Q.      But not the transactional data

24   of, say, a competitor of theirs who is also a

25   wholesaler?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.       That's correct.

2          Q.       And what did you tell the

3    plaintiffs' attorneys regarding suspicious

4    order monitoring, that topic?

5          A.       We discussed the suspicious

6    order monitoring, what the regulation says

7    about suspicious order monitoring, and what

8    the current practice is within DEA.

9          Q.       And by "current practice," you

10   mean today?

11         A.       Yes.

12         Q.       Now, you left DEA.  We'll go

13   through your background in more detail, but

14   you left DEA in 2007, correct?

15         A.       That's correct.

16         Q.       But you're aware of the current

17   practice today with respect to DEA because

18   you are still in the industry and are aware

19   of DEA practices; is that fair?

20         A.       That specific practice, yes,

21   because I've talked to DEA folks about it.

22         Q.       When you say you've "talked to

23   DEA folks" about that specific practice, are

24   you saying you've talked to DEA folks since

25   you left DEA in 2007 regarding DEA's approach

```
 1    to suspicious order monitoring?

 2         A.      Yes.

 3         Q.      With whom have you had

 4    discussions at DEA since you left it in 2007

 5    about DEA's approach to suspicious order

 6    monitoring?

 7         A.      More than one person.  The one

 8    I remember is Cathy Gallagher, who was the

 9    chief of the liaison and policy section.

10         Q.      And have you talked with

11    Ms. Gallagher once or more than once?

12         A.      More than once.

13         Q.      How regularly have you

14    communicated with Ms. Gallagher since 2007

15    regarding DEA's approach to suspicious order

16    monitoring?

17         A.      Not regularly.  It's been two

18    or three times, possibly.

19         Q.      And that's two or three times

20    since 2007?

21         A.      Yes.

22         Q.      Have you spoken with anyone

23    else at DEA regarding DEA's approach to

24    suspicious order monitoring since the time

25    you left DEA?
```

1      A.      No.

2      Q.      So a minute ago when I asked

3    you with whom had you spoken with DEA since

4    you left in 2007 about DEA's approach to

5    suspicious order monitoring, I thought you

6    indicated that it was more than one person,

7    but the one that you remembered was Cathy

8    Gallagher.

9              Is there more than one person

10   that you've spoken with since 2007?

11     A.      I don't recall talking to

12   anyone else about that specific subject.

13     Q.      Have you talked with DEA

14   representatives since you left in 2007 about

15   other nonsuspicious order monitoring topics?

16     A.      About DEA policy specifically

17   or about other --

18     Q.      I'm not asking about your

19   personal connections with people you may have

20   worked with that you keep in touch with about

21   non-DEA matters.

22             So my question is limited to

23   DEA-related matters, whether it's suspicious

24   order monitoring or policies or something

25   else, enforcement approach.  You tell me what

1    the topics would be.

2              MR. BENNETT:  Objection.  Form.

3              Go ahead.

4              THE WITNESS:  I have spoken

5         with other people in DEA about issues

6         related to pharmacies that I was

7         working for and DEA's approach with

8         those pharmacies.

9    QUESTIONS BY MS. MCCLURE:

10        Q.     So about specific registrants?

11        A.     Yes.

12        Q.     That you were either employed

13   by or consulting for?

14        A.     Yes, employed by.

15        Q.     And was the nature of those

16   conversations asking for guidance from DEA,

17   or were you providing information to DEA?

18        A.     Providing information about

19   what the pharmacy was doing, how they were

20   handling controlled substances.

21        Q.     How about the topic of DEA

22   policies?

23              We're going back to the

24   meetings that you had in summer and fall

25   of 2018 with plaintiffs' counsel.

Highly Confidential - Subject to Further Confidentiality Review

 1                    What did you tell plaintiffs'

 2    counsel regarding DEA's policies?

 3         A.        Are we talking a particular

 4    policy, like suspicious orders, or...

 5         Q.        I don't know.

 6                    Did you discuss more than one

 7    policy, DEA policy, with plaintiffs' counsel?

 8         A.        I don't think so because I

 9    hadn't been there for a number of years, so I

10    wasn't sure what DEA's current policies are

11    on most topics.

12         Q.        But you recall discussing

13    suspicious order monitoring, DEA policies,

14    with plaintiffs, correct?

15         A.        Yes.

16         Q.        And were those DEA policies

17    that you discussed with plaintiffs in the

18    summer or fall of 2018 the policies that had

19    been in effect when you were at DEA?  So

20    prior to December of 2007.

21         A.        We discussed those policies as

22    part of the Distributor Initiative meetings

23    that we had with wholesalers.

24         Q.        Were you paid for your

25    attendance at these two meetings?

```
 1          A.      Yes.

 2          Q.      How much were you paid?

 3          A.      $300 an hour.

 4          Q.      And each of the meetings was

 5   two to three hours, meaning that the most it

 6   was was six hours, is that correct, in total?

 7          A.       It may have been an hour or two

 8   more.  I don't recall for sure.

 9          Q.      Okay.  Were you asked to serve

10   as an expert at the conclusion of or during

11   these meetings?

12          A.      We discussed it, but it didn't

13   go any further.

14          Q.      Why?

15          A.      You would have to ask them.

16          Q.      Do you have any understanding

17   as to why you were not retained as an expert?

18          A.      No.

19          Q.      Were those meetings

20   informational meetings in which you were

21   providing information to the plaintiffs, or

22   were the plaintiffs also providing you

23   information about their lawsuits?

24          A.       It was mostly me providing

25   information to them in response to their
```

Highly Confidential - Subject to Further Confidentiality Review

1    questions.

2         Q.    Do you recall any information

3    that they provided to you?

4         A.    No.

5              (Mapes Exhibit 2 marked for

6         identification.)

7    QUESTIONS BY MS. MCCLURE:

8         Q.    I'm going to hand you a

9    document that's been marked as Mapes

10   Exhibit 2, which is a LinkedIn printout of

11   your bio.

12             If you could take a moment and

13   review that, and let me know when you've had

14   a chance to do so.

15        A.    I have.

16        Q.    And so according to this

17   profile, you worked for DEA for a little more

18   than 30 years in total, correct?

19        A.    That's correct.

20        Q.    From 1977 to 2007?

21        A.    Yes.

22        Q.    And you held a number of

23   positions over the course of your tenure at

24   DEA, correct?

25        A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Were all of those positions in

2  the diversion side of DEA?

3         MR. BENNETT:  Objection.  Form.

4         THE WITNESS:  They were all

5    related to the diversion program, yes.

6  QUESTIONS BY MS. MCCLURE:

7    Q.    And so some of your positions

8  may not have been actually having you housed

9  in diversion, but the subject matter about

10 which you were employed for DEA related to

11 diversion in all of your 30-year -- in all of

12 your positions over 30 years?

13   A.    That's correct.

14   Q.    You started out as a diversion

15 investigator in Detroit and Cleveland?

16   A.    Yes.

17   Q.    Detroit was approximately

18 '80 -- sorry, '77 to '83 or '84?

19   A.    Yes.

20   Q.    And then Cleveland was '83 or

21 '84 to '85 or '86?

22   A.    Yes.

23   Q.    I note that you graduated from

24 college, which was Ferris State University,

25 in 1974; is that correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    It is.

2    Q.    And then what -- did you have

3  any jobs or positions between 1974 and 1977?

4    A.    I did.

5    Q.    What were those?

6    A.    I was a deputy sheriff for

7  about two and a half years in Michigan, and

8  after that I worked for the -- as a civilian

9  for the Department of the Army as a budget

10 analyst for about a year.

11   Q.    And then you applied for a

12 position at DEA?

13   A.    Yes.

14   Q.    What is a diversion

15 investigator?

16   A.    Someone that investigates

17 registrants or potential registrants that

18 handle controlled substances, investigates

19 the movement of controlled substances and

20 diversion of controlled substances from

21 legitimate channels.

22   Q.    In the course of your duties as

23 a diversion investigator, did you conduct

24 audits or cyclic investigations of

25 registrants?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I did.

2    Q.    Including wholesalers?

3    A.    Yes.

4    Q.    In connection with those cyclic

5    audits -- am I using the correct phrase?

6    A.    Yes.

7    Q.    Okay.  In connection with those

8    cyclic audits, would you review suspicious

9    order monitoring systems?

10   A.    Yes.

11   Q.    Was that a standard part in

12   your experience of a diversion investigator's

13   role?

14   A.    It was.

15   Q.    And so it was a responsibility

16   that diversion investigators needed to carry

17   out with respect to registrants for the field

18   office to which they were assigned?

19   A.    That's correct.

20   Q.    The results of those audits

21   would be reported on a DEA 6 report?

22   A.    They would.

23   Q.    If a diversion investigator

24   determines that a registrant was not

25   complying with the regulations, would the

Highly Confidential - Subject to Further Confidentiality Review

1   investigator tell the registrant what that

2   registrant was doing wrong?

3           MR. BENNETT:  Objection.

4       Incomplete hypothetical.

5   QUESTIONS BY MS. MCCLURE:

6       Q.    You can answer.

7       A.    Yes, they would.

8       Q.    And that's in your experience

9   at DEA?

10      A.    Yes.

11      Q.    As a diversion investigator?

12      A.    Yes.

13      Q.    And later as a group

14  supervisor, you expected your diversion

15  investigators to communicate with registrants

16  about what they were doing wrong?

17      A.    Yes.

18      Q.    So that they could correct it?

19      A.    That's right.

20      Q.    Was it an expectation in your

21  experience that a diversion investigator in

22  such a circumstance would follow up to see if

23  that issue had been corrected?

24          MR. BENNETT:  Objection.  Form.

25          THE WITNESS:  It would be

Highly Confidential - Subject to Further Confidentiality Review

1          followed up, whether it was by that

2          diversion investigator or another one.

3     QUESTIONS BY MS. MCCLURE:

4          Q.     Okay.  Audits can also be

5     conducted outside of the cyclic process if

6     there was a particular reason or something

7     came up that suggested that an audit might be

8     appropriate; is that accurate?

9          A.     It is.

10         Q.     What was your next position at

11    DEA after diversion investigator in

12    Cleveland?

13         A.     I was a staff coordinator at

14    headquarters in Washington, DC.

15         Q.     And was that for -- for how

16    long a period of time?

17         A.     A little less than a year.

18         Q.     What is the job of a staff

19    coordinator?

20         A.     To review the reports from a

21    field office and the requests from the field

22    office for assistance with investigative

23    matters.

24         Q.     So do I have it correct that a

25    field office, one of DEA's field offices, may

1    reach out to headquarters because they had

2    something that they required more resources

3    for than they had available to them?

4         A.    Either resources in terms of

5    funding or in terms of more personnel or

6    whatever they needed.

7         Q.    Did headquarters have access to

8    some information that a field office would

9    not have had access to?

10        A.    Yes.

11        Q.    Let me rephrase that question.

12              Would a diversion investigator

13   reach out to a staff coordinator such as

14   yourself to get some information to support

15   an investigation?

16              MR. BENNETT:  Objection.  Form.

17              THE WITNESS:  They may.

18   QUESTIONS BY MS. MCCLURE:

19        Q.    You later became an instructor

20   at Quantico?

21        A.    Yes.

22        Q.    Quantico is a location in

23   Virginia where DEA diversion investigators

24   train; is that right?

25        A.    It is.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And what did you -- did you, in
2  fact, instruct those potential diversion
3  investigators in the course of that position?
4    A.    I did.
5    Q.    What did you instruct them
6  about?
7    A.    Various topics related to
8  diversion, whether it's drug field testing,
9  auditing, those kind of things.
10         I didn't do the majority of the
11 teaching for diversion investigators.  We had
12 folks from the field come in and do that.
13   Q.    But you did some instruction
14 about diversion?
15   A.    Yes.
16   Q.    Your next position in the
17 1990s, if I have this timing correct, was as
18 a group supervisor in the Denver field
19 office?
20   A.    That's correct.
21   Q.    What were the years of that
22 position?
23   A.    Roughly '92 to '97.
24   Q.    Were you also a regional
25 manager of diversion control --

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    -- in that same time period?

3    A.    Yes.  The diversion program

4  manager, yes.

5    Q.    Is that a different position,

6  or is that part of the group supervisor

7  title?

8    A.    That's a different position.

9    Q.    How did the duties of a

10  diversion program manager differ from those

11  of a group supervisor?

12    A.    The supervisor supervises a

13  group of investigators, in this case in the

14  Denver office, and the manager deals with the

15  supervisor in Denver, the supervisor in Salt

16  Lake City, the supervisor in Albuquerque, in

17  the entire field division.

18    Q.    Okay.  So the regional man --

19  I'm sorry.  The diversion program manager is

20  a higher-up position than the group

21  supervisor?

22    A.    Yes.

23    Q.    And what were the years that

24  you held the position of diversion program

25  manager?

Highly Confidential - Subject to Further Confidentiality Review

1        A.        Roughly '97, '98-ish.

2        Q.        And in each of these two

3   positions, the group supervisor position and

4   the diversion program manager position, you

5   oversaw diversion investigators, or the group

6   supervisors who are overseeing those

7   diversion investigators, in connection with

8   their oversight and investigation and

9   enforcement of the Controlled Substances Act;

10  is that correct?

11       A.        Yes.

12       Q.        What was your next position

13  after diversion program manager?

14       A.        Liaison with the United Nations

15  International Archives Control Board in

16  Vienna, Austria.

17       Q.        Did you actually live in

18  Vienna?

19       A.        Yes.

20       Q.        And that was for approximately

21  two years?

22       A.        Yes.

23       Q.        And what were your

24  responsibilities in that position?

25       A.        Working mostly with the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    precursor control group of the UN to deal

 2    with issues between countries about shipments

 3    of precursor chemicals for controlled

 4    substance manufacture.

 5          Q.      And your next position was

 6    deputy chief of the liaison and policy

 7    section?

 8          A.      It was.

 9          Q.      And is that a promotion from

10    what your prior position had been?

11          A.      No, it was a lateral.

12          Q.      Was it a promotion from the

13    diversion program manager role?

14          A.      No, it was lateral.

15          Q.      That's all lateral.

16                  And what were your

17    responsibilities as deputy chief of liaison

18    and policy?

19          A.      Working with the staff

20    coordinators and with the section chief to

21    work with the industry to interpret policies

22    and procedures, and work with those who were

23    writing Federal Register announcements about

24    various issues.

25          Q.      When you say "work with those
```

1    who were writing Federal Register

2    announcements," what does that mean?

3         A.      For issues related to the

4    Office of Diversion, there were a couple of

5    people in liaison and policy who wrote the

6    Federal Register announcements about

7    policies, and so we'd review those and

8    discuss those and that kind of thing.

9         Q.    So did you have oversight

10   responsibility over the individuals who were

11   writing announcements about DEA policies in

12   the Federal Register?

13        A.      They worked for a unit chief,

14   and the unit chief reported to the section

15   chief that I worked with, but I didn't have

16   oversight.

17        Q.    What was your next position

18   after deputy chief of liaison and policy?

19        A.      I was chief of the planning and

20   resources section at headquarters.

21        Q.      How long did you have that

22   role?

23        A.      About two years.

24        Q.      So what years are we in at this

25   point for the planning and resources role?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    2003 and '4, possibly.

2    Q.    And what were the

3    responsibilities of that position?

4    A.    Dealing with personnel issues,

5    hiring, budget issues, equipment, those kind

6    of things.

7    Q.    And your next position after

8    the planning and resources one?

9    A.    Was chief of the E-Commerce

10   section.

11   Q.    So did that begin in

12   approximately 2004?

13   A.    Yes.

14   Q.    And go through when?

15   A.    Middle of 2005.

16   Q.    What is chief of a section at

17   DEA?  What does that mean?

18   A.    It means that there are units

19   within a section that have people that are

20   performing various functions, and the section

21   chief is the manager of the unit chiefs.

22   Q.    So who were the unit chiefs

23   that you were overseeing in the E-Commerce

24   section?

25        MR. BENNETT:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

```
 1          form.  Time.

 2     QUESTIONS BY MS. MCCLURE:

 3          Q.     So he's identified the time

 4     period as -- am I correct that it's 2004 to

 5     2005 that you were the chief of E-Commerce?

 6          A.     Yes.

 7          Q.     How many unit chiefs did you

 8     have?

 9          A.     Three, I believe.

10          Q.     And did they each have

11     different roles?

12          A.     Yes.

13          Q.     What were those roles?

14          A.     One was dealing with the

15     programs known as CSOS and EPCS, computerized

16     programs, one was detailing with the

17     contractors that were working in the

18     programs, and one was the targeting and

19     analysis unit that was looking at data from

20     available sources.

21          Q.     Did the data from available

22     sources that the targeting and analysis unit

23     look at include ARCOS?

24          A.     Yes.

25          Q.     What other sources?
```

Highly Confidential - Subject to Further Confidentiality Review

1          MR. BENNETT:  Objection.

2     Scope.

3          You're not authorized to

4     disclose any confidential law

5     enforcement databases or confidential

6     law enforcement investigative tools.

7          To the extent that you can

8     answer without disclosing such

9     confidential databases or

10    investigative tools, you may answer

11    the question.

12         THE WITNESS:  There's none

13    other -- other tools that are public

14    tools.

15 QUESTIONS BY MS. MCCLURE:

16    Q.    So the only public tool that

17 you are authorized here to discuss today that

18 targeting and analysis work with is ARCOS,

19 correct?

20    A.    Correct.

21    Q.    In that role as chief of

22 E-Commerce, did you meet with registrants?

23    A.    I had meetings with

24 representative of different registrants to

25 talk about different issues.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.      What do you mean by

2    "representatives"?

3    A.      It might be someone from their

4    IT department or someone from their legal

5    department or someone from their compliance

6    department or something like that.

7    Q.      You then served as the chief of

8    the regulatory unit?

9    A.      That's correct.

10   Q.      What is the regulatory unit?

11   A.      It was a unit that looked at --

12   well, it was a section that looked at the

13   regulatory investigations that were done

14   within the Office of Diversion Control by the

15   field offices.  Also issued import/export

16   declarations and permits for controlled

17   substances that were coming into or leaving

18   the country.

19   Q.      When you say that that section

20   looked at the regulatory investigations that

21   were done within the Office of Diversion

22   Control, what does that mean, to look at

23   them?

24   A.      It means all the reports that

25   are written by the field offices come to the

Highly Confidential - Subject to Further Confidentiality Review

1    staff coordinators in headquarters that

2    review those to see if they're following the

3    appropriate policies and procedures and see

4    if there are issues that are consistent

5    issues across the country with several

6    registrants or not.

7        Q.    What would those reports be

8    called that you reviewed?

9        A.    They would be DEA 6s that were

10   reports of investigation of registrants of

11   any kind.

12       Q.    You left DEA in 2007?

13       A.    That's correct.

14       Q.    At that time were you the chief

15   of the regulatory unit?

16       A.    The regulatory section, yes.

17       Q.    I'm sorry, the regulatory

18   section.

19             And why did you leave DEA?

20       A.    I retired.

21       Q.    And after that you became a

22   consultant, correct?

23       A.    Yes.

24       Q.    Is that what iSAW means,

25   I-S-A-W?  Is that your company?

1      A.      No, it's not.

2      Q.      Okay.  What is iSAW?

3      A.      It's a company that's

4  developing technology to identify suspects

5  and witnesses to criminal activity.

6      Q.      Is iSAW related to diversion --

7      A.      No.

8      Q.      -- or the pharmaceutical

9  industry?

10     A.      No.

11     Q.      After you left DEA in 2007,

12 were you also a consultant in the industry

13 for diversion-related questions or issues?

14     A.      Yes, I was.

15     Q.      And did that -- did you form a

16 consulting company for that?

17     A.      No, that was mostly an

18 independent consultant.

19     Q.      But there's not a company name

20 or something like that that I would -- that

21 you would be able to tell me for the purpose

22 of your post-DEA consulting to industry

23 regarding diversion?

24     A.      A pharmacy that I worked for

25 created a company to do consulting.  That was

Highly Confidential - Subject to Further Confidentiality Review

1    a Controlled Substance Compliance Group, but

2    that was owned by that pharmacy, and I worked

3    with them and did consulting.

4         Q.    When did you begin working for

5    that pharmacy?

6         A.    About 2009.

7         Q.    And what is that pharmacy

8    called at that time in 2009?

9         A.    At the time that pharmacy was

10   Assured Pharmacy.

11        Q.    And so Assured created a

12   subsidiary company called the Controlled

13   Substance Compliance Group.

14             Do I have that correct?

15        A.    Yes.

16        Q.    And you began working for the

17   Controlled Substance Compliance Group in

18   2009?

19        A.    No, that wasn't created until

20   probably 2013-ish.

21        Q.    And so initially you worked

22   directly for Assured?

23        A.    Yes.

24        Q.    What kinds of activities did

25   you do for Assured?

1    A.    I was the chief compliance

2  officer for the group of pharmacies and wrote

3  policies and procedures, reviewed the

4  pharmacies to be sure they're following the

5  policies and procedures.

6    Q.    Are you still working for

7  Assured today?

8    A.    No.

9    Q.    When did you stop working for

10 Assured?

11   A.    Assured was bought out by

12 another group called Cordant Health Services,

13 and so they became known as Cordant

14 pharmacies, and I worked with them through

15 the end of 2015.

16   Q.    So from 2009 through 2015, you

17 were working for Assured or Cordant,

18 depending on what the name was at the time?

19   A.    Right.

20   Q.    Did your job duties change over

21 that 2009 to 2015 time period?

22   A.    No.

23   Q.    Going back to your independent

24 consulting unrelated to Assured or Cordant,

25 there's no company name that you had or that

1    you used for that kind of consulting,

2    correct?

3         A.    Correct.

4         Q.    And who were your clients in

5    the independent consulting business that you

6    had after leaving DEA, to the best that you

7    can recall?

8         A.    AmerisourceBergen, HD Smith,

9    Meijer Company, M-e-i-j-e-r, Henry Schein,

10   Physicians Pharmaceutical Corporation.

11              There's others I just can't

12   recall this second.

13        Q.    Okay.  During what period of

14   time were you acting as an independent

15   consultant after leaving DEA in 2007?

16        A.    The --

17        Q.    And I'm talking now

18   specifically about the consulting relating to

19   diversion.

20        A.    From 2008 through 2015 or '16.

21        Q.    So there's some overlap there

22   between the independent consulting work that

23   you were doing and your work for Assured and

24   Cordant in terms of time, correct?

25        A.    Yes.  Assured was part time.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Okay.  Did Assured become full

2  time at some point?

3      A.      No.

4      Q.      So for the entire 2009 to 2015

5  time period with Assured and then Cordant,

6  that was all part time?

7      A.      That's correct.

8      Q.      What was your first position

9  that was physically located at DEA

10 headquarters?

11     A.      That was the staff coordinator.

12     Q.      Okay.

13             MR. BENNETT:  Do you need a

14     break, or are you okay?

15 QUESTIONS BY MS. MCCLURE:

16     Q.      And that was 2001 to 2003?

17     A.      No.

18     Q.      If I have it wrong, then tell

19 me.

20     A.      Yeah, that was -- that was

21 earlier than that.  That was right after

22 Cleveland.

23     Q.      Okay.  Thank you.

24             So Cleveland ended in '85, '86,

25 right?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    Okay.  Then you went back into

3    the field, correct, at some point?

4          MR. BENNETT:  Objection.  Form.

5    QUESTIONS BY MS. MCCLURE:

6    Q.    When you were working -- let me

7    rephrase that.

8          During the time that you were a

9    group supervisor, that was in Denver --

10   A.    Correct.

11   Q.    -- not at headquarters,

12   correct?

13   A.    Correct.

14   Q.    And during the time that you

15   were the diversion program manager, that was

16   not physically located at headquarters,

17   correct?

18   A.    Correct.

19   Q.    Okay.  When was the next

20   position that you had when you went to --

21   when you were working at headquarters?

22         MR. BENNETT:  Objection.  Form.

23         THE WITNESS:  When I went back

24   to headquarters, it was the deputy

25   chief of liaison and policy first.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. MCCLURE:

 2         Q.      Okay.  Thank you.

 3                 In 2005, who was the head of

 4    the Office of Diversion Control?

 5         A.      I'm not certain.  It could have

 6    been one of a couple of different people.

 7         Q.      Was Bill Walker one of those

 8    couple of different people?

 9         A.      Yes.

10         Q.      Who else could it have been?

11         A.      Joe Rannazzisi.

12         Q.      You just don't recall when the

13    transition happened?

14         A.      Correct.

15         Q.      Did Joe Rannazzisi take over

16    that role from Bill Walker?

17         A.      Yes.

18         Q.      Okay.  No one in between,

19    correct?

20         A.      Correct.

21         Q.      Did you work with Joe

22    Rannazzisi in that time period?

23         A.      I did.

24         Q.      Did you report to him?

25         A.      I did.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And this is in the role as

2  chief of liaison and policy or chief of the

3  E-Commerce section?

4    A.    Either E-Commerce or the

5  regulatory section.  I'm not sure exactly

6  when he came in.

7    Q.    Right.

8          So he was not the head of the

9  Office of Diversion when you were chief of

10  liaison and policy?

11    A.    No, that was Laura Nagel.

12    Q.    But you don't recall whether

13  you reported to him in your role as chief of

14  E-Commerce or chief of regulatory section or

15  both?

16    A.    I did, as chief of regulatory

17  section, report to Joe Rannazzisi, but I'm

18  not sure in E-Commerce who it was.

19    Q.    Now, you previously talked

20  about your role in -- do I have it --

21  planning and budget?

22          Do I have that title correct?

23  Probably not.

24    A.    It was planning and resources.

25    Q.    Planning and resources.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   There's two different sides to

 2   DEA, correct?

 3        A.      Yes.

 4                   MR. BENNETT:  Objection.  Form.

 5                   You can answer.

 6   QUESTIONS BY MS. MCCLURE:

 7        Q.      And is there some other word

 8   that you would use to refer to them other

 9   than "sides"?

10        A.      Well, there is the diversion

11   part of DEA, there's enforcement, there's

12   intelligence, there's laboratories.  So

13   there's several different aspects to DEA.

14        Q.      So you said diversion,

15   enforcement, lab --

16        A.      Intelligence, laboratories.

17        Q.      Is diversion funded differently

18   than enforcement?

19        A.      It is.

20        Q.      How is that funding different?

21        A.      It's paid for through a fee

22   account by fees paid by the registrants to

23   register.

24        Q.      You said there's the laboratory

25   section and the intelligence section.
```

```
 1                    Do laboratories and

 2      intelligence support both enforcement and

 3      diversion, or do they support one or the

 4      other?

 5                    MR. BENNETT:  Objection.

 6           Scope.

 7                    You can answer.

 8                    THE WITNESS:  Yes, both.

 9      QUESTIONS BY MS. MCCLURE:

10           Q.     And how is enforcement funded?

11                    MR. BENNETT:  Objection.

12           Scope.

13                    THE WITNESS:  Through

14           Congressional appropriations.

15      QUESTIONS BY MS. MCCLURE:

16           Q.     What is on-call time, if you

17      know?

18           A.     I don't know.

19           Q.     Okay.  That's not something

20      that happened in the diversion side?

21           A.     No, it's nothing I've heard of.

22           Q.     So if diversion is funded by

23      fee accounts paid for by registrants, the

24      fees that are set for registrants are at

25      DEA's discretion and under DEA's control; is
```

Highly Confidential - Subject to Further Confidentiality Review

1    that right?

2              MR. BENNETT:  Objection.

3         Scope.

4              THE WITNESS:  They're set

5         through a rulemaking process.

6    QUESTIONS BY MS. MCCLURE:

7         Q.    That includes input from DEA?

8         A.    Yes.

9              MS. MCCLURE:  Why don't we go

10        off the record and take a short break.

11             MR. BENNETT:  Okay.

12             VIDEOGRAPHER:  We're going off

13        record.  The time is 10:49.

14         (Off the record at 10:49 a.m.)

15             VIDEOGRAPHER:  We're going back

16        on record, beginning Media File

17        Number 2.  The time is 11:06.

18   QUESTIONS BY MS. MCCLURE:

19        Q.    Still good morning, Mr. Mapes.

20              You understand that you're

21   still under oath today?

22        A.    I do.

23        Q.    What is the role of a wholesale

24   distributor?

25        A.    To distribute drugs and other

1    products to the retail pharmacies and doctors

2    and anyone else that has a need for them, if

3    it's registered, if it's a controlled

4    substance.

5         Q.    So distributors and wholesalers

6    sell more than just controlled substances?

7         A.    Yes.

8         Q.    A whole variety of products?

9         A.    Yes.

10        Q.    Do you understand the use of

11   the term "distributors" and "wholesalers," do

12   you use that interchangeably, or do you think

13   of those as being different words?

14        A.    Interchangeable.

15        Q.    Do distributors sell

16   pharmaceutical products directly to patients?

17        A.    No.

18        Q.    So they sell to other

19   registrants within the supply chain, whether

20   it's a retail pharmacy, a hospital customer,

21   a physician, et cetera, right?

22        A.    Correct.

23        Q.    So prescriptions are written by

24   doctors?

25             MR. BENNETT:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. MCCLURE:

 2         Q.      In your knowledge?

 3         A.      Among others.

 4         Q.      Other health care professionals

 5    write a prescription, correct?

 6         A.      Correct.

 7         Q.      And then a patient takes that

 8    prescription generally to a pharmacy or to

 9    some other entity who is a registered -- if

10    it's a controlled substance within the supply

11    chain?

12         A.      Yes.

13         Q.      But not a wholesaler or a

14    distributor?

15         A.      Correct.

16         Q.      And so an order that a

17    wholesaler or a distributor receives from,

18    say, a pharmacy is generally a bulk order,

19    correct?

20         A.      Yes.

21         Q.      It's not intended to be -- it's

22    not as if a pharmacy places an order to fill

23    a specific person's prescription most

24    commonly, right?

25         A.      Correct.
```

1    Q.    Instead, the pharmacy or the

2    person ordering from the wholesaler has

3    grouped together an anticipated need for a

4    particular medication, and they order that in

5    bulk from a distributor, right?

6              MR. BENNETT:  Objection.  Form.

7              THE WITNESS:  Correct.

8    QUESTIONS BY MS. MCCLURE:

9    Q.    So an order is not being filled

10   in response to a particular patient's

11   prescription?

12   A.    Not normally.

13   Q.    Is it your understanding that

14   distributors do not see prescription-level

15   data in the ordinary course of doing their

16   day-to-day business of filling orders placed

17   by other -- by their customers?

18              MR. BENNETT:  Objection.  Form.

19              THE WITNESS:  They may see

20        prescription-level data when they're

21        establishing new customers or when

22        they're reviewing what's going on at a

23        pharmacy, but not when filling every

24        order.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. MCCLURE:

 2         Q.      In your experience,

 3    distributors conduct due diligence on new

 4    customers that they're considering bringing

 5    on board, correct?

 6         A.      Yes.

 7         Q.      And is it in that context that

 8    they may see some prescription-level data?

 9         A.      That's one of the reasons they

10    would.

11         Q.      And how would the distributor

12    obtain that data in that new customer

13    situation?

14         A.      By visiting the pharmacy and

15    asking to see information about how many

16    prescriptions, what drugs, frequency, that

17    kind of thing.

18         Q.      So they would request it?

19         A.      Yes.

20         Q.      And then you also mentioned

21    that in a, what I will call, ongoing due

22    diligence situation when a customer is

23    already a customer and you're evaluating

24    whether there's some concern or problem with

25    that customer, a distributor may obtain
```

1    prescription-level data?

2         A.    Correct.

3         Q.    During your time at DEA, you

4    became familiar with the regulation regarding

5    the identification and reporting of

6    suspicious orders?

7         A.    Yes.

8         Q.    To your knowledge, has that

9    regulation changed since it was issued or

10   promulgated?

11        A.    Not that I'm aware of.

12        Q.    Is that something that you

13   believe you would have been aware of in your

14   course of employment at DEA and your

15   subsequent employment?

16        A.    Probably.

17              (Mapes Exhibit 3 marked for

18        identification.)

19   QUESTIONS BY MS. MCCLURE:

20        Q.    Okay.  I'll hand you what's

21   been marked as 3.

22              If you could take a look at

23   that and let me know when you've had a chance

24   to look through it.

25        A.    I've reviewed it.

1    Q.    So when we're talking about the

2 regulation regarding to the identification

3 and reporting of suspicious orders, which

4 section of this Exhibit 3 are we talking

5 about?

6    A.    Suspicious orders ends in

7 1301.74(b).

8    Q.    And 1301.74(b) defines a

9 suspicious order to include orders of unusual

10 size, orders deviating substantially from a

11 normal pattern and orders of unusual

12 frequency, right?

13    A.    Yes.

14    Q.    Does the regulation explain to

15 a registrant how to identify an order of

16 unusual size?

17         MR. BENNETT:  Objection.  Form.

18         THE WITNESS:  It does not.

19 QUESTIONS BY MS. MCCLURE:

20    Q.    Does the regulation explain to

21 a registrant how to identify an order of

22 unusual frequency?

23         MR. BENNETT:  Objection.  Form.

24         THE WITNESS:  It does not.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. MCCLURE:

 2         Q.     Does the regulation explain to

 3    a registrant how to identify an order that

 4    deviates substantially from a normal pattern?

 5                MR. BENNETT:  Objection.  Form.

 6                THE WITNESS:  It does not.

 7    QUESTIONS BY MS. MCCLURE:

 8         Q.     Registrants are responsible for

 9    designing their own suspicious order

10    monitoring systems; is that correct?

11         A.     It is.

12         Q.     Is a registrant to take into

13    account considerations that are unique to

14    them in designing such a system, for example,

15    their customer base?

16         A.     Yes.

17         Q.     So would one registrant

18    potentially have a different-looking or

19    different nature of a customer base than

20    another registrant?

21         A.     Yes.

22         Q.     Is it possible that those

23    registrants would then have designed

24    different suspicious order monitoring

25    systems?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.      It's possible.

2      Q.      Is there a holy grail or

3   articulated DEA model standard for what

4   constitutes a suspicious order?

5              MR. BENNETT:  Objection.  Form.

6              THE WITNESS:  Not that I'm

7       aware of.

8   QUESTIONS BY MS. MCCLURE:

9      Q.      And you've spent your 30-year

10  career in DEA in diversion-related roles?

11     A.      Yes.

12     Q.      Does DEA define for registrants

13  what essential features are that every

14  suspicious order monitoring system must have

15  to be compliant?

16             MR. BENNETT:  You can answer.

17             THE WITNESS:  They may talk

18      with industry or with industry

19      associations about those kind of

20      things or answer specific questions

21      from a registrant.

22  QUESTIONS BY MS. MCCLURE:

23     Q.      So in your experience, DEA may

24  answer a specific question from a registrant

25  about a possible feature that that registrant

Highly Confidential - Subject to Further Confidentiality Review

1    is considering for its suspicious order

2    monitoring system and provide information to

3    that registrant as to whether that feature

4    would be compliant --

5                    MR. BENNETT:  Objection.

6    QUESTIONS BY MS. MCCLURE:

7        Q.     -- with the Controlled

8    Substances Act?

9                    MR. BENNETT:  Objection.

10        Incomplete hypothetical.

11                    You can answer.

12                    THE WITNESS:  Yes.

13    QUESTIONS BY MS. MCCLURE:

14        Q.     Tell me more about what you

15    know about that.

16        A.     If a registrant asks a specific

17    question, if having a particular part of a

18    system is appropriate, they could give their

19    opinion about whether that's appropriate as

20    part of a system.

21        Q.     But does DEA mandate that

22    certain features must be included by every

23    registrant within suspicious order monitoring

24    systems?

25        A.     No.

1    Q.    So, for example, in your

2  experience, would DEA instruct registrants

3  that to be compliant, a suspicious order

4  monitoring system must compare orders to

5  orders received from other similarly sized

6  pharmacies within a geographic area?

7              MR. BENNETT:  Objection.

8        Vague.  Incomplete hypothetical.

9        Scope.

10             You can answer within the

11       limits of scope letter, if you can.

12             THE WITNESS:  DEA looks at them

13       one registrant at a time, so they're

14       not telling them to compare them with

15       other registrants.  Looking at each

16       registrant uniquely.

17  QUESTIONS BY MS. MCCLURE:

18       Q.    And is that because DEA affords

19  registrants the discretion to design a

20  compliant suspicious order monitoring?

21             MR. BENNETT:  Objection.

22       Scope.

23             You are not here to speak on

24       behalf of DEA.  You may speak in your

25       personal capacity.

Highly Confidential - Subject to Further Confidentiality Review

1    THE WITNESS:  I'm now confused

2    about what the question was.

3  QUESTIONS BY MS. MCCLURE:

4    Q.    No problem.

5    In your experience, DEA affords

6  registrants the discretion to design a

7  suspicious order monitoring system that is

8  effective?

9    MR. BENNETT:  Same objection.

10    You may answer --

11    THE WITNESS:  Yes.

12    MR. BENNETT:  -- in your

13  personal capacity.

14  QUESTIONS BY MS. MCCLURE:

15    Q.    And so if I have this correct,

16  DEA will advise as to a specific feature when

17  requested, when information is requested by a

18  registrant, but will not put together a list

19  of the mandated features that every

20  suspicious order monitoring system must

21  include in order to be compliant.

22    Do I have that correct?

23    A.    I have talked with registrants

24  in the past about specific aspects of their

25  system in giving them advice.  I'm not sure

Highly Confidential - Subject to Further Confidentiality Review

 1    if DEA is currently doing that or not.

 2         Q.    When you say you have "talked

 3    with registrants in the past about specific

 4    aspects of their system in giving them

 5    advice," is that in your capacity at DEA?

 6         A.    Yes.

 7         Q.    But in your experience, DEA

 8    does not publish, put forth, any sort of list

 9    of mandated requirements that must be in a

10    suspicious order monitoring system in order

11    for that system to be effective or compliant?

12         A.    I haven't seen one.

13         Q.    If you haven't seen a written

14    list, are you aware of some informal list --

15         A.    No.

16         Q.    -- of features --

17         A.    No, I'm not.

18         Q.    -- that DEA mandates be

19    included in every suspicious order monitoring

20    system?

21              MR. BENNETT:  Let her finish

22        the question first.

23              THE WITNESS:  Okay.

24              No.

25

Highly Confidential - Subject to Further Confidentiality Review

1    QUESTIONS BY MS. MCCLURE:

2         Q.    If a former DEA diversion

3    investigator identified a number of features

4    that must be included in a suspicious order

5    monitoring system in order for it to be

6    compliant, would that match with your

7    experience at DEA?

8              MR. BENNETT:  Objection.

9         Scope.  Incomplete hypothetical and

10        vague.

11             You can answer in your personal

12        capacity but not on behalf of DEA.

13             THE WITNESS:  I'm not aware of

14        any that we've had, so it wouldn't be

15        consistent with what I have seen.

16   QUESTIONS BY MS. MCCLURE:

17        Q.    It would not be consistent with

18   what you've seen or experienced in your time

19   at DEA?

20        A.    That's correct.

21        Q.    Do you agree that there -- that

22   the review of an order to determine whether

23   it is suspicious or not is a subjective one?

24             MR. BENNETT:  Objection.

25        Vague.

Highly Confidential - Subject to Further Confidentiality Review

1          You can answer.

2          THE WITNESS:  Yes.

3   QUESTIONS BY MS. MCCLURE:

4      Q.    Meaning that the individual or

5   entity reviewing that order takes into

6   account the totality of the circumstances and

7   makes a determination as to whether that

8   order is or is not a suspicious order; is

9   that right?

10      A.    Yes.

11      Q.    Have you heard the phrase

12   "totality of circumstances" previously in the

13   course of your tenure at DEA?

14      A.    I have.

15      Q.    Do you recall in what context

16   you've heard that?

17      A.    Discussing suspicious orders.

18      Q.    And is that a phrase that's

19   used commonly within DEA or the industry

20   regarding reporting suspicious orders?

21      A.    I don't know that it's common.

22      Q.    Regardless -- okay.

23          You've heard the term "totality

24   of the circumstances" before?

25      A.    Yes.

1      Q.      Okay.  And as we discussed

2  previously, each customer -- or I'm sorry,

3  each registrant has a different customer

4  base, right?

5      A.      Correct.

6      Q.      No customer -- or no

7  registrant's customer base will exactly match

8  that of another registrant?

9      A.      Correct.

10      Q.      And so the information

11  available to one registrant regarding whether

12  an order -- let me strike that and start

13  over.

14              The information available to

15  one registrant about a particular order and

16  the customer placing it might be different

17  than the information available to another

18  registrant?

19      A.      And you're using -- I don't

20  quite understand the question yet.

21      Q.      Okay.  We've talked about how

22  registrants have different customer bases,

23  right?

24      A.      Yes.

25      Q.      And so when a registrant or a

1    wholesaler in this case is evaluating an

2    order and trying to determine whether it's

3    suspicious or not --

4                Are you with me?

5        A.      Uh-huh.  Yes.

6        Q.      -- the information that

7    Registrant A may have about that order or

8    that customer may be different than the

9    information that is available to

10   Registrant B?

11               MR. BENNETT:  Objection.

12       Vague.  Incomplete hypothetical.

13               THE WITNESS:  Yes, they may be

14       different.

15   QUESTIONS BY MS. MCCLURE:

16       Q.      Each registrant conducts its

17   own due diligence?

18       A.      They should.

19       Q.      To your knowledge, they should,

20   right?

21       A.      Yes.

22       Q.      So do registrants, in your

23   experience, share due diligence files?

24       A.      No.

25       Q.      Does the regulation -- I'm

1    looking back at Mapes Exhibit 3 -- define the

2    form or format that a suspicious order report

3    must take?

4         A.    It does not.

5         Q.    Does it say what information is

6    supposed to be provided to DEA?

7         A.    No, it doesn't.

8         Q.    Does the regulation in Mapes

9    Exhibit 3 say anything about whether a

10   registrant can ship a suspicious order?

11              MR. BENNETT:  Objection.  Form.

12              THE WITNESS:  No, it doesn't.

13   QUESTIONS BY MS. MCCLURE:

14        Q.    And this section of the

15   regulation, 1301.74(b), it has not changed

16   since 1971?

17        A.    I'm not aware of any changes.

18        Q.    Are you familiar with excessive

19   purchase reports?

20        A.    Yes.

21        Q.    What are they?

22        A.    Reports that are sent by

23   wholesalers of purchases of controlled

24   substances that they, after the fact, think

25   may be excessive.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.     Was the submission of excessive

2     purchase reports, in your experience,

3     standard practice in the industry?

4     A.     It was.

5     Q.     Was there a particular time

6     that you believe, in your experience, it was

7     standard practice in the industry to submit

8     those?

9     A.     From the time I started with

10    DEA in 1977 until we had the meetings with

11    the individual wholesalers, that was the --

12    the standard practice, to submit those.

13    Q.     And in your experience, DEA

14    reviewed those reports as compliant with the

15    Controlled Substances Act?

16              MR. BENNETT:  Objection.

17         Scope.

18              This is not a 30(b)(6) witness

19         who can speak on behalf of DEA.

20              You may answer in your personal

21         capacity within the limits of the

22         scope letter.

23              THE WITNESS:  Yeah, I viewed

24         those as compliant with the regulation

25         for suspicious orders.

```
 1    QUESTIONS BY MS. MCCLURE:

 2         Q.    And in your experience of

 3    conducting audits of distribution centers,

 4    that was one of your roles as a diversion

 5    investigator, right?

 6         A.    Yes.

 7         Q.    Conducting audits?

 8         A.    Yes.

 9         Q.    And as a group supervisor, you

10    would oversee diversion investigators who

11    were conducting audits?

12         A.    That's correct.

13         Q.    And that would include a review

14    of their suspicious order monitoring systems?

15         A.    That's correct.

16         Q.    Including the formats that they

17    were using to submit and how they were

18    identifying and reporting suspicious orders

19    to DEA?

20         A.    Correct.

21         Q.    And in the course of your role

22    as a diversion investigator and a group

23    supervisor, you accepted these excessive

24    purchase reports as compliant with the

25    Controlled Substances Act?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. BENNETT:  You can answer

 2          that.

 3                    THE WITNESS:  Yes.

 4   QUESTIONS BY MS. MCCLURE:

 5          Q.    You don't recall saying to

 6   anyone, "Hey, you can't submit these kinds of

 7   documents" in the course of your roles as a

 8   diversion investigator or a group supervisor?

 9                    MR. BENNETT:  Objection.

10          Scope.

11                    You are not authorized to

12          disclose information regarding any

13          specific DEA investigations or

14          activities.

15                    You may answer this question

16          yes or no on whether you remember

17          saying that.

18                    THE WITNESS:  Can you repeat

19          the question?

20   QUESTIONS BY MS. MCCLURE:

21          Q.    I can.

22                    You don't recall saying to

23   anyone, a registrant, for example, "You can't

24   submit these kinds of excessive purchase

25   reports and still be compliant with the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Controlled Substances Act" in your role as a
 2   diversion investigator or a group supervisor?
 3              MR. BENNETT:  Same objection.
 4              You can answer.
 5              THE WITNESS:  No, I don't
 6        remember saying that.
 7   QUESTIONS BY MS. MCCLURE:
 8        Q.    And we've been talking about
 9   excessive purchase reports, but sometimes
10   people -- registrants would call them by
11   different names.
12              Do you recall that, or in your
13   experience were they all called excessive
14   purchase reports?
15        A.    Generally referred to as
16   excessive purchase reports.  Could be called
17   suspicious order reports.
18        Q.    And were they generally in a
19   similar format across the industry?
20              MR. BENNETT: Objection.  Form.
21        Vague.
22              You can answer it.
23   QUESTIONS BY MS. MCCLURE:
24        Q.    Do you understand my question?
25        A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1              They were in different formats

2    depending on the company that was sending

3    them.  Some would send computer printouts.

4    Some would send copies of invoices.  So there

5    are different ways that they were sent.

6         Q.    They generally provided the

7    same kind of information?

8         A.    Yes.

9         Q.    About purchases and sales that

10   had already happened?

11        A.    Correct.

12        Q.    And DEA accepted those?

13            MR. BENNETT:  Objection.

14   QUESTIONS BY MS. MCCLURE:

15        Q.    In your personal experience?

16            MR. BENNETT:  Scope.

17            You're not here as a 30(b)(6)

18       witness to answer on behalf of DEA.

19            You may answer in your personal

20       capacity of what you did.

21            THE WITNESS:  Yes, we accepted

22       those.

23            MR. LANIER:  Did he say -- I'm

24       trying to be careful -- "we" after you

25       told him not to speak for the DEA but

Highly Confidential - Subject to Further Confidentiality Review

```
 1        himself?

 2                MS. MCCLURE:  Mark --

 3                MR. BENNETT:  I believe that

 4        was his testimony, yes.

 5                MS. MCCLURE:  That is his

 6        testimony.

 7                MR. LANIER:  Okay.

 8   QUESTIONS BY MS. MCCLURE:

 9        Q.     So in your personal experience,

10   were you the only one who accepted these?

11                MR. BENNETT:  You can answer.

12                THE WITNESS:  No other groups

13        accepted the same type of reports.

14   QUESTIONS BY MS. MCCLURE:

15        Q.     So saying "we" is referring to

16   you and those other groups, right?

17        A.     The others that I was

18   supervising at the time.

19        Q.     So in the course of your role

20   as a diversion investigator, as well as the

21   time when you acted as a group supervisor and

22   had diversion investigators reporting to you,

23   yes?

24        A.     Yes.

25        Q.     Are you aware of DEA
```

Highly Confidential - Subject to Further Confidentiality Review

1   headquarters approving particular suspicious

2   order monitoring systems submitted by a

3   registrant at any time in your experience at

4   DEA?

5           MR. BENNETT:  Objection.  Form.

6           You can answer.

7           THE WITNESS:  I do recall one

8       time that I was in headquarters and we

9       received a letter from a wholesaler

10      about their suspicious order

11      monitoring program, and we told them

12      that it did comply with the

13      requirements in the regulation.

14  QUESTIONS BY MS. MCCLURE:

15      Q.    What role were you in when you

16  received that letter?

17      A.    The deputy chief of liaison and

18  policy.

19      Q.    And when you say "we" received

20  that letter, were you personally involved

21  with the approval of that suspicious order

22  monitoring system?

23          MR. BENNETT:  You can answer.

24          THE WITNESS:  Yes.

25

```
 1   QUESTIONS BY MS. MCCLURE:

 2       Q.    Who else is encompassed within

 3   that "we" that you've provided?

 4       A.    A staff coordinator that

 5   reviewed the incoming correspondence from the

 6   company, drafted the response to the company

 7   and then sent it to me for approval, or in

 8   this case signature, to send it to the

 9   company.

10       Q.    Did you sign that?

11       A.    Yes.

12       Q.    And what company was that?

13       A.    AmerisourceBergen.

14       Q.    Can you think of any other

15   instances in which you have a personal

16   recollection of DEA's approval of a

17   suspicious order monitoring system?

18       A.    No, I cannot.

19             (Mapes Exhibit 4 marked for

20       identification.)

21   QUESTIONS BY MS. MCCLURE:

22       Q.    I'm going to mark an exhibit as

23   4.  This is a series of letters exchanged,

24   and they're all going to be amalgamated as

25   one exhibit for today.
```

1          If you could take a look

2     through those letters and let me know when

3     you've had a chance to review them.

4          A.     Okay.  I've generally reviewed

5     them.

6          Q.     Now, when I was previously

7     asking you about approvals, you recalled a

8     situation in which you had signed a letter to

9     AmerisourceBergen.

10          Is that a different set of

11     letters or a letter that is not this set

12     that's marked as Exhibit 4?

13          A.     Yes, it's not included in here.

14          Q.     Okay.  So let me back up.

15          This set of letters is dated in

16     the '96 to '98 time period, right?  Over a

17     time span through '96, '97, and then ending

18     in June 23rd -- I'm sorry, July 23, '98,

19     right?

20          A.     Correct.

21          Q.     And these are exchanged between

22     the Department of Justice, DEA Enforcement

23     Administration -- I'm sorry, the Drug

24     Enforcement Administration and Chris

25     Zimmerman at Bergen, right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     Correct.
 2        Q.     So not AmerisourceBergen
 3   because this predated the merger with
 4   Amerisource.
 5               Are you aware of that?
 6               MR. BENNETT:  Objection.  Form.
 7               THE WITNESS:  Could you restate
 8        the question?
 9   QUESTIONS BY MS. MCCLURE:
10        Q.     Yes, I can.
11               As of 1998, Bergen was a
12   separate company from Amerisource.
13               Do you know that, or am I
14   telling you --
15        A.     Yes.
16        Q.     You are aware of that?
17        A.     Yes, I am.
18        Q.     Okay.  You previously told me
19   you had signed a letter approving a system
20   that AmerisourceBergen had.
21               Was that a later letter that
22   was subsequent to the 2001 merger between
23   Amerisource and Bergen, or was that a letter
24   that you recall being part of this exchange
25   with Bergen?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.      It was subsequent to this.  It

2  was after the merger of Amerisource and

3  Bergen.

4      Q.      Do you recall the approximate

5  time period of the approval letter that you

6  recall signing regarding AmerisourceBergen's

7  suspicious order monitoring program that had

8  to have been after 2001, which was the merger

9  of those two companies?

10             MR. BENNETT:  Objection.  Form.

11             THE WITNESS:  No, I don't

12      recall the time frame.

13  QUESTIONS BY MS. MCCLURE:

14      Q.      Can we agree it would have --

15  you recall it being AmerisourceBergen, so

16  after the merger in 2001, if I'm telling you

17  the correct date of the merger, right?

18      A.      Yes.

19      Q.      Would it have been prior to

20  2007, which is when there was a settlement

21  and release agreement executed between DEA

22  and AmerisourceBergen?

23      A.      Yes.

24      Q.      So sometime in between 2001 and

25  2007, you recall a different exchange of

1    letters that is not reflected here in Mapes

2    Exhibit 4 in which you signed a document, a

3    letter, approving AmerisourceBergen's

4    suspicious order monitoring system?

5         A.    That's correct.

6         Q.    In your experience at DEA,

7    would letters approving suspicious order

8    monitoring systems be things that were

9    retained, kept by DEA?

10             MR. BENNETT:  Objection.

11        Scope.  Calls for speculation.

12             You can answer.

13             THE WITNESS:  Generally all

14        correspondence was retained.

15   QUESTIONS BY MS. MCCLURE:

16        Q.    Okay.  So is it reasonable to

17   think that a letter approving a suspicious

18   order monitoring system, of which you can

19   only recall one instance of it happening,

20   would be something that would be retained by

21   DEA?

22             MR. BENNETT:  Objection.

23        Scope.  Calls for speculation.

24             You can answer.

25             THE WITNESS:  Yes.

```
 1   QUESTIONS BY MS. MCCLURE:

 2        Q.    So you don't recall when in

 3   between '01 and '07 this would have been?

 4        A.    It would have been while I was

 5   deputy chief of the liaison and policy

 6   section, so it would have been during that

 7   time frame.

 8        Q.    And would you be so kind as to

 9   remind me to the best of your recollection

10   when that time frame was?

11             MR. BENNETT:  Objection.  Asked

12        and answered.

13             MS. MCCLURE:  Yeah, it is asked

14        and answered.

15             MR. BENNETT:  You can answer.

16             MS. MCCLURE:  I just don't

17        remember.

18             MR. BENNETT:  You can answer

19        again.

20   QUESTIONS BY MS. MCCLURE:

21        Q.    Was that approximate --

22             MR. BENNETT:  Wait a second.

23             MS. MCCLURE:  Okay.

24             MR. BENNETT:  You have a

25        question pending.
```

```
 1              MS. MCCLURE:  Yeah, I have a
 2         question pending, you're right.
 3              THE WITNESS:  I can't recall
 4         the exact dates of that.
 5    QUESTIONS BY MS. MCCLURE:
 6         Q.    But that was immediately prior
 7    to you becoming chief of the E-Commerce
 8    section in 2004?
 9         A.    No, it was immediately prior to
10    me becoming chief of the administrative
11    section.
12         Q.    Planning and resources?
13         A.    The planning and resources
14    section.
15         Q.    And you did that from
16    approximately 2003 to 2004 as to your prior
17    testimony?
18         A.    Correct.
19         Q.    So can we limit the time period
20    for when this letter would have been as
21    sometime between 2001 and then 2003 when you
22    took over the chief of the planning and
23    resources section?
24         A.    Yes.
25         Q.    Division?  Section?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Section.

2          Q.      Section.

3                  Okay.  So between '01 and '03.

4                  Understanding you've been gone

5    from DEA since 2007, do you have a copy of

6    this letter in your personal possession?

7          A.      No.

8          Q.      Do you recall to whom you sent

9    this letter approving of AmerisourceBergen's

10   suspicious order monitoring system sometime

11   between 2001 and 2003?

12         A.      To Chris Zimmerman at

13   AmerisourceBergen.

14         Q.      How did that letter come about?

15   What led to you -- strike that.

16                 What led to you issuing that

17   letter?

18                 MR. BENNETT:  Objection.

19         Scope.

20                 You are not authorized to

21         disclose the internal deliberative

22         process of the Department of Justice

23         or any attorney-client communication

24         or privileged conversations.

25                 To the extent you can answer

Highly Confidential - Subject to Further Confidentiality Review

```
 1          the question without disclosing that

 2          information, you may answer.

 3                  THE WITNESS:  It was in

 4          response to a letter from

 5          AmerisourceBergen.

 6   QUESTIONS BY MS. MCCLURE:

 7          Q.    Was that letter from

 8   AmerisourceBergen from Chris Zimmerman?

 9          A.    It was.

10          Q.    Did you know Chris Zimmerman at

11   the time -- in this 2001 to 2003 time period?

12          A.    No.

13          Q.    And you said you recall a staff

14   coordinator passing that letter on to you for

15   evaluation?

16          A.    To review, yes.

17          Q.    What do you recall, if

18   anything, doing to evaluate the request?

19          A.    I don't --

20                  MR. BENNETT:  Objection.  Same

21          instruction regarding the internal

22          deliberative process.

23                  You can answer.

24                  THE WITNESS:  I don't recall.

25
```

```
 1   QUESTIONS BY MS. MCCLURE:

 2        Q.    But you do recall that the end

 3   conclusion that you reached was to issue a

 4   letter back to Chris Zimmerman at

 5   AmerisourceBergen approving of the suspicious

 6   order monitoring system?

 7        A.    That's correct.

 8        Q.    The letters I showed you, which

 9   are Mapes Exhibit 4, do you recall whether

10   you reviewed those letters in evaluating

11   Chris Zimmerman's 2001 to 2003, somewhere in

12   that time period, letter he sent to you on

13   behalf of AmerisourceBergen?

14             MR. BENNETT:  Objection.

15        Scope.

16             You can answer that question

17        yes or no only, if you remember.

18             THE WITNESS:  I don't recall.

19   QUESTIONS BY MS. MCCLURE:

20        Q.    Do you recall if you were aware

21   of these letters, meaning Mapes Exhibit 4,

22   when you evaluated the subsequent 2001 to

23   2003 request from Chris Zimmerman for

24   approval of the AmerisourceBergen Drug

25   Corporation suspicious order monitoring
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    system?
2         A.     I don't recall seeing these
3    when I was looking at that other letter.
4         Q.     Meaning that you don't know if
5    you did or not or -- let me ask you.
6                You don't know if you reviewed
7    these letters or not when you evaluated that
8    letter?
9         A.     I don't believe that I did, but
10   I don't know.
11        Q.     You don't know for certain?
12        A.     That's correct.
13        Q.     Is this the first time that
14   you've ever seen the letters that are
15   reflected as Mapes Exhibit 4, when I've shown
16   them to you, or have you seen them prior to
17   today?
18        A.     I don't recall seeing any of
19   these letters before.
20        Q.     It's possible you may have in
21   the course of your time at DEA or in
22   consulting with AmerisourceBergen, but
23   sitting here today, you don't recall; is that
24   correct?
25                MR. BENNETT:  Objection.
```

1          You can answer.

2          Form.

3          You can answer.

4          THE WITNESS:  Yeah, I don't

5     recall seeing them before.

6   QUESTIONS BY MS. MCCLURE:

7          Q.    Did you take over the chief of

8   liaison and policy section role from Patricia

9   Good?

10         A.    No.

11         Q.    Who was previously in that role

12  when you took it over?

13         A.    I was the deputy chief of

14  liaison and policy working with Patricia.

15         Q.    I apologize.

16         So in this 2001 to 2003 time

17  frame when you issued this letter approving

18  of AmerisourceBergen's suspicious order

19  monitoring system, at that time you were

20  reporting to Patricia Good?

21         A.    Yes.

22         Q.    Okay.  Was Thomas Gitchel the

23  immediate prior chief of liaison and policy

24  prior to Patricia Good, to your knowledge?

25         A.    Yes, he was.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. MCCLURE:  Go off the

 2         record.

 3              VIDEOGRAPHER:  Going off the

 4         record.  The time is 11:52.

 5          (Off the record at 11:52 a.m.)

 6              MR. LANIER:  And the reason

 7         I've asked to go back on the record is

 8         because you are asking for production

 9         of this letter that you clearly had

10         some indication, as you asked your

11         questions, might exist.  You have

12         asked for the letter, and it has not

13         been produced by them.

14              But by my recollection, and I'm

15         having our people search diligently,

16         it's not been presented by y'all,

17         either.

18              MS. MCCLURE:  Well, agreed.

19              SPECIAL MASTER COHEN:  Why

20         don't we --

21              MR. LANIER:  If you've got that

22         letter --

23              MS. MCCLURE:  I thought he was

24         finished.

25              MR. LANIER:  If you've got that
```

```
 1          letter, you have not produced it prior

 2          to this deposition.  That's

 3          outrageous.

 4               MS. MCCLURE:  Mr. Lanier, I,

 5          sitting here today, am not aware of

 6          that letter.

 7               To the extent that you believe

 8          that my questions, quote, clearly have

 9          some indication that I'm aware of the

10          letter existing, that is false.

11               MR. LANIER:  Okay.  As long as

12          you'll state on the record you had no

13          clue that that letter exists --

14               MS. MCCLURE:  Didn't I just do

15          that?

16               MR. LANIER:  That's fine.  I'll

17          accept that from you.

18               And I'll also accept that you

19          think your client's done a diligent

20          search and your client doesn't have

21          the letter or they sure would have

22          produced it because it's absolutely

23          subject to a lot of requests.

24               MS. MCCLURE:  Do you think that

25          that letter would have been in the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          best interests of my client to produce
 2          had we located it?
 3                  SPECIAL MASTER COHEN:  Don't
 4          need to argue amongst each other.
 5                  MS. MCCLURE:  Regardless,
 6          Mr. Bennett, as we discussed off the
 7          record and we will now memorialize on
 8          the record, the defendants -- I do not
 9          have the Touhy request in front of me.
10          Nevertheless, I believe it's fairly
11          obvious and not disputable that such
12          an approval letter of
13          AmerisourceBergen's 2000 -- some --
14          such an approval letter from DEA to
15          AmerisourceBergen sometime between the
16          2001-2003 time period, executed and
17          signed by Mr. Mapes, as he has
18          testified here today, would be
19          included within the scope of the
20          requests that the defendants have
21          made.
22                  I would request that DEA search
23          for and produce that letter to the
24          extent it can be located.
25                  Mr. Mapes has testified that in
```

```
 1        his experience such a letter would

 2        have been retained by DEA, similar to

 3        the letter that DEA did produce to

 4        AmerisourceBergen dated July 23, 1998,

 5        issued to Bergen Brunswig and having a

 6        subject at the bottom of it called

 7        "Approved Suspicious Order Monitoring

 8        System, US-DEA-00025671."

 9            I would also request that for

10        the convenience of the witness that

11        search be conducted promptly, because

12        I will state now on the record that to

13        the extent the letter is produced

14        subsequent to Mr. Mapes deposition,

15        I'm in the unfortunate position, and

16        apologize to Mr. Mapes for doing this,

17        but we would request that his

18        deposition, to the extent it's not

19        produced today or tomorrow, be

20        reconvened to -- for the purpose of

21        questioning regarding that letter.

22            MR. BENNETT:  Counsel, I can

23        tell you that DEA did do a diligent

24        search for records responsive to the

25        requests that, in particular, the
```

```
1              defense sent.  It has produced a

2              number of documents.

3                     I have never seen the document

4              that was Mr. Mapes referenced, and to

5              the best of my knowledge, that was

6              never collected in the DEA's search

7              process and was not being withheld.

8                     I would ask DEA to do a search.

9                     I do want the parties to

10             understand that there are retention

11             schedules and documents are, in the

12             normal course of a government agency,

13             not retained beyond certain periods of

14             time.

15                    I do not know whether a

16             retention schedule would have applied

17             to this document and whether or not

18             it -- how long it would have been

19             retained.  But I will ask DEA to look

20             for the document, and we'll make a

21             determination whether or not it can be

22             released or whether it needs to be

23             redacted and released.

24                    MS. MCCLURE:  Regardless --

25                    MR. BENNETT:  I will make that
```

```
 1            at our next break.

 2                  MS. MCCLURE:  Regardless, what

 3            I would ask in terms of whether the

 4            document can be produced or would have

 5            to be redacted, what I do ask is if

 6            their document located and it is being

 7            withheld, in other words, not just

 8            redacted and produced in redacted

 9            form, if the document is being

10            withheld, we would ask that you

11            confirm the existence of the document

12            and explain what the reason is --

13                  MR. BENNETT:  Of course.

14                  MS. MCCLURE:  -- that you

15            believe it should be withheld, not

16            simply withhold the document.

17                  MR. BENNETT:  Of course.

18                  Yes, I mean, I think we have to

19            do a privilege log for any documents

20            we withhold, so...

21                  But at our next break, I will

22            send an e-mail to DEA to see if they

23            can locate it.

24                  MS. MCCLURE:  Thank you.

25            Mr. Mapes, apologies for the --
```

 1                VIDEOGRAPHER:  Go back on the

 2       video?

 3                MS. MCCLURE:  Yes, let's go

 4       back on video.

 5                VIDEOGRAPHER:  Going back on

 6       video.  Beginning of Media File 3.

 7       The time is 11:59.

 8   QUESTIONS BY MS. MCCLURE:

 9       Q.     Mr. Mapes, thank you, and

10   apologies for the -- as we said, sometimes

11   there will be attorney sidebars and

12   discussions, so thank you for your patience

13   while we work through that.

14       A.     Okay.

15       Q.     Do you remember anything about

16   the program that AmerisourceBergen submitted

17   to you for -- with that request for approval

18   in that 2001 to 2003 time frame?

19       A.     No, I don't remember the

20   details of it.

21       Q.     Sitting here today and having

22   reviewed Mapes Exhibit 4, which discusses --

23   well, let's turn to the last document within

24   that set of documents, which begins -- the

25   little Bates numbers on the bottom say

1    319751.

2         A.    Yes.

3         Q.    That's a letter from Chris

4    Zimmerman at Bergen to Tom Gitchel dated

5    September 30, 1996, correct?

6         A.    Yes, it is.

7         Q.    And we don't need to read

8    through the entire letter, but is it your

9    understanding generally, having reviewed this

10   letter, that at the time Bergen was doing two

11   things to report a suspicious order; one was

12   monthly excessive purchase reports, correct?

13             MR. BENNETT:  Objection.  Form.

14        This witness lacks personal knowledge.

15        He said he'd never seen this letter

16        before.

17   QUESTIONS BY MS. MCCLURE:

18        Q.    Okay.  You've reviewed this

19   letter when I handed it to you a few minutes

20   ago, correct?

21        A.    Correct.

22        Q.    This letter -- I'm trying to

23   avoid having to go through the whole letter

24   and use up a lot of time, everyone's time,

25   here.  But essentially there were two methods

Highly Confidential - Subject to Further Confidentiality Review

1    that this letter discusses, whether you've

2    seen it before or not, that Bergen was using

3    in 1998 to report and identify suspicious

4    orders to DEA.

5                 MR. BENNETT:  Same -- I'm

6          sorry.

7    QUESTIONS BY MS. MCCLURE:

8          Q.     One of those was the provision

9    of monthly excessive purchase reports,

10   correct?

11                MR. BENNETT:  Objection.  Form.

12         Lack of personal knowledge.

13   QUESTIONS BY MS. MCCLURE:

14         Q.     And that's referenced on

15   page 1, paragraph 2?

16                MR. BENNETT:  You can answer

17         the last question.

18                THE WITNESS:  Yes, it does talk

19         about excessive purchase reports being

20         sent.

21   QUESTIONS BY MS. MCCLURE:

22         Q.     And then in the next paragraph

23   it also talks about phone calls placed by

24   Bergen to DEA?

25                MR. BENNETT:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MS. MCCLURE:

 2        Q.     Correct?

 3        A.     Yes.  Yes, it does.

 4        Q.     And ultimately, the proposal in

 5   this letter was to prepare a daily suspicious

 6   order report of completed transactions that

 7   would go either via fax or some other method

 8   to DEA field offices.

 9               Is that your understanding

10   having read this letter?

11               MR. BENNETT:  Objection.  Form.

12               THE WITNESS:  I'm not certain

13        that they're completed orders or sales

14        or orders that they've received, from

15        what it says here.

16   QUESTIONS BY MS. MCCLURE:

17        Q.     Okay.  Do you recall whether

18   the letter that you approved sometime between

19   2001 and 2003 reflected daily reports going

20   to DEA field offices from AmerisourceBergen

21   of suspicious orders?

22        A.     I don't recall.

23        Q.     Okay.  So reviewing this letter

24   does not refresh your recollection as to what

25   it was you approved sometime between 2001 and
```

Highly Confidential - Subject to Further Confidentiality Review

1    2003?

2         A.    No, it does not.

3              (Mapes Exhibit 5 marked for

4         identification.)

5    QUESTIONS BY MS. MCCLURE:

6         Q.    Okay.  This is Mapes 5.  It's a

7    single-page document.

8              Now, Mr. Mapes, on the previous

9    document I handed -- oh, let me know when

10   you've had a chance to review it.  Apologies.

11        A.    Okay.

12        Q.    So having done a comparison,

13   this document is, I believe, the DEA's

14   version of the same letter that's attached as

15   Mapes Exhibit 4.  It's produced by the DEA,

16   which we can tell because at the bottom it

17   says US-DEA-00025671.

18              Do you see that at the bottom?

19        A.    Yes, I do.

20        Q.    And the difference is that at

21   the bottom there's a blacked-out box which is

22   a redaction implemented by DEA, and then the

23   subject added there is "approved suspicious

24   order monitoring system."

25              Are you familiar with these

1  subjects or notations at the bottom of DEA

2  copies of letters and communications in your

3  experience at DEA?

4             MR. BENNETT:  Objection.

5       Scope.

6             You may answer that question

7       yes or no only.

8             THE WITNESS:  No, I'm not.

9             MS. MCCLURE:  Okay.  You can

10      set that aside.

11            (Mapes Exhibit 6 marked for

12      identification.)

13  QUESTIONS BY MS. MCCLURE:

14      Q.    I'm going to hand you a

15  document that is marked Mapes Exhibit 6.

16            And I just realized -- I

17  apologize for the record -- I have not been

18  reading Bates numbers in.  US-DEA-00001771.

19            Take a look at that and let me

20  know when you've had a chance to review it.

21      A.    I've reviewed it.

22      Q.    Have you seen this document

23  before?

24      A.    I have.

25      Q.    Did you see this document, to

Highly Confidential - Subject to Further Confidentiality Review

1  the best of your recollection,

2  contemporaneously with it being issued in or

3  around December of 2007, or have you seen

4  this document more -- only more recently?

5        A.     Only more recently.

6        Q.     By "only more recently," is

7  that referencing the two meetings that you

8  had with DEA counsel to both give information

9  to them and prepare for this deposition, or

10 did you see this letter in connection with

11 your summer and fall 2018 meeting with

12 plaintiffs' counsel?

13              MR. BENNETT:  Objection.  Form.

14              THE WITNESS:  I don't recall

15        seeing it with meetings with plaintiff

16        counsel.

17              I didn't see it at DEA because

18        I was retired before the letter was

19        sent out.

20              I did see it yesterday in

21        preparation for the deposition.

22 QUESTIONS BY MS. MCCLURE:

23       Q.     To the best of your

24 recollection then, the first time you recall

25 seeing this letter was yesterday?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     No, I've seen it other times

 2   between the time I retired and yesterday.

 3        Q.     Do you recall how you saw it

 4   those other times?

 5        A.     It was from a registrant, I

 6   can't remember which one, but a registrant

 7   that sent it to me that had received it from

 8   DEA.

 9        Q.     Do you recall whether it would

10   have been shortly after this letter was sent

11   in the early course of your consulting work,

12   or was it later than that, if you can --

13        A.     It was later than that.

14        Q.     So it's fair to say from your

15   answers that you, it seems, did not review

16   this letter prior to it being issued, say, in

17   the last months of your tenure at DEA?

18             MR. BENNETT:  Objection.

19        Scope.

20             You're not authorized to

21        disclose the internal deliberations of

22        DEA.

23             You may answer that question

24        yes or no only, whether you saw it

25        prior to leaving DEA, a draft.
```

Highly Confidential - Subject to Further Confidentiality Review

1                    THE WITNESS:  No, I did not.

2    QUESTIONS BY MS. MCCLURE:

3          Q.      If we look at paragraph 3 of

4    this letter, the second sentence says,

5    "Filing a monthly report of completed

6    transactions, e.g., excessive purchase report

7    or high unit purchases, end parens, does not

8    meet the regulatory requirement to report

9    suspicious orders."

10                   Based on your experience at

11   DEA, was this a change in how DEA handled

12   suspicious order reporting?

13                   MR. BENNETT:  Objection.

14        Scope.

15                   You're not here as a 30(b)(6)

16        witness to talk on behalf of DEA.

17                   You may disclose your personal

18        knowledge regarding this topic from

19        your time at DEA, what you personally

20        did.

21                   THE WITNESS:  I believe from my

22        experience it was a change.

23   QUESTIONS BY MS. MCCLURE:

24        Q.      Because previously in your

25   experience at DEA excessive purchase reports

Highly Confidential - Subject to Further Confidentiality Review

```
1    had been accepted by DEA for suspicious order

2    reporting as you previously testified,

3    correct?

4              MR. BENNETT:  Objection.

5         Scope.  This is not a 30(b)(6) witness

6         that can answer on behalf of DEA.

7              You may answer what you

8         personally did while at DEA in

9         response to that question.

10             THE WITNESS:  It was a change

11        that was started, from my experience,

12        when we had the meetings with

13        individual wholesalers, individual

14        distributors, starting in 2005.

15   QUESTIONS BY MS. MCCLURE:

16        Q.    So in 2005, which you've just

17   referenced, you began talking with

18   distributors on something called the

19   Distributor Initiative?

20        A.    That's correct.

21        Q.    Whose idea was the Distributor

22   Initiative?

23             MR. BENNETT:  Objection.

24        Scope.  Objection.

25             You're not to disclose internal
```

```
 1            deliberative process.

 2                  If you know of a person who

 3            came up with the idea for a

 4            Distributor Initiative, you may answer

 5            who that person was.

 6                  THE WITNESS:  I'm not sure I

 7            can answer the question.

 8                  MR. BENNETT:  Can we go off the

 9            record for a minute?

10                  MS. MCCLURE:  Yeah.

11                  VIDEOGRAPHER:  We're going off

12            record.  The time is 12:14.

13             (Off the record at 12:14 p.m.)

14                  VIDEOGRAPHER:  We're going back

15            on record.  Beginning of Media File 4.

16            The time is 12:17.

17                  MR. BENNETT:  So the witness

18            can answer the question as far as the

19            people who came up with the idea.

20                  In addition, we did discuss and

21            would prefer to wait until one o'clock

22            for the lunch break because we started

23            late this morning, and it would make

24            the afternoon very long if we go two

25            hours and then we have the rest of the
```

```
1        time in the afternoon.

2                So if the parties would agree,

3        we'd prefer to wait until -- take the

4        lunch break at one o'clock.

5                MS. MCCLURE:  Provided that my

6        personal comfort situation will last

7        us until one o'clock, we can do that.

8                MR. BENNETT:  Well, we can take

9        a quick break, but as far as the lunch

10       break goes, we'd rather wait.

11               If you want to take a comfort

12       break --

13               MS. MCCLURE:  Okay.  I would

14       like to take a five-minute comfort

15       break.

16               MR. BENNETT:  So let's have his

17       answer.  We'll take --

18               MS. MCCLURE:  So let's have you

19       answer.  We'll do five really short,

20       short, short five -- three to five

21       minutes and then go back on.

22               MR. BENNETT:  And then we can

23       do a lunch break 1, 1:30, whatever.

24               MS. MCCLURE:  Yeah.  Exactly.

25               MR. BENNETT:  All right.  You
```

 1          can answer the last question, based on

 2          our conversation, as far as the name

 3          of the individuals.

 4                  THE WITNESS:  It was Kyle

 5          Wright and myself that initiated that.

 6                  MS. MCCLURE:  Okay.  Quick

 7          five-minute-or-less break.

 8                  VIDEOGRAPHER:  Going off the

 9          record.  The time is 12:18.

10           (Off the record at 12:18 p.m.)

11                  VIDEOGRAPHER:  Going back on

12          the record.  Beginning of Media

13          File 5.  The time is 12:27.

14      QUESTIONS BY MS. MCCLURE:

15          Q.     Okay.  So Kyle Wright and

16      yourself initiated the Distributor

17      Initiative?

18          A.     That's correct.

19          Q.     Is it sometimes called the

20      distributor briefings?

21          A.     Yes.

22          Q.     Do you -- okay.

23                  So those are interchangeable?

24          A.     They are.

25          Q.     And what was the reason that

Highly Confidential - Subject to Further Confidentiality Review

 1    you and Mr. Wright initiated the distributor

 2    briefings?

 3                    MR. BENNETT:  Objection.

 4         Scope.  Internal deliberative process.

 5                    You may answer why the

 6         initiative was started but may not

 7         give specifics of the deliberations.

 8                    THE WITNESS:  It was started in

 9         response to the Internet pharmacy

10         issue.

11    QUESTIONS BY MS. MCCLURE:

12         Q.    What was the Internet pharmacy

13    issue?

14         A.    That was when websites were

15    starting to offer their service to patients,

16    doctors and pharmacies to put the three

17    together so that patients could get a

18    prescription filled by a pharmacy after

19    completing a questionnaire on a website and

20    getting that approved by a doctor for a

21    prescription, and a pharmacy getting the

22    prescriptions and filling those and sending

23    them to the patients.

24         Q.    So DEA's concern, am I right,

25    that there was not a doctor-patient

1    relationship in this scenario, the Internet

2    pharmacy situation?

3         A.     That's one of the concerns,

4    yes.

5         Q.     What was the other concern?

6    I'm sorry if I missed it.

7         A.     That the pharmacies were

8    filling prescriptions for patients that they

9    knew nothing about, for doctors that weren't

10   within the geographic area, all for the same

11   drug.

12        Q.     Okay.  And this Internet

13   pharmacy issue, as you called it, was

14   concerning to DEA?

15        A.     It was concerning to me, yes.

16        Q.     In fact, by 2005, were Internet

17   pharmacies overwhelming DEA and exhausting

18   its resources as -- in your experience during

19   that time period?

20             MR. BENNETT:  Objection.

21        Scope.

22             You may answer in your personal

23        experience and not on behalf of DEA.

24             THE WITNESS:  There were a

25        significant number of investigations,

1        and the investigations are lengthy.

2   QUESTIONS BY MS. MCCLURE:

3        Q.     So is that, yes, that the

4   resources needing to be devoted to the

5   Internet pharmacy issue were becoming a

6   problem or a concern?

7        A.     A concern.

8        Q.     A concern.

9               So you, together with

10  Mr. Wright, developed presentations for

11  distributors, correct?

12       A.     That's correct.

13       Q.     Was it basically the same

14  presentation given multiple times, or did the

15  presentation itself change?

16       A.     It was the same basic

17  presentation with some unique information

18  about sales of each specific wholesaler that

19  we were talking with.

20       Q.     And before you gave -- or held

21  the first distributor briefing, had you

22  gotten your PowerPoint approved by DEA?

23              MR. BENNETT:  Objection.

24       Scope.

25              You are not authorized to

Highly Confidential - Subject to Further Confidentiality Review

1          disclose the internal deliberative

2          process or any advice you received

3          from counsel.

4                  You may answer the last

5          question yes or no only, whether there

6          was formal approval of DEA of the

7          final PowerPoint.

8                  THE WITNESS:  Yes, there was.

9    QUESTIONS BY MS. MCCLURE:

10         Q.    And did you give this

11   presentation to individual distributors or

12   distributors as a whole?

13                How did it work?

14         A.    Individual distributors.

15         Q.    And how would you communicate

16   to the distributors that there was a new

17   initiative starting?

18                How did you communicate?

19         A.    Called them and asked them to

20   come to headquarters to discuss it.

21                (Mapes Exhibit 7 marked for

22         identification.)

23   QUESTIONS BY MS. MCCLURE:

24         Q.    I'm going to mark a document

25   Exhibit 7.

Highly Confidential - Subject to Further Confidentiality Review

1                    And for the record,

2    US-DEA-00000147 through 164?

3         A.      Okay.  I've reviewed it.

4         Q.      Okay.  The first page of this

5    document that ends in 147, what is this?

6         A.      This is a memo that I signed to

7    William Walker, who was the deputy assistant

8    administration in diversion, about a meeting

9    that was held on August 10th with Steve Mays

10   of the AmerisourceBergen Drug Company.

11        Q.      And this memo was authored by

12   you, right?

13                That's your signature?

14        A.      Yeah, it was actually authored

15   by Kyle Wright, and I signed it.

16        Q.      Okay.  But you signed it after

17   reviewing it, I assume?

18        A.      Yes.

19        Q.      Right?

20        A.      Yes.

21        Q.      And you wouldn't have signed it

22   unless it was a complete and accurate

23   description of the meeting you had had?

24                MR. BENNETT:  Objection.  Form.

25

```
 1    QUESTIONS BY MS. MCCLURE:

 2        Q.      Let me strike that.

 3                Is this a complete and accurate

 4    description of the meeting that you had with

 5    Steve Mays?

 6        A.      As I remember it, yes.

 7        Q.      And then the second document

 8    that begins 149 and ends at 162, what is that

 9    document?

10        A.      That is a copy of the

11    PowerPoint presentation that was used in the

12    meeting.

13        Q.      So this is DEA's PowerPoint

14    presentation, correct?

15        A.      Yes.

16        Q.      In other words, it's not a

17    presentation AmerisourceBergen brought; it's

18    a DEA-authored presentation, correct?

19        A.      Yes.

20        Q.      The presentation that you

21    previously testified you had approved as part

22    of the distributor briefings, right?

23        A.      Yes.

24        Q.      And then the last document,

25    which is 163 to 164, what is that?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Those are some questions that

2  we provided to AmerisourceBergen that could

3  be asked to help them in their

4  decision-making process about whether or not

5  to ship controlled substances to a specific

6  pharmacy.

7    Q.    To Internet pharmacies?

8    A.    In this case we were discussing

9  Internet pharmacies, yes.

10    Q.    That was the purpose of the

11  meeting you had with AmerisourceBergen on

12  August 10, 2005, correct?

13    A.    Yes, it was.

14    Q.    To discuss Amerisource -- I

15  mean to discuss Internet pharmacies?

16    A.    Yes.

17    Q.    And that's what it says -- and

18  if we flip back to the first page of Mapes 7,

19  the purpose of the meeting was to address the

20  illegal domestic Internet pharmacy problem

21  and their source of supply.

22         That's at the bot -- first

23  paragraph?

24    A.    Yes.

25    Q.    And the memo is called "The

Highly Confidential - Subject to Further Confidentiality Review

```
1    Internet Presentation," right?
2         A.    It is.
3         Q.    And the title of the document
4    that begins on 149, which is the PowerPoint
5    that you gave, is called "Internet Pharmacy
6    Data," right?
7         A.    Yes.
8         Q.    And from the memo that you
9    wrote -- I'm sorry, that Kyle Wright wrote
10   and you signed, it looks like you led -- you,
11   Michael Mapes, led this distributor briefing
12   with AmerisourceBergen, this particular one,
13   right?
14        A.    That's correct.
15        Q.    This was the first distributor
16   briefing?
17        A.    It was.
18        Q.    Why start with
19   AmerisourceBergen Drug Corporation?
20        A.    I don't recall why.
21        Q.    Okay.  And at the conclusion of
22   the presentation, from your memo, it seems
23   that Mr. Mays had arrived to this meeting
24   with some material for DEA -- I'm sorry,
25   that's not at the end of the memo.  That's at
```

Highly Confidential - Subject to Further Confidentiality Review

 1    the bottom of page 1 of the memo.

 2              Do you see that?

 3        A.    Yes, I do.

 4        Q.    Do you recall Mr. Mays arriving

 5    at this meeting with material to discuss with

 6    you?

 7        A.    No.

 8        Q.    Do you recall when you set

 9    up -- well, first of all, let me back up.

10              Did you personally set up this

11    meeting with Steve Mays?

12        A.    I did.

13        Q.    Do you recall your conversation

14    with Steve Mays to set up this meeting?

15        A.    No.

16        Q.    So it appears that Mr. Mays

17    presented a sales profile for a pharmacy.

18              Do you see that?

19        A.    Yes, I do.

20        Q.    Did you know Mr. Mays before

21    this meeting?

22        A.    I had seen him at industry

23    meetings and that kind of thing.  Didn't know

24    him well.

25        Q.    How would you describe

1    Mr. Mays' demeanor during this meeting?

2         A.    I really don't recall.

3         Q.    Okay.  At the end of the memo

4    on the top of the document Bates-labeled 148,

5    the -- I'm sorry, the third full paragraph,

6    it says, "It was agreed that if E-Commerce

7    operations were to identify a highly

8    suspicious pharmacy to which

9    AmerisourceBergen was the wholesaler, that

10   OC -- ODCO" --

11              That stands for E-Commerce

12   operations, right?

13        A.    Yes.

14        Q.    -- "would notify

15   AmerisourceBergen via e-mail of the

16   suspicious activity for AmerisourceBergen to

17   review and take the actions the company deems

18   appropriate."

19              Do you recall that portion of

20   the meeting?

21        A.    No.

22        Q.    Subsequent to this, do you

23   recall reaching out to AmerisourceBergen to

24   notify AmerisourceBergen of any suspicious

25   activity that DEA wanted AmerisourceBergen to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    review and take appropriate action?

 2              MR. BENNETT:  Objection.

 3         Scope.

 4              You're not authorized to

 5         disclose information about specific

 6         investigations.

 7              At this time you can answer

 8         this question yes or no only regarding

 9         whether you remember having such

10         conversations.

11              THE WITNESS:  No, I don't

12         recall any specific conversations.

13    QUESTIONS BY MS. MCCLURE:

14         Q.    Was Mr. Mays cooperative during

15    this meeting, to your recollection?

16              MR. BENNETT:  Objection.  Form.

17         Vague.

18              THE WITNESS:  I just don't

19         recall.

20    QUESTIONS BY MS. MCCLURE:

21         Q.    Okay.  Other than what is

22    outlined in this memo and the presentation,

23    was there anything else discussed with

24    Mr. Mays during this briefing?

25         A.    I don't recall.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    If there was anything else

2    discussed, is it fair to say that your

3    practice would have been to put it in a memo

4    or in the presentation?

5    A.    In the memo.

6    Q.    Okay.  So if there's anything

7    else discussed, it would be in the memo

8    itself?

9    A.    Right.

10        (Mapes Exhibit 8 marked for

11        identification.)

12   QUESTIONS BY MS. MCCLURE:

13   Q.    Okay.  A document marked as 8.

14        Let me know when you've had a

15   chance to review that document.

16   A.    Okay.  I've reviewed it.

17   Q.    Okay.  So this is a similar

18   presentation titled "Internet Presentation

19   with McKesson Corp" for the memo on page 1 of

20   this Mapes 8, right?

21   A.    Yes, it is.

22   Q.    And this is a similar document

23   to what we just reviewed.

24        There's a cover memo followed

25   by a somewhat clearer copy of the

1    presentation, and that's MCKMDL00496859 to

2    875, right?

3         A.    Yes.

4         Q.    And same -- may not be

5    literally identical, but the same basic

6    presentation you had given to

7    AmerisourceBergen Drug Corporation, correct?

8         A.    Yes.

9         Q.    And again, for the same

10   purpose, Internet pharmacies?

11        A.    Yes.

12        Q.    And again, if there had been

13   something additional discussed in your

14   meeting, you would have included it in the

15   cover memo?

16        A.    Yes.

17              (Mapes Exhibit 9 marked for

18        identification.)

19   QUESTIONS BY MS. MCCLURE:

20        Q.    And Mapes 9, US-DEA-00000352

21   through 366.

22        A.    Okay.  I've reviewed that.

23        Q.    Okay.  And that is a similar

24   memo followed by the PowerPoint presentation

25   that you provided to Cardinal Health on the

Highly Confidential - Subject to Further Confidentiality Review

1    topic of Internet pharmacies on August 22,

2    2005?

3        A.    It is.

4        Q.    Okay.  And again, may not be

5    literally identical, but the same basic

6    presentation you had given to

7    AmerisourceBergen Drug Corporation and

8    McKesson, correct?

9        A.    Yes.

10       Q.    For the same purpose, Internet

11   pharmacy issues?

12       A.    Yes.

13       Q.    And again, if there had been

14   something additional discussed in your

15   meeting, you would have included it in your

16   cover memo?

17       A.    Yes.

18       Q.    And we've gone through

19   AmerisourceBergen Drug Corporation, Cardinal

20   and McKesson.

21              Did you give similar

22   presentation to other registrants during the

23   '05-'06 time frame?

24       A.    Yes.

25       Q.    Did you personally continue to

Highly Confidential - Subject to Further Confidentiality Review

1    give distributor briefings in your role as

2    the chief of the regulatory section?

3         A.    I don't recall.

4         Q.    So at the time, these ones that

5    we've gone through in 2005, you were the

6    chief of the E-Commerce section; is that

7    right?

8         A.    Correct.

9         Q.    And you don't recall whether

10   you -- when you shifted to the new role as

11   the chief of regulatory section, whether you

12   continued to give these distributor

13   briefings?

14        A.    I just don't recall.

15        Q.    Do you know whether -- do you

16   know whether the briefings continued into the

17   year 2007, whether you were involved with

18   them or not?

19        A.    There were other briefings, but

20   I don't recall exactly the time frame of

21   them.

22        Q.    Okay.  What is a termination

23   notice in relation to a pharmacy?

24        A.    I'm not sure whose terminology

25   that is.

1     Q.     Okay.  Would sometimes DEA

2     inform registrants that another registrant

3     had stopped shipping controlled substances to

4     a pharmacy?

5     A.     That was done for a short

6     period of time, yes.

7     Q.     And do you know what short

8     period of time that process was done for?

9     A.     No, I don't recall.

10          (Mapes Exhibit 10 marked for

11          identification.)

12    QUESTIONS BY MS. MCCLURE:

13    Q.     Okay.  I'm going to hand you a

14    document marked 10, which is

15    CAH_MDL_PRIORPROD_DEA07_00857912-R.

16    A.     Okay.

17    Q.     Is this an example of an

18    instance where DEA would advise wholesalers

19    that distribution of controlled substances

20    had been halted to -- let me rephrase that.

21    Sorry.

22          Is this an example of DEA

23    notifying registrants of an immediate

24    suspension order for certain DEA

25    registrations?

1      A.      Yes, it is.

2      Q.      Okay.  You can put that one

3  aside.

4              (Mapes Exhibit 11 marked for

5      identification.)

6  QUESTIONS BY MS. MCCLURE:

7      Q.      And I will mark Mapes 11, which

8  is all -- the same intro to the Bates number,

9  ending in 01106667-R.

10     A.      Okay.

11     Q.      Is this document that I've

12 marked as Mapes 11 an example of DEA

13 notifying registrants that a certain

14 distributor who's unnamed had cut back on

15 sales of hydrocodone combination products?

16             MR. BENNETT:  Objection.

17     Foundation.  Vague.

18 QUESTIONS BY MS. MCCLURE:

19     Q.      You can answer, if you can.

20     A.      It is.

21     Q.      And this document is dated

22 January 11, 2006.

23             Does reviewing this document

24 refresh your recollection of the time period

25 during which DEA would advise registrants

1    about pharmacy activity, either terminations

2    or, as in this example, cutbacks took place?

3         A.    It's an example of that, yes.

4         Q.    And does it refresh your

5    recollection as to the time period?

6         A.    Yes.

7         Q.    At least in '06?

8         A.    Yes.

9         Q.    Do you know how long after

10   January 11, 2006, DEA engaged in this

11   practice?

12        A.    No, I don't.

13        Q.    Do you know why this practice

14   was halted?

15             MR. BENNETT:  Objection.

16        Scope.

17             You can answer that question

18        yes or no but may not disclose

19        internal deliberative process or

20        attorney-client privileged

21        communications.

22             THE WITNESS:  Yes.

23   QUESTIONS BY MS. MCCLURE:

24        Q.    Can you tell me why this

25   practice was halted?

Highly Confidential - Subject to Further Confidentiality Review

1     A.     No.

2     Q.     Is that because your counsel --

3  or DEA counsel, Mr. Bennett, has instructed

4  you not to reveal internal deliberative

5  process or attorney-client privileged

6  communications?

7     A.     Yes.

8     Q.     Okay.  Looking back at that

9  exhibit, it looks like it went to an e-mail

10  address called ODC@USDOJ.gov.

11           Do you know what that means?

12    A.     No, I don't recall.

13    Q.     Is that possibly an internal

14  distribution list that was set up for

15  purposes of communicating with registrants?

16           MR. BENNETT:  Objection.  Calls

17      for speculation.

18           THE WITNESS:  I just don't

19      recall.

20  QUESTIONS BY MS. MCCLURE:

21    Q.     Why did DEA send this

22  information that's reflected in Mapes 11 to

23  registrants?

24           MR. BENNETT:  Objection.

25      Scope.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    You're not a 30(b)(6) witness
 2           to answer on behalf of DEA.  You may
 3           answer based on your reason for
 4           sending the e-mail while you were
 5           there.
 6                    THE WITNESS:  My reason for
 7           sending the e-mail was to provide
 8           additional information to the
 9           wholesalers when they're making a
10           decision about selling controlled
11           substances to a specific registrant.
12      QUESTIONS BY MS. MCCLURE:
13           Q.    Because you believed that the
14      additional information would be helpful to
15      wholesalers?
16           A.    Yes.
17           Q.    Based on your experience, would
18      a distributor have a way to know about
19      another distributor's actions in cutting off
20      or cutting back supply to a pharmacy, other
21      than your e-mail that we just looked at of
22      Mapes 11?
23                    MR. BENNETT:  Objection.
24           Vague.
25                    You can answer.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  They may know

 2          about that.  If their salespeople were

 3          in the pharmacy and talked to the

 4          pharmacist, they may know those

 5          things.

 6     QUESTIONS BY MS. MCCLURE:

 7          Q.     Okay.  Do you recall whether

 8     you or others with whom you worked, to the

 9     extent you know, sent this kind of

10     information out frequently or whether it was

11     uncommon?

12                    MR. BENNETT:  Objection.

13          Vague.  Compound.

14                    THE WITNESS:  Uncommon.

15     QUESTIONS BY MS. MCCLURE:

16          Q.     In the course of your

17     employment at DEA, you were aware that

18     registrants were shipping orders that had

19     been reported to DEA as suspicious, right?

20                    MR. BENNETT:  Objection.

21          Scope.

22                    This is beyond the scope that

23          this witness has been authorized.

24                    You may answer based on your

25          personal recollection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  After having the
 2         distributor briefings with individual
 3         wholesalers, I don't recall instances
 4         where products that were reported as
 5         suspicious were shipped.
 6   QUESTIONS BY MS. MCCLURE:
 7         Q.    Does the Controlled Substances
 8   Act say that registrants should not ship
 9   suspicious orders?
10                    MR. BENNETT:  Objection.  Form.
11         Calls for a legal conclusion.
12                    You can answer based on your
13         personal capacity, not on behalf of
14         DEA.
15                    If you know.
16                    THE WITNESS:  Not specifically,
17         no.
18   QUESTIONS BY MS. MCCLURE:
19         Q.    And if an order is unusual in
20   size, frequency or pattern, do you agree that
21   that does not necessarily mean that that
22   order is going to be diverted?
23                    MR. BENNETT:  Objection.
24         Vague.  Objection.  Incomplete
25         hypothetical.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    You can answer it.
 2                    THE WITNESS:  I agree.
 3     QUESTIONS BY MS. MCCLURE:
 4          Q.    And so the fact that an order
 5     or a portion of an order is diverted after a
 6     distributor ships it, would you agree that
 7     that does not make that order that has
 8     already been shipped now suspicious, if it
 9     was not suspicious at the time it was
10     shipped?
11                    MR. BENNETT:  Objection.
12              Vague.  Objection.  Calls for
13              speculation.  Legal conclusion.
14                    You may answer in your personal
15              capacity but not on behalf of DEA.
16                    THE WITNESS:  I don't really
17              understand the nuances there.
18     QUESTIONS BY MS. MCCLURE:
19          Q.    Okay.  If an order is not
20     suspicious and is therefore filled and
21     shipped and later downstream is diverted,
22     that fact of that diversion does not now
23     render the order suspicious; do you agree
24     with that?
25                    MR. BENNETT:  Objection.  Same
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              objections.
 2                    You can answer in your personal
 3              capacity.
 4                    THE WITNESS:  Yes.
 5    QUESTIONS BY MS. MCCLURE:
 6         Q.    Similarly, if an order is
 7    regarded as suspicious but is shipped, would
 8    you agree that that order is not necessarily,
 9    in fact, going to be diverted?
10                    MR. BENNETT:  Objection.  Calls
11              for speculation.  Vague.  Incomplete
12              hypothetical.  Outside the scope.
13                    You may answer in your personal
14              capacity but not on behalf of DEA.
15                    THE WITNESS:  Yes.
16                    MS. MCCLURE:  It's 1:06.  I'm
17              going to suggest we go ahead and take
18              a lunch break.  That may allow us to
19              streamline.
20                    MR. BENNETT:  Okay.  That's
21              fine.
22                    VIDEOGRAPHER:  We're going off
23              record.  The time is 1:06.
24         (Off the record at 1:06 p.m.)
25                    VIDEOGRAPHER:  We're going back
```

Highly Confidential - Subject to Further Confidentiality Review

1    on the record.  Beginning of Media

2    File Number 6.  The time is 2:11.

3  QUESTIONS BY MS. MCCLURE:

4    Q.    Good afternoon, Mr. Mapes.

5         You understand you're still

6  under oath?

7    A.    I do.

8    Q.    Okay.  Are you aware that DEA

9  issued an order to show cause and immediate

10  suspension order served on April 24, 2007, to

11  AmerisourceBergen Drug Corporation?

12         MR. BENNETT:  You can answer.

13         THE WITNESS:  I'm aware that

14    they issued one for a specific

15    distribution center.

16  QUESTIONS BY MS. MCCLURE:

17    Q.    For the Orlando distribution

18  center?

19    A.    Yes.

20         (Mapes Exhibit 12 marked for

21    identification.)

22  QUESTIONS BY MS. MCCLURE:

23    Q.    Go ahead and mark this document

24  as Mapes 12.

25    A.    Okay.  I've read it.

```
 1          Q.      Did you have any involvement in

 2    DEA work leading up to the issuance of this

 3    document that is Mapes 12?

 4                  MR. BENNETT:  Objection.

 5          Scope.

 6                  You can answer that question

 7          yes or no only.

 8                  THE WITNESS:  No, I did not.

 9    QUESTIONS BY MS. MCCLURE:

10          Q.      Have you seen this document

11    before?

12          A.      No, I haven't.

13          Q.      But you were aware of its

14    existence prior to me telling you this today?

15          A.      Yes.

16          Q.      And you're familiar with the

17    concepts of DEA's use of order to show cause

18    and immediate suspension orders?

19          A.      I am.

20          Q.      And so was the effect of this

21    order to halt AmerisourceBergen Drug

22    Corporation's ability to fill any orders for

23    controlled substances out of the Orlando

24    distribution center?

25                  MR. BENNETT:  You can answer.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    You can answer, I'm sorry.

 2                    THE WITNESS:  Yes.

 3                    (Mapes Exhibit 13 marked for

 4          identification.)

 5     QUESTIONS BY MS. MCCLURE:

 6          Q.     Mark a document -- keep both

 7     that out and this, if you would.

 8                    This is 13, which is

 9     ABDCMDL00398334, and the prior document,

10     which was Mapes 12 is ABDCMDL00269383.

11                    Take a look at that and let me

12     know when you've had a chance to review it.

13          A.     I've reviewed it.

14          Q.     And have you seen this document

15     before?

16          A.     No, I have not.

17          Q.     Were you aware of this document

18     prior to today, even if you've not seen the

19     actual document?

20          A.     Yes.

21          Q.     Okay.  So this order of special

22     dispensation is dated April 27, 2007, on the

23     last page, right?

24          A.     Yes.

25          Q.     And it indicates on the first
```

Highly Confidential - Subject to Further Confidentiality Review

1    page that the immediate suspension order,

2    which is Mapes 12, had been served on

3    April 24th, right?

4         A.    Yes.

5         Q.    So three days after the

6    original immediate suspension order was

7    issued, this order of special dispensation,

8    which is Mapes 13, was signed by DEA,

9    correct?

10        A.    Yes.

11        Q.    And that order of special

12   dispensation permitted AmerisourceBergen Drug

13   Corporation to fill orders for controlled

14   substances out of the Orlando facility for a

15   specific set of customers, namely hospitals,

16   clinics, the Department of Defense,

17   pharmacies within hospitals, clinics or

18   Department of Defense facilities, and the

19   facilities of PMSI, PharMerica and Kindred

20   Health Care and their subsidiaries, correct?

21        A.    Yes.

22        Q.    And do you have an

23   understanding as to why this order of special

24   dispensation happened three days after the

25   immediate suspension order?

Highly Confidential - Subject to Further Confidentiality Review

 1         A.      No, I wasn't involved in that

 2    process.

 3         Q.      Okay.  What involvement did you

 4    have in connection with this order to show

 5    cause?

 6              MR. BENNETT:  Objection.

 7         Scope.

 8              You are not allowed to disclose

 9         any nonpublic information regarding

10         enforcement actions taken by DEA or

11         any nonpublic information regarding

12         your investigations or activities at

13         DEA.

14              To the extent that there is

15         publicly disclosed facts about what

16         role you played in any investigation

17         that resulted in these documents, you

18         may answer.

19              MS. MCCLURE:  In response to

20         that instruction, I am going to

21         withdraw that question, introduce

22         another document and come back to it.

23              (Mapes Exhibit 14 marked for

24         identification.)

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MS. MCCLURE:

 2        Q.     This is going to be marked as

 3   Mapes 14.

 4             MS. MCCLURE:  And, James, while

 5        Mr. Mapes is reviewing Mapes 14, I

 6        will direct your attention to

 7        paragraph 6 under Section 3 of the

 8        agreement on page 6, which provides

 9        "AmerisourceBergen and the DEA may

10        each disclose the existence of this

11        agreement and information about this

12        agreement to the public without

13        restriction."

14             Moreover, Mr. Mapes' Touhy

15        letter permits him to provide

16        information regarding his personal

17        recollection regarding DEA's

18        interpretation and enforcement of and

19        practices related to the CSA and its

20        implementing regulations.

21             So I will just note that and

22        ask you to take a look at those.

23             MR. BENNETT:  Okay.  I

24        understand your comment about the

25        settlement agreement "the DEA may
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        disclose" doesn't necessarily mean

 2        that a former employee has been

 3        authorized to disclose that on behalf

 4        of DEA.

 5              And in addition, I would note

 6        that even with the authorization that

 7        you're -- that you reference, which

 8        was number 8, it does say in number 7

 9        his personal recollection of any

10        information publicly disclosed by the

11        United States regarding enforcement

12        actions taken by DEA.

13              And I will also note in A it

14        says he is not authorized to disclose,

15        irrespective of the above

16        authorizations, any information

17        regarding any specific DEA

18        investigations or activities.

19              And so I don't know what your

20        questions are going to be, and to the

21        extent that this agreement has been

22        disclosed and other information has

23        been disclosed, he is authorized to

24        talk about that.

25              To the extent that he may --
```

Highly Confidential - Subject to Further Confidentiality Review

1            and I don't know the answer to this,

2            but to the extent that he may have

3            been involved in investigation before

4            these orders were issued and that

5            information has never been made public

6            to your clients or to the public, he

7            is not authorized to disclose what he

8            did as an investigation that led up to

9            this.

10                   THE WITNESS:  Okay.  I reviewed

11           it.

12    QUESTIONS BY MS. MCCLURE:

13           Q.    Okay.  Let's address one --

14    let's address Mr. Bennett's concern first.

15                   Did you have any personal

16    involvement in the investigation that led to

17    the issuance of the -- what we've marked as

18    Mapes 12?

19                   MR. BENNETT:  You may answer

20           that question yes or no only.

21    QUESTIONS BY MS. MCCLURE:

22           Q.    And the question is the time

23    leading up to it, so prior to April 19, 2007.

24           A.    Yes.

25           Q.    But you said that you did not

1    have any involvement in the order of special

2    dispensation which we've marked as Mapes 13?

3                 MR. BENNETT:  Objection.

4        Mischaracterizes past testimony.

5    QUESTIONS BY MS. MCCLURE:

6        Q.    And if that's not correct,

7    please correct me.

8        A.    I had not seen that document

9    prior to today.

10       Q.    But you did have involvement in

11   events or discussions that led up to the

12   issuance of the order of special dispensation

13   marked as Mapes 13?

14       A.    No.

15                MR. BENNETT:  You may -- okay.

16   QUESTIONS BY MS. MCCLURE:

17       Q.    Okay.  Let me just be -- so no

18   involvement in Mapes 13 leading up to it?

19       A.    That's correct.

20       Q.    Okay.  After DEA issued

21   Mapes 12, the order to show cause, did the

22   DEA work with AmerisourceBergen to evaluate

23   and develop a new suspicious order monitoring

24   program?

25       A.    Can you repeat that question,

1    please?

2        Q.    After DEA issued what we've

3    marked as Mapes 12, which is the order to

4    show cause and immediate suspension of

5    registration, did the DEA work with

6    AmerisourceBergen to evaluate and develop a

7    new suspicious order monitoring program?

8            MR. BENNETT:  Objection.

9        Vague.

10           You can answer it.

11           THE WITNESS:  No,

12       AmerisourceBergen created a new

13       program that we reviewed after they

14       created it.

15   QUESTIONS BY MS. MCCLURE:

16       Q.    When you say "we reviewed after

17   they created it," was that something that you

18   were personally involved with, that review?

19       A.    Yes.

20       Q.    So AmerisourceBergen created a

21   new program in response to this order to show

22   cause, and then DEA reviewed that newly

23   designed program.

24           Do I have that correct?

25       A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.      And you were involved from DEA?

2        A.      Yes.

3        Q.      Who else from DEA was involved

4   in the review of AmerisourceBergen's program

5   that was developed in this April, May 2007

6   time period?

7                MR. BENNETT:  You can answer.

8                THE WITNESS:  I think I need to

9           discuss that with these folks.

10               MR. BENNETT:  Can we go off the

11          record?

12               VIDEOGRAPHER:  Going off

13          record.  The time is 2:29.

14        (Off the record at 2:29 p.m.)

15               VIDEOGRAPHER:  Going back on

16          record.  Beginning of Media File 7.

17          Time 2:31.

18               MR. BENNETT:  Counsel, I've had

19          an opportunity to discuss off the

20          record with the witness, and I have

21          explained to the witness that he is

22          authorized to answer your last

23          question, which was to identify the

24          people at DEA involved in the review.

25               I have indicated to him that he
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          is not authorized to disclose what
 2          might have been specifically said that
 3          was an internal deliberation or was
 4          guidance from General Counsel's
 5          office.
 6                  And with that, he's authorized
 7          to answer the last question that you
 8          asked.
 9                  Do you need the last question
10          read back?
11                  THE WITNESS:  No, I'm good.
12                  MS. MCCLURE:  Okay.
13                  THE WITNESS:  I reviewed it,
14          along with Kyle Wright and Larry Cody
15          from the Office of Chief Counsel.
16   QUESTIONS BY MS. MCCLURE:
17          Q.     And when you say "I reviewed
18   it," the "it" you're referring to is the
19   changed program that AmerisourceBergen had
20   developed, correct?
21          A.     Yes.
22          Q.     And after you, Kyle Wright and
23   Larry Cody reviewed that new program is when
24   the document that I've marked as Mapes 14,
25   settlement and release agreement, was
```

Highly Confidential - Subject to Further Confidentiality Review

1   executed by DEA and AmerisourceBergen Drug

2   Corporation on June 22, 2007; is that

3   correct?

4        A.    Yes, it is.

5        Q.    In between April 24, 2007, when

6   the order to show cause was served, and

7   June 22, 2007, when the settlement and

8   release agreement was signed, you worked with

9   AmerisourceBergen personnel who were

10  developing that program, correct?

11            MR. BENNETT:  Objection.

12       Vague.

13            THE WITNESS:  I reviewed the

14       work product that they created and

15       gave comments, but didn't work

16       directly with them as they were

17       developing it.

18  QUESTIONS BY MS. MCCLURE:

19       Q.    And then they would take your

20  comments and incorporate them into the

21  program that they were working on; is that

22  correct?

23       A.    Yes.

24       Q.    So it was not one time that you

25  reviewed something related to this changed

Highly Confidential - Subject to Further Confidentiality Review

1    program, but instead you would review it,

2    give comments, they would be incorporated,

3    you would review again.

4              Is that an accurate assessment?

5              MR. BENNETT:  Objection.

6         Vague.  Compound.

7              THE WITNESS:  It was more along

8         the lines of them having a specific

9         question that was a part of the

10        changes.

11             They would call with a specific

12        question, we'd discuss it, and then

13        they would go back and work on it with

14        another specific question, that kind

15        of thing, rather than reviewing an

16        entire document.

17   QUESTIONS BY MS. MCCLURE:

18        Q.    Okay.  So it was -- pieces of

19   it along the way would be presented to you

20   for review and comment, and then maybe the

21   next day or a few days later they would reach

22   out again with some other related question.

23             Is that a fair assessment of

24   that time period?

25             MR. BENNETT:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Vague.

 2                THE WITNESS:  Yes.

 3    QUESTIONS BY MS. MCCLURE:

 4        Q.    And do you recall whether that

 5    work was primarily in April and May of 2007?

 6        A.    I don't recall exactly when

 7    these things happened, no.

 8        Q.    Okay.  So you've talked about

 9    some phone calls that you would have with

10    AmerisourceBergen personnel.

11                Did you also have, you,

12    personally, have in-person meetings that you

13    attended about this changed program?

14                And I'm specifically talking

15    about the time period between April 24th of

16    '07, and the signing of the settlement and

17    release agreement on June 22, 2007.

18        A.    There were meetings to discuss

19    the settlement agreement that included

20    discussions about the suspicious order

21    monitoring.

22        Q.    Where were those meetings

23    physically?

24        A.    I'm not sure.  I do recall one

25    that was at the AmerisourceBergen
```

Highly Confidential - Subject to Further Confidentiality Review

1    headquarters.  I'm not sure if there was

2    others or not.

3         Q.    We've talked about DEA

4    personnel who were involved.

5              Who do you recall being

6    involved in the work on this changed program

7    from the AmerisourceBergen Drug Corporation

8    side?

9         A.    I don't recall who it was.

10        Q.    You don't recall anyone from

11   AmerisourceBergen Drug Corporation that was

12   involved in the development of that changed

13   program over that two months?

14        A.    It would be a guess at this

15   point.  I just don't recall it.

16             (Mapes Exhibit 15 marked for

17        identification.)

18   QUESTIONS BY MS. MCCLURE:

19        Q.    Show you a document that's

20   marked 15.  For the record, ABDCMDL00316083.

21             This is a series of e-mails

22   that I'm not intending to ask you specific

23   questions about except to the extent as to

24   whether they refresh your recollection

25   regarding who from AmerisourceBergen Drug

Highly Confidential - Subject to Further Confidentiality Review

1    Corporation was involved in development of

2    the new program that you worked with.

3           A.      Okay.  I've reviewed it.

4           Q.      And does Exhibit 15 refresh

5    your recollection as to who from

6    AmerisourceBergen was involved with the

7    design of the changed program in the April,

8    May, June 2007 time period?

9           A.      Could you repeat the initial

10   question?

11          Q.      You mean the question I just

12   asked as to who was involved with the --

13                  Who do you recall being

14   involved with the changed program that

15   AmerisourceBergen was working with and that

16   you reviewed in that April, May, June 2007

17   time period from AmerisourceBergen?

18          A.      I was thinking the initial

19   question had to do with who was at specific

20   meetings that we had with Amerisource instead

21   of general involvement.

22          Q.      Okay.  Let's start with general

23   involvement.

24                  Who from AmerisourceBergen do

25   you generally recall being involved with the

1    creation of the changed program in April, May

2    and June of 2007?

3        A.    The person that I dealt with

4    most on that was Steve Mays.

5        Q.    Okay.  Anyone else you

6    recollect?

7        A.    I can see e-mails related to

8    that from Eric Triveni and others that I

9    don't really recall.

10       Q.    So your primary recollection is

11   Steve Mays?

12       A.    Yes.

13       Q.    And so it sounds like the

14   communications between you and

15   AmerisourceBergen during this time period

16   involved phone calls, e-mails, as we've just

17   seen in Mays 15 {sic}, as well as some

18   in-person meetings; is that correct?

19       A.    Yes, it is.

20       Q.    But you don't recall the number

21   of in-person meetings that you attended

22   regarding the changed program?

23       A.    No, I don't.

24       Q.    One feature of the changed

25   program was that AmerisourceBergen would now

Highly Confidential - Subject to Further Confidentiality Review

1    hold orders flagged by a computer program and

2    investigate them as to whether they were

3    suspicious or not and only ship the orders

4    that AmerisourceBergen determined were not

5    suspicious; is that correct?

6         A.    That's my understanding, yes.

7         Q.    And is it your understanding

8    that that was a significant change in the

9    industry that was undertaken in 2007?

10              MR. BENNETT:  Objection.

11        Vague.

12              You can answer.

13              THE WITNESS:  Yes, that was a

14        change.

15   QUESTIONS BY MS. MCCLURE:

16        Q.    Do you recall in connection

17   with this review also reviewing

18   AmerisourceBergen's due diligence procedures

19   and files?

20        A.    I don't specifically recall

21   that, no.

22        Q.    Do you recall working with

23   AmerisourceBergen during this time period on

24   thresholds?

25        A.    No, I don't.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.     Do you recall working with

2   AmerisourceBergen on a new customer due

3   diligence questionnaire in this time period?

4        A.     No.

5        Q.     The settlement agreement, if we

6   turn to Mapes 14, on page 3, in

7   Subsection 2C.  Tell me when you're there.

8        A.     I'm there.

9        Q.     The settlement agreement called

10  for -- or required -- okay.  Let me back up.

11             This Section 2 is called

12  "Obligations of DEA," correct?

13        A.     It is.

14        Q.     And Section C provides that

15  "the DEA shall conduct reviews of the

16  functionality of AmerisourceBergen's

17  diversion compliance program, parentheses,

18  compliance reviews, end parentheses, at up to

19  five distribution centers of

20  AmerisourceBergen."

21             And then it lists them out,

22  correct?

23        A.     Yes.

24        Q.     Were you involved in the

25  functionality compliance reviews conducted
```

1   between June 22, 2007, and the August 24,

2   2007 date set forth in this settlement

3   agreement?

4       A.    My memory is that I was

5   involved in two of them.

6       Q.    So of the five facilities or

7   distribution centers, you attended the

8   functionality compliance reviews at two of

9   them?

10      A.    Yes.

11      Q.    Do you recall which two?

12      A.    Williamston, Michigan, and

13  Columbus, Ohio.

14      Q.    And Columbus is not listed

15  there because there was an avenue to just

16  have DEA select two facilities, correct?

17      A.    Yes.

18      Q.    And so Columbus -- the Columbus

19  distribution center was one that DEA selected

20  for these compliance functionality reviews?

21      A.    Yes.

22      Q.    Do you recall who attended the

23  compliance functionality reviews at Orlando,

24  Sugar Land and the fifth distribution center

25  that DEA selected?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      I do not.

2      Q.      How long were the functionality

3 compliance reviews that you attended in

4 Williamston and Columbus?

5      A.      Most of the day at each of

6 them.

7      Q.      And what was the purpose that

8 you understood you were fulfilling when you

9 conducted these functionality compliance

10 reviews?

11      A.      To determine if the

12 distribution centers were following the new

13 procedures that Amerisource had concerning

14 compliance.

15      Q.      What activities do you recall

16 performing in connection with those

17 compliance functionality reviews?

18              MR. BENNETT:  Objection.

19      Objection.  Scope.

20              To the extent that this would

21      reveal investigative or intelligence

22      gathering and dissemination techniques

23      whose effectiveness would be impaired

24      by disclosing, you may not disclose

25      your activities.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              To the extent that it does not,

 2        you may answer the question.

 3              THE WITNESS:  Okay.  And the

 4        answer is, I don't remember

 5        specifically what we did at the

 6        locations.

 7   QUESTIONS BY MS. MCCLURE:

 8        Q.    Okay.  Do you remember who else

 9   from DEA -- I understand you don't recall who

10   did the other specific functionality

11   reviews -- scratch that.  Back up.

12              Moving along further in that

13   paragraph it says, "DEA shall also review the

14   investigatory files of the customers serviced

15   by the distribution centers subject to the

16   compliance reviews that are maintained by

17   AmerisourceBergen's corporate security and

18   regulatory affairs department in

19   Chesterbrook, Pennsylvania."

20              Do you see that language?

21        A.    Yes, I do.

22        Q.    Do you recall being involved in

23   the review of the customer files at

24   Chesterbrook?

25        A.    No, I don't.
```

1    Q.    Was it your understanding that

2  AmerisourceBergen Drug Corporation's license

3  for the Orlando facility was returned and

4  AmerisourceBergen was permitted to fulfill

5  customer controlled substances orders out of

6  the Orlando facility after the execution of

7  the settlement agreement?

8    A.    If by "license" you're

9  referring to the DEA registration, yes.

10   Q.    Thank you.

11         And so is it fair to conclude

12 that the compliance functionality reviews

13 confirmed that the distribution centers were,

14 in fact, following the new procedures that

15 AmerisourceBergen had regarding compliance?

16   A.    Yes.

17   Q.    Okay.  You can set those

18 documents aside.

19         After you reviewed the new

20 changed program that AmerisourceBergen had

21 developed, you attended a DEA-sponsored

22 pharmaceutical industry conference in

23 Houston, Texas, in September of 2007.

24         Do you recall that?

25   A.    Yes, I do.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.  And that was a DEA diversion

2 control division-sponsored conference,

3 correct?

4    A.  It was.

5    Q.  And you invited Chris Zimmerman

6 to present with you at this conference,

7 right?

8    A.  Someone did, yes.

9    Q.  It was not you personally?

10    A.  No.

11    Q.  Did you have an understanding

12 that Chris Zimmerman was asked to present at

13 this conference because you and DEA thought

14 that AmerisourceBergen's new system, the

15 changed system, was appropriate and would be

16 good to share with others in the industry?

17      MR. BENNETT:  Objection.

18   Scope.

19      You are not a 30(b)(6) witness

20   authorized to testify on behalf of

21   what DEA thought.  You may answer with

22   respect to what you thought personally

23   while you were at DEA.

24      THE WITNESS:  Yes, that was my

25   understanding of why he was asked to

Highly Confidential - Subject to Further Confidentiality Review

1      be part of that.

2   QUESTIONS BY MS. MCCLURE:

3      Q.    And so I wasn't there, but it

4   sounds like you and Mr. Zimmerman were both

5   up on stage together presenting ABDC's

6   changed program to industry at a DEA

7   conference.

8           Do I have that correct?

9      A.    Yes.

10          (Mapes Exhibit 16 marked for

11      identification.)

12  QUESTIONS BY MS. MCCLURE:

13     Q.    Show you a document marked 16.

14          Now, Mr. Mapes, you are, of

15  course, free to review the entire document.

16  The section that I will be asking you about

17  is on the second page under a header called

18  "Suspicious Orders."

19     A.    I've reviewed it.

20     Q.    In the second paragraph under

21  Suspicious Orders, it says, "Mr. Zimmerman

22  stressed the importance of knowing your

23  customer and providing due diligence

24  investigation on all new retail and wholesale

25  accounts with the exception of retail chain

1    pharmacies."

2              Do you see that language there?

3        A.    I do.

4        Q.    Can you explain the exception

5    for retail chain pharmacies?

6        A.    No, I didn't discuss that

7    particular exception with him, so I don't

8    know why he included that.

9        Q.    Did you review Mr. Zimmerman's

10   PowerPoint prior to co-presenting with him at

11   this DEA-sponsored industry conference?

12       A.    I'm not sure he had a

13   PowerPoint.

14             (Mapes Exhibit 17 marked for

15       identification.)

16   QUESTIONS BY MS. MCCLURE:

17       Q.    Show you a document that is

18   marked Mapes 17.

19       A.    I've reviewed this.

20       Q.    So does this refresh your

21   recollection that Chris Zimmerman had a

22   PowerPoint that he presented at the

23   September 11, 2007 industry conference?

24       A.    No, I still don't remember the

25   presentation details.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  I'm not asking if you

2    remember the presentation details.  I'm just

3    asking if you recall that Chris Zimmerman

4    stood on stage with you and made a

5    presentation and that it had a PowerPoint

6    attached in connection with it.

7    A.    We were both --

8         MR. BENNETT:  Objection.

9    Compound.

10        You can answer.

11        THE WITNESS:  We were both on

12        stage for a presentation, but I don't

13        remember the PowerPoint.

14   QUESTIONS BY MS. MCCLURE:

15   Q.    Okay.  Was there anyone else

16   from DEA who presented on this changed

17   AmerisourceBergen program along with

18   Mr. Zimmerman, or was it only you?

19   A.    It was just Mr. Zimmerman and

20   myself.

21   Q.    Do you recall referring to this

22   changed program as the new industry standard?

23   A.    No, I don't recall that.

24   Q.    Do you believe that -- was it

25   your understanding that it was expected by

Highly Confidential - Subject to Further Confidentiality Review

1   DEA, to your understanding, to serve as a new

2   standard?

3                    MR. BENNETT:  Objection.

4        Scope.

5                    You're not authorized as a

6        30(b)(6) witness to speak on behalf of

7        DEA.  You may answer based on your

8        personal understanding at the time.

9                    THE WITNESS:  It's my

10       understanding that the

11       AmerisourceBergen system was an

12       example of a system that contained the

13       type of information that we were

14       looking for.

15   QUESTIONS BY MS. MCCLURE:

16       Q.    And was compliant with the

17   Controlled Substances Act?

18       A.    Yes.

19       Q.    And was being carried out in

20   connection with the program that you had

21   reviewed based on your personal, on-site

22   reviews of those distribution centers?

23       A.    Yes.

24       Q.    If you turn to page 9 of

25   whatever this PowerPoint exhibit is --

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   MR. BENNETT:  Mapes 17.

 2                   MS. MCCLURE:  Thank you.  Yes,

 3         Mapes 17.

 4    QUESTIONS BY MS. MCCLURE:

 5         Q.     -- which has little Bates

 6    numbers on it that end in 1786.

 7                   It says, "Historically,

 8    controlled substance" -- I'm looking at the

 9    second and third bullet -- "slash, listed

10    chemical order monitoring has been based on a

11    ship and report process."

12                   And the next bullet, "ABC's OMP

13    process is now based on identify, capture,

14    investigate and report suspicious orders, all

15    prior to shipment."

16                   Do you see that language?

17         A.     Yes, I do.

18         Q.     And was it your understanding

19    that this was one of the new features of the

20    changed program that AmerisourceBergen had

21    developed?

22         A.     Yes.

23         Q.     And this was new not just to

24    AmerisourceBergen but to the wholesale

25    industry?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. BENNETT:  Objection.
 2        Vague.  Foundation.
 3   QUESTIONS BY MS. MCCLURE:
 4        Q.    Distributor industry.
 5              MS. MCCLURE:  He can answer the
 6        question, right?  He was waiting --
 7              MR. BENNETT:  Oh, yeah.
 8              So, objection.  Vague.
 9        Objection.  Foundation.
10              You may answer.
11              THE WITNESS:  Yes, this was a
12        change for the wholesale industry.
13   QUESTIONS BY MS. MCCLURE:
14        Q.    Mr. Mapes, after you retired
15   from DEA in 2007, you began consulting, as we
16   discussed much earlier in today's deposition?
17        A.    Yes.
18        Q.    And one of those companies that
19   you performed some consulting work for was
20   AmerisourceBergen Drug Corporation, correct?
21        A.    That's correct.
22        Q.    When did you first start
23   consulting for AmerisourceBergen Drug
24   Corporation?
25        A.    In early 2008.
```

1        Q.      And are you still consulting

2    for them?

3        A.      No, I'm not.

4        Q.      When did you stop consulting

5    for ABDC?

6        A.      Around 2014, 2015.

7        Q.      And why was that?

8        A.      Because I was spending a lot of

9    time with the pharmacy that I was working

10   with and didn't have time to do both

11   adequately.

12       Q.      And the work you performed for

13   ABDC, did that include advising on compliance

14   with DEA regulations and policies?

15       A.      It did.

16       Q.      Did that include discussing

17   issues that might come up about DEA's

18   interpretation of the regulations?

19       A.      Yes.

20       Q.      And did it include actual

21   on-site visits to pharmacies to assist with

22   due diligence, whether it's new customer or

23   ongoing customer due diligence?

24       A.      It did.

25       Q.      Did you also -- sorry, strike

1    that.

2              Do you recall actually visiting

3    pharmacies on behalf of ABDC?

4         A.    Yes.

5         Q.    Do you recall how often?

6         A.    Generally it would be two or

7    three times a year for a week, but seeing

8    several pharmacies in that week's time in a

9    part of the country.

10        Q.    What kind of activities would

11   you perform at the pharmacy?

12        A.    Looking at the pharmacies,

13   seeing what kind of customers they had, what

14   kind of drugs they were selling, the

15   relationship between the pharmacy and the

16   physicians, discussing issues with the

17   pharmacist.

18        Q.    Did anyone from ABDC accompany

19   you on these visits to pharmacies?

20        A.    Yes, every time.

21        Q.    And do you know whether ABDC

22   was also performing other on-site visits at

23   pharmacies that you were not personally

24   involved with?

25        A.    Yes, they were.

1    Q.     Did you also perform audits of

2    AmerisourceBergen Drug Corporation's

3    suspicious order monitoring program?

4    A.     Yes, I did.

5    Q.     How many times did you audit

6    the order monitoring program?

7    A.     Annually for five or six years.

8    Q.     And do you recall concluding

9    that ABDC's suspicious order monitoring

10   program for those audits that you conducted

11   was in compliance with the Controlled

12   Substances Act?

13   A.     That's not the review that I

14   was conducting.

15   Q.     Tell me about the review that

16   you were conducting.

17   A.     I was looking at it to

18   determine if it was in compliance with the

19   ABC policies and procedures.

20   Q.     Okay.  And those ABC policies

21   and procedures were the policies and

22   procedures that were developed in connection

23   with the changed program in 2007, correct?

24   A.     In conjunction with that and

25   changes that were made subsequent to that.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Okay.  So it would have been

2   the policies and procedures that were enacted

3   that you would have reviewed back in 2007

4   during your time at DEA, as well as any

5   updates or improvements that had been made to

6   them subsequent?

7      A.      Yes.

8      Q.      And did you determine that ABDC

9   was in compliance with its policies and

10  procedures for these annual audits?

11     A.      There were generally issues to

12  discuss, improvements to be made, but

13  generally in compliance, yes.

14     Q.      Going back to excessive

15  purchase reports.

16             DEA's acceptance of excessive

17  purchase reports changed at some point,

18  correct?

19             MR. BENNETT:  Objection.

20         Scope.

21             You're not authorized to speak

22         on behalf of DEA.  You may speak on

23         your personal knowledge of what you

24         observed while working at DEA.

25             THE WITNESS:  The nature of the

1    reports that I was involved with that

2    were accepted did change, yes.

3  QUESTIONS BY MS. MCCLURE:

4        Q.    And what was the change?

5        A.    It was change from a report

6  that was called an excessive purchase report

7  after the fact to a report that was of

8  specific suspicious orders before they were

9  shipped.

10        Q.    And that's the change that

11  we've talked about that AmerisourceBergen had

12  in the April, May, June 2007 time period that

13  you reviewed, correct?

14        A.    Yes.

15        Q.    Were you aware of any industry

16  participants making that change prior to that

17  program that you reviewed in April, May and

18  June of 2007?

19        A.    I don't recall the exact dates

20  when other companies were making the changes,

21  but it was a change that happened routinely

22  after we had the Distributor Initiative

23  meeting with companies.

24        Q.    And was this -- do you know if

25  this was viewed by industry, based on your

Highly Confidential - Subject to Further Confidentiality Review

1  knowledge, as a significant change or a minor

2  one?

3       A.    I don't know how they viewed

4  it.

5       Q.    No one ever said anything to

6  you about that?

7       A.    No.

8       Q.    Was there any rulemaking put

9  into effect regarding this change?

10            Do you know what I mean by

11  rulemaking?

12       A.    Yeah.  Notice and comment

13  rulemaking, no, there wasn't.

14            MS. MCCLURE:  So we know who

15       put us on hold, and it's Napoli.

16            Hunter.  I recall Hunter.

17            So I think we're going to need

18       to hang this up.

19            So anyone who's on the phone

20       who can hear us, we're going to --

21            So I think we need -- so we're

22       going to go off the record.

23            VIDEOGRAPHER:  Okay.  Going off

24       record.  The time is 3:13.

25        (Off the record at 3:13 p.m.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1              VIDEOGRAPHER:  We're going back
 2        on the record.  Beginning of Media
 3        File 8.  The time is 3:26.
 4              MS. MCCLURE:  So thank you,
 5        Mr. Mapes.  I'm going to at this point
 6        turn the defense questioning over to
 7        Ms. Wicht on behalf of Cardinal.  I
 8        appreciate you, again, being here
 9        today.  And subject to my redirect
10        anticipated for tomorrow, I will turn
11        over questioning.
12              EXAMINATION
13   QUESTIONS BY MS. WICHT:
14        Q.    Good afternoon, Mr. Mapes.
15        A.    Good afternoon.
16        Q.    As Shannon just said, I'm
17   Jennifer Wicht, and I represent Cardinal
18   Health.
19              And you -- as you indicated
20   before, you and I have met previously on one
21   occasion, correct?
22        A.    Correct.
23        Q.    Okay.  I have just basically
24   some follow-up questions.  I'm going to come
25   back to some areas that you spoke about
```

Highly Confidential - Subject to Further Confidentiality Review

1  already with Ms. McClure generally and just

2  ask a few more questions on them.

3          So what I will do generally at

4  the beginning is try to just orient you about

5  the subject that I'm going to back to, so

6  I'll refer to the testimony that you gave

7  earlier today.  But certainly if I, in doing

8  that, I say something that's incorrect and is

9  not what you said earlier today, I ask you to

10 please correct me when I do that.

11         Okay?

12 A.      Okay.

13 Q.      Thank you.

14         Okay.  So earlier today you

15 testified that during your tenure at the DEA

16 you would have periodic conversations with

17 registrants about their suspicious order

18 monitoring systems, correct?

19 A.      Yes.

20 Q.      And I think you said that from

21 time to time you would speak with people and

22 they would ask you for advice or input about

23 some particular feature of their suspicious

24 order monitoring system.

25         Do I have that correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    Okay.  And when you had those

3  conversations with registrants, did you

4  attempt to provide them with guidance about

5  their systems?

6    A.    More than guidance about their

7  system.  Just answering the specific question

8  that they had.

9    Q.    Okay.  You were --

10    MR. BENNETT:  I'm not sure the

11    realtime is rolling.  At least our

12    screen isn't working.  I don't know if

13    others are having the same problem.

14  QUESTIONS BY MS. WICHT:

15    Q.    Okay.  Thank you.  I had to

16  look back and see the answer that you had

17  given because I got distracted there.

18    So you were answering questions

19  about -- from registrants about their

20  suspicious order monitoring systems; is that

21  fair?

22    A.    Yes.

23    Q.    And when you had those

24  conversations where you would answer

25  questions, were you attempting to help

Highly Confidential - Subject to Further Confidentiality Review

```
 1    registrants meet their regulatory

 2    obligations?

 3         A.     Yes.

 4         Q.     And when you had those

 5    conversations with registrants, were you

 6    honest in the advice that you provided to

 7    them about their suspicious order monitoring

 8    systems?

 9         A.     Yes.

10         Q.     And did you believe that

11    registrants could rely on the information

12    that you provided in those conversations that

13    you had with them about their suspicious

14    order monitoring systems?

15         A.     Yes.

16         Q.     And were you aware -- strike

17    that.

18                At the point in time in your

19    tenure at DEA when you were supervising other

20    diversion investigators, were you aware of

21    whether those individuals were having

22    conversations with registrants about their

23    suspicious order monitoring systems of a

24    similar nature to what you've described?

25                MR. BENNETT:  Objection.
```

1          Vague.

2                  THE WITNESS:  Not necessarily,

3          no.

4     QUESTIONS BY MS. WICHT:

5          Q.     Do you know -- you don't know

6     one way or another whether they were or they

7     were not having those conversations?

8          A.     That's correct.

9          Q.     Okay.  You were Kyle Wright's

10    supervisor for a period of time at DEA,

11    correct?

12         A.     Yes.

13         Q.     Do you have any knowledge or

14    recollection as to whether Mr. Wright

15    specifically had conversations with

16    registrants where he provided -- where he

17    answered questions about suspicious order

18    monitoring systems?

19         A.     No, I don't.

20         Q.     Okay.  Would you expect that if

21    a representative of DEA was having a

22    conversation with a registrant to answer

23    their questions about suspicious order

24    monitoring systems, that the DEA employee

25    would be honest in their conversations with

Highly Confidential - Subject to Further Confidentiality Review

1    the registrant?

2         A.      Yeah, I would expect so.

3         Q.      And would you expect that the

4    registrant would be able to rely on the

5    information that was provided by the DEA

6    employee in those conversations?

7         A.      Yes.

8         Q.      Okay.  I'm going to change

9    topics a little bit here.

10                Another thing that you

11   described in your testimony earlier today was

12   a change in DEA's expectation of how

13   suspicious order reporting should be done.

14                Do you recall that?

15                MR. BENNETT:  Objection.

16           Mischaracterizes testimony.  This

17           witness did not speak for DEA's

18           expectation.

19   QUESTIONS BY MS. WICHT:

20        Q.      I'll rephrase the question in

21   light of the objection.

22                Earlier in your testimony

23   today, you described a change in your

24   expectation or understanding of how

25   wholesalers would conduct suspicious order

Highly Confidential - Subject to Further Confidentiality Review

1    monitoring and reporting, correct?

2         A.    Yes.

3         Q.    And that was -- you were just

4    recently testifying about that in connection

5    with the presentation that you did with ABDC

6    at the diversion conference in the fall

7    of 2007, correct?

8         A.    Yes.

9         Q.    Okay.  And I think you said,

10   but please correct me if I'm wrong, that you

11   were aware that the expectation -- or you

12   were -- excuse me, strike that.  Let me start

13   again.

14              You were aware that the system

15   that ABDC was presenting at the conference

16   represented a change in how wholesalers were

17   conducting suspicious order monitoring and

18   reporting; is that correct?

19        A.    It is.

20        Q.    Okay.  And when -- but there

21   was no change in the regulation, correct?

22        A.    That's correct.

23        Q.    So is it fair to say that the

24   change was in what DEA -- how DEA was

25   expecting wholesalers to comply with the

1    regulation?

2              MR. BENNETT:  Objection.

3         Scope.

4              You're not authorized to speak

5         on behalf of DEA.  You may speak upon

6         your personal knowledge of what was

7         happening.

8              THE WITNESS:  Yes, I did expect

9         that wholesalers would report

10        suspicious orders differently than

11        they had prior to the meetings and

12        that conference.

13   QUESTIONS BY MS. WICHT:

14        Q.    Okay.  So when you -- when your

15   expectations changed about how wholesalers

16   would report suspicious orders, did you

17   expect that wholesalers would be able to

18   change their systems instantaneously, or did

19   you expect that it would take some time for

20   them to implement the change to the systems?

21        A.    My expectation is that it would

22   take some time.  Not a -- not a year, not six

23   months, but some time for them to change.

24        Q.    Because they were required

25   to -- they were being asked to prepare and

Highly Confidential - Subject to Further Confidentiality Review

1    establish effectively a new suspicious order

2    monitoring system, correct?

3         A.    Yes.

4         Q.    Okay.  I want to come back to

5    talking about the presentation that you made

6    with ABDC in the fall of 2007, and I want to

7    direct your attention back to Exhibit 17, if

8    you still have that in front of you.

9         A.    Yes, I do.

10        Q.    Sorry, thank you.

11              So if you would -- if you

12   would -- and this was a -- I believe you

13   testified earlier that the presentation was

14   made by Mr. Zimmerman of ABDC, correct?

15        A.    Yes, it was.

16        Q.    And you were on the stage with

17   him at the time that he presented?

18        A.    Yes.

19        Q.    And if you would turn to Slide

20   Number 7 in the deck, which has the Bates

21   number ending 1784?

22        A.    Yes.

23        Q.    And that's a slide that's

24   titled "New Customer Due Diligence," correct?

25        A.    It is.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And do you see that on the

2  slide deck it says, "Retail chain pharmacies

3  are exempted from the due diligence

4  investigations completed on new retail and

5  wholesale accounts"?

6    A.    It does.

7    Q.    Do you recall, when this

8  presentation was delivered, whether anyone

9  from DEA stated -- stood up and told the

10  group that DEA didn't agree with that

11  exemption?

12    A.    I don't recall if they did or

13  didn't.

14         (Mapes Exhibit 18 marked for

15    identification.)

16  QUESTIONS BY MS. WICHT:

17    Q.    I've handed you what's been

18  marked as Exhibit 18, if you want to take a

19  moment and look at that.

20         And just for the record, this

21  is a document that's Bates-stamped

22  HDS_MDL_00135664 through 65.

23         MR. LANIER:  Do you have a copy

24    for me, Shannon?

25         MS. WICHT:  I'm not Shannon,

1          but I can get you one.

2                  MR. LANIER:  Oh, I'm sorry, I

3          don't have my glasses on.

4                  Thank you.  Sorry, Jennifer.

5                  MS. WICHT:  No problem.

6                  THE WITNESS:  Okay.

7      QUESTIONS BY MS. WICHT:

8          Q.      Have you ever seen this

9      document before, Mr. Mapes?

10         A.      No, I have not.

11         Q.      Okay.  Do you see at the top

12     that it's titled as a "Summary of the DEA

13     HDMA Meeting on Suspicious Orders"?

14         A.      Yes.

15         Q.      And are you familiar with HDMA?

16         A.      Yes.

17         Q.      And what is HDMA?

18         A.      It's an industry association,

19     the Healthcare Distribution Management

20     Association.

21         Q.      And do you see that this

22     recites a meeting date of September 7, 2007,

23     and it lists several DEA attendees, including

24     you?

25         A.      Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      Do you recall meeting with HDMA

 2   on the subject of suspicious orders in

 3   approximately this time frame?

 4          A.      No.

 5          Q.      Okay.  If you could turn your

 6   attention to the second page of the document,

 7   please.

 8          A.      (Witness complies.)

 9          Q.      And there's a first sort of

10   full bullet that appears on that page, and it

11   says, "DEA also does not want to see --

12   receive suspicious order reports that merely

13   reflect volumes that went over a threshold.

14   They wanted reports that are, quote, true,

15   close quote, suspicious orders."

16                  Do you see that?

17          A.      Yes.

18          Q.      Do you recall ever

19   communicating that to HDMA?

20          A.      No, because I really don't

21   recall the meeting.

22          Q.      Okay.  Do you recall -- leaving

23   aside whether it was at this particular

24   meeting, which I understand that you can't

25   recall, do you recall ever communicating that
```

Highly Confidential - Subject to Further Confidentiality Review

1   point that's recited here, that DEA only

2   wanted to receive suspicious order reports

3   of, quote, true suspicious orders to

4   registrants?

5        A.     I recall discussing that, but I

6   don't recall who it was with or when, that

7   kind of thing.

8        Q.     Okay.  Fair enough.

9               And what does that mean, to say

10  that DEA -- well, to your understanding, what

11  did that mean when you communicated that DEA

12  wanted to receive reports that were true

13  suspicious orders, not merely volumes that

14  went over a threshold?

15       A.     That we are looking for reports

16  that the wholesalers had reviewed, not just

17  with a raw number of drugs that were ordered

18  but reviewed it and determined that it was

19  suspicious.

20       Q.     So I think earlier you

21  described suspicious order reporting as

22  requiring some element of subjective

23  judgment; is that right?

24       A.     Yes.

25       Q.     So this point that DEA wanted

Highly Confidential - Subject to Further Confidentiality Review

1   reports that are true suspicious orders, is

2   that conveying that DEA wanted to receive

3   reports only after the wholesaler had applied

4   that subjective judgment?

5                   MR. BENNETT:  Objection.

6        Scope.

7                   You're not authorized to speak

8        on what DEA wanted.

9                   You may speak on what you

10       personally meant when you communicated

11       that point to registrants.

12                  THE WITNESS:  Now I don't

13       remember the question.

14   QUESTIONS BY MS. WICHT:

15       Q.    That's what I was just about to

16   say.

17                  So the question was:  When you

18   were communicating to registrants that DEA

19   wanted to receive true suspicious order

20   reports, not merely volumes that went over a

21   threshold, were you conveying that you wanted

22   to receive reports only after the wholesaler

23   had applied their subjective judgment to

24   determine whether the order was truly

25   suspicious?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes, that's what I was...

2    Q.    Okay.  If someone asserted that

3  90 percent of all orders that were shipped

4  after September of 2007 should have been

5  reported to DEA as suspicious, would that be

6  consistent with your expectations as you've

7  described them today?

8    A.    If they said 90 percent of

9  orders shipped by wholesalers, no, I wouldn't

10  think that was a number that was close to

11  those that should be suspicious.

12    Q.    I'm going to switch gears again

13  here for a moment and just talk -- a couple

14  of questions about excessive purchase

15  reports.

16        I think you mentioned earlier

17  today that different registrants may have

18  provided excessive purchase reports in

19  different forms; is that right?

20    A.    That's correct.

21    Q.    And sometimes different

22  registrants may have called the reports by

23  different names; is that right?

24    A.    Yes.

25    Q.    Do you have any recollection

1    about whether Cardinal Health referred to

2    those reports as ingredient limit reports?

3         A.    I don't recall.

4         Q.    Don't recall one way or the

5    other?

6         A.    Right.

7         Q.    Fair enough.

8              You testified earlier today

9    about cyclic audits performed by DEA

10   investigators of wholesalers' distribution

11   centers, correct?

12        A.    Yes.

13        Q.    I just have a couple of

14   follow-up questions about that.

15             At the conclusion of a cyclic

16   audit, is it correct that the DEA

17   investigator's report would not be provided

18   to the registrant?

19        A.    Yes, that's correct.

20        Q.    So is it correct that a

21   registrant who went through a cyclic audit

22   and had no discrepancies found, the

23   registrant would not have a DEA document

24   reflecting that fact?  Is that correct?

25        A.    Unless the registrant requested

Highly Confidential - Subject to Further Confidentiality Review

```
 1    it through FOI or something like that.

 2         Q.     So your understanding that

 3    registrants could receive audit reports

 4    through the FOIA process?

 5         A.     Yes.

 6                MS. WICHT:  I don't have any

 7         more questions this afternoon, so I'm

 8         going to turn it over to the next

 9         person.

10                Thank you very much, Mr. Mapes.

11                THE WITNESS:  Okay.

12                VIDEOGRAPHER:  Going off the

13         record.  The time is 3:48.

14          (Off the record at 3:48 p.m.)

15                VIDEOGRAPHER:  We're going back

16         on record.  Beginning of Media File 9.

17         The time is 3:50.

18                     EXAMINATION

19    QUESTIONS BY MR. EPPICH:

20         Q.     Good afternoon, Mr. Mapes.  My

21    name is Chris Eppich.  I represent McKesson

22    in this litigation.

23         A.     Good afternoon.

24         Q.     I just have a few questions for

25    you to follow up on the questions of my
```

1    colleagues this morning and this afternoon.

2              It's true that the DEA

3    registers every pharmacy, distributor and

4    manufacturer that handles controlled

5    substances, correct?

6         A.    Yes.

7         Q.    And each pharmacy, distributor

8    and manufacturer must submit an application

9    for controlled substances to DEA?

10        A.    Yes.

11        Q.    DEA evaluates each application?

12             MR. BENNETT:  Objection.

13        Scope.

14             You can answer, if you know.

15             THE WITNESS:  They evaluate

16        them in different ways depending on

17        the category of the registrant.  A

18        manufacturer is much more of an

19        evaluation than a retail pharmacy.

20   QUESTIONS BY MR. EPPICH:

21        Q.    What is the evaluation of a

22   manufacturer?

23             MR. BENNETT:  Objection.

24        Scope.

25             THE WITNESS:  It's an on-site

Highly Confidential - Subject to Further Confidentiality Review

1    review of their recordkeeping,

2    security, quotas, what they're going

3    to manufacture, all the -- you know,

4    everything from A through Z at the

5    manufacturer.

6    QUESTIONS BY MR. EPPICH:

7        Q.    Will you describe the

8    evaluation of a potential distributor

9    registrant?

10            MR. BENNETT:  Objection.

11       Scope.

12            THE WITNESS:  It's a review, an

13       on-site review, at the location to

14       determine if they have the proper

15       security, recordkeeping and other such

16       things to become a wholesaler.

17   QUESTIONS BY MR. EPPICH:

18       Q.    And will you describe the

19   evaluation process for a potential pharmacy

20   registrant?

21            MR. BENNETT:  Objection.

22       Scope.

23            THE WITNESS:  It's basically a

24       clerical review to be sure that they

25       have the appropriate state license.

```
 1    QUESTIONS BY MR. EPPICH:

 2          Q.     Is there an on-site inspection

 3    or review of a potential pharmacy registrant?

 4                 MR. LANIER:  Object to these

 5          questions.  The time frame is not put

 6          into them.

 7                 MR. BENNETT:  I object to

 8          scope.

 9    QUESTIONS BY MR. EPPICH:

10          Q.     While you were at DEA, sir.

11          A.     It changed while I was at DEA.

12    For the first several years there was no

13    on-site review of pharmacies, but after some

14    point in time in the mid-2005-ish time, there

15    were some offices that were performing

16    on-site reviews of pharmacies.

17          Q.     Do you know why that changed?

18                 MR. BENNETT:  Objection.

19          Scope.

20                 You're not authorized to

21          disclose the internal deliberative

22          process of the DEA.

23                 To the extent that you can

24          answer this question based on your

25          personal knowledge without disclosing
```

Highly Confidential - Subject to Further Confidentiality Review

1          internal deliberations, you may

2          answer.

3                    THE WITNESS:  So I don't really

4          know why some divisions did that and

5          others didn't.

6     QUESTIONS BY MR. EPPICH:

7          Q.      If I could ask you to turn to

8     Exhibit 3.

9          A.      I've got it.

10         Q.      Look at Section 1301.74(a).

11                 Are you familiar with

12    Section 1301.74(a), sir?

13         A.      Yes.

14         Q.      Section 1301.74(a) says,

15    "Before distributing a controlled substance

16    to any person who the registrant does not

17    know to be registered to possess the

18    controlled substance, the registrant shall

19    make a good faith inquiry either with the

20    administration or with the appropriate state

21    controlled substances registration agency, if

22    any, to determine that the person is

23    registered to possess the controlled

24    substance."

25                 Do you see that, sir?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I do.

2    Q.    So Section 1301.74(a) requires

3    a registrant to make a good faith inquiry to

4    determine that a customer is registered to

5    possess controlled substances; is that

6    correct?

7    A.    It is.

8    Q.    Section 1301.74(a) requires a

9    registrant to then check its customer's DEA

10   registration before distributing controlled

11   substances to the customer, correct?

12   A.    It requires they check it at

13   some point in time, not necessarily every

14   time before they distribute.

15   Q.    Section 1301.74(a) imposes no

16   other requirement on distributors to perform

17   due diligence on its customers, does it?

18   A.    It does not.

19   Q.    And DEA conducts diligence on

20   the applicants so the distributors can rely

21   on the DEA registrations when complying with

22   1301.74(a)?

23   MR. BENNETT:  Objection.

24   Scope.  Objection.  Vague.  Objection.

25   Calls for speculation.

Highly Confidential - Subject to Further Confidentiality Review

1          And this witness is not a

2          30(b)(6) witness, so he's not

3          answering on behalf of DEA.

4                 To the extent you have an

5          opinion in your personal capacity, you

6          may answer.

7                 THE WITNESS:  Okay.  If you

8          could restate the question for me.

9     QUESTIONS BY MR. EPPICH:

10         Q.    I'll strike the question.

11                Earlier today you testified

12    about how the Office of Diversion Control is

13    funded.

14                Do you remember that testimony?

15         A.    Yes.

16         Q.    And you testified that the

17    Office of Diversion Control is funded through

18    registration fees; is that correct?

19         A.    Yes.

20         Q.    The Office of Diversion Control

21    is also funded through any fines levied

22    against registrants, correct?

23         A.    No.

24         Q.    Is the only source of funding

25    for the Office of Diversion Control

Highly Confidential - Subject to Further Confidentiality Review

1    registration fees?

2        A.    The majority is registration

3    fees.  There are also a few positions that

4    are from appropriated funds, but very few.

5        Q.    Earlier today you testified

6    about the emergence of Internet pharmacies in

7    the early 2000s.

8            Do you recall that testimony?

9        A.    Yes, I do.

10       Q.    Internet pharmacies represented

11   a significant shift in pharmaceutical

12   diversion, correct?

13           MR. BENNETT:  Objection.

14       Vague.

15           You can answer.

16           THE WITNESS:  They did

17       represent a shift.

18   QUESTIONS BY MR. EPPICH:

19       Q.    There were concerns that DEA's

20   anti-diversion group was understaffed to

21   address the Internet pharmacy issue?

22       A.    I don't recall those concerns,

23   no.

24       Q.    DEA decided that one way to

25   help combat the Internet pharmacies would be

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to establish this Internet Distributor

 2    Initiative, correct?

 3              Excuse me, the Internet -- let

 4    me strike that.

 5              One way that -- and DEA decided

 6    that one way to combat the Internet pharmacy

 7    issue would be to establish the Distributor

 8    Initiative, correct?

 9              MR. BENNETT:  You can answer.

10              THE WITNESS:  Yes.

11    QUESTIONS BY MR. EPPICH:

12         Q.    And these Distributor

13    Initiative meetings were meant to educate

14    distributors about Internet pharmacies?

15         A.    Yes.

16         Q.    And during the Distributor

17    Initiative meetings, you introduced

18    additional diligence, guidance and

19    instructions to distributors to confirm that

20    a distributor is not servicing a rogue

21    Internet pharmacy, correct?

22              MR. BENNETT:  Objection.

23         Vague.

24              THE WITNESS:  To help them

25         understand what to look at to
```

1    determine if a customer is a rogue

2    Internet pharmacy.

3  QUESTIONS BY MR. EPPICH:

4    Q.    The objective of this

5  additional diligence that you were requesting

6  out of distributors was for the distributors

7  to be able to identify those rogue Internet

8  pharmacy customers of theirs, correct?

9    A.    Yes.

10   Q.    You were not intending the

11 additional diligence to require distributors

12 to investigate the inner workings of every

13 independent pharmacy across America that they

14 may service, correct?

15       MR. BENNETT:  Objection.

16     Vague.  Objection.  Scope.

17       You may speak on your personal

18     capacity but not on behalf of DEA in

19     response to this question.

20       THE WITNESS:  I was expecting

21     that over time they would use the same

22     procedures for all the pharmacies that

23     they were dealing with to be certain

24     that there wasn't a problem that they

25     wouldn't see without the extra due

1      diligence.

2    QUESTIONS BY MR. EPPICH:

3          Q.      And the problem that they were

4    to be looking for was whether or not they

5    were an Internet pharmacy?

6          A.      An Internet pharmacy or any

7    pharmacy that was selling drugs for other

8    than legitimate medical purpose.

9          Q.      Such as a pill mill, correct?

10         A.      Yes.

11         Q.      Now, during the distributor

12   briefings, you told distributors that you

13   were not concerned with large retail chain

14   pharmacies at the time, correct?

15         A.      No.

16         Q.      That's not correct?

17         A.      I don't believe so.

18         Q.      Do you recall instructing

19   distributors at the distributor briefings to

20   conduct due diligence on retail chain

21   pharmacies?

22         A.      I don't recall that we made a

23   distinction between retail chain pharmacies

24   and independent pharmacies.

25         Q.      In asking the distributors to

1    conduct this additional diligence, you

2    understood that distributors did not have

3    access to all of the distribution and sales

4    data from each of their pharmacy customers,

5    correct?

6         A.    Yes.

7         Q.    And you also understood the

8    distributors would not be able to identify

9    all of the bad actors within the supply chain

10   with this additional diligence, correct?

11              MR. BENNETT:  Objection.

12        Vague.

13              THE WITNESS:  I didn't expect

14        that they could immediately identify

15        everyone, no.

16   QUESTIONS BY MR. EPPICH:

17        Q.    DEA -- or let me strike that.

18              It wasn't your intention that

19   distributors became deputized agents to the

20   DEA, was it?

21              MR. BENNETT:  Objection.

22        Vague.  Argumentative.

23              THE WITNESS:  No.

24   QUESTIONS BY MR. EPPICH:

25        Q.    I would like to return to the

Highly Confidential - Subject to Further Confidentiality Review

1    2007 presentation that you provided to

2    industry with ABDC in September of 2007.  I

3    believe it's marked as Exhibit 17.

4                So the primary purpose, or a

5    primary purpose --

6                MR. BENNETT:  Counsel, I'm

7         sorry, I just want to make sure I have

8         the right exhibit.

9                You said 17, which I believe

10        was Amerisource -- represented to be

11        AmerisourceBergen's presentation, not

12        Mr. Mapes' presentation.  I think he

13        said he'd never seen it.

14                I just want to make sure since

15        your question said the one "you"

16        presented at the conference.

17                MR. EPPICH:  Thank you.  Thank

18        you, Mr. Bennett.  Let me strike that

19        question.

20                MR. BENNETT:  Okay.

21    QUESTIONS BY MR. EPPICH:

22        Q.    I'd just like to direct you to

23    Exhibit 17.

24                Now, Mr. Mapes, you were

25    present for the presentation by ABDC on

Highly Confidential - Subject to Further Confidentiality Review

1    September 11, 2007; is that correct?

2         A.     Yes.

3         Q.     And you asked ABDC to present

4    this information to the industry at this

5    conference, correct?

6              MR. BENNETT:  Objection.

7         Mischaracterizes prior testimony.

8              THE WITNESS:  They were asked

9         to present it.  I didn't personally

10        ask them, but someone within DEA did.

11   QUESTIONS BY MR. EPPICH:

12        Q.     Thank you for that

13   clarification.

14             And someone from the DEA asked

15   ABDC to provide this presentation to educate

16   the other distributors in the industry on the

17   new standards for suspicious order monitoring

18   programs; is that correct?

19        A.     That's correct.

20        Q.     I'd like you to turn to page 9

21   of Exhibit 17.

22             And earlier you looked at the

23   third bullet on page 9 that reads, "ABC's OMP

24   process is now based on identify, capture,

25   investigate and report suspicious orders all

Highly Confidential - Subject to Further Confidentiality Review

1  prior to shipment."

2         Do you remember that testimony?

3     A.    Yes.

4     Q.    Do you agree that a

5  distributor's program that identified,

6  captured or blocked, investigated and

7  reported suspicious orders prior to shipment

8  would be in compliance with the Controlled

9  Substances Act and its regulations?

10     A.    It could be, depending on what

11  their criteria for identifying suspicious

12  orders were.

13     Q.    And if that criteria were

14  similar to the criteria presented in

15  Exhibit 17, then such a program would be in

16  compliance with the Controlled Substances Act

17  and its regulations, correct?

18         MR. BENNETT:  Objection.

19     Incomplete hypothetical.  Vague.

20         THE WITNESS:  I believe it

21     could be, yes.

22  QUESTIONS BY MR. EPPICH:

23     Q.    Earlier today you testified

24  about -- let me strike that.

25         Sir, would you agree with me

 1    that there is an opioid crisis?

 2         A.    Yes.

 3         Q.    Would you agree that there are

 4    a variety of factors that contribute to the

 5    opioid crisis?

 6         A.    Yes.

 7         Q.    Illegal heroin from cartels

 8    contributes to the opioid crisis?

 9              MR. BENNETT:  Objection.

10         Vague.

11              THE WITNESS:  I would be

12         guessing at this point because I

13         haven't currently kept up with the

14         intelligence on those kind of issues.

15    QUESTIONS BY MR. EPPICH:

16         Q.    Well, in your time at the DEA,

17    was illegal heroin from cartels contributing

18    to an opioid crisis?

19              MR. BENNETT:  Objection.

20         Foundation.  Objection.  Scope.

21              You're not authorized to

22         disclose information from specific DEA

23         investigations, activities or

24         intelligence that has not been

25         publicly disseminated.

Highly Confidential - Subject to Further Confidentiality Review

 1              To the extent that you can

 2        answer this question without

 3        disclosing nonpublic DEA information,

 4        you can answer.

 5              THE WITNESS:  I believe

 6        generally the opioid crisis started

 7        after I left DEA.  There was heroin,

 8        the source of which I don't know, but

 9        there was heroin available, illicit.

10    QUESTIONS BY MR. EPPICH:

11        Q.    When do you believe the opioid

12    crisis started?

13        A.    I don't know.

14        Q.    Would you agree with me that

15    diversion can occur in many different ways?

16        A.    Yes.

17        Q.    For example, opioids can be

18    stolen from a delivery truck; that's

19    diversion, correct?

20        A.    Yes.

21        Q.    Someone could go into their

22    grandmother's cabinet and take their

23    grandmother's opioids that she was prescribed

24    for a legitimate purpose; that would be

25    diversion?

1      A.      Yes.

2      Q.      Someone could take opioids from

3   a friend who was prescribed the opioids for

4   legitimate reasons; that would be diversion,

5   wouldn't it?

6      A.      Yes.

7      Q.      Distributors have nothing to do

8   with opioids that are diverted when the

9   opioids are stolen from friends or family

10  members, do they?

11     A.      No, they don't.

12     Q.      The vast majority of diversion

13  occurs once opioids leave the closed system

14  of distribution; would you agree with that?

15     A.      I don't know that to be true or

16  not.

17     Q.      Would you agree that

18  distributors cannot control what happens to

19  pills diverted outside the closed -- let me

20  strike that.

21             You would agree that

22  distributors cannot control what happens to

23  pills once those pills are delivered to their

24  pharmacy customers, correct?

25             MR. BENNETT:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                You can answer.

 2                THE WITNESS:  That's correct.

 3    QUESTIONS BY MR. EPPICH:

 4        Q.    Are you familiar with the term

 5    "overprescribing"?

 6        A.    Yes.

 7        Q.    What is overprescribing?

 8        A.    It's when a prescriber

 9    prescribes more controlled substances than

10    are necessary or prescribes controlled

11    substances to people that it may not be

12    necessary for.

13        Q.    Is overprescribing a form of

14    diversion?

15        A.    Yes.

16        Q.    Overprescribing is a form of

17    diversion even if the prescriber is

18    well-intentioned and believes there's a

19    legitimate medical purpose for prescribing

20    the amount and dosage that he or she

21    prescribed?

22                MR. BENNETT:  Objection.  Form.

23        Calls for speculation.  Scope.

24                THE WITNESS:  It could be.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. EPPICH:

 2         Q.     But it's not always, is it,

 3    sir?

 4         A.     I don't think so.

 5         Q.     You'd agree with me the

 6    distributors have no insight into determining

 7    whether a doctor has overprescribed opioids

 8    to her patient?

 9              MR. BENNETT:  Objection.  Form.

10         Calls for speculation.  Incomplete

11         hypothetical.

12              THE WITNESS:  Generally not.

13    QUESTIONS BY MR. EPPICH:

14         Q.     Are you familiar with the term

15    "illegal prescribing"?

16         A.     Yes.

17         Q.     What is illegal prescribing?

18         A.     Prescribing controlled

19    substances for other than a legitimate

20    medical purpose.

21         Q.     Is illegal prescribing a form

22    of diversion?

23         A.     Yes.

24         Q.     You'd agree with me that

25    illegal prescribing contributes to the opioid
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    crisis?
2          A.      Yes.
3          Q.      Earlier today you testified
4    about meetings that you had with the
5    plaintiffs' counsel in 2018.
6                  Do you remember that testimony?
7          A.      Yes.
8          Q.      I believe you said you had two
9    meetings, one in the summer and one in the
10   fall of 2018, correct?
11         A.      Yes.
12         Q.      Now, did you -- during those
13   meetings with the plaintiffs' counsel in
14   2018, did you tell plaintiffs' counsel that
15   the DEA had approved the distributors'
16   submission of excessive purchase reports
17   after orders had been shipped?
18         A.      I believe that was discussed,
19   yes.
20         Q.      Did you tell plaintiffs'
21   counsel during those meetings that in your
22   experience excessive purchase reports
23   complied with the requirements of the
24   Controlled Substances Act and its
25   regulations, at least for your time at DEA
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    between 1977 and the distributor briefings?

 2         A.     Yes.

 3         Q.     Did you tell plaintiffs'

 4    counsel during these meetings in 2018 that

 5    the Controlled Substances Act and its

 6    regulations do not include a no shipping

 7    requirement?

 8         A.     I don't believe so.

 9         Q.     You didn't discuss the no

10    shipping requirement?

11         A.     I don't recall that

12    specifically.

13         Q.     During these meetings with the

14    plaintiffs' counsel in 2018, did you tell

15    plaintiffs' counsel the distributor briefings

16    focused on Internet pharmacy issues?

17         A.     Yes.

18         Q.     Did you tell plaintiffs'

19    counsel that the additional diligence you

20    requested of distributors at these

21    distributor briefings was to help identify

22    Internet pharmacies?

23         A.     I don't recall specifically

24    that was how it was worded.

25         Q.     But something similar?
```

Highly Confidential - Subject to Further Confidentiality Review

 1          A.      Yes.

 2          Q.      At these meetings with

 3   plaintiffs' counsel in 2018, did you tell

 4   plaintiffs' counsel that distributors had no

 5   access to the ARCOS data submitted by other

 6   distributors?

 7          A.      I don't believe so.

 8          Q.      Did you discuss ARCOS data with

 9   the plaintiffs' counsel in 2018?

10          A.      There was a discussion of ARCOS

11   data, what it consists of and what's

12   available.

13          Q.      Did you discuss who had access

14   to ARCOS data during your meetings with

15   plaintiffs' counsel?

16          A.      I don't recall if we did.

17          Q.      After your discussions with the

18   plaintiffs' counsel, the plaintiffs did not

19   contact you to ask you to serve as an expert

20   for plaintiffs in this case, correct?

21          A.      That's correct.

22          Q.      Do you recall what other topics

23   you discussed with plaintiffs' counsel during

24   these meetings in 2018?

25          A.      Not really.  It was just a

```
 1    broad range of topics, but I can't come up

 2    with any particular one.

 3            Q.      Do you recall the names of any

 4    attorneys present at the meetings with

 5    plaintiffs' counsel in 2018?

 6            A.      No, I don't at this point.

 7            Q.      If you look to your right, do

 8    you see any of the plaintiffs' counsel here

 9    today that attended that meeting?

10            A.      There's a couple that may have

11    been at the meeting, at one of the meetings,

12    yes.

13            Q.      Do you remember any of their --

14    can you point to any of those individuals,

15    sir?

16                    MR. FARRELL:  We're just

17        waving.

18                    THE WITNESS:  Yeah, they're

19        just waving.

20                    MR. LANIER:  None of us were

21        there.

22                    THE WITNESS:  Yeah, I don't

23        see...

24    QUESTIONS BY MR. EPPICH:

25            Q.      Okay.  Now, you mentioned that
```

1    Mr. Rannazzisi contacted you to join

2    plaintiffs' counsel at this meeting?

3         A.      That's correct.

4         Q.      Do you remember that testimony?

5                 Have you had any conversations

6    with Mr. Rannazzisi outside of these two

7    meetings with Mr. Rannazzisi about the opioid

8    crisis?

9         A.      Before the meetings, yes.

10        Q.      And when were those

11   conversations?

12        A.      I don't recall the exact dates

13   or even approximately when they were.  We had

14   a couple of phone calls and...

15        Q.      Were they just prior to your

16   first meeting in 2018 with the plaintiffs'

17   counsel, or were they some years prior?

18        A.      More along the lines of months

19   prior.

20        Q.      Do you recall what you

21   discussed with Mr. Rannazzisi during those

22   conversations?

23        A.      A little bit about opioids and

24   a lot about people that we knew and where

25   they were and that kind of thing.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     During your meetings

 2   with plaintiff --

 3               MR. LANIER:  Can I interrupt

 4          for just a moment?  I apologize.

 5               The record on 218, line 16, has

 6          me saying, "One of us was there,"

 7          Ms. Campbell.

 8               It should be "none of us was

 9          there," is what I said.

10               Thank you.

11   QUESTIONS BY MR. EPPICH:

12          Q.     If there was a question

13   pending, I'll strike it and start over.

14               Mr. Mapes, during the meetings

15   with plaintiffs' counsel in 2018, were there

16   any other former DEA employees present at the

17   meeting?

18          A.     Joe Rannazzisi was present at

19   both, but he was the only former DEA employee

20   that was there besides myself.

21               MR. EPPICH:  Thank you, sir.  I

22          have no further questions at this

23          time, and I'll turn you over to my

24          colleague, Mr. Stephens.

25               VIDEOGRAPHER:  Going off
```

Highly Confidential - Subject to Further Confidentiality Review

1        record.  The time is 4:20.

2         (Off the record at 4:20 p.m.)

3             VIDEOGRAPHER:  We're going on

4        the record.  Beginning of Media

5        File 10.  The time is 4:34.

6             EXAMINATION

7    QUESTIONS BY MR. STEPHENS:

8        Q.    Mr. Mapes, good afternoon.  My

9    name's Neal Stephens.  I'm from the Jones Day

10   law firm, and I represent Walmart.

11            We met earlier today, but you

12   and I have never spoken before?

13       A.    That's correct.

14       Q.    Okay.  I'll also be asking you

15   some questions, not just on Walmart's behalf

16   but also on behalf of retail chain

17   pharmacies.  And for your benefit, that will

18   include CVS, Rite Aid, Walgreens and HBC and

19   Giant Eagle.

20            Okay?

21       A.    Yes.

22       Q.    Okay.  All right.

23            And since I'm going last, I've

24   carved out a lot of material out of my

25   outline, but I do have a couple follow-up

1    questions on some of the topics that you've

2    already testified to today.

3                Okay?

4       A.      Okay.

5       Q.      And the first one is, there was

6    a series of questions from a couple of my

7    colleagues that related to shipping orders

8    that had been flagged as suspicious.

9                Do you recall that line of

10   questions?

11      A.      Yes.

12      Q.      And you had indicated that at

13   some point you were aware that registrants

14   had a practice of shipping orders that had

15   been reported as suspicious.

16                Do you recall that?

17      A.      That had been reported before

18   2005 in excess -- in suspicious or excessive,

19   that they had shipped those.

20      Q.      I'm just -- right.

21                So my point is that you were

22   just aware that there had been a practice at

23   some point in time that orders that had been

24   flagged as potentially suspicious had still

25   been shipped.  I'm just trying to reorient

Highly Confidential - Subject to Further Confidentiality Review

1    you --

2         A.    Yes.

3         Q.    -- to that testimony.  Okay?

4               Now, is it fair --

5               MR. BENNETT:  Objection.

6         Mischaracterizes his testimony.  He

7         said suspicious or excessive, not just

8         suspicious.

9    QUESTIONS BY MR. STEPHENS:

10        Q.    Okay.  Is it fair to say that

11   you're not aware of any deadline that DEA set

12   that changed this practice related to the

13   shipping of suspicious orders?

14        A.    I'm aware that the practice was

15   changed as we had meetings with wholesalers

16   in 2005 and beyond; that then they changed

17   from sending the excessive or suspicious

18   orders after the fact, and they started doing

19   it ahead of the fact and then resolving that

20   suspicion before they shipped.

21        Q.    Okay.  Mr. Mapes, but are you

22   aware of any deadline that was set, any date

23   certain set by DEA sent out to the

24   registrants, as to what date that practice

25   had to change?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. BENNETT:  Objection.  Asked

2     and answered.

3          THE WITNESS:  I'm not aware of

4     a specific deadline.

5  QUESTIONS BY MR. STEPHENS:

6     Q.    Okay.  All right.  Another

7  topic that you addressed earlier today in the

8  first session of questioning related to what

9  DEA's expectations were of various

10 registrants about how they designed their SOM

11 system.

12          Do you recall that line of

13 questions?

14    A.    Yes.

15    Q.    And just to reorient you, it

16 was basically along the lines of your

17 expectation was that a SOMs system for a

18 registrant was not a one-size-fits-all

19 proposition, correct?

20    A.    Correct.

21    Q.    It would depend on the

22 registrant's business model, right?

23    A.    Yes.

24    Q.    Okay.  And it's a situation

25 where, for example, some distributors supply

1    hospitals and some don't, right?

2         A.     That's correct.

3         Q.     And some distributors would

4    supply hospice centers, for example, and

5    other registrants don't?

6         A.     Correct.

7         Q.     Okay.  And some distributors

8    might supply independent pharmacies that the

9    distributor does not own, right?

10        A.     Yes.

11        Q.     But other distributors, like

12   retail chain pharmacies, do not supply

13   independent pharmacies that they do not own,

14   right?

15        A.     Correct.

16        Q.     Retail chain pharmacies

17   commonly use a self-distribution model where

18   they only distribute through to chain stores

19   that the retail chain pharmacy owns; is that

20   fair?

21        A.     Yes.

22        Q.     And so, for example, you'd

23   agree that during your tenure at DEA, Walmart

24   distribution centers only distributed

25   controlled substances to Walmart store

1    pharmacies, fair?

2         A.    Yeah, that's my understanding.

3         Q.    Okay.  And for CVS, CVS would

4    have done the same; they would have only

5    supplied through to CVS stores?

6         A.    Yes.

7         Q.    And Rite Aid would have only

8    distributed through to Rite Aid stores?

9         A.    Yes.

10        Q.    And Walgreens would have only

11   distributed through to Walgreens stores?

12        A.    Yes.

13        Q.    And my last example, HBC, Giant

14   Eagle would have only distributed through to

15   HBC, Giant Eagle stores, fair?

16        A.    I don't know about that

17   particular retail chain, so I can't really

18   comment.

19        Q.    Okay.  During your tenure at

20   DEA, did you think that a SOM system for a

21   retail chain pharmacy who only distributes to

22   pharmacies that it owns may be different than

23   a SOM system for a distributor who

24   distributes to pharmacies that it doesn't

25   own?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    And would you agree that it

3  could be reasonable for a retail chain

4  pharmacy like Walmart to not have to include

5  all of the compliance measures in its SOM

6  systems that might be necessary for a

7  distributor who distributes controlled

8  substances to customers that the distributor

9  does not own?

10           MR. BENNETT:  Objection.

11       Scope.  Vague.  Incomplete

12       hypothetical.

13           You can answer.

14           THE WITNESS:  Yes, I agree

15       there could be differences between the

16       systems for those two organizations.

17  QUESTIONS BY MR. STEPHENS:

18    Q.    Okay.  Would you agree that

19  during your tenure at DEA you expected that

20  each registrant would take reasonable steps

21  to try to avoid shipping to customers who

22  would divert the controlled substances?

23    A.    Yes.

24    Q.    And would you agree that one

25  key point of the Controlled Substances Act is

Highly Confidential - Subject to Further Confidentiality Review

1    that you wanted distributors to set up their

2    supply chain so they took reasonable steps to

3    try to avoid supplying controlled substances

4    to customers who may divert them?

5         A.    Yes.

6         Q.    And is it fair to say that if a

7    distributor did not supply customers who

8    diverted opioids, the distributor was

9    behaving reasonably?

10              MR. BENNETT:  Objection.

11         Scope.  Incomplete hypothetical.

12              You can answer.

13              THE WITNESS:  It would be fair

14         to say, yes, that if no one that they

15         distributed to was diverting drugs,

16         that their systems were appropriate.

17    QUESTIONS BY MR. STEPHENS:

18         Q.    Okay.  As an example, would you

19    agree that a distributor was acting

20    reasonably if it structured its business so

21    it did not distribute controlled substances

22    to rogue Internet pharmacies and only

23    distributed to retail chain pharmacies who

24    were among the registrants who did not divert

25    controlled substances?

Highly Confidential - Subject to Further Confidentiality Review

1           MR. BENNETT:  Objection.

2      Scope.  Incomplete hypothetical.

3      Calls for speculation.

4           THE WITNESS:  If they did not

5      distribute to Internet pharmacies and

6      did not distribute to anyone who

7      diverted, my opinion is that

8      they're being reasonable, yes.

9  QUESTIONS BY MR. STEPHENS:

10      Q.     As a general matter, during

11  your tenure as a diversion investigator,

12  would you agree that you focused your

13  anti-diversion efforts where you saw

14  diversion occurring?

15      A.     Where we saw diversion

16  occurring and where we saw where we could

17  influence that, whether it was at that level

18  or another level.

19      Q.     Okay.  Would you agree that in

20  the 2005, 2006 time frame, you saw diversion

21  of controlled substances occurring in rogue

22  Internet pharmacies?

23      A.     Yes, among other places.

24      Q.     Okay.  And during that time

25  frame, the 2005, 2006 time frame, rogue

1    Internet pharmacies became a focus for you

2    and other diversion investigators at DEA?

3         A.      They did.

4         Q.      Would you agree that in the

5    2006 era, rogue Internet pharmacies presented

6    you and your colleagues at DEA with the

7    greatest threat of diversion that was

8    operating within the closed system of

9    distribution that DEA regulates?

10        A.      I don't know that they were the

11   greatest threat, because there was still all

12   the other situations with doctors who were

13   overprescribing and pharmacies who were

14   selling without prescriptions and those

15   things.  So I can't really quantify which was

16   the biggest threat.

17        Q.      Okay.  But would you agree,

18   Mr. Mapes, that in this time period, this

19   2005, 2006 time frame, the onset of rogue

20   Internet pharmacies led DEA to institute its

21   Internet Distributor Initiative that you've

22   testified earlier today?

23        A.      Yes.

24        Q.      And as part of that effort, you

25   met with wholesale distributors to educate

```
 1    them about the issues presented by rogue

 2    Internet pharmacies?

 3          A.    That's correct.

 4          Q.    Can you recall how many

 5    meetings you personally attended?

 6          A.    No.

 7          Q.    Can you estimate?

 8                Was it more than ten?

 9          A.    My estimate is 10 or 12.

10          Q.    Okay.  But it wouldn't have

11    been more than 15?

12          A.    I'm not really certain.

13          Q.    Okay.  How about this:  It

14    wouldn't have been more than 20?

15          A.    Probably not.

16          Q.    Okay.  Were there others?  Did

17    you have other colleagues at DEA during this

18    time frame that you're aware of who were also

19    meeting with wholesale distributors on this

20    distributor briefing?

21          A.    There were others after I

22    retired from DEA who were doing it.  I think

23    I was involved in every one of the

24    distributor briefings while I was still

25    there.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     Okay.  And can you refresh me

2   on when these briefings started?

3             Was it 2005?

4      A.     Yes.

5      Q.     Okay.  And you retire in

6   mid-2007?

7      A.     October of 2007, yes.

8      Q.     You remember that date, right?

9      A.     Yes.

10     Q.     Okay.  After 30 years, you can

11  remember that date, right?

12            Okay.  Fair enough.

13            All right.  So in between 2005

14  and October of 2007, your recollection is, is

15  that there were about 12 or so Internet

16  distributor briefings that you conducted with

17  wholesale distributors?

18     A.     Yes.

19     Q.     Okay.  And was each of those

20  like a one-on-one meeting between DEA and one

21  wholesale distributor?

22     A.     One distributor, several people

23  from the distributor at times, sometimes an

24  individual, and sometimes with counsel,

25  sometimes without.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     Okay.  So my point, Mr. Mapes,

2    is your recollection of the entirety of the

3    number of wholesale distributors who received

4    this briefing during your career at DEA is

5    about 12?

6      A.     About that.

7      Q.     Okay.  How did DEA -- or how

8    did you select which wholesale distributor

9    was going to receive the briefing?

10     A.     We started at first with

11   Amerisource, Cardinal and McKesson because

12   they're obviously those with the largest

13   volume, and then we went to lower volume

14   distributors such as HD Smith and others that

15   were maybe regional distributors, not

16   nationwide distributors, that kind of thing.

17     Q.     Okay.  So you've identified

18   four.

19            Can you recall any of the other

20   eight or so that you met with during your

21   career?

22     A.     Not right now, I can't.

23     Q.     You did not meet with Walmart

24   to provide an Internet distributor briefing

25   between 2005 and 2007, correct?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     That's correct.

2      Q.     Do you agree that during this

3    time frame DEA acknowledged in presentations

4    that it made that no chain pharmacies were

5    rogue pharmacies?

6              MR. BENNETT:  You can answer.

7              THE WITNESS:  I don't believe

8         that was in DEA presentations.

9    QUESTIONS BY MR. STEPHENS:

10     Q.     Okay.  Let me see if I can

11   refresh your recollection.

12     A.     Okay.

13             (Mapes Exhibit 19 marked for

14        identification.)

15   QUESTIONS BY MR. STEPHENS:

16     Q.     So I'm going to show you what's

17   been marked as Deposition Exhibit Number 19.

18   It's a document that is Bates-numbered

19   US-DEA-00002413.

20             And if you look at the very

21   first slide, it says "Internet Pharmacies."

22   It's got Mr. Rannazzisi's name there, and

23   it's a slide deck.

24             Do you see that?

25     A.     Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     And I'd ask you to turn to

2  Slide 50 in the presentation.  It's almost

3  all the way at the back, Mr. Mapes.

4             Do you see that?

5      A.     I do.

6      Q.     And Slide 50 details -- the

7  title is "The Rogue Pharmacy."

8             Do you see that?

9      A.     Yes.

10     Q.     Do you see the second bullet?

11     A.     Yes.

12     Q.     What does the second bullet

13  say?

14     A.     "No chain pharmacies."

15     Q.     Okay.  And does this appear to

16  you to be a presentation that DEA provided on

17  the topic of Internet pharmacies?

18             MR. BENNETT:  Objection.

19        Foundation.

20             And I also object that the

21        witness did not have a chance to

22        review the entire document or

23        understand the context of the

24        particular slide that you pointed him

25        out to.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  It appears to be
 2         a presentation that Mr. Rannazzisi did
 3         concerning Internet pharmacies.  I
 4         don't know when or to which group or
 5         anything like that, and I haven't seen
 6         this before.
 7    QUESTIONS BY MR. STEPHENS:
 8         Q.    If you look at the -- page 2 or
 9    slide 2, you'll see a date at the bottom,
10    March of 2007.
11              Do you see that?
12         A.    Yes.
13         Q.    Okay.  And you were still at
14    DEA in March of 2007?
15         A.    Yes.
16         Q.    Okay.  All right.  I'm finished
17    with that exhibit, Mr. Mapes.
18              In enforcing the Controlled
19    Substances Act during your tenure at DEA, did
20    you believe that every registrant was
21    entitled to due process in every diversion
22    investigation that you conducted?
23              MR. BENNETT:  You can answer.
24              THE WITNESS:  Yes.
25
```

Highly Confidential - Subject to Further Confidentiality Review

1    QUESTIONS BY MR. STEPHENS:

2        Q.    Why?

3        A.    Just part of the system.

4        Q.    But what do you mean "part of

5    the system"?

6        A.    That if we find something that

7    we think is wrong, that they, either in a

8    response to a letter of admonition or an

9    administrative hearing or any other forum,

10   they provide their take on the situation.

11       Q.    Okay.  Do you believe that DEA

12   must separately assess the facts as to each

13   individual actor in DEA's closed system of

14   distribution to determine whether a

15   particular registrant has violated the

16   Controlled Substances Act?

17            MR. BENNETT:  You can answer.

18            THE WITNESS:  Yes, I believe

19        that they need to look at each

20        registrant individually rather than

21        looking at an entire group.

22   QUESTIONS BY MR. STEPHENS:

23       Q.    So would you agree that every

24   manufacturer, distributor and retail chain

25   pharmacy is entitled to individualized review

1    of its own conduct before being accused for

2    potential violations of the Controlled

3    Substances Act committed by somebody else?

4              MR. BENNETT:  Objection.

5         Vague.  Scope.

6              You can answer in your personal

7         capacity.

8              THE WITNESS:  Yeah, I believe

9         that they -- they should have that

10        opportunity, yes.

11   QUESTIONS BY MR. STEPHENS:

12        Q.    So, for example, would you

13   agree that you should not accuse a retail

14   chain pharmacy of improper distribution where

15   a rogue Internet pharmacy diverts controlled

16   substances and there is no evidence that the

17   retail chain pharmacy distributed the

18   controlled substances to the rogue Internet

19   pharmacy?

20             MR. BENNETT:  Objection.

21        Vague.  Scope.  Incomplete

22        hypothetical.

23             You can answer in your personal

24        capacity.

25             THE WITNESS:  Yes, I believe

Highly Confidential - Subject to Further Confidentiality Review

1           that each should be treated

2           differently based on the facts and

3           circumstances.

4    QUESTIONS BY MR. STEPHENS:

5           Q.     So let's go back to another

6    topic that you mentioned briefly this

7    morning.  You had mentioned a DEA 6 report.

8                  Do you remember talking about

9    that when you were talking about your time in

10   Detroit and Cleveland as diversion

11   investigator?

12          A.     Yes.

13          Q.     Can you describe what a DEA 6

14   report is?

15          A.     A DEA 6 is just a form for

16   reporting investigative information.

17          Q.     And one of the purposes of

18   reporting it in a DEA 6 is that information

19   is preserved for other investigators to use

20   on other investigations if the information

21   that you put in there might be relevant to

22   them?

23                 MR. BENNETT:  Objection.

24          Scope.

25                 You're not authorized to

Highly Confidential - Subject to Further Confidentiality Review

1           disclose law enforcement sensitive

2           information or confidential

3           investigative techniques.

4                   You may answer this question

5           yes or no only on whether that would

6           be one of your purposes in doing a

7           DEA 6.

8                   THE WITNESS:  Yes, it would be.

9    QUESTIONS BY MR. STEPHENS:

10          Q.     Okay.  You also, in the course

11   and scope of your duties as a diversion

12   investigator over your 30 years at DEA, you

13   had the opportunity to use DEA's NADDIS

14   database, correct?

15                  MR. BENNETT:  Objection.

16          Scope.

17                  You may answer that question

18          yes or no only on whether you used the

19          NADDIS database.

20                  THE WITNESS:  Yes, I did.

21   QUESTIONS BY MR. STEPHENS:

22          Q.     And the NADDIS database stands

23   for Narcotics and Dangerous Drugs Information

24   System?

25                  MR. BENNETT:  You can answer

 1          that question, if you know.

 2                THE WITNESS:  Yes.

 3     QUESTIONS BY MR. STEPHENS:

 4          Q.    Okay.  NADDIS -- at a very

 5     general, high level, NADDIS is a database

 6     where DEA agents will input information about

 7     subjects of investigation, including any

 8     contact information or biographical

 9     information they might have on that subject?

10                MR. BENNETT:  Objection.

11          Scope.

12                You are not authorized to

13          disclose information regarding

14          confidential databases maintained by

15          the DEA or the information contained

16          therein.

17                And so to the extent you can

18          answer without disclosing the

19          confidential information or ways that

20          the database is used, you can answer.

21                Beyond that, you are not

22          authorized to disclose information

23          regarding specific databases that are

24          nonpublic.

25                THE WITNESS:  Okay.

```
 1                    It's a database where

 2          headquarters inputs information from

 3          DEA reports of investigation.

 4   QUESTIONS BY MR. STEPHENS:

 5          Q.    Okay.  And it's preserved for

 6   other agents in other locations to use

 7   downstream if there might be something

 8   helpful there?

 9                    MR. BENNETT:  Objection.

10          Scope.

11                    You are not authorized to

12          disclose confidential law enforcement

13          investigative techniques.

14                    You may answer yes or no only

15          as far as whether you used NADDIS for

16          the purpose -- for that purpose.

17                    THE WITNESS:  Yes, I did.

18   QUESTIONS BY MR. STEPHENS:

19          Q.    Okay.  DEA diversion

20   investigators also use something called the

21   RICS database; is that accurate?

22          A.    I never heard of that.

23          Q.    You have not heard of the

24   database called the Registrant Information

25   Consolidation System database?
```

```
 1          A.      I have not.

 2          Q.      Would you agree that narcotics

 3   enforcement, based on your experience, is

 4   more effective when federal agencies

 5   cooperate with each other on investigations?

 6                  MR. BENNETT:  Objection.

 7          Scope.

 8                  You may answer that with your

 9          personal opinion, but you are not

10          speaking on behalf of DEA.

11                  THE WITNESS:  Yes, my personal

12          opinion is that cooperation with other

13          agencies is important.

14   QUESTIONS BY MR. STEPHENS:

15          Q.      And your personal opinion,

16   based on all of your personal experience as a

17   DEA diversion investigator, would be that

18   when both agencies share information with

19   each other, the agencies can make more

20   informed decisions about how to structure

21   their investigations?

22                  MR. BENNETT:  Objection.

23          Vague.  Objection.  Scope.

24                  You may give your personal

25          opinion, if you understand the
```

Highly Confidential - Subject to Further Confidentiality Review

1          question.

2                    THE WITNESS:  Yes, they can.

3     QUESTIONS BY MR. STEPHENS:

4          Q.     And would you agree as a

5     general matter, based on your 30 years of

6     experience at DEA, that the sharing of

7     information between investigative agencies

8     leads to more collaboration among law

9     enforcement, which often leads to more

10    successful investigation and reduces

11    diversion?

12                   MR. BENNETT:  Same objection.

13                   THE WITNESS:  I would agree

14         that it leads to more collaboration

15         and effective investigations.

16    QUESTIONS BY MR. STEPHENS:

17         Q.     Okay.  And would you agree,

18    based on your experience in your cases that

19    you've worked over the years, that diversion

20    can be reduced when DEA chooses to share

21    information with other federal, state and

22    local law enforcement agencies?

23                   MR. BENNETT:  Objection.

24         Scope.

25                   You are not authorized to speak

1          on behalf of DEA.

2                  If you have a personal opinion,

3          you may give your personal opinion

4          based on your personal experiences.

5                  THE WITNESS:  My opinion is

6          that it's hard to quantify diversion

7          and whether or not sharing of

8          information reduces diversion.

9                  So it does lead to more

10         investigations, but whether those

11         reduce diversion or not, I'm not

12         certain.

13   QUESTIONS BY MR. STEPHENS:

14         Q.      Would you agree that drug

15   traffickers and diverters are the ones who

16   potentially benefit if DEA decides to isolate

17   itself from folks who could help advance

18   DEA's diversion investigations?

19                 MR. BENNETT:  Objection.

20         Vague.  Calls for speculation.  Scope.

21                 You are not authorized to speak

22         on behalf of DEA.

23                 If you have personal

24         information that you can form a

25         personal opinion, you may give your

1        personal opinion.

2               THE WITNESS:  I've forgotten

3        the question now.

4    QUESTIONS BY MR. STEPHENS:

5        Q.     Sure.

6               Would you agree that drug

7    traffickers and diverters are the ones who

8    potentially benefit if DEA decides to isolate

9    itself from individuals who could help

10   advance DEA's diversion investigations who

11   are outside of DEA?

12       A.     If those individuals are other

13   law enforcement agencies, yes.

14       Q.     Okay.  Would you agree that DEA

15   should be ready, willing and able to share

16   information with any good faith registrant

17   who could help DEA prevent diversion?

18              MR. BENNETT:  Objection.

19       Scope.  Vague.  Incomplete

20       hypothetical.  Calls for speculation.

21              You are not authorized to speak

22       on behalf of DEA.  If you have

23       personal experiences which will allow

24       you to form a personal opinion, you

25       may give your personal opinion.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  I would agree
 2        with that as long as the information
 3        sharing is within the bounds of that
 4        that's allowed by law and regulation.
 5   QUESTIONS BY MR. STEPHENS:
 6        Q.    Okay.  Based on your experience
 7   at DEA, as you were trying to make a
 8   determination as to whether to bring an
 9   action against someone, would you agree that
10   to make the most accurate assessment of the
11   charging decision that was in front of you,
12   that you wanted as much relevant information
13   as possible about the suspect's action in
14   front of you so you can make an accurate,
15   informed decision on what DEA should do?
16                MR. BENNETT:  Objection.
17        Vague.  Form.
18                You can answer.
19                THE WITNESS:  Yes.
20   QUESTIONS BY MR. STEPHENS:
21        Q.    If your colleagues down the
22   road at FBI withheld relevant information
23   from you on an investigation so that you only
24   had partial information about your suspect's
25   conduct, would you agree that it would make
```

1    it harder for you to make an accurate,

2    informed decision about what to do?

3              MR. BENNETT:  Objection.  Form.

4        Scope.  Vague.  Calls for speculation.

5              You can answer.

6              THE WITNESS:  I never had the

7        situation personally where the FBI

8        withheld information.  It could be

9        detrimental if they did.

10   QUESTIONS BY MR. STEPHENS:

11       Q.    Okay.  And since it could be

12   detrimental, would you agree that the sharing

13   of information between FBI and DEA in the

14   question I just posed to you would reduce the

15   number of potential mistakes a law

16   enforcement agency might make on an important

17   decision in an investigation?

18             MR. BENNETT:  Objection.  Form.

19       Scope.  Vague.  Calls for speculation.

20       Incomplete hypothetical.

21             You can answer.

22             THE WITNESS:  Yes, I would

23       agree.

24   QUESTIONS BY MR. STEPHENS:

25       Q.    Okay.  Given your general

Highly Confidential - Subject to Further Confidentiality Review

```
 1   duties included some leadership positions at

 2   DEA and at headquarters, I'd like to ask you

 3   some questions about leadership principles

 4   that you may have followed during your time

 5   at DEA.

 6            Okay?

 7       A.     Okay.

 8       Q.     All right.  So based on your

 9   experience as a leader at DEA, would you

10   agree that the success of an organization

11   often depends in part on tactical decisions

12   made by its leader?

13            MR. BENNETT:  Objection.

14       Vague.

15            THE WITNESS:  Yes.

16   QUESTIONS BY MR. STEPHENS:

17       Q.     Do you agree that good leaders

18   hold themselves accountable for the decisions

19   they make?

20       A.     Yes.

21       Q.     If your goal is to reduce

22   diversion, would you agree that a good leader

23   at DEA should be willing to share information

24   about diversion issues with good faith

25   registrants so the registrants may be able to
```

1    use that information to help DEA decrease

2    diversion?

3                    MR. BENNETT:  Objection.  Form.

4            Scope.  Vague.  Incomplete

5            hypothetical.  Calls for speculation.

6                    You can answer, if you have an

7            opinion.

8                    THE WITNESS:  Yes, they should,

9            but again within the constraints of

10           what's authorized by law and

11           regulation.

12   QUESTIONS BY MR. STEPHENS:

13           Q.    Would you agree that good

14   leaders at DEA also ensure that their

15   personal conduct and the conduct of their

16   team comports to the standards that they

17   expect others to follow?

18                   MR. BENNETT:  Objection.

19           Vague.

20                   THE WITNESS:  I don't quite

21           understand the question.

22                   If you're saying that the DEA

23           employees comport to the same

24           standards they're of expecting

25           registrants, they're in a different

Highly Confidential - Subject to Further Confidentiality Review

1       business and doing different things,

2       so...

3   QUESTIONS BY MR. STEPHENS:

4       Q.      Well, let me ask it this way.

5               Do you agree that the American

6   public has a right to expect that the leaders

7   of our law enforcement agencies will lead

8   their teams in a fashion that is consistent

9   with the standards that they impose on the

10  folks that they regulate?

11              MR. BENNETT:  Objection.

12      Vague.  Calls for speculation.

13              THE WITNESS:  It seems

14      reasonable, yes.

15  QUESTIONS BY MR. STEPHENS:

16      Q.      Okay.  Is it fair to say that

17  the American public has a right to expect

18  that when DEA sees diversion happening, DEA

19  will not simply let the diversion continue to

20  happen?

21              MR. BENNETT:  Objection.

22      Vague.  Incomplete hypothetical.

23      Calls for speculation.

24              THE WITNESS:  Yes, but within

25      the bounds of the available resources.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MR. STEPHENS:

 2        Q.    Based on your experience as a

 3   leader at DEA, if DEA expects registrants it

 4   regulates to take reasonable measures to

 5   prevent diversion, is it fair for the

 6   American public to expect that DEA will do

 7   the same?

 8              MR. BENNETT:  Objection.

 9        Incomplete hypothetical.  Vague.

10        Calls for speculation.  Scope.

11              You can answer, if you have an

12        opinion.

13              THE WITNESS:  I really don't

14        have an opinion on that.

15   QUESTIONS BY MR. STEPHENS:

16        Q.    All right.  Well, how about

17   this.

18              If DEA has information that a

19   shipment of controlled substances headed to

20   Customer X will be diverted by Customer X, do

21   you think that the American public should be

22   able to rely on DEA to step in and intercept

23   that shipment of controlled substances before

24   those controlled substances reach Customer X?

25              MR. BENNETT:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Scope.  Vague.  Incomplete

 2          hypothetical.  Calls for speculation

 3          and calls for a legal conclusion.

 4                 THE WITNESS:  I believe the DEA

 5          should take some appropriate action,

 6          and that should be expected.

 7    QUESTIONS BY MR. STEPHENS:

 8          Q.    Okay.  Let me switch gears here

 9    a little bit.

10                 And what I'd like to do is ask

11    you some questions about some of -- some of

12    the investigative techniques that DEA has

13    that may be different than what a registrant

14    might be able to do as it's setting up its

15    SOM program.

16                 Okay?

17          A.    Okay.

18          Q.    During your tenure as a DEA

19    investigator, were there occasions where you

20    were able to identify a potential diverter

21    based on information that DEA developed as

22    opposed to information that was provided to

23    DEA by a registrant in a suspicious order

24    report?

25                 MR. BENNETT:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Scope.

 2               You may answer that question

 3     yes or no only.

 4               THE WITNESS:  Yes.

 5   QUESTIONS BY MR. STEPHENS:

 6     Q.    Okay.  Would you agree that DEA

 7   has unique law enforcement investigative

 8   powers that are available to DEA to identify

 9   potential diverters that are not available to

10   a registrant like Walmart?

11               MR. BENNETT:  Objection.

12     Vague.

13               THE WITNESS:  Yes.

14   QUESTIONS BY MR. STEPHENS:

15     Q.    Okay.  DEA has subpoena power,

16   for example, correct?

17     A.    That's correct.

18     Q.    Walmart does not have subpoena

19   power to subpoena a doctor, correct?

20     A.    Not that I'm aware of.

21     Q.    Okay.  Now, DEA can issue

22   subpoenas to help investigate potential

23   diversion, right?

24               MR. BENNETT:  Objection.  Form.

25
```

Highly Confidential - Subject to Further Confidentiality Review

1    QUESTIONS BY MR. STEPHENS:

2        Q.      Based on your experience, do

3    you agree that DEA can issue a subpoena to

4    help investigate potential diverters?

5                MR. BENNETT:  You can answer,

6        if you know.

7                THE WITNESS:  Yes.

8    QUESTIONS BY MR. STEPHENS:

9        Q.      Okay.  And during your time at

10   DEA, DEA collected information in diversion

11   investigation through subpoenas?

12               MR. BENNETT:  Objection.

13       Scope.

14               You may answer that question

15       yes or no only.

16               THE WITNESS:  Yes.

17   QUESTIONS BY MR. STEPHENS:

18       Q.      To your knowledge, did Joe

19   Rannazzisi ever authorize you or anyone else

20   to share information with any registrant the

21   DEA had obtained through subpoenas?

22               MR. BENNETT:  Objection.

23       Scope.

24               You may answer that question

25       yes or no only.

```
 1                    THE WITNESS:  No.

 2   QUESTIONS BY MR. STEPHENS:

 3        Q.      Would you agree that search

 4   warrants are a second vehicle that provide

 5   DEA an investigative tool that registrants

 6   like Walmart do not have?

 7                    MR. BENNETT:  You can answer.

 8                    THE WITNESS:  Yes.

 9   QUESTIONS BY MR. STEPHENS:

10        Q.      Okay.  DEA can apply to a

11   magistrate judge to obtain a search warrant,

12   right?

13        A.      Yes.

14        Q.      And a search warrant would give

15   DEA the ability to potentially search rogue

16   pain clinics to obtain documents that might

17   advance a diversion investigation the DEA is

18   conducting?

19        A.      That's correct.

20                    MR. BENNETT:  Objection.

21        Objection.  Scope.

22                    You can answer that yes or no

23        only based on your personal

24        experiences.

25                    THE WITNESS:  Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. STEPHENS:
 2         Q.    Okay.  Based on your personal
 3    experience, Mr. Mapes, DEA also can obtain
 4    what is known as an ISP search warrant, an
 5    Internet service provider search warrant,
 6    which allows DEA to intercept e-mail
 7    communications which would include
 8    conversations between a doctor and the
 9    doctor's patients that might relate to
10    diversion, true?
11              MR. BENNETT:  Objection.
12         Scope.
13              You are authorized to answer
14         whether you know of a document
15         entitled an "ISP search warrant" in
16         your personal experience, yes or no
17         only.
18              THE WITNESS:  No.
19    QUESTIONS BY MR. STEPHENS:
20         Q.    You've never heard of an ISP
21    search warrant?
22         A.    No.
23         Q.    Okay.  All right.
24              But just on the topic of search
25    warrants generally, we'll go to premises
```

1    search warrant, which is the first example I

2    gave you where you go to a magistrate, the

3    magistrate authorizes DEA to go to address X

4    and DEA conducts a search there.

5              You're familiar with those,

6    right?

7         A.    Yes.

8         Q.    Okay.  Now, did Joe Rannazzisi

9    ever authorize, to your knowledge, anyone at

10   DEA to disclose to any registrant any

11   information obtained from a search warrant so

12   that that registrant could help DEA in a

13   diversion investigation?

14             MR. BENNETT:  Objection.

15        Scope.

16             You may answer that question.

17             THE WITNESS:  Not that I'm

18        aware of.

19             MR. BENNETT:  Well --

20   QUESTIONS BY MR. STEPHENS:

21        Q.    Okay.

22             MR. BENNETT:  He's answered

23        your question.

24             I do object to the scope of

25        that.  I was going to authorize him to

1        answer that yes or no only.

2                He has said not to his

3        knowledge, so we can move on.

4    QUESTIONS BY MR. STEPHENS:

5        Q.      And just to reconfirm, Walmart

6    has no ability to go to a magistrate judge to

7    obtain a search warrant, right?

8        A.      That's correct.

9        Q.      No registrant can go to a

10   magistrate judge and seek a search warrant,

11   right?

12       A.      I wouldn't say that, because

13   DEA is a registrant, so...

14       Q.      Okay.  Other than law

15   enforcement agencies, no private sector

16   registrant can go to a magistrate and seek a

17   search warrant; is that fair?

18       A.      Yes.

19       Q.      All right.  The use of the

20   grand jury is a third example of an

21   investigative technique that is unique to law

22   enforcement and something that is not

23   available to private sector registrants,

24   fair?

25                MR. BENNETT:  Objection.

1    Scope.  Objection.  Form.  Calls for a

2    legal conclusion.

3         You can answer, if you know, in

4    your personal knowledge.

5         THE WITNESS:  Yes.

6         MR. BENNETT:  I'm sorry, I'm

7    not sure I understand his answer to

8    your question on whether somebody in

9    the private sector can go to the grand

10   jury or not.

11   QUESTIONS BY MR. STEPHENS:

12   Q.    Okay.  So let me restate it.

13        Based on your experience at

14   DEA, can anyone other than law enforcement

15   use the grand jury as a tool to conduct due

16   diligence on a customer?

17   A.    No.

18   Q.    Okay.  Would you agree that the

19   grand jury is an investigative technique that

20   is available to law enforcement and law

21   enforcement only?

22        MR. BENNETT:  Objection.

23   Vague.  Objection.  Calls for a legal

24   conclusion.

25        You can answer in your personal

Highly Confidential - Subject to Further Confidentiality Review

```
 1            knowledge, if you know.
 2                 THE WITNESS:  Yes, it is a
 3            tool.
 4    QUESTIONS BY MR. STEPHENS:
 5            Q.    Okay.  And DEA can subpoena a
 6    suspected diverter to the grand jury and ask
 7    him questions under the penalty of perjury
 8    related to whether that individual has
 9    diverted any controlled substances?
10                 MR. BENNETT:  Objection.
11            Vague.  Objection.  Calls for a legal
12            conclusion.  Objection.  Foundation.
13                 If you have any personal
14            knowledge whether DEA can subpoena a
15            suspected diverter -- oh, and
16            objection.  Scope.
17                 You may answer in your personal
18            knowledge.
19                 THE WITNESS:  My personal
20            opinion is that DEA can serve a
21            subpoena that was issued, but DEA
22            doesn't issue subpoenas.
23    QUESTIONS BY MR. STEPHENS:
24            Q.    Okay.  The subpoena would be
25    issued by either a federal prosecutor's
```

1   office, a US Attorney's office, or a state

2   prosecutor's office?

3       A.      Yes.

4       Q.      A district attorney's office,

5   right?

6       A.      Yes.

7       Q.      Okay.  If DEA and the

8   prosecutors believe that a witness has lied

9   in providing testimony to a grand jury, that

10  individual could be prosecuted for perjury,

11  right?

12          MR. BENNETT:  Objection.

13      Incomplete hypothetical.  Calls for a

14      legal conclusion.  Scope.

15          You can answer based on your

16      personal experience, if you know.

17          THE WITNESS:  I haven't had the

18      personal experience of that happening,

19      no.

20  QUESTIONS BY MR. STEPHENS:

21      Q.      Okay.  Would you agree that

22  being able to compel witnesses to the grand

23  jury and answer questions under the penalty

24  of perjury is a very valuable tool to DEA in

25  building diversion cases?

```
 1                  MR. BENNETT:  Objection.

 2          Vague.  Scope.  Calls for a legal

 3          conclusion.

 4                  You can answer.

 5                  THE WITNESS:  Yes.

 6   QUESTIONS BY MR. STEPHENS:

 7          Q.     And Walmart cannot compel

 8   witnesses to testify in front a grand jury,

 9   correct?

10          A.     That's correct.

11          Q.     And the other companies who

12   you've met today at your deposition, none of

13   them have the ability to compel any witnesses

14   to go to a grand jury; is that fair?

15          A.     That's correct.

16          Q.     Okay.  Would you agree that

17   conducting undercover operations present a

18   fourth example where DEA has unique

19   investigative tools to conduct diversion

20   investigations?

21                  MR. BENNETT:  Objection.

22          Vague.  Objection.  Scope.

23                  If you have an opinion, you may

24          answer that question yes or no only.

25                  THE WITNESS:  Yes.
```

```
 1    QUESTIONS BY MR. STEPHENS:

 2          Q.    Okay.  For example, based on

 3    your experience conducting diversion

 4    investigations, DEA can use undercover

 5    officers to purchase controlled substances

 6    from diverting Internet pharmacies and pain

 7    clinics?

 8                MR. BENNETT:  Objection.

 9          Scope.

10                You are not authorized to

11          disclose confidential law enforcement

12          investigative or intelligence-

13          gathering and dissemination techniques

14          whose effectiveness would thereby be

15          impaired.

16                To the extent that you can

17          answer the question without disclosing

18          confidential law enforcement

19          investigative techniques, you can

20          answer.  Otherwise, you are instructed

21          not to answer.

22                THE WITNESS:  Yes, they can.

23    QUESTIONS BY MR. STEPHENS:

24          Q.    Okay.  The undercover officers

25    in a DEA operation, for example, in a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    diversion investigation, are allowed to

 2    legally tape record the conversations that

 3    they have with the operator of the business

 4    that's under investigation?

 5              MR. BENNETT:  Objection.

 6         Scope.

 7              You are not authorized to

 8         disclose confidential law enforcement

 9         techniques or how undercover

10         investigations are done.  Also, you

11         are not authorized to draw legal

12         conclusions.

13              I'm instructing you not to

14         answer that question.

15              MR. STEPHENS:  On what --

16              MR. FARRELL:  Sustained.

17              MR. STEPHENS:  On what basis?

18              MR. BENNETT:  That it's a

19         confidential law enforcement

20         investigative technique on how they do

21         investigations and what evidence they

22         gather.

23    QUESTIONS BY MR. STEPHENS:

24         Q.    Are you aware, Mr. Mapes, that

25    there had been literally thousands of
```

1    investigations that have played out in

2    courtrooms across the United States of

3    America where United States Attorneys have

4    put DEA agents on the stand and have played

5    tapes of undercover operations to convince

6    juries to convict drug traffickers under

7    Title 21?

8                    MR. BENNETT:  You may answer

9            that question, based on your personal

10           knowledge, yes or no only.

11                   THE WITNESS:  Yes.

12   QUESTIONS BY MR. STEPHENS:

13           Q.    Okay.  So then undercover

14   officers can legally tape record

15   conversations that they have with the

16   operators of the businesses that DEA is

17   investigating; is that fair?

18                   MR. BENNETT:  Objection.  Calls

19           for a legal conclusion.  Scope.

20                   I don't think this witness can

21           draw a legal conclusion in this

22           deposition.

23                   You're asking whether he can

24           legally tape.  I don't think he's both

25           authorized to do that or qualified to

Highly Confidential - Subject to Further Confidentiality Review

```
 1          make a conclusion.  Plus, I think it's

 2          an incomplete hypothetical.

 3               So I'm going to instruct him

 4          that he's not authorized on behalf of

 5          DEA or use any DEA information in

 6          answering that question.

 7               MR. STEPHENS:  Okay.  I will

 8          move on to conserve time.

 9   QUESTIONS BY MR. STEPHENS:

10          Q.    Would you agree that Walmart

11   and CVS, Walgreens, Rite Aid, do not have the

12   ability to use law enforcement agents to

13   conduct undercover operations of businesses?

14               MR. BENNETT:  Objection.

15          Vague.  Incomplete hypothetical.

16          Calls for a legal conclusion.

17               You can answer if you have an

18          opinion.

19               THE WITNESS:  No, I'm not

20          really certain about that.

21   QUESTIONS BY MR. STEPHENS:

22          Q.    Okay.  Are you aware that it

23   might be illegal in certain states for a

24   private actor, private company, to secretly

25   tape record conversations with other people?
```

```
 1                    MR. BENNETT:  Objection.
 2         Scope.
 3                    To the extent you have personal
 4         information, you can answer that --
 5         you can give your personal opinion.
 6                    Calls for a legal conclusion.
 7                    THE WITNESS:  I don't know
 8         which states may have which laws, so I
 9         can't really answer that.
10    QUESTIONS BY MR. STEPHENS:
11         Q.    So you don't know one way or
12    the other.  Okay.
13                    To your knowledge, did Joe
14    Rannazzisi ever authorize you or anyone else
15    that you know of at DEA to disclose to
16    registrants who could help DEA in diversion
17    investigations information that DEA had
18    obtained in undercover operations?
19                    MR. BENNETT:  Objection.
20         Scope.
21                    You are not authorized to
22         disclose information regarding
23         specific DEA investigations or
24         activities.  You may answer this
25         question yes or no only.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   THE WITNESS:  No.
 2    QUESTIONS BY MR. STEPHENS:
 3         Q.     Okay.  As a fifth example of an
 4    investigative technique that is unique to DEA
 5    and federal law enforcement, would you agree
 6    that DEA, in a local US Attorney's Office,
 7    has the ability to apply to a judge for an
 8    order that would allow DEA to record
 9    telephone calls made by the subject of DEA's
10    investigation, a Title 3 wiretap?
11                   MR. BENNETT:  You can answer
12         that question.
13                   THE WITNESS:  Yes.
14    QUESTIONS BY MR. STEPHENS:
15         Q.     And would you agree that a
16    Title 3 wiretap allows DEA to listen in to
17    every discussion over the target's telephone?
18                   MR. BENNETT:  Objection.
19         Scope.  Calls for a legal conclusion.
20         Incomplete hypothetical.
21                   You can answer, if you know.
22                   THE WITNESS:  Every call except
23         for those that are required to be
24         minimized.
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MR. STEPHENS:

 2        Q.    Okay.  Very good.

 3              And that's spelled out in the

 4   order that the judge -- the DEA and the

 5   US Attorney's Office present to the judge and

 6   the judge signs, right?

 7        A.    Yes.

 8        Q.    Okay.  All right.  Another form

 9   of electronic surveillance is a room bug.

10              Are you familiar with a room

11   bug?

12              MR. BENNETT:  Objection.

13         Scope.

14              He's not authorized to disclose

15         confidential law enforcement

16         investigative or intelligence-

17         gathering techniques, the

18         effectiveness of which would be

19         impaired.

20              You may answer this question

21         yes or no only whether you are

22         familiar with the term "a room bug."

23              THE WITNESS:  Yes.

24   QUESTIONS BY MR. STEPHENS:

25        Q.    Okay.  A room bug is like a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Title 3 telephonic intercept.  It's a device
 2   that's placed in a particular location and it
 3   records, right?
 4              MR. BENNETT:  You can answer
 5         that question yes or no only if you
 6         know.
 7              THE WITNESS:  Yes.
 8   QUESTIONS BY MR. STEPHENS:
 9         Q.    Okay.  And in comparison to
10   DEA, which has the ability to apply to a
11   judge for these wiretaps and room bugs,
12   Walmart would not have the ability to apply
13   to a judge for a room bug or a wiretap, fair?
14              MR. BENNETT:  Objection.  Calls
15         for a legal conclusion.
16              You can answer in your personal
17         knowledge, if you know.
18              THE WITNESS:  That's correct.
19   QUESTIONS BY MR. STEPHENS:
20         Q.    And would you agree that
21   electronic surveillance can be an enormous
22   help to DEA in determining whether a suspect
23   is diverting controlled substances?
24              MR. BENNETT:  Objection.
25         Vague.  Scope.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   You can answer in your personal

 2          capacity if you have an opinion.

 3                   THE WITNESS:  Yes, it could be.

 4      QUESTIONS BY MR. STEPHENS:

 5          Q.    Okay.  And based on your

 6      30 years at DEA, are you aware of any

 7      situation where Joe Rannazzisi or anyone else

 8      who was running the Office of Diversion

 9      Control ever authorized you or anyone else at

10      DEA to disclose to a registrant who could

11      help DEA in a diversion investigation the

12      information that DEA had obtained through

13      electronic surveillance?

14                   MR. BENNETT:  Objection.  Form.

15          Scope.  Compound.

16                   You're not authorized to

17          disclose any information regarding

18          specific DEA investigations or

19          activities.

20                   You may answer this question

21          yes or no only, if you understand.

22                   THE WITNESS:  Could you restate

23          the question?

24      QUESTIONS BY MR. STEPHENS:

25          Q.    Sure.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Based on your 30 years at DEA,
 2    are you aware of any situation where anyone
 3    who is running the Office of Diversion
 4    Control ever authorized you or anyone else at
 5    DEA to disclose to a registrant who could
 6    help DEA in a diversion investigation with
 7    information that DEA had obtained through
 8    electronic surveillance?
 9                    MR. BENNETT:  Same objections
10        and instruction.
11                    THE WITNESS:  No, I'm not.
12    QUESTIONS BY MR. STEPHENS:
13        Q.     All right.  Let's talk about
14    number 6, and that will be information from
15    state medical boards or state local law
16    enforcement.  Okay?
17                    DEA, during your tenure and on
18    investigations you worked, obtained
19    information from state and local law
20    enforcement regarding diversion
21    investigations the DEA was conducting; is
22    that accurate?
23                    MR. BENNETT:  Objection.
24        Scope.
25                    You can answer yes or no only.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Yes.

 2  QUESTIONS BY MR. STEPHENS:

 3        Q.      Okay.  Would you agree that

 4  private sector registrants like the companies

 5  that you've met here today do not have the

 6  ability to obtain information from state and

 7  local law enforcement investi -- state and

 8  local law enforcement regarding

 9  investigations that state and local law

10  enforcement is conducting on suspected

11  diverters?

12                    MR. BENNETT:  Objection.  Form.

13        Incomplete hypothetical.  Calls for

14        speculation.

15                    You can answer, if you have an

16        opinion.

17  QUESTIONS BY MR. STEPHENS:

18        Q.      Let me strike the question and

19  ask a better question.

20        A.      Okay.

21        Q.      That question wasn't so

22  artfully crafted, Mr. Mapes.

23                    Are you aware of any situation

24  during your tenure at DEA where state and

25  local law enforcement shared information with
```

Highly Confidential - Subject to Further Confidentiality Review

1  a registrant related to an investigation that

2  state and local law enforcement was doing of

3  a suspected diverter?

4            MR. BENNETT:  Objection.

5       Scope.

6            You can answer that question

7       yes or no only.

8            THE WITNESS:  Yes.

9  QUESTIONS BY MR. STEPHENS:

10      Q.    Okay.  Would you agree that DEA

11 can obtain information from state medical

12 boards regarding investigations that the

13 state medical board is conducting?

14            MR. BENNETT:  You can answer

15      that question.

16            THE WITNESS:  Yes.

17 QUESTIONS BY MR. STEPHENS:

18      Q.    Okay.  Are you aware of any

19 situation where a state medical board

20 provided information to a non-law enforcement

21 registrant related to investigation --

22 pending investigations that the state medical

23 board was conducting?

24            MR. BENNETT:  You can answer

25      that question yes or no only.

1            THE WITNESS:  Yes.

2    QUESTIONS BY MR. STEPHENS:

3        Q.    Okay.  Are you aware of any

4    situation where Mr. Rannazzisi ever

5    authorized you or anyone else at DEA to

6    disclose to a registrant who could help DEA

7    advance its diversion investigation with

8    information that DEA had obtained from state

9    and local law enforcement?

10            MR. BENNETT:  Objection.

11        Scope.  Vague.

12            You can answer that question

13        yes or no.

14            THE WITNESS:  No.

15    QUESTIONS BY MR. STEPHENS:

16        Q.    Are you aware of any situation

17    where Mr. Rannazzisi ever authorized you or

18    anyone else at DEA to disclose to a

19    registrant who could help DEA advance its

20    diversion investigation with information that

21    DEA had obtained from a state medical board?

22            MR. BENNETT:  Objection.

23        Scope.  Vague.

24            You can answer that question

25        yes or no only.

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  No.

2    QUESTIONS BY MR. STEPHENS:

3           Q.    Are you aware of anyone who was

4    in the position of running the Office of

5    Diversion Control who ever authorized you or

6    anyone else at DEA to disclose to a

7    registrant who could help DEA advance its

8    diversion investigation with information that

9    DEA had obtained from a state medical board?

10          MR. BENNETT:  Objection.

11      Scope.  Vague.

12          You can answer that question

13      yes or no only.

14          THE WITNESS:  No.

15   QUESTIONS BY MR. STEPHENS:

16          Q.    Are you aware of anyone who was

17   in the position of running the Office of

18   Diversion Control who had ever authorized you

19   or anyone else at DEA to disclose to a

20   registrant who could help DEA advance its

21   diversion investigation with information the

22   DEA had obtained from state or local law

23   enforcement?

24          MR. BENNETT:  Objection.

25      Scope.  Vague.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  You can answer that question

 2          yes or no only.

 3                  THE WITNESS:  No.

 4   QUESTIONS BY MR. STEPHENS:

 5          Q.     Did private sector companies

 6   such as Walmart or Walgreens or Rite Aid have

 7   the ability to access NADDIS information?

 8                  MR. BENNETT:  You can answer

 9          that question, if you know.

10                  THE WITNESS:  No.

11   QUESTIONS BY MR. STEPHENS:

12          Q.     Did private sector companies,

13   Walmart, Walgreens, CVS, have the ability to

14   access DEA 6 reporting from DEA's databases?

15                  MR. BENNETT:  You can answer

16          the question.

17                  THE WITNESS:  Only through FOI

18          requests or discovery from a case or

19          something like that.

20   QUESTIONS BY MR. STEPHENS:

21          Q.     Okay.  But DEA will not provide

22   responses, if you know, to FOIA requests

23   related to pending investigations?

24                  MR. BENNETT:  Objection.

25          Scope.  Calls for speculation.  Calls
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              for a legal conclusion.
 2                   You may answer based on your
 3          personal experience and personal
 4          knowledge while you were at DEA.
 5                   THE WITNESS:  They have not
 6          provided that that I'm aware of.
 7   QUESTIONS BY MR. STEPHENS:
 8          Q.     Okay.  So information from
 9   NADDIS would be a seventh example where DEA
10   agents can use that information, but private
11   sector companies cannot obtain that
12   information related to pending investigations
13   where the registrant might be able to help
14   DEA with its diversion investigation?
15                   MR. BENNETT:  Objection.
16          Vague.  Form.
17                   You can answer.
18                   THE WITNESS:  That's correct.
19   QUESTIONS BY MR. STEPHENS:
20          Q.     Okay.  So let's talk about
21   ARCOS here briefly.
22                   You testified a little bit
23   about ARCOS earlier.
24                   Do you recall that?
25          A.     Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         Q.     Okay.  Now, DEA could analyze
 2   ARCOS information from all registrants to
 3   develop leads on potential diverters during
 4   your tenure at DEA; is that fair?
 5               MR. BENNETT:  You can answer
 6        it.
 7               THE WITNESS:  Yes, it is.
 8   QUESTIONS BY MR. STEPHENS:
 9         Q.     Okay.  And was that information
10   helpful in advancing DEA diversion
11   investigations?
12               MR. BENNETT:  Objection.
13        Vague.
14               You can answer.
15               THE WITNESS:  Yes, it was.
16   QUESTIONS BY MR. STEPHENS:
17         Q.     Okay.  During your tenure at
18   DEA, did DEA share ARCOS information it
19   received from one distributor with all other
20   distributors?
21               MR. BENNETT:  You can answer
22        that question.
23               THE WITNESS:  No.
24   QUESTIONS BY MR. STEPHENS:
25         Q.     So did Mr. Rannazzisi, when he
```

```
 1   ran the Office of Diversion Control, ever
 2   authorize you or anyone else, to your
 3   knowledge, at DEA to disclose to a registrant
 4   who could help advance DEA's investigation of
 5   a suspected diverter with information from
 6   ARCOS that related to information that had
 7   been supplied to DEA from other registrants?
 8                 MR. BENNETT:  Objection.
 9       Scope.  Vague.  Form.
10                 You can answer that question
11       yes or no only.
12                 THE WITNESS:  No.
13   QUESTIONS BY MR. STEPHENS:
14       Q.     To your knowledge, did anyone
15   who ran the Office of Diversion Control at
16   DEA during your tenure there ever authorize
17   you or anyone else at DEA to disclose to a
18   registrant who could help advance DEA's
19   investigation of a suspected diverter with
20   information from ARCOS that related to
21   information that had been supplied to DEA
22   from other registrants?
23                 MR. BENNETT:  Objection.  Form.
24       Scope.  Vague.
25                 You can answer that question
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          yes or no only.

2                  THE WITNESS:  No.

3     QUESTIONS BY MR. STEPHENS:

4          Q.     Okay.  Move on to my next

5     topic.

6                  You testified a little bit

7     earlier about your background and how you had

8     worked in field divisions and then had gone

9     to headquarters, right?

10         A.     Yes.

11         Q.     And you also provided some

12    information about how DEA is structured and

13    how certain squads have DEA enforcement

14    agents and other squads have DEA diversion

15    investigators.

16                 Do you recall that testimony?

17         A.     Yes.

18                 MR. BENNETT:  Objection.

19    Mischaracterizes testimony.

20                 MR. STEPHENS:  I don't think

21    so, but...

22    QUESTIONS BY MR. STEPHENS:

23         Q.     You also -- during your tenure

24    at DEA, when you were retiring, is it fair

25    that there were about 20 field divisions or
```

Highly Confidential - Subject to Further Confidentiality Review

1    so throughout the country at DEA?

2              MR. BENNETT:  You can answer.

3              THE WITNESS:  Yes.

4    QUESTIONS BY MR. STEPHENS:

5         Q.    And each division is run by a

6    special agent in charge?

7         A.    It is.

8         Q.    And the special agent in charge

9    is known as the SAC, the S-A-C?

10        A.    Yes.

11        Q.    Okay.  And that's the highest

12   level at a field division, right?

13        A.    Yes.

14        Q.    Okay.  And there are a couple

15   other high-level positions, one of which

16   would be the assistant special agent in

17   charge, the ASAC; is that fair?

18        A.    Fair.

19        Q.    And another high-level position

20   in the field is what they call a RAC, a

21   resident agent in charge, fair?

22        A.    Yes.

23        Q.    Okay.  Now, based on your

24   experience at DEA, how many of -- how many

25   SACs can you identify that came up through

1    the ranks as a diversion investigator?

2          A.      None.

3          Q.      Zero?

4          A.      Yeah.

5          Q.      Okay.  Based on your career,

6    how many ASACs can you identify that came up

7    through the ranks as a diversion investigator

8    as opposed to a special agent on the

9    enforcement side?

10         A.      An ASAC position is a special

11   agent position, the equivalent in diversion

12   is the diversion program manager.

13         Q.      Okay.  So can you identify any

14   ASAC who came up through the ranks as a

15   diversion investigator during your 30 years

16   at DEA?

17         A.      There were a couple who were

18   diversion investigators and then went to

19   become special agents and ended up being

20   ASACs, but they were -- they were agents at

21   that point.

22         Q.      Okay.  So there were two that

23   you can recall?

24         A.      A couple I can recall, yes.

25         Q.      Okay.  All right.  Now,

1    enforcement agents are special agents, right?

2    That's how they're referred to within DEA?

3           A.      Yes.

4           Q.      And the enforcement agents

5    investigate drug trafficking organizations

6    like the Medellin cartel or the Sinaloa

7    cartel, fair?

8           A.      Among their own duties, yes.

9           Q.      Okay.  Diversion investigators,

10   by contrast, focus on diversion

11   investigations; is that fair?

12          A.      Yes.

13          Q.      Now, at DEA, special agents can

14   also work diversion investigations, right?

15          A.      Yes.

16          Q.      There is no rule, there's no

17   law, there's no regulation that says

18   enforcement agents are prohibited from

19   helping diversion investigators work

20   diversion investigations; is that fair?

21          A.      That's correct.

22          Q.      Do you think that diversion

23   would have been further reduced during your

24   time at DEA if the special agents in charge

25   at the field division level would have made

1    diversion investigations more of a priority?

2              MR. BENNETT:  Objection.

3         Scope.  Incomplete hypothetical.

4         Calls for speculation.

5              This is not a 30(b)(6) witness,

6         so you are not authorized to answer on

7         behalf of DEA.

8              To the extent that you have a

9         personal opinion in your personal

10        capacity, you may answer the question.

11             THE WITNESS:  No, I really

12        don't know if that would have made a

13        difference or not.

14   QUESTIONS BY MR. STEPHENS:

15        Q.    Okay.  Well, for example, would

16   you expect that supervisors in the field

17   divisions like SACs, ASACs and RACs should be

18   familiar with suspicious activity reports?

19             MR. BENNETT:  Objection.

20        Scope.  Incomplete hypothetical.

21        Calls for speculation.

22             This is not a 30(b)(6) witness

23        who can speak on behalf of the DEA.

24             To the extent that you have a

25        personal opinion, you may answer in

Highly Confidential - Subject to Further Confidentiality Review

1          your personal capacity.

2                  THE WITNESS:  I don't believe

3          the SACs and ASACs would be involved

4          in something at that level and that

5          detail.

6      QUESTIONS BY MR. STEPHENS:

7          Q.     Okay.  How about US Attorney's

8      Offices, during your 30 years at DEA, do you

9      think that the US Attorney's Offices devoted

10     the level of resources that you wanted to

11     diversion cases as opposed to enforcement

12     cases against drug trafficking organizations?

13                 MR. BENNETT:  Objection.

14         Scope.  Incomplete hypothetical.

15         Calls for speculation.

16                 This is not a 30(b)(6) witness

17         who can answer on behalf of DEA or

18         give DEA's position.

19                 To the extent that you have a

20         personal opinion, you may give your

21         opinion in your personal capacity.

22                 THE WITNESS:  Personally, we

23         always had good support from the

24         US Attorney's Offices.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. STEPHENS:

 2         Q.    Can you name any chief of

 3    narcotics for any of the 94 US Attorney's

 4    Offices during your tenure at DEA, based on

 5    your experience, who prosecuted more

 6    diversion investigations than enforcement

 7    matters against drug trafficking

 8    organizations?

 9              MR. BENNETT:  Objection.  Form.

10         Scope.

11              You can answer.

12              THE WITNESS:  I don't know how

13         many enforcement cases they did versus

14         diversion cases, so I really don't

15         know.

16    QUESTIONS BY MR. STEPHENS:

17         Q.    Can you name any OCDETF chief,

18    who ran any of the nine OCDETF regions in the

19    United States and the Caribbean during your

20    tenure at DEA, whose OCDETF team prosecuted

21    more diversion investigations compared

22    against enforcement cases brought by special

23    agents against drug trafficking

24    organizations?

25              MR. BENNETT:  Objection.  Form.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Scope.

2            You can answer.

3            THE WITNESS:  Again, I don't

4      know the total of the numbers of

5      cases, so I couldn't say.

6  QUESTIONS BY MR. STEPHENS:

7      Q.    Okay.  Would you agree that

8  within DEA, both diversion investigators and

9  enforcement special agents are investigators

10  within DEA?

11            MR. BENNETT:  Objection.

12      Vague.

13            THE WITNESS:  Yes.

14  QUESTIONS BY MR. STEPHENS:

15      Q.    Okay.  Based on your 30 years

16  of experience and what you wanted to

17  accomplish in anti-diversion efforts, what

18  percentage of mix between how many -- what

19  percent of enforcement special agents that

20  were allocated at DEA against what percentage

21  of diversion investigators there were at DEA

22  was the right mix?

23            MR. BENNETT:  Objection.  Form.

24      Objection.  Scope.  Objection.  Calls

25      for speculation.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MR. STEPHENS:

 2        Q.    Let me re -- fair enough,

 3   Counsel.  Let me restate it.

 4             So during your tenure, 30-year

 5   tenure, at DEA working diversion

 6   investigations, for DEA to be as effective as

 7   possible in its anti-diversion efforts, what

 8   percentage of authorized investigator slots

 9   should have been allocated to diversion

10   investigators as opposed to special agents?

11             MR. BENNETT:  Objection.  Form.

12        Objection.  Scope.

13             To the extent that you have a

14        personal opinion, you may give it in

15        your personal capacity.

16             But you are not a 30(b)(6)

17        witness, and you are not authorized to

18        speak on behalf of DEA's allocation of

19        resources.

20             THE WITNESS:  And I really

21        don't know what that -- allocation

22        would be best.

23   QUESTIONS BY MR. STEPHENS:

24        Q.    During your tenure at DEA, did

25   you think that there should have been more
```

Highly Confidential - Subject to Further Confidentiality Review

1  diversion investigators in the mix working

2  diversion investigations as opposed to

3  enforcement special agents focused on drug

4  trafficking organizations?

5           MR. BENNETT:  Objection.

6      Scope.

7           You can answer in your personal

8      capacity if you have a personal

9      opinion, but you may not speak on

10      behalf of DEA.

11           THE WITNESS:  My opinion is no,

12      because we usually had agents to work

13      on the cases with us when necessary.

14  QUESTIONS BY MR. STEPHENS:

15      Q.    What percentage of time do you

16  think enforcement special agents, during your

17  tenure at DEA, spent working on diversion

18  matters as opposed to enforcement matters

19  against drug trafficking organizations?

20           MR. BENNETT:  Objection.

21      Foundation.  Calls for speculation.

22           You can answer, if you know.

23           THE WITNESS:  I really don't

24      know what percentage.  A small

25      percentage.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. STEPHENS:  Okay.  Let me
 2       take a quick break and see if we are
 3       done for the night.
 4              VIDEOGRAPHER:  We're going off
 5       record.  The time is 5:47.
 6         (Off the record at 5:47 p.m.)
 7              VIDEOGRAPHER:  Going back on
 8       record.  Beginning of Media File 11.
 9       The time is 5:48.
10  QUESTIONS BY MR. STEPHENS:
11       Q.     Mr. Mapes, thank you.  I just
12  have a few more questions for you before we
13  wrap up for the evening.
14              I had asked you some questions
15  earlier on about who you recall meeting with
16  between 2005 and 2007 in those 12 or so
17  distributor briefings that you gave.
18              Do you recall that testimony?
19       A.     Yes.
20       Q.     Okay.  Let me ask a couple of
21  follow-up questions.
22              Did you meet with CVS in a
23  Distributor Initiative meeting between 2005
24  and 2007?
25       A.     No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.     Did you meet with Rite Aid?

 2        A.     No.

 3        Q.     Did you meet with Walgreens?

 4        A.     No.

 5               MR. STEPHENS:  Okay.  Thank

 6        you.  I have no further questions.

 7               I would like to state for the

 8        record that we're reserving our full

 9        90 minutes for any potential redirect.

10               And with that, I'm done.  Thank

11        you.

12               MR. BENNETT:  Okay.

13               MS. LEVY:  This is Jennifer

14        Levy for the manufacturing defendants.

15        We will decline to ask questions today

16        and reserve any questions we may have

17        until the 90-minute redirect we may do

18        tomorrow.

19               VIDEOGRAPHER:  All right.  This

20        concludes the deposition for today.

21        Going off the record.  The time is

22        5:50.

23         (Off the record at 5:50 p.m.)

24               - - - - - - -

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      CERTIFICATE

 2

 3              I, CARRIE A. CAMPBELL, Registered
       Diplomate Reporter, Certified Realtime
 4     Reporter and Certified Shorthand Reporter, do
       hereby certify that prior to the commencement
 5     of the examination, Michael Mapes, was duly
       sworn by me to testify to the truth, the
 6     whole truth and nothing but the truth.

 7              I DO FURTHER CERTIFY that the
       foregoing is a verbatim transcript of the
 8     testimony as taken stenographically by and
       before me at the time, place and on the date
 9     hereinbefore set forth, to the best of my
       ability.

10

                I DO FURTHER CERTIFY that I am
11     neither a relative nor employee nor attorney
       nor counsel of any of the parties to this
12     action, and that I am neither a relative nor
       employee of such attorney or counsel, and
13     that I am not financially interested in the
       action.

14

15

16

                Carrie A. Campbell
17     CARRIE A. CAMPBELL,
       NCRA Registered Diplomate Reporter
18     Certified Realtime Reporter
       Notary Public
19     Dated:  July 11, 2019

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4   carefully and make any necessary corrections.

 5   You should state the reason in the

 6   appropriate space on the errata sheet for any

 7   corrections that are made.

 8              After doing so, please sign the

 9   errata sheet and date it.  You are signing

10   same subject to the changes you have noted on

11   the errata sheet, which will be attached to

12   your deposition.

13              It is imperative that you return

14   the original errata sheet to the deposing

15   attorney within thirty (30) days of receipt

16   of the deposition transcript by you.  If you

17   fail to do so, the deposition transcript may

18   be deemed to be accurate and may be used in

19   court.

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4          I,_____, do

    hereby certify that I have read the foregoing

 5  pages and that the same is a correct

    transcription of the answers given by me to

 6  the questions therein propounded, except for

    the corrections or changes in form or

 7  substance, if any, noted in the attached

    Errata Sheet.

 8

 9

10

11

12  _____

    Michael Mapes              DATE

13

14

15  Subscribed and sworn to before me this

16  _____ day of _____, 20 _____.

17  My commission expires: _____

18

19  Notary Public

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              - - - - - - -

                    ERRATA

2              - - - - - - -

3     PAGE   LINE   CHANGE/REASON

4     _____  _____  _____

5     _____  _____  _____

6     _____  _____  _____

7     _____  _____  _____

8     _____  _____  _____

9     _____  _____  _____

10    _____  _____  _____

11    _____  _____  _____

12    _____  _____  _____

13    _____  _____  _____

14    _____  _____  _____

15    _____  _____  _____

16    _____  _____  _____

17    _____  _____  _____

18    _____  _____  _____

19    _____  _____  _____

20    _____  _____  _____

21    _____  _____  _____

22    _____  _____  _____

23    _____  _____  _____

24    _____  _____  _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

1                        – – – – – – –

                    LAWYER'S NOTES

2                        – – – – – – –

3       PAGE      LINE

4       _____     _____    _____

5       _____     _____    _____

6       _____     _____    _____

7       _____     _____    _____

8       _____     _____    _____

9       _____     _____    _____

10      _____     _____    _____

11      _____     _____    _____

12      _____     _____    _____

13      _____     _____    _____

14      _____     _____    _____

15      _____     _____    _____

16      _____     _____    _____

17      _____     _____    _____

18      _____     _____    _____

19      _____     _____    _____

20      _____     _____    _____

21      _____     _____    _____

22      _____     _____    _____

23      _____     _____    _____

24      _____     _____    _____

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3
      IN RE: NATIONAL         )
 4    PRESCRIPTION            )   MDL No. 2804
      OPIATE LITIGATION       )
 5    _____)   Case No.
                              )   1:17-MD-2804
 6                            )
      THIS DOCUMENT RELATES   )   Hon. Dan A.
 7    TO ALL CASES            )   Polster
 8
                   FRIDAY, JULY 12, 2019
 9
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10              CONFIDENTIALITY REVIEW
11                    VOLUME II
                        - - -
12
13          Videotaped deposition of Michael
14    Mapes, held at the offices of The Mining
15    Exchange, A Wyndham Grand Hotel & Spa, 8
16    South Nevada Avenue, Colorado Springs,
17    Colorado, commencing at 8:01 a.m., on the
18    above date, before Carrie A. Campbell,
19    Registered Diplomate Reporter and Certified
20    Realtime Reporter.
21
22
23                      - - -
            GOLKOW LITIGATION SERVICES
24      877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A P P E A R A N C E S :
 2
        LANIER LAW FIRM, P.C.
 3      BY:  W. MARK LANIER
             wml@lanierlawfirm.com
 4           RACHEL LANIER
             rachel.lanier@lanierlawfirm.com
 5           ROBERT LEONE
             robert.leone@lanierlawfirm.com
 6      10940 W. Sam Houston Parkway N., Suite 100
        Houston, Texas 77064
 7      (713) 659-5200
 8
 9      GREENE, KETCHUM, FARRELL, BAILEY
        & TWEEL LLP
10      BY:  PAUL T. FARRELL, JR.
             paul@greeneketchum.com
11      419 Eleventh Street
        Huntington, West Virginia 25701
12      (314) 525-9115
13
14      MCHUGH FULLER LAW GROUP
        BY:  MICHAEL J. FULLER, JR.
15           mike@mchughfuller.com
             AJ ELKINS
16           aj@mchughfuller.com
             (VIA REALTIME STREAM)
17      97 Elias Whiddon Road
        Hattiesburg, Mississippi 39402
18      (601) 261-2220
19
20      SIMMONS HANLY CONROY LLC
        BY:  LAURA L. FITZPATRICK
21           lfitzpatrick@simmonsfirm.com
             SANFORD SMOKLER
22           ssmokler@simmonsfirm.com
             (VIA REALTIME STREAM)
23      112 Madison Avenue
        New York, New York  10016-7416
24      (212) 784-6400
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        BARON & BUDD, P.C.
          BY:  MARK PIFKO
 2             mpifko@baronbudd.com
               JAY LICHTER
 3             jlichter@baronbudd.com
               (VIA REALTIME STREAM)
 4             STERLING CLUFF
               scluff@baronbudd.com
 5             (VIA REALTIME STREAM)
          15910 Ventura Boulevard, Suite 1600
 6        Encino, California 91436
          (818) 839-2333
 7
 8

          SPANGENBERG SHIBLEY & LIBER LLP
 9        BY:  PETER WEINBERGER
               pweinberger@spanglaw.com
10             (VIA TELECONFERENCE)
          1001 Lakeside Avenue East, Suite 1700
11        Cleveland, Ohio 44114
          (216) 600-0114
12
13

          MOTLEY RICE LLC
14        BY:  LINDA SINGER
               lsinger@motleyrice.com
15             (VIA REALTIME STREAM)
               AMANDA UNTERREINER
16             aunterreiner@motleyrice.com
               (VIA REALTIME STREAM)
17        401 Ninth Street NW, Suite 1001
          Washington, DC 20004
18        (202) 232-5504
19
20        LEVIN PAPANTONIO THOMAS MITCHELL
          RAFFERTY PROCTOR, P.A.
21        BY:  PAGE POERSCHKE
               ppoerschke@levinlaw.com
22             (VIA REALTIME STREAM)
          316 South Baylen Street
23        Pensacola, Florida 32502
          (850) 435-7000
24        Counsel for Plaintiffs
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        NAPOLI SHKOLNIK, PLLC
          BY:   HUNTER SHKOLNIK
 2              hunter@napolilaw.com
                (VIA TELECONFERENCE)
 3              SHAYNA SACKS
                ssacks@napolilaw.com
 4              (VIA REALTIME STREAM)
                JOSEPH CIACCIO
 5              JCiaccio@napolilaw.com
                (VIA REALTIME STREAM)
 6        360 Lexington Avenue, 11th Floor
          New York, New York 10017
 7        (212) 397-1000
          Counsel for Cuyahoga County
 8
 9
          US DEPARTMENT OF JUSTICE
10        BY:   JAMES R. BENNETT, II
                james.bennett4@usdoj.gov
11        United States Courthouse
          801 West Superior Avenue, Suite 400
12        Cleveland, Ohio 44113
          (216) 622-3988
13
          and
14
          US DEPARTMENT OF JUSTICE
15        BY:   MARIAMA C. SPEARS
                mariama.c.spears@usdoj.gov
16        8701 Morrisette Drive
          Springfield, Virginia 22152
17        (202) 598-6204
          Representing the US DOJ and the Witness
18
19
          REED SMITH LLP
20        BY:   SHANNON MCCLURE
                smcclure@reedsmith.com
21              ABIGAIL PIERCE
                abigail.pierce@reedsmith.com
22        1717 Arch Street, Suite 3100
          Philadelphia, Pennsylvania 19103
23        (215) 851-8100
          Counsel for AmerisourceBergen
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        WILLIAMS & CONNOLLY LLP
          BY:  JENNIFER G. WICHT
 2             jwicht@wc.com
               BRAD MASTERS
 3             bmasters@wc.com
          725 Twelfth Street, N.W.
 4        Washington, DC 20005
          (202) 434-5331
 5        Counsel for Cardinal Health, Inc.
 6
 7        COVINGTON & BURLING LLP
          BY:  CHRISTOPHER K. EPPICH
 8             ceppich@cov.com
          1999 Avenue of the Stars
 9        Los Angeles, California 90067
          (424) 332-4764
10
          and
11
          BY:  MEGHAN E. MONAGHAN
12             mmonaghan@cov.com
          850 Tenth Street, NW
13        Washington, DC 20001-4956
          (202) 662-6000
14        Counsel for McKesson Corporation
15
16        JONES DAY
          BY:  NEAL J. STEPHENS
17             nstephens@jonesday.com
               PATRICK BEISELL
18             pbeisell@jonesday.com
               (VIA TELECONFERENCE)
19        1755 Embarcadero Road
          Palo Alto, California 94303
20        (650) 739-3939
          Counsel for Walmart
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        KIRKLAND & ELLIS, LLP
          BY:  JENNIFER LEVY
 2             jennifer.levy@kirkland.com
               CATIE VENTURA
 3             catie.ventura@kirkland.com
          1301 Pennsylvania Avenue, N.W.
 4        Washington, DC 20004
          (202) 879-5000
 5        Counsel for Allergan Finance, LLC
 6
 7

          BARTLIT BECK LLP
 8        BY:  KATE SWIFT
               kswift@bartlit-beck.com
 9        54 West Hubbard Street, Suite 300
          Chicago, Illinois 60654
10        (312) 494-4400
          Counsel for Walgreens
11
12

          DECHERT LLP
13        BY:  ERIK W. SNAPP
               erik.snapp@dechert.com
14        35 West Wacker Drive, Suite 3400
          Chicago, Illinois  60601
15        (312) 646-5800
          Counsel for Purdue Pharma
16
17

          ROPES & GRAY, LLP
18        BY:  WILLIAM DAVISON
               william.davison@ropesgray.com
19        800 Boylston Street
          Boston, Massachusetts 02199-3600
20        (617) 951-7000
          Counsel for Mallinckrodt & SpecGx
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      BARNES & THORNBURG LLP
        BY:  WILLIAM A. HAHN
 2           william.hahn@btlaw.com
        11 South Meridian Street
 3      Indianapolis, Indiana  46204-3535
        (317) 236-1313
 4      Counsel for HD Smith
 5
 6      MORGAN, LEWIS & BOCKIUS LLP
        BY:  JOHN P. LAVELLE, JR.
 7           john.lavelle@morganlewis.com
        1701 Market Street
 8      Philadelphia, Pennsylvania 19103-2921
        (215) 963-5000
 9      Counsel for Rite Aid
10
11      LOCKE LORD LLP
        BY:  BRANDAN MONTMINY
12           brandan.montminy@lockelord.com
        2200 Ross Avenue, Suite 2800
13      Dallas, Texas 75201
        (214) 740-8445
14      Counsel for Henry Schein, Inc., and
        Henry Schein Medical Systems, Inc.
15
16
        ZUCKERMAN SPAEDER LLP
17      BY:  ANTHONY M. RUIZ
             aruiz@zuckerman.com
18           (VIA TELECONFERENCE AND STREAM)
        1800 M Street NW, Suite 1000
19      Washington, DC  20036-5807
        (202) 778-1800
20      Counsel for CVS Indiana, LLC, and
        CVS RX Services, Inc.
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      O'MELVENY & MYERS LLP
        BY:  RYAN SYNDER
 2           rsnyder@omm.com
             (VIA TELECONFERENCE AND STREAM)
 3           AMY LUCAS
             alucas@omm.com
 4           (VIA REALTIME STREAM)
             SETH BAGLIN
 5           sbaglin@omm.com
             (VIA REALTIME STREAM)
 6      1999 Avenue of the Stars, 8th Floor
        Los Angeles, California 90067
 7      (213) 430-6326
 8      and
 9      TUCKER ELLIS LLP
        BY:  JEFFREY C. SINDELAR, JR.
10           jeffrey.sindelar@tuckerellis.com
             (VIA TELECONFERENCE)
11      950 Main Avenue, Suite 1100
        Cleveland, Ohio  44113-7213
12      (216) 696-3697
        Counsel for Janssen and Johnson &
13      Johnson
14
15      MORGAN, LEWIS & BOCKIUS LLP
        BY:  MAUREEN K. BARBER
16           valerie.toth@morganlewis.com
             (VIA TELECONFERENCE AND STREAM)
17      One Oxford Centre, 32nd Floor
        Pittsburgh, Pennsylvania 15219-6401
18      (412) 560-3300
        Counsel for Teva Pharmaceuticals
19      USA, Inc., Cephalon, Inc., Watson
        Laboratories, Inc., Actavis LLC,
20      Actavis Pharma, Inc., f/k/a Watson
        Pharma, Inc.
21
22
23
24
25
```

```
 1        MARCUS & SHAPIRA LLP
          BY:  JOSHUA A. KOBRIN
 2             kobrin@Marcus-Shapira.com
               (VIA TELECONFERENCE AND STREAM)
 3        301 Grant Street, 35th Floor
          Pittsburgh, Pennsylvania 15219-6401
 4        (412) 338-4690
          Counsel for HBC
 5

 6

          FOX ROTHSCHILD LLP
 7        BY:  ZACHARY MARTIN
               Zmartin@foxrothschild.com
 8             (VIA TELECONFERENCE)
          2700 Kelly Road, Suite 300
 9        Warrington, Pennsylvania  18976-3624
          (215) 345-7500
10        Counsel for Prescription Supply, Inc.

11

12        CAVITCH FAMILO & DURKIN, CO., L.P.A.
          BY:  ERIC J. WEISS
13             eweiss@cavitch.com
               (VIA TELECONFERENCE)
14        1300 East 9th Street
          Cleveland, Ohio  44114
15        (216) 621-7860
          Counsel for Discount Drug Mart

16

17

          FOLEY & LARDNER LLP
18        BY:  KATY K. KOSKI
               kkoski@foley.com
19             (VIA REALTIME STREAM)
          111 Huntington Avenue, Suite 2500
20        Boston, Massachusetts 02199-7610
          (617) 342-4000
21        Counsel for Anda

22

23

24

25
```

```
 1        BAILEY WYANT PLLC
          BY:  JUSTIN TAYLOR
 2             jtaylor@baileywyant.com
               (VIA REALTIME STREAM)
 3        500 Virginia Street East, Suite 600
          Charleston, West Virginia 25301
 4        (304) 345-4222
          Counsel for West Virginia Board of
 5        Pharmacy
 6
 7   ALSO PRESENT:
 8        SPECIAL MASTER DAVID R. COHEN
          david@specialmaster.law
 9        24400 Chagrin Boulevard, Suite 300
          Cleveland, Ohio 44122
10        (216) 831-0001
11
          Juan Wilson, Lanier Law Firm
12        Georgia Macy, Lanier Law Firm
13
14   VIDEOGRAPHER:
          DAN LAWLOR,
15        Golkow Litigation Services
16                    - - -
17
18
19
20
21
22
23
24
25
```

```
 1                      INDEX
 2                                        PAGE
 3    APPEARANCES.................................. 312
 4    EXAMINATIONS
 5      BY MR. LANIER............................. 324
 6      BY MS. MCCLURE............................ 509
 7      BY MR. EPPICH............................. 522
 8      BY MS. FITZPATRICK........................ 537
 9
10                    EXHIBITS
11      No.     Description                       Page
```

| No. | Description | Page |
|---|---|---|
| Mapes 4A | July 23, 1998 US Department of Justice, DEA letter to Chris Zimmerman, ABDCMDL00269347 - ABDCMDL00269357 | 454 |
| Mapes 20 | ABDC Privilege Log - Alaska Subpoena, ABDCMDL00037421 - ABDCMDL00037422 | 332 |
| Mapes 21 | "The Drug Industry's Triumph Over the DEA," Higham and Bernstein | 345 |
| Mapes 22 | E-mail(s). His-MDL-00064822 - his-MDL-00064825 | 355 |
| Mapes 23 | E-mail(s), His-MDL-00650515 - his-MDL-00650522 | 358 |
| Mapes 24 | Mike Mapes LinkedIn profile | 360 |

```
12    Mapes 4A   July 23, 1998 US Department of   454
                 Justice, DEA letter to Chris
13               Zimmerman,
                 ABDCMDL00269347 -
14               ABDCMDL00269357
15    Mapes 20   ABDC Privilege Log - Alaska     332
                 Subpoena,
16               ABDCMDL00037421 -
                 ABDCMDL00037422
17
      Mapes 21   "The Drug Industry's Triumph    345
18               Over the DEA,"
                 Higham and Bernstein
19
      Mapes 22   E-mail(s).                      355
20               His-MDL-00064822 -
                 his-MDL-00064825
21
      Mapes 23   E-mail(s),                      358
22               His-MDL-00650515 -
                 his-MDL-00650522
23
      Mapes 24   Mike Mapes LinkedIn profile     360
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

| 1 | Mapes 25 | Organizational chart,<br>ABDCMDL00046783 - | 365 |
| 2 | | ABDCMDL00046788 | |
| 3 | Mapes 26 | E-mail(s),<br>ABDCMDL00315883 - | 395 |
| 4 | | ABDCMDL00315884 | |
| 5 | Mapes 27 | Conference call with Mr. John<br>Gilbert, December 6, 2005 | 401 |
| 6 | | memorandum,<br>US-DEA-00000369 - | |
| 7 | | US-DEA-00000370 | |
| 8 | Mapes 28 | January 18, 2006 letter from<br>McKesson to Joseph T. | 407 |
| 9 | | Rannazzisi,<br>US-DEA-00000503 - | |
| 10 | | US-DEA-00000506 | |
| 11 | Mapes 29 | Settlement and Release Agreement<br>and Administrative Memorandum of | 408 |
| 12 | | Agreement,<br>MCKMDL00337001 - MCKMDL00337024 | |
| 13 | | | |
| | Mapes 30 | Internet Pharmacy Data meeting | 412 |
| 14 | | with AmerisourceBergen DEA<br>Headquarters August 10, 2005 | |
| 15 | | | |
| | Mapes 31 | Suspicious Order Reporting | 456 |
| 16 | | Policy and Procedure,<br>ABDCMDL00478320 - | |
| 17 | | ABDCMDL00478322 | |
| 18 | Mapes 32 | Mark Lanier handwritten<br>demonstratives | 509 |
| 19 | | | |
| | Mapes 33 | Deposition of Michael Mapes, | 517 |
| 20 | | September 16, 2016,<br>ABDCMDL00046855 - | |
| 21 | | ABDCMDL00046856; ABDCMDL00046909<br>- ABDCMDL000466910 | |
| 22 | | | |
| | Mapes 34 | 1:17-md-0804-DAP, list of | 522 |
| 23 | | attorneys | |
| 24 | Mapes 35 | Handwritten demonstratives by<br>plaintiffs further marked up by | 537 |
| 25 | | defendants | |

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Mapes 36    Irpino Law Firm Memorandum, from    541
                  Pearl Robertson to File, Date
 2                July 11, 2019
 3    Mapes 37    Excerpt from Volume II of the       543
                  deposition of Thomas Prevoznik,
 4                April 18, 2019
 5    Mapes 38    Appendix B,                         553
                  MCKMDL00355349 - MCKMDL00355415
 6
          (Exhibits attached to the deposition.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    VIDEOGRAPHER:  We are now on

 2           the record.  My name is Dan Lawlor.

 3           I'm the videographer with Golkow

 4           Litigation Services.

 5                    Today's date is July 12, 2019.

 6           The time is 8:01 a.m.

 7                    This video deposition is being

 8           held in Colorado Springs, Colorado, in

 9           the matter of National Prescription

10           Opiate Litigation, MDL Number 2804.

11                    This is the continuing

12           deposition of Michael Mapes.  The

13           court reporter is Carrie Campbell.

14                    And, Mr. Mapes, I remind you

15           that you're still under oath from

16           yesterday, and please proceed.

17                         EXAMINATION

18     QUESTIONS BY MR. LANIER:

19           Q.    Sir, you are Mr. Mapes?

20           A.    Yes.

21           Q.    You gave a deposition yesterday

22     with a bunch of lawyers for the opioid

23     companies asking you questions, right?

24                    MS. MCCLURE:  Form.

25                    THE WITNESS:  Right.
```

1    QUESTIONS BY MR. LANIER:

2         Q.     You had the distributors asking

3    you questions; you had some of the pharmacies

4    asking you questions, correct?

5         A.     Yes.

6         Q.     Through their lawyers?

7         A.     Right.

8         Q.     Okay.  You understand I

9    represent the plaintiffs in this case, the

10   counties, the folks that have brought the

11   lawsuit.

12              You understand that?

13        A.     Yes.

14        Q.     All right.  One of the things I

15   found interesting yesterday is one of the

16   lawyers, I believe it was the young lady for

17   the AmerisourceBergen group company -- let's

18   find where we've got -- there it is -- made a

19   big point of saying to you on the record for

20   the jury "we've never met before."

21              MS. MCCLURE:  Form.

22   QUESTIONS BY MR. LANIER:

23        Q.     Do you remember that?

24        A.     Yes.

25        Q.     And you, "Oh, no, I've never

Highly Confidential - Subject to Further Confidentiality Review

```
 1    met you."

 2                    Remember?

 3         A.     Well, not those exact words,

 4    but that -- yes.

 5         Q.     And y'all went on and on about

 6    two meetings that you had with plaintiffs'

 7    lawyers, oh, a year or so ago where you never

 8    even could remember the names of the lawyers

 9    there or the faces, right?

10                    MS. MCCLURE:  Objection.

11                    MR. EPPICH:  Objection.

12          Misstates testimony.

13                    THE WITNESS:  Correct, I didn't

14          remember the names of the attorneys

15          that were there.

16    QUESTIONS BY MR LANIER:

17         Q.     Right.

18                    And remember they were -- you

19    were asked over and over, could it be any

20    lawyers in this room?  You know, we're in a

21    room with, what, more lawyers than people --

22    I mean, you've got 20-plus lawyers in this

23    room, don't you?

24                    MS. MCCLURE:  Objection to

25          form.  Compound.  Misstates the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            record.
 2                    MR. EPPICH:  Objection.
 3            Characterization.
 4     QUESTIONS BY MR. LANIER:
 5            Q.    I mean, just listen to how many
 6     of them are objecting.
 7                    You've got a bunch of them in
 8     here, don't you?
 9            A.    Yes.
10            Q.    And not one lawyer do you
11     recognize from that meeting?
12            A.    That's correct.
13            Q.    And not one name do you
14     remember from that meeting?
15                    MS. MCCLURE:  Form.
16                    THE WITNESS:  I remember a
17            couple of names at the meeting now,
18            but I didn't remember those yesterday.
19     QUESTIONS BY MR. LANIER:
20            Q.    Did you go back and look at
21     some notes or something?
22            A.    Yes, I looked at my calendar.
23            Q.    Oh, okay.
24                    What were the names that you
25     went back and did homework on overnight?
```

```
 1              A.     I saw one was Richard Fields.

 2              Q.     I've never heard of him.

 3                     Who is he?

 4              A.     He's an attorney representing

 5      some plaintiffs.

 6              Q.     Who?

 7              A.     I'm not sure.

 8              Q.     Me either.

 9                     Who else?

10              A.     See, I don't remember the name

11      of the other one.

12              Q.     Okay.  But you understand

13      you're here to tell the truth?

14              A.     Yes.

15              Q.     And you understand that's to be

16      the whole truth?

17              A.     Yes.

18              Q.     And you're not supposed to

19      shade things or make things look one way just

20      because of relationships or things like that,

21      right?

22              A.     Correct.

23              Q.     And what struck me as odd is in

24      all of the talk that the Amerisource lawyer

25      did with you and the other lawyers, and we've
```

1    never met before, blah-blah-blah, you never

2    told the jury you sure had met her client,

3    AmerisourceBergen, on many times, hadn't you?

4                    MS. MCCLURE:  Objection to

5            form.  Misstates the witness'

6            testimony.  Mischaracterizes the

7            record.

8                    THE WITNESS:  Yeah, I did

9            mention, I'm not sure it was to her,

10           that I did consulting for

11           AmerisourceBergen.

12   QUESTIONS BY MR. LANIER:

13           Q.    Yeah, but by "did consulting,"

14   that's one thing.

15                  But in terms of having meetings

16   and all the rest of this stuff, you met with

17   AmerisourceBergen a whole lot, didn't you?

18                  MS. MCCLURE:  Form.

19                  THE WITNESS:  With anyone from

20           the company or --

21   QUESTIONS BY MR. LANIER:

22           Q.    Yes, sir.

23           A.    And are we talking about during

24   my time at DEA or post-DEA?

25           Q.    I'm talking about post-DEA.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes, because I was working with

2    them, consulting with them.

3    Q.    Well, you weren't just working

4    with them, consulting with them.  You

5    understand they've got you on their

6    organizational charts?

7    A.    Okay.

8    Q.    You understand that they had

9    you doing confidential work for them that

10   they don't want anybody to know about?

11        MS. MCCLURE:  Objection to

12        form.

13        THE WITNESS:  Looking at things

14        for them, yes.

15   QUESTIONS BY MR. LANIER:

16   Q.    So you met AmerisourceBergen,

17   her client, the lawyer's client, even though

18   the lawyer made a big show out of the fact

19   she'd personally not met you, true?

20        MS. MCCLURE:  Form.

21        THE WITNESS:  Yes, I've met

22        with AmerisourceBergen.

23   QUESTIONS BY MR. LANIER:

24   Q.    And you do privileged work for

25   AmerisourceBergen, don't you, confidential

```
 1    work?

 2            A.      I did.

 3            Q.      I mean, we've got -- do you

 4    know what a privilege log is?

 5            A.      Yes.

 6            Q.      A privilege log is where

 7    lawyers don't want to give up documents in

 8    litigation --

 9                    MS. MCCLURE:  Objection to

10            form.

11    QUESTIONS BY MR. LANIER:

12            Q.      -- so instead of --

13                    MR. LANIER:  Can I get the

14            question finished, please?

15                    MS. MCCLURE:  I thought you

16            were finished.

17                    MR. LANIER:  Oh, no, there

18            wasn't a question there.

19    QUESTIONS BY MR. LANIER:

20            Q.      A privilege log is when lawyers

21    don't want to give up documents during

22    litigation because they believe that they're

23    privileged for some reason, and so they --

24                    MS. MCCLURE:  Objection to the

25            narrative.
```

```
1                 MR. LANIER:  Can I finish

2         before you object, please?  Otherwise

3         it makes it really hard to cut a video

4         to play.

5                 Special Master, I'd ask that I

6         be allowed to finish my question

7         before the objection.

8                 MS. MCCLURE:  Special Master,

9         it wasn't a question.  I --

10                SPECIAL MASTER COHEN:  Will you

11        just wait for the objection to be

12        posed until the question is asked.

13        You'll still have time to lodge it.

14   QUESTIONS BY MR. LANIER:

15        Q.    You understand that lawyers on

16   behalf of their clients will produce

17   privilege logs when they believe that there

18   are documents that they do not want to hand

19   out because those documents have a privilege

20   or some reason that they may have.

21                Do you understand about that?

22                MS. MCCLURE:  Objection to

23        form.

24                THE WITNESS:  Yes.

25                (Mapes Exhibit 20 marked for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              identification.)

 2      QUESTIONS BY MR. LANIER:

 3          Q.     I'm going to hand you a

 4      document we're going to mark as Exhibit

 5      Number 20.  And this is just one sample, but

 6      you'll look at this, and this is a privilege

 7      log by ABDC.

 8                 Do you know what that

 9      abbreviation stands for?

10                 MR. BENNETT:  Counsel, do you

11          have a copy for me?

12                 MR. LANIER:  Yes.

13      QUESTIONS BY MR. LANIER:

14          Q.     Do you know what that

15      abbreviation stands for?

16          A.     Yes, I do.

17          Q.     What does that stand for?

18          A.     AmerisourceBergen Drug Company.

19          Q.     That's the client of the young

20      lady that was asking you the questions saying

21      over and over "we've never met before,"

22      right?

23                 MS. MCCLURE:  Objection to

24          form.

25                 THE WITNESS:  Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. LANIER:

 2         Q.    And so that company produces

 3    this privilege log, and they've got a

 4    document down here, just one example, but

 5    it's the first privileged document on the log

 6    that dates from December of 2009, Michael

 7    Mapes being the author of the document.

 8               Do you see that?

 9         A.    I do.

10         Q.    And it's evidently under the

11    description a report that you prepared --

12    thank you.

13               It is a report you prepared at

14    the direction of a lawyer, not the head

15    lawyer, just a vice president and associate

16    general counsel.

17               Do you see that?

18         A.    I do.

19         Q.    Providing information to assist

20    with rendering of legal advice on their order

21    monitoring program review.

22               Do you see that?

23         A.    I do.

24         Q.    So when I say you did

25    privileged work for them, even though the
```

1    lawyer had you tell the jury that you'd never

2    met her before, the truth of the matter is

3    you've been working with their lawyers,

4    haven't you?

5                    MS. MCCLURE:  Form.

6                    THE WITNESS:  Yes.

7    QUESTIONS BY MR. LANIER:

8         Q.     So you may not have met that

9    lawyer for AmerisourceBergen, but you were

10   working for other lawyers, weren't you?

11        A.     Yes.

12        Q.     And that's all part of what you

13   did with the company as their man helping

14   them with the diversion control program,

15   right?

16                    MS. MCCLURE:  Form.

17                    THE WITNESS:  That's correct.

18   QUESTIONS BY MR. LANIER:

19        Q.     Well, we'll get into that in a

20   little bit, but I want to start out with a

21   roadmap and show you what I plan on asking

22   you today.

23                    Okay?

24        A.     Okay.

25        Q.     I call your roadmap -- that's

1    you, right there, Michael Mapes, right?

2        A.    Yes.

3        Q.    Tried to get a good picture.

4              You okay with that picture?

5        A.    It is what it is.

6        Q.    Oh, it's not bad.

7              How old do you think that

8    picture is?

9        A.    Three years maybe.

10       Q.    Okay.  You shaved for that

11   picture.  You didn't shave for the jury

12   today, did you?

13       A.    I did not.

14       Q.    That's all right.

15             U-turn road.

16             Your career has taken a lot of

17   twists and turns, hasn't it?

18             MS. MCCLURE:  Form.

19             THE WITNESS:  In what regard?

20   QUESTIONS BY MR. LANIER:

21       Q.    Well, I mean, you're all over

22   the map.  You've done work for the

23   government.  You've done work for industry,

24   lots of different parts of industry.  You've

25   got companies that you've kind of helped

```
 1    start and help get off the ground.  You've

 2    got -- you claim expertise in a lot of

 3    different areas, right?

 4              MS. MCCLURE:  Form.  Compound.

 5         Characterization.

 6              THE WITNESS:  I have experience

 7         in a lot of areas, yes.

 8    QUESTIONS BY MR. LANIER:

 9         Q.    And so here's what I'd like to

10    do.  I'd like to look at this road, and I'd

11    like to consider your personal background

12    first.  We'll make a stop there.

13              Then we're going to make a stop

14    at your time with the DEA, and then we're

15    going to make a stop at your time doing work

16    for industry.

17              And let's see if maybe your

18    testimony kind of rotates around based upon

19    where you are and who you're working for.

20              Okay?

21         A.    Okay.

22              MR. BENNETT:  Objection.

23    QUESTIONS BY MR. LANIER:

24         Q.    Now, in that regard, the first

25    stop we're going to make is personal
```

1    background.  And I'm going to keep a sheet of

2    your personal background, and we're going to

3    mark these documents that I'm showing to the

4    jury as an exhibit so that both sides have

5    them and we've got the benefit of them as a

6    demonstrative exhibit for the jury.

7              Your personal background, you

8    gave us a lot of it yesterday, but what I'd

9    like to do is sort of go in and look at you

10   from another angle.

11             Are you familiar with the

12   concern that has been expressed about a

13   revolving door between government and

14   industry?

15        A.    Yes.

16        Q.    And a revolving door -- you

17   know, most doors are just a door that's, you

18   know, this, with a doorknob.  But a revolving

19   door is one of those doors that tends to

20   revolve around, such that you've got an

21   ability to go in one way and out the other.

22             Do you follow me?

23        A.    Yes.

24        Q.    And the concern has been one

25   because there seem to be people who work for

Highly Confidential - Subject to Further Confidentiality Review

1     the DEA and spend their time making

2     connections, learning the ins and outs,

3     learning the niceties of how things work, but

4     then they'll retire or take their pension

5     from the DEA and go to work for industry, the

6     very companies that they were supposed to be

7     looking over, right?

8               MS. MCCLURE:  Form.

9               MR. EPPICH:  Objection.

10         Argumentative.

11              THE WITNESS:  And could you

12         restate the question again?

13    QUESTIONS BY MR. LANIER:

14         Q.    Sure.

15              The reason the revolving door

16    is a concern is because there seems to be a

17    pattern of folks working for the DEA who then

18    go to work for the very industries they were

19    supposed to be overseeing, correct?

20              MS. MCCLURE:  Form.

21         Argumentative.

22              THE WITNESS:  Yes, I went to

23         work with the industries after

24         retiring from DEA.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1     QUESTIONS BY MR. LANIER:

 2          Q.     Yeah.  You worked at DEA, and

 3     they have a mandatory retirement, don't they?

 4               MS. MCCLURE:  Form.

 5               THE WITNESS:  Not in the

 6          diversion control program.

 7     QUESTIONS BY MR. LANIER:

 8          Q.     So you did not have a mandatory

 9     retirement; you could have kept working

10     there?

11          A.     Yes.

12          Q.     But you chose to retire?

13          A.     Yes, I did.

14          Q.     You chose to retire at what

15     age, 65?  70?

16          A.     55.

17          Q.     Oh, you retired at 55.

18               Did you get a pension?

19          A.     Yes.

20          Q.     What percentage of your pay was

21     your pension?

22          A.     I don't really recall.

23          Q.     How much were you making a year

24     when you retired?

25          A.     I'm not certain of that number.
```

```
1            Q.      Well, you got to have a general

2      idea.  I mean, you're remembering

3      conversations yesterday that happened

4      12 years ago, 14 years ago.  Surely you've

5      got a general idea how much money you used to

6      make.

7                    MS. MCCLURE:  Form.

8           Argumentative.

9                    THE WITNESS:  Generally 120,

10          125,000.

11     QUESTIONS BY MR. LANIER:

12           Q.      All right.  So making something

13     in the range -- I'll do that squiggle mark --

14     of 120 to 125,000 per year.

15                   Now, when you retired -- that

16     had been your salary.  When you retired, you

17     got a percentage of that as your retirement

18     pay, correct?

19           A.      That's correct.

20           Q.      And you don't know even roughly

21     what percentage?

22                   MS. MCCLURE:  Form.  Asked and

23          answered.

24                   THE WITNESS:  Roughly 55 or

25          60 percent.
```

```
 1    QUESTIONS BY MR. LANIER:

 2         Q.    All right.  So you would get

 3    roughly -- and that's still today, I assume,

 4    right?

 5         A.    Yes.

 6               MS. SWIFT:  We've got the

 7    realtime --

 8               MR. LANIER:  Y'all want to go

 9         off the record?  Okay.

10               VIDEOGRAPHER:  We're going off

11         record.  The time is 8:17.

12          (Off the record at 8:17 a.m.)

13               VIDEOGRAPHER:  We're going back

14         on record.  Beginning of Media File 2.

15         The time is 8:21.

16    QUESTIONS BY MR. LANIER:

17         Q.    Before the technical glitch,

18    you and I had made clear that you were

19    drawing about half of your salary now that

20    you're in retirement, maybe a little more,

21    maybe 60 percent, so somewhere around $75,000

22    a year?

23         A.    That's correct.

24         Q.    But while you retired from the

25    DEA, so the jury's clear, you just started
```

```
 1    going to work for industry, didn't you?

 2                MS. MCCLURE:  Form.

 3                THE WITNESS:  Yes, I did work

 4        for industry.

 5    QUESTIONS BY MR. LANIER:

 6        Q.    In fact, there's an expression

 7    that y'all use; you were hired up --

 8                MS. MCCLURE:  Form.

 9    QUESTIONS BY MR. LANIER:

10        Q.    -- by industry, weren't you?

11                MS. MCCLURE:  Foundation.

12                THE WITNESS:  I haven't heard

13        that expression.

14    QUESTIONS BY MR LANIER:

15        Q.    You've never heard the

16    expression "hired up"?

17        A.    No, I haven't.

18        Q.    Okay.

19                MS. MCCLURE:  Mr. Lanier,

20        consistent with the practice during

21        the Rannazzisi deposition, I do note

22        that you are writing information on

23        the sheet of paper you have in front

24        of me in advance of asking the witness

25        the question and in advance of the
```

```
 1          witness confirming that yes or no he's

 2          familiar with the concept of "hired

 3          up."

 4              So I would request, again, that

 5          you refrain from writing information

 6          on the sheet which suggests that it

 7          is, in fact, information obtained from

 8          Mr. Mapes until Mr. Mapes has, in

 9          fact, provided you with that

10          information.

11              MR. LANIER:  I'm allowed --

12          he's an adverse witness.  I'm allowed

13          to lead him, so I'm allowed to write

14          questions that may be leading in that

15          way.

16              I'm also allowed to write any

17          note I want to in terms of "look at

18          this, please, and tell me if you agree

19          with that statement."

20              You show him a document; I show

21          him a demonstrative.  Nobody, no

22          lawyer in any trial I've ever been in,

23          has to ask questions before they use a

24          demonstrative or show a demonstrative

25          to a witness, and this is no
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          different.
 2                    MS. MCCLURE:  I continue to
 3          maintain my objection.
 4                    MR. LANIER:  Okay.
 5     QUESTIONS BY MR. LANIER:
 6          Q.    So you've not heard that
 7     expression "hired up" by industry?
 8          A.    No, I have not.
 9          Q.    All right.  Let's see if we can
10     find some of where it may come from.
11                    You read the New York -- I mean
12     the Washington Post ever?
13          A.    I have in the past.
14          Q.    Are you familiar with the
15     article "The Drug Industry's Triumph Over the
16     DEA"?  I'm going to mark it as Exhibit
17     Number 21.
18                    (Mapes Exhibit 21 marked for
19          identification.)
20     QUESTIONS BY MR. LANIER:
21          Q.    Put it up here for the jury to
22     see.
23                    Are you familiar with this
24     article, sir?
25                    MS. MCCLURE:  Mr. Lanier, while
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Mr. Mapes is taking the opportunity to
 2          review the document that you've put in
 3          front of you him, I would also note
 4          that Mr. Mapes is not an adverse
 5          witness at this point.  You did
 6          cross-notice the deposition.
 7                MR. LANIER:  You will find that
 8          I often notice the deposition of
 9          adverse witnesses.  A cross-notice is
10          not what defines him as an adverse
11          witness.
12                MS. MCCLURE:  You have not
13          established adversity; nevertheless, I
14          continue to maintain my objection to
15          the extent that you write information
16          on a sheet of paper and suggest for
17          the jury that it is --
18                MR. LANIER:  Timeout.
19                MS. MCCLURE:  -- in fact,
20          information that Mr. Mapes has
21          provided.
22                MR. LANIER:  May I suggest that
23          all objections except to form and
24          responsiveness have been reserved
25          under the rules, and that we're trying
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          to get out of this today in an

2          expedient manner and that I'm spending

3          more time talking to you on the record

4          and hearing you talk to me than I am

5          the witness.  And that's no way to get

6          this done.

7               And I'm under a limited time

8          perspective of what I can do, so I'd

9          ask you to adhere to the rules or I

10         will ask the special master to

11         intervene.

12              MS. MCCLURE:  I am adhering to

13         the rules, and I also note that we

14         were talking during the time Mr. Mapes

15         was taking the opportunity to review a

16         lengthy document that you have placed

17         before him.

18    QUESTIONS BY MR. LANIER:

19         Q.    Sir, are you familiar with this

20    document?

21         A.    I don't believe I've seen the

22    document itself before.  I've heard

23    discussions about it.

24         Q.    All right.  You've heard

25    discussions about this article that is
```

```
 1    subtitled "Amid a targeted lobbying effort,

 2    Congress weakened the DEA's ability to go

 3    after drug distributors even as opioid deaths

 4    continue to rise, a Washington Post and

 5    60 Minutes investigation finds."

 6              You're at least familiar with

 7    the fact this article's out there even if you

 8    haven't read it, fair?

 9         A.    Yes.

10         Q.    In fact, you were contacted by

11    60 Minutes but you chose not to speak to

12    them, true?

13              MS. MCCLURE:  Objection.

14         Foundation.  Leading.  Form.

15              THE WITNESS:  That's correct.

16    QUESTIONS BY MR. LANIER:

17         Q.    Now, in this article I direct

18    your attention to what is marked in the

19    corner as page 53.15.  It's a chart that I've

20    got on the overhead.

21              Do you find that chart?

22         A.    Yes.

23         Q.    It says, "At least 56 DEA and

24    justice officials went to work for the

25    pharmaceutical industry.  Pharmaceutical
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    companies and the law firms that represent

2    them hired at least 56 former officials since

3    2000."

4              And then you got all of these

5    yellow dots that show the people.

6              Do you see that?

7              MR. STEPHENS:  Object to form.

8              THE WITNESS:  I do.

9    QUESTIONS BY MR. LANIER:

10        Q.    You're one of these dots,

11   aren't you?

12             MR. STEPHENS:  Object to form.

13             MR. EPPICH:  Objection.

14        Foundation.  Calls for speculation.

15             THE WITNESS:  I don't know that

16        I am, because it's not -- there aren't

17        names with the majority of the dots.

18   QUESTIONS BY MR. LANIER:

19        Q.    Well, let's put it this way:

20   You are someone who was a DEA official who

21   went to work for the pharmaceutical industry

22   since 2000, aren't you?

23             MS. MCCLURE:  Form.

24        Foundation.

25             THE WITNESS:  Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      QUESTIONS BY MR. LANIER:

 2          Q.    You did that in 2007 or '8?

 3          A.    2008.

 4          Q.    So this row right here may not

 5      have a dot for you, but we at least know that

 6      Michael Mapes belongs in that column, fair?

 7                MS. MCCLURE:  Form.  Leading.

 8                MR. EPPICH:  Object to the

 9          demonstrative.  Misstates the

10          testimony.

11                THE WITNESS:  Yes.

12      QUESTIONS BY MR. LANIER:

13          Q.    All right.  Now, in this

14      regard, sir, this idea of a revolving door,

15      you being -- working governing industry and

16      then all of a sudden you going to work for

17      industry, you get paid by industry when they

18      hire you to do their work, don't you?

19                MS. MCCLURE:  Form.

20          Foundation.  Leading.

21                THE WITNESS:  Yes.

22      QUESTIONS BY MR. LANIER:

23          Q.    So in addition to the money

24      that you were getting in retirement from the

25      government, you start making money from
```

```
 1    industry, fair?

 2              MS. MCCLURE:  Form.

 3              THE WITNESS:  Yes.

 4    QUESTIONS BY MR. LANIER:

 5         Q.    And the money you've made from

 6    industry, is that based always on an hourly

 7    rate or was it ever on a project or as a

 8    salary?

 9         A.    A little of both.

10         Q.    All right.  So tell us -- you

11    know, American taxpayers are continuing to

12    pay you your retirement benefit while

13    industry is paying you to do work for them.

14    Tell us how industry is paying you.

15              MS. SWIFT:  Objection.

16         Leading.

17              MS. MCCLURE:  Objection.

18         Leading.  Form.

19    QUESTIONS BY MR. LANIER:

20         Q.    That is a bad question.  Let me

21    reask it.

22              Sir, how has industry been

23    paying you since 2008?

24              MS. MCCLURE:  Form.

25              THE WITNESS:  Mostly by the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        hour.
 2   QUESTIONS BY MR. LANIER:
 3        Q.    All right.  What's your hourly
 4   rate been?
 5             MS. MCCLURE:  Form.
 6             THE WITNESS:  It has changed.
 7        It started at $100 an hour, and the
 8        most recent sum at $300 an hour.
 9   QUESTIONS BY MR. LANIER:
10        Q.    If you were to work 40 hours a
11   week, which maybe you do more, maybe you do
12   less, but if you work 40 hours a week, full
13   time, for 50 weeks out of the year, take a
14   couple weeks vacation, that would be
15   2,000 hours a year.  2,000 hours a year, is
16   that somewhere between 200,000 and 600,000
17   per year you now make or could make doing
18   industry work in addition to your retirement
19   from DEA?
20             Did I do that right?
21             MS. MCCLURE:  Form.
22        Speculation.  And object to the
23        narrative and the testimony by the
24        plaintiffs' attorney.  Incomplete
25        hypothetical.
```

```
 1                    THE WITNESS:  I think you're

 2          correct if I worked 40 hours a week,

 3          50 weeks a year, but I don't.

 4     QUESTIONS BY MR. LANIER:

 5          Q.    Right.

 6                    Are you getting paid for your

 7     testimony here?

 8          A.    No.

 9          Q.    Okay.  Because I know you've

10     been hired by one of the companies in this

11     case right now, haven't you?

12                    MS. MCCLURE:  Form.  Misstates

13          the witness' testimony.

14                    THE WITNESS:  Yes.

15     QUESTIONS BY MR. LANIER:

16          Q.    Tell the jury who's hired you,

17     who you're working for right now, that was

18     asking you questions yesterday.

19                    MS. WICHT:  Object to form.

20                    THE WITNESS:  The Williams

21          Connolly firm.

22     QUESTIONS BY MR. LANIER:

23          Q.    And who do they represent, to

24     your knowledge?

25          A.    Cardinal Health.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.     Now, sir, we've got -- I went
2     on the Internet.
3               MR. LANIER:  Do I have copies
4        of this?
5               While they're getting that, let
6        me take a step back.
7     QUESTIONS BY MR LANIER:
8          Q.     You went out to these companies
9     you used to oversee.  You went out to these
10    companies and you actually solicited their
11    business, didn't you?
12              MS. MCCLURE:  Form.
13       Speculation.  Foundation.
14              THE WITNESS:  No, I didn't.
15    QUESTIONS BY MR. LANIER:
16         Q.     You didn't send letters to
17    these companies saying, "Hey, I'm out of the
18    door now.  I'm out of the DEA.  I'm ready to
19    work for you"?
20         A.     No, I did not.
21              MS. MCCLURE:  Form.
22    QUESTIONS BY MR. LANIER:
23         Q.     Now, see, I got, for example,
24    what looked to me like you asking Henry
25    Schein if they would like you to work for
```

```
 1    them.

 2              MS. MCCLURE:  Form.

 3         Foundation.  Leading.

 4    QUESTIONS BY MR. LANIER:

 5         Q.    Do you not remember that at

 6    all?

 7         A.    No, I don't.

 8              (Mapes Exhibit 22 marked for

 9         identification.)

10    QUESTIONS BY MR. LANIER:

11         Q.    I'm going to hand you a

12    document that we'll mark as Exhibit

13    Number 22.

14              There you go, sir.  Exhibit

15    Number 22 looks like an e-mail from an

16    MR Mapes.

17              Is that you?

18         A.    Yes, it is.

19         Q.    And it is, subject, consulting

20    proposal.

21              Do you see that?

22         A.    Yes.

23         Q.    You sent an e-mail to this

24    Michael DiBello where you said, "Attached is

25    a proposal for due diligence consulting for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     Henry Schein, Inc."

 2               Did I read that correctly?

 3     A.      Yes.

 4     Q.      Who is Henry Schein, Inc.?

 5     A.      They are a -- a distributor of

 6     pharmaceuticals.

 7     Q.      Yeah, they get opioids from the

 8     people who make them and get them to the

 9     people that sell them, right?

10     A.      Yes.

11     Q.      They are a distributor of

12     opioids, along with other drugs, I assume,

13     fair?

14     A.      Yes.

15               MR. HAHN:  Objection.  Form.

16     QUESTIONS BY MR. LANIER:

17     Q.      And you did a proposal for

18     consulting.

19               Do you see that?

20     A.      Yes, I do.

21     Q.      And consulting is what this

22     industry work you do is called.  You call

23     this consulting work, don't you?

24     A.      Yes.

25     Q.      And so what you did is back in
```

1    2011 is you sent an e-mail out with a

2    proposal --

3         A.    In re -- yes, I did, in

4    response to their request.

5         Q.    They asked you to pitch your

6    services to them?

7              MS. MCCLURE:  Form.

8              THE WITNESS:  Yes.

9    QUESTIONS BY MR. LANIER:

10        Q.    And then you pitched your

11   services to them?

12        A.    Yes.

13        Q.    Okay.  So you only pitch your

14   services if they come to you first and say,

15   "Would you pitch your services"?

16        A.    Yes.

17        Q.    And then you send them these

18   elaborate proposals for consulting --

19              MR. EPPICH:  Objection.

20   QUESTIONS BY MR. LANIER:

21        Q.    -- where you talk about what

22   you will do to provide them consulting

23   services related to their due diligence

24   investigations of their current or potential

25   customers.

Highly Confidential - Subject to Further Confidentiality Review

1              See that?

2              MS. MCCLURE:  Form.

3    QUESTIONS BY MR. LANIER:

4         Q.    You see that?

5         A.    Yes, I see that.

6         Q.    Now, that wasn't your first

7    correspondence with them.  You actually say

8    you didn't pitch yourself to them, but I want

9    to give you another document and see if it

10   changes your mind.

11             I'll mark this one as Exhibit

12   Number 23.

13             (Mapes Exhibit 23 marked for

14        identification.)

15   QUESTIONS BY MR. LANIER:

16        Q.    Do you have Exhibit Number 23

17   in front of you?

18        A.    Yes.

19        Q.    It's another e-mail, but it's

20   one that you sent out before this last

21   exhibit, correct?

22             The one we were just looking

23   at, Exhibit Number 22, was May the 10th.  Oh,

24   oh, oh.  No, this is afterwards.  This is

25   May 26th, isn't it?

Highly Confidential - Subject to Further Confidentiality Review

1                     See that date?

2          A.     Yes, I do.

3          Q.     May 26, you're sending an

4    e-mail where you attach a draft of the letter

5    concerning their SOM program.

6                     What does SOM stand for?

7          A.     Suspicious order monitoring.

8          Q.     That's what the government

9    requires these companies to do; they are to

10   monitor suspicious orders for drugs, right?

11                   MR. HAHN:  Objection.  Form.

12                   THE WITNESS:  Yes.

13   QUESTIONS BY MR. LANIER:

14         Q.     You said, "I have attached a

15   draft of the letter concerning that program

16   at Henry Schein.  I have some background in

17   the letter about the DEA requirements, as I

18   believe I'm a unique position to talk about

19   those requirements."

20                   See that?

21         A.     Yes.

22         Q.     Sir, you were certainly telling

23   folks that you were the man for the job,

24   weren't you?

25                   MS. MCCLURE:  Form.

```
 1                    THE WITNESS:  Yes.

 2                    (Mapes Exhibit 24 marked for

 3            identification.)

 4     QUESTIONS BY MR. LANIER:

 5            Q.     Now, I'll give you Exhibit

 6     Number 24.  This is a copy of your LinkedIn

 7     page.

 8                    LinkedIn is one of these

 9     Internet things where people can list their

10     information on a professional level; is that

11     right?

12                    MS. MCCLURE:  Form.

13                    THE WITNESS:  It is.

14     QUESTIONS BY MR. LANIER:

15            Q.     And so we've got you, Mike

16     Mapes.

17                    Did you do your own LinkedIn

18     page?

19            A.     I did.

20            Q.     iSAW Solutions, CEO.  That

21     means you're the boss of the bosses.  You are

22     the chief executive, right?

23            A.     There are no other bosses, but,

24     yes, there's only two people in the company.

25            Q.     You and who?
```

```
 1          A.      My brother.

 2          Q.      All right.  What's your

 3     brother's background and training?

 4          A.      He does accounting and tax

 5     preparation.

 6          Q.      Okay.  Because I was looking at

 7     this, and, I mean, you hold yourself out to

 8     be an expert in a lot of different areas,

 9     don't you?

10               MS. MCCLURE:  Form.

11     QUESTIONS BY MR. LANIER:

12          Q.      You see this page, "Industry

13     Knowledge"?

14               Do you see it?

15          A.      I see it.

16          Q.      I mean, criminal

17     investigations?  National security?

18     Litigation?  Firearms?

19               MS. MCCLURE:  Is there a

20          question?

21     QUESTIONS BY MR. LANIER:

22          Q.      Physical security, defense --

23               MS. MCCLURE:  Objection.

24     QUESTIONS BY MR. LANIER:

25          Q.      -- tactics, regulatory affairs,
```

```
 1    asset protection.

 2              Did I read those right?

 3        A.    You read those -- they're on

 4    the page, but those aren't things that I put

 5    in.

 6        Q.    Do you think they just

 7    automatically appear on your LinkedIn page?

 8              MR. EPPICH:  Objection.

 9        Argumentative.

10              MS. MCCLURE:  Objection.

11        Foundation.

12              THE WITNESS:  I don't know

13        where they came from.

14    QUESTIONS BY MR. LANIER:

15        Q.    Well, you're the one who did

16    your LinkedIn page.

17        A.    Yes.

18        Q.    Did you not know when you do

19    LinkedIn you have to check the areas where

20    you have expertise or industry knowledge so

21    that people know when to use you?

22              MS. MCCLURE:  Form.

23        Foundation.

24              THE WITNESS:  Well, I did not

25        check any of those areas.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. LANIER:
 2         Q.    Do you think that they're
 3    default areas that just show up on
 4    everybody's LinkedIn page?
 5              Because I promise you they're
 6    not on mine.
 7              MS. MCCLURE:  Object to the
 8         narrative.  Form.  Foundation.
 9         Speculation.  Argumentative.
10              THE WITNESS:  No.
11    QUESTIONS BY MR. LANIER:
12         Q.    I mean, you're going to consult
13    on the police?  You're going to consult on --
14    well, now regulatory requirements, that's --
15    you've already shown us that, right?
16              MS. MCCLURE:  Form.
17    QUESTIONS BY MR. LANIER:
18         Q.    Right?
19              Regulatory requirements, that
20    one may be legit.
21         A.    Yes.
22              MS. MCCLURE:  Form.
23    QUESTIONS BY MR. LANIER:
24         Q.    But come on, counterterrorism?
25         A.    I don't know where that came
```

```
 1   from.

 2         Q.      Huh.

 3                 Then there are like information

 4   on the last page where you've got like

 5   endorsements.  Some lawyer named Daniel

 6   Christopher says, "Mike" --

 7                 That's your first name, right?

 8         A.      Yes.

 9         Q.      -- "has the knowledge and

10   experience to solve problems and give perfect

11   outcome-oriented recommendations and

12   planning."

13                 Do you see that?

14         A.      I do.

15         Q.      Outcome-oriented, other than

16   the fact it's not spelled right, that's what

17   these pharmaceutical companies have hired you

18   to do, give outcome-oriented recommendations.

19                 You're trying to get them to

20   where they want to be, aren't you?

21                 MS. MCCLURE:  Objection.  Form.

22         Compound.  Incomplete hypothetical.

23         Foundation.  Misstates the witness'

24         testimony.

25                 THE WITNESS:  Yes, I'm trying
```

Highly Confidential - Subject to Further Confidentiality Review

1          to get them to understand the rules

2          and procedures to be in compliance.

3     QUESTIONS BY MR. LANIER:

4          Q.    And that's why companies like

5     AmerisourceBergen put you into their

6     corporate charts.

7               MS. MCCLURE:  Objection.

8          Leading.

9     QUESTIONS BY MR. LANIER:

10         Q.    Right?

11              MS. MCCLURE:  Leading.

12         Foundation.

13              THE WITNESS:  I don't know why

14         they added me to their chart.

15              (Mapes Exhibit 25 marked for

16         identification.)

17    QUESTIONS BY MR. LANIER:

18         Q.    Let me give you a document that

19    we'll mark as Exhibit Number 25, and it's

20    actually a set of documents that have come.

21              Gives us an idea of how the

22    company charted out the associates -- let's

23    start up here, the bold.  "Associates

24    assigned to provide resources for the

25    diversion control program."

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Do you see that?
 2                    MR. EPPICH:  Objection.
 3          Foundation.
 4                    THE WITNESS:  Yes, I do.
 5     QUESTIONS BY MR. LANIER:
 6          Q.    Now, understand that -- make
 7     sure that we're clear on our terms here.
 8     There is within the pharmaceutical world a
 9     closed loop when it comes to drugs like
10     opioids.  Opioids only belong within a closed
11     loop.
12                    MS. MCCLURE:  Objection to the
13          narrative.
14     QUESTIONS BY MR. LANIER:
15          Q.    Correct?
16          A.    Yeah.
17                    MR. EPPICH:  Objection.  Form.
18     QUESTIONS BY MR. LANIER:
19          Q.    And so in here you've got the
20     companies that are, I guess, importing,
21     bringing in the opium, the materials for the
22     opioids.  You've got the importers.
23                    You've got the companies that
24     are manufacturing the pills or the medicine,
25     whatever.  You've got the manufacturers.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              You've got the people who are

 2    passing those out, the distributors.

 3              And then you've got the

 4    pharmacies at the end that are supposed to be

 5    getting them to the sick, right?

 6              MS. MCCLURE:  Objection.

 7              MS. SWIFT:  Objection.

 8         Leading.

 9              MS. MCCLURE:  Form.

10         Foundation.  Incomplete

11         representation.  Object to the

12         narrative by counsel.

13              THE WITNESS:  Yes, all those

14         are registrants that would handle

15         controlled substances.

16    QUESTIONS BY MR. LANIER:

17         Q.    And that's the word that you

18    were using "registrants," because they have

19    to register with the government.  And if they

20    are not registered and accepted, it's illegal

21    for them to market in opioids, isn't it?

22              MS. MCCLURE:  Objection.  Form.

23         Leading.  Foundation.

24              MS. SWIFT:  Objection.  Form.

25
```

```
1    QUESTIONS BY MR. LANIER:

2         Q.     True?

3         A.     It is illegal for them to

4    handle opioids if they're not registered,

5    yes.

6         Q.     And so when we talk about

7    diversion, diversion is when these pills

8    somehow, somewhere, go outside the loop and

9    they are diverted.  And instead of going to

10   properly prescribed patients, they get

11   diverted into an improper use, right?

12              MS. MCCLURE:  Objection.

13        Leading.  Foundation.  Misstates.

14              THE WITNESS:  Correct.

15   QUESTIONS BY MR. LANIER:

16        Q.     Okay.  So we're looking at the

17   associates that were assigned to provide

18   resources for the diversion control program,

19   the program to keep these drugs from being

20   diverted, right?

21        A.     Yes.

22        Q.     Because these are dangerous

23   drugs, true?

24              MS. MCCLURE:  Form.

25              THE WITNESS:  I don't know what
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           you mean by "dangerous."

 2    QUESTIONS BY MR. LANIER:

 3           Q.     They can kill you?

 4                  MS. MCCLURE:  Form.

 5    QUESTIONS BY MR. LANIER:

 6           Q.     They can do damage to you if

 7    you are taking them improperly, in an

 8    improper dose at an improper time?

 9           A.     They could.

10           Q.     They can be addictive?

11           A.     Yes.

12           Q.     That's dangerous to me.  Is

13    that dangerous to you?

14           A.     Yes.

15           Q.     Okay.  So we can agree these

16    are dangerous drugs?

17           A.     Yes.

18           Q.     All right.  And so you want to

19    keep them from being diverted.  And not only

20    do you want to, the distributors are required

21    by law to do a number of different things to

22    stop diversion of opioids, aren't they?

23           A.     They are.

24                  MS. WICHT:  Object to the form.

25
```

```
1    QUESTIONS BY MR. LANIER:

2         Q.    And the law they are supposed

3    to follow is what?

4         A.    The Controlled Substances Act.

5         Q.    And it sets out

6    responsibilities, doesn't it?

7         A.    It does.

8         Q.    Okay.  And so here we see for

9    AmerisourceBergen in Exhibit 25 associates

10   assigned to provide resources for the

11   diversion control program, and it starts up

12   here with a vice president and an

13   administrative assistant.

14              You see all of that?

15        A.    Yes.

16        Q.    Look at this.  Mike Mapes, DEA

17   consultant.  You made their chart.

18              Did you know that?

19              MS. MCCLURE:  Objection to

20        form.

21              THE WITNESS:  I see that.

22   QUESTIONS BY MR. LANIER:

23        Q.    And if I follow the chart

24   right, they've got you basically reporting to

25   the vice president, don't they?
```

```
 1                    MS. MCCLURE:  Objection.  Form.

 2                    THE WITNESS:  I didn't report

 3           to the vice president.  It was mainly

 4           with Steve Mays, the director of CSRA.

 5    QUESTIONS BY MR. LANIER:

 6           Q.    This fellow that's lateral to

 7    you on the chart?

 8           A.    Yes.

 9           Q.    So practically speaking, the

10    vice president didn't take your cares or

11    concerns.  You didn't even know technically

12    you were reporting to him; is that right?

13                    MS. MCCLURE:  Form.

14           Foundation.

15                    THE WITNESS:  Practically I

16           reported to Steve Mays.

17    QUESTIONS BY MR. LANIER:

18           Q.    Now, also of note here, it

19    looks like these aren't people who are just

20    fully assigned to diversion control.

21    Everyone already had a full-time job in

22    addition to doing this work; is that right?

23                    MS. MCCLURE:  Form.

24           Foundation.  Calls for speculation.

25                    THE WITNESS:  I'm not aware of
```

Highly Confidential - Subject to Further Confidentiality Review

1          the full-time jobs that others on the

2          chart would have.

3     QUESTIONS BY MR. LANIER:

4          Q.     But do you see where it says,

5     "Everyone already has a full-time job"?

6          A.     I see what that says, yes.

7               MS. MCCLURE:  Objection.

8     QUESTIONS BY MR. LANIER:

9          Q.     Like diversion control program,

10    that's just an afterthought.  That's

11    something you do in extra time, when you got

12    a little extra time.  Hey, you got a few

13    extra minutes in addition to your full-time

14    job, would you come do this critical work to

15    make sure the drugs don't get diverted?

16               MS. MCCLURE:  Form.  Misstates

17          the record.  Foundation.  Calls for

18          speculation.

19    QUESTIONS BY MR. LANIER:

20         Q.     Did you know about any of that?

21               MS. MCCLURE:  All of the same

22          objections.

23               THE WITNESS:  No.

24    QUESTIONS BY MR. LANIER:

25         Q.     And there are multiple sheets

 1    to the exhibit that I've given you that are

 2    just different charts that they've done over

 3    the times that have you in it.

 4              You worked for

 5    AmerisourceBergen for a long time, didn't

 6    you?

 7              MS. MCCLURE:  Objection.

 8         Leading.  Foundation.

 9              Objection to the continuing

10         narrative by counsel.

11              THE WITNESS:  Yes, I did.

12    QUESTIONS BY MR. LANIER:

13         Q.    Okay.  Now, one more thing that

14    I want to cover before we leave here is there

15    are some people you know who have been

16    designated as experts by the plaintiffs that

17    I think maybe you worked with, and I need to

18    know if you're going to say anything bad

19    about at trial.

20              You understand what I'm asking

21    you?

22         A.    Yes.

23              MS. MCCLURE:  Form.

24    QUESTIONS BY MR. LANIER:

25         Q.    Did you work in the DEA Detroit

Highly Confidential - Subject to Further Confidentiality Review

1    office with Jim Geldhof, who later became the

2    regional supervisor?

3         A.    No.

4         Q.    You did not?

5         A.    We worked in the Detroit office

6    at different times.

7         Q.    Okay.  Do you know Jim Geldhof?

8         A.    Yes.

9         Q.    Good guy?

10             MS. MCCLURE:  Form.

11             THE WITNESS:  Yes.

12   QUESTIONS BY MR. LANIER:

13        Q.    Know what he's doing?

14        A.    Yes.

15        Q.    Honest?

16             MS. MCCLURE:  Form.

17             THE WITNESS:  As far as I know.

18   QUESTIONS BY MR. LANIER:

19        Q.    Reliable?

20             MS. MCCLURE:  Form.

21             THE WITNESS:  As far as I know.

22   QUESTIONS BY MR. LANIER:

23        Q.    All right.  Jim Rafalski, who

24   did the ARCOS and field analysis work, do you

25   know Jim Rafalski?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      I know the name more than I

 2     know the person.

 3          Q.      All right.

 4          A.      I may have met him a couple of

 5     times.

 6          Q.      You're not able to comment on

 7     him --

 8          A.      No.

 9          Q.      -- one way or the other.

10                  The jury is also going to hear

11     from Joe Rannazzisi.

12                  You know Joe Ran, don't you?

13          A.      Yes.

14          Q.      Good man?

15                  MS. MCCLURE:  Form.

16                  THE WITNESS:  Yes.

17     QUESTIONS BY MR. LANIER:

18          Q.      Honest?

19          A.      Yes.

20          Q.      Reliable?

21          A.      Yes.

22          Q.      Okay.  We are through the first

23     stop on your roadmap, personal background.

24                  Next stop, DEA.

25                  The DEA stop is going to take
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    about an hour or so.  We've been going

 2    54 minutes.

 3              Are you good to keep going?

 4    A.     Yes.

 5    Q.     Okay.

 6              MS. LEVY:  While we're in

 7    transition, can we ask the court reporter if

 8    she can refresh the realtime?

 9              MR. LANIER:  Let's go off the

10         record for you to refresh the

11         realtime, and I'm going to run down

12         the hall to use the restroom.

13         (Off the record at 8:55 a.m.)

14              VIDEOGRAPHER:  We're going back

15         on record.  Beginning of Media File 3.

16         The time is 9:03.

17    QUESTIONS BY MR. LANIER:

18    Q.     Mr. Mapes, we have finished

19    that first stop on my roadmap of your

20    personal background.

21              You with me?

22    A.     Yes.

23    Q.     And now I want to ask you about

24    questions and subjects that were asked of you

25    yesterday by the lawyers for the various
```

```
 1     companies.

 2               Okay?

 3     A.        Yes.

 4     Q.        And I've divided them up into

 5     two different areas:  those matters that

 6     arose while you were working for the DEA, and

 7     those matters that arose generally while

 8     you've been doing industry work.

 9               Okay?

10     A.        Okay.

11     Q.        And so our first stop are the

12     matters while you were working with the DEA.

13     A.        Okay.

14     Q.        Now, in this regard, we'll

15     focus in on the DEA time.  We'll keep a

16     little running list of notes for this stop,

17     but in general you covered a number of

18     different subjects that came up yesterday,

19     and I kind of want to isolate each one and

20     talk about them.

21               Okay?

22     A.        Okay.

23     Q.        So one subject that you talked

24     about a lot was Internet pharmacy issues.

25               Correct?
```

```
 1              A.      Yes.

 2              Q.      And so these are pharmacies

 3      that exist somehow on the worldwide web more

 4      than they do, you know, in a building down

 5      the street.

 6                      MS. MCCLURE:  Form.

 7                      MR. LANIER:  That's supposed to

 8              be a keyboard and a monitor.  I'm not

 9              very good at this, am I?

10                      MS. MCCLURE:  Objection.  Form.

11              Narrative.

12                      MR. LANIER:  Bad art.

13      QUESTIONS BY MR. LANIER:

14              Q.      Internet pharmacies.  That's

15      different than a storefront pharmacy, right?

16              A.      It's different in that it's a

17      website that refers people to a doctor and a

18      storefront pharmacy.

19              Q.      To go pick up their pills?

20              A.      Or have them delivered, yes.

21              Q.      All right.  Now, the Internet

22      pharmacy issues that you talked about

23      yesterday, can we agree that this became a

24      huge problem as part of the opioid mess?

25                      MR. BENNETT:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Vague.

 2    QUESTIONS BY MR. LANIER:

 3            Q.      Would you agree with me?

 4                    MR. EPPICH:  Objection to form.

 5                    THE WITNESS:  I don't recall it

 6            being part of the opioid issue,

 7            because the majority of the drugs

 8            being dispensed from pharmacies that

 9            were related to the Internet were not

10            opioids.  They were phentermine and

11            benzodiazepines and those kinds of

12            things.

13    QUESTIONS BY MR. LANIER:

14            Q.      So you're not aware of how many

15    opioids were actually being dispensed by

16    these Internet pharmacies?

17            A.      There were some, but it wasn't

18    the major part of the pharmacies in the

19    beginning.

20            Q.      Interesting.

21                    So you believe that the

22    Internet pharmacy problem was more than

23    simply an opioid problem; it applied to other

24    drugs as well?

25                    MS. MCCLURE:  Form.  Misstates
```

1              the witness' testimony.

2       QUESTIONS BY MR. LANIER:

3              Q.       Fair?

4              A.       Yes, it did.

5              Q.       But it was a huge problem.  It

6       was one that required direct attention,

7       right?

8              A.       Yes.

9                       MS. MCCLURE:  Form.

10      QUESTIONS BY MR. LANIER:

11             Q.       And in that regard, sir, I got

12      to ask you:  Where were these pharmacies

13      getting their drugs?

14                      MS. MCCLURE:  Form.

15      QUESTIONS BY MR. LANIER:

16             Q.       Whether they were opioids or

17      the benzodiazepines or whatever they were,

18      where were they getting them from?

19                      MS. MCCLURE:  Form.

20                      MR. EPPICH:  Objection.

21          Foundation.

22                      THE WITNESS:  From registered

23          wholesalers.

24      QUESTIONS BY MR. LANIER:

25             Q.       Are those what we call

Highly Confidential - Subject to Further Confidentiality Review

```
 1    distributors?

 2          A.     Yes.

 3          Q.     Those are companies like

 4    AmerisourceBergen?

 5                 MS. MCCLURE:  Form.

 6    QUESTIONS BY MR. LANIER:

 7          Q.     McKesson?  Cardinal?

 8          A.     Yes, they're distributors.

 9          Q.     I mean, those are in our --

10    going back to our picture drawing, those are

11    these people who take them from the

12    manufacturers and get them to the pharmacies,

13    right?

14          A.     That's correct.

15          Q.     And so you've got this huge

16    problem with these Internet pharmacies.  The

17    pharmacies are getting their drugs from the

18    distributors.

19                 My question to you is:  Did the

20    major distributors bring this problem to the

21    DEA's attention?

22          A.     No.

23          Q.     You mean McKesson didn't tell

24    y'all about this?

25                 MS. MCCLURE:  Form.
```

```
 1                    MR. EPPICH:  Object to the

 2          form.

 3                    MS. MCCLURE:  Scope.

 4                    MR. BENNETT:  I'm going to join

 5          the scope objection.

 6                    You can answer that question

 7          yes or no only.

 8                    THE WITNESS:  No.

 9   QUESTIONS BY MR. LANIER:

10          Q.    AmerisourceBergen didn't say,

11   "Hey, we figured out there's a big problem

12   out there where there's a diversion issue

13   that's occurring with these Internet

14   pharmacies."

15                    You didn't get that huge alert

16   from AmerisourceBergen?

17                    MS. MCCLURE:  Form.  Compound.

18          Scope.

19                    MR. BENNETT:  Objection.

20          Scope.

21                    You can answer that question

22          yes or no only.

23                    THE WITNESS:  No.

24   QUESTIONS BY MR. LANIER:

25          Q.    From Cardinal?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MS. MCCLURE:  Form.
 2        Foundation.  Scope.
 3                MR. BENNETT:  Same objection.
 4        Same instruction.
 5                THE WITNESS:  No.
 6   QUESTIONS BY MR. LANIER:
 7        Q.     Well, aren't these distributors
 8   required under law to know their customers?
 9                MR. EPPICH:  Objection.  Form.
10                MS. MCCLURE:  Form.
11                MR. EPPICH:  Calls for a legal
12        conclusion.
13                MS. SWIFT:  Foundation.
14   QUESTIONS BY MR. LANIER:
15        Q.     Let me reask it.
16                Haven't you preached
17   vociferously, stridently, strongly, loudly,
18   clearly, that the distributors are required
19   to know their customers?
20                MS. MCCLURE:  Form.  Compound.
21                MR. EPPICH:  Object to the
22        form.
23                THE WITNESS:  Yes, and that
24        started with the Distributor
25        Initiative, mostly.
```

```
 1      QUESTIONS BY MR. LANIER:

 2          Q.    Well, you say it started there.

 3                The obligation for them to know

 4      their customers didn't start there.  This --

 5      did it?

 6                MR. EPPICH:  Objection.

 7                MS. MCCLURE:  Form.

 8          Argumentative.  Leading.

 9                MS. SWIFT:  Foundation.

10                MR. EPPICH:  Objection.  Form.

11          Calls for a legal conclusion.

12                THE WITNESS:  No, the

13          regulations did not change.

14      QUESTIONS BY MR. LANIER:

15          Q.    Right.

16                That law that closes this loop,

17      that requires the distributors to only give

18      to registered and approved pharmacies for

19      legitimate purposes to stop diversion.  I

20      mean, knowing their customers, knowing the

21      pharmacies, that's diversion control 101,

22      isn't it?

23                MS. MCCLURE:  Form.  Narrative

24          by counsel.  Foundation.  Leading.

25          Misstates.  Calls for a legal
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          conclusion.

2                    THE WITNESS:  Yes, it's basic.

3                    MS. MCCLURE:  And again,

4          continuing objection to counsel's

5          filling in information on a sheet of

6          paper implying that it comes from the

7          witness before providing the

8          information through counsel.

9                    MR. LANIER:  If it helps you,

10         I've had at least one judge -- two

11         judges, two federal judges, tell me I

12         have to do that because otherwise it

13         consumes too much time.  I don't know

14         if that helps you.

15                   MS. MCCLURE:  Well, we don't

16         have any such ruling here, so it

17         doesn't help me, and I continue to

18         maintain all of those objections.

19                   MR. LANIER:  I'll give you a

20         running objection on that so you don't

21         consume my time continuing to say it.

22                   MS. MCCLURE:  Great.

23         QUESTIONS BY MR. LANIER:

24              Q.     Internet pharmacy concerns.

25         Let's talk about what some of the concerns
```

```
 1      were.

 2                  Okay?

 3          A.     Okay.

 4          Q.     First of all, we know the law

 5      is the law is the law.

 6                  MS. MCCLURE:  Form.

 7      QUESTIONS BY MR. LANIER:

 8          Q.     Fair?

 9                  MR. BENNETT:  Objection.

10      Vague.

11                  MR. EPPICH:  Form.  Vague.

12      QUESTIONS BY MR. LANIER:

13          Q.     Let me be more clear.  Some

14      people don't understand what I mean.

15                  This law for the Controlled

16      Substances Act, that doesn't apply just to

17      Internet pharmacies, does it?

18                  MR. EPPICH:  Objection.  Form.

19                  THE WITNESS:  It applies to all

20          handlers of controlled substances.

21      QUESTIONS BY MR. LANIER:

22          Q.     Yeah.  There's not a -- where's

23      the note I just used?

24                  Aren't distributors required to

25      know their customers, diversion control 101,
```

1    that's not only applicable to Internet

2    pharmacies; it applies to all their

3    customers, doesn't it?

4                    MS. SWIFT:  Objection.  Form.

5                    MS. MCCLURE:  Form.  Compound.

6                    MS. WICHT:  Foundation.

7            Mischaracterizes testimony.

8                    THE WITNESS:  It applies to all

9            registrants, yes.

10   QUESTIONS BY MR. LANIER:

11           Q.    Yeah.  Everybody in the loop,

12   right?

13           A.    Yes.

14           Q.    And so when the lawyers talked

15   to you about these Internet pharmacy

16   concerns, let's just make real clear that the

17   law that we're talking about is -- the same

18   law applies to all pharmacies, whether

19   they're Internet or not.

20                   MR. EPPICH:  Objection to form.

21   QUESTIONS BY MR. LANIER:

22           Q.    True?

23                   MR. EPPICH:  Objection to form,

24           vague, and calls for a legal

25           conclusion.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MS. MCCLURE:  Leading.

 2                  MR. BENNETT:  You can answer.

 3                  THE WITNESS:  It does.

 4      QUESTIONS BY MR. LANIER:

 5           Q.    I mean, there's no special law

 6      for Internet pharmacies, right?

 7                  MS. MCCLURE:  Form.

 8                  THE WITNESS:  There is a

 9           separate registration category for

10           Internet pharmacies, so there are some

11           unique rules for Internet pharmacies.

12      QUESTIONS BY MR. LANIER:

13           Q.    No fuss about that at all.

14                  But in terms of the opioid loop

15      and what the distributors have to do, there's

16      no special law for distributors that pertains

17      to how they treat Internet pharmacies versus

18      others, is there?

19                  MS. MCCLURE:  Form.

20                  THE WITNESS:  No.

21      QUESTIONS BY MR. LANIER:

22           Q.    And I've got to ask you, these

23      rogue Internet pharmacies -- that's a term we

24      heard yesterday with you and the distributor

25      lawyers, or maybe -- yes.
```

Highly Confidential - Subject to Further Confidentiality Review

 1              How do these rogue Internet

 2    pharmacies get their pills historically?

 3         A.    Well, all pharmacies get them

 4    from wholesalers, from the distributors.

 5         Q.    Are we supposed to believe that

 6    AmerisourceBergen, Cardinal and McKesson

 7    can't figure out a fake pharmacy?

 8              MS. MCCLURE:  Objection.

 9         Leading.

10              MR. EPPICH:  Objection.

11              MS. MCCLURE:  Form.

12         Foundation.  Argumentative.

13              THE WITNESS:  I don't know.

14    QUESTIONS BY MR. LANIER:

15         Q.    I mean, have you heard the

16    expression "ignorance is no excuse"?

17         A.    Yes.

18         Q.    I mean, if you get pulled over

19    for speeding, do you get out of it if you

20    say, "Hey, I'm sorry, it's not my fault; I

21    wasn't looking at my speedometer"?

22              You can't get out of it that

23    way, can you?

24              MS. MCCLURE:  Form.

25              THE WITNESS:  I don't know.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. LANIER:

 2         Q.    Have you ever tried that one?

 3         A.    No, I haven't.

 4         Q.    I'll bet you don't ever try

 5    that one either.

 6               I mean, that one is just not

 7    going to work now, Mr. Mapes, is it?

 8               MS. MCCLURE:  Form.

 9    QUESTIONS BY MR. LANIER:

10         Q.    Would you expect it to?

11               MS. MCCLURE:  Form.

12               THE WITNESS:  I don't know.

13    QUESTIONS BY MR. LANIER:

14         Q.    Now, AmerisourceBergen had a

15    meeting with you concerning these Internet

16    pharmacies, and we got Exhibit Number 7 that

17    was handed to us yesterday as part of that

18    meeting, correct?

19         A.    That's correct.

20         Q.    You had an Internet

21    presentation with AmerisourceBergen,

22    August 10, 2005, and you wrote it up.

23               MS. MCCLURE:  Form.

24               THE WITNESS:  Actually, someone

25         else wrote it up, but I signed it,
```

Highly Confidential - Subject to Further Confidentiality Review

1          yes.

2     QUESTIONS BY MR. LANIER:

3          Q.     Okay.  And a point was made

4     yesterday by the lawyer for

5     AmerisourceBergen, Ms. McClure, that after

6     the presentation, Mr. Mays --

7                Do you see that?

8          A.     Yes, I do.

9          Q.     And that's the same Mr. Mays

10    that you wound up reporting to when you went

11    to work for AmerisourceBergen --

12         A.     Correct.

13         Q.     -- two years later?

14               MS. MCCLURE:  Form.

15    QUESTIONS BY MR. LANIER:

16         Q.     So two years before you went to

17    work for him, he informed representatives of

18    the DEA that AmerisourceBergen does not want

19    to be associated with this type of illegal

20    activities, and it reviews its customers

21    thoroughly before engaging in business with

22    them.

23               Do you see that?

24         A.     I do.

25         Q.     Now, I asked you before if

1    distributors were required to know their

2    customers, and you said, "Well, that's what

3    it ultimately worked into, but they didn't

4    always do that earlier."

5              Do you remember that?

6       A.    Yes.

7       Q.    And I said, "But the law has

8    always been that way," right?

9              MS. MCCLURE:  Form.  Calls for

10             a legal conclusion.

11             THE WITNESS:  It has.

12   QUESTIONS BY MR. LANIER:

13      Q.    And we see that here, that

14   AmerisourceBergen was trying to tell you or

15   the DEA that they were, in fact, reviewing

16   their customers thoroughly before engaging in

17   business with them, and they don't want to be

18   associated with this type of illegal

19   activity.

20             Do you see that?

21      A.    I do.

22      Q.    Now this, sir, shows us -- let

23   me go back to this.

24             So AmerisourceBergen, you have

25   this meeting with them.  If we look

```
 1    thoroughly at Exhibit Number 7, it shows the

 2    glaring problems with the way Amerisource was

 3    doing business, doesn't it?

 4              MS. MCCLURE:  Objection.

 5         Leading.  Foundation.  Form.

 6              THE WITNESS:  It shows examples

 7         that we use to -- to them about what

 8         we considered Internet pharmacies that

 9         they had distributed to.

10    QUESTIONS BY MR. LANIER:

11         Q.    Well, it not only does that,

12    sir, but it says in very plain English, the

13    purpose of your meeting with them was "to

14    address the illegal" --

15              Do you see that word?

16         A.    Yes.

17         Q.    -- "the illegal domestic

18    Internet pharmacy problem and their source of

19    supply."

20              Do you see that as well?

21         A.    I do.

22         Q.    The source of their supply, if

23    we're telling the whole truth, was

24    AmerisourceBergen, among others, true?

25              MS. MCCLURE:  Objection to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            form.  Leading.  Speculation.

 2            Foundation.

 3                 THE WITNESS:  Yes, in these

 4            examples.

 5     QUESTIONS BY MR. LANIER:

 6            Q.    Yeah.

 7                 In other words,

 8     AmerisourceBergen may have language where

 9     they tell you, "Oh, look, we don't want to be

10     associated with this.  We review our

11     customers thoroughly before engaging in

12     business with them."

13                 They say that to the DEA.  You

14     see?

15            A.    Yes.

16            Q.    And the lawyer for

17     AmerisourceBergen has you look at that for

18     the jury and -- you remember?

19            A.    Yes.

20            Q.    And she said, "And if there was

21     any other information, it would be course of

22     practice to put it into this memo so we can

23     trust that reasonably this is all the

24     information that there was."

25                 MS. MCCLURE:  Form.
```

```
 1     QUESTIONS BY MR. LANIER:

 2          Q.     Right?

 3          A.     Yes, that's what she said.

 4          Q.     Do you have the expression --

 5     there's a lot of different ones.  You know,

 6     it's one thing to say one thing, but the

 7     truth isn't always what people say.

 8               Right?

 9               MS. MCCLURE:  Form.  Leading.

10               THE WITNESS:  That's correct.

11     QUESTIONS BY MR. LANIER:

12          Q.     You've heard the expression "I

13     want to see someone walk the walk instead of

14     talk the talk"?

15          A.     Yes.

16          Q.     Or "practice what they preach"?

17          A.     Yes.

18               (Mapes Exhibit 26 marked for

19          identification.)

20     QUESTIONS BY MR. LANIER:

21          Q.     Okay.  And the reason I'm

22     asking that is because I've looked at Exhibit

23     Number 26.  I want to give a copy of it to

24     you and the lawyers around the room, a chance

25     for the jury to see it.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Do you have Exhibit Number 26

 2      in front of you?

 3           A.     I do.

 4           Q.     See --

 5                    MR. BENNETT:  Counsel, may he

 6           have a moment to finish reviewing the

 7           document?

 8                    MR. LANIER:  Yeah.  The only

 9           part that I need to ask you about

10           initially is the very bottom e-mail

11           from you.  It says, "Michael R.

12           Mapes," and it's a real short, little

13           e-mail.

14                    So if you'll review it, and in

15           the interest of time I'll read it to

16           the jury at the same time you're

17           reading it.

18      QUESTIONS BY MR. LANIER:

19           Q.     Do you see that e-mail from you

20      down at the bottom?

21           A.     Yes.

22           Q.     "Steve, at the meeting at

23      DEA" --

24                    And that Steve is Steve Mays?

25      He's the fellow you ultimately started
```

```
 1    working for a couple years later?

 2              MS. MCCLURE:  Form.

 3    QUESTIONS BY MR. LANIER:

 4         Q.     Right?

 5         A.     Yes.

 6         Q.     "Steve, at the meeting at DEA,

 7    I was not sure if your company had sold

 8    controlled substances to any of the

 9    pharmacies that were used as examples in the

10    presentation.  We checked ARCOS" --

11              What is ARCOS?

12         A.     It's a system that collects

13    data from registrants concerning sales of

14    Schedule II and III narcotic drugs.

15         Q.     It is a system you guys have

16    that will get all of the information about

17    who's selling the drugs and who they're

18    selling them to?

19         A.     Yes.

20         Q.     All right.  "We checked the

21    system that collects info on drug sales,

22    ARCOS, and found you made several sales to

23    Example Number 2 on page 10 of the printed

24    presentation.  It's a Florida pharmacy that's

25    now out of business.  Your sales were mostly
```

Highly Confidential - Subject to Further Confidentiality Review

1    hydrocodone products."

2              That's an opiate drug, isn't

3    it?

4         A.    It is.

5         Q.    So while the lawyer will show

6    you and the jury that Mr. Mays informed you

7    guys that they didn't want to be associated

8    with this type of illegal activity and they

9    reviewed their customers thoroughly, the

10   truth of the matter is, y'all went back and

11   checked and AmerisourceBergen was, in fact,

12   supplying drugs to this illegal, domestic

13   Internet pharmacy problem, correct?

14              MS. MCCLURE:  Form.

15         Foundation.  Leading.

16              MR. BENNETT:  Objection.

17         Scope.

18              You can answer that question

19         yes or no only.

20              THE WITNESS:  Yes.

21   QUESTIONS BY MR. LANIER:

22         Q.    And you said that the Internet

23   pharmacy problem was not generally opioids,

24   it was more benzo drugs, but this was mostly

25   opioid.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. MCCLURE:  Form.  Leading.

 2     QUESTIONS BY MR. LANIER:

 3          Q.    Wasn't it?

 4          A.    Yes.

 5          Q.    So we can look at the entire

 6     story and see that AmerisourceBergen's

 7     business included the illegal Internet

 8     pharmacies that were subject to your

 9     investigation on the issue of opioids, true?

10                    MR. BENNETT:  Form.

11          Foundation.  Leading.

12                    THE WITNESS:  It included one

13          of the Internet pharmacies that we

14          used as an example in the

15          presentations, yes.

16     QUESTIONS BY MR. LANIER:

17          Q.    And you don't know whether or

18     not the DEA checked on the other example

19     y'all used, do you?

20                    MS. MCCLURE:  Form.

21          Mischaracterizes the document.

22                    THE WITNESS:  I believe that's

23          the only one of the examples in the

24          presentation that AmerisourceBergen

25          had distributed to.
```

```
 1    QUESTIONS BY MR. LANIER:

 2         Q.    And you have three examples in

 3    the presentation.  So you've got

 4    AmerisourceBergen on one-third of them?

 5         A.    Yes.

 6         Q.    Okay.  Still on the subject of

 7    Internet pharmacies.

 8               You met with McKesson on the

 9    Internet pharmacies, didn't you?

10         A.    Yes.

11         Q.    McKesson is another one of

12    these distributors, correct?

13         A.    Yes, they are a distributor.

14         Q.    And McKesson was participating

15    in the problem, too, weren't they?

16               MR. EPPICH:  Objection to the

17          form.  Foundation.  Vague.

18               MS. MCCLURE:  Leading.

19               MR. BENNETT:  Objection.

20          Vague.  Objection.  Scope.

21    QUESTIONS BY MR. LANIER:

22         Q.    The question pending is,

23    McKesson was participating in the problem,

24    too, true?

25               MR. EPPICH:  Same objections.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  THE WITNESS:  I don't know to
 2           what extent they were involved in
 3           distributing to any of the pharmacies
 4           that are in the examples here.
 5    QUESTIONS BY MR. LANIER:
 6           Q.    All right.  Well, you've seen
 7    Exhibit Number 8, which is the presentation
 8    that y'all did -- write-up of the
 9    presentation that y'all did with McKesson,
10    September 1 of 2005, correct?
11           A.    Yes.
12                 (Mapes Exhibit 27 marked for
13           identification.)
14    QUESTIONS BY MR. LANIER:
15           Q.    And then if we want to take it
16    a step further, I'll give you a document that
17    we'll mark as Exhibit Number 27.
18                 And Exhibit Number 27 -- do you
19    have it in front of you?
20           A.    I do.
21           Q.    -- is one where -- take a
22    moment and look at it, but I'll show you the
23    part that I'm interested in so it saves
24    everybody some time.
25                 It talks about John Gilbert,
```

Highly Confidential - Subject to Further Confidentiality Review

1    the legal counsel for McKesson, representing

2    McKesson, contacting you and Kyle Wright,

3    responding to questions about sales of

4    controlled substances by McKesson to six

5    Internet pharmacies that were located in the

6    Miami field division.

7              And then I'm specifically going

8    to ask you about this.  You'll see it

9    references that they were briefed -- McKesson

10   was briefed by the DEA on September 1st of

11   2005, and the ARCOS report for the month of

12   October revealed that McKesson distribution

13   center in Lakeland, Florida, distributed over

14   2 million dosage units of hydrocodone --

15             Now, that's an opioid, right?

16   A.      Yes, it is.

17   Q.      -- to six suspected illicit

18   Internet pharmacies.  They even filed

19   suspicious order reports involving these same

20   pharmacies but still distributed them.

21             Do you see that?

22   A.      I do.

23   Q.      Does that help refresh your

24   recollection of whether or not McKesson was

25   participating in this problem of Internet

Highly Confidential - Subject to Further Confidentiality Review

 1    pharmacies as well, illegal Internet

 2    pharmacies?

 3                MR. EPPICH:  Objection to form.

 4         Characterization.

 5                THE WITNESS:  It does.

 6    QUESTIONS BY MR. LANIER:

 7         Q.    And in fact, were they

 8    participating in the problem?  Is that true?

 9                MR. EPPICH:  Objection to form.

10         Vague.  Foundation.

11                THE WITNESS:  Yes.

12    QUESTIONS BY MR. LANIER:

13         Q.    And the McKesson lawyer, if we

14    look at the whole truth, he never showed you

15    that follow-up document, did he?

16                MR. EPPICH:  Objection.

17         Argumentative.

18                THE WITNESS:  Which

19         follow-up --

20    QUESTIONS BY MR. LANIER:

21         Q.    The one that I had to show you

22    because you couldn't remember whether or not

23    McKesson contributed to this problem.  And I

24    showed you Exhibit 27.

25                MR. EPPICH:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Misstates testimony.

 2    QUESTIONS BY MR. LANIER:

 3         Q.    You'd never been shown that

 4    before, had you?

 5              MR. EPPICH:  Objection.  Form.

 6         Misstates testimony.

 7              THE WITNESS:  No, I had not.

 8    QUESTIONS BY MR. LANIER:

 9         Q.    And so now that you see it and

10    see the whole truth, you've got an ability to

11    determine whether or not McKesson was

12    participating, fair?

13         A.    Yes.

14         Q.    All right.  Now, one other

15    thing I found interesting.  When the lawyer

16    for McKesson was asking you questions, he

17    said, "You would typically note in the

18    meeting," and he referenced the meeting

19    notes, "if more had been said that meeting."

20              MR. EPPICH:  Objection.

21         Misstates.

22    QUESTIONS BY MR. LANIER:

23         Q.    He was talking about Exhibit

24    Number 7.

25              Do you recall that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. EPPICH:  Objection.

 2        Misstates testimony.

 3                  THE WITNESS:  Yes.

 4    QUESTIONS BY MR. LANIER:

 5        Q.    And in truth of fact, he's

 6    probably right.  If something significant had

 7    been said at the meeting, y'all would have

 8    noted it, true?

 9                  MR. EPPICH:  Objection.

10        Misstates.  Leading.  Form.

11                  THE WITNESS:  Yes.

12    QUESTIONS BY MR. LANIER:

13        Q.    Which tells us that the

14    distributor did not confess to the problem at

15    the meeting.

16                  MR. EPPICH:  Objection.

17    QUESTIONS BY MR. LANIER:

18        Q.    Because McKesson -- if McKesson

19    had said, "Hey, we're doing this," or "We're

20    selling with blinders on and we're not

21    looking," or "We hadn't been following this

22    stuff," or "We haven't been checking for

23    diversion the way the law says," if they had

24    told you at the meeting, you surely would

25    have noted it, wouldn't you?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. EPPICH:  Objection to the

 2          form.  Misstates testimony.

 3                    THE WITNESS:  Yes.

 4     QUESTIONS BY MR. LANIER:

 5          Q.    So they didn't tell you that at

 6     the meeting, we can surmise.  Y'all had to go

 7     dig it out from all of the files that you've

 8     got in the ARCOS data, as you call it, right?

 9          A.    Yes.

10                    MR. EPPICH:  Objection to form.

11     QUESTIONS BY MR. LANIER:

12          Q.    In fact, McKesson not only did

13     it, but y'all wound up sending them a show

14     cause order, didn't you?

15                    MS. MCCLURE:  Scope.

16                    THE WITNESS:  I don't recall if

17          there was one.

18     QUESTIONS BY MR. LANIER:

19          Q.    There was at least discussion

20     of one.  I think I may be one when I say "one

21     issued."

22                    There was discussion of a show

23     cause order, right?

24                    MR. EPPICH:  Objection.

25          Foundation.  Form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. LANIER:

 2         Q.    Did you know that when that

 3    lawyer was asking you questions yesterday,

 4    that there had been a discussion of a show

 5    cause order?

 6              MS. WICHT:  Scope.

 7              MR. EPPICH:  I'll object to the

 8         scope and form.

 9    QUESTIONS BY MR. LANIER:

10         Q.    Can you answer the question,

11    please?

12         A.    I'm reading through it.

13         Q.    That's coming up for the next

14    question.  First answer the one pending,

15    please.

16         A.    It had been mentioned at a

17    meeting with McKesson as of -- as a possible

18    sanction.

19              (Mapes Exhibit 28 marked for

20         identification.)

21    QUESTIONS BY MR. LANIER:

22         Q.    Yeah.

23              I've just handed you Exhibit

24    Number 28.

25              Well, let's -- I don't think in
```

Highly Confidential - Subject to Further Confidentiality Review

1    light of your answer that I need to deal with

2    that exhibit, so you can set it aside.  We'll

3    come back to it if we need to.

4              I mean, ultimately the Lakeland

5    problem is what led to a $13 million

6    settlement between McKesson and the US

7    Department of Justice, or the DEA, in 2008.

8              Did you know that?

9              MR. EPPICH:  Objection to form.

10        Misstates facts.

11             THE WITNESS:  No, I didn't -- I

12        wasn't aware of everything that led to

13        the settlement because I had retired

14        prior to that.

15   QUESTIONS BY MR. LANIER:

16        Q.    Did you ever see the settlement

17   and release agreement?

18        A.    I did not.

19             (Mapes Exhibit 29 marked for

20        identification.)

21   QUESTIONS BY MR. LANIER:

22        Q.    I'll hand it to you -- a copy

23   of it to you marked as Exhibit Number 29.

24   It's long.  I don't need you to -- you're

25   welcome to go through the whole thing, but I

Highly Confidential - Subject to Further Confidentiality Review

1    want to direct your attention specifically to

2    the background section.  Just right there at

3    the start.

4                 August 4, 2006, you were still

5    at the DEA at that time, weren't you?

6          A.    I was.

7          Q.    By its deputy administrator,

8    Joseph T. Rannazzisi, issued an order to show

9    cause to McKesson with respect to its

10   Lakeland distribution center in Lakeland,

11   Florida.

12                Do you see that?

13         A.    I do.

14         Q.    Order number 1 alleged, among

15   other things, that "McKesson failed to

16   maintain effective controls at the Lakeland

17   facility against diversion of particular

18   controlled substances."

19                Do you see that as well?

20         A.    I do.

21                MR. EPPICH:  Objection.  Form.

22   QUESTIONS BY MR. LANIER:

23         Q.    And then it says that,

24   "Whereas, on November 1, 2007, Mr. Rannazzisi

25   issued a second order to show cause to

Highly Confidential - Subject to Further Confidentiality Review

1    McKesson with respect to its Landover

2    distribution in Maryland for failing to

3    maintain effective controls."

4              Did you see that as well?

5              MR. EPPICH:  Objection.  Form.

6         Foundation.

7              THE WITNESS:  Yes, I see that.

8    QUESTIONS BY MR. LANIER:

9         Q.    Now, when defendants fail to

10   maintain effective control, is that a good

11   thing or a bad thing?

12             MR. EPPICH:  Objection.  Form.

13             THE WITNESS:  It's a bad thing.

14   QUESTIONS BY MR. LANIER:

15        Q.    Why?

16        A.    Because that may allow drugs to

17   be diverted.

18        Q.    And then I've got to fill in

19   the blank here on my question for you.

20             In response to the questions by

21   the lawyer from McKesson, "If more had been

22   said at the meetings of note, it would have

23   been noted," no distributor confessed.

24             That's true, isn't it?

25             MS. MCCLURE:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Misstates testimony.  Argumentative.
 2                   MR. EPPICH:  I'll join in those
 3         objections.  Foundation.  Vague.
 4                   THE WITNESS:  Yes.
 5    QUESTIONS BY MR. LANIER:
 6         Q.    Okay.  Next.  All of the -- let
 7    me do it this way.
 8                   The questions that I've asked
 9    you about Internet pharmacies, as far as
10    Cardinal Health is concerned, you also met
11    with them, right?
12         A.    With counsel for Cardinal
13    Health, yes.
14         Q.    And we have the notes from that
15    as Exhibit Number 9 that we looked at
16    yesterday, correct?
17                   MS. WICHT:  Object to form.
18                   THE WITNESS:  Yes, that is
19         correct.
20    QUESTIONS BY MR. LANIER:
21         Q.    And Cardinal Health never
22    confessed to having problems?
23                   MS. WICHT:  Object to form.
24    QUESTIONS BY MR. LANIER:
25         Q.    Did they?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. WICHT:  I'm sorry.  Object

 2          to form, foundation and vague.

 3                    THE WITNESS:  They did not.

 4     QUESTIONS BY MR. LANIER:

 5          Q.    And yet you know Cardinal

 6     Health was also trafficking in the pills to

 7     the Internet pharmacies that were illegal or

 8     illicit, right?

 9                    MS. WICHT:  Object to form.

10          Foundation.  Vague.  Argumentative.

11                    THE WITNESS:  They were selling

12          pills to pharmacies, yes.

13     QUESTIONS BY MR. LANIER:

14          Q.    Failing to maintain effective

15     controls against diversion, true?

16                    MS. WICHT:  Object to form.

17          Foundation.  Calls for a legal

18          conclusion.  Leading.  Object to the

19          improper demonstrative.

20                    THE WITNESS:  Yes.

21                    (Mapes Exhibit 30 marked for

22          identification.)

23     QUESTIONS BY MR. LANIER:

24          Q.    Okay.  Now, if we want to see

25     specifically some of what you've done, I
```

1   found a color set we can show the jury of

2   your presentation.  I think the record will

3   reflect in the exhibit, it's Exhibit 30.  I'm

4   marking it now.  That this is the one that

5   you gave to AmerisourceBergen.

6              But your presentation was

7   basically the same to each of these

8   distributors, true?

9              MS. MCCLURE:  Asked and

10        answered.

11             THE WITNESS:  Yes.

12   QUESTIONS BY MR. LANIER:

13        Q.    So Exhibit 30 is the actual

14   data.

15             And you told these folks about

16   these Internet issues, but the Internet

17   issues had been around for years before this

18   meeting, hadn't they?

19             MS. MCCLURE:  Form.

20        Foundation.  Misstates the witness'

21        testimony.

22             THE WITNESS:  I'm not certain

23        what time the Internet issues started.

24   QUESTIONS BY MR. LANIER:

25        Q.    Well, look on Slide 9.

Highly Confidential - Subject to Further Confidentiality Review

 1                  The Internet policy, at least,

 2      that you reference --

 3                  MR. BENNETT:  Hang on a second,

 4          Counsel.  He's trying to find --

 5                  MR. LANIER:  Oh, yeah, because

 6          they're not numbered.

 7      QUESTIONS BY MR. LANIER:

 8          Q.    So it's the one that says "DEA

 9      Internet policy."

10                  Do you see that?

11          A.    I do.

12          Q.    The Internet policy was 2001,

13      the policy that you said was specific for the

14      Internet registration issues, right?

15          A.    No, I believe that's the policy

16      about prescriptions being issued by a doctor

17      acting in the usual course of professional

18      practice, not specifically relating to

19      Internet.

20          Q.    Okay.  So the 2001 is not the

21      Internet policy date?

22          A.    No.

23          Q.    Thank you.  That helps clarify.

24                  If you will flip to page 21,

25      it's the slide entitled -- the first one

1    entitled "Suspicious Orders."  Several slides

2    have that title.

3              Do you see it?

4      A.    Yes.

5      Q.    Now, the suspicious orders --

6    21 CFR means the Code of Federal Regulations.

7    That's the regulations that have been enacted

8    that have the authority of law, right?

9              MS. MCCLURE:  Leading.

10              THE WITNESS:  Correct.

11   QUESTIONS BY MR. LANIER:

12      Q.    1301.74, that's part of what

13   was asked you about yesterday, correct?

14      A.    That's correct.

15      Q.    It requires that the

16   registrants design and operate a system to

17   identify suspicious orders.

18              Do you see that?

19      A.    Yes.

20      Q.    And registrants here are these

21   distributors in our closed-loop drawing,

22   correct?

23              MS. MCCLURE:  Form.

24          Foundation.  Misstates.

25              THE WITNESS:  Yes, among

```
 1              others.

 2      QUESTIONS BY MR. LANIER:

 3              Q.      Yeah, you've got to register

 4      also as a manufacturer and a pharmacist, but

 5      this requirement to identify suspicious

 6      orders, you were specifically talking at that

 7      point in time to the distributors, fair?

 8                      MS. MCCLURE:  Leading.

 9                      THE WITNESS:  Yes.

10      QUESTIONS BY MR. LANIER:

11              Q.      And this law that requires that

12      they design and operate a system to identify

13      these suspicious orders had been in effect

14      since when?

15                      MS. MCCLURE:  Form.  Calls for

16          a legal conclusion.

17                      THE WITNESS:  I don't know when

18          that regulation first was in effect.

19      QUESTIONS BY MR. LANIER:

20              Q.      But it was the 1970s, wasn't

21      it?

22                      MS. MCCLURE:  Leading.

23                      THE WITNESS:  I believe so.

24      QUESTIONS BY MR. LANIER:

25              Q.      And this is the same law that
```

1   requires them to report suspicious orders to

2   the DEA when discovered, fair?

3               MS. MCCLURE:  Form.  Calls for

4       a legal conclusion.

5               THE WITNESS:  It is.

6   QUESTIONS BY MR. LANIER:

7       Q.    So this is the company's

8   requirement to design and operate the system.

9   It's not the DEA's job --

10              MS. MCCLURE:  Same objection.

11  QUESTIONS BY MR. LANIER:

12      Q.    -- right?

13      A.    That's correct.

14      Q.    And then on suspicious orders,

15  report -- the next slide, "Reporting a

16  suspicious order to the DEA does not" --

17              And you put that in all caps

18  for your presentation, didn't you?

19      A.    Yes.

20      Q.    -- "does not relieve the

21  distributor of the responsibility to maintain

22  effective controls."

23              You can't just report the

24  suspicious order; you still have to maintain

25  effective controls, don't you?

1          A.      Yes.

2          Q.      Because it's the distributor's

3    decision whether or not they're going to ship

4    those suspicious drugs or not, isn't it?

5                  MS. MCCLURE:  Form.  Leading.

6                  THE WITNESS:  Yes.

7    QUESTIONS BY MR. LANIER:

8          Q.      And that's your next slide.

9    You said, "The DEA cannot tell a distributor

10   if an order is legitimate or not.  The

11   distributor must determine which orders are

12   suspicious and then make a sales decision."

13               Correct?

14                 MR. EPPICH:  Objection.

15        Misstates the document.

16                 THE WITNESS:  Correct.

17   QUESTIONS BY MR. LANIER:

18         Q.      Now, that's kind of a weird

19   thing, but let's -- at the risk of stating

20   the obvious, every drug the distributor

21   sells, the distributor's making money on that

22   transaction, right?

23                 MS. MCCLURE:  Form.

24        Foundation.  Calls for speculation.

25        Leading.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  I don't know for
 2        certain, but we were never involved in
 3        the financial portion of things.
 4   QUESTIONS BY MR. LANIER:
 5        Q.    Well, you know that there are
 6   companies that operate for profit?
 7        A.    Yes.
 8        Q.    And you know they make their
 9   profit distributing drugs.  You call them a
10   wholesaler at times, right?
11        A.    Yes.
12                MS. MCCLURE:  Form.
13   QUESTIONS BY MR. LANIER:
14        Q.    Because they take from the
15   manufacturer and they put in the hands of the
16   pharmacies, right?
17                MR. EPPICH:  Objection.  Form.
18        Foundation.  Calls for speculation --
19                MS. MCCLURE:  Leading.
20                MR. EPPICH:  -- to this and the
21        prior question.
22                THE WITNESS:  Yes.
23   QUESTIONS BY MR. LANIER:
24        Q.    And you know that that's
25   generally how they make their money.  They're
```

1    not sitting on the street corner with a cup

2    saying, "We do our work for free; would you

3    please give us money"?

4               MS. MCCLURE:  All the same

5          objections, plus argumentative, plus

6          compound.

7               THE WITNESS:  It would be an

8          assumption that that's how they're

9          making their money.

10   QUESTIONS BY MR. LANIER:

11        Q.    Yeah.  Have you ever known a

12   big distributor of opioids that's a nonprofit

13   company?

14        A.    No.

15        Q.    All right.  So you've got a

16   company that's got to make a sales decision,

17   knowing if they ship and sell the product

18   they make their money, most likely.  And yet

19   it's their decision, it's not the DEA's, in

20   the normal course of events, absent some

21   order, right?

22               MR. EPPICH:  Objection.  Form.

23          Misstates testimony.

24               MS. MCCLURE:  Leading.

25               THE WITNESS:  Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    QUESTIONS BY MR. LANIER:

2         Q.    And so in your summary sheet,

3    which is right toward the end, you had to

4    tell them that any "distributor selling

5    controlled substances that are being

6    dispensed outside the course of professional

7    practice must stop immediately."

8              You had to tell them that,

9    right?

10             MS. MCCLURE:  Form.  Compound.

11        Leading.

12             THE WITNESS:  We did tell them

13        that, yes.

14   QUESTIONS BY MR. LANIER:

15        Q.    But, I mean, that's a gimme.

16   Should be, shouldn't it?

17             MS. MCCLURE:  Argumentative.

18        Form.  Foundation.  Leading.

19             THE WITNESS:  It should be.

20   QUESTIONS BY MR. LANIER:

21        Q.    Right before you left the DEA

22   to go do work as a consultant for

23   AmerisourceBergen and others, there was a

24   show cause order that was issued.  It was

25   Exhibit 12 that you were shown yesterday,

Highly Confidential - Subject to Further Confidentiality Review

1    this order to show cause and immediate

2    suspension of registration to

3    AmerisourceBergen in 2007.

4              Do you see that?

5    A.      Yes.

6    Q.      And the order to show cause was

7    based on the respondent -- that would be

8    AmerisourceBergen, right?

9              MS. MCCLURE:  Form.

10             THE WITNESS:  Yes.

11   QUESTIONS BY MR. LANIER:

12   Q.      -- failing to maintain

13   effective controls against diversion of

14   particular controlled substances, in

15   violation of the law.

16             Do you see that?

17   A.      I do.

18   Q.      Several of their largest

19   purchasers of hydrocodone --

20             That's an opioid, right?

21   A.      It is.

22   Q.      -- in 2005 and 2006 were

23   pharmacies engaged in schemes to dispense

24   controlled substances based on prescriptions

25   that are issued for other than a legitimate

1    medical purpose and by physicians acting

2    outside the usual course of professional

3    practice.

4              That's while you were there,

5    wasn't it?

6         A.    Yes.

7         Q.    I mean, y'all were listing it

8    here.  Y'all have got over a million doses of

9    these opioids in just one year at one place,

10   right?

11             MS. MCCLURE:  Form.

12             THE WITNESS:  Correct.

13   QUESTIONS BY MR. LANIER:

14        Q.    And you've got them doing it

15   under similarly suspicious circumstances to a

16   number of different pharmacies, don't you?

17             MS. MCCLURE:  Form.  Vague.

18             THE WITNESS:  Yes.

19   QUESTIONS BY MR. LANIER:

20        Q.    And then y'all's investigation

21   and your work and what you knew is that

22   public information regarding several of the

23   pharmacy customers was readily available to

24   AmerisourceBergen.

25             MS. MCCLURE:  Form.  Scope.

Highly Confidential - Subject to Further Confidentiality Review

```
 1      QUESTIONS BY MR. LANIER:

 2           Q.     That's true, isn't it?

 3           A.     Yes.

 4           Q.     And had AmerisourceBergen

 5      attempted to learn about these pharmacies

 6      prior to filling the suspicious orders, they

 7      would have known many of the named pharmacies

 8      were filling prescriptions issued by

 9      physicians acting outside the usual course of

10      professional practice, in violation of the

11      law, wouldn't they?

12                  MS. MCCLURE:  Form.

13                  THE WITNESS:  That's correct.

14      QUESTIONS BY MR. LANIER:

15           Q.     And this is all work that

16      happened while you were at the DEA, isn't it?

17           A.     It is.

18           Q.     It continues on page 3 to talk

19      about how they sold over 5.2 million dose

20      units of this opioid to pharmacies that bore

21      the characteristics that the DEA described in

22      that very October -- August 2005 meeting,

23      correct?

24                  MS. MCCLURE:  Form.

25                  THE WITNESS:  Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. LANIER:

 2         Q.    So y'all met with them.  You

 3    made it clear what the law was, and they,

 4    afterwards, continued to sell in violation of

 5    the law, based upon the way you understood

 6    it, correct?

 7              MS. MCCLURE:  Objection.  Form.

 8         Foundation.  Leading.

 9              THE WITNESS:  Correct.

10    QUESTIONS BY MR. LANIER:

11         Q.    Interestingly, you were shown

12    yesterday Exhibit Number 18, which is this

13    summary of the DEA HDMA meeting.

14              HDMA, who are they?

15         A.    They're a trade association,

16    the Healthcare Distribution Management

17    Association.

18         Q.    This is a trade association.

19    This is an organization that the pharmacy

20    companies fund and join, right?

21              MS. MCCLURE:  Form.

22              MS. WICHT:  Object to form.

23              MS. MCCLURE:  Foundation.

24              THE WITNESS:  Yes.

25
```

```
 1      QUESTIONS BY MR. LANIER:

 2           Q.      And you were meeting with them.

 3      You were one of the DEA attendees, right?

 4           A.      Correct.

 5           Q.      And then I was reading this

 6      Exhibit 18 they showed you yesterday, and it

 7      says that y'all "prioritize who to meet with

 8      on a combination of wholesale distributor

 9      sales volumes and tracing back to where you

10      felt the source of the products for illicit

11      Internet pharmacies was located."

12                   Is that true?

13                   MS. MCCLURE:  Form.

14      QUESTIONS BY MR. LANIER:

15           Q.      So in other words, y'all met

16      with the volume source problems first?

17           A.      We met with those wholesalers

18      that handled the largest volumes of

19      controlled substances first.

20           Q.      Yeah.

21                   So that means you met first

22      with the AmerisourceBergen, I guess, right?

23           A.      Yes.

24           Q.      Who did you meet with next?

25           A.      I believe it was Cardinal.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.      Who did you meet with next?

2          A.      McKesson.

3          Q.      Have you heard the expression

4    "the big three" when it comes to

5    distributors?

6          A.      Yes.

7          Q.      Those are the big three, aren't

8    they?

9          A.      They are referred to as that.

10         Q.      Now, it's apparent by us

11   reading this -- it's apparent by us reading

12   this that holding shipments that were

13   suspicious was a new thing for Amerisource in

14   2007, true?

15         A.      Yes.

16         Q.      I mean, they made that point

17   yesterday.  They never did that before, did

18   they, to your knowledge?

19         A.      Not that I'm aware of, no.

20         Q.      I mean, think of this:  Before

21   that, AmerisourceBergen would be suspicious

22   that this might be an order that could be

23   diverted, and they'd just sell it anyway --

24              MS. MCCLURE:  Form.

25         Foundation.

Highly Confidential - Subject to Further Confidentiality Review

```
 1     QUESTIONS BY MR. LANIER:

 2          Q.      -- wouldn't they?

 3          A.      They were reporting things

 4     after shipment, yes.

 5          Q.      In other words, oh, we have our

 6     suspicions that this may be illegal, may be

 7     used for wrong purposes, may hurt the public,

 8     may hurt health.  We have suspicions this can

 9     be diverted, but we're going to sell anyway.

10               MS. MCCLURE:  Objection.

11     QUESTIONS BY MR. LANIER:

12          Q.      That was their policy --

13               MS. MCCLURE:  Objection.

14          Misstates.

15     QUESTIONS BY MR. LANIER:

16          Q.      -- before 2007, wasn't it?

17               MS. MCCLURE:  Objection.

18          Misstates the record.  Form.

19          Foundation.

20               THE WITNESS:  I don't know that

21          it was a policy of theirs.

22     QUESTIONS BY MR. LANIER:

23          Q.      Well, it was their practice --

24               MS. MCCLURE:  All the same.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      QUESTIONS BY MR. LANIER:

 2          Q.      -- wasn't it?

 3          A.      Yes.

 4          Q.      I mean, you told these

 5      companies that under the old Harrison

 6      Narcotic Act -- you know what that is, right?

 7          A.      Yes.

 8          Q.      That's what preceded the

 9      Controlled Substances Act?

10          A.      Correct.

11          Q.      And you would talk to these

12      companies about this US Supreme Court

13      explaining the need to hold suspicious

14      shipments, didn't you?

15          A.      In those meetings, yes.

16          Q.      And the case you were citing

17      from the US Supreme Court -- I looked at your

18      meeting notes -- 1943, Direct Sales versus

19      United States, correct?

20          A.      Yes.

21          Q.      So you knew since 1943 about

22      the need to hold suspicious orders --

23              MR. EPPICH:  Object to form.

24      QUESTIONS BY MR. LANIER:

25          Q.      -- didn't you?
```

```
 1              MR. EPPICH:  Object to form.

 2              THE WITNESS:  I don't recall

 3         the details of that case and what it

 4         refers to, but it was a case from...

 5   QUESTIONS BY MR. LANIER:

 6         Q.    From 1943, Direct Sales versus

 7   the United States, where the petitioner was a

 8   registered drug manufacturer and wholesaler,

 9   and they were selling to Dr. Tate in such

10   quantities and so frequently that it must

11   have known he couldn't dispense the amounts

12   lawfully, and so he was distributing them

13   illegally.  And they were continuing to ship

14   to him even after they should have known

15   this, and that's what they got nailed for.

16              That's the case, isn't it?

17              MS. MCCLURE:  Form.

18              MR. EPPICH:  Objection.

19              THE WITNESS:  Yes.

20   QUESTIONS BY MR. LANIER:

21         Q.    And you included that case in

22   what you gave the companies?

23         A.    Yes, we did.

24         Q.    And that was an opioid case,

25   wasn't it?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. MCCLURE:  Form.

 2                    THE WITNESS:  It was.

 3     QUESTIONS BY MR. LANIER:

 4          Q.    So this idea that, ah, geez, we

 5     couldn't know, I mean, you gave them a case

 6     that said since 1943 the US Supreme Court

 7     said that you should be holding these things,

 8     right?

 9                    MS. MCCLURE:  Form.

10          Foundation.  Misstates.

11                    THE WITNESS:  Yes, the Supreme

12          Court said that you should have known.

13     QUESTIONS BY MR. LANIER:

14          Q.    And with all due respect, have

15     you seen a chart of how the opioid crisis

16     exploded in Summit and Cuyahoga Counties --

17     Cuyahoga County?  Sorry, I'm from Lubbock,

18     Texas.  We don't do that well.

19                    Cuyahoga County?

20          A.    No, I have not.

21          Q.    So no one showed you the chart

22     that was prepared, and it's in the expert

23     report of Craig McCann.  I want to make it

24     real clear he's one of our experts, but I

25     don't think anybody disputes this chart.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. MCCLURE:  Note for the

 2         record significant laughter, and

 3         objection to characterization

 4         regarding the plaintiffs' exhibit.

 5   QUESTIONS BY MR. LANIER:

 6         Q.    This is actually from Rafalski,

 7   Jim Rafalski, originally.  And it shows --

 8              MR. EPPICH:  Objection.

 9   QUESTIONS BY MR. LANIER:

10         Q.    -- the huge -- I mean, boy,

11   this is all we had.  If we were just looking

12   at this, you'd say, man, what happened in

13   1999 and 2000?  All of a sudden the sales

14   just went through the roof?

15              Do you see that?

16              MS. SWIFT:  Objection.

17              MS. MCCLURE:  Objection.

18         Characterization.  Scope.

19              THE WITNESS:  I see an

20         increase.

21   QUESTIONS BY MR. LANIER:

22         Q.    Yeah.  And then -- but that's

23   nothing compared to what happened after that.

24   That's a mountain, isn't it?

25              MS. SWIFT:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Mischaracterizes the evidence.
 2                 MS. MCCLURE:  Objection.
 3            Narrative.  Scope.
 4                 THE WITNESS:  Yes, it's another
 5            large increase.
 6      QUESTIONS BY MR. LANIER:
 7            Q.    We're taking the deposition,
 8      your deposition today, in Colorado Springs
 9      where you live, right?
10            A.    Yes.
11            Q.    Is that Pikes Peak I saw out
12      the window?
13            A.    Could have been.
14            Q.    14,000-plus feet?
15            A.    Yes.
16            Q.    I mean, you know mountains,
17      don't you?
18                 MS. MCCLURE:  Form.
19                 THE WITNESS:  Yes.
20      QUESTIONS BY MR. LANIER:
21            Q.    So when a company sees a
22      suspicious order, the company's got to make
23      this decision:  Do we sell it and make our
24      money, or do we hold it and investigate it?
25                 That's the company's decision,
```

```
 1    right?

 2                  MS. MCCLURE:  Form.  Compound.

 3                  THE WITNESS:  It is.

 4    QUESTIONS BY MR. LANIER:

 5         Q.    Always has been the company's

 6    decision, hasn't it?

 7         A.    It has.

 8         Q.    And common sense weighs in to

 9    this just as much as the law and everything

10    else, doesn't it?

11                  MS. MCCLURE:  Form.

12                  THE WITNESS:  Yes.

13    QUESTIONS BY MR. LANIER:

14         Q.    And decency weighs in on this,

15    too, and concern for public good and public

16    health, right?

17                  MS. MCCLURE:  Form.

18                  THE WITNESS:  Yes.

19    QUESTIONS BY MR. LANIER:

20         Q.    And so faced with that on one

21    side of the coin, and on the other side of

22    the coin or the ledger you've got corporate

23    profits and business, right?

24                  MS. MCCLURE:  Form.

25                  THE WITNESS:  Yeah, those are
```

1          factors they need to consider.

2     QUESTIONS BY MR. LANIER:

3          Q.     All right.  In this regard, I

4     asked Joe Rannazzisi some questions in his

5     deposition, and I'd like to -- I've got the

6     notes that I made from his deposition, and

7     I'd like to just ask you some questions based

8     on those notes to see if you agree or

9     disagree?

10          Okay?

11          A.     Okay.

12          MS. MCCLURE:  Objection.  Based

13          on the notes, mischaracterized

14          Mr. Rannazzisi's actual testimony.

15     QUESTIONS BY MR. LANIER:

16          Q.     "All registrants are required

17     to maintain effective control against

18     diversion."  I'm going to put your answers in

19     blue.

20          Do you agree or disagree?

21          A.     Agree.

22          Q.     And so this is blue for

23     Mr. Mapes.

24          "The registrant is required to

25     report a suspicious order to the DEA."

Highly Confidential - Subject to Further Confidentiality Review

```
1                 Do you agree?

2       A.      Yes.

3       Q.      "The registrant is required to

4    maintain a system to detect suspicious

5    orders."

6                 Do you agree with that part?

7       A.      Yes.

8       Q.      And "It's a business decision,

9    but they must identify suspicious orders."

10                Do you agree?

11      A.      Yes.

12      Q.      And "They should not ship

13   suspicious orders without full due diligence

14   that resolves their suspicions."

15                Do you agree?

16      A.      I agree.

17                MS. WICHT:  Object to form on

18       the last question.

19   QUESTIONS BY MR. LANIER:

20      Q.      I don't need ask you this one

21   because we've covered it with our own

22   drawing, although I did a better drawing for

23   him, didn't I?

24                Let's just work through it.

25                A closed system of
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    distribution, that's what we called a loop,

2    right?

3              Agreed?

4        A.    Yes.

5        Q.    And it accounts for the drugs

6    from the manufacturing to the patient, agree?

7        A.    Yes.

8        Q.    And this system, it's for the

9    legal obligation to secure, keep records and

10   control against diversion, agree?

11       A.    Yes.

12             MS. SWIFT:  Object to form.

13   QUESTIONS BY MR. LANIER:

14       Q.    Manufacturers, they make money

15   off the manufacturing and selling of the

16   pills, generally, true?

17             MR. EPPICH:  Objection.

18        Foundation.

19             MS. MCCLURE:  Form.

20        Foundation.

21   QUESTIONS BY MR. LANIER:

22       Q.    Let me ask it this way, and I

23   don't think that's the way I asked

24   Mr. Rannazzisi.

25             Manufacturers manufacture pills
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    and sell them, general course of business,

 2    right?

 3              I'm not saying they don't give

 4    samples.  I'm not saying they don't, you

 5    know, have some that they may put under

 6    various programs, but they manufacture pills,

 7    fair?

 8         A.    Yeah, various dosage forms.

 9         Q.    And the distributors are the

10    middleman who send out the money -- or take

11    orders and get paid as a bridge, agreed?

12              MR. EPPICH:  Objection.  Form.

13    QUESTIONS BY MR. LANIER:

14         Q.    Between the manufacturers and

15    retailers?

16              MR. EPPICH:  Object to the

17         form.

18              THE WITNESS:  Yes.

19    QUESTIONS BY MR. LANIER:

20         Q.    Would you agree that they are a

21    key component to this registration system?

22              MR. EPPICH:  Object to form.

23              THE WITNESS:  Yes.

24    QUESTIONS BY MR. LANIER:

25         Q.    Would you agree that they must
```

Highly Confidential - Subject to Further Confidentiality Review

1    be vigilant, and by that include due

2    diligence, knowing their customers and

3    looking at suspicious orders, agreed?

4                    MR. EPPICH:  Objection.  Form.

5         Vague.

6                    MS. SWIFT:  Objection.  Legal

7         conclusion.

8                    MR. EPPICH:  Calls for a legal

9         conclusion.

10                    THE WITNESS:  Yes.

11    QUESTIONS BY MR. LANIER:

12         Q.    And would you agree that this

13    is critical to stop diversion?

14                    MR. EPPICH:  Object to the

15         form.

16                    THE WITNESS:  Yes.

17    QUESTIONS BY MR. LANIER:

18         Q.    And I've asked you if you know

19    whether or not the more they sell, the more

20    money they make.

21                    You assume that to be true, but

22    you don't know firsthand, fair?

23         A.    That's correct.

24         Q.    All right.  We'll leave that

25    unmarked.

Highly Confidential - Subject to Further Confidentiality Review

```
1                    Now, in 2005, Joe Rannazzisi
2       says he sat down with the distributors, he
3       explained the law as he interpreted it and
4       what was expected.
5                    Were you in on that meeting?
6                    MS. WICHT:  Objection.
7            Foundation.
8                    MS. MCCLURE:  Objection to the
9            extent it mischaracterizes what
10           Mr. Rannazzisi testified to.
11                   THE WITNESS:  I don't know
12           which meeting he may have been
13           referring to.
14      QUESTIONS BY MR. LANIER:
15           Q.    Okay.  So don't know if you
16      were there.
17                   Did you know that those
18      meetings took place?
19                   MS. MCCLURE:  Continuing
20           objection.  Same.
21                   THE WITNESS:  The meetings I'm
22           aware of were the Distributor
23           Initiative meetings that we've talked
24           about already, and he was at, I
25           believe, one of those.
```

```
 1     QUESTIONS BY MR. LANIER:

 2          Q.     So you know -- whoops.  You

 3     know about those meetings with the

 4     distributors where you were involved

 5     explaining the law?

 6          A.     Yes.

 7          Q.     Okay.  And then in 2006 and

 8     2007, he sent letters telling them to

 9     remember their responsibilities.

10               Did you know about that?

11          A.     Yes.

12               MS. MCCLURE:  Form.

13          Mischaracterizes the document.

14     QUESTIONS BY MR. LANIER:

15          Q.     And then he testified the

16     companies, at least several companies, didn't

17     do what they were directed to do.  They

18     didn't comply.

19               You know that to be true, at

20     least for the McKesson story -- I mean, the

21     AmerisourceBergen story we were talking about

22     before, right?

23               MS. MCCLURE:  Objection.  Form.

24          Foundation.  Mischaracterizes the

25          witness' testimony.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Yeah, I know

 2          there were continuing issues.

 3     QUESTIONS BY MR. LANIER:

 4          Q.    Well, not just continuing

 5     issues, continuing violations based upon your

 6     interpretation?

 7                    MS. MCCLURE:  All the same

 8          objections plus asked and answered.

 9          Argumentative.

10     QUESTIONS BY MR. LANIER:

11          Q.    And by "your" I mean you,

12     individually, not the DEA.

13                    MS. MCCLURE:  All the same.

14                    MR. BENNETT:  Objection.

15          Scope.

16                    You may answer that question

17          yes or no only.

18                    THE WITNESS:  Yes.

19     QUESTIONS BY MR. LANIER:

20          Q.    Okay.  And the company changed

21     the law.  They lobbied hard to get a bill

22     passed that changed the ability of the DEA to

23     control distributors, didn't they?

24                    MS. MCCLURE:  Form.

25          Foundation.  Compound.  Misstates the
```

 1      record.  Vague.

 2              THE WITNESS:  There was a

 3          change in the law, yes.

 4   QUESTIONS BY MR. LANIER:

 5          Q.    We'll look at how much the

 6   company spent to lobby for that in a little

 7   bit, if we have time.

 8              And diversion causes overdose

 9   and deaths, 16,000 in 2014 to 2015.  That's

10   consistent with what you knew as well, right?

11              MR. EPPICH:  Objection.

12          Foundation.

13              THE WITNESS:  No, I don't know

14          what the numbers are.  I wasn't with

15          DEA at that point and don't know.

16   QUESTIONS BY MR. LANIER:

17          Q.    Okay.  Now, "if the companies

18   are asserting a roadblock," I asked

19   Mr. Rannazzisi in his deposition, "that the

20   DEA was part of the problem, that you didn't

21   do your job right or that Joe Ran didn't do

22   his job right or the others," Joe Ran

23   disagreed and said the DEA tried to stop

24   diversion and to clean up the supply chain.

25              Do you think that the DEA was

```
 1      the problem?

 2                  MS. MCCLURE:  Form.

 3                  MR. EPPICH:  Objection.  Form.

 4          Misstates the testimony.

 5                  MR. BENNETT:  Objection.

 6          Scope.  This is not a 30(b)(6) witness

 7          here to testify on behalf of DEA.

 8                  If you have a personal opinion

 9          based on your personal experiences,

10          you may answer the question.

11                  THE WITNESS:  I believe the DEA

12          worked within the resources they had

13          to address the problem.

14      QUESTIONS BY MR. LANIER:

15          Q.      Uh-huh.

16                  Would you agree that if the

17      companies stopped diversions, the DEA's never

18      even going to be an issue?

19                  If the companies truly did what

20      the law told them to do, the DEA's not a

21      problem on this, right?

22                  MS. MCCLURE:  Form.

23          Speculation.  Foundation.  Calls for a

24          legal conclusion and scope.

25                  MS. WICHT:  Incomplete
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          hypothetical.

 2                  MR. BENNETT:  Same instruction.

 3                  THE WITNESS:  I believe that

 4          DEA would always have to be there to

 5          provide oversight, so it would

 6          continue.

 7   QUESTIONS BY MR. LANIER:

 8          Q.     Right.  To make sure the

 9   oversight is there.

10                  But if the companies have

11   stopped diversion, oversight is pretty

12   simple, right?

13                  MS. MCCLURE:  All the same

14          objections.  Leading.

15                  THE WITNESS:  Yes.

16   QUESTIONS BY MR. LANIER:

17          Q.     And then if there's an argument

18   that the distributors, the manufacturers,

19   pharmacies, they were just confused, you know

20   from your work that those companies have

21   lawyers that are inside the company and

22   lawyers that they hire outside the companies,

23   right?

24                  MS. SWIFT:  Objection.

25          Leading.
```

```
 1                    THE WITNESS:  That's correct.

 2     QUESTIONS BY MR. LANIER:

 3          Q.    And the DEA hasn't and doesn't

 4     give legal counsel, true?

 5                    MS. MCCLURE:  Form.

 6                    MR. EPPICH:  Objection.

 7          Misstates testimony.

 8                    MS. MCCLURE:  Foundation.

 9          Misstates the testimony and the

10          record.

11                    THE WITNESS:  That's correct.

12     QUESTIONS BY MR. LANIER:

13          Q.    And some companies, you know

14     for a fact, hired former employees from the

15     DEA so they had that resource available as

16     well, true?

17                    MS. MCCLURE:  Foundation.

18                    THE WITNESS:  True.

19     QUESTIONS BY MR. LANIER:

20          Q.    And if a company is confused,

21     they can always stop selling until they get

22     their questions answered, can't they?

23                    MS. MCCLURE:  Leading.

24                    MS. WICHT:  Foundation.

25                    THE WITNESS:  Yes, they could.
```

```
 1                MR. LANIER:  All right.  That

 2          ends our second stop on the road.

 3          We're ready to go to the third stop.

 4                If we could take a break for

 5          about five minutes and I'll clean up

 6          this mess.

 7                VIDEOGRAPHER:  Going off

 8          record.  The time is 10:12.

 9           (Off the record at 10:12 a.m.)

10                VIDEOGRAPHER:  We're going back

11          on record.  Beginning of Media File 4.

12          The time is 10:23.

13    QUESTIONS BY MR. LANIER:

14          Q.   Mr. Mapes, on the road that we

15    were doing, we've done your personal

16    background, we've done your work for your

17    DEA.

18                Now I want to talk to you about

19    some of the industry issues that arose when

20    you were with industry and some of the

21    questions that industry asked you today.

22                And as a reminder, you still do

23    work for industry today, right?

24                MS. MCCLURE:  Form.

25                THE WITNESS:  In what form?
```

```
 1    QUESTIONS BY MR. LANIER:

 2         Q.     Well, you're a consultant to

 3    one of the parties in this litigation, to

 4    Cardinal, correct?

 5         A.     Yes.

 6         Q.     And I assume you're still --

 7    your services are still out there to hire if

 8    they need help on some DEA issue, fair?

 9         A.     No.

10         Q.     You don't do that anymore?

11         A.     No.

12         Q.     So now your consulting is

13    limited to the legal arena for these

14    companies?

15         A.     To this one instance, yes.

16         Q.     All right.  Now, in that

17    regard, sir, let's talk then about your

18    industry work and let's stop there on our

19    road.

20              Okay?

21         A.     Okay.

22         Q.     I want to begin with a question

23    from the AmerisourceBergen lawyer.

24              Now, the AmerisourceBergen

25    lawyer told you that the DEA had approved
```

1    their suspicious order monitoring system at

2    one point in time.

3              You were surprised by that,

4    remember?

5              MS. MCCLURE:  Objection to the

6         narrative.  Objection to misstates the

7         record.  Form.

8              THE WITNESS:  No, I don't

9         believe I was surprised by that.

10   QUESTIONS BY MR. LANIER:

11        Q.   Okay.  Then I may have

12   misunderstood you yesterday.

13             In regard to Exhibit Number 5,

14   going back to 1998 where the DEA said that

15   they would grant approval of the request to

16   implement on a nationwide basis the newly

17   developed system to identify and report

18   suspicious orders for controlled substances,

19   you already knew about that before yesterday?

20             MS. MCCLURE:  Form.

21             THE WITNESS:  What year was

22        this?

23   QUESTIONS BY MR. LANIER:

24        Q.   1998.

25        A.   I don't believe I had seen that

```
 1    particular memo before yesterday.

 2          Q.    Okay.  Well, then that's what I

 3    was saying.  You did not know before

 4    yesterday about this -- it was Exhibit 4.

 5    I'll give you another copy of Exhibit 4 from

 6    yesterday.

 7                Exhibit 4 is this 1998 approval

 8    of the request to implement nationwide a

 9    newly developed system to identify and report

10    suspicious orders.

11                Do you see that?

12          A.    Yes.

13          Q.    Now, you say today that you

14    knew about this; you'd just not seen it?

15          A.    I had not seen it before

16    yesterday.

17          Q.    Okay.  But yesterday it was set

18    forward before you as the method of providing

19    information being approved or the entire

20    monitoring system being approved?

21                MS. MCCLURE:  Form.

22    QUESTIONS BY MR. LANIER:

23          Q.    Which was it?

24          A.    This appears to me to approve

25    the system to identify and report suspicious
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    orders, so that would be their entire system.

 2         Q.    Okay.  So in that regard, look

 3    at -- let's do it this way.

 4               Did you ever look at the

 5    system?

 6               MS. MCCLURE:  Form.  Vague.

 7               THE WITNESS:  Did I look at --

 8    QUESTIONS BY MR. LANIER:

 9         Q.    Yeah.

10         A.    -- which system and --

11         Q.    At what was approved?

12         A.    -- at what point in time?

13         Q.    Have you looked at the system

14    that was approved that she was talking about?

15               MS. MCCLURE:  Form.  Vague.

16               THE WITNESS:  No.

17    QUESTIONS BY MR. LANIER:

18         Q.    By the way, all of this was

19    dealing with methamphetamines, not opioids,

20    right?

21               MS. MCCLURE:  Form.  Misstates

22         the document.  Foundation.  Leading.

23    QUESTIONS BY MR. LANIER:

24         Q.    Same law, same requirements to

25    deal with it, but these were all dealing with
```

Highly Confidential - Subject to Further Confidentiality Review

1    methamphetamines back then, weren't they?

2                MS. MCCLURE:  All the same

3          objections.

4                THE WITNESS:  I believe they

5          were dealing with both, the chemicals,

6          the listed chemicals, and controlled

7          substances.

8    QUESTIONS BY MR. LANIER:

9          Q.    If you'll look on the page

10   that's marked -- it's one of the overhead

11   letters, December 30, 1997.  It's about three

12   or four pages in.  It's got down in the lower

13   right-hand corner the number 350.

14                Do you see that?

15         A.    Yes.

16         Q.    It talks about how the

17   Methamphetamine Control Act requires

18   distributors to report suspicious orders of

19   listed chemicals to the DEA.

20                MS. MCCLURE:  So I note that

21          the Exhibit 4 that you've just handed

22          out does have a different set of Bates

23          numbers applied to it, so the

24          reference to 350 that you read out for

25          the December 30th letter actually, in

Highly Confidential - Subject to Further Confidentiality Review

1          this copy that you just handed to the

2          witness, ends in 786.

3                    MR. LANIER:  Okay.  Thank you

4          for helping us do that.

5     QUESTIONS BY MR. LANIER:

6          Q.    So she wants you to look at

7     page 786 instead of 9350.  It's been produced

8     in multiple ways.  Same document, though.

9                    So Exhibit 4, page 786 in the

10    corner --

11                   MS. MCCLURE:  So we should

12         designate --

13    QUESTIONS BY MR. LANIER:

14         Q.    -- is talking about the

15    Methamphetamine Control Act?

16                   Do you see that?

17                   MS. MCCLURE:  So two things.

18         We should designate this document

19         you've handed the witness as 4A in

20         light of the fact that it is, in fact,

21         a different Bates numbers set.

22                   And I continue to maintain all

23         of the same previously articulated

24         objections to your characterization of

25         the document.

```
 1                 (Mapes Exhibit 4A marked for

 2           identification.)

 3      QUESTIONS BY MR. LANIER:

 4           Q.     Do you see that, sir?

 5           A.     I do.

 6           Q.     This is talking about the need

 7      to report suspicious orders of ephedrine and

 8      pseudoephedrine.

 9                  Do you see that?

10                  MS. MCCLURE:  Continuing

11           objection to the use of the document

12           and the witness' testimony and...

13      QUESTIONS BY MR. LANIER:

14           Q.     Do you see that, sir?

15           A.     I do.

16           Q.     That's Sudafed.  The concern

17      was people taking Sudafed and buying large

18      amounts of it and using it to manufacture

19      crack; is that right?

20           A.     No.

21                  MS. MCCLURE:  Continuing

22           objection.

23      QUESTIONS BY MR. LANIER:

24           Q.     What was the concern?

25           A.     They were using it to
```

1    manufacture methamphetamine.

2         Q.    Crack's not methamphetamine?

3         A.    No.

4         Q.    Okay.  I grew up in Lubbock.

5    We didn't know this stuff.

6              But they make drugs off of it.

7    They make illegal drugs, right?

8         A.    Yes.

9         Q.    Speed?

10        A.    Yes.

11        Q.    It's not opioids, is it?

12        A.    No, it's not.

13             MS. MCCLURE:  Form.

14   QUESTIONS BY MR. LANIER:

15        Q.    Methamphetamine Control Act

16   doesn't apply to opioids, does?

17             MS. MCCLURE:  Form.  Calls for

18        a legal conclusion.

19             THE WITNESS:  It does not.

20   QUESTIONS BY MR. LANIER:

21        Q.    Okay.  But just aside from the

22   fact that she gave you a methamphetamine --

23   deal -- the bottom line is, if you look at

24   it, the plan that was approved says that

25   they're going to hold shipping while

1    contacting and reporting it to the DEA.

2                    Did she tell you that?

3                    MS. MCCLURE:  Form.

4           Mischaracterizes the document.

5           Continuing objection to all of the

6           previous ones I had identified.

7                    THE WITNESS:  I don't remember

8           specifically what she said yesterday.

9           There were a lot of questions.

10   QUESTIONS BY MR. LANIER:

11          Q.    Well, she never gave you the

12   actual -- never gave it to you, never gave it

13   to the jury, the actual suspicious order

14   monitoring system she says was approved.

15                  She never gave it to you, did

16   she?

17                    MS. MCCLURE:  Form.

18                    THE WITNESS:  That's correct.

19                    (Mapes Exhibit 31 marked for

20          identification.)

21   QUESTIONS BY MR. LANIER:

22          Q.    Well, let me give it to you.

23   We'll mark it as Exhibit Number 31.

24   Exhibit 31, suspicious order policy and

25   procedure for Bergen.

Highly Confidential - Subject to Further Confidentiality Review

1          This is before they got bought

2     out by Amerisource.

3          Do you see that?

4     A.     I see that.

5     Q.     The old company, before they

6     got bought out by Amerisource, knew what is a

7     suspicious order.  They're able to cite the

8     regulation on that, aren't they?

9          MS. MCCLURE:  Form.  Leading.

10     QUESTIONS BY MR. LANIER:

11     Q.     Do you see that?

12     A.     I see that.

13     Q.     And they talk about they knew

14     what the division manager's responsibility

15     was, that they had to "design and operate a

16     system to disclose to the registrant

17     suspicious orders of controlled substances."

18          They knew that, didn't they?

19     A.     It's included in the memo.

20     Q.     But if you go to the last page,

21     you'll see some things at the very end, the

22     very last thing they have to say about it.

23          "It is imperative each division

24     manager understand these computer reports do

25     not relieve them of their responsibility to

Highly Confidential - Subject to Further Confidentiality Review

```
1     report suspicious orders, especially large

2     single orders.  Remember, the reports contain

3     information on actual sales only and do not

4     necessarily reflect actual orders."

5               Do you see where I'm reading?

6         A.    I do.

7         Q.    Talks about the different

8     formats, but then it says, "If these

9     customers' orders fit the suspicious order

10    criteria explained above" --

11              You tracking with me?

12        A.    Yes.

13        Q.    -- "you must contact DEA to

14    report the order before actually shipping the

15    merchandise.  This must be done even if you

16    decide to cut the order back for business

17    reasons.  Again, in this case, it is the

18    order that is suspicious, not the actual

19    shipment."

20              Did you see that?

21        A.    Yes, I see that.

22        Q.    In other words, don't ship it

23    until you report it to the FDA {sic}?

24              MS. MCCLURE:  Form.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      QUESTIONS BY MR. LANIER:

 2           Q.     That was in the program, wasn't

 3      it?

 4           A.     To DEA.

 5           Q.     To DEA, I apologize.  Let me

 6      ask it again.

 7                  In other words, don't ship it

 8      until you report it to the DEA?

 9                  MS. MCCLURE:  Form.

10                  THE WITNESS:  That's correct.

11      QUESTIONS BY MR. LANIER:

12           Q.     Well, that's not what the

13      company was doing once they'd been bought out

14      by Amerisource, is it?

15                  MS. MCCLURE:  Form.  Calls

16           for -- foundation.

17      QUESTIONS BY MR. LANIER:

18           Q.     Go ahead and answer.

19           A.     They were not doing that.

20           Q.     Yeah.

21                  So they even quit the policy

22      that they had claimed to have gotten approved

23      for on the methamphetamine front, right?

24                  MS. MCCLURE:  Form.

25           Foundation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  I don't know if
 2          they quit the policy, there were
 3          lapses or what, but, yeah, there were
 4          instances where it wasn't followed.
 5   QUESTIONS BY MR. LANIER:
 6          Q.     Yeah.
 7                 Okay.  Now I want to ask you
 8   some specific questions from the industries.
 9                 Walmart asked you a bunch of
10   questions.  Put Walmart up here.
11                 The Walmart lawyer, you
12   remember him?
13          A.     Yes.
14          Q.     And the Walmart lawyer got here
15   and sat in this very chair and said, quote,
16   "Do you agree that good leaders hold
17   themselves accountable for the decisions they
18   make?"
19                 Do you remember him asking you
20   that?
21          A.     Yes.
22          Q.     Well, I got a question.
23                 If that's true for good leaders
24   inside the DEA and other places, that sure
25   ought to be true for Walmart, shouldn't it?
```

```
 1          A.      Yes.

 2          Q.      In other words, Walmart, if

 3     they're good leaders in Walmart, they ought

 4     to hold themselves accountable for the

 5     decisions they're making, fair?

 6          A.      Fair.

 7          Q.      Then he asked you this:  "Do

 8     you agree the American public" -- and I've

 9     written this out word for word, but it's

10     really a complicated question.  I had trouble

11     understanding it, so I want to read it

12     carefully.  I want you to read it with me.  I

13     want the jury to be able to read it.

14                  He said to you:  "Do you agree

15     the American public has a right to expect

16     that the leaders of our law enforcement

17     agencies will lead their teams in a fashion

18     consistent with the standards?"

19                  Remember that?

20          A.      Generally, yes.

21          Q.      And you generally agreed with

22     it, right?

23          A.      Yeah.

24          Q.      Well, do you agree the American

25     has a public -- has a right to expect that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the leaders of huge companies like Walmart

 2    will lead their teams to follow the law and

 3    not try to get away with actions that

 4    endanger our communities and people?

 5         A.    Yes.

 6         Q.    I mean, company CEOs shouldn't

 7    expect special treatment when it comes to

 8    breaking the law, right?

 9         A.    That's right.

10         Q.    Ignorance of law is no excuse,

11    right?

12         A.    Right.

13         Q.    Then he asked you this:  "Would

14    you agree that drug traffickers and diverters

15    are the ones who potentially benefit if the

16    DEA decides to isolate itself from

17    individuals who help advance the DEA's

18    diversion investigations who are outside of

19    DEA?"

20               Again, I had to read that like

21    three or four times to understand it, but do

22    you understand that question?

23         A.    I'm reading it again right now.

24         Q.    I think what he was saying in

25    everyday language is, if someone's not doing
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      their job right, the drug traffickers and the

 2      diverters can potentially benefit.  That's

 3      from the Walmart guy.

 4                  Right?

 5                  MR. STEPHENS:  Object to form.

 6                  THE WITNESS:  That is what I

 7          think he's saying, yes.

 8      QUESTIONS BY MR. LANIER:

 9          Q.    All right.  Well, let's just be

10      real clear.

11                  The drug traffickers here,

12      they're the people who are selling the

13      opioids, aren't they?

14                  MR. STEPHENS:  Object to form.

15      QUESTIONS BY MR. LANIER:

16          Q.    Drug traffickers, they traffic,

17      they sell opioids, right?

18                  MR. STEPHENS:  Object to form.

19                  THE WITNESS:  In my mind,

20          traffickers are the ones that would

21          illegally sell as opposed to

22          legitimately sell.

23      QUESTIONS BY MR. LANIER:

24          Q.    No fuss about that either.

25                  Because if a distributor, even
```

Highly Confidential - Subject to Further Confidentiality Review

1    if it's a legal company instead of some

2    fellow on the street, if that distributor is

3    not following the law, they're selling the

4    drugs illegally, aren't they?

5         A.    They could be, yes.

6         Q.    And so the traffickers, the

7    ones selling it illegally, and the diverters,

8    they're the ones who potentially benefit if

9    they can get away with it.

10             That's what this means, in

11   effect, isn't it?

12             MR. STEPHENS:  Object to form.

13             THE WITNESS:  It could mean

14       that, yes.

15   QUESTIONS BY MR. LANIER:

16        Q.    Yeah.  If we go back to our

17   little model, if we assume that the drug

18   companies -- if we can assume that these

19   distributors are for profit, they're going to

20   buy from the manufacturer and get it at a

21   wholesale cost, or get it at a cost that they

22   can then wholesale it to the pharmacies,

23   right?

24             MR. EPPICH:  Objection.

25       Foundation.

Highly Confidential - Subject to Further Confidentiality Review

```
1     QUESTIONS BY MR. LANIER:

2          Q.    Now, there's a bunch of folks

3     that actually hit both of these columns.  By

4     that I mean they're distributors and

5     pharmacies.  They get to make the money from

6     both ends of that, aren't there?

7               MS. SWIFT:  Objection.

8          Leading.  Mischaracterizes the

9          evidence.

10              THE WITNESS:  There are people

11         who are registered both as

12         distributors and pharmacies, yes.

13    QUESTIONS BY MR. LANIER:

14         Q.    People like Walmart?

15         A.    Yes.

16         Q.    Walgreens?  CVS?

17         A.    CVS, yes.  Walgreens, I'm not

18    sure.

19         Q.    Okay.  I mean, they're the ones

20    who profit.  They make money off these sales,

21    don't they?

22              MR. STEPHENS:  Object to form.

23              THE WITNESS:  Again, I never

24         have been involved in the financial

25         end of things so don't really...
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    QUESTIONS BY MR. LANIER:
2         Q.    All right.  Here's another one
3    from the Walmart lawyer.  He said:  "You're
4    not aware of any deadline that the DEA set
5    that changed this practice related to the
6    shipping of suspicious orders."
7              Do you remember that?
8         A.    Yes.
9         Q.    I mean, come on, you give them
10   the 1943 decision from the Supreme Court,
11   right?
12             MR. STEPHENS:  Object to form.
13        Foundation.
14   QUESTIONS BY MR. LANIER:
15        Q.    The law -- right?  You gave it
16   to them, right?
17             MR. STEPHENS:  Objection.
18             THE WITNESS:  Gave that to
19        whom, Walmart?
20   QUESTIONS BY MR. LANIER:
21        Q.    Well, you gave it to different
22   distributors, but, I mean, it's -- Walmart's
23   lawyers, their in-house legal team, that
24   is -- they've got, like, lots of lawyers on
25   it.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    They have access to the Supreme
 2    Court just as well as you, don't they?
 3         A.    I'm sure they do.
 4         Q.    Okay.  So you have your 1943
 5    decision, but the law itself, that was from
 6    the 1970s, wasn't it?
 7         A.    Yes.
 8         Q.    And did the DEA ever tell the
 9    companies, "Oh, go ahead, just ship those
10    suspicious orders.  It's following the law
11    when you ship a suspicious order.  You don't
12    need to do due diligence.  You don't need to
13    check into it.  You don't -- yeah, it's
14    excessive, yeah, it's suspicious, yeah, it's
15    probably going to be diverted, but just ship
16    it anyway and make the money"?
17                    Did y'all ever tell them to do
18    that?
19         A.    I never did.
20              MS. WICHT:  Object to form.
21    QUESTIONS BY MR. LANIER:
22         Q.    Do you know anyone who ever
23    did?
24              MR. EPPICH:  Object to form.
25              MS. WICHT:  Object to form.
```

```
 1     QUESTIONS BY MR. LANIER:

 2          Q.     At the DEA?

 3          A.     No, I don't.

 4          Q.     That's the company's decision

 5     whether or not they want to understand the

 6     law and follow the law, right?

 7               MS. MCCLURE:  Form.  Calls for

 8          a legal conclusion.

 9               THE WITNESS:  Yes.

10     QUESTIONS BY MR. LANIER:

11          Q.     It's the company's decision

12     whether or not they want to ship a suspicious

13     order or hold it, isn't it?

14          A.     It is.

15          Q.     And your answers about Walmart

16     apply to any of the other companies that that

17     Walmart lawyer said he was asking questions

18     on behalf of that were in the same or similar

19     shoes, fair?

20               MR. STEPHENS:  Object to form.

21               MR. EPPICH:  Object to form.

22          Vague.

23               THE WITNESS:  Yes.

24     QUESTIONS BY MR. LANIER:

25          Q.     Now, the Walmart lawyer asked
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    you some other things.  He said -- I couldn't
 2    follow this.  It sounded to me like the
 3    Walmart lawyer is blaming the DEA for not
 4    disclosing who their informants and their
 5    sources are for diversion problems.
 6                 MR. STEPHENS:  Object to form.
 7    QUESTIONS BY MR. LANIER:
 8         Q.     Did you remember those
 9    questions?
10         A.     The general line of questions,
11    yes.
12         Q.     Yeah.
13                I mean, is the DEA supposed to
14    be telling people, "Oh, here are our
15    informants, and here's how we figured out
16    who's breaking the law and who's not"?
17                 MR. STEPHENS:  Object to form.
18    QUESTIONS BY MR. LANIER:
19         Q.     I mean, y'all aren't supposed
20    to tell that to the companies that you're
21    investigating, are you?
22         A.     No.
23         Q.     And the fact that you're not
24    telling Walmart about how you figured out
25    AmerisourceBergen may or may not be breaking
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     the law, that doesn't excuse Walmart for

 2     breaking the law, does it?

 3              MR. STEPHENS:  Object to form.

 4        Foundation.

 5              THE WITNESS:  No, it does not.

 6     QUESTIONS BY MR. LANIER:

 7        Q.    And then he says, "The DEA can

 8     get a search warrant."

 9              Remember that question?

10        A.    I do.

11        Q.    Well, Walmart doesn't need a

12     search warrant to look in its own closet,

13     does it?

14              MR. STEPHENS:  Object to form.

15              THE WITNESS:  No.

16     QUESTIONS BY MR. LANIER:

17        Q.    I mean, if you want to go look

18     into the bowels of Walmart's records and what

19     they're doing and their due diligence and

20     all, you may need to get a search warrant if

21     you're working for the DEA, but Walmart

22     doesn't need a search warrant to go

23     investigate their own processes and

24     procedures, do they?

25        A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     I mean, this whole idea of the

2     DEA's -- can get a search warrant when

3     Walmart can't, Walmart doesn't need that

4     search warrant to look at their own records,

5     fair?

6          A.     That's fair.

7          Q.     And by the same token, does

8     Walmart need a grand jury before they can

9     figure out if Walmart is diverting or selling

10    to bad pharmacies?

11         A.     I don't believe so.

12         Q.     Does Walmart need a grand jury

13    before they figure out whether or not they're

14    selling on bad prescriptions that are

15    obviously suspicious on their face?

16              MR. STEPHENS:  Object to form.

17              MS. MCCLURE:  Object to form.

18              MR. EPPICH:  Scope.

19              THE WITNESS:  No.

20    QUESTIONS BY MR. LANIER:

21         Q.     Does Walmart need a subpoena to

22    see what information Walmart has?

23         A.     No.

24         Q.     Does Walmart need the FBI to

25    see what information Walmart has?

```
 1            A.     No.

 2            Q.     And then the Walmart lawyer

 3     said, "Yeah, the DEA has lots of tools for

 4     fighting diversion."

 5                   Remember that?

 6            A.     Yes.

 7            Q.     Walmart can see in realtime an

 8     excessive flood of pills going out.  That's

 9     an ability they've got the DEA doesn't have

10     realtime, true?

11                   MR. STEPHENS:  Object to form.

12                   THE WITNESS:  I don't really

13          know all the capabilities of their

14          system, so it would be a guess.

15     QUESTIONS BY MR. LANIER:

16            Q.     Well, if they're going out

17     through their pharmacies, they got a

18     pharmacist who's selling them.  I mean, it's

19     happening at their store in realtime.

20                   They can see that, fair?

21                   MR. STEPHENS:  Object to form.

22          Scope.

23                   THE WITNESS:  They should be

24          able to see that, yes.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    QUESTIONS BY MR. LANIER:

2         Q.     That's a valuable tool, isn't

3    it?

4         A.     Yes.

5         Q.     Next.  He said:  "The DEA can

6    use undercover folks."

7                Remember that?

8         A.     Yes.

9         Q.     Well, Walmart can, too, can't

10   they?

11               Look, have you ever seen those

12   mystery shoppers, where they dress people up

13   and just have them pretend they're someone

14   else in the store?

15        A.     Yes.

16        Q.     I mean, they can put people in

17   the store that don't have "Greetings, I'm

18   from Walmart" on their clothes to watch the

19   people who are coming in to peddle or buy

20   these things, can't they?

21        A.     They could.

22               MR. STEPHENS:  Object to form.

23   QUESTIONS BY MR. LANIER:

24        Q.     Everybody who works at Walmart

25   doesn't have to have the Walmart greeter blue
```

1    on, do they?

2            A.      No.

3            Q.      And then he asked you these

4    questions about the DEA being able to use

5    hidden room bugs.

6                    Remember that?

7            A.      I do.

8            Q.      Heck, Walmart sells hidden room

9    bugs.

10                   Did you know that?

11           A.      I did not.

12           Q.      Did you know that they hide

13   cameras all over their stores?

14                   MR. STEPHENS:  Object to form.

15                   THE WITNESS:  I assume they do.

16   QUESTIONS BY MR. LANIER:

17           Q.      They hide the cameras inside

18   the stores and they got cameras outside their

19   stores; did you know that?

20                   MR. STEPHENS:  Object to form.

21                   THE WITNESS:  I've seen cameras

22       outside.

23   QUESTIONS BY MR. LANIER:

24           Q.      They've got security guys

25   driving around in the parking lots of some of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    their stores; did you know that?
 2         A.    Yes.
 3         Q.    Did you know that Walmart has
 4    security forces that have trained people how
 5    to pick up and stop shoplifters?
 6         A.    Yes.
 7         Q.    In other words, if someone is
 8    going to get something from Walmart illegally
 9    that's going to affect Walmart's bottom line,
10    they've got an entire force set up that
11    trains people to stop that.
12              MR. STEPHENS:  Object to form.
13    QUESTIONS BY MR. LANIER:
14         Q.    But have you ever seen Walmart
15    have an entire force --
16              MR. STEPHENS:  Scope.
17    QUESTIONS BY MR. LANIER:
18         Q.    -- set up how to train people
19    how to find suspicious orders from the people
20    who are coming in with the prescriptions and
21    buying the pills in their stores?
22              MR. STEPHENS:  Object to form.
23         Scope.
24              THE WITNESS:  I have never had
25         discussions with Walmart about their
```

1    suspicious order procedures and their

2    training and those kind of things.

3  QUESTIONS BY MR. LANIER:

4    Q.    All right.  Next.  The Walmart

5  lawyer asked you questions about whether Joe

6  Rannazzisi or the DEA shared the ARCOS data

7  with companies, right?

8    A.    Yes.

9    Q.    Now, let's flesh out ARCOS data

10  for just a moment.

11    ARCOS data, that is this --

12  each company, each registrant, is required to

13  turn in data to the DEA about drugs that

14  they're selling.  Opioids is what we're

15  concerned about here, opioids they're

16  selling, right?

17    A.    That's correct.

18    Q.    And each company has their own

19  data, right?

20    A.    Yes, they do.

21    Q.    But one company doesn't have

22  the data of another company, right?

23    A.    That's correct.

24    Q.    So Walmart can't see who CVS is

25  selling their drugs to and who's writing

1    their prescriptions, right?

2                CVS's data is in a silo for CVS

3    that they can know, but Walmart doesn't get

4    that competitive edge of knowing what CVS is

5    doing, fair?

6        A.    That's correct, except that it

7    doesn't get to the level of prescription

8    data.  It's wholesalers selling to retail

9    pharmacies.

10        Q.    Still they --

11        A.    Manufacturers to wholesalers.

12        Q.    That's fine.

13                They don't know, gee, that

14    store is selling more opioids than this

15    store.  Maybe we need to put something in

16    that location so we can get on that

17    prescription gravy train.

18                That type of information is a

19    competitive edge if one company gets it on

20    another, fair?

21                MR. STEPHENS:  Object to form.

22                THE WITNESS:  It could be.

23    QUESTIONS BY MR. LANIER:

24        Q.    And so the companies

25    themselves, they won't agree to share in the

Highly Confidential - Subject to Further Confidentiality Review

```
1    data, at least based upon your experience --

2         A.    I am --

3         Q.    -- inside the DEA and out,

4    right?

5         A.    I have not seen them agree to

6    share it.

7         Q.    All right.  Never seen them --

8    see.

9              I mean, if the lawyer for

10   Walmart wants to make a big deal out of this,

11   then Walmart could easily give its ARCOS data

12   to CVS if he thought it was an important

13   thing to do, couldn't they?

14              MR. STEPHENS:  Object to form.

15              THE WITNESS:  They could.

16   QUESTIONS BY MR. LANIER:

17        Q.    I mean, if Walmart thought it

18   was going to help this opioid crisis by

19   sharing its own sales data with its

20   competitors, there's nothing the DEA, the

21   DOJ, the FBI, the CIA, the US Constitution,

22   the Magna Carta, there's nothing The Ten

23   Commandments would do to stop that, right?

24        A.    Not that I'm aware of.

25              MR. EPPICH:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. MCCLURE:  Objection.

 2        Foundation.  Form.

 3              MR. EPPICH:  Calls for a legal

 4        conclusion.

 5   QUESTIONS BY MR. LANIER:

 6        Q.    Did you know the DOJ won't

 7   agree to share the ARCOS data from one

 8   company to another?

 9              MR. BENNETT:  And I'm going to

10        interject an objection to the last

11        question.  Scope.  He doesn't speak on

12        behalf of Department of Justice or

13        DEA.

14              MR. LANIER:  True.

15              MR. BENNETT:  I'll also

16        interject an objection to this

17        question for the same reasons.

18              If you have an opinion in your

19        personal capacity, you may answer.

20              MR. LANIER:  And that's what

21        I'm asking, thank you, your opinion in

22        a personal capacity based on your

23        experience.

24   QUESTIONS BY MR LANIER:

25        Q.    You haven't seen the DOJ just
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    open up pell-mell this data to everybody,

2    have you, the Department of Justice?

3         A.    I understand that there may be

4    some type of way to share a limited subset of

5    the data, but I don't know the details of

6    that.

7         Q.    Yeah.

8               It's not easy to get, but each

9    company's got their own data; that's the

10   bottom line, right?

11        A.    Yes.

12        Q.    And the enforcement that the

13   DEA did when you've seen it from the outside

14   or when you were there based on your personal

15   experience -- not secret data.  I don't want

16   to go behind the curtain of how y'all did

17   stuff, and I don't want you speaking for the

18   DEA.  Just what you know from your personal

19   knowledge and public information.

20              We know publicly enforcement

21   always comes from a company's own data --

22              MS. MCCLURE:  Form.  Misstates.

23   QUESTIONS BY MR. LANIER:

24        Q.    -- true?

25              MR. STEPHENS:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   THE WITNESS:  As well as other

 2        sources.

 3   QUESTIONS BY MR. LANIER:

 4        Q.     Right.

 5               But you use the company's ARCOS

 6   data in McKesson -- let me write that down,

 7   "with other sources."

 8               But for McKesson, for

 9   example -- or, no, AmerisourceBergen.  When

10   y'all held AmerisourceBergen responsible for

11   selling wrong through one of their

12   facilities --

13               You and I looked at that

14   earlier, remember?

15        A.     Yes.

16        Q.     -- that was based on their

17   ARCOS data --

18        A.     It was.

19        Q.     -- their own data.

20               Okay.  And then the lawyer from

21   Walmart asked you, he said:  "Rogue Internet

22   pharmacies, those were the greatest threat of

23   diversion."

24               Remember that?

25        A.     Yes.
```

```
 1            Q.      Well, those rogue Internet

 2     pharmacies, weren't they basically shut down

 3     by around 2009?

 4            A.      Generally, yes.

 5            Q.      So if the problem continued

 6     past there, the problem can't just be rogue

 7     Internet pharmacies.  That's simple logic,

 8     right?

 9                    MR. STEPHENS:  Object to form.

10            Misstates the testimony.

11                    MS. MCCLURE:  Form.

12                    THE WITNESS:  That's correct.

13     QUESTIONS BY MR. LANIER:

14            Q.      So I gave you that chart

15     earlier.  2009's right here.  It's not like

16     once y'all shut down the rogue Internet

17     pharmacies they didn't continue to be a

18     problem.

19                    See what I'm talking about?

20                    MS. SWIFT:  Object to form.

21                    MS. MCCLURE:  Form.

22                    MR. EPPICH:  Object to the use

23            of this document.

24                    THE WITNESS:  Yes, I see what

25            you're talking about.
```

```
 1     QUESTIONS BY MR. LANIER:

 2          Q.     Okay.  And again, your answers

 3     on these Walmart questions would apply

 4     equally to the other folks he was asking

 5     questions on behalf of.

 6                 CVS, they've got their own

 7     data, right?

 8          A.     Yes.

 9          Q.     Walgreens has got their own

10     data, right?

11          A.     Yes.

12          Q.     Now, the McKesson lawyer asked

13     you some questions.

14                 Do you remember those?

15          A.     Not specifically, but...

16          Q.     All right.  Let's look at some

17     of them.

18                 First of all, the McKesson

19     lawyer asked you about the requirement of

20     Section 1301.74(a), and he said:  "It's only

21     to see if a customer is registered."

22                 Do you remember that?

23                 MR. EPPICH:  Object to form.

24          Objection to the extent it misstates

25          the question.
```

```
 1     QUESTIONS BY MR. LANIER:

 2          Q.     You remember he asked you, he

 3     said:  "The requirements of the law" -- and

 4     he used Exhibit 3, and he put Exhibit 3 up

 5     there which has 1301.74(a) -- "before

 6     distributing a controlled substance to any

 7     person who the registrant does not know to be

 8     registered to possess, got to make a good

 9     faith inquiry to determine if they were

10     registered to possess the controlled

11     substance."

12               And he asked you about that,

13     remember?

14          A.     Yes.

15          Q.     Well, have you ever seen those

16     magicians who do a sleight of hand where they

17     distract you over here while they're doing

18     something over there?

19               Are you familiar with that?

20          A.     Yes.

21          Q.     Okay.  He asked you like

22     1301.74(a) is the only part of this law.

23               It's not the only part of the

24     law, is it?

25               MR. EPPICH:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Misstates the question.

 2                   THE WITNESS:  No, it's not.

 3    QUESTIONS BY MR. LANIER:

 4         Q.    So when he asked you, the

 5    requirement of 1301.74(a) is only to see if a

 6    customer is registered, that's not the only

 7    section that applies to these distributors.

 8                   They got to do more than that,

 9    don't they?

10                   MR. EPPICH:  Object to form.

11         Vague.

12                   THE WITNESS:  Yes, they do.

13    QUESTIONS BY MR. LANIER:

14         Q.    They got to do subpoint (b)

15    that came after his subpoint (a).  I've

16    highlighted it here on Exhibit 3.

17                   Do you see it?

18         A.    I do.

19         Q.    "The registrant," McKesson in

20    this case, "shall design" -- or any of the

21    other distributors -- "shall design and

22    operate a system to disclose to the

23    registrant suspicious orders of controlled

24    substances.  The registrant shall inform the

25    field division office of the administration
```

Highly Confidential - Subject to Further Confidentiality Review

1    in his area of suspicious orders when

2    discovered."

3              By the way, it says "when

4    discovered," doesn't it?

5        A.    Yes.

6        Q.    This is that 1970s law?

7        A.    It is.

8        Q.    "Suspicious orders include

9    orders of unusual size, orders deviating

10   substantially from a normal pattern, orders

11   of unusual frequency."

12             That's included, but that's not

13   an exclusive list of what makes something

14   suspicious, fair?

15             MR. EPPICH:  Objection.  Calls

16         for a legal conclusion.  Foundation.

17             THE WITNESS:  Yes, that's fair.

18   QUESTIONS BY MR. LANIER:

19       Q.    All right.  And so my question

20   is, he followed up by saying this:  "Does

21   1301.74 say distributors can't ship

22   suspicious orders?"

23             Remember that?

24       A.    Yes.

25             MR. EPPICH:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Misstates the question.
 2    QUESTIONS BY MR. LANIER:
 3         Q.    Well, that's not the part that
 4    tells you you can't ship them.  You're not
 5    allowed to sell something that you are
 6    suspicious may be used for illegal purposes,
 7    are you?
 8                MS. MCCLURE:  Form.
 9            Foundation.  Calls for a legal
10            conclusion.  Misstates.
11                MS. WICHT:  Vague.
12                THE WITNESS:  That's correct.
13    QUESTIONS BY MR. LANIER:
14         Q.    Okay.  Good.
15                Anyway, even setting the law
16    aside, what's most important, community
17    health and safety or company profits --
18                MR. EPPICH:  Objection.
19    QUESTIONS BY MR. LANIER:
20         Q.    -- for selling illegal drugs?
21                MR. EPPICH:  Objection to form.
22            Argumentative.
23                MS. WICHT:  Scope.
24                MS. MCCLURE:  Foundation.
25
```

```
1    QUESTIONS BY MR. LANIER:

2         Q.    This is a no-brainer.  You

3    ought to be able to get this one?

4              MS. MCCLURE:  Objection.

5         Argumentative.

6              MR. BENNETT:  I'll join in the

7         objection.  Argumentative.

8              MR. LANIER:  All right.  Let me

9         go back to the original question.

10             SPECIAL MASTER COHEN:

11        Sustained.

12   QUESTIONS BY MR. LANIER:

13        Q.    Even setting the law aside,

14   what's most important, community health and

15   safety or company profits from selling

16   illegal drugs?

17             MR. EPPICH:  Object to form.

18        Foundation.

19             MS. WICHT:  Scope.

20             THE WITNESS:  In my opinion,

21        it's the health and safety.

22   QUESTIONS BY MR. LANIER:

23        Q.    And then the McKesson lawyer

24   asked you this one.  He said:  "Isn't it true

25   there are other causes of the opioid crisis,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    like illegal prescribing?"

 2                Remember that?

 3    A.      Yes.

 4    Q.      "Question:  A good suspicious

 5    order monitoring system can even help catch

 6    illegal prescribing, can't it?"

 7                MR. EPPICH:  Objection to form.

 8                MR. HAHN:  Objection.

 9                THE WITNESS:  Yes, it can.

10    QUESTIONS BY MR. LANIER:

11    Q.      And then he said:

12    "Distributors can't control what happens to

13    pills once the pills are delivered to the

14    customer of the pharmacy?"

15                Remember that one?

16    A.      Yes.

17                MR. EPPICH:  Objection.

18    QUESTIONS BY MR. LANIER:

19    Q.      But the distributor has a ton

20    of control before that, don't they?

21                MR. EPPICH:  Objection.  Form.

22          Foundation.  Vague.

23                THE WITNESS:  Yes, they do.

24    QUESTIONS BY MR. LANIER:

25    Q.      And then the McKesson lawyer
```

```
 1    said:  "The DEA" -- and he talked about your

 2    staffing and your Internet policies -- the

 3    DEA staffing, not yours, and Internet

 4    policies -- or Internet pharmacies, and

 5    whether or not they had enough staff.

 6              And you said:  "I don't know if

 7    they did or didn't."

 8              You wouldn't go along with him

 9    on that, remember?

10              MR. EPPICH:  Objection.

11         Argumentative.  Misstates the

12         testimony and questions.

13              THE WITNESS:  Yes, I remember

14         that.

15    QUESTIONS BY MR. LANIER:

16         Q.    Well, my question is pretty

17    simple.  If the companies do their jobs

18    right, the DEA had plenty of manpower when

19    you were there, didn't it?

20              MR. EPPICH:  Objection.  Calls

21         for a legal conclusion.

22    QUESTIONS BY MR. LANIER:

23         Q.    Based on your opinion?

24              MR. EPPICH:  Objection.  Form.

25              MS. MCCLURE:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Scope.

 2                  MR. BENNETT:  Objection.

 3          Scope.

 4                  You're not speaking on behalf

 5          of the DEA.  You may give your

 6          personal opinion.

 7   QUESTIONS BY MR. LANIER:

 8          Q.      True?

 9          A.      I really can't comment on that

10   because there's so many other things that

11   DEA's involved in.  It's not just --

12          Q.      Ah, and you shouldn't comment

13   on that stuff.  You're right.  You're right.

14   I'll pull that down.  I don't want y'all to

15   divulge DEA secrets.

16                  Okay.  Shifting gears to some

17   stuff from AmerisourceBergen's lawyer and

18   others.

19                  You were asked this question by

20   AmerisourceBergen yesterday:  "In the course

21   of your role as a diversion investigator and

22   a group supervisor, you accepted these

23   excessive purchase reports as compliant with

24   the Controlled Substances Act?"

25                  Do you remember that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.
 2          Q.    Sir, but after-the-fact
 3    reporting of suspicious orders has never been
 4    in compliance with federal law according to
 5    your understanding of the DEA's guidance
 6    provided to registrants, true?
 7                MS. MCCLURE:  Objection.  Form.
 8          Scope.  Vague.  Misstates the witness'
 9          prior testimony.  Foundation.  Asked
10          and answered.
11                MR. BENNETT:  You can answer.
12                THE WITNESS:  It was the
13          practice, but they may not have been
14          in compliance with the regulations.
15    QUESTIONS BY MR. LANIER:
16          Q.    Right?
17                They may have been breaking the
18    regulations for a long time --
19                MS. MCCLURE:  All same
20          objections.
21    QUESTIONS BY MR. LANIER:
22          Q.    -- right?
23          A.    Yes.
24          Q.    Okay.  I mean, that's part of
25    what this is about, you understand?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yes.

2          Q.     Okay.  Good.

3                 And I just want to clarify a

4     couple things for the record.  The lawyer

5     just objected and said I mischaracterized

6     your testimony.  I've got here the actual

7     draft from the court reporter.  I don't think

8     I mischaracterized it.  I think I wrote it

9     exactly the way it is, so I don't know what

10    she meant when she said I mischaracterized

11    it.

12                But you see that's exactly what

13    you said yesterday?  It's exactly what the

14    question was.

15                MS. MCCLURE:  That was in

16         response to your second question, not

17         the first.

18    QUESTIONS BY MR. LANIER:

19         Q.     Do you see that?

20         A.     I see that.

21         Q.     And now she says that was in

22    response to my second question, not the

23    first.

24                Sir, you hadn't testified about

25    the second question until I asked you, true?

1           MS. MCCLURE:  Again,

2      mischaracterizes.

3           THE WITNESS:  True.

4  QUESTIONS BY MR. LANIER:

5      Q.    I got that testimony on that

6  from a Mr. Thomas Prevoznik.

7           Do you know him?

8      A.    I do.

9      Q.    Mr. Prevoznik was the actual

10 designate by the DEA to speak on behalf of

11 the DEA, as opposed to you, who's just

12 speaking as you, right?

13     A.    Correct.

14     Q.    And I did write it exactly

15 right, in spite of the lawyer's objection.

16          "Has after-the-fact reporting

17 of suspicious orders ever been in

18 compliance" -- ever been in compliance --

19 "with federal law according to the DEA's

20 guidance provided to registrants?"

21          The answer was:  "No."  And

22 that's from the DEA witness.

23          So he would agree with you that

24 this is a true statement:  After-the-fact

25 reporting has never been in compliance,

1    right?

2                   MS. WICHT:  Object to form.

3                   MS. MCCLURE:  Form.

4                   THE WITNESS:  Yes.

5    QUESTIONS BY MR. LANIER:

6         Q.    That's why the law says it's

7    when -- I'm using Exhibit 30 -- yeah, here it

8    is.  Exhibit 3.  The law is specific and says

9    you're supposed to turn in suspicious orders

10   "when discovered by the registrant," not at

11   the end of the month after you've sold them

12   and made the money?

13                  MS. MCCLURE:  Form.

14   QUESTIONS BY MR. LANIER:

15        Q.    Right?

16                  MS. MCCLURE:  Calls for a legal

17        conclusion.

18                  THE WITNESS:  It does say "when

19        discovered," yes.

20   QUESTIONS BY MR. LANIER:

21        Q.    And you knew who Linden Barber

22   was, didn't you?

23        A.    Yes.

24                  MR. LANIER:  I want to take a

25        break for five minutes, please.

```
 1                VIDEOGRAPHER:  We're going off

 2        record.  The time is 11:08.

 3         (Off the record at 11:08 a.m.)

 4                VIDEOGRAPHER:  We're going back

 5        on record.  Beginning of Media File 5.

 6        Time is 11:23.

 7   QUESTIONS BY MR LANIER:

 8        Q.    Sir, just a few final things I

 9   want to make sure that I've covered, and I'll

10   pass the witness, and we'll be through with

11   your road for this moment, though I think I

12   get to come back and we'll travel another

13   road together in a little bit.

14                The DEA may answer a specific

15   question about whether part of a system is

16   appropriate, and the DEA will give its

17   opinion.

18                We know that based on your

19   testimony yesterday, right?

20                MR. BENNETT:  Objection.

21        Scope.

22                He doesn't speak for the DEA.

23        He may speak about his practices while

24        he was at the DEA.

25                MR. LANIER:  Great point.
```

```
 1      QUESTIONS BY MR. LANIER:

 2           Q.     When you were at the DEA, you

 3      yourself and people you observed may answer a

 4      specific question about whether or not part

 5      of a system's appropriate.

 6                  The DEA hasn't given its

 7      opinion on that to distributors and others,

 8      right?

 9           A.     Generally, yes.

10           Q.     But the DEA does not do legal

11      work for the industry, true?

12                  MR. BENNETT:  Same objection.

13      Same instruction.

14      QUESTIONS BY MR. LANIER:

15           Q.     Based on what you know?

16                  MR. EPPICH:  Object to form.

17                  THE WITNESS:  Based on what I

18      know, that's true.

19      QUESTIONS BY MR. LANIER:

20           Q.     And industry, based on what you

21      know, is required to interpret and follow the

22      law.  That's part of the honor system and the

23      law if they want to be allowed to make money

24      selling opioids, true?

25                  MS. MCCLURE:  Objection.
```

```
 1            Compound.

 2                 MS. WICHT:  Objection to form.

 3                 MR. EPPICH:  Object to form.

 4                 THE WITNESS:  It's part of the

 5            requirement if they want to continue

 6            to be registered to handle controlled

 7            substances.

 8       QUESTIONS BY MR. LANIER:

 9            Q.    In other words, if they want to

10       legally sell opioids, industry is required to

11       interpret and follow the law, true?

12            A.    True.

13            Q.    Now, the AmerisourceBergen

14       lawyer pointed out yesterday that determining

15       suspicious orders is subjective.  There's not

16       a formula that is a litmus test where you can

17       say yes/no automatically.

18                 A computer is not going to do

19       it, right?

20            A.    That's correct.

21            Q.    This is a reason that you need

22       to be hypervigilant if you're a registrant,

23       if you're a distributor.  You need to truly

24       know your customer and truly look for

25       suspicious orders and truly do your due
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    diligence if it looks like something might be

 2    suspicious, true?

 3                  MS. MCCLURE:  Objection.

 4         Vague.  Compound.

 5                  MR. EPPICH:  Object to form.

 6         Calls for a legal conclusion.

 7                  THE WITNESS:  Yeah, the

 8         registrants need to be vigilant.

 9    QUESTIONS BY MR. LANIER:

10         Q.    And in fairness, they need to

11    be very vigilant, or I put it hypervigilant.

12    They really need to pay attention to this,

13    don't they?

14                  MS. MCCLURE:  Same objections.

15                  MR. EPPICH:  Object to form.

16         Calls for a legal conclusion.

17                  THE WITNESS:  Yes.

18    QUESTIONS BY MR. LANIER:

19         Q.    This is based on your

20    understanding.  I know you're not

21    interpreting the law.  But this is from your

22    perspective the legal responsibility of the

23    distributor, true?

24                  MR. EPPICH:  Object to the

25         form.  Calls for a legal conclusion.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  True.
 2   QUESTIONS BY MR. LANIER:
 3        Q.    Now, you were asked another
 4   curious question yesterday about is it
 5   possible that 90 percent of orders shipped
 6   are suspicious, and you said you don't see
 7   how 90 percent of the orders shipped to be a
 8   suspicious number.
 9              Do you remember that?
10        A.    I do.
11        Q.    Now, did you ever read the
12   deposition given by the DEA in this case,
13   someone speaking on behalf of the DEA?
14        A.    I did not.
15        Q.    I want to show you part of
16   Mr. Prevoznik's deposition.  It's Volume II
17   from April 18, 2019.  Let me give you some of
18   the testimony that I'm going to reference so
19   you can look at it.
20              I'm specifically interested in
21   what starts at the bottom of page 628.  This
22   is questioning by Mr. Farrell.  Mr. Farrell
23   has been one of the key lawyers for years in
24   trying to chase down this data and
25   information.
```

Highly Confidential - Subject to Further Confidentiality Review

 1              Okay?

 2              MR. EPPICH:  Object to form.

 3              MS. MCCLURE:  Object to the

 4       narrative.

 5   QUESTIONS BY MR. LANIER:

 6       Q.    Do you know him?  He's a

 7   handsome fellow from West Virginia, real

 8   athletic.

 9              MS. LEVY:  Objection.

10              THE WITNESS:  I don't recall

11       him.

12   QUESTIONS BY MR. LANIER:

13       Q.    Okay.  He's sitting right over

14   there.

15              Seriously, Mr. Farrell asked:

16   "Do you agree" -- this is to the DEA.  "Do

17   you agree if a wholesale distributor gets a

18   flag of a suspicious order, that they've

19   determined to be a suspicious order, and that

20   they block that shipment, that they should

21   terminate all future sales to that same

22   customer until they can rule out that

23   diversion is occurring?"

24              Do you see the question?

25       A.    I do.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     And you're going to find this

 2    really stunning, but there's lots of

 3    objections before the answer.

 4               Everybody should object to me

 5    saying that.

 6               Strike what I just said.  That

 7    actually is objectionable.

 8               The answer is:  "Yes, I would

 9    agree."

10               Do you see that?

11          A.     I do.

12          Q.     So if, in fact, that once there

13    is a flag of a suspicious order, someone's

14    determined something's suspicious, a

15    suspicious order, and as a result, all of the

16    orders to that pharmacy, customer, are

17    stopped until a real determination is made

18    that rules out diversion, that could really

19    change the picture and actually make

20    90 percent of orders shipped suspicious --

21               MS. SWIFT:  Object to the form

22        of the question.

23    QUESTIONS BY MR. LANIER:

24          Q.     -- in certain years that are at

25    issue here.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Would you agree?
 2                    MS. SWIFT:  Object to form.
 3                    MR. EPPICH:  Object to form.
 4          Incomplete hypothetical.  Calls for
 5          speculation.
 6                    MS. MCCLURE:  Foundation.
 7                    THE WITNESS:  No, I wouldn't
 8          agree with that.
 9     QUESTIONS BY MR. LANIER:
10          Q.    Well, let's just be real clear
11     then.
12                    You hadn't done the math, had
13     you?
14          A.    This is the first time I've
15     seen this.
16          Q.    In other words, when the lawyer
17     asked you yesterday, "Would you be" -- "Would
18     you agree with the idea that 90 percent of
19     the orders shipped are suspicious?" and you
20     said, "No," you hadn't done that math, have
21     you?
22                    MS. WICHT:  Object to form.
23          Mischaracterizes.
24     QUESTIONS BY MR. LANIER:
25          Q.    You're guessing?
```

```
 1              MS. WICHT:  Mischaracterizes
 2        the testimony yesterday.
 3              THE WITNESS:  Yes, that's my
 4        opinion.
 5   QUESTIONS BY MR. LANIER:
 6        Q.    Yeah.  It's your opinion based
 7   upon no research?
 8              MS. MCCLURE:  Objection.
 9   QUESTIONS BY MR. LANIER:
10        Q.    You have not researched the
11   question of how many pharmacies had
12   suspicious orders that had not done their due
13   diligence and had not resolved them and
14   continued to sell.
15              You have not done the math on
16   that, have you?
17        A.    I have not.
18              MS. WICHT:  Objection to form.
19   QUESTIONS BY MR. LANIER:
20        Q.    Thank you.
21              And then the last thing I want
22   to do on your industry work and our stop
23   there is -- lest there be any concern, I want
24   to go over and ask you if you are aware of
25   certain things, if you have personal
```

1    knowledge.

2                   Rite Aid, they're a pharmacy,

3    right?

4          A.    Yes.

5          Q.    Do you know about them paying a

6    $5 million fine in 2009 for filling

7    prescriptions that were not issued for

8    legitimate medical purposes and failing to

9    notify the DEA of significant thefts and

10   losses that they were required -- and other

11   records they were required to keep under the

12   Controlled Substances Act?

13                   MR. BENNETT:  Objection.

14                   MR. LAVELLE:  Object to form.

15                   MR. BENNETT:  Objection.

16         Scope.

17                   You may answer that question

18         yes or no only.

19                   THE WITNESS:  No.

20   QUESTIONS BY MR. LANIER:

21         Q.    Did you know about CVS in 2013

22   having to pay an $11 million fine for

23   recordkeeping violations under the Controlled

24   Substances Act?

25                   MR. BENNETT:  You can answer.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Yes or no?
 2     QUESTIONS BY MR. LANIER:
 3          Q.     Yes, sir.
 4                    MR. BENNETT:  You can answer
 5          the question.
 6                    THE WITNESS:  Yes.
 7     QUESTIONS BY MR. LANIER:
 8          Q.     Did you know about CVS in 2015
 9     paying a $22 million fine?
10          A.     No.
11          Q.     2016, paying an $8 million
12     fine?
13          A.     No, I don't recall that.
14          Q.     2017, paying a $5 million fine?
15          A.     No.
16          Q.     Do you know about Walgreens in
17     2013 paying an $80 million fine --
18                    MS. SWIFT:  Objection.  Form.
19     QUESTIONS BY MR. LANIER:
20          Q.     -- for filling prescriptions
21     that they knew or should have known were not
22     issued for a legitimate medical purpose?
23                    MS. SWIFT:  Object to form.
24                    MR. BENNETT:  Objection.
25          Scope.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                You may answer that question
 2        yes or no only.
 3                THE WITNESS:  Yes.
 4     QUESTIONS BY MR. LANIER:
 5        Q.    Well, these aren't rogue
 6     Internet pharmacies, are they?
 7        A.    No.
 8        Q.    Do you know any other fines of
 9     pharmacies off the top of your head?
10        A.    I do not.
11        Q.    So fining the companies, have
12     you found fining the companies doesn't always
13     seem to work?
14                MR. EPPICH:  Object to form.
15                THE WITNESS:  That's correct.
16     QUESTIONS BY MR. LANIER:
17        Q.    The DEA used to have at its
18     disposal a tool it no longer has, true?
19                MR. BENNETT:  Objection.
20        Vague.
21                MS. MCCLURE:  Form.
22                THE WITNESS:  I'm not aware
23        that any tools have been taken away.
24     QUESTIONS BY MR. LANIER:
25        Q.    Are you familiar with the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    Marino Bill?

2                MS. MCCLURE:  Vague.

3                THE WITNESS:  No.

4    QUESTIONS BY MR. LANIER:

5        Q.    It was subject to that article

6    that we looked at earlier that had the yellow

7    dots, the Marino Bill -- I think there's just

8    one N in Marino -- that took away some of the

9    powers of the DEA.

10               You're not familiar with that?

11               MS. MCCLURE:  Form.

12           Foundation.  Mischaracterizes.

13               THE WITNESS:  I had not heard

14           of that name, but I've heard of a bill

15           that has different requirements than

16           they had in the past.

17   QUESTIONS BY MR. LANIER:

18       Q.    So you don't have any knowledge

19   of whether or not the DEA still has today all

20   of the same tools at its disposal that it had

21   when you were there?

22       A.    No, I don't know.

23               MR. LANIER:  Okay.  Brings me

24           to the end of the road.  I'll pass the

25           witness.
```

```
 1              MS. MCCLURE:  Off the record.

 2              VIDEOGRAPHER:  We're going off

 3         record.  The time is 11:36.

 4              (Mapes Exhibit 32 marked for

 5         identification.)

 6         (Off the record at 11:36 a.m.)

 7              VIDEOGRAPHER:  We're going back

 8         on the record.  Beginning of Media

 9         File Number 6.  The time is 12:59.

10              RE-EXAMINATION

11    QUESTIONS BY MS. MCCLURE:

12         Q.    Good afternoon, Mr. Mapes.

13         A.    Good afternoon.

14         Q.    Just a reminder, my name is

15    Shannon McClure.  I represent

16    AmerisourceBergen Drug Corporation.  I just

17    have a few follow-up questions for you today.

18              I'm going to be talking about

19    certain things that Mr. Lanier talked to you

20    about, so it may seem less like the roadmap

21    that Mr. Lanier had and a little more

22    scattershot.  So if at any time you'd like me

23    to clarify a little bit more about where I

24    am, that's the nature of conducting this part

25    of the examination, which is a response to
```

```
 1    what the plaintiffs have done.

 2             Will you agree that if at any

 3    time you would like me to orient you as to

 4    what we're talking about, just let me know.

 5             Okay?

 6    A.       Okay.

 7    Q.       Do you recall Mr. Lanier asking

 8    you about some audits and work that you had

 9    done on behalf of AmerisourceBergen Drug

10    Corporation after you had left DEA?

11    A.       Yes.

12    Q.       And that included audits of

13    AmerisourceBergen's order monitoring program

14    and diversion control program, right?

15    A.       Yes.

16    Q.       And those are audits that we

17    talked about yesterday, first, before

18    Mr. Lanier questioned you today when we

19    talked about your post-DEA consulting work,

20    right?

21    A.       Yes.

22    Q.       And Mr. Lanier showed you a

23    privilege log marked as Exhibit 20 and asked

24    you about the fact that several entries here

25    indicated that you were involved in these.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Do you recall looking at this

2   document, Exhibit Number 20?

3      A.    Yes.

4      Q.    Okay.  And those audits that

5   you conducted on behalf of AmerisourceBergen,

6   we did, in fact, talk about yesterday that

7   you had done several years of audits in which

8   you generally found that the company was in

9   compliance.

10      Do you recall that?

11      A.    Yes.

12      Q.    And that's basically walking

13   the walk, in the language that Mr. Lanier had

14   used.  You found in your review of the order

15   monitoring program of AmerisourceBergen that

16   AmerisourceBergen was walking the walk,

17   right?

18      A.    Generally, yes.

19      Q.    And so Mr. Lanier presented

20   this document to you and the jury, and it

21   seemed -- and acted like all those audits

22   were, in fact, not produced in this case and

23   were not going to be available and had not

24   been produced by AmerisourceBergen.

25      Was that your understanding of

```
 1    the situation yesterday --

 2         A.    Yeah.

 3         Q.    -- or earlier today?  I'm

 4    sorry.

 5         A.    Yes.

 6         Q.    Okay.  He didn't tell you that,

 7    in fact, every single one of the documents on

 8    this list that we're looking at here, which

 9    comprises two pages, had, in fact, been

10    produced by AmerisourceBergen.  He didn't

11    tell you that, right?

12         A.    That's correct.

13         Q.    Okay.  Thank you.

14               Mr. Mapes, does DEA have ethics

15    rules in place about post-DEA employment for

16    DEA employees like yourself who leave or

17    retire?

18               MR. BENNETT:  Objection.

19         Scope.

20               You can answer based on your

21         personal knowledge but not on behalf

22         of DEA.

23               THE WITNESS:  Yes, there are.

24    QUESTIONS BY MS. MCCLURE:

25         Q.    And you followed those
```

```
 1     post-employment ethics rules?

 2         A.     Yes.

 3         Q.     Thank you.

 4                Mr. Lanier's questions to you

 5     seemed to imply and seemed to say to me, at

 6     least, and perhaps the jury as well, that

 7     there was -- that you, as a former DEA

 8     agent -- or former DEA diversion investigator

 9     and your various roles in DEA, had done

10     something wrong by leaving DEA and then going

11     to work for industry.

12                Do you recall those questions?

13         A.     I recall the questions, yes.

14         Q.     Okay.  And, in fact, your role

15     as a consultant, am I stating it accurately

16     to say that you were trying to help companies

17     be compliant with DEA regulations and policy

18     and the Controlled Substances Act?

19         A.     That's correct.

20         Q.     And compliance with the

21     Controlled Substances Act would be something

22     that the DEA, in your experience, would want

23     and expect of registrants, right?

24         A.     That's correct.

25         Q.     And so your goal and DEA's goal
```

1    are the same in your conducting of your

2    consulting business today, or for the --

3    since you left DEA, not today, correct?

4              MR. BENNETT:  Objection.

5         Scope.

6              You may speak in your personal

7              capacity, but you may not speak on

8              behalf of DEA in answering this

9              question.

10             THE WITNESS:  Yes, they are.

11   QUESTIONS BY MS. MCCLURE:

12        Q.    And do you think that there's

13   anything wrong that you've done in consulting

14   for various industry participants to help

15   them be compliant with the Controlled

16   Substances Act and DEA policies and

17   procedures in your post-DEA work?

18        A.    No.

19        Q.    And moving on to a different

20   topic -- as I said, this would be less like a

21   roadmap and more like stops along the way.

22             To orient you to what we're

23   going to be talking about next, I want to

24   show you the document that was marked as

25   Exhibit 4 and Exhibit 4A, same document, just

Highly Confidential - Subject to Further Confidentiality Review

1    different Bates numbers, which are a series

2    of letters between 1996 and 1998 regarding

3    DEA's approval of Amerisource -- I'm sorry,

4    of Bergen's newly developed system to

5    identify and report suspicious orders for

6    controlled substances.

7              Do you recall this document?

8         A.    Yes.

9         Q.    And Mr. Lanier's questions to

10   you seemed to suggest that he thought that

11   this document related only to

12   methamphetamine, the Methamphetamine Control

13   Act, and phentermine is the -- or Sudafed.

14             But is it your understanding

15   that this document relates only to

16   methamphetamine or pseudoephedrine, or does

17   it in your mind relate more broadly?

18        A.    I believe it relates to

19   controlled substances and regulated

20   chemicals.

21        Q.    Okay.  And so the language here

22   is that this is "an approval of the newly

23   developed system to both identify and report

24   suspicious orders for controlled substances

25   and regulated chemicals," right?

```
 1            A.      Yes.

 2            Q.      And, in fact, if we look at the

 3     original letter -- one moment.

 4                    Well, I'll just use the one

 5     that has my underlining in it because,

 6     really, what does it matter.

 7                    If we look at the original

 8     letter dated September 30, 1996, that

 9     Mr. Zimmerman wrote to Mr. Gitchel, it, in

10     fact, talks about "an innovative, new system

11     to both monitor and report customer orders of

12     controlled substances which fit the

13     suspicious order criteria outlined in 21 CFR

14     1301.74(b)."

15                    Do you see that?

16            A.      Yes.

17            Q.      Okay.  And that's -- so it is

18     your understanding, having reviewed this

19     series of letters marked as Exhibit 4 and

20     Exhibit 4A, that that's an approval of

21     AmerisourceBergen's entire suspicious order

22     monitoring and diversion control system, not

23     just dealing with listed chemicals or

24     Sudafed -- or the listed chemical that would

25     go into the manufacturing of methamphetamine?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      That would be the Sudafed.
 2          Q.      Okay.  So this system, this
 3    approval, is for the entire diversion control
 4    program and suspicious order monitoring
 5    system, based on what you've seen in these
 6    letters?
 7          A.      For the entire suspicious order
 8    monitoring system, yes.
 9          Q.      Okay.  Thank you.
10                  And so looking again at a
11    demonstrative document that Mr. Lanier had
12    shown you, I want to make sure I have this
13    right, that this approved not only the method
14    of providing information but the system that
15    was used to identify suspicious orders as
16    well, correct?
17          A.      Yes.
18          Q.      And that this was not just
19    related to methamphetamines, it was related
20    to all controlled substances, whether it's
21    methamphetamine, opioids or anything else
22    that's regulated under 1301.74(b), correct?
23          A.      Yes.
24                  (Mapes Exhibit 33 marked for
25          identification.)
```

```
 1    QUESTIONS BY MS. MCCLURE:

 2         Q.    I'm going to hand you a

 3    document that's been marked Exhibit 33.

 4               Let me know when you've had a

 5    chance to review that.

 6         A.    Okay.

 7         Q.    And so you testified in a

 8    lawsuit in West Virginia in 2016, correct?

 9         A.    Yes.

10         Q.    And in that you testified that

11    the shift from ship and then report to

12    instead halt and investigate was a gradual

13    change, right?

14         A.    Yes, it was.

15         Q.    And that the regulations did

16    not change, but the DEA's interpretation of

17    them did, right?

18         A.    Yes.

19         Q.    And that companies were

20    responding to DEA's changed interpretation

21    and then coming up with programs to handle

22    that new different expectation, right?

23         A.    That's correct.

24         Q.    And there was not a date

25    certain by which companies were expected or
```

Highly Confidential - Subject to Further Confidentiality Review

1    anticipated to implement the changes to DEA's

2    new interpretation of 1301.74(b)?

3         A.    That's correct.

4         Q.    And so here Mr. Lanier had

5    excerpted a statement you had made to me

6    yesterday when I was originally talking to

7    you, right, and that you had accepted these

8    excessive purchase reports as compliant with

9    the Controlled Substances Act, right?

10             That's what you testified to

11   yesterday?

12        A.    Yes.

13        Q.    And then Mr. Lanier presented

14   you with this document that said that

15   essentially after-the-fact reporting of

16   suspicious orders has never been in

17   compliance with federal law according to the

18   DEA's guidance.

19             That testimony, to the extent

20   that this actually reflects your testimony,

21   which I don't believe it does, is not

22   actually consistent with the testimony you

23   gave earlier yesterday or with the testimony

24   you gave in 2016 when you were under oath in

25   that proceeding, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. BENNETT:  Objection.  Form.

 2                    MR. LANIER:  Objection.  Form.

 3                    MR. BENNETT:  Misstates

 4         testimony.

 5                    THE WITNESS:  The regulation

 6         didn't change.  So the regulation was

 7         still there, but the practice was to

 8         allow them to send the excessive

 9         purchase reports and that that was

10         considered to be in compliance, even

11         though the regulation hadn't changed

12         to allow that or to not allow that.

13    QUESTIONS BY MS. MCCLURE:

14         Q.    And so that was -- the

15    submission of excessive purchase reports was

16    considered, in your experience at DEA, to be

17    in compliance with the Controlled Substances

18    Act for the period of time that those reports

19    were accepted, correct?

20         A.    Yes.

21         Q.    Just one moment.

22                    And in addition, I just asked

23    you a question as to whether they were in

24    compliance with the Controlled Substances

25    Act.
```

```
 1                  They were also then in

 2     compliance -- I just asked you a question

 3     that stated that they were in compliance --

 4     the acceptance of the excessive purchase

 5     reports is being compliant -- was compliant

 6     with the Controlled Substances Act.

 7                  They were also compliant with

 8     the regulations that underscored and

 9     implemented that act, correct?

10              MR. BENNETT:  Objection.

11          Scope.

12              You may answer based on your

13          personal understanding, but you may

14          not speak on behalf of DEA.

15              THE WITNESS:  Personally we

16          accepted them, the excessive purchase

17          reports, as compliant for the

18          suspicious order monitoring, yes.

19              MS. MCCLURE:  Okay.  Thank you,

20          Mr. Mapes.

21              I have no further questions,

22          and at this time I turn my time over

23          to counsel for additional defendants.

24              Thank you very much.

25              MR. LANIER:  Make sure there's
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          no fuss.  I'm going to have one of the

 2          other lawyers do our recross.

 3               Nobody's got any problem with

 4          that, do they?

 5               Thank you.

 6               (Mapes Exhibit 34 marked for

 7          identification.)

 8                  RE-EXAMINATION

 9     QUESTIONS BY MR. EPPICH:

10          Q.    Good afternoon, Mr. Mapes.  My

11     name is Chris Eppich.  Once again, I'm from

12     the McKesson company.

13          A.    Good afternoon.

14          Q.    I'm going to hand you what I've

15     marked as Exhibit Number 34 in this

16     litigation.

17               Exhibit 34, Mr. Mapes, is a

18     partial list of the attorneys in this case.

19               Do you see at the top of the

20     page it says, "1:17-md-02804-DAP, In Re:

21     National Prescription Opiate Litigation, Dan

22     Aaron Polster presiding"?

23               Do you see that, sir?

24          A.    I do.

25          Q.    And then it says "attorneys."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Do you see that, sir?
 2         A.    Yes.
 3         Q.    If we could turn to page 2 of
 4    Exhibit 34, the third name down, sir, Richard
 5    W. Fields, do you recognize that name?
 6         A.    Yes.
 7         Q.    Is Mr. Fields the attorney that
 8    you met with during the summer and the fall
 9    2018?
10         A.    Yes, he's one of them.
11         Q.    And do you see under
12    Mr. Fields' name he has his firm name,
13    Fields, PLLC?
14                    Do you see that?
15         A.    Yes.
16         Q.    And then the address of his
17    firm?
18                    Do you see that?
19         A.    Yes.
20         Q.    Did you have your meetings at
21    the Fields law firm in 2018 at that address,
22    if you recall?
23         A.    I don't believe it was.
24         Q.    Do you see under Mr. Fields'
25    address and e-mail it says the words "lead
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    attorney, attorney to be noticed"?

 2              Do you see that, sir?

 3         A.    Yes.

 4         Q.    Earlier today, plaintiffs'

 5    counsel asked you questions about two of its

 6    expert witnesses, Mr. Jim Geldhof and Mr. Jim

 7    Rafalski.

 8              Do you remember that

 9    discussion?

10         A.    Yes, I do.

11         Q.    Now, in your time at DEA, did

12    you have an opportunity to work on projects

13    with Mr. Geldhof?

14              MR. BENNETT:  Objection.

15         Scope.

16              You can answer that question

17         yes or no only.

18              THE WITNESS:  Yes.

19    QUESTIONS BY MR. EPPICH:

20         Q.    You had the opportunity to

21    evaluate his work product?

22         A.    No.

23         Q.    Do you have any personal

24    knowledge as to his experience,

25    qualifications or effectiveness with DEA
```

```
 1    diversion issues?

 2         A.    Yes.

 3         Q.    Did you have an opportunity to

 4    work with Mr. Rafalski while at DEA?

 5         A.    No.

 6         Q.    Did you ever have an

 7    opportunity to evaluate Mr. Rafalski's work?

 8         A.    No.

 9         Q.    Did you have an opportunity --

10    oh, strike that.

11              So you have no personal

12    knowledge as to Mr. Rafalski's experience,

13    qualifications or effectiveness with DEA

14    diversion issues; is that correct?

15         A.    That's correct.

16         Q.    If I could ask you to turn to

17    Exhibit 26.

18              Sir, do you have Exhibit 26 in

19    your hand?

20         A.    Yes, I do.

21         Q.    Plaintiffs' counsel asked you

22    some questions about your e-mail on the

23    bottom of page 1 and continuing on to page 2.

24              Do you remember those

25    questions?
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Yes.

2        Q.      Now, Mr. Mays at

3    AmerisourceBergen then responded to your

4    original e-mail in this chain.  He responded

5    on Tuesday, August 16, 2005.

6                Do you see that e-mail on

7    page 1?

8        A.      I do.

9        Q.      He says, "Mike, thanks for the

10   info.  I would love to know the name of the

11   pharmacy.  It looks like the picture in the

12   presentation indicates that Example Number 2

13   is a warehouse of some type.  I'm very

14   concerned that this type of location would

15   have received retail pharmacy licensing and a

16   DEA registration in the first place."

17               Do you see that, sir?

18       A.      I do.

19       Q.      And you respond at the top of

20   the page on August 16, 2005.  You respond to

21   Mr. Mays and you say, "Steve, we are also

22   concerned that a pharmacy such as the one in

23   the picture could be licensed by the state

24   authorities and obtain a DEA registration.

25   For that reason, DEA is physically inspecting

1    pharmacy locations in some parts of the

2    country before they are authorized to receive

3    a DEA registration to be sure that they are,

4    in fact, a retail pharmacy.  DEA can no

5    longer rely on a state physical inspection

6    before a state license is issued."

7              Do you see that, sir?

8         A.    I do.

9         Q.    Now, August 2005, that was

10   during the distributor briefings that you

11   were providing to certain distributors on

12   Internet pharmacy issues, correct?

13        A.    Yes.

14        Q.    And you shared ABDC's concern

15   that a pharmacy such as the one that you

16   discussed with ABDC could receive a DEA

17   registration, correct?

18        A.    Yes.

19        Q.    Now, prior to this time, DEA

20   did not inspect pharmacies before approving

21   the pharmacy applicant's registration,

22   correct?

23              DEA was -- let me just stop

24   there.

25              Let me strike it.  I'll ask it

1    again.

2            Now, prior to this time, DEA

3    did not inspect pharmacies before approving

4    the pharmacy's registration, correct?

5            MR. BENNETT:  Objection.

6        Scope.  This is outside the area that

7        he's authorized.  He's also not

8        authorized to speak on behalf of DEA

9        or what DEA did.

10            He may answer based on his

11        personal experience what he or the

12        diversion investigators working under

13        him did.

14            THE WITNESS:  We did not

15        routinely inspect physical locations

16        for retail pharmacies.

17    QUESTIONS BY MR. EPPICH:

18        Q.    Instead, DEA was relying on

19    state inspections -- states' inspections of

20    pharmacy applicants, right?

21            MR. BENNETT:  Objection.

22        Scope.  He's not authorized to speak

23        on behalf of DEA or what DEA did.

24            He may testify about what he

25        personally did in his position at DEA

```
 1              and what he relied on.

 2                   THE WITNESS:  Yes, we -- the

 3              groups that I was involved with relied

 4              on the state license and the fact that

 5              there had been an inspection, a

 6              physical inspection, to obtain the

 7              state license.

 8    QUESTIONS BY MR. EPPICH:

 9         Q.    But the state inspections were

10    not detecting Internet pharmacies, were they?

11                   MR. BENNETT:  Objection.

12         Scope.

13                   You may talk based in your

14         personal knowledge and not on behalf

15         of DEA.

16                   THE WITNESS:  In my experience,

17         they were not always detecting that.

18    QUESTIONS BY MR. EPPICH:

19         Q.    And so DEA changed the policy,

20    right?

21                   MR. BENNETT:  Objection.

22         Scope.

23                   This witness has not been

24         authorized to testify regarding DEA

25         policy or changes in policy.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  To the extent he has personal

 2            experience or knowledge as far as

 3            changes, he may say what he observed

 4            while he was at DEA.

 5                  THE WITNESS:  My personal

 6            experience at the time in the Denver

 7            division was that it did not require

 8            us to do inspections of retail

 9            pharmacy applicants because the state

10            board in Colorado was doing

11            appropriate inspections.

12      QUESTIONS BY MR. EPPICH:

13            Q.    But you're aware of other

14      divisions throughout the country where

15      inspections of pharmacies were occurring,

16      correct?

17            A.    Yes.

18            Q.    Now, in your experience, DEA

19      started to physically inspect pharmacies

20      seeking DEA registrations to distribute --

21      let me strike that.

22                  Mr. Mapes, earlier today

23      plaintiffs' counsel asked you some questions

24      about DEA's distributor briefing with

25      McKesson.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Do you remember that

 2   discussion?

 3        A.    Yes.

 4        Q.    And DEA's distributor briefing

 5   with McKesson led to a series of telephone

 6   conferences and meetings with McKesson as the

 7   two discussed the DEA's new guidance and the

 8   Internet pharmacy concern, right?

 9        A.    It did.

10        Q.    DEA identified six suspected

11   Internet pharmacies to McKesson as part of

12   these meetings, correct?

13        A.    I'd have to -- I don't remember

14   the exact number, but...

15        Q.    But the DEA identified

16   suspected Internet pharmacies to McKesson

17   during these meetings?

18        A.    Yes.

19        Q.    McKesson stopped supplying

20   those pharmacies, right?

21              MR. BENNETT:  You can answer,

22        if you know.

23              THE WITNESS:  I don't recall

24        specifically without looking at the

25        documentation.
```

Highly Confidential - Subject to Further Confidentiality Review

1    QUESTIONS BY MR. EPPICH:

2         Q.    Well, in fact, one of the

3    pharmacies that McKesson stopped supplying

4    sued the DEA because McKesson immediately

5    stopped supplying controlled substances to

6    that pharmacy after meeting with DEA.

7              Do you recall that?

8         A.    No, I do not.

9         Q.    Do you recall testifying at a

10   federal district court hearing in Florida in

11   2006 in the case of United Prescription

12   Services versus Alberto Gonzales and Karen

13   Tardy {sic}?

14        A.    I remember testifying in

15   Florida, yes.

16        Q.    And do you recall that that

17   testimony was in relation to McKesson's

18   immediate cease of supplying controlled

19   substances to that pharmacy?

20        A.    I don't remember the substance

21   of the testimony.

22        Q.    But it's fair to say that

23   following the discussions that DEA had with

24   McKesson during these distributor meetings,

25   that McKesson acted promptly to address the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    concerns of the DEA?

 2              MR. BENNETT:  Objection.

 3         Scope.

 4              This witness is not authorized

 5         to disclose nonpublic information

 6         about DEA activities or investigations

 7         that they may have had.

 8              To the extent that you can

 9         answer this question with publicly

10         available information, you may answer.

11              THE WITNESS:  And the question

12         again?

13    QUESTIONS BY MR. EPPICH:

14         Q.    I'll restate the question, sir.

15              It's fair to say that following

16    the discussions the DEA had with McKesson

17    during these distributor meetings, that

18    McKesson acted promptly to address the

19    concerns of the DEA?

20              MR. BENNETT:  Do you understand

21         my instruction in responding to that

22         question?

23              THE WITNESS:  Yes.

24              MR. BENNETT:  Okay.

25              THE WITNESS:  I can't really
```

```
 1          say.

 2     QUESTIONS BY MR. EPPICH:

 3          Q.     You don't recall?

 4          A.     I just don't recall.

 5          Q.     Now, earlier today the

 6     plaintiffs' counsel asked you and showed you

 7     a slide.  He asked you some questions about

 8     other causes of the opioid crisis, e.g.,

 9     illegal prescribing.

10               Do you remember this

11     conversation?

12          A.     Yes.

13          Q.     And he asked you whether or not

14     a good suspicious order monitoring system can

15     help catch that.

16               Do you remember that testimony,

17     sir?

18          A.     Yes.

19          Q.     Are you familiar with HIPAA?

20          A.     Yes.

21          Q.     What is HIPAA?

22          A.     The Health Insurance Privacy

23     Act or something like that.

24          Q.     Now, pursuant to that Act,

25     distributors don't have access to a patient's
```

```
 1    medical records, correct?

 2          A.     Generally, no.

 3          Q.     And distributors are not in the

 4    doctor's office when the doctor and the

 5    patient are talking, are they?

 6          A.     Not in my experience, no.

 7          Q.     Now, you'll recall that

 8    plaintiffs' counsel asked you -- he presented

 9    the following question to you earlier today

10    in a slide titled "Diversion Control 101."

11               He asked you:  "If a company

12    sees a suspicious order, the company has a

13    choice to make, ship/sell or hold and

14    investigate."

15               Do you remember this slide?

16          A.     Yes.

17          Q.     But this question isn't found

18    in the Controlled Substances Act, is it?

19          A.     It doesn't say that

20    specifically in the Controlled Substances

21    Act, no.

22          Q.     And it doesn't say this

23    specifically in the regulations, correct?

24          A.     No.

25          Q.     You started to ask distributors
```

Highly Confidential - Subject to Further Confidentiality Review

 1    to ask themselves this question as a part of

 2    the distributor briefings, correct?

 3         A.    We did.

 4              MR. EPPICH:  Thank you,

 5         Mr. Mapes.  I have no further

 6         questions.

 7              We can go off the record.

 8              VIDEOGRAPHER:  We're going off

 9         the record.  The time is 1:33.

10          (Off the record at 1:33 p.m.)

11              VIDEOGRAPHER:  Going back on

12         the record.  Beginning of Media

13         File 7.  Time, 1:39.

14              MR. EPPICH:  Just a quick

15         housekeeping issue.

16              For the record, let's go ahead

17         and mark as Exhibit 4A, document

18         bearing Bates number ABDCMDL00269347

19         through 358.

20              And let's mark as Exhibit 35

21         three pages from the demonstratives

22         that plaintiffs presented this

23         morning, further marked up by

24         defendants.

25              We can go off.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (Mapes Exhibit 35 marked for
 2           identification.)
 3                    VIDEOGRAPHER:  Going off record
 4           at 1:40.
 5            (Off the record at 1:40 p.m.)
 6                    VIDEOGRAPHER:  We're going back
 7           on record.  Beginning Media File 8.
 8           The time is 1:59.
 9                    RE-EXAMINATION
10    QUESTIONS BY MS. FITZPATRICK:
11           Q.     Good afternoon, Mr. Mapes.  We
12    met briefly yesterday, but my name is Laura
13    Fitzpatrick, and I'm here on behalf of the
14    plaintiffs, and I'm going to take over for
15    Mr. Lanier for a little bit.
16                    I want to just kind of reorient
17    you and the jury here.  I'd like to talk --
18    just a second.
19                    I'd like to kind of redirect
20    us, call this my redirect roadmap that
21    Ms. Lanier made for me here.
22                    I'd like to take us from the
23    muddy waters that you were brought into over
24    the last, I think, 45 minutes or so, back on
25    to what I'm going to call clarity road.
```

```
 1                  Okay?

 2         A.      Okay.

 3         Q.      All right.  Now, you were shown

 4    by the ABDC lawyer the document that we've

 5    referred to as the methamphetamine document,

 6    and there were some suggestions that ABDC had

 7    a policy that the DEA approved of.

 8                  Do you recall that?

 9                  MS. MCCLURE:  Form.

10                  THE WITNESS:  Yes.

11    QUESTIONS BY MS. FITZPATRICK:

12         Q.      Okay.  Now, would you agree

13    with me that a policy is no good if a company

14    doesn't follow it?

15         A.      Yes.

16         Q.      And would you agree that if

17    someone doesn't put their seat belt on and

18    they get into a car wreck, they may not be

19    protected by the seat belt?

20                  MS. MCCLURE:  Form.

21                  THE WITNESS:  Correct.

22    QUESTIONS BY MS. FITZPATRICK:

23         Q.      Okay.  Thank you.

24                  Now, with respect to

25    Ms. McClure's questions to you about the ABDC
```

Highly Confidential - Subject to Further Confidentiality Review

1  audits and the privilege log, you said that

2  you found the company just generally

3  compliant; is that right?

4              MS. MCCLURE:  Form.

5              THE WITNESS:  Yes.

6  QUESTIONS BY MS. FITZPATRICK:

7       Q.    Okay.  So does that mean that

8  if you only shoplift once a month instead of

9  every time that you enter a store that it's

10  not going to be against the law?

11             Still against the law,

12  correct --

13             MS. MCCLURE:  Form.  Vague.

14  QUESTIONS BY MS. FITZPATRICK:

15      Q.    -- whether you do it once a

16  month or every day?

17             MS. MCCLURE:  Form.  Vague.

18      Compound.  Ambiguous.  Scope.

19             THE WITNESS:  That's not what I

20      meant by saying "generally compliant."

21  QUESTIONS BY MS. FITZPATRICK:

22      Q.    What did you mean?

23      A.    I meant that there were minor

24  improvements that could be made, but they

25  were being generally compliant with their

Highly Confidential - Subject to Further Confidentiality Review

1    policies.

2        Q.     Compliant with their policy,

3    correct?

4        A.     Yes.

5        Q.     Okay.  Now, Ms. McClure made a

6    big deal about you only appearing on one page

7    of a privilege log.

8              Do you recall that --

9              MS. MCCLURE:  Form.  Mis --

10   QUESTIONS BY MS. FITZPATRICK:

11       Q.     -- line of questioning?

12             MS. MCCLURE:  Form.

13         Mischaracterizes.

14             THE WITNESS:  She did say that

15         I was on that page of the privilege

16         log, yes.

17   QUESTIONS BY MS. FITZPATRICK:

18       Q.     And only that page, correct?

19             MS. MCCLURE:  Objection.

20         Misstates the question.

21             THE WITNESS:  I don't recall

22         that, but...

23   QUESTIONS BY MS. FITZPATRICK:

24       Q.     Okay.  I'll represent to you

25   that Ms. McClure put -- well, let's have the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    exhibit, actually.  I think it was Exhibit

 2    Number 1 -- 2?

 3                 MS. MCCLURE:  20.

 4                 MS. FITZPATRICK:  I'm sorry,

 5         20, yes, first of today.

 6    QUESTIONS BY MS. FITZPATRICK:

 7         Q.     Thank you.

 8                 So, Mr. Mapes, Ms. McClure had

 9    you look at Exhibit Number 20.

10                 Do you see Exhibit Number 20 on

11    the screen in front of you?

12         A.     Yes.

13         Q.     And she said this was only one

14    page where you appeared on the ABDC privilege

15    log, correct?

16                 MS. MCCLURE:  Objection to

17         form.  Misstates the record.

18                 THE WITNESS:  I don't remember

19         her exact language.

20                 (Mapes Exhibit 36 marked for

21         identification.)

22    QUESTIONS BY MS. FITZPATRICK:

23         Q.     Okay.  Well, I'm going to show

24    you what we're going to mark as Exhibit

25    Number 36, which is a memorandum that was
```

Highly Confidential - Subject to Further Confidentiality Review

1    done by some of the plaintiffs.  Here you go.

2              Do you have Exhibit 36 in front

3    of you?

4         A.    Yes.

5         Q.    Okay.  Now, would you agree

6    here with me, sir, that this is not just one

7    entry on a privilege log, that there are

8    several pages here where you are listed on

9    ABDC's privilege log?

10             And I might add that you're

11   also listed on the Henry Schein privilege log

12   as well as the Par and Endo privilege log.

13             Did you know that, sir?

14             MS. MCCLURE:  Objection.  Form.

15        Compound.  Misstates the record.

16             THE WITNESS:  I see that I am

17        several places on the

18        AmerisourceBergen privilege log.

19   QUESTIONS BY MS. FITZPATRICK:

20        Q.    Okay.  Thank you.

21             So it's more than just one,

22   correct?

23        A.    Yes.

24        Q.    Okay.  Thank you, sir.

25             Now, there were some questions

Highly Confidential - Subject to Further Confidentiality Review

 1    about -- the ABDC lawyer asked you about the

 2    gradual change, she called it a gradual

 3    change, in what the companies were doing to

 4    be in compliance with the law.

 5              Do you recall that line of

 6    questioning?

 7         A.    Yes.

 8         Q.    Okay.  Now, did the questions

 9    that the ABDC lawyer asked you change

10    anything about your testimony earlier today,

11    that this has always been the law?

12              MS. MCCLURE:  Objection to the

13         form.  Compound.

14              THE WITNESS:  It has always

15         been the law but not necessarily the

16         practice of what DEA accepted.

17    QUESTIONS BY MS. FITZPATRICK:

18         Q.    But you would agree with me

19    that whether DEA accepted it or not, the law

20    was the law, correct?

21              MS. MCCLURE:  Objection to the

22         form.  Calls for a legal conclusion.

23              THE WITNESS:  Yes.

24              (Mapes Exhibit 37 marked for

25         identification.)

```
 1    QUESTIONS BY MS. FITZPATRICK:

 2         Q.    And in fact, speaking of the

 3    DEA, I will mark as Exhibit Number 37 an

 4    excerpt of the DEA's 30(b)(6) testimony.

 5              Here you go, sir.

 6              And do you understand what

 7    30(b)(6) testimony is, sir?

 8         A.    Yes.

 9         Q.    So it means that the person

10    speaking is speaking for the company, not

11    just in their personal capacity, correct?

12              MS. MCCLURE:  Form.

13              THE WITNESS:  For the Agency,

14         yes.

15    QUESTIONS BY MS. FITZPATRICK:

16         Q.    For the Agency.

17              All right.  I'd like you to

18    take a look at what Mr. Prevoznik said.  He

19    was asked:  "Does the DEA take the position

20    that a registrant of controlled substances

21    has a duty to block shipments of suspicious

22    order?"

23              The DEA's answer was:  "Yes.

24              He was also asked:  "Is that

25    now and always has been the law in the United
```

1    States of America?"

2              What was his answer, sir?

3    A.    "Yes."

4              MS. FITZPATRICK:  Thank you.

5              MS. MCCLURE:  Objection to the

6         narrative statements from counsel.

7    QUESTIONS BY MS. FITZPATRICK:

8    Q.    All right, sir, I'd like to

9    talk a little bit about McKesson.

10             Now, the McKesson lawyer talked

11   to you about relying on state inspectors.

12             Do you recall that testimony?

13   A.    Yes.

14   Q.    Okay.  Let me ask you this:

15   Does the DEA -- is the DEA a multimillion

16   dollar corporation?

17             MR. EPPICH:  Object to the

18        form.

19             THE WITNESS:  It's not a

20        corporation.

21   QUESTIONS BY MS. FITZPATRICK:

22   Q.    Okay.  Does it have endless

23   resources?

24             MS. MCCLURE:  Form.

25             THE WITNESS:  No.

```
 1    QUESTIONS BY MS. FITZPATRICK:

 2         Q.    Okay.  If the companies had

 3    maintained effective controls, there wouldn't

 4    be much to inspect, would there?

 5              MS. MCCLURE:  Objection.  Asked

 6         and answered.  Scope, in terms this is

 7         supposed to be recross.

 8              MR. STEPHENS:  And objection.

 9         Form.

10    QUESTIONS BY MS. FITZPATRICK:

11         Q.    You can answer, Mr. Mapes.

12         A.    There would still be a lot to

13    inspect to be sure that they were maintaining

14    effective controls, so the oversight of those

15    companies.

16         Q.    But if a company fails to

17    maintain effective controls, there's a lot

18    more to inspect, isn't there?

19         A.    That's correct.

20              MS. MCCLURE:  Form.

21    QUESTIONS BY MS. FITZPATRICK:

22         Q.    Okay.  Thank you.

23              All right.  Now, there was --

24    another part of the blame game today was

25    the -- when we talked about the Internet
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    pharmacies.  The McKesson lawyer talked to

2    you about the Internet pharmacies and how

3    they got their registrations and that their

4    registrations were granted by the DEA.

5              Do you recall that line of

6    questioning?

7              MS. MCCLURE:  Objection.

8         Argumentative.

9              MR. EPPICH:  Objection to the

10        form and characterization.

11             THE WITNESS:  Yes.

12   QUESTIONS BY MS. FITZPATRICK:

13        Q.    Okay.  Defendants have a duty

14   to know their customers, correct?

15             MR. EPPICH:  Objection.  Calls

16        for a legal conclusion.  Form.

17             THE WITNESS:  Yes.

18             MS. MCCLURE:  Scope.

19   QUESTIONS BY MS. FITZPATRICK:

20        Q.    Is the DEA a registrant?

21        A.    Yes.

22        Q.    The DEA is a registrant and has

23   a duty to prevent against abuse and

24   diversion?

25             MR. BENNETT:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

1           Scope.

2               You may not speak on behalf of

3           DEA.  You may speak on your personal

4           understanding, if you have one.

5               THE WITNESS:  DEA's

6           registrations are not as distributors

7           or manufacturers.  They're as

8           analytical laboratories and that kind

9           of thing, so they have different

10          requirements.

11  QUESTIONS BY MS. FITZPATRICK:

12          Q.    Correct.

13               And the DEA does not

14  distribute, manufacture or sell opioids, does

15  it?

16          A.    It does not.

17          Q.    Okay.  Thank you.

18               MR. EPPICH:  Objection to the

19          extent the demonstrative does not

20          reflect the testimony.

21               MS. FITZPATRICK:  I'll fix that

22          right now.

23  QUESTIONS BY MS. FITZPATRICK:

24          Q.    The DEA is not the same type of

25  registrant, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.     Yes.

2              Q.     Thank you, sir.

3                     Now, I believe you already

4     testified to this today but to make sure that

5     there's no confusion for the jury, where do

6     Internet pharmacies get their pills?

7                     MS. MCCLURE:  Again, asked and

8              answered.  Scope.  Outside of the

9              scope of redirect.

10    QUESTIONS BY MS. FITZPATRICK:

11             Q.     Do they get them from the DEA,

12    sir?

13                    MS. MCCLURE:  All the same

14             objections.

15                    THE WITNESS:  No.

16    QUESTIONS BY MS. FITZPATRICK:

17             Q.     Okay.  Does the United States

18    government provide these?

19             A.     No.

20             Q.     Okay.  The manufacturers,

21    distributors and pharmacies provide opioids,

22    correct?

23                    MS. MCCLURE:  All the same

24             objections, including scope of

25             recross.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Yes.

 2      QUESTIONS BY MS. FITZPATRICK:

 3           Q.      Thank you.

 4                   Now, the McKesson lawyer talked

 5      to you a little bit about the duty to ship

 6      and when that -- when that duty existed and

 7      when it didn't.

 8                   The CSA, which Mr. Lanier put

 9      in front of you, says "report when

10      discovered," does it not?

11                   MR. EPPICH:  Object to the

12           form.

13                   MS. MCCLURE:  Form.  Calls for

14           a legal conclusion.

15                   THE WITNESS:  The CSA does not.

16           The regulations do.

17      QUESTIONS BY MS. FITZPATRICK:

18           Q.      Excuse me, yes.  Apologies.

19                   The regulations say -- let me

20      fix this.  The regulations say "report when

21      discovered," correct?

22           A.      Yes.

23                   MS. MCCLURE:  Same objections.

24      QUESTIONS BY MS. FITZPATRICK:

25           Q.      Okay.  Now, I looked up the
```

```
 1    definition of the word "when" because I was a

 2    little confused about why we were still

 3    fighting about this.  But the definition of

 4    "when" is "at or during that time."

 5              Is that your understanding of

 6    the definition of "when"?

 7              MS. MCCLURE:  Same objections,

 8         including outside the scope of

 9         recross.

10              THE WITNESS:  When, yes.

11    QUESTIONS BY MS. FITZPATRICK:

12         Q.    Thank you, sir.

13              Now, the McKesson lawyer talked

14    to you about McKesson's reactions and

15    responses to the DEA feeling the need to

16    reach out to McKesson and inform them that

17    they were distributing pills to some of the

18    rogue Internet pharmacies.

19              Do you recall that line of

20    questioning?

21         A.    Yes.

22         Q.    Okay.

23              MR. EPPICH:  Objection to the

24         form.  Misstates the testimony.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1     QUESTIONS BY MS. FITZPATRICK:

2          Q.     And the McKesson lawyer

3     represented to you that McKesson reacted

4     promptly.

5               Do you recall that?

6               MR. BENNETT:  You can answer.

7               THE WITNESS:  Yes.

8     QUESTIONS BY MS. FITZPATRICK:

9          Q.     Sir, isn't it true that

10    McKesson got busted?

11              MR. EPPICH:  Objection.

12         Argumentative.

13              MS. MCCLURE:  Form.

14         Argumentative.

15    QUESTIONS BY MS. FITZPATRICK:

16         Q.     I forget the exact exhibit

17    number --

18              MR. EPPICH:  Calls for

19         speculation.

20    QUESTIONS BY MS. FITZPATRICK:

21         Q.     -- but Mr. Lanier showed you a

22    copy of the 2007 McKesson settlement

23    agreement.

24              Do you recall that?

25              MR. EPPICH:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Misstates the document.  Form.

 2                   THE WITNESS:  Yes.

 3      QUESTIONS BY MS. FITZPATRICK:

 4           Q.    Okay.  And, sir, did you know

 5      that they did it again?

 6                   MR. EPPICH:  Objection.

 7              Argumentative.  Form.

 8                   MS. MCCLURE:  Form.

 9                   THE WITNESS:  I'm not aware of

10              what happened after that time, no.

11                   (Mapes Exhibit 38 marked for

12              identification.)

13      QUESTIONS BY MS. FITZPATRICK:

14           Q.    All right.  Sir, I'm going to

15      mark for you Exhibit Number 38, I believe

16      this is.

17                   All right.  Sir, I'd like you

18      to turn to --

19                   MR. BENNETT:  Counsel, can he

20              have a minute to review the document?

21                   MS. FITZPATRICK:  Oh, sure.

22                   Well, and I'll tell you, the

23              only page I'm going to be looking at

24              is the one that ends in 5352 at the

25              bottom for the McKesson Bates.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. EPPICH:  Object to the
 2           scope and use of this document on
 3           redirect.
 4                    MS. MCCLURE:  And scope in
 5           terms of authorization.
 6                    MR. BENNETT:  Review as much of
 7           this as you need to familiarize
 8           yourself with the document.
 9                    THE WITNESS:  Okay.
10  QUESTIONS BY MS. FITZPATRICK:
11           Q.    Mr. Mapes, do you see paragraph
12  number 2 on the page labeled 5352?  That's
13  really the only paragraph I'm going to be
14  talking to you about and -- just a few
15  sentences in that paragraph.
16                    Do you see I have it here on
17  the screen in front of you?
18                    MR. EPPICH:  Objection.  Scope.
19           Foundation.  Calls for speculation.
20                    MR. BENNETT:  And I'll object
21           to the extent the witness needs more
22           time to familiarize himself with the
23           document before he answers questions.
24                    Whenever you're prepared,
25           please let her know that you're ready
```

1       to go forward.

2               THE WITNESS:  Okay.

3   QUESTIONS BY MS. FITZPATRICK:

4       Q.    And let's try this.  Let me --

5   why don't I start, and if you have any

6   questions or if you feel you need to look at

7   any other of the pages, then we can do that.

8               Does that work for you, sir?

9       A.    Okay.

10      Q.    All right.  So if you follow

11  with me here, it states:  "McKesson

12  acknowledges that at various times during the

13  period from January 1, 2009" --

14              That's after the 2007

15  settlement agreement, correct?

16              MR. EPPICH:  Objection.  Scope.

17          Foundation.  Calls for speculation.

18              THE WITNESS:  Yes, it is.

19  QUESTIONS BY MS. FITZPATRICK:

20      Q.    Okay.

21              -- "up through and including

22  the effective date of this agreement, it did

23  not identify or report to the DEA certain

24  orders placed by certain pharmacies which

25  should have been detected by McKesson as

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious based on the guidance contained in

2    the DEA letters about the requirements set

3    forth in 21 CFR Section 1301.74(b)."

4               And 74(b), that's the section

5    that Mr. Lanier had to point out to you,

6    correct?  The McKesson lawyer hadn't shown

7    you that one initially?

8               MS. MCCLURE:  Form.  Compound.

9        Argumentative.

10              MR. EPPICH:  Objection.

11       Misstates testimony.  Form.  Scope.

12       Foundation.

13              THE WITNESS:  I don't recall

14       when that was first pointed out.

15   QUESTIONS BY MS. FITZPATRICK:

16       Q.    Okay.  And 21 USC Section

17   842(a)(5), "McKesson has taken steps to

18   prevent such conduct from occurring in the

19   future, including the measures delineated in

20   the compliance addendum."

21              Did I read that correctly?

22              MR. EPPICH:  Objection.

23       Foundation.  Calls for speculation.

24       Scope.

25              THE WITNESS:  Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    QUESTIONS BY MS. FITZPATRICK:

2        Q.      And I found it interesting that

3    the same language about McKesson taking steps

4    to prevent such conduct from occurring in the

5    future appears in the 2007 settlement

6    agreement as well.

7                Did you know that, sir?

8                MR. EPPICH:  Objection.  Scope.

9        Foundation.  Calls for speculation.

10               THE WITNESS:  No, I didn't.

11   QUESTIONS BY MS. FITZPATRICK:

12       Q.      So, sir, even if the DEA is

13   using the tools that the lawyer for Walmart

14   talked about for quite a bit yesterday, one

15   such being a suspension order and having the

16   Department of Justice -- supporting the

17   Department of Justice and entering into a

18   settlement agreement, that doesn't

19   necessarily mean the company won't do it

20   again, correct?

21               MR. EPPICH:  Objection.  Scope.

22       Foundation.  Calls for speculation.

23       Calls for legal conclusion and

24       misstates facts.

25               MR. STEPHENS:  Objection.  Also

Highly Confidential - Subject to Further Confidentiality Review

```
1            misstates the question and the
2            testimony.
3    QUESTIONS BY MS. FITZPATRICK:
4        Q.     You can answer, sir.
5        A.     I have now forgotten the
6    question.
7        Q.     No problem.  So I'll read it
8    back.
9               Even if the DEA is using the
10   tools -- you recall the discussion with the
11   Walmart lawyer yesterday about the tools
12   available to the DEA that in his opinion
13   another person may not have access to.
14              Do you recall that?
15       A.     I do.
16       Q.     Okay.  So even if the DEA is
17   using those tools, one of which being a
18   suspension order that could lead to a
19   settlement agreement, that does not mean that
20   the company is not going to continue to break
21   the law, does it?
22              MR. EPPICH:  Objection.  Scope.
23   Form.  Calls for speculation.
24              THE WITNESS:  It does not.
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. FITZPATRICK:

 2         Q.    And the fact that McKesson, in

 3    2007, signed a settlement agreement and

 4    agreed to not do it again, they did it again,

 5    didn't they?

 6              MR. EPPICH:  Objection.  Form.

 7         Foundation.  Scope.  Misstates the

 8         documents and testimony and misstates

 9         facts.

10    QUESTIONS BY MS. FITZPATRICK:

11         Q.    Didn't they admit to doing

12    that, sir?

13              MR. EPPICH:  Same objections.

14              THE WITNESS:  Yes, they did.

15    QUESTIONS BY MS. FITZPATRICK:

16         Q.    Okay.  Do you think it's just

17    the cost of doing business for the company?

18              MR. EPPICH:  Objection.

19         Argumentative.

20    QUESTIONS BY MS. FITZPATRICK:

21         Q.    These settlement agreements?

22              MR. EPPICH:  Objection.

23         Argumentative.  Form.  Calls for

24         speculation.  Scope.

25              THE WITNESS:  No, I don't think
```

```
 1              it's just the cost of doing business.

 2      QUESTIONS BY MS. FITZPATRICK:

 3              Q.      Okay.  And that's your opinion

 4      sitting here today as a paid consultant for

 5      one of the companies that's a defendant in

 6      this litigation, correct?

 7              A.      Yes.

 8                      MS. MCCLURE:  Objection.

 9              Argumentative.

10      QUESTIONS BY MS. FITZPATRICK:

11              Q.      Now, I want to ask -- the last

12      thing I'm going to ask you about is the

13      lawyer for McKesson talked to you a lot about

14      HIPAA and that companies don't have patient

15      medical records.

16                      Do you recall that?

17              A.      I recall the discussion, yes.

18              Q.      Okay.  And I believe what he

19      was getting at was he was trying to make the

20      point with you that because the companies --

21      because he represented to you that companies

22      did not have the patient medical records,

23      there was no way for the companies to monitor

24      overprescribers.

25                      Was that your understanding?
```

```
 1                    MR. EPPICH:  Objection.

 2          Misstates the question and testimony.

 3          Form.

 4                    THE WITNESS:  That wasn't my

 5          understanding of his question.

 6     QUESTIONS BY MS. FITZPATRICK:

 7          Q.    Okay.  Let me ask you this:  Do

 8     you think it would be more fair if the

 9     McKesson lawyer had told you the whole truth,

10     had talked with you and told the jury the

11     whole truth?

12                    MS. MCCLURE:  Objection.

13          Argumentative.  Scope.

14          Mischaracterizes the questions.

15                    MR. EPPICH:  I'll join in that

16          objection.  Thank you very much.

17                    THE WITNESS:  And the question

18          is that the --

19     QUESTIONS BY MS. FITZPATRICK:

20          Q.    Is it important to tell the

21     whole truth, is the question.

22                    MS. MCCLURE:  All those same

23          objections.

24                    THE WITNESS:  Yes.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. FITZPATRICK:

 2         Q.    Okay.  And did you know that

 3    manufacturers have the data of not only their

 4    top prescribers but all prescribers?

 5               MR. EPPICH:  Objection.  Form.

 6         Foundation.  Calls for speculation.

 7         Vague.

 8               MS. MCCLURE:  Scope.  Both of

 9         the Touhy notice as well as outside

10         the scope of redirect.

11    QUESTIONS BY MS. FITZPATRICK:

12         Q.    You can answer, sir.

13         A.    I know that there is data

14    available to manufacturers.  Whether it's

15    complete and of all prescribers, I don't

16    know, but --

17         Q.    So you don't -- I'm sorry, sir,

18    were you finished?

19         A.    Yeah.  I don't know the

20    completeness and the scope of the data, but

21    there is some data available, yes.

22         Q.    Okay.  And the companies can do

23    the red flag test without a prescription

24    record, correct?

25               MS. MCCLURE:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Vague.  Ambiguous.  Foundation.

 2              Scope, both of Touhy and redirect.

 3                   MR. EPPICH:  Also object that

 4              the demonstrative does not reflect the

 5              witness' testimony if it is meant to

 6              do so.

 7                   MS. MCCLURE:  But I assume we

 8              still have a standing objection to

 9              those.

10                   MS. FITZPATRICK:  You do, and

11              it's a demonstrative.  I can write

12              whatever I want.  It doesn't have to

13              be exactly what the witness says.

14         QUESTIONS BY MS. FITZPATRICK:

15              Q.   But go ahead, Mr. Mapes.

16                   MR. EPPICH:  Just making a

17              record in case you want to use it at

18              trial.

19                   THE WITNESS:  That's correct.

20                   MS. FITZPATRICK:  Okay.  Let me

21              take a minute.  I don't think we have

22              anything else, but let me just...

23                   All right.  We're done.  Thank

24              you, Mr. Mapes.

25                   MR. BENNETT:  Mr. Mapes, you'll
```

```
1              have an opportunity to read this

2              deposition or you can waive that

3              right.  It's up to you to decide

4              whether you want to review it or

5              whether you want to waive signature.

6                    THE WITNESS:  And if I review

7              it and find something that I --

8                    MR. BENNETT:  You would have

9              the right in your errata sheet to

10             correct errors.

11                   But you have to tell the court

12             reporter now, and if you don't tell

13             her anything, then you don't waive

14             signature and you'll get it to review.

15                   THE WITNESS:  Yeah, I think I'd

16             rather review it.

17                   MR. BENNETT:  He does not want

18             to waive signature.  Thank you.

19                   All right.  Thank you,

20        Mr. Mapes.

21                   VIDEOGRAPHER:  This concludes

22             today's deposition.  The time is 2:22.

23        (Deposition concluded at 2:22 p.m.)

24                    - - - - - - -

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE

 2

 3           I, CARRIE A. CAMPBELL, Registered
    Diplomate Reporter, Certified Realtime
 4  Reporter and Certified Shorthand Reporter, do
    hereby certify that prior to the commencement
 5  of the examination, Michael Mapes, was duly
    sworn by me to testify to the truth, the
 6  whole truth and nothing but the truth.

 7           I DO FURTHER CERTIFY that the
    foregoing is a verbatim transcript of the
 8  testimony as taken stenographically by and
    before me at the time, place and on the date
 9  hereinbefore set forth, to the best of my
    ability.

10

             I DO FURTHER CERTIFY that I am
11  neither a relative nor employee nor attorney
    nor counsel of any of the parties to this
12  action, and that I am neither a relative nor
    employee of such attorney or counsel, and
13  that I am not financially interested in the
    action.

14

15

16
           Carrie A. Campbell
17  CARRIE A. CAMPBELL,
    NCRA Registered Diplomate Reporter
18  Certified Realtime Reporter
    Notary Public
19  Dated:  July  13, 2019

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 INSTRUCTIONS TO WITNESS

 2

 3           Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the

 6    appropriate space on the errata sheet for any

 7    corrections that are made.

 8           After doing so, please sign the

 9    errata sheet and date it.  You are signing

10    same subject to the changes you have noted on

11    the errata sheet, which will be attached to

12    your deposition.

13           It is imperative that you return

14    the original errata sheet to the deposing

15    attorney within thirty (30) days of receipt

16    of the deposition transcript by you.  If you

17    fail to do so, the deposition transcript may

18    be deemed to be accurate and may be used in

19    court.

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT
 2

 3

 4         I,_____, do
      hereby certify that I have read the foregoing
 5    pages and that the same is a correct
      transcription of the answers given by me to
 6    the questions therein propounded, except for
      the corrections or changes in form or
 7    substance, if any, noted in the attached
      Errata Sheet.
 8

 9

10

11

12    _____
      Michael Mapes            DATE
13

14

15    Subscribed and sworn to before me this
16    _____ day of _____, 20 _____.
17    My commission expires: _____
18

19    Notary Public
20

21

22

23

24

25
```

```
 1              - - - - - - -

                        ERRATA

 2              - - - - - - -

 3      PAGE    LINE   CHANGE/REASON

 4      _____   _____  _____

 5      _____   _____  _____

 6      _____   _____  _____

 7      _____   _____  _____

 8      _____   _____  _____

 9      _____   _____  _____

10      _____   _____  _____

11      _____   _____  _____

12      _____   _____  _____

13      _____   _____  _____

14      _____   _____  _____

15      _____   _____  _____

16      _____   _____  _____

17      _____   _____  _____

18      _____   _____  _____

19      _____   _____  _____

20      _____   _____  _____

21      _____   _____  _____

22      _____   _____  _____

23      _____   _____  _____

24      _____   _____  _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - - -

                    LAWYER'S NOTES

 2                    - - - - - - -

 3      PAGE    LINE

 4      _____   _____   _____

 5      _____   _____   _____

 6      _____   _____   _____

 7      _____   _____   _____

 8      _____   _____   _____

 9      _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____

25
```