# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br>*County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*<br>Case No. 1:18-OP-45090<br><br>*The County of Cuyahoga v. Purdue Pharma L.P., et al.*<br>Case No. 17-OP-45004 | MDL No. 2804<br><br>Case No. 17-md-2804<br><br>Hon. Dan Aaron Polster |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO TRACK ONE PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY ADJUDICATION OF THEIR EQUITABLE
CLAIMS FOR ABATEMENT OF AN ABSOLUTE PUBLIC NUISANCE**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 3

I.     The Court Cannot Declare as a Matter of Law that the Undefined Opioid Epidemic
Constitutes a Public Nuisance. ................................................................................ 3

        A.     The Court Cannot Conclude that a Public Nuisance Exists Without Consideration
of Defendants' Conduct. ................................................................................ 3

        B.     Plaintiffs Have Not Proven Any Interference Is with a Public Right. ................... 7

II.    The Court Should Not Strike Defendants' Apportionment Affirmative Defenses or Hold
that any Abatement Liability Is Automatically Joint and Several. .................................... 9

        A.     Plaintiffs' Common Law Public Nuisance Claim is a Tort Claim and Is Thus
Subject to Ohio's Apportionment Statute. ........................................................ 9

        B.     Regardless, Public Nuisance Liability Is Apportionable Under Common Law
Rules. ...................................................................................................... 12

        C.     Declaring Abatement Liability To Be Joint and Several Would Be Procedurally
Improper. .................................................................................................. 14

CONCLUSION ................................................................................................................ 15

i

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
    458 U.S. 592 (1982)..............................................................................................12

*Brown v. Scioto Cty. Bd. of Commrs.*,
    622 N.E.2d 1153 (Ohio Ct. App. 1993).........................................................7, 8, 10

*Cincinnati v. Beretta U.S.A. Corp.*,
    768 N.E.2d 1136 (Ohio 2002) .....................................................................................5

*City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*,
    863 F.3d 474 (6th Cir. 2017) ................................................................1, 5, 6, 10

*City of Cleveland v. Ameriquest Mort. Securities, Inc.*,
    615 F.3d 496 (2010).....................................................................................................6

*City of Columbus v. Rohr*,
    1907 WL 572 (Cir. Ct. Ohio Oct. 10, 1907)..........................................................12

*City of Hamilton v. Dilley*,
    165 N.E. 713 (Ohio 1929) .........................................................................................6

*Cleveland v. JP Morgan Chase Bank, N.A.*,
    2013 WL 1183332 (Ohio Ct. App. Mar. 21, 2013) ......................................5, 10, 12

*Cooke v. Gen. Dynamics Corp.*,
    1998 WL 696013 (D. Conn. Sept. 11, 1998)..........................................................15

*Coy v. No Limits Educ.*,
    2016 WL 7911333 (D. Minn. Dec. 9, 2016)...........................................................15

*D.A.B.E., Inc. v. Toledo-Lucas Cty. Bd. of Health*,
    773 N.E.2d 536 (Ohio 2002) .....................................................................................8

*Higgins v. Conn. Light & Power Co.*,
    30 A.2d 388 (Conn. 1943) ..........................................................................................8

*Holmes v. Sec. Investor Prot. Corp.*,
    503 U.S. 258 (1992).....................................................................................................6

*In re Lead Paint Litig.*,
    191 N.J. 405,
    924 A.2d 484 (2007) ...................................................................................................5

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
   517 F. Supp. 2d 662 (S.D.N.Y. 2007) ...................................................................... 14

*Marshall Contractors, Inc. v. Peerless Ins. Co.*,
   827 F. Supp. 91 (D.R.I. 1993) ................................................................................ 15

*Pang v. Minch*,
   559 N.E.2d 1313 (Ohio 1990) .................................................................... 12, 13, 14

*Paulus v. Citicorp N. Am., Inc.*,
   2014 WL 4557603 (S.D. Ohio Sept. 12, 2014) ........................................................ 7

*Smith as Tr. for Bos. Chicken v. Andersen*,
   2005 WL 8160701 (D. Ariz. Mar. 24, 2005) .......................................................... 15

*State ex rel. Miller v. Anthony*,
   647 N.E.2d 1368 (Ohio 1995) ................................................................................ 10

*State v. Lead Indus., Ass'n, Inc.*,
   951 A.2d 428 (R.I. 2008) .......................................................................................... 5

*United States v. Hamilton*,
   2013 WL 12344194 (D. Wyo. July 1, 2013) .......................................................... 14

**Statutes**

Ohio Rev. Code Ann. § 2307.011 ................................................................................... 13

Ohio Rev. Code Ann. § 2307.22 ..................................................................................... 11

**Other Authorities**

Donald G. Gifford, *Public Nuisance As A Mass Products Liability Tort*,
   71 U. Cin. L. Rev. 741 (2003) .................................................................................. 8

