# Exhibit 1

```
                                             Page 1
 1              IN THE UNITED STATES DISTRICT COURT
 2                 NORTHERN DISTRICT OF OHIO
 3                      EASTERN DIVISION
 4
                    ~~~~~~~~~~~~~~~~~~~~
 5
 6      IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804
        OPIATE LITIGATION
 7                                      Case No. 17-md-2804
 8                                      Judge Dan Aaron
        This document relates to:      Polster
 9
        The County of Cuyahoga v. Purdue
10      Pharma L.P., et al.
        Case No. 18-OP-45090
11
12                  ~~~~~~~~~~~~~~~~~~~~
13              Videotaped deposition of
                   THOMAS GILSON, M.D.
14                      30(b)(6)
15
16                  January 14, 2019
                      9:07 a.m.
17
18
19                     Taken at:
20          Climaco, Wilcox, Peca & Garofoli
21           55 Public Square, Suite 1950
22                  Cleveland, Ohio
23
24
25          Renee L. Pellegrino, RPR, CLR
```

Page 2

```
1  APPEARANCES:
2  On behalf of Cuyahoga County:
      Napoli Shkolnik PLLC
3     SALVATORE BADALA, ESQ
      360 Lexington Avenue
4  New York, New York  10017
      (844) 230-7676
5  sbadala@napolilaw.com
         - and -
6  Plevin & Gallucci
      FRANK GALLUCCI, ESQ
7  55 Public Square
      Suite 2222
8  Cleveland, Ohio  44113-1901
      (216) 861-0804
9  fgallucci@pglawyer.com
10 On behalf the City of Cleveland:
      Zashin & Rich
11    AMI J  PATEL, ESQ
      950 Main Avenue, Fourth Floor
12 Cleveland, Ohio  44113
      (216) 696-4441
13 ajp@zrlaw.com
14 On behalf of Walmart, Inc :
      Jones Day
15    EDWARD M  CARTER, ESQ
      BRANDY H  RANJAN, ESQ
16 325 John H  McConnell Boulevard
      Suite 600
17 Columbus, Ohio  43215-2673
      (614) 469-3939
18 ecarter@jonesday.com
      branjan@jonesday.com
19
      On behalf of McKesson Corporation:
20    Covington & Burling LLP
      ASEEM PADUKONE, ESQ
21 One Front Street
      San Francisco, California  94111-5356
22 (415) 591-6000
      apadukone@cov.com
23
24               ~ ~ ~ ~ ~
25
```

Page 3

```
1  APPEARANCES, CONT'D:
2  On behalf of AmerisourceBergen Drug Corporation:
      Reed Smith LLP
3     STEVEN J  BORANIAN, ESQ
      LUKE PORTER, ESQ  (Via Telephone and Veritext
4  Virtual Stream)
      101 Second Street
5  Suite 1800
      San Francisco, California  94105
6  (415) 659-5980
      sboranian@reedsmith.com
7  lporter@reedsmith.com
         - and -
8  Jackson Kelly PLLC
      SANDRA K  ZERRUSEN, ESQ
9  50 South Main Street
      Suite 201
10 Akron, Ohio  44308
      (330) 252-9060
11 skzerussen@jacksonkelly.com
12 On behalf of Purdue Pharma, L P :
      Dechert LLP
13    MARK S  CHEFFO, ESQ
      Three Bryant Park, 1095 Avenue of the Americas
14 New York, New York  10036-6796
      (212) 698-3814
15 mark cheffo@dechert.com
         - and -
16 Dechert LLP
      SARA D  ROITMAN, ESQ
17 35 West Wacker Drive
      Suite 3400
18 Chicago, Illinois  20005
      (312) 646-5857
19 sara roitman@wc.com
20 On behalf of Cardinal Health:
      (Via Telephone)
21 Williams & Connolly LLP
      J  ANDREW KEYES, ESQ
22 725 Twelfth Street NW
      Washington, D C  20005
23 (202) 434-5584
      akeyes@wc.com
24
25               ~ ~ ~ ~ ~
```

Page 4

```
1  APPEARANCES, CONT'D:
2  On behalf of Teva Pharmaceuticals:
      (Via Telephone)
3     Morgan, Lewis & Bockius LLP
      ALYSE FISCHER, ESQ
4  77 West Wacker Drive
      Chicago, Illinois  60601-5094
5  (312) 324-1107
      alyse fischer@morganlewis.com
6
      On behalf of Discount Drug Mart:
7     (Via Telephone)
      Cavitch Familo & Durkin
8     CHIP ERB, ESQ
      1300 East Ninth Street, 20th Floor
9  Cleveland, Ohio  44114
      (216) 621-7860
10 lwerb@cavitch.com
11 On behalf of H D  Smith:
      (Via Telephone)
12 Barnes & Thornburg
      WILLIAM PADGETT, ESQ
13 11 South Meridian Street
      Indianapolis, Indiana  46204-3535
14 (317) 231-7353
      william padgett@btlaw.com
15
      On behalf of Endo Pharmaceuticals, Inc , Endo
16 Health Solutions, Inc , Par Pharmaceuticals,
      Inc  and Par Pharmaceutical Companies, Inc :
17 Baker & Hostetler
      RUTH HARTMAN, ESQ
18 127 Public Square, Suite 2000
      Cleveland, Ohio  44114-1214
19 (216) 621-0200
      rhartman@bakerlaw.com
20
21               ~ ~ ~ ~ ~
22
23
24
25
```

Page 5

```
1  APPEARANCES, CONT'D:
2  On behalf of Johnson & Johnson and Janssen
      Pharmaceuticals, Inc.:
3     Tucker Ellis LLP
      ERICA M. JAMES, ESQ.
4  950 Main Avenue, Suite 1100
      Cleveland, Ohio  44113-7213
5  (216) 592-5000
      erica.james@tuckerellis.com
6
7  ALSO PRESENT:  Shaun Crum, Videographer
8
                  ~ ~ ~ ~ ~
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 6

1    TRANSCRIPT INDEX
2
3  APPEARANCES ....................................2
4  INDEX OF EXHIBITS .............................7
5  INDEX OF OBJECTIONS .........................9
6
7  EXAMINATION OF THOMAS GILSON, M.D.:
8  BY MR. CHEFFO ................................20
9  BY MR. BORANIAN .............................183
10 BY MR. CARTER ................................284
11 BY MS. ROITMAN ...............................344
12 BY MR. BADALA ................................354
13
14 AFTERNOON SESSION .............................183
15
16 REPORTER'S CERTIFICATE ........................358
17
18 EXHIBIT CUSTODY - RETAINED BY COURT REPORTER
19
20
21
22
23
24
25

Page 7

1      INDEX OF EXHIBITS
2
3   Number     Description        Marked
4
5   Exhibit 1   Third Amended Notice of      29
               Videotaped 30(b)(6) Deposition
6              of the County of Cuyahoga
7   Exhibit 2   Plaintiff's The County of      66
               Cuyahoga, Ohio and State of Ohio
8              Ex Rel, Prosecuting Attorney of
               Cuyahoga County, Michael C
9              O'Malley's Amended Responses to
               the Manufacturer Defendants' and
10             National Retail Pharmacy
               Defendants' First Set of
11             Interrogatories, with Attached
               Spreadsheets
12
    Exhibit 3   Plaintiffs The City of        84
13             Cleveland, County of Cuyahoga,
               County of Summit and City of
14             Akron's Supplemental Amended
               Responses and Objections to the
15             Manufacturer Defendants' First
               Set of Interrogatories,
16             Submitted Pursuant to Discovery
               Ruling No  13
17
    Exhibit 7   Handwritten Notes      127
18
    Exhibit 8   Handwritten Notes      127
19
    Exhibit 9   E-Mail String, Beginning Bates   234
20             Number CUYAH_001709118 - Marked
               Confidential
21
    Exhibit 10  Article Entitled "The Cuyahoga   240
22             County Heroin Epidemic"
23  Exhibit 11  Document Entitled "Overdose     244
               Deaths in Cuyahoga County,"
24             Beginning Bates Number
               CUYAH_001397330
25

Page 8

1    INDEX OF EXHIBITS, CONT'D
2
3   Exhibit 12  Document Entitled "Opioid Crisis 248
               Response:  Examining Overdose
4              Deaths at Cuyahoga County
               Medical Examiner's Office," with
5              Attached Sheet Bates Numbered
               CUYAH_001684555 - Marked
6              Confidential
7   Exhibit 13  Document Entitled "Ohio      263
               Department of Health, Ohio's
8              Prescription Drug Overdose
               Epidemic:  Epidemiology,
9              Contributing Factors and Ongoing
               Prevention Efforts," Beginning
10             Bates Number CUYAH_001547662 -
               Marked Confidential
11
    Exhibit 14  Binder              343
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 9

1      INDEX OF OBJECTIONS
2
3   Objection           26
               Objection          31
4   Objection           32
               Objection          33
5   Objection           34
               Objection          34
6   Objection           35
               Objection          36
7   Objection           37
               Objection          37
8   Objection           38
               Objection          39
9   Objection           40
               Objection          40
10  Objection           40
               Objection          41
11  Objection           41
               Objection          42
12  Objection           43
               Objection          44
13  Objection           45
               Objection          45
14  Objection           45
               Objection          46
15  Objection           47
               Objection          47
16  Objection           47
               Objection          48
17  Objection           49
               Objection          49
18  Objection           49
               Objection          50
19  Objection           50
               Objection          50
20  Objection           51
               Objection          51
21  Objection           52
               Objection          53
22  Objection           53
               Objection          54
23  Objection           54
               Objection          56
24  Objection           57
               Objection          57
25  Objection           57

Veritext Legal Solutions

www.veritext.com                                          888-391-3376

## Page 10

INDEX OF OBJECTIONS, CONT'D

| | | |
|---|---|---|
| 3 | Objection | 58 |
| | Objection | 60 |
| 4 | Objection | 60 |
| | Objection | 61 |
| 5 | Objection | 62 |
| | Objection | 62 |
| 6 | Objection | 63 |
| | Objection | 63 |
| 7 | Objection | 64 |
| | Objection | 68 |
| 8 | Objection | 71 |
| | Objection | 71 |
| 9 | Objection | 72 |
| | Objection | 72 |
| 10 | Objection | 73 |
| | Objection | 74 |
| 11 | Objection | 75 |
| | Objection | 75 |
| 12 | Objection | 76 |
| | Objection | 76 |
| 13 | Objection | 76 |
| | Objection | 76 |
| 14 | Objection | 77 |
| | Objection | 77 |
| 15 | Objection | 78 |
| | Objection | 78 |
| 16 | Objection | 79 |
| | Objection | 79 |
| 17 | Objection | 80 |
| | Objection | 80 |
| 18 | Objection | 80 |
| | Objection | 81 |
| 19 | Objection | 81 |
| | Objection | 85 |
| 20 | Objection | 86 |
| | Objection | 86 |
| 21 | Objection | 86 |
| | Objection | 86 |
| 22 | Objection | 86 |
| | Objection | 87 |
| 23 | Objection | 87 |
| | Objection | 87 |
| 24 | Objection | 88 |
| | Objection | 88 |
| 25 | Objection | 88 |

## Page 11

INDEX OF OBJECTIONS, CONT'D

| | | |
|---|---|---|
| 3 | Objection | 89 |
| | Objection | 89 |
| 4 | Objection | 89 |
| | Objection | 89 |
| 5 | Objection | 90 |
| | Objection | 91 |
| 6 | Objection | 91 |
| | Objection | 92 |
| 7 | Objection | 93 |
| | Objection | 95 |
| 8 | Objection | 95 |
| | Objection | 95 |
| 9 | Objection | 96 |
| | Objection | 96 |
| 10 | Objection | 96 |
| | Objection | 97 |
| 11 | Objection | 97 |
| | Objection | 97 |
| 12 | Objection | 98 |
| | Objection | 98 |
| 13 | Objection | 98 |
| | Objection | 99 |
| 14 | Objection | 99 |
| | Objection | 99 |
| 15 | Objection | 100 |
| | Objection | 100 |
| 16 | Objection | 101 |
| | Objection | 102 |
| 17 | Objection | 102 |
| | Objection | 103 |
| 18 | Objection | 103 |
| | Objection | 104 |
| 19 | Objection | 104 |
| | Objection | 104 |
| 20 | Objection | 105 |
| | Objection | 105 |
| 21 | Objection | 105 |
| | Objection | 106 |
| 22 | Objection | 107 |
| | Objection | 107 |
| 23 | Objection | 108 |
| | Objection | 108 |
| 24 | Objection | 109 |
| | Objection | 109 |
| 25 | Objection | 110 |

## Page 12

INDEX OF OBJECTIONS, CONT'D

| | | |
|---|---|---|
| 3 | Objection | 110 |
| | Objection | 111 |
| 4 | Objection | 112 |
| | Objection | 112 |
| 5 | Objection | 113 |
| | Objection | 113 |
| 6 | Objection | 114 |
| | Objection | 114 |
| 7 | Objection | 116 |
| | Objection | 117 |
| 8 | Objection | 117 |
| | Objection | 118 |
| 9 | Objection | 118 |
| | Objection | 118 |
| 10 | Objection | 120 |
| | Objection | 120 |
| 11 | Objection | 121 |
| | Objection | 122 |
| 12 | Objection | 123 |
| | Objection | 124 |
| 13 | Objection | 124 |
| | Objection | 124 |
| 14 | Objection | 125 |
| | Objection | 125 |
| 15 | Objection | 126 |
| | Objection | 129 |
| 16 | Objection | 130 |
| | Objection | 130 |
| 17 | Objection | 131 |
| | Objection | 131 |
| 18 | Objection | 131 |
| | Objection | 132 |
| 19 | Objection | 133 |
| | Objection | 133 |
| 20 | Objection | 134 |
| | Objection | 134 |
| 21 | Objection | 135 |
| | Objection | 135 |
| 22 | Objection | 135 |
| | Objection | 136 |
| 23 | Objection | 136 |
| | Objection | 137 |
| 24 | Objection | 137 |
| | Objection | 138 |
| 25 | Objection | 139 |

## Page 13

INDEX OF OBJECTIONS, CONT'D

| | | |
|---|---|---|
| 3 | Objection | 139 |
| | Objection | 141 |
| 4 | Objection | 142 |
| | Objection | 144 |
| 5 | Objection | 145 |
| | Objection | 147 |
| 6 | Objection | 147 |
| | Objection | 148 |
| 7 | Objection | 149 |
| | Objection | 150 |
| 8 | Objection | 150 |
| | Objection | 151 |
| 9 | Objection | 151 |
| | Objection | 152 |
| 10 | Objection | 152 |
| | Objection | 152 |
| 11 | Objection | 153 |
| | Objection | 153 |
| 12 | Objection | 154 |
| | Objection | 154 |
| 13 | Objection | 155 |
| | Objection | 157 |
| 14 | Objection | 158 |
| | Objection | 159 |
| 15 | Objection | 160 |
| | Objection | 160 |
| 16 | Objection | 161 |
| | Objection | 162 |
| 17 | Objection | 164 |
| | Objection | 164 |
| 18 | Objection | 165 |
| | Objection | 166 |
| 19 | Objection | 166 |
| | Objection | 168 |
| 20 | Objection | 173 |
| | Objection | 173 |
| 21 | Objection | 176 |
| | Objection | 176 |
| 22 | Objection | 176 |
| | Objection | 177 |
| 23 | Objection | 179 |
| | Objection | 181 |
| 24 | Objection | 185 |
| | Objection | 185 |
| 25 | Objection | 186 |

Veritext Legal Solutions
www.veritext.com                    888-391-3376

### Page 14

INDEX OF OBJECTIONS, CONT'D

| | | |
|---|---|---|
| 3 | Objection | 186 |
| | Objection | 186 |
| 4 | Objection | 187 |
| | Objection | 187 |
| 5 | Objection | 188 |
| | Objection | 189 |
| 6 | Objection | 189 |
| | Objection | 191 |
| 7 | Objection | 193 |
| | Objection | 194 |
| 8 | Objection | 194 |
| | Objection | 195 |
| 9 | Objection | 195 |
| | Objection | 195 |
| 10 | Objection | 196 |
| | Objection | 196 |
| 11 | Objection | 196 |
| | Objection | 200 |
| 12 | Objection | 200 |
| | Objection | 201 |
| 13 | Objection | 202 |
| | Objection | 205 |
| 14 | Objection | 205 |
| | Objection | 209 |
| 15 | Objection | 210 |
| | Objection | 210 |
| 16 | Objection | 211 |
| | Objection | 211 |
| 17 | Objection | 212 |
| | Objection | 216 |
| 18 | Objection | 217 |
| | Objection | 218 |
| 19 | Objection | 218 |
| | Objection | 219 |
| 20 | Objection | 219 |
| | Objection | 221 |
| 21 | Objection | 221 |
| | Objection | 221 |
| 22 | Objection | 222 |
| | Objection | 224 |
| 23 | Objection | 224 |
| | Objection | 225 |
| 24 | Objection | 225 |
| | Objection | 226 |
| 25 | Objection | 228 |

### Page 15

INDEX OF OBJECTIONS, CONT'D

| | | |
|---|---|---|
| 3 | Objection | 236 |
| | Objection | 236 |
| 4 | Objection | 237 |
| | Objection | 237 |
| 5 | Objection | 237 |
| | Objection | 238 |
| 6 | Objection | 239 |
| | Objection | 239 |
| 7 | Objection | 240 |
| | Objection | 245 |
| 8 | Objection | 257 |
| | Objection | 259 |
| 9 | Objection | 264 |
| | Objection | 265 |
| 10 | Objection | 266 |
| | Objection | 267 |
| 11 | Objection | 267 |
| | Objection | 268 |
| 12 | Objection | 269 |
| | Objection | 269 |
| 13 | Objection | 270 |
| | Objection | 270 |
| 14 | Objection | 271 |
| | Objection | 271 |
| 15 | Objection | 271 |
| | Objection | 272 |
| 16 | Objection | 273 |
| | Objection | 275 |
| 17 | Objection | 278 |
| | Objection | 279 |
| 18 | Objection | 279 |
| | Objection | 279 |
| 19 | Objection | 279 |
| | Objection | 280 |
| 20 | Objection | 280 |
| | Objection | 281 |
| 21 | Objection | 281 |
| | Objection | 282 |
| 22 | Objection | 282 |
| | Objection | 284 |
| 23 | Objection | 285 |
| | Objection | 287 |
| 24 | Objection | 288 |
| | Objection | 289 |
| 25 | Objection | 290 |

### Page 16

INDEX OF OBJECTIONS, CONT'D

| | | |
|---|---|---|
| 3 | Objection | 290 |
| | Objection | 294 |
| 4 | Objection | 295 |
| | Objection | 296 |
| 5 | Objection | 296 |
| | Objection | 298 |
| 6 | Objection | 298 |
| | Objection | 299 |
| 7 | Objection | 300 |
| | Objection | 301 |
| 8 | Objection | 303 |
| | Objection | 303 |
| 9 | Objection | 304 |
| | Objection | 306 |
| 10 | Objection | 306 |
| | Objection | 307 |
| 11 | Objection | 307 |
| | Objection | 308 |
| 12 | Objection | 308 |
| | Objection | 309 |
| 13 | Objection | 312 |
| | Objection | 313 |
| 14 | Objection | 313 |
| | Objection | 316 |
| 15 | Objection | 316 |
| | Objection | 316 |
| 16 | Objection | 317 |
| | Objection | 318 |
| 17 | Objection | 318 |
| | Objection | 318 |
| 18 | Objection | 319 |
| | Objection | 319 |
| 19 | Objection | 319 |
| | Objection | 320 |
| 20 | Objection | 320 |
| | Objection | 320 |
| 21 | Objection | 323 |
| | Objection | 324 |
| 22 | Objection | 325 |
| | Objection | 325 |
| 23 | Objection | 326 |
| | Objection | 326 |
| 24 | Objection | 333 |
| | Objection | 333 |
| 25 | Objection | 334 |

### Page 17

INDEX OF OBJECTIONS, CONT'D

| | | |
|---|---|---|
| 3 | Objection | 336 |
| | Objection | 336 |
| 4 | Objection | 336 |
| | Objection | 337 |
| 5 | Objection | 337 |
| | Objection | 338 |
| 6 | Objection | 338 |
| | Objection | 339 |
| 7 | Objection | 339 |
| | Objection | 340 |
| 8 | Objection | 340 |
| | Objection | 340 |
| 9 | Objection | 340 |
| | Objection | 341 |
| 10 | Objection | 341 |
| | Objection | 342 |
| 11 | Objection | 349 |
| | Objection | 352 |
| 12 | Objection | 353 |
| | Objection | 47 |

Veritext Legal Solutions

Page 18

1        THE VIDEOGRAPHER:  The date is
2  January 14th, 2019.  We are on the record at
3  9:07 a.m.  This is the deposition of Thomas
4  Gilson in the matter of In Re: National
5  Prescription Opiate Litigation, in the United
6  States District Court, Northern District of
7  Ohio, Eastern Division.
8        Will counsel please state
9  appearances for the record?
10       MR. BADALA:  Salvatore Badala for
11  the Plaintiff, Cuyahoga County.
12       MR. GALLUCCI:  Frank Gallucci for
13  Plaintiff, Cuyahoga County.
14       MS. PATEL:  Ami Patel, for
15  Plaintiff, City of Cleveland.
16       MS. JAMES:  Erica James, Tucker
17  Ellis, for Janssen Pharmaceuticals and Johnson &
18  Johnson.
19       MR. PADUKONE:  Aseem Padukone,
20  Covington & Burling, on behalf of McKesson
21  Corporation.
22       MS. HARTMAN:  Ruth Hartman, Baker
23  Hostetler, on behalf of the Endo Defendants.
24       MS. RANJAN:  Brandy Ranjan from
25  Jones Day on behalf of Walmart.

Page 19

1        MR. CARTER:  Ed Carter for Walmart.
2        MS. ZERRUSEN:  Sandy Zerrusen,
3  Jackson Kelly, on behalf of AmerisourceBergen.
4        MR. BORANIAN:  Steven Boranian from
5  Reed Smith for Defendant AmerisourceBergen.
6        MS. ROITMAN:  Sara Roitman from
7  Dechert on behalf of Purdue.
8        MR. CHEFFO:  Mark Cheffo, also from
9  Dechert, for Purdue.
10       THE VIDEOGRAPHER:  Will counsel on
11  the phone please state appearances for the
12  record?
13       MR. PADGETT:  Bill Padgett on behalf
14  of Defendant H.D. Smith.
15       MR. KEYES:  Andrew Keyes on behalf
16  of Cardinal Health.
17       MS. FISCHER:  Alyse Fischer, Morgan
18  Lewis, on behalf of the Teva Defendants.
19       MR. PORTER:  Luke Porter with Reed
20  Smith on behalf of AmerisourceBergen.
21       MR. ERB:  Chip Erb of Cavitch on
22  behalf of Discount Drug Mart.
23       MR. CHEFFO:  Anybody else?
24       THE VIDEOGRAPHER:  Will the court
25  reporter please swear in the witness?

Page 20

1        MR. BADALA:  I'm sorry.  Before you
2  do that, is Ms. Rendon on the phone?  I assume
3  not.  We just have a standing objection to
4  Ms. Rendon's participation in this matter and
5  Baker Hostetler as well.
6        MS. HARTMAN:  Just so you know, Endo
7  Defendants want their client to have counsel
8  here and we know your objection but we're here.
9        MR. BADALA:  That's fine.
10       THOMAS GILSON, M.D., of lawful
11  age, called for examination, as provided by
12  the Federal Rules of Civil Procedure, being
13  by me first duly sworn, as hereinafter
14  certified, deposed and said as follows:
15       EXAMINATION OF THOMAS GILSON, M.D.
16  BY MR. CHEFFO:
17    Q.   Good morning, Doctor.
18         You understand you're under oath
19  today?
20    A.   Yes, I do.
21    Q.   You've been deposed before?
22    A.   Yes, I have.
23    Q.   And you understand that you've been
24  designated today as what we call a 30(b)(6) or a
25  corporate designee?

Page 21

1    A.   Yes, I do.
2    Q.   And you understand that that means
3  that you're testifying on behalf of the county?
4    A.   Cuyahoga County, yes, I do.
5    Q.   Great.  Thank you.
6         Would you be good enough to tell us
7  what you did in connection with your preparation
8  today?  And I don't want you to tell me any
9  conversations you had with your lawyers, but you
10  can tell me if you met with lawyers, what you
11  reviewed and what else you may or may not have
12  done.
13    A.   I did meet with attorneys today.
14  Pardon me.  I met with attorneys prior to today.
15  I reviewed case material in the medical
16  examiner's office.  I also reviewed case
17  material with regard to the Division of Child
18  and Family Services.  I discussed information
19  with the previous coroner.  I also discussed
20  information with other county officials with
21  regard to the impact of the opioid crisis on
22  their agencies.  I would say in preparation, in
23  general, we've been dealing with the crisis now
24  for a number of years and I've done a lot of
25  preparation in an indirect way ready for today.

6 (Pages 18 - 21)

Page 22

1    Q.    Well, about how many hours did you
2  spend preparing for the deposition and your
3  topics today?
4    A.    All those seven years.
5    Q.    Well, you didn't know that you were
6  going to be deposed today seven years ago, did
7  you?
8    A.    I hope not.  No.
9    Q.    When did you first learn that you
10  were going to be a corporate designee in this
11  deposition?
12    A.    It was a few months ago.  I couldn't
13  give you an exact answer how many hours.
14  Several I can say.
15    Q.    Several?
16    A.    Several.
17    Q.    Like five, ten?
18    A.    No.  I'd say probably closer to 35
19  to 40.
20    Q.    For all the topics?
21    A.    For all those topics, yes.
22    Q.    And what specific documents did you
23  review from the case materials and the various
24  coroner information on the divisions in
25  connection with your preparing for the

Page 23

1  deposition today?
2    A.    I reviewed materials in association
3  with the medical examiner's website, other
4  things that were available from task forces.  I
5  also reviewed, as I mentioned, things from the
6  Division of Child and Family Services, medical
7  literature, internet searches.
8    Q.    And I guess what I'm trying to just
9  find -- if you can help us out, Doctor, a little
10  more specificity.  Did you keep track of
11  anything?  Did you make copies of anything you
12  reviewed?
13    A.    I did not, no, not specifically.
14    Q.    Was there anything that was reviewed
15  that was not publicly available?
16    A.    To the best of my knowledge,
17  everything that I reviewed was publicly
18  available.
19    Q.    Were they things that you reviewed
20  of your own volition or were they anything that
21  was provided to you?
22    A.    Primarily things of my own volition.
23  I don't think anything was provided to me
24  separately.
25    Q.    And did you print anything out or

Page 24

1  did you review everything online?
2    A.    More online.  I mean, our website is
3  online and I can access things through that.
4    Q.    And who else did you talk to in
5  connection with your preparation for the various
6  topics that you're going to testify about today?
7    A.    I would have spoken to Dr. Elizabeth
8  Balraj, who was the previous coroner.  I spoke
9  to Hugh Shannon, who was the administrator,
10  chief of operations, in my office.  I spoke to
11  Tamara Chapman in the Department of Child and
12  Family Services, in addition to David Merriman,
13  who is the director of health and human
14  services.  I spoke to Commander Gingell in the
15  Cleveland Police Department in preparation for
16  today.  I spoke to Keith Martin, who is in the
17  Drug Enforcement Agency.  I also spoke to Derek
18  Siegel, who is the director of the High
19  Intensity Drug Trafficking Area for Ohio.
20  Nobody else is coming to mind.
21    Q.    Okay.  And you probably know from
22  your experience and you have good lawyers -- I'm
23  sure they've told you as well -- but if during
24  the course of the deposition something pops up
25  into your mind, oh, I remember speaking to him,

Page 25

1  it's perfectly appropriate for you to amend your
2  response and let us know if that does happen.
3    A.    Sure.
4          Oh, I'm sorry.  I can add two
5  people.  I spoke to Vince Caraffi, who was the
6  injury prevention program head at the Board of
7  Health in Cuyahoga County and he was also the
8  head of the opiate task force for the County
9  Board of Health.  And I also spoke to Dr. Joan
10  Papp, who is an emergency room physician at your
11  county hospital, MetroHealth Medical Center.
12  She is also the medical director of Project
13  DAWN, our Deaths Avoided With Naloxone program.
14    Q.    Project --
15    A.    DAWN.
16    Q.    -- DAWN.
17          Did you take any notes during these
18  interviews or conversations?
19    A.    Nothing I retained.
20    Q.    Well, did you take notes during the
21  time?
22    A.    I might have scribbled things on
23  pads, but I don't have them now.
24    Q.    Where are they?
25    A.    I threw them away.

7 (Pages 22 - 25)

Page 26

1    Q.    You weren't asked to retain those?
2    A.    Nobody asked me to retain them, no.
3    Q.    Why would you throw them away?
4    A.    They are just really things to
5  refresh my memory, but once I had gotten things
6  in my head, I didn't feel I needed them anymore.
7    Q.    And you're certain that all of your
8  notes are -- have been destroyed?
9        MR. BADALA:  Objection to form.
10    A.    I don't know where they would be.  I
11  mean, if they're in the Cleveland trash dump
12  somewhere I guess, but I don't have access to
13  them anymore.
14    Q.    And you took notes during each of
15  these calls?
16    A.    I took notes I recall when I was
17  talking to the folks at the Division of Child
18  and Family Services, Mr. Caraffi and Dr. Papp.
19  They're the only ones I remember taking notes
20  with.
21    Q.    Did you bring any documents with you
22  today?
23    A.    I brought a binder, which was made
24  available to me by counsel.
25    Q.    Do you know what's in it?

Page 27

1    A.    Yes, I do.
2        There is a copy of my declaration
3  with regard to Carole Rendon.  There is a copy
4  of the corrected complaint, second amended
5  corrected complaint, with a list of the
6  Defendants.  There is information that was
7  generated from my office that was shared with
8  counsel already.  Our monthly report.  This is
9  dated from June 1st, 2018.  We've done
10  subsequent reports, but certainly this was the
11  most up to date that was furnished at that time.
12  The other ones, if you're interested in
13  obtaining them, were -- recent copy are
14  available on our website, and that would be
15  going up to January of this year.  This is a
16  copy of the third amended notice of a videotaped
17  deposition.  And that is in regard to the topics
18  for the deposition that I was asked to prepare
19  for today.  This is an organizational chart for
20  Cuyahoga County for my reference.  And last is a
21  letter to Special Master David R. Cohen, and I
22  believe this is a correspondence about the
23  interrogatories.
24    Q.    Is that from Linda Singer?
25    A.    Pardon me?

Page 28

1    Q.    Is that a Linda Singer letter?
2    A.    Linda Singer, that's it.
3    Q.    Okay.  Did I see some handwritten
4  notes in the very beginning?
5    A.    Yes, you did.
6    Q.    And are those your notes?
7    A.    These are my notes, yes.
8    Q.    Okay.  Well, we may come back to
9  that, but let's -- so other than what you've
10  told us, Doctor -- you've spoken to the folks
11  that you've identified, you looked at some
12  publicly available information, you met with
13  your lawyers -- did you do anything else to
14  prepare for giving testimony here on behalf of
15  Cuyahoga?
16    A.    No.  I think I reviewed my articles
17  that I've written on this as well and
18  presentations and things like that, but I
19  believe those were made available already as
20  well.
21        -  -  -  -  -
22        (Thereupon, Gilson Deposition
23        Exhibit 1, Third Amended Notice of
24        Videotaped 30(b)(6) Deposition of
25        the County of Cuyahoga, was marked

Page 29

1        for purposes of identification.)
2        -  -  -  -  -
3    Q.    Okay.  So this is what I think you
4  probably have already, Doctor.  This is just a
5  copy of the notice of deposition.  So as you
6  know, there's a number of topics, and I'm going
7  to be covering a number of them, Doctor, and my
8  colleagues are going to be covering them.  We
9  have a limited period of time, so I'm going to
10  ask you to do your best to try to answer the
11  questions that I ask.  Obviously if they're not
12  clear, you should let me know if you don't
13  understand them, but what we're going to try and
14  do, because these are relatively targeted, is
15  kind of focus on these specific areas within the
16  limited time we have --
17    A.    Sure.
18    Q.    -- just to give you a little bit of
19  a roadmap.
20        I'd also like to maybe just start
21  with number -- topic 34.  Do you see that?  It's
22  listed on page 4.
23    A.    Yes.
24    Q.    So of the individuals that you
25  mentioned, did you speak with any of them

8 (Pages 26 - 29)

Page 30

1 specifically with respect to 34?
2     A.    If I could just take a second to
3 refresh myself with the topic.  I did speak to
4 the individual from the department -- Drug
5 Enforcement Agency about ARCOS data.
6     Q.    Was that someone that you listed
7 already or somebody else?
8     A.    Keith Martin.
9     Q.    Okay.  And how long did you speak to
10 Mr. Martin for?
11     A.    Maybe no more than five minutes.
12     Q.    Did you do anything else to prepare
13 for topic 34?
14     A.    I discussed it with counsel when we
15 were preparing.
16     Q.    Anything else?
17     A.    Not that I remember, no.
18     Q.    So who are the individuals and
19 entities other than Defendants, if any, who
20 Cuyahoga County believes caused or contributed
21 to the opioid crisis in Cuyahoga County?
22     A.    Cuyahoga County believes that the
23 opioid crisis in our county is directly
24 responsible to the Defendants and does not
25 mention any others.

Page 31

1     Q.    I think that doesn't answer my
2 question.
3     A.    There are no others.
4     Q.    So you -- it's Cuyahoga's testimony
5 that there are no other individuals or entities
6 anywhere in the world other than the Defendants
7 who caused or contributed to the opioid crisis?
8 Is that your testimony?
9         MR. BADALA:  Objection to form.
10     A.    It's the testimony of Cuyahoga
11 County that there are other individuals involved
12 but their responsibility is ultimately referable
13 back to the Defendants.
14     Q.    And that's not answering my
15 question, Doctor.
16         You spoke with --
17     A.    I'm sorry.  I'm trying the best I
18 can.
19     Q.    Okay.  One of the topics was to
20 identify the entities and individuals, other
21 than Defendants, who Cuyahoga County, as a
22 non-expert, believes caused or contributed to
23 the opioid crisis in the Cuyahoga geographic
24 entity -- area.  Excuse me.  And I'm just trying
25 to understand, as you sit here today on behalf

Page 32

1 of Cuyahoga, if you could tell me any
2 individuals or entities, other than the
3 Defendants, that Cuyahoga County believes caused
4 or contributed to --
5         MR. BADALA:  Objection to form.
6 Asked and answered.
7     A.    Cuyahoga County does not identify
8 any additional individuals other than the
9 Defendants who caused the opioid epidemic in the
10 county.
11     Q.    What about contributed to?
12     A.    Again, referable back to the
13 Defendants, so that we have not named anybody
14 separately other than the Defendants.
15     Q.    Has Cuyahoga County looked at the
16 ARCOS data?
17     A.    Cuyahoga County does not have access
18 to the ARCOS data, and as such, we have never
19 been able to review it.
20     Q.    How do you know that Cuyahoga County
21 doesn't have access to it?
22     A.    Based on my discussions with
23 Mr. Martin from the Drug Enforcement Agency, who
24 oversees the ARCOS data, Cuyahoga County would
25 not have access to that data.

Page 33

1     Q.    That includes currently today?
2     A.    As of today.
3     Q.    And if you had access, would you
4 look at it?
5     A.    As it was relevant to the opioid
6 crisis, it certainly would have been something
7 we would have considered looking at, sure.
8     Q.    If you had access to it for the last
9 three or four months, it's certainly something
10 important to Cuyahoga County to look at, right?
11         MR. BADALA:  Objection to form.
12     A.    I think it's relevant in terms of --
13 as I understand ARCOS data, it's distribution
14 of -- quantifications of distributions of drugs
15 into Cuyahoga County, and I think that that
16 would be something that would be potentially
17 relevant to our efforts to address the opioid
18 crisis.
19         I think, you know, at this point in
20 the opioid crisis we're also looking at an
21 evolution from the original problem with opioid
22 pain relievers to heroin and fentanyl, but I
23 think the information from a county standpoint
24 would still be potentially helpful.
25     Q.    And as you understand it, the county

9 (Pages 30 - 33)

Page 34

1 hasn't had access and hasn't looked at any of
2 the ARCOS data even to today?
3           MR. BADALA: Objection to form.
4      A.   I am not aware of any access the
5 county has to ARCOS data, and based on my
6 discussion with the Drug Enforcement
7 Administration representative with whom I spoke,
8 the county does not have access to ARCOS data.
9      Q.   And when did you speak with
10 Mr. Miller -- Mr. Martin?  Excuse me.
11     A.   I spoke with him on Friday.
12     Q.   Just to see if we could just make
13 sure that we're on the same page, Doctor, so
14 it's the county's position that if a doctor
15 prescribed unlawfully a number of prescriptions
16 to patients solely for his or her economic gain,
17 not for any medical purpose, would that have
18 contributed to the opioid crisis?
19           MR. BADALA: Objection to form.
20     A.   Yes, it would have.
21     Q.   And if a Mexican cartel had shipped
22 illegal synthetic fentanyl into the geographic
23 boundary of Cuyahoga County, would that have
24 contributed to the opioid crisis?
25     A.   Yes, it would have.

Page 35

1      Q.   And if a -- do you know what a pill
2 mill is?
3      A.   In a general sense.
4      Q.   If there was a pill mill operating
5 in Cuyahoga County, would that have contributed
6 to the opioid crisis?
7      A.   Just so we're on the same page,
8 because it sounded similar to your initial
9 question, I would define a pill mill as an
10 illegal operation with a doctor dispensing drugs
11 without establishing a doctor/patient
12 relationship, essentially for profit, and these
13 were frequently operations that would be cash
14 only, very few questions asked, and I think, you
15 know, they were not reputable in any sense.
16     Q.   And that's -- I would adopt that
17 definition, Doctor.
18     A.   You can use that one.
19     Q.   Okay.  So when I talk about a pill
20 mill, I'm talking about kind of people who are
21 doing things for non-medically appropriate uses
22 to essentially create economic gain for
23 themselves at the expense of patients or others.
24           MR. BADALA: Objection to form.
25     A.   Yes, that would have contributed,

Page 36

1 and I think it's still in this way referable
2 back to the Defendants.
3      Q.   Well, has anybody -- have you
4 identified any of those, any pill mills, any
5 doctors who engaged in illegal conduct, any drug
6 gang or other drug activity?
7           MR. BADALA: Objection to form.
8      A.   The county has.  I couldn't, as I
9 sit here today, give you names of those
10 individuals.  The pill mill was something that
11 wasn't as prevalent in this area as it was in
12 the southern part of the state, but we were
13 certainly aware of them and there were pain
14 clinics or things like that here.
15     Q.   So you're not suggesting that none
16 of that ever happened in Cuyahoga County?
17     A.   Oh, no, certainly not.  Certainly
18 not.
19     Q.   And all of those things contributed
20 to the opioid crisis in Cuyahoga County,
21 correct?
22     A.   That would be the county's opinion,
23 yes.
24     Q.   And then the question here is,
25 Doctor, identify them.  Who are they?

Page 37

1      A.   I would have to refer to the
2 prosecutor, who's also a witness, in terms of
3 Defendants who were identified and prosecuted.
4      Q.   But I thought you just told me that
5 none of those people did cause or contribute, so
6 I'm a little confused.  Did they cause or
7 contribute or did they not?
8           MR. BADALA: Objection to form.
9      A.   Oh, no.  I'm sorry.  I said that
10 they -- their actions contributed, but
11 ultimately I think their actions are referable
12 back to the Defendants.
13     Q.   Well, that's not my question.  My
14 question is if their -- let's start with their
15 actions.  You might have a view, a personal view
16 as to whether it's attributable, but what we're
17 trying to find out is the identification of
18 those individuals.  Are you prepared to tell us
19 the identification of even one of those improper
20 doctors or pill mills or drug conduct?
21           MR. BADALA: Objection to form.
22     A.   The only one I can think of off the
23 top of my head was an organization -- I believe
24 it was called the Northeast Ohio Pain Clinic.
25     Q.   So are they one of the individuals

Page 38

1 or entities that caused or contributed to the
2 opioid crisis?
3      MR. BADALA:  Objection to form.
4   A.  Again, I think they had a
5 contribution in being an illicit source of
6 opioid pain reliever, sure.
7   Q.  And anyone else?
8   A.  Again, I have to say I would have to
9 defer to the prosecutor who they identified in
10 prosecutions as overprescribing in their work.
11 We wouldn't have directly investigated some of
12 these things through my agency or many others
13 and the prosecutor would be the best source of
14 information there.
15   Q.  I understand, Doctor.  As we
16 discussed, you're here testifying on behalf of
17 the county, right?
18   A.  That's right.
19   Q.  Did you talk to the prosecutor?
20   A.  I spoke with James Gutierrez in
21 the -- oh, there's another one.  James Gutierrez
22 in the prosecutor's office.
23   Q.  Did you ask him to identify any of
24 the people that he prosecuted?
25   A.  I did not.  I asked him in a general

Page 39

1 way the impact of the opioid crisis on
2 prosecutions.
3   Q.  Did you ask anyone, in sum or
4 substance, hey, I have to respond to topic 34
5 and identify entities or individuals, can you
6 give me some of those names?
7   A.  As I say, I spoke with the
8 individuals I spoke with, and -- in attempting
9 to identify those individuals and entities, it's
10 the county's position that while there may have
11 been intermediary steps in diversion and those
12 kind of issues, all of the responsibility for
13 the opioid crisis is referable back to the
14 Defendants.
15   Q.  Even if a drug cartel shipped in
16 illicit fentanyl from Mexico, that's the
17 responsibility of the Defendants?
18      MR. BADALA:  Objection to form.
19   A.  Yes, because there would be no need
20 to ship fentanyl to this area if there wasn't a
21 drug-addicted population, and the drug-addicted
22 population is referable back to the opioid pain
23 relievers and the actions of the Defendants.
24   Q.  So is it your testimony -- is it
25 Cuyahoga's testimony that every person who is

Page 40

1 drug addicted in Cuyahoga County ultimately took
2 a prescription opioid medicine?
3   A.  No, that would not be Cuyahoga
4 County's position.
5   Q.  Okay.  Are there people who never
6 had prescription opioids who are addicted?
7      MR. BADALA:  Objection to form.
8   A.  As far as I know, yes.
9   Q.  Can you identify any person or
10 prescription, or can the county, and directly
11 relate it to any alleged improper conduct or
12 omission or misrepresentation by any of the
13 Defendants?
14      MR. BADALA:  Objection to form.
15 Outside the scope.
16   A.  Could we just reference which topic?
17   Q.  It's in the interrogatories, but --
18      MR. BADALA:  Same objection.
19   A.  The county identified claims for
20 opiates that were not for cancer patients, were
21 high dose, that is more than 120 medical
22 morphine equivalents, and patients who were
23 diagnosed with a substance use disorder, and
24 patients who, by definition, had been grievously
25 hurt by their prescription.  That's in reference

Page 41

1 to Exhibit 6 in my folder.
2   Q.  And we're going to get to Exhibit 6,
3 but with respect to any of those, can you
4 identify any specific conduct and tie it to any
5 specific prescription or patient?  Do you have
6 any of that data or information here today?
7      MR. BADALA:  Objection to form.
8 Outside the scope.
9   A.  I think this is, again, in reference
10 to the interrogatories that were -- data was
11 provided to counsel, reviewed with experts, and
12 that was made available in response to
13 interrogatories.  I don't have that with me
14 beyond that.
15   Q.  Not my question, Doctor.
16      With respect to any alleged addicted
17 person -- let's start with that -- do you have
18 any information that their addiction -- can you
19 identify any person -- is relatable to any
20 conduct, action or omission of any Defendant?
21      MR. BADALA:  Objection to form.
22 Outside the scope.  Asked and answered.
23   A.  Sorry.  I missed your question.  Do
24 I have any information --
25   Q.  As to any person who you believe is

11 (Pages 38 - 41)

1 addicted in the county, that that addiction was
2 caused by any specific representation, omission
3 or misrepresentation by a Defendant; if so, who
4 and what was the statement or omission.
5          MR. BADALA:  Objection to form.
6 Outside the scope.  Asked and answered.
7      A.   I mean, we have people who are
8 addicted, and going back and looking at their
9 prescription drug monitoring data, had lengthy
10 records there and subsequently went on to die of
11 heroin or fentanyl overdose, and, you know, I
12 think that they're, initially in the first wave
13 of the epidemic, in the heroin phase, that's
14 approximately 80 percent or so of our
15 population, so while I don't think everybody who
16 is addicted to drugs in Cuyahoga County had some
17 antecedent effect or, you know, cause with the
18 opioid pain relievers, a substantial percentage
19 had contact with opioid pain relievers.
20      Q.   And you know that how?
21      A.   That was based on the review of the
22 Ohio Automated RX Reporting System, which is our
23 prescription drug monitoring program.  That was
24 started in 2006 to track prescriptions of
25 controlled substances throughout the State of

1 Ohio, and we obtained access to that and
2 retrospectively reviewed our heroin overdoses,
3 2012, '13, actually going forward, and we
4 included our fentanyl overdoses more recently to
5 identify previous prescriptions received by
6 those individuals.
7      Q.   Let's go back to 34 for a minute,
8 Doctor.  So other than the one -- you named one
9 pill mill.  What was that?
10      A.   The Northeast Ohio Pain Clinic.  I
11 don't remember its exact name, but something
12 like that.  We participated in reviewing some
13 records for that.
14      Q.   Other than that Northeast Ohio Pain
15 Clinic, can you give the names of any specific
16 individual or entity in response to topic 34?
17          MR. BADALA:  Objection to form.
18      A.   I cannot give specific names.  They
19 are available through the county and I would
20 have to refer to the county prosecutor as a
21 better source of that information.
22      Q.   So the prosecutor has them, you're
23 just not prepared to tell me what they are right
24 now?
25          MR. BADALA:  Objection to form.

1      A.   Yes.
2      Q.   Did you talk to anybody else?
3      A.   They're coming to me, but I have to
4 say --
5      Q.   In connection with 34.
6      A.   Not as I remember.
7      Q.   And is it your -- let me see if I
8 make sure we're clear on this.  Is it the
9 county's testimony that even to the extent that
10 there's any contribution of anybody or entity
11 other than Defendants, ultimately every single
12 one of those instances relates back to the
13 Defendants' conduct?  Is that your testimony?
14      A.   Which instances are we talking
15 about?
16      Q.   Well, I'm talking about 34, right?
17      A.   Right.  I -- I'm just asking the
18 identification and -- entities of individuals
19 other than the Defendant who contributed or
20 caused?  Is that the instances you're talking
21 about?
22      Q.   Here's what I'm trying to
23 understand.  I want to leave this but I want to
24 make sure that we're on the same page here.
25      A.   Yeah.  Yeah.  Sure.

1      Q.   You've told me you can't identify
2 anybody, but you've also then said there may be
3 some individuals or entities out there that are
4 somehow in the chain, if you will, but their
5 conduct is somehow relatable ultimately to the
6 manufacturers.  Did I get that right?
7          MR. BADALA:  Objection to form.
8      A.   Yes, you did.
9      Q.   Okay.  And is there anybody out
10 there in the chain whose conduct is not in some
11 way, in the county's view, relatable to any of
12 the Defendants?
13          MR. BADALA:  Objection to form.
14      A.   I think ultimately the county would
15 say no, there is not anybody out there whose
16 conduct is not referable back to the Defendants.
17      Q.   And you're not aware and you can't
18 tell me anybody in the chain, whether they were
19 relatable to the Defendants' conduct or not,
20 right?
21          MR. BADALA:  Objection to form.
22      A.   Other than the one I mentioned, I
23 can't give you specific names, no.
24      Q.   Are you aware of any?
25      A.   I know there were prosecutions of

Page 46

1  doctors who were overprescribing based on my
2  discussion with the prosecutor, but the names of
3  those individuals or entities I do not know.
4      Q.  Did some of them go to jail?
5      A.  I would hope so, but I don't know
6  for sure.
7      Q.  Did they lose their licenses?
8      A.  Again, I would hope so, but I don't
9  know the result of that.  That isn't something I
10  have access to right now.
11     Q.  And you would hope so, I take it,
12  because your understanding of those doctors were
13  that they were engaging in improper conduct that
14  was not in the best interest of their patients,
15  right?
16         MR. BADALA:  Objection to form.
17  Outside the scope.
18     A.  I would have hoped so because this
19  county is in the midst of a terrible crisis that
20  I think those actions contribute to.
21     Q.  "Those actions" meaning the criminal
22  conduct of doctors?
23     A.  The overprescribing and the flooding
24  of our county with pain medication, yes.
25     Q.  By doctors, right?

Page 47

1         MR. BADALA:  Objection to form.
2      A.  By the prescribers, yes.
3      Q.  And you believe those people should
4  be punished, I take it?
5         MR. BADALA:  Objection to form.
6  Outside the scope.
7      A.  Yes.
8      Q.  And they should lose their licenses?
9         MR. BADALA:  Objection to form.
10  Outside the scope.
11     Q.  Go ahead.
12     A.  They broke the law.  Yeah, I think
13  they should be punished for that, as anybody who
14  breaks the law should get some consequence.
15     Q.  And if a doctor broke the law and
16  improperly prescribed, they should be punished
17  and perhaps lose their license and perhaps go to
18  jail, correct?
19         MR. BADALA:  Objection to form.
20  Outside the scope.
21     A.  I think that's a decision the county
22  would support.
23     Q.  And you believe that if they engaged
24  in illegal conduct such that they should lose
25  their license or go to jail, that somehow one of

Page 48

1  the Defendants is ultimately responsible for
2  that?
3      A.  Yes.
4      Q.  Why is that?
5      A.  These operations did not spring up
6  in a vacuum.  The overprescribing of pain
7  medication in a pill mill was to address an
8  addicted population, and that addicted
9  population is the byproduct of overprescribing
10  and over-distribution of pain medication.  So
11  the pill mill, while those activities are
12  illegal and I certainly would say contribute,
13  are ultimately referable back to an addicted
14  population that was created by the actions of
15  the Defendant.
16     Q.  The doctor wrote the prescription,
17  right, in a pill mill?
18         MR. BADALA:  Objection to form.
19  Outside the scope.
20     A.  The doctor in the pill mill had to
21  write the prescription, yes.
22     Q.  And that's the illegal conduct,
23  right?
24         MR. BADALA:  Objection to form.
25  Outside the scope.

Page 49

1      A.  I think, you know, in speaking with
2  the prosecutor, they would say, you know, there
3  were, you know, some legitimate patients in the
4  pill mills and some illegitimate patients, and
5  certainly the ones who were receiving
6  diverted -- receiving prescriptions for
7  illegitimate purposes or under improper means,
8  those are the ones that are breaking the law.
9      Q.  So even in a pill mill, some of them
10  were legitimate, some of them were illegitimate?
11         MR. BADALA:  Objection to form.
12  Outside the scope.
13     A.  That was my understanding based on
14  discussion with the county prosecutor's
15  representative, yes.
16     Q.  And if a doctor was punished or
17  prosecuted, it was because he or she engaged in
18  knowingly willfully wrong conduct, right?
19         MR. BADALA:  Objection to form.
20  Outside the scope.
21     A.  I would think so, yeah, sure.
22     Q.  And are you aware of any statement,
23  misrepresentation and conduct that led any of
24  those doctors -- by the Defendants that led any
25  of those doctors to engage in illegal conduct?

13 (Pages 46 - 49)

Page 50

1        MR. BADALA:  Objection to form.
2   Outside the scope.
3       Q.   Any specifics?
4       A.   Statements by the Defendants?
5       Q.   Right, that led to someone engaging
6   in illegal prescribing conduct.
7        MR. BADALA:  Objection to form.
8   Outside the scope.
9       A.   I think it's the misrepresentations
10  of the Defendants that create the addicted
11  population.  They don't specifically recruit
12  people to run a pill mill, but as they create
13  the addicted population and that generates the
14  pill mill, I would say then those statements are
15  relevant.
16      Q.   Let's just talk about the doctors
17  who wrote those prescriptions.  Do you have any
18  information about any statements made to any of
19  those doctors that caused them to engage in
20  illegal conduct?
21       MR. BADALA:  Objection to form.
22  Outside the scope.
23      A.   I don't believe the county does, no.
24      Q.    And what could any of the Defendants
25  have done to prevent the Mexican drug cartel

Page 51

1   from making and trafficking and sending illicit
2   fentanyl to the county?  Are you aware of any
3   steps?
4        MR. BADALA:  Objection to form.
5   Outside the scope.
6       A.   Could have avoided creating an
7   addicted population in the first place.
8       Q.   An addicted population, you've
9   mentioned that many times.  I understand your
10  point on that.  What I'm talking about is the
11  conduct of others, right, of doctors right now
12  and the cartel.  Let's talk about that.  Do you
13  have any information as to what any of the
14  Defendants could have done to prevent any of
15  those illegal conduct by Mexican drug cartels?
16       MR. BADALA:  Objection to form.
17  Asked and answered.  Outside the scope.
18      A.   If the addicted population was not
19  created, there would not have been a market for
20  the Mexican drug cartel.
21      Q.   Does the addicted population --
22  well, strike that.
23       Other than what we've talked about,
24  can you identify any specific individual or
25  entity in connection with 34, topic 34?

Page 52

1        MR. BADALA:  Objection to form.
2       A.   I think I've answered everybody I
3   can, sir.
4       Q.   Let's look at topic 9, the factors
5   that the county as a non-expert believe affect
6   the prescribing practices for prescription
7   opioids in your community other than the conduct
8   of Defendants.
9        Do you see that?
10      A.   Yes.
11      Q.   Who did you talk to in order to be
12  able to testify about that?
13      A.   Mr. Shannon, in my office, and I
14  would have described that, and then based -- in
15  the medical examiner's office -- I'm sorry.  I'm
16  just trying to get up to speed again with this.
17  I read it.  And I don't want to take up a lot of
18  your time.  Some of this would be related to my
19  discussion with Dr. Papp as well as the county
20  hospital.
21      Q.   Okay.  So let me just ask you, then,
22  an open-ended question that hopefully you can
23  help us with.  What are the factors that you as
24  a non-expert, the county as a non-expert,
25  believe affected prescribing physicians for

Page 53

1   prescription opioids in Cuyahoga County other
2   than the conduct of any Defendant?
3       A.   It is, again, the county's opinion
4   that ultimately those actions are all referable
5   back to the Defendants, and there's nothing --
6   there are intermediate steps, but ultimately
7   they're referable back to the Defendants.
8       Q.    And can you identify -- are you able
9   to parse out any conduct by any Defendant?
10       MR. BADALA:  Objection to form.
11  Outside the scope.
12      A.   Yes, I am.  We are.  The county, as
13  you know.
14      Q.   So the answer essentially to 9 is
15  there are none?
16       MR. BADALA:  Objection to form.
17      A.   Other than the Defendant or actions
18  referable back to the Defendant.
19      Q.   Well, that's not what it says.  It
20  says -- let's not rewrite the interrogatory.  It
21  says, "Other than the conduct of any Defendant."
22  Are there any factors, even one, that the county
23  believes affected prescribing practices for
24  prescription opioids other than the conduct of
25  any Defendant?  Are there any, yes or no?

14 (Pages 50 - 53)

Page 54

1        MR. BADALA:  Objection to form.
2  Asked and answered.
3        A.    On behalf of the county, I'd have to
4  say again that there are intermediates, but
5  ultimately the answer to that would be no,
6  excepting those intermediates; that all of the
7  actions around the prescribing are referable
8  back to the Defendants.
9        Q.    So tell me all the intermediates.
10       MR. BADALA:  Objection to form.
11       A.    If we look at the heroin-addicted
12  population, again, 80 percent or so of these
13  individuals in Cuyahoga County, give or take --
14  I mean, you use national data coupled with local
15  data to say that that addicted population
16  started their addiction with opioid pain
17  relievers.
18       Now, if you would say does one of
19  the Defendants run a drug cartel in Mexico, I
20  think we would all agree the answer to that is
21  no.  But at the time the opioid crisis evolved
22  from a more opioid pain reliever to a heroin
23  phase, again, with these folks having their
24  antecedent addiction to opioid pain relievers in
25  large measure, the availability of heroin at

Page 55

1  that point was an inducement to the cartels to
2  start to sell that here, and because of less
3  availability of narcotics, potential
4  reformulations of the prescription pain
5  relievers, costs of the prescription pain
6  relievers, any other potential factors, heroin
7  started to become a crisis in our county, but
8  the actions of heroin, or the genesis of the
9  heroin addiction is referable back to the opioid
10  pain relievers.
11       Q.    I'm going to move to strike.  I
12  asked you specifically, Doctor, what the
13  intermediates are.  One is, in that answer I
14  think you just gave us, cartels; they're an
15  intermediary, right?
16       A.    Sure.
17       Q.    Who else?
18       A.    The addicted population I guess are
19  intermediaries in that they are now engaged in
20  drug-seeking behavior.
21       Q.    Who else?
22       A.    In that model, I think that just
23  describes kind of the chain from the cartel.
24  You know, there's obviously distribution points
25  between cartel, dealer, and things like that.

Page 56

1        Q.    Be specific as you could, please,
2  Doctor.
3        MR. BADALA:  Objection to form.
4        A.    Well, a cartel would basically
5  oversee an operation that potentially would have
6  local distribution points, regional distribution
7  points.  A lot of our drugs, for example, could
8  have come through Columbus, Detroit, Chicago,
9  New York, there, and ultimately come down to
10  people distributing those drugs locally.  I
11  guess they would be intermediate points.  They
12  just kind of lump the cartel as the distribution
13  system there.
14       And then the sale of the heroin,
15  which, as I indicated, it's really not something
16  that is being manufactured or distributed by the
17  Defendants, but as we look at how this
18  population was initially created, that is
19  referable back to the actions of the Defendants.
20       Q.    Now, I'm going to go back and we're
21  going to read number 9 again because I think
22  we've gotten a little off topic, but let me just
23  ask you a few questions here.
24       So the intermediaries are the people
25  in the cartel and illegal drug distribution

Page 57

1  chains; is that fair?
2        MR. BADALA:  Objection to form.
3        A.    I think so, yes.
4        Q.    And you can't tell me any of the
5  names of those people, right?
6        A.    Thankfully not, not.
7        Q.    What about doctors who engaged in
8  illegal conduct; are they intermediaries in the
9  chain?
10       MR. BADALA:  Objection to form.
11       A.    The illegal conduct, as I just want
12  to be clear, is the pill mill type doctor?
13       Q.    Yes.
14       A.    Yes.  I'd say they're part of the
15  intermediary, too.
16       Q.    What about healthcare policies that
17  encouraged doctors to write prescriptions for
18  opioids as opposed to other therapies?
19       MR. BADALA:  Objection to form.
20       A.    They could contribute in some way as
21  well.
22       Q.    Could a lack of focus or funding or
23  attention by governments also contribute?
24       A.    I'd have to say in a theoretical
25  sense, it's certainly possible.

15 (Pages 54 - 57)

1    Q.   Now let's get back to number 9. It
2 says, The factors that you, as an expert {sic},
3 believe affected prescribing practices, right?
4 Do you see that, prescribing practices for
5 prescription opioids in your community rather
6 than the conduct of the Defendant. Do you see
7 that?
8    A.   Yes, I do.
9    Q.   I take it you would not tell me
10 that, in response to number 9, the drug cartels
11 would be one that you would list, would you?
12    A.   No.
13    Q.   So let's focus on number 9. What
14 are the factors in response to number 9?
15        MR. BADALA: Objection to form.
16 Asked and answered.
17    A.   The factors that affected
18 prescribing practices were, in the early part of
19 the crisis, the advertisements that were
20 indicating that the opioid pain relievers were
21 either not addictive or had tremendously low
22 addiction potential with very little evidence.
23 The influence of regulatory policies with
24 lobbying efforts that were, again, referable
25 back to Defendants.

1    Q.   Doctor, I'm sorry to interrupt you,
2 and I apologize, but it says other than the
3 conduct of the Defendants. Do you see that?
4    A.   I do, you know, but --
5    Q.   So is there --
6        MR. BADALA: Hold on. Let him
7 finish.
8        MR. CHEFFO: Well, I didn't ask a
9 question yet.
10        MR. BADALA: He was still talking
11 before moving on to the next one.
12    Q.   Go ahead.
13    A.   Thanks. I'm sorry if I'm not clear,
14 but it's the county's position that ultimately
15 all of the things that affect those prescribing
16 factors are referable back to the Defendants.
17    Q.   And if that's the case, Doctor, all
18 you have to tell me, then, is just I have none,
19 right. I don't need the whole long answer. I
20 want to just make sure, before I move to the
21 next topic, are there any -- let's make sure
22 we're clear on this. Are there any factors that
23 the county, as a non-expert, believe affected
24 prescribing practices for prescription opioids
25 in Cuyahoga County other than the conduct of any

1 of the Defendants?
2        MR. BADALA: Objection to form.
3 Asked and answered.
4    A.   I guess it's hard because what I am
5 saying to you, and I hope I'm clear, and I'm
6 sorry if I'm not, it is the county's position
7 that everything is referable back to the
8 Defendants, but there are chains, there's
9 degrees of separation. But I would say, in
10 answer to your question, if you need a one-word
11 answer, the county says no, there are no other
12 folks who are ultimately responsible other than
13 the Defendants.
14    Q.   And I'm not trying to limit you to a
15 one-word answer, but are there any factors --
16 this is different. Are there any factors
17 relatable to that affected prescribing practices
18 other than the conduct of Defendants?
19        MR. BADALA: Objection to form.
20 Asked and answered.
21    A.   No.
22    Q.   And do you know if the county
23 employed an economist to analyze the motivating
24 factors for illicit drug markets? Are you aware
25 of any work that was done in that regard?

1        MR. BADALA: Objection to form.
2 Also, I instruct you not to answer if you
3 learned this through counsel in any way.
4    A.   I'm not sure I understand the
5 question, actually.
6        MR. BADALA: Also, outside the
7 scope.
8    Q.   Do you know when the first year the
9 Mexican drug cartel sent product into this
10 county?
11    A.   I don't think the county would know
12 that.
13    Q.   You don't know, though?
14    A.   I don't know and I don't think the
15 county would. I don't think that's really
16 something we would be able to know given the
17 illegal and surreptitious nature of that kind of
18 distribution.
19    Q.   So before we leave 9, there is no --
20 there are no factors that you can testify to
21 today, right? In fact, the county believes that
22 there are no other factors?
23        MR. BADALA: Objection. Asked and
24 answered.
25    A.   Ultimately, the county's position is

16 (Pages 58 - 61)

1 that the factors are all referable back to the
2 Defendants.
3     Q.  That may be the county's position,
4 but I want you to read 9 and tell me if there
5 are no other factors, because it doesn't say
6 ultimately. It says, "Other than the conduct of
7 any Defendant."
8        MR. BADALA: Objection. Asked and
9 answered.
10     A.  I don't know how else to answer
11 that. The county would say there were
12 intermediate steps, but ultimately the conduct
13 of the Defendants is responsible for the
14 prescribing practices.
15     Q.  Okay. Is the county's testimony and
16 position that all prescriptions of opioids for
17 chronic pain in Cuyahoga were written in
18 reliance on misrepresentations and omissions and
19 wrongdoing of Defendants?
20        MR. BADALA: Objection to form.
21        Which topic are we looking at?
22        MR. CHEFFO: It's a general question
23 first.
24        MR. BADALA: Outside the scope.
25     A.  The county doesn't have an opinion

1 on the medical appropriateness of prescriptions
2 written for opioid pain relievers in association
3 with all chronic pain patients.
4        MR. CHEFFO: I'm sorry. Can you
5 read that back to me, please?
6        (Record read.)
7     Q.  Does it have a position on the
8 appropriateness of opioid therapy in connection
9 with any chronic pain patients?
10        MR. BADALA: Objection to form.
11 Outside the scope.
12     A.  The county doesn't have an opinion
13 on appropriateness of therapy. That's, I think,
14 referred to experts.
15     Q.  So the county has not taken a
16 position, as you know it, as to whether any
17 prescription for any chronic pain patient is
18 appropriate or not?
19        MR. BADALA: Objection to form.
20 Outside the scope.
21     A.  As I understood your question,
22 you're asking about all prescriptions, which I
23 think the question would not offer an opinion.
24 The overprescribing in the setting of chronic
25 pain is certainly a factor the county recognizes

1 as a potential -- or not a potential; as a
2 source of the opioid epidemic.
3     Q.  But with respect to taking a
4 position on all chronic therapies -- I'm sorry.
5 Strike that.
6        In connection with taking a position
7 about all prescriptions for opioid medicines for
8 chronic therapies, the county is not taking a
9 position on that?
10        MR. BADALA: Objection to form.
11     A.  No, it is not.
12     Q.  Let us -- you did some work in
13 connection with certain interrogatory responses
14 in connection with preparing for today, did you
15 not?
16     A.  No, not that I'm aware of. I mean
17 --
18     Q.  Did you look at any charts --
19     A.  The data was certainly available to
20 everybody, but --
21     Q.  Did you look at any charts or
22 printouts of prescription drug data?
23     A.  I mean, I've reviewed the Ohio
24 Automated RX Recovery System in my capacity as
25 the medical examiner in association with the

1 fatalities that were passing through our office.
2 That wasn't in preparation for today
3 specifically.
4     Q.  Well, the interrogatory responses to
5 interrogatory 6, 7 and 10, did you look at
6 those?
7     A.  No. They weren't on my scope of --
8 or 6 was, I guess. 7 and 10 --
9     Q.  They're encompassed within the
10 Special Master's order, but tell us what you did
11 for 6.
12     A.  The county collected claims data
13 from third parties, such as Medical Mutual of
14 Ohio, which was the healthcare carrier for the
15 county; Bureau of Workers' Compensation, which
16 is the state workman's compensation board; and
17 CVS, which oversees -- CVS Pharmacy, which
18 oversees our prescription planning for the
19 county, and turned that data over to its
20 attorneys, and the attorneys then worked with
21 experts to respond to the interrogatories. So
22 we furnished the claims data to attorneys, and
23 then it was reviewed with experts to respond to
24 the interrogatories. I was not among the
25 experts who were consulted on that.

17 (Pages 62 - 65)

Page 66

1    Q.    And did you see a spreadsheet that
2  was produced that had 500 prescriptions on it?
3    A.    I'm aware that there were 500 -- I
4  thought it was 500 patients who were identified
5  who met the criteria that I mentioned
6  previously.  Beyond that, that's as much as I'm
7  familiar with that.
8           -  -  -  -  -
9           (Thereupon, Gilson Deposition
10           Exhibit 2, Plaintiff's The County of
11           Cuyahoga, Ohio and State of Ohio Ex
12           Rel, Prosecuting Attorney of
13           Cuyahoga County, Michael C.
14           O'Malley's Amended Responses to the
15           Manufacturer Defendants' and
16           National Retail Pharmacy Defendants'
17           First Set of Interrogatories, with
18           Attached Spreadsheets, was marked
19           for purposes of identification.)
20           -  -  -  -  -
21    Q.    Okay.  What was the criteria --
22  let's be more specific.  We've marked this as 2.
23  This is Exhibit 2.
24           MR. BADALA:  Mark, we're on topic 6
25  but interrogatory 6?  I'm just trying to keep

Page 67

1  track.
2           MR. CHEFFO:  No.  It is a little
3  confusing.
4           MS. ROITMAN:  So we're going to be
5  on topic 4, 5 and 6.
6           MR. BADALA:  Just so it's clear.
7  Okay.
8    Q.    Are you prepared to talk about
9  topics 4, 5 and 6, Doctor?
10    A.    Just to generally state the county's
11  position, yes.
12    Q.    What did you do to prepare yourself
13  for topics 4, 5 and 6?
14    A.    I discussed them with counsel and
15  they responded to the interrogatories, which I
16  didn't do much preparation beyond the turning --
17  the county turning over data to our attorneys
18  and then that being reviewed with experts to
19  respond to the interrogatories.
20    Q.    I'm talking about your preparation,
21  so one of the things you did was you met with
22  your lawyers, right?
23    A.    Yes.
24    Q.    Did you meet with anybody else in
25  connection with those topics?

Page 68

1    A.    No, I did not.
2    Q.    Did you review any documents?
3    A.    No, I did not.
4    Q.    And how much time did you spend
5  meeting with your lawyers in connection with
6  those topics?
7    A.    Oh.  Well, we met over a couple of
8  days, and, I mean, topics were coming and going.
9  Our total meeting time I would say is probably
10  about 10 to 12 hours.  Some portion of that.  I
11  couldn't be more specific.  We did not spend a
12  lot of time on these, as the responses to
13  interrogatories were generated in consultation
14  with the experts.  So this was going to just
15  have a reply that they were furnished and that
16  that was the county's response, what was in the
17  interrogatories.
18    Q.    I'm sorry.  Is it your testimony you
19  don't have much to add other than what's in the
20  interrogatories?
21           MR. BADALA:  Objection to form.
22    A.    That's correct.
23    Q.    Okay.  Well, let's -- let's ask you
24  to take a look at what we've marked as
25  Exhibit -- it's Exhibit 2.

Page 69

1           MR. GALLUCCI:  Which one is 2?
2           MR. CHEFFO:  It's the whole thing.
3    Q.    Have you seen that before, Doctor?
4    A.    I have not seen this document
5  before, no.  At least I'm not --
6    Q.    So with respect to any of the names
7  or prescriptions in these charts, do you have
8  any information about the criteria that was used
9  in responding to interrogatory 6?
10    A.    The claims were identified for
11  opioids that were not for cancer patients, were
12  high dose, that is 120 medical morphine
13  equivalents or higher, which are far more
14  dangerous, and for patients with diagnosed
15  substance use disorder.
16    Q.    Is that for the interrogatory 6
17  response or is that for more than that, or do
18  you know?
19    A.    It was -- I think the criteria were
20  spelled out in interrogatory -- or in topic
21  number 4, but as it related back to number 4,
22  it's the reply for number 6.
23    Q.    So those three criteria, not for
24  cancer patients, above 20 milligrams --
25    A.    120.

18 (Pages 66 - 69)

Page 70

1    Q.   120.  Excuse me.  Thank you for
2 that.
3    A.   Morphine medical equivalents.
4    Q.   So we'll just call it MME.
5    A.   MME, yes.
6    Q.   And then there is also a requirement
7 on the criteria that they are -- had been
8 diagnosed with an opioid abuse disorder?
9    A.   Diagnosed substance use disorder,
10 yes.
11    Q.   Substance use disorder.
12    A.   I think in some places that will
13 also be spelled out as substance abuse disorder.
14 The nomenclature is kind of in flux I think in
15 trying to avoid the stigmatization of addicts.
16    Q.   Do you know who created those
17 criteria?
18    A.   I do not.
19    Q.   So is it -- are there any other
20 criteria that were used?
21    A.   That's the extent of my knowledge as
22 to the county of the criteria that were used to
23 identify the claims.
24    Q.   Do you know if anyone at the county
25 set those criteria?

Page 71

1         MR. BADALA:  Objection to form.
2 Outside the scope.
3    A.   That, I do not know.
4    Q.   And do you know what -- what
5 information or databases were queried in order
6 to generate the 500 list?
7    A.   These criteria and then third-party
8 claims data was collected from Medical Mutual of
9 Ohio, Workman's Compensation and CVS, as they
10 had their relationship to the county.  Beyond
11 that, I do not know what other entities were
12 queried for claims data.
13    Q.   Who actually did the work of
14 querying it?  Was it the county or was it
15 somebody else?
16         MR. BADALA:  Objection to form.
17 Outside the scope.
18    A.   I believe the county collected the
19 claims data, but the analysis beyond that, to
20 respond to the interrogatories, was with
21 attorneys and experts.
22    Q.   Okay.  And I think you told us you
23 never saw Exhibit 2 before, right?
24         MR. BADALA:  Objection to form.
25 Mischaracterizes testimony.

Page 72

1    Q.   Did you see Exhibit 2 before?
2    A.   I don't remember seeing this, no, I
3 myself.  I mean, the county, I can't necessarily
4 say that they did not see it.  Myself, I did not
5 see it.
6    Q.   Okay.  In the response to
7 interrogatory 6, the county identified Exhibit
8 A.  Do you see this big document here?
9    A.   This one (indicating)?
10    Q.   Yes.
11    A.   Yes.
12    Q.   Have you seen that exhibit before?
13         MR. BADALA:  Objection to form.
14    A.   Can you give me a second to not give
15 a quick off-the-cuff answer?
16         No, I have not seen that before.
17    Q.   And is it your understanding that in
18 order -- so let me strike that.
19         You just identified for us three
20 criteria, right, the one -- over 120 MME,
21 substance disorder, and not for cancer, right?
22    A.   And a diagnosed substance use/abuse
23 disorder, yes.
24    Q.   That was one of the three, right?
25 It was diagnosed --

Page 73

1    A.   Oh, I'm sorry.  You said that first
2 --
3    Q.   I may have said it backwards, but it
4 was not for a cancer patient, above 120 MME --
5    A.   Which would be considered dangerous,
6 and then identified substance abuse disorder.
7    Q.   Okay.  And what -- what were those
8 criteria used for?
9         MR. BADALA:  Objection to form.
10 Outside the scope.
11    A.   I think identification of claims
12 data, as I understand it.
13    Q.   Identification of certain claims.
14 Did you understand it that those were the
15 criteria that were used to generate Exhibit A?
16    A.   You know, I don't know Exhibit A, so
17 I'm reluctant to give an answer on that.  These
18 were the criteria that were identified to
19 identify the claims -- they were spelled out to
20 identify the claims.  Being unfamiliar with this
21 document, if these are the claims that were
22 passed by the county, then these were the
23 criteria that were used for that.  Not knowing
24 the document, I'm reluctant to go further than
25 that.

19 (Pages 70 - 73)

Page 74

1    Q.   What I'm just trying to understand,
2 you gave us those three criteria.  What did you
3 understand those criteria were going to be used
4 for?
5    A.   As I understood it, there was a
6 population of 500 patients who were identified
7 to be a representative of harms that the county
8 had claimed, and then the claims data for those
9 individuals were identified using those three
10 criteria.
11    Q.   So you thought that there were an
12 effort to identify 500 individuals and there
13 were these criteria and those criteria generated
14 the 500 individuals?
15    A.   That's my understanding of that,
16 yes.
17    Q.   Were you aware of any prescriptions
18 that were also identified?
19        MR. BADALA:  Objection to form.
20 Outside the scope.
21    A.   My understanding of this topic is
22 that the 500 number identified patients, not
23 prescriptions.  I mean, prescriptions obviously
24 were attached to the patients, but they were
25 patients who were identified, not specific

Page 75

1 prescriptions.
2    Q.   And you've never seen any
3 information or list of the actual 500 patients
4 or prescriptions, have you?
5    A.   No, I have not.
6    Q.   Do you understand that a list was
7 prepared?
8    A.   Yes, I do understand that.
9    Q.   And is it your understanding that
10 every one of the patients or prescriptions on
11 the list meets these three criteria?
12        MR. BADALA:  Objection to form.
13 Outside the scope.
14    A.   I mean, that's my understanding of
15 the criteria that were agreed to to select the
16 patients who were the 500 patients.
17    Q.   So in order to identify the patients
18 or prescriptions, they had to meet all of these
19 three criteria; is that right?
20    A.   That's my understanding, yes.
21    Q.   Did they have to meet any other
22 criteria?
23        MR. BADALA:  Objection to form.
24 Asked and answered.
25    A.   Not that I'm aware of, no.

Page 76

1    Q.   And how was it determined that the
2 patient received opioid therapy for non-cancer
3 use?
4        MR. BADALA:  Objection to form.
5 Outside the scope.
6    A.   As I say, I can't give you personal
7 knowledge on that.  I would think from a review
8 of medical records.
9    Q.   Do you know?
10        MR. BADALA:  Same objection.
11    A.   I don't know for certain.
12    Q.   Do you know at all?
13        MR. BADALA:  Same objections.
14    A.   No.  They were identified as not
15 being cancer patients.  The criteria, how that
16 was arrived at, I do not know.
17    Q.   Not how it was arrived at, but how
18 it was determined.  Do you know how they
19 determined whether -- if a person or
20 prescription was on the list, how it was for a
21 non-cancer patient or diagnosis?  Do you have
22 any information at all?
23        MR. BADALA:  Objection to form.
24    A.   No, I do not have separate
25 information on that.

Page 77

1    Q.   Did you talk to anybody about that?
2    A.   No, I did not.
3    Q.   Did you -- do you have any
4 information how it was determined that a
5 prescription was above 120 MME?
6        MR. BADALA:  Objection to form.
7 Outside the scope.
8    A.   Other than a review of pharmacy or
9 medical record data, I'm giving you my best
10 opinion as an individual, but how the county
11 came to that, I do not have specific information
12 for it.
13    Q.   And I appreciate that.  I don't want
14 you to guess or speculate.  I think your lawyers
15 would agree with me.  Do you have any personal
16 knowledge, through either your own knowledge or
17 from any work that you've done to prepare for
18 the deposition, as to how it was determined that
19 a prescription or patient received above 120
20 MME?
21        MR. BADALA:  Objection to form.
22 Outside the scope.
23    A.   Other than what I've said, you know,
24 a review of medical records would seem to
25 furnish that.  I don't know.

20 (Pages 74 - 77)

Page 78

1     Q.    Did you talk to anyone who reviewed
2 medical records?
3     A.    No, I did not.
4     Q.    Do you know that they reviewed
5 medical records?
6         MR. BADALA:  Objection to form.
7     A.    No.  I was just giving you my
8 best --
9     Q.    Guess?
10     A.    I think informed guess.  There's
11 only so many ways you can get this kind of
12 information, so --
13     Q.    But you don't know how they did it?
14     A.    But I do not know the methodology
15 exactly.
16     Q.    And you don't know what the QC
17 process was, if any, do you?
18         MR. BADALA:  Objection to form.
19 Outside the scope.
20     A.    No, I do.
21     Q.    And did -- was there -- and the
22 third criteria that you said was the substance
23 abuse disorder?
24     A.    Yes.
25     Q.    Do you know how they determined if

Page 79

1 somebody had a substance abuse disorder?
2         MR. BADALA:  Objection to form.
3 Outside the scope.
4     A.    I'm aware that criteria are spelled
5 out for that diagnosis.  How they came to
6 that -- any application of this criteria, I do
7 not know.
8     Q.    Do you know what criteria they used?
9 Was it the DSM-5 criteria?
10         MR. BADALA:  Objection to form.
11 Outside the scope.
12     A.    You're grazing into a lot of
13 medicine I don't remember, but I don't know what
14 criteria were used.
15     Q.    I thought you told me that you did
16 know what the criteria for substance abuse
17 disorder was.
18     A.    I don't believe I said that.  I said
19 there are criteria.  I'm aware of the diagnosis,
20 but I don't know them personally.
21     Q.    There's a diagnosis of substance
22 abuse disorder?
23     A.    I believe so, yeah.
24     Q.    And are you familiar what those
25 criteria are?

Page 80

1         MR. BADALA:  Objection to form.
2 Outside the scope.
3     A.    No, I'm not.
4     Q.    And are you aware of any criteria
5 that was used to identify over 120 MME?
6         MR. BADALA:  Objection to form.
7 Outside the scope.
8     A.    I didn't understand your question.
9     Q.    You told us one of the criteria was
10 over 120 MME, I take it, per daily use; is that
11 right?
12     A.    Medical morphine equivalents for
13 daily use.
14     Q.    For daily use.
15         Can you be more specific about how
16 that was defined and how it was identified?
17         MR. BADALA:  Objection to form.
18 Outside the scope.
19     A.    I'm aware of standard definitions
20 for -- that they exist for medical morphine
21 equivalents.  What was used here, I cannot
22 honestly say I know for certain.
23     Q.    In fact, you don't know at all, do
24 you --
25         MR. BADALA:  Objection to form.

Page 81

1     A.    Don't know at all.
2     Q.    -- how any of these criteria were
3 used or developed or applied, because you didn't
4 ask anybody, did you?
5         MR. BADALA:  Objection to form.
6 Outside the scope.
7     A.    No.  I was told these had been
8 answered in interrogatories.
9     Q.    Did you understand that one of the
10 topics you were going to be -- or several of the
11 topics was the criteria that were going to be
12 used, that were used, in connection with
13 responding to the interrogatories?
14     A.    I was aware of the topics and these
15 are the answers that I have to give on behalf of
16 the county.
17         MR. BADALA:  So we're going over
18 about an hour now.  Is it a good time to take a
19 break?
20         MR. CHEFFO:  Yes.  Sure.
21         THE VIDEOGRAPHER:  Off the record at
22 10:16 a.m.
23         (Recess had.)
24         THE VIDEOGRAPHER:  Back on the
25 record at 10:38 a.m.

21 (Pages 78 - 81)

Page 82

1    A.   May I make a correction on the
2  record before we start?
3         I said I had destroyed notes of
4  conversations with three individuals.  I was
5  able to locate notes that I did keep and I'll
6  provide them to counsel.
7         MR. BADALA:  We'll review them and
8  make sure that they don't have any
9  communications.
10   Q.   Where are they?
11   A.   They were in a case file I have on
12  this.
13   Q.   In your office?
14   A.   I brought them here with me today.
15   Q.   So they're not in the landfill?
16   A.   Pardon me?
17   Q.   They're not in the landfill?
18   A.   One might be.  I can say that they
19  mentioned the three individuals, Dr. Papp and
20  Vince Caraffi.  I found those notes.  The other
21  one, with Tamara Chapman from DCFS, I had on a
22  phone -- list of phone numbers, was just taking
23  messages, and I'm quite certain I threw that one
24  away.  So that might be in the landfill.
25         I can tell you the points on that

Page 83

1  were that, when I spoke with her, the number of
2  custody cases that DCFS had seen had risen over
3  the time of the opiate crisis, the number of
4  toxicology positive infants had risen over the
5  time of the opioid crisis, and that it was her
6  impression that that was related to the opioid
7  crisis.
8         MR. CHEFFO:  I'm going to move to
9  strike that.
10        MR. BADALA:  We'd object to that
11  motion to strike.
12        MR. CHEFFO:  And at the break I
13  would call for those notes, since you have them
14  here, produced to us, because otherwise, we're
15  going to reserve our rights to continue this
16  30(b)(6) when I get the notes.  So you can take
17  it under advisement.  I don't want to quibble
18  with you, but I think that would be the most
19  efficient way to deal with it.
20   Q.   So, Doctor, any other clarifications
21  before we start?
22   A.   No.  That's the only one.  Sorry
23  about that.
24              -  -  -  -  -
25        (Thereupon, Gilson Deposition

Page 84

1         Exhibit 3, Plaintiffs The City of
2         Cleveland, County of Cuyahoga,
3         County of Summit and City of Akron's
4         Supplemental Amended Responses and
5         Objections to the Manufacturer
6         Defendants' First Set of
7         Interrogatories, Submitted Pursuant
8         to Discovery Ruling No. 13, was
9         marked for purposes of
10        identification.)
11             -  -  -  -  -
12   Q.   Let me show you Exhibit 3.  Have you
13  seen this document before, Doctor?
14   A.   No, I have not.
15   Q.   Would you look at page 5, please?  I
16  asked you a question earlier, and this may look
17  or sound familiar to you, Doctor, but let me
18  kind of ask you the question.  The second full
19  paragraph, do you see where it says, "Subject to
20  and without waiving"?
21   A.   Oh, I'm sorry.  I'm on 6.
22   Q.   I'm on 5.
23   A.   Yes.
24   Q.   "Subject to and without waiving the
25  foregoing objections and limitations, Bellwether

Page 85

1  Plaintiffs contend that all prescriptions of
2  opioids for chronic pain in the Bellwether
3  jurisdictions were in reliance on the
4  misrepresentation, omissions, and wrongdoing
5  alleged in their complaints."
6         Do you see that?
7    A.   Yes, I do.
8    Q.   And you testified earlier that
9  that's not the county's position; is that right?
10        MR. BADALA:  Objection to form.
11   A.   I think the prescriptions for
12  chronic pain were based on misrepresentations,
13  but whether they actually were written for
14  people with legitimate chronic pain is a
15  separate issue, and whether they were
16  efficacious short term for that is a separate
17  issue.
18   Q.   Is this right or wrong?
19   A.   I would say it's right.
20   Q.   So it is Cuyahoga County's position
21  that all prescriptions of opioids for chronic
22  pain in Cuyahoga were written in reliance on the
23  misrepresentations, omissions, and wrongdoing
24  alleged in the complaint?
25        MR. BADALA:  Objection to form.

22 (Pages 82 - 85)

Page 86

1    A.   Yes.
2    Q.   Every single one?
3         MR. BADALA:  Objection to form.
4  Asked and answered.
5    A.   Yes.
6    Q.   Going back to when?
7         MR. BADALA:  Objection to form.
8  Outside the scope.
9    A.   I was told the -- for any time frame
10  that we were going back to was 1995 for the
11  litigation.
12   Q.   How was chronic pain defined?
13        MR. BADALA:  Objection to form.
14  Outside the scope.
15   A.   I think in the usual way.  I don't
16  know that I have a specific definition for it on
17  behalf of the county.
18   Q.   How was it defined here in the
19  responses?
20        MR. BADALA:  Objection to form.
21   A.   I don't have a specific answer on
22  behalf of the county of the definition of that.
23   Q.   Well, you've told me the statement
24  was true, so how do you know if it's true or not
25  if you can't define chronic pain?

Page 87

1         MR. BADALA:  Objection to form.
2  Outside the scope.
3    A.   The opioids were prescribed for
4  chronic pain.  That's the way I read that as a
5  whole block there.
6    Q.   And do you know what definition --
7  what's your definition for chronic pain?
8         MR. BADALA:  Objection to form.
9  Outside the scope.
10   A.   I don't believe the county has a
11  specific definition for chronic pain.  It would
12  have been referred to experts.
13   Q.   Do you have one?
14        MR. BADALA:  Objection to form.
15  Outside the scope.
16   A.   Me personally?  Nothing more than I
17  would say my layman's definition.  I don't have
18  a specific medical definition of chronic pain.
19   Q.   What steps were taken to verify that
20  every single prescription written in Cuyahoga
21  for chronic pain for opioids since 1995 was done
22  so in reliance on misrepresentations, omissions
23  and wrongdoing by the Defendants?
24        MR. BADALA:  Objection to form.
25  Outside the scope.

Page 88

1    A.   I'm sorry.  Your question again?
2    Q.   What steps were taken to verify that
3  every prescription written since 1995 for an
4  opioid medicine for chronic pain was done so in
5  reliance on misrepresentations, omissions, and
6  wrongdoing by the Defendants?
7         MR. BADALA:  Objection to form.
8  Outside the scope.
9    A.   The county collected the claims data
10  from the third parties and then it was turned
11  over to attorneys and experts for review.
12   Q.   Was one of the criteria whether a
13  doctor was visited by a sales rep?
14        MR. BADALA:  Objection to form.
15  Asked and answered.
16   A.   The criteria that were applied to
17  identify the claims were that they were not for
18  cancer patients, were high dose, higher than 120
19  medical morphine equivalents, or for patients
20  diagnosed with substance abuse -- and for
21  patients diagnosed with substance abuse
22  disorder.  I don't see any reference in the
23  criteria specifically to visits from
24  pharmaceutical representatives.
25   Q.   Are there any criteria related to

Page 89

1  any conduct on behalf of any of the Defendants?
2         MR. BADALA:  Objection to form.
3  Outside the scope.
4    A.   The criteria that I enumerated here
5  are the ones that were used to identify the
6  claims.
7    Q.   Do any of them relate to any conduct
8  by any Defendant?
9         MR. BADALA:  Objection to form.
10  Outside the scope.
11   A.   Do the claims have?
12   Q.   Do the criteria?
13        MR. BADALA:  Objection to form.
14   A.   I'm not understanding your question.
15  I'm sorry.
16   Q.   Do these relate to any criteria --
17  do any of the criteria relate to any conduct or
18  acts or omissions of any of the Defendants?
19        MR. BADALA:  Objection to form.
20  Outside the scope.
21   A.   I think the criteria are clear
22  enough, and then -- I'm sorry.  Your question is
23  just confusing me.
24   Q.   So one of the criteria is not for
25  cancer pain, right?

23 (Pages 86 - 89)

Page 90

1    A.   Yes.
2    Q.   But you've just told me that if
3 there was an opioid prescription for chronic
4 pain for cancer patients, that was in reliance
5 on misrepresentations, omissions and wrongdoing
6 of Defendants, right?
7    A.   Yes.
8    Q.   So which criteria applies?  Does
9 it --
10    A.   Cancer pain is viewed separately
11 from chronic pain.  That's terminal care,
12 hospice care type of pain.
13    Q.   I'm talking about the statement on
14 paragraph 5, page 5, paragraph 2, that you just
15 told me was accurate.  It doesn't carve out
16 cancer pain, does it?
17    A.   No.  It says, "chronic pain."
18    Q.   So is it accurate not carving out
19 cancer pain?
20       MR. BADALA:  Objection to form.
21    A.   Cancer pain is considered different
22 than chronic pain.
23    Q.   It's your testimony that you can't
24 have -- a cancer patient can't have chronic
25 pain?

Page 91

1       MR. BADALA:  Objection to form.
2 Outside the scope.
3    A.   No.  I think that, you know, they're
4 as eligible for chronic pain as anyone else, but
5 the cancer pain that they would receive opioid
6 pain relievers for was terminal pain and not
7 chronic in the conventional sense of the
8 understanding of that word.
9    Q.   So you don't think pain for cancer
10 patients is included in the statement on page 5?
11       MR. BADALA:  Objection to form.
12 Outside the scope.
13    A.   That's my understanding, yes.
14    Q.   So let's see if we can make sure
15 that we're on the same page.  So with respect to
16 Exhibit 2, that was in response to
17 interrogatories 7 and 10; is that your
18 understanding?
19    A.   This exhibit (indicating)?
20    Q.   Yes.
21    A.   I thought was in response to
22 interrogatories -- or, I'm sorry.  Maybe I'm
23 confusing topics with interrogatories.  I
24 thought these were generated in response to
25 topics 4, 5, 6 and 19.

Page 92

1    Q.   So that response to 4, 5 and 6 and
2 19, Exhibit 2, right?
3    A.   Topics 4, 5, 6 and 19.  That's my
4 understanding, yes.
5    Q.   The interrogatory 6 asks Plaintiffs
6 to, among other things, identify and describe
7 500 prescriptions of opioids that were written
8 in Plaintiff's jurisdiction, here Cuyahoga, in
9 reliance on any alleged misrepresentations,
10 omission or other wrongdoing; is that right?
11       MR. BADALA:  Objection to form.
12 Outside the scope.
13    A.   I'm sorry.  I don't know where
14 you're at.
15    Q.   It's in Exhibit 3 on page 1.  Do you
16 see on page 1, Identify and describe 500
17 prescriptions of opioids that were written in
18 reliance on any alleged misrepresentations or
19 other wrongdoing by any Defendant?  Do you see
20 that?
21    A.   Yes, I do.
22       MR. BADALA:  Just for the record,
23 there's more beyond that in the interrogatory.
24       MR. CHEFFO:  Right, and there is.
25    Q.   And it also basically -- in addition

Page 93

1 to other things, Plaintiffs were asked to
2 provide various details, including the physician
3 who wrote the prescription, the specific
4 misrepresentation, the specific person
5 associated with Defendants who made the alleged
6 misrepresentation.  Do you see that?
7    A.   Yes, I do.  That's further down on
8 the page.
9    Q.   And in order to respond, the
10 Plaintiffs referred back and the county referred
11 back to Exhibit A, which is that large printout
12 that I just showed you.
13    A.   This one here (indicating).
14    Q.   Right.
15    A.   Okay.
16    Q.   And you've never seen that before
17 today?
18       MR. BADALA:  Objection to form.
19    A.   No, I have not.
20    Q.   And if you look at page 14 of
21 Exhibit 3 -- if you look at the last paragraph
22 on page 14 of Exhibit 3, in the first sentence,
23 kind of midway through, it says, "Bellwether
24 Plaintiffs contend that each prescription in the
25 previously-provided Exhibit A was the result of

24 (Pages 90 - 93)

1 Manufacturer Defendants' deceptive marketing."
2     A.    I'm sorry.
3     Q.    It's right down here, Doctor
4 (indicating).
5     A.    Okay, right down at the bottom.
6 Okay.
7     Q.    You've told us about three criteria?
8     A.    Yes.
9     Q.    Are those the only three criteria
10 that you're aware of for topics 4, 5, 7 and 19
11 or for topics -- interrogatories 6, 7 and 10?
12        MR. BADALA:  I think you have them
13 mixed up again, Mark.
14     Q.    Well, irrespective of the topics or
15 the interrogatories.
16     A.    4, 5, 6, 19, my understanding is
17 that the county collected the claims data based
18 on these criteria, turned them over to our
19 attorneys, and they were consulted with experts
20 and those were used to answer the
21 interrogatories.  The county didn't have any
22 further involvement with the interpretation of
23 that.
24     Q.    And with respect to any of the
25 topics that are the subject of Exhibit A, are

1 those the only three criteria, is just what I'm
2 trying to find out, or were there other
3 criteria?
4        MR. BADALA:  Objection to form.
5 Asked and answered.
6     A.    That's my understanding, is those
7 are the three criteria.  I am not aware of any
8 others that were used.
9     Q.    Was a requirement that a
10 prescription be written by a doctor who engaged
11 in unlawful conduct or was prosecuted -- was
12 that one of the criteria that you were aware of?
13        MR. BADALA:  Objection to form.
14 Asked and answered.
15     A.    That criteria is not spelled out in
16 what I have.
17     Q.    And it was not a criteria that a
18 prescription be written for something other than
19 chronic pain, correct?
20        MR. BADALA:  Objection to form.
21     A.    It was a criteria that they were not
22 cancer patients.
23     Q.    So the answer to my question is yes,
24 the criteria was not to find prescriptions that
25 were not written for chronic pain?

1     A.    Double negatives.
2        MR. BADALA:  Objection to form.
3     Q.    Chronic pain was not a criteria, was
4 it?
5     A.    For selection, no.
6     Q.    In connection with identifying any
7 of the individuals or prescriptions on Exhibit
8 A, did Cuyahoga County or anyone at its behest
9 talk to any doctors?
10        MR. BADALA:  Objection to form.
11 Outside the scope.
12     A.    The county submitted the claims data
13 to our attorneys and they consulted with
14 experts.  I don't know the specific experts.
15 And that was the basis of the answers to the
16 interrogatories.
17     Q.    Do you know if anyone spoke to
18 individual doctors or patients on Exhibit A?
19        MR. BADALA:  Objection to form.
20 Outside the scope.  Asked and answered.
21     A.    The only expert I was aware of was
22 Rawlings, but other than that, I don't know what
23 experts were consulted.
24     Q.    Doctor, my question is not that.  I
25 didn't ask that question.  I asked you if you're

1 aware of whether anyone, including experts or
2 others, spoke with any of the doctors or
3 patients on Exhibit A.
4     A.    Oh, I'm sorry.  Now I understand.
5        MR. BADALA:  Same objection.
6 Objection to form.  Outside the scope.  Asked
7 and answered.
8     A.    Once we turned the data over, I'm
9 not aware of what the experts did beyond that to
10 form the answers to the interrogatories.
11     Q.    Are you aware of any -- if anyone,
12 experts or others, spoke to any doctors or
13 patients listed on Exhibit A?
14        MR. BADALA:  Objection to form.
15 Outside the scope.
16     A.    I am not aware of that.
17     Q.    Are you aware of whether anyone
18 reviewed, as part of the criteria, any call
19 notes for sales reps in connection with the
20 individuals or prescriptions on Exhibit A?
21        MR. BADALA:  Objection to form.
22 Outside the scope.
23     A.    The county wouldn't be aware of
24 that.  After things were turned over to the
25 attorneys, they consulted with experts, and that

Page 98

1 wasn't part of the county's process anymore.
2    Q.   So is the answer no?
3       MR. BADALA: Objection to form.
4    A.   I'm not aware.
5    Q.   Did you ask anyone that question?
6       MR. BADALA: Objection to form.
7 Outside the scope.
8    A.   I don't know.
9    Q.   You don't know if you asked?
10    A.   Me personally or the county?
11    Q.   I'm asking you, the county, you
12 as the representative. In connection with your
13 work and your preparation, did you ask anyone if
14 anyone had spoken to a doctor or a patient in
15 connection with the preparation of Exhibit A?
16       MR. BADALA: Objection to form.
17 Outside the scope. Asked and answered.
18    A.   Again, when we finished collecting
19 claims data, it was referred over to attorneys,
20 who consulted with experts to formulate
21 responses. The process that was involved to
22 generate those responses the county does not
23 know.
24    Q.   So in terms of the three criteria
25 that you talked about, do you know who came up

Page 99

1 with those criteria? Was it the county or
2 somebody else?
3       MR. BADALA: Objection to form.
4 Outside the scope.
5    A.   I do not know.
6    Q.   Do you know how any of those
7 criteria were applied in practice?
8       MR. BADALA: Objection to form.
9 Outside the scope.
10    A.   In the selection of claims?
11    Q.   Yes.
12    A.   They were the basis for identifying
13 the claims for opiates that would be referred to
14 our attorneys.
15    Q.   But do you know how they were
16 actually applied? I think we talked about this
17 a little bit earlier.
18       MR. BADALA: Objection to form.
19 Outside the scope.
20    A.   They were applied -- I'm sorry.
21    Q.   Let's do it again, Doctor.
22       You don't know how any claims
23 information was determined whether it was for a
24 non-cancer patient or not, do you?
25       MR. BADALA: Objection to form.

Page 100

1 Outside the scope.
2    A.   How they identified that this was
3 not a cancer patient?
4    Q.   Yes.
5    A.   That, I do not know the criteria
6 that they used.
7    Q.   And you don't know how they applied
8 the criteria of above 120 MME, do you?
9       MR. BADALA: Objection to form.
10 Outside the scope.
11       MR. CHEFFO: I'm not going to argue
12 with you. How could that possibly be outside
13 the scope? You can say it every single time.
14 It doesn't make it true.
15       MR. BADALA: Are you asking for my
16 view or --
17       MR. CHEFFO: No. I'm just saying I
18 think it's becoming abusive. This is specific
19 within it. You can do it, but we'll take it up
20 with the Special Master.
21       MR. BADALA: It's just that he
22 rewrote it that it's what's the criteria, not
23 how it was applied but what is the criteria.
24 That's what it says. He's giving you the
25 criteria.

Page 101

1       MR. CHEFFO: And if that's your
2 position, that that's what you think that a
3 deposition in good faith is supposed to be
4 about, I welcome that.
5       MR. BADALA: That's how Special
6 Master Cohen --
7       MR. CHEFFO: We'll take that up with
8 him very clearly, if you think that's what --
9       MR. BADALA: It's Exhibit B in your
10 notice. It's right there.
11       MR. CHEFFO: That's good. I can
12 read it, too.
13    Q.   So do you know how the criteria for
14 above 120 MME was applied?
15       MR. BADALA: Objection to form.
16 Outside the scope.
17    A.   120 MME has a specific definition.
18 I would think that was what was applied. How
19 the criteria was created I do not know other
20 than that would be a dangerous level of
21 prescription opioids on a daily basis.
22    Q.   Do doctors -- are they able to
23 prescribe in Cuyahoga County today over 120 MME?
24       MR. BADALA: Objection to form.
25 Outside the scope.

26 (Pages 98 - 101)

Page 102

1    A.   I don't honestly know the county
2 would know that.
3    Q.   Do you prescribe --
4    A.   I'm not a prescriber.
5        MR. BADALA:  Were you done with your
6 answer?
7        THE WITNESS:  Yeah.
8    Q.   So you're not a prescriber, are you?
9    A.   No.
10    Q.   You said a few times it's dangerous.
11 Have you ever prescribed opioids?
12    A.   Yes, I have.
13    Q.   When?
14    A.   Back in my training as a surgical
15 resident.
16    Q.   Was that decades ago?
17    A.   Early 1990s.
18    Q.   Can doctors in Cuyahoga County today
19 lawfully --
20    A.   Late 1980s.  I'm sorry.
21    Q.   Can doctors lawfully prescribe
22 opioid medicines above 120 MME?
23        MR. BADALA:  Objection to form.
24 Outside the scope.
25    A.   I believe the state has set out

Page 103

1 criteria with which I am not familiar regarding
2 prescribing of opiates.  As I understand them,
3 as the county, those would be specifically with
4 regard to duration, and I don't know that there
5 was a specific MME cap placed on them.  I just
6 don't know.
7    Q.   Is the answer to my question yes or
8 no?  Can a doctor prescribe 120 MME or more
9 today in Cuyahoga County lawfully?
10        MR. BADALA:  Objection to form.
11 Outside the scope.
12    A.   It's regulated by the state, so I
13 can't tell you that I remember the criteria, so
14 my answer, not yes or no, is I don't know.
15    Q.   Well, you would assume if it was
16 dangerous, then the county wouldn't allow it;
17 isn't that right?
18        MR. BADALA:  Objection to form.
19 Outside the scope.
20    A.   I think the criteria that we're
21 placed out by the Board of Pharmacy, Board of
22 Medicine and the governor were to caution about
23 the use of excessive opioids.  I don't think
24 that they spelled out necessarily that it was
25 impossible to do this.  They said you could not

Page 104

1 prescribe -- or you needed to use the Board of
2 Pharmacy database beyond seven days.  I don't
3 know if they put an MME on that.  And then you
4 were expected to check the Board of Pharmacy
5 database, the Prescription Drug Monitoring
6 Program, every 90 days thereafter if you were
7 continuing to prescribe opioids.
8        So I think they're not, as I
9 understand it, saying it's absolutely forbidden,
10 but it is a practice that needs to be more
11 closely monitored.
12    Q.   Do you hold yourself out as an
13 expert in opioids?
14        MR. BADALA:  Objection to form.
15 Outside the scope.
16    A.   In some aspects of it, sure.
17    Q.   Which aspects?
18        MR. BADALA:  Objection to form.
19 Outside the scope.
20    A.   The opioid crisis.
21    Q.   Are you an expert in opioid efficacy
22 in prescribing?
23        MR. BADALA:  Objection to form.
24 Outside the scope.
25    A.   Again, as the county, I wouldn't

Page 105

1 answer myself an expert in that.
2    Q.   When is the last time you read a
3 label for an opioid product?
4        MR. BADALA:  Objection to form.
5 Outside the scope.
6    A.   Me personally --
7    Q.   Yes.
8    A.   -- or the county?
9    Q.   No.  You.
10    A.   Label for an opioid product, I don't
11 remember.
12    Q.   Was it in the last decade?
13        MR. BADALA:  Objection to form.
14 Outside the scope.
15    A.   I don't remember.  Might have been.
16    Q.   And with respect to substance abuse
17 disorder, do you know how that criteria was
18 applied?
19        MR. BADALA:  Objection to form.
20 Outside the scope.
21    A.   No.  Beyond the county submission of
22 the claims data, I don't know how that criteria
23 was applied.
24    Q.   Do you know if any determination was
25 made as to whether any of the individuals or

27 (Pages 102 - 105)

1 prescriptions on Exhibit A received a medically
2 unnecessary opioid prescription?
3     A.   The county doesn't have a position
4 on whether these were medically unnecessary.
5     Q.   What about medically inappropriate?
6          MR. BADALA:  Objection to form.
7     A.   The county used these criteria to
8 identify the claims that were submitted and
9 doesn't express opinions on medically
10 inappropriate or medically -- the interpretation
11 of a medical opinion.
12     Q.   Can you look at Exhibit 2, please,
13 Doctor, page 5?  There's not page numbers on
14 this one.
15     A.   I can count them.  Would this be 1
16 or is this 1 here (indicating)?
17     Q.   I don't know.  It's --
18     A.   That's very helpful.  Okay.  Just so
19 we're literally on the same page, this page
20 (indicating)?
21     Q.   Exactly.  Exactly.
22     A.   Sure.
23     Q.   And I'm going to just direct your
24 attention to the answer section, second sentence
25 there.  I'll read it to save your voice, but it

1 says, "Bellwether Plaintiffs contend that each
2 prescription identified in Exhibit A" -- that's
3 that big chart in front of you -- was
4 unauthorized, medically unnecessary, ineffective
5 or harmful."
6          Do you see that?
7     A.   Yes.
8     Q.   And you just told us that the county
9 doesn't have a position on whether something is
10 medically unnecessary or unauthorized, right?
11     A.   May have been ineffective or
12 harmful, but --
13     Q.   So the county does not have a
14 position about whether something is medically
15 unnecessary or unauthorized, right?
16          MR. BADALA:  Objection to form.
17     A.   I think what they say here is that
18 the prescriptions identified there are
19 unauthorized, medically unnecessary, ineffective
20 or harmful.
21     Q.   So is that right or wrong?  Does the
22 county have a position or not?
23          MR. BADALA:  Objection to form.
24     A.   The county does have this position.
25     Q.   Didn't you say exactly the opposite

1 30 seconds ago?
2          MR. BADALA:  Objection to form.
3 Mischaracterizes the testimony.
4     A.   As I understood your question, you
5 were asking me separate parts of these, and the
6 conjunction here is "or," which means one or all
7 of these.  So the county doesn't necessarily
8 have an opinion that a specific prescription was
9 medically unnecessary.  It may have been
10 harmful.  It may have been unauthorized.
11     Q.   But does it have a position that any
12 of them were -- let's start with unauthorized?
13 And if so, show me which ones.
14          MR. BADALA:  Objection to form.
15 Outside the scope.
16     A.   It is the position that
17 prescriptions identified in Exhibit A were
18 unauthorized.
19     Q.   Which ones?
20     A.   Again, the county collected the data
21 and referred it to experts for further
22 interpretation of it.
23     Q.   What's the basis for that statement
24 that they were unauthorized?
25          MR. BADALA:  Objection to form.

1 Outside the scope.
2     A.   That they were either, you know,
3 prescribed to someone with a pain disorder or
4 higher.  I don't know the criteria that were
5 applied to make that decision.
6     Q.   That wasn't one of the criteria,
7 right?
8          MR. BADALA:  Objection to form.
9     A.   Pardon me?
10     Q.   That wasn't one of the three
11 criteria, right?
12     A.   What's that?
13     Q.   That something was unauthorized.
14     A.   No.  These are the criteria again
15 for -- not for cancer patients, high dose, or
16 for patients with a diagnosis of substance use
17 disorder.
18     Q.   Well, let's talk about each of these
19 then, since you told me they now -- it is the
20 policy.
21          If -- what is the criteria for a
22 prescription identified as Exhibit A,
23 unauthorized?  How do we know which one is?
24 What's the criteria?
25     A.   I don't personally know.  That was

Page 110

1 collected data which was submitted to the
2 attorneys based on these criteria, and the
3 experts reviewed that for unauthorized --
4      Q.   Well, no.  It says here that they
5 were unauthorized.  Someone had to make -- use
6 certain criteria.  That's what you're here to
7 talk about is the criteria used in connection
8 with these interrogatory responses, and I want
9 to know for each one of these what the criteria
10 is in order to determine whether something was
11 unauthorized.  Do you know?
12      MR. BADALA:  Objection to form.
13 Asked and answered.
14      A.   That's not what the county was
15 doing.  That was what was referred to the
16 attorneys with consultation with experts.
17      Q.   So the answer is you don't have any
18 idea what criteria was used to determine whether
19 or not something was unauthorized, right?
20      MR. BADALA:  Objection to form.
21      A.   That would have been a decision from
22 the experts' review.
23      Q.   That's not my question, Doctor.
24      As you sit here today under oath,
25 testifying on behalf of the county, do you have

Page 111

1 any idea whatsoever what criteria was used with
2 respect to making a determination whether a
3 prescription was unauthorized?
4      MR. BADALA:  Objection to form.
5      A.   No, I do not.  The criteria that
6 were used for the claims that were reviewed are
7 what I've previously enumerated, but the
8 criteria that were used by the experts, I do not
9 have that.
10      Q.   Do you know this is used by the
11 experts or this is an answer in an interrogatory
12 that you're supposed to testify about?  That's
13 why I'm confused.  You keep saying experts.
14 What experts?
15      A.   We submitted claims data as the
16 county to our attorneys and they consulted with
17 experts to generate responses to the
18 interrogatories.  The county did not
19 specifically generate those responses, though
20 they signed off on them.
21      Q.   Okay.  We'll talk about that in a
22 few minutes, but your deposition here, one of
23 the topics is about the criteria used for the
24 prescriptions that are on that big chart there,
25 right, and in the interrogatory responses it

Page 112

1 refers us back to those -- those prescriptions,
2 right.  And I think we've covered unauthorized.
3 You told me you have no idea what the criteria
4 is for determining whether a prescription is
5 unauthorized or not, correct?
6      MR. BADALA:  Objection to form.
7      A.   I don't know what the criteria were
8 that were applied to the unauthorized because
9 that would have been the consultation with the
10 experts.
11      Q.   So the answer, again, is you don't
12 know, right?
13      MR. BADALA:  Objection to form.
14      A.   The county does not know.
15      Q.   And you did not ask anybody, did
16 you?
17      A.   We didn't ask anybody what?
18      Q.   Did you ask anyone in your
19 preparation for your deposition today, Doctor,
20 hey, what are the criteria for determining
21 whether something is unauthorized or not?  Did
22 that subject matter come up, yes or no?
23      A.   No.  That was, again, a topic that
24 was addressed when these were referred to the
25 attorneys in consultation with their experts.

Page 113

1      Q.   And I take it if you went through
2 any of those prescriptions in that whole list,
3 you couldn't tell me which ones were
4 unauthorized because you don't know what the
5 criteria are; is that fair?
6      MR. BADALA:  Objection to form.
7      A.   I could not specifically look
8 through this because it wasn't my expert area to
9 tell you which of these were unauthorized or
10 medically unnecessary or ineffective or harmful.
11 I don't know the criteria that were applied to
12 the consultation -- the experts that our
13 attorneys consulted with.
14      Q.   What criteria were used to determine
15 whether a prescription was medically
16 unnecessary?
17      MR. BADALA:  Objection to form.
18      Q.   Do you know?
19      A.   Again, they were referred to the
20 experts and that was their criteria.  The county
21 did not have a separate criteria other than
22 their --
23      Q.   Move to strike.
24      I'm going to ask you again, Doctor.
25 What criteria were used to determine whether it

1 was something medically unnecessary?  Do you
2 know or do you not know?
3        MR. BADALA:  Objection to form.
4    A.    Again, I do not know as a
5 representative of the county because those were
6 referred to counsel for consultation with
7 experts in that area.
8    Q.    So you can't testify about the
9 criteria as you sit here today, fair?
10        MR. BADALA:  Objection to form.
11    A.    I cannot.
12    Q.    And you didn't ask anybody about the
13 criteria for medically unnecessary prescriptions
14 before coming here to testify, did you?
15    A.    No, I did not.
16    Q.    And you did not ask anyone about the
17 criteria for what makes a prescription that's on
18 Exhibit A ineffective or not, what the criteria
19 are, correct?
20    A.    I'm sorry.  I lost my page.
21    Q.    Are you with me?
22    A.    I'm not because I was trying to go
23 back.
24    Q.    It's on 5.  It's with those names.
25    A.    My apology.  I'm sorry.  I just lost

1 my place.
2    Q.    That's fine.
3        Same questions for ineffective.  I
4 can do it again for you.
5    A.    Would you, please?  I'm sorry.
6    Q.    Sure.
7        You did not ask anyone what the
8 criteria was to determine whether -- criteria
9 were with respect to whether a prescription on
10 Exhibit A was ineffective, right?
11    A.    No.  That was the referral that we
12 made to the attorneys for the consultation with
13 an expert who could make a decision on that, but
14 the county did not specifically identify the
15 medically unnecessary or any of the other three
16 there.
17    Q.    And not only didn't identify, you
18 can't tell me what they are, can you?
19    A.    As the county, no, I cannot tell you
20 the criteria that were applied there.
21    Q.    You said they referred those to the
22 experts?
23    A.    Right.
24    Q.    So can you give me a list of all the
25 experts you talked to to find out what those

1 criteria were?
2        MR. BADALA:  Objection to form.
3    A.    I'm only aware that the county made
4 me aware that there was a Rawlings who was used.
5 I don't know what other experts were used and I
6 did not speak to any myself personally.  I am
7 not sure about other members of the county.
8    Q.    How much time did you spend speaking
9 to Rawlings?
10    A.    I didn't personally speak to
11 Rawlings.  I just became aware that they were an
12 expert that was being used.
13    Q.    But you knew that they were one of
14 the entities that was actually making these
15 determinations, right?
16    A.    I just learned that, yes.
17    Q.    And you didn't talk to them?
18    A.    I just learned it this morning.  I
19 don't know that I would have talked to them, but
20 I certainly didn't have the opportunity to talk
21 to them in preparation for today.
22    Q.    And the same would be true for
23 harmful.  You can't tell us what criteria were
24 used to determine whether a prescription that's
25 listed on Exhibit A was harmful, right?

1    A.    No.  Again, these were things that
2 the county turned over to its attorneys in
3 consultation with experts who would be able to
4 address that criteria.
5    Q.    Did you talk to any of the experts
6 about what was harmful?
7    A.    Same answer.  I mean, I'm aware only
8 of Rawlings as an expert, but I just found out
9 about that.  I did not speak to any specific
10 experts.  I didn't know of them.  And once the
11 county made the referral in that direction, we
12 didn't pursue that further.  That was a topic
13 for expert review.
14    Q.    So if I asked you to look through
15 any of those -- any of those names or
16 prescriptions in Exhibit A and said tell me
17 which ones were ineffective, you couldn't do
18 that, could you?
19        MR. BADALA:  Objection to form.
20 Outside the scope.
21    A.    No, I could not.
22    Q.    I couldn't do it either, could I?
23        MR. BADALA:  Objection to form.
24    A.    I would hope not.  Maybe you have
25 hidden talents I don't know about.  But no, I

30 (Pages 114 - 117)

Page 118

1 could not.
2     Q.    All right.  The only way we would be
3 able to do that is if we actually knew what
4 criteria were applied, correct?
5         MR. BADALA:  Objection to form.
6     A.    Right.  The experts would have
7 applied their criteria.
8     Q.    And unless we know what the criteria
9 is, we can't actually understand which ones are
10 ineffective, which ones are harmful, which ones
11 are medically unnecessary, right?
12        MR. BADALA:  Objection to form.
13    A.    That's my understanding of that,
14 yes.
15    Q.    And you don't have that information
16 for us today, do you?
17        MR. BADALA:  Objection to form.
18 Mischaracterizes testimony.
19    A.    I do not have that information.
20    Q.    Is it your understanding or
21 testimony on behalf of the county that Rawlings
22 is an expert?
23    A.    I just know of their name and that
24 that was a group that was reviewing it.  I'd
25 have to say that we relied on our attorneys to

Page 119

1 identify the expert in that case.
2     Q.    Let me ask you this, Doctor:  Tell
3 me everything you know about Rawlings, what you
4 think they are, what they do.  It sounds like
5 you just learned about them this morning.
6     A.    I just learned about them, so
7 honestly, I don't know really much at all about
8 them.
9     Q.    What's the extent of your knowledge?
10    A.    That they were an entity -- I don't
11 even know if it's a person, a group -- who were
12 consulted by our attorneys to provide expert
13 input into the prescriptions that were reviewed,
14 with the purpose of responding to the
15 interrogatories.
16    Q.    So at least in terms of those
17 criteria that we talked about, the three, in
18 order to make it on the list, is it your
19 understanding that they had to satisfy all three
20 of those criteria?
21    A.    The -- just were not a cancer
22 patient, high dose -- I'll summarize --
23 diagnosed substance use disorder?
24    Q.    Yes, sir.
25    A.    Yes, that was the criteria to

Page 120

1 identify claims.
2     Q.    And they may have had other
3 criteria, but that was ancillary to what the
4 search criteria were; is that right?
5     A.    They may have had other conditions,
6 I would say, but they did not have other
7 criteria that were being applied.  These were
8 the three criteria used to select the -- to
9 identify the claims.
10    Q.    So it wasn't -- at least in
11 selecting those claims, it was not part of the
12 process to determine whether any doctor who
13 wrote a prescription received information from a
14 manufacturer of opioids, correct?
15        MR. BADALA:  Objection to form.
16    A.    That's not spelled out in the
17 criteria that were used to identify the claims.
18    Q.    And it's not part of the criteria
19 that a doctor who wrote any of those
20 prescriptions was prosecuted or was under
21 investigation for improper conduct, correct?
22        MR. BADALA:  Objection to form.
23    A.    The criteria are the three that I
24 mentioned.  Specifically whether a doctor had
25 visits from a representative of the

Page 121

1 pharmaceutical industry, whether they were
2 prosecuted, those were not independent criteria
3 for the identification of claims.
4     Q.    And I think you said this, Doctor,
5 but just sometimes I mishear, so let me make
6 sure.  They actually have to satisfy all three
7 of those, not any one of those three criteria,
8 in order to make it on the list, right?
9     A.    That's my understanding, yes.
10    Q.    In terms of -- you said earlier that
11 there may have been other conditions.  Am I
12 correct that you're just saying due to just the
13 way people see doctors or get conditions, they
14 may have had a host of different conditions or
15 illnesses, but that wasn't a factor in
16 determining whether they were going to be on the
17 list or not other than the fact that it was not
18 for cancer pain, right?
19        MR. BADALA:  Objection to form.
20    A.    These were the criteria that were
21 used to identify the claims that we submitted to
22 our attorneys, and I think, if I remember what I
23 said, you know, these individuals could have had
24 other conditions, but these were the criteria
25 that were used to identify the claims we

31 (Pages 118 - 121)

Page 122

1 submitted to our attorneys.
2    Q.   Okay.  And just to make sure we're
3 clear, so those are the only three criteria,
4 right?
5    A.   Yes.
6    Q.   You're not aware of how they came
7 about or who devised them, right?
8    A.   I did not devise them and I do not
9 know who devised them, yes.
10    Q.   And no one in the course of your
11 preparation told you who was responsible for
12 those criteria, right?
13    A.   No, they did not.
14    Q.   And you don't know how they were
15 implemented in terms of kind of matching up
16 those criteria to actual claims and information,
17 right?  Someone else did that work, right?
18        MR. BADALA:  Objection to form.
19 Outside the scope.
20    A.   I -- as I tried to say earlier,
21 certainly in other definitions of these that
22 could have been applied, but the specific
23 application of those, I do not know for certain.
24    Q.   And even with respect to something
25 that seems clear, like it says not for cancer

Page 123

1 pain, do you see that?
2    A.   Not for cancer patients.
3    Q.   Cancer patients, right.  So does
4 that mean somebody -- do you know -- whether I
5 is currently having an acute problem from cancer
6 or do you know whether it would include people
7 who have cancer in remission?
8        MR. BADALA:  Objection to form.
9    A.   They were not cancer patients.  I
10 don't know if it was specifically they had a
11 history of cancer or if it was whether they had
12 an active cancer.  Again, I can give you my
13 opinion as an individual, but I don't want to
14 speak for the county, that it would not have
15 been people who had a history with cancer
16 because it wouldn't be an active problem.
17    Q.   The point of what we're talking
18 about at least on this is we're trying to
19 understand the criteria used to generate Exhibit
20 A, and I think what you're telling me is you
21 don't know, even with respect to cancer, whether
22 they were trying to find people who were not
23 active cancer patients or whether they excluded
24 anyone who never had cancer?  You just don't
25 know the answer, right?

Page 124

1        MR. BADALA:  Objection to form.
2    A.   I don't know for certain.
3    Q.   You couldn't go through any of the
4 list in front of you in Exhibit A and tell me
5 categorically all these people never had cancer,
6 could you?
7    A.   It would be pretty good if I could
8 do that.  I don't think so.  As I would
9 understand, cancer patient would be an active
10 problem, but I can't say that for certain.
11    Q.   In order to understand that, you
12 would want to see how it was defined and what
13 exact criteria was used, right, because then
14 that would help you understand how the selection
15 process worked?
16        MR. BADALA:  Objection to form.
17    A.   It would be helpful, yes.
18    Q.   It would be essential, wouldn't it?
19        MR. BADALA:  Objection to form.
20    A.   As I say, I don't know that I could
21 tell you how the identification was made not for
22 cancer patients, but I do know that the claims
23 were identified with that criteria.  I just
24 don't, as I sit here, have the capacity to tell
25 you how they ruled out the patients who did have

Page 125

1 cancer.
2    Q.   And substance abuse disorder, does
3 that include people who ever had a diagnosis or
4 is it people who are currently in treatment for
5 substance abuse disorder or is it people who
6 have a family history for substance abuse
7 disorder?  Do you know?
8        MR. BADALA:  Objection to form.
9    A.   I don't know the definition.  I
10 could give you my impression, but I don't know
11 that that's really representing the county.
12    Q.   I'm only asking -- you know, you're
13 here to testify on behalf of the county as to
14 what those criteria mean.  And other than what
15 you've told me, you can't tell me whether
16 individuals who previously had a substance abuse
17 disorder or currently had a substance abuse
18 disorder or have a family history of substance
19 abuse disorder are encompassed within that
20 criteria; is that fair?
21        MR. BADALA:  Objection to form.
22    A.   Fair.
23    Q.   And even as to the 120 MME, you
24 can't tell me whether that includes people who
25 are downwardly titrating or tapering, whether

32 (Pages 122 - 125)

1 it's used for methadone, whether it's used for
2 some other opioid therapy to help addiction, you
3 just don't know, right?
4         MR. BADALA:  Objection to form.
5     A.   It's 120 MME.  I don't know what
6 direction the person would have been in in their
7 treatment or what specific medication would have
8 been used other than it would have a correlate
9 as an MME.
10    Q.   Do you know as to any of the people
11 whether the prescription was manufactured or
12 distributed by one of the Defendants in this
13 case?
14    A.   I don't know that for certain.
15       MR. CHEFFO:  Can we take a short
16 break?
17       MR. BADALA:  Yes.
18       THE VIDEOGRAPHER:  Off the record at
19 11:23.
20          (Recess had.)
21          -   -   -   -   -
22       (Thereupon, Gilson Deposition
23       Exhibit 7, Handwritten Notes, was
24       marked for purposes of
25       identification.)

1          -   -   -   -   -
2       (Thereupon, Gilson Deposition
3       Exhibit 8, Handwritten Notes, was
4       marked for purposes of
5       identification.)
6          -   -   -   -   -
7       THE VIDEOGRAPHER:  Back on the
8 record at 11:48 a.m.
9     A.   If I could, another clarification
10 into the record.
11       In our last area, I was looking at
12 Exhibit 2 on the break, where you had asked me
13 about how we had defined unauthorized, medically
14 unnecessary, ineffective or harmful.  And I did
15 not have a chance to review the entire page
16 there, but I believe the answers to those
17 questions are here in the continuation, and I'd
18 like to read those into the record, that "The
19 basis for assertion that these prescriptions
20 were medically unnecessary is that the
21 healthcare providers listed below and in Exhibit
22 A were prosecuted or the subject of disciplinary
23 actions for their illegal or improper
24 prescribing of opioids, for example, without
25 examining patients or determining whether they

1 had conditions or diagnoses appropriately
2 treated with opioids or prescribing dangerously
3 high dosages of opioids."  I won't read the list
4 of the people who were prosecuted, but I think
5 that spells out the criteria that were used as
6 medically unnecessary.
7         The next paragraph below the last
8 guy's name is the criteria that were used to say
9 that these were ineffective.  The "Bellwether
10 Plaintiffs further contend that prescriptions or
11 reformulated OxyContin, Hysingla ER, Opana ER,
12 Exalgo, and Xartemis XR listed in Exhibit A were
13 ineffective in that they did not prevent
14 tampering, were not actually abuse-deterrent,
15 and did not prevent oral abuse, despite the
16 manufacturers' representations to the contrary."
17         And, lastly, "Bellwether Plaintiffs
18 further contend that by misrepresenting the
19 risks, benefits, and superiority of opioids,
20 particularly for use long-term and at high
21 doses, including, but not limited to, through
22 sales visits, continued medical education and
23 speaker programs, publications and websites, and
24 treatment guidelines, Manufacturer Defendants
25 deprived prescribers and patients of the ability

1 to make informed choices about whether, when and
2 which opioids to use -- to prescribe and use,
3 for how long, and at what doses.  Though
4 Defendants do not define 'unauthorized,'
5 'medically unnecessary,' or 'harmful,'
6 Bellwether Plaintiffs contend that Defendants'
7 misstatements regarding the benefits and very
8 significant risks of opioids and the
9 redefinition of the standard of care to include
10 opioids rendered the prescriptions unauthorized,
11 unnecessary and harmful in that they were
12 prescribed and taken without full and accurate
13 information."
14    Q.   You met with the lawyers on the
15 break?
16    A.   Yes, I did.
17    Q.   You know we've discussed for a few
18 hours now various criteria, and you told me, I
19 think, probably at least a half a dozen times,
20 if not more, that there are three only.  Do you
21 remember that testimony?
22    A.   Yes, I do.
23       MR. BADALA:  Objection to form.
24    Q.   So is that still true?
25    A.   These were the criteria that were

33 (Pages 126 - 129)

Page 130

1 identified -- that were used to identify the
2 claims, and then what I was just reading are the
3 bases for the contention that these were
4 unauthorized, medically unnecessary, et cetera,
5 harmful.
6     Q.   Did you know any of that information
7 before about 20 minutes ago?
8         MR. BADALA:  Objection to form.
9         I instruct you not to disclose any
10 conversations you might have had with the
11 attorneys.  It's pretty clear in the deposition
12 protocol.
13     Q.   You can answer.
14     A.   I read them at the break because I
15 was unable to kind of read beyond that
16 statement, and that's when I found the terms and
17 just wanted to clarify them.
18     Q.   So do all those terms apply to all
19 of the prescriptions and individuals?
20         MR. BADALA:  Objection to form.
21     A.   The terms are -- the criteria for
22 those terms are spelled out in the answer to the
23 interrogatory as it relates back to topic 6.
24     Q.   If I ask you questions about this,
25 other than what's in the interrogatory response,

Page 131

1 do you have any personal knowledge or have you
2 done any preparation to respond to any of those
3 questions?
4         MR. BADALA:  Objection to form.
5 Asked and answered.
6     A.   I've reviewed a lot of, you know,
7 papers and forms.  I can't tell you I remember
8 everything.  As I say, I didn't remember if I
9 saw this before.  I don't think I did, but --
10     Q.   But, Doctor, we've spent a few hours
11 now and I've asked you many, many times about
12 criteria, so are those new criteria that we need
13 to go back and talk to you about, or did -- the
14 criteria that you've been telling me about for
15 two hours, do they still apply?
16         MR. BADALA:  Objection to form.
17     A.   As I said when I clarified the
18 record, on reviewing these, I came to understand
19 how those terms were used.  When we spoke
20 before, I didn't have that information, as I
21 hadn't read the entire page there, but I think
22 it clarified the questions you were asking me.
23     Q.   Let me ask you some questions about
24 it then.
25         Does that mean that all of the

Page 132

1 prescriptions were written by one of these
2 doctors listed in the exhibit; do you know?
3         MR. BADALA:  Objection to form.
4 Document speaks for itself.
5     A.   As I understood what I just read,
6 the criteria, namely, that they were
7 medically -- let me just go back and read it.
8 Give me a second.
9     Q.   So you're only going to be able to
10 answer my questions by reading the
11 interrogatories; is that right?
12         MR. BADALA:  Objection to form.
13     A.   I would like to give you a good
14 answer, so I'd like to read them.
15         Exhibit A was unauthorized,
16 medically unnecessary, or ineffective or
17 harmful, and then the next sentence is the basis
18 for the assertion that these were medically
19 unnecessary is because of these healthcare
20 providers in Exhibit A being prosecuted or
21 disciplined.
22     Q.   So does that mean that every
23 prescription on the list was written by one of
24 those doctors?
25     A.   I would --

Page 133

1         MR. BADALA:  Objection to form.
2 Outside the scope.
3     A.   I would interpret that as the
4 medically unnecessary ones that we talked about.
5 Remember, it's the OARRS, so they don't all have
6 to be all four, but this was the definition used
7 for medically unnecessary.
8     Q.   And you can't tell me what the
9 criteria are as to whether something is
10 medically unnecessary other than you telling me
11 that it was written by one of these doctors,
12 right?
13         MR. BADALA:  Objection to form.
14     A.   Well, and these doctors were
15 prosecuted or subject to disciplinary action.
16     Q.   Which prescriptions did they write
17 on the list; do you know?
18     A.   On this list?
19     Q.   Yes.
20     A.   I believe the prescribers are
21 listed.  I don't want to take up your time
22 trying to find each name there.
23     Q.   Okay.  So a criteria for medically
24 unnecessary is that they were written by one of
25 these doctors?

34 (Pages 130 - 133)

Page 134

1    A.   Right.  "The basis for the assertion
2  that these prescriptions were medically
3  unnecessary is that the healthcare providers
4  listed below were prosecuted or the subject of
5  disciplinary action for their illegal or
6  improper prescribing of opioids."
7    Q.   Did you talk to anybody about any of
8  the circumstances for any of the prosecutions or
9  any of the prescriptions?
10       MR. BADALA:  Objection to form.
11  Outside the scope.
12    A.   I spoke with a prosecutor about
13  prosecutions in general, but I did not
14  specifically talk about any of these individuals
15  named here in the interrogatory.
16    Q.   Do you know whether all of their
17  prescriptions were determined to be medically
18  unnecessary or only certain prescriptions --
19       MR. BADALA:  Objection to form.
20    Q.   -- in determining the criteria?
21    A.   I would just point back that they
22  were prosecuted for improper prescribing of
23  opioids.
24    Q.   But if they wrote a prescription --
25       MR. BADALA:  Were you done with your

Page 135

1  answer?
2       THE WITNESS:  No, I was not.  Could
3  I finish?
4       MR. BADALA:  Finish your answer.
5    A.   It doesn't, as I read this,
6  specifically say every prescription, but that
7  they were prosecuted for improper prescribing of
8  opioids.  It doesn't specify whether every
9  prescription they wrote was improper or whether
10  some were.  That's not how I'm reading that.
11    Q.   Well, is there any way for us to
12  differentiate?
13       MR. BADALA:  Objection to form.
14    Q.   How would we know whether this
15  includes prescriptions before they were
16  prosecuted or after they were prosecuted?
17       MR. BADALA:  Objection to form.
18    A.   I think these prescriptions are the
19  ones that they are being prosecuted for.
20    Q.   Do you know?
21    A.   That's my reading of this.
22    Q.   Do you know?
23       MR. BADALA:  Objection to form.
24    A.   That's my understanding.
25    Q.   And your understanding is based on

Page 136

1  reading this for the first time 15 minutes ago?
2       MR. BADALA:  Objection.
3  Mischaracterizes testimony.
4    A.   As I said, I've read a lot of
5  things.  I don't remember reading this.  So my
6  best answer to you is I remember reading it, you
7  know, within the last half hour, but I don't
8  know if I saw that before.
9    Q.   So were all of the prescriptions
10  written on Exhibit A written by the doctors
11  listed in this response?
12       MR. BADALA:  Objection to form.
13  Outside the scope.
14    A.   As I understand it, the ones that
15  were defined as medically unnecessary were
16  written by these individuals.  There are other
17  criteria in the topic, as I read it, which is
18  unauthorized, medically unnecessary, ineffective
19  or harmful, so I would say that the ones that
20  were written by these, the claim, as I
21  understand it, is that they were medically
22  unnecessary.
23    Q.   Let's go then one by one.
24       So medically unnecessary.  Are there
25  any other criteria other than they were written

Page 137

1  by one of these doctors?
2    A.   I have to go back to what it says,
3  that the basis for the assertion they were
4  medically unnecessary is that these doctors were
5  prosecuted or subject to disciplinary actions
6  for illegal or improper prescribing.
7    Q.   Any other criteria?
8    A.   Not that I'm seeing here.  I mean,
9  I'm relying on this document.
10    Q.   You didn't do any work to answer
11  that question, did you?
12       MR. BADALA:  Objection to form.
13  Mischaracterizes testimony.
14    A.   This would have been something our
15  experts would have identified as medically
16  unnecessary.
17    Q.   And I just want to go through each
18  one.  We have limited time.
19       For medically unnecessary, is it
20  your testimony the only criteria that you're
21  aware of is that it was written by one of these
22  doctors?
23       MR. BADALA:  Objection to form.
24  Mischaracterizes testimony.
25    A.   Who were prosecuted or disciplined

35 (Pages 134 - 137)

Page 138

1 for their activities.
2    Q.   What about ineffective?
3    A.   Ineffective I think is defined
4 further down in the paragraph just below Jerome
5 Yokiel, Bellwether Plaintiffs further contend
6 that prescriptions of reformulated OxyContin,
7 Hysingla ER, Opana ER, Exalgo ER {sic} and
8 Xartemis ER {sic} listed in Exhibit A were
9 ineffective in that they did not prevent
10 tampering, were not actually abuse-deterrent,
11 and did not prevent oral abuse despite
12 Manufacturers' representations to the contrary.
13    Q.   Other than reading those responses,
14 do you have any independent knowledge, based on
15 any work that you did or people that you talked
16 to, in connection with the criteria used for
17 whether something was unauthorized, medically
18 unnecessary, ineffective or harmful?
19        MR. BADALA:  Objection to form.
20    A.   I know that some of these
21 formulations with which I am familiar were not
22 abuse-deterrent formulations.
23    Q.   That's not my question.
24        Other than reading from that
25 document that you saw 15 minutes ago, do you

Page 139

1 have independent knowledge, based on your review
2 as a 30(b)(6) witness, of whether prescriptions
3 were unauthorized, medically unnecessary,
4 ineffective or harmful?
5        MR. BADALA:  Objection to form.
6    A.   I'm sorry.  I thought I answered
7 your question in that using the criteria, that
8 these were actually abuse deterrent.  I am
9 familiar, as an individual and a representative
10 of the county, that certain formulations here
11 are not abuse-deterrent formulations.
12    Q.   So if they're not abuse-deterrent
13 formulations, what does that mean?
14    A.   Plaintiffs further contend that the
15 prescription of reformulated drugs were
16 ineffective in that they do not prevent
17 tampering, were not actually abuse-deterrent, et
18 cetera.
19    Q.   So if there were prescriptions on
20 the list that were not written by any of these
21 doctors, does that mean that they're medically
22 necessary?
23        MR. BADALA:  Objection to form.
24 Outside the scope.
25    A.   I did not conduct the expert review

Page 140

1 of this, so I can't speak to that.
2    Q.   So if you look at Exhibit 2, there's
3 not doctors listed for every one.  Do you know
4 that?  Do you know or not, Doctor?
5    A.   You know, this is an incredibly long
6 document, and I have to tell you I don't know.
7    Q.   Okay.
8    A.   I don't know that that's untrue.  I
9 don't know that's true.  I haven't had the
10 time to review this.  And I don't want to get
11 into what I initially brought back, again, of
12 saying I reviewed a document that I didn't have
13 the time to review and tell you that no, there's
14 not a prescriber listed for everything here.  I
15 do not know.
16    Q.   So there's a list of -- this is
17 Exhibit B.  It's in there.  Do you see this?
18        MS. ROITMAN:  It's in the back of
19 Exhibit 2.
20        MR. BADALA:  Oh, behind the big
21 spreadsheet?
22        MS. ROITMAN:  Yes.
23        MR. BADALA:  All the way back.  Go
24 back to the 8 and a half by 11.
25    Q.   So in connection with topic 19 and

Page 141

1 interrogatory 7, you refer to this document.  Do
2 you know what this is?
3    A.   I have not seen this before.
4    Q.   Do you know what the criteria are
5 for any of the people who are on this list?
6    A.   It says that they all died from an
7 overdose death so far as -- if you'll give me
8 time to read through to the end.
9    Q.   Do you know what substances were
10 certified --
11    A.   I'm sorry.  Just give me a second,
12 please.
13    Q.   Sure.
14    A.   Okay.  I'm sorry.
15    Q.   Do you know what substances were
16 certified as the cause of death?
17        MR. BADALA:  Objection to form.
18    A.   For all of these?
19    Q.   Yes.
20    A.   I don't know what the death
21 certificates read.
22    Q.   Or any of them, right?  You don't
23 know?
24    A.   I don't have that information, no.
25    Q.   Do you know whether these people had

36 (Pages 138 - 141)

Page 142

1 a diagnosis of opioid use disorder?
2        MR. BADALA:  Objection to form.
3    A.   Are these the claims that were
4 referred, because that was one of the criteria
5 that we used for referrals?
6    Q.   Well, you're here to tell me,
7 Doctor.
8    A.   Again, I have to say, you know, I
9 read a lot of documents.  I don't know if these
10 are the names -- some of these are from Summit
11 County, which I can't speak for.  I can't tell
12 you, you know, again, if all of these folks had
13 a diagnosis of substance use disorder and --
14    Q.   I guess what I'm trying to find --
15 this is in response to topic 19, "The criteria
16 used by Plaintiffs to identify individuals who
17 overdosed on, or became addicted to,
18 prescription opioids in Plaintiff's geographic
19 area."  Do you see that?
20        MR. BADALA:  I think you're
21 referring to the depo notice.
22        MR. CHEFFO:  Yes.
23        MR. BADALA:  He's referring to this
24 Exhibit 1.
25        THE WITNESS:  Okay.

Page 143

1    Q.   And in response to that, we received
2 this document, right?  The first few pages talk
3 about Summit, but if you go to the third and
4 fourth page, or fifth page, it's Cuyahoga.
5    A.   Right.
6    Q.   So, as the topic says, could you
7 tell us what criteria were used to identify
8 these individuals?
9    A.   The criteria that we used to
10 identify claims for opioids were, again, not
11 cancer patients, higher dose, higher than 120
12 MME, and patients with a diagnosed substance use
13 disorder.
14    Q.   But this is different.  This is --
15 again, you have to read the paragraph.  It says,
16 "The criteria used by Plaintiffs to identify
17 individuals who overdosed on, or became addicted
18 to, prescription opioids."  That's why there's
19 individual people listed here.  Are you telling
20 me that that's the same criteria?
21    A.   Those were the criteria used for the
22 response to the interrogatory.
23    Q.   To this, B?
24    A.   Again, I don't recognize this list
25 right off the top of my head, but if this is the

Page 144

1 list of individuals in that 500 claims, those
2 were the criteria that were used, the three that
3 I mentioned.
4    Q.   In the overdose deaths?
5    A.   Pardon?
6    Q.   Overdose deaths.  Does that criteria
7 apply -- are those the only three criteria that
8 apply to the overdose deaths that are
9 articulated in topic 19?
10    A.   The claims that were identified all
11 have those three criteria.
12    Q.   What about the overdose deaths?
13    A.   If they were identified as claims by
14 the county, then they would have met those
15 criteria.
16    Q.   Putting aside whether they were
17 claims or not, what's the criteria for the
18 individuals who were on Exhibit B?
19        MR. BADALA:  Objection to form.
20 Asked and answered.
21    Q.   Do you know anything other than the
22 three criteria you've been telling us about this
23 morning?
24    A.   No.  Those were the criteria that I
25 was told were used to identify claims.

Page 145

1    Q.   And individuals?
2    A.   And to identify individuals or --
3 yeah, individuals, I guess prescriptions or
4 individuals.
5    Q.   And people who overdosed?
6    A.   I'm out in the weeds a little with
7 what you're saying.
8    Q.   Really, Doctor?  Maybe I'm not doing
9 a good job about it.  What does 19 say?  Can you
10 just read that out loud?
11    A.   "The criteria used by Plaintiffs to
12 identify individuals who overdosed on, or became
13 addicted to, prescription opioids in the
14 Plaintiff's geographic area."
15    Q.   That's all I want to know is what's
16 the criteria.
17    A.   How did we identify the overdose
18 deaths or the ones who became addicted to
19 prescription opioids?
20    Q.   Either.
21        MR. BADALA:  Objection to form.
22    A.   The overdose deaths are, you know,
23 searchable in the database either in our office
24 or in Summit County, and those overdose deaths
25 would meet these criteria.

37 (Pages 142 - 145)

Page 146

1    Q.   What criteria?
2    A.   The three criteria we keep
3 mentioning.
4    Q.   Oh, they would?  The overdose deaths
5 would all meet those criteria?
6    A.   If they were submitted for claims,
7 identified claims --
8    Q.   Putting aside claims; a separate
9 issue, overdose and addiction.  What are the
10 criteria for determining whether someone made it
11 on the list that we've been looking at?  Do you
12 know?
13        THE WITNESS:  Can I take a break?  I
14 have to tinkle really.  I'll be right back,
15 though.
16        THE VIDEOGRAPHER:  Off the record at
17 12:08 p.m.
18        (Recess had.)
19        THE VIDEOGRAPHER:  Back on the
20 report at 12:11 p.m.
21    A.   Much obliged.  That was a necessary
22 break.
23    Q.   Understood.
24        We've talked a lot about claims data
25 and you've told me that there are three criteria

Page 147

1 only, right?  Correct?
2    A.   Right.
3    Q.   I'm going to put that aside.  Then
4 there were some interrogatories and topics that
5 talked about people who overdosed and people who
6 became addicted.
7    A.   Okay.  Right.  That's topic 19.
8    Q.   Is it fair to say -- you didn't do
9 any preparation for that topic, did you?
10        MR. BADALA:  Objection to form.
11    A.   Other than to familiarize myself
12 with the criteria and that they were submitted
13 to attorneys from the county for review in
14 consultation with experts to generate lists that
15 were provided to answer these interrogatories,
16 no, I did not actively participate.
17    Q.   No.  No.  I'm not asking if you
18 actively participated at all.  So I'm just
19 trying to find out -- you said you know the
20 criteria.  What are the criteria to determine if
21 somebody should be on a list for either being
22 opioid addicted or an overdose death
23 attributable to opioids?
24        MR. BADALA:  Objection to form.
25    Q.   Do you know?

Page 148

1    A.   Overdose deaths -- I mean, I don't
2 know how Summit County works.  In our office we
3 would define those as deaths with a death
4 certificate including an opioid on it.
5    Q.   Is that the criteria that was used?
6    A.   That, I do not know.  Again, I think
7 this was something that was generated by experts
8 in response --
9    Q.   No.  Doctor, it says -- Doctor, I'm
10 asking about the criteria, and if you -- let's
11 not -- you know, if you don't know, all you have
12 to do is just say, "I'm not prepared, I don't
13 know the answer."  If you do know, I'm not
14 asking you about experts or anybody else who
15 looked at it.  I'm just asking, I think, a very
16 fair question, which is, do you know what
17 criteria were used in order to determine if
18 somebody made it on this list as an overdose
19 death?  Yes or no.  Do you have personal
20 knowledge of that?
21        MR. BADALA:  Objection to form.
22 Asked and answered.
23    A.   Right now, no, I do not.
24    Q.   Okay.  And the same would be true
25 for somebody who was addicted who made it on

Page 149

1 this list; you do not know what criteria were
2 used, correct?
3        MR. BADALA:  Which list?  I'm sorry.
4 Which list are you referring to?
5        MR. CHEFFO:  On the -- the list of
6 people who were opioid addicted.
7        MR. BADALA:  We're talking about B?
8        MR. CHEFFO:  Yes.
9        MR. BADALA:  Exhibit B.
10    Q.   Do you know, Doctor?
11    A.   Again, my information is that the
12 500 patients who were identified, and I do not
13 know if that includes this group, were
14 identified with those criteria, the three
15 criteria which I keep mentioning.
16    Q.   Do you know anything about people
17 who were identified as being addicted?
18        MR. BADALA:  Objection to form.
19    A.   If they were on that list of 500, I
20 would say they had -- these criteria applied to
21 them.
22    Q.   You're sure of that?
23    A.   The list of 500?
24    Q.   That's your testimony under oath,
25 that if they were on the list of addicted, those

Page 150

1 three apply?  Because if it's yes, we'll move
2 on.  Is that your testimony?
3        MR. BADALA:  Objection to form.
4 Outside the scope.
5    A.    The claims data that was submitted
6 to the attorneys --
7    Q.    I'm not talking about claims data.
8    A.    -- included those three criteria.
9    Q.    I'm talking about people who were
10 listed as opioid addicted.  Are those the
11 criteria that were used to determine whether
12 they were opioid addicted?
13        MR. BADALA:  Objection to form.
14    A.    I don't know that I understand what
15 you're asking me.
16    Q.    What don't you understand?
17    A.    The interrogatories spelled out --
18 or I was told there were criteria here, that the
19 county provided patients with this name -- with
20 the names based on whether they had -- did not
21 have -- were not cancer patients, had a high
22 dose, or -- and -- not or, and they were
23 diagnosed with a substance use disorder.  Those
24 claims, which would include addicted and
25 overdose deaths, were referred over to our

Page 151

1 attorneys for consultation with experts, and
2 that's the basis of these responses.  And I do
3 not know, to answer you, what criteria the
4 experts used, but if they were drawing that from
5 our claims data, these folks would have met
6 those three criteria.
7    Q.    So is it your testimony there may
8 have been other criteria that's used?
9        MR. BADALA:  Objection to form.
10 Misstates his testimony.
11    A.    I think I've answered that before,
12 that these are the three criteria that were
13 used.
14    Q.    That's it?
15    A.    There may be other conditions, as I
16 say, but criteria were these.
17    Q.    And you think that if they meet
18 those criteria, you could determine whether
19 someone was -- I mean, how would you even know
20 if they were dead based on those criteria?
21        MR. BADALA:  Objection to form.
22    A.    I don't think you would.
23    Q.    You wouldn't, would you?
24    A.    No.
25    Q.    How would you know if they were

Page 152

1 addicted?  You wouldn't know that either, would
2 you?
3        MR. BADALA:  Objection to form.
4    A.    Solely on these three criteria?
5    Q.    Right.
6    A.    This, again, is a basis for
7 selection, and that's what we refer from the
8 county.  Beyond that, you know, you would have
9 to do a consultation to determine those
10 questions you asked.
11    Q.    You would have to look at other
12 criteria, right?
13        MR. BADALA:  Objection to form.
14    A.    I don't know what went into the
15 experts' determinations of this.
16    Q.    You don't even know if there were
17 experts who made these determinations, do you?
18        MR. BADALA:  Objection to form.
19    A.    I was informed that when the county
20 turned over its list of 500 names to the
21 attorneys, that they would be consulting with
22 experts to determine claims data and share
23 that --
24    Q.    And what happened?
25    A.    -- and in response to the

Page 153

1 interrogatories.
2    Q.    And what happened after that, what
3 criteria, who was consulted, how it was applied,
4 you have no information, do you?
5        MR. BADALA:  Objection to form.
6 Misstates testimony.
7    A.    Unless we're going back to Exhibit
8 2, with the things about what constituted
9 medically unnecessary, harmful -- I forget the
10 other two -- those are spelled out in this
11 document.
12    Q.    Can you tell me everything that the
13 Plaintiffs did, if anything, to identify whether
14 prescribers who wrote any of the prescriptions
15 on Exhibit A relied in any way on anything any
16 Defendant did or said?
17        MR. BADALA:  Objection to form.
18        Are you talking about Cuyahoga
19 County?  You said Plaintiffs.
20        MR. CHEFFO:  Yes, Cuyahoga County,
21 sure.
22    A.    Sorry.
23    Q.    Tell me everything that Cuyahoga
24 County did, if anything, to determine whether
25 prescribers who wrote the prescriptions on

1 Exhibit A relied in any way on anything any
2 Defendant ever did or said.
3        MR. BADALA:  Objection to form.
4    A.   I don't know.  I mean, I don't know
5 what wasn't covered in the investigation of the
6 prosecutions of the medically unauthorized
7 folks, so --
8    Q.   And just before we leave this, with
9 respect to interrogatories -- I'm sorry.  With
10 respect to topics 19 and 4, are you aware of any
11 other criteria that were used in order to
12 determine any of who those claims or individuals
13 were or is it just the three we've been talking
14 about?
15        MR. BADALA:  Objection to form.
16 Mischaracterizes testimony.
17    A.   The basis for the claims were the
18 three criteria that I applied.  Those were the
19 claims that were submitted to the attorneys for
20 review.
21    Q.   Topic 3 you've also been designated
22 on.  I want to see if we can cover it briefly.
23 "Plaintiffs' knowledge of:  (a) concerns or
24 complaints made to them and by them about any
25 promotion, marketing or educational activities

1 with respect to prescription opioids within or
2 relating to Plaintiff's geographic area; and
3 actions taken by them or others in response to
4 those concerns."
5        Do you see that?
6    A.   Yes, I do.
7    Q.   Are you prepared to testify about
8 that?
9    A.   Yes, I am.
10    Q.   Okay.  What knowledge does Cuyahoga
11 have about concerns or complaints made to it or
12 by it about any promotion, marketing or
13 educational activities?
14        MR. BADALA:  Objection to form.
15    A.   The county itself would not receive
16 the complaints of physicians.  They would be
17 more state functions, Board of Pharmacy, Board
18 of Medicine.  I can say that as part of our
19 county's response to the opioid epidemic, I
20 spoke at all of our major institutions as a
21 representative of the county, our hospital
22 organizations -- there are three in Cuyahoga
23 County, the Cleveland Clinic, University
24 Hospital, which is affiliated with Case Western,
25 and MetroHealth Medical Center -- about issues

1 because we were becoming concerned about the
2 role of prescription opioids in the creation of
3 our heroin crisis and subsequent fentanyl
4 crisis.
5        At those educational activities or
6 town halls or things like that, I frequently
7 spoke to physicians, who conveyed to me -- if
8 they were older, they said they were concerned
9 about the safety of these drugs and were
10 reassured that the addiction potential of opioid
11 prescription pain relievers was low, less than 1
12 percent.  In speaking to younger physicians,
13 they were told that the inadequate treatment of
14 pain would be something they might be subject to
15 discipline for and that they would not run the
16 risk of addicting patients to opioids if they
17 had not controlled their pain.
18        So I think those were statements
19 that were misrepresentations of the actual harm
20 that the opioids could potentially cause, and
21 those are complaints I'm hearing from
22 communities.  That's anecdotally I realize, but
23 it was such a consistent thing whenever I spoke
24 to prescribers.
25    Q.   I move to strike.

1        Let's see if we can just focus on
2 the topic that's actually listed there, Doctor.
3 "Plaintiff's knowledge of concerns or complaints
4 made to them or by them about promotion,
5 marketing, or educational activities with
6 respect to prescription opioids within or
7 related to Plaintiff's geographic area."
8        Do you see that?
9    A.   Um-hum.
10    Q.   Giving me some level of specificity,
11 are you aware of any specific complaints or
12 concerns that were raised to you or to the
13 county responding specifically to the wording of
14 topic 3?
15        MR. BADALA:  Objection to form.
16 Asked and answered.
17    A.   As I said, the concerns were being
18 expressed to me in the course of educational
19 activities and they did relate to marketing and
20 the promotion of these drugs as being not
21 potentially significantly addictive.
22    Q.   When?  When did you first hear
23 those?
24        MR. BADALA:  Objection to form.
25 Outside of the scope.

40 (Pages 154 - 157)

1  A.  I could not give you a specific
2  date. I had town hall and multiple meetings in
3  which I believe were furnished educational
4  activities with physicians specifically to
5  address the heroin crisis, but also to start to
6  share information that we had gleaned from the
7  prescription monitoring program, OARRS, in our
8  state, that indicated that there was a
9  substantial concern that the heroin-addicted
10  population was progressing from an opioid pain
11  reliever addicted population, and that was when
12  I would hear the concerns because there were
13  concerns about overprescribing and a setup for
14  heroin addiction or fentanyl addiction and they
15  were expressed to me at those town halls.
16  Q.  And I'm going to move to strike and
17  we're going to have to ask for more time. I
18  asked you very specifically when and you've
19  given me kind of a speech.
20  A.  2013.
21  Q.  Okay. Thank you.
22  A.  That's when I started my town halls.
23  Q.  It's very simple.
24  A.  It would have continued to the
25  present.

1  Q.  So I'm asking -- bite size pieces --
2  2013 is the first time that you did your town
3  halls and that's when you heard complaints,
4  fair?
5  A.  That's the first time I, as an agent
6  of the county, became aware of it, and I think
7  that that's the first time, you know, that I am
8  aware that people were expressing those concerns
9  about addiction.
10  Q.  And so is the answer that the
11  county's first time that it had concerns or
12  complaints in response to topic 3 was in 2013
13  based on your investigation and work in
14  preparation for this deposition? Is that fair?
15  MR. BADALA:  Objection to form.
16  A.  Let me just reread that.
17  With the understanding that we would
18  not have -- I'm not representing the state, who
19  may have received those complaints. That's the
20  first I'm aware of the county understanding
21  that. So around 2013.
22  Q.  There's no -- is it really your
23  testimony there's no ability for the county to
24  receive a complaint by a consumer or another
25  doctor or a public citizen to one of the various

1  people in town -- in county government?
2  MR. BADALA:  Objection to form.
3  A.  The appropriate mechanism for those
4  investigations would be at the state level. Can
5  somebody from the county receive those, that's
6  certainly possible. Local law enforcement
7  could, who also are not county employees. We
8  have our sheriff. And they may have received
9  those as well, but the actual complaints and
10  concerns, as I know them to be a county
11  function, are probably the date I mentioned.
12  Q.  Other than the individual complaints
13  that you heard of when you were having these
14  anecdotal conversations, did you identify any
15  database or any people who maintained those or
16  any complaints about pharmaceutical or other
17  Defendant conduct or marketing activities?
18  MR. BADALA:  Objection to form.
19  A.  Not as I remember the county level.
20  Q.  And that's -- as part of your
21  preparation for today, you did a full and fair
22  analysis of whether there were any concerns or
23  complaints maintained by the county, fair?
24  A.  Yes, I did.
25  Q.  And your testimony is you didn't

1  find any?
2  A.  I could not find anything within the
3  county that I would say were fulfilling this,
4  but as I say, whether there were complaints made
5  from the county up to the state, that, I did not
6  investigate.
7  Q.  Now, you also were --
8  A.  Or to federal. I guess they could
9  also possibly --
10  Q.  Why didn't you investigate those?
11  MR. BADALA:  Objection to form.
12  A.  The regulation of medicine in the
13  state of Ohio is at the state level, and the
14  regulation of complaints about doctors'
15  practices and things like that would seem to be
16  more appropriate at the state level. The county
17  doesn't have a specific mechanism to investigate
18  those complaints to the best of my knowledge.
19  Q.  But you just told me that the county
20  may have made a referral to the state or the
21  Feds because those are the right people, and
22  that's exactly what this calls for, right? It
23  says, "Concerns or complaints made to them or by
24  them," meaning Cuyahoga County. Do you see
25  that?

41 (Pages 158 - 161)

Page 162

1     A.   Yes, I do.
2     Q.   And the answer may be the same, but
3  I just want to make sure we're on the same page.
4  Did you do any work to identify whether the
5  county ever made a complaint or expressed any
6  concerns to any federal agency or any statewide
7  agency with respect to promotional, marketing or
8  educational activities concerning prescription
9  opioids?
10     A.   Not that I know of.
11     Q.   And it's your testimony that the
12  state is actually the agency that's best
13  empowered to handle those types of complaints?
14     A.   The state would investigate
15  overprescribing through the Board of Pharmacy,
16  medical practices through the Board of Medicine.
17  That would be the more appropriate people to
18  address that.
19     Q.   And you're not aware of whether
20  anybody in the entire Cuyahoga County system
21  made a complaint or a referral to any of those
22  state agencies, are you?
23        MR. BADALA:  Objection to form.
24     A.   I know the prosecutor, in my
25  discussions with him, talked about prescribings

Page 163

1  of, you know, doctors over, you know, the time
2  frame for the lawsuit, and, you know, those
3  people could have, you know, or should have been
4  referred to the Board of Pharmacy or Board of
5  Medicine.
6     Q.   But you'd be speculating?  Do you
7  know?
8     A.   What's that?
9     Q.   Do you know whether they did or not
10  or are you speculating?
11     A.   Well, I think the other piece of it,
12  not to evade your question, is that there would
13  be opportunities, based on my discussion with
14  the prosecutor, where information would be
15  filtered back to them from those state agencies
16  as well.
17     Q.   I understand.
18        And you understand, Doctor, today is
19  just my opportunity to try and just probe for
20  information and get it, which I don't have.
21     A.   I think that's great and I hope I'm
22  being helpful.
23     Q.   So these are very simple questions.
24        Are you aware of any facts in which
25  the state made a referral or a complaint

Page 164

1  regarding pharmaceutical or defense advertising
2  or marketing information to a state or federal
3  agency?  Do you have any specific --
4        MR. BADALA:  Objection.  Outside the
5  scope.
6     A.   Whether the county did?
7     Q.   Yes.
8     A.   No, I do not.
9     Q.   And do you have any information
10  whether the county made any of those inquiries
11  or concerns and expressed them to any federal
12  agency?
13     A.   Before the time we're talking about?
14     Q.   Any time.  That's what this calls
15  for.
16        MR. BADALA:  Objection to form.
17     A.   I think when we identified, through
18  the Poison Death Review Committee, through our
19  task forces, that there was a role for the
20  prescription opiates in the subsequent evolution
21  into heroin and fentanyl addiction, there were
22  representatives on the task forces at the
23  federal level, at state level, and that
24  information would have been passed up to them.
25        We as a county would have -- when we

Page 165

1  identified people who were doctor shopping based
2  on that review, we went back and looked at all
3  of their prescribing as far as we could with our
4  prescription drug monitoring program for
5  overdose deaths.  If we identified doctor
6  shopping, which we defined as five or more
7  prescribers within a one-year period, we would
8  refer that back to the Board of Pharmacy, "we"
9  being the medical examiner's office.
10        I also know, based on conversations
11  with the Division of Child and Family Services,
12  there were also instances -- I don't have
13  specifics that I could share with you, and I
14  don't know if the county would have them, but
15  when they became aware of what looked like -- I
16  remember the term -- my contact used "fishy
17  prescriptions," they would also be referred to
18  the state for further investigation.
19     Q.   Are fishy prescriptions -- do they
20  contribute to the opioid crisis?
21        MR. BADALA:  Objection to form.
22     A.   I think, sure.  You know, if they're
23  not going to be, you know, something that's
24  legitimate -- you know, anything I think that
25  puts more drugs into the system, especially by

42 (Pages 162 - 165)

Page 166

1 an illegal means, has the potential to
2 contribute to the opioid crisis.
3     Q.   And do you know whether any of those
4 fishy prescriptions are on the list in front of
5 you?
6     A.   They were child and family services,
7 so I don't know really.  That was an anecdotal
8 recollection.
9     Q.   Does doctor shopping lead to and
10 contribute to the opioid crisis?
11       MR. BADALA:  Objection to form.
12 Which topic are we on?
13       MR. CHEFFO:  General questions.
14     Q.   You can answer.
15       MR. BADALA:  Outside the scope.
16     A.   Does doctor shopping contribute to
17 the opioid crisis?
18       MR. BADALA:  Objection to form.
19     A.   I think that that's a well
20 recognized form of diversion of pharmaceuticals.
21     Q.   You presented us with some
22 handwritten notes just a little while ago.  Do
23 you have a copy in front of you?
24     A.   I do not.
25       MR. CHEFFO:  Let's mark them.  Have

Page 167

1 we marked them yet?
2       MR. BADALA:  Yes.  We have 7 and 8.
3     Q.   What are these, Doctor?
4     A.   Oh, when we talked earlier, we had
5 said was there anybody who I had talked to about
6 -- in preparation for today, and these are two
7 of the conversations I had where I took notes
8 actually.  And I think I mentioned the third
9 one, which I'm quite confident I threw away.  I
10 wasn't at the time remembering that I had kept
11 these.  They were just preserved, so I produced
12 them.
13       But anyway, one is -- Exhibit 7 is
14 my notes when I talked to Joan Papp, who was the
15 doctor at MetroHealth Medical Center who was the
16 principal founder of our Deaths Avoided With
17 Naloxone program, naloxone being the antidote to
18 potentially reverse an opioid overdose.
19       And the other one was Vince Caraffi,
20 and that's C-a-r-a-f-f-i, and he was -- he is
21 still the injury prevention program supervisor
22 at the County Board of Health and he was also
23 the chair of the County Board of Health opiate
24 task force.
25       There was a second task force which

Page 168

1 both of these folks participated in.  If I say
2 task force, this is the Board of Health task
3 force.  The other one was housed in the -- or
4 chaired by the U.S. Attorney, initially Steve
5 Dettelbach, then Carole Rendon, and now Justin
6 Herdman, our succession of U.S. Attorneys.
7 Sorry I went on.
8     Q.   I'm trying to not cut you off, but
9 I'm asking very specific questions here.
10       Have you ever been media trained?
11       MR. BADALA:  Objection.  Outside the
12 scope.
13     A.   No.  Am I good?
14     Q.   You're looking at the camera a lot.
15     A.   Well, that -- I have been trained to
16 talk to the jury.
17     Q.   Oh, okay.
18       You only took notes for three
19 people?
20     A.   Yes.
21     Q.   And are these the complete notes
22 from the two that you provided or are there
23 anything missing?
24     A.   No.  This is everything.
25     Q.   In fact, when you told us that these

Page 169

1 were somewhere in a landfill, they were in your
2 bag back in your room probably?
3     A.   Yes.  One was in a landfill.
4     Q.   But these two, where were they?
5     A.   These were in a file in my bag.
6     Q.   In your bag.
7       When was the last time you looked at
8 them before right now?
9     A.   I just wrote them I think within the
10 last week or two, so within the last week or
11 two.
12       MR. CHEFFO:  Okay.  I think I'm just
13 about done.  Just give me about two minutes.
14       MR. BADALA:  Yes.  Do you want to go
15 off the record?
16       MR. CHEFFO:  Yes.  Let's go off the
17 record for a minute.
18       THE VIDEOGRAPHER:  Off the record at
19 12:35 p.m.
20       (Recess had.)
21       THE VIDEOGRAPHER:  Back on the
22 record at 12:46 p m.
23 BY MR. CHEFFO:
24     Q.   Before I ask you questions, Doctor,
25 some of this is, frankly, illegible.  And I

43 (Pages 166 - 169)

1  don't want to quibble.  I appreciate we have it
2  now.
3      A.  I'm a doctor.  I can read it all, or
4  most of it I should say.  Some of it I can't
5  even read.
6      Q.  At some point we may just ask you to
7  do it because it's just really hard to do, but
8  I'm not going to ask you to do it at this
9  minute.  I'll see if we can decipher it over
10  lunch.
11      Before we leave topic 3, I did just
12  want to ask you -- there's a part B here.  Now,
13  you told us that the only information -- tell me
14  if this is correct -- that you had of kind of
15  claims or complaints was some anecdotal
16  information that you obtained during some town
17  hall meetings starting in 2013.  Is that fair?
18      A.  I'd characterize it more as these
19  were talks that were specifically towards the
20  medical communities, so they were more formal I
21  think than -- we did a lot of town halls, too,
22  but these were -- those concerns that I
23  expressed were more expressed to me when I was
24  in that forum where I was doing the grand rounds
25  or something like that.

1      Q.  And then the topic 3 has B.  It
2  talks about the actions taken by Cuyahoga County
3  in response to those concerns or complaints.  So
4  in your preparation, can you tell us all the
5  things -- so when you heard those things, I
6  assume there was a litany of things that you or
7  the county did.
8      A.  Sure.
9      I think, you know -- I have to
10  stress that at the time that I'm doing these,
11  you know, grand rounds, town halls, we have a
12  heroin epidemic and we have not really
13  established its link back to prescription drugs
14  at that point definitively.  That's why we
15  needed to go back and do the OARRS data.  I'm
16  sharing what I'm seeing because it's concerning
17  to me, but I don't think it would represent the
18  county to say that we had established that link.
19  So I am presenting data about heroin, I'm
20  collecting their anecdotal information and, at
21  the same time, in the medical examiner's office
22  we are going back to do reviews of the heroin
23  fatalities with specific things that we're
24  looking at in addition to demographic
25  information, just, you know, age, race, sex.

1  We're looking at things like where did the
2  person live, where -- what was their level of
3  education, was there anything that might have
4  predisposed them in terms of a job to develop a
5  heroin addiction.  And the last one that I want
6  to stress, because it's relevant to this, is we
7  were looking at the role that prescription
8  opioids might have played in generating a heroin
9  crisis.  We've had heroin epidemics in Cuyahoga
10  County before the prescription drug problem.  So
11  we were really trying to collect good data to
12  make that association.
13      Q.  Again, Doctor, my question is really
14  a little bit different.
15      A.  I'm sorry.
16      Q.  It's just basically you told us that
17  you had some anecdotal information, and B says
18  the actions taken by the county in response to
19  those.  I know you told me -- let me ask you a
20  few follow-ups.
21      You said you were hearing this and
22  collecting.  Did you memorialize this?  Did you
23  put this in a file?  Did you take notes on any
24  of this?
25      MR. BADALA:  Objection to form.

1      A.  These complaints as I'm hearing
2  them?
3      Q.  Yes.
4      A.  No.  They were mostly conversations
5  I would have after these meetings.  I have a
6  record in our statistical report of where I was
7  speaking, but the actual person who came up to
8  me, I didn't ask them their name.  If I knew it,
9  I knew it.  If I didn't -- and writing down any
10  memos about that, I didn't do that.
11      Q.  So the answer is no, you have no
12  written record of any of that, right?
13      A.  No.
14      Q.  Have you identified any written
15  record of anybody in the county that
16  memorialized a complaint or concern about
17  promotion, marketing or educational activities
18  with respect to prescription opioids?
19      MR. BADALA:  Objection to form.
20      A.  Again, you know, I don't have the
21  access to the state data where those complaints
22  would have been made, but within the county we
23  don't have really a reporting structure like
24  that that I'm aware of and I didn't find any
25  evidence of those complaints being filed at the

44 (Pages 170 - 173)

1  county level.
2      Q.    And with respect to those specific
3  concerns or complaints that you were told
4  anecdotally, are there actions that the county
5  took or steps taken?
6      A.    Not to be unresponsive, but what I
7  was saying before about --
8      Q.    When someone starts an answer "not
9  to be unresponsive," I know what's coming, so I
10  would kind of maybe ask you to try to be
11  responsive.
12      A.    Well, what I want to say is doing
13  those look-backs on our heroin overdoses into
14  the prescription database was my way of
15  responding to the concerns that these folks had
16  about overprescribing based on misinformation
17  about the safety of these drugs.  And, you know,
18  the other piece of anecdotal information that
19  I'm hearing, and this would be at town halls in
20  addition to other places, and I think there was
21  also a national concern that we were really one
22  of the first counties to recognize is that
23  people are going from the opioid pain relievers
24  to heroin, and I think the only way we could
25  really go back and look at that with decedent

1  data as a county was to go back and look at our
2  decedents, our drug overdoses, and establish
3  that link that they had to the --
4      Q.    Doctor, I'm going to have to move to
5  strike.  We're going to have to ask for more
6  time because this is not even remotely
7  responsive.
8          MR. BADALA:  That was -- he just
9  said that in response to that, that's what they
10  did.  They started looking at the data.
11          MR. CHEFFO:  I'm getting an entire
12  speech about the heroin --
13          MR. BADALA:  You are completely
14  incorrect.  That is completely responsive.
15      Q.    Is there anything that the county
16  did in response to any of these anecdotal
17  complaints other than what you've just told us?
18      A.    The county hospital, after they
19  initiated Project DAWN, opened an office of
20  opioid affairs to monitor prescribing within the
21  county hospital, and that was with follow-up to
22  people who might have been overprescribing, and,
23  you know, to just look at that and potentially
24  try to steer them towards less prescribing.
25      Q.    Anything else?

1      A.    Let me just read the question one
2  more time.
3          Not that I can think of.  It's a
4  very pervasive problem, as I think you know, and
5  whether there were more concerns or complaints
6  I'm not thinking of, I don't want to shut the
7  door on it, but I would just say that's the best
8  I can think of now.
9      Q.    Does the county still reimburse for
10  opioids?
11          MR. BADALA:  Objection to form.
12  Outside the scope.
13      A.    I'm not sure I understand.
14      Q.    Does the county still reimburse for
15  opioid medicines for people for which it funds?
16          MR. BADALA:  Objection to form.
17  Outside the scope.
18      Q.    Do you know?
19          MR. BADALA:  Same objections.
20      A.    I don't know that.  I would say, you
21  know, the jail or someplace like that, but most
22  of that -- I mean, we did the Medicaid expansion
23  in Ohio, so I would think most of that would be
24  reimbursed by federal.  I honestly don't know.
25      Q.    Have you seen any information or

1  memoranda of any interviews with any healthcare
2  providers who wrote any of the prescriptions in
3  connection with Exhibit A?
4          MR. BADALA:  Objection to form.
5  Outside the scope.
6      A.    No, I have not.
7      Q.    And I think the last kind of
8  question or area, you mentioned -- I just want
9  to follow up.  You testified that when you heard
10  these anecdotal reports, you went back and you
11  checked OARRS data, perhaps amongst others, in
12  connection with your database of overdose
13  deaths.  Did I get that right?
14      A.    Right.  We were cross-checking our
15  heroin overdoses against the OARRS database.  We
16  would also, I should say -- and I think this
17  started about 2014 or '15.  We were sending
18  lists of our prescription opioid deaths
19  quarterly to the Ohio Department of Health as
20  part of a grant, but the specific checks we were
21  doing in the office that I mentioned were on the
22  heroin overdose population.
23      Q.    And you were looking for what?
24      A.    Well, there was, again, the
25  anecdotal evidence that we may be seeing a

45 (Pages 174 - 177)

Page 178

1 transition from prescription opiates to heroin.
2 We had a spike in heroin mortality, and the
3 function of going back to look at that was to
4 firm up to our satisfaction that this was, in
5 fact, the relationship. I think the data to
6 inform that was critical because, you know,
7 policies get into trouble when you have
8 inadequate data, and I think that this was
9 really something that we wanted to be sure we
10 were right on.
11     Q.   Did the county conduct any studies
12 to assess the potential impact of pharmaceutical
13 marketing on prescribing practices in Cuyahoga?
14     A.   The county itself, I don't -- not
15 that I know of.
16     Q.   Any neighboring counties that you're
17 aware of?
18     A.   Marketing practices -- I'm sorry.
19 Read it one more time.
20     Q.   Sure.
21         Did the county conduct any studies
22 to assess the potential impact of pharmaceutical
23 marketing on prescribing practices or did a
24 neighboring county?
25     A.   You know, I'll say no because I

Page 179

1 think there were reports that I read about, you
2 know, how did this opioid crisis, you know,
3 start, and they would point to things like, you
4 know, marketing practices. But the county
5 specifically studying that, that -- I don't know
6 of anything specific research-wise.
7     Q.   If someone has an overdose death of
8 heroin, can you determine whether they ever had
9 a prescription opioid?
10         MR. BADALA: Objection to form.
11     Q.   A lawful prescription opioid.
12         MR. BADALA: Outside the scope.
13     A.   What we were doing going back into
14 the OARRS file was to find if they had a
15 prescription.
16     Q.   That's what you were trying to do is
17 find out if they had a lawful prescription?
18     A.   Right.
19     Q.   And for how long did you go back?
20     A.   Well, I shouldn't say -- I don't
21 know that they were lawful. Whether they had a
22 prescription for opioid pain relievers. Whether
23 they were diverted or, you know, pill mill, that
24 I couldn't tell.
25     Q.   So what would it show, though? It

Page 180

1 would show a prescription from a pharmacy?
2     A.   You know, our access to that
3 database evolved over time, so originally -- oh,
4 one other person I spoke to in preparation was
5 the head of the OARRS, Chad Garner. But our
6 access to this actually predated his becoming
7 the head of that.
8         We reached back to them because of
9 the concern that the prescription opioids might
10 be creating that drug-addicted population who
11 eventually move on to heroin; and when we
12 originally requested that access, because I
13 don't have a DEA number, I'm not writing
14 prescriptions for opioids, I could not actually
15 get access as a prescriber, so what they did,
16 and it's part of OARRS' mission, is they'll
17 support public health initiatives to, you know,
18 ultimately respond to responsible opioid
19 prescribing. They gave us de-identified data.
20         So what I could tell from that was
21 the overdose victim -- those were the names we
22 supplied, what they had been prescribed, but
23 what I could not see was who was doing the
24 prescribing. So it became hard for us to do
25 anything about doctor shopping or really a lot

Page 181

1 of things that would have been specific about
2 diversion at a prescriber level.
3         In, I want to say, about June of
4 2013, we get law enforcement access to the
5 opioid -- pardon me, the OARRS, the Ohio
6 Automated Reporting RX System, and at that point
7 I can start to go back and look at physicians
8 specifically and prescribers.
9         So initially the -- pardon me --
10 2012 data was just aggregated. I could tell,
11 geez, a lot of these folks have prescriptions,
12 but I couldn't really get a good handle on what
13 was going on at a deeper level of, you know,
14 where is the diversion occurring, and there were
15 very lengthy reports at that time.
16     Q.   Are you aware of any studies that
17 were done by either Cleveland or Summit that
18 showed that well over 90 percent of the doctors
19 who responded indicated that they were not
20 influenced by pharmaceutical marketing? Does
21 that ring a bell to you?
22         MR. BADALA: Objection to form.
23     A.   Not a study I'm familiar with.
24     Q.   Over 90 percent?
25     A.   I'm not familiar with any study

46 (Pages 178 - 181)

Page 182

1 along those lines.
2    Q.   And the last question, I think I
3 promise, is, of the three criteria, the
4 substance abuse disorder -- we talked about that
5 earlier.
6    A.   Yeah.  Sure.
7    Q.   Other than saying that's a criteria,
8 can you tell us anything more about how that's
9 defined, whether that's used -- something from
10 the DSM-4 or 5 or something else, or is that the
11 extent of your knowledge?
12    A.   That's the extent of my knowledge.
13 As I think I said earlier, there's criteria for
14 that diagnosis.  I don't know if they were
15 specifically applied in identifying that
16 population or which criteria were.
17        MR. CHEFFO:  Okay.  Let's take a
18 lunch break.
19        THE VIDEOGRAPHER:  Off the record at
20 1 o'clock p.m.
21
22        (Luncheon recess had.)
23
24
25

Page 183

1        THE VIDEOGRAPHER:  Back on the
2 record at 1:38 p.m.
3        - - - - -
4        AFTERNOON SESSION
5     EXAMINATION OF THOMAS GILSON, M.D.
6 BY MR. BORANIAN:
7    Q.   Good afternoon, Dr. Gilson.  I'm
8 Steven Boranian.
9        You understand you're here
10 testifying as a representative of the county,
11 correct?
12    A.   Yes, I do.
13    Q.   So I'm going to question you on some
14 topics different from this morning's
15 questioning, although there may be some modest
16 overlap.  I'm going to read off those topics and
17 please, Doctor, tell me if you understand that
18 you are testifying for the county on these
19 particular topics.
20        The first is topic number 2,
21 "Diversion of prescription opioids in
22 Plaintiff's geographic area."
23    A.   Yes, I do.  That was one of the ones
24 that I was prepared to respond to as well.
25    Q.   The next is topic number 15, "The

Page 184

1 investigation of doctors, pharmacists,
2 pharmacies, clinics, 'pill mills,' or hospitals
3 in Plaintiff's geographic area for diversion of
4 prescription opioids or the improper prescribing
5 of opioids."
6        Is that one?
7    A.   Yes.
8    Q.   The next is, "Plaintiff's knowledge
9 of and access to data concerning prescription
10 opioid manufacturing, prescribing, distribution,
11 or dispensing."  Is that one, Doctor?
12    A.   Topic 27 for me, right?
13    Q.   Correct.
14    A.   Okay.  Yes.
15    Q.   The next is topic 28, "The policies
16 regarding the Ohio Board of Pharmacy's OARRS
17 database."  Is that one?
18    A.   Yes.
19    Q.   And then, finally, for my portion of
20 this deposition, topic number 30, "What efforts,
21 if any, Plaintiffs made to influence the DEA's
22 quota-setting process; and what actions, if any,
23 Plaintiffs took in response to the DEA's setting
24 of quotas."  Is that one of yours, Doctor?
25    A.   Yes, it is, sir.

Page 185

1    Q.   Excellent.  Thank you.
2        Let me ask you a few questions about
3 the prescription drug supply chain and diversion
4 of prescription drugs.
5        Do you understand or do you have an
6 understanding of the prescription drug supply
7 chain?
8    A.   In a general way.
9    Q.   So prescription drugs go from a
10 prescription drug manufacturer to pharmacies or
11 healthcare facilities, there's usually a
12 wholesaler or distributor involved, and then the
13 drugs are prescribed to patients or dispensed to
14 patients who hold valid prescriptions, true?
15        MR. BADALA:  Objection to form.
16        Sorry, Steve.  Is this topic 2?
17        MR. BORANIAN:  Correct.
18        MR. BADALA:  I'm going to also
19 object to outside the scope.
20    A.   Right.  As I understand your
21 question, they would be receiving --
22    Q.   My question is this:  Does what I
23 just said match your understanding of the
24 prescription drug supply chain?
25        MR. BADALA:  Same objections.

47 (Pages 182 - 185)

Page 186

1    A.    Could you read it back quick?
2    Q.    Let me do it again for you.
3    A.    Sure.  Thank you.
4    Q.    A prescription drug manufacturer
5  supplies prescription drugs to a pharmacy or
6  healthcare facility, there's usually a
7  distributor or wholesaler involved, and drugs
8  are then dispensed to patients who hold valid
9  prescriptions.  Does that match your
10  understanding as a physician of the prescription
11  drug supply chain?
12        MR. BADALA:  Objection to form.
13  Outside the scope.
14    A.    As a physician, yes.  In this
15  county, I would say yes.
16    Q.    And are you familiar with the
17  concept known as a closed supply chain?
18        MR. BADALA:  Same objection.
19    A.    No, I'm not.
20    Q.    So within that whole process, from
21  manufacturer to the patient, product should
22  neither enter nor exit the supply chain, and
23  that's what we mean by a closed supply chain.
24  Is that clear, Doctor?
25        MR. BADALA:  Objection to form.

Page 187

1    A.    Got it.  Okay.
2    Q.    So if a product is channeled or
3  provided to someone outside the supply chain for
4  a non-legitimate medical purpose, is that known
5  as drug diversion?
6    A.    I could see that.  I usually think
7  of it as kind of the improper use of medication
8  for non-therapeutic use, but I think we're
9  saying the same thing.
10    Q.    Would that be your definition of
11  drug diversion, what you just said?
12    A.    It would be one I would be willing
13  to work with, sure.
14    Q.    Is drug diversion a crime?
15        MR. BADALA:  Objection to form.
16  Outside the scope.
17    A.    I believe so.
18    Q.    When a licensed manufacturer or
19  distributor ships a prescription opioid to
20  another licensed entity for legal sale, is that
21  considered drug diversion?
22    A.    When a licensed manufacturer ships
23  it to a distributor, no, I don't think so.
24    Q.    What percentage of prescription
25  opioid abuse in the county stems from opioids

Page 188

1  that have been diverted?
2        MR. BADALA:  Objection to form.
3  Outside the scope.
4    A.    I think, you know, the data I can
5  look at evolves over time.  The best number I
6  can give you is from an Ohio Department of
7  Health report from 2010, which estimated, using
8  their methodology, that somewhere about 20 to 23
9  percent of the overdoses that were being seen
10  were associated with diverted prescription
11  medication.
12        I don't know that we've actually
13  looked at the percentage of diversion because
14  the crisis, as it's evolved, has really gone to
15  a point where we're not talking about the
16  diversion of legal substances so much as an
17  evolution into illegal substances.
18    Q.    And that's the prevalence you're
19  currently seeing with heroin and fentanyl,
20  correct?
21    A.    Right.  That's where our opioid
22  crisis is now as of -- probably since about
23  2011, 2012.  It wasn't that the opioid pain
24  reliever aspect of it and mortality associated
25  with it went away.  It's just that the rise in

Page 189

1  what's been driving mortality more since those
2  years I mentioned has been the illicit drugs.
3    Q.    But it's fair to say that the aspect
4  associated with opioid pain relievers has
5  plateaued or diminished since 2011?
6        MR. BADALA:  Objection to form.
7  Outside the scope.
8    A.    It bounces around, but it appears to
9  have plateaued after rising, yes.
10    Q.    In about 2011, right?
11        MR. BADALA:  Objection to form.
12  Outside the scope.
13    A.    Sure.  Okay.
14    Q.    Now, the Ohio Department of Health
15  report that you just referenced, is that
16  statewide data or is that -- well, strike that.
17        What geographic scope does that data
18  cover?
19    A.    It was divided into regional
20  reports, so there wasn't really any
21  county-specific data that I can point to in it.
22  I do know at one point around that time the Ohio
23  Department of Health identified different
24  counties that they thought were having a problem
25  with opioid pain relievers.  Most of them were

48 (Pages 186 - 189)

Page 190

1 in the southern part of the state, though
2 Cuyahoga County was one of those counties as
3 well.
4     Q.    Now, you've said the county has not
5 really tracked the percentage related to
6 diverted opioids, but has the county ever
7 collected any information from which that
8 percentage could be calculated on a countywide
9 basis?
10     A.    I would think that would be more at
11 a state level.  I'm not aware of anything at the
12 county level that I could think of off the top
13 of my head.  The prescribing information would
14 be more state level, so OARRS and things like
15 that, which would have the pharmacies
16 responding, would be more state -- might drill
17 down into the county, but I don't know that.
18 The county itself would not collect that data to
19 the best of my knowledge.
20     Q.    Let me ask you about how diversion
21 occurs.  When a patient gives or sells his or
22 her medication to someone else, that's drug
23 diversion, true?
24     A.    I'd consider that, sure.
25     Q.    If a doctor intentionally

Page 191

1 overprescribes medication without establishing a
2 doctor/patient relationship and without a valid
3 medical purpose, is that drug diversion?
4     A.    I think I would consider that the
5 same, yes.
6     Q.    When a drug user or consumer steals
7 prescription drugs from another patient, is that
8 drug diversion?
9     A.    Yes.  They weren't -- they're
10 outside their intended recipient.
11     Q.    Is doctor shopping a well-known form
12 of diversion?
13         MR. BADALA:  Objection to form.
14     A.    I would consider that it's within
15 the intent to obtain multiple prescriptions.
16     Q.    And doctor shopping is defined as
17 you defined earlier today, correct?
18     A.    That's the definition I use.  I know
19 that some other individuals, when I talk, we use
20 slightly different variations, but that was
21 actually one our task force or our Poison Death
22 Review Committee received from the medical
23 director of our alcohol, drug abuse and mental
24 health services department, so that's the one
25 we've used since inception.

Page 192

1     Q.    Do you agree that almost all
2 prescription drug diversion occurs after
3 prescription drugs have been dispensed to
4 patients?
5     A.    I wouldn't know.  I mean, I am
6 certainly aware of instances where it has been
7 dispensed to the patient and instances where
8 somebody may overmedicate themselves or they're
9 selling drugs or they're potentially just having
10 leftover drugs that somebody has access to, but
11 I wouldn't know that I would say the majority
12 would be that.  I wouldn't have an opinion on
13 it.
14     Q.    So those are all examples of drug
15 diversion that occur?
16     A.    At a patient level.
17     Q.    At a patient level.  Very well.
18         Can you give me any examples of
19 diversion that occur before drugs have been
20 dispensed to patients?
21     A.    I think the overprescribing, the
22 pill mill scenario, the robbery of a pharmacy,
23 the influx of large amounts of drugs beyond the
24 population density would be indications to me of
25 diversion.

Page 193

1     Q.    Can you identify any examples of
2 drugs being stolen from pharmacies in Cuyahoga
3 County?
4     A.    I am aware of that phenomenon
5 happening, but I don't have specifics I could
6 share with you.
7     Q.    And when a doctor intentionally
8 overprescribes prescription drugs, the diversion
9 occurs after the drugs have been dispensed to a
10 patient in that example, true?
11     A.    Okay.  I can see your point.
12     Q.    And when a drug distributor
13 distributes drugs lawfully to a pharmacy and
14 those drugs are then dispensed to a patient and
15 then diverted to another, that occurs after the
16 product has been dispensed to patients, true?
17     A.    Sure.  I would say so.
18     Q.    Has the county ever investigated any
19 pharmaceutical distributor or manufacturer for
20 drug diversion?
21         MR. BADALA:  Objection to form.
22     A.    When we filed the lawsuit, I know
23 they were named as defendants.
24     Q.    Sure.
25         Other than this lawsuit, has the

49 (Pages 190 - 193)

Page 194

1 county ever investigated any pharmaceutical
2 distributor or manufacturer for drug diversion?
3     MR. BADALA: Objection to form.
4 Outside the scope.
5     A.  Not that I know of.
6     Q.  Had the county ever considered doing
7 that before it filed this lawsuit?
8     A.  I know there were concerns about
9 just how many opioids there were in our county.
10 Whether it was discussed, you know, to look at
11 distribution, manufacturing, marketing and
12 things like that -- there were a lot of
13 discussions with different task forces how that
14 could have been done, but to the best of my
15 knowledge, they didn't get beyond the discussion
16 phase.
17     Q.  Has the county ever investigated any
18 of the Defendants in this case for drug
19 diversion other than filing this lawsuit?
20     MR. BADALA: Objection to form.
21 Outside the scope.
22     A.  Let me just review all the
23 Defendants.  I know we were investigating
24 prescribers more than the actual distribution
25 companies.  I'd have to say prior to the filing

Page 195

1 of the lawsuit, I'm not aware of any specific
2 county initiatives to investigate the
3 pharmaceutical or distribution companies that
4 are mentioned here.
5     Q.  Are you aware of any instance where
6 any of the Defendants in this lawsuit sold or
7 distributed prescription opioids outside the
8 closed supply chain?
9     MR. BADALA: Objection to form.
10 Outside the scope.
11     A.  Not that I'm aware of.
12     Q.  Now, when a patient fills a
13 legitimate and valid prescription, can any of
14 the Defendants in this lawsuit stop that patient
15 from reselling their pills?
16     MR. BADALA: Objection to form.
17 Outside the scope.
18     A.  I don't see how they could.
19     Q.  Can any of the Defendants stop that
20 patient from sharing his or her medication with
21 someone else?
22     MR. BADALA: Same objections.
23     A.  Again, I don't see how they could do
24 that.
25     Q.  Do any of the Defendants in this

Page 196

1 lawsuit have any power to arrest people engaged
2 in drug diversion?
3     MR. BADALA: Objection to form.
4 Outside the scope.
5     A.  I don't know of any arrests.
6     Q.  So along those same lines, would any
7 of the Defendants have -- do any of the
8 Defendants have any power to revoke any
9 professional licenses, such as doctors or
10 pharmacists?
11     MR. BADALA: Objection to form.
12 Outside the scope.
13     A.  Not that I know of.
14     Q.  Would those be issues addressed by
15 law enforcement and other regulators?
16     MR. BADALA: Objection to form.
17 Outside the scope.
18     A.  They would be investigations by law
19 enforcement, I would think, and oversight by
20 regulatory boards, in our case in the state, not
21 at the county level.
22     Q.  Has the county ever reported doctors
23 to the State Medical Board for suspected
24 diversion of controlled substances?
25     A.  Yes.

Page 197

1     Q.  In your office, the medical examiner
2 has done that, right?
3     A.  Yes, we have.  I would say they were
4 reported to the Board of Pharmacy under the
5 criteria that I mentioned this morning.  If we
6 saw high dosages that were being given by a
7 doctor or if we saw that an individual had
8 received the doctor shopping -- met the doctor
9 shopping criteria, we would refer that
10 individual, the overdose victim, to Board of
11 Pharmacy.
12     I'm also aware that the Division of
13 Child and Family Services also had some similar
14 anecdotal things, which I do not have specifics
15 for, but also made reports about concerns about
16 diversion of drugs.
17     There were, obviously, prosecutions
18 of doctors who were diverting drugs through the
19 prosecutor's office.
20     Q.  And the prosecution was at the
21 county level, correct?
22     A.  No.  Actually, there were
23 prosecutions of diversion or individuals -- you
24 know, in terms of county, there were federal
25 prosecutions, especially as the opioid crisis

Page 198

1 evolved to the point where we were seeing more
2 of the heroin and fentanyl deaths.  And I
3 specifically met with Carole Rendon about
4 strategies on those prosecutions.  So I would
5 say that there were death specification
6 discussions that we had with the Federal
7 Department of Justice and, you know, those
8 sentencing guidelines were certainly discussed
9 in our U.S. Attorney's task force because they
10 can tend to be significantly longer sentences
11 for individuals.
12     Q.    Let me ask you about the medical
13 examiner office's reports to the medical board
14 for investigation.  When did the office first do
15 that?
16     A.    We started to collect the data from
17 the Board of Pharmacy in 2012, but that was
18 de-identified, so we couldn't really find out
19 who was prescribing.
20        When we did our Poison Death Review
21 Committee in 2013, that's when we started to
22 identify doctor shoppers.  At that point about
23 36 percent of our heroin overdose deaths -- and
24 it would have been in 2013 we would have started
25 those reports, and would have continued into

Page 199

1 2014 as well, and other years.  I mean, we
2 haven't stopped some of these efforts, but that
3 would have been the start of that.
4     Q.    So you reported certain doctors to
5 the medical board in 2014.  Have you done it in
6 subsequent years?
7     A.    Yes.
8     Q.    And in what years have you done it
9 since 2014?
10     A.    I think every year until the
11 present.
12     Q.    And have any suspensions --
13     A.    You know, let me take that back
14 because with this magnitude of the crisis, we
15 fell behind in terms of our, you know, ability
16 to check OARRS data and we just finished 2016's
17 data.  We did 2015.  2014, 2015, 2012, those
18 dates I would be willing to say with certainty
19 we did the reports, 2016 to say we just
20 finished.  And the specific look we were doing
21 there was with fentanyl.  Whether those have
22 been reported, I'm not certain enough to say
23 that that actually has happened.  It would be
24 our intention to do so.
25     Q.    And, to be clear, those are reports

Page 200

1 of doctors to the medical board, true?
2     A.    Board of Pharmacy, yes.  The Board
3 of Pharmacy will oversee that aspect of the
4 investigation.  We will refer decedents to them
5 for further evaluation and investigation.
6     Q.    So have you ever referred a doctor
7 to the medical board for overprescribing or for
8 drug diversion?
9     A.    Our practice would be to report to
10 the Board of Pharmacy.  I don't know to what
11 extent they would coordinate with the medical
12 board.
13     Q.    Have any suspensions or prosecutions
14 resulted from your reporting of particular
15 physicians to -- we'll just stick to the state?
16        MR. BADALA:  Objection to form.
17     A.    I'm not aware, once we referred
18 them, what the consequences of those
19 investigations were.
20     Q.    So, to your knowledge, there have
21 been no consequences; is that right?
22        MR. BADALA:  Objection to form.
23     A.    -- be disappointed in that, but we
24 referred them to the appropriate investigative
25 agency; and as I mentioned earlier, the county

Page 201

1 prosecutor has also participated in prosecutions
2 of pill mill doctors and things like that as
3 well.
4     Q.    But you don't know if there's been
5 any result from your reporting of doctors to the
6 medical board or the board of pharmacy, right?
7        MR. BADALA:  Objection to form.
8 Outside the scope.
9     A.    No, I don't.
10     Q.    Have there been other times when the
11 county has suspected diversion that you haven't
12 already described to me?
13     A.    As I mentioned, the diversion
14 concerns that would be expressed with the
15 Division of Child and Family Services in the
16 course of custodial placement, investigation of
17 children who were born with positive toxicology,
18 my discussions with them were that they would
19 report, again, instances to the Board of
20 Pharmacy and that they would refer them, again,
21 for investigation beyond their capacity.
22     Q.    So you've not made any reports,
23 then, directly to any state agency other than
24 the Board of Pharmacy; is that correct?
25        MR. BADALA:  Objection to form.

51 (Pages 198 - 201)

1    A.   I cannot speak for the whole county,
2 so I don't know where those referrals were from
3 the Division of Child and Family Services -- the
4 appropriate agency at the state level to receive
5 those complaints, as the county understands it,
6 is the Board of Pharmacy, but whether
7 individuals made those referrals to other
8 places, including the Board of Medicine, which
9 would certainly be somebody overseeing medical
10 practitioners' conduct, may have happened.  I
11 don't know for certain whether it did or did
12 not.
13    Q.   Are you aware of any referrals to
14 the dental board?
15    A.   No, I am not.
16    Q.   Are you aware of any referrals to
17 the nursing board?
18    A.   No.
19         I should back up with the dentists.
20 There are certain medical dentists, doctor of
21 medical dentistry, and they may have been on our
22 reports and I don't know about them, but
23 specifically that I knew this was a dentist and
24 we made a referral, that I can't say.
25    Q.   Have you ever reported anything or

1 has the county ever reported anything to the
2 veterinary medical licensing board?
3    A.   Not that I know of.
4    Q.   Has the county ever notified any of
5 the Defendants of any suspected drug diversion?
6    A.   I mean, we've shared things, data,
7 that the county has collected with folks like --
8 I know CVS Pharmacy has, you know, agreed to
9 sell naloxone without a prescription.  We would
10 have made that effort to all of the pharmacies
11 locally in response to the drug epidemic, which
12 is an outgrowth of the diversion I think.  So
13 that would have been something.
14    Q.   My question is, have you ever
15 reported --
16         MR. BADALA:  Were you done with your
17 answer?
18    Q.   I thought you were done.  I'm sorry.
19         MR. BADALA:  Only if you're done.
20    A.   I think that, you know, those
21 entities were probably the ones we had contact
22 with.  We did not, to the best of my knowledge,
23 reach back to the manufacturers.  I don't know
24 to what extent the local task forces or anybody
25 would have spoken to distributors.  I do not

1 know that.
2    Q.   Are you aware of any instance where
3 the county reported a specific suspicion of drug
4 diversion to any of the Defendants in this case?
5    A.   Seeing it from that perspective, I
6 explained how we've been trying to kind of work
7 with our pharmacies to address the overdose
8 crisis.  Those are people we have communicated
9 with.  To specifically address diversion at the
10 county level to any of the Defendants, including
11 those pharmacies, that would not have been
12 something we would have done.  I think we may
13 have done that further upstream through pharmacy
14 again, Board of Pharmacy.
15         We did -- I take that back, too.
16 One year we did -- for 2014 we tracked pharmacy
17 data to see if there was specific pharmacies
18 that were being identified as frequent sources
19 or multiple sources of diversion.  So if we used
20 the same paradigm, it was kind of if we had five
21 pharmacies that were being used by an individual
22 within a one-year period, we did report that to
23 the Board of Pharmacy in addition to the doctor
24 shopper prescribers.
25    Q.   Were there occasions when the county

1 suspected diversion but made no report to
2 anyone?
3         MR. BADALA:  Objection to form.
4    A.   I don't know.  None that I know of.
5    Q.   Are there instances in which the
6 county is aware that drug diversion is occurring
7 and that it continues to occur today?
8         MR. BADALA:  Objection to form.
9 Outside the scope.
10    A.   I think we continue to run our OARRS
11 reports at the medical examiner's office on our
12 decedents and we have, you know, continued to
13 find doctor shoppers up into, you know, recent
14 years.  We, again, you know, make those
15 referrals and tend to make those referrals.  So
16 I would say that, you know, the number of doctor
17 shoppers has not gone down to zero, so we're
18 still aware of diversion and reporting it.
19         And one of the benefits, I would
20 say, of, you know, the evolution of our
21 prescription drug monitoring program, in
22 association with other states developing these
23 in response to diversion, is that we are now
24 able to identify people who can cross state
25 lines more easily to identify doctor shopping in

52 (Pages 202 - 205)

1 that capacity, so that if they were not
2 necessarily doctor shopping in Cuyahoga County,
3 we might be able to identify them through going
4 to Pennsylvania or West Virginia or someplace
5 like that.
6    Q.   When did the county first become
7 aware that drug diversion was occurring within
8 the county?
9    A.   You know, that's a hard question to
10 answer because I think at some level drug
11 diversion has gone on for a very long time.  So,
12 you know, there were people who would write
13 prescriptions for codeine back in the 1970s
14 during that heroin epidemic that I've been told
15 about.  There were, you know, diversions that
16 were going on, you know, back in the 1980s per
17 the prosecutor's discussion with me.  I would
18 say with regard to this crisis, we started back
19 in the opioid prescription phase to track
20 oxycodone in terms of mortality in the medical
21 examiner, then coroner's office, back in 1998.
22 So I would say, you know, diversion has a broad
23 definition, and it probably has gone on for a
24 very long time, whether somebody is giving
25 somebody a pill because they complained of

1 something.  But diversion on the scale that we,
2 you know -- it's getting that attention in the
3 prosecutions, I would say the prosecutor related
4 to me that their prosecution stepped up in the
5 late 1990s and through the 2000s.
6    Q.   Is the county aware of diversion
7 occurring outside the county that has an impact
8 within the county?
9    A.   I would suspect that, you know, the
10 pill mills and other places certainly have an
11 impact.  The fact that we see doctor shopping in
12 jurisdictions outside of Cuyahoga County with
13 individuals dying here I think would tend to
14 indicate that there is a diversion problem
15 outside of Cuyahoga County as well.
16    Q.   And where is that occurring?
17    A.   Where is what occurring?
18    Q.   So if there's diversion occurring
19 outside of Cuyahoga County, as you've described,
20 that has an impact within the county, where is
21 that diversion occurring?
22    A.   Well, the doctor shopping, as I
23 mentioned, could be other counties.  It could
24 be, as I mentioned, recently other states that
25 we've been able to look at.  And the diversion

1 by its nature is somewhat clandestine, so may
2 not be able to provide solid evidence of it, but
3 I think there were suspicions where the pill
4 mills were more prevalent in the southern part
5 of the state, that they may have contributed to
6 pills coming up to our county as well.
7    Q.   And what is the basis for what you
8 just told me?  In other words, what information
9 are you relying on to describe this drug
10 diversion occurring outside of the county?
11    A.   Primarily discussions with law
12 enforcement who would have been present at task
13 force meetings.  They would be both local law
14 enforcement, state law enforcement, state
15 representatives, and including our, you know,
16 federal partners with regards to diversion of
17 drugs into our area.  Again, I'd have to point
18 back to the two task forces, the Board of Health
19 one with Vince Caraffi and then the U.S.
20 Attorneys with Steve Dettelbach and Carole
21 Rendon.
22    Q.   Does the county keep any records or
23 statistics of the source of diverted drugs that
24 have an impact within the county?
25    A.   I'm not sure I understand your

1 question.  Do they keep a record of diverted
2 drugs that would produce overdoses, fatalities?
3    Q.   Sure.  So let me ask it again.
4       You've described you've heard from
5 law enforcement professionals in connection with
6 task forces that drug diversion outside the
7 county might be having an impact within the
8 county.  Does the county have any record of that
9 happening?  If I wanted to look for documents
10 reflecting that dynamic, what would the county
11 have, if anything?
12       MR. BADALA:  Objection to form.
13 Outside the scope.
14    A.   Well, it's probably more of a local
15 law enforcement function, so the county wouldn't
16 have those records individually.  They would be
17 a local law enforcement.  That said, the
18 sheriff's department provides local law
19 enforcement for some of the smaller
20 municipalities in our county and they may have
21 that data.  I am not aware of that.
22    Q.   Are you aware of any data tracking
23 the source, the geographic source of diverted
24 drugs that made their way into Cuyahoga County?
25       MR. BADALA:  Objection to form.

Page 210

1 Outside the scope.
2      A.   Am I aware -- sorry.  I was looking
3 out the window, but am I aware of --
4      Q.   Are you aware of any data which
5 would reflect the geographic source of diverted
6 drugs that have an impact within the county?
7           MR. BADALA: Same objections.
8      A.   Well, sure.  I mean, you know, more
9 recently with the fentanyl epidemic, we were
10 quite aware from medical examiner investigations
11 that some of those, you know, drugs were coming
12 from China.  There were, you know, reports of
13 individuals trafficking drugs from Mexico into
14 this area along our interstates.
15          In terms of diverted drugs and the
16 source there, you mean the opioid prescription
17 pain medication.  That I'm not as aware as --
18 having as clear identification of a source on
19 that.
20      Q.   So the examples of drugs being
21 imported from China and Mexico, those have to do
22 with the illicit shipment of drugs, correct?
23      A.   Which the county would maintain is
24 an extension of the opioid crisis.  They are
25 illicit drugs, yes.

Page 211

1      Q.   And so that does not fall within the
2 definition of drug diversion, does it?
3           MR. BADALA: Objection to form.
4      Q.   You may think that they're related,
5 but those are not diverted drugs, are they?
6      A.   Fentanyl is a Schedule 2 drug and
7 it's being diverted into this country.
8      Q.   But our definition of drug diversion
9 is when a drug leaves the closed supply chain
10 for an illegitimate medical purpose.  So illicit
11 drugs, they're never within the closed supply
12 chain; the use of illicit drugs is not drug
13 diversion, is it?
14           MR. BADALA: Objection to form.
15      A.   No.  I think the consequence of the
16 opioid pain relievers creates this climate where
17 we see a heroin crisis and a fentanyl crisis,
18 though, so I don't think it's completely a
19 stretch to go back and say that the diversion
20 and overprescribing that was done prior to the
21 crises is completely separate from the crisis we
22 deal with now.
23      Q.   I understand your opinion on that.
24 I'm not asking you now whether they're
25 completely separate.  What I'm asking is, is the

Page 212

1 supply of illicit fentanyl from Mexico drug
2 diversion?
3           MR. BADALA: Objection to form.
4 Asked and answered.
5      A.   Within your definition of that
6 closed chain, no.
7      Q.   And the same is true for illicit
8 fentanyl from China, correct?
9      A.   Within the closed chain, again,
10 that's true.
11      Q.   Do you have any information or
12 data -- does the county have any information or
13 data suggesting that diverted drugs from Florida
14 are making their way into Ohio?
15      A.   It would be anecdotal, talking to
16 law enforcement.  And I believe at the time I
17 had those conversations, Florida had not enacted
18 pill mill legislation, so our pill mill
19 legislation in Ohio came in 2011, and I think
20 there were adjacent states, including Florida,
21 who did not enact that legislation until later,
22 and it was again through discussions with law
23 enforcement that I was made aware, as a county
24 agent in the medical examiner's office, as with
25 the task forces which have county representation

Page 213

1 as well as other partners, that there were drugs
2 that were being brought from other jurisdictions
3 into Ohio and into Cuyahoga County.
4      Q.   And what has the county done to --
5 if anything, to interdict that flow of drugs
6 into the county?
7      A.   Those would be law enforcement
8 things.  I mean, we have, as a county, designed
9 protocols for the investigation of drug-related
10 deaths, and they were shared with local law
11 enforcement as well as our sheriff for training,
12 and we would basically instruct them -- I mean,
13 it was developed in conjunction with law
14 enforcement processing a death scene, which the
15 medical examiner's office would notify them
16 about, so that should these cases come to
17 prosecution in the future, the evidence that
18 would be needed to facilitate that would be more
19 acceptable than if you were trying to start that
20 investigation as much as months afterwards when
21 the death was finally ruled.
22          In terms of other means of, you
23 know, trying to minimize diversion, the county
24 sheriff's office instituted a drug drop box
25 program that would enable people who had

1 medications in their medicine cabinets, opioid
2 pain relievers --
3    Q.   Let me cut you off there, Doctor.
4 The question was what has the county done to
5 interdict drugs, the flow of drugs, from outside
6 the county, and I think you've answered the
7 question.  Is there anything else you wanted to
8 add to that?
9    A.   I would like to think that -- and
10 it's your time and I really am very sensitive to
11 that, but I'd like to say that, you know, that
12 diversion out of the medicine cabinets that I
13 was just mentioning about by reports that were
14 more on a national level was a very significant
15 problem.  We introduced in Cuyahoga County, with
16 the support of our sheriff, who was a county
17 official, drug drop boxes, drug take-back --
18    Q.   Doctor, the question pending is, has
19 the county done anything to interdict the flow,
20 which the county is claiming, the flow of drugs
21 from other states.  If you finished answering,
22 then I'll ask you another question.
23    A.   Oh, I thought you wanted me to go on
24 about what I was talking about.
25    Q.   I wanted you to answer the question.

1    A.   Sure.
2    Q.   Okay.  Thank you.
3         Has the county dealt with law
4 enforcement in other places like Florida to
5 interdict the flow of drugs into the county if
6 the county is claiming that's happening?
7    A.   Again, I would say a lot of that
8 might be local law enforcement the county would
9 not be aware of.  With regard to task forces and
10 federal partners, I would say that we are
11 sharing information through them, Department of
12 Justice, Drug Enforcement Agency, and I would
13 say that that would be a means of, you know, a
14 more global approach than just our region.
15    Q.   Let me ask you about the
16 investigation of drug diversion, and these
17 topics somewhat overlap, Doctor.
18    A.   Which topic are we on?
19    Q.   We're on topic 15, but again,
20 they're not so neatly contained.
21         Which county agency or agencies are
22 responsible for investigating drug diversion?
23    A.   Well, I think our sheriff, as a law
24 enforcement agency, would do that, but primarily
25 the investigation of diversion would be local

1 law enforcement.
2    Q.   Referring to the City of Cleveland,
3 right?
4    A.   Pardon me?
5    Q.   Referring to cities, right, when you
6 say "local law enforcement"?
7    A.   Cities, yeah.  It would not be
8 necessarily a county.  But I have to stress the
9 county sheriff provides that service to some of
10 the smaller counties that otherwise could not
11 afford it.  So they would do some investigation.
12 Investigation would also be done at the level of
13 the prosecutor's office, though that may be
14 significantly overlapping with local law
15 enforcement.
16    Q.   Which county agency or agencies are
17 responsible for investigating the
18 overprescription of opioid medicines?
19         MR. BADALA:  Objection to form.
20    A.   That would be a state function.  I
21 mean, the investigation of overprescribing would
22 be a Board of Pharmacy issue and we would report
23 things there as we detected them for further
24 investigation, but beyond that, that would be
25 something that would have been more handled at a

1 state level -- or a federal level, I mean, if
2 you know, there was some issue of that, and
3 sharing information across multiple partners.
4    Q.   Does the county collaborate with
5 state or federal agencies in that effort?
6    A.   Our task forces have representation
7 from local, county, state and federal level
8 people, so we would be sharing that information.
9    Q.   Is that collaboration formalized in
10 writing, in a memorandum of understanding or any
11 other writing?
12         MR. BADALA:  Objection to form.
13    A.   These committees were formed.  I
14 mean, the U.S. Attorney's committee keeps
15 minutes, has monthly meetings, and would address
16 these kinds of topics.  We would share things
17 like that.  I had a personal meeting with Carole
18 Rendon to discuss strategies about drug
19 prosecutions and mixed intoxications.  I mean,
20 some of those things we have done.  Some of them
21 may not be documented as well.
22    Q.   So you've told me about the
23 referrals that the county has made to state
24 authorities.  How many cases of drug diversion
25 has the county itself investigated?

55 (Pages 214 - 217)

Page 218

1   A.   That may be something the prosecutor
2 could tell you better than I.
3   Q.   Do you know how many county
4 investigations have resulted in disciplinary
5 proceedings or criminal charges?
6        MR. BADALA:  Objection to form.
7 Outside the scope.
8   A.   I'd have to say, again, you know,
9 the disciplinary process for pharmacies or
10 prescribers would have occurred outside of the
11 county's framework.  It would be a state
12 function.
13   Q.   But you mentioned the county
14 prosecutors.  I'll ask you again.  Do you know
15 how many county investigations have resulted in
16 criminal charges?
17        MR. BADALA:  Objection to form.
18   A.   I'd have to say again the county
19 prosecutor is in a better position to answer
20 that than I am.
21   Q.   Has there been diversion occurring
22 that the county has not investigated?
23   A.   I guess there's diversions they
24 don't know about.
25   Q.   Other than not knowing, is there any

Page 219

1 reason the county hasn't investigated diversion
2 more?
3        MR. BADALA:  Objection to form.
4   A.   Not that I know of.
5   Q.   Has the county dedicated resources
6 specifically to the investigation of drug
7 diversion?
8   A.   Through the sheriff's office, again,
9 as a local law enforcement agency I'd have to
10 say, but again, a lot of these investigations do
11 not start at the county level.  They start with
12 local law enforcement.
13   Q.   And are you aware of any local law
14 enforcement, including the county sheriff,
15 dedicating resources specifically to the
16 investigation of drug diversion?
17        MR. BADALA:  Objection to form.
18 Outside the scope.
19   A.   I don't know.  I want to say that I
20 anecdotally heard that Cleveland -- the City of
21 Cleveland had done that, but I don't know that
22 for certain.  They had a narcotics unit, and I
23 believe they were investigating diversion as
24 part of their duties, but it's outside the scope
25 of what I know for certain.

Page 220

1   Q.   And that's a local law enforcement
2 function, not a county function, true?
3   A.   Exactly.  Right.  Cleveland is their
4 biggest city, but it's not under the county's
5 direction.
6   Q.   So how many cases related to the use
7 of illegal opioids has the county investigated,
8 including heroin and fentanyl?
9   A.   Tough question.  I can tell you how
10 many fatalities we've had.  How many overdoses
11 potentially --
12   Q.   I'm --
13   A.   -- I couldn't give a specific answer
14 because that's one of the challenges we faced,
15 in terms of identifying impacts of illegal
16 opioids, is if we try to track emergency room
17 data, they're not always coded appropriately or
18 they may be coded as something different.  So I
19 think that would be a very tough number to
20 actually get in terms of the impact of illegal
21 opioids and what might have been followed up on,
22 what might not have.  I don't know.
23   Q.   So the answer is in the end you
24 don't know, right?
25   A.   Give me your question again.  I

Page 221

1 really feel like I'm not helping, but I want to.
2   Q.   How many cases relating to illegal
3 opioids, including heroin and fentanyl and
4 carfentanil and others, has the county
5 investigated?
6        MR. BADALA:  Objection to form.
7 Outside the scope.
8   A.   I'd have to say I don't know and I
9 don't know if it's knowable.
10   Q.   Do county agencies prescribe
11 opioids?
12        MR. BADALA:  Objection to form.
13 Outside the scope.
14   A.   I know opioids are prescribed at the
15 jail as part of the medical treatment.  I
16 believe the jail is staffed by MetroHealth
17 Medical Center for care.  Other than that, I
18 don't know that they're prescribing opioids.
19   Q.   Do county-affiliated hospitals or
20 healthcare facilities prescribe opioids?
21        MR. BADALA:  Same objections.
22   A.   Our county-affiliated hospital is
23 the MetroHealth Medical Center, so it would be
24 the same one that services the jail.  It's a
25 large hospital.  They would prescribe opioids

56 (Pages 218 - 221)

Page 222

1 for certain.
2     Q.   And has the county ever investigated
3 diversion that might be occurring in connection
4 with patients being treated by county
5 representatives, either in the jail or at the
6 hospital?
7         MR. BADALA:  Objection to form.
8 Outside the scope.
9     A.   I do know that the MetroHealth
10 Medical Center initiated an office of opioid
11 safety, and one of the functions of that would
12 be to investigate prescribing practices within
13 the county hospital, within MetroHealth Medical
14 Center, and then there would be a loop
15 potentially closing back on individuals who were
16 identified who might have been overprescribing
17 or felt to be overprescribing outside of the
18 basic, you know, metrics that they were using.
19 I don't know what those metrics are, but there
20 was definitely feedback in that office of opioid
21 safety to the prescribers within that system,
22 and they would be the prescribers in the jail as
23 well because they oversee the jail -- healthcare
24 service at the jail.  They don't oversee the
25 whole jail.  And I think, you know, that office

Page 223

1 of opioid safety would also be overseeing those
2 physicians as well.
3     Q.   Have there been any criminal charges
4 or disciplinary proceedings arising from that
5 investigation?
6     A.   I do not know.
7     Q.   Are you familiar with the ARCOS
8 database, Doctor?
9     A.   In a very general way.
10     Q.   Are you aware that ARCOS is a
11 database through which distributors and
12 manufacturers report controlled substances
13 transactions to the DEA?
14     A.   Yes.
15     Q.   Have you ever -- has the county ever
16 had access to the ARCOS data?
17     A.   No.  I know recently the county's
18 attorneys received information related to the
19 ARCOS database, but the county itself has no
20 direct access to that.
21     Q.   So you're aware that the county,
22 through its attorneys, was granted access to
23 ARCOS data in 2018, but the county itself has
24 not seen those data; is that what you're saying?
25     A.   That's -- that's correct.

Page 224

1     Q.   Has the county ever asked for ARCOS
2 data at any time?
3         MR. BADALA:  Objection to form.
4     A.   In my discussion with the DEA
5 representative, he said that access would
6 never have occurred, so I don't think we ever
7 asked.
8     Q.   That conversation occurring last
9 Friday, true?
10     A.   Yeah, but, you know, I sit on the
11 task force with this fellow and he was certainly
12 aware of their database, I was aware of it, and
13 it was never volunteered because we could not
14 access it.
15     Q.   So you have interfaced with DEA?
16     A.   Absolutely.
17     Q.   And during that time have you ever
18 asked for access to ARCOS data?
19         MR. BADALA:  Objection to form.
20     A.   I guess no because we knew we
21 weren't going to get it.
22     Q.   Well -- but if the county is
23 concerned with drug diversion and the abuse of
24 drugs, wouldn't that information be useful to
25 you?

Page 225

1         MR. BADALA:  Objection to form.
2     A.   Absolutely.  Yes, it would have been
3 very helpful.
4     Q.   But you never asked DEA about it,
5 did you?
6     A.   Because we knew that we weren't
7 going to have -- or they never made it any
8 clearer to us that it was not something we as a
9 county would have access to.
10     Q.   They never offered, right?
11     A.   They never offered.
12     Q.   And you never asked, right?
13         MR. BADALA:  Objection to form.
14     A.   No.  I guess because we just didn't
15 think that that was going to happen.
16     Q.   Are you familiar with the term
17 "suspicious order report"?
18     A.   No.
19     Q.   Is the county familiar with the
20 requirements that DEA registrants have for
21 reporting suspicious orders of controlled
22 substances to the DEA?
23     A.   In a general way, yes.
24     Q.   Has the county ever seen a
25 suspicious order report?

57 (Pages 222 - 225)

Page 226

1     A.   To the best of my knowledge, no.
2     Q.   Has the county ever asked DEA for
3  information or access to suspicious order
4  reports?
5     A.   We have not, but again, my
6  understanding is that that wouldn't be something
7  that would be granted to the county, so we
8  didn't ask.
9     Q.   The answer is you didn't ask, true?
10    A.   We did not ask.
11    Q.   So if the county, again, was
12  concerned or is concerned with diversion and
13  abuse of controlled substances, wouldn't that
14  information have been useful to the county?
15        MR. BADALA:  Objection to form.
16    A.   Sure would have, yeah.
17    Q.   Now, we've talked quite a lot
18  already about the OARRS database, right?
19    A.   Yes.
20    Q.   Let me ask you flat out, Doctor.
21  What is the OARRS database?
22    A.   It's a prescription drug monitoring
23  program that's operated at the state level, and
24  in Ohio we call it OARRS.  It has other names in
25  different states.

Page 227

1        The function of it is to provide a
2  database of prescribed controlled substances.
3  The OARRS database was formed in 2006,
4  legislation I think enabled it in 2005, and then
5  it became operational towards the end of 2006.
6  It was formed at least in response to Kentucky
7  forming a prescription drug monitoring system
8  and a concern that Kentucky residents were
9  coming to Ohio, where we were not monitoring
10  these things, for drug -- obtaining drugs.
11        So data started to be collected, and
12  then, going forward, pharmacies would enter the
13  data from prescribing information into OARRS,
14  and then that could be accessed by prescribers,
15  law enforcement, and I believe distributors at
16  different levels, partly if there was an active
17  investigation.
18    Q.   What do you base that understanding
19  on, that the distributors had access to the
20  OARRS data?
21    A.   It's my recollection of my
22  conversation with the director of OARRS.  Or
23  maybe it was at a pharmacy level.  I don't
24  remember.  I don't want to be dogmatic about
25  that.  I don't recall.

Page 228

1     Q.   So you don't recall why you just
2  said that distributors had access to OARRS data?
3     A.   Well, I was thinking distributor
4  pharmacists, the pharmacies.
5     Q.   Okay.  I just wanted to clear that
6  up.
7     A.   Distributors -- I'd have to say I
8  don't remember that detail.
9     Q.   So the OARRS system has information
10  on all outpatient prescriptions for controlled
11  substances and other -- a few other drugs,
12  right?
13    A.   When it started, the data that was
14  entered was from pharmacies, and then in 2011
15  there were requirements to enter data from
16  medications that were being dispensed from
17  prescriber's offices, so they wouldn't
18  necessarily have gotten into a pharmacy.
19    Q.   And then drug wholesalers were also
20  required to submit information to the OARRS
21  database, true?
22        MR. BADALA:  Objection to form.
23    A.   I'd have to say I believe so, but I
24  don't remember.  I know that it was pharmacy
25  data.

Page 229

1     Q.   OARRS has been a helpful tool in
2  identifying drug diversion, right?
3     A.   I said it.  So did the prosecutor.
4  Yes, it has.
5     Q.   Has the county ever used OARRS data?
6     A.   We've used it at the medical
7  examiner's office extensively.
8     Q.   Let's start with that.  So how has
9  the medical examiner's office used OARRS data?
10    A.   We especially used it when we became
11  aware of the heroin crisis in our county, and
12  what we were trying to do at that point was to
13  see if what we were hearing anecdotally, that
14  this represented a shift from the prescription
15  pain medications to the illicit heroin was
16  referable back to the prescribing practices of
17  these individuals who had died of heroin
18  overdose.  So, as I said, we started to collect
19  that data in a de-identified form in 2012.  We
20  continued until we got full access in 2013, and
21  we continue to collect the data and have that
22  access with the idea of trying to stay relevant
23  as our crisis evolves, so that -- now heroin,
24  and we've evolved to fentanyl, and those still
25  have very high rates of OARRS files being

58 (Pages 226 - 229)

1 created.  They've received prescription opioids.
2     Q.    So we've talked a little bit about
3 that, the data analysis you've done.  Is there
4 any other use of OARRS data?  For example, when
5 you have a subject, a decedent, does the office
6 do anything with OARRS data in connection with
7 that decedent?
8     A.    I mean, you know, as I mentioned
9 before, if we see multiple prescribers, we will
10 start to alert investigative agencies about
11 that.
12     Q.    Do you try to pull an OARRS file for
13 every decedent, Doctor?
14     A.    We have tried to pull an OARRS file
15 for every heroin overdose from 2012 forward and
16 for every fentanyl overdose, and that started
17 actually when the fentanyl part of the crisis
18 got worse, which was 2015.
19     Q.    Let's look through some documents
20 and try to nail down this a little bit, Doctor.
21 I'm going to mark this as the next in order.
22         THE WITNESS:  Would this be a good
23 time for a break?
24         MR. BADALA:  Yeah.  We've been going
25 about an hour.  Let's take a five-minute break.

1         MR. BORANIAN:  Okay.
2         THE VIDEOGRAPHER:  Off the record at
3 2:33 p.m.
4         (Recess had.)
5         THE VIDEOGRAPHER:  Back on the
6 record at 2:49 p.m.
7 BY MR. BORANIAN:
8     Q.    Dr. Gilson, you've made reference a
9 couple of times to a task force or task forces
10 --
11     A.    There are two essentially in our
12 county, yes.
13     Q.    -- including one involving Attorney
14 Carole Rendon.  Can you tell me who else is on
15 those two task forces?
16     A.    We would be, the county, the medical
17 examiner's office.  City of Cleveland would have
18 their public health -- or health department
19 individuals, as well as police department.  The
20 County Board of Health would have representation
21 there, individuals from MetroHealth Medical
22 Center, Dr. Papp from Project DAWN.  Cleveland
23 Clinic would have a representative I'm certain.
24 There were individuals from the governor's
25 office and the State Attorney General's office

1 who were present.  I can't say they were always
2 at every meeting, but they certainly were
3 represented there.  Individuals from the
4 treatment and recovery community sober houses
5 and those individuals.
6         I'm sort of running around the table
7 in my head who might be sitting there, and I may
8 have overlooked somebody, but that's a good
9 starting list, I would guess.
10     Q.    Have you covered both task forces
11 you referred to?
12     A.    Thinking more of the U.S. Attorney's
13 with Carole, but I would say there was a lot of
14 overlap between the two, and that the health
15 department was more Cuyahoga County, so the City
16 of Cleveland's health department was not there.
17 There would be presentations from different
18 people, too, like community groups that were
19 trying to address, you know, interventions,
20 educational strategies.  That would have been
21 more likely at the Board of Health, but there
22 were also, you know, individuals who were
23 representing education at the U.S. Attorney's
24 task force as well.
25     Q.    Were there any private citizens as

1 members of either of those task forces?
2     A.    I think the individuals in the
3 recovery community were essentially there as
4 private citizens.  I mean, they were, you know,
5 representing that viewpoint, which is very
6 valuable to us.  But in terms of just an
7 at-large member from the county, that I don't
8 think we had.
9     Q.    And I should have asked you this
10 first, but can you please name for us the two
11 task forces?
12     A.    I call them, and I hope this will be
13 clear enough -- I don't know what their formal
14 names are as I sit here, but the Cuyahoga County
15 Board of Health task force, which was in the
16 injury prevention program at the Board of
17 Health.  That's Vince Caraffi, who is the one
18 that chaired that up until recently.  He stepped
19 down, and April Vince is in charge of that
20 coordination now.
21         The second one was the U.S.
22 Attorney's task force, which I mentioned, and
23 that was convened with Steve Dettelbach, who was
24 our U.S. Attorney at the time it started, and he
25 had called our summit at the Cleveland Clinic at

59 (Pages 230 - 233)

Page 234

1 the end of 2013. Steve Dettelbach was replaced
2 by Carole Rendon, who was our U.S. Attorney.
3     Q.   I think you've answered the
4 question, Doctor.
5          MR. BADALA:  Were you done answering
6 the question?
7     Q.   The question was what were the two
8 task forces, and you've now named two task
9 forces.
10    A.   Oh, okay.
11          -  -  -  -  -
12         (Thereupon, Gilson Deposition
13          Exhibit 9, E-Mail String, Beginning
14          Bates Number CUYAH_001709118 -
15          Marked Confidential, was marked for
16          purposes of identification.)
17          -  -  -  -  -
18    Q.   Let me direct your attention to
19 Exhibit 9, Dr. Gilson.  Is this an e-mail
20 exchange in February 2013 between you and
21 someone named Rose and an attorney at the Board
22 of Pharmacy named Danna Droz?
23    A.   Yes.
24    Q.   If you go to the second page on the
25 back of the document there, Danna Droz writes in

Page 235

1 the second paragraph, "In talking with
2 Dr. Gilson, he wants to obtain data on persons
3 who died sometime in the past for research
4 purposes.  His right to obtain identified data
5 is limited to persons with whom he is currently
6 involved.  So he may request an OARRS report
7 during the process of an autopsy or death
8 investigation.  He cannot request retrospective
9 data even though he could have requested it at
10 the time of death."
11         Is that what it says, Doctor?
12    A.   That's my understanding of it, yes.
13 Could I finish reading it just for a second?
14    Q.   Are you finished, Doctor?
15    A.   Give me just a second.
16    Q.   Just look at me when you're done.
17    A.   Okay.
18    Q.   So in February of 2013 you had
19 access to OARRS for any subject that was
20 currently under investigation in your office,
21 true?
22    A.   That's what this reads, yes.
23    Q.   And that was true even before 2013,
24 right; that is, you had access to OARRS reports
25 for individuals who you were investigating in

Page 236

1 your office, true?
2    A.   We had aggregate data that was
3 supplied by the Board of Pharmacy through OARRS
4 for 2012.  We were not granted full access to
5 that data.
6    Q.   Well, did you -- I'm not asking
7 about full access to aggregated data.  I'm
8 asking about access to an OARRS report for a
9 subject being investigated in the medical
10 examiner's office.  You had access to those
11 reports for the individuals you were
12 investigating even prior to 2013, right?
13          MR. BADALA:  Objection to form.
14    A.   We had incomplete access to those
15 individuals.
16    Q.   If an individual died in 2010 and
17 was under investigation in your office, you had
18 access to that individual's OARRS report, true?
19          MR. BADALA:  Objection to form.
20    A.   Again, I would say not the full
21 report, but we had access to some of their OARRS
22 report, yes.
23    Q.   You had access to that individual's
24 prescription history, right?
25          MR. BADALA:  Objection to form.

Page 237

1    A.   We had access to the prescription
2 history, but not to the prescriber information,
3 yes.
4    Q.   And that's true since the inception
5 of OARRS in 2006, you had that particular
6 access, right?
7          MR. BADALA:  Objection to form.
8    A.   I requested access to OARRS.  I
9 don't believe the agency, the coroner's office,
10 had that access.  I don't know that they pursued
11 it or if they were even aware of it.  I became
12 aware of it and that's when I started to pursue
13 it.
14    Q.   Whether the office was aware of it
15 prior to 2012, the office could have requested
16 and could have received an OARRS report for an
17 individual it was investigating as early as
18 inception of the program, true?
19          MR. BADALA:  Objection to form.
20    A.   I can't answer that because I had a
21 lot of difficulty myself obtaining that access.
22    Q.   Well, when you asked for access,
23 they told you that you can have access for an
24 individual during the process of an autopsy,
25 right?  That's what they told you, right?

60 (Pages 234 - 237)

Page 238

1     A.    That's what this says here, but --
2     Q.    And that access was available to you
3  since the inception of the program, you just
4  never asked, right?
5           MR. BADALA:  Objection to form.
6     A.    I was obtaining this, you know,
7  trying to reach out to get this for a period of
8  time before this and not getting a lot of
9  headway with it.
10          In 2017 the Board of Pharmacy
11  actually created a special designation based on
12  discussions that we were having around this for
13  coroners and medical examiners to guarantee they
14  would have access.  A lot of the coroners in
15  Ohio are elected physicians who are not trained,
16  like me, to be death investigators, so they
17  could access OARRS through their own DEA license
18  because they were prescribers.  I could not
19  because I did not have a DEA license, and as I
20  tried to go into this to obtain the access, my
21  recollection, as the medical examiner, an agent
22  of the county, was that that was difficult
23  because I was not treating people with opioids.
24    Q.    You keep saying when you obtained
25  access, Doctor.  As a matter of fact, the

Page 239

1  medical examiner's office has always had access
2  to OARRS and to an OARRS report, including
3  prescribing history, for as long as OARRS has
4  been in inception; is that right?
5           MR. BADALA:  Objection to form.
6     Q.    You may not have had access to
7  retrospective de-identified data before you
8  asked in 2013, but, like we said, in 2010 or
9  2008, if you had a subject you were
10  investigating, you could get that person's
11  prescription history, true?
12          MR. BADALA:  Objection to form.
13    A.    I don't think that was actually my
14  experience in 2011 when I started the process.
15    Q.    Did you ask before 2013?
16    A.    Yes, I did.
17    Q.    What did you ask for before 2013?
18    A.    I wanted access to the OARRS
19  database to see if we could establish the
20  relationship between the 2000 -- pardon me, the
21  heroin epidemic and the prescribing practices of
22  those decedents before they died.
23    Q.    And had you ever -- before placing
24  that request in 2012, had you ever requested an
25  OARRS report for an individual you were

Page 240

1  investigating?
2           MR. BADALA:  Objection to form.
3     A.    No.
4     Q.    So you mentioned, Doctor, that you
5  had eventually received de-identified data?
6     A.    Yes, I did.
7           -  -  -  -  -
8           (Thereupon, Gilson Deposition
9           Exhibit 10, Article Entitled "The
10          Cuyahoga County Heroin Epidemic,"
11          was marked for purposes of
12          identification.)
13          -  -  -  -  -
14    Q.    And let me show you Exhibit 10,
15  which is an article you published in 2014, and
16  this article describes de-identified data --
17  analysis of de-identified data for 2012
18  fatalities; is that right?
19    A.    What page are you at?
20    Q.    Just take a look at the abstract.
21  It says in the third paragraph, "The medical
22  examiner's office conducted a retrospective
23  analysis of 2012 fatalities to identify
24  potential risk factors and intervention points."
25  That's the de-identified data you received from

Page 241

1  OARRS, true?
2     A.    The OARRS data is part of that.  We
3  were identifying a lot of different things in
4  terms of what we were looking at here to try to
5  see if we could identify intervention points.
6  The OARRS data at that time, as I say, was
7  de-identified and incomplete, but we mentioned
8  it as much as it was helpful and relevant to the
9  investigation, retrospective investigation of
10  these fatalities.
11    Q.    So Exhibit 10 is an article that you
12  published, right?
13    A.    Yes, it is.
14    Q.    And it's titled "The Cuyahoga County
15  Heroin Epidemic," right?
16    A.    Yes, it is.
17    Q.    This article reports on your
18  analysis of 161 heroin-related deaths in 2012,
19  true?
20    A.    Yes.  We actually excluded one of
21  them because it was a stillborn and our feeling
22  was that that really wasn't relevant to the
23  population we wanted to look at.
24    Q.    And one of the observations that you
25  made was that a prescription for legal

Page 242

1 controlled substances was noted in 64 percent of
2 deaths associated with heroin, true?
3     A.   What page are you on?  It sounds
4 familiar to me.
5     Q.   The abstract, the beginning of the
6 abstract.
7     A.   I'm sorry.  Yes, that's right.
8     Q.   And that's based on that
9 de-identified 2012 OARRS data, right?
10     A.   Yes.
11     Q.   Now, I've seen this number 64
12 percent in other documents that relate to you
13 and your office.  When we see that number, 64
14 percent who had a prescription for legal
15 controlled substances, that number comes from
16 the analysis of the 2012 de-identified OARRS
17 data, right?
18     A.   Yes.
19     Q.   Now, once you started taking
20 advantage of your access to OARRS in 2013, did
21 you start gathering data prospectively for
22 individuals who the office was investigating?
23     A.   We would, in the death review
24 committee, wait a period of a few months for
25 final certification of deaths, and while we were

Page 243

1 doing that process, we would collect an OARRS
2 file on them.  So, in that sense, it's
3 retrospective, we're looking back at their
4 prescription history.
5     Q.   Okay.  Fair enough.
6     A.   Prospectively we're recruiting
7 people, but we're looking retrospectively at
8 their prescription histories.
9     Q.   My question is, going forward from
10 2013, you were collecting OARRS reports for each
11 of your subjects, right?
12     A.   Right.  And at that time, around
13 mid-year, we did get the final access to the
14 prescribers in addition to the drugs that were
15 being prescribed.
16     Q.   And have you collected that
17 information from OARRS for each of your subjects
18 since 2013 up until today?
19     A.   We're trying.  As I said before, you
20 know, just the burden of the extent of the
21 crisis, we have fallen behind on that, so we
22 have --
23     Q.   And --
24     A.   If I could finish.
25     Q.   Sure.

Page 244

1     A.   We have collected and analyzed data
2 on heroin overdoses through 2016.  We recently
3 got a grant for an employee to finish up the
4 work on additional OARRS examination, and we
5 started to look retrospectively at the fentanyl
6 overdose data in 2016, when it became a
7 substantially larger problem.
8         - - - - -
9         (Thereupon, Gilson Deposition
10         Exhibit 11, Document Entitled
11         "Overdose Deaths in Cuyahoga
12         County," Beginning Bates Number
13         CUYAH_001397330, was marked for
14         purposes of identification.)
15         - - - - -
16     Q.   This is Exhibit 11, Dr. Gilson.  And
17 this cover sheet is merely to note the Bates
18 number, which is Cuyahoga 001397330.  The
19 document starts on the second page, Doctor.  And
20 this appears to be a set of slides with your
21 name on the first page.
22         Doctor, what is this document?
23     A.   It looks like a -- I don't remember
24 which talk it was, but a talk I put together
25 to -- I don't know who the audience was for it.

Page 245

1 I didn't specify.  A talk of mine, though.
2     Q.   I'm trying to figure out when you
3 did this.  It might help to look at the fifth
4 page of the presentation.  There's a chart there
5 that reflects some 2014 data.  So would it be
6 fair to date this in 2015?
7         MR. BADALA:  Objection to form.
8     A.   Probably, yes.  I would not put it
9 any earlier than 2014, and it looks like we have
10 completed data for 2014, so I would say it was
11 into 2015, because you wouldn't have had that
12 data until actually 2015.
13     Q.   If you go to the eighth page of the
14 presentation, that's entitled "Heroin Epidemic."
15 It looks like that, Doctor (indicating).
16     A.   Let me just get there.
17         Okay.
18     Q.   It refers to a 2012 retrospective
19 review, and that's the same review that we just
20 went over in Exhibit 10, the article you wrote,
21 right?
22     A.   This is the review that we did at
23 the medical examiner's office using only our
24 data, and we did not have primary sources of
25 information.  That would have been in the 2013

62 (Pages 242 - 245)

Page 246

1  review.  So this paper mentions some things from
2  2013, but I think the gist of the bulk of it is
3  about the 2012 review that we did in the office.
4      Q.   The paper referring to Exhibit 10,
5  right?
6      A.   Exhibit 10, yes.
7      Q.   Okay.  Fair enough.
8           The next bullet point there under
9  the Heroin Epidemic title is "2013 prospective
10  review of heroin mortality done with ME staff,"
11  et cetera, et cetera, right?
12      A.   Right.  We assembled people within
13  the room at the ME's office in a committee that
14  I called together to review that data, and the
15  goal was -- for example, in law enforcement we
16  had the sheriffs there, a county officer.  He
17  had a representative who could provide
18  information to us, partly on arrests but mostly
19  on incarceration data, because what we were
20  trying to do in this was to identify
21  intervention points, and one of the risk factors
22  for fatal overdose was somebody who was coming
23  out of incarceration or a treatment facility.
24  So that was kind of the makeup of this.
25      Q.   So if you go to the next page, we're

Page 247

1  talking about a set of 194 overdose fatalities,
2  right?
3      A.   Right.
4      Q.   And that's 2013, right?
5      A.   Right.
6      Q.   And then if you go three more pages,
7  it says, "PDR Findings."  It looks like that
8  (indicating).
9      A.   Yes.
10      Q.   It says here 73 percent of heroin
11  overdose victims had a file with OARRS, right?
12      A.   Right.  About three-fourths.
13      Q.   Now, we've also seen that number, 73
14  percent, in other documents associated with you
15  or your office.  And when we see that, 73
16  percent of heroin overdoses who had an OARRS
17  file, that refers to this 2013 data set, right?
18      A.   Right.
19           MR. BORANIAN:  I'm told the phone
20  isn't working.  I'm not sure what to do about
21  that.
22           MR. GALLUCCI:  I think that's
23  probably from before when we heard it right
24  before we took a break.
25           MR. BORANIAN:  Okay.  Let's take a

Page 248

1  break, but if you could indulge me, don't go
2  away, Doctor.
3           THE VIDEOGRAPHER:  Off the record at
4  3:09 p.m.
5              (Short recess had.)
6           THE VIDEOGRAPHER:  Back on the
7  record at 3:10 p m.
8  BY MR. BORANIAN:
9      Q.   This is Exhibit 12.  Oops.  I marked
10  the wrong one.  Hang on.
11      - - - - -
12           (Thereupon, Gilson Deposition
13           Exhibit 12, Document Entitled
14           "Opioid Crisis Response:  Examining
15           Overdose Deaths at Cuyahoga County
16           Medical Examiner's Office," with
17           Attached Sheet Bates Numbered
18           CUYAH_001684555 - Marked
19           Confidential, was marked for
20           purposes of identification.)
21      - - - - -
22      Q.   This is Exhibit 12, Dr. Gilson.
23  This appears to be a presentation, or maybe a
24  poster, with your name on it, along with
25  Dr. Deo.  Can you tell us what this is, Doctor?

Page 249

1      A.   I'm not completely certain, but I
2  think this was a poster that Dr. Deo, who is a
3  student at the Case Western School of Public
4  Health, produced based on research he was doing
5  at our office.
6      Q.   So it's entitled "Opioid Crisis
7  Response:  Examining Overdose Deaths at Cuyahoga
8  County Medical Examiner's Office," with a Bates
9  number noted on the second page as 001684555,
10  and if you look over at the far right column,
11  Doctor, it says, "OARRS Data, Fentanyl Overdose
12  Deaths February 2017," right?
13      A.   Right.
14      Q.   Is this part of the analysis of
15  fentanyl deaths in connection with OARRS that
16  you've described before?
17      A.   Yes.
18      Q.   It says, "55 fentanyl overdose
19  deaths in February 2017," right?
20      A.   That was one of the worst months in
21  Cuyahoga County.
22      Q.   And the fourth bullet point says
23  that 41 out of 55 had an OARRS file, right?
24      A.   That's correct.
25      Q.   That's about 80 percent, right?

63 (Pages 246 - 249)

Page 250

1   A.   Yes.
2   Q.   Now, you've mentioned earlier in the
3 deposition that same number, 80 percent.  Is
4 this the source for your citation of the 80
5 percent figure?
6   A.   No.
7   Q.   Okay.  Has the medical examiner's
8 office done any analysis of fentanyl overdose
9 deaths other than what's represented here on
10 Exhibit 12?
11   A.   Yes, we have.
12   Q.   What is the source of your stated
13 opinion that 80 percent of fentanyl deaths have
14 a history of prescription medication?
15   A.   It's this information.  I thought
16 you said 80 percent of our opioid deaths, heroin
17 deaths.
18   Q.   Maybe I misspoke.  I'm sorry,
19 Doctor.  I haven't looked at the transcript, but
20 I think you said earlier today that 80 percent
21 of fentanyl deaths have a recent history or a
22 history of a prescription drug prescription,
23 right?
24   A.   No.  What I said earlier today was
25 that approximately 80 percent of the heroin

Page 251

1 overdose deaths that we had in that phase of the
2 crisis had an OARRS file, and that was the 73
3 percent that I'm referencing here.
4   Q.   Okay.  So that's where I'm confused
5 then.  Okay.  So what I was seeing for heroin
6 deaths is 64 percent based on the 2012
7 retrospective data.
8   A.   Sure.
9   Q.   I have seen 73 percent based on the
10 194 cases in 2013.  Doctor, where do you get 80
11 percent of heroin-related deaths have an OARRS
12 file?
13   A.   Sure.
14       My estimate, if I might say, is that
15 we estimated approximately 80 percent of the
16 heroin overdose victims had a history of
17 receiving prescription pain relievers.  I take
18 that from this data, the 73 percent.  And I'm
19 not parsing that for, you know, this is closer
20 to what I want.
21       The 2012 data, where the 66 percent
22 came from, was actually limited in the time of
23 look-back because we had delay in getting access
24 to OARRS to do the look-back.  So some of the
25 look-backs we did on heroin overdoses in 2012

Page 252

1 were as short as six months and, at the longest,
2 18 months.  So I thought that number -- and this
3 was one of the reasons I wanted to continue to
4 collect the data -- was potentially an
5 underestimate.
6       When I saw this number, this still
7 actually represents, to some extent, a, you
8 know, initial period look-back of about two
9 years for virtually all of these cases in 2013.
10 That was a better look-back period.
11   Q.   Let me stop you there.  When you say
12 "this number," which number?
13   A.   73 percent.
14   Q.   Okay.  Continue.
15   A.   Is better data, and that's really
16 what we were striving to get to see if we could
17 tie the heroin crisis back to opioid pain
18 relievers.
19       At the time we were collecting this
20 data, there was really very little, other than
21 anecdotal reports, to say this heroin phase of
22 the crisis represented a transition.
23       In 2013 substance abuse and mental
24 health services published a bulletin, where they
25 had gone back and talked to actual heroin users

Page 253

1 and said, "How did you get started abusing
2 opioids," and that number was 79.5 percent, 80
3 percent of those addicts said I started using
4 opioid pain relievers.  And when they looked the
5 other direction, most of the people who were
6 abusing opioid pain relievers said no, I never
7 started with heroin, I'm abusing this substance.
8       So when I saw that number in
9 conjunction with this -- and this is again as
10 more data is becoming involved -- that's where I
11 draw that number of about 80 percent of our
12 addicted population come from that transition.
13 I can't talk to the people after they died to
14 ask them how did you get started, but somebody
15 did that, we didn't duplicate that effort, but
16 we used this data as a support to that to say,
17 listen, almost 80 percent of our overdoses have
18 been using prescription opioids, some of them
19 with very long track records and, in fact, you
20 know, that number is very close to what's being
21 quoted from the interviews with the living
22 individuals who are abusing heroin currently.
23   Q.   The 80 percent, then, comes from a
24 bulletin that you read, right?
25   A.   From the substance abuse and mental

64 (Pages 250 - 253)

1 health services.
2    Q.   Have you reviewed the data upon
3 which they base that bulletin?
4    A.   Yes, I did.
5    Q.   And what form did that data take?
6    A.   They're interviewing heroin addicts,
7 current heroin addicts, with the question that I
8 said, you know, how did you get started abusing
9 opioids, and 80 percent, 79.5 percent said that
10 they had started abusing prescription
11 medications.
12    Q.   Did those interviews take into
13 account whether those individuals had a
14 prescription for the opioid that they say they
15 initiated with?
16    A.   They talked about non-medical pain
17 reliever use.  I do not know that I remember
18 enough detail to say whether they had, in fact,
19 obtained those legally or by diversion.
20    Q.   So you can't tell from those data
21 whether the use of prescription opioids was
22 legal or illegal for that population, true?
23    A.   I don't remember exactly the -- what
24 that metric was.
25         The other thing I wanted to add --

1    Q.   They didn't ask about that in their
2 survey, did they?
3    A.   Pardon?
4         MR. BADALA:  Were you done?
5    Q.   They didn't ask about that in their
6 survey, did they?
7    A.   Could I finish the previous thought,
8 though?
9    Q.   Sure.
10    A.   The other thing I wanted to add
11 about that study is they did a ten-year
12 look-back.  Basically they wouldn't trust the
13 addict's memory beyond ten years, so they were
14 looking back further than we were with our data.
15 So I thought that might have explained some of
16 the smaller discrepancy, the 73 percent versus
17 the 79 percent, but statistically they were very
18 close.
19    Q.   In what form was that data provided
20 to you?
21    A.   What data was that?
22    Q.   The data that supported the bulletin
23 that you reviewed.  You said you reviewed the
24 data.  In what form was it?
25    A.   I reviewed the bulletin.  I didn't

1 go back to review the original research data.  I
2 didn't understand you if that was what you were
3 saying.
4    Q.   Okay.  My question was if you had
5 reviewed the data, so I'll ask again.
6         Did you review the original research
7 data for that bulletin?
8         MR. BADALA:  Objection to form.
9 Outside the scope.
10    A.   No.  I reviewed the bulletin and the
11 methods that were spelled out in it.
12         MR. BADALA:  Do you have to take a
13 break or anything?
14         THE WITNESS:  Sure.  Okay.
15         MR. BADALA:  Why don't we take a
16 five-minute break.
17         THE VIDEOGRAPHER:  Off the record at
18 3:19 p.m.
19         (Recess had.)
20         THE VIDEOGRAPHER:  Back on the
21 record at 3:26 p.m.
22 BY MR. BORANIAN:
23    Q.   So, Dr. Gilson, we've been
24 discussing the investigation of diversion and
25 overprescription and the use of the OARRS

1 database.  Has the county made any other uses of
2 the OARRS database beyond what we've already
3 discussed?
4         MR. BADALA:  Objection to form.
5    Q.   Not just your office, the whole
6 county.
7    A.   We're obviously sharing our data at
8 these task forces, including the data that we've
9 gleaned from OARRS -- by "we" in this case, I'm
10 putting on my medical examiner hat -- and
11 impacts that could have on law enforcement,
12 prosecutions, things like that.  I can't
13 necessarily quantitate, but the collaborative
14 effort that we created I think with this data
15 and pointing it back towards opioid pain
16 relievers I think is kind of a ripple effect of
17 using the OARRS system.
18         Specifics in terms of using the
19 OARRS system, I'm aware some jurisdictions use
20 it to identify doctors to sign death
21 certificates.  We have not done that.
22    Q.   Do you know who the OARRS
23 registrants are within the county, people who
24 actually have an OARRS access set of
25 credentials?

65 (Pages 254 - 257)

Page 258

1    A.   Within the county itself?
2    Q.   Yes.
3    A.   As county representatives or just
4 the whole county?
5    Q.   As representatives of the county,
6 for example, the sheriff's office or protective
7 services or the medical examiner.
8    A.   I would know that the physicians at
9 the county hospital would all have OARRS access
10 because that was actually part of an initiative
11 in 2015, to have all of the medical
12 practitioners have access to OARRS, and then I
13 think the pharmacists are similar, that they
14 have to have access, so I would think pharmacy
15 personnel at our county hospital would have
16 that; jail, by extension, as we covered that,
17 would have access.  And we in the medical
18 examiner's office.  The sheriff, unless it's
19 through a law enforcement, which I'm not aware
20 of -- I don't know if they do or do not.  Other
21 law enforcement agencies I believe do, but
22 they're not county representatives.
23    Q.   Does the county sheriff ever
24 directly access the OARRS database?
25    A.   I do not know.  I don't know.  As I

Page 259

1 said, they have access.  They can have access
2 through law enforcement.
3    Q.   So other than your office, are you
4 aware of any other county office that makes
5 direct access to the OARRS database?
6    A.   Oh, I'm sorry if I wasn't clear.
7 The county hospital has to have that access with
8 its practitioners and its pharmacy.
9    Q.   Anyone else?  Any other agencies?
10    A.   Can I look at the org chart?  I
11 can't see anybody here I could say with
12 certainty has access.
13    Q.   Is there any database or central
14 file system for cases investigating drug
15 diversion?
16       MR. BADALA:  Objection to form.
17    A.   At the county level or --
18    Q.   Yes.
19    A.   Unless it's in the county
20 prosecutor's office, I'm not aware of one.  I
21 know they have a unit who would be investigating
22 cases for prosecution, but otherwise, most of
23 the investigation of diversion and things like
24 that I think would be at a state level.
25    Q.   Is there any central database or

Page 260

1 file system for county investigations of
2 overprescribing of medicine?
3    A.   Again, at our county hospital, with
4 the office of opioid affairs that was opened,
5 they review prescribing practices with opioid
6 pain relievers with the idea of addressing
7 apparent overprescribing with practitioners that
8 they identify.
9    Q.   When a physician is under
10 investigation for participating in illegal
11 diversion, does the county take steps to stop
12 the behavior during the investigation?
13    A.   Are we talking -- I'm a little
14 confused -- pill mill scenario or something like
15 that or --
16    Q.   Yeah, any doctor under
17 investigation, whether a county employee or
18 someone running a pill mill, someone running a
19 pain clinic.  If that doctor is under
20 investigation, does the county take any steps to
21 stop the illegal activity while the
22 investigation is going on?
23    A.   I mean, ultimately they would arrest
24 them, I guess, if they were founded in the
25 evidence collection period.  I guess until you

Page 261

1 really know that it's a crime --
2    Q.   Short of arresting somebody, is
3 anything done to stop the behavior that is under
4 investigation?
5    A.   If I can go back to the county
6 hospital, the example with the office of opioid
7 affairs there, yes, they are liaisoned with --
8 through the medical staff and the practices are
9 described.  And I don't think it's an immediate
10 you're doing the wrong thing so much as they
11 require an explanation, and if that explanation
12 isn't satisfactory, then they're remediated to,
13 you know, prescribing practices, maybe
14 reacquaintance with CDC prescribing guidelines
15 from 2016 or something like that as a basis.
16    Q.   Now, Doctor, I'm also going to ask
17 you about topic number 27, which is "Knowledge
18 of and access to data concerning prescription
19 opioid manufacturing, prescribing, distribution,
20 or dispensing."  We've already gone through
21 ARCOS and OARRS and a few others.  I'm not going
22 to repeat that.
23       So here's my question, Doctor:  Are
24 there other databases that the county could use
25 to gain information about the manufacturing,

66 (Pages 258 - 261)

1 prescribing, distribution or dispensing of
2 opioids?
3      A.   I just want to say, for clarity, we
4 do not have access to the ARCOS database, so we
5 could not access that.
6           And then OARRS is really the best
7 access that I know of we have for data
8 concerning at least dispensing and distribution.
9 Manufacture, we don't have any independent
10 access to that.  And prescribing obviously does
11 come through the OARRS database.
12      Q.   Do you have any access to any
13 databases from the Department of Health?
14      A.   We are in task forces with the
15 Department of Health, and if I understand,
16 county department of health or state department
17 of health, city department of health?
18      Q.   Well, I was referring to the state
19 department of health, so let's start with that.
20 Do they have any databases that you have access
21 to regarding the manufacture and distribution,
22 dispensing, et cetera, of opioids?
23      A.   I don't know where the Board of
24 Pharmacy sits, if that sits in the Department of
25 Health, but we maintain that relationship with

1 Department of Health through our task forces.  I
2 don't have any databases I could steer you
3 towards about those topics.
4      Q.   I'm going to mark this as the next
5 exhibit, which is number 12.  And this is a
6 relatively long one, Doctor, but my question is
7 going to be specific.  This is a document that
8 appears to have -- we're at 13.
9           -  -  -  -  -
10           (Thereupon, Gilson Deposition
11           Exhibit 13, Document Entitled "Ohio
12           Department of Health, Ohio's
13           Prescription Drug Overdose Epidemic:
14           Epidemiology, Contributing Factors
15           and Ongoing Prevention Efforts,"
16           Beginning Bates Number
17           CUYAH_001547662 - Marked
18           Confidential, was marked for
19           purposes of identification.)
20           -  -  -  -  -
21           MR. BORANIAN:  Can you mark that
22 number 13, Doctor, or Sal?
23           Thanks.
24      Q.   This is a document that's Bates
25 label is 001547662.  It's dated April 17, 2014

1 and it's authored purportedly by the Ohio
2 Department of Health.  It has a number of
3 statistics and bullet points in it.  On page 12,
4 for example, it has numbers for unintentional
5 drug overdoses.  On pages 30, 31 and 32 there's
6 some statistics purporting to identify how this
7 occurred.  The document is entitled "Ohio's
8 Prescription Drug Overdose Epidemic."
9           My question is, do you know where
10 these data came from?
11      A.   There's a lot of data in this.
12 Could you be a little more specific?
13      Q.   Well, let's start with the chart
14 that I identified, the one on page 12,
15 unintentional drug overdoses.  Do you know where
16 these data came from?
17           MR. BADALA:  Objection to form.
18 Outside the scope.
19      A.   They list their data sources at the
20 bottom of the page.
21      Q.   Okay.  And so does the county have
22 access to these same data sources?
23      A.   I don't know if we have access to
24 the Wonder data, or if that's pushed downward
25 towards state departments of health.  That's a

1 CDC function and they tend to collaborate more
2 with state departments of health.  I don't think
3 there would have been any impediment to us
4 necessarily getting that from the Department of
5 Health, but it might not have come directly to
6 us.  The Office of Vital Statistics we
7 contribute towards.  And, again, that
8 information gets tabulated.  It takes a very
9 long time, though, for death certificate data to
10 get tabulated just because of an inherent lag
11 that can be sometimes up to two years behind
12 real time.
13      Q.   So the Office of Vital Statistics is
14 listed as a source on many of these slides.
15 Just to clarify, does the county have access --
16 I know you contribute to that database, but does
17 the county have access to that database?
18           MR. BADALA:  Objection to form.
19      A.   To search that database?
20      Q.   Yes.
21      A.   I don't know.  I certainly would see
22 no reason we couldn't query the Ohio Department
23 of Health for that.
24      Q.   Are you familiar with SAMHSA data,
25 S-A-M-H-S-A, data?

67 (Pages 262 - 265)

Page 266

1    A.   I had mentioned SAMHSA earlier, yes.
2    Q.   What is that data?
3    A.   That's the Substance Abuse and
4 Mental Health Services Administration. That's a
5 federal entity that pretty much tracks what its
6 name says, substance abuse and mental health
7 services.
8    Q.   Does the county have access to that
9 data?
10        MR. BADALA:  Objection to form.
11    A.   Through their publications.  I don't
12 know -- again, I don't know if we have direct
13 access to their data or if we rely on their
14 publications and data that they might push down
15 toward the Department of Health.  A lot of times
16 the federal data comes down to the Department of
17 Health, not down to our county level.
18    Q.   Does the county have access to the
19 child and protective service database that the
20 state runs known as SACWIS, S-A-C-W-I-S?
21    A.   Which page are we on?
22    Q.   We're on data.
23    A.   Which topic?
24    Q.   Let me read it to you.  "Plaintiff's
25 knowledge of and access to data concerning

Page 267

1 prescription opioid manufacturing, prescribing,
2 distribution, or dispensing."
3    A.   And we're talking about child and
4 family service data from the state?
5    Q.   Yes.
6    A.   I don't know if we have access to
7 that data.
8    Q.   Do you have access to any law
9 enforcement databases, such as the LERMs
10 database for the City of Cleveland?
11        MR. BADALA:  Objection to form.
12 Outside the scope.
13    A.   As a county, the sheriff has access
14 to law enforcement databases; as an entity, law
15 enforcement within the county.
16    Q.   You have access to the medical
17 examiner office's data, true?
18    A.   Yes, I would hope so.
19    Q.   Do you have access to data from
20 other jurisdictions, such as the federal
21 government, other than ARCOS, states, cities or
22 counties?
23        MR. BADALA:  Objection to form.
24 Outside the scope.
25    A.   Both informally and by participation

Page 268

1 in national efforts.  Informally I've certainly
2 reached out to colleagues in different areas,
3 Summit County being one; the New England states,
4 where I spent a decent part of my career; New
5 York City; participation in national
6 organizations around prescription drug
7 monitoring.  I've presented at two of those
8 meetings in 2017 and 2018 as they were trying to
9 kind of formulate policies, best policies.  I
10 kind of left both meetings with Mr. Garner, the
11 director of OARRS, thinking we had it probably
12 better than a lot of other states.
13        So I'm aware of efforts by other
14 states, if that's answering your question.
15    Q.   Is the county aware of any data
16 concerning the manufacturing, prescribing,
17 distribution or dispensing of opioids other than
18 what we've already discussed?
19    A.   To the best of my knowledge, I've
20 covered everything I think I can.
21    Q.   Okay.  Does the county have access
22 to any additional data that we haven't already
23 discussed?
24        MR. BADALA:  Objection to form.
25    A.   Let me just read the topic.

Page 269

1        I mean, in participation in national
2 meetings and other things like that, I would
3 become aware of opioid prescribing and, you
4 know, mortality as it impacted other areas in
5 the country, and colleagues, as I said, from
6 previous jurisdictions where I've worked or just
7 know, and I've had discussions with them along
8 those lines.
9    Q.   Do some of the Defendants in this
10 lawsuit submit data to the ARCOS database?
11        MR. BADALA:  Objection to form.
12 Outside the scope.
13    A.   I believe that the distributors are
14 required to submit data to the ARCOS database
15 and to monitor potentially suspicious activity
16 with distribution.  That's my very cursory
17 knowledge of the ARCOS database.
18    Q.   Does any Defendant have access to
19 data, to ARCOS data, other than what it itself
20 submitted?
21        MR. BADALA:  Objection to form.
22 Outside the scope.
23    A.   I honestly don't know.
24    Q.   Do some of the Defendants in this
25 case submit data to ARCOS?

68 (Pages 266 - 269)

Page 270

1         MR. BADALA:  Objection to form.
2 Outside the scope.
3     A.   As I understand the ARCOS system,
4 and again, I wouldn't say I or the county would
5 be expert in that given that we have no access,
6 my understanding of how that database works
7 is --
8     Q.   I was asking about OARRS.  Did I say
9 ARCOS?
10     A.   You said ARCOS.
11     Q.   Strike that.
12         MR. BADALA:  I think you keep mixing
13 them up.
14         MR. BORANIAN:  No.  Just that one
15 time.
16     Q.   Do some of the Defendants in this
17 case submit data to OARRS?
18         MR. BADALA:  Same objection.
19     A.   I think the pharmacies that I see
20 listed as Defendants would be submitting data to
21 OARRS.  We previously talked about the
22 distributors, and I don't know to what extent
23 they're required to submit information to OARRS.
24 I just honestly don't know that.  I'd have to
25 check that.  But the pharmacies are the source

Page 271

1 of the information for a lot of the OARRS
2 database.
3     Q.   Does any Defendant in this case have
4 access to data other than what it submitted to
5 OARRS?
6         MR. BADALA:  Objection to form.
7 Outside the scope.
8     A.   I'm sorry.  That's a question that's
9 just broad.  Do they have access to what kind of
10 data.
11     Q.   So, for example, if my client is a
12 distributor.  It submits wholesale data to
13 OARRS.  Does my client have access to any data
14 in OARRS other than what itself submitted?
15         MR. BADALA:  Objection to form.
16     A.   I do not know what kind of access
17 the distributors have if they submit data to
18 OARRS.  I'd have to say that's something the
19 state would be better to answer than I.
20     Q.   Okay.  Fair enough.
21         To your knowledge, distributors like
22 my client don't have access to OARRS like you
23 do, true?
24         MR. BADALA:  Objection to form.
25     A.   We have a specialized medical

Page 272

1 examiner/coroner access, which no, you would not
2 have.  What we can pull out of OARRS with that
3 access, I don't know how that would relate, just
4 not knowing what sort of access the wholesalers
5 or the distributors would have to OARRS.
6     Q.   Do any of the Defendants in this
7 case have access to suspicious order reports
8 submitted by other entities?
9         MR. BADALA:  Objection to form.
10     A.   The suspicious order report, as I
11 understand it, is a DEA reporting about quantity
12 of drugs that were put into an area that seemed
13 excessive.  That's my understanding of it.  And
14 I don't know that any entity in the county has
15 access to those.
16     Q.   Do Defendants have access to
17 those --
18     A.   Oh, do the Defendants?
19     Q.   -- other than the ones that they
20 themselves submitted?
21     A.   I don't know the workings of that
22 system.
23     Q.   Do Defendants have access to any of
24 the other databases we've reviewed today?
25     A.   I don't know.

Page 273

1         MR. BADALA:  Objection to form.
2     A.   I honestly just don't know.
3     Q.   Doctor, topic 28 is "The policies
4 regarding the Ohio Board of Pharmacy's OARRS
5 database."
6         Doctor, what policies -- let's start
7 with written policies.  What written policies
8 does the county have relating to the OARRS
9 database?
10     A.   The OARRS is a state database.  I
11 don't know that we have any specific county
12 policies regarding it.  The county hospital, as
13 I mentioned, would have to have its
14 practitioners registered with OARRS, and to
15 check under specific circumstances for
16 prescribing pain medication, so any prescription
17 lasting over seven days, any continued pain
18 medication therapy that would extend beyond 90
19 days has to be revisited every 90 days.  And
20 that would apply, again, to the medical services
21 provided in the jail.
22     Q.   Those are state regulations, right?
23     A.   Right.  I mean, we have to comply at
24 the county level with the state legislations.
25     Q.   And OARRS is now mandatory, right?

69 (Pages 270 - 273)

1    A.    OARRS checks, except in that setting
2 of like immediate post-therapy, the seven-day
3 window, is mandatory to be checked.  And
4 dentists do not get an exception for that.
5 That's only physicians.
6    Q.    And that became mandatory for
7 physicians in 2015?
8    A.    April 2015.
9    Q.    And for pharmacies in 2016, right?
10    A.    That's my best understanding of it.
11 I talked with the head of OARRS and he said some
12 of those things are vague, but that's a fair
13 estimate.
14    Q.    So it was nine to ten years before
15 it became mandatory?
16    A.    OARRS was started in 2006.  The
17 reporting by the pharmacies about the controlled
18 substances was mandatory.  The checks on it did
19 not go into place until 2015, I think we just
20 said, so about nine years.
21    Q.    And for pharmacies in 2016, right?
22    A.    Or the pharmacies.
23    Q.    Okay.  Could that have been done
24 sooner?
25    A.    I think that, you know, the

1 legislation regarding the practice of medicine
2 is always a touchy topic.  And could it have
3 been done sooner?  I guess it could have.  I
4 wouldn't really know, you know, enough to say
5 how that could have been enacted.
6    Q.    Did the county do anything in those
7 intervening nine or ten years to make it
8 mandatory for physicians and pharmacies in the
9 county to report to OARRS --
10       MR. BADALA:  Objection to form.
11 Outside the scope.
12    Q.    -- or to check OARRS?
13    A.    The county did not.  Again, the
14 oversight of prescribing is a state function, so
15 it would not have really been something the
16 county I think would have addressed.
17    Q.    Are you aware of any policies or
18 practices that specifically address when a
19 county agency or employee can or should access
20 data through OARRS?
21    A.    I don't know the specifics regarding
22 the county hospital and their prescribers.  I
23 know they have to adhere to the state
24 guidelines, as we mentioned, and whether they
25 implemented any of those guidelines earlier than

1 that -- I believe in the emergency department at
2 the MetroHealth Medical Center they did
3 implement the check on OARRS for any narcotic
4 prescription earlier than 2015.
5    Q.    How about in law enforcement?  Were
6 there any policies -- are there any policies or
7 procedures in the county law enforcement
8 agencies that address when those employees can
9 or should access data through OARRS?
10    A.    Again, most of our law enforcement
11 investigation of diversion, which OARRS would be
12 beneficial for, would be done at a local level.
13 So I don't know to what extent the sheriff has
14 done that or has access to it.
15    Q.    How about any other agency, whether
16 it's protective services or the county
17 department of health; do they have written
18 policies or procedures which specify when an
19 employee can or should access data through
20 OARRS?
21    A.    They wouldn't have access to OARRS
22 because they're not prescribers, law
23 enforcement, or, obviously, pharmacies.  So no,
24 I -- I would expect they do not because they
25 don't have access to it.

1    Q.    And how about the medical examiner's
2 office; do you have policies, written policies
3 which address when your employees can or should
4 access data through OARRS?
5    A.    I don't know if we have them in
6 writing, to be honest with you, but we have used
7 the OARRS database for different data mining in
8 regard to especially our linkage of the
9 heroin-addicted population back to the opioid
10 pain relievers, and the fentanyl-addicted
11 population back to the opioid pain relievers as
12 well.  But written policies, I would think that
13 if we had them, they should have been shared by
14 counsel, but I don't know that I can tell you
15 that for certain.
16    Q.    And we have already covered, haven't
17 we, the data mining that you've done with the
18 OARRS database?
19    A.    I feel like we have, but I'd
20 certainly be willing to help you answer any
21 questions you might want to ask.
22    Q.    Now, you first requested OARRS data
23 in 2013.  Are you aware of any effort to -- by
24 anyone in the county to use the OARRS database
25 for the purpose of detecting and stopping drug

70 (Pages 274 - 277)

Page 278
1 diversion before 2013?
2    A.  Using the OARRS database?
3    Q.  Yes.
4        MR. BADALA:  Objection to form.
5    A.  In the course of investigations that
6 the prosecutor would address, I would expect --
7 again, this is local law enforcement, but our
8 prosecutor will be ultimately prosecuting those
9 cases.  They would have accessed OARRS for that
10 purpose.
11       And when I spoke with James
12 Gutierrez, he was also, like me, saying that
13 OARRS was a great tool for them in prosecutions.
14    Q.  Did the county use OARRS for
15 prosecutions prior to 2013?
16    A.  Yes.
17    Q.  And when was the first time the
18 county used OARRS for prosecution?
19    A.  I'd have to defer to the
20 prosecutor's office on that.  I do not know the
21 date.
22    Q.  In the end, OARRS is a very useful
23 tool for both law enforcement and public health,
24 right?
25       MR. BADALA:  Objection to form.

Page 279
1 Outside the scope.
2    A.  I find it very useful in my capacity
3 as a public health officer.
4    Q.  And it would be more difficult to
5 detect and address diversion, drug diversion, if
6 that didn't exist, right?
7        MR. BADALA:  Objection to form.
8 Outside the scope.
9    Q.  Strike that.
10       It would be more difficult to detect
11 and address drug diversion if you didn't have
12 access to those data, right?
13       MR. BADALA:  Objection to form.
14 Outside the scope.
15    A.  Detect or investigate, I don't -- I
16 certainly would say it might be -- it's a great
17 tool to facilitate investigation.  The detection
18 of it and getting started with it might be
19 painfully obvious in some situations.
20    Q.  And the investigation would be more
21 difficult without access to those data, right?
22       MR. BADALA:  Objection to form.
23 Outside the scope.
24    A.  Which topic -- are we still on
25 data -- I'm sorry -- or are we back to OARRS?

Page 280
1    Q.  We're talking about policies and
2 procedures that relate to the OARRS database,
3 but I'm following up on OARRS generally.  The
4 question is, would the investigation of drug
5 diversion be more difficult without the OARRS
6 database?
7        MR. BADALA:  Objection to form.
8    Q.  Without access to the OARRS
9 database?
10       MR. BADALA:  Outside the scope.
11    A.  I would say, you know, again, the
12 investigation of drug diversion is primarily
13 much more of a local law enforcement function.
14 Again, our sheriff could be participating in,
15 and certainly, as I said, our prosecutor was
16 able to say that the OARRS database was very
17 helpful in the prosecution of diversions, but
18 the identification of diversion, I would have to
19 say from a county standpoint that's probably
20 more something that local law enforcement is
21 doing.
22    Q.  Would the investigation of drug
23 diversion be more difficult without access to
24 the OARRS database?
25       MR. BADALA:  Objection to form.

Page 281
1 Asked and answered.  Outside the scope.
2    A.  I'd have to say it's a great tool to
3 do investigations on prescribing, and if we've
4 already mentioned those prescribing practices
5 that result in diversion, yes, the OARRS
6 database certainly would be helpful to identify
7 them.
8    Q.  You're not going to answer, are you,
9 Doctor?
10       MR. BADALA:  Objection.
11    Q.  Could I ask you again?
12    A.  I didn't hear what you said, sir.
13    Q.  Forget it.
14       Okay, topic 30, "What efforts, if
15 any, Plaintiffs made to influence the DEA's
16 quota-setting process; and what actions, if any,
17 Plaintiffs took in response to the DEA setting
18 of quotas."
19       Doctor, is the county aware that the
20 DEA sets quotas with respect to Schedule 1 and 2
21 controlled substances?
22    A.  I wasn't aware Schedule 1 they set
23 quotas on.  Those are illegal drugs.
24    Q.  Is the county aware -- fine.  Is the
25 county aware that the DEA sets quotas with

Page 282

1 respect to any controlled substances?
2     A.   The Schedule 2 drugs are the ones
3 that are potentially addictive.  Heroin is a
4 Schedule 1, as I understand, so there better not
5 be any quota setting by the DEA on that.
6     Q.   Is the county aware that the DEA
7 sets quotas with respect to controlled
8 substances?
9     A.   I think in a general way they are,
10 yes.
11     Q.   And when did it become aware of
12 that?
13     A.   I honestly don't know.
14     Q.   What is -- well, strike that.
15     Do you know what the aggregate
16 production quota is?
17     A.   No, I do not.
18     MR. BADALA:  Objection to form.
19     Q.   Does the county know how the
20 aggregate production quota is calculated?
21     MR. BADALA:  Objection to form.
22 Outside the scope.
23     A.   I don't know the answer to that.
24     Q.   Has the county ever made any
25 comments or objections to the aggregate

Page 283

1 production quota?
2     A.   None that I'm aware of.
3     Q.   Has the county ever provided any
4 input into that quota?
5     A.   Again, in my discussions with our
6 DEA liaison to the opiate task force, the
7 Attorney General's task force especially, that
8 input isn't sought from DEA and we don't
9 influence their quota-setting process.
10     Q.   And that same goes for the
11 manufacturing quota?
12     A.   If that's part of the DEA's
13 quota-setting process, we don't influence that.
14     Q.   And how about the procurement quota?
15     A.   I'm assuming you're telling me
16 genuine parts of that process, but we have no
17 influence on them.
18     Q.   No input at all, right?
19     A.   Pardon me?
20     Q.   No input into that at all, right?
21     A.   I would only say, you know, as we
22 share this data, that our office, as the medical
23 examiner's office, and then these other task
24 force pieces of data, are being shared, that's
25 obviously something that we're sharing with

Page 284

1 federal partners.  To what extent that has any
2 influence, I have no idea, if it has any at all.
3     Q.   Has the county ever become aware of
4 any of the quotas in any year?
5     A.   No.
6     Q.   And the county has not reacted to
7 any of those quotas in any year?
8     MR. BADALA:  Objection.  Outside the
9 scope.
10     A.   Not knowing them, we could not react
11 to them.
12     MR. BORANIAN:  Let's take a break.
13     THE VIDEOGRAPHER:  Off the record at
14 3:59 p.m.
15     (Recess had.)
16     THE VIDEOGRAPHER:  Back on the
17 record at 4:13 p.m.
18     EXAMINATION OF THOMAS GILSON, M.D.
19 BY MR. CARTER:
20     Q.   Good afternoon, Doctor.
21     A.   Hi, Mr. Carter.
22     Q.   Yes.  You just got my name.  I'm Ed
23 Carter.  I've got some questions for you this
24 afternoon, okay?
25     A.   Yeah.  Sure.

Page 285

1     Q.   With respect to the SAMHSA bulletin
2 that you mentioned, what was the date of that?
3     MR. BADALA:  Objection to form.
4     A.   It was, I believe, August 2013.
5     Q.   And SAMHSA, by its nature, was not
6 compiling Cuyahoga County-specific data, was it?
7 It was national data, right?
8     A.   Yes, that's correct.
9     Q.   You were also asked a question
10 earlier whether the county ever reported
11 diversion to the Defendants, and you mentioned a
12 request to CVS and pharmacies to provide
13 naloxone without a prescription.  Do you recall
14 that testimony?
15     A.   It came through a task force.  I
16 don't remember the exact wording I said, but as
17 we were trying to blanket the community with
18 naloxone, that was one of the interventions that
19 was recommended, yes.
20     Q.   And that's one of the interventions
21 that was requested from the task force to the
22 pharmacies, correct?
23     A.   That's my understanding of that,
24 yes.
25     Q.   And in response to that, the

72 (Pages 282 - 285)

Page 286

1 pharmacies did make naloxone available without
2 prescription, correct?
3     A.   Yes, they did.  Or at least I know
4 that certain ones did, but I know that in
5 general that was a very positive response.
6     Q.   Are you aware of any that refused
7 that request?
8     A.   I don't know that I know if anybody
9 did refuse or not.
10     Q.   I want to ask you about topic 18.
11         You were designated as a witness for
12 the county to testify on topic 18, correct?
13     A.   Yes, I am.
14     Q.   What did you do to prepare to
15 respond to questions about topic 18?
16     A.   I reviewed medical examiner data
17 with regard to overdose deaths as they related
18 to these medications and drugs listed here.  I
19 also reviewed the drug chemistry data, the
20 seized drug data in the forensic crime
21 laboratory.  And I think that's -- those are my
22 biggest pieces of that.
23     Q.   How far back did you review the ME
24 data?
25     A.   2006.

Page 287

1     Q.   And how far back did you review the
2 seized drug data?
3     A.   Through 2017.
4     Q.   So 2017 was as far back as you went?
5     A.   Yes.
6     Q.   Okay.  Anything else to prepare on
7 topic 18?  Did you talk to anyone specifically
8 about topic 18?
9     A.   I discussed things with Mr. Shannon
10 in my office, about trends and things, as we
11 recalled them, and our memories were pretty
12 similar on those things.
13     Q.   Anyone else?
14     A.   Specifically on these topics, I
15 don't remember, but I think that's everybody.
16     Q.   You agree --
17     A.   That's my preparation.  I should say
18 there's one person.  That's everybody.
19     Q.   Sure.
20         You agree many illegal drugs have
21 been abused in Cuyahoga County?
22         MR. BADALA:  Objection to form.
23     A.   Over the course of its history?
24     Q.   Over the course of the time period
25 relevant to this lawsuit.

Page 288

1         MR. BADALA:  Objection to form.
2         THE COURT REPORTER:  I'm sorry?  Did
3 you say --
4         THE WITNESS:  Sure.  I said yes.
5     Q.   Cocaine is one of those drugs that's
6 been abused in the county, correct?
7     A.   Yes.  In fact, in 2006 that was
8 actually the highest cause of drug overdose
9 mortality.
10     Q.   Methamphetamine has been abused in
11 the county?
12     A.   We issued an alert actually earlier
13 in 2018, about almost a year ago, to notice that
14 there was an upsurge in methamphetamine.  It's
15 not a drug we see terribly frequently in our
16 county, but -- there were months in 2018 where
17 we did, but it's really not a major player in
18 what gets seized, and certainly not in our death
19 data.
20     Q.   If it's not a major player, why did
21 the county release an alert?
22     A.   Oh.  Well, I think that was the
23 responsible thing to do when we saw a big uptick
24 in the number of seizures.  Methamphetamine is
25 not a drug that is without its problems.  It

Page 289

1 certainly has issues in the southern part of
2 Ohio.  It's not just been a big factor in the
3 Cuyahoga County experience.
4     Q.   In the alert did it say anything
5 describing the extent to which meth was a
6 problem in the county?  Did it say
7 methamphetamine is not a real problem here but
8 we're issuing an alert?
9     A.   I don't remember the exact wording
10 of the alert, but I would certainly say,
11 Mr. Carter, it did not say it wasn't a problem.
12 Any of these drugs are problems, and the fact
13 that we were seeing more of it and issuing an
14 alert, it certainly wasn't the intention of the
15 medical examiner's officer or crime laboratory
16 to downplay that.  We were issuing the alert
17 because we were concerned.
18     Q.   Is marijuana an illegal drug that's
19 been abused in the county?
20         MR. BADALA:  Objection to form.
21     A.   Well, it's a legal substance now in
22 Ohio.  I think the details are being worked out
23 now about distribution.  But for the time frame
24 that we're talking about, most of that time it
25 was an illegal drug.

73 (Pages 286 - 289)

Page 290

1    Q.   And during that time period when it
2  was classified as an illegal drug was it abused
3  in the county?
4         MR. BADALA:  Objection to form.
5    A.   Yes.
6    Q.   What about synthetic marijuana; was
7  that abused in the county?
8         MR. BADALA:  Objection to form.
9    A.   You know, I saw this question, and I
10  would define synthetic marijuana as having a lot
11  of overlap with spice and bath salts, and that's
12  how I would answer your question, which is that
13  we did have spice, bath salts, synthetic
14  marijuana.  How you described them as a problem,
15  probably for about a year.  And we were seizing
16  lots of them.  They were scheduled in Ohio, and
17  I want to say this is about 2013, and largely
18  vanished after that scheduling.  We saw very few
19  of them being submitted to the laboratory.
20  Those numbers dropped off dramatically.
21        And in terms of mortality from the
22  synthetic cannabinoids, very, very rare.  We did
23  research in the office and presented that on
24  MDPV, which I would have to look up what those
25  letters stand for.  I think it's methyl -- I'd

Page 291

1  have to look them up, but we didn't see a lot of
2  mortality associated with them.  And in my
3  discussions with Dr. Papp, who's an emergency
4  room physician, they weren't also something that
5  was really dominating the picture in the
6  emergency rooms either.  Opioids are, far and
7  away, dominating this picture in terms of what's
8  being seized and certainly what's being, you
9  know, a source of mortality.
10    Q.   So lumping those together, synthetic
11  marijuana, spice, bath salts, those substances
12  were abused in the county with a focus around
13  2013, correct?
14    A.   That's my best recollection.
15    Q.   What about amphetamines; have
16  amphetamines been abused in Cuyahoga County?
17    A.   I think, you know, most of that is
18  referable back to methamphetamine, and when
19  methamphetamine is broken down in the body, it
20  goes to amphetamine.  So a lot of our toxicology
21  positive testing on that -- for example, in
22  2016, we had 15 overdose deaths with
23  methamphetamine -- 16 overdoses with
24  methamphetamine detected, 15 with amphetamine
25  detected, so it's a little bit harder to tease

Page 292

1  out what is just amphetamine versus
2  methamphetamine because of the relationship they
3  have in the breakdown in the body.
4    Q.   As a result of that chemical
5  relationship, is it possible that the
6  methamphetamine overdose deaths are
7  underreported?
8    A.   Meaning, I guess, if I understand
9  you correctly, could we have something reported
10  as an amphetamine death and that actually being
11  methamphetamine --
12    Q.   Correct.
13    A.   -- and it would have been
14  misidentified?  I suppose that's certainly a
15  possibility.  I would add, too, parenthetically,
16  in 2017 most of our methamphetamine deaths were
17  in association with fentanyl and it was about 24
18  deaths, so the numbers aren't large, and it's
19  sort of one of those things I think that
20  fentanyl has a general trend in our county of
21  pulling up a lot of other drugs.  So
22  methamphetamine, cocaine, heroin all got pulled
23  up in 2016 when fentanyl really took off.  And
24  in analyzing that data, especially with cocaine
25  and heroin, the change wasn't due to increases

Page 293

1  in isolated cocaine and heroin mortality.  It
2  was due to mixtures.  Methamphetamine, being as
3  small as it is, we didn't do that analysis.
4    Q.   And the fentanyl that you referenced
5  pulling things up, that's illicit manufactured
6  fentanyl that you described earlier, correct?
7    A.   That's -- that's our best
8  understanding of that, yes.
9    Q.   What about benzodiazepines; have
10  they been abused in Cuyahoga County?
11    A.   Yes, they have.
12    Q.   K2, has that been abused in the
13  county?
14    A.   K2 is another one of the synthetic
15  cannabinoids, so I would sort of lump it under
16  the answer that I gave there.
17    Q.   You would answer it the same way
18  that you did with respect to spice, bath salts?
19    A.   Right, and the synthetic
20  cannabinoids, that sort of cluster, the
21  cathinones and other things.  That was a trend
22  that we saw for a period of time, and mostly it
23  came under that heading of bath salts, but these
24  were other names for that.
25    Q.   What about hallucinogens?  Has

74 (Pages 290 - 293)

Page 294

1 ectasy and has LSD -- have those been abused in
2 the county?
3    A.   We don't see a lot of LSD in the
4 county, at least in the mortality data or
5 particularly in the seizure data.  I would
6 hesitate to say, especially over this time
7 frame, that that number is zero, but again I
8 would emphasize it's a very small participant.
9 And in and of itself, LSD is not a fatal
10 substance in overdose.  It probably would prompt
11 more visits to the emergency department, and,
12 again, based on my discussions with an emergency
13 room physician at one of our three healthcare
14 systems, it's not the player that the opioids
15 are.
16    Q.   And with respect to drug abuse, the
17 county recognizes drug abuse that does not
18 result in an overdose death, correct?
19        MR. BADALA:  Objection to form.
20    Q.   So, for example, with LSD, you can
21 have people abusing the drug whether or not they
22 overdose and die on it, correct?
23    A.   Right.  We don't have, for example,
24 a lot of deaths from marijuana.  In fact, we
25 don't have any deaths from marijuana by itself.

Page 295

1 The benzodiazepines by themselves very
2 infrequently to vanishingly rare cause death by
3 themselves.  Alcohol.  Opioids, yes, they're
4 very much present there, but by themselves, not
5 a particularly toxic compound.
6    Q.   What about PCP?  Has that been
7 abused in the county?
8    A.   We have a certain number of seizures
9 with PCP every month.  It's probably similar to
10 oxycodone seizures, maybe about 10 to 25 a
11 month.
12    Q.   Is PCP a major player?
13        MR. BADALA:  Objection to form.
14    A.   I wouldn't consider it anywhere near
15 the scope of fentanyl and heroin, and I would
16 not, if I was handicapping the race, say in any
17 way that it's a major player.  I wouldn't list
18 any of these except for the cocaine as a major
19 player.
20    Q.   And every one of these drugs that we
21 just went through that are listed here in topic
22 18, cocaine, methamphetamine, marijuana, the
23 synthetics, amphetamines, benzodiazepine,
24 ectasy, LSD and PCP, every one of those has
25 caused addictions in the county, correct?

Page 296

1        MR. BADALA:  Objection to form.
2 Outside the scope.
3    A.   You know, I don't want to voice an
4 opinion as to what constitutes addiction for
5 some of these substances because I don't know
6 and I don't think it's very clearly defined.
7 There are addictions to cocaine and
8 methamphetamine.  Are there addictions to the
9 synthetic cannabinoids?  I don't know how
10 clearly defined that is.  Are there addictions
11 to LSD versus abuse of it?  That, I don't know.
12 I don't think it's clear and I don't think the
13 county would say all of these can be potentially
14 addictive substances.
15    Q.   So to put a fine point on it,
16 sitting here today, does the county consider
17 each of those substances to be an addictive
18 substance?
19        MR. BADALA:  Objection to form.
20 Outside the scope.
21    A.   The --
22    Q.   Hold on one second so I can cure the
23 objection if it's valid.
24        MR. CARTER:  How is that outside the
25 scope of the use and abuse of controlled or

Page 297

1 regulated substances?
2        MR. BADALA:  It just asked about
3 Plaintiff's knowledge and the actions taken.
4 You're taking it much further than that.  You're
5 asking if it constitutes addiction.  I don't see
6 the word "addiction."
7        MR. CARTER:  So are you stipulating
8 for this case that abuse is not related to
9 addiction?
10        MR. BADALA:  I'm reading the topics
11 that you wrote clearly, but you're reading
12 something completely different it seems like.
13        MR. CARTER:  If the position is
14 abuse does not equal addiction, then that will
15 streamline my questions.  Are you saying abuse
16 is not addiction?
17        MR. BADALA:  You wrote the topics.
18 I'm reading exactly how you wrote it.
19        MR. CARTER:  So I'll reask my
20 question the same way then because I'm not
21 worried about the objection.
22    Q.   Does the county consider each of
23 those drugs on the list to be an addictive drug?
24        MR. BADALA:  Same objections.
25 Outside the scope.

75 (Pages 294 - 297)

Page 298

1    A.    No, because abuse does not equal
2 addiction.
3    Q.    Has the county seen reports of
4 minors using and abusing every one of these
5 substances on the list?
6    A.    I don't know that I could drill that
7 specifically into the data; that I know a lot of
8 the charges around these would, again, be things
9 that would be investigated by local law
10 enforcement, and that data wouldn't be furnished
11 necessarily to the county.
12    Q.    From the county's perspective, is
13 drug abuse by minors a significant issue that
14 they're concerned in addressing and preventing?
15    MR. BADALA:  Objection to form.
16    A.    Of course.  I mean, nobody wants to
17 see kids suffer.  They don't like to see anybody
18 suffer from drug use and abuse, but if you were
19 asking me, you know, are there specific
20 initiatives, I believe there are.  We certainly
21 have tried with the opioid crisis to establish a
22 presence in our school systems to do education
23 on that.  I know we're not talking about the
24 opioids here, but -- no.  I'd have to say it's
25 such an obvious question.  Any abuse by a child

Page 299

1 would be a source of concern to the county.
2    Q.    And given the county's concern about
3 children abusing drugs, do you understand the
4 rates or prevalence of children abusing the
5 drugs in this list?
6    A.    There's data that's collected from
7 federal groups, like the behavioral risk factor
8 surveys, that our County Board of Health would
9 be more familiar with than I.  To the extent
10 that goes down to the county level, I would have
11 to defer to them on that.  That's a somewhat
12 separate entity from us as the county.
13    Q.    Of the drugs on this list, which one
14 of them is most frequently abused by minors
15 under 18?
16    A.    I don't think the county could give
17 you an answer on that.
18    Q.    Has the use and abuse of the
19 substances identified in topic 18 -- has every
20 one of those caused the county to incur costs?
21    MR. BADALA:  Objection to form.
22 Outside the scope.
23    A.    To the extent, obviously, that we
24 have, you know, treatment programs for
25 individuals abusing drugs, the county certainly

Page 300

1 would be incurring costs.  We have an alcohol,
2 drug addiction and mental health services agency
3 in the county.  It's separate from -- it's
4 legally separate from county government, but
5 they certainly are a group we collaborate with
6 on the task force and are incurring costs around
7 this.
8    The other thing I would say is, you
9 know, to the extent that these are people who
10 wind up in our county hospital, they would also
11 be incurring costs.  Maybe they're reimbursed,
12 maybe they're not, but I would say they
13 certainly would probably cost the county money.
14 There hasn't been, I think, a dramatic
15 escalation in any of these that I am aware of
16 over the time frame, but at a baseline they
17 certainly cost the county money.
18    Q.    When you say there hasn't been a
19 dramatic escalation, what was the baseline cost
20 that the county incurred related to the use and
21 abuse of the substances in topic 18 in 2015?
22    MR. BADALA:  Objection to form.
23 Outside the scope.
24    A.    I don't have an answer to that
25 question.  I did not come across that number in

Page 301

1 my research on cost to the county on that.  As I
2 said, some of the costs that I mentioned are
3 outside of the county, and that the ADAMHS --
4 that's our alcohol, drug addiction and mental
5 health services -- is a separate entity and
6 their budget is separate from the county.
7    Q.    Is there any year from 1995 through
8 to 2018 for which you could quantify the costs
9 related to the use and abuse of the topic 18
10 substances?
11    MR. BADALA:  Objection to form.
12 Outside the scope.
13    A.    No.
14    Q.    Given that inability, do you stand
15 by your testimony that those costs have not
16 escalated over time?
17    A.    No.  I didn't say the costs didn't
18 escalate.  I'm sorry if I wasn't clear.  The
19 mortality that we see with these drugs
20 especially, and the emergency room visits that
21 we see with these drugs, are not significantly
22 changed over time.  I will make an exception
23 about cocaine and heroin, but in general, those
24 numbers haven't changed.  So the treatments that
25 are in place for them were not, to the best of

Page 302

1 my knowledge, changing, because there wasn't an
2 increase in the problems these were causing with
3 the opioid epidemic.  Some of these things
4 certainly would have the effect of the opioids
5 pushing a lot of things that were less prevalent
6 out.
7        So, for example, in our drug court,
8 which was started in 2007, at the time it
9 started, per the presiding judge there, most of
10 the cases they were hearing at that time were
11 cocaine related, and over time they've evolved
12 to almost exclusively opioids, to the point that
13 the county had to incur the cost of setting up a
14 separate docket for drug court.
15       We had cases in place where there
16 was a START program, which is a program that
17 brings children and parents of addicted children
18 in contact with people in recovery, and that
19 was, again, primarily driven by cocaine, but as
20 the opioid crisis has worsened, the focus has
21 come again towards opioids.  We don't ignore the
22 cocaine population, but there's only so much the
23 county has money to do and we have to treat as
24 many of these folks as we can.
25       MR. CARTER:  I'll move to strike

Page 303

1 everything after the portion of the response
2 where it said, "in general those numbers haven't
3 changed"  MR. BADALA:  Just note my objection.
4        MR. BADALA:  Just note my objection.
5        MR. CARTER:  You object to my motion
6 to strike; is that what you're saying?
7        MR. BADALA:  Yes.
8        MR. CARTER:  Okay.
9     Q.  Do any of the Defendants in this
10 case -- have they ever made, sold, marketed or
11 distributed any of the drugs identified in topic
12 18?
13       MR. BADALA:  Objection to form.
14 Outside the scope.
15    A.  Many of these drugs are illegal, so
16 I wouldn't consider them controlled substances.
17 Cocaine and amphetamine and benzodiazepines are
18 legal Schedule 2 -- I think cocaine --
19 medications.  I do not know whether these are
20 manufactured or distributed by the Defendants.
21    Q.  Does the cocaine -- excuse me.
22 Strike that.  Does the county link the use and
23 abuse of the drugs in topic 18 to any specific
24 Defendant?
25       MR. BADALA:  Objection to form.

Page 304

1 Outside the scope.
2     A.  I don't think so.
3     Q.  Does Cuyahoga County have a cocaine
4 epidemic?
5     A.  No.  I mean, if I can qualify that
6 and explain.  If you look at our mortality data,
7 which somebody was kind enough to give me -- on
8 the chart this would be Exhibit 11.  Cocaine is
9 shown here from 2006 to 2014, and the mortality
10 hasn't changed dramatically over that period of
11 time.  I can tell you that in 2015 that was also
12 true, and in 2016, when we looked at that data,
13 cocaine deaths nearly doubled in the county,
14 from about 100 to over 200.  But when we
15 filtered out the impact of mixtures on the
16 cocaine data, what we saw was that, in fact,
17 cocaine had actually remained flat in isolation;
18 in other words, cocaine without fentanyl hadn't
19 really changed, but the fentanyl had pulled that
20 curve up.  That was also similar for heroin.
21    Q.  Is it possible that Cuyahoga County
22 residents intended to abuse cocaine and,
23 instead, ended up getting a mixture of cocaine
24 laced with illicit fentanyl?
25    A.  I think that's a true statement.

Page 305

1     Q.  The same with respect to meth; are
2 there examples where people may have intended to
3 use meth but instead got meth that was laced
4 with other substances, such as illicit fentanyl?
5     A.  I can only say these are
6 possibilities.  I can't get inside the mind of
7 what people were intending to abuse with regard
8 to your question about cocaine.  Traditionally,
9 that was a drug that we saw much more prevalent
10 in the African-American community and did not
11 see a lot of fentanyl or heroin or opioid pain
12 overdoses in the community.  With that rise that
13 I described, though, in 2016, we started to see
14 a rise -- actually, it went back to 2015 -- in
15 African-American fentanyl mortality, and it was
16 our concern at that time that the mixture was
17 pulling up that group.
18       On the other hand, the percentage of
19 African-American cocaine deaths relative to
20 other races declined because the mixture of
21 cocaine in the fentanyl distribution was also
22 showing up in the people intending to purchase
23 fentanyl.
24       So I can't be specific, especially
25 with a small subset like methamphetamine, what

77 (Pages 302 - 305)

Page 306

1  they were intending to purchase and what they
2  got.
3      Q.   How does the county define an
4  epidemic?
5          MR. BADALA:  Objection to form.
6  Outside the scope.
7      A.   With the standard definition, which
8  is an elevated prevalence of a disease beyond
9  its baseline in a community.
10     Q.   So when you were talking about
11 cocaine and the doubling of deaths between, I
12 think it was -- you said it was 2015 and 2016?
13     A.   Right.  Yes.
14     Q.   So do you consider that doubling a
15 cocaine epidemic?
16         MR. BADALA:  Objection to form.
17 Outside the scope.
18     A.   No, for the reason that I am -- that
19 I mentioned, which is that when you factor out
20 the opioid contribution to that elevation, it's
21 not an increased incidence over baseline.
22     Q.   Would you consider the number of
23 deaths in 2016 where cocaine was adjudicated and
24 certified as the cause of death, is that a
25 crisis for Cuyahoga County?

Page 307

1          MR. BADALA:  Objection to form.
2  Outside the scope.
3      A.   I mean, we were in the midst of an
4  opioid crisis before that.  Certainly there was
5  an acute worsening in 2016 that was driven by --
6  primarily by fentanyl.  That's the position of
7  the county.  The fact that cocaine was pulled
8  back up with that, heroin was pulled back up
9  with that doesn't negate the contribution of
10 fentanyl to that part of the crisis.
11     Q.   So I'm trying to understand, with
12 respect to cocaine specifically, does the county
13 consider itself to be in the middle of a cocaine
14 crisis?
15         MR. BADALA:  Objection to form.
16 Outside the scope.
17     A.   We're in the middle of a drug
18 crisis.  I mean, is cocaine up from where it
19 was, yes, and I think the strategy is all of the
20 above with the drugs.  But if you're asking me
21 is the elevation in cocaine significant relative
22 to the elevation of the opioids, I would say
23 that it's less, because what our data shows in
24 the mortality data is that the elevation in the
25 cocaine is, unfortunately, being pulled up by

Page 308

1  fentanyl.
2      Q.   So before the cocaine doubled
3  between '15 and '16, that previous baseline
4  level of cocaine abuse and death, do you
5  consider -- does the county consider the 2014
6  level of cocaine abuse and use to be a crisis in
7  and of itself?
8          MR. BADALA:  Objection to form.
9  Outside the scope.
10     A.   It's an area of concern.  If you're
11 asking me is it a crisis because it's acutely
12 worsened, the answer to that is no.
13     Q.   So my question is if -- well, how
14 many deaths were there in 2014 caused by
15 cocaine?
16     A.   I can check.  124.
17     Q.   Does Cuyahoga County consider 124
18 deaths to be a crisis?
19         MR. BADALA:  Objection to form.
20     A.   I'm sorry.  You know, we're not
21 turning our back on these folks.  All of these
22 things are sad, that these people are dying, and
23 I think, you know, the overshadowing of this
24 crisis by heroin, fentanyl is just more tragic,
25 but if you're asking me are these folks any less

Page 309

1  valuable or something, like no.  That's not a
2  position.  The county is concerned about all of
3  our citizens, and these 124 folks who died of a
4  cocaine overdose are just as much, you know,
5  missed by their people as the hundreds who died
6  of a fentanyl or heroin overdose.
7      Q.   So from the county's perspective,
8  the 124 deaths in 2014, the county would
9  consider those to be a crisis for cocaine?
10         MR. BADALA:  Objection to form.
11 Outside the scope.
12     A.   I mean, as you use the term
13 "crisis," I think of that in terms of the
14 epidemic, and that is not part of the epidemic,
15 but it's a source of great concern.  We don't
16 like to see our citizens die of any drug
17 overdose, but -- maybe we're parsing over words,
18 but, you know, the crisis is really the opioids,
19 it's not the cocaine here, but that doesn't mean
20 that it's not a source of tremendous concern.
21     Q.   What did Cuyahoga County do in 2014
22 or the years that followed to address the use
23 and abuse of cocaine that resulted in 124 deaths
24 in 2014?
25     A.   The county would have continued its

78 (Pages 306 - 309)

Page 310

1 drug treatment services. The county would have
2 made available things like the START program to
3 those parents. It wasn't like we exclusively,
4 you know, excluded them. So we would connect
5 those parents with cocaine issues, with, you
6 know, a mentor in recovery. The county would
7 have responded to separate families where there
8 potentially was an issue that wasn't resolvable
9 with cocaine. I think the county, you know,
10 continued its treatment efforts. Drug court
11 didn't shut cocaine people out. It's just that
12 the docket became much more tilted towards
13 opioids.
14      Q.   Is that everything you can identify
15 sitting here today the county did in response to
16 the cocaine use and abuse in 2014?
17      A.   If I can look at our organizational
18 chart again.
19          During that time period, around
20 2013, 2014, the sheriff's office instituted
21 strike forces. They were supposed to supplement
22 local law enforcement so that they could address
23 any multitude of issues. So it could have been
24 in part, you know, drug trafficking. Re-entry
25 programs obviously were making efforts to

Page 311

1 reintegrate cocaine addicts. Workforce
2 development. Prosecutions of drug dealers by
3 our county prosecutor. The creation of drug
4 court for the treatment of drug addicts in lieu
5 of incarceration, provision of mental and
6 medical health services in the county jail.
7      Q.   Does the county --
8      A.   There's a lot of things --
9      Q.   I'm sorry.
10      A.   I'm sorry. I just wanted to sort of
11 close it.
12          This problem touches so many levels
13 of our community, and I think, you know,
14 interventions for some of these things are not
15 necessarily just we shut the door on everything
16 except the opioids. We're trying to deal with
17 all of them, and I don't want to say that I
18 could be exhaustive. I think as I run through
19 our org chart, there's a lot of things I can see
20 there.
21      Q.   From the county's perspective, is
22 the use and abuse of methamphetamine at crisis
23 level?
24          MR. BADALA: Objection to form.
25 Outside the scope.

Page 312

1      A.   Again, you know, with what I've said
2 about crisis, I would say no, it hasn't really
3 escalated to the comparabilities of like being
4 similar to heroin or, especially now, fentanyl.
5      Q.   Has the county done everything in
6 its power to combat the abuse of the illegal
7 drugs identified in topic 18?
8      A.   I think the county has made
9 significant investments to do that. I think if
10 you ask me are there more things we wish we
11 could do, we do. But there's -- you know, as
12 much as we can do, I really feel, especially our
13 models of collaboration, cooperation -- they're
14 national models now, and I do feel that this has
15 really been a very exemplary response to this
16 crisis, both this one and the opioid crisis
17 especially.
18      Q.   You talked earlier in the day about
19 Mexican cartels and China with respect to
20 illicit fentanyl. Do you recall that topic
21 generally?
22      A.   I remember mentioning China, and I
23 think the person who was asking me at the time
24 mentioned Mexico, and that's part of the story I
25 think as well.

Page 313

1      Q.   Do you agree that the importation of
2 heroin and illicit fentanyl from other countries
3 into the county could be considered an act of
4 terrorism?
5          MR. BADALA: Objection to form.
6 Outside the scope.
7          Which topic are we on?
8          MR. CARTER: We're on 34.
9          MR. BADALA: If you could just
10 indicate that.
11      A.   I think I made that statement.
12      Q.   You've made that statement. I'm
13 asking does the county agree with it.
14      A.   I wouldn't want to necessarily put
15 that as the county's position. It's a personal
16 opinion. I don't know that I have independent
17 confirmation to say that.
18      Q.   Okay. In terms of the drivers of
19 the rapid increase in mortality in the county
20 from 2010 through to today, do you agree that
21 it's been heroin, illicit fentanyl, fentanyl
22 analogs and cocaine since 2010?
23          MR. BADALA: Objection to form.
24      A.   Sure. I mean, I think that, you
25 know, you can look at this page from Exhibit 13,

79 (Pages 310 - 313)

Page 314

1 which goes up to 2012. Here's our crack
2 cocaine. There's our prescription opioids.
3 Here's the heroin phase. And if you want to go
4 back to our own charts and graphs, the fentanyl
5 phase was even worse than the heroin escalation
6 The analogs of fentanyl that we saw,
7 carfentanil, the elephant tranquilizer, those
8 other drugs, all caused significant rises in
9 mortality, and like the opioid pain relievers,
10 heroin, fentanyl, they are illicit opioids that
11 act on the same mechanism in the brain that the
12 opioid pain relievers do.
13    Q.   So I think we're on the same page,
14 but just to be clear then, from 2010 through to
15 today the primary drivers of the increase in
16 mortality in the county have been heroin,
17 illicit fentanyl, fentanyl analogs and cocaine,
18 true?
19    A.   Again, I'd have to put the caveat
20 with cocaine that, by itself, it hasn't
21 dramatically changed, and that the changes that
22 we see in cocaine can be reasonably attributed
23 to fentanyl, as can the changes after 2016 with
24 heroin, but heroin, in the time frame you
25 mentioned, is a significant game changer from

Page 315

1 2012, 2011 onward.
2    Q.   I want to follow up on some
3 questions on topic 19. You talked about the
4 criteria. I'm not going to go through all that
5 again, but I want to focus on the criteria, the
6 third one you identified, people that have been
7 diagnosed with an opioid use disorder, okay?
8        How does the county define an opioid
9 use disorder?
10    A.   The county identified that in
11 consultation with experts beyond what I'm
12 prepared to talk about today.
13    Q.   So sitting here today, can you give
14 me a scientific or a layperson definition that
15 the county used to define opioid use disorder or
16 did you defer to the experts on that?
17    A.   I believe we deferred to the experts
18 on that.
19    Q.   Related, does the county have an
20 official working definition of addiction that it
21 used to identify individuals in response to
22 Exhibit A and Exhibit B that are part of
23 Deposition Exhibit 2?
24    A.   I'm not aware of a working
25 definition the county has for addiction.

Page 316

1    Q.   Do you agree that a diagnosis of
2 addiction is a medical task?
3        MR. BADALA: Objection to form.
4    A.   I mean, the addiction has a
5 definition in medicine.
6    Q.   And there are physicians who provide
7 medical diagnoses of addiction, correct?
8        MR. BADALA: Objection to form.
9 Outside the scope.
10    A.   I don't know if I would say
11 addiction versus substance use or abuse
12 disorder. It's an area of medicine, the
13 terminology of which I am not familiar and I
14 would not think the county would have an opinion
15 on.
16    Q.   Do you know whether there are ICD-10
17 codes to define a substance use disorder?
18        MR. BADALA: Objection to form.
19 Outside the scope.
20    A.   ICD-10?
21    Q.   Yes.
22    A.   I don't think the county knows that.
23 I don't know it myself.
24    Q.   Do you know what ICD codes refer to
25 generally?

Page 317

1    A.   Sure. Sure do. I do I should say.
2 The county may not, but the International
3 Classification of Diseases. As their agent, I
4 would be able to inform them of that.
5    Q.   Do you agree that, from a medical
6 perspective, it's inappropriate to assume a use
7 disorder or an addiction, however you want to
8 use that term -- you would need to look at an
9 individual case, an individual resident story to
10 arrive at a conclusion of a use disorder or
11 addiction, right?
12        MR. BADALA: Objection to form.
13 Outside the scope.
14    A.   Yeah. That's a medical diagnosis
15 again and I don't think the county would express
16 anything about the appropriateness of
17 misclassifying that.
18    Q.   So the county has never -- well, the
19 county has never used its medical examiner data
20 or any other data set that it creates and
21 assigned classification of a use disorder or an
22 addiction based on looking at that data set,
23 correct? That's nothing the county has ever
24 done before?
25        MR. BADALA: Objection to form.

Page 318

1    A.   The medical examiner data would not
2 arrive at those diagnoses.  The alcohol, drug
3 addiction and mental health services of the
4 county would arrive at diagnoses like that.  The
5 hospital could arrive at diagnoses like that.
6 Does the county itself, you know, oversee that
7 diagnosis?  No.
8    Q.   You agree that all use -- substance
9 use disorders can be treated, correct?
10       MR. BADALA:  Objection to form.
11 Outside the scope.
12    A.   That's a question outside my area of
13 expertise.
14    Q.   So you do not know whether the
15 county is able to treat substance use disorders
16 for any substance they might classify?
17       MR. BADALA:  Objection to form.
18 Outside the scope.
19    A.   As I understood your question, all
20 substance use disorders being treatable, I don't
21 know that that's something that I could say the
22 county has an opinion on.
23    Q.   What about, does the county agree
24 that, with appropriate support, all addicted
25 individuals can make a recovery?

Page 319

1       MR. BADALA:  Objection to form.
2 Outside the scope.
3    A.   I think the county would like to
4 give all those addicted individuals that
5 opportunity.  Whether or not they can recover
6 would be beyond really the scope of the county's
7 ability to predict that.
8    Q.   Do you agree that there are a number
9 of people who take prescription opioids and do
10 not develop an opioid use disorder?
11       MR. BADALA:  Objection to form.
12 Outside the scope.
13    A.   Again, without having a definition
14 of an opioid use disorder, I could only say that
15 the long-term use of opioids would be expected
16 over time to create dependence on them and
17 physical withdrawal symptoms when they were
18 removed.  Whether that moves into addiction or
19 not, I couldn't really say.
20    Q.   Do you agree there are a number of
21 people who take prescription opioids and never
22 go on to break the law?
23       MR. BADALA:  Objection to form.
24 Outside the scope.
25    A.   I would sure hope so.

Page 320

1    Q.   Are there people who have an opioid
2 use disorder from prescription opioids who do
3 not go on to use illegal narcotics?
4       MR. BADALA:  Objection to form.
5 Outside the scope.
6       Which topic are we on?
7       MR. CARTER:  Topic 19, "The criteria
8 used to identify individuals who overdosed on,
9 or became addicted to, prescription opioids."
10       MR. BADALA:  Objection to form.
11 Outside the scope.
12    A.   Now you guys made me lose the
13 question.
14    Q.   Sure.
15       The question was, are there people
16 who have an opioid use disorder from
17 prescription opioids who nonetheless do not go
18 on to use illegal narcotics?
19       MR. BADALA:  Same objections.
20    A.   I think national data would support
21 that and probably local data, that there were
22 people prescribed who did not go on to become
23 addicted.
24    Q.   With respect to topic 19, has the
25 county itself vetted or confirmed any individual

Page 321

1 diagnosis of an opioid use disorder?
2    A.   That information was submitted to
3 the experts for their interpretation.  The
4 county did not independently vet those experts.
5 They were referred to our attorneys and they
6 consulted with the experts.
7    Q.   In connection with compiling the
8 individuals identified on Exhibit A, did the
9 county conduct any interviews of those
10 individuals?
11    A.   We identified claims data with the
12 criteria that I've mentioned, and that was
13 submitted through to our attorneys, and then
14 they conferred with experts and responded to the
15 interrogatories.  To my knowledge, the county
16 did not conduct independent interviews after
17 that referral.
18    Q.   After that information was referred
19 to the attorneys and the experts, do you know if
20 the attorneys or the experts interviewed the
21 individuals listed on Exhibit 2, sub-Exhibit A?
22 It's the oversized printout.
23    A.   It's the big one, right?
24    Q.   Yes.
25       MR. BADALA:  And I would just

81 (Pages 318 - 321)

Page 322

1 instruct you, if you learned about any
2 conversations through the attorney, not to
3 disclose those.
4     Q.    So it's the oversized one?
5     A.    The big kahuna.
6     Q.    So I'll ask a simpler question.
7          Sitting here today as the
8 representative of the county, do you know
9 whether anyone whose name appears on Exhibit A
10 has been interviewed in connection with their
11 identification on that chart?
12    A.    Again, that would have been referred
13 to the attorneys in consultation with experts on
14 behalf of the county.  To the best of my
15 knowledge, there was no follow-up interviews
16 conducted to the experts' opinions.
17    Q.    To the extent the DSM-5 definition
18 of an opioid use disorder was employed, do you
19 know, for the individuals on Exhibit A,
20 whether -- what severity of an opioid use
21 disorder they were found to have had?
22    A.    To the extent that we're not
23 familiar with the criteria used, I wouldn't want
24 to speculate on DSM-5 criteria and whether they
25 were employed.

Page 323

1     Q.    For everyone listed on Exhibit A, do
2 you know when in time they first developed any
3 kind of substance abuse disorder?
4     A.    All I can say is the patients were
5 diagnosed with a substance use disorder.  The
6 timing, based on the documents I have in front
7 of me, which were provided by our attorneys and
8 experts, don't specify, to my examination of
9 them, a date when they developed the diagnosis
10 -- when they developed the disorder or were
11 diagnosed with it.  They may be two different
12 dates, as I'm sure you know.
13    Q.    For any of the individuals listed on
14 Exhibit A, do you know whether they are
15 currently diagnosed with an opioid use disorder
16 or whether they are in some stage of remission?
17         MR. BADALA:  Objection to form.
18    A.    I can speak, as the county's medical
19 examiner, that once diagnosed with an opioid use
20 disorder, my understanding is that diagnosis
21 remains, whether it's in remission or not.
22    Q.    And my question is, do you know
23 whether any of them are in remission such that
24 the diagnostic code would include that modifier?
25    A.    I don't know that the diagnostic

Page 324

1 code includes that modifier, so I can't answer
2 your question.
3     Q.    Do you know for any of the
4 individuals on Exhibit A what the first drug was
5 that they abused?
6     A.    That may be known, but as I say, we
7 just identified the patients and referred them
8 to counsel for consultation with experts.
9 Whether they identified that in the course of
10 their investigation, I do not know if they
11 identified what initial drug they first used.
12    Q.    For the individuals listed on
13 Exhibit A, can you identify any specific name of
14 a person whose first drug of abuse was a
15 prescription opioid?
16         MR. BADALA:  Objection to form.
17 Outside the scope.
18    A.    It's getting a little bit late.  I'm
19 just getting a little fuzzy.  Could you read
20 that back?
21    Q.    Sure.  Happy to.
22         Of the individuals listed on Exhibit
23 A, can you identify any individual for which
24 their first drug of abuse was a prescription
25 opioid?

Page 325

1         MR. BADALA:  Objection to form.
2 Outside the scope.
3     A.    The county cannot.  We referred
4 these for the consultation with the experts, and
5 that may be something uncovered in their
6 consultation, but from our standpoint, we did
7 not go further than that to identify first drug
8 used or anything from the county's standpoint.
9     Q.    Who on Exhibit A was arrested, if
10 anyone?
11         MR. BADALA:  Objection to form.
12 Outside the scope.
13    A.    I don't know who was arrested there.
14 We didn't really explore that when we made the
15 referrals.  We just identified people who did
16 not have cancer, who were receiving high doses
17 of opioids, and who were diagnosed with a
18 substance use disorder, but we did not include
19 criteria for arrests.
20    Q.    Who on Exhibit A doctor shopped?
21    A.    Again, when the county submitted the
22 claims data, that was as far as we went in terms
23 of that investigation, and the doctor shopping
24 may have come to light with the consultation
25 with experts and review of records, but we are

Page 326

1 not aware of that.
2    Q.   Who on Exhibit A pharmacy shopped?
3    A.   I'd have to say the same answer to
4 that.
5    Q.   Do you know what any individual on
6 Exhibit A understood about the risks of using
7 prescription opioids?
8        MR. BADALA:  Objection to form.
9 Outside the scope.
10   A.   I don't understand your question.
11 Could you rephrase it?
12   Q.   Sure.
13       For any of the individuals listed on
14 Exhibit A do you know what any of them
15 individually understood about the health risks
16 associated with using prescription opioids?
17   A.   The county would not know that.
18   Q.   Okay.  Do you know about any
19 conversations that any individual on Exhibit A
20 had with their doctor or pharmacist?
21       MR. BADALA:  Objection to form.
22 Outside the scope.
23   A.   Again, we submitted the names, the
24 500 names, with the criteria that I've spelled
25 out, and beyond that, I really am not in a

Page 327

1 position to state more for the county's
2 involvement.
3    Q.   Sitting here today, do you know
4 whether any individual on Exhibit A actually
5 overdosed on an opioid?
6    A.   I do not.
7    Q.   All right.  Home stretch.
8        Exhibit B to Exhibit 2.  It's the
9 one at the very back.  If you turn a couple
10 pages to page 5, that's where it starts with
11 Cuyahoga instead of Summit.  Are you with me?
12   A.   Yes, I am.
13   Q.   So for anyone on Exhibit B, do you
14 know what substance was certified as their cause
15 of death?
16   A.   The causes of death are not listed
17 on this sheet.
18   Q.   Does the county know which of these
19 individuals on Exhibit B had multiple substances
20 certified as the cause of death?
21   A.   As I sit here, I can't answer that
22 question, but that information could be
23 obtained.
24   Q.   Does the county know which of these
25 individuals, if any, had prescription opioids

Page 328

1 identified as the cause of death?
2    A.   We would send prescription opioid
3 overdose data to the Ohio Department of Health
4 on a quarterly basis.  I believe that started in
5 2014 based on grant funding.  So that database
6 could be cross-checked with this, but as I sit
7 here today, I don't have that information.
8    Q.   So sitting here today, you can't
9 point me to any of these individuals on page 5,
10 6 or 7 and tell me specifically which ones had a
11 prescription opioid identified as their cause of
12 death?
13   A.   No.  As I say, the information is
14 available based on what we, I believe, referred
15 to Defendants in information that was sent to
16 the Ohio Department of Health, but these
17 individuals, I can't run through the list and
18 pick out names and tell you this one died from
19 prescription opioids.  I can't -- I can't do
20 that today.
21   Q.   To the extent individuals on Exhibit
22 B did have prescription opioids identified in
23 their cause of death, do you know which ones
24 obtained those legally pursuant to a
25 prescription?

Page 329

1    A.   I don't know if that would be
2 knowable, so I don't -- I'd have to say the
3 county would say we don't know.
4    Q.   For anyone on Exhibit B with an
5 overdose attributable to a prescription opioid,
6 can you tell me whether it was obtained legally
7 or illegally?
8    A.   I thought that was the question I
9 just answered.  I'm sorry.
10   Q.   I just wanted to make sure I was on
11 the same page with you.
12       So do you know -- I think I asked
13 you if you knew if it was legal, so I'm asking
14 all together, both sides, can you tell me one
15 way or the other whether anyone on here with a
16 death that was attributable to a prescription
17 opioid, whether that was obtained legally or
18 illegally?
19   A.   I cannot tell you that.  I don't
20 know whether these prescription opioid deaths
21 would have been legal or, as I said, whether we
22 can actually track that through our database
23 because of the potential legal -- obtaining
24 something legally in another jurisdiction that
25 we don't have access to.

Page 330

1    Q.   From the medical examiner's
2 perspective, there's no data or ability at the
3 medical examiner level to posthumously diagnose
4 an opioid use disorder, is there?
5    A.   We would have to rely, in the course
6 of a death investigation, whether the individual
7 came to our office with that diagnosis, but in
8 terms of an anatomical examination or laboratory
9 testing, I'm not aware of anything that
10 facilitates that diagnosis.
11    Q.   Has the county's medical examiner
12 ever diagnosed -- made a primary diagnosis of an
13 opioid use disorder in a case that it was
14 investigating?
15    A.   We may list it as a diagnosis in our
16 investigation, but as I say, that would have
17 been uncovered in the course of a historical
18 review, not from the actual physical examination
19 of an individual.
20    Q.   For the individuals listed on
21 Exhibit B, do you know which ones, if any, were
22 arrested?
23    A.   Again, I don't know if that
24 information is available, but I do not know it
25 as I sit here today.

Page 331

1    Q.   Was anyone on Exhibit B involved in
2 doctor shopping?
3    A.   I would have to go back to the
4 database.  Again, information might be
5 available, but I don't honestly know that I
6 could point to a specific name on this list and
7 tell you that was a doctor shopper.
8    Q.   Who on Exhibit B pharmacy shopped?
9    A.   I'd have to answer the same way.
10 That information may be available but I do not
11 have it with me today in preparation for
12 testimony.
13    Q.   Who on Exhibit B diverted
14 prescription opioids?
15    A.   That may be a very tough question to
16 answer, actually, because if they weren't
17 caught, nobody would probably know that, so I
18 couldn't -- I don't think anybody could give you
19 an answer to that question in completion.  There
20 may be records of prosecutions within the county
21 for some of these folks diverting, but I don't
22 think I would be able to say whether they would
23 be exhaustive given the surreptitious nature of
24 that activity.
25    Q.   Is the county able to say

Page 332

1 conclusively for every person listed on Exhibit
2 B that but for their use of prescription
3 opioids --
4        THE WITNESS:  I'm sorry.  Could we
5 take a break?  My daughter was supposed to be
6 picked up at 5:30 and I want to make sure my
7 wife knows I won't be doing that today.
8        MR. CARTER:  Sure.  Absolutely.  I
9 only have three questions left, but you can take
10 a break.
11        THE WITNESS:  I'll be right back.  I
12 just have to call her.
13        MR. CARTER:  That's fine.  We'll go
14 off the record.
15        THE VIDEOGRAPHER:  Off the record at
16 5:08 p.m.
17        (Short recess had.)
18        THE VIDEOGRAPHER:  Back on the
19 record at 5:10 p.m.
20 BY MR. CARTER:
21    Q.   Is the county prepared to say
22 conclusively for every person listed on Exhibit
23 B that but for their use of prescription
24 opioids, they would not have overdosed and died
25 when they did?

Page 333

1    A.   As I say --
2        MR. BADALA:  Objection to form.
3    A.   As I say, these were identified with
4 criteria.  Not having their causes of death in
5 front of me, I do not know what they died from.
6 We do, as a county, support and state that
7 individuals who died from opioid pain relievers,
8 in addition to heroin and fentanyl, in large
9 measure, are referable back to the opiate pain
10 reliever use in this county, but I don't know
11 the causes of death on these individuals other
12 than they overdosed, and not knowing specifics
13 on that, I just know that they have a substance
14 use disorder, but I don't know the substances
15 and I don't think I should offer an opinion
16 without that information.
17    Q.   So I asked you about every person on
18 the list.  Let me ask any person on the list.
19 For any person on that list is the county able
20 to tell me that but for their use of
21 prescription opioids, they would not have
22 overdosed and died when they did?
23        MR. BADALA:  Objection to form.
24    A.   Again, lacking their cause of death,
25 I can only point to the criteria that were used

84 (Pages 330 - 333)

Page 334

1 to select this list, but I don't know that I
2 could specifically answer your question beyond
3 that.
4    Q.   With respect to some of the
5 questions I asked you in terms of doctor
6 shopping arrests, pharmacy shopping, whether
7 they diverted, were any of those factors
8 considered in compiling the list of individuals
9 on Exhibit B?
10    A.   We identified the claims, as I said,
11 for the opioids on the basis that they did not
12 have -- they were not cancer patients, they were
13 receiving high dose, which we defined as 120
14 medical morphine equivalents or higher, and that
15 they had a diagnosis of a substance use
16 disorder.  Beyond that, I cannot characterize
17 them further in terms of arrests or other
18 things.
19    Q.   With respect to the folks on Exhibit
20 B, who on there had a dose of over 120 MME?
21        MR. BADALA:  Objection to form.
22 Outside the scope.
23    A.   As I understand it, these criteria
24 were applied to the individuals on that list of
25 500 that were provided, and they met all three

Page 335

1 of these criteria.
2    Q.   So you believe everyone on Exhibit B
3 met all three of those criteria?
4    A.   I am not familiar enough with
5 Exhibit B, but if they are taken from the claims
6 data, then they would have met those three
7 criteria.
8    Q.   Does Exhibit B include all
9 prescription-related opioid deaths that the
10 county has experienced during the time frame or
11 is it some subset?
12    A.   It's got to be a subset.  There just
13 aren't enough names on there for all the opioid
14 deaths that we've had.
15    Q.   My question was prescription opioid
16 related, so would you give the same answer to
17 that?  So does Exhibit B contain all
18 prescription opioid deaths that the county has
19 experienced?
20    A.   Give me a second to think on that.
21        That would be impossible given the
22 number here.  There's more prescription opioid
23 deaths in the county than these names here.
24    Q.   Can you attribute any Cuyahoga
25 County resident's death to the specific conduct

Page 336

1 of a specific Defendant?
2        MR. BADALA:  Objection to form.
3 Outside the scope.
4    A.   The opioid crisis has its genesis in
5 the prescribing practices that were facilitated
6 by the Defendants, and, to that extent, the
7 opioid deaths, in large measure, are the
8 responsibility of the actions of the Defendants.
9 That's the position of the county.
10    Q.   Can you link any specific conduct to
11 any individual's death?
12        MR. BADALA:  Objection to form.
13 Outside the scope.
14    A.   Any specific conduct --
15    Q.   Of the Defendants to an individual's
16 death.
17        MR. BADALA:  Same objections.
18    A.   The misrepresentation of the
19 addiction potential of the compounds, the large
20 distribution of drugs into the county, the
21 efforts to create formulations that were not --
22 I shouldn't say not tamper resistant.  The
23 efforts to create guidelines for prescribing and
24 lobbying efforts around those.  A lot of -- I
25 can't think of everything necessarily in one

Page 337

1 swoop, but the actions of the Defendants are --
2 in the counties have been responsible for the
3 deaths -- the creation of the opioid crisis and
4 the deaths that we're seeing.
5    Q.   Which individual on Exhibit B died
6 as a result of a misrepresentation of the
7 addictive potential of the compounds?
8        MR. BADALA:  Objection to form.
9 Outside the scope.
10    A.   I think again I have to say that
11 with regard to Exhibit B, I do not have causes
12 of death as to substances and I wouldn't want to
13 hazard a guess as to what information would be
14 relevant to your question.
15    Q.   Which individual on Exhibit B died
16 as a result of the large distribution of drugs
17 into the county?
18        MR. BADALA:  Objection to form.
19 Outside the scope.
20    A.   To point to a specific one, I could
21 not do.
22    Q.   Which individual on Exhibit B died
23 as a result of efforts to create guidelines for
24 prescribing and/or lobbying efforts around
25 those?

1    MR. BADALA: Objection to form.
2 Outside the scope.
3    A.   I'd have to say, again, I can't
4 point to specific ones.  I don't know their
5 causes of death.  And not knowing that, I can't
6 go further on characterizing them.
7    Q.   With respect to the
8 misrepresentation of the addictive potential of
9 the compounds, the large distribution into the
10 county, and the lobbying efforts, which specific
11 Defendants engaged in that conduct that you
12 believe was causal of any death?
13    MR. BADALA: Objection to form.
14 Outside the scope.
15    A.   Which topic are we on now?
16    Q.   On topic 19 and 34 and 2 and 18 and
17 probably others.
18    MR. BADALA: So is it your position
19 that this applies to all those topics, this
20 question?
21    MR. CARTER: Yes.  The ones that I
22 just mentioned, yes.
23    A.   And one more time.  I'm sorry.
24    Q.   So which Defendants, sitting here
25 today, does the county identify as engaging in

1 the specific conduct that you just mentioned
2 related to the death of anyone on Exhibit B?
3    MR. BADALA: Objection to form.
4 Outside the scope.
5    A.   The county identifies all of the
6 Defendants.  That was why we filed the lawsuit.
7 And the specifics of these individuals I regret
8 I don't have, but the county's position is that
9 all of the Defendants are ultimately responsible
10 for this creation of this drug-addicted
11 population.
12    Q.   So for any individual on Exhibit B,
13 can you link their death to any specific
14 Defendant?
15    MR. BADALA: Objection to form.
16 Outside the scope.  Asked and answered.
17    A.   As I understand the individuals on
18 B, the county identified them and referred them
19 for -- to our attorneys for expert analysis.
20 The county doesn't have a position on what you
21 had asked me.
22    Q.   And then my last question, can you
23 identify any Defendant named in the lawsuit who
24 could have prevented the county's opioid crisis?
25    MR. BADALA: Objection to form.

1 Outside the scope.
2    Which topic are we on?
3    MR. CARTER: Topic 34.
4    MR. BADALA: Objection to form.
5 Outside the scope.
6    A.   So if I understand your question,
7 you're asking me to identify which of the
8 Defendants we believe caused or contributed to
9 the opioid crisis in our geographic area.
10    Q.   No.  I'm asking the flip of that.
11 My question is, can you identify any Defendant
12 who could have prevented Cuyahoga County's
13 opioid crisis?
14    MR. BADALA: Objection to form.
15 Outside the scope.
16    A.   Yes.  All of them.
17    Q.   And how could they have prevented
18 it?
19    MR. BADALA: Same objections.
20    A.   By not creating that culture of
21 undertreatment of pain, by not encouraging the
22 overprescribing of pain medications, by not
23 misrepresenting the addictive potential of those
24 medications.  The things that have been spelled
25 out before I think in terms of the actions of

1 the Defendants that contributed to the opioid
2 crisis, with pain relievers initially and
3 subsequently transitioning into the opioid
4 crisis as we saw it with heroin and fentanyl and
5 the analogs of fentanyl.
6    Q.   With respect to the mortality data
7 that you have, what was the mortality
8 attributable to illegal drugs for 2017 --
9    MR. BADALA: Objection to form.
10    Q.   -- or whatever year you have in
11 front of you?  In Exhibit 11, what's the last
12 year?  That's the yellow one that's at the top.
13    A.   The last year on here is 2014.
14    Q.   Okay.  Then let's do it without a
15 specific number.  What could any Defendant have
16 done to prevent the deaths in 2017 in Cuyahoga
17 County that your office determined were caused
18 by heroin, illicit fentanyl, fentanyl analogs,
19 carfentanil or cocaine?
20    MR. BADALA: Objection to form.
21 You said '14 and then you said '17.
22    MR. CARTER: I did.  So this
23 question is 2017.  I was trying to give him a
24 reference point to a number.  I was trying to
25 wrap up since we're at the end of the day.  So

Page 342

1 I'll ask it again to be clear.
2     Q.   I understand you don't have a
3 specific number of deaths in front of you, but
4 there were deaths in 2017 in Cuyahoga County
5 that were attributable to heroin, illicit
6 fentanyl, carfentanil, fentanyl analogs and
7 cocaine.  Each of those substances represented
8 at least one death in 2017, correct?
9     A.   Yes.  Illicit fentanyl, I'd sort of
10 just say that our testing can't distinguish
11 diverted fentanyl from illicitly manufactured
12 fentanyl, but our general impression is that
13 most of those deaths were attributable to
14 illicitly manufactured fentanyl.
15     Q.   So whatever the number was
16 attributable to that combination of illegal
17 drugs that I just mentioned, what -- can you
18 identify any Defendant who could have prevented
19 those deaths in 2017?
20         MR. BADALA:  Objection to form.
21 Beyond the scope.
22     A.   Again, all the Defendants could have
23 prevented that situation.
24     Q.   So all the Defendants could have
25 prevented every single illicit drug death from

Page 343

1 those substances I just mentioned in 2017?
2     A.   I don't think it would be the
3 county's position on every one, but most of
4 them, yes.
5     Q.   Can you identify a percentage?
6     A.   I'd have to look closer at that.  I
7 don't know.
8         MR. CARTER:  Okay.  And then just as
9 an administrative clean-up, I'd like to mark the
10 binder that the witness brought with him today
11 as whatever the next number is.  I think it's
12 14.
13         MS. RANJAN:  That one has the notes
14 on it, doesn't it?
15         THE WITNESS:  This one has my notes.
16         MR. BADALA:  You can mark that one.
17         MR. CARTER:  We'll handle the
18 logistics of --
19         MR. BADALA:  That's okay.
20           - - - - -
21         (Thereupon, Gilson Deposition
22         Exhibit 14, Binder, was marked for
23         purposes of identification.)
24           - - - - -
25         MR. CARTER:  If we could go off the

Page 344

1 record.  I think we're done, but just a quick
2 caucus.
3         THE VIDEOGRAPHER:  Off the record at
4 5:22 p.m.
5           (Recess had.)
6         THE VIDEOGRAPHER:  Back on the
7 record at 5:35 p.m.
8         EXAMINATION OF THOMAS GILSON, M.D.
9 BY MS. ROITMAN:
10     Q.   Good evening, Mr. Gilson, or
11 Dr. Gilson.  I'm Sara Roitman from Purdue.  I
12 introduced myself to you earlier.  I just have a
13 few more questions for you.
14         MS. ROITMAN:  Before we begin, I
15 think we have a housekeeping administrative
16 point.  Exhibits 4, 5 and 6 were premarked but
17 they were not introduced into the record.  I
18 think that's the consensus of everyone for
19 clarity sake.  Thank you.
20     Q.   Dr. Gilson, I'd like to talk about
21 topic 4, and topic 4 is -- includes the criteria
22 that Plaintiffs used to identify the information
23 required by the interrogatories at issue in
24 discovery ruling number 5, and for your
25 reference, those interrogatories at issue, the

Page 345

1 ones I'm going to talk about, are manufacturers'
2 interrogatories 6, 7 and 10, specifically, the
3 Plaintiffs' response to number 6, which was
4 marked as Exhibit 3 today.  And it's -- to
5 orient you, it's the December 31st, 2018
6 response to interrogatory 6.
7     A.   I have Exhibit 3.
8     Q.   So, Dr. Gilson, to orient you, the
9 exhibit that we have been referring to today as
10 Exhibit 2, I believe, that giant Excel
11 spreadsheet --
12     A.   This one, yes.
13     Q.   -- that was -- Plaintiffs referred
14 to that in their response to interrogatory 6
15 when they were identifying 500 alleged
16 prescriptions that were written in reliance of
17 Manufacturer Defendants' alleged misstatement.
18 I appreciate that you have testified numerous
19 times today that you didn't see Exhibit 2 or
20 that spreadsheet prior to today, and so I'm
21 just --
22     A.   I'm going to say I don't remember
23 seeing them.
24         MR. BADALA:  Object to that
25 characterization.

1    Q.   Fair enough.
2         What I'm going to ask you really is
3    just strictly the criteria that the county used
4    when responding to interrogatory number 6.
5         So did any of the criteria that the
6    county used in responding to interrogatory 6
7    include determining whether a doctor on that
8    Excel spreadsheet was ever visited by a sales
9    representative?
10        MR. BADALA:  She's talking about
11   Exhibit 3.
12   A.   This would be page -- I remember the
13   list was there.
14   Q.   I can tell you it's not -- it is --
15   what I'm trying to figure out is the criteria
16   that was used for identifying the prescriptions
17   listed on that giant Excel spreadsheet, the 500
18   prescriptions.
19   A.   I just want to refresh my memory.
20   So it says in Exhibit 2, on the page with the
21   doctors' names, that the "Bellwether Plaintiffs
22   further contend that, by misrepresenting the
23   risks, benefits, and superiority of opioids,
24   particularly for use long-term and at high
25   doses, including, but not limited to, through

1    sales visits, continuing medical education and
2    speaker programs, publications and websites, and
3    treatment guidelines, Manufacturer Defendants
4    deprived prescribers and patients of the ability
5    to make informed choices about whether, when and
6    which opioids to prescribe and use, for how
7    long, and at what doses."  So it mentions sales
8    visits in that.  I don't know specifically, of
9    the doctors who were listed, which ones had a
10   sales visit.
11   Q.   Doctor, I don't want to interrupt
12   you, but I do want you to answer my question.
13   It's getting late, and I think all of us want to
14   get out of here and get you out of here.  That
15   wasn't my question.  My question was, in coming
16   up with the prescriptions that are identified in
17   Exhibit 2, that big Excel spreadsheet, which was
18   provided in response to interrogatory 6, did the
19   criteria that Plaintiffs used to come up with
20   the prescriptions on that list include any
21   criteria to determine whether any of the
22   prescribers on that list had ever been visited
23   by a sales representative?
24   A.   The criteria that I have harkened
25   back to that were used to create the list where

1    they were not cancer patients, they were high
2    dose, that is greater than 120 morphine --
3    medical morphine equivalents or higher, and
4    patients who were diagnosed with a substance
5    abuse disorder.
6    Q.   And so would the answer to my
7    question be no?
8    A.   But I think they were saying -- at
9    least the prescriptions identified in Exhibit A
10   was unauthorized, medically unnecessary,
11   ineffective, or harmful, and then further down
12   on that page they identify that the
13   misrepresentation was unnecessary and harmful,
14   do not -- but that the sales visits are included
15   in some of the misrepresentations.
16   Q.   Doctor, I'm going to move to strike.
17   I need you to answer my question.
18   A.   I'm trying to, ma'am.  I'm very
19   sorry.
20   Q.   So if you can focus on what I'm
21   asking.
22        Did the criteria that Plaintiffs
23   used to come up with the prescriptions on that
24   list, did it include determining whether or not
25   any of those doctors had been visited by a sales

1    representative?
2         MR. BADALA:  Objection to form.
3    Asked --
4    Q.   The answer should be yes or no.
5    A.   I've tried to answer it as best I
6    can from the response from the interrogatory.
7    Whether that was a separate criteria, that's not
8    my understanding.
9    Q.   For the record, you're not -- the
10   response that you're reading from there is not
11   in response to interrogatory 6.  It's in
12   response to interrogatory 7 or interrogatory 10.
13   My question is focused on interrogatory 6.  If
14   you're not going to answer my questions, I am
15   going to have to request more time.  I assure
16   you we are all trying to get out of here, so --
17   was there any separate criteria that was used
18   besides the three criteria that you've
19   identified, non-cancer, high dose opioids in
20   your words, and patients identified with an
21   opioid use disorder?  Were any other criteria
22   used for coming up with the prescriptions on
23   Exhibit A?
24   A.   That's how we identified the claims.
25   Q.   So the rest of my questions should

Page 350

1 be fairly simple for you to answer.  Would any
2 of the criteria include whether any of those
3 doctors were visited by a sales representative?
4     A.    These criteria do not include that.
5     Q.    Do any of the criteria include being
6 visited by one of the Manufacturer Defendants'
7 sales representatives?
8     A.    Not the criteria that were used.
9     Q.    Did any of the criteria used pertain
10 to whether or not any of the physicians on that
11 list ever attended a continuing medical
12 education program that was sponsored by any of
13 the Manufacturer Defendants?
14     A.    Not listed in my list of criteria.
15     Q.    Did the criteria include ever --
16 whether any of those doctors ever had attended a
17 continuing medical --
18     A.    I think I finally understand where
19 we're differing.  These are --
20     Q.    Please let me finish my question.
21     A.    Oh, sure.  Absolutely.
22     Q.    Did the criteria that you used
23 include if they ever attended any sort of
24 continuing medical education program at all
25 relating to opioids?

Page 351

1     A.    No.  I think what I'm saying, if I
2 could answer where I think we might be on
3 different purposes, is I think that things I was
4 describing were characterizations of the
5 prescriptions, but the claims that we submitted
6 to attorneys were based on these criteria.
7     Q.    Again -- and this may be an issue
8 that you just have not read that response before
9 today and why it has been somewhat frustrating
10 to get accurate kind of answers to our questions
11 on this -- what are you referring to there isn't
12 the response to interrogatory number 6 that I'm
13 asking about.  It's in response to a completely
14 different interrogatory, 7 and 10.  So if you
15 could just stay with me and answer my questions,
16 I think we would all be grateful for it.
17     MR. BADALA:  I think part of the
18 problem is you're telling him to look at 2 when
19 you're talking about 3.
20     MS. ROITMAN:  No.  For the record,
21 he's, on his own volition, reading a different
22 exhibit that we're not talking about.
23     MR. BADALA:  I get it, but you keep
24 saying back to the prescriptions in Exhibit 2.
25 Exhibit 3 is what you're talking about.  So we

Page 352

1 can put 2 to the side and he can look at 3.  I
2 think that's the confusion.
3     MS. ROITMAN:  The confusion is
4 Exhibit 2, which is that big list of -- that
5 huge Excel spreadsheet, that is what I'm
6 referring to.  Plaintiffs -- you referred to
7 that big list when they were responding to
8 interrogatory 6.
9     MR. BADALA:  So that's where I think
10 the confusion is.  He is now looking at that.
11 If he can look at Exhibit 3, then I think that's
12 more helpful.
13     Q.    So we can call it 2A if you want.  I
14 think part of the problem is --
15     MR. BADALA:  I think that's going to
16 mess up the record a little bit.
17     A.    -- is you have not looked at these
18 responses before today and you're not familiar
19 with them.
20     MR. BADALA:  I'm going to object to
21 that characterization.  That's not been his
22 testimony.
23     MS. ROITMAN:  You can object all you
24 want.
25     Q.    Let's go back to my questions.

Page 353

1     A.    Sure.
2     Q.    Did any of the criteria that were
3 used to come up with the prescriptions that were
4 identified in that big Excel spreadsheet include
5 trying to figure out if any of the doctors on
6 there had had any specific contact with one of
7 the Manufacturing Defendants?
8     A.    In coming up with a list, no.
9     Q.    Any criteria -- was there any
10 criteria that was used for determining why any
11 of the doctors on that big exhibit, Excel
12 spreadsheet, prescribed the opioids to the
13 patients listed there?
14     A.    I think some of them were the ones
15 who were prosecuted, so they were identified by
16 that.
17     Q.    So is that a different criteria that
18 you're saying you were using?
19     MR. BADALA:  Objection to form.
20 Asked and answered.
21     A.    I am not following your question.
22 I'm sorry.
23     Q.    I'm trying to -- you've identified
24 the three criteria that were used.  I'm trying
25 to figure out if there are any other criteria

Page 354

1 that were used to identify the people on Exhibit
2 2A.
3      A.   Oh, I thought you were talking about
4 the doctors.  No.  The claims for the opioids
5 are the three criteria that I mentioned.
6           MS. ROITMAN:  Thank you.  I have no
7 further questions.
8           THE WITNESS:  Thanks.
9           MR. BADALA:  Anyone else in the room
10 have any questions?  Anyone on the phone have
11 any questions?
12           I just have a few questions.
13           MS. ROITMAN:  Can we just go off the
14 record quickly?
15           THE VIDEOGRAPHER:  Off the record at
16 5:45 p.m.
17           (Recess had.)
18           THE VIDEOGRAPHER:  Back on the
19 record at 5:47 p.m.
20      EXAMINATION OF THOMAS GILSON, M.D.
21 BY MR. BADALA:
22      Q.   Dr. Gilson, I just have a couple of
23 follow-up questions from your deposition today.
24           You mentioned earlier that you took
25 some notes during your conversation with Tamara

Page 355

1 Chapman.  Do you recall that?
2      A.   Yes, I do.
3      Q.   Can you describe those notes for me?
4      A.   I was having a phone conversation.
5 I wrote them on a piece of paper no bigger than
6 two-by-two inches, and they -- the points I
7 wrote down were that they were seeing an
8 increase in the number of custody cases at DCSF,
9 which is where Ms. Chapman is employed, an
10 increase in the number of positive toxicology
11 bursts, and that she indicated that it was her
12 impression that was related to opioids.
13           MR. BADALA:  I have no further
14 questions.
15           MR. CARTER:  Nothing further.
16           MR. BORANIAN:  Nothing for me.
17           MR. BADALA:  Anyone on the phone?
18           And I just want to note one thing
19 for the record.  Plaintiffs did serve amended
20 responses and objections to the 30(b)(6)
21 deposition.  Those weren't included, but by
22 reference, we refer to our responses and
23 objections.
24           THE VIDEOGRAPHER:  Off the record at
25 5:48 p.m.

Page 356

2           (Deposition concluded at 5:48 p.m.)
3           - - - - -

Page 357

1 Whereupon, counsel was requested to give
2 instruction regarding the witness' review of
3 the transcript pursuant to the Civil Rules.
4
5           SIGNATURE:
6 Transcript review was requested pursuant to
7 the applicable Rules of Civil Procedure.
8
9           TRANSCRIPT DELIVERY:
10 Counsel was requested to give instruction
11 regarding delivery date of transcript.

Page 358

```
1           REPORTER'S CERTIFICATE
2  The State of Ohio,   )
3                       ) SS:
4  County of Cuyahoga.  )
5
6       I, Renee L. Pellegrino, a Notary Public
7  within and for the State of Ohio, duly
8  commissioned and qualified, do hereby certify
9  that the within named witness, THOMAS GILSON, M.D.,
10 was by me first duly sworn to testify the truth, the
11 whole truth and nothing but the truth in the cause
12 aforesaid; that the testimony then given by the
13 above referenced witness was by me reduced to
14 stenotypy in the presence of said witness;
15 afterwards transcribed, and that the foregoing is a
16 true and correct transcription of the testimony so
17 given by the above referenced witness.
18      I do further certify that this
19 deposition was taken at the time and place in the
20 foregoing caption specified and was completed
21 without adjournment.
22
23
24
25
```

Page 359

```
1       I do further certify that I am not a
2  relative, counsel or attorney for either party,
3  or otherwise interested in the event of this
4  action.
5       IN WITNESS WHEREOF, I have hereunto set
6  my hand and affixed my seal of office at
7  Cleveland, Ohio, on this 15th day of January, 2019.
8
9
10
11
12   Renee L. Pellegrino
13 Renee L. Pellegrino, Notary Public
14 within and for the State of Ohio
15
16 My commission expires October 12, 2020.
17
18
19
20
21
22
23
24
25
```

Page 360

```
1           Veritext Legal Solutions
               1100 Superior Ave
2                 Suite 1820
               Cleveland, Ohio 44114
3              Phone: 216-523-1313
4
   January 15, 2019
5
   To: SALVATORE BADALA
6
   Case Name: In Re: National Prescription Opiate Litigation v
7
   Veritext Reference Number: 3191875
8
   Witness:  Thomas Gilson, M D     Deposition Date:  1/14/2019
9
10 Dear Sir/Madam:
11
   The deposition transcript taken in the above-referenced
12
   matter, with the reading and signing having not been
13
   expressly waived, has been completed and is available
14
   for review and signature   Please call our office to
15
   make arrangements for a convenient location to
16
   accomplish this or if you prefer a certified transcript
17
   can be purchased
18
19 If the errata is not returned within thirty days of your
20 receipt of this letter, the reading and signing will be
21 deemed waived
22
23 Sincerely,
24 Production Department
25
   NO NOTARY REQUIRED IN CA
```

Page 361

```
1           DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 3191875
3  CASE NAME: In Re: National Prescription Opiate Litigation v
   DATE OF DEPOSITION: 1/14/2019
4  WITNESS' NAME: Thomas Gilson, M D
5     In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me
7     I have made no changes to the testimony
   as transcribed by the court reporter
8
9  Date          Thomas Gilson, M D
10    Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
   They have read the transcript;
13 They signed the foregoing Sworn
   Statement; and
14 Their execution of this Statement is of
   their free act and deed
15
   I have affixed my name and official seal
16
   this _____ day of_____, 20____
17
18     Notary Public
19
       Commission Expiration Date
20
21
22
23
24
25
```

Page 362

```
 1        DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
 2
     ASSIGNMENT REFERENCE NO: 3191875
 3   CASE NAME: In Re: National Prescription Opiate Litigation v
     DATE OF DEPOSITION: 1/14/2019
 4   WITNESS' NAME: Thomas Gilson, M D
 5       In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me
 7       I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
 8   well as the reason(s) for the change(s)
 9       I request that these changes be entered
     as part of the record of my testimony
10
         I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein
13   _____
     Date            Thomas Gilson, M D
14
         Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17       They have read the transcript;
         They have listed all of their corrections
18       in the appended Errata Sheet;
         They signed the foregoing Sworn
19       Statement; and
         Their execution of this Statement is of
20       their free act and deed
21       I have affixed my name and official seal
22   this _____ day of_____, 20____
23   _____
         Notary Public
24
25   Commission Expiration Date
```

Page 363

```
 1            ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS MIDWEST
 2           ASSIGNMENT NO: 1/14/2019
 3   PAGE/LINE(S) /      CHANGE      /REASON
 4   _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19
     _____    _____
20   Date               Thomas Gilson, M.D.
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23   _____
         Notary Public
24
     _____
25   Commission Expiration Date
```

Veritext Legal Solutions

888-391-3376