Page 189

1              IN THE UNITED STATES DISTRICT COURT
2                  NORTHERN DISTRICT OF OHIO
3                       EASTERN DIVISION
4

                    ~~~~~~~~~~~~~~~~~~~~
5

6        IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804
         OPIATE LITIGATION
7                                    Case No. 17-md-2804
8                                    Judge Dan Aaron
         This document relates to:      Polster
9

10       County of Cuyahoga v. Purdue
         Pharma L.P., et al.
11       Case No. 17-OP-45004
12       City of Cleveland, Ohio v. Purdue
         Pharma L.P., et al.
13       Case No. 18-OP-45132
14       The County of Summit, Ohio, et al.
         v. Purdue Pharma L.P., et al.
15       Case No. 1:18-OP-45909
16                  ~~~~~~~~~~~~~~~~~~~~
17                        Volume 2
              Continued videotaped deposition of
18                  MARY APPLEGATE, M.D.
19

                      March 28, 2019
20                      9:01 a.m.
21

22                      Taken at:
              Sheraton at Capitol Square
23               75 East State Street
                    Columbus, Ohio
24

25          Renee L. Pellegrino, RPR, CLR

```
 1   APPEARANCES:
 2   On behalf of Summit County and City of Akron:
         Motley Rice
 3       MICHAEL J. PENDELL, ESQ.
         One Corporate Center
 4       20 Church Street
         17th Floor
 5       Hartford, Connecticut   06103
         (860) 218-2722
 6       mpendell@motleyrice.com
 7   On behalf of Cuyahoga County:
         Napoli Shkolnik PLLC
 8       CHRISTOPHER L. SCHNIEDERS, ESQ.
         6731 W. 121st Street
 9       Suite 201
         Overland Park, Kansas   66209
10       (844) 230-7676
         cschnieders@napoli.com
11
     On behalf of Ohio Department of Medicaid:
12       Office of the Ohio Attorney General
         MORGAN LINN, ESQ.
13       30 East Broad Street
         26th Floor
14       Columbus, Ohio   43215
         (800) 282-0515
15       morgan.linn@attorneygeneral.ohio.gov
             - and -
16       Ohio Department of Medicaid
         JULIE BABTIST, ESQ.
17       Lazarus Building
         50 West Town Street
18       Suite 400
         Columbus, Ohio   43215
19       (614) 752-5573
         julie.babtist@medicaid.ohio.gov
20
     On behalf of Cardinal Health:
21       Williams & Connolly
         COLLEEN McNAMARA, ESQ.
22       725 12th Street, N.W.
         Washington, D.C.   20005
23       (202) 434-5186
         cmcnamara@wc.com
24
                         ~ ~ ~ ~ ~
25
```

Page 191

```
 1   APPEARANCES, CONT'D:
 2   On behalf of McKesson Corporation:
         Covington & Burling LLP
 3       RON DOVE, ESQ.
         ANNA HAN, ESQ.
 4       One CityCenter
         850 Tenth Street, NW
 5       Washington, D.C.  20001-4956
         (202) 662-6000
 6       rdove@cov.com
         ahan@cov.com
 7
     On behalf of Walmart:
 8       Jones Day
         KRISTIN K. ZINSMASTER, ESQ.
 9       90 South Seventh Street
         Suite 4950
10       Minneapolis, Minnesota  55402
         (612) 217-8800
11       kzinsmaster@jonesday.com
12   On behalf of Purdue Defendants:
         Dechert LLP
13       DEBRA D. O'GORMAN, ESQ.
         1095 Avenue of the Americas
14       New York, New York  10036-6797
         (212) 698-3500
15       debra.ogorman@dechert.com
16
     ALSO PRESENT:  Jim Torok, Videographer
17
18                      ~ ~ ~ ~ ~
19
20
21
22
23
24
25
```

Page 192

1                      TRANSCRIPT INDEX

2

3     APPEARANCES ................................190

4     INDEX OF EXHIBITS .........................193

5     INDEX OF OBJECTIONS .......................195

6

7     EXAMINATION OF MARY APPLEGATE, M.D.:

8     BY MR. DOVE ...............................201

9     BY MS. HAN ................................267

10    BY MS. O'GORMAN ...........................314

11    BY MR. SCHNIEDERS .........................321

12    BY MR. PENDELL ............................358

13

14    REPORTER'S CERTIFICATE ....................368

15

16    EXHIBIT CUSTODY - RETAINED BY COURT REPORTER

17

18

19

20

21

22

23

24

25

Page 193

1                    INDEX OF EXHIBITS
2
3      Number              Description                Marked
4

5    Exhibit 21    The Ohio Department of Medicaid   216
               Ohio Medical Assistance Provider
6               Agreement for Managed Care Plan,
               Revised 2/2019
7

     Exhibit 22    E-Mail from Benjamin Link to      227
8               Several Recipients, dated
               December 19, 2018, with
9               Attachments
10    Exhibit 23    Molina Healthcare of Ohio        234
               Preferred Drug List (Formulary)
11

     Exhibit 24    A Drug Utilization Review of      246
12               Duplicative Long-Acting Opiate
               Use, September 2012, Beginning
13               Bates Number ODM_039326
14    Exhibit 25    Ohio Department of Medicaid       249
               (ODM) Quarterly Clinical Report
15               Q2 2018, Beginning Bates Number
               ODM_040711
16

     Exhibit 26    Letter from Mary Applegate, M.D. 258
17               to Dr. Bailit, dated October 13,
               2017, Bates Numbered ODM_015989
18

     Exhibit 27    Letter from Michael C. Barnes to 261
19               Ohio Medicaid Pharmaceutical &
               Therapeutics Committee, dated
20               June 25, 2010, Beginning Bates
               Number ODM_039341
21

     Exhibit 28    Letter from Margaret A. Scott to 265
22               Michael C. Barnes, dated July
               29, 2010, Beginning Bates Number
23               ODM_038848
24
25

Page 194

1                    INDEX OF EXHIBITS, CONT'D
2

3    Exhibit 29    One-Page Document Entitled       269
                   "Overview of Opioid Prescribing
4                  Metrics," Bates Numbered
                   ODM_016480
5

     Exhibit 30    Two-Page Document Entitled        281
6                  "Opioid Guideline Feedback,"
                   Beginning Bates Number
7                  ODM_027015
8    Exhibit 31    Multi-Page Document Entitled      291
                   "Limiting Prescribed Opioid
9                  Doses Through Standardized Plan
                   Efforts," Beginning Bates Number
10                 ODM_034210
11   Exhibit 32    Multi-Page Document Entitled      300
                   "Ohio's State Innovation Model:
12                 Using Episodes of Care to Impact
                   the Opioid Crisis (and Other
13                 Public Health Priorities),
                   Beginning Bates Number
14                 ODM_034768
15   Exhibit 33    Office of Health Transformation   302
                   Document Beginning Bates Number
16                 ODM_034768
17   Exhibit 34    Nucynta Label                     334
18   Exhibit 35    Presentation Slides - OPQC MOMS+  337
                   Project, Regional Meeting -
19                 Northeast Ohio, Ohio Perinatal
                   Quality Collaborative, May 22,
20                 2018
21
22
23
24
25

```
 1              INDEX OF OBJECTIONS
 2
```

```
 3    Objection ...................................221
      Objection ...................................234
 4    Objection ...................................240
      Objection ...................................242
 5    Objection ...................................254
      Objection ...................................254
 6    Objection ...................................255
      Objection ...................................256
 7    Objection ...................................261
      Objection ...................................262
 8    Objection ...................................263
      Objection ...................................263
 9    Objection ...................................263
      Objection ...................................264
10    Objection ...................................264
      Objection ...................................264
11    Objection ...................................266
      Objection ...................................266
12    Objection ...................................266
      Objection ...................................267
13    Objection ...................................273
      Objection ...................................277
14    Objection ...................................278
      Objection ...................................278
15    Objection ...................................279
      Objection ...................................280
16    Objection ...................................284
      Objection ...................................285
17    Objection ...................................286
      Objection ...................................288
18    Objection ...................................288
      Objection ...................................290
19    Objection ...................................290
      Objection ...................................291
20    Objection ...................................293
      Objection ...................................294
21    Objection ...................................294
      Objection ...................................294
22    Objection ...................................294
      Objection ...................................294
23    Objection ...................................295
      Objection ...................................295
24    Objection ...................................296
      Objection ...................................298
25    Objection ...................................299
```

1              INDEX OF OBJECTIONS, CONT'D

2

3    Objection ....................................304
     Objection ....................................304
4    Objection ....................................305
     Objection ....................................305
5    Objection ....................................306
     Objection ....................................307
6    Objection ....................................307
     Objection ....................................308
7    Objection ....................................310
     Objection ....................................310
8    Objection ....................................310
     Objection ....................................311
9    Objection ....................................311
     Objection ....................................312
10   Objection ....................................313
     Objection ....................................314
11   Objection ....................................315
     Objection ....................................315
12   Objection ....................................315
     Objection ....................................315
13   Objection ....................................315
     Objection ....................................317
14   Objection ....................................317
     Objection ....................................317
15   Objection ....................................317
     Objection ....................................317
16   Objection ....................................319
     Objection ....................................319
17   Objection ....................................320
     Objection ....................................320
18   Objection ....................................321
     Objection ....................................321
19   Objection ....................................323
     Objection ....................................323
20   Objection ....................................324
     Objection ....................................326
21   Objection ....................................329
     Objection ....................................330
22   Objection ....................................332
     Objection ....................................333
23   Objection ....................................336
     Objection ....................................336
24   Objection ....................................336
     Objection ....................................336
25   Objection ....................................337

```
1              INDEX OF OBJECTIONS, CONT'D
2
```

```
3    Objection ...................................337
     Objection ...................................342
4    Objection ...................................344
     Objection ...................................344
5    Objection ...................................353
     Objection ...................................353
6    Objection ...................................355
     Objection ...................................355
7    Objection ...................................356
     Objection ...................................356
8    Objection ...................................356
     Objection ...................................357
9    Objection ...................................357
     Objection ...................................358
10   Objection ...................................361
     Objection ...................................361
11   Objection ...................................362
     Objection ...................................362
12   Objection ...................................363
```

```
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 198

1           THE VIDEOGRAPHER:  We're on the

2   record.  Today's date is March 28, 2019.  The

3   time is approximately 9:01 a.m.  We are here at

4   the Sheraton in Columbus, Ohio to take the

5   videotaped deposition of Dr. Mary Applegate in

6   the case of National Prescription Opiate

7   Litigation, Case Number 1:17-md-2804, to be

8   heard in the United States District Court of

9   Ohio by Judge Polster.

10          Counsel, please state your

11  appearances for the record.

12          MR. DOVE:  This is Ron Dove.  I'm

13  with the law firm of Covington & Burling on

14  behalf of McKesson Corporation.

15          MS. HAN:  Anna Han from Covington &

16  Burling, also on behalf of McKesson.

17          MS. McNAMARA:  Colleen McNamara from

18  Williams & Connolly on behalf of Cardinal

19  Health.

20          MS. ZINSMASTER:  Kristin Zinsmaster

21  of Jones Day on behalf of Walmart.

22          MS. O'GORMAN:  Debra O'Gorman from

23  Dechert on behalf of the Purdue Defendants.

24          MR. PENDELL:  Mike Pendell, Motley

25  Rice, for Plaintiffs.

```
                                        Page 199
 1              MR. SCHNIEDERS:  Chris Schnieders,
 2      Napoli Shkolnik, for Plaintiffs and Cuyahoga
 3      County.
 4              MS. BABTIST:  Julie Babtist,
 5      in-house legal counsel for Ohio Department of
 6      Medicaid.
 7              MS. LINN:  Morgan Linn, Assistant
 8      Attorney General for the Ohio Attorney General's
 9      Office, representing the Ohio Department of
10      Medicaid.
11              MR. SCHNIEDERS:  Mr. Dove, briefly,
12      before we start, I just want to make a record of
13      the fact that the Plaintiffs received a
14      production last night at approximately 6:59 EST,
15      which was hundreds of documents, something that
16      we understand was in the possession of the
17      defense as of Monday.  We provided this to our
18      vendor and then we had to work through to try to
19      get a file to load and look at.  We are
20      proceeding with this deposition subject to the
21      fact that we have not been able to completely
22      review what was submitted last night and we'll
23      be holding the deposition open based upon that
24      and we'll possibly have to come back and do this
25      again.
```

Page 200

```
1              MR. DOVE:  And just so the record is
2    clear, we did receive a -- we received a number
3    of productions since the date of Dr. Applegate's
4    last deposition, all of which have been timely
5    posted on the RICO site.  We received our latest
6    production from Ohio Medicaid on Monday.  There
7    were some issues with regard to confidentiality
8    designations, such that were confirmed, I guess,
9    at 10:30 yesterday from the Ohio Department of
10   Medicaid.  As soon as those confidentiality
11   designations were confirmed, we immediately had
12   our vendor post those documents on the RICO
13   site, as is the practice in these cases.  We
14   also, as a courtesy to counsel for the
15   Plaintiffs, provided, on their request, a zip
16   file as quickly as we could to do that, and --
17   but we understand your desire to potentially
18   keep the deposition open.
19              We also, in conversations with Ohio
20   Medicaid, note that there are some additional
21   documents still yet to be produced, e-mails and
22   some other documents, and that we are also, you
23   know, leaving the possibility of the deposition
24   being kept open if we're unable to resolve any
25   outstanding issues by other means.
```

1              MR. SCHNIEDERS:  And, lastly, I

2    just want to make clear that Plaintiffs were not

3    aware of this production, again, until

4    eastern last night, so it sounds like at least

5    as of 10:30 yesterday morning, you knew that

6    there were confidentiality issues and that they

7    could be at least addressed with us, and the

8    production happened on Monday.

9              Subject to all those objections,

10   we'll go ahead and move forward and deal with it

11   later.

12        MARY APPLEGATE, M.D., of lawful age,

13   called for examination, as provided by the

14   Federal Rules of Civil Procedure, being by me

15   first duly sworn, as hereinafter certified,

16   deposed and said as follows:

17     CONTINUED EXAMINATION OF MARY APPLEGATE, M.D.

18   BY MR. DOVE:

19        Q.    Good morning, Dr. Applegate.

20        A.    Good morning.

21        Q.    As I said, my name is Ron Dove, and

22   I'm with the law firm of Covington & Burling,

23   and we first met when we began your deposition

24   back on January 23rd, and I represent McKesson

25   Corporation in this litigation.  McKesson is one

Page 202

1   of the Defendants.

2              Do you understand, Dr. Applegate,

3   that this is a continuation of your January 23rd

4   deposition?

5        A.    Yes, I do.

6        Q.    And that you're testifying both on

7   behalf of the Ohio Department of Medicaid as a

8   30(b)(6) witness and in your personal capacity

9   as before?

10       A.    Yes.

11       Q.    Is there any reason why you cannot

12  give complete and truthful testimony today?

13       A.    No.

14       Q.    And are there any medications you

15  are taking or any illness or condition that

16  would make it difficult for you to give complete

17  and truthful information?

18       A.    No.

19       Q.    What did you do to prepare for

20  today's deposition session beyond what you did

21  to prepare for the last session on January 23rd,

22  if anything?

23       A.    Earlier this week I met with the

24  Department of Medicaid and the Attorney General'

25  and they informed me that they had a number of

