1                UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF OHIO

3                    EASTERN DIVISION

4

5     ----------------------------) MDL No. 2804

6     IN RE:  NATIONAL PRESCRIPTION )

7     OPIATE LITIGATION            )

8     ----------------------------) Case No. 17-md-2804

9     THIS DOCUMENT RELATES TO:     )

10    ALL CASES                     )

11    ----------------------------) Hon. Dan A. Polster

12

13                   HIGHLY CONFIDENTIAL

14        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

15

16                VIDEOTAPED DEPOSITION OF

17                   KELLY JAMES BAKER

18

19                   January 24, 2019

20

21                 Indianapolis, Indiana

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5           The videotaped deposition of KELLY JAMES

6   BAKER, called by the Plaintiffs for examination, taken

7   pursuant to the Federal Rules of Civil Procedure of

8   the United States District Courts pertaining to the

9   taking of depositions, taken before JULIANA F.

10  ZAJICEK, a Registered Professional Reporter and a

11  Certified Shorthand Reporter, at the Indianapolis

12  Marriott Downtown, Texas Room, 350 West Maryland

13  Street, Indianapolis, Indiana, on January 24, 2019, at

14  9:03 a.m.

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2    ON BEHALF OF THE PLAINTIFFS:

 3          MOTLEY RICE LLC
            28 Bridgeside Boulevard
 4          Mt. Pleasant, South Carolina 29464
            843-216-9250
 5          BY:  MICHAEL E. ELSNER, ESQ.
                 melsner@motleyrice.com
 6

 7    ON BEHALF OF THE PLAINTIFFS:

 8          WEISMAN KENNEDY & BERRIS CO LPA
            1600 Midland Building
 9          101 Prospect Avenue
            Cleveland, Ohio 44115
10          216-781-1111
            BY:  DANIEL P. GOETZ, ESQ.
11               dgoetz@weismanlaw.com

12
      ON BEHALF OF CARDINAL HEALTH, INC.:
13
            ARMSTRONG TEASDALE LLP
14          7700 Forsyth Boulevard, Suite 1800
            St. Louis, Missouri 63105
15          314-621-5070
            BY:  SARAH E. HARMON, ESQ.
16               sharmon@ArmstrongTeasdale.com

17
      ON BEHALF OF CVS INDIANA, LLC AND CVS RX SERVICES,
18    INC.:

19          ZUCKERMAN SPAEDER LLP
            1800 M Street, NW, Suite 1000
20          Washington, D.C. 20036
            202-778-1800
21          BY:  R. MILES CLARK, ESQ.
                 mclark@zuckerman.com

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES: (Continued)
 2    ON BEHALF OF ENDO HEALTH SOLUTIONS INC., ENDO
      PHARMACEUTICALS INC., PAR PHARMACEUTICAL COMPANIES,
 3    INC.:
 4          ARNOLD & PORTER KAYE SCHOLER LLP
            777 South Figueroa Street, 44th Floor
 5          Los Angeles, California 90017-5844
            213-243-4238
 6          BY:  JAKE R. MILLER, ESQ. (Telephonically)
                 jake.miller@arnoldporter.com
 7
 8    ON BEHALF OF HBC SERVICES:
 9          MARCUS & SHAPIRA LLP
            One Oxford Centre, 35th Floor
10          Pittsburgh, Pennsylvania 15219
            412-471-3490
11          BY:  PAUL M. MANNIX, ESQ. (Telephonically)
                 pmannix@marcus-shapira.com
12
13    ON BEHALF OF McKESSON CORPORATION:
14          COVINGTON & BURLING, LLP
            One City Center
15          850 Tenth Street, NW
            Washington, D.C. 20001
16          202-662-5531
            BY:  KEVIN KELLY, ESQ. (Telephonically)
17               kkelly@cov.com
18
      ON BEHALF OF WALMART INC.:
19
            JONES DAY
20          77 West Wacker Drive
            Chicago, Illinois 60601-1692
21          312-269-4164
            BY:  PATRICK J. BEISELL, ESQ. (Telephonically)
22               pbeisell@jonesday.com
23
24
```

```
 1   ALSO PRESENT:

 2         KAITLYN EEKHOFF, Law Clerk,

                 Motley Rice LLC

 3

           JOHN KNOWLES, Trial Technician

 4

 5   THE VIDEOGRAPHER:

 6         MR. ANTHONY MICHELETTO,

           Golkow Litigation Services.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    I N D E X
 2   WITNESS:                              PAGE:
 3    KELLY JAMES BAKER
 4        EXAM BY MR. ELSNER................... 11
 5        EXAM BY MR. CLARK................... 366
 6
 7                     *****
 8
 9                 E X H I B I T S
10   CVS- BAKER EXHIBIT              MARKED FOR ID
11    No. 1    Kelly Baker | LinkedIn          13
12    No. 2    7/17/13 E-mail chain with       21
               attachment; CVS-MDLT1-000118931 -
13             934
14    No. 3    9/27/06 DEA letter sent to CVS  55
               Indiana; CVS-MDLT1-000010552 - 555
15
      No. 4    12/27/07 DEA letter sent to Dear 56
16             Registrant; CVS-MDLT1-000013535 -
               536
17
      No. 5    8/29/13 E-mail with attachment;  58
18             CVS-MDLT1-000009821 - 847
19    No. 6    1/4/13 E-mail with attachment;   68
               CVS-MDLT1-000081372 - 373
20
      No. 7    8/30/13 Item Review Report -     76
21             Control Drugs; CVS-MDLT1-000010672
               - 757
22
      No. 8    Controlled Drug - DEA Standard   92
23             Operating Procedures Manual, last
               Revision date 4/18/13;
24             CVS-MDLT1-000008572 - 635
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  E X H I B I T S (Continued)
 2    CVS- BAKER EXHIBIT                   MARKED FOR ID
 3    No. 9      1/27/11 E-mail chain with          108
                 attachments; CVS-MDLT1-000112597 -
 4               635
 5    No. 10     3/26/12 E-mail with attachment;    117
                 CVS-MDLT1-000109870 - 878
 6
      No. 11     Report titled VIPERx PDMR - High   133
 7               Priority; CVS-MDLT1-000074450 -
                 454
 8
      No. 12     Store metric sheet;               141
 9               CVS-MDLT1-000080069
10    No. 13     CVS-MDLT1-000010302 - 363          155
11    No. 14     11/29/12 E-mail chain with         167
                 attachments; CVS-MDLT1-000083064 -
12               069
13    No. 15     7/16/12 E-mail with attachment;    171
                 CVS-MDLT1-000112686 - 687
14
      No. 16     9/7/12 E-mail; CVS-MDLT1-000008249 184
15
      No. 17     3/13/13 E-mail with attachment;    198
16               CVS-MDLT1-000009848 - 855
17    No. 18     4/4/13 E-mail chain with           202
                 attachment; CVS-MDLT1-000111877 -
18               879
19    No. 19     6/10/13 E-mail;                    208
                 CVS-MDLT1-000009678
20
      No. 20     6/11/13 E-mail chain;              211
21               CVS-MDLT1-000009683
22    No. 21     Kelly Baker - Mid-Year Review -    214
                 2013 (Finalized);
23               CVS-MDLT1-000121559 - 560
      No. 22     6/10/13 E-mail;                    222
24               CVS-MDLT1-000014750
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S (Continued)
 2     CVS- BAKER EXHIBIT                   MARKED FOR ID
 3     No. 23     6/10/13 E-mail chain;                223
                  CVS-MDLT1-000030472 - 473
 4
       No. 24     6/10/13 E-mail;                      226
 5                CVS-MDLT1-000119953
 6     No. 25     7/9/13 E-mail chain;                 229
                  CVS-MDLT1-000077946 - 948
 7
       No. 26     7/9/13 E-mail chain;                 239
 8                CVS-MDLT1-000051586 - 588
 9     No. 27     7/16/13 E-mail chain;                247
                  CVS-MDLT1-000078116 - 119
10
       No. 28     7/17/13 E-mail chain;                251
11                CVS-MDLT1-000076114 - 117
12     No. 29     12/20/12 E-mail;                     257
                  CVS-MDLT1-000109775
13
       No. 30     7/16/13 E-mail chain;                263
14                CVS-MDLT1-000077910 - 911
15     No. 31     7/16/13 E-mail chain;                269
                  CVS-MDLT1-000028615 - 617
16
       No. 32     7/18/13 E-mail chain;                271
17                CVS-MDLT1-000029478 - 479
18     No. 33     7/23/13 E-mail chain;                276
                  CVS-MDLT1-000077953 - 954
19
       No. 34     11/13/13 E-mail chain;               278
20                CVS-MDLT1-000017255 - 258
21     No. 35     7/17/13 E-mail chain;                284
                  CVS-MDLT1-000077973 - 974
22
       No. 36     7/18/13 E-mail chain;                288
23                CVS-MDLT1-000118897 - 898
       No. 37     9/27/13 E-mail chain;                292
24                CVS-MDLT1-000017250
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  E X H I B I T S (Continued)
 2    CVS- BAKER EXHIBIT                    MARKED FOR ID
 3     No. 38    8/12/13 E-mail chain;                 298
                 CVS-MDLT1-000076095 - 096
 4
       No. 39    9/12/13 E-mail chain;                 301
 5               CVS-MDLT1-000119704 - 705
 6     No. 40    9/16/13 E-mail chain;                 305
                 CVS-MDLT1-000102845 - 846
 7
       No. 41    9/13/13 E-mail chain;                 309
 8               CVS-MDLT1-000103068
 9     No. 42    9/17/13 E-mail chain;                 311
                 CVS-MDLT1-000099708 - 709
10
       No. 43    7/23/13 E-mail chain;                 318
11               CVS-MDLT1-000057777
12     No. 44    9/17/13 E-mail chain;                 320
                 CVS-MDLT1-000119935
13
       No. 45    10/11/13 E-mail chain;                325
14               CVS-MDLT1-000119938
15     No. 46    11/21/13 E-mail with attachments;     334
                 CVS-MDLT1-000000409 - 420
16
       No. 47    CVS Indianapolis, IN DC DEA Visit     337
17               8/5 - 8/8/2013, Audit Report;
                 CVS-MDLT1-000008389 - 395
18
       No. 48    11/15/13 E-mail chain;                352
19               CVS-MDLT1-000092932
20     No. 49    11/25/13 E-mail;                      355
                 CVS-MDLT1-000076135
21
       No. 50    Closing letter from the DEA to CVS
22               Indiana, signed 12/31/15;             363
                 CVS-MDLT1-000008014 - 015
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        THE VIDEOGRAPHER:  We are now on the record.  My

 2  name is Anthony Micheletto.  I am the videographer for

 3  Golkow Litigation Services.

 4             Today's date is January 24th, 2019.  The

 5  time is 9:03 a.m. as indicated on the video screen.

 6             This video deposition is being held in

 7  Indianapolis, Indiana, in the matter of In Re National

 8  Prescription Opiate Litigation for the United States

 9  District Court for the Northern District of Ohio,

10  Eastern Division.

11             The deponent is Kelly Baker.

12             Will counsel please identify themselves

13  for the video record.

14        MR. ELSNER:  My name is Michael Elsner from the

15  law firm of Motley Rice on behalf of Plaintiffs.

