1                UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF OHIO
2                    EASTERN DIVISION
3    IN RE: NATIONAL              )   MDL No. 2804
     PRESCRIPTION OPIATE          )
4    LITIGATION                   )   Case No.
                                  )   1:17-MD-2804
5                                 )
     THIS DOCUMENT RELATES TO     )   Hon. Dan A.
6    ALL CASES                    )   Polster
                                  )
7

8

9                      __ __ __
10             Thursday, June 6, 2019
                       __ __ __
11

12       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                 CONFIDENTIALITY REVIEW
                       __ __ __
13

14

15

16       Videotaped Deposition of LAURENCE C.
     BAKER, Ph.D., held at JONES DAY, 1755
17   Embarcadero Road, Palo Alto, California,
     commencing at 9:18 a.m., on the above date,
18   before Debra A. Dibble, Registered Diplomate
     Reporter, Certified Realtime Reporter,
19   Certified Realtime Captioner, and Notary
     Public.
20

21
                       __ __ __
22
             GOLKOW LITIGATION SERVICES
23       877.370.3377 ph | fax 917.591.5672
                  deps@golkow.com
24

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:
 2        KELLER ROHRBACK LLC
          BY:  GARY A. GOTTO, ESQUIRE
 3             ggotto@kellerrohrback.com
               ERIKA EMERSON, ESQUIRE
 4             eemerson@kellerrohrback.com
          3101 North Central Avenue
 5        Suite 1400
          Phoenix, Arizona 85012-2643
 6        (602) 2480088
          Counsel for MDL Plaintiffs
 7
 8

          BARTLIT BECK LLP
 9        BY:  MATTHEW BREWER, ESQUIRE
               Matthew.Brewer@BartlitBeck.com
10        54 West Hubbard Street
          Suite 300
11        Chicago, Illinois 60654
          (312) 494-4432
12        Counsel for Walgreens Company
13
14        O'MELVENY & MYERS LLP
          BY:  TRISHA PARIKH, ESQUIRE
15             tparikh@omm.com
          Two Embarcadero Center
16        28th Floor
          San Francisco, California 94111-3823
17        (415) 984-8700
          Counsel for Janssen Pharmaceuticals
18        Inc.
19
20        JONES DAY
          BY:  CHRISTOPHER J. LOVRIEN, ESQUIRE
21             cjlovrien@jonesday.com
          555 South Flower Street
22        Fiftieth Floor
          Los Angeles, California 90071-2300
23        (213) 489-3939
          Counsel for Walmart
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          DECHERT LLP
            BY:  MARY KIM, ESQUIRE
 2              mary.kim@dechert.com
            One Bush Street
 3          Suite 1600
            San Francisco, California 94104
 4          (415) 262-4500
            Counsel for Purdue Pharma
 5

 6
            COVINGTON & BURLING LLP
 7          BY:  LAENA ST.-JULES, ESQUIRE
                 lstjules@cov.com
 8          New York Times Building
            620 Eighth Avenue
 9          New York, New York 10018-1405
            (212) 841-1201
10          Counsel for McKesson Corporation
11
12          CAVITCH FAMILO DURKIN CO. LPA
            BY:  ERIC WEISS, ESQUIRE
13               EWeiss@cavitch.com
            1300 East 9th Street
14          Twentieth Floor
            Cleveland, Ohio  44114
15           216-472-4657
            Counsel for Discount Drug Mart
16

17
            ROPES & GRAY, LLP
18          BY:  KAITLIN BERGIN, ESQUIRE
                 kaitlin.bergin@ropesgray.com
19          800 Boylston Street
            Boston, Massachusetts 02199-3600
20          (617) 951-7000
            Counsel for Mallinckrodt
21          Pharmaceuticals
22     ATTENDING VIA VIDEOCONFERENCE:
23          Harrison Cyrus
                hcyrus@baileywyant.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1      VIDEOGRAPHER:

2           Jim Lopez,

            Golkow Litigation Services

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          INDEX

 2

     APPEARANCES                                    2

 3

     PROCEEDINGS                                    7

 4

 5

     EXAMINATION OF LAURENCE C. BAKER, Ph.D.:

 6

          DIRECT EXAMINATION BY MR. GOTTO         8

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    DEPOSITION EXHIBITS
                    LAURENCE C. BAKER, Ph.D.
 2                      June 6, 2019
 3      NUMBER              DESCRIPTION            PAGE
 4      Exhibit 1    Plaintiffs' Notice of Oral        9
                     Videotaped Expert
 5                   Deposition of Lawrence
                     Baker
 6
        Exhibit 2    The Effects of Medicare          10
 7                   Advantage on Opioid Use,
                     Baker, et al.
 8
        Exhibit 3    6-5-19 invoices for             10
 9                   Professor Laurence Baker
10      Exhibit 4    6-5-19 invoices for             11
                     Analysis Group
11
        Exhibit 5    5-10-19 Expert Report of        12
12                   Laurence C. Baker
13      Exhibit 6    Corrections to Expert           12
                     Report of Laurence C. Baker
14
15
16
17
18
19
20
21
22
23
24
```

```
 1                   PROCEEDINGS
 2             (June 6, 2019 at 9:18 a.m.)
 3             THE VIDEOGRAPHER:  We are now
 4       on the record.  My name is Jim Lopez.
 5       I'm a videographer for Golkow
 6       Litigation Services.  Today's date is
 7       June 6, 2019, and the time is
 8       approximately 9:18 a.m.  This video
 9       deposition is being held in Palo Alto,
10       California, in the matter of In Re:
11        National Prescription Opiate
12       Litigation, Case No. 1:17-MD-2804, for
13       the United States District Court for
14       the Northern District of Ohio, Eastern
15       Division.  The deponent is Laurence
16       Baker.  Counsel will be noted on the
17       stenographic record.
18             The court reporter is Debbie
19       Dibble, and she will now swear in the
20       witness.
21         LAURENCE C. BAKER, Ph.D.,
22  having first been duly sworn, was examined
23  and testified as follows:
24                   *   *   *
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    DIRECT EXAMINATION

 2   BY MR. GOTTO:

 3        Q.     Good morning, Professor Baker.

 4        A.     Good morning.

 5        Q.     How are you today?

 6        A.     Fine.  Thanks.

 7        Q.     Great.  My name is Gary Gotto,

 8   and with me is my colleague Erika Emerson.

 9   We're with the law firm Keller Rohrback, and

10   we're one of the firms representing the

11   plaintiffs in the opioid litigation.

12             We've never met before today;

13   correct?

14        A.     I think that's correct.

15        Q.     I realize you've given

16   depositions previously, so I won't belabor

17   the deposition ground rules and that sort of

18   thing.  I will tell you if any of my

19   questions are unclear to you in any way,

20   please let me know and I'll do my best to

21   clarify them.  Okay?

22        A.     Okay.

23        Q.     I'm going to begin by handing

24   you what we've marked as Exhibit 1, which is
```

Highly Confidential - Subject to Further Confidentiality Review

1       the notice of today's deposition.

2                  (Baker Deposition Exhibit 1,

3            Plaintiffs' Notice of Oral Videotaped

4            Expert Deposition of Lawrence Baker,

5            was marked for identification.)

6            Q.    (BY MR. GOTTO)  Why don't you

7       take a look at that document and tell me if

8       you've seen it before.

9            A.    Yes, I have seen this before.

10           Q.    And Exhibit A to the notice

11      requests certain documents be produced.  I

12      understand from counsel you do have some

13      responsive documents for me; is that correct?

14           A.    Yes.

15           Q.    Perhaps we could share those at

16      this time.

17                  MR. BREWER:  So for the record,

18            this is a document entitled The

19            Effects of Medicare Advantage on

20            Opioid Use.  It's an NBER working

21            paper authored by Professor Baker.

22                  MR. GOTTO:  Okay.

23                  Let's go ahead and mark that --

24            we'll mark that as Exhibit 2, please.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (Baker Deposition Exhibit 2,

 2         The Effects of Medicare Advantage on

 3         Opioid Use, Baker, et al., was marked

 4         for identification)

 5              MR. GOTTO:  Is there anything

 6         else that's responsive?

 7              MR. BREWER:  Not to that -- not

 8         to item No. 1.

 9              MR. GOTTO:  Okay.  How about to

10         item No. 2?

11              MR. BREWER:  In response to

12         item No. 2, I have two sets of

13         invoices.  One from Professor Baker

14         and then one from the support staff

15         that he used at the Analysis Group.

16              MR. GOTTO:  Okay.  Great.

17              MR. BREWER:  I'll hand you

18         those.  There are six copies of each.

19              MR. GOTTO:  Okay.  So let's

20         mark, as Exhibit 3, Professor Baker's

21         invoice.

22              (Baker Deposition Exhibit 3,

23         6-5-19 invoices for Professor Laurence

24         Baker, was marked for identification.)
```

1            MR. GOTTO:  And as Exhibit 4,

2      the Analysis Group invoice.

3            (Baker Deposition Exhibit 4,

4      6-5-19 invoices for Analysis Group,

5      was marked for identification.)

6            MR. GOTTO:  I take it that's

7      all that's responsive to point 2?

8            MR. BREWER:  Yes.

9            MR. GOTTO:  And anything

10     responsive to point 3?

11           MR. BREWER:  No.

12           MR. GOTTO:  Okay.

13           MR. BREWER:  Meaning that the

14     CV he attached is up-to-date.

15           MR. GOTTO:  Right.

16           And then were there some

17     corrections to -- or a supplement to

18     the report?

19           MR. BREWER:  Yes.  This

20     document is titled Corrections to

21     Expert Report of Laurence C. Baker,

22     and it contains a few corrections to

23     his expert report.

24           MR. GOTTO:  Okay.  So why don't

1    we just, for logic, we'll mark the

2    report first and then the corrections.

3              Let's mark that as 5, please.

4              (Baker Deposition Exhibit 5,

5    5-10-19 Expert Report of Laurence C.

6    Baker, was marked for identification.)

7              MR. GOTTO:  And then that will

8    be 6.

9              (Baker Deposition Exhibit 6,

10   Corrections to Expert Report of

11   Laurence C. Baker, was marked for

12   identification.)

13        Q.    (BY MR. GOTTO)  Okay.  Now that

14   we have the documents marked, I have just a

15   few questions for you on them.

16              If you would turn to Exhibit 2,

17   the working paper.

18        A.    Yes.

19        Q.    And at the same time, if you'll

20   look at Exhibit A to Exhibit 1.  Item one on

21   Exhibit A asks for all documents or other

22   materials you reviewed since the date of your

23   report that you have not specifically

24   identified in your report in preparation for

Highly Confidential - Subject to Further Confidentiality Review

1    your expected testimony.

2              And I understand that Exhibit 2

3    is -- was produced in response to that

4    request; correct?

5         A.    Yes.  That's correct.

6         Q.    Okay.  So that is a document

7    you reviewed in anticipation of today's

8    testimony?

9         A.    Yes.

10        Q.    And apart from Exhibit 2 and

11   apart from the materials that are identified

12   in your expert report, have you reviewed any

13   other materials in preparing -- in

14   preparation for today's testimony?

15             MR. BREWER:  Objection, form.

16             THE WITNESS:  No, I don't

17        believe I have.

18             MR. GOTTO:  Okay.  Great.

19        Q.    (BY MR. GOTTO)  Exhibit 3

20   appears to be an invoice for your services

21   for the periods April 1 through May 31 of

22   2019; correct?

23        A.    Yes.

24        Q.    And is that the only invoice

1    you've issued for services performed in

2    connection with this litigation?

3         A.    Well, I would clarify that it's

4    an invoice that was issued by Analysis Group.

5         Q.    Okay.  The invoices for your

6    services, though?

7              So let me ask the question a

8    different way.  To your knowledge, have there

9    been any other invoices issued for your

10   services in connection with the opioid

11   litigation other than Exhibit 3?

12        A.    Not to my knowledge.

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

3        Q.     Okay.  To your knowledge, it

4   does; correct?

5        A.     To my knowledge, it does.

6        Q.     Okay.

7            Do you know if the Exhibit 3

8   invoice has been paid?

9        A.     I don't believe it's been paid.

10       Q.     Okay.  Is there -- are there

11   payment terms that you're aware of?

12            MR. BREWER:  Objection, form.

13            THE WITNESS:  I imagine there

14      are in the retention letter, but I

15      can't recall them at the moment.

16       Q.     (BY MR. GOTTO) Okay.  Do you

17   recall any particular agreement regarding

18   deferral of payment for a period of time, or

19   anything along those lines?

20       A.     No, I don't recall any

21   agreement like that.

22       Q.     So would you generally expect

23   this invoice to be paid in the ordinary

24   course of business?

1          A.      Yes.

2          Q.      Okay.

3                  And Exhibit 3, it seems like it

4    had two pages stapled together, but they look

5    to just be copies of one another.  Is that --

6    I guess the second page has remittance

7    instructions.

8                  Is that the only difference?

9          A.      I'm looking at this with you,

10   in some sense.  I didn't issue this.  It

11   looks to me like that's correct.  I don't

12   know if there's another reason to be two

13   pages on this.

14         Q.      Okay.  Would you have reviewed

15   Exhibit 3 before it was sent out?

16         A.      No, not specifically.

17         Q.      Okay.  Let's look at Exhibit 4

18   for a moment.  And Exhibit 4 is the

19   analysis -- the invoice for services in

20   support of you in connection with preparation

21   of your expert report.

22                 So services by Analysis Group

23   in support of you; correct?

24         A.      Yes, that's what it looks like

1    to me.

2         Q.    Okay.  Can you tell me who at

3    Analysis Group provided support to you in

4    your work here?

5         A.    So I worked specifically with a

6    fellow named Steve Cacciola, who was my point

7    of contact.  I understand that he supervised

8    a larger team of people.

9         Q.    And I'm sorry, the spelling on

10   his name?  Do you recall?

11        A.    C-A-C-C-I-O-L-A is his last

12   name.  First name is Stephen.  And that would

13   be S-T-E-P-H-E-N, if I have it correct.

14        Q.    And he supervised a group of

15   other folks at Analysis Group?

16        A.    Yes.

17        Q.    And do you know the names of

18   any of those other people?

19        A.    A couple of them come to mind.

20   One is Federico Mantovanelli.

21              And the second was Lucia Antos,

22   I believe.  Goodness.  I hope I have

23   everybody's name correct.

24        Q.    And Ms. Antos, the spelling on

Highly Confidential - Subject to Further Confidentiality Review

1    that last name?  Or approximation?

2         A.    I'm going to say A-N-T-O-S,

3    with my apologies to her if I have misspelled

4    her name.

5         Q.    Okay.

6               And I understand you indicated

7    that Mr. Cacciola was your principal point of

8    contact.

9               Did you also have direct

10   contact with either Mr. Mantovanelli or

11   Ms. Antos?

12        A.    Not that I recall.

13        Q.    Okay.  Any other direct contact

14   with Analysis Group personnel that you can

15   recall?

16        A.    No.

17        Q.    Do you know what Mr. Cacciola's

18   background is?

19        A.    I believe he has training in

20   economics, but I'm not sure, no.

21        Q.    Okay.  So you're not familiar

22   with -- does he hold a Ph.D., for example, do

23   you know?

24        A.    I believe, yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.     Okay.  And is there any

 2    particular area of economics that he has

 3    expertise in, to your knowledge?

 4              A.     I did not investigate that.

 5              Q.     Have you worked with

 6    Mr. Cacciola other than this engagement?

 7              A.     No, I don't believe so.

 8              Q.     Okay.  How about

 9    Mr. Mantovanelli, do you know what his area

10    of expertise is?

