```
 1              IN THE UNITED STATES DISTRICT COURT

               FOR THE NORTHERN DISTRICT OF OHIO

 2                      EASTERN DIVISION

 3

     -------------------------   )

 4   IN RE: NATIONAL             ) MDL No. 2804

     PRESCRIPTION OPIATE         )

 5   LITIGATION                  ) Case No.

     -------------------------   ) 1:17-MD-2804

 6                               )

     THIS DOCUMENT RELATES TO    ) Hon. Dan A. Polster

 7   ALL CASES                   )

     -------------------------   )

 8

 9

10                   HIGHLY CONFIDENTIAL

11       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

12

13               VIDEOTAPED DEPOSITION OF

14                 WAYNE EUGENE BANCROFT

15                   January 10, 2019

16

17                   Chicago, Illinois

18

19

20

21

22

23           GOLKOW LITIGATION SERVICES

         877.370.3377 ph | 917.591.5672 fax

24               deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2

 3

 4

 5              The videotaped deposition of

 6    WAYNE EUGENE BANCROFT, called by the Plaintiffs for

 7    examination, taken pursuant to the Federal Rules of

 8    Civil Procedure of the United States District

 9    Courts pertaining to the taking of depositions,

10    taken before CORINNE T. MARUT, C.S.R. No. 84-1968,

11    Registered Professional Reporter and a Certified

12    Shorthand Reporter of the State of Illinois, at the

13    offices of Bartlit Beck LLP, Suite 600, 54 West

14    Hubbard Street, Chicago, Illinois, on

15    January 10, 2019, commencing at 9:11 a.m.

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES:
 2     ON BEHALF OF THE PLAINTIFFS:
 3         LEVIN PAPANTONIO THOMAS MITCHELL
           RAFFERTY & PROCTOR P.A.
 4         316 South Baylen Street, Suite 600
           Pensacola, Florida  32502
 5         205-396-3982
           BY:  PETER J. MOUGEY, ESQ.
 6              pmougey@levinlaw.com
                     -and-
 7              PAGE A. POERSCHKE, ESQ.
                ppoerschke@levinlaw.com
 8                 (via livestream)
                LAURA DUNNING, ESQ.
 9                 (via livestream)
10
11         BLASIGAME BURCH GARRARD & ASHLEY P.C.
           440 College Avenue, Suite 320
12         Athens, Georgia  30601
           706-707-3497
13         BY:  SARA SCHRAMM, ESQ.
                sschramm@bbga.com
14                 (via livestream)
15
16     ON BEHALF OF WALGREENS BOOTS ALLIANCE, INC.
       aka WALGREEN CO.:
17
           BARTLIT BECK LLP
18         54 West Hubbard Street, Suite 300
           Chicago, Illinois  60654
19         312-494-4475
           BY:  KATHERINE M. SWIFT, ESQ.
20              kswift@bartlit-beck.com
21
           BARTLIT BECK LLP
22         1801 Wewatta Street, Suite 1200
           Denver, Colorado  80202
23         303-592-3177
           BY:  LESTER C. HOUTZ, ESQ.
24              Lester.Houtz@bartlitbeck.com
```

```
 1    APPEARANCES (Continued):
 2      ON BEHALF OF ENDO HEALTH SOLUTIONS INC. and
        ENDO PHARMACEUTICALS, INC.,
 3      PAR PHARMACEUTICAL, INC., and PAR PHARMACEUTICAL
        COMPANIES, INC. (f/k/a Par Pharmaceutical
 4      Holdings, Inc.):
 5          ARNOLD & PORTER KAYE SCHOLER LLP
            601 Massachusetts Avenue, NW
 6          Washington, DC  20001-3743
            202-942-5000
 7          BY:  ERICA I. GUTHRIE, ESQ.
                 erica.guthrie@arnoldporter.com
 8                  (via telephone/livestream)
 9    ON BEHALF OF McKESSON CORPORATION:
10          TABET DIVITO & ROTHSTEIN LLC
            209 South LaSalle Street, 7th Floor
11          Chicago, Illinois  60604
            312-762-9461
12          BY:  DANIEL L. STANNER, ESQ.
                 dstanner@tdrlawfirm.com
13
14    ON BEHALF OF CARDINAL HEALTH, INC.:
15          ARMSTRONG TEASDALE LLP
            7700 Forsyth Boulevard, Suite 1800
16          St. Louis, Missouri  63105
            314-621-5070
17          BY:  JULIE FIX MEYER, ESQ.
                 jfixmeyer@ArmstrongTeasdale.com
18
19    ON BEHALF OF AMERISOURCEBERGEN CORPORATION:
20          JASZCZUK, P.C.
            311 South Wacker Drive, Suite 3200
21          Chicago, Illinois  60606
            312-442-0509
22          BY:  MARGARET M. SCHUCHARDT, ESQ.
                 mschuchardt@jaszczuk.com
23
24
```

```
 1    APPEARANCES (Continued):
 2      ON BEHALF OF WALMART:
 3          JONES DAY
            77 West Wacker Drive
 4          Chicago, Illinois  60601-1692
            312-782-3939
 5          BY:  MARK W. DeMONTE, ESQ.
                 mdemonte@jonesday.com
 6
 7      ON BEHALF OF HBC COMPANY:
 8          MARCUS & SHAPIRA LLP
            One Oxford Centre, 35th Floor
 9          Pittsburgh, Pennsylvania  15219
            412-338-4383
10          BY:  ZACHARY FENSTEMAKER, ESQ.
                 fenstemaker@marcus-shapira.com
11                  (via telephone/livestream)
12
13    ALSO PRESENT:
14          ALEXANDRA M. GARLOCK, Paralegal
            agarlock@levinlaw.com
15          MADISON SHELQUIST, Legal Assistant,
            mshelquist@levinlaw.com
16            Levin Papantonio Thomas Mitchell
              Rafferty & Proctor P.A.
17
18          CHRIS GRIMM, Trial Technician
19
20    VIDEOTAPED BY:  ANTHONY MICHELETTO
21
22    REPORTED BY:  CORINNE T. MARUT, C.S.R. No. 84-1968
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     I N D E X
 2   WAYNE EUGENE BANCROFT                EXAMINATION
 3        BY MR. MOUGEY.................  11
          BY MS. SWIFT.................  202
 4
 5
 6                   E X H I B I T S
 7   WALGREENS-BANCROFT EXHIBIT           MARKED FOR ID
 8   No. 1      Resume, Wayne Bancroft,        13
               P-WAG-02258
 9
     No. 2      6/23/08 Walgreens memo;        49
10             WAGMDL00624503 - 00624509
11   No. 3      Document, 8/5/09, Order Item   81
               Detail; WAGMDL00674553
12
     No. 4      Document, 9/23/09 Threshold    85
13             Violations-Monthly;
               WAGMDL00674619
14
     No. 5      Document, 9/23/09, Threshold   86
15             Violations-Monthly;
               WAGMDL00674620
16
     No. 6      Various Documents, first       87
17             document, 2/17/10, Threshold
               Violations-Weekly;
18             WAGMDL00674576 - 00674594
19   No. 7      Various document, first page,  88
               8/18/10 Order Item Detail;
20             WAGMDL00674562 - 00574575
21   No. 8      3/27/09 e-mail string with     99
               attachments; WAGMDL00325368 -
22             00325378
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S
 2     WALGREENS-BANCROFT EXHIBIT              MARKED FOR ID
 3       No. 9     Document, "Controlled              109
                   Substance Threshold";
 4                 WAGMDL00491896 - 00491912
 5       No. 10    Document, 10/1/09 Project           116
                   Request Estimate;
 6                 WAGMDL00492070 - 00492072
 7       No. 11    10/27/11 e-mail with                124
                   attachment; WAGMDL00119542 -
 8                 00119548
 9       No. 12    Document, "Functional               129
                   Requirements & (Macro)
10                 Design"; WAGMDL00400342 -
                   00400356
11
         No. 13    4/27/12 e-mail with                 144
12                 attachment; WAGMDL00119539 -
                   0019541
13
         No. 14    7/2/12 e-mail with attachment;      183
14                 WAGMDL00077015 - 00077023
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          THE VIDEOGRAPHER:  We are now on the record.

 2              My name is Anthony Michelletto.  I'm a

 3    legal videographer for Golkow Litigation Services.

 4              Today's date is January 10, 2019.  The

 5    time is 9:11 a.m., as indicated on the video

 6    screen.

 7              This video deposition is being held in

 8    Chicago, Illinois, in the matter of In Re National

 9    Prescription Opiate Litigation, in the

10    United States District Court for the Northern

11    District of Ohio, Eastern Division.

12              The deponent is Wayne Bancroft.

13              Will counsel please identify yourselves

14    for the video record.

15      MR. MOUGEY:  Peter Mougey on behalf of the

16    Plaintiffs.

17      MS. SHELQUIST:  Madison Shelquist on behalf of

18    the Plaintiffs.

19      MS. GARLOCK:  Alexandra Garlock on behalf of

20    the Plaintiffs.

21      MS. MEYER:  Julie Fix Meyer, Armstrong

22    Teasdale, on behalf of Cardinal Health.

23      MS. SCHUCHARDT:  Margaret Schuchardt,

24    Jaszczuk P.C., on behalf of AmerisourceBergen Drug
```

Highly Confidential - Subject to Further Confidentiality Review

1    Corporation.

2        MR. STANNER:  Dan Stanner for McKesson.

3        MR. DeMONTE:  Mark DeMonte on behalf of

4    Walmart.

5        MR. HOUTZ:  Les Houtz from Bartlit Beck for

6    Walgreens.

7        MS. SWIFT:  Kate Swift for Walgreens.

8        THE VIDEOGRAPHER:  Our Court Reporter today is

9    Corinne Marut.  Please swear in the witness.

10               (WHEREUPON, the witness was duly

11                sworn.)

12        THE REPORTER:  Folks on the phone, can you

13    identify yourselves for the record.

14               I have two names.

15        MS. SWIFT:  The Court Reporter has noted that

16    she has two names for folks who are on the phone

17    but have not identified themselves.  So, I would

18    appreciate it if you go ahead and note those names

19    on the record.  Thanks, Corinne.

20               There is also another gentleman in the

21    room who didn't identify himself.

22        MR. GRIMM:  Chris Grimm.

23        MS. SWIFT:  Are you with the Plaintiffs?

24        MR. GRIMM:  I am with the videographer.

Highly Confidential - Subject to Further Confidentiality Review

1      MS. SWIFT:  Thanks very much.  Appreciate it.

2      THE WITNESS:  Can I say something?

3      MR. MOUGEY:  I think Kate would like the names

4    of the people on the phone.

5      MS. SWIFT:  Thanks, Peter.

6      THE REPORTER:  I have on the phone Erica

7    Guthrie from Arnold & Porter and also Zach

8    Fenstemaker from Marcus & Shapira for HBC.

9      MS. SWIFT:  Thank you.

10      THE WITNESS:  For the record I'd like to let

11    everybody know that I have Parkinson's, and I don't

12    know if it's going to interfere with the testimony

13    at all.  But I just want you to be aware of it.

14    Sometimes my voice goes soft and -- but I will try

15    to do the best I can to not let it interfere.

16          And I've also had a little bit of a head

17    cold lately.  So, those things are working against

18    me.  But I think I will get through them fine.  But

19    I just wanted to let you know.  Thank you.

20      MR. MOUGEY:  Thank you.

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    WAYNE EUGENE BANCROFT,

 2    called as a witness herein, having been first duly

 3    sworn, was examined and testified as follows:

 4                         EXAMINATION

 5    BY MR. MOUGEY:

 6          Q.    Good morning, Mr. Bancroft.

 7          A.    Good morning.

 8          Q.    My name is Peter Mougey.  I represent

 9    the Plaintiffs in this case.

10                You are an employee of Walgreens,

11    correct, sir?

12          A.    That's correct.

13          Q.    And you have been an employee of

14    Walgreens since 2004, correct?

15          A.    That's correct.

16          Q.    And your title from 2004 to today has

17    remained the same?

18          A.    Basically, yes.

19          Q.    And senior quantitative analyst at

20    Walgreens from 2004 up and to the current time,

21    correct?

22          A.    That's correct.

23          Q.    And you said "basically."  Has your --

24          A.    Business analyst.  The titles change
```

Highly Confidential - Subject to Further Confidentiality Review

1    slightly.

2         MS. SWIFT:  Let him finish his questions --

3         THE WITNESS:  Sorry.

4         MS. SWIFT:  -- before you start to answer.

5    BY MR. MOUGEY:

6         Q.    And it's hard.  In the course of

7    conversation, typically I will, I am 100 percent

8    positive, will interrupt you at some point today

9    before you're finished.  So, if you take a breath,

10   I think you're done, Mr. Bancroft.  I don't mean to

11   be disrespectful or rude.

12        A.    Yes.

13        Q.    So, just tell me, "I'm not finished

14   answering," and I'll stop.  Okay?

15        A.    Okay.  Thank you.

16        Q.    And, of course, at any point in time

17   today if you want to take a break or you want to

18   stop a few minutes, let me know as well.  Okay?

19        A.    Thank you, Peter.

20        Q.    Have you already -- have you been

21   deposed at any point in time or provided testimony?

22        A.    No.

23        Q.    Okay.  And I'm going to hand you what I

24   have I believe is your resume.  Okay, sir?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (WHEREUPON, a certain document was

 2                     marked as Walgreens-Bancroft

 3                     Exhibit No. 1:  Resume, Wayne

 4                     Bancroft, P-WAG-02258.)

 5    BY MR. MOUGEY:

 6        Q.    All right, Mr. Bancroft.  I believe this

 7    is your resume.  Is that -- you have this in front

 8    of you?

 9        A.    It looks right.

10        Q.    Yes, sir.  Do you recognize this as a

11    document that you put together?

12        A.    I believe so, yes.

13        Q.    All right.  And if you could, sir, I'd

14    like to turn to the second page of this document,

15    Bancroft 1, and just start with your education.

16              Sir, you have an undergraduate degree, a

17    graduate degree and then also your Ph.D., correct,

18    sir?

19        A.    That's correct.

20        Q.    And your undergrad is in chemistry,

21    correct?

22        A.    Yes.

23        Q.    And your Master's Degree, similar to

24    your Ph.D., is in management sciences/operations
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    research, correct, sir?

 2         A.    That's correct.

 3         Q.    And those are both, both your Master's

 4    and your Ph.D., are from the Institute of

 5    Technology here in Chicago, correct, sir?

 6         A.    Illinois Institute of Technology.

 7         Q.    Yes, sir.  Thank you.

 8               And, sir, when did you finish your

 9    Ph.D., late '80s?

10         A.    '87.

11         Q.    '87.  And I see that your first job

12    experience on your resume is from 1990.  What did

13    you do after your Ph.D. from '87 until '90?

14         A.    From '87 to '90?  Let's see.

15         Q.    If you're -- do you see how your

16    education doesn't have a date on it?

17         A.    Oh, yes.

18         Q.    So, did you graduate somewhere around

19    1987?

20         A.    Yes.

21         Q.    Okay.  And your first entry on your

22    resume is Motorola in 1990.

23               Do you see that?

24         A.    Yes.
```

1      Q.    Did you have --

2      A.    Before -- before Motorola I worked for

3  Lucent Technologies.

4      Q.    For Lucent Technologies?

5      A.    Yes.

6      Q.    What did you do for Lucent?

7      A.    Quantitative analyst.

8      Q.    Okay.  So, your very broad, macro, your

9  employment starting with Lucent all the way to

10  today at Walgreens involved some component of

11  quantitative analysis, correct, sir?

12      A.    Some component.

13      Q.    And just to kind of put that in layman's

14  terms, that involves statistics, modeling, kind of

15  a math-based background.  Is that fair?

16      A.    Yes.

17      Q.    And, now, if you would, sir, turn to the

18  first page of your resume.  And you have a number

19  of bullets here listed under Walgreens Co. from

20  2004 and the resume says till '14, but you've

21  continue to work at Walgreens up until today,

22  correct?

23      A.    Yes.

24      Q.    And what we're here today to talk to you

Highly Confidential - Subject to Further Confidentiality Review

1  about, sir, is Walgreens' suspicious order

2  monitoring policies.  You understand that?

3       A.    That's correct.

4       Q.    And, sir, you had a role in Walgreens'

5  suspicious order monitoring algorithm or formula

6  used, correct, sir?

7       A.    That's right.

8       Q.    And that algorithm or formula was

9  designed by you, correct?

10      MS. SWIFT:  Object to form.

11  BY THE WITNESS:

12      A.    Not entirely.

13      MS. SWIFT:  Vague.

14           Give me a chance to object before you

15  answer.

16      THE WITNESS:  I'm sorry.

17      MR. MOUGEY:  Are you done, Kate?

18      MS. SWIFT:  Yes.

19  BY MR. MOUGEY:

20      Q.    So, I understand it wasn't written

21  entirely by you.  But that's something that you

22  worked on at Walgreens, correct?

23      A.    Yes, that's correct.

24      MS. SWIFT:  Same objection.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. MOUGEY:

 2       Q.    And when I say "something that you

 3   worked on," the suspicious order monitoring

 4   algorithm was a part of your employment while you

 5   were at Walgreens, correct?

 6       MS. SWIFT:  Same objection.

 7   BY THE WITNESS:

 8       A.    Yes.

 9   BY MR. MOUGEY:

10       Q.    So, do you have a recollection of when

11   you began to work on the suspicious order

12   monitoring policies at Walgreens?

13       MS. SWIFT:  Object to the form, vague.

14   BY THE WITNESS:

15       A.    Yes.

16   BY MR. MOUGEY:

17       Q.    What time period do you recall that you

18   began to work on the -- I'm going to call it SOM,

19   suspicious order monitoring.  Okay?

20       A.    The recollection, yeah, I think it was

21   around 2008.

22       Q.    Around 2008.  And do you have a

23   recollection, sir, of who brought to your attention

24   or asked you to work on the suspicious order
```

1    monitoring at Walgreens?

2         A.    I don't know for certain.

3         Q.    And who do you believe it is?

4         A.    I would believe my manager, Joe

5    Tiemeyer.

6         Q.    I'm sorry?

7         A.    My manager at the time, Joseph Tiemeyer,

8    Joseph Tiemeyer.

9         Q.    Joseph Tiemeyer.  Okay.  And do you have

10   a recollection of the conversation about what you

11   were asked to do, what the scope of work was?

12        A.    No.

13        Q.    Do you have a recollection, was there a

14   team or a group that was formed to help assist you

15   or participate in drafting Walgreens' SOM?

16        MS. SWIFT:  Object to the form.

17   BY THE WITNESS:

18        A.    Yes.

19   BY MR. MOUGEY:

20        Q.    And was there a name for that team or

21   task force?

22        A.    I --

23        MS. SWIFT:  Object to the form.

24   BY THE WITNESS:

```
 1        A.    I don't know.  I don't recall.

 2   BY MR. MOUGEY:

 3        Q.    Do you recall who was on the team with

 4   you helping put together Walgreens' SOM policies?

 5        MS. SWIFT:  Object to the form.

 6   BY THE WITNESS:

 7        A.    A few people.

 8   BY MR. MOUGEY:

 9        Q.    And who were those few people?

10        A.    Tracy Morris was one.

11        Q.    Tracy Morris.

12        A.    Barb Martin.  Joanne, I don't remember

13   her last name.

14        Q.    Okay.

15        A.    I know there were some people from loss

16   prevention.  I don't remember -- I don't know any

17   names.  That's -- that's who I can recall.

18        Q.    All right.  So, five or so, less than

19   ten people on a group with you helping put

20   together --

21        A.    I wouldn't say that.

22        Q.    You wouldn't say that?

23        A.    I don't know if it was less than ten

24   people.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.

2      A.    I think there -- at least ten people.

3      Q.    At least ten people.

4            All right.  So we have three names

5      including yourself.  So, there is four people.  We

6      have Joanne, Barb Martin and Tracy Morris, and some

7      folks from loss prevention.  Don't remember who?

8      A.    Don't remember.

9      Q.    Okay.  Any other groups within Walgreens

10     that were on the team?

11     A.    I don't recall.

12     Q.    All right.  And kind of walk me through

13     the genesis of how this project started and, you

14     know, how you met, who you met, how often, just

15     kind of walk me through how this started.

16     A.    Well --

17     MS. SWIFT:  Object to the form.

18     BY THE WITNESS:

19     A.    It was in 2008.  My memory is not

20     crystal clear.  I remember the objective was to --

21     that we had requirements from the DEA to put -- to

22     control our -- to monitor our stores for suspicious

23     ordering in terms of order size and order frequency

24     is what I recall.

1    BY MR. MOUGEY:

2        Q.    Why do you believe you were asked to be

3    on this team?

4        MS. SWIFT:  Object to the form, foundation.

5    BY THE WITNESS:

6        A.    I think any kind of quantitative issue

7    that they usually involved me.

8    BY MR. MOUGEY:

9        Q.    All right.  So, would you help me

10   understand and help this jury understand when you

11   say "quantitative issue," what do you mean?

12       A.    I think that would -- statistical

13   modeling.  Anything that might involve that.

14       Q.    So, if we go back to your resume,

15   Bancroft 1, and we look at your education under

16   "Management Sciences/Operations Research," is

17   that -- is your educational background kind of math

18   or statistics-heavy?

19       A.    I would say it's -- yes.

20       Q.    Yes.  And would you consider yourself to

21   have a significant educational background in

22   statistical modeling?

23       A.    I have an educational background in

24   modeling in general.

1       Q.      Modeling in general.  Now, how many

2   years were you, in both your Master's Degree and

3   Ph.D., your graduate programs, how many years were

4   you in school working on your management

5   sciences/operations research Ph.D.?

6       A.      At least eight.

7       Q.      Eight years.  In addition to your

8   undergrad?

9       A.      Yes.

10      Q.      And your undergrad was in chemistry?

11      A.      Yes.

12      Q.      So, you have 12 years in total, maybe a

13  little more, eight years based in management

14  sciences and operations research, correct?

15      A.      Some of those years were part time.

16      Q.      Some of those years were part time.  But

17  a significant amount of time in the educational

18  process, kind of understanding operations,

19  management science, correct?

20      A.      That's correct.

21      Q.      And did you have a focus or an area

22  that -- that you specialized in during your

23  graduate work?

24      A.      Graduate work, there was a general array

Highly Confidential - Subject to Further Confidentiality Review

1    of courses that you were required to take.  So, I

2    would say I was not specialized at that point.

3         Q.    When you finished your -- when you

4    finished your Ph.D., had you focused or specialized

5    in any area?

6         A.    Forecasting and inventory.

7         Q.    Forecasting and inventory.  Okay.

8              So, your career, starting with Lucent,

9    going to Motorola, your -- has all been

10   forecasting, inventory, modeling, kind of

11   math-based work experience, correct?

12        A.    Not totally.

13        Q.    And when you say "not totally," what

14   other kind of work have you specialized in?

15        A.    Well, at Motorola I did some strategic

16   planning and operational plan for -- help plan for

17   operations.

18        Q.    Would you agree with me that a

19   significant part of your work experience after your

20   graduate work at -- did you say it was Illinois

21   Institute of Technology?

22        A.    Illinois Institute of Technology, IIT.

23        Q.    Okay.  Oh, I see.  It's -- all right.

24             Would you agree with me that after your

Highly Confidential - Subject to Further Confidentiality Review

 1    eight or so years of graduate work at Illinois

 2    Institute of Technology in management sciences and

 3    operations research that the bulk of your work

 4    experience has been building upon your academic

 5    background?

 6         A.    I would say so.

 7         Q.    And as a matter of fact, on your resume

 8    on the second page, your -- one of the titles of

 9    the grouping of Motorola and the issues below were

10    all forecasting and inventory consultants, correct?

11         A.    Yes.

12         Q.    And, now, you began at Walgreens in '04

13    and within a few years you had been asked to serve

14    on this -- on this team with suspicious order

15    monitoring policies, correct?

16         A.    That's correct.

17         MS. SWIFT:  Object to the form.

18         THE WITNESS:  Sorry.

19    BY MR. MOUGEY:

20         Q.    So, did you -- when you started as part

21    of this team, did you and the team start from

22    scratch or was there any work product that had

23    already been developed when you started?

24         MS. SWIFT:  Object to the form, foundation.

1    BY THE WITNESS:

2        A.    We gave it a clean slate and took it

3    from scratch.

4    BY MR. MOUGEY:

5        Q.    All right.  So, when you say you gave it

6    a clean slate, was there a body of work that you

7    started with as part of the team to develop a

8    suspicious order monitoring algorithm or was there

9    already some work done?

10       MS. SWIFT:  Object to the form.

11   BY THE WITNESS:

12       A.    Could you repeat the question.

13   BY MR. MOUGEY:

14       Q.    Yes, sir.  When I asked you if -- what

15   would you call it?  Would you call it a team, this

16   group of people?  Would you call it a committee?

17   What would you refer to it as?

18       A.    Initially I'd refer to it as a

19   committee.

20       Q.    A committee.  All right.  So, did

21   that -- you said "initially."  Did that change over

22   some period of time?

23       A.    Well, we started to put together a

24   solution and we worked as a team then.

1        Q.    Okay.  So, it started as a committee and

2    then worked and developed into a team?

3        A.    Yes.

4        Q.    Because you continued to work on this

5    committee, which ultimately became a team, to

6    develop and implement the suspicious order

7    monitoring policy for several years after it was

8    brought to your attention in 2008, correct?

