```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION

 3

     IN RE: NATIONAL          )
 4   PRESCRIPTION             )   MDL No. 2804
     OPIATE LITIGATION        )
 5   _____  )   Case No.
                              )   1:17-MD-2804
 6                            )
     THIS DOCUMENT RELATES  )   Hon. Dan A.
 7   TO ALL CASES             )   Polster

 8

               MONDAY, OCTOBER 22, 2018
 9

       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10              CONFIDENTIALITY REVIEW

11                     - - -

12          Videotaped deposition of Sean
13   Barnes, held at the offices of BARTLIT BECK
14   HERMAN PALENCHAR & SCOTT LLP, 54 West
15   Hubbard, Suite 300, Chicago, Illinois,
16   commencing at 9:03 a.m., on the above date,
17   before Carrie A. Campbell, Registered
18   Diplomate Reporter, Certified Realtime
19   Reporter, Illinois, California & Texas
20   Certified Shorthand Reporter, Missouri &
21   Kansas Certified Court Reporter.
22                     - - -

              GOLKOW LITIGATION SERVICES
23        877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com
24

25
```

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

# REDACTED

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

# REDACTED

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

# REDACTED

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

REDACTED

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

# REDACTED

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

# REDACTED

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

```
 5    did you ever receive any training or

 6    education on the scope of prescription drugs

 7    being abused?

 8                    MS. SWIFT:  Object to the form.

 9                    THE WITNESS:  No.  In IT,

10         again, we're not the experts.  We

11         gather the data from the experts.

12    QUESTIONS BY MR. GADDY:

13         Q.    Okay.  But did anybody at

14    Walgreens provide any training or education

15    on prescription drugs being abused within the

16    country?

17                    MS. SWIFT:  Object to the form.

18                    THE WITNESS:  No, no direct

19         education was provided to me as an IT

20         person.

21    QUESTIONS BY MR. GADDY:

22         Q.    Okay.  Did Walgreens provide

23    you any education or training on the scope of

24    individuals within the US overdosing and

25    dying from prescription medication?
```

1          A.       Again, as my personal role in

2    IT, no specific education.

3               Internally, there's newsletters

4    making people aware about the epidemic,

5    steps, according to those letters, that were

6    directly -- steps the company was taking and

7    generally asking people to be alert, but in

8    my role as IT, no direct training.

9          Q.       When did you begin getting

10   newsletters within Walgreens?

11         A.       Various newsletters have

12   been -- different types have been published

13   since I started.

14         Q.       Okay.  Did you get a newsletter

15   within Walgreens regarding the $80 million

16   settlement that Walgreens paid to the DEA?

17         A.       There was a communication about

18   it.  I don't know how I would characterize

19   the content, whether it was a newsletter or a

20   web article or whatever, again, because

21   there's multiple types.  And I don't remember

22   how you categorized it, but just that there

23   was an agreement with the DEA on that issue.

24         Q.       When do you believe you began

25   getting newsletters from Walgreens related to

Highly Confidential - Subject to Further Confidentiality Review

1    the abuse of prescription narcotics within

2    the US?

3              MS. SWIFT:  Objection to the

4         extent it mischaracterizes the

5         testimony.

6              THE WITNESS:  I don't believe

7         that the -- that would be the way it

8         was worded.  It was more -- you know,

9         a lot of these newsletters are general

10        for all employees to say here's -- it

11        tries to bring people together in

12        Walgreens so you know a little bit

13        about other job functions that were --

14        what we're doing as a company to be

15        responsible.

16             So it was more -- you might

17        hear how I characterized it earlier.

18        You might hear about on the news all

19        this opioid epidemic and here's what

20        we're doing as a company, is how I'd

21        characterize it.

