1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                       EASTERN DIVISION

 3   IN RE:  NATIONAL       :  MDL No. 2804
     PRESCRIPTION OPIATE    :
 4   LITIGATION             :  Case No. 17-md-2804
                            :
 5   APPLIES TO ALL CASES   :  Hon. Dan A. Polster
                            :
 6                          :

 7

 8                     HIGHLY CONFIDENTIAL

 9        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11                      -  -  -  -

12                    JANUARY 18, 2019

13                      -  -  -  -

14        VIDEOTAPED DEPOSITION OF MICHAEL BIANCO,

15   taken pursuant to notice, was held at Marcus &

16   Shapira, One Oxford Center, 35th Floor, Pittsburgh,

17   Pennsylvania 15219, by and before Ann Medis,

18   Registered Professional Reporter and Notary Public in

19   and for the Commonwealth of Pennsylvania, on Friday,

20   January 18, 2019, commencing at 9:07 a.m.

21                      -  -  -  -

22              GOLKOW LITIGATION SERVICES
           877.370.3377 ph | 917.591.5672 fax
23                  deps@golkow.com

24

25
```

2

```
 1                  A P P E A R A N C E S

 2    On behalf of Plaintiffs

 3            WAGSTAFF & CARTMELL, LLP
              BY:   TYLER HUDSON, ESQUIRE
 4            AND   THOMAS SIDLINGER, ESQUIRE
              4740 Grand Avenue, Suite 300
 5            Kansas City, Missouri  64112
              816.701.1100
 6            thudson@wcllp.com
              tsidlinger@wcllp.com
 7
      On behalf of Defendant AmerisourceBergen Drug
 8    Corporation

 9            (By Phone/Livestream)
              JACKSON KELLY, LLP
10            BY:   ANDREW N. SCHOCK ESQUIRE
              50 South Main Street, Suite 201
11            Akron, Ohio  44308
              330.252.9078
12            anschock@jacksonkelly.com

13
      On behalf of Defendant Cardinal Health, Inc.
14
              PIETRAGALLO GORDON ALFANO BOSICK &
15            RASPANTI, LLP
              BY:   JOHN A. SCHWAB, ESQUIRE
16            One Oxford Centre, 38th Floor
              301 Grant Street
17            Pittsburgh, Pennsylvania  15219
              412.263.2000
18            jas@pietragallo.com

19
      On behalf of Defendants Endo Pharmaceuticals, Endo
20    Health Solutions and Par Pharmaceuticals

21            (By Phone/Livestream)
              ARNOLD & PORTER KAYE SCHOLER LLP
22            BY:   SEAN P. HENNESSY, ESQUIRE
              601 Massachusetts Avenue, NW
23            Washington, DC  20001-37453
              202.942.5743
24            sean.hennessy@arnoldporter.com

