Highly Confidential - Subject to Further Confidentiality Review

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE:  NATIONAL PRESCRIPTION    ) No. 17-md-2804
OPIATE LITIGATION NO. 2804       )
                                 )
APPLIES TO ALL CASES             ) Hon. Dan A. Polster
                                 )


HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

CONFIDENTIALITY REVIEW


VIDEO DEPOSITION OF DEMIR BINGOL

January 17, 2019
9:05 a.m.




Reporter:  Mark Arndt, CSR, CCR, RPR
CSR No. 084-004711
CCR No. 1398

Highly Confidential - Subject to Further Confidentiality Review

## Page 2

1    DEPOSITION OF DEMIR BINGOL, produced,
2  sworn, and examined on January 17, 2019, at Goodell,
   DeVries, Leech & Dann LLP, 1001 Market Street, Suite
3  3700, in the City of Philadelphia, State of
   Pennsylvania, before Mark Arndt, a Certified Shorthand
   Reporter and Certified Court Reporter.
4
5        APPEARANCES OF COUNSEL
6
   On Behalf of Plaintiffs:
7     Seeger Weiss LLP
      77 Water Street, 8th Floor
8     New York, NY 10005
      (212) 584-0780
9     BY:  MS. JENNIFER SCULLION
         jscullion@seegerweiss.com
10        MS. ERICA KUBLY
         ekubly@seegerweiss.com
11
   On Behalf of Tennessee plaintiffs:
12    Branstetter Stranch & Jennings, PLLC
      223 Rosa L. Parks Avenue
13    Nashville, TN  37203
      (615) 254-8801
14    BY:  MR. BENJAMIN A. GASTEL
         beng@bsjfirm.com
15
   On Behalf of Walmart:
16    Jones Day
      555 California Street, 26th Floor
17    San Francisco, CA  94104
      (415) 626-3939
18    BY:  MS. TAYLOR A. GOODSPEED
         tgoodspeed@jonesday.com
19
   On Behalf of AmerisourceBergen:
20    Jackson Kelly PLLC
      175 East Main Street
21    Lexington, KY  40507
      (859) 288-2805
22    BY:  MS. M. JANE BRANNON
         mjbrannon@jacksonkelly.com
23
24

## Page 3

1
2        APPEARANCES OF COUNSEL (CONTINUED)
   On Behalf of Endo Pharmaceuticals:
3     Endo Pharmaceuticals
      1400 Atwater Drive
4     Malvern, PA  19355
      (484) 216-6813
5     BY:  MS. CAROLYN M. HAZARD
         hazard.carrie@endo.com
6
   On Behalf of Cardinal Health:
7     Pietragallo Gordon Alfano Bosick & Raspanti, LLP
      1818 Market Street, Suite 3402
8     Philadelphia, PA  19103
      (215) 988-1464
9     BY:  MR. DOUGLAS K. ROSENBLUM
         dkr@pietragallo.com
10
   On Behalf of UCB, Inc.:
11    Hughes Hubbard & Reed LLP
      2345 Grand Boulevard
12    Kansas City, MO  64108
      (816) 709-4100
13    BY:  MS. TINA M. SCHAEFER
         tina.schaefer@hugheshubbard.com
14       (present via speakerphone)
15  On Behalf of Gemini Laboratories:
      Ulmer & Berne, LLP
16    65 East State Street
      Columbus, OH  43215
17    (614) 365-4500
      BY:  MS. SARAH M. BENOIT
18       sbenoit@ulmer.com
         (present via speakerphone)
19
   On Behalf of Demir Bingol:
20    Goodell, DeVries, Leech & Dann, LLP
      2001 Market Street, Suite 3700
21    Philadelphia, PA  19103
      (267) 765-3600
22    BY:  MR. ROBERT A. LIMBACHER
         rlimbacher@gdldlaw.com
23       MR. ADAM S. TOLIN
         atolin@gdldlaw.com
24       (present via speakerphone)

## Page 4

1        APPEARANCES OF COUNSEL (CONTINUED)
2
   Also present:  Devyn Mulholland, videographer
3              Daniel Brown, technician
              Sabrian Tyjer, paralegal
4
5        INDEX OF INTERROGATION
6  Examination by Ms. Scullion          Page 9
   Examination by Mr. Gastel            Page 280
7  Examination by Mr. Limbacher         Page 320
   Examination by Ms. Scullion          Page 329
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 5

1        INDEX OF EXHIBITS
2
   Exhibit Endo-Bingol-001          Page 14
3  (Notice of deposition)
   Exhibit Endo-Bingol-002          Page 14
4  (Subpoena)
5
   Exhibit Endo-Bingol-003          Page 23
6  (E-mail with résumé attached)
   Exhibit Endo-Bingol-004          Page 23
7  (Résumé)
8  Exhibit Endo-Bingol-005          Page 24
   (E-mail with résumé attached)
9  (PPLPC0120000412133 - PPLPC0120000412137)
10
   Exhibit Endo-Bingol-006          Page 75
11 (E-mail with attachments)
   (E1396.1 - E1396.26)
12
   Exhibit Endo-Bingol-007          Page 84
13 (Endo Pharmaceuticals business plan)
   (E0329.1 - E0329.67)
14
   Exhibit Endo-Bingol-008          Page 88
15 (Building the OPANA ER Story)
   Exhibit Endo-Bingol-009          Page 99
16 (Risk minimization action plan)
   (E0554.1 - E0554.46)
17 Exhibit Endo-Bingol-010          Page 113
   (OPANA brand advisory board meeting
18 transcript)
   (E1379.1 - E1379.75)
19
20 Exhibit Endo-Bingol-011          Page 146
   (Pain Medicine)
21 (E0977.1 - E0977.57)
22 Exhibit Endo-Bingol-012          Page 156
   (E-mail with attachments)
23 (E0520.1 - E0520.150)
24

2  (Pages 2 to 5)

Highly Confidential - Subject to Further Confidentiality Review

Page 6

INDEX OF EXHIBITS (CONTINUED)

Exhibit Endo-Bingol-013          Page 162
(E-mail)
(E522.1)

Exhibit Endo-Bingol-014          Page 170
(E-mail)
(E1378.1 - E1378.4)

Exhibit Endo-Bingol-015          Page 174
(E-mail)

Exhibit Endo-Bingol-016          Page 188
(E-mail, executive summary, and final report)

Exhibit Endo-Bingol-017          Page 202
(Opana ER successful rep research final
report)

Exhibit Endo-Bingol-018          Page 212
(2009 OPANA brand strategic plan)
(E1387.1 - E1387.78)

Exhibit Endo-Bingol-019          Page 219
(Report)

Exhibit Endo-Bingol-020          Page 223
(OPANA 2007-2011 business plan)
(E0912.1 - E0912.66)

Exhibit Endo-Bingol-021          Page 231
(E-mail with attachment)
(E1531.1 - E1531.3)

Exhibit Endo-Bingol-022          Page 237
(E-mail with attachment)
(E1511.1 - E1511.2)

Exhibit Endo-Bingol-023          Page 239
(E-mail)
(E1278.1 - E1278.3)

Page 8

INDEX OF EXHIBITS (CONTINUED)

Exhibit Endo-Bingol-036          Page 333
(Drug Intelligence Brief)
(E0563.1 - E0563.4)

(Exhibits are attached.)

Page 7

INDEX OF EXHIBITS (CONTINUED)

Exhibit Endo-Bingol-024          Page 250
(E-mail)
(E1514.1)

Exhibit Endo-Bingol-025          Page 250
(E-mail)
(E1515.1 - E1515.2)

Exhibit Endo-Bingol-026          Page 252
(E-mail with redactions)
(EPI001676707 - EPI001676709)

Exhibit Endo-Bingol-027          Page 257
(E-mail)
(EPI001794412 - EPI001794413)

Exhibit Endo-Bingol-028          Page 259
(E-mail)
(E1355.1 - E1355.3)

Exhibit Endo-Bingol-029          Page 263
(E-mail)
(E1354.1 - E1354.2)

Exhibit Endo-Bingol-030          Page 270
(E-mail)
(E1357.1 - E1357.19)

Exhibit Endo-Bingol-032          Page 285
(E-mail with attachments)

Exhibit Endo-Bingol-033          Page 294
(E-mail with attachments)

Exhibit Endo-Bingol-034          Page 301
(E-mail with attachments)
(ENDO-OPIOID_MDL-00999189 -
  ENDO-OPIOID_MDL-00999192)

Exhibit Endo-Bingol-035          Page 301
(Article by Melody Petersen)

Page 9

1    THE VIDEOGRAPHER:  We are now on the
2    record.  My name is Devyn Mulholland.  I'm a
3    videographer for Golkow Litigation Services.  Today's
4    date is January 17th, 2019.  The time is 9:05 AM.  This
5    video deposition is being held in Philadelphia,
6    Pennsylvania, in the matter of National Prescription
7    Opiate Litigation.  The deponent is Demir Bingol.
8    Counsel will be noted on the stenographic record.  The
9    court reporter is Mark Arndt and will now swear in the
10   witness.
11
12       The witness, DEMIR BINGOL, first having been
13   duly sworn, testified as follows:
14           QUESTIONS BY MS. SCULLION:
15   Q.   Good morning, Mr. Bingol.
16   A.   Good morning.
17   Q.   I introduced myself briefly off the
18   record.  My name is Jennifer Scullion.  I represent the
19   plaintiffs in this action.  Mr. Bingol, have you ever
20   been deposed before?
21   A.   Yes.
22   Q.   How many times?
23   A.   Four.  Starting to lose count.
24   Q.   And can you tell me about on each of those

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1       times, beginning with the earliest, what was the nature
2       of the litigation?
3           A.   Usually in relation to op -- a generic
4       settlement suit. I've been deposed several times for
5       that and also once as an expert witness in a suit,
6       although I can't recall the exact -- it was many years
7       ago -- the exact nature of that particular action.
8           Q.   Can we start with the expert witness
9       deposition? That's how you characterize it; right?
10          A.   That's -- yes.
11          Q.   Okay. Was that when you were employed by
12      Endo?
13          A.   Correct.
14          Q.   Okay. Do you recall anything about what
15      you testified about in terms of being an expert
16      witness?
17          A.   I recall being in court that day and being
18      asked a lot of questions, but then we had reached a
19      settlement -- I think Endo had reached a settlement
20      with the plaintiff very soon thereafter, so it was --
21      that's what I really recall. It was a suit between I
22      guess Endo and other generic manufacturers.
23          Q.   Do you know with regard to what product?
24          A.   Opana ER.

Page 11

1           Q.   Was it a patent lawsuit?
2           A.   I don't recall the specifics.
3           Q.   So you testified in court. So it wasn't a
4       deposition? It was actually in court?
5           A.   That's correct.
6           Q.   Okay. Was that before the Federal Trade
7       Commission?
8           A.   No. This was in New Jersey.
9           Q.   And you say you testified as an expert
10      there. Do you recall what areas you offered expert
11      testimony on?
12          A.   Just my functional role. Marketing.
13          Q.   When -- do you know -- were you actually
14      classified as an expert in that case? Were you offered
15      as an expert?
16          A.   I'm not sure of the exact technical term.
17      That's how I recall it.
18          Q.   Okay.
19          A.   I don't know what designation, legal
20      destination, there was, but I was there to provide that
21      particular, I guess, marketing expertise, and that's
22      why I think I was selected for that.
23          Q.   Do you recall what you testified about
24      with respect to Opana ER specifically?

Page 12

1           A.   I don't recall the questions at this point
2       or what they were probing for. It's been many years,
3       maybe over 10 years now.
4           Q.   So that was your in-court testimony. Also
5       said you had testified in depositions in the context of
6       a number of, you said, generic settlement suits.
7           A.   Correct.
8           Q.   What do you mean by generic settlement
9       suits?
10          MR. LIMBACHER: Let me just caution the
11      witness not to disclose any privileged communications
12      that you had with counsel in connection with any of
13      your prior testimony. I'm happy to have you answer
14      questions from counsel, but in doing so, just be
15      careful not to inadvertently disclose any privileged
16      communications.
17          A.   The nature of the lawsuits, I guess, were
18      focused on whether or not the settlements that Endo had
19      reached with generic manufacturers was appropriate or
20      not.
21          Q.   (By Ms. Scullion) These were antitrust
22      lawsuits.
23          A.   I guess they might have been considered
24      that. I don't know for sure the -- again, the legal.

Page 13

1           Q.   Okay. And these were all in connection
2       with settlements of patent litigation over Opana ER?
3           A.   Yes.
4           Q.   Were any of them with respect to
5       settlement of litigation for generic Oxycodone?
6           A.   I don't think so. Not to my knowledge.
7           Q.   Okay. Other than what you've described,
8       the testimony with respect to generic settlement suits
9       for Opana ER, your in-court testimony in New Jersey,
10      any other testimony you've given?
11          A.   Yes. The Federal Trade Commission.
12          Q.   And that was in the Impax proceeding?
13          A.   Yes, I think that's correct.
14          Q.   Any other testimony?
15          A.   Not that I recall.
16          Q.   Did you give any testimony before the New
17      York attorney general in connection with an
18      investigation of Opana -- Endo's marketing and
19      promotion of Opana ER?
20          A.   No.
21          MS. SCULLION: Can I have the --
22      deposition --
23          Q.   (By Ms. Scullion) I'm going to hand you
24      what's been marked as Exhibits 1 and 2. And Exhibit 1

4  (Pages 10 to 13)

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1  is a copy of the notice of deposition of Demir Bingol,
2  and Exhibit Number 2 is a copy of a subpoena to testify
3  at deposition in a civil action.  Have you seen Exhibit
4  Number 1 before?
5       [Exhibit Endo-Bingol-001 marked for
6       identification.]
7       [Exhibit Endo-Bingol-002 marked for
8       identification.]
9     A.  Yes.
10    Q.  Okay.  Do you understand that you're here
11 today to testify pursuant to -- strike that.  Have you
12 seen Exhibit 2 as well, the subpoena?
13    A.  Yes.
14    Q.  Okay.  And do you understand that you're
15 here today to testify pursuant to the subpoena, Exhibit
16 Number 2?
17    A.  Yes.
18    Q.  If you look, Exhibit Number 2 at the
19 bottom half of the page says production.  Do you see
20 that?
21    A.  Yes.
22    Q.  And it calls for certain documents to be
23 produced.  Were you asked to search your documents
24 prior to coming to today's deposition?

Page 16

1     Q.  Okay.  At your house?
2     A.  Yes.
3     Q.  Okay.  Search anywhere else?
4     A.  No.  That's where I keep all of my files.
5     Q.  You don't have any paper files that relate
6  to your work at Endo?
7     A.  No.
8     Q.  Just to make sure that we're all on the
9  same page, your job at Endo involved promotion and
10 marketing of various drug products; correct?
11    A.  Yes.
12    Q.  Okay.  And from time to time there were
13 promotional materials that were created in connection
14 with those efforts; right?
15    A.  Yes.
16    Q.  Brochures, slim gens (ph)?
17    A.  Yes.
18    Q.  Maybe little premium materials like pens,
19 these kind of things?  Do you have any of those
20 materials still in your possession at home?
21    A.  No.
22    Q.  Okay.  Thanks.  You searched on your
23 desktop.  Did you just search your hard drive files, or
24 did you also search, for example, e-mails?

Page 15

1       MR. LIMBACHER:  Let me just caution the
2  witness not to disclose privileged communication.  I'll
3  allow him to answer him question with a yes or no,
4  assuming we have an understanding that it's not going
5  to be deemed a waiver of privilege.
6       MS. SCULLION:  That's fine.
7     A.  Yes.
8     Q.  (By Ms. Scullion) Okay.  And before we go
9  on, are you represented by counsel today?
10      MR. LIMBACHER:  Yes, he is.
11    A.  Yes.
12    Q.  (By Ms. Scullion) And Mr. Limbacher is
13 your counsel?
14    A.  Yes.
15      MR. LIMBACHER:  Yes.
16    Q.  (By Ms. Scullion) When were you first
17 asked to search for documents in connection with the
18 deposition?
19    A.  Tuesday.
20    Q.  And where did you look for documents?
21    A.  On my personal computer.
22    Q.  A laptop or a -- is it a desktop or
23 laptop?
24    A.  It's a desktop.

Page 17

1     A.  My hard drive files.
2     Q.  And did you find documents there
3  responsive to the subpoena?
4     A.  Yes.
5     Q.  And were those all provided to counsel?
6     A.  Yes.
7       MS. SCULLION:  Counsel, have those all
8  been produced to us at this time, or are there any that
9  have been withheld for any reason?
10      MR. TOLIN:  My understanding is they've
11 all been produced, every one.
12      MS. SCULLION:  And that was the Tuesday
13 evening production?
14      MR. TOLIN:  Correct.
15      MS. SCULLION:  And just so we're clear,
16 those are the ones that are Bates-stamped beginning
17 with Bingol?
18      MR. TOLIN:  I don't know the Bates
19 labeling of it, but my understanding is each document
20 that Mr. Bingol provided to us was produced Tuesday
21 night.
22      MS. SCULLION:  Okay.
23    Q.  (By Ms. Scullion) Mr. Bingol, we'll show
24 you some of those documents.  Why did you have

5  (Pages 14 to 17)

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    Endo-related documents still on your desktop as of
2    Tuesday night -- Tuesday?
3              MR. LIMBACHER:  Object to form.
4         A.    Just a collection over, you know, my
5    career there.  If I worked from home periodically, I
6    might collect a document here or there.  I might
7    intentionally keep something I created that I thought
8    might be professionally useful to refresh my memory on
9    how I created a model or, you know, maybe a template
10   or, you know, some -- more for professional reasons.
11   But those are documents that I haven't even thought or
12   touched, to be honest with you, in the last eight years
13   or more.  They just happened to be there, and when I
14   was asked to double-check, quite frankly I was
15   surprised at what I still had, and so I surprised
16   everything I had.
17        Q.    (By Ms. Scullion)  Had you been asked to
18   search before Tuesday?
19        A.    No.
20        Q.    You said double-check.  You sound like
21   somebody had asked you before and you were
22   double-checking.
23        A.    Well, they asked on Tues --
24              MR. LIMBACHER:  Object to form.

Page 19

1         A.    Excuse me.  They asked for -- if I had any
2    documents, and I thought about it.  I said I may have
3    one or two.  They said, please go double-check.
4              MR. LIMBACHER:  I would caution the
5    witness again -- and I know counsel is not trying to
6    get into our communications -- but communications with
7    counsel, Mr. Bingol, I'll remind you, are privileged,
8    and she's not entitled to get into the substance of
9    those communications.
10        Q.    (By Ms. Scullion)  I think I understand.
11   Did you make any effort on Tuesday to look through your
12   personal e-mails to see if there are responsive
13   documents there?
14        A.    No.
15        Q.    You have from time to time used a personal
16   Hotmail account; correct?
17              MR. LIMBACHER:  Object to form.
18        A.    Correct.
19        Q.    (By Ms. Scullion)  And you've used that in
20   connection with your professional endeavors; correct?
21        A.    Correct.
22              MS. SCULLION:  Counsel, we are going to
23   ask that Mr. Bingol be asked to search through his
24   Hotmail account to see if there's any responsive

Page 20

1    documents there.  The subpoena does call for them.  I
2    think as the witness has made clear, from time to time
3    there are documents remaining that the witness may not
4    even be remembering right now, so we're going to need
5    to have those searched for and produced.
6         Q.    (By Ms. Scullion)  Have you used any other
7    personal e-mail accounts other than a Hotmail account?
8              MR. LIMBACHER:  Object to form.
9         A.    No.
10        Q.    (By Ms. Scullion)  When you searched for
11   documents responsive to subpoena, Exhibit 2, did you
12   search only for documents that concerned your work for
13   Endo?
14        A.    Yes.
15        Q.    Did you search for whether there were any
16   documents with respect to your work for Grunenthal?
17              MR. LIMBACHER:  Object to form.
18        A.    No.
19        Q.    (By Ms. Scullion)  Am I correct that your
20   work at Grunenthal has involved at least one opioid
21   product -- that would be a reformulated version of
22   Opana ER?  Is that correct?
23              MR. LIMBACHER:  Object to form.
24        A.    Not necessarily.  I'm not directly

Page 21

1    involved in the formulation of that product, and my
2    role at Grunenthal is business development and
3    licensing.
4         Q.    (By Ms. Scullion)  And that licens -- the
5    business development and licensing includes the
6    relationship that Grunenthal at least had with Endo
7    with respect to their formulated version of Opana ER;
8    correct?
9              MR. LIMBACHER:  Object to form.
10        A.    Early on I would be liaising with Endo for
11   about maybe the first 18 months or so, but it's been
12   probably three-and-a-half years or so since I've had
13   any contact really with Endo --
14        Q.    (By Ms. Scullion)  Okay.
15        A.     -- on anything related to the product.
16        Q.    And so I understand then you would not
17   have searched your -- you did not search your desktop
18   to see if you had any documents relating to that work
19   liaising with Endo; correct?
20              MR. LIMBACHER:  Object to form.  Counsel,
21   it appears the request is specific to employment with
22   Endo, unless I'm misreading it.
23        Q.    (By Ms. Scullion)  If you could answer the
24   question.  Did you in fact search for any documents

6  (Pages 18 to 21)

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1  relating to your work liaising with Endo concerning the
2  license on the reformulated version of Opana ER?
3       MR. LIMBACHER:  Object to form.  Asked and
4  answered.
5       Q.  (By Ms. Scullion)  Please answer.
6       A.  No, I wasn't aware that I had to.
7       Q.  Okay.  And because counsel raised it, I'm
8  looking at Exhibit Number 2, the last page, which is
9  the second page of Attachment A listing the documents
10  requested.  And Paragraph 2 refers to all documents
11  concerning the sale, promotion, marketing,
12  distribution, efficacy, adverse effects, abuse, misuse,
13  diversion, or regulation of, risk associated with,
14  indications for, or education, medical guidelines, or
15  public policies concerning any opioid product other
16  than your personal health records.
17       MS. SCULLION:  So we do not believe that
18  the subpoena was limited to his work for Endo.
19       MR. LIMBACHER:  I'd point out that
20  Paragraph Number 1 and -- under documents requested,
21  Paragraph Number 1, under tangible things requested, is
22  specifically limited to documents and things concerning
23  his employment with Endo.
24       MS. SCULLION:  That's true -- the tangible

Page 23

1  things.  The documents requested is broader, and we
2  request that he search his files for such materials and
3  they be produced.
4       MR. LIMBACHER:  Grunenthal has produced
5  documents in the litigation; am I correct?
6       MS. SCULLION:  I am not going to get into
7  a colloquy about it.  We issued a subpoena to the
8  witness and we request the documents be produced from
9  his files, if they are there.
10       MR. LIMBACHER:  We understand your request
11  and we'll take it under advisement.
12       MS. SCULLION:  Can we have his CV?
13  Thanks.
14       Q.  (By Ms. Scullion)  Do this slightly out of
15  order.  This is Exhibit Number 4.  We'll get back to
16  Number 3, I promise.  Exhibit Number 4, Mr. Bingol --
17  can you identify it, please?
18       [Exhibit Endo-Bingol-003 marked for
19       identification.]
20       [Exhibit Endo-Bingol-004 marked for
21       identification.]
22       A.  It's a résumé.
23       Q.  This is a copy of a résumé that you
24  brought with you today to the deposition; correct?

Page 24

1       A.  That's correct.
2       Q.  Okay.  And we'll represent that counsel
3  did provide it to us just before the deposition
4  started.
5       MS. SCULLION:  Can we have E1452, please?
6  Okay, my apologies for skipping 3 altogether.
7       Q.  (By Ms. Scullion)  I'm going to hand you
8  what's been marked as Exhibit Number 5.  Exhibit Number
9  5 is marked in the lower right-hand corner PPLPC
10  012000412133, and we have marked it as E1452 right
11  above that.  Mr. Bingol, do you recognize Exhibit
12  Number 5?
13       [Exhibit Endo-Bingol-005 marked for
14       identification.]
15       MR. LIMBACHER:  Take your time to review
16  the document.
17       A.  I do.
18       Q.  (By Ms. Scullion)  And what is it?
19       A.  It's a copy of my CV.
20       Q.  Is it a copy of an e-mail attaching your
21  CV that you sent to Russell Gasdia at Purdue in March
22  of 2013?
23       A.  Yes.
24       Q.  At the time you were applying for a

Page 25

1  position with Purdue as VP of marketing; is that
2  correct?
3       A.  I was hoping to apply.  I didn't get very
4  far in the process.
5       Q.  Okay.  You were submitting your résumé for
6  consideration?
7       A.  Correct.
8       Q.  Okay.  If you'll turn to the last page of
9  your résumé, E1452.5.  List there your education.  So
10  if I understand correctly, you had an undergraduate
11  degree in marketing.  Correct?
12       A.  That's correct.
13       Q.  Okay.  And then an MBA with a marketing
14  concentration; correct?
15       A.  That's correct.
16       Q.  Okay.  Fair to say you do not have a
17  science -- a formal science degree; correct?
18       A.  That's correct.
19       Q.  And just looking through your employment
20  history, start off at the American Heart Association in
21  1991, and I assume that you had no involvement there
22  with controlled substances marketing?
23       A.  No.
24       Q.  Okay.  Moved on to AstraZeneca from 1996

7  (Pages 22 to 25)

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    to 2002; correct?
2        A.    That's correct.
3        Q.    And your experience there, again, did not
4    relate to any opioid products; correct?
5        A.    Correct.
6        Q.    And no pain products; correct?
7        A.    Correct.
8        Q.    Moved on to aaiPharma in 2002-2004.  There
9    did you have any responsibilities in connection with
10   any pain products?
11       A.    Yes.
12       Q.    What were those?
13       A.    Was propoxyphene as a molecule, either
14   alone or in combination with acetaminophen.  The brand
15   was Darvon or Darvocet.
16       Q.    Is propoxyphene an opioid?
17       A.    Yes.
18       Q.    Do you know if it's a Schedule II
19   substance?
20       A.    No, it was not.
21       Q.    It was a Schedule III or IV?
22       A.    It was a IV, I think, but it's since been
23   withdrawn from the market.
24       Q.    Okay.  And then your next position was

Page 27

1    with Adolor from 2004-2006, and again, there did you
2    have responsibilities for any opioid products?
3        A.    No.
4        Q.    What products were you -- did you have
5    responsibilities for?
6        A.    It was -- we were developing a product
7    called alvimopan, which was a new antagonist, whereas
8    opioid is a new agonist.  This is a new antagonist to
9    block the effect of the opioid in the GI tract to help
10   mitigate some of the adverse events of opioid
11   medications.
12       Q.    Okay.  From your experience at aaiPharma
13   and Adolor, did you begin to have some familiarity with
14   the prescription opioids marketplace?
15            MR. LIMBACHER:  Object to form.
16       A.    Yes.
17       Q.    (By Ms. Scullion)  And you had started at
18   aaiPharma 2002.  At that time did you become familiar
19   with certain concerns in the marketplace about abuse,
20   diversion of prescription opioids stemming, for
21   example, from the experience with OxyContin?
22            MR. LIMBACHER:  Object to form.
23       A.    Somewhat.  The segment of the market we
24   were competing in was not the same scheduling and

Page 28

1    didn't have a lot of the same concerns, and not
2    necessarily 100 percent attuned to that topic as such,
3    but of course in pain management this becomes an
4    obvious topic over time.
5        Q.    (By Ms. Scullion)  Okay.  And you said you
6    didn't have the same concerns at aaiPharma.  What did
7    you understand the concerns were with respect to, for
8    example, OxyContin?
9            MR. LIMBACHER:  Object to form.
10       A.    Just that in general Schedule IIs are
11   more -- they have a higher risk profile than, say, a
12   Schedule III or Schedule IV, and OxyContin belonging in
13   that class had those effects or adverse events,
14   safety risks, associated with Schedule II products.
15       Q.    (By Ms. Scullion)  When you say a higher
16   risk profile, risks of what?  What type of risk
17   specifically?
18       A.    There are a number of risks associated
19   with scheduled narcotics and Schedule II in particular.
20   Risk of abuse, misuse, and diversion, risk of
21   respiratory depression and other serious adverse
22   events, and then there are those that are maybe more
23   transient adverse events, just like the
24   gastrointestinal upset or things that you --

Page 29

1    byproduct -- let's say adverse events just from taking
2    the drug appropriately.
3        Q.    You said abuse, misuse, diversion.  Is
4    addiction also a risk?
5            MR. LIMBACHER:  Object to form.
6        A.    Yes.
7        Q.    (By Ms. Scullion)  And were there
8    particular concerns about how those risks have been
9    addressed in Purdue's marketing of OxyContin?
10            MR. LIMBACHER:  Object to form and
11   foundation.
12       A.    I can't speak to Purdue's marketing and
13   what they did or didn't do.  I was never employed
14   there.
15       Q.    (By Ms. Scullion)  Well, between 2002 and
16   2006 in your time at aaiPharma and Adolor, did you come
17   to learn, for example, about a government
18   accountability office report, a federal GAO report,
19   examining Purdue's marketing of OxyContin?
20            MR. LIMBACHER:  Object to form.
21       A.    I don't recall if I -- I don't recall
22   that.
23       Q.    (By Ms. Scullion)  Do you recall it even
24   in the media, in the news, there being concerns about

8 (Pages 26 to 29)

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1    OxyContin and developing widespread abuse of OxyContin?
2        A.   I don't recall when I became sensitized to
3    that topic, whether it was at Adolor or aaiPharma or
4    even when I start at Endo.  I -- certainly I
5    became aware over time, but I just don't know when --
6        Q.   Fair enough.  You say at some point you
7    became aware.  Tell me what you recall being aware of.
8            MR. LIMBACHER:  Object to form.
9        A.   Just the safety concerns and the risks of
10   OxyContin as a long-acting opioid.
11       Q.   (By Ms. Scullion)  Were there particular
12   concerns about the way that OxyContin had been marketed
13   by Purdue?
14           MR. LIMBACHER:  Object to form.  Asked and
15   answered.
16       Q.   (By Ms. Scullion)  Did you become aware of
17   those?
18       A.   I became aware that Purdue, I believe, was
19   in litigation for their marketing practices and that
20   they paid a penalty ultimately.
21       Q.   Including criminal penalties?
22       A.   I assume so.  I don't really recall
23   what -- I know there was a financial compensation or a
24   component to that.  I didn't know if there's criminal

Page 31

1    or -- I don't recall that.
2        Q.   Okay.  Let's go back to your résumé.
3    Looking at your description of your work at -- is it
4    Adolor?
5        A.   Adolor.
6        Q.   Adolor?
7        A.   Yes.
8        Q.   Thank you.  I was mispronouncing it.
9    Adolor.  In the third bullet point down, on Page
10   E1452.3, you describe conditioned the market for a
11   new-to-the-world class of opioid antagonists called
12   PAMORs.  What do you mean by conditioned the market for
13   a new-to-the-world class of opioid antagonists?
14       A.   That's referring to the work that you
15   might do in advance of a product launch to have
16   customers anticipate your product's coming, so you
17   might work with -- working through your publication
18   strategy and other forms of updated dissemination to
19   let folks know that there's a product that's coming,
20   that these are the clinical data, this is where you
21   might use it, but it's not specific to the product, of
22   course.  It's about getting your scientific data into
23   the market and seeing the applicability of where that
24   drug might fit.

Page 32

1        Q.   It's creating some awareness in advance of
2    the launch?
3        A.   Correct.
4        Q.   Okay.  One thing I do want to mention.  I
5    know you've testified a number of times before.  For
6    the sake of the court reporter, we're going to have to
7    be careful not to talk over each other.  I'm going to
8    try to not speak over your answers.  You're going to
9    have to just be careful, let me finish my question and
10   then begin your answer.  It will -- otherwise, it will
11   be very difficult for the court reporter to take down.
12   Thank you.
13           The other thing is just if you could
14   remember to give actual verbal answers instead of
15   shaking your head or nodding your head, again for the
16   sake of the court reporter.  He's going to need to be
17   able to take down actual words.  Is that okay?
18       A.   That's okay.  Thank you.
19       Q.   And if at any point today you don't
20   understand my question, would you please let me know
21   that?
22       A.   Yes.
23       Q.   Thank you.  Is there any reason today you
24   can't give your best testimony?

Page 33

1        A.   No.
2        Q.   No medications that are interfering with
3    your cognitive abilities, for example?
4        A.   No.
5        Q.   Okay.  Let's stay with your résumé.  If
6    you'll go up to your description of your time with Endo
7    Pharmaceuticals.  You list here Chadds Ford,
8    Pennsylvania.  Was that where your office was?
9        A.   Yes.
10       Q.   And you were senior director of oral pain
11   solutions group; correct?
12       A.   That's correct.
13       Q.   And it says here you were responsible for
14   managing the P and L of each product in the oral pain
15   solutions group.  I just want to ask you what products
16   those were, and just to hopefully help out on that, if
17   you'll go down -- one, two -- three bullet points
18   underneath your introduction.  You list a number of
19   products there.  Let's do it this way.  If you can just
20   confirm that each of these were part of the oral pain
21   solutions group.  Opana?
22       A.   Yes.
23       Q.   Opana ER?
24       A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1     Q.  Percocet?
2     A.  Yes.
3     Q.  Frova?
4     A.  Yes.
5     Q.  And Zydone?
6     A.  Yes.
7     Q.  Were there any other products that were
8  part of the oral pain solutions group during your time
9  at Endo?
10    A.  I don't recall if there were any more.
11 There might have been a smaller brand or two that were
12 kind of in a mature state, but I think these were the
13 prominent ones.
14    Q.  Okay.  Percocet.  You're familiar with
15 that product, obviously.  That was within your realm of
16 responsibilities; correct?
17    A.  Yes, but only for about the last nine to
18 10, 12 months, maybe, when the oral pains -- when I
19 became the senior director of the oral pain solutions
20 group.  It was only for a very short period of my
21 tenure there.
22    Q.  Let's go back then.  When you joined Endo
23 Pharmaceuticals, what was your position?
24    A.  Senior director of marketing.

Page 35

1     Q.  And were you responsible for certain
2  products as senior director of marketing when you first
3  joined?
4     A.  Yes.
5     Q.  Which products?
6     A.  Opana and Opana ER.
7     Q.  Any others?
8     A.  No.
9     Q.  And do you know -- what was your next
10 position after director of marketing?
11    A.  That was my basic position until my --
12 until I took over the extra products.  In fact, you
13 might even say the title itself and the level is the
14 same.  Just took on additional responsibilities for
15 other brands.  I also had a small -- a short stint as a
16 regional sales director, and -- but that was a
17 development opportunity, not an official, let's say,
18 position in that sense.  So I kept my marketing
19 responsibilities in parallel with doing that job
20 rotation.
21    Q.  Okay.  Let me make sure that I understand.
22 So you joined as senior director of marketing, and you
23 had responsibilities for Opana and Opana ER from a
24 marketing perspective; correct?

Page 36

1     A.  That's correct.
2     Q.  Okay.  And if I understand correctly, you
3  also took on concurrently, it looks like from September
4  2009 to September 2010, responsibilities to serve as
5  the regional sales director for the Midwest region; is
6  that right?
7     A.  That is correct.
8     Q.  Okay.  And so you maintained your
9  marketing responsibilities, but also took on the
10 additional responsibilities of regional sales director?
11    A.  Correct.
12    Q.  All right.  And then I think you said for
13 the last nine to 12 months of your time with Endo, so
14 sometime, earliest June 2010, you became senior
15 director for the oral pain solutions groups, which you
16 expanded your marketing responsibilities to more
17 products; correct?
18        MR. LIMBACHER:  Object to form.
19    A.  Correct.
20    Q.  (By Ms. Scullion)  Okay.  And I think you
21 told me that Percocet was one of the products that you
22 did eventually have responsibility for in the last nine
23 to 12 months of your time.  Percocet was a combination
24 of Oxycodone and Apap (ph); correct?

Page 37

1     A.  Correct.
2     Q.  Okay.  Oxycodone is the same opioid as
3  an OxyContin; correct?
4     A.  Correct.
5     Q.  All right.  And when you took on
6  responsibilities for Percocet in, sounds like
7  approximately late 2010 -- let's put it that way -- at
8  that point that was a fairly mature product; correct?
9        MR. LIMBACHER:  Object to form.
10    A.  That's correct.
11    Q.  (By Ms. Scullion)  Percocet had been in
12 fact launched way back in the 1970s; right?
13    A.  I don't know the launch date of the
14 original.
15    Q.  Do you recall if it was launched well
16 prior to Endo itself being founded in 1997?
17    A.  I don't know.  It was -- when I got there,
18 you know, Percocet was already there.  I know that they
19 had it.  I don't know the timing or what happened and
20 when.
21    Q.  Okay.  And in that last period of your
22 employment with Endo, latter half of 2010 through 2011,
23 was Endo also selling a branded generic version of
24 Percocet called Endocet?

10  (Pages 34 to 37)

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1    MR. LIMBACHER: Object to form and
2  foundation.
3      A.  Yes.
4      Q.  (By Ms. Scullion) Okay.  Did you ever
5  have responsibilities with respect to Endocet?
6      A.  No.
7      Q.  Do you know which group within Endo did
8  have responsibilities for Endocet during that time
9  period?
10      A.  I don't recall specifically.  I assume it
11  was the generic division.
12      Q.  During the time that you were with Endo
13  starting back in 2006, at the very beginning of your
14  time with Endo, was Endo also selling generic version
15  of OxyContin?
16      A.  I don't recall.  I don't remember that.
17      Q.  Are you aware whether Endo had sold at
18  some point in time a generic version of OxyContin?
19      MR. LIMBACHER: Object to form.
20      A.  I don't recall that.
21      Q.  (By Ms. Scullion) Okay.  Safe to say you
22  did not have responsibility for such -- that product if
23  they did sell it; right?
24      A.  I didn't have responsibility for any --

Page 39

1  that kind of product at all.  No.
2      Q.  Okay.  Okay.  Going to the first bullet
3  point under your description of your time at Endo.  You
4  say successfully launched the Opana brand in 2006,
5  building it into a 600 million dollar franchise and
6  becoming the Number Two product in its market segment.
7  Safe to say that your work on the Opana brand was
8  successful?
9      MR. LIMBACHER: Object to form.
10      A.  It was -- yes, it was successful as far as
11  I was concerned.  A relatively percentage of the
12  overall market.
13      Q.  (By Ms. Scullion)  It did build up to a
14  600 million dollar franchise; correct?
15      MR. LIMBACHER: Object to form.
16      A.  Yes.
17      Q.  (By Ms. Scullion) Okay.  And through the
18  marketing promotion efforts, it did become Number Two
19  product in the market segment, at least; correct?
20      A.  Correct.
21      Q.  And in fact, as you go on to state, at
22  least for four full years running, 2007 to 2010, under
23  your leadership the Opana brand exceeded its net sales;
24  correct?

Page 40

1      MR. LIMBACHER: Object to form.
2      A.  Correct.
3      Q.  (By Ms. Scullion) And exceeded its --
4  also it says TRX forecast.  What's TRX forecast?
5      A.  TRX is an acronym for total prescriptions.
6      Q.  Okay.  So for those four years, the Opana
7  brand also exceeded its total prescription forecast;
8  correct?
9      A.  Yes.
10      Q.  Okay.  If you go back up to the summary of
11  your time at Endo.  You say you were responsible for
12  managing the P and L of the products for which you had
13  responsibility; correct?
14      A.  Correct.
15      Q.  And just to make sure I understand, so at
16  the beginning when you first were -- had responsibility
17  just for Opana and Opana ER, you did -- you were
18  responsible for managing the P and L for those
19  products; correct?
20      A.  Correct, although at the beginning we did
21  not.  That became something we did later on into my
22  tenure.
23      Q.  So in terms of having responsibility for
24  the P and L, that came on later in your tenure?

Page 41

1      A.  Yes.  You know, the way the business was
2  managed was every year you evaluate who's doing what,
3  and soon -- after a year or two, I think they decided
4  we would manage brand P and Ls.
5      Q.  Okay.  Got it.  And then you go on to
6  explain you're also responsible for managing the -- it
7  says in line marketing functions.  What does that mean?
8      A.  In line marketing functions would refer to
9  things like product promotion, customer -- promotional
10  materials, coupon programs, things that would
11  facilitate the communication of the product to
12  customers.
13      Q.  And customers -- just to make sure that
14  we're clear -- let's start with Opana ER.  The
15  customers would include physicians; correct?
16      MR. LIMBACHER: Object to form.
17      A.  Correct.
18      Q.  (By Ms. Scullion)  Could also include
19  other health care providers such as nurses or
20  physicians' assistants to the extent that they're
21  authorized under their relevant state's regimes to
22  prescribe?
23      MR. LIMBACHER: Object to form.
24      A.  Yeah.  Our customers were always

11  (Pages 38 to 41)

Page 42

1    determined by the appropriate targeting of clinicians,
2    health care professionals who were responsible and had
3    the ability -- and the ability to write these products
4    for their patients who were suffering from pain -- you
5    know, pain patients.  So we had a very focused
6    definition of who we would target, who we would promote
7    to.
8        Q.   (By Ms. Scullion)  Okay.  Who determined
9    which customers to target for Opana ER during your
10   time?
11           MR. LIMBACHER:  Object to form.
12       Q.   (By Ms. Scullion)  Your time with Endo?
13   Sorry.
14       A.   The ultimate target list ulti -- was
15   derived from a number of different inputs, but
16   ultimately would have to start with where the business
17   is.  We were not expanding the market.  We were rather
18   focused on taking share from existing products.  So you
19   would look at who's already writing products, and then
20   it would go through an internal review to ensure that
21   customers that we were targeting were appropriate based
22   on legal and regulatory guidelines.  Ultimately who
23   made the final decision, I'm not quite sure how that
24   would filter down, whether that was sales or regulatory

Page 43

1    working together.
2        Q.   Okay.  If I understand correctly, you're
3    saying you're targeting physician -- sorry --
4    providers, I should say -- who were already writing
5    long-acting opioids in the case of Opana ER; correct?
6        A.   Correct.  Those clinicians who had a pain
7    practice, those who are experienced in writing
8    long-acting opioids.  We were not trying to go outside
9    and build up a new base of business, but rather to do a
10   share acquisition strategy to going after where
11   clinicians who might be using a competitor product and
12   hopefully showing the benefits of Opana ER and having
13   them consider that in their choice set.
14       Q.   Okay.  In order to do that targeting of
15   physicians who are already currently writing
16   competitive products, I think you said -- and obviously
17   had information then about which physicians were then
18   currently writing which competitive products and at
19   which levels; correct?
20       A.   Correct.
21       Q.   To know who to target?
22       A.   IMS data provides that insight.
23       Q.   Okay.  So for example, again looking at
24   Opana ER, Endo would be able to tell which physicians

Page 44

1    were already writing higher volumes of long-acting
2    opioids and which were really only writing more modest
3    volumes of long-acting opioids; correct?
4            MR. LIMBACHER:  Object to form.
5        A.   With IMS data, you can see physicians'
6    prescribing habits --
7        Q.   (By Ms. Scullion)  Okay.
8        A.   -- whether that's for opioids or any
9    class of product.  You can see that.
10       Q.   But you could take IMS data and you --
11   sorry.  Strike that.  You did take that IMS data and
12   look at it just, for example, for long-acting opioids
13   to see who's writing what volumes of long-action
14   opioids; correct?
15       A.   That data was used to help determine the
16   targeting.  Sales analytics usually did the targeting
17   process, so I can't really speak to all the decisions
18   that went into, you know, how they trimmed down the
19   sales list or the target list, but generally speaking
20   they would use IMS data to help them make those
21   determinations.
22       Q.   Okay.  So we're talking about the in line
23   marketing functions in your description of your
24   position with Endo.  You then go on to -- so you also

Page 45

1    had a responsibility for life cycle management.  I'm
2    looking at your résumé, Page E1452.3.  What was life
3    cycle management?
4        A.   Life cycle management is a term used
5    generally just to talk about how you might be able to
6    identify ways to improve the value of the product to
7    the market, things that the market may be still looking
8    for in terms of additional improvements or benefits,
9    and trying to determine if it's possible to bring those
10   improvements to the product and to offer that value
11   back to the market.
12       Q.   And in looking at life cycle management,
13   did you look at life cycle management for Opana ER?
14       A.   Yes.
15       Q.   Was one of the things that you looked at
16   the projection of when there may be a generic version
17   of Opana ER launched?
18           MR. LIMBACHER:  Object to form.
19       A.   The potential for generic is a scenario
20   that we plan for.  In fact, every product does; right?
21   Eventually products lose their patent and you have
22   to -- in good faith as a marketer, you always have to
23   take into account those potential scenarios that are
24   going to have an effect on your business.

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1      Q.   (By Ms. Scullion)  Okay.  And that's
2  because the entry of a generic would tend to drive down
3  revenues from a branded -- existing branded product;
4  correct?
5          MR. LIMBACHER:  Object to form.
6      A.   When a generic is launched, the systems
7  that are in place within pharmacies and managed care,
8  you will generally lose, you know, a significant
9  portion of your business in a relatively short period
10  of time because there's -- a lot of payors or
11  pharmacies will do an automatic switch.
12      Q.   (By Ms. Scullion)  And planning for the
13  potential for generic entry for Opana ER, was that
14  something you were looking at from the time you started
15  with Endo in June of 2006?
16          MR. LIMBACHER:  Object to form.
17      A.   It's a scenario that we always considered
18  from the beginning.
19      Q.   (By Ms. Scullion)  And you did in fact
20  consider it from the beginning for Opana ER; correct?
21          MR. LIMBACHER:  Object to form.
22      A.   Correct.
23      Q.   (By Ms. Scullion)  Okay.  You go on in the
24  same line in your résumé to state you also had

Page 47

1  responsibility for pricing and contracting.  What did
2  that refer to?
3      A.   So pricing and contracting as a
4  function -- these are roles that we have within
5  pharmaceutical companies to determine what price should
6  be offered to the marketplace and to different customer
7  classes.  I mean, there are discounts involved to
8  certain different customers, distributors, and so
9  forth.
10          Government agencies get a different price.
11  I mean, it's a very complex pricing environment.  Let's
12  put it that way.  And contracting goes along with that,
13  you know, to establish certain prices and you have to
14  put contracts in place with payors or government or
15  whomever that you may be establishing those pricing
16  tiers with.  So there's a certain department that did
17  that work.
18      Q.   Okay.  Just staying focused on Opana ER
19  for the moment, make sure I understand.  Opana ER --
20  strike that.  Endo had certain distributors for Opana
21  ER -- correct -- like Cardinal, for example, McKesson,
22  the big wholesalers; is that right?
23          MR. LIMBACHER:  Object to form.
24      A.   They were among the distributors.

Page 48

1      Q.   (By Ms. Scullion)  Okay.  And if I
2  understand correctly, you're saying Endo, though, also
3  had pricing contracts between Endo and let's say the
4  customers to whom the distributors were distributing
5  the product; correct?
6          MR. LIMBACHER:  Object to form.
7      A.   I don't know if that -- the customers to
8  whom the distributors typically sell to would be other
9  smaller maybe wholesalers or directly to pharmacy.  I
10  don't know if we had contracts specifically with
11  pharmacies or those other end players or not.
12      Q.   (By Ms. Scullion)  I apologize.  So when
13  you -- the contracts with respect to pricing that you
14  discussed, you said those were with, for example,
15  payors; correct?
16      A.   Correct.  So --
17      Q.   Can you give me some examples of -- for
18  example, for Opana ER who would those payors be that
19  you had pricing contracts with?
20      A.   I don't recall the individual plans, but
21  usually these are managed care plans, insurance
22  companies.
23      Q.   Okay.
24      A.   Maybe state's Medicare -- Medicaid,

Page 49

1  rather.  The government for -- you know, if you had
2  Medicare contracts.  It just depends on which customer
3  it was, but usually these are the ones that you're
4  basically providing the insurance coverage for the
5  product.
6      Q.   Are you familiar with the term
7  charge-backs?
8      A.   I know the term.  I'm not sure I
9  understand the mechanism in detail.
10      Q.   What's your best understanding of what
11  charge-backs were?  Let's -- again, with respect to
12  Opana ER.
13          MR. LIMBACHER:  Object to form.
14  Foundation.
15      A.   I'm not sure exactly how to describe that,
16  to be honest with you.  I think it has something to do
17  with the wholesalers, but I don't know how that's
18  calculated.
19      Q.   (By Ms. Scullion)  If you wanted to
20  understand how charge-backs worked when you were with
21  Endo for Opana ER, was there someone you would have
22  wanted to speak to?
23          MR. LIMBACHER:  Object to form.
24      A.   Yes, I guess there would be.

13  (Pages 46 to 49)

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1  Q.  (By Ms. Scullion)  Who would that have
2  been, by title or name?  Either way.
3  A.  Probably somebody in the pricing and
4  contracts department.
5  Q.  Was pricing and contracts -- was that its
6  own department?  Was that under managed care?  Do you
7  recall?
8  A.  I know who it was under.  I'm trying to
9  remember the title of the -- of his -- it was called
10  managed markets --
11  Q.  Who's the name that you're recalling?
12  What's the name you're recalling?
13  A.  Steve Cooper.
14  Q.  Going back to your résumé.  Same
15  paragraph.  You have a summary of your position at
16  Endo.  You go on to say that you also had a
17  responsibility for portfolio development opportunities.
18  Do you see that?
19  A.  Yes.
20  Q.  What do you mean by that?
21  A.  Trying to help identify other products
22  that we might be able to bring in to help grow the
23  portfolio beyond the brands that were already there.
24  Q.  During the time that you were with Endo,

Page 51

1  did Endo acquire Qualitest (ph)?
2  MR. LIMBACHER:  Object to form.
3  A.  I think so.
4  Q.  (By Ms. Scullion)  Did you have any role
5  in that?
6  A.  No.
7  Q.  Want to go back to your reference to the
8  Opana brand exceeding its total prescription forecast
9  in that first bullet point.  How were total
10  prescription forecasts set -- or how were they derived,
11  I should say -- during those years you referenced,
12  2007-2010?
13  MR. LIMBACHER:  Object to form.
14  A.  I don't recall specifics on -- I mean,
15  again, being, you know, over 10 years ago now with some
16  of these things -- I don't recall all the specific
17  assumptions that went in, but you generally create a
18  forecast based on a specific set of assumptions that
19  includes, you know, competitive intelligence, your --
20  the level of promotion you expect, and any number of
21  other factors that would lead you to believe that a
22  prescriber would choose your product more frequently or
23  less frequently for whatever reason.
24  Q.  (By Ms. Scullion)  Okay.  When you say

Page 52

1  level of promotion you expect, what do you mean?
2  A.  Again, as a share acquisition strategy in
3  trying to take market share from, you know, a
4  competitor, that often became a discussion of -- share
5  voice -- you know, are you calling on that doctor the
6  same level of call frequency as your competitor?
7  If you only have 10 reps and they have a
8  thousand reps, you probably aren't going to have a very
9  strong expectation on a forecast, so the question is,
10  you know, what is it that you're putting into the
11  marketplace to generate the demand that you're hoping
12  to achieve and the number specifically and how many
13  patients you're able to help?  I think we would take
14  all this into account and that would drive the
15  forecast.  There are other -- like I said, other
16  assumptions, any other kind of inputs and outputs, but
17  generally speaking, we would create a forecast that
18  way.
19  Q.  So if I understand correctly, one of the
20  things you would consider with a forecast would be how
21  much promotional effort are we expecting to put in and
22  that would -- that could impact the number of
23  prescriptions you may be expecting to see in any given
24  year; correct?

Page 53

1  MR. LIMBACHER:  Object to form.
2  A.  That's one input.  Certainly there are
3  others.
4  Q.  (By Ms. Scullion)  You mentioned -- strike
5  that.  You mentioned one of the others were -- what's
6  the competitive intelligence.  Is that -- so what do
7  you mean by that factor?
8  MR. LIMBACHER:  Object to form.
9  A.  You want to understand what your
10  competition is doing, how are they perceived, how are
11  they covered in the marketplace from a payor
12  perspective, how are you covered, how does that match
13  up with your opportunity -- there's lots of bits of
14  information that will help guide and direct whether or
15  not you are -- how your forecast should grow or flatten
16  as -- you never know what that output really looks
17  like, but that's what drives a lot of the forecast
18  modeling.
19  Q.  (By Ms. Scullion)  You mentioned looking
20  at how your competitors are perceived.  What do you
21  mean by that?
22  A.  It can be any number of things, really.
23  Again, a perception is, you know, based on how products
24  are being used, what clinicians are thinking about

14  (Pages 50 to 53)

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1  them, how patients feel about them.  Are they looking
2  for different alternatives?
3        In the opioid marketplace, for example,
4  prior to launching Opana and Opana ER, you really had
5  kind of two molecules, even though there were multiple
6  products -- you know, generic morphine and different --
7  a number of different brands, and Oxycodone certainly
8  with OxyContin -- but when it came right down to it,
9  the way opioids work is that not every molecule works
10  the same in every patient.
11        Having really only two molecules to use in
12  a very diverse and complex condition such as chronic
13  pain, whether it's cancer pain or low back pain, the
14  importance of having a third molecule was, you know,
15  welcomed by the marketplace.  Gives patients another
16  choice and clinicians another choice to help patients
17  suffering of pain.  So how -- the perception of those
18  two molecules, for example, led to really the need for
19  another different opioid that would perhaps have a
20  different effect for patients in pain.
21      Q.   With respect to perception of the
22  molecules, was it part of your responsibility as -- in
23  your marketing position -- to, again, sort of create
24  awareness around like, for example, oxymorphone with

Page 55

1  respect to Opana ER and the perception of that as a new
2  alternative?
3        MR. LIMBACHER:  Object to form.
4      A.   You mean prelaunch?  Is that what you
5  mean?
6      Q.   (By Ms. Scullion)  We can start with
7  prelaunch.
8      A.   Yeah.  Well, we didn't have much time to
9  do any prelaunch when I was hired, so it was late May,
10  early June when I was hired in 2006.  The product was
11  approved very soon thereafter, so there was -- the
12  awareness that you create, of course, is just, again,
13  based on the approved promotional material, that we had
14  our approved label from the FDA and using that as our
15  guidepost in promoting the material that was approved
16  internally from our legal, medical, regulatory review
17  board, and that's kind of how we were forced to launch.
18  We didn't have the benefit of a longer period.  There
19  was no prelaunch activities per se because of the very
20  short time frame.
21      Q.   Okay.  But fair to say, I mean, your job
22  in marketing existed because it wasn't enough just to
23  have a new molecule be approved by the FDA?  You had to
24  make the medical community aware of that; right?

Page 56

1        MR. LIMBACHER:  Object to form.
2      A.   Customers have to become aware of a
3  product in order to use it.  Otherwise, they don't use
4  it.
5      Q.   (By Ms. Scullion)  Okay.  And that was
6  fundamentally your job, is to make them aware of the
7  products that they might use it; correct?
8        MR. LIMBACHER:  Object to form.
9      A.   Correct.
10      Q.   (By Ms. Scullion)  Okay.  You discussed
11  perceptions of the molecule.  Was it also relevant to
12  look at the perception of the manufacturer or the
13  perceptions of the manufacturers that were looked at?
14        MR. LIMBACHER:  Object to form.
15      A.   Yes.  In any situation when you're dealing
16  with the public, it's good to know how your company is
17  being perceived.
18      Q.   (By Ms. Scullion)  So reputation of the
19  company is a relevant factor in marketing?
20      A.   Yes.
21      Q.   Was it relevant in the marketing of Opana
22  ER?
23      A.   Relevant for all the products we marketed
24  at Endo.

Page 57

1      Q.   Including Opana ER; correct?
2      A.   Sure.
3        MR. LIMBACHER:  Jen, we've been going a
4  little over an hour.  Whenever is a good time for a
5  break.
6        MS. SCULLION:  Yeah, I think we're almost
7  there.
8      Q.   (By Ms. Scullion)  In the marketing and
9  promotion of Opana and Opana ER, was the reputation of
10  Purdue a relevant consideration for you?
11        MR. LIMBACHER:  Object to form.
12      A.   Not in our marketing efforts.
13      Q.   (By Ms. Scullion)  I'm just going to
14  finish up with this portion of the résumé; okay?  Third
15  bullet point down under your Endo entry on the résumé,
16  you refer to successfully leading a number of things --
17  in line prelaunch development stage products within the
18  oral pain solutions group, including Opana, Opana ER,
19  Percocet.  You go on to say as well as the development
20  and filing of new crush-resistance form of oxymorphone
21  extended-release tablets.  Was that a reference -- the
22  new crush-resistance form -- to the reformulated
23  version of Opana ER?
24      A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1    Q.   And what was your role in the development
2  of filing -- development and filing of the new
3  crush-resistant form of Opana ER?
4    A.   On these -- when you do this type of life
5  cycle management, there's a lead from each cross
6  functional team.  Obviously the commercial is the lead
7  on that.  I didn't lead that group -- there was a
8  clinical group to do the work -- but I was the
9  commercial lead on supporting that.
10    Q.   What was your role as commercial lead in
11  the development of that product?
12    A.   To provide commercial input as needed to
13  ensure that we were developing a product in accordance
14  with market needs.
15    Q.   So for example, you're looking and seeing
16  what is the market interest in a crush-resistant form
17  and is there a need for that form; is that right?
18         MR. LIMBACHER:  Object to form.
19    A.   We would look at market data and market
20  trends and by virtue and feedback maybe from customers
21  as well, taking into account lots of different inputs,
22  and then deciding, you know, how would we -- how could
23  we improve the product to offer a better value back to
24  the marketplace.

Page 59

1    Q.   (By Ms. Scullion)  Did your market
2  research, your customer feedback, indicate to you that
3  there was an interest in a crush-resistant form of
4  Opana ER?
5         MR. LIMBACHER:  Object to form.
6    A.   I don't recall specifics in terms of
7  market research data points, but clearly the market was
8  moving in that direction in general.
9    Q.   (By Ms. Scullion)  Okay.  And that was a
10  movement within the market that Endo was looking to
11  follow in introducing a reformulated version of Opana
12  ER; correct?
13    A.   Endo took its responsibility very
14  seriously to try to create the best product it could
15  when it came to these -- when it came to Opana ER, and
16  looking at the trends of where the market seemed to be
17  heading, I think made a conscious decision to try to
18  improve the product as much as possible.
19    Q.   But the specific improvement that it
20  looked at was a crush-resistant form; correct?
21         MR. LIMBACHER:  Object to form.
22    A.   The specific form would be to be
23  tamper-resistant.
24    Q.   (By Ms. Scullion)  Okay.  And that was

Page 60

1  something that Endo perceived based on its market
2  research and customer feedback was of interest to the
3  marketplace; correct?
4         MR. LIMBACHER:  Object to form.
5    A.   Again, I don't recall specific data and
6  market research points, but in general the trends were
7  moving in that direction and we certainly wanted to
8  make an offer of the best product we could for the
9  marketplace.
10    Q.   (By Ms. Scullion)  Okay.  Just going to
11  the last bullet point in this section of your résumé --
12  I'm sorry -- second-to-last.  I apologize.  You
13  reference leading the development of harmonized brand
14  performance initiative.  What does that refer to?
15    A.   It was just a process by which trying to
16  do brand planning cross functionally and making sure
17  that we had full cross functional support in the brand
18  planning process so that we took a holistic view of
19  brand planning every year rather than having kind of a
20  myopic one -- not myopic per se -- but having more
21  marketing-focused rather than having a kind of
22  completely holistic -- taking into complete cross
23  functional support of the brand.
24    Q.   (By Ms. Scullion)  So if I understand,

Page 61

1  you're saying that doing the planning for any given
2  brand -- for example, was this true with Opana ER, what
3  you just described?
4         MR. LIMBACHER:  Object to form.
5    Q.   (By Ms. Scullion)  The cross functional
6  approach that was true with respect to Opana ER?
7    A.   I'm sorry.  I'm not sure I understand what
8  you're asking.
9    Q.   That's okay.  Did you use this harmonized
10  brand performance approach in brand planning for Opana
11  ER?
12         MR. LIMBACHER:  Object to form.
13    A.   Yes.
14    Q.   (By Ms. Scullion)  Okay.  And if I
15  understand correctly, that meant making sure brand
16  planning for Opana ER included not just a marketing
17  perspective, but you said cross functional
18  perspectives; correct?
19    A.   Correct.
20    Q.   And so what does that mean, cross
21  functional?  What other functions outside of marketing
22  would be having input into the brand plan for Opana ER?
23    A.   It would be any number of departments that
24  were -- that had or touched the brand in some way, so

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1  it could be sales, it could be training, it could be
2  clinical, it could be distribution, regulatory.  We
3  wanted to make sure that we had everybody's full
4  support so that we had a very comprehensive and
5  holistic view of the business for the brand.
6       Q.   Public relations?
7       A.   Could be.  I don't recall specifically.
8       Q.   Okay.  Government affairs?
9       A.   Yes.
10      Q.   Okay.  And then you go on in the same
11  sentence to discuss leading the development of -- it
12  says SpeakerNet.  What was SpeakerNet?
13      A.   SpeakerNet was a software -- an attempt
14  that I had to develop our own internal software package
15  to help facilitate speaker programs within the field.
16  Just an internal tool that you can probably buy for 100
17  bucks today from a lot of people, but back then it
18  seemed like a good idea.
19      Q.   Okay.  And when you say speaker programs,
20  what were speaker programs?
21           MR. LIMBACHER:  Object to form.
22      A.   Speaker dinner programs where we were --
23  have an educational message around the benefits and the
24  safety of Opana ER and how to appropriately prescribe

Page 63

1  all of the things that you'd want to make sure your
2  customers knew about your product.  These -- this was
3  one avenue to have program with a number of customers
4  at once, probably in a restaurant, and they would be
5  able to spend a lot of quality time going through the
6  approved slide deck to talk about all the risks and
7  benefits of Opana ER.
8       Q.   (By Ms. Scullion)  So these were health
9  care providers that were invited to, for example, a
10  dinner in a restaurant; is that right?
11      A.   Correct.
12      Q.   And who would be the speaker at such a
13  dinner program for Opana ER?
14      A.   They would usually be KOLs or key opinion
15  leaders who were trained by Endo on the benefits and
16  the risks of the product, on Endo's policies,
17  compliance policies, et cetera, and they would be the
18  ones who would deliver the message.
19      Q.   So these are speakers chosen by Endo
20  then; correct?
21           MR. LIMBACHER:  Object to form.
22      A.   Correct.
23      Q.   (By Ms. Scullion)  And trained by Endo?
24      A.   Correct.

Page 64

1       Q.   And I think you said the slide deck, the
2  presentation itself, would also have been reviewed and
3  approved by Endo; correct?
4       A.   All of our promotional materials were
5  reviewed internally through our medical, legal, and
6  regulatory -- what we call the PMRB board.
7       Q.   Yeah.
8       A.   And that's where all of the materials
9  would be reviewed for quality and compliance reasons.
10      Q.   Okay.  You said KOLs -- key opinion
11  leaders.  Are those sometimes referred to as thought
12  leaders, or were they?  Thought leaders?
13      A.   Could be.
14           MR. LIMBACHER:  Object to form.
15      A.   Synonymous.
16      Q.   (By Ms. Scullion)  Okay.
17           MR. LIMBACHER:  Good time for a break?
18           MS. SCULLION:  Yeah, I think that works
19  fine.  Thank you.
20           MR. LIMBACHER:  Thank you.
21           THE VIDEOGRAPHER:  Off the record at 10:17
22  AM.
23           [A brief recess was taken.]
24           THE VIDEOGRAPHER:  We are back on the

Page 65

1  record at 10:32 AM.
2       Q.   (By Ms. Scullion)  Welcome back, Mr.
3  Bingol.  You understand you're still under oath?
4       A.   Yes.
5       Q.   Terrific.  Just going back to your résumé,
6  which is Exhibit 5.  Looking on the same page marked
7  E1452.3 in the right-hand corner -- lower right-hand
8  corner.  We were talking about the bullet points under
9  your Endo Pharmaceuticals entry.  The last bullet point
10  there, you state served as a founding member of the
11  Endo PAC.  What was the Endo PAC?
12      A.   That was a political action committee.
13      Q.   And what did Endo PAC do?  Let me strike
14  that.  Did Endo PAC do anything with respect to opioids
15  while you were with Endo?
16      A.   There were a number of initiatives, I
17  guess, that I don't recall specifically what the PAC
18  did.  We had a government affairs person who was in
19  charge of that.
20      Q.   And who was that?
21      A.   I don't recall his last name.
22      Q.   Brian Munroe?
23      A.   Yes.
24      Q.   Great.  What was your role in Endo PAC?

17  (Pages 62 to 65)

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1    A.   Mostly as a member.  We -- I would sit on
2   the committee to discuss whatever the PAC was doing, to
3   help provide guidance, I guess, on the PAC.  There was
4   a small group that would be responsible for reviewing
5   opportunities or whatever topics were being discussed,
6   and we would -- just kind of a committee for political
7   action activities in Washington.
8       Q.   And these were activities that Endo
9   thought would support Endo's business; is that right?
10          MR. LIMBACHER: Object to form.
11      A.   I don't recall, again, the specific
12  initiatives to know what they were or not, but
13  generally speaking, these were activities that would --
14  I mean, I just don't recall the specific activities.  I
15  would be giving you a guess at this point.
16      Q.   (By Ms. Scullion)  Okay.  Do you recall
17  whether from time to time through Endo PAC the PAC
18  coordinated with PACs for any other manufacturers of
19  opioids?
20      A.   I don't recall if that was done or not.
21      Q.   You don't recall one way or the other?
22      A.   (Shaking head "no.")
23      Q.   Okay.
24      A.   No.

Page 67

1       Q.   Thank you.  We're going to need to say yes
2   or no.  Thank you.  It's helpful.  In going down to
3   your duties as regional sales director, you state
4   responsible for managing 80 sales representatives, and
5   it says eight DMs.  The 80 sales representatives, these
6   were the sales people in the field; correct?
7       A.   Correct.
8       Q.   Those who were out there, you know,
9   calling on doctors and other providers?
10      A.   Correct.
11      Q.   All right.  And the DMs -- that's district
12  managers; correct?
13      A.   Yes.
14      Q.   And the Midwest region -- that included
15  Ohio; correct?
16      A.   Yes.
17      Q.   Do you recall if it also included
18  Pittsburgh?
19      A.   Yes.
20      Q.   Do you know whether it included West
21  Virginia or Tennessee?
22      A.   I don't recall.  It might have had a
23  portion of it.  I don't know if it had all of it.  I
24  don't recall the exact territorial boundaries between

Page 68

1   the Midwest and what might have been a different
2   region.
3       Q.   Okay.  And the district managers during
4   the time that you were regional sales director -- did
5   the district managers from time to time go out on
6   ride-alongs with the sales representatives in the
7   field?
8       A.   Yes.
9       Q.   Did you yourself ever go out on any
10  ride-alongs with any sales representatives?
11      A.   Yes.
12      Q.   Do you recall how many times approximately
13  you did that?
14      A.   No, I don't recall a number.
15      Q.   Okay.  Okay.  Do you remember what
16  geographic areas you went to on your ride-alongs?
17      A.   There were many, so I don't recall which
18  ones -- you know, as marketing on the brand, I might go
19  anywhere in the country at any one time to see and hear
20  for myself what was happening and the perceptions of
21  the product and so forth.
22      Q.   Do you recall ever doing any ride-alongs
23  in Akron?
24      A.   I don't recall a ride-along in Akron.

Page 69

1       Q.   Okay.  How about Pittsburgh?  Any
2   ride-alongs in Pittsburgh?
3       A.   Yes.
4       Q.   What do you remember about your
5   ride-alongs in Pittsburgh?
6       A.   I don't recall a lot of the details
7   around, you know, those types of discussions with --
8   meeting doctors and talking to sales reps, you know, in
9   the car, kind of the more mundane aspects of it, but I
10  don't recall specifics.
11      Q.   Sales reps -- were they expected to get to
12  know the providers they were calling on?
13          MR. LIMBACHER: Object to form.
14      A.   Yes.
15      Q.   (By Ms. Scullion)  Get to know the nature
16  of the practice of their providers?
17      A.   Yes.
18      Q.   The office environment?
19      A.   Yes.
20      Q.   Medical needs of the patients being
21  served?
22          MR. LIMBACHER: Object to form.
23      A.   Yes.  In order to understand best how our
24  product might help the patients they're serving, it

18  (Pages 66 to 69)

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1    would be useful to understand how the practices were --
2    you know, how they were made up, how they were run,
3    who's there, who's not, that type of thing.
4        Q.   (By Ms. Scullion)  Okay.  And the sales
5    reps were assigned to specific geographic territories;
6    correct?
7        A.   Correct.
8        Q.   Were they expected to try to understand
9    the medical needs more generally of the communities in
10   those territories that they were assigned to?
11       A.   Their expectations would be to know their
12   business in general, so whether it's into the
13   community, whether it's the bigger picture of pain
14   management.  There was a lot of different expectations
15   in terms of what they should know.
16       Q.   And as part of knowing their business,
17   that would have included an expectation that they know
18   the medical needs of the community -- the community in
19   which they are visiting doctors; correct?
20       MR. LIMBACHER:  Object to form.
21       A.   I don't know what you mean by community,
22   but they certainly should to be effective understand
23   what's going on within the environment of the doctor's
24   office in which they are targeting and discussing the

Page 71

1    product with.
2        Q.   (By Ms. Scullion)  Okay.  Would they be
3    expected to know the pharmacists in the territory that
4    they're --
5        A.   They would be expected to attempt to know
6    the pharmacists.  That was a trickier proposition
7    sometimes because of busy stores and whether or not
8    they would see you, but pharmacy calls were encouraged.
9        Q.   As part of knowing their business, would
10   they have been expected to try to understand any
11   concerns that members of the medical community within a
12   territory that they're serving might have had about,
13   let's say, Opana ER?
14       MR. LIMBACHER:  Object to form.
15       A.   They're responsible for if any such
16   concern was raised, to report and -- feedback to
17   Endo -- any kind of concern or as an adverse event or
18   as a drug safety issue, we had a protocol in place to
19   handle those kinds of signals or information, and they
20   would be responsible for managing it through our
21   protocols.
22       Q.   (By Ms. Scullion)  Okay.  Just going back
23   again to your résumé, Exhibit 5, under discussion of
24   your role as regional sales director.  You say that the

Page 72

1    Midwest region exceeded revenue targets for Opana ER
2    from September 2009 through September 2010; correct?
3        A.   That's correct.
4        Q.   Okay.  And do you recall that during the
5    time that you served as regional sales director, the
6    Midwest region achieved the Number One position for
7    Opana ER?
8        MR. LIMBACHER:  Object to form.
9        A.   Yes.
10       Q.   (By Ms. Scullion)  And that was due as --
11   due to your leadership within that region?
12       MR. LIMBACHER:  Object to form.
13       A.   Due to probably a number of factors, quite
14   frankly.  Improvements and growth are usually relative
15   to what's already happened there.  It doesn't
16   necessarily reflect, let's say, a broader picture of
17   how successful you are, but just relative to the
18   previous year, we had done better.
19       Q.   (By Ms. Scullion)  Okay.  Did you ask to
20   be assigned the regional sales director position?
21       A.   Yes.
22       Q.   And why was that?
23       A.   I saw it as a career development
24   opportunity.  I had a short stint in sales at

Page 73

1    AstraZeneca and thought I could learn more about the
2    sales process and sales management by taking on this
3    additional responsibility.
4        Q.   Before taking on that responsibility, had
5    you asked to be considered to be appointed as VP of
6    marketing for Endo in 2008?
7        A.   Yes.
8        Q.   And that did not occur?  You were not
9    appointed, obviously; right?
10       A.   No.
11       Q.   Okay.  Was part of the feedback that you
12   received that it would be useful for you to have more
13   sales experience under your belt?
14       A.   I don't recall that.
15       Q.   Okay.  You are currently employed by
16   Grunenthal USA; correct?
17       A.   Correct.
18       Q.   Are you also employed by the Grunenthal
19   German entity?
20       A.   No.  My contract is with Grunenthal USA
21   directly.
22       Q.   Okay.  You mentioned earlier that
23   Grunenthal did at one point in time have a license
24   agreement with Endo in connection with the -- I think

19  (Pages 70 to 73)

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    it was Intac technology; correct?
2    A.    That's correct.
3    Q.    Does Grunenthal still have that -- is that
4    license agreement still in effect?
5    A.    I don't have an answer to that question.
6    That's a proprietary question for Grunenthal.
7    Q.    I'm not sure -- do you know the answer, or
8    you do not?
9    A.    I don't know the answer because they
10   pulled the product from the market. I don't know what
11   the status of the actual license is.
12   Q.    Okay. Does Grunenthal, to your knowledge,
13   have -- currently have any financial relationship with
14   Endo?
15            MR. LIMBACHER: Object to the form.
16   A.    Again, because the product is no longer on
17   the market, I don't know what the actual license or
18   relationship is financially or otherwise.
19   Q.    (By Ms. Scullion) Do you know --
20   A.    I don't deal with Grunenthal -- excuse
21   me -- with Endo today. I don't know what they're doing
22   with them.
23   Q.    Okay. And again, just if you know or
24   don't know. Do you know whether Endo -- sorry --

Page 75

1    whether Grunenthal has any agreement with Endo with
2    respect to potential liabilities flowing from Endo's
3    marketing and sale of reformulated Opana ER?
4            MR. LIMBACHER: Object to the form and
5    foundation.
6    A.    I don't know.
7    Q.    (By Ms. Scullion) Okay. Do you yourself
8    have any current financial relationship with Endo?
9    A.    No.
10   Q.    Do you hold any Endo stock?
11   A.    No.
12   Q.    Are you being paid at all in connection
13   with your testimony today?
14   A.    Just parking.
15            MS. SCULLION: Yeah. Can I have 1396 and
16   329?
17            MR. LIMBACHER: Can we take it off the
18   screen until we've actually shown it to the witness?
19            MS. SCULLION: Yeah. Great. Yeah, let's
20   do that. Thank you.
21            MR. LIMBACHER: Thank you.
22   Q.    (By Ms. Scullion) I'm going to hand you
23   what's been marked as Exhibit Number 6.
24            [Exhibit Endo-Bingol-006 marked for

Page 76

1    identification.]
2            MR. LIMBACHER: Thank you.
3    Q.    (By Ms. Scullion) And Exhibit Number 6 is
4    Bates-stamped Endo CHI_LIT 00552601. And let me
5    explain -- we're going to have to read numbers during
6    the day here for the record. We have marked Exhibit
7    Number 6 in the upper right-hand corner as E1396.1.
8    Are you on the same page with me?
9    A.    Yes.
10   Q.    Okay. And Exhibit Number 6 -- this is an
11   e-mail from you to a number of individuals dated June
12   28, 2006, subject matter 2007 Opana strategic business
13   planning. Do you see that?
14   A.    Yes.
15   Q.    And was this an e-mail that you sent out
16   in connection with beginning the business planning
17   process for 2007 for Opana?
18   A.    It appears to be.
19   Q.    Okay. And at the -- in the second
20   sentence of your e-mail, you state it is vitally
21   important that we get input from each functional area
22   in order to make this a meaningful and robust plan for
23   Opana and Opana ER. Is that reference to input from
24   each functional area conveying the same idea we

Page 77

1    discussed earlier about having a cross functional team
2    working on the brand plan?
3    A.    Yes.
4    Q.    All right. And if you look at the
5    individuals to whom you sent this e-mail. Do those
6    include, Ms. Kitlinski? Is she in
7    clinical? Was she in clinical, rather?
8    A.    I'm not -- I don't recall her functional
9    alignment in terms of what department she was tied to.
10   Q.    Okay. How about Mr. Barto? Do you
11   remember he was in regulatory?
12   A.    Yes.
13   Q.    Okay. And Mr. Gould? Do you remember
14   what department he was with?
15   A.    He was in our clinical group.
16   Q.    And there are some other names in here
17   that look to be outside of Endo. You see Christine
18   Connolly Smith (ph) at CHC.Inc. What was CHC?
19   A.    I forget -- I don't recall what their
20   designation was, but I think they were -- I don't
21   recall specifically.
22   Q.    An outside vendor assisting with
23   marketing?
24   A.    An agency of some kind. I'm not sure what

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1    they were supporting.
2        Q.   Okay.  And same thing with respect to Mr.
3    Waterman (ph) at nyccohenwolf.com and Jennifer Jacob
4    (ph) at nyc.cohenwolf.com.  Was Cohen Wolf also an
5    outside agency helping with promotion of Opana ER?
6        A.   They were an outside agency.  I'm not sure
7    if they were helping with promotion or not.
8        Q.   You don't recall one way or the other?
9        A.   I don't recall.  Right.
10        Q.   Okay.  All right.  And if you go down to
11    the bottom half of your e-mail, you reference attached
12    you'll find two documents.  First was a draft agenda
13    for the day, and the second you say is a copy of the
14    2006 plan.  I take it when you joined Endo, there
15    already was a brand plan in place for Opana and Opana
16    ER; correct?
17        A.   I don't recall.
18        Q.   Okay.  Well, if you look at what you
19    reference as a copy of the 2006 plan.  If you go back
20    to page -- we've marked it in the top right-hand corner
21    E1396.7.  Wait till you get to the page.  Yeah.  This
22    page is the page that comes out of the system when we
23    load the documents that were provided by counsel, and
24    it says file name.  This comes out of the metadata for

Page 79

1    the document and says -- the file name is 2006 Opana
2    strat plan and that's a PowerPoint.  Opana -- 2006
3    Opana strat plan would be a reference to the Opana
4    strategic plan for 2006; correct?
5        MR. LIMBACHER:  Object to form.
6        A.   That's what it says.
7        Q.   (By Ms. Scullion) Okay.  Well, let's go
8    on to the next couple pages.  If you'll look from
9    E1396.8 -- you can go back to -- sorry -- 1396.18,
10    several pages that begins with the cover page saying
11    Opana business plan, December 12th, 2005.  If you just
12    look that through and just tell me, does this appear to
13    be the 2006 strat plan for Opana?
14        A.   I mean, that's what it says.  This was
15    created prior to my arrival.
16        Q.   Okay.  But as indicated in your cover
17    e-mail, you were using this plan as the basis to begin
18    the planning for 2007 for Opana ER; correct?
19        A.   I don't recall this.  I mean, that's what
20    it says here, but I don't have any recollection of this
21    document.
22        Q.   Okay.  Do you recall when you joined Endo
23    taking a look back -- just in general taking a look
24    back at existing plans for Opana and Opana ER?

Page 80

1        A.   This was almost 13 years ago.  I don't
2    recall specifically what steps I took.
3        Q.   I understand you don't recall
4    specifically.  Do you recall, though, generally taking
5    a look and seeing what's in place, where are we going?
6        A.   I think in general I would do such a
7    thing.  I don't recall doing it.
8        Q.   Okay.  Can we go to 329?  This is -- and
9    again, let's wait till I hand it out.  Exhibit 7.  I'll
10    hand you what's been marked as Exhibit 7.
11        MR. LIMBACHER:  Thank you.
12        Q.   (By Ms. Scullion)  And this is
13    Bates-stamped END 00000923.  And we have stamped it
14    E329 in the upper right-hand corner.  And Mr. Bingol,
15    this is another copy of the December 12th, 2005,
16    business plan for Opana, and you're welcome to compare
17    that back to what we were looking at in Exhibit 6, but
18    it does appear to be another copy of the plan.  I'm
19    going to take you to Page -- in the upper right-hand
20    corner -- 329.15.
21        MR. LIMBACHER:  I'm just a little confused
22    for the record.  Exhibit 7 is different than Exhibit 6;
23    right?
24        MS. SCULLION:  It is a different

Page 81

1    exhibit -- correct -- but it does appear to be a
2    reference to the same plan.  I think Exhibit 7 has
3    additional pages beyond the portion of the plan in
4    Exhibit 6.
5        Q.   (By Ms. Scullion)  So are you on Page
6    E329.15?
7        A.   Yes.
8        Q.   Okay.  Before the break, you testified
9    about the notion of creating awareness around a product
10    both before -- I think before its launch.  Let's just
11    start there.  Before its launch.  Do you recall that
12    Endo had made efforts to create awareness around Opana
13    ER prior to its launch?
14        MR. LIMBACHER:  Object to form and
15    foundation.
16        A.   I recall that when I was hired, there was
17    no active marketing efforts in place, and we had a very
18    short window to try to pull together the activities
19    and/or launch planning with an expected approval in the
20    coming months, which we had.  So I don't recall
21    specifically what kind of market prelaunch activities
22    were done.  My recollection is that we weren't doing
23    anything until the point where I was hired, and then
24    the product was approved very soon thereafter.

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1    Q.   (By Ms. Scullion)  Okay.  Looking on Page
2  E329.15.  It speaks to an Opana awareness crescendo.
3  And I just wanted to just ask generally, looking at --
4  in the prelaunch section of this page, there's a
5  reference under awareness to publications, congresses,
6  national thought leaders, and CME.  Do you see that?
7    A.   I do.
8    Q.   When you came on with Endo, did you use
9  publications to try to create awareness in connection
10  with Opana ER?
11          MR. LIMBACHER:  Object to form.
12    A.   Publications is part of -- a publication
13  plan is part of the awareness campaign, I guess.
14    Q.   (By Ms. Scullion)  And what's a
15  publication plan?
16    A.   It's just taking the data that you have
17  and submitting it for peer-reviewed opportunities where
18  it might be placed in a journal or in a -- as opposed
19  to a presentation at a symposia, that type of thing.
20    Q.   So these would be Endo undertaking efforts
21  to have the data, as you said, go to a peer-reviewed
22  journal and published; correct?
23    A.   This would be -- yes --
24    Q.   Okay.

Page 83

1    A.   -- taking data and highlighting the risks
2  and benefits of the product and putting it in a more
3  clinical presentation and disseminating your data so
4  that more clinicians can have a better understanding of
5  the utility of the product.
6    Q.   And you mentioned symposia.  What were
7  symposia?
8    A.   Just a variety of different professional
9  society meetings like the American Pain Foundation, or
10  the -- I forget all the other -- there's College (ph)
11  of Pain Management or something, but there were a
12  number of different professional societies focused on
13  the appropriate treatment of pain, and we would work
14  with targeting some of those venues to have your data
15  published.
16    Q.   And that was another way of creating
17  awareness around the product?
18    A.   It was a way of creating awareness for the
19  appropriate use of the product and the utility of the
20  product.  There's different patient populations and how
21  the product should be used and considered.
22    Q.   Okay.  And this document E -- Exhibit 7,
23  E329.15, references congresses under awareness.  Is
24  that the same thing as the symposia you're just

Page 84

1  referencing?
2          [Exhibit Endo-Bingol-007 marked for
3  identification.]
4    A.   Yes.
5    Q.   And then it goes on to reference national
6  thought leaders.  Are those the KOLs that we discussed
7  earlier?
8    A.   Yes.
9    Q.   When you worked on Opana ER, did you use
10  national thought leaders to create awareness around the
11  product?
12          MR. LIMBACHER:  Object to form.
13    A.   Yes.
14    Q.   (By Ms. Scullion)  How did you do that?
15    A.   As previously answered, we would mostly
16  use their input or use KOLs to help provide educational
17  opportunities for other clinicians to help them
18  understand the utility of the product, to understand
19  the risks and benefits of Opana ER, and conduct those
20  kinds of sessions where they might be having
21  face-to-face one-on-one or group meetings with their
22  peers around the country.
23    Q.   (By Ms. Scullion)  Okay.  And it also
24  discusses CME.  That's continuing medical education?

Page 85

1  Sorry, I'm back on Exhibit 7, same page.  It says CME.
2  That's continuing medical education; is that right?
3    A.   That's correct.
4    Q.   Did you use continuing medical education
5  to help create awareness around Opana ER?
6          MR. LIMBACHER:  Object to form.
7    A.   Endo would engage in continuing medical
8  education.  That was really at arm's length.  That was
9  done by our medical group, so we would -- by virtue of
10  whatever topic they were doing.  It would often be done
11  through a third party unrestricted educational grant.
12  So those programs were there.  We didn't necessarily
13  use them ourselves or direct them ourselves.
14    Q.   (By Ms. Scullion)  Okay.  Was the medical
15  group part of the cross functional team that you
16  brought together to assist with brand planning for
17  Opana ER?
18          MR. LIMBACHER:  Object to form.
19    A.   Yes.
20    Q.   (By Ms. Scullion)  Okay.  And on this same
21  page in Exhibit 7, Page E329.15, it goes on from
22  awareness -- the next column to the right is noise.  Do
23  you know what noise means in respect -- in connection
24  with promoting a product?

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1      A.   No.  Again, this document predated me and
2   was created by somebody else.  I don't know what
3   they're referring to per se.
4      Q.   Understood.  Let me just ask you then
5   separate from the document.  Did you ever talk about
6   creating noise in connection with Opana ER?
7      A.   That's not like an official term.  That's
8   like a colloquialism.  I don't recall using that term
9   particularly.
10     Q.   Okay.  All right.  And under the noise
11  column, discusses payor education.  Did you use payor
12  education as part of creating awareness around Opana
13  ER?
14          MR. LIMBACHER:  Object to form.
15     A.   I don't recall educational programs for
16  payors.
17     Q.   (By Ms. Scullion)  Did you make any effort
18  to engage payors in connection with creating awareness
19  around Opana ER?
20          MR. LIMBACHER:  Object to form.
21     A.   Yes.
22     Q.   (By Ms. Scullion)  How did you do that?
23     A.   We had account managers, national account
24  managers, regional account managers, who would call on

Page 87

1   payors and let them know we had a new product, what the
2   price was, how it fits into their -- might fit into
3   their formulary, kind of the basics that they would
4   need to understand about the product either -- we offer
5   a formulary kit so they could understand the risks and
6   benefits of the product.
7          And they would create the awareness that
8   way, because the payor, obviously like any other
9   customer, until they know the product is there and how
10  it fits into their practice, they won't know whether or
11  not they should include it in their formulary.
12     Q.   And again, going back to the same column
13  on Page E329.15, the next entry says public relations.
14  Did you use public relations in connection with
15  creating awareness around Opana ER?
16          MR. LIMBACHER:  Object to form.
17     A.   I don't recall specifically.  I -- there
18  might have been a press release or approval or
19  something of that nature, but I don't recall a frank
20  public relations campaign.
21     Q.   (By Ms. Scullion)  Did you use public
22  relations in connection with promotion of Opana ER?
23          MR. LIMBACHER:  Object to form.
24     A.   I don't recall.

Page 88

1          MS. SCULLION:  Can we mark -- thank you.
2      Q.   (By Ms. Scullion)  Let me hand you what's
3   been marked as Exhibit Number 8.  It is not stamped on
4   Exhibit Number 8, but the Bates number under which it
5   was produced to us Tuesday is Bingol-opioid-MDL
6   00000369.  Mr. Bingol, I'll represent to you we
7   understand that that means it was a document that came
8   from your personal collection that you pulled from your
9   desktop.  Looking at Exhibit Number 8, it says building
10  the Opana ER story, leveraging public relations to
11  build market receptivity, midyear review June 2007.
12  Mr. Bingol, that was when you were director of
13  marketing for Opana ER; correct?
14          [Exhibit Endo-Bingol-008 marked for
15          identification.]
16          MR. LIMBACHER:  Object to form.
17     Q.   (By Ms. Scullion)  Or sorry.  I misstated
18  your title.  That was when you had responsibility for
19  the promotion of Opana ER; correct?
20          MR. LIMBACHER:  Object to form.
21     Q.   (By Ms. Scullion)  June 2007?
22     A.   That's correct.
23     Q.   Okay.  Looking through Exhibit 8, does
24  this refresh your recollection that there was an effort

Page 89

1   to leverage public relations to build market
2   receptivity in connection with Opana ER?
3      A.   Yeah, I don't remember this document, but
4   yes, obviously this is -- this was an agency that was
5   retained to help us with some communications.
6      Q.   Okay.  And the agency you're referring
7   to -- on the bottom right-hand corner of the front page
8   of Exhibit 8, that's Edelman?
9      A.   That's correct.
10     Q.   And that was a PR agency that Endo
11  engaged; is that right?
12     A.   That is correct.
13     Q.   Thank you.  If you'll look at the second
14  page of Exhibit 8.  It says PR objective, help drive
15  share acquisition.  I think you mentioned earlier that
16  was a goal for Opana ER.  It was to acquire share in
17  the long-acting opioid market; right?
18          MR. LIMBACHER:  Object to form.
19     A.   That's correct.
20     Q.   (By Ms. Scullion)  Okay.  And was the
21  principal competitive product from which Opana was --
22  Opana ER was looking to acquire share -- was that
23  OxyContin?
24     A.   Yes.

23  (Pages 86 to 89)

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1    Q.   Okay.
2    A.   As well as other long-acting morphine
3  forms, so there was really basically two molecules.  We
4  had -- we would target both of those.
5    Q.   Was OxyContin, though, the -- did that
6  have the largest share of the long-acting opioid market
7  when Opana ER was launching?
8    A.   I don't recall specifically, but on a
9  volume basis, maybe not.  There are multiple forms of
10  morphine, long-acting morphine, from MS Contin to
11  cadienvenzen (ph) and generic forms of MS Contin, so
12  volume-wise, probably not the market leader, but both
13  were significant players or significant competitors for
14  us.
15    Q.   Okay.  And if you go to -- there's
16  actually slide numbers in the lower left-hand corner.
17  That'll help.  Slide Number 3, which is entitled help
18  drive share acquisition issues and strategic
19  imperatives.  Again, this is Exhibit 8.  The right-hand
20  side, the first bullet point, states provide physicians
21  and managed markets with reasons to think differently
22  about opioids and the need for Opana ER.  Do you see
23  that?
24    A.   I do.

Page 91

1    Q.   Just taking the first half of that
2  statement, provide physicians and managed markets with
3  reasons to think differently about opioids.  Was that
4  something you sought to do as part of your
5  responsibilities in connection with Opana ER?
6    A.   I don't recall this -- again, this
7  document per se, so this statement is trying -- I think
8  the statement just is indicating the need for
9  differentiating your product in the marketplace and
10  where it's going to fit in and the utility of that
11  product amongst -- with pain patients who are not
12  getting the pain relief they need today with the
13  available options.
14    Q.   And you're speaking to differentiating
15  Opana ER versus other long-action opioids -- correct --
16  what you just talked about there?
17    A.   Correct.
18    MR. LIMBACHER:  Object to form.
19    Q.   (By Ms. Scullion) Okay.  In addition,
20  though, did you also make efforts to address reasons
21  for the medical community to use long-acting opioids
22  generally?
23    MR. LIMBACHER:  Object to form.
24    Q.   (By Ms. Scullion)  Not just Opana ER

Page 92

1  specifically?
2    A.   The appropriate use of long-action
3  opioids in the appropriate patient -- appropriate
4  selected patients.
5    Q.   Okay.  And it says here provide physicians
6  and managed markets with reason to think differently
7  about opioids.  When you were managing Opana ER, was it
8  one of your goals to have physicians think differently
9  about their approach to opioids?
10    A.   Yes.
11    Q.   In what ways?
12    A.   We -- in general, one size does not fit
13  all.  That -- because you have one opioid painkiller
14  doesn't mean everybody is going to benefit from that
15  one, so in order to break through their thinking around
16  how opioid -- what opioid to select, you have to show
17  them that there are differences in products, and you
18  have a choice to make, and it's not just that one
19  opioid works for everybody.
20    Q.   And how about with respect to opioids
21  versus other analgesic products?  Was it also one of
22  the things that was focused on, was to try to educate
23  physicians around why use opioids versus non-opioid
24  products for appropriate patients?

Page 93

1    MR. LIMBACHER:  Object to form.
2    A.   We always promoted the product based on
3  the label, which always indicates that, you know, the
4  use of Opana ER should be reserved for those patients
5  for which a long-acting opioid was appropriate for
6  round-the-clock therapy.  So we were not necessarily
7  going after or could not legitimately and would not go
8  after necessarily patients who don't fit that category.
9  That would not be compliant.  And we always promoted
10  the product in that way.
11    Q.   (By Ms. Scullion) Understood.  And with
12  respect to Opana ER -- I'm just asking, though, as part
13  of that, for example, were sales reps trained on how to
14  address concerns that physicians might express with
15  respect to long-acting opioids generally?
16    MR. LIMBACHER:  Object to form.
17    A.   I don't recall the specific training
18  around those -- that topic.  I don't recall that.
19    Q.   (By Ms. Scullion) Do you recall in
20  general training around that topic, though, not
21  specifics?
22    A.   No, I don't.
23    Q.   You just don't recall one way or the
24  other?

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1      A.  (Shaking head "no.")  No, ma'am.
2      Q.   Thank you.  And next bullet point in this
3    Exhibit 8, Page 3, says focus on current levels of
4    dissatisfaction with opioid class and raise awareness
5    of an appreciation for how Opana ER addresses unmet
6    needs.  Was that something you tried to do -- let me
7    just take one part of it -- to raise awareness of an
8    appreciation for how Opana ER could meet unmet needs?
9    Is that something you tried to do?
10     A.  Yes.
11     Q.   Okay.  Did you also try to address
12   dissatisfaction with opioid class?
13     A.  Yes.
14     Q.   How did you do that?
15     A.  The dissatisfaction arises when patients
16   aren't treated or maintained well on their current
17   medication, so if they're starting -- if they started
18   on, let's say, a morphine product or even Oxycodone,
19   OxyContin and you're not getting the pain relief they
20   need or they can't tolerate it, then there's a
21   dissatisfaction there, an opportunity for another
22   treatment for those patients, and that's what Opana ER
23   represented for many years.  Morphine and Oxycodone
24   were the only two molecular options in the market.

Page 95

1    This served as a welcome third option for patients who
2    weren't getting the relief they needed.
3      Q.   Okay.  Next bullet point discusses engage
4    KOL to legitimatize messages.  Is that a reference to
5    what we discussed earlier in terms of your use of KOLs
6    in connection with the promotion of Opana ER?
7          MR. LIMBACHER:  Object to form.
8      A.  Using KOLs as thought leaders -- they had
9    a broad network and a broad following, and if they
10   were -- as they work with you, it brings more
11   credibility to the message.
12     Q.   (By Ms. Scullion)  So that could help
13   legitimatize the message that Endo wanted to send to
14   the market about Opana ER, for example?
15     A.  It would help legitimatize the need and
16   the utility of our product in those appropriate
17   patients.
18     Q.   It would also help legitimatize the
19   message; correct?
20          MR. LIMBACHER:  Object to form.
21     A.  That is the message, that for patients who
22   are undertreated or not be able to get the pain relief
23   they made with the adverse event profile they might be
24   able to tolerate, that there's another option.

Page 96

1      Q.   (By Ms. Scullion)  If you go to Page 5 of
2    Exhibit 8.  This slide is titled communications,
3    opportunity, reasons to think differently about
4    opioids, and in the middle it's discussing responsible
5    pain management.  Do you see that?
6      A.  I do.
7      Q.   In connection with the promotion of Opana
8    ER, did Endo make an effort to support the general
9    concept of responsible pain management?
10          MR. LIMBACHER:  Object to form.
11     A.  I'm sorry.  Can you ask that again?
12     Q.   (By Ms. Scullion)  Sure.  In connection
13   with the promotion of Opana ER --
14     A.  Uh-huh.
15     Q.   -- did Endo support the concept of
16   responsible pain management generally?
17          MR. LIMBACHER:  Object to form.
18     A.  Endo supported the concept of responsible
19   pain management for all of its products, Opana ER
20   being, of course, among them, but Endo took the concept
21   of being -- ensuring the responsible management of pain
22   and the use of our products very seriously.
23     Q.   (By Ms. Scullion)  Do you recall there
24   being a RiskMAP associated with Opana ER?

Page 97

1      A.  Yes.
2      Q.   Okay.  And was one of the goals of RiskMAP
3    to address responsible pain management?
4          MR. LIMBACHER:  Object to form.
5      A.  Yes.
6      Q.   (By Ms. Scullion)  Okay.  What do you
7    recall about what efforts Endo made to promote the
8    concept of responsible pain management?
9          MR. LIMBACHER:  Object to form.
10     A.  Of course in every promotional material
11   that we use in the field highlighted the important
12   safety information and warnings.  That was front and
13   center on all of our materials, and then laced --
14   interlaced throughout any promotional material in the
15   form of fair balance.
16          We offered tamper-proof prescription pads
17   in order to help clinicians with the need -- because
18   when you prescribe a Schedule II product, you have to
19   have a triplicate pad.  We had a vendor who was
20   providing us some pads that we give away for free to
21   clinicians to help them improve the security of their
22   prescriptions.  There's a number of initiatives.  I
23   don't recall all of them, but they were -- there was a
24   number laid out in the RiskMAP.

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1     Q.   Okay.  Can you go to Slide 7 of Exhibit 8?
2     This is PR core tactics.  The third bullet point down
3     references pain week, meet the experts.  Do you see
4     that?
5     A.   I do.
6     Q.   Do you know what pain week was?
7     A.   Yes.
8     Q.   What was pain week?
9     A.   It's a professional -- it's just like the
10    American Pain Foundation.  It's a pain society, an
11    organization of pain management specialists who created
12    their own annual congress.
13    Q.   And did Endo participate in pain week
14    while you were responsible for Opana ER?
15    A.   I don't know if they did every year, but I
16    think we did on occasion.
17    Q.   Okay.  Put aside Exhibit Number 8 for a
18    moment.
19    MS. SCULLION:  Can I have E554, please?
20    Thank you.
21    Q.   (By Ms. Scullion)  I'm going to hand you
22    what's been marked as Exhibit Number 9.  And Exhibit
23    Number 9 is Bates-stamped Endo CHI_LIT 00234542, and we
24    have stamped it E554 in the upper right-hand corner.

Page 99

1     Mr. Bingol, we just spoke about the RiskMAP for Opana
2     ER.  Do you recognize Exhibit Number 9 as the RiskMAP
3     for Opana ER dated June 2007?
4     [Exhibit Endo-Bingol-009 marked for
5     identification.]
6     MR. LIMBACHER:  Take your time and review
7     the document.
8     A.   Yes.
9     Q.   (By Ms. Scullion)  Okay.  And in your role
10    and responsibility for Opana ER at Endo, did you become
11    generally familiar with the RiskMAP for Opana ER?
12    A.   Yes.
13    Q.   Okay.  If you could turn to Page E554.7 of
14    Exhibit 9.  This is under the section entitled
15    background.  Looking at the third full paragraph down
16    the page, and third sentence in that paragraph, it
17    begins thus Endo has developed.  Do you see the
18    sentence?
19    A.   Yes.
20    Q.   And as indicated in this sentence, is it
21    correct that RiskMAP had two aspects to it -- a RiskMAP
22    for Opana ER had two aspects to it -- the first being
23    to promote the safe and responsible use of the product?
24    MR. LIMBACHER:  Object to form.

Page 100

1     Q.   (By Ms. Scullion)  Is that correct?
2     A.   Yes.
3     Q.   And the second goal was to minimize abuse,
4     misuse, diversion, and other adverse events through --
5     and it lists a number of methods; correct?
6     A.   Yes.
7     Q.   It's correct to say a RiskMAP had both
8     purposes, to promote safe use of the product, but also
9     to address risks in the product; correct?
10    MR. LIMBACHER:  Object to form.
11    A.   Yes.
12    Q.   (By Ms. Scullion)  And you understand that
13    in order for this -- for Opana ER to have been approved
14    by the FDA, the FDA had to have concluded that the
15    benefits of the product outweighed the risks; correct?
16    A.   Yes.
17    Q.   And RiskMAP was entered into by Endo in
18    order to address the risk part of that equation;
19    correct?
20    MR. LIMBACHER:  Object to form.
21    A.   This was Endo's agreement to show good
22    faith and to do what it could to make sure that the
23    product was used safe and effectively and to minimize
24    potential risks.

Page 101

1     Q.   (By Ms. Scullion)  Okay.  If you go to
2     Page E554.33 of Exhibit 9, and this is the conclusion
3     paragraph of the RiskMAP.  Looking at the first
4     sentence in the conclusion, it states Endo understands
5     the potential risks inherent in Opana ER and thus has
6     developed a RiskMAP that can effectively minimize the
7     known risks of abuse, misuse, and diversion of Opana ER
8     while preserving its benefits.  Mr. Bingol, did you
9     understand that there were in fact inherent risks in
10    Opana ER?
11    MR. LIMBACHER:  Object to form.
12    A.   Well, Opana ER is a Schedule II opioid
13    medication and has the same inherent risks as all
14    Schedule II products as determined by the DEA.
15    Q.   (By Ms. Scullion)  And the inherent risks
16    are those we discussed earlier -- being abuse --
17    correct -- was one risk?
18    MR. LIMBACHER:  Object to form.
19    A.   That's one risk.
20    Q.   (By Ms. Scullion)  Misuse is another
21    inherent risk in Opana ER?
22    MR. LIMBACHER:  Object to form.
23    A.   As with all Schedule II opioids.  That's
24    how they get labeled and determined to be Schedule II.

26  (Pages 98 to 101)

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1     Q.   (By Ms. Scullion) Including Opana ER?
2  There was an inherent risk of misuse of Opana ER;
3  correct?
4     A.   Yes.
5         MR. LIMBACHER: Object to form.
6     Q.   (By Ms. Scullion) Inherent risk of
7  diversion of Opana ER?
8         MR. LIMBACHER: Object to form.
9     A.   Yes.
10     Q.   (By Ms. Scullion) Inherent risk of
11  addiction in Opana ER; correct?
12         MR. LIMBACHER: Object to form.
13     A.   Again, as with all Schedule II opioids --
14  the FDA approves it as a safe and effective drug where
15  the risks -- or the benefits outweigh the risks.
16     Q.   (By Ms. Scullion) Okay. In the course of
17  promoting Opana ER, did Endo attempt to address --
18  sorry -- address concerns that clinicians had about
19  those inherent risks in -- let's start with Opana ER?
20         MR. LIMBACHER: Object to form.
21     A.   I -- when we say Endo, I'm not sure --
22     Q.   (By Ms. Scullion) How about you? Were
23  you looking at addressing clinicians' concerns about
24  the inherent risks in Opana ER as part of your effort

Page 103

1  to promote Opana ER?
2     A.   We promoted the product in accordance with
3  its labeling. All of our promotional materials always
4  reviewed by our legal, medical, and regulatory review
5  to ensure that the correct safety information was
6  prevalent and obvious and usually on -- very prominent
7  on the beginning of any sales material that we had.
8  And we took that obligation very seriously to ensure
9  that clinicians understood the utility of the product
10  and the risks -- potential risks of prescribing Opana
11  ER and other Schedule II opioids.
12     Q.   And was one of the efforts you undertook
13  in promoting Opana ER to explain to clinicians how
14  Opana ER could be used safely despite the inherent
15  risks in the product?
16         MR. LIMBACHER: Object to form.
17     A.   We promoted the product based on its
18  labeling and based on the data that were allowed in the
19  label in terms of how it should be used, along with the
20  important safety information always being front and
21  center.
22     Q.   (By Ms. Scullion) And -- but my question
23  is, but when -- in promoting Opana ER, was one of your
24  goals to ensure the clinicians knew how they could

Page 104

1  safely use Opana ER despite its inherent risks?
2         MR. LIMBACHER: Object to form. Asked and
3  answered.
4     A.   Again, we promoted the proper use of the
5  product always with the clinician. I mean, that was
6  all the promotional materials, the guidance that we
7  gave from a marketing perspective was to always be
8  thorough and provide the appropriate fair balance so
9  the clinician could decide based on their expertise how
10  to use the product and which patient populations and
11  what types of scenarios they would utilize it. But we
12  were always prominent with the important safety
13  information so that the product could be used safely.
14     Q.   (By Ms. Scullion) In addition to the
15  product label, Endo did undertake as part of RiskMAP
16  additional educational initiatives in connection with
17  the appropriate use of opioids; correct?
18     A.   Yes.
19     Q.   Okay. If you go to Page E554.10 of
20  Exhibit 9, Section 3.2 of RiskMAP. This is an entire
21  section on education for physicians, pharmacists,
22  nurses, health care professionals, as well as patients,
23  families, and caregivers; correct?
24         MR. LIMBACHER: Object to form.

Page 105

1     A.   Correct.
2     Q.   (By Ms. Scullion) And the goal of this
3  education was in fact to address with those audiences
4  use of opioids despite the inherent risks in them;
5  correct?
6         MR. LIMBACHER: Object to form.
7     Q.   (By Ms. Scullion) How to address those
8  risks?
9     A.   The education, of course, is predicated on
10  the fact that a patient needs a long-acting opioid for
11  their pain, and once that decision is made, how to
12  minimize the risk associated with that patient's
13  treatment.
14     Q.   Okay. And Endo had conducted market
15  research both before -- they did conduct market
16  research before and after the launch of Opana ER;
17  correct?
18         MR. LIMBACHER: Object to form and
19  foundation.
20     A.   I don't recall what market research was
21  done prior to launch since I was there for just a very
22  short couple of months, but certainly we did market
23  research after we launched.
24     Q.   (By Ms. Scullion) Okay. Those -- the

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    market research included, for example, advisory boards?
2        A.   That is one component.
3        Q.   You attended some of those advisory boards
4    yourself; right?
5        A.   Yes.
6        Q.   And market research also included message
7    recall studies; correct?
8        A.   Message recall was part of a market
9    research project.
10       Q.   Okay.  And in the course of the market
11   research that Endo did while you were there with
12   respect to Opana ER, was one of the things that came
13   back from market research that some clinicians were in
14   fact concerned about the inherent risks of opioids?
15           MR. LIMBACHER:  Object to form.
16       A.   I don't recall specific feedback at this
17   point.
18       Q.   (By Ms. Scullion)  But in general do you
19   recall that was one of the pieces of feedback, was that
20   some clinicians were concerned about prescribing
21   opioids due to their inherent risks?
22           MR. LIMBACHER:  Object to form.
23       A.   I simply don't recall specific feedback to
24   be able to --

Page 107

1        Q.   (By Ms. Scullion)  Okay.
2            MR. LIMBACHER:  We've been going a little
3    over an hour.  Is this a good time for a break?
4            MS. SCULLION:  Yes, I think this is a good
5    place for a break.
6            MR. LIMBACHER:  Thank you.
7            THE VIDEOGRAPHER:  Off the record at 11:35
8    AM.
9            [A brief recess was taken.]
10           THE VIDEOGRAPHER:  We're back on the
11   record at 11:50 AM.
12       Q.   (By Ms. Scullion)  Mr. Bingol, welcome
13   back.  You realize you're still under oath?
14       A.   Yes.
15       Q.   Thank you.  You know, I asked you about
16   whether, to your knowledge, Grunenthal has any current
17   relationships with Endo.  Do you know whether
18   Grunenthal has any current financial relationship with
19   any of the manufacturers of opioids?  I'll give you
20   some of the names -- okay -- that are the defense in
21   this case.  Purdue, Janssen, Johnson & Johnson,
22   Allergan, Teva, Insys, or Mallinckrodt?
23           MR. LIMBACHER:  Object to the form and
24   foundation, and I would caution the witness not to

Page 108

1    disclose any confidential information, but subject to
2    that, you can go ahead and respond.
3        Q.   (By Ms. Scullion)  Just any -- if there is
4    confidential information, I'd like to know yes or no.
5    If there is such information, then we can address the
6    appropriate way to disclose that.
7        A.   I guess I'm confused, given that
8    Grunenthal is a privately-held company, proprietary
9    information.  I don't know what is considered
10   confidential versus public or what I'm allowed to
11   disclose here.
12       Q.   Okay.  Is there -- I mean, so is there
13   anything you -- is there something you're thinking of
14   that falls in the category I mentioned that you're not
15   sure that you can disclose?  Is that what you're
16   saying?
17       A.   I'm not sure what I can disclose given my
18   company's position as a privately-held company, and
19   based on my confidentiality agreements or my
20   confidentiality obligations I have with Grunenthal, I'm
21   not sure what I'm allowed to discuss.
22       Q.   Okay.  There is a protective order in
23   place in this action that is designed specifically to
24   protect confidential -- highly confidential

Page 109

1    information -- and it can in fact be used to protect
2    third-party information such as Grunenthal's.  And we
3    are willing to designate your testimony on this issue
4    as highly confidential under that protective order.
5            MS. SCULLION:  So counsel, my question is,
6    will you permit him to answer the question?
7            MR. LIMBACHER:  Why don't we discuss it
8    with the witness over lunch and then we can get back to
9    you after lunch?
10           MS. SCULLION:  That's fine.
11       Q.   (By Ms. Scullion)  If you go back to
12   Exhibit Number 9, please, which is the RiskMAP.  And if
13   you turn to Page E554.18, which is at the bottom,
14   Section 3.2.2, patient and family education.  Do you
15   see Section 3.2.2.1?  And it's a reference to a patient
16   family brochure, understanding your pain, taking oral
17   opioid analgesics.  Do you see that?
18       A.   Yes.
19       Q.   And do you recall that the sales force,
20   the Endo sales force, had a role in distributing that
21   brochure as part of this RiskMAP?
22           MR. LIMBACHER:  Object to form.
23       A.   Yes.
24       Q.   (By Ms. Scullion)  Okay.  And do you

28  (Pages 106 to 109)

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1    recall in connection with Opana ER a program called
2    PROMISE -- P-R-O-M-I-S-E?
3        A.   Yes.
4        Q.   What was PROMISE?
5        A.   I don't recall.  I guess an acronym of
6    some kind, but it was --
7        Q.   Generally.
8        A.   It was a program to promote the
9    appropriate use of opioids.
10       Q.   Okay.  And that program was implemented in
11   part in the promotional materials that Endo circulated
12   for Opana ER; correct?
13           MR. LIMBACHER:  Object to form.
14       A.   Yes.
15       Q.   (By Ms. Scullion)  Okay.  So PROMISE was
16   part of the promotional efforts for Opana ER?
17           MR. LIMBACHER:  Object to form.
18       A.   PROMISE was an element of the promotional
19   efforts.
20       Q.   (By Ms. Scullion)  Okay.  We can go back
21   to Exhibit Number 7.  That's the one.  And ask you to
22   turn to Page E329.13.  In the right-hand -- sorry -- in
23   the column in the middle, it says leverage Endo's track
24   record.  Do you see that?

Page 111

1        A.   I do.
2        Q.   Okay.  And it states -- and this is a
3    document entitled business plan for Opana dated
4    December 12th, 2005.  It says as part of the
5    strategy initiative alignment, in that column, leverage
6    Endo's track record of responsible pain management and
7    leadership position in risk management.  Was that
8    something you undertook to do when you were responsible
9    for promoting Opana ER?  That is, leverage Endo's track
10   record of responsible pain management?
11           MR. LIMBACHER:  Object to form.
12       A.   Again, this document predated my
13   employment.
14       Q.   (By Ms. Scullion)  Uh-huh.
15       A.   So I don't know in what -- how this
16   language or what these words represent, but in general
17   Endo had a very good reputation as being a responsible
18   pain management company.
19       Q.   And is that reputation something you
20   sought to leverage in the promotion of Opana ER?
21           MR. LIMBACHER:  Object to form.
22       A.   Our reputation is one we intended to
23   uphold through the responsible prescribing, use, and --
24   of opioids and Schedule II or for Opana ER and making

Page 112

1    sure that the product was used correctly and promoted
2    correctly.  That's how we continued to leverage our
3    reputation, by making sure that we don't violate that
4    reputation.
5        Q.   (By Ms. Scullion)  And did you seek to
6    build on that reputation as one aspect to convince
7    prescribers to use Opana ER with their patients?
8            MR. LIMBACHER:  Object to form.  Asked and
9    answered.
10       A.   Again, not -- I don't think I really
11   understand the question in terms of how we leverage it,
12   but we would -- as a responsible organization in the
13   field of pain management and one company who markets
14   long-acting opioids, we took the obligation to be
15   responsible and to ensure the responsible use and
16   safety of our drug very seriously, and that was
17   something Endo did very well and earned a reputation
18   for.
19       Q.   (By Ms. Scullion)  Okay.
20           MS. SCULLION:  Can I have E1379, please?
21   Thank you.
22           MR. LIMBACHER:  Again, if we can wait
23   until the witness has actually got the document in
24   front of him before we put it up on the screen.

Page 113

1            MS. SCULLION:  Yes.  Thanks.
2            MR. LIMBACHER:  Thank you.
3        Q.   (By Ms. Scullion)  I'm going to hand you
4    what's been marked as Exhibit Number 10.
5            MR. LIMBACHER:  Thank you.
6        Q.   (By Ms. Scullion)  And for the record,
7    Exhibit Number 10 is Bates-stamped Endo Opioid MDL
8    01141511, and we've marked it in the top right-hand
9    corner E1379.  Mr. Bingol, do you recall we were
10   discussing before the break your participation in
11   advisory boards in connection with Opana ER?
12           [Exhibit Endo-Bingol-010 marked for
13           identification.]
14       A.   Yes.
15       Q.   Okay.  And does Exhibit 10 -- this is a
16   transcript of one such advisory board that took place
17   in -- on July 15th, 2006, not too far from here, the
18   Four Seasons?
19       A.   That's what's indicated.
20       Q.   Okay.  No reason to doubt the accuracy of
21   the transcript of that advisory board; correct?
22           MR. LIMBACHER:  Object to form.
23       A.   No.
24       Q.   (By Ms. Scullion)  Okay.  If you look on

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1  the first page, E1379.1, the first speaker is
2  identified as Amy Romero.  What was Ms. Romero's
3  position in July 2006 as best you can recall?
4      A.  She was group director.
5      Q.  For which group?
6      A.  I'm not sure how they qualified the group
7  part in that case, but -- I don't really recall if she
8  was Opana ER only or if she had other products or not,
9  but --
10     Q.  But whatever groups she had, it did
11  include Opana ER?  Fair to say?
12     A.  Correct.
13     Q.  Okay.
14     A.  She was my line manager.
15     Q.  She was your immediate supervisor?
16     A.  Correct.
17     Q.  Okay.  And if you go to the next page,
18  E1379.2, in the paragraph that begins so you are here
19  as far as the schedule.  Do you see that?
20     A.  Yes.
21     Q.  And then third sentence in, Ms. Romero
22  says we also have a presentation on the marketing
23  strategy and overview for Opana that would be provided
24  by Demir Bingol, our senior director on the brand.  And

Page 115

1  so that was a reference to you were going to be doing a
2  presentation on the marketing strategy and overview for
3  Opana; correct?
4      A.  Correct.
5      Q.  All right.  Three paragraphs down, Ms.
6  Romero discusses -- she says we were actually founded
7  in the 1920s and sold out to DuPont with Percada (ph)
8  in the pipe in the late mid-1960s, at which time
9  Percocet was launched in the mid-1970s.  Do you see
10  that?
11     A.  I do.
12     Q.  And she's referring -- she's basically
13  sort of harkening back to the lineage for -- heritage
14  for Endo going back to 1920s; correct?
15         MR. LIMBACHER:  Object to form.
16     A.  That's what it says.
17     Q.  (By Ms. Scullion)  You remember that
18  Endo -- an entity called Endo had existed as far back
19  as 1920s?
20     A.  No, I don't recall that at all, but that
21  that's the history.
22     Q.  Okay.  And there's a reference in this
23  paragraph, third sentence in -- she says the
24  interesting sort of newer factoid is that our current

Page 116

1  chairman of our board, Carol Ammon, who was for some
2  time and actually just recently moved in that position
3  who was our CEO president for some time, actually
4  worked with a small group and had a really strong
5  belief in several products here, including oxymorphone.
6  Did you ever have occasion to meet Ms. Ammon?
7      A.  Maybe once.
8      Q.  Okay.  In what context?
9      A.  Perhaps at a -- in a meeting somewhere,
10  but I had virtually no contact with her as chairman of
11  the board.
12     Q.  Did you ever come to have an understanding
13  about her history with Endo, how Endo was founded and
14  developed?
15     A.  Only --
16         MR. LIMBACHER:  Object to form.
17     A.  Only generally speaking.  It was kind of a
18  little bit of folklore on how a company gets started.
19     Q.  (By Ms. Scullion)  All right.  And part of
20  the folklore was that she and a few others had taken a
21  portfolio of products out of DuPont Merck and founded
22  Endo?
23     A.  Correct.
24     Q.  Okay.  And you understood that -- did you

Page 117

1  understand that one of those products that was brought
2  over from DuPont Merck was oxymorphone?
3      A.  So I don't recall how that product came to
4  be or where it came from, but it was already here -- it
5  was already at Endo once I joined, so I -- in my mind,
6  it was mostly about Percocet being the thing that kind
7  of got her going, but --
8      Q.  So -- sorry, I didn't mean to --
9      A.  No, no, that's --
10     Q.  When you say Percocet was the thing that
11  kind of got her going, what do you mean?
12         MR. LIMBACHER:  Object to form.
13     A.  It was just -- that was the product that I
14  think she brought first and -- or commercialized first,
15  and that's what kind of set the stage for all the other
16  products and the business to grow from.  So that's what
17  I recall.  I don't recall anything about oxymorphone as
18  a byproduct of any other moves that she may have made
19  between Endo and DuPont.
20     Q.  (By Ms. Scullion)  You recall that
21  Percocet was an important product to the initial
22  success of Endo under Ms. Ammon?
23         MR. LIMBACHER:  Object to form.
24     A.  Yes.

30  (Pages 114 to 117)

Page 118

1      Q.   (By Ms. Scullion)  A lot of products on
2  which Endo built its reputation in the pain
3  marketplace?
4           MR. LIMBACHER: Object to form.
5      A.   It was one product.
6      Q.   (By Ms. Scullion)  Okay.  If you'll go to
7  Page E1379.4.  Toward the bottom of the page you'll
8  see -- you make your introduction into the transcript,
9  Demir Bingol, and you introduce yourself.  And it says
10  here you -- at the time -- I joined Endo about seven
11  weeks ago, and you reference the fact that Ms. Vitanza
12  and you joined around the same day; is that right?
13      A.   Yes.  We were very close -- hired almost
14  the same time.
15      Q.   Okay.  And on the next page, E1379.5,
16  about a third of the way down, then we see Ms. Vitanza.
17  She's introduced.  She introduced herself, rather;
18  correct?
19      A.   That's correct.
20      Q.   And Ms. Vitanza -- she -- you were her
21  supervisor, immediate supervisor; is that right?
22      A.   That's correct.
23      Q.   Was there any specific distinction in the
24  roles between yourself and Ms. Vitanza, the things that

Page 119

1  she was specifically responsible for?
2      A.   The division of responsibility was
3  probably varied over time, but typically in her role
4  she might have been more responsible for working with
5  ad agencies and creating promotional materials and
6  working with the sales force.
7      Q.   Okay.  She would have been familiar with
8  the core messages used to promote Opana ER let's say in
9  2006, 2007?
10           MR. LIMBACHER: Object to form.
11      A.   Yes.
12      Q.   (By Ms. Scullion)  She would have
13  understood those very well?
14           MR. LIMBACHER: Object to form.
15      A.   Yes.
16      Q.   (By Ms. Scullion)  Okay.  Now, at this
17  advisory board, yourself, Ms. Romero, Ms. Vitanza are
18  there, I think some other representatives from Endo.
19  Who else attended the advisory board -- were there --
20  who was the audience -- let me put it that way -- at
21  the advisory board?
22      A.   I don't recall other at the --
23      Q.   In general who would have been invited to
24  the advisory board?

Page 120

1      A.   Again, I don't recall this advisory board
2  in particular, so I don't know what the objective was
3  which might have driven different participants.
4      Q.   Okay.  If you go to Page E1379.12.  You
5  see a few times on this page the name Bill McCarberg
6  appears?  Do you see that?
7      A.   Yes.
8      Q.   Do you remember who Mr. McCarberg was?
9      A.   He was a clinician, Dr. McCarberg.  I
10  don't recall his exact subspecialty.
11      Q.   Fair enough.  Was he a KOL for Opana ER?
12      A.   I don't recall if he participated like in
13  speaker programs or not or merely provided input as an
14  adviser.  I don't recall his full capacity.
15      Q.   Fair enough.  But he's at least an
16  adviser, you think?
17      A.   Periodically.  If we needed for -- like
18  this type of advisory board, he clearly participated
19  in.
20      Q.   Okay.  If you go to the next page,
21  E1379.13.  You see at the bottom a reference to --
22  sorry -- the name Patricia Bruckenthal.  Was that
23  another clinician participating in the advisory board?
24  She --

Page 121

1      A.   I don't recall Patricia Bruckenthal at
2  all.
3      Q.   Okay.  According to the transcript, Ms.
4  Bruckenthal, possibly Dr. Bruckenthal, states towards
5  the bottom in part of a discussion, oh, undertreat in
6  general, and I think that those of us who are used to
7  treating with opioids and comfortable with it are now
8  shifting to be less comfortable.  You see that?
9      A.   Yes.
10      Q.   And then Dr. McCarberg responds and asks,
11  so you're less comfortable than you were?  And then
12  directs a question over to Zorba Paster.  Zorba, less
13  comfortable or more comfortable.  You see that?
14      A.   Yes.
15      Q.   And Zorba Paster responds.  Do you recall
16  who Zorba Paster was?
17      A.   I don't recall specifically.  It's another
18  adviser that we would use from time to time.
19      Q.   Another clinician?
20      A.   I don't recall.
21      Q.   Okay.  But an adviser?
22      A.   Yes.
23      Q.   Okay.  And do you recall whether Zorba
24  Paster is a man or woman?

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1       A.   I don't recall.
2       Q.   We'll just say Zorba Paster.  And then
3   Zorba Paster in responding to Mr. McCarberg says, well,
4   no, I think you're right about this balance.  Talks
5   about it being a continuous process.  And then goes on
6   on the next page, E1379.14, to comment, you know, the
7   other issue is no matter how hard you try, you will
8   always have addicts in your practice who do a great job
9   of getting through all your screens, and then relates
10  an anecdote about a friend's wife who came to see Zorba
11  Paster once a year for migraine headaches, and then
12  Zorba Paster is told by a pharmacist, you know, she
13  sees 20 of your partners once a year for her migraine
14  headaches.  Do you recall coming to understand that
15  this phenomenon of a patient seeing multiple doctors
16  for opioid prescriptions was something that did occur
17  in the long-acting opioid marketplace?
18      MR. LIMBACHER:  Object to form.
19      A.   Yes.  Over a time of working within that
20  market, the concept of doctor-shopping became apparent.
21      Q.   (By Ms. Scullion)  Was one of the inherent
22  risks of diversion with respect to Opana ER?
23      MR. LIMBACHER:  Object to form.
24      A.   It was a risk with any Schedule II opioid.

Page 123

1       Q.   (By Ms. Scullion)  Including Opana ER;
2   right?
3       A.   Yes.
4       Q.   Okay.  And then Zorba Paster goes on to
5   say, so you know we're always going to be dealing with
6   that, this phenomenon of doctor-shopping, but I think
7   talking about this -- that's the crucial issue -- so
8   you don't develop opioid phobia.  Do you know what
9   Zorba Paster is referring to with the concept of opioid
10  phobia there?
11      MR. LIMBACHER:  Object to form.
12  Foundation.
13      A.   That term is generally related to the fact
14  that people who genuinely need these medications to
15  help relieve their pain are afraid to take it because
16  of potential stigma or other fears, other risks, and
17  they go untreated or their pain is unresolved as a
18  result of people fearful of the medications or -- that
19  they might be prescribed.
20      Q.   (By Ms. Scullion)  And Zorba Paster is
21  referring here to, so you don't develop opioid phobia.
22  Seems to be referring to clinicians.  Do clinicians
23  also sometimes have opioid phobia?
24      MR. LIMBACHER:  Object to form.

Page 124

1       A.   That's his characterization of it, but
2   certainly some clinicians would resist prescribing a
3   product, a Schedule II long-acting opioid, because of
4   their own perception of what might happen within their
5   practice.
6       Q.   (By Ms. Scullion)  Okay.  So is this an
7   example of some of the feedback that you did receive
8   that indicated some clinicians did have concerns about
9   the inherent risks in opioids and that impacted their
10  willingness to prescribe opioids?
11      MR. LIMBACHER:  Object to form.
12      A.   I think any physician who deals with pain
13  patients understands that these products come with a
14  certain risk involved.  They're trained in these
15  products.  They understand the risk when they start to
16  prescribe it.  And that inherent risk is well-known and
17  documented, and we promote with our materials -- again,
18  the black box and safety warnings -- to highlight those
19  inherent risks that are associated with this product --
20  approved by the FDA as being more beneficial --
21  benefits outweighing the risk -- but yeah, I mean,
22  certainly if -- I would be more concerned if they
23  didn't -- weren't aware of the potential risks because
24  they would not be able to prescribe it properly then.

Page 125

1       Q.   (By Ms. Scullion)  And was Zorba
2   Paster there referring to a phenomenon of being -- at
3   least a perception that Zorba Paster had of some
4   clinicians being overly concerned about the risks such
5   that it's an opioid phobia?
6       MR. LIMBACHER:  Object to form and
7   foundation.
8       A.   That's his opinion, I suppose, and his
9   characterization of it, but certainly there are
10  clinicians who would resist prescribing it for patients
11  who require this kind of therapy to relieve their pain.
12      Q.   (By Ms. Scullion)  Let's put aside Zorba
13  Paster's term opioid phobia.  You did become aware that
14  there were certain clinicians, though, who resisted
15  prescribing opioids because of their concerns about the
16  inherent risks in the products; correct?
17      MR. LIMBACHER:  Object to form.
18      A.   I would say that there were some
19  clinicians who felt like they didn't want to take on
20  the additional burden of making sure patients -- that
21  they were screening patients properly, that they were
22  able to identify appropriate patients for these kinds
23  of medications, and rather than take on that -- what
24  they would perceive to be as an additional burden, they

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1    would opt to either not prescribe them or simply refer
2    those patients to other doctors who would treat them.
3        Q.   (By Ms. Scullion)  So there was a concern
4    among some clinicians then about prescribing opioids,
5    as you just described?
6        MR. LIMBACHER:  Object to form.
7        Q.   (By Ms. Scullion)  Right?
8        MR. LIMBACHER:  Asked and answered.
9        A.   As I just described.
10       Q.   (By Ms. Scullion)  Okay.  And was -- were
11   those concerns something that, for example, sales reps
12   sought to address in their detailing of clinicians?
13       MR. LIMBACHER:  Object to form.
14       A.   Our sales reps were always trained to
15   promote the product on label, and the materials, again,
16   approved through our medical, legal, and regulatory
17   process to ensure the quality and the consistency and
18   the compliant nature of our promotional materials, and
19   always promoting the safety risks within our materials
20   and promoting it in a responsible way, in trying to
21   make sure that the appropriate patients were always the
22   ones who are being selected for these medications.
23       Our goal was to do a share acquisition.
24   We were targeting clinicians who by and large were

Page 127

1    already prescribing long-acting opioids to take share
2    from a competitor.  That was the primary goal of our
3    promotional effort.
4        Q.   (By Ms. Scullion)  And as part of that --
5    strike that.  You said that physicians were
6    well-trained with respect to the prescribing of
7    opioids?  That's what you said; right?
8        A.   Physicians are the learned intermediary.
9    They -- when they prescribe a long-acting opioid, they
10   have some knowledge about the products and what they're
11   doing, and you know, it's not something they can just
12   start tomorrow.  They have to have a DEA license.  They
13   have to have the appropriate prescription forms and so
14   forth.  So they have on their end an obligation to
15   understand the products that they are prescribing for
16   their patients.
17       Q.   And if you go back to Exhibit Number 9,
18   the RiskMAP.  You recall, though, that the RiskMAP was
19   designed in part to address the fact that the lack of
20   training among physicians and other health care
21   providers in both pain treatment and substance abuse
22   management was in fact an enormous problem; right?
23       MR. LIMBACHER:  Object to form.
24       A.   Our process was to continually improve the

Page 128

1    understanding of how we can -- how our products should
2    be used within the population.  Whether or not
3    everybody had the same level of training and the same
4    level of education, I cannot speak to that, but our
5    RiskMAP and the way we promoted the product was
6    considered a kind of process of continual improvement.
7    The job is never really done because the educational
8    need is always there.
9        Q.   (By Ms. Scullion)  Right, but the question
10   was the fact that the lack of training of physicians
11   and other health care providers in pain treatment and
12   substance abuse management was an enormous problem in
13   June of 2007.
14       MR. LIMBACHER:  Object to form.
15       Q.   (By Ms. Scullion)  Right?
16       A.   I don't know if I understand the word
17   enormous and what that means, but clearly clinicians
18   could benefit from a reaffirmation and continual
19   improvement in terms of understanding the use and
20   safety -- the proper prescription of these products,
21   where they fit in their practice, making sure they have
22   the right safety information, and that's what Endo
23   strived to do on all of its promotional materials.
24       Q.   Mr. Bingol, if you'll turn to E554.7 of

Page 129

1    Exhibit 9, which you described RiskMAP as Endo's
2    agreement --
3        A.   I'm sorry.  What page again?
4        Q.   I'm sorry.  E -- Page E554.7.
5        A.   .7?  Okay.
6        Q.   Uh-huh.  You described RiskMAP as Endo's
7    agreement about what education and other initiatives
8    they would undertake to address some of the risks
9    inherent in Opana ER; right?
10       MR. LIMBACHER:  Object to form.
11       A.   Correct.
12       Q.   (By Ms. Scullion)  Okay.  And on Page
13   554.7, if you'll look in the first full paragraph that
14   begins, while addiction.  Do you see that?
15       A.   Yes.
16       Q.   And second sentence.  This is what Endo
17   said in its RiskMAP agreement.  Although lack of
18   training of physicians and other health care providers
19   and pain treatment and substance abuse management is an
20   enormous problem, it is also apparent that even in the
21   hands of well-trained physicians, some patients develop
22   abuse problems that are difficult to detect and manage.
23   So Endo acknowledged the lack of training of physicians
24   and other health care providers in pain treatment and

33 (Pages 126 to 129)

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1    substance abuse management was in fact an enormous
2    problem as of at least June 2007; correct?
3            A.   Yeah, I --
4            MR. LIMBACHER:  Object to form.
5            A.   You know, I'm not -- I can't speak to what
6    Endo did or didn't do in this regard.  What I'm saying
7    is that, with the RiskMAP, it was a commitment that we
8    made to continually improve the education of how
9    opioids are prescribed and to make sure that our
10   product was used correctly.
11           Q.   (By Ms. Scullion)  Sir, you're responsible
12   in June 2007 for the promotion of Opana ER; correct?
13           MR. LIMBACHER:  Object to form.
14           A.   Correct.
15           Q.   (By Ms. Scullion)  And RiskMAP was
16   fundamental to the approval of Opana ER by FDA;
17   correct?
18           MR. LIMBACHER:  Object to form.
19   Foundation.
20           A.   That, I don't recall.  That would be a
21   regulatory topic in terms of whether or not it was
22   required, at what stage it was required, and when we
23   had to have it completed.  I can't speak --
24           Q.   (By Ms. Scullion)  Not required, but it

Page 131

1    was part of the approval process, the RiskMAP; correct?
2            MR. LIMBACHER:  Object to form and
3    foundation.
4            Q.   (By Ms. Scullion)  You testified earlier
5    that the RiskMAP addressed the risk-benefit equation in
6    FDA's decision to approve Opana ER.  Remember that?
7            MR. LIMBACHER:  Object to form.
8    Foundation.
9            A.   I do remember that.
10           Q.   (By Ms. Scullion)  Okay.
11           A.   But what I'm saying is that, whether or
12   not RiskMAP was approved, was part of the actual
13   approval or required at a subsequent date, I can't
14   speak to that.  I don't recall that.
15           Q.   Okay.  And RiskMAP was also a foundation
16   for Endo's promotion of Opana ER; correct?  Had to be
17   consistent with the RiskMAP; right?
18           A.   Correct.
19           Q.   And in fact, part of RiskMAP -- for
20   example, the PROMISE initiative -- was implemented
21   through the promotional materials; right?
22           MR. LIMBACHER:  Object to form.
23           A.   Correct.
24           Q.   (By Ms. Scullion)  And some of the RiskMAP

Page 132

1    materials were in fact handed out by the sales force;
2    correct?
3            A.   Correct.
4            Q.   All right.  So RiskMAP was something that
5    was an important part of your responsibilities in
6    connection with the promotion of Opana ER; right?
7            A.   The RiskMAP provided the compliance
8    framework and our foundation of how to be a responsible
9    company along many parameters, and certainly promotion
10   was one of them, how we trained our sales reps, how we
11   created our promotional materials, and so forth.
12           Q.   And certainly then you understood that
13   Endo had acknowledged in the RiskMAP the lack of
14   training of physicians and other health care providers
15   in pain treatment and substance abuse management was an
16   enormous problem?  You knew that in the course of
17   promoting Opana ER; correct?
18           MR. LIMBACHER:  Object to form and
19   foundation.  Asked and answered.  The document speaks
20   for itself.
21           A.   There are some clinicians who could always
22   benefit for additional educational information and
23   training in terms of how the -- what the appropriate
24   use of our medication was, and that's what we

Page 133

1    endeavored to do.
2            Q.   (By Ms. Scullion)  Are you saying that you
3    did not know that the fact the lack of training was an
4    enormous problem -- you would not have -- you did not
5    know that?
6            MR. LIMBACHER:  Object to form.  Misstates
7    his testimony.
8            A.   No.  What I'm saying is that I don't know
9    any individual doctor, what their level of training may
10   or may not be and how to quantify that problem in this
11   context.  I didn't write this part of the document, so
12   I can't really speak to that, but what I can say is
13   that we consistently provided this -- educational
14   efforts in order to improve on a continual basis
15   clinicians' understanding of how to appropriately use
16   our product.
17           Q.   (By Ms. Scullion)  And I'm just asking,
18   when you were doing that, did you do it against the
19   background knowledge, which Endo put in its RiskMAP,
20   that the lack of training of physicians, other health
21   care providers, on pain management -- pain treatment
22   and substance abuse management -- was an enormous
23   problem?
24           MR. LIMBACHER:  Object to form.  Asked and

34  (Pages 130 to 133)

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1   answered.
2       A.   I cannot answer what the -- when you want
3   to point to the enormous problem -- to quantify that
4   based on this document. I didn't write it. This is
5   not part of what I do. What I can tell you was that we
6   consistently promoted the product in accordance with
7   safety and -- the safety messages and the black box
8   warning front and prominent. We made a very conscious
9   effort to always make sure that we were educating where
10  we could the proper use of our product with patients.
11      Q.   (By Ms. Scullion) I'm not asking you to
12  quantify it. I'm asking, when you're sending sales
13  reps out there to sell Opana ER, Schedule II controlled
14  substance, to clinicians, did you do so understanding
15  that the clinicians they were detailing lacked training
16  because there was an enormous problem of lack of
17  training?
18      MR. LIMBACHER: Object to form. Asked and
19  answered.
20      A.   No. Every doctor has a different level of
21  training and understanding. We did not send reps out
22  there knowing that every doctor lacked training in pain
23  management. That is -- that would not be correct.
24      Q.   (By Ms. Scullion) When you sent the reps

Page 135

1   out there to detail on Schedule II controlled
2   substance, did you do so with the understanding that if
3   you looked at it broadly, there was an enormous problem
4   of lack of training of physicians and health care
5   providers in pain treatment and substance abuse
6   management? Did that -- was that a concept that you
7   had in mind at all in directing the promotion of Opana
8   ER within -- sorry -- to clinicians?
9       MR. LIMBACHER: Object to form. Asked and
10  answered multiple times.
11      A.   We would not make an assumption on
12  anybody's educational level and insisted that we always
13  promoted the product with the same level of -- I don't
14  know how many other ways to say it. We made no
15  assumption on that account. We would not assume that
16  somebody knew more than another.
17          We would always make sure we promoted the
18  product consistently with the label and making sure
19  that clinicians were well aware of our particular black
20  box warning, the safety information was there,
21  materials always approved through our PMRB review
22  board, and we ensured that we always treated everybody
23  the same in that regard. We didn't -- we wouldn't say,
24  oh, you know more than somebody else or you know less

Page 136

1   than somebody else. We would strive to make sure
2   everybody had the same level of understanding.
3       Q.   You would agree if a clinician lacked the
4   training -- lacked training for pain treatment or
5   substance abuse management, they would not be -- your
6   term -- a learned intermediary with respect to the
7   prescription of Opana ER; correct?
8       MR. LIMBACHER: Object to form and
9   foundation.
10      A.   Again, we targeted physicians who had
11  historically been pain management specialists, who had
12  been prescribing long-acting opioids as a significant
13  portion of their business, and already had awareness of
14  these therapies, so the level of training I can't speak
15  to.
16      Q.   (By Ms. Scullion) But there were
17  physicians that you were calling on that would lack
18  that training? That's why Endo acknowledged in this
19  RiskMAP that there was an enormous problem that
20  Endo undertook to --
21      A.   Again, Endo --
22      Q.   -- to -- to wait -- I'm sorry -- that Endo
23  took to address through this RiskMAP through the
24  education initiatives that Endo undertook as part of

Page 137

1   RiskMAP; correct?
2       MR. LIMBACHER: Object to form.
3   Foundation. Asked and answered multiple times. I
4   understand, counsel, you're not happy with his answers,
5   but can we move on to another subject?
6       MS. SCULLION: Counsel, you will refrain
7   from making comments on the record beyond objection to
8   form, and it's coaching the witness.
9       MR. LIMBACHER: Well, you've asked him the
10  same question at least --
11      MS. SCULLION: I am not. I am asking very
12  different questions --
13      MR. LIMBACHER: -- a half a dozen times.
14      MS. SCULLION: -- and he is not answering
15  what is written in the RiskMAP, this FDA document that
16  Endo entered into for a product that he was responsible
17  to promote.
18      MR. LIMBACHER: And he's explained it to
19  you multiple times.
20      MS. SCULLION: There --
21      MR. LIMBACHER: -- I object to the
22  questioning. I object to the fact that you are
23  harassing the witness --
24      MS. SCULLION: I am not harassing the

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1  witness.
2       MR. LIMBACHER:  -- by simply asking him
3  the same thing over and over and over because you don't
4  like the answers that you're getting.
5       Q.  (By Ms. Scullion)  It's -- then very
6  simply.  Yes or no, did you understand when you were
7  promoting Opana ER that there was an enormous problem
8  of lack of training of physicians and other health care
9  providers in pain treatment and substance abuse
10  management?
11       MR. LIMBACHER:  Objection.  Form.  And
12  asked and answered.
13       A.  I understood there was a variety of levels
14  of understanding and education in the physician
15  population.  I can't speak to the enormity to it.  I
16  didn't write that statement.  This was not a document
17  that I crafted, so I cannot speak to what was being
18  considered enormous, but yes, was there a -- does the
19  educational or the knowledge level between one
20  clinician and another vary?  Certainly.  Somebody more
21  astute in terms of how they manage their pain practice
22  and what they're aware of?  Certainly.  But I can't
23  speak to that particular statement in that regard.
24       Q.  (By Ms. Scullion)  Then if you go on in

Page 139

1  that same statement, Endo goes on to state, it is also
2  apparent that even in the hands of well-trained
3  physicians, some patients develop abuse problems that
4  are difficult to detect and manage.  Is that a true
5  statement?
6       MR. LIMBACHER:  Objection.  Form and
7  foundation.
8       A.  That's what's written there.
9       Q.  (By Ms. Scullion)  Was that a true
10  statement?
11       MR. LIMBACHER:  Same objection.
12       A.  It's written there and it's referenced.  I
13  assume it must be true.  Certainly these products have
14  the potential to be abused and to be -- for patients or
15  others to become addicted.
16       Q.  (By Ms. Scullion)  And that was true even
17  for a well-trained physician, that they could have
18  patients who would develop abuse problems that they did
19  not detect?
20       MR. LIMBACHER:  Object to form.
21       A.  Again, that's what's written there and
22  it's referenced.  I have to assume it's referencing an
23  article and it must be true.
24       Q.  (By Ms. Scullion)  Well, I mean, putting

Page 140

1  aside the fact that it's written here, did you as an
2  Endo employee charged with promoting Opana ER -- did
3  you know that to be true, that even in the hands of
4  well-trained physicians, some patients develop abuse
5  problems that are difficult to detect and manage?
6       MR. LIMBACHER:  Object to form.
7       A.  I know that the potential risk is there
8  regardless of what physician is prescribing the
9  product, and that's something that everybody always has
10  to be vigilant on, and it's a terrible thing to have to
11  deal with and to have happen in anybody's life, but I
12  don't know to what extent or I don't know how to
13  qualify the physician's level of training and their
14  expertise and how that impacts a patient's potential
15  for becoming addicted, because maybe they have a
16  physiologic receptivity to a molecule that nobody saw
17  coming.
18       There's so many variables there that I
19  cannot speak to this in any kind of manner that --
20  beyond what's written here on the page and what's
21  referenced here.  I can only assume that they
22  referenced it properly and that's true.
23       MR. LIMBACHER:  We talked about shutting
24  it down at 12:30 for lunch.

Page 141

1       MS. SCULLION:  That's fine.
2       MR. LIMBACHER:  Are we at a good spot for
3  a break?
4       MS. SCULLION:  Yes.
5       MR. LIMBACHER:  Thank you.
6       THE VIDEOGRAPHER:  Off the record at 12:32
7  PM.
8       [A recess was taken.]
9       THE VIDEOGRAPHER:  We're back on the
10  record at 1:13 PM.
11       Q.  (By Ms. Scullion)  Welcome back, Mr.
12  Bingol.  And you realize you're still under oath;
13  correct?
14       A.  Yes.
15       Q.  Okay.  Mr. Bingol, before lunch I had
16  asked you whether, to your knowledge, Grunenthal
17  currently has any business relationships with any of
18  the manufacturer defendants in this case.  Without
19  answering yes or no, do you have knowledge on that
20  topic?
21       MR. LIMBACHER:  Well, counsel, as we
22  discussed before we went on the record, our position is
23  that he's here testifying with regard to his work as an
24  Endo employee.  He doesn't have Grunenthal counsel for

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1    him here today with whom he can consult with regard to
2    what would be appropriate and under what circumstances
3    to provide information in response to questioning with
4    regard to his current employment at Grunenthal, and in
5    light of that, I'm not going to allow him to answer
6    those questions.
7         If you need to inquire with regard to
8    Grunenthal about these issues, you're certainly free to
9    do so.  And there may be an opportunity for you to ask
10   these questions of Mr. Bingol or some other
11   representative of Grunenthal down the road.
12        MS. SCULLION:  So just a few things.
13   Number One, I was just trying to lay a foundation to
14   see if there's anything to even worry about, if he has
15   any knowledge one way or the other on the issue, but I
16   understand you're instructing him not to answer that
17   question; correct?
18        MR. LIMBACHER:  That's correct.
19        MS. SCULLION:  Okay.  And you do represent
20   him in his personal capacity here today; correct?
21        MR. LIMBACHER:  I do.
22        MS. SCULLION:  All right.  And the
23   subpoena called for him in his personal capacity;
24   correct?

Page 143

1         MR. LIMBACHER:  The subpoena -- we can
2    argue about what it called for.  It made references to
3    his time as an employee at Endo, as was already pointed
4    out.
5         MS. SCULLION:  It certainly was not
6    limited to that.  We won't burden the record, but we
7    are going to reserve the right to call you back to
8    answer those questions.
9    Q.  (By Ms. Scullion)  But before we move on,
10   just to be very clear, are you going to follow your
11   counsel's instructions not to answer the question?
12   A.   Yes.
13   Q.   Okay.  Mr. Bingol, is it correct that one
14   of the messages Endo used in connection with promotion
15   of Opana ER and Opana was that these were new products
16   entering the oral long-acting opioid market in 2006?
17        MR. LIMBACHER:  Object to form.
18   A.   They were new forms of an old molecule.
19   Q.   (By Ms. Scullion)  And what do you mean by
20   that?
21   A.   Oxymorphone had been available previously
22   as an injection also, so this was a new solid dosage
23   form of that molecule.
24   Q.   And was the fact that it was a new solid

Page 144

1    dosage form of the molecule -- was that a message that
2    you used in connection with promotion of Opana ER?
3    A.   Yes, because it's the -- it is the essence
4    of the product, a tablet that's short-acting and a
5    long-acting tablet as well.
6    Q.   Okay.  So by the nature of your response
7    there, you also used the message that this was a new
8    oral form of a molecule in connection with your
9    promotion of Opana IR as well; right?
10        MR. LIMBACHER:  Object to form.
11   A.   It was a new version of that molecule.
12   Q.   (By Ms. Scullion)  Okay.  That was a
13   message that Endo sought to deliver to clinicians in
14   connection with promotion of the two Opana products, IR
15   and ER; correct?
16        MR. LIMBACHER:  Object to form.
17   A.   That's the message, because the product is
18   what it is.  It's oxymorphone and it's a dosage form
19   that was not available until now, until the approval,
20   so by virtue of simply discussing the product, you
21   discuss that it's -- what its active ingredient is and
22   how it's delivered.
23   Q.   (By Ms. Scullion)  And I think as you
24   mentioned earlier, that one of the things that Endo

Page 145

1    sought to highlight in connection with the launch of
2    Opana and Opana ER was that this was a new alternative
3    to other long-acting opioids already in the
4    marketplace; correct?
5    A.   Correct.
6    Q.   And that was a relevant -- what Endo
7    believed to be a relevant point of distinction for
8    Opana and Opana ER in its promotion of the products to
9    the clinicians?
10        MR. LIMBACHER:  Object to form.
11   A.   The fact that patients don't all respond
12   the same to every molecule -- this gave another option
13   for those who might not be well-maintained or whose
14   pain may not be well-controlled with the two other
15   molecules that were on the market at the time --
16   primarily morphine and Oxycodone.
17   Q.   (By Ms. Scullion)  All right.  So again,
18   the newness of the product was a relevant factor that
19   Endo sought to highlight to clinicians; correct?
20        MR. LIMBACHER:  Object to form.  Asked and
21   answered.
22   A.   The fact that it was approved and
23   available.
24   Q.   (By Ms. Scullion)  And new; correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1          MR. LIMBACHER: Object to form.
2     A.   Well, I guess I don't -- it's new by
3   virtue of its approval, and like I said, oxymorphone
4   had been available in the past.  It was also available
5   as an injectable.  This was a new dosage form that
6   allowed clinicians to treat pain patients that did --
7   that were not responding well to other similar forms of
8   existing molecules, like morphine and Oxycodone.
9     Q.   (By Ms. Scullion) Hand you what's been
10  marked as Exhibit 11.
11         [Exhibit Endo-Bingol-011 marked for
12         identification.]
13         MR. LIMBACHER: Thank you.
14         MS. SCULLION: Yeah.
15    Q.   (By Ms. Scullion) And it's Bates-stamped
16  END 00006991.  And we have it marked in the upper
17  right-hand corner as E977.  Mr. Bingol, do you
18  recognize Exhibit 11 as a piece of promotional
19  literature that Endo used in connection with the
20  promotion of Opana?
21    A.   I don't recall this being used as a
22  promotional piece.  I don't recall the piece, I guess.
23  I would have to look through it.
24    Q.   Well, and you can do so.  If I could just

Page 147

1   orient you to one thing on the front of Exhibit 11 to
2   make sure I understand it.  In the lower right-hand
3   corner, you see what appears to be a sticker on the
4   front of this --
5     A.   Yes.
6     Q.   -- journal.  Says item number OP-0399.
7   You see that?
8     A.   Yes.
9     Q.   Does that appear to be an item number used
10  for tracking promotional materials within Endo?
11    A.   Yes.
12    Q.   Okay.  And the OP at the beginning -- that
13  indicates it was a promotional piece in connection with
14  Opana; correct?
15    A.   Yes.
16    Q.   Okay.  If I could take you to the --
17  strike that.  Page -- here we go.  Take you to Page
18  977.6.  And just looking at the bottom of that page, it
19  indicates this supplement has been generously sponsored
20  by Endo Pharmaceuticals; correct?
21    A.   Correct.
22    Q.   Did Endo from time to time sponsor
23  supplements for publications such as Pain Medicine in
24  connection with Opana ER?

Page 148

1          MR. LIMBACHER: Object to form.
2     A.   Yes.
3     Q.   (By Ms. Scullion) And did it do so in
4   connection with Opana IR as well?
5     A.   Typically it would be one and the same, a
6   molecule -- a review of the molecule and how it works
7   and metabolized.  This is about the science of the
8   product, so to the -- yes, to the extent that this was
9   one or the other, more of an overall oxymorphone review
10  versus, say, a particular product, ER versus IR.
11    Q.   Okay.  If you go to Page 977.8, which is
12  headed at the top left-hand corner introduction
13  oxymorphone status.  Do you see that?
14    A.   I'm sorry.  .8?
15    Q.   Correct.  Does it say at the top
16  introduction oxymorphone status?
17    A.   Yes.
18    Q.   Okay.  And the middle of that first
19  paragraph states the editors of Pain Medicine have
20  decided to launch these supplements because research
21  information about specific medications is often
22  scattered among various journals and some --
23  information may only be in a poster form presented at
24  various meetings.  As such, it is difficult for the

Page 149

1   busy clinician to get an overall impression of the
2   status of this research.  Were the statements there
3   consistent with your experience as well, that it could
4   be difficult for the busy clinician to get an overall
5   impression of the status of research on a molecule such
6   as oxymorphone?
7          MR. LIMBACHER: Object to form.
8     A.   I don't know how to answer how clinicians
9   get their data and understand it.  This is written --
10  not written by me, not anything I had a hand in
11  creating, so I don't know how to quantify that either
12  in terms of --
13    Q.   (By Ms. Scullion) Okay.  So sitting here
14  today, for example, you wouldn't dispute that
15  statement?
16         MR. LIMBACHER: Object to form.
17    A.   I don't know how to respond to that
18  statement for you.
19    Q.   (By Ms. Scullion) Okay.  But clearly this
20  is a statement in a supplement sponsored by Endo, as we
21  saw; correct?
22         MR. LIMBACHER: Object to form.  Document
23  speaks for itself.
24    A.   That is correct, and my understanding

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1   these types of things are usually sponsored at arm's
2   length.  The content is usually relied upon the
3   publication or the author to create this, so I don't
4   know who had what input at what time into the document.
5   We certainly sponsored the intent of publishing
6   scientific information about oxymorphone to help
7   educate the public -- the clinicians on -- to better
8   understand it so they could better use the product
9   safely within their practice.
10      Q.   (By Ms. Scullion)  And based on the item
11  number on the front of Exhibit 11, would that indicate
12  it had gone through what you refer to as the PMRB
13  within Endo?
14      A.   Yes.
15      Q.   And the PMRB was an internal promotional
16  materials review board; correct?
17      A.   Correct.
18      Q.   And one of the things that the PMRB would
19  be reviewing materials for was to assess the accuracy
20  of the statements in them?
21      A.   The PMRB would be responsible for
22  reviewing the content and ensuring that the clinical
23  data and how the products is represented is accurate.
24  With respect to third-party publications, that would be

Page 151

1   somebody different bringing that through the PMRB board
2   and the exact requirements that they might have I don't
3   recall because it would not be something that was part
4   of my normal day-to-day activity.
5       Q.   Okay.
6       A.   I would not bring a piece necessarily like
7   this through.
8       Q.   Understood.  So who would have been
9   bringing a piece like this through the PMRB, to the
10  best of your recollection?
11          MR. LIMBACHER:  Object to form and
12  foundation.
13      A.   It might have been our medical liaison
14  group.  It could have been also marketing as well, but
15  I don't recall this piece as such, so I don't know how
16  it was brought through, but in terms of, you know, the
17  checking for accuracy and editorial comment, that's the
18  point of having an unrestricted educational grant or
19  funding this through supplement where we're not
20  necessarily controlling that editorial content.
21      Q.   (By Ms. Scullion)  Okay.  But it would be
22  reviewed for the accuracy of the statements about the
23  molecule itself -- correct -- the science around the
24  molecule?

Page 152

1           MR. LIMBACHER:  Object to form and
2   foundation.  Misstates his testimony.
3       Q.   (By Ms. Scullion)  If I've misunderstood,
4   please correct me.
5       A.   I cannot speak exactly to what they would
6   look for in a piece like this, but the science is --
7   you know, in fact, I would have to review this in
8   greater detail, but most of these publica -- most of
9   the articles in here seem to be republished articles or
10  otherwise other peer-reviewed journal information that
11  had been consolidated into a piece, so I wouldn't be
12  able to tell you with any great certainty to what
13  extent anything was actually reviewed, for -- what type
14  of accuracy, or if they're taking an older article
15  that's already been reviewed and because it's been
16  peer-reviewed, it's accepted.  We want to make
17  sure that -- that's all I can say about it.  I mean, I
18  just don't have that background on how this piece would
19  ultimately approved be.
20      Q.   Okay.  But regardless of how it was
21  ultimately approved, we have confirmed it was sponsored
22  by Endo and did go through Endo's PMRB process?
23      A.   It appears to.  That's what the label
24  seems to indicate.

Page 153

1       Q.   Okay.  So it was available for use, for
2   example, by the sales force in detailing clinicians?
3           MR. LIMBACHER:  Object to form.
4       A.   It would be available for some sort of
5   promotional activity.  I don't recall if it was
6   distributed widely through the sales force or if it
7   were through other kinds of interactions at a
8   convention or something like that, but it would be
9   available.
10      Q.   (By Ms. Scullion)  It could have been used
11  in any of those settings -- you said conventions,
12  detailing -- correct?
13          MR. LIMBACHER:  Object to form.  Misstates
14  his testimony.
15      A.   It could be -- it was available.  How it
16  was used, I don't recall exactly.
17      Q.   (By Ms. Scullion)  Understood.  If you'll
18  go to Page E977.10.  And this is an article, clinical
19  pharmacology of oxymorphone.  Under the heading
20  introduction, states oxymorphone is a semi-synthetic
21  new opioid receptor agonist which entered the United
22  States marketplace in 1959, available at the time in
23  only parenteral and rectal formulations.  Correct?
24  That's what it states?

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1    A.   That's correct.
2    Q.   So someone -- a clinician reading this
3  would understand that oxymorphone had not been
4  available, for example, in oral form back in the 1950s;
5  correct?
6          MR. LIMBACHER:  Object to form and
7  foundation.
8    A.   That's what it states.
9    Q.   (By Ms. Scullion)  And then it goes to
10 state in this paragraph, in June 2006 oral oxymorphone
11 immediate-release, IR, and oxymorphone
12 extended-release, ER, tablets were approved by the FDA.
13 And so a clinician reading this would understand that
14 that is when an oral form of oxymorphone became
15 available, was in -- after the FDA approval in June
16 2006; correct?
17         MR. LIMBACHER:  Object to form and
18 foundation.
19   A.   That's what it reads.
20   Q.   (By Ms. Scullion)  That's what a clinician
21 reading this would understand?
22         MR. LIMBACHER:  Object to form and
23 foundation.
24   A.   That's what's written here on the page.  I

Page 155

1  mean, it's pretty straightforward.
2    Q.   (By Ms. Scullion)  Definitely it's very
3  straightforward; right?  And if you go similarly to
4  Page 977.49, which is part of an article that starts on
5  Page 977.46, just to orient you.  Page 977.49 -- again,
6  this article states, left-hand column, first full
7  paragraph, oxymorphone in both IR and ER formulations
8  is one of the newest additions to the opioid
9  armamentarium and is recommended in the literature as
10 an opioid to be considered in opioid rotation.
11 Correct?
12   A.   That's what's written.
13   Q.   And so, again, a reasonable clinician
14 reading this would come away with the understanding
15 that oxymorphone in IR oral formulation was a new
16 addition to the opioid armamentarium as of the date of
17 this article?
18         MR. LIMBACHER:  Object to form and
19 foundation.
20   A.   That's what's written.  Again, I can't
21 speak to what a clinician might think or perceive.
22   Q.   (By Ms. Scullion)  But that's a pretty
23 straightforward reading of what that says; right?
24         MR. LIMBACHER:  Object to form.

Page 156

1    A.   That's a verbatim reading of what it says.
2          MS. SCULLION:  Can I have E520, please?
3    Q.   (By Ms. Scullion)  Okay.  Hand you what's
4  been marked as Exhibit Number 12.  And this is
5  Bates-stamped Endo Opioid MDL 0100157 -- sorry -- 1527.
6  And we've stamped it in the upper right-hand corner
7  E520.  And Mr. Bingol, draw your attention to the
8  e-mail in the middle of the first page, E520.1.  This
9  is an e-mail from you to Ron Wickline and Amy Romero
10 dated September 5th, 2006, subject matter field voice
11 message; correct?
12         [Exhibit Endo-Bingol-012 marked for
13         identification.]
14   A.   Yes.
15   Q.   Okay.  Now, you mentioned earlier in your
16 testimony that Endo had focused its promotion of Opana
17 ER to clinicians who were writing large amounts of
18 opioids; correct?
19         MR. LIMBACHER:  Object to form.  Misstates
20 his testimony.
21   A.   We targeted clinicians who were
22 prescribing competitor products as part of our share
23 acquisition strategy.
24   Q.   (By Ms. Scullion)  Okay.  And did you look

Page 157

1  just at the volume of the competitor products that they
2  were writing?  That was what you looked at in terms of
3  targeting?
4          MR. LIMBACHER:  Object to form.
5    A.   Probably initially.
6    Q.   (By Ms. Scullion)  Okay.  And so taking
7  you to the third paragraph of your e-mail.  And this
8  is, again, a few months into the launch.  You're
9  talking about monthly results for July.  And you
10 stated, Mr. Wickline and Ms. Romero, in terms of
11 messages for reinforcement, I have two that I'd like to
12 offer.  First, we need to apply as much frequency as
13 possible, perhaps even weekly, to our top four deciles.
14 What does that mean, top four deciles?
15   A.   A decile is one method by which you
16 segment your target list.  Perhaps you can divide
17 things into tenths and therefore, depending on how you
18 approach it, your best -- or your most, let's say,
19 target-rich decile may be Number 10 or it may be Number
20 One.  Some people arrange it, you know, different ways.
21 But the top four deciles would have been those targets
22 that were.  For whatever reason, however they were
23 decided, deemed to be the most opportunity-rich.
24   Q.   And in terms of it being the most

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1    opportunity-rich, that's based on, as you go on to
2    state a couple sentences down, these docs are the most
3    receptive to our message write opioid analgesics on a
4    large-scale basis, and provide more than ample
5    opportunity to meet our 2006 -- share requirements;
6    correct?
7            MR. LIMBACHER: Object to form.
8        A.   That's what it says.
9        Q.   (By Ms. Scullion)  That accurately
10   captures the concept of these being the target-rich
11   deciles?
12           MR. LIMBACHER: Object to form.
13       A.   Yes.  Not remember -- I don't recall what
14   was going into the deciling because you can decile by a
15   number of features, but in this case these deciles were
16   made up of a relatively small number of doctors who
17   prescribed about 40 percent of the market, so this is
18   showing that we made a concerted effort to focus on
19   those doctors who were already prescribing our
20   competitor's products and that that's where we should
21   really focus a lot, if not, you know, most, of our
22   energy, talking to those clinicians, because the
23   targets we had were relatively modest in terms of
24   prescription volumes compared to what the rest of the

Page 159

1    market -- what these guys represented in their
2    prescribing habits.
3        Q.   And they weren't just, again, clinicians
4    who wrote your competitors' opioids, but they wrote
5    them on a large-scale basis?  That was what part of
6    made them a target-rich decile; correct?
7        A.   Relative --
8            MR. LIMBACHER: Object to form.
9        Q.   (By Ms. Scullion)  Relative to?
10       A.   To others in their category.
11       Q.   So these were clinicians who were writing
12   relatively more opioid prescriptions than other
13   clinicians; correct?
14       A.   Yes.  This was why they were deciled a
15   certain way, based on their prescribing habits.
16       Q.   Okay.  At the end of this paragraph you
17   say, we need an Opana ER total prescription market
18   share of 1.8 percent by December.  This is also
19   especially important given the CI we are getting on
20   OxyContin.  CI there means competitive intelligence;
21   right?
22       A.   That's correct.
23       Q.   What was it about the competitive
24   intelligence on OxyContin in fall of 2006 that made it

Page 160

1    especially important to get an Opana ER total
2    prescription market share of 1.8 percent by December?
3            MR. LIMBACHER: Object to form.
4        A.   I don't recall the specific time or event.
5    There was a number of points in time over the course of
6    the first few years that we were marketing where
7    availability of OxyContin was shorted or they
8    had generics that were coming in and then going out, so
9    I don't recall which event was occurring, but there was
10   clearly something happening with that particular
11   product that made an opportunity for us or at least we
12   perceived that there was an opportunity to have --
13   again, to take more share from that product based on
14   whatever was happening at that time.
15       Q.   (By Ms. Scullion)  Okay.  You then go on
16   to -- your next paragraph states, second, I would like
17   to reinforce the two pillars of the Opana ER strategy.
18   And you describe the first pillar as being durable
19   efficacy; correct?
20       A.   That's correct.
21       Q.   And in the next sentence you explain the
22   fact that Opana ER has been demonstrated to maintain
23   its analgesic efficacy over the 12-hour dosing period
24   and that Opana ER's every-12-hour dosing held up for

Page 161

1    over 12 weeks is critical in differentiating our
2    product from others.  That sentence explains the pillar
3    of durable efficacy that you were pointing to?
4            MR. LIMBACHER: Object to form.
5        A.   That's correct.
6        Q.   (By Ms. Scullion)  Okay.  And durable
7    efficacy described as a pillar of the Opana ER
8    strategy.  This is September of 2006.  Did durable
9    efficacy continue to be a pillar of the Opana
10   ER strategy, at least for original Opana ER, for the
11   period that it was promoted?
12       A.   The duration of effect and the consistency
13   of the effect was certainly a key message.  Whether we
14   called it durable efficacy or tried to characterize it
15   a different way may have changed over time, but the
16   concept of dosing every 12 hours and having that be
17   robust I believe was consistent throughout the period.
18       Q.   Right.  So the concept you describe here
19   in Exhibit 12 is whether -- you say whether it was
20   used -- same term -- durable efficacy or something
21   else -- continued to be an important pillar of
22   promotion of Opana ER original formulation?
23           MR. LIMBACHER: Object to form.
24       A.   Yes, this pillar is important because it

41  (Pages 158 to 161)

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1  allows patients to understand -- clinicians to
2  understand that they can have a certain consistency of
3  expectation with regard to how this opioid is going to
4  help relieve those patients' pain, and so making sure
5  that we did work or demonstrating that Opana ER worked
6  as indicated on the label was an important component of
7  our messaging.
8      Q.   (By Ms. Scullion)  Okay.
9      MS. SCULLION:  Can I have 1522, please?
10     Q.   (By Ms. Scullion)  Let me hand you what's
11  been marked as Exhibit 13, and this is Bates-stamped
12  Endo Opioid MDL 00880735, and we've marked it in the
13  upper right-hand corner E1522.  Mr. Bingol, Exhibit 13
14  is an e-mail that you wrote to David Kerr and others
15  dated October 16th, 2006; correct?
16          [Exhibit Endo-Bingol-013 marked for
17          identification.]
18     A.   Correct.
19     Q.   Okay.  And you state in the first
20  sentence, Dave asked about the primary reasons for the
21  current sales trajectory not meeting prelaunch
22  expectation.  Is that a reference to Mr. Kerr asking
23  for your insights and others about why sales for Opana
24  ER were not reaching the levels that had been expected

Page 163

1  prelaunch?
2      A.   He was asking the group, but certainly
3  wanting to understand the difference of performance
4  versus expectation.
5      Q.   Okay.  And in responding -- strike that.
6  You are summarizing the discussion that happened at a
7  meeting on that issue; correct?
8      A.   Can I read the whole thing and --
9      Q.   Sure.  Absolutely.
10     A.   Okay.
11     Q.   You had a chance to read through Exhibit
12  13?
13     A.   Yes.
14     Q.   Okay.  And so you are summarizing a
15  discussion that happened at a meeting to discuss Mr.
16  Kerr's inquiry about what were the reasons sales of
17  Opana ER were not up to prelaunch expectations; right?
18     A.   Yes.
19     Q.   Okay.  And my understanding from reading
20  this is that one of the primary reasons discussed was
21  that the launch had been delayed to a certain extent;
22  correct?
23     A.   Yes.
24     Q.   Also discussed the fact that Endo had new

Page 164

1  sales representatives who were still getting up to
2  speed?
3      A.   Yes.
4      Q.   And then you then go on to list certain
5  action items following from the meeting.  And the first
6  action item you say, sales to provide an analysis of
7  territory performance of tenured reps versus new hire
8  with little or pharma experience.  The reference to new
9  hire with little experience -- is that a reference to
10  Endo having recently retained sales reps who had at
11  that point little experience?
12     MR. LIMBACHER:  Object to form.
13     A.   I don't recall exactly, you know, what the
14  makeup of the sales force was or who and when they
15  hired, but presumably in a hypothesis, that the ones
16  that were more tenured had more ability to be ready and
17  to go than those who were less tenured.
18     Q.   (By Ms. Scullion)  Okay.  And then you go
19  on to say, we also discussed the three things that need
20  to do right now in order to achieve 12,000
21  prescriptions per week in 2006.  I take it that was in
22  fact the sales target as of the date of your e-mail;
23  correct?  12,000 prescriptions a week?
24     A.   I don't recall if that was the forecast or

Page 165

1  if that was a recalibration to know what we needed to
2  do in order to reach a particular number at the end of
3  the year, but that was a -- some target that was
4  calculated at this point in time.
5      Q.   So it's -- this may have been a calculus
6  for where Endo wanted to be by the end of 2006, was a
7  12,000-prescriptions-per-week target?
8      A.   That is what this says.  My point is that
9  I don't know if that was the original forecast or a
10  recalibrated forecast based on the current performance.
11     Q.   Okay.  With respect to the 12,000
12  prescriptions per week in 2006, you then go on to have
13  in your first bullet point under that one of the things
14  that was discussed at the meeting was continue to focus
15  on Decile 7 to 10 with high-frequency call volume.  And
16  again, that's a reference to targeting those highest
17  target-rich deciles of clinicians; correct?
18     MR. LIMBACHER:  Object to form.
19     A.   Correct.
20     Q.   (By Ms. Scullion)  And high-frequency call
21  volume referred to how often the sales reps would be
22  detailing that target -- those target-rich deciles;
23  correct?
24     MR. LIMBACHER:  Object to form.

42  (Pages 162 to 165)

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1     A.   That's correct.
2     Q.   (By Ms. Scullion)  And then you say, in
3  addition to focusing on the highest per capita
4  prescribers, this tactic will also drive much-needed
5  adoption with specialist -- excuse me -- specialists,
6  which in turn will help drive FP prescribing behavior.
7  What did FP refer to there?
8     A.   I don't really recall.  Family
9  practitioner, I think is what that means.
10     Q.   And that's in contrast to specialists;
11  correct?
12     A.   No, not necessarily.
13     Q.   Okay.  Let me und -- what did you mean --
14  what was meant by the idea of the focus on the Decile 7
15  to 10 with high frequency will also drive much-needed
16  adoption with specialists, which in turn will help
17  drive FP prescribing behavior?
18     A.   So in the pain market you have specialists
19  who are -- you know, certified pain management
20  specialists are a relatively small group of people.  In
21  many communities family practitioners take on the task
22  of pain management and are de facto the specialist in
23  their area, so you have -- some communities don't have,
24  because of the lack of actual certified pain management

Page 167

1  specialists, access to somebody who can do their pain
2  management.
3     These FPs are in those deciles and
4  represent -- again, the prescribing pattern of
5  long-acting opioids and our ability to -- they were
6  slower adopters because they were family practitioners,
7  but they were certainly ones who were considered to be
8  the local pain management expert in town.
9     Q.   And you say they were slower adopters.
10  Why were they slower adopters?
11     A.   Just generally speaking, as a family
12  practice physician, their rate of adoption for new
13  products is not as quick as any specialist.  It's true
14  for most categories of products.  The specialists are
15  usually the first adopters to try it out, see how it
16  works.  They start to make, you know, certain
17  recommendations to other clinicians in their region --
18  however, they might disseminate their experience with a
19  product.  But just on an adoption curve basis, your
20  specialists generally speaking are just quicker to
21  adopt anything.
22     Q.   In terms of specialists spreading
23  information about their use of a product -- let's say
24  Opana ER -- did you do anything to try to facilitate

Page 168

1  specialists within a region sharing with, say, family
2  practitioners the specialists' experience using Opana
3  ER?
4     MR. LIMBACHER:  Object to form.
5     A.   As previously answered, we did run
6  promotional programs with KOLs or thought leaders who
7  would perhaps have one-on-one or group discussions with
8  Endo-approved materials with appropriate promotional
9  information about the product, and to help ensure that
10  clinicians who were considering our product in the
11  context of their practice would do so safely and
12  effectively.
13     Q.   (By Ms. Scullion)  Okay.  And were you --
14  what you just described -- was that part of what would
15  help drive family practitioner prescribing behavior for
16  Opana ER?
17     MR. LIMBACHER:  Object to form.
18     A.   What I just described was an educational
19  opportunity for those practitioners, and certainly
20  learning more about the product and understanding how
21  to use it safely and effectively would obviously be an
22  encouragement to try the product and their population
23  where needed.
24     Q.   (By Ms. Scullion)  And that was one of the

Page 169

1  reasons that Endo used these speaker programs, speaker
2  opportunities, as part of its promotional efforts;
3  correct?
4     MR. LIMBACHER:  Object to form.
5     A.   Correct.
6     Q.   (By Ms. Scullion)  Okay.  Next bullet
7  point says, keep accelerating program and promotional
8  spends (ph) as feasible in order to generate as much
9  promotional noise as possible to support focused sales
10  targeting.  What did you mean by promotional noise
11  there?
12     A.   Again, as a competitive product working in
13  a competitive environment, you try to make sure your
14  messages are being heard with your customers as it
15  relates to the competition.  They're in their office
16  also giving their messages and providing their
17  materials, and so you have to -- in order to take share
18  effectively, you have to have a certain level of --
19  call it noise, call it promotional presence,
20  whatever -- to break through the clutter and to have
21  your product be considered in their choice set.
22     Q.   And then your last bullet point, take
23  advantage of current market dynamics in order to
24  position Opana ER in a favorable or at the very least

43  (Pages 166 to 169)

Highly Confidential - Subject to Further Confidentiality Review

---

Page 170

1    in a non-disadvantaged position versus OxyContin.  What
2    did you mean by that?
3            MR. LIMBACHER:  Object to form.
4        A.    Again, I don't recall the specific issue
5    with OxyContin at that time, so I don't remember
6    exactly why or how non-disadvantaged versus OxyContin
7    means in this context.  I don't remember.
8        Q.    (By Ms. Scullion)  Okay.
9            MS. SCULLION:  Could I have 1378, please?
10   Thank you.
11       Q.    (By Ms. Scullion)  I'll hand you what's
12   been marked as Exhibit 14, and this is Bates-stamped
13   Endo Opioid MDL 04118668, and we've stamped it E1378.
14   And Mr. Bingol, Exhibit 14 is a series of e-mails,
15   which if you start at the back begins with an e-mail
16   from someone identified as Ms. Ken Brake (ph), and it's
17   going to general information.  It's then forwarded on
18   to you and others at Endo by Ms. Edie Dawson.  And then
19   in the middle of Page E1378.3, we have your response to
20   that part of the e-mail chain.
21           [Exhibit Endo-Bingol-014 marked for
22           identification.]
23       A.    Okay.
24       Q.    And that's where I wanted to focus you.

---

Page 171

1        A.    Can I read the whole thing, please?
2        Q.    You absolutely can.  Have you had a chance
3    to read it?
4        A.    Yes.  Thank you.
5        Q.    Sure.  So again, starting at the back of
6    the exhibit, looking at the e-mail from Ken Brake, the
7    e-mail represents that it's from somebody who has taken
8    Opana ER and is comparing it to their experience on
9    OxyContin.  And in the second-to-last sentence on Page
10   1378.4, the e-mail states, you product -- your
11   product -- you product has no signs of becoming
12   addictive, in my opinion.  You feel normal and not
13   foggy.  Do you see that?
14       A.    Yes.
15       Q.    And then if you go back to E1378.3.
16   Again, Ms. Dawson forwards this e-mail to you and to
17   others, and in your response in the middle of Page
18   1378.3 you say, perhaps we should conduct some kind of
19   cognition study that demonstrates the phenomena
20   described below.  Do you see that?
21       A.    Yes.
22       Q.    And you're referring to the phenomenon Ken
23   Brake has described as your product has no signs of
24   becoming addictive, in my opinion; you feel normal and

---

Page 172

1    not foggy; correct?
2            MR. LIMBACHER:  Object to form.
3        A.    It refers more to the normal and not foggy
4    portion.  The CNS effects could be different by patient
5    then -- this was one of the -- you know, relative to
6    other products in the market -- morphine especially
7    problematic in that regard -- that this was a signal
8    that might be a reason for opioid rotation and trying
9    our product with particular patients, and so if you can
10   demonstrate that through some sort of study, then maybe
11   that data would lead to the ability to have that in
12   your label, or at the least get a signal and then know
13   where to go from there on a research basis.
14       Q.    (By Ms. Scullion)  Okay.  And those
15   cognitive effects -- how do they relate to whether the
16   product is or is not addictive?
17           MR. LIMBACHER:  Object to form and
18   foundation.
19       A.    I can't speak to that.  I don't know the
20   pharmaco dynamics of how that would work.
21       Q.    (By Ms. Scullion)  Did Endo ever perform a
22   cognitive study on Opana ER original formulation?
23       A.    Yes.
24       Q.    And what did that cognitive study

---

Page 173

1    demonstrate?
2        A.    I recall the study.  I recall the kind of
3    study it was.  The output or the outcome as I remember
4    was relatively positive for oxymorphone, but I don't
5    recall specifics in terms of, you know, any kind of
6    hard data or conclusions.
7        Q.    Do you know whether Endo did apply to
8    change the label from Opana ER original formulation
9    based on that study?
10       A.    No, not while I was there.  I don't know
11   of any effort.
12       Q.    Okay.  To the best of your knowledge, it
13   did not apply for such a label change based on the
14   study while you were there?
15       A.    Not while I was there.
16       Q.    Okay.
17           MS. SCULLION:  Can I have 1169?
18       Q.    (By Ms. Scullion)  Hand you what's been
19   marked as Exhibit 15, and that's Bates-stamped Endo
20   Opioid MDL 01723746.  And Mr. Bingol, I am going to
21   take you through the document in some detail.  You're
22   welcome to look it over and get oriented to it, but I'm
23   going to step through in some detail if you -- if you
24   like, I can take you through the report itself.  You've

---

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1  oriented yourself to Exhibit 15?
2      [Exhibit Endo-Bingol-015 marked for
3  identification.]
4      A.   Okay.
5      Q.   Okay.  So looking on the first page of
6  Exhibit 15, this is an e-mail from you to David Kerr
7  and others dated October 2nd, 2007.  And the subject is
8  Opana Fastape study.  And this looks to be an e-mail
9  from you discussing the final report of the Opana
10 Fastape study, which is attached to the e-mail; is that
11 correct?
12     A.   Correct.
13     Q.   What was the Fastape study?
14     A.   It's a -- I don't recall the underpinnings
15 of how the research is done, but it's a specific type
16 of relatively quick market research study in order to
17 gauge and assess what's happening with your sales force
18 and product and perceptions thereof.
19     Q.   Okay.  So it's one piece of market
20 research that Endo conducted in connection with, in
21 this case, Opana ER?
22     A.   That's correct.
23     Q.   And a piece of market research that -- one
24 of the pieces of market research that you then used in

Page 175

1  connection with the promotion of Opana ER?
2      A.   We didn't use it in conjunction with
3  promotion.  It was helping us understand the effect of
4  what we were doing in the marketplace.
5      Q.   Okay.  Fair enough.  So it's helping you
6  assess the effect of the promotion that had taken
7  place; is that correct?
8      A.   Correct.
9      Q.   Okay.  And I assume since you have
10 commented on the study in your cover e-mail, that you
11 at the time would have read the study in some detail;
12 correct?
13     A.   Correct.
14     Q.   I should say, you would have read the
15 final report of the study in some detail; correct?
16     A.   That's correct.
17     Q.   Okay.  If you go to Page E1169.5.  It's
18 the beginning of a PowerPoint presentation.  And this
19 is a PowerPoint presentation that was prepared
20 internally by Endo to summarize the Fastape research;
21 correct?
22         MR. LIMBACHER:  Object to form.
23     A.   I don't know who actually put it together,
24 if the vendor had a hand in it or if it was done by

Page 176

1  Endo specifically.
2      Q.   (By Ms. Scullion)  Okay.  But you then --
3  but I mean, obviously you then circulated to your
4  colleagues as something they should look over in the
5  course of their duties; correct?
6      A.   Yes.
7      Q.   Okay.  If you go to Page E1169.8, which is
8  entitled introduction objectives.  Looking at the
9  objectives, under the second full bullet point, first
10 like checkmark there, it says evaluate the content of
11 the messages communicated to physicians by measuring
12 unaided and aided message recall and response for Opana
13 and competitors.  Looking at that, does that refresh
14 your recollection about at least one objective of the
15 Fastape study?
16         MR. LIMBACHER:  Object to form.
17     A.   Yes.
18     Q.   (By Ms. Scullion)  Okay.  And then if you
19 go to the next page, E1169.9, it describes the method
20 for the Fastape study.  Indicates under the heading
21 data collection that Endo had provided a list of target
22 physicians that the vendor, GfK Market Measures, then
23 matched to its database to see which physicians had
24 opted into participating in such research; correct?

Page 177

1      A.   That's correct.
2      Q.   Okay.  And if you go to E1169.12.  And the
3  summary of key findings states under the first bullet
4  point, on aided (ph) basis, two-thirds of physicians
5  recall the Opana ER message true every-12-hour dosing.
6  Do you see that?
7      A.   Yes.
8      Q.   And that message, true every-12-hour
9  dosing -- that was one of the key messages for Opana ER
10 original formulation at this time; correct?
11         MR. LIMBACHER:  Object to form.
12     A.   Yes.
13     Q.   (By Ms. Scullion)  And the label, of
14 course, stated that the dosing for Opana ER original
15 formulation was 12-hour dosing; correct?
16     A.   That's correct.
17     Q.   What was conveyed by saying it was true
18 every-12-hour dosing.  What would be untrue
19 every-12-hour dosing?
20         MR. LIMBACHER:  Object to form.
21     A.   If the product didn't maintain its dosing
22 interval, if somehow you needed to take more doses more
23 frequently.
24     Q.   (By Ms. Scullion)  Okay.  Do you recall

45  (Pages 174 to 177)

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1  whether -- that OxyContin also had 12-hour dosing on
2  its label at this time?
3       A.  Yes.
4       Q.  Do you recall there being experience,
5  though, in clinical practice that patients had to take
6  OxyContin more frequently than every 12 hours?
7       A.  Yes.
8       Q.  And that was a concern, at least among
9  some clinicians, with respect to OxyContin; correct?
10      A.  I don't know how much of a concern it was
11  with clinicians per se, but because it was an -- as
12  indicated on its label, gave us an opportunity to show
13  how a product like Opana ER could fit into their
14  practice and maintain the pain relief with a true
15  every-12-hour dosing interval.
16      Q.  And that was one of the reasons that Endo
17  emphasized true every-12-hour dosing, was understanding
18  that there were clinicians who were seeing OxyContin
19  not have true every-12-hour dosing; correct?
20      A.  I think they were seeing that with maybe
21  lots of products, too.  It's a way to position yourself
22  as a product that's doing what it's supposed to do.
23      Q.  Okay.  If you go to Page E1169.18.  Just
24  to orient you again, within the report this is a

Page 179

1  section on unaided message recall.  What's your
2  understanding of what unaided message recall means?
3       A.  It's when you ask an open-ended question
4  and don't provide like potential answers or multiple
5  choices where the respondent has to respond with
6  whatever comes to their top of mind.
7       Q.  Okay.  And then if we go to the next two
8  pages, then summarize the main message recall from
9  unaided message recall; correct?
10      A.  I'm sorry.  What were you asking?
11      Q.  Sure.  I'm just looking at these next two
12  pages then, 1169.19 and .20.
13      A.  Yes.
14      Q.  These two pages then summarize the main
15  messages that were recalled on an unaided basis;
16  correct?
17      A.  Yeah.  These messages, of course, are what
18  the clinician believes or perceives and provides back.
19  It's their opinion of what they recall.
20      Q.  Right.  This is the intent of doing such a
21  study, is to see what clinicians are recalling;
22  correct?
23      A.  Correct.
24      Q.  Okay.  And then if you go to Page 1169.20.

Page 180

1  Indicates under safety/side effects -- for Opana ER it
2  states one of the messages -- main messages recalled
3  was low potential for abuse/diversion; correct?
4       A.  That's what's written there, but of course
5  we never promoted the product in that way.  Our
6  promotional materials don't indicate that in any way,
7  and so that's why the perception of what a clinician
8  says I remember can also be a function of their own
9  empirical evidence, what they see in their practice.
10  It's certainly not representative of the marketing
11  materials and the promotional guidance that we give our
12  sales force.
13      Q.  I'm just asking, though, that the research
14  report told Endo that one of the main messages
15  clinicians were recalling with respect to Opana ER was
16  low potential for abuse/diversion?  That's what the
17  report told Endo?
18          MR. LIMBACHER:  Object to form.
19      A.  What this is telling me is that clinicians
20  in this study -- some believe that that's what they
21  remember, but that doesn't mean that that's what was --
22  the message that was delivered.
23      Q.  (By Ms. Scullion)  But it does say that
24  that's what they believe and that they remember;

Page 181

1  correct?
2       A.  Because it can come from --
3          MR. LIMBACHER:  Object to form.
4       A.  -- any of their own experiences.  If
5  they're using the product in their practice and they
6  see something -- people may not be coming in and asking
7  for it by name -- they may develop a perception on
8  their own that this is -- somehow has these qualities,
9  but it does not reflect the promotional messaging that
10  we put into the marketing.
11      Q.  (By Ms. Scullion)  And then if you go to
12  the next page, E1169.21, in the second message
13  recall --
14          MR. LIMBACHER:  Jen, I don't mean to
15  interrupt, but we've been going a little over an hour,
16  so whenever you get to a good stopping point.
17          MS. SCULLION:  I think -- I mean, we're
18  going to need to get through this document, so we
19  should -- won't be too long, but I need to get through
20  it.
21          MR. LIMBACHER:  Well, we're going to take
22  a break in the next few minutes.
23          MS. SCULLION:  Let's -- then let's keep
24  going.  We'll take a break in the next few minutes.

46 (Pages 178 to 181)

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1    MR. LIMBACHER:  Okay.
2        Q.  (By Ms. Scullion)  So secondary message
3    recall -- again, it reports telling Endo that
4    clinicians are recalling low potential of
5    abuse/diversion for Opana ER; correct?
6        MR. LIMBACHER:  Object to form.
7        A.   Again, same answer.  It's a perception
8    that they have, and that's what they're reporting in
9    the study.
10       Q.  (By Ms. Scullion)  That's -- the reporting
11   is telling -- it's telling Endo that physicians have
12   this perception of Opana ER; correct?
13       MR. LIMBACHER:  Object to form.  The
14   document speaks for itself.
15       A.   That's what's written here.
16       Q.  (By Ms. Scullion)  And now, it was not a
17   correct statement about Opana ER to say it had a low
18   abuse profile; correct?
19       MR. LIMBACHER:  Object to form.
20       A.   Opana ER as a Schedule II opioid has the
21   same potential for abuse, misuse, and diversion as all
22   other Schedule II opioids.
23       Q.  (By Ms. Scullion)  Right.  So it's not
24   correct to describe Opana ER as having a low abuse

Page 183

1    profile; right?
2        MR. LIMBACHER:  Object to form.
3        A.   That is correct, but that doesn't mean --
4    there are probably multiple messages here that are also
5    not correct, such as flexible dosing 12 or 24 hours.
6    We never promote them 24 hours either, but somehow the
7    clinicians come up with their view and perception that
8    is what they respond to, not necessarily in any way
9    indicative of how Endo promoted the product.
10       Q.  (By Ms. Scullion)  And at this time of
11   this report, though, the primary source of information
12   for clinicians about Opana ER was Endo sales reps;
13   correct?
14       MR. LIMBACHER:  Objection.  Form and
15   foundation.
16       A.   I would have to go back and -- this is two
17   thousand and --
18       Q.  (By Ms. Scullion)  Seven.
19       A.   Seven?  When you say primary, what do
20   you -- how do you mean that?
21       Q.   You had research coming back to you that
22   said in this time period that clinicians' primary
23   source of information about Opana ER was from sales
24   reps?

Page 184

1        MR. LIMBACHER:  Objection.  Form.
2        A.   I don't know how to quantify it, but it
3    certainly was a significant portion of the promotional
4    effort.
5        Q.  (By Ms. Scullion)  Okay.  And again, so
6    seeing that clinicians are recalling Opana ER as having
7    a low abuse profile, did Endo make any affirmative
8    effort to go out to clinicians and say we have to
9    correct your misunderstanding?  To the extent you
10   understand we have a low abuse profile, that's wrong?
11   Did you make any effort to specifically do that?
12       MR. LIMBACHER:  Object to form.
13       A.   Endo consistently promoted the product
14   based on the approved label, and again, with the
15   clearance of our promotional review board, our
16   materials always represented the safety risks front and
17   center on all of our promotional materials.  This is a
18   sample of doctors who remained blinded to us -- market
19   research -- we don't even know who's responding to
20   even -- to have that type of targeted effort.  What we
21   would always do and what we always maintained was the
22   highest ethical standard in how we promoted the product
23   to our clinicians.
24       Q.  (By Ms. Scullion)  But despite the PMRB

Page 185

1    review, et cetera, for promotional materials, you had
2    clinicians that you knew believed something wrong about
3    Opana ER, and that something was that they believed
4    Opana ER had a low abuse profile.  Endo knew that
5    belief was out there; right?
6        MR. LIMBACHER:  Object to form.
7        A.   What we know is that somehow they
8    determined that on -- based on their experience and how
9    they used the product.  That's -- a clinician's
10   determination is how they viewed the product.  We did
11   not promote it that way, and we never promoted the fact
12   that this was anything other than a Schedule II opioid
13   with the same safety risks.
14       Q.  (By Ms. Scullion)  You say you knew that
15   clinicians had this belief based on something other
16   than promotion.  Did you make any effort to go find out
17   where this belief was coming from from clinicians, this
18   wrong belief about Opana ER?
19       MR. LIMBACHER:  Object to form.
20       Q.  (By Ms. Scullion)  Any effort specifically
21   out there and investigate how they came to this belief?
22       MR. LIMBACHER:  Same objection.
23       A.   I don't recall any specific activity was
24   undertaken to find out why they thought this particular

47  (Pages 182 to 185)

Highly Confidential - Subject to Further Confidentiality Review

---

Page 186

1  quality existed, although we received, as you saw in
2  the previous e-mail, sometimes spontaneous reports
3  where patients and clinicians would be explaining that
4  they saw these kinds of effects happening.
5      Q.  (By Ms. Scullion)  And in fact, you had
6  market research -- multiple pieces of market research,
7  not just Fastape, but other pieces of market research,
8  that were saying the same thing, were some clinicians
9  wrongly believed that Opana ER had a low abuse profile.
10 You saw that multiple places; correct?
11         MR. LIMBACHER:  Object to form.  Misstates
12 the evidence.
13     A.  I believe that perception probably came up
14 in other market research.
15     Q.  (By Ms. Scullion)  And did Endo, for
16 example, ever send out a dear-doctor letter that
17 basically said, it's come to our attention some of you
18 have this misimpression; we want to correct it here and
19 now?  Did that ever happen?
20         MR. LIMBACHER:  Object to form.
21     A.  That would have happened through a
22 different department.  It was not through marketing.
23 So I don't know -- we didn't -- to my knowledge, we did
24 not send out a dear-doctor letter.

---

Page 187

1          MS. SCULLION:  Okay.  We can take a break.
2          MR. LIMBACHER:  Thank you.
3          THE VIDEOGRAPHER:  Off the record at 2:21
4  PM.
5          [A brief recess was taken.]
6          THE VIDEOGRAPHER:  We're back on the
7  record at 2:37 PM.
8      Q.  (By Ms. Scullion)  Welcome back, Mr.
9  Bingol.  Again, you understand you're still under oath;
10 correct?
11     A.  Yes.
12     Q.  Fantastic.
13         MS. SCULLION:  Can I have 1248, please?
14     Q.  (By Ms. Scullion)  While we're getting the
15 exhibit, if you could keep your voice up just a little
16 bit.
17     A.  Sure.
18     Q.  I'm having a little bit difficulty.  I
19 want to make sure I understand you.  Thank you.  Let me
20 hand you what's marked as Exhibit 17.
21         MR. TOLIN:  16; right?
22         MS. SCULLION:  Oh, I'm so sorry.
23         MS. KUBLY:  16.
24         MS. SCULLION:  16.  You know what, let's

---

Page 188

1  fix that before we -- does it say 17 at the top?
2          MR. TOLIN:  16.
3          MS. SCULLION:  Oh, I just misread.
4      Q.  (By Ms. Scullion)  Okay.  Exhibit 16,
5  which Bates-stamped Endo Opioid MDL 02086096.  And Mr.
6  Bingol, this is an e-mail from Laurie Blunt to you and
7  to others dated December 19th, 2007, which is sending
8  along a final report for Opana ATU Wave 3.  And again,
9  I'm happy to take you through the report in detail, so
10 if you wanted to quickly review Exhibit 16 and let me
11 know when you're ready.
12         [Exhibit Endo-Bingol-016 marked for
13         identification.]
14     A.  Okay.
15     Q.  You have a chance to look over Exhibit 16?
16     A.  Yes.
17     Q.  Thank you.  And Exhibit 16 is a cover
18 e-mail, an executive summary, and a final report from
19 Wave 3 of the ATU for Opana; correct?
20     A.  That's correct.
21     Q.  And the ATU, if you go to Page E1248.7, it
22 says Opana ATU Wave 3 final report.  ATU is another
23 piece of market research that Endo had performed in
24 connection with Opana ER -- correct -- had engaged in

---

Page 189

1  an agency to perform?
2      A.  That is correct.  Commissioned it through
3  a third party.
4      Q.  All right.  And it says ATU Wave 3.  It
5  came in multiple waves over the course of various
6  portions of the Opana ER promotion; correct?
7      A.  That's correct.
8      Q.  Okay.  And this is dated December of 2007.
9  You would have read the ATU Wave 3 final report when it
10 was received; correct?
11     A.  That's correct.
12     Q.  Okay.  Let's go to Page 1248.10.  Under
13 the first bullet point, in background, it discusses
14 Endo received FDA approval for its extended-release and
15 immediate-release formulations of oxymorphone
16 hydrochloride with the trade name Opana on July 23rd,
17 2006.  And then it refers to relaunching oxymorphone
18 hydrochloride injection and there's a trade name
19 Numorphan.  Do you recall Numorphan?
20     A.  Yes.
21     Q.  What do you understand about the history
22 of Numorphan?
23     A.  I don't recall much of the historical
24 perspective.  It was just another product in our

---

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1   portfolio that we weren't really focused on at the --
2   when I first got there, and we were just harmonizing
3   all of the Opana -- or all of the oxymorphone products
4   under one brand name.
5       Q.   So if I understand, you took the
6   then-existing oxymorphone injection product which had
7   been brand-named Numorphan and rebranded it under
8   Opana; correct?
9       A.   That is correct.
10      Q.   Did Endo do the same thing with respect to
11  the rectal suppository form of oxymorphone -- rebrand
12  it from Numorphan to Opana?
13      A.   I don't recall that product being
14  available when I was there.
15      Q.   Okay.  And if you'll go to Page E1248.15.
16  Just to orient you in the document, this is the section
17  that is executive summary, as it states in the -- on
18  the title page there.  And it states on Pages E1248.16
19  to .17 -- it's summarizing the upward path in terms of
20  awareness and usage of Opana ER; correct?
21      A.   I'm sorry.  Where are you exactly?
22      Q.   Sure.  1248.16.
23      A.   Right.
24      Q.   Starts with discussion of the upward path

Page 191

1   in terms of awareness and usage for Opana; correct?
2           MR. LIMBACHER:  Object to form.
3       A.   Correct.
4       Q.   (By Ms. Scullion)  So it's referring to
5   the fact that in June 2007, about a year, a little less
6   than a year after commercial launch of Opana ER and IR,
7   you're starting to see some moderate increase in
8   awareness and usage for the products; correct?  Oh, I
9   misspoke.  I apologize.  Within 2007, the latter half
10  of 2007, from June 2007 to December 2007, there started
11  to be an increase in awareness and usage of Opana ER
12  and IR; correct?
13      A.   Correct.
14      Q.   Okay.  And if you go to Page E1248.18,
15  this page summarizes some of the perceptions of Opana;
16  correct?
17      A.   Correct.
18      Q.   And the very first bullet point states
19  Opana ER continues to be perceived as an effective
20  opioid in terms of potency and duration of action,
21  important characteristics.  Duration of action there
22  again refers to the durable efficacy we discussed
23  earlier; is that right?
24          MR. LIMBACHER:  Object to form.

Page 192

1       A.   Correct.
2       Q.   (By Ms. Scullion)  And that was an
3   important characteristic; correct?
4       A.   That's correct.
5       Q.   And then goes on to say that -- and this
6   is for Opana ER -- its unique strengths are low abuse
7   potential, proven Q12 dosing, and multiple formulations
8   available.  So again, this is another piece of market
9   research that Endo had that told it that there was a
10  perception of Opana ER as having a unique strength of
11  low abuse potential; correct?
12          MR. LIMBACHER:  Object to form.
13      A.   Again, this is a perception that a doctor
14  may come into their own by virtue of their own clinical
15  practice and nothing that we have ever promoted the
16  product on.  Promotional materials -- always very clear
17  on the safety, concerns, and the risks associated with
18  these kinds of products, and that's the way we promoted
19  the product in the marketplace.
20      Q.   (By Ms. Scullion)  Again, I think -- so
21  you testified earlier, though, that Endo did have
22  multiple pieces of market research that did tell it
23  that clinicians did have a perception of Opana ER as
24  having low abuse potential; right?

Page 193

1           MR. LIMBACHER:  Object to form.
2       A.   I think I said I'm sure it was likely that
3   there was other market research.
4       Q.   (By Ms. Scullion)  This is one such piece
5   of other market research?  Saw the Fastape; right?  Now
6   we see the ATU; correct?
7           MR. LIMBACHER:  Object to form.
8       A.   That's correct.
9       Q.   (By Ms. Scullion)  Two different avenues
10  of market research, two different companies, in fact;
11  correct?
12          MR. LIMBACHER:  Object to form.
13      A.   That, I don't know --
14      Q.   (By Ms. Scullion)  Okay.
15      A.   -- who did which piece of research.
16      Q.   But two different avenues of market
17  research are telling you the same thing in terms of
18  perception of Opana ER; correct?
19          MR. LIMBACHER:  Object to form.
20      A.   This came up in both studies.
21      Q.   (By Ms. Scullion)  Okay.  And this
22  study -- if you'll go to Page E1248.19, very next page.
23  In discussing Opana's unique strengths in having
24  multiple formulations and low abuse potential as key

49  (Pages 190 to 193)

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1    differentiating factors, study states at the very last
2    bullet point physicians say the primary factor that
3    leads them to anticipate an increase in use of Opana ER
4    over the next six months is low abuse potential;
5    correct?
6            MR. LIMBACHER:  Object to form.
7        A.   That's what's stated.
8        Q.   (By Ms. Scullion)  And so now Endo had
9    information that told it, not only of a perception that
10   physicians had that Opana ER had low abuse potential,
11   but that perception was a primary factor that led
12   them to anticipate an increase in use of the product
13   over the near -- next six months; right?
14           MR. LIMBACHER:  Object to form.
15       A.   This is what's stated here.
16       Q.   (By Ms. Scullion)  That's what the report
17   told Endo; correct?
18           MR. LIMBACHER:  Object to form.
19       A.   Yes, that's what's written here.
20       Q.   (By Ms. Scullion)  And again, it was not
21   true that Opana ER had a low abuse potential; correct?
22           MR. LIMBACHER:  Object to form.
23       A.   Opana ER is a Schedule II opioid.  Same
24   basic black box safety warnings and risks associated

Page 195

1    with Opana ER as with all other Schedule II opioids.
2        Q.   (By Ms. Scullion)  Which meant Opana ER
3    did not have a low abuse potential; correct?
4            MR. LIMBACHER:  Object to form.  Asked and
5    answered.
6        A.   Because a Schedule II product has been
7    determined to have a certain level of abuse potential.
8    That's why it's Schedule II.
9        Q.   (By Ms. Scullion)  Right.  And that level
10   of abuse potential is not a low abuse potential?
11           MR. LIMBACHER:  Object to form.
12       A.   It has an abuse potential.  That's the
13   designation.  There are different categories.  This is
14   the -- Schedule II is a designation by the DEA --
15   Schedule III, Schedule IV -- and this one is one of the
16   higher scheduled products.
17       Q.   (By Ms. Scullion)  Endo had no clinical
18   data telling it that Opana ER had a low abuse
19   potential; correct?
20           MR. LIMBACHER:  Objection.  Form and
21   foundation.
22       A.   Not to my knowledge.
23       Q.   (By Ms. Scullion)  Okay.  And again, did
24   Endo having received this report with this information

Page 196

1    about a primary factor leading physicians to anticipate
2    increased use of this Schedule II narcotic -- did Endo
3    undertake affirmatively to go out to physicians with a
4    dear-doctor letter and say we have to correct this
5    mistaken understanding about our product?
6            MR. LIMBACHER:  Object to form.  Asked and
7    answered.
8        A.   A dear-doctor letter would have been a
9    corporate decision on when and how to send that out
10   through a different department.  It is not my --
11   necessarily my purview to do that, so to my knowledge,
12   there was no dear-doctor letter that was sent out.
13       Q.   (By Ms. Scullion)  I should say, Endo
14   never made the corporate decision to send out that
15   dear-doctor letter, did it?
16           MR. LIMBACHER:  Object to form.  Asked and
17   answered.
18       A.   Not to my knowledge.
19       Q.   (By Ms. Scullion)  And then you've said a
20   few times that Endo wasn't sure where physicians may
21   have been getting this perception of low abuse
22   potential; right?
23           MR. LIMBACHER:  Object to form.  Misstates
24   his testimony.

Page 197

1        A.   No.  I think I said that doctors can make
2    their own determination based on their own clinical
3    experience with the product if somebody's not coming
4    in -- if they're not getting a string of patients
5    coming in and asking for it by name, if they're not
6    seeing dose escalations in the prescribing pattern when
7    they're writing the product, they may make their own
8    determination that somehow this has certain qualities
9    that they may call low abuse potential, but Endo never
10   promoted the product to indicate that this was any
11   less -- or any more -- I should say -- any more safe
12   than any other Schedule II product in the market.
13       Q.   (By Ms. Scullion)  But again, Endo never
14   went out to inquire and find out what was the source of
15   the perception among physicians that Opana ER had a low
16   abuse potential?  It never went out to do that
17   research; right?
18           MR. LIMBACHER:  Object to form.  Asked and
19   answered.
20       A.   I don't recall that being a research
21   project.
22       Q.   (By Ms. Scullion)  Okay.
23       A.   We did attempt to study it and understand
24   it through cognition study to see if the effect was

Highly Confidential - Subject to Further Confidentiality Review

---

Page 198

1  real or not or perceived, but that would be the extent
2  of it.
3      Q.  Make sure I understand what you're saying.
4  You're saying Endo did a cognition study with respect
5  to Opana ER to see whether it had a less foggy -- I
6  think we talked about -- a less foggy cognition effect
7  on patients; correct?
8          MR. LIMBACHER:  Object to form.
9      A.  Correct.  As compared to other long-acting
10 opioids.
11     Q.  (By Ms. Scullion)  Uh-huh.
12     A.  It was never intended to -- or there
13 was -- it would be ridiculous on its face to assume
14 that this was a low abuse potential product, and no
15 one -- we never promoted the product that way, but if
16 they were seeing differences, CNS effect differences,
17 as reported here, we were trying to understand that.
18     Q.  You were trying to understand whether the
19 product had different CNS impact, but you never went
20 out to research what it was that was causing in fact
21 physicians to have that perception of Opana ER -- you
22 didn't ask them where are you getting this information?
23 You didn't ask them that, did you?
24         MR. LIMBACHER:  Object to form.  Asked and

---

Page 199

1  answered.
2      A.  I do not recall a formal project in which
3  that was taken -- undertaken.
4      Q.  (By Ms. Scullion)  Okay.  And if you go to
5  Page 1248.21.  So this market research study not only
6  told Endo that physicians were saying that the primary
7  factor leading them to anticipate an increase in the
8  use of Opana ER was their perception of a low abuse
9  potential for the product, but the same study tells
10 you -- second bullet point on Page 1248.21 -- that
11 physicians continued to rely on sales reps as the main
12 source of Opana information; correct?
13         MR. LIMBACHER:  Object to form.
14     A.  That's what's written.
15     Q.  (By Ms. Scullion)  And Endo -- did Endo
16 ever do any research to indicate that that was a false
17 statement?
18         MR. LIMBACHER:  Object to form.
19     A.  That they rely on reps for their main
20 source of information is a false statement?
21     Q.  (By Ms. Scullion)  Right.  Did Endo ever
22 go out to see -- to do research to say, wait, is that
23 correct?
24         MR. LIMBACHER:  Object to form.

---

Page 200

1      A.  I guess I don't understand the question.
2  Most doctors that you detail will tell you that their
3  rep visits are kind of where they get their
4  information.
5      Q.  (By Ms. Scullion)  It's the main source of
6  information generally; correct?
7          MR. LIMBACHER:  Object to form.
8  Foundation.
9      A.  It is a source.  I guess in this case they
10 said it's their main source of information.  Of course,
11 as I pointed out, that main source of information was
12 always provided in a compliant and ethical manner, and
13 based on the materials and the training that those reps
14 received, and we did not promote the product as being
15 less abusable or more safe than another product.
16     Q.  (By Ms. Scullion)  Who was Mr. Larry
17 Romaine when you were with Endo?  What was his
18 position?
19     A.  He was the vice president of sales.
20     Q.  He had responsibility to oversee Endo
21 sales force?
22     A.  That's correct.
23     Q.  And that was the sales force that was,
24 among other things, detailing physicians with respect

---

Page 201

1  to Opana ER; correct?
2      A.  That's correct.
3      Q.  And you recall, don't you, that in 2008
4  Mr. Romaine issued a memorandum to the sales force
5  specifically calling out that they should not be
6  comparing Opana ER to other long-acting opioids in
7  terms of abuse potential; correct?
8          MR. LIMBACHER:  Object to form.
9      A.  You're asking me if I recall such a memo?
10     Q.  (By Ms. Scullion)  Uh-huh.
11     A.  Not off the top of my head.
12     Q.  Do you recall that there was concern that
13 in fact the sales force was actually out there sending
14 out a message that Opana ER had a lower abuse potential
15 compared to other low-acting -- long-acting opioids?
16         MR. LIMBACHER:  Object to form.
17     A.  I don't recall that there was a problem
18 per se with any particular messaging, but if Larry sent
19 out a memo correcting that, then I think that is the
20 right thing that he should have done and to make sure
21 that the sales rep was acting in an ethical manner, but
22 I don't recall that kind of memo.
23     Q.  (By Ms. Scullion)  And again -- and you
24 certainly don't recall any memo going out -- or

---

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1    dear-doctor letter going out to the clinicians
2    reminding them of the fact that Opana ER did not have a
3    low abuse potential?
4          MR. LIMBACHER:  Object to form.  Asked and
5    answered multiple times.
6          A.  No.  As I previously testified.
7          MS. SCULLION:  Can we have 1249, please?
8    Thank you.
9          Q.  (By Ms. Scullion)  I'm handing you what's
10   been marked as Exhibit 17.  And Exhibit 17 is
11   Bates-stamped Endo Opioid MDL 02162731.  And it begins
12   with a cover e-mail from Larry Romaine to some of his
13   colleagues forwarding on an e-mail, again, from Laurie
14   Blunt to you and others transmitting the Opana ER
15   successful rep research final report and brand IQ
16   summary on December 19th, 2007.  Do you see that?
17         [Exhibit Endo-Bingol-017 marked for
18         identification.]
19         MR. LIMBACHER:  Take your time and review
20   the document.
21         Q.  (By Ms. Scullion)  You had a chance to
22   review Exhibit 17?
23         A.  Yes.
24         Q.  Okay.  And Exhibit 17, again, attaches the

Page 203

1    Opana ER successful rep research final report,
2    beginning at Page E1249.7; correct?
3          A.  Correct.
4          Q.  And the successful rep study was another
5    piece of research Endo had evaluating its sales and
6    promotion efforts with respect to Opana ER; correct?
7          A.  I don't -- it was not about evaluating a
8    sales and promotion effort.  This was about
9    characteristics or traits reps would -- I think to
10   discuss what made a rep more successful versus another.
11         Q.  But to be clear, if you'll turn to Page
12   1249.9 in the report of the successful rep study.  The
13   second bullet point explains Endo would like to conduct
14   a successful rep study to understand the rationale
15   behind keys to successfully selling Opana ER; right?
16         MR. LIMBACHER:  Object to form.
17         A.  Yes, which could be anything from how they
18   manage their day, to how they make an office call,
19   to -- you know, all the intricacies of detailing a
20   physician beyond just promotional messaging.
21         Q.  (By Ms. Scullion)  Understood, but it was
22   not just about being a successful rep generally; it was
23   about being a successful rep selling Opana ER?
24         MR. LIMBACHER:  Object to form.

Page 204

1          Q.  (By Ms. Scullion)  Correct?
2          A.  I think Endo ran a couple of these studies
3    for different products, but this one was for Opana ER.
4          Q.  And the study report is dated December
5    2007.  If you'll go to Page E1249.11, under method.
6    You see it explains that the interviews that form the
7    basis for the study were conducted in November of 2007?
8          A.  Yes, I see that.
9          Q.  And then it explains that the sample of
10   reps who were interviewed in connection with the study
11   were drawn both from the top -- 30 top tier reps and
12   the 30 low tier reps and they were a mix of both
13   specialty and pharma; correct?
14         A.  Yes.
15         Q.  If you'll go to Page E1249.33, and this is
16   in the section of the report discussing promotional
17   sales tools.  See that the report indicates in the last
18   bullet point that reps are using the TIMERx and
19   delivery system to differentiate Opana ER from the
20   competition by its delivery system, and it's also a
21   good discussion point if the physician is afraid of
22   abuse.  You see that?
23         A.  Yes.
24         Q.  So this report was telling Endo, one, that

Page 205

1    there were physicians being detailed who were in fact
2    afraid of abuse; correct?
3          MR. LIMBACHER:  Object to form.
4          A.  That's what it says.
5          Q.  (By Ms. Scullion)  And it indicates that
6    reps were using the TIMERx delivery system as a good
7    discussion point if a physician in fact had that fear
8    of abuse; right?
9          MR. LIMBACHER:  Object to form.
10         A.  In this case, that's what is -- what a
11   rep -- or some reps have indicated, which of course
12   would not be in alignment with our promotional
13   practice.
14         Q.  (By Ms. Scullion)  The TIMERx delivery
15   system had never been proven to be abuse-deterrent;
16   correct?
17         MR. LIMBACHER:  Object to form.
18         A.  No, not to my knowledge.
19         Q.  (By Ms. Scullion)  And the TIMERx delivery
20   system did not render Opana ER less susceptible to
21   abuse; correct?
22         MR. LIMBACHER:  Object to form.
23         A.  Opana ER has the same abuse liability as
24   other Schedule II opioids in the marketplace.  There

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1   was no difference in its abuse profile.
2       Q.   (By Ms. Scullion)  So as you indicate,
3   discussion of the TIMERx delivery system in response to
4   a physician's fear of abuse would not have been an
5   appropriate message to be delivered; correct?
6           MR. LIMBACHER:  Object to form.
7       A.   That is correct.
8       Q.   (By Ms. Scullion)  And yet this is what
9   Endo is being told -- its reps -- as of November 2007,
10  more than a year after launch of this product, that is
11  a message being delivered to physicians; right?
12      A.   No --
13          MR. LIMBACHER:  Object to form.  Misstates
14  the evidence.
15      A.   It says that there may be some reps who
16  are responding that way and incorrectly so, and that
17  would have to have to been somehow dealt with.
18      Q.   (By Ms. Scullion)  And that was -- again,
19  some reps were doing that more than a year after this
20  product had been launched; correct?
21          MR. LIMBACHER:  Object to form.
22      A.   Based on the timing of this survey, that's
23  what that would indicate.
24      Q.   (By Ms. Scullion)  And this survey is

Page 207

1   analyzing data from interviews in November of 2007, so
2   that's after Endo has seen the Fastape report and the
3   ATU report telling it that some physicians had a
4   perception of the product as having a low abuse
5   potential; correct?
6           MR. LIMBACHER:  Object to form.
7       A.   That is the timing of those studies.
8       Q.   (By Ms. Scullion)  Wouldn't this have told
9   Endo, this successful rep report in December 2007, that
10  it was likely that that perception was coming from the
11  fact that at least some reps were improperly
12  communicating that the TIMERx delivery system impacted
13  the abuse profile of Opana ER?
14          MR. LIMBACHER:  Object to form.  You're
15  mischaracterizing the document.
16      A.   This is based on obviously some reps'
17  feedback and an item that should be addressed through
18  sales leadership.  I can't speak to how it was
19  addressed or if it was addressed, but this is not the
20  way we promoted the product and not the way we trained
21  them to promote the product.  So this is going beyond
22  what was given to them in terms of their training
23  materials and how to effectively and safely promote --
24  and in a compliant manner promote the product.  This

Page 208

1   does not comport to that.
2       Q.   (By Ms. Scullion)  When you saw this page
3   of the successful rep report telling you that reps --
4   some reps were citing the TIMERx system in response to
5   physicians' fears of abuse, what did you do personally?
6           MR. LIMBACHER:  Object to form.  That's
7   not what the document says, counsel.  You're mis -- you
8   have mischaracterized the document.
9           MS. SCULLION:  Counsel, I'm -- counsel,
10  you are now -- you have now crossed the line into
11  coaching this witness on the record.
12          MR. LIMBACHER:  And you are --
13          MS. SCULLION:  You will not do that.
14          MR. LIMBACHER:  -- consciously
15  mischaracterizing the document and the language that is
16  right in front of you.
17          MS. SCULLION:  I'm asking the witness the
18  question --
19          MR. LIMBACHER:  I've stated my objection.
20      A.   Can you ask me again, please?
21      Q.   (By Ms. Scullion)  When you saw this page
22  of a successful rep report, E1249.33, in the last
23  bullet point on that page, what did you personally do
24  in response to that?

Page 209

1       A.   I don't recall -- it's been 11 years
2   ago -- what actions were taken as a result of any piece
3   of market research.  I would, however, point out that
4   the TIMERx delivery system was the component of
5   the product that gave it its true -- what we called
6   that durable dosing, the true-12-hour dosing -- because
7   that was the long-acting component.
8           Whether they're making a leap -- and I
9   don't know how -- who makes the comment that it's a
10  good discussion point.  It's not necessarily written
11  here that that's what they were doing, but certainly
12  concerning that somebody made that kind of analysis or
13  characterization, but certainly using TIMERx to
14  differentiate Opana ER based on its dosing interval was
15  part of the message.
16      Q.   (By Ms. Scullion)  But it wasn't part of
17  the message that it would be a response to a concern
18  about abuse; correct?
19      A.   Never.  And that's -- and while it says it
20  could be here, it's not saying that that's what they're
21  doing either.
22      Q.   Did you try to find out whether that's
23  what they were doing?
24      A.   Again, that's 11 years ago.  I don't

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1    recall what I did in response to really a lot of
2    individual market research findings.
3         Q.    That would have been a pretty serious
4    concern if reps were out there giving a message about a
5    Schedule II controlled substance having a low abuse
6    profile -- it would have been a concern; right?
7              MR. LIMBACHER:  Object to form.
8         A.    Yes.  And typically when we find those
9    kinds of things, we would take the time to either
10   correct the behavior, notify their management, a number
11   of different things we might have done to ensure that
12   the rep is actually staying within the guidelines of
13   what is approved for the product.
14        Q.    (By Ms. Scullion)  But you don't remember
15   actually doing any of that; correct?
16             MR. LIMBACHER:  Object to form.  Asked and
17   answered.
18        A.    I don't remember what response in this
19   particular market research -- you know, I just don't
20   recall if we did or if we didn't.
21             MS. SCULLION:  And can I have E1387,
22   please?
23        Q.    (By Ms. Scullion)  Well, in fact, though,
24   what you did was continue to cite the research showing

Page 211

1    perceptions of low abuse potential in the brand plants?
2    That's what you did; right?
3              MR. LIMBACHER:  Object to form.
4         A.    That's a different element.  That's taking
5    an opportunity, trying to understand if there's an
6    opportunity, and how we can make that reality through
7    cognition study or the other kinds of studies that we
8    could ultimately develop to understand this nuance of
9    CNS differences.  And is there a way to improve the
10   product or to articulate the benefits of the product
11   with appropriate research?  That's different than
12   telling the sales reps promote on low abuse potential,
13   which we never did.
14        Q.    (By Ms. Scullion)  The perception -- the
15   CNS differences -- did Endo ever find out whether in
16   fact in 2007-2008 the clinicians that its sales reps
17   are calling on had determined that Opana ER had a
18   different CNS effect?
19             MR. LIMBACHER:  Object to form.
20   Foundation.
21        A.    I guess I don't understand what you mean
22   by that.
23        Q.    (By Ms. Scullion)  Well, again, you're
24   still assuming that the ATU results are stemming from

Page 212

1    clinicians' experience with the CNS -- CNS -- sorry --
2    CNS effect of Opana ER; right?  That's your assumption?
3              MR. LIMBACHER:  Objection.  Object to
4    form.  I think you've misstated his testimony.
5         Q.    (By Ms. Scullion)  If I have, please let
6    me know.
7         A.    So I'm still not sure I understand exactly
8    what you're asking me about the CNS effect.  Could --
9    one more time, please?
10        Q.    (By Ms. Scullion)  Did Endo ever determine
11   whether physicians' perception of Opana ER as having a
12   low abuse potential was in fact based on the
13   physicians' experiences with the CNS effect of Opana
14   ER?
15             MR. LIMBACHER:  Objection.  Form and
16   foundation.
17        A.    I don't know if they did or not.
18        Q.    (By Ms. Scullion)  Okay.  Let's go to
19   Exhibit 18.
20             MR. LIMBACHER:  Thank you.
21             MS. SCULLION:  Yeah.
22             [Exhibit Endo-Bingol-018 marked for
23             identification.]
24        Q.    (By Ms. Scullion)  And Exhibit 18 is

Page 213

1    Bates-stamped Endo CHI_LIT 00024398, and we have
2    stamped in the upper right-hand corner E1387.  And Mr.
3    Bingol, you can see on Page 1387.3, which is the title
4    page, that this is the 2009 Opana brand strategic plan
5    listing you on the front page dated December of 2008.
6    Is Exhibit 18 your 2008 Opana brand strategic plan?
7              MR. LIMBACHER:  Take your time and review
8    the document.
9         Q.    (By Ms. Scullion)  Have you had a chance
10   to review Exhibit 18?
11        A.    Yes.
12        Q.    And is it in fact your 2009 brand
13   strategic plan for Opana?
14        A.    Yes.
15        Q.    Okay.  And again, this is dated December
16   of 2008.  That would be approximately when you put it
17   together; right?
18        A.    Yes.
19        Q.    Okay.  And if you turn to Page E1387.28.
20   This is a slide summarizing the positive clinical
21   profile, challenges within our control.  Do you see
22   that?  Looking at the title of the slide.
23        A.    I do.
24        Q.    And listed here among the advantages of

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1  Opana ER -- if you go down, the sixth bullet point --
2  one of the advantages of Opana ER listed in the brand
3  strategic plan is low abuse potential; right?
4      A.  Correct.
5      Q.  And again, the source cited for that is
6  the monthly ATU -- sorry, lower right-hand corner of
7  this slide says source, monthly ATU conducted by RBD,
8  data from Wave 4 April 2008; right?
9      A.  That's correct.
10     Q.  So the data from April of 2008 is still
11 showing clinicians having a perception of Opana ER as
12 having low abuse potential; right?
13         MR. LIMBACHER: Object to form.
14     A.  That is correct.
15     Q.  (By Ms. Scullion)  So Endo knows that that
16 misunderstanding, misperception, false fact about its
17 product is persistent through this period; correct?
18         MR. LIMBACHER: Object to form.
19     A.  It's a finding that continues to occur.
20     Q.  (By Ms. Scullion)  So it's a false
21 understanding about Opana ER that continues to persist
22 among clinicians until at least April of 2008; right?
23         MR. LIMBACHER: Object to form.
24     A.  Again, how the perception is derived and

Page 215

1  what it means in a particular -- and how a clinician
2  determined that that's what they feel about the
3  product -- this is letting us know that that's a
4  perception, but you know, it's not a message.  It's not
5  the way we promoted the product.  And some of the
6  perceptions that they have on the products beyond this
7  are also incorrect, but that's a perception that that
8  was persistent.
9      Q.  (By Ms. Scullion)  This is a false
10 perception about the product that continues to persist?
11 That's the question.
12     A.  I don't know if -- how false or true it is
13 in the sense of if in a doctor's mind nobody's asking
14 for it by name and coming into their office, they may
15 say, oh, this has got less of abuse potential because I
16 don't have, you know, 20 people knocking on my door
17 coming and asking for this product by name.  That's the
18 way they characterize what they are seeing in their
19 practice.  It is not a perception or not a message that
20 we promoted on, and we didn't create any promotional
21 materials or instruct the sales force to use this as a
22 primary promotional message.
23     Q.  (By Ms. Scullion)  But you're citing it --
24     A.  Because it's --

Page 216

1      Q.  -- in the brand plan -- excuse me -- as
2  an advantage of Opana ER, not just passively, allowing
3  it to persist.  You're now citing it as an advantage in
4  the brand strategic plan; correct?
5          MR. LIMBACHER: Object to form and I think
6  you're misstating the document.
7      A.  We are reporting what is being cited by
8  customers, not that we are citing it per se.  This is
9  what the data show.
10     Q.  (By Ms. Scullion)  And it's -- you're
11 citing it -- it says the brand strategic plan for Opana
12 for 2009, and this research is being cited in that
13 strategic plan; right?
14         MR. LIMBACHER: Object to form.  The
15 document speaks for itself.
16     A.  As we cite any other research that we
17 stick into our brand plans.
18     Q.  (By Ms. Scullion)  Well, you're not citing
19 it and saying this is a perception that we need to
20 correct because Opana ER has in fact the same abuse
21 profile as all other Schedule II opioids?  It's not
22 what you're doing in this plan; right?
23     A.  What we're doing is continuing to promote
24 the product in an ethical and compliant manner,

Page 217

1  regardless of what that perception is.
2      Q.  Didn't matter what the perception was?
3  Didn't matter if it was a false perception in the
4  market?
5          MR. LIMBACHER: Object to form to the
6  extent that's a question.
7      Q.  (By Ms. Scullion)  Did it?
8          MR. LIMBACHER: Same objection.
9      A.  Again, because that perception is derived
10 by clinicians' experience perhaps and how they defined
11 it and how they saw it within their population.  It's
12 not so easy to say we're going to go in and make
13 that -- clarify it.  I don't know why they're saying
14 that per se, but that's what they are indicating.
15     Q.  (By Ms. Scullion)  Well, that's the
16 problem, though, isn't it?  You didn't know why this
17 perception was persistent?  You didn't know if it was
18 in fact because, as we saw, sales reps were improperly
19 getting a message that, for example, TIMERx affected
20 the abuse profile?  Didn't know whether that was in
21 fact the source of that perception; right?
22         MR. LIMBACHER: Object to form on multiple
23 grounds, and you've also misstated the evidence,
24 counsel.

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1    A.   So again, I've sort of lost track of your
2    question.  Sorry.
3        Q.   (By Ms. Scullion)  You still didn't know
4    where that perception was in fact coming from; right?
5        MR. LIMBACHER:  Object to form.  Asked and
6    answered.
7        A.   The perception could be multifactorial.
8        Q.   (By Ms. Scullion)  Could be, but still as
9    of December 2008 you still didn't know where it was
10   coming from?
11       MR. LIMBACHER:  Object to form.  Asked and
12   answered.
13       A.   I don't recall that we did any kind of
14   research to determine the origin of that.
15       Q.   (By Ms. Scullion)  And you didn't know one
16   way or the other whether in fact the perception may be
17   coming from improper messaging coming from sales reps?
18   Just didn't know that at that point; right?
19       MR. LIMBACHER:  Object to form.
20       A.   Again, that perception is probably
21   multifactorial.  I have no -- I don't know where it
22   came from.  I can tell you again that it was not based
23   on materials or promotional training that we gave our
24   organization.

Page 219

1        Q.   (By Ms. Scullion)  But you didn't know
2    whether, nonetheless, it was coming from the detailing
3    by sales reps?
4        A.   I don't know where it came from.
5        Q.   Correct.  Okay.
6        MR. LIMBACHER:  Object to form.  I think
7    he just answered that question.  Are we at a good
8    stopping point?  We've been going about an hour.
9        MS. SCULLION:  Yeah, we can stop here.
10       MR. LIMBACHER:  Thank you.
11       THE VIDEOGRAPHER:  Off the record at 3:32
12   PM.
13       [A brief recess was taken.]
14       THE VIDEOGRAPHER:  We're back on the
15   record at 3:50 PM.
16       Q.   (By Ms. Scullion)  Back, Mr. Bingol.  Hand
17   you what's been marked as Exhibit 19.  And Exhibit 19
18   is Bates-stamped Endo CHI_LIT 00547543, and we've
19   marked it as E914.  And Mr. Bingol, do you recognize
20   this exhibit as the final report for Opana ATU W6 dated
21   December 2008?
22       [Exhibit Endo-Bingol-019 marked for
23   identification.]
24       MR. LIMBACHER:  Take your time and review

Page 220

1    the document.
2        Q.   (By Ms. Scullion)  And Mr. Bingol, just
3    for your reference, I'm only going to be asking you
4    about one aspect of this report, if you'd like to turn
5    to Page E914.108.
6        A.   08?
7        Q.   Yeah.  .108.
8        MR. LIMBACHER:  Yeah --
9        A.   Oh, Page 108.
10       MR. LIMBACHER:  -- you can flip through
11   it just to make sure that --
12       A.   Yeah.
13       MR. LIMBACHER:  -- you have an
14   understanding of the context of the report.
15       Q.   (By Ms. Scullion)  Are you on Page
16   E914.108?
17       A.   Yes, but I'm still taking a quick look
18   to --
19       Q.   Sure.
20       A.   Okay.
21       Q.   Okay.  And so again, do you recognize the
22   exhibit as a copy of the Opana ATU W6 final report
23   dated December 2008?
24       A.   I do.

Page 221

1        Q.   Okay.  And this is another wave of the
2    same ATU studies we've been looking at earlier;
3    correct?
4        A.   That's correct.
5        Q.   All right.  And actually, before we get to
6    Page 108, if you'll go to Page 914.6, which discusses
7    the background.  And the background section, it states
8    in the last bullet point, in order to provide strategic
9    input to help maximize the market potential and
10   continue tracking changes in the ATU measures, Endo
11   conducted -- just completed a sixth wave, W6, of this
12   study.  So that indicates that this is a report on Wave
13   6, that the Wave 6 was just conducted right prior to
14   December of 2008; correct?
15       A.   That's correct.
16       Q.   Okay.  And then, again, if you'll -- now
17   if you'll turn to Page E914.108.  And here again, we
18   see a report of advantages and disadvantages of Opana
19   ER by specialty, and it's -- to W6.  That's Wave 6;
20   correct?
21       A.   That's correct.
22       Q.   And in the advantages section, once again,
23   it's listing low abuse potential as an advantage cited
24   by PCPs.  Do you see that column?

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1           MR. LIMBACHER: Object to form.
2       A.  Yes.
3       Q.  (By Ms. Scullion) Let's be clear and make
4   sure -- let me do this a little bit better. How's
5   that? If you look under the left-hand side under
6   advantages, do you see under safety tolerability, fewer
7   side effects, the entry for low abuse potential?
8       A.  Yes.
9       Q.  And then moving to the right, you see
10  under the column for PCPs, there's an entry for 10;
11  correct? N equals 10?
12      A.  Yes.
13      Q.  And PCP there refers to primary care
14  physicians; right?
15      A.  Yes.
16      Q.  We also see, moving to the right, next
17  column, for non-hospital pain. That would be pain
18  specialists outside of the hospital; right?
19      A.  That's correct.
20      Q.  We see N equals eight listed for low abuse
21  potential; correct?
22      A.  That's correct.
23      Q.  Then for the in-hospital pain, we see N
24  equals four listed for low abuse potential; correct?

Page 223

1       A.  That's correct.
2       Q.  And those are indications of the fact that
3   certain primary care physicians, non-hospital pain
4   specialists, and in-hospital pain specialists were
5   reporting a perception of low abuse potential for Opana
6   ER as a perceived advantage of the product; correct?
7           MR. LIMBACHER: Object to form.
8       A.  That's how they responded.
9       Q.  (By Ms. Scullion) Okay.
10          MS. SCULLION: And can I have 912, please?
11  Thank you.
12      Q.  (By Ms. Scullion) Hand you what's been
13  marked as Exhibit Number 20.
14          [Exhibit Endo-Bingol-020 marked for
15          identification.]
16          MR. LIMBACHER: Thank you.
17      Q.  (By Ms. Scullion) And it is Bates-stamped
18  Endo CHI_LIT 00545916, and we have stamped it as E912.
19  And Mr. Bingol -- make sure I have the same document.
20  912? Okay. Thank you. And Exhibit 20. This is the
21  2007-2011 business plan for Opana ER dated September
22  21st, 2006; correct?
23          MR. LIMBACHER: Take your time and look at
24  the document.

Page 224

1       Q.  (By Ms. Scullion) And again, I'm just
2   going to be asking you about one page in Exhibit 20.
3   As you're looking through the document, I'm going to be
4   focusing on the SWOT analysis, which begins on Page
5   nine -- sorry -- 912.18.
6       A.  Okay.
7       Q.  So Exhibit 20 is a copy of your September
8   21st, 2006, business plan for 2007 to 2011; correct?
9       A.  Correct.
10      Q.  If you look on --
11      A.  I don't recall this particular version,
12  but that's what it says.
13      Q.  Okay. And if you'll turn to Page E912.20
14  within the SWOT analysis, the section labeled
15  weaknesses. Do you see that?
16      A.  Yes.
17      Q.  Okay. And the first weakness listed as of
18  September 2006 was perception of oxymorphone as a
19  me-too opioid may slow physician adoption of Opana and
20  formulary acceptance. Is that accurate that at that
21  time that was a weakness for Opana?
22      A.  As I said, I don't particularly recall
23  this version of the document, but that's what was
24  written here.

Page 225

1       Q.  Do you recall that in the fall of 2006
2   that was a perceived weakness for Opana?
3           MR. LIMBACHER: Object to form.
4       A.  Again, I don't recall a lot of specific
5   details from 13 years ago, but if that's what's written
6   here, then I assume it must have been a concern.
7       Q.  (By Ms. Scullion) Okay. If you go to the
8   next page, E912.21, under opportunities. The third
9   bullet point from the bottom refers to JCAHO
10  guidelines, refer to pain as the fifth vital sign and
11  require appropriate diagnosis and treatment of pain for
12  all patients. Do you know what's referred to there by
13  the JCAHO guidelines?
14      A.  I don't recall the acronym.
15      Q.  Do you recall guidelines referring to pain
16  as the fifth vital sign?
17      A.  Yes. There were -- there was a movement
18  to address undertreatment of pain and pain as the fifth
19  vital sign was kind of their tag line, if you will, in
20  terms of trying to create the awareness of appropriate
21  pain management for the appropriate patients.
22      Q.  And Endo regarded that as an opportunity
23  for Opana ER?
24          MR. LIMBACHER: Object to form.

57 (Pages 222 to 225)

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1      A.   Yeah, again, I don't know what Endo
2  regarded.
3      Q.   (By Ms. Scullion) How about you?
4      A.   Certainly it raised the awareness of
5  needing to treat patients with pain properly,
6  appropriately, and hopefully take patients who are not
7  currently being treated and getting them the relief
8  they need, and that would -- of course, is an
9  opportunity to have a positive effect on the overall
10  pain market, not just Opana ER, but rather the
11  opportunity on a market-wide basis.
12      Q.   And then the next bullet point discusses
13  leverage Endo's relationship with external parties in
14  order to gain top-of-mind awareness for the Opana brand
15  with societies, KOLs, et cetera.  You mentioned earlier
16  in your testimony APF, the American Pain Foundation.
17  Was that an external party that Endo had a relationship
18  with in the fall of 2006?
19      A.   I don't recall when the relationships were
20  or weren't, but we -- at some point in time we worked
21  with them, with the American Pain Foundation.
22      Q.   Okay.  And was the American Pain
23  Foundation an example of an external party with whom
24  Endo sought to leverage its relationship in order to

Page 227

1  gain top-of-mind awareness with the Opana brand with
2  societies, KOLs, et cetera?
3      MR. LIMBACHER: Object to form.
4      A.   I guess it could have been categorized
5  that way.  I don't know if that was what's being
6  considered because it's not written here as such.  I
7  read societies and KOLs as being more around the
8  American College of -- the American Pain Society and
9  like professional societies -- KOLs -- but it could
10  certainly have been considered maybe an external party
11  also.
12      Q.   (By Ms. Scullion) Well, let me just ask
13  you this then more generally.  You did mention the APF.
14  What role did the APF play for you in connection
15  with -- let's start with the promotion of Opana ER.
16      A.   Yeah.  I think originally I said APS,
17  American Pain Society.
18      Q.   Oh, I'm sorry.  I misheard.
19      A.   So I was kind of getting a little confused
20  to --
21      Q.   Thank you.  So same question.
22      Q.   Versus the American Pain Foundation.
23      Q.   Let's do the AP -- the American Pain
24  Society.  What role did the American Pain Society play

Page 228

1  in connection with the promotion of Opana ER?
2      MR. LIMBACHER: Object to form and
3  foundation.
4      A.   In terms of promotion, none.  This is a
5  professional society with medical clinicians, and we
6  would either partner with them to sponsor an event for
7  them with -- through an unrestricted educational grant
8  or we would perhaps get a post represented there,
9  conduct symposia, those kinds of things for medical
10  education.
11      Q.   (By Ms. Scullion) Okay.  Was the same
12  true with respect to the American Pain Foundation, the
13  APF?
14      MR. LIMBACHER: Object to form.
15      A.   To my recollection, the American Pain
16  Foundation was more of a consumer organization than a
17  professional society.  It wasn't a medical -- it was
18  not a collection of clinicians, but rather a patient
19  advocacy group.
20      Q.   (By Ms. Scullion) And what connection did
21  the APF have to Endo's promotion of Opana ER, if any?
22      MR. LIMBACHER: Object to form.
23      A.   I don't recall specific tactics or
24  activities that we conducted with them.  I do recall

Page 229

1  that we had engaged with them on a number of occasions,
2  but I don't recall what those specifics were.
3      Q.   (By Ms. Scullion) Do you recall whether
4  you engaged with APF on the topic of supporting the use
5  of opioids generally, not just with respect to Opana
6  ER?
7      A.   Again, I don't recall specific topics of
8  engagement with the APF, but Endo often was a proponent
9  of the appropriate use of its medications and
10  appropriate patient selection for those products.
11      Q.   And that would have been with respect to
12  opioids generally, not just for Opana ER; correct?
13      A.   In general, we were a proponent of making
14  sure pain patients who were undertreated got the pain
15  management and the pain relief they needed.
16      Q.   And that would include, for example,
17  supporting the use of opioids when appropriate;
18  correct?
19      A.   When appropriate with the appropriate
20  patient.
21      Q.   And that support for the use of opioids
22  when appropriate for the appropriate patient, I think
23  you said -- that would have supported Endo's -- would
24  have supported the use of Opana ER; correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1           MR. LIMBACHER:  Object to form.
2      Q.    (By Ms. Scullion)  Let me ask it this way.
3      A.    Yeah.
4      Q.    That support -- Endo had multiple opioid
5    products.  It had branded, it had Opana ER, and Opana;
6    correct?
7      A.    Correct.
8      Q.    And it also had Percocet as a branded
9    product, although not actively promoted as of 2006
10   through detailing, et cetera; correct?
11     A.    That's correct.
12     Q.    And it had Endocet, which was the -- I
13   would call it branded generic; correct?
14     A.    Correct.
15     Q.    And then over time Endo also had generic
16   opioids through Qualitest (ph) as well; correct?
17     A.    I'm not sure exactly what products came
18   with Qualitest, but we had generic opioids.
19     Q.    Okay.  Okay.  And fair to say that Endo's
20   support of the appropriate use of opioids with those
21   appropriate patients would have benefitted all of those
22   opioid products, not just Opana ER, for example?
23     A.    And the --
24           MR. LIMBACHER:  Object to form.

Page 231

1      A.    And the use of products from other
2    companies or the use of the appropriate medication for
3    the appropriate patient that may not require opioids.
4    We also -- the idea there was to make sure that
5    patients of any kind that weren't being treated
6    properly were hopefully diagnosed correctly and
7    afforded the correct pain medication for their
8    condition.
9           MS. SCULLION:  Can I have 1531?
10     Q.    (By Ms. Scullion)  Hand you what's been
11   marked as Exhibit Number 21, and Exhibit Number 21 is
12   Bates-stamped Endo Opioid MDL 015949.17, and we have
13   marked it as E1531 in the upper right-hand corner.
14   Putting Exhibit 21 to the side for just one moment.  Do
15   you recall, Mr. Bingol, that Endo supported programs to
16   educate veterans on pain?
17          [Exhibit Endo-Bingol-021 marked for
18           identification.]
19     A.    No, I do not recall that.
20     Q.    Do you recall a book called Exit Wounds
21   that discussed the use of -- sorry -- the treatment of
22   pain for veterans?
23     A.    I don't recall that book.
24     Q.    Okay.  If you look at Exhibit 21, there's

Page 232

1    a series of e-mails that start at the back on Page
2    E1531.2.  It's an e-mail -- if you look at the very
3    bottom of the page -- from American Pain Foundation to,
4    it looks like, Annette Eyer at the Cullari Group.
5    Subject matter, treating pain, arming New Yorkers with
6    access.  Do you see that?
7      A.    I'm sorry, let me --
8      Q.    Sure.
9      A.    -- the whole thing.
10     Q.    You see the e-mail at the bottom of
11   E1531.2 that is forwarding the -- it's either a flyer
12   or a brochure that's on E1531.3?
13     A.    Yes.
14     Q.    Okay.  And if you look on E1531.3, this is
15   a brochure from the American Pain Foundation, and it's
16   referencing military and veterans pain care.  And if
17   you look on the left-hand side, you'll see there's a
18   featured article about exit wounds, a survival guide to
19   pain management for returning veterans and their
20   families.  Do you see that?
21     A.    Yes.
22     Q.    And then the brochure indicates the
23   American Pain Foundation is holding an
24   informational briefing on treating pain, arming New

Page 233

1    Yorkers with access, and among the features of
2    that briefing will be a presentation by -- it says
3    Charles Argoff is the first presentation, understanding
4    the clinical challenge of treating low back.  Do you
5    see that?
6      A.    Yes.
7      Q.    And Dr. Argoff -- he was a KOL in
8    connection with Opana ER; correct?
9      A.    Yes.
10     Q.    Did you ever meet him?
11     A.    Yes.
12     Q.    Okay.  Roughly how many times?
13     A.    I would really be guessing.
14     Q.    A few times?
15     A.    Yes.
16     Q.    Okay.  And if you keep going down on the
17   flyer, the next-to-last entry says Derek McGinnis,
18   story author of Exit Wounds, a Survival Guide to Pain
19   Management for Returning Veterans and Their Families.
20   Do you see that?
21     A.    Yes.
22     Q.    Okay.  And then so going back to E1531.2.
23   It's going -- now following the e-mail chain.  It goes
24   from the American Pain Foundation to Ms. Eyer at

59  (Pages 230 to 233)

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1   Cullari Group.  Was Cullari Group an agency that Endo
2   had engaged?
3        A.   That name is -- that company is actually
4   very foreign to me.  I don't recognize that.
5        Q.   Okay.  But if you go up on Page 1531.2,
6   Ms. Eyer forwards the e-mail on to Greg Thomas,
7   Jennifer Wagner (ph), and someone named M. Gizzi at the
8   Cullari Group.  And Mr. Thomas was the senior director
9   of state government affairs for Endo Pharmaceuticals;
10  correct?
11       A.   I really don't remember, but --
12       Q.   Well, if you look at the next e-mail up
13  the chain, you see Mr. Thomas's signature block?
14       A.   Right.
15       Q.   He identifies himself as senior director,
16  state government affairs; correct?
17       A.   That is correct.
18       Q.   Okay.  Going back to Ms. Eyer's e-mail to
19  Mr. Thomas, she's asking to confirm if Endo -- if you
20  would like Endo's logo on the invitation, and the
21  invitation being referenced is this invitation on Page
22  E1531.3.  Do you see that?
23       A.   Yes.
24       Q.   Okay.  And then Mr. Thomas asks you to see

Page 235

1   her -- see questions below relating to having our logo
2   or a statement related to Endo on the invite.  What are
3   your thoughts?  Mr. Thomas was coming to you because
4   you were a director of marketing for Opana ER at that
5   point; correct?
6        MR. LIMBACHER:  Object to form.
7        A.   I'm not sure of his motivation of why he's
8   coming to me, but he obviously e-mailed me.
9        Q.   (By Ms. Scullion)  Okay.  And then if you
10  go to the first page, E1531.1, at the very bottom is
11  your response to Mr. Thomas, and you say I think having
12  our name on this is fine; right?
13       A.   That was an opinion I had, but also
14  qualified it by we needed to run by legal because I'm
15  not the expert to make that determination.
16       Q.   But from a marketing promotion
17  perspective, you thought it would be fine to have
18  Endo's name on the American Pain Foundation
19  invitation --
20       A.   No.
21       Q.   -- invitation subject to legal review?
22       MR. LIMBACHER:  Object to form.
23       A.   No, my -- I thought it was fine based on
24  the regulations and promotional guidelines that we had,

Page 236

1   but again, I suggested we check with legal to ensure
2   compliance.
3        Q.   (By Ms. Scullion)  Fair to say you didn't
4   think having Endo's name on the American Pain
5   Foundation invitation would be harmful to Endo's
6   promotion of any of its opioid products; correct?
7        MR. LIMBACHER:  Object to form.
8        A.   No.  It was a common practice to sponsor
9   and support these kinds of third-party initiatives, and
10  having the name on it was not detrimental to Endo.
11       Q.   (By Ms. Scullion)  Okay.  You described
12  for us the American Pain Foundation -- I think you said
13  it was a consumer-oriented organization with respect to
14  treatment of pain; correct?
15       A.   That's probably a misnomer.  More a
16  patient advocacy.
17       Q.   Okay.  Fine.  A patient advocacy
18  organization.  And you have been involved with the APF
19  for a number of years yourself; correct?
20       MR. LIMBACHER:  Object to form.
21       Q.   (By Ms. Scullion)  Let me ask you this
22  way.  You've been involved with the APF going back to
23  your days at Adolor; correct?
24       MR. LIMBACHER:  Object to form.

Page 237

1        A.   Again, I don't recall the APF and how
2   often I interacted with him.  I know we had a
3   relationship over some period of time.  I don't recall
4   it being overly -- I just don't recall the interaction
5   that we had.  I -- as I said, I don't even recall this
6   particular initiative.
7        MS. SCULLION:  Okay.  Can I have E1511?
8        Q.   (By Ms. Scullion)  Let me hand you what's
9   been marked as Exhibit Number 22, and Exhibit Number 22
10  is Bates-stamped PPLPC 023000090853.  And we have
11  stamped it in the upper right-hand corner E1511.  Mr.
12  Bingol, do you recognize Exhibit 22 as an e-mail
13  from -- if you look down about two-thirds of the way
14  down for a page -- from Bonnie Weissfeld, and it's to a
15  number of people, including -- you come in on the -- a
16  third of the way down in the top, on the right-hand
17  side.  Do you see Demir Bingol, dbingol@adolor.com?
18       [Exhibit Endo-Bingol-022 marked for
19       identification.]
20       A.   Yes, I do.
21       Q.   Okay.  And that was your e-mail address
22  at Adolor; correct?
23       A.   Yes.
24       Q.   Okay.  And it's dated April 2006.  You

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1    were employed by Adolor at that time; right?
2        A.   Yes.
3        Q.   Okay.  And Ms. Weissfeld, if you look at
4    the body of her e-mail on the first page, says, as you
5    know, the APF corporate round table will be meeting in
6    San Antonio on May 3rd.  Attached is the agenda.  Did
7    you ever attend any APF corporate round table events
8    while at Adolor?
9        A.   No, not that I recall.
10       Q.   Okay.  If you look back up at the e-mail
11   addresses, right before your e-mail is the e-mail
12   address of Debra Travers, travers.debbie@endo.com.  Do
13   you know who Ms. Travers was?
14       A.   Yes.
15       Q.   Who was she?
16       A.   You want to know what job she did, or --
17       Q.   Yes.  What was her title?
18       A.   Well, it changed over time.
19       Q.   Position.  Position.
20       A.   She was product manager when I came to
21   Endo.
22       Q.   Did she have responsibilities for Opana ER
23   when you joined Endo?
24       A.   Yes.

Page 239

1        Q.   Okay.  Did you have any interactions with
2    Ms. Travers before you joined Endo?
3        A.   No.
4        Q.   All right.  And to the best of your
5    knowledge, you did not go to this APF corporate round
6    table meeting in San Antonio?
7            MR. LIMBACHER:  Objection.  Asked and
8    answered.
9        A.   No.
10       Q.   (By Ms. Scullion)  Okay.
11           MS. SCULLION:  Could I have 1278?
12       Q.   (By Ms. Scullion)  What do you recall
13   Adolor's relationship was with the APF while you were
14   employed by them?
15       A.   Honestly, until you brought it up here, I
16   never even considered -- I couldn't remember that we
17   had a relationship with the APF.  I don't have any
18   recollection of that.
19       Q.   Okay.  I'm going to hand you what's been
20   marked as Exhibit Number 23.
21           [Exhibit Endo-Bingol-023 marked for
22           identification.]
23       A.   Thank you.
24       Q.   And Exhibit 23 is Bates-stamped CHI

Page 240

1    000254752.  And we have stamped it E1278.  And Mr.
2    Bingol, again, this is an e-mail chain.  I'm interested
3    to ask you about the very first e-mail in the chain on
4    Page E1278.2, which is where your name appears.  Do you
5    see the e-mail from Mary Bennett --
6        A.   I'm sorry.  I just wanted to --
7        Q.   Sure.
8        A.   -- orient myself.  Okay.
9        Q.   So going to Page E1278.2, the e-mail at
10   the bottom of the page from Mary Bennett at
11   painfoundation.org, and it's directed to yourself,
12   Linda Kitlinski, David Kerr, and others at Endo.
13   Subject Endo/APF meeting.  And in the e-mail Ms.
14   Bennett discusses a meeting that took place the prior
15   week in Chadds Ford.  Did you attend a meeting in
16   Chadds Ford between Endo and the APF in early June or
17   late May of 2006?
18       A.   I don't recall such a meeting, but it's
19   possible.
20       Q.   Do you recall attending any APF meetings
21   while you were employed with Endo?
22       A.   Nothing -- no specific meeting.
23       Q.   Do you recall any general interactions
24   with APF while you were at Endo?

Page 241

1        A.   I think perhaps -- I remember Will Rowe,
2    who was heading it up, just because I can see his
3    face in my head.  I know I must have interacted with
4    him a couple of times, but I don't remember specific
5    sessions or meetings like this.
6        Q.   Okay.  And if you go into Ms. Bennett's
7    note, she says in the first paragraph -- she says,
8    pleasure meeting you, thank you for taking the time to
9    share information about Endo, providing us
10   an opportunity to share our accomplishments.
11           In her last sentence, she says, in
12   addition, we appreciate the rich discussion regarding
13   our quote -- "mission match" -- closed quote -- the
14   challenges we all face to improve pain management, and
15   potential ways we might work together.  Understanding
16   you don't recall the specific meeting, do you recall
17   that Endo did share -- had a shared mission with the
18   APF with respect to improving pain management and
19   potential ways that Endo and the APF might work
20   together?
21           MR. LIMBACHER:  Object to form.  I think
22   you misstated his testimony.
23       Q.   (By Ms. Scullion)  I'm sorry.  Did I
24   misstate your testimony?  I thought you said you did

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1    not recall a specific meeting.
2        MR. LIMBACHER: I think he testified he
3    doesn't recall attending this meeting.
4        Q.   (By Ms. Scullion) Okay.  Understanding
5    that you don't recall attending this meeting, do you
6    recall in general, though, that Endo and the APF did
7    have a shared mission with respect to the challenges
8    faced in improving pain management and potential ways
9    to work together?
10       MR. LIMBACHER: Object to form.
11       A.   I don't recall how the missions were
12   perfectly aligned or not.  Certainly both organizations
13   have an interest in seeing the betterment of pain
14   management.
15           This is a relationship that's typically
16   managed through somebody like Linda Kitlinski and
17   through her team, so it's not something I would be
18   necessarily intimately involved in, which is probably
19   why I don't remember all of the interactions.  I was
20   not necessarily part of that -- those interactions on a
21   regular basis if I was -- you know, to the extent that
22   I was.
23       Q.   (By Ms. Scullion) But based on what you
24   just said, you would agree with Ms. Bennett's

Page 243

1    characterization in her closing sentence that there was
2    a common goal to improve pain management between Endo
3    and APF; correct?
4        A.   I can say that it was Endo's goal to make
5    sure that pain management was improving around the
6    country, and I assume it was a match for their mission
7    statement as well.  I can't speak to that.
8        Q.   Based on your interactions with the APF
9    while at Endo, do you recall generally that was a
10   common goal of the two organizations?
11       MR. LIMBACHER: Objection.  Form and
12   foundation.
13       A.   Again, unfortunately, I don't really
14   recall all the specifics around what we were doing with
15   the APF and how it related to their mission or --
16   mostly because I was tangentially involved in the
17   management part of it.  This was really done by a
18   different department.
19       Q.   (By Ms. Scullion) After leaving Endo, you
20   worked for a period of time at -- is it Welldoc (ph)?
21       A.   Correct.
22       Q.   And then you joined Grunenthal; correct?
23       A.   That's correct.
24       Q.   And at Grunenthal did you again become

Page 244

1    engaged with the APF?
2        MR. LIMBACHER: Object to form.
3        A.   Not to my knowledge.
4        Q.   (By Ms. Scullion)  Do you recall -- do you
5    know whether Grunenthal had involvement with the APF?
6        A.   Perhaps.  Perhaps.
7        Q.   Do you recall making an introduction of
8    Grunenthal to Burt Rosen at Purdue in connection with
9    the APF?
10       A.   I mean, I know who Burt Rosen is.  I don't
11   recall specifically that interaction.
12       Q.   See if we can refresh your recollection
13   here.  Let me show you what's been marked as Exhibit
14   Number 24, and Exhibit Number 24 is Bates-stamped PPLPC
15   012000432942, and we have stamped it E1514 in the top
16   right-hand corner.  Directing your attention to the
17   e-mail at the bottom of 1514 from Burt Rosen to James
18   Dolan, Philip Strassburger, John Stewart (ph), Allen
19   Must (ph).  Subject matter Grunenthal intelligence.
20   And this is dated July 2013.  Again, you said you know
21   Mr. Rosen; correct?
22       A.   Yes.  Met him a couple of times.
23       Q.   And he was an executive at Purdue?
24       A.   I don't know his title, but a Purdue

Page 245

1    employee.
2        Q.   Do you recall what his area of
3    responsibility was, to your understanding?
4        A.   Government affairs.
5        Q.   Okay.  How did you know Mr. Rosen?
6        A.   I don't recall how the introduction was
7    made.  I think -- well, perhaps through our government
8    affairs contractor, we had somebody helping us with our
9    participation in government affairs that knew Mr. Rosen
10   and made a connection that way.
11       Q.   When you say our, you mean Grunenthal's --
12   Grunenthal had contracted in someone to help it with
13   government affairs issues?
14       A.   Correct.
15       Q.   Who was that?  Was it Dan Cohen (ph)?
16       A.   Yes.  Thank you.
17       Q.   Okay.  And so Mr. Rosen, from what you
18   know of him, you wouldn't expect him to misrepresent or
19   misreport on a meeting he had had with you; right?
20       MR. LIMBACHER: Object to form.
21       A.   I have no reason to suspect that he would.
22       Q.   (By Ms. Scullion) Okay.  And in his
23   e-mail, Mr. Rosen says, just FYI, I just had a fun
24   meeting with Dr. Alexander Kraus, VP product

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1    development and technical affairs, and A. Demir Bingol,
2    VP business expansion.  Seeing this, do you recall
3    having a meeting with Mr. Rosen attended also by Dr.
4    Alexander Kraus in July of 2013?
5        A.   I don't recall the specific meeting.
6        Q.   Okay.  And as it says, Dr. Kraus -- he was
7    VP product development and technical affairs for
8    Grunenthal at that time?
9        A.   That is correct.
10       Q.   And Mr. Rosen says in terms of the
11   meeting, they, meaning you and Mr. Kraus, were mostly
12   interested in the pain care forum and how they could
13   contribute to the overall public policy debate on ADF.
14   Do you see that?
15       A.   I do.
16       Q.   Did Grunenthal in July of 2013 have an
17   interest in working with the pain care forum?
18            MR. LIMBACHER:  Object to form.
19       Q.   (By Ms. Scullion)  What was the pain care
20   forum?
21       A.   I'm not sure I can describe it.  Just --
22   it was a -- I don't recall their mission or how they
23   were formed, but it was, I guess, a group of
24   like-minded organizations working to improve pain

Page 247

1    management.
2        Q.   Was Purdue one of those organizations?
3        A.   I don't recall the organizations or the
4    list of membership or how that was formed.
5        Q.   Was Grunenthal looking to be part of the
6    pain care forum?
7        A.   There was some interest there.  Mostly
8    Alexander's responsibility.  He was also our government
9    affairs lead.  I was -- my role there -- I'm not
10   even -- I don't even recall the meeting, so I can't
11   really provide more detail than that.
12       Q.   And when Mr. Rosen references an interest
13   by yourself and Dr. Kraus and how they could contribute
14   to the overall public policy debate on ADF.  Was
15   Grunenthal looking to contribute to the public policy
16   debate at that time on ADF abuse deterrents,
17   formulations?
18            MR. LIMBACHER:  Object to form.
19       A.   Yes.
20       Q.   (By Ms. Scullion)  Why was Grunenthal
21   interested in contributing to that debate?
22            MR. LIMBACHER:  Object to form.  And I
23   would caution the witness not to disclose any
24   proprietary information.

Page 248

1        A.   The interest being that we have ADF
2    technology and obviously wanted to participate in
3    trying to ensure that -- trying to understand more than
4    ensure where the debate was going, what is happening
5    with the acceptance of ADF technologies.
6             It was a growing and evolving construct,
7    seemingly always changing and a moving target and being
8    involved in part of that to understand exactly how that
9    market was going to evolve and where we're going to fit
10   and how we're going to play in it.
11       Q.   And did you understand that Purdue also
12   had an interest in the ADF public policy debate at that
13   time?
14            MR. LIMBACHER:  Object to form and
15   foundation.
16       A.   I understood that most manufacturers of
17   long-acting opioids -- in fact, other kinds of products
18   as well -- the ADF debate or as it's written here, you
19   know -- is broader than just long-acting opioids --
20   we're interested to some extent.
21       Q.   (By Ms. Scullion)  But that would -- so
22   the debate would include, though, as you said, most
23   manufacturers of long-acting opioids at that point,
24   including Purdue; correct?

Page 249

1             MR. LIMBACHER:  Object to form.
2        A.   I don't -- I can't characterize or speak
3    for Purdue and what they wanted to do and I don't know
4    who -- to what level of interest any one company had.
5        Q.   (By Ms. Scullion)  Did you understand that
6    Endo had an interest in the public policies
7    concerning ADF at that time?
8             MR. LIMBACHER:  Object to form.  I'd point
9    out he did not work at Endo at that time.
10       Q.   (By Ms. Scullion)  If you had any
11   knowledge of that.
12            MR. LIMBACHER:  Foundation.
13       A.   I don't recall specifically what Endo
14   wanted to do with public policy at that time.  I just
15   don't have a recollection.
16            MS. SCULLION:  Okay.  We're going to take
17   a quick break.  I apologize.  I need to take a phone
18   call.
19            THE VIDEOGRAPHER:  Off the record at 4:39
20   PM.
21            [A brief recess was taken.]
22            THE VIDEOGRAPHER:  We're back on the
23   record at 4:50 PM.
24       Q.   (By Ms. Scullion)  Let me hand you what's

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1  been marked as Exhibit 25, and Exhibit 25 is
2  Bates-stamped PPLP 004270602, and we've marked it E1515
3  in the top right-hand corner.  And Mr. Bingol, you'll
4  see in the middle of Page E1515 is an e-mail from Dr.
5  Alexander Kraus to Burt Rosen dated July 19th, 2013.
6  You are CC'ed and the subject is follow-up.
7          And this appears to be, again, an e-mail
8  from Dr. Kraus now to Mr. Rosen in reference to the
9  meeting referenced in Exhibit 24.  And the question is
10  just, in looking at Exhibit 25, does that refresh your
11  recollection at all further about that meeting?
12          [Exhibit Endo-Bingol-024 marked for
13          identification.]
14          [Exhibit Endo-Bingol-025 marked for
15          identification.]
16          MR. LIMBACHER:  Take your time and review
17  the document.
18      A.  Just -- not beyond the fact that I know we
19  met with him.
20      Q.  (By Ms. Scullion)  And does it at all
21  refresh your recollection about what was discussed
22  during the meeting?
23          MR. LIMBACHER:  Object to form.  Asked and
24  answered.

Page 251

1      A.  Not specifically.  I mean, I don't recall
2  the meeting other than the general fact that we had a
3  meeting with him.
4      Q.  (By Ms. Scullion)  Okay.
5      A.  I believe in his office, as I recall.
6      Q.  Okay.  Did Grunenthal reach out to any
7  other opioid manufacturers in this time frame, July
8  2013, to discuss potential involvement with the pain
9  care forum?
10      A.  I don't really know.  Again, that was more
11  Alexander's role to do those things, so I don't know
12  who he contacted.
13      Q.  Okay.  You mentioned earlier Mr. Will
14  Rowe.  Do you recall that he was a CEO of the American
15  Pain Foundation?
16      A.  Yes.
17      Q.  Okay.  And Endo was involved with the pain
18  care forum through the American Pain Foundation;
19  correct?
20      A.  I don't recall if we were participating or
21  not.
22      Q.  Let's show you Exhibit Number 26.  And
23  Exhibit Number 26 is Bates-stamped EPI 001676707.  And
24  I just want to draw your attention to page at the

Page 252

1  bottom right-hand corner that ends in 1676708.  You'll
2  see on that page an e-mail from Mr. Rowe.  And it is
3  dated January 13th, 2009, discussing the PCF REMS task
4  force.  Do you see that?
5          [Exhibit Endo-Bingol-026 marked for
6          identification.]
7      A.  Yes, I do.
8      Q.  Okay.  Do you -- see if you recognize any
9  of the names in the to line there.  The first line
10  there, it says Aaron Gilson, PhD (ph).  Do you know Dr.
11  Gilson?
12      A.  I don't recall any Dr. Gilson.
13      Q.  You don't recall him from the pain policy
14  group, for example?
15      A.  I don't know who he is.
16      Q.  Do you know -- have you heard of the pain
17  policy group?
18      A.  No.
19      Q.  Doesn't ring a bell?  Okay.
20      A.  No.
21      Q.  I think we discussed on the second line
22  Brian Munroe.  He was with Endo; correct?
23      A.  Correct.
24      Q.  And that was Endo's government affairs;

Page 253

1  correct?
2      A.  That's correct.
3      Q.  And Burt Rosen was with Purdue, government
4  affairs; right?
5      A.  I don't know where Rosen was working at
6  that time.  I hadn't met him yet.
7      Q.  Fair enough.  You -- did you eventually
8  know Mr. Rosen, though, through the pain care forum?
9          MR. LIMBACHER:  Object to form.
10      A.  No.  My meeting with him was just -- as I
11  said, I remember a meeting with him in his office with
12  our -- with Alexander.  It was not directly through the
13  pain care forum.
14      Q.  (By Ms. Scullion)  But do you know why you
15  reached out to Mr. Rosen with respect to the meeting
16  concerning the pain care forum?
17          MR. LIMBACHER:  Object to form.
18      A.  I don't recall what facilitated the
19  discussion.
20      Q.  (By Ms. Scullion)  Okay.  And if you go
21  on -- my apologies.  I lost my -- there we go.  The
22  fourth line down the to's, you'll see a reference to
23  June Doll (ph).  Do you see her name?
24      A.  Sorry.

64 (Pages 250 to 253)

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1    Q.   That's okay.  Bad counting by me.  Fifth
2  line down.  June Doll.
3    A.   Yes.  Got it.  Thank you.
4    Q.   June Doll -- is she a KOL?
5    A.   I recall her being shown some sort of expert,
6  but I don't recall in what field or what her area of
7  expertise was.
8    Q.   You have any recollection about how you
9  came to know her name?
10    A.   I don't over the time of working at Endo,
11  but certainly the name Doll sticks out.  I mean, I
12  recognize the name.
13    Q.   Okay.  In the next line you see a
14  reference to Lisa Robin (ph)?
15    A.   I see that.
16    Q.   Do you have a recollection of who Lisa
17  Robin was?
18    A.   I don't have any idea who she is.
19    Q.   Did you ever have any dealings with the
20  federation of state medical boards?
21    A.   No, I didn't.
22    Q.   If you go to the next line, you see Mary
23  Bennett a little bit to the left-hand side?
24    A.   Yes.

Page 255

1    Q.   Does that name ring a bell?
2    A.   No, I don't recall a Mary Bennett.
3    Q.   Do you recall her in connection with the
4  APF or the PCF?
5    A.   I don't recall it, but -- I don't know
6  what connection she would have.
7    Q.   Okay.  And at the very end of that line,
8  you see Mickey Brown (ph).  Again, is that a name you
9  recognize?
10    A.   No.
11    Q.   Anyone you recognize in connection with
12  the APF or the PCF, for example?
13    A.   I'm sorry.  Are you asking me if Mickey
14  Brown is connected?
15    Q.   Yes.  Do you recognize that name in
16  connection with the APF or the PCF?
17    A.   I don't recognize that name.
18    Q.   Okay.  Next line, Meyer Christopher (ph).
19  Oh, two -- yeah, next line.
20    A.   Uh-huh.
21    Q.   Meyer Christopher on the left-hand side.
22  Do you recognize that name as a KOL?
23    A.   I don't know this name.
24    Q.   Okay.  Same line.  You see Pamela Bennett

Page 256

1  (ph)?
2    A.   Yes.
3    Q.   Do you recall who Ms. Bennett was?
4    A.   No.
5    Q.   Do you recall that she was affiliated with
6  Purdue?
7    A.   No.
8    Q.   Okay.  And next line to the right you see
9  Scott Fishman?
10    A.   Yes.
11    Q.   Dr. Fishman was a KOL; correct?
12    A.   Yes.
13    Q.   Okay.  The subject matter of Mr. Rowe's
14  e-mail is PCF REMS task force.  Did Endo coordinate
15  with the PCF on a REMS task force in 2009?
16    A.   I don't know the answer to that.
17    Q.   Do you recall Endo coordinating with any
18  other manufacturers to respond to the FDA's
19  announcement that a class-wide REMS would be mandatory
20  for extended-release long-acting opioids?
21    A.   I recall that Endo, like other
22  manufacturers, were curious to know what the new REMS
23  would be and how they would be formed, and that was
24  really not -- more of a medical affairs and

Page 257

1  regulatory-driven process, so I'm not sure with whom
2  they routinely discussed things with, if there was a --
3  if this was a vehicle for that or not.  I wasn't
4  necessarily -- was not my area to manage.
5    Q.   Okay.  But you were concerned, were you
6  not, that Purdue was trying to gain a marketing
7  advantage in connection with the class-wide REMS?
8         MR. LIMBACHER:  Object to form.
9    A.   I don't recall that type of concern.
10    Q.   (By Ms. Scullion)  Okay.  Let me hand you
11  what's been marked as Exhibit Number 27.  And Exhibit
12  Number 27 is Bates-stamped EPI 001794412.  And Mr.
13  Bingol, do you see Exhibit 27 begins at the
14  bottom with, again, that same e-mail from Mr. Rowe?
15  And now Mr. Monroe -- Mr. Munroe -- has forwarded that
16  e-mail to you and to Mr. Barto at the top of Exhibit
17  27.  Do you see that?
18         [Exhibit Endo-Bingol-027 marked for
19         identification.]
20    A.   Yes, I do.
21    Q.   And Mr. Munroe has annotated the subject
22  line PCF REMS task force, I need your input ASAP.  Do
23  you recall Mr. Munroe seeking your input in connection
24  with the PCM -- PCF REMS task force in December of

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1  2008?
2      A.   I don't specifically recall it, but it's
3  entirely possible.
4      Q.   Okay.  And in the second line of his
5  e-mail, Mr. Munroe's e-mail to you and Mr. Barto, he
6  states, Demir -- sorry -- Demir -- I apologize --
7  Demir, your concerns of Purdue trying to gain marketing
8  advantages are still out there and I don't think we
9  will know where this is going to go before having to
10  decide whether or not to sign on to this letter.  Does
11  that refresh your recollection about any discussion you
12  might have had with Mr. Munroe about the PCF REMS task
13  force?
14     A.   Not particularly.  Clearly we had
15  discussions around -- cross functionally around what a
16  REMS document might mean and how it will impact maybe
17  potentially other parties.  I don't recall the specific
18  concern that was obviously raised here at that time.
19     Q.   (By Ms. Scullion)  Okay.
20         MS. SCULLION:  Can we take a quick break?
21         THE VIDEOGRAPHER:  Off the record at 5:04
22  PM.
23         [A brief recess was taken.]
24         THE VIDEOGRAPHER:  We're back on the

Page 259

1  record at 5:17 PM.
2      Q.   (By Ms. Scullion)  Mr. Bingol, I want to
3  take you back to your work as the regional business
4  director for the Midwest region.  If you recall, that
5  was September 2009 to September 2010.  Correct?
6      A.   Yes.
7      Q.   Okay.  Let me show you what's been marked
8  Exhibit -- as Exhibit Number 28.
9         [Exhibit Endo-Bingol-028 marked for
10         identification.]
11        MR. LIMBACHER:  Thank you.
12        MS. SCULLION:  Yeah.
13     Q.   (By Ms. Scullion)  And that is
14  Bates-stamped Endo Opioid MDL 00982037.  And Mr.
15  Bingol, you see it's an e-mail from you to the
16  specialty district managers, Midwest, as well as Mr.
17  Albers and Ms. Butterfield, dated February 24th, 2010.
18  And the subject is Midwest weekly summary.  Did you as
19  regional business director have weekly summaries of
20  sales within the Midwest region?
21     A.   I'm sorry.  I'm reading this first, if you
22  don't mind.
23     Q.   Sure.  Go ahead.
24     A.   Okay.

Page 260

1      Q.   And the question is, did you get weekly
2  reports on sales within the Midwest region when you
3  were regional business director?
4      A.   Yes.
5      Q.   Okay.  And those were -- if you look at
6  the bottom of the page -- broken down by district, so
7  you could see the district at the bottom of the page,
8  Pittsburgh, Columbus, Detroit, Indianapolis, Chicago,
9  Annapolis, et cetera?
10     A.   Yes.
11     Q.   Okay.  And in your e-mail, you're writing
12  to team, and that's your district managers; correct?
13     A.   Correct.
14     Q.   Okay.  And you're going to talk about
15  some -- quote -- "pretty cool stuff" -- closed quote --
16  that's happening this week; right?
17     A.   That's what I wrote.
18     Q.   And the first thing you note as some
19  pretty cool stuff was you say we are trading paint with
20  the southeast on Opana ER and I can tell you that Tim
21  Cochran (ph) -- oh, yes, now it's personal -- continues
22  to chide me about taking the Number One spot from us.
23  When you say trading paint, that was a reference to the
24  Midwest region and the southeast region were going back

Page 261

1  and forth on a weekly basis as to who was in the Number
2  One spot -- is that right -- on Opana ER?
3      A.   Yes.  Generally speaking, sales teams are
4  relatively competitive with one another.
5      Q.   And that's intentionally so?  They are
6  competitive in order to spur everyone on to try to
7  maximize sales; correct?
8         MR. LIMBACHER:  Object to form.
9      A.   That's not -- they're not intentionally
10  competitive with each other, but they tend to be.
11  Somebody wants to beat out the other guy.
12     Q.   (By Ms. Scullion)  Meaning you're keeping
13  track on a weekly basis as to which region was Number
14  One with regard to Opana ER; correct?
15     A.   We do that with respect to all of our
16  products.
17     Q.   Including Opana ER?
18     A.   Correct.
19     Q.   All right.  And every week the regions
20  were competing to see who would be Number One on Opana
21  ER?
22     A.   No, it wasn't quite that formal.  Just --
23  Tim happened to be a friend of mine, and so we happened
24  to have that kind of relationship.  It wasn't that we

66 (Pages 258 to 261)

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1    were definitely competing against him or anybody on a
2    weekly basis, but always looking to reach our sales
3    objectives.
4         Q.   And exceed those sales objectives; right?
5              MR. LIMBACHER:  Object to form.
6         A.   Sure.
7         Q.   (By Ms. Scullion)  Okay.  And I think we
8    spoke earlier -- the question was whether the Midwest
9    region included Pittsburgh.  I think you said you
10   thought so, but you weren't sure.  Looking at Exhibit
11   28, does this refresh your recollection that
12   Pittsburgh, which is listed as one of the districts
13   under the Midwest region, was in fact part of the
14   Midwest region?
15        A.   Correct.
16        Q.   (By Ms. Scullion)  Okay.
17             MS. SCULLION:  And can we have Exhibit
18   13 -- thank you --
19        Q.   (By Ms. Scullion)  Let me hand you what's
20   been marked as Exhibit Number 29.  And Exhibit 29 is
21   Bates-stamped Endo Opioid MDL 00961320, and it's
22   stamped in the upper right-hand corner E1354.  And
23   starting with the bottom e-mail, which is from you
24   again to the specialty DMs, Midwest -- and this is

Page 263

1    dated February 17th, 2010.  And the subject matter now
2    is Opana speaker program allocations.  Do you see that?
3              [Exhibit Endo-Bingol-029 marked for
4              identification.]
5         A.   Yes.
6         Q.   We spoke earlier about the Opana ER
7    speaker programs.  I just want to make sure -- the
8    reference here to speaker programs is a reference to
9    dinners at which Endo would invite KOLs to come and
10   speak in this case about Opana ER to clinicians in the
11   territory where the program is taking place; correct?
12        A.   Yes.  These are programs that are always
13   managed and approved from our headquarters and making
14   sure that the content and the KOL selection is always
15   done in a compliant manner, and all of the materials
16   considered promotional went through PMRB and always
17   presented the product with all its full safety and
18   efficacy messages.
19        Q.   Right.  As we spoke earlier, so these
20   speakers are chosen by Endo; correct?
21        A.   That is correct.
22        Q.   Paid by Endo?
23        A.   That is correct.
24        Q.   And the speaker slides are reviewed and

Page 264

1    approved through the PMRB of Endo; correct?
2         A.   That is correct.
3         Q.   All right.  And you explain in your e-mail
4    to your team, you'll be happy to know that we, Midwest
5    Magic -- that's the Midwest region; right -- have the
6    second highest allocation of programs in the country
7    based on Midwest Magic's ability to drive Opana ER
8    business.  Do you see that?
9         A.   Yes.
10        Q.   What did that mean, Midwest Magic's
11   ability to drive Opana ER business?
12        A.   I don't recall the context of that.
13   Usually these programs are allocated based on, again,
14   the same kind of prescribing potential, where the
15   business is and who's writing the prescriptions and
16   where of the long-acting opioid market, and where do we
17   want to compete, but specifically as it relates to
18   ability to drive the business -- I don't know if it
19   refers to that or what it might else refer to, but
20   certainly reference to potential.
21        Q.   So if I understand you correctly, speaker
22   programs are being allocated to areas where at the time
23   Endo perceived they would have the most potential to
24   engage target-rich clinicians?  That was the term you

Page 265

1    had used earlier.
2              MR. LIMBACHER:  Object to form.
3         A.   As with all of our promotional resources,
4    we would undergo a certain level of analytics, so you
5    would fish where the fish are, and if a doctor is
6    prescribing a long-acting opioid, you would want to
7    have a resource allocated there versus somewhere where
8    there was no activity.
9              After all, we wanted to, again, acquire
10   share, not necessarily develop new prescribers for
11   long-action opioids in that.  So these -- I don't recall
12   the exact analytics that went into how these particular
13   programs were allocated, but generally speaking there's
14   a potential overlay here to understand that you would
15   invest a little more here, a little less there.
16   Everybody across the country got speaker programs.
17   It's just a question of how you might concentrate
18   those.
19        Q.   So fair to say at this point in time,
20   February of 2010, based on the Midwest region's
21   performance to date on generating prescriptions for
22   Opana ER, it was given the second highest allocation of
23   programs -- speaker programs in the country; correct?
24        A.   Again, I don't recall the analytics that

67 (Pages 262 to 265)

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1    drove the decision to allocate them, but they got the
2    second highest allocation.  I don't know -- I don't
3    recall what the parameters were that actually drove the
4    analysis.
5        Q.    Did the -- had the Midwest region shown an
6    ability to drive Opana ER business as of February 2010?
7        A.    I don't recall the weekly or the monthly
8    data to know that -- as of what point in time their
9    growth trends were going in which direction.
10       Q.    But fair to say in your e-mail as of
11   February 2010, you are saying that the allocation was
12   based on that region's ability to drive Opana ER
13   business -- what you wrote; right?
14           MR. LIMBACHER:  Object to form.
15       A.    That's what I wrote.
16       Q.    (By Ms. Scullion)  Okay.
17       A.    As I said, I don't recall what the
18   calculus was that quantifies that ability to drive
19   business, if it was based on script trends or if it was
20   based on just where the potential lied within the
21   region.  There could be a number of other smaller
22   factors, so I can't speak to exactly what the analysis
23   was.
24       Q.    (By Ms. Scullion)  Well, if you go up

Page 267

1    above to the e-mail from William Kellens, and it's
2    to -- there's an e-mail address.  It looks like maybe
3    it's a list.  ZZ330500.  Is that a territory list?
4        A.    Yeah, that's his --
5        Q.    Or a district list, rather?
6        A.    That's his district moniker.  He's got a
7    distribution list based on that.
8        Q.    Okay.  Make sure I understand.  At the
9    time William Kellens was a district manager within the
10   Midwest region; correct?
11       A.    That's correct.
12       Q.    And his district he referred to as the
13   Thunderbolts.  It's in his introduction to his e-mail;
14   correct?
15       A.    That is correct.
16       Q.    Okay.  And Mr. Kellens says, Thunderbolts,
17   we have another opportunity to shine early and shine
18   often.  And he says, as we have seen from Wade and
19   Laura executing strong Opana ER speaker programs with
20   measurable return on investment as well as Eddie and
21   Bethany and their recent successes -- success with
22   fence-sitting Oxycodone SR prescribers, we can drive
23   business with speaker programs.  Do you see that?
24       A.    I do.

Page 268

1        Q.    And do you agree that as of February 2010
2    Endo could drive business with speaker programs?
3            MR. LIMBACHER:  Object to form.
4        A.    Yes.  The purpose of a speaker program was
5    to educate clinicians on the appropriate use of the
6    product along with all its inherent safety risks, and
7    of course we invested in those kinds of educational
8    programs in the hope that clinicians would include it
9    in their choice set for the appropriate patient.
10       Q.    (By Ms. Scullion)  Yeah.  And then in
11   the -- as Mr. Kellens has indicated -- a measurable
12   return on investment for the speaker programs; correct?
13           MR. LIMBACHER:  Object to form.
14       A.    That's what he wrote.
15       Q.    (By Ms. Scullion)  Okay.  Did you see a
16   measurable return on investment for the speaker
17   programs for Opana ER?
18       A.    I don't recall specific analysis, but you
19   can see in weekly data switching that occurs, whether a
20   clinician has started writing less of one competitor
21   and more of yours through IMS data, so it's not
22   difficult to see prescribing patterns changing.  You
23   don't always know why and you don't always know which
24   promotional tactic works, so it's very difficult

Page 269

1    sometimes to actually make a direct one-to-one
2    correlation.
3        Q.    But over time did you tend to see a
4    correlation between speaker programs and, as you
5    said -- I think you said switching of patients from one
6    long-acting opioid to hopefully Opana ER; correct?
7        A.    Again, over time you saw a trend increase.
8    Whether it was wholly responsible or due to speaker
9    programs or rep details -- very difficult to tease out
10   what one promotional element might -- the impact one
11   might have versus another.
12       Q.    But there was an overall impact of the
13   combination of all the promotional elements; correct?
14           MR. LIMBACHER:  Object to form.
15       A.    That's what you invest in, and that's what
16   you hope to achieve.
17       Q.    (By Ms. Scullion)  I mean, certainly Endo
18   did not stop doing speaker programs in connection with
19   Opana ER between 2006 when they had started and 2010 --
20   they continued to use those speaker programs; correct?
21           MR. LIMBACHER:  Object to form.
22       A.    I'm not sure -- I can't remember when they
23   started.  I don't think they started in 2006.  If they
24   did, maybe late.  Maybe in 2007.  But certainly from

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1  that period in time to what I can recall -- when I --
2  by the time I left, they were still doing it.
3      Q.  (By Ms. Scullion)  Okay.  Okay.
4          MS. SCULLION:  And can I have 1357?  Thank
5  you.
6      Q.  (By Ms. Scullion)  I hand you what's been
7  marked as Exhibit Number 30, and Exhibit 30 is
8  Bates-stamped Endo Opioid MDL 06009589, and we stamped
9  it E1357 in the upper right-hand corner.  And let me
10  draw your attention -- if you look at the very bottom
11  of the first page, you'll see there's a beginning of an
12  e-mail again from William Kellens to his district
13  Thunderbolts, and that carries over on to Page 1357.2.
14  Do you see that?
15          [Exhibit Endo-Bingol-030 marked for
16          identification.]
17      A.  I need to read this, if you don't mind,
18  from the beginning.
19      Q.  Sure.
20      A.  Okay.
21      Q.  Okay.  Looking, again, at the bottom of
22  the first page of Exhibit 30.  It's the very beginning
23  of Mr. Kellens's e-mail that carries over to the next
24  page.  And it's -- the subject matter is Opana ER

Page 271

1  success story, and he is, again, writing to his
2  district Thunderbolts; correct?
3      A.  That's correct.
4      Q.  And he is sharing what he calls a
5  fantastic success story, and it's in reference to Eddie
6  and Bethany used a very important tool in their
7  toolbox.  Eddie and Bethany were two sales reps in that
8  territory; correct?
9      A.  Yes.  I don't remember them specifically,
10  but they were obviously Bill's reps.
11      Q.  Okay.  And the fantastic success story
12  he's congratulating them on is using speaker programs
13  to drive sales with two high-potential late adopters;
14  correct?
15      A.  That's what he wrote.
16      Q.  And I think you also discussed that -- the
17  phrase late adopters earlier today.  What did you
18  understand late adopters to mean?
19      A.  Somebody who for one reason or another
20  hadn't tried the product or used it very much compared
21  to others who may have used it more quickly -- adopted
22  it more readily in their practice.
23      Q.  And so with respect to this e-mail, these
24  are clinicians who prior to this fantastic success

Page 272

1  story had not been using Opana ER; correct?
2      A.  I wouldn't say that.  I would say they
3  probably were using -- I don't know what they were
4  using, quite honestly.  I don't know what level of
5  prescription they were driving at this point.
6      Q.  Okay.  Well, if you go to the first page
7  of Exhibit 30 -- and this is your follow on e-mail to
8  the specialty reps in the Midwest.  And you're
9  addressing to the two reps, Bethany and Eddie;
10  correct?
11      A.  That's correct.
12      Q.  And you're congratulating them.  And in
13  your second paragraph -- let me start with the first
14  paragraph.  In your first paragraph, in the last
15  sentence, you say, although the results do speak for
16  themselves, I am excited to point out your efforts have
17  led to 134 percent increase of Opana ER total
18  prescriptions for these two -- it says HCP -- health
19  care providers -- combined.  And you say that's
20  awesome.  Right?
21      A.  Yes, that's what I wrote.
22      Q.  Okay.  So -- and then you go on to
23  congratulate the reps in your second paragraph on the
24  fact that they didn't give up on these two clinicians,

Page 273

1  and you're congratulating them for their persistence as
2  the true hallmark of a success.  Correct?
3      A.  That's correct.
4      Q.  And what you describe as a success is two
5  sentences later -- it would have been very easy for you
6  to think Dr. Variakojis hasn't written Opana ER by now,
7  so she probably won't write it at all.  That's what you
8  wrote; right?
9      A.  That was my characterization.
10      Q.  And so your characterization was that this
11  was a clinician who hadn't yet written any Opana ER,
12  and then did so as a result of the persistent promotion
13  by these two reps; correct?
14          MR. LIMBACHER:  Object to form.
15      A.  Yeah, I don't remember or really know
16  Dr. -- I don't know how you pronounce it, Variako --
17  Dr. V -- to know exactly how much or how little they
18  were prescribing.  I was characterizing what I would
19  have thought the reps were thinking to themselves, and
20  it doesn't remove the fact that this doctor was
21  probably also writing a lot of other long-acting
22  opioids.
23          So the fact of the matter, we were simply
24  trying to see how do we get a share of their business

69 (Pages 270 to 273)

Page 274

1  with Opana ER, and this particular rep was persistent
2  in trying to get trial and usage in this practice, and
3  I congratulated her for that.
4      Q.   (By Ms. Scullion)  Right.  And the
5  congratulations is they're persistent, they're going
6  back, they're not giving up, they're continuing to
7  detail the doctor; correct?
8          MR. LIMBACHER:  Object to form.  The
9  document speaks for itself.
10     A.   Correct.  That's their job.
11     Q.   (By Ms. Scullion)  And -- correct.  And in
12 doing their job, they succeeded in, as you say, leading
13 both themselves and Dr. V to a completely different
14 conclusion about Opana ER; correct?
15     A.   That's what I wrote.
16     Q.   And that was the job of a sales rep to do
17 that?
18     A.   The job is to --
19         MR. LIMBACHER:  Object to form.
20     A.   The job is to encourage trial and usage
21 within their population to see where the product might
22 serve a clinically meaningful role within their pain
23 patients.  And for whatever reason a clinician may --
24 maybe just through inertia, always used to writing

Page 275

1  morphine, never really taking the time to think about
2  it.  This was an opportunity perhaps to get a trial --
3  Opana ER trial in this practice, and they finally seem
4  to have succeeded.
5      Q.   (By Ms. Scullion)  You didn't congratulate
6  them on inertia.  You congratulated these sales reps on
7  their efforts and their persistence; correct?
8          MR. LIMBACHER:  Object to form.  Asked and
9  answered.
10     A.   The inertia would be with the prescriber
11 who doesn't -- who doesn't try something different
12 because they just have always done something a
13 particular way, so that's the inertia I was referring
14 to.  Certainly the sales reps were persistent and able
15 to get the trial of the product in that practice when
16 the doctor was able to use it and obviously started to
17 prescribe more of it.
18     Q.   (By Ms. Scullion)  You were holding up
19 that example of persistence as something you thought
20 other sales reps in your region should also strive for?
21         MR. LIMBACHER:  Object to form.
22     A.   I would say that any sales rep in any
23 industry who stops after being told no would be an
24 unemployed sales rep.  It is the nature of any sales

Page 276

1  role, any business, when you're selling something to be
2  able to overcome certain objections and to be
3  persistent.
4      Q.   (By Ms. Scullion)  In -- take a step back.
5  Sales reps were compensated in part through incentive
6  compensation plans; correct?
7          MR. LIMBACHER:  Object to form and
8  foundation.
9      A.   That is correct.
10     Q.   (By Ms. Scullion)  Okay.  And you became
11 familiar with the incentive compensation system in part
12 in your role as a regional business director for the
13 Midwest region; correct?
14     A.   That's correct.  I became familiar with it
15 at that time, but it's been many years.
16     Q.   Understood.  Big picture, though, the
17 incentive compensation plans were rewarded compensation
18 based on whether a sales rep met a certain percentage
19 of their sales goal against a call plan for any given
20 period; correct?
21         MR. LIMBACHER:  Object to form and
22 foundation.
23     A.   I don't recall the specific mechanisms of
24 what triggered the incentive compensation, but it was a

Page 277

1  component.  There was a performance component.  I don't
2  recall how it was structured.
3      Q.   (By Ms. Scullion)  Do you recall that
4  incentive compensation was an important part of the
5  compensation for sales reps, for example, in the
6  region, the Midwest region, when you were the regional
7  business director?
8          MR. LIMBACHER:  Object to form.
9      A.   The incentive compensation plan is
10 important to all the sales reps in the company, and in
11 every company by which when you have a portion of your
12 overall compensation as a performance-based metric, it
13 becomes obviously very important.
14     Q.   (By Ms. Scullion)  And as regional
15 business director, did you also become familiar with
16 systems that Endo had to remove physicians from a sales
17 rep's call plan?
18     A.   Yes.  There was some process by which that
19 could be managed.  Again, the specifics I don't really
20 recall, but if there was -- if for whatever reason a
21 physician needed to be removed from the call plan, then
22 that -- there was a trigger, and that could be removed,
23 and then I'm not sure -- I can't remember the specifics
24 of how it would relate to their incentive comp, but I

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1    think it also reduced some obligation in terms of their
2    annual prescription expectations or goal.
3        Q.   So for example, could a physician be
4    removed from a sales rep's call plan based on a
5    conclusion that the physician was diverting Opana ER?
6        A.   I don't remember the specific criteria,
7    but Endo certainly took any notification or signals
8    very seriously with regard to how clinical practices
9    were operating.  Let's put it that way.  And I know
10   that periodically there could be a reason for reviewing
11   a particular physician and removing them from the call
12   plan based on any number of criteria, but I assume
13   diversion is probably one of those.
14       Q.   Do you recall that there was a process by
15   which the compliance department would investigate
16   reports of diversion, suspected diversion, to determine
17   whether to remove the physician from a call plan?
18       A.   I know there's -- again, that there was a
19   process.  I don't know specifically what the -- I don't
20   recall all the steps or how it was enacted, but yes,
21   there was clearly a process for that.
22       Q.   But you don't have an understanding of how
23   removal of a physician from the call plan for diversion
24   would impact a sales rep's incentive compensation?

Page 279

1        MR. LIMBACHER:  Object to form and
2    foundation.
3        A.   Again, I don't remember the specifics of
4    how -- what the mechanics were of removing the doctor
5    and what happened with their data and how that impacted
6    the sales rep and their data.  I know there was some
7    interaction there, but I don't recall the specifics.
8        MS. SCULLION:  Okay.  Mr. Bingol, that's
9    all the questions that we have for you today.  We -- I
10   think we noted earlier that -- I've asked for you to
11   search for additional documents in response to our
12   subpoena.  They should have been produced.  So we're
13   going to reserve our rights to potentially recall you
14   for further testimony after receiving those documents.
15       We also have the issue with respect to the
16   instruction not to testify with respect to Grunenthal,
17   so we're reserving our rights on those as well.  And on
18   a more housekeeping note, Exhibit Number 3 was
19   intentionally -- that exhibit number was skipped, for
20   the record, so it's not missing, it just was not used
21   today.  Thank you.
22       THE VIDEOGRAPHER:  Off the record at 5:48
23   PM.
24       [Discussion off the record.]

Page 280

1        THE VIDEOGRAPHER:  We're back on the
2    record at 5:50 PM.
3        QUESTIONS BY MR. GASTEL:
4        Q.   Good evening, Mr. Bingol.  My name is Ben
5    Gastel.  I represent a group of plaintiffs in the State
6    of Tennessee.
7        MR. GASTEL:  And I'll begin with our usual
8    objection that we object to the deposition going
9    forward today for the reasons that we've previously
10   laid out and in our motion to quash.
11       Q.   (By Mr. Gastel)  Subject to that
12   objection, Mr. Bingol, I'm going to have a handful of
13   questions for you here.  And as I stated, I represent a
14   different group of plaintiffs than the attorney who was
15   asking you questions most of the day.  All of my
16   clients are in the State of Tennessee, so I'll begin
17   with a question of whether or not in your work with
18   Endo you ever traveled to the State of Tennessee.
19       A.   I don't recall a trip to Tennessee.
20       Q.   We saw throughout today various business
21   plans and marketing plans for Opana.  Those business
22   plan and marketing plans apply for Endo sales of Opana
23   throughout the country; is that safe to say?
24       A.   I'm sorry.  I'm not sure if I understand

Page 281

1    the question.
2        Q.   Sure.  I don't want to rehash what has
3    been gone over today.  You obviously looked at numerous
4    exhibits today about business plans and marketing plans
5    for Opana.  You remember those questions?
6        A.   Yes.
7        Q.   And my question is is that was a plan that
8    was in place to market and sell Opana throughout the
9    country; correct?
10       A.   Yes.
11       Q.   And those plans would have also applied to
12   Endo's efforts to sell Opana in the State of Tennessee;
13   right?
14       A.   Yes.
15       Q.   Do you have any idea of or understanding
16   of opioid prescription rates in the State of Tennessee?
17       A.   I don't have a particular recollection of
18   opioid prescription rates from 15 years ago in any one
19   state.
20       Q.   Have you ever looked at any information
21   published by the Tennessee Department of Health on
22   Tennessee's opioid crisis?
23       A.   Ever?
24       Q.   Ever.

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1     A.   Not to my knowledge.  Not that I recall.
2     Q.   Are you aware that as of 2013 the
3   Tennessee Department of Health estimated that there
4   were 221,000 adults in Tennessee using prescription
5   pain relievers for non-medical purposes?
6          MR. LIMBACHER:  Objection to form and
7   foundation.
8     A.   No, I'm not aware of that, but in 2013,
9   having left Endo, I was not necessarily as attuned to
10   some of those concerns.
11     Q.   (By Mr. Gastel)  And are you aware that
12   the Department of Justice has found that prescription
13   opioids rank as the Number One abused drug among
14   individuals receiving state-funded services in the
15   State of Tennessee?
16          MR. LIMBACHER:  Objection.  Form and
17   foundation.
18     A.   I'm not aware of that.
19     Q.   (By Mr. Gastel)  Would it surprise you if
20   that were true?
21          MR. LIMBACHER:  Same objection.
22     A.   I wouldn't know what to -- how to react to
23   that.
24     Q.   (By Mr. Gastel)  During your time with

Page 283

1   Endo, do you recall any discussions concerning the
2   Tennessee effect as it relates to the use of Opana in
3   the state of Tennessee?
4     A.   I've not heard that term before.
5     Q.   After you left Endo, do you recall
6   discussions with anybody at any time concerning the
7   Tennessee effect as it relates to the use of Opana in
8   the State of Tennessee?
9     A.   Again, I don't recall hearing that term,
10   the Tennessee effect.
11     Q.   Did you have any conversations with Tara
12   Chapman concerning any of the documents that she filed
13   with the FDA shortly after you left Endo?
14          MR. LIMBACHER:  Objection to form and
15   foundation.
16     A.   I don't recall having those discussions,
17   although I may have had meetings with Endo briefly when
18   I first started at Grunenthal.
19     Q.   (By Mr. Gastel)  And what would those
20   meetings have concerned?
21     A.   Mostly their clinical study and what they
22   were doing with trying to understand how the new
23   product was -- studying the properties of the new
24   crush-resistant product.

Page 284

1     Q.   And do you recall specifically what those
2   clinical trials were about?
3     A.   Vaguely, but again, that's probably under
4   my Grunenthal proprietary information.
5          MR. LIMBACHER:  Well, if it implicates
6   what you believe to be Grunenthal proprietary
7   information, then I would direct you not to answer the
8   question for the same reasons as discussed previously.
9          MR. GASTEL:  And obviously we're going to
10   take the same issue that the MDL plaintiffs took with
11   that position.  I won't rehash all of that here, but we
12   obviously will reserve the right to recall the witness
13   and explore that.
14     Q.   (By Mr. Gastel)  Do you recall during your
15   time with Endo that Tennessee was the top state for
16   prescribing of Opana in the entire country?
17     A.   I don't recall necessarily the prescribing
18   patterns.
19          MR. GASTEL:  I'm actually going to go out
20   of order.  I'm going to go with Document 7.
21          MR. BROWN:  7?
22          MR. GASTEL:  Yeah.
23     Q.   (By Mr. Gastel)  I'm going to hand you a
24   document that's been marked as Exhibit 32.

Page 285

1          [Exhibit Endo-Bingol-032 marked for
2          identification.]
3          MR. LIMBACHER:  Thank you.
4     Q.   (By Mr. Gastel)  And you'll see that this
5   is an e-mail that you sent in May of 2010 to a variety
6   of individuals at Endo.  Do you see that?
7          MR. LIMBACHER:  Take your time and review
8   the document.
9          MR. GASTEL:  And I'm sorry.  For the
10   record, the Bates number for this document is EPI
11   002386765.
12     A.   Okay.
13     Q.   (By Mr. Gastel)  Do you recall sending
14   this e-mail, sir?
15     A.   No, I don't recall sending it.
16     Q.   Do you see that on the cover e-mail there
17   is an attachment that's labeled as 2011 oxymorphone
18   strategic summary 05-14-10.  Did I read that correctly?
19     A.   Yes.
20     Q.   And then in the body of the e-mail, it
21   states please read data deck.  This is to level set
22   everyone with current dynamics with a focus on managed
23   care.  There will be few additional slides to review
24   with you live on Wednesday based on late-breaking

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1    research, but we wanted to get you most of the
2    information for your preread.  Did I read that
3    correctly?
4         A.   Yes.
5         Q.   So I assume that that's you directing the
6    people who receive this e-mail to go through this
7    PowerPoint presentation prior to the meeting that's
8    contemplated in this e-mail.  Is that right?
9         A.   Yes.
10        Q.   And you thought that that was important
11   for the strategic placement of Opana for the coming
12   year of 2011; is that right?
13             MR. LIMBACHER:  Object to form.
14        A.   The -- to preread this before they get to
15   the meeting?
16        Q.   (By Mr. Gastel)  And -- well, the slide
17   deck -- you wanted them to review the slide deck
18   because you thought that it was important for the
19   strategic meeting for Opana in 2011; right?
20        A.   Yes.  This would have been information
21   that we wanted to share cross-functionally to give
22   everybody a basic framework from which to contribute to
23   the strategic plan.
24        Q.   Sure.  And I don't want to go through the

Page 287

1    entire slide deck, but will you turn to Page 25 of the
2    slide deck, please?  And it's the slide that carries
3    the title 10 states driving approximately half of Opana
4    ER business.  Did I read that correctly, sir?
5         A.   Yes.
6         Q.   And then the first bullet point there says
7    top 10 states represent 56 percent of Opana ER
8    prescription volume.  Did I read that correctly?
9         A.   Yes.
10        Q.   And then the first state listed there is
11   the State of Tennessee; is that right?
12        A.   That is correct.
13        Q.   And it's showing that there was 13,652 --
14   I assume that that's prescriptions.  Is that right?
15        A.   That's correct.
16        Q.   Do you know what time period that would
17   have covered?
18        A.   That's what I was looking at.  I was
19   trying to see.  I don't know what that was covering
20   time-wise.
21        Q.   Do you see in the bottom left-hand corner
22   there is a reference to the source, IMS Xponent.  Did I
23   read that correctly?
24        A.   Correct.

Page 288

1         Q.   Does that signal to you that the source of
2    the information in this slide comes from IMS data?
3         A.   That's correct.
4         Q.   Would you just describe what IMS data is
5    for the jury, please?
6         A.   IMS was -- I guess they changed their name
7    to IQVIA, but they're a data reporting company that
8    work with pharmacies and maybe other commercial
9    entities -- I'm not quite sure -- to report their
10   prescriptions and how they're filling them.
11             IMS would collect all this data across all
12   product categories, of course, and then report them
13   back to -- offer for purchase back to pharmaceutical
14   companies or other constituents who may have interest
15   in understanding what's going on on a
16   prescription-level basis for any one product or
17   category.
18        Q.   Sure.  And if I'm understanding your
19   testimony correctly, IMS basically collects
20   prescription data and is able to determine what
21   companies are selling what products in what markets; is
22   that fair to say?
23             MR. LIMBACHER:  Object to form.
24        A.   I'm not sure what granularity they get in

Page 289

1    terms of knowing what companies are doing what, but
2    they can tell you typically which products are being
3    dispensed and which physicians are prescribing them.
4         Q.   (By Mr. Gastel)  And in what locations
5    those prescriptions are being filled; right?
6         A.   Yes, there is -- to my understanding, that
7    there is some sort of algorithm in that process, so
8    it's not necessarily always 100 percent accurate, but
9    sometimes more directional than not.
10        Q.   But you relied on IMS data to develop a
11   lot of your marketing business plans for Opana; right?
12             MR. LIMBACHER:  Object to form.
13        A.   IMS data was considered, I guess, the gold
14   standard in terms of understanding prescription trends.
15   They're -- one other company did the same kind of
16   thing, Welters Core (ph), but between the two IMS was
17   generally considered the gold standard.
18        Q.   (By Mr. Gastel)  After -- and I assume
19   that you put this slide together?
20        A.   I don't recall who put this slide
21   together.
22        Q.   Regardless, when you saw the data from IMS
23   that's reflected in this PowerPoint presentation that
24   you put together in May of 2010, did it bother you at

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1    all that the State of Tennessee was seeing more Opana
2    prescriptions than large states like New York,
3    Pennsylvania, Florida, or California?
4           MR. LIMBACHER:  Object to form.
5       A.   I don't recall how I internalized the data
6    when I saw it.
7       Q.   (By Mr. Gastel)  Did you ever conduct any
8    investigation about what legitimate medical need was
9    present in Tennessee that drove Opana prescription
10   rates in the State of Tennessee to levels above larger
11   states like New York, Pennsylvania, Florida,
12   California, or Texas?
13          MR. LIMBACHER:  Object to form.
14      A.   I don't recall any such analysis per se.
15      Q.   (By Mr. Gastel)  Did you ever conduct any
16   investigation whatsoever about why Tennessee was
17   receiving more Opana prescriptions than states of
18   comparative size?
19      A.   I don't recall, again, conducting that
20   type of analysis.  Endo had a number of systems --
21   databases, signal detection, surveillance type of
22   programs through its RiskMAP, and I don't recall
23   specifically if anything was detected or reported and
24   how it might have been handled through that vehicle,

Page 291

1    but that was -- that's where these kinds of things
2    might typically come to light.
3       Q.   Are you aware of anyone at Endo conducting
4    any such investigation with regard to the high
5    prescription rates in Tennessee for Opana?
6           MR. LIMBACHER:  Object to form and
7    foundation.
8       A.   Again, I don't recall one way or another
9    if we did -- or if they did or if they didn't.
10      Q.   (By Mr. Gastel)  Did you ever report this
11   information to your suspicious order monitoring team?
12      A.   I don't recall if that was done or not.
13   Certainly it was a cross-functional team, some of those
14   same folks would be participating in the annual
15   planning process, but I don't recall if we did a formal
16   query or not.
17      Q.   But you don't ever recall going to
18   somebody on your suspicious order monitoring team or
19   your risk management team and saying, "Hey, we're
20   seeing a lot of prescriptions in Tennessee.  Can you
21   guys go investigate that for us?"
22          MR. LIMBACHER:  Object to form.
23      Q.   (By Mr. Gastel)  Did you ever make that
24   inquiry?

Page 292

1           MR. LIMBACHER:  Same objection.
2       A.   I don't recall making such an inquiry.
3       Q.   (By Mr. Gastel)  Did you ever have
4    discussions with your sales team about why Opana was
5    being prescribed so heavily in Tennessee compared to
6    elsewhere in the country?
7       A.   Again, I don't recall singling out
8    Tennessee as a particular topic to have discussed or
9    analyzed in that way.
10      Q.   Did you ever ask your sales team to
11   investigate any potential diversion that was going on
12   in Tennessee as it related to Opana?
13          MR. LIMBACHER:  Object to form.
14      A.   We instructed our sales force to be on the
15   lookout for those kinds of activities regardless of
16   where they were.  I don't recall specifically asking
17   about Tennessee.  Again, we -- I don't recall such a
18   specific analysis being conducted.
19      Q.   (By Mr. Gastel)  As you sit here today,
20   are you aware of any legitimate medical reason why
21   patients in Tennessee required more prescriptions of
22   Opana than any other state in the country?
23          MR. LIMBACHER:  Object to form and
24   foundation.

Page 293

1       A.   Again, I'm not a clinician to know whether
2    or not somebody is a legitimate patient or what's going
3    on there.  Clearly there's a problem, but whether or
4    not -- my opinion on whether or not there's a
5    legitimate reason for that, I can't speculate.
6       Q.   (By Mr. Gastel)  During your time with
7    Endo, who was the regional sales director for the
8    region covering Tennessee, if you remember?
9       A.   I don't remember.  This was a question
10   asked earlier about where the kind of boundaries of the
11   regions were, and I don't recall who had Tennessee.
12      Q.   Could we assume that Tennessee was in the
13   southeast region?
14          MR. LIMBACHER:  Object to form.
15      Q.   (By Mr. Gastel)  I don't want to bust out
16   a map of the United States --
17      A.   No, but there's --
18      Q.   -- but I'll represent to you that we're
19   pretty southeast.
20      A.   No, I agree.  You'd be surprised, however,
21   when some pharma companies kind of mark up
22   their regions what gets included and what is a
23   southeast you know --
24      Q.   Sure.

74  (Pages 290 to 293)

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1        A.   From Maine, for some reason, or
2    mid-Atlantic.  And so it could be mid-Atlantic, it
3    could be southeast.  I don't know -- I don't recall how
4    they configured it.
5             MR. LIMBACHER: I know Pittsburghers who
6    would object to being designated in the Midwest.
7        A.   That's right.
8             MR. GASTEL: I think I'm done with that
9    document.  You can set it aside.
10       Q.   (By Mr. Gastel) I'm going to hand you a
11   document -- I just want to make sure I'm not handing
12   you mine.  I want to hand you a document that I've
13   marked as Exhibit 33.
14            [Exhibit Endo-Bingol-033 marked for
15            identification.]
16            MR. GASTEL: This is Document 1.  Can you
17   show the whole document on the screen for a second,
18   please?
19            MR. BROWN: Sure.
20            MR. GASTEL: Sorry.  My Bates numbers have
21   been cut off, but for the record Bates number on this
22   document is EPI 000559487.
23       Q.   (By Mr. Gastel) And do you see that this
24   is an e-mail from you to Pamela Wright dated February

Page 295

1    5th, 2008?
2        A.   Yes.
3        Q.   Who is Pamela Wright?
4        A.   I don't remember.
5        Q.   And you see that there's an attachment to
6    this e-mail entitled Opana brand positioning update
7    02-05-08.  Did I read that correctly?
8        A.   Yes, you did.
9        Q.   And you direct Pamela to print six copies
10   for your meeting at 4:30.  Do you see that?
11       A.   I do.
12       Q.   And then attached to that is this
13   PowerPoint presentation.  And again, I don't want to go
14   through the whole thing, and they're not -- there's no
15   numbers of these ones, but if you go to the slide
16   that's entitled what if positioning project.
17            MR. LIMBACHER: Take your time and review
18   the document.
19       A.   Okay.
20       Q.   (By Mr. Gastel) You're familiar with this
21   document, sir?
22       A.   I don't recall it, but --
23       Q.   Any reason to believe that you didn't send
24   it?

Page 296

1        A.   No.
2        Q.   So if you flip to that page, what if
3    positioning project.  It says emotional insights.  Do
4    you see that?
5        A.   I do.
6        Q.   And under the first bullet point it says
7    physicians are scared by opioids.  What does that mean,
8    if you recall?
9             MR. LIMBACHER: Object to form.
10       A.   I don't recall how this deck or what
11   this -- first of all, I don't recall the deck per se,
12   but how these kind of insights are derived, I don't
13   know what that really means other than I remember what
14   if was.  It was a kind of internal just
15   brainstorming-type project.
16            And we had a variety of people working,
17   perhaps including an ad agency or people from that and
18   people who were just kind of coming up with trying to
19   figure out how we want to position the product.  I
20   don't know how these insights were derived, but that's
21   what's written here.
22       Q.   (By Mr. Gastel) And then the next bullet
23   point states true pain sufferers are displeased.  Do
24   you have any idea what that means, true pain sufferers

Page 297

1    are displeased?
2             MR. LIMBACHER: Object to form.
3        A.   Again, I don't know how these insights
4    were derived and the characterization of these
5    statements, whether -- sometimes agencies come up with
6    their own kind of perspective and lingo and throw
7    things on a slide because they think they makes it
8    sound -- they're trying to make a distinction or a
9    nuanced point.  But clearly the fact that we focus on
10   true pain sufferers, real pain patients who require the
11   product -- that's probably what that's getting at.
12       Q.   (By Mr. Gastel) When you say real pain or
13   when this thing says true pain, does that suggest that
14   there are people who are using Opana who are not in
15   true pain?
16            MR. LIMBACHER: Object to form.
17       Q.   (By Ms. Scullion) Don't have real pain?
18       A.   No, it suggests that we want to focus on
19   the right -- selecting the appropriate patient for our
20   medication.
21       Q.   And then the last bullet point says Opana
22   has emerged and shows promise to help PCPs overcome
23   their fear and do what's right by themselves and their
24   patients.  Did I read that correctly?

75 (Pages 294 to 297)

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1      A.   That's what's written.
2      Q.   And then if you flip to the next page.
3   It's entitled the role Opana can play.  Did I read that
4   correctly?
5      A.   That is what's written.
6      Q.   And then it has kind of two columns.  It
7   has an opportunities column and a relevant Opana
8   properties column.  Did I read that correctly?
9      A.   Yes.
10     Q.   I want to direct your attention to the
11  second bullet point in the first blue bubble under the
12  relevant Opana properties.  You with me?
13     A.   Yes.
14     Q.   And it says the active molecule has also
15  proven more difficult to extract from this matrix by
16  abusers than many ER opioids.  Did I read that
17  correctly?
18     A.   That's what's written.
19     Q.   Is that bullet point meant to suggest that
20  Opana is -- that the active molecule in Opana is more
21  difficult to extract than other opioids?
22        MR. LIMBACHER:  Object to form and
23  foundation.
24     A.   Again, these slides seemingly produced by

Page 299

1   probably an ad agency helping -- trying to help us
2   position the product, coming up with their
3   own literature searches or other inputs, and then
4   putting what they think might be relevant to helping
5   the product or the business.
6        Of course we never promoted the product on
7   extractability.  Always promoting on the inherent
8   safety, risk profile of the product in all of our
9   promotional materials.  This is an attempt by perhaps
10  an ad agency or internal brainstorming to kind of
11  figure out unconstrained what might we think about and
12  how do we even do studies or provide data that help to
13  support certain hypotheses.  It has nothing to do with
14  actual promotional efforts.
15     Q.   (By Mr. Gastel)  Did this -- well, is this
16  statement true?
17        MR. LIMBACHER:  Object to form.
18     A.   I don't know if that statement is true
19  versus other ER opioids.  The TIMERx technology had
20  some gelling properties to it, so it was difficult --
21  it was reported to be difficult to extract.
22     Q.   (By Mr. Gastel)  Are you aware of any
23  scientific study that comes to that conclusion?
24     A.   As I said, these were internal discussions

Page 300

1   and hypotheses, and putting them here would be more of
2   a way to think about how we might prove that through
3   additional studies, perhaps.  But this was really more
4   positioning, thought-provoking comments from an ad
5   agency trying to help us create what the next kind of
6   position of the product might be.
7      Q.   Did you -- do you recall at this meeting
8   suggesting that -- to anybody -- that this statement
9   lacked scientific support or wasn't true?
10        MR. LIMBACHER:  Object to form.
11     A.   As I said previously, I don't really
12  recall this meeting or this document as such.
13     Q.   (By Mr. Gastel)  I want to direct your
14  attention to the second blue bubble.  Last bullet
15  point.  Are you with me?
16     A.   Yes.
17     Q.   And it says because of its less attractive
18  target to abusers, it has less stigma.  Did I read that
19  correctly?
20     A.   Yes, you did.
21     Q.   What does that mean to you?
22        MR. LIMBACHER:  Object to form.
23     A.   Well, on the face of it, it means again --
24  it reinforces my opinion that this is developed by

Page 301

1   somebody who is not considering the fact that these are
2   thoughts or hypotheses that are not necessarily proven,
3   or using ideas and language that have not -- going
4   through a PMRB process, but rather blue skying, kind of
5   trying to figure out a position and how the product
6   might fit in a clinician's armamentarium.
7        In this case, this statement, I don't know
8   how to gauge the veracity of it.  I don't -- it's a
9   positioning point that they are trying to -- that an ad
10  agency or somebody like that is trying to put onto
11  paper.
12     Q.   (By Mr. Gastel)  Is this a true statement?
13        MR. LIMBACHER:  Object to form.
14  Foundation.
15     A.   I don't know if -- I don't know how to
16  gauge whether it's truthful or not at the time it was
17  written.
18     Q.   (By Mr. Gastel)  I'll hand you a document
19  that we'll mark as Exhibit 34.
20        [Exhibit Endo-Bingol-034 marked for
21        identification.]
22        MR. GASTEL:  There should be two.
23        MR. LIMBACHER:  Thank you.
24     Q.   (By Mr. Gastel)  This is an e-mail chain

76 (Pages 298 to 301)

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1  from February 2011. Do you recall receiving this
2  document, sir?
3       MR. ROSENBLUM: Sorry. Can we get a Bates
4  number, please?
5       MR. GASTEL: Yeah, I'm sorry. It's Endo
6  Opioid MDL 00999189.
7       MR. ROSENBLUM: Thank you.
8      A. Okay.
9      Q. (By Mr. Gastel) The e-mail chain begins
10  with an e-mail from -- and I'm sorry, I'm going to
11  very back of the document. When I say very back of the
12  document, I mean the second page, actually. There you
13  go. Sorry about that.
14      The e-mail begins with an e-mail from
15  Richard Schwartz, and it's sent to you and Gregory --
16  and I'm not even going to try to pronounce that last
17  name. But do you see that, sir?
18      A. Pyszczymuka.
19      Q. Pyszczymuka?
20      A. Yeah.
21      Q. Thank you. Do you see that?
22      A. Yes, I do.
23      Q. Richard Schwartz apparently works for
24  WebMD. Do you recall that?

Page 303

1      A. I don't recall Richard.
2      Q. And he e-mails you, and it says -- the
3  second sentence -- I noticed an article in the March
4  issue of Men's Health, painkillers, I wanted to bring
5  to your attention. Your PR folks likely picked it up
6  already as it is a bit rough and mentions Opana and
7  Endo from the onset. Did I read that correctly?
8      A. Yes, you did.
9      Q. You don't know why Mr. Schwartz had
10  e-mailed you this article from Men's Health?
11      MR. LIMBACHER: Object to form.
12      A. I don't recall why he forwarded it.
13      Q. (By Mr. Gastel) And that e-mail came in
14  at 11:15, and then one minute later I think you forward
15  it on to Mr. Chris Clark. Can you see that?
16      A. Yes.
17      Q. Who is Chris Clark?
18      A. Chris was in our corporate communications
19  group.
20      Q. And then about 40 minutes later he e-mails
21  you and Gregory back and says, FYI, link to entire
22  article, and it has the web address. Do you see that?
23      A. Yes.
24      Q. And then 10 minutes later you also say

Page 304

1  FYI -- I'm sorry. About 10 minutes later you then
2  forward this e-mail chain on to Brian Lortie. Do you
3  see that?
4      A. Yes.
5      Q. Who is Brian Lortie?
6      A. He's my direct line manager at that point
7  in time.
8      Q. And it says FYI, also I have asked Chris
9  Clark to lead an issues management task force on behalf
10  of Opana ER given that our rising profile will likely
11  require us to be prepared for additional scrutiny as
12  our market share continues to grow. Did I read that
13  correctly?
14      A. Yes, you did.
15      Q. Do you recall directing Chris Clark to
16  lead an issue management task force back in 2011?
17      A. I don't recall it specifically.
18      Q. Did you do that in response to this Men's
19  Health article?
20      MR. LIMBACHER: Object to form.
21      A. I don't recall specifically what -- it
22  appears to be yes, that I did, but I don't recall the
23  action taken.
24      Q. (By Mr. Gastel) Do you recall reading the

Page 305

1  Men's Health article that he sent you?
2      A. I recall as I was looking at it here the
3  photo that was in it, so yes, I'm sure I did read it,
4  but I don't recall what the article was saying today.
5      Q. I'm going to hand you a document that I'll
6  mark as Exhibit 35. This document is a Men's Health
7  article that's referenced in this e-mail entitled
8  painkillers. Do you see that, sir?
9      [Exhibit Endo-Bingol-035 marked for
10      identification.]
11      A. Yes, I do.
12      Q. Do you recall reviewing this when this was
13  forwarded to you in 2011?
14      MR. LIMBACHER: Object to form. Asked and
15  answered.
16      A. Again, I don't recall actually reading it,
17  but I do -- I assume I did.
18      Q. (By Mr. Gastel) The article details the
19  fatal overdose of Brett Lute. And I want to direct
20  your attention to the second page in the third --
21  fourth paragraph down beginning Opana, even when taken
22  as prescribed. And it states -- are you with me, sir?
23      A. Yes.
24      Q. And it states Opana, even when taken as

77 (Pages 302 to 305)

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1    prescribed, has such high potential for abuse and
2    dependence that the Drug Enforcement Administration
3    puts it in the same category as cocaine.  Did I read
4    that correctly?
5        A.   You read it correctly, but the statement
6    is incorrect.
7        Q.   What's wrong with the statement?
8        A.   I believe cocaine is considered a Class I
9    narcotic.  Long-acting opioids such as Opana ER,
10   Class -- or Schedule II.
11       Q.   And then it says but that hasn't stopped
12   Endo from promoting the drug directly to consumers
13   through its website.  That was a true statement, you
14   were promoting Opana directly to consumers through your
15   website in 2011; correct?
16           MR. LIMBACHER:  Object to form.
17       A.   I believe that's correct.
18       Q.   (By Mr. Gastel)  Do you re -- and then it
19   states, hello, my name is Bill, and I am a 40-year-old
20   construction worker who developed low back pain, it
21   says, next to a photo of a heavyset man in jeans and
22   work boots.  Are you like Bill?  Talk to your doctor.
23   Did I read that correctly?
24       A.   Yes, you did.

Page 307

1        Q.   And that appears to be a quote from the
2    Endo website in 2011.  Do you recall that portion of
3    your website?
4            MR. LIMBACHER:  Object to form.
5        A.   Yes, I do.
6        Q.   (By Ms. Scullion)  And then it says the
7    same promotional website warns patients not to drink
8    alcohol while taking Opana because doing so can result
9    in a fatal overdose.  And that's true, drinking alcohol
10   with Opana can result in a fatal overdose; correct?
11           MR. LIMBACHER:  Object to form.
12       A.   Drinking alcohol with opioids can result
13   in a fatal overdose.  In this case, it was particularly
14   unfortunate that this individual also broke a tablet in
15   half, which could have also given a more bolus dose
16   than the product was designed to give.
17           So this is certainly a sad event, but this
18   fellow drinking alcohol and breaking the tablet is
19   probably not a very -- it was a very toxic combination
20   of events.
21       Q.   (By Mr. Gastel)  And this would be an
22   example of an individual abusing and misusing Opana;
23   right?
24           MR. LIMBACHER:  Object to form.

Page 308

1        A.   Yes.  By that definition of what misuse
2    and abuse is, this would qualify.
3        Q.   (By Mr. Gastel)  I want to direct your
4    attention to the next page.  Third paragraph down,
5    beginning America has a new drug problem.  Are you with
6    me?
7        A.   Yes.
8        Q.   America has a new drug problem.  It's
9    being facilitated by white-coated pharmacists in
10   neighboring drug stores and delivered by letter
11   carriers in convenient mail-order envelopes.  Did I
12   read that correctly?
13           MR. LIMBACHER:  Objection.
14       A.   Yes, you read it correctly.
15       Q.   (By Mr. Gastel)  Sometimes drugs are
16   pushed across counters in cash-only pain clinics or
17   passed among addicts who sell part of their stashes to
18   buy more drugs.  Did I read that correctly?
19       A.   You read it correctly.
20       Q.   Whatever the delivery method, the fatal
21   overdoses that resulted have increased by almost
22   fivefold since 1990.  Did I read that correctly?
23       A.   You read it correctly.
24       Q.   Most of the increase is due to

Page 309

1    prescription medications.  In 18 states, the number of
2    deaths caused by drugs now exceeds the number of motor
3    vehicle deaths.  Did I read that correctly?
4        A.   You read that correctly.
5        Q.   When you looked at this in 2011, did it
6    cause you any pause with regard to your marketing and
7    selling efforts that these statistics about fatal
8    overdoses, increased prescription rates, and increased
9    death rates cause you any hesitation in your marketing
10   and sales efforts in 2011 --
11           MR. LIMBACHER:  Object to form.
12       Q.   (By Mr. Gastel)  -- with regard to Opana?
13       A.   It made us want to double down on making
14   sure our reps were well-trained, making sure that the
15   product was being prescribed for appropriate use for
16   appropriate patients, and to adhere more stringently as
17   possible to all of our policies.
18           We did -- an obligation to treat patients
19   who have a genuine need for pain management, and
20   marketing the product appropriately for those patients
21   was always our Number One concern.
22       Q.   Let's -- I want to follow up on that.  In
23   your 2011 e-mail back to Brian Lortie, who I think you
24   said was your direct supervisor.  This is back to

78  (Pages 306 to 309)

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1   Exhibit 33, the e-mail exchange.
2       A.  34?
3       Q.  34. I'm sorry.  And this was after Chris
4   Clark had sent you the link to the full Men's Health
5   article.  In that response back to Brian, you don't
6   talk about making sure your sales force is trained
7   correctly.  You talk about growing your market share;
8   right?
9           MR. LIMBACHER:  Objection to form.
10  Misstates the evidence.
11      A.  I don't see any reference to market
12  share -- excuse me.  Market shares -- our market share
13  is growing.  We expect to have more scrutiny.  It's not
14  that we expect to grow market share any more as a
15  result of this type of activity.
16          I would also direct you to the message
17  above in which we -- in which I wrote to Julie McHugh,
18  who was Brian's boss, that we are doubling down in
19  terms of Opana ER brand training.  We've provided
20  compliance-specific training at jump-start meetings in
21  January, and in addition we are dedicating another
22  general session time for the upcoming national sales
23  meeting to stress the importance of regulatory and
24  compliance.  These are actions that we took very

Page 312

1       Q.  (By Mr. Gastel)  And you do that by
2   selling more of your product; correct?
3           MR. LIMBACHER:  Excuse me, counsel.  I
4   think you interrupted him.  He was in the middle of his
5   response.
6       Q.  (By Mr. Gastel)  Sorry, I didn't mean to
7   interrupt you.  I thought you were done.  I apologize.
8   If you want to finish your answer, go ahead.
9       A.  No, it's always the goal of every brand
10  team to grow their market share, regardless of the kind
11  of product that you're selling.
12      Q.  And you do that by selling more Opana;
13  right?
14          MR. LIMBACHER:  Object to form.
15      A.  Yes, technically.  You can also do it if
16  other things are happening in the market in terms of
17  market share, but usually you take -- you grow your
18  market share by taking more business from your
19  competitor.
20          Whether that's actually growing your
21  business or growing through a shrinking pie, that you
22  might increase your share without actually selling
23  more -- but perhaps a technicality.
24      Q.  (By Mr. Gastel)  I want to go back to the

Page 311

1   seriously, and always responded in an ethical manner to
2   these kinds of episodes.
3       Q.  (By Mr. Gastel)  But your stated goal here
4   in the February 9th, 2011, e-mail was to grow your
5   market share; right?  Sell more opioids?
6           MR. LIMBACHER:  Object to form.
7   Foundation.  You've mischaracterized the document.
8       A.  No, I disagree with that characterization.
9   The -- I'm simply stating that we will likely have more
10  of a higher profile as a result of our market share
11  growing; therefore, we needed to have a more intense
12  discussion on how we're going to handle these things.
13          On top of that, my e-mail above explains
14  exactly some of the things that we were doing in order
15  to mitigate these kinds of events.  This is not about
16  growing our -- I never referenced that we need to grow
17  our market share more, but merely the fact that as our
18  market share does grow, these types of things may
19  become more common.
20      Q.  (By Mr. Gastel)  But it was a goal at this
21  point to grow your market share; right?
22          MR. LIMBACHER:  Object to form.
23      A.  It's a goal every year to grow your market
24  share, as --

Page 313

1   Men's Health article.  It is six pages in.  I want to
2   direct your attention to the last paragraph on that
3   page.  It's the next page, I'm sorry -- I think.
4   You're on the right page.  I think my tech guy is on
5   the wrong page.
6           MR. BROWN:  Oh --
7       Q.  (By Mr. Gastel)  I'm sorry.  Yes.  Yes,
8   last page.  I'm sorry, last paragraph, beginning he
9   points to a study.  Do you see?  Are you with me?
10      A.  Yes.
11      Q.  The he is a reference to Dr. R. Aaron
12  Adams of the Scioto County health commissioner, who's
13  referenced in the previous paragraph.  Do you see that?
14      A.  Yes.
15      Q.  And it says he, referencing Dr. Adams,
16  points to a study by state officials that found that
17  doctors in southern Ohio were writing far more
18  prescriptions for painkillers than physicians in
19  similar-size communities in the northwestern part of
20  the state.  Did I read that correctly?
21          MR. LIMBACHER:  Actually, I think it is
22  says counties, not communities.
23          MR. GASTEL:  Sorry, let me reread that.
24      Q.  (By Mr. Gastel)  He points to a study by

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1  state officials that found that doctors in southern
2  Ohio were writing far more prescriptions for
3  painkillers than physicians in similar-size counties in
4  the northwestern part of the state.  Did I read that
5  correctly?
6      A.  Yes.
7      Q.  And those higher rates of prescriptions,
8  the researchers found, corresponded directly with
9  sharply higher death rates.  Did I read that correctly?
10     A.  Yes.
11     Q.  It says I've grown up here -- going to the
12 next page.  I've grown up here and I've watched this
13 thing evolve, says Dr. Adams, looking over his reading
14 glasses as we sit in his medical office discussing the
15 prescription problem.  Did I read that correctly?
16     A.  Yes.
17     Q.  He concludes, the numbers don't lie.
18 We're dispensing too many of these drugs.  Did I read
19 that correctly?
20     A.  Yes.
21     Q.  Do you agree with that statement from Dr.
22 Adams of the Scioto County health commissioner that the
23 problem is that we're dispensing too many of these
24 drugs?

Page 315

1          MR. LIMBACHER:  Object to form.
2      A.  I would agree that if these drugs are
3  being dispensed to people who are not pain patients,
4  then that would be a problem.
5      Q.  (By Mr. Gastel)  And you knew that that
6  was going on throughout the country during your time
7  with Endo and selling Opana; correct?
8          MR. LIMBACHER:  Objection, form and
9  foundation.  Misstates the evidence.
10     A.  I don't know where and to what extent any
11 misuse, abuse, or diversion was taking place, but that
12 was what our systems and RiskMAP were set up to help
13 detect and to help identify, and then we would -- the
14 company would react in accordance to those guidelines
15 and our RiskMAP.
16     Q.  (By Mr. Gastel)  Are you aware that after
17 you left the company, Endo sought the FDA's approval to
18 take the Opana that you had on the market in 2011 off
19 the market because of safety reasons?
20         MR. LIMBACHER:  Object to form and
21 foundation.
22     A.  I'm aware that they attempted to -- well,
23 it was after I left the company.  I don't know the
24 specifics of what they were doing and when they were

Page 316

1  doing it.  But just through my limited understanding of
2  what they were doing, that they wanted to remove the
3  old formulation in favor of the new formulation.
4      Q.  (By Mr. Gastel)  And then they sought to
5  take the old formulation off the market because of
6  safety reasons; right?
7          MR. LIMBACHER:  Objection.  Form.
8  Foundation, and it's well beyond the time when he no
9  longer worked at the company.
10     Q.  (By Mr. Gastel)  Are you aware of that?
11         MR. LIMBACHER:  Same objections.
12     A.  Again, I'm not aware of all the details
13 and what they were doing with the two products.  I just
14 know that they wanted to remove one in place of the new
15 improved -- what they thought was an improved version.
16     Q.  (By Mr. Gastel)  And they wanted to remove
17 it because of safety reasons; right?
18         MR. LIMBACHER:  Objection.  Form.
19 Foundation, and long after he was working at the
20 company.
21     A.  I don't know.  I would have to direct you
22 to somebody in the organization who was there at that
23 time.
24         MR. GASTEL:  Sure.  I think I'm largely

Page 317

1  done, but can I take a five-minute break, look at my
2  notes, and I think that you can get off the hot seat.
3          THE VIDEOGRAPHER:  Off the record at 6:42
4  PM.
5          [A brief recess was taken.]
6          THE VIDEOGRAPHER:  We're back on the
7  record at 6:53 PM.
8      Q.  (By Mr. Gastel)  Mr. Bingol, before the
9  break we were talking about Endo's attempts to have the
10 FDA pull Opana ER original formulation off the market.
11 You had mentioned how you knew that that was happening.
12 How did you know that?
13     A.  I don't recall specifically.  Just through
14 either some casual contact.  I know as we were leaving,
15 they were contemplating different ways to submit the
16 product and what they might do as a result, but I
17 don't -- I was not part of that final decision, and I
18 did not know what logic or rationale they actually
19 offered the FDA.
20         So just peripherally, just -- I'm not sure
21 how I came about understanding that other than, you
22 know, at the time I was there, they were always
23 debating about how they were going to introduce one
24 product -- the EN3288 product that we were working

80  (Pages 314 to 317)

Highly Confidential - Subject to Further Confidentiality Review

| Page 318 | Page 320 |
|---|---|

**Page 318**

1  on -- how that would be introduced to the market.
2  Q.   And that's a product that would eventually
3  become the Opana ER crush-resistant formulation; right?
4  MR. LIMBACHER:  Object to form and
5  foundation.
6  A.   That is correct.
7  Q.   (By Mr. Gastel)  And what were some of the
8  things that were being discussed about why Endo would
9  seek taking the original formulation off the market?
10  MR. LIMBACHER:  Object to form and
11  foundation.
12  A.   Having a crush-resistant product was
13  perceived to be safer, and therefore that would be the
14  product that they would want to introduce into the
15  market and replace the old product.
16  Q.   (By Mr. Gastel)  Then after you left
17  Endo, how did you become aware that they had filed with
18  the FDA in an attempt to get the original formulation
19  off the market?
20  A.   Again--
21  MR. LIMBACHER:  Object to form, and asked
22  and answered.
23  A.   I don't recall how -- with whom I may have
24  seen or talked with or through casual contact, or maybe

**Page 319**

1  I even read something.  I don't know if there was
2  literature in a pink sheet or something.  I don't
3  recall how I retained that or knew that at that time.
4  Q.   (By Mr. Gastel)  Where do you live, sir?
5  A.   Kennett Square, Pennsylvania.
6  Q.   Will you please give your address?
7  A.   107 Merry Met Farm Drive, Kennett Square,
8  Pennsylvania, 19348.
9  Q.   And who lives there with you, sir?
10  A.   My wife and my dog at the moment.
11  Q.   Any plans to move any time soon?
12  A.   No.
13  Q.   How long have you lived there?
14  A.   15 years -- coming up on 15 years.
15  MR. GASTEL:  Mr. Bingol, I appreciate the
16  time.  We'll reserve the rest of our questions at
17  trial, subject to our previous objection.  I have no
18  other questions.
19  THE VIDEOGRAPHER:  Are we going to
20  switch -- you're going to have questions?
21  MR. LIMBACHER:  Yes, I'm going to ask a
22  few questions.
23  THE VIDEOGRAPHER:  Off the record at 6:56
24  PM.

**Page 320**

1  [Discussion off the record.]
2  THE VIDEOGRAPHER:  We're back on the
3  record at 6:58 PM.
4  QUESTIONS BY MR. LIMBACHER:
5  Q.   Good evening, Mr. Bingol.  It's finally my
6  opportunity to ask you a few questions.  I know it's
7  been a very long day.  It's 7:00 at night here.  I'm
8  sure you're interested in getting home to your wife and
9  to your dog, so I will not be asking you a whole lot of
10  questions.  But for the benefit of the jury, can you
11  just tell us, where do you live, sir?
12  A.   I live in Kennett Square, Pennsylvania.
13  Q.   And do you have children?
14  A.   I do.
15  Q.   And how many kids do you have?
16  A.   I have three.
17  Q.   And tell us, because I'm not sure it was
18  entirely clear, how long you worked at Endo.  When were
19  you employed at Endo Pharmaceuticals?
20  A.   I think around late May 2006 until June
21  2011.
22  Q.   And tell us briefly about your education,
23  please, sir.
24  A.   I have an MBA from Old Dominion University

**Page 321**

1  in Norfolk, Virginia, and a bachelor's degree
2  from Christopher Newport University in Newport News,
3  Virginia.
4  Q.   And when did you receive your MBA from Old
5  Dominion?
6  A.   That was in -- I would probably have to
7  actually jog my memory on that, but 1995 or 1994.
8  Q.   Okay.  And let's take a look at what you
9  were previously questioned about that was marked as
10  Exhibit Number 4.  Is that a copy of a one-page CV that
11  you prepared?
12  A.   It is.
13  Q.   And does that set forth your work
14  experience?
15  A.   It does.
16  Q.   And briefly, if you could just walk us
17  through your work experience in the pharmaceutical
18  industry, starting with when you were employed as a
19  U.S. brand director at AstraZeneca.
20  A.   I started my pharmaceutical career as a
21  sales rep.  I took the position and got sent out to a
22  territory in West Virginia, and was working out in the
23  Huntington, southern Ohio, eastern Kentucky region.
24  After a little more than 18 months or so,

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1    I was promoted in-house and went to Boston, where at
2    that time it was not AstraZeneca but rather Astra USA,
3    which predated the mergers that created AstraZeneca.
4    From there I worked my way into brand management and up
5    to -- when I left, I was brand director on their
6    rhinitis franchise at AZ.
7         Q.   And where did you go next?
8         A.   From there I took a job in North Carolina
9    at a small company called aaiPharma?
10   senior director of marketing there for -- it was a
11   fledgling pharmaceutical operation.  It was a small CRO
12   that wanted to also market their own ethical
13   pharmaceutical products.
14        Q.   And then did you come to Pennsylvania
15   after working at aaiPharma?
16        A.   Returned, actually.  When I was with
17   AstraZeneca, they -- and after the merger to create
18   AstraZeneca, we all moved down from Boston to
19   Pennsylvania.  I left Pennsylvania to go to aaiPharma
20   in North Carolina, and then we came back to roughly the
21   same area here at Kennett Square, and have been here
22   ever since.
23        Q.   And what did you do at Adolor Corporation
24   when you worked there from 2004 until about 2006?

Page 323

1         A.   I was senior director of marketing there
2    for their -- they had a new class of product they were
3    developing to help treat the -- some of the side
4    effects of opioid medications.
5         Q.   Okay.  And after Adolor, that's when you
6    were employed at Endo Pharmaceuticals?
7         A.   That's correct.
8         Q.   And tell us, what were you hired to do at
9    Endo starting in 2006?
10        A.   I was hired specifically to launch Opana
11   and Opana ER as a senior director of that book of
12   business.
13        Q.   And as the senior director for Opana ER at
14   Endo, what were your basic job responsibilities during
15   that period of time when you held that position?
16        A.   It's a fairly traditional marketing role.
17   Managing the business plan for the brand, which would
18   also lead to managing the commercial components of
19   developing a brand identity and promotional materials,
20   working cross-functionally to help set pricing and
21   contracting guidelines for the brand, working on life
22   cycle management opportunities, helping with sales
23   training, ensuring that the quality of the messages
24   that we're -- that the sales force was being trained on

Page 324

1    were consistent with brand communication objectives, et
2    cetera.
3         Q.   You mentioned developing promotional
4    materials.  Can you tell us just a little bit about how
5    that process worked at Endo?
6         A.   Yes.  It was a very rigorous process,
7    actually.  It was a cross-functional team again.  The
8    primary vehicle for promotional materials creation, you
9    would create the -- outside of -- each brand team would
10   create their own materials but then have to bring them
11   through what we call the PMRB process, which was a
12   promotional review board for marketing materials.
13   Well, frankly, for all external materials.
14        And it was led by legal, regulatory, and
15   medical.  These were members that were always required
16   to be there.  And then if you were submitting a piece,
17   you would also attend those types of meetings.  But
18   that would be the mechanism by which the quality and
19   the compliant nature of the product of the materials
20   were always ensured through that process.
21        Q.   And once the promotional materials for
22   Opana ER went through that PMRB process internally at
23   Endo, would they then be sent to FDA?
24        MS. SCULLION:  Objection.  Leading.

Page 325

1         A.   Yes, it was Endo's standard practice and
2    requirement by the FDA that all promotional materials
3    used in the field eventually get sent to the FDA for
4    their review as needed.
5         Q.   (By Mr. Limbacher)  Do you recall being
6    asked questions with regard to Endo's RiskMAP?
7         A.   I'm sorry.  What do you mean?  Today?
8         Q.   Yes, today.  I'm sorry.  Do you recall
9    being asked some questions with regard to and being
10   shown a copy of the RiskMAP document from June of 2007?
11        A.   Yes.
12        Q.   And as part of the RiskMAP, was there
13   something called the risk management team?
14        A.   Yes.
15        Q.   And were you occasionally a participant in
16   meetings of the risk management team at Endo with
17   regard to Opana ER?
18        A.   I was, I guess, an ad hoc member, so as
19   needed I would participate.
20        Q.   And let's take a look at what counsel
21   marked as Exhibit Number 19.  Do you have that in front
22   of you, sir?
23        A.   I do.
24        Q.   And if you can look at the first page that

82 (Pages 322 to 325)

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1   has the title on it.  Is -- tell me what this is.  Is
2   this the results of some market research?
3       A.   Yes, it is.
4       Q.   And what's the date on this?
5       A.   December 2008.
6       Q.   And you recall being asked some questions
7   about certain pages in Exhibit Number 19?
8       A.   I recall lots of questions today on lots
9   of research, but yes, I --
10      Q.   I understand.  Let me direct you
11  specifically to what's identified in the document as
12  Slide Number 10.  It actually has a number on it of
13  E0914.12.  Are you with me?
14      A.   Yes.
15      Q.   And this -- what's the title of this
16  particular slide?
17      A.   Key insights.
18      Q.   Do you recall being asked about whether or
19  not Endo had any market research on the issue of why
20  doctors might have this perception of Opana ER having a
21  low potential for abuse?
22      A.   Yes, I recall being asked.
23      Q.   And in connection with those questions,
24  were you shown what's set forth here on Slide Number 10

Page 327

1   in Exhibit Number 19?
2       A.   I don't recall being shown this slide.
3       Q.   Can you read for us, please, the first
4   bullet point here as one of the key insights in this
5   market research?
6       A.   From the beginning?
7       Q.   Please.
8       A.   On the most -- one -- excuse me.  It says
9   on the most important characteristics, physicians rated
10  Opana ER significantly lower than all other opioids on
11  insurance and formulary availability, and significantly
12  higher than all others on does not have reputation for
13  street abuse.
14           Therefore, Opana ER's position in doctor's
15  minds is around the drug's lack of street value,
16  leading to a perception of lower potential for street
17  abuse.
18      Q.   Does this key insight from market research
19  from December of 2008 shed any light on why doctors
20  perceived Opana ER to have a low potential for abuse?
21           MS. SCULLION:  Objection.  Foundation.
22      A.   Yes, I think as I testified earlier today,
23  as a matter of fact, that these kind -- perception can
24  be created a number of different ways, and this is

Page 328

1   articulating one way that that perception might have
2   been created.
3       Q.   (By Mr. Limbacher)  What did Endo say in
4   its promotional materials for Opana ER about whether or
5   not Opana ER had a low potential for abuse?
6       A.   We didn't refer to that at all in our
7   promotional materials.  Our promotional materials were
8   always squarely focused on presenting the safety
9   information, with the black box warnings usually very
10  prominently, if not on the very first page, and
11  certainly fair balance provided throughout our
12  promotional pieces.
13           And as I mentioned, through the PMRB
14  process, all pieces went through the internal review of
15  our legal, medical, and regulatory teams, and we never
16  promoted the idea that this was a less abusable opioid
17  to clinicians.
18      Q.   To your understanding, Mr. Bingol, did
19  Endo ever train its sales force to promote Opana ER as
20  having a low abuse potential?
21      A.   No, we did not do that.
22           MR. LIMBACHER:  That's all the questions I
23  have.  Thank you very much.
24           THE VIDEOGRAPHER:  Off the record at 7:09

Page 329

1   PM.
2           [A brief recess was taken.]
3           THE VIDEOGRAPHER:  We're back on the
4   record at 7:16 PM.
5           QUESTIONS BY MS. SCULLION:
6       Q.   Mr. Bingol, welcome back.  Counsel asked
7   you about Exhibit 19, and you testified -- he asked you
8   can you read us -- read for us, please, the first
9   bullet point here as one of the key insights in market
10  research?  Do you recall reading the key insight from
11  Exhibit 19?
12      A.   I do.
13      Q.   And then counsel asked you, does this key
14  insight from market shed any light on why doctors
15  perceive Opana ER to have a lower potential for abuse?
16           Your response was, yes, I think as I
17  testified earlier today, as a matter of fact, that
18  these kinds of perception can be presented a number of
19  different ways, and this is articulating one way that
20  that perception might have been created.
21           Do you remember that testimony?
22      A.   I do.
23      Q.   And that testimony was with respect to
24  doctors understanding that Opana ER had a -- did not

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1    have a reputation for street abuse at the time of the
2    research; correct?
3             MR. LIMBACHER: Object to form.
4        A.  I'm sorry. Ask that question again,
5    please.
6        Q.  (By Ms. Scullion) Sure. What you looked
7    at in terms of the key insight --
8        A.  Yes.
9        Q.  -- was doctors understanding that Opana
10   ER did not have a reputation for street abuse at the
11   time that that research was undertaken; correct?
12            MR. LIMBACHER: Object to form. Misstates
13   the evidence.
14       A.  My reading of that statement is that some
15   doctors perceived that. I don't know if that was a
16   true understanding or how they viewed it, but that was
17   a perception that they had, that patients weren't
18   coming in and necessarily asking for it by name the way
19   they might other products in the category.
20       Q.  (By Ms. Scullion) Can you turn to Exhibit
21   19 and go to Page E914.12? Do you have it in front of
22   you?
23       A.  Yes.
24       Q.  And what that first bullet point speaks to

Page 331

1    is not about patients coming in, asking for it by name,
2    but whether it has a reputation for street abuse;
3    correct?
4             MR. LIMBACHER: Object to form. Misstates
5    the evidence.
6        A.  That's what it says.
7        Q.  (By Ms. Scullion) Okay. Now, you knew,
8    did you not, that in fact oxymorphone in oral
9    formulations did in fact have a history of street
10   abuse; correct?
11            MR. LIMBACHER: Object to form.
12   Foundation.
13       A.  I'm sorry. A history as -- so I'm not
14   clear on your question. I'm sorry.
15       Q.  (By Ms. Scullion) Sure. You're aware,
16   were you not, that oxymorphone in oral formulation had
17   been abused as a street drug in the 1960s and 1970s?
18            MR. LIMBACHER: Object to form and
19   foundation.
20       A.  I'm not clear on all the history of the
21   product or -- because as I mentioned before, it was an
22   older molecule, and I wasn't sure exactly when or how
23   it was previously in the marketplace, but certainly
24   oxymorphone was available in the past.

Page 332

1        Q.  (By Ms. Scullion) And you knew that not
2    only had it been available in the past, it had been
3    available in oral formulation in the past; correct?
4        A.  It was an injectable and suppository. I
5    guess there was -- I don't really recall, to be honest
6    with you, but I assume there was perhaps an oral
7    formulation available.
8        Q.  (By Ms. Scullion) Did you ever --
9             MR. LIMBACHER: I would caution the
10   witness not to speculate.
11       Q.  (By Ms. Scullion) You're aware, were you
12   not, of the history of oxymorphone in oral formulation
13   having been abused as a street drug, though, in the
14   1960s and 1970s; right? You're aware of that; right?
15            MR. LIMBACHER: Object to form. Asked and
16   answered.
17       A.  I don't recall all of the historical
18   perspective of the molecule.
19            MS. SCULLION: Can we have E563?
20       Q.  (By Ms. Scullion) I'm going to hand you
21   what's been marked as Exhibit Number 31. And Exhibit
22   31 -- I apologize -- the Bates numbers are cut off on
23   mine.
24            MS. SCULLION: Thank you.

Page 333

1             MR. LIMBACHER: Well, we're up to Exhibit
2    35.
3             MS. SCULLION: Well, then let's mark it
4    35.
5             MR. LIMBACHER: No, I think --
6             MR. BROWN: 36.
7             MR. GASTEL: I think you're 36.
8             MR. LIMBACHER: Yeah, we've got up to 35.
9    So is this 36?
10            MS. SCULLION: It will be 36.
11       Q.  (By Ms. Scullion) Let me just remark
12   that, if you don't mind, Mr. Bingol.
13            [Exhibit Endo-Bingol-036 marked for
14            identification.]
15       A.  Oh, of course.
16       Q.  Thank you so much. It's 36. And Exhibit
17   36 is Bates-stamped Endo OR CID 00694084. And Mr.
18   Bingol, Exhibit 36 is a copy of a May 2011 Drug
19   Enforcement Administration drug intelligence brief from
20   the Philadelphia division intelligence program,
21   entitled Opana oxymorphone abuse. You see that;
22   correct?
23       A.  Yes, I see it.
24       Q.  And if you look in the details section on

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1    the first page of the brief, which is E563.2.  Do you
2    see here that the DEA is explaining that -- in the
3    second sentence -- in the early 1970s, oxymorphone in
4    the form of Numorphan instant-release tablets was one
5    of the most sought-after and well-regarded opioids of
6    the Class IV drug-using community.  See that?
7         A.  I see.
8         Q.  Popularly known as blues for their blue
9    coloring, the tablets contained very few insoluble
10   ingredients, making them extremely easy to inject, and
11   they were dangerously potent when used intravenously.
12   Blues were also considered to be especially euphoric,
13   better than heroin or morphine.  Did I read that
14   correctly?
15        A.  You read it correctly.
16        Q.  And having read that -- those details
17   provided by the DEA, does that refresh your
18   recollection that oxymorphone in oral formulation had a
19   history of street abuse?
20             MR. LIMBACHER:  Object to form.
21        A.  Certainly it does now that I read it.  I
22   simply didn't recall the parameters around which this
23   product was historically used or abused, but I have no
24   reason to doubt what's written here.

Page 335

1         Q.  (By Ms. Scullion)  You were aware of that
2    history of abuse when you were the product manager for
3    Opana ER; correct?
4             MR. LIMBACHER:  Object to form, and asked
5    and answered.
6         A.  Again, I don't recall the specifics of the
7    history of the product when I was there, but as I said,
8    I read and see what's written here, and I have no
9    reason to doubt it.
10        Q.  (By Ms. Scullion)  And did Endo ever
11   specifically inform the doctors, nurses, physicians
12   assistants, health care providers it was calling on to
13   sell Opana and Opana ER about this history of street
14   abuse for oxymorphone?
15            MR. LIMBACHER:  Object to form.
16        A.  Endo promoted and always encouraged
17   physicians to be aware of the safety concerns and the
18   black box warning of the product, as approved by the
19   FDA, which approved this product as a safe and
20   effective option for patients requiring long-acting
21   opioids.
22        Q.  (By Ms. Scullion)  But my question, sir,
23   was did Endo ever specifically inform the health care
24   providers that its sales reps were detailing on Opana

Page 336

1    and Opana ER about the history of abuse and misuse of
2    oxymorphone in oral formulation?
3             MR. LIMBACHER:  Object to form.
4         A.  Again, this is a different formulation and
5    approved by the FDA.  What we were marketing at the
6    time was approved as safe and effective.  And
7    therefore, we promoted the product based on its
8    labeling, based on its safety -- black box warnings,
9    and always in compliance with the regulations that were
10   in place at the time.
11        Q.  (By Ms. Scullion)  We discussed earlier
12   today the RiskMAP for Opana ER, and you recall that a
13   significant portion of that RiskMAP involved education
14   of health care providers with respect to prescribing of
15   long-acting opioids; correct?
16        A.  Correct.
17        Q.  And as part of that education, Endo could
18   have told health care providers about the specific
19   history of abuse for oxymorphone; correct?
20             MR. LIMBACHER:  Object to form.
21        A.  Endo promoted and displayed the black box
22   warnings prominently on all of its materials,
23   highlighting the risks of potential abuse, misuse, and
24   diversion.

Page 337

1         Q.  (By Ms. Scullion)  And that was for Opana
2    ER; correct -- the labeling for Opana ER?  That's what
3    you were just referring to?
4         A.  For both products.
5         Q.  Okay.  Separate and apart from the
6    labeling for Opana and Opana ER, Endo could have
7    educated health care providers about the history of
8    abuse for the oxymorphone molecule when it was sold in
9    oral formulation back in the 1960s and 1970s; right?
10   Could have done that?
11            MR. LIMBACHER:  Object to form.  Calls for
12   speculation.
13        A.  Again, we have always promoted the product
14   in accordance with its label, and always providing the
15   appropriate safety information that was associated with
16   this product and this formulation.
17        Q.  (By Ms. Scullion)  Right.  I hear what
18   you're saying.  It's not answering my question.  My
19   question was not about Opana ER and Opana.  Question
20   was about, could Endo have provided education to health
21   care providers about the history of abuse with the
22   oxymorphone molecule?
23            MR. LIMBACHER:  Same objection.
24        A.  The molecule in its form with Opana ER and

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1  a new IR formulation, not necessarily being available
2  in the market in the same formulation that was in the
3  1970s. I was not part of those decisions, but I don't
4  know what the rationale was, but we always promoted the
5  product on label with the correct safety information,
6  and we always made it prominent as part of our overall
7  promotion.
8      So we never underplayed the risks of Opana
9  ER or Opana for that matter with respect to the
10 formulations and the products that were approved by the
11 FDA.
12     Q.  (By Ms. Scullion)  I'm just going to ask
13 factually. Factually, did Endo ever sponsor a medical
14 education program that discussed the history of abuse
15 of the oxymorphone molecule back in the 1960s and
16 1970s; yes or no?
17         MR. LIMBACHER:  Objection.  Form and
18 foundation.
19     A.  I don't know.
20     Q.  (By Ms. Scullion)  Are you aware of Endo
21 ever having sent around any patient education brochures
22 educating patients as to the history of abuse of the
23 oxymorphone molecule back in the 1960s and 1970s; yes
24 or no?

Page 340

1      A.  Again, we promoted these products in
2  accordance with their safety data. These are not the
3  exact same product, the molecule in a different
4  formulation, and promoting the product in accordance
5  with the black box warnings, never underplaying the
6  risk associated with these products.
7      Q.  (By Ms. Scullion)  Mr. Bingol, this is the
8  final question, and so I do want to have an answer to
9  it. I wasn't asking about promotion.  I'm asking did
10 Endo ever send out a dear-doctor letter to health care
11 providers informing them there was in fact a history of
12 street abuse for the oxymorphone molecule back in the
13 1960s and 1970s?  It's just a yes-or-no question.
14         MR. LIMBACHER:  Objection.  Form and
15 foundation, and asked and answered.
16     THE WITNESS:  Not that I'm aware of.
17     MS. SCULLION:  Okay.  Thank you.
18     THE VIDEOGRAPHER:  Off the record at 7:28
19 PM.
20
21     [SIGNATURE RESERVED.]
22
23
24

Page 339

1         MR. LIMBACHER:  Objection.  Form and
2  foundation.
3      A.  I don't recall creating materials like
4  that for patients. The materials we did create were
5  always, again, compliant and providing the appropriate
6  risk information for patients who might be taking this
7  product.
8      Q.  (By Ms. Scullion)  Did Endo provide any
9  training to its sales reps -- yes or no -- on the
10 history of abuse with respect to the oxymorphone
11 molecule in the 1960s and 1970s?
12         MR. LIMBACHER:  Objection.  Form and
13 foundation.
14     A.  I don't recall that we did that.
15     Q.  (By Ms. Scullion)  Did Endo ever send a
16 dear-doctor letter to health care providers informing
17 them that there was in fact a history of street abuse
18 for the oxymorphone molecule back in the 1960s and
19 1970s?
20         MR. LIMBACHER:  Objection.  Form and
21 foundation.  And Jen, I think we're out of time.
22     MS. SCULLION:  Okay.
23         MR. LIMBACHER:  He can answer the
24 question.

Page 341

1         C E R T I F I C A T E
2
3      I, MARK ARNDT, a Certified Shorthand
4  Reporter and Certified Court Reporter, do hereby
5  certify that prior to the commencement of the
6  examination, DEMIR BINGOL was sworn by me to testify
7  the truth, the whole truth and nothing but the truth.
8      I DO FURTHER CERTIFY that the foregoing is a
9  true and accurate transcript of the proceedings as
10 taken stenographically by and before me at the time,
11 place and on the date hereinbefore set forth.
12     I DO FURTHER CERTIFY that I am neither a
13 relative nor employee nor attorney nor counsel of any
14 of the parties to this action, and that I am neither a
15 relative nor employee of such attorney or counsel, and
16 that I am not financially interested in this action.
17
18
19     _____
20     MARK ARNDT, CSR, CCR, RPR
21     CSR No. 084-004711
22     CCR No. 1398
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 342

```
 1
 2          I, DEMIR BINGOL, the witness herein,
 3    having read the foregoing testimony of the pages of
 4    this deposition, do hereby certify it to be a true and
 5    correct transcript, subject to the corrections, if any,
 6    shown on the attached page.
 7
 8
 9
10          _____
11             DEMIR BINGOL
12
13
14    Sworn and subscribed to before me,
15    This _____ day of _____, 201_.
16
17
18    _____
19        Notary Public
20
21
22
23
24
```

Page 343

```
 1        DEPOSITION ERRATA SHEET
 2
 3    Page No._____Line No._____Change to:_____
 4    _____
 5    Reason for change:_____
 6    Page No._____Line No._____Change to:_____
 7    _____
 8    Reason for change:_____
 9    Page No._____Line No._____Change to:_____
10    _____
11    Reason for change:_____
12    Page No._____Line No._____Change to:_____
13    _____
14    Reason for change:_____
15    Page No._____Line No._____Change to:_____
16    _____
17    Reason for change:_____
18    Page No._____Line No._____Change to:_____
19    _____
20    Reason for change:_____
21
22    SIGNATURE:_____DATE:_____
23            DEMIR BINGOL
24
```

87 (Pages 342 to 343)

**A**

**a.m** 1:11
**aaiPharma** 26:8
  27:12,18 28:6
  29:16 30:3
  322:9,15,19
**Aaron** 252:10
  313:11
**abilities** 33:3
**ability** 42:3,3
  164:16 167:5
  172:11 264:7
  264:11,18
  266:6,12,18
**able** 32:17 43:24
  45:5 50:22
  52:13 63:5
  95:22,24
  106:24 124:24
  125:22 152:12
  275:14,16
  276:2 288:20
**absolutely** 163:9
  171:2
**abusable** 200:15
  328:16
**abuse** 22:12
  27:19 28:20
  29:3 30:1
  100:3 101:7,16
  127:21 128:12
  129:19,22
  130:1 132:15
  133:22 135:5
  136:5 138:9
  139:3,18 140:4
  182:18,21,24
  184:7,10 185:4
  186:9 192:6,11
  192:24 193:24
  194:4,10,21
  195:3,7,10,10
  195:12,18
  196:21 197:9
  197:16 198:14
  199:8 201:7,14

202:3 204:22
  205:2,8,21,23
  206:1,4 207:4
  207:13 208:5
  209:18 210:5
  211:1,12
  212:12 214:3
  214:12 215:15
  216:20 217:20
  221:23 222:7
  222:20,24
  223:5 247:16
  306:1 308:2
  315:11 326:21
  327:13,17,20
  328:5,20
  329:15 330:1
  330:10 331:2
  331:10 333:21
  334:19 335:2
  335:14 336:1
  336:19,23
  337:8,21
  338:14,22
  339:10,17
  340:12
**abuse-deterrent**
  205:15
**abuse/diversion**
  180:3,16 182:5
**abused** 139:14
  282:13 331:17
  332:13 334:23
**abusers** 298:16
  300:18
**abusing** 307:22
**accelerating**
  169:7
**acceptance**
  224:20 248:5
**accepted** 152:16
**access** 167:1
  232:6 233:1
**accomplishme...**
  241:10
**account** 19:16

19:24 20:7
  45:23 52:14
  58:21 86:23,23
  86:24 135:15
**accountability**
  29:18
**accounts** 20:7
**accuracy** 113:20
  150:19 151:17
  151:22 152:14
**accurate** 150:23
  224:20 289:8
  341:9
**accurately** 158:9
**acetaminophen**
  26:14
**achieve** 52:12
  164:20 269:16
**achieved** 72:6
**acknowledged**
  129:23 132:13
  136:18
**acquire** 51:1
  89:16,22 265:9
**acquisition**
  43:10 52:2
  89:15 90:18
  126:23 156:23
**acronym** 40:5
  110:5 225:14
**acting** 201:21
**action** 5:16 9:19
  10:7 14:3
  65:12 66:7
  108:23 164:5,6
  191:20,21
  304:23 341:14
  341:16
**actions** 209:2
  310:24
**active** 81:17
  144:21 298:14
  298:20
**actively** 230:9
**activities** 55:19
  66:7,8,13,14

81:18,21
  228:24 292:15
**activity** 151:4
  153:5 185:23
  265:8 310:15
**actual** 32:14,17
  74:11,17
  131:12 166:24
  299:14
**ad** 119:5 296:17
  299:1,10 300:4
  301:9 325:18
**ADAM** 3:23
**Adams** 313:12
  313:15 314:13
  314:22
**addicted** 139:15
  140:15
**addiction** 29:4
  102:11 129:14
**addictive** 171:12
  171:24 172:16
**addicts** 122:8
  308:17
**addition** 91:19
  104:14 155:16
  166:3 241:12
  310:21
**additional** 35:14
  36:10 45:8
  73:3 81:3
  104:16 125:20
  125:24 132:2
  279:11 285:23
  300:3 304:11
**additions** 155:8
**address** 91:20
  93:14 94:11
  97:3 100:9,18
  102:17,18
  105:3,7 108:5
  126:12 127:19
  129:8 136:23
  225:18 237:21
  238:12 267:2
  303:22 319:6

**addressed** 29:9
  131:5 207:17
  207:19,19
**addresses** 94:5
  238:11
**addressing**
  102:23 272:9
**ADF** 246:13
  247:14,16
  248:1,5,12,18
  249:7
**adhere** 309:16
**Administration**
  306:2 333:19
**Adolor** 27:1,13
  29:16 30:3
  31:4,5,6,9
  236:23 237:22
  238:1,8 322:23
  323:5
**Adolor's** 239:13
**adopt** 167:21
**adopted** 271:21
**adopters** 167:6,9
  167:10,15
  271:13,17,18
**adoption** 166:5
  166:16 167:12
  167:19 224:19
**adults** 282:4
**advance** 31:15
  32:1
**advantage**
  169:23 216:2,3
  221:23 223:6
  257:7
**advantages**
  213:24 214:2
  221:18,22
  222:6 258:8
**adverse** 22:12
  27:10 28:13,21
  28:23 29:1
  71:17 95:23
  100:4
**advisement**

Highly Confidential - Subject to Further Confidentiality Review

23:11
**adviser** 120:14
120:16 121:18
121:21
**advisory** 5:18
106:1,3 113:11
113:16,21
119:17,19,21
119:24 120:1
120:18,23
**advocacy** 228:19
236:16,17
**affairs** 62:8
65:18 234:9,16
245:4,8,9,13
246:1,7 247:9
252:24 253:4
256:24
**affiliated** 256:5
**affirmative**
184:7
**affirmatively**
196:3
**afforded** 231:7
**afraid** 123:15
204:21 205:2
**Again--** 318:20
**agencies** 47:10
119:5 297:5
**agency** 77:24
78:5,6 89:4,6
89:10 189:1
234:1 296:17
299:1,10 300:5
301:10
**agenda** 78:12
238:6
**ago** 10:7 51:15
80:1 118:11
209:2,24 225:5
281:18
**agonist** 27:8
153:21
**agree** 136:3
242:24 268:1
293:20 314:21

315:2
**agreement** 73:24
74:4 75:1
100:21 129:2,7
129:17
**agreements**
108:19
**ahead** 108:2
259:23 312:8
**aided** 176:12
177:4
**Akron** 68:23,24
**Albers** 259:17
**alcohol** 307:8,9
307:12,18
**Alexander**
245:24 246:4
250:5 253:12
**Alexander's**
247:8 251:11
**Alfano** 3:7
**algorithm** 289:7
**aligned** 242:12
**alignment** 77:9
111:5 205:12
**Allen** 244:18
**Allergan** 107:22
**allocate** 266:1
**allocated** 264:13
264:22 265:7
265:13
**allocation** 264:6
265:22 266:2
266:11
**allocations**
263:2
**allow** 15:3 142:5
**allowed** 103:18
108:10,21
146:6
**allowing** 216:2
**allows** 162:1
**alternative** 55:2
145:2
**alternatives** 54:2
**altogether** 24:6

**alvimopan** 27:7
**America** 308:5,8
**American** 25:20
83:9 98:10
226:16,21,22
227:8,8,17,22
227:23,24
228:12,15
232:3,15,23
233:24 235:18
236:4,12
251:14,18
**AmerisourceB...**
2:19
**Ammon** 116:1,6
117:22
**amounts** 156:17
**ample** 158:4
**Amy** 114:2
156:9
**analgesic** 92:21
160:23
**analgesics**
109:17 158:3
**analysis** 164:6
209:12 224:4
224:14 266:4
266:22 268:18
290:14,20
292:18
**analytics** 44:16
265:4,12,24
**analyzed** 292:9
**analyzing** 207:1
**and/or** 81:19
**anecdote** 122:10
**Annapolis** 260:9
**Annette** 232:4
**annotated**
257:21
**announcement**
256:19
**annual** 98:12
278:2 291:14
**answer** 12:13
15:3 21:23

22:5 32:10
74:5,7,9 109:6
134:2 142:5,16
143:8,11 149:8
182:7 256:16
284:7 312:8
339:23 340:8
**answered** 22:4
30:15 84:15
104:3 112:9
126:8 132:19
134:1,19
135:10 137:3
138:12 145:21
168:5 195:5
196:7,17
197:19 199:1
202:5 210:17
218:6,12 219:7
239:8 250:24
275:9 305:15
318:22 332:16
335:5 340:15
**answering**
137:14 141:19
337:18
**answers** 32:8,14
137:4 138:4
179:4
**antagonist** 27:7
27:8
**antagonists**
31:11,13
**anticipate** 31:16
194:3,12 196:1
199:7
**antitrust** 12:21
**Antonio** 238:6
239:6
**anybody** 262:1
283:6 300:8
**anybody's**
135:12 140:11
**AP** 227:23
**Apap** 36:24
**apart** 337:5

**APF** 226:16
227:13,14
228:13,21
229:4,8 236:18
236:22 237:1
238:5,7 239:5
239:13,17
240:16,20,24
241:18,19
242:6 243:3,8
243:15 244:1,5
244:9 255:4,12
255:16
**apologies** 24:6
253:21
**apologize** 48:12
60:12 191:9
249:17 258:6
312:7 332:22
**apparent** 122:20
129:20 139:2
**apparently**
302:23
**appear** 79:12
80:18 81:1
147:9
**APPEARAN...**
2:5 3:1 4:1
**appears** 21:21
76:18 120:6
147:3 152:23
240:4 250:7
304:22 307:1
**applicability**
31:23
**applied** 281:11
**APPLIES** 1:5
**apply** 25:3
157:12 173:7
173:13 280:22
**applying** 24:24
**appointed** 73:5
73:9
**appreciate**
241:12 319:15
**appreciation**

**approach** 61:6
61:10 92:9
157:18
**appropriate**
12:19 42:1,21
83:13,19 92:2
92:3,3,24 93:5
95:16 104:8,17
108:6 110:9
125:22 126:21
127:13 132:23
142:2 168:8
206:5 211:11
225:11,20,21
229:9,10,17,19
229:19,22,22
230:20,21
231:2,3 268:5
268:9 297:19
309:15,16
337:15 339:5
**appropriately**
29:2 62:24
133:15 226:6
309:20
**approval** 81:19
87:18 130:16
131:1,13
144:19 146:3
154:15 189:14
315:17
**approve** 131:6
**approved** 55:11
55:13,14,15,23
63:6 64:3
81:24 100:13
124:20 126:16
131:12 135:21
145:22 152:19
152:21 154:12
184:14 210:13
263:13 264:1
335:18,19
336:5,6 338:10
**approves** 102:14
**approximately**

37:7 68:12
213:16 287:3
**April** 214:8,10
214:22 237:24
**APS** 227:16
**area** 76:21,24
166:23 245:2
254:6 257:4
322:21
**areas** 11:10
68:16 264:22
**Argoff** 233:3,7
**argue** 143:2
**arises** 94:15
**arm's** 85:8 150:1
**armamentari...**
155:9,16 301:6
**arming** 232:5,24
**Arndt** 1:14 2:3
9:9 341:3,20
**arrange** 157:20
**arrival** 79:15
**article** 7:22
139:23 152:14
153:18 155:4,6
155:17 232:18
303:3,10,22
304:19 305:1,4
305:7,18 310:5
313:1
**articles** 152:9,9
**articulate**
211:10
**articulating**
328:1 329:19
**ASAP** 257:22
**aside** 98:17
125:12 140:1
294:9
**asked** 10:18
14:23 15:17
18:14,17,21,23
19:1,23 22:3
30:14 73:5
104:2 107:15
112:8 126:8

132:19 133:24
134:18 135:9
137:3,9 138:12
141:16 145:20
162:20 195:4
196:6,16
197:18 198:24
202:4 210:16
218:5,11 239:7
250:23 275:8
279:10 293:10
304:8 305:14
318:21 325:6,8
326:6,18,22
329:6,7,13
332:15 335:4
340:15
**asking** 61:8
93:12 133:17
134:11,12
137:11 138:2
162:22 163:2
179:10 180:13
181:6 197:5
201:9 208:17
212:8 215:13
215:17 220:3
224:2 234:19
255:13 280:15
292:16 320:9
330:18 331:1
340:9,9
**asks** 121:10
234:24
**aspect** 112:6
220:4
**aspects** 69:9
99:21,22
**assess** 150:19
174:17 175:6
**assigned** 70:5,10
72:20
**assist** 85:16
**assistants** 41:20
335:12
**assisting** 77:22

**associated** 22:13
28:14,18 96:24
105:12 124:19
192:17 194:24
337:15 340:6
**Association**
25:20
**assume** 25:21
30:22 38:10
135:15 139:13
139:22 140:21
175:9 198:13
225:6 243:6
278:12 286:5
287:14 289:18
293:12 305:17
332:6
**assuming** 15:4
211:24
**assumption**
135:11,15
212:2
**assumptions**
51:17,18 52:16
**Astra** 322:2
**AstraZeneca**
25:24 73:1
321:19 322:2,3
322:17,18
**astute** 138:21
**atolin@gdldla...**
3:23
**attached** 5:6,9
8:4 78:11
174:10 238:6
295:12 342:6
**attaches** 202:24
**attaching** 24:20
**attachment** 6:17
6:19 22:9
285:17 295:5
**attachments**
5:11,23 7:17
7:18,20
**attempt** 62:13
71:5 102:17

197:23 299:9
318:18
**attempted**
315:22
**attempts** 317:9
**attend** 238:7
240:15 324:17
**attended** 106:3
119:19 246:3
**attending**
240:20 242:3,5
**attention** 156:7
186:17 244:16
251:24 270:10
298:10 300:14
303:5 305:20
308:4 313:2
**attorney** 13:17
280:14 341:13
341:15
**attractive**
300:17
**attuned** 28:2
282:9
**ATU** 188:8,19
188:21,22,22
189:4,9 193:6
207:3 211:24
214:6,7 219:20
220:22 221:2
221:10
**Atwater** 3:3
**audience** 119:20
**audiences** 105:3
**author** 150:3
233:18
**authorized**
41:21
**automatic** 46:11
**availability**
160:7 327:11
**available** 91:13
143:21 144:19
145:23 146:4,4
153:1,4,9,15
153:22 154:4

Highly Confidential - Subject to Further Confidentiality Review

154:15 190:14
192:8 331:24
332:2,3,7
338:1
**avenue** 2:12
63:3
**avenues** 193:9
193:16
**aware** 22:6 30:5
30:7,7,16,18
38:17 55:24
56:2,6 124:23
125:13 135:19
138:22 282:2,8
282:11,18
291:3 292:20
299:22 315:16
315:22 316:10
316:12 318:17
331:15 332:11
332:14 335:1
335:17 338:20
340:16
**awareness** 32:1
54:24 55:12
81:9,12 82:2,5
82:9,13 83:17
83:18,23 84:10
85:5,22 86:12
86:18 87:7,15
94:4,7 136:13
190:20 191:1,8
191:11 225:20
226:4,14 227:1
**awesome** 272:20
**AZ** 322:6

**B**
**bachelor's** 321:1
**back** 23:15 31:2
34:22 37:12
38:13 40:10
45:11 50:14
51:7 54:13
58:23 62:17
64:24 65:2,5

71:22 78:19
79:9,23,24
80:17 85:1
87:12 106:13
107:10,13
109:8,11
110:20 115:13
115:14,18
127:17 141:9
141:11 143:7
154:4 170:15
171:5,15
179:18 183:16
183:21 187:6,8
219:14,16
232:1 233:4,22
234:18 236:22
238:10 249:22
258:24 259:3
260:24 274:6
276:4 280:1
288:13,13
302:11,11
303:21 304:16
306:20 309:23
309:24 310:5
312:24 317:6
320:2 322:20
329:3,6 337:9
338:15,23
339:18 340:12
**background**
99:15 133:19
152:18 189:13
221:7,7
**Bad** 254:1
**balance** 97:15
104:8 122:4
328:11
**Barto** 77:10
257:16 258:5
**base** 43:9
**based** 42:21
51:18 53:23
55:13 60:1
93:2 103:17,18

104:9 108:19
134:4 150:10
158:1 159:15
160:13 165:10
173:9,13
184:14 185:8
185:15 197:2
200:13 206:22
207:16 209:14
212:12 218:22
235:23 242:23
243:8 264:7,13
265:20 266:12
266:19,20
267:7 276:18
278:4,12
285:24 336:7,8
**basic** 35:11
194:24 286:22
323:14
**basically** 49:4
90:3 115:12
186:17 288:19
**basics** 87:3
**basis** 79:17 90:9
133:14 158:4
159:5 167:19
172:13 177:4
179:15 204:7
226:11 242:21
261:1,13 262:2
288:16
**Bates** 17:18 88:4
285:10 294:20
294:21 302:3
332:22
**Bates-stamped**
17:16 76:4
80:13 98:23
113:7 146:15
156:5 162:11
170:12 173:19
188:5 202:11
213:1 219:18
223:17 231:12
237:10 239:24

244:14 250:2
251:23 257:12
259:14 262:21
270:8 333:17
**beat** 261:11
**becoming** 39:6
140:15 171:11
171:24
**beginning** 10:1
17:16 38:13
40:16,20 46:18
46:20 76:16
103:7 147:12
175:18 203:2
270:11,18,22
305:21 308:5
313:8 327:6
**begins** 79:10
99:17 114:18
129:14 170:15
202:11 224:4
257:13 302:9
302:14
**behalf** 2:6,11,15
2:19 3:2,6,10
3:15,19 304:9
**behavior** 166:6
166:17 168:15
210:10
**belief** 116:5
185:5,15,17,18
185:21
**believe** 22:17
30:18 51:21
161:17 180:20
180:24 186:13
251:5 284:6
295:23 306:8
306:17
**believed** 145:7
185:2,3 186:9
**believes** 179:18
**bell** 252:19
255:1
**belonging** 28:12
**belt** 73:13

**Ben** 280:4
**beneficial**
124:20
**benefit** 55:18
92:14 128:18
132:22 320:10
**benefits** 43:12
45:8 62:23
63:7,15 83:2
84:19 87:6
100:15 101:8
102:15 124:21
211:10
**benefitted**
230:21
**beng@bsjfirm...**
2:14
**BENJAMIN**
2:14
**Bennett** 240:5
240:10,14
254:23 255:2
255:24 256:3
**Bennett's** 241:6
242:24
**BENOIT** 3:17
**Berne** 3:15
**best** 32:24 49:10
59:14 60:8
69:23 114:3
151:10 157:18
173:12 239:4
**Bethany** 267:21
271:6,7 272:9
**better** 58:23
72:18 83:4
150:7,8 222:4
334:13
**betterment**
242:13
**beyond** 50:23
81:3 137:7
140:20 203:20
207:21 215:6
250:18 316:8
**big** 47:22 276:16

Highly Confidential - Subject to Further Confidentiality Review

**bigger** 70:13
**Bill** 120:5
  306:19,22
**Bill's** 271:10
**Bingol** 1:9 2:1
  3:19 9:7,12,15
  9:19 14:1
  17:17,20,23
  19:7,23 23:16
  24:11 65:3
  80:14 88:6,12
  99:1 101:8
  107:12 113:9
  114:24 118:9
  128:24 141:12
  141:15 142:10
  143:13 146:17
  156:7 162:13
  170:14 173:20
  187:9 188:6
  213:3 219:16
  219:19 220:2
  223:19 231:15
  237:12,17
  240:2 246:1
  250:3 257:13
  259:2,15 279:8
  280:4,12 317:8
  319:15 320:5
  328:18 329:6
  333:12,18
  340:7 341:6
  342:2,11
  343:23
**Bingol-opioid-...**
  88:5
**bit** 116:18
  187:16,18
  222:4 254:23
  303:6 324:4
**bits** 53:13
**black** 124:18
  134:7 135:19
  194:24 328:9
  335:18 336:8
  336:21 340:5

**blinded** 184:18
**block** 27:9
  234:13
**blue** 298:11
  300:14 301:4
  334:8
**blues** 334:8,12
**Blunt** 188:6
  202:14
**board** 5:18
  55:17 64:6
  113:16,21
  116:1,11
  119:17,19,21
  119:24 120:1
  120:18,23
  135:22 150:16
  151:1 184:15
  324:12
**boards** 106:1,3
  113:11 254:20
**body** 238:4
  285:20
**bolus** 307:15
**Bonnie** 237:14
**book** 231:20,23
  323:11
**boots** 306:22
**Bosick** 3:7
**boss** 310:18
**Boston** 322:1,18
**bother** 289:24
**bottom** 14:19
  78:11 89:7
  109:13 118:7
  120:21 121:5
  147:18 225:9
  232:3,10
  235:10 240:10
  244:17 252:1
  257:14 260:6,7
  262:23 270:10
  270:21 287:21
**Boulevard** 3:11
**boundaries**
  67:24 293:10

**box** 124:18
  134:7 135:20
  194:24 328:9
  335:18 336:8
  336:21 340:5
**brainstorming**
  299:10
**brainstorming...**
  296:15
**Brake** 170:16
  171:6,23
**brand** 5:18 6:12
  26:14 34:11
  39:4,7,23 40:7
  41:4 51:8
  60:13,16,17,19
  60:23 61:2,10
  61:10,15,22,24
  62:5 68:18
  77:2 78:15
  85:16 114:24
  190:4 202:15
  211:1 213:4,6
  213:12 214:2
  216:1,4,11,17
  226:14 227:1
  295:6 310:19
  312:9 321:19
  322:4,5 323:17
  323:19,21
  324:1,9
**brand-named**
  190:7
**branded** 37:23
  46:3,3 230:5,8
  230:13
**brands** 35:15
  50:23 54:7
**BRANNON**
  2:22
**Branstetter** 2:12
**break** 57:5
  64:17 81:8
  92:15 107:3,5
  113:10 141:3
  169:20 181:22

  181:24 187:1
  249:17 258:20
  317:1,9
**breaking** 307:18
**Brett** 305:19
**Brian** 65:22
  252:22 304:2,5
  309:23 310:5
**Brian's** 310:18
**brief** 8:3 64:23
  107:9 187:5
  219:13 249:21
  258:23 317:5
  329:2 333:19
  334:1
**briefing** 232:24
  233:2
**briefly** 9:17
  283:17 320:22
  321:16
**bring** 45:9 50:22
  151:6 303:4
  324:10
**bringing** 151:1,9
**brings** 95:10
**broad** 95:9,9
**broader** 23:1
  72:16 248:19
**broadly** 135:3
**brochure** 109:16
  109:21 232:12
  232:15,22
**brochures** 16:16
  338:21
**broke** 307:14
**broken** 260:6
**brought** 23:24
  85:16 117:1,14
  151:16 239:15
**Brown** 4:3 255:8
  255:14 284:21
  294:19 313:6
  333:6
**Bruckenthal**
  120:22 121:1,4
  121:4

**bubble** 298:11
  300:14
**bucks** 62:17
**build** 39:13 43:9
  88:11 89:1
  112:6
**building** 5:15
  39:5 88:9
**built** 118:2
**bullet** 31:9 33:17
  39:2 51:9
  57:15 60:11
  65:8,9 90:20
  94:2 95:3 98:2
  165:13 169:6
  169:22 176:9
  177:3 189:13
  191:1 194:2
  199:10 203:13
  204:18 208:23
  214:1 221:8
  225:9 226:12
  287:6 296:6,22
  297:21 298:11
  298:19 300:14
  327:4 329:9
  330:24
**burden** 125:20
  125:24 143:6
**Burt** 244:8,10
  244:17 250:5
  253:3
**business** 5:13
  6:15 21:2,5
  41:1 42:16
  43:9 45:24
  46:9 62:5 66:9
  70:12,16 71:9
  76:12,16 79:11
  80:16 111:3
  117:16 136:13
  141:17 223:21
  224:8 246:2
  259:3,19 260:3
  264:8,11,15,18
  266:6,13,19

267:23 268:2
273:24 276:1
276:12 277:7
277:15 280:20
280:21 281:4
287:4 289:11
299:5 312:18
312:21 323:12
323:17
**bust** 293:15
**busy** 71:7 149:1
149:4
**Butterfield**
259:17
**buy** 62:16
308:18
**byproduct** 29:1
117:18

**C**
C 341:1,1
**CA** 2:17
**cadienvenzen**
90:11
**calculated** 49:18
165:4
**calculus** 165:5
266:18
**California** 2:16
290:3,12
**call** 20:1 52:6
64:6 86:24
143:7 165:15
165:20 169:19
169:19 197:9
203:18 230:13
249:18 276:19
277:17,21
278:4,11,17,23
324:11
**called** 27:7
31:11 37:24
50:9 110:1
115:18 142:23
143:2 161:14
209:5 231:20

322:9 325:13
**calling** 52:5 67:9
69:12 136:17
201:5 211:17
335:12
**calls** 14:22 71:8
271:4 337:11
**campaign** 82:13
87:20
**cancer** 54:13
**capacity** 120:14
142:20,23
**capita** 166:3
**captures** 158:10
**car** 69:9
**Cardinal** 3:6
47:21
**care** 41:19 42:2
46:7 48:21
50:6 63:9
104:22 127:20
128:11 129:18
129:24 132:14
133:21 135:4
138:8 222:13
223:3 232:16
246:12,17,19
247:6 251:9,18
253:8,13,16
272:19 285:23
335:12,23
336:14,18
337:7,21
339:16 340:10
**career** 18:5
72:23 321:20
**careful** 12:15
32:7,9
**caregivers**
104:23
**Carol** 116:1
**Carolina** 322:8
322:20
**CAROLYN** 3:5
**carriers** 308:11
**carries** 270:13

270:23 287:2
**case** 11:14 43:5
107:21 114:7
141:18 158:15
174:21 200:9
205:10 263:10
301:7 307:13
**CASES** 1:5
**cash-only**
308:16
**casual** 317:14
318:24
**categories**
167:14 195:13
288:12
**categorized**
227:4
**category** 93:8
108:14 159:10
288:17 306:3
330:19
**cause** 309:6,9
**caused** 309:2
**causing** 198:20
**caution** 12:10
15:1 19:4
107:24 247:23
332:9
**CC'ed** 250:6
**CCR** 1:14,15
341:20,22
**center** 97:13
103:21 184:17
**CEO** 116:3
251:14
**certain** 14:22
27:19 35:1
47:8,13,16,20
124:14 125:14
159:15 162:2
163:21 164:4
167:16 169:18
195:7 197:8
223:3 265:4
276:2,18
299:13 326:7

**certainly** 30:4
53:2 54:7 60:7
70:22 105:22
124:2,22 125:9
132:9,12
138:20,22
139:13 142:8
143:5 150:5
161:13 163:2
167:7 168:19
180:10 184:3
201:24 209:11
209:13 226:4
227:10 242:12
254:11 264:20
269:17,24
275:14 278:7
291:13 307:17
328:11 331:23
334:21
**certainty** 152:12
**certified** 2:3,3
166:19,24
341:3,4
**certify** 341:5,8
341:12 342:4
**cetera** 63:17
185:1 226:15
227:2 230:10
260:9 324:2
**Chadds** 33:7
240:15,16
**chain** 170:20
233:23 234:13
240:2,3 301:24
302:9 304:2
**chairman** 116:1
116:10
**challenge** 233:4
**challenges**
213:21 241:14
242:7
**chance** 163:11
171:2 188:15
202:21 213:9
**change** 173:8,13

343:3,5,6,8,9
343:11,12,14
343:15,17,18
343:20
**changed** 161:15
238:18 288:6
**changes** 221:10
**changing** 248:7
268:22
**Chapman**
283:12
**characteristic**
192:3
**characteristics**
191:21 203:9
327:9
**characterizati...**
124:1 125:9
209:13 243:1
273:9,10 297:4
311:8
**characterize**
10:9 161:14
215:18 249:2
**characterizing**
273:18
**charge** 65:19
**charge-backs**
49:7,11,20
**charged** 140:2
**Charles** 233:3
**CHC** 77:18
**CHC.Inc** 77:18
**check** 236:1
**checking** 151:17
**checkmark**
176:10
**CHI** 239:24
**CHI_LIT** 76:4
98:23 213:1
219:18 223:18
**Chicago** 260:8
**chide** 260:22
**children** 320:13
**choice** 43:13
54:16,16 92:18

169:21 268:9
**choices** 179:5
**choose** 51:22
**chosen** 63:19
263:20
**Chris** 303:15,17
303:18 304:8
304:15 310:3
**Christine** 77:17
**Christopher**
255:18,21
321:2
**chronic** 54:12
**CI** 159:19,20
**CID** 333:17
**circulated**
110:11 176:3
**circumstances**
142:2
**cite** 210:24
216:16
**cited** 214:5
216:7,12
221:23
**citing** 208:4
215:23 216:3,8
216:11,18
**City** 2:2 3:12
**civil** 14:3
**clarify** 217:13
**Clark** 303:15,17
304:9,15 310:4
**class** 28:13
31:11,13 44:9
94:4,12 306:8
306:10 323:2
334:6
**class-wide**
256:19 257:7
**classes** 47:7
**classified** 11:14
**clear** 17:15 20:2
41:14 143:10
192:16 203:11
222:3 320:18
331:14,20

**clearance**
184:15
**clearly** 59:7
120:18 128:17
149:19 160:10
258:14 278:21
293:3 297:9
**clients** 280:16
**clinical** 31:20
58:8 62:2 77:7
77:7,15 83:3
150:22 153:18
178:5 192:14
195:17 197:2
213:20 233:4
278:8 283:21
284:2
**clinically** 274:22
**clinician** 104:5,9
120:9,23
121:19 136:3
138:20 149:1,4
154:2,13,20
155:13,21
179:18 180:7
215:1 268:20
273:11 274:23
293:1
**clinician's** 185:9
301:6
**clinicians** 42:1
43:6,11 53:24
54:16 83:4
84:17 97:17,21
102:18 103:9
103:13,24
106:13,20
123:22,22
124:2,8 125:4
125:10,14,19
126:4,12,24
128:17 132:21
134:14,15
135:8,19
144:13 145:9
145:19 146:6

149:8 150:7
153:2 156:17
156:21 158:22
159:3,11,13
162:1 165:17
167:17 168:10
178:9,11,18
179:21 180:15
180:19 182:4
183:7,12 184:6
184:8,23 185:2
185:15,17
186:3,8 192:23
202:1 211:16
214:11,22
228:5,18
263:10 264:24
268:5,8 271:24
272:24 328:17
**clinicians'**
102:23 133:15
183:22 212:1
217:10
**clinics** 308:16
**close** 118:13
**closed** 241:13
260:15
**closing** 243:1
**clutter** 169:20
**CME** 82:6 84:24
85:1
**CNS** 172:4
198:16,19
211:9,15,18
212:1,1,2,8,13
**coaching** 137:8
208:11
**cocaine** 306:3,8
**Cochran** 260:21
**cognition** 171:19
197:24 198:4,6
211:7
**cognitive** 33:3
172:15,22,24
**Cohen** 78:4
245:15

**colleagues** 176:4
202:13
**collect** 18:6
288:11
**collection** 18:4
88:8 176:21
228:18
**collects** 288:19
**College** 83:10
227:8
**colloquialism**
86:8
**colloquy** 23:7
**coloring** 334:9
**Columbus** 3:16
260:8
**column** 85:22
86:11 87:12
110:23 111:5
155:6 221:24
222:10,17
298:7,8
**columns** 298:6
**combination**
26:14 36:23
269:13 307:19
**combined**
272:19
**come** 29:16
116:12 124:13
155:14 181:2
183:7 186:17
192:14 237:15
263:9 291:2
297:5 322:14
**comes** 78:22,24
179:6 288:2
299:23
**comfortable**
121:7,8,11,13
121:13
**coming** 14:24
31:16,19 81:20
122:14 140:17
160:8 181:6
183:21 185:17

197:3,5 207:10
215:14,17
218:4,10,17,17
219:2 235:3,8
286:11 296:18
299:2 319:14
330:18 331:1
**commencement**
341:5
**comment** 122:6
151:17 209:9
**commented**
175:10
**comments** 137:7
300:4
**commercial** 58:6
58:9,10,12
191:6 288:8
323:18
**commercialized**
117:14
**Commission**
11:7 13:11
**Commissioned**
189:2
**commissioner**
313:12 314:22
**commitment**
130:7
**committee** 65:12
66:2,6
**common** 236:8
243:2,10
311:19
**communicated**
176:11
**communicating**
207:12
**communication**
15:2 41:11
324:1
**communicatio...**
12:11,16 19:6
19:6,9 89:5
96:2 303:18
**communities**

Highly Confidential - Subject to Further Confidentiality Review

70:9 166:21,23
313:19,22
**community**
55:24 70:13,18
70:18,21 71:11
91:21 334:6
**comp** 277:24
**companies** 47:5
48:22 193:10
231:2 288:14
288:21 289:1
293:21
**company** 56:16
56:19 108:8,18
111:18 112:13
116:18 132:9
234:3 249:4
277:10,11
288:7 289:15
315:14,17,23
316:9,20 322:9
**company's**
108:18
**comparative**
290:18
**compare** 80:16
**compared**
158:24 198:9
201:15 271:20
292:5
**comparing**
171:8 201:6
**compensated**
276:5
**compensation**
30:23 276:6,11
276:17,17,24
277:4,5,9,12
278:24
**compete** 264:17
**competing** 27:24
261:20 262:1
**competition**
53:10 169:15
204:20
**competitive**

43:16,18 51:19
53:6 89:21
159:20,23
169:12,13
261:4,6,10
**competitor**
43:11 52:4,6
127:2 156:22
157:1 268:20
312:19
**competitor's**
158:20
**competitors**
53:20 90:13
176:13
**competitors'**
159:4
**complete** 60:22
**completed**
130:23 221:11
**completely**
60:22 274:13
**complex** 47:11
54:12
**compliance**
63:17 64:9
132:7 236:2
278:15 310:24
336:9
**compliance-sp...**
310:20
**compliant** 93:9
126:18 200:12
207:24 216:24
263:15 324:19
339:5
**component**
30:24 106:2
162:6 209:4,7
277:1,1
**components**
323:18
**comport** 208:1
**comprehensive**
62:4
**computer** 15:21

**concentrate**
265:17
**concentration**
25:14
**concept** 96:9,15
96:18,20 97:8
122:20 123:9
135:6 158:10
161:16,18
**concern** 71:16
71:17 126:3
178:8,10
201:12 209:17
210:4,6 225:6
257:9 258:18
309:21
**concerned** 20:12
39:11 106:14
106:20 124:22
125:4 257:5
283:20
**concerning** 22:1
22:11,15,22
209:12 249:7
253:16 283:1,6
283:12
**concerns** 27:19
28:1,6,7 29:8
29:24 30:9,12
71:11 93:14
102:18,23
124:8 125:15
126:11 192:17
258:7 282:10
335:17
**concerted**
158:18
**concluded**
100:14
**concludes**
314:17
**conclusion**
101:2,4 274:14
278:5 299:23
**conclusions**
173:6

**concurrently**
36:3
**condition** 54:12
231:8
**conditioned**
31:10,12
**conduct** 84:19
105:15 171:18
203:13 228:9
290:7,15
**conducted**
105:14 174:20
204:7 214:7
221:11,13
228:24 292:18
**conducting**
290:19 291:3
**confidential** 1:7
108:1,4,10,24
108:24 109:4
**confidentiality**
1:8 108:19,20
**configured**
294:4
**confirm** 33:20
234:19
**confirmed**
152:21
**confused** 80:21
108:7 227:19
**congratulate**
272:23 275:5
**congratulated**
274:3 275:6
**congratulating**
271:12 272:12
273:1
**congratulations**
274:5
**congress** 98:12
**congresses** 82:5
83:23
**conjunction**
175:2
**connected**
255:14

**connection**
12:12 13:1,17
15:17 16:13
19:20 26:9
73:24 75:12
76:16 82:9
85:23 86:6,18
87:14,22 89:2
91:5 95:6 96:7
96:12 104:16
110:1 113:11
132:6 143:14
144:2,8,14
145:1 146:19
147:13,24
148:4 174:20
175:1 188:24
204:10 227:14
228:1,20 233:8
244:8 245:10
255:3,6,11,16
257:7,23
269:18 326:23
**Connolly** 77:18
**conscious** 59:17
134:8
**consciously**
208:14
**consider** 43:13
46:20 52:20
**consideration**
25:6 57:10
**considered**
12:23 46:17
73:5 83:21
108:9 128:6
138:18 155:10
167:7 169:21
227:6,10
239:16 263:16
289:13,17
306:8 334:12
**considering**
168:10 301:1
**consistency**
126:17 161:12

Highly Confidential - Subject to Further Confidentiality Review

consistent
   131:17 149:3
   161:17 324:1
consistently
   133:13 134:6
   135:18 184:13
consolidated
   152:11
constituents
   288:14
construct 248:6
construction
   306:20
consult 142:1
consumer
   228:16
consumer-orie...
   236:13
consumers
   306:12,14
contact 21:13
   116:10 317:14
   318:24
contacted
   251:12
contained 334:9
contemplated
   286:8
contemplating
   317:15
content 150:2,22
   151:20 176:10
   263:14
context 12:5
   116:8 133:11
   168:11 170:7
   220:14 264:12
Contin 90:10,11
continual 128:6
   128:18 133:14
continually
   127:24 130:8
continue 161:9
   165:14 210:24
   221:10
continued 3:1

4:1 6:1 7:1 8:1
   112:2 161:21
   199:11 269:20
continues
   191:19 214:19
   214:21 215:10
   260:21 304:12
continuing
   84:24 85:2,4,7
   216:23 274:6
continuous
   122:5
contract 73:20
contracted
   245:12
contracting 47:1
   47:3,12 323:21
contractor 245:8
contracts 47:14
   48:3,10,13,19
   49:2 50:4,5
contrast 166:10
contribute
   246:13 247:13
   247:15 286:22
contributing
   247:21
control 213:21
controlled 25:22
   134:13 135:1
   210:5
controlling
   151:20
convenient
   308:11
convention
   153:8
conventions
   153:11
conversations
   283:11
conveyed 177:17
conveying 76:24
convince 112:6
cool 260:15,19
Cooper 50:13

coordinate
   256:14
coordinated
   66:18
coordinating
   256:17
copies 295:9
copy 14:1,2
   23:23 24:19,20
   78:13,19 80:15
   80:18 220:22
   224:7 321:10
   325:10 333:18
core 98:2 119:8
   289:16
corner 24:9 65:7
   65:8 76:7
   78:20 80:14,20
   89:7 90:16
   98:24 113:9
   146:17 147:3
   148:12 156:6
   162:13 213:2
   214:6 231:13
   237:11 244:16
   250:3 252:1
   262:22 270:9
   287:21
corporate 196:9
   196:14 238:5,7
   239:5 303:18
Corporation
   322:23
correct 10:13
   11:5 12:7
   13:13 16:10
   17:14 19:16,18
   19:20,21 20:19
   20:22 21:8,19
   23:5,24 24:1
   25:2,7,11,12
   25:14,15,17,18
   26:1,2,4,5,6,7
   32:3 33:11,12
   34:16 35:24
   36:1,7,11,17

36:19,24 37:1
   37:3,4,8,10
   39:14,19,20,24
   40:2,8,13,14
   40:19,20 41:15
   41:17 43:5,6
   43:19,20 44:3
   44:14 46:4,20
   46:22 47:21
   48:5,15,16
   52:24 56:7,9
   57:1 59:12,20
   60:3 61:18,19
   63:11,20,22,24
   64:3 67:6,7,10
   67:12,15 70:6
   70:7,19 72:2,3
   73:16,17 74:1
   74:2 78:16
   79:4,18 81:1
   82:22 85:3
   88:13,19,22
   89:9,12,19
   91:15,17 95:19
   99:21 100:1,5
   100:7,9,15,19
   101:17 102:3
   102:11 103:5
   104:17,23
   105:1,5,17
   106:7 110:12
   113:21 114:12
   114:16 115:3,4
   115:14 116:23
   118:18,19,22
   125:16 129:11
   130:2,12,14,17
   131:1,16,18,23
   132:2,3,17
   134:23 136:7
   137:1 141:13
   142:17,18,20
   142:24 143:13
   144:15 145:4,5
   145:19,24
   147:14,20,21

148:15 149:21
   149:24 150:16
   150:17 151:23
   152:4 153:12
   153:23 154:1,5
   154:16 155:11
   156:11,18
   158:6 159:6,13
   159:22 160:19
   160:20 161:5
   162:15,18
   163:7,22
   164:23 165:17
   165:19,23
   166:1,11 169:3
   169:5 172:1
   174:11,12,22
   175:7,8,12,13
   175:15,16,21
   176:5,24 177:1
   177:10,15,16
   178:9,19 179:9
   179:16,22,23
   180:3 181:1
   182:5,12,17,18
   182:24 183:3,5
   183:13 184:9
   186:10,18
   187:10 188:19
   188:20,24
   189:2,6,7,10
   189:11 190:8,9
   190:20 191:1,3
   191:8,12,13,16
   191:17 192:1,3
   192:4,11 193:6
   193:8,11,18
   194:5,17,21
   195:3,19 196:4
   198:7,9 199:12
   199:23 200:6
   200:22 201:1,2
   201:7 203:2,3
   203:6 204:1,13
   205:2,16,21
   206:5,7,20

207:5 209:18
210:10,15
214:4,9,14,17
216:4,20 219:5
221:3,4,14,15
221:20,21
222:11,19,21
222:22,24
223:1,6,22
224:8,9 229:12
229:18,24
230:6,7,10,11
230:13,14,16
231:7 233:8
234:10,16,17
235:5 236:6,14
236:19,23
237:22 243:3
243:21,22,23
244:21 245:14
246:9 248:24
251:19 252:22
252:23 253:1,2
256:11 259:5
260:12,13
261:7,14,18
262:15 263:11
263:20,21,23
264:1,2 265:23
267:10,11,14
267:15 268:12
269:6,13,20
271:2,3,8,14
272:1,10,11
273:2,3,13
274:7,10,11,14
275:7 276:6,9
276:13,14,20
281:9 287:12
287:15,24
288:3 306:15
306:17 307:10
312:2 315:7
318:6 323:7
330:2,11 331:3
331:10 332:3

333:22 335:3
336:15,16,19
337:2 338:5
342:5
**correcting**
201:19
**corrections**
342:5
**correctly** 25:10
36:2 43:2 48:2
52:19 61:15
112:1,2 130:10
231:6 264:21
285:18 286:3
287:4,8,23
288:19 295:7
297:24 298:4,8
298:17 300:19
303:7 304:13
306:4,5,23
308:12,14,18
308:19,22,23
309:3,4 310:7
313:20 314:5,9
314:15,19
334:14,15
**correlation**
269:2,4
**corresponded**
314:8
**counsel** 2:5 3:1
4:1 9:8 12:12
12:14 15:9,13
17:5,7 19:5,7
19:22 21:20
22:7 24:2
78:23 109:5
137:4,6 141:21
141:24 208:7,9
208:9 217:24
312:3 325:20
329:6,13
341:13,15
**counsel's** 143:11
**count** 9:23
**counters** 308:16

**counties** 313:22
314:3
**counting** 254:1
**country** 68:19
84:22 243:6
264:6 265:16
265:23 280:23
281:9 284:16
292:6,22 315:6
**County** 313:12
314:22
**couple** 79:8
105:22 158:2
204:2 241:4
244:22
**coupon** 41:10
**course** 28:3
31:22 55:12
96:20 97:10
102:16 105:9
106:10 132:16
160:5 176:5
177:14 179:17
180:4 189:5
200:10 205:11
226:8 268:7
288:12 299:6
333:15
**court** 1:1 2:3 9:9
10:17 11:3,4
32:6,11,16
341:4
**cover** 79:10,16
175:10 188:17
202:12 285:16
**coverage** 49:4
**covered** 53:11
53:12 287:17
**covering** 287:19
293:8
**crafted** 138:17
**create** 51:17
52:17 54:23
55:12 59:14
81:12 82:9
84:10 85:5

87:7 150:3
215:20 225:20
300:5 322:17
324:9,10 339:4
**created** 16:13
18:7,9 79:15
86:2 98:11
132:11 322:3
327:24 328:2
329:20
**creating** 32:1
81:9 83:16,18
86:6,12,18
87:15 119:5
149:11 339:3
**creation** 324:8
**credibility** 95:11
**crescendo** 82:2
**criminal** 30:21
30:24
**crisis** 281:22
**criteria** 278:6,12
**critical** 161:1
**CRO** 322:11
**cross** 58:5 60:16
60:17,22 61:5
61:17,20 77:1
85:15 258:15
**cross-functional**
291:13 324:7
**cross-function...**
286:21 323:20
**crossed** 208:10
**crucial** 123:7
**crush-resistance**
57:20,22
**crush-resistant**
58:3,16 59:3
59:20 283:24
318:3,12
**CSR** 1:14,14
341:20,21
**Cullari** 232:4
234:1,1,8
**curious** 256:22
**current** 75:8

94:3,16 107:16
107:18 115:24
142:4 162:21
165:10 169:23
285:22
**currently** 43:15
43:18 73:15
74:13 141:17
226:7
**curve** 167:19
**customer** 41:9
47:6 49:2 59:2
60:2 87:9
**customers** 31:16
41:12,13,15,24
42:9,21 47:8
48:4,7 56:2
58:20 63:2,3
169:14 216:8
**cut** 294:21
332:22
**CV** 23:12 24:19
24:21 321:10
**cycle** 45:1,3,4,12
45:13 58:5
323:22

---

**D**

**Dan** 1:5 245:15
**dangerously**
334:11
**Daniel** 4:3
**Dann** 2:2 3:20
**Darvocet** 26:15
**Darvon** 26:15
**data** 31:20,22
43:22 44:5,10
44:11,15,20
58:19 59:7
60:5 82:16,21
83:1,3,14
103:18 149:9
150:23 172:11
173:6 176:21
195:18 207:1
214:8,10 216:9

266:8 268:19
268:21 279:5,6
285:21 288:2,4
288:7,11,20
289:10,13,22
290:5 299:12
340:2
**database** 176:23
**databases**
290:21
**date** 9:4 37:13
131:13 155:16
164:22 265:21
326:4 341:11
343:22
**dated** 76:11 99:3
111:3 156:10
162:15 174:7
188:7 189:8
204:4 213:5,15
219:20 220:23
223:21 237:24
244:20 250:5
252:3 259:17
263:1 294:24
**Dave** 162:20
**David** 162:14
174:6 240:12
**Dawson** 170:18
171:16
**day** 2:16 10:17
76:6 78:13
118:12 203:18
280:15 320:7
342:15
**day-to-day**
151:4
**days** 236:23
**dbingol@adol...**
237:17
**de** 166:22
**DEA** 101:14
127:12 195:14
334:2,17
**deal** 74:20
140:11

**dealing** 56:15
123:5
**dealings** 254:19
**deals** 124:12
**dealt** 206:17
**dear-doctor**
186:16,24
196:4,8,12,15
202:1 339:16
340:10
**death** 309:9
314:9
**deaths** 309:2,3
**debate** 246:13
247:14,16,21
248:4,12,18,22
**debating** 317:23
**Debra** 238:12
**December** 79:11
80:15 111:4
159:18 160:2
188:7 189:8
191:10 202:16
204:4 207:9
213:5,15 218:9
219:21 220:23
221:14 257:24
326:5 327:19
**decide** 104:9
258:10
**decided** 41:3
148:20
**deciding** 58:22
**decile** 157:15,19
158:14 159:6
165:15 166:14
**deciled** 157:23
159:14
**deciles** 157:13
157:14,21
158:11,15
165:17,22
167:3
**deciling** 158:14
**decision** 42:23
59:17 105:11

131:6 196:9,14
266:1 317:17
**decisions** 44:17
338:3
**deck** 63:6 64:1
285:21 286:17
286:17 287:1,2
296:10,11
**dedicating**
310:21
**deemed** 15:5
157:23
**defendants**
141:18
**defense** 107:20
**defined** 217:10
**definitely** 155:2
262:1
**definition** 42:6
308:1
**degree** 25:11,17
321:1
**delayed** 163:21
**deliver** 63:18
144:13
**delivered** 144:22
180:22 206:5
206:11 308:10
**delivery** 204:19
204:20 205:6
205:14,19
206:3 207:12
209:4 308:20
**demand** 52:11
**Demir** 1:9 2:1
3:19 9:7,12
14:1 114:24
118:9 237:17
246:1 258:6,6
258:7 341:6
342:2,11
343:23
**demonstrate**
172:10 173:1
**demonstrated**
160:22

**demonstrates**
171:19
**demonstrating**
162:5
**department**
47:16 50:4,6
77:9,14 186:22
196:10 243:18
278:15 281:21
282:3,12
**departments**
61:23
**dependence**
306:2
**depending**
157:17
**depends** 49:2
**deponent** 9:7
**deposed** 9:20
10:4
**deposition** 1:9
2:1 5:3 9:5
10:9 11:4
13:22 14:1,3
14:24 15:18
23:24 24:3
280:8 342:4
343:1
**depositions** 12:5
**depression**
28:21
**Derek** 233:17
**derived** 42:15
51:10 214:24
217:9 296:12
296:20 297:4
**describe** 31:10
49:15 160:18
161:18 182:24
246:21 273:4
288:4
**described** 13:7
61:3 126:5,9
129:1,6 161:7
168:14,18
171:20,23

236:11
**describes** 176:19
**description** 31:3
33:6 39:3
44:23
**designate** 109:3
**designated**
294:6
**designation**
11:19 77:20
195:13,14
**designed** 108:23
127:19 307:16
**desktop** 15:22
15:24 16:23
18:1 21:17
88:9
**despite** 103:14
104:1 105:4
184:24
**destination**
11:20
**detail** 49:9 135:1
152:8 173:21
173:23 175:11
175:15 188:9
200:2 247:11
274:7
**detailed** 205:1
**detailing** 126:12
134:15 153:2
153:12 165:22
200:24 203:19
219:2 230:10
335:24
**details** 69:6
225:5 269:9
305:18 316:12
333:24 334:16
**detect** 129:22
139:4,19 140:5
315:13
**detected** 290:23
**detection** 290:21
**determination**
185:10 197:2,8

235:15
determinations
44:21
determine 44:15
45:9 47:5
212:10 218:14
278:16 288:20
determined 42:1
42:8 101:14,24
185:8 195:7
211:17 215:2
deterrents
247:16
detrimental
236:10
Detroit 260:8
develop 62:14
123:8,21
129:21 139:3
139:18 140:4
181:7 211:8
265:10 289:10
developed 99:17
101:6 116:14
300:24 306:20
developing 27:6
30:1 58:13
323:3,19 324:3
development
21:2,5 35:17
50:17 57:17,19
58:1,2,11
60:13 62:11
72:23 246:1,7
DeVries 2:2 3:20
Devyn 4:2 9:2
diagnosed 231:6
diagnosis 225:11
difference 163:3
206:1
differences
92:17 198:16
198:16 211:9
211:15
different 42:15
47:6,8,10 54:2

54:6,7,19,20
58:21 68:1
70:14 80:22,24
83:8,12,20
120:3 134:20
137:12 151:1
157:20 161:15
172:4 186:22
193:9,10,16
195:13 196:10
198:19 204:3
210:11 211:4
211:11,18
243:18 274:13
275:11 280:14
317:15 327:24
329:19 336:4
340:3
differentiate
204:19 209:14
differentiating
91:9,14 161:1
194:1
differently 90:21
91:3 92:6,8
96:3
difficult 32:11
129:22 139:4
140:5 148:24
149:4 268:22
268:24 269:9
298:15,21
299:20,21
difficulty 187:18
dinner 62:22
63:10,13
dinners 263:9
direct 53:14
85:13 269:1
284:7 295:9
298:10 300:13
304:6 305:19
308:3 309:24
310:16 313:2
316:21 326:10
directed 240:11

directing 135:7
244:16 286:5
304:15
direction 59:8
60:7 266:9
directional
289:9
directly 20:24
48:9 73:21
253:12 306:12
306:14 314:8
director 33:10
34:19,24 35:2
35:10,16,22
36:5,10,15
67:3 68:4
71:24 72:5,20
88:12 114:4,24
234:8,15 235:4
259:4,19 260:3
276:12 277:7
277:15 293:7
321:19 322:5
322:10 323:1
323:11,13
directs 121:12
disadvantages
221:18
disagree 311:8
disclose 12:11
12:15 15:2
108:1,6,11,15
108:17 247:23
discounts 47:7
discuss 62:11
66:2 108:21
109:7 144:21
163:15 203:10
251:8
discussed 48:14
56:10 66:5
77:1 84:6 95:5
101:16 141:22
163:20,24
164:19 165:14
191:22 231:21

250:21 252:21
257:2 271:16
284:8 292:8
318:8 336:11
338:14
discusses 84:24
86:11 95:3
115:6 189:13
221:6 226:12
240:14
discussing 70:24
96:4 113:10
144:20 174:9
193:23 204:16
252:3 314:14
discussion 52:4
71:23 121:5
163:6,15
190:24 204:21
205:7 206:3
209:10 241:12
253:19 258:11
279:24 311:12
320:1
discussions 69:7
168:7 258:15
283:1,6,16
292:4 299:24
dispensed 289:3
315:3
dispensing
314:18,23
displayed
336:21
displeased
296:23 297:1
dispute 149:14
dissatisfaction
94:4,12,15,21
disseminate
167:18
disseminating
83:3
dissemination
31:18
distinction

118:23 145:7
297:8
distributed
153:6
distributing
48:4 109:20
distribution
22:12 62:2
267:7
distributors
47:8,20,24
48:4,8
district 1:1,1
67:11 68:3,5
259:16 260:6,7
260:12 267:5,6
267:9,12
270:12 271:2
districts 262:12
diverse 54:12
diversion 22:13
27:20 28:20
29:3 100:4
101:7 102:7
122:22 182:21
278:13,16,16
278:23 292:11
315:11 336:24
diverting 278:5
divide 157:16
division 1:2
38:11 119:2
333:20
dkr@pietraga...
3:9
DMs 67:5,11
262:24
docs 158:2
doctor 52:5
133:9 134:20
134:22 192:13
265:5 273:20
274:7 275:16
279:4 306:22
doctor's 70:23
215:13 327:14

Highly Confidential - Subject to Further Confidentiality Review

doctor-shoppi...
122:20 123:6
doctors 67:9
69:8 70:19
122:15 126:2
158:16,19
184:18 197:1
200:2 313:17
314:1 326:20
327:19 329:14
329:24 330:9
330:15 335:11
document 17:19
18:6 24:16
79:1,21 83:22
86:1,5 88:7
89:3 91:7 99:7
111:3,12
112:23 132:19
133:11 134:4
137:15 138:16
149:22 150:4
173:21 181:18
182:14 190:16
202:20 207:15
208:7,8,15
213:8 216:6,15
220:1 223:19
223:24 224:3
224:23 250:17
258:16 274:9
284:20,24
285:8,10 294:9
294:11,12,16
294:17,22
295:18,21
300:12 301:18
302:2,11,12
305:5,6 311:7
325:10 326:11
documented
124:17
documents
14:22,23 15:17
15:20 17:2,24
18:1,11 19:2

19:13 20:1,3
20:11,12,16
21:18,24 22:9
22:10,20,22
23:1,5,8 78:12
78:23 279:11
279:14 283:12
dog 319:10
320:9
doing 12:14
35:19 41:2
53:10 61:1
66:2 68:22
74:21 80:7
81:22 85:10
115:1 127:11
133:18 175:4
178:22 179:20
206:19 209:11
209:21,23
210:15 216:22
216:23 243:14
269:18 270:2
274:12 283:22
289:1 307:8
311:14 315:24
316:1,2,13
Dolan 244:18
Doll 253:23
254:2,4,11
dollar 39:5,14
Dominion
320:24 321:5
door 215:16
dosage 143:22
144:1,18 146:5
dose 197:6
307:15
doses 177:22
dosing 160:23
160:24 161:16
177:5,9,14,15
177:18,19,21
178:1,15,17,19
183:5 192:7
209:6,6,14

double 309:13
double-check
18:14,20 19:3
double-checki...
18:22
doubling 310:18
doubt 113:20
334:24 335:9
DOUGLAS 3:9
dozen 137:13
Dr 120:9 121:4
121:10 233:7
245:24 246:3,6
247:13 250:4,8
252:10,12
256:11 273:6
273:16,17
274:13 313:11
313:15 314:13
314:21
draft 78:12
draw 156:7
251:24 270:10
drawn 204:11
drink 307:7
drinking 307:9
307:12,18
drive 3:3 16:23
17:1 46:2
52:14 89:14
90:18 166:4,6
166:15,17
168:15 264:7
264:11,18
266:6,12,18
267:22 268:2
271:13 319:7
driven 120:3
drives 53:17
driving 272:5
287:3
drove 266:1,3
290:9
drug 8:3 16:10
29:2 31:24
71:18 102:14

112:16 282:13
306:2,12 308:5
308:8,10
331:17 332:13
333:18,19
drug's 327:15
drug-using
334:6
drugs 308:15,18
309:2 314:18
314:24 315:2
due 72:10,11,13
106:21 269:8
308:24
duly 9:13
DuPont 115:7
116:21 117:2
117:19
durable 160:18
161:3,6,8,14
161:20 191:22
209:6
duration 161:12
191:20,21
duties 67:3
176:5
dynamics
169:23 172:20
285:22

——————
E
——————
E 83:22 129:4
341:1,1
e-mail 5:6,9,11
5:23 6:3,5,7,8
6:17,19,21 7:3
7:5,7,9,11,13
7:15,17,18,20
20:7 24:20
76:11,15,20
77:5 78:11
79:17 156:8,9
157:7 162:14
164:22 170:15
170:20 171:6,7
171:10,16

174:6,8,10
175:10 186:2
188:6,18
202:12,13
232:2,10
233:23 234:6
234:12,18
237:12,21
238:4,10,11,11
240:2,3,5,9,13
244:17 245:23
250:4,7 252:2
256:14 257:14
257:16 258:5,5
259:15 260:11
262:23 264:3
266:10 267:1,2
267:13 270:12
270:23 271:23
272:7 285:5,14
285:16,20
286:6,8 294:24
295:6 301:24
302:9,10,14,14
303:13 304:2
305:7 309:23
310:1 311:4,13
e-mailed 235:8
303:10
e-mails 16:24
19:12 170:14
232:1 303:2,20
E0329.1 5:13
E0329.67 5:13
E0520.1 5:23
E0520.150 5:23
E0554.1 5:17
E0554.46 5:17
E0563.1 8:3
E0563.4 8:3
E0912.1 6:16
E0912.66 6:16
E0914.12 326:13
E0977.1 5:21
E0977.57 5:21
E1169.12 177:2

Highly Confidential - Subject to Further Confidentiality Review

| | | | | |
|---|---|---|---|---|
| **E1169.18** 178:23 | **E1387.78** 6:12 | **E914** 219:19 | 105:3,9 109:14 | 185:16,20 |
| **E1169.21** 181:12 | **E1396.1** 5:11 | **E914.108** 220:5 | 128:4 129:7 | 203:8 |
| **E1169.5** 175:17 | 76:7 | 220:16 221:17 | 130:8 136:24 | **efforts** 16:14 |
| **E1169.8** 176:7 | **E1396.26** 5:11 | **E914.12** 330:21 | 138:14 228:10 | 39:18 57:12 |
| **E1169.9** 176:19 | **E1396.7** 78:21 | **E977** 146:17 | 320:22 336:13 | 81:12,17 82:20 |
| **E1248.15** 190:15 | **E1396.8** 79:9 | **E977.10** 153:18 | 336:17 337:20 | 91:20 97:7 |
| **E1248.16** 190:18 | **E1452** 24:5,10 | **earlier** 73:22 | 338:14,21 | 103:12 110:16 |
| **E1248.18** 191:14 | **E1452.3** 31:10 | 77:1 84:7 | **educational** | 110:19 133:14 |
| **E1248.19** 193:22 | 45:2 65:7 | 89:15 95:5 | 62:23 84:16 | 169:2 203:6 |
| **E1248.7** 188:21 | **E1452.5** 25:9 | 101:16 131:4 | 85:11 86:15 | 272:16 275:7 |
| **E1249.11** 204:5 | **E1511** 237:7,11 | 144:24 156:15 | 104:16 128:7 | 281:12 299:14 |
| **E1249.33** 204:15 | **E1511.1** 6:20 | 191:23 192:21 | 132:22 133:13 | 309:7,10 |
| 208:22 | **E1511.2** 6:20 | 221:2 226:15 | 135:12 138:19 | **eight** 18:12 67:5 |
| **E1249.7** 203:2 | **E1514** 244:15 | 251:13 262:8 | 151:18 168:18 | 222:20 |
| **E1278** 240:1 | **E1514.1** 7:3 | 263:6,19 265:1 | 228:7 268:7 | **either** 26:13 |
| **E1278.1** 6:22 | **E1515** 250:2,4 | 271:17 279:10 | **effect** 27:9 45:24 | 50:2 87:4 |
| **E1278.2** 240:4,9 | **E1515.1** 7:5 | 293:10 327:22 | 54:20 74:4 | 126:1 149:11 |
| **E1278.3** 6:22 | **E1515.2** 7:5 | 329:17 336:11 | 161:12,13 | 183:6 209:21 |
| **E1354** 262:22 | **E1522** 162:13 | **earliest** 10:1 | 175:3,6 197:24 | 210:9 228:6 |
| **E1354.1** 7:13 | **E1531** 231:13 | 36:14 | 198:6,16 | 232:11 317:14 |
| **E1354.2** 7:13 | **E1531.1** 6:18 | **early** 21:10 | 211:18 212:2,8 | **ekubly@seege...** |
| **E1355.1** 7:11 | 235:10 | 55:10 240:16 | 212:13 226:9 | 2:10 |
| **E1355.3** 7:11 | **E1531.2** 232:2 | 267:17 334:3 | 283:2,7,10 | **element** 110:18 |
| **E1357** 270:9 | 232:11 233:22 | **earned** 112:17 | **effective** 70:22 | 211:4 269:10 |
| **E1357.1** 7:15 | **E1531.3** 6:18 | **East** 2:20 3:16 | 102:14 191:19 | **elements** 269:13 |
| **E1357.19** 7:15 | 232:12,14 | **eastern** 1:2 | 335:20 336:6 | **emerged** 297:22 |
| **E1378** 170:13 | 234:22 | 321:23 | **effectively** | **emotional** 296:3 |
| **E1378.1** 6:5 | **E329** 80:14 | **easy** 217:12 | 100:23 101:6 | **emphasized** |
| **E1378.3** 170:19 | **E329.13** 110:22 | 273:5 334:10 | 168:12,21 | 178:17 |
| 171:15 | **E329.15** 81:6 | **Eddie** 267:20 | 169:18 207:23 | **empirical** 180:9 |
| **E1378.4** 6:5 | 82:2 83:23 | 271:5,7 272:9 | **effects** 22:12 | **employed** 10:11 |
| **E1379** 112:20 | 85:21 87:13 | **Edelman** 89:8 | 28:13 172:4,15 | 29:13 73:15,18 |
| 113:9 | **E520** 156:2,7 | **Edie** 170:18 | 180:1 186:4 | 238:1 239:14 |
| **E1379.1** 5:19 | **E520.1** 156:8 | **editorial** 151:17 | 222:7 323:4 | 240:21 320:19 |
| 114:1 | **E522.1** 6:3 | 151:20 | **efficacy** 22:12 | 321:18 323:6 |
| **E1379.12** 120:4 | **E554** 98:19,24 | **editors** 148:19 | 160:19,23 | **employee** 140:2 |
| **E1379.13** 120:21 | **E554.10** 104:19 | **educate** 92:22 | 161:3,7,9,14 | 141:24 143:3 |
| **E1379.14** 122:6 | **E554.18** 109:13 | 150:7 231:16 | 161:20 191:22 | 245:1 341:13 |
| **E1379.2** 114:18 | **E554.33** 101:2 | 268:5 | 263:18 | 341:15 |
| **E1379.4** 118:7 | **E554.7** 99:13 | **educated** 337:7 | **effort** 19:11 | **employment** |
| **E1379.5** 118:15 | 128:24 129:4 | **educating** 134:9 | 52:21 86:17 | 21:21 22:23 |
| **E1379.75** 5:19 | **E563** 332:19 | 338:22 | 88:24 96:8 | 25:19 37:22 |
| **E1387** 210:21 | **E563.2** 334:1 | **education** 22:14 | 102:24 127:3 | 111:13 142:4 |
| 213:2 | **E912** 223:18 | 25:9 84:24 | 134:9 158:18 | **EN3288** 317:24 |
| **E1387.1** 6:12 | **E912.20** 224:13 | 85:2,4,8 86:11 | 173:11 184:4,8 | **enacted** 278:20 |
| **E1387.28** 213:19 | **E912.21** 225:8 | 86:12 104:21 | 184:11,20 | **encourage** |

274:20
**encouraged** 71:8
335:16
**encouragement**
168:22
**endeavored**
133:1
**endeavors** 19:20
**Endo** 3:2,3 5:13
10:12,19,22
12:18 16:6,9
20:13 21:6,10
21:13,19,22
22:1,18,23
30:4 33:6 34:9
34:22 36:13
37:16,22,23
38:7,12,14,14
38:17 39:3
40:11 42:12
43:24 44:24
46:15 47:20
48:2,3 49:21
50:16,24 51:1
56:24 57:15
59:10,13 60:1
63:15,19,23
64:3 65:9,11
65:11,13,14,15
65:24 66:8,17
71:17 73:6,24
74:14,21,24
75:1,8,10 76:4
77:17 78:14
79:22 81:12
82:8,20 85:7
89:10 95:13
96:8,15,18,20
97:7 98:13,23
99:10,17
100:17 101:4
102:17,21
104:15 105:14
106:11 107:17
109:20 110:11
111:17 112:17

113:7 115:14
115:18,18
116:13,13,22
117:5,19,22
118:2,10
119:18 128:22
129:16,23
130:6 132:13
133:19 136:18
136:20,21,22
136:24 137:16
139:1 140:2
141:24 143:3
143:14 144:13
144:24 145:6
145:19 146:19
147:10,20,22
149:20 150:13
152:22 156:5
156:16 162:12
163:24 164:10
165:6 169:1
170:13,18
172:21 173:7
173:19 174:20
175:20 176:1
176:21 178:16
180:14,17
182:3,11 183:9
183:12 184:7
184:13 185:4
186:15 188:5
188:23 189:14
190:10 192:9
192:21 194:8
194:17 195:17
195:24 196:2
196:13,20
197:9,13 198:4
199:6,15,15,21
200:17,20
202:11 203:5
203:13 204:2
204:24 206:9
207:2,9 211:15
212:10 213:1

214:15 219:18
221:10 223:18
225:22 226:1
226:17,24
229:8 230:4,15
231:12,15
234:1,9,19
235:2 236:10
238:21,23
239:2 240:12
240:16,21,24
241:9,17,19
242:6 243:2,9
243:19 249:6,9
249:13 251:17
252:22 254:10
256:14,17,21
259:14 262:21
263:9,20,22
264:1,23 268:2
269:17 270:8
277:16 278:7
280:18,22
282:9 283:1,5
283:13,17
284:15 285:6
290:20 291:3
293:7 302:5
303:7 306:12
307:2 315:7,17
318:8,17
320:18,19
323:6,9,14
324:5,23
325:16 326:19
328:3,19
333:17 335:10
335:16,23
336:17,21
337:6,20
338:13,20
339:8,15
340:10
**Endo's** 13:18
63:16 66:9
75:2 100:21

110:23 111:6,9
129:1,6 131:16
152:22 226:13
228:21 229:23
230:19 234:20
235:18 236:4,5
243:4 252:24
281:12 317:9
325:1,6
**Endo-approved**
168:8
**Endo-Bingol-...**
5:2 14:5
**Endo-Bingol-...**
5:4 14:7
**Endo-Bingol-...**
5:5 23:18
**Endo-Bingol-...**
5:7 23:20
**Endo-Bingol-...**
5:8 24:13
**Endo-Bingol-...**
5:10 75:24
**Endo-Bingol-...**
5:12 84:2
**Endo-Bingol-...**
5:14 88:14
**Endo-Bingol-...**
5:16 99:4
**Endo-Bingol-...**
5:18 113:12
**Endo-Bingol-...**
5:20 146:11
**Endo-Bingol-...**
5:22 156:12
**Endo-Bingol-...**
6:2 162:16
**Endo-Bingol-...**
6:4 170:21
**Endo-Bingol-...**
6:6 174:2
**Endo-Bingol-...**
6:8 188:12
**Endo-Bingol-...**
6:9 202:17
**Endo-Bingol-...**

6:11 212:22
**Endo-Bingol-...**
6:13 219:22
**Endo-Bingol-...**
6:15 223:14
**Endo-Bingol-...**
6:17 231:17
**Endo-Bingol-...**
6:19 237:18
**Endo-Bingol-...**
6:21 239:21
**Endo-Bingol-...**
7:2 250:12
**Endo-Bingol-...**
7:4 250:14
**Endo-Bingol-...**
7:6 252:5
**Endo-Bingol-...**
7:8 257:18
**Endo-Bingol-...**
7:10 259:9
**Endo-Bingol-...**
7:12 263:3
**Endo-Bingol-...**
7:14 270:15
**Endo-Bingol-...**
7:16 285:1
**Endo-Bingol-...**
7:18 294:14
**Endo-Bingol-...**
7:19 301:20
**Endo-Bingol-...**
7:22 305:9
**Endo-Bingol-...**
8:2 333:13
**ENDO-OPIOI...**
7:20
**ENDO-OPIOI...**
7:21
**Endo-related**
18:1
**Endo/APF**
240:13
**Endocet** 37:24
38:5,8 230:12
**ends** 252:1

**Enforcement**
306:2 333:19
**engage** 85:7
86:18 95:3
264:24
**engaged** 89:11
188:24 229:1,4
234:2 244:1
**engagement**
229:8
**enormity** 138:15
**enormous**
127:22 128:12
128:17 129:20
130:1 132:16
133:4,22 134:3
134:16 135:3
136:19 138:7
138:18
**ensure** 42:20
58:13 103:5,8
103:24 112:15
126:17 168:9
210:11 236:1
248:3,4
**ensured** 135:22
324:20
**ensuring** 96:21
150:22 323:23
**entered** 100:17
137:16 153:21
**entering** 143:16
**entire** 104:20
284:16 287:1
303:21
**entirely** 258:3
320:18
**entities** 288:9
**entitled** 19:8
90:17 99:14
111:3 176:8
295:6,16 298:3
305:7 333:21
**entity** 73:19
115:18
**entry** 46:2,13

57:15 65:9
87:13 222:7,10
233:17
**envelopes**
308:11
**environment**
47:11 69:18
70:23 169:13
**EPI** 251:23
257:12 285:10
294:22
**EPI001676707**
7:7
**EPI001676709**
7:7
**EPI001794412**
7:9
**EPI001794413**
7:9
**episodes** 311:2
**equals** 222:11,20
222:24
**equation** 100:18
131:5
**ER** 5:15 6:10
10:24 11:24
13:2,9,19
20:22 21:7
22:2 33:23
35:6,23 40:17
41:14 42:9
43:5,12,24
45:13,17 46:13
46:20 47:18,19
47:21 48:18
49:12,21 54:4
55:1 56:22
57:1,9,18,23
58:3 59:4,12
59:15 61:2,6
61:11,16,22
62:24 63:7,13
71:13 72:1,7
75:3 76:23
78:5,16 79:18
79:24 81:13

82:10 84:9,19
85:5,17 86:6
86:13,19 87:15
87:22 88:10,13
88:19 89:2,16
89:22 90:7,22
91:5,15,24
92:7 93:4,12
94:5,8,22 95:6
95:14 96:8,13
96:19,24 98:14
99:2,3,10,11
99:22 100:13
101:5,7,10,12
101:21 102:1,2
102:7,11,17,19
102:24 103:1
103:11,13,14
103:23 104:1
105:16 106:12
110:1,12,16
111:9,20,24
112:7 113:11
114:8,11 119:8
120:11 122:22
123:1 129:9
130:12,16
131:6,16 132:6
132:17 134:13
135:8 136:7
138:7 140:2
143:15 144:2
144:15 145:2,8
147:24 148:10
154:12 155:7
156:17 159:17
160:1,17,22
161:7,10,10,22
162:5,24
163:17 167:24
168:3,16
169:24 171:8
172:22 173:8
174:21 175:1
177:5,9,14
178:13 180:1

180:15 182:5
182:12,17,20
182:24 183:12
183:23 184:6
185:3,4,18
186:9 188:24
189:6 190:20
191:6,11,19
192:6,10,23
193:18 194:3
194:10,21,23
195:1,2,18
197:15 198:5
198:21 199:8
201:1,6,14
202:2,14 203:1
203:6,15,23
204:3,19
205:20,23
207:13 209:14
211:17 212:2
212:11,14
214:1,2,11,21
216:2,20
221:19 223:6
223:21 225:23
226:10 227:15
228:1,21 229:6
229:12,24
230:5,22 233:8
235:4 238:22
260:20 261:2
261:14,17,21
263:6,10 264:7
264:11 265:22
266:6,12
267:19 268:17
269:6,19
270:24 272:1
272:17 273:6
273:11 274:1
274:14 275:3
278:5 287:4,7
298:16 299:19
304:10 306:9
310:19 317:10

180:15 182:5
318:3 323:11
323:13 324:22
325:17 326:20
327:10,20
328:4,5,19
329:15,24
330:10 335:3
335:13 336:1
336:12 337:2,2
337:6,19,24
338:9
**ER's** 160:24
327:14
**ERICA** 2:10
**ERRATA** 343:1
**escalations**
197:6
**especially**
159:19 160:1
172:6 334:12
**essence** 144:3
**establish** 47:13
**establishing**
47:15
**estimated** 282:3
**et** 63:17 185:1
226:15 227:2
230:10 260:9
324:1
**ethical** 184:22
200:12 201:21
216:24 311:1
322:12
**euphoric** 334:12
**evaluate** 41:2
176:10
**evaluating** 203:5
203:7
**evening** 17:13
280:4 320:5
**event** 71:17
95:23 160:4,9
228:6 307:17
**events** 27:10
28:13,22,23
29:1 100:4

238:7 307:20
311:15
**eventually** 36:22
45:21 253:7
318:2 325:3
**every-12-hour**
160:24 177:5,8
177:18,19
178:15,17,19
**everybody** 92:14
92:19 128:3
135:22 136:2
140:9 265:16
286:22
**everybody's**
62:3
**evidence** 180:9
186:12 206:14
217:23 310:10
315:9 330:13
331:5
**evolve** 248:9
314:13
**evolving** 248:6
**exact** 10:6,7
11:16 67:24
120:10 151:2
265:12 340:3
**exactly** 49:15
152:5 153:16
164:13 170:6
190:21 212:7
230:17 248:8
266:22 273:17
311:14 331:22
**examination** 4:6
4:6,7,7 341:6
**examined** 2:1
**examining** 29:19
**example** 16:24
27:21 28:8
29:17 33:3
43:23 44:12
47:21 48:14,18
54:3,18,24
58:15 61:2

63:9 77:6
93:13 95:14
106:1 124:7
126:11 131:20
149:14 153:2
154:4 186:16
217:19 226:23
229:16 230:22
252:14 255:12
275:19 277:5
278:3 307:22
**examples** 48:17
**exceed** 262:4
**exceeded** 39:23
40:3,7 72:1
**exceeding** 51:8
**exceeds** 309:2
**exchange** 310:1
**excited** 272:16
**excuse** 19:1
74:20 166:5
216:1 310:12
312:3 327:8
**executing**
267:19
**executive** 6:8
188:18 190:17
244:23
**exhibit** 5:2,4,5,7
5:8,10,12,14
5:16,18,20,22
6:2,4,6,8,9,11
6:13,15,17,19
6:21 7:2,4,6,8
7:10,12,14,16
7:18,19,22 8:2
13:24 14:2,3,5
14:7,12,15,18
20:11 22:8
23:15,16,18,20
24:8,8,11,13
65:6 71:23
75:23,24 76:3
76:6,10 80:9
80:10,17,22,22
81:1,2,4 83:22

84:2 85:1,21
88:3,4,9,14,23
89:8,14 90:19
94:3 96:2 98:1
98:17,22,22
99:2,4,14
101:2 104:20
109:12 110:21
113:4,7,12,15
127:17 129:1
146:10,11,18
147:1 150:11
156:4,12
161:19 162:11
162:13,16
163:11 170:12
170:14,21
171:6 173:19
174:1,2,6
187:15,20
188:4,10,12,15
188:17 202:10
202:10,17,22
202:24 212:19
212:22,24
213:6,10
219:17,17,20
219:22 220:22
223:13,14,20
224:2,7 231:11
231:11,14,17
231:24 237:9,9
237:12,18
239:20,21,24
244:13,14
250:1,1,9,10
250:12,14
251:22,23
252:5 257:11
257:11,13,16
257:18 259:8,8
259:9 262:10
262:17,20,20
263:3 270:7,7
270:15,22
272:7 279:18

279:19 284:24
285:1 294:13
294:14 301:19
301:20 305:6,9
310:1 321:10
325:21 326:7
327:1 329:7,11
330:20 332:21
332:21 333:1
333:13,16,18
**exhibits** 5:1 6:1
7:1 8:1,4 13:24
281:4
**existed** 55:22
115:18 186:1
**existing** 42:18
46:3 79:24
146:8
**exit** 231:20
232:18 233:18
**expanded** 36:16
**expanding** 42:17
**expansion** 246:2
**expect** 51:20
52:1 245:18
310:13,14
**expectation** 52:9
70:17 162:3,22
163:4
**expectations**
70:11,14
163:17 278:2
**expected** 69:11
70:8 71:3,5,10
81:19 162:24
**expecting** 52:21
52:23
**experience** 26:3
27:12,21 73:13
149:3 164:8,9
164:11 167:18
168:2 171:8
178:4 185:8
197:3 212:1
217:10 321:14
321:17

**experienced**
43:7
**experiences**
181:4 212:13
**expert** 10:5,8,15
11:9,10,14,15
167:8 235:15
254:5
**expertise** 11:21
104:9 140:14
254:7
**experts** 98:3
**explain** 41:6
76:5 103:13
160:21 264:3
**explained**
137:18
**explaining** 186:3
334:2
**explains** 161:2
203:13 204:6,9
311:13
**explore** 284:13
**express** 93:14
**extended-rele...**
57:21 154:12
189:14 256:20
**extent** 41:20
140:12 148:8
152:13 163:21
184:9 198:1
217:6 242:21
248:20 315:10
**external** 226:13
226:17,23
227:10 324:13
**extra** 35:12
**extract** 298:15
298:21 299:21
**extractability**
299:7
**extremely**
334:10
**Eyer** 232:4
233:24 234:6
**Eyer's** 234:18

**F**

F 341:1
face 198:13
241:3,14
300:23
face-to-face
84:21
faced 242:8
facilitate 41:11
62:15 167:24
facilitated
253:18 308:9
fact 21:24 35:12
37:12 39:21
45:20 46:19
101:9 105:3,10
106:14 109:1
118:11 123:13
127:19,22
128:10 130:1
131:19 132:1
133:3 137:22
140:1 143:24
145:11,22
152:7 160:22
163:24 164:22
185:11 186:5
191:5 193:10
198:20 201:13
202:2 205:1,7
207:11 210:23
211:16 212:12
213:12 214:16
216:20 217:18
217:21 218:4
218:16 223:2
248:17 250:18
251:2 262:13
272:24 273:20
273:23 297:9
301:1 311:17
327:23 329:17
331:8,9 339:17
340:11
facto 166:22
factoid 115:24

factor 53:7
56:19 145:18
194:2,11 196:1
199:7
factors 51:21
72:13 194:1
266:22
factually 338:13
338:13
fair 25:16 30:6
55:21 97:15
104:8 114:11
120:11,15
175:5 230:19
236:3 253:7
265:19 266:10
288:22 328:11
fairly 37:8
323:16
faith 45:22
100:22
fall 159:24 225:1
226:18
falls 108:14
false 199:16,20
214:16,20
215:9,12 217:3
familiar 27:18
34:14 49:6
99:11 119:7
276:11,14
277:15 295:20
familiarity
27:13
families 104:23
232:20 233:19
family 109:14,16
166:8,21 167:6
167:11 168:1
168:15
fantastic 187:12
271:5,11,24
far 25:4 39:10
113:17 114:19
115:18 313:17
314:2

Farm 319:7
Fastape 174:8
174:10,13
175:20 176:15
176:20 186:7
193:5 207:2
fatal 305:19
307:9,10,13
308:20 309:7
favor 316:3
favorable
169:24
FDA 55:14,23
100:14,14
102:14 124:20
130:16 137:15
154:12,15
189:14 283:13
317:10,19
318:18 324:23
325:2,3 335:19
336:5 338:11
FDA's 131:6
256:18 315:17
fear 205:7 206:4
297:23
fearful 123:18
fears 123:16
208:5
feasible 169:8
featured 232:18
features 158:15
233:1
February
259:17 263:1
265:20 266:6
266:11 268:1
294:24 302:1
311:4
federal 11:6
13:11 29:18
federation
254:20
feedback 58:20
59:2 60:2
71:16 73:11

106:16,19,23
124:7 207:17
feel 54:1 171:12
171:24 215:2
fellow 307:18
felt 125:19
fence-sitting
267:22
fewer 222:6
field 62:15 67:6
68:7 97:11
112:13 156:10
254:6 325:3
fifth 225:10,16
225:18 254:1
figure 296:19
299:11 301:5
file 78:24 79:1
filed 283:12
318:17
files 16:4,5,23
17:1 23:2,9
filing 57:20 58:2
58:2
filled 289:5
filling 288:10
filter 42:24
final 6:8,10
42:23 174:9
175:15 188:8
188:18,22
189:9 202:15
203:1 219:20
220:22 317:17
340:8
finally 275:3
320:5
financial 30:23
74:13 75:8
107:18
financially 74:18
341:16
find 17:2 78:12
185:16,24
197:14 209:22
210:8 211:15

finding 214:19
findings 177:3
210:2
fine 15:6 64:19
109:10 141:1
235:12,17,23
236:17
finish 32:9 57:14
312:8
first 9:12 15:16
21:11 35:2
39:2 40:16
51:9 78:12
90:20 91:1
99:22 101:3
114:1,1 117:14
117:14 129:13
148:18 155:6
156:8 157:2
160:6,18
162:19 164:5
165:13 167:15
174:5 176:9
177:3 189:13
190:2 191:18
224:17 233:3
235:10 238:4
240:3 241:7
252:9 259:21
260:18 270:11
270:22 272:6
272:13,14
283:18 287:6
287:10 296:6
296:11 298:11
325:24 327:3
328:10 329:8
330:24 334:1
fish 265:5,5
Fishman 256:9
256:11
fit 31:24 87:2
91:10 92:12
93:8 128:21
178:13 248:9
301:6

fits 87:2,10
five-minute
  317:1
fivefold 308:22
fix 188:1
flatten 53:15
fledgling 322:11
flexible 183:5
flip 220:10 296:2
  298:2
Floor 2:7,16
Florida 290:3,11
flowing 75:2
flyer 232:11
  233:17
focus 94:3
  158:18,21
  165:14 166:14
  170:24 285:22
  297:9,18
focused 12:18
  42:5,18 47:18
  83:12 92:22
  156:16 169:9
  190:1 328:8
focusing 166:3
  224:4
foggy 171:13
  172:1,3 198:5
  198:6
folklore 116:18
  116:20
folks 31:19
  291:14 303:5
follow 59:11
  143:10 272:7
  309:22
follow-up 250:6
following 95:9
  164:5 233:23
follows 9:13
force 109:19,20
  119:6 132:1
  153:2,6 164:14
  174:17 180:12
  200:21,23

201:4,13
215:21 252:4
256:14,15
257:22,24
258:13 292:14
304:9,16 310:6
323:24 328:19
forced 55:17
Ford 33:7
240:15,16
forecast 40:4,4,7
51:8,18 52:9
52:15,17,20
53:15,17
164:24 165:9
165:10
forecasts 51:10
foregoing 341:8
342:3
foreign 234:4
forget 77:19
83:10
form 18:3,24
19:17 20:8,17
20:23 21:9,20
22:3 27:15,22
28:9 29:5,10
29:20 30:8,14
36:18 37:9
38:1,19 39:9
39:15 40:1
41:16,23 42:11
44:4 45:18
46:5,16,21
47:23 48:6
49:13,23 51:2
51:13 53:1,8
55:3 56:1,8,14
57:11,20,22
58:3,16,17,18
59:3,5,20,21
59:22 60:4
61:4,12 62:21
63:21 64:14
66:10 69:13,22
70:20 71:14

72:8,12 74:15
75:4 79:5
81:14 82:11
84:12 85:6,18
86:14,20 87:16
87:23 88:16,20
89:18 91:18,23
93:1,16 95:7
95:20 96:10,17
97:4,9,15
99:24 100:10
100:20 101:11
101:18,22
102:5,8,12,20
103:16 104:2
104:24 105:6
105:18 106:15
106:22 107:23
109:22 110:13
110:17 111:11
111:21 112:8
113:22 115:15
116:16 117:12
117:23 118:4
119:10,14
122:18,23
123:11,24
124:11 125:6
125:17 126:6
126:13 127:23
128:14 129:10
130:4,13,18
131:2,7,22
132:18 133:6
133:24 134:18
135:9 136:8
137:2,8 138:11
139:6,20 140:6
143:17,23
144:1,8,10,16
144:18 145:10
145:20 146:1,5
148:1,23 149:7
149:16,22
151:11 152:1
153:3,13 154:4

154:6,14,17,22
155:18,24
156:19 157:4
158:7,12 159:8
160:3 161:4,23
164:12 165:18
165:24 168:4
168:17 169:4
170:3 172:2,17
175:22 176:16
177:11,20
180:18 181:3
182:6,13,19
183:2,14 184:1
184:12 185:6
185:19 186:11
186:20 190:11
191:2,24
192:12 193:1,7
193:12,19
194:6,14,18,22
195:4,11,20
196:6,16,23
197:18 198:8
198:24 199:13
199:18,24
200:7 201:8,16
202:4 203:16
203:24 204:6
205:3,9,17,22
206:6,13,21
207:6,14 208:6
210:7,16 211:3
211:19 212:4
212:15 214:13
214:18,23
216:5,14 217:5
217:22 218:5
218:11,19
219:6 222:1
223:7 225:3,24
227:3 228:2,14
228:22 230:1
230:24 235:6
235:22 236:7
236:20,24

241:21 242:10
243:11 244:2
245:20 246:18
247:18,22
248:14 249:1,8
250:23 253:9
253:17 257:8
261:8 262:5
265:2 266:14
268:3,13
269:14,21
273:14 274:8
274:19 275:8
275:21 276:7
276:21 277:8
279:1 282:6,16
283:14 286:13
288:23 289:12
290:4,13 291:6
291:22 292:13
292:23 293:14
296:9 297:2,16
298:22 299:17
300:10,22
301:13 303:11
304:20 305:14
306:16 307:4
307:11,24
309:11 310:9
311:6,22
312:14 315:1,8
315:20 316:7
316:18 318:4
318:10,21
330:3,12 331:4
331:11,18
332:15 334:4
334:20 335:4
335:15 336:3
336:20 337:11
337:24 338:17
339:1,12,20
340:14
formal 25:17
199:2 261:22
291:15

formed 246:23
247:4 256:23
forms 31:18
90:3,9,11
127:13 143:18
146:7
formulary 87:3
87:5,11 224:20
327:11
formulated 21:7
formulation
21:1 155:15
161:22 172:22
173:8 177:10
177:15 316:3,3
316:5 317:10
318:3,9,18
331:16 332:3,7
332:12 334:18
336:2,4 337:9
337:16 338:1,2
340:4
formulations
153:23 155:7
189:15 192:7
193:24 247:17
331:9 338:10
forth 47:9 68:21
127:14 132:11
261:1 321:13
326:24 341:11
forum 246:12,17
246:20 247:6
251:9,18 253:8
253:13,16
forward 280:9
303:14 304:2
forwarded
170:17 257:15
303:12 305:13
forwarding
202:13 232:11
forwards 171:16
234:6
found 282:12
313:16 314:1,8

foundation
29:11 38:2
49:14 75:5
81:15 83:9
98:10 105:19
107:24 123:12
125:7 130:19
131:3,8,15
132:8,19 136:9
137:3 139:7
142:13 151:12
152:2 154:7,18
154:23 155:19
172:18 183:15
195:21 200:8
211:20 212:16
226:16,21,23
227:22 228:3
228:12,16
232:3,15,23
233:24 235:18
236:5,12
243:12 248:15
249:12 251:15
251:18 276:8
276:22 279:2
282:7,17
283:15 291:7
292:24 298:23
301:14 311:7
315:9,21 316:8
316:19 318:5
318:11 327:21
331:12,19
338:18 339:2
339:13,21
340:15
founded 37:16
115:6 116:13
116:21
founding 65:10
four 9:23 39:22
40:6 113:18
157:13,14,21
222:24
fourth 253:22

305:21
FP 166:6,7,17
FPs 167:3
frame 55:20
251:7
framework
132:8 286:22
franchise 39:5
39:14 322:6
Francisco 2:17
frank 87:19
frankly 18:14
72:14 324:13
free 97:20 142:8
frequency 52:6
157:12 166:15
frequently 51:22
51:23 177:23
178:6
friend 261:23
friend's 122:10
front 89:7 97:12
103:20 112:24
134:8 147:1,4
150:11 184:16
208:16 213:5
325:21 330:21
Frova 34:3
full 39:22 60:17
62:3 99:15
120:14 129:13
155:6 176:9
263:17 310:4
fun 245:23
function 47:4
180:8
functional 11:12
58:6 60:17,23
61:5,17,21
76:21,24 77:1
77:8 85:15
functionally
60:16 258:15
functions 41:7,8
44:23 61:21
fundamental

130:16
fundamentally
56:6
funding 151:19
further 1:7
250:11 279:14
341:8,12
FYI 245:23
303:21 304:1,8

—————————
G
—————————
gain 226:14
227:1 257:6
258:7
GAO 29:18
Gasdia 24:21
Gastel 2:14 4:6
280:3,5,7,11
282:11,19,24
283:19 284:9
284:14,19,22
284:23 285:4,9
285:13 286:16
289:4,18 290:7
290:15 291:10
291:23 292:3
292:19 293:6
293:15 294:8
294:10,16,20
294:23 295:20
296:22 297:12
299:15,22
300:13 301:12
301:18,22,24
302:5,9 303:13
304:24 305:18
306:18 307:21
308:3,15
309:12 311:3
311:20 312:1,6
312:24 313:7
313:23,24
315:5,16 316:4
316:10,16,24
317:8 318:7,16
319:4,15 333:7

gastrointestinal
28:24
gauge 174:17
301:8,16
gelling 299:20
Gemini 3:15
general 13:17
28:10 59:8
60:6 70:12
79:23 80:6
92:12 93:20
96:8 106:18
111:16 119:23
121:6 170:17
229:13 240:23
242:6 251:2
310:22
generally 44:19
45:5 46:8
51:17 52:17
66:13 70:9
80:4 82:3
91:22 93:15
96:16 99:11
110:7 116:17
123:13 167:11
167:20 200:6
203:22 227:13
229:5,12 243:9
261:3 265:13
289:17
generate 52:11
169:8
generating
265:21
generic 10:3,22
12:6,8,19 13:5
13:8 37:23
38:11,14,18
45:16,19 46:2
46:6,13 54:6
90:11 230:13
230:15,18
generics 160:8
generously
147:19

Highly Confidential - Subject to Further Confidentiality Review

Page 364

gens 16:16
genuine 309:19
genuinely
123:14
geographic
68:16 70:5
German 73:19
getting 31:22
91:12 94:19
95:2 122:9
138:4 159:19
164:1 187:14
196:21 197:4
198:22 217:19
226:7 227:19
297:11 320:8
GfK 176:22
GI 27:9
Gilson 252:10
252:11,12
give 13:16 32:14
32:24 48:17
97:20 107:19
180:11 272:24
286:21 307:16
319:6
given 13:10
52:23 61:1
108:7,17
159:19 207:22
265:22 276:19
304:10 307:15
Gives 54:15
giving 66:15
169:16 210:4
274:6
Gizzi 234:7
glasses 314:14
go 15:8 19:3
31:2 33:6,17
34:22 39:21
40:10 41:5
42:20 43:8
44:24 46:23
50:16 51:7
57:19 62:10

68:5,9,18
78:10,19 79:7
79:9 80:8
82:21 90:15
93:7 96:1 98:1
101:1 104:19
108:2 109:11
110:20 114:17
118:6 120:4,20
123:17 127:17
138:24 147:17
148:11 152:22
153:18 155:3
158:1 160:15
164:4,17,18
165:12 171:15
172:13 175:17
176:7,19 177:2
178:23 179:7
179:24 181:11
183:16 184:8
185:16 188:21
189:12 190:15
191:14 193:22
196:3 199:4,22
204:5,15
212:18 214:1
217:12 221:6
225:7 234:5
235:10 239:5
241:6 253:20
253:21 254:22
258:9 259:23
266:24 272:6
272:22 284:19
284:20 286:6
286:24 291:21
295:13,15
302:13 312:8
312:24 322:7
322:19 330:21
goal 89:16 100:3
105:2 126:23
127:2 243:2,4
243:10 276:19
278:2 311:3,20

311:23 312:9
goals 92:8 97:2
103:24
goes 47:12 84:5
85:21 122:5
123:4 139:1
154:9 192:5
233:23
going 13:23 15:4
19:22 20:4
23:6 24:7 32:6
32:7,8,16 39:2
43:10 45:24
50:14 52:8
57:3,13 60:10
63:5 65:5 67:1
67:2 70:23
71:22 75:22
76:5 80:5,19
87:12 91:10
92:14 93:7
98:21 107:2
113:3 115:1,14
117:7,11 123:5
142:5 143:7,10
158:14 160:8
162:3 170:17
173:20,23
181:15,18,21
181:24 201:24
202:1 207:21
217:12 219:8
220:3 224:2,3
233:16,22,23
234:18 236:22
239:19 240:9
248:4,9,9,10
249:16 258:9
260:14,24
266:9 274:5
279:13 280:8
280:12 284:9
284:19,20,23
288:15 291:17
292:11 293:2
294:10 301:3

302:10,16
305:5 311:12
314:11 315:6
317:23 319:19
319:20,21
332:20 338:12
gold 289:13,17
Golkow 9:3
good 9:15,16
45:22 56:16
57:4 62:18
64:17 100:21
107:3,4 111:17
141:2 181:16
204:21 205:6
209:10 219:7
280:4 320:5
Goodell 2:1 3:20
GOODSPEED
2:18
Gordon 3:7
Gould 77:13
government
29:17 47:10,14
49:1 62:8
65:18 234:9,16
245:4,7,9,13
247:8 252:24
253:3
Grand 3:11
grant 85:11
151:18 228:7
granularity
288:24
great 65:24
75:19 122:8
152:12
greater 152:8
Greg 234:6
Gregory 302:15
303:21
grounds 217:23
group 33:11,15
33:21 34:8,20
38:7 57:18
58:7,8 66:4

77:15 84:21
85:9,15 114:4
114:5,6 116:4
151:14 163:2
166:20 168:7
228:19 232:4
234:1,1,8
246:23 252:14
252:17 280:5
280:14 303:19
groups 36:15
114:10
grow 50:22
53:15 117:16
304:12 310:14
311:4,16,18,21
311:23 312:10
312:17
growing 248:6
310:7,13
311:11,16
312:20,21
grown 314:11,12
growth 72:14
266:9
Grunenthal
20:16,20 21:2
21:6 23:4
73:16,18,20,23
74:3,6,12,20
75:1 107:16,18
108:8,20
141:16,24
142:4,8,11
243:22,24
244:5,8,19
245:12 246:8
246:16 247:5
247:15,20
251:6 279:16
283:18 284:4,6
Grunenthal's
109:2 245:11
guess 10:22
11:21 12:17,23
49:24 65:17

66:3,15 82:13
108:7 110:5
146:2,22 200:1
200:9 211:21
227:4 246:23
288:6 289:13
325:18 332:5
guessing 233:13
guidance 66:3
104:6 180:11
guide 53:14
232:18 233:18
guidelines 22:14
42:22 210:12
225:10,13,15
235:24 315:14
323:21
guidepost 55:15
guy 261:11
313:4
guys 159:1
291:21

**H**
habits 44:6
159:2,15
half 14:19 37:22
78:11 91:1
137:13 191:9
287:3 307:15
hallmark 273:2
hand 13:23 24:7
75:22 80:9,10
88:2 98:21
113:3 146:9
149:10 156:3
162:10 170:11
173:18 175:24
187:20 219:16
223:12 231:10
237:8 239:19
249:24 257:10
262:19 270:6
284:23 294:10
294:12 301:18
305:5 332:20

handed 132:1
handful 280:12
handing 202:9
294:11
handle 71:19
311:12
handled 290:24
hands 129:21
139:2 140:3
happen 124:4
140:11 186:19
happened 18:13
37:19 72:15
163:6,15
186:21 261:23
261:23 279:5
happening
68:20 160:10
160:14 174:17
186:4 248:4
260:16 312:16
317:11
happy 12:13
137:4 188:9
264:4
harassing
137:23,24
hard 16:23 17:1
122:7 173:6
harkening
115:13
harmful 236:5
harmonized
60:13 61:9
harmonizing
190:2
HAZARD 3:5
hazard.carrie...
3:5
HCP 272:18
head 32:15,15
66:22 94:1
201:11 241:3
headaches
122:11,14
headed 148:12

heading 59:17
153:19 176:20
241:2
headquarters
263:13
health 3:6 22:16
41:19 42:2
63:8 104:22
127:20 128:11
129:18,24
132:14 133:20
135:4 138:8
272:18 281:21
282:3 303:4,10
304:19 305:1,6
310:4 313:1,12
314:22 335:12
335:23 336:14
336:18 337:7
337:20 339:16
340:10
hear 68:19
337:17
heard 169:14
252:16 283:4
hearing 283:9
Heart 25:20
heavily 292:5
heavyset 306:21
held 9:5 160:24
323:15
hello 306:19
help 27:9 33:16
44:15,20 50:21
50:22 52:13
53:14 54:16
62:15 66:3
69:24 84:16,17
85:5 89:5,14
90:17,17 95:12
95:15,18 97:17
97:21 123:15
150:6 162:4
166:6,16 168:9
168:15 221:9
245:12 297:22

299:1,12 300:5
315:12,13
323:3,20
helpful 67:2
helping 78:5,7
175:3,5 245:8
299:1,4 323:22
hereinbefore
341:11
heritage 115:13
heroin 334:13
hesitation 309:9
Hey 291:19
high 166:15
291:4 306:1
high-frequency
165:15,20
high-potential
271:13
higher 28:11,15
44:1 195:16
311:10 314:7,9
327:12
highest 165:16
166:3 184:22
264:6 265:22
266:2
highlight 124:18
145:1,19
highlighted
97:11
highlighting
83:1 336:23
highly 1:7
108:24 109:4
hire 164:7,9
hired 55:9,10
81:16,23
118:13 164:15
323:8,10
historical 189:23
332:17
historically
136:11 334:23
history 25:20
115:21 116:13

189:21 331:9
331:13,20
332:12 334:19
335:2,7,13
336:1,19 337:7
337:21 338:14
338:22 339:10
339:17 340:11
hoc 325:18
hold 75:10
holding 232:23
275:18
holistic 60:18,22
62:5
home 16:20 18:5
320:8
Hon 1:5
honest 18:12
49:16 332:5
honestly 239:15
272:4
hope 268:8
269:16
hopefully 33:16
43:12 226:6
231:6 269:6
hoping 25:3
52:11
hospital 222:18
hot 317:2
Hotmail 19:16
19:24 20:7
hour 57:4 107:3
181:15 219:8
hours 161:16
178:6 183:5,6
house 16:1
housekeeping
279:18
How's 222:4
Hubbard 3:11
Hughes 3:11
Huntington
321:23
hydrochloride
189:16,18

**hypotheses**
299:13 300:1
301:2
**hypothesis**
164:15

**I**

**idea** 62:18 76:24
166:14 231:4
254:18 281:15
296:24 328:16
**ideas** 301:3
**identification**
14:6,8 23:19
23:21 24:14
76:1 84:3
88:15 99:5
113:13 146:12
156:13 162:17
170:22 174:3
188:13 202:18
212:23 219:23
223:15 231:18
237:19 239:22
250:13,15
252:6 257:19
259:10 263:4
270:16 285:2
294:15 301:21
305:10 333:14
**identified** 114:2
170:16 326:11
**identifies** 234:15
**identify** 23:17
45:6 50:21
125:22 315:13
**identity** 323:19
**II** 26:18 28:14
28:19 97:18
101:12,14,23
101:24 102:13
103:11 111:24
122:24 124:3
134:13 135:1
182:20,22
185:12 194:23

195:1,6,8,14
196:2 197:12
205:24 210:5
216:21 306:10
**III** 26:21 28:12
195:15
**IIs** 28:10
**immediate**
114:15 118:21
**immediate-rel...**
154:11 189:15
**impact** 52:22
198:19 258:16
269:10,12
278:24
**impacted** 124:9
207:12 279:5
**impacts** 140:14
**Impax** 13:12
**imperatives**
90:19
**implemented**
110:10 131:20
**implicates** 284:5
**importance**
54:14 310:23
**important** 76:21
97:11 103:20
104:12 117:21
132:5 159:19
160:1 161:21
161:24 162:6
191:21 192:3
271:6 277:4,10
277:13 286:10
286:18 327:9
**impression**
149:1,5
**improper**
218:17
**improperly**
207:11 217:18
**improve** 45:6
58:23 59:18
97:21 127:24
130:8 133:14

211:9 241:14
243:2 246:24
**improved**
316:15,15
**improvement**
59:19 128:6,19
**improvements**
45:8,10 72:14
**improving**
241:18 242:8
243:5
**IMS** 43:22 44:5
44:10,11,20
268:21 287:22
288:2,4,6,11
288:19 289:10
289:13,16,22
**in-court** 12:4
13:9
**in-hospital**
222:23 223:4
**in-house** 322:1
**inadvertently**
12:15
**incentive** 276:5
276:11,17,24
277:4,9,24
278:24
**include** 41:15,18
77:6 87:11
114:11 229:16
248:22 268:8
**included** 61:16
67:14,17,20
70:17 106:1,6
262:9 293:22
**includes** 21:5
51:19
**including** 30:21
57:1,18 102:1
116:5 123:1
237:15 248:24
261:17 296:17
**incorrect** 215:7
306:6
**incorrectly**

206:16
**increase** 191:7
191:11 194:3
194:12 199:7
269:7 272:17
308:24 312:22
**increased** 196:2
308:21 309:8,8
**INDEX** 4:5 5:1
6:1 7:1 8:1
**Indianapolis**
260:8
**indicate** 59:2
150:11 152:24
180:6 197:10
199:16 206:2
206:23
**indicated** 79:16
99:20 113:19
124:8 162:6
178:12 205:11
268:11
**indicates** 93:3
147:13,19
176:20 180:1
204:17 205:5
221:12 232:22
**indicating** 91:8
217:14
**indications**
22:14 223:2
**indicative** 183:9
**individual** 48:20
133:9 210:2
307:14,22
**individuals**
76:11 77:5
282:14 285:6
**industry** 275:23
321:18
**inertia** 274:24
275:6,10,13
**inform** 335:11
335:23
**information**
43:17 53:14

71:19 97:12
103:5,20
104:13 108:1,4
108:5,9 109:1
109:2 128:22
132:22 135:20
142:3 148:21
148:23 150:6
152:10 167:23
168:9 170:17
183:11,23
194:9 195:24
194:22 199:12
199:20 200:4,6
200:10,11
241:9 247:24
281:20 284:4,7
286:2,20 288:2
291:11 328:9
337:15 338:5
339:6
**informational**
232:24
**informing**
339:16 340:11
**ingredient**
144:21
**ingredients**
334:10
**inherent** 101:5,9
101:13,15,21
102:2,6,10,19
102:24 103:14
104:1 105:4
106:14,21
122:21 124:9
124:16,19
125:16 129:9
268:6 299:7
**initial** 117:21
**initially** 157:5
**initiative** 60:14
111:5 131:20
237:6
**initiatives** 65:16
66:12 97:22

104:16 129:7
136:24 236:9
**inject** 334:10
**injectable** 146:5
332:4
**injection** 143:22
189:18 190:6
**input** 53:2 58:12
61:22 76:21,23
84:16 120:13
150:4 221:9
257:22,23
**inputs** 42:15
52:16 58:21
299:3
**inquire** 142:7
197:14
**inquiry** 163:16
291:24 292:2
**insight** 43:22
327:18 329:10
329:14 330:7
**insights** 162:23
296:3,12,20
297:3 326:17
327:4 329:9
**insisted** 135:12
**insoluble** 334:9
**instant-release**
334:4
**instruct** 215:21
**instructed**
292:14
**instructing**
142:16
**instruction**
279:16
**instructions**
143:11
**insurance** 48:21
49:4 327:11
**Insys** 107:22
**Intac** 74:1
**intelligence** 8:3
51:19 53:6
159:20,24

244:19 333:19
333:20
**intended** 111:22
198:12
**intense** 311:11
**intent** 150:5
179:20
**intentionally**
18:7 261:5,9
279:19
**interacted** 237:2
241:3
**interaction**
237:4 244:11
279:7
**interactions**
153:7 239:1
240:23 242:19
242:20 243:8
**interest** 58:16
59:3 60:2
242:13 246:17
247:7,12 248:1
248:12 249:4,6
288:14
**interested** 240:2
246:12 247:21
248:20 320:8
341:16
**interesting**
115:24
**interfering** 33:2
**interlaced** 97:14
**intermediary**
127:8 136:6
**internal** 42:20
62:14,16
150:15 296:14
299:10,24
328:14
**internalized**
290:5
**internally** 55:16
64:5 175:20
324:22
**INTERROGA...**

4:5
**interrupt** 181:15
312:7
**interrupted**
312:4
**interval** 177:22
178:15 209:14
**interviewed**
204:10
**interviews** 204:6
207:1
**intimately**
242:18
**intravenously**
334:11
**intricacies**
203:19
**introduce** 118:9
317:23 318:14
**introduced** 9:17
118:17,17
318:1
**introducing**
59:11
**introduction**
33:18 118:8
148:12,16
153:20 176:8
244:7 245:6
267:13
**invest** 265:15
269:15
**invested** 268:7
**investigate**
185:21 278:15
291:21 292:11
**investigation**
13:18 290:8,16
291:4
**investment**
267:20 268:12
268:16
**invitation**
234:20,21,21
235:19,21
236:5

**invite** 235:2
263:9
**invited** 63:9
119:23
**involved** 16:9
20:20 21:1
47:7 124:14
236:18,22
242:18 243:16
248:8 251:17
336:13
**involvement**
25:21 244:5
251:8
**IQ** 202:15
**IQVIA** 288:7
**IR** 144:9,14
148:4,10
154:11 155:7
155:15 191:6
191:12 338:1
**issue** 71:18
109:3 122:7
123:7 142:15
163:7 170:4
279:15 284:10
303:4 304:16
326:19
**issued** 23:7
201:4
**issues** 90:18
142:8 245:13
304:9
**item** 147:6,9
150:10 164:6
207:17
**items** 164:5
**IV** 26:21,22
28:12 195:15
334:6

——————————
**J**
——————————
**Jackson** 2:20
**Jacob** 78:3
**James** 244:17
**JANE** 2:22

**Janssen** 107:21
**January** 1:10
2:1 9:4 252:3
310:21
**JCAHO** 225:9
225:13
**jeans** 306:21
**Jen** 57:3 181:14
339:21
**Jennifer** 2:9
9:18 78:3
234:7
**Jennings** 2:12
**Jersey** 11:8 13:9
**job** 16:9 35:19
55:21 56:6
122:8 128:7
238:16 274:10
274:12,16,18
274:20 322:8
323:14
**jog** 321:7
**John** 244:18
**Johnson** 107:21
107:21
**joined** 34:22
35:3,22 78:14
79:22 117:5
118:10,12
238:23 239:2
243:22
**Jones** 2:16
**journal** 82:18,22
147:6 152:10
**journals** 148:22
**jscullion@see...**
2:9
**Julie** 310:17
**July** 113:17
114:3 157:9
189:16 244:20
246:4,16 250:5
251:7
**jump-start**
310:20
**June** 36:14

46:15 55:10
76:11 88:11,21
99:3 128:13
130:2,12
154:10,15
191:5,10
240:16 253:23
254:2,4 320:20
325:10
**jury** 288:5
320:10
**Justice** 282:12

---
**K**

**K** 3:9
**Kansas** 3:12
**keep** 16:4 18:7
169:7 181:23
187:15 233:16
**keeping** 261:12
**Kellens** 267:1,9
267:16 268:11
270:12
**Kellens's** 270:23
**Kelly** 2:20
**Ken** 170:16
171:6,22
**Kennett** 319:5,7
320:12 322:21
**Kentucky**
321:23
**kept** 35:18
**Kerr** 162:14,22
174:6 240:12
**Kerr's** 163:16
**key** 63:14 64:10
161:13 177:3,9
193:24 326:17
327:4,18 329:9
329:10,13
330:7
**keys** 203:15
**kids** 320:15
**kind** 16:19
34:12 39:1
52:16 54:5

55:17 60:19,21
66:6 69:9
71:17 77:24
81:21 87:3
110:6 116:17
117:6,11,15
125:11 128:6
140:19 171:18
173:2,5 200:3
201:22 209:12
218:13 225:19
227:19 231:5
261:24 264:14
289:15 293:10
293:21 296:12
296:14,18
297:6 298:6
299:10 300:5
301:4 312:10
327:23
**kinds** 71:19
84:20 125:22
153:7 186:4
192:18 210:9
211:7 228:9
236:9 248:17
268:7 291:1
292:15 311:2
311:15 329:18
**kit** 87:5
**Kitlinski** 77:6
240:12 242:16
**knew** 63:2
103:24 132:16
135:16 185:2,4
185:14 245:9
315:5 317:11
319:3 331:7
332:1
**knocking** 215:16
**know** 10:23
11:13,19 12:24
17:18 18:4,9
18:10 19:5
26:18 30:5,23
30:24 31:19

32:5,20 35:9
37:13,17,18,18
37:19 38:7
41:1 42:5
43:21 44:18
46:8 47:13
48:7,10 49:1,8
49:17 50:8
51:15,19 52:3
52:5,10 53:16
53:23 54:6,14
56:16 58:22
66:12 67:8,20
67:23 68:18
69:7,8,12,15
70:2,11,15,17
70:21 71:3,5
74:7,9,10,17
74:19,21,23,24
74:24 75:6
85:23 86:2
87:1,9,10 93:3
98:6,15 107:15
107:17 108:4,9
111:15 120:2
122:6,12 123:5
123:8 127:11
128:16 130:5
133:3,5,8
135:14,24,24
140:3,7,12,12
149:8,11,17
150:4 151:15
151:16 152:7
157:20 158:21
164:13 165:1,9
166:19 167:16
172:5,12,19
173:5,7,10
175:23 178:10
184:2,19 185:7
186:23 187:24
188:11 193:13
203:19 209:9
210:19 212:6
212:17 215:3,4

215:12,16
217:13,16,17
217:20 218:3,9
218:15,18,21
219:1,4 225:12
226:1 227:5
237:2 238:5,13
238:16 241:3
242:21 244:5
244:10,20,24
245:5,18
248:19 249:3
250:18 251:10
251:11 252:10
252:15,16
253:5,8,14
254:9 255:5,23
256:16,22
258:9 264:4,18
266:2,8 268:23
268:23 272:3,4
273:15,16,17
278:9,18,19
279:6 282:22
287:16,19
293:1,23 294:3
294:5 296:13
296:20 297:3
299:18 301:7
301:15,15
303:9 315:10
315:23 316:14
316:21 317:12
317:14,18,22
319:1 320:6
330:15 338:4
338:19
**knowing** 70:16
71:9 134:22
289:1
**knowledge** 13:6
74:12 107:16
127:10 133:19
138:19 141:16
141:19 142:15
173:12 186:23

195:22 196:11
196:18 205:18
239:5 244:3
249:11 282:1
**known** 101:7
334:8
**knows** 214:15
**KOL** 95:4
120:11 233:7
254:4 255:22
256:11 263:14
**KOLs** 63:14
64:10 84:6,16
95:5,8 168:6
226:15 227:2,7
227:9 263:9
**Kraus** 245:24
246:4,6,11
247:13 250:5,8
**KUBLY** 2:10
187:23
**KY** 2:21

---
**L**

**L** 2:12 33:14
40:12,18,24
**label** 55:14 93:3
103:19 104:15
126:15 135:18
152:23 162:6
172:12 173:8
173:13 177:13
178:2,12
184:14 337:14
338:5
**labeled** 101:24
224:14 285:17
**labeling** 17:19
103:3,18 336:8
337:2,6
**Laboratories**
3:15
**laced** 97:13
**lack** 127:19
128:10 129:17
129:23 132:13

Highly Confidential - Subject to Further Confidentiality Review

133:3,20
134:16 135:4
136:17 138:8
166:24 327:15
**lacked** 134:15
134:22 136:3,4
300:9
**laid** 97:24
280:10
**language** 111:16
208:15 301:3
**laptop** 15:22,23
**large** 126:24
156:17 290:2
**large-scale**
158:4 159:5
**largely** 316:24
**larger** 290:10
**largest** 90:6
**Larry** 200:16
201:18 202:12
**late** 37:7 55:9
115:8 240:17
269:24 271:13
271:17,18
320:20
**late-breaking**
285:24
**launch** 31:15
32:2 37:13
55:17 81:10,11
81:13,19
105:16,21
145:1 148:20
157:8 163:21
191:6 206:10
323:10
**launched** 37:12
37:15 39:4
45:17 46:6
105:23 115:9
206:20
**launching** 54:4
90:7
**Laura** 267:19
**Laurie** 188:6

202:13
**lawsuit** 11:1
**lawsuits** 12:17
12:22
**lay** 142:13
**lead** 51:21 58:5
58:6,7,9,10
172:11 247:9
304:9,16
323:18
**leader** 90:12
**leaders** 63:15
64:11,12,12
82:6 84:6,10
95:8 168:6
**leadership** 39:23
72:11 111:7
207:18
**leading** 57:16
60:13 62:11
196:1 199:7
274:12 324:24
327:16
**leads** 194:3
**leap** 209:8
**learn** 29:17 73:1
**learned** 127:8
136:6
**learning** 168:20
**leaving** 243:19
317:14
**led** 54:18 194:11
272:17 324:14
**Leech** 2:2 3:20
**left** 270:2 282:9
283:5,13
315:17,23
318:16 322:5
322:19
**left-hand** 90:16
148:12 155:6
222:5 232:17
254:23 255:21
287:21
**legal** 11:19
12:24 42:22

55:16 64:5
103:4 126:16
235:14,21
236:1 324:14
328:15
**legitimate** 290:8
292:20 293:2,5
**legitimately** 93:7
**legitimatize** 95:4
95:13,15,18
**length** 85:8
150:2
**let's** 29:1 31:2
33:5,19 34:22
35:17 37:7
41:14 47:11
48:3 49:11
71:13 72:16
75:19 79:7
80:9 81:10
94:18 102:19
119:8 125:12
157:18 167:23
181:23,23
187:24 189:12
212:18 222:3
227:15,23
251:22 278:9
309:22 321:8
325:20 333:3
**letter** 186:16,24
196:4,8,12,15
202:1 258:10
308:10 339:16
340:10
**letting** 215:3
**level** 35:13 51:20
52:1,6 128:3,4
133:9 134:20
135:12,13
136:2,14
138:19 140:13
169:18 195:7,9
249:4 265:4
272:4 285:21
**levels** 43:19 94:3

138:13 162:24
290:10
**leverage** 89:1
110:23 111:5,9
111:20 112:2
112:11 226:13
226:24
**leveraging** 88:10
**Lexington** 2:21
**liabilities** 75:2
**liability** 205:23
**liaising** 21:10,19
22:1
**liaison** 151:13
**licens** 21:4
**license** 22:2
73:23 74:4,11
74:17 127:12
**licensing** 21:3,5
**lie** 314:17
**lied** 266:20
**life** 45:1,2,4,12
45:13 58:4
140:11 323:21
**light** 142:5
291:2 327:19
329:14
**like-minded**
246:24
**Limbacher** 3:22
4:7 12:10 15:1
15:10,12,15
18:3,24 19:4
19:17 20:8,17
20:23 21:9,20
22:3,19 23:4
23:10 24:15
27:15,22 28:9
29:5,10,20
30:8,14 36:18
37:9 38:1,19
39:9,15 40:1
41:16,23 42:11
44:4 45:18
46:5,16,21
47:23 48:6

49:13,23 51:2
51:13 53:1,8
55:3 56:1,8,14
57:3,11 58:18
59:5,21 60:4
61:4,12 62:21
63:21 64:14,17
64:20 66:10
69:13,22 70:20
71:14 72:8,12
74:15 75:4,17
75:21 76:2
79:5 80:11,21
81:14 82:11
84:12 85:6,18
86:14,20 87:16
87:23 88:16,20
89:18 91:18,23
93:1,16 95:7
95:20 96:10,17
97:4,9 99:6,24
100:10,20
101:11,18,22
102:5,8,12,20
103:16 104:2
104:24 105:6
105:18 106:15
106:22 107:2,6
107:23 109:7
109:22 110:13
110:17 111:11
111:21 112:8
112:22 113:2,5
113:22 115:15
116:16 117:12
117:23 118:4
119:10,14
122:18,23
123:11,24
124:11 125:6
125:17 126:6,8
126:13 127:23
128:14 129:10
130:4,13,18
131:2,7,22
132:18 133:6

| | | | | |
|---|---|---|---|---|
| 133:24 134:18 | 205:3,9,17,22 | 293:14 294:5 | **Lisa** 254:14,16 | 30:10 43:5,8 |
| 135:9 136:8 | 206:6,13,21 | 295:17 296:9 | **list** 25:9 33:7,18 | 44:1,3,12 |
| 137:2,9,13,18 | 207:6,14 208:6 | 297:2,16 | 42:14 44:19,19 | 89:17 90:2,6 |
| 137:21 138:2 | 208:12,14,19 | 298:22 299:17 | 157:16 164:4 | 90:10 91:21 |
| 138:11 139:6 | 210:7,16 211:3 | 300:10,22 | 176:21 247:4 | 93:5,15 105:10 |
| 139:11,20 | 211:19 212:3 | 301:13,23 | 267:3,3,5,7 | 112:14 122:17 |
| 140:6,23 141:2 | 212:15,20 | 303:11 304:20 | **listed** 213:24 | 124:3 127:1,9 |
| 141:5,21 | 213:7 214:13 | 305:14 306:16 | 214:2 222:20 | 136:12 143:16 |
| 142:18,21 | 214:18,23 | 307:4,11,24 | 222:24 224:17 | 144:5 145:3 |
| 143:1,17 | 216:5,14 217:5 | 308:13 309:11 | 262:12 287:10 | 167:5 198:9 |
| 144:10,16 | 217:8,22 218:5 | 310:9 311:6,22 | **listing** 22:9 | 201:6,15 209:7 |
| 145:10,20 | 218:11,19 | 312:3,14 | 213:5 221:23 | 248:17,19,23 |
| 146:1,13 148:1 | 219:6,10,24 | 313:21 315:1,8 | **lists** 100:5 | 256:20 264:16 |
| 149:7,16,22 | 220:8,10,13 | 315:20 316:7 | **literature** | 265:6 269:6 |
| 151:11 152:1 | 222:1 223:7,16 | 316:11,18 | 146:19 155:9 | 273:21 306:9 |
| 153:3,13 154:6 | 223:23 225:3 | 318:4,10,21 | 299:3 319:2 | 335:20 336:15 |
| 154:17,22 | 225:24 227:3 | 319:21 320:4 | **litigation** 1:4 9:3 | **long-action** |
| 155:18,24 | 228:2,14,22 | 325:5 328:3,22 | 9:7 10:2 13:2,5 | 44:13 91:15 |
| 156:19 157:4 | 230:1,24 235:6 | 330:3,12 331:4 | 23:5 30:19 | 92:2 265:11 |
| 158:7,12 159:8 | 235:22 236:7 | 331:11,18 | **little** 16:18 57:4 | **longer** 55:18 |
| 160:3 161:4,23 | 236:20,24 | 332:9,15 333:1 | 80:21 107:2 | 74:16 316:9 |
| 164:12 165:18 | 239:7 241:21 | 333:5,8 334:20 | 116:18 164:8,9 | **look** 14:18 15:20 |
| 165:24 168:4 | 242:2,10 | 335:4,15 336:3 | 164:11 181:15 | 19:11 42:19 |
| 168:17 169:4 | 243:11 244:2 | 336:20 337:11 | 187:15,18 | 44:12 45:13 |
| 170:3 172:2,17 | 245:20 246:18 | 337:23 338:17 | 191:5 222:4 | 56:12 58:19 |
| 175:22 176:16 | 247:18,22 | 339:1,12,20,23 | 227:19 254:23 | 77:4,17 78:18 |
| 177:11,20 | 248:14 249:1,8 | 340:14 | 265:15,15 | 79:8,12,23,23 |
| 180:18 181:3 | 249:12 250:16 | **limited** 22:18,22 | 273:17 321:24 | 80:5 89:13 |
| 181:14,21 | 250:23 253:9 | 143:6 316:1 | 324:4 | 113:24 129:13 |
| 182:1,6,13,19 | 253:17 257:8 | **Linda** 240:12 | **live** 285:24 | 146:23 152:6 |
| 183:2,14 184:1 | 259:11 261:8 | 242:16 | 319:4 320:11 | 156:24 173:22 |
| 184:12 185:6 | 262:5 265:2 | **line** 41:7,8 44:22 | 320:12 | 176:4 188:15 |
| 185:19,22 | 266:14 268:3 | 46:24 57:17 | **lived** 319:13 | 220:17 222:5 |
| 186:11,20 | 268:13 269:14 | 114:14 208:10 | **lives** 319:9 | 223:23 224:10 |
| 187:2 191:2,24 | 269:21 273:14 | 225:19 252:9,9 | **LLP** 2:2,7 3:7 | 231:24 232:2 |
| 192:12 193:1,7 | 274:8,19 275:8 | 252:21 253:22 | 3:11,15,20 | 232:14,17 |
| 193:12,19 | 275:21 276:7 | 254:2,13,22 | **load** 78:23 | 234:12 237:13 |
| 194:6,14,18,22 | 276:21 277:8 | 255:7,18,19,24 | **local** 167:8 | 238:3,10 260:5 |
| 195:4,11,20 | 279:1 282:6,16 | 256:8 257:22 | **locations** 289:4 | 270:10 317:1 |
| 196:6,16,23 | 282:21 283:14 | 258:4 304:6 | **logic** 317:18 | 321:8 325:20 |
| 197:18 198:8 | 284:5 285:3,7 | 343:3,6,9,12 | **logo** 234:20 | 325:24 333:24 |
| 198:24 199:13 | 286:13 288:23 | 343:15,18 | 235:1 | **looked** 45:15 |
| 199:18,24 | 289:12 290:4 | **lineage** 115:13 | **long** 181:19 | 56:13 59:20 |
| 200:7 201:8,16 | 290:13 291:6 | **lingo** 297:6 | 316:19 319:13 | 135:3 157:2 |
| 202:4,19 | 291:22 292:1 | **link** 303:21 | 320:7,18 | 281:3,20 309:5 |
| 203:16,24 | 292:13,23 | 310:4 | **long-acting** | 330:6 |

looking 22:8
25:19 31:3
43:23 45:2,7
45:12 46:14
53:19 54:1
58:15 59:10,16
65:6 80:17
82:1,3 88:9,23
89:22 99:15
101:3 102:23
147:18 171:6
174:5 176:8,13
179:11 213:22
221:2 224:3
247:5,15
250:10 262:2
262:10 270:21
287:18 305:2
314:13
lookout 292:15
looks 36:3 53:16
174:8 232:4
267:2
Lortie 304:2,5
309:23
lose 9:23 45:21
46:8
lost 218:1
253:21
lot 10:18 28:1
46:10 53:17
62:17 63:5
69:6 70:14
118:1 158:21
210:1 225:4
273:21 289:11
291:20 320:9
lots 53:13 58:21
178:21 326:8,8
low 54:13 180:3
180:16 182:4
182:17,24
184:7,10 185:4
186:9 192:6,11
192:24 193:24
194:4,10,21

195:3,10,18
196:21 197:9
197:15 198:14
199:8 202:3
204:12 207:4
210:5 211:1,12
212:12 214:3
214:12 221:23
222:7,20,24
223:5 233:4
306:20 326:21
327:20 328:5
328:20
low-acting
201:15
lower 24:9 65:7
90:16 147:2
201:14 214:6
327:10,16
329:15
Ls 41:4
lunch 109:8,9
140:24 141:15
Lute 305:19

## M

M 2:22 3:5,13
3:17 234:7
ma'am 94:1
Magic 264:5
Magic's 264:7
264:10
mail-order
308:11
main 2:20 179:8
179:14 180:2
180:14 199:11
199:19 200:5
200:10,11
Maine 294:1
maintain 160:22
177:21 178:14
maintained 36:8
94:16 184:21
makeup 164:14
making 60:16

61:15 111:24
112:3 125:20
128:21 135:18
137:7 162:4
209:8 229:13
244:7 263:13
292:2 309:13
309:14 310:6
334:10
Mallinckrodt
107:22
Malvern 3:4
man 121:24
306:21
manage 41:4
129:22 138:21
139:4 140:5
203:18 257:4
managed 41:2
46:7 48:21
50:6,10 90:21
91:2 92:6
242:16 263:13
277:19 285:22
management
28:3 45:1,3,4
45:12,13 58:5
70:14 73:2
83:11 96:5,9
96:16,19,21
97:3,8 98:11
111:6,7,10,18
112:13 127:22
128:12 129:19
130:1 132:15
133:21,22
134:23 135:6
136:5,11
138:10 166:19
166:22,24
167:2,8 210:10
225:21 229:15
232:19 233:19
241:14,18
242:8,14 243:2
243:5,17 247:1

291:19 304:9
304:16 309:19
322:4 323:22
325:13,16
manager 114:14
238:20 267:9
304:6 335:2
managers 67:12
68:3,5 86:23
86:24,24
259:16 260:12
managing 33:14
40:12,18 41:6
67:4 71:20
92:7 323:17,18
mandatory
256:19
manner 140:19
200:12 201:21
207:24 216:24
263:15 311:1
manufacturer
56:12 141:18
manufacturers
10:22 12:19
56:13 66:18
107:19 248:16
248:23 251:7
256:18,22
map 293:16
March 24:21
303:3
mark 1:14 2:3
9:9 88:1
293:21 301:19
305:6 333:3
341:3,20
marked 13:24
14:5,7 23:18
23:20 24:8,9
24:10,13 65:6
75:23,24 76:6
78:20 80:10
84:2 88:3,14
98:22 99:4
113:4,8,12

146:10,11,16
156:4,12
162:11,12,16
170:12,21
173:19 174:2
187:20 188:12
202:10,17
212:22 219:17
219:19,22
223:13,14
231:11,13,17
237:9,18
239:20,21
244:13 250:1,2
250:12,14
252:5 257:11
257:18 259:7,9
262:20 263:3
270:7,15
284:24 285:1
294:13,14
301:20 305:9
321:9 325:21
332:21 333:13
market 2:2 3:7
3:20 26:23
27:23 31:10,12
31:23 39:6,12
39:19 42:17
45:7,7,11 52:3
58:14,16,19,19
59:1,7,7,10,16
60:1,6 74:10
74:17 81:21
88:11 89:1,17
90:6,12 94:24
95:14 105:14
105:15,20,22
106:1,6,8,10
106:13 122:20
143:16 145:15
158:17 159:1
159:17 160:2
166:18 169:23
172:6 174:16
174:19,23,24

176:22 184:18 186:6,6,7,14 188:23 192:8 192:22 193:3,5 193:10,16 197:12 199:5 209:3 210:2,19 217:4 221:9 226:10 248:9 264:16 281:8 304:12 310:7 310:11,12,12 310:14 311:5 311:10,17,18 311:21,23 312:10,16,17 312:18 315:18 315:19 316:5 317:10 318:1,9 318:15,19 322:12 326:2 326:19 327:5 327:18 329:9 329:14 338:2
**market-wide** 226:11
**marketed** 30:12 56:23
**marketer** 45:22
**marketing** 11:12 11:21 13:18 16:10 22:11 25:1,11,13,22 29:9,12,19 30:19 34:24 35:2,10,18,22 35:24 36:9,16 39:18 41:7,8 44:23 54:23 55:22 56:19,21 57:8,12 61:16 61:21 68:18 73:6 75:3 77:23 81:17 88:13 104:7 114:22 115:2 151:14 160:6 180:10 181:10 186:22 235:4 235:16 257:6 258:7 280:21 280:22 281:4 289:11 309:6,9 309:20 322:10 323:1,16 324:12 336:5
**marketing-foc...** 60:21
**marketplace** 27:14,19 47:6 52:11 53:11 54:3,15 58:24 60:3,9 91:9 118:3 122:17 145:4 153:22 175:4 192:19 205:24 331:23
**markets** 50:10 90:21 91:2 92:6 112:13 288:21
**Mary** 240:5,10 254:22 255:2
**match** 53:12 241:13 243:6
**matched** 176:23
**material** 55:13 55:15 97:10,14 103:7
**materials** 16:13 16:18,20 23:2 41:10 64:4,8 97:13 103:3 104:6 110:11 119:5 124:17 126:15,18,19 128:23 131:21 132:1,11 135:21 147:10 150:16,19 168:8 169:17 180:6,11 184:16,17 185:1 192:16 200:13 207:23 215:21 218:23 263:15 299:9 323:19 324:4,8 324:10,12,13 324:19,21 325:2 328:4,7 328:7 336:22 339:3,4
**matrix** 298:15
**matter** 9:6 76:12 122:7 156:10 217:2,3 232:5 244:19 256:13 263:1 270:24 273:23 327:23 329:17 338:9
**mature** 34:12 37:8
**maximize** 221:9 261:7
**MBA** 25:13 320:24 321:4
**McCarberg** 120:5,8,9 121:10 122:3
**McGinnis** 233:17
**McHugh** 310:17
**McKesson** 47:21
**MDL** 113:7 156:5 162:12 170:13 173:20 188:5 202:11 231:12 259:14 262:21 270:8 284:10 302:6
**me-too** 224:19
**mean** 12:8 31:12 41:7 47:7,11 50:20 51:14 52:1 53:7,21 55:4,5,21 61:20 66:14 70:21 79:14,19 92:14 104:5 108:12 117:8 117:11 124:21 139:24 143:19 152:17 155:1 157:14 166:13 169:10 170:2 176:3 180:21 181:14,17 183:3,20 211:21 244:10 245:11 251:1 254:11 258:16 264:10 269:17 271:18 296:7 300:21 302:12 312:6 325:7
**meaning** 246:11 261:12
**meaningful** 76:22 274:22
**means** 85:23 88:7 128:17 159:20 166:9 170:7 179:2 215:1 296:13 296:24 300:23
**meant** 61:15 166:14 195:2 298:19
**measurable** 267:20 268:11 268:16
**measures** 176:22 221:10
**measuring** 176:11
**mechanics** 279:4
**mechanism** 49:9 324:18
**mechanisms** 276:23
**media** 29:24
**Medicaid** 48:24
**medical** 22:14 55:16,24 64:5 69:20 70:9,18 71:11 84:24 85:2,4,7,9,14 91:21 103:4 126:16 151:13 228:5,9,17 254:20 256:24 290:8 292:20 314:14 324:15 328:15 338:13
**Medicare** 48:24 49:2
**medication** 94:17 101:13 132:24 231:2,7 297:20
**medications** 27:11 33:2 123:14,18 125:23 126:22 148:21 229:9 309:1 323:4
**Medicine** 5:21 147:23 148:19
**meet** 94:8 98:3 116:6 158:5 233:10
**meeting** 5:18 69:8 116:9 162:21 163:7 163:15 164:5 165:14 238:5 239:6 240:13 240:14,15,18 240:22 241:8 241:16 242:1,3 242:5 245:19 245:24 246:3,5 246:11 247:10 250:9,11,22 251:2,3 253:10 253:11,15 286:7,15,19 295:10 300:7 300:12 310:23

Highly Confidential - Subject to Further Confidentiality Review

meetings 83:9
84:21 148:24
240:20 241:5
283:17,20
310:20 324:17
325:16
Melody 7:22
member 65:10
66:1 325:18
members 71:11
324:15
membership
247:4
memo 201:9,19
201:22,24
memorandum
201:4
memory 18:8
321:7
Men's 303:4,10
304:18 305:1,6
310:4 313:1
mention 32:4
227:13
mentioned 53:4
53:5,19 73:22
83:6 89:15
108:14 144:24
156:15 226:15
251:13 317:11
324:3 328:13
331:21
mentions 303:6
Merck 116:21
117:2
merely 120:13
311:17
merger 322:17
mergers 322:3
Merry 319:7
message 62:23
63:18 95:11,13
95:19,21 106:6
106:8 144:1,7
144:13,17
156:11 158:3

161:13 176:12
177:5,8 179:1
179:2,8,9
180:22 181:12
182:2 201:14
206:5,11
209:15,17
210:4 215:4,19
215:22 217:19
310:16
messages 95:4
119:8 134:7
143:14 157:11
169:14,16
176:11 177:9
179:15,17
180:2,2,14
183:4 263:18
323:23
messaging 162:7
181:9 201:18
203:20 218:17
met 244:22
250:19 253:6
276:18 319:7
metabolized
148:7
metadata 78:24
method 157:15
176:19 204:5
308:20
methods 100:5
metric 277:12
Meyer 255:18
255:21
Mickey 255:8,13
mid-1960s 115:8
mid-1970s 115:9
mid-Atlantic
294:2,2
middle 96:4
110:23 148:18
156:8 170:19
171:17 250:4
312:4
Midwest 36:5

67:14 68:1
72:1,6 259:4
259:16,18,20
260:2,24 262:8
262:13,14,24
264:4,5,7,10
265:20 266:5
267:10 272:8
276:13 277:6
294:6
midyear 88:11
migraine 122:11
122:13
military 232:16
million 39:5,14
mind 117:5
135:7 179:6
215:13 259:22
270:17 333:12
minds 327:15
mine 261:23
294:12 332:23
minimization
5:16
minimize 100:3
100:23 101:6
105:12
minute 303:14
minutes 181:22
181:24 303:20
303:24 304:1
mis 208:7
mischaracteri...
208:8 311:7
mischaracteri...
207:15 208:15
misheard 227:18
misimpression
186:18
misnomer
236:15
misperception
214:16
mispronouncing
31:8
misread 188:3

misreading
21:22
misreport
245:19
misrepresent
245:18
missing 279:20
mission 241:13
241:17 242:7
243:6,15
246:22
missions 242:11
misspoke 191:9
misstate 241:24
misstated 88:17
212:4 217:23
241:22
Misstates 133:6
152:2 153:13
156:19 186:11
196:23 206:13
310:10 315:9
330:12 331:4
misstating 216:6
mistaken 196:5
misunderstan...
184:9 214:16
misunderstood
152:3
misuse 22:12
28:20 29:3
100:4 101:7,20
102:2 182:21
308:1 315:11
336:1,23
misusing 307:22
mitigate 27:10
311:15
mix 204:12
mjbrannon@j...
2:22
MO 3:12
model 18:9
modeling 53:18
moderate 191:7
modest 44:2

158:23
molecular 94:24
molecule 26:13
54:9,14 55:23
56:11 140:16
143:18,23
144:1,8,11
145:12 148:6,6
149:5 151:23
151:24 298:14
298:20 331:22
332:18 337:8
337:22,24
338:15,23
339:11,18
340:3,12
molecules 54:5
54:11,18,22
90:3 145:15
146:8
moment 47:19
98:18 231:14
319:10
moniker 267:6
monitoring
291:11,18
Monroe 257:15
monthly 157:9
214:6,7 266:7
months 21:11
34:18 36:13,23
81:20 105:22
157:8 194:4,13
321:24
morning 9:15,16
morphine 54:6
90:2,10,10
94:18,23
145:16 146:8
172:6 275:1
334:13
motion 280:10
motivation
235:7
motor 309:2
move 137:5

143:9 319:11
**moved** 25:24
   26:8 116:2
   322:18
**movement** 59:10
   225:17
**moves** 117:18
**moving** 59:8
   60:7 222:9,16
   248:7
**much-needed**
   166:4,15
**Mulholland** 4:2
   9:2
**multifactorial**
   218:7,21
**multiple** 54:5
   90:9 122:15
   135:10 137:3
   137:19 179:4
   183:4 186:6,10
   189:5 192:7,22
   193:24 202:5
   217:22 230:4
**mundane** 69:9
**Munroe** 65:22
   252:22 257:15
   257:21,23
   258:12
**Munroe's** 258:5
**myopic** 60:20,20

—— N ——
**N** 222:11,20,23
**name** 9:2,18
   50:2,11,12
   65:21 78:24
   79:1 120:5,22
   181:7 189:16
   189:18 190:4
   197:5 215:14
   215:17 234:3
   235:12,18
   236:4,10 240:4
   253:23 254:9
   254:11,12

255:1,8,15,17
255:22,23
280:4 288:6
302:17 306:19
330:18 331:1
**named** 234:7
**names** 77:16
   107:20 252:9
**narcotic** 196:2
   306:9
**narcotics** 28:19
**Nashville** 2:13
**national** 1:3 9:6
   82:6 84:5,10
   86:23 310:22
**nature** 10:1,7
   12:17 69:15
   87:19 126:18
   144:6 275:24
   324:19
**near** 194:13
**necessarily**
   20:24 28:2
   72:16 85:12
   93:6,8 151:6
   151:20 166:12
   183:8 196:11
   209:10 242:18
   242:20 257:4
   265:10 282:9
   284:17 289:8
   301:2 330:18
   338:1
**need** 20:4 32:16
   54:18 58:17
   67:1 87:4
   90:22 91:8,12
   94:20 95:15
   97:17 123:14
   128:8 142:7
   157:12 159:17
   164:19 181:18
   181:19 216:19
   226:8 249:17
   257:22 270:17
   290:8 309:19

311:16
**needed** 58:12
   95:2 120:17
   165:1 168:23
   177:22 229:15
   235:14 277:21
   311:11 325:4
   325:19
**needing** 226:5
**needs** 58:14
   69:20 70:9,18
   94:6,8 105:10
**neighboring**
   308:10
**neither** 341:12
   341:14
**net** 39:23
**network** 95:9
**never** 29:13
   53:16 128:7
   180:5 183:6
   185:11 196:14
   197:9,13,16
   198:12,15,19
   205:15 209:19
   211:13 239:16
   275:1 299:6
   311:16 328:15
   338:8 340:5
**new** 2:8 11:8
   13:9,16 27:7,8
   27:8 43:9 55:1
   55:23 57:20,22
   58:2 87:1
   143:15,18,22
   143:24 144:7
   144:11 145:2
   145:24 146:2,5
   153:21 155:15
   163:24 164:7,8
   167:12 232:5
   232:24 256:22
   265:10 283:22
   283:23 290:2
   290:11 308:5,8
   316:3,14 323:2

338:1
**new-to-the-wo...**
   31:11,13
**newer** 115:24
**newest** 155:8
**newness** 145:18
**Newport** 321:2,2
**news** 29:24
   321:2
**next-to-last**
   233:17
**night** 17:21 18:2
   320:7
**nine** 34:17 36:13
   36:22 224:5
**nobody's** 215:13
**nodding** 32:15
**noise** 85:22,23
   86:6,10 169:9
   169:10,19
**non-disadvant...**
   170:1,6
**non-hospital**
   222:17 223:3
**non-medical**
   282:5
**non-opioid**
   92:23
**Norfolk** 321:1
**normal** 151:4
   171:12,24
   172:3
**North** 322:8,20
**NORTHERN**
   1:1
**northwestern**
   313:19 314:4
**Notary** 342:19
**note** 241:7
   260:18 279:18
**noted** 9:8 279:10
**notes** 317:2
**notice** 5:3 14:1
**noticed** 303:3
**notification**
   278:7

**notify** 210:10
**notion** 81:9
**November** 204:7
   206:9 207:1
**nuance** 211:8
**nuanced** 297:9
**number** 12:6
   14:2,4,16,18
   22:8,20,21
   23:15,16,16
   24:8,8,12
   28:18 32:5
   33:18 39:6,18
   42:15 51:20
   52:12,22 53:22
   54:7 57:16
   61:23 63:3
   65:16 68:14
   72:6,13 75:23
   76:3,7,10,11
   83:12 88:3,4,4
   88:9 90:17
   97:22,24 98:17
   98:22,23 99:2
   100:5 109:12
   110:21 113:4,7
   127:17 142:13
   147:6,9 150:11
   156:4 157:19
   157:19 158:15
   158:16 160:5
   165:2 210:10
   223:13 229:1
   231:11,11
   236:19 237:9,9
   237:15 239:20
   244:14,14
   251:22,23
   257:11,12
   259:8 260:22
   261:1,13,20
   262:20 266:21
   270:7 278:12
   279:18,19
   282:13 285:10
   290:20 294:21

| | | | | |
|---|---|---|---|---|
| 302:4 309:1,2 | 70:20 71:14 | 156:19 157:4 | 249:1,8 250:23 | 327:21 337:23 |
| 309:21 321:10 | 72:8,12 74:15 | 158:7,12 159:8 | 253:9,17 257:8 | 338:17 339:1 |
| 325:21 326:7 | 75:4 79:5 | 160:3 161:4,23 | 261:8 262:5 | 339:12,20 |
| 326:12,12,24 | 81:14 82:11 | 164:12 165:18 | 265:2 266:14 | 340:14 |
| 327:1,24 | 84:12 85:6,18 | 165:24 168:4 | 268:3,13 | **objections** 276:2 |
| 329:18 332:21 | 86:14,20 87:16 | 168:17 169:4 | 269:14,21 | 316:11 |
| **numbers** 76:5 | 87:23 88:16,20 | 170:3 172:2,17 | 273:14 274:8 | **objective** 89:14 |
| 90:16 294:20 | 89:18 91:18,23 | 175:22 176:16 | 274:19 275:8 | 120:2 176:14 |
| 295:15 314:17 | 93:1,16 95:7 | 177:11,20 | 275:21 276:7 | **objectives** 176:8 |
| 332:22 | 95:20 96:10,17 | 180:18 181:3 | 276:21 277:8 | 176:9 262:3,4 |
| **numerous** 281:3 | 97:4,9 99:24 | 182:6,13,19 | 279:1 280:8 | 324:1 |
| **Numorphan** | 100:10,20 | 183:2 184:12 | 286:13 288:23 | **obligation** 103:8 |
| 189:19,19,22 | 101:11,18,22 | 185:6,19 | 289:12 290:4 | 112:14 127:14 |
| 190:7,12 334:4 | 102:5,8,12,20 | 186:11,20 | 290:13 291:6 | 278:1 309:18 |
| **nurses** 41:19 | 103:16 104:2 | 191:2,24 | 291:22 292:13 | **obligations** |
| 104:22 335:11 | 104:24 105:6 | 192:12 193:1,7 | 292:23 293:14 | 108:20 |
| **NY** 2:8 | 105:18 106:15 | 193:12,19 | 294:6 296:9 | **obvious** 28:4 |
| **nyc.cohenwolf...** | 106:22 107:23 | 194:6,14,18,22 | 297:2,16 | 103:6 |
| 78:4 | 109:22 110:13 | 195:4,11 196:6 | 298:22 299:17 | **obviously** 34:15 |
| **nyccohenwolf....** | 110:17 111:11 | 196:16,23 | 300:10,22 | 43:16 58:6 |
| 78:3 | 111:21 112:8 | 197:18 198:8 | 301:13 303:11 | 73:9 87:8 89:4 |
| | 113:22 115:15 | 198:24 199:13 | 304:20 305:14 | 168:21 176:3 |
| **O** | 116:16 117:12 | 199:18,24 | 306:16 307:4 | 207:16 235:8 |
| **oath** 65:3 107:13 | 117:23 118:4 | 200:7 201:8,16 | 307:11,24 | 248:2 258:18 |
| 141:12 187:9 | 119:10,14 | 202:4 203:16 | 309:11 311:6 | 271:10 275:16 |
| **object** 18:3,24 | 122:18,23 | 203:24 205:3,9 | 311:22 312:14 | 277:13 281:3 |
| 19:17 20:8,17 | 123:11,24 | 205:17,22 | 315:1,20 318:4 | 284:9,12 |
| 20:23 21:9,20 | 124:11 125:6 | 206:6,13,21 | 318:10,21 | **occasion** 98:16 |
| 22:3 27:15,22 | 125:17 126:6 | 207:6,14 208:6 | 330:3,12 331:4 | 116:6 |
| 28:9 29:5,10 | 126:13 127:23 | 210:7,16 211:3 | 331:11,18 | **occasionally** |
| 29:20 30:8,14 | 128:14 129:10 | 211:19 212:3 | 332:15 334:20 | 325:15 |
| 36:18 37:9 | 130:4,13,18 | 214:13,18,23 | 335:4,15 336:3 | **occasions** 229:1 |
| 38:1,19 39:9 | 131:2,7,22 | 216:5,14 217:5 | 336:20 337:11 | **occur** 73:8 |
| 39:15 40:1 | 132:18 133:6 | 217:22 218:5 | **objection** 137:7 | 122:16 214:19 |
| 41:16,23 42:11 | 133:24 134:18 | 218:11,19 | 138:11 139:6 | **occurring** 160:9 |
| 44:4 45:18 | 135:9 136:8 | 219:6 222:1 | 139:11 183:14 | **occurs** 268:19 |
| 46:5,16,21 | 137:2,21,22 | 223:7 225:3,24 | 184:1 185:22 | **October** 162:15 |
| 47:23 48:6 | 139:20 140:6 | 227:3 228:2,14 | 195:20 208:19 | 174:7 |
| 49:13,23 51:2 | 143:17 144:10 | 228:22 230:1 | 212:3,15 217:8 | **offer** 45:10 |
| 51:13 53:1,8 | 144:16 145:10 | 230:24 235:6 | 239:7 243:11 | 58:23 60:8 |
| 55:3 56:1,8,14 | 145:20 146:1 | 235:22 236:7 | 280:8,12 282:6 | 87:4 157:12 |
| 57:11 58:18 | 148:1 149:7,16 | 236:20,24 | 282:16,21 | 288:13 |
| 59:5,21 60:4 | 149:22 151:11 | 241:21 242:10 | 283:14 292:1 | **offered** 11:10,14 |
| 61:4,12 62:21 | 152:1 153:3,13 | 244:2 245:20 | 308:13 310:9 | 47:6 97:16 |
| 63:21 64:14 | 154:6,17,22 | 246:18 247:18 | 315:8 316:7,18 | 317:19 |
| 66:10 69:13,22 | 155:18,24 | 247:22 248:14 | 319:17 324:24 | **office** 29:18 33:8 |

Highly Confidential - Subject to Further Confidentiality Review

69:18 70:24
169:15 203:18
215:14 251:5
253:11 314:14
**official** 35:17
86:7
**officials** 313:16
314:1
**oh** 3:16 121:5
135:24 187:22
188:3 191:8
215:15 220:9
227:18 255:19
260:21 313:6
333:15
**Ohio** 1:1 67:15
313:17 314:2
321:23
**okay** 10:11,14
11:6,18 13:1,7
14:10,14 15:8
16:1,3,12,22
17:22 21:14
22:7 24:2,6
25:5,8,13,16
25:24 26:24
27:12 28:5
31:2 32:4,17
32:18 33:5
34:14 35:21
36:2,8,20 37:2
37:21 38:4,21
39:2,2,17 40:6
40:10 41:5
42:8 43:2,14
43:23 44:7,22
46:1,23 47:18
48:1,23 51:24
55:21 56:5,10
57:14 59:9,24
60:10 61:9,14
62:8,10,19
64:10,16 66:16
66:23 68:3,15
68:15 69:1
70:4 71:2,22

72:4,19 73:11
73:15,22 74:12
74:23 75:7
76:10,19 77:10
77:13 78:2,10
78:18 79:7,16
79:22 80:8
81:8 82:1,24
83:22 84:23
85:14,20 86:10
88:23 89:6,20
90:1,15 91:19
92:5 94:11
95:3 97:2,6
98:1,17 99:9
99:13 101:1
102:16 104:19
105:14,24
106:10 107:1
107:20 108:12
108:22 109:24
110:10,15,20
111:2 112:19
113:15,20,24
114:13,17
115:22 116:8
116:24 118:6
118:15 119:7
119:16 120:4
120:20 121:3
121:21,23
123:4 124:6
126:10 129:5
129:12 131:10
131:15 141:15
142:19 143:13
144:6,12
147:12,16
148:11,18
149:13,19
151:5,21
152:20 153:1
156:3,15,24
157:6 159:16
160:15 161:6
162:8,19 163:5

163:10,14,19
164:18 165:11
166:13 168:13
169:6 170:8,23
172:14 173:12
173:16 174:4,5
174:19 175:5,9
175:17 176:2,7
176:18 177:2
177:24 178:23
179:7,24 182:1
184:5 187:1
188:4,14 189:8
189:12 190:15
191:14 193:14
193:21 195:23
197:22 199:4
202:24 212:18
213:15,19
219:5 220:20
220:21 221:1
221:16 223:9
223:20 224:6
224:13,17
225:7 226:22
228:11 230:19
230:19 231:24
232:14 233:12
233:16,22
234:5,18,24
235:9 236:11
236:17 237:7
237:21,24
238:3,10 239:1
239:10,19
240:8 241:6
242:4 245:5,17
245:22 246:6
249:16 251:4,6
251:13,17
252:8,19
253:20 254:1
254:13 255:7
255:18,24
256:8,13 257:5
257:10 258:4

258:19 259:7
259:24 260:5
260:11,14
262:7,16
266:16 267:8
267:16 268:15
270:3,3,20,21
271:11 272:6
272:22 276:10
279:8 285:12
295:19 302:8
321:8 323:5
331:7 337:5
339:22 340:17
**old** 143:18 316:3
316:5 318:15
320:24 321:4
**older** 152:14
331:22
**once** 10:5 63:4
105:11 116:7
117:5 122:11
122:13 221:22
324:21
**one-on-one**
84:21 168:7
**one-page** 321:10
**one-to-one**
269:1
**ones** 17:16 34:13
49:3 63:18
68:18 126:22
164:15 167:7
295:15
**onset** 303:7
**op** 10:3 147:12
**OP-0399** 147:6
**Opana** 5:15,18
6:10,12,15
10:24 11:24
13:2,9,18,19
20:22 21:7
22:2 33:21,23
35:6,6,23,23
39:4,7,23 40:6
40:17,17 41:14

42:9 43:5,12
43:24 45:13,17
46:13,20 47:18
47:19,20 48:18
49:12,21 51:8
54:4,4 55:1
56:21 57:1,9,9
57:18,18,23
58:3 59:4,11
59:15 61:2,6
61:10,16,22
62:24 63:7,13
71:13 72:1,7
75:3 76:12,17
76:23,23 78:5
78:15,15 79:1
79:2,3,3,11,13
79:18,24,24
80:16 81:12
82:2,10 84:9
84:19 85:5,17
86:6,12,19
87:15,22 88:10
88:13,19 89:2
89:16,21,22
90:7,22 91:5
91:15,24 92:7
93:4,12 94:5,8
94:22 95:6,14
96:7,13,19,24
98:14 99:1,3
99:10,11,22
100:13 101:5,7
101:10,12,21
102:1,2,7,11
102:17,19,24
103:1,10,13,14
103:23 104:1
105:16 106:12
110:1,12,16
111:3,9,20,24
112:7 113:11
114:8,11,23
115:3 119:8
120:11 122:22
123:1 129:9

Highly Confidential - Subject to Further Confidentiality Review

| | | | | |
|---|---|---|---|---|
| 130:12,16 | 211:17 212:2 | 323:11,13 | 194:23 202:11 | 82:17 84:17 |
| 131:6,16 132:6 | 212:11,13 | 324:22 325:17 | 224:19 230:4 | 169:2 225:8 |
| 132:17 134:13 | 213:4,6,13 | 326:20 327:10 | 230:22 231:12 | 298:7 323:22 |
| 135:7 136:7 | 214:1,2,11,21 | 327:14,20 | 236:6 251:7 | **opportunity** |
| 138:7 140:2 | 216:2,11,20 | 328:4,5,19 | 259:14 262:21 | 35:17 53:13 |
| 143:15,15 | 219:20 220:22 | 329:15,24 | 264:16 265:6 | 72:24 94:21 |
| 144:2,9,14 | 221:18 223:5 | 330:9 333:21 | 269:6 270:8 | 96:3 142:9 |
| 145:2,2,8,8 | 223:21 224:19 | 335:3,13,13,24 | 281:16,18,22 | 158:5 160:11 |
| 146:20 147:14 | 224:21 225:2 | 336:1,12 337:1 | 302:6 323:4 | 160:12 168:19 |
| 147:24 148:4 | 225:23 226:10 | 337:2,6,6,19 | 328:16 | 178:12 211:5,6 |
| 156:16 159:17 | 226:14 227:1 | 337:19,24 | **opioids** 27:14,20 | 225:22 226:9 |
| 160:1,17,22,24 | 227:15 228:1 | 338:8,9 | 43:5,8 44:2,3,8 | 226:11 241:10 |
| 161:7,9,10,22 | 228:21 229:5 | **Opana's** 193:23 | 44:12,14 54:9 | 267:17 275:2 |
| 162:5,23 | 229:12,24 | **open-ended** | 65:14 66:19 | 320:6 |
| 163:17 167:24 | 230:5,5,22 | 179:3 | 90:22 91:3,15 | **opportunity-r...** |
| 168:2,16 | 233:8 235:4 | **operating** 278:9 | 91:21 92:3,7,9 | 157:23 158:1 |
| 169:24 171:8 | 238:22 260:20 | **operation** | 92:20,23 93:15 | **opposed** 82:18 |
| 172:22 173:8 | 261:2,14,17,20 | 322:11 | 96:4 101:23 | **opt** 126:1 |
| 174:8,9,21 | 263:2,6,10 | **Opiate** 1:4 9:7 | 102:13 103:11 | **opted** 176:24 |
| 175:1 176:12 | 264:7,11 | **opinion** 63:14 | 104:17 105:4 | **option** 95:1,24 |
| 177:5,9,14 | 265:22 266:6 | 64:10 125:8 | 106:14,21 | 145:12 335:20 |
| 178:13 180:1 | 266:12 267:19 | 171:12,24 | 107:19 110:9 | **options** 91:13 |
| 180:15 182:5 | 268:17 269:6 | 179:19 235:13 | 111:24 112:14 | 94:24 |
| 182:12,17,20 | 269:19 270:24 | 293:4 300:24 | 121:7 124:9,10 | **oral** 33:10,14,20 |
| 182:24 183:12 | 272:1,17 273:6 | **opioid** 20:20 | 125:15 126:4 | 34:8,18,19 |
| 183:23 184:6 | 273:11 274:1 | 22:15 26:4,16 | 127:1,7 130:9 | 36:15 57:18 |
| 185:3,4,18 | 274:14 275:3 | 27:2,8,9,10 | 136:12 145:3 | 109:16 143:16 |
| 186:9 188:8,19 | 278:5 280:21 | 30:10 31:11,13 | 156:18 159:4 | 144:8 154:4,10 |
| 188:22,24 | 280:22 281:5,8 | 37:2 54:3,19 | 167:5 182:22 | 154:14 155:15 |
| 189:6,16 190:3 | 281:12 283:2,7 | 89:17 90:6 | 195:1 198:10 | 331:8,16 332:3 |
| 190:8,12,20 | 284:16 286:11 | 92:13,16,16,19 | 201:6,15 | 332:6,12 |
| 191:1,6,11,15 | 286:19 287:3,7 | 93:5 94:4,12 | 205:24 216:21 | 334:18 336:2 |
| 191:19 192:6 | 289:11 290:1,9 | 101:12 105:10 | 229:5,12,17,21 | 337:9 |
| 192:10,23 | 290:17 291:5 | 109:17 113:7 | 230:16,18,20 | **order** 23:15 |
| 193:18 194:3 | 292:4,12,22 | 122:16,17,24 | 231:3 248:17 | 43:14 56:3 |
| 194:10,21,23 | 295:6 297:14 | 123:8,9,21,23 | 248:19,23 | 69:23 76:22 |
| 195:1,2,18 | 297:21 298:3,7 | 124:3 125:5,13 | 256:20 265:11 | 92:15 97:17 |
| 197:15 198:5 | 298:12,20,20 | 127:9 143:16 | 273:22 282:13 | 100:13,18 |
| 198:21 199:8 | 303:6 304:10 | 153:21 155:8 | 296:7 298:16 | 108:22 109:4 |
| 199:12 201:1,6 | 305:21,24 | 155:10,10,16 | 298:21 299:19 | 133:14 164:20 |
| 201:14 202:2 | 306:9,14 307:8 | 156:5 158:3 | 306:9 307:12 | 165:2 169:8,17 |
| 202:14 203:1,6 | 307:10,22 | 159:12 162:3 | 311:5 327:10 | 169:23 174:16 |
| 203:15,23 | 309:12 310:19 | 162:12 170:13 | 334:5 335:21 | 221:8 226:14 |
| 204:3,19 | 312:12 315:7 | 172:8 173:20 | 336:15 | 226:24 261:6 |
| 205:20,23 | 315:18 317:10 | 182:20 185:12 | **opportunities** | 284:20 291:11 |
| 207:13 209:14 | 318:3 323:10 | 188:5 191:20 | 50:17 66:5 | 291:18 311:14 |

organization
  98:11 112:12
  218:24 228:16
  236:13,18
  316:22
organizations
  242:12 243:10
  246:24 247:2,3
orient 147:1
  155:5 178:24
  190:16 240:8
oriented 173:22
  174:1
origin 218:14
original 37:14
  161:10,22
  165:9 172:22
  173:8 177:10
  177:14 317:10
  318:9,18
originally
  227:16
outcome 173:3
output 53:16
  173:3
outputs 52:16
outside 43:8
  61:21 77:17,22
  78:5,6 222:18
  324:9
outweigh 102:15
outweighed
  100:15
outweighing
  124:21
overall 39:12
  148:9 149:1,4
  226:9 246:13
  247:14 269:12
  277:12 338:6
overcome 276:2
  297:22
overdose 305:19
  307:9,10,13
overdoses
  308:21 309:8

overlay 265:14
overly 125:4
  237:4
oversee 200:20
overview 114:23
  115:2
Oxycodone 13:5
  36:24 37:2
  54:7 94:18,23
  145:16 146:8
  267:22
OxyContin
  27:21 28:8,12
  29:9,19 30:1,1
  30:10,12 37:3
  38:15,18 54:8
  89:23 90:5
  94:19 159:20
  159:24 160:7
  170:1,5,6
  171:9 178:1,6
  178:9,18
oxymorphone
  54:24 57:20
  116:5 117:2,17
  143:21 144:18
  146:3 148:9,13
  148:16 149:6
  150:6 153:19
  153:20 154:3
  154:10,11,14
  155:7,15 173:4
  189:15,17
  190:3,6,11
  224:18 285:17
  331:8,16,24
  332:12 333:21
  334:3,18
  335:14 336:2
  336:19 337:8
  337:22 338:15
  338:23 339:10
  339:18 340:12

——————
P
——————
P 33:14 40:12,18

40:24 41:4
P-R-O-M-I-S-E
  110:2
PA 3:4,8,21
PAC 65:11,11
  65:13,14,17,24
  66:2,3,17,17
package 62:14
PACs 66:18
pad 97:19
pads 97:16,20
page 4:6,6,7,7
  5:2,4,5,7,8,10
  5:12,14,16,18
  5:20,22 6:2,4,6
  6:8,9,11,13,15
  6:17,19,21 7:2
  7:4,6,8,10,12
  7:14,16,18,19
  7:22 8:2 14:19
  16:9 22:8,9
  25:8 31:9 45:2
  65:6 76:8
  78:20,21,22,22
  79:10 80:19
  81:5 82:1,4
  85:1,21,21
  87:13 89:7,14
  94:3 96:1
  99:13,16 101:2
  104:19 109:13
  110:22 114:1
  114:17 118:7,7
  118:15 120:4,5
  120:20 122:6
  129:3,4,12
  140:20 147:17
  147:17,18
  148:11 153:18
  154:24 155:4,5
  155:5 156:8
  170:19 171:9
  171:17 174:5
  175:17 176:7
  176:19 178:23
  179:24 181:12

188:21 189:12
  190:15,18
  191:14,15
  193:22,22
  199:5,10 203:2
  203:11 204:5
  204:15 208:2
  208:21,23
  213:3,4,5,19
  220:5,9,15
  221:6,6,17
  224:2,4,13
  225:8 232:1,3
  234:5,21
  235:10 237:14
  238:4 240:4,9
  240:10 250:4
  251:24 252:2
  260:6,7 270:11
  270:13,22,24
  272:6 287:1
  296:2 298:2
  302:12 305:20
  308:4 313:3,3
  313:4,5,8
  314:12 325:24
  328:10 330:21
  334:1 342:6
  343:3,6,9,12
  343:15,18
pages 79:8,10
  81:3 179:8,12
  179:14 190:18
  313:1 326:7
  342:3
paid 30:20 75:12
  263:22
pain 5:21 26:6
  26:10 28:3
  33:10,14,20
  34:8,19 36:15
  42:4,5 43:6
  54:13,13,13,17
  54:20 57:18
  70:13 83:9,11
  83:13 91:11,12

94:19 95:22
  96:5,9,16,19
  96:21 97:3,8
  98:3,6,8,10,10
  98:11,13
  105:11 109:16
  111:6,10,18
  112:13 118:2
  123:15,17
  124:12 125:11
  127:21 128:11
  129:19,24
  132:15 133:21
  133:21 134:22
  135:5 136:4,11
  138:9,21
  145:14 146:6
  147:23 148:19
  162:4 166:18
  166:19,22,24
  167:1,8 178:14
  222:17,17,23
  223:3,4 225:10
  225:11,15,18
  225:18,21
  226:5,10,16,21
  226:22 227:8
  227:17,22,23
  227:24 228:12
  228:15 229:14
  229:14,15
  231:7,16,22
  232:3,5,15,16
  232:19,23,24
  233:18,24
  235:18 236:4
  236:12,14
  241:14,18
  242:8,13 243:2
  243:5 246:12
  246:17,19,24
  247:6 251:8,15
  251:17,18
  252:13,16
  253:8,13,16
  274:22 282:5

296:23,24
297:10,10,12
297:13,15,17
306:20 308:16
309:19 315:3
**painfoundatio...**
240:11
**painkiller** 92:13
**painkillers**
303:4 305:8
313:18 314:3
**pains** 34:18
**paint** 260:19,23
**Pamela** 255:24
294:24 295:3,9
**PAMORs** 31:12
**paper** 16:5
301:11
**paragraph**
22:10,20,21
50:15 99:15,16
101:3 114:18
115:23 129:13
148:19 154:10
155:7 157:7
159:16 160:16
241:7 272:13
272:14,14,23
305:21 308:4
313:2,8,13
**paragraphs**
115:5
**paralegal** 4:3
**parallel** 35:19
**parameters**
132:9 266:3
334:22
**parenteral**
153:23
**parking** 75:14
**Parks** 2:12
**part** 33:20 34:8
54:22 70:16
71:9 73:11
82:12,13 85:15
86:12 91:4

93:12 94:7
100:18 102:24
104:15 106:8
109:21 110:11
110:16 111:4
114:7 116:19
121:5 127:4,19
131:1,12,19
132:5 133:11
134:5 136:24
151:3 155:4
156:22 159:5
168:14 169:2
170:20 209:15
209:16 242:20
243:17 247:5
248:8 262:13
276:5,11 277:4
308:17 313:19
314:4 317:17
325:12 336:17
338:3,6
**participant**
325:15
**participants**
120:3
**participate**
98:13 248:2
325:19
**participated**
120:12,18
**participating**
120:23 176:24
251:20 291:14
**participation**
113:10 245:9
**particular** 10:7
11:21 28:19
29:8 30:11
120:2 135:19
138:23 148:10
160:10 165:2
172:9 185:24
201:18 210:19
215:1 224:11
237:6 265:12

274:1 275:13
278:11 281:17
292:8 326:16
**particularly**
86:9 224:22
258:14 307:13
**parties** 226:13
258:17 341:14
**partner** 228:6
**partners** 122:13
**party** 85:11
189:3 226:17
226:23 227:10
**passed** 308:17
**passively** 216:2
**Paster** 121:12,15
121:16,24
122:2,3,11,12
123:4,9,20
125:2,3
**Paster's** 125:13
**patent** 11:1 13:2
45:21
**path** 190:19,24
**patient** 54:10
83:20 92:3
104:10 105:10
109:14,15
122:15 172:4
228:18 229:10
229:20,22
231:3 236:16
236:17 268:9
293:2 297:19
338:21
**patient's** 105:12
140:14
**patients** 42:4,5
52:13 54:1,15
54:16,20 69:20
69:24 91:11
92:4,24 93:4,8
94:15,22 95:1
95:17,21
104:22 112:7
124:13 125:10

125:20,21,22
126:2,21
127:16 129:21
134:10 139:3
139:14,18
140:4 145:11
146:6 162:1
172:9 178:5
186:3 197:4
198:7 225:12
225:21 226:5,6
229:14 230:21
231:5 269:5
274:23 292:21
297:10,24
307:7 309:16
309:18,20
315:3 330:17
331:1 335:20
338:22 339:4,6
**patients'** 162:4
**Patricia** 120:22
121:1
**pattern** 167:4
197:6
**patterns** 268:22
284:18
**pause** 309:6
**payor** 53:11
86:11,11 87:8
**payors** 46:10
47:14 48:15,18
86:16,18 87:1
**PCF** 252:3 255:4
255:12,16
256:14,15
257:22,24
258:12
**PCM** 257:24
**PCP** 222:13
**PCPs** 221:24
222:10 297:22
**peer-reviewed**
82:17,21
152:10,16
**peers** 84:22

**penalties** 30:21
**penalty** 30:20
**Pennsylvania**
2:3 9:6 33:8
290:3,11 319:5
319:8 320:12
322:14,19,19
**pens** 16:18
**people** 62:17
67:6 123:14,18
157:20 166:20
181:6 215:16
237:15 286:6
296:16,17,18
297:14 315:3
**Percada** 115:7
**perceive** 125:24
155:21 329:15
**perceived** 53:10
53:20 56:17
60:1 160:12
191:19 198:1
223:6 225:2
264:23 318:13
327:20 330:15
**perceives** 179:18
**percent** 28:2
158:17 159:18
160:2 272:17
287:7 289:8
**percentage**
39:11 276:18
**perception**
53:23 54:17,21
55:1 56:12
124:4 125:3
180:7 181:7
182:7,12 183:7
186:13 192:10
192:13,23
193:18 194:9
194:11 196:21
197:15 198:21
199:8 207:4,10
211:14 212:11
214:11,24

215:4,7,10,19
216:19 217:1,2
217:3,9,17,21
218:4,7,16,20
223:5 224:18
326:20 327:16
327:23 328:1
329:18,20
330:17
**perceptions**
56:11,13 68:20
174:18 191:15
211:1 215:6
**Percocet** 34:1,14
36:21,23 37:6
37:11,18,24
57:19 115:9
117:6,10,21
230:8
**perfectly** 242:12
**perform** 172:21
189:1
**performance**
60:14 61:10
163:3 164:7
165:10 265:21
277:1
**performance-...**
277:12
**performed**
188:23
**period** 34:20
37:21 38:9
46:9 55:18
160:23 161:11
161:17 183:22
214:17 237:3
243:20 270:1
276:20 287:16
323:15
**periodically**
18:5 120:17
278:10
**peripherally**
317:20
**permit** 109:6

**persist** 214:21
215:10 216:3
**persistence**
273:1 275:7,19
**persistent**
214:17 215:8
217:17 273:12
274:1,5 275:14
276:3
**person** 65:18
**personal** 15:21
19:12,15 20:7
22:16 88:8
142:20,23
260:21
**personally** 208:5
208:23
**perspective**
35:24 53:12
61:17 104:7
189:24 235:17
297:6 332:18
**perspectives**
61:18
**Petersen** 7:22
**ph** 16:16 36:24
51:1 77:18
78:3,4 83:10
90:11 115:7
169:8 170:16
177:4 230:16
234:7 243:20
244:18,19
245:15 252:10
253:23 254:14
255:8,18 256:1
260:21 289:16
**pharma** 164:8
204:13 293:21
**pharmaceutical**
47:5 288:13
321:17,20
322:11,13
**Pharmaceutic...**
3:2,3 5:13 33:7
34:23 65:9

147:20 234:9
320:19 323:6
**pharmacies** 46:7
46:11 48:11
288:8
**pharmacist**
122:12
**pharmacists**
71:3,6 104:21
308:9
**pharmaco**
172:20
**pharmacology**
153:19
**pharmacy** 48:9
71:8
**PhD** 252:10
**phenomena**
171:19
**phenomenon**
122:15 123:6
125:2 171:22
**Philadelphia** 2:2
3:8,21 9:5
333:20
**Philip** 244:18
**phobia** 123:8,10
123:21,23
125:5,13
**phone** 249:17
**photo** 305:3
306:21
**phrase** 271:17
**physician** 43:3
124:12 138:14
139:17 140:8
167:12 203:20
204:21 205:7
224:19 277:21
278:3,5,11,17
278:23
**physician's**
140:13 206:4
**physicians** 41:15
43:15,17,24
90:20 91:2

92:5,8,23
93:14 104:21
127:5,8,20
128:10 129:18
129:21,23
132:14 133:20
135:4 136:10
136:17 138:8
139:3 140:4
176:11,22,23
177:4 182:11
194:2,10 196:1
196:3,20
197:15 198:21
199:6,11
200:24 205:1
206:11 207:3
222:14 223:3
277:16 289:3
296:7 313:18
314:3 327:9
335:11,17
**physicians'**
41:20 44:5
208:5 212:11
212:13
**physiologic**
140:16
**picked** 303:5
**picture** 70:13
72:16 276:16
**pie** 312:21
**piece** 146:18,22
146:22 147:13
151:6,9,15
152:6,11,18
174:19,23
188:23 192:8
193:4,15 203:5
209:2 324:16
**pieces** 106:19
174:24 186:6,7
192:22 328:12
328:14
**Pietragallo** 3:7
**pillar** 160:18

161:2,7,9,21
161:24
**pillars** 160:17
**pink** 319:2
**pipe** 115:8
**Pittsburgh**
67:18 69:1,2,5
260:8 262:9,12
**Pittsburghers**
294:5
**place** 46:7 47:14
71:18 78:15
80:5 81:17
107:5 108:23
113:16 175:7
240:14 263:11
281:8 315:11
316:14 336:10
341:11
**placed** 82:18
**placement**
286:11
**places** 186:10
**plaintiff** 10:20
**plaintiffs** 2:6,11
9:19 280:5,14
284:10
**plan** 5:13,16
6:12,15 45:20
61:22 76:22
77:2 78:14,15
78:19 79:2,3,4
79:11,13,17
80:16,18 81:2
81:3 82:13,15
111:3 213:4,6
213:13 214:3
216:1,4,11,13
216:22 223:21
224:8 276:19
277:9,17,21
278:4,12,17,23
280:22 281:7
286:23 323:17
**planning** 46:12
60:16,18,19

61:1,10,16
76:13,16 79:18
81:19 85:16
291:15
**plans** 48:20,21
79:24 216:17
276:6,17
280:21,21,22
281:4,4,11
289:11 319:11
**plants** 211:1
**play** 227:14,24
248:10 298:3
**players** 48:11
90:13
**please** 19:3 22:5
23:17 24:5
32:20 98:19
109:12 112:20
152:4 156:2
162:9 170:9
171:1 187:13
202:7 208:20
210:22 212:5,9
223:10 285:21
287:2 288:5
294:18 302:4
319:6 320:23
327:3,7 329:8
330:5
**pleasure** 241:8
**PLLC** 2:12,20
**PM** 141:7,10
187:4,7 219:12
219:15 249:20
249:23 258:22
259:1 279:23
280:2 317:4,7
319:24 320:3
329:1,4 340:19
**PMRB** 64:6
135:21 150:12
150:15,18,21
151:1,9 152:22
184:24 263:16
264:1 301:4

324:11,22
328:13
**point** 12:1 22:19
30:6 31:9
32:19 37:8
38:18 39:3
51:9 57:15
60:11 65:9
66:15 73:23
81:23 90:20
94:2 95:3 98:2
106:17 134:3
145:7 151:18
164:11 165:4,8
165:13 169:7
169:22 176:9
177:4 181:16
189:13 191:18
194:2 199:10
203:13 204:18
204:21 205:7
208:23 209:3
209:10 214:1
218:18 219:8
221:8 225:9
226:12,20
235:5 248:23
249:8 265:19
266:8 272:5,16
287:6 296:6,23
297:9,21
298:11,19
300:15 301:9
304:6 311:21
327:4 329:9
330:24
**pointed** 143:3
200:11
**pointing** 161:3
**points** 33:17
59:7 60:6 65:8
160:5 313:9,16
313:24
**policies** 22:15
63:16,17 249:6
309:17

**policy** 246:13
247:14,15
248:12 249:14
252:13,17
**political** 65:12
66:6
**Polster** 1:5
**Popularly** 334:8
**population**
128:2 138:15
168:22 217:11
274:21
**populations**
83:20 104:10
**portfolio** 50:17
50:23 116:21
190:1
**portion** 46:9
57:14 67:23
81:3 136:13
172:4 184:3
277:11 307:2
336:13
**portions** 189:6
**position** 25:1
26:24 34:23
35:10,11,18
44:24 50:15
54:23 72:6,20
108:18 111:7
114:3 116:2
141:22 169:24
170:1 178:21
200:18 238:19
238:19 284:11
296:19 299:2
300:6 301:5
321:21 323:15
327:14
**positioning**
295:6,16 296:3
300:4 301:9
**positive** 173:4
213:20 226:9
**possession** 16:20
**possible** 45:9

59:18 157:13
169:9 240:19
258:3 309:17
**possibly** 121:4
**post** 228:8
**poster** 148:23
**potency** 191:20
**potent** 334:11
**potential** 45:19
45:23 46:13
75:2 100:24
101:5 103:10
123:16 124:23
139:14 140:7
140:14 179:4
180:3,16 182:4
182:21 192:7
192:11,24
193:24 194:4
194:10,21
195:3,7,10,10
195:12,19
196:22 197:9
197:16 198:14
199:9 201:7,14
202:3 207:5
211:1,12
212:12 214:3
214:12 215:15
221:9,23 222:7
222:21,24
223:5 241:15
241:19 242:8
251:8 264:14
264:20,23
265:14 266:20
292:11 306:1
326:21 327:16
327:20 328:5
328:20 329:15
336:23
**potentially**
258:17 279:13
**PowerPoint** 79:2
175:18,19
286:7 289:23

295:13
**PPLP** 250:2
237:10 244:14
**PPLPC01200...**
5:9
**PPLPC01200...**
5:9
**PR** 89:10,14
98:2 303:5
**practice** 43:7
69:16 87:10
122:8 124:5
128:21 138:21
150:9 167:12
168:11 178:5
178:14 180:9
181:5 192:15
205:13 215:19
236:8 271:22
274:2 275:3,15
325:1
**practices** 30:19
70:1 278:8
**practitioner**
166:9 168:15
**practitioners**
166:21 167:6
168:2,19
**predated** 86:1
111:12 322:3
**predicated**
105:9
**prelaunch** 55:4
55:7,9,19
57:17 81:21
82:4 162:21
163:1,17
**premium** 16:18
**prepared** 175:19
304:11 321:11
**preread** 286:2
286:14
**prescribe** 41:22
62:24 97:18
124:10,16,24

126:1 127:9
275:17
**prescribed**
123:19 130:9
158:17 292:5
305:22 306:1
309:15
**prescriber** 51:22
275:10
**prescribers**
112:7 166:4
265:10 267:22
**prescribing** 44:6
103:10 106:20
111:23 124:2
125:10,15
126:4 127:1,6
127:15 136:12
140:8 156:22
158:19 159:2
159:15 166:6
166:17 167:4
168:15 197:6
264:14 265:6
268:22 273:18
284:16,17
289:3 336:14
**prescription** 1:3
9:6 27:14,20
40:7 51:8,10
97:16 127:13
128:20 136:7
158:24 159:17
160:2 272:5
278:2 281:16
281:18 282:4
282:12 287:8
288:20 289:14
290:9 291:5
309:1,8 314:15
**prescription-l...**
288:16
**prescriptions**
40:5 52:23
97:22 122:16
159:12 164:21

164:23 165:12
264:15 265:21
272:18 287:14
288:10 289:5
290:2,17
291:20 292:21
313:18 314:2,7
**presence** 169:19
**present** 3:14,18
3:24 4:2 290:9
**presentation**
64:2 82:19
83:3 114:22
115:2 175:18
175:19 233:2,3
286:7 289:23
295:13
**presented**
148:23 263:17
329:18
**presenting**
328:8
**preserving**
101:8
**president** 116:3
200:19
**press** 87:18
**presumably**
164:15
**pretty** 155:1,22
210:3 260:15
260:19 293:19
**prevalent** 103:6
**previous** 72:18
186:2 313:13
319:17
**previously** 84:15
143:21 168:5
202:6 280:9
284:8 300:11
321:9 331:23
**price** 47:5,10
87:2
**prices** 47:13
**pricing** 47:1,3
47:11,15 48:3

48:13,19 50:3
50:5 323:20
**primarily**
145:16
**primary** 127:2
162:20 163:20
183:11,19,22
194:2,11 196:1
199:6 215:22
222:13 223:3
324:8
**principal** 89:21
**print** 295:9
**prior** 12:13
14:24 37:16
54:4 79:15
81:13 105:21
221:13 240:14
271:24 286:7
341:5
**privately-held**
108:8,18
**privilege** 15:5
**privileged** 12:11
12:15 15:2
19:7
**probably** 21:12
50:3 52:8
62:16 63:4
72:13 90:12
119:3 157:5
183:4 186:13
218:20 236:15
242:18 272:3
273:7,21
278:13 284:3
297:11 299:1
307:19 321:6
**probing** 12:2
**problem** 127:22
128:12 129:20
130:2 132:16
133:4,10,23
134:3,16 135:3
136:19 138:7
201:17 217:16

293:3 308:5,8
314:15,23
315:4
**problematic**
172:7
**problems** 129:22
139:3,18 140:5
**proceeding**
13:12
**proceedings**
341:9
**process** 25:4
44:17 60:15,18
73:2 76:17
122:5 126:17
127:24 128:6
131:1 152:22
257:1 277:18
278:14,19,21
289:7 291:15
301:4 324:5,6
324:11,20,22
328:14
**produced** 2:1
14:23 17:8,11
17:20 20:5
23:3,4,8 88:5
279:12 298:24
**product** 10:23
20:21 21:1,15
22:15 27:6
31:15,19,21
33:14 34:15
37:8 38:22
39:1,6,19 41:9
41:11 43:11
44:9 45:6,10
45:20 46:3
48:5 49:5
51:22 55:10
56:3 58:11,13
58:23 59:14,18
60:8 63:2,16
68:21 69:24
71:1 74:10,16
81:9,24 83:2,5

83:17,19,20,21
84:11,18 85:24
87:1,4,6,9
89:21 91:9,11
93:2,10 94:18
95:16 97:18
99:23 100:8,9
100:15,23
103:2,9,15,17
104:5,10,13,15
112:1 117:3,13
117:21 118:5
124:3,19
126:15 128:5
130:10 133:16
134:6,10
135:13,18
137:16 140:9
144:4,17,20
145:18 148:8
148:10 150:8
160:11,13
161:2 167:19
167:23 168:9
168:10,20,22
169:12,21
171:10,11,11
171:23 172:9
172:16 174:18
177:21 178:13
178:22 180:5
181:5 183:9
184:13,22
185:9,10
189:24 190:6
190:13 192:16
192:19 194:12
195:6 196:5
197:3,7,10,12
198:14,15,19
199:9 200:14
200:15 206:10
206:20 207:4
207:20,21,24
209:5 210:13
211:10,10

Highly Confidential - Subject to Further Confidentiality Review

214:17 215:3,5
215:10,17
216:24 223:6
230:9 238:20
245:24 246:7
263:17 268:6
271:20 274:21
275:15 283:23
283:24 288:12
288:16 296:19
297:11 299:2,5
299:6,8 300:6
301:5 307:16
309:15,20
312:2,11
317:16,24,24
318:2,12,14,15
323:2 324:19
331:21 334:23
335:2,7,18,19
336:7 337:13
337:16 338:5
339:7 340:3,4
**product's** 31:16
**production**
14:19 17:13
**products** 16:10
26:4,6,10 27:2
27:4 28:14
33:15,19 34:7
35:2,5,12
36:17,21 40:12
40:19 42:3,18
42:19 43:16,18
45:21 50:21
53:23 54:6
56:7,23 57:17
92:17,21,24
96:19,22
101:14 114:8
116:5,21 117:1
117:16 118:1
124:13,15
125:16 127:10
127:15 128:1
128:20 139:13

143:15 144:14
145:8 150:23
156:22 157:1
158:20 167:13
167:14 172:6
178:21 190:3
191:8 192:18
195:16 204:3
215:6 229:10
230:5,17,22
231:1 236:6
248:17 261:16
288:21 289:2
316:13 322:13
330:19 337:4
338:10 340:1,6
**professional**
18:10 19:20
83:8,12 98:9
227:9 228:5,17
**professionally**
18:8
**professionals**
42:2 104:22
**profile** 28:11,16
95:23 182:18
183:1 184:7,10
185:4 186:9
206:1 207:13
210:6 213:21
216:21 217:20
299:8 304:10
311:10
**program** 63:3
63:13 110:1,8
110:10 169:7
263:2,11 268:4
333:20 338:14
**programs** 41:10
62:15,19,20,22
85:12 86:15
120:13 168:6
169:1 231:15
263:7,8,12
264:6,13,22
265:13,16,23

265:23 267:19
267:23 268:2,8
268:12,17
269:4,9,18,20
271:12 290:22
**project** 106:9
197:21 199:2
295:16 296:3
296:15
**projection** 45:16
**prominent**
34:13 103:6
104:12 134:8
338:6
**prominently**
328:10 336:22
**promise** 23:16
110:2,4,15,18
131:20 297:22
**promote** 42:6
97:7 99:23
100:8 103:1
110:8 119:8
124:17 126:15
137:17 183:6
185:11 200:14
207:21,23,24
211:12 216:23
328:19
**promoted** 93:2,9
103:2,17 104:4
112:1 128:5
134:6 135:13
135:17 161:11
180:5 183:9
184:13,22
185:11 192:15
192:18 197:10
198:15 207:20
215:5,20 230:9
299:6 322:1
328:16 335:16
336:7,21
337:13 338:4
340:1
**promoting**

55:15 85:24
102:17 103:13
103:23 111:9
126:19,20
132:17 138:7
140:2 299:7
306:12,14
340:4
**promotion**
13:19 16:9
22:11 39:18
41:9 51:20
52:1 57:9 78:5
78:7 87:22
88:19 95:6
96:7,13 111:20
130:12 131:16
132:6,9 135:7
143:14 144:2,9
144:14 145:8
146:20 156:16
161:22 175:1,3
175:6 185:16
189:6 203:6,8
227:15 228:1,4
228:21 235:16
236:6 273:12
338:7 340:9
**promotional**
16:13 41:9
52:21 55:13
64:4 97:10,14
103:3 104:6
110:11,16,18
119:5 126:18
127:3 128:23
131:21 132:11
146:18,22
147:10,13
150:15 153:5
168:6,8 169:2
169:7,9,10,19
180:6,11 181:9
184:3,15,17
185:1 192:16
203:20 204:16

205:12 215:20
215:22 218:23
235:24 263:16
265:3 268:24
269:10,13
299:9,14 307:7
323:19 324:3,8
324:12,21
325:2 328:4,7
328:7,12
**pronounce**
273:16 302:16
**proper** 104:4
128:20 134:10
**properly** 124:24
125:21 140:22
226:5 231:6
**properties**
283:23 298:8
298:12 299:20
**proponent** 229:8
229:13
**proposition** 71:6
**propoxyphene**
26:13,16
**proprietary** 74:6
108:8 247:24
284:4,6
**protect** 108:24
109:1
**protective**
108:22 109:4
**protocol** 71:18
**protocols** 71:21
**prove** 300:2
**proven** 192:7
205:15 298:15
301:2
**provide** 11:20
24:3 58:12
66:3 84:16
90:20 91:2
92:5 104:8
142:3 158:4
164:6 179:4
221:8 247:11

Highly Confidential - Subject to Further Confidentiality Review

299:12 339:8
**provided** 17:5
17:20 78:23
114:23 120:13
132:7 133:13
176:21 200:12
310:19 328:11
334:17 337:20
**providers** 41:19
43:4 63:9 67:9
69:12,16
127:21 128:11
129:18,24
132:14 133:21
135:5 138:9
272:19 335:12
335:24 336:14
336:18 337:7
337:21 339:16
340:11
**provides** 43:22
179:18
**providing** 49:4
97:20 169:16
241:9 337:14
339:5
**public** 22:15
56:16 62:6
87:13,14,20,21
88:10 89:1
108:10 150:7
246:13 247:14
247:15 248:12
249:6,14
342:19
**publica** 152:8
**publication**
31:17 82:12,15
150:3
**publications**
82:5,9,12
147:23 150:24
**published** 82:22
83:15 281:21
**publishing**
150:5

**pull** 81:18
317:10
**pulled** 74:10
88:8
**purchase** 288:13
**Purdue** 24:21
25:1 30:13,18
57:10 107:21
244:8,23,24
247:2 248:11
248:24 249:3
253:3 256:6
257:6 258:7
**Purdue's** 29:9
29:12,19
**purpose** 268:4
**purposes** 100:8
282:5
**pursuant** 14:11
14:15
**purview** 196:11
**pushed** 308:16
**put** 37:7 47:12
47:14 52:21
98:17 112:24
119:20 125:12
133:19 175:23
181:10 213:16
278:9 289:19
289:20,24
301:10
**puts** 306:3
**putting** 52:10
83:2 139:24
231:14 299:4
300:1
**Pyszczymuka**
302:18,19

**Q**

**Q12** 192:7
**qualified** 114:6
235:14
**qualify** 140:13
308:2
**Qualitest** 51:1

230:16,18
**qualities** 181:8
197:8
**quality** 63:5
64:9 126:17
186:1 323:23
324:18
**quantifies**
266:18
**quantify** 133:10
134:3,12
149:11 184:2
**quash** 280:10
**query** 291:16
**question** 15:3
21:24 32:9,20
52:9 74:5,6
103:22 109:5,6
112:11 121:12
128:9 137:10
142:17 143:11
179:3 200:1
208:18 215:11
217:6 218:2
219:7 227:21
250:9 260:1
262:8 265:17
280:17 281:1,7
284:8 293:9
330:4 331:14
335:22 337:18
337:19,19
339:24 340:8
340:13
**questioned**
321:9
**questioning**
137:22 142:3
**questions** 9:14
10:18 12:1,14
137:12 142:6
142:10 143:8
235:1 279:9
280:3,13,15
281:5 319:16
319:18,20,22

320:4,6,10
325:6,9 326:6
326:8,23
328:22 329:5
**quick** 167:13
174:16 220:17
249:17 258:20
**quicker** 167:20
**quickly** 188:10
271:21
**quite** 18:14
42:23 72:13
261:22 272:4
288:9
**quote** 241:13,13
260:15,15
307:1

**R**

**R** 313:11 341:1
**raise** 94:4,7
**raised** 22:7
71:16 226:4
258:18
**ran** 204:2
**rank** 282:13
**Raspanti** 3:7
**rate** 167:12
**rated** 327:9
**rates** 281:16,18
290:10 291:5
309:8,9 314:7
314:9
**rationale** 203:14
317:18 338:4
**RBD** 214:7
**reach** 165:2
251:6 262:2
**reached** 10:18
10:19 12:19
253:15
**reaching** 162:24
**react** 282:22
315:14
**read** 76:5 163:8
163:11 171:1,3

175:11,14
189:9 227:7
270:17 285:18
285:21 286:2
287:4,8,23
295:7 297:24
298:3,8,16
300:18 303:7
304:12 305:3
306:3,5,23
308:12,14,18
308:19,22,23
309:3,4 313:20
314:4,9,15,18
319:1 327:3
329:8,8 334:13
334:15,16,21
335:8 342:3
**readily** 271:22
**reading** 154:2
154:13,21
155:14,23
156:1 163:19
259:21 304:24
305:16 314:13
329:16 330:14
**reads** 154:19
**ready** 164:16
188:11
**reaffirmation**
128:18
**real** 198:1
297:10,12,17
**reality** 211:6
**realize** 107:13
141:12
**really** 10:21
21:13 30:22
44:2,17 53:16
53:22 54:4,11
54:18 85:8
90:3 112:10
114:7 116:4
128:7 133:12
158:21 166:8
190:1 210:1

Highly Confidential - Subject to Further Confidentiality Review

233:13 234:11
243:13,17
247:11 251:10
256:24 273:15
275:1 277:19
296:13 300:3
300:11 332:5
**realm** 34:15
**reason** 17:9
32:23 51:23
92:6 113:20
157:22 172:8
245:21 271:19
274:23 277:20
278:10 292:20
293:5 294:1
295:23 334:24
335:9 343:5,8
343:11,14,17
343:20
**reasonable**
155:13
**reasons** 18:10
64:9 90:21
91:3,20 96:3
162:20 163:16
163:20 169:1
178:16 280:9
284:8 315:19
316:6,17
**rebrand** 190:11
**rebranded** 190:7
**recalibrated**
165:10
**recalibration**
165:1
**recall** 10:6,14,17
10:21 11:2,10
11:17,23 12:1
13:15 29:21,21
29:23 30:2,7
30:22 31:1
34:10 37:15
38:10,16,20
48:20 50:7
51:14,16 59:6

60:5 62:7
65:17,21 66:11
66:14,16,20,21
67:17,22,24
68:12,14,17,22
68:24 69:6,10
72:4 73:14
77:8,19,21
78:8,9,17
79:19,22 80:2
80:3,4,7 81:11
81:16,20 86:8
86:15 87:17,19
87:24 90:8
91:6 93:17,18
93:19,23 96:23
97:7,23 105:20
106:7,8,16,19
106:23 109:19
110:1,5 113:9
114:3,7 115:20
117:3,17,17,20
119:22 120:1
120:10,12,14
121:1,15,17,20
121:23 122:1
122:14 127:18
130:20 131:14
146:21,22
151:3,15 153:5
153:16 158:13
160:4,9 164:13
164:24 166:8
170:4 173:2,2
173:5 174:14
176:12 177:5
177:24 178:4
179:1,2,8,9,19
181:13 182:3
185:23 189:19
189:23 190:13
197:20 199:2
201:3,9,12,17
201:22,24
209:1 210:1,20
218:13 224:11

224:22 225:1,4
225:14,15
226:19 228:23
228:24 229:2,3
229:7 231:15
231:19,20,23
237:1,3,4,5
238:9 239:12
240:18,20,23
241:16,16
242:1,3,5,6,11
243:9,14 244:4
244:7,11 245:2
245:6 246:2,5
246:22 247:3
247:10 249:13
251:1,5,14,20
252:12,13
253:18 254:5,6
255:2,3,5
256:3,5,17,21
257:9,23 258:2
258:17 259:4
264:12 265:11
265:24 266:3,7
266:17 268:18
270:1 276:23
277:2,3,20
278:14,20
279:7,13
280:19 282:1
283:1,5,9,16
284:1,12,14,17
285:13,15
289:20 290:5
290:14,19,22
291:8,12,15,17
292:2,7,16,17
293:11 294:3
295:22 296:8
296:10,11
300:7,12 302:1
302:24 303:1
303:12 304:15
304:17,21,22
304:24 305:2,4

305:12,16
307:2 317:13
318:23 319:3
325:5,8 326:6
326:8,18,22
327:2 329:10
332:5,17
334:22 335:6
336:12 339:3
339:14
**recalled** 179:15
180:2
**recalling** 50:11
50:12 179:21
180:15 182:4
184:6
**receive** 124:7
286:6 321:4
**received** 73:12
186:1 189:10
189:14 195:24
200:14
**receiving** 279:14
282:14 290:17
302:1
**receptive** 158:3
**receptivity**
88:11 89:2
140:16
**receptor** 153:21
**recess** 64:23
107:9 141:8
187:5 219:13
249:21 258:23
317:5 329:2
**recognize** 24:11
99:2 146:18
219:19 220:21
234:4 237:12
252:8 254:12
255:9,11,15,17
255:22
**recollection**
79:20 81:22
88:24 151:10
176:14 228:15

239:18 244:12
249:15 250:11
250:21 254:8
254:16 258:11
262:11 281:17
334:18
**recommendati...**
167:17
**recommended**
155:9
**record** 9:2,8,18
64:21 65:1
76:6 80:22
107:7,11
110:24 111:6
111:10 113:6
137:7 141:6,10
141:22 143:6
187:3,7 208:11
219:11,15
249:19,23
258:21 259:1
279:20,22,24
280:2 285:10
294:21 317:3,7
319:23 320:1,3
328:24 329:4
340:18
**records** 22:16
**rectal** 153:23
190:11
**redactions** 7:7
**reduced** 278:1
**Reed** 3:11
**refer** 41:8 47:2
57:16 60:14
126:1 150:12
166:7 225:10
264:19 328:6
**reference** 51:7
57:21 60:13
76:23 78:11,19
79:3 81:2 82:5
84:5 95:4
109:15 115:1
115:22 118:11

120:21 162:22
164:8,9 165:16
220:3 250:8
253:22 254:14
260:23 263:8,8
264:20 271:5
287:22 310:11
313:11
**referenced**
51:11 139:12
139:22 140:21
140:22 234:21
250:9 305:7
311:16 313:13
**references** 83:23
98:3 143:2
247:12
**referencing** 84:1
139:22 232:16
313:15
**referred** 64:11
165:21 225:12
267:12
**referring** 31:14
86:3 89:6
115:12 123:9
123:21,22
125:2 171:22
191:4 225:15
275:13 337:3
**refers** 22:10
172:3 189:17
191:22 222:13
225:9 264:19
**reflect** 72:16
181:9
**reflected** 289:23
**reformulated**
20:21 22:2
57:22 59:11
75:3
**refrain** 137:6
**refresh** 18:8
88:24 176:13
244:12 250:10
250:21 258:11

262:11 334:17
**regard** 10:23
130:6 135:23
138:23 141:23
142:1,4,7
162:3 172:7
261:14 278:8
291:4 309:6,12
325:6,9,17
**regarded** 225:22
226:2
**regarding**
241:12
**regardless** 140:8
152:20 217:1
289:22 292:15
312:10
**regimes** 41:21
**region** 36:5
67:14 68:2
72:1,6,11
167:17 168:1
259:4,20 260:2
260:24,24
261:13 262:9
262:13,14
264:5 266:5,21
267:10 275:20
276:13 277:6,6
293:8,13
321:23
**region's** 265:20
266:12
**regional** 35:16
36:5,10 67:3
68:4 71:24
72:5,20 86:24
259:3,19 260:3
276:12 277:6
277:14 293:7
**regions** 261:19
293:11,22
**regular** 242:21
**regulation** 22:13
**regulations**
235:24 336:9

**regulatory** 42:22
42:24 55:16
62:2 64:6
77:11 103:4
126:16 130:21
310:23 324:14
328:15
**regulatory-dri-**
257:1
**rehash** 281:2
284:11
**reinforce** 160:17
**reinforcement**
157:11
**reinforces**
300:24
**relate** 16:5 26:4
172:15 277:24
**related** 21:15
123:13 235:2
243:15 292:12
**relates** 122:9
169:15 264:17
283:2,7
**relating** 21:18
22:1 235:1
**relation** 10:3
**relations** 62:6
87:13,14,20,22
88:10 89:1
**relationship**
21:6 74:13,18
75:8 107:18
226:13,17,24
237:3 239:13
239:17 242:15
261:24
**relationships**
107:17 141:17
226:19
**relative** 72:14,17
159:7,9 172:5
341:13,15
**relatively** 39:11
46:9 158:16,23
159:12 166:20

173:4 174:16
261:4
**relaunching**
189:17
**release** 87:18
**relevant** 41:21
56:11,19,21,23
57:10 145:6,7
145:18 298:7
298:12 299:4
**relied** 150:2
289:10
**relief** 91:12
94:19 95:2,22
178:14 226:7
229:15
**relieve** 123:15
125:11 162:4
**relievers** 282:5
**rely** 199:11,19
**remained**
184:18
**remaining** 20:3
**remark** 333:11
**remember** 32:14
38:16 50:9
68:15 69:4
77:11,13 89:3
115:17 120:8
131:6,9 158:13
170:5,7 173:3
180:8,21,24
210:14,18
234:11 239:16
241:1,4 242:19
253:11 269:22
271:9 273:15
277:23 278:6
279:3 281:5
293:8,9 295:4
296:13 329:21
**remembering**
20:4
**remind** 19:7
**reminding** 202:2
**removal** 278:23

**remove** 273:20
277:16 278:17
316:2,14,16
**removed** 277:21
277:22 278:4
**removing**
278:11 279:4
**REMS** 252:3
256:14,15,19
256:22 257:7
257:22,24
258:12,16
**render** 205:20
**rep** 6:10 200:3
201:21 202:15
203:1,4,10,12
203:14,22,23
205:11 207:9
208:3,22
210:12 269:9
274:1,16
275:22,24
276:18 279:6
321:21
**rep's** 277:17
278:4,24
**replace** 318:15
**report** 6:8,10,14
29:18,18 71:16
173:24 174:9
175:15 178:24
180:14,17
183:11 188:8,9
188:18,22
189:9 194:16
195:24 202:15
203:1,12 204:4
204:16,17,24
207:2,3,9
208:3,22
219:20 220:4
220:14,22
221:12,18
288:9,12
291:10
**reported** 198:17

290:23 299:21
**reporter** 1:14
2:3,3 9:9 32:6
32:11,16 341:4
341:4
**reporting** 182:8
182:10 216:7
223:5 288:7
**reports** 182:3
186:2 260:2
278:16
**represent** 9:18
24:2 88:6
111:16 142:19
167:4 280:5,13
287:7 293:18
**representative**
142:11 180:10
**representatives**
67:4,5 68:6,10
119:18 164:1
**represented**
15:9 94:23
150:23 159:1
184:16 228:8
**represents** 171:7
**reps** 52:7,8 69:8
69:11 70:5
93:13 126:11
126:14 132:10
134:13,21,24
164:7,10
165:21 183:12
183:24 199:11
199:19 200:13
203:9 204:10
204:11,12,18
205:6,11 206:9
206:15,19
207:11 208:3,4
210:4 211:12
211:16 217:18
218:17 219:3
271:7,10 272:8
272:9,23
273:13,19

275:6,14,20
276:5 277:5,10
309:14 335:24
339:9
**reps'** 207:16
**republished**
152:9
**reputation**
56:18 57:9
111:17,19,22
112:3,4,6,17
118:2 327:12
330:1,10 331:2
**request** 21:21
23:2,8,10
**requested** 22:10
22:20,21 23:1
**require** 125:11
225:11 231:3
297:10 304:11
**required** 130:22
130:22,24
131:13 292:21
324:15
**requirement**
325:2
**requirements**
151:2 158:5
**requiring**
335:20
**reread** 313:23
**research** 6:10
59:2,7 60:2,6
105:15,16,20
105:23 106:1,6
106:9,11,13
148:20 149:2,5
172:13 174:15
174:16,20,23
174:24 175:20
176:24 180:13
183:21 184:19
186:6,6,7,14
188:23 192:9
192:22 193:3,5
193:10,15,17

197:17,20
198:20 199:5
199:16,22
202:15 203:1,5
209:3 210:2,19
210:24 211:11
216:12,16
218:14 286:1
326:2,9,19
327:5,18
329:10 330:2
330:11
**researchers**
314:8
**reserve** 143:7
279:13 284:12
319:16
**reserved** 93:4
340:21
**reserving** 279:17
**resist** 124:2
125:10
**resisted** 125:14
**resource** 265:7
**resources** 265:3
**respect** 11:24
13:4,8 20:16
21:7 28:7 38:5
48:13 49:11
54:21 55:1
61:6 65:14
75:2 78:2
85:23 92:20
93:12,15
106:12 122:22
127:6 136:6
150:24 165:11
178:9 180:15
190:10 198:4
200:24 203:6
228:12 229:5
229:11 236:13
241:18 242:7
253:15 261:15
271:23 279:15
279:16 329:23

336:14 338:9
339:10
**respiratory**
28:21
**respond** 108:2
145:11 149:17
179:5 183:8
256:18
**responded** 223:8
311:1
**respondent**
179:5
**responding**
122:3 146:7
163:5 184:19
206:16
**responds** 121:10
121:15
**response** 142:3
144:6 170:19
171:17 176:12
206:3 208:4,24
209:17 210:1
210:18 235:11
279:11 304:18
310:5 312:5
329:16
**responsibilities**
26:9 27:2,5
34:16 35:14,19
35:23 36:4,9
36:10,16 37:6
38:5,8 91:5
132:5 238:22
323:14
**responsibility**
36:22 38:22,24
40:13,16,23
45:1 47:1
50:17 54:22
59:13 73:3,4
88:18 99:10
119:2 200:20
245:3 247:8
**responsible**
33:13 35:1

40:11,18 41:6
42:2 66:4 67:4
71:15,20 96:4
96:9,16,18,21
97:3,8 98:14
99:23 111:6,8
111:10,17,23
112:12,15,15
119:1,4 126:20
130:11 132:8
137:16 150:21
269:8
**responsive** 17:3
19:12,24 20:11
**rest** 158:24
319:16
**restaurant** 63:4
63:10
**result** 123:18
209:2 273:12
307:8,10,12
310:15 311:10
317:16
**resulted** 308:21
**results** 157:9
211:24 272:15
326:2
**résumé** 5:6,7,9
23:22,23 25:5
25:9 31:2 33:5
45:2 46:24
50:14 57:14,15
60:11 65:5
71:23
**retained** 89:5
164:10 319:3
**return** 267:20
268:12,16
**Returned**
322:16
**returning**
232:19 233:19
**revenue** 72:1
**revenues** 46:3
**review** 1:8 24:15
42:20 55:16

88:11 99:6
103:4 135:21
148:6,9 150:16
152:7 184:15
185:1 188:10
202:19,22
213:7,10
219:24 235:21
250:16 285:7
285:23 286:17
295:17 324:12
325:4 328:14
**reviewed** 64:2,5
64:9 103:4
151:22 152:13
152:15 263:24
**reviewing** 66:4
150:19,22
278:10 305:12
**rewarded**
276:17
**rhinitis** 322:6
**rich** 241:12
**Richard** 302:15
302:23 303:1
**ride-along** 68:24
**ride-alongs** 68:6
68:10,16,22
69:2,5
**ridiculous**
198:13
**right** 10:9 16:14
20:4 24:10
36:6,12 37:5
37:12 38:23
45:20 47:22
54:8 55:24
58:17 63:10
66:9 67:11
73:9 77:4 78:9
78:10 80:23
85:2,22 86:10
89:11,17 106:4
115:5 116:19
118:12,21
122:4 123:2

126:7 127:7,22
128:9,15,22
129:9 131:17
131:21 132:4,6
142:22 143:7
144:9 145:17
155:3,23
159:21 161:18
163:17 164:20
179:20 182:23
183:1 185:5
187:21 189:4
190:23 191:23
192:24 193:5
194:13 195:9
196:22 197:17
199:21 201:20
203:15 205:8
206:11 208:16
210:6 211:2
212:2 213:17
214:3,8,12,22
216:13,22
217:21 218:4
218:18 221:5
221:13 222:9
222:14,16,18
234:14 235:12
238:1,11 239:4
245:19 253:4
256:8 260:16
261:2,19 262:4
263:19 264:3,5
266:13 272:20
273:8 274:4
281:13 284:12
286:8,12,19
287:11,14
289:5,11 294:7
297:19,23
307:23 310:8
311:5,21
312:13 313:4
316:6,17 318:3
332:14,14
337:9,17

**right-hand** 24:9
65:7,7 76:7
78:20 80:14,19
89:7 90:19
98:24 110:22
113:8 146:17
147:2 156:6
162:13 213:2
214:6 231:13
237:11,16
244:16 250:3
252:1 262:22
270:9
**rights** 279:13,17
**rigorous** 324:6
**ring** 252:19
255:1
**rising** 304:10
**risk** 5:16 22:13
28:11,16,16,20
28:20 29:4
100:18 101:17
101:19,21
102:2,6,10
105:12 111:7
122:24 124:14
124:15,16,21
140:7 291:19
299:8 325:13
325:16 339:6
340:6
**risk-benefit**
131:5
**RiskMAP** 96:24
97:2,24 99:1,2
99:11,21,21
100:7,17 101:3
101:6 104:15
104:20 109:12
109:21 127:18
127:18 128:5
129:1,6,17
130:7,15 131:1
131:5,12,15,17
131:19,24
132:4,7,13

133:19 136:19
136:23 137:1
137:15 290:22
315:12,15
325:6,10,12
336:12,13
**risks** 28:14,16
28:18 29:8
30:9 63:6,16
83:1 84:19
87:5 100:9,15
100:24 101:5,7
101:9,13,15
102:15,15,19
102:24 103:10
103:10,15
104:1 105:4,8
106:14,21
122:22 123:16
124:9,19,23
125:4,16
126:19 129:8
184:16 185:13
192:17 194:24
268:6 336:23
338:8
**rlimbacher@g...**
3:22
**road** 142:11
**ROBERT** 3:22
**Robin** 254:14,17
**robust** 76:22
161:17
**role** 11:12 21:2
51:4 58:1,10
65:24 71:24
99:9 109:20
119:3 227:14
227:24 247:9
251:11 274:22
276:1,12 298:3
323:16
**roles** 47:4
118:24
**Romaine** 200:17
201:4 202:12

**Romero** 114:2
114:21 115:6
119:17 156:9
157:10
**Romero's** 114:2
**Ron** 156:9
**Rosa** 2:12
**Rosen** 244:8,10
244:17,21
245:5,9,17,23
246:3,10
247:12 250:5,8
253:3,5,8,15
**ROSENBLUM**
3:9 302:3,7
**rotation** 35:20
155:10 172:8
**rough** 303:6
**roughly** 233:12
322:20
**round** 238:5,7
239:5
**round-the-clock**
93:6
**routinely** 257:2
**Rowe** 241:1
251:14 252:2
257:14
**Rowe's** 256:13
**RPR** 1:14
341:20
**run** 70:2 168:5
235:14
**running** 39:22
**Russell** 24:21

_____
        **S**
_____
**S** 3:23
**Sabrian** 4:3
**sad** 307:17
**safe** 38:21 39:7
99:23 100:8,23
102:14 197:11
200:15 280:23
335:19 336:6
**safely** 103:14

104:1,13 150:9
168:11,21
207:23
**safer** 318:13
**safety** 28:14
30:9 62:24
71:18 97:12
103:5,20
104:12 112:16
124:18 126:19
128:20,22
134:7,7 135:20
184:16 185:13
192:17 194:24
222:6 263:17
268:6 299:8
315:19 316:6
316:17 328:8
335:17 336:8
337:15 338:5
340:2
**safety/side** 180:1
**sake** 32:6,16
**sale** 22:11 75:3
**sales** 35:16 36:5
36:10 39:23
42:24 44:16,19
62:1 67:3,4,5,6
68:4,6,10 69:8
69:11 70:4
71:24 72:5,20
72:24 73:2,2
73:13 93:13
103:7 109:19
109:20 119:6
126:11,14
132:1,10
134:12 153:2,6
162:21,23
163:16 164:1,6
164:10,14,22
165:21 169:9
174:17 180:12
183:12,23
199:11 200:19
200:21,23

201:4,13,21
203:5,8 204:17
207:18 211:12
211:16 215:21
217:18 218:17
219:3 259:20
260:2 261:3,7
262:2,4 271:7
271:13 274:16
275:6,14,20,22
275:24,24
276:5,18,19
277:5,10,16
278:4,24 279:6
280:22 292:4
292:10,14
293:7 309:10
310:6,22
321:21 323:22
323:24 328:19
335:24 339:9
**sample** 184:18
204:9
**San** 2:17 238:6
239:6
**SARAH** 3:17
**saw** 72:23
140:16 149:21
186:1,4,10
193:5 208:2,21
217:11,18
269:7 280:20
289:22 290:6
**saying** 43:3 48:2
61:1 79:10
108:16 130:6
131:11 133:2,8
177:17 186:8
198:3,4 199:6
209:20 216:19
217:13 266:11
291:19 305:4
337:18
**says** 14:19 33:13
40:4 41:7
62:12 67:5

78:24 79:1,6
79:14,20 85:1
87:13 88:9
89:14 92:5
94:3 110:23
111:4 114:22
115:6,16,23
118:9 122:3
147:6 155:23
156:1 158:8
165:8 169:7
176:10 180:8
188:22 189:4
205:4 206:15
208:7 209:19
214:7 216:11
224:12 233:2
233:17 238:4
241:7,7,11
245:23 246:6
246:10 252:10
267:16,18
272:18 287:6
296:3,6 297:13
297:21 298:14
300:17 303:2
303:21 304:8
306:11,21
307:6 313:15
313:22 314:11
314:13 327:8
331:6
**sbenoit@ulme...**
3:18
**scared** 296:7
**scattered** 148:22
**scenario** 45:19
46:17
**scenarios** 45:23
104:11
**SCHAEFER**
3:13
**schedule** 26:18
26:21 28:10,12
28:12,14,19
97:18 101:12

101:14,23,24
102:13 103:11
111:24 114:19
122:24 124:3
134:13 135:1
182:20,22
185:12 194:23
195:1,6,8,14
195:15,15
196:2 197:12
205:24 210:5
216:21 306:10
**scheduled** 28:19
195:16
**scheduling**
27:24
**Schwartz** 302:15
302:23 303:9
**science** 25:17,17
148:7 151:23
152:6
**scientific** 31:22
150:6 299:23
300:9
**Scioto** 313:12
314:22
**Scott** 256:9
**screen** 75:18
112:24 294:17
**screening**
125:21
**screens** 122:9
**script** 266:19
**scrutiny** 304:11
310:13
**Scullion** 2:9 4:6
4:7 9:14,18
12:21 13:21,23
15:6,8,12,16
17:7,12,15,22
17:23 18:17
19:10,19,22
20:6,10,19
21:4,14,23
22:5,17,24
23:6,12,14

24:5,7,18
27:17 28:5,15
29:7,15,23
30:11,16 36:20
37:11 38:4,21
39:13,17 40:3
41:18 42:8,12
44:7 46:1,12
46:19,23 48:1
48:12 49:19
50:1 51:4,24
53:4,19 55:6
56:5,10,18
57:6,8,13 59:1
59:9,24 60:10
60:24 61:5,14
63:8,23 64:16
64:18 65:2
66:16 69:15
70:4 71:2,22
72:10,19 74:19
75:7,15,19,22
76:3 79:7
80:12,24 81:5
82:1,14 84:14
84:23 85:14,20
86:17,22 87:21
88:1,2,17,21
89:20 91:19,24
93:11,19 95:12
96:1,12,23
97:6 98:19,21
99:9 100:1,12
101:1,15,20
102:1,6,10,16
102:22 103:22
104:14 105:2,7
105:24 106:18
107:1,4,12
108:3 109:5,10
109:11,24
110:15,20
111:14 112:5
112:19,20
113:1,3,6,24
115:17 116:19

Highly Confidential - Subject to Further Confidentiality Review

| | | | | |
|---|---|---|---|---|
| 117:20 118:1,6 | 185:14,20 | 249:10,16,24 | 89:13 100:3 | 204:6,8,17,22 |
| 119:12,16 | 186:5,15 187:1 | 250:20 251:4 | 129:16 160:16 | 213:3,21 |
| 122:21 123:1 | 187:8,13,14,22 | 253:14,20 | 176:9 181:12 | 221:18,24 |
| 123:20 124:6 | 187:24 188:3,4 | 257:10 258:19 | 199:10 203:13 | 222:6,9,16,20 |
| 125:1,12 126:3 | 191:4 192:2,20 | 258:20 259:2 | 252:21 258:4 | 222:23 224:15 |
| 126:7,10 127:4 | 193:4,9,14,21 | 259:12,13 | 264:6 265:22 | 232:6,10,17,20 |
| 128:9,15 | 194:8,16,20 | 261:12 262:7 | 266:2 272:13 | 233:5,20 |
| 129:12 130:11 | 195:2,9,17,23 | 262:16,17,19 | 272:23 294:17 | 234:13,22,24 |
| 130:15,24 | 196:13,19 | 266:16,24 | 298:11 300:14 | 235:1 237:17 |
| 131:4,10,24 | 197:13,22 | 268:10,15 | 302:12 303:3 | 240:5 241:2 |
| 133:2,17 | 198:11 199:4 | 269:17 270:3,4 | 305:20 334:3 | 244:12 246:14 |
| 134:11,24 | 199:15,21 | 270:6 274:4,11 | **second-to-last** | 250:4 252:2,4 |
| 136:16 137:6 | 200:5,16 | 275:5,18 276:4 | 60:12 171:9 | 252:8 253:22 |
| 137:11,14,20 | 201:10,23 | 276:10 277:3 | **secondary** 182:2 | 253:23 254:13 |
| 137:24 138:5 | 202:7,9,21 | 277:14 279:8 | **section** 60:11 | 254:15,22 |
| 138:24 139:9 | 203:21 204:1 | 297:17 307:6 | 82:4 99:14 | 255:8,24 256:8 |
| 139:16,24 | 205:5,14,19 | 324:24 327:21 | 104:20,21 | 257:13,17 |
| 141:1,4,11 | 206:2,8,18,24 | 329:5 330:6,20 | 109:14,15 | 259:15 260:7 |
| 142:12,19,22 | 207:8 208:2,9 | 331:7,15 332:1 | 179:1 190:16 | 261:20 263:2 |
| 143:5,9,19 | 208:13,17,21 | 332:8,11,19,20 | 204:16 221:7 | 264:8 267:23 |
| 144:12,23 | 209:16 210:14 | 332:24 333:3 | 221:22 224:14 | 268:15,19,22 |
| 145:17,24 | 210:21,23 | 333:10,11 | 333:24 | 269:3 270:11 |
| 146:9,14,15 | 211:14,23 | 335:1,10,22 | **security** 97:21 | 270:14 273:24 |
| 148:3 149:13 | 212:5,10,18,21 | 336:11 337:1 | **see** 14:19 19:12 | 274:21 285:4,6 |
| 149:19 150:10 | 212:24 213:9 | 337:17 338:12 | 19:24 21:18 | 285:16 287:19 |
| 151:21 152:3 | 214:15,20 | 338:20 339:8 | 44:5,9,13 | 287:21 294:23 |
| 153:10,17 | 215:9,23 | 339:15,22 | 50:18 52:23 | 295:5,10 296:4 |
| 154:9,20 155:2 | 216:10,18 | 340:7,17 | 68:19 71:8 | 302:17,21 |
| 155:22 156:2,3 | 217:7,15 218:3 | **se** 55:19 60:20 | 76:13 77:17 | 303:15,22 |
| 156:24 157:6 | 218:8,15 219:1 | 86:3 91:7 | 82:6 90:22 | 304:3 305:8 |
| 158:9 159:9 | 219:9,16 220:2 | 178:11 201:18 | 96:5 98:3 | 310:11 313:9 |
| 160:15 161:6 | 220:15 222:3 | 216:8 217:14 | 99:17 109:15 | 313:13 333:21 |
| 162:8,9,10 | 223:9,10,12,17 | 290:14 296:11 | 109:17 110:24 | 333:23 334:2,6 |
| 164:18 165:20 | 224:1 225:7 | **search** 14:23 | 114:19 115:9 | 334:7 335:8 |
| 166:2 168:13 | 226:3 227:12 | 15:17 16:3,23 | 118:8,16 120:5 | **Seeger** 2:7 |
| 168:24 169:6 | 228:11,20 | 16:24 18:18 | 120:6,21 121:8 | **seeing** 31:23 |
| 170:8,9,11 | 229:3 230:2 | 19:23 20:12,15 | 121:13 122:10 | 58:15 80:5 |
| 172:14,21 | 231:9,10 235:9 | 21:17,24 23:2 | 129:14 142:14 | 122:15 178:18 |
| 173:17,18 | 236:3,11,21 | 279:11 | 147:3,7 148:13 | 178:20 184:6 |
| 176:2,18 | 237:7,8 239:10 | **searched** 16:22 | 167:15 171:13 | 197:6 198:16 |
| 177:13,24 | 239:11,12 | 20:5,10 21:17 | 171:20 176:23 | 215:18 242:13 |
| 180:23 181:11 | 241:23 242:4 | **searches** 299:3 | 177:6 179:21 | 246:2 290:1 |
| 181:17,23 | 242:23 243:19 | **Seasons** 113:18 | 180:9 181:6 | 291:20 |
| 182:2,10,16,23 | 244:4 245:22 | **seat** 317:2 | 191:7 193:6 | **seek** 112:5 318:9 |
| 183:10,18 | 246:19 247:20 | **second** 22:9 | 197:24 198:5 | **seeking** 257:23 |
| 184:5,24 | 248:21 249:5 | 76:19 78:13 | 199:22 202:16 | **seemingly** 248:7 |

298:24
seen 14:3,12
  207:2 267:18
  318:24
sees 122:13
segment 27:23
  39:6,19 157:16
select 92:16
selected 11:22
  92:4 126:22
selecting 297:19
selection 229:10
  263:14
sell 38:23 48:8
  134:13 281:8
  281:12 308:17
  311:5 335:13
selling 37:23
  38:14 203:15
  203:23 276:1
  288:21 309:7
  312:2,11,12,22
  315:7
semi-synthetic
  153:20
send 95:13
  134:21 186:16
  186:24 196:9
  196:14 295:23
  339:15 340:10
sending 134:12
  188:7 201:13
  285:13,15
senior 33:10
  34:19,24 35:2
  35:10,22 36:14
  114:24 234:8
  234:15 322:10
  323:1,11,13
sense 35:18
  215:13
sensitized 30:2
sent 24:21 76:15
  77:5 134:24
  196:12 201:18
  285:5 302:15

305:1 310:4
321:21 324:23
325:3 338:21
sentence 62:11
  76:20 99:16,18
  99:20 101:4
  114:21 115:23
  129:16 160:21
  161:2 162:20
  171:9 241:11
  243:1 272:15
  303:3 334:3
sentences 158:2
  273:5
separate 86:5
  337:5
September 36:3
  36:4 72:2,2
  156:10 161:8
  223:21 224:7
  224:18 259:5,5
series 170:14
  232:1
serious 28:21
  210:3
seriously 59:14
  96:22 103:8
  112:16 278:8
  311:1
serve 36:4
  274:22
served 65:10
  69:21 72:5
  95:1
services 9:3
  282:14
serving 69:24
  71:12
session 310:22
sessions 84:20
  241:5
set 43:13 51:10
  51:18 117:15
  169:21 268:9
  285:21 294:9
  315:12 321:13

323:20 326:24
  341:11
settings 153:11
settlement 10:4
  10:19,19 12:6
  12:8 13:5,8
settlements
  12:18 13:2
seven 118:10
  183:18,19
shaking 32:15
  66:22 94:1
share 42:18
  43:10 52:2,3,4
  89:15,16,22
  90:6,18 126:23
  127:1 156:22
  158:5 159:18
  160:2,13
  169:17 241:9
  241:10,17
  265:10 273:24
  286:21 304:12
  310:7,12,12,14
  311:5,10,17,18
  311:21,24
  312:10,17,18
  312:22
shared 241:17
  242:7
shares 310:12
sharing 168:1
  271:4
sharply 314:9
shed 327:19
  329:14
sheet 319:2
  343:1
shifting 121:8
shine 267:17,17
short 34:20
  35:15 46:9
  55:20 72:24
  81:18 105:22
short-acting
  144:4

shorted 160:7
Shorthand 2:3
  341:3
shortly 283:13
show 17:23
  92:16 100:21
  178:12 216:9
  244:13 251:22
  259:7 294:17
showing 43:12
  158:18 210:24
  214:11 287:13
shown 75:18
  266:5 325:10
  326:24 327:2
  342:6
shows 297:22
shrinking
  312:21
shutting 140:23
side 90:20 222:5
  222:7 231:14
  232:17 237:17
  254:23 255:21
  323:3
sign 225:10,16
  225:19 258:10
signal 172:7,12
  288:1 290:21
signals 71:19
  278:7
signature
  234:13 340:21
  343:22
significant 46:8
  90:13,13
  136:12 184:3
  336:13
significantly
  327:10,11
signs 171:11,23
similar 146:7
similar-size
  313:19 314:3
similarly 155:3
simply 106:23

126:1 138:2,6
  144:20 273:23
  311:9 334:22
singling 292:7
sir 130:11
  285:14 287:4
  295:21 302:2
  302:17 305:8
  305:22 319:4,9
  320:11,23
  325:22 335:22
sit 66:1 292:19
  314:14
sitting 149:13
situation 56:15
six 194:4,13
  295:9 313:1
sixth 214:1
  221:11
size 92:12
  290:18
skipped 279:19
skipping 24:6
skying 301:4
slide 63:6 64:1
  90:16,17 96:2
  98:1 213:20,22
  214:7 286:16
  286:17 287:1,2
  287:2 288:2
  289:19,20
  295:15 297:7
  326:12,16,24
  327:2
slides 263:24
  285:23 298:24
slightly 23:14
slim 16:16
slow 224:19
slower 167:6,9
  167:10
small 35:15 66:4
  116:4 158:16
  166:20 322:9
  322:11
smaller 34:11

48:9 266:21
**Smith** 77:18
**societies** 83:12
226:15 227:2,7
227:9
**society** 83:9
98:10 227:8,17
227:24,24
228:5,17
**software** 62:13
62:14
**sold** 38:17 115:7
337:8
**solid** 143:22,24
**solutions** 33:11
33:15,21 34:8
34:19 36:15
57:18
**somebody** 18:21
50:3 86:2
135:16,24
136:1 138:20
151:1 167:1
171:7 209:12
242:16 245:8
261:11 271:19
291:18 293:2
301:1,10
316:22
**somebody's**
197:3
**Somewhat** 27:23
**soon** 10:20 41:3
55:11 81:24
319:11
**sorry** 42:13 43:3
44:11 60:12
61:7 74:24
79:9 85:1
88:17 96:11
102:18 110:22
117:8 120:22
129:3,4 135:8
136:22 148:14
156:5 179:10
187:22 190:21

212:1 214:6
218:2 224:5
227:18 231:21
232:7 240:6
241:23 253:24
255:13 258:6
259:21 280:24
285:9 294:20
302:3,5,10,13
304:1 310:3
312:6 313:3,7
313:8,23 325:7
325:8 330:4
331:13,14
**sort** 54:23
115:13,24
153:4 172:10
218:1 254:5
289:7
**sought** 91:4
111:20 126:12
144:13 145:1
145:19 226:24
315:17 316:4
**sought-after**
334:5
**sound** 18:20
297:8
**sounds** 37:6
**source** 183:11
183:23 197:14
199:12,20
200:5,9,10,11
214:5,7 217:21
287:22 288:1
**southeast**
260:20,24
293:13,19,23
294:3
**southern** 313:17
314:1 321:23
**speak** 29:12 32:8
44:17 49:22
128:4 130:5,23
131:14 133:12
136:14 138:15

138:17,23
140:19 152:5
155:21 172:19
207:18 243:7
249:2 263:10
266:22 272:15
**speaker** 62:15
62:19,20,22
63:12 114:1
120:13 169:1,1
263:2,7,8,24
264:21 265:16
265:23 267:19
267:23 268:2,4
268:12,16
269:4,8,18,20
271:12
**SpeakerNet**
62:12,12,13
**speakerphone**
3:14,18,24
**speakers** 63:19
263:20
**speaking** 44:19
52:17 66:13
91:14 116:17
167:11,20
261:3 265:13
**speaks** 82:2
132:19 149:23
182:14 216:15
274:9 330:24
**specialist** 166:5
166:22 167:13
**specialists** 98:11
136:11 166:5
166:10,16,18
166:20 167:1
167:14,20,22
168:1 222:18
223:4,4
**specialists'**
168:2
**specialty** 204:13
221:19 259:16
262:24 272:8

**specific** 21:21
31:21 51:16,18
59:19,22 60:5
66:11,14 70:5
93:17 106:16
106:23 118:23
148:21 160:4
170:4 174:15
185:23 225:4
228:23 229:7
240:22 241:4
241:16 242:1
246:5 258:17
268:18 276:23
278:6 292:18
336:18
**specifically**
11:24 22:22
28:17 38:10
48:10 52:12
62:7 65:17
77:21 80:2,4
81:21 87:17
90:8 92:1
108:23 119:1
121:17 176:1
184:11 185:20
201:5 244:11
249:13 251:1
258:2 264:17
271:9 278:19
284:1 290:23
292:16 304:17
304:21 317:13
323:10 326:11
335:11,23
**specifics** 11:2
51:14 59:6
69:10 93:21
173:5 229:2
243:14 277:19
277:23 279:3,7
315:24 335:6
**speculate** 293:5
332:10
**speculation**

337:12
**speed** 164:2
**spend** 63:5
**spends** 169:8
**spoke** 99:1 262:8
263:6,19
**sponsor** 147:22
228:6 236:8
338:13
**sponsored**
147:19 149:20
150:1,5 152:21
**spontaneous**
186:2
**spot** 141:2
260:22 261:2
**spreading**
167:22
**spur** 261:6
**Square** 319:5,7
320:12 322:21
**squarely** 328:8
**SR** 267:22
**stage** 57:17
117:15 130:22
**stamped** 80:13
88:3 98:24
156:6 170:13
213:2 223:18
237:11 240:1
244:15 262:22
270:8
**standard** 184:22
289:14,17
325:1
**start** 10:8 25:20
30:4 41:14
42:16 55:6
81:11 102:19
124:15 127:12
167:16 170:15
227:15 232:1
272:13
**started** 24:4
27:17 46:14
94:17 116:18

191:10 268:20
269:19,23,23
275:16 283:18
321:20
**starting** 9:23
38:13 94:17
171:5 191:7
262:23 321:18
323:9
**starts** 155:4
190:24
**stashes** 308:17
**state** 2:2 3:16
34:12 39:21
46:24 65:10
67:3 76:20
139:1 154:10
158:2 162:19
234:9,16
254:20 280:5
280:16,18
281:12,16,19
282:15 283:3,8
284:15 287:10
287:11 290:1
290:10 292:22
313:16,20
314:1,4
**state's** 41:21
48:24
**state-funded**
282:14
**stated** 157:10
177:14 194:7
194:15 208:19
280:13 311:3
**statement** 91:2,7
91:8 138:16,23
139:1,5,10
149:15,18,20
182:17 199:17
199:20 235:2
243:7 299:16
299:18 300:8
301:7,12 306:5
306:7,13

314:21 330:14
**statements**
149:2 150:20
151:22 297:5
**states** 1:1 90:20
101:4 111:2
121:4 148:19
153:20,22,24
154:8 155:6
160:16 171:10
177:3 180:2
190:17,18
191:18 194:1
221:7 258:6
285:21 287:3,7
290:2,11,17
293:16 296:23
305:22,24
306:19 309:1
**stating** 311:9
**statistics** 309:7
**status** 74:11
148:13,16
149:2,5
**stay** 33:5
**staying** 47:18
210:12
**stemming** 27:20
211:24
**stenographic**
9:8
**stenographica...**
341:10
**step** 173:23
276:4
**steps** 80:2
278:20
**Steve** 50:13
**Stewart** 244:18
**stick** 216:17
**sticker** 147:3
**sticks** 254:11
**stigma** 123:16
300:18
**stint** 35:15 72:24
**stock** 75:10

**stop** 219:9
269:18
**stopped** 306:11
**stopping** 181:16
219:8
**stops** 275:23
**stores** 71:7
308:10
**story** 5:15 88:10
233:18 271:1,5
271:11 272:1
**straightforward**
155:1,3,23
**Stranch** 2:12
**Strassburger**
244:18
**strat** 79:2,3,13
**strategic** 6:12
76:12 79:4
90:18 213:4,6
213:13 214:3
216:4,11,13
221:8 285:18
286:11,19,23
**strategy** 31:18
43:10 52:2
111:5 114:23
115:2 156:23
160:17 161:8
161:10
**street** 2:2,7,16
2:20 3:7,16,20
327:13,15,16
330:1,10 331:2
331:9,17
332:13 334:19
335:13 339:17
340:12
**strength** 192:10
**strengths** 192:6
193:23
**stress** 310:23
**strike** 14:11
44:11 47:20
53:4 65:13
127:5 147:17

163:5
**string** 197:4
**stringently**
309:16
**strive** 136:1
275:20
**strived** 128:23
**strong** 52:9
116:4 267:19
**structured** 277:2
**studies** 106:7
193:20 204:2
207:7 211:7
221:2 299:12
300:3
**study** 171:19
172:10,22,24
173:2,3,9,14
174:8,10,13,16
175:10,11,15
176:15,20
179:21 180:20
182:9 193:22
194:1 197:23
197:24 198:4
199:5,9 203:4
203:12,14
204:4,7,10
211:7 221:12
283:21 299:23
313:9,16,24
**studying** 283:23
**stuff** 260:15,19
**subject** 1:7
76:12 108:1
137:5 156:10
174:7 232:5
235:21 240:13
244:19 250:6
256:13 257:21
259:18 263:1
270:24 280:11
319:17 342:5
**submit** 317:15
**submitting** 25:5
82:17 324:16

**subpoena** 5:4
14:2,12,15
17:3 20:1,11
22:18 23:7
142:23 143:1
279:12
**subscribed**
342:14
**subsequent**
131:13
**subspecialty**
120:10
**substance** 19:8
26:19 127:21
128:12 129:19
130:1 132:15
133:22 134:14
135:2,5 136:5
138:9 210:5
**substances**
25:22
**succeeded**
274:12 275:4
**success** 117:22
267:21 271:1,5
271:11,24
273:2,4
**successes** 267:21
**successful** 6:10
39:8,10 72:17
202:15 203:1,4
203:10,12,14
203:22,23
207:9 208:3,22
**successfully** 39:4
57:16 203:15
**sufferers** 296:23
296:24 297:10
**suffering** 42:4
54:17
**suggest** 297:13
298:19
**suggested** 236:1
**suggesting** 300:8
**suggests** 297:18
**suit** 10:4,5,21

**Suite** 2:2 3:7,20
**suits** 12:6,9 13:8
**summaries**
  259:19
**summarize**
  175:20 179:8
  179:14
**summarizes**
  191:15
**summarizing**
  163:6,14
  190:19 213:20
**summary** 6:8
  40:10 50:15
  177:3 188:18
  190:17 202:16
  259:18 285:18
**supervisor**
  114:15 118:21
  118:21 309:24
**supplement**
  147:19 149:20
  151:19
**supplements**
  147:23 148:20
**support** 60:17
  60:23 62:4
  66:9 96:8,15
  169:9 229:21
  230:4,20 236:9
  299:13 300:9
**supported** 96:18
  229:23,24
  231:15
**supporting** 58:9
  78:1 229:4,17
**suppose** 125:8
**supposed** 178:22
**suppository**
  190:11 332:4
**sure** 11:16 12:24
  16:8 35:21
  40:15 41:13
  42:23 47:19
  49:8,15 57:2
  60:16 61:7,15

62:3 63:1 74:7
77:24 78:6
96:12 100:22
102:21 108:15
108:17,21
112:1,3 114:6
125:20 126:21
128:21 130:9
134:9 135:17
135:18 136:1
147:2 152:17
162:4 163:9
169:13 171:5
179:11 187:17
187:19 190:22
193:2 196:20
198:3 201:20
212:7 220:11
220:19 222:4
223:19 229:14
230:17 231:4
232:8 235:7
240:7 243:5
246:21 257:1
259:23 262:6
262:10 263:7
263:14 267:8
269:22 270:19
277:23 280:24
281:2 286:24
288:9,18,24
293:24 294:11
294:19 305:3
309:14,14
310:6 316:24
317:20 320:8
320:17 330:6
331:15,22
**surprise** 282:19
**surprised** 18:15
  18:15 293:20
**surveillance**
  290:21
**survey** 206:22
  206:24
**survival** 232:18

233:18
**susceptible**
  205:20
**suspect** 245:21
**suspected**
  278:16
**suspicious**
  291:11,18
**swear** 9:9
**switch** 46:11
  319:20
**switching**
  268:19 269:5
**sworn** 2:1 9:13
  341:6 342:14
**SWOT** 224:4,14
**symposia** 82:19
  83:6,7,24
  228:9
**Synonymous**
  64:15
**system** 78:22
  204:19,20
  205:6,15,20
  206:3 207:12
  208:4 209:4
  276:11
**systems** 46:6
  277:16 290:20
  315:12

---

**T**

**T** 341:1,1
**table** 238:5,7
  239:6
**tablet** 144:4,5
  307:14,18
**tablets** 57:21
  154:12 334:4,9
**tactic** 166:4
  268:24
**tactics** 98:2
  228:23
**tag** 225:19
**take** 23:11 24:15
  32:11,17 44:10

44:11 45:23
52:3,13 75:17
78:14 80:19
94:7 99:6
123:15 125:19
125:23 127:1
147:16,17
160:13 164:21
166:21 169:17
169:22 173:21
173:24 177:22
178:5 181:21
181:24 187:1
188:9 202:19
210:9 213:7
219:24 223:23
226:6 249:16
249:17 250:16
258:20 259:3
276:4 284:10
285:7 295:17
312:17 315:18
316:5 317:1
321:8 325:20
**taken** 64:23
  107:9 116:20
  141:8 171:7
  175:6 187:5
  199:3 209:2
  219:13 249:21
  258:23 304:23
  305:21,24
  317:5 329:2
  341:10
**talk** 32:7 45:5
  63:6 86:5
  260:14 306:22
  310:6,7
**talked** 91:16
  140:23 198:6
  318:24
**talking** 44:22
  65:8 69:8
  123:7 157:9
  158:22 317:9
**Talks** 122:4

**tamper-proof**
  97:16
**tamper-resist...**
  59:23
**tangentially**
  243:16
**tangible** 22:21
  22:24
**Tara** 283:11
**target** 42:6,9,14
  43:21 44:19
  90:4 157:16
  164:22 165:3,7
  165:22 176:21
  248:7 300:18
**target-rich**
  157:19 158:10
  159:6 165:17
  165:22 264:24
**targeted** 136:10
  156:21 184:20
**targeting** 42:1
  42:21 43:3,14
  44:16,16 70:24
  83:14 126:24
  157:3 165:16
  169:10
**targets** 72:1
  157:21 158:23
**task** 166:21
  252:3 256:14
  256:15 257:22
  257:24 258:12
  304:9,16
**TAYLOR** 2:18
**team** 58:6 77:1
  85:15 242:17
  260:12 264:4
  291:11,13,18
  291:19 292:4
  292:10 312:10
  324:7,9 325:13
  325:16
**teams** 261:3
  328:15
**tease** 269:9

tech 313:4
technical 11:16
  246:1,7
technicality
  312:23
technically
  312:15
technician 4:3
technologies
  248:5
technology 74:1
  248:2 299:19
tell 9:24 30:7
  43:24 79:12
  134:5 152:12
  192:22 200:2
  218:22 260:20
  289:2 320:11
  320:17,22
  323:8 324:4
  326:1
telling 180:19
  182:3,11,11
  193:17 195:18
  204:24 207:3
  208:3 211:12
tells 199:9
template 18:9
tend 46:2 261:10
  269:3
Tennessee 2:11
  67:21 280:6,16
  280:18,19
  281:12,16,21
  282:3,4,15
  283:2,3,7,8,10
  284:15 287:11
  290:1,9,10,16
  291:5,20 292:5
  292:8,12,17,21
  293:8,11,12
Tennessee's
  281:22
tenths 157:17
tenure 34:21
  40:22,24

tenured 164:7
  164:16,17
term 11:16 45:4
  49:6,8 86:7,8
  123:13 125:13
  136:6 161:20
  264:24 283:4,9
terms 10:15
  40:23 45:8
  59:6 70:15
  77:9 95:5
  103:19 112:11
  128:19 130:21
  132:23 138:21
  149:12 151:16
  157:2,10,24
  158:23 167:22
  173:5 190:19
  191:1,20
  193:17 201:7
  207:22 225:20
  228:4 246:10
  278:1 289:1,14
  310:19 312:16
  330:7
terrible 140:10
Terrific 65:5
territorial 67:24
territories 70:5
  70:10
territory 71:3,12
  164:7 263:11
  267:3 271:8
  321:22
testified 9:13
  10:15 11:3,9
  11:23 12:5
  32:5 81:8
  131:4 192:21
  202:6 242:2
  327:22 329:7
  329:17
testify 14:2,11
  14:15 279:16
  341:6
testifying 141:23

testimony 11:11
  12:4,13 13:8,9
  13:10,14,16
  32:24 75:13
  109:3 133:7
  152:2 153:14
  156:16,20
  196:24 212:4
  226:16 241:22
  241:24 279:14
  288:19 329:21
  329:23 342:3
Teva 107:22
Texas 290:12
tgoodspeed@j...
  2:18
thank 31:8
  32:12,18,23
  64:19,20 67:1
  67:2 75:20,21
  76:2 80:11
  88:1 89:13
  94:2 98:20
  107:6,15
  112:21 113:2,5
  141:5 146:13
  170:10 171:4
  187:2,19
  188:17 202:8
  212:20 219:10
  223:11,16,20
  227:21 239:23
  241:8 245:16
  254:3 259:11
  262:18 270:4
  279:21 285:3
  301:23 302:7
  302:21 328:23
  332:24 333:16
  340:17
Thanks 16:22
  23:13 113:1
then-existing
  190:6
therapies 136:14
therapy 93:6

125:11
thereof 174:18
thing 32:4,13
  70:3 78:2 80:7
  82:19 83:24
  117:6,10 138:3
  140:10 147:1
  163:8 171:1
  186:8 190:10
  193:17 201:20
  232:9 260:18
  289:16 295:14
  297:13 314:13
things 16:19
  22:21,22 23:1
  28:24 41:9,10
  45:7,15 51:16
  52:20 53:22
  57:16 63:1
  92:22 106:12
  118:24 142:12
  144:24 150:1
  150:18 157:17
  164:19 165:13
  200:24 210:9
  210:11 228:9
  251:11 257:2
  291:1 297:7
  311:12,14,18
  312:16 318:8
think 10:19
  11:22 13:6,13
  19:10 20:2
  26:22 34:12
  36:12,20 41:3
  43:16 49:16
  51:3 52:13
  57:6 59:17
  64:1,18 73:24
  77:20 80:6
  81:2,10 89:15
  90:21 91:3,7
  92:6,8 96:3
  98:16 107:4
  112:10 117:14
  119:18 120:16

121:6 122:4
  123:6 124:12
  144:23 155:21
  166:9 178:20
  181:17 192:20
  193:2 197:1
  198:6 201:19
  203:9 204:2
  212:4 216:5
  219:6 227:16
  229:22 235:11
  236:4,12 241:1
  241:21 242:2
  245:7 252:21
  258:8 262:7,9
  269:5,23
  271:16 273:6
  275:1 278:1
  279:10 294:8
  297:7 299:4,11
  300:2 303:14
  309:23 312:4
  313:3,4,21
  316:24 317:2
  320:20 327:22
  329:16 333:5,7
  339:21
thinking 53:24
  92:15 108:13
  273:19
third 31:9 54:14
  57:14 85:11
  95:1 98:2
  99:15,16
  114:21 115:23
  118:16 157:7
  189:3 225:8
  237:16 305:20
  308:4
third-party
  109:2 150:24
  236:9
Thomas 234:6,8
  234:19,24
  235:3,11
Thomas's

Highly Confidential - Subject to Further Confidentiality Review

234:13
thorough 104:8
thought 18:7,11
  19:2 64:11,12
  66:9 73:1 82:6
  84:6,10 95:8
  168:6 185:24
  235:17,23
  241:24 262:10
  273:19 275:19
  286:10,18
  312:7 316:15
thought-prov...
  300:4
thoughts 235:3
  301:2
thousand 52:8
  183:17
three 33:17
  115:5 164:19
  320:16
three-and-a-h...
  21:12
throw 297:6
Thunderbolts
  267:13,16
  270:13 271:2
tied 77:9
tier 204:11,12
tiers 47:16
till 78:21 80:9
Tim 260:20
  261:23
time 9:4 16:12
  16:12 17:8
  19:15,15 20:2
  20:2 24:15,24
  27:18 28:4
  29:16 30:5
  33:6 34:8
  36:13,23 38:8
  38:12,14,18
  39:3 40:11
  42:10,12 46:10
  46:14 50:24
  55:8,20 57:4

63:5 64:17
66:17,17 68:4
68:5,5,19 72:5
73:23 99:6
107:3 115:8
116:2,3 118:10
118:14 119:3
121:18,18
122:19 143:3
145:15 147:22
147:22 150:4
153:22 160:4,5
160:14 161:15
165:4 170:5
175:11 177:10
178:2 183:10
183:22 202:19
210:9 212:9
213:7 219:24
223:23 224:21
226:20 230:15
237:3 238:1,18
241:8 243:20
246:8 247:16
248:13 249:7,9
249:14 250:16
251:7 253:6
254:10 258:18
264:22 265:19
266:8 267:9
269:3,7 270:1
270:2 275:1
276:15 282:24
283:6 284:15
285:7 287:16
293:6 295:17
301:16 304:7
310:22 315:6
316:8,23
317:22 319:3
319:11,16
322:2 323:15
330:1,11 336:6
336:10 339:21
341:10
time-wise

287:20
TIMERx 204:18
  205:6,14,19
  206:3 207:12
  208:4 209:4,13
  217:19 299:19
times 9:22 10:1
  10:4 32:5
  68:12 120:5
  135:10 137:3
  137:13,19
  196:20 202:5
  233:12,14
  241:4 244:22
timing 37:19
  206:22 207:7
TINA 3:13
tina.schaefer...
  3:13
title 35:13 50:2,9
  88:18 190:18
  213:3,22
  238:17 244:24
  287:3 326:1,15
titled 96:2
TN 2:13
to's 253:22
today 14:11,15
  15:9 23:24
  32:19,23 62:17
  74:21 75:13
  91:12 142:1,20
  149:14 271:17
  279:9,21 280:9
  280:20 281:3,4
  292:19 305:4
  325:7,8 326:8
  327:22 329:17
  336:12
today's 9:3
  14:24
told 36:21
  122:12 180:14
  180:17 192:9
  194:9,17 199:6
  206:9 207:8

275:23 336:18
tolerability
  222:6
tolerate 94:20
  95:24
TOLIN 3:23
  17:10,14,18
  187:21 188:2
tomorrow
  127:12
tool 62:16 271:6
toolbox 271:7
tools 204:17
top 78:20 113:8
  148:12,15
  157:13,14,21
  179:6 188:1
  201:11 204:11
  204:11 237:16
  244:15 250:3
  257:16 284:15
  287:7 311:13
top-of-mind
  226:14 227:1
topic 28:2,4 30:3
  85:10 93:18,20
  130:21 141:20
  229:4 292:8
topics 66:5
  229:7
total 40:5,7 51:8
  51:9 159:17
  160:1 272:17
touched 18:12
  61:24
town 167:8
toxic 307:19
track 110:23
  111:6,9 218:1
  261:13
tracking 147:10
  221:10
tract 27:9
trade 11:6 13:11
  189:16,18
trading 260:19

260:23
traditional
  323:16
train 328:19
trained 63:15,23
  93:13 124:14
  126:14 132:10
  207:20 310:6
  323:24
training 62:1
  93:17,20
  127:20 128:3
  128:10 129:18
  129:23 132:14
  132:23 133:3,9
  133:20 134:15
  134:17,21,22
  135:4 136:4,4
  136:14,18
  138:8 140:13
  200:13 207:22
  218:23 310:19
  310:20 323:23
  339:9
traits 203:9
trajectory
  162:21
transcript 5:19
  113:16,21
  118:8 121:3
  341:9 342:5
transient 28:23
transmitting
  202:14
traveled 280:18
Travers 238:12
  238:13 239:2
travers.debbie...
  238:12
treat 126:2
  146:6 226:5
  309:18 323:3
treated 94:16
  135:22 226:7
  231:5
treating 121:7

232:5,24 233:4
**treatment** 83:13
94:22 105:13
127:21 128:11
129:19,24
132:15 133:21
135:5 136:4
138:9 225:11
231:21 236:14
**trend** 269:7
**trends** 58:20
59:16 60:6
266:9,19
289:14
**trial** 274:2,20
275:2,3,15
319:17
**trials** 284:2
**trickier** 71:6
**tried** 94:6,9
161:14 271:20
**trigger** 277:22
**triggered** 276:24
**trimmed** 44:18
**trip** 280:19
**triplicate** 97:19
**true** 22:24 61:2
61:6 139:4,9
139:13,16,23
140:3,22
167:13 177:5,8
177:17 178:14
178:17,19
194:21 209:5
215:12 228:12
273:2 282:20
296:23,24
297:10,13,15
299:16,18
300:9 301:12
306:13 307:9
330:16 341:9
342:4
**true-12-hour**
209:6
**truth** 341:7,7,7

**truthful** 301:16
**TRX** 40:4,4,5
**try** 32:8 59:14
59:17 70:8
71:10 81:18
82:9 92:22
94:11 122:7
167:15,24
168:22 169:13
209:22 261:6
275:11 302:16
**trying** 19:5 43:8
45:9 50:8,21
52:3 60:15
91:7 126:20
142:13 172:8
198:17,18
211:5 225:20
248:3,3 257:6
258:7 273:24
274:2 283:22
287:19 296:18
297:8 299:1
300:5 301:5,9
301:10
**Tues** 18:23
**Tuesday** 15:19
17:12,20 18:2
18:2,18 19:11
88:5
**turn** 25:8 99:13
109:13 110:22
128:24 166:6
166:16 203:11
213:19 220:4
221:17 224:13
287:1 330:20
**two** 19:3 33:17
34:11 39:6,18
41:3 54:5,11
54:18 78:12
90:3 94:24
99:21,22
144:14 145:14
157:11 160:17
179:7,11,14

183:16 193:9
193:10,16
243:10 255:19
271:7,13 272:9
272:18,24
273:4,13
289:16 298:6
301:22 316:13
**two-thirds** 177:4
237:13
**Tyjer** 4:3
**type** 28:16 58:4
70:3 82:19
120:18 152:13
174:15 184:20
257:9 290:20
290:21 310:15
**types** 69:7
104:11 150:1
311:18 324:17
**typically** 48:8
119:3 148:5
210:8 242:15
289:2 291:2

---

**U**

**U.S** 321:19
**UCB** 3:10
**Uh-huh** 96:14
111:14 129:6
198:11 201:10
255:20
**Ulmer** 3:15
**ulti** 42:14
**ultimate** 42:14
**ultimately** 30:20
42:16,22
152:19,21
211:8
**unaided** 176:12
179:1,2,9,15
**unconstrained**
299:11
**und** 166:13
**undergo** 265:4
**undergraduate**

25:10
**underneath**
33:18
**underpinnings**
174:14
**underplayed**
338:8
**underplaying**
340:5
**understand**
14:10,14 19:10
21:16 23:10
25:10 28:7
32:20 35:21
36:2 40:15
43:2 47:19
48:2 49:9,20
52:19 53:9
60:24 61:7,15
65:3 69:23
70:1,8,22
71:10 80:3
84:18,18 87:4
87:5 88:7
100:12 101:9
112:11 117:1
122:14 124:15
127:15 128:16
137:4 138:6
142:16 147:2
149:9 150:8
154:3,13,21
162:1,2 163:3
175:3 184:10
187:9,19
189:21 190:5
197:23 198:3
198:17,18
200:1 203:14
211:5,8,21
212:7 248:3,8
248:11 249:5
264:21 265:14
267:8 271:18
280:24 283:22
326:10

**understanding**
15:4 17:10,19
49:10 83:4
109:16 116:12
128:1,19
133:15 134:14
134:21 135:2
136:2 138:14
149:24 155:14
163:19 168:20
178:17 179:2
196:5 214:21
220:14 233:3
241:15 242:4
245:3 278:22
281:15 288:15
288:18 289:6
289:14 316:1
317:21 328:18
329:24 330:9
330:16
**understands**
101:4 124:13
**understood** 86:4
93:11 103:9
116:24 119:13
132:12 138:13
151:8 153:17
203:21 248:16
276:16
**undertake**
104:15 129:8
196:3
**undertaken**
185:24 199:3
330:11
**undertaking**
82:20
**undertook**
103:12 111:8
136:20,24
**undertreat**
121:5
**undertreated**
95:22 229:14
**undertreatment**

225:18
**unemployed**
275:24
**unfortunate**
307:14
**unfortunately**
243:13
**unique** 192:6,10
193:23
**United** 1:1
153:21 293:16
**University**
320:24 321:2
**unmet** 94:5,8
**unresolved**
123:17
**unrestricted**
85:11 151:18
228:7
**untreated**
123:17
**untrue** 177:18
**upcoming**
310:22
**update** 295:6
**updated** 31:18
**uphold** 111:23
**upper** 76:7
80:14,19 98:24
146:16 156:6
162:13 213:2
231:13 237:11
262:22 270:9
**upset** 28:24
**upward** 190:19
190:24
**USA** 73:16,20
322:2
**usage** 190:20
191:1,8,11
274:2,20
**use** 31:21 44:20
54:11 56:3,3,7
61:9 82:8
83:19 84:9,16
84:16 85:4,13

86:11 87:14,21
91:21 92:2,23
93:4 95:5
96:22 97:11
99:23 100:8
104:1,4,10,17
105:4 110:9
111:23 112:7
112:15 121:18
128:19 132:24
133:15 134:10
150:8 153:1
167:23 168:21
175:2 194:3,12
196:2 199:8
215:21 229:4,9
229:17,21,24
230:20 231:1,2
231:21 268:5
269:20 275:16
283:2,7 309:15
**useful** 18:8 70:1
73:12
**usual** 280:7
**usually** 10:3
44:16 48:21
49:3 63:14
72:14 103:6
150:1,2 167:15
264:13 312:17
328:9
**utility** 83:5,19
84:18 91:10
95:16 103:9
**utilize** 104:11

———————
**V**
**V** 273:17 274:13
**Vaguely** 284:3
**value** 45:6,10
58:23 327:15
**variables** 140:18
**Variako** 273:16
**Variakojis** 273:6
**varied** 119:3
**variety** 83:8

138:13 285:5
296:16
**various** 16:10
148:22,24
189:5 280:20
**vary** 138:20
**vehicle** 257:3
290:24 309:3
324:8
**vendor** 77:22
97:19 175:24
176:22
**venues** 83:14
**veracity** 301:8
**verbal** 32:14
**verbatim** 156:1
**version** 20:21
21:7 22:2
37:23 38:14,18
45:16 57:23
59:11 144:11
224:11,23
316:15
**versus** 91:15
92:21,23
108:10 148:10
148:10 163:4
164:7 170:1,6
203:10 227:22
265:7 269:11
299:19
**veterans** 231:16
231:22 232:16
232:19 233:19
**vice** 200:19
**video** 1:9 9:5
**videographer**
4:2 9:1,3 64:21
64:24 107:7,10
141:6,9 187:3
187:6 219:11
219:14 249:19
249:22 258:21
258:24 279:22
280:1 317:3,6
319:19,23

320:2 328:24
329:3 340:18
**view** 60:18 62:5
183:7
**viewed** 185:10
330:16
**vigilant** 140:10
**violate** 112:3
**Virginia** 67:21
321:1,3,22
**virtual** 146:3
**virtually** 116:10
**virtue** 58:20
85:9 144:20
192:14
**visiting** 70:19
**visits** 200:3
**vital** 225:10,16
225:19
**vitally** 76:20
**Vitanza** 118:11
118:16,20,24
119:17
**voice** 52:5
156:10 187:15
**volume** 90:9
157:1 165:15
165:21 287:8
**volume-wise**
90:12
**volumes** 44:1,3
44:13 158:24
**VP** 25:1 73:5
245:24 246:2,7

———————
**W**
**W6** 219:20
220:22 221:11
221:19
**Wade** 267:18
**Wagner** 234:7
**wait** 78:21 80:9
112:22 136:22
199:22
**waiver** 15:5
**walk** 321:16

**Walmart** 2:15
**want** 32:4 33:15
51:7 53:9 63:1
125:19 134:2
152:16 186:18
187:19 238:16
251:24 259:2
263:7 264:17
265:6 281:2
286:24 293:15
294:11,12
295:13 296:19
297:18 298:10
300:13 305:19
308:3 309:13
309:22 312:8
312:24 313:1
318:14 340:8
**wanted** 49:19,22
60:7 62:3 82:3
95:13 165:6
170:24 188:10
240:6 248:2
249:3,14 265:9
286:1,17,21
303:4 316:2,14
316:16 322:12
**wanting** 163:3
**wants** 261:11
**warning** 134:8
135:20 335:18
**warnings** 97:12
124:18 194:24
328:9 336:8,22
340:5
**warns** 307:7
**Washington**
66:7
**wasn't** 11:3 22:6
55:22 196:20
209:16 228:17
257:3 261:22
261:24 300:9
331:22 340:9
**watched** 314:12
**Water** 2:7

Highly Confidential - Subject to Further Confidentiality Review

wave 188:8,19
188:22 189:4,9
214:8 221:1,11
221:12,13,19
waves 189:5
way 30:12 33:19
37:7,12 41:1
47:12 50:2
52:18 54:9
61:24 66:21
78:8 83:16,18
87:8 93:10,23
108:6 118:16
119:20 126:20
128:5 142:15
159:15 161:15
178:21 180:5,6
183:8 185:11
192:18 198:15
206:16 207:20
207:20 211:9
215:5,18
218:16 227:5
230:2 236:22
237:13,16
245:10 275:13
278:9 291:8
292:9 300:2
322:4 328:1
329:19 330:18
ways 45:6 92:11
135:14 157:20
241:15,19
242:8 317:15
327:24 329:19
we'll 17:23
23:11,15 24:2
122:2 181:24
301:19 319:16
we're 16:8 17:15
20:4 32:6
41:14 44:22
57:6 67:1 76:5
107:10 123:5
141:9 151:19
181:17,21

187:6,14
216:23 217:12
219:14 248:9
248:10,20
249:16,22
258:24 279:12
279:17 280:1
284:9 291:19
293:18 311:12
314:18,23
317:6 320:2
323:24 329:3
333:1 339:21
we've 57:3 75:18
78:20 107:2
113:8 156:6
162:12 170:13
181:15 219:8
219:18 221:2
250:2 280:9
310:19 333:8
weakness 224:17
224:21 225:2
weaknesses
224:15
web 303:22
WebMD 302:24
website 306:13
306:15 307:2,3
307:7
Wednesday
285:24
week 98:3,6,8,13
164:21,23
165:12 240:15
260:16 261:19
weekly 157:13
259:18,19
260:1 261:1,13
262:2 266:7
268:19
weeks 118:11
161:1
Weiss 2:7
Weissfeld
237:14 238:3

welcome 65:2
80:16 95:1
107:12 141:11
173:22 187:8
329:6
welcomed 54:15
well-controlled
145:14
well-known
124:16
well-maintained
145:13
well-regarded
334:5
well-trained
127:6 129:21
139:2,17 140:4
309:14
Welldoc 243:20
Welters 289:16
went 44:18
51:17 68:16
141:22 197:14
197:16 198:19
263:16 265:12
322:1 324:22
328:14
weren't 81:22
95:2 124:23
159:3 190:1
226:20 231:5
262:10 330:17
West 67:20
321:22
whatsoever
290:16
white-coated
308:9
wholesalers
47:22 48:9
49:17
wholly 269:8
Wickline 156:9
157:10
widely 153:6
widespread 30:1

wife 122:10
319:10 320:8
William 267:1,9
270:12
willing 109:3
willingness
124:10
window 81:18
withdrawn
26:23
withheld 17:9
witness 9:10,12
10:5,8,16
12:11 15:2
19:5 20:2,3
23:8 75:18
107:24 109:8
112:23 137:8
137:23 138:1
208:11,17
247:23 284:12
332:10 340:16
342:2
Wolf 78:4
woman 121:24
word 128:16
words 32:17
111:16
work 16:6 20:12
20:16,20 21:18
22:1,18 31:3
31:14,17 39:7
47:17 54:9
58:8 83:13
95:10 141:23
162:5 172:20
241:15,19
242:9 249:9
259:3 280:17
288:8 306:22
321:13,17
worked 18:5
49:20 84:9
116:4 162:5
226:20 243:20
316:9 320:18

322:4,24 324:5
worker 306:20
working 31:17
43:1 77:2
119:4,6 122:19
169:12 246:17
246:24 253:5
254:10 296:16
316:19 317:24
321:22 322:15
323:20,21
works 54:9
64:18 92:19
148:6 167:16
268:24 302:23
worry 142:14
wouldn't 135:23
149:14 152:11
207:8 245:18
272:2 282:22
wounds 231:20
232:18 233:18
Wright 294:24
295:3
write 42:3
133:11 134:4
138:16 158:3
273:7
writing 42:19
43:4,7,15,18
44:1,2,13
156:17 157:2
159:11 197:7
260:11 264:15
268:20 271:1
273:21 274:24
313:17 314:2
written 137:15
139:8,12,21
140:1,20 149:9
149:10 154:24
155:12,20
180:4 182:15
194:19 199:14
209:10 224:24
225:5 227:6

Highly Confidential - Subject to Further Confidentiality Review

Page 400

248:18 273:6
273:11 296:21
298:1,5,18
301:17 334:24
335:8
**wrong** 184:10
185:2,18 306:7
313:5
**wrongly** 186:9
**wrote** 159:4,4
162:14 260:17
266:13,15
268:14 271:15
272:21 273:8
274:15 310:17

**X**

**Xponent** 287:22

**Y**

**yeah** 41:24 55:8
57:6 64:7,18
75:15,19,19
78:21 89:3
124:21 130:3
146:14 179:17
212:21 219:9
220:7,8,12
226:1 227:16
230:3 255:19
259:12 267:4
268:10 273:15
284:22 302:5
302:20 333:8
**year** 41:2,3
52:24 60:19
72:18 98:15
122:11,13
165:3 191:5,6
206:10,19
286:12 311:23
**years** 10:6 12:2
12:3 18:12
21:12 39:22
40:6 51:11,15
80:1 94:23
160:6 209:1,24

225:5 236:19
276:15 281:18
319:14,14
**yes-or-no**
340:13
**York** 2:8 13:17
290:2,11
**Yorkers** 232:5
233:1

**Z**

**Zorba** 121:12,12
121:15,16,23
122:2,3,10,12
123:4,9,20
125:1,3,12
**Zydone** 34:5
**ZZ330500** 267:3

**0**

**00000369** 88:6
**00000923** 80:13
**00006991**
146:16
**00024398** 213:1
**000254752**
240:1
**000559487**
294:22
**001676707**
251:23
**001794412**
257:12
**00234542** 98:23
**002386765**
285:11
**004270602**
250:2
**00545916**
223:18
**00547543**
219:18
**00552601** 76:4
**00694084**
333:17
**00880735**
162:12

**00961320**
262:21
**00982037**
259:14
**00999189** 302:6
**0100157** 156:5
**01141511** 113:8
**012000412133**
24:10
**012000432942**
244:15
**015949.17**
231:12
**01723746**
173:20
**02-05-08** 295:7
**02086096** 188:5
**02162731**
202:11
**023000090853**
237:10
**04118668**
170:13
**05-14-10** 285:18
**06009589** 270:8
**08** 220:6
**084-004711** 1:14
341:21

**1**

**1** 13:24,24 14:4
22:20,21
294:16
**1.8** 159:18 160:2
**1:13** 141:10
**10** 12:3 34:18
51:15 52:7
113:4,7,15
157:19 165:15
166:15 222:10
222:11 287:3,7
303:24 304:1
326:12,24
**10:17** 64:21
**10:32** 65:1
**100** 28:2 62:16

289:8
**10005** 2:8
**1001** 2:2
**107** 319:7
**108** 220:7,9
221:6
**11** 146:10,18
147:1 150:11
209:1,24
**11:15** 303:14
**11:35** 107:7
**11:50** 107:11
**113** 5:18
**1169** 173:17
**1169.19** 179:12
**1169.20** 179:24
**12** 34:18 36:13
36:23 156:4
161:1,16,19
178:6 183:5
**12-hour** 160:23
177:15 178:1
**12,000** 164:20
164:23 165:11
**12,000-prescri...**
165:7
**12:30** 140:24
**12:32** 141:6
**1248** 187:13
**1248.10** 189:12
**1248.16** 190:22
**1248.21** 199:5
199:10
**1249** 202:7
**1249.9** 203:12
**1278** 239:11
**12th** 79:11 80:15
111:4
**13** 80:1 162:11
162:13 163:12
225:5 262:18
**13,652** 287:13
**134** 272:17
**1357** 270:4
**1357.2** 270:13
**1378** 170:9

**1378.3** 171:18
**1378.4** 171:10
**1387.3** 213:3
**1396** 75:15
**1396.18** 79:9
**1398** 1:15
341:22
**13th** 252:3
**14** 5:2,4 170:12
170:14
**1400** 3:3
**146** 5:20
**15** 173:19 174:1
174:6 281:18
319:14,14
**1514** 244:17
**1522** 162:9
**1527** 156:5
**1531** 231:9
**1531.2** 234:5
**156** 5:22
**15th** 113:17
**16** 187:21,23,24
188:2,4,10,15
188:17
**162** 6:2
**1676708** 252:1
**16th** 162:15
**17** 1:10 2:1
187:20 188:1
190:19 202:10
202:10,22,24
**17-md-2804** 1:3
**170** 6:4
**174** 6:6
**175** 2:20
**17th** 9:4 263:1
**18** 21:11 212:19
212:24 213:6
213:10 309:1
321:24
**1818** 3:7
**188** 6:8
**19** 219:17,17
325:21 326:7
327:1 329:7,11

Highly Confidential - Subject to Further Confidentiality Review

330:21
**19103** 3:8,21
**1920s** 115:7,14
115:19
**19348** 319:8
**19355** 3:4
**1950s** 154:4
**1959** 153:22
**1960s** 331:17
332:14 337:9
338:15,23
339:11,18
340:13
**1970s** 37:12
331:17 332:14
334:3 337:9
338:3,16,23
339:11,19
340:13
**1990** 308:22
**1991** 25:21
**1994** 321:7
**1995** 321:7
**1996** 25:24
**1997** 37:16
**19th** 188:7
202:16 250:5

**— 2 —**
**2** 13:24 14:2,12
14:16,18 20:11
22:8,10
**2:21** 187:3
**2:37** 187:7
**20** 122:13
179:12 215:16
223:13,20
224:2,7
**2001** 3:20
**2002** 26:1 27:18
29:15
**2002-2004** 26:8
**2004** 322:24
**2004-2006** 27:1
**2005** 79:11
80:15 111:4

**2006** 29:16
38:13 39:4
46:15 55:10
76:12 78:14,19
79:1,2,4,13
113:17 114:3
119:9 143:16
154:10,16
156:10 158:5
159:24 161:8
162:15 164:21
165:6,12
189:17 223:22
224:8,18 225:1
226:18 230:9
237:24 240:17
269:19,23
320:20 322:24
323:9
**2007** 39:22
76:12,17 79:18
88:11,21 99:3
119:9 128:13
130:2,12 174:7
188:7 189:8
191:5,9,10,10
191:10 202:16
204:5,7 206:9
207:1,9 224:8
269:24 325:10
**2007-2008**
211:16
**2007-2010** 51:12
**2007-2011** 6:15
223:21
**2008** 73:6 201:3
213:5,6,16
214:8,10,22
218:9 219:21
220:23 221:14
258:1 295:1
326:5 327:19
**2009** 6:12 36:4
72:2 213:4,12
216:12 252:3
256:15 259:5

**201** 342:15
**2010** 36:4,14
37:7,22 39:22
72:2 259:5,17
263:1 265:20
266:6,11 268:1
269:19 285:5
289:24
**2011** 37:22
224:8 285:17
286:12,19
302:1 304:16
305:13 306:15
307:2 309:5,10
309:23 311:4
315:18 320:21
333:18
**2013** 24:22
244:20 246:4
246:16 250:5
251:8 282:2,8
**2019** 1:10 2:1
9:4
**202** 6:9
**21** 231:11,11,14
231:24
**212** 2:8 6:11
**215** 3:8
**216-6813** 3:4
**219** 6:13
**21st** 223:22
224:8
**22** 237:9,9,12
**221,000** 282:4
**223** 2:12 6:15
**23** 5:5,7 239:20
239:24
**231** 6:17
**2345** 3:11
**237** 6:19
**239** 6:21
**23rd** 189:16
**24** 5:8 183:5,6
244:14,14
250:9
**24th** 259:17

**25** 250:1,1,10
287:1
**250** 7:2,4
**252** 7:6
**254-8801** 2:13
**257** 7:8
**259** 7:10
**26** 251:22,23
**263** 7:12
**267** 3:21
**26th** 2:16
**27** 257:11,12,13
257:17
**270** 7:14
**28** 76:12 259:8
262:11
**280** 4:6
**2804** 1:4
**285** 7:16
**288-2805** 2:21
**29** 262:20,20
**294** 7:18
**2nd** 174:7

**— 3 —**
**3** 23:16 24:6
90:17 94:3
188:8,19,22
189:4,9 279:18
**3.2** 104:20
**3.2.2** 109:14
**3.2.2.1** 109:15
**3:32** 219:11
**3:50** 219:15
**30** 204:11,12
270:7,7,22
272:7
**301** 7:19,22
**31** 332:21,22
**32** 284:24
**320** 4:7
**329** 4:7 75:16
80:8
**329.15** 80:20
**33** 294:13 310:1
**333** 8:2

**34** 301:19 310:2
310:3
**3402** 3:7
**35** 305:6 333:2,4
333:8
**36** 333:6,7,9,10
333:16,17,18
**365-4500** 3:17
**3700** 2:2 3:20
**37203** 2:13
**3rd** 238:6

**— 4 —**
**4** 23:15,16 214:8
321:10
**4:30** 295:10
**4:39** 249:19
**4:50** 249:23
**40** 158:17
303:20
**40-year-old**
306:19
**40507** 2:21
**415** 2:17
**43215** 3:16
**484** 3:4

**— 5 —**
**5** 24:8,9,12 65:6
71:23 96:1
**5:04** 258:21
**5:17** 259:1
**5:48** 279:22
**5:50** 280:2
**554.7** 129:13
**555** 2:16
**56** 287:7
**584-0780** 2:8
**5th** 156:10 295:1

**— 6 —**
**6** 75:23 76:3,7
76:10 80:17,22
81:4 221:13,13
221:19
**6:42** 317:3
**6:53** 317:7

Golkow Litigation Services - 877.370.DEPS

**6:56** 319:23
**6:58** 320:3
**600** 39:5,14
**614** 3:17
**615** 2:13
**626-3939** 2:17
**64108** 3:12
**65** 3:16

---

**7**

**7** 80:9,10,22
  81:2 83:22
  85:1,21 98:1
  110:21 129:5
  165:15 166:14
  284:20,21
**7:00** 320:7
**7:09** 328:24
**7:16** 329:4
**7:28** 340:18
**709-4100** 3:12
**75** 5:10
**765-3600** 3:21
**77** 2:7

---

**8**

**8** 88:3,4,9,23
  89:8,14 90:19
  94:3 96:2 98:1
  98:17 148:14
**80** 67:4,5
**816** 3:12
**84** 5:12
**859** 2:21
**88** 5:14
**8th** 2:7

---

**9**

**9** 4:6 98:22,23
  99:2,14 101:2
  104:20 109:12
  127:17 129:1
**9:05** 1:11 9:4
**912** 223:10,20
**912.18** 224:5
**914.6** 221:6
**94104** 2:17

**977.46** 155:5
**977.49** 155:4,5
**977.6** 147:18
**977.8** 148:11
**988-1464** 3:8
**99** 5:16
**9th** 311:4