Restatement (Second) of Torts § 433A ....................................................................... 2, 14

Restatement (Second) of Torts § 433B .......................................................................... 14

Restatement (Second) of Torts § 821B ................................................................... passim

Restatement (Second) of Torts § 840E ..................................................................... 14, 15

## INTRODUCTION

Plaintiffs ask the Court to "hold that the opioid crisis constitutes a public nuisance in both counties" by referencing the common use of the terms "crisis" or "epidemic" to refer to the problems associated with abuse of opioids in this country (both prescription and illegal).  Pls.' Br. (Dkt. 1880) at 1.  But Plaintiffs cannot prove a public nuisance as a legal matter by mere repetition of these labels.  The definition of public nuisance under Restatement (Second) of Torts § 821B is quite clear.  It includes two elements: (1) "an unreasonable interference" (2) with a "right common to the general public."  Restatement (Second) of Torts § 821B(1).

In order to determine whether there has been an "unreasonable interference," the trier of fact needs to consider "[w]hether the *conduct* involves a significant interference with the public health."[1]  *Id.* § 821B(2)(a).  That is because determining whether a plaintiff has proven a public nuisance requires consideration of all of the facts and circumstances, not just the alleged harm.  *E.g.*, *City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*, 863 F.3d 474, 480 (6th Cir. 2017) (a plaintiff must "at a minimum must connect [alleged conduct] to the existence of an actual nuisance.").  After more than a year of discovery, Plaintiffs have not even identified, much less established, the unreasonable interference from any Defendant's conduct—instead merely repeating that the entire opioid abuse crisis in itself is a public nuisance.  But the Court cannot read "unreasonable interference" out of the definition of public nuisance, as Plaintiffs urge.

Plaintiffs also fail to carry their summary judgment burden because the "opioid epidemic" described by Plaintiffs does not implicate a "right common to the general public."  Restatement (Second) of Torts § 821B(1).  Such public rights are distinct from individual rights, like the "the *individual right* that everyone has not to be … *defrauded* or *negligently injured*," even where

---

[1] All emphasis herein has been added, unless otherwise noted.

the interference is with a large number of people.  *Id.* § 821B, cmt. g.  Plaintiffs use terms like "public health crisis" and "opioid crisis" interchangeably to refer to the many distinct harms associated with "[a]n epidemic of opioid addiction and abuse," Pls.' Br. at 5, but this description confirms that the public health issue involves the aggregation of private rights.  Addiction to a wide-ranging class of drugs, even when suffered by a large number of people, is very different from the interferences with public health as defined in the public nuisance caselaw.  Unlike a pond breeding malaria-carrying mosquitos or the threat of smallpox communication, *see* Restatement (Second) of Torts § 821B, cmts. b & g, addiction is not a contagion that poses a threat to all members of the public.  Plaintiffs have not proven interference with a right common to the public, and they cannot satisfy this element by vague references to the "public health."

For related reasons, the Court should reject Plaintiffs' request for a determination that all Defendants are subject to joint and several liability for the amorphous opioid epidemic.  Ohio's apportionment statute applies to Plaintiffs' public nuisance claim because it is unquestionably a tort, and regardless of Plaintiffs' "abatement" label, what Plaintiffs are actually seeking in "abatement" are future "compensatory damages that represent economic loss" as that phrase is defined in the statute.  Even if the apportionment statute does not apply, Ohio's common law rules dictate that liability is "to be apportioned among two or more causes where (a) there are distinct harms, or (b) there is a reasonable basis for determining the contribution of each cause to a single harm."  Restatement (Second) of Torts § 433A(1).

The opioid epidemic Plaintiffs reference is not a single harm.  Plaintiffs challenge different alleged conduct by different Defendants without even attempting to isolate the necessarily different effects.  At a minimum, there are genuine issues of disputed fact regarding whether each individual Defendant's specific conduct created a public nuisance, and if so, the scope of that

unreasonable interference (*e.g.*, whether it constitutes indivisible harm; whether such harm would be capable of reasonable apportionment).  In short, there is no basis upon which the Court can determine at this stage that liability (if any) must be joint and several.