```
 1   documents that were submitted.  I did not review
 2   all of them.  The discussion was --
 3             MS. LINN:  I wouldn't get into the
 4   specifics of our discussion because it's
 5   privileged.
 6        A.   So I just didn't read every single
 7   document.  I'm just aware that there were
 8   documents that were submitted.
 9        Q.   So you had -- you met with your --
10   you met with attorneys from the Ohio
11   Department -- the AG's office and the Ohio
12   Department of Medicaid, and that would be
13   Ms. Linn and Ms. Babtist?
14        A.   That's correct.
15        Q.   Did you meet with anyone else?
16        A.   No.
17        Q.   Did you review your prior deposition
18   transcript?
19        A.   Proximate to the deposition I did,
20   but not in the recent week.
21        Q.   Did you -- other than the documents
22   that you mentioned and your deposition
23   transcript, did you review any additional
24   information?
25        A.   No.
```

1      Q.    Did you speak with anyone on the

2  pharmacy team regarding any of the outstanding

3  issues from last deposition?

4      A.    There were a couple of points of

5  clarification that I believe you asked.

6      Q.    Yes.  And did you speak with your

7  pharmacy team with regard to those?

8      A.    Yes.

9      Q.    Did you do anything else in

10  preparation for today's deposition?

11      A.    I did review just one of the

12  presentations that was a summary of the work

13  over the last several years, which was discussed

14  at the last deposition.

15      Q.    Dr. Applegate, has anything changed

16  in your role or your responsibilities at ODM

17  since your deposition on January 23rd?

18      A.    I think I'm aware of additional work

19  that needs to be done, but other than that, no.

20      Q.    We understand that a new Ohio

21  Department of Medicaid director, Maureen

22  Corcoran, was appointed in January 2019,

23  correct?

24      A.    That is correct.

25      Q.    Has Director Corcoran made any

Page 205

1    policy changes related to opioids or opioid

2    coverage?

3        A.    No.

4        Q.    Are there any changes that the

5    director expects to make this year that you're

6    aware of with regard to opioids or opioid

7    coverage?

8        A.    Not that I'm aware.

9        Q.    During the last deposition on

10   January 23rd, you testified that the

11   prescription drug benefit was carved into

12   managed care, then carved out, and then back

13   into managed care, correct?

14       A.    That is correct.

15       Q.    When was the prescription benefit

16   first carved into managed care?

17       A.    I would have to check with people

18   from the agency.

19       Q.    Do you have a general idea of when

20   it was?

21       A.    Early 2000s.  I really would need to

22   have someone who was here at that time let me

23   know.

24       Q.    When you arrived at the Medicaid

25   agency in 2006, was the -- was the prescription

Page 206

1    benefit carved into managed care at that time?

2         A.    I don't recall.

3         Q.    Is it correct that between February

4    1st, 2010 and October 1st, 2011 the prescription

5    drug benefit was carved out of managed care?

6         A.    There was a year.  I would have to

7    double-check exactly which year that was.

8         Q.    But if I represented to you that

9    between February 1st, 2010 and October 1st, 2011

10   the prescription drug benefit was carved out of

11   managed care, that would not surprise you?

12        A.    That's correct.

13        Q.    Other than that one-year time

14   period, and I understand you don't remember the

15   exact date but that one-year time period, was

16   there any other periods that you're aware of

17   where there was a prescription carve-out?

18        A.    When the agency was largely fee for

19   service, the drug benefit was also fee for

20   service.

21        Q.    And when was that?

22        A.    Again, I would have to check with

23   folks who were in the agency at that time.

24        Q.    But that would have been before

25   2006?

Page 207

1          A.     Yes.

2          Q.     I believe you also testified

3     previously that there was a requirement that the

4     fee-for-service preferred drug list and the

5     managed care plans preferred drug lists should

6     have an 80 or 85 percent agreement.

7               Do you recall that?

8          A.     Yes.

9          Q.     Do you know what time period that

10    requirement of 80 or 85 percent agreement

11    between the preferred drug lists was in place?

12         A.     I would need to check.  I should

13    perhaps just remind you that I was -- the agency

14    became a stand-alone agency in 2013 and so my

15    knowledge of the pharmacy program essentially

16    starts in some detail at that time.  When I

17    first went to the agency, I was there part time

18    and mainly worked on prior authorization and was

19    not directly connected to the pharmacy part of

20    the program.

21         Q.     Is it your understanding that the 80

22    or 85 percent agreement requirement was in place

23    prior to 2013 or after 2013 or both?

24         A.     I suspect it's both.

25         Q.     What are the current obligations of

1    managed care plans to cover drugs that are on

2    the fee-for-service preferred drug list?

3         A.    They are required not to cover less

4    than what's on the fee-for-service list;

5    however, they are free to offer a broader

6    benefit.

7         Q.    And how long has that requirement

8    been in place, to the best of your knowledge?

9         A.    Since its inception.

10        Q.    Since what's inception?

11        A.    Since managed care came to be in the

12   program.

13        Q.    So just so I understand, and I'll

14   have more questions about this, so if a drug is

15   on the fee-for-service preferred drug list, it

16   also needs to be on the managed care preferred

17   drug list?

18        A.    So it must be covered.  Whether or

19   not there's a prior authorization is a separate

20   question.  It must be on the formulary, and then

21   the formulary is different from what's on the

22   preferred drug list.

23        Q.    Just drilling down a bit, my

24   understanding from your testimony last time is

25   that the formulary covered by fee for service is

1   pretty broad.  I mean, it's every drug that is

2   part of the federal Medicaid rebate program,

3   correct?

4          A.    Not exactly.  So what's on the

5   formulary is everything that's FDA approved for

6   those specific indications.  The rebate program

7   is part of what determines what's on the

8   preferred drug list.  That may or may not

9   correlate with the need for a prior

10  authorization.

11         Q.    And so what you're saying, and again

12  we'll get into this in more detail, is that it's

13  possible for the preferred drug lists of

14  different managed care plans and fee for service

15  to differ between each other, correct?

16         A.    That's correct.  And connected to

17  your prior question about that 80, 85 percent,

18  that's actually what that means, so that

19  variation is not to exceed that 80 or 85 percent

20  threshold.

21         Q.    And maybe this also relates to the

22  80 to 85 percent issue, but how much discretion

23  do Medicaid managed care plans have to determine

24  the status of drugs on their preferred drug

25  lists compared to those on the fee-for-service

Page 210

1    preferred drug lists?  By status I mean, you

2    know, prior authorization, step therapy,

3    quantity limits, that sort of thing.  How much

4    discretion do Medicaid managed care plans have

5    to make those determinations on their preferred

6    drug list compared to fee-for-service preferred

7    drug lists?

8              MR. SCHNIEDERS:  Are you talking

9    about Ohio or are you talking just generally

10   across the country?

11             MR. DOVE:  This is all Ohio unless I

12   specify otherwise, but Ohio.

13        A.   The discretion they have to vary is

14   within that threshold of 80 to 85 percent, so

15   approximately 20 percent.  If prior

16   authorization is required, every plan has their

17   own processes that include their own P&T and

18   they can decide what they want the criteria to

19   be for their prior authorization, for example.

20        Q.   When you say every plan has its own

21   criteria, can you elaborate a little bit more

22   for me?  What do you mean by criteria in that

23   context?

24        A.   So let's say as part of, you know,

25   falling within that 80 percent threshold, they

Page 211

1   agree that they're going to cover drug A.  The

2   first plan may say you have to have the

3   diagnosis and you have to have failed one prior

4   drug.  The second plan may say -- they might

5   allow a broader range of diagnosis, but you have

6   to have failed two drugs before you actually can

7   receive the drug that's requested.  So there may

8   be age restrictions.  They may add additional

9   detail related to requirements under the FDA

10  approval.

11       Q.   And so there could be considerable

12  variability both between plans and -- between

13  different managed care plans and also as

14  compared to managed care plans to the

15  fee-for-service plan; is that right?

16       A.   Yes.

17       Q.   And the 80 to 85 percent threshold,

18  where could we find information about that?

19  Where would that be located?

20       A.   I'm not sure.  I'd have to ask my

21  pharmacy team.

22       Q.   Do you know if it's published

23  somewhere even?  If you don't know where it is,

24  do you know that's a publicly available

25  threshold?

Page 212

1          A.      My understanding is that was part of

2     the operations, so not necessarily a

3     public-facing document.  It was part of how we

4     did business.

5               MR. DOVE:  We would ask the agency

6     to look for documents relating to the 80 to 85

7     percent threshold number.

8          Q.      Can Medicaid managed care plans

9     decide to require prior authorization or step

10    therapy for a drug if the fee-for-service

11    preferred drug list does not?

12         A.      Yes.

13         Q.      Can a Medicaid managed care plan

14    decide not to require a prior authorization or

15    step therapy if the fee-for-service plan does?

16         A.      Yes.

17         Q.      Can Medicaid managed care plans

18    impose quantity limits on drugs that do not

19    require prior authorization or step therapy on

20    the fee-for-service preferred drug list?

21         A.      Yes.

22         Q.      And then how about vice versa; can

23    Medicaid managed care plans decide not to impose

24    quantity limits on drugs for which the

25    fee-for-service preferred drug list requires

1   prior authorization or step therapy?

2        A.    Yes.  We do not dictate the exact

3   edits within the pharmacy program.  We ask that

4   they adhere to all state laws.  And there may be

5   flexibility in how their systems are set up as

6   to how they actually get there.

7        Q.    And just to tie the loop on this

8   line of questioning, can Medicaid managed care

9   plans impose quantity limits on drugs that do

10  not have quantity limits on the fee-for-service

11  preferred drug list?

12       A.    Yes.

13       Q.    And can Medicaid managed care plans

14  decide not to impose quantity limits on drugs

15  that do have quantity limits on fee for service?

16       A.    Yes.

17       Q.    During our session in January you

18  mentioned that medical directors from the

19  managed care plans follow certain standards of

20  safety when considering the drug coverage that

21  is offered?

22       A.    Yes.

23       Q.    Could you tell us a little bit more

24  about, you know, who are these medical

25  directors?  Who were you talking about when you

Page 214

1   used that term?

2       A.    Every managed care plan is required

3   to have a medical director to oversee all the

4   clinical activities within their program, and we

5   meet with them routinely to review issues,

6   discuss population health, and discuss any

7   issues of safety that might be relevant.

8       Q.    And do you know what the

9   requirements are to be a medical director?  I

10  mean, what types of individuals typically serve

11  in that role for managed care plans?

12      A.    There's a wide variety, but they all

13  must be board certified and have expertise in

14  the care of patients over a broad span, so

15  everywhere from, you know, birth to death and

16  every single condition, and if all of those

17  requirements cannot be met with one individual,

18  many of the plans have several medical directors

19  to be sure there's adequate expertise in

20  behavioral health, physical health and all sites

21  of service.

22      Q.    How do the medical directors make

23  their determinations about which drugs to cover?

24      A.    Each of the managed care plans have

25  their own internal processes that largely are

Page 215

1  similar to what we have in fee for service, so

2  they all have a P&T committee, they all have a

3  DUR, a drug utilization review board, and those

4  similar processes.

5          Q.    And when you talked about standards

6  of safety, what -- was that just a general term?

7  What standards of safety are applied in making

8  these determinations?

9          A.    These are clinical standards that

10  may be considered best practice in clinical

11  care.  So, for example, if someone is on a

12  ventilator, we don't just take them off without

13  testing that their lungs are ready, that they're

14  strong, that they're not on medications that

15  would interfere with spontaneous respirations,

16  so that would be an example of a clinical

17  standard of safety.

18          Q.    And are there standards of safety

19  that relate specifically to opioids that you're

20  aware of?

21          A.    Yes, there are.

22          Q.    And what standards of safety would

23  be considered in that context?

24          A.    They do write books about this, so I

25  likely will not review all of them, but the

Page 216

1  combinations of drugs that are prescribed, how

2  fast someone is taken off medications, how we

3  might start medication-assisted treatment, start

4  and wean somebody from medication-assisted

5  treatment or other controlled substances.  These

6  are all considerations that are relevant to

7  safety.

8          Q.    And these are all standards of

9  safety that the medical directors of the managed

10 care plans are supposed to be familiar with,

11 correct?

12         A.    Correct.

13                   -    -    -    -    -

14                (Thereupon, Applegate Deposition

15                Exhibit 21, The Ohio Department of

16                Medicaid Ohio Medical Assistance

17                Provider Agreement for Managed Care

18                Plan, Revised 2/2019, was marked for

19                purposes of identification.)

20                   -    -    -    -    -

21         Q.    I'd like to mark now as Exhibit 21 a

22 document entitled "The Ohio Department of

23 Medicaid, Ohio Medical Assistance Provider

24 Agreement for Managed Care Plan."  I ask for you

25 to take a moment to look at that.

 1           MR. SCHNIEDERS:  And just to be

 2    clear, counsel, this is an excerpt.  It looks

 3    like there was 216 pages in the actual document.

 4           MR. DOVE:  I'll get to that in a

 5    moment.

 6        Q.    So this is -- first of all, do you

 7    know what this document is reviewing it,

 8    Dr. Applegate?

 9        A.    Yes.  This document spells out the

10    requirements for the managed care plans as it

11    relates to participating in our program.

12        Q.    And I can -- following up with

13    Plaintiffs' counsel, I can represent that what

14    we did with this, we pulled this off of Ohio

15    Medicaid's website and this is only the main

16    contract.  It does not include the appendices.

17        A.    Okay.

18        Q.    If I could direct your attention to

19    the fourth paragraph on the first page.  The

20    third line down, it states that "The MCP," which

21    I assume means managed care plan, "has provided

22    and will continue to provide proof of the MCP's

23    capability to provide quality services

24    efficiently, effectively and economically during

25    the term of this agreement."

Page 218

1           Do you see that?

2      A.    Yes.

3      Q.    And let me step back for a moment.

4  So I take it, is this the model contract that

5  managed care plans are -- are supposed to enter

6  into?  What is the purpose of this document?

7      A.    It specifies the terms and

8  conditions and requirements for the managed care

9  plans to take care of members, the beneficiaries

10  in the Medicaid program.

11      Q.    So going back then to that fourth

12  paragraph, the portion that I just read, is

13  prescription drug coverage considered one of the

14  "quality services" contemplated by this

15  agreement?

16           MR. SCHNIEDERS:  Are you talking

17  about this agreement that's dated the end of

18  February of 2019 or are you talking about a

19  different agreement?  I just want to make sure

20  we're clear on the timing of this document.

21           MR. DOVE:  I'm talking about this

22  document, which appears to have been revised in

23  February 2019, but if -- we printed it off the

24  website, so I can ask it both ways, but -- well,

25  I will ask it both ways just to make it clear.

Page 219

1     Q.    As of today, is prescription drug

2  coverage considered one of the "quality

3  services" contemplated by this agreement?

4     A.    The pharmacy benefit is part of the

5  agreement with the managed care plans, yes.

6     Q.    And that's the pharmacy benefit that

7  is considered one of the quality services

8  contemplated by this agreement?

9     A.    Well, let me clarify.  I'm not sure

10  exactly what question you're asking.  The

11  program does cover goods as well as services.

12  This term is used as a holistic way to take care

13  of patients, and so in that broader context,

14  yes.

15     Q.    And that would have been true not

16  just today but true for as long as you had

17  relationships with managed care plans that

18  you're aware of?

19     A.    Yes.

20     Q.    Is this agreement with managed care

21  plans a tool that ODM can use to effect

22  prescription drug coverage by its managed care

23  plans?

24     A.    Yes.

25     Q.    And how can it do that?

Page 220

1    A.    We can set forth requirements

2  related to how some of the services are either

3  provided or monitored.

4    Q.    Can you give me an example or two of

5  that in the, sort of, pharmacy benefit context?

6    A.    We can require that there are

7  routine meetings with the directors of all the

8  pharmacies to review utilization concerns if

9  there are issues.  Specifically in this case,

10  related to the opioid epidemic, we met with them

11  to be sure that they were monitoring utilization

12  and that they all put edits in place to adhere

13  to state guidelines.

14    Q.    Does the Medicaid agency impose any

15  restrictions on how managed care plans can

16  structure their preferred drug lists?

17    A.    As you mentioned earlier, they are

18  required to provide not less than what is

19  provided in fee for service.  As I also

20  mentioned earlier, we do have standards of

21  safety, so if there are sudden changes that

22  impact more than one percent of their

23  population, they must give us notification in

24  advance.  That might be a good example.

25    Q.    And where can one find a listing of

Page 221

1   these restrictions?

2          A.     I would have to ask my pharmacy

3   team.

4          Q.     And maybe you touched on this

5   earlier.  I just want to make sure I'm clear

6   with it.  Has the Medicaid agency ever, in the

7   time that you've worked there, imposed

8   restrictions on how its managed care plans

9   structure their preferred drug lists?

10                MR. SCHNIEDERS:  Are you asking

11  this in her personal capacity or in her 30(b)(6)

12  capacity?

13                MR. DOVE:  In her 30(b)(6) capacity.

14                MR. SCHNIEDERS:  I'll object to the

15  extent it goes beyond the time she's been there,

16  but go ahead.

17                MS. LINN:  You can answer that.

18         A.     We referenced this earlier related

19  to the consensus list, that 80 percent that we

20  talked about, so they would consider that to be

21  a restriction.

22         Q.     Other than that consensus list, are

23  there any other restrictions that the Medicaid

24  agency has imposed on its managed care plans and

25  how they structure their preferred drug lists?

Page 222

1          A.     If there were issues of safety, we
2     actually did ask that they follow procedures to
3     ensure that members were safe.  So, for example,
4     on a certain date they are not allowed to
5     suddenly switch all of their members from one
6     controlled substance, for example, to an entire
7     other one if, in fact, there could be
8     differences by availability, if, in fact, those
9     butted up against the state requirements to
10    access to specialists beyond certain thresholds.
11    So that may be an example of how we've done that
12    in the past.
13         Q.     And have these safety issues that
14    you're discussing ever come up within the
15    context of opioids that you're aware of?
16         A.     They have come up as it relates to
17    medication-assisted treatment, so yes.
18         Q.     And could you explain a little bit
19    more how that worked within the context of
20    Medicaid -- or MAT?
21         A.     Okay, medication-assisted treatment.
22         Q.     Yes.
23         A.     Okay.  So one of the managed care
24    plans on one occasion wanted to switch brands,
25    and we required that -- which is allowed, of

Page 223

1    course.  This is a common practice among managed

2    care plans.  However, we required a very

3    detailed analysis of the dosages that patients

4    were on and the availability of clinicians who

5    could help navigate that change in brand,

6    because particularly for that problem, it could

7    create instability in the recovery of patients.

8    So we did require a much longer runway and

9    communication with the providers as well as with

10   the members before they took such an action.

11        Q.    And how did this issue come to ODM's

12   attention?

13        A.    We received the announcement that as

14   of a certain date, all of their members were

15   required to switch.

16        Q.    Other than this one instance with

17   regard to medication-assisted treatment, is

18   there -- do you recall any other instance where

19   issues of safety caused the Medicaid agency to

20   impose a particular restriction on one of its

21   managed care plans' preferred drug lists?

22        A.    I would have to check with the

23   detail of my pharmacy team since I'm not the one

24   who's closest to all of the detail.

25        Q.    But sitting here today, you don't

Page 224

1    recall any other instance, correct?

2         A.    That's correct.  There could have

3    been smaller ones, but again, I'd have to defer

4    to my pharmacy team.

5         Q.    Does the Medicaid agency impose any

6    restrictions on how many drugs the managed care

7    plan may include on their preferred drug lists,

8    you know, compared to the overall formulary,

9    sort of a percentage or any other sort of

10   restriction like that?

11        A.    No.

12        Q.    Does the Medicaid agency require

13   managed care plans to list a specific number of

14   drugs within a category on its preferred drug

15   lists?

16        A.    No.

17        Q.    Does the Medicaid agency require

18   managed care plans to have a specific number of

19   drugs within a category, such as the opioids

20   category -- does the agency require managed care

21   plans to have a specific number of drugs within

22   a category that are preferred and do not require

23   prior authorization?

24        A.    That's that consensus list that we

25   talked about, and as I mentioned earlier, they

Page 225

1    must make available what we have in fee for

2    service, but they have the flexibility to cover

3    more.

4         Q.    Dr. Applegate, do the actual

5    agreements with the managed -- that the agency

6    has with the managed care plans, do those

7    agreements differ from the sample agreement that

8    we just looked at?

9         A.    I can't speak to that.  All of the

10   managed care plans have the same provider

11   agreement, but I certainly haven't gone through

12   every page of all of this to actually verify

13   that independently.

14        Q.    But that's helpful.  Each of the

15   managed care plans have the same agreement with

16   ODM?

17        A.    That's correct.

18        Q.    Are there other tools besides the

19   agreement that ODM -- strike that.

20             Besides the agreement that we just

21   looked at as Exhibit 21, are there any tools

22   that the Medicaid agency can use to effect

23   prescription drug coverage by its managed care

24   plans?

25        A.    Yes.  The provider agreement does

Page 226

1    not get into all of the detail of the very

2    specific population health improvement

3    initiatives, so they're referenced generally,

4    and that gives us the flexibility over the

5    period of the contract to be nimble in

6    addressing certain needs.  So, for example, we

7    have special programs in place for pregnant

8    women who have opioid use disorder, we have

9    special programs for recently incarcerated

10   individuals specifically to address outcomes --

11   access, number one, and then quality and

12   outcomes for specific populations.

13          Q.    And those specific programs that you

14   just mentioned apply not just to fee for service

15   but to the managed care plans as well?

16          A.    That's correct.

17          Q.    And has that tool been available to

18   the Medicaid agency for as long as the agency

19   has been involved with managed care?

20          A.    I can only speak to the time that I

21   was there.

22          Q.    During the time that you've been

23   there.

24          A.    So that has been true since I've

25   been there.

Page 227

1              -   -   -   -   -

2              (Thereupon, Applegate Deposition

3              Exhibit 22, E-Mail from Benjamin

4              Link to Several Recipients, dated

5              December 19, 2018, with Attachments,

6              was marked for purposes of

7              identification.)

8              -   -   -   -   -

9        Q.    Dr. Applegate, I'd like to hand you

10   a document that has been marked as Exhibit 22,

11   and I'll represent to you that this document --

12   I'll represent to you that this document was

13   produced by the -- by ODM in this litigation.

14   It appears that our exhibit copy, that the Bates

15   label was cut off in the copying process, so I

16   will read it for the record.  This can be found

17   at ODM_040493 through 04049 -- or, excuse me,

18   through 040500.

19              Do you recognize this document,

20   Dr. Applegate?

21        A.    No.  I do recognize the content of

22   it, so I'm not personally responsible for the

23   in-pharmacy processes because the pharmacy team

24   is.

25        Q.    Can you describe what this document

Page 228

1   is, to the best of your understanding?

2        A.    This looks like an accounting of

3   different classes of drugs with a consensus rate

4   by class.

5        Q.    And there's a reference here to

6   Change Healthcare.  Is that ODM's pharmacy

7   benefits administrator?

8        A.    Yes, it is.

9        Q.    And ODM has had or the Medicaid

10  agency has had past pharmacy vendors, correct,

11  prior to Change Healthcare?

12       A.    That's correct.

13       Q.    And those have included Gould, Xerox

14  and ACS, correct?

15       A.    That's correct.

16       Q.    And they propose or they process

17  pharmacy claims for the Medicaid agency,

18  correct?

19       A.    That's correct.

20       Q.    Can you describe what types of

21  decisions -- strike that.

22            Can you describe what types of

23  coverage decisions are made by pharmacy vendors

24  with regard to opioids, if any?

25       A.    The pharmacy vendor does not make

1   the coverage decision; the agency makes the

2   coverage decision, and they actually pay the

3   claims for us.

4        Q.    So their role is more of an

5   administrative one, not a policy-making or sort

6   of medical decision-making role?

7        A.    That's correct.

8        Q.    How long has Change Healthcare been

9   providing these consensus reports to the

10  Medicaid agency?

11       A.    I would have to check with my

12  pharmacy team.  This vendor has not been with

13  the agency terribly long.

14       Q.    Would this type of document cross

15  your desk, Dr. Applegate?

16       A.    Usually not.

17       Q.    Do you know whether previous

18  pharmacy benefits administrators, the ones we

19  just talked about, Gould, Xerox, ACS, whether

20  they provided similar reports to the Medicaid

21  agency?

22       A.    I would expect that they would,

23  although I can't comment because I haven't seen

24  them.

25       Q.    If you could turn to page 3 of this

Page 230

1    report, and by that I mean the -- what's

2    numbered page 3, and in particular, to the

3    second bullet point or second -- excuse me, the

4    second to last bullet point states that "Change

5    Healthcare delivers to ODM a summary report

6    identifying percentage of consensus among plans

7    and FFS at the NDC and GPI 10 level."

8              Do you see that?

9       A.    Yes.

10      Q.    Is this the summary report that's

11   being described in this document?

12      A.    I actually don't totally know

13   because this is at such a high level, but the

14   tops of the graph do suggest GP 110 and NDC.

15      Q.    What does GP 110 mean?

16      A.    It's a class of drugs, but again,

17   I'd have to -- I'd actually have to check with

18   my pharmacy team.  The NDCs are the very

19   specific numbers of each particular -- every

20   drug has an NDC number.

21      Q.    So, you know, by looking at these

22   tables in this exhibit, I mean, can someone tell

23   what the consensus is among the managed care

24   plans and the fee-for-service plan with respect

25   to drugs requiring prior authorization?

Page 231

1        A.    What this articulates is a consensus

2   rate the way Change Health has calculated it

3   with their methodology, so I'm not sure actually

4   how that compares to what was done with prior

5   PBAs, and then I'm also -- there's not a huge

6   amount of detail related to specialty drugs,

7   physician-administered drugs.  You know, there

8   are many categories of drugs.  So with just this

9   summary statement -- I'm sure the pharmacy team

10  actually understands the detailed methodology,

11  so I would actually have to defer to them

12  because this is just a very, very high level

13  calculation.

14       Q.    So do these -- do you have an

15  understanding of whether these consensus rate

16  percentages that are included in this document,

17  in figure 1 the consensus rate of 54.3 percent,

18  and in figure 2 the consensus rate of 67.76

19  percent, and in figure 3 the consensus rate of

20  72.45 percent -- do these percentages relate in

21  any way to the 80 to 85 percent consensus number

22  that we were discussing earlier or is this a

23  different type of analysis?

24       A.    So I believe it's related.  Whether

25  or not it's the same methodology, I cannot

1  comment on.  So as you note, when they use one

2  methodology, they get one number, and when they

3  use another methodology, they get another

4  number.  It could be that in prior years they

5  refined their methodology.  So, again, I would

6  have to check with my pharmacy team, but yes, I

7  think they're related.

8      Q.    I believe we talked earlier about

9  how one managed care plan can require some kind

10  of prior authorization for a particular

11  prescription opioid while another managed care

12  plan might not require prior authorization for

13  that opioid, correct?

14      A.    Correct.

15      Q.    And the Medicaid agency allows that,

16  correct?

17      A.    Correct.

18      Q.    Why does the Medicaid agency allow

19  that to occur?

20      A.    Well, the plans are able to be more

21  flexible than we can be.  They may not want to

22  make as many changes as another plan.  They may

23  have business operations that they're trying to

24  honor.  So we don't actually, you know -- we

25  actually pay them to do the best job they can to

Page 233

1    actually manage the health of patients without
2    taking away all of their flexibilities.
3             There are new drugs that come on and
4    off the program, mainly on, so as you add new
5    drugs, you can imagine that the consensus rate
6    actually might go down until you get your
7    processes together, so some flexibility actually
8    is required to respond to the changes in the
9    field.
10        Q.    But if the Medicaid agency wanted
11   to, it could control this, right; it could say,
12   look, all managed care plans must require a
13   prior authorization for a particular opioid,
14   correct?
15        A.    So the state does have flexibility;
16   however, the perspective of the agency is that
17   if a plan wants to do a particular effort, for
18   example, around removing barriers for patients
19   with diabetes, they actually can look at their
20   pharmacy benefit and try to create a path of
21   easier access for better diabetes control, for
22   example.  And so that may impact how they
23   structure the pharmacy benefit.
24        Q.    Let's kind of stay with opioids for
25   a moment, though.  Again, the agency, if it

Page 234

1  wanted to, could require prior authorization

2  across all its managed care plans for particular

3  opioids, correct?  I understand it chooses not

4  to, but it could do that if it wanted to.

5              MR. SCHNIEDERS:  Object to the

6  form.  It's also been asked and answered.

7              Go ahead.

8       A.    Yes.  We could have essentially the

9  fee-for-service formulary.  Yes, that is

10  possible.

11              -    -    -    -    -

12              (Thereupon, Applegate Deposition

13              Exhibit 23, Molina Healthcare of

14              Ohio Preferred Drug List

15              (Formulary), was marked for purposes

16              of identification.)

17              -    -    -    -    -

18       Q.    Dr. Applegate, I'm now handing you

19  what we've marked as Exhibit 23.  This is the

20  current Ohio preferred drug list for Molina,

21  which I understand is one of the five Ohio

22  Medicaid managed care plans, and we printed this

23  off Molina's public website.  And I'd ask you to

24  turn to pages 6 and 7 of this document and then

25  just leave it in front of you.  We're going to

Page 235

1   show you another document and then ask

2   questions.

3              And what I'm handing you now is what

4   was previously marked in your January deposition

5   as Exhibit 6, which is a copy of the 2018 Ohio

6   Medicaid fee-for-service preferred drug list

7   that we discussed at that deposition.

8              And in this document I'd like you to

9   turn to page 9 of Exhibit 6, and you'll see

10  there that several drugs -- well, if you could

11  turn to page 9 and then I'll ask you a question.

12  All right.  Again, turn to page 9 of the

13  fee-for-service preferred drug list, Exhibit 6.

14  You'll see that several drugs listed on the

15  long-acting opioids -- long-acting oral chart,

16  including hydrocodone in the second white row,

17  and methadone in the last white row, are not on

18  the Molina preferred drug list.  I ask you if

19  you see that.

20       A.    I'm not sure -- what you're asking

21  me to do is compare these side by side?

22       Q.    Yes.  Just compare them and confirm

23  for me that the -- that hydrocodone, which is in

24  the second white row of the -- on page 9 of

25  Exhibit 6, and methadone, which is in the last

Page 236

1    white row, neither of those drugs are included

2    on the Molina preferred drug list.

3         A.    That's correct.

4         Q.    And on the next page, page 10, of

5    Exhibit 6, if you could confirm that oxymorphone

6    is in the prior authorization required column in

7    the fee-for-service preferred drug list but on

8    the Molina list it does not have prior

9    authorization next to it.

10                Do you see that?

11        A.    Yes.

12        Q.    And I was going to ask you more

13   questions about this, but given your prior

14   testimony, my understanding is -- tell me if I'm

15   right or wrong -- is that that doesn't surprise

16   you because there's a great deal of variability

17   between the fee-for-service list and the managed

18   care lists, correct?

19        A.    Yes, within that consensus process

20   that we discussed.

21        Q.    If you could turn to page 6 of the

22   Molina healthcare preferred drug list, which is

23   Exhibit 23, right under the subheading "Opioid

24   Analgesics" at the bottom -- do you see that?

25        A.    Yes.

1          Q.      -- it states that, "All opioid

2    analgesics are subject to Ohio Department of

3    Medicaid opioid policy."

4               Do you see that?

5          A.      Yes.

6          Q.      What is the Ohio Department of

7    Medicaid opioid policy?

8          A.      You recall I talked about the

9    pharmacy directors having routine meetings, and

10   they worked through the detail of the kinds of

11   limits and edits that are required to meet state

12   guidelines.  Many of these guidelines, as we

13   mentioned last time, relate to, for example,

14   quantity limits for acute pain for new patients,

15   as well as other checkpoints as delineated by

16   the guidelines.

17         Q.      Does the Medicaid agency maintain

18   documents describing the Ohio Department of

19   Medicaid opioid policy?

20         A.      I would have to ask my pharmacy team

21   details about documentation of those internal

22   operational processes; otherwise, we actually

23   look to published state guidelines for the

24   policies.

25         Q.      And does the Medicaid agency require

1  all managed care plans to adhere to its opioid

2  policy?

3          A.    Yes.

4          Q.    And when did this opioid policy go

5  into effect, if you know?

6          A.    I actually don't know specifically,

7  and, again, let me clarify that the policy that

8  you speak about is actually state law, so I

9  wouldn't say that Medicaid is the only entity

10  that actually owns it.  This is actually how we

11  operationalize state law.

12          Q.    And have you been involved

13  personally as medical director in the

14  operationalizing of state law in this way?

15          A.    We have an entire team that actually

16  assists in various capacities.

17          Q.    And who is on that team?

18          A.    There are members from almost all

19  areas of the department.  The last time we

20  talked a bit about the governor's cabinet opiate

21  action team.  So we have people in managed care

22  who are part of the lock-in program.  We

23  certainly have our pharmacy team, our managed

24  care team, the people involved in special

25  efforts around special populations, as I

Page 239

1   referenced, the recently incarcerated pregnant

2   women, infants.  So it's a team.

3        Q.    What requirements does the opioid

4   policy impose on managed care plans opioid

5   coverage?

6        A.    I'm not sure what you're asking.

7   You want me to repeat all of the guidelines?

8        Q.    No.

9        A.    Okay.  So that's the basis of all of

10  our policy.

11       Q.    I mean, we've talked about some

12  examples.  For example, does the Medicaid agency

13  require managed care plans to require prior

14  authorization for all long-acting opioids?

15       A.    We require that long-acting opioids

16  are not utilized for acute pain, which is what's

17  in the guideline.  Exactly how the managed care

18  plan does that, they have flexibility around

19  doing that.  They can actually work with

20  hospitals, they can work with providers, they

21  can work at the point of sale with pharmacies,

22  and they can work with the pharmacy edits inside

23  their pharmacy systems.  So they have many ways

24  that they can actually implement.

25       Q.    I believe you previously testified

1    that all managed care plans provide their

2    formularies and preferred drug lists to the

3    Medicaid agency.  Does that --

4          A.    Yes.

5          Q.    And they've done that since 2006,

6    correct?

7          A.    I can't comment on before I was

8    there, but I would expect that to be true.

9          Q.    You were there since 2006, correct?

10         A.    Yes, but not involved -- you know, I

11   really did prior authorization very specific

12   clinical tasks until I was there full time.

13         Q.    Which was 2010 roughly?

14         A.    At the end, yes, '11.

15         Q.    But in any event, it's your

16   understanding and expectation that the managed

17   care plans working with the Department of

18   Medicaid would provide them with copies of their

19   formularies and preferred drug lists, correct?

20               MR. PENDELL:  Object to the form.

21         A.    Yes.

22         Q.    Who at the Medicaid agency is

23   responsible for maintaining those formularies

24   and preferred drug lists?

25         A.    That should have been overseen and

Page 241

1   managed by the lead pharmacist and the pharmacy

2   team.

3          Q.    So that would have been Margaret

4   Scott in the early days, correct?

5          A.    Yes, with her team.

6          Q.    And Dr. Wharton today, correct?

7          A.    Yes, that's correct.  Yes.

8          Q.    Now, the Medicaid agency has access

9   to its own claims data that's kept in the

10  Medicaid information technology system or MITS,

11  correct?

12         A.    Correct.

13         Q.    And I think you previously testified

14  that ODM has access to the State Board of

15  Pharmacy's Ohio Automated Rx Reporting System,

16  or O-A-R-R-S, correct?

17         A.    We have constrained access to the

18  OARRS reporting system.  We have a very tight

19  partnership with the Board of Pharmacy, in which

20  aggregate information is shared.

21         Q.    Let me drill down into that a little

22  bit.  Aren't you able to access the OARRS

23  database to look up particular patients or

24  prescribers or pharmacists of concern?

25              MR. PENDELL:  Objection to form.

Page 242

1          MS. LINN:  You can answer the

2     question.

3          A.     We are able to look up one patient

4     at a time, particularly if we have concern, but

5     we actually cannot explore the database

6     independently.  There are special laws that

7     actually govern access to that database.

8          Q.     So on one hand, you can do one

9     patient at a time, but then you mentioned

10    aggregate data.  Can you explain what that

11    means?

12         A.     Yes.

13              We have a tight partnership with the

14    Board of Pharmacy.  Under the umbrella of our

15    past governor's cabinet opiate action team --

16    GCOAT we called it for short last time.  And as

17    part of that, all of the agencies in the state

18    were interested in the effect of the prescribing

19    guidelines and the impact of prescription drugs

20    on the opioid-related death rate.  So that's

21    actually really what drove the formation of that

22    group.

23              So as part of that, we received

24    regular reports from the Board of Pharmacy

25    related to who was checking OARRS, which sort of

Page 243

1  drugs were being prescribed, what the proportion

2  of short acting and long acting were at varying

3  morphine equivalent doses to really get a handle

4  of what was going on with prescription opioids.

5  Q.   And did the Medicaid agency have

6  input into the items that are included in that

7  Board of Pharmacy report?

8  A.   We helped them develop the

9  methodology, essentially to develop the measures

10  that were then reported and tracked over time.

11  Q.   And so under this agreement with the

12  Board of Pharmacy, if the Medicaid agency wanted

13  to do other analyses that it thought would be

14  helpful to its -- to the performance of its

15  duties that involved the OARRS database, could

16  it conduct those analyses with the Board of

17  Pharmacy?

18  A.   Not easily.  We have to go through

19  an entire legal process with a DUA and a series

20  of -- data utilization agreement, and a series

21  of other legal agreements with very -- a very

22  specified purpose.  So that has not been an easy

23  path and we do not have a body of research

24  related to the Medicaid-only portion of the

25  OARRS database.

Page 244

1        Q.    You say it's not easily but it would
2   be possible, correct, if you could get agreement
3   with the Board of Pharmacy under this
4   relationship you have with them; is that fair?
5        A.    It's fair, but let me tell you,
6   we've been waiting four years for a single
7   research project, so, in reality, I actually do
8   not think that that's a feasible activity under
9   the current rules that we have right now.
10        Q.    And you mentioned one report, I
11   believe -- maybe it was a series of reports, but
12   I know you mentioned one report from the Board
13   of Pharmacy.  Does the Medicaid agency receive,
14   you know, regular reports from the Board of
15   Pharmacy that discuss drug utilization or
16   prescription opioids?
17        A.    Under that GCOAT group, we received
18   at least quarterly reports related to
19   utilization, just as we received quarterly
20   reports from the Department of Public Safety
21   related to seizures and that sort of thing.  The
22   Board of Pharmacy does publish an annual OARRS
23   report, and that's actually a source of
24   information as well.
25        Q.    And has the Board of Pharmacy been

1  providing these sorts of reports since the time

2  you've been at -- for the full time you've been

3  at the agency?

4        A.    As I mentioned earlier, we helped

5  them develop the methodology, so I don't think

6  they existed right when I came to the agency but

7  they were developed over the course of that

8  time.

9        Q.    And when did you develop that

10 methodology?

11       A.    So there's several measures, so it's

12 actually probably over a period of a couple

13 years.  I'd have to ask my colleagues at the

14 Board of Pharmacy for the exact dates.

15       Q.    Do you have a general understanding

16 of the time frame that this occurred?

17       A.    I actually would have to ask them.

18 The point at which it was official I'm actually

19 not clear because it was a process.  We

20 certainly had the first measure of total solid

21 doses dispensed, you know, at least

22 approximately 2012, but over time we have a much

23 more robust series of measures that we've

24 tracked, including utilization, doctor shopping,

25 the number of patients over 80 morphine

Page 246

1  equivalents for more than three months, et

2  cetera.  So the annual report really is quite

3  complete and does reflect the number of measures

4  that were developed.

5                      -   -   -   -   -

6                 (Thereupon, Applegate Deposition

7                 Exhibit 24, A Drug Utilization

8                 Review of Duplicative Long-Acting

9                 Opiate Use, September 2012,

10                 Beginning Bates Number ODM_039326,

11                 was marked for purposes of

12                 identification.)

13                      -   -   -   -   -

14       Q.    Dr. Applegate, I would like to hand

15  you now a document that was produced by ODM in

16  this litigation.  It bears the Bates label

17  ODM_039326 through 039327.  It's entitled "A

18  Drug Utilization Review of Duplicative

19  Long-Acting Opiate Use September 2012."  I just

20  ask you to look at that document and tell me if

21  you recognize it.

22       A.    No, but I can look at it now.

23       Q.    Sure.  You can take a moment just to

24  review it and then provide your understanding

25  what this document is.

Page 247

1           MS. BABTIST:  This computer is

2     looking like it's trying to restart.

3           THE VIDEOGRAPHER:  Let's go off the

4     record.

5           Off the record.

6               (Recess had.)

7           THE VIDEOGRAPHER:  We're back on the

8     record.  The time is 10:29.

9        Q.    Dr. Applegate, if we could just turn

10    back again to Exhibit 24, and if you could tell

11    me what that document is to the best of your

12    understanding.

13       A.    This is a drug utilization review of

14    what they're calling duplicative long-acting

15    opiate use dated September 2012.  It begins with

16    the objectives of the evaluation that summarize

17    the clinical best practice of not being on two

18    long-acting different opioid products at the

19    same time.  And the second point is that there's

20    an intervention in which the DUR committee

21    identifies patients who may be on duplicative

22    long-acting opioids and they send letters of

23    educational information and guidance for

24    checking the OARRS system, which is the

25    prescription drug monitoring program system,

1    which tells the clinicians the entirety of the

2    controlled substances that were prescribed for

3    that patient.  In here is the suggestion that

4    one prescriber may not know what another

5    prescriber has for that same patient and that

6    they'll be reevaluating this.

7        Q.    And do you know why this document

8    was prepared?

9        A.    I don't have the rest of the

10   context, but the suggestion is that they're

11   aware that there are circumstances that they can

12   see based on pharmacy claims in which best

13   practice is not being followed, but there's no

14   additional context or reasons for it or

15   conclusions or anything like that.  It does

16   appear that there are additional pages since

17   this stops mid-sentence.

18       Q.    Dr. Applegate, you can put that

19   document aside.

20            I'd like to now show you what's been

21   -- we're marking as Exhibit 25.  It bears the

22   Bates numbers ODM_040711 through 040756.  And

23   I'll represent to you that this was produced by

24   the Medicaid agency in this litigation.

25                -    -    -    -    -

Page 249

1                 (Thereupon, Applegate Deposition
2                 Exhibit 25, Ohio Department of
3                 Medicaid (ODM) Quarterly Clinical
4                 Report Q2 2018, Beginning Bates
5                 Number ODM_040711, was marked for
6                 purposes of identification.)
7                          -   -   -   -   -
8        Q.    If you can take a look at that
9    document and tell me if you recognize what it
10   is.
11       A.    This is a quarterly clinical report
12   from the second quarter of 2018 produced by
13   Change Healthcare.
14       Q.    And how long has Change Healthcare
15   been providing these clinical reports to the
16   Medicaid agency?
17       A.    It is part of their requirement
18   since they became our pharmacy benefit
19   administrator.
20       Q.    And does ODM receive any other drug
21   utilization information from Change Healthcare?
22       A.    I believe this is just the clinical
23   report.  I think there are reports related to
24   claims paid, expenses.  Yes, there are
25   additional reports.

Page 250

1      Q.    And did the Medicaid agency receive

2  such information in the past from Change

3  Healthcare's predecessors, like Gould and Xerox?

4      A.    I cannot comment on the entirety of

5  what the reports in the past were.  I do know

6  that since we've had Change Health --

7  Healthcare, we wanted to have a clinical focus

8  because the shift is to not just pay claims but

9  actually to take better care of people.  So to

10  that end, it's possible that the clinical nature

11  of this report is something that's happened in

12  more recent years.

13      Q.    If you could turn your attention to

14  the executive summary page, which is ODM_040715.

15  And I'd like to direct your attention to the

16  third paragraph, last sentence, where it talks

17  about "efforts to coordinate drug coverage

18  across the ODM program such as through the

19  single preferred drug list initiative."

20          Do you see that?

21      A.    Oh, yes.

22      Q.    What is the single preferred drug

23  list initiative?

24      A.    As part of our effort to take care

25  of populations better, one of the complaints

Page 251

1    that we heard from clinicians is that there was

2    too much variation in -- in the types of

3    medications that they needed for adherence, for

4    best adherence, so one of the policy thoughts at

5    that time was that we would take classes of

6    medications and require that all of the plans

7    treat them the same.  And we were looking at

8    the -- a couple of different areas that were of

9    high impact for the agency.  So opioid use

10   disorder and diabetes are of particular interest

11   in that regard.

12          Q.    And what was the result of that

13   effort?

14          A.    So that never went through.  The

15   managed care plans objected to the idea.  So

16   we're trying to find different ways to meet the

17   same objective.

18          Q.    But if it were up to Ohio Medicaid,

19   this single preferred drug list initiative would

20   be in place?  Is that the preference of Ohio

21   Medicaid?

22          A.    I'm not sure I can speak for the

23   entire agency since we do have a director who

24   works in conjunction with her other partners in

25   state government, but from a clinical

Page 252

1   perspective, reducing variation in adherence to

2   chronic medications is a sound strategy.

3        Q.    Just directing your attention

4   further on in the report to page ODM_040744,

5   there's a reference to opioid dashboard reports.

6   I'd just like you to explain, what are -- just

7   in a general way, what are the opioid dashboard

8   reports.

9        A.    Well, what we wanted to do was to

10  have our finger on the pulse of prescription

11  opioids because, you know, years ago we were

12  aware that about a quarter of the opioid-related

13  deaths had some sort of prior prescription

14  opioid, and many of the collective actions

15  across the agencies were all about safe

16  prescribing and not starting that journey of

17  addiction through prescription medications.  So

18  to that end, you know, related to my comments

19  with the Board of Pharmacy and the protection of

20  the OARRS information, we at least internally

21  wanted to monitor progress because we had a

22  number of efforts in play, including the

23  pharmacy edits and our work with the managed

24  care plans and the coordinated services program,

25  the lock-in to pharmacies, for example, so we

Page 253

1   wanted to be able to, within our population,

2   have an understanding of what was happening.

3        Q.    I'd like now to turn back to Exhibit

4   6 in your stack.  Actually, before we do that,

5   one final question on drug utilization reports.

6   Does the Medicaid agency receive drug

7   utilization reports or other drug utilization

8   information from its managed care plans?  Is

9   that something you get?

10       A.    The reports that we just referenced

11  actually includes the managed care plans, so for

12  high-priority items, like the measures that

13  mirror what we have in the OARRS database, we

14  actually get that directly from Change Health.

15  There's a lot of information -- a lot of work in

16  compiling them.  I'd have to check with the

17  pharmacy team about the entirety of the reports

18  that they receive from the plans.

19       Q.    All right.  So going back to Exhibit

20  6, I'd like to direct your attention to page 10.

21  And on page 10 do you see that for several of

22  the drugs, like hydromorphone HCL, it says

23  "generic of" a brand name medication?

24       A.    Yes.

25       Q.    Does the Medicaid agency consider

Page 254

1    the same factors for placing a generic drug on

2    the preferred drug list compared to placing a

3    brand name drug on the preferred drug list?

4         A.    I'm not sure.  I'd have to check

5    into that detail with the pharmacy team.

6         Q.    Is whether a generic drug is

7    preferred or non-preferred related to the status

8    of the equivalent brand name drug?

9         A.    I'm actually not sure.  There's an

10   entire process related to that.  I believe that

11   is tied up in the rebate process that I'm not

12   able to discuss.

13        Q.    Is it fair to say that you're not

14   the right person to discuss the details of sort

15   of how these preferred drug lists are created

16   with regard to generics versus brands and the

17   sort of process that the pharmacy team goes

18   through?

19             MR. PENDELL:  Objection to form.

20             MR. SCHNIEDERS:  Join.

21             MS. LINN:  You can answer.

22        A.    I'm not sure they're able to discuss

23   that either, because information about rebates

24   is protected.

25        Q.    Excluding the rebate piece, I'm

Page 255

1    trying to understand, as an example, you know,

2    why hydromorphone HCL, a generic of a particular

3    brand name -- why that generic is included but

4    not the brand name itself in some situations,

5    but sometimes the brand name is included, so the

6    process in which those determinations are made.

7                    Are you the right person to talk to

8    about those issues or would that be someone else

9    on your pharmacy team?

10                    MR. SCHNIEDERS:  Object to form.

11        A.     Yeah.  Likely Dr. Wharton would be

12    the person to speak to.

13        Q.     So just as an example, on page 9 of

14    this exhibit, the 2018 preferred drug list, it

15    lists MS Contin -- this MS Contin as a brand

16    name drug of morphine sulfate ER tablet, but MS

17    Contin itself is not included on the preferred

18    drug list.

19                    Do you see that?

20        A.     So I see where you're reading that,

21    yes.

22        Q.     But to explain why that's the case,

23    are you the right person to answer that

24    question?

25                    MR. SCHNIEDERS:  Object to form.

Page 256

1          A.      No.

2          Q.      No, you're not?

3          A.      That's correct.

4          Q.      And who would be the right person

5    who could explain that?

6          A.      Again, that would be my pharmacy

7    team.

8          Q.      If the Department of Medicaid covers

9    a particular generic drug, does it cover all

10   generic drugs that use the same active

11   ingredient?

12         A.      I actually don't know.

13         Q.      And who would know that answer?

14         A.      My pharmacy team.

15         Q.      During the last deposition session,

16   Dr. Applegate, we discussed the drug look-up

17   tool and the list of drugs covered without prior

18   authorization, which both are available on Ohio

19   Medicaid's website.

20              Do you recall that?

21         A.      Yes.

22         Q.      And I believe you stated that you

23   would need to check with the pharmacy team about

24   how frequently they are updated.

25              Do you recall that?

1          A.     Yes.

2          Q.     Were you able to do that?

3          A.     So I'm not sure that I did that.  So

4   I can likely make sure that my team has that

5   information and they can get that to you.

6               MR. DOVE:  We're going to definitely

7   follow up with some of these questions with the

8   department.

9               MS. LINN:  If we could take like a

10  one-minute, two-minute break.

11              MR. DOVE:  Why don't -- we're going

12  to take a break in about, I would say, a half an

13  hour --

14              MS. LINN:  Or give me one second.

15  Your question is not pending anymore, right?

16              MR. DOVE:  The question is not

17  pending.

18          (Discussion had off the record

19           between the witness and Ms. Linn.)

20          Q.     Should I ask the question again?

21          A.     That would be great.

22          Q.     So do you have an understanding now

23  about how often the drug look-up tool is

24  updated?

25          A.     Yes.

Page 258

1          Q.     And what is that understanding?

2          A.     Weekly.

3          Q.     Weekly.

4                 Are you able to confirm whether the

5     drug look-up tool includes all drugs covered by

6     the Medicaid agency?

7          A.     I believe so.

8          Q.     And do you have an understanding now

9     about how often the list of drugs covered

10    without prior authorization is updated?

11         A.     I would expect it to be at the same

12    weekly interval.

13                      -    -    -    -    -

14                (Thereupon, Applegate Deposition

15                Exhibit 26, Letter from Mary

16                Applegate, M.D. to Dr. Bailit, dated

17                October 13, 2017, Bates Numbered

18                ODM_015989, was marked for purposes

19                of identification.)

20                      -    -    -    -    -

21         Q.     Dr. Applegate, I'm now showing you a

22    document that's been marked as Exhibit 26.  This

23    document was produced by Medicaid agency and

24    bears the Bates number ODM_015989.

25                Do you recognize this document?

Page 259

1           A.      I do.

2           Q.      And what is it?

3           A.      This is a letter of support to

4    improve the models of care to try to improve

5    better outcomes for pregnant women who have

6    opioid use disorder.

7           Q.      And this is dated October 13th,

8    2017, correct?

9           A.      That's correct.

10          Q.      And you're the signatory of this

11   document, correct?

12          A.      I am, yes.

13          Q.      Now, you and Dr. Bailet were

14   collaborating on a grant to study prenatal care

15   for opiate dependent mothers, correct?

16          A.      Yes.  This was for the submission of

17   the grant.

18          Q.      And who -- well, first of all, was

19   the grant approved?

20          A.      I actually don't think so.

21          Q.      Meaning it was rejected or it's

22   still pending?

23          A.      I would have to check with

24   Dr. Bailet.

25          Q.      If the grant had been approved,

                                        Page 260

1    where would the funding have come from?

2         A.    This would have been federal

3    funding.

4         Q.    So I was going to ask, has

5    Dr. Bailet's study concluded?

6         A.    No.

7         Q.    Has it even begun?

8         A.    I'm not sure.  We are doing -- I

9    realize that may sound strange.  We actually

10   proceeded with trying to improve the

11   coordination and the integration of obstetrical

12   and opioid use disorder care even without the

13   grant.  So we are continuing to improve -- you

14   know, trying to improve independent of federal

15   funding processes.

16                    -   -   -   -   -

17                    (Thereupon, Applegate Deposition

18                    Exhibit 27, Letter from Michael C.

19                    Barnes to Ohio Medicaid

20                    Pharmaceutical & Therapeutics

21                    Committee, dated June 25, 2010,

22                    Beginning Bates Number ODM_039341,

23                    was marked for purposes of

24                    identification.)

25                    -   -   -   -   -

Page 261

1        Q.    Dr. Applegate, I'm now showing you a

2   document that we've marked as Exhibit 27, and I

3   can represent to you that this has been produced

4   by the agency in this litigation and bears the

5   label ODM_039341 to 039342.

6              Dr. Applegate, do you see that this

7   letter is addressed to the Ohio Medicaid

8   Pharmaceutical & Therapeutics Committee from

9   Michael C. Barnes at the Center for Lawful

10  Access and Abuse Deterrence?

11       A.    Yes, but let me comment this was

12  from 2010, so I can't speak to the entire

13  context of that particular time.

14       Q.    My understanding is that you're here

15  as a 30(b)(6) witness for the agency covering

16  the years 2010 to 2013, so do you think you

17  would be able to answer my questions on this

18  document?

19       A.    So I can try, depending on what the

20  question is here.

21             MR. SCHNIEDERS:  I would object

22  based upon the designation in the letter that

23  counsel provided.

24             MR. PENDELL:  And I would also

25  object based on the case law I just looked at in

Page 262

1    this case, where when you notice a broad topic

2    for a 30(b)(6) witness, a witness cannot be

3    expected to anticipate and know the answer to

4    every single question you're going to ask.

5        Q.    Organizations like the Center for

6    Lawful Access and Abuse Deterrence are able to

7    submit letters to the P&T for consideration,

8    correct?

9        A.    Correct.

10       Q.    And providers can do that as well,

11   correct?

12       A.    That is correct.

13       Q.    And do you see at the end of the

14   first paragraph the letter states that the P&T

15   committee "will soon be evaluating for inclusion

16   on the state's Medicaid formulary one or more

17   opioid pain relievers designed to limit

18   intentional abuse"?  Do you see that?

19       A.    Yes.

20       Q.    And are those pain relievers also

21   known as abuse-deterrent medications?

22       A.    Yes.

23       Q.    And this letter is dated, as we

24   talked about, June 25, 2010.  Was there a

25   particular reason that the P&T committee was

Page 263

1   considering opioid abuse-deterrent medications

2   at that time?

3              MR. SCHNIEDERS:  Object to form.

4        A.    The P&T considers all the

5   recommendations that are put forth to them.

6        Q.    And do you recall a particular

7   reason why they were considering abuse-deterrent

8   opioid medications at that time?

9              MR. SCHNIEDERS:  Object to form.

10       A.    Again, I actually did not attend P&T

11  so I actually cannot comment on that.

12       Q.    And this letter asks the P&T

13  committee to approve coverage of abuse-deterrent

14  opioid medications, correct?

15             MR. SCHNIEDERS:  Object to form.

16       A.    It asks that we evaluate the

17  inclusion in the state formulary for

18  abuse-deterrent forms, yes.

19       Q.    Just directing your attention to the

20  first bullet point after the second paragraph,

21  it states, "Prescription opioid abuse is an

22  urgent public health threat that must be

23  addressed immediately."

24             Do you see that?

25       A.    Yes.

Page 264

1      Q.     And would you agree that by June 25,

2   2010 the Medicaid agency was aware that

3   prescription opioid abuse was an urgent public

4   health threat?

5           MR. SCHNIEDERS:  Object to the form

6   and foundation.

7      A.     During my prior testimony I did note

8   that it was around 2011 that we were aware that

9   this was a problem.

10     Q.     So would this document suggest that

11  the agency was aware even earlier that the

12  prescription opioid abuse was an urgent public

13  health threat that must be addressed

14  immediately?

15          MR. SCHNIEDERS:  Object to form.

16          MS. LINN:  Objection.

17          You can answer.

18     A.     You know, the language I'm not sure

19  everybody would agree with.  I think what we

20  were aware of is that more people were dying.  I

21  don't know that we were aware of everything that

22  went into that.  So certainly as a clinician, I

23  actually do think it was clear around that time

24  that we needed to pay more attention to

25  prescription opioid medication.

Page 265

1          I might add that as a clinician at

2     that time, my focus was on trying to minimize

3     any prescribing, not just switching to a

4     different formulation of a dangerous medication.

5     So the clinicians in general were focused on

6     prescribing less, not just switching to

7     different forms.

8          Q.    Dr. Applegate, I'd now like to show

9     you a letter that's been marked -- that I'm

10    marking as Exhibit 28.  It was produced by ODM

11    and bears the Bates label 038848.

12                    -   -   -   -   -

13               (Thereupon, Applegate Deposition

14               Exhibit 28, Letter from Margaret A.

15               Scott to Michael C. Barnes, dated

16               July 29, 2010, Beginning Bates

17               Number ODM_038848, was marked for

18               purposes of identification.)

19                    -   -   -   -   -

20         Q.    I'd ask you to take a look at that

21    letter and if you could tell me whether it would

22    be accurate to say that this letter is the

23    response that the Medicaid agency sent to

24    Mr. Barnes from the Center for Lawful Access and

25    Abuse Deterrence dated July 29th 2010.

Page 266

1            MR. SCHNIEDERS:  Object to the form,

2   foundation.

3       A.    So I read this.  Now remind me what

4   your question was.

5       Q.    Would it be accurate to say that

6   this letter is the response ODM -- or, excuse

7   me.  Would it be accurate to say that this

8   letter is the response of the Medicaid agency,

9   which was at the time the Ohio Department of Job

10  and Family Services, that they sent to

11  Mr. Barnes from the Center for Lawful Access and

12  Abuse Deterrence?

13            MR. SCHNIEDERS:  Same objections.

14      A.    Yes.  The timing of this suggests

15  that this is the response to that letter, yes.

16      Q.    And in the second to last paragraph

17  are the long-acting opioids available without

18  prior authorization, morphine, sulfate ER,

19  fentanyl patch, Kadian and OxyContin.  Are those

20  abuse-deterrent opioids in your view?

21            MR. SCHNIEDERS:  Object to form.

22      A.    No, they are not.

23      Q.    And so would it be accurate to say

24  that this letter is stating that coverage of

25  abuse-deterrent opioids was considered but not

Page 267

1    approved by the Medicaid agency and P&T

2    committee?

3              MR. SCHNIEDERS:  Object to the form

4    and foundation.

5         A.    Yes, as part of PDL, but I will note

6    that there's a process to receive non-preferred

7    drugs, so you must ask for it and fill out a

8    piece of paper and have a discussion with the

9    managed care plans.  So it would not be true to

10   say that there was zero access to

11   abuse-deterrent forms.

12        Q.    And was that process in place in

13   2010?

14        A.    Yes, it was.

15             MR. DOVE:  I think now would be a

16   good time for us to take a break.

17             THE VIDEOGRAPHER:  Off the record,

18   10:58.

19                  (Recess had.)

20             THE VIDEOGRAPHER:  We're back on the

21   record, 11:21.

22        EXAMINATION OF MARY APPLEGATE, M.D.

23   BY MS. HAN:

24        Q.    Dr. Applegate, my name is Anna Han

25   and I represent McKesson in this litigation.  We

Page 268

1    met at your last deposition and I'll be asking

2    the next set of questions.

3              So both you and Dr. Wharton

4    testified that ODM has data analysts on staff;

5    is that correct?

6         A.    That is correct.

7         Q.    Have the data analysts or any other

8    researchers been used to obtain and analyze data

9    related to opioid utilization and prescription

10   trends?

11        A.    Yes.  Not all of that has been by

12   specific data analysts within the agencies.

13   Some of that work has been done by research

14   partners.

15        Q.    And who are those research partners?

16        A.    The majority are through the

17   Government Resource Center, who is tied to the

18   Ohio State University.

19        Q.    Do you also rely on analysts from

20   Change Healthcare?

21        A.    Yes, as you saw in the prior report.

22        Q.    Does the Medicaid agency also rely

23   on analysts from the managed care plans?

24        A.    We get reports from the managed care

25   plans, and they must have an analytic staff that

Page 269

1    actually does that work for them, yes.

2         Q.    And have the researchers and

3    analysts at the Medicaid agency also analyzed

4    claims data for other projects unrelated to

5    opioid prescriptions?

6         A.    Yes.

7                    -   -   -   -   -

8              (Thereupon, Applegate Deposition

9              Exhibit 29, One-Page Document

10             Entitled "Overview of Opioid

11             Prescribing Metrics," Bates Numbered

12             ODM_016480, was marked for purposes

13             of identification.)

14                  -   -   -   -   -

15        Q.    I'm going to show you the next

16   exhibit marked 29.  This is a document that was

17   produced by ODM in this litigation.  The Bates

18   number is ODM_016480.

19             Dr. Applegate, do you recognize this

20   document?

21        A.    So I recognize the content of the

22   document, yes.

23        Q.    And what is the content of this

24   document?

25        A.    This is a description of the

1  opioid-related metrics that exist in OARRS,

2  which is our prescription drug monitoring

3  program.

4        Q.    And this document is dated with a

5  revision date August 20th -- I assume that's a

6  typo -- 2013.

7        A.    I think I would presume that -- it's

8  2103, so far into the future, so I would

9  presume, so yes.

10       Q.    Do you know if there have been any

11 updates to the content of this document?

12       A.    I would have to talk to my

13 colleagues at the Board of Pharmacy to see if

14 there were any methodology revisions.  This

15 simply notes the numerator and denominator in

16 each of the measures but does not necessarily

17 specify the time spans, 90 days, 120 days.  So

18 there's additional methodology that actually may

19 go with this, but the -- the title of the

20 measures actually still exist.

21       Q.    What are the opioid-prescribing

22 metrics intended to assess?

23       A.    Broadly, they're intended to assess

24 overall utilization of controlled substances, so

25 not just opioids in particular but controlled

Page 271

1   substances, and when we developed these metrics

2   several years ago, we were focused on an

3   understanding of what was happening in Ohio at a

4   population level as well as specific points that

5   might be particularly dangerous as it relates to

6   being at risk for overdose or death.

7        Q.    And just to make sure I understand,

8   for the first two prescribing metrics here,

9   they're related to controlled substances

10  generally, not specifically opioids; is that

11  right?

12       A.    That is correct.

13       Q.    So I just want to go through these

14  six metrics.

15            Why is it important to know the

16  percentage of prescribers of controlled

17  substances registered on OARRS?

18       A.    So I think there's an underlying

19  strategy here, and that is -- or a few

20  assumptions.

21            One of the assumptions is that one

22  of the reasons there were so many patients with

23  many prescribers and pharmacies related to the

24  fact that their care was not coordinated, and so

25  checking the OARRS database was a way to let the

Page 272

1    clinicians know who else was involved in the
2    care of that patient because the patients were
3    not always certain or forthcoming with that
4    information.
5         Q.    And the second metric, the
6    percentage of registered prescribers of
7    controlled substances using OARRS, is it
8    accurate to say that not every registered
9    prescriber actually uses OARRS in his or her
10   practice?
11        A.    So part of history is that only
12   certain prescriptions required like mandatory
13   checking of the PDMP, the OARRS system.  So
14   specifically, if you had a patient on over 80
15   morphine equivalents for more than three months,
16   you know, by law you actually had to check
17   OARRS.  In emergency departments, for example,
18   you might just be giving a day supply or a
19   two-day supply and you would not be required to
20   check OARRS.  So you can have somebody who is a
21   prescriber, who actually may not be registered,
22   because the nature of that prescription did not
23   meet the level of the law.
24        Q.    Is it correct that there are
25   registered prescribers on OARRS who don't

Page 273

1    actually use OARRS, though?

2           MR. SCHNIEDERS:   Object to the

3    foundation.

4      A.    Actually, to register means that --

5    you have to look at OARRS to be registered, so I

6    think what this gets to is the total number of

7    prescribers and then the total number who are

8    actually using OARRS.

9      Q.    Right.  So I'm trying to understand

10   the distinction between the first two points.

11   The first one is measuring the percentage of

12   prescribers registered on OARRS and then the

13   second is measuring the percentage of registered

14   prescribers using OARRS.  So is there no

15   distinction there?

16     A.    So I read this differently.

17           The first one is the percentage of

18   prescribers that prescribe controlled

19   substances.  So what happens is there are plenty

20   of providers who actually don't do any

21   controlled substances, maybe related to their

22   specialty.  For example, a neonatologist I would

23   not expect to actually be prescribing controlled

24   substances, for example, or if their practices

25   are constrained to an in-hospital system, that

Page 274

1    actually would not show up on the OARRS

2    database.  So what happens, though, is when

3    there's a prescription for a controlled

4    substance that somebody brings to a pharmacy,

5    that's actually -- that script is actually what

6    gets registered in OARRS.  So all prescribers of

7    outpatient control medications, all those drugs

8    are actually registered in OARRS or are -- that

9    data is actually in OARRS whether or not -- the

10   script -- the drug data is in there.  Whether or

11   not the prescriber has to register and use OARRS

12   is something different.

13           So the example I gave was if you're

14   just prescribing one pill after you had all your

15   wisdom teeth removed, that would not require by

16   law that you actually check OARRS, but that

17   prescription will be in OARRS.  So one is the

18   prescription itself and the other one is those

19   who are actually registered and taking care of

20   patients where it's required.

21       Q.    I see.  Thank you.

22           Why is it important for the Medicaid

23   agency to know the proportion of patients at AD,

24   MED, morphine equivalent dose, and above who

25   have at least one OARRS inquiry over a specific

Page 275

1  time period?

2      A.    That is directly linked to the

3  requirement in law that I just referenced, and

4  so we're actually checking for adherence to the

5  law.

6      Q.    Is that also the case for the fourth

7  metric, number and percentage of patients

8  prescribed both sedatives and opioids?

9      A.    Yes.  I think there's been an

10  evolution over time.  At this time we actually

11  think part of the assessment of the patient is

12  that every single controlled substance is --

13  should -- you know, we should check OARRS as

14  part of the prescribing process, and I think

15  that's much of what you've seen in the

16  5,000-fold increase in those who are registered

17  and checking OARRS.  But yes, these are

18  consistent with the state guidelines that I

19  referenced earlier.

20      Q.    And the increase you just mentioned

21  in using OARRS, what is the time period that

22  that increase has occurred?

23      A.    Since 2012.  That data is actually

24  in the annual OARRS report that I just

25  referenced, and that has been tightly associated

1  with an 89 percent drop in doctor shopping,

2  which is the going -- you know, having

3  prescriptions from four or more clinicians and

4  having them fill it at four or more pharmacies.

5  So, again, you know, to my earlier point,

6  this -- these are measures that support the

7  underlying strategy of trying to do a better job

8  in coordinating care.

9       Q.    And the fifth metric, "Percentage of

10  prescriptions filled with a quantity of 120 plus

11  capsules or pills per prescription," is that

12  also linked to a legal requirement?

13       A.    It is linked to the guideline in

14  that we need to prescribe the smallest amount in

15  the shortest duration in order to meet the need

16  of the patient.

17       Q.    And, finally, the average MED per

18  prescription metric, is that also linked to a

19  legal guideline?

20       A.    Yes, it is.

21       Q.    And has ODM been tracking the change

22  over time of these metrics?

23       A.    Yes.  As you saw in the Change

24  Healthcare report, you actually note the trends

25  in time specifically for the Medicaid population

Page 277