16        MR. GOETZ:  Dan Goetz on behalf of the

17  Plaintiffs.

18        MS. HARMON:  Sarah Harmon of Armstrong &

19  Teasdale on behalf of Cardinal Health.

20        MR. CLARK:  Miles Clark from Zuckerman Spaeder

21  on behalf of CVS Indiana, LLC, CVS RX Services, Inc.

22  and the witness.

23        THE VIDEOGRAPHER:  Counsel on the phone.

24        MR. MILLER:  Hi.  This is Jake Miller from
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   Arnold & Porter on behalf of the Endo and Par

2   Defendants.

3        MR. MANNIX:  Paul --

4        MR. KELLY:  Kevin Kelly from Coving -- Kevin

5   Kelly from Covington & Burling on behalf of McKesson.

6        MR. MANNIX:  Paul Mannix with Marcus & Shapira

7   on behalf of HBC Services.

8        THE VIDEOGRAPHER:  Okay.  Our court reporter

9   today is Juliana Zajicek.

10             Please swear in the witness.

11             (WHEREUPON, the witness was duly

12              sworn.)

13                  KELLY JAMES BAKER,

14   called as a witness herein, having been first duly

15   sworn, was examined and testified as follows:

16                        EXAMINATION

17   BY MR. ELSNER:

18       Q.   Good morning.  My name is Michael Elsner

19   and I represent the Plaintiffs in the action.  I'm

20   going to be asking you some questions this morning.

21       A.   Okay.

22       Q.   Could you tell us your full name, please?

23       A.   I am Kelly James Baker.

24       Q.   And how old are you?
```

```
1        A.     I am 51.

2        Q.     And where do you live?

3        A.     I live in Frankfort, Indiana.

4        Q.     Okay.  How far is that from Indianapolis?

5        A.     It's about an hour.

6        Q.     Okay.  And did you attend Ivy Tech

7   Community College?

8        A.     Uh, yeah, so, yeah.  Yeah.

9        Q.     Okay.  And what did you study when you

10  were there?

11       A.     Computer infor -- I think they called it

12  computer information technology.

13       Q.     Okay.  Did you obtain a degree?

14       A.     Yeah, I got an associate's, but I already

15  had a degree, so I never actually went through

16  graduation.

17       Q.     Okay.  And what year did you attend Ivy

18  Tech Community College?

19       A.     It had to be about seven years ago.  I

20  can't remember the exact date because it was -- it was

21  while I was home with my daughter.

22       Q.     Okay.

23       A.     I -- I -- I attended some classes, some

24  extra computer classes --
```

```
 1        Q.    Okay.

 2        A.    -- to supplement what I already had.

 3        Q.    Was this before or after you started

 4   working with CVS?

 5        A.    I think it was before.

 6              (WHEREUPON, a certain document was

 7               marked CVS - Elsner Deposition

 8               Exhibit No. 1, for identification, as

 9               of 01/24/2019.)

10   BY MR. ELSNER:

11        Q.    I am going to just mark for you as the

12   first exhibit in the -- in the deposition, this is a

13   copy of your -- of your LinkedIn page.  It may just

14   help us get through some of your background a little

15   bit, make it easier.

16        A.    Oh, okay.  Yeah.

17        Q.    Do you recognize that?

18        A.    Yeah, that looks like me.  Yeah, that's a

19   terrible picture, but yeah.

20        Q.    I don't think it is so bad.  It is better

21   in -- in color.  On the screen you can see that.

22        A.    Oh, I -- I was actually holding the

23   camera, so...

24        Q.    Okay.  And did you write -- did you write
```

Highly Confidential - Subject to Further Confidentiality Review

1    this, your LinkedIn page?

2        A.    Yeah, I think so.

3        Q.    Okay.

4        A.    I don't look at it a lot, you know, but...

5        Q.    Okay.  I'm also -- you said you also --

6    you already had an associate degree.

7              You attended Purdue University as an

8    undergraduate, right?

9        A.    Yep, undergraduate and a graduate.

10       Q.    And a graduate, right.

11             And you -- what was your degree in as an

12   undergraduate?

13       A.    An undergraduate, it was considered

14   aeronautical engineering technology, AOT.

15       Q.    Okay.  And -- and then you got a master's

16   degree, is that right?

17       A.    Correct.

18       Q.    And what was your master's in?

19       A.    At the time they called it a master's of

20   science in business.  It is basically an MBA.  They've

21   changed the name now to an MBA, but then, Purdue being

22   a technical school, they wanted to give it a technical

23   connotation.

24       Q.    Okay.  And are you an engineer?

```
 1        A.    I am a quality engineer.

 2        Q.    Okay.  And you got your master's degree

 3   from Purdue between 1998 and 2001, does that sound

 4   about right?

 5        A.    No.  I graduated in '98.

 6        Q.    You graduated in '98 --

 7        A.    Right.

 8        Q.    -- with the degree?

 9        A.    Correct.

10        Q.    The master's degree?

11        A.    Correct.

12        Q.    Okay.  When did you graduate for your

13   undergrad?  And did you work in between or --

14        A.    I graduated in '94.

15        Q.    Okay.

16        A.    I went to work for a while, then -- only

17   about a year or so, then I decided to go back to

18   school.

19        Q.    Okay.  What did you do in that year?

20        A.    I worked for a local airport, started out

21   at a local airport in Frankfort --

22        Q.    Okay.

23        A.    -- as their mechanic, and then I went to

24   work for -- which is now a Rolls Royce but at the time
```

Highly Confidential - Subject to Further Confidentiality Review

1    it was owned by Allison Engine Company here in

2    Indianapolis, technical writer.

3         Q.    What -- what did you do when you finished

4    your MBA from Purdue, what was your first job?

5         A.    I went to work for Ford Motor Company.

6         Q.    Okay.  And what year was that?

7         A.    That was in '98.

8         Q.    And how long did you work for Ford Motor

9    Company?

10        A.    Well, ten years, but somewhere along the

11   line I became a Visteon employee because they die --

12   they divested their plant.  It just happened to be

13   where you were at at the time.  It wasn't -- real

14   similar to, like, Delphi and Delco situation.  I don't

15   remember where that delineation happened, just one day

16   your check said Ford, the next day it said Visteon.

17   But it was technically, it's the same people, same

18   place, everything, so...

19        Q.    And -- and they were -- what were they --

20   what were they doing, is this building automobile

21   plants?

22        A.    Yeah, automotive.

23        Q.    Okay.  And -- and what were you doing for

24   them?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     I did several different roles.  I went in

 2   a college rotation program.  I did, like, logistics,

 3   I -- I was an auditor for a while, traveled around

 4   doing audits.  And then I came back to Indianapolis

 5   plant, because I am from Indiana, and then I worked as

 6   a quality engineer at that plant.

 7        Q.     Is this all -- and -- and when you say "at

 8   that plant," you mean -- is that Visteon?

 9        A.     That -- it was an Visteon plant at the

10   time.

11        Q.     Okay.

12        A.     It -- it -- it is weird because it was all

13   staffed by Ford hourly people, Ford the union, and all

14   of that, and I was in the salary.  It got kind of

15   muddied.  It is hard to keep track of, but...

16        Q.     And is it fair to say you were -- you were

17   working sort of as a -- as a quality engineer and in

18   quality assurance, is that accurate?

19        A.     Correct.

20        Q.     Okay.  And then -- and then at some point

21   in -- and tell me if I'm wrong -- maybe July of 2007,

22   you started working for, is it Aerodyne Engineering?

23        A.     Aerodyne Engineering.

24        Q.     Okay.
```

```
 1        A.      After --

 2        Q.      And what did they do?

 3        A.      They make components for aerospace

 4   applications and gas turbines, some even energy.

 5        Q.      Okay.

 6        A.      It's a high -- kind of a high-end

 7   engineering firm, pretty small.

 8        Q.      And -- and were you again a quality

 9   assurance --

10        A.      I was a --

11        Q.      -- manager?

12        A.      -- quality assurance manager.  I don't

13   know if you are familiar with ISO 9001.

14        Q.      I am not, but I see it indicated.

15        A.      You'll see it in places and you'll see it,

16   like, on the water company.  Anyway, it is quality

17   management system to be certified as a third-party

18   registrar.  I installed their system for them because

19   the -- their customer base was leaning on them to be

20   certified.

21        Q.      Okay.

22        A.      They are common in manufacturing.

23        Q.      And I saw that you worked there until

24   about March of 2009, does that --
```

```
 1        A.    Correct.

 2        Q.    -- sound about right?

 3              Okay.  And -- and then why did you leave

 4   Aerodyne?

 5        A.    They had a round of layoffs.  It was --

 6   you know, like I say, it was kind of funny because --

 7   well, not funny.  Being a small company, coming from

 8   Ford, nothing moves on a dime, but when I got there in

 9   March we were having a pizza party to celebrate their

10   previous year's record sales.  By the next month,

11   well, they were laying everybody off.

12              Yeah, so -- and so I got laid off.  And

13   I'll answer your next question.  I became a

14   stay-at-home dad at that time.

15        Q.    Okay.

16        A.    My wife was a pharmacist, she was

17   pregnant, and our baby was born maybe almost like

18   three weeks after I got laid off, so...

19        Q.    Okay.  And you said you're --

20        MR. CLARK:  And I'm sorry.  You can wait until

21   he asks the question before you answer it, but...

22   BY THE WITNESS:

23        A.    Well, I knew it.

24   BY MR. ELSNER:
```

1    Q.    Well, in this -- in this background

2    questions it's pretty --

3    A.    It is like being on a job interview.

4    Q.    It is a different job, but yes.

5          You said your wife worked as a pharmacist.

6    For whom did she work?

7    A.    It's called Eskenazi Health.  It is the

8    state -- or not really state, but the city hospital.

9    Q.    Okay.

10   A.    It was -- it was called Wishard at the

11   time, but they got a grant, I think, of something and

12   they've changed the name.  It is downtown

13   Indianapolis.

14   Q.    Okay.  And how -- is she still working as

15   a pharmacist?

16   A.    Correct.

17   Q.    Where does she work now?

18   A.    I do not know.  She works in that system,

19   but I don't know where.  We are no longer married,

20   so...

21   Q.    Okay.  And so at some point in time in

22   around 2011 you started to do some work at the VA

23   hospital, is that right?

24   A.    Yeah, I -- I was part -- that was part of

1    the Ivy Tech curriculum, you know, you do some

2    volunteer work.  I did some volunteer work for the VA

3    hospital in their IT department.

4         Q.    Okay.  And you did that through, what,

5    almost a year, is that right?

6         A.    I think so.

7         Q.    You know, I've -- I've got also -- why

8    don't we mark this as Exhibit 2.  This may be a little

9    bit easier.

10                   (WHEREUPON, a certain document was

11                    marked CVS - Elsner Deposition

12                    Exhibit No. 2, for identification, as

13                    of 01/24/2019.)

14   BY MR. ELSNER:

15        Q.    Mr. Kelly, this is a -- the front page is

16   an e-mail, but it is forwarding your resume back in

17   2013.  And if you turn to the second page, it's a copy

18   of the resume that you --

19        A.    Yeah --

20        Q.    -- gave CVS.

21        A.    Yeah.

22        Q.    Is that it?  Does that look about right?

23        A.    Yeah.

24        Q.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

1              And it -- it lists, it says your current

2    work experience, the very first thing, Indianapolis

3    Veterans VA Hospital, is that right?

4         A.    Yeah.

5         Q.    Okay.

6         A.    And I wasn't being paid.  That was a

7    volunteer position.