11              A.     Again, he's a -- he works in

12    economics.  He has training in economics.

13              Q.     Okay.  Does he have a Ph.D., do

14    you know?

15              A.     I believe, yes.

16              Q.     Have you worked with him in any

17    other engagement?

18              A.     Yes.  One previous engagement.

19              Q.     What was that?

20              A.     That was a matter involving --

21    it's listed in my --

22              Q.     One of the ones listed?

23              A.     Yes.

24              Q.     We'll turn to those a little
```

1    later on, so maybe you can identify that for

2    us when we're actually looking at your CV and

3    your prior testimony.

4            So apart from that one other

5    engagement, any other background with

6    Mr. Mantovanelli?

7        A.    I don't believe so.

8        Q.    How about Ms. Antos?  What's

9    her area of expertise?

10       A.    I believe also economics.

11       Q.    Does she hold a Ph.D.?

12       A.    That, I don't know.

13       Q.    Have you worked with her in any

14   other engagement?

15       A.    No.

16       Q.    I believe you indicated that

17   those three individuals are the ones whose

18   names you can recall from Analysis Group at

19   this point.

20           Were there other people that

21   you understood to be working on this support

22   engagement?

23       A.    It would only be in the general

24   sense.  I worked with Steve, and I understood

1    that he had a team of people working on this.

2    So I might infer that there were, but I don't

3    know any specifics.

# REDACTED

14          Q.     Do you know if there were

15   different rates applied for different

16   Analysis Group personnel?

17          A.     No.

18          Q.     Do you know if this -- if the

19   Exhibit 4 invoice has been paid?

20          A.     No.  This invoice is not

21   something that I have any real awareness of

22   other than I'm just seeing it really today.

23          Q.     Okay.  Any reason to think the

24   terms of payment are other than the ordinary

Highly Confidential - Subject to Further Confidentiality Review

1    course of business?

2         A.     No reason to think that, or no

3    knowledge of any aspects of that.

4         Q.     The Exhibit 4 invoice appears

5    to be for services performed during the month

6    of April.  Do you know if there is an

7    additional Analysis Group invoice for

8    services performed in the month of May?

9         A.     I don't know.

10        Q.     Did Analysis Group, to your

11   knowledge, perform support services in

12   connection with your work during the month of

13   May?

14        A.     Yes, they did.

15        Q.     Do you have -- in terms of the

16   magnitude of the amount of work that they

17   did, Do you have a sense of whether it was

18   greater or lesser than the amount of work

19   they did in the month of April?

20        A.     That would be hard for me to

21   make an estimate of.  I gave them

22   instructions and asked for their support in

23   April and in May.  I couldn't tell you if

24   they were doing more or less work off the top

Highly Confidential - Subject to Further Confidentiality Review

1   of my head right now.

2       Q.     Okay.  Your report is dated

3   May 10th.

4       A.     Yes.

5       Q.     So do you know if they did any

6   work after May 10th?

7       A.     You know, I spoke with Steve

8   after May 10th to review a couple of aspects

9   of my work.  So there may be bits, but I

10  don't know.

11      Q.     Okay.  Fair to say that you

12  would expect that the substance of their --

13  the bulk of their work was done prior to --

14  on or before May 10th?

15      A.     If I had to make an estimate,

16  that would be my estimate, but I don't know

17  their -- their -- I'm retained separately

18  from them, and they provide services to me to

19  help me; but I don't really keep track of or

20  know anything about the timing or specifics

21  of their activity.

22      Q.     Okay.  Any services that they

23  performed at your request in preparation for

24  today's deposition?

1          A.     Other than answering questions

2     that I had to familiarize myself -- or to

3     refamiliarize myself with aspects of the

4     work, I don't believe so.

5          Q.     And what areas did you ask --

6     did you speak with them about to

7     refamiliarize yourself with --

8               MR. BREWER:  And I'm going to

9          let you answer the question, but just

10          give you the caution that to the

11          extent your response would disclose

12          any substance of conversation with

13          counsel, I'd ask you not to include

14          that in your response.

15          Q.     (BY MR. GOTTO)  Let me see if I

16     can ask the question a little bit differently

17     and maybe address counsel's concern.

18               Just in terms of the subject

19     matter, you indicated there were some areas

20     you had some discussions to refamiliarize

21     yourself with matters in the report.  Just in

22     terms -- at the level of just subject matter,

23     do you recall what those were?

24               MR. BREWER:  Same instruction.

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  So as I was

2       reviewing the report, I wanted to just

3       go back over some of the analyses that

4       I conducted and the empirical work and

5       walk through the specific conduct of

6       those and make sure I was completely

7       familiar and recalling everything

8       correctly.  So that was the main

9       issue.

10      Q.    (BY MR. GOTTO)  Okay.

11           When were you first contacted

12  regarding potential expert work in connection

13  with the opioids litigation?

14      A.    It would be late March, I

15  believe.  Maybe middle of March this year.

16  It's hard for me to recall the date

17  specifically.

18      Q.    And by whom were you contacted?

19      A.    The first contact was from

20  Analysis Group indicating that the counsel

21  was looking for an expert.  And subsequent to

22  that, the substantive discussions were

23  between me and counsel.

24      Q.    Okay.  So that first Analysis

Highly Confidential - Subject to Further Confidentiality Review

```
1    Group contact, was that from Mr. Cacciola?
2         A.    I don't recall.  It may have
3    been.  That would make sense to me.
4    Sometimes the initial contacts come from
5    other people there, so I -- I don't recall at
6    the moment.
7         Q.    Okay.  In any event, it was
8    someone in the Analysis Group that you had
9    had prior contact with?
10        A.    Yes.  Well, it was someone from
11   Analysis Group.  If it was Steve, I wouldn't
12   have had prior contact with him at that
13   point.  But it would have been someone from
14   Analysis Group.
15        Q.    Okay.  And so when you were
16   initially contacted, what was your
17   understanding of the nature of the potential
18   engagement?
19        A.    That there was counsel here for
20   one of the defendants in this matter that was
21   interested in talking with potential Experts.
22   And I believe I was informed of the general
23   matter, but it's also a matter that I had
24   noted in the press, for example.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              So I had the general

 2    understanding from that and then the

 3    understanding that counsel was interested in

 4    talking to potential Experts.

 5         Q.    Did you have any understanding

 6    as to who any of the plaintiffs' experts were

 7    at that point of the initial conversation?

 8         A.    No.

 9         Q.    Did you have any understanding

10    as to any particular aspect of the opioids

11    litigation where your testimony could be

12    used?

13         A.    No.

14         Q.    Did you have an understanding

15    as to why the person at Analysis Group had

16    contacted you about this potential

17    engagement?

18         A.    I do work at health economics,

19    and I understood that they were looking --

20    that there was an interest in talking to

21    people who had expertise in health economics.

22         Q.    Okay.  Any particular item in

23    your background that you understood to be of

24    particular significance?
```

```
 1            A.      I was not made aware of

 2     anything like that.

 3            Q.      In your own mind, is there any

 4     particular item in your professional

 5     experience that was particularly germane to

 6     what you understood to be the engagement?

 7                    MR. BREWER:  Objection, vague.

 8                    MR. GOTTO:  Let me break it

 9         down a little bit.

10                    THE WITNESS:  Okay.

11            Q.      (BY MR. GOTTO)  In your CV you

12     list many publications, for example, that

13     you've authored or coauthored in your career.

14     Were any of those publications -- did you

15     have an understanding as to whether any of

16     those publications were of particular

17     pertinence to any aspect of the litigation as

18     to which your testimony would be of interest?

19            A.      So if we're talking about at

20     the time of the initial contact.

21            Q.      Yes.

22            A.      I was not made aware of

23     anything in particular.  It was simply a

24     matter of reaching out to me, informing me
```

```
 1    that counsel was interested in talking to

 2    people that -- who might be willing to be

 3    expert -- offer expert opinions in this

 4    matter and would I be interested in talking

 5    to counsel.

 6             So no specifics about my

 7    background were indicated to me at that time.

 8    It was a fairly general inquiry.

 9        Q.    Okay.  And in terms of in your

10    own mind, though -- understanding that

11    nothing was necessarily communicated to you,

12    but in terms of your own mind, was there

13    anything in your background that you felt

14    would be of particular pertinence to what you

15    understood to be the nature of the testimony

16    that would be sought from you?

17        A.    Well, I would have to be using

18    my imagination at this time to go back.  I'm

19    a health economist.  You can see in my CV

20    some work related to opioids.  Perhaps that

21    had something to do with it.  I didn't spend

22    a lot of time thinking about that at the

23    time.

24        Q.    Okay.  So, for example,
```

Highly Confidential - Subject to Further Confidentiality Review

1  Exhibit 2, I think we marked it as it's a

2  working paper that you are a coauthor that

3  relates to opioids; correct?

4       A.     Yes.  I believe that's correct.

5       Q.     And I guess what I'm getting

6  at, in terms of whether there was a

7  communication or just in your own mind, this

8  isn't a situation where there -- for example,

9  there is a paper you published in 2015 that

10  addresses a specific issue that we're

11  anticipating needing or wanting your

12  testimony on.  There's no kind of

13  conversation or thought process along those

14  lines; is that fair?

15       A.     That was my sense at the time,

16  I believe.

17       Q.     Okay.  So more your general

18  background and professional experience was

19  what was of interest in terms of contacting

20  you about this particular engagement?  At

21  least that was your understanding?

22       A.     Yes.  The last part was

23  important.  To the extent I had any

24  understanding or even thought about it, which

1    I'm not sure I did at the time, that would be

2    the kind of thing that I would perhaps now in

3    retrospect think would have been it.  But I

4    don't remember reflecting on that at the time

5    at all.

6            Q.    Okay.  When you were originally

7    contacted, were you given any information in

8    order to assess whether there would be a

9    conflict or some other circumstance that

10   would make it inappropriate for you to be

11   retained in this matter?

12                MR. BREWER:  Objection to form.

13                THE WITNESS:  So, yes, early

14           on.  And I can't recall if that was in

15           the transition to the conversation

16           with the counsel or as an initial step

17           in that conversation, but yes, I did

18           assess whether there were any

19           conflicts that could be an issue.

20           Q.    (BY MR. GOTTO)  Okay.  And I

21   take it there were none?

22           A.    I -- no, I don't think there

23   are any.

24           Q.    Okay.

```
 1            A.      Were any or are any.

 2            Q.      And did you understand from the

 3    initial conversation that the client of the

 4    counsel that was interested in potentially

 5    retaining you was representing Walgreens?

 6                    MR. BREWER:  I'm going to give

 7            you just the same caution about

 8            responding about the substance of any

 9            conversation with counsel.

10                    You can answer.

11                    THE WITNESS:  So that would

12            have come out pretty early on.  I

13            can't recall if that was in the

14            initial contact or if that was pretty

15            immediate in the initial conversation

16            with counsel.

17            Q.      (BY MR. GOTTO)  Okay.  And have

18    you ever in your career been retained by

19    Walgreens for any purpose?

20            A.      No.

21            Q.      And my understanding from

22    reading your report, and ask you to confirm

23    if this is accurate, is that the client of

24    counsel that has retained you in this matter
```

1    is Walgreens; correct?

2         A.    That's my understanding.

3         Q.    Okay.  And so is it your

4    understanding that your opinions in this

5    matter are being offered on behalf of any

6    defendant other than Walgreens?

7         A.    So I've been retained by

8    Walgreens -- or by counsel associated with

9    Walgreens.  That was the focus of my report.

10   You would see one part of my report I do say

11   that I have been informed that my testimony

12   could be offered -- at trial could be offered

13   by Walgreens or by other defendants.  So I do

14   understand that to be the case.

15        Q.    Okay.  In preparing your

16   report, have you reviewed any documents

17   produced by defendants other than Walgreens?

18             MR. BREWER:  Objection, form.

19             THE WITNESS:  I don't believe

20        so.  We could go back and look through

21        my materials if we wanted to make an

22        itemized list of that, but I don't

23        believe so.

24        Q.    (BY MR. GOTTO)  So after the

1    initial contact with the Analysis Group, you

2    indicated then there was a contact with

3    counsel.

4              With whom did you have that

5    conversation with counsel?

6         A.    That was with Mr. Brewer.

7         Q.    Okay.  And I don't want you to

8    divulge the substance of any of the

9    communications you've had with Mr. Brewer or

10   anyone else at his firm.  Apart from

11   Mr. Brewer and his colleagues at his firm,

12   have you had conversations with any other

13   persons other than at Analysis Group in

14   connection with the preparation of your

15   report?

16        A.    No.

17        Q.    Have you had occasion to speak

18   with any other person who has submitted an

19   expert report in this litigation with respect

20   to the litigation or any of the issues in the

21   litigation?

22        A.    No.

23        Q.    Are you aware that Daniel

24   Kessler has submitted an expert report?

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.    Yes.

2            Q.    And you know Professor Kessler?

3            A.    Yes.

4            Q.    And you've coauthored several

5     papers with him; correct?

6            A.    That's correct.

7            Q.    Okay.  But you've had no

8     conversations with him with respect to any

9     aspect of this litigation, is that fair?

10           A.    Yes.

11           Q.    Okay.  Have you previously been

12    retained by Mr. Brewer or anyone at his firm?

13           A.    No.

14           Q.    And I know you indicated

15    already that you have not previously been

16    retained by Walgreens.

17                 Have you previously been

18    retained for any purpose by any of the other

19    defendants in this litigation?

20           A.    No.  I don't believe so.

21           Q.    In your report, you describe

22    the scope of your assignment.  And did -- did

23    the scope of your assignment as reported in

24    your report, was that in any way different
```

1    from what you understood to be the potential

2    scope of the assignment from your initial

3    contact by Analysis Group?

4              MR. BREWER:  Objection to form.

5              THE WITNESS:  I don't think it

6         was different.  I think the -- my

7         initial understanding was fairly

8         broad, that this -- there were defense

9         counsel in this matter that were

10        looking for health economists or a

11        health economist to opine on matters

12        related -- health economic matters

13        related to the issues.  So I did not

14        have a specific sense at the initial

15        contact of what it was, and so I'd say

16        it falls within what I might have

17        thought at the time would be the scope

18        of the engagement.

19    Q.    (BY MR. GOTTO)  Okay.  So fair

20    to say that there -- there wasn't a point at

21    which there was a subject matter that had

22    been identified to you as a potential area

23    for your testimony that was then taken off

24    the table?

1        A.     No.  Certainly not.

2        Q.     And did you understand from the

3    initial contact that it was anticipated that

4    there would be one or more expert reports

5    submitted by plaintiffs that you would be

6    requested to review and comment on?

7              MR. BREWER:  I'm going to just

8         lodge an objection.  Because the

9         questions are increasingly getting

10        closer to substance of discussions

11        with counsel.  So you can answer this,

12        but that is my objection.

13             MR. GOTTO:  Okay.  And again,

14        this is the Analysis Group initial

15        contact that I'm asking you about.

16             THE WITNESS:  Oh, the Analysis

17        Group initial contact, I don't recall

18        whether there was -- there were

19        specifics about responding to expert

20        reports.  There could have been.

21        Q.     (BY MR. GOTTO)  Okay.  In your

22    own mind, did you anticipate that as being

23    one of the potential aspects of the

24    assignment?

1          A.     I'm used to that being part of

2     these matters.  So to the extent that I would

3     have thought about it, I suppose I would have

4     imagined that.