9        MS. SWIFT:  Object to the form, compound.

10   BY THE WITNESS:

11       A.    There was two phases.  So, the first

12   phase was -- it was in 2008; and then we had a

13   second phase where we enhanced the model, and that

14   was around 2012.

15   BY MR. MOUGEY:

16       Q.    So, there was the initial phase in '08

17   and then a second phase in around 2012?

18       A.    Yes.

19       Q.    Okay.  So, let's start with the 2008.

20   Okay?

21       A.    Okay.

22       Q.    Beginning of 2008, somewhere in 2008,

23   your boss brought to your attention, you think, we

24   need to develop an algorithm for suspicious order

 1   monitoring, correct?

 2       MS. SWIFT:  Object to the form.

 3   BY THE WITNESS:

 4       A.    I was asked to attend the meeting and at

 5   the meeting that was where it was brought to my

 6   attention.

 7   BY MR. MOUGEY:

 8       Q.    All right.  And do you recall where the

 9   meeting was?

10       A.    It was in Deerfield.

11       Q.    Deerfield.  And did the committee

12   continue to meet after the initial meeting?

13       A.    Yes.

14       Q.    And do you have a recollection of how

15   often the committee met?

16       A.    No.

17       Q.    Would it meet once a quarter?  Were you

18   all meeting weekly?  Were you meeting once a day?

19       A.    I don't recall.

20       Q.    You don't recall at all?

21       A.    No.

22       Q.    You don't recall if you met once and

23   never met again or you don't --

24       A.    No, I recall meeting more than once.

1    Q.    More than once.  Do you recall meeting

2  two or three times or how did -- how did the --

3    A.    I'm sure we met several times.

4    Q.    All right.  So, did everyone on this

5  committee have a different area of expertise and

6  did you all -- or were you assigned specific tasks

7  within the committee?

8    A.    Everybody had their -- brought their own

9  talents, yes, they had different talents.

10   Q.    So, what do you -- do you have an

11  understanding of what Ms. Tracy Morris' talents

12  were on that, on the committee?

13   A.    She worked in the same capacity I did.

14   Q.    All right.  And if you had just a

15  couple-of-word description about you and

16  Ms. Morris' area, would you call it a statistical

17  modeling?  What would you call your area?

18   A.    I never thought about giving it.  I

19  never had a name that I --

20   Q.    I want to use something you're

21  comfortable with today.

22         Were you the -- were you the -- you and

23  Tracy the modeling folks?

24   A.    Yes.

1      Q.    Okay.  So, you and Ms. Morris were kind

2   of in charge of putting together the model,

3   correct?

4      A.    I don't know if we were in charge.  We

5   certainly took lead.

6      Q.    All right.  You took lead in --

7      A.    Yes.

8      Q.    -- in developing the model.

9            But you needed input from other folks

10   within Walgreens to develop the model, correct?

11      A.    Yes.

12      Q.    So, for example, Ms. Martin, what would

13   you -- what would you explain her area of --

14      A.    She's a pharmacist, so she's familiar

15   with the store ordering process.  She's familiar

16   with how things, operations are in the stores.

17      Q.    All right.  And how about Joan who you

18   couldn't --

19      A.    Same.  She was a pharmacist.

20      Q.    Same.  Pharmacist.

21      A.    Yeah.

22      Q.    And was familiar with, you said SOR,

23   S-O-R, suspicious order reporting, correct?

24      A.    She was familiar with dispensing in the

```
 1    stores.  She is familiar with store operations.
 2         Q.    Okay.  Did you not use the word "SOR" --
 3         MR. MOUGEY:  Kate, I'd appreciate it if I
 4    don't have shaking of the head yes or no from you.
 5    I'm asking the witness.  Okay?
 6         MS. SWIFT:  Peter, I'm sorry.  I did not
 7    intend to shake my head at you.  Ignore me.
 8         MR. MOUGEY:  You are and that's been a
 9    continuing issue for --
10         MS. SWIFT:  Just ignore me.
11         MR. MOUGEY:  I appreciate it, but you're
12    leaning up in front of the witness shaking your
13    head yes and no, which has been a continued issue
14    for months on end.  If you could please refrain --
15         MS. SWIFT:  For the record I'm not at all in
16    front of the witness, which I'm sure is clear from
17    the video.  But for the transcript I am not in
18    front of the witness.
19         MR. MOUGEY:  You're in the witness' line of
20    sight.  I've asked repeatedly that you stop shaking
21    your head yes and no during testimony when the
22    witness can see you in the peripheral vision.  So,
23    I'd appreciate that.
24    BY MR. MOUGEY:
```

1    Q.    Mr. Bancroft, did you -- and I might

2  have misunderstood.  I thought you said "SOR,"

3  which to me would be suspicious order reporting.

4  Did you say "store"?

5    A.    Store.

6    Q.    Okay.  Thank you.

7    A.    Yes.  I'm sorry.  It's part of --

8    Q.    No.

9    A.    Yeah.

10    Q.    And I'm also -- we are just making sure.

11    A.    I am glad you clarified that.  Thank

12  you.

13    Q.    So, we were talking about Barb Martin

14  and I wrote down SOR.  But let me go back and clean

15  that up.

16         So, Ms. Martin is a pharmacist?

17    A.    Yes.

18    Q.    And she brought together to the

19  committee store operations?

20    A.    Operational, yes.

21    Q.    Gotcha.  And Joanne, sounds like the

22  same thing, she was a pharmacist and brought store

23  operations kind of expertise to the committee,

24  right?

1    A.    Yes.  They are also, they both worked

2  for Rx purchasing.

3    Q.    And Rx purchasing.  Okay.

4          So, now, loss prevention, what was their

5  area of expertise or what skill set did they bring

6  to the table?

7    MS. SWIFT:  Object to the form, foundation.

8  BY THE WITNESS:

9    A.    I wasn't as familiar with them as much,

10  but they brought the skill set they brought, they

11  looked for theft.  Loss prevention.

12  BY MR. MOUGEY:

13    Q.    Thefts and loss prevention.  Okay.

14          Now, safe to assume you ultimately came

15  up with a product or a model to -- that was used at

16  Walgreens, correct?

17    MS. SWIFT:  Objection; form.

18  BY THE WITNESS:

19    A.    Did we come up with a way of monitoring?

20  BY MR. MOUGEY:

21    Q.    Yes, sir.

22    A.    Yes, we did.

23    Q.    All right.  Now, was there some code or

24  computer language written that was deployed at

Highly Confidential - Subject to Further Confidentiality Review

1    Walgreens?

2        MS. SWIFT:  Object to the form.

3    BY THE WITNESS:

4        A.    Yes.

5    BY MR. MOUGEY:

6        Q.    And were there any people in this

7    committee that had more programming backgrounds?

8        A.    I don't remember.

9        Q.    Do you have a computer -- do you have a

10   programming background?

11       A.    I could -- I'm a good hack.

12       Q.    Okay.  But you wouldn't -- for a company

13   the size of Walgreens, your area of expertise

14   wasn't writing code to implement the model,

15   correct?

16       A.    I use code to help develop the model and

17   test data, but I do not write any code that gets --

18   none of the code I write is implemented on

19   Walgreens' systems.  It gets written by a

20   professional.

21       Q.    So, let's go back to kind of where I

22   started, which is when this committee was formed in

23   '08, did you start from a base of work that was

24   already developed at Walgreens?

Highly Confidential - Subject to Further Confidentiality Review

1        MS. SWIFT:  Object to the form.

2   BY THE WITNESS:

3        A.    No.

4   BY MR. MOUGEY:

5        Q.    Did you ask what was currently being

6   used at Walgreens?

7        MS. SWIFT:  Object to the form.

8   BY THE WITNESS:

9        A.    I don't recall.

10  BY MR. MOUGEY:

11       Q.    Do you recall that there was any system

12  in place at Walgreens prior to the 2008 committee

13  meeting?

14       MS. SWIFT:  Object to the form, foundation.

15  BY THE WITNESS:

16       A.    I remember there was some general

17  discussions of what was -- what was done, but I

18  don't remember details.

19  BY MR. MOUGEY:

20       Q.    Why don't you give me the general

21  discussions about what was done?

22       A.    What loss prevention, what involvement

23  they had, but we -- we went with a -- we started

24  from scratch.  So, I don't remember any details.

1    Q.    Okay.  Now, I get that you started from

2    scratch and I get that loss prevention was

3    involved.

4          But you -- you have no understanding of

5    anything that was in place prior to the 2008

6    committee meeting at Walgreens?

7    A.    That would be accurate.

8    MS. SWIFT:  Object to the form.

9    BY THE WITNESS:

10   A.    That would be accurate.

11   BY MR. MOUGEY:

12   Q.    Now, you have -- the resume we still

13   have in front of us, Bancroft 1, is filled with

14   different projects that you've done at a number of

15   very large companies, correct?

16   A.    Yes.

17   Q.    And I would imagine that a lot of these

18   projects were developed from a -- just a blank

19   slate, as you called it, correct?

20   A.    I would say so.

21   Q.    And I would say a number of these

22   projects you've worked on were enhancing or

23   improving what had already been built, correct?

24   A.    Most of the projects I work on, I tend

Highly Confidential - Subject to Further Confidentiality Review

1  to like to start from scratch and not be influenced

2  by -- most of the projects I try to get on the

3  ground floor and so I don't have influence by

4  other -- outside, something that's already in

5  place.

6      Q.    Help me because I'm hearing a couple

7  different things, and I want to make sure I

8  understand you.

9         You say you want to get in on the ground

10 floor and you want to start from scratch?

11     A.    Yes.

12     Q.    Okay.  But if you come in in a system

13 that's already been developed, isn't it important

14 for you to understand what's being employed at the

15 point in time when you start?

16     A.    Of course, yes.

17     Q.    Okay.

18     A.    And I stand corrected.  Yes, I have to

19 work with any systems that's in place for the

20 company.  I have to be able to work within that.

21     Q.    Yes, sir.  And as part of the committee

22 in the beginning of 2008, it was important that you

23 understood what was currently being used so you

24 could understand how to fit into that system,

1    correct?

2        MS. SWIFT:   Object to the form.

3    BY THE WITNESS:

4        A.    I would not say that's correct.  No, I

5    would disagree with that.

6    BY MR. MOUGEY:

7        Q.    Was there any system that was in place

8    at Walgreens when you began on this committee in

9    2008?

10       A.    I can't answer that question.

11       Q.    Why not?

12       A.    Because I wasn't involved with what was

13   there prior to.

14       Q.    I understand that you weren't involved.

15   All right.  And I understand you didn't write it.

16   But you're coming in in 2008 and being asked to

17   serve on a committee to develop an algorithm for

18   suspicious order monitoring, correct?

19       A.    We were asked to develop an algorithm,

20   not to -- not to fix an algorithm.  That's correct.

21       Q.    So, do you have an understanding of

22   whether or not a system was in place in 2008 that

23   was already deployed within Walgreens?

24       A.    No, I didn't.

 1        MS. SWIFT:  Object to the form.

 2    BY THE WITNESS:

 3        A.    No.

 4    BY MR. MOUGEY:

 5        Q.    No, there wasn't a system or --

 6        A.    No, I don't have an understanding.

 7        Q.    So, you didn't ask anyone at Walgreens

 8    what system's already being used?

 9        A.    I don't recall.

10        Q.    You don't recall -- you don't recall

11    at any -- saying, "Well, what is -- what's being

12    used at Walgreens?  Do we have a system?  How is it

13    being deployed"?  Never asked?

14        A.    I remember we had general discussions

15    and -- but the details of those discussions I don't

16    remember.

17        Q.    All right.  Well, give me some general

18    parts of those discussions that you remember.

19        A.    I just told you I don't remember.

20        Q.    So, you don't remember anything about

21    what system was in place at Walgreens prior to

22    2008?

23        A.    That would be correct.

24        Q.    You don't even know -- you don't have an

1    independent recollection of whether a system was in

2    place prior to 2008?

3         MS. SWIFT:  Objection; mischaracterizes the

4    testimony.

5    BY THE WITNESS:

6         A.    Yes, that's correct.

7    BY MR. MOUGEY:

8         Q.    All right.  Now, when you write and sit

9    down to put together an algorithm, a -- it's

10   important that you gather information from others,

11   kind of end users, so to speak, so you have all the

12   information you need to put together an accurate

13   model, correct?

14        A.    I would say in general speaking that

15   would be a true statement.

16        Q.    That you and Ms. Morris writing an

17   algorithm in a vacuum without understanding the

18   business side probably wouldn't come up with a very

19   good product, correct?

20        A.    That sounds right.

21        Q.    So, the part -- point of this committee

22   was to help you and Ms. Morris gather information

23   to put together a model that would have the highest

24   likelihood of success, correct?

1      A.     I would say that's correct.

2      Q.     So, do you have an understanding of how

3   long you and Ms. Morris worked on this model to

4   where you had a proof of concept?

5      A.     That was a long time ago.  I -- to ask

6   me exactly how long I worked on it, I couldn't tell

7   you.

8      Q.     And I'm not asking you exactly, like did

9   it take ten days or eight months and three days.

10  Just a general understanding of how long it would

11  take to put together a model that was ultimately a

12  proof of concept at Walgreens.  Was it six months?

13  Was it, you know, a year and a half?  Any general

14  understanding.

15     A.     It was -- it was -- it was less than six

16  months.

17     Q.     Less than six months.

18     A.     To put together the initial.  But the

19  work that everybody else did extended beyond the

20  six months.  So, it depends on how you define the

21  work scope, scope of work.

22     Q.     And the initial scope of work I asked

23  was a proof of concept.  Something that you came

24  up, that was in place, that was a proposal that

```
 1    was -- that was tested.

 2         A.    It would be less than six months.

 3         Q.    Less than six months.

 4               And, now, did you walk away after that

 5    first six months, seven, eight months, however it

 6    took to get a model in place, and then you were

 7    never brought back in again?

 8         A.    No.

 9         Q.    Until 2012?

10         A.    No.

11         Q.    So, you continued your involvement with

12    any tweaks or modifications from the initial

13    committee work in '06 all the way through your

14    tenure at Walgreens?

15         MS. SWIFT:  Object to the form.  You said '06.

16    BY THE WITNESS:

17         A.    2006, no, that's not correct.

18    BY MR. MOUGEY:

19         Q.    Thank you.  Sounds like what Ms. Swift

20    said.

21               So, 2008.  Okay.  So, from 2008.  Okay.

22    Did you stay involved in the suspicious order

23    monitoring model project or committee for several

24    years?
```

1          A.     I got involved as needed.

2          Q.     So, at some points in time after '08 and

3     after the model was put in place, you were brought

4     back in with either questions or concerns or any

5     input, correct?

6          A.     As needed.

7          Q.     Now, will you describe to me in 2008

8     what was your scope of work, as you called it?

9     What were you charged with doing?

10         A.     I was charged to help identify a method

11    for monitoring the orders for size and frequency.

12         Q.     For size and frequency.  Did anyone tell

13    you why?

14         A.     Those were the requirements from the

15    DEA.

16         Q.     Did anyone -- were you given materials

17    or descriptions or any documents to help you

18    determine what -- what you should be looking for

19    for size and frequency?

20         A.     No.

21         Q.     Were any consultants brought in from the

22    outside to help you determine what you should be

23    looking for with size and frequency?

24         A.     Not to my recollection.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Are you familiar with a company -- I'm

2    going to probably mispronounce it -- but Tata,

3    T-A-T-A, Consulting?

4      A.    Yes.

5      Q.    Who was Tata Consulting?

6      A.    They're a consulting firm that -- that

7    we hire a lot of consultants from them, mostly

8    programmers.

9      Q.    Mostly for what, sir?  Mostly

10   programmers?

11     A.    Yes.

12     Q.    Okay.  Do you have a recollection of

13   what time period Walgreens hired programmers from

14   Tata?

15     MS. SWIFT:  Object to the form, foundation.

16   BY THE WITNESS:

17     A.    No, I don't have any, hiring practices

18   and staff, no.

19   BY MR. MOUGEY:

20     Q.    I'm not asking you if you were -- about

21   hiring practices.  Okay.

22           What I'm asking is:  Do you have a

23   recollection of when folks from Tata were brought

24   in to Walgreens?

1          MS. SWIFT:  Objection; foundation.

2    BY THE WITNESS:

3          A.    Walgreens is a big company.  Tata is a

4    big company.  And what their relationships are is

5    way out of my scope of expertise.

6    BY MR. MOUGEY:

7          Q.    Was anyone from Tata brought in on the

8    project that you worked on, on this committee, to

9    develop an algorithm to -- for suspicious order

10   monitoring for size and frequency?

11         MS. SWIFT:  Objection; foundation.

12   BY THE WITNESS:

13         A.    I don't recall.

14   BY MR. MOUGEY:

15         Q.    You don't recall?

16         A.    I don't recall.

17         Q.    Do you have -- broaden that question up.

18         Do you have any recollection from Tata

19   ever coming in to Walgreens to assist in the

20   suspicious order monitoring policies and

21   procedures?

22         MS. SWIFT:  Objection; foundation.

23   BY THE WITNESS:

24         A.    I don't recall.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. MOUGEY:

 2        Q.    So, let's go back to the scope of work.

 3              What information did you need and

 4   Ms. Morris need to put together the algorithm to

 5   monitor orders for size and frequency?

 6        A.    We would need order history.  Order.

 7        Q.    Order history from where?

 8        A.    From the -- from the stores.

 9        Q.    Okay.  How long?

10        A.    We probably asked for a year worth of

11   data.

12        Q.    All right.  And what -- what types of

13   information or fields would you ask for within that

14   order history category?

15        A.    We were looking for order size, so the

16   order quantity and the time, when, the date it was

17   placed and the size of the orders for the different

18   drugs.

19        Q.    So, we have order, we have time, we have

20   size.  What else would you have needed?

21        A.    That would be the main part of the data

22   that we need and the stores -- obviously, every

23   store has their unique set of data.  That would be

24   what I recall.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  So, just if I use the word

2    "fields," does that make sense to you in a database

3    or a data pool concept?

4    A.    Yes.

5    Q.    Okay.  What's your -- the word "fields"

6    in kind of a database concept do you understand

7    that to mean?

8    MS. SWIFT:  Object to the form.

9    BY THE WITNESS:

10    A.    It means an attribute of a record.

11    BY MR. MOUGEY:

12    Q.    Okay.  So, what different fields would

13    you have pulled or needed to write the algorithm

14    with Ms. Morris?

15    A.    To test the algorithm, we would need the

16    store, the order size, the date of the order, the

17    item itself, a description of the item.

18    Q.    And help me understand.  Do you

19    understand if I use the word "parameter values"?

20    Does that -- is that a --

21    A.    Sure.

22    Q.    -- a term of art that you would use --

23    A.    Yes.

24    Q.    -- in kind of statistical modeling?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Yes, yes.

2      Q.     All right.  So, what do you understand

3  the parameter values means?

4      A.     Can you be more specific?

5      Q.     Just your general definition of what you

6  believe parameter values means.

7      A.     A parameter is something that controls

8  an output of a calculation.

9      Q.     And do you have an understanding of what

10  data you needed to determine the parameter values

11  of the algorithm?

12      MS. SWIFT:  Object to the form.

13  BY THE WITNESS:

14      A.     Can you tell me what parameters you're

15  referring to.

16  BY MR. MOUGEY:

17      Q.     You tell me.  Whatever parameters you

18  used in the model.  I want -- you've worked on this

19  model for years.  Help me understand what parameter

20  values you needed to put together this algorithm.

21      A.     The parameter values for which

22  algorithm?

23      Q.     For the algorithm to identify orders of

24  outliers for size.

1      MS. SWIFT:  Object to the form.

2      A.    One of the parameters would be a

3  statistical, a k-value.

4  BY MR. MOUGEY:

5      Q.    Okay.  And what's your definition of

6  k-value?

7      A.    Based on -- it's how many standard

8  errors that we're going to allow above the mean.

9      Q.    All right.  And who gave you the

10 information to fill in the k-values?

11     A.    The k-values used in production?

12     Q.    Yes, sir.

13     A.    That was done by another group.  I

14 didn't get involved with the production.  I came up

15 with the -- we came up with the model.  We showed

16 how it could be used.  But how it was actually used

17 in operations, I was not involved in that.

18     Q.    Okay.  So, what group came up with the

19 k-values?

20     A.    I don't know.

21     Q.    You don't know.  You have no idea?

22     A.    Initially, no, I don't.

23     Q.    How about just --

24     A.    Eventually there was an integrity group

1  that got involved that was formed.

2      Q.   And that was late '12, 2013, correct?

3      A.   I would -- it sounds about right.  I

4  can't say exactly.

5      Q.   So, do you have any understanding of who

6  the individuals were that helped identify what the

7  k-values were?

8      A.   I can't say for certain.

9      Q.   I'll tell you what.  Why don't we put --

10  I'm going to mark as Bancroft 2.

11                  (WHEREUPON, a certain document was

12                   marked as Walgreens-Bancroft

13                   Exhibit No. 2:  6/23/08 Walgreens

14                   memo; WAGMDL00624503 - 00624509.)

15  BY MR. MOUGEY:

16      Q.   Do you recognize what's been marked as

17  Bancroft 2 in front of you, Mr. Bancroft?

18      A.   Yes.

19      Q.   And is this a document that you and

20  Ms. Morris drafted?

21      A.   That's correct.

22      Q.   And is this one of the first memos that

23  were generated regarding the algorithm or the

24  modeling that you had been working on?

1      A.    Yes.

2      Q.    Was this the very first?

3      A.    Could be.

4      Q.    And did you have a working set of this

5 document that you were making changes to over a

6 period of time?

7      A.    I'm sure we made changes to it as we

8 were writing it, but no.

9      Q.    And you see the date is June 23, 2008,

10 correct?

11     A.    Yes.

12     Q.    And "DEA Suspicious Order Reporting" is

13 under the "Re" line, correct, sir?

14     A.    Yes.

15     Q.    And the deliverable that you were

16 working on was a proposal for defining suspicious

17 orders in the Walgreens distribution system,

18 correct, sir?

19     A.    That's correct.

20     Q.    And that's what you and Ms. Morris were

21 charged with doing was delivering a model to

22 identify suspicious orders, correct, sir?

23     A.    Yes.

24     Q.    And will you take a second and look

 1   through this document and make sure we've got the

 2   whole thing and this looks like the -- an accurate

 3   copy of the memo put together for this team.

 4        A.   Yes, it looks complete.

 5        Q.   Now, the memo has a "To" section.  Do

 6   you see at the very top, Steve Bamberg,

 7   Ed Choroski?

 8        A.   Yes.

 9        Q.   Now, is this -- are these individuals

10   the same people that were on the committee?

11        A.   Like I said, I don't remember.  I don't

12   recall all the names.  So, most likely it would

13   have been.  And my boss, Joe Tiemeyer, he was not

14   on the committee but he -- I included him.

15        Q.   Okay.  So, your recollection is these

16   are -- these are folks that may have been on the

17   committee?

18        A.   Yes.

19        Q.   Okay.  And do you have any recollection

20   of how many hours, just kind of ballpark, it took

21   you from one of the first meetings to put together

22   this algorithm?

23        A.   I --

24        MS. SWIFT:  Objection; asked and answered.

1    BY THE WITNESS:

2          A.     I'm not good with concepts of time.  I

3    work on something and I get involved in it and time

4    flies and I'm done.  And, no, I don't have really a

5    good concept of time.  Hours.

6    BY MR. MOUGEY:

7          Q.     Help me --

8          A.     And that was back in 2008.

9          Q.     No, sure, I understand.  I guess what

10   I'm trying to get a handle on, is this something

11   that took you, just with all your experience, is

12   this algorithm something that would take you 50,

13   100 hours or is this something that would take

14   several hundred hours to put together?

15         MS. SWIFT:  Object to the form, asked and

16   answered.

17   BY THE WITNESS:

18         A.     I'm not good with concept of time.  So,

19   I couldn't answer that.

20   BY MR. MOUGEY:

21         Q.     Well, there is a lot of people that

22   aren't good with concept of time.  I have a wife

23   that's not real good with concept of time.  I mean,

24   I get that.  But I probably...

1           Did this take months for you to put

2    together?  Is this something that you could -- turn

3    to page 2.  You see the algorithm right there,

4    right?

5        A.    Yeah.  The concept --

6        MS. SWIFT:  Object to the form of the

7    question.

8    BY THE WITNESS:

9        A.    The -- come up with a concept, it

10   probably didn't take months, you know.  It took a

11   little time.

12   BY MR. MOUGEY:

13       Q.    Sure.

14       A.    Then to develop and to code, do some

15   testing, pass it by everybody, that involves time.

16   But, you know, putting it all together, how many

17   hours was involved, I couldn't -- I couldn't tell

18   you.

19       Q.    But it certainly didn't take you several

20   months to put together?

21       A.    Oh, no.

22       MS. SWIFT:  Object to the form.

23   BY MR. MOUGEY:

24       Q.    Okay.  And, now, you don't have any

1    specific educational background in suspicious order

2    monitoring for controlled substances, right?

3         A.    That's correct.  No formal training, no.

4         Q.    And you don't have any even work

5    experience prior to this project or this committee

6    with suspicious order monitoring for controlled

7    substances, correct?

8         A.    That's correct.

9         Q.    You were brought in to this committee

10   because of your modeling background, right?