22   QUESTIONS BY MR. GADDY:

23        Q.    But you didn't receive any

24   training or education from Walgreens on those

25   issues?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.     No.
 2             (Walgreens-Barnes Exhibit 9
 3      marked for identification.)
 4  QUESTIONS BY MR. GADDY:
 5      Q.     I'll show what you we'll mark
 6  as Barnes 9.  You see on the first page at
 7  the top that says this is from the United
 8  States General Accounting Office?
 9             It's a report to Congressional
10  requesters.
11             You see that?
12      A.     I do.
13      Q.     Do you see it's dated on the
14  left-hand side there December 2003?
15      A.     I do.
16      Q.     The title of the document is,
17  "Prescription drugs:  OxyContin abuse and
18  diversion and efforts to address the
19  problem."
20             Do you see that?
21      A.     I do.
22      Q.     And this document that has a
23  December 2003 date, that would have been just
24  before you started at Walgreens, correct?
25      A.     Yeah, December -- given that I
```

1  started in January of 2004, yes.

2       Q.     Okay.  When you started with

3  Walgreens in 2004, you agree that Walgreens

4  was a distributor of Schedule II narcotics?

5       A.     To my knowledge, yes, that was

6  the case.  I didn't know that at the time,

7  but later on as I was asked to help out with

8  some compliance apps, yes.

9       Q.     Okay.  As you sit here today,

10  you know that in 2004 Walgreens was a

11  distributor of Schedule II narcotics?

12       A.     Can I swear that that was

13  occurring?  No.  I was led to believe that

14  these systems had existed for a while since I

15  support systems and had data.  So I could

16  deduce that that was likely the case, but I

17  have no personal knowledge.

18       Q.     And do you also have an

19  understanding that one of the drugs, one of

20  the Schedule II drugs, that Walgreens

21  distributed and dispensed in their pharmacies

22  was OxyContin?

23       A.     Now or then?

24       Q.     As you sit here today, do you

25  have an understanding that OxyContin is a

1    drug that Walgreens has distributed from its

2    distribution centers and dispensed from its

3    pharmacies?

4         A.    I don't have any personal

5    knowledge on that dispensing from either the

6    pharmacy or from the distribution center, but

7    it's my general, again, secondhand knowledge.

8         Q.    Is that yes?

9         A.    That Walgreens has distributed

10   from both, no longer from our DCs, and

11   continues to do so from our pharmacies.

12        Q.    Okay.  Walgreens used to

13   distribute OxyContin, no longer does.

14             Has always dispensed OxyContin,

15   correct?

16             MS. SWIFT:  Object to the form

17        of the question.

18             THE WITNESS:  Yeah, the

19        specific drug -- I was speaking as

20        secondhand knowledge of a general drug

21        class and type.  I don't know

22        OxyContin -- I don't know if that's

23        the name brand or the generic form,

24        but in general.

25             At a high level, I believe

```
1              we've dispensed and continue to

2              dispense from the stores and no longer

3              from the warehouse or DCs.

4    QUESTIONS BY MR. GADDY:

5         Q.    Okay.  And if you turn a couple

6    pages in, on the bottom of page you'll see it

7    says page 1.

8         A.    I do.

9              MS. SWIFT:  I think that's

10        page I.

11             THE WITNESS:  Oh.

12   QUESTIONS BY MR. GADDY:

13        Q.    Sorry, yeah, not roman

14   numerals, but...

15        A.    Okay.  Thank you.

16        Q.    You see at the top of the page

17   there's a date, December 23, 2003?

18        A.    I do.

19        Q.    And you see that this is

20   addressed to three members of Congress -

21   Honorable Frank Wolf, James Greenwood and

22   Harold Rogers - all identified as being

23   within the House of Representatives?

24        A.    I do.

25        Q.    If you'd turn to the next page
```

```
 1    for me, please.

 2         A.      Okay.

 3         Q.      In the paragraph that starts in

 4    the middle of the page, it says, "In early

 5    2000, media reports began to surface in

 6    several states that OxyContin was being

 7    abused, that is, used for nontherapeutic

 8    purposes or for purposes other than those for

 9    which it was prescribed, and illegally

10    diverted."

11               Do you see that?

12         A.      I do.

13         Q.      And after the word "diverted,"

14    you see there's a footnote there, correct?

15         A.      I do.

16         Q.      If we go down to the bottom of

17    page and look at that footnote 4, it says,

18    "Prescription drug diversion can involve such

19    activities as doctor shopping by individuals

20    who visited" -- excuse me, "who visit

21    numerous physicians to obtain multiple

22    prescriptions, prescription forgery and

23    pharmacy theft."

24               Do you see that?

25         A.      I do.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you agree those are all

2  issues that Walgreens has dealt with over

3  time as it relates to Schedule II narcotics?

4              MS. SWIFT:  Object to the form.

5              THE WITNESS:  I can't agree.  I

6       have no personal knowledge of that.

7  QUESTIONS BY MR. GADDY:

8    Q.    Going back up to the main

9  paragraph, it says, "According to FDA and the

10 Drug Enforcement Administration, DEA, the

11 abuse of OxyContin is associated with serious

12 consequences, including addiction, overdose

13 and death."

14              Do you see that?

15   A.    I do.

16   Q.    It says, "When OxyContin was

17 approved, the federal government classified

18 it as a Schedule II controlled substance

19 under the Controlled Substance Act because it

20 has a high potential for abuse and may lead

21 to severe psychological or physical

22 dependence."

23              Do you see that?

24   A.    Yes.

25   Q.    Did anybody at Walgreens ever

1    provide you with any information, education

2    or training when you started in 2004 that

3    these types of reports were being made to

4    Congress a year earlier?

5        A.    No, not in my role as an IT

6    person.

7        Q.    Okay.  Who supported the

8    compliance division of Walgreens, correct?

9        A.    You asked in 2004, and I did

10    not at that time.