25
```

3

1            A P P E A R A N C E S (Continued)

2    On behalf of Defendant HBC Service Company

3            MARCUS & SHAPIRA, LLP
             BY:  JOSHUA A. KOBRIN, ESQUIRE
4            AND  ROBERT M. BARNES, ESQUIRE
             One Oxford Centre, 35th Floor
5            Pittsburgh, Pennsylvania  15219
             412.471.3490
6            jkobrin@marcus-shapira.com
             rbarnes@marcus-shapira.com
7

8    On behalf of Defendant McKesson Corporation

9            (By Phone/Livestream)
             COVINGTON & BURLING, LLP
10           BY:  RAJ PAUL, ESQUIRE
             One CityCenter
11           850 Tenth Street, NW
             Washington, DC  20001-4956
12           202.662.5807
             rpaul@cov.com
13

14   On behalf of Defendant Walmart

15           (By phone/Livestream)
             JONES DAY
16           BY:  NICOLE LANGSTON, ESQUIRE
             77 West Wacker
17           Chicago, Illinois 60601
             312.782.3939
18           nlangston@jonesday.com

19

     Also present
20
             Adam Balenciaga, legal videographer
21

22

23

24

25

4

1                          * I N D E X *

2    MICHAEL BIANCO                                    PAGE

3      EXAMINATION BY MR. HUDSON                    8, 191
       EXAMINATION BY MR. SIDLINGER                     163
4      EXAMINATION BY MR. KOBRIN                   185, 201

5


6          * INDEX OF HBC-BIANCO EXHIBITS *

7    NO.                    DESCRIPTION            PAGE
     Exhibit 1   Giant Eagle Pharmacy As of          28
8                February 2015 organizational chart
                 HBC_MDL00002219
9
     Exhibit 2   Email chain, 9/9/13, from G.         36
10               Carlson to K. Remas, subject: RE:
                 Controls at HBC
11               HBC_MDL000135002 - 00135024

12   Exhibit 3   20131030_Daily_HBC_Controls          52
                 HBC_MDL00002348
13
     Exhibit 4   Email, 10/25/13, from L. Wasielak    52
14               to G. Carlson, et al., subject:
                 Anda/GE Demo Meeting Minutes 131016,
15               attaching Anda GE Meeting
                 Minutes_131016.docx
16               HBC_MDL00135030 - 00135036

17   Exhibit 5   Email, 11/11/13, from G. Carlson     56
                 to M. Bianco, subject: Fw: Controlled
18               Substance Suspicious Monitoring,
                 attaching invite_4469.ics
19               HBC_MDL00136771 - 00136772

20   Exhibit 6   Email chain, 12/5/13, from J.        60
                 Millward to A. Mollica, et al.,
21               subject: 2401
                 HBC_MDL00132815 - 00132816
22
     Exhibit 7   Email chain, 1/11/14, from G.        71
23               Carlson to M. Bianco, subject: Fyi
                 FW: Daily HBC Suspicious Purchasing
24               Report - 01/09/14
                 HBC_MDL00134729
25

5

1       * INDEX OF HBC-BIANCO EXHIBITS (Continued) *

2    NO.                 DESCRIPTION              PAGE
     Exhibit 8   Email chain, 1/15/14, from G.      87
3                Carlson to J. Millward, et al.,
                 subject: FW: Qualitest SOM,
4                attaching Wholesaler
                 Questionnaire.docx
5                HBC_MDL00134936 - 00134940

6    Exhibit 9   Email chain, 1/22/14, from J.      89
                 Millward to G. Carlson, et al.,
7                subject: FW: Wholesale Distributor
                 Questionnaire, attaching Wholesale
8                Distributor Questionnaire
                 HBC_MDL00135570 - 0013557
9
     Exhibit 10  Qualitest Wholesale Distributor/   90
10               Chain Distribution Center
                 Questionnaire
11               ENDO_HSGAC_0000841 - 0000843

12   Exhibit 11  Email chain, 5/9/14, from M. Cullen  95
                 M. Bianco, subject: FW: Purdue
13               Meeting Request
                 HBC_MDL00154218 - 00154219
14
     Exhibit 12  Email, 7/31/14, from E. Brantley    97
15               to M. Murphy, subject: Giant Eagle
                 ENDO_HSGAC_0017819 - 0017820
16
     Exhibit 13  Email, 8/22/14, from M. Murphy to   97
17               E. Brantley, subject: FW: Qualitest/
                 Giant Eagle, attaching Risk
18               Evaluation Report by T. Sheller
                 ENDO_HSGAC_0007616 - 0007639
19
     Exhibit 14  Email chain, 10/1/14, from M.      111
20               Bianco to J. Millward, subject: FW:
                 Narcs found in tote
21               HBC_MDL00137363 - 00137364

22
     Exhibit 15  Email, 4/9/15, from S. Green to D.  134
23               Stevens, et al., subject: All
                 policies for VAWD reflected as of
24               5:00pm today, attaching various
                 policies
25               HBC_MDL00078594 - 00078668

6

1      * INDEX OF HBC-BIANCO EXHIBITS (Continued) *

2    NO.                    DESCRIPTION              PAGE
     Exhibit 16  Invitation from G. Carlson to R.     151
3                McClune, et al., for Pharmacy
                 Quarterly Meeting on 11/11/14
4                HBC_MDL00015549 - 00015608

5    Exhibit 17  Email chain, 12/18/13, from G.       163
                 Carlson to M. Bianco, et al.,
6                subject: RE: Hydrocodone APAP/
                 Elixir/TabConv Progr status
7                HBC_MDL00171642 - 00171645

8    Exhibit 18  Email chain, 5/22/14, from G.        172
                 Carlson to M. Bianco, subject: Re:
9                CSMP Report: Follow-Up with Account
                 Manager
10               HBC_MDL00135101 - 00135103

11   Exhibit 19  Email chain, 4/18/14, from M.        179
                 Bianco to G. Carlson, subject: Re:
12               35 missing tote
                 HBC_MDL00135668 - 00135670

13

14                      - - - -

15

16

17

18

19

20

21

22

23

24

25

                                                                          7

1                     P R O C E E D I N G S

2                          - - - -

3           THE VIDEOGRAPHER:  We are now on the

4    record.  My name is Adam Balenciaga.  I'm a

5    videographer retained by Golkow Litigation

6    Services.  Today's date is January 18, 2019, and

7    the time is 9:07 a.m.

8        This video deposition is being held at

9    Marcus & Shapira, LLP, One Oxford Centre, 35th

10   Floor, Pittsburgh, PA 15219, in the matter of

11   National Prescription Opiate Litigation,

12   MDL No. 2804, for the United States District Court

13   for the Northern District of Ohio, Eastern

14   Division.

15       The deponent is Mike Bianco.

16       All counsel will be noted on the stenographic

17   record.  Will all counsel identify themselves.

18           MR. HUDSON:  Ty Hudson and Thomas

19   Sidlinger of Wagstaff & Cartmell for plaintiffs.

20           MR. SCHWAB:  John Schwab on behalf of

21   Cardinal Health.

22           MR. KOBRIN:  Joshua A. Kobrin of Marcus

23   & Shapira on behalf of HBC Service Company.

24           THE VIDEOGRAPHER:  Anyone on the phone?

25           MR. PAUL:  This is Raj Paul of Covington

8

1    & Burling on behalf of McKesson.

2            MS. LANGSTON:  This is Nicole Langston

3    from Jones Day on behalf of Walmart, Inc.

4            MR. HENNESSY:  This is Sean Hennessy

5    from Arnold & Porter on behalf of the Endo and Par

6    Pharmaceutical defendants.

7            MR. SCHOCK:  Andrew Schock of Jackson

8    Kelly on behalf of AmerisourceBergen Drug

9    Corporation.

10           THE VIDEOGRAPHER:  Anyone else?

11       The court reporter is Ann Medis and will now

12    swear in the witness.

13                   MICHAEL BIANCO,

14       having been first duly sworn, was examined

15             and testified as follows:

16                   EXAMINATION

17    BY MR. HUDSON:

18       Q.   Good morning, sir.  Could you please

19    state your name for the record.

20       A.   Mike Bianco.

21       Q.   Mr. Bianco, my name is Ty Hudson, and I

22    represent the plaintiffs here today.  I'm going to

23    be asking you some questions in this deposition.

24       What is your current address?  Do you live

25    here in the Pittsburgh area?

9

1          A.    Yes, sir.

2          Q.    And are you currently employed by Giant

3     Eagle?

4          A.    Yes.

5          Q.    Have you ever had your deposition taken

6     before?

7          A.    No.

8          Q.    Let's just make sure then that we

9     understand the process before we get going.  I'm

10    going to be asking you questions, and you're going

11    to be giving answers.  Do you understand that?

12         A.    Yes.

13         Q.    At some point your counsel may put

14    objections on the record or other counsel may put

15    objections for the record for the court just to

16    preserve that.  Unless your counsel instructs you

17    not to answer, can we agree that you'll answer my

18    questions?

19         A.    Yes.

20         Q.    You do understand that you're under

21    oath.  Although we're here in an office at a law

22    firm, it has the same force and effect as if we

23    were in a courtroom in front of a judge and a

24    jury.  Do you understand that?

25         A.    Yes.

1          Q.    If you don't understand my question,

2    will you let me know so I can reframe it?

3          A.    Yes.

4          Q.    And the flip side of that is, is it fair

5    that if you do answer my question, it's fair for

6    me to assume that you did understand it?

7          A.    Yes.

8          Q.    And you're doing a great job of this,

9    but we need audible answers rather than head

10    nodding or other nonverbals.   Okay?

11          A.    Understood.

12          Q.    And then lastly, at any time if you want

13    to take a break, just let me know and we can go

14    off the record.   All I would ask is that you

15    answer any question that's pending at the time.

16    Is that fair?

17          A.    Yes.

18          Q.    Let's just start with your preparation.

19    What did you do to prepare for this deposition

20    today?

21          A.    I met with counsel yesterday to discuss

22    the process.

23          Q.    About how long was that meeting?

24          A.    A few hours, five hours.

25          Q.    Did you look at any documents?

1       A.   I did.

2       Q.   Did those refresh your recollection in

3  any way?

4       A.   Yes.

5       Q.   Any particular documents you recall

6  reviewing that refreshed your recollection?

7            MR. KOBRIN:  Objection.  I don't want

8  him talking about particular documents.  That's

9  work product that we selected from the file.

10           MR. HUDSON:  You're taking the position

11  that it's privileged or work product if he

12  reviewed documents that refreshed his

13  recollection?

14           MR. KOBRIN:  The documents that I put

15  together I think are privileged, yeah.

16           MR. HUDSON:  Are you going to instruct

17  him not to answer?

18           MR. KOBRIN:  I'd rather you not answer

19  that.  Are there any documents that you would cite

20  that you particularly remember?  The answer "yes"

21  or "no" is fine, but I don't want to get into

22  specifics.  Are there particular documents that

23  you recall right now that refreshed your

24  recollection?

25               THE WITNESS:  No.

1    BY MR. HUDSON:

2         Q.   Let's shift gears and talk about your

3    education.  Where did you attend college?

4         A.   Duquesne University.

5         Q.   And did you obtain a degree from

6    Duquesne?

7         A.   I did.

8         Q.   What was your degree?

9         A.   Doctor of pharmacy.

10        Q.   When did you graduate from pharmacy

11   school?

12        A.   2013.

13        Q.   And when did you start pharmacy school?

14        A.   2005.

15        Q.   And did you work while you attended

16   pharmacy school?

17        A.   I did.

18        Q.   And during that time, it looked to me,

19   and I've looked at your LinkedIn profile, so I'll

20   try to kind of shortcut this background, but it

21   looked like for most of the, I guess, 13 years,

22   from 2005 until the present, you've worked at

23   Giant Eagle with a couple of exceptions.  It looks

24   like you were at -- you were the director of

25   orientation of Duquesne; right?

13

```
 1        A.    Correct.

 2        Q.    And that was from 2008 to 2010?

 3        A.    Yes.

 4        Q.    And then it looked like you had about a

 5   five-month stint at HC Pharmacy in 2015.