## ARGUMENT

I.    **The Court Cannot Declare as a Matter of Law that the Undefined Opioid Epidemic Constitutes a Public Nuisance.**

A.    **The Court Cannot Conclude that a Public Nuisance Exists Without Consideration of Defendants' Conduct.**

Although there is a general recognition that the country is experiencing a serious problem with opioid abuse, Plaintiffs' motion confirms that the "opioid epidemic" is too amorphous and multifaceted to constitute a legal "public nuisance."  Plaintiffs contend there is no dispute that a "public nuisance" exists because in certain testimony or documents individuals discuss at various times in various ways that the country is experiencing problems with opioid abuse.  Pls.' Br. at 14-22.  That is false.  As set forth herein and in Manufacturer Defendants' affirmative motion for summary judgment, *see* Dkt. 1761, Defendants dispute the existence of a "public nuisance" on both the facts and the law Plaintiffs have used terms like "opioid epidemic" and "opioid crisis" to encompass a whole range of different individual issues, and their experts and 30(b)(6) witnesses do not even agree on what they means:

- The opioid epidemic is evolving, and the "different phases of the opioid epidemic" have included "medical use, non-medical opioid use, OUD [opioid use disorder], overdose and death."  Alexander Rpt. ¶¶ 13, 175 (Dkt. 1999-1/2000-1).[2]

- "Q. And what does Summit County mean by th[e] terms ['opioid epidemic' and an 'opioid crisis'] in its complaint?  A. I think any time there is an individual suffering from addiction, that is a crisis in that person's family, and that becomes a crisis in their community. And when you add all of those crises up, you have an epidemic.  You know, the -- the root of the term really comes down to this -- this illness or plague occurring in a much more rapid or increased

---

[2] Initial citations to expert reports and deposition transcripts that have been filed on the docket include the docket numbers for the sealed and public versions of those filings.

fashion than should be in a population.  So all of those crises add up to the epidemic that our county is facing."  G. Johnson 30(b)(6) Dep. Tr. at 41:20-42:16 (Dkt. 1963-7/1978-18).

- "[T]he current epidemic of opioid addiction … entailed an unexpectedly rapid increase in the number of new cases" of opioid addiction.  Courtwright Rpt. at 7-8. (Dkt. 1999-3/2000-3).

- "Q. Are you aware of any data which would reflect the geographic source of diverted drugs that have an impact within the county?"  A. "[W]ith the fentanyl epidemic, we were quite aware from medical examiner investigations that some of those … drugs were coming from China. There were … reports of individuals trafficking drugs from Mexico into this area …. Q. So the examples of drugs being imported from China and Mexico, those have to do with the illicit shipment of drugs, correct?  A. Which the county would maintain is an extension of the opioid crisis …."  Ex. 1, Gilson 30(b)(6) Dep. Tr. at 210:4-25.

- "I will use the term 'Defendants' shipments of prescription opioids,' or sometimes just 'shipments,' as a shorthand for the activity the Bellwether Plaintiffs claim constitutes a public nuisance regarding both the marketing and distribution of prescription opioids by Defendants." McGuire Public Nuisance Rpt. ¶ 10 (Dkt. 1999-17/2000-18).

Plaintiffs' varying descriptions of the public nuisance thus range from "shipments" of prescription opioid medications to "individuals suffering from addition" to all harms with any direct or indirect connection to opioids generally—whether prescription medications, illicit drugs like heroin and carfentanil, or even other drugs and alcohol.[3]  This is no accident.  Plaintiffs do not want to explain the alleged public nuisance or give it any bounds.  They want to skip that step and avoid their burden to prove that the alleged public nuisance meets the legal standards for public nuisance by asking the Court to simply declare that there is a single "opioid crisis" nuisance.

There simply is no authority for Plaintiffs' unprecedented request.  Under Ohio law, the existence of an "unreasonable interference" requires an assessment of the effect of the alleged wrongful conduct; the two issues are intertwined and must be considered together to determine

---

[3] *See, e.g.*, Pls.' Br. at 11 ("I have 60 agencies calling me daily saying they're in a crisis due specifically to the opiate epidemic, prescription opiates, Fentanyl, carfentanil, and heroin." (quoting Deposition of Margaret Keenan (30(b)(6) Cuyahoga County), at 385:9-14); *id.* at 12 ("The number of children in placement has increased as well as the number of abuse, dependency, and neglect cases in juvenile court[.]  As of 2017, 32% of removals were due to drugs or alcohols and there were 2,000 children and teens in temporary or permanent custody, the highest since 2011." (footnote omitted)).

whether there is a public nuisance.  *See, e.g.*, *Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1142–43 (Ohio 2002).

In *Beretta*, the Ohio Supreme Court repeatedly emphasized that "public nuisance" is defined by relation to *conduct that unreasonably interferes*, not simply the effects of that conduct. 768 N.E.2d at 1141, 1143 (defendants' alleged "manufacturing, marketing, distributing, and selling firearms in ways that unreasonably interfere with the public health, welfare, and safety in Cincinnati" stated a claim for public nuisance because, if proved, the "residents of Cincinnati have a common right to be free from such *conduct*").  On this point, *Beretta* is consistent with the public nuisance precedent in Ohio and elsewhere.  *See, e.g.*, *Cleveland v. JP Morgan Chase Bank, N.A.*, 2013 WL 1183332, at *3 (Ohio Ct. App. Mar. 21, 2013) (defining "unreasonable interference" to include "*those acts* that significantly interfere with public health" (internal quotation marks omitted)); *City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*, 863 F.3d 474, 479 (6th Cir. 2017); *see also State v. Lead Indus., Ass'n, Inc.*, 951 A.2d 428, 446 (R.I. 2008) ("Put another way, 'public nuisance is an act or omission which obstructs or causes inconvenience or damage the public in the exercise of rights common to all.'" (citations omitted)).  *In re Lead Paint Litig.*, 191 N.J. 405, 429, 924 A.2d 484, 499 (2007) ("[A] public nuisance, by definition, is related to conduct, performed in a location within the actor's control, which has an adverse effect on a common right.").