```
 1    as opposed to what OARRS has, which is all
 2    payers and all prescriptions in the state for
 3    all populations.
 4         Q.    Does ODM rely on Change Healthcare
 5    for that information without its own analysis?
 6         A.    So Change Health is one group of
 7    analysts that actually looks at the data.  I
 8    referenced earlier that we have research
 9    partners who are also helping us with this.
10         Q.    At your last deposition you
11    testified about a CDC reference that was cited
12    in the Ohio Prescribing Guidelines for Chronic
13    Pain?
14         A.    Yes.
15         Q.    Were you able to find that
16    reference?
17         A.    Yes.
18         Q.    And did that reference clarify
19    whether the opioids mentioned were necessarily
20    prescription opioids?
21              MR. SCHNIEDERS:  Object to the form.
22              Go ahead.
23         A.    Yes.
24         Q.    So if so, did it clarify whether the
25    prescription opioids were legitimately
```

Page 278

1  prescribed?

2          MR. SCHNIEDERS:  Object to the form.

3          Go ahead.

4      A.    The report discussed the nature of

5  the opioid epidemic at that time, including the

6  connectivity to prescription medications kind of

7  opening the door to future illicit use that then

8  led to either fatal or non-fatal overdose.  It

9  also noted that the Medicaid population may be

10  at higher risk for opioid utilization as well as

11  overdose, and that's actually what prompted a

12  lot of the agency's efforts, that then realized

13  a 40 percent reduction in prescriptions for

14  opioids.  So it did highlight the national

15  problem related to opioids.

16      Q.    Right.  So as I understand it, the

17  reference was focused on prescription opioids?

18      A.    Yes.

19      Q.    My question is, did the reference

20  clarify whether those prescription opioids were

21  prescribed based on legitimate medical

22  prescriptions?

23          MR. SCHNIEDERS:  Object to the form.

24      A.    So there's a judgment there as to

25  what's legitimate.  All of the guidelines are

Page 279

1    around medical necessity and safety, so

2    legitimate is a judgment and separate from what

3    we think of as medically necessary.

4         Q.    So would it be accurate to say that

5    the guidelines discussing prescription opioids

6    were referring to prescription opioids that were

7    prescribed based on medical necessity?

8              MR. SCHNIEDERS:  Object to form.

9         A.    Yes.

10         Q.    Are you familiar with the CDC

11    prescribing guidelines that were issued in 2016?

12         A.    Yes.

13         Q.    Is Ohio Medicaid required to follow

14    the CDC guidelines?

15         A.    In Ohio everyone is required to

16    follow Ohio's state guidelines, which are

17    actually stricter than the CDC's guidelines.

18    The CDC did not include children and we are

19    aware that those under 18 are at higher risk for

20    future addiction.

21              In addition, the CDC guidelines

22    really had a focus on primary care clinicians,

23    and in Ohio we actually include all clinicians.

24    So in Ohio they are required to follow Ohio law,

25    which is stricter than the CDC guidelines.

Page 280

1     Q.    At the time in 2016 that the CDC
2  guidelines were issued, did Ohio Medicaid
3  already have stricter guidelines?

4     A.    Yes.

5     Q.    Did Ohio Medicaid have any concerns
6  about how strict guidelines could be detrimental
7  to individuals with chronic pain?

8            MR. SCHNIEDERS:  Object to the form.
9            Go ahead.

10    A.    There was an entire separate body of
11 work related to individuals who had chronic
12 pain.  As I testified before, patients with
13 chronic pain cannot be equated to those with
14 acute pain.  They may develop tolerance and
15 dependency, and they also may have really severe
16 conditions that are problematic.  So I think
17 it's easy to just develop a rule that says no
18 more than -- I'm making this up -- no more than
19 three pills for anybody under any circumstance,
20 and the medical profession really is dedicated
21 to alleviating suffering and curing people, but
22 it actually is with safety in mind.

23            So I'm not sure if that addresses
24 your question.

25    Q.    Yes.  So I'm going to mark the next

Page 281

1   document as Exhibit 30, and this is a document

2   that's been produced by Ohio Medicaid in this

3   litigation.  The Bates numbers are ODM_027015 to

4   ODM_027016.

5                    -   -   -   -   -

6               (Thereupon, Applegate Deposition

7               Exhibit 30, Two-Page Document

8               Entitled "Opioid Guideline

9               Feedback," Beginning Bates Number

10              ODM_027015, was marked for purposes

11              of identification.)

12                   -   -   -   -   -

13      Q.    Dr. Applegate, do you recognize this

14   document?

15      A.    I do.

16      Q.    What is it?

17      A.    A long time ago -- actually, this is

18   dated in 2018, but this is feedback from the

19   opioid guideline.  I'm actually not sure who

20   produced -- like who wrote this document, but

21   we, since the beginning of GCOAT, had a

22   professional education committee that started

23   the whole process of developing guidelines for

24   the State of Ohio.  It's a very broad group that

25   included emergency room physicians, primary care

Page 282

1    clinicians, subspecialists, pain medicine docs,

2    those in addiction treatment; and as we tried to

3    delineate the key points of the guidelines, we

4    actually did receive input from this larger

5    group in a variety of formats, both verbally,

6    and in this case it actually looks like somebody

7    wrote the specific input from key members of

8    that group.

9         Q.   At the top of the document where it

10   says, "Opioid Guideline Feedback," what opioid

11   guidelines was that referencing?

12        A.   So I'm actually trying to decide

13   which ones these might be because a lot of the

14   content actually could apply to more than one.

15   But based on the date, I actually think this is

16   connected to -- I think there are a number of

17   subjects that are encompassed in here because I

18   think this is for acute pain but they reference

19   the chronic pain rule so I'm actually not sure.

20        Q.   Okay.  Right under that first

21   heading, do you know who Ted Wymyslo is?

22        A.   Yes.  He used to be the prior

23   director of health and now is in charge of the

24   Association of the Federally Qualified Health

25   Centers.

Page 283

1      Q.     When you say he was the director of

2  health, was that for the Medicaid agency?

3      A.     Let me think about this.  I actually

4  don't remember relative to when we became a

5  stand-alone agency.  I would have to look up his

6  dates of service in that capacity.

7      Q.     Sure.

8             But he's no longer working for the

9  state; is that right?

10      A.     That's correct.

11      Q.     And then going about halfway down

12  the page, the bold "APNs," do you know what that

13  means?

14      A.     Advanced practice nurses.

15      Q.     And so who -- are MF and JS

16  initials?

17      A.     It likely references APNs that may

18  have been in discussion.

19      Q.     Okay.  Do you know who they are?

20      A.     I'm not sure.  I think I know

21  hundreds of APNs.

22      Q.     And then at the very bottom, do you

23  know who Dr. Ports is?

24      A.     I think he's a primary care

25  clinician.

Page 284

1          Q.     Is he affiliated with Ohio Medicaid?

2          A.     No.  I think he was part of the

3     group.

4          Q.     And on the second page, Dr. Justin,

5     do you know who he is?

6          A.     Again, there are -- there are many,

7     you know, including in and out-of-state

8     government, so actually -- I don't actually

9     recall.

10          Q.     Okay.  And Dr. Bechtel, do you know

11     who that is?

12          A.     He's a clinician from the State

13     Medical Board.

14          Q.     Okay.  Going back to the first page

15     under the Ted Wymyslo heading, the third from

16     the bottom in his section, there's a statement

17     that says, "Access a concern - as the list of

18     financially and administratively undesirable

19     patients grows (not just pain med doc access -

20     but PCPs willing to treat)."

21               Do you have an understanding of why

22     access would have been a concern?

23               MR. SCHNIEDERS:  Object to the form

24     and foundation.

25          A.     You know, these are -- these are

Page 285

1    just notes from a broader conversation, so I'm

2    not sure that I understand the entirety.  I

3    think the suggestion here is that if we have so

4    many rules, then patients who actually have pain

5    will not have access to relief, and if we have

6    so many administrative requirements, primary

7    care clinicians will be unwilling to treat

8    Medicaid patients, especially if they have pain

9    conditions.

10         Q.   Do you know if the guidelines --

11   whichever guidelines which were being discussed

12   ultimately addressed this concern?

13         A.   Well, there was this entire group

14   process, and, actually, there was a discussion

15   related to the need to ensure access to high

16   quality care that included safety as part of the

17   objective.

18         Q.   Do you know what the outcomes were

19   of that discussion?

20              MR. SCHNIEDERS:  Object to the form.

21         A.   I'd have to check the dates, but

22   the -- after we wrote the acute pain guidelines,

23   we actually developed limits, so if you're a

24   grown up and you have acute pain, you're not

25   allowed to exceed a seven-day duration of your

Page 286

1    prescription limited to 30 morphine equivalents

2    or less unless you have additional documentation

3    to support why that's appropriate.  So it's

4    seven days for adults and five days for

5    children.  And some of that may be part of what

6    prompted this conversation.  So, again, this is

7    actually somewhere in the spectrum of all of

8    these guidelines, so I'm actually not sure about

9    any additional detail.

10        Q.    Those acute pain limit guidelines

11   that had the limits that you mentioned, when

12   were those limits put in place?

13        A.    So I'd have to check for the final

14   date.  My thought was that it was in late '17.

15   I think it was in '17.

16        Q.    Are those limits something the

17   Medicaid agency had the capability to implement

18   before 2017?

19            MR. SCHNIEDERS:  Object to the form.

20        A.    What we did was whenever we were --

21   you know, this is a process.  When you come up

22   with guidelines, it's actually a process.  So we

23   didn't wait until everything was final to start

24   working with the plans to make sure they could

25   plan to put edits in place because everything

Page 287

1    takes time.  So I think the idea that we should

2    pay attention to morphine equivalents and to the

3    duration of the script actually was an ongoing

4    conversation over this period of time.

5              And periodically we do want to keep

6    in touch with the clinicians related to what's

7    the impact of it, were there any inadvertent

8    consequences, did we create issues that were not

9    clear at the time the initial guidance was

10   written.  So even now we're actually in touch

11   with clinicians to be sure that we're all kind

12   of working towards the same purpose, which is

13   really to eliminate all opioid-related drug

14   deaths.

15         Q.    On the first page of that same

16   document, under the APN's heading, there's a

17   line that states, "Worried about pushing to

18   heroin," and then on page 2, under the

19   Dr. Bechtel heading, it appears Dr. Bechtel was

20   asking if -- if we know if overshooting with

21   primary care docs so that patients are moving to

22   illicit sooner and getting caught in the

23   fentanyl lacing bubble.

24              What is your understanding of those

25   concerns about illicit opioids?

```
                                      Page 288
 1              MR. SCHNIEDERS:  Object to the form.
 2              MR. PENDELL:  Same.
 3              THE WITNESS:  So I can answer that?
 4              MS. LINN:  Yes.
 5              THE WITNESS:  Okay.
 6         A.    So the issue there is that if
 7    patients are suffering and they're not allowed
 8    to get pain medications even under reasonable
 9    circumstances because of fear that the
10    clinician's license will be yanked by the state
11    medical board for not adhering to state
12    guidelines, that somebody who ordinarily would
13    not consider obtaining pain medications
14    illicitly might actually do so.  So that was
15    actually the concern.  So the way that we
16    monitor this is we actually track what's
17    happening with prescription drugs and then we
18    track what's happening not just with deaths but
19    in conjunction with the Department of Public
20    Safety.  We're actually monitoring their view of
21    what's happening with illicit use.
22         Q.    When you say you track the
23    prescriptions and the deaths, that's the
24    Medicaid agency conducting its own analysis?
25         A.    No.  Again, this is in partnership
```

Page 289

```
 1   with the agencies that actually have the data.
 2   So in this case it's the Department of Health
 3   that actually has all vital stats, statistics.
 4         Q.    What does the Ohio Medicaid agency
 5   do with the information that it gathers from the
 6   other agencies?
 7         A.    So it's a collective impact model.
 8   I think it helps give us an awareness so that we
 9   can keep thinking about how to do a better job.
10   So in recent years, as we've seen the trend in
11   prescriptions drop dramatically -- so 40 percent
12   is really a dramatic drop -- we've had a
13   parallel effort related to screening early
14   intervention and effective treatment for opioid
15   use disorder in addition to attention to
16   ensuring that alternatives to opioids are
17   available not just on the front end with acute
18   pain but also along the entire chronic pain
19   journey.
20             So to that end, as I mentioned in my
21   earlier testimony, the department did begin the
22   benefit of acupuncture.  We already had massage,
23   physical therapy and other modalities available.
24   And we also increased the opportunity for new
25   provider types, including chiropractors and
```

```
                                          Page 290
```

1   acupuncturists, to provide these alternative

2   therapies.

3        Q.    Going back to the CDC guidelines for

4   a minute, are you aware that over 300 medical

5   experts have signed on to a letter to the CDC

6   that expresses concern about the misuse of

7   guidelines to deprive chronic pain sufferers of

8   much needed medication?

9             MR. SCHNIEDERS:  Object to the form.

10  Foundation.  Also beyond the scope of the notice

11  for this deposition.

12            MR. PENDELL:  Same.

13       A.    Yes.  Actually, I am aware of that.

14  I will note, however, that other states have

15  even stricter requirements, and I'm unaware as

16  to the percentage of the delegation that

17  actually represented any clinicians in Ohio.

18       Q.    Are you aware of instances in Ohio

19  where a Medicaid patient was denied medication

20  by a doctor because of the Ohio prescribing

21  guidelines?

22       A.    I am not; however, I will note that

23  the guidelines simply say not that there's no

24  access but that the clinicians must document the

25  reason that they're exceeding the guidelines.

Page 291

1      Q.    You sponsored an ODM project to

2   limit prescribed opioid doses through

3   standardized plan efforts; is that right?

4            MR. SCHNIEDERS:  Object to the form.

5      A.    Yes.  As I mentioned earlier, we did

6   gather all the pharmacy directors to ensure that

7   they put edits in place to adhere to state

8   guidelines.

9            MS. HAN:  I'd like to mark as

10   Exhibit 31 a document produced by ODM in this

11   litigation.  The Bates numbers are ODM_034210

12   through ODM_034224.

13                 -   -   -   -   -

14            (Thereupon, Applegate Deposition

15            Exhibit 31, Multi-Page Document

16            Entitled "Limiting Prescribed Opioid

17            Doses Through Standardized Plan

18            Efforts," Beginning Bates Number

19            ODM_034210, was marked for purposes

20            of identification.)

21                 -   -   -   -   -

22      Q.    Do you recognize this document?

23      A.    Yes, I do.

24      Q.    And what is it?

25      A.    So as part of our effort to do a

Page 292

1   better job taking care of people, we have

2   trained internal people in the department in

3   very specific processes that more reliably get

4   us results.  So this is a field called

5   implementation science, and what we have here is

6   a document delineating one of those quality

7   improvement efforts.

8          Q.    Who is Katie Weiskirchner?

9          A.    I'm actually not sure -- I'm

10  actually not sure who she is.

11         Q.    If you'll turn to the second slide

12  where it says the "Aim of the Project."

13         A.    Yes.

14         Q.    Do you see that the aim of the

15  project was to decrease Ohio total and managed

16  care plan-specific solid opioid doses by 30

17  percent by December 31st, 2017?

18         A.    Yes.

19         Q.    What steps did the pharmacy team

20  listed on the front of this presentation take to

21  reach that goal?

22         A.    So very specifically, this is

23  Dr. Wharton's project, so I can tell you about

24  it, but I know you spoke to him as well.

25                As you will note on page 5, actions

Page 293

1  were undertaken to have the managed care plans

2  support both patient education as well as

3  provider education to be sure that it was

4  specific enough to actually fall in line with

5  state guidelines, and to put in place some of

6  the efforts that I referenced earlier as it

7  relates to quantity limits and monitoring

8  morphine equivalents, et cetera.

9        Q.    Do you know if the goal described in

10  this presentation was achieved?

11              MR. SCHNIEDERS:  Object to form.

12        A.    Let me check over the period of

13  time.

14              So I don't know that there's a

15  percentage.  There's this dramatic drop that you

16  see on the page that ends in 16.  I can tell you

17  that over the period of time there's been a 40

18  percent drop within the Medicaid program.  So

19  since I can't see the exact date on this, it's

20  not clear.

21              When we've looked at managed care

22  plan activity, we actually do follow the same

23  rate of improvement as the state as a whole has.

24        Q.    Would you agree that it wouldn't be

25  improper for a provider to prescribe opioids

Page 294

1    pursuant to the ODM guidelines to a patient with
2    a legitimate medical need?
3                MR. SCHNIEDERS:  Object to the form.
4         A.    No.  That would be fine.
5         Q.    And would you agree that it wouldn't
6    be improper for a pharmacy to dispense the
7    opioids designated in that prescription?
8                MR. SCHNIEDERS:  Object to the form.
9         A.    That's correct.
10        Q.    And it would not be improper for ODM
11   to reimburse for those particular opioids?
12                MR. SCHNIEDERS:  Object to the form.
13        A.    That's correct.
14        Q.    Now, if the patient receiving those
15   opioids then sold those opioids to somebody
16   else, would ODM have any responsibility for that
17   sale?
18                MR. SCHNIEDERS:  Object to the form.
19                MR. PENDELL:  Objection to form and
20   beyond the scope.
21                THE WITNESS:  So am I allowed to
22   address this?
23                MS. LINN:  It's outside of the scope
24   of their topics, but you can answer in your
25   personal capacity.

Page 295

1      A.    So we actually -- so this is called

2  diversion, and we actually monitor a number of

3  things that actually look for that.

4           So one of the ways that we think

5  that's happening is by going to four pharmacies,

6  having four different prescribers.  So the

7  layperson term is doctor shopping.  So we

8  actually do watch for that.  We watch for

9  escalations of doses without a change in

10  clinical condition.  And we listen to clinicians

11  who suggest that there actually may be a

12  concern.

13           The pharmacy benefit for the

14  Medicaid program is meant to be for the

15  beneficiary, so we do have some of those

16  processes in place to ensure that that, in fact,

17  is the case.

18      Q.    If a patient is diverting, is it the

19  pharmacy's responsibility to know about that?

20           MR. SCHNIEDERS:  Object to the form.

21  Foundation.  Also, calls for a legal conclusion.

22           MR. PENDELL:  Join.

23           MS. LINN:  Objection.  In either

24  capacity she wouldn't be able to answer that

25  question.

Page 296

1      Q.    Is it correct that Ohio Medicaid has

2  a coordinated services program?

3      A.    Yes.

4      Q.    And that coordinated services

5  program requires members with certain indicators

6  of unsafe drug use to participate in the

7  program?

8      A.    That's not entirely correct because

9  the patients actually have a choice, but the

10 plans do have criteria that would make them

11 eligible for such a program and we encourage the

12 managed care plans to enroll patients in that.

13     Q.    And what is the goal of the

14 coordinated services program?

15     A.    So the layperson's term for this is

16 lock in, as we've talked about, so that all of

17 the controlled substances are actually filled at

18 the same pharmacy so that there's a view at the

19 point of the service of the entirety of the

20 safety of the medication regimen that the

21 patient may be on.  With this comes a care

22 management function on the part of the managed

23 care plans, and they work to coordinate care

24 among different provider types.

25           We've found that this has been

Page 297

1    successful and has been associated with almost a

2    30 percent drop in morphine equivalents and

3    better utilization of health services for

4    routine care, so, for example, less emergency

5    department use because they're actually

6    connected to a routine source of care.

7         Q.    You said that those beneficiaries

8    who are eligible for the coordinated services

9    program can choose whether or not to

10   participate.  Do you know what percentage of

11   beneficiaries who are eligible are actually

12   enrolled?

13        A.    No, not offhand.

14        Q.    Do you know if there's a limit on

15   how many beneficiaries can participate in the

16   coordinated services program?

17        A.    I can't think of a reason there

18   would be a limit, but again, the patients may

19   have a number of reasons or restrictions or

20   circumstances.  So what happens is we may see

21   the pharmacy data and there actually may be

22   clinical reasons we're seeing that pharmacy

23   pattern.

24             So, for example, if we have a

25   patient who has to go to a quaternary center for

Page 298

1    very specialized surgery or specialty care, they
2    may -- they may get a prescription there, they
3    may stay nearby for a while to get follow-up and
4    then actually go home.  If they have a reaction
5    to the initial prescription, let's say nausea or
6    it's too sedating or something like that, they
7    may get another one actually when they're home.
8    And so there could actually be legitimate or
9    medically necessary reasons that you actually
10   may see the pattern that we see on the pharmacy
11   side without it actually being an indication of
12   diversion or addiction.  So the reason that
13   program happens is so that someone else can
14   actually help with all of that coordination to
15   ensure that the patient is safe.
16        Q.    Is there a way for ODM to
17   distinguish between the -- someone in the
18   example that you mentioned and someone who is
19   diverting?
20             MR. SCHNIEDERS:  Object to the form.
21        A.    So with this function is care
22   management, and so the only way that you can
23   know is actually knowing that level of detail at
24   the person level, which needs to happen close to
25   the patient.

Page 299

1          Q.    And who is responsible for going

2    through the care management -- who's responsible

3    for having that relationship with the patient?

4               MR. SCHNIEDERS:  Object to the form,

5    foundation.

6          A.    The program runs largely through the

7    managed care plans, who then have relationships

8    with the clinicians in their panel.

9          Q.    Do you know what the Ohio Opioid

10   Analytics project is?

11         A.    Yes.

12              We have a partnership with the

13   Government Resource Center for a number of

14   research topics, one of which is predictive

15   modeling for patients with opioid use disorder

16   or opioid use in general to try to predict who's

17   at risk for misuse, abuse and fatal and

18   non-fatal overdose.

19         Q.    When did ODM become involved in the

20   opioid analytics project?

21         A.    I'd have to look at documents.  It

22   seems like maybe approximately 18 months ago.

23         Q.    Do you know when the opioid

24   analytics project was first discussed?

25         A.    When we set it up.  So we're

Page 300

1   actually the funders for the project.

2        Q.    So about 18 months ago?

3        A.    Yes.  I'd have to look at an exact

4   date.  It might be -- it's possible it was two

5   years ago.

6             MS. HAN:  I'm going to mark as

7   Exhibit 31 a document produced by ODM -- sorry,

8   32, a document produced by ODM in this

9   litigation.  The Bates number is ODM_022801 to

10  ODM_022802.

11                   -    -    -    -    -

12             (Thereupon, Applegate Deposition

13             Exhibit 32, Multi-Page Document

14             Entitled "Ohio's State Innovation

15             Model:  Using Episodes of Care to

16             Impact the Opioid Crisis (and Other

17             Public Health Priorities), Beginning

18             Bates Number ODM_034768, was marked

19             for purposes of identification.)

20                   -    -    -    -    -

21        Q.    Do you recognize this document?

22        A.    Not necessarily specifically,

23  although the content is familiar to me.

24        Q.    If you turn to page 2, you'll see

25  there's a timeline for deliverables at the

Page 301

1    bottom.

2            A.     Yes.

3            Q.     And it states, "December 15th, 2018

4    - GRC submits draft tools and draft report for

5    state sponsor review."

6                   Is Ohio Medicaid the state sponsor?

7            A.     Yes, as well as the Ohio Board of

8    Higher Ed, as it notes in the first paragraph.

9            Q.     Right.

10                  So by December 15th, 2018 did Ohio

11   Medicaid and the Ohio Department of Higher

12   Education receive the draft report from the GRC?

13           A.     Yes.

14           Q.     And what information did that

15   include?

16           A.     So -- so this becomes complex.

17   There are a series of logistics regression

18   analyses that go into every risk factor that

19   they actually look at and we need to see how

20   well the model fits.  They measure the area

21   under the curve.  They apply a number of

22   statistical tests.  So it was really all that

23   math and science that actually was presented at

24   that time.  The model was not refined enough or

25   actually good enough for them to have something

Page 302

1   that we could show in public with dashboards in

2   that real-time visualization, as is described on

3   the first page.  So this is still under

4   development and they're refining it at this

5   time.

6          Q.    Do you know if the GRC is on track

7   to meet the other deliverables on this timeline?

8          A.    So I know we're meeting with them

9   again.  We did ask them to go back and make

10  adjustments, so I'm not sure if the -- if this

11  particular timeline reflects the adjustments we

12  asked them to make.

13         Q.    Next I'd like to show you an exhibit

14  that will be marked as 33, and this was produced

15  by ODM in this litigation with the Bates numbers

16  ODM_034768 to ODM_034780.

17                      -   -   -   -   -

18                 (Thereupon, Applegate Deposition

19                 Exhibit 33, Office of Health

20                 Transformation Document Beginning

21                 Bates Number ODM_034768, was marked

22                 for purposes of identification.)

23                      -   -   -   -   -

24         Q.    Do you recognize this document?

25         A.    Yes.

Page 303

1        Q.     What is it?

2        A.     This is a document from the Office

3   of Health Transformation describing efforts

4   underway to consider safety in opioid

5   prescribing as part of how we pay for high value

6   in healthcare.

7        Q.     And what is ODM's involvement in

8   this innovation model?

9        A.     We're the implementing entity.

10       Q.     If we turn to slide 7, there's a

11  description about dentistry?

12       A.     Yes.

13       Q.     The slide states that dentists --

14  the first bullet point in the dark box states

15  that "Dentists make up 4 percent of unique

16  opioid prescribers in Ohio, but write 8 percent

17  of the total opioid prescriptions."

18            Has ODM made any dentist-specific

19  recommendations related to opioid prescribing?

20       A.     So I'm not sure that ODM did this.

21  I think as part of our larger GCOAT, it was

22  recognized that all prescribers could be part of

23  the solution, and at the time we had written 43

24  different episodes of care.  So I want to make

25  sure we keep this in context.  So we had

                                                        Page 304

1    headache, low back pain, hysterectomies, newborn

2    deliveries, newborn infections, heart failure,

3    joint replacements, you know, 40 different

4    episodes.  And we involved all provider types,

5    surgeons, primary care docs, pediatricians,

6    geriatricians, but not dentists.  So one of the

7    points that was made at this time was we could

8    widen the circle of clinicians who could

9    actually help us with this problem by including

10   a dental episode of care related to tooth

11   extraction.

12        Q.    If you turn to slide 9, in the

13   graphic on the right, is that showing that 36

14   percent of total patients prescribed opioids

15   with one or more risk factors are developing --

16   had one or more risk factors for developing

17   opioid use disorder --

18              MR. SCHNIEDERS:  Object to the form.

19        Q.    -- during that particular time

20   period?

21              MR. SCHNIEDERS:  Same objection.

22        A.    Yes, that is correct, and the risk

23   factors are what are actually listed here, which

24   include having behavioral health diagnoses, et

25   cetera.  So yes.

Page 305

1        Q.    Are the four risk factors listed on
2   this slide the only risk factors for opioid use
3   disorder?
4        A.    No.
5        Q.    Would you say that they are the main
6   risk factors?
7              MR. SCHNIEDERS:  Object to the form.
8        A.    You know what, I actually don't know
9   the entirety of the methodology behind this.
10  This clearly has a focus on those with
11  behavioral health conditions.
12       Q.    Are there any restrictions in place
13  regarding prescribing opioids to someone with
14  one or more risk factors for opioid use
15  disorder?
16             MR. SCHNIEDERS:  Object to the form.
17       A.    So the guidelines are that we do an
18  assessment of risk factors, and that's one of
19  many variables that go into ensuring that the
20  prescriptions are safe.
21       Q.    And if you turn to slide 12, you'll
22  see there's a timeline shown on that slide.
23             Is the Medicaid agency on track with
24  the reporting timeline shown here?
25       A.    Yes, we are.

Page 306

1              MS. HAN:  I think that is all that I

2    have.  Thank you.

3              MR. SCHNIEDERS:  Counsel, do you

4    want to take a quick break?

5              MR. DOVE:  Just a quick break.

6              THE VIDEOGRAPHER:  Off the record,

7    12:10.

8                   (Recess had.)

9              THE VIDEOGRAPHER:  We're back on the

10   record, 12:26.

11      FURTHER EXAMINATION OF MARY APPLEGATE, M.D.

12   BY MS. HAN:

13       Q.    Dr. Applegate, I just have a few

14   more questions.

15              Earlier when we were discussing the

16   ODM activities related to diversion, you

17   mentioned that ODM looks for doctor shopping,

18   escalating dosages without a change in condition

19   and whether a clinician has expressed concern;

20   is that correct?

21              MR. SCHNIEDERS:  Object to the form.

22       A.    Yes.  There may be additional

23   factors, but those are a few.

24       Q.    And if ODM has not observed the

25   doctor shopping, escalating dosages without a

Page 307

1   change in condition and no clinician has

2   expressed concern but a beneficiary has still

3   diverted the prescription medication, you would

4   agree that ODM doesn't bear responsibility for

5   the diversion?

6               MR. SCHNIEDERS:  Object to the form,

7   foundation.  Also, calls for a legal conclusion.

8         A.    I'm not sure I can answer something

9   about which we know nothing, so we may not know

10  that information.

11        Q.    Right.

12              So if ODM doesn't know about it,

13  would you agree that ODM is not responsible for

14  what happens to that medication?

15              MR. SCHNIEDERS:  Same objections.

16        A.    I actually don't know how to answer

17  that.

18        Q.    And, again, earlier when we were

19  talking about the opioid policy or opioid

20  guidelines, you stated that managed care plans

21  work with the point of sale -- work with the

22  point of sale to implement the policy.  What did

23  you mean by that?

24        A.    That's actually connected to my

25  comments about the edits that they put in place;

Page 308

1  so, for example, there are quantity limits, they

2  might have step therapy requirements.  Right at

3  the point of sale there are a number of edits

4  that are in place before that prescription can

5  be filled.  So that's actually how we ensure

6  that we have processes in place to make sure

7  that we're supporting the state guidelines.

8       Q.    Who is actually putting those edits

9  in place for the quantity limits?  Is that the

10  managed care plans requiring that?

11       A.    In conjunction with their pharmacy

12  partners.  I'm sure they have to have analysts

13  who have to code it and their IT people to

14  actually make it happen.  I'm sure they have a

15  team to go through the whole process.

16       Q.    One of the last documents that I

17  showed you had a reference to opioid use

18  disorder.  With respect to opioid use disorder,

19  does the Medicaid agency differentiate between

20  beneficiaries who are addicted to prescription

21  opioids and those who are addicted to illicit

22  opioids?

23            MR. SCHNIEDERS:  Object to the form.

24       A.    Not necessarily specifically because

25  that information may not be known to us.  We

Page 309

1   don't necessarily know who may have illicit use.

2   Illicit use can happen at the same time as

3   prescription drug use.  So all we know is that

4   diagnosis from a claim.

5          Q.    Have you ever been involved with any

6   task forces or action teams or similar groups

7   concerning drug use?

8          A.    In my prior testimony I noted to you

9   that there was a task force prior to GCOAT.  I

10  actually couldn't quite remember the name.  It

11  was at a time that the Department of Drug and

12  Addiction Services was separate from the

13  Department of Mental Health.  So that was a task

14  force.  I mentioned the groups within GCOAT as

15  well.  And I'm not sure that we have other

16  formal task forces per se, but I'm sure you're

17  aware that around the country there are many

18  groups who are trying to get their arms around

19  promising best practices as it relates to this

20  issue, and the agency certainly has participated

21  in those.

22         Q.    So the task force that you

23  referenced prior to GCOAT, that was also focused

24  on opioids?

25         A.    Yes.

Page 310

1      Q.    What is your understanding of the

2   purpose of these types of task forces as they

3   relate to opioids?

4              MR. PENDELL:  Objection to form.

5              MR. SCHNIEDERS:  Object to the form.

6      A.    The primary purpose was to address

7   opioid-related deaths specifically as they

8   relate to prescription medications.  As time

9   went on and we made progress in that area, we're

10  trying to address the totality of opioid use

11  disorder even beyond prescription medications,

12  so very specifically, when we treat patients, we

13  will treat patients if they have illicit use and

14  try to help them get to recovery just as much as

15  we would treat folks who actually have

16  prescription medications as their cause.

17     Q.    And when you say we will treat

18  patients if they have illicit use and try to

19  help them just as if they were actually having

20  prescription medications, do you mean that ODM

21  treats beneficiaries who have illicit use the

22  same as if they had prescription medication?

23             MR. SCHNIEDERS:  Object to the form.

24     A.    What I mean is if they have that

25  diagnosis, we will treat them independent of

Page 311

1    where they received their opioids.

2         Q.    I just want to clarify.  You're

3    saying ODM will treat them the same?

4         A.    We pay for services for opioid use

5    disorder.  Just stop the sentence there.  We

6    actually don't discriminate related to the --

7    how the person got to that condition.

8         Q.    So you stated that the primary

9    purpose of the task forces is to address opioid

10   deaths.  Do the task forces conduct

11   investigations into the cause of death?

12             MR. SCHNIEDERS:  Object to the form.

13        A.    The Department of Health is the only

14   one who actually has more specific data related

15   to the causes of death, and not all of that is

16   public.  I believe coroners and perhaps like

17   child fatality review forums may have additional

18   information and additional activities related to

19   causes of death.

20        Q.    Do you know if the task forces

21   investigate drug manufacturers?

22             MR. SCHNIEDERS:  Object to the form.

23        A.    I'm not aware.

24        Q.    Do you know if they investigate drug

25   distributors?

Page 312

1            MR. SCHNIEDERS:  Object to the form.

2        A.    I am not aware.  The focus really

3    was on what the agencies were able to do about

4    the problem, so it was really more focused on

5    best evidence practice, making sure that we had

6    an adequate treatment provider network, making

7    sure that everybody followed safe prescribing

8    guidelines, making sure that patients had

9    choices in the types of treatment they received,

10   making sure there were adequate psychosocial

11   services as well, and addressing any other

12   barriers, like transportation.

13       Q.    Have you heard of the Ohio

14   Prescription Drug Abuse Task Force?

15       A.    I'm not sure that's a totally

16   specific thing.  I think what I described may

17   have been one.  I know that local communities

18   also have coalitions.  So there could be 80 such

19   task forces locally.  So I'm not familiar with

20   the names of all of them.

21       Q.    Does ODM have involvement with the

22   local task forces?

23       A.    The main state agency that oversees

24   that and pays attention to what is going on at

25   that level is the Ohio Department of Mental

Page 313

1    Health and Addiction Services.

2         Q.    Does that mean that ODM is not

3    involved with the local task forces related to

4    opioids?

5              MR. SCHNIEDERS:  Object to the form.

6         A.    We have members within the agency

7    who are liaisons to the other agencies and may

8    participate -- may have some level of

9    participation at the local level, but in the

10   entirety of our work related to this, that's not

11   the most prominent part.

12        Q.    Do you know who those members who

13   are liaisons are?

14        A.    I think over the years they have

15   changed as personnel has changed.

16        Q.    Do you know who they are today?

17        A.    I can get you the names

18   specifically.

19              MS. HAN:  That is the end of my

20   questioning, but I believe we have another

21   attorney for the Defendants who will question.

22              THE VIDEOGRAPHER:  Off the record,

23   12:36.

24                   (Short recess had.)

25              THE VIDEOGRAPHER:  We're back on the

Page 314

1    record, 12:37.

2         EXAMINATION OF MARY APPLEGATE, M.D.

3    BY MS. O'GORMAN:

4         Q.    Good afternoon, Dr. Applegate.  I

5    just have a few questions for you.  My name is

6    Debra O'Gorman.  I represent the Purdue

7    Defendants in this action.

8              Does the ODM have a predetermined

9    standard for determining medical necessity of

10   prescriptions that it covers?

11             MR. SCHNIEDERS:  Object to the form.

12        A.    The definition of medical necessity

13   actually is coded in law.

14        Q.    Is that a federal law?

15        A.    It's a state law.  I'm unaware of a

16   federal law related to that.

17        Q.    Are you familiar with that

18   definition?

19        A.    Not verbatim, but I understand the

20   content, yes.

21        Q.    And does the standard for medical

22   necessity apply to managed care organizations

23   that provide coverage to Medicaid patients?

24        A.    It applies to all aspects of the

25   Medicaid program, so managed care and fee for

Page 315

1    service.

2          Q.    Are you aware of ODM reimbursing for

3    any opioid prescriptions that were not medically

4    necessary for the persons for whom they were

5    written?

6          A.    I am not.

7          Q.    So then if ODM was aware that an

8    opioid prescription was not medically necessary

9    for the patient for which it was written, it

10   would not reimburse for that prescription,

11   correct?

12              MR. SCHNIEDERS:  Object to the form.

13              MR. PENDELL:  Objection.

14              MS. LINN:  Objection.

15              THE WITNESS:  Can I answer that?

16              MS. LINN:  Yes.

17         A.    Yes.

18         Q.    If the ODM became aware of a

19   prescription that was written that was not

20   medically necessary, what actions would be

21   taken?

22              MR. PENDELL:  Form.

23              MR. SCHNIEDERS:  Same objection.

24         A.    So this is an interesting question

25   because the medical establishment really focused