8         Q.    That was a volunteer work.

9         A.    Yeah.

10        Q.    Okay.

11             And -- and then, how is it that you came

12   to be hired by CVS?

13        A.    I decided to return to the workforce and I

14   applied for a posting on LinkedIn, actually.

15        Q.    Okay.  What was the post for?

16        A.    I don't remember what it was called, it

17   has been so long ago.  It was for a type of analyst

18   position and, I think, talked about numbers and trend

19   analysis and my quality background.  It seemed like a

20   pretty logical fit, so I applied.

21        Q.    Okay.  Who did you interview with when you

22   were hired?

23        A.    When I was -- I interviewed with Aaron

24   Burtner and, oh, I can't remember the name, you'll

Highly Confidential - Subject to Further Confidentiality Review

1    bring her up, when you -- when you bring her name up

2    I'll -- I'll remember it, which was -- I think she was

3    his boss at the time.

4         Q.    His boss?  Pam Hinkle?

5         A.    Pam Hinkle, that was it.

6         Q.    That --

7         A.    That was, yeah, Pam Hinkle.

8         Q.    Okay.

9         A.    I think that was the only time I ever met

10   Pam.

11        Q.    And do you -- Aaron Burtner was your --

12   was he your immediate supervisor --

13        A.    Correct.

14        Q.    -- when you joined CVS?

15        A.    Yeah.

16        Q.    And was he a -- a suspicious order

17   monitoring analyst, do you recall?

18        A.    I don't know.

19        Q.    Or manager?

20        A.    I don't -- I didn't -- he was the manager.

21   I knew he had a manager role, I believe, and -- and

22   that's all I can remember.  I can't even --

23        Q.    Do you remember what Pam Hinkle's role

24   was?

Highly Confidential - Subject to Further Confidentiality Review

1     A.    No.  I -- like I say, she interviewed me

2  and I never saw her again after that.

3     Q.    Okay.  Did you interview with anybody

4  else, did you interview with Mark Nicastro or anybody

5  else?

6     A.    Not that I can remember, you know.  I --

7  not that I can remember.  All I remember, the one

8  interview, because I -- the only reason I re --

9  remember that is because I brought in all of my

10  statistical analysis slides from automotive and I was

11  showing him all of these little graphs and they're

12  like, Oh, wow, you know.

13     Q.    And at that point in time did you have any

14  experience working in -- with pharmaceuticals?

15     A.    With pharmaceuticals, no.

16     Q.    Okay.  And did you have any experience

17  with controlled substances, controlled drugs?

18     MR. CLARK:  Object to -- object to the form.

19     THE WITNESS:  What did you say?

20     MR. CLARK:  I -- sorry.  I objected to the form

21  of the question.

22     THE WITNESS:  Oh.  Oh.

23     MR. CLARK:  You can still answer.

24  BY THE WITNESS:

```
 1       A.    No.  You mean in a professional format?

 2  BY MR. ELSNER:

 3       Q.    I -- I don't mean did you take them

 4  yourself.

 5       A.    No, I didn't say -- that could be --

 6       Q.    I mean in a professional sense, did you --

 7       A.    No, no, no, no, really.

 8       Q.    -- did you -- did you work at all with

 9  controlled substances in any of your prior work?

10       A.    No, no.

11       Q.    All of your prior work was -- it's sort of

12  in engineering, wasn't it?

13       A.    Manufacturing, yes.

14       Q.    Okay.  All right.

15             And you worked at CVS from December

16  of 2012 through November of 2013, is that right?

17       A.    Apparently.  I don't remember.  I thought

18  it was something like six months.  It's such a flash

19  in the past, but I don't...

20       Q.    If -- if you look back to Exhibit 1, which

21  is your LinkedIn page, you put some -- you put some

22  dates here?

23       A.    Yeah.

24       Q.    And if you look at the CVS Health section,
```

1    which is on the second page.

2         MR. ELSNER:  John, this is Exhibit 1.

3    BY THE WITNESS:

4         A.    Yeah, that's what it says.

5    BY MR. ELSNER:

6         Q.    You -- you -- you wrote here on your

7    LinkedIn page that it was between December 2012 and

8    November of 2013.

9              Does that -- is that accurate?

10        A.    I think so.

11        Q.    Okay.  I mean, you -- you -- you did your

12   best to make your LinkedIn page as accurate as you

13   could?

14        A.    Yeah, I did at that time, you know.

15        MR. CLARK:  Mike, I just wanted to note for the

16   record I see here on this version that's printed out

17   of the LinkedIn page under the CVS, at the end there

18   is a -- it says "see more."  I assume that the actual

19   LinkedIn page has further description.

20        MR. ELSNER:  What we may try to do on a break is

21   we'll see if we can pull that out.  I -- I thought it

22   was more complete, but I -- I don't think there is

23   much else there, but we'll get it printed out.

24        MR. CLARK:  No, I just wanted to note it for the

1    record.

2        MR. ELSNER:  I understand.

3    BY MR. ELSNER:

4        Q.    After you left CVS you started work as a

5    quality engineer -- engineer at Voestalpine, is

6    that --

7        A.    Yeah.

8        Q.    I'm sure I butchered that.  How do you say

9    it?

10       A.    Well, that's a European firm.  It's

11   Voestalpine, I think.  Well, we never knew.  Somebody

12   said Voestalpine, who knows, you know, but -- but,

13   yeah, it's here in Lafayette.

14       Q.    Okay.  And what type of work did you do

15   for them?

16       A.    Quality engineering.

17       Q.    Okay.  And -- and you were there for about

18   two years, is that right, 2012 to '14?

19       A.    No, no, it wasn't very long.  Because the

20   only reason I can remember -- true --

21       Q.    Oh, you had --

22       A.    -- the reason I left, they got hit by a

23   tornado.

24       Q.    Oh.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    And it was even in the news.  And it took

 2   out half of the building, so our capacity went back

 3   overseas, so I really had nothing to do.

 4        Q.    All right.

 5        A.    And then I went up to Peru.

 6        Q.    Okay.  So on your ap -- on your LinkedIn

 7   page just above CVS, it -- it lists that company and

 8   it says November 2013 through May of 2014, so about

 9   seven months, is that right?

10        A.    Yeah, seven months, yeah, because I wasn't

11   there very long, I knew that.

12        Q.    And then -- and then you started working

13   for -- on the first page, what is this company on the

14   bottom there?

15        A.    That is Heraeus Miller.  It's another

16   firm -- European firm.  So it's Heraeus Electro Nite.

17        Q.    I learned my lesson not to try to

18   pronounce it.

19        A.    Yeah.

20        Q.    I'm going to let you do that.

21              And you worked there from July 2014 to

22   November 2015?

23        A.    Yeah.  That's up in Peru, Indiana.

24        Q.    Okay.  And also as a quality engineer?
```

```
 1        A.     Correct.

 2        Q.     All right.  And why did you leave that

 3    position?

 4        A.     Another -- they had a big round of

 5    layoffs.  Quality is typically overhead for most of

 6    the companies, so there were years -- you get used to

 7    be being on the chopping block.  We are a cost center,

 8    so.  They closed a plant up in Pennsylvania.  They

 9    supported the steel industry, and so lacking in

10    economics, so, yeah, everybody was crunching at that

11    time, so.  Which is probably more than you wanted to

12    know, but...

13        Q.     How -- how many people got laid off

14    roughly?

15        A.     Oh, I don't know.  I know me and two other

16    engineers, and they closed the whole plant in

17    Pennsylvania and brought some of them down.  But once

18    you're out, you're out.  They -- you're out the door.

19    They don't let you come back in.

20        Q.     Okay.  And then -- and then it looks -- at

21    least according to your LinkedIn page there, the next

22    position here is as another quality assurance

23    consultant for Sommer Met -- Metalcraft, is that

24    right, on the --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Sommer Metalcraft.  Well, no, because,
 2   see, I did some other jobs --
 3        Q.    Okay.
 4        A.    -- in that time.  Now, I --
 5        Q.    What -- what did you do between Heraeus
 6   Electro or the company called --
 7        A.    I had some -- some contract hourly jobs,
 8   you know, just to pay the bills.  I worked for the gas
 9   company for a while, and a --
10        Q.    Okay.
11        A.    -- and that.  Now --
12        Q.    And who else?
13        A.    And I don't even remember all of them.
14              I also -- all of this time, and probably
15   for the last 15 years, maybe, I have been a motorcycle
16   safety instructor.
17        Q.    Yes, I see that here.
18        A.    I do that on weekends and the summer.
19        Q.    Okay.
20        A.    And so I kind of picked that -- you know,
21   I keep doing that during this time and...
22        Q.    Is that a paid position?
23        A.    Yes.
24        Q.    Okay.  So you had -- you had a series
```

Highly Confidential - Subject to Further Confidentiality Review

1   of -- of contract jobs --

2       A.    Yeah.

3       Q.    -- from about November 2015 to

4   January 2018, does that -- or I guess May of 2008 --

5   or, no, January of 2018.

6             Does that seem right?

7       A.    Well, nah -- yeah -- well, there were some

8   other -- yes, some quality jobs that didn't last very

9   long and, you know, contract like that.

10      Q.    Okay.

11      A.    Engineering.  Nothing to really --

12  suitable for the resume.

13      Q.    All right.  And then -- and it has here

14  that you worked for this Sommer Metalcraft as a

15  qual -- this --

16      A.    Yeah.

17      Q.    -- again, as a quality assurance?

18      A.    That's what -- that's my last role before

19  this role now.

20      Q.    Okay.  And how long did you work there?

21      A.    Three months.

22      Q.    Three months.

23      A.    Just --

24      Q.    What happened there?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    They closed the plant.

 2        Q.    All right.

 3        A.    They were like, Hey, sorry, we thought it

 4   was going to work out, but we are closing the plant,

 5   so...

 6        Q.    Okay.

 7        A.    It was a family-owned business.

 8        Q.    All right.  And then -- then who do you

 9   work with today?

10        A.    FLIR.

11        Q.    Okay.  And you started there in May

12   of 2018?

13        A.    No.  I think it was closer to June.

14        Q.    Okay.

15        A.    June.

16              Yeah, there was a little bit of time off

17   in between.

18        Q.    All right.  And -- and -- and what do you

19   do for them?

20        A.    Quality engineer.

21        Q.    Okay.  So all of your positions, except

22   for the one position at CVS, have generally been in

23   quality assurance or quality engineer, is that...?

24              MR. CLARK:  Object to the form.
```

```
1   BY THE WITNESS:

2       A.    I wouldn't say that specifically because

3   at Ford I did a little bit of everything.

4   BY MR. ELSNER:

5       Q.    Okay.

6       A.    I only -- I ended up in quality at the

7   tail end of my tenure at Ford.  You know, I did -- I

8   came in at quality rotation, I did some -- I did some

9   finance, some statistics -- or I -- I had an stint in

10  the finance department, I did some logistics, shipping

11  and receiving, I was supervisor of metrology.

12      Q.    But -- but most of your jobs were as an

13  engineer?

14      A.    Yeah --

15      Q.    Is that fair?

16      A.    -- that's what I recall.

17      Q.    Okay.  And -- and you have a degree in

18  that, right?

19      A.    Well, I have a general degree.

20      Q.    But a master's degree?

21      A.    Yes.

22      Q.    Okay.  Let's go back to -- well, let me

23  say this:  What did you do to prepare for today's

24  deposition?
```

1          You are not currently employed at CVS, is

2    that right?