5          Q.     Have you had occasion to review

6     any of the complaints filed by any of the

7     plaintiffs in the opioid litigation?

8          A.     Yes.  There are two complaints.

9     Second amended complaint from Cuyahoga County

10    and the second amended complaint from Summit

11    County, if I recall correctly.

12               If we want to get specific, I

13    should probably refer to the list to make

14    sure I caption those or quote those

15    correctly.

16         Q.     Let's turn to Exhibit 6 for a

17    moment, which is the corrections page.  And

18    perhaps the best way to -- well, just give me

19    a moment.  I'm just looking at this for the

20    first time myself.

21               The correction on paragraph 45,

22    is it simply striking the words "one court or

23    two"?

24         A.     Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And the correction in

2    paragraph 122 simply inserting the word "two"

3    in the first line?

4    A.    Yes.

5    Q.    And then the correction in

6    paragraph 18 is simply including the

7    underlined sentence at the end?

8    A.    Yes.

9    Q.    Okay.  Great.  Then perhaps we

10   can get back into that then when we're

11   actually going through your report.

12           Are you aware that there's

13   trial dates scheduled in this matter in

14   October of this year?

15   A.    Yes.  I think I'm aware of

16   that.

17   Q.    Do you anticipate performing

18   any additional services in connection with

19   testimony in this matter prior to the trial

20   other than reviewing the report to refresh

21   yourself on what you said in the report?

22   A.    Oh, I suppose it depends on the

23   circumstances.  It may be appropriate to

24   prepare other exhibits or prepare ways of

1    presenting my testimony that I would want to

2    undertake.  I also would say that in my

3    report I note that if additional material

4    becomes available or additional opinions are

5    offered or new information relevant to my

6    report becomes available, that I would want

7    to reserve the opportunity to take a look at

8    that and possibly do additional work or

9    extend or revise my opinions.  So it's

10    possible that that would come along, and I

11    want to have the ability to do that.

12         Q.      Okay.  But in terms of as we

13    sit here today and additional work that

14    you're actually anticipating performing as we

15    sit here today, other than reviewing the

16    report you've already submitted so that it

17    would be fresh in your mind when you testify

18    at trial, is there any other work, again, as

19    we sit here today, that you have in mind that

20    you would do before trial?

21           MR. BREWER:  Asked and

22        answered.

23           THE WITNESS:  So as we sit here

24        today, the things that I can imagine

1        were, as I said before, possibly

2        preparing additional exhibits or

3        demonstratives or working on ways to

4        effectively or suitably present my

5        opinions at trial, so that that could

6        be additional work.

7              And then I suppose your

8        question asked me to avoid this, but

9        to the extent other material becomes

10       available, I would revise or extend my

11       opinion.

12       Q.    (BY MR. GOTTO)  Are there any

13  particular demonstratives you have in mind

14  that you are anticipating putting together

15  for trial?

16       A.    I have not given thought to

17  that at this point.

18       Q.    Fair to say, though, that

19  there's no additional analysis or research

20  that you, at least as we sit here today, have

21  in mind to perform prior to testifying at

22  trial?

23            MR. BREWER:  Asked and

24       answered.

Highly Confidential - Subject to Further Confidentiality Review

```
1              THE WITNESS:  As we sit here

2         today, the kinds of things that would

3         lead me to do additional analyses

4         would be the arrival of new

5         information or other opinions in this

6         matter that would be relevant to mine.

7         So I haven't anticipated it right now,

8         but it could happen.

9         Q.    (BY MR. GOTTO)  Okay.

10             As you sit here today, are you

11    anticipating testifying at trial?

12        A.    If I'm asked to.
```

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

18          Q.      Okay.  So what is Analysis

19    Group?

20          A.      They're a litigation support

21    consulting firm.

22          Q.      Do they have particular areas

23    of expertise, to your knowledge?

24          A.      I know they have people who

```
 1    work on health economics, and I work with
 2    them in that area.
 3              If I look at their website, I
 4    can recall they list other areas as well.
 5    They do a lot of different kinds of economic
 6    work, as I understand it.
 7         Q.    Okay.  Your experience with
 8    them, though, has that been limited to health
 9    economics?
10         A.    Yes.
11         Q.    And when did you first work
12    with them?
13         A.    That would go back quite a
14    while, to the 1990s.
15         Q.    And what were the
16    circumstances?  Did they contact you?  Did
17    you contact them?
18              How did that come to be?
19         A.    That was a long time ago.  I --
20    as I recall now in the fuzzy way of 20- or
21    30-year-old conversations, they must have
22    contacted me with a matter and asked if I was
23    interested.  And that would have started the
24    conversation with them.
```

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

7    How is the work divided between

8    yourself and Analysis Group that is reflected

9    in those professional hours?

10   A.    So the way that I wrote the

11   report was that I came up with a plan, a game

12   plan, if you will.  And I sat down with Steve

13   or talked to Steve on the phone and informed

14   him or let him know the areas in which I was

15   hoping to get support from Analysis Group.

16   And we came up with a plan of attack and

17   worked through it.

18         So as I was writing the report,

19   they were providing me with materials at my

20   request.  And, you know, we went through the

21   report in that way.  So that is what led to

22   these hours.

23   Q.    Okay.  And so what were the

24   areas in which you were hoping to get support

1    from Analysis Group?

2         A.    Oh, in a number of areas as I

3    was working on the report:  gathering

4    relevant materials, conducting analyses,

5    preparing exhibits, collecting information to

6    make the points that I wanted to make.

7              I asked for support in numerous

8    areas.  It was a big job.

9         Q.    Are there any particular

10   analyses you can recall requesting Analysis

11   Group to perform?

12             MR. BREWER:  I'm going to just

13        object on the lines that these

14        questions are starting to get into

15        drafting of his expert report, which

16        is protected under the federal rules.

17             I'll allow him to answer

18        because I understand -- I'll allow him

19        to answer to a point because I

20        understand in this case we've gotten

21        rulings that have permitted some

22        questioning, but I am going to lodge

23        the objection.

24             MR. GOTTO:  Okay.  And let me

1           just clarify what I'm interested in,

2           and perhaps this addresses some of

3           counsel's concern.

4       Q.     (BY MR. GOTTO)  I just want to

5   know the individuals who actually performed

6   the work that ultimately is reflected in your

7   report.

8           So if there's -- if there's a

9   piece of analysis that you thought, I'd like

10  to -- I'd like this analysis done, but I'm

11  not going to do it myself.  I'd like someone

12  at Analysis Group to do this analysis and

13  then report back to me the results.  That's

14  what I'm asking about, if there's things that

15  are in that category.

16      A.     So my interaction with them was

17  nearly always that I would communicate with

18  Steve and I would indicate areas in which I

19  wanted their support.  And that might have --

20  that would have included, for example, the --

21  a statistical analysis.

22          And then he would work with the

23  team to conduct that, and then I would get

24  results back through him.

Highly Confidential - Subject to Further Confidentiality Review

1    So, you know, throughout the

2    report there was that sort of interaction,

3    where I would ask for support in the area.

4    He would see to it that it was conducted.  I

5    would review the materials coming back.

6                But I was not aware of or

7    directing the specific personnel who would

8    have worked on a particular piece of

9    analysis.

10        Q.    Okay.  Yeah, and I -- I wasn't

11   necessarily asking for individuals' names.  I

12   was just trying to get an understanding of

13   aspects of your report that reflect analysis

14   that you personally conducted as compared to

15   analysis that you requested someone at

16   Analysis Group conduct.

17        A.    Oh, I would say these are my

18   analyses.  I gave instructions for how I

19   wanted them done.  I saw the results along

20   the way.  And I view them as my work.

21                I asked for support to get the

22   specifics taken care of, but they're analyses

23   that I directed and then I received and

24   reviewed.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  You comment in your

2    report, in some detail, on a number of the

3    reports submitted by plaintiffs' experts;

4    correct?

5    A.    Yes.

6    Q.    And fair to say you personally

7    reviewed each one of those reports that you

8    comment on?

9    A.    Yes.

10   Well, yes.  The ones I comment

11   on, I would say there are -- there was a

12   report that I refer only in a footnote to,

13   for example, and those I reviewed parts of

14   but would have reviewed more quickly and in

15   less depth than the reports that I comment

16   on.

17   Q.    Okay.  But for example, the

18   McCann report, you've reviewed personally?

19   A.    Yes.

20   Q.    And the McGuire report?

21   A.    There are two, but yes.

22   Q.    And -- thank you.

23   And the Gruber report?

24   A.    Yes.

1      Q.      And the Cutler report?

2      A.      Yes.

3      Q.      Now, you indicated that you had

4  a conversation with Mr. Cacciola about -- I

5  think your term was plan of attack for the

6  engagement.  You had not previously worked

7  with him; correct?

8      A.      That's correct.

9      Q.      Okay.  So when you make

10  reference to plan of attack, what did you

11  communicate to Mr. Cacciola?

12      A.      So as we were getting started,

13  I had looked at some of the reports and some

14  of the -- well, I looked at the complaints

15  and -- I'm trying to recall the specific

16  timing.  I think we had done some looking at

17  pieces before the plaintiffs' reports were

18  filed.  So in that space, some initial

19  conversations about things I was interested

20  in, but then once the plaintiffs' experts

21  were filed and I had reviewed them, a much

22  more specific set of points that I wanted to

23  make, a set of analyses that I wanted to

24  investigate.  And we worked through, looked

1    at those steps.  And I asked him to help with

2    those.  And then he would have worked out a

3    plan to conduct the work that I had asked

4    for.

5         Q.    In the course of your

6    engagement, have you been provided with any

7    assumptions that you were to make in forming

8    any of your opinions?

9         A.    It is a little hard for me to

10   know what you mean by assumptions, but I

11   would say no.  I wasn't given anything called

12   an assumption, or really an assumption by

13   counsel, and I can't recall at this point

14   making assumptions that would be important

15   factors in the analysis or in the results.

16        Q.    Okay.  Were there any summaries

17   of facts that you were provided and

18   instructed to assume to be true for purposes

19   of your report?

20        A.    No.

21        Q.    As your work on the engagement

22   progressed -- well, strike that.

23             I had asked you early on about

24   when you were first contacted, if there were

1    aspects of your background or experience that

2    you thought to be particularly germane.  As

3    your work on the engagement progressed, did

4    you come to view any aspects of your

5    background or experience as particularly

6    germane to the opinions that you were

7    formulating?

8         A.    I would say I felt somewhat

9    informed by having worked on some papers

10   related to opioids in the past.  And so that

11   made me feel familiar with many of the

12   aspects of -- in general that were coming up

13   in this matter.  I can recall that.

14        Q.    Okay.  And is one of those

15   papers Exhibit 2?

16        A.    Yes.  That's -- that's correct.

17        Q.    Okay.  And are there others

18   that are listed on your CV?

19        A.    Yes.

20        Q.    Okay.  Well, we'll -- and we'll

21   turn to those in a little bit.

22              Did you maintain a file with

23   respect to this engagement?

24        A.    No.  I mean, I looked at the

```
 1    plaintiffs' expert reports and so -- but I

 2    didn't maintain a file of their materials.

 3         Q.    Okay.  Anywhere where you

 4    maintained any record of notes that you made

 5    in the course of formulating your opinions,

 6    or outlines, anything of that nature?

 7         A.    No.

 8         Q.    Okay.  Let's turn to your

 9    report, which we've marked as Exhibit 5.

10              First, would you just look at

11    it and confirm for me that that is the report

12    you've prepared and submitted in this matter?

13              [Document review.]

14         A.    Flipping through it a moment,

15    it does look like my report.

16         Q.    Okay.  And does the report

17    contain all of the opinions that you have

18    formulated in connection with this

19    litigation?

20         A.    Up to this point, it contains

21    the opinions that I've formulated.

22         Q.    Okay.  And apart from

23    Exhibit 6, which had those corrections, are

24    there any corrections or updates to the
```

1    report that you would provide today if you

2    were -- if you were reissuing this report as

3    of June 6th rather than May 10th?

4           A.     I don't think so, no.  I will

5    note, as we talked about before, I would like

6    to reserve my ability to respond to other

7    material that may come forth in the future.

8    So I'll leave that out there.  But as of

9    today, this expresses the opinions that I

10   have in the matter.

11          Q.     Okay.  Let's just look at

12   Exhibit 6 for a moment and paragraph 18,

13   footnote 16 of your report so that we have

14   the context for that change.

15                 Okay.  So in Exhibit 6, you add

16   to the end of footnote 16 a sentence that

17   states:  However, in my own work, I have

18   found that a small share of physicians do

19   account for a significant share of opioid

20   prescriptions.

21                 Did I read that correctly?

22          A.     Yes.

23          Q.     And just so we have the full

24   context, in paragraph 18, the first sentence

1    in the text states:  Over time, prescription

2    opioid use, both medically appropriate and

3    nonmedical, increased, and many patients

4    became dependent on opioids.

5              Did I read that correctly?

6         A.    Yes.

7         Q.    And then in the footnote, in

8    the citation to footnote 16 and in the

9    footnote, the footnote in the -- in Exhibit 5

10   in your report states:  Note that according

11   to Plaintiffs' expert Dr. Alexander, only a

12   small proportion of the prescription opioids

13   that entered the general circulation are the

14   result of, quote, bad actors, closed quote,

15   such as, quote, rogue physicians, closed

16   quote, and, quote, Doctor Shoppers, closed

17   quote, and a citation to Dr. Alexander's

18   report; correct?

19        A.    Yes.

20        Q.    And so the addition reflected

21   in Exhibit 6 provides some commentary on

22   that -- the existing sentencing in footnote

23   16 of Exhibit 5, referencing your own work

24   and in which you found that a small share of

1   physicians do account for a significant share

2   of opioid prescriptions.  So what is that --

3   your own work that you're referring to in

4   that added sentence?

5       A.      That would be principally be

6   the NBER working paper and the analysis

7   contained and the literature review contained

8   in that.

9       Q.      Okay.  And what's your reason

10  for including the added sentence in

11  Exhibit 6, including that in footnote 16?

12      A.      Oh, I had meant to include that

13  reference and to call out the importance of

14  physician prescribing behavior in

15  understanding the changes in prescription

16  opioid use over time.

17              I could have sworn I had

18  written that into the report.  But when I

19  went back to look at this in the last few

20  days, I found it wasn't there.

21      Q.      Okay.  So just an oversight on

22  your part when you were preparing the initial

23  report?

24      A.      Yes.

1      Q.     Okay.  Is Dr. Alexander's

2  report noted in footnote 16 the plaintiff

3  expert report that you were referring to

4  earlier that you mentioned in a footnote?

5      A.     Yes, that's a report that I

6  mentioned once, I believe, in a footnote.  So

7  it's one that I would say I took a look at

8  but I did not review at the level of depth as

9  the other reports that I'm talking about in

10  this report here.

11      Q.     And you don't comment on it

12  other than what's in footnote 16; correct?

13      A.     I don't believe so.  That's

14  correct.

15      Q.     Okay.  Let's turn to some of

16  your background information that's in your

17  CV, Appendix A to your report.

18          Do you maintain any other CV

19  other than the CV included in Appendix A?

20      A.     No.

21      Q.     Under employment history, you

22  list academic appointments starting in August

23  of 1994 to present, and then you list other

24  appointments, various appointments with dates

1    from 1994 to the present.

2              The appointment -- the other

3    appointment entries, are you compensated or

4    have you been compensated for any of those

5    appointments?