11        A.    I would say that's accurate.

12        Q.    And -- I mean, I hope this comes across

13   as a compliment.  But you're brought in as the guy

14   with the Ph.D. to help with the model because

15   you're a smart guy that can take complex problems

16   and create solutions, correct?

17        MS. SWIFT:  Object to the form.

18   BY THE WITNESS:

19        A.    I would say that's correct, but

20   everybody on the team is smart.

21   BY MR. MOUGEY:

22        Q.    Sure, and I recognize.  But smart in

23   different areas, right?

24        A.    We work as a team, yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Right.  That's a very good political

2    answer.

3         So, the folks that you worked with all

4    had different areas of specialty, right?

5    MS. SWIFT:  Object to the form.

6    BY THE WITNESS:

7    A.    That's right.  They all had their own

8    specialties, yes.

9    BY MR. MOUGEY:

10    Q.    And you're the smart math guy?

11    MS. SWIFT:  Object.

12    BY MR. MOUGEY:

13    Q.    You and Ms. Morris, right?

14    MS. SWIFT:  Object to the form.

15    BY THE WITNESS:

16    A.    We -- we're competent in math.

17    BY MR. MOUGEY:

18    Q.    Yes, sir.  We'll see how -- what you

19    define as competent versus the rest of us.  All

20    right.

21         So, if we -- if we get into page 2, this

22    is -- starts to lay out what your proof of concept

23    is, correct?

24    MS. SWIFT:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1    BY THE WITNESS:

2        A.    I believe that's correct.

3    BY MR. MOUGEY:

4        Q.    So, I'm going to go back to the first

5    page.  But the broad tests you have, tolerance

6    limits and order frequency, correct?

7        A.    Yes.

8        Q.    And the tolerance limits has to do with

9    the size, correct?

10       A.    That's correct.

11       Q.    And order frequency has to do with how

12   often orders are entered, correct?

13       A.    That's correct.

14       Q.    And the order frequency was changed a

15   few years down the road to have more of a ceiling,

16   correct?

17       A.    That's correct.

18       Q.    Were you involved in the ceiling?

19       A.    Yes.

20       Q.    So, when you said earlier "I'm brought

21   back in as needed," one of the tweaks along the way

22   was changing order frequency to order ceiling

23   threshold, correct?

24       A.    Yes, we constantly tried to improve our

1    system --

2        Q.    So, let's go back to --

3        A.    -- for that concept.

4        Q.    -- to the first page.

5            But as needed, as you said.  Okay?

6        A.    Yes.

7        Q.    So, the overview is, "The DEA's

8    requiring Walgreens to monitor the orders, for

9    control substances, that our stores place on our

10   distribution centers for suspicious activity.

11   Suspicious orders are defined in terms of order

12   size and order frequency."

13           Did I read that right?

14       A.    That's correct.

15       Q.    That's kind of the very broad scope of

16   work, correct?

17       A.    That's right.

18       Q.    And this document proposes a methodology

19   for identifying suspicious orders in terms of order

20   size and order frequency.  Did I read that right?

21       A.    That's correct that you read it right.

22       Q.    Okay.  So, those first few sentences

23   that I just read, are those an accurate kind of job

24   description of what this committee was charged with

1    doing?

2        A.    It is with exception that when we say

3    "suspicious," we say order of interest.

4        Q.    An order of interest.  But it doesn't

5    say "order of interest" here, right?

6        A.    No, but that's how we used the term.

7        Q.    So, suspicious orders here doesn't

8    really mean suspicious orders?

9        A.    It doesn't mean that there is -- the

10   order is not valid.  It means it's an order that

11   was worth looking into.

12       Q.    So, now, this is January 23, 2008.  The

13   deliverable includes the word "suspicious order,"

14   right?

15       A.    Yes.

16       MS. SWIFT:  Object to the form of the

17   question.

18   BY MR. MOUGEY:

19       Q.    So, under "Deliverable," it's "Proposal

20   for defining 'suspicious orders.'"  Correct?

21       A.    Can you repeat that?

22       Q.    The deliverable is "Proposal for

23   defining 'suspicious orders.'"  Correct?

24       A.    That's what -- that's what it says.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     Okay.  And this is something you drafted

2   based on your work with this committee, right?

3      A.     That's correct.

4      Q.     And you believe at the time you drafted

5   this memo, you and Ms. Morris drafted the memo, you

6   had been working with this committee for a matter

7   of several months, correct?

8      MS. SWIFT:  Object to the form.

9   BY THE WITNESS:

10     A.     I can't say it's months.  I don't know.

11  Like I said, I don't have a good sense of -- sense

12  of time.

13  BY MR. MOUGEY:

14     Q.     Yes, sir.  But you believe it was

15  beginning of 2008 when you generally started

16  working with this committee, right?

17     MS. SWIFT:  Object to the form.

18  BY THE WITNESS:

19     A.     I would say that's correct.

20  BY MR. MOUGEY:

21     Q.     So, you'd agree with me that this memo

22  culminated in at least a few months' worth of work

23  in meeting with these committee members, right?

24     MS. SWIFT:  Object to the form.

 1    BY THE WITNESS:

 2         A.    I would say that's correct.

 3    BY MR. MOUGEY:

 4         Q.    So, the words "suspicious orders," like,

 5    for example, in the second sentence, "Suspicious

 6    orders are defined in terms of order size and order

 7    frequency," was that -- was that something you just

 8    misunderstood of what your deliverable was?

 9         A.    The way I used "suspicious orders" was

10    to identify orders that were worth -- were of

11    interest, out of the norm, and worth looking into.

12         Q.    All right.  So, these -- all of these

13    people that this memo is to, those are some pretty

14    sophisticated people, right, in their own right?

15         A.    That's correct.

16         Q.    I mean, like, for example, Dwayne Piñon,

17    he's counsel, isn't he?

18         A.    I believe yes, he is.

19         Q.    There is some pretty smart folks here on

20    the "To" line of this memo, right?

21         A.    Yes.

22         Q.    So, after this memo went out and you

23    used the word "suspicious orders," did anyone

24    correct you and say, "Mr. Bancroft, you

1    misunderstood our first few months of meetings.

2    That suspicious orders you're using incorrectly"?

3    Did anybody say that to you?

4         A.   I don't recall.

5         MS. SWIFT:  Object to the form.

6    BY MR. MOUGEY:

7         Q.   You don't recall that?

8         A.   No.

9         Q.   So, do you recall that in the documents

10   generated after this initial memo in June of 2008

11   that you didn't use the word "suspicious orders"

12   anymore, that it was more, I think you said, orders

13   of interest?

14        A.   No.

15        MS. SWIFT:  Object to the form.

16   BY MR. MOUGEY:

17        Q.   No.  So, actually, you continued to use

18   the word "suspicious orders" for months after this,

19   correct?

20        A.   That's correct.

21        Q.   And, actually, you continued to use the

22   word "suspicious orders" in the context of this

23   deliverable for years afterwards, correct?

24        MS. SWIFT:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1   BY THE WITNESS:

2        A.    I think --

3        MS. SWIFT:  Foundation.

4   BY THE WITNESS:

5        A.    I think that's correct.

6   BY MR. MOUGEY:

7        Q.    Yes, sir.  I mean, 2008, 2009, 2010,

8   2011, 2012, no one ever said, "Mr. Bancroft, you

9   didn't understand our deliverable that the

10  algorithm was designed to detect suspicious

11  orders"?  Anybody ever say that to you?

12       MS. SWIFT:  Object to the form.

13  BY THE WITNESS:

14       A.    In the -- we -- as a supplement of this

15  algorithm?

16  BY MR. MOUGEY:

17       Q.    Yes, sir.

18       A.    We had a -- they would -- this was used

19  so that we would not generate orders of suspicion.

20  So, I think the answer to your question is nobody

21  corrected my language.

22       Q.    Okay.  Thank you.  Let's keep going on

23  this June 23, 2008 memo.  It's Bancroft 2.

24            And the next sentence says, "First the

1  reasoning behind the method is described.  Followed

2  by the steps needed to perform the analysis."

3          And, so, this memo was a culmination of

4  committee work that was a proposal for identifying

5  suspicious orders, correct?

6      MS. SWIFT:  Object to the form.

7  BY THE WITNESS:

8      A.    I think that's correct.

9  BY MR. MOUGEY:

10     Q.    Let me -- maybe even just another big,

11  broad kind of question.

12          So, the algorithm was designed to flag

13  orders, correct, sir?

14     MS. SWIFT:  Object to the form.

15  BY THE WITNESS:

16     A.    Yes.

17  BY MR. MOUGEY:

18     Q.    And those orders that were flagged are

19  what you are referring to in Bancroft 2 in June of

20  2008 as suspicious, correct, sir?

21     MS. SWIFT:  Object to the form.

22  BY THE WITNESS:

23     A.    Yes.

24  BY MR. MOUGEY:

1      Q.     All right.  Now, the next two paragraphs

2   is where you identify the order size and the order

3   frequency, correct, sir?

4      A.     Yes.

5      Q.     And the last paragraph on this page, "In

6   either case, if the order quantity does not exceed

7   the SIMS suggested order quantity."

8             And I swear Walgreens is worse than the

9   military with the acronyms.  So, help me out here.

10            SIMS, S-I-M-S, is?

11     A.     That's our replenishment system.

12     Q.     Okay.  And when you say "replenishment,"

13  would the words "inventory management" be okay?

14     A.     Yes.  In this case, the word SIMS was

15  referring to our replenishment logic.  SIMS is a

16  bigger system.  So, that's a small component of it.

17     Q.     All right.  So, to read that sentence

18  again.

19            "In either case, if the order quantity

20  does not exceed the SIMS," and that was the

21  replenishment system, "suggested order quantity,

22  then the order should no longer be considered

23  suspicious."

24            Correct?

```
 1        A.     That's what I wrote at the time.

 2        Q.     Yes, sir.  And "If the order is

 3   identified as suspicious, a detailed report should

 4   be created to aid the analysis that has to make a

 5   quick decision to allow or stop the order."

 6           Correct?

 7        A.     That was what I wrote.

 8        Q.     And your understanding at this point in

 9   time based on these meetings with the folks in the

10   "To" line up here was that if an order was flagged

11   as suspicious, there had to be a detailed report

12   created to aid the analysis of whether or not the

13   order could be shipped, correct?

14       MS. SWIFT:  Objection; foundation.

15   BY THE WITNESS:

16        A.     I'm -- I'm not sure I understood the

17   question.  Could you repeat it.

18   BY MR. MOUGEY:

19        Q.     You understand based on your meetings

20   with this group by June of 2008 that before an

21   order that's flagged by the algorithm could be

22   shipped, that there had to be some analysis on that

23   order, correct?

24       MS. SWIFT:  Object to the form, foundation.
```

1   BY THE WITNESS:

2        A.    I'm not sure that's correct.

3   BY MR. MOUGEY:

4        Q.    Well, let's look at this exact language

5   of your statement.

6        A.    That's what I -- that's what I said.

7        Q.    There you go.  That's what I -- I'm

8   asking about your understanding, based on the

9   committee meetings in June of 2008, you understood

10  that an order flagged by the algorithm, A, was

11  suspicious, correct?

12       MS. SWIFT:  Object to the form.

13  BY THE WITNESS:

14       A.    No.  It identified as what I was

15  referring to as suspicious as an order of interest.

16  BY MR. MOUGEY:

17       Q.    Yes, sir.  And I understand that's your

18  testimony of what it is now.  I'm saying at the

19  time you drafted this memo.  Let's just make sure.

20  I want to have this snapshot in time of June 2008.

21            As of June 2008 based on your meetings,

22  committee meetings, up until this point, you

23  understood that an order flagged by the model you

24  and Ms. Morris were creating was suspicious,

1    correct?

2        MS. SWIFT:  Object to the form.

3    BY THE WITNESS:

4        A.    At the time of this memorandum we were

5    making a proposal.

6    BY MR. MOUGEY:

7        Q.    Yes, sir.

8        A.    And this was a proposal.

9        Q.    And I understand.  And that's what I'm

10   asking about.  This proposal, June of 2008, your

11   understanding when drafting this order was that an

12   order flagged -- I'm sorry.  Let me do that

13   question again.

14           Your understanding in June of 2008, when

15   you drafted this memo, was that an order flagged by

16   your algorithm was identified, it was considered

17   suspicious, correct?

18       MS. SWIFT:  Object to the form.

19   BY THE WITNESS:

20       A.    The definition of suspicious that we

21   used in this -- this memorandum was an order of

22   interest.

23   BY MR. MOUGEY:

24       Q.    Yes, sir.  I understand that's what

Highly Confidential - Subject to Further Confidentiality Review

1    you're saying.  But I don't see the words -- I

2    mean, take your time and look through this.

3         A.    No.

4         Q.    I don't see the words "order of

5    interest" -- 1, 2, 3, 4, 5, 6 -- six pages.  I

6    don't see the word "order of interest" in here.

7         A.    No, you won't see the word "order of

8    interest."  What I'm trying to convey is the fact

9    that when I used the term "suspicious," I meant an

10   order of interest.  I -- if I miswrote, that could

11   be true.  But what I -- the intent was order of

12   interest.

13        Q.    What I'm asking is what you said in this

14   memo.  What you say in this memo is that an order

15   flagged by your algorithm is suspicious.  Does your

16   memo say that?

17        MS. SWIFT:  Object to the form.

18   BY THE WITNESS:

19        A.    What I intended, what I -- when I wrote

20   those words, I wrote those words with the

21   suspicious as -- as order of interest.

22   BY MR. MOUGEY:

23        Q.    Yes, sir.

24        A.    That's the definition that I had in

Highly Confidential - Subject to Further Confidentiality Review

 1    mind.

 2         Q.    I understand.  That's not what it says

 3    in this memo.  So, what I'm asking you is based on

 4    what you say in this memo.

 5              So, is what you say in this memo is that

 6    an order flagged by your algorithm, that order is

 7    suspicious, that's what it says in this memo,

 8    correct, sir?

 9         MS. SWIFT:  Object to the form.

10    BY MR. MOUGEY:

11         Q.    That's the language you used here,

12    right?

13         MS. SWIFT:  Objection.

14    BY THE WITNESS:

15         A.    That's the language.

16    BY MR. MOUGEY:

17         Q.    Yes, sir.  Now, the language in your

18    memo in June of 2008, based on input from this

19    committee, is once that order is flagged as

20    suspicious, that there had to be analysis on that

21    order before it was shipped.  That's what you say

22    in your memo, right?

23         A.    That was --

24         MS. SWIFT:  Object to the form.

1    BY THE WITNESS:

2        A.    That was the proposal.

3    BY MR. MOUGEY:

4        Q.    Yes, sir.  And that's what you say in

5    your memo, correct, sir?

6        MS. SWIFT:  Object to the form.

7    BY THE WITNESS:

8        A.    That's what I propose in the memo, yes.

9    BY MR. MOUGEY:

10       Q.    Yes, sir.  I want to make sure we have a

11   clear record.

12            The language in your memo is that once

13   an order is flagged as suspicious, there had to be

14   analysis on that order before it shipped.  That's

15   the language in the memo, correct, sir?

16       A.    That's --

17       MS. SWIFT:  Object to the form;

18   mischaracterizes the document.

19   BY THE WITNESS:

20       A.    That's what I was proposing in the

21   document.

22   BY MR. MOUGEY:

23       Q.    Yes, sir.  When you say that's what you

24   were proposing in the document, the language in the

 1    document, based on your committee meetings, was

 2    once an order is flagged by the algorithm, it's

 3    considered suspicious and analysis had to be

 4    performed before it was shipped, correct, sir?

 5         A.    That was my --

 6         MS. SWIFT:  Objection; asked and answered

 7    several times.

 8    BY THE WITNESS:

 9         A.    That was my proposal to the committee.

10    BY MR. MOUGEY:

11         Q.    So, the answer is yes, that's what's in

12    the memorandum, correct?

13         MS. SWIFT:  Same objection.

14    BY MR. MOUGEY:

15         Q.    Just a yes or no would be -- would be

16    plenty sufficient.

17         MS. SWIFT:  Same objection.

18    BY THE WITNESS:

19         A.    I --

20    BY MR. MOUGEY:

21         Q.    I know it's hard to answer and you keep

22    looking at Ms. Swift, and I know just try to tune

23    it out and --

24         A.    No, I just wanted -- I didn't want to

Highly Confidential - Subject to Further Confidentiality Review

1    interrupt her.

2         MS. SWIFT:  Object to the argument.

3    BY MR. MOUGEY:

4         Q.    I'm sorry.  I couldn't hear what you

5    said over Ms. Swift.

6         A.    I wanted to wait until she was finished.

7    That's why I was looking at her.

8         Q.    We're both trying to.  It's hard.

9               So --

10        MS. SWIFT:  Object to the argument.  Is there

11   a question?

12   BY THE WITNESS:

13        A.    I don't know the question.

14        MS. SWIFT:  Is there a question?

15   BY THE WITNESS:

16        A.    The question is lost.  You have to

17   repeat it.

18   BY MR. MOUGEY:

19        Q.    It's hard when you're trying to get the

20   back-and-forth.  So, let's do it again.  Okay?

21              Your memo explains to this committee

22   that when an order is flagged, it's considered

23   suspicious?  Yes or no.

24        MS. SWIFT:  Objection; asked and answered a

1    dozen times.  Mischaracterizes the document.

2    BY THE WITNESS:

3        A.    I -- the -- what I was proposing to the

4    committee was of what method for identifying a

5    potentially suspicious orders, and I was suggesting

6    that we do, we -- an analysis or report on that

7    item, that order, be put together for further

8    investigation.

9    BY MR. MOUGEY:

10       Q.    And I appreciate that explanation.  I

11   think my question is capable of just a clear yes or

12   no answer.  And so what I would appreciate is if

13   you would give me a yes or a no and if you want to

14   explain, explain, but I would like a yes or no.

15            Sir, your memorandum explains to this

16   committee that an order that's flagged by your

17   algorithm was considered suspicious?  Yes or no.

18       A.    I --

19       MS. SWIFT:  Objection.  If it's not a yes or

20   no answer, you can answer it the way it requires to

21   be answered.  It's been asked more than a dozen

22   times.  You can answer again.

23   BY THE WITNESS:

24       A.    I -- I would say you're

1    mischaracterizing the statement, and the answer --

2    BY MR. MOUGEY:

3         Q.    Sounds like what Ms. Swift just said.

4         A.    And the answer is no.

5         Q.    Well, let's go through the exact

6    language again.  Okay?

7         A.    Okay.

8         Q.    Second sentence, the sentence that

9    begins with "If," the second sentence.

10             Do you see that?

11        A.    Second paragraph?

12        Q.    Yes, sir.

13        A.    It begins with "To."  What document?

14        Q.    Let's focus on the whole second

15   paragraph.  You ready?  To make it easy.  Begins

16   with "To."  You ready?

17        A.    Okay.  Oh, okay.

18        Q.    "To monitor the orders size."  Do you

19   see that?

20        A.    Yes.

21        Q.    "To monitor the orders size, tolerance

22   limits will be established for each store/item

23   combination."

24             Do you see that, sir?

1       A.      That's correct.

2       Q.      So, the tolerance limits were part of

3    the algorithm, correct?

4       A.      Yes.

5       Q.      And if an order is placed on the DC, and

6    that's distribution center, right?

7       A.      Yes.

8       Q.      That exceeds its tolerance limit, the

9    order is flagged as suspicious, correct?  That's

10   what you told this committee in 2008, correct?

11      A.      That's what the words say.

12      Q.      Yes, sir.  That's what the words say.

13             Now, if you would go down to the fourth

14   paragraph, second sentence of the fourth paragraph

15   that begins with "If."

16             "If the order is identified as

17   suspicious, a detailed report should be created to

18   aid the analysis that has to make a quick decision

19   to allow or stop the order."

20             Correct, sir?

21      A.      That would be because there is two types

22   of errors you can make in identifying an item as

23   suspicious.  You can identify an item as suspicious

24   that's not or you can -- or you could, you know, or

Highly Confidential - Subject to Further Confidentiality Review

1    it could be true.

2            So, there is more than one error when

3    you identify, you draw a line, you have the

4    tolerance limit, if you could be on one side of the

5    limit and you could be suspicious and you could be

6    on the other side of the limit and not be

7    suspicious or vice versa.

8        Q.    None of the explanation you gave is in

9    that -- in that paragraph discussing that an

10   analysis has to be done on a suspicious order

11   before it's shipped, correct?

12       A.    Could you repeat that.

13       Q.    Step 1, flagged on your algorithm,

14   suspicious, right?

15       MS. SWIFT:  Object to the form.

16   BY THE WITNESS:

17       A.    Suspicious as I was defining at the

18   time, yes.

19   BY MR. MOUGEY:

20       Q.    Yes, sir.  Step 2, analysis has to be

21   made before it's shipped.  Plain language of the

22   document.  That's what you're referring to in

23   June of 2008, correct?

24       A.    That's what I --

 1          MS. SWIFT:  Object to the form.

 2     BY THE WITNESS:

 3          A.    That's what I proposed.

 4     BY MR. MOUGEY:

 5          Q.    Yes, sir.

 6          MS. SWIFT:  I'm just going to note it's 10:10.

 7     Do you need to stop for a break?

 8          THE WITNESS:  Yeah, I probably should.

 9          MS. SWIFT:  He's got medication he needs to

10     take.

11               Can we go off the record, please.

12          THE VIDEOGRAPHER:  We are off the record at

13     10:12 a.m.

14                    (WHEREUPON, a recess was had

15                     from 10:12 to 10:26 a.m.)

16          THE VIDEOGRAPHER:  We are back on the record

17     at 10:26 a.m.

18     BY MR. MOUGEY:

19          Q.    Mr. Bancroft, was the algorithm that you

20     and Ms. Morris were working on, that was ultimately

21     a finished product, correct, sir?

22          MS. SWIFT:  Object to the form.

23     BY THE WITNESS:

24          A.    The -- it was implemented, yes.

1    BY MR. MOUGEY:

2        Q.    Yes, sir.  And do you have a

3    recollection of when it was implemented?

4        A.    No.

5        Q.    Generally do you have an understanding

6    of when the proof of concept was implemented?

7        MS. SWIFT:  Object to the form.

8    BY THE WITNESS:

9        A.    This was -- the proposal -- this was a

10   proposal.  I don't know what you mean by proof of

11   concept.

12   BY MR. MOUGEY:

13       Q.    When was the algorithm you and

14   Ms. Morris worked on with the committee implemented

15   in any shape, form or fashion?

16       A.    I don't know.  I don't know how long it

17   took to program.  I don't know.

18       Q.    I'm sorry, sir?

19       A.    I don't know is my answer.

20       Q.    And you said you don't know how long it

21   took to program?

22       A.    It had to have been programmed.

23       Q.    And, sir, you have an understanding that

24   the algorithm you used was implemented to detect or

1    flag orders, right?

2         MS. SWIFT:  Objection to form.

3    BY THE WITNESS:

4         A.    It was used to identify orders.

5    BY MR. MOUGEY:

6         Q.    Yes, sir.  And the mechanism for

7    identifying orders, you understand that there was a

8    report generated?

9         MS. SWIFT:  Objection to form.

10   BY THE WITNESS:

11        A.    I did not get involved with the report

12   generated.

13   BY MR. MOUGEY:

14        Q.    Did you understand that there was -- how

15   did you think that the orders were identified that

16   were flagged as a result of your algorithm?

17        MS. SWIFT:  Object to the form.

18   BY THE WITNESS:

19        A.    That -- that was done by other people.

20   I don't have knowledge.

21   BY MR. MOUGEY:

22        Q.    You don't -- I'm not asking who it was

23   done by.  I'm saying how were the orders

24   identified.  You have no idea?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      Well, they were identified by the

2  tolerance and the frequency.

3       Q.      And then those orders would be

4  communicated to other people at Walgreens.  Is that

5  fair?

6       A.      I believe that's correct.

7       Q.      Okay.  And are you aware -- well, let me

8  just hand you -- do you believe that the language

9  we just went through in Bancroft 2, meaning if an

10  order exceeds the tolerance limit, that order is

11  flagged as suspicious, was your language in the

12  June '08 proposal corrected or fixed shortly after

13  this memo?

14       A.      I don't have any knowledge.  What -- I

15  think everybody understood what the spirit of

16  the -- the language was.

17       Q.      Everybody understood that suspicious

18  really didn't mean suspicious?

19       A.      The -- the system was designed to

20  prevent orders that might be suspicious from even

21  being placed on the DC.

22       Q.      But you don't see that language anywhere

23  in your June of '08 memorandum, correct?

24       A.      No, we already came to that.

 1      Q.    Well, let me hand you what I will mark

 2   as Bancroft 3.

 3                (WHEREUPON, a certain document was

 4                 marked as Walgreens-Bancroft

 5                 Exhibit No. 3:  Document, 8/5/09,

 6                 Order Item Detail; WAGMDL00674553.)

 7   BY MR. MOUGEY:

 8      Q.    I want you, sir, to look at the bottom

 9   of this document.  On the left-hand side it says

10   "Suspicious Reason Code:"  Do you see that?

11      A.    I see it.

12      Q.    And it says, "T - Exceeds Tolerance

13   Limits."  Correct, sir?

14      A.    That's what it says.

15      Q.    And the date of this document in the

16   upper right-hand corner is August 25, 2009,

17   correct, sir?