11        Q.    Okay.  In 2006 you did?

12        A.    I would say roughly.

13        Q.    Okay.  It goes on to say, "DEA

14    has characterized the pharmacological effects

15    of OxyContin and its active ingredient,

16    oxycodone, as similar to those of heroin."

17        Do you see that?

18        A.    Yes.

19        Q.    Did anybody at Walgreens, at

20    any time while you were serving in a support

21    to a compliance role from 2006 to 2015,

22    provide you any education or training on how

23    the DEA equivalized oxycodone and heroin?

24        MS. SWIFT:  Object to the form.

25        THE WITNESS:  Can you please

1          restate that -- I didn't follow that

2          question.

3     QUESTIONS BY MR. GADDY:

4          Q.     Sure.

5                 Did anybody at Walgreens ever

6     provide you with any training or education on

7     this statement that was provided to Congress

8     in 2003, that the DEA was equating the

9     impacts of oxycodone with heroin?

10         A.     Not to my knowledge.  Not in

11    IT.

12         Q.     It says, "Media reports

13    indicated that abusers were crushing

14    OxyContin tablets and snorting the powder or

15    dissolving it in water and injecting it to

16    defeat the intended controlled release effect

17    of the drug and obtain a rush or high through

18    the body's rapid absorption of oxycodone."