 6        A.    Yes.

 7        Q.    Otherwise -- I guess one other.  It

 8   looked like you were a pharmacy intern at a

 9   women's hospital for about a year and a half.

10        A.    Correct.

11        Q.    But then otherwise, it looked like the

12   remaining 10 or 11 years were at Giant Eagle.

13        A.    Yes.

14        Q.    If you could, just walk me through those

15   jobs that you had at Giant Eagle and what your

16   responsibilities were.

17        A.    Starting from --

18        Q.    Starting from 2005.

19        A.    I started in 2005 as a pharmacy

20   technician doing day-to-day technician tasks,

21   which that would include ringing a register,

22   counting medication, data entry.  And then after

23   that I was on a --

24        Q.    If I could, now you're going to pharmacy

25   school and working at the same time?
```

1          A.    Correct.

2          Q.    Go ahead.

3          A.    After that, I was on a software

4    implementation team where we trained

5    nonpharmacists, pharmacy staff how to use our

6    dispensing software.  And then my work with Giant

7    Eagle, then I was on a support desk team where our

8    pharmacies would call in and ask questions

9    pertaining to how to use the software.

10         From there I was manager of pharmacy

11   inventory and vendor relations, which essentially

12   was maximizing inventory utilization, so turns,

13   et cetera, with the main focus of reducing shrink,

14   the unknown loss, or I'm sorry, known loss which

15   would be expired products.

16         And then after that, I took a reduced

17   capacity because my school load picked up.  And

18   then from there I was category manager where I

19   oversaw our sourcing of products for pharmacy.

20         Q.    And is that the role you're still in

21   today?

22         A.    I'm sorry.  No.  I apologize.  After

23   that, I went to UPMC.  When I came back, now I'm

24   on what's called the managed care side where we

25   do -- my main focus is contracting with insurance

```
1    companies.
2         Q.   And you've had that role for a little
3    more than three years?
4         A.   Correct, 2015 I think, end of 2015.
5         Q.   Let's go back, if we could, to the first
6    role that you described, the pharmacy software
7    implementation team.
8         A.   That was the second.
9         Q.   Oh, you're right.  You were pharmacy
10   intern for a couple years; right?
11        A.   Correct.  I think two years, yes.
12        Q.   So you're right.  The second job then,
13   the pharmacy software implementation team member,
14   was that software implementation at the Giant
15   Eagle retail pharmacies?
16        A.   Yes.
17        Q.   Did you have any responsibilities
18   related to the HBC warehouse?
19        A.   During?
20            MR. KOBRIN:  Object to form.
21   BY MR. HUDSON:
22        Q.   Doctor, this time period from 2007 to
23   2009 when you're dealing with software
24   implementation.
25        A.   When I was dealing with the software,
```

16

1   no.

2        Q.   At that point in time, from 2007 to

3   2009, were you aware that Giant Eagle had created

4   a warehouse?

5        A.   Yes.

6        Q.   Was that generally known as the HBC

7   Service Company warehouse or the HBC warehouse?

8        A.   I don't recall.  I think it was just the

9   warehouse.

10        Q.   Were you aware at that time or did you

11   become aware at some point that Giant Eagle had

12   created an operating division or an entity known

13   as HBC Service Company?

14             MR. KOBRIN:  Object to form.

15             THE WITNESS:  Can you repeat that.

16   BY MR. HUDSON:

17        Q.   Sure.  At this time in the 2009

18   timeframe, were you aware that Giant Eagle had

19   created an operating division or a subsidiary that

20   was known as HBC Service Company?

21             MR. KOBRIN:  Object to form.

22             THE WITNESS:  When I was -- as a store

23   technician or intern and then on the pharmacy

24   team, the software implementation team, I don't

25   believe I was aware of that.

17

BY MR. HUDSON:

1  BY MR. HUDSON:

2      Q.    Did you become aware of that at some

3  point in time?

4      A.    Yes.

5      Q.    Do you have any sort of ballpark

6  recollection of when that was?

7      A.    When I took on the vendor relations,

8  inventory manager position.  So '9, '10.  '10 I

9  think is when I started that.

10     Q.    It looks like from your LinkedIn profile

11 maybe it was in 2011.

12     A.    Yes, yeah.

13     Q.    So fair to say that in the 2007 to 2009

14 timeframe, in your role as the pharmacy software

15 implementation team, did you have any occasion to

16 visit the warehouse, the HBC warehouse?

17     A.    During that time, no.

18     Q.    If we jump forward, it looks like as you

19 discussed, then you came back to Giant Eagle in

20 2011 on the inventory, focused on inventory?

21     A.    I came back originally on the pharmacy

22 support team, so fielding questions at a technical

23 help desk.

24     Q.    And where was that desk located?

25     A.    At our corporate office in Pittsburgh.

18

```
1          Q.   And then were you promoted into the

2    manager, pharmacy inventory and vendor income

3    role?

4          A.   Yes.

5          Q.   And then I think you indicated at that

6    time you learned about the HBC operating division.

7          A.   Correct.

8               MR. KOBRIN:  Object to form.

9    BY MR. HUDSON:

10         Q.   And how did you learn of that?

11         A.   It would have been part of understanding

12   how our supply chain worked.

13   ████████████████████████████████████████████

14   ████████████████████████████████████████████

15   ████████████████████████████████████████████

16   ██████████████████████████

17   ████████████████████████████████████████████

18   ████████████████████████████████████████████

19   ██████████████████████████████████████

20   ████

21         Q.   At this timeframe from 2011 to 2013, did

22   you ever visit the HBC warehouse?

23         A.   Yes.

24         Q.   How many times?

25         A.   I believe just once.
```

1      Q.    And why did you visit it?

2      A.    Just to see the facility.

3      Q.    And at that time were you aware of who

4  was overseeing that facility?

5      A.    Yes.

6      Q.    And who was that?

7      A.    I believe Christy Hart was.

8      Q.    Was there somebody in particular

9  overseeing the controlled substances portion of

10  the warehouse?

11      A.    I believe Christy was overseeing the

12  whole warehouse.

13      Q.    What about Matt Rogos, is that a name

14  that is familiar?

15      A.    Yes.  Matt was -- yes.  Matt would have

16  overseen the warehouse as well.  I'm sorry.  I

17  think Christy might have reported in to him.

18      Q.    And do you know the timeframe of when

19  Matt oversaw the warehouse?

20      A.    He left before I did originally, but I'm

21  not sure of the specifics.

22      Q.    Explain to me what that means.

23      A.    I believe he left Giant Eagle before.

24  I'm sorry.  I left in 2015.  I believe he left

25  before me, but I don't know exactly when before.







23

```
 1          Q.   Do you have any knowledge about problems

 2    with opioid abuse or opioid diversion that's

 3    occurred in Ohio or generally in the United

 4    States?

 5              MR. KOBRIN:  Object to form.

 6              THE WITNESS:  Other than what I've seen

 7    on the news or read in articles, no.

 8    BY MR. HUDSON:

 9          Q.   And from what you've seen and what

10    you've heard, what is your understanding of

11    problems with opioids in the United States?

12              MR. KOBRIN:  Object to form.

13              THE WITNESS:  That they're being

14    misused, I believe, whether it be prescription or

15    illicit.

16    BY MR. HUDSON:

17          Q.   Do you have any knowledge about the

18    opioids that were most likely to be abused or

19    diverted?

20          A.   No.

21    ████████████████████████████████████

22    ████████████████████████████████████

23    ████████████████████████████████████

24    ████████████████████

25    ██████████████████████
```















31















38







41



42



43



44



45





47





49



50



51



52







55







58





59

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21          MR. KOBRIN:  Do you want to take a break

22     after this exhibit?

23          MR. HUDSON:  If you need to.

24          MR. KOBRIN:  Do you want to take a

25     break?