The Sixth Circuit's opinion in *City of Cincinnati v. Deutsche Bank* illustrates this point.  In that case, the City alleged that after the defendant banks foreclosed on homes during the 2008 financial crisis and became owners of many properties throughout the City, they instituted a "policy of violating local and state property regulations when the cost of compliance outweighed the value that could be recouped through the resale of a foreclosed property."  863 F.3d at 476.  The

City alleged that this resulted in a public nuisance because such neglect would cause a housing blight leading to "lowered property tax revenues, increased police and fire expenses, and added other administrative costs."  *Id.*  However, the City did not identify any particular conduct with respect to any particular property that constituted a public nuisance, instead seeking to proceed in the abstract based on theory that the policy of "selective non-compliance with health and safety codes will inevitably result in a public nuisance."  *Id.* at 479.

The Court rejected that theory, noting that without details regarding "why a particular property owned by [the defendant bank] endangers the public, we have no way of testing the plausibility of the nuisance allegations or assessing the proximity of" the alleged conduct to any harm.  *Id.*  Explaining that "not every failure to comply with the [housing] code amounts to a public nuisance," and the Court held that the alleged conduct and asserted harm must be considered together and with enough details to render the causation analysis meaningful.  *Id.*  This controlling Sixth Circuit authority makes plain that a "nuisance" must be defined by reference to the alleged wrongful conduct—*e.g.*, failure to maintain particular properties owned by the defendant, as opposed to urban blight in general.  One cannot simply declare the existence of nuisance before any trial, and then assess conduct and causation later.  *See City of Hamilton v. Dilley*, 165 N.E. 713, 714 (Ohio 1929) ("The issue made by the pleadings and the evidence [is] whether or not the" alleged interference, "*under all the circumstances of the case*, constitute[s] a public nuisance."); *City of Cleveland v. Ameriquest Mort. Securities, Inc.*, 615 F.3d 496, 502 (2010) (noting that in public nuisance cases the law "'requires some direct relation between the injury asserted and the injurious conduct alleged.'" (quoting *Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 268 (1992)).

6

Plaintiffs' attempt to have this Court declare as a matter of law that the "opioid crisis" is a public nuisance is the equivalent of declaring "obesity" a public nuisance. That is just one of the many fundamental problems with what Plaintiffs are attempting to do with their motion. In a case such as this, one cannot start with a finding as a matter of law that something a multifaceted problem like opioid abuse (or obesity, or homelessness, or urban blight) is a public nuisance and then work backward to determine if a defendant caused "it" (or has legal liability for contributing to it). Courts do not start with societal problems and go in search of solutions to them. Courts adjudicate disputes over conduct and the legal consequences of that conduct.

**B.    Plaintiffs Have Not Proven Any Interference Is with a Public Right.**

A "public nuisance is an unreasonable interference with a right *common to the general public*," as opposed to an unreasonable interference with private rights. Restatement (Second) of Torts § 821B(1). Plaintiffs must therefore prove that the interference was with an identified public right, not an aggregation of individual rights like "the *individual right* that everyone has not to be … *defrauded* or *negligently injured*." *Id.* § 821B, cmt. g. Plaintiffs contend that there is no dispute of material fact that the "opioid epidemic" is a public nuisance because "[b]y any measure, the opioid epidemic is a significant interference with the public health." Pls.' Br. at 3-4. But mere repeated reference to the "public health" does not satisfy the requirement to show that the interference is with a common public right as opposed to an aggregation of individual rights.

Ohio applies the traditional definition of a public right to common law nuisance claims. *See Brown v. Scioto Cty. Bd. of Commrs.*, 622 N.E.2d 1153, 1158 (Ohio Ct. App. 1993). Under that definition, "[c]onduct does not become a public nuisance merely because it interferes with a large number of people." *Id.*; Restatement (Second) of Torts § 821B, cmt. g; *see Paulus v. Citicorp N. Am., Inc.*, 2014 WL 4557603, at *17 (S.D. Ohio Sept. 12, 2014) (granting summary judgment to defendants where "Plaintiffs ha[d] not produced any evidence of a violation

of a public right in the proper sense of the term"); Donald G. Gifford, *Public Nuisance As A Mass Products Liability Tort*, 71 U. Cin. L. Rev. 741, 815 (2003) ("That which might … harm[] 'the public interest' is a far broader category than that which actually violates 'a public right.'").  "The test is not the number of persons" afflicted, "but the possibility of [affliction] to the public" at large.  *Higgins v. Conn. Light & Power Co.*, 30 A.2d 388, 391 (Conn. 1943).