```
 1   on what they knew within the walls of their
 2   offices and hospitals, and we did not have
 3   greater insight into what might be happening
 4   outside of that until we started seeing the
 5   data, and then it was in conjunction with the
 6   medical community, patient stakeholders and task
 7   force, for example, that we really refined what
 8   we understood was required for a whole variety
 9   of procedures and for pain control.  So over the
10   period of this time the field of pain management
11   actually has evolved to actually being a
12   safer -- you know, a safer field.
13        Q.    And what period of time would you
14   assign to this course of --
15        A.    The last several years.  Certainly
16   since the time frame we're talking about, you
17   know, around 2011 or so.
18        Q.    I don't think you answered my
19   question.
20              Are you able to tell me what ODM
21   would do if it became aware that a prescription
22   was written that was not medically necessary,
23   what actions would be taken in that instance?
24              MR. PENDELL:  Objection to form.
25   Calls for speculation.
```

1              MR. SCHNIEDERS:  Object to the form.

2      It's also been asked and answered.

3          A.    So after the fact, after it's been

4      paid, is that what you're asking me, like what

5      would we do after the fact?

6          Q.    Or even before the fact.  If a

7      claim -- if an individual went to a pharmacy and

8      tried to fill a prescription.

9          A.    So we won't fill it if it's not

10     medically necessary.  So if it doesn't meet our

11     standards, then it actually won't fill at the

12     point of sale.

13         Q.    And what about if you became aware

14     after the fact, what would be done?

15              MR. PENDELL:  Objection.

16              MR. SCHNIEDERS:  Same objections.

17              MS. LINN:  Objection.  Asked and

18     answered.  This was discussed at Dr. Wharton's

19     deposition in November.

20              MR. PENDELL:  And I'll say outside

21     the scope then, too.

22              MR. SCHNIEDERS:  Same.

23              MS. O'GORMAN:  Are you instructing

24     her not to answer?

25              MS. LINN:  You can go ahead if you

Page 318

1    know, but Dr. Wharton has covered this area and

2    this wouldn't be in your capacity as ODM's rep.

3         A.    I did just describe all these

4    processes related to a data feedback group and

5    trying to make sure that it doesn't happen

6    again.  And, as you know, this has been a

7    concerted effort over the last several years

8    that has resulted in a 40 percent drop in

9    prescriptions as well as the development of

10   newer modalities, like acupuncture, to try to

11   deal with pain in ways that actually might be

12   safer.  There's also been a focus on predictive

13   analytics so that we could have patients that

14   were worried about being care managed in a

15   proactive way and possibly participate in the

16   program as I just described.

17        Q.    Does ODM expect that doctors

18   providing care to its covered patients will rely

19   on clinical judgment as to what prescriptions to

20   write?

21        A.    Yes.  We expect that clinicians do

22   rely on clinical judgment, data, input from

23   patients, other healthcare experts for their

24   prescribing, yes.

25        Q.    Would you expect them to make a

Page 319

1    risk/benefit determination as to the risks and

2    benefits of the prescription they're considering

3    for that particular patient?

4         A.    Yes.

5         Q.    You testified a little bit about P&T

6    committees.  Do you recall that testimony?

7         A.    (Witness nodding head

8    affirmatively).

9         Q.    Are P&T committees made up of

10   medical professionals?

11             MS. LINN:  Objection.  This is

12   outside the scope.  Dr. Wharton answered this at

13   his November deposition.  So she's not going to

14   cover that.

15             MR. PENDELL:  Same objections.

16             MS. O'GORMAN:  You won't let her

17   answer that question?

18             MS. LINN:  It's in the transcript of

19   Donald Wharton's testimony from November of last

20   year, so no, because that was ODM's official

21   response of what a P&T committee is.

22             MR. DOVE:  Just for the record,

23   Dr. Wharton's testimony was limited to the time

24   period that he was -- has been employed at Ohio

25   Medicaid, so to the extent there are differences

Page 320

1  from 2010 to '13, this witness is ODM's

2  representative for all things that happened

3  during that time period.

4            MS. LINN:  You can answer in that

5  limited scope.

6       A.    So the membership of P&T is also

7  coded in law.  We do have clinicians,

8  pharmacists and a variety of subject matter

9  expertise that's actually part of that group.

10      Q.    And what information is available to

11 P&T committee members at the time they're

12 considering whether a drug should or should not

13 be put on a preferred drug list or formulary?

14            MR. SCHNIEDERS:  Object to the form.

15            MS. LINN:  Objection.

16            You can answer.

17      A.    So oftentimes members bring their

18 own information, often from clinical studies.

19 Certainly all the FDA indications.  So any

20 existing information is actually what's

21 discussed that goes into the recommendation of

22 the P&T committee.

23      Q.    Does that include the product label

24 for the drug under consideration?

25            MR. SCHNIEDERS:  Object to form.

Page 321

1      A.    Since I don't attend those meetings,
2  I can't necessarily give you that level of
3  specificity.
4      Q.    Okay.  But you can say that the P&T
5  committee members certainly do their own
6  research and bring that with them to the
7  meeting?
8          MR. SCHNIEDERS:  Object to form.
9      A.    Yes, they do.
10     Q.    Are you aware whether drug
11 manufacturers are present at these meetings?
12     A.    I'm actually not aware.
13          MS. O'GORMAN:  I don't have any
14 further questions.  Thank you.
15          THE VIDEOGRAPHER:  Off the record,
16 12:45.
17              (Short recess had.)
18          THE VIDEOGRAPHER:  We're back on the
19 record, 12:47.
20      EXAMINATION OF MARY APPLEGATE, M.D.
21 BY MR. SCHNIEDERS:
22     Q.    All right, Doctor.  My name is Chris
23 Schnieders.  We met briefly off the record.  You
24 know that I represent Cuyahoga County and the
25 Plaintiffs in this matter, right?

Page 322

1          A.     Yes.

2          Q.     Okay.  I just have a few follow-ups

3     that I want to ask you.  If there's anything I

4     ask you that you don't understand, please ask me

5     to rephrase.  I'll make sure I get it right so

6     you can actually answer the question.

7          A.     Thank you.

8          Q.     Briefly, there were a few exhibits,

9     like Exhibit 33, that were put in front of you.

10    I don't know if you want to dig through the

11    pile.

12         A.     This is fine.  I recall it, yes.

13         Q.     You recall this?

14         A.     Yes.

15         Q.     And you recall that there were some

16    aspects of it you were asked about regarding

17    potential risk factors?

18         A.     Yes.

19         Q.     Things along those lines.

20                There's also other initiatives that

21    ODB has taken along with partners in order to

22    try to stem the effects of the opioid epidemic,

23    correct?

24         A.     Yes.

25         Q.     This particular process that's in

Page 323

1    place in Exhibit 33, is that funded by industry,

2    by the manufacturers or the distributors or the

3    pharmacies, related to opioids?

4              MR. DOVE:  Objection to form.

5         A.   No.

6         Q.   That's something that you've taken

7    on yourself, right?

8         A.   Yes.

9         Q.   If industry decided to figure out

10   what the risk factors were and fund something

11   like that, you would be interested in that,

12   right?

13        A.   Yes.

14        Q.   If that had been done in 2011, you

15   would have been interested in it, right?

16             MS. O'GORMAN:  Objection.

17        A.   Yes.  Our quality improvement work

18   has existed since I've been there.

19        Q.   But industry has never come to ODB

20   with that type of information, have they?

21        A.   No.

22             MR. DOVE:  You referred to ODB?

23        A.   ODM I'm presuming?

24        Q.   I'm sorry.  ODM.  I apologize for

25   that.

Page 324

1            So with regard to what industry has

2    done, they haven't come to ODM with that type of

3    information, correct?

4        A.    Correct.

5        Q.    And had they come to ODM with that

6    type of information, you would have paid

7    attention to it, right?

8            MS. O'GORMAN:  Objection.

9        A.    Yes.

10        Q.    You can set that to the side.

11            Earlier and throughout this

12    deposition you've been asked by counsel things

13    related to the PDL.  Do you recall that?

14        A.    Yes.

15        Q.    Okay.  And what is the PDL?

16        A.    The PDL is the preferred drug list.

17        Q.    What does it mean to be preferred?

18        A.    Okay.  So let me restate this again.

19    What gets on the formulary is what's FDA

20    approved, and what gets on the preferred drug

21    list is largely the result of the decision from

22    the P&T committee.  The term "preferred" is not

23    a layperson term "preferred," so it doesn't mean

24    that we're saying that that's what everybody

25    needs to take.  What it does suggest, there is a

Page 325

1   correlation between what has a prior
2   authorization requirement and what doesn't, but
3   that's actually not absolute, as we mentioned
4   with the consensus list.  So, generally, 80
5   percent of the time if a drug is on the
6   preferred drug list, it does not require a prior
7   authorization, and if it's not preferred, then
8   it does, but the medication may still be
9   available.
10          Q.    So things that are not on the
11  preferred list may still be available, correct?
12          A.    Yes.
13          Q.    And there's a whole host of reasons
14  why a drug might end up on the preferred list;
15  is that fair?
16          A.    That's correct.
17          Q.    I want to take you back to some
18  exhibits that you were shown in your first part
19  of your deposition back in January.  First is
20  Exhibit 10.  So let me dig through this pile and
21  find it for you.
22               Exhibit 10, that's a P&T committee
23  meeting minutes memorandum that you have in
24  front of you; is that right?
25          A.    Yes.

1        Q.    And with counsel you were just

2    discussing the P&T committee; is that right?

3        A.    Yes.

4        Q.    She asked you if you were aware if

5    pharmaceutical manufacturers appeared at those

6    meetings.

7              Do you recall that?

8        A.    Yes.

9        Q.    Do you see there in the third line

10   where it says, "Approximately 25 stakeholders

11   were present, most representing pharmaceutical

12   manufacturers"?

13       A.    Yes.

14       Q.    So you're aware that pharmaceutical

15   manufacturers actually do attend these meetings,

16   right?

17             MS. O'GORMAN:  Objection.

18       A.    So these are -- none of our meetings

19   in the department actually are secret, so these

20   are public meetings, and often what happens is

21   the committee members are actually part of the

22   core group, but there could be a hundred people

23   in the room, and stakeholders, patients,

24   families, and here there is this note that there

25   were mostly pharmaceutical manufacturers.  So

Page 327

1  yes.

2      Q.    And it could be anybody that shows

3  up, but in this particular note, it's mostly

4  pharmaceutical manufacturers that come to those

5  meetings, right?

6      A.    So, again, I don't attend them so I

7  don't know about all of the meetings.  Certainly

8  these minutes reflect that there were lots of

9  pharmaceutical manufacturers, yes.

10      Q.    You can set that one to the side.

11          I'm going to show you Exhibit 7 now.

12  Here's a copy of Exhibit 7.  Exhibit 7 is,

13  again, another memorandum of the P&T committee

14  minutes; is that correct?

15      A.    Yes.

16      Q.    If you look here, it says under the

17  second portion where it starts with Stephanie

18  Levine, RPH -- do you see that?

19      A.    Yes.

20      Q.    The second sentence says,

21  "Approximately 50 stakeholders were present,

22  most representing pharmaceutical manufacturers

23  and advocacy associations."

24          Do you see where I've read that

25  from?

Page 328

1          A.     Yes, I see that.

2          Q.     Again, this is a public meeting and

3    anyone can come, right?

4          A.     Yes.

5          Q.     But these minutes that were put in

6    front of you during the first portion of your

7    deposition reflect that approximately 50

8    stakeholders from pharmaceutical manufacturers

9    and advocacy associations came?

10         A.     Yes.

11         Q.     Let's look at Exhibit 9.  So Exhibit

12   9, this is, again, another P&T committee meeting

13   minutes exhibit; is that correct?

14         A.     Yes.

15         Q.     And this one actually is the third

16   paragraph.  It says approximately 90

17   stakeholders were present at this one, right?

18         A.     Yes.

19         Q.     Most representing pharmaceutical

20   manufacturers and advocacy associations.  Have I

21   read that correct?

22         A.     Yes.

23         Q.     So, again, open meeting, correct?

24         A.     Yes.

25         Q.     And it appears that 90 stakeholders

Page 329

1   were there and most were representing

2   pharmaceutical manufacturers and advocacy

3   associations, right?

4                 MS. McNAMARA:  Objection.

5         A.     That's correct.

6                 MR. SCHNIEDERS:  What's the

7   objection, counsel?

8                 MS. McNAMARA:  She wasn't at the

9   meeting.  You're asking her to speculate.

10                 MR. SCHNIEDERS:  Well, this is from

11   2011 and she's the 30(b)(6) witness.

12                 MS. McNAMARA:  I'm pretty sure you

13   made the same objections to our questioning,

14   so --

15                 MR. SCHNIEDERS:  I just wanted to

16   make sure I had a basis if I needed to cure it.

17   Thank you.

18         Q.     Let's look at Exhibit 17.  Exhibit

19   17, this is from the Drug Utilization Review

20   Board; is that correct?

21         A.     Yes, it is.

22         Q.     And is this also a public meeting

23   that the outside is able to attend?

24         A.     Yes.

25         Q.     If you look at the bottom of the

Page 330

1    paragraph that starts with, "Also present," the

2    last sentence says, "Approximately 13 observers

3    were present, most representing pharmaceutical

4    manufacturers."

5              Do you see that?

6         A.   Let me find it.

7         Q.   Sure.

8         A.   Yes, I see that.

9         Q.   So you would agree that during your

10   time at the Medicaid entity that it's been a

11   constant that pharmaceutical industry has been

12   represented at open meetings, correct?

13             MS. O'GORMAN:  Objection.

14             MS. LINN:  You can answer.

15        A.   That is what the minutes reflect,

16   yes.

17        Q.   Let's go back to Exhibit 10 now that

18   we've looked at those.  Exhibit 10 are the

19   meeting minutes that are dated October 7th of

20   2009, and this was put in front of you as part

21   of the first part of your deposition.  I want to

22   ask you a question about something that appears

23   at the bottom of the front page and continues on

24   to the second page.

25             Under Subsection 2 at the bottom do

Page 331

1   you see it says, "Drugs under consideration"?

2          A.    Yes.

3          Q.    And under that, under Subsection B,

4   it's analgesics.

5                Do you see that?

6          A.    Yes.

7          Q.    If you go down to the last sentence

8   that's on this page, it says, "Dr. Wilker also

9   asked about addiction potential because the drug

10  is C2, and according to the clinical

11  presentation, has fewer side effects than

12  traditional opioids."

13               Do you see that?

14         A.    Yes.

15         Q.    Do you see that based on the context

16  of this paragraph, they're talking about an

17  opioid called Nucynta?

18         A.    Yes.

19         Q.    If you go on to the second page

20  there, you'll see it says, "The manufacturer's

21  representative said there is potential for

22  addiction but Nucynta has less opioid activity

23  than traditional opioids."

24               Do you see where I've read that

25  from?

Page 332

1           A.     I do.

2           Q.     So in this instance we've got a

3    manufacturer that has a representative there

4    that is commenting on the safety profile of its

5    drug, Nucynta, fair?

6           A.     Yes.

7           Q.     And this manufacturer's

8    representative is saying that while there's

9    potential for addiction, that Nucynta has less

10   opioid activity than traditional opioids; is

11   that fair?

12          A.     That is what this states.

13          Q.     And based upon that, it's leaving

14   the conclusion that it's a safer alternative

15   than other opioids?

16               MR. DOVE:  Objection to form.

17               MS. LINN:  You can --

18          A.     That is what's indicated in this

19   paragraph.

20          Q.     If you wouldn't mind going to

21   Exhibit 9 now.  Exhibit 9 is a later meeting,

22   it's approximately two years later, June 29th of

23   2011.

24               Do you see that?

25          A.     Yes.

Page 333

1      Q.    And if you go to the second page, 2
2  of 6, under "Analgesic Agents Opioids" -- do you
3  see that heading?
4      A.    Yes.
5      Q.    You'll see here two years later
6  Dr. Hunter said he is in favor of Nucynta based
7  on the potential for less diversion.  The
8  committee voted 7 to 1 in favor of the preferred
9  status for Nucynta.
10            Do you see that?
11      A.    I do.
12      Q.    So here two years prior to this you
13  see a manufacturer representative for Nucynta,
14  which would be Ortho Janssen McNeil, lobbying on
15  behalf of Nucynta, correct?
16            MS. O'GORMAN:  Objection.
17            MS. LINN:  You can answer.
18      A.    Yes, it appears so.
19      Q.    And two years later there's a
20  placement of Nucynta on the preferred drug list;
21  is that fair?
22      A.    Yes.
23      Q.    You can set that to the side.
24            I'm going to put in front of you
25  what I'm marking as Exhibit 34, which is the

Page 334

1   label that was in place at the time for Nucynta

2   of the 2009 meeting.  You'll see that on the

3   front page of Exhibit 34, on the bottom

4   right-hand side, it says, "Revised 03/2009."

5                        -   -   -   -   -

6               (Thereupon, Applegate Deposition

7               Exhibit 34, Nucynta Label, was

8               marked for purposes of

9               identification.)

10                       -   -   -   -   -

11       Q.    Do you see that?

12       A.    Yes.

13       Q.    And you recall that when we looked

14   at Exhibit 10, that that meeting was October 7th

15   of 2009, correct?

16       A.    Correct.

17       Q.    So it appears that this would be the

18   label that was in place at the time of that

19   meeting, fair?

20       A.    Yes.

21       Q.    And if you go to page 5 of this,

22   you'll see that there's a section that says,

23   "Misuse and Abuse."

24               Do you see that?

25       A.    I do.

Page 335

1         Q.    And here it says that Tapentadol,

2    which is the generic name for Nucynta, that

3    Tapentadol is a new opioid agonist and is a

4    Schedule 2 controlled substance.  Such drugs are

5    sought by drug abusers and people with addiction

6    disorders.  Diversion of Schedule 2 products is

7    an act subject to criminal penalty.

8              Do you see that?

9         A.    Yes.

10        Q.    Further, it says, "Nucynta can be

11   abused in a manner similar to other opioid

12   agonists, illegal or illicit."

13             Do you see that?

14        A.    Yes.

15        Q.    It doesn't say anything about this

16   being a different kind of opioid that's not

17   subject to abuse, does it?

18        A.    It does not.

19        Q.    Going further into the label, on

20   page 12, under Subsection 9, at the very bottom,

21   it again repeats a similar sentence, "Nucynta

22   contains Tapentadol, a new opioid agonist, and

23   is a Schedule 2 controlled substance," and it

24   says, "Nucynta has an abuse potential similar to

25   hydromorphone, can be abused and is subject to

Page 336

1   criminal diversion."

2           Do you see that?

3       A.    I do.

4       Q.    Are you familiar with what

5   hydromorphone is?

6       A.    Yes.

7       Q.    And is that Dilaudid?

8       A.    Yes.

9       Q.    Dilaudid is a substance that

10  everyone is aware now can be abused, correct?

11      A.    Yes.

12      Q.    But here you've got a manufacturer

13  telling you that the abuse potential for this

14  particular drug was less, correct?

15          MS. O'GORMAN:  Objection.

16          MR. DOVE:  Object to the form.

17      A.    That's correct.

18      Q.    And they were coming to the meetings

19  in an attempt to be placed on a preferred

20  formulary, fair?

21          MS. O'GORMAN:  Objection.

22          MR. DOVE:  Object to the form.

23      A.    That's correct.

24      Q.    And these are the same manufacturers

25  and industry components that are not funding

                                      Page 337

1   things like what we saw in Exhibit 33, correct?

2             MS. O'GORMAN:  Objection.

3             MR. DOVE:  Objection to form.  No

4   foundation.

5        A.    That is correct.

6        Q.    Lastly, I'm going to mark Exhibit

7   35.

8                  -   -   -   -   -

9             (Thereupon, Deposition Exhibit 35,

10            Presentation Slides - OPQC MOMS+

11            Project, Regional Meeting -

12            Northeast Ohio, Ohio Perinatal

13            Quality Collaborative, May 22, 2018,

14            was marked for purposes of

15            identification.)

16                 -   -   -   -   -

17       Q.    Are you familiar with Exhibit 35?

18       A.    Yes, I am.

19       Q.    This is actually a presentation that

20  you were a part of giving; is that right?

21       A.    That's correct.

22       Q.    What was the contact for this

23  presentation?

24       A.    We have gathered a partnership

25  called the Ohio Perinatal Quality Collaborative,

Page 338

1   and we have a number of efforts underway, two of

2   which deal specifically with opioid use

3   disorder.

4           One is focused on pregnant mothers

5   with opioid use disorder and trying to

6   coordinate care, provide access to

7   medication-assisted treatment and psychosocial

8   services, earlier identification, retention in

9   care, things that actually lead to better

10  long-term outcomes.

11          The second component is related to

12  neonatal abstinence syndrome or caring for

13  infants who had in-uterine exposure to opioids,

14  so that we can do a better job ensuring that

15  those babies have better neurocognitive

16  outcomes.

17          MR. DOVE:  Counsel, just for the

18  record, this doesn't bear a Bates label?  Was

19  this something you printed off a website or was

20  this part of a production.

21          MR. SCHNIEDERS:  No.  This is

22  publicly available.  It's from a website.

23      Q.   Doctor, if I understood you

24  correctly, it sounds like one part of this is a

25  project that's trying to help those that are

Page 339

1    dependent upon opioids; is that fair?

2         A.    Yes.

3         Q.    And another part is trying to help

4    those infants that are born to mothers that are

5    born at a time when they are also addicted to

6    opioids; is that fair?

7         A.    Officially the infant can't be

8    addicted because they don't have the behaviors

9    to seeking the next dose, so officially they're

10   exposed to opioids before birth.

11        Q.    Okay.  And as part of that exposure,

12   they have a whole list of sequelae that exist?

13        A.    Yes.  The constellation of symptoms

14   we call neonatal abstinence syndrome.

15        Q.    Can you tell us what the symptoms

16   are for neonatal abstinence syndrome?

17        A.    Yes.  So these infants often are

18   jittery, have tremors, can have seizure.  They

19   won't eat.  They have diarrhea.  They're very,

20   very difficult to console and they're really

21   irritable.  So one of the most important things

22   babies can do is they need to eat to maintain

23   weight, and this is actually difficult for these

24   babies.

25        Q.    And while you said that they are

Page 340

1    exposed, not addicted, these are things that are

2    occurring, in part at least, due to the fact

3    that their exposure has given them some of the

4    same symptoms that someone that might be in

5    withdrawal would incur, correct?

6          A.    Yes.

7          Q.    If we go into your presentation

8    here, I want to ask about a few specific slides.

9    They're not numbered so I'll do my best.

10   They're back to back.

11              The third page here has a welcome

12   from you that I think you would have offered to

13   this group; is that fair?

14         A.    Yes.

15         Q.    Going further in, there's a whole

16   host of other medical professionals that are

17   involved in this particular presentation

18   project, fair?

19         A.    Yes.

20         Q.    Going all the way to the page that

21   looks like a green and blue map --

22         A.    Yes.

23         Q.    -- there's a slide that says,

24   "Age-adjusted drug overdose death rates, by

25   state, United States, 2016"?

Page 341

1      A.     Yes.

2      Q.     And this has every state in the

3  United States coded by a color; green meaning

4  statistically lower than the U.S. rate, lighter

5  blue meaning statistically the same as the U.S.

6  rate, and dark blue meaning statistically higher

7  than the U.S. rate; is that right?

8      A.     That is correct.

9      Q.     And so the states that are in dark

10 blue would be the states that have drug overdose

11 death rates that are higher than the typical in

12 the United States; is that fair?

13     A.     That is correct.

14     Q.     And Ohio is one of those states,

15 right?

16     A.     Yes, it is.

17     Q.     If you can move on to the page that

18 is titled "Incidence of Maternal Opiate Use and

19 NAS since 2004."

20     A.     Yes.

21     Q.     There's a chart here, and could you

22 explain to me what this chart is?

23     A.     This indicates a trend over time of

24 the incidence of pregnant mothers using opioids,

25 and they add NAS in here as well.  So let me

Page 342

1   think about this.  This is actually -- this is

2   actually the infant, not the mother.  It's the

3   incidence of neonatal abstinence syndrome from

4   commercial -- mothers covered by commercial

5   industries versus Medicaid.

6        Q.    So this is talking about those

7   little babies that we discussed that are born

8   with this syndrome, right?

9        A.    Yes.

10        Q.    And if you look at the chart, I

11   believe it has Medicaid, it has private

12   insurance and all payers on that; is that right?

13        A.    Yes.

14        Q.    And the highest numbers on this

15   chart are Medicaid, right?

16        A.    That is correct.

17        Q.    Is it fair to say that those on

18   Medicaid, the babies born to women that are on

19   Medicaid, have a disproportionately higher

20   chance of having NAS?

21             MS. O'GORMAN:  Objection.

22        A.    Let me have you state that again.

23        Q.    Sure.  It wasn't a very good

24   question.

25             Based on this chart here, I see the

Page 343

1   Medicaid line is higher than the other two; is

2   that fair?

3       A.    That is correct.

4       Q.    So the incidence of children born

5   and covered by Medicaid that have NAS is higher

6   than that which are born and covered by private

7   insurance, fair?

8       A.    That's correct.

9       Q.    Do you have any understanding as to

10  why that would be?

11      A.    Yes.  This actually gets into the

12  question as to how it is you can become eligible

13  for Medicaid.  If you're in the hospital as a

14  baby for over a month, you're eligible for

15  Medicaid, and many of these babies have to stay

16  in the hospital for weeks.  So if they had --

17  they may become eligible just by virtue of such

18  an extensive hospital stay.

19          The other thing that we are aware of

20  is related to the nature of opioid use disorder.

21  So let's say you develop this problem.  You may

22  be late for work.  You may then lose your job.

23  You then can't pay your car payment so now you

24  have no transportation so you can't get another

25  job, can't pay your rent, and all of a sudden

Page 344