3          A.    No, no.

4          Q.    Okay.  And who contacted you to let you

5    know that you were going to be deposed in this case?

6          A.    I believe it was Eric, initially --

7          Q.    Okay.

8          A.    -- through you.

9          Q.    And -- and he is one of the lawyers that

10   represents CVS?

11         A.    Correct.

12         Q.    Is that right?  Okay.

13         A.    Via phone call.

14         Q.    And what did he tell you that we were

15   going to -- the reason for your deposition?

16               Did you ask him?

17         A.    Well, yeah.  He just told me that I wasn't

18   being, and he said that we -- you need to be at --

19   deposed.

20         Q.    Okay.  Did --

21         MR. CLARK:  And I'm --

22         MR. ELSNER:  I'll try to be careful.

23         MR. CLARK:  -- just going to object to -- yeah.

24   BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    Did you --

2        MR. CLARK:  And I just want to -- sorry, before

3   it's -- I'm just going to caution you not to testify

4   about the substance of the conversations you've had

5   with --

6        THE WITNESS:  Yeah, yeah, yeah, yeah, exactly.

7        MR. CLARK:  -- Mr. Delinsky or me.

8   BY MR. ELSNER:

9        Q.    After you decided to use them, did -- did

10  they tell you that you could hire your own counsel if

11  you want or that you could come without a lawyer?

12       A.    Did --

13       MR. CLARK:  Object to the form.

14            And, again, I'm going to instruct you not

15  to testify about the substance of your conversation.

16  BY THE WITNESS:

17       A.    Yeah, yeah, that's -- to my understanding,

18  that's privileged.

19  BY MR. ELSNER:

20       Q.    Are you being compensated in any way to

21  appear here today?

22       A.    Nope.

23       Q.    Okay.  Did -- did you talk with anyone

24  other than the lawyers for CVS about your deposition
```

```
 1    today?

 2        A.    No.

 3        Q.    Okay.  No other former employees of CVS,

 4    have you had any communication with them?

 5        A.    Uhn-uhn.

 6        Q.    No?

 7        A.    No, I mean, other than -- I -- Andy Eck is

 8    a friend on Facebook, but we don't converse.  I see

 9    pictures of his kids, but that's...

10        Q.    Okay.  But did you talk to Andy Eck about

11    your deposition?

12        A.    Nah.

13        Q.    Did you talk to Andy Eck about the lawsuit

14    at all?

15        A.    I don't think I talked -- I don't -- like

16    I say, I don't actually talk to him.  I just put a

17    "like."

18        Q.    Okay.  You've just seen his -- you've just

19    seen his Facebook posts?

20        A.    Yeah.

21        Q.    Okay.  Do you -- do you have any documents

22    at your house from the time you worked at CVS?  Did

23    you keep any materials there?

24        A.    No documents.  I'm -- I may have a key
```

```
 1    chain, but that's it.

 2         Q.    A key chain?

 3         A.    Yeah.

 4         Q.    Okay.

 5               All right.  To prepare for your

 6    deposition, did you speak with anyone other than

 7    lawyers for CVS about the deposition?

 8         A.    I mean, I -- I told work I had to go do

 9    this --

10         Q.    Oh, sure.

11         A.    -- you know, and that I won't be here

12    today, you know.

13         Q.    Okay.

14         A.    Other than that, I mean...

15         Q.    And you met with counsel to prepare for

16    your deposition, is that right?

17         A.    Correct.

18         Q.    Okay.  And who did you meet with?

19         A.    Miles.

20         Q.    And how -- how long -- how long did you

21    meet with Miles, how many days and how much time each

22    day?

23         MR. CLARK:  Object to the form.

24    BY THE WITNESS:
```

```
1        A.    I don't know how long.  I just -- I know

2   by number of meals we had, which was four, so.

3   BY MR. ELSNER:

4        Q.    Four meals, okay.

5              So did you meet with him on multiple days?

6   You didn't eat four meals in one day, right?

7        A.    Yeah, yeah, yeah, it was usually a little

8   bit of time after work at the local LaQuinta Inn there

9   in Frankfort we'd sit down and...

10       Q.    Okay.  And so you'd have a meal and how

11  long would you talk, roughly?

12       A.    An hour or two.

13       Q.    An hour or two.

14             Did he show you documents, just yes or no?

15       A.    Yes.

16       Q.    Okay.  And did you review those documents?

17       A.    Yes.

18       Q.    Okay.  Did you meet with any other lawyers

19  representing CVS?

20       A.    Uhn-uhn.

21       Q.    Do you have any e-mails, text messages

22  with any -- anyone you worked with at CVS?

23       MR. CLARK:  Object to the form.

24  BY THE WITNESS:
```

```
 1        A.    Did I?

 2   BY MR. ELSNER:

 3        Q.    Do you?

 4        A.    Do I.  Not normally.  I haven't talked to

 5   anybody in a long time.  Now, I have -- I did get a --

 6   a text from Andy, just one saying, Baker, is this

 7   still your number?  I'm like, Uh, I'm like, Hey, you

 8   know, and that was it.

 9        Q.    Okay.

10        A.    Because I -- I really haven't talked to

11   anybody in a long time.

12        Q.    Okay.  You've never worked in a pharmacy

13   before, have you?

14        A.    No.

15        Q.    Okay.  And prior to joining CVS, you --

16   you didn't have any prior work experience with

17   controlled substances, did you?

18        A.    No, other than --

19        Q.    Okay.

20        A.    -- than being married, my ex-wife being a

21   pharmacist.

22        Q.    That is your only exposure, right?

23        A.    Yeah.
```

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22       Q.     Okay.   You -- you wrote in your LinkedIn
23    page that you were -- that you were -- you -- you
24    analyze -- if we go back to the LinkedIn page, this --
```

Highly Confidential - Subject to Further Confidentiality Review

1    the first bullet:

2            "Analyze trend and transaction data for

3    controlled substance transactions..."

4            We had it and now we just lost it.

5        MR. ELSNER:  It is down under CVS, John.

6    BY THE WITNESS:

7        A.    Yeah, yeah.

8    BY MR. ELSNER:

9        Q.    Sorry.  I'm just going to get it up on the

10   screen so that everyone can follow us.

11           "Analyze trend and transaction data for

12   controlled substance transactions for over 10,000

13   stores."

14           Is that -- is that what you wrote?

15       A.    Well, yeah, I obviously wrote it, so...

16       Q.    Okay.

17           And so what you were doing is you were

18   reviewing orders of controlled substances across all

19   CVS pharmacies around the country, is that right?

20       A.    I believe so.

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.      Well, regardless, but it was all the --

 2        A.      Yeah.

 3        Q.      -- it was all of the CVS pharmacies around

 4   the country?

 5        A.      Yeah, right.

 6        Q.      Okay.  You also wrote that you:  "Target

 7   shrinkage and illegal activities" and "Report findings

 8   to the FDA."

 9                What does that mean?

10        A.      I don't know.  I can't remember, to tell

11   you the truth.

12                I remember at the time trying to make this

13   sound -- make it understandable for non-people, you

14   know, because --

15        Q.      So --

16        A.      -- somebody from the factory would say,

17   what were you doing.  I don't remember what that

18   meant, shrinkage.  And like I say, I haven't did this

19   job for six years, so I don't know.

20        Q.      No.  I'm -- I'm just trying to understand

21   what you wrote.

22                So, were -- did you have any involvement

23   with -- with investigating illegal activities at CVS,

24   like thefts of controlled substances or anything like
```

Highly Confidential - Subject to Further Confidentiality Review

1    that?

2        MR. CLARK:   Object to the form.

3    BY THE WITNESS:

4        A.    No, I didn't.

5    BY MR. ELSNER:

6        Q.    Okay.

7            You next write that you:   "Developed

8    metrics and algorithms for the development of a

9    tracking system" with a budget of $650,000?

10       A.    Yeah.

11

12

13

14

15

16

17

18

19       Q.    Right.  I mean, and you were -- you're

20   mainly focused on trying here in your LinkedIn page to

21   create something that would explain what you were

22   doing --

23       A.    Yeah.

24       Q.    -- for people who work in engineering

Highly Confidential - Subject to Further Confidentiality Review

```
1    and --

2         A.    Yeah.

3         Q.    -- in manufacturing, right?
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10        Q.    Okay.  Let's talk a little bit about the

11    training that you got when you first joined CVS.

12             Did -- who provided you training?  Was it

13    Aaron Burtner?

14        A.    Aaron trained me, if you will, on the job.

15        Q.    Okay.  And was there any other kind of

16    training, any kind of videos, computer programs,

17    manuals you reviewed?

18        MR. CLARK:  Objection to form.

19    BY THE WITNESS:

20        A.    I -- I know there was some -- the standard

21    safety.  I don't remember what training I had.  I

22    watched a lot of videos in the beginning, but so many

23    times, many different jobs, I'd -- I watch videos

24    about a job everywhere I go, you know, but yeah, there

1    was.

2    BY MR. ELSNER:



Highly Confidential - Subject to Further Confidentiality Review



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
```

12      Q.    Did Aaron ever tell you that there was

13   a -- a crisis in the United States or a public health

14   concern in the United States about the misuse of

15   prescription drugs?

16      A.    At that time probably the only experience

17   I had was the Rush Limbaugh.

18      Q.    Tell me about that.

19      A.    Remember Rush Limbaugh got busted for

20   doing --

21      Q.    For --

22      A.    -- because he was addicted to prescription

23   something.

24      Q.    Oh, that's right.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yeah.

 2        Q.    And so you followed that?

 3        A.    I knew -- well, I don't follow that.

 4        Q.    But you heard it?

 5        A.    I don't watch a lot of news, but, no, I

 6   remembered it, you know.
```



```
16   BY MR. ELSNER:

17        Q.    Okay.  Are you aware of whether there is

18   an opioid crisis in the United States?

19        A.    I'm -- I don't pay attention to it.  I

20   don't watch a lot of news.  No, I'm kind of a hermit,

21   you know.  I just -- until you guys come knocking on

22   my door, I was kind of blissfully ignorant, you know.

23        Q.    Okay.  What about when you were working at

24   CVS?
```

1        A.    Well --



Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2

 3                    (WHEREUPON, a certain document was

 4                     marked CVS - Elsner Deposition

 5                     Exhibit No. 3, for identification, as

 6                     of 01/24/2019.)

 7    BY MR. ELSNER:

 8         Q.    I'm going to show you a letter that was

 9    sent -- this is Exhibit 3.

10              This is a letter that was sent to CVS

11    Indiana.

12              Do you see that on the top left?

13         A.    Yeah.

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16          Q.     Okay.

17          MR. ELSNER:   And can we see the second letter.

18                    (WHEREUPON, a certain document was

19                     marked CVS - Elsner Deposition

20                     Exhibit No. 4, for identification, as

21                     of 01/24/2019.)

22     BY MR. ELSNER:

23          Q.    Mr. Kelly, this is Exhibit 4.  This is

24     a -- another letter from the DEA a year later,

1    December of 2007.

2            And if you look in the middle of the

3    second paragraph.

4        A.    Okay.

5        Q.    They cite to a code section.  And then

6    they say it:

7            "Specifically requires that a registrant

8    design..." -- and on the screen they are going to

9    highlight that for you.