6         A.    Not other than as part of my

7    normal compensation from, say, Stanford

8    University, which is primarily associated

9    with my faculty appointment.

10        Q.    Okay.

11              Is any of your research funded

12   in whole or in part by any grants?

13        A.    Yes.

14        Q.    And can you describe for me any

15   of your current research that's funded in

16   whole or in part by any grants?

17        A.    So I have been working on a

18   project related to insurance type and the use

19   of medical services that's funded by a grant

20   from AHRQ, the Agency For Healthcare Research

21   and Quality, a federal government agency.

22              I've been working on a project

23   related to medical group practices that is

24   funded by a grant from the National Institute

Highly Confidential - Subject to Further Confidentiality Review

1    For Healthcare Management.

2              I'm associated with other

3    grant-funded projects, also generally

4    federally funded grants.

5         Q.    What is the National Institute

6    For Healthcare Management?  Is that a

7    governmental agency or private agency?

8         A.    It's a private entity.

9         Q.    And do you know what the source

10   of its funding is?

11        A.    I'm given a grant from them,

12   and so I don't particularly pay attention to

13   that.

14             I have a general understanding

15   that they receive some of their support from

16   healthcare plans, large insurance companies.

17        Q.    So you indicate -- you

18   identified the National Institute For

19   Healthcare Management.  Are there any other

20   nongovernment agencies that provide grants

21   that fund any portion of your current

22   research?

23        A.    I don't think so, no.

24        Q.    How about in the last five

1    years?  Have there -- is there any research

2    that you've conducted in the last five years

3    funded in whole or in part by grants from

4    agencies other than governmental agencies?

5         A.     I would have to look at the

6    time periods precisely.  I've had a grant

7    from the Robert Wood Johnson Foundation in

8    the not-too-distant past, and I've had a

9    grant from the California Health Care

10   Foundation in the not-too-distant past.  I'm

11   not sure whether those are within five years.

12        Q.     Okay.

13        A.     But then those are

14   nongovernmental foundations.

15        Q.     And so the Robert Wood Johnson

16   Foundation grant, what was the nature of the

17   research that that's related to?

18        A.     Usually it's healthcare markets

19   and the performance of healthcare markets.

20        Q.     And how about the California

21   Health Care Foundation grant?  What was the

22   research that that's related to?

23        A.     Ambulatory surgical centers.

24        Q.     What's the nature of the

1    California Health Care Foundation?

2         A.    Oh, they're a philanthropy that
3    makes grants.

4         Q.    Do you understand if they're
5    funded in whole or in part by private
6    industry?

7         A.    I understand that they have a
8    large endowment that is the source of their
9    funds, the grants they make, but I don't know
10   the past history.  If there is an interesting
11   one in that, I don't know of it.

12        Q.    Okay.  How about the Robert
13   Wood Johnson Foundation?  Do you know if that
14   foundation is funded in whole or in part by
15   funds from private industry?

16        A.    Again, I understand that they
17   have a large endowment that they use to make
18   grants, so I don't believe they're funded at
19   the moment by that.  I don't know where their
20   endowment might in history have come from.

21        Q.    On your CV, you -- well, you
22   have a heading Nonacademic Employment,
23   Research Economist.  Well, that's back in
24   '93, '94.  So I take it that was before your

1    position at Stanford; correct?

2         A.    Yes.

3         Q.    Okay.  You then list a number

4    of public and professional service

5    engagements or positions.

6              Are you compensated or have you

7    been compensated for any of those positions?

8         A.    Let me take a look.

9         Q.    Sure.

10             [Document review.]

11        A.    So a couple of these I can

12   recall receiving honoraria associated with

13   the role.  Most of these, no.

14        Q.    Okay.  Can you identify the

15   ones where you can recall receiving

16   honoraria?

17        A.    Yes.  So, for example, on

18   page A-3, toward the bottom there's a

19   notation as a member of the Research Awards

20   Selection Committee, and then it says for the

21   National Institute of Health Care Management.

22             And then it says Chair, 2009 to

23   the present.

24             As the chair I have received an

Highly Confidential - Subject to Further Confidentiality Review

1    honorarium for that work.

2              And then next to that, when I

3    was senior associate editor of Health

4    Services Research, the journal, there was an

5    annual honorarium associated with that

6    position.

7              Those are the two that come to

8    mind.

9              I'll tell you, I can't recall

10   at the moment -- for example, when you do

11   study sections.  So the special member of the

12   HSOD study section, that could have been an

13   honorarium associated with that, but I can't

14   recall at the moment if there was.

15             So those are the two that I

16   know that there was some honorarium

17   associated with it.

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

5      Q.     Okay.  Let's turn to your prior

6   testimony, which is Appendix B to your

7   report.

8      A.     Okay.

9      Q.     And fair to say Appendix B

10  lists all of the expert testimony you've

11  provided since 2015?

12     A.     Yes.

13     Q.     Okay.  And are there any

14  matters in which you -- since 2015 in which

15  you have prepared an expert report that, to

16  your knowledge, was provided to the other

17  side of the litigation, as to which you did

18  not provide testimony?

19     A.     There are other matters in

20  which I know I prepared an expert report.  I

21  don't know whether it was always provided to

22  the other side in the litigation.

23     Q.     Okay.  So since 2015, you have

24  had expert engagements, litigation-related

1    expert engagements other than those listed on

2    Appendix B.

3              Is that fair?

4         A.    Yes.

5         Q.    Okay.  Do you have any estimate

6    as to the approximate number of such

7    engagements?

8         A.    As I sit here today, I would

9    have to think it over.  Five would be an

10   estimate.

11        Q.    Okay.  Okay.  Let's go through

12   the ones that are listed on Appendix B for a

13   few moments.

14              The first item, the

15   Kimberly-Clark litigation, you indicate there

16   you gave trial testimony.

17        A.    Correct.

18        Q.    What was the nature of the

19   opinions that you expressed in that

20   litigation?

21        A.    That litigation concerned in my

22   involvement, prices for its purchase by

23   hospitals.  And so my opinion was related to

24   those prices and factors affecting those

Highly Confidential - Subject to Further Confidentiality Review

1    prices and trends and prices over time.

2        Q.    Okay.  And do you recall the

3    law firm that retained you in that matter?

4        A.    Oh, I am terrible at recalling

5    all of the law firms.  So I don't right now.

6    I -- no.

7        Q.    Okay.

8        A.    I shouldn't try to guess at it.

9        Q.    Do you recall the names of any

10   of the lawyers that were at the firm that

11   retained you?

12       A.    I wish I were better at

13   remembering those names, but no,

14   unfortunately.

15       Q.    In addition to the trial

16   testimony, did you also give a deposition in

17   that matter?

18       A.    No.  There was no deposition in

19   that matter.

20       Q.    Did you prepare a report?

21       A.    Yes.

22       Q.    Were you cross-examined at

23   trial?

24       A.    Yes.

1    Q.    Do you recall the lawyer who

2  cross-examined you?

3    A.    Oh, what's his name?

4    Q.    I'm sure you recall.  I guess

5  the fair question is whether you recall his

6  name?

7    A.    That's my thought exactly.  I

8  can picture him.  He's been in the news.  But

9  as I say, I'm -- in this moment, I'm sorry,

10  I -- in five seconds I'll recall it, but --

11    Q.    Okay.

12    A.    -- you asked me and I...

13        I'm embarrassed that I can't

14  remember it right now.

15    Q.    Now that you mention it, I seem

16  to recall seeing Mr. Avenatti's name

17  associated with that litigation in some news

18  reports.

19    A.    That sounds familiar.

20    Q.    Okay.  I'm sure if you're

21  following recent news accounts, you're

22  probably feeling pretty good about what

23  you're reading about him these days, after

24  your cross-examine experience.  But that's

1    another matter.

2        A.    I shouldn't comment, I suppose.

3        Q.    Okay.  The next matter, the

4    appraisal of Towers Watson & Co. matter, what

5    was the nature of the opinions you expressed

6    in that litigation?

7        A.    That matter involved the

8    valuation of a business that was involved in

9    selling health insurance of a particular

10   type.  And so my opinions were related to the

11   market for health insurance and how that

12   might be performing.

13       Q.    Okay.  It indicates it was in

14   chancery court in Delaware.  Was it some sort

15   of corporate dispute?

16            Do you recall the nature of the

17   litigation?

18       A.    The dispute was over the

19   valuation of a company that had been involved

20   in a transaction.

21       Q.    Okay.  How about the next

22   matter, the Duke University matter?  What was

23   the nature of the opinions you gave in that

24   matter?

1    A.    That was a matter involving

2  allegations about pay for academic

3  physicians.  And so I gave opinions about the

4  market for academic physicians and how

5  compensation might be affected by different

6  environmental issues or contextual issues.

7    Q.    Do you remember the law firm

8  that retained you in that matter?

9    A.    Again, I have worked with a

10 number of law firms, and so I'd be guessing

11 to try to associate particular law firms with

12 these.

13   Q.    Okay.

14   A.    So no, not specifically, no.

15   Q.    Any individual lawyer you

16 recall in connection with that matter?

17   A.    It's very hard for me to recall

18 the names in this particular setting right

19 here.  So no.  I can picture a face, but I --

20 no.

21   Q.    Okay.

22        MR. BREWER:  He'll forget my

23      name in a few weeks.

24        THE WITNESS:  I'm sorry to say.

```
 1          Q.     (BY MR. GOTTO)  I should have
 2   asked you those same questions regarding the
 3   Delaware matter.
 4          Do you recall the -- either the
 5   law firm that retained you or any of the --
 6   any of the lawyers at that firm?
 7          A.     No, I'm sorry.
 8          Q.     Okay.  Do you recall either the
 9   law firm or name of the lawyer who took your
10   deposition in the Delaware matter?
11          A.     No.
12          Q.     How about in the Duke matter?
13          A.     Again, I can picture a face in
14   the matter, but no, there are just too many
15   names and jumbles going on for me to try to
16   associate them all.
17             MR. GOTTO:  Okay.  Why don't we
18             take a short break.  We'll reconvene
19             in a few minutes.
20             THE VIDEOGRAPHER:  Approval of
21             all counsel, going off the record.
22             Time is approximately 10:32 a.m.  This
23             marks the end of recording Media
24             No. 1.
```

```
 1                   (Recess taken, 10:32 a.m. to

 2           10:47 a.m.)

 3                   THE VIDEOGRAPHER:  With the

 4           approval of counsel, back on the

 5           record.  The time is approximately

 6           10:47 a.m.  This marks the recording

 7           Media No. 2.

 8           Q.    (BY MR. GOTTO)  Professor

 9   Baker, let's continue to go through the

10   litigation matters that are listed on

11   Appendix B to your report.  We talked about

12   the first three.

13                   Item No. 4, the Blue Shield of

14   California matter.  What was the nature of

15   the opinions you expressed in that

16   litigation?

17           A.    That matter had to do with

18   insurance products and the characteristics of

19   insurance products of -- my opinions were

20   about the normal market for insurance

21   products and their characteristics.

22           Q.    And the normal market meaning

23   what?

24           A.    Meaning the kinds of
```

1    identifiers of insurance products that are

2    found commonly offered to the public.

3         Q.    Do you recall the law firm that

4    hired you in that matter, the names of any

5    the individual lawyers you worked with?

6         A.    The law firms, no.

7               I believe one of the attorneys

8    was John Fogerty.

9         Q.    Do you recall the lawyer who

10   took your deposition in that matter, or that

11   person's law firm?

12        A.    No, I'm afraid I don't.

13        Q.    Item 5, the Evident, Inc.

14   matter, what's the nature of the opinions you

15   rendered or formed in that opinion -- in that

16   case?

17        A.    That was a matter involving

18   electronic medical records software, and my

19   opinions were about the common uses of

20   electronic medical records software in

21   hospitals and other parts of the healthcare

22   system, that -- the normal ways in which

23   those are used by hospitals.

24        Q.    And do you -- what's the nature

1   of Evident, Inc's business?

2          A.      Evident, Inc. offers a medical

3   records software product for primarily dental

4   laboratories.

5          Q.      Do you recall the law firm that

6   retained you in that matter or any of the

7   names of the individual lawyers?

8          A.      No, I'm afraid I don't.

9          Q.      How about the lawyer that took

10  your deposition or cross-examined you at

11  trial, and or that person's firm?

12         A.      I'm afraid I can picture the

13  face again, but I can't come up with a name

14  for you.

15         Q.      You indicated in that matter

16  you gave trial testimony April of last year.

17                 Do you know what the outcome of

18  that case was?

19         A.      I have a general understanding

20  that the outcome of the case was against the

21  client that I had worked for.  I don't recall

22  the specific issues in the judgment.

23         Q.      Was that also true as to item

24  No. 1, the Kimberly-Clark case, in terms of

Highly Confidential - Subject to Further Confidentiality Review

1    the outcome of the case?

2        A.    That's my understanding, yes.

3        Q.    Item No. 6, the Mylan versus

4    Sanofi-Aventis matter, what was the nature of

5    the opinions you gave in that matter?

6        A.    That's a matter related to

7    the -- my involvement is related to the

8    commercial success of a pharmaceutical

9    product, and so my opinions were related to

10   the assessment of commercial success for that

11   product.

12       Q.    What was the nature of the

13   product?

14       A.    It's a diabetes drug, insulin

15   product.

16       Q.    Do you recall the name of the

17   firm that retained you or any lawyers?

18       A.    Weil might come to mind more

19   specifically than it has for other cases

20   here, but again, I'm not completely sure I

21   have all of these right.

22       Q.    Did you mean Weil as a name, or

23   were you using the word "while" as an adverb?

24       A.    Oh, I'm sorry, Weil as a name.

1    Q.    So it was Weil Gotshal?  Is

2    that the firm?

3    A.    I would say that's familiar,

4    yeah.

5    Q.    And do you remember the name of

6    the lawyer who took your deposition or that

7    person's firm?

8    A.    No.

9    Q.    And item 7, Blue Cross Blue

10   Shield of Florida matter, what's the nature

11   of the opinions you formed in that case?

12   A.    It's a matter involving

13   competition in insurance markets.  And so my

14   opinions were related to how the market for

15   insurance was functioning, whether there was

16   evidence of problems with that market.

17   Q.    And do you recall the name of

18   the firm that retained you or any of the

19   lawyers at that firm that you worked with?

20   A.    Cravath, I believe, and Lauren

21   Kennedy is one of the lawyers.

22   Q.    And you indicate that you gave

23   hearing testimony.

24        Was that in a courtroom or an

Highly Confidential - Subject to Further Confidentiality Review

1    administrative hearing?  What was the nature

2    of that proceeding?

3           A.    It was in a courtroom.

4           Q.    Do you recall the name of the

5    lawyer who cross-examined you or that

6    person's firm?

7           A.    I'm sorry, I don't.

8           Q.    You indicate hearing.  Are you

9    distinguishing a hearing from a trial?

10          A.    I wrote down hearing because I

11   understand it was a hearing preliminary to

12   the trial.

13          Q.    Okay.

14                Do you know if that matter is

15   still currently pending?

16          A.    Yes, I believe there are

17   ongoing aspects to that matter.

18          Q.    Of the seven matters pending on

19   Exhibit B, can you tell me which ones, if

20   any, you've worked with with Analysis Group?

21          A.    Yes.  Let me take a look.

22                That would be No. 2, No. 3,

23   No. 4.

24          Q.    And can you remember any of the

1    names that you worked with at Analysis Group

2    on those matters?