18      A.    That's what it says.

19      Q.    And, sir, have you seen a document

20   similar to this before?

21      A.    No.

22      Q.    And, sir, do you have an understanding

23   of whether or not this document is -- was generated

24   as a result of an order being flagged by your

Highly Confidential - Subject to Further Confidentiality Review

1    algorithm?

2        A.    I would only be speculating.

3        Q.    Do you know of any other parallel system

4    being run at Walgreens detecting orders flagged for

5    tolerance limits?

6        A.    No, I would suspect that this is based

7    on my algorithm, but I'm not familiar with the

8    screen.

9        Q.    Because that's what your algorithm, one

10   of the thresholds was the exceeding the tolerance

11   limit, correct?

12       A.    Yes.

13       Q.    That's language out of your model,

14   correct?

15       A.    I would think that's correct.

16       Q.    Yes, sir.  And you see here in the

17   bottom left-hand side of Bancroft 3 as of August 25

18   of 2009 that Walgreens considers this order flagged

19   by the -- by your algorithm as suspicious, correct?

20       A.    I --

21       MS. SWIFT:  Object to the form.

22   BY THE WITNESS:

23       A.    I just can go by what it says on the

24   memo.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. MOUGEY:

 2       Q.    Yes, sir.

 3       A.    Or on the screen.

 4       Q.    Yes, sir.  And it uses the word

 5   "suspicious" in the bottom left-hand corner,

 6   correct?

 7       A.    Yes, it does.

 8       Q.    And the upper right-hand corner also

 9   uses the language "Suspicious Order," correct?

10       A.    Yes.

11       Q.    So, this is approximately 14 months

12   after your proposal to the committee for the

13   algorithm, correct?

14       A.    That seems right, yes.

15       Q.    And based on your recollection, sir, was

16   your model implemented within a year after the

17   June of '08 proposal?

18       MS. SWIFT:  Objection; foundation.

19   BY THE WITNESS:

20       A.    That would -- I don't know exactly when

21   it was implemented.

22   BY MR. MOUGEY:

23       Q.    I didn't ask you exactly on June 23 of

24   2009.  What I said, within a year, is it your
```

1    understanding that your model was -- your algorithm

2    was implemented at Walgreens?

3         A.    I --

4         MS. SWIFT:  Objection; foundation.

5    BY THE WITNESS:

6         A.    I was tasked with coming up with the

7    algorithm.  I wasn't tasked with delivering it.

8    BY MR. MOUGEY:

9         Q.    And I understand that, and I didn't ask

10   you if you were tasked with implementing.  I didn't

11   ask if you were tasked with programming.  I didn't

12   ask if you were responsible for doing any of the

13   analysis on the due diligence.

14         What I simply asked is:  Do you have an

15   understanding of generally, within the year, was

16   your algorithm to detect suspicious orders as you

17   elaborated in June of '08 implemented at Walgreens?

18        MS. SWIFT:  Objection; foundation, asked and

19   answered.

20   BY THE WITNESS:

21        A.    I would say that yes.

22   BY MR. MOUGEY:

23        Q.    Okay.  I hand you what I have marked as

24   Bancroft 4, sir.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (WHEREUPON, a certain document was

 2                     marked as Walgreens-Bancroft

 3                     Exhibit No. 4:  Document, 9/23/09

 4                     Threshold Violations-Monthly;

 5                     WAGMDL00674619.)

 6   BY MR. MOUGEY:

 7        Q.    The very top of this document,

 8   "Threshold Violation-Monthly."

 9              Do you see that, sir?

10        A.    Yes.

11        Q.    That's language from your algorithm,

12   correct, sir?

13        A.    "Threshold Violation-Monthly"?

14   Threshold was -- sounds like it came from my...

15        Q.    Yes, sir.  And if you look in the middle

16   of this page, you see the OxyContin identified in

17   three separate orders.  Do you see that, sir?

18        A.    Yes, I do.

19        Q.    And you see in the -- after the

20   OxyContin, with the tab and the strength, you see

21   "PUR," correct, sir?

22        A.    Yes.

23        Q.    And do you have an understanding that

24   would be Purdue?
```

 1         A.     I'm not familiar with that.

 2         Q.     Upper right-hand corner, sir, with this

 3    list of orders, you see the title "Suspicious

 4    Order" as of September 23, 2009, correct, sir?

 5         A.     That's correct.

 6         Q.     I hand you what I will mark as Bancroft

 7    5.

 8                      (WHEREUPON, a certain document was

 9                       marked as Walgreens-Bancroft

10                       Exhibit No. 5:  Document, 9/23/09,

11                       Threshold Violations-Monthly;

12                       WAGMDL00674620.)

13    BY MR. MOUGEY:

14         Q.     This is another example of OxyContin,

15    amongst other controlled substances, being

16    identified in a report titled "Suspicious Order,"

17    correct, sir?

18         MS. SWIFT:  Object to the form.

19    BY THE WITNESS:

20         A.     This is a report that I haven't created,

21    but that's what it looks like.

22    BY MR. MOUGEY:

23         Q.     Hand you what we're going to mark as

24    Bancroft 6.

1                    (WHEREUPON, a certain document was

2                     marked as Walgreens-Bancroft

3                     Exhibit No. 6:  Various Documents,

4                     first document, 2/17/10, Threshold

5                     Violations-Weekly; WAGMDL00674576 -

6                     00674594.)

7    BY MR. MOUGEY:

8         Q.    Do you see the upper right-hand side,

9    the date is February 17, 2010?

10        A.    Yes.

11        Q.    So, your memo was June of 2008, correct,

12   sir?

13        A.    Yes.

14        Q.    And you'll see again that the

15   "suspicious order" was still being used on internal

16   reports at Walgreens, correct?

17        A.    That's what it looks like.

18        Q.    And you see below, sir, you understand

19   that the first entry on this list, hydrocodone, is

20   a controlled substance, an opiate, correct, sir?

21        A.    Yes, I think that's correct.

22        Q.    And you'll see here a list of controlled

23   substances that were being monitored from your

24   algorithm, correct, sir?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MS. SWIFT:  Object to the form, foundation.

 2   BY THE WITNESS:

 3        A.    I would assume so.

 4   BY MR. MOUGEY:

 5        Q.    And February 17, 2010, orders that were

 6   flagged by your system appeared to still be

 7   referred to as suspicious, correct, sir?

 8        MS. SWIFT:  Object to the form, foundation.

 9   BY THE WITNESS:

10        A.    I -- I didn't write this.  So, I don't

11   know.

12   BY MR. MOUGEY:

13        Q.    I hand you what I'm going to mark as

14   Bancroft 7.

15               (WHEREUPON, a certain document was

16                marked as Walgreens-Bancroft

17                Exhibit No. 7:  Various document,

18                first page, 8/18/10 Order Item

19                Detail; WAGMDL00674562 - 00574575.)

20   BY MR. MOUGEY:

21        Q.    Upper right-hand corner, the date is

22   8/18/10.  Do you see that, sir?

23        A.    Yes, I do.

24        Q.    And do you see in the middle of the
```

1    page, hydromorphone.

2            Do you see that?

3        A.    Yes.

4        Q.    And, sir, you have an understanding that

5    hydromorphone is also an opiate controlled

6    substance, correct?

7        MS. SWIFT:  Objection.

8    BY THE WITNESS:

9        A.    I never heard of that specific drug, but

10   it sounds like it is.

11   BY MR. MOUGEY:

12       Q.    And you see in the upper right-hand

13   corner that this order is identified as suspicious,

14   correct?

15       A.    Yes.  No, no, I wouldn't say.  It says

16   "Suspicious Orders," yes, that's what it says.

17       Q.    So, sir, this is almost two years after

18   your memo that internal documents at Walgreens are

19   referring to orders flagged by the model as

20   suspicious, correct, sir?

21       MS. SWIFT:  Objection; foundation.

22   BY THE WITNESS:

23       A.    That's what it says on the report.

24   BY MR. MOUGEY:

1    Q.    Sir, based on the work you did on the

2  committee, you understand that suspicious orders

3  are required to be reported to the DEA, correct?

4    MS. SWIFT:  Objection; calls for a legal

5  conclusion, foundation.

6  BY THE WITNESS:

7    A.    I don't know that these were ever orders

8  that got through.  I wouldn't know that.

9  BY MR. MOUGEY:

10    Q.    I didn't ask you if those were orders.

11  I'm not asking about any specific orders.  What I'm

12  asking you, sir, is you understand what an order

13  is, right?

14    A.    Yes.

15    Q.    A pharmacist places an order to the

16  system at Walgreens, correct?

17    A.    The pharmacist, the system -- there is a

18  lot of ways orders are created.  Pharmacists

19  placing an order is one avenue.  The system could

20  place an order.

21    Q.    And when you say "The system could place

22  an order," it could be a standing order, correct?

23    MS. SWIFT:  Object to the form.

24  BY THE WITNESS:

1        A.      Define standing, please.

2   BY MR. MOUGEY:

3        Q.      An order comes in from the pharmacy to

4   the Walgreens system, correct?

5        A.      The pharmacy is part of the Walgreens

6   system.

7        Q.      Yes, sir.  But they're two separate

8   stand-alone operations typically, correct,

9   buildings, brick and mortar, two separate places,

10  right?

11       A.      Yes.

12       Q.      This is simple.  All right?

13       A.      Yes.

14       Q.      All I'm asking --

15       A.      Yes.

16       Q.      -- sir, is --

17       A.      Yes.

18       Q.      There are orders that come in to keep

19  pharmaceuticals in the pharmacies, correct?

20       A.      We want to keep our -- the business

21  going, yes.

22       Q.      Yes, sir.  And you understand that

23  opiates, under the Controlled Substance Act, if the

24  orders are suspicious, those should be reported to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the DEA, correct?

 2        MS. SWIFT:  Objection; foundation, calls for a

 3    legal conclusion.

 4    BY THE WITNESS:

 5        A.    I'm not a lawyer.  So -- so, I don't

 6    know if I can answer that.

 7    BY MR. MOUGEY:

 8        Q.    But you were on the committee, right?

 9    You were on the committee for months and months and

10    months, correct?

11        A.    That's correct.

12        Q.    And you have to have an understanding in

13    order to generate the algorithm of what your goals

14    were, correct?

15        A.    That's --

16        MS. SWIFT:  Object to the form.

17    BY THE WITNESS:

18        A.    Yes.

19    BY MR. MOUGEY:

20        Q.    And you understand when I say what your

21    charge was on that committee, right?

22        A.    Yes.

23        Q.    And you have to gather information to

24    implement the charge on that committee, right?
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.    I would say that's correct.

2        Q.    And you have to have an understanding

3   generally about what the information surrounding

4   your charge is, correct?

5        MS. SWIFT:  Object to the form.

6   BY THE WITNESS:

7        A.    I'd say that's correct.

8   BY MR. MOUGEY:

9        Q.    And, sir, you understood as part of your

10  information-gathering process that one of the goals

11  of your algorithm was to prevent suspicious orders,

12  correct?

13       MS. SWIFT:  Object to the form.

14  BY THE WITNESS:

15       A.    Yes.

16  BY MR. MOUGEY:

17       Q.    And it was -- one of the goals was to

18  detect suspicious orders, correct?

19       MS. SWIFT:  Object to the form.

20  BY THE WITNESS:

21       A.    Define order.  I mean, is an order if it

22  gets placed?  If it doesn't get placed, is it an

23  order?

24  BY MR. MOUGEY:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    There are orders that are suspicious

2  that need to be sent to the DEA, correct, sir?

3    MS. SWIFT:  Object to the form, calls for a

4  legal conclusion, foundation.

5  BY THE WITNESS:

6    A.    Define what you're referring to as an

7  order.  I don't know how to answer that question.

8  BY MR. MOUGEY:

9    Q.    Do you have any general understanding

10  that an order flagged as suspicious needs to be

11  reported to the DEA?

12    MS. SWIFT:  Objection; foundation, calls for a

13  legal conclusion.

14  BY THE WITNESS:

15    A.    I -- I would be assuming.  But I --

16  BY MR. MOUGEY:

17    Q.    I don't want you to assume.

18        You sat on a committee, sir, for years

19  that worked on designing a system to identify

20  suspicious orders.  As part of your committee work,

21  do you have an understanding that an order flagged

22  as suspicious needs to be reported to the DEA?

23    A.    I never --

24    MS. SWIFT:  Object to the form of the

1    question, calls for a legal conclusion, foundation.

2    BY THE WITNESS:

3         A.    I never worked on the legal aspects of

4    it.  So, I can't say for certainty.

5    BY MR. MOUGEY:

6         Q.    I didn't ask you whether you were a

7    lawyer.  You've given me, "I'm not a lawyer.  I

8    didn't work on the legal aspects."

9              I'm asking Mr. Wayne Bancroft, Ph.D.,

10   eight years of graduate work, undergrad in

11   chemistry, charged with designing a system to

12   detect suspicious orders.

13             As part of that committee do you have an

14   understanding that orders flagged as suspicious

15   need to be reported to the DEA?

16        MS. SWIFT:  Object to the form of the

17   question, foundation, calls for a legal conclusion.

18   BY THE WITNESS:

19        A.    I would say no.  From a legal aspect, I

20   can't give you a yes answer.

21   BY MR. MOUGEY:

22        Q.    I'm not asking for a legal aspect.

23        A.    Then the --

24        Q.    I understand that's what your lawyer --

1      A.      Then the answer is no, then.

2      Q.      I've asked -- I'm asking from what your

3   understanding was, not as a lawyer, not as a legal

4   aspect, not if you were asked to work on the legal

5   side of it.  I haven't asked you anything.

6           I'm asking Mr. Wayne Bancroft, eight

7   years of graduate work, four years of undergrad,

8   charged with designing an algorithm.

9           Did you have an understanding that

10   orders identified as suspicious needed to be

11   reported to the DEA?

12      MS. SWIFT:  Object to the form of the

13   question, calls for a legal conclusion, foundation,

14   asked and answered.  And I will also object to the

15   abusive nature of the questioning.

16   BY THE WITNESS:

17      A.      The -- we had groups that were in charge

18   of monitoring and we formed an integrity group.

19   Those were -- those were the people that you should

20   ask that question to.  That was not my charter.

21   BY MR. MOUGEY:

22      Q.      I appreciate.  But today you're sitting

23   in the chair and I get to ask you questions and I'm

24   asking what your understanding was sitting on that

Highly Confidential - Subject to Further Confidentiality Review

```
 1    committee.  Okay.

 2              And you generated a memo in June of 2008

 3    addressed to several important folks at Walgreens,

 4    correct, sir?

 5         MS. SWIFT:  Object to the form of the

 6    question.

 7    BY THE WITNESS:

 8         A.    Yes.

 9    BY MR. MOUGEY:

10         Q.    And when you drafted that memo, did you

11    have an understanding that orders identified as

12    suspicious for controlled substances had to be

13    reported to the DEA?

14         MS. SWIFT:  Object to the form of the

15    question, foundation, calls for a legal conclusion,

16    asked and answered, and I'll object to the abusive

17    nature of the questioning.

18    BY THE WITNESS:

19         A.    My answers from previous stand.

20    BY MR. MOUGEY:

21         Q.    I'm sorry.  I get to get an answer to my

22    question.  I'd like an answer to my question.

23         MR. MOUGEY:  You have a standing objection on

24    this line of questions for the 18 different
```

1    objections you had.

2    BY MR. MOUGEY:

3        Q.    What I'm asking you, sir, not as a

4    lawyer, not did you implement from the legal

5    component.

6            Sitting on this committee, when you

7    drafted this memorandum, did you have an

8    understanding that orders identified as suspicious

9    had to be reported to the DEA?

10       MS. SWIFT:  Object to the form of the

11   question, calls for a legal --

12       MR. MOUGEY:  I already agreed you have a

13   standing.

14       MS. SWIFT:  Calls for -- I didn't agree to

15   that, Peter.

16   BY MR. MOUGEY:

17       Q.    Answer my question, sir.

18       MS. SWIFT:  It calls for a legal conclusion.

19   He lacks foundation.  You've asked it multiple

20   times and the questioning has become abusive.

21   BY MR. MOUGEY:

22       Q.    Please answer my question.

23       A.    When my -- what my understanding was in

24   2008 I don't recall.

1        Q.    I hand you what I've marked as Bancroft

2   8.

3               (WHEREUPON, a certain document was

4                marked as Walgreens-Bancroft

5                Exhibit No. 8:  3/27/09 e-mail

6                string with attachments;

7                WAGMDL00325368 - 00325378.)

8   BY MR. MOUGEY:

9        Q.    March 27, 2009.  Do you see that, sir?

10       A.    Yes.

11       Q.    And do you see your name as a copy on

12  this e-mail, sir?

13       A.    Yes, I do.

14       Q.    And you see under the subject line,

15  "Revised Suspicious Order Document," correct?

16       A.    Yes.  That's correct.

17       Q.    If you'd turn to the second page, and

18  just flip through the next few pages.

19             Do you have an understanding of who

20  drafted this document?

21       A.    Tracy Morris.

22       Q.    And that was your kind of equal on that

23  committee charged with designing an algorithm to

24  identify suspicious orders, right?

Highly Confidential - Subject to Further Confidentiality Review

```
1        MS. SWIFT:  Object to the form.

2   BY THE WITNESS:

3        A.    She was my equal on the committee, yes.

4   BY MR. MOUGEY:

5        Q.    And, sir, if you would -- now, did you

6   read -- do you recall reading this memo before it

7   went out?

8        A.    I -- I've seen this memorandum, yes.

9        Q.    Okay.  But that was a little different

10  than what I asked.  What I asked was have you -- do

11  you recall seeing it before it went out?

12       A.    What I recall on this -- this -- in

13  committee, there was different scenarios that

14  were -- were different conditions and the group got

15  together and decided what should be considered to

16  be flagged and what shouldn't be flagged.

17       Q.    Okay.

18       A.    And it was done in committee.

19       Q.    What I asked you was a little different.

20  What I asked you was do you recall reviewing this

21  memo before it was sent out?

22       A.    I remember -- I recall going through

23  these spreadsheets.

24       Q.    Do you recall you and Ms. Morris working
```

1  on this memorandum together before it was sent to

2  your peers on the committee?

3       A.    I know this is something that Tracy

4  worked on and I probably looked at it.

5       Q.    Does Tracy have similar academic

6  background that you have?

7       A.    I don't know Tracy's credentials.

8       Q.    And from your experience working with

9  Tracy, Ms. Morris, is she pretty sharp?

10       A.    She was very sharp.

11       Q.    Do you trust her analysis and her work?

12       A.    I -- yes, she was good.

13       Q.    She does a good job?

14       A.    She does a good job, yes.

15       Q.    Did she have a firm command of what the

16  charge was at Walgreens to design an algorithm to

17  detect suspicious orders?

18       A.    You'd have to --

19       MS. SWIFT:  Object to the form.

20  BY THE WITNESS:

21       A.    You'd have to ask Tracy.

22  BY MR. MOUGEY:

23       Q.    I'm asking you from your perception of

24  dealing with her on this committee for now,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    March 27, 2009, for a little over a year, did

 2    Ms. Morris have a firm command on the charge of the

 3    committee to design an algorithm to detect

 4    suspicious orders?

 5        MS. SWIFT:  Object to the form.

 6    BY THE WITNESS:

 7        A.    You'd have to ask Tracy.  That specific

 8    knowledge, I don't know specific.

 9    BY MR. MOUGEY:

10        Q.    I'm asking you your understanding.

11    Okay.  Do you see I'm not saying did she?  I'm

12    saying:  Is your perception that Ms. Morris had a

13    firm command on the material needed to develop an

14    algorithm to detect suspicious orders?

15        MS. SWIFT:  Object to the form of the

16    question, foundation.

17    BY THE WITNESS:

18        A.    I know she had a firm command of what

19    was in this document and she went over it very

20    thoroughly.

21    BY MR. MOUGEY:

22        Q.    Because you interacted with Ms. Morris

23    on a regular basis during this time period

24    developing the algorithm, correct, sir?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.     During what time period?

 2         Q.     From the time when you started, 2009, to

 3    the time -- I'm sorry -- 2008, to the time of this

 4    document, March 27, 2009.

 5         A.     In between there, we did other things.

 6    So, yes.  But, yes, I -- we worked together.

 7         Q.     Yes.  If you'd flip to the second page,

 8    Bates numbered 69, "Compliance Status of Controlled

 9    Substances by Order Size."

10            Do you see that, sir?

11         A.     Let me see.  Where is that on the

12    screen?

13         Q.     Very top of the page.

14         A.     Oh, the page 1.  It's marked page 1 on

15    the bottom.

16         Q.     Yes, sir.  Page 1 on the bottom.

17         A.     Yes.

18         Q.     Do you see the section titled

19    "Compliance Status of Controlled Substances by

20    Order Size," correct?

21         A.     Yes.

22         Q.     "Orders of controlled substances will be

23    monitored and evaluated based on its order size

24    when compared to upper tolerance limits established
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    for each item."

 2              Correct, sir?

 3        A.    That's what it says.

 4        Q.    And that's the algorithm that you and

 5    Ms. Morris were working on, correct?

 6        A.    Yes.

 7        Q.    Now, let's go to the second paragraph.

 8              "Orders that are flagged as suspicious

 9    will be intercepted and the order quantity will be

10    reduced to a level which is not considered to be an

11    outlier when compared to other orders within its

12    history."

13              Do you see that, sir?

14        A.    Yes.

15        Q.    So, as of the date of this memo that

16    Ms. Morris drafted, she too thought that orders

17    flagged by the system were suspicious, correct?

18        MS. SWIFT:  Objection; foundation.

19    BY THE WITNESS:

20        A.    If you read this, the sentence, it

21    refers to an order before it is an order.  The

22    order was intercepted and not gone out.  So, I

23    don't think it's -- "order" is not a correct term

24    maybe either.  Potential order.
```

```
 1   BY MR. MOUGEY:

 2        Q.   So now we've got Ms. Morris doesn't

 3   understand what order is.  Is that accurate?

 4        A.   No.

 5        MS. SWIFT:  Object to the form.

 6   BY MR. MOUGEY:

 7        Q.   And she's -- and the word "suspicious"

 8   doesn't really mean suspicious, is that accurate?

 9        MS. SWIFT:  Object to the form.

10   BY THE WITNESS:

11        A.   I -- the term "order" in this document

12   meant potential order and suspicious meant

13   something, an item of interest.

14   BY MR. MOUGEY:

15        Q.   So, let me make sure I understand.

16             The word -- the sentence "Orders that

17   are flagged as suspicious will be intercepted and

18   the order quantity will be reduced which is not

19   considered to be an outlier when compared to other

20   orders within its history."

21             Did I read that right?

22        A.   You read it right, yes.

23        Q.   So the first word, "Orders that are

24   flagged as suspicious," is it your testimony to
```

1    this jury that that really doesn't mean order?

2         A.    It means --

3         MS. SWIFT:  Object to the form.

4    BY THE WITNESS:

5         A.    It means it was -- it was a potential

6    order.  We had -- we intercepted it.  Apparently we

7    intercepted the order and changed it.

8    BY MR. MOUGEY:

9         Q.    So, "order" means -- doesn't really mean

10   order.  It means potential order is what your

11   testimony is?

12        A.    In this -- in this example, yes.

13        Q.    And "suspicious" doesn't really mean

14   suspicious.  It means orders of interest?

15        A.    Yes.

16        Q.    So, Ms. Morris also, similar to you,

17   didn't understand the word "suspicious"; that it

18   really meant orders of interest, correct?

19        MS. SWIFT:  Objection; foundation.

20   BY THE WITNESS:

21        A.    That's -- that's how we used the term.

22   BY MR. MOUGEY:

23        Q.    So, both of you had similar confusions,

24   correct?

1     MS. SWIFT:  Object to the form of the

2  question.

3  BY THE WITNESS:

4     A.    I -- that's -- I didn't know the legal

5  definition of suspicious.  This is how I used

6  suspicious.  It was order -- it was order of

7  interest.

8  BY MR. MOUGEY:

9     Q.    Now, this memo has now -- March 27,

10  2009.  You're the math guy.  That's approximately

11  nine months after your initial memo with

12  Ms. Morris, correct?

13     A.    Yeah, I'm the math guy.

14     Q.    Yes.  But your -- this memo, March 27 of

15  2009, is approximately nine months after your

16  initial memo that we looked at from June of '08,

17  right?

18     A.    Yes, you're correct.

19     Q.    Okay.  And no one on the committee had

20  corrected you or Ms. Morris that an order that was

21  flagged by the system was really not a suspicious

22  order, right?

23     MS. SWIFT:  Object to the form.

24  BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

1    A.    They -- I would say that's -- I don't

2    remember being corrected.

3    BY MR. MOUGEY:

4    Q.    Sure.  Because if you had been

5    corrected, you or Ms. Morris, by some of the pretty

6    sharp people on this, that received this, you would

7    have incorporated that into your work, right?  You

8    wouldn't have kept writing the same thing over and

9    over again that was wrong?

10   A.    I would have added a word or two, yes.

11   Q.    Yes.  So, if "suspicious" really didn't

12   mean suspicious and someone had corrected you, your

13   work would have reflected that, correct?

14   A.    Yes.  In a statistical model, there's

15   always -- there's no absolute.