19                Do you see that?

20         A.     Yes.

21         Q.     Okay.  And did anybody at

22    Walgreens provide you any education or

23    training on those issues as it related to

24    your support of the compliance division

25    within Walgreens?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. SWIFT:  Object to the form.
 2                    THE WITNESS:  I'm not in the
 3           compliance division at Walgreens to --
 4           brief correction there.  We support
 5           applications in IT.  We're --
 6           thousands of IT people, thousands of
 7           business people.  We specialize.  So
 8           we get information from the
 9           specialists in order to support.
10                    We don't -- you know, we take
11           compliance very seriously.  That's why
12           we provide so many people on it.  But
13           we give training to the people -- my
14           experience is the training I've been
15           given is specific to my individual
16           needs.
17   QUESTIONS BY MR. GADDY:
18           Q.    Okay.  Prior to today, have you
19   ever seen the statement that DEA has
20   characterized pharmacological effects of
21   OxyContin and its active ingredient,
22   oxycodone, as similar to those of heroin?
23                    Have you ever heard of that
24   concept before today?
25           A.    I have not heard it in my
```

1    professional capacity.  I think I've read it

2    in various news organizations.

3         Q.    Okay.  Nobody at Walgreens has

4    ever made you aware of that?

5         A.    I don't -- honestly, I'm trying

6    to think of a specific time.  There's general

7    conversations that will go along on a

8    project, and, you know, you might discuss in

9    general but not specifically.

10        Q.    In your role of supporting

11   compliance, you talked a little bit about how

12   you supported some of the ARCOS reporting

13   that was done.

14             Did you have any involvement in

15   supporting divisions within Walgreens that

16   were charged with making suspicious order

17   reports?

18        A.    No.

19        Q.    Okay.  Ever?

20        A.    Repeat your question just so I

21   can be sure.

22        Q.    Sure.

23             Did you have any involvement in

24   supporting divisions within Walgreens that

25   were charged with making suspicious order

1    reports?

2        A.      Have I had any encounters or

3    dealings with any group that was in charge of

4    making suspicious order reports; is that your

5    question?

6        Q.      I'm asking if that was ever

7    within the scope of your duties.

8        A.      I might need you to repeat it

9    again because I think you're asking have I

10   worked with groups that might do that, and

11   that answer would be yes, but my duties do

12   not include supporting those applications.

13       Q.      Okay.  Well, let me ask it one

14   more time just to make sure.

15       A.      Okay.

16       Q.      At any time in your employment

17   with Walgreens, did your duties ever include

18   supporting divisions within Walgreens that

19   were charged with making suspicious order

20   reports?

21               MS. SWIFT:  Object to the form.

22               THE WITNESS:  The question -- I

23          would support the groups that do that,

24          but there's another IT team that

25          supports the suspicious drug reporting

Highly Confidential - Subject to Further Confidentiality Review

1          applications, I believe.  We do not do

2          that, but -- we do also have

3          involvement with that group, but not

4          for that purpose.

5     QUESTIONS BY MR. GADDY:

6          Q.      Okay.

7          A.      That business group, to

8     clarify.

9          Q.      Okay.  So who's in that

10    business group?

11         A.      I'm sorry?

12         Q.      Who's in that business group?

13              MS. SWIFT:  Object to the form.

14              THE WITNESS:  Currently that

15         would be Tasha Polster and her

16         reports, Patricia Daugherty.

17    QUESTIONS BY MR. GADDY:

18         Q.      You're talking about the

19    pharmaceutical integrity team?

20         A.      RX integrity, yes.

21         Q.      Okay.  Prior to --

22         A.      I believe, again, it's not

23    my -- that's the team I work with.  I've

24    heard they support that, but since I don't

25    support that application, I'm making somewhat

Highly Confidential - Subject to Further Confidentiality Review

1    of an assumption.

2        Q.    I understand.

3            Prior to the formation of the

4    RX integrity team, what -- who was in the

5    business group that was charged with

6    reporting suspicious orders?

7        A.    I do not know.

8        Q.    What is -- who was in charge of

9    the IT team that supports the suspicious

10   order monitoring program now?

11       A.    That supports it currently?

12           I believe -- no direct

13   knowledge, but I believe that's Steve Bamberg

14   is the IT manager, my peer.

15       Q.    And Steve's the head of the IT

16   unit that supports the suspicious order

17   reporting currently?

18           MS. SWIFT:  Object to the form.

19           THE WITNESS:  Again, that's my

20       understanding.  It's, you know,

21       third -- you know, secondhand

22       knowledge.

23   QUESTIONS BY MR. GADDY:

24       Q.    Okay.  Who else works with

25   Steve on that team?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I actually don't know any of

2  his reports, anyone that reports to him

3  offhand.  No.

4    Q.    So prior to Tasha Polster and

5  her RX integrity group being in charge of

6  reporting suspicious orders, when that team

7  was formed, you don't know who was in charge

8  of reporting suspicious orders prior to that?

9    A.    No, there's no reason for me to

10  have known since we didn't support that

11  application.

12    Q.    Okay.  Do you offer any support

13  to any of the loss prevention divisions or

14  departments?

15    A.    Not directly.  The -- I mean,

16  support's a funny thing because people can

17  come and ask you a question in a large

18  organization and just ask for input, but

19  directly it's not one of our day-to-day

20  functions.

21        MR. GADDY:  Okay.  Do you want

22    to take a break?

23        THE WITNESS:  Yeah.

24        MR. GADDY:  I saw you

25    stretching.

Highly Confidential - Subject to Further Confidentiality Review

 1                    THE WITNESS:  Thank you.

 2                    VIDEOGRAPHER:  We're going off

 3         the record at 11:13.

 4          (Off the record at 11:13 a.m.)

 5                    VIDEOGRAPHER:  We're back on

 6         the record at 11:28.

 7    QUESTIONS BY MR. GADDY:

 8         Q.     Mr. Barnes, I think just before

 9    the break you testified that you did not

10    support any of the divisions that were

11    charged with suspicious order monitoring at

12    Walgreens, correct?

13         A.     I was trying to make a

14    distinction between we do support them but

15    not for suspicious drug monitoring.

16         Q.     Okay.

17         A.     Ordering.

18         Q.     What do you support them for?

19         A.     They would be the SMEs or the

20    teams we go to for CSOS ordering, ARCOS,

21    things like that, but there's another IT team

22    that I'm told that supports the suspicious

23    monitoring.

24         Q.     Okay.  Do you have any

25    understanding of Walgreens' suspicious order

Highly Confidential - Subject to Further Confidentiality Review

1    monitoring or reporting obligations under the

2    CSA?

3         A.    I don't know what CSA is, so,

4    no, I do not.

5         Q.    Okay.  That's fair.

6               Are you familiar with the

7    Controlled Substance Act?

8         A.    I've heard it mentioned, but

9    I -- no, I would have to say familiar, no.

10        Q.    Okay.  So are you familiar with

11   Walgreens' suspicious order reporting

12   obligations under the Controlled Substance

13   Act?

14        A.    Am I familiar with Walgreens'

15   reporting obligations under the suspicious --

16        Q.    Under the Controlled Substance

17   Act?

18        A.    Controlled Substance Act.

19               Not -- no, I -- directly or

20   indirectly, no.

21               (Walgreens-Barnes Exhibit 10

22        marked for identification.)

23   QUESTIONS BY MR. GADDY:

24        Q.    Okay.  I'm going to show you

25   what we'll mark as Barnes Exhibit Number 10.

Highly Confidential - Subject to Further Confidentiality Review

1           Do you recognize this document?

2      A.      Not offhand.

3      Q.      Okay.  Have you ever seen this

4  before?

5      A.      Are you asking for a general

6  opinion or for me to read it?  Because I

7  don't believe --

8           MS. SWIFT:  He's just asking if

9      you've seen it.

10           THE WITNESS:  I don't believe

11      so.

12  QUESTIONS BY MR. GADDY:

13      Q.      Okay.  And I'll represent to

14  you that this document relates to suspicious

15  order monitoring, and you're telling me that

16  that's not part of the scope of your duties

17  or nor has it ever been while you were at

18  Walgreens, correct?

19      A.      Correct.

20           (Walgreens-Barnes Exhibit 11

21      marked for identification.)

22  QUESTIONS BY MR. GADDY:

23      Q.      I'll show you what I'm going to

24  mark as Exhibit Number 11.

25           Do you see at the top left of

 1    this, this is a Department of Justice

 2    document?

 3         A.    Okay.  Yes.

 4         Q.    And that just below the seal

 5    there's a date, Friday, May 2, 2008.

 6              Do you see that?

 7         A.    I do.

 8         Q.    Okay.  And the title of this

 9    document is "McKesson Corporation agrees to

10    pay more than 13 million to pay claims that

11    it failed to report suspicious sales of

12    prescription medications."

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

# REDACTED

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