```
 1              THE WITNESS:  Yeah.

 2              MR. KOBRIN:  Do you want to take a break

 3    now?

 4              THE WITNESS:  We can finish this.

 5              MR. HUDSON:  Now is as good a time as

 6    any.  We can go off the record.

 7              THE VIDEOGRAPHER:  The time is

 8    10:11 a.m.  We're off the video record.

 9              (Recess from 10:12 a.m. to 10:25 a.m.)

10              THE VIDEOGRAPHER:  The time is

11    10:25 a.m.  We are now back on the video record.

12              (HBC-Bianco Exhibit 6 was marked.)

13    ███████████

14    ████████████████████████████████

15    ███████████████████████████████

16    ███████████████████████████████

17    █████████████████

18    ███████████████████████████████

19    ████████████

20    ███████

21    ██████████████████

22    ████████████████████████████████

23    ████████████████████████████████

24    ████████████████

25    ████████████████
```









65









































85









89













95



96



97



 1

 2

 3

 4

 5

 6

 7

 8

 9

10   BY MR. HUDSON:

11        Q.   Let me show you then what I'm marking as

12   Exhibit 12.

13             MR. KOBRIN:  Well, this is going to be

14   Exhibit 12.  This is going to be Exhibit 13.

15             MR. HUDSON:  Mark that as 12.

16             (HBC-Bianco Exhibit 13 was marked.)

17   BY MR. HUDSON:

18        Q.   I'll hand you what I marked as 13.

19             MR. KOBRIN:  Do you want me to read the

20   Bates range for the record?

21             MR. HUDSON:  Yeah, you can.

22             MR. KOBRIN:  Exhibit 12 is

23   ENDO_HSGAC_0017819.

24   BY MR. HUDSON:

25







101







104



105







108



109

```
1    today, do you have actually have firsthand

2    knowledge that the HBC warehouse had the ability

3    to hold or stop orders?

4            MR. KOBRIN:  Object to form.  Asked and

5    answered.

6            THE WITNESS:  Yes.

7    BY MR. HUDSON:

8        Q.   And how then did that occur?

9            MR. KOBRIN:  Object to form.  Asked and

10   answered.

11           THE WITNESS:  I mean, I'm reading an

12   email that I wrote that says an order was stopped.

13   BY MR. HUDSON:

14       Q.   I'm trying to get an understanding of

15   what you're relying on other people to tell you.

16   Did somebody tell you the order had been

17   stopped --

18           MR. KOBRIN:  Ty, are you asking if he

19   went to the warehouse to stop the order himself?

20   BY MR. HUDSON:

21       Q.   -- versus you having firsthand knowledge

22   of how the process worked and how orders were

23   stopped?

24           MR. KOBRIN:  Object to form.  Ty, this

25   has been gone over several times in this
```

110

1    deposition.  He's told you he knew the orders were

2    stopped.  He's told you that he didn't understand

3    the exact technicalities of it.  I don't

4    understand why you're beating this witness up

5    about this issue.

6              THE WITNESS:  I never physically went

7    there to stop an order or see an order physically

8    stopped.

9    BY MR. HUDSON:

10         Q.   And as you sit here today, you don't

11   know the process of how an order could be stopped?

12   I'll be real honest with you.  The reason why I'm

13   asking is because other witnesses have testified

14   that orders can't be stopped.

15             MR. KOBRIN:  Object to form.

16   Misrepresents the testimony of other witnesses.

17             THE WITNESS:  I don't know how --

18             MR. HUDSON:  The record will tell that.

19             THE WITNESS:  I don't know how they

20   were -- I don't know the details behind it.

21   BY MR. HUDSON:

22         Q.   Is it fair to say it was your

23   understanding at this time that orders could be

24   stopped, but you didn't understand how, you didn't

25   understand who did it, and you didn't understand

111

1    how the process worked?

2          MR. KOBRIN:  Object to form.

3          THE WITNESS:  Yes.

4    BY MR. HUDSON:

5       Q.   Fair enough.  Thank you.

6          MR. KOBRIN:  Can we take just a quick

7    break?

8          MR. HUDSON:  Sure.  Let's go off the

9    record.

10         THE VIDEOGRAPHER:  The time is 11:23.

11   We're going off the video record.

12         (Recess from 11:23 a.m. to 11:42 a.m.)

13         THE VIDEOGRAPHER:  The time is

14   11:42 a.m.  We are now back on the video record.

15   BY MR. HUDSON:

16      Q.   Mr. Bianco, let's move to a new topic.

17   Were you ever involved in any DEA inspections?

18      A.   Formal inspections, not that I remember.

19         (HBC-Bianco Exhibit 14 was marked.)

20   BY MR. HUDSON:

21      Q.   Let me hand you what I've marked as

22   Exhibit 14.

23         MR. HUDSON:  The internal number is 1226

24   for this one.

25

112

1    BY MR. HUDSON:

2         Q.   This looks like two emails.  I'm going

3    to start with the bottom email.  And that was from

4    you to STR_Pharmacy_PDLs.  Do you see that?

5         A.   I do.

6         Q.   Are you emailing then a distribution

7    list of all the Giant Eagle PDLs?

8         A.   Yes.

9         Q.   And then you're copying Mr. Millward,

10   Ms. Matty, Mr. Shaheen and Mr. Carlson; right?

11        A.   Yes.

12        Q.   And the subject is Narcs Found in Tote?

13        A.   Correct.

14        Q.   And it's September 25, 2014; right?

15        A.   Correct.

16        Q.   And in this email you're indicating that

17   a narcotic tote was returned to the HBC warehouse

18   today with no identifying marks; right?

19        A.   Yes.

20        Q.   And then below you've identified what

21   the contents are in that tote there; right?

22        A.   It appears to be.

23        Q.   The top one is two units of a

24   hydrocodone combination product; right?

25        A.   Correct.

113

1      Q.   And then if we go on down, the fifth

2   item down is one unit of a hydrocodone combination

3   product; right?

4      A.   Correct.

5      Q.   And then the sixth item is another one

6   unit of a hydrocodone combination product?

7      A.   Correct.

8      Q.   And then below that you wrote,

9   "Additionally, we have seen a large number of

10  totes being returned to the warehouse with their

11  contents still inside, many of which are

12  refrigerated or controlled items.  Please attempt

13  to address this as you see fit."

14      Now, if we go up above to your -- that's in

15  October.  If we go up to the top email, this is an

16  email from you to Mr. Millward with a copy to

17  Mr. Carlson; right?

18      A.   To who?

19      Q.   It's an email from you to Mr. Millward

20  with a copy to Mr. Carlson.

21      A.   Yes.  Sorry.

22      Q.   And you're forwarding your email below;

23  right?

24      A.   Yes.

25      Q.   And that was the narcs found in tote

114

1    email; right?

2        A.   Correct.

3        Q.   So this is about a little less than a

4    week after your September 25 email is this forward

5    on October 1; right?

6        A.   Correct.

7        Q.   In here you said, "Hi, Joe.  As you

8    likely know, the DEA was in for an inspection of

9    the warehouse today specifically asking about

10   hydrocodone-containing products."

11       Do you see that?

12       A.   Yes.

13       Q.   Do you have any recollection other than

14   what you're reading in this email about this DEA

15   next of the warehouse today asking about

16   hydrocodone-containing products?

17            MR. KOBRIN:  Object to form.

18            THE WITNESS:  No.

19   BY MR. HUDSON:

20       Q.   Here you wrote, "At the time the

21   warehouse reported having no

22   hydrocodone-containing products on hand."

23   Correct?

24       A.   Yes.

25       Q.   Then in the next paragraph you said,

115

```
 1      "Currently, we have one case of a

 2    hydrocodone/APAP5/325 that was intended for 6510."