The Restatement provides examples of interference with the public health—for instance, "the threat of communication of smallpox," "keeping diseased animals," or "maintenance of a pond breeding malarial mosquitoes."  Restatement § 821B, cmts. b & g.  Plaintiffs claim these examples "illustrate how the common law is not a fossil but remains responsive to contemporary societal needs by defining public nuisance in terms of harms that affect the health of so many persons as to involve the interests of the public at large."  Pls.' Br. at 4 (internal quotation marks omitted).  But Plaintiffs' conception cannot be squared with Ohio law and the Restatement, under which "[c]onduct does not become a public nuisance merely because it interferes with a large number of people."  *Brown*, 622 N.E.2d at 1158.  Each example cited in the Restatement involves an interference with "public health" because it involves a course of conduct that puts everyone in the community at risk of injury.  This underscores Defendants' point: an unreasonable interference with "public health" is not the same as a wide-ranging public health concern.  *Cf. D.A.B.E., Inc. v. Toledo-Lucas Cty. Bd. of Health*, 773 N.E.2d 536, 547 (Ohio 2002) ("[W]e find that the language of R.C. 3709.21 that 'the board of health of a general health district may make such orders and regulations as are necessary for the public health, [the prevention or restriction of disease, and the prevention, abatement, or suppression of nuisances]' does not vest local boards of health with unlimited authority to adopt regulations addressing all public-health concerns.").

8

Injuries to individuals that have cascading effects is not the same as a health threat to the entire public.  The distinction is what determines whether a right is common to the public or private.  While dispersing opioids into the public water sources, for example, might fit within the paradigm of an interference with public health, addiction to a wide-ranging class of drug, even when suffered by a large number of people, is not like the examples of interference with public health in the caselaw.  *See* Restatement (Second) of Torts § 821B, cmt b, g.  It affects (or does not affect) any one person based on factors personal to that individual, unlike a communicable disease spread by contact. *See, e.g.*, Parran Rpt. ¶ 31 (Dkt. 1908-36).  If the prevalence of a non-communicable disease in itself were a public nuisance, alcoholism, heart disease, obesity, and diabetes could all constitute a "public nuisance."  As explained in Manufacturer Defendants' motion for summary judgment, there is no precedent to support the sweeping expansion of public nuisance law suggested by Plaintiffs.  Plaintiffs' motion should be denied.

## II.     The Court Should Not Strike Defendants' Apportionment Affirmative Defenses or Hold that any Abatement Liability Is Automatically Joint and Several.

Plaintiffs also ask the Court to strike Defendants' apportionment defense, as it applies to their common law public nuisance claim seeking billions of dollars in "abatement costs," and to hold as a matter of law that there is a contingent joint and several liability to "abate" the entirety of the opioid epidemic.  Plaintiffs contend that this extraordinary result is justified because (1) Ohio's apportionment statute does not apply to the absolute common law public nuisance claim seeking billions of dollars in "abatement costs," and (2) any and all liability for these costs per se joint and several.  Plaintiffs are wrong.  They again ask this Court to ignore settled authority.

### A.     Plaintiffs' Common Law Public Nuisance Claim is a Tort Claim and Is Thus Subject to Ohio's Apportionment Statute.

Plaintiffs strain credulity when they contend that Ohio's apportionment statute does not apply to their public nuisance claim because "[t]his equitable action for abatement is not a tort

action." Pls.' Br. at 24.   The Third Amended Complaints expressly assert the claim as "a common law *tort claim* for absolute public nuisance."  Summit TAC (ECF No. 1466) ¶ 1038; Cuyahoga TAC (ECF No. 1631) ¶ 1080.  Plaintiffs also purportedly rely on § 821B of the Restatement to define the public nuisance standard, and that Restatement, of course, is the Restatement (Second) *of Torts*.  Plaintiffs' argument incorrectly attempts to draw a supposed distinction between legal and equitable public nuisance claims based on the fact that they now style the billions of dollars they seek in their absolute common law public nuisance claims as "abatement costs."  *See* ECF No. 1025 at 62-63 ("Plaintiffs aver that their self-styled 'common law absolute public nuisance claim is . . . an 'equitable nuisance' claim," but "numerous courts, including a recent decision of the Sixth Circuit Court of Appeals, have recognized that an absolute public nuisance claim in Ohio is a common law action." (citing *Deutsche Bank*, 863 F.3d at 477, *JP Morgan Chase Bank*, 2013 WL 1183332, at *3, and *Brown*, 622 N.E.2d at 1158)).  Plaintiffs' common law *tort claim* for absolute public nuisance is indeed a tort claim.