```
 1   you're poor enough to meet the financial ability
 2   to be on Medicaid.  So if the mother is on
 3   Medicaid, then the infant is eligible as well.
 4   So there are a couple of reasons that we --
 5   those are two of the really big reasons it's not
 6   surprising to us that we see a disproportionate
 7   share of NAS infants being paid for by the
 8   Medicaid program.
 9        Q.    I think earlier you referenced the
10   line "Journey to addiction through
11   prescriptions."  Do you recall that line?
12        A.    Yes.
13        Q.    And this would be consistent with
14   that where you're seeing some people that might
15   be caught in that spiral that ultimately do end
16   up on Medicaid that maybe didn't start there,
17   fair?
18              MR. DOVE:  Objection to form.
19              MS. McNAMARA:  Objection.
20        A.    Yes.
21        Q.    If we go on to the next slide,
22   you'll see that there is a slide that's
23   entitled, "NAS Statewide Rate Per 1,000 Live
24   Births."
25              Do you see that?
```

Page 345

1          A.     Yes.

2          Q.     And can you tell me what this chart

3     is reflecting?

4          A.     This is information from the

5     Hospital Associations related to the number of

6     infants who are discharged with a diagnosis of

7     neonatal abstinence syndrome and it's calculated

8     into a rate per thousand births.  So that way we

9     get consistency in how we measure this over a

10    period of time.  And what it shows is -- let's

11    pick a year, 2007.  For every thousand

12    deliveries, only 2.5, so a little over two

13    babies, actually had NAS, compared to the last

14    date on this particular graph is 2015, in which

15    case there were 16 babies.  So that's an

16    eight-fold -- approximate eight-fold difference

17    over the period of those years.

18         Q.     Fair to say that as you chart this

19    over time, it's clear that there is a trend and

20    it's spiking at its highest rate here in 2015,

21    which is the last date you have data for on this

22    chart, correct?

23         A.     Yes.

24         Q.     Go to the next page.  There's a map

25    of Ohio that says, "Discharge Rates for Neonatal

                                                    Page 346

1    Abstinence Syndrome per 1,000 Live Births."

2              Do you see that?

3         A.   Yes.

4         Q.   And up in the corner here where

5    Cuyahoga County is it says 1.9.  What does that

6    mean?

7         A.   That actually means relative to the

8    graph we just saw, for Cuyahoga County it was

9    1.9 babies had NAS out of every thousand live

10   births.

11        Q.   And this is for the five-year

12   weighted average from 2004 to 2008?

13        A.   Yes.  So we do calculations over a

14   period of years, so that if the numbers are

15   really small, no one individual person could be

16   identified for privacy reasons.

17        Q.   The next slide has weighted average

18   from 2005 to 2009; is that right?

19        A.   Yes.

20        Q.   And the number for Cuyahoga County

21   has gone up to 2.4; is that right?

22        A.   That is correct.

23        Q.   The next slide has a date, a

24   five-year weighted average from 2006 to 2010,

25   correct?

1      A.    Yes.

2      Q.    And Cuyahoga County has changed

3  colors at this point; is that correct?

4      A.    It is, yes.

5      Q.    Why is that?

6      A.    The graphs are color coded into

7  quintiles so that we can tell sort of how fast

8  you're either getting better or getting worse so

9  there's a visual of which parts of the state may

10  be increasingly or decreasingly affected.

11      Q.    And in this instance the color and

12  number are both getting worse, right?

13      A.    Yes.  If you put these all side by

14  side, I think you'll be able to see the trend

15  just visually in the spreading geographic area

16  as well as the severity of the problem across

17  the state.

18      Q.    If you go to the next slide, which

19  is the five-year weighted average from 2007 to

20  2011, again you have another increase in

21  Cuyahoga County; is that right?

22      A.    Yes.  It's 3.3.

23      Q.    Going to the next slide, the

24  weighted average from 2008 to 2012, again you

25  have another number jump in Cuyahoga County?

Page 348

1          A.     Yes.

2          Q.     It's up to 3.8 by that point?

3          A.     Yes.

4          Q.     Going to the next slide, the

5     weighted average from 2009 to 2013, Cuyahoga

6     County has jumped up to 4.5, correct?

7          A.     That is correct.

8          Q.     And the next slide, the weighted

9     average from 2011 to 2015, Cuyahoga County has

10    changed colors again; is that right?

11         A.     Yes.

12         Q.     And what does this color reflect?

13         A.     This is actually in the top or the

14    second to the top quintile, because the rate in

15    that county is now 6.1 per thousand live births.

16         Q.     So the trend continues to be a bad

17    one, right?

18         A.     That's correct.

19         Q.     If you go to the next slide, you've

20    got something here that's titled "What a

21    Difference Over the Past Seven Years," and it

22    gives a map on the left-hand side from '04 to

23    '08 weighted average and on the right-hand side

24    from 2011 to 2015; is that right?

25         A.     That's correct.

Page 349

1        Q.    And you can see the difference in
2    colors and in numbers in the majority of these
3    counties, right?
4        A.    That is correct.
5        Q.    In 2004 to 2008 it appears that
6    there were only three counties that were in the
7    brown; is that right?
8        A.    That's correct.
9        Q.    And then over on the right-hand
10   side, it appears that a majority of the counties
11   in the state are in the dark brown at that
12   point; is that right?
13       A.    Yes.  So on the left -- let's just
14   clarify -- it's not the darkest color brown,
15   it's the second to the darkest, whereas in the
16   most recent one, 2011 to 2015, we do see a
17   predominance of the worst rate bracket.
18       Q.    And that's fair.  So on the
19   left-hand side there's only three of the four
20   categories that are even showing up and the
21   worst of the colors is not one of them, right?
22       A.    That's correct.
23       Q.    Whereas over on the right, the worst
24   of the colors is the majority of the state?
25       A.    That's correct.

Page 350

1      Q.    If we go to the next page that's

2  titled "MOMS, Maternal Opiate Medical Support"

3  --

4      A.    Yes.

5      Q.    -- could you explain to us what the

6  MOMS project is?

7      A.    Yes.

8            So we appreciated that mothers who

9  had this problem with opioid use disorder had

10  great difficulty getting care.  They either

11  received obstetrical care, where we were trying

12  to make sure the baby was growing properly

13  because the mother was pregnant, or they got

14  care for their opioid use disorder, but often

15  not both together at the same time.

16            So historically these services were

17  funded separately, not just at the state level

18  but also at the federal level, and there's

19  different language, there's a different culture,

20  there are different eligibility requirements,

21  and trying to connect the two was actually quite

22  difficult.  So even if women were trying to seek

23  treatment, they had difficulty adhering to what

24  the best evidence-based practice was.

25            So we gathered kind of a core team

Page 351

1   from both the behavioral health treatment side

2   as well as the obstetrical side to try to

3   explain what ideal care looked like on both

4   sides, to try to figure out could we create a

5   system that actually takes care of the women

6   without the women having to glue these pieces

7   together in order to get to a better outcome.

8   And so the MOMS project was all about the

9   details of what kind of support they needed and

10  what we asked the health systems and clinicians

11  to do to do a better job to take care of them.

12        Q.    And over the last several years,

13  programs like the MOMS program and other

14  initiatives that have been put forward by the

15  Medicaid entity and the state and the counties,

16  they've helped somewhat with regard to the

17  opioid epidemic; is that fair?

18        A.    We have done a better job with

19  treatment, yes.

20        Q.    But it's not a quick fix, is it?

21        A.    No.

22        Q.    And the fix for the opioid epidemic

23  is still something that's going to take a lot of

24  work and a lot of time?

25        A.    Yes.

Page 352

1              So when you say "fix," there are a

2     couple of things.  We still have to deal with

3     people who currently have the problem, because

4     just because the mother is pregnant now doesn't

5     mean she won't be again in the future.  So there

6     are future babies potentially still at risk.

7     And at the same time you're trying to deal with

8     the existing problem, you need to prevent new

9     ones from starting.  So it actually is a pretty

10    complex effort across multiple parts of the

11    health system.

12              MR. SCHNIEDERS:  Thank you, Doctor.

13    I appreciate your time here today.

14              THE VIDEOGRAPHER:  Off the record,

15    1:21.

16                   (Recess had.)

17              THE VIDEOGRAPHER:  We're back on the

18    record, 1:34.

19     FURTHER EXAMINATION OF MARY APPLEGATE, M.D.

20    BY MS. O'GORMAN:

21         Q.    Good afternoon again.  I just have a

22    few more questions for you.

23              You were asked by counsel for

24    Plaintiff about various initiatives undertaken

25    by the ODM and whether industry participants had

Page 353

1    provided support.

2              Do you recall those questions?

3        A.    Yes.

4        Q.    Have you ever been in contact with

5    manufacturers of pharmaceutical drugs or other

6    industry participants to request support for

7    opioid-related initiatives?

8        A.    We're actually not allowed to do

9    that.  That would represent a conflict of

10   interest.

11       Q.    So would it be a conflict of

12   interest for the manufacturers to have provided

13   support or simply for you to contact them?

14       A.    So I'm not the lawyer.  I can just

15   tell you that we have strict standards around

16   conflicts of interest, so even the appearance of

17   impropriety would be problematic for us.

18       Q.    Okay.  So if support were to be

19   offered by manufacturers or other industry

20   participants, you would not be able to accept

21   that; is that correct?

22             MR. SCHNIEDERS:  Object to the form.

23             MR. PENDELL:  Objection.

24       A.    So I'm not sure that that's actually

25   true.  I cannot go out and ask for that because

Page 354

1    it would be the appearance of impropriety.

2         Q.    If a manufacturer came to you and

3    offered support, would you be able to take --

4    accept that offer?

5         A.    I'd have to defer to legal folks.

6    I'd have to defer to legal counsel.

7         Q.    Do you recall being asked about some

8    P&T committee meeting minutes?

9         A.    Yes.

10        Q.    Now -- and some of those meeting

11   minutes reflected that there were

12   representatives of pharmaceutical manufacturers

13   in attendance.  Do you recall that?

14        A.    Yes.  Not as committee members but

15   as stakeholders, yes.

16        Q.    Was there a list of participants or

17   attendees at these meetings retained as far as

18   you know?

19        A.    I'm not sure if they have people --

20   generally in these meetings people sign in.  The

21   documents that were given did not include the

22   attendance sheet, so it was just a summary

23   statement as to approximately how many were

24   there at that time.

25        Q.    Was the attendance sheet retained

Page 355

1   and stored somewhere?

2        A.    I did not attend so I actually don't

3   know that level of detail.

4        Q.    Okay.  Does the fact that

5   manufacturers' representatives may have been in

6   attendance at a meeting mean they spoke at the

7   meeting?

8              MR. SCHNIEDERS:  Objection to form.

9        A.    The minutes reflect that they did

10  speak.

11       Q.    If there were 30 manufacturer

12  representatives in attendance but only, say, two

13  or three were noted in the meeting minutes, does

14  that mean that only those couple actually spoke?

15             MR. SCHNIEDERS:  Objection to form.

16       A.    I wasn't there so I actually can't

17  comment on the nature of it.  My understanding

18  is that there's discussion, there's a more

19  formal process now in which people who want to

20  speak need to submit that request in advance,

21  but back then I actually can't tell you what the

22  process was.

23       Q.    If somebody spoke at the meeting,

24  would it be reflected in the minutes?

25             MR. SCHNIEDERS:  Object to the form.

1   A. Yeah. I actually can't comment on

2 the degree to which every detail was included in

3 the minutes.

4   Q. And the P&T committee meetings

5 included consideration of oral drugs, not just

6 opioids, correct?

7   A. That's correct.

8   Q. So there would be pharmaceutical

9 manufacturer representatives for various types

10 of drugs other than opioids, correct?

11   A. I would presume so, yes.

12   Q. Okay. And you were asked

13 specifically about a clinical presentation made

14 by a manufacturer representative with regard to

15 Nucynta in 2009.

16    Do you recall that?

17   A. Yes.

18   Q. Would you expect that the P&T

19 committee would do its own investigation

20 independent of whatever information they were

21 given by the pharmaceutical representative?

22    MR. SCHNIEDERS: Object to the form.

23    MR. PENDELL: Objection.

24   A. The purpose of the P&T committee is

25 actually to have expertise in all these fields

Page 357

1   to provide input.  Many of the members actually

2   are researchers themselves.  So I think all of

3   the information is taken into consideration, but

4   the agency does not conduct independent

5   investigations of every drug on the formulary.

6        Q.    Does the P&T committee conduct that

7   independent investigation?

8             MR. SCHNIEDERS:  Object to the form.

9        A.    So I think there's review of the

10  literature, but they do not conduct studies.  So

11  many of the members may be associated with

12  institutions that are looking at a variety of

13  topics but that's actually not the primary

14  purpose of the P&T committee.

15       Q.    Would you expect that a presentation

16  by a pharmaceutical manufacturer would supplant

17  the research and judgment of the medical

18  professionals on the P&T committee?

19            MR. SCHNIEDERS:  Object to the form.

20       A.    I wouldn't say supplant.  Perhaps

21  complement.  I'd imagine that this was some of

22  the discussion that ensued at these meetings.  I

23  think clinicians have a different view perhaps

24  than what the drug companies may have and it may

25  or may not match their experience or their

Page 358

1    concerns.

2         Q.    And the members would -- of the

3    committee would rely on their own clinical

4    judgment and experiences and not what the

5    manufacturer's representative told them; is that

6    what you would expect?

7              MR. SCHNIEDERS:  Object to the form.

8         A.    I would expect that they actually do

9    their own readings, have a good understanding of

10   the medical literature, and, like I said, any

11   additional information -- could be that those

12   representatives had additional information that

13   may have been helpful to the P&T committee.

14             MS. O'GORMAN:  I have nothing

15   further.  Thank you.

16        EXAMINATION OF MARY APPLEGATE, M.D.

17   BY MR. PENDELL:

18        Q.    I have one follow-up, Doctor.

19             Have you ever heard, in either your

20   personal capacity or in your capacity as a

21   representative of the ODM, of a single opioid

22   manufacturer reaching out to the Ohio Medicaid,

23   offering assistance to help with the opioid

24   crisis?  Have you ever heard of that happening?

25        A.    That has not happened.  Actually, as

Page 359

1    we tried to be strategic about how we were going

2    to address this issue at one of the earlier task

3    forces, we reviewed every public health

4    promising practice.  We looked at collective

5    impact.  We had every agency, every stakeholder

6    that we could think of who actively

7    participated, and the only one in that box which

8    I think was submitted at one of the earlier,

9    like prior to my first testimony -- the only

10   intervention that has not happened is the one in

11   which the pharmaceutical industry contributed to

12   the solution.

13            MR. PENDELL:  I appreciate it.  I

14   have no further questions, Doctor.

15            MS. ZINSMASTER:  If we have 30

16   seconds or so left, I have one clean-up question

17   from the pharmacy perspective.

18            MR. PENDELL:  I don't have any

19   objections.

20            THE VIDEOGRAPHER:  Off the record,

21   1:41.

22                (Short recess had.)

23            THE VIDEOGRAPHER:  We're back on the

24   record, 1:42.

25        EXAMINATION OF MARY APPLEGATE, M.D.

Page 360

1   BY MS. ZINSMASTER:

2        Q.    Dr. Applegate, I'm Kristin

3   Zinsmaster.  I represent Walmart and I have just

4   one question for you, but it takes us back in

5   time a little bit so I'll set the stage.

6             Ms. Han was asking you about death

7   investigations and you testified that the

8   Department of Health performed such

9   investigations to your knowledge, correct?

10       A.    Well, officially they house vital

11  statistics so they have the death certificates,

12  which are filled out by the coroners, who are

13  the ones who actually do the investigations and

14  the determination of causes of death.

15       Q.    Okay.  So coroners determine cause

16  of death and the Department of Health houses the

17  data or the results of that investigation?

18       A.    That's correct.

19       Q.    Thank you.

20             And you testified earlier that you

21  were not aware of either a coroner or the

22  Department of Health investigating manufacturers

23  or distributors, correct?

24       A.    Correct.

25             MR. PENDELL:  Form.

Page 361

1        Q.    Is your answer the same when it

2   comes to pharmacies?  Are you aware of any

3   investigation that involved a pharmacy?

4        A.    Well, at least within our agency,

5   there is a fraud and abuse section, and so if

6   there are unusual patterns by either providers,

7   clinicians or by pharmacies, there's actually an

8   investigation.  And in my earlier testimony I

9   did talk about one of the first steps that we

10  took was actually to close what they called pill

11  mills, which were either clinical practices or

12  associations of pharmacies with clinical

13  practices or even pharmacies that actually were

14  not following the laws as it relates to

15  prescribing.

16       Q.    So pill mills are prescribers,

17  correct?

18             MR. SCHNIEDERS:  Object to the form.

19       A.    Yes, but some -- some clinics

20  actually may have a pharmacy within them.

21       Q.    Meaning that the prescriber

22  dispenses the medication in addition to

23  prescribing it, correct?

24       A.    Or there may be a pharmacy within it

25  or there may be a very tight pharmacy associated

Page 362

1   with it so that every client goes to the same

2   pharmacy.  So there are a number of different

3   arrangements when those pill mills were closed.

4        Q.    Okay.  But are you aware -- taking

5   us back to the specific question, are you aware

6   of any death investigation that involved a

7   pharmacy?

8              MR. SCHNIEDERS:  Object to form.

9              MR. PENDELL:  Objection.

10       A.    So I personally can't answer that

11  because it may be the Board of Pharmacy or a

12  different state department that actually looked

13  into that.

14       Q.    But you personally are not aware of

15  such an investigation?

16       A.    No.

17             MS. ZINSMASTER:  That's it for me.

18  Thank you, Doctor.

19             THE WITNESS:  Thank you.

20             MR. DOVE:  Counsel, I just want to

21  say a couple things for the record.

22             First, as we said early in the

23  deposition, it's our position that the

24  deposition of Ohio Medicaid remains open.  We're

25  still waiting on documents, e-mails from

                                              Page 363

1   Dr. Wharton and from Dr. Applegate, and some

2   additional documents, and so we're going to work

3   with the department to figure out the best way

4   to deal with that, but in our view, we are

5   entitled to additional testimony.

6            And, in addition, there were certain

7   areas of testimony today where Dr. Applegate

8   conceded that she was not the person most

9   knowledgeable about that area and that she would

10  have to defer to her pharmacy team.  So, again,

11  these are areas we can negotiate and discuss,

12  but our position is the deposition remains open.

13           MR. PENDELL:  It is our position

14  that -- first of all, we'll object.

15           It is my understanding from counsel

16  for the witness that she offered to move the

17  deposition date so that you could have those

18  documents and you refused to do so.  You've now

19  sat with this witness on two occasions.  There

20  was another witness that you sat with.  So

21  that's now three witnesses that you've had on

22  these topics.  You gave broad deposition topics

23  on top of it.  She's not obligated as a

24  corporate witness to be able to anticipate every

25  single question that you're going to ask.  And I

Page 364

1    would also note for the record that several

2    times at least today and in the transcript I

3    read from last time you would put a document in

4    front of her, read it and then ask her isn't

5    that true.  So I think that you've more than had

6    ample opportunity.  You may not have chosen to

7    use the time the way that in retrospect you wish

8    you had, but we do object to keeping the

9    deposition open.

10              MS. LINN:  And I would just also add

11   that we've made our pharmacy team names known

12   from months and months ago, that those were an

13   option to have as a representative and as a

14   witness, so that's not been a secret either.

15              MR. DOVE:  I would just have to say

16   for the record, from our perspective, Michelle

17   Barger's name was identified early on and then

18   the department decided to pull her.  She did not

19   want to be deposed.  And so we've been trying to

20   work cooperatively with the department in its

21   selection of witnesses.  If you're saying those

22   witnesses are available for deposition, that's

23   something we can take into consideration as to

24   who is the appropriate person for the next

25   round.  It's just -- you know, again, we don't

Page 365

1    have to get into --

2              MR. PENDELL:  I will object that

3    discovery is closed as far as I know.  It's been

4    closed for like a month.

5              MR. SCHNIEDERS:  And these are not

6    new topics at this point.  You served an

7    incredibly broad 30(b)(6).  This witness was

8    adequately and above adequately prepared to

9    answer questions related to that 30(b)(6) that

10   were within the scope.  So we would object.

11             MS. ZINSMASTER:  Plaintiffs'

12   counsel, you requested yourself to keep this

13   deposition open.  Are you withdrawing that

14   request?

15             MR. SCHNIEDERS:  To be clear, I

16   didn't say -- I said we might ask, based upon

17   the production we received at 6:00 last night,

18   when we have a chance to look at those, if we

19   need to.  As of right now, we are not holding

20   this deposition open.

21             MS. ZINSMASTER:  I wanted to clarify

22   the status of that request.

23             MR. PENDELL:  We will withdraw.

24             MR. DOVE:  Thank you.

25             THE VIDEOGRAPHER:  Off the record,

Page 366

1    1:49.

2

3                    (Deposition concluded at 1:49 p.m.)

4                        - - - - -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 367

1   Whereupon, counsel was requested to give

2   instruction regarding the witness' review of

3   the transcript pursuant to the Civil Rules.

4

5                    SIGNATURE:

6   Transcript review was requested pursuant to

7   the applicable Rules of Civil Procedure.

8

9                 TRANSCRIPT DELIVERY:

10  Counsel was requested to give instruction

11  regarding delivery date of transcript.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 368

1              REPORTER'S CERTIFICATE

2   The State of Ohio,    )

3                         ) SS:

4   County of Cuyahoga.   )

5

6          I, Renee L. Pellegrino, a Notary

7   Public within and for the State of Ohio, duly

8   commissioned and qualified, do hereby certify

9   that the within named witness, MARY APPLEGATE,

10  M.D., was by me first duly sworn to testify the

11  truth, the whole truth and nothing but the truth

12  in the cause aforesaid; that the testimony then

13  given by the above referenced witness was by me

14  reduced to stenotypy in the presence of said

15  witness; afterwards transcribed, and that the

16  foregoing is a true and correct transcription of

17  the testimony so given by the above referenced

18  witness.

19          I do further certify that this

20  deposition was taken at the time and place in

21  the foregoing caption specified and was

22  completed without adjournment.

23

24

25

Page 369

1          I do further certify that I am not a

2    relative, counsel or attorney for either party,

3    or otherwise interested in the event of this

4    action.

5          IN WITNESS WHEREOF, I have hereunto

6    set my hand and affixed my seal of office at

7    Cleveland, Ohio, on this 2nd day of April,

8    2019.

9

10

11

12

13

14   Renee L. Pellegrino, Notary Public

15   within and for the State of Ohio

16

17   My commission expires October 12, 2020.

18

19

20

21

22

23

24

25

```
                                                          Page 370
 1                      Veritext Legal Solutions
                            1100 Superior Ave
 2                              Suite 1820
                         Cleveland, Ohio 44114
 3                       Phone: 216-523-1313
 4
       April 2, 2019
 5
       To: Morgan Linn, Esq.
 6
       Case Name: In Re: National Prescription Opiate Litigation
 7
       Veritext Reference Number: 3255027
 8
       Witness:  Mary Applegate, M.D.      Deposition Date:  3/28/2019
 9
10     Dear Sir/Madam:
11
       Enclosed please find a deposition transcript.  Please have the witness
12
       review the transcript and note any changes or corrections on the
13
       included errata sheet, indicating the page, line number, change, and
14
       the reason for the change.  Have the witness' signature notarized and
15
       forward the completed page(s) back to us at the Production address
16     shown
17     above, or email to production-midwest@veritext.com.
18
       If the errata is not returned within thirty days of your receipt of
19
       this letter, the reading and signing will be deemed waived.
20
21     Sincerely,
22     Production Department
23
24
25     NO NOTARY REQUIRED IN CA
```

Page 371

```
1                    DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 3255027
3  CASE NAME: In Re: National Prescription Opiate Litigation
   DATE OF DEPOSITION: 3/28/2019
4  WITNESS' NAME: Mary Applegate, M.D.
5          In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7          I have made no changes to the testimony
   as transcribed by the court reporter.
8