10       A.    Yeah.

11       Q.    -- "...and operate a system to disclose to

12   the registrant suspicious orders of controlled

13   substances."

14           And then if you go down to the next

15   paragraph.  Or, sorry, the -- the one on the bottom of

16   the page.  It says:

17           "The regulation specifically states that a

18   suspicious order includes orders of an unusual size,

19   orders deviating substantially from a normal pattern,

20   and orders of an unusual frequency."

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15    BY MR. ELSNER:

16         Q.    Okay.

17         A.    I looked -- a lot of my other jobs I look

18    a lot of ITAR stuff, so.

19         MR. ELSNER:  Okay.  Let's look at Exhibit 299.

20                   (WHEREUPON, a certain document was

21                    marked CVS - Elsner Deposition

22                    Exhibit No. 5, for identification, as

23                    of 01/24/2019.)

24    BY MR. ELSNER:

1      Q.     Mr. Kelly, this is Exhibit 5.

2      A.     A lot of dead trees.

3      Q.     This is an e-mail to you from Matt Murphy?

4      A.     Matthew, yep.

5      Q.     It is actually to Shauna Helfrich.

6             Who is she?

7      A.     Shauna was the other analyst that worked

8   under Aaron.

9      Q.     Okay.  And you're cc'd on this e-mail --

10            DEFENSE COUNSEL:  Is there a Bates number for

11   Exhibit 5?

12            MR. ELSNER:  Yes.  98 -- it is CVS-MDLT1 9821

13   through 9847.

14   BY MR. ELSNER:

15     Q.     And who is Matt Murphy?

16     A.     Well, he is vice president of Pharma --

17   Pharma Compliance Group.

18     Q.     And who is -- and who is that?

19     A.     Well, he was the consultant that came in

20   for -- for -- for -- he was a -- a former FDA

21   investigator, I believe?  Or something.  He was an

22   agent for the F --

23     Q.     Okay.  And he -- was he --

24     A.     -- or DEA, one of the two, yeah.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And so did he have his own company and --

2  and did CVS hire that company?

3            He wasn't an employee of CVS, right?

4      A.    No, no.

5      MR. CLARK:  Object to form.

6  BY THE WITNESS:

7      A.    He came in to consult for us.  I think

8  that -- that was, like, for -- when Aaron left the

9  company.

10  BY MR. ELSNER:

11      Q.    After Aaron left, he was one of the people

12  they brought in to help out?

13      A.    Yeah, that's right.

14      Q.    Okay.

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21        Q.     Were you aware when you were working at
22   CVS that -- that there was an epidemic facing the
23   country and that -- and that pharmacies could be a
24   part of that epidemic in distributing controlled drugs
```

1    to people who shouldn't have them?

2        MR. CLARK:  Object to the form.

3    BY THE WITNESS:

4        A.    I don't know anything about an epidemic.

5    I don't know what the cause of that or -- or what the

6    problem was.  I knew it was a problem, but, I think,

7    yeah.

8    BY MR. ELSNER:

9        Q.    Okay.

10       A.    But as far as an epidemic, I don't.  I

11   can't quantify that.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



       8         MR. ELSNER:  I want to -- I want to take a look

       9    at MR 318.

      10                     (WHEREUPON, a certain document was

      11                      marked CVS - Elsner Deposition

      12                      Exhibit No. 6, for identification, as

      13                      of 01/24/2019.)

      14    BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

18      Q.    Let me --

19      MR. CLARK:  I'm sorry, if you are moving on,

20   Mike, and is now a good time?  We've been on for

21   almost an hour.

22      MR. ELSNER:  Okay.  We can a break.

23      MR. CLARK:  Is that okay?

24      MR. ELSNER:  Yeah, that's fine.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        THE WITNESS:  Yeah, I've kind of got -- my hot
 2   chocolate is going through me.
 3        THE VIDEOGRAPHER:  We are off the record at
 4   9:58 a.m.
 5              (WHEREUPON, a recess was had
 6               from 9:58 to 10:09 a.m.)
 7        THE VIDEOGRAPHER:  We are back on the record at
 8   10:09 a.m.
 9              (WHEREUPON, a certain document was
10               marked CVS - Elsner Deposition
11               Exhibit No. 7, for identification, as
12               of 01/24/2019.)
13   BY MR. ELSNER:
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16    Q.    When you were -- when you were looking at

17    this report -- well, let me -- let me -- let me do

18    something else.

19        MR. ELSNER:  Could we see MR 336.

20            (WHEREUPON, a certain document was

21            marked CVS - Elsner Deposition

22            Exhibit No. 8, for identification, as

23            of 01/24/2019.)

24    BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9      Q.     And then from the orders that were in that

10   spreadsheet, would you use all of the ones that you --

11   that were color coded as red as the ones you'd do the

12   deeper dive, would you do the yellows, and how many a

13   day would you --

14      A.     I --

15      Q.     -- do a deeper dive on?

16   MR. CLARK:  Object to the --

17   BY THE WITNESS:

18      A.     Honestly, all I remember --

19   MR. CLARK:  Object to the form.  Sorry.

20   THE WITNESS:  Huh?

21   MR. CLARK:  I'm sorry.

22   BY THE WITNESS:

23      A.     All I remember is the horse story.  That

24   kind of ex -- because I've told that several times.

Highly Confidential - Subject to Further Confidentiality Review

1    That's an -- it illustrated what I was doing.  That

2    stuck out.

3              How it stuck out, why it stuck out, I

4    don't remember.  What color it was, I don't remember,

5    but I called and that illustrated what I would do on a

6    daily basis.

Highly Confidential - Subject to Further Confidentiality Review

10    BY THE WITNESS:

11         A.    I don't remember the -- like I say, the

12    only thing I remember is because, I explain it to

13    people, you are looking for if a store ordered more

14    than it was giving out, where was it going.  And

15    that's about the only thing I can remember.

16              I mean, what you are saying is making

17    sense, it sounds like something you should probably

18    do, but I can't say that I did or did not do it, you

19    know.  I just can't remember.

20    BY MR. ELSNER:

21         Q.    I do -- I do try to make sense.  I'm

22    rarely successful --

23         A.    Yeah, no, and I --

24         Q.    -- but I do -- I do try.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.      -- I understand what you are trying to get

 2    at here and I -- I understand.

 3        Q.      Well --

 4        A.      I'm not trying to be difficult.  I just

 5    don't want to say something I don't remember.

 6        Q.      All I want you to do today is let's work

 7    together to try to extract the things that you can

 8    remember and I'll try to do my best to show you some

 9    things to help you to try to remember and then -- and

10    then you'll do your best to try to tell me what you

11    remember.

12                If we went back to this IRR report that we

13    looked at, the -- the -- the document with all of

14    the -- the lines down the side, right?

15        MR. CLARK:  Which exhibit is it, Mike?  Seven?

16        THE WITNESS:  Seven.

17        MR. ELSNER:  Seven.

18        THE WITNESS:  See, you'll have to look at me

19    pretty soon.

20    BY MR. ELSNER:

21        Q.      And if you look at -- if you look at

22    Page 10744.

23        A.      10 -- ooh, okay.

24        Q.      It is near the very back of the document.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.    Yeah.

 2       Q.    On the very top there are also some

 3   numbers, MR 278-73.

 4       A.    MR.

 5             Okay.  Where are you at?

 6       Q.    Are you with me?

 7       MR. ELSNER:  If you go to the bottom of that

 8   page, John.

 9   BY THE WITNESS:

10       A.    Yes, I see.

11       MR. ELSNER:  If you go -- if you can -- yeah.

12   BY MR. ELSNER:

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6          Q.    Okay.

7          MR. ELSNER:  Can I see MR 333.

8          THE WITNESS:  I'm going to take my sweater off.

9          MR. ELSNER:  Why don't we go off the record for

10   a second.

11         MR. CLARK:  Yeah, let's just go off for a

12   second.

13         THE VIDEOGRAPHER:  We are off the record at

14   10:36 a.m.

15                   (WHEREUPON, a recess was had

16                    from 10:36 to 10:38 a.m.)

17         THE VIDEOGRAPHER:  We are back on the record at

18   10:37 a.m.

19                   (WHEREUPON, a certain document was

20                    marked CVS - Elsner Deposition

21                    Exhibit No. 9, for identification, as

22                    of 01/24/2019.)

23   BY MR. ELSNER:

24         Q.    Okay.  Mr. Baker, I'm going to show you

Highly Confidential - Subject to Further Confidentiality Review

1    Exhibit 9.

2        A.    Okay.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15        Q.    Okay.  I want to show you a flowchart

16    which we've marked as Exhibit 10.

17                    (WHEREUPON, a certain document was

18                     marked CVS - Elsner Deposition

19                     Exhibit No. 10, for identification,

20                     as of 01/24/2019.)

21    BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



23        MR. ELSNER:  Why don't we take a quick break and

24     I'll find that document.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        THE VIDEOGRAPHER:  We are off the record at

 2   10:56 a.m.

 3                (WHEREUPON, a recess was had

 4                 from 10:56 to 11:09 a.m.)

 5        THE VIDEOGRAPHER:  We are back on the record at

 6   11:09 a.m.

 7   BY MR. ELSNER:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11                    (WHEREUPON, a certain document was

12                     marked CVS - Elsner Deposition

13                     Exhibit No. 11, for identification,

14                     as of 01/24/2019.)

15    BY MR. ELSNER:

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
4        Q.    Okay.  So this report lets you compare how

5    many was shipped versus how many was dispensed, right?

6        A.    Correct.

7        Q.    Does that sound right?

8        A.    Yeah.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Let me mark this as Exhibit 12.

 2              (WHEREUPON, a certain document was

 3               marked CVS - Elsner Deposition

 4               Exhibit No. 12, for identification,

 5               as of 01/24/2019.)

 6   BY MR. ELSNER:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3        Q.     Okay.  All right.

4               Let's go back to the flowchart then.

5        MR. CLARK:  Exhibit 10.

6        THE WITNESS:  Yep.

7   BY MR. ELSNER:

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9

10

11

12

13

14     Q.   No.  Let's look at it.

15    MR. ELSNER:  343.

16    THE WITNESS:  That's a lot of ink, man.  You

17  guys are killing trees and printer cartridges.

18    MR. ELSNER:  I know.  If we could do it all

19  electronic, believe me, I'd prefer it.

20          (WHEREUPON, a certain document was

21          marked CVS - Elsner Deposition

22          Exhibit No. 13, for identification,

23          as of 01/24/2019.)

24  BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    This is Exhibit 13.

 2        A.    So obviously the first page doesn't count.

 3        Q.    Well, the only reason the first page is

 4   there is so we could --

 5        A.    It is all redacted, I know.

 6        Q.    No, I know, but do you see the titles on

 7   the top?

 8        A.    Yeah, that's the header.

 9        Q.    The title columns.

10        A.    Yeah.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
```

14    Q.    You didn't do that for every single

15  controlled drug order, right?

16    A.    I can't say.  That would be putting words

17  in my mouth.  I don't remember doing it, so.  Maybe I

18  did.  I'm pretty good, you know.

19    Q.    Okay.  Well, why don't we -- why don't

20  we -- well, how long would it -- well, let -- let me

21  strike that.