3          A.     So Federico Mantovanelli was

4    one of the people that I worked with on

5    No. 3.

6                 Mark Gustafson on No. 4 comes

7    to mind.

8                 Goodness.  I'm trying to

9    recall, again, with lots of different people

10   over time.  So those are the ones that I can

11   come up with for you.

12         Q.     Now, you indicated before the

13   break that since 2015, you've also provided

14   some expert work on I think you indicated

15   five matters other than those listed on

16   Appendix B; correct?

17         A.     That would be my estimate.

18         Q.     Sure.  Did you work with

19   Analysis Group in any of those matters?

20         A.     I would have to estimate yes,

21   but I'm having a hard time coming up with the

22   specifics for that for you.

23         Q.     Okay.  Okay.  And I think you

24   indicated before the break that you weren't

1    sure whether or not your -- your involvement

2    in those other five matters had been

3    disclosed to the other side; is that correct?

4         A.    That's correct.

5         Q.    Okay.  I would request, if

6    after today if you can -- if, in fact, there

7    are -- if, in fact, in any of those matters

8    you did prepare a report that's been provided

9    to the other side, or if your involvement has

10   otherwise been disclosed to the other side in

11   that litigation, if you could supplement

12   Appendix B to identify those matters as well,

13   please.

14            MR. BREWER:  And I'm going to

15        object to the question just in that

16        he's only required to provide

17        testimony and not expert reports.

18            MR. GOTTO:  Okay.  Fair enough.

19        Well, I understand your objection.  I

20        reiterate my request, and we can just

21        move on from there.

22        Q.    (BY MR. GOTTO)  I think you

23   indicated before the break that your first

24   involvement with Analysis Group goes back to

1    the 1990s; correct?

2         A.    Yes.

3         Q.    Is that when you first

4    performed any sort of litigation-related

5    expert work?

6         A.    That's probably fair to say.

7         Q.    Okay.  And so what were the

8    circumstances under which you were -- the

9    first time you took on a litigation expert

10   assignment?

11        A.    It's a little fuzzy, but I can

12   remember a matter involving hospital

13   competition in California.

14        Q.    Looking at Appendix B, since

15   2015 you list seven matters on Appendix B.

16   You've indicated there were about five

17   others.  That's 12.  And then there's the

18   opioids matter.  So that's about 13

19   litigation-related engagements since 2015.

20             Prior to 2015, was sort of the

21   level of your activity as an expert witness

22   comparable?

23             MR. BREWER:  I object to the

24        question to the extent the question

1          mischaracterizes the witness's

2          previous testimony.

3                    THE WITNESS:  I'd say it was

4          less before the last five years.

5          Q.     (BY MR. GOTTO)  Okay.

6                    So starting with the first

7     engagement back in the '90s, were there

8     periods of time -- say from the period from

9     whenever that first engagement was in the

10    '90s to 2015, were there periods of time when

11    you did not have any ongoing expert

12    engagements?

13         A.     I'm going to have a hard time

14    recalling the specifics of it.  You know, the

15    last few years I've done more than I did

16    before.  It used to come up from time to

17    time.

18                    And it may have been that there

19    was reasonably steady streams, but there may

20    have been some times in there where there was

21    no case at a particular time that I was

22    working on.

23         Q.     Okay.

24         A.     Hard to recall the specifics.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.      Any particular reason that the

2    level has increased in the last few years?

3    A.      I felt able to take on more

4    opportunities in my life.

5    Q.      Did you do any -- do you take

6    any steps to try to -- to try to solicit

7    business as an expert witness?

8    A.      No.

9    Q.      Don't do any advertising,

10   anything like that?

11   A.      Nothing that I do, no.

12   Q.      Does your -- are there any

13   restrictions or limitations imposed by

14   Stanford in terms of the amount of litigation

15   consulting work you're able to do?

16   A.      Yes.  I'm able to do work up to

17   a day a week.

18   Q.      And is it just for the academic

19   year or is that calendar year?

20   A.      Oh, I suppose that would

21   probably go for 11 months of the year and

22   average out at a day a week.

23   Q.      Okay.  And then for the 12th

24   month, you can do your -- you're a free

1      agent?

2           A.      You know, there are vagaries

3      about how they determine or think about

4      vacation time that I would be at my

5      discretion.  And so my general understanding

6      is that my appointment is for 11 months of

7      the year, but there are different

8      interpretations of the details of that,

9      depending on how exactly you look at it.

10          Q.      Okay.  So for those 11 months,

11     you can -- just round numbers, you can do

12     about 50 days of -- slightly under 50 days of

13     expert work.  Is that fair?

14          A.      Yes.

15          Q.      That day-a-week limitation,

16     does that apply only to litigation-related

17     work or is that any outside professional

18     employment that you have?

19          A.      I think that would extend to

20     outside employment that's not part of my

21     assignment at Stanford.

22          Q.      Okay.

23                  Have there been any times in

24     which your litigation expert work has

Highly Confidential - Subject to Further Confidentiality Review

1    exhausted your day-a-week allotment?

2         A.    No.  My understanding is that's

3    averaged over, you know, multiple weeks or

4    multiple months to make the calculation.  And

5    so I believe it's -- I've kept it within the

6    allotment.

7         Q.    Okay.  Do you report to

8    Stanford -- anything formal -- with respect

9    to your outside activities?

10        A.    There are required disclosures

11   for NIH grants.  To the extent that I would

12   have conflicts that might be viewed as a

13   conflict by the NIH, I have to report that.

14   But otherwise, no.

15        Q.    Okay.

16        A.    I certify that I'm in

17   compliance.

18        Q.    You provide a certification

19   that you are in compliance with this

20   day-a-week limitation?

21        A.    Yes.

22        Q.    Is that day-a-week limitation a

23   formal policy at Stanford?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     And so if I wanted to review

2     that policy, where would I look in the

3     Stanford, you know, library of materials?

4          A.     I have no idea.

5          Q.     Okay.  But your understanding

6     is it's written down somewhere and is

7     applicable to faculty at Stanford?

8          A.     Yes.

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

1        Q.        Apart from your expert witness

2    work, since 2015 -- and I realize you

3    mentioned the honoraria earlier, and so we

4    can exclude those as well -- are there any

5    other items of recurring income -- and I

6    don't want -- I'm not referring here to

7    passive investments, but income for services

8    that you have received other than your

9    employment at Stanford, expert witness work,

10    and the honoraria you've identified?

11        A.        If there is, it's a minimal

12    amount.  I can't think of anything in that

13    time period that would be relevant.

14        Q.        And your compensation at

15    Stanford, is that a fixed amount?

16        A.        It's a salary, yes.

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

```
19          Q.     In the last five years, have
20   you received any compensation for speaking
21   engagements of any sort?
22          A.     I don't think so in the last
23   five years.
24          Q.     Okay.  Prior to that time have
```

1    you?

2         A.     I can recall an engagement of a

3    few years back that I got a speaking fee.

4         Q.     Okay.  And do you recall the

5    nature of the engagement?

6         A.     It was to speak to a group

7    associated with an insurance company about

8    variations in healthcare use across different

9    areas, different geographic areas.

# REDACTED

13         Q.     In the last five years, have

14   you received any compensation for

15   participation in any conferences, any

16   professional conferences?

17         A.     No.

18         Q.     Have you -- in the last five

19   years, have you received any compensation for

20   publicly expressing any opinions with respect

21   to pharmaceutical -- the pharmaceutical

22   industry?

23         A.     No.

24         Q.     How about any opinions with

Highly Confidential - Subject to Further Confidentiality Review

1    respect to any aspect of the medical

2    industry?

3              MR. BREWER:  Objection, form.

4              THE WITNESS:  Not that I can

5        think of.

6        Q.    (BY MR. GOTTO)  Same questions

7    prior to the last five years:  Any

8    compensation you can recall receiving for

9    publicly expressing any opinions related to

10   the pharmaceutical industry?

11             MR. BREWER:  Same objection.

12             THE WITNESS:  No.

13       Q.    (BY MR. GOTTO)  Or the medical

14   industry?

15             MR. BREWER:  Same objection.

16             THE WITNESS:  No.

17       Q.    (BY MR. GOTTO)  Do you have any

18   equity ownership in any business, public or

19   private, related -- that's engaged in any

20   aspect of the pharmaceutical industry?

21       A.    No.  Other than maybe through a

22   mutual fund that I don't know of the direct

23   investment in.

24       Q.    And same question with respect

Highly Confidential - Subject to Further Confidentiality Review

1    to any company, public or private, that's

2    engaged in any aspect of the medical

3    industry.

4          A.     No.

5          Q.     Are you the holder of any

6    patents?

7          A.     No.

8          Q.     Or any applications for any

9    patents?

10         A.     No.

11         Q.     Ever been listed as an inventor

12   on a patent?

13         A.     No.

14         Q.     In the last five years, apart

15   from litigation-related consulting, have you

16   had any other consulting engagements for

17   which you were compensated?

18         A.     I can recall one small one with

19   a company that had a product that we were

20   helping them think about how to evaluate.

21         Q.     What was the nature of the

22   product?

23         A.     Product designed to encourage

24   or help people get better sleep.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you remember the approximate
2    time frame on that?
3    A.    Oh, it's been going on for the
4    last year or so, and it's still going on.

# REDACTED

8    Q.    With respect to the
9    approximately five litigation engagements
10   since 2015 which are not included on
11   Appendix B, do any of them relate in any way
12   to the opioid crisis?
13   A.    No.
14   Q.    Have you ever testified in any
15   litigation prior to 2015 that related in any
16   way to the opioid crisis?
17   A.    No.
18   Q.    Have you ever testified before
19   Congress?
20   A.    No.
21   Q.    How about any state
22   legislature?
23   A.    Yes.
24   Q.    On what occasion?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      The California state

2    legislature on an occasion or two in which

3    they were holding hearings related to aspects

4    of the healthcare system in California.

5        Q.      Do you remember the approximate

6    time -- time frame?

7        A.      The one that I can remember was

8    in the last few years.  They were considering

9    reforms one could make to the California

10   healthcare system, and they held a hearing to

11   hear from some academics about that.

12       Q.      And what was the particular

13   subject matter of your testimony?

14       A.      It was related to competition

15   in California.  Competition for healthcare

16   providers in California.

17       Q.      And how did you come to do that

18   testimony?  Were you approached, or did you

19   approach someone?

20       A.      Oh, I was approached by someone

21   from the committee that was holding the

22   hearing.

23       Q.      Have you ever provided any

24   testimony either oral or written to the DEA?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     No.

 2          Q.     How about the FDA?

 3          A.     No.  I'm trying to -- I don't

 4   believe so, no.

 5          Q.     You were hesitating as if there

 6   was something that you thought might fall

 7   into that category.

 8          A.     Oh, I just took a look at No. 6

 9   here.