16   Q.    We're not talking about a statistical

17   model right now.  All I'm talking about is the

18   plain language that "Orders that are flagged

19   suspicious will be intercepted," right?

20         That's just -- that just phrase right

21   there.

22         If someone had told you that "order"

23   really meant potential order and "suspicious"

24   really didn't mean suspicious, you would have

1    incorporated that corrected language into your

2    memo, correct, sir?

3         A.    I would think so.

4         Q.    Yes, sir.  You wouldn't keep writing the

5    same thing with a mistake in it, correct?

6         A.    I like to say I correct my mistakes.

7         Q.    And you don't have any independent

8    recollection of anybody within Walgreens coming and

9    telling you that these memos are incorrect.

10   "Order" really doesn't mean order.  It means

11   potential order.  Right?

12        A.    I don't remember.

13        Q.    Sir, let me hand you what I'm going to

14   mark as Bancroft 9.

15              (WHEREUPON, a certain document was

16               marked as Walgreens-Bancroft

17               Exhibit No. 9:  Document,

18               "Controlled Substance Threshold";

19               WAGMDL00491896 - 00491912.)

20   BY MR. MOUGEY:

21        Q.    Sir, if you would just flip through this

22   document.  This is a -- you recognize this format,

23   correct, sir?

24        A.    It's a requirements document.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Yes, sir.  And this type of document was

2   used to manage projects within Walgreens, correct?

3    A.    Yes.

4    Q.    And this kind of format was used

5   frequently, correct?

6    A.    Yes.

7    Q.    And it was a way of keeping track of --

8   keeping track of the project and communicating with

9   different individuals within Walgreens, right?

10    A.    Correct.

11    Q.    And if you see here on the "Store

12   Ordering Team" on the first page, right underneath

13   that is a date February 2009, correct?

14    A.    Correct.

15    Q.    So, this is a group identified in

16   Walgreens as the ordering team, Store Ordering

17   Team, correct?

18    A.    Yes.

19    Q.    And explain to the jury what -- what

20   Store Ordering Team is.

21    A.    Store Ordering Team is part of inventory

22   systems, which was Joe Tiemeyer's organization, and

23   they would be -- they wrote the code for

24   implementing store orders in general, front end,

1    back end, replenishment, forecasting and so on.

2        Q.    And if you look at the top of this

3    document, under "Walgreens," it's titled

4    "Controlled Substance Threshold," correct?

5        A.    Yes.

6        Q.    And, sir, if you would -- if you want to

7    refresh your memory by looking through this

8    document, this document is an overview of the

9    algorithm you and Ms. Morris worked on, correct?

10        A.    That's correct.

11        Q.    And  -- I apologize.  I lost my place

12    here, Mr. Bancroft.  If you would give me a minute.

13        A.    Take two.

14        Q.    Thank you.

15            Sir, let's turn to, if you would, it

16    says page 3 of 17.  It's Bates No. 98.  The top of

17    the document is "Systems Training & Consulting

18    Impact" and then it has "Overview" underneath of

19    that.  Are you on the same place I am?

20        A.    Yes.

21        Q.    All right.  And, sir, you recognize the

22    language in the first paragraph under "Overview."

23    That language was used in a number of different

24    memorandums within Walgreens to communicate what

Highly Confidential - Subject to Further Confidentiality Review

 1    the primary objective was of this project, correct?

 2        MS. SWIFT:  Object to the form, foundation.

 3    BY MR. MOUGEY:

 4        Q.    I'm sorry?

 5        A.    Give me time to read it.

 6        Q.    Certainly.

 7        A.    This paragraph?

 8        Q.    Yes, sir.

 9        A.    I may have seen it before.  I never --

10    if it was used over and over again, I don't know.

11        Q.    Okay.  The gentleman that prepared it is

12    on the first page, Rakesh?

13        A.    Rakesh.

14        Q.    I'm sorry?

15        A.    Rakesh.

16        Q.    Yeah.  Rakesh Khanna?

17        A.    Yes.

18        Q.    Did you have interactions with

19    Mr. Khanna about the algorithm?

20        A.    I had interactions with Rakesh, but I

21    don't recall if it was specifically regarding this

22    algorithm.

23        Q.    Okay.  The second paragraph identifies

24    "The purpose of this project is to create a process

Highly Confidential - Subject to Further Confidentiality Review

1    to systematically" -- I'm sorry -- "to systemic" --

2    no, I got it right the first time -- "to

3    systematically identify and prevent suspicious

4    orders based on a formula used to determine

5    inconsistent," just in case anyone was confused,

6    open and closed parens, "(suspicious) ordering

7    patterns for controlled drugs."

8            Do you see that?

9        A.   Yes.

10       Q.   And is it your understanding that the

11   Store Ordering Team also believed that orders

12   flagged by your algorithm were suspicious?

13       MS. SWIFT:  Objection; foundation.

14   BY THE WITNESS:

15       A.   The term "inconsistent" is -- was what

16   comes -- doesn't sound like that's a true

17   understanding.  Inconsistent means inconsistent.

18   Suspicious was the word I -- I was using.

19   BY MR. MOUGEY:

20       Q.   Yes, sir.

21       A.   Why one is in parentheses and the other

22   isn't, I don't know.  But I would say inconsistent.

23       Q.   So, the first sentence, end of the

24   second paragraph, "The purpose of this project is

Highly Confidential - Subject to Further Confidentiality Review

1   to create a process to systematically identify and

2   prevent suspicious orders based on a formula used

3   to determine inconsistent or suspicious ordering

4   patterns."

5         Do you agree with that sentence?

6     MS. SWIFT:  Object to the form.

7   BY THE WITNESS:

8     A.   There's no "or."  You said "or."  There

9   was no "or" in there.

10  BY MR. MOUGEY:

11     Q.   Let's do it again.  Thank you.

12        "The purpose of this project is to

13  create a process to systematically identify and

14  prevent suspicious orders based on a formula used

15  to determine inconsistent (suspicious) ordering

16  patterns for controlled drugs."

17        Do you agree with that sentence?

18    MS. SWIFT:  Object to the form.

19  BY THE WITNESS:

20    A.   I agree that's what it says.

21  BY MR. MOUGEY:

22    Q.   Do you agree that that is the purpose of

23  the project?

24    A.   The wording here is sort of convoluted.

1    So...

2              The purpose of the project was to -- to

3    control our stores from ordering suspicious on the

4    DC.  This is -- this says, this sort of explains

5    how based on a formula.

6         Q.   So, you do agree or you don't agree with

7    that sentence?

8         MS. SWIFT:  Object to the form.

9    BY MR. MOUGEY:

10        Q.   That it's accurate?

11        A.   I don't think I agree with the way you

12   characterize the sentence.

13        Q.   I'm simply asking you, sir, do you agree

14   that the purpose of the project as defined in that

15   first sentence on Bates No. 98 of the second

16   paragraph is accurate?

17        MS. SWIFT:  Object to the form.

18   BY THE WITNESS:

19        A.   It's more than just create a process.

20   The purpose of the process -- the project was

21   bigger than just create a process.  Than

22   identifying.  We did -- the system does more than

23   just identifying.

24   BY MR. MOUGEY:

1      Q.    Sir, let me hand you what I'll mark as

2  Bancroft 10.

3                 (WHEREUPON, a certain document was

4                  marked as Walgreens-Bancroft

5                  Exhibit No. 10:  Document, 10/1/09

6                  Project Request Estimate;

7                  WAGMDL00492070 - 00492072.)

8  BY MR. MOUGEY:

9      Q.    Sir, this is dated -- Bancroft 10 is

10  dated 10/1 of 2009.

11            Do you see that, sir?

12      A.    Yes.

13      Q.    And under "Project Name:  DEA Suspicious

14  Order Part II - Phase II"?

15      A.    Yes.

16      Q.    And the -- Rakesh is the programmer

17  analyst, the same gentleman that was on the last

18  document that we looked at, correct, sir?

19      A.    Yes.

20      Q.    And you see under the list of 1 through

21  7, No. 5, "Create a process to purge DEA Suspicious

22  items on a regular basis."

23      A.    Yes.

24      Q.    Do you have any understanding of what

Highly Confidential - Subject to Further Confidentiality Review

 1    that means?

 2         MS. SWIFT:  Object to the form, foundation.

 3    BY THE WITNESS:

 4         A.    I would have to speculate.

 5    BY MR. MOUGEY:

 6         Q.    Sir, I'm asking you do you have an

 7    understanding of what is meant by No. 5, "Create a

 8    process to purge DEA Suspicious items on a regular

 9    basis"?

10         MS. SWIFT:  Objection; foundation.

11    BY THE WITNESS:

12         A.    I would -- again, it gets to the

13    definition of suspicious.  So, it's...

14    BY MR. MOUGEY:

15         Q.    So, this sentence is confusing to you

16    because you're not sure what the word "suspicious"

17    means?

18         A.    I'm not sure how -- I -- how it's -- let

19    me read it.

20              So, what -- I'm sorry.  Could you repeat

21    the question.

22         Q.    Sure.  Do you have any individual

23    understanding of what is meant on Bancroft 10,

24    No. 5, "Create a process to purge DEA Suspicious

Highly Confidential - Subject to Further Confidentiality Review

 1    items on a regular basis"?

 2         MS. SWIFT:  Objection; foundation.

 3    BY THE WITNESS:

 4         A.    I have an idea what it -- what the

 5    intent of that statement is, yes.

 6    BY MR. MOUGEY:

 7         Q.    Okay.  What is your idea of what the

 8    intent of "create a process to purge DEA Suspicious

 9    items on a regular basis"?

10         A.    To not let orders of suspicious nature

11    get through to our distribution centers so there

12    would be no suspicious orders ever placed on them.

13    We wanted to be proactive and stop suspicious

14    orders from happening, period.

15         Q.    So, now, when you say "stop suspicious

16    orders," is that the definition of an order as it

17    comes into the distribution center that's flagged

18    by your system or some other definition?

19         MS. SWIFT:  Objection; foundation.

20    BY THE WITNESS:

21         A.    Defined by the distribution center?

22    BY MR. MOUGEY:

23         Q.    Um-hmm.

24         A.    No, we were defining it at corporate.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So, under "Description," second

2    sentence, "An order quantity will be deemed

3    suspicious based on a formula used to determine

4    inconsistent ordering patterns."

5         Do you see that sentence?

6    A.    Yes.

7    Q.    Did I read it correctly?

8    A.    Yeah, I think you did, yes.

9    Q.    And do you agree with that sentence that

10   an order quantity will be deemed suspicious based

11   on a formula?

12   MS. SWIFT:  Objection; foundation.

13   BY THE WITNESS:

14   A.    We use tolerance limits to identify

15   orders that have potential -- are potentially

16   suspicious.

17   BY MR. MOUGEY:

18   Q.    Yes, sir.

19   A.    So, if that's what they are referring

20   to, yes.

21   Q.    And that's the only formula that you're

22   aware of that was in play identifying or flagging

23   orders, correct, sir?

24   MS. SWIFT:  Object to the form, vague.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2        A.    There was frequency, too, in 2009.

 3   BY MR. MOUGEY:

 4        Q.    The threshold and the frequency are two

 5   of the algorithms or formulas that you used, that

 6   you implemented, correct?

 7        MS. SWIFT:  Object to the form.

 8   BY THE WITNESS:

 9        A.    I was part of the committee that

10   implemented them, yes.

11   BY MR. MOUGEY:

12        Q.    Yes, sir.  So, this second sentence, "An

13   order quantity will be deemed suspicious based on a

14   formula used to determine inconsistent ordering

15   patterns."  Do you agree with that sentence?

16        MS. SWIFT:  Object to the form.

17   BY THE WITNESS:

18        A.    In general sense, I would -- let me see.

19   I'm sorry.  I lost my place.

20   BY MR. MOUGEY:

21        Q.    That's okay.  Second sentence.

22              "An order quantity will be deemed

23   suspicious based on a formula."  Do you agree with

24   that, sir?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Let's see.

 2        MS. SWIFT:  Object to the form.

 3   BY THE WITNESS:

 4        A.    I'm -- could you highlight it.

 5   BY MR. MOUGEY:

 6        Q.    Yes, sir.  It is.  Take your time.

 7        A.    Oh, okay.  I went too far down.

 8        Q.    "An order quantity will be deemed

 9   suspicious based on a formula."  Do you agree with

10   that, sir?

11        MS. SWIFT:  Object to the form of the

12   question.

13   BY THE WITNESS:

14        A.    A formula was used to identify -- to set

15   tolerance limits, and that was what we were using,

16   yes.

17   BY MR. MOUGEY:

18        Q.    Yes, sir.  And that formula used to

19   identify or set tolerance limits, if an order was

20   flagged, do you agree with Rakesh that it was

21   deemed suspicious?

22        MS. SWIFT:  Object to the form, foundation.

23   BY THE WITNESS:

24        A.    The term "suspicious" is -- the
```

1    tolerance limits was used to identify orders that

2    were suspiciously -- worth looking into, an order

3    of interest.

4              So, the term "suspicious" was, if he was

5    using it the same way I was using it, then I would

6    say yes.  But if he -- but "suspicious" under the

7    legal definition, I can't answer that.

8    BY MR. MOUGEY:

9         Q.    Okay.  So, as of October of 2009, Rakesh

10   is similarly confused as you and Ms. Morris about

11   order of interest versus suspicious?

12        MS. SWIFT:  Objection; mischaracterizes the

13   testimony, foundation.

14   BY THE WITNESS:

15        A.    I don't know that he was confused.  He

16   was using it the same way that I was using it.

17   BY MR. MOUGEY:

18        Q.    Sure.  He was using --

19        A.    He is not a lawyer either.

20        Q.    -- the language that you used in your

21   June of 2008 memo that an order flagged by your

22   algorithm was suspicious, correct, sir?

23        MS. SWIFT:  Object to the form of the

24   question.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. MOUGEY:

2        Q.    This language is almost identical to the

3    June of '08 memo, correct, sir?

4        MS. SWIFT:  Object to the form.

5    BY THE WITNESS:

6        A.    The introduct- -- the use of

7    "suspicious" meant order of interest, and it was

8    used consistently that way and it's being used here

9    it looks like.

10   BY MR. MOUGEY:

11       Q.    The language that you used in your '08

12   memo that an order flagged by your algorithm is

13   deemed suspicious is almost identical to the

14   language used by Rakesh in 2009, correct?

15       A.    He was using it in the same vein that I

16   was using it.

17       Q.    Yes, sir.  So, the answer to my question

18   is yes, correct?

19       A.    I -- I'm sorry.  I lost the question.

20   But the -- so, I don't want to say yes.

21       Q.    The language that you used in your '08

22   memo.

23       A.    Yes.

24       Q.    That an order flagged by your algorithm

Highly Confidential - Subject to Further Confidentiality Review

```
1    was suspicious is almost identical to the language

2    Mr. Rakesh uses -- I'm sorry -- Rakesh uses in

3    February of '09 in his memorandum, correct?

4         A.    We both mischaracterized the term

5    "suspicious," yes.

6         Q.    And the language you used in your

7    January -- June 2008 memo about an order being

8    flagged by the system is deemed suspicious is

9    almost identical to the language Mr. or Rakesh uses

10   in October of 2009 in Bancroft 10, correct?

11        A.    We both mischaracterized the use of

12   "suspicious," yes.

13        Q.    Yes, sir.

14        MR. MOUGEY:  Mark the next exhibit as Bancroft

15   11.

16                   (WHEREUPON, a certain document was

17                    marked as Walgreens-Bancroft

18                    Exhibit No. 11:  10/27/11 e-mail

19                    with attachment; WAGMDL00119542 -

20                    00119548.)

21   BY MR. MOUGEY:

22        Q.    Sir, Bancroft 11 is dated 10/27/2011.

23              Do you see that, sir?

24        A.    Yes.
```

1    Q.    And this is now over three years after

2   your June of 2008 memorandum, correct?

3    A.    That's right.

4    Q.    And walk me through who these folks are

5   in this e-mail.  Kristie Provost.  Do you see that?

6   What's her title, if you know?

7    A.    No.  She -- no, I don't know her title.

8    Q.    What department?

9    A.    She was a manager.

10    Q.    Manager of what?

11    A.    I don't know the department.

12    Q.    Okay.  How about Ferdinand Dungca?

13    A.    I would think he works for Kristie.

14    Q.    But you're not sure what department?

15    A.    No, I'm not.

16    Q.    Okay.  How about Edward -- I can't

17   pronounce the last name.  On the cc line.

18    A.    I don't recall Edward.

19    Q.    How about Marcella Ranick?

20    A.    Marcella.  I'm -- no, I don't recall.

21    Q.    Okay.  And then Barbara Martin?

22    A.    She worked for Rx purchasing.

23    Q.    Okay.  And Barbara Martin was one of the

24   folks that was involved in this committee

1    developing the algorithm to identify suspicious

2    orders from inception, correct?

3         A.    That's correct.

4         Q.    So, this is -- Ms. Martin is copied on

5    this e-mail and a memorandum from Rakesh almost a

6    little over three years after your initial memo,

7    correct?

8         A.    Yes.

9         Q.    And if we go back to your initial memo

10   in June of '08, do you recall that Ms. Martin's

11   copied on that --

12        A.    Yes.

13        Q.    -- as well?

14        A.    Yes, I do recall that.

15        Q.    Okay.  And if you'd turn, sir, to

16   page 1, 543, I want you to go to the second

17   paragraph, and take your time if you want to read

18   through it to get the context, but you'll see the

19   language is very similar to other documents.

20              And I want to direct your attention to

21   the middle of the second paragraph that begins

22   with, "The order that is flagged as suspicious."

23              Do you see that, sir?

24        A.    I see that.

1    Q.    Okay.  That's the language I want you to

2    focus on.

3              Sir, this language, "The order that is

4    flagged as suspicious on the store side will be

5    intercepted and the order quantity will be reduced

6    to a non-suspicious (order limits) level."

7              Do you see that, sir?

8    A.    Yes.

9    Q.    All right.  The initial part of this

10   sentence, "The order that is flagged as

11   suspicious," that language in October of 2011 is

12   almost identical to the language you used in your

13   June 2008 memorandum, correct, sir?

14   A.    That language would be incorrect.

15   Q.    Yes, sir.  But that's almost the exact

16   language that you used in your memo more than three

17   years earlier, correct?

18   A.    I don't remember saying that the

19   order -- that it would be flagged.  I -- orders

20   would be identified -- let's see.  This says the

21   orders will be reduced, right?

22   Q.    First part of that sentence is what I

23   want you to focus on, "The order that is flagged as

24   suspicious on the store side."

Highly Confidential - Subject to Further Confidentiality Review

1              Do you see that, sir?

2       A.    Yes.

3       Q.    That concept is --

4       A.    Yes.

5       Q.    -- almost identical to the memo that you

6    wrote in June of 2008, correct?

7       MS. SWIFT:  Object to the form, foundation.

8    BY THE WITNESS:

9       A.    I -- I apologize.  Yes.  That would --

10   that in general is correct.  There is a lot of

11   other things going on in the sentence so it's, you

12   know.

13   BY MR. MOUGEY:

14      Q.    Yes, sir.

15      A.    I want to make sure I got it correct.

16      Q.    Yes, sir.  But an order flagged by the

17   algorithm was deemed suspicious, that concept

18   that's in this October of 2011 memo is almost

19   identical to your June 2008 memorandum, correct?

20      A.    The language is correct --

21      MS. SWIFT:  Objection; foundation.

22   BY THE WITNESS:

23      A.    The language is correct.  The orders

24   were not actually orders at that point.  They are

Highly Confidential - Subject to Further Confidentiality Review

1    potential.

2    BY MR. MOUGEY:

3        Q.    But the question I asked you was that

4    the language, meaning that the order that's flagged

5    as part of your algorithm is deemed suspicious,

6    that language in October of 2011 in Bancroft 11 is

7    almost identical to your June 2008 memorandum,

8    correct?

9        A.    They're similar.

10       Q.    Yes, sir.  I hand you what I'm going to

11   mark as Bancroft 12.

12                  (WHEREUPON, a certain document was

13                   marked as Walgreens-Bancroft

14                   Exhibit No. 12:  Document,

15                   "Functional Requirements & (Macro)

16                   Design"; WAGMDL00400342 -

17                   00400356.)

18   BY MR. MOUGEY:

19       Q.    Sir, you see that this document is

20   titled -- I'm sorry -- is dated right in the middle

21   of the page.  The last date entry is 4/6/2012.

22                  Do you see that?

23       A.    Yes.

24       Q.    And so now we are going on almost four

Highly Confidential - Subject to Further Confidentiality Review

1    years after your memorandum, correct, sir?

2        A.    That would be correct.

3        Q.    And you can see from the top box of this

4    document that this document involves the suspicious

5    order monitoring at Walgreens, correct?

6        A.    Yes.

7        Q.    And you can see in the bottom right-hand

8    side, the business owner Barb Martin's name is in

9    there, correct, sir?

10       A.    Yes.

11       Q.    And you see the project manager is

12   Rakesh again, the same gentleman we just went

13   through the last couple memorandums, correct?

14       A.    And Steve Bamberg.

15       Q.    And Steve Bamberg, correct.

16             And do you recall what department Steve

17   Bamberg is in at this point?

18       A.    Yes.  He -- well, he was part of

19   inventory systems.

20       Q.    Yes, sir.  And ultimately ended up being

21   in Pharmaceutical Integrity?

22       A.    No.

23       Q.    No.  Okay.  So, again, Ms. Martin,

24   pretty knowledgeable, been in the process from --

Highly Confidential - Subject to Further Confidentiality Review

```
1    from inception on developing this algorithm,

2    correct?

3         MS. SWIFT:  Objection; foundation.

4    BY THE WITNESS:

5         A.    Barb is very knowledgeable.

6    BY MR. MOUGEY:

7         Q.    Yes, sir.  And if you turn to the second

8    page of this document, under "Phase I Overview."

9    Do you see that, sir?

10        A.    Yes.

11        Q.    "In this Phase, DEA suspicious orders

12   were not reduced.  System was implemented as a

13   'Proof of Concept.'"

14             Do you see that, sir?

15        A.    Yes.  I see that's what it says.

16        Q.    Do you have any understanding of what

17   Phase I was?

18        MS. SWIFT:  Objection; foundation.

19   BY THE WITNESS:

20        A.    I think Phase I was the tolerance and

21   frequency.

22   BY MR. MOUGEY:

23        Q.    That you drafted?

24        A.    Yes.
```

1   Q.   And did you have an understanding of how

2   long Phase I lasted?

3   A.   Until about 2012.

4   Q.   Does your algorithm or your work have

5   anything to do with how the orders were reduced?

6   MS. SWIFT:  Objection; foundation.

7   BY THE WITNESS:

8   A.   The -- by committee, it was decided

9   whether an order was -- under certain conditions,

10  what orders would be considered suspicious and the

11  orders -- it was my understanding that orders were

12  reduced to bring it under tolerance.

13  BY MR. MOUGEY:

14  Q.   All right.  And was it your algorithm

15  that identified what an acceptable tolerance level

16  was?

17  A.   Acceptable tolerance level?

18  Q.   Yes, sir.

19  A.   I'm not familiar with that terminology.

20  Q.   All right.  The threshold.  How is that?

21  Is that easier?

22  A.   Determined a threshold?

23  Q.   Yes, sir.

24  A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And the threshold that you helped draft

2  was used as a ceiling for what -- when an order was

3  acceptable, correct?

4    MS. SWIFT:  Object to the form.

5  BY THE WITNESS:

6    A.    That would be an order that was -- yes.

7  BY MR. MOUGEY:

8    Q.    Okay.  So, as of April 6, 2012, in

9  Bancroft Exhibit 12, under Phase I, the orders

10  flagged by your algorithm, Walgreens still was

11  referring to as suspicious orders, correct, sir?

12    A.    I wouldn't -- whoever wrote the

13  memorandum was referring to it that way.

14    Q.    Yes, sir.  And --

15    A.    I can't say Walgreens in general, you

16  know.  I can't say what legal was.  I could just

17  say if that's what the -- how it was being used in

18  a memorandum, in a memo.

19    Q.    Orders flagged by your system were

20  deemed suspicious, correct?

21    MS. SWIFT:  Object to the form.

22  BY THE WITNESS:

23    A.    They were deemed an item of interest.

24  BY MR. MOUGEY:

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    But it doesn't -- the words "item of

2  interest" here --

3     A.    No, that's correct.

4     Q.    -- almost a little over four years later

5  isn't being used, correct?

6     A.    The terminology that was used as item of

7  interest, that's what we -- how it was used

8  initially and it stuck.

9     Q.    As of April 6, 2012 in Bancroft

10  Exhibit 12, the language that you used in your

11  initial memo in June of 2008, orders flagged by

12  your algorithm were suspicious, were still being

13  used at Walgreens, correct, sir?

14     A.    I would -- sounds like it, yes.

15     Q.    Now, at what point in time -- do it

16  another way.

17          Did you change your language at any

18  point in time from "suspicious orders" to "orders

19  of interest" like you're referring to today?

20     A.    I don't think so.

21     Q.    Okay.  And did Walgreens formally change

22  their language, intentionally change their language

23  about suspicious orders?

24     A.    I can't speak for the larger, the larger

Highly Confidential - Subject to Further Confidentiality Review

```
 1    audience.

 2         Q.    Were you aware of anyone at Walgreens

 3    that analyzed that the language "suspicious orders"

 4    should be changed to "orders of interest"?