```
 7          Q.      The next sentence says,

 8    "Cardinal's negligent conduct contributed to

 9    our nation's serious pharmaceutical abuse

10    problem.  The substantial civil penalty

11    underscores DEA's determination to prevent

12    pharmaceutical diversion and protect the

13    public health and safety by continuing to

14    hold companies responsible if they fail to

15    fulfill their obligations under the

16    Controlled Substance Act."

17               Do you see that?

18          A.      I do.

19          Q.      And again, did anybody at

20    Walgreens have any conversations with you or

21    provide you any training or education in your

22    role as serving a compliance function as it

23    relates to the controlled substance ordering

24    system at Walgreens?

25               MS. SWIFT:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 THE WITNESS:  No, they would
 2         not come to me with news such as this.
 3         We fulfill the IT functionality and we
 4         specialize.  It would be like me going
 5         to them with the latest RAM technology
 6         or memory technology.
 7                 It's -- while it's serious news
 8         and -- they just would come to us with
 9         what they want changed.  They try to
10         be efficient.
11    QUESTIONS BY MR. GADDY:
12         Q.    You see the very bottom line on
13    that page says, "Hydrocodone is the most
14    commonly diverted and abused controlled
15    pharmaceutical in the United States."
16                 Do you see that?
17         A.    I do.
18         Q.    Did you have an understanding
19    of that back in 2008?
20         A.    I did not.  Assuming, you know,
21    that that's the truth.
22         Q.    Has anybody at Walgreens ever
23    made it clear to you that hydrocodone is the
24    most commonly abused controlled
25    pharmaceutical in the US?
```

```
1        A.      Not to my knowledge, offhand.

2                (Walgreens-Barnes Exhibit 21

3        marked for identification.)

4    QUESTIONS BY MR. GADDY:

5        Q.      Let me show you what I'm going

6    to mark as Barnes Exhibit 21.

7                And do you see at the bottom

8    that this is another e-mail that gets

9    forwarded to you by Caroline Rawa?

10       A.      I do.

11       Q.      And if you start down there,

12   you see that it's another press release from

13   DEA that says, "DEA publishes proposal to

14   reschedule hydrocodone"?

15       A.      I do.

16       Q.      And the next page it says,

17   "Today, the US DEA published in the Federal

18   Register a notice of proposed rulemaking to

19   move hydrocodone combination products, HCPs,

20   from Schedule III to Schedule II."

21               Do you see that?

22       A.      I do.

23       Q.      The next paragraph it says,

24   "The Controlled Substance Act places

25   substances with accepted medical uses into
```

1    one of four schedules, with the most

2    potentially harmful and abusable medications

3    being placed in Schedule II."

4              Do you see that?

5         A.    I do.

6         Q.    Is that consistent with your

7    understanding of how the DEA classifies

8    controlled substances?

9              MS. SWIFT:  Object to the form.

10         Foundation.

11              THE WITNESS:  I don't really

12         have any basis of understanding how

13         they go about it except for in

14         general, the more controls are placed,

15         the lower the number is.

16    QUESTIONS BY MR. GADDY:

17         Q.    If you go to the next

18    paragraph, start at the second sentence, it

19    says, "The analysis by HHS and the DEA shows

20    HCPs have a high potential for abuse, and

21    abuse may lead to severe psychological or

22    physical dependence."

23              Do you see that?

24         A.    I do.

25              What is HCPs?

1     Q.     Hydrocodone combination

2   products.

3     A.     Okay.

4     Q.     Is that sentence there

5   consistent with your understanding that

6   hydrocodone has a high potential for abuse

7   and may lead to psychological or physical

8   dependence, i.e., addiction?

9                MS. SWIFT:  Object to the form.

10          Foundation.

11                THE WITNESS:  That's definitely

12          what I've heard on the news.

13   QUESTIONS BY MR. GADDY:

14     Q.     If you skip a sentence it says,

15   "Data and surveys from multiple federal and

16   nonfederal agencies show the extent of abuse

17   of HCPs" -- that's again hydrocodone

18   combination products.

19     A.     Uh-huh.

20     Q.     It says, "For example,

21   monitoring the future, surveys of 8th, 10th

22   and 12th graders from 2002 to 2011 found that

23   twice as many high school seniors used

24   Vicodin, an HCP, nonmedically, as used

25   OxyContin, a Schedule II substance, which is

Highly Confidential - Subject to Further Confidentiality Review

1    more tightly controlled."

2             Do you see that?

3        A.    I do.

4        Q.    Do you recall reading this

5    press release when it was sent to you by

6    Caroline?

7        A.    No, I don't.

8        Q.    Do you recall receiving it?

9        A.    No, I actually don't recall

10   receiving it.

11       Q.    When Caroline sends to you --

12   and I'm looking in the middle of the page

13   there.

14       A.    Uh-huh.

15       Q.    She forwards it to you, and her

16   comment to you is, "FYI.  Potential for lots

17   of CSOS orders here," with a smiley face.

18       A.    Uh-huh.

19       Q.    Do you see that?

20       A.    I do.

21       Q.    What did that mean to you?

22             MS. SWIFT:  Object to the form.

23             THE WITNESS:  Again, I'm not

24        remembering specifically, but seeing

25        the timeline, as I've explained in

Highly Confidential - Subject to Further Confidentiality Review