 3         Is that a particular store, 6510?

 4         A.   Yes.

 5         Q.   "Which is being shipped out tonight

 6    after discussion with Tracy Patel.  We also have

 7    one tote of which the contents are described below

 8    that was returned to the warehouse.  The original

 9    owner of the returned tote is not able to be

10    identified by Donna Matty or myself through

11    various methods.  Can you tell me how you would

12    like these contents to be handled.  I would like

13    to have the four units of hydrocodone-containing

14    products out of the warehouse by 10/5 so we can

15    avoid any issues with the schedule change."

16         Do you see that?

17         A.   Yes.

18         Q.   Does this email from you to Mr. Millward

19    and a copy to Mr. Carlson indicate that on

20    October 1 when you were writing this email, there

21    were hydrocodone combination products that were at

22    the warehouse?

23         A.   On October 1, yes.

24         Q.   And you wrote this email at 1827.  Would

25    that be 6:27 at night?
```

116

```
 1          A.   Assuming the time stamps are correct,

 2     yes.

 3          Q.   And here in this email you're writing

 4     that there was a DEA inspection of the warehouse

 5     today, which means on October 1; right?

 6          A.   That's what it reads, yes.

 7          Q.   And at that inspection where that DEA

 8     came in, the warehouse reported to the DEA having

 9     no hydrocodone-containing products on hand;

10     correct?

11          A.   That's what it reads, yes.

12          Q.   But that wasn't true; right?

13               MR. KOBRIN:  Object to form.

14               THE WITNESS:  I don't know that.

15     BY MR. HUDSON:

16          Q.   In this email that you forwarded, you

17     forwarded an email from September 25 that talked

18     about a tote being returned to the HBC warehouse

19     that had four units of hydrocodone combination

20     products; right?

21          A.   Yes.

22          Q.   And in your above email, you're talking

23     about shipping it out that night, the night of

24     October 1, right, from the warehouse?

25          A.   That's what it reads.
```

117

```
1          Q.   So that tote was there that day when the

2     DEA was inspecting; right?

3          A.   I don't know that.

4          Q.   You can't tell that from reading your

5     below email and this email?

6          A.   I wasn't physically at the location.  So

7     I don't know where the tote in question was or how

8     it was handled.

9          Q.   In this email that you're writing to

10    Mr. Millward, we know where the tote was, right,

11    because you're talking shipping it out that night?

12               MR. KOBRIN:  Object to form.  Where are

13    you talking about they were shipping it out that

14    night?

15    BY MR. HUDSON:

16         Q.   Do you see that, Mr. Bianco?

17         A.   Can you repeat that.

18         Q.   Sure.  You said currently -- or you

19    said, "Currently we have one case of

20    hydrocodone/APAP 5/325..."  What is that?

21         A.   That's -- I can't remember if it's

22    Vicodin or Norco.  I think it's Norco, the generic

23    Norco.

24         Q.   "...that was intended for 6510, which is

25    being shipped out tonight after discussion with
```

118

1    Tracy Patel."  And who is Tracy Patel?

2         A.    She's an PDL.

3         Q.    So this is indicating the HBC warehouse

4    is going to ship this hydrocodone-containing

5    product to -- it's going to ship it out that

6    night.  Is that a fair reading of this email.

7         A.    I don't know where it was shipping from.

8    It just says that it was shipping.

9         Q.    You can't tell from your email where it

10   was shipping from, that particular

11   hydrocodone-containing product?

12        A.    I can make an assumption.

13        Q.    What would your assumption be?

14            MR. KOBRIN:  Object to form.

15            THE WITNESS:  Strictly speculating, it

16   would be from the warehouse.

17   BY MR. HUDSON:

18        Q.    Is there anywhere else that you can

19   think of as you sit here now where that

20   hydrocodone-containing product would be other than

21   the warehouse?

22        A.    At the time I believe it wasn't a CII.

23   How it was handled didn't have as -- the DEA

24   doesn't regulate it as tightly.  So I don't know

25   where it was.  I can't speak to where it was.

119

1        Q.   So if it was a hydrocodone-containing

2    product, since it's less regulated, in your mind,

3    somehow it's less critical that you tell the truth

4    to the DEA about which products are there?

5           MR. KOBRIN:  Object to form.

6    BY MR. HUDSON:

7        Q.   I don't understand what that means.

8           MR. KOBRIN:  Object to form.  Misstates

9    the testimony and it's argumentative.

10          THE WITNESS:  You don't understand what

11   what means?

12   BY MR. HUDSON:

13       Q.   Why did you say that hydrocodone was not

14   a CII at the time?

15       A.   I thought you had said earlier that

16   hydrocodone changed in late October 2014.

17       Q.   It changed at some point in

18   October 2014; right?

19       A.   Okay.

20       Q.   Do you know specifically when it

21   changed?

22       A.   I don't know off the top of my head, no.

23       Q.   Do you know why the DEA was conducting

24   this inspection?

25       A.   I do not.

120

1        Q.   Do you know why they were asking about

2    hydrocodone-containing products?

3        A.   I do not.

4        Q.   Do you know why the warehouse reported

5    having no hydrocodone-containing products on hand?

6        A.   I do not.

7        Q.   From your email, do you think it's fair

8    to infer that you're saying that there were

9    hydrocodone products that are on hand, but they're

10   being shipped out as soon as possible?

11            MR. KOBRIN:  Object to form.

12            THE WITNESS:  At what time?

13   BY MR. HUDSON:

14       Q.   On October 1.  One shipment you're going

15   to ship out later that night on October 1, and the

16   other shipment you're trying to get shipped out by

17   10/5.

18       A.   We can infer that as of October 1 at

19   6:30 p.m. there was hydrocodone there.  That's

20   fair.

21       Q.   Right.  So we know for sure that on

22   October 25, 2014, you wrote to all the PDLs about

23   a tote that had been returned to the HBC warehouse

24   that day that contained four units of hydrocodone

25   combination products; right?

121

1        A.    Correct.

2        Q.    And then we also know that in your email

3    of October 1, you reference that tote again, and

4    you say, we also have one tote of which the

5    contents are described below, and that's your

6    email from September 25, right, that was returned

7    to the warehouse?  The original owner of the

8    returned tote is not able to identify by Donna

9    Matty or myself -- is not able to be identified by

10   Donna Matty or myself through various methods;

11   right?

12       A.    That's what it reads.

13       Q.    Then you said, "Can you tell me how you

14   would like these contents to be handled?"  And you

15   wrote, "I would like to have the four units of

16   hydrocodone-containing products out of the

17   warehouse."

18       When you say out of the warehouse, that

19   indicates that at least on October 1 at 6:27 p.m.

20   when you wrote this email that they're in the

21   warehouse; right?

22            MR. KOBRIN:  Object to form.

23   BY MR. HUDSON:

24       Q.    Do you agree with that?

25       A.    (Nodding.)

122