The relevant question in determining if Ohio's apportionment statute applies is whether Plaintiffs seek "compensatory damages that represent economic loss" as that phrase is used in the statute.  *See* Ohio Rev. Code Ann. § 2307.22.  Although the statute may not apply to a true "summary proceeding" for equitable abatement, *see State ex rel. Miller v. Anthony*, 647 N.E.2d 1368, 1371 (Ohio 1995), Plaintiffs' common law public nuisance claim for the payment of money by Defendants into a fund to cover supposed "abatement costs" is no such claim—it is a claim for damages, regardless of the label they now put on it.  Indeed, although Plaintiffs now disclaim any recovery for damages, Plaintiffs allege in their Third Amended Complaints that they "have suffered and will continue to suffer economic damages," including their "significant expenses" as a result of the alleged nuisance, and seek "compensatory and punitive damages and all damages

10

allowed by law" in their common law public nuisance counts. *See, e.g.*, Summit TAC ¶¶ 1025, 1039; Cuyahoga TAC (ECF No. 1631) ¶¶ 1067, 1081.

Plaintiffs' proposed abatement plans confirm that they do not seek merely to remove an alleged nuisance—conduct creating unreasonable interference with a public right—but rather to recover for myriad harms that have some connection to opioid abuse and/or addiction. For example, they include:

- "Treatment" through "additional capacity for detoxification, inpatient and outpatient therapy, recovery housing, and medication-assisted treatment (or MAT), resources for better connecting individuals to treatment services, and targeted interventions with high priority populations";

- "distributing naloxone, resources for needle exchange, and interventions to treat and reduce the spread of HIV and hepatitis C among intravenous drug users, as well as the provision of housing support for vulnerable populations that have high rates of opioid use";

- "media campaigns to reduce opioid use and misuse and decrease the stigma of seeking treatment, school-based prevention programs, resources for law enforcement, drug disposal programs, and medical provider education"; and

- "data collection and surveillance to track the evolution of the epidemic."

Liebman Supp. Rpt. ¶ 3 (Dkt. 1999-12/2000-12).

Plaintiffs' purported nuisance is unlike any unreasonable interference with public health found in precedent. Moreover, they confirm that Ohio's apportionment statute is applicable to at least parts of Plaintiffs' proposed "abatement plan" that seeks more than $7 billion for things like "interventions to treat and reduce the spread of HIV and hepatitis C among intravenous drug users." Liebman Supp. Rpt. ¶ 3. The statute defines "Economic loss" to include "[a]ll expenditures for medical care or treatment, rehabilitation services, or other care, treatment, services, products, or accommodations incurred as a result of an injury, death, or loss" including "expenditures for those purposes that, in the determination of the trier of fact, *will be incurred in the future* because of the injury, whether paid by the injured person or by another person on behalf of the injured person." Ohio Rev. Code Ann. § 2307.011(C)(2). The Court should reject Plaintiffs' attempt to

11

mislabel the economic loss they apparently still seek as "abatement" not subject to Ohio's apportionment statute.[4]

### B. Regardless, Public Nuisance Liability Is Apportionable Under Common Law Rules.

Even if Ohio's apportionment statue did not apply, Ohio courts and the Sixth Circuit have confirmed repeatedly that absolute common law public nuisance claims are governed by the common law rules set forth in the Restatement.  *See, e.g.*, *JP Morgan*, 2013 WL 1183332, at *3; Pls.' Br. at 3 (noting that Ohio has "adopt[ed] [the] Restatement" for public nuisance claims).  And these common law rules include rules to determine when liability is joint and several.  *See Pang v. Minch*, 559 N.E.2d 1313, 1323 (Ohio 1990).  Accordingly, contrary to Plaintiffs' suggestion, Ohio common law *has no bright-line rule* that any and all abatement liability is per se joint and several.  The only authority Plaintiffs cite in support of their position is dictum from a century-old case (whose actual holding, Plaintiffs contend, is no longer good law in Ohio).  *See* Pls.' Br. at 22 & n.44 (citing *City of Columbus v. Rohr*, 1907 WL 572, *2 (Cir. Ct. Ohio Oct. 10, 1907)).  Rather, "[a]s a practical matter, many nuisances are capable of apportionment among two or more persons who contribute to them, because a reasonable basis can be found for dividing the harm done on the basis of the extent of the contribution of each party."  Restatement (Second) of Torts § 840E & cmt. b.