   _____          _____
9  Date                      Mary Applegate, M.D.
10         Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
           They have read the transcript;
13         They signed the foregoing Sworn
           Statement; and
14         Their execution of this Statement is of
           their free act and deed.
15
           I have affixed my name and official seal
16
   this _____ day of_____, 20_____.
17
                   _____
18                 Notary Public
19                 _____
                   Commission Expiration Date
20
21
22
23
24
25
```

Page 372

1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
2

    ASSIGNMENT REFERENCE NO: 3255027
3   CASE NAME: In Re: National Prescription Opiate Litigation
    DATE OF DEPOSITION: 3/28/2019
4   WITNESS' NAME: Mary Applegate, M.D.
5          In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7          I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9          I request that these changes be entered
    as part of the record of my testimony.
10

           I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____          _____
    Date                      Mary Applegate, M.D.
14

           Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17         They have read the transcript;
           They have listed all of their corrections
18         in the appended Errata Sheet;
           They signed the foregoing Sworn
19         Statement; and
           Their execution of this Statement is of
20         their free act and deed.
21         I have affixed my name and official seal
22  this _____ day of_____, 20_____.
23         _____
           Notary Public
24

           _____
25         Commission Expiration Date

Page 373

1                          ERRATA SHEET
              VERITEXT LEGAL SOLUTIONS MIDWEST
2                   ASSIGNMENT NO: 3/28/2019
3     PAGE/LINE(S) /        CHANGE        /REASON
4     _____
5     _____
6     _____
7     _____
8     _____
9     _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19

      _____       _____
20    Date                    Mary Applegate, M.D.
21    SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22    DAY OF _____, 20_____ .
23                    _____
                      Notary Public
24
                      _____
25                    Commission Expiration Date

| & |
| --- |
| **&**  190:21 191:2 193:19 198:13,15 198:18 201:22 260:20 261:8 |

| 0 |
| --- |
| **015989**  193:17 258:18,24 |
| **016480**  194:4 269:12,18 |
| **022801**  300:9 |
| **022802**  300:10 |
| **027015**  194:7 281:3,10 |
| **027016**  281:4 |
| **03/2009**  334:4 |
| **034210**  194:10 291:11,19 |
| **034224**  291:12 |
| **034768**  194:14,16 300:18 302:16,21 |
| **034780**  302:16 |
| **038848**  193:23 265:11,17 |
| **039326**  193:13 246:10,17 |
| **039327**  246:17 |
| **039341**  193:20 260:22 261:5 |
| **039342**  261:5 |
| **04**  348:22 |
| **04049**  227:17 |
| **040493**  227:17 |
| **040500**  227:18 |
| **040711**  193:15 248:22 249:5 |
| **040715**  250:14 |
| **040744**  252:4 |
| **040756**  248:22 |

**06103**  190:5
**08**  348:23

| 1 |
| --- |
| **1**  231:17 333:8 |
| **1,000**  344:23 346:1 |
| **1.9**  346:9 |
| **1.9.**  346:5 |
| **10**  230:7 236:4 253:20,21 325:20 325:22 330:17,18 334:14 |
| **10036-6797**  191:14 |
| **1095**  191:13 |
| **10:29**  247:8 |
| **10:30**  200:9 201:5 |
| **10:58**  267:18 |
| **11**  240:14 |
| **110**  230:14,15 |
| **1100**  370:1 |
| **11:21**  267:21 |
| **12**  305:21 335:20 369:17 |
| **120**  270:17 276:10 |
| **121st**  190:8 |
| **12:10**  306:7 |
| **12:26**  306:10 |
| **12:36**  313:23 |
| **12:37**  314:1 |
| **12:45**  321:16 |
| **12:47**  321:19 |
| **12th**  190:22 |
| **13**  193:17 258:17 320:1 330:2 |
| **13th**  259:7 |
| **15th**  301:3,10 |
| **16**  293:16 345:15 |
| **17**  189:7,11 286:14 286:15 329:18,19 |
| **17th**  190:4 |

**18**  189:13 279:19 299:22 300:2
**1820**  370:2
**19**  193:8 227:5
**190**  192:3
**193**  192:4
**195**  192:5
**1:17**  198:7
**1:18**  189:15
**1:21**  352:15
**1:34**  352:18
**1:41**  359:21
**1:42**  359:24
**1:49**  366:1,3
**1st**  206:4,4,9,9

| 2 |
| --- |
| **2**  189:17 231:18 287:18 300:24 330:25 333:1 335:4,6,23 370:4 |
| **2.4**  346:21 |
| **2.5**  345:12 |
| **2/2019**  193:6 216:18 |
| **20**  190:4 210:15 371:16 372:22 373:22 |
| **20001-4956**  191:5 |
| **20005**  190:22 |
| **2000s**  205:21 |
| **2004**  341:19 346:12 349:5 |
| **2005**  346:18 |
| **2006**  205:25 206:25 240:5,9 346:24 |
| **2007**  345:11 347:19 |
| **2008**  346:12 347:24 349:5 |

**2009**  330:20 334:2 334:15 346:18 348:5 356:15
**201**  190:9 192:8
**2010**  193:20,22 206:4,9 240:13 260:21 261:12,16 262:24 264:2 265:16,25 267:13 320:1 346:24
**2011**  206:4,9 264:8 316:17 323:14 329:11 332:23 347:20 348:9,24 349:16
**2012**  193:12 245:22 246:9,19 247:15 275:23 347:24
**2013**  207:14,23,23 261:16 270:6 348:5
**2015**  345:14,20 348:9,24 349:16
**2016**  279:11 280:1 340:25
**2017**  193:17 258:17 259:8 286:18 292:17
**2018**  193:8,15 194:20 227:5 235:5 249:4,12 255:14 281:18 301:3,10 337:13
**2019**  189:19 198:2 204:22 218:18,23 369:8 370:4
**202**  190:23 191:5
**2020**  369:17
**20th**  270:5

**21** 193:5 216:15,21
225:21
**2103** 270:8
**212** 191:14
**216** 193:5 217:3
**216-523-1313**
370:3
**217-8800** 191:10
**218-2722** 190:5
**22** 193:7 194:19
227:3,10 337:13
**221** 195:3
**2227** 369:13
**227** 193:7
**23** 193:10 234:13
234:19 236:23
**230-7676** 190:10
**234** 193:10 195:3
**23rd** 201:24 202:3
202:21 204:17
205:10
**24** 193:11 246:7
247:10
**240** 195:4
**242** 195:4
**246** 193:11
**249** 193:14
**25** 193:14,20
248:21 249:2
260:21 262:24
264:1 326:10
**254** 195:5,5
**255** 195:6
**256** 195:6
**258** 193:16
**26** 193:16 258:15
258:22
**261** 193:18 195:7
**262** 195:7
**263** 195:8,8,9

**264** 195:9,10,10
**265** 193:21
**266** 195:11,11,12
**267** 192:9 195:12
**269** 194:3
**26th** 190:13
**27** 193:18 260:18
261:2
**273** 195:13
**277** 195:13
**278** 195:14,14
**279** 195:15
**28** 189:19 193:21
198:2 265:10,14
**280** 195:15
**2804** 189:6,7 198:7
**281** 194:5
**282-0515** 190:14
**284** 195:16
**285** 195:16
**286** 195:17
**288** 195:17,18
**29** 193:22 194:3
265:16 269:9,16
**290** 195:18,19
**291** 194:8 195:19
**293** 195:20
**294** 195:20,21,21
195:22,22
**295** 195:23,23
**296** 195:24
**298** 195:24
**299** 195:25
**29th** 265:25
332:22
**2nd** 369:7

**3**

**3** 229:25 230:2
231:19
**3.3.** 347:22

**3.8** 348:2
**3/28/2019** 370:8
371:3 372:3 373:2
**30** 190:13 194:5
202:8 221:11,13
261:15 262:2
281:1,7 286:1
292:16 297:2
329:11 355:11
359:15 365:7,9
**300** 194:11 290:4
**302** 194:15
**304** 196:3,3
**305** 196:4,4
**306** 196:5
**307** 196:5,6
**308** 196:6
**31** 194:8 291:10,15
300:7
**310** 196:7,7,8
**311** 196:8,9
**312** 196:9
**313** 196:10
**314** 192:10 196:10
**315** 196:11,11,12
196:12,13
**317** 196:13,14,14
196:15,15
**319** 196:16,16
**31st** 292:17
**32** 194:11 300:8,13
**320** 196:17,17
**321** 192:11 196:18
196:18
**323** 196:19,19
**324** 196:20
**3255027** 370:7
371:2 372:2
**326** 196:20
**329** 196:21

**33** 194:15 302:14
302:19 322:9
323:1 337:1
**330** 196:21
**332** 196:22
**333** 196:22
**334** 194:17
**336** 196:23,23,24
196:24
**337** 194:18 196:25
197:3
**34** 194:17 333:25
334:3,7
**342** 197:3
**344** 197:4,4
**35** 194:18 337:7,9
337:17
**353** 197:5,5
**355** 197:6,6
**356** 197:7,7,8
**357** 197:8,9
**358** 192:12 197:9
**36** 304:13
**361** 197:10,10
**362** 197:11,11
**363** 197:12
**368** 192:14

**4**

**4** 303:15
**4.5** 348:6
**40** 278:13 289:11
293:17 304:3
318:8
**400** 190:18
**43** 303:23
**43215** 190:14,18
**434-5186** 190:23
**44114** 370:2
**45004** 189:11
**45132** 189:13

**45909** 189:15
**4950** 191:9

**5**

**5** 292:25 334:21
**5,000** 275:16
**50** 190:17 327:21
328:7
**54.3** 231:17
**55402** 191:10

**6**

**6** 202:8 221:11,13
234:24 235:5,9,13
235:25 236:5,21
253:4,20 261:15
262:2 329:11
333:2 365:7,9
**6.1** 348:15
**612** 191:10
**614** 190:19
**662-6000** 191:5
**66209** 190:9
**67.76** 231:18
**6731** 190:8
**698-3500** 191:14
**6:00** 365:17
**6:59** 199:14

**7**

**7** 234:24 303:10
327:11,12,12
333:8
**72.45** 231:20
**725** 190:22
**75** 189:23
**752-5573** 190:19
**7th** 330:19 334:14

**8**

**8** 303:16
**80** 207:6,10,21
209:17,19,22

210:14,25 211:17
212:6 221:19
231:21 245:25
272:14 312:18
325:4
**800** 190:14
**844** 190:10
**85** 207:6,10,22
209:17,19,22
210:14 211:17
212:6 231:21
**850** 191:4
**860** 190:5
**89** 276:1

**9**

**9** 235:9,11,12,24
255:13 304:12
328:11,12 332:21
332:21 335:20
**90** 191:9 270:17
328:16,25
**9:01** 189:20 198:3

**a**

**a.m.** 189:20 198:3
**aaron** 189:8
**ability** 344:1
**able** 199:21
232:20 241:22
242:3 253:1
254:12,22 257:2
258:4 261:17
262:6 277:15
295:24 312:3
316:20 329:23
347:14 353:20
354:3 363:24
**absolute** 325:3
**abstinence** 338:12
339:14,16 342:3
345:7 346:1

**abuse** 261:10
262:6,18,21 263:1
263:7,13,18,21
264:3,12 265:25
266:12,20,25
267:11 299:17
312:14 334:23
335:17,24 336:13
361:5
**abused** 335:11,25
336:10
**abusers** 335:5
**accept** 353:20
354:4
**access** 222:10
226:11 233:21
241:8,14,17,22
242:7 261:10
262:6 265:24
266:11 267:10
284:17,19,22
285:5,15 290:24
338:6
**accounting** 228:2
**accurate** 265:22
266:5,7,23 272:8
279:4
**achieved** 293:10
**acknowledge**
371:11 372:16
**acs** 228:14 229:19
**act** 335:7 371:14
372:20
**acting** 193:12
235:15,15 239:14
239:15 243:2,2
246:8,19 247:14
247:18,22 266:17
**action** 223:10
238:21 242:15
309:6 314:7 369:4

**actions** 252:14
292:25 315:20
316:23
**active** 256:10
**actively** 359:6
**activities** 214:4
306:16 311:18
**activity** 244:8
293:22 331:22
332:10
**actual** 217:3 225:4
**acupuncture**
289:22 318:10
**acupuncturists**
290:1
**acute** 237:14
239:16 280:14
282:18 285:22,24
286:10 289:17
**ad** 274:23
**add** 211:8 233:4
265:1 341:25
364:10
**addicted** 308:20
308:21 339:5,8
340:1
**addiction** 252:17
279:20 282:2
298:12 309:12
313:1 331:9,22
332:9 335:5
344:10
**addition** 279:21
289:15 361:22
363:6
**additional** 200:20
203:23 204:18
211:8 248:14,16
249:25 270:18
286:2,9 306:22
311:17,18 358:11

358:12 363:2,5
**address** 226:10
294:22 310:6,10
311:9 359:2
370:15
**addressed** 201:7
261:7 263:23
264:13 285:12
**addresses** 280:23
**addressing** 226:6
312:11
**adequate** 214:19
312:6,10
**adequately** 365:8
365:8
**adhere** 213:4
220:12 238:1
291:7
**adherence** 251:3,4
252:1 275:4
**adhering** 288:11
350:23
**adjournment**
368:22
**adjusted** 340:24
**adjustments**
302:10,11
**administered**
231:7
**administrative**
229:5 285:6
**administratively**
284:18
**administrator**
228:7 249:19
**administrators**
229:18
**adults** 286:4
**advance** 220:24
355:20

**advanced** 283:14
**advocacy** 327:23
328:9,20 329:2
**affiliated** 284:1
**affirmatively**
319:8
**affixed** 369:6
371:15 372:21
**aforesaid** 368:12
**afternoon** 314:4
352:21
**ag's** 203:11
**age** 201:12 211:8
340:24
**agencies** 242:17
252:15 268:12
289:1,6 312:3
313:7
**agency** 205:18,25
206:18,23 207:13
207:14,17 212:5
220:14 221:6,24
223:19 224:5,12
224:17,20 225:5
225:22 226:18,18
228:10,17 229:1
229:10,13,21
232:15,18 233:10
233:16,25 237:17
237:25 239:12
240:3,22 241:8
243:5,12 244:13
245:3,6 248:24
249:16 250:1
251:9,23 253:6,25
258:6,23 261:4,15
264:2,11 265:23
266:8 267:1
268:22 269:3
274:23 283:2,5
286:17 288:24

289:4 305:23
308:19 309:20
312:23 313:6
357:4 359:5 361:4
**agency's** 278:12
**agents** 333:2
**aggregate** 241:20
242:10
**ago** 252:11 271:2
281:17 299:22
300:2,5 364:12
**agonist** 335:3,22
**agonists** 335:12
**agree** 211:1 264:1
264:19 293:24
294:5 307:4,13
330:9
**agreement** 193:6
207:6,10,22
216:17,24 217:25
218:15,17,19
219:3,5,8,20 225:7
225:11,15,19,20
225:25 243:11,20
244:2
**agreements** 225:5
225:7 243:21
**ahan** 191:6
**ahead** 201:10
221:16 234:7
277:22 278:3
280:9 317:25
**aim** 292:12,14
**akron** 190:2
**al** 189:10,12,14,14
**alleviating** 280:21
**allow** 211:5
232:18
**allowed** 222:4,25
285:25 288:7
294:21 353:8

**allows** 232:15
**alternative** 290:1
332:14
**alternatives**
289:16
**americas** 191:13
**amount** 231:6
276:14
**ample** 364:6
**analgesic** 333:2
**analgesics** 236:24
237:2 331:4
**analyses** 243:13
243:16 301:18
**analysis** 223:3
231:23 277:5
288:24
**analysts** 268:4,7
268:12,19,23
269:3 277:7
308:12
**analytic** 268:25
**analytics** 299:10
299:20,24 318:13
**analyze** 268:8
**analyzed** 269:3
**anna** 191:3 198:15
267:24
**announcement**
223:13
**annual** 244:22
246:2 275:24
**answer** 221:17
242:1 254:21
255:23 256:13
261:17 262:3
264:17 288:3
294:24 295:24
307:8,16 315:15
317:24 319:17
320:4,16 322:6

330:14 333:17
361:1 362:10
365:9
**answered** 234:6
316:18 317:2,18
319:12
**anticipate** 262:3
363:24
**anybody** 280:19
327:2
**anymore** 257:15
**apn's** 287:16
**apns** 283:12,17,21
**apologize** 323:24
**appear** 248:16
371:11 372:15
**appearance**
353:16 354:1
**appearances**
190:1 191:1 192:3
198:11
**appeared** 326:5
**appears** 218:22
227:14 287:19
328:25 330:22
333:18 334:17
349:5,10
**appended** 372:11
372:18
**appendices** 217:16
**applegate** 189:18
192:7 193:16
198:5 201:12,17
201:19 202:2
204:15 216:14
217:8 225:4 227:2
227:9,20 229:15
234:12,18 246:6
246:14 247:9
248:18 249:1
256:16 258:14,16

258:21 260:17
261:1,6 265:8,13
267:22,24 269:8
269:19 281:6,13
291:14 300:12
302:18 306:11,13
314:2,4 321:20
334:6 352:19
358:16 359:25
360:2 363:1,7
368:9 370:8 371:4
371:9 372:4,13
373:20
**applegate's** 200:3
**applicable** 367:7
**applied** 215:7
**applies** 314:24
**apply** 226:14
282:14 301:21
314:22
**appointed** 204:22
**appreciate** 352:13
359:13
**appreciated** 350:8
**appropriate** 286:3
364:24
**approval** 211:10
**approve** 263:13
**approved** 209:5
259:19,25 267:1
324:20
**approximate**
345:16
**approximately**
198:3 199:14
210:15 245:22
299:22 326:10
327:21 328:7,16
330:2 332:22
354:23

**april** 369:7 370:4
**area** 301:20 310:9
318:1 347:15
363:9
**areas** 238:19
251:8 363:7,11
**arms** 309:18
**arrangements**
362:3
**arrived** 205:24
**articulates** 231:1
**aside** 248:19
**asked** 204:5 234:6
302:12 317:2,17
322:16 324:12
326:4 331:9
351:10 352:23
354:7 356:12
**asking** 219:10
221:10 235:20
239:6 268:1
287:20 317:4
329:9 360:6
**asks** 263:12,16
**aspects** 314:24
322:16
**assess** 270:22,23
**assessment** 275:11
305:18
**assign** 316:14
**assignment** 371:2
372:2 373:2
**assistance** 193:5
216:16,23 358:23
**assistant** 199:7
**assisted** 216:3,4
222:17,21 223:17
338:7
**assists** 238:16
**associated** 275:25
297:1 357:11

361:25
**association** 282:24
**associations**
327:23 328:9,20
329:3 345:5
361:12
**assume** 217:21
270:5
**assumptions**
271:20,21
**attached** 372:7
**attachments** 193:9
227:5
**attempt** 336:19
**attend** 263:10
321:1 326:15
327:6 329:23
355:2
**attendance** 354:13
354:22,25 355:6
355:12
**attendees** 354:17
**attention** 217:18
223:12 250:13,15
252:3 253:20
263:19 264:24
287:2 289:15
312:24 324:7
**attorney** 190:12
199:8,8 202:24
313:21 369:2
**attorneygeneral....**
190:15
**attorneys** 203:10
**august** 270:5
**authorization**
207:18 208:19
209:10 210:2,16
210:19 212:9,14
212:19 213:1
224:23 230:25

232:10,12 233:13
234:1 236:6,9
239:14 240:11
256:18 258:10
266:18 325:2,7
**authorize** 372:11
**automated** 241:15
**availability** 222:8
223:4
**available** 211:24
225:1 226:17
256:18 266:17
289:17,23 320:10
325:9,11 338:22
364:22
**ave** 370:1
**avenue** 191:13
**average** 276:17
346:12,17,24
347:19,24 348:5,9
348:23
**aware** 201:3 203:7
204:18 205:6,8
206:16 215:20
219:18 222:15
248:11 252:12
264:2,8,11,20,21
279:19 290:4,13
290:18 309:17
311:23 312:2
315:2,7,18 316:21
317:13 321:10,12
326:4,14 336:10
343:19 360:21
361:2 362:4,5,14
**awareness** 289:8

**b**

**b** 202:8 221:11,13
261:15 262:2
329:11 331:3
365:7,9

**babies** 338:15
339:22,24 342:7
342:18 343:15
345:13,15 346:9
352:6
**babtist** 190:16
199:4,4 203:13
247:1
**baby** 343:14
350:12
**back** 199:24
201:24 205:12
218:3,11 247:7,10
253:3,19 267:20
284:14 290:3
302:9 304:1 306:9
313:25 321:18
325:17,19 330:17
340:10,10 352:17
355:21 359:23
360:4 362:5
370:15
**bad** 348:16
**bailet** 259:13,24
**bailet's** 260:5
**bailit** 193:17
258:16
**barger's** 364:17
**barnes** 193:18,22
260:19 261:9
265:15,24 266:11
**barriers** 233:18
312:12
**based** 199:23
248:12 261:22,25
278:21 279:7
282:15 331:15
332:13 333:6
342:25 350:24
365:16

**basis** 239:9 329:16
**bates** 193:13,15,17
193:20,22 194:4,6
194:9,13,15
227:14 246:10,16
248:22 249:4
258:17,24 260:22
265:11,16 269:11
269:17 281:3,9
291:11,18 300:9
300:18 302:15,21
338:18
**bear** 307:4 338:18
**bears** 246:16
248:21 258:24
261:4 265:11
**bechtel** 284:10
287:19,19
**began** 201:23
**beginning** 193:12
193:15,20,22
194:6,9,13,15
246:10 249:4
260:22 265:16
281:9,21 291:18
300:17 302:20
**begins** 247:15
**begun** 260:7
**behalf** 190:2,7,11
190:20 191:2,7,12
198:14,16,18,21
198:23 202:7
333:15
**behavioral** 214:20
304:24 305:11
351:1
**behaviors** 339:8
**believe** 204:5
207:2 231:24
232:8 239:25
244:11 249:22

254:10 256:22
258:7 311:16
313:20 342:11
**beneficiaries**
218:9 297:7,11,15
308:20 310:21
**beneficiary**
295:15 307:2
**benefit** 205:11,15
206:1,5,10,19
208:6 219:4,6
220:5 233:20,23
249:18 289:22
295:13 319:1
**benefits** 228:7
229:18 319:2
**benjamin** 193:7
227:3
**best** 208:8 215:10
228:1 232:25
247:11,17 248:12
251:4 309:19
312:5 340:9
350:24 363:3
**better** 233:21
250:9,25 259:5
276:7 289:9 292:1
297:3 338:9,14,15
347:8 351:7,11,18
**beyond** 202:20
221:15 222:10
290:10 294:20
310:11
**big** 344:5
**birth** 214:15
339:10
**births** 344:24
345:8 346:1,10
348:15
**bit** 208:23 210:21
213:23 222:18

238:20 241:22
319:5 360:5
**blue** 340:21 341:5
341:6,10
**board** 214:13
215:3 241:14,19
242:14,24 243:7
243:12,16 244:3
244:12,14,22,25
245:14 252:19
270:13 284:13
288:11 301:7
329:20 362:11
**body** 243:23
280:10
**bold** 283:12
**books** 215:24
**born** 339:4,5
342:7,18 343:4,6
**bottom** 236:24
283:22 284:16
301:1 329:25
330:23,25 334:3
335:20
**box** 303:14 359:7
**bracket** 349:17
**brand** 223:5
253:23 254:3,8
255:3,4,5,15
**brands** 222:24
254:16
**break** 257:10,12
267:16 306:4,5
**briefly** 199:11
321:23 322:8
**bring** 320:17
321:6
**brings** 274:4
**broad** 190:13
209:1 214:14
262:1 281:24

363:22 365:7
**broader** 208:5
211:5 219:13
285:1
**broadly** 270:23
**brown** 349:7,11
349:14
**bubble** 287:23
**building** 190:17
**bullet** 230:3,4
263:20 303:14
**burling** 191:2
198:13,16 201:22
**business** 212:4
232:23
**butted** 222:9

**c**

**c** 193:18,22 260:18
261:9 265:15
**c2** 331:10
**ca** 370:25
**cabinet** 238:20
242:15
**calculated** 231:2
345:7
**calculation** 231:13
**calculations**
346:13
**call** 339:14
**called** 201:13
242:16 292:4
295:1 331:17
337:25 361:10
**calling** 247:14
**calls** 295:21 307:7
316:25
**capability** 217:23
286:17
**capacities** 238:16
**capacity** 202:8
221:11,12,13

283:6 294:25
295:24 318:2
358:20,20
**capitol** 189:22
**capsules** 276:11
**caption** 368:21
**car** 343:23
**cardinal** 190:20
198:18
**care** 193:6 194:12
205:12,13,16
206:1,5,11 207:5
208:1,11,16
209:14,23 210:4
211:13,14 212:8
212:13,17,23
213:8,13,19 214:2
214:11,14,24
215:11 216:10,17
216:24 217:10,21
218:5,8,9 219:5,12
219:17,20,22
220:15 221:8,24
222:23 223:2,21
224:6,13,18,20
225:6,10,15,23
226:15,19 230:23
232:9,11 233:12
234:2,22 236:18
238:1,21,24 239:4
239:13,17 240:1
240:17 250:9,24
251:15 252:24
253:8,11 259:4,14
260:12 267:9
268:23,24 271:24
272:2 274:19
276:8 279:22
281:25 283:24
285:7,16 287:21
292:1,16 293:1,21

296:12,21,23,23
297:4,6 298:1,21
299:2,7 300:15
303:24 304:5,10
307:20 308:10
314:22,25 318:14
318:18 338:6,9
350:10,11,14
351:3,5,11
**caring** 338:12
**carve** 206:17
**carved** 205:11,12
205:16 206:1,5,10
**case** 189:7,11,13
189:15 198:6,7
220:9 255:22
261:25 262:1
275:6 282:6 289:2
295:17 345:15
370:6 371:3 372:3
**cases** 200:13
**categories** 231:8
349:20
**category** 224:14
224:19,20,22
**caught** 287:22
344:15
**cause** 310:16
311:11 360:15
368:12
**caused** 223:19
**causes** 311:15,19
360:14
**cdc** 277:11 279:10
279:14,18,21,25
280:1 290:3,5
**cdc's** 279:17
**center** 190:3 261:9
262:5 265:24
266:11 268:17
297:25 299:13

centers 282:25
certain 213:19
222:4,10 223:14
226:6 272:3,12
296:5 363:6
certainly 225:11
238:23 245:20
264:22 309:20
316:15 320:19
321:5 327:7
certificate 192:14
368:1 372:11
certificates 360:11
certification 371:1
372:1
certified 201:15
214:13
certify 368:8,19
369:1
cetera 246:2 293:8
304:25
chance 342:20
365:18
change 223:5
228:6,11 229:8
230:4 231:2
249:13,14,21
250:2,6 253:14
268:20 276:21,23
277:4,6 295:9
306:18 307:1
370:13,14 372:8
373:3
changed 204:15
313:15,15 347:2
348:10
changes 205:1,4
220:21 232:22
233:8 370:12
371:7 372:7,9

charge 282:23
chart 235:15
341:21,22 342:10
342:15,25 345:2
345:18,22
check 205:17
206:7,22 207:12
223:22 229:11
230:17 232:6
253:16 254:4
256:23 259:23
272:16,20 274:16
275:13 285:21
286:13 293:12
checking 242:25
247:24 271:25
272:13 275:4,17
checkpoints
237:15
child 311:17
children 279:18
286:5 343:4
chiropractors
289:25
choice 296:9
choices 312:9
choose 297:9
chooses 234:3
chosen 364:6
chris 199:1 321:22
christopher 190:8
chronic 252:2
277:12 280:7,11
280:13 282:19
289:18 290:7
church 190:4
circle 304:8
circumstance
280:19
circumstances
248:11 288:9

297:20
cited 277:11
city 189:12 190:2
citycenter 191:4
civil 201:14 367:3
367:7 371:5 372:5
claim 309:4 317:7
claims 228:17
229:3 241:9
248:12 249:24
250:8 269:4
clarification 204:5
clarify 219:9
238:7 277:18,24
278:20 311:2
349:14 365:21
class 228:4 230:16
classes 228:3
251:5
clean 359:16
clear 200:2 201:2
217:2 218:20,25
221:5 245:19
264:23 287:9
293:20 345:19
365:15
clearly 305:10
cleveland 189:12
369:7 370:2
client 362:1
clinical 193:14
214:4 215:9,10,16
240:12 247:17
249:3,11,15,22
250:7,10 251:25
295:10 297:22
318:19,22 320:18
331:10 356:13
358:3 361:11,12
clinician 264:22
265:1 283:25

284:12 306:19
307:1
clinician's 288:10
clinicians 223:4
248:1 251:1 265:5
272:1 276:3
279:22,23 282:1
285:7 287:6,11
290:17,24 295:10
299:8 304:8
318:21 320:7
351:10 357:23
361:7
clinics 361:19
close 298:24
361:10
closed 362:3 365:3
365:4
closest 223:24
clr 189:25
cmcnamara
190:23
coalitions 312:18
code 308:13
coded 314:13
320:7 341:3 347:6
collaborating
259:14
collaborative
194:19 337:13,25
colleagues 245:13
270:13
collective 252:14
289:7 359:4
colleen 190:21
198:17
color 341:3 347:6
347:11 348:12
349:14
colors 347:3
348:10 349:2,21

349:24
**columbus**  189:23
190:14,18 198:4
**column**  236:6
**combinations**
216:1
**come**  199:24
222:14,16 223:11
233:3 260:1
286:21 323:19
324:2,5 327:4
328:3
**comes**  296:21
361:2
**coming**  336:18
**comment**  229:23
232:1 240:7 250:4
261:11 263:11
355:17 356:1
**commenting**  332:4
**comments**  252:18
307:25
**commercial**  342:4
342:4
**commission**
369:17 371:19
372:25 373:25
**commissioned**
368:8
**committee**  193:19
215:2 247:20
260:21 261:8
262:15,25 263:13
267:2 281:22
319:21 320:11,22
321:5 324:22
325:22 326:2,21
327:13 328:12
333:8 354:8,14
356:4,19,24 357:6
357:14,18 358:3

**committees**  319:6
319:9
**common**  223:1
**communication**
223:9
**communities**
312:17
**community**  316:6
**companies**  357:24
**compare**  235:21
235:22
**compared**  209:25
210:6 211:14
224:8 254:2
345:13
**compares**  231:4
**compiling**  253:16
**complaints**  250:25
**complement**
357:21
**complete**  202:12
202:16 246:3
**completed**  368:22
370:15
**completely**  199:21
**complex**  301:16
352:10
**component**  338:11
**components**
336:25
**computer**  247:1
**conceded**  363:8
**concern**  241:24
242:4 284:17,22
285:12 288:15
290:6 295:12
306:19 307:2
**concerning**  309:7
**concerns**  220:8
280:5 287:25

**concerted**  318:7
**concluded**  260:5
366:3
**conclusion**  295:21
307:7 332:14
**conclusions**
248:15
**condition**  202:15
214:16 295:10
306:18 307:1
311:7
**conditions**  218:8
280:16 285:9
305:11
**conduct**  243:16
311:10 357:4,6,10
**conducting**  288:24
**confidentiality**
200:7,10 201:6
**confirm**  235:22
236:5 258:4
**confirmed**  200:8
200:11
**conflict**  353:9,11
**conflicts**  353:16
**conjunction**
251:24 288:19
308:11 316:5
**connect**  350:21
**connected**  207:19
209:16 282:16
297:6 307:24
**connecticut**  190:5
**connectivity**  278:6
**connolly**  190:21
198:18
**consensus**  221:19
221:22 224:24
228:3 229:9 230:6
230:23 231:1,15

231:17,18,19,21
233:5 236:19
325:4
**consequences**
287:8
**consider**  221:20
253:25 288:13
303:4
**considerable**
211:11
**consideration**
262:7 320:24
331:1 356:5 357:3
364:23
**considerations**
216:6
**considered**  215:10
215:23 218:13
219:2,7 266:25
**considering**
213:20 263:1,7
319:2 320:12
**considers**  263:4
**consistency**  345:9
**consistent**  275:18
344:13
**console**  339:20
**constant**  330:11
**constellation**
339:13
**constrained**
241:17 273:25
**cont'd**  191:1 194:1
196:1 197:1
**contact**  337:22
353:4,13
**contains**  335:22
**contemplated**
218:14 219:3,8
**content**  227:21
269:21,23 270:11

**[content - criteria]**

282:14 300:23
314:20
**context** 210:23
215:23 219:13
220:5 222:15,19
248:10,14 261:13
303:25 331:15
**contin** 255:15,15
255:17
**continuation**
202:3
**continue** 217:22
**continued** 189:17
201:17
**continues** 330:23
348:16
**continuing** 260:13
**contract** 217:16
218:4 226:5
**contributed**
359:11
**control** 233:11,21
274:7 316:9
**controlled** 216:5
222:6 248:2
270:24,25 271:9
271:16 272:7
273:18,21,23
274:3 275:12
296:17 335:4,23
**conversation**
285:1 286:6 287:4
**conversations**
200:19
**cooperatively**
364:20
**coordinate** 250:17
296:23 338:6
**coordinated**
252:24 271:24
296:2,4,14 297:8

297:16
**coordinating**
276:8
**coordination**
260:11 298:14
**copies** 240:18
**copy** 227:14 235:5
327:12
**copying** 227:15
**corcoran** 204:22
204:25
**core** 326:22
350:25
**corner** 346:4
**coroner** 360:21
**coroners** 311:16
360:12,15
**corporate** 190:3
363:24
**corporation** 191:2
198:14 201:25
**correct** 203:14
204:23,24 205:13
205:14 206:3,12
209:3,15,16
216:11,12 224:1,2
225:17 226:16
228:10,12,14,15
228:18,19 229:7
232:13,14,16,17
233:14 234:3
236:3,18 240:6,9
240:19 241:4,6,7
241:11,12,16
244:2 256:3 259:8
259:9,11,15 262:8
262:9,11,12
263:14 268:5,6
271:12 272:24
283:10 294:9,13
296:1,8 304:22

306:20 315:11
322:23 324:3,4
325:11,16 327:14
328:13,21,23
329:5,20 330:12
333:15 334:15,16
336:10,14,17,23
337:1,5,21 340:5
341:8,13 342:16
343:3,8 345:22
346:22,25 347:3
348:6,7,18,25
349:4,8,22,25
353:21 356:6,7,10
360:9,18,23,24
361:17,23 368:16
**corrections** 370:12
372:17
**correctly** 338:24
**correlate** 209:9
**correlation** 325:1
**counsel** 198:10
199:5 200:14
217:2,13 261:23
306:3 324:12
326:1 329:7
338:17 352:23
354:6 362:20
363:15 365:12
367:1,10 369:2
**counties** 349:3,6
349:10 351:15
**country** 210:10
309:17
**county** 189:10,14
190:2,7 199:3
321:24 346:5,8,20
347:2,21,25 348:6
348:9,15 368:4
371:10 372:15

**couple** 204:4
245:12 251:8
344:4 352:2
355:14 362:21
**course** 223:1
245:7 316:14
**court** 189:1
192:16 198:8
371:7
**courtesy** 200:14
**cov.com** 191:6,6
**cover** 208:1,3
211:1 214:23
219:11 225:2
256:9 319:14
**coverage** 205:2,7
213:20 218:13
219:2,22 225:23
228:23 229:1,2
239:5 250:17
263:13 266:24
314:23
**covered** 208:18,25
256:17 258:5,9
318:1,18 342:4
343:5,6
**covering** 261:15
**covers** 256:8
314:10
**covington** 191:2
198:13,15 201:22
**create** 223:7
233:20 287:8
351:4
**created** 254:15
**criminal** 335:7
336:1
**crisis** 194:12
300:16 358:24
**criteria** 210:18,21
210:22 296:10

cross  229:14
cschnieders
  190:10
culture  350:19
cure  329:16
curing  280:21
current  207:25
  234:20 244:9
currently  352:3
curve  301:21
custody  192:16
cut  227:15
cuyahoga  189:10
  190:7 199:2
  321:24 346:5,8,20
  347:2,21,25 348:5
  348:9 368:4

d

d  191:13
d.c.  190:22 191:5
dan  189:8
dangerous  265:4
  271:5
dark  303:14 341:6
  341:9 349:11
darkest  349:14,15
dashboard  252:5
  252:7
dashboards  302:1
data  241:9 242:10
  243:20 268:4,7,8
  268:12 269:4
  274:9,10 275:23
  277:7 289:1
  297:21 311:14
  316:5 318:4,22
  345:21 360:17
database  241:23
  242:5,7 243:15,25
  253:13 271:25
  274:2

date  198:2 200:3
  206:15 222:4
  223:14 270:5
  282:15 286:14
  293:19 300:4
  345:14,21 346:23
  363:17 367:11
  370:8 371:3,9,19
  372:3,13,25
  373:20,25
dated  193:8,17,19
  193:22 218:17
  227:4 247:15
  258:16 259:7
  260:21 262:23
  265:15,25 270:4
  281:18 330:19
dates  245:14 283:6
  285:21
day  191:8 198:21
  272:18,19 285:25
  369:7 371:16
  372:22 373:22
days  241:4 270:17
  270:17 286:4,4
  370:18
deal  201:10
  236:16 318:11
  338:2 352:2,7
  363:4
dear  370:10
death  214:15
  242:20 271:6
  311:11,15,19
  340:24 341:11
  360:6,11,14,16
  362:6
deaths  252:13
  287:14 288:18,23
  310:7 311:10

debra  191:13
  198:22 314:6
debra.ogorman
  191:15
december  193:8
  227:5 292:17
  301:3,10
dechert  191:12
  198:23
dechert.com
  191:15
decide  210:18
  212:9,14,23
  213:14 282:12
decided  323:9
  364:18
decision  229:1,2,6
  324:21
decisions  228:21
  228:23
decrease  292:15
decreasingly
  347:10
dedicated  280:20
deed  371:14
  372:20
deemed  370:19
defendants  191:12
  198:23 202:1
  313:21 314:7
defense  199:17
defer  224:3 231:11
  354:5,6 363:10
definitely  257:6
definition  314:12
  314:18
degree  356:2
delegation  290:16
delineate  282:3
delineated  237:15

delineating  292:6
deliverables
  300:25 302:7
deliveries  304:2
  345:12
delivers  230:5
delivery  367:9,11
denied  290:19
denominator
  270:15
dental  304:10
dentist  303:18
dentistry  303:11
dentists  303:13,15
  304:6
department
  190:11,16 193:5
  193:14 199:5,9
  200:9 202:7,24
  203:11,12 204:21
  216:15,22 237:2,6
  237:18 238:19
  240:17 244:20
  249:2 256:8 257:8
  266:9 288:19
  289:2,21 292:2
  297:5 301:11
  309:11,13 311:13
  312:25 326:19
  360:8,16,22
  362:12 363:3
  364:18,20 370:22
departments
  272:17
dependency
  280:15
dependent  259:15
  339:1
depending  261:19
deposed  201:16
  364:19

deposition 189:17
198:5 199:20,23
200:4,18,23
201:23 202:4,20
203:17,19,22
204:3,10,14,17
205:9 216:14
227:2 234:12
235:4,7 246:6
249:1 256:15
258:14 260:17
265:13 268:1
269:8 277:10
281:6 290:11
291:14 300:12
302:18 317:19
319:13 324:12
325:19 328:7
330:21 334:6
337:9 362:23,24
363:12,17,22
364:9,22 365:13
365:20 366:3
368:20 370:8,11
371:1,3 372:1,3
deprive 290:7
describe 227:25
228:20,22 318:3
described 230:11
293:9 302:2
312:16 318:16
describing 237:18
303:3
description 193:3
269:25 303:11
designated 294:7
designation
261:22
designations 200:8
200:11

designed 262:17
desire 200:17
desk 229:15
detail 207:16
209:12 211:9
223:23,24 226:1
231:6 237:10
254:5 286:9
298:23 355:3
356:2
detailed 223:3
231:10
details 237:21
254:14 351:9
determination
319:1 360:14
determinations
210:5 214:23
215:8 255:6
determine 209:23
360:15
determines 209:7
determining 314:9
deterrence 261:10
262:6 265:25
266:12
deterrent 262:21
263:1,7,13,18
266:20,25 267:11
detrimental 280:6
develop 243:8,9
245:5,9 280:14,17
343:21
developed 245:7
246:4 271:1
285:23
developing 281:23
304:15,16
development
302:4 318:9

diabetes 233:19,21
251:10
diagnoses 304:24
diagnosis 211:3,5
309:4 310:25
345:6
diarrhea 339:19
dictate 213:2
differ 209:15
225:7
difference 345:16
348:21 349:1
differences 222:8
319:25
different 208:21
209:14 211:13
218:19 228:3
231:23 247:18
251:8,16 265:4,7
274:12 295:6
296:24 303:24
304:3 335:16
350:19,19,20
357:23 362:2,12
differentiate
308:19
differently 273:16
difficult 202:16
339:20,23 350:22
difficulty 350:10
350:23
dig 322:10 325:20
dilaudid 336:7,9
direct 217:18
250:15 253:20
directing 252:3
263:19
directly 207:19
253:14 275:2
director 204:21,25
205:5 214:3,9

238:13 251:23
282:23 283:1
directors 213:18
213:25 214:18,22
216:9 220:7 237:9
291:6
discharge 345:25
discharged 345:6
discovery 365:3
discretion 209:22
210:4,13
discriminate
311:6
discuss 214:6,6
244:15 254:12,14
254:22 363:11
discussed 204:13
235:7 236:20
256:16 278:4
285:11 299:24
317:18 320:21
342:7
discussing 222:14
231:22 279:5
306:15 326:2
discussion 203:2,4
257:18 267:8
283:18 285:14,19
355:18 357:22
disorder 226:8
251:10 259:6
260:12 289:15
299:15 304:17
305:3,15 308:18
308:18 310:11
311:5 338:3,5
343:20 350:9,14
disorders 335:6
dispense 294:6
dispensed 245:21

dispenses 361:22
disproportionate
  344:6
disproportionately
  342:19
distinction 273:10
  273:15
distinguish 298:17
distributors
  311:25 323:2
  360:23
district 189:1,2
  198:8
diversion 295:2
  298:12 306:16
  307:5 333:7 335:6
  336:1
diverted 307:3
diverting 295:18
  298:19
division 189:3
doc 284:19
docs 282:1 287:21
  304:5
doctor 245:24
  276:1 290:20
  295:7 306:17,25
  321:22 338:23
  352:12 358:18
  359:14 362:18
doctors 318:17
document 189:8
  194:3,5,8,11,15
  203:7 212:3
  216:22 217:3,7,9
  218:6,20,22
  227:10,11,12,19
  227:25 229:14
  230:11 231:16
  234:24 235:1,8
  246:15,20,25

247:11 248:7,19
249:9 258:22,23
258:25 259:11
261:2,18 264:10
269:9,16,20,22,24
270:4,11 281:1,1,7
281:14,20 282:9
287:16 290:24
291:10,15,22
292:6 300:7,8,13
300:21 302:20,24
303:2 364:3
documentation
  237:21 286:2
documents 199:15
  200:12,21,22
  203:1,8,21 212:6
  237:18 299:21
  308:16 354:21
  362:25 363:2,18
doing 239:19
  260:8
donald 319:19
door 278:7
dosages 223:3
  306:18,25
dose 274:24 339:9
doses 194:9 243:3
  245:21 291:2,17
  292:16 295:9
double 206:7
dove 191:3 192:8
  198:12,12 199:11
  200:1 201:18,21
  210:11 212:5
  217:4 218:21
  221:13 257:6,11
  257:16 267:15
  306:5 319:22
  323:4,22 332:16
  336:16,22 337:3

338:17 344:18
362:20 364:15
365:24
dr 193:17 198:5
  200:3 201:19
  202:2 204:15
  217:8 225:4 227:9
  227:20 229:15
  234:18 241:6
  246:14 247:9
  248:18 255:11
  256:16 258:16,21
  259:13,24 260:5
  261:1,6 265:8
  267:24 268:3
  269:19 281:13
  283:23 284:4,10
  287:19,19 292:23
  306:13 314:4
  317:18 318:1
  319:12,23 331:8
  333:6 360:2 363:1
  363:1,7
draft 301:4,4,12
dramatic 289:12
  293:15
dramatically
  289:11
drill 241:21
drilling 208:23
drop 276:1 289:11
  289:12 293:15,18
  297:2 318:8
drove 242:21
drug 193:10,11
  205:11 206:5,10
  206:19 207:4,5,11
  208:2,14,15,17,22
  209:1,8,13,24
  210:1,6,7 211:1,4
  211:7 212:10,11

212:20,25 213:11
213:20 215:3
218:13 219:1,22
220:16 221:9,25
223:21 224:7,14
225:23 230:20
234:14,20 235:6
235:13,18 236:2,7
236:22 240:2,19
240:24 244:15
246:7,18 247:13
247:25 249:20
250:17,19,22
251:19 253:5,6,7
254:1,2,3,3,6,8,15
255:14,16,18
256:9,16 257:23
258:5 270:2
274:10 287:13
296:6 309:3,7,11
311:21,24 312:14
320:12,13,24
321:10 324:16,20
325:5,6,14 329:19
331:9 332:5
333:20 335:5
336:14 340:24
341:10 357:5,24
drugs 208:1
  209:24 211:6
  212:18,24 213:9
  213:14 214:23
  216:1 224:6,14,19
  224:21 228:3
  230:16,25 231:6,7
  231:8 233:3,5
  235:10,14 236:1
  242:19 243:1
  253:22 256:10,17
  258:5,9 267:7
  274:7 288:17

[drugs - evidence]

331:1 335:4 353:5
356:5,10
**dua** 243:19
**due** 340:2
**duly** 201:15 368:7
368:10