22         Do you know who Gary Milikan is?

23    A.    I recognize the name but I don't know him.

24  I know the name.  I'm not even sure if I ever met him.

```
1        Q.    Did he ever do some part-time work on

2   reviewing IRR reports and suspicious orders for CVS?

3        A.    I don't remember who he is.  I know the

4   name.  I don't know what he was.  Did he?  I can --

5   I -- I --

6        Q.    He -- he testified earlier in the case

7   and -- and he worked at CVS and he did do some

8   suspicious order monitoring review.  And he said that

9   of all of the control drug orders that he'd look at in

10  a day, you know, he'd select his best estimate was

11  about 5 percent of which he would then do this sort of

12  deeper dive review.

13          And so my question to you is, does that

14  sound consistent with what you did?

15       MR. CLARK:  Object to the form.

16  BY THE WITNESS:

17       A.    I can't say.  I mean, what percentage.

18  It's just --

19  BY MR. ELSNER:

20       Q.    Do you have a reason to dispute what Gary

21  Milikan said?

22       A.    I don't have a reason to dispute.

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12      Q.    I want to show you this document which

13  we'll mark as Exhibit 14.

14              (WHEREUPON, a certain document was

15              marked CVS - Elsner Deposition

16              Exhibit No. 14, for identification,

17              as of 01/24/2019.)

18  BY MR. ELSNER:

19      Q.    This is a -- this is a -- an e-mail from

20  Craig Schiavo.

21             And who -- do you -- do you remember

22  working with Craig Schiavo?

23      A.    Nope.

24             See, a lot of this, like I say, we didn't

```
 1    work for the DC.  We worked for corporate.  We

 2    happened to be located -- so most of the people, most

 3    of the -- the names were -- were only e-mail

 4    correspondence or phone calls, you know.

 5         Q.    Right.

 6         A.    We didn't see most of these people.

 7         Q.    Right.  So Craig Schiavo was at corporate.

 8    He was in Rhode Island.

 9         A.    Yeah, see, his name sounded fam -- it

10    sounds familiar, but I never personally met him.

11         Q.    Okay.  And this e-mail he sends to

12    Pam Hinkle and to Aaron Burtner, right?

13         A.    I don't see Aaron's name on there, do I?

14         Q.    It's the very last one on the "to" -- the

15    first "to" line.

16         A.    Oh, yeah, yeah.  I'm -- but there.  I --

17         Q.    Okay.

18         A.    -- I'm somewhere on here, right, so.

19         Q.    No, you are not.  This is before you got

20    there.

21         A.    Okay.

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



22      Q.    -- let me see -- let me show you 337.

23      A.    Do they have phone records back then

24   perhaps or...?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    So I don't know.  We -- I have -- I have

 2   something that might be a little better than a phone

 3   record I'm going to show you and see if that kind of

 4   helps jog your memory.

 5                   (WHEREUPON, a certain document was

 6                    marked CVS - Elsner Deposition

 7                    Exhibit No. 15, for identification,

 8                    as of 01/24/2019.)

 9   BY MR. ELSNER:

10        Q.    This is Exhibit 15.

11              And this is -- was put together in July

12   of 2012, so before you got there.  It's an e-mail from

13   Aaron Burtner to Pam Hinkle.

14        A.    Ah, yeah, okay.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



19        Q.    Okay.

20        A.    The only thing I remember -- the only

21    thing I can remember, Aaron, he started out at Mike's

22    Car Wash --

23        Q.    Oh, yeah?

24        A.    -- as a safety manager.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.

2      A.    So he made a jump, too, you know.  And --

3    and other than that, I don't remember why he got

4    involved with the job.

5      Q.    Okay.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

15     Q.    Okay.

16     A.    Do you -- can you -- do you remember, does

17  it say if I was salary or hourly?  I can't remember.

18     Q.    I asked you the question.  I don't know

19  the answer.

20     A.    I can't remember.  I was just curious.  I

21  think I was salary, but...

22         I thought you guys were only supposed to

23  ask questions you already knew the answers to?

24     Q.    Well, that's the difference between a good

Highly Confidential - Subject to Further Confidentiality Review

1    lawyer and me.

2         MR. CLARK:  No objection.

3         MR. ELSNER:  Oh, I'm going to ask that that be

4    stricken from the record.

5         MR. CLARK:  Move to strike.  And I apologize.

6         MR. ELSNER:  I'm just teasing.

7              Can we see 338.

8         THE WITNESS:  So who is running this, is it you

9    or...?  Ah, you're pretty good.  I thought you were

10   pretty good for being handing me documents and still

11   running that.

12        MR. ELSNER:  That would not be me, my friend.

13                  (WHEREUPON, a certain document was

14                   marked CVS - Elsner Deposition

15                   Exhibit No. 16, for identification,

16                   as of 01/24/2019.)

17   BY MR. ELSNER:

18        Q.    Exhibit 16.

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



18    BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11   BY MR. ELSNER:

12        Q.    Okay.

13        THE WITNESS:  Did I hit something?

14        MR. CLARK:  No.  I think he is switching

15   documents.

16        THE WITNESS:  Oh, okay.

17   BY MR. ELSNER:

18        Q.    Let me show you this document.

19                (WHEREUPON, a certain document was

20                 marked CVS - Elsner Deposition

21                 Exhibit No. 17, for identification,

22                 as of 01/24/2019.)

23   BY MR. ELSNER:

24        Q.    This is Exhibit 17.

Highly Confidential - Subject to Further Confidentiality Review



```
 8          Q.     Okay.

 9          A.     Who is Cassandra?  Is she a -- was she a

10     CVS employee?

11          Q.     I don't know.  I -- I'm not sure.  I

12     believe she is because it says CVS Caremark Exchange

13     Administrative Group.

14          A.     Okay.  Yeah, okay.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
```

14        Q.    Do you -- do you --

15        MR. ELSNER:  Let me see Exhibit 285.

16    BY THE WITNESS:

17        A.    You know, when we used to have an auditor

18    to come into our plant, we'd turn the heat up

19    sometimes to make them -- so they would quit the audit

20    early.

21    BY MR. ELSNER:

22        Q.    I can promise you that's not the intent,

23    because as difficult it is for you, it also is for me.

24        A.    I know, I was going to say, you can take

Highly Confidential - Subject to Further Confidentiality Review

```
 1    your coat off, you know, I won't be offended.

 2         Q.    I probably could, but I'm not going to.

 3               (WHEREUPON, a certain document was

 4               marked CVS - Elsner Deposition

 5               Exhibit No. 18, for identification,

 6               as of 01/24/2019.)

 7    BY MR. ELSNER:

 8         Q.    This is Exhibit 18.  I'm sorry.  I did

 9    that backwards.

10         MR. CLARK:  And just for the record, that

11    comment referred to the temperature in the room.

12         MR. ELSNER:  Yeah.

13         MR. CLARK:  The literal temperature in the room.

14         MR. ELSNER:  I don't think -- I don't think

15    anyone would be confused by that.

16    BY MR. ELSNER:

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



```
 1        MR. ELSNER:  Okay.  Why don't we take a quick

 2   break.

 3        THE VIDEOGRAPHER:  We are off the record at

 4   12:14 p.m.

 5             (WHEREUPON, a recess was had

 6              from 12:14 to 1:13 p.m.)

 7        THE VIDEOGRAPHER:  We are back on the record at

 8   1:13 p.m.

 9   BY MR. ELSNER:

10        Q.   Mr. Baker, six months after you joined

11   CVS, Aaron Burtner resigned from CVS, is that right?

12        A.   Correct.

13        Q.   Okay.

14        A.   I think -- well, I know -- yeah, he did,

15   yeah.

16        Q.   Okay.  Do you know, did he resign or --

17        A.   Well, he -- yeah, because he went

18   through -- he got a job offer from -- somebody he knew

19   before got him a job by Amazon.

20        Q.   Okay.  I'm going to show you Exhibit 19.

21             (WHEREUPON, a certain document was

22              marked CVS - Elsner Deposition

23              Exhibit No. 19, for identification,

24              as of 01/24/2019.)
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. ELSNER:



Highly Confidential - Subject to Further Confidentiality Review

```
 1  ████████████████████████████████████████████████
 2  ████████████████████████████████████████████████
 3  ████████████████████████████████████████████████
 4  ████████████████████████████████████████████████
 5  ████████████████████████████████████████████████
 6   Pike --

 7       A.    Okay.

 8       Q.    -- in this e-mail?

 9       A.    And who was Crystal Pike, anyway?

10       Q.    Well, I take it from the second paragraph

11   here, it says:

12  ████████████████████████████████████████████████
13  ████████████████████████████████████████████████
14  ████████████████████████████████████████████████
15  ████████████████████████████████████████████████
16  ████████████████████████████████████████████████
17  ████████████████████████████████████████████████
18  ████████████████████████████████████████████████
19  ████████████████████████████████████████████████
20  ████████████████████████████████████████████████
21  ████████████████████████████████████████████████
22  ████████████████████████████████████████████████

23       Q.    Okay.  And so anyway, he -- he had --

24       MR. MILLER:  This is Jake Miller on the phone.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    It appears that the phone was just un-muted.

 2              Was the deposition started with the phone

 3    still muted after the lunch break?

 4         MR. ELSNER:  It was for about two questions.

 5    We've established that his boss resigned in June 26th,

 6    2013.  I'm going to --

 7         MR. MILLER:  Do you -- do you have a rough idea

 8    of how long the phone was on mute during the actual

 9    deposition?

10         MR. CLARK:  Two minutes.

11         MR. ELSNER:  Maybe a minute, two minutes.

12         MR. MILLER:  Okay.  Thank you.

13         MR. ELSNER:  Your objections will be preserved.

14                  (WHEREUPON, a certain document was

15                   marked CVS - Elsner Deposition

16                   Exhibit No. 20, for identification,

17                   as of 01/24/2019.)

18    BY MR. ELSNER:

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

9    Q.    Okay.  So did Aaron -- did Aaron Burtner

10  ever discuss with you why he left CVS?

11   A.    I'm sure he did.  Because we went out --

12  the four of us went out for lunch every day.  I think

13  he just had a better role, a better job.

14   Q.    Did -- did he tell you he was leaving CVS

15  before he told CVS?

16   A.    I don't remember.

17   Q.    Did he ever express to you during any of

18  those lunches any issues he was having with CVS

19  related to staffing or finances or anything?

20   A.    No, no, no.  I just think a nice -- a

21  really much better deal came up and he -- he went

22  there.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2
 3
 4
 5                    (WHEREUPON, a certain document was
 6                    marked CVS - Elsner Deposition
 7                    Exhibit No. 21, for identification,
 8                    as of 01/24/2019.)
 9   BY MR. ELSNER:
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



17   BY THE WITNESS:

18       A.    I don't remember, I mean.

19   BY MR. ELSNER:

20       Q.    But she was working part-time, right?

21       A.    No, I think what it was, she was working

22   full time just as a contractor.  She wasn't -- you

Highly Confidential - Subject to Further Confidentiality Review

```
1
2
3
4
5
```

6    Q.    This says in that -- well, Mark Nicastro

7    writes here that you assumed the duties of the

8    manager?

9    A.    Yeah, he assumed that I was assuming to do

10   it.  I mean, he didn't really -- I don't think he

```
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```



. 



Highly Confidential - Subject to Further Confidentiality Review



23              (WHEREUPON, a certain document was

24                  marked CVS - Elsner Deposition

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Exhibit No. 22, for identification,

 2                    as of 01/24/2019.)