10          Q.     Okay.

11          A.     To make sure that that did not

12   list the FDA, and it listed the Patent and

13   Trademark Office.

14          Q.     How about the CDC?

15          A.     No.

16          Q.     And any grand jury?

17          A.     No.

18          Q.     Do you know if there's a

19   transcript of the testimony you gave to the

20   California legislature?

21          A.     I'm not aware if there is.

22          Q.     Apart from grants issued by

23   governmental agencies in connection with

24   research you've done, have you ever had --
```

1    received compensation from the federal

2    government for any services?

3         A.     No.  The most I -- I don't

4    believe so.  The most I can think of would be

5    an honorarium associated with, say, grant

6    review, if, in fact, I got an honorarium

7    associated with grant review.  So those would

8    be smaller amounts.  That would have been the

9    kind of thing we reviewed earlier.

10         Q.     Okay.  How about any state

11    government?  Any compensated employment apart

12    from a grant for research?

13         A.     I don't believe so, no.

14         Q.     On Appendix A to your report,

15    the first page to your CV, you indicate under

16    Other Appointments, you indicate from 1994 to

17    2002, you were a faculty research fellow at

18    the National Bureau of Economic Research.

19              What is the National Bureau of

20    Economic Research?

21         A.     That is an organization that

22    facilitates and encourages economic research.

23    Brings people together for meetings and helps

24    encourage research projects.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And do you have continuing

2  involvement with that organization?

3    A.    Yes.

4    Q.    And what is your continuing

5  involvement?

6    A.    Oh, I continue to be affiliated

7  with them as a research associate.

8    Q.    Okay.  How does one become

9  affiliated with the National Bureau of

10  Economic Research?

11    A.    There's a nomination process,

12  and so one is nominated and then accepted, I

13  suppose, as a member.

14    Q.    Is it generally viewed as a

15  prestigious retention?

16    A.    I don't know how to attach

17  meaning to that.  It's positively viewed in

18  the field.

19    Q.    What does your ongoing

20  involvement as a fellow, a research fellow

21  for the NBER entail?

22    A.    So it's as a research

23  associate.

24    Q.    I'm sorry.

1          A.     And I attend meetings from time

2     to time, and work on projects associated with

3     NBER.  They have some data that I use, for

4     example.

5          Q.     And they maintain data that you

6     sometimes use in your research?

7          A.     Yes.

8          Q.     I think you indicated earlier

9     that there were, in addition to Exhibit 2,

10    there were perhaps some other of your

11    publications that related to opioids.

12               Could you identify those for

13    me, please?

14         A.     Yes.  Let me flip through here.

15               [Document review.]

16         A.     So on the list of publications

17    by the number, it would be No. 125.

18               No. 130.

19               No. 132.

20               No. 133.

21         Q.     Is that it?

22         A.     Yes.  I'm sorry.

23         Q.     Okay.  So if we look at

24    No. 125, Incidence of and Risk Factors for

1    Chronic Opioid Abuse Among Opioid-Naive

2    Patients in the Postoperative Period, from

3    September of 2016, can you tell me what your

4    contributions to that paper were?

5         A.    Yes.  So you can see that there

6    are four authors listed.  So I worked with

7    others to write that paper.

8              My particular expertise as

9    relates to that paper was in the use of the

10   database that the analyses were derived from.

11             So I had arranged for some

12   access to that database, and I have some

13   expertise to its use, and so I contributed

14   that to the team.

15        Q.    Okay.

16        A.    I also worked on drafting the

17   manuscript and different aspects of doing the

18   research.

19        Q.    What were the circumstances

20   under which you got involved in that

21   particular project?

22        A.    Oh, Professor Sun, who is the

23   lead author, is a colleague of mine at

24   Stanford, and we cross paths from time to

Highly Confidential - Subject to Further Confidentiality Review

1    time.  And we had a conversation about his

2    interest in working on this question and the

3    fact that I had a database that might allow

4    one to look at it.  And we -- with, of

5    course, other conversations that he or I were

6    having as well, came up with the idea of

7    doing the research project.

8         Q.    How about item 130, the 2017

9    paper on Association Between Concurrent Use

10   of Prescription Opioids and Benzodiazapines?

11             Do I have that right?

12        A.    Pretty close.

13        Q.    And Overdose:  Retrospective

14   Analysis.

15             What was your contribution to

16   that paper?

17        A.    It was similar.  You can see,

18   again, there are several coauthors to that

19   paper, so I participated as a member of a

20   group in writing this paper.  This uses the

21   same database that I had arranged for access

22   to and was expert in using, and so I

23   contributed my expertise in how to use the

24   database to address the questions that the

1    paper was aiming to study.

2         Q.    What's the nature of the

3    database that you're referring to?

4         A.    Oh, it's -- it's a large claims

5    database that contains insurance claims for a

6    large group of people.

7         Q.    Is it one of the NBER databases

8    that you referred to earlier?

9         A.    Yes.

10        Q.    And your involvement in the

11   paper under 130, did that come about with

12   your same interactions with Professor Sun?

13        A.    Yes.  I would say principally

14   so.

15        Q.    How about item 132, which is a

16   September of 2000 -- am I reading it right?

17    Looks like it's September 2017, published

18   paper, with a long title that I won't read.

19              What was your contribution to

20   that paper?

21        A.    Again, that will be similar.

22   That also uses that database of insurance

23   claims, and so I was participating with the

24   group of people helping them do analyses and

1    think about the way to use the database to

2    conduct analyses of the questions that were

3    of interest to the paper.

4              And I'll just be clear, I also

5    participated in the writing of the paper and

6    other aspects of authoring the paper.

7         Q.    And item 133, which is also a

8    2017 publication, what was your involvement

9    in that paper?

10        A.    I would give a similar answer

11   to the one I just gave.  I can give it again

12   if you --

13        Q.    No, that's fine.  That's fine.

14   Thank you.

15             And I see that paper, Professor

16   Sun's not listed on that one.  What were the

17   circumstances under which you became involved

18   in that project?

19        A.    Professor Sun is listed on that

20   one.

21        Q.    Oh, I'm sorry.

22        A.    As the last author.

23        Q.    I see.  I'm sorry.  So then it

24   would be similar circumstances to your

Highly Confidential - Subject to Further Confidentiality Review

1    interaction with him as what --

2         A.    Yes.

3         Q.    -- brought that about?

4         A.    Yes.

5         Q.    The four papers that you've

6    just identified, 125, 130, 132, and 133, did

7    you perform any research or analysis in

8    connection with those papers with respect to

9    the economic consequences of the opioid

10   crisis?

11              MR. BREWER:  Objection, vague.

12              THE WITNESS:  You can see the

13         titles of the work that we were doing.

14         So we were interested in the incidence

15         and risk factors of opioid use.  So we

16         were interested in concurrent use of

17         benzodiazapines.  We were interested

18         in nerve blocks.

19              I would not characterize those

20         as directly related to the economic

21         consequences of the opioid crisis.

22         These papers all involved opioids.

23         Q.    (BY MR. GOTTO)  Fair to say

24   that none of them involve any costs incurred

1    by governmental agencies as a result of the

2    opioid crisis?

3           A.     Yes, that's correct.

4           Q.     Apart from your report in this

5    case, have you performed any research with

6    respect to the costs incurred by any

7    governmental agencies as a result of the

8    opioid crisis?

9           MR. BREWER:  Objection, form.

10          THE WITNESS:  I don't believe

11   so, no.

12          Q.     (BY MR. GOTTO)  You've

13   coauthored a number of papers with Professor

14   Kessler; correct?

15          A.     Yes.

16          Q.     And when did you first

17   collaborate with him on a project?

18          A.     It would be years ago.  I -- we

19   could search through here to find some

20   specifics about that, but a number of years

21   ago.

22          Q.     Okay.  What were the

23   circumstances under which you first began

24   working with Professor Kessler?

1      A.     Oh, we've been colleagues at

2   Stanford for many years, going back to when I

3   first came there when he did, around the same

4   time.

5          I think at one point we crossed

6   paths and started talking about research

7   ideas and came to write some -- write what

8   would be our first paper.  I'd have to go

9   look back at it, but it's just in the normal

10  course of interacting with my colleagues.

11     Q.     Okay.  Do you view Professor

12  Kessler's area of expertise as similar to

13  yours?

14     A.     I don't know how he would

15  characterize his area of expertise.  I see

16  him as an economist and interested in

17  healthcare.

18     Q.     And you're an economist that's

19  interested in healthcare too, right?

20     A.     Yes.

21     Q.     Are there any particular

22  focuses of your academic or research work

23  that you associate with Professor Kessler as

24  being in any way different from your own

1    focuses?

2        A.    Oh, I've seen him do

3    interesting work on lots of issues in

4    healthcare.  I think we're both interested in

5    a broad set of issues in healthcare and

6    health economics.

7        Q.    So when the two of you

8    collaborate on a paper, is there a particular

9    division of responsibilities that you employ?

10       A.    No.  I think it's specific to

11   the individual matter, the individual paper

12   that we'd be working on.

13       Q.    So Exhibit 2, I believe we

14   labeled it, is the working paper that you and

15   Professor Kessler and Professor Bundorf are

16   working on; correct?

17       A.    Yes.

18       Q.    What were the circumstances

19   under which you commenced work on this

20   project?

21       A.    This would be similar to other

22   projects.  We cross paths, Professor Kessler

23   and I and Professor Bundorf, from time to

24   time.  And I think we had taken note of the

Highly Confidential - Subject to Further Confidentiality Review

1   fact that we had some data that would allow

2   us to take a look at an aspect of the issue

3   here with insurance coverage and opioid use

4   that hadn't been looked at to our knowledge

5   before.  And so we identified that in a

6   conversation and decided to go look into it.

7        Q.    Have you worked with Professor

8   Bundorf on other projects?

9        A.    Yes.

10       Q.    Was there a division of

11  responsibilities among the three of you in

12  the preparation of the paper that we've

13  marked as Exhibit 2?

14       A.    Oh, I'd say we all made

15  contributions to the writing of the paper.  I

16  think Professor Kessler carried out most of

17  the specific analyses, and then we would meet

18  to discuss and work on the ideas and the

19  writing of the paper.

20       Q.    The current status of this

21  paper is -- it has not been peer-reviewed at

22  this point; is that correct?

23       A.     It's submitted to a peer-review

24  journal, so that peer review may be ongoing.

Highly Confidential - Subject to Further Confidentiality Review

1    I can't speak to that.  But this is a working

2    paper, and it's not yet finished the

3    peer-review process.

4         Q.     Your anticipation at the

5    conclusion of the peer-review process, it

6    would be published in an academic journal?

7         A.     I hope it's successful.

8         Q.     Okay.

9              If you'd turn to the Materials

10   Reviewed list that I believe is Appendix C --

11   your Materials Reviewed list, Appendix C to

12   your report.

13        A.     Yes.

14        Q.     Fair to say that the materials

15   listed on Appendix C are all of the materials

16   you considered in formulating your opinions

17   here?

18        A.     I believe that's correct, yes.

19        Q.     Okay.  You list under Court

20   Documents:  plaintiff expert reports,

21   depositions, and court filings.

22              Did you receive all of those

23   from counsel?

24        A.     Yes.

1              Yes.  Some by way of Analysis

2     Group, but from counsel I understand

3     originally.

4         Q.     Was there anything listed under

5     Court Documents that you received by way of a

6     request by you, or were these matters simply

7     provided to you by counsel or by Analysis

8     Group?

9         A.     So in my work on the report, I

10    had asked the -- the support team to make me

11    aware of materials that might be relevant to

12    the points I was making -- the points I was

13    trying to make.

14              And so in response to that

15    request, for example, you know, I'd say

16    that's how I became aware of the Alexander

17    report they identified that has something the

18    support team knew about and thought maybe I'd

19    want to take a glance at.

20              I'd say the same thing about

21    the Rafalski report.  Others of these I think

22    I was provided as part of my assignment.

23              Thinking about the depositions,

24    again I -- that came from Analysis Group and

Highly Confidential - Subject to Further Confidentiality Review

1    from the support team as part of my request

2    that they help me identify things that I

3    should be looking at, and they were aware of

4    what I wanted to do.

5              So I thought it was quite

6    natural for them to provide that.  And if I

7    hadn't heard from them, I probably would have

8    asked for the chance to look at some of that

9    material if I had known about it.

10             So I -- so there's, you know, a

11   bit of back and forth in this.

12        Q.    Focusing on the plaintiff

13   expert reports, you've already testified

14   regarding Dr. Alexander's report, so we can

15   exclude that one.

16             The Rafalski report -- correct

17   me if I'm wrong.  I don't think you commented

18   on that report in your report; is that

19   correct?

20        A.    No.  I think that appears in a

21   footnote or two, but there's no specific

22   comment on that, no.

23        Q.    And the Rafalski report, did

24   you personally review it?

1          A.      I would say it was brought to

2    my attention that there might be something in

3    there that I should look at.  So I took a

4    glance through the whole thing, but I

5    specifically looked at a very small part of

6    it that would have been relevant to my

7    footnote.

8          Q.      And what was that part that you

9    looked at?

10         A.      Oh, I'd have to go back in my

11   report.  But it --

12         Q.      Is it identified in your

13   report?

14         A.      Yeah.  It's a footnote in my

15   report to the relevant piece of material.

16         Q.      That's fine.

17                 The remaining reports that are

18   listed on Appendix C, I believe, are all

19   reports that you comment on in varying

20   degrees of detail in your report.

21                 Did you review each of them

22   personally?

23         A.      Yes.

24         Q.      And the deposition transcripts

1    that you list on Appendix C, did you review

2    those personally as well?

3         A.    So those, I would say I

4    reviewed sections, in some cases significant

5    sections of, but I would not say I've

6    reviewed the entirety of those in detail.

7         Q.    Okay.  How did you know which

8    sections to review?

9         A.    Oh, this was a result of,

10   again, a request to the support team to, with

11   the points I was making in mind, help me

12   identify parts of those that I should be

13   looking at.  So they would call that to my

14   attention; I would read sections.

15              It's my custom to read a few

16   pages before and a few pages after any

17   section they identified, so that would lead

18   to me reviewing chunks of these depositions.

19        Q.    Do you know Dr. McCann apart

20   from this engagement?  Any familiarity with

21   him?

22        A.    No.

23        Q.    How about Professor Cutler?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     And in what context do you know

2   Professor Cutler?

3      A.     We both work in the same area.

4   So cross paths from time to time at

5   professional meetings or in other contexts

6   related to our work.

7      Q.     For about how long have you

8   known him and crossed paths with him?

9      A.     Oh, going back to the 1990s

10  again.

11     Q.     Apart from this matter, have

12  you had occasion in any of your expert

13  litigation engagements to comment on any of

14  Professor Cutler's work?

15     A.     Not that I can recall

16  specifically.  I can -- I've been in

17  conferences where he's presented his work

18  and, although I can't recall it specifically,

19  I sometimes ask questions at those meetings.

20  And so it may be that you would construe that

21  as a comment of sorts, but not in a formal

22  way like we're talking about here.

23     Q.     And I think I was asking

24  initially in a way of an actual litigation

1    setting, where it's similar to what we've got

2    here, where there's an expert report that

3    you've commented on.  That hasn't occurred

4    previously; correct?

5         A.    That's correct.

6         Q.    Have you ever participated in

7    the peer review of any paper that Professor

8    Cutler was an author on?

9         A.    I peer review a lot of papers.

10   And it is quite possible, but I couldn't

11   recall a specific instance in this -- as I

12   sit here right now.

13        Q.    And obviously you express in

14   your report here various commentary and

15   criticisms on Professor Cutler's report.

16             As a general matter, do you

17   have an opinion on Professor Cutler's

18   academic rigor?

19             MR. BREWER:  Objection to form.

20             THE WITNESS:  I have seen

21        Professor Cutler do some nice work

22        over the years, and I have a generally

23        positive view of research that he

24        does.  I'd be careful to say that I

1          would never extend a general view like

2          that to anything and everything

3          someone does or says.

4          Q.    (BY MR. GOTTO)  Apart from

5     Professor Cutler's report in this matter, can

6     you recall any other work of Professor Cutler

7     as to which you've ever expressed any

8     meaningful criticism?

9          A.    I can't recall a specific

10    instance, no.

11         Q.    How about Professor Gruber?  Do

12    you know him apart from this litigation?

13         A.    Yes.

14         Q.    And in what context do you know

15    him?

16         A.    In a similar way.  We both work

17    in the same general area and so cross paths

18    from time to time, even with some regularity

19    lately, at meetings and conferences and other

20    settings.

21         Q.    And for about how --

22         A.    And --

23         Q.    I'm sorry, I didn't mean to

24    interrupt.

Highly Confidential - Subject to Further Confidentiality Review

1        A.      And all related to work.

2        Q.      And for about how long have you

3    had that sort of relationship with Professor

4    Gruber?

5        A.      Oh, I probably first

6    encountered him back in the 1990s also.

7        Q.      Have you ever participated in

8    the peer review of any paper that he was an

9    author on?

10       A.      In the same way I regularly do

11   peer review and have reviewed a large number

12   of manuscripts.  So it is not unlikely at all

13   that there is something from him in that, but

14   I can't recall a specific instance.

15               I'll also just note that in

16   many cases the authors are -- of papers that

17   one is peer reviewing are not revealed to the

18   peer reviewer.  So it's possible that I did

19   and wouldn't have been able to know.

20       Q.      Okay.  In a litigation setting,

21   apart from this case, have you had occasion

22   to comment on any report or testimony

23   provided by Professor Gruber?

24       A.      No.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.      And again, apart from this

2    case, have there been any indications on

3    which you can recall expressing any material

4    criticism of any work done by Professor

5    Gruber?

6       A.      Not in any formal sense, no.

7       Q.      And do you have a general

8    opinion of the quality of the work of

9    Professor Gruber that you've seen apart from

10   work in this litigation?

11      A.      Oh, I would give a similar

12   answer to the one I gave before.  I've

13   observed Professor Gruber do some good work

14   over time, and I -- my general impression is

15   positive of the work that he does.  But

16   again, I would never extend that as a blanket

17   statement to anything that -- or everything

18   that he's ever done.

19      Q.      How about Professor Rosenthal?

20   Are you -- do you have -- are you familiar

21   with her apart from this litigation?

22      A.      Yes.

23      Q.      And in what context?

24      A.      In a similar context.  We cross

Highly Confidential - Subject to Further Confidentiality Review

1    paths -- or have crossed paths from time to

2    time.

3         Q.    And approximate time frame?

4         A.    That's less clear to me.  It's

5    not as far back as Professors Cutler and

6    Gruber, but it would go back a number of

7    years that I've seen her around.

8         Q.    Okay.  And to your knowledge,

9    have you ever participated in a peer review

10   of a paper in which she was an author?

11        A.    It's the same answer.  It's

12   likely at some point that it happened.  I

13   couldn't recall specifics.

14        Q.    And in a litigation setting

15   apart from this case, have you had occasion

16   to comment on any expert report or testimony

17   that she's provided?

18        A.    No.

19        Q.    And in any setting, have you

20   had -- can you recall a situation in which

21   you expressed any material disagreement with

22   any work of Professor Rosenthal?

23        A.    No.

24        Q.    And do you have a general

1    opinion as to the quality of Professor

2    Rosenthal's academic work?

3         A.    My answer would, again, be

4    similar to the one I gave before for the

5    other two.

6         Q.    And how about Professor

7    McGuire?  Do you have familiarity with him

8    apart from this litigation?

9         A.    Yes.

10        Q.    In what context?

11        A.    In the same way.  We worked in

12   the same area and have crossed paths from

13   time to time.

14        Q.    Any approximate time frame?

15        A.    Back to the 1990s again.

16        Q.    Okay.  And have you, to your

17   knowledge, participated in peer review of any

18   papers that Professor McGuire is an author

19   on?

20        A.    The same answer that I gave

21   before.

22        Q.    And I apologize for the

23   repetition of questions.  I think you can

24   discern the pattern that is emerging here.

Highly Confidential - Subject to Further Confidentiality Review

1            But in the litigation setting,

2     apart from this case, have you had occasion

3     to comment on any expert report or testimony

4     provided by Professor McGuire?

5            A.     No.

6            Q.     And in any setting can you

7     recall, apart from this case, expressing any

8     material disagreement with any work done by

9     Professor McGuire?

10           A.     No.

11           Q.     And do you have an overall

12    general view as to the academic quality of

13    the work done by Professor McGuire?

14           A.     It would be the same kind of

15    answer that I've given in the previous

16    questions.

17           Q.     Apart from the expert reports

18    that are listed on Appendix C, are you aware

19    of the identity of any other plaintiff

20    experts who have submitted reports in this

21    litigation?

22           A.     No, I don't believe I am.

23           Q.     And have you reviewed any

24    reports submitted by any other expert

1    retained by counsel for any of the defendants

2    in this matter?

3        A.    No.

4        Q.    Have you reviewed any

5    transcripts of testimony given in this

6    litigation other than the four deposition

7    transcripts that you list on Appendix C?

8        A.    No.

9        Q.    Were the -- strike that.

10            You list a number of

11   publications under Academic Literature and

12   Publicly Available Documents.

13            How did you compile that list?

14       A.    There were multiple parts of

15   the work to compile that list.  Some of this

16   is literature that I knew of or had taken

17   note of over the last few years as I've been

18   entrusted in this area and have followed

19   along.

20            So I've actually tried to keep

21   up myself with some of the literature and so

22   knew a number of these papers from that.

23            I've worked on these other

24   papers and so had some idea of where to look

1    for materials from that.  And then in

2    addition, I asked the support team to do

3    their own look at the literature and inform

4    me of things that they identified that they

5    thought could be relevant to my work, and so

6    then I would take a look at things that they

7    suggested.

8         Q.    Were any of the materials

9    listed under Academic Literature or Publicly

10   Available Documents brought to your attention

11   by the support team other than after -- than

12   following up on a request by you?

13        A.    No.  It was part of the plan

14   that they would go look into these -- look

15   into the literature and help me identify

16   things of interest.  And that was part of the

17   plan from the outset.

18        Q.    Okay.  And in terms of the plan

19   from the outset, was there subject matter or

20   subject matters as to which they were going

21   to review the literature and report back to

22   you?

23        A.    So they were aware of the kinds

24   of points that I was interested in making,

Highly Confidential - Subject to Further Confidentiality Review

1    and so the request was actually related to

2    those points.  And so it's across the

3    spectrum of things that I was looking at in

4    my report.

5         Q.    Can you articulate for me what

6    some -- what all of those points were?

7         A.    For example, the kinds of

8    factors that are associated with use of

9    opioids.

10        Q.    Okay.  Any others you can think

11   of?

12        A.    We would have to start going

13   through the report.  The report deals with

14   the multiple different areas and so it would

15   essentially be any area in my report.

16        Q.    Were the matters or the items

17   that are listed on Appendix C provided to you

18   in hard copy or electronically or a

19   combination.  Do you recall?

20        A.    They were generally posted on a

21   website that I could use to go look, and I

22   could look at them on the website.

23        Q.    And I realize you indicated

24   that you had an existing familiarity with

Highly Confidential - Subject to Further Confidentiality Review

1    some of the academic literature that you list

2    on Appendix C.  Did you personally perform

3    any literature review other than identifying

4    literature you were already familiar with?

5         A.    Over the last few years, I've

6    tried to keep up on the literature, and so

7    I'm not sure whether you'd call that a

8    systematic literature review.  But even

9    preceding this -- predating this matter, I

10   was trying to pay attention to things coming

11   through.

12        Q.    Okay.  But after you were

13   retained in this matter, understanding you

14   were already familiar with much of the

15   literature in this area -- and I understand

16   from your earlier answer that there was a

17   literature review performed by Analysis Group

18   at your request -- did you personally perform

19   any literature review after you were retained

20   in this matter?

21        A.    Not a systematic one.  It would

22   be working from things that I knew.  Some of

23   them have citations that I could go follow up

24   on and then receiving things from Analysis

1    Group that would have filled out my

2    understanding.

3              So it was not that I was

4    conducting a specific literature review for

5    this matter other than the kinds of things

6    that I just talked about:  Trying to make

7    sure that I had a sense of what was out in

8    the literature from my own experience, from

9    following that up where it led me, and then

10   from Analysis Group.

11        Q.    So is there -- apart from your

12   work in this litigation, do you maintain a

13   file or some other compilation of

14   opioid-related academic literature as a

15   result of your efforts to stay current in

16   this area?

17        A.    No.  It's more that I paid

18   attention to things that were coming along

19   and would try to read them.

20        Q.    Okay.

21              MR. GOTTO:  Why don't we take a

22        few minutes.

23              THE VIDEOGRAPHER:  With

24        approval of counsel, going off the

1    record.  The time is approximately

2    11:54 a.m.  This ends recording Media

3    No. 2.

4         (Recess taken, 11:55 a.m. to

5    12:07 p.m.)

6         THE VIDEOGRAPHER:  With the

7    approval of counsel, back on the

8    record.  Time is approximately

9    12:06 p.m.  This marks the beginning

10   of recording Media No. 3.

11   Q.    (BY MR. GOTTO)  Professor

12   Baker, you list in your report at appendix --

13   the testimony you've given, expert testimony

14   since 2015, and I -- I asked you a little

15   earlier regarding when you first gave expert

16   testimony, which I think you indicated went

17   back to the 1990s at some point.

18        Can you recall the names of any

19   of the cases in which you were engaged in

20   which you provided expert testimony prior to

21   2015?

22   A.    The names of the cases.  No.

23        No.

24   Q.    Okay.  Can you recall the names

1    of any of the law firms or lawyers who

2    retained you in matters in which you provided

3    testimony prior to 2015?

4        A.    No, I'm afraid not.

5        Q.    Did you provide trial testimony

6    in any matter prior to 2015?

7        A.    No.

8        Q.    So just deposition testimony

9    would be the limit?

10       A.    Yes.

11       Q.    In any of the matters, whether

12   before or after 2015, in which you provided

13   testimony, to your knowledge has there ever

14   been a motion made to a court seeking to

15   eliminate or exclude your testimony?

16       A.    I'm aware of one time a motion

17   like that was made.  It was not granted.

18       Q.    So there's never been an order

19   entered limiting or excluding testimony

20   you've proposed to give in any matter, to

21   your knowledge?

22       A.    No.

23       Q.    I'm sorry.  I asked the

24   question with a negative answer, which is

Highly Confidential - Subject to Further Confidentiality Review