 5         A.    I didn't know anybody that analyzed the

 6    language.

 7         Q.    Do you think that everyone at Walgreens

 8    when they were saying -- using the word

 9    "suspicious" in this year after year really didn't

10    mean suspicious?

11         A.    You'd have to ask them.

12         Q.    But you really didn't mean suspicious

13    when you were using it.  You meant something else,

14    right?

15         A.    I meant there were outliers and they

16    were worth looking into.

17         Q.    I'm going to hand you what --

18         MS. SWIFT:  Peter, before you mark another

19    document, can we take a five-minute break?  We have

20    been going more than an hour.

21         MR. MOUGEY:  Yeah, I'm really trying to get

22    through today, and the last break took 15 minutes.

23    So, I think we've been --

24         MS. SWIFT:  I --
```

 1          MR. MOUGEY:  I understand.  We have been on

 2     the record for about two hours and I just don't

 3     want another 15-minute break.

 4          MS. SWIFT:  Understood.  That's fine.

 5          MR. MOUGEY:  If we can take a five-minute

 6     break --

 7          MS. SWIFT:  Sounds great.

 8          MR. MOUGEY:  -- I am more than fine with that,

 9     but I'd like it to be five minutes.

10          THE VIDEOGRAPHER:  We are off the record at

11     11:23 a.m.

12                    (WHEREUPON, a recess was had

13                     from 11:23 to 11:31 a.m.)

14          THE VIDEOGRAPHER:  We are back on the record

15     at 11:31 a.m.

16     BY MR. MOUGEY:

17          Q.    Mr. Bancroft, I believe it was your

18     testimony that you were called upon at different

19     periods in time to analyze the algorithm you

20     initially put together in 2008, correct?

21          A.    To analyze the algorithm?

22          Q.    Just to look at it for enhancements or

23     updates or tweaks or modifications, right?

24          MS. SWIFT:  Object to the form, compound.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY THE WITNESS:

 2         A.    We -- the algorithm we put in from the

 3    beginning, it was what was -- what was used.

 4    BY MR. MOUGEY:

 5         Q.    Yes, sir.  That was a little different

 6    than what I asked.

 7               There were -- you were called in to look

 8    at potential modifications to the algorithm after

 9    the initial proposal in 2008, correct?

10         A.    I was called in to verify that the

11    algorithms were working as designed during the

12    programming phase.  I would check -- I'd verify the

13    data was right and the algorithms were right.  It's

14    not until 2012 that we made any changes that I'm

15    aware of.

16         Q.    So, talk to me a little bit about

17    your -- I'm going to call it -- is "sensitivity

18    testing" the right math term?

19         A.    Sensitivity?  No.

20         Q.    No.

21         A.    No.

22         Q.    What would you call it?  Confidence

23    testing?  What would you call the right math term?

24         MS. SWIFT:  Objection; vague.
```

```
 1   BY THE WITNESS:

 2         A.    Testing of what?

 3   BY MR. MOUGEY:

 4         Q.    The algorithm.  You just talked about

 5   testing --

 6         A.    Testing --

 7         Q.    -- the algorithm to make sure it was

 8   working as planned, right?

 9         A.    Yes.

10         Q.    Okay.

11         A.    There is no sensitivity there.  It's

12   either right or wrong.  Calculations came out of

13   the computer were what the -- equal to the

14   calculations that we would do on paper, you know,

15   or in another system.  We verified that the

16   calculations were being done correctly.

17         Q.    And --

18         A.    It's not sensitivity.

19         Q.    What was your -- so, there was no

20   sensitivity testing on the algorithm?

21         A.    Sensitivity testing is a total different

22   concept.

23         Q.    So, the answer is no?

24         A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    And what testing -- tell me what testing

2  was done to make sure it was working --

3     MS. SWIFT:  Objection; vague.

4  BY MR. MOUGEY:

5     Q.    -- as intended.

6     A.    That was in 2008.  I don't recall.

7     Q.    You don't recall?

8     A.    I don't recall the details of the tests,

9  no.

10    Q.    You don't even recall generally what was

11 done to make it -- make sure that it was working as

12 intended?

13    A.    I know we -- we did our due diligence.

14 But, no, I don't have any recollection exactly what

15 that entailed at this point.

16    Q.    Yeah.

17    A.    I don't recall.

18    Q.    Are there any documents that memorialize

19 the testing of the algorithm?

20    A.    That was -- would have been done by the

21 inventory system, people that programmed it.  That

22 wouldn't be my responsibility.

23    Q.    So, I didn't -- but I didn't ask if it

24 was your responsibility or not.

```
 1               What I asked you was there any documents

 2    memorializing it that you were aware of?

 3         A.    You would have to ask inventory systems

 4    group.  Steve Bamberg.

 5         Q.    I'm asking you, sir.  I'm asking you

 6    sitting in this chair today, are you aware of any

 7    documents memorializing any testing on the

 8    algorithm that you drafted?

 9         MS. SWIFT:  Objection; argumentative.

10    BY THE WITNESS:

11         A.    I don't have any -- I don't know of any

12    other documents.

13    BY MR. MOUGEY:

14         Q.    You don't know?

15         A.    I don't know.

16         Q.    Do you agree based on your academic and

17    your decades in this space, drafting complex

18    statistical solutions, that it's important that the

19    algorithms are tested to ensure they're working

20    accurately?

21         A.    Yes.

22         Q.    And would you agree with me, sir, that

23    it's important that any testing that's done is

24    memorialized?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.    I think that would be a good thing, yes.

2      Q.    And after you drafted this, you didn't

3  ask anyone to -- to review any memorandum or

4  testing or anything to make sure that the algorithm

5  was working?

6      A.    Did I ask?

7      Q.    Yes.

8      A.    I'm sure I was involved in testing it.

9  Exactly the details, I don't recall.

10     Q.    Now, you mentioned earlier that in 2012

11  you were called in to help make some modifications,

12  correct?

13     A.    That's correct.

14     Q.    Yes, sir.  And you, when you drafted --

15  you drafted a memorandum documenting your

16  additional proposals, correct?

17     A.    I'd have to see the document.  I don't

18  recall exactly.  If I saw the document, I would

19  recall.

20     Q.    When you draft a memorandum, do you --

21  do you take good care in ensuring that it's

22  accurate?

23     A.    I would think I do.

24     Q.    Do you take time to make sure and

Highly Confidential - Subject to Further Confidentiality Review

1    perform due diligence to ensure that the document

2    contents are correct and complete?

3         A.    To the best of my ability.

4         Q.    Do you even share the memorandum with

5    your colleagues to get another set of eyes on it to

6    make sure it's accurate?

7         A.    I would say yes, that would be the

8    standard practice.

9         Q.    You understood that your job within

10   Walgreens, for example, this algorithm on

11   suspicious order monitoring policies, were

12   important, correct?

13        A.    Yes.

14        Q.    Did you have an understanding by the

15   time you got to 2012 of the opiate epidemic that

16   was occurring in the United States?

17        A.    I know that we took the controlled

18   substance very seriously and we wanted to make sure

19   that we didn't ship orders that were in violation

20   and we wanted -- we continued -- and in 2008 to

21   2012, we continued -- we enhanced our system.

22        Q.    Yes, sir.  And what I was asking was a

23   little different.  What I asked was:  Were you

24   aware that there was an opiate epidemic as of 2012

1    in the United States?

2        A.    I was aware that they were concerned

3    that some of the -- that the -- our algorithms

4    needed to be enhanced.

5        Q.    Yes, sir.  And that there were concerns

6    about the algorithm because overdoses were quickly

7    becoming the leading cause of death in certain age

8    groups, correct, sir?

9        A.    I can't say --

10   MS. SWIFT:  Objection; foundation.

11   BY THE WITNESS:

12       A.    I can't make that parallelism.

13   BY MR. MOUGEY:

14       Q.    Did you have any understanding as you

15   got into 2012 that there had been Congressional

16   investigations into the opiate crisis dating back

17   over ten years?

18       A.    That was not an area of interest for me.

19       Q.    Did you have any -- did anybody from

20   Walgreens ever provide a sense of urgency to you

21   about the importance that people were dying from

22   overdoses?

23       A.    There was a sense of importance that we

24   needed to become -- needed to have further controls

Highly Confidential - Subject to Further Confidentiality Review

1   on our orders.  But the genesis of that concern, I

2   don't know.

3        Q.    You don't know.

4              I'll hand you what we'll mark as

5   Bancroft 14 -- is it 13?  I'm sorry.  Bancroft 13.

6                   (WHEREUPON, a certain document was

7                   marked as Walgreens-Bancroft

8                   Exhibit No. 13:  4/27/12 e-mail

9                   with attachment; WAGMDL00119539 -

10                  0019541.)

11  BY MR. MOUGEY:

12       Q.    You'll see on Bancroft 13 that this is

13  an e-mail generated from you, correct, sir?

14       A.    Yes.

15       Q.    And you see the date of 4/27/2012 --

16       A.    Yes.

17       Q.    -- correct, sir?

18       A.    That's correct.

19       Q.    This is coming up almost, what is that,

20  four years after your initial proposal, correct?

21       A.    That would be four, yes.

22       Q.    And the subject line is "DEA Suspicious

23  Store Ordering."  Do you see that?

24       A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And had you been asked to look at

2    enhancing the algorithm?

3    A.    I know in 2012 we made an enhancement to

4    the algorithm, yes.

5    Q.    And my question I asked, though, was had

6    you been asked to enhance it.  Is this something

7    you came up with on your own or did someone ask

8    you?

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

11    Q.    You mentioned a committee?

12    A.    Yes.

13    Q.    Was this the same committee, with

14    obviously some people being replaced, that had been

15    in place since 2008?

16    A.    John was new to the committee.

17    Q.    Right.  But it was the same?

18    A.    Denny Morris was new to the committee.

19    Q.    The charge of the committee, which

20    meaning the algorithm from suspicious order

21    monitoring policy, was similar to what was put

22    together in 2008?

23    A.    What was similar?

24    Q.    The charge of the committee.

Highly Confidential - Subject to Further Confidentiality Review

1      A.     The charge of the committee was

2   continuation of the same.

3      Q.     Thank you.  And this e-mail is directed

4   to Barb Martin who had been in the -- in the mix

5   since 2008, correct?

6      A.     Yes, that's correct.

7      Q.     The DE -- "The enclosed offers two

8   possible enhancements to the DEA Suspicious" -- it

9   says DES, but I'm assuming you meant DEA?

10     A.     Where does it say DES?  What page are we

11  on?

12     Q.     We're on the very first page.

13     A.     Yes, DEA, yes.

14     Q.     Okay.  "DEA Suspicious Order" -- I'm

15  sorry -- "Suspicious Store Ordering application for

16  your consideration."  Correct?

17     A.     Yes.

18     Q.     And that was the tolerance versus the

19  frequency, correct?

20     A.     That was the initial.

21     Q.     Yes, sir.  And the -- I believe you

22  didn't use these words, but I think what you're

23  referring to is the subsequent linear regression

24  model that was in place, right?

Highly Confidential - Subject to Further Confidentiality Review

1        A.     Yes.

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

4          So, you can't isolate one store.  It was

5    based on corporate data in total.

6          Q.    The linear regression model creates a

7    line with a slope on an axis, correct?

8          A.    Yes.

9          Q.    And then the -- and then if we look at

10   some of these models, the slope of the line has

11   dots below the line and dots above the line,

12   correct?

13         A.    It -- yes.

14         Q.    And that slope of the line is used to

15   identify outlier stores, correct?

16         A.    That plus -- that's one of the

17   components of identifying.

18         Q.    Thank you.  And the slope of the line

19   is, on that axis, is created in part by the stores

20   with similar prescription size within that store,

21   correct?

22         A.    No.

23         Q.    How is that slope of the line?

24         A.    The slope, linear regression considers

Highly Confidential - Subject to Further Confidentiality Review

1    all the data.  It doesn't isolate the data.

2        Q.    Does the slope of the line change when

3    comparing one store to another or is it the same

4    slope every time?

5        A.    Same slope.  Not -- same slope when the

6    line is generated, same slope for all stores.

7        Q.    The store -- the dots above the line and

8    below the line that represent individual order

9    sizes from individual stores, does the grouping of

10   those stores change?

11       MS. SWIFT:  Object to the form.

12   BY THE WITNESS:

13       A.    There is no grouping.

14   BY MR. MOUGEY:

15       Q.    The stores represented are compared

16   against the slope of the line.  Does that change?

17       MS. SWIFT:  Object to the form.

18   BY THE WITNESS:

19       A.    Could you repeat the question.

20   BY MR. MOUGEY:

21       Q.    Yes, sir.  The stores -- the slope of

22   the line is used to identify outliers, correct?

23       A.    It's part of the component, yes.

24       Q.    All right.  And the dots that are

Highly Confidential - Subject to Further Confidentiality Review

1    groupings of stores, how are those -- how are

2    those --

3        A.    Groupings of stores, we don't -- I'm

4    not -- you're using groupings.  There is no

5    grouping.

**REDACTED**

10        Q.    I'll get to one of the --

11        A.    So, I don't know what you mean by

12    grouping.

13        Q.    Let's just go back to your memo here

14    dated 4/27/2012, Bancroft 13.

15        A.    We --

16        Q.    Same memo we got.  Right?

17        A.    Okay.

18        Q.    April 27, 2012, you're asked to create

19    some enhancements, correct?

20        A.    Yes.

21        Q.    And I'm assuming you spent some time

22    working on these enhancements to make a

23    recommendation, correct?

24        A.    Yes.

1    Q.    And this was something you consider

2  fairly serious at this point in time?

3    A.    We -- all along we considered it

4  serious.

5    Q.    Of course.  So, as we get into our first

6  paragraph titled "DEA Suspicious Store Ordering

7  Application Proposed Enhancement."  Did I read that

8  right?

9    A.    What paragraph?

10   Q.    Very first, very top of the page, Bates

11  No. 40.  Page 1.

12   A.    Where is "Proposed"?  Highlight it.

13   Q.    "DEA Suspicious" --

14   A.    Oh, at the title.  I'm sorry.  The

15  title.

16   Q.    -- "Store Ordering Application."

17   A.    I was looking at the paragraph, not the

18  title.

19   Q.    Okay.

20   A.    Sorry.

21   Q.    Are we on the same page?

22   A.    Yes.

23   Q.    Are you there?

24   A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And the title is "DEA Suspicious Store

2    Ordering Application Proposed Enhancement," right?

3    A.    That's the title.

4    Q.    Okay.  And the language directly under

5    the title is, "The DEA Suspicious Store Ordering

6    application was developed based on DEA requirements

7    for our DCs to monitor for suspicious orders of

8    control substances."  Correct?

9    A.    Yes.

10    Q.    Now, how did you have an understanding

11    of what the DEA requirements?  Who told you what

12    the DEA requirements were?

13    A.    In the initial committee?

14    Q.    Yes, sir.

15    A.    There was -- we were told the

16    requirements is for us to monitor in terms of order

17    size and frequency, and there was no -- they gave

18    no definition.  It was our obligation to define

19    what that meant.

20    Q.    Order size and frequency was the only

21    parameters you were given on this algorithm?

22    A.    That was the -- that was the gist of it,

23    yes.

24    Q.    Okay.  That was the gist of it or was

Highly Confidential - Subject to Further Confidentiality Review

1    that it?

2         A.    That's -- in 2008, I don't -- I think

3    that was -- that was primarily it.

4         Q.    The second paragraph, "This process

5    allows for any single order to be compared to the

6    last 26 weeks of order history."

7              Did I get that right?

8         A.    Yes.

9         Q.    I'm sorry.  I skipped the first

10   paragraph.

11             The last sentence of the first

12   paragraph, "Orders placed on the DC," and that's

13   distribution center, right?

14        A.    Yes.

15        Q.    "That exceed its tolerance limit are

16   flagged as suspicious."  Correct?

17        A.    That's what it says.

18        Q.    Yes, sir.  And that language is almost

19   identical to the language that you used four years

20   earlier in your June of 2008 memorandum, correct?

21        A.    That -- the language is similar, yes.

22   "Suspicious" was being used in the same -- same

23   definition.

24        Q.    And that would be that orders that were

1    flagged by your algorithm were suspicious, correct?

2         A.    Were --

3         Q.    That's the plain language of this

4    document, right?

5         A.    The language as potentially suspicious

6    would be the correct terminology.

7         Q.    Yes, sir.  But that's not what I'm

8    asking.  The language that's in this memo in

9    April of '12, four years after your initial memo,

10   is almost identical to the language in your

11   June 2008, meaning that orders flagged by the

12   algorithm are suspicious, right?

13        A.    "Potentially suspicious" should have

14   been used, but yes.

15        Q.    Yes, sir.  But that -- what I want to

16   make sure that you and I are on the same page.

17              The language that you're using in

18   April of 2012, that orders flagged by your

19   algorithm are suspicious, is almost identical to

20   the language you used in June of 2008, correct?

21        A.    The languages are similar.

22        Q.    Not similar.  It's almost identical,

23   correct?

24        MS. SWIFT:  Object to form.

1    BY THE WITNESS:

2         A.    Almost identical is similar.

3    BY MR. MOUGEY:

4         Q.    Yes, sir.  Now, were you aware at the

5    time of this memorandum that with the enhancements

6    that Walgreens was under investigation by the DEA?

7         A.    No.

8         Q.    Let's turn to the next page.

9               "DEA Suspicious Store Ordering

10   Application Proposed Enhancement," "Comparing the

11   average order size across time."

12              Do you see that?  Page 2 of the

13   document.

14        A.    Yes.

15        Q.    "The DEA is conducting crackdown on

16   Florida pharmacies where the market is notorious

17   for illicit prescription painkillers."

18              Do you see that, sir?

19        A.    Yes.

20        Q.    Was that your language?

21        A.    That's -- I put this document together.

22        Q.    Yes, sir.  You drafted that, right?

23        A.    Yes.

24        Q.    So, you knew as of the date of this

1  document that the Florida market was notorious for

2  illicit prescription painkillers, correct?

3      A.    I -- I knew that this was a problem in

4  Florida and the DEA was looking at it.  I didn't --

5  yes.

6      Q.    The DEA wasn't looking at it.  They were

7  conducting a crackdown, correct, sir?

8      A.    That's what the language says, yes.

9      Q.    And the next language in quotes says,

10 "Walgreen pharmacies now account for 53 of the top

11 100 retail sellers of oxycodone in the state."

12         Correct, sir?

13     A.    That's what it says, yes.

14     Q.    "According to an affidavit filed by the

15 DEA."

16         So, you knew that there was at least

17 affidavits being filed by the DEA, correct, sir?

18     A.    I -- that's what it says.  So, that

19 would be correct.

20     Q.    And at the bottom of this paragraph you

21 cite to the Miami Herald, April 6, 2012, correct,

22 sir?

23     A.    At the bottom of the paragraph?

24     Q.    Yes, sir.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    And, sir, how were you aware about -- of

 3   the Miami Herald article?

 4        A.    I -- I'm not sure.

 5        Q.    You're not sure?

 6        A.    I may have Googled it.  I may have --

 7        Q.    You live in Chicago, right?

 8        A.    Yes.

 9        Q.    You don't read the Miami Herald on a

10   regular basis, correct?

11        A.    No.

12        Q.    And the next sentence says, "Three years

13   ago, when Walgreens pharmacies were among the top

14   100 sellers of the drug."  Correct?

15        A.    Where does it say that?

16        Q.    In the middle of the paragraph.

17        A.    Oh, yes.

18        Q.    Sir --

19        A.    That's what it says.

20        Q.    -- you were aware that oxycodone was one

21   of the most abused controlled substances in the

22   opiate space, correct, sir?