```
 1          other questions, is roughly around the
 2          time where we changed the CSOS system
 3          to fulfill signing for store orders
 4          and not for -- not for bringing orders
 5          into our warehouses for wholesale to
 6          our stores.
 7               We had a lot of problems with
 8          getting the system stable to perform,
 9          and we were trying to hold back the
10          number of orders and advising the
11          business to stay paper as long as
12          possible.
13               My belief is that, you know,
14          this was like a -- anytime you're
15          going through struggles together as a
16          team, you know, oh, gosh, here's going
17          to be another 10,000 orders or
18          whatever type of feeling, is my best
19          surmise of what I would think was
20          going on here.
21     QUESTIONS BY MR. GADDY:
22          Q.    Okay.  And Walgreens sold
23     hydrocodone in the stores at this time,
24     correct?
25          A.    I don't know specifically about
```

1    hydrocodone.

2              Knowing -- Caroline is one of

3    my most detailed people.  Knowing her, she

4    was just probably trying to make sure we're

5    aware of it and that they could hit it.  And

6    I trust her to read the details on things

7    like this and call my attention to anything

8    specific, so I probably sped-read the

9    high-level topic.

10             So I don't know -- but

11   specifically back to your question, you

12   asked:  Did Walgreens carry it?

13             I would assume so because I

14   think we try to carry legal drugs to

15   prescribe, but I don't have any personal,

16   direct knowledge that that was the case

17   either.

18        Q.    As you sit here today, you're

19   telling me that you don't have an

20   understanding as to whether or not Walgreens

21   sold hydrocodone?

22        A.    Like I said, I would assume so,

23   but as my -- it's not my specialty.  It's not

24   what I do day to day.  I would think we do

25   because I would think people would go to

1  other pharmacies if we didn't.

2      Q.    And you respond up top, and the

3  first comment that you make is, "and lots of

4  suspicious drug orders," correct?

5      A.    Correct.

6      Q.    Okay.  And do your job duties

7  have anything to do with suspicious drugs

8  orders?

9      A.    No, they do not.

10     Q.    Okay.  Well, what did you mean

11  by your comment that because hydrocodone was

12  now going to be scheduled as II instead of

13  III, that you would now have lots of

14  suspicious drug orders?

15     A.    Again, trying to put this in

16  context, I think this is roughly around the

17  time I probably learned a little bit about

18  suspicious drug ordering being in effect.

19         Like I said before, when I'd

20  heard of the settlement -- you have water

21  cooler conversations.  I talked to people and

22  I heard that there was such a thing, so I'm

23  assuming that with that and with the

24  knowledge -- like I said, I heard that

25  Tasha's group was formed.  It was just kind

1    of a -- and we were working with them closely

2    to roll out this.  We were hit -- I'm kind of

3    just guessing here that that's where that

4    comment came.

5         Q.    Well, I'm a little confused

6    because just a minute ago you told me that

7    you didn't know whether or not y'all sold

8    hydrocodone, but now you're making a comment

9    that because it's getting rescheduled, you're

10   going to now have a lot of suspicious drug

11   orders.

12             So can you help me understand

13   that?

14        A.    Well, I think I also said I'm

15   making a lot of assumptions based on the

16   e-mail.  I don't directly remember.

17             So given that, all I can do is

18   make what I don't prefer to do, is

19   assumptions, based on the evidence in front

20   of me.  And that's what I can conclude, is

21   that, A, I would assume that we sold them as

22   a company that tries to provide the best

23   service and most products to our customers;

24   and B, likely having just recently learned

25   there was such a thing as suspicious drug

1    ordering, that it might apply in this case.

2         Q.    Well, why would you think that

3    it might apply to hydrocodone?

4         A.    Because it's a Schedule II

5    drug, and according to that article, it's

6    being moved over.

7         Q.    Okay.  It was not a secret to

8    you that people were abusing hydrocodone, was

9    it?

10             MS. SWIFT:  Object to the form.

11             THE WITNESS:  I think it's fair

12        to say that between starting to see

13        articles back then and hearing about

14        the settlement, that regardless of the

15        truth of the settlement or anything

16        around it, that there was -- you were

17        starting to see hints.

18   QUESTIONS BY MR. GADDY:

19        Q.    What is the next comment that

20   you make related to the e-mail that Caroline

21   sent you?

22        A.    Personal medical issues.

23        Q.    Okay.

24        A.    It's related to my co-pay.

25        Q.    Okay.  So at the time that you