```
 1          Q.    And you want them out within the next
 2    four days, by 10/5, so you can void issues with
 3    the schedule change; right?
 4          A.    That's what it says.
 5          Q.    As you sit here today, do you believe
 6    that the warehouse conveyed information to the DEA
 7    that was not accurate?
 8          A.    I don't know.
 9          Q.    Was the purpose of your email to
10    Mr. Millward to make him aware of what had been
11    told to the DEA and make sure that those
12    hydrocodone combination products were out of the
13    warehouse as soon as possible?
14          A.    I think the purpose would have been to
15    let him know about the hydrocodone products in the
16    warehouse at that time.
17          Q.    Why then did you mention the DEA
18    inspection?
19          A.    I don't know.
20          Q.    Why did you mention that the warehouse
21    reported having no hydrocodone-containing
22    products?
23          A.    I don't know.  I don't know if that was
24    said to the DEA or not.
25          Q.    You think from your email it's possible
```

123

1    that the warehouse did not report to the DEA of

2    having no hydrocodone-containing products on hand?

3         A.   I can't speak to that.  I wasn't there.

4         Q.   Let's look more carefully then, if we

5    can go back up to the top paragraph of your email.

6    This is what you wrote on October 1.

7         "As you likely know, the DEA was in for an

8    inspection of the warehouse today specifically

9    asking about hydrocodone-containing products.  At

10   the time the warehouse reported having no

11   hydrocodone-containing products on hand."

12        In your mind, is there any doubt at all that

13   the HBC warehouse reported to the DEA on October 1

14   that it had no hydrocodone-containing products on

15   hand?

16        A.   I don't know.  I don't know if the DEA

17   asked if there was any on hand.  I wasn't at

18   the...

19        Q.   You don't know whether or not the DEA

20   asked the warehouse whether there were

21   hydrocodone-containing products on hand?

22        A.   I don't know how I could know that.

23        Q.   You wrote it in your email, didn't you?

24        A.   No.

25        Q.   You say, "As you likely know, the DEA

124

1    was in for an inspection of the warehouse today

2    specifically asking about hydrocodone-containing

3    products."

4         Then you went on and said, "At the time the

5    warehouse reported having no

6    hydrocodone-containing products on hand."

7         In your mind is there any uncertainty as to

8    what you wrote?

9              MR. KOBRIN:  Object to form.

10             THE WITNESS:  I can read what I wrote.

11   BY MR. HUDSON:

12        Q.   You agree that that day when the DEA was

13   there, what you're writing is that the warehouse

14   told the DEA that there were no

15   hydrocodone-containing products on hand; right?

16        A.   I disagree.

17        Q.   You don't think that's what's written in

18   that paragraph?

19        A.   I know definitively that's not what's

20   written in the paragraph.

21        Q.   What do you think the warehouse told the

22   DEA?

23        A.   I don't know.

24        Q.   What was your overall point in writing

25   this email to Mr. Millward who was the head of

125

```
1   compliance at the time?
2        A.   I don't remember.  As I said earlier, I
3   could speculate that it was likely to tell him at
4   time of day that there may have been products on
5   hand.
6        Q.   Why would it be important to tell him
7   that there were hydrocodone products on hand?
8             MR. KOBRIN:  Object to form.
9             THE WITNESS:  Based on my email because
10  we wanted them out of the warehouse by 10/5.
11  BY MR. HUDSON:
12       Q.   And why did you want them out of the
13  warehouse by 10/5?
14       A.   So we can avoid any issue with the
15  schedule change.
16       Q.   What about the DEA, is there any
17  connection between the DEA coming and asking about
18  hydrocodone-containing products and the decision
19  to ship out the hydrocodone combination products
20  that you identified as being on hand?
21            MR. KOBRIN:  Object to form.
22            THE WITNESS:  Can you repeat that.
23  BY MR. HUDSON:
24       Q.   Sure.  Is there any connection between
25  the DEA conducting this inspection of the
```

126

```
 1    warehouse that day and your decision to email

 2    Mr. Millward and Mr. Carlson about shipping out

 3    the hydrocodone combination products as soon as

 4    possible or at least by 10/5?

 5              MR. KOBRIN:  Object to form.

 6              THE WITNESS:  I don't -- I don't know.

 7    BY MR. HUDSON:

 8        Q.   If it was just about shipping the

 9    hydrocodone combination products out, would there

10    have been any need to reference that the DEA had

11    made an inspection that day?

12        A.   They're two separate paragraphs, so...

13        Q.   So you think these are two unconnected

14    points?

15        A.   No.  I don't know.

16        Q.   Does this cause you concern as you're

17    sitting here today reading these two paragraphs

18    that it's possible that the HBC warehouse may have

19    provided inaccurate information to the DEA about

20    whether it had hydrocodone-containing products on

21    hand?

22              MR. KOBRIN:  Object to form.

23              THE WITNESS:  No.

24    BY MR. HUDSON:

25        Q.   It does not?
```

127

```
 1         A.   It doesn't state that they did.

 2         Q.   Do you think it's possible that the

 3    warehouse reported to the DEA that it had no

 4    hydrocodone-containing products on hand when, in

 5    fact, the warehouse did have

 6    hydrocodone-containing products in the warehouse

 7    at the time of the DEA inspection?

 8              MR. KOBRIN:  Object to form.  Calls for

 9    speculation.

10              THE WITNESS:  Is that possible?  Yes.

11    BY MR. HUDSON:

12         Q.   And from the contents of your email,

13    doesn't it appear to be highly likely that that's

14    what happened?

15              MR. KOBRIN:  Object to form.

16              THE WITNESS:  No.  We had a very close

17    relationship with the DEA.  So I don't know what

18    the conversations specifically were about, but

19    they could have been about many issues surrounding

20    the hydrocodone change, schedule change.

21    BY MR. HUDSON:

22         Q.   We do know though as part of that

23    conversation, the warehouse did report to the DEA

24    having no hydrocodone-containing products on hand.

25    We know that; right?
```

128

1        A.    No.

2        Q.    We don't know that?

3        A.    I don't know who they reported that to.

4        Q.    You think it's possible in the same

5    paragraph you wrote about a DEA inspection of the

6    warehouse asking about hydrocodone-containing

7    products and in the next sentence you changed the

8    subject completely and talked about a report to

9    somebody other than the DEA about having no

10   hydrocodone-containing products on hand?

11            MR. KOBRIN:  Object to form.

12   Argumentative.

13            THE WITNESS:  And what was the question?

14            MR. HUDSON:  Would you mind reading back

15   the question.

16            (The record was read back.)

17   BY MR. HUDSON:

18       Q.    Do you understand the question?

19       A.    I'm not changing the subject entirely.

20   I'm still talking about hydrocodone.  But, again,

21   I can't -- I don't know what they said.  I wasn't

22   there.  I don't know what was reported.  I would

23   presume the DEA has a report on that date.

24       Q.    Sir, that first paragraph, you're

25   recapping a DEA inspection that occurred and what

129

1    you told the DEA about hydrocodone-containing

2    products; right?

3         A.   No.  I was not there to report anything

4    to the DEA.

5         Q.   But you're not -- in that paragraph you

6    are not recapping what happened at that DEA

7    inspection that day?

8         A.   In the first sentence, yes.

9         Q.   Only the first sentence.

10        A.   I don't know.  I don't recall this

11   email.  I don't recall the situation.

12        Q.   As you're sitting here today, just

13   understanding the English language and that

14   paragraph and how it's written, is there any doubt

15   in your mind that those two sentences are

16   connected and that you're talking about a DEA

17   inspection of the warehouse, about

18   hydrocodone-containing products, and exactly what

19   the warehouse reported to the DEA?

20             MR. KOBRIN:  Object to form.

21   Argumentative.  Asked and answered.

22             THE WITNESS:  Was there concern?  What

23   was the leading part of that?  Was there concern

24   that I --

25

130

```
 1    BY MR. HUDSON:

 2         Q.   I just want to get your best testimony

 3    on the record about the first paragraph.  When you

 4    read that paragraph as you sit here today, is your

 5    best recollection of what you wrote back on

 6    October 1 -- are those two sentences connected and

 7    are you reporting to Mr. Millward and copying

 8    Mr. Carlson, your boss at the time, about a DEA

 9    inspection of the HBC warehouse and what the

10    warehouse reported to the DEA?