---

[4] It is noteworthy that Plaintiffs do not seek damages for any harm to the counties themselves.  Instead, they purportedly seek abatement to address harm to the "public health" of their residents.  Plaintiffs lack standing to bring such claims even on behalf of their residents, and they have not identified harm to the public health in their counties (as opposed to expenditures at the local level) that is distinct from the public health concerns of all other Ohio citizens.  Indeed, "if the health and comfort of the inhabitants of a State are threatened, the State is the proper party to represent and defend them."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 603–04 (1982) (internal quotations or citations omitted).  Plaintiffs are not the proper parties.  The Ohio Attorney General has made clear that only it can pursue public nuisance claims—which it is currently doing in separate litigation.  *See* Ohio AG Letter (Dkt. 1973) at 3 ("The universal impact on the residents of Ohio is the basis of the claims being litigated. This impact is directly to 'the health and well-being—both physical and economic—of its residents in general', and is parens patriae in nature…. These claims belong to the States and cannot be pursued by political subdivisions.").  The Court should adopt the Ohio Attorney General's position and reject Plaintiffs' public nuisance claims.

The common law rules for joint and several liability and apportionment (found in Restatement Sections 433A and 433B) set forth the framework applicable to public nuisance abatement claims.  *See id.*; *Pang*, 559 N.E.2d at 1323.  Under this framework, (1) a plaintiff must first prove that it suffered an *indivisible* harm proximately caused by multiple defendants' unlawful conduct, and if so, then (2) the burden "shifts to the defendants to demonstrate that the harm produced by their separate tortious acts is capable of apportionment" in order to avoid joint and several liability.  *Pang*, 559 N.E.2d at 1322-24.  Given these respective burdens of persuasion, it would be error for a court "to conclude, prior to trial, [whether] such apportionment was possible."  *Id.* at 1324-25 & n.4.

Plaintiffs have not proved (or even attempted to prove by summary adjudication) the predicates for joint and several liability—a single, *indivisibl*e harm proximately caused by multiple defendants' unlawful conduct.  *See id.* at 1325 ("[T]he language of Sections 433A and 433B and the comments thereto place upon the plaintiff the burden to demonstrate that he has suffered an injury and that the tortious act of each defendant was a substantial cause in producing that injury. *Once this burden has been met*, it is the responsibility of the defendants to apportion the harm if joint and several liability is to be avoided."). Given Plaintiffs' use of the term "opioid epidemic" to refer to many distinct types of harms associated with the abuse of both lawful and unlawful opioids, the complex societal implications of the wide-ranging opioid abuse crisis is simply not a "unitary harm" for which joint and several liability even is possible.  *See* Restatement (Second) Torts § 433A (1) (liability for harm is "to be apportioned among two or more causes where (a) there are distinct harms, or (b) there is a reasonable basis for determining the contribution of each cause to a single harm.").

13

Moreover, even if there were a "unitary harm" in this case, depending on how the scope of any "public nuisance" might ultimately be defined, the available evidence affords myriad ways to apportion liability among Defendants, in which case the Restatement requires liability to be apportioned. *See* Restatement (Second) of Torts § 840E & cmts. a-b. Defendants are not required by any rule to choose a common method of apportionment, nor is each Defendant required to make that choice now—before anyone knows which, if any, Defendants will be found liable. *See Pang*, 559 N.E.2d at 1324 & n.4.

### C.    Declaring Abatement Liability To Be Joint and Several Would Be Procedurally Improper.

Similarly, Plaintiffs' request is procedurally improper under Federal Rule of Procedure 56 because it relates not to the merits, but to the remedies available in the event one or more Defendants are found liable for public nuisance. The issue of joint and several liability is inappropriate for resolution on summary judgment without a predicate determination of liability. While Rule 56 permits a party to move for summary judgment on "part of [a] claim or defense," available remedies are not fairly understood as "part" of a claim. *See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 517 F. Supp. 2d 662, 666 (S.D.N.Y. 2007) (rejecting motion for summary judgment on issue of punitive damages because damages are "forms of relief," not causes of action or claims and "partial summary judgment as to a particular remedy … is outside the contemplation of the Federal Rules"); *United States v. Hamilton*, 2013 WL 12344194, at *1 (D. Wyo. July 1, 2013) (holding "procedurally improper" a motion for partial summary judgment on the appropriate fine for violation of statute because "the appropriate fine … is not part of the … claim; it's simply something the statute provides for in the event of a violation"). Indeed, "'partial summary judgments' with respect to questions the existence of which depend upon the resolution

14

of controverted matters would be tantamount to advisory opinions." *Marshall Contractors, Inc. v. Peerless Ins. Co.*, 827 F. Supp. 91, 93 (D.R.I. 1993).[5]

The Court should reject Plaintiffs' request for a premature ruling that any Defendant held liable will be automatically jointly and severally liable for the billions of dollars in "abatement costs" that Plaintiffs seek and that apportionment is unavailable as a matter of law. Both Ohio substantive law and federal procedure confirm that the question depends on the evidence presented at trial.

## CONCLUSION

The Court should deny Plaintiffs' partial motion for summary judgment on Plaintiffs' absolute common law public nuisance claim in its entirety for the reasons set forth above.