**duplicative** 193:12
246:8,18 247:14
247:21
**dur** 215:3 247:20
**duration** 276:15
285:25 287:3
**duties** 243:15
**dying** 264:20

**e**

**e** 193:7 200:21
227:3 362:25
**earlier** 202:23
220:17,20 221:5
221:18 224:25
231:22 232:8
245:4 264:11
275:19 276:5
277:8 289:21
291:5 293:6
306:15 307:18
324:11 338:8
344:9 359:2,8
360:20 361:8
**early** 205:21 241:4
289:13 362:22
364:17
**easier** 233:21
**easily** 243:18
244:1
**east** 189:23 190:13
**eastern** 189:3
201:4
**easy** 243:22
280:17

**eat** 339:19,22
**economically**
217:24
**ed** 301:8
**edits** 213:3 220:12
237:11 239:22
252:23 286:25
291:7 307:25
308:3,8
**education** 281:22
293:2,3 301:12
**educational**
247:23
**effect** 219:21
225:22 238:5
242:18
**effective** 289:14
**effectively** 217:24
**effects** 322:22
331:11
**efficiently** 217:24
**effort** 233:17
250:24 251:13
289:13 291:25
318:7 352:10
**efforts** 194:9
238:25 250:17
252:22 278:12
291:3,18 292:7
293:6 303:3 338:1
**eight** 345:16,16
**either** 220:2
254:23 278:8
295:23 347:8
350:10 358:19
360:21 361:6,11
364:14 369:2
**elaborate** 210:21
**eligibility** 350:20
**eligible** 296:11
297:8,11 343:12

343:14,17 344:3
**eliminate** 287:13
**email** 370:17
**emergency** 272:17
281:25 297:4
**employed** 319:24
**enclosed** 370:11
**encompassed**
282:17
**encourage** 296:11
**ends** 293:16
**enroll** 296:12
**enrolled** 297:12
**ensued** 357:22
**ensure** 222:3
285:15 291:6
295:16 298:15
308:5
**ensuring** 289:16
305:19 338:14
**enter** 218:5
**entered** 372:9
**entire** 222:6
238:15 243:19
251:23 254:10
261:12 280:10
285:13 289:18
371:5 372:5
**entirely** 296:8
**entirety** 248:1
250:4 253:17
285:2 296:19
305:9 313:10
**entitled** 194:3,5,8
194:11 216:22
246:17 269:10
281:8 291:16
300:14 344:23
363:5
**entity** 238:9 303:9
330:10 351:15

**epidemic** 220:10
278:5 322:22
351:17,22
**episode** 304:10
**episodes** 194:12
300:15 303:24
304:4
**equated** 280:13
**equivalent** 243:3
254:8 274:24
**equivalents** 246:1
272:15 286:1
287:2 293:8 297:2
**er** 255:16 266:18
**errata** 370:13,18
372:7,10,18 373:1
**escalating** 306:18
306:25
**escalations** 295:9
**especially** 285:8
**esq** 190:3,8,12,16
190:21 191:3,3,8
191:13 370:5
**essentially** 207:15
234:8 243:9
**est** 199:14
**establishment**
315:25
**et** 189:10,12,14,14
246:1 293:8
304:24
**evaluate** 263:16
**evaluating** 262:15
**evaluation** 247:16
**event** 240:15
369:3
**everybody** 264:19
312:7 324:24
**evidence** 312:5
350:24

evolution  275:10
evolved  316:11
exact  206:15 213:2
  245:14 293:19
  300:3
exactly  206:7
  209:4 219:10
  239:17
examination  192:7
  201:13,17 267:22
  306:11 314:2
  321:20 352:19
  358:16 359:25
example  210:19
  215:11,16 220:4
  220:24 222:3,6,11
  226:6 233:18,22
  237:13 239:12
  252:25 255:1,13
  272:17 273:22,24
  274:13 297:4,24
  298:18 308:1
  316:7
examples  239:12
exceed  209:19
  285:25
exceeding  290:25
excerpt  217:2
excluding  254:25
excuse  227:17
  230:3 266:6
executed  372:10
execution  371:14
  372:19
executive  250:14
exhibit  192:16
  193:5,7,10,11,14
  193:16,18,21
  194:3,5,8,11,15,17
  194:18 216:15,21
  225:21 227:3,10

227:14 230:22
234:13,19 235:5,9
235:13,25 236:5
236:23 246:7
247:10 248:21
249:2 253:3,19
255:14 258:15,22
260:18 261:2
265:10,14 269:9
269:16 281:1,7
291:10,15 300:7
300:13 302:13,19
322:9 323:1
325:20,22 327:11
327:12,12 328:11
328:11,13 329:18
329:18 330:17,18
332:21,21 333:25
334:3,7,14 337:1,6
337:9,17
exhibits  192:4
  193:1 194:1 322:8
  325:18
exist  270:1,20
  339:12
existed  245:6
  323:18
existing  320:20
  352:8
expect  229:22
  240:8 258:11
  273:23 318:17,21
  318:25 356:18
  357:15 358:6,8
expectation
  240:16
expected  262:3
expects  205:5
expenses  249:24
experience  357:25

experiences  358:4
expertise  214:13
  214:19 320:9
  356:25
experts  290:5
  318:23
expiration  371:19
  372:25 373:25
expires  369:17
explain  222:18
  242:10 252:6
  255:22 256:5
  341:22 350:5
  351:3
explore  242:5
exposed  339:10
  340:1
exposure  338:13
  339:11 340:3
expressed  306:19
  307:2
expresses  290:6
extensive  343:18
extent  221:15
  319:25
extraction  304:11

f

facing  212:3
fact  199:13,21
  222:7,8 271:24
  295:16 317:3,5,6
  317:14 340:2
  355:4
factor  301:18
factors  254:1
  304:15,16,23
  305:1,2,6,14,18
  306:23 322:17
  323:10
failed  211:3,6

failure  304:2
fair  244:4,5
  254:13 325:15
  332:5,11 333:21
  334:19 336:20
  339:1,6 340:13,18
  341:12 342:17
  343:2,7 344:17
  345:18 349:18
  351:17
fall  293:4
falling  210:25
familiar  216:10
  279:10 300:23
  312:19 314:17
  336:4 337:17
families  326:24
family  266:10
far  270:8 354:17
  365:3
fast  216:2 347:7
fatal  278:8,8
  299:17,18
fatality  311:17
favor  333:6,8
fda  209:5 211:9
  320:19 324:19
fear  288:9
feasible  244:8
february  206:3,9
  218:18,23
federal  201:14
  209:2 260:2,14
  314:14,16 350:18
federally  282:24
fee  206:18,19
  207:4 208:2,4,15
  208:25 209:14,25
  210:6 211:15
  212:10,15,20,25
  213:10,15 215:1

220:19 225:1
226:14 230:24
234:9 235:6,13
236:7,17 314:25
**feedback** 194:6
281:9,18 282:10
318:4
**fentanyl** 266:19
287:23
**fewer** 331:11
**ffs** 230:7
**field** 233:9 292:4
316:10,12
**fields** 336:25
**fifth** 276:9
**figure** 231:17,18
231:19 323:9
351:4 363:3
**file** 199:19 200:16
**fill** 267:7 276:4
317:8,9,11
**filled** 276:10
296:17 308:5
360:12
**final** 253:5 286:13
286:23
**finally** 276:17
**financial** 344:1
**financially** 284:18
**find** 211:18 220:25
251:16 277:15
325:21 330:6
370:11
**fine** 294:4 322:12
**finger** 252:10
**firm** 198:13
201:22
**first** 201:15,23
205:16 207:17
211:2 217:6,19
245:20 259:18

262:14 263:20
271:8 273:10,11
273:17 282:20
284:14 287:15
299:24 301:8
302:3 303:14
325:18,19 328:6
330:21 359:9
361:9 362:22
363:14 368:10
**fits** 301:20
**five** 234:21 286:4
346:11,24 347:19
**fix** 351:20,22
352:1
**flexibilities** 233:2
**flexibility** 213:5
225:2 226:4 233:7
233:15 239:18
**flexible** 232:21
**floor** 190:4,13
**focus** 250:7 265:2
279:22 305:10
312:2 318:12
**focused** 265:5
271:2 278:17
309:23 312:4
315:25 338:4
**fold** 275:16 345:16
345:16
**folks** 206:23
310:15 354:5
**follow** 213:19
222:2 257:7
279:13,16,24
293:22 298:3
322:2 358:18
**followed** 248:13
312:7
**following** 217:12
361:14

**follows** 201:16
**force** 309:9,14,22
312:14 316:7
**forces** 309:6,16
310:2 311:9,10,20
312:19,22 313:3
359:3
**foregoing** 368:16
368:21 371:13
372:18
**form** 234:6 240:20
241:25 254:19
255:10,25 263:3,9
263:15 264:5,15
266:1,21 267:3
277:21 278:2,23
279:8 280:8
284:23 285:20
286:19 288:1
290:9 291:4
293:11 294:3,8,12
294:18,19 295:20
298:20 299:4
304:18 305:7,16
306:21 307:6
308:23 310:4,5,23
311:12,22 312:1
313:5 314:11
315:12,22 316:24
317:1 320:14,25
321:8 323:4
332:16 336:16,22
337:3 344:18
353:22 355:8,15
355:25 356:22
357:8,19 358:7
360:25 361:18
362:8
**formal** 309:16
355:19

**formation** 242:21
**formats** 282:5
**forms** 263:18
265:7 267:11
**formularies** 240:2
240:19,23
**formulary** 193:10
208:20,21,25
209:5 224:8 234:9
234:15 262:16
263:17 320:13
324:19 336:20
357:5
**formulation** 265:4
**forth** 220:1 263:5
**forthcoming** 272:3
**forums** 311:17
**forward** 201:10
351:14 370:15
**found** 227:16
296:25
**foundation** 264:6
266:2 267:4 273:3
284:24 290:10
295:21 299:5
307:7 337:4
**four** 244:6 276:3,4
295:5,6 305:1
349:19
**fourth** 217:19
218:11 275:6
**frame** 245:16
316:16
**fraud** 361:5
**free** 208:5 371:14
372:20
**frequently** 256:24
**front** 234:25
289:17 292:20
322:9 325:24
328:6 330:20,23

333:24 334:3
364:4
**full**  240:12 245:2
**function**  296:22
298:21
**fund**  323:10
**funded**  323:1
350:17
**funders**  300:1
**funding**  260:1,3
260:15 336:25
**further**  252:4
306:11 321:14
335:10,19 340:15
352:19 358:15
359:14 368:19
369:1
**future**  270:8 278:7
279:20 352:5,6

**g**

**gather**  291:6
**gathered**  337:24
350:25
**gathers**  289:5
**gcoat**  242:16
244:17 281:21
303:21 309:9,14
309:23
**general**  190:12
199:8 202:24
205:19 215:6
245:15 252:7
265:5 299:16
**general's**  199:8
**generally**  210:9
226:3 271:10
325:4 354:20
**generic**  253:23
254:1,6 255:2,3
256:9,10 335:2

**generics**  254:16
**geographic**  347:15
**geriatricians**
304:6
**getting**  287:22
347:8,8,12 350:10
**give**  202:12,16
220:4,23 257:14
289:8 321:2 367:1
367:10
**given**  236:13
340:3 354:21
356:21 368:13,17
**gives**  226:4 348:22
**giving**  272:18
337:20
**glue**  351:6
**go**  201:10 221:16
233:6 234:7 238:4
243:18 247:3
270:19 271:13
277:22 278:3
280:9 297:25
298:4 301:18
302:9 305:19
308:15 317:25
330:17 331:7,19
333:1 334:21
340:7 344:21
345:24 347:18
348:19 350:1
353:25
**goal**  292:21 293:9
296:13
**goes**  221:15
254:17 320:21
362:1
**going**  211:1
218:11 234:25
236:12 243:4
253:19 257:6,11

260:4 262:4
269:15 276:2
280:25 283:11
284:14 290:3
295:5 299:1 300:6
312:24 319:13
327:11 332:20
333:24 335:19
337:6 340:15,20
347:23 348:4
351:23 359:1
363:2,25
**good**  201:19,20
220:24 267:16
301:25 314:4
342:23 352:21
358:9
**goods**  219:11
**gould**  228:13
229:19 250:3
**govern**  242:7
**government**
251:25 268:17
284:8 299:13
**governor's**  238:20
242:15
**gp**  230:14,15
**gpi**  230:7
**grant**  259:14,17
259:19,25 260:13
**graph**  230:14
345:14 346:8
**graphic**  304:13
**graphs**  347:6
**grc**  301:4,12 302:6
**great**  236:16
257:21 350:10
**greater**  316:3
**green**  340:21
341:3

**group**  242:22
244:17 277:6
281:24 282:5,8
284:3 285:13
318:4 320:9
326:22 340:13
**groups**  309:6,14
309:18
**growing**  350:12
**grown**  285:24
**grows**  284:19
**guess**  200:8
**guidance**  247:23
287:9
**guideline**  194:6
239:17 276:13,19
281:8,19 282:10
**guidelines**  220:13
237:12,12,16,23
239:7 242:19
275:18 277:12
278:25 279:5,11
279:14,16,17,21
279:25 280:2,3,6
281:23 282:3,11
285:10,11,22
286:8,10,22
288:12 290:3,7,21
290:23,25 291:8
293:5 294:1
305:17 307:20
308:7 312:8

**h**

**half**  257:12
**halfway**  283:11
**han**  191:3 192:9
198:15,15 267:23
267:24 291:9
300:6 306:1,12
313:19 360:6

**hand** 227:9 242:8
 246:14 334:4
 348:22,23 349:9
 349:19 369:6
**handing** 234:18
 235:3
**handle** 243:3
**happen** 298:24
 308:14 309:2
 318:5
**happened** 201:8
 250:11 320:2
 358:25 359:10
**happening** 253:2
 271:3 288:17,18
 288:21 295:5
 316:3 358:24
**happens** 273:19
 274:2 297:20
 298:13 307:14
 326:20
**hartford** 190:5
**hcl** 253:22 255:2
**head** 319:7
**headache** 304:1
**heading** 282:21
 284:15 287:16,19
 333:3
**health** 190:20
 194:13,15 198:19
 214:6,20,20 226:2
 231:2 233:1 250:6
 253:14 263:22
 264:4,13 277:6
 282:23,24 283:2
 289:2 297:3
 300:17 302:19
 303:3 304:24
 305:11 309:13
 311:13 313:1
 351:1,10 352:11

359:3 360:8,16,22
**healthcare** 193:10
 228:6,11 229:8
 230:5 234:13
 236:22 249:13,14
 249:21 250:7
 268:20 276:24
 277:4 303:6
 318:23
**healthcare's** 250:3
**heard** 198:8 251:1
 312:13 358:19,24
**heart** 304:2
**help** 223:5 298:14
 304:9 310:14,19
 338:25 339:3
 358:23
**helped** 243:8
 245:4 351:16
**helpful** 225:14
 243:14 358:13
**helping** 277:9
**helps** 289:8
**hereinafter** 201:15
**hereunto** 369:5
**heroin** 287:18
**high** 230:13
 231:12 251:9
 253:12 285:15
 303:5
**higher** 278:10
 279:19 301:8,11
 341:6,11 342:19
 343:1,5
**highest** 342:14
 345:20
**highlight** 278:14
**historically**
 350:16
**history** 272:11

**holding** 199:23
 365:19
**holistic** 219:12
**home** 298:4,7
**honor** 232:24
**hospital** 273:25
 343:13,16,18
 345:5
**hospitals** 239:20
 316:2
**host** 325:13
 340:16
**hour** 257:13
**house** 199:5
 360:10
**houses** 360:16
**huge** 231:5
**hundred** 326:22
**hundreds** 199:15
 283:21
**hunter** 333:6
**hydrocodone**
 235:16,23
**hydromorphone**
 253:22 255:2
 335:25 336:5
**hysterectomies**
 304:1

**i**

**idea** 205:19
 251:15 287:1
**ideal** 351:3
**identification**
 216:19 227:7
 234:16 246:12
 249:6 258:19
 260:24 265:18
 269:13 281:11
 291:20 300:19
 302:22 334:9
 337:15 338:8

**identified** 346:16
 364:17
**identifies** 247:21
**identifying** 230:6
**illegal** 335:12
**illicit** 278:7 287:22
 287:25 288:21
 308:21 309:1,2
 310:13,18,21
 335:12
**illicitly** 288:14
**illness** 202:15
**imagine** 233:5
 357:21
**immediately**
 200:11 263:23
 264:14
**impact** 194:12
 220:22 233:22
 242:19 251:9
 287:7 289:7
 300:16 359:5
**implement** 239:24
 286:17 307:22
**implementation**
 292:5
**implementing**
 303:9
**important** 271:15
 274:22 339:21
**impose** 212:18,23
 213:9,14 220:14
 223:20 224:5
 239:4
**imposed** 221:7,24
**improper** 293:25
 294:6,10
**impropriety**
 353:17 354:1
**improve** 259:4,4
 260:10,13,14

**improvement**
226:2 292:7
293:23 323:17
**inadvertent** 287:7
**incarcerated**
226:9 239:1
**inception** 208:9,10
**incidence** 341:18
341:24 342:3
343:4
**include** 210:17
217:16 224:7
279:18,23 301:15
304:24 320:23
354:21
**included** 228:13
231:16 236:1
243:6 255:3,5,17
281:25 285:16
356:2,5 370:13
**includes** 253:11
258:5
**including** 235:16
245:24 252:22
278:5 284:7
289:25 304:9
**inclusion** 262:15
263:17
**incorporated**
372:12
**increase** 275:16,20
275:22 347:20
**increased** 289:24
**increasingly**
347:10
**incredibly** 365:7
**incur** 340:5
**independent**
260:14 310:25
356:20 357:4,7

**independently**
225:13 242:6
**index** 192:1,4,5
193:1 194:1 195:1
196:1 197:1
**indicated** 332:18
**indicates** 341:23
**indicating** 370:13
**indication** 298:11
**indications** 209:6
320:19
**indicators** 296:5
**individual** 214:17
317:7 346:15
**individuals** 214:10
226:10 280:7,11
**industries** 342:5
**industry** 323:1,9
323:19 324:1
330:11 336:25
352:25 353:6,19
359:11
**infant** 339:7 342:2
344:3
**infants** 239:2
338:13 339:4,17
344:7 345:6
**infections** 304:2
**information**
202:17 203:24
211:18 241:10,20
244:24 247:23
249:21 250:2
252:20 253:8,15
254:23 257:5
272:4 277:5 289:5
301:14 307:10
308:25 311:18
320:10,18,20
323:20 324:3,6
345:4 356:20

357:3 358:11,12
**informed** 202:25
**ingredient** 256:11
**initial** 287:9 298:5
**initials** 283:16
**initiative** 250:19
250:23 251:19
**initiatives** 226:3
322:20 351:14
352:24 353:7
**innovation** 194:11
300:14 303:8
**input** 243:6 282:4
282:7 318:22
357:1
**inquiry** 274:25
**inside** 239:22
**insight** 316:3
**instability** 223:7
**instance** 223:16,18
224:1 316:23
332:2 347:11
**instances** 290:18
**institutions** 357:12
**instructing** 317:23
**instruction** 367:2
367:10
**insurance** 342:12
343:7
**integration** 260:11
**intended** 270:22
270:23
**intentional** 262:18
**interest** 251:10
353:10,12,16
**interested** 242:18
323:11,15 369:3
**interesting** 315:24
**interfere** 215:15
**internal** 214:25
237:21 292:2

**internally** 252:20
**interval** 258:12
**intervention**
247:20 289:14
359:10
**investigate** 311:21
311:24
**investigating**
360:22
**investigation**
356:19 357:7
360:17 361:3,8
362:6,15
**investigations**
311:11 357:5
360:7,9,13
**involved** 226:19
238:12,24 240:10
243:15 272:1
299:19 304:4
309:5 313:3
340:17 361:3
362:6
**involvement** 303:7
312:21
**irritable** 339:21
**issue** 209:22
223:11 288:6
309:20 359:2
**issued** 279:11
280:2
**issues** 200:7,25
201:6 204:3 214:5
214:7 220:9 222:1
222:13 223:19
255:8 287:8
**items** 243:6
253:12

**j**

**j** 190:3
**janssen** 333:14
**january** 201:24
　202:3,21 204:17
　204:22 205:10
　213:17 235:4
　325:19
**jim** 191:16
**jittery** 339:18
**job** 232:25 266:9
　276:7 289:9 292:1
　338:14 343:22,25
　351:11,18
**join** 254:20 295:22
**joint** 304:3
**jones** 191:8 198:21
**jonesday.com**
　191:11
**journey** 252:16
　289:19 344:10
**js** 283:15
**judge** 189:8 198:9
**judgment** 278:24
　279:2 318:19,22
　357:17 358:4
**julie** 190:16 199:4
**julie.babtist**
　190:19
**july** 193:22 265:16
　265:25
**jump** 347:25
**jumped** 348:6
**june** 193:20
　260:21 262:24
　264:1 332:22
**justin** 284:4

**k**

**k** 191:8

**kadian** 266:19
**kansas** 190:9
**katie** 292:8
**keep** 200:18 287:5
　289:9 303:25
　365:12
**keeping** 364:8
**kept** 200:24 241:9
**key** 282:3,7
**kind** 232:9 233:24
　278:6 287:11
　335:16 350:25
　351:9
**kinds** 237:10
**knew** 201:5 316:1
**know** 200:23
　205:23 207:9
　210:2,24 211:22
　211:23,24 213:24
　214:8,15 217:7
　224:8 229:17
　230:12,21 231:7
　232:24 238:5,6
　240:10 244:12,14
　245:21 248:4,7
　250:5 252:11,18
　255:1 256:12,13
　260:14 262:3
　264:18,21 270:10
　271:15 272:1,16
　274:23 275:13
　276:2,5 282:21
　283:12,19,20,23
　284:5,7,10,25
　285:10,18 286:21
　287:20 292:24
　293:9,14 295:19
　297:10,14 298:23
　299:9,23 302:6,8
　304:3 305:8,8
　307:9,9,12,16

309:1,3 311:20,24
　312:17 313:12,16
　316:12,17 318:1,6
　321:24 322:10
　327:7 354:18
　355:3 364:25
　365:3
**knowing** 298:23
**knowledge** 207:15
　208:8 360:9
**knowledgeable**
　363:9
**known** 262:21
　308:25 364:11
**kristin** 191:8
　198:20 360:2
**kzinsmaster**
　191:11

**l**

**l** 189:25 190:8
　368:6 369:14
**l.p.** 189:10,12,14
**label** 194:17
　227:15 246:16
　261:5 265:11
　320:23 334:1,7,18
　335:19 338:18
**lacing** 287:23
**language** 264:18
　350:19
**largely** 206:18
　214:25 299:6
　324:21
**larger** 282:4
　303:21
**lastly** 201:1 337:6
**late** 286:14 343:22
**latest** 200:5
**law** 198:13 201:22
　238:8,11,14
　261:25 272:16,23

274:16 275:3,5
　279:24 314:13,14
　314:15,16 320:7
**lawful** 201:12
　261:9 262:6
　265:24 266:11
**laws** 213:4 242:6
　361:14
**lawyer** 353:14
**layperson** 295:7
　324:23
**layperson's**
　296:15
**lazarus** 190:17
**lead** 241:1 338:9
**leave** 234:25
**leaving** 200:23
　332:13
**led** 278:8
**left** 348:22 349:13
　349:19 359:16
**legal** 199:5 243:19
　243:21 276:12,19
　295:21 307:7
　354:5,6 370:1
　373:1
**legitimate** 278:21
　278:25 279:2
　294:2 298:8
**legitimately**
　277:25
**letter** 193:16,18,21
　258:15 259:3
　260:18 261:7,22
　262:14,23 263:12
　265:9,14,21,22
　266:6,8,15,24
　290:5 370:19
**letters** 247:22
　262:7

**level** 230:7,13
231:12 271:4
272:23 298:23,24
312:25 313:8,9
321:2 350:17,18
355:3
**levine** 327:18
**liaisons** 313:7,13
**license** 288:10
**lighter** 341:4
**limit** 262:17
286:10 291:2
297:14,18
**limited** 286:1
319:23 320:5
**limiting** 194:8
291:16
**limits** 210:3
212:18,24 213:9
213:10,14,15
237:11,14 285:23
286:11,12,16
293:7 308:1,9
**line** 213:8 217:20
287:17 293:4
326:9 343:1
344:10,11 370:13
372:7 373:3
**lines** 322:19
**link** 193:7 227:4
**linked** 275:2
276:12,13,18
**linn** 190:12 199:7
199:7 203:3,13
221:17 242:1
254:21 257:9,14
257:19 264:16
288:4 294:23
295:23 315:14,16
317:17,25 319:11
319:18 320:4,15

330:14 332:17
333:17 364:10
370:5
**list** 193:10 207:4
208:2,4,15,17,22
209:8 210:6
212:11,20,25
213:11 221:19,22
224:13,24 234:14
234:20 235:6,13
235:18 236:2,7,8
236:17,22 250:19
250:23 251:19
254:2,3 255:14,18
256:17 258:9
284:17 320:13
324:16,21 325:4,6
325:11,14 333:20
339:12 354:16
**listed** 235:14
292:20 304:23
305:1 372:7,17
**listen** 295:10
**listing** 220:25
372:7
**lists** 207:5,11
209:13,25 210:1,7
220:16 221:9,25
223:21 224:7,15
236:18 240:2,19
240:24 254:15
255:15
**literature** 357:10
358:10
**litigation** 189:6
198:7 201:25
227:13 246:16
248:24 261:4
267:25 269:17
281:3 291:11
300:9 302:15

370:6 371:3 372:3
**little** 210:21
213:23 222:18
241:21 319:5
342:7 345:12
360:5
**live** 344:23 346:1,9
348:15
**llp** 191:2,12
**load** 199:19
**lobbying** 333:14
**local** 312:17,22
313:3,9
**locally** 312:19
**located** 211:19
**lock** 238:22
252:25 296:16
**logistics** 301:17
**long** 193:12 208:7
219:16 226:18
229:8,13 235:15
235:15 239:14,15
243:2 246:8,19
247:14,18,22
249:14 266:17
281:17 338:10
**longer** 223:8 283:8
**look** 199:19 212:6
216:25 233:12,19
237:23 241:23
242:3 246:20,22
249:8 256:16
257:23 258:5
265:20 273:5
283:5 295:3
299:21 300:3
301:19 327:16
328:11 329:18,25
342:10 365:18
**looked** 225:8,21
261:25 293:21

330:18 334:13
351:3 359:4
362:12
**looking** 230:21
247:2 251:7
357:12
**looks** 217:2 228:2
277:7 282:6
306:17 340:21
**loop** 213:7
**lose** 343:22
**lot** 253:15,15
278:12 282:13
351:23,24
**lots** 327:8
**low** 304:1
**lower** 341:4
**lungs** 215:13

**m**

**m.d.** 189:18 192:7
193:16 201:12,17
258:16 267:22
306:11 314:2
321:20 352:19
358:16 359:25
368:10 370:8
371:4,9 372:4,13
373:20
**madam** 370:10
**mail** 193:7 227:3
**mails** 200:21
362:25
**main** 217:15 305:5
312:23
**maintain** 237:17
339:22
**maintaining**
240:23
**majority** 268:16
349:2,10,24

**making** 215:7
229:5,6 280:18
312:5,6,8,10
**manage** 233:1
**managed** 193:6
205:12,13,16
206:1,5,11 207:5
208:1,11,16
209:14,23 210:4
211:13,14 212:8
212:13,17,23
213:8,13,19 214:2
214:11,24 216:9
216:17,24 217:10
217:21 218:5,8
219:5,17,20,22
220:15 221:8,24
222:23 223:1,21
224:6,13,18,20
225:5,6,10,15,23
226:15,19 230:23
232:9,11 233:12
234:2,22 236:17
238:1,21,23 239:4
239:13,17 240:1
240:16 241:1
251:15 252:23
253:8,11 267:9
268:23,24 292:15
293:1,21 296:12
296:22 299:7
307:20 308:10
314:22,25 318:14
**management**
296:22 298:22
299:2 316:10
**mandatory** 272:12
**manner** 335:11
**manufacturer**
332:3 333:13
336:12 354:2

355:11 356:9,14
357:16 358:22
**manufacturer's**
331:20 332:7
358:5
**manufacturers**
311:21 321:11
323:2 326:5,12,15
326:25 327:4,9,22
328:8,20 329:2
330:4 336:24
353:5,12,19
354:12 355:5
360:22
**map** 340:21
345:24 348:22
**march** 189:19
198:2
**margaret** 193:21
241:3 265:14
**mark** 216:21
280:25 291:9
300:6 337:6
**marked** 193:3
216:18 227:6,10
234:15,19 235:4
246:11 249:5
258:18,22 260:23
261:2 265:9,17
269:12,16 281:10
291:19 300:18
302:14,21 334:8
337:14
**marking** 248:21
265:10 333:25
**mary** 189:18
192:7 193:16
198:5 201:12,17
258:15 267:22
306:11 314:2
321:20 352:19

358:16 359:25
368:9 370:8 371:4
371:9 372:4,13
373:20
**massage** 289:22
**mat** 222:20
**match** 357:25
**maternal** 341:18
350:2
**math** 301:23
**matter** 320:8
321:25
**maureen** 204:21
**mckesson** 191:2
198:14,16 201:24
201:25 267:25
**mcnamara** 190:21
198:17,17 329:4,8
329:12 344:19
**mcneil** 333:14
**mcp** 217:20
**mcp's** 217:22
**md** 189:7 198:7
**mdl** 189:6
**mean** 209:1 210:1
210:22 214:10
230:1,15,22
239:11 307:23
310:20,24 313:2
324:17,23 346:6
352:5 355:6,14
**meaning** 259:21
341:3,5,6 361:21
**means** 200:25
209:18 217:21
242:11 273:4
283:13 346:7
**meant** 295:14
**measure** 245:20
301:20 345:9

**measures** 243:9
245:11,23 246:3
253:12 270:16,20
276:6
**measuring** 273:11
273:13
**med** 274:24
276:17 284:19
**medicaid** 190:11
190:16 193:5,14
193:19 199:6,10
200:6,10,20 202:7
202:24 203:12
204:21 205:24
209:2,23 210:4
212:8,13,17,23
213:8,13 216:16
216:23 218:10
220:14 221:6,23
222:20 223:19
224:5,12,17
225:22 226:18
228:9,17 229:10
229:20 232:15,18
233:10 234:22
235:6 237:3,7,17
237:19,25 238:9
239:12 240:3,18
240:22 241:8,10
243:5,12,24
244:13 248:24
249:3,16 250:1
251:18,21 253:6
253:25 256:8
258:6,23 260:19
261:7 262:16
264:2 265:23
266:8 267:1
268:22 269:3
274:22 276:25
278:9 279:13

280:2,5 281:2
283:2 284:1 285:8
286:17 288:24
289:4 290:19
293:18 295:14
296:1 301:6,11
305:23 308:19
314:23,25 319:25
330:10 342:5,11
342:15,18,19
343:1,5,13,15
344:2,3,8,16
351:15 358:22
362:24
**medicaid's** 217:15
256:19
**medicaid.ohio.gov**
190:19
**medical** 193:5
213:18,24 214:3,9
214:18,22 216:9
216:16,23 229:6
238:13 278:21
279:1,7 280:20
284:13 288:11
290:4 294:2 314:9
314:12,21 315:25
316:6 319:10
340:16 350:2
357:17 358:10
**medically** 279:3
298:9 315:3,8,20
316:22 317:10
**medication** 216:3
216:4 222:17,21
223:17 253:23
264:25 265:4
290:8,19 296:20
307:3,14 310:22
325:8 338:7
361:22

**medications**
202:14 215:14
216:2 251:3,6
252:2,17 262:21
263:1,8,14 274:7
278:6 288:8,13
310:8,11,16,20
**medicine** 282:1
**meet** 203:15 214:5
237:11 251:16
272:23 276:15
302:7 317:10
344:1
**meeting** 194:18
302:8 321:7
325:23 328:2,12
328:23 329:9,22
330:19 332:21
334:2,14,19
337:11 354:8,10
355:6,7,13,23
**meetings** 220:7
237:9 321:1,11
326:6,15,18,20
327:5,7 330:12
336:18 354:17,20
356:4 357:22
**members** 218:9
222:3,5 223:10,14
238:18 282:7
296:5 313:6,12
320:11,17 321:5
326:21 354:14
357:1,11 358:2
**membership**
320:6
**memorandum**
325:23 327:13
**mental** 309:13
312:25

**mentioned** 203:22
213:18 220:17,20
224:25 226:14
237:13 242:9
244:10,12 245:4
275:20 277:19
286:11 289:20
291:5 298:18
306:17 309:14
325:3
**met** 201:23 202:23
203:9,10 214:17
220:10 268:1
321:23
**methadone** 235:17
235:25
**methodology**
231:3,10,25 232:2
232:3,5 243:9
245:5,10 270:14
270:18 305:9
**metric** 272:5
275:7 276:9,18
**metrics** 194:4
269:11 270:1,22
271:1,8,14 276:22
**mf** 283:15
**michael** 190:3
193:18,22 260:18
261:9 265:15
**michelle** 364:16
**mid** 248:17
**midwest** 370:17
373:1
**mike** 198:24
**mills** 361:11,16
362:3
**mind** 280:22
332:20
**minimize** 265:2

**minneapolis**
191:10
**minnesota** 191:10
**minute** 257:10,10
290:4
**minutes** 325:23
327:8,14 328:5,13
330:15,19 354:8
354:11 355:9,13
355:24 356:3
**mirror** 253:13
**misuse** 290:6
299:17 334:23
**mits** 241:10
**modalities** 289:23
318:10
**model** 194:11
218:4 289:7
300:15 301:20,24
303:8
**modeling** 299:15
**models** 259:4
**molina** 193:10
234:13,20 235:18
236:2,8,22
**molina's** 234:23
**moment** 216:25
217:5 218:3
233:25 246:23
**moms** 194:18
337:10 350:2,6
351:8,13
**monday** 199:17
200:6 201:8
**monitor** 252:21
288:16 295:2
**monitored** 220:3
**monitoring** 220:11
247:25 270:2
288:20 293:7

**month** 343:14
365:4
**months** 246:1
272:15 299:22
300:2 364:12,12
**morgan** 190:12
199:7 370:5
**morgan.linn**
190:15
**morning** 201:5,19
201:20
**morphine** 243:3
245:25 255:16
266:18 272:15
274:24 286:1
287:2 293:8 297:2
**mother** 342:2
344:2 350:13
352:4
**mothers** 259:15
338:4 339:4
341:24 342:4
350:8
**motley** 190:2
198:24
**motleyrice.com**
190:6
**move** 201:10
341:17 363:16
**moving** 287:21
**mpendell** 190:6
**multi** 194:8,11
291:15 300:13
**multiple** 352:10

**n**

**n.w.** 190:22
**name** 201:21
253:23 254:3,8
255:3,4,5,16
267:24 309:10
314:5 321:22

335:2 364:17
370:6 371:3,4,15
372:3,4,21
**named** 368:9
**names** 312:20
313:17 364:11
**napoli** 190:7 199:2
**napoli.com** 190:10
**nas** 341:19,25
342:20 343:5
344:7,23 345:13
346:9
**national** 189:6
198:6 278:14
370:6 371:3 372:3
**nature** 250:10
272:22 278:4
343:20 355:17
**nausea** 298:5
**navigate** 223:5
**ndc** 230:7,14,20
**ndcs** 230:18
**nearby** 298:3
**necessarily** 212:2
270:16 277:19
300:22 308:24
309:1 321:2
**necessary** 279:3
298:9 315:4,8,20
316:22 317:10
**necessity** 279:1,7
314:9,12,22
**need** 205:21
207:12 209:9
256:23 276:14,15
285:15 294:2
301:19 339:22
352:8 355:20
365:19
**needed** 251:3
264:24 290:8

329:16 351:9
**needs** 204:19
208:16 226:6
298:24 324:25
**negotiate** 363:11
**neither** 236:1
**neonatal** 338:12
339:14,16 342:3
345:7,25
**neonatologist**
273:22
**network** 312:6
**neurocognitive**
338:15
**never** 251:14
323:19
**new** 191:14,14
204:20 233:3,4
237:14 289:24
335:3,22 352:8
365:6
**newborn** 304:1,2
**newer** 318:10
**night** 199:14,22
201:4 365:17
**nimble** 226:5
**nodding** 319:7
**non** 254:7 267:6
278:8 299:18
**northeast** 194:19
337:12
**northern** 189:2
**notarized** 370:14
**notary** 368:6
369:14 370:25
371:10,18 372:15
372:23 373:23
**note** 200:20 232:1
264:7 267:5
276:24 290:14,22
292:25 326:24

327:3 364:1
370:12
**noted** 278:9 309:8
355:13
**notes** 270:15 285:1
301:8
**notice** 262:1
290:10
**notification**
220:23
**november** 317:19
319:13,19
**nucynta** 194:17
331:17,22 332:5,9
333:6,9,13,15,20
334:1,7 335:2,10
335:21,24 356:15
**number** 193:3,13
193:15,20,22
194:6,9,13,15
198:7 200:2
202:25 212:7
224:13,18,21
226:11 230:20
231:21 232:2,4
245:25 246:3,10
249:5 252:22
258:24 260:22
265:17 269:18
273:6,7 275:7
281:9 282:16
291:18 295:2
297:19 299:13
300:9,18 301:21
302:21 308:3
338:1 345:5
346:20 347:12,25
362:2 370:7,13
**numbered** 193:17
194:4 230:2
258:17 269:11

340:9
**numbers** 230:19
248:22 281:3
291:11 302:15
342:14 346:14
349:2 372:7
**numerator** 270:15
**nurses** 283:14
**nw** 191:4

**o**

**o** 241:16
**o'gorman** 191:13
192:10 198:22,22
314:3,6 317:23
319:16 321:13
323:16 324:8
326:17 330:13
333:16 336:15,21
337:2 342:21
352:20 358:14
**oarrs** 241:18,22
242:25 243:15,25
244:22 247:24
252:20 253:13
270:1 271:17,25
272:7,9,13,17,20
272:25 273:1,5,8
273:12,14 274:1,6
274:8,9,11,16,17
274:25 275:13,17
275:21,24 277:1
**object** 221:14
234:5 240:20
255:10,25 261:21
261:25 263:3,9,15
264:5,15 266:1,21
267:3 273:2
277:21 278:2,23
279:8 280:8
284:23 285:20
286:19 288:1

290:9 291:4
293:11 294:3,8,12
294:18 295:20
298:20 299:4
304:18 305:7,16
306:21 307:6
308:23 310:5,23
311:12,22 312:1
313:5 314:11
315:12 317:1
320:14,25 321:8
336:16,22 353:22
355:25 356:22
357:8,19 358:7
361:18 362:8
363:14 364:8
365:2,10
**objected** 251:15
**objection** 195:3,3
195:4,4,5,5,6,6,7,7
195:8,8,9,9,10,10
195:11,11,12,12
195:13,13,14,14
195:15,15,16,16
195:17,17,18,18
195:19,19,20,20
195:21,21,22,22
195:23,23,24,24
195:25 196:3,3,4,4
196:5,5,6,6,7,7,8,8
196:9,9,10,10,11
196:11,12,12,13
196:13,14,14,15
196:15,16,16,17
196:17,18,18,19
196:19,20,20,21
196:21,22,22,23
196:23,24,24,25
197:3,3,4,4,5,5,6,6
197:7,7,8,8,9,9,10
197:10,11,11,12

241:25 254:19
264:16 294:19
295:23 304:21
310:4 315:13,14
315:23 316:24
317:15,17 319:11
320:15 323:4,16
324:8 326:17
329:4,7 330:13
332:16 333:16
336:15,21 337:2,3
342:21 344:18,19
353:23 355:8,15
356:23 362:9
**objections** 192:5
195:1 196:1 197:1
201:9 266:13
307:15 317:16
319:15 329:13
359:19
**objective** 251:17
285:17
**objectives** 247:16
**obligated** 363:23
**obligations** 207:25
**observed** 306:24
**observers** 330:2
**obstetrical** 260:11
350:11 351:2
**obtain** 268:8
**obtaining** 288:13
**occasion** 222:24
**occasions** 363:19
**occur** 232:19
**occurred** 245:16
275:22
**occurring** 340:2
**october** 193:17
206:4,9 258:17
259:7 330:19
334:14 369:17

**odb** 322:21 323:19
323:22
**odm** 193:13,14,15
193:17,20,23
194:4,7,10,14,16
204:16 219:21
225:16,19 227:13
227:17 228:9
230:5 241:14
246:10,15,17
248:22 249:3,5,20
250:14,18 252:4
258:18,24 260:22
261:5 265:10,17
266:6 268:4
269:12,17,18
276:21 277:4
281:3,4,10 291:1
291:10,11,12,19
294:1,10,16
298:16 299:19
300:7,8,9,10,18
302:15,16,16,21
303:18,20 306:16
306:17,24 307:4
307:12,13 310:20
311:3 312:21
313:2 314:8 315:2
315:7,18 316:20
318:17 323:23,24
324:2,5 352:25
358:21
**odm's** 223:11
228:6 303:7 318:2
319:20 320:1
**offer** 208:5 354:4
**offered** 213:21
340:12 353:19
354:3 363:16
**offering** 358:23

**offhand** 297:13
**office** 190:12
  194:15 199:9
  203:11 302:19
  303:2 369:6
**offices** 316:2
**official** 245:18
  319:20 371:15
  372:21
**officially** 339:7,9
  360:10
**oftentimes** 320:17
**oh** 250:21
**ohio** 189:2,12,14
  189:23 190:11,12
  190:14,16,18
  193:5,5,10,14,19
  194:19,19 198:4,9
  199:5,8,9 200:6,9
  200:19 202:7
  203:10,11 204:20
  210:9,11,12
  216:15,16,22,23
  217:14 234:14,20
  234:21 235:5
  237:2,6,18 241:15
  249:2 251:18,20
  256:18 260:19
  261:7 266:9
  268:18 271:3
  277:12 279:13,15
  279:23,24,24
  280:2,5 281:2,24
  284:1 289:4
  290:17,18,20
  292:15 296:1
  299:9 301:6,7,10
  301:11 303:16
  312:13,25 319:24
  337:12,12,25
  341:14 345:25

  358:22 362:24
  368:2,7 369:7,15
  370:2
**ohio's** 194:11
  279:16 300:14
**okay** 217:17
  222:21,23 239:9
  282:20 283:19
  284:10,14 288:5
  321:4 322:2
  324:15,18 339:11
  353:18 355:4
  356:12 360:15
  362:4
**ones** 224:3 229:18
  282:13 352:9
  360:13
**ongoing** 287:3
**op** 189:11,13,15
**open** 199:23
  200:18,24 328:23
  330:12 362:24
  363:12 364:9
  365:13,20
**opening** 278:7
**operational**
  237:22
**operationalize**
  238:11
**operationalizing**
  238:14
**operations** 212:2
  232:23
**opiate** 189:6
  193:12 198:6
  238:20 242:15
  246:9,19 247:15
  259:15 341:18
  350:2 370:6 371:3
  372:3

**opioid** 194:3,6,8
  194:12 205:1,6
  220:10 226:8
  232:11,13 233:13
  236:23 237:1,3,7
  237:19 238:1,4
  239:3,4 242:20
  247:18 251:9
  252:5,7,12,14
  259:6 260:12
  262:17 263:1,8,14
  263:21 264:3,12
  264:25 268:9
  269:5,10 270:1,21
  278:5,10 281:8,19
  282:10,10 287:13
  289:14 291:2,16
  292:16 299:9,15
  299:16,20,23
  300:16 303:4,16
  303:17,19 304:17
  305:2,14 307:19
  307:19 308:17,18
  310:7,10 311:4,9
  315:3,8 322:22
  331:17,22 332:10
  335:3,11,16,22
  338:2,5 343:20
  350:9,14 351:17
  351:22 353:7
  358:21,23
**opioids** 205:1,6
  215:19 222:15
  224:19 228:24
  233:24 234:3
  235:15 239:14,15
  243:4 244:16
  247:22 252:11
  266:17,20,25
  270:25 271:10
  275:8 277:19,20

  277:25 278:14,15
  278:17,20 279:5,6
  287:25 289:16
  293:25 294:7,11
  294:15,15 304:14
  305:13 308:21,22
  309:24 310:3
  311:1 313:4 323:3
  331:12,23 332:10
  332:15 333:2
  338:13 339:1,6,10
  341:24 356:6,10
**opportunity**
  289:24 364:6
**opposed** 277:1
**opqc** 194:18
  337:10
**option** 364:13
**oral** 235:15 356:5
**order** 276:15
  322:21 351:7
**ordinarily** 288:12
**organizations**
  262:5 314:22
**ortho** 333:14
**outcome** 351:7
**outcomes** 226:10
  226:12 259:5
  285:18 338:10,16
**outpatient** 274:7
**outside** 294:23
  316:4 317:20
  319:12 329:23
**outstanding**
  200:25 204:2
**overall** 224:8
  270:24
**overdose** 271:6
  278:8,11 299:18
  340:24 341:10

overland 190:9
oversee 214:3
overseen 240:25
oversees 312:23
overshooting
287:20
overview 194:3
269:10
owns 238:10
oxycontin 266:19
oxymorphone
236:5

**p**

p&t 210:17 215:2
262:7,14,25 263:4
263:10,12 267:1
319:5,9,21 320:6
320:11,22 321:4
324:22 325:22
326:2 327:13
328:12 354:8
356:4,18,24 357:6
357:14,18 358:13
p.m. 366:3
page 194:3,5,8,11
217:19 225:12
229:25 230:2
235:9,11,12,24
236:4,4,21 250:14
252:4 253:20,21
255:13 269:9
281:7 283:12
284:4,14 287:15
287:18 291:15
292:25 293:16
300:13,24 302:3
330:23,24 331:8
331:19 333:1
334:3,21 335:20
340:11,20 341:17
345:24 350:1

370:13,15 372:7
373:3
pages 217:3
234:24 248:16
paid 249:24 317:4
324:6 344:7
pain 237:14
239:16 262:17,20
277:13 280:7,12
280:13,14 282:1
282:18,19 284:19
285:4,8,22,24
286:10 288:8,13
289:18,18 290:7
304:1 316:9,10
318:11
panel 299:8
paper 267:8
paragraph 217:19
218:12 250:16
262:14 263:20
266:16 301:8
328:16 330:1
331:16 332:19
parallel 289:13
park 190:9
part 207:17,19
209:2,7 210:24
212:1,3 219:4
238:22 242:17,23
249:17 250:24
267:5 272:11
275:11,14 284:2
285:16 286:5
291:25 296:22
303:5,21,22
313:11 320:9
325:18 326:21
330:20,21 337:20
338:20,24 339:3
339:11 340:2

372:9
participants
352:25 353:6,20
354:16
participate 296:6
297:10,15 313:8
318:15
participated
309:20 359:7
participating
217:11
participation
313:9
particular 223:20
230:2,19 232:10
233:13,17 234:2
241:23 251:10
255:2 256:9
261:13 262:25
263:6 270:25
294:11 302:11
304:19 319:3
322:25 327:3
336:14 340:17
345:14
particularly 223:6
242:4 271:5
partners 251:24
268:14,15 277:9
308:12 322:21
partnership
241:19 242:13
288:25 299:12
337:24
parts 347:9 352:10
party 369:2
patch 266:19
path 233:20
243:23
patient 242:3,9
248:3,5 272:2,14

275:11 276:16
290:19 293:2
294:1,14 295:18
296:21 297:25
298:15,25 299:3
315:9 316:6 319:3
patients 214:14
219:13 223:3,7
233:1,18 237:14
241:23 245:25
247:21 271:22
272:2 274:20,23
275:7 280:12
284:19 285:4,8
287:21 288:7
296:9,12 297:18
299:15 304:14
310:12,13,18
312:8 314:23
318:13,18,23
326:23
pattern 297:23
298:10
patterns 361:6
pay 229:2 232:25
250:8 264:24
287:2 303:5 311:4
343:23,25
payers 277:2
342:12
payment 343:23