 3    BY MR. ELSNER:
```

Highly Confidential - Subject to Further Confidentiality Review



 9        Q.    Well, let me show you Exhibit 23.

10              (WHEREUPON, a certain document was

11               marked CVS - Elsner Deposition

12               Exhibit No. 23, for identification,

13               as of 01/24/2019.)

14    BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12          Q.     Because I'll show you Exhibit 24.
13                  (WHEREUPON, a certain document was
14                   marked CVS - Elsner Deposition
15                   Exhibit No. 24, for identification,
16                   as of 01/24/2019.)
17   BY MR. ELSNER:
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
1

2

3

4

5

6        A.    Yes, and --

7        MR. CLARK:  Object to the form.

8   BY THE WITNESS:

9        A.    I guess where I'm drawing a blank, do you

10   remember how long after Aaron left did they bring in

11   the consultant that took over as a manager role?

12   BY MR. ELSNER:

13       Q.    Well, we may find -- I don't know the

14   answer to that right now, but we may find some

15   documents that helps us answer that.

16       A.    Yeah, because I'm want -- I'm wanting to

17

18

19

20       Q.    Well, I am going to move to strike that.

21   We'll get to the question and --

22       A.    Okay.

23       Q.    -- and we'll get there.

24             Can we look at 290, please.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    290?

 2        Q.    Oh, I'm -- I'm going to show you another

 3   exhibit.

 4        A.    Oh.

 5        Q.    We are done with that one.

 6                  (WHEREUPON, a certain document was

 7                   marked CVS - Elsner Deposition

 8                   Exhibit No. 25, for identification,

 9                   as of 01/24/2019.)

10   BY MR. ELSNER:

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23         Do you know who Dean Vanelli is?

24    A.    Once again, he -- that's another guy that
```

Highly Confidential - Subject to Further Confidentiality Review

 1   I never met.  I -- I recognize the name, I've heard

 2   the name, but it was so long ago.

Highly Confidential - Subject to Further Confidentiality Review



24          MR. ELSNER:  If we could look at 291.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (WHEREUPON, a certain document was

 2                     marked CVS - Elsner Deposition

 3                     Exhibit No. 26, for identification,

 4                     as of 01/24/2019.)

 5    BY MR. ELSNER:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

16      MR. ELSNER:  Can we go off the record for a

17  quick, just a minute.

18      MR. CLARK:  Yeah, absolutely.

19      THE VIDEOGRAPHER:  We are off the record at

20  1:46 p.m.

21             (WHEREUPON, a recess was had

22              from 1:46 to 1:50 p.m.)

23      THE VIDEOGRAPHER:  We are back on the record at

24  1:50 p.m.

```
 1                    (WHEREUPON, a certain document was

 2                     marked CVS - Elsner Deposition

 3                     Exhibit No. 27, for identification,

 4                     as of 01/24/2019.)

 5    BY MR. ELSNER:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
1
2
3
```

4      Q.    And he attaches your -- your e-mail below,

5   correct.

6              Okay.  I want to have you take a look at

7   the next exhibit.

8      MR. ELSNER:  No, I don't think so.  Hold on a

9   second.  Can I see Exhibit 91.

10             Can we go off the record real quick.

11     THE VIDEOGRAPHER:  We are off the record at

12   1:54 p.m.

13                  (WHEREUPON, a recess was had

14                   from 1:54 to 1:57 p.m.)

15     THE VIDEOGRAPHER:  We are back on the record at

16   1:57 p.m.

17   BY MR. ELSNER:

```
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5     Q.     Potential risks.

6             (WHEREUPON, a certain document was

7             marked CVS - Elsner Deposition

8             Exhibit No. 28, for identification,

9             as of 01/24/2019.)

10   BY MR. ELSNER:

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14   BY MR. ELSNER:

15        Q.    Is that what you wrote --

16        A.    That's what I wrote.

17        Q.    -- to Mark Nicastro?

18              (WHEREUPON, a certain document was

19               marked CVS - Elsner Deposition

20               Exhibit No. 29, for identification,

21               as of 01/24/2019.)

22   BY MR. ELSNER:

23

24

Highly Confidential - Subject to Further Confidentiality Review



```
 1   BY THE WITNESS:

 2        A.    I don't -- I don't -- all right.  Walk me

 3   through something.

 4              Are we sure what this -- is 29 directly

 5   related to Exhibit 28?

 6   BY MR. ELSNER:

 7        Q.    Yeah, let's look back at your e-mail.

 8        A.    Oh, okay.

 9        Q.    This is Exhibit 27.

10        A.    I mean, I know we are talking about the

11   same type of problem.  But, I mean, I want to see

12   something that says --

13        Q.    Okay.

14        A.    -- I'm talking about this and this and

15   this.

16        Q.    Let's -- let's -- let's look at

17   Exhibit 27, the second page.  Your e-mail to Craig

18   Schiavo on July 11th, 2013.  This is 78117.

19        A.    Hang on.

20        Q.    You write:

21              "Craig, another concern I have is the

22   store metric report."  That's what we are talking

23   about.

24        A.    Yep.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And then you write:

 2              "The data snapshot is a three-month window

 3    that is a year old."

 4        A.    Yeah, okay, you're right.

 5        Q.    So the issue related to the store metric

 6    report was first raised in -- in December of 2012 and

 7    it still hadn't been fixed in July of 2013 and you

 8    brought it again to the attention of corporate because

 9    you didn't want to get blamed if something slipped

10    through, right?

11        A.    Well --

12        MR. CLARK:  Objection to the form.

13    BY THE WITNESS:

14        A.    -- I'm going to --

15    BY MR. ELSNER:

16        Q.    Yes or no, is that what was written?

17        A.    I'm going to say that I brought it to

18    their attention.  What happened before that, I'm --

19    that's for you to decide.  I'm not --

20        Q.    Well, that will --

21        A.    -- I'm going to let you know --

22        Q.    -- be for the jury to decide.

23        A.    Yeah.

24        Q.    But that's what the e-mail says, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    That's what this e-mail says here.  It

 2   said what you said it said.  And what -- I brought it

 3   up when I said -- when I brought it up.

 4        Q.    Okay.  And you said that the -- that the

 5   three-month window you are looking at now is a year

 6   old.

 7              That's what you wrote, right?

 8        A.    Yeah, okay.

 9        Q.    "The data snapshot is a three-month window

10   that is a year old."

11              That's what you wrote, right?

12        A.    Yeah, I -- that's what I write.  And it

13   sounds --

14        Q.    And then -- and then you write --

15        A.    Probably.

16        Q.    -- "And any analysis that I make from the

17   data is for the most part irrelevant and pointless."

18              That's what you wrote, right?

19        A.    Yeah, if the data would be a year old,

20   then it wouldn't make --

21        Q.    It -- it would be irrelevant and

22   pointless?

23        A.    Well, from a -- to me in my mind it was

24   irrelevant if it's not current, you know.
```

1      Q.    And there is a risk that if you don't use

2   the right data that something could slip through,

3   right?

4      MR. CLARK:  Objection to form, asked and

5   answered.

6   BY MR. ELSNER:

7      Q.    That's what you wrote?

8      A.    Yeah.  Yeah, I think so.  I think that's

9   what I wrote.

10     Q.    And that makes sense, right?

11     A.    Yeah.

12     Q.    If you don't use the right data, then you

13  are not going to be able to check the system, right?

14     A.    I don't even -- even "right."  Just it may

15  be the right data, just not current.

16     Q.    Not current?

17     A.    Yeah.

18     Q.    It needs to be current data, right?

19     A.    Correct.

20     Q.    All right.  So at this point in time, just

21  to orient you, this is July 2013.

22     A.    Okay.

23     Q.    You're doing your job, you're encountering

24  some problems with -- with some of the metric reports,

Highly Confidential - Subject to Further Confidentiality Review



```
 1
 2
 3
 4
 5
 6
 7
 8        Q.    Okay.  Well, let's look at Exhibit 30.
 9              (WHEREUPON, a certain document was
10              marked CVS - Elsner Deposition
11              Exhibit No. 30, for identification,
12              as of 01/24/2019.)
13   BY THE WITNESS:
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17                    (WHEREUPON, a certain document was

18                     marked CVS - Elsner Deposition

19                     Exhibit No. 31, for identification,

20                     as of 01/24/2019.)

21    BY MR. ELSNER:

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

13   BY MR. ELSNER:

14        Q.    Let's look at the next -- this next

15   exhibit.

16                (WHEREUPON, a certain document was

17                marked CVS - Elsner Deposition

18                Exhibit No. 32, for identification,

19                as of 01/24/2019.)

20   BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10      Q.    Okay.

11      MR. ELSNER:  Why don't we take a quick break.

12  We've been going about an hour.

13      THE VIDEOGRAPHER:  We are off the record at

14  2:16 p.m.

15              (WHEREUPON, a recess was had

16               from 2:16 to 2:31 p.m.)

17      THE VIDEOGRAPHER:  We are back on the record at

18  2:31 p.m.

19  BY MR. ELSNER:

20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



21      Q.      You could be faster, yeah.

22                      (WHEREUPON, a certain document was

23                      marked CVS - Elsner Deposition

24                      Exhibit No. 33, for identification,

Highly Confidential - Subject to Further Confidentiality Review

1                    as of 01/24/2019.)

2    BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review



19       Q.    Yeah.  Let me show you Exhibit 34.

20            (WHEREUPON, a certain document was

21             marked CVS - Elsner Deposition

22             Exhibit No. 34, for identification,

23             as of 01/24/2019.)

24   BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



6        MR. ELSNER:  Okay.  Can we see 295.

7                    (WHEREUPON, a certain document was

8                     marked CVS - Elsner Deposition

9                     Exhibit No. 35, for identification,

10                    as of 01/24/2019.)

11   BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10                 (WHEREUPON, a certain document was

11                  marked CVS - Elsner Deposition

12                  Exhibit No. 36, for identification,

13                  as of 01/24/2019.)

14   BY MR. ELSNER:

15        Q.    This is Exhibit 36.

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1

 2

 3

 4

 5

 6

 7                  (WHEREUPON, a certain document was

 8                   marked CVS - Elsner Deposition

 9                   Exhibit No. 37, for identification,

10                   as of 01/24/2019.)

11    BY MR. ELSNER:

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1
2
3
4
5
6
7
8
9
```

10      Q.    So you needed to be here to be with her?

11      A.    Yeah.

12      Q.    Okay.  And --

13      A.    I almost brought the picture of the Easter

14  bunny.  It is on my refrigerator at home.  I forgot

15  to.

16      Q.    Oh, it's in your annual review?

17      A.    Yeah, I did that.  It was my daughter

18  sitting on my lap.

19      Q.    Do you have a picture?

20      A.    Yeah.

21      Q.    Okay.

22      A.    It's on my refrigerator.  I was going to

23  bring it for -- for laughs.  But --

24      Q.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     -- she still hated it.  She knew -- she

 2    could hear my voice but she screamed the whole time.

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





```
 5              (WHEREUPON, a certain document was

 6              marked CVS - Elsner Deposition

 7              Exhibit No. 38, for identification,

 8              as of 01/24/2019.)

 9   BY MR. ELSNER:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11          MR. ELSNER:  Can we -- can we see 281.