```
1    going to be confusing when you read the
2    transcript.
3              Is it correct that you have
4    never -- there's never been an order entered
5    limiting or excluding testimony you proposed
6    to give in a matter?
7        A.    Yes, it's correct that there
8    has never been such an order.
9        Q.    Okay.  You were good enough to
10   provide Exhibit 6, which has correction or
11   supplement -- I guess corrections to your
12   report.
13             I would ask that if you become
14   aware of any other inaccuracies or errors in
15   your report that you would like to correct
16   before trial, if you would supplement
17   Exhibit 6 rather than wait for trial to make
18   those corrections, that would be helpful.
19             Let's turn to your -- the
20   substance of the opinions that you express in
21   your report.  On pages 4 to 5 of your report,
22   you have your summary of conclusions.  Fair
23   to say that -- that's Section 2 -- paragraphs
24   11 through 15 summarize the opinions that
```

1    you've reached in this matter?

2         A.    That's my intent with this

3    section.  Of course the full set of opinions

4    is expressed in the full set of the report,

5    but this was intended to be a summary.

6         Q.    Sure.  And fair to say that the

7    opinions you express in your report and were

8    summarized in paragraphs 11 to 15 are all in

9    the nature of criticisms or critiques of the

10   opinions expressed by plaintiffs' experts?

11        A.    Yes.  That was my assignment,

12   to review and respond to that set of expert

13   reports.  And so the report is focused on

14   that, yes.

15        Q.    So you haven't formulated any

16   opinions that are independent of the opinions

17   expressed by plaintiffs' experts that you

18   comment on in your report; is that fair?

19             MR. BREWER:  Objection to form.

20             THE WITNESS:  I believe my

21        report was, yes, responsive to the

22        request that I look at those expert

23        reports and comment on them.  So I

24        believe that's correct, yes.

1     Q.     (BY MR. GOTTO)  In the

2     preparation of your report, were there any

3     documents or testimony that you requested

4     that you did not receive?

5     A.     No.

6     Q.     To your knowledge, are you

7     aware of any information that has not been

8     available to you that could either strengthen

9     or weaken any of the opinions you've

10    expressed in this matter?

11    A.     I can't think of any right now.

12    Q.     Are there any facts that could

13    influence or change any of the opinions

14    you've expressed in this matter?

15         MR. BREWER:  Objection to form.

16         THE WITNESS:  My opinions are

17         responding to these expert reports,

18         and I feel like I was able to consider

19         them and I had adequate information to

20         do that.  So, no, I don't have

21         anything in mind to -- that would

22         allow me a different answer than no to

23         your question.

24    Q.     (BY MR. GOTTO)  How would you

Highly Confidential - Subject to Further Confidentiality Review

1    characterize the degree of certainty to which

2    you hold the opinions you've expressed in

3    this matter?

4         A.    I'm very confident about these

5    opinions.

6         Q.    In paragraph 11 on page 4 of

7    your report, you state that:  Plaintiffs'

8    experts' methodology does not establish that

9    Walgreens' alleged failure to appropriately

10   monitor the prescription opioid shipments

11   that it distributed caused any harm to the

12   Bellwether counties.

13             Did I read that correctly?

14        A.    Yes, I think so.

15        Q.    And then you go on to elaborate

16   on that in the balance of that paragraph.

17             I want to be sure I understand

18   the basis for the opinion that you summarize

19   in paragraph 11.  Can you point out to me in

20   your report where you describe the basis for

21   that opinion?

22        A.    That in some sense is

23   throughout the report.  So we could look at

24   different sections, but the -- that would

1    encompass the failure of the structure of the

2    several reports to create a causal chain, if

3    you will, that would link some action of

4    Walgreens to the harms.

5              It would go to the validity of

6    the analyses that were conducted by Professor

7    Rosenthal, by Professor Cutler, by Professor

8    Gruber, and ultimately by Professor McGuire

9    using those inputs, and the lack of proof of

10   a causal connection in the methodologies and

11   the analyses used in those reports.

12             And so in some sense this

13   summarizes the entire -- this summarizes work

14   in the entirety of my report.

15        Q.    If we turn to pages 16 and 17

16   of your report, you have Figures 2 and 3

17   that -- where you graphically depict what you

18   referred to as Causal Links Alleged By

19   Plaintiffs Between Walgreens' Alleged

20   Misconduct and Prescription Opioid Mortality,

21   in the case of Figure 2; and in the case of

22   Figure 3, Causal Links Alleged By Plaintiffs

23   Between Walgreens' Alleged Misconduct and

24   Illicit Opioid Mortality; correct?

1      A.      Yes.   Those are the titles of

2  those figures.

3      Q.      And are those the causal links

4  that you're -- that you're referring -- that

5  you referred to in your answer a moment ago

6  in terms of the -- what you view as

7  inadequacies in the plaintiffs' expert

8  reports?

9      A.      I would say my opinion is

10  possibly even more general than these two

11  figures.  My opinion generally is that there

12  has not been shown to be a link between any

13  alleged activity or lack of activity by

14  Walgreens and the harms that are at issue in

15  this matter.

16              These are illustrations of what

17  I took to be possible causal chains as

18  alleged in the matter, and so I work through

19  these to discuss the failure to create a

20  causal chain.  I would say that my opinion

21  about the lack of causality or lack of a

22  causal link would extend possibly beyond

23  these if other people were to say, Well, I

24  had a different causal chain in mind.  I

Highly Confidential - Subject to Further Confidentiality Review

1    think I would still say I don't see a causal

2    chain overall.

3         Q.    If we look at paragraph 33 of

4    your report.  Starting in the second

5    sentence, you say:  To show that Walgreens'

6    alleged misconduct caused an increase in

7    prescription opioid mortality and harms to

8    the Bellwether counties, one would need to

9    demonstrate that, and then you list three

10   circumstances; correct?

11        A.    Yes, I see that sentence.

12        Q.    Okay.  So is that statement in

13   paragraph 33, including circumstances one,

14   two, and three, that I didn't take the time

15   to read, is that your description of what

16   would, if established, constitute a causal

17   link between misconduct and prescription

18   opioid mortality?

19        A.    So I identify this as a causal

20   chain that I inferred to be alleged from the

21   materials that I read, and so I characterize

22   it in this way.

23             One would need to demonstrate

24   those steps, and then the entirety of the

1   linkage between all of those steps being

2   accurate in the data or in the analyses to

3   establish a causal chain.

4        Q.    Okay.  And what I'm trying to

5   be sure I understand is, in paragraph 33,

6   whether you're describing -- whether you're

7   characterizing what you understand to be the

8   plaintiffs' allegation of the causal chain,

9   or are you describing what you believe would

10  be a causal chain if, in fact, those

11  circumstances were demonstrated?

12       A.    So what I'm trying to make --

13  the larger point I'm trying to make here is

14  that there is no causal chain established.

15  So in order to walk through some steps in

16  that discussion, I outlined what I thought to

17  be a causal chain that was in the background

18  of the plaintiffs' reports that I was

19  reviewing.

20            And so I characterized it this

21  way in order to set up my broader discussion,

22  which leads me to the conclusion that there

23  isn't a causal chain established here.

24       Q.    So in paragraph 33, though,

1    you -- when you say:  To show that Walgreens'

2    alleged misconduct caused an increase in

3    prescription opioid mortality and harms to

4    the Bellwether counties, one would need to

5    demonstrate that, and then you list

6    circumstances one, two, and three, are you

7    saying that that's the only way that a causal

8    link between the alleged misconduct and

9    increase in prescription opioid mortality

10   could be demonstrated?

11              MR. BREWER:  Objection, asked

12        and answered.

13              THE WITNESS:  So I believe we

14        just walked through this.  I set this

15        up because my larger point is that a

16        causal chain has not been established.

17        And so in order to organize a

18        discussion relevant to what was in the

19        plaintiffs' -- or expert reports, I

20        characterized a causal chain that I

21        believed they were reasoning with, in

22        this way, and then I walked through

23        the ways in which I believe the causal

24        chain is established here.  And so

1           that's the context in which I'm

2           setting this up.

3               Q.     (BY MR. GOTTO)   And when you

4     used the phrase in paragraph 33, "One would

5     need to demonstrate," are you opining that

6     the circumstances listed under causes one,

7     two, and three, as a legal matter, are

8     elements of a claim asserted by the

9     plaintiffs?

10              MR. BREWER:  Objection, form.

11          And to the extent it calls for a legal

12          conclusion.

13              THE WITNESS:  Yes.  So let me

14          be careful just to say that I am not

15          going to make a legal judgment.  I'm

16          not a lawyer.

17              This is to write down what I

18          think is in the -- what I thought when

19          I was writing this report, and still

20          think, is in the background of

21          plaintiffs' reasoning, or would have

22          to be in some way for them to be

23          thinking about the causal chain that

24          they allege exists.  And so by putting

Highly Confidential - Subject to Further Confidentiality Review