23        MS. SWIFT:  Objection; foundation.

24   BY THE WITNESS:
```

1      A.    I don't know that it was the most abused

2   or where it was -- stood in the space.

3   BY MR. MOUGEY:

4      Q.    You continue, "One Walgreen pharmacy in

5   Fort Myers now under investigation."

6            Do you see that, sir?

7      A.    Yes.

8      Q.    So, you were aware at the time you

9   drafted --

10     A.    At this --

11     Q.    -- this memorandum that Walgreens was

12  under investigation at least in Fort Myers,

13  correct?

14     A.    That would be correct, yes.

15     Q.    And that one pharmacy "sold more than

16  2.1 million oxycodone pills in 2011."

17           Do you see that, sir?

18     A.    That's what it says, yes.

19     Q.    "More than 22 times the oxycodone sales

20  at the same pharmacy two years earlier," according

21  to the DEA.  Did I read that right?

22     A.    That's -- you read it right.

23     Q.    Yes, sir.  So, at the time that you were

24  brought back in to look at this enhancement,

1   Walgreens was under a crackdown by the DEA,

2   correct, sir?

3       MS. SWIFT:  Object to the form.

4   BY THE WITNESS:

5       A.    I -- there was problems in Florida.

6   That's what I was -- that's what it says in my

7   mind.

8            I -- what the DEA was cracking down on,

9   this is what -- it looks -- yeah, there was --

10  could you rephrase the question.

11  BY MR. MOUGEY:

12      Q.    Sir, you understand what difference

13  testing is, correct?

14      A.    Yes, I do.

15      Q.    And what is difference testing?

16      A.    When you compare two stores -- you --

17  the way I would do difference testing is I would

18  take -- depends what you're testing.

19           If you're testing like sales to see if

20  there is a change in sales because you implemented

21  a program, you would -- you take a set of stores

22  and you find two stores that have -- that are very

23  well correlated, they have similar sales over a

24  whole year or two years of time, and you find

Highly Confidential - Subject to Further Confidentiality Review

1    several pairs like that.  You have a control group

2    and pilot group.

3              You introduce your change and see if the

4    difference -- the differences between these two

5    pilot and control groups should be, on average,

6    should be close to zero, statistically zero.

7              And then you measure it after the change

8    takes place and you monitor for a number of weeks

9    or months or even a year and you see if there's a

10   statistically difference in -- if there is a gap

11   between the two, the control group and pilot group.

12             If the pilot, what you're -- whatever

13   you're testing is -- had a significant influence on

14   the sales, for example.  That was --

15       Q.    You see the chart in the middle of the

16   page, correct, sir?

17       A.    Chart in the middle of the page, yes.

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

8    Q.    And, sir, were you aware from the

9  time -- let me do it another way.

10        Do you believe that your algorithm that

11  you and Ms. Morris put together in '08 was a good

12  algorithm?

13    A.    Yes, I do.

14    Q.    Do you believe that it achieved the

15  purpose that your committee was charged to do?

16    A.    I believe that there was some -- it

17  could -- extra algorithms were needed to make it

18  even stronger.

19    Q.    Was it good work?

20    A.    It was -- the work was good.

21    Q.    Yes, sir.  Was the result what you

22  intended it to be when you and Ms. Morris put it

23  together?

24    A.    It did -- it did its function.  So, in

1   isolation, yes.

2       Q.    And when you say "it did its function,"

3   its function was to identify suspicious orders and

4   report those to the DEA, correct?

5       A.    It was -- no, it was more than that.  It

6   was -- the algorithm kept the store from growing

7   because it didn't allow for orders to be placed.

8   It was allowed to place one order a week and it

9   didn't allow for those orders to be increasing in

10  size.  So, it kept the order, it kept -- the

11  tolerance kept the orders in bay.

12      Q.    Let me go back to the paragraph on

13  Bancroft 13.

14            "One Walgreen pharmacy in Fort Myers now

15  under investigation sold more than 2.1 million

16  oxycodone pills in 2011 - more than 22 times the

17  oxycodone sales at the same pharmacy two years

18  earlier."

19            Your algorithm, if used as deployed,

20  would never have allowed that to occur, correct,

21  sir?

22      MS. SWIFT:  Objection; foundation.

23  BY THE WITNESS:

24      A.    No, I can't -- I wouldn't say that's

Highly Confidential - Subject to Further Confidentiality Review

1    correct.

2    BY MR. MOUGEY:

3        Q.    Sir, in order for a pharmacy's oxycodone

4    sales to increase 22 times, there had to be some

5    subjective human intervention into your algorithm,

6    correct?

7        MS. SWIFT:  Objection; foundation.

8    BY THE WITNESS:

9        A.    No, that's not correct.

10   BY MR. MOUGEY:

11       Q.    There was a decision made by Walgreens

12   personnel to allow this pharmacy's sales of

13   oxycodone to increase 22 times in a year, correct,

14   sir?

15       MS. SWIFT:  Objection; foundation.

16   BY THE WITNESS:

17       A.    I can't --

18   BY MR. MOUGEY:

19       Q.    Your algorithm would have flagged

20   that --

21       MS. SWIFT:  Are you going to let him answer

22   the question?

23   BY MR. MOUGEY:

24       Q.    Your algorithm -- are you finished, sir?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Could you repeat.  Between the

2    objections, I'm -- I lost the question.

3      Q.    There was a decision made by Walgreens

4    personnel to allow this pharmacy's sales of

5    oxycodone to increase 22 times in a year, correct?

6      MS. SWIFT:  Objection; foundation.

7    BY THE WITNESS:

8      A.    No.  By a person?  To allow it?

9    BY MR. MOUGEY:

10     Q.    I said there's a Walgreens personnel.

11   Listen to the question.

12           There is a Walgreens personnel allowed

13   this pharmacy in Fort Myers to increase its

14   oxycodone sales by 22 times, correct?

15     MS. SWIFT:  Objection; foundation.

16   BY THE WITNESS:

17     A.    I would -- I don't know of any person

18   that allowed this to happen.

19   BY MR. MOUGEY:

20     Q.    Personnel.  Walgreens.  Your algorithm

21   would have flagged this as suspicious and cut the

22   sale down to the threshold amount, correct?

23     MS. SWIFT:  Objection; foundation.

24   BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

 1        A.    If my algorithm was used exclusively,

 2    this would not have happened.

 3    BY MR. MOUGEY:

 4        Q.    Exactly.  If your algorithm would have

 5    been used exclusively, this pharmacy, as an

 6    example, in Fort Myers would never have increased

 7    its oxy sales by 22 times, correct, sir?

 8        MS. SWIFT:  Objection; foundation.

 9    BY THE WITNESS:

10        A.    I believe it wouldn't.

11    BY MR. MOUGEY:

12        Q.    Yes, sir.  You believe.  You drafted the

13    algorithm.  You know that your algorithm would not

14    have allowed this to occur, correct, sir?

15        MS. SWIFT:  Objection; foundation.

16    BY MR. MOUGEY:

17        Q.    As drafted.  Your algorithm would not

18    have allowed a 22-time increase in oxycodone sales

19    in this pharmacy, correct, sir?

20        A.    I believe --

21        MS. SWIFT:  Objection; foundation.

22    BY THE WITNESS:

23        A.    I believe the algorithm was designed to

24    keep the stores in check.

Highly Confidential - Subject to Further Confidentiality Review

1   BY MR. MOUGEY:

2       Q.    Yes, sir.

3       A.    Not from growing.

4       Q.    And the question I've asked three or

5   four times now is your algorithm would not have

6   allowed this pharmacy, as an example, oxycodone

7   sales to increase by 22 times in one year, correct,

8   sir?

9       MS. SWIFT:  Objection; foundation.

10  BY THE WITNESS:

11      A.    I believe that's correct.

12  BY MR. MOUGEY:

13      Q.    And in order for this pharmacy to

14  increase its oxycodone sales in one year by 22

15  times, Walgreens personnel had to override your

16  algorithm, correct, sir?

17      A.    I don't have knowledge.

18      MS. SWIFT:  Objection; foundation.

19  BY MR. MOUGEY:

20      Q.    I didn't ask whether you had knowledge.

21  An order --

22      A.    If I don't have knowledge, how could I

23  answer the question?  The answer is no.

24      Q.    If your algorithm would have been used

1    as intended, this would never have happened,

2    meaning that this --

3         A.    That's correct.

4         Q.    -- pharmacy --

5         MS. SWIFT:  Objection; foundation.

6         MR. MOUGEY:  I'm not finished with my

7    question.

8         MS. SWIFT:  It's abusive, Peter.

9         MR. MOUGEY:  This isn't abusive.

10        MS. SWIFT:  It's absolutely abusive.  In every

11   one of these depositions you do the same thing.

12   You've asked the question 12 different times trying

13   to get the answer you want.

14             Objection; foundation, asked and

15   answered, and the questioning is abusive.

16   BY MR. MOUGEY:

17        Q.    This result if someone at Walgreens

18   wouldn't have intervened would never have occurred

19   with just your algorithm, meaning 22 times increase

20   of oxycodone sales in one year?

21        A.    You said --

22        MS. SWIFT:  Objection; foundation, asked and

23   answered, and the questioning has become abusive.

24   BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

1       A.      You said if somebody wouldn't have

2   intervened.

3   BY MR. MOUGEY:

4       Q.      Yes.

5       MS. SWIFT:  Objection.

6   BY THE WITNESS:

7       A.      Who intervened?  I don't know of anybody

8   that intervened.

9   BY MR. MOUGEY:

10      Q.      I'm not asking you if you know of anyone

11  that intervened.  Okay?  Listen to my question.

12          Without intervention from Walgreens

13  personnel, your algorithm would have prevented an

14  increase in oxycodone sales of 22 times in one

15  calendar year, correct?

16      MS. SWIFT:  Objection; foundation, asked and

17  answered, as you said yourself, many times.

18  BY THE WITNESS:

19      A.      I'm -- my algorithm would have -- would

20  curtail the orders from growing substantially.

21  What -- how this happened, what the mechanism was,

22  I don't know.  I can't answer about personnel.

23  BY MR. MOUGEY:

24      Q.      Do you have an understanding of whether

Highly Confidential - Subject to Further Confidentiality Review

1    or not there were exceptions to your algorithm

2    allowed at Walgreens?

3        MS. SWIFT:  Objection; foundation.

4    BY THE WITNESS:

5        A.    Exceptions to the algorithm?

6    BY MR. MOUGEY:

7        Q.    Yes, sir.

8        A.    No.  Define exceptions.  I don't know

9    what you mean by exceptions.

10       Q.    Do you have an understanding if a store

11   could be turned off from the algorithm, meaning

12   they just -- the algorithm didn't apply to that

13   store?

14       A.    I have no understanding of that.

15       Q.    Do you -- would that have defeated the

16   purpose of what the algorithm --

17       A.    Well --

18       MS. SWIFT:  Objection; foundation.

19   BY THE WITNESS:

20       A.    The store could be turned off?

21   BY MR. MOUGEY:

22       Q.    Yes.

23       A.    If the algorithm wasn't used, it wasn't

24   used.

1      Q.    Thank you.

2      A.    But if it was used, you know -- I don't

3   have any knowledge of a store being turned off.

4      Q.    Do you have any understanding of whether

5   or not a store could fulfill an order from a

6   third-party vendor that had been cut by your

7   algorithm?

8      A.    I've never worked in the stores.  I've

9   never had firsthand experience.  So, I don't have

10  that firsthand experience.  I don't know.

11     Q.    Okay.  So, would -- if a store had the

12  ability to order the amount that had been cut by

13  your algorithm, would that fulfill the intended

14  purpose of your algorithm?

15     MS. SWIFT:  Objection; foundation.

16  BY THE WITNESS:

17     A.    If a store had the ability --

18  BY MR. MOUGEY:

19     Q.    If the store had the ability --

20     A.    Yes.

21     Q.    -- to order the amount that had been cut

22  from a third-party vendor, would that have

23  fulfilled the obligation -- I'm sorry.  Let me do

24  that over.

Highly Confidential - Subject to Further Confidentiality Review

1      A.    It's very confusing.

2      Q.    Yeah, it is a little confusing.  Bad

3  question.

4            Do you have any understanding of whether

5  or not a store could fill an order that had been

6  cut by your algorithm by a third-party vendor?

7      MS. SWIFT:  Object to the form of the

8  question.

9  BY THE WITNESS:

10     A.    I -- I didn't work in operations.  So, I

11  don't know.  I never worked -- I don't have any

12  experience at the store.

13  BY MR. MOUGEY:

14     Q.    So you don't know?

15     A.    No, I don't know.

16     Q.    Did you account for the ability of a

17  store to order from a third-party vendor in your

18  algorithm?

19     A.    Did I account?

20     Q.    Yes, sir.

21     A.    I don't have control of how the --

22  how -- the different mechanisms for the store to

23  order.  I know that if the store was ordered, went

24  through the algorithm, it would be cut.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.    Yes, sir.  But what I asked was a little

2   different.

3             In your algorithm, did you account for

4   the fact that a store could order from a

5   third-party vendor?

6       A.    The algorithm has nothing to do how a

7   store could order.  It has to do with the order.

8       Q.    Do you have an understanding of whether

9   or not only stores that were ordering from

10  Walgreens were run through your algorithm?

11      A.    It was a Walgreens system.  We didn't do

12  CVS.

13      Q.    Just answer the questions I got.  That's

14  exactly right.

15            Your algorithm.  Did you have an

16  understanding of whether or not it was run or

17  applied to stores that were ordering from

18  third-party vendors like Cardinal?

19      A.    I wouldn't have -- if --

20      MS. FIX MEYER:  Objection; foundation.

21  BY THE WITNESS:

22      A.    The algorithm looked at the order in

23  relationship to other orders and it wouldn't -- it

24  had a tolerance limit and if it exceeded the

1    tolerance limit, it flagged it as potentially

2    suspicious.

3              How the orders got into the algorithm,

4    what the -- what orders got in and what orders

5    didn't get out, I have no knowledge of that.

6    BY MR. MOUGEY:

7         Q.   Do you have an understanding sitting

8    here or a belief that all Walgreens orders were run

9    through your algorithm?

10        MS. SWIFT:  Object to the form of the

11   question.

12   BY THE WITNESS:

13        A.   I don't have firsthand knowledge.

14   BY MR. MOUGEY:

15        Q.   Did you design the algorithm --

16        A.   Yes.

17        Q.   -- that all Walgreen orders would be run

18   through your algorithm?

19        MS. SWIFT:  Object to the form.

20   BY THE WITNESS:

21        A.   The -- I designed the algorithm to look

22   at -- to look at orders and -- for all orders to go

23   through the algorithm?  Whether there is

24   exceptions, I'm sure -- I don't know.

1    BY MR. MOUGEY:

2         Q.    You don't know.

3         A.    I don't know.

4         Q.    But you designed the algorithm that you

5    proposed in 2008 to apply to all Walgreens pharmacy

6    orders, correct?

7         MS. SWIFT:  Object to the form, foundation.

8    BY THE WITNESS:

9         A.    I didn't control what orders got pushed

10   through the system.  If they -- if they got pushed

11   through the system, they were a part of the

12   process.

13        Q.    But what I asked -- I understand you're

14   not in ordering.  I understand you're not a lawyer.

15   I understand.  That's not what I'm asking.

16             What I'm asking you -- just focus on

17   just what I'm asking.

18        A.    Yes.

19        Q.    Your algorithm that you and Ms. Morris

20   put together in 2008, was it designed to review all

21   Walgreens orders for controlled substances and

22   specifically opiates?

23        A.    It was --

24        MS. SWIFT:  Object to the form.

```
 1    BY THE WITNESS:

 2         A.    It was designed to control all orders

 3    that went through the system.  I have no control of

 4    what orders go which way or how they get processed.

 5    BY MR. MOUGEY:

 6         Q.    We get that.  Okay.  I'm talking about

 7    your algorithm.  What I want to know -- you defined

 8    it as "the system."

 9               So, was your algorithm designed to be

10    applied to all Walgreens orders?

11         A.    In spirit?  I -- it was designed to

12    measure orders that went through the system.  What

13    orders, where it went through the system, which

14    orders didn't go through the system, I didn't -- I

15    have no knowledge of that.

16         Q.    No one -- no one is asking you right

17    now, I'm not asking you what orders went through

18    the system or not.  Okay.

19               What I'm simply asking is:  When you put

20    together this algorithm with Ms. Morris designed to

21    identify suspicious orders, did you intend it to

22    apply to all Walgreens orders for controlled

23    substances?

24         A.    My -- I was charged with the task of
```

Highly Confidential - Subject to Further Confidentiality Review

1  coming up with an algorithm to identify suspicious

2  orders and if they went through the system, they

3  would be identified.  If they didn't go through, I

4  wasn't tasked to determine what path the orders

5  take.  Just -- so I don't have any firsthand

6  knowledge of that.

7      Q.    I'm sorry if we're speaking past each

8  other.  All I'm asking you is what you intended

9  your algorithm to do.

10     A.    I intended my algorithm to identify

11 orders that went through the -- through my

12 algorithm as suspicious orders, potentially

13 suspicious or not suspicious.

14     Q.    And was it your understanding when you

15 put together the algorithm at Walgreens that all

16 orders for controlled substances were being run

17 through your system?

18     A.    I -- I wasn't in control of all orders.

19     Q.    I didn't ask you if you were in -- sir,

20 I'm asking a really simple question.  Okay?

21         What I'm asking is:  When you designed

22 your algorithm, Mr. Bancroft -- hold on -- did you

23 have an understanding that all Walgreens orders for

24 controlled substances were going to be run through

Highly Confidential - Subject to Further Confidentiality Review

1    your algorithm?

2        MS. SWIFT:  Objection; asked and answered.

3    BY THE WITNESS:

4        A.    I had -- definitively, I can't answer

5    that.  I have no knowledge if all orders would go

6    through or not.

7    BY MR. MOUGEY:

8        Q.    So, you didn't have an understanding

9    when you drafted it whether it was going to be run

10   through 1%, 5%, 50%, 90, you never asked?

11       A.    No.  I don't have any percentage.

12       Q.    You don't have any idea, you never asked

13   when you put together this algorithm, what pieces

14   of orders were going to be run through your system?

15       A.    I think it was intended for -- for

16   orders to go through the system.  If there's other

17   ways, mechanisms for store ordering, I -- that

18   was -- that was out of my realm.

19            So, I -- there may have been other

20   mechanisms for the store to order to circumvent the

21   system, but I have no knowledge of that and I --

22   and that was not part of the design of the system.

23            The design of the system was to identify

24   orders as suspicious or potentially suspicious that

1    went through the algorithm.

2         Q.    So no one ever came to you and asked

3    you --

4         A.    Why would they?

5         Q.    -- will you please design --

6         MS. SWIFT:  Just let him ask the question,

7    Wayne.

8         THE WITNESS:  Sorry.

9    BY MR. MOUGEY:

10        Q.    -- will you please design a system to

11   flag stores that were trying to circumvent your

12   algorithm?

13        A.    No.

14        Q.    Do you believe or do you have any

15   individual knowledge that Walgreens allowed stores

16   to circumvent your system?

17        A.    I have no firsthand knowledge.

18        Q.    If there were stores that Walgreens

19   allowed to circumvent your system, that would

20   minimize the impact of your algorithm, correct,

21   sir?

22        A.    That would be correct.

23        MS. SWIFT:  Objection; foundation.

24   BY THE WITNESS:

1          A.     Yes.

2     BY MR. MOUGEY:

3          Q.     I'm sorry.  Yes?

4          A.     That would -- yes.

5          Q.     Sir, outside of your algorithm that

6     we've been talking about for the last couple of

7     hours, are you -- were you involved in any other

8     component of Walgreens' suspicious order monitoring

9     systems?

10         A.     I believe not.

11         Q.     Okay.  So, you didn't write any

12    algorithm or formula for any other of Walgreens'

13    suspicious order monitoring systems other than the

14    ones we have been talking about today?

15         A.     Including the ceiling?

16         Q.     Yes, sir.

17         A.     Yes.

18         Q.     Yes, sir.  That's the universe of what

19    you were involved in?

20         A.     I think so, yes.

21         Q.     Okay.  Are you familiar with the orders

22    that Walgreens was sending to the DEA from 2006

23    until the beginning of 2012 being identified as

24    suspicious?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    I wasn't, no.

2      Q.    No knowledge at all?

3      A.    No.

4      Q.    Do you have any -- do you have any

5 knowledge of what formula or algorithm was used to

6 detect the orders that were sent to the DEA from

7 2006 to 2012?

8      A.    I would assume it's the algorithms I

9 designed, I worked on.

10     Q.    So, you don't -- would you be surprised

11 to hear that the orders sent to the DEA as

12 suspicious were based on another formula, something

13 different than you drafted?

14     A.    I'd be surprised to hear that.

15     Q.    Why would you be surprised?

16     A.    I'm not aware of any.

17     Q.    Are you proud of the work that you did,

18 the model you put together?

19     A.    I think it was good work.

20     Q.    You think it was good work.  And so

21 you're proud of what you did?

22     A.    I'm proud of everything I've done at

23 Walgreens.

24     Q.    And you would think that the algorithm

1    you put together was used to identify suspicious

2    orders to the DEA?

3        MS. SWIFT:  Objection; foundation.

4    BY MR. MOUGEY:

5        Q.    You believed that Walgreens was using

6    your algorithm to identify suspicious orders that

7    it was reporting to the DEA?

8        A.    It was --

9        MS. SWIFT:  Objection; mischaracterizes the

10   testimony.

11   BY THE WITNESS:

12       A.    I was aware -- I believe that the

13   algorithms were used to prevent suspicious orders

14   from occurring.

15   BY MR. MOUGEY:

16       Q.    The question I asked was a little

17   different.  I asked you did you believe that

18   Walgreens was using your algorithm to identify

19   suspicious orders that were reported to the DEA?

20       MS. SWIFT:  Objection; asked and answered.

21   BY THE WITNESS:

22       A.    The system -- what I believed is that

23   the algorithms were used to cut orders from being

24   suspicious so there would be no need to report

Highly Confidential - Subject to Further Confidentiality Review

1    them.  They'd be -- they would not allow suspicious

2    orders to even be generated.

3              So, if what was reported, I'm not sure

4    how -- what the reporting system was or what other

5    mechanisms there were for stores to order.  I am

6    unaware of that.

7    BY MR. MOUGEY:

8       Q.    Mr. Bancroft, I'm going to hand you what

9    I'm going to mark as Bancroft 14.

10                  (WHEREUPON, a certain document was

11                   marked as Walgreens-Bancroft

12                   Exhibit No. 14:  7/2/12 e-mail with

13                   attachment; WAGMDL00077015 -

14                   00077023.)

15   BY MR. MOUGEY:

16      Q.    This is an e-mail that you're copied on,

17   July 2, 2012.  Do you see that, sir?

18      A.    Yes.

19      Q.    And you see your name under the "To"

20   section?

21      A.    Yes.

22      Q.    Wayne Bancroft?

23      A.    Yes.

24      Q.    All right.  And the subject, "Discussion

1    of ceiling limits - updated with PowerPoint for

2    review"?

3         A.    Yes.

4         Q.    And "Attachments:  CSR talking points

5    6-22-12," and it's a meeting invite, correct?

6         A.    Yes.

7         Q.    All right.  And you were invited to this

8    meeting.  And, in fact, the e-mail below, "Hi John

9    and Wayne, We've done some additional

10   analysis/simulation on the ceiling limits issue and

11   wanted to walk through a few results with you to

12   gather your perspective and make sure we're on the

13   same page.  I'll be able to get you the slides for

14   review on Monday morning in advance of the

15   meeting."

16             Do you see that?

17        A.    Yes.

18        Q.    And, so, there was a meeting discussing

19   the enhancements to the algorithm that we went

20   through on Exhibit 13, correct, sir?

21        A.    Exhibit 13?  This is 19.

22        Q.    Yes, sir.  The Exhibit 13 that we just

23   went through, citing to the store in Fort Myers

24   where the oxycodone --

 1          A.    Yes.

 2          Q.    -- increased by 22 --

 3          A.    Yes.

 4          Q.    -- times, that was a memo where you were

 5     discussing enhancements, correct?

 6          A.    Yes.

 7          Q.    And that memo was dated 4/27/2012,

 8     Exhibit 13.  Do you see that?

 9          A.    Yes.

10          Q.    And now we're, Exhibit 14, we're in

11     July of 2012, just a few months later, right?

12          A.    This is 14?

13          Q.    Yes, sir.

14          A.    Oh, I thought it was 19.  The year 19.

15     Okay.

16          Q.    14.

17          A.    Yes.  So, this was dated -- what was

18     your question about the date?

19          Q.    The ceiling limits in Exhibit 14 --

20          A.    Yes.

21          Q.    -- dated 7/2 of 2012 --

22          A.    Yes.

23          Q.    -- are referencing the enhancements from

24     Exhibit 13, correct?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    I'm not sure.

2      Q.    Do you want to check?

3      A.    Yes.

4      Q.    Do you see in the e-mail on 14 where it

5  says "ceiling limits"?

6      A.    On 14.  14, but I'm looking at what's on

7  13.

8      Q.    Okay.

9      A.    Is there ceiling limits on 13, tolerance

10  limits?  I don't see ceiling limits, do I?  I don't

11  see ceiling limits on 13.

12      Q.    So, these are a different, a different

13  enhancement that's being discussed in 13 -- I'm

14  sorry -- in Exhibit 14?

15      MS. SWIFT:  Object to the form.

16  BY THE WITNESS:

17      A.    I -- I don't see ceiling limits in 13.

18  BY MR. MOUGEY:

19      Q.    Why don't you explain to me what you

20  think the difference of the enhancements were in 13

21  from what's being discussed in 14?

22          Let's do it this way.  We can make it

23  quick.

24          In Exhibit 13 the enhancements were

1  discussing adding a time dimension to the

2  application, correct?

3       A.    I think that's correct.

4       Q.    All right.  And Exhibit 14 is discussing

5  adding a ceiling limits tool as an enhancement to

6  the system, correct?

7       A.    Yes.

8       Q.    So, there were discussions in early '12

9  making enhancements to the system, correct?

10      A.    Enhancements, yes.

11      Q.    So, it's not just one enhancement.

12 There were different things that were being

13 discussed.  Is that accurate?

14      A.    Yeah, that would be accurate.

15      Q.    Okay.  So, let's stick with Exhibit 14

16 on the ceiling limits.  Okay, sir?

17      A.    Yes.

18      Q.    I'd like to walk through the PowerPoint

19 that's attached.

20      A.    Okay.

21      Q.    Very first page, Bates No. 16,

22 "Controlled Substance Order Review, Business

23 Logic."

24           Do you see that, sir?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      Yes.

2       Q.      And A, under the wheel, is "Ongoing

3   controlled substance order review logic includes

4   PSE," right?

5       A.      Yes.

6       Q.      B is "Manual line limits for select

7   drugs."

8               Do you see that, sir?

9       A.      Yes.

10      Q.      C, "Automated ceilings."

11              Do you see that?

12      A.      Yes.

13      Q.      And "Automated ceilings," next to it has

14  "Phase 5:  In design, ceilings trump step A below

15  if/when necessary."

16              Do you see that?

17      A.      Yes.

18      Q.      So, let's go to the second page, Bates

19  No. 17, "Ongoing Controlled Drug Order Review

20  Logic."  Okay?

21      A.      Sorry.  17, got it.

22      Q.      Yes, sir.  And you see at the bottom of

23  Bates No. 17, along with the other pages, where it

24  says, "Privileged & confidential prepared in

1    anticipation of litigation by or at the direction

2    of litigation & regulatory law."

3            Do you see that, sir?

4    A.    Yes.

5    Q.    Do you have any understanding of whether

6    or not this was created in anticipation of meeting

7    with the DEA?

8    A.    I don't have -- I didn't create this

9    document.  I don't know what the anticipation was.

10   Q.    I didn't ask if you created it.  I just

11   asked do you have any understanding?

12   A.    I --

13   MS. SWIFT:  Objection; asked and answered.

14   BY THE WITNESS:

15   A.    I'm not -- I don't know.  I'm not -- I

16   didn't create this document.  I don't know the

17   intent of the author.

18   BY MR. MOUGEY:

19   Q.    Okay.  So, if we look at Bates No. 17,

20   you see that there is a table with 1, 2, 3 and 4.

21           Do you see that, sir?

22   A.    Yes.

23   Q.    And it has -- the titles of the column

24   are "Phase" and then "Key Points."

1          Do you see that?

2     A.   Yes.

3     Q.   So, sir, the order review logic that's

4  at the top of the page, do you have an

5  understanding that this was referencing in part the

6  algorithm that you drafted?

7     MS. SWIFT:  Objection; foundation.

8  BY THE WITNESS:

9     A.   I -- again, I don't know the intent of

10 this document.  I'm not -- I'm not familiar with

11 this document.

12 BY MR. MOUGEY:

13    Q.   Sir, this was e-mailed to you on July 2

14 of 2012, right?

15    A.   That was, yes.

16    Q.   You were brought into a meeting to

17 discuss the ceiling limits, correct?

18    A.   Yes, I guess.

19    Q.   And --

20    A.   That's what it says.

21    Q.   And do you know any other order review

22 logic other than your algorithm?

23    A.   No.

24    Q.   So, what I want to direct your attention

1    to, under 1 you say, "August of 2009 to

2    September of 2009" (sic)?

3        A.    Yes.

4        Q.    And under "Key points," "Reviews WAG DC

5    orders only."

6              Do you see that, sir?

7        A.    Yes.

8        Q.    And "WAG DC orders only" would mean

9    Walgreens distribution centers only, correct?

10       MS. SWIFT:  Objection; foundation.

11   BY THE WITNESS:

12       A.    That would be an assumption.

13   BY MR. MOUGEY:

14       Q.    You don't know that?

15       A.    I didn't write the document.

16       Q.    So, that would be -- I'm not asking if

17   you've read the document.  What I'm asking you:  Is

18   it news to you that the order review logic was only

19   applied to Walgreens distribution centers only?

20       MS. SWIFT:  Object to the form.

21   BY THE WITNESS:

22       A.    I'm not sure what -- if it was

23   restricted to Walgreens distribution centers only

24   or not.  I don't have any knowledge.

1    BY MR. MOUGEY:

2         Q.    And if you go across to the last column

3    under "Phase I Key Points," "No order reductions in

4    Phase I."

5              Do you see that?

6         A.    Yes.

7         Q.    Were you aware that there were no order

8    reductions at least to September of 2010?

9         A.    I know it takes time to build a system.

10   So, initially -- we design an algorithm, it takes

11   time to program it, so it makes sense.

12        Q.    You started on this algorithm in the

13   beginning of 2008, correct?

14        A.    Yes.

15        Q.    And you've pointed to several times

16   today that one of the benefits of the algorithm was

17   it reduced the orders that were flagged as a result

18   of the algorithm, right?

19        A.    That was the intent.  That was one of

20   the intents of what the committee put together,

21   yes.

22        Q.    Were you aware that more than two years

23   later it was still not reducing the orders?

24        MS. SWIFT:  Object to the form, foundation.

1   BY THE WITNESS:

2      A.   No, I was not aware if it was or was

3   not.

4   BY MR. MOUGEY:

5      Q.   So, until we looked at this document,

6   September 2010, "No order reductions in Phase I,"

7   sitting here today you didn't know that it wasn't

8   until September of 2010 that orders were being

9   reduced?

10      MS. SWIFT:  Objection; asked and answered.

11   BY THE WITNESS:

12      A.   I don't know when the orders were

13   started to be reduced.

14   BY MR. MOUGEY:

15      Q.   Line No. 2, September 2010 to current.

16   Do you see "Reviews WAG DC orders only"?

17      A.   Yes.

18      Q.   And in the third -- I'm sorry -- fourth

19   column under "Key Points," "Reductions begin in

20   Phase 2 - only applies to WAG DC orders."  Correct?

21      A.   That's what it says.

22      Q.   That would be a hole in your algorithm,

23   correct, sir?

24      MS. SWIFT:  Object to the form.