```
 1   sent this e-mail, you were filling, regularly
 2   filling, 90-day supplies for the medication?
 3              MS. SWIFT:  Object to the form
 4        of the question.
 5              THE WITNESS:  I don't remember
 6        if they were 90-day supplies.  In
 7        fact, now I don't even know that you
 8        can get them, but I don't remember.  I
 9        just know that I've had -- I had need
10        of pain medications due to a personal
11        illness that's ongoing.
12              MS. SWIFT:  We've been going
13        for a more than an hour.  Can we --
14        you want to take a break?
15              MR. GADDY:  Yeah, now is a good
16        time.
17              VIDEOGRAPHER:  We're going off
18        the record at 2:17.
19         (Off the record at 2:17 p.m.)
20              VIDEOGRAPHER:  We're back on
21        the record at 2:38.
22   QUESTIONS BY MR. GADDY:
23        Q.    Mr. Barnes, the last document
24   we were looking at was the -- we'd marked as
25   Barnes number 21.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Do you have that in front of

2   you?

3      A.    I do.

4      Q.    Okay.  Prior to just before the

5   break, when was the last time you'd seen that

6   document?

7      A.    Prior to the break, just before

8   the break, you had given it to us.

9      Q.    Sure.

10      Prior to that, when was the

11   last time you'd seen it?

12      A.    It was reviewed in some of

13   my -- some documents that were shown to me

14   preparing for this.

15      Q.    Okay.  You reviewed it in

16   preparation for the deposition?

17      MS. SWIFT:  You can answer that

18      yes or no.

19      THE WITNESS:  Yes.

20   QUESTIONS BY MR. GADDY:

21      Q.    Okay.  How much time did you

22   spend preparing for the deposition today?

23      A.    For both parts of my deposition

24   or just the personal or --

25      Q.    Just the personal right now.

```
 1         A.      I'd say maybe just a few hours

 2    in preparation for that.  More was spent on

 3    the -- on 30(b)(6), I think it's called.

 4         Q.      Okay.  When did you have the

 5    opportunity to prepare for your individual

 6    deposition?

 7         A.      Last week on a couple of days,

 8    a couple hours on those days, and then

 9    previously.

10         Q.      Okay.  How many separate

11    meetings did you have?

12         A.      Three.

13         Q.      I wouldn't normally have asked

14    this question, but I'm going to based on the

15    e-mail and based on the response that you

16    gave, but are you still currently taking

17    opioid medication?

18              MS. SWIFT:  And I'll let him

19         answer that question, Jeff, but I'm

20         not going to let him go to -- in too

21         much detail here.  Your co-counsel had

22         repeatedly instructed witnesses not to

23         answer those exact same questions.

24              THE WITNESS:  I still have a

25         prescription, and I take it as needed.
```

```
 1    QUESTIONS BY MR. GADDY:

 2         Q.    Okay.  Did you take a dose

 3    today?

 4         A.    No, I did not.

 5         Q.    Have you felt at any time today

 6    that you were under the influence of any

 7    opioid medication that you're prescribed?

 8              MS. SWIFT:  I'm going to object

 9         to the form of the question.

10              THE WITNESS:  No, I have not.

11    QUESTIONS BY MR. GADDY:

12         Q.    Have you felt during the course

13    of the deposition that you needed to take a

14    dose of your prescribed medication?

15              MS. SWIFT:  Object to the form

16         of the question.

17              THE WITNESS:  You know, I've

18         had some pain and I've -- just because

19         of the serious nature of this, I want

20         to make sure I give the best answer.

21         Not that I even normally feel any

22         impact.  But, no.  I felt pain, but

23         not of any -- like needing or anything

24         like that.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. GADDY:

 2         Q.     Okay.  It hasn't impacted any

 3    answers that you've given today?

 4         A.     No, absolutely not.

 5               MR. GADDY:  Mr. Barnes, at this

 6          time I'm going to suspend the taking

 7          of your individual deposition and

 8          transition into your deposition in

 9          your 30(b)(6) capacity.

10               Understand?

11               THE WITNESS:  Okay.

12    Understood.

13               MS. SWIFT:  How much time do we

14          have on the record?

15               VIDEOGRAPHER:  4 hours,

16          4 minutes.

17    QUESTIONS BY MR. GADDY:

18         Q.     Mr. Barnes, do you understand

19    that when you're giving testimony here in the

20    30(b)(6) capacity, that you will be

21    testifying on behalf of Walgreens?

22         A.     I do.

23         Q.     And that's been explained to

24    you?

25         A.     It has been.
```

```
 1                  (Walgreens-Barnes Exhibit 22

 2        marked for identification.)

 3   QUESTIONS BY MR. GADDY:

 4        Q.     I want to show you what I will

 5   mark as Barnes Exhibit Number 22 and ask if

 6   you'd turn to page 5 of that document.

 7                This is plaintiff's second

 8   notice of 30(b)(6) deposition, and on page 5

 9   we see topics 1 A through G.

10                Do you see that?

11        A.     I do.

12        Q.     Okay.

13        A.     Section 3?

14        Q.     Correct.

15                Have you had the opportunity to

16   review this before, or have you seen this

17   before?

18        A.     I believe it was presented at a

19   high level to me, but not in the detail.

20        Q.     Okay.  Reading number 1, it

21   says that you're going to provide testimony

22   on defendant's document retention policy for

23   hard copy and electronic documents, and then

24   it includes a list of what followed under

25   that.
```