11              MR. KOBRIN:  Object to form.

12              THE WITNESS:  I guess if I had any

13    concern -- I don't recall this email.  But if I

14    had any concern that there was a suspicious order,

15    I wouldn't put it in five words in an email at

16    6:30 at night, or a dozen words.

17    BY MR. HUDSON:

18         Q.   My question though wasn't about a

19    suspicious order.  My question is that first

20    paragraph, it's just what the warehouse told the

21    DEA about whether there were hydrocodone

22    combination products at the warehouse at the time

23    of the inspection and then you reporting to them

24    later about what your understanding of what was at

25    that warehouse later that night.
```

131

1          Isn't that what's going on in this email?

2          A.   Like I said, I wouldn't -- if I had

3    concerns that there was a suspicious response to a

4    DEA inspection, I would have taken further steps

5    than to put it in several words in an email at

6    6:30 at night.

7          Q.   With all due respect, it's not just

8    several words.  In the second paragraph goes in

9    and you describe in detail exactly how to solve

10   the problem and get those hydrocodone combination

11   products out of the warehouse as soon as possible;

12   right?

13              MR. KOBRIN:  Object to form.

14              THE WITNESS:  I disagree with that.

15   BY MR. HUDSON:

16         Q.   You do agree that for one case of the

17   hydrocodone products, you're shipping those out

18   later that same night; right?  It's 6:27 at night

19   and you're going to ship that case out later that

20   night.

21         A.   Correct.

22         Q.   Is that usual or unusual for shipments

23   to be shipped out after 6:30 at night?

24         A.   Our first wave I don't believe started

25   until 6:30 at night.  I can't remember if it was

132

1    6:30, 7:30 or 8:30, but it was something similar

2    to that.

3         Q.    We can agree that what you identified in

4    this second paragraph was a case of

5    hydrocodone-containing products that had been

6    meant to be shipped to store 6510, but it hadn't.

7    So now you're putting in place a plan to get that

8    shipped out of the warehouse that night on

9    October 1?  Can we agree on that?

10             MR. KOBRIN:  Object to form.

11             THE WITNESS:  I did not put the plan --

12   it doesn't look like I put the plan in place.  I'm

13   letting them know what the plan was.

14   BY MR. HUDSON:

15        Q.    But you're relaying to them what the

16   plan was for that particular case?

17        A.    Correct.

18        Q.    And then for the second, the tote that

19   you talked about before that had been in the

20   warehouse for about a week and hadn't been

21   claimed, it also had hydrocodone-containing

22   products.  And then in the rest of the paragraph

23   you're laying out or relaying to the head of

24   compliance and your boss the plan to get that

25   shipped out of the warehouse, too; right?

133

1          A.    No.   I'm asking if they can tell me how

2      they should be handled.

3          Q.    And then because you're laying out for

4      them a recommendation what you think should

5      happen; right?

6              MR. KOBRIN:   Object to form.   Misstates

7      the evidence.

8              THE WITNESS:   No.

9      BY MR. HUDSON:

10         Q.    At a minimum you're telling them you

11     would sure like to see the product out of the

12     warehouse by 10/5 so that you can avoid any issue

13     with the scheduling change.

14         A.    Agreed.

15         Q.    Do you know whether or not those

16     hydrocodone-containing products were, in fact,

17     shipped from the warehouse that night?   Do you

18     have any recollection?

19         A.    No.

20         Q.    Do you know anything more about this

21     topic than what we've talked about?

22         A.    The topic of changing schedules?

23         Q.    Yeah, this DEA inspection and then the

24     plan for shipping these two hydrocodone-containing

25     products.

134

1          A.    No.   The conversion of the schedule,

2     yes.

3                (HBC-Bianco Exhibit 15 was marked.)

4     BY MR. HUDSON:

5          Q.    We'll move to a new topic and hand you

6     what I've marked as Exhibit 15.  Exhibit 15 is a

7     thick set -- it's a cover email with a set of

8     attachments, and the subject of this email is All

9     Policies for VAWD Reflected as of 5:00 p.m. Today.

10         Do you recognize Exhibit 15, Mr. Bianco?

11         A.    Flipping through it, they look like

12    policies, but without having an opportunity to

13    read them all.

14         Q.    This is an email from Sara Green; right?

15         A.    Appears to be, yes.

16         Q.    And who is Sara Green?

17         A.    Based on her signature, she was an

18    executive secretary.  I'm not sure.

19         Q.    And she's then distributing this set of

20    policies to a distribution group that includes

21    yourself and others?

22         A.    Yes.

23         Q.    And she wrote down in the body of the

24    email, "Good afternoon.  Sorry for so many emails

25    throughout the day.  Attached are all final PDF

1    version policies for VAWD as well as the document

2    retention policy and chart.  If you have any

3    questions, let me know."

4         A.   Yes.

5         Q.   Were you part of the group that reviewed

6    these policies before they were put into final

7    form?

8         A.   On each specific policy, again, without

9    having an opportunity to read them, I may have

10   interacted on some of them, but I don't know

11   without having an opportunity to review them all.

12        Q.   What is VAWD?

13        A.   Verified accredited wholesale

14   distributor.

15        Q.   And is that a certification that you can

16   obtain?

17        A.   I believe through NABP.

18        Q.   Through NABP?

19        A.   National Association of Boards of

20   Pharmacy.

21        Q.   And did the HBC warehouse ever get VAWD

22   certification?

23        A.   I don't believe so.

24        Q.   Did the HBC warehouse ever apply for

25   VAWD certification?

136

1        A.   I'm not -- I'm not sure if we ever

2   actually applied or not.

3        Q.   Were you part of the effort to create

4   these policies for VAWD?

5        A.   I helped on some of the policies, but,

6   again, without reading all of these, I'm not sure

7   which ones I did or did not.

8        Q.   Let's go back, if we could.  For this

9   purpose, I'll just use the Bates numbers that are

10  in the bottom right, the Bates ending number.  So

11  go back, if you could, to Bates 629.

12       A.   Is that this?

13       Q.   Exactly.  It's the HBC_MDL.

14       A.   What was the number?

15       Q.   The ending number is 629.

16       A.   Okay.

17       Q.   And if you could, at the top it says

18  Security Policy.  Do you see that at the top

19  right?

20       A.   Yes.

21       Q.   And then, if you could, do you see the

22  table that's got two columns?

23       A.   Yes.

24       Q.   Explain to me, if you could, how to read

25  that, if you know.

137



138

















146



147





149



150



151





153



154





156



157



158



159



15    Q.   Fair enough.  Do you have any sense of

16  what the hydrocodone combination products volumes

17  were in terms of dosage units or pills that were

18  shipped by the HBC warehouse between November 2009

19  and October 2014?

20    A.   No.  In 2009 I was in still in school

21  all the way up through, so no, up through 2013.

22    Q.   Are you aware of any shipments of

23  hydrocodone combination products that were flagged

24  by the HBC warehouse as being beyond thresholds?

25        MR. KOBRIN:  Object to form.

160

1           THE WITNESS:  I believe we saw an email

2    earlier that stated that.

3    BY MR. HUDSON:

4        Q.   That one in the end, do you know what

5    happened, whether or not that order was actually

6    shipped or not shipped?  That was the one relating

7    to store 8; right?

8        A.   I think it was Exhibit 10 maybe.

9        Q.   I'm thinking maybe it was Exhibit 7.

10       A.   If it didn't state in the email, I don't

11   know.  I don't recall.  If it states in the email,

12   then I can read what was on the email.

13       Q.   And are you aware of any pharmacists

14   that refused to fill prescriptions for hydrocodone

15   combination products on the grounds that it was at

16   risk of diversion?

17       A.   Specific examples you're asking?

18       Q.   Yeah.

19       A.   I don't know of any specific examples.

20       Q.   How about investigations of flagged

21   orders of hydrocodone products other than the one

22   that we talked about today in Exhibit 7?

23       A.   Am I aware of them?

24       Q.   Yes.

25       A.   Yes.

161

1        Q.   I mean, in other words, you're aware of

2   specific investigations that occurred other than

3   the ones that we've talked about today?

4        A.   Not specific examples, no.

5        Q.   Do you have any sense of the volume, in

6   other words, the number of investigations that

7   occurred?

8        A.   No.

9        Q.   Do you know who conducted the

10  investigations?

11       A.   During which time period?

12       Q.   November of 2009 to October of 2014.

13       A.   I can only speak to the time when I

14  was -- the only ones I'm aware of would be Joe

15  Millward.  And part of it is because I wasn't in a

16  role that I knew was even in the corporate office.

17  But Joe Millward, Rick Shaheen.  And I know they

18  had teams, but I don't know who necessarily was on

19  those teams.  George Chunderlik would have been

20  another one, I think.

21       Q.   Do you know how many investigations that

22  team conducted?

23       A.   No.

24            MR. KOBRIN:  Object to form.

25

162

```
1    BY MR. HUDSON:

2        Q.   Do you know what criteria was applied in

3    conducting those investigations?

4             MR. KOBRIN:  Object to form.  I think we

5    covered all this stuff.

6             THE WITNESS:  No.

7             MR. HUDSON:  I don't think I have any

8    further questions.  He's just got a couple that

9    will take probably ten minutes.  Do you want to

10   just knock those out?

11            MR. KOBRIN:  Yeah.  You want to just

12   knock them out and do lunch?

13            MR. HUDSON:  Yeah.

14            MR. KOBRIN:  We'll probably have a

15   little bit of cleanup I think.  Actually, we

16   should ask Mike.  Do you want to take a break?  Do

17   you want to have lunch?

18            THE WITNESS:  I'm okay.

19            MR. KOBRIN:  Are you sure?

20            THE WITNESS:  Yes.

21       Let's take a break actually.  I'll use the

22   rest room.

23            MR. KOBRIN:  We'll take a very quick

24   break.

25            THE VIDEOGRAPHER:  The time is
```

163

1    12:44 p.m.  We're going off the video record.

2                (Recess from 12:44 p.m. to 12:55 p.m.)

3                THE VIDEOGRAPHER:  The time is

4    12:55 p.m.  We are now back on the video record.

5                (HBC-Bianco Exhibit 17 was marked.)

6                        EXAMINATION

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

164





166







169







172



173





175









179









182

183





185

1 ████████████████████████████████████████

2 ████████████████

3          THE VIDEOGRAPHER:  The time is 1:24 p.m.

4  We're going off the video record.

5          (Recess from 1:24 p.m. to 2:13 p.m.)

6          THE VIDEOGRAPHER:  The time is 2:13 p.m.

7 We're now back on the video record.

8                     EXAMINATION

9 BY MR. KOBRIN:

10     Q.   Mr. Bianco, you spoke earlier today with

11 plaintiffs' counsel about the Controlled

12 Substances Act.  Do you remember that?

13     A.   Yes.

14     Q.   In your education and in your career,

15 have you studied the Controlled Substances Act?

16     A.   Yes, not in detail, but highlights.

17     Q.   And have you also looked at the

18 regulations of the Controlled Substances Act?

19     A.   Yes.

20     Q.   Based on your knowledge and experience

21 and education and your career, what is the central

22 thrust of the Controlled Substances Act and its

23 regulations?

24     A.   It's the security requirements, so a

25 combination of different processes in place that

186

1    would allow you to safeguard from theft or

2    diversion.







189



190



24      Q.   So when was it that you passed your

25   boards based on this email?

191

 1          A.   April of '14, but I'm not sure of the

 2     date.

 3          Q.   A lot of the emails you looked at today

 4     then were prior to April of '14; is that accurate?

 5          A.   Yes.

 6          Q.   So you were not even a board certified

 7     pharmacist at that time?

 8          A.   Correct.  I was not licensed.

 9          Q.   So in some of these cases, were you a

10     more junior person on these email threads?

11          A.   I think on every email I was the least

12     senior member on them that we looked at today.

13          Q.   Some of the emails that you read today,

14     were you instructed by other people to send them

15     or were you following instructions from more

16     senior members of the Giant Eagle organization?

17          A.   I presume, yes.

18          Q.   That you.

19                    RE-EXAMINATION

20     ███████████████

21     ███████████████████████████████████

22     ██████████████████████████████████████

23     █████████████████████████████████

24     ███████████████████████████████████

25     ██████████████████████



193



194



195



196







199





201



23          MR. HUDSON:  No further questions.

24    Thanks for your time.

25          THE VIDEOGRAPHER:  The time is 2:30 p.m.

202

1    This concludes the video deposition.

2              (Whereupon, at 2:30 p.m., the taking of

3    the instant deposition ceased.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

203

```
 1   COMMONWEALTH OF PENNSYLVANIA  )

 2   COUNTY OF ALLEGHENY            )      SS:

 3                 C E R T I F I C A T E

 4            I, Ann Medis, Registered Professional

 5   Reporter, Certified Livenote Reporter and Notary

 6   Public within and for the Commonwealth of

 7   Pennsylvania, do hereby certify:

 8            That MICHAEL BIANCO, the witness whose

 9   deposition is hereinbefore set forth, was duly

10   sworn by me and that such deposition is a true

11   record of the testimony given by such witness.

12            I further certify the inspection,

13   reading and signing of said deposition were not

14   waived by counsel for the respective parties and

15   by the witness.

16            I further certify that I am not related

17   to any of the parties to this action by blood or

18   marriage and that I am in no way interested in the

19   outcome of this matter.

20            IN WITNESS WHEREOF, I have hereunto set

21   my hand this 23rd day of January, 2019.

22
                     _____
23                             Notary Public

24

25
```

204

1    COMMONWEALTH OF PENNSYLVANIA    )    E R R A T A
     COUNTY OF ALLEGHENY             )    S H E E T
2

3         I, MICHAEL BIANCO, have read the foregoing
     pages of my deposition given on January 18, 2019,
4    and wish to make the following, if any,
     amendments, additions, deletions or corrections:
5

6    Page  Line    Change and reason for change:

7    ____  ____    _____

8    ____  ____    _____

9    ____  ____    _____

10   ____  ____    _____

11   ____  ____    _____

12   ____  ____    _____

13   ____  ____    _____

14   ____  ____    _____

15   ____  ____    _____

16   ____  ____    _____

17   ____  ____    _____

18

19   In all other respects, the transcript is true and
     correct.
20

21                 _____
                   MICHAEL BIANCO
22

23   _____ day of _____, 2019.

24   _____
                   Notary Public
25