---

[5] *E.g.*, *Coy v. No Limits Educ.*, 2016 WL 7911333, at *3 (D. Minn. Dec. 9, 2016) ("To the extent Plaintiff's motion asks this Court to separately decide the question of damages against any particular Defendant, that exercise is premature because no liability on any claim . . . has been determined."); *Smith as Tr. for Bos. Chicken v. Andersen*, 2005 WL 8160701, at *8 (D. Ariz. Mar. 24, 2005) (motion seeking ruling that every defendant found to have joined alleged conspiracy would be jointly liable sought an "improper and premature advisory opinion" because the question of allocation of damages before liability has been established is "purely academic at this stage and could possibly never arise"); *Cooke v. Gen. Dynamics Corp.*, 1998 WL 696013, at *1 (D. Conn. Sept. 11, 1998) (rejecting motion seeking partial summary judgment on issue of "the correct methodology for calculating damages" because liability had not yet been established, so the motion sought "an advisory opinion outlining what the court would do if certain events were to eventually come to pass").

Dated:  July 31, 2019                    Respectfully submitted,


                                         /s/ Mark S. Cheffo
                                         Mark S. Cheffo
                                         DECHERT LLP
                                         Three Bryant Park
                                         1095 Avenue of the Americas
                                         New York, NY 10036
                                         Tel: (212) 698-3500
                                         Mark.Cheffo@dechert.com

                                         *Co-Liaison Counsel for the Manufacturer
                                         Defendants*[6]


                                         /s/ Carole S. Rendon
                                         Carole S. Rendon
                                         BAKER & HOSTETLER LLP
                                         Key Tower 127 Public Square, Suite 2000
                                         Cleveland, OH 44114-1214
                                         Telephone: (216) 621- 0200
                                         Fax: (216) 696-0740
                                         crendon@bakerlaw.com

                                         *Co-Liaison Counsel for the Manufacturer Defendants*

---

[6] Teva Pharmaceutical Industries Ltd., Allergan plc f/k/a Actavis plc, and Mallinckrodt plc are respectively an Israeli corporation, Irish holding company, and Irish company that are not subject to and contest personal jurisdiction for the reasons explained in their pending motions to dismiss for lack of personal jurisdiction; they are specially appearing to join this Opposition even though it never manufactured, packaged, branded, marketed, promoted, distributed or sold the finished drug products that are at issue in this litigation. Indeed, Noramco is an active pharmaceutical ingredient supplier, and not a finished drug product manufacturer. As such there is no evidence that Noramco, an active pharmaceutical ingredient supplier, engaged in any wrongful conduct that might give rise to liability (See Noramco's Memorandum in Support of Motion for Judgment on the Pleadings Or, in the Alternative, Summary Judgment, Dkt. 1902-1), let alone conduct that could impose liability under a theory of public nuisance.

In the Complaints, Plaintiffs lump Defendant Noramco, Inc. ("Noramco") together with Johnson & Johnson and its other affiliated entities, all Marketing Defendants, or all Defendants collectively. For this reason, Noramco joins this opposition even though it never manufactured, packaged, branded, marketed, promoted, distributed or sold the finished drug products that are at issue in this litigation. Indeed, Noramco is an active pharmaceutical ingredient supplier, and not a finished drug product manufacturer. As such there is no evidence that Noramco, an active pharmaceutical ingredient supplier, engaged in any wrongful conduct that might give rise to liability (See Noramco's Memorandum in Support of Motion for Judgment on the Pleadings Or, in the Alternative, Summary Judgment, Dkt. 1902-1), let alone conduct that could impose liability under a theory of public nuisance.

/s/ Geoffrey E. Hobart
Geoffrey E. Hobart
Mark H. Lynch
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, DC 20001
(202) 662-5281
ghobart@cov.com
mlynch@cov.com

*Co-Liaison Counsel for the Distributor
Defendants*

/s/ Robert A. Nicholas
Robert A. Nicholas
Shannon E. McClure
REED SMITH LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
(215) 851-8100
rnicholas@reedsmith.com
smcclure@reedsmith.com

*Co-Liaison Counsel for the Distributor
Defendants*

/s/ Enu Mainigi
*/s/ Enu Mainigi (consent)*
Enu Mainigi
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000
emainigi@wc.com

*Co-Liaison Counsel for the Distributor
Defendants*

/s/ Kaspar J. Stoffelmayr
Kaspar J. Stoffelmayr
BARTLIT BECK LLP
54 West Hubbard Street
Chicago, IL 60654
(312) 494-4400
kaspar.stoffelmayr@bartlitbeck.com

*Liaison Counsel for the Chain Pharmacy
Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 31st day of July 2019, the foregoing was served upon all counsel of record via email.

*/s/ Donna M. Welch*
Donna M. Welch, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