pays 312:24
pbas 231:5
pcps 284:20
pdl 267:5 324:13
324:15,16
pdmp 272:13
pediatricians
304:5
pellegrino 189:25
368:6 369:14

**penalty** 335:7
**pendell** 190:3
  192:12 198:24,24
  240:20 241:25
  254:19 261:24
  288:2 290:12
  294:19 295:22
  310:4 315:13,22
  316:24 317:15,20
  319:15 353:23
  356:23 358:17
  359:13,18 360:25
  362:9 363:13
  365:2,23
**pending** 257:15,17
  259:22
**people** 205:17
  238:21,24 250:9
  264:20 280:21
  292:1,2 308:13
  326:22 335:5
  344:14 352:3
  354:19,20 355:19
**percent** 207:6,10
  207:22 209:17,19
  209:22 210:14,15
  210:25 211:17
  212:7 220:22
  221:19 231:17,19
  231:20,21 276:1
  278:13 289:11
  292:17 293:18
  297:2 303:15,16
  304:14 318:8
  325:5
**percentage** 224:9
  230:6 271:16
  272:6 273:11,13
  273:17 275:7
  276:9 290:16
  293:15 297:10

**percentages**
  231:16,20
**performance**
  243:14
**performed** 360:8
**perinatal** 194:19
  337:12,25
**period** 206:14,15
  207:9 226:5
  245:12 275:1,21
  287:4 293:12,17
  304:20 316:10,13
  319:24 320:3
  345:10,17 346:14
**periodically** 287:5
**periods** 206:16
**person** 254:14
  255:7,12,23 256:4
  298:24 311:7
  346:15 363:8
  364:24
**personal** 202:8
  221:11 294:25
  358:20
**personally** 227:22
  238:13 362:10,14
  371:11 372:15
**personnel** 313:15
**persons** 315:4
**perspective**
  233:16 252:1
  359:17 364:16
**pharma** 189:10,12
  189:14
**pharmaceutical**
  193:19 260:20
  261:8 326:5,11,14
  326:25 327:4,9,22
  328:8,19 329:2
  330:3,11 353:5
  354:12 356:8,21

  357:16 359:11
**pharmacies** 220:8
  239:21 252:25
  271:23 276:4
  295:5 323:3 361:2
  361:7,12,13
**pharmacist** 241:1
**pharmacists**
  241:24 320:8
**pharmacy** 204:2,7
  207:15,19 211:21
  213:3 219:4,6
  220:5 221:2
  223:23 224:4
  227:23,23 228:6
  228:10,17,23,25
  229:12,18 230:18
  231:9 232:6
  233:20,23 237:9
  237:20 238:23
  239:22,23 241:1
  241:19 242:14,24
  243:7,12,17 244:3
  244:13,15,22,25
  245:14 248:12
  249:18 252:19,23
  253:17 254:5,17
  255:9 256:6,14,23
  270:13 274:4
  291:6 292:19
  294:6 295:13
  296:18 297:21,22
  298:10 308:11
  317:7 359:17
  361:3,20,24,25
  362:2,7,11 363:10
  364:11
**pharmacy's**
  241:15 295:19
**phone** 370:3

**physical** 214:20
  289:23
**physician** 231:7
**physicians** 281:25
**pick** 345:11
**piece** 254:25 267:8
**pieces** 351:6
**pile** 322:11 325:20
**pill** 274:14 361:10
  361:16 362:3
**pills** 276:11
  280:19
**place** 207:11,22
  208:8 220:12
  226:7 251:20
  267:12 286:12,25
  291:7 293:5
  295:16 305:12
  307:25 308:4,6,9
  323:1 334:1,18
  368:20
**placed** 336:19
**placement** 333:20
**placing** 254:1,2
**plaintiff** 352:24
**plaintiffs** 198:25
  199:2,13 200:15
  201:2 217:13
  321:25 365:11
**plan** 193:6 194:9
  210:16,20 211:2,4
  211:15 212:13,15
  214:2 216:18,24
  217:21 224:7
  230:24 232:9,12
  232:22 233:17
  239:18 286:25
  291:3,17 292:16
  293:22
**plans** 207:5 208:1
  209:14,23 210:4

211:12,13,14
212:8,17,23 213:9
213:13,19 214:11
214:18,24 216:10
217:10 218:5,9
219:5,17,21,23
220:15 221:8,24
222:24 223:2,21
224:13,18,21
225:6,10,15,24
226:15 230:6,24
232:20 233:12
234:2,22 238:1
239:4,13 240:1,17
251:6,15 252:24
253:8,11,18 267:9
268:23,25 286:24
293:1 296:10,12
296:23 299:7
307:20 308:10
**play**  252:22
**please**  198:10
322:4 370:11,11
**plenty**  273:19
**pllc**  190:7
**plus**  276:10
**point**  230:3,4
239:21 245:18
247:19 263:20
276:5 296:19
303:14 307:21,22
308:3 317:12
347:3 348:2
349:12 365:6
**points**  204:4 271:4
273:10 282:3
304:7
**policies**  237:24
**policy**  205:1 229:5
237:3,7,19 238:2,4
238:7 239:4,10

251:4 307:19,22
**polster**  189:8
198:9
**poor**  344:1
**population**  214:6
220:23 226:2
253:1 271:4
276:25 278:9
**populations**
226:12 238:25
250:25 277:3
**portion**  218:12
243:24 327:17
328:6
**ports**  283:23
**position**  362:23
363:12,13
**possession**  199:16
**possibility**  200:23
**possible**  209:13
234:10 244:2
250:10 300:4
**possibly**  199:24
318:15
**post**  200:12
**posted**  200:5
**potential**  322:17
331:9,21 332:9
333:7 335:24
336:13
**potentially**  200:17
352:6
**practice**  200:13
215:10 223:1
247:17 248:13
272:10 283:14
312:5 350:24
359:4
**practices**  273:24
309:19 361:11,13

**predecessors**
250:3
**predetermined**
314:8
**predict**  299:16
**predictive**  299:14
318:12
**predominance**
349:17
**preference**  251:20
**preferred**  193:10
207:4,5,11 208:2
208:15,16,22
209:8,13,24 210:1
210:5,6 212:11,20
212:25 213:11
220:16 221:9,25
223:21 224:7,14
224:22 234:14,20
235:6,13,18 236:2
236:7,22 240:2,19
240:24 250:19,22
251:19 254:2,3,7,7
254:15 255:14,17
267:6 320:13
324:16,17,20,22
324:23 325:6,7,11
325:14 333:8,20
336:19
**pregnant**  226:7
239:1 259:5 338:4
341:24 350:13
352:4
**prenatal**  259:14
**preparation**
204:10
**prepare**  202:19,21
**prepared**  248:8
365:8
**prescribe**  273:18
276:14 293:25

**prescribed**  194:8
216:1 243:1 248:2
275:8 278:1,21
279:7 291:2,16
304:14
**prescriber**  248:4,5
272:9,21 274:11
361:21
**prescribers**
241:24 271:16,23
272:6,25 273:7,12
273:14,18 274:6
295:6 303:16,22
361:16
**prescribing**  194:3
242:18 252:16
265:3,6 269:11
270:21 271:8
273:23 274:14
275:14 277:12
279:11 290:20
303:5,19 305:13
312:7 318:24
361:15,23
**prescription**  189:6
198:6 205:11,15
205:25 206:4,10
206:17 218:13
219:1,22 225:23
232:11 242:19
243:4 244:16
247:25 252:10,13
252:17 263:21
264:3,12,25 268:9
270:2 272:22
274:3,17,18
276:11,18 277:20
277:25 278:6,17
278:20 279:5,6
286:1 288:17
294:7 298:2,5

307:3 308:4,20
309:3 310:8,11,16
310:20,22 312:14
315:8,10,19
316:21 317:8
319:2 370:6 371:3
372:3
**prescriptions**
269:5 272:12
276:3,10 277:2
278:13,22 288:23
289:11 303:17
305:20 314:10
315:3 318:9,19
344:11
**presence** 368:14
**present** 191:16
321:11 326:11
327:21 328:17
330:1,3
**presentation**
194:18 292:20
293:10 331:11
337:10,19,23
340:7,17 356:13
357:15
**presentations**
204:12
**presented** 301:23
**presume** 270:7,9
356:11
**presuming** 323:23
**pretty** 209:1
329:12 352:9
**prevent** 352:8
**previous** 229:17
**previously** 207:3
235:4 239:25
241:13
**primary** 279:22
281:25 283:24

285:6 287:21
304:5 310:6 311:8
357:13
**printed** 218:23
234:22 338:19
**prior** 203:17
207:18,23 208:19
209:9,17 210:2,15
210:19 211:3
212:9,14,19 213:1
224:23 228:11
230:25 231:4
232:4,10,12
233:13 234:1
236:6,8,13 239:13
240:11 252:13
256:17 258:10
264:7 266:18
268:21 282:22
309:8,9,23 325:1,6
333:12 359:9
**priorities** 194:13
300:17
**priority** 253:12
**privacy** 346:16
**private** 342:11
343:6
**privileged** 203:5
**proactive** 318:15
**probably** 245:12
**problem** 223:6
264:9 278:15
304:9 312:4
343:21 347:16
350:9 352:3,8
**problematic**
280:16 353:17
**procedure** 201:14
367:7 371:5 372:5
**procedures** 222:2
316:9

**proceeded** 260:10
**proceeding** 199:20
**process** 227:15
228:16 236:19
243:19 245:19
254:10,11,17
255:6 267:6,12
275:14 281:23
285:14 286:21,22
308:15 322:25
355:19,22
**processes** 210:17
214:25 215:4
227:23 233:7
237:22 260:15
292:3 295:16
308:6 318:4
**produced** 200:21
227:13 246:15
248:23 249:12
258:23 261:3
265:10 269:17
281:2,20 291:10
300:7,8 302:14
**product** 320:23
**production** 199:14
200:6 201:3,8
338:20 365:17
370:15,17,22
**productions** 200:3
**products** 247:18
335:6
**profession** 280:20
**professional**
281:22
**professionals**
319:10 340:16
357:18
**profile** 332:4
**program** 207:15
207:20 208:12

209:2,6 213:3
214:4 217:11
218:10 219:11
233:4 238:22
247:25 250:18
252:24 270:3
293:18 295:14
296:2,5,7,11,14
297:9,16 298:13
299:6 314:25
318:16 344:8
351:13
**programs** 226:7,9
226:13 351:13
**progress** 252:21
310:9
**project** 194:18
244:7 291:1
292:12,15,23
299:10,20,24
300:1 337:11
338:25 340:18
350:6 351:8
**projects** 269:4
**prominent** 313:11
**promising** 309:19
359:4
**prompted** 278:11
286:6
**proof** 217:22
**properly** 350:12
**proportion** 243:1
274:23
**propose** 228:16
**protected** 254:24
**protection** 252:19
**provide** 217:22,23
220:18 240:1,18
246:24 290:1
314:23 338:6
357:1

**provided** 199:17
200:15 201:13
217:21 220:3,19
229:20 261:23
353:1,12
**provider** 193:5
216:17,23 225:10
225:25 289:25
293:3,25 296:24
304:4 312:6
**providers** 223:9
239:20 262:10
273:20 361:6
**providing** 229:9
245:1 249:15
318:18
**proximate** 203:19
**psychosocial**
312:10 338:7
**public** 194:13
212:3 234:23
244:20 263:22
264:3,12 288:19
300:17 302:1
311:16 326:20
328:2 329:22
359:3 368:7
369:14 371:10,18
372:15,23 373:23
**publicly** 211:24
338:22
**publish** 244:22
**published** 211:22
237:23
**pull** 364:18
**pulled** 217:14
**pulse** 252:10
**purdue** 189:10,12
189:14 191:12
198:23 314:6

**purpose** 218:6
243:22 287:12
310:2,6 311:9
356:24 357:14
**purposes** 216:19
227:6 234:15
246:11 249:6
258:18 260:23
265:18 269:12
281:10 291:19
300:19 302:22
334:8 337:14
**pursuant** 294:1
367:3,6
**pushing** 287:17
**put** 220:12 248:18
263:5 286:12,25
291:7 293:5
307:25 320:13
322:9 328:5
330:20 333:24
347:13 351:14
364:3
**putting** 308:8

| q |
|---|

**q2** 193:15 249:4
**qualified** 282:24
368:8
**quality** 194:19
217:23 218:14
219:2,7 226:11
285:16 292:6
323:17 337:13,25
**quantity** 210:3
212:18,24 213:9
213:10,14,15
237:14 276:10
293:7 308:1,9
**quarter** 249:12
252:12

**quarterly** 193:14
244:18,19 249:3
249:11
**quaternary**
297:25
**question** 208:20
209:17 219:10
235:11 242:2
253:5 255:24
257:15,16,20
261:20 262:4
266:4 278:19
280:24 295:25
313:21 315:24
316:19 319:17
322:6 330:22
342:24 343:12
359:16 360:4
362:5 363:25
**questioning** 213:8
313:20 329:13
**questions** 208:14
235:2 236:13
257:7 261:17
268:2 306:14
314:5 321:14
352:22 353:2
359:14 365:9
**quick** 306:4,5
351:20
**quickly** 200:16
**quintile** 348:14
**quintiles** 347:7
**quite** 246:2 309:10
350:21

| r |
|---|

**r** 241:16,16
**range** 211:5
**rate** 228:3 231:2
231:15,17,18,19
233:5 242:20

293:23 341:4,6,7
344:23 345:8,20
348:14 349:17
**rates** 340:24
341:11 345:25
**rdove** 191:6
**reach** 292:21
**reaching** 358:22
**reaction** 298:4
**read** 203:6 218:12
227:16 266:3
273:16 327:24
328:21 331:24
364:3,4 371:5,6,12
372:5,6,17
**reading** 255:20
370:19
**readings** 358:9
**ready** 215:13
**real** 302:2
**reality** 244:7
**realize** 260:9
**realized** 278:12
**really** 205:21
240:11 242:21
243:3 246:2
279:22 280:15,20
287:13 289:12
301:22 312:2,4
315:25 316:7
339:20 344:5
346:15
**reason** 202:11
262:25 263:7
290:25 297:17
298:12 370:14
372:8 373:3
**reasonable** 288:8
**reasons** 248:14
271:22 297:19,22
298:9 325:13

344:4,5 346:16
**rebate** 209:2,6
254:11,25
**rebates** 254:23
**recall** 206:2 207:7
223:18 224:1
237:8 256:20,25
263:6 284:9 319:6
322:12,13,15
324:13 326:7
334:13 344:11
353:2 354:7,13
356:16
**receipt** 370:18
**receive** 200:2
211:7 244:13
249:20 250:1
253:6,18 267:6
282:4 301:12
**received** 199:13
200:2,5 223:13
242:23 244:17,19
311:1 312:9
350:11 365:17
**receiving** 294:14
**recess** 247:6
267:19 306:8
313:24 321:17
352:16 359:22
**recipients** 193:8
227:4
**recognize** 227:19
227:21 246:21
249:9 258:25
269:19,21 281:13
291:22 300:21
302:24
**recognized** 303:22
**recommendation**
320:21

**recommendations**
263:5 303:19
**record** 198:2,11
199:12 200:1
227:16 247:4,5,8
257:18 267:17,21
306:6,10 313:22
314:1 319:22
321:15,19,23
338:18 352:14,18
359:20,24 362:21
364:1,16 365:25
372:9
**recovery** 223:7
310:14
**reduced** 368:14
**reducing** 252:1
**reduction** 278:13
**reevaluating**
248:6
**reference** 228:5
252:5 277:11,16
277:18 278:17,19
282:18 308:17
370:7 371:2 372:2
**referenced** 221:18
226:3 239:1
253:10 275:3,19
275:25 277:8
293:6 309:23
344:9 368:13,17
371:11 372:15
**references** 283:17
**referencing**
282:11
**referred** 323:22
**referring** 279:6
**refined** 232:5
301:24 316:7
**refining** 302:4

**reflect** 246:3 327:8
328:7 330:15
348:12 355:9
**reflected** 354:11
355:24
**reflecting** 345:3
**reflects** 302:11
**refused** 363:18
**regard** 200:7
204:7 205:6
223:17 228:24
251:11 254:16
324:1 351:16
356:14
**regarding** 204:2
305:13 322:16
367:2,11
**regimen** 296:20
**regional** 194:18
337:11
**register** 273:4
274:11
**registered** 271:17
272:6,8,21,25
273:5,12,13 274:6
274:8,19 275:16
**regression** 301:17
**regular** 242:24
244:14
**reimburse** 294:11
315:10
**reimbursing** 315:2
**rejected** 259:21
**relate** 215:19
231:20 237:13
310:3,8
**related** 205:1
211:9 220:2,10
221:18 231:6,24
232:7 242:20,25
243:24 244:18,21

249:23 252:12,18
254:7,10 268:9
270:1 271:9,23
273:21 278:15
280:11 285:15
287:6,13 289:13
303:19 304:10
306:16 310:7
311:6,14,18 313:3
313:10 314:16
318:4 323:3
324:13 338:11
343:20 345:5
353:7 365:9
**relates** 189:8
209:21 217:11
222:16 271:5
293:7 309:19
361:14
**relating** 212:6
**relationship** 244:4
299:3
**relationships**
219:17 299:7
**relative** 283:4
346:7 369:2
**relevant** 214:7
216:6
**reliably** 292:3
**relief** 285:5
**relievers** 262:17
262:20
**rely** 268:19,22
277:4 318:18,22
358:3
**remains** 362:24
363:12
**remember** 206:14
283:4 309:10
**remind** 207:13
266:3

| | | | |
|---|---|---|---|
| **removed**  274:15 | 332:3,8 333:13 | 217:10 218:8 | **result**  251:12 |
| **removing**  233:18 | 356:14,21 358:5 | 220:1 222:9 239:3 | 324:21 |
| **renee**  189:25 | 358:21 364:13 | 285:6 290:15 | **resulted**  318:8 |
| 368:6 369:14 | **representatives** | 308:2 350:20 | **results**  292:4 |
| **rent**  343:25 | 354:12 355:5,12 | **requires**  212:25 | 360:17 |
| **rep**  318:2 | 356:9 358:12 | 296:5 | **retained**  192:16 |
| **repeat**  239:7 | **represented**  206:8 | **requiring**  230:25 | 354:17,25 |
| **repeats**  335:21 | 290:17 330:12 | 308:10 | **retention**  338:8 |
| **rephrase**  322:5 | **representing** | **research**  243:23 | **retrospect**  364:7 |
| **replacements** | 199:9 326:11 | 244:7 268:13,15 | **returned**  370:18 |
| 304:3 | 327:22 328:19 | 277:8 299:14 | **review**  193:11 |
| **report**  193:14 | 329:1 330:3 | 321:6 357:17 | 199:22 203:1,17 |
| 230:1,5,10 243:7 | **request**  200:15 | **researchers**  268:8 | 203:23 204:11 |
| 244:10,12,23 | 353:6 355:20 | 269:2 357:2 | 214:5 215:3,25 |
| 246:2 249:4,11,23 | 365:14,22 372:9 | **resolve**  200:24 | 220:8 246:8,18,24 |
| 250:11 252:4 | 372:11 | **resource**  268:17 | 247:13 301:5 |
| 268:21 275:24 | **requested**  211:7 | 299:13 | 311:17 329:19 |
| 276:24 278:4 | 365:12 367:1,6,10 | **respect**  230:24 | 357:9 367:2,6 |
| 301:4,12 | **require**  212:9,14 | 308:18 | 370:12 371:1 |
| **reported**  243:10 | 212:19 220:6 | **respirations** | 372:1 |
| **reporter**  192:16 | 223:8 224:12,17 | 215:15 | **reviewed**  359:3 |
| 371:7 | 224:20,22 232:9 | **respond**  233:8 | **reviewing**  217:7 |
| **reporter's**  192:14 | 232:12 233:12 | **response**  265:23 | **revised**  193:6 |
| 368:1 | 234:1 237:25 | 266:6,8,15 319:21 | 216:18 218:22 |
| **reporting**  241:15 | 239:13,13,15 | **responsibilities** | 334:4 |
| 241:18 305:24 | 251:6 274:15 | 204:16 | **revision**  270:5 |
| **reports**  229:9,20 | 325:6 | **responsibility** | **revisions**  270:14 |
| 242:24 244:11,14 | **required**  208:3 | 294:16 295:19 | **rice**  190:2 198:25 |
| 244:18,20 245:1 | 210:16 214:2 | 307:4 | **rico**  200:5,12 |
| 249:15,23,25 | 220:18 222:25 | **responsible** | **right**  211:15 |
| 250:5 252:5,8 | 223:2,15 233:8 | 227:22 240:23 | 233:11 235:12 |
| 253:5,7,10,17 | 236:6 237:11 | 299:1,2 307:13 | 236:15,23 244:9 |
| 268:24 | 272:12,19 274:20 | **rest**  248:9 | 245:6 253:19 |
| **represent**  201:24 | 279:13,15,24 | **restart**  247:2 | 254:14 255:7,23 |
| 217:13 227:11,12 | 316:8 370:25 | **restate**  324:18 | 256:4 257:15 |
| 248:23 261:3 | **requirement** | **restriction**  221:21 | 271:11 273:9 |
| 267:25 314:6 | 207:3,10,22 208:7 | 223:20 224:10 | 278:16 282:20 |
| 321:24 353:9 | 249:17 275:3 | **restrictions**  211:8 | 283:9 291:3 301:9 |
| 360:3 | 276:12 325:2 | 220:15 221:1,8,23 | 304:13 307:11 |
| **representative** | **requirements** | 224:6 297:19 | 308:2 321:22,25 |
| 320:2 331:21 | 211:9 214:9,17 | 305:12 | 322:5 323:7,12,15 |

324:7 325:24
326:2,16 327:5
328:3,17 329:3
334:4 337:20
341:7,15 342:8,12
342:15 346:18,21
347:12,21 348:10
348:17,23,24
349:3,7,9,12,21,23
365:19
**risk** 271:6 278:10
279:19 299:17
301:18 304:15,16
304:22 305:1,2,6
305:14,18 319:1
322:17 323:10
352:6
**risks** 319:1
**robust** 245:23
**role** 204:16 214:11
229:4,6
**ron** 191:3 198:12
201:21
**room** 281:25
326:23
**roughly** 240:13
**round** 364:25
**routine** 220:7
237:9 297:4,6
**routinely** 214:5
**row** 235:16,17,24
236:1
**rph** 327:18
**rpr** 189:25
**rule** 280:17 282:19
**rules** 201:14 244:9
285:4 367:3,7
371:5 372:5
**runs** 299:6
**runway** 223:8

**rx** 241:15

**s**

**s** 241:16 370:15
372:8,8 373:3
**safe** 222:3 252:15
298:15 305:20
312:7
**safer** 316:12,12
318:12 332:14
**safety** 213:20
214:7 215:6,7,17
215:18,22 216:7,9
220:21 222:1,13
223:19 244:20
279:1 280:22
285:16 288:20
296:20 303:4
332:4
**sale** 239:21 294:17
307:21,22 308:3
317:12
**sample** 225:7
**sat** 363:19,20
**saw** 268:21 276:23
337:1 346:8
**saying** 209:11
311:3 324:24
332:8 364:21
**says** 253:22
280:17 282:10
284:17 292:12
326:10 327:16,20
328:16 330:2
331:1,8,20 334:4
334:22 335:1,10
335:24 340:23
345:25 346:5
**schedule** 335:4,6
335:23
**schnieders** 190:8
192:11 199:1,1,11

201:1 210:8 217:1
218:16 221:10,14
234:5 254:20
255:10,25 261:21
263:3,9,15 264:5
264:15 266:1,13
266:21 267:3
273:2 277:21
278:2,23 279:8
280:8 284:23
285:20 286:19
288:1 290:9 291:4
293:11 294:3,8,12
294:18 295:20
298:20 299:4
304:18,21 305:7
305:16 306:3,21
307:6,15 308:23
310:5,23 311:12
311:22 312:1
313:5 314:11
315:12,23 317:1
317:16,22 320:14
320:25 321:8,21
321:23 329:6,10
329:15 338:21
352:12 353:22
355:8,15,25
356:22 357:8,19
358:7 361:18
362:8 365:5,15
**science** 292:5
301:23
**scope** 290:10
294:20,23 317:21
319:12 320:5
365:10
**scott** 193:21 241:4
265:15
**screening** 289:13

**script** 274:5,10
287:3
**se** 309:16
**seal** 369:6 371:15
372:21
**second** 211:4
230:3,3,4 235:16
235:24 247:19
249:12 257:14
263:20 266:16
272:5 273:13
284:4 292:11
327:17,20 330:24
331:19 333:1
338:11 348:14
349:15
**seconds** 359:16
**secret** 326:19
364:14
**section** 284:16
334:22 361:5
**sedating** 298:6
**sedatives** 275:8
**see** 218:1 230:8
235:9,14,19
236:10,24 237:4
248:12 250:20
253:21 255:19,20
261:6 262:13,18
263:24 270:13
274:21 292:14
293:16,19 297:20
298:10,10 300:24
301:19 305:22
326:9 327:18,24
328:1 330:5,8
331:1,5,13,15,20
331:24 332:24
333:3,5,10,13
334:2,11,22,24
335:8,13 336:2

342:25 344:6,22
344:25 346:2
347:14 349:1,16
**seeing** 297:22
316:4 344:14
**seek** 350:22
**seeking** 339:9
**seen** 229:23
275:15 289:10
**seizure** 339:18
**seizures** 244:21
**selection** 364:21
**send** 247:22
**sent** 265:23 266:10
**sentence** 248:17
250:16 311:5
327:20 330:2
331:7 335:21
**separate** 208:19
279:2 280:10
309:12
**separately** 350:17
**september** 193:12
246:9,19 247:15
**sequelae** 339:12
**series** 243:19,20
244:11 245:23
301:17
**serve** 214:10
**served** 365:6
**service** 206:19,20
207:4 208:2,4,15
208:25 209:14,25
210:6 211:15
212:10,15,20,25
213:10,15 214:21
215:1 220:19
225:2 226:14
230:24 234:9
235:6,13 236:7,17
283:6 296:19

315:1
**services** 217:23
218:14 219:3,7,11
220:2 252:24
266:10 296:2,4,14
297:3,8,16 309:12
311:4 312:11
313:1 338:8
350:16
**session** 202:20,21
213:17 256:15
**set** 213:5 220:1
268:2 299:25
324:10 327:10
333:23 360:5
369:6
**seven** 285:25
286:4 348:21
**seventh** 191:9
**severe** 280:15
**severity** 347:16
**share** 344:7
**shared** 241:20
**sheet** 354:22,25
370:13 372:7,10
372:18 373:1
**sheraton** 189:22
198:4
**shift** 250:8
**shkolnik** 190:7
199:2
**shopping** 245:24
276:1 295:7
306:17,25
**short** 242:16 243:2
313:24 321:17
359:22
**shortest** 276:15
**show** 235:1 248:20
265:8 269:15
274:1 302:1,13

327:11
**showed** 308:17
**showing** 258:21
261:1 304:13
349:20
**shown** 305:22,24
325:18 370:16
**shows** 327:2
345:10
**side** 235:21,21
298:11 324:10
327:10 331:11
333:23 334:4
347:13,14 348:22
348:23 349:10,19
351:1,2
**sides** 351:4
**sign** 354:20
**signatory** 259:10
**signature** 367:5
369:13 370:14
**signed** 290:5
371:13 372:18
**signing** 370:19
**similar** 215:1,4
229:20 309:6
335:11,21,24
**simply** 270:15
290:23 353:13
**sincerely** 370:21
**single** 203:6
214:16 244:6
250:19,22 251:19
262:4 275:12
358:21 363:25
**sir** 370:10
**site** 200:5,13
**sites** 214:20
**sitting** 223:25
**situations** 255:4

**six** 271:14
**slide** 292:11
303:10,13 304:12
305:2,21,22
340:23 344:21,22
346:17,23 347:18
347:23 348:4,8,19
**slides** 194:18
337:10 340:8
**small** 346:15
**smaller** 224:3
**smallest** 276:14
**sold** 294:15
**solid** 245:20
292:16
**solution** 303:23
359:12
**solutions** 370:1
373:1
**somebody** 216:4
272:20 274:4
282:6 288:12
294:15 355:23
**somewhat** 351:16
**soon** 200:10
262:15
**sooner** 287:22
**sorry** 300:7
323:24
**sort** 210:3 220:5
224:9,9 229:5
242:25 244:21
252:13 254:14,17
347:7
**sorts** 245:1
**sought** 335:5
**sound** 252:2 260:9
**sounds** 201:4
338:24
**source** 244:23
297:6

south 191:9
span 214:14
spans 270:17
speak 204:1,6
225:9 226:20
238:8 251:22
255:12 261:12
355:10,20
special 226:7,9
238:24,25 242:6
specialists 222:10
specialized 298:1
specialty 231:6
273:22 298:1
specific 209:6
224:13,18,21
226:2,12,13
230:19 240:11
268:12 271:4
274:25 282:7
292:3,16 293:4
303:18 311:14
312:16 340:8
362:5
specifically 215:19
220:9 226:10
238:6 271:10
272:14 276:25
292:22 300:22
308:24 310:7,12
313:18 338:2
356:13
specificity 321:3
specifics 203:4
specified 243:22
368:21
specifies 218:7
specify 210:12
270:17
spectrum 286:7

speculate 329:9
speculation
316:25
spells 217:9
spiking 345:20
spiral 344:15
spoke 292:24
355:6,14,23
sponsor 301:5,6
sponsored 291:1
spontaneous
215:15
spreading 347:15
square 189:22
ss 368:3
stack 253:4
staff 268:4,25
stage 360:5
stakeholder 359:5
stakeholders
316:6 326:10,23
327:21 328:8,17
328:25 354:15
stand 207:14
283:5
standard 215:17
314:9,21
standardized
194:9 291:3,17
standards 213:19
215:5,7,9,18,22
216:8 220:20
317:11 353:15
start 199:12 216:3
216:3 286:23
344:16
started 281:22
316:4
starting 252:16
352:9

starts 207:16
327:17 330:1
state 189:23
194:11 198:10
213:4 220:13
222:9 233:15
237:11,23 238:8
238:11,14 241:14
242:17 251:25
263:17 268:18
275:18 277:2
279:16 281:24
283:9 284:7,12
288:10,11 291:7
293:5,23 300:14
301:5,6 308:7
312:23 314:15
340:25 341:2
342:22 347:9,17
349:11,24 350:17
351:15 362:12
368:2,7 369:15
371:10 372:15
state's 262:16
stated 256:22
307:20 311:8
statement 231:9
284:16 354:23
371:13,14 372:19
372:19
states 189:1 198:8
217:20 230:4
237:1 262:14
263:21 287:17
290:14 301:3
303:13,14 332:12
340:25 341:3,9,10
341:12,14
statewide 344:23
stating 266:24

statistical 301:22
statistically 341:4
341:5,6
statistics 289:3
360:11
stats 289:3
status 209:24
210:1 254:7 333:9
365:22
stay 233:24 298:3
343:15,18
stem 322:22
stenotypy 368:14
step 210:2 212:9
212:15,19 213:1
218:3 308:2
stephanie 327:17
steps 292:19 361:9
stop 311:5
stops 248:17
stored 355:1
strange 260:9
strategic 359:1
strategy 252:2
271:19 276:7
street 189:23
190:4,8,13,17,22
191:4,9
strict 280:6 353:15
stricter 279:17,25
280:3 290:15
strike 225:19
228:21
strong 215:14
structure 220:16
221:9,25 233:23
studies 320:18
357:10
study 259:14
260:5

**subheading**
236:23
**subject** 199:20
201:9 237:2 320:8
335:7,17,25
**subjects** 282:17
**submission** 259:16
**submit** 262:7
355:20
**submits** 301:4
**submitted** 199:22
203:1,8 359:8
**subscribed** 371:10
372:14 373:21
**subsection** 330:25
331:3 335:20
**subspecialists**
282:1
**substance** 222:6
274:4 275:12
335:4,23 336:9
**substances** 216:5
248:2 270:24
271:1,9,17 272:7
273:19,21,24
296:17
**successful** 297:1
**sudden** 220:21
343:25
**suddenly** 222:5
**sufferers** 290:7
**suffering** 280:21
288:7
**suggest** 230:14
264:10 295:11
324:25
**suggestion** 248:3
248:10 285:3
**suggests** 266:14
**suite** 190:9,18
191:9 370:2

**sulfate** 255:16
266:18
**summarize** 247:16
**summary** 204:12
230:5,10 231:9
250:14 354:22
**summit** 189:14
190:2
**superior** 370:1
**supplant** 357:16
357:20
**supply** 272:18,19
**support** 259:3
276:6 286:3 293:2
350:2 351:9 353:1
353:6,13,18 354:3
**supporting** 308:7
**supposed** 216:10
218:5
**sure** 211:20
214:19 218:19
219:9 220:11
221:5 231:3,9
235:20 239:6
246:23 251:22
254:4,9,22 257:3,4
260:8 264:18
271:7 280:23
281:19 282:19
283:7,20 285:2
286:8,24 287:11
292:9,10 293:3
302:10 303:20,25
307:8 308:6,12,14
309:15,16 312:5,7
312:8,10,15 318:5
322:5 329:12,16
330:7 342:23
350:12 353:24
354:19

**surgeons** 304:5
**surgery** 298:1
**surprise** 206:11
236:15
**surprising** 344:6
**suspect** 207:24
**switch** 222:5,24
223:15
**switching** 265:3,6
**sworn** 201:15
368:10 371:10,13
372:14,18 373:21
**symptoms** 339:13
339:15 340:4
**syndrome** 338:12
339:14,16 342:3,8
345:7 346:1
**system** 241:10,15
241:18 247:24,25
272:13 273:25
351:5 352:11
**systems** 213:5
239:23 351:10

**t**

**tables** 230:22
**tablet** 255:16
**take** 198:4 215:12
216:25 218:4,9
219:12 246:23
249:8 250:9,24
251:5 257:9,12
265:20 267:16
292:20 306:4
324:25 325:17
351:11,23 354:3
364:23
**taken** 189:22
216:2 315:21
316:23 322:21
323:6 357:3
368:20

**takes** 287:1 351:5
360:4
**talk** 255:7 270:12
361:9
**talked** 215:5
221:20 224:25
229:19 232:8
237:8 238:20
239:11 262:24
296:16
**talking** 210:8,9
213:25 218:16,18
218:21 307:19
316:16 331:16
342:6
**talks** 250:16
**tapentadol** 335:1
335:3,22
**task** 309:6,9,13,16
309:22 310:2
311:9,10,20
312:14,19,22
313:3 316:6 359:2
**tasks** 240:12
**team** 204:2,7
211:21 221:3
223:23 224:4
227:23 229:12
230:18 231:9
232:6 237:20
238:15,17,21,23
238:24 239:2
241:2,5 242:15
253:17 254:5,17
255:9 256:7,14,23
257:4 292:19
308:15 350:25
363:10 364:11
**teams** 309:6
**technology** 241:10

**ted** 282:21 284:15
**teeth** 274:15
**tell** 213:23 230:22
    236:14 244:5
    246:20 247:10
    249:9 265:21
    292:23 293:16
    316:20 339:15
    345:2 347:7
    353:15 355:21
**telling** 336:13
**tells** 248:1
**tenth** 191:4
**term** 214:1 215:6
    217:25 219:12
    295:7 296:15
    324:22,23 338:10
**terms** 218:7
**terribly** 229:13
**testified** 205:10
    207:2 239:25
    241:13 268:4
    277:11 280:12
    319:5 360:7,20
**testify** 368:10
**testifying** 202:6
**testimony** 202:12
    208:24 236:14
    264:7 289:21
    309:8 319:6,19,23
    359:9 361:8 363:5
    363:7 368:12,17
    371:6,7 372:6,9,12
**testing** 215:13
**tests** 301:22
**thank** 274:21
    306:2 321:14
    322:7 329:17
    352:12 358:15
    360:19 362:18,19
    365:24

**therapeutics**
    193:19 260:20
    261:8
**therapies** 290:2
**therapy** 210:2
    212:10,15,19
    213:1 289:23
    308:2
**thing** 210:3 244:21
    312:16 343:19
**things** 295:3 320:2
    322:19 324:12
    325:10 337:1
    338:9 339:21
    340:1 352:2
    362:21
**think** 204:18
    232:7 241:13
    244:8 245:5
    249:23 259:20
    261:16 264:19,23
    267:15 270:7
    271:18 273:6
    275:9,11,14 279:3
    280:16 282:15,16
    282:18 283:3,20
    283:24 284:2
    285:3 286:15
    287:1 289:8 295:4
    297:17 303:21
    306:1 312:16
    313:14 316:18
    340:12 342:1
    344:9 347:14
    357:2,9,23 359:6,8
    364:5
**thinking** 289:9
**third** 217:20
    250:16 284:15
    326:9 328:15
    340:11

**thirty** 370:18
**thought** 243:13
    286:14
**thoughts** 251:4
**thousand** 345:8,11
    346:9 348:15
**threat** 263:22
    264:4,13
**three** 246:1 272:15
    280:19 349:6,19
    355:13 363:21
**threshold** 209:20
    210:14,25 211:17
    211:25 212:7
**thresholds** 222:10
**tie** 213:7
**tied** 254:11 268:17
**tight** 241:18
    242:13 361:25
**tightly** 275:25
**time** 198:3 205:22
    206:1,13,15,23
    207:9,16,17
    208:24 221:7,15
    226:20,22 237:13
    238:19 240:12
    242:4,9,16 243:10
    245:1,2,8,16,22
    247:8,19 251:5
    261:13 263:2,8
    264:23 265:2
    266:9 267:16
    270:17 275:1,10
    275:10,21 276:22
    276:25 278:5
    280:1 281:17
    287:1,4,9 293:13
    293:17 301:24
    302:2,5 303:23
    304:7,19 309:2,11
    310:8 316:10,13

316:16 319:23
    320:3,11 325:5
    330:10 334:1,18
    339:5 341:23
    345:10,19 350:15
    351:24 352:7,13
    354:24 360:5
    364:3,7 368:20
**timeline** 300:25
    302:7,11 305:22
    305:24
**timely** 200:4
**times** 364:2
**timing** 218:20
    266:14
**title** 270:19
**titled** 341:18
    348:20 350:2
**today** 202:12
    219:1,16 223:25
    241:6 313:16
    352:13 363:7
    364:2
**today's** 198:2
    202:20 204:10
**told** 358:5
**tolerance** 280:14
**tool** 219:21 226:17
    256:17 257:23
    258:5
**tools** 225:18,21
    301:4
**tooth** 304:10
**top** 282:9 348:13
    348:14 363:23
**topic** 262:1
**topics** 294:24
    299:14 357:13
    363:22,22 365:6
**tops** 230:14

**torok** 191:16
**total** 245:20 273:6
  273:7 292:15
  303:17 304:14
**totality** 310:10
**totally** 230:12
  312:15
**touch** 287:6,10
**touched** 221:4
**town** 190:17
**track** 288:16,18,22
  302:6 305:23
**tracked** 243:10
  245:24
**tracking** 276:21
**traditional** 331:12
  331:23 332:10
**trained** 292:2
**transcribed**
  368:15 371:7
**transcript** 192:1
  203:18,23 319:18
  364:2 367:3,6,9,11
  370:11,12 371:5
  371:12 372:5,11
  372:17
**transcription**
  368:16
**transformation**
  194:15 302:20
  303:3
**transportation**
  312:12 343:24
**treat** 251:7 284:20
  285:7 310:12,13
  310:15,17,25
  311:3
**treatment** 216:3,5
  222:17,21 223:17
  282:2 289:14
  312:6,9 338:7

  350:23 351:1,19
**treats** 310:21
**tremors** 339:18
**trend** 289:10
  341:23 345:19
  347:14 348:16
**trends** 268:10
  276:24
**tried** 282:2 317:8
  359:1
**true** 219:15,16
  226:24 240:8
  267:9 353:25
  364:5 368:16
**truth** 368:11,11,11
**truthful** 202:12,17
**try** 199:18 233:20
  259:4 261:19
  299:16 310:14,18
  318:10 322:22
  351:2,4
**trying** 232:23
  247:2 251:16
  255:1 260:10,14
  265:2 273:9 276:7
  282:12 309:18
  310:10 318:5
  338:5,25 339:3
  350:11,21,22
  352:7 364:19
**turn** 229:25
  234:24 235:9,11
  235:12 236:21
  247:9 250:13
  253:3 292:11
  300:24 303:10
  304:12 305:21
**two** 194:5 211:6
  220:4 247:17
  257:10 271:8
  272:19 273:10

  281:7 300:4
  332:22 333:5,12
  333:19 338:1
  343:1 344:5
  345:12 350:21
  355:12 363:19
**type** 229:14
  231:23 323:20
  324:2,6
**types** 214:10
  228:20,22 251:2
  289:25 296:24
  304:4 310:2 312:9
  356:9
**typical** 341:11
**typically** 214:10
**typo** 270:6

## u

**u.s.** 341:4,5,7
**ultimately** 285:12
  344:15
**umbrella** 242:14
**unable** 200:24
**unaware** 290:15
  314:15
**underlying** 271:18
  276:7
**understand**
  199:16 200:17
  202:2 204:20
  206:14 208:13
  234:3,21 255:1
  271:7 273:9
  278:16 285:2
  314:19 322:4
**understanding**
  207:21 208:24
  212:1 228:1
  231:15 236:14
  240:16 245:15
  246:24 247:12

  253:2 257:22
  258:1,8 261:14
  271:3 284:21
  287:24 310:1
  343:9 355:17
  358:9 363:15
**understands**
  231:10
**understood** 316:8
  338:23
**undertaken** 293:1
  352:24
**underway** 303:4
  338:1
**undesirable**
  284:18
**unique** 303:15
**united** 189:1 198:8
  340:25 341:3,12
**university** 268:18
**unrelated** 269:4
**unsafe** 296:6
**unusual** 361:6
**unwilling** 285:7
**updated** 256:24
  257:24 258:10
**updates** 270:11
**ups** 322:2
**urgent** 263:22
  264:3,12
**use** 193:12 219:21
  225:22 226:8
  232:1,3 246:9,19
  247:15 251:9
  256:10 259:6
  260:12 273:1
  274:11 278:7
  288:21 289:15
  296:6 297:5
  299:15,16 304:17
  305:2,14 308:17

308:18 309:1,2,3,7
310:10,13,18,21
311:4 338:2,5
341:18 343:20
350:9,14 364:7
**uses** 272:9
**usually** 229:16
**uterine** 338:13
**utilization** 193:11
215:3 220:8,11
243:20 244:15,19
245:24 246:7,18
247:13 249:21
253:5,7,7 268:9
270:24 278:10
297:3 329:19
**utilized** 239:16

**v**

**v** 189:10,12,14
**value** 303:5
**variability** 211:12
236:16
**variables** 305:19
**variation** 209:19
251:2 252:1
**variety** 214:12
282:5 316:8 320:8
357:12
**various** 238:16
352:24 356:9
**vary** 210:13
**varying** 243:2
**vendor** 199:18
200:12 228:25
229:12
**vendors** 228:10,23
**ventilator** 215:12
**verbally** 282:5
**verbatim** 314:19
**verify** 225:12

**veritext** 370:1,7
373:1
**veritext.com.**
370:17
**versa** 212:22
**versus** 254:16
342:5
**vice** 212:22
**videographer**
191:16 198:1
247:3,7 267:17,20
306:6,9 313:22,25
321:15,18 352:14
352:17 359:20,23
365:25
**videotaped** 189:17
198:5
**view** 266:20
288:20 296:18
357:23 363:4
**virtue** 343:17
**visual** 347:9
**visualization**
302:2
**visually** 347:15
**vital** 289:3 360:10
**volume** 189:17
**voted** 333:8

**w**

**w** 190:8
**wait** 286:23
**waiting** 244:6
362:25
**waived** 370:19
**walls** 316:1
**walmart** 191:7
198:21 360:3
**want** 199:12 201:2
210:18 218:19
221:5 232:21
239:7 271:13

287:5 303:24
306:4 311:2 322:3
322:10 325:17
330:21 340:8
355:19 362:20
364:19
**wanted** 222:24
233:10 234:1,4
243:12 250:7
252:9,21 253:1
329:15 365:21
**wants** 233:17
**washington**
190:22 191:5
**watch** 295:8,8
**way** 219:12 231:2
231:21 238:14
252:7 271:25
288:15 298:16,22
318:15 340:20
345:8 363:3 364:7
**ways** 218:24,25
239:23 251:16
295:4 318:11
**wc.com** 190:23
**we've** 222:11
234:19 239:11
244:6 245:23
250:6 261:2
289:10,12 293:21
296:16,25 330:18
332:2 364:11,19
**wean** 216:4
**website** 217:15
218:24 234:23
256:19 338:19,22
**week** 202:23
203:20
**weekly** 258:2,3,12
**weeks** 343:16

**weight** 339:23
**weighted** 346:12
346:17,24 347:19
347:24 348:5,8,23
**weiskirchner**
292:8
**welcome** 340:11
**went** 207:17
251:14 264:22
310:9 317:7
**west** 190:17
**wharton** 241:6
255:11 268:3
318:1 319:12
363:1
**wharton's** 292:23
317:18 319:19,23
**whereof** 369:5
**whichever** 285:11
**white** 235:16,17
235:24 236:1
**wide** 214:12
**widen** 304:8
**wilker** 331:8
**williams** 190:21
198:18
**willing** 284:20
**wisdom** 274:15
**wish** 364:7
**withdraw** 365:23
**withdrawal** 340:5
**withdrawing**
365:13
**witness** 202:8
257:19 261:15
262:2,2 288:3,5
294:21 315:15
319:7 320:1
329:11 362:19
363:16,19,20,24
364:14 365:7

367:2 368:9,13,15
368:18 369:5
370:8,11 371:1,4
371:11 372:1,4,15
**witnesses** 363:21
364:21,22
**witness'** 370:14
**women** 226:8
239:2 259:5
342:18 350:22
351:5,6
**work** 199:18
204:12,18 239:19
239:20,21,22
252:23 253:15
268:13 269:1
280:11 296:23
307:21,21 313:10
323:17 343:22
351:24 363:2
364:20
**worked** 207:18
221:7 222:19
237:10
**working** 240:17
283:8 286:24
287:12
**works** 251:24
**worried** 287:17
318:14
**worse** 347:8,12
**worst** 349:17,21
349:23
**write** 215:24
303:16 318:20
**written** 287:10
303:23 315:5,9,19
316:22
**wrong** 236:15
**wrote** 281:20
282:7 285:22

**wymyslo** 282:21
284:15

**x**

**xerox** 228:13
229:19 250:3

**y**

**yanked** 288:10
**yeah** 255:11 356:1
**year** 205:5 206:6,7
206:13,15 319:20
345:11 346:11,24
347:19
**years** 204:13
232:4 244:6
245:13 250:12
252:11 261:16
271:2 289:10
300:5 313:14
316:15 318:7
332:22 333:5,12
333:19 345:17
346:14 348:21
351:12
**yesterday** 200:9
201:5
**york** 191:14,14

**z**

**zero** 267:10
**zinsmaster** 191:8
198:20,20 359:15
360:1,3 362:17
365:11,21
**zip** 200:15

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.