12                    (WHEREUPON, a certain document was

13                     marked CVS - Elsner Deposition

14                     Exhibit No. 39, for identification,

15                     as of 01/24/2019.)

16    BY MR. ELSNER:

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23                    (WHEREUPON, a certain document was
24                      marked CVS - Elsner Deposition
```

1                    Exhibit No. 40, for identification,

2                    as of 01/24/2019.)

3     BY MR. ELSNER:



Highly Confidential - Subject to Further Confidentiality Review

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
1

2

3

4

5

6

7

8     BY MR. ELSNER:

9          Q.    Okay.

10         MR. ELSNER:  Can I see 301.  301.

11    BY MR. ELSNER:

12

13

14

15

16

17

18

19              (WHEREUPON, a certain document was

20               marked CVS - Elsner Deposition

21               Exhibit No. 41, for identification,

22               as of 01/24/2019.)

23    BY MR. ELSNER:

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17              (WHEREUPON, a certain document was
18               marked CVS - Elsner Deposition
19               Exhibit No. 42, for identification,
20               as of 01/24/2019.)
21    BY MR. ELSNER:
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17                (WHEREUPON, a certain document was

18                 marked CVS - Elsner Deposition

19                 Exhibit No. 43, for identification,

20                 as of 01/24/2019.)

21    BY MR. ELSNER:

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4        MR. ELSNER:  Can I see 329.

5        MR. CLARK:  Are you good?  Do you need a break?

6        THE WITNESS:  Hmm?

7        MR. CLARK:  Are you good?

8        THE WITNESS:  I'm fine.  Do you need a break?

9        MR. CLARK:  Yeah, I'm fine, but thank you.

10                  (WHEREUPON, a certain document was

11                   marked CVS - Elsner Deposition

12                   Exhibit No. 44, for identification,

13                   as of 01/24/2019.)

14   BY MR. ELSNER:

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
1

2

3

4                    (WHEREUPON, a certain document was

5                     marked CVS - Elsner Deposition

6                     Exhibit No. 45, for identification,

7                     as of 01/24/2019.)

8    BY MR. ELSNER:

9         Q.    This is Exhibit 45.

10        MR. CLARK:  Oh, actually, don't write on that

11   one.

12   BY MR. ELSNER:

13        Q.    This is Exhibit 45.

14

15

16

17

18

19             Did you end up resigning from CVS?

20        A.    Yeah, yeah.

21        Q.    Okay.

22        A.    Of course.

23        Q.    And do you know when your last day was at

24   CVS?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Not right offhand, no.

2      Q.     Okay.

3             I think your LinkedIn page said it was

4   November?

5      A.     Yeah, that was just something that I --

6   yeah, that's the, you know, I -- the LinkedIn page may

7   not be accurate down to the day.

8      Q.     Completely acc -- down to the day?

9      A.     No, it was just an approximation.

10     Q.     Okay.  So it could have been sometime in

11  October or November of 2013, is that right?

12     A.     Yeah, I just know my last week Mark took

13  me out for a lunch, you know, as a going away, and

14  that's -- but I don't even remember what day that was,

15  so...

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



23       MR. ELSNER:  Why don't we take a quick break.

24       THE VIDEOGRAPHER:  We are off the record at

Highly Confidential - Subject to Further Confidentiality Review

1    3:23 p.m.

2                    (WHEREUPON, a recess was had

3                     from 3:23 to 3:39 p.m.)

4        THE VIDEOGRAPHER:  We are back on the record at

5    3:39 p.m.

6    BY MR. ELSNER:

7        Q.    Mr. Baker --

8        A.    You can call me Kelly, if you don't mind.

9        Q.    Okay.  Okay.  Thanks.

10            Did you -- were you aware of how many --

11   oh.  Why don't we get it settled.

12       A.    Okay.  I got it.

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12      Q.   Okay.  Let me -- let me show you a

13  document.  This is Exhibit 46.

14              (WHEREUPON, a certain document was

15              marked CVS - Elsner Deposition

16              Exhibit No. 46, for identification,

17              as of 01/24/2019.)

18  BY MR. ELSNER:

19

20

21

22         Do you know who Daniel Gillen is?

23      A.   No.  I'm assuming you are going to tell me

24  he is DEA?

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16        Q.    Let me -- let me mark this as the next

17    exhibit.  Sorry.  We are going to jump around just a

18    little bit.

19                 (WHEREUPON, a certain document was

20                 marked CVS - Elsner Deposition

21                 Exhibit No. 47, for identification,

22                 as of 01/24/2019.)

23    BY MR. ELSNER:

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16          (WHEREUPON, a certain document was

17          marked CVS - Elsner Deposition

18          Exhibit No. 48, for identification,

19          as of 01/24/2019.)

20    BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

1

2

3     Q.    Except not for the centers that lost their

4   license, right?

5     A.    Yeah, yeah, it make -- make it easier,

6   yeah, that's a good point, you know.

7     MR. ELSNER:  Can I see Motley Rice 57.  Well,

8   let me see 49, but I'm probably going to jump to 57.

9              (WHEREUPON, a certain document was

10             marked CVS - Elsner Deposition

11             Exhibit No. 49, for identification,

12             as of 01/24/2019.)

13  BY MR. ELSNER:

14    Q.    Let me show you what we've marked as

15  Exhibit 49.

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20      Q.    Do you recall --

21      MR. ELSNER:  Why don't we go off the record real

22   quick.

23      THE VIDEOGRAPHER:  We are off the record at

24   4:03 p.m.

Highly Confidential - Subject to Further Confidentiality Review

```
1                    (WHEREUPON, a recess was had

2                     from 4:03 to 4:14 p.m.)

3          THE VIDEOGRAPHER:  We are back on the record at

4     4:14 p.m.

5     BY MR. ELSNER:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2
 3
 4       A.    -- it didn't seem -- yeah.
 5             (WHEREUPON, a certain document was
 6              marked CVS - Elsner Deposition
 7              Exhibit No. 50, for identification,
 8              as of 01/24/2019.)
 9   BY MR. ELSNER:
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20    BY MR. ELSNER:

21        Q.    But you did your best, didn't you, to --

22    to --

23        A.    Oh, I always did my best at my job, but...

24        Q.    And you did your best with the -- with the

```
 1    staff you had and the system that you were given,

 2    right?

 3         A.    Correct.

 4         MR. ELSNER:  Okay.  I -- I don't think I have

 5    any other questions.  I pass the witness.

 6                        EXAMINATION

 7    BY MR. CLARK:

 8         Q.    Mr. Baker, I just have a couple of very

 9    brief clarification questions.

10              Is that all right?

11         A.    Sure.  Sure, sure.

12         Q.    Do you remember today being shown a number

13    of e-mails where you identified for more senior

14    officials at CVS certain areas of improvement that you

15    had identified in the SOM practices and procedures?

16         A.    Yes.

17         Q.    I gather you understood it was an open

18    environment where you could readily raise such issues,

19    correct?

20         MR. ELSNER:  Objection.

21    BY THE WITNESS:

22         A.    Oh, yeah, yeah.

23    BY MR. CLARK:

24         Q.    Was there ever a time when you felt you
```

Highly Confidential - Subject to Further Confidentiality Review

1   did not have the resources or time to complete your

2   job?

3       A.    That's kind of -- I think we had the

4   resources I needed to do my job.  Time, that's --

5   that's hard to answer that because I -- you know,

6   sometimes I could get done early, sometimes I could

7   get done later.  If the reports -- the internet were

8   slow, your report would come in, say, 15 minutes

9   instead of two minutes, that kind of stuff, so.

10          I wouldn't say I didn't have enough time.

11  It just took time.  You know, sometimes it was longer

12  than others a bit.

13      Q.    You were always able to perform your job

14  then?

15      A.    Correct, yeah, I always left the day able

16  to sleep at night.

17      Q.    And I think, moving to another topic,

18  there were a number of times today when you were

19  testifying about the staffing of the SOM team after

20  Mr. Burtner's leaving CVS.

21          Do you remember that?

22      A.    Correct.

23      Q.    And I think a couple of times you

24  testified that it was you and Shauna Helfrich who were

1    the individuals performing those functions after Aaron

2    Burtner left?

3         A.    Correct.

4         Q.    And then a number of times you've also

5    testified about DEA consultants that were brought

6    in --

7         A.    Yes.

8         Q.    -- after Mr. Burtner's leaving CVS?

9         A.    Um-hum.

10        Q.    Were they also assisting in the SOM?

11        A.    I believe so.

12        MR. ELSNER:  Objection.  Foundation.

13   BY MR. CLARK:

14        Q.    Is it your understanding that the DEA

15   consultants that were brought in after Mr. Burtner's

16   leaving CVS were assisting the SOM?

17        A.    Yes.

18        MR. ELSNER:  Objection.

19   BY THE WITNESS:

20        A.    That's my understanding.

21        MR. ELSNER:  Same -- same objection.

22   BY MR. CLARK:

23        Q.    Mr. Baker, during your time at CVS, were

24   you aware of any time when a CVS distribution center

1    shipped a suspicious order to a CVS Pharmacy?

2        A.    Am I aware that it happened?  Not that I

3    recall.

4        MR. CLARK:  Thank you.  I have no further

5    questions.

6        MR. ELSNER:  I think we are done.  Thank you.

7        THE VIDEOGRAPHER:  We are off the record at

8    4:22 p.m.  This concludes the videotaped deposition of

9    Kelly Baker.

10                (Time Noted:  4:22 p.m.)

11                FURTHER DEPONENT SAITH NOT.

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                   REPORTER'S CERTIFICATE

 2

 3            I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,

 4      a Certified Shorthand Reporter, do hereby certify:

 5            That previous to the commencement of the

 6      examination of the witness herein, the witness was

 7      duly sworn to testify the whole truth concerning the

 8      matters herein;

 9            That the foregoing deposition transcript

10      was reported stenographically by me, was thereafter

11      reduced to typewriting under my personal direction and

12      constitutes a true record of the testimony given and

13      the proceedings had;

14            That the said deposition was taken before

15      me at the time and place specified;

16            That I am not a relative or employee or

17      attorney or counsel, nor a relative or employee of

18      such attorney or counsel for any of the parties

19      hereto, nor interested directly or indirectly in the

20      outcome of this action.

21            IN WITNESS WHEREOF, I do hereunto set my

22      hand on this 28th day of January, 2019.

23

24            JULIANA F. ZAJICEK, Certified Reporter
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    DEPOSITION ERRATA SHEET

 2

 3

 4   Case Caption:   In Re: National Prescription

 5                    Opiate Litigation

 6

 7          DECLARATION UNDER PENALTY OF PERJURY

 8

 9          I declare under penalty of perjury that I

10   have read the entire transcript of my Deposition taken

11   in the captioned matter or the same has been read to

12   me, and the same is true and accurate, save and except

13   for changes and/or corrections, if any, as indicated

14   by me on the DEPOSITION ERRATA SHEET hereof, with the

15   understanding that I offer these changes as if still

16   under oath.

17

18                             KELLY JAMES BAKER

19

20   SUBSCRIBED AND SWORN TO

21   before me this       day

22   of                 , A.D. 20__.

23

24          Notary Public
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24                    KELLY JAMES BAKER
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    _____

 4    Reason for change:_____

 5    Page No._____Line No._____Change to:_____

 6    _____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to:_____

 9    _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23    SIGNATURE:_____DATE:_____

24                   KELLY JAMES BAKER
```