```
 1              this down, I can use it to organize my
 2              writing about why a causal chain
 3              doesn't exist in this case, is not
 4              proven.  And that's what I mean by
 5              that part of the report.
 6         Q.     (BY MR. GOTTO)  Okay.  And
 7    so -- just so I understand, you're not
 8    opining in your report or in paragraph 3 or
 9    elsewhere in your report as to the legal
10    elements of any claim that the plaintiffs
11    need to establish in order to prevail.
12              Is that fair?
13              MR. BREWER:  Same objection.
14              THE WITNESS:  I'm opining as an
15              economist looking at the issues here
16              and the analyses in these reports.
17              I'm not here with a legal conclusion
18              or a legal opinion.
19              MR. GOTTO:  Okay.
20         Q.     (BY MR. GOTTO)  Okay.  And if
21    we turn to paragraph 34, on page 16, you
22    state:  To show that Walgreens' alleged
23    misconduct caused an increase in illicit
24    opioid mortality, one would need to
```

1    demonstrate that, and then you list four

2    circumstances; correct?

3            A.     Yes, I see that.

4            Q.     When you use the word "illicit"

5    in paragraph 34, what do you mean by that?

6            A.     I'm generally referring to the

7    illegal use of opioids, for instance, heroin.

8            Q.     Okay.  So if someone obtained a

9    prescription for opioids by lying to their

10   doctor, for example, about their tolerance of

11   ibuprofen, would their use of those opioids

12   be illicit in your -- as you use the term?

13           A.     So some of this --

14                  MR. BREWER:  I'm just going to

15           object to the extent it's an

16           incomplete hypothetical.

17                  THE WITNESS:  So again, what's

18           happening here is I'm trying to set up

19           causal chains or alleged causal chains

20           that I think are relevant to an

21           analysis of whether there is a causal

22           chain established here.  So I think

23           these are expressions of things that

24           were in the -- or I can infer were in

1          the background of the plaintiffs'

2          experts' reasoning.

3               Whether one would characterize

4          that particular scenario in the

5          hypothetical as illicit or as

6          prescription, something of a function

7          of the kind of analysis or thinking

8          one would be doing at the time, how

9          it's characterized in the data, other

10         things.

11              So I don't know that I need to

12         put it in one of these categories.  I

13         would tend to think of that as

14         illicit, but I don't know that that

15         needs to be the case.  I'm not sure

16         how I would change that if I were

17         doing different kinds of analyses.

18              So these are meant to

19         characterize a set of links that allow

20         me to structure a discussion that --

21         in which I express my conclusion or

22         come to my conclusion that there is no

23         causal link here.

24         Q.    (BY MR. GOTTO)  Okay.  But I

```
 1    just want to be sure I understand what you're

 2    saying in paragraph 34 and when you use the

 3    word "illicit."  I'm understanding from your

 4    last answer that you're not necessarily

 5    limiting illicit to -- to being drugs

 6    obtained other than from a registered DEA

 7    registrant.

 8              MR. BREWER:  Objection -- well,

 9         is that a question -- is that the

10         question?

11              MR. GOTTO:  Yes.  I want to

12         know if that's a fair understanding of

13         how he's using the word "illicit."

14              THE WITNESS:  Yes, I don't

15         know -- I don't need -- I don't think

16         it matters particularly to my analysis

17         which way that goes.

18              So in certain contexts, I might

19         say that, yes, maybe that there are

20         data or other things in which one

21         would confine illicit to be heroin or

22         other things, it wouldn't matter to my

23         conclusion.

24              MR. GOTTO:  Okay.
```

1    Q.    (BY MR. GOTTO)  Look at

2  paragraph 38 of your report.  The concluding

3  sentence states:  As I will discuss in more

4  detail below, Plaintiffs' experts have not

5  provided a method that would allow them to

6  isolate the effect of Walgreens' alleged

7  misconduct from the impact of these other

8  factors on prescription opioid use.

9         Did I read that correctly?

10    A.    Yes.

11    Q.    What are the other factors that

12  you're referring to in that sentence?

13    A.    So the literature includes

14  numerous factors that can be involved in

15  opioid use, and they include a wide range of

16  individual and contextual characteristics.

17  And the plaintiffs' experts here have not

18  produced a method that would allow them to

19  identify Walgreens' -- the effect of

20  Walgreens' alleged misconduct separate from

21  other factors -- individual characteristics,

22  economic characteristics, insurance

23  characteristics -- other characteristics that

24  could also be affecting opioid use here.

1    Q.    Would the other factors that

2    you are referring to in that sentence include

3    misconduct by other defendants in this

4    litigation?

5              MR. BREWER:  Objection, form.

6              THE WITNESS:  The report refers

7         to a number of different pieces of

8         evidence that were the things that I

9         had in mind.

10              So I hadn't even considered

11         that particularly.

12    Q.    (BY MR. GOTTO)  Well, the

13    language that you use in 38, you talk about

14    the -- to isolate the effect of Walgreens'

15    alleged misconduct from the impact of these

16    other factors.  So I'm just trying to

17    understand.  When you said that, are you --

18    did you mean to refer to isolating Walgreens'

19    alleged misconduct from, among other things,

20    misconduct alleged by the other -- any other

21    defendants in the litigation?

22    A.    Oh, I mean what I say in the

23    overall report here.  So the report

24    identifies other factors as I've said.

Highly Confidential - Subject to Further Confidentiality Review

1    Individual, contextual, insurance

2    characteristics are the things that I have in

3    mind.

4              I make the point in other parts

5    of the report that the methods would not

6    distinguish manufacturers from distributors

7    in other things -- in other -- make other

8    distinctions.  The methods simply don't do

9    that.  And so the points that I make with

10   respect to the question you're asking are

11   expressed in the report, and they're the

12   things I just summarized.

13        Q.    So you end that answer by

14   saying:  I mean what I say in the overall

15   report here.  And I'm -- I'm trying to get at

16   that same concept, what you mean in the

17   overall report, because you've -- in

18   paragraph 38 you make reference to these

19   other factors, which earlier in paragraph 38

20   are only very generally alluded to.

21              And I'm just trying to

22   understand what those other factors are, or

23   if you can direct me where in the report you

24   identify those other factors.

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yes.  So the -- what I'm

2     specifically thinking about in the sentence

3     that precedes this in paragraph 38, where I

4     say a number of other independent factors

5     identified in medical studies contributed to

6     the observed increases, those are referred to

7     later in the report.  They'll be things like

8     changes in the prevalence of diabetes or

9     cancer survivorship, changes in treatments of

10    pain, things like that.  And so that's what's

11    meant by that.

12              And as I discuss those in more

13    detail, that's what I'm referring to in the

14    last sentence.  And I conclude that those --

15    that the plaintiffs' experts have not

16    provided a method that identifies the effect

17    or any effect of Walgreens' alleged

18    misconduct separate from those other factors.

19         Q.     Thank you.

20              If you'd turn to paragraph 50

21    of your report and pages 22, 23.

22         A.     Yes.

23         Q.     In this paragraph you lead in

24    by saying, Plaintiffs' experts contribute not

1    only prescription opioid mortality, but also

2    almost all of the opioid mortality after 2010

3    to Walgreens' and other Defendants' alleged

4    misconduct.

5                    And then in the last two

6    sentences of that paragraph, you state:  In

7    order for Plaintiffs' experts to establish

8    this claim, they must make the same

9    assumptions regarding an alleged causal link

10   between alleged insufficient monitoring and

11   prescription opioid abuse described above and

12   shown in Steps 1 and 2 of Figure 3.  And

13   Figure 3 we looked at a few moments ago.

14                   You then go on to say:

15   Further, they must also assume the

16   prescription opioid addiction was the primary

17   driver of increased abuse of illicit opioids

18   and associated mortality.

19                   And my question for you is,

20   what do you mean by the phrase "primary

21   driver" in that sentence?

22        A.    Oh, I'm referring back to

23   Figure 3.  And this is, again, an

24   illustration of a potential causal chain that

Highly Confidential - Subject to Further Confidentiality Review

1    seems to me to be relevant to the plaintiffs'

2    allegations.  And so I'm beginning here in

3    Section B to walk through the reasons that

4    that is not established.

5              And so what I'm simply doing in

6    this paragraph is summarizing what I think is

7    the -- is the background structure here.

8              So you asked about primary

9    driver.  I -- what I'm trying to say is, in

10   order for this to go through, you have to

11   have all of those steps.  That's the context,

12   and that's the intention of this paragraph.

13        Q.    Okay.  And maybe I'm

14   misunderstanding the last sentence, though,

15   because it starts off by saying:  Further --

16             Which suggests to me that

17   it's -- this is something beyond what's

18   covered in Figure 3.

19             -- they must also assume that

20   the prescription opioid addiction was the

21   primary driver of increased abuse of illicit

22   opioids and associated mortality.

23             And I -- I didn't think this

24   constituted the primary driver was included

1    in Figure 3.  So I'm just trying to

2    understand what you mean by that.

3         A.    Oh.  So what that is capturing

4    is really the third step, that there has to

5    be a causal piece in that third step where

6    the people become addicted to prescription

7    opioids and then transition to using illicit

8    opioids because of the addiction.

9              So that has to be established

10   after you go through Steps 1 and Step 2, as

11   I've illustrated it in that figure.

12        Q.    And is that -- do you reach

13   that conclusion sort of purely as a logical

14   matter, or do you base it on something else?

15        A.    So this -- this is as we've

16   discussed before.  What I try to do is

17   illustrate what could have been the causal

18   chain in the background of the plaintiffs'

19   expert analyses.  And then I walk through --

20   I use that as a structure to walk through the

21   reasons that I don't believe it's

22   established.

23              So that's all that this

24   paragraph is doing, also, is referring to

1    paragraph -- or Figure 3 and walking through

2    the pieces there.

3        Q.    If you look back at

4    paragraph 15 on page 5 of your report.

5        A.    Yes.

6        Q.    You state that:  The

7    methodologies employed by Professor

8    Rosenthal, Dr. McCann, Professor Cutler,

9    Professor McGuire, Professor Gruber also

10   suffer from flaws that render them each

11   unreliable for their respective purposes.

12   These flaws include errors in statistical

13   modeling, reliance on unsupported

14   assumptions, and inappropriate inferences of

15   causation in the estimated relationships of

16   interest.

17            Can you point out to me where

18   in your report you identify the various flaws

19   that you're summarizing in paragraph 15?

20       A.    Yes.  So we'd have to go to

21   specific sections of the report, but there

22   are specific comments on the methodologies

23   used by Professor Rosenthal, Dr. McCann,

24   Professor Cutler, Professor McGuire, and

1    Professor Gruber in the report.  And so there

2    are specific sections for each, and that

3    would contain the particular -- particular

4    points I'm trying to make.

5        Q.    Okay.  So fair to say that all

6    of the flaws that you're referring to in

7    paragraph 15 are identified elsewhere in your

8    report?

9        A.    Yes.  I -- so I believe this is

10   a summary of the report and the points in the

11   report.

12            MR. GOTTO:  Okay.  Why don't we

13        take just a couple of minutes for me

14        to review my notes.

15            THE VIDEOGRAPHER:  With the

16        approval of counsel, going off the

17        record.  The time is approximately

18        12:40 p.m.  This marks the end of

19        Recording No. 3.

20            (Recess taken, 12:41 p.m. to

21        12:45 p.m.)

22            THE VIDEOGRAPHER:  With

23        approval of counsel, back on the

24        record.  The time is approximately

Highly Confidential - Subject to Further Confidentiality Review

```
 1          12:44 p.m.  This marks the beginning

 2     of recording Media No. 4.

 3               MR. GOTTO:  Professor Baker, I

 4     have no further questions.  Thank you

 5     for your time.

 6               MR. BREWER:  And I have no

 7     questions.

 8               THE WITNESS:  Okay.

 9               MR. GOTTO:  Great.

10               THE VIDEOGRAPHER:  This

11     concludes today's video deposition.

12     The time is approximately 12:45 p.m.

13     We are now off the record.

14               (Proceedings recessed at

15     12:45 p.m.)

16                    --o0o--

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        CERTIFICATE
 2              I, DEBRA A. DIBBLE, Registered
      Diplomate Reporter, Certified Realtime
 3    Reporter, Certified Realtime Captioner,
      Certified Court Reporter and Notary Public,
 4    do hereby certify that prior to the
      commencement of the examination, LAURENCE C.
 5    BAKER, Ph.D. was duly sworn by me to testify
      to the truth, the whole truth and nothing but
 6    the truth.
 7              I DO FURTHER CERTIFY that the
      foregoing is a verbatim transcript of the
 8    testimony as taken stenographically by and
      before me at the time, place and on the date
 9    hereinbefore set forth, to the best of my
      ability.
10
                I DO FURTHER CERTIFY that pursuant
11    to FRCP Rule 30, signature of the witness was
      not requested by the witness or other party
12    before the conclusion of the deposition.
13              I DO FURTHER CERTIFY that I am
      neither a relative nor employee nor attorney
14    nor counsel of any of the parties to this
      action, and that I am neither a relative nor
15    employee of such attorney or counsel, and
      that I am not financially interested in the
16    action.
17
18
19    _____
      DEBRA A. DIBBLE, RDR, CRR, CRC
20    NCRA Registered Diplomate Reporter
      NCRA Certified Realtime Reporter
21    Certified Court Reporter
22
      Dated: 6-6-19
23
24
```

```
 1                  INSTRUCTIONS TO WITNESS

 2

 3            Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the

 6    appropriate space on the errata sheet for any

 7    corrections that are made.

 8              After doing so, please sign the

 9    errata sheet and date it.

10              You are signing same subject to

11    the changes you have noted on the errata

12    sheet, which will be attached to your

13    deposition.

14              It is imperative that you return

15    the original errata sheet to the deposing

16    attorney within thirty (30) days of receipt

17    of the deposition transcript by you.  If you

18    fail to do so, the deposition transcript may

19    be deemed to be accurate and may be used in

20    court.

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        ERRATA

 2    PAGE   LINE   CHANGE

 3    _____  _____  _____

 4           REASON: _____

 5    _____  _____  _____

 6           REASON: _____

 7    _____  _____  _____

 8           REASON: _____

 9    _____  _____  _____

10           REASON: _____

11    _____  _____  _____

12           REASON: _____

13    _____  _____  _____

14           REASON: _____

15    _____  _____  _____

16           REASON: _____

17    _____  _____  _____

18           REASON: _____

19    _____  _____  _____

20           REASON: _____

21    _____  _____  _____

22           REASON: _____

23    _____  _____  _____

24           REASON: _____
```

Highly Confidential - Subject to Further Confidentiality Review

1           ACKNOWLEDGMENT OF DEPONENT

2

3

4           I, LAURENCE C. BAKER, Ph.D., do
      hereby certify that I have read the foregoing
5     pages and that the same is a correct
      transcription of the answers given by me to
6     the questions therein propounded, except for
      the corrections or changes in form or
7     substance, if any, noted in the attached
      Errata Sheet.

8

9

10

11

12     _____

       LAURENCE C. BAKER, Ph.D.              DATE
13

14

15     Subscribed and sworn to before me this

16     _____ day of _____, 20 _____.

17     My commission expires: _____

18

19     _____

20     Notary Public

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1                              LAWYER'S NOTES

2

3       PAGE       LINE

4       _____      _____       _____

5       _____      _____       _____

6       _____      _____       _____

7       _____      _____       _____

8       _____      _____       _____

9       _____      _____       _____

10      _____      _____       _____

11      _____      _____       _____

12      _____      _____       _____

13      _____      _____       _____

14      _____      _____       _____

15      _____      _____       _____

16      _____      _____       _____

17      _____      _____       _____

18      _____      _____       _____

19      _____      _____       _____

20      _____      _____       _____

21      _____      _____       _____

22      _____      _____       _____

23      _____      _____       _____

24      _____      _____       _____