```
 1   BY THE WITNESS:

 2       A.    No.

 3   BY MR. MOUGEY:

 4       Q.    So, if a pharmacy could go around the

 5   algorithm and order from a vendor like Cardinal or

 6   McKesson, that would be a hole in your algorithm,

 7   correct, sir?

 8       MS. FIX MEYER:  Object to the form,

 9   foundation.

10       MS. SWIFT:  Object to the form, foundation.

11   BY THE WITNESS:

12       A.    The -- it wouldn't be a hole in my

13   algorithm.  It might be -- I -- the -- the

14   algorithm is the algorithm.

15   BY MR. MOUGEY:

16       Q.    Fair enough.  And you're right.  It's

17   not a hole in the algorithm.

18       A.    Thank you.

19       Q.    It's a hole in Walgreens' system that

20   your algorithm was only applied to orders that were

21   entered at Walgreens, correct, sir?

22       MS. SWIFT:  Object to the form, foundation.

23   BY THE WITNESS:

24       A.    That would go beyond my -- my scope.
```

1    BY MR. MOUGEY:

2        Q.    Under 3, estimated June of 2012 to 7 of

3    2012, "Reviews only WAG distribution center orders

4    plus checks to see if vendor order placed within 48

5    hours for the same drug."

6            Do you see that, sir?

7        A.    Yes.

8        Q.    Were you aware until sitting here today

9    that a pharmacy could place an order with a vendor

10   like Cardinal or McKesson or AmerisourceBergen

11   within 48 hours --

12       MS. FIX MEYER:  Objection to form and

13   foundation.

14       MS. SCHUCHARDT:  Objection to form and

15   foundation.

16   BY THE WITNESS:

17       A.    I didn't work in the stores.  I don't

18   know how the order systems got, you know.  I don't

19   know all the mechanisms of the store operations.  I

20   know the algorithms.  I worked on the algorithms,

21   and that was my responsibility.  And when I wasn't

22   working on these algorithms, I was working on some

23   other algorithms most likely.

24   BY MR. MOUGEY:

1      Q.    Last, No. 4, July 2012.

2      A.    Yes.

3      Q.    "Reviews WAG DC," distribution center,

4    "orders plus applies same logic to vendor orders

5    making them eligible for flagging and order

6    reduction."

7           Do you see that, sir?

8      A.    Yes.

9      Q.    That was just months after your memo

10   citing to the Miami Herald article citing the DEA

11   crackdown and investigation into Walgreens,

12   correct, sir?

13     A.    I don't remember the date, but I believe

14   that's correct.  I believe you.

15     Q.    So, July of 2012, '9, '10, '11, '12,

16   four months -- I'm sorry -- four years after your

17   proposed algorithm, Walgreens, according to this

18   document, has now rolled out your algorithm to both

19   Walgreens distribution centers and vendor orders,

20   correct?

21     MS. SWIFT:  Object to the form,

22   mischaracterizes the document.

23   BY THE WITNESS:

24     A.    I wasn't in charge of how -- what

Highly Confidential - Subject to Further Confidentiality Review

1    systems were in place at what time.  Like I said, I

2    designed the algorithms and when I wasn't designing

3    those algorithms, I was designing some other

4    algorithms.

5    BY MR. MOUGEY:

6         Q.    So, sitting here -- until sitting here

7    today, you weren't aware that your algorithm was

8    not being applied to third-party vendor orders like

9    Cardinal and AmerisourceBergen and McKesson until

10   July of 2012?

11        MS. SCHUCHARDT:  Objection.

12        MS. FIX MEYER:  Objection; form, foundation.

13        MR. STANNER:  Also assumes facts not in

14   evidence.

15        MS. FIX MEYER:  Also calls for speculation.

16   BY THE WITNESS:

17        A.    I was not -- no, I was not aware.  I

18   don't know if it was or wasn't.  Goes beyond my

19   knowledge.

20   BY MR. MOUGEY:

21        Q.    Phase 4, very last column under "Key

22   Points," "Both WAG DC and vendor orders reduced if

23   thresholds exceeded."

24             Do you see that, sir?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Yes.

2        Q.    Do you have any understanding of why in

3   July of 2012 Walgreens decided to apply your

4   algorithm to reduce orders to third-party vendors?

5        MS. SWIFT:  Object to the form, foundation.

6   BY THE WITNESS:

7        A.    I have no knowledge.

8        MS. SWIFT:  It is about 12:30.  Can we stop

9   for a lunch, please?

10       MR. MOUGEY:  Actually, I'm going to make your

11  day I think.  I've got a couple more docs and if

12  you'll give me a few more minutes, I think I might

13  be done.

14       MS. SWIFT:  I'm actually going to have

15  probably a few questions as well.  So, keep that in

16  mind --

17       MR. MOUGEY:  When you say --

18       MS. SWIFT:  -- when you're thinking about how

19  hungry you are.

20       MR. MOUGEY:  How much time do you have?

21       MS. SWIFT:  I won't know until you're done,

22  Peter.

23       MR. MOUGEY:  I just have a few --

24       MS. SWIFT:  I actually probably won't know --

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MR. MOUGEY:  If I were to stop right now, how
 2   much longer do you have?
 3        MS. SWIFT:  I don't know.  I honestly don't
 4   know.
 5        MR. MOUGEY:  Five minutes?  It sounds like.
 6        MS. SWIFT:  Probably more than five minutes.
 7        MR. MOUGEY:  Ten minutes, a half hour?  It
 8   depends -- I am going to gauge my answer by how
 9   much longer I have to what you tell me.
10        MS. SWIFT:  I am going to answer the question
11   the same way no matter how many times you ask it.
12   I don't know.  Five minutes, 15 minutes.
13        MR. MOUGEY:  I can continue to go until 4,
14   5 o'clock and I'm open to knocking off here in the
15   next few minutes if you can tell me if you've got
16   15, 20 minutes' worth of questions if I were to
17   stop.
18        MS. SWIFT:  It might be 15 to 20 questions.  I
19   don't know.
20        MR. MOUGEY:  15, 20 minutes is what I was --
21   is that fair?  Is that the same answer?
22        MS. SWIFT:  It might be 15 or 20 minutes.  I
23   don't know.  I am trying to be honest.
24        THE WITNESS:  I'm flexible either way.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          MS. SWIFT:  Thank you, sir.

 2          MR. MOUGEY:  Thank you.

 3          MS. SWIFT:  I will say, Peter, either way,

 4     we're going to want to stop.  I want a little bit

 5     of a break before asking questions, just FYI.

 6          MR. MOUGEY:  If we -- I am willing to tell you

 7     I'm done right now.  If we can take a couple-minute

 8     break, organize what you need to do, and then if

 9     you have got 15 or 20 minutes, I'm willing to knock

10     off the rest of what I have to do.

11          MS. SWIFT:  I'm going to need to eat a

12     sandwich is what I'm telling you.

13          MR. MOUGEY:  You're going to need to eat a

14     sandwich to ask 15 minutes' worth of questions?

15          MS. SWIFT:  Yes, sir.

16          MR. MOUGEY:  Then I'll keep going for the rest

17     of the day, then.

18          MS. SWIFT:  Okay.  That's your choice.

19          MR. MOUGEY:  I mean, you got to be kidding me.

20     I'm just asking can we just take a five-minute

21     break, you get organized --

22          MS. SWIFT:  I will go get -- here's what I'll

23     do for you.

24          MR. MOUGEY:  You've got to be kidding me.
```

Highly Confidential - Subject to Further Confidentiality Review

1     MS. SWIFT:  I'll go get the sandwich right now

2  and I'll bring it in here, you can do your

3  remainder questions.

4     MR. MOUGEY:  I am not asking you to bring it

5  in here.  I'm telling you --

6     MS. SWIFT:  I know you're not.  I'll telling

7  you I'll do that to speed things along.

8     MR. MOUGEY:  I'm telling you I'm done if we

9  can take a five-minute break and you organize your

10  stuff and if you've got 15, 20 minutes, great.

11  Organize your things.

12          If you're telling me you want to take an

13  hour lunch break, I am going to miss the reason why

14  I want to get out of here and then I'm going to

15  keep going.

16          So, if you would like to get done, let

17  Mr. Bancroft off, take five minutes, get your stuff

18  organized and eat a sandwich in 20 minutes versus

19  now, that would be great.  I think everybody would

20  appreciate it.  If you want to take an hour lunch

21  break, I am going to miss the reason why I want to

22  get going.

23     MS. SWIFT:  We're wasting time now.  I don't

24  need an hour to eat a sandwich.  If you've got 5,

Highly Confidential - Subject to Further Confidentiality Review

1    10 minutes of questions, I'll run outside and get a

2    protein bar.  I don't care what it is.  And then

3    I'll take 15 minutes and we'll come back.

4         MR. MOUGEY:  Let's do that.  We'll take a

5    five-minute break.  You go eat a protein bar and

6    then I'll be done.

7         THE VIDEOGRAPHER:  We are off the record at

8    12:28 p.m.

9                   (WHEREUPON, a recess was had

10                   from 12:28 to 12:38 p.m.)

11        THE VIDEOGRAPHER:  We are back on the record

12   at 12:38 p.m.

13        MR. MOUGEY:  I'm done.  I don't have any more

14   questions.

15        THE WITNESS:  Thank you.

16                        EXAMINATION

17   BY MS. SWIFT:

18        Q.   Mr. Bancroft, now that I know once we've

19   gone back on the record that Mr. Mougey doesn't

20   have any more questions, I do actually have a few

21   for you.  Are you ready for those questions right

22   now?

23        A.   I'm ready.

24        Q.   Great.  I think you testified earlier

 1    today that you received all of your education here

 2    in Chicago.  Is that right, sir?

 3        A.    My Master's, yes.  Well, most of my

 4    education.  I spent a little time at SIU as an

 5    undergrad.

 6        Q.    Was that SUI in Carbondale, Illinois?

 7        A.    Yes, it is.

 8        Q.    Did you grow up in the Chicago area?

 9        A.    Yes, I did.

10        Q.    When did you get your Ph.D.?  And I

11    apologize if you already testified about that

12    earlier today.

13        A.    In May of '87.

14        Q.    Your -- what was your Ph.D. in?

15        A.    Management sciences.

16        Q.    Does that involve statistical modeling?

17        A.    It does.

18        Q.    Does it involve other things?

19        A.    Yes.

20        Q.    What else does it involve?

21        A.    It was part of the business school.  My

22    Master's was with the engineering school.  It

23    was -- the program got moved from the engineering

24    school to the business school.  So, there were some

1    finance with the business school.  There was linear

2    programming.  There was simulation.  There was an

3    array of disciplines that would fit under

4    management sciences that we -- we were responsible

5    for.

6          Q.    You received both your Master's and your

7    Ph.D. in management sciences.  Were both of those

8    degrees from the Illinois Institute of Technology

9    in Chicago?

10         A.    Yes, they were.

11         Q.    And your undergraduate degree was from

12   Loyola here in Chicago, is that right?

13         A.    Yes, it was.

14         Q.    I understand you had a variety of jobs

15   after receiving your Ph.D.  Were all of those,

16   before you came to Walgreens, were those all in the

17   Chicago area as well?

18         A.    Yes.

19         Q.    All performing quantitative analysis

20   along the lines of what you have been discussing

21   today?

22         A.    Either all or part of my work, yes.

23         Q.    Am I right that you came to Walgreens in

24   2004?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Yes.

2        Q.    Prior to your involvement in developing

3    the algorithms that you discussed today for

4    identifying orders that were potentially

5    suspicious, did you have any involvement at all in

6    anything called suspicious order monitoring or

7    reporting at Walgreens?

8        A.    No.

9        Q.    You talked today about I think a number

10    of algorithms that you developed for Walgreens

11    related to identifying potentially suspicious

12    orders.  Is that correct?

13        A.    Yes.

14        Q.    Was the first of those algorithms that

15    you developed for Walgreens relating to identifying

16    potentially suspicious orders, was that developed

17    in around the 2008 time frame?

18        A.    Yes.

19        Q.    And was it just one algorithm that you

20    developed in 2008 or was there more than one at

21    that point in time?

22        A.    There was two at that time.

23        Q.    Please describe to me those two

24    algorithms that you developed in the 2008 time

1  frame.

2      A.    In the 2008 time frame first we

3  developed -- one of the algorithms was tolerance,

4  the other was frequency.

5           The objective of tolerance is to find

6  anything that lied above the norm, the orders that

7  the store placed in its history.  So, it didn't

8  want -- it was allowed to place an order once a

9  week through the system and it didn't want those

10  orders to grow very much, but you had -- there is

11  some dispersion around the means.

12           So, we would calculate the mean, and we

13  calculate so many standard errors about that mean;

14  and if it went above that, we would -- we would

15  flag it as potentially suspicious.

16           Now, in developing the mean and the

17  standard error, we'd go through the data and we

18  took care to filter out anything that looked --

19  that was outlier in the history.

20           So, we only used -- we -- our goal was

21  to only use orders that were -- conform to the

22  normal pattern for that store.  So, if there was

23  orders that were high, they got thrown out and they

24  did not go into the calculations of the mean or to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the tolerance limit.

 2               And that should -- itself every store

 3    has to go -- every order -- every item goes through

 4    this for every store, and that should keep the

 5    stores from being able to grow at a very high rate.

 6    It would put like a governor on their ability to

 7    increase their amount of sales that they had.

 8    So -- so, historically that kept the -- each

 9    individual store in check.

10               The order frequency --

11        Q.    Before you go on -- I'm sorry to

12    interrupt you.  Before you go on to order

13    frequency, can I ask you a follow-up question about

14    tolerance limits?

15        A.    Yes.

16        Q.    Was the tolerance limit algorithm that

17    you developed designed to place limits on

18    individual orders?

19        A.    Placed -- it placed limits on individual

20    items and those individual orders for that item,

21    yes, it would place a limit on that.

22        Q.    But it wasn't like the tolerance limit

23    was looking at a limit over an entire store, like a

24    group of orders, individual --
```

1    A.    No.  Every item had its own -- own

2    calculation, yes.

3        Q.    Do you have an understanding whether the

4    algorithm that you developed for tolerance limits

5    is still in place at Walgreens today, do you know?

6        A.    I believe it's still in place.

7        Q.    All right.  You said there was another

8    algorithm that you developed in the 2008 time frame

9    related to order frequency, is that right?

10       A.    Yeah.  One of the requirements from the

11   DEA was order size and order frequency.

12            Frequency I had -- I scratched my head

13   as to what does it mean, and we talked about it.

14   What we came up with is if orders were placed too

15   close together, you placed an order today and you

16   placed an order tomorrow and that's not a normal

17   pattern, that's what the frequency.  Used a

18   geometric distribution.

19            And if -- so, if it was a slow-moving

20   item and two orders showed up back to back, it

21   could be a little bit suspicious or were

22   potentially suspicious.

23       Q.    And you say a little bit suspicious,

24   potentially suspicious.  There was a lot of

Highly Confidential - Subject to Further Confidentiality Review

1    questioning today about what you meant in your memo

2    from June of 2008 when you said suspicious orders.

3             Your -- I understand that you're not a

4    lawyer, is that right, sir?

5       A.    Yes.  And I'm not a linguist either.

6       Q.    You are also not somebody who is in the

7    store on the Store Ordering Team, is that right,

8    sir?

9       A.    That's right.

10      Q.    Am I also correct that you're not in the

11   Rx purchasing department?

12      A.    That's correct.

13      Q.    Am I also correct that you are not in

14   the Rx Integrity department?

15      A.    That's right.

16      Q.    Do you have an understanding of whether

17   folks on each of those different departments may

18   or -- do you know whether -- how they use the words

19   "suspicious orders" over time?

20      A.    I can't -- that would be speculation.  I

21   don't know how other people intended.  I know when

22   I heard the term "suspicious," how I interpret it

23   and how I intended it.

24      Q.    All right.  So, we talked about the two

1    algorithms that you developed in the 2008 time

2    frame.

3           Once you were done writing your

4    algorithms, did you -- did you maintain an ongoing

5    constant presence on the project to develop

6    Walgreens' suspicious order monitoring policies and

7    how those were implemented?

8    A.    Constant, no.  I would -- when asked to

9    participate, I'd participate.

10    Q.    Did that happen frequently,

11    infrequently, something else?

12    A.    I -- I would say something else.  You

13    know, I would say when needed.  I was needed more

14    upfront and then for a while I wasn't -- I was

15    doing other things, and then in 2012 I was -- I had

16    a more active role again.

17    Q.    Do you have an understanding of whether

18    the Store Ordering Team, Rakesh Khanna and Steve

19    Bamberg and folks like that, whether they took what

20    you did in 2008 and developed it further and

21    implemented it at the store -- at the company?

22    A.    That was their -- their job, yes.

23    Q.    Did they, in doing that, in that

24    development process, did they do that in large part

Highly Confidential - Subject to Further Confidentiality Review

1    without your involvement?

2        A.    In large part but, you know, I

3    participated where needed.

4        Q.    You said that at a certain point you got

5    back involved for making enhancements to the

6    system, is that correct?

7        A.    That would be correct.

8        Q.    In 2012, did you develop an additional

9    algorithm for use in identifying suspicious orders?

10       A.    In 2012 we -- we -- it was a group of us

11   called together, and we -- there was a -- they

12   wanted to tighten the or enhance the system, put

13   more controls on it, and so John Merritello, he

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

14        Q.      Do you know that for sure?

15        A.      I know it's a variable.  So, no, I don't

16    know that for sure.

# REDACTED

22        Q.      You talked a bit about the fact that

23    there are standard deviations that are used in

24    conjunction with your algorithms.  Is that right?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Yes.

2        Q.    Is it up to you to set the standard

3    deviations that are used?

4        A.    No.

5        Q.    Do you know who is responsible for that?

6        A.    The integrity group is my understanding.

7        Q.    Is it your understanding that that's who

8    is responsible for setting the standard deviations

9    today?

10       A.    Yes.

11       Q.    Prior to the time when the Rx Integrity

12   group was in place, do you have an understanding of

13   who was responsible for the standard deviations

14   that would have applied to the algorithms that you

15   developed?

16       A.    Prior to today, no.  Yeah, prior to

17   today, no.  I got a hint from today but...

18       Q.    You were asked a lot of questions about

19   what might happen to an order after it was flagged

20   on one of your algorithms.

21            Do you have any understanding of what

22   other folks in other departments at Walgreens may

23   have done once an order was flagged on one of your

24   algorithms?

1     A.     The system, my understanding was the

2   system would -- would adjust the order size.  And

3   exactly how, what that logic was, I wasn't too

4   involved in that.

5     Q.     There were other folks at Walgreens --

6     A.     Yes.

7     Q.     -- who were involved in that?

8     A.     Yes.

9     Q.     You were asked questions about the

10  timeline of development of Walgreens' suspicious

11  order monitoring policies and procedures over time.

12          Do you actually know when the tolerance

13  limit and frequency algorithms that you developed

14  were implemented at Walgreens?

15    A.     Time frame, no.  Timeline, I don't know.

16    Q.     Same question with respect to the

17  ceiling limits.  Do you actually know when the

18  ceiling limits were implemented at Walgreens?

19    A.     No, timeline, I'm not aware of.

20    Q.     Take a look, if you would, please, sir,

21  at Exhibit 12 just as an example.  This is the

22  "Functional Requirements & (Macro) Design" document

23  from -- the latest date on it is April 6, 2012.

24          Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    Your name isn't actually on this

3    document.  Did you have responsibility and

4    involvement in documents like this that were

5    developed by folks like Steve Bamberg and Rakesh

6    Khanna?

7    A.    The functional requirements, no, I was

8    not involved in that.  They probably used some of

9    the stuff I worked on, but creating this document,

10   no.

11   Q.    You were asked a question -- well, I

12   will look at Exhibit 12 for this purpose as well.

13        If you turn to page 2, you were asked

14   questions about the Phase I Overview and Phase II

15   Overview, and I believe you testified that Phase I

16   as used in Exhibit 12, the functional requirements

17   document, lasted until 2012.

18        Do you have any understanding of whether

19   other groups may have had different timelines using

20   different phases than what's in your mind?

21   A.    No, I -- no.  No knowledge.

22   MS. SWIFT:  I don't have any other questions.

23   MR. MOUGEY:  I don't have anything else.

24        Thank you, Mr. Bancroft.

1          THE WITNESS:  Thank you.

2          MR. MOUGEY:  Thanks, everybody.  Appreciate

3     it.

4          MS. SWIFT:  Ten to 1:00.

5          THE VIDEOGRAPHER:  We are off the record at

6     12:52 p.m.  This concludes the video deposition of

7     Wayne Bancroft.

8               (Time Noted:  12:52 p.m.)

9               FURTHER DEPONENT SAITH NAUGHT.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1
            I, CORINNE T. MARUT, C.S.R. No. 84-1968,
 2   Registered Professional Reporter and Certified
     Shorthand Reporter, do hereby certify:
 3            That previous to the commencement of the
     examination of the witness, the witness was duly
 4   sworn to testify the whole truth concerning the
     matters herein;
 5            That the foregoing deposition transcript
     was reported stenographically by me, was thereafter
 6   reduced to typewriting under my personal direction
     and constitutes a true record of the testimony
 7   given and the proceedings had;
              That the said deposition was taken
 8   before me at the time and place specified;
              That the reading and signing by the
 9   witness of the deposition transcript was agreed
     upon as stated herein;
10            That I am not a relative or employee or
     attorney or counsel, nor a relative or employee of
11   such attorney or counsel for any of the parties
     hereto, nor interested directly or indirectly in
12   the outcome of this action.
13

             _____
14            CORINNE T. MARUT, Certified Reporter
15
              (The foregoing certification of this
16   transcript does not apply to any
     reproduction of the same by any means, unless under
17   the direct control and/or supervision of the
     certifying reporter.)
18
19
20
21
22
23
24
```

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4   carefully and make any necessary corrections.  You

 5   should state the reason in the appropriate space on

 6   the errata sheet for any corrections that are made.

 7                   After doing so, please sign the errata

 8   sheet and date it.

 9                   You are signing same subject to the

10   changes you have noted on the errata sheet, which

11   will be attached to your deposition.

12                   It is imperative that you return the

13   original errata sheet to the deposing attorney

14   within thirty (30) days of receipt of the

15   deposition transcript by you.  If you fail to do

16   so, the deposition transcript may be deemed to be

17   accurate and may be used in court.

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -   -   -   -

                        E  R  R  A  T  A

 2                    -   -   -   -   -   -

 3

 4    PAGE   LINE   CHANGE

 5    _____  _____   _____

 6                   REASON:  _____

 7    _____  _____   _____

 8                   REASON:  _____

 9    _____  _____   _____

10                   REASON:  _____

11    _____  _____   _____

12                   REASON:  _____

13    _____  _____   _____

14                   REASON:  _____

15    _____  _____   _____

16                   REASON:  _____

17    _____  _____   _____

18                   REASON:  _____

19    _____  _____   _____

20                   REASON:  _____

21    _____  _____   _____

22                   REASON:  _____

23    _____  _____   _____

24                   REASON:  _____
```

Highly Confidential - Subject to Further Confidentiality Review

1

2            ACKNOWLEDGMENT OF DEPONENT

3

4        I, WAYNE EUGENE BANCROFT, do hereby

5 certify under oath that I have read the foregoing

6 pages, and that the same is a correct transcription

7 of the answers given by me to the questions therein

8 propounded, except for the corrections or changes

9 in form or substance, if any, noted in the attached

10 Errata Sheet.

11

12

13     _____

14    WAYNE EUGENE BANCROFT          DATE

15

16

17 Subscribed and sworn

to before me this

18 _____ day of _____, 20\_\_\_\_.

19 My commission expires:_____

20

_____ Notary Public

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1                          LAWYER'S NOTES

2    PAGE   LINE

3    _____  _____   _____

4    _____  _____   _____

5    _____  _____   _____

6    _____  _____   _____

7    _____  _____   _____

8    _____  _____   _____

9    _____  _____   _____

10   _____  _____   _____

11   _____  _____   _____

12   _____  _____   _____

13   _____  _____   _____

14   _____  _____   _____

15   _____  _____   _____

16   _____  _____   _____

17   _____  _____   _____

18   _____  _____   _____

19   _____  _____   _____

20   _____  _____   _____

21   _____  _____   _____

22   _____  _____   _____

23   _____  _____   _____

24   _____  _____   _____