1              Do you see that?

2       A.      I do.

3       Q.      Okay.  Is that your

4  understanding of what you're going to provide

5  testimony on?

6              MS. SWIFT:  And I'll just lodge

7         an objection to the extent that your

8         questioning goes beyond the objections

9         that we served on you guys on August

10        31st, and Special Master Cohen's

11        ruling as well.

12             THE WITNESS:  Could you repeat

13        your question?  I'm sorry.

14 QUESTIONS BY MR. GADDY:

15      Q.      Sure.

16             Is that your understanding of

17 what you are to provide 30(b)(6) testimony on

18 here today?

19             MS. SWIFT:  Same objection.

20             THE WITNESS:  It is.  However,

21        she did explain that there were some

22        that were -- objections to?  Okay.

23 QUESTIONS BY MR. GADDY:

24      Q.      Okay.  Are you the person at

25 Walgreens most knowledgeable on the topic of

Highly Confidential - Subject to Further Confidentiality Review

```
1    document retention policies?
2         A.      I am not.
3         Q.      Who would be?
4              MS. SWIFT:  Object to the form.
5              THE WITNESS:  I believe that
6         would have -- I'm trying to remember
7         who gave me the retention policy.
8              I was presented with three
9         different people who had different
10        specialties, and I believe it was -- I
11        think it was Caitlin that was -- no...
12             MS. SWIFT:  If you don't
13        remember, you don't remember.
14             THE WITNESS:  I just don't
15        remember.  I know I was given -- I
16        believe you have the same cheat sheet
17        list of document -- relevant document
18        retention policies.
19             MR. GADDY:  Kate, do you have a
20        copy of this to mark for the record?
21             MS. SWIFT:  Yeah.  You can mark
22        that one if you want.  You can mark
23        the one he's got in front of you.
24        It's up to you.  They're all the same.
25             MR. GADDY:  Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (Walgreens-Barnes Exhibit 23

 2        marked for identification.)

 3                    MR. GADDY:  Mr. Barnes, do you

 4        mind slapping a sticker on that one

 5        you've got in front of you?

 6                    THE WITNESS:  Sure.

 7                    MR. GADDY:  I'm going to mark

 8        that as Barnes 23.

 9    QUESTIONS BY MR. GADDY:

10        Q.    And is this -- this binder with

11    a couple of documents and some loose leaf

12    handouts in it, is that what you were

13    referring to when you were talking about

14    material that's been provided?

15        A.    Yes.

16        Q.    Okay.  Does this have within it

17    the names of the individuals who you met with

18    regarding document retention?

19        A.    I don't believe it has their

20    names on it.  I wrote the three -- well, I

21    wrote down the three people for my own

22    information --

23        Q.    Okay.

24        A.    -- because names have always

25    been something for decades that I've
```

1    struggled with.  So I just wanted to make

2    sure I was able to provide the right info.

3        Q.    Their names are?

4        A.    Chris Kopeck, Caitlin and Adam

5    Rouse.  I'm trying to remember Caitlin's last

6    name.

7              MS. SWIFT:  Layton.

8              THE WITNESS:  Lay -- Lay -- I

9        thought, yeah.

10             MR. GADDY:  Layton?

11             MS. SWIFT:  Layton.

12             THE WITNESS:  Layton.

13   QUESTIONS BY MR. GADDY:

14       Q.    And what was Adam's last name?

15       A.    Rouse, R-o-u-s-e.

16       Q.    You said you spent a couple

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential – Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential – Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential – Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED

Highly Confidential - Subject to Further Confidentiality Review

